**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PERRY CAPITAL LLC, | |
| Plaintiff, | |
| v. | Civil Action No. 1:13-cv-1025-RCL |
| JACOB J. LEW, *et al.*, | |
| Defendants. | |
| FAIRHOLME FUNDS, INC., *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 13-cv-1053-RCL |
| FEDERAL HOUSING FINANCE AGENCY, *et al.*, | |
| Defendants. | |
| ARROWOOD INDEMNITY COMPANY, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 13-cv-1439-RCL |
| FEDERAL NATIONAL MORTGAGE ASSOCIATION, *et al.*, | |
| Defendants. | |

## PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

Plaintiffs Perry Capital LLC, Fairholme Funds, Inc., Fairholme Fund, Berkley Insurance

Company, Acadia Insurance Company, Admiral Indemnity Company, Admiral Insurance

Company, Berkley Regional Insurance Company, Carolina Casualty Insurance Company,

Midwest Employers Casualty Insurance Company, Nautilus Insurance Company, Preferred

Employers Insurance Company, Arrowood Indemnity Company, Arrowood Surplus Lines

Insurance Company, and Financial Structures Limited, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 7(h), move for the Court to enter summary judgment in their favor and to "hold unlawful and set aside," 5 U.S.C. § 706(2), the Third Amendment to the Amended and Restated Senior Preferred Stock Purchase Agreements entered into on August 17, 2012, by the Department of Treasury and the Federal Housing Finance Agency, as conservator for the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation.  As set forth in the accompanying Memorandum of Law in Opposition to Defendants' Motions to Dismiss and Motions for Summary Judgment and in Support of Plaintiffs' Cross-Motion for Summary Judgment on Administrative Procedure Act Claims, Plaintiffs are entitled to judgment as a matter of law.

Pursuant to Local Rule 7(f), Plaintiffs respectfully request oral argument on this Motion.

Respectfully submitted,

Dated:  March 21, 2014

/s/ Charles J. Cooper

Charles J. Cooper, SBN 24870
Vincent J. Colatriano, SBN 429562
David H. Thompson, SBN 450503
Peter A. Patterson, SBN 998668
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C.  20036
Telephone:  202.220.9600
Facsimile:  202.220.9601

*Attorneys for Plaintiffs Fairholme Funds, Inc.,*
*et al.*

/s/ Theodore B. Olson

Theodore B. Olson, SBN 367456
Douglas R. Cox, SBN 459668
Matthew D. McGill, SBN 481430
Nikesh Jindal, SBN 492008
Derek S. Lyons, SBN 995720
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone:  202.955.8500
Facsimile:  202.467.0539

Janet M. Weiss (*Pro Hac Vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, N.Y.  10166
Telephone:  212.351.3988
Facsimile:  212.351.5234

*Attorneys for Plaintiff Perry Capital LLC*

/s/ Drew W. Marrocco
Drew W. Marrocco, SBN 452305
DENTONS US LLP
1301 K Street, N.W., Suite 600, East Tower
Washington, D.C.  20005
Telephone:  202.408.6400
Facsimile:  202.408.6399

Michael H. Barr (*Pro Hac Vice*)
Richard M. Zuckerman (*Pro Hac Vice*)
Sandra Hauser (*Pro Hac Vice*)
DENTONS US LLP
1221 Avenue of the Americas
New York, N.Y.  10020
Telephone:  212.768.6700
Facsimile:  212.768.6800

*Attorneys for Plaintiffs Arrowood Indemnity
Co., et al.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PERRY CAPITAL LLC,<br><br>                    Plaintiff,<br><br>        v.<br><br>JACOB J. LEW, *et al.*,<br><br>                    Defendants. | Civil Action No. 1:13-cv-1025-RCL |
| FAIRHOLME FUNDS, INC., *et al.*,<br><br>                    Plaintiffs,<br><br>        v.<br><br>FEDERAL HOUSING FINANCE AGENCY, *et al.*,<br><br>                    Defendants. | Civil Action No. 13-cv-1053-RCL |
| ARROWOOD INDEMNITY COMPANY, *et al.*,<br><br>                    Plaintiffs,<br><br>        v.<br><br>FEDERAL NATIONAL MORTGAGE ASSOCIATION, *et al.*,<br><br>                    Defendants. | Civil Action No. 13-cv-1439-RCL |

**MEMORANDUM OF LAW OF PLAINTIFFS PERRY CAPITAL LLC, FAIRHOLME FUNDS, INC., FAIRHOLME FUND, BERKLEY INSURANCE COMPANY, ACADIA INSURANCE COMPANY, ADMIRAL INDEMNITY COMPANY, ADMIRAL INSURANCE COMPANY, BERKLEY REGIONAL INSURANCE COMPANY, CAROLINA CASUALTY INSURANCE COMPANY, MIDWEST EMPLOYERS CASUALTY INSURANCE COMPANY, NAUTILUS INSURANCE COMPANY, PREFERRED EMPLOYERS INSURANCE COMPANY, ARROWOOD INDEMNITY COMPANY, ARROWOOD SURPLUS LINES INSURANCE COMPANY, AND FINANCIAL STRUCTURES LIMITED IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND MOTIONS FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT ON ADMINISTRATIVE PROCEDURE ACT CLAIMS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

STATEMENT OF THE FACTS ........................................................................ 4

    A.    Fannie Mae And Freddie Mac. ................................................................ 4

    B.    The Housing And Economic Recovery Act Of 2008. ............................... 6

    C.    The Federal Government Takes Control Of Fannie Mae And Freddie Mac. .............. 7

    D.    Treasury Amends The Purchase Agreements Twice Before The Expiration Of Its Statutory Authority On December 31, 2009. ........................................ 11

    E.    The Government Establishes A Policy That The Companies Should Never Exit Conservatorship. .................................................................................. 13

    F.    The Companies Regain Profitability. ....................................................... 13

    G.    Treasury And FHFA "Amend" The Treasury Stock In 2012 To Permit Treasury To Seize All Of The Companies' Net Worth. ............................. 15

STANDARD OF REVIEW .............................................................................. 18

ARGUMENT ..................................................................................................... 20

I.   This Court Has Jurisdiction Over Plaintiffs' APA Claims. ......................... 20

    A.    Plaintiffs Are "Aggrieved" By The Sweep Amendment And Have Standing To Challenge Its Legality. ........................................................................ 20

        1.    The Sweep Amendment Has Injured Plaintiffs. ............................ 21

        2.    The Prudential Shareholder-Standing Doctrine Has No Application To Plaintiffs' APA Claims. ............................................................ 24

        3.    HERA Does Not Strip Plaintiffs Of Their Rights In Their Stock ...... 25

    B.    HERA's Jurisdictional Bar Does Not Prohibit Plaintiffs' Claims. ............ 29

        1.    Section 4617(f) Does Not Bar The Claims Against Treasury. ........ 29

        2.    Section 4617(f) Does Not Bar The Claims Against FHFA. ............ 31

II.  The Sweep Amendment Exceeded Treasury's Statutory Authority. ........... 36

    A.    The Sweep Amendment Cannot Be Characterized As An Exercise Of Rights Under Treasury's Previously Purchased Preferred Stock. ......................... 37

    B.    The Sweep Amendment Constitutes A Purchase Of The Companies' Obligations Or Securities That Is Expressly Barred By HERA's Sunset Provision. ................................................................................................. 41

## Table of Contents
### (Continued)

**Page**

III. FHFA Lacked Authority To Agree To The Sweep Amendment On The Companies' Behalf. ................................................................................................... 46

    A.    FHFA's Failure To Produce An Administrative Record Deprives The Court Of A Sufficient Basis To Uphold FHFA's Entry Into The Sweep Amendment. ....... 46

    B.    FHFA Violated HERA By Acting At Treasury's Direction. ...................................... 51

    C.    In Agreeing To The Sweep Amendment, FHFA Violated The APA By Acting In Excess Of Its Statutory Authority As Conservator. ................................................ 51

        1.    As Conservator Of The Companies, FHFA Is Obligated To Preserve And Conserve Their Assets With The Aim Of Rehabilitating The Companies. ................................................................................................ 52

        2.    The Sweep Amendment Exceeded FHFA's Powers As The Companies' Conservator. .......................................................................... 55

        3.    FHFA's Post Hoc Justifications For The Sweep Amendment Lack Merit. ....... 58

IV. The Sweep Amendment Was An Arbitrary And Capricious Exercise Of Treasury's And FHFA's Authority. ............................................................................................... 74

    A.    Treasury's And FHFA's Decision To Execute The Sweep Amendment Was Based On A Knowingly Erroneous View Of The Companies' Financial Performance And Prospects. ..................................................................................... 75

    B.    Neither Treasury Nor FHFA Considered Obvious Alternative Solutions. ................. 79

    C.    Treasury And FHFA Failed To Consider The Factors Prescribed By Congress As Relevant To Such A Change In Course............................................................... 82

    D.    Treasury And FHFA Failed To Heed State-Law Fiduciary Duties Owed To Other Shareholders Or Explain The Departure From Them. ....................................... 85

CONCLUSION ............................................................................................................. 88

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*7547 Corp. v. Parker & Parsley Dev. Partners, L.P.,*
  38 F.3d 211 (5th Cir. 1994) .......................................................................... 42, 44

*Abbott Bldg. Corp. v. United States,*
  951 F.2d 191 (9th Cir. 1991) ............................................................................... 30

*Abrahamson v. Fleschner,*
  568 F.2d 862 (2d Cir. 1978) .......................................................................... 42, 44

*Adagio Inv. Holding Ltd. v. FDIC,*
  338 F. Supp. 2d 71 (D.D.C. 2004).......................................................................... 65

*Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.,*
  719 F. Supp. 2d 26 (D.D.C. 2010),
  *aff'd,* 663 F.3d 476 (D.C. Cir. 2011) ................................................................... 20

*Albrecht v. Comm. on Emp. Benefits of Fed. Reserve Emp't Benefit Sys.,*
  357 F.3d 62 (D.C. Cir. 2004).................................................................................. 88

*Am. Library Ass'n v. FCC,*
  406 F.3d 689 (D.C. Cir. 2005)............................................................................... 37

*Am. Radio Relay League, Inc. v. FCC,*
  524 F.3d 227 (D.C. Cir. 2008)............................................................................... 48

*Ameristar Fin. Servs. Co. v. United States,*
  75 Fed. Cl. 807 (2007).......................................................................................... 61

*Ams. for Safe Access v. DEA,*
  706 F.3d 438 (D.C. Cir.),
  *cert. denied,* 134 S. Ct. 267 (2013) ...................................................................... 21

*Appalachian Power Co. v. EPA,*
  249 F.3d 1032 (D.C. Cir. 2001).............................................................................. 77

*Armstrong v. Exec. Office of President, Office of Admin.,*
  1 F.3d 1274 (D.C. Cir. 1993).................................................................................. 48

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009).............................................................................................. 19

*Bank of Am. N.A. v. FDIC,*
  --- F. Supp. 2d. ---, 2013 WL 4505424 (D.D.C. Aug. 26, 2013)............................... 22

*Bank of Am. Nat'l Ass'n v. Colonial Bank,*
  604 F.3d 1239 (11th Cir. 2010) ............................................................................. 29

*Beatty v. Guggenheim Exploration Co.,*
  122 N.E. 378 (N.Y. 1919)....................................................................................... 39

**Table of Authorities**
**(Continued)**

**Cases**
**(Continued)**

Page(s)

*Bell Atl. Corp. v. Twombly,*
 550 U.S. 544 (2007).............................................................................................. 19

*Blue Chip Stamps v. Manor Drug Stores,*
 421 U.S. 723 (1975)............................................................................................. 42

*Bowen v. Mich. Acad. of Family Physicians,*
 476 U.S. 667 (1986)..................................................................................... 29, 34

*Bragdon v. Abbott,*
 524 U.S. 624 (1998).............................................................................................. 52

*Bryce v. Nat'l City Bank of New Rochelle,*
 17 F. Supp. 792 (S.D.N.Y. 1936),
 *aff'd,* 93 F.2d 300 (2d Cir. 1937)...................................................................... 73

*Burlington Truck Lines, Inc. v. United States,*
 371 U.S. 156 (1962)............................................................................................. 50

*Camp v. Pitts,*
 411 U.S. 138 (1973)............................................................................................. 50

*Chamber of Commerce of U.S. v. SEC,*
 412 F.3d 133 (D.C. Cir. 2005)........................................................................ 82

*Chaplaincy of Full Gospel Churches v. Navy,*
 697 F.3d 1171 (D.C. Cir. 2012)..................................................................... 21

*Chem. Futures & Options, Inc. v. RTC,*
 832 F. Supp. 1188 (N.D. Ill. 1993)................................................................ 36

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
 401 U.S. 402 (1971),
 *overruled on unrelated grounds by Califano v. Sanders,* 430 U.S. 99 (1977) ............. 47, 49

*City of Arlington v. FCC,*
 133 S. Ct. 1863 (2013)...................................................................................... 32

*City of Kan. City v. HUD,*
 923 F.2d 188 (D.C. Cir. 1991).......................................................................... 68

*Clapper v. Amnesty Int'l USA,*
 133 S. Ct. 1138 (2013)...................................................................................... 21

*Cnty. of Los Angeles v. Shalala,*
 192 F.3d 1005 (D.C. Cir. 1999)...................................................................... 75

*Cnty. of Sonoma v. FHFA,*
 710 F.3d 987 (9th Cir. 2013) ..................................................................... 31, 33

**Table of Authorities**
**(Continued)**

**Cases**
**(Continued)**

**Page(s)**

*Cobell v. Babbitt,*
   30 F. Supp. 2d 24 (D.D.C. 1998)................................................................. 30

*Cobell v. Norton,*
   240 F.3d 1081 (D.C. Cir. 2001)................................................................. 85

*Coit Independence Joint Venture v. Fed. Sav. & Loan Ins. Corp.,*
   489 U.S. 561 (1989)................................................................. 32

*Constellation Energy Commodities Grp., Inc. v. FERC,*
   457 F.3d 14 (D.C. Cir. 2006)................................................................. 22

*Cook v. FDA,*
   733 F.3d 1 (D.C. Cir. 2013)................................................................. 52

*Courtney v. Halleran,*
   485 F.3d 942 (7th Cir. 2007)................................................................. 65

*Dallas Aerospace, Inc. v. CIS Air Corp.,*
   352 F.3d 775 (2d Cir. 2003)................................................................. 39

*Davis Trust Co. v. Hardee,*
   85 F.2d 571 (D.C. Cir. 1936)................................................................. 53

*De Csepel v. Republic of Hungary,*
   714 F.3d 591 (D.C. Cir. 2013)................................................................. 19

*Del E. Webb McQueen Dev. Corp. v. RTC,*
   69 F.3d 355 (9th Cir. 1995)................................................................. 53, 58

*Delta Sav. Bank v. United States,*
   265 F.3d 1017 (9th Cir. 2001)................................................................. 27, 28

*Deutsche Bank Nat'l Trust Co. v. FDIC,*
   717 F.3d 189 (D.C. Cir. 2013)................................................................. 28

*Dickson v. Sec'y of Def.,*
   68 F.3d 1396 (D.C. Cir. 1995)................................................................. 74, 75

*Dillmon v. NTSB,*
   588 F.3d 1085 (D.C. Cir. 2009)................................................................. 84

*Dopico v. Goldschmidt,*
   687 F.2d 644 (2d Cir. 1982)................................................................. 49

*Douglas Timber Operators, Inc. v. Salazar,*
   774 F. Supp. 2d 245 (D.D.C. 2011)................................................................. 37

*Dura Pharm., Inc. v. Broudo,*
   544 U.S. 336 (2005)................................................................. 23

**Table of Authorities**
**(Continued)**

**Cases**
**(Continued)**

<u>Page(s)</u>

*ECCO Plains, LLC v. United States*,
   728 F.3d 1190 (10th Cir. 2013) ......................................................... 30

*Eisenberg v. Chi. Milwaukee Corp.*,
   537 A.2d 1051 (Del. Ch. 1987) .......................................................... 85

*Elmco Props., Inc. v. Second Nat'l Fed. Sav. Ass'n*,
   94 F.3d 914 (4th Cir. 1996) ............................................................... 63

*EME Homer City Generation L.P. v. EPA*,
   696 F.3d 7 (D.C. Cir. 2012),
   *cert. granted*, 133 S. Ct. 2857 (2013). ............................................. 37

*Ensley v. Cody Res., Inc.*,
   171 F.3d 315 (5th Cir. 1999) ............................................................. 23

*Esther Sadowsky Testamentary Trust v. Syron*,
   639 F. Supp. 2d 347 (S.D.N.Y. 2009) ............................................... 26

*FAIC Sec. Inc. v. United States*,
   768 F.2d 352 (D.C. Cir. 1985) ........................................................... 24

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009).......................................................................... 85

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000).......................................................................... 61

*First Hartford Sav. Corp. Pension Plan & Trust v. United States*,
   194 F.3d 1279 (Fed. Cir. 1999) .................................................... 27, 28

*Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd.*,
   493 U.S. 331 (1990).................................................................... 23, 24

*Freeman v. FDIC*,
   56 F.3d 1394 (D.C. Cir. 1995)................................................... passim

*Fund for Animals v. Babbitt*,
   903 F. Supp. 96 (D.D.C. 1995) ......................................................... 20

*Gelles v. TDA Indus., Inc.*,
   44 F.3d 102 (2d Cir. 1994) .......................................................... 42, 44

*Gentile v. Rossette*,
   906 A.2d 91 (Del. 2006) ................................................................... 25

*Gilardi v. U.S. Dep't of Health & Human Servs.*,
   733 F.3d 1208 (D.C. Cir. 2013) ........................................................ 24

**Table of Authorities**
**(Continued)**

**Cases**
**(Continued)**

**Page(s)**

*Glass v. Glass,*
  321 S.E.2d 69 (Va. 1984) ................................................................................. 85

*Goldstein v. FDIC,*
  No. 11-1604, 2014 WL 69882 (D. Md. Jan. 8, 2014)........................................ 23

*Gosnell v. FDIC,*
  No. 90-1266, 1991 WL 533637 (W.D.N.Y. Feb. 4, 1991),
  *aff'd*, 938 F.2d 372 (2d Cir. 1991)................................................................... 66

*Greater Slidell Auto Auction, Inc. v. Am. Bank & Trust Co. of Baton Rouge, La.,*
  32 F.3d 939 (5th Cir. 1994) .............................................................................. 63

*Gross v. Bell Sav. Bank Pa SA,*
  974 F.2d 403 (3d Cir. 1992) ........................................................................ 32, 33

*Grubbs v. Bailes,*
  445 F.3d 1275 (10th Cir. 2006) ........................................................................ 23

*Helmerich & Payne Int'l Drilling Co. v. Bolivarian Rep. of Venez.,*
  --- F. Supp. 2d ----, 2013 WL 5290126 (D.D.C. Sept. 20, 2013) ................. 24, 25

*Henrichs v. Valley View Dev.,*
  474 F.3d 609 (9th Cir. 2007) ............................................................................ 31

*Houlihan v. Anderson-Stokes, Inc.,*
  434 F. Supp. 1330 (D.D.C. 1977) ................................................................ 42, 43

*In re Ames Dep't Stores, Inc.,*
  115 B.R. 34 (Bankr. S.D.N.Y. 1990).................................................................. 46

*In re Fed. Home Loan Mortg. Corp. Derivative Litig.,*
  643 F. Supp. 2d 790 (E.D. Va. 2009) ................................................................ 27

*In re Kaplan,*
  143 F.3d 807 (3d Cir. 1998) .............................................................................. 24

*In re Tenney Village Co., Inc.,*
  104 B.R. 562 (Bankr. D.N.H. 1989)................................................................... 46

*In re Tri-Star Pictures, Inc., Litig.,*
  634 A.2d 319 (Del. 1993) .................................................................................. 25

*Ingenito v. Bermec Corp.,*
  376 F. Supp. 1154 (S.D.N.Y. 1974) .................................................................. 42

*Int'l Ladies' Garment Workers' Union v. Donovan,*
  722 F.2d 795 (D.C. Cir. 1983).......................................................................... 81

**Table of Authorities**
**(Continued)**

**Cases**
**(Continued)**

<u>Page(s)</u>

*James Madison Ltd. by Hecht v. Ludwig,*
    82 F.3d 1085 (D.C. Cir. 1996) ......................................................................... 29, 32

*Jerdine v. FDIC,*
    730 F. Supp. 2d 218 (D.D.C. 2010) ...................................................................... 19

*Jerome Stevens Pharms., Inc. v. FDA,*
    402 F.3d 1249 (D.C. Cir. 2005) ........................................................................... 19

*Jicarilla Apache Nation v. U.S. Dep't of Interior,*
    613 F.3d 1112 (D.C. Cir. 2010) ........................................................................... 74

*Kahn v. Lynch Commc'n Sys. Inc.,*
    638 A.2d 1110 (Del. 1994) .................................................................................. 86

*Katz v. Gerardi,*
    655 F.3d 1212 (10th Cir. 2011) ........................................................................... 43

*Kellmer v. Raines,*
    674 F.3d 848 (D.C. Cir. 2012) ........................................................................ 26, 27

*Kent Cnty., Del. Levy Court v. EPA,*
    963 F.2d 391 (D.C. Cir. 1992) ............................................................................. 48

*Keys v. Wolfe,*
    709 F.2d 413 (5th Cir. 1983) ........................................................................... 42, 44

*Laclede Gas Co. v. FERC,*
    873 F.2d 1494 (D.C. Cir. 1989) ........................................................................... 81

*LaRoque v. Holder,*
    650 F.3d 777 (D.C. Cir. 2011) ............................................................................. 19

* *Leon Cnty. v. FHFA,*
    700 F.3d 1273 (11th Cir. 2012) ....................................................................... 31, 32

*Local 2, OPEIU v. FDIC,*
    962 F.2d 63 (D.C. Cir. 1992) ............................................................................... 60

*Marcum v. Salazar,*
    751 F. Supp. 2d 74 (D.D.C. 2010) .................................................................. 47, 50

*MBIA Ins. Corp. v. FDIC,*
    708 F.3d 234 (D.C. Cir. 2013) ........................................................................ 53, 60

* *MBIA Ins. Corp. v. FDIC,*
    816 F. Supp. 2d 81 (D.D.C. 2011),
    *aff'd,* 708 F.3d 234 (D.C. Cir. 2013) ....................................................... 53, 62, 63, 64

**Table of Authorities**
**(Continued)**

**Cases**
**(Continued)**

<u>Page(s)</u>

*McAllister v. RTC*,
    201 F.3d 570 (5th Cir. 2000) ............................................................... 54

*MCI Telecomms. Corp. v. AT&T*,
    512 U.S. 218 (1994).............................................................................. 43

*McLaughlin v. CIR*,
    113 F.2d 611 (7th Cir. 1940) ............................................................... 45

\* *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)........................................................ 50, 74, 83, 85

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
    551 U.S. 644 (2007)............................................................................ 74

*Nat'l Trust for Historic Pres. in U.S. v. FDIC*,
    995 F.2d 238 (D.C. Cir. 1993),
    *as modified*, 21 F.3d 469 (D.C. Cir. 1994) ................................. 31, 32, 33

*Northland Capital Corp. v. Silver*,
    735 F.2d 1421 (D.C. Cir. 1984)....................................................... 42, 43

*Parsch v. Massey*,
    72 Va. Cir. 121 (Va. Cir. Ct. 2006) ...................................................... 25

*Parsch v. Massey*,
    79 Va. Cir. 446 (Va. Cir. Ct. Nov. 5, 2009)........................................... 86

*Pls. in All Winstar-Related Cases at the Court v. United States*,
    44 Fed. Cl. 3 (1999)............................................................................. 26

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.*,
    374 F.3d 1209 (D.C. Cir. 2004) ........................................................... 82

*Rawoof v. Texor Petroleum Co.*,
    521 F.3d 750 (7th Cir. 2008) ............................................................... 24

*Reno v. Catholic Soc. Servs.*,
    509 U.S. 43 (1993).............................................................................. 30

*Royer v. Fed. Bureau of Prisons*,
    933 F. Supp. 2d 170 (D.D.C. 2013)...................................................... 30

*RTC v. CedarMinn Bldg. Ltd. P'ship*,
    956 F.2d 1446 (8th Cir. 1992) ........................................................ 54, 73

*Sacks v. Reynolds Sec., Inc.*,
    593 F.2d 1234 (D.C. Cir. 1978)....................................................... 42, 43

**Table of Authorities**
**(Continued)**

**Cases**
**(Continued)**

<u>Page(s)</u>

*SEC v. Banner Fund Int'l,*
211 F.3d 602 (D.C. Cir. 2000) ................................................................. 31, 84

\* *SEC v. Chenery Corp.,*
318 U.S. 80 (1943) ................................................................................. 47, 50

*SEC v. Nat'l Sec., Inc.,*
393 U.S. 453 (1969) ............................................................................... 42, 45

*SEC v. Sloan,*
436 U.S. 103 (1978) ............................................................................... 37, 46

*Sofonia v. Principal Life Ins. Co.,*
465 F.3d 873 (8th Cir. 2006) ......................................................................... 43

*Stanford Hosp. & Clinics v. NLRB,*
370 F.3d 1210 (D.C. Cir. 2004) ..................................................................... 39

*Tenn. Gas Pipeline Co. v. FERC,*
926 F.2d 1206 (D.C. Cir. 1991) ..................................................................... 57

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.,*
845 A.2d 1031 (Del. 2004) ............................................................................ 24

*Town of Babylon v. FHFA,*
699 F.3d 221 (2d Cir. 2012) .................................................................... 33, 34

*United States v. Petty Motor Co.,*
327 U.S. 372 (1946) ..................................................................................... 38

*United States v. Rogers,*
461 U.S. 677 (1983) ..................................................................................... 55

*Upton v. S. Produce Co.,*
133 S.E. 576 (Va. 1926) ............................................................................... 86

*Verizon v. FCC,*
740 F.3d 623 (D.C. Cir. 2014) ................................................................. 35, 83

*Volges v. RTC,*
32 F.3d 50 (2d Cir. 1994) ............................................................................. 33

*Walter O. Boswell Mem'l Hosp. v. Heckler,*
749 F.2d 788 (D.C. Cir. 1984) ................................................................. 49, 79

*Ward v. RTC,*
996 F.2d 99 (5th Cir. 1993) ............................................................... 33, 65, 66

*Warth v. Seldin,*
422 U.S. 490 (1975) ..................................................................................... 19

**Table of Authorities**
**(Continued)**

**Cases**
**(Continued)**

**Page(s)**

*Waterview Mgmt. Co. v. FDIC*,
   105 F.3d 696 (D.C. Cir. 1997)................................................................... 26, 66

*Weinberger v. UOP, Inc.*,
   457 A.2d 701 (Del. 1983) ........................................................................ 86

*Whatley v. RTC*,
   32 F.3d 905 (5th Cir. 1994) ...................................................................... 63

*Whelan v. Abell*,
   953 F.2d 663 (D.C. Cir. 1992)................................................................... 23

*WLR Foods, Inc. v. Tyson Foods, Inc.*,
   869 F. Supp. 419 (W.D. Va. 1994) .......................................................... 85

**Statutes**

* 5 U.S.C. § 702 ............................................................................................. 20, 29

* 5 U.S.C. § 706 ............................................................................................. passim

   11 U.S.C. § 364 ........................................................................................... 46

* 12 U.S.C. § 1455 ......................................................................................... passim

* 12 U.S.C. § 1719 ......................................................................................... passim

   12 U.S.C. § 1821 ......................................................................................... passim

   12 U.S.C. § 4511 ......................................................................................... 6, 48

   12 U.S.C. § 4513 ......................................................................................... 6

* 12 U.S.C. § 4617 ......................................................................................... passim

   15 U.S.C. § 77c ........................................................................................... 45

   15 U.S.C. § 78j ........................................................................................... 42

   44 U.S.C. § 2901 ......................................................................................... 48

   44 U.S.C. § 3101 ......................................................................................... 48

Housing and Economic Recovery Act of 2008, Pub. L. No. 110-289...................... 6, 31, 33, 60

Housing and Urban Development Act of 1968, Pub. L. No. 90-448............................ 4

**Rules**

Fed. R. Civ. P. 12 ............................................................................................ 19, 20

Fed. R. Civ. P. 56 ............................................................................................ 19, 20

**Table of Authorities**
**(Continued)**

**Page(s)**

**Regulations**

12 C.F.R. § 1237.13 ................................................................ 58

12 C.F.R. § 1237.3 ............................................................ 63, 64

26 C.F.R. § 1.1001-3 ......................................................... 45, 46

* 76 Fed. Reg. 35,724 (June 20, 2011) ................................ passim

**Other Authorities**

A.A. Sommer, Jr., *Federal Securities Act of 1933* (2013) ........................... 45

Barclays, *A Fresh Look at the GSEs* (May 15, 2013) ................................ 22

*Black's Law Dictionary* (9th ed. 2009) .......................................... 40, 63

Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* (3d ed. 2004) ........ 20

CNBC, *Fannie, Freddie Adequately Capitalized:  Lockhart* (July 8, 2008) ................ 5

Cong. Budget Office, *Fannie Mae, Freddie Mac, and the Federal Role in the Secondary Mortgage Market* (Dec. 2010) ............................................... 5

Cong. Budget Office, *The Budget and Economic Outlook:  2014 to 2024* (Feb. 2014) ........ 19, 74

David H. Carpenter & M. Maureen Murphy, Cong. Research Serv., RL34657, *Financial Institution Insolvency:  Federal Authority over Fannie Mae, Freddie Mac, and Depository Institutions* (2008) ................................. 54, 56, 57, 65

Dep't of Treasury, *Treasury Dep't Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac* (Aug. 17, 2012) ............................... passim

Donald Resseguie, *Banks & Thrifts:  Government Enforcement & Receivership* (2013) 55, 62, 63

E. Allan Farnsworth, *Farnsworth on Contracts* (3d ed. 2004) ..................... 40

Fannie Mae Offering Circular (May 13, 2008) ..................................... 6

Fannie Mae Offering Circular, Universal Debt Facility (May 14, 2013) .............. 59

FDIC, *Managing the Crisis:  The FDIC and RTC Experience* (1998) ................. 55

FHFA Office of Inspector General, *Analysis of the 2012 Amendments to the Government Stock Purchase Agreements* (Mar. 20, 2013) ...................... 76

FHFA, *2012 Report to Congress* (June 13, 2013) ................................. 60

Fitch, *Improved GSE Results May Ease Push for Immediate Reform* (Aug. 13, 2012) ...... 15

*Fletcher Cyclopedia of the Law of Corporations* (2011 rev. vol.) ............... 26, 46

*Folk on Delaware General Corporation Law* ...................................... 46

Gov't Accountability Office, *Fannie Mae & Freddie Mac, Analysis of Options for Revising the Housing Enterprises' Long-Term Structures* (Sept. 2009) ............. 11

**Table of Authorities**
**(Continued)**

**Other Authorities**
**(Continued)**

**Page(s)**

Height, *GSE Reform Muddles Along, Prospects Look Grim; MI Capital Standards Held*
(Feb. 11, 2014)................................................................................................................ 23

James D. Cox & Thomas Lee Hazen, *Treatise on the Law of Corporations* (3d ed. 2012)......... 26

John W. Head, *Lessons from the Asian Financial Crisis:  The Role of the IMF and the
United States*, 7 Kan. J.L. & Pub. Pol'y 70 (1998)............................................... 56, 57

Joint Status Report, *McKinley v. FHFA*, No. 10-cv-1165 (D.D.C. Sept. 16, 2011).................... 28

Keefe, Bruyette & Woods, *GSE Profitability Should Continue but Shareholders Are
Unlikely to Benefit* (Apr. 4, 2013).......................................................................... 22

Louis Loss et al., *Securities Regulation* (4th ed. 2007) ...................................................... 45

Michael P. Malloy, *Banking Law and Regulation* (2011) .................................................. 55, 61

N. Eric Weiss, Cong. Research Serv., RL34661, *Fannie Mae's and Freddie Mac's
Financial Problems* (Aug. 10, 2012)....................................................................... 70, 85

Office of Management & Budget, *Fiscal Year 2015 Analytical Perspectives:  Budget of
the U.S. Government* (2014) .................................................................................... 19, 23

Office of the Comptroller of the Currency, Interpretative Letter No. 964 (May 2003) ............... 5

*Oxford English Dictionary* Online (Dec. 2013)........................................................ 40, 47, 63

Remarks of Edward J. DeMarco, *Getting Our House in Order* (Oct. 24, 2013)....................... 60

Statement of Edward J. DeMarco Before the U.S. Senate Committee on Banking,
Housing and Urban Affairs (Apr. 18, 2013)........................................................... 60

*Williston on Contracts* (4th ed. 2013) ........................................................................... 41

## INTRODUCTION

This is a case about agencies that exceed the power given them by Congress.

In response to the mortgage finance crisis, Congress enacted the Housing and Economic Recovery Act of 2008 ("HERA"), taking the extraordinary step of authorizing the government to invest in and operate Fannie Mae and Freddie Mac.  Congress granted the Department of Treasury authority to invest in Fannie and Freddie, but only for a limited time—until December 31, 2009.  After that date, Treasury's authority was strictly limited to exercising the rights it previously had received in connection with its investments.

HERA also created a new regulator for Fannie and Freddie, the Federal Housing Finance Agency ("FHFA"), and granted FHFA authority to install itself as Fannie's and Freddie's conservator to "preserve and conserve" their assets so as to restore them to a "sound and solvent" condition.  Alternatively, in the event that there was no hope of reviving the institutions as going concerns, Congress granted FHFA the power to act as their receiver, to wind them up and liquidate them.

FHFA placed the Companies into conservatorship—not receivership—on September 7, 2008.  According to FHFA's Director, conservatorship would preserve the possibility that the Companies could return to "normal business operations."  FHFA, on the Companies' behalf, then agreed to sell Treasury a new class of senior preferred stock ("Treasury Stock") under the terms of a purchase agreement permitting each company to draw funds from Treasury.  The Treasury Stock gave Treasury a liquidation preference of $1 billion in each Company that increases dollar for dollar with the Companies' draws from Treasury.  Treasury also received a fixed dividend on the total amount of its liquidation preferences and the right to purchase 79.9 percent of the Companies' common stock at a nominal price.  While this extraordinary governmental investment in the Companies was highly dilutive to existing shareholders, Treasury and FHFA

each emphasized that their agreement left the existing capital structure in place, consistent with conservatorship's goal of returning the Companies to normal business operations.

The Companies' financial situation improved over time and, by 2010, some market participants (including some Plaintiffs here) forecast that the Companies would soon again be profitable. But by that same year, according to an internal Treasury memorandum—disclosed for the first time in this litigation—the Administration had adopted a "commitment" to "ensur[ing] [that] existing common equity holders will not have access to *any* positive earnings from the [Companies] in the future." The meaning of the Treasury memorandum is crystal clear: The government of the United States established a policy to destroy private shareholder value.

Then, in 2012, just as the Companies were becoming immensely profitable, the Administration found the opportunity to execute the previously undisclosed "commitment" to wipe out shareholders. Notwithstanding that under HERA Treasury's authority was now limited to the exercise of rights it had previously received in connection with its earlier investments, Treasury and FHFA agreed to amend the Treasury Stock, radically transforming that stock by replacing Treasury's fixed dividend with the so-called "Net-Worth Sweep" that is the subject of these lawsuits.

Under the Net-Worth Sweep, beginning in 2013 and continuing in perpetuity, each Company must pay to Treasury as a "dividend" virtually every cent of its net worth each and every quarter. The conservator's statutory mandate to restore the Companies to sound and solvent operations notwithstanding, the Sweep Amendment ensures that—in Treasury's words—the Companies cannot "retain profits, rebuild capital, [or] return to the market in their prior form"; in other words, the Sweep Amendment initiates the Companies' liquidation. By

depriving the Companies of any ability to retain earnings, the Net-Worth Sweep places the Companies in a financial coma with the explicit intention of slowly killing them.

Predictably, in its short life, the Net-Worth Sweep has been a spectacular boon for Treasury.  The government contends that it did not anticipate that Treasury would receive any more under the Net-Worth Sweep than the $19 billion per year it previously received under the fixed dividends.  But in 2013, Treasury received *more than $130 billion* as a "dividend" from the Companies.  From the government's telling, it had no idea that the Net-Worth Sweep would cause Treasury to receive an additional $111 billion—or nearly 600 percent more—than it would have received under the original Treasury Stock, a preposterous notion that becomes more so upon closer inspection.  Indeed, with the collection of this outlandish "dividend," the $189.5 billion that the Companies owe to Treasury now has been fully repaid.  Yet the government predicts that the largesse to Treasury will continue; it anticipates reaping an additional $181 billion from the Companies over the next decade.

The Net-Worth Sweep is nothing less than a nationalization of the Companies that is both unauthorized by Congress and that belies the government's earlier promise to keep in place the Companies' existing capital structure.  The Sweep Amendment simply discards the conservator's commitment—and statutory mandate under HERA—to operate the Companies with the goal of returning them to financial health and normal business operations.  By disregarding the authority granted to it by Congress, and turning its back on the policies it established when it invested in the Companies, Treasury and FHFA have also violated the Administrative Procedure Act several times over—exceeding the limits on their statutory authority and engaging in conduct that lacks any foundation in fact or logic.  Defendants' arguments are defeated by ample, well-known precedent under the APA, HERA and analogous statutes, and the securities laws.  Plaintiffs here,

holders of preferred and common stock that the government intends to—and has tried to—wipe

out, ask the Court to put an end to this illegal conduct and to vacate and set aside the Net-Worth

Sweep.

## STATEMENT OF THE FACTS

**A.      Fannie Mae And Freddie Mac.**

Fannie Mae and Freddie Mac (the "Companies") are federally chartered financial

institutions, known as Government Sponsored Enterprises, whose mission is to increase liquidity

in the residential mortgage market.[1]  Congress created Fannie Mae in 1938 in the Federal

National Mortgage Act and privatized the Company in 1968.  *See* Housing and Urban

Development Act of 1968, Pub. L. No. 90-448.  Two years after privatizing Fannie Mae,

Congress chartered Freddie Mac under the Federal Home Loan Corporation Act.  For the next

thirty-eight years, the Companies conducted business as publicly traded corporations, owned by

private shareholders and governed by state corporation law:  Delaware law for Fannie Mae,

Virginia law for Freddie Mac.

The Companies increase liquidity in the mortgage market primarily through mortgage

securitization.  The Companies purchase mortgages from lenders, pool them, and sell the pooled

assets as mortgage-backed securities to investors.  *See generally* Cong. Budget Office, *Fannie

Mae, Freddie Mac, and the Federal Role in the Secondary Mortgage Market* 1 (Dec. 2010),

*available at* http://www.cbo.gov/sites/default/files/cbofiles/ftpdocs/120xx/doc12032/12-23-

fanniefreddie.pdf.  For a fee, the Companies guarantee that investors will receive payments due

under those securities, even if the mortgages default.

---

[1]  Fannie Mae's official name is the Federal National Mortgage Association; Freddie Mac's official name is the
Federal Home Loan Mortgage Corporation.

The Companies have long been attractive to investors.  Up until 2008, the Companies were successful enterprises.  Fannie Mae had not reported a full-year loss since 1985, and Freddie Mac had never reported a full-year loss since becoming owned by private shareholders in 1989.  In addition, the government encouraged investors to purchase the Companies' equity. Federal regulators repeatedly signaled that the Companies were extraordinarily safe investments. For example, the Office of the Comptroller of the Currency permitted banks to carry certain types of the Companies' stock on their balance sheets at 20 percent risk weighting (versus 100 percent for other companies' stock).  *See* Office of the Comptroller of the Currency, Interpretative Letter No. 964 (May 2003), http://www.occ.gov/static/interpretations-and-precedents/may03/int964.pdf.  This allowed banks to hold less capital if they owned the Companies' stock than if they owned similar securities of other companies.  Indeed, on July 8, 2008—a mere two months before the Federal Housing Finance Agency ("FHFA") placed the Companies into conservatorship—James Lockhart, Director of the Companies' then regulator, the Office of Federal Housing Enterprise Oversight ("OFHEO"), and later Director of FHFA, declared that the Companies were "adequately capitalized," the agency's "highest criteria" for capitalization.  CNBC, *Fannie, Freddie Adequately Capitalized:  Lockhart* (July 8, 2008), http://www.cnbc.com/id/25584136.

This favorable treatment generally applied to the Companies' "preferred stock," which differs from common stock because it carries rights to contractually agreed-upon dividends and liquidation preferences.  A liquidation preference is a priority right to receive distributions from the Companies' assets in the event they are dissolved.  For example, Fannie Mae issued preferred stock on May 23, 2008, that offered investors an 8.5 percent annual dividend and a $25-per-share liquidation preference.  *See* Fannie Mae Offering Circular (May 13, 2008), *available at*

http://www.fanniemae.com/resources/file/ir/pdf/stock-info/series_T_05152008.pdf.  Plaintiffs in these cases own various series of preferred stock issued by the Companies.[2]

### B.    The Housing And Economic Recovery Act Of 2008.

Notwithstanding Director Lockhart's assurances, Congress perceived that the Companies might require government intervention during the downturn in the housing market and passed the Housing and Economic Recovery Act of 2008, Pub. L. No. 110-289 ("HERA"), on July 30, 2008.  HERA changed the Companies' regulatory framework in two ways.

*First*, HERA abolished OFHEO and created FHFA to serve as the Companies' regulator. 12 U.S.C. § 4511.  HERA authorized FHFA to exercise "general regulatory authority" to ensure that the Companies operated in a safe and sound manner and accomplished their statutory missions.  *Id.* §§ 4511(b)(2), 4513(a)(1).

HERA also empowered FHFA to take control of the Companies under certain circumstances linked to the Companies' financial stability.  *See id.* § 4617(a)(1), (3).  FHFA can elect to exercise that power through one of two means:  as a "conservator" or as a "receiver." But FHFA cannot simultaneously act as both conservator and receiver.  *See id.* § 4617(a)(4)(D) ("The appointment of [FHFA] as receiver . . . shall immediately terminate any conservatorship.").

FHFA's choice affects its authority.  As a conservator, FHFA may "take such action as may be—(i) necessary to put the [Companies] in a sound and solvent condition; and (ii) appropriate to carry on the business of the [Companies] and preserve and conserve the assets of the property of the [Companies]."  *Id.* § 4617(b)(2)(D).  But if FHFA chooses to act as a

---

[2]  *See* Decl. of Michael C. Neus (Mar. 21, 2014); Decl. of Eugene G. Ballard (Mar. 21, 2014); Decl. of Bruce R. Berkowitz (Mar. 20, 2014); Decl. of Sean Beatty (Mar. 21, 2014); filed as attachments hereto.

receiver, HERA grants it the "additional" power to "place the [Company] in *liquidation* and proceed to realize upon the assets of the [Company] in such manner as [FHFA] deems appropriate." *Id.* § 4617(b)(2)(E) (emphasis added).  FHFA as receiver may also adjudicate claims against the Companies in accordance with certain procedures. *Id.* § 4617(b)(3)(A). FHFA's powers as receiver thus exceed its powers as conservator.

*Second*, Congress granted Treasury "*temporary authority*" to recapitalize the Companies by purchasing their "obligations or other securities." *Id.* §§ 1455(*l*)(1)(A) (Fannie Mae), 1719(g)(1)(A) (Freddie Mac) (emphasis added).  Before making any purchases, the Secretary of the Treasury was required to "determine that such actions are necessary to (i) provide stability to the financial markets; (ii) prevent disruptions in the availability of mortgage finance; and (iii) protect the taxpayer." *Id.* §§ 1455(*l*)(1)(B), 1719(g)(1)(B) (the "required findings").  In addition, Treasury must also "take into consideration" six factors, the most relevant here being:  (i) "[t]he [Companies'] plan[s] for the orderly resumption of private market funding or capital market access," and (ii) "[t]he need to maintain the Corporation[s'] status[es] as . . . private shareholder-owned compan[ies]." *Id.* §§ 1455(*l*)(1)(C), 1719(g)(1)(C) (the "required considerations"). Treasury's temporary authority expired on December 31, 2009. *Id.* §§ 1455(*l*)(4), 1719(g)(4).

### C.    The Federal Government Takes Control Of Fannie Mae And Freddie Mac.

On September 6, 2008, FHFA placed the Companies into conservatorships.  At the time, FHFA's Director described the conservatorship as a temporary measure "to put [the Companies] in a sound and solvent condition" and "return[ ] the entities to normal business operations." FHFA 0016, 0026-0027; Treasury 0090, 0094.[3]  FHFA explained that it understood its

---

[3]  Citations to the Administrative Record and briefs are as follows, with all docket citations referring to No. 13-cv-1025 unless otherwise indicated:  "FHFA" refers to the "Document Compilation" filed by FHFA and Defendant Edward DeMarco on December 17, 2013 (Dkt. 27); "Treasury" refers to the Administrative Record filed by

*(Cont'd on next page)*

conservatorship powers to be those specified in HERA:  The "powers of the Conservator" are to "take all actions necessary and appropriate to (1) put the Company in a sound and solvent condition and (2) carry on the Company's business and preserve and conserve the assets and property of the Company."  FHFA 0027.  FHFA also made clear that, as the Companies' conservator, FHFA could not "make a determination to liquidate the Company."  FHFA 0028.

The next day, Treasury exercised its temporary authority to purchase a new class of senior preferred stock in the Companies (the "Treasury Stock").  Certificates of Designation set forth the terms of the Treasury Stock, and Treasury purchased those securities under terms and conditions set forth in Preferred Stock Purchase Agreements (the "Purchase Agreements"). Treasury 0017-0040 (Fannie Mae), 0051-0074 (Freddie Mac).

Under the Purchase Agreements, Treasury committed to provide each Company up to $100 billion (Treasury 0020, 0054 (§ 2.1)), which the Companies could draw upon at the end of any quarter to ensure that their assets were equal to their liabilities (Treasury 0018, 0052 ("Deficiency Amount"); Treasury 0020, 0054 (§ 2.2)).  In exchange, Treasury received 1 million senior preferred shares in each Company.  The Treasury Stock and the Purchase Agreements gave Treasury four rights.  First, the Treasury Stock entitled Treasury to a senior liquidation preference of at least $1,000 per share—or $1 billion—for each Company.  The Agreements

---

*(Cont'd from previous page)*

Treasury and Defendant Jacob J. Lew on December 17, 2013 (Dkt. 26); "FHFA Br." refers to the FHFA Defendants' Memorandum in Support of Motion to Dismiss All Claims and, in the Alternative, for Summary Judgment as to Plaintiffs' Arbitrary and Capricious Claims filed on January 17, 2014 (Dkt. 32); "Treasury Br." refers to the Treasury Defendants' Memorandum in Support of Their Motion to Dismiss, or in the Alternative, for Summary Judgment filed on January 17, 2014 (Dkt. 31); "Treasury Discovery Opp." refers to the Department of the Treasury's Memorandum in Opposition to Fairholme Funds' Motion to Supplement the Administrative Records, to Take Discovery, to Suspend the Agreed Briefing Schedule, and for a Status Conference filed on March 4, 2014 (No. 13-cv-1053 Dkt. 33); and "FHFA Discovery Opp." refers to the Opposition of Defendants FHFA as Conservator for Fannie Mae and Freddie Mac, FHFA Director Melvin L. Watt, Fannie Mae and Freddie Mac to Plaintiffs' Motion for Supplementation of the Administrative Records, for Limited Discovery, for Suspension of Briefing on Defendants' Dispositive Motions, and for a Status Conference filed on March 4, 2014 (No. 13-cv-1053 Dkt. 34).

further provided that Treasury's liquidation preference in a Company would increase dollar-for-dollar every time that Company drew upon Treasury's funding commitment.  Treasury 0100, 0133; FHFA 0133, 0147 (§§ 3.1, 3.3).  Second, the Treasury Stock granted Treasury the right to cash dividends equal to 10 percent of the value of its liquidation preference *or* an "in kind" dividend equal to 12 percent of the liquidation preference, which would be added to Treasury's liquidation preference.  Treasury 0033, 0067-0068 (§ 2(c)).  Third, the Purchase Agreements gave Treasury warrants allowing it to purchase up to 79.9 percent of the Companies' common stock at a nominal price.  Treasury 0020, 0054.  Fourth, the Purchase Agreements gave Treasury the right to collect Periodic Commitment Fees from the Companies—in addition to the dividends—beginning in 2010.  Treasury 0022, 0056.

Before purchasing its stock in the Companies, Treasury purported to make the findings required by HERA.  Treasury found that the purchases were "necessary to provide stability to the financial markets, prevent disruptions in the availability of mortgage finance, and protect the taxpayer."  Treasury 0001.  In making those findings, the Treasury Secretary approved a memorandum analyzing the required considerations.  Treasury 0001-0005.

The Purchase Agreements provide Treasury with control over the Companies.  In addition to its warrants to purchase 79.9% of the Companies' common stock, the Purchase Agreements grant Treasury veto power, while the Treasury Stock remains outstanding, over a variety of the Companies' activities such as paying dividends on other classes of stock, issuing new stock, transferring certain assets, making certain fundamental changes to their operations, and increasing their indebtedness above a specified amount.  *See* Treasury 0024-0025, 0058-0059.  Indeed, the Purchase Agreements also require FHFA to obtain Treasury's consent before

returning the Companies to private control by terminating the conservatorship.  Treasury 0024, 0058.

Both Treasury and FHFA emphasized that the conservatorships and Treasury's investments did not nationalize the Companies, and that the Companies' equity structures would remain intact.  Consistent with HERA's goal of maintaining the Companies' private-ownership status, then-Secretary Paulson explained that "conservatorship does not eliminate the outstanding preferred stock."  FHFA 0022; *see also* Treasury 0005 (Treasury memorandum stating that "[c]onservatorship preserves the status and claims of the preferred and common shareholders").  FHFA similarly confirmed that the conservatorships did not alter the Companies' statuses as privately owned entities.  FHFA 0028 ("Stockholders will continue to retain all rights in the stock's financial worth; as such worth is determined by the market."); *see also* FHFA 0018 (Director Lockhart's statement that "the common and all preferred stocks will continue to remain outstanding"); FHFA 0061-0062 (Director Lockhart's testimony that "the shareholders are still in place; both the preferred and common shareholders have an economic interest in the [C]ompanies").  Significantly, maintaining each Company's privately owned status and capital structure forestalled any accounting obligation to consolidate the Companies' debts onto the federal balance sheet.  *See* Gov't Accountability Office, *Fannie Mae & Freddie Mac, Analysis of Options for Revising the Housing Enterprises' Long-Term Structures* 18 (Sept. 2009), *available at* http://www.gao.gov/assets/300/295025.pdf.

In the months after the Companies entered conservatorship, the value of residential mortgage-backed securities fell.  The Companies, whose long-term assets and liabilities are sensitive to market prices, incurred substantial non-cash losses as a result of the mark down of assets and the increase in reserves set aside for potential future losses.  These paper losses

decreased the Companies' on-paper net worth, requiring the Companies to make several draws

against Treasury's funding commitment.  By the end of 2009, the Companies had drawn a total

of $125.9 billion—$75.2 billion for Fannie Mae and $50.7 billion for Freddie Mac—to remedy

the negative net worth generated largely by the Companies' substantial non-cash losses arising

from write-downs of assets and increases in loss reserves.  Treasury 4351.

> **D.     Treasury Amends The Purchase Agreements Twice Before The Expiration Of Its Statutory Authority On December 31, 2009.**

In 2009, Treasury and FHFA twice agreed to amend the Purchase Agreements to increase

the total amount that the Companies could draw from Treasury.  On May 6, 2009, Treasury and

FHFA executed the First Amendment, in which Treasury agreed to provide each Company up to

$200 billion and permitted the Companies to increase the size of their loan portfolios and

outstanding debt.  Treasury 0165-0169 (Fannie Mae), 0170-0174 (Freddie Mac); FHFA 0676-

0680 (Fannie Mae), 0681-0685 (Freddie Mac).  Treasury explained that it did not expect the

Companies to need these additional funds, but that they would "increase market confidence."

Treasury 0162.  Before executing the amendment, Treasury purported to make the statutorily

required findings based on the statutorily required considerations.  Treasury 0163-0164.

On December 24, 2009, on the eve of the expiration of Treasury's temporary authority,

Treasury and FHFA agreed to a Second Amendment.  Treasury 0189-0194 (Fannie Mae), 0195-

0200 (Freddie Mac).  As Treasury explained, its "authority to purchase [the Companies']

obligations and securities [would expire] at year end" and "[t]herefore, after December 31, [its]

ability to make further changes to the [Purchase Agreements], particularly with respect to the

commitment amount, is constrained."  Treasury 0177.  The Second Amendment thus converted

the $200 billion per Company maximum funding commitment into a formulaic maximum

commitment that enabled each Company to draw either $200 billion or $200 billion plus the

Companies' negative net worth, if any, for 2010-2012, whichever amount was greater.  Under this formula, the Companies could draw unlimited sums from Treasury until the end of 2012, but Treasury's commitment to each Company would thereafter be capped at the amount drawn from 2010 through 2012, plus $200 billion.  Treasury 0178.  The Second Amendment also adjusted other features of the Purchase Agreements, delaying the beginning of the required decrease in the size of the Companies' portfolios and delaying the implementation of the Periodic Commitment Fee by one year.  Treasury 0183, 0190, 0192-0193, 0196, 0198-0199 (§§ 3, 8, 9).  Treasury also characterized the three-year, infinite draw permitted by the Second Amendment as a "temporary" measure "to support [the Companies] until Congress determines a more sustainable long-term path."  Treasury 0178.  As it did before executing the First Amendment, Treasury purported to make the required findings and address the required considerations when it executed the Second Amendment.  Treasury 0188.

At this point, Treasury still asserted that the Companies could exit conservatorship.  It explained that "[t]he structure of the [Purchase Agreements] . . . enhance[s] the probability [that] both Fannie Mae and Freddie Mac [will] ultimately repay[ ] amounts owed" to Treasury.  Treasury 0184.  Because of this "probability," Treasury recognized that "Fannie Mae and Freddie Mac may emerge from conservatorship to resume independent operations."  *Id.*  Significantly, Treasury expressly recognized that "[c]onservatorship, [accordingly,] preserves the status and claims of the preferred and common shareholders."  *Id.*

Treasury's temporary authority ended seven days later, on December 31, 2009.  FHFA confirmed this fact two months later, when it described the Second Amendment to Congress as the "final adjustment" to Treasury's commitment.  FHFA 1181.  FHFA's statement to Congress also acknowledged limitations on FHFA's own authority, explaining that its only "option"

"under existing law" with respect to the Companies' futures would be "to reconstitute the two companies under their current charters."  FHFA 1185.

E.     **The Government Establishes A Policy That The Companies Should Never Exit Conservatorship.**

Not long after the Second Amendment, Treasury changed course.  Though it was not announced to the public, an internal memorandum reveals that sometime before December 2010, the Administration embarked upon a policy of "ensur[ing] [that] existing common equity holders will not have access to any positive earnings from the [Companies] in the future."  Treasury 0202.  Treasury suggested that the objective could be achieved by "[s]et[ting] the [Periodic Commitment Fee] equal to any generated positive net income," though it noted that this option was "subject to further legal review."  *Id.*  A 2011 white paper thereafter set forth the Administration's goal of "ultimately wind[ing] down both [Companies]."  Treasury 0217.  It would "seek opportunities, wherever possible, to accelerate Fannie Mae and Freddie Mac's withdrawal."  Treasury 0218.

FHFA made similar statements, including in September 2011 remarks by the Acting Director, and again in its February 2012 Strategic Plan, that the Companies "will not be able to earn their way back to a condition that allows them to emerge from conservatorship" (FHFA 2397), and, as a result, the Companies' "stock lower in priority" than the Treasury Stock— including the preferred stock—"is not likely to have any value" (FHFA 2640).

F.     **The Companies Regain Profitability.**

FHFA's pessimistic forecasts proved incorrect.  As the Companies staunched their losses in 2010, FHFA altered its 2010 projections of the Companies' likely draws from Treasury, observing that the Companies' "actual results" "were substantially better than projected." Treasury 1900; FHFA 2410.  FHFA's October 2011 analysis predicted that, by 2013, the

Companies' annual draws from Treasury—including those needed to pay the 10 percent

dividend—would approach zero:  Even under FHFA's worst-case scenario, Freddie Mac's draws

were predicted to cease altogether.  Treasury 1901; FHFA 2411.  For Fannie Mae, FHFA's

positive and baseline scenarios projected that its annual draws would decline substantially, such

that Fannie Mae would require only an additional $3 billion during 2014, and leave the Company

$84 billion below Treasury's funding cap.  *Compare* FHFA 2412 ($150 billion cumulative draws

by 2014), *with* Treasury 4351 ($233.7 billion funding cap after January 1, 2013).  It was only

under FHFA's worst-case scenario that Fannie Mae continued to make substantial draws on

Treasury's funding commitment.  FHFA 2412.  By late 2011, Treasury recognized that the

Companies possibly would have "positive net income after dividends."  Treasury 2359.

The Companies' financial fortunes continued to improve—dramatically so—in 2012.  In

May 2012, both Fannie Mae and Freddie Mac announced that they had posted net profits in the

first quarter of 2012:  Fannie Mae reported net income of $2.7 billion, and Freddie Mac reported

$577 million in net income.  FHFA 3157, 3351.  This performance meant that Fannie Mae did

not require any funds from Treasury that quarter to pay Treasury's then 10 percent cash

dividend, and Freddie Mac required only $19 million.  Treasury 4351.  FHFA's April 2012

report on the Companies' finances noted that the Companies' performances had exceeded even

its most optimistic projections.  FHFA had projected that the Companies would draw at least a

combined $33 billion during the second half of 2011 and the first quarter of 2012; the actual

draw was only $19 billion.  Treasury 3865, 3879; FHFA 3125, 3139, 3145.  The Companies'

performances further improved in the second quarter, as Fannie Mae and Freddie Mac reported

net income of $5.1 billion and $3.0 billion, respectively, easily out-earning Treasury's 10 percent

cash dividend.  For the first time since 2008, both Companies had positive net worth.  *See*

Treasury 3351 (Fannie Mae Q1 2012 10-Q (May 2012)); FHFA 3589 (Freddie Mac Q2 2012 10-Q (Aug. 2012)); FHFA 3848-3849 (Fannie Mae Q2 2012 10-Q (Aug. 2012)); Treasury 3910, 4087; FHFA 3589, 3848; *see also* FHFA 4069 (FHFA report explaining that the Companies' second quarter performance again exceeded FHFA's most optimistic projection).   In view of the steadily improving outlook, Fitch told bond investors that "absent changes in the terms of government support for Fannie and Freddie under the conservatorship agreement, we do not expect any near-term pressure on [the Companies'] ratings."  Fitch, *Improved GSE Results May Ease Push for Immediate Reform* (Aug. 13, 2012), *available at* http://in.reuters.com/article/2012/08/13/idINWNA330420120813.

### G.   Treasury And FHFA "Amend" The Treasury Stock In 2012 To Permit Treasury To Seize All Of The Companies' Net Worth.

On August 17, 2012—less than two weeks after the Companies released their second quarter earnings reports showing dramatic growth in net income—Treasury and FHFA decided to change fundamentally the nature of Treasury's investment in the Companies.  In the Third Amendment (the "Sweep Amendment," or what Treasury characterizes as "the Net-Worth Sweep," *see* Treasury Br. 50), Treasury and FHFA replaced the fixed-rate dividend with a "net-worth sweep" of each Company's net worth above a capital reserve of $3 billion that steadily declines to zero by 2018.  *See* Treasury 4337, 4345; FHFA 4034, 4042 (§ 3).[4]  The Sweep Amendment thus permits Treasury to take virtually every cent of each Company's net worth,

---

[4]  The Third Amendment also made two additional changes to the terms of the Treasury Stock.  First, it suspended Treasury's authority to set a Periodic Commitment Fee.  Treasury 4338, 4346; FHFA 4035, 4043 (§ 4).  Second, it accelerated the decrease of the Companies' retained portfolio.  Treasury 4339, 4347; FHFA 4036, 4044 (§ 6).  The original Purchase Agreements required the Companies to decrease the size of their portfolios by 10 percent per year until they reached $250 billion—a requirement that was waived in the First and Second Amendments through 2010.  Treasury 0025, 0059 (§ 5.7); Treasury 0168, 0173 (§ 8); Treasury 0192-0193, 0198-0199 (§ 9).  The Third Amendment increased the pace of this reduction, requiring the Companies to reduce their assets by 15 percent per year.  Treasury 4339, 4347 (§ 6).

leaving them with no operating capital cushion.  Importantly, none of these payments reduces Treasury's liquidation preference; all payments are characterized as dividends.  Thus, under the Sweep Amendment, the Companies will collectively owe Treasury at least $189.5 billion for as long as they exist and no matter how much they pay Treasury.

Publicly, Treasury and FHFA gave conflicting justifications for the Sweep Amendment. On the one hand, the agencies claimed that the Sweep Amendment was needed to avert a "downward spiral," in which the Companies would deplete Treasury's funding commitment in order to pay Treasury's dividends.  Treasury's press release explained that replacing the 10 percent dividend "[e]nd[ed] the circular practice of the Treasury advancing funds to the [Companies] simply to pay dividends back to Treasury."  Dep't of Treasury, *Treasury Dep't Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac* (Aug. 17, 2012), *available at* http://www.treasury.gov/press-center/press-releases/Pages/tg1684.aspx ("2012 Press Release").  FHFA said that eliminating the 10 percent dividend would "ensure [financial] stability" by eliminating investors' concerns about "the adequacy of the financial commitment contained in the [Purchase Agreements]."  FHFA 4047.

On the other hand, the agencies also justified the Sweep Amendment as consistent with the Administration's policy of "ultimately wind[ing] down both" Companies.  Treasury 0217. Indeed, Treasury's press release announcing the Sweep Amendment was titled:  "Treasury Department Announces Further Steps to *Expedite Wind Down* of Fannie Mae and Freddie Mac." 2012 Press Release (emphasis added).  "Acting upon the commitment made in the Administration's 2011 White Paper" to "ultimately wind down" the Companies and to "seek opportunities, wherever possible, to accelerate" this process, Treasury explained that—with the Net-Worth Sweep—the Companies "w[ould] be wound down" and "w[ould] not be allowed to

retain profits, rebuild capital, and return to the market in their prior form."  2012 Press Release; *see also* Treasury 0207, 0218 (White Paper).  Moreover, Treasury said, the Net-Worth Sweep would "[en]sure that every dollar of earnings that Fannie Mae and Freddie Mac generate will be used to benefit taxpayers."  2012 Press Release.  FHFA, too, justified the Sweep Amendment on the ground that it would "fully capture financial benefits for taxpayers."  FHFA 4047.

The Sweep Amendment has been an enormous windfall for the government.  Fannie Mae and Freddie Mac were hugely profitable in 2013, posting cumulative net income of $84.0 billion and $51.6 billion, respectively.  Fannie Mae 2013 10-K, at 2 (Feb. 21, 2014); Freddie Mac 2013 10-K, at 1 (Feb. 27, 2014).[5]  Indeed, Fannie Mae declared that it had reported "the highest annual net income . . . in [its] history."  Fannie Mae 2013 10-K, at 2.  The Companies—under FHFA's supervision—achieved large profits in part by reversing some of the non-cash accounting losses that led to negative net income in 2009 and 2010.  For example, the Companies recognized deferred tax assets—an accounting term for losses that a company can use to offset future income—that increased Fannie Mae's and Freddie Mac's net incomes by $50.6 billion and $23.9 billion, respectively.  *See* Fannie Mae Q1 2013 10-Q, at 2 (May 9, 2013); Freddie Mac Q3 2013 10-Q, at 1 (Nov. 7, 2013).[6]

These gains were immediately captured by Treasury, resulting in "dividend" payments of *$130 billion* in 2013.  Treasury 4352.  With these payments, the Companies have given Treasury

---

[5]  Fannie Mae's annual and quarterly SEC filings are available at http://www.fanniemae.com/portal/about-us/investor-relations/quarterly-annual-results.html.  Freddie Mac's annual and quarterly SEC filings are available at http://www.freddiemac.com/investors/sec_filings/index.html.

[6]  Deferred tax assets are assets (such as net operating loss carry forwards) that a company can use to reduce income tax liability in a subsequent tax period.  Because these assets operate only to reduce tax liability, deferred tax assets only have value if the company will have positive income in the future to generate tax liability.  These assets must be written down if a company does not expect to generate sufficient income to use these assets.  In contrast, a company may recognize once-written down deferred tax assets if it expects to generate sufficient income to use the deferred tax assets to offset future tax liability.

$185.2 billion since 2008—*97.7 percent* of Treasury's liquidation preference, Treasury 4352, and they will pay an additional $17.6 billion during the first quarter of 2014, Fannie Mae 2013 10-K, at 4 ($7.2 billion); Freddie Mac 2013 10-K, at 102 ($10.4 billion).  The Companies' enormous profits will continue to fill Treasury's coffers over the coming years, as the Office of Management and Budget estimates that Treasury will receive $181.5 billion from the Companies over the next decade.  *See* Office of Management & Budget, *Fiscal Year 2015 Analytical Perspectives:  Budget of the U.S. Government* 323 (2014), *available at* http://www.whitehouse.gov/sites/default/files/omb/budget/fy2015/assets/spec.pdf ("OMB Analysis"); *see also* Fannie Mae 2012 10-K, at 12 (Apr. 2, 2013) ("[A]nnual net income [will] remain strong over the next few years.").  Though it will have fully recovered its investment, Treasury will maintain its liquidation preference of more than $189 billion, meaning that, if the Companies are wound down as Treasury suggests, after all liabilities are paid, no other shareholders could recover from the net assets until Treasury first is paid $189 billion.  But, such repayment is impossible under the Sweep Amendment, which requires the Companies to pay out all net assets as dividends to Treasury.  Indeed, the Congressional Budget Office predicts that the Companies will send an additional $81 billion to Treasury in 2014.  Cong. Budget Office, *The Budget and Economic Outlook:  2014 to 2024*, at 64 (Feb. 2014), *available at* http://www.cbo.gov/sites/default/files/cbofiles/attachments/45010-Outlook2014_Feb.pdf ("CBO Report").

## STANDARD OF REVIEW

Treasury and FHFA move to dismiss Plaintiffs' complaints for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim for relief under Rule 12(b)(6).  In the alternative, they move for summary judgment under Rule 56, with Treasury moving for summary judgment on all of Plaintiffs' claims and FHFA moving for summary

judgment only on Plaintiffs' claims that FHFA violated the Administrative Procedure Act ("APA") by acting arbitrarily and capriciously when it executed the Sweep Amendment. Plaintiffs oppose those motions and, in addition, cross-move for summary judgment on their claims under the APA.

"In ruling on a motion under Rule 12(b)(1), the Court 'must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.'" *Jerdine v. FDIC*, 730 F. Supp. 2d 218, 222-23 (D.D.C. 2010) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)); *see also* 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1350 (3d ed. 2004). "While the district court may consider materials outside the pleadings . . . , the court must still accept all of the factual allegations in the complaint as true." *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (citations, internal quotation marks, and brackets omitted).

To survive a motion to dismiss under Federal Rule of Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court "'must accept as true all material allegations of the complaint, drawing all reasonable inferences from those allegations in plaintiffs' favor.'" *De Csepel v. Republic of Hungary*, 714 F.3d 591, 597 (D.C. Cir. 2013) (quoting *LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011)). "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d).

The APA directs courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . (A) arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law; . . . [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).  In APA challenges to agency action, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 719 F. Supp. 2d 26, 32 (D.D.C. 2010) (internal quotation marks omitted), *aff'd*, 663 F.3d 476 (D.C. Cir. 2011).  This Court must "thoroughly review[ ] the agency's actions," and "consider[ ] whether the agency acted within the scope of its legal authority, whether the agency has explained its decision, whether the facts on which the agency purports to have relied have some basis in the record, and whether the agency considered the relevant factors."  *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995).

## ARGUMENT

### I.   This Court Has Jurisdiction Over Plaintiffs' APA Claims.

Having embarked on a policy to ensure that private shareholders in the Companies "will not have access to any positive earnings in the future," and having swept into Treasury more than $110 billion beyond the amount owed under the pre-Sweep-Amendment dividend, Defendants now claim that Plaintiffs have no recourse to judicial review.  Either, Defendants say, Plaintiffs lack standing, or HERA bars their APA claims.  Both arguments lack merit.

### A.   Plaintiffs Are "Aggrieved" By The Sweep Amendment And Have Standing To Challenge Its Legality.

The APA grants standing to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute."  5 U.S.C. § 702.  Aside from one frivolous argument based on a misinterpretation of HERA,

Defendants do not dispute that Plaintiffs are aggrieved by the Sweep Amendment, but Treasury nevertheless maintains that Plaintiffs lack standing.  *See* Treasury Br. 33-36.  Treasury is wrong.

### 1.    The Sweep Amendment Has Injured Plaintiffs.

To establish Article III standing, a plaintiff must "show a substantial probability that it has been injured, that the defendant caused its injury, and that the court could redress that injury."  *Ams. for Safe Access v. DEA*, 706 F.3d 438, 443 (D.C. Cir.), *cert. denied*, 134 S. Ct. 267 (2013).  A plaintiff need not establish that a future injury will occur with absolute certainty, but rather need only "demonstrate[ ] a likelihood of injury that rises above the level of unadorned speculation—that is, a realistic danger that [it] will suffer future harm."  *Chaplaincy of Full Gospel Churches v. Navy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012) (internal quotation marks omitted); *see also Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1150 n.5 (2013) (collecting cases finding standing based on substantial risk of harm).

The Sweep Amendment harms Plaintiffs in at least two ways:  First, by prohibiting the Companies from accumulating any capital, the Sweep Amendment eliminates the possibility of any recovery under the liquidation preference of Plaintiffs' preferred stock.  Because, under the Sweep Amendment, Treasury takes all of the Companies' net worth (*i.e.*, the amount by which the Companies' assets exceed their liabilities) without reducing Treasury's $189 billion liquidation preference, the Sweep Amendment means *both* that the Companies' private shareholders will have no access to the Companies' earnings for as long as they remain going concerns (per Administration policy), *and* that, if the Companies are liquidated, they will enter liquidation with no excess capital and a $189 billion bill from Treasury.  The Sweep Amendment

thus makes it impossible for Plaintiffs to recover anything in a liquidation scenario.[7]  This

"increased risk of non-recovery" suffices to establish Article III standing.  *Constellation Energy*

*Commodities Grp., Inc. v. FERC*, 457 F.3d 14, 18, 20 (D.C. Cir. 2006).[8]

Treasury and FHFA say that the Sweep Amendment causes Plaintiffs no harm because

Section 4617(e) of HERA limits any recovery by Plaintiffs "to the amount that shareholders

would have received had the [Companies'] assets and liabilities been liquidated *at the time the*

*conservator was appointed* in September 2008."  Treasury Br. 28 (emphasis added); *see also*

FHFA Br. 28, 33; Treasury Br. 34, 62.  That is incorrect.  Section 4617(e) caps FHFA's liability

in the event of *receivership*, not conservatorship.  The provision Treasury and FHFA invoke

limits liability of the "receiver or the regulated entity for which such receiver is appointed."  12

U.S.C. § 4617(e)(2).  By limiting claimants' recoveries to "the amount that such claimant would

have received if the Agency had liquidated the assets and liabilities of the regulated entity

without exercising the authority of the Agency under subsection (i)"—a provision that empowers

FHFA "as *receiver*" to operate something called "a limited-life regulated entity"—the statute

simply ensures that FHFA cannot be liable for a failed company's debts and otherwise prohibits

recovery from assets generated by FHFA's decision to create a limited-liability regulated entity.

*Id.* § 4617(e)(2), (i)(1)(A)(ii) (emphasis added); *see also Bank of Am. N.A. v. FDIC*, --- F. Supp.

2d. ---, 2013 WL 4505424, at *6-7 (D.D.C. Aug. 26, 2013) (explaining that, under analogous

FDIC provision, the maximum liability provision enforces the order-of-priority scheme);

---

[7]  Analysts project that the Companies' total earnings will long exceed Treasury's 10 percent cash dividend.  *See, e.g.*, Keefe, Bruyette & Woods, *GSE Profitability Should Continue but Shareholders Are Unlikely to Benefit* 7 (Apr. 4, 2013); Barclays, *A Fresh Look at the GSEs* 3 (May 15, 2013); Height, *GSE Reform Muddles Along, Prospects Look Grim; MI Capital Standards Held* 4, 7 (Feb. 11, 2014); OMB Analysis at 323 (estimating that the Companies will have paid Treasury $366.7 billion by the end of FY2024).  There is thus no question that, had the 10 percent dividend remained, the Companies would have out-earned Treasury's dividend, therefore holding open the possibility that the Companies could amass sufficient capital to satisfy Treasury's liquidation preference.

[8]  Treasury's argument that Plaintiffs' APA claims are not ripe fails for the same reason.  *See* Treasury Br. 33-34.

*Goldstein v. FDIC*, No. 11-1604, 2014 WL 69882, at *6 (D. Md. Jan. 8, 2014) ("Put another way, if no receivership assets are available to satisfy the claims of creditors, the creditors cannot recover from the FDIC as receiver.").  The provision has no relevance outside of receivership, and even in receivership does not remotely suggest that shareholders are prohibited from seeking the injunctive relief sought here.  Plaintiffs' APA claims do not seek to recover FHFA assets; rather, Plaintiffs ask the Court to vacate the Sweep Amendment so that the market will accurately reflect the value of their shares, unencumbered by the unlawful Sweep Amendment.[9]

Second, that depression in stock value is itself an Article III injury.  *See Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336 (1990); *Whelan v. Abell*, 953 F.2d 663, 672 (D.C. Cir. 1992); *Grubbs v. Bailes*, 445 F.3d 1275, 1280 (10th Cir. 2006); *Ensley v. Cody Res., Inc.*, 171 F.3d 315, 319-20 (5th Cir. 1999).  Here, the announcement of the Sweep Amendment on August 17, 2012, predictably battered the value of the Companies' publicly traded stock.  *See, e.g.*, FMCCH, Bloomberg Terminal (shares traded at $3.55 on August 15 and $1.15 on August 20).  While the shares have since increased in value—thanks to the Companies' improved performance—the Sweep Amendment continues to depress the shares' value, which is sufficient to establish standing.  *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342-43 (2005) (recognizing that a "share's higher price" may still be "lower than it would otherwise have been").

---

[9]  Treasury suggests that Plaintiffs would reap a "windfall" if this Court vacates the Sweep Amendment.  Treasury Br. 34.  But Plaintiffs seek only to be returned to the position that Treasury and FHFA assured shareholders that they occupied when the conservatorships were imposed.  *See* Treasury 0005 ("Conservatorship preserves the status and claims of the preferred and common shareholders."); FHFA 0021 ("[C]onservatorship does not eliminate the outstanding preferred stock.").  And, coming from the party that has already benefitted to the tune of more than $147 billion under the Sweep Amendment, Treasury's complaint of any potential "windfall" is deeply ironic.

### 2. The Prudential Shareholder-Standing Doctrine Has No Application To Plaintiffs' APA Claims.

Treasury contends that Plaintiffs lack prudential standing under the "shareholder-standing rule," which generally prohibits shareholders from enforcing rights that belong to the corporation. *See Alcan Aluminium*, 493 U.S. at 336; Treasury Br. 34-36. Treasury is incorrect. Notably, Treasury does not cite a single case in which a court has held that the shareholder-standing doctrine applies in APA cases, and there are good reasons to conclude that it does not. *See FAIC Sec. Inc. v. United States*, 768 F.2d 352, 357 (D.C. Cir. 1985) ("The zone of interests adequate to sustain judicial review is particularly broad in suits to compel federal agency compliance with law, since Congress itself has pared back traditional prudential limitations by the Administrative Procedure Act, which affords review to any person 'adversely affected or aggrieved by [federal] agency action within the meaning of the relevant statute.'"). In any event, none of Plaintiffs' claims runs afoul of the shareholder-standing doctrine because their claims seek to redress personal injuries and vindicate rights that belong to Plaintiffs, not the Companies.

The shareholder-standing rule under Delaware law, and more generally, affects only derivative actions. *See, e.g.*, *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1036 (Del. 2004).[10] It has no application where a plaintiff asserts "a direct, personal interest," "even if the corporation's rights are also implicated." *Alcan Aluminium*, 493 U.S. at 336; *see also Gilardi v. U.S. Dep't of Health & Human Servs.*, 733 F.3d 1208, 1216 (D.C. Cir. 2013) (citing *Rawoof v. Texor Petroleum Co.*, 521 F.3d 750, 757 (7th Cir. 2008)); *In re Kaplan*, 143 F.3d 807, 812-13 (3d Cir. 1998) (Alito, J.); *Helmerich & Payne Int'l Drilling Co. v. Bolivarian Rep. of Venez.*, --- F. Supp. 2d ----, 2013 WL 5290126, at *17 (D.D.C. Sept. 20, 2013). This includes cases where

---

[10] Fannie Mae's and Freddie Mac's corporate governance practices are governed by Delaware law and Virginia law, respectively.

the plaintiff challenges conduct that benefits one class of shareholders at the expense of another, as when a controlling shareholder expropriates the company's economic value for its own benefit, to the other shareholders' detriment. *Gentile v. Rossette*, 906 A.2d 91, 100 (Del. 2006) ("A separate harm also results: an extraction from the public shareholders, and a redistribution to the controlling shareholder . . . ."); *In re Tri-Star Pictures, Inc., Litig.*, 634 A.2d 319, 330-32 (Del. 1993); 12B *Fletcher Cyclopedia of the Law of Corporations* § 5914 (2011 rev. vol.).[11] Accordingly, where a plaintiff claimed that the defendant had impaired its "'essential right . . . to share in the profits and in the distribution of assets on liquidation in proportion to their interest in the enterprise'" (much as Plaintiffs assert here), Judge Wilkins held that the shareholder-standing doctrine was inapplicable. *Helmerich & Payne Int'l Drilling Co.*, 2013 WL 5290126, at *20 (quoting 1 James D. Cox & Thomas Lee Hazen, *Treatise on the Law of Corporations* § 7:2 (3d ed. 2012)) (brackets omitted). So, too, here.

### 3.     HERA Does Not Strip Plaintiffs Of Their Rights In Their Stock.

FHFA and Treasury contend that HERA vested FHFA, as the Companies' conservator, with any "rights, titles, powers, and privileges" that inhered in Plaintiffs' stock, and that Plaintiffs accordingly have no rights in that stock left to vindicate. *See* FHFA Br. 36-37 (citing 12 U.S.C. § 4617(b)(2)(A)); Treasury Br. 29-33, 45-46 (same). This argument is meritless for two independent reasons.

First, HERA does not grant the conservator *all* of the rights of the shareholders; if it had, it would have effected a taking, and it would have meant that Treasury's assurances that it was retaining the Companies' existing capital structure were lies from the day they were uttered. *See*

---

[11] Virginia law also recognizes that shareholders may bring individual actions where the alleged harm accrued to the shareholder directly. *See Parsch v. Massey*, 72 Va. Cir. 121, 128 (Va. Cir. Ct. 2006) .

*Waterview Mgmt. Co. v. FDIC*, 105 F.3d 696, 699 (D.C. Cir. 1997) ("[T]o hold that the federal government could simply vitiate the terms of existing assets, taking rights of value from private owners with no compensation in return, would raise serious constitutional issues.").  Rather, consistent with established principles of conservatorship, the conservator succeeds to the shareholders' rights "*with respect to the regulated entity and the assets of the regulated entity*." 12 U.S.C. § 4617(b)(2)(A)(i) (emphasis added).  That does not include the shareholders' rights that are personal to shareholders, such as the right to receive dividends or a liquidation preference, or the right to bring direct actions when those rights are impaired.  *See supra* pp. 21-23, 25; *see also Pls. in All Winstar-Related Cases at the Court v. United States*, 44 Fed. Cl. 3, 10 (1999) (shareholders of thrift in FDIC receivership "have a direct, vested interest in such excess portion of any recovery" after liquidation).  This is not contrary to *Kellmer v. Raines*, on which FHFA relies, FHFA Br. 36, and which stands for the very different proposition that FHFA may represent the Companies' interests in derivative suits.  *See* 674 F.3d 848, 851 (D.C. Cir. 2012); *see also Esther Sadowsky Testamentary Trust v. Syron*, 639 F. Supp. 2d 347, 351 (S.D.N.Y. 2009) (same).

HERA itself recognizes that the shareholders retain the "right to payment, resolution, or other satisfaction of their claims" if the Companies are placed in receivership.  *See* 12 U.S.C. § 4617(b)(2)(K)(i).  Indeed, that provision provides that most shareholder rights "terminate" upon "appointment of [FHFA] as receiver," presupposing that, prior to receivership, the Companies' shareholders retain an array of rights.  *Id.*  A FHFA internal memorandum, disclosed in prior litigation, explains that it is only "[t]he appointment of the FHFA as receiver—*as opposed to conservator*—[that] terminates all rights and claims [of] the stockholders . . . as a result of their status as stockholders."  *See* Joint Status Report, Attachment A at 7, *McKinley v.*

*FHFA*, No. 10-cv-1165 (D.D.C. Sept. 16, 2011) (emphasis added) (internal memorandum dated August 18, 2008).  Treasury's Purchase Agreements similarly recognize that shareholders retain their contractual rights during conservatorship, as the Agreements grant Treasury the otherwise wholly unnecessary right to veto dividends during conservatorship.  *See* Treasury 0102, 0135 (§ 5.1); FHFA Br. 14, 42; Treasury Br. 13.  If the Companies' shareholders lost all rights that could be asserted, there would be no "dividends" for FHFA to pay subject to Treasury's veto, and the Purchase Agreements merely would have prohibited FHFA from giving the Companies' shareholders an unwarranted gift—a result that makes little sense.  Indeed, the senselessness of this line of argument is reinforced by Treasury's failure to cite any authority for its contention that HERA also bars *direct* claims under the APA, Treasury Br. 32—an omission even more notable because FHFA does not invoke 12 U.S.C. § 4617(b)(2) to bar Plaintiffs' APA claims.

Second, to the extent that Plaintiffs' APA claims are incorrectly construed as derivative claims—Plaintiffs' APA claims are direct—shareholders of an entity in conservatorship retain the right to bring derivative suits where, as here, the conservator has a "manifest conflict of interest."  *Kellmer*, 674 F.3d at 850 (citing *First Hartford Sav. Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1295 (Fed. Cir. 1999)); *see also Delta Sav. Bank v. United States*, 265 F.3d 1017, 1021-24 (9th Cir. 2001) (allowing shareholder to bring derivative suit against OTS based on FDIC's conflict of interest as receiver); *In re Fed. Home Loan Mortg. Corp. Derivative Litig.*, 643 F. Supp. 2d 790, 798 (E.D. Va. 2009) ("Absent a showing of a clear conflict of interest similar to the conflicts at issue in *First Hartford* and *Delta Savings*, the plaintiffs lack standing to pursue these claims.").  *First Hartford* is instructive.  There, the shareholder of a bank in FDIC receivership brought a derivative suit alleging that the FDIC breached a contract between the government and the bank under receivership.  *See* 194 F.3d at

1282-86.  The court of appeals held that the FDIC could not prohibit the shareholder's suit because the FDIC had a conflict of interest when it "was asked to decide on behalf of the depository institution in receivership whether it should sue the federal government based upon a breach of contract, which, if proven, was caused by the FDIC itself."  *Id.* at 1296.  Like the FDIC in *First Hartford*, FHFA here could not possibly impartially decide whether to pursue claims against itself for violating the APA and Plaintiffs' contractual and fiduciary rights.[12]

FHFA attempts to distinguish this precedent by arguing that neither *First Hartford* nor *Delta Savings* considered the import of HERA's language granting FHFA the "rights, titles, powers and privileges" of shareholders.  FHFA Br. 52 (citing 12 U.S.C. § 4617(b)(2)(A)(i)).  But both decisions apply the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), which contains a materially identical provision.  *See* 12 U.S.C. § 1821(d)(2)(A)(i).  Treasury's citation to *Deutsche Bank National Trust Co. v. FDIC*, 717 F.3d 189 (D.C. Cir. 2013), also is unavailing.  *See* Treasury Br. 31.  That case dealt with whether a creditor with no interest in a particular contract dispute could intervene in that litigation, a concern far afield from Plaintiffs' claims here.  *See id.* at 192.

Because FHFA could not possibly dispassionately pursue litigation against itself, and because Plaintiffs' APA claims seek to vindicate rights that are personal to themselves—their right to their contractual liquidation preferences—and are not claims of the Companies, the fact that the conservator has succeeded to the shareholders' rights "with respect to [the Companies]" has no relevance to the standing analysis here.

---

[12]  Treasury suggests that the *First Hartford* rule advocated here would allow shareholders to bring *any* derivative action during a conservatorship, Treasury Br. 32—a result that Treasury says is unworkable.  Treasury errs, for not every derivative suit involves a "manifest conflict of interest" like the one at issue here, as demonstrated by the numerous cases Treasury cites in which courts held that no such conflict existed.

### B.      HERA's Jurisdictional Bar Does Not Prohibit Plaintiffs' Claims.

Treasury and FHFA contend that HERA's limitation on judicial review, 12 U.S.C.

§ 4617(f), prohibits all APA claims concerning the Sweep Amendment.  It does not.  Courts

embrace a "strong presumption that Congress intends judicial review of administrative action."

*Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986); *see also* 5 U.S.C. § 702

("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by

agency action within the meaning of a relevant statute, is entitled to judicial review

thereof.").  Indeed, courts must "assume . . . that the [APA] authorizes" review unless some other

statute specifically precludes review or the action is committed to agency discretion by law.  *See*

*James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996).  Here, Section

4617(f)'s instruction that courts not "restrain or affect the exercise of powers or functions of the

Agency as a conservator or a receiver" does not implicate claims against Treasury at all.  Nor

does it preclude claims that FHFA exceeded the "powers" and "functions" granted to it by

HERA because the Sweep Amendment was not an "exercise" of conservatorship powers.  *See*

*Bank of Am. Nat'l Ass'n v. Colonial Bank*, 604 F.3d 1239, 1243 (11th Cir. 2010) (applying

analogous provision under FIRREA, 12 U.S.C. § 1821(j)).

### 1.      Section 4617(f) Does Not Bar The Claims Against Treasury.

Though HERA includes no provision limiting judicial review of claims against Treasury,

Treasury nevertheless argues Section 4617(f) bars judicial review of its conduct with respect to

the Sweep Amendment because a court's setting aside the Sweep Amendment would "affect"

FHFA's power to enter into it.  Treasury cites no authority for this broad assertion of implied

immunity.  *See* Treasury Br. 22-29.  If Treasury were correct, FHFA would be empowered to

immunize a wide range of illegal conduct by third parties simply because that illegal conduct had

a peripheral connection to FHFA's activities as the Companies' conservator.  For example,

courts would be impotent to review a decision of the Department of Education to begin guaranteeing the Companies' mortgage-backed securities, even though it has no statutory authority to do so. *See Reno v. Catholic Soc. Servs.*, 509 U.S. 43, 63-64 (1993) ("[T]here is a well-settled presumption favoring interpretations of statutes that allow judicial review of administrative action, and we will accordingly find an intent to preclude such review only if presented with clear and convincing evidence." (internal quotation marks omitted)); *see also Royer v. Fed. Bureau of Prisons*, 933 F. Supp. 2d 170, 181-82 (D.D.C. 2013) (reviewing constitutional claim in prisoner-location case because "Congress has not explicitly precluded review"); *Cobell v. Babbitt*, 30 F. Supp. 2d 24, 32 (D.D.C. 1998) ("[T]he statutory language relied upon by the defendants falls well short of evidencing a congressional intent to preclude judicial review . . . ."). It would immunize unlawful conduct by private parties as well. Under Treasury's theory, persons statutorily prohibited from owning mortgage securities could purchase those securities from FHFA; persons barred from the mortgage finance industry could also work for FHFA in their prohibited roles; and in each case, no court could stop it.

But law rejects these absurdities and recognizes instead the common-sense proposition that the conservator's "powers and functions" do not include the power to contract with other persons or entities to take actions that violate the law. Judicial action that holds private persons or entities or government agencies to their independent statutory obligations accordingly "do[ ] not affect the receiver's [or conservator's] own powers." *Abbott Bldg. Corp. v. United States*, 951 F.2d 191, 195 (9th Cir. 1991). That is why courts construing FIRREA's analogous provision concerning FDIC conservatorships and receiverships, 12 U.S.C. § 1821(j), have held it "only applies to a claim for injunctive relief against FDIC." *ECCO Plains, LLC v. United States*, 728 F.3d 1190, 1202 n.17 (10th Cir. 2013); *see also Nat'l Trust for Historic Pres. in U.S. v.*

*FDIC*, 995 F.2d 238, 241 (D.C. Cir. 1993) (noting "[t]he prohibition *against restraining the FDIC*" (emphasis added)), *as modified on other grounds*, 21 F.3d 469 (D.C. Cir. 1994); *Henrichs v. Valley View Dev.*, 474 F.3d 609, 614 (9th Cir. 2007) (FIRREA bar did not defeat jurisdiction because the "FDIC was not a party"). Treasury suggests no reason to give HERA's nearly identical provision its radical interpretation, there is no textual support for Treasury's view, and the absurdities that interpretation invites are reason enough to reject it. *See SEC v. Banner Fund Int'l*, 211 F.3d 602, 617 (D.C. Cir. 2000) (rejecting interpretation because it would "lead to absurd results"). Even accepting FHFA's argument that "Section 4617(f) exists to prevent . . . 'second-guessing' of the Conservator's decisions," FHFA Br. 29, questioning *Treasury's* statutory authority does not require this Court to "second-guess" FHFA's actions as conservator.[13]

### 2.    Section 4617(f) Does Not Bar The Claims Against FHFA.

a.    HERA's jurisdictional bar is inapplicable to Plaintiffs' claims that FHFA exceeded its statutory authority. By its terms, Section 4617(f) applies only where FHFA is acting within the scope of its statutory authority as conservator or receiver; it "is inapplicable when FHFA acts beyond the scope of its conservator power." *Cnty. of Sonoma v. FHFA*, 710 F.3d 987, 992 (9th Cir. 2013). Courts interpreting HERA agree on this point. *Id.*; *Leon Cnty. v. FHFA*, 700 F.3d 1273, 1278 (11th Cir. 2012). And their interpretations mirror the judicial treatment of Section 1821(j), which "does not bar injunctive relief when the FDIC has acted or proposes to act beyond, or contrary to, its statutorily prescribed, constitutionally permitted,

---

[13]  Unlike FHFA, Treasury does not claim that Section 4617(f) excuses it of the responsibility to compile and file an administrative record. *Compare* Administrative Record of the Department of Treasury (Dec. 17, 2013) (Dkt. 26), *with* Notice of Filing Document Compilation by Defs. FHFA and Edward DeMarco at 2 (Dec. 17, 2013) (Dkt. 27). If FHFA is correct—and it is not—Treasury's submission of an administrative record effectively concedes that Section 4617(f) does not bar claims against Treasury.

powers or functions." *Nat'l Trust for Historic Pres.*, 995 F.2d at 240; *see also James Madison Ltd.*, 82 F.3d at 1093 (same); *Freeman v. FDIC*, 56 F.3d 1394, 1398 (D.C. Cir. 1995) (same); *cf. Coit Independence Joint Venture v. Fed. Sav. & Loan Ins. Corp.*, 489 U.S. 561, 572 (1989). Indeed, even Treasury acknowledges that the jurisdictional bar does not apply where FHFA "'is acting clearly outside its statutory powers.'"  Treasury Br. 23 (quoting *Gross v. Bell Sav. Bank Pa SA*, 974 F.2d 403, 407 (3d Cir. 1992)).  FHFA's *ipse dixit* that the Sweep Amendment was an exercise of its statutory authority does not affect this analysis:  "FHFA cannot evade judicial scrutiny by merely labeling its actions with a conservator stamp." *Leon Cnty.*, 700 F.3d at 1278. As explained in Part III, *infra*, FHFA exceeded its conservatorship powers.

Rather than accept binding circuit precedent, Treasury and FHFA grab hold of *Gross*'s "clearly outside" language to argue, in effect, that courts are powerless to prevent FHFA from engaging in unlawful conduct, so long as FHFA's conduct is not *too obviously* unlawful. *See* Treasury Discovery Opp. 13-14; *see also* FHFA Discovery Opp. 19-20.  That is not the law. Indeed, the Supreme Court recently rejected any distinction between unlawful agency conduct and conduct beyond the scope of the agency's powers:  The "power to act and how [agencies] are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires." *City of Arlington v. FCC*, 133 S. Ct. 1863, 1869 (2013).  FHFA either acted unlawfully and exceeded its powers when it executed the Sweep Amendment, or it did not.  Before the Court can determine whether Section 4617(f) has any applicability to the claims in this lawsuit, it must first determine whether the Sweep Amendment exceeded FHFA's authority as a conservator.[14]

---

[14]  To the extent that Treasury argues that it benefits from a similarly flaccid mode of judicial review, Treasury "clearly" exceeded its authority under HERA by executing the Sweep Amendment two and a half years after its authority expired. *See infra* Part II.

FHFA and Treasury also argue that this Court cannot rule on Plaintiffs' APA claims because Section 4617(f) applies "even if the conservator is 'improperly or even unlawfully exercising' the conservatorship power."  *See* Treasury Discovery Opp. 14 (quoting *Ward v. RTC*, 996 F.2d 99, 103 (5th Cir. 1993)); *see also* FHFA Discovery Opp. 22.  They are wrong yet again. HERA does not prohibit courts from enjoining FHFA if it exceeds its statutory authority as conservator.  *See Cnty. of Sonoma*, 710 F.3d at 992; *Nat'l Trust for Historic Pres.*, 995 F.2d at 240.  Indeed, the source of this "rule," *Ward*, concerned a plaintiff's attempt to thwart a receiver's sale of a single property—an action clearly within a receiver's powers.  996 F.2d at 103-04; *see also infra* pp. 64-66 (explaining that a conservator's or receiver's authority to sell assets cannot sustain the Sweep Amendment).  *Ward*'s endorsement of "unlawful" conduct refers instead to the fact that HERA bars injunctions where the conservator—acting perfectly within its conservatorship authority—happens to violate a separate substantive law, as demonstrated by *Ward*'s citations to *National Trust for Historic Preservation* and *Gross*.  996 F.2d at 103-04.  In *National Trust for Historic Preservation*, the court held that an analogous jurisdictional bar (Section 1821(j)) prohibited a suit requiring the FDIC as receiver to comply with the National Historic Preservation Act.  995 F.2d at 238-39.  And in *Gross*, the plaintiffs sought recovery of pension assets on the ground that the Resolution Trust Corporation ("RTC") had violated the Employee Retirement Income Security Act of 1974.  974 F.2d at 405.  *See also Volges v. RTC*, 32 F.3d 50, 52 (2d Cir. 1994) (plaintiff could not enjoin sale of home in reliance on oral modification to contract).  By contrast, Defendants have violated HERA, the statute that gives FHFA its conservatorship powers in the first place—and, in doing so, violated the APA as well.[15]

---

[15]  FHFA's and Treasury's reliance on *Town of Babylon v. FHFA*, 699 F.3d 221 (2d Cir. 2012), is similarly misplaced.  The court's statement that "[a] conclusion that the challenged acts were directed to an institution in conservatorship and within the powers given to the conservator ends the inquiry," did not proffer a two-step test to

*(Cont'd on next page)*

That courts cannot prohibit FHFA from violating separate substantive laws while it validly exercises its conservatorship powers is itself a reason to construe FHFA's conservatorship powers narrowly.  On FHFA's view, so long as it is exercising its powers as conservator, no court could stop it from dumping toxic waste into the Potomac River.  That is an extraordinary power at odds with the "strong presumption that Congress intends judicial review of administrative action." *Bowen*, 476 U.S. at 670.  For that reason, FHFA's authority to violate other substantive laws—provided that it is acting within the scope of its "conservatorship powers"—should be understood to extend *only* to situations in which it is taking emergency action to preserve and conserve its ward's assets.  FHFA's more sweeping understanding of its own powers conflicts not only with the long-standing presumption in favor of judicial review of administrative action but also would, in effect, expand the carefully circumscribed and enumerated list of conservatorship powers that appears in Section 4617(b).

b.      FHFA's statutory powers as conservator do not include the power to act arbitrarily, capriciously, or irrationally, and therefore Section 4617(f) cannot preclude claims that FHFA acted arbitrarily and capriciously in agreeing to the Sweep Amendment.  Section 706(2) of the APA sets a single baseline for agency conduct, providing that agency conduct must both be "in accordance with law" and "statutory . . . authority, or limitations," and not "arbitrary" or "capricious."  5 U.S.C. § 706(2)(A), (C).  Indeed, there is no bright line distinguishing between the exercise of an agency's discretion and the limits of its statutory authority, as a prior exercise of agency discretion can limit the agency's statutory authority.  *See, e.g.*, *Verizon v. FCC*, 740

---

*(Cont'd from previous page)*

determine when Section 4617(f) applies.  *Id.* at 228.  That statement instead addressed the plaintiff's contention that FHFA "did not rely on powers as a conservator when issuing the Directive."  *Id.* at 227-28.  Plaintiffs here do not contend that FHFA exceeded its authority by failing to state that it had purported to act as the Companies' conservator, but rather that FHFA exceeded its powers as conservator under HERA.

F.3d 623, 649-50 (D.C. Cir. 2014) (explaining that the FCC's decision to classify broadband providers as "information services" rather than "telecommunications services" prohibited the agency from imposing regulations permitted only for "telecommunications services").  The APA thus establishes that no agency has authority to act arbitrarily and capriciously, and it is against that background that Plaintiffs' challenge to FHFA's authority must be evaluated.

Nothing in HERA suggests that, in granting FHFA conservatorship authority, Congress was granting FHFA the power to act in an arbitrary or capricious manner without regards to the limits of its conservatorship powers.  To the contrary, HERA spells out the powers and obligations of the conservator in some detail, 12 U.S.C. § 4617(b)(2), (d), and it grants FHFA rulemaking authority regarding the conduct of conservatorships, *id.* § 4617(b)(1); *see also* 12 C.F.R. pt. 1237.  In light of those statutory provisions, it cannot follow that Congress intended to grant FHFA authority to conduct its conservatorships arbitrarily and with caprice.  As FHFA itself observed in issuing its conservatorship regulations, "[a]s Conservator, FHFA is authorized to take such action as may be 'necessary to put the regulated entity in a sound and solvent condition' and 'appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity.'"  76 Fed. Reg. 35,724, 35,725 (June 20, 2011) (quoting 12 U.S.C. § 4617(b)(2)(D)).  Those powers are broad, as FHFA often observes, *see* FHFA Br. 20, 21, 27, but they do not embrace the power to act arbitrarily without regard to those congressionally sanctioned goals.  Section 4617(f) therefore cannot preclude judicial review of Plaintiffs' claims that FHFA's decision to enter into the Sweep Amendment was arbitrary and capricious.  Far from "restrain[ing] or affect[ing]" the "exercise" of FHFA's powers as conservator, Plaintiffs' APA claims operate only to ensure that FHFA is not operating

"above the law." *See Chem. Futures & Options, Inc. v. RTC*, 832 F. Supp. 1188, 1192 (N.D. Ill. 1993).

*     *     *

The Sweep Amendment has clearly injured Plaintiffs in a direct and personal way. Their right to an opportunity to benefit from the liquidation preferences in their preferred stock—once valuable—is now worthless, as the Sweep Amendment guarantees that the Companies will never build any capital even to repay Treasury's senior liquidation preference. Although Treasury and FHFA insist that this Court is powerless to redress Plaintiffs' injuries, HERA does not bar Plaintiffs' APA claims as to either Defendant. This Court must address the merits.

## II. The Sweep Amendment Exceeded Treasury's Statutory Authority.

HERA granted Treasury carefully circumscribed authority "to purchase any obligations and other securities issued by the [Companies]." 12 U.S.C. §§ 1455(*l*)(1)(A), 1719(g)(1)(A). Recognizing the dangers of unfettered governmental intrusion into the private market, Congress limited Treasury's authority in two important ways. First, Treasury's authority to purchase obligations or securities of the Companies expired on December 31, 2009. Second, before exercising its new power, Treasury was required to make an "emergency determination," based on consideration of several factors, including "the [Companies'] plan for the orderly resumption of private market funding or capital market access" and "the need to maintain the [Companies'] status as . . . private shareholder-owned compan[ies]." *Id.* §§ 1455(*l*)(1)(C)(iii), (v), 1719(g)(1)(C)(iii), (v).

Other than this limited purchasing authority, Treasury has no statutory authority to participate in the market for the Companies' securities. As of 2010, Treasury's authority as a market participant was limited to "hold[ing], exercis[ing] any rights received in connection with, or sell[ing] any obligations or securities purchased." *Id.* §§ 1455(*l*)(2)(D), 1719(g)(2)(D). As

concerns the Companies, Congress authorized Treasury to do *nothing else* after 2009.  That is because "[a] federal agency 'literally has no power to act . . . unless and until Congress confers power upon it.'"  *Douglas Timber Operators, Inc. v. Salazar*, 774 F. Supp. 2d 245, 257 (D.D.C. 2011) (quoting *Am. Library Ass'n v. FCC*, 406 F.3d 689, 698 (D.C. Cir. 2005)).

Treasury's argument that the Sweep Amendment was not a purchase of securities thus misses the key point:  The Sweep Amendment was authorized only if it was the "exercise" of a "right[ ] received in connection with . . . securities purchased."  12 U.S.C. §§ 1455(*l*)(2)(D), 1719(g)(2)(D).  It is not.  In any event, the transformative nature of the Sweep Amendment— effectively nationalizing the Companies—so fundamentally changed the nature of the securities held by Treasury that they must be regarded as new securities.  And Treasury's exchange of its fixed dividend and commitment fee rights for these new securities amply qualifies their acquisition as a purchase.  The Sweep Amendment violated Congress's express statutory command and must be vacated and set aside.  *See SEC v. Sloan*, 436 U.S. 103, 111-12 (1978) (holding that an agency exceeds its authority by acting after a statutorily prescribed date); *EME Homer City Generation L.P. v. EPA*, 696 F.3d 7, 23 (D.C. Cir. 2012) ("An agency may not . . . violate a statute's limits."), *cert. granted*, 133 S. Ct. 2857 (2013).

A.     **The Sweep Amendment Cannot Be Characterized As An Exercise Of Rights Under Treasury's Previously Purchased Preferred Stock.**

Treasury does not dispute that, unless the Sweep Amendment falls within the Secretary's authority "to hold, exercise any rights received in connection with, or sell, any obligations or securities purchased," Treasury lacked authority to enter into it.  *See* Treasury Br. 37, 39 (quoting 12 U.S.C. § 1719(g)(2)(D)).  Treasury's argument is that the Sweep Amendment was merely the "exercise" of its supposed "right" under Section 6.3 of the Purchase Agreements to amend those agreements.  Treasury Br. 39.  This litigation-inspired argument appears nowhere in

37

Treasury's contemporaneous analysis of the Sweep Amendment and, in any event, fails because Section 6.3's acknowledgment that the Agreements could be amended by a subsequent writing did not confer on Treasury a "right" that Treasury could "exercise."

A contractual "right" is an entitlement to certain performance from the counter-party, and it is "exercised" through unilateral action that does not require negotiation or mutual assent.  A "right" to act means "[a] legal, equitable, or moral entitlement to do something." *Oxford English Dictionary* Online (Dec. 2013) ("OED") (accessed Mar. 3, 2014) ("right, n.," definition 9d).  Similarly, "exercise"—in the context of contracts—means "[t]o implement the terms of; to execute," as in to "exercise the option to buy the commodities." *Black's Law Dictionary* 654 (9th ed. 2009).  A party has a contractual "right" when it "can initiate legal proceedings that will result in coercing" the other party to act.  1 E. Allan Farnsworth, *Farnsworth on Contracts* § 3.4, at 205 n.3 (3d ed. 2004).  Even if FHFA was likely to agree to proposed amendments, an arrangement that depends on a subsequent "mutual consent" of the parties "does not add to their rights." *United States v. Petty Motor Co.*, 327 U.S. 372, 380 n.9 (1946).

The Agreements, which of course were drafted against the background of HERA and its limitation on Treasury's authority, grant Treasury a suite of rights that it can exercise at its option.  Most significant among them is Treasury's right under the common-stock Warrant to purchase 79.9 percent of the Companies' common stock at a nominal price. *See* Treasury 0043.  The Warrant provides that "Treasury . . . is *entitled* to purchase at the Exercise Price . . . common stock" and "may be exercised in whole or in part at any time" by delivering a "Notice of Exercise."  Treasury 0041, 0043 (emphasis added).  The Notice of Exercise informs the Companies that the "undersigned hereby *elects* to purchase ____ shares" in the Companies under the terms of the Warrant.  Treasury 0050 (emphasis added).  The Warrant provisions of the

Agreements thus reflect that a "right" is an entitlement to performance that can be "exercised" at the right-holder's election.

Far from according Treasury an entitlement that it unilaterally may elect to exercise, Section 6.3 simply specifies how the Purchase Agreements may be amended: "by a writing executed by both of the parties." *See* Treasury 0027-0028. This type of exclusion of oral modifications is a standard feature of most sophisticated contracts. *See, e.g.*, 10 *Williston on Contracts* § 29:43 (4th ed. 2013). Parties can always agree to change a contract. *See Beatty v. Guggenheim Exploration Co.*, 122 N.E. 378, 381 (N.Y. 1919) (Cardozo, J.). But the fact that the contract recognizes the parties' ability to amend it does not accord Treasury any entitlement to do so unilaterally. Like the underlying contract, any amendments require mutual assent. *See Stanford Hosp. & Clinics v. NLRB*, 370 F.3d 1210, 1214 (D.C. Cir. 2004) (referencing need "'to demonstrate mutual assent' to modification of agreement" (quoting *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 783 (2d Cir. 2003))). As a party to a contract, Treasury could not coerce the other party, FHFA, to agree to an amendment.[16] Treasury's ability to seek FHFA's assent to an amendment thus cannot be construed as a "right" Treasury received in connection with its purchase of the Companies' securities, and the Sweep Amendment accordingly cannot be construed as the "exercise" of such a "right."

If Treasury were correct that its continuing authority to exercise rights received in connection with the Agreements embraced the authority to amend those Agreements, Congress's limitations on Treasury's purchasing authority quickly could be nullified. On this view of Treasury's continuing authority, although Treasury no longer has authority to purchase securities

---

[16]  Indeed, doing so would violate HERA. *See* 12 U.S.C. § 4617(a)(7) ("When acting as conservator or receiver, [FHFA] shall not be subject to the direction or supervision of any other agency of the United States.").

in the Companies, Treasury could agree with FHFA to amend the terms of the Agreements to provide for the Companies to issue an additional million shares of senior preferred stock to Treasury, or to change the terms of the Warrant so that Treasury has a right to receive 99.9 percent of the Companies' common stock, or to convert Treasury's preferred stock into a 100-year, zero-coupon bond.  And on Treasury's view, so long as these measures were styled as amendments, they would constitute only the "exercise" of a "right" Treasury received to seek amendments of the Agreements, rather than the exercise of purchasing authority, which would require "emergency determination[s]," consideration of statutorily prescribed factors, and observance of HERA's sunset date.

Treasury did not claim to "exercise" a "right" when it executed the Second Amendment, further undermining its litigation-inspired rationale for the Sweep Amendment.  Executed in December 2009, the Second Amendment made several changes to the Purchase Agreements:  It increased Treasury's funding commitment from a fixed amount to a three-year unlimited draw; it increased the maximum size of the Companies' investment portfolios; and it delayed for one year the setting of the Periodic Commitment fee.  *See* Treasury 0175, 0189-0194.  This Amendment did not grant Treasury any additional securities.  Yet Treasury made a "Determination"—which is nearly identical to the one it executed in September 2008 when it first purchased the Treasury Stock—making the required findings and addressing the considerations set forth in HERA. *Compare* Treasury 0187-0188 (Dec. 24, 2009 "Determination"), *with* Treasury 0001-0002 (Sept. 7, 2008 "Determination").  This act by itself suggests that Treasury believed that its authority to "amend" the Purchase Agreements was coextensive with its power to "purchase" new securities. If there were any doubt as to this point, Treasury's "Determination" explained that it made findings and addressed the considerations because the Second Amendment not only "modif[ied]

the Treasury's funding commitment," but also because it "*amend*[*ed*] *the terms of the Original Agreements*."  Treasury 0188 (emphasis added).  Thus, prior to the Sweep Amendment, Treasury believed that "amendments" to the Purchase Agreements were akin to purchases requiring findings and considerations, rather than exercises of rights that it may execute at its whim.

Given that Treasury itself previously regarded much less significant amendments to the Agreements to be exercises of HERA's authority requiring an emergency determination and consideration of statutorily prescribed factors, this Court should reject Treasury's boundless construction of the clause empowering it to exercise rights received in connection with the securities.  Treasury's construction would allow it to circumvent HERA's sunset provision with ease, styling every action as an "exercise" of its "right" to "amend" the Agreements.  The Sweep Amendment was not the exercise of a right Treasury received in connection with the Agreements, and accordingly it must be vacated and set aside.

**B.      The Sweep Amendment Constitutes A Purchase Of The Companies' Obligations Or Securities That Is Expressly Barred By HERA's Sunset Provision.**

There was a good reason Treasury treated the First and Second Amendments to the Purchase Agreements as exercises of its purchasing authority.  Securities law and Treasury's own IRS regulations both recognize that an amendment that substantially changes the economic substance of a security is, in fact, an exchange for a new security.  Under these tests, the Sweep Amendment plainly created a new security.  And there can be no doubt that Treasury "purchased" the new security, giving in exchange an old security that provided for a fixed dividend and a commitment fee.  FHFA 0005 (¶ 9).  So, even if the Sweep Amendment validly could be characterized as Treasury's exercise of a right granted to Treasury in the Companies' senior preferred stock—and it cannot—it still would constitute a purchase of securities expressly barred by HERA's sunset provision.

41

Courts applying federal securities law long have recognized that amendments that fundamentally change the nature of the security result in a new security, and the law treats such a transformation as a purchase of the new security.  For example, plaintiffs alleging fraud under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), must establish that they have either purchased or sold a security.  *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 737-38 (1975).  Courts treat amendments to existing securities as purchases of new securities for purposes of Section 10(b) when the amendment brings about "'such a significant change in the nature of the investment or in the investment risks as to amount to a new investment.'"  *Gelles v. TDA Indus., Inc.*, 44 F.3d 102, 104 (2d Cir. 1994) (quoting *Abrahamson v. Fleschner*, 568 F.2d 862, 868 (2d Cir. 1978)); *see also Sacks v. Reynolds Sec., Inc.*, 593 F.2d 1234, 1240 (D.C. Cir. 1978); *Northland Capital Corp. v. Silver*, 735 F.2d 1421, 1427 (D.C. Cir. 1984); *Houlihan v. Anderson-Stokes, Inc.*, 434 F. Supp. 1330, 1337-39 (D.D.C. 1977).  This "fundamental change" analysis focuses on the "economic reality of the transaction," *Keys v. Wolfe*, 709 F.2d 413, 416-17 (5th Cir. 1983), including the risk profile of the investment, *see 7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*, 38 F.3d 211, 229 (5th Cir. 1994) (plaintiff exchanged "units in a financially solvent limited partnership" for stock in a financially unstable corporation); *Ingenito v. Bermec Corp.*, 376 F. Supp. 1154, 1178 (S.D.N.Y. 1974) (subsequent amendments to notes including "extended payment terms and waiver and estoppel provisions").  Where a security undergoes a fundamental change, holders whose securities have been so altered are treated as having purchased the new security.  *See SEC v. Nat'l Sec., Inc.*, 393 U.S. 453, 467 (1969) ("[A]n alleged deception has affected individual shareholders' decisions in a way not at all unlike that involved in a typical cash sale or exchange.").[17]

---

[17]  Treasury criticizes the fundamental change doctrine, observing that some courts have "declined to adopt" it.

*(Cont'd on next page)*

What is more, Treasury's own taxation regulations similarly recognize that a substantial change in a security results in an exchange of an old security for a new one. To prevent evasion of taxes due upon the sale of a security, the IRS treats any "significant modification" to a debt security, such that the new security "differs materially either in kind or in extent" from the old security, as a sale of the old security. 26 C.F.R. § 1.1001-3(b). Under the regulations, a modification is "economically significant" if it alters the security's annual yield by "1/4 of one percent" or "5 percent of the annual yield of the unmodified instrument (0.5 x annual yield)," or if it converts a debt security into an equity security. *Id.* § 1.1001-3(e)(1), (2)(ii), (5).

Under these standards, the Sweep Amendment plainly resulted in a new security. Contrary to Treasury's protestation, Treasury Br. 42 n.16, this was no mere modification. "'Modify' . . . connotes moderate change." *MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218, 228 (1994). Unlike the First and Second Amendments to the Agreements, the Sweep Amendment required the Companies to amend the underlying Treasury preferred stock certificates, meaning Treasury literally was issued new securities as a result of the Sweep Amendment. *Compare* Treasury 0165-0169 (First Amendment amending only terms of Purchase Agreements), *and* Treasury 0189-0194 (Second Amendment amending only terms of Purchase Agreements), *with* Treasury 4335-4337 (§§ 2-3) (Sweep Amendment amending the "Senior Preferred Stock"). And

---

*(Cont'd from previous page)*

Treasury Br. 41 (citing *Katz v. Gerardi*, 655 F.3d 1212, 1221 (10th Cir. 2011)). But this Court, following the D.C. Circuit, has applied versions of it for decades. *See Sacks*, 593 F.2d at 1240; *Northland Capital*, 735 F.2d at 1427; *Houlihan*, 434 F. Supp. at 1337-39. The doctrine similarly is applied under the Securities Act of 1933, with a "sale" occurring when a "modification in the terms of a security" makes "a fundamental change in the nature of the investment it represents." 1 A.A. Sommer, Jr., *Federal Securities Act of 1933* § 2.02 (2013); 2 Louis Loss et al., *Securities Regulation* 1149 (4th ed. 2007) (when "the rights of security holders have been so substantially affected by the particular change in the terms of the outstanding security[,] . . . it becomes a new security" for purposes of the Securities Act). It also has been applied under the Securities Litigation Uniform Standards Act of 1998, which preempts state-law actions for fraud "in connection with [the] purchase or sale" of a security. *See Sofonia v. Principal Life Ins. Co.*, 465 F.3d 873, 878 (8th Cir. 2006). Even the Tenth Circuit case invoked by Treasury did not reject the doctrine; it held only that the plaintiff could not be viewed as a purchaser because he never came to own the security he claimed was new. *Katz*, 655 F.3d at 1223.

looking to the "economic reality of the transaction," *Keys*, 709 F.2d at 416-17, the Sweep

Amendment resulted in an increase in dividends of more than ***$110 billion in year one***.

Treasury's annual yield soared from 10 percent of the liquidation preference to almost 70 percent

of the preference—many times more than the IRS's test for economic significance.

      If that were not enough, the fact that the Sweep Amendment transformed Treasury's

stock from a fixed-rate dividend investment to a variable dividend would be an independently

sufficient basis for finding that the Sweep Amendment resulted in a new security under either the

securities law, *see 7547 Corp.*, 38 F.3d at 229, or IRS regulations, *see* 26 C.F.R.

§ 1.1001-3(e)(5).  Indeed, the Treasury Stock now bears all the salient characteristics of

perpetual common stock.  Preferred shares "generally give the holder a claim to a fixed dividend

that must be satisfied before any dividend is paid on common shares. . . .  In contrast to common

shares, preferred shares do not provide an unlimited claim on the corporation's residual

earnings . . . ."  11 *Fletcher Cyclopedia of the Law of Corporations* § 5283 (2011 rev.

vol.).  Under the Sweep Amendment, by contrast, Treasury takes virtually all of the Companies'

net worth in perpetuity—but only their net worth; no fixed dividends, no commitment fee.  So

there is no longer any lower-ranked equity over which Treasury's stock could take "priority."

*See Folk on Delaware General Corporation Law* § 151.04.  The Sweep Amendment thus

effected "'such significant change in the nature of the investment [and] in the investment risks as

to amount to a new investment.'"  *Gelles*, 44 F.3d at 104 (quoting *Abrahamson*, 568 F.2d at

868).

      One need not rely on the fundamental change doctrine to establish that Treasury in fact

"purchased" this new investment.  Treasury points to a dictionary definition of "purchase" to

mean "to acquire in exchange for payment in money or an equivalent; to buy," and argues that

because the Sweep Amendment "did not commit additional funds from Treasury ([or] increase the amount of [Treasury's] liquidation preference)," there could be no purchase.  Treasury Br. 38 (citing OED (3d ed. Sept. 2007) (viewed online)).  The securities laws again belie Treasury's position, as the Securities Act of 1933 makes clear that exchanges of securities "by the issuer with its existing security holders" "where no . . . remuneration is paid" would be regulated sales of securities but for a statutory exemption that is inapplicable here.  15 U.S.C. § 77c(a)(9).  In other words, Congress clearly does not believe that sales or purchases are confined to cash transactions.

Moreover, that Treasury did not commit additional funds to obtain the rights to all the Companies' future profits is beside the point.  As FHFA explains, the Sweep Amendment "transfer[red] an Enterprise asset—potential future profits—to Treasury in exchange for relief from an obligation—10% dividends," FHFA Br. 27, as well as relief from the obligation to pay Treasury the periodic Commitment Fee.  Both the rights to a fixed dividend and the Commitment Fee are "equivalent[s]" to money because each was payable in cash, and Treasury certainly could have sold either or both of them on the open market for cash.  *See Nat'l Sec., Inc.*, 393 U.S. at 467 (exchange of shares is a "purchase"); *cf. McLaughlin v. CIR*, 113 F.2d 611, 613 (7th Cir. 1940) (a financial instrument is "equivalent to cash" if the instrument may be "exchange[d], either for cash, or for property of value substantially equivalent to the face of the instrument").  Thus, even Treasury's cherry-picked definition of "purchase" is satisfied:  It "acquired" new rights in the Companies using the "equivalent" of money.

Treasury asserts repeatedly that its decision in 2008 to provide the Companies with funding somehow justifies its 2012 decision to sweep the Companies' net worth every quarter until the last syllable of recorded time.  Treasury Br. 3, 15.  Treasury provides no support for this

proposition, and it is entirely erroneous.  The financial support Treasury provided—no matter

how substantial—does not authorize Treasury to violate the strict limits Congress imposed on

Treasury's investment authority in HERA.  And the factual premise on which the argument is

based—that private investors would have received nothing if the Companies had been liquidated

in 2008—even if true (and it is quite doubtful) is undone by the fact that the government did not

put the Companies into receivership, but instead chose the path of conservatorship, investing

funds into the Companies to restore them to a sound and solvent condition and preserve and

conserve their assets.[18]

Treasury thus purchased securities in the Companies after 2009, in direct contravention

of Congress's express command in HERA and in violation of the APA.  That purchase

accordingly must be vacated and set aside.  *See Sloan*, 436 U.S. at 111-12.

## III.   FHFA Lacked Authority To Agree To The Sweep Amendment On The Companies' Behalf.

### A.   FHFA's Failure To Produce An Administrative Record Deprives The Court Of A Sufficient Basis To Uphold FHFA's Entry Into The Sweep Amendment.

The APA requires an agency to produce an administrative record so that the reviewing

court can evaluate the agency's decisionmaking process to ensure that the process, its rationales,

and its conclusions conform to applicable law and are not arbitrary and capricious.  FHFA,

however, filed no administrative record in this case, claiming that it was not required to create

one.  *See* Dkt. No. 27, at 2.  Instead, the agency filed a "Document Compilation," headlined by a

---

[18]  In this sense, the conservatorship closely resembles a reorganization under the bankruptcy code, 11 U.S.C. § 101 *et seq.*  Similarly, Treasury resembles a lender to a reorganizing bankruptcy debtor.  Such lenders may receive priority over other creditors, but the overall terms of the financing must be fair and reasonable, benefitting the debtor and its stakeholders.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 39 (Bankr. S.D.N.Y. 1990) ("[A] proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate."); *In re Tenney Village Co.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989) (refusing to approve debtor financing because constraints of financing, including requirement that all proceeds from asset sales be remitted to lender, "pervert[ed] the reorganization process"); *see also* 11 U.S.C. § 364.

declaration created only for purposes of this litigation, 16 months after the Sweep Amendment

was implemented.  *See* FHFA 0001-0010.  FHFA is asking this Court evaluate its decision with

cherry-picked documents and *post hoc* rationalizations.  That is not permitted.  *See Citizens to*

*Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971) ("These affidavits [submitted to the

district court] were merely 'post hoc' rationalizations, which have traditionally been found to be

an inadequate basis for review[,] [a]nd [which] clearly do not constitute the 'whole record'

compiled by the agency." (citations omitted) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87

(1943))), *overruled on unrelated grounds by Califano v. Sanders*, 430 U.S. 99 (1977).  It is the

agency's actual rationales that control, and FHFA provides virtually no contemporaneous

documents that substantiate its actual decisionmaking.  The Court should vacate the Sweep

Amendment on the present record; it certainly cannot sustain it.

> Well-established standards govern administrative records in APA cases:

> Judicial review of agency action under the APA is generally confined to the
> administrative record.  The record is comprised of those documents that were
> before the administrative decision maker.  A court should consider neither more
> nor less than what was before the agency at the time it made its decision.  It is the
> agency's responsibility to compile for the court *all information it considered*
> *either directly or indirectly*.

*Marcum v. Salazar*, 751 F. Supp. 2d 74, 78 (D.D.C. 2010) (Lamberth, C.J.) (citations and

internal quotation marks omitted) (emphasis added).

FHFA claims that it was "not required to . . . create or maintain an administrative record

relating to the execution of the [Sweep] Amendment because FHFA took that action expressly in

its capacity as Conservator."  FHFA Discovery Opp. 28.  FHFA is wrong.  FHFA is a federal

agency.  *See* 12 U.S.C. § 4511(a).  Under the Federal Records Act, "[t]he head of each Federal

agency shall make and preserve records containing adequate and proper documentation of the . . .

decisions . . . and essential transactions of the agency and designed to furnish the information

necessary to protect the legal and financial rights . . . of persons directly affected by the agency's activities."  44 U.S.C. § 3101; *see also Armstrong v. Exec. Office of President, Office of Admin.*, 1 F.3d 1274, 1278 (D.C. Cir. 1993).  The Federal Records Act excludes some governmental actors from its recordkeeping requirements, but FHFA is not one of them.  44 U.S.C. § 2901(14) ("the term 'Federal agency'" excludes only "the Supreme Court, the Senate, the House of Representatives, and the Architect of the Capitol").  Similarly, HERA exempts FHFA from some legal requirements when acting as conservator, *see* 12 U.S.C. § 4617(j), but recordkeeping is not one of them.  FHFA was thus required to document its decision to execute the Sweep Amendment.

FHFA's substitute "Document Compilation" is insufficient for at least two reasons:  (1) it allows FHFA to cherry-pick documents and disclose only the ones that further its legal contentions; and (2) it transparently relies on *post hoc* rationalizations, *see* FHFA 0001-0010, 4051-4087.  Without a contemporaneous administrative record, this Court cannot sustain FHFA's decision to enter into the Sweep Amendment.

An agency that does not compile a complete record of contemporaneous documents may be tempted to "exclude[ ] from the record evidence adverse to its position."  *Kent Cnty., Del. Levy Court v. EPA*, 963 F.2d 391, 396 (D.C. Cir. 1992) (citation omitted); *see also Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 245 (D.C. Cir. 2008) (Tatel, J., concurring) ("reviewing less than the full administrative record might allow a party to withhold evidence unfavorable to its case" (citation and brackets omitted)).  Such skewed records thwart judicial review:  "The fact that [the agency] presented documents that seemed to support the rationality of [its] actions does not mean that the same conclusion would have been reached if the Court had been aware of other information that was before the agency."  *Dopico v. Goldschmidt*, 687 F.2d

644, 654 (2d Cir. 1982).  For APA review to be more than a judicial rubber stamp, the agency must disclose all documents relied upon, including adverse documents.

Recognizing this, the APA requires a court to "review the whole record."  5 U.S.C. § 706. That "whole record" includes everything that was before the agency at the time of the decision. *See, e.g.*, *Citizens to Pres. Overton Park*, 401 U.S. at 420 (judicial review of whether "the Secretary acted within the scope of his authority" is "to be based on the full administrative record that was before the Secretary at the time he made his decision"); *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984) ("If a court is to review an agency's action fairly, it should have before it neither more nor less information than did the agency when it made its decision.").  Yet FHFA in this case has not filed the "whole record" with this Court.  Indeed, FHFA has admitted that the record before the Court is incomplete, because the agency failed to "create[ ] or maintain[ ] an administrative record relating to the execution of the Sweep Amendment."  Dkt. No. 27, at 2; *see also* FHFA Discovery Opp. 28 ("[T]he FHFA Defendants were not required to—and did not—create or maintain an administrative record relating to the execution of the Third Amendment because FHFA took that action expressly in its capacity as Conservator.").  FHFA's failure to maintain an administrative record hardly can allow FHFA to substitute a partial "document compilation" of its choosing.

FHFA now claims that its Document Compilation is "complete," asserting that "no documents considered by FHFA in connection with the decision to execute the [Sweep] Amendment were *excluded* from the Document Compilation."  FHFA Discovery Opp. 29 (emphasis added).  This is a remarkable claim.  First, because its Document Compilation does not contain any internal FHFA documents memorializing the agency's independent assessment of the Sweep Amendment, it strongly implies that FHFA did not rely on a single agency

49

document in deciding to enter into the highly consequential Sweep Amendment.  Second, when combined with FHFA's admission that it has not maintained an administrative record, the assertion that no documents were "excluded" is not the same as an assertion that the record is a complete set of documents FHFA relied upon in deciding to execute the Sweep Amendment. For example, there is no indication that FHFA kept, or recorded, a complete set of contemporaneous documents.  This is plainly insufficient.  By its own admission, FHFA's patchy Document Compilation does not reveal "all information it considered either directly or indirectly" in executing the Sweep Amendment.  *Marcum*, 751 F. Supp. 2d at 78.  And merely producing the documents that, in its judgment, "reflect[ ] the considerations and views FHFA as Conservator took into account in connection with execution of the [Sweep] Amendment," *see* FHFA Discovery Opp. 29, is simply inconsistent with the requirement that APA review be based on the "whole record."  FHFA's refusal to produce the "whole record" justifies vacatur of the Sweep Amendment.

Moreover, while the *Chenery* doctrine holds that "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based," *Chenery*, 318 U.S. at 87, the story that emerges from FHFA's "Document Compilation" largely comes from a new declaration by a FHFA employee, written mid-litigation.  *See* FHFA 0001-0010.  Courts do not accept such "*post hoc* rationalizations for agency action."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983); *see also Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) (same).  "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."  *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

Without an appropriate administrative record, FHFA's attempted defense of the Sweep Amendment must fail.

**B.      FHFA Violated HERA By Acting At Treasury's Direction.**

To ensure that the Companies and their billions of dollars of assets may not be hijacked by other federal agencies with their own policy priorities, Congress mandated that when FHFA acts as a conservator, it "shall not be subject to the direction or supervision of any other agency of the United States." 12 U.S.C. § 4617(a)(7). But the Administrative Record—including FHFA's "Document Compilation"—shows that Treasury invented the net-worth sweep concept with no input from FHFA, and it chose to pursue that arrangement with no apparent concern that FHFA might not consent to such a one-sided deal. *See* Treasury 3775-3802, 3833-3862, 3883-3894, 3895-3903 (Treasury presentations). Indeed, even FHFA's litigating declaration does not claim that FHFA attempted to negotiate a more favorable arrangement with Treasury on the Companies' behalf or undertook its own independent analysis of the probable effects of the Sweep Amendment. *See* FHFA 0001-0010. The only reasonable inference is that FHFA considered itself bound to do whatever Treasury ordered, contrary to HERA, and in violation of the APA.[19]

**C.      In Agreeing To The Sweep Amendment, FHFA Violated The APA By Acting In Excess Of Its Statutory Authority As Conservator.**

Since 2008, FHFA has operated the Companies as their conservator. This formal legal status requires FHFA to "preserve and conserve" the Companies' assets to "put the [Companies]" in a "sound and solvent condition." 12 U.S.C. § 4617(b)(2)(D). These statutory duties are in keeping with the well-established and understood functions of conservatorships

---

[19] Even more evidence supporting this conclusion is likely to be disclosed if the Court orders Defendants to supplement the inadequate administrative records they have submitted thus far.

generally.  Yet, far from preserving or conserving the Companies' assets and ensuring that the Companies remain "solvent," the Sweep Amendment dissipates the Companies' assets by giving away every cent of their net worth to Treasury.  By ignoring its statutory charge, FHFA exceeded its authority.  *Cook v. FDA*, 733 F.3d 1, 5, 11 (D.C. Cir. 2013) (FDA's failure to comply with its "mandatory duties" rendered its decision "'not in accordance with law'" and in violation of the APA).

1.      **As Conservator Of The Companies, FHFA Is Obligated To Preserve And Conserve Their Assets With The Aim Of Rehabilitating The Companies.**

When Congress enacts a statute using "a well-established term," courts presume that "Congress intended the term to be construed in accordance with pre-existing . . . interpretations." *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998).  Conservatorship is among those "well-established term[s]" and has been employed frequently in the context of financial regulation.  As the Congressional Research Service has explained, "a conservator is appointed to operate the institution, conserve its resources, and restore it to viability."  David H. Carpenter & M. Maureen Murphy, Cong. Research Serv., RL34657, *Financial Institution Insolvency: Federal Authority Over Fannie Mae, Freddie Mac, and Depository Institutions* 5 (2008), *available at* http://fpc. state.gov/documents/organization/110098.pdf.  This authority stands in contrast to that of a "receiver," which "is appointed to liquidate the institution, sell its assets, and pay claims against it to the extent available funds allow."  *Id.*

Courts, regulators, and commentators have emphasized that a conservator's purpose is to revive a troubled entity.  Since the Great Depression, the Court of Appeals for the D.C. Circuit has explained that Congress granted the Comptroller of the Currency authority to place a bank in conservatorship where the bank's "situation was not so hopeless as then to require the appointment of a receiver" because "there was a prospect that the bank . . . might, under [the

conservator's] direction and control, later reopen and resume its corporate functions." *Davis Trust Co. v. Hardee*, 85 F.2d 571, 572-73 (D.C. Cir. 1936).  Case law continues to emphasize that conservatorship is intended to operate entities so that they "might someday be rehabilitated." *Del E. Webb McQueen Dev. Corp. v. RTC*, 69 F.3d 355, 361 (9th Cir. 1995); *see also MBIA Ins. Corp. v. FDIC*, 708 F.3d 234, 236 (D.C. Cir. 2013) (conservatorship is intended to "'carry on the business of the institution'").  The FDIC also espouses this view.  *See* FDIC, *Managing the Crisis:  The FDIC and RTC Experience* 216 (1998), *available at* http://www.fdic.gov/ bank/historical/managing/history1-08.pdf ("A conservatorship is designed to operate the institution for a period of time in order to return the institution to a sound and solvent operation.").  And commentators explain that a conservatorship's "basic statutory assumption is that the institution may well return to the transaction of its business."  3 Michael P. Malloy, *Banking Law and Regulation* § 11.3.4.2 (2011); *see also* Donald Resseguie, *Banks & Thrifts: Government Enforcement & Receivership* § 11.01 (2013) ("The intent of conservatorship is to place the insured depository institution in a sound and solvent condition, rather than liquidating the institution as in the case of a receivership.").

This goal—rehabilitation with a view to a return to viability as a going concern—informs the scope of a conservator's power.  For example, this Court concluded that the FDIC as conservator was not required to exercise its statutory authority to repudiate contracts "immediately" upon placing the entity in conservatorship because "[t]his would put the conservator 'in the untenable position of trying to operate the business as an ongoing concern with one hand, while at the same time calculating the . . . repudiation issue as if it were shutting the business down.'"  *MBIA Ins. Corp. v. FDIC*, 816 F. Supp. 2d 81, 96-97 (D.D.C. 2011) (quoting *RTC v. CedarMinn Bldg. Ltd. P'ship*, 956 F.2d 1446, 1454 (8th Cir. 1992)), *aff'd*, 708

F.3d 234 (D.C. Cir. 2013).  The Fifth Circuit explained that "a conservator *only* has the power to take actions necessary to restore a financially troubled institution to solvency" and that it cannot "as a matter of law" take actions reserved to a receiver.  *McAllister v. RTC*, 201 F.3d 570, 579 (5th Cir. 2000) (emphasis added); *see also id.* ("Expenses of liquidation cannot be incurred by a conservator as a matter of law, as liquidation is not a function of the conservator.").  Thus, when exercising their incidental powers, conservators must always act consistent with their overarching goal of rehabilitating their charges.

A conservator's inherently optimistic outlook contrasts with the inherently pessimistic outlook of a receiver.  Receivers act to "liquidat[e] [an] institution and wind[ ] up its affairs."  Carpenter & Murphy, *supra*, at 6.  During this process of liquidation, receivers sell the financial institution's assets and "distribute[ ]" the proceeds to creditors with claims against the failed entity.  *See* John W. Head, *Lessons from the Asian Financial Crisis:  The Role of the IMF and the United States*, 7 Kan. J.L. & Pub. Pol'y 70, 76-78 (1998) ("[T]he bank's assets would be sold and the proceeds from that sale would be distributed among depositors and other selected creditors."); *Freeman*, 56 F.3d at 1401 (Receivership "'ensure[s] that the assets of a failed institution are distributed fairly and promptly among those with valid claims against the institution.'").  As this distribution process leaves the receivership entity with no remaining assets, receivership requires a "determination . . . that the institution is not viable."  Carpenter & Murphy, *supra*, at 6.  Indeed, "[p]lacing a bank in receivership acknowledges that restoration is impossible."  Head, *supra*, at 77.

Both HERA's text and FHFA's regulatory constructions of its conservatorship powers under HERA embrace an optimistic outlook.  HERA requires FHFA as conservator to "put the [Companies] in a sound and solvent condition" and "preserve and conserve [their] assets and

property." 12 U.S.C. § 4617(b)(2)(D).  FHFA's regulations explain that these statutory powers "charge[ ] [FHFA] with rehabilitating the regulated entity." 76 Fed. Reg. at 35,727; *id.* ("the essential function of a conservator is to preserve and conserve the institution's assets"); *id.* at 35,730 ("A conservator's goal is to continue the operations of a regulated entity, rehabilitate it and return it to a safe, sound and solvent condition.").  This is consistent with FHFA's statement at the outset of the conservatorships that FHFA's mission was to "return[ ] the entities to normal business operations," FHFA 0016, and with its  February 2010 letter to Congress explaining that FHFA's "only" legally authorized option with respect to the Companies' futures would be "to reconstitute" them, FHFA 1185.  Indeed, FHFA's own regulations generally prohibit distributions of capital such as dividends precisely because they would "deplete the entity's conservatorship assets" and therefore "would be inconsistent with the agency's statutory goals, as they would result in removing capital at a time when the Conservator is charged with rehabilitating the regulated entity." 76 Fed. Reg. at 35,727.  Even FHFA's briefing in this litigation has emphasized that a conservator must act to "preserv[e] the capital available to the [Companies]."  FHFA Discovery Opp. 17; *see also* FHFA Br. 22-23.[20]

## 2. The Sweep Amendment Exceeded FHFA's Powers As The Companies' Conservator.

The Sweep Amendment contravenes FHFA's basic obligation to preserve and conserve the Companies' assets, and to place the Companies in a sound and solvent condition, with the goal of rehabilitating them.

---

[20] Treasury argues, puzzlingly, that FHFA had no obligation to "preserve and conserve" the Companies' assets because HERA "expresse[s]" this power "in permissive, not mandatory, terms."  Treasury Br. 27-28; *see also* 12 U.S.C. § 4617(b)(2)(B)(iv) ("The Agency may, as conservator . . . preserve and conserve . . . .").  This argument lacks merit.  Here, FHFA's own conservatorship regulations recognize that preserving and conserving assets is its "statutory charge" as a conservator.  76 Fed. Reg. at 35,727.  While use of the word "may" "usually implies some degree of discretion," it can have a mandatory meaning when "the structure and purpose of the statute" dictate as much.  *See United States v. Rogers*, 461 U.S. 677, 706 (1983).

First, the Sweep Amendment depletes the Companies' capital, a consequence that FHFA has elsewhere determined is "inconsistent with [its] statutory goals."  76 Fed. Reg. at 35,727. Rather than allow the Companies to build up their capital, the Sweep Amendment places the Companies in an untenable position, siphoning off every dollar earned by the Companies into Treasury's coffers, precluding them from strengthening along with the improving economy. Indeed, Treasury made clear at the time of the Sweep Amendment that its very purpose was to prevent the Companies from "retain[ing] profits" or "rebuild[ing] capital."  2012 Press Release. This perpetual and complete giveaway to Treasury is certainly more offensive to the Companies' chances of rehabilitation than other capital distributions that FHFA has prohibited altogether. *See* 12 C.F.R. § 1237.13 (prohibiting payment of securities litigation claims).  And, even though FHFA's own regulations require FHFA's Director to explicitly authorize any capital distribution, *id.* § 1237.13(a), FHFA's contemporaneous documentation does not disclose any such authorization here, *see* FHFA 4047.

Second, the Sweep Amendment guarantees that the Companies will never resume "normal business operations."  "Normal" companies recovering from financial distress save their profits to withstand the next downturn, as Treasury recognized when it waived the Periodic Commitment Fee in 2011.  *See* Treasury 2359 ("Even if the [Companies] generated positive net income after dividends . . . that income could be used to offset potential draws in future quarters.").  Indeed, FHFA agreed to the original Purchase Agreements, and First and Second Amendments thereto, in order to "enhance the probability of both Fannie Mae and Freddie Mac ultimately repaying amounts owed" to Treasury and "resum[ing] independent operations." Treasury 0184.  But, after the Sweep Amendment, the Companies' opportunities to operate as normal, private companies exist in name only because the Sweep Amendment depletes every

dollar of their net worth, depriving them of the "future income flows" that represent a company's "fundamental value." *See Tenn. Gas Pipeline Co. v. FERC*, 926 F.2d 1206, 1208 n.2 (D.C. Cir. 1991). Indeed, the Companies themselves have described the Sweep Amendment as a "risk factor" because it "do[es] not allow [them] to build capital reserves." *See* Fannie Mae Offering Circular, Universal Debt Facility 11 (May 14, 2013), *available at* http://www.fanniemae.com/ resources/file/debt/pdf/tools-resources/519479ACL.pdf. FHFA has clearly and impermissibly abandoned its conservatorship duty to "rehabilitate" the Companies and has instead converted them into government functionaries, prohibited from "retain[ing] profits" or "rebuild[ing] capital." *See* 2012 Press Release; 76 Fed. Reg. at 35,727, 35,730.

Third, the government has made clear that, far from rehabilitation, the Sweep Amendment is aimed at winding down the Companies' operations. FHFA told Congress that its goal was to "wind down" the Companies and prepare for "a housing industry . . . without Fannie Mae and Freddie Mac." FHFA, *2012 Report to Congress* 13 (June 13, 2013), *available at* http:// www.fhfa.gov/webfiles/25320/FHFA2012_AnnualReport.pdf. FHFA's Acting Director tied the Sweep Amendment to this goal, telling Congress that the Sweep Amendment was part of the Administration's "clear" policy of "wind[ing] down the [Companies]." Statement of Edward J. DeMarco Before the U.S. Senate Committee on Banking, Housing and Urban Affairs 3 (Apr. 18, 2013), *available at* http://fhfa.gov/webfiles/25114/DeMarcoSenateBankingTestimony41813.pdf. As then Acting Director DeMarco explained it, the Sweep Amendment "reinforce[d] the notion that the [Companies] will not be building capital as a potential step to regaining their former corporate status." *Id.*[21] Treasury has been even more candid. At the time of the Sweep

---

[21] *See also* Remarks of Edward J. DeMarco, *Getting Our House in Order* 6 (Oct. 24, 2013), *available at* http://www.fhfa.gov/webfiles/25634/ZillowspeechFinal102413.pdf (explaining that FHFA is "winding up the affairs of Fannie and Freddie").

Amendment, Treasury explained that the Sweep Amendment would "help expedite the wind down of Fannie Mae and Freddie Mac [and] make sure that every dollar of earnings each firm generates is used to benefit taxpayers," such that the Companies will not be allowed to "retain profits [or] rebuild capital."  2012 Press Release.

These actions—depleting capital, eliminating the possibility of normal business operations, and doing so with the intent to wind down, rather than revive, the Companies—cannot be reconciled with FHFA's obligations as a conservator to "preserve and conserve" the Companies' assets with an eye to the Companies' financial rehabilitation.  *See Del E. Webb McQueen Dev. Corp.*, 69 F.3d at 361.  These actions instead resemble those of a receiver charged to "ensure that the assets of [the Companies] are distributed" outwards, leaving the Companies with no remaining capital.  *See Freeman*, 56 F.3d at 1401.  But that liquidation function is an "additional" receivership power that conservators lack.  *See* 12 U.S.C. § 4617(b)(2)(E).  There may indeed come a time when FHFA legitimately concludes that one or both of the Companies cannot be rehabilitated and must be placed in liquidation under receivership.  Until that happens, however, FHFA must "assum[e]" that the Companies "may well return to the transaction of [their] business" outside of governmental control.  *See* Malloy, *supra*, § 11.3.4.2.  FHFA's actions to the contrary exceeded its authority under HERA and violated the APA.

### 3.    FHFA's Post Hoc Justifications For The Sweep Amendment Lack Merit.

#### a.    FHFA May Not Wind Up The Companies In Preparation For Liquidation.

FHFA argues that the Sweep Amendment was not a step towards "winding up" the Companies' affairs and that, even if it was, FHFA has authority to exercise its conservatorship powers to shrink the Companies in preparation for liquidation.  These arguments are meritless.

1.      FHFA contends that Treasury's statement that the Companies would be "w[ound] down" referred only to the planned reduction in their investment portfolios.  FHFA Br. 31.  This is incorrect.  Treasury expressed its views clearly on the day Treasury and FHFA executed the Sweep Amendment:  "The [Companies] will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form."  2012 Press Release.  This "wind down" was thus tied directly to the Net-Worth Sweep, which prohibited the Companies from "retain[ing] profits" or "rebuild[ing] capital."  *Id.*  Indeed, one of Treasury's internal memoranda uses the term "wind down" as synonymous with liquidation:  "Some will say we should wind-down the [Companies] instead of continuing to allow them to operate in conservatorship."  *See* Treasury 0179.  These references to a "wind down" thus had nothing to do with FHFA's separate plan to reduce the size of the Companies' portfolios.  FHFA's argument regarding its authority to "minimize [the Companies'] risk exposure," FHFA Br. 31, is thus designed to distract this Court's attention away from FHFA's *ultra vires* conduct.

2.      FHFA next contends that it has "ample statutory authority" to wind down the Companies and to "prepare them for potential liquidation," and need not maintain an objective of "rehabilitation."  FHFA Br. 30.  FHFA is wrong.  Liquidation is exclusively the province of a receiver, as both HERA's text and FHFA's regulations acknowledge, and allowing FHFA to nudge the Companies towards liquidation under conservatorship would allow FHFA to ignore the important procedural protections provided during receivership.

HERA makes clear that only FHFA as receiver—not as conservator—may place the Companies in liquidation.  12 U.S.C. § 4617(b)(2)(E) (liquidation is among FHFA's "[a]dditional powers as receiver").  This separation of authority—rehabilitation for conservators and liquidation for receivers—is again echoed throughout the case law and treatises.  *See MBIA*

*Ins. Corp.*, 708 F.3d at 236 (receivers "liquidate the remaining assets of the failed institution," whereas conservators "carry on the business of the institution and preserve and conserve the assets and property"); Resseguie, *supra*, § 11.01 ("When acting as a receiver the function of the FDIC is to liquidate the institution . . . .   Conservatorship serves a different purpose.").

FHFA's own regulations draw this same distinction.  In a separate subsection titled "Agency as receiver," FHFA's regulations provide that, "as receiver, [FHFA] shall place the regulated entity in liquidation, *employing the additional powers expressed* in [HERA] § 4617(b)(2)(E)."  12 C.F.R. § 1237.3(b) (emphasis added).  It further explained this dichotomy as inherent in the different functions of a conservator and a receiver:  While "[a] conservator's goal is to continue the operations of a regulated entity, rehabilitate it and return it to a safe, sound and solvent condition," "[t]he ultimate responsibility of FHFA as receiver is to resolve and liquidate the existing entity."  76 Fed. Reg. at 35,730.

By prohibiting FHFA from liquidating the Companies while it acts as their conservator, HERA also prohibits FHFA from "winding [them] up" in preparation for liquidation.  Indeed, HERA, case law, commentators, and even dictionaries all use "liquidation" and "wind up" synonymously.  For example, HERA imposes specific requirements on FHFA when it initiates "the *liquidation* or *winding up* of the [Companies'] affairs."  12 U.S.C. § 4617(b)(3)(B) (emphases added).  Similarly, case law regarding the FDIC's receivership authority underscores this point, holding that the purpose of receivership is "to expeditiously 'wind up the affairs of failed banks.'"  *Freeman*, 56 F.3d at 1401 (quoting *Local 2, OPEIU v. FDIC*, 962 F.2d 63, 64 (D.C. Cir. 1992)).  Treatises explain that receivers "liquidate the institution and wind up its affairs."  Resseguie, *supra*, § 11.01.  Dictionaries also define "liquidation" and "winding up" as virtually the same.  *See Black's Law Dictionary*, *supra*, at 1738 ("winding up, *n.* (1858) The

process of settling accounts and liquidating assets in anticipation of a partnership's or a corporation's dissolution."); OED, *supra* ("liquidation, n." defined as "[t]he action or process of winding up the affairs of a company").  Because HERA prohibits FHFA as conservator from liquidating the Companies, it also prohibits FHFA as conservator from winding them up.

FHFA argues that—contrary to the traditional limitations of conservatorship authority— HERA empowers conservators to wind up regulated entities because 12 U.S.C. § 4617(a)(2) states that FHFA may "be appointed conservator or receiver for the purpose of reorganizing, rehabilitating, or winding up the affairs of a regulated entity."  *See* FHFA Br. 30-31; *see also* Treasury Br. 26-27.  FHFA misreads the statute.  It does not follow that the powers articulated in Section 4617(a)(2) belong to conservators and receivers alike.  After all, "the words of a statute must be read in their context."  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).  As explained above, HERA, case law, commentators, and dictionaries use "liquidation" and "winding up" as synonyms.  And, given that it is well established that liquidating the Companies is beyond FHFA's conservatorship powers, it follows that steps to wind up the Companies are also forbidden to FHFA as conservator.  Further, concluding that FHFA as conservator may wind up the Companies generates absurd results:  If FHFA as conservator has all three powers listed in Section 4617(a)(2)—"reorganizing, rehabilitating, [and] winding up"— it follows that FHFA as receiver must also have these three powers, including rehabilitation.  But that cannot be, as even FHFA explains that as receiver it "shall place the [Companies] in liquidation," leaving no room to rehabilitate them.  12 C.F.R. § 1237.3(b).

FHFA's reliance on *Ameristar Financial Services Co. v. United States*, 75 Fed. Cl. 807 (2007), is similarly misplaced.  *Ameristar*'s statement that a conservator "manage[s] and protects the troubled institution's assets until the institution has stabilized or has been closed by the

chartering authority," *id.* at 808 n.3, merely acknowledges that a conservatorship can be successful (with the "stabilized" entity exiting conservatorship), or it can fail, ending in receivership. *See* 12 U.S.C. § 4617(a)(4)(D) ("Receivership terminates conservatorship"). To be sure, there could come a time when FHFA's Director concludes that the Companies cannot be rehabilitated or returned to normal business operations. At that point—and after observing all other required procedures—FHFA can place the Companies in receivership. *See* Carpenter & Murphy, *supra*, at 6 ("[A] conservatorship may be followed by a receivership if a determination is made that the institution is not viable."). That does not mean that a conservator can operate an entity with the *goal* of receivership and liquidation. FHFA's view that as conservator it may push the Companies toward eventual liquidation—contrary to the language of HERA and FHFA's own expressed goal of using the conservatorship to "return[ ] the [Companies] to normal business operations," FHFA 0016—is simply "untenable." *MBIA Ins. Corp.*, 816 F. Supp. 2d at 96-97.

If FHFA were correct—and it could wind down the Companies as conservator—FHFA would have license to evade the procedural protections afforded by receivers. In receivership, with competing claims against the Companies' assets, HERA requires FHFA, "as receiver, [to] determine claims in accordance with the requirements of" 12 U.S.C. § 4617(b). 12 U.S.C. § 4617(b)(3)(A). These rules require FHFA to "promptly publish a notice to the creditors of the entity to present their claims, together with proof . . . not less than 90 days after the date of publication of such notice," and to provide a mailing to the same effect. *Id.* § 4617(b)(3)(B), (C). After considering these claims, FHFA may allow or disallow a creditor's claim under its prescribed rules. *Id.* § 4617(b)(5)(B), (C). These rules ensure that receivers "fairly adjudicat[e] claims against failed financial institutions." *Whatley v. RTC*, 32 F.3d 905, 909-10 (5th Cir.

1994) (describing similar procedures for FDIC and RTC).  Indeed, the Court of Appeals for the

D.C. Circuit has explained that a receiver's failure to provide statutorily required notice raises

"serious due process concerns."  *Freeman*, 56 F.3d at 1403 n.2; *see also Greater Slidell Auto*

*Auction, Inc. v. Am. Bank & Trust Co. of Baton Rouge, La.*, 32 F.3d 939, 942 (5th Cir. 1994)

("Mailing of notice to claimants known to the receiver is constitutionally required."); *Elmco*

*Props., Inc. v. Second Nat'l Fed. Sav. Ass'n*, 94 F.3d 914, 922 (4th Cir. 1996) ("[I]t would

violate the Due Process Clause of the Fifth Amendment to allow the RTC to treat Elmco's claim

as untimely, hence permanently denied.").

    The Sweep Amendment, in FHFA's view, allows it to circumvent this adjudication

process.  By FHFA's own admission, the net-worth sweep transfers the Companies' "potential

future profits" to Treasury.  FHFA Br. 27.  Without future profits, the Companies will never be

able to repay Treasury's liquidation preference, which will necessarily overwhelm the

Companies' dwindling capital cushion if they are ever formally liquidated—leaving preferred

shareholders with nothing.  This result is identical to what would happen if FHFA as receiver

had adjudicated, and disallowed, Plaintiffs' claims.  *See MBIA Ins. Corp.*, 816 F. Supp. 2d at 87

(describing FDIC receivership notice that the entity's funds "are insufficient to pay claims below

the depositor class and that all non-depositor creditor claims have no value").  Yet FHFA

provided no notice to Plaintiffs, who have valid claims against the Companies' assets.  FHFA's

action, if permitted, would deprive Plaintiffs of due process.  *See Freeman*, 56 F.3d at 1403-04

n.2.  Judicial endorsement of FHFA's effort to side-step Congress's procedural protections will

simply provide other agencies with a roadmap for similar evasion and overreach.

    3.    Clearly prohibited from winding down the Companies, FHFA argues that it may

accomplish the same end by virtue of its authority under HERA to "'transfer or sell any asset' of

63

the [Companies] 'without any approval, assignment, or consent.'"  FHFA Br. 27 (citing 12

U.S.C. § 4617(b)(2)(G)).  This is not the law.  As an initial matter, this death-by-a-thousand-cuts

argument is undermined by Treasury's and FHFA's decision to wind down the Companies.

FHFA cannot be heard to argue that it is just going about its business as a conservator, in light of

this declared purpose.[22]

Even accepting FHFA's outlandish claim, this argument fails.  FHFA as conservator may

engage in a wide array of conduct while it oversees the Companies:  For example, it may "collect

all obligations and money due" to the Companies, or contract with third parties to "fulfill[ ] any

function, activity, action, or duty of the Agency as conservator," or pay valid obligations

incurred by the Companies.  *See* 12 U.S.C. § 4617(b)(2)(B)(ii), (b)(2)(H).  But FHFA does not

exercise these powers in a vacuum, devoid of statutory goals or its own regulatory guidance.

HERA instructs FHFA as conservator to "preserve and conserve" the Companies' assets, which

FHFA has explained requires it to use its powers to "rehabilitate" the Companies.  *Id.*

§ 4617(b)(2)(D)(ii); 76 Fed. Reg. at 35,730.  These goals shape the nature of FHFA's powers—

what may be appropriate for a receiver may not be appropriate for a conservator.  *See MBIA Ins.*

*Corp.*, 816 F. Supp. 2d at 96-97 (explaining that the limits on the FDIC's authority to repudiate

contracts may vary depending on whether the FDIC acted as a conservator or as a receiver).  This

simple truth governs many areas:  An emergency-room doctor might have the power to amputate

a patient's arm without the patient's formal consent, but that general rule does not empower that

doctor, during a standard office visit, to forcibly sedate the patient and amputate his foot.

---

[22]  FHFA asserts that its "improper motive or intent when carrying out its statutory powers and functions . . . is
irrelevant" to whether FHFA acted within its powers as conservator.  FHFA Discovery Opp. 20.  However true that
may be in some instances, it is irrelevant here.  Plaintiffs' argument is that FHFA acted beyond its statutory
authority in executing the Sweep Amendment.  That FHFA had improper motives serves only to illuminate why
FHFA undertook the extraordinary and risky decision to ignore the congressionally prescribed limits on its
authority.

Context matters.  And in the context of a conservatorship, FHFA lacks the authority to "transfer assets" if doing so means that the Companies could not be rehabilitated.

FHFA rests its argument to the contrary on the Seventh Circuit's decision in *Courtney v. Halleran*, 485 F.3d 942, 949 (7th Cir. 2007).  *See* FHFA Br. 28-29.  But *Courtney* cannot bear the weight FHFA would place on it.  First, *Courtney* expressly declined to follow this Court's decision in *Adagio Investment Holding Ltd. v. FDIC*, 338 F. Supp. 2d 71 (D.D.C. 2004), which reached the common sense conclusion that the FDIC may not use its transfer authority to circumvent specific statutory restrictions.  *Id.* at 81.  Tellingly, FHFA does not even cite *Adagio*.  Second, *Courtney* involved the powers of a receiver, not a conservator.  Third, *Courtney* does not stand for the proposition that a receiver may transfer assets in derogation of statutory constraints on its authority.  Rather, *Courtney*, addressing an agreement entered into by the FDIC as receiver with a third party to pursue legal claims against another entity and divide the proceeds of any recovery, held that the receiver's power to settle legal claims in 12 U.S.C. § 1821(p)(3)(A), "if it is to mean anything at all," must "operate independently" of any statutory priority distribution scheme.  485 F.3d at 949.  That ruling provides no support at all to FHFA's argument here that its power to transfer assets is unbounded by the goals of conservatorship.

FHFA and Treasury also cite *Ward* for the proposition that it is within a conservator's authority to sell any asset, even if those sales "fail[ ] to maximize the value of the failed entity's assets [or] unfairly favor[ ] a potential purchaser."  FHFA Discovery Opp. 22; *see also* Treasury Br. 23; Treasury Discovery Opp. 12-13.  This proposition—even if correct—cannot support the Sweep Amendment, particularly in light of *Ward*'s inapposite context.  First, *Ward* was a

receivership case and thus sheds no light on the powers of a conservator.  996 F.2d at 101.[23]

Second, even if *Ward* were relevant to the powers of a conservator, that case dealt with the sale

of a single property and the court's opinion does not suggest that the sale would have left the

institution unable to be rehabilitated.  *Id.* at 100.  In contrast, the Sweep Amendment involves the

sale of not just one asset, but the transfer of the Companies' entire net worth in perpetuity,

ensuring that they cannot "retain profits [or] rebuild capital" to rehabilitate themselves.

> ### b.   The Sweep Amendment Did Not Arrest A Purported "Downward Spiral."

FHFA argues that trading away the Companies' net worth in exchange for eliminating the

obligation to pay dividends each quarter "preserved" Treasury's funding commitment because it

arrested a "downward spiral" caused by the Companies' draws from Treasury to pay Treasury's

10 percent cash dividend.  FHFA Br. 23, 22; *see also* Treasury Br. 24.  This "downward spiral"

narrative is pure fiction—a mere pretext designed to mask the Defendants' true aim:  To seize all

of the Companies' enormous profits for the federal government.  And, even if this fiction were

reality, this "downward spiral" could never justify the Sweep Amendment.

First, the "downward spiral"—which FHFA describes as a "harmful practice," FHFA

Discovery Opp. 3—was entirely of FHFA's own creation.  The Companies had no obligation to

pay the 10 percent dividend in cash.  They could have instead paid Treasury "in kind" by

increasing Treasury's liquidation preference.  *See* Treasury 0033 (Treasury Stock § 2(c)).

Indeed, seven days before Treasury and FHFA executed the Sweep Amendment, the

Congressional Research Service noted that the Companies "could instead pay a 12 percent

---

[23]  FHFA's other featured authorities—*Waterview Management Co. v. FDIC*, 105 F.3d 696 (D.C. Cir. 1997), and *Gosnell v. FDIC*, No. 90-1266, 1991 WL 533637 (W.D.N.Y. Feb. 4, 1991), *aff'd*, 938 F.2d 372 (2d Cir. 1991), *see* FHFA Br. 27—both dealt with receiverships and therefore have nothing to teach regarding the scope of a conservator's authority to transfer assets.

annual senior preferred stock dividend [in kind] indefinitely." N. Eric Weiss, Cong. Research Serv., RL34661, *Fannie Mae's and Freddie Mac's Financial Problems* i (Aug. 10, 2012), *available at* http://www.fas.org/sgp/crs/misc/RL34661.pdf. This solution would have solved FHFA's purported concern—eliminating the need to draw from Treasury to pay dividends— consistent with its conservatorship obligation to "preserve and conserve" the Companies' assets. FHFA thus could have extended the life of Treasury's commitment without trading away the Companies' future opportunities for success.

Second, the data disclosed in Treasury's Administrative Record and FHFA's "Document Compilation" belies FHFA's "downward spiral" narrative. FHFA's own projections from October 2011 showed that the Companies' draws from Treasury would ebb by 2014. *See* Treasury 1902; FHFA 2412. In fact, under those projections, only Fannie Mae, and only under FHFA's worst-case scenario, would continue to draw from Treasury at all.[24] *See* Treasury 1902; FHFA 2412. Because these figures *included* draws taken to pay Treasury's dividend, this data demonstrates that not even FHFA believed the Companies would be in an unstoppable "downward spiral" absent intervention along the lines of the Sweep Amendment.

FHFA's "downward spiral" narrative further unravels, as the Companies' performance continued to improve and, by June 2012, the Companies had beaten the projections on which FHFA and Treasury purport to rely. FHFA's October 2011 estimate projected that, by 2014, Fannie Mae would draw between $145 billion and $219 billion and Freddie Mac would draw between $75 billion and $92 billion. Treasury 1901 (October 2011 projections). Near-term

---

[24] Indeed, Treasury was sufficiently confident in Freddie Mac's financial future—including its ability to withstand a purported "downward spiral" under a "Downside" forecast, *see* Treasury 3850 (June 2012 presentation showing that Freddie Mac would have $102.6 billion remaining in Treasury commitment by FY2023)—that Treasury's presentations in July and August 2012 did not even bother to model Freddie Mac's performance absent the Sweep Amendment. *See* Treasury 3883-3894, 3895-3903.

projected draws were also sizeable, with estimates that, from July 2011 to March 2012 alone, the Companies would collectively draw at least $33 billion, plus another $2 billion from April 2012 to June 2012.  Treasury 3879 (2012 report showing projections of the first three quarters of the 2011-12 reporting period); FHFA 4069 (2012 report showing projections for the four quarters of the 2011-12 reporting period).  After the first quarter of 2012, however, the Companies had drawn only $19 billion from Treasury since July 2011, beating FHFA's $33 billion prediction by 42 percent.  Treasury 3879.  The Companies exceeded expectations again in the second quarter, drawing nothing, whereas FHFA predicted that they would draw an additional $2 billion during that period from Treasury.  FHFA 4069.  They also increased their profitability over and above Treasury's 10 percent cash dividend.  *See* FHFA 3832, 4013.  There is thus no question that, at the time FHFA executed the Sweep Amendment, it could not believe that the Companies were in danger of exhausting Treasury's funding commitment.

To the extent that FHFA now purports to have relied on the Companies' SEC filings—or other analysts' reports—to support its argument that they did not expect to out-earn Treasury's dividend each quarter, FHFA provides no contemporaneous evidence supporting such reliance. Indeed, FHFA's *only* evidence suggesting that it considered these materials is an affidavit prepared for this litigation.  *See* FHFA 0001-0010.  This is exactly the sort of litigation-inspired reasoning that the APA prohibits.  *See City of Kan. City v. HUD*, 923 F.2d 188, 192 (D.C. Cir. 1991) ("[A]gency rationales developed for the first time during litigation do not serve as adequate substitutes.").[25]

---

[25]  Even accepting FHFA's reliance on the Companies' SEC filings—which were written under FHFA's supervision—those statements do not say that the Companies will never out-earn the dividend.  They say only that the Companies "may experience period-to-period variability in earnings and comprehensive income," and that "over the long term" "it is unlikely that [the Companies] will generate net income or comprehensive income in excess of [their] annual dividends."  FHFA Br. 23 (quoting FHFA 3598, 3857-3858).  This statement does not foreclose the

*(Cont'd on next page)*

Third, the credibility of FHFA's "downward spiral" narrative is further undermined by the comparison of FHFA's decision to execute the Sweep Amendment in 2012 with its decision to execute the Second Amendment in 2009.  When Treasury and FHFA executed the Second Amendment in December 2009, the Companies were losing money, forcing sizeable draws from Treasury, and raising the prospect that the Companies' "outsized losses" could exhaust Treasury's commitment in two years.  *See* Treasury 0177.  Treasury and FHFA clearly deemed the Second Amendment's provisions—which did not include a net-worth sweep—adequate to address the Companies' dire financial condition.  By 2012, however, there was no similar urgency, as Freddie Mac was projected to have more than $100 billion in remaining Treasury funding in 2023, and Fannie Mae's funding would run out by 2018 only in the most extreme downside scenario.  Treasury 3849-3850, 3894.

FHFA's concern in 2012 for the consequences of a "downward spiral" is thus credible only if events between 2009 and 2012 presented some other changed circumstance.  But the only differences between 2009 and 2012 show the government's true motivations behind the Sweep Amendment:  By 2012, the government had reached a policy decision to cease attempting to rehabilitate the Companies, *see* 2012 Press Release, in order to "ensure [that] existing common equity holders will not have access to any positive earnings from the [Companies] in the future," Treasury 0202.  And, by 2012, the Companies were profitable again, giving rise to an opportunity for Treasury to tap a new and plentiful funding stream.  Pursuit of these two

---

*(Cont'd from previous page)*

possibility that the Companies could out-earn Treasury's 10 percent cash dividend.  Nor does it estimate the size of any deficit, leaving the possibility of miniscule draws from Treasury that have little overall impact on the lifespan of Treasury's commitment.

objectives is utterly inconsistent with FHFA's duty to preserve and conserve the Companies'

assets with an eye towards their rehabilitation.

Fourth, even accepting the existence of the threat of a "downward spiral"—which even

under Treasury's projections would not materialize for nearly a decade and *only* for Fannie Mae,

*see* Treasury 3847-3850 (June 2012 projections for Fannie Mae and Freddie Mac), 3889-3890

(July 2012 projection for Fannie Mae)—FHFA lacked authority to employ the Sweep

Amendment against this supposed threat.  FHFA has explained from the beginning of the

conservatorships that their purpose was to "return[ ] the [Companies] to normal business

operations," Treasury 0089-0090, which FHFA has maintained prohibits it from removing

capital from the Companies "at a time when [it] is *charged with rehabilitating* [them]."  76 Fed.

Reg. at 35,727 (emphasis added).  But the Sweep Amendment takes rehabilitation off the table,

preventing the Companies from "retain[ing] assets" or "rebuild[ing] capital."  2012 Press

Release.  Even if FHFA truly intended to cure the downward spiral, it employed a means

designed to kill its patient.  Those are not the actions of a conservator.

c.   <u>FHFA's Contention That The Sweep Amendment Would Not<br>Increase Payments To Treasury Is Meritless.</u>

FHFA contends that the Sweep Amendment conserved the Companies' assets because

Treasury would receive the same amount of money under the Sweep Amendment as it would

under the terms of the pre-Sweep Amendment Purchase Agreements.

It first argues that, had Treasury sought to collect the Periodic Commitment Fee, it could

have set that Fee equal to the Companies' net profits because the value of Treasury's

commitment was "incalculably large."  FHFA Br. 68.  FHFA is mistaken.  First, FHFA could not

agree to such a term consistent with its conservator powers.  The Periodic Commitment Fee was

designed to be mutually negotiated between Treasury and FHFA, subject to their "reasonable

70

discretion." Treasury 0022 (§ 3.2(b)).  Agreeing to a Fee equal to the Companies' net worth would be utterly inconsistent with FHFA's obligations to preserve and conserve the Companies' assets.  Second, FHFA provides no basis for why the Fee would be "incalculably large" and no way to evaluate whether the additional $110 billion the Companies paid to Treasury in 2013 was more or less than that "incalculable" sum.[26]  Third, the Periodic Commitment Fee could not have forced the Companies to pay Treasury the value of their net worth in cash because the Purchase Agreements gave the Companies the right to pay the Periodic Commitment Fee in kind by increasing Treasury's liquidation preference, rather than by paying in cash.  *See* Treasury 0022 (§ 3.2(c)).  Fourth, setting the Periodic Commitment Fee equal to the Companies' net assets would not provide Treasury with "the market value" of its financial commitment, Treasury 0022 (§ 3.2(b))—as the Companies' net worth increased, the Companies would  place a lower value on Treasury's financial commitment, yet would be required to pay ever greater Commitment Fees.  Fifth, neither Treasury nor FHFA ever explain why the Net-Worth Sweep was appropriate in August 2012 after Treasury had rejected that exact same idea in December 2010.  When Treasury waived the Periodic Commitment Fee in December 2010, it suggested that it might set the Fee equal to the Companies' future profits, but noted that this arrangement would be "subject to further legal review."  Treasury 0202.  Presumably after conferring with counsel, Treasury abandoned this approach, preferring instead to allow the Companies to retain their income, which "could be used to offset potential draws in future quarters."  Treasury 2359.  FHFA offers no explanation for this about-face, and no contemporaneous analysis showing why such an arrangement would be legal.

---

[26]  In stark contrast to FHFA's fuzzy math, the Congressional Budget Office projected that Treasury's commitment will cost the government $19 billion over the next decade.  CBO Report at 64 (projecting "the net lifetime costs—that is, the subsidy costs adjusted for market risk—of guarantees that will be issued by as well as loans that will be held by the [Companies]").

FHFA also argues that, even without the Periodic Commitment Fee, FHFA did not believe that the Net-Worth Sweep would increase payments to Treasury, and that the Sweep Amendment would thus conserve the Companies' assets exactly as the 10 percent cash dividend had.  FHFA Br. 67; FHFA 0009.  This argument strains credulity, since during the first 12 months of the Sweep Amendment, the Companies paid to Treasury *$110 billion* more than they would have absent the Sweep Amendment.  Treasury 4352.  Even before the Sweep Amendment, it was clear that the Companies would pay more under the Net-Worth Sweep. Treasury's internal presentations show that the Companies would pay more under various "stress" scenarios and disclosed that they would also do so under "positive scenarios," though Treasury did not bother to model them, as the Administrative Record reveals.  Treasury 3886-3888, 3862; *see also* Treasury 3785-3790, 3846-3850.  It was *only* under a "base" scenario that the Companies' payments under the Net-Worth Sweep equaled those under the 10 percent dividend.  *Id.*  But that could occur only if the Companies performed *exactly* as predicted.  If the Companies beat expectations even once because, for example, they recognized $50 billion in deferred tax assets, Treasury would receive more.  *See* Treasury 3775-3802, 3833-3862, 3883-3894, 3895-3903; FHFA 3737 (Freddie Mac Q2 2012 10-Q (Aug. 7, 2012)); Treasury 2705 (Fannie Mae 2011 10-K (Feb. 29, 2012)).

FHFA is conspicuously silent as to whether it *considered* the Companies' deferred tax assets when it agreed to the Sweep Amendment, representing only that it never *discussed* the matter with the Companies.  FHFA 0009-0010.  Even this limited representation is not credible. The Companies repeatedly identified sizeable deferred tax assets in their SEC filings, *see* FHFA 3737 (Freddie Mac disclosing $34.7 billion in deferred tax assets on August 7, 2012); Treasury 2705 (Fannie Mae disclosing $64.1 billion in deferred tax assets on February 29, 2012), and the

Companies' renewed profitability suggested that the Companies might soon recognize these massive assets.  Indeed, FHFA's Office of the Inspector General explained soon after FHFA executed the Sweep Amendment that the Amendment could result in "an extraordinary payment to Treasury" "due to the accounting treatment surrounding deferred tax assets."  FHFA Office of Inspector General, *Analysis of the 2012 Amendments to the Government Stock Purchase Agreements* 15 (Mar. 20, 2013), *available at* http://www.fhfaoig.gov/Content/Files/WPR-2013-002_2.pdf.  To the extent that FHFA was blind to the existence of these assets, it was willfully so.

d.    The Sweep Amendment Did Not Keep The Companies In A "Holding Pattern."

FHFA contends that it may operate the Companies "in a holding pattern, awaiting major policy decisions in the future," and that the Sweep Amendment is simply its chosen means of doing so.  FHFA Br. 31-32.  Even if FHFA had such authority, the Sweep Amendment does not place the Companies in a "holding pattern," but rather makes the Companies' wind down inevitable.  Treasury made this point on the date that it and FHFA executed the Sweep Amendment, explaining that the Companies "w[ould] be wound down" and "w[ould] not be allowed to retain profits, rebuild capital, and return to the market in their prior form."  2012 Press Release.  Far from a "holding pattern," the Sweep Amendment puts the Companies on a planned descent into liquidation.  This certainly does not maintain the "status quo," which is the bare minimum the law expects from a conservator.  *See Bryce v. Nat'l City Bank of New Rochelle*, 17 F. Supp. 792, 799 (S.D.N.Y. 1936), *aff'd*, 93 F.2d 300 (2d Cir. 1937); *see also CedarMinn*, 956 F.2d at 1454 ("[T]he purpose of a conservator [is] to maintain the institution as an ongoing concern.").

*        *        *

When FHFA installed itself as the Companies' conservator, it was obligated to "preserve and conserve" the Companies' assets with the goal of rehabilitating the Companies, so that they might resume "normal business operations." FHFA 0016. The Sweep Amendment starves the Companies of the capital necessary to accomplish these goals. FHFA apparently takes pride in this accomplishment, as both it and Treasury openly proclaimed this as the Sweep Amendment's purpose. But FHFA had no authority to ignore its statutory obligation to rehabilitate the Companies. FHFA thus exceeded its authority and violated the APA.

## IV.    The Sweep Amendment Was An Arbitrary And Capricious Exercise Of Treasury's And FHFA's Authority.

The APA forbids an agency from acting in a manner that is "arbitrary" or "capricious" and requires an agency to engage in "reasoned decisionmaking." 5 U.S.C. § 706(2)(A); *State Farm*, 463 U.S. at 52. Reasoned decisionmaking requires federal agencies to "'consider an important aspect of the problem'" before it. *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007) (quoting *State Farm*, 463 U.S. at 43). An agency's contemporaneous account of its decisionmaking "enable[s] the court to evaluate the agency's rationale at the time of the decision" and "must minimally contain a rational connection between the facts found and the choice made." *Dickson v. Sec'y of Defense*, 68 F.3d 1396, 1404 (D.C. Cir. 1995) (internal quotation marks omitted). When an agency acts contrary to its prior interpretation of a statute or otherwise goes against its prior practice, it must explain its reasons for "depart[ing] from established precedent." *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1119 (D.C. Cir. 2010).

The Administrative Record and "Document Compilation" disclose devastating flaws in Treasury's and FHFA's decisionmaking process. First, the agencies' factual basis for the Sweep Amendment—the so-called "downward spiral"—was the product of stale and stunningly

inaccurate projections of the Companies' profitability and of the Sweep Amendment's impact.

Second, the agencies never considered an alternative solution to the Net-Worth Sweep, although

at least three were obvious and available.  Third, Treasury and FHFA ignored both the factors

that Congress mandated they consider and their prior understandings of their own statutory

authority.  Fourth, neither agency considered the interests of the Companies' private

shareholders, to whom Treasury and FHFA both owed fiduciary duties.  Each of these failures is

itself grounds for vacatur.  Together, they demonstrate regulatory dysfunction that

unquestionably violated the APA.

> **A.     Treasury's And FHFA's Decision To Execute The Sweep Amendment Was
> Based On A Knowingly Erroneous View Of The Companies' Financial
> Performance And Prospects.**

Administrative agencies must justify their actions, providing "a rational connection

between the facts found and the choice made." *Dickson*, 68 F.3d at 1404 (internal quotation

marks omitted).  An agency must support its decisions with the best available data, and may not

ignore more current information simply because it undermines the agency's preferred action.

*See Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1020-23 (D.C. Cir. 1999) (finding agency's

use of outdated data, without adequate explanation, to be arbitrary and capricious).  Treasury and

FHFA ignore these simple commands, as they seek to justify the Sweep Amendment—and

breathe life into their "downward spiral" narrative—with stale data, and erroneous interpretations

of that stale data.  The APA requires more.

Treasury used stale projections to support its argument that the Companies were in

danger of exhausting Treasury's commitment if FHFA continued to require the Companies to

pay Treasury's dividend in cash.  Treasury's projections—FHFA presents no contemporaneous

analysis—cited projections by Grant Thornton, Treasury 3786, which in turn relied on FHFA's

October 2011 forecasts, Treasury 3782, 3786.  These projections showed that the Companies'

future revenues would be insufficient to cover Treasury's 10 percent cash dividend. *See* Treasury 3900 (August 8, 2012, presentation on the proposed Sweep Amendment listing "Source:  FHFA and Grant Thornton Projections, Treasury staff estimates").[27]  But, by June 2012, those underlying FHFA projections had become obsolete, as the Companies had beaten even FHFA's most optimistic projections. *See supra* pp. 67-68.  None of Treasury's presentations—on which FHFA purports to have relied, FHFA 0008; FHFA Br. 66—indicates that it incorporated this new data. *See* Treasury 3775-3802, 3833-3862, 3883-3894, 3895-3903.

Treasury attempts to fill this gap, explaining that presentations dated before July 2012 used only FHFA's October 2011 data, while subsequent presentations incorporated the Companies' more recent performance. *See* Treasury Discovery Opp. 21.  But that assertion appears plainly mistaken.  Treasury's profit projections *decreased* between presentations given in June and July 2012, even as the Companies continued to earn large profits. *Compare* Treasury 3847 (June 2012 presentation projecting Fannie Mae comprehensive income of $13.5 billion in 2015 under "base case"), *with* Treasury 3890 (July 2012 presentation projecting Fannie Mae comprehensive income of $6.6 billion in 2015 under "base case").  Treasury attributes this discrepancy to "different set[s] of assumptions" in each projection.  According to Treasury, the June projection assumed that the Companies would increase guarantee fees—thereby increasing revenue—and decrease the size of their investment portfolios at 10 percent per year as required by the then-governing Purchase Agreements; the July projection, in contrast, purportedly assumed that these fees would not increase and that the Companies would decrease the size of their portfolios by 15 percent annually—the same rate eventually adopted as part of the Sweep

---

[27]  Neither Treasury nor FHFA has provided the Grant Thornton projections or these "Treasury staff estimates," depriving the Court and Plaintiffs of the ability to assess the reasonableness of Treasury's and FHFA's reliance on them.

Amendment. Treasury Discovery Opp. 21. These explanations are insufficient. First, the July 2012 projections cited above *did* provide for a guarantee fee increase, as indicated by the title of the slide, "Fannie Mae: Base Case II (with g-Fee Increase)," Treasury 3890, and nothing in the June 2012 slide indicates that it assumed a fee increase, *see* Treasury 3833-3862. Second, Treasury does not explain why its July 2012 projections assumed a 15 percent annual decrease in the Companies' portfolios, or why that change would more than halve the Company's profit. Indeed, one would have thought that, to project the Companies' performance under pre-Sweep Amendment conditions, Treasury would have assumed the *actual* conditions prior to the Sweep Amendment—including the 10 percent rate of decrease.[28] Treasury cannot simply cherry-pick its favorite assumptions to reach a pre-ordained conclusion, as the APA requires any "model assumptions [to] have a 'rational relationship' to the real world." *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1053 (D.C. Cir. 2001).

Nor did any of these projections account for the Companies' tens of billions of dollars in deferred tax assets. As discussed above, FHFA's self-serving declaration that neither Treasury nor FHFA considered these assets, *see* FHFA 0009-0010, is neither credible nor sufficient to bring Treasury and FHFA's conduct into compliance with the APA. The Companies' pre-Sweep Amendment financial disclosures—written under FHFA's supervision—made clear that there were sizeable deferred tax assets available whenever the Companies began generating profits. *See* Treasury 3642 (Freddie Mac Q1 2012 10-Q (May 3, 2012)); Treasury 2504 (Fannie Mae 2011 10-K (Feb. 29, 2012)). And, at virtually the moment that the Sweep Amendment took effect, Fannie Mae miraculously decided to recognize its deferred tax assets, thereby increasing

---

[28] Treasury also argues that the June and July presentations are different because the June presentation uses fiscal-year data, whereas the July presentation uses calendar-year data. Treasury Discovery Opp. 21. This distinction surely cannot support a nearly $7 billion decline in projected revenue, as Treasury implicitly concedes by failing to explain how different calendars could produce such drastically different revenues. *Id.*

Treasury's dividend by more than $50 billion.  *See* Fannie Mae Q1 2013 10-Q, at 2 (May 9, 2013).  Recognition of those assets was inevitable even under Treasury's most pessimistic financial projections, all of which showed the Companies earning taxable income that the deferred tax assets could be used to offset.  *See* Treasury 3900, 3889-3894, 3847-3850.

The availability of these deferred tax assets also undermines entirely Treasury's and FHFA's protestations that the Sweep Amendment was not designed to increase payments to Treasury.  *See* FHFA Br. 67.  Indeed, Treasury's internal presentations projected that the Companies would pay Treasury more under both the various "stress" scenarios and under the "positive scenarios" that Treasury did not bother to model.  Treasury 3886-3888, 3862; *see also* Treasury 3785-3790, 3846-3850.  It was *only* under a "base" scenario that the Companies' payments under the Net-Worth Sweep would equal projected payments under the 10 percent dividend.  *Id.*  And, of course, even the base-scenario projections simply ignored billions in deferred tax assets that both Companies recognized virtually immediately following the Sweep Amendment.

Treasury and FHFA contend that the Sweep Amendment was necessary to maintain investor confidence.  *See* Treasury Br. 50; FHFA Br. 66.  The record does not support this conclusion, and is particularly belied by the agencies' actions around the Second Amendment. When Treasury and FHFA executed the Second Amendment in December 2009, the Companies were losing money at a considerable pace, in part due to Treasury's 10 percent cash dividend. *See* Treasury 4351.  Treasury recognized that these "outsized losses" could exhaust Treasury's commitment to Fannie Mae within two years—by 2011.  Treasury 0177.[29]  Yet neither Treasury nor FHFA embraced a net-worth sweep at that point.  Indeed, by 2011, Treasury had embraced

---

[29]  FHFA does not proffer contemporaneous documentation surrounding the Second Amendment.

the opposite notion—that the Companies' "positive net income after dividends . . . could be used to offset potential draws in future quarters."  Treasury 2359.

By 2012, there was no similar urgency, as both Fannie Mae and Freddie Mac were projected to have funding for more than a decade.  *See* Treasury 3787-3790, 3900.  The Companies were clearly able to fund the 10 percent cash dividend in 2012 and 2013, and could use the payment-in-kind feature as needed, meaning that Treasury and FHFA had ample time to gauge investors' reactions.  *See* Treasury 4352 (dividend payments exceeding the 10 percent dividend levels).  Yet, the agencies claim, the Sweep Amendment was necessary in 2012. Neither FHFA nor Treasury suggests why the events of 2012—renewed profitability over and above Treasury's dividend—justified the Net-Worth Sweep, whereas the events of 2009 did not. Indeed, the only plausible difference between 2009 and 2012 is that the Companies were profitable in 2012, and the government saw an opportunity to seize those plentiful profits, while simultaneously acting on its "commitment" to harm the Companies' private shareholders.  *See* Treasury 0202.

### B.    Neither Treasury Nor FHFA Considered Obvious Alternative Solutions.

"[A]n agency must consider reasonably obvious alternative rules and explain its reasoning for rejecting alternatives in sufficient detail to permit judicial review."  *Walter O. Boswell Mem'l Hosp.*, 749 F.2d at 797 (internal quotation marks omitted).  The Administrative Record reveals that neither agency considered alternatives.  FHFA proffers no administrative record at all, and even its litigating declaration does not suggest that it ever considered a different solution.  *See* FHFA 0001-0010.  Treasury's contemporaneous presentations make clear that Treasury only ever considered variations on the net-worth sweep theme.  *See* Treasury 3775-3802, 3833-3862, 3883-3894, 3895-3903.

At least three viable alternatives were available.  First, the Companies could have exercised their rights under the Treasury Stock to pay Treasury's dividend in kind by increasing Treasury's liquidation preference, rather than in cash.  *See* Treasury 0033, 0067-0068 (§ 2(c)), 3841 ("Dividend Rate":  "Cash 10%; if elected to be paid in kind . . . 12%").  In other words, if the Companies found themselves unable to out-earn the 10 percent cash dividend, they were not required to draw from Treasury—they could have increased Treasury's liquidation preference. Second, Treasury could have refinanced the Companies' payment schedule to establish a lower dividend rate.  *See* Treasury 3286 (Moody's presentation identifying "[l]ower preferred dividends" as an "[a]lternative[ ] to reverse GSE capital deficits"); Treasury 3253; FHFA 3101 (Deutsche Bank suggesting, among options, the alternative of amending the Purchase Agreements to "defer or reduce the dividend").[30]  Third, Treasury and FHFA could have amended the Treasury Stock and the Purchase Agreements (assuming, of course, that Treasury even had that authority) to allow the Companies to use any excess profit to pay down Treasury's liquidation preference, which would in turn decrease the size of the 10 percent dividend.

Treasury argues that any alternative proposal would have been inconsistent with "the goals of maintaining the solvency of the [Companies] while also protecting the interests of taxpayers."  Treasury Br. 54.  This is incorrect.  Surely, Treasury did not believe that the "in kind" option was contrary to the taxpayers' interests, since Treasury certified in 2008 that the terms of the original Purchase Agreements—which included the 12 percent "in kind" provision—would "protect the taxpayer."  Treasury 0001.  Moreover, HERA—the statute authorizing Treasury to invest in the Companies—provides Treasury with other "goals" with

---

[30]  Although FHFA and Treasury both cite the Deutsche Bank report to support the necessity of the Sweep Amendment, neither agency ever suggests that it considered this alternative proposal.  *See* FHFA Br. 24; Treasury Br. 53.

which these alternative proposals would be consistent, specifically the Companies' "resumption

of private market funding" and their "status as . . . private shareholder-owned compan[ies]."  12

U.S.C. §§ 1455(*l*)(1)(C)(iii), (v), 1719(g)(1)(C)(iii), (v).  In contrast, the Sweep Amendment was

designed to ensure that these goals could never be achieved.  *See* 2012 Press Release.

Treasury implicitly argues that it was not required to consider these alternative solutions,

citing the maxim that an agency need not consider "'every alternative device and thought

conceivable by the mind of man.'"  *See* Treasury Br. 54 (quoting *Laclede Gas Co. v. FERC*, 873

F.2d 1494, 1498 (D.C. Cir. 1989)).  This *non sequitur* does not save the Sweep Amendment, as

each of these alternative solutions to the problem the agencies perceived was readily apparent at

the time of Treasury's action—Treasury was thus obligated to consider those alternative

solutions.  *See Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 816-17 (D.C.

Cir. 1983).  The 12 percent "in kind" payment was clearly set forth as a term and condition of the

Treasury Stock, Treasury 0033 (§ 2.5(c)), and was acknowledged in the Sweep Amendment

itself, Treasury 4337 (§ 3).  In fact, seven days before Treasury and FHFA executed the Sweep

Amendment, the Congressional Research Service noted that the Companies "could instead pay a

12 percent annual senior preferred stock dividend indefinitely."  Weiss, *supra*, at i.  Paying down

Treasury's liquidation preference was also explicitly referenced in the Treasury Stock certificate.

*See* Treasury 0034 (§ 3).  The refinancing alternative was included in at least two reports that

Treasury included in its own Administrative Record.  *See* Treasury 3253 (Deutsche Bank report

dated March 14, 2012), 3286 (Moody's presentation dated April 4, 2012).

These solutions also would have addressed FHFA's concerns regarding the so-called

"downward spiral" and the longevity of Treasury's commitment.  *See* FHFA Br. 65-66.

Allowing in-kind dividend payments would have relieved any need the Companies might have

had to draw additional funds from Treasury.  A lower dividend rate commensurate with the

Companies' reasonable profit expectations would have had the same effect.  And allowing the

Companies to pay down Treasury's liquidation preference would have reduced the 10 percent

dividend.  Indeed, if Treasury had the authority to "amend" the Treasury Stock in any way it saw

fit—as it erroneously argues—there is no reason why Treasury and FHFA could not have

amended the Treasury Stock and Purchase Agreements to provide that every dollar paid to

decrease Treasury's liquidation preference would increase Treasury's available funding

commitment by one dollar.  In other words, the Companies' excess payments in good quarters

could have increased Treasury's ability to support the Companies in bad quarters.

　　　　In the end, the record does not reflect that Treasury and FHFA considered any alternative

solutions, because they did not consider any.  That omission violated their obligations under the

APA.[31]

### C.    Treasury And FHFA Failed To Consider The Factors Prescribed By Congress As Relevant To Such A Change In Course.

　　　　Agency action is arbitrary and capricious if the administrative record lacks "any

discussion of a statutorily mandated factor," as such absence "leaves [the court] with no

alternative but to conclude that the agency failed to take account of [a] statutory limit on its

authority."  *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir.

2004) (internal quotation marks and alterations removed).  And, where the agency has previously

---

[31]  FHFA contends that requiring it to consider alternative solutions, such as paying Treasury's dividend in kind at 12 percent, would "constitute pure second-guessing of the means by which the Conservator took action to address a problem."  FHFA Discovery Opp. 23 n.12.  FHFA is incorrect.  Requiring FHFA to consider other alternatives does not mean that FHFA was obligated to adopt those other alternatives; it only requires FHFA to exercise its conservatorship powers in a rational manner.  *See Chamber of Commerce of U.S. v. SEC*, 412 F.3d 133, 144-45 (D.C. Cir. 2005) ("[T]he Commission's failure to consider the disclosure alternative violated the APA. . . . The Commission may ultimately decide the disclosure alternative will not sufficiently serve the interests of shareholders, but the Commission—not its counsel and not this court—is charged by the Congress with bringing its expertise and its best judgment to bear upon that issue.").

set forth its opinion of its own authority, it must "acknowledge and explain the reasons for a change [of] interpretation." *Verizon*, 740 F.3d at 636. Treasury and FHFA both fail this test.

Treasury did not provide any contemporaneous explanation of how the Sweep Amendment is consistent with its statutory authority. Treasury's authority under HERA expired on December 31, 2009, with a few limited exceptions. 12 U.S.C. §§ 1455(*l*)(2)(D), (4), 1719(g)(2)(D), (4). Yet none of Treasury's internal memoranda provide any explanation for why the Sweep Amendment was a mere "[e]xercise of [r]ights," as Treasury now argues. *See* Treasury Br. 37. Treasury's belated and litigation-inspired rationale certainly cannot satisfy its obligation under the APA. *See State Farm*, 463 U.S. at 50.

Treasury also failed to make the required findings or address the required considerations. Before Treasury exercised its limited investment authority, HERA required Treasury to determine that such purchases would "provide stability to the financial markets," "prevent disruptions in the availability of mortgage finance," and "protect the taxpayer." 12 U.S.C. §§ 1455(*l*)(1)(B), 1719(g)(1)(B). This determination would, in turn, be based on specific factors, such as "the [Companies'] plan[s] for the orderly resumption of private market funding or capital market access" and "the need to maintain the [Companies'] status as . . . private shareholder-owned compan[ies]." *Id.* §§ 1455(*l*)(1)(C), 1719(g)(1)(C). Treasury's Administrative Record lacks any of these findings or considerations in connection with the Sweep Amendment. This is in sharp contrast to the Second Amendment, where Treasury made findings and addressed the required considerations, explaining that they were necessary to "amend the terms of the Original Agreements." Treasury 0188. If Treasury is correct that it has no obligation to address any of the required considerations when fundamentally changing its investment, then Treasury could simply purchase securities on day one on terms that advance HERA's goals, and then, on day

two, amend those same securities in ways that destabilize financial markets, disrupt mortgage

finance, and hurt taxpayers.  HERA did not contemplate such an absurd result.  *See Banner Fund*

*Int'l*, 211 F.3d at 617.  And Treasury was, at the very least, required to explain why it had

departed from the precedent it set in the Second Amendment.  *See Dillmon v. NTSB*, 588 F.3d

1085, 1089-90 (D.C. Cir. 2009).

Similarly, FHFA has never explained how the Sweep Amendment—which gives away all

of the Companies' net worth in perpetuity—is consistent with its prior understanding of its

obligations as a conservator.  FHFA explained in 2008 that the conservatorships were intended to

"return [the Companies] to normal business operations," FHFA 0016, and that HERA authorized

FHFA *only* to "reconstitute the [C]ompanies under their current charters," FHFA 1185.  But the

Sweep Amendment prohibits the Companies from "retain[ing] profits" or "rebuild[ing] capital,"

2012 Press Release, something "normal business[es]" certainly do.  In fact, the Sweep

Amendment means that resumption of "normal business operations" is impossible.  And the

Sweep Amendment certainly does not allow the Companies to "reconstitute" their pre-

conservatorship operations.  FHFA's 2011 regulations also made clear that "capital distributions"

are "inconsistent with [its] statutory goals" because they "deplete the entity's conservatorship

assets."  76 Fed. Reg. at 35,727.  But the Sweep Amendment is nothing more than a series of

massive "capital distributions" that "deplete" the Companies' assets over time.  At a minimum,

FHFA had to explain why it changed its position and why asset depletion is consistent with its

conservatorship authority.  *See Dillmon*, 588 F.3d at 1089-90.

FHFA was also required to explain why it dramatically altered the regulatory regime

governing the preferred stock's rights.  Until the Sweep Amendment, preferred stockholders

had—at the very least—an opportunity to share in the Companies' financial gains, *via* a

84

liquidation preference and annual dividend.  FHFA initially preserved this opportunity under the conservatorships by committing to "rehabilitat[ing] the [Companies]" and "return[ing them] to normal business operations."  FHFA 0016; 76 Fed. Reg. at 35,730.  Indeed, Treasury's decision to purchase warrants for a super-majority of the Companies' common stock presupposes that the privately held stock had substantial value.  But the Sweep Amendment eliminates even the possibility that Plaintiffs' preferred stock will have any value because it prevents the Companies from amassing any capital to repay Treasury's liquidation preference.  Such a dramatic change required a reasoned explanation.  *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009) ("[A] reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy.").

### D.     Treasury And FHFA Failed To Heed State-Law Fiduciary Duties Owed To Other Shareholders Or Explain The Departure From Them.

When a federal agency acts as a fiduciary over a particular class of persons, the agency's normal discretion to choose among reasonable policy options is constrained by that special trust relationship.  *See Cobell v. Norton*, 240 F.3d 1081, 1099 (D.C. Cir. 2001) ("This duty necessarily constrains the Secretary's discretion.").  Like other "important aspects of [any] problem," an agency bearing fiduciary responsibilities acts arbitrarily and capriciously—and violates the APA—when it fails to "offer[ ] an explanation for its decision" that harms its fiduciary charge. *See State Farm*, 463 U.S. at 43.

State-law fiduciary duties required FHFA and Treasury to consider the interests of preferred shareholders.  A company's officers and directors owe fiduciary duties to their shareholders, including preferred shareholders.  *See Eisenberg v. Chi. Milwaukee Corp.*, 537 A.2d 1051, 1062 (Del. Ch. 1987); *WLR Foods, Inc. v. Tyson Foods, Inc.*, 869 F. Supp. 419, 421 (W.D. Va. 1994) (citing *Glass v. Glass*, 321 S.E.2d 69, 74 (Va. 1984)).  As FHFA repeatedly

emphasizes, it "immediately succeed[ed] to . . . all rights titles, powers, and privileges of . . . [any] officer or director of [the Companies]." FHFA Br. 2 (quoting 12 U.S.C. § 4617(b)(2)(A)); *see also* FHFA Br. 9, 36, 48, 46, 50. It thus owes fiduciary duties to Plaintiffs.

Treasury also owed Plaintiffs fiduciary duties as the Companies' dominant shareholder. *See Kahn v. Lynch Commc'n Sys. Inc.*, 638 A.2d 1110, 1115 (Del. 1994); *Parsch v. Massey*, 79 Va. Cir. 446, at *11 (Va. Cir. Ct. Nov. 5, 2009). "Dominant shareholders" are those that "exercise[ ] control over the business affairs of the corporation," as demonstrated by "actual control of corporation conduct." *See Kahn*, 638 A.2d at 1114. Any dealings between such control persons and the corporation must meet a rigorous test to ensure that the transaction was fair to the minority shareholders. *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983); *see also Kahn*, 638 A.2d at 1115; *Upton v. S. Produce Co.*, 133 S.E. 576, 580 (Va. 1926).

Treasury improbably contends that it is not the Companies' dominant shareholder because FHFA operates the Companies and, under HERA, "shall not be subject to the direction or supervision of any other agency." Treasury Br. 48 (citing 12 U.S.C. § 4617(a)(7)). Treasury errs. The Purchase Agreements themselves give Treasury veto power over an array of the Companies' activities. *See, e.g.*, Treasury 0024 (§ 5.2, issuance of capital stock); Treasury 0025 (§ 5.5, indebtedness). Indeed, Treasury even has veto power over whether FHFA may terminate the conservatorships. *See* Treasury 0024 (§ 5.3).

The Administrative Record demonstrates the extent of Treasury's control, as Treasury invented the net-worth sweep concept apparently without FHFA's input, and FHFA's "Document Compilation" does not show *any* effort to negotiate with Treasury or propose alternative solutions to try to achieve a better deal for the Companies. *See* Treasury 3775-3802, 3833-3862, 3883-3894, 3895-3903 (Treasury presentations). Indeed, nothing in Treasury's

Administrative Record or FHFA's "Document Compilation" suggests that the Sweep

Amendment was anything other than a *fait accompli* once Treasury decided to impose that

change to its own great advantage.  Treasury does not even attempt to argue otherwise.

The Administrative Record demonstrates that neither FHFA nor Treasury ever considered

its obligations to private shareholders such as Plaintiffs.  Indeed, to the extent that the

government ever considered the interests of private shareholders, they were regarded with open

hostility, given the Administration's "commitment to ensure [that] existing common equity

holders will not have access to any positive earnings from the [Companies] in the future."

Treasury 0202.  And by prohibiting the Companies from "retain[ing] profits" or "rebuild[ing]

capital," the Sweep Amendment guarantees that Plaintiffs will never recover a cent of their

liquidation preferences.

FHFA and Treasury argue that they were not required to consider state-law fiduciary

duties because they conflict with HERA and are thus preempted.  *See* FHFA Br. 54; Treasury Br.

45.  This is incorrect.  Treasury concedes that HERA requires it to consider the Companies'

"status as . . . private shareholder-owned compan[ies]" whenever it makes "investment

decisions."  12 U.S.C. §§ 1455(*l*)(1)(C)(v), 1719(g)(1)(C)(v); Treasury Br. 46.  And FHFA's

obligation to private shareholders is fully consistent with its obligation to "preserve and

conserve" the Companies' assets.  *See* 12 U.S.C. § 4617(b)(2)(D)(ii).  Indeed, FHFA recognizes

that private shareholders "continue to retain all rights in the stock's financial worth," FHFA

0028, and, if the Companies exit conservatorship, it is these private shareholders that would

resume operations as the Companies' equity owners.  It would make little sense for Congress to

grant FHFA the authority to "rehabilitate" the Companies, yet permit it to do so without regard

for the shareholders that will eventually run the rehabilitated entities.  *See* 76 Fed. Reg. at 35,730.[32]

Treasury and FHFA contend that they need only consider the "public interest" and not the interests of private shareholders.  FHFA Br. 55; Treasury Br. 46.  Again, they are wrong.  FHFA is charged with preserving and conserving the Companies' assets—none of the "powers and duties of the Agency as conservator" suggests that FHFA may choose the public interest if it conflicts with the Companies' interests.  *See* 12 U.S.C. § 4617(b).  And Treasury is clearly obligated to consider the Companies' futures as entities to be operated by "private shareholders."  *Id.* §§ 1455(*l*)(1)(C)(v), 1719(g)(1)(C)(v).[33]  Treasury's and FHFA's failure to address their important duties to the Companies' private shareholders—basically conceded in their briefs—violated the APA.

## CONCLUSION

Congress granted Treasury and FHFA the authority to seize control over two of the largest financial institutions in the world, but placed specific limitations on the exercise of that power.  Both agencies ignored their statutory limitations and chose to ransack the Companies' net worth, contrary to the intent of Congress and to the detriment of holders of the Companies'

---

[32] Citing *Albrecht v. Committee on Employee Benefits of Federal Reserve Employment Benefit System*, 357 F.3d 62 (D.C. Cir. 2004), Treasury argues that Plaintiffs' APA claims grounded on fiduciary duties must be brought before the Court of Federal Claims.  Treasury Br. 44.  This is incorrect.  Plaintiffs' APA claims here do not seek relief for Treasury's or FHFA's breach of their fiduciary duties—they seek relief from Treasury's and FHFA's arbitrary and capricious decision to execute the Sweep Amendment in violation of the APA; and the breach of fiduciary duties embodies and illuminates that violation of the APA.  In any event, *Albrecht* does not hold that claims for breach of fiduciary duty are within the jurisdiction of the Court of Federal Claims, but rather held that a plaintiff cannot circumvent the Tucker Act by styling breach of contract claims against the United States as breaches of fiduciary duties, *see* 357 F.3d at 68-69, a legal rule with no applicability here.

[33] Requiring FHFA and Treasury to consider their duties to shareholders would not, as Treasury argues, require agencies to consider every "arguably relevant statutory [or here, common law] policy."  Treasury Br. 45.  HERA clearly contemplated an ongoing relationship between private shareholders and the Companies, requiring Treasury to consider "the need to maintain the Corporation's status as a private shareholder-owned company."  12 U.S.C. §§ 1455(*l*)(1)(C)(v), 1719(g)(1)(C)(v).

preferred stock.  The Sweep Amendment is a blatant example of agency overreach and must be vacated because both agencies exceeded their statutory authority and acted arbitrarily and capriciously in violation of the APA.

Respectfully Submitted,

Dated:  March 21, 2014

/s/ Charles J. Cooper
Charles J. Cooper, SBN 24870
Vincent J. Colatriano, SBN 429562
David H. Thompson, SBN 450503
Peter A. Patterson, SBN 998668
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C.  20036
Telephone:  202.220.9600
Facsimile:  202.220.9601

*Attorneys for Plaintiffs Fairholme Funds, Inc., et al.*

/s/ Drew W. Marrocco
Drew W. Marrocco, SBN 452305
DENTONS US LLP
1301 K Street, N.W., Suite 600, East Tower
Washington, D.C.  20005
Telephone:  202.408.6400
Facsimile:  202.408.6399

Michael H. Barr (*Pro Hac Vice*)
Richard M. Zuckerman (*Pro Hac Vice*)
Sandra Hauser (*Pro Hac Vice*)
DENTONS US LLP
1221 Avenue of the Americas
New York, N.Y.  10020
Telephone:  212.768.6700
Facsimile:  212.768.6800

*Attorneys for Plaintiffs Arrowood Indemnity Co., et al.*

/s/ Theodore B. Olson
Theodore B. Olson, SBN 367456
Douglas R. Cox, SBN 459668
Matthew D. McGill, SBN 481430
Nikesh Jindal, SBN 492008
Derek S. Lyons, SBN 995720
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone:  202.955.8500
Facsimile:  202.467.0539

Janet M. Weiss (*Pro Hac Vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, N.Y.  10166
Telephone:  212.351.3988
Facsimile:  212.351.5234

*Attorneys for Plaintiff Perry Capital LLC*