## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PERRY CAPITAL LLC,

                Plaintiff,

      v.

JACOB J. LEW, *et al*.,

                Defendants.

Civil Action No. 1:13-cv-1025-RCL

### DECLARATION OF MICHAEL C. NEUS

I, Michael C. Neus, hereby declare as follows:

1.     I am currently a Managing Partner and General Counsel of Perry Capital LLC ("Perry Capital"). I have been General Counsel since April 1, 2005.

2.     As a Managing Partner and General Counsel, I am familiar with Perry Capital's holdings of stock in the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac").

3.     Funds managed by Perry Capital or its affiliates own a variety of classes of preferred stock in Fannie Mae, including Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series S (FNMAS). Funds managed by Perry Capital or its affiliates have continuously owned FNMAS shares since November, 18, 2010. Attached hereto as Exhibit A is a true and correct copy of the Offering Circular, as found of the website of Fannie Mae at http://www.fanniemae.com/resources/file/ir/pdf/stock-info/series_s_12062007.pdf, that sets forth the terms and conditions of the Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series S.

4.      Funds managed by Perry Capital or its affiliates also own a variety of classes of preferred stock in Freddie Mac, including Fixed-to-Floating Rate Non-Cumulative Preferred Stock (FMCKJ).  Funds managed by Perry Capital or its affiliates have continuously owned shares in FMCKJ since November 16, 2010.  Attached hereto as Exhibit B is a true and correct copy of the Offering Circular, as found on the website of Freddie Mac at http://www.freddiemac.com/investors/pdffiles/FtFPrefStock-oc.pdf, that sets forth the terms and conditions of the Fixed-to-Floating Rate Non-Cumulative Preferred Stock.

5.      In addition, funds managed by Perry Capital or its affiliates have continuously owned common stock in both Fannie Mae (FNMA) and Freddie Mac (FMCC) from February 17, 2011 through the date hereof.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of March, 2014, in New York, New York.

_____

Michael C. Neus
Managing Partner and General Counsel
Perry Capital LLC

# Exhibit A

**OFFERING CIRCULAR**



### 280,000,000 SHARES
### FIXED-TO-FLOATING RATE NON-CUMULATIVE PREFERRED STOCK
### SERIES S

**Dividend Rate:**

| | |
|---|---|
| From the issue date to but excluding December 31, 2010: | 8.25% per annum |
| For the period beginning December 31, 2010: | The greater of (i) 7.75% per annum and (ii) 3-Month LIBOR plus 4.23% per annum; Dividend Rate will reset quarterly beginning on December 31, 2010 |
| **Payment Dates:** | Quarterly; on each March 31, June 30, September 30, and December 31, beginning March 31, 2008, subject to the declaration of dividends by the Board of Directors in its discretion |
| **Optional Redemption by Fannie Mae:** | On December 31, 2010, and on each fifth anniversary thereafter, at $25 per share plus accrued dividends from the most recent payment date, whether or not the dividend was declared |
| **Stated Value:** | $25 per share |
| **Liquidation Preference:** | $25 per share plus accrued dividends from the most recent payment date, whether or not the dividend was declared |
| **Issue Date:** | December 11, 2007 |

We will apply to list the Preferred Stock on the New York Stock Exchange ("NYSE") under the symbol "FNMprS". If approved for listing, we expect trading on the NYSE to commence by December 31, 2007.

An investment in Preferred Stock involves risks for investors. It is important that you read the "Risk Factors" section beginning on page 6 of this Offering Circular, beginning on page 22 of our Annual Report on Form 10-K for the fiscal year ended December 31, 2006, and beginning on page 104 of our Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2007.

The obligations related to this Preferred Stock, including any dividend payments, are solely the obligation of Fannie Mae. The Preferred Stock is not guaranteed by, and is not a debt or obligation of, the United States or of any of its agencies or instrumentalities.

| | Initial Public Offering Price[1] | Underwriting Discount | Proceeds to Fannie Mae[1][2] |
|---|---|---|---|
| Per Share................................................................ | $25.00 | $0.25 | $24.75 |
| Total...................................................................... | $7,000,000,000 | $70,000,000 | $6,930,000,000 |

(1)     Plus accrued dividends, if any, from December 11, 2007.
(2)     Before deducting estimated expenses of $255,000 (exclusive of any underwriting discount and advisory fees).

The Underwriters expect to deliver the Preferred Stock in book-entry only form through the facilities of The Depository Trust Company against payment in New York, New York, on or about December 11, 2007.

———————————
Joint Book-Running Managers

**LEHMAN BROTHERS**                                    **MERRILL LYNCH & CO.**

———————————
Senior Co-Managers

**GOLDMAN, SACHS & CO.**                                              **JPMORGAN**

———————————
Co-Managers

**BANC OF AMERICA SECURITIES LLC**
**BEAR, STEARNS & CO. INC.**
**CITI**
**DEUTSCHE BANK SECURITIES**
**MORGAN STANLEY**
**UBS INVESTMENT BANK**

The date of this Offering Circular is December 6, 2007.

This Offering Circular relates to the offer of 280,000,000 shares of the Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series S (the "Preferred Stock") of the Federal National Mortgage Association ("Fannie Mae").

We are not required to register the Preferred Stock with the U.S. Securities and Exchange Commission (the "SEC") under the Securities Act of 1933, as amended. The shares of Preferred Stock are "exempted securities" within the meaning of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Neither the SEC nor any state securities commission has approved or disapproved of the Preferred Stock or determined if this Offering Circular is truthful or complete.  Any representation to the contrary is a criminal offense.

In some jurisdictions it may be unlawful to distribute this Offering Circular or offer, sell, or deliver the Preferred Stock. Persons who distribute or receive this Offering Circular should know about and observe these restrictions.

Any dividends paid on the Preferred Stock will not be exempt from federal, state or local taxation. See "United States Taxation" beginning on page 30 of this Offering Circular.

## TABLE OF CONTENTS

**Page**

Additional Information .................................................................................................................. 3

Summary of the Offering ............................................................................................................. 4

Risk Factors ................................................................................................................................ 6

Fannie Mae ................................................................................................................................. 12

Recent Developments ................................................................................................................. 12

Use of Proceeds.......................................................................................................................... 13

Capitalization .............................................................................................................................. 14

Selected Financial Information ................................................................................................... 16

Previous Issuances of Preferred Stock ...................................................................................... 18

Description of the Preferred Stock.............................................................................................. 20

Regulatory Capital Matters ......................................................................................................... 25

Legality of Investment ................................................................................................................. 30

United States Taxation ................................................................................................................ 30

Underwriting ................................................................................................................................ 33

Ratings ........................................................................................................................................ 34

Independent Registered Public Accounting Firm ....................................................................... 34

Validity of the Preferred Stock .................................................................................................... 34

Forward-Looking Statements...................................................................................................... 35

Certificate of Designation ........................................................................................................... A-1

## ADDITIONAL INFORMATION

You should read this Offering Circular (including the Certificate of Designation of Terms of Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series S, attached hereto as Exhibit A) together with:

- our Annual Report on Form 10-K for the year ended December 31, 2006, filed with the SEC on August 16, 2007 (the "2006 10-K");

- our Quarterly Reports on Form 10-Q for the quarters ended March 31, 2007, June 30, 2007, and September 30, 2007, filed with the SEC on November 9, 2007; and

- proxy soliciting materials that we file with the SEC, and all documents that we file with the SEC pursuant to Section 13(a), 13(c) or 14 of the Exchange Act, after the date of this Offering Circular and prior to the termination of the offering of the Preferred Stock, excluding any information we "furnish" to the SEC on Form 8-K.

This Offering Circular incorporates these documents by reference, which means that we are disclosing information to you by referring to them rather than by providing you with separate copies. They are considered part of this Offering Circular and you should read them before you consider an investment in the Preferred Stock. You should rely only on the most up-to-date information.

Our common stock is registered with the SEC under the Exchange Act, and our SEC filings are available on our website at www.fanniemae.com and on the SEC's website at www.sec.gov. We are referring these websites to you for your reference only, and we are not incorporating in this Offering Circular all of the information available on these websites.  You should rely only on the information included or incorporated by reference or deemed to be incorporated by reference in this Offering Circular in deciding whether or not to invest in the Preferred Stock. We have not authorized anyone to provide you with any different or additional information.

You can obtain paper copies of this Offering Circular and the documents incorporated by reference herein without charge by contacting our Office of Investor Relations, Fannie Mae, 3900 Wisconsin Avenue, NW, Washington D.C. 20016, telephone: (202) 752-7115. You may also read and copy any document we file with or furnish to the SEC by visiting the SEC's Public Reference Room at 100 F Street, NE, Washington D.C. 20549; telephone 1-800-SEC-0330 for further information.  In addition, you may read our SEC filings at the offices of the New York Stock Exchange ("NYSE"), which is located at 20 Broad Street, New York, NY 10005.

# SUMMARY OF THE OFFERING

This summary highlights select information about the Preferred Stock. You also should refer to the more detailed information contained elsewhere in this Offering Circular and in the documents incorporated by reference for information about us and the Preferred Stock.

## Fannie Mae

Fannie Mae is a federally chartered and stockholder-owned corporation organized and existing under the Federal National Mortgage Association Charter Act. We were established in 1938 as a United States government agency to provide supplemental liquidity to the mortgage market and were transformed into a stockholder-owned and privately managed corporation by legislation enacted in 1968.

## Description of the Preferred Stock

| | |
|---|---|
| Issuer............................................................. | Fannie Mae |
| Securities Offered ........................................... | 280,000,000 shares of Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series S, no par value, with a stated value of $25 per share. |

Dividends:

*For the period from the issue date to but excluding December 31, 2010:*

| | |
|---|---|
| Fixed Dividend Rate ............................ | 8.25% per annum |
| Day Count Convention.......................... | 30/360 |
| Payment Dates........................................ | Quarterly; on each March 31, June 30, September 30, and December 31, beginning March 31, 2008, subject to the declaration of dividends by the Board of Directors in its sole discretion. |

*For the period beginning  December 31, 2010:*

| | |
|---|---|
| Dividend Rate Formula: ...................... | The greater of (i) 7.75% per annum and (ii) 3-Month LIBOR plus 4.23% per annum. The Dividend Rate will reset quarterly beginning on December 31, 2010. |
| Dividend Reset Frequency:.................. | Quarterly; on each March 31, June 30, September 30, and December 31, beginning December 31, 2010. |
| Day Count Convention.......................... | Actual/360 |
| Payment Dates........................................ | Quarterly; on each March 31, June 30, September 30, and December 31, beginning March 31, 2011, subject to the declaration of dividends by the Board of Directors in its sole discretion. |

| | |
|---|---|
| Calculation Agent ............................................. | Fannie Mae |
| Preferences....................................................... | The Preferred Stock will be entitled to a preference, both as to dividends and upon liquidation, over the common stock (and any other junior stock) of Fannie Mae. The Preferred Stock will rank equally, both as to dividends |

|  | and upon liquidation, with all other currently outstanding series of Fannie Mae preferred stock. |
|---|---|
| Maturity ........................................................ | Perpetual |
| Optional Redemption ...................................... | On December 31, 2010, and on each fifth anniversary thereafter, we may redeem the Preferred Stock, in whole or in part, at our option at the redemption price of $25 per share plus accrued dividends from the most recent Payment Date (whether or not declared but without accumulation of any undeclared dividends for prior periods). Holders of Preferred Stock will have no right to require the redemption of the Preferred Stock. |
| Liquidation Rights .......................................... | In the event of any dissolution, liquidation or winding up of Fannie Mae, holders of the Preferred Stock will be entitled to receive, out of any assets available for distribution to preferred stockholders, $25 per share plus accrued dividends from the most recent Payment Date (whether or not declared but without accumulation of any undeclared dividends for prior periods). |
| Voting Rights................................................... | None, except with respect to certain changes in the terms of the Preferred Stock. |
| Preemptive and Conversion Rights.................. | None |
| Ratings ........................................................... | We expect that the Preferred Stock will be rated "AA–" (negative) by Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies, "Aa3" (stable) by Moody's Investors Service, Inc. and "AA–" by Fitch Ratings. |
| Use of Proceeds............................................... | The capital raised from the sale of the Preferred Stock will be used to increase our capital base and for general corporate purposes. See "Regulatory Capital Matters" beginning on page 25 of this Offering Circular. |
| Transfer Agent, Dividend Disbursing Agent and Registrar .......................................................... | Computershare Trust Company, N.A. |
| NYSE Listing................................................... | We will apply to list the Preferred Stock on the NYSE under the symbol "FNMprS". If approved for listing, we expect trading on the NYSE to commence by December 31, 2007. |
| CUSIP Number ................................................ | 313586752 |

5

# RISK FACTORS

Prospective investors in the Preferred Stock should carefully consider the risk factors set forth below, in our 2006 Form 10-K and in our Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2007 (the "Third Quarter 10-Q"), as well as all other information contained or incorporated by reference in this Offering Circular, in evaluating an investment in the Preferred Stock.

## RISKS RELATED TO AN INVESTMENT IN THE PREFERRED STOCK

### *Our Board may be restricted in declaring or decide not to declare dividends.*

Dividends on the Preferred Stock are not mandatory. Our Charter Act restricts the ability of our Board of Directors to declare dividends in certain circumstances, depending on whether or not we meet or exceed certain capital standards set by the Office of Federal Housing Enterprise Oversight ("OFHEO"), our current federal safety and soundness regulator. In addition, our Board of Directors has the sole discretion to decide whether or not to declare dividends on our preferred or common stock notwithstanding our compliance with capital standards.  On December 4, 2007, we announced that our Board of Directors currently intends to reduce our common stock dividend for the first quarter of 2008 from 50 cents per share to 35 cents per share.

### *The Preferred Stock is subordinated to our debt securities.*

The Preferred Stock is subordinated to our debt securities. In particular, our outstanding subordinated debt securities provide that during any period where interest payments on those debt securities are deferred, dividend payments on our equity securities, including the Preferred Stock, may not be paid.  See "Capitalization" beginning on page 14 of this Offering Circular.

### *The terms of the Preferred Stock will not be adjusted for any change to the dividends-received deduction.*

No adjustment in respect of the amount of dividends payable on the Preferred Stock will be made in the event of a change to the dividends-received deduction under the Internal Revenue Code of 1986, as amended (the "Code").

### *There may be no active trading market for the Preferred Stock.*

Prior to this issuance, there has been no trading market for the Preferred Stock, and there can be no assurance that an active market for the Preferred Stock will develop or be sustained in the future. We will apply to list the Preferred Stock on the NYSE, but there is no assurance that the Preferred Stock will be accepted for listing. If accepted for listing by the NYSE, we anticipate that trading will commence on the NYSE by December 31, 2007. We cannot assure you regarding the liquidity of, or trading market for, the Preferred Stock, and, if such a market does develop, the trading price of the Preferred Stock could widely fluctuate in response to variations in our operating results, general market conditions, interest rates, and other events or factors.

### *The market value of the Preferred Stock may be influenced by unpredictable factors.*

The market value of the Preferred Stock may fluctuate after the date of your purchase. Several factors, many of which are beyond the our control, could influence the market value of the Preferred Stock. Some factors that may influence the market value of the Preferred Stock include: (i) our creditworthiness and rating of our securities; (ii) whether dividends are likely to be paid on the Preferred Stock from time to time; (iii) supply and demand of corporate issuances of preferred stock generally, and (iv) economic, financial, political, regulatory or judicial events that affect us or the financial markets or

mortgage markets generally. Accordingly, if you sell your Preferred Stock in the secondary market, you may not be able to obtain a price equal to the price that you paid for the Preferred Stock.

## COMPANY RISKS

***Increased delinquencies and credit losses relating to our mortgage assets and the mortgage loans that back our Fannie Mae MBS continue to adversely affect our results of operations and could affect our financial condition.***

We are experiencing increasing mortgage loan delinquencies and credit losses. Weak economic conditions in the Midwest and home price declines on a national basis have increased our single-family serious delinquency rates and contributed to higher default rates and loan loss severities in the first nine months of 2007. We have experienced increases in serious delinquency rates across our conventional single-family mortgage credit book, including in higher risk loan categories, such as subprime loans, Alt-A loans, adjustable-rate loans, interest-only loans, loans made for the purchase of investment properties, negative-amortizing loans, loans to borrowers with lower credit scores and loans with high loan-to-value ratios. We have experienced particularly rapid increases in our conventional single-family serious delinquency rates in some higher risk loan categories, such as Alt-A loans, interest-only loans, loans with subordinate financing and loans made for the purchase of condominiums. If current housing market trends continue, we expect that we will continue to experience increased delinquencies and credit losses for 2007 and 2008. Moreover, if a recession occurs that negatively impacts economic conditions in the United States as a whole or in specific regions of the country, we could experience significantly higher delinquencies and credit losses. An increase in our credit losses would reduce our earnings and adversely affect our financial condition.

***We are subject to increased credit risk exposures related to subprime and Alt-A mortgage loans that back our private-label mortgage-related securities investments, and any increased delinquency rates and credit losses could adversely affect the yield on or value of our investments, which could negatively affect our earnings and financial condition.***

We invest in private-label mortgage-related securities that are backed by Alt-A and subprime mortgage loans. In October 2007, Standard & Poor's downgraded the credit ratings of a small number of private-label securities held in our portfolio that are backed by subprime mortgage loans, and Moody's placed under review for possible downgrade several additional subprime-backed private-label securities held in our portfolio. In recent months, mortgage loan delinquencies and credit losses generally have increased, particularly in the subprime and Alt-A sectors. In addition, home prices in many states have declined, after extended periods during which home prices appreciated. If delinquency and loss rates on subprime and Alt-A mortgages continue to increase, or there is a further decline in home prices, we could experience reduced yields or losses on our investments in private-label mortgage-related securities backed by subprime or Alt-A loans. In addition, the fair value of these investments may be adversely affected. A reduction in the fair value of these investments could negatively affect our earnings and financial condition.

***Our potential exposure to the risks associated with our dependence on the institutional counterparties to provide services that are critical to our business has increased in recent months, and our earnings and liquidity may be reduced if one or more of our institutional counterparties defaults on its obligations to us.***

Our primary exposure to institutional counterparty risk is with our mortgage insurers, mortgage servicers, lender customers, depository institutions, dealers that commit to sell mortgage pools or loans to us, issuers of investments held in our liquid investment portfolio, and derivatives counterparties. Our business with many of these institutional counterparties is heavily concentrated. For example, seven mortgage insurance companies provided over 99% of our total coverage as of September 30, 2007. In

addition, as of September 30, 2007, our ten largest single-family mortgage servicers and their affiliates serviced 78% of our single-family mortgage credit book of business, and Countrywide Financial Corporation and its affiliates, which is our largest single-family mortgage servicer, serviced 23% of our single-family mortgage credit book of business.

The products or services that these counterparties provide are critical to our business operations, and a default by a counterparty with significant obligations to us could adversely affect our ability to conduct our operations efficiently and at cost-effective rates, which in turn could adversely affect our results of operations and our financial condition.

*Mortgage Insurers.* In August and September 2007, two of our seven primary mortgage insurers had their external ratings for claims paying ability or insurer financial strength downgraded by Fitch from AA to AA-. Both have maintained their Standard & Poor's and Moody's ratings of AA and Aa3, respectively. As of September 30, 2007, these two mortgage insurers provided primary and pool mortgage insurance coverage on $59.1 billion and $27.8 billion, respectively, of single-family loans in our portfolio or underlying Fannie Mae MBS, which represented approximately 2% and 1%, respectively, of our single-family mortgage credit book of business. Ratings downgrades imply an increased risk that these mortgage insurers will fail to fulfill their obligations to reimburse us for claims under insurance policies. In addition, if a mortgage insurer were downgraded below AA-/Aa3 by any of the three national rating agencies, we would evaluate the insurer, the current market environment and our alternative sources of credit enhancement. Based on the outcome of our evaluation, we could restrict that insurer from conducting certain types of business with us and we may take actions that may include not purchasing loans insured by that mortgage insurer. Restricting our business activity with any of our mortgage insurer counterparties would increase our concentration risk with the remaining insurers in the industry.

*Lender Customers and Mortgage Servicers.* Challenging market conditions in recent months have adversely affected, and may continue to adversely affect, the liquidity and financial condition of a number of our lender customers and mortgage servicers. Several of our lender customers and servicers have experienced ratings downgrades and liquidity constraints, including Countrywide Financial Corporation and its affiliates, our largest lender customer and servicer. These and other lender customers and mortgage servicers may become subject to serious liquidity problems that, either temporarily or permanently, negatively affect the viability of their business plans or reduce their access to funding sources. Our arrangements with our lender customers and mortgage servicers could result in significant exposure to us if any one of our significant lender customers or servicers were to default or experience a serious liquidity event. In addition, if current housing market trends continue or worsen, the number of delinquent mortgage loans serviced by our counterparties could continue to increase. Managing a substantially higher volume of non-performing loans could create operational difficulties for our servicers. The financial difficulties that a number of our lender customers and mortgage servicers are currently experiencing, coupled with growth in the number of delinquent loans on their books of business, may negatively affect the ability of these counterparties to meet their obligations to us and the amount or quality of the products or services they provide to us. The failure of any of our primary lender customers or mortgage servicers to meet their obligations to us could increase our credit-related expenses and credit losses, and have a material adverse effect on our results of operations and financial condition.

*Derivatives counterparties.* As of September 30, 2007, we had outstanding transactions with 21 interest rate and foreign currency derivatives counterparties, of which eight counterparties accounted for approximately 80% of the total outstanding notional amount of our derivatives contracts as of that date. Each of these eight counterparties accounted for between approximately 5% and 17% of the total outstanding notional amount of our derivatives contracts as of September 30, 2007. Downgrades in the credit ratings of any of our derivatives counterparties could increase the collateral we hold to reduce our exposure to that counterparty. If a counterparty's credit rating is downgraded below A-, we may cease entering into new arrangements with that counterparty, which would further increase the concentration of our business with our remaining derivatives counterparties. In addition, a derivatives counterparty

8

experiencing liquidity or financial constraints may not be able to meet their obligations to us, which could adversely affect our results of operations and our financial condition.

***We have several key lender customers, and the loss of business volume from any one of these customers could adversely affect our business and result in a decrease in our market share and earnings.***

Our ability to generate revenue from the purchase and securitization of mortgage loans depends on our ability to acquire a steady flow of mortgage loans from the originators of those loans. We acquire a significant portion of our mortgage loans from several large mortgage lenders. For the first nine months of 2007, our top five lender customers of single-family mortgage loans accounted for approximately 57% of our single-family business volume, and the top five lender customers of multifamily mortgage loans accounted for approximately 46% of our multifamily business volume during those periods. In addition, during the first nine months of 2007, Countrywide, which is our largest lender customer of single-family mortgage loans, accounted for approximately 29% of our single-family business volume, and our largest lender customer of multifamily mortgage loans accounted for approximately 14% of our multifamily business volume during those periods. Accordingly, maintaining our current business relationships and business volumes with our top lender customers is critical to our business. Some of our lender customers are experiencing, or may become subject to, liquidity problems that would affect the volume of business they are able to generate. If any of our key lender customers significantly reduces the volume or quality of mortgage loans that the lender delivers to us or that we are willing to buy from them, we could lose significant business volume that we might be unable to replace, which could adversely affect our business and result in a decrease in our market share and earnings.

***In reporting our financial condition, results of operations and liquidity position, and in providing forward-looking statements relating to our results of operations, management must make estimates and rely on the use of models about matters that are inherently uncertain, which may result in significant changes from previously reported information.***

Our accounting policies and methods are fundamental to how we record and report our financial condition and results of operations. Our management must exercise judgment in applying many of these accounting policies and methods so that these policies and methods comply with GAAP and reflect management's judgment of the most appropriate manner to report our financial condition and results of operations. The recent market price volatility resulting from increased credit risk has raised issues of how to measure the fair value of mortgage-related assets in a volatile market. Due to the complexity of many of our accounting policies, our accounting methods relating to these policies involve substantial use of models. Models are inherently imperfect predictors of actual results because they are based on assumptions, including assumptions about future events. Our models may not include assumptions that reflect very positive or very negative market conditions and, accordingly, our actual results could differ significantly from those generated by our models. As a result, the estimates that we use to prepare our financial statements, as well as our estimates of our future results of operations, may be inaccurate, potentially significantly.

***Our results of operations are subject to uncertainty based upon continuing developments in the housing and mortgage markets, making it more difficult for us to operate our business and manage risk.***

The current disruption in the housing and mortgage markets may continue or worsen. The disruption may adversely impact the U.S. economy in general and the housing and mortgage markets in particular. In addition, a variety of legislative, regulatory and other proposals have been or may be introduced in an effort to address the disruption. Depending on the scope and nature of legislative, regulatory or other initiatives, if any, that are adopted to respond to this disruption and applied to us, our

9

financial condition, results of operations or liquidity could, directly or indirectly, benefit or be adversely affected in a manner that could be material to our business.

***Material weaknesses and other control deficiencies relating to our internal control over financial reporting could result in errors in our reported results and could have a material adverse effect on our operations, investor confidence in our business and the trading prices of our securities.***

We have not yet remediated material weaknesses in our financial statement preparation and reporting or our disclosure controls and procedures, which may result in errors in our financial or other reporting, cause us to fail to meet our reporting obligations on a timely basis and decrease investor confidence in our reported information, leading to a decline in our stock price.

In addition, we may identify additional material weaknesses or significant deficiencies in our internal control over financial reporting that we have not discovered to date or that we believed had been remediated and would not reoccur. In addition, we cannot be certain that we will be able to maintain effective disclosure controls and procedures in the future.

***Continued declines in our earnings could negatively impact our regulatory capital position.***

We are required to meet various capital standards, including a requirement that our core capital equal or exceed both our statutory minimum capital requirement and an OFHEO-directed minimum capital requirement. Our retained earnings are a component of our core capital. Accordingly, the level of our core capital may fluctuate significantly depending on our results of operations.  Our net income declined in the first nine months of 2007 due to derivatives fair value losses, a significant reduction in net interest income, significantly higher losses on certain guaranty contracts and a substantial increase in credit-related expenses. If some or all of the market trends that contributed to these results continue to negatively affect our net income, they will continue to cause a reduction in our retained earnings and, as a result, in the amount of our core capital. In order to maintain our statutory and OFHEO-directed minimum capital surplus, we may be required to take actions, or refrain from taking actions, to ensure that we maintain or increase our core capital. These actions have included, and in the future may include, selling assets at a time when we believe that it would be economically advantageous to continue to hold the assets and issuing additional equity securities, which in general is a more expensive method of funding our operations than issuing debt securities. Either of these actions may further reduce our net income. In addition, in order to remain in compliance with our regulatory capital requirements, we may need to limit or forgo attractive opportunities to acquire assets, and we may lose market share as a result.

***Possible legislation could be introduced that could negatively impact our business.***

As a federally chartered corporation, we are subject to Congressional legislation and oversight and regulation by various government agencies. We expect that the U.S. Congress will consider various bills in the House of Representatives and the Senate that address our business and regulatory environment. We cannot predict whether any legislation will be approved by Congress and signed into law by the President and, if so, the final form or effective date of such legislation or impact on us and our operations.

## RISKS RELATING TO OUR INDUSTRY

***A continuing, or broader, decline in home prices or in activity in the U.S. housing market could negatively impact our earnings and financial condition.***

The continued deterioration of the housing market and national decline in home prices in the first nine months of 2007, along with the expected continued decline, is likely to result in increased delinquencies or defaults on the mortgage assets we own or that back our guaranteed Fannie Mae MBS. In addition, home price declines reduce the fair value of our mortgage assets. Further, the features of a significant portion of mortgage loans made in recent years, including loans that reset to higher interest rates either once or throughout their term, and loans that were made based on limited or no credit or income documentation, also increase the likelihood of future increases in delinquencies or defaults on mortgage loans. An increase in delinquencies or defaults likely will result in a higher level of credit losses, which in turn will reduce our earnings.

Our business volume is affected by the rate of growth in total U.S. residential mortgage debt outstanding and the size of the U.S. residential mortgage market. We expect total mortgage originations to decline by 12% in 2007, from $2.8 trillion in 2006 to $2.4 trillion in 2007, and by an additional 18% in 2008 to $2.0 trillion. If we do not continue to increase our share of the secondary mortgage market, this decline in mortgage originations could reduce our guaranty fee income.

***Changes in general market and economic conditions in the U.S. and abroad may adversely affect our financial condition and results of operations.***

Our financial condition and results of operations may be adversely affected by changes in general market and economic conditions in the U.S. and abroad. These conditions are beyond our control, and may change suddenly and dramatically. Changes in market and economic conditions could adversely affect us in many ways, including the following:

- fluctuations in the global debt and equity capital markets, including sudden and unexpected changes in short-term or long-term interest rates, could decrease the fair value of our mortgage assets, derivatives positions and other investments, negatively affect our ability to issue debt at attractive rates, and reduce our net interest income;

- a recession or other economic downturn, or rising unemployment, in the United States as a whole or in specific regions of the country could decrease homeowner demand for mortgage loans and increase the number of homeowners who become delinquent or default on their mortgage loans. An increase in delinquencies or defaults would likely result in a higher level of credit losses, which would reduce our earnings. Also, decreased homeowner demand for mortgage loans could reduce our guaranty fee income, net interest income and the fair value of our mortgage assets. A recession or other economic downturn could also increase the risk that our counterparties will default on their obligations to us, resulting in an increase in our liabilities and a reduction in our earnings; and

- general economic conditions may become exacerbated, and the state and local governmental solutions currently under development, including proposed funds to assist subprime borrowers in refinancing existing subprime loans, may not succeed in their stated objective of making more mortgage products available. We cannot assure you that these and other proposed federal, state and local governmental responses to the housing market downturn will achieve their purpose. If governmental solutions do not have a positive impact, our financial condition and results of operations could be harmed.

11

## FANNIE MAE

Fannie Mae is a federally chartered and stockholder-owned corporation organized and existing under the Federal National Mortgage Association Charter Act, 12 U.S.C. § 1716 et seq. (the "Charter Act"). See "Our Charter and Regulation of Our Activities" in our 2006 10-K for further information. We were established in 1938 as a United States government agency to provide stability and liquidity to the mortgage market and were transformed into a stockholder-owned and privately managed corporation by legislation enacted in 1968.

Our business operates within the U.S. residential mortgage market. The residential mortgage market comprises a major portion of the domestic capital markets and provides a vital source of financing for the housing segment of the U.S. economy, as well as one of the most important means for Americans to achieve their homeownership objectives. We operate an integrated business that contributes to providing liquidity to the U.S. residential mortgage market and increasing the availability and affordability of housing in the United States. See "Business" in our 2006 10-K for further information.

Our principal customers are lenders that operate within the primary mortgage market by originating mortgage loans for homebuyers and for current homeowners refinancing their existing mortgage loans. Lenders originating mortgages in the primary market often sell them in the secondary market in the form of loans or mortgage-related securities. We operate in the secondary market, where we securitize mortgage loans originated by lenders into Fannie Mae mortgage-backed securities ("MBS") and other mortgage-related securities and purchase mortgage loans (often referred to as "whole loans") and mortgage related securities for our mortgage portfolio. By selling loans to us, lenders replenish their funds and, consequently, are able to make additional loans. Pursuant to the Charter Act, we do not lend money directly to consumers in the primary mortgage market.

Our principal office is located at 3900 Wisconsin Avenue, NW, Washington, D.C. 20016 (telephone: (202) 752-7000).

## RECENT DEVELOPMENTS

### Announcement of Reduction of Common Stock Dividend

On December 4, 2007, we announced that, at its regularly scheduled meeting in January 2008, our Board of Directors currently intends to reduce our quarterly common stock dividend beginning with the first quarter of 2008 from 50 cents per share to 35 cents per share. We made this announcement as part of a capital-raising initiative that includes the issuance of the Preferred Stock.

### Announcement of Current View of Housing Market and Impact on Fannie Mae

On December 4, 2007, we announced that we continue to believe that the worsening housing and credit markets, continued losses on certain guaranty contracts, substantial credit-related expenses and fair value losses on derivatives and securities will adversely affect in a material way our fourth quarter 2007 results. We continue to believe that conditions in the housing and credit markets, including expected further declines in home prices, will negatively affect our financial condition and results of operations in 2008. Overall economic conditions in 2008 could also materially affect our future performance.

**New Shareholder Derivative Actio Mae**

On November 26, 2007, a plaintiff filed a new derivative action in the U.S. District Court for the District of Columbia against certain of our current and former officers and directors on behalf of us. The complaint alleges that the named officers and directors wrongfully failed to disclose our exposure to the subprime mortgage market in sufficient detail. The plaintiff also alleges that this failure to disclose artificially inflated our stock price and allowed the officers and directors to profit by selling their shares based on material inside information, and that our Board of Directors improperly authorized us to buy back shares worth $100 million while in possession of such knowledge. The plaintiff asked the Court to award us damages from the named officers and directors, including restitution and disgorgement of all profits, benefits and compensation. In addition, the plaintiff seeks injunctive relief against us related to the adoption of certain corporate governance policies and related internal controls.

## USE OF PROCEEDS

The capital raised from the sale of the Preferred Stock will be used to increase our capital base and for general corporate purposes. See "Regulatory Capital Matters" beginning on page 25 of this Offering Circular.

# CAPITALIZATION

The following tables set forth our capitalization as of September 30, 2007, and our Stockholder's Equity table is adjusted to reflect the issuance of the Preferred Stock (before giving effect to the payment of estimated offering expenses and any underwriting discount and advisory fees), the issuance of our 6.75% Non-Cumulative Preferred Stock, Series Q in October 2007 and the issuance of our 7.625% Non-Cumulative Preferred Stock, Series R in November 2007. This information should be read together with our unaudited condensed consolidated financial statements and other financial information set forth in the Third Quarter 10-Q.

| | | As of September 30, 2007 | |
| --- | --- | --- | --- |
| | Maturities | Weighted Average Interest Rate[1] | Outstanding |
| | | | (Dollars in millions) |
| **Short-Term Borrowings** | | | |
| Federal funds purchased and securities sold under agreements to repurchase............................................. | | 5.60% | $ 1,645 |
| Fixed short-term debt: | | | |
| Discount notes ............................................................ | | 5.06% | $ 150,162 |
| Foreign exchange discount notes ............................... | | 4.32 | 183 |
| Other short-term debt................................................. | | 5.15 | 2,124 |
| Total fixed short-term debt ................................. | | 5.06 | 152,469 |
| Debt from consolidations ............................................... | | 5.35 | 677 |
| Total short-term debt ........................................... | | 5.06% | $ 153,146 |
| **Long-Term Debt** | | | |
| Senior fixed: | | | |
| Benchmark notes and bonds ...................................... | 2007-2030 | 5.11% | $ 261,539 |
| Medium-term notes ..................................................... | 2007-2017 | 5.11 | 241,693 |
| Foreign exchange notes and bonds ........................... | 2007-2028 | 3.38 | 3,459 |
| Other long-term debt ................................................. | 2007-2038 | 6.01 | 68,655 |
| Total senior fixed ................................................. | | 5.20 | 575,346 |
| Senior floating: | | | |
| Medium-term notes ..................................................... | 2007-2017 | 5.81 | 14,727 |
| Other long-term debt ................................................. | 2022-2037 | 6.80 | 924 |
| Total senior floating ............................................ | | 5.87 | 15,651 |
| Subordinated fixed: | | | |
| Medium-term notes..................................................... | 2008-2011 | 5.62 | 3,500 |
| Other subordinated debt............................................. | 2012-2019 | 6.37 | 7,480 |
| Total subordinated fixed ..................................... | | 6.13 | 10,980 |
| Debt from consolidations ............................................... | 2007-2039 | 5.84 | 6,642 |
| Total long-term debt[2] ........................................... | | 5.25% | $ 608,619 |
| **Other liabilities** ......................................................... | | | 36,330 |
| Total liabilities............................................................. | | | $ 799,740 |

---

(1) Includes discounts, premiums, and other cost basis adjustments.

(2) Reported amounts include a net premium and cost basis adjustment of $12.4 billion as of September 30, 2007.

**Stockholders' Equity**

| | Amount Issued and Outstanding as of September 30, 2007 | | As Adjusted | Annual Dividend Rate as of September 30, 2007 | Redeemable on or After |
|---|---|---|---|---|---|
| | (Dollars in millions) | | | | |
| **Preferred Stock,** 150,175,000 shares issued at September 30, 2007, 465,175,000 shares issued As Adjusted | | | | | |
| Series D, 3,000,000 shares issued September 30, 1998……. | $ | 150 | $  150 | 5.250% | September 30, 1999 |
| Series E, 3,000,000 shares issued April 15, 1999…………. | | 150 | 150 | 5.100 | April 15, 2004 |
| Series F, 13,800,000 shares issued March 20, 2000……….. | | 690 | 690 | 4.560[1] | March 31, 2002[7] |
| Series G, 5,750,000 shares issued August 8, 2000…………. | | 288 | 288 | 4.590[2] | September 30, 2002[7] |
| Series H, 8,000,000 shares issued April 6, 2001…………… | | 400 | 400 | 5.810 | April 6, 2006 |
| Series I, 6,000,000 shares issued October 28, 2002……….. | | 300 | 300 | 5.375 | October 28, 2007 |
| Series L 6,900,000 shares issued April 29, 2003………….. | | 345 | 345 | 5.125 | April 29, 2008 |
| Series M, 9,200,000 shares issued June 10, 2003………….. | | 460 | 460 | 4.750 | June 10, 2008 |
| Series N, 4,500,000 shares issued September 25, 2003…… | | 225 | 225 | 5.500 | September 25, 2008 |
| Series O, 50,000,000 shares issued December 30, 2004…... | | 2,500 | 2,500 | 7.000[3] | December 31, 2007 |
| Series 2004-1, 25,000 shares issued December 30, 2004….. | | 2,500 | 2,500 | 5.375 | January 5, 2008 |
| Series P, 40,000,000 shares issued September 28, 2007…... | | 1,000 | 1,000 | 5.948[4] | September 30, 2012 |
| Series Q, 15,000,000 shares issued October 4, 2007………. | | — | 375 | 6.75[5] | September 30, 2010 |
| Series R, 20,000,000 shares issued November 21, 2007…... | | — | 500 | 7.625[5] | November 21, 2012 |
| Series S, 280,000,000 shares issued December 11, 2007….. | | — | 7,000 | 8.25[6] | December 31, 2010[8] |
| Total | $ | 9,008 | $  16,883 | | |
| | | | | | |
| **Common Stock,** 973,750,241 shares outstanding at September 30, 2007……………………………… | $ | 593 | $  593 | | |
| | | | | | |
| Additional paid-in capital …………………………………… | | 1,888 | 1,888 | | |
| Retained earnings……………………………………………... | | 37,737 | 37,737 | | |
| Accumulated other comprehensive loss………………………… | | (1,791) | (1,791) | | |
| Treasury stock, at cost, 155,340,179 shares at September 30, 2007 ……………………………………………… | | (7,513) | (7,513) | | |
| Total stockholders' equity …………………………………… | $ | 39,922 | $  47,797 | | |
| Total liabilities and stockholders' equity …………………… | $ | 839,783 | $  847,658 | | |

---

(1) Rate effective March 31, 2006. Variable dividend rate resets every two years at the two-year Constant Maturity U.S. Treasury Rate ("CMT") minus 0.16% with a cap of 11% per year. As of December 31, 2005, the annual dividend rate was 1.37%.

(2) Rate effective September 30, 2006. Variable dividend rate resets every two years at the two-year CMT rate minus 0.18% with a cap of 11% per year. As of December 31, 2005, the annual dividend rate was 2.35%.

(3) Rate effective December 31, 2006 and 2005. Variable dividend rate resets quarterly thereafter at the greater of 7.00% or the 10-year CMT rate plus 2.375%. As of September 30, 2007, the annual dividend rate was 7.00%.

(4) Rate effective September 28, 2007 through December 31, 2007.  Variable dividend rate resets quarterly thereafter at a per annum rate of 3-Month LIBOR plus 0.75%.

(5) Reflects dividend rate at issuance.

(6) Rate effective December 11, 2007 to but excluding December 31, 2010. Variable dividend rate resets quarterly thereafter at the greater of 7.75% and 3-month LIBOR plus 4.23%.

(7) Represents initial call date. Redeemable every two years thereafter.

(8) Represents initial call date. Redeemable every five years thereafter.

We frequently issue debentures, notes, and other debt obligations, and from time to time we redeem such debt obligations. The amount of debentures, notes, other debt obligations outstanding, and stockholders' equity on any date subsequent to September 30, 2007 may differ from that shown in the table above.

## SELECTED FINANCIAL INFORMATION

The following selected financial information has been summarized or derived from our audited financial statements from the 2006 Form 10-K and our unaudited condensed consolidated financial statements from the Third Quarter 10-Q and other financial information for such periods. The data should be read in conjunction with the audited financial statements and notes to financial statements contained in the 2006 10-K and the unaudited condensed consolidated financial statements and notes to financial statements contained in the Third Quarter 10-Q.

On any date after September 30, 2007, our financial information may differ from the data contained in this table. In conjunction with this financial information, you should also read the "Risk Factors" section of this Offering Circular, the 2006 10-K, and the Third Quarter 10-Q.

| | For the Nine Months Ended | | For the Year Ended | | |
|---|---|---|---|---|---|
| | September 30, 2007 | September 30, 2006 | December 31, 2006 | December 31, 2005 | December 31, 2004 |
| | (Dollars and shares in millions, except per share amounts) | | | | |
| **Income Statement Data:** | | | | | |
| Net interest income.................... | $ 3,445 | $ 5,407 | $ 6,752 | $ 11,505 | $ 18,081 |
| Guaranty fee income[1] ................ | 3,450 | 2,968 | 4,174 | 3,925 | 3,715 |
| Derivative fair value losses, net......................... | (891) | (854) | (1,522) | (4,196) | (12,256) |
| Other income (loss)[1][2] .............. | 449 | (612) | (927) | (871) | (923) |
| Credit-related expenses[3] ............ | (2,039) | (457) | (783) | (428) | (363) |
| Income before extraordinary gains (losses)......................... | 1,512 | 3,444 | 4,047 | 6,294 | 4,975 |
| Extraordinary gains (losses), net of tax effect .................... | (3) | 11 | 12 | 53 | (8) |
| Net income.............................. | 1,509 | 3,455 | 4,059 | 6,347 | 4,967 |
| Preferred stock dividends and issuance costs at redemption............................ | (372) | (380) | (511) | (486) | (165) |
| Net income available to common stockholders.................. | 1,137 | 3,075 | 3,548 | 5,861 | 4,802 |
| **Common Share Data:** | | | | | |
| Earnings per share: | | | | | |
|   Basic........................................ | $1.17 | $3.17 | $3.65 | $6.04 | $4.95 |
|   Diluted..................................... | 1.17 | 3.16 | 3.65 | 6.01 | 4.94 |
| Weighted-average common shares outstanding: | | | | | |
|   Basic........................................ | 973 | 971 | 971 | 970 | 970 |
|   Diluted..................................... | 975 | 972 | 972 | 998 | 973 |
| Cash dividends declared per common share ...................... | $1.40 | $ 0.78 | $1.18 | $1.04 | $2.08 |
| **New Business Acquisition Data:** | | | | | |
| Fannie Mae MBS issues acquired by third parties[4] ........... | $ 407,962 | $ 308,371 | $ 417,471 | $ 465,632 | $ 462,542 |
| Mortgage portfolio purchases[5]............................ | 134,407 | 150,340 | 185,507 | 146,640 | 262,647 |
|   New business acquisitions............................... | $ 542,369 | $ 458,711 | $ 602,978 | $ 612,272 | $ 725,189 |

16

| | As of | | | |
|---|---|---|---|---|
| | September 30, 2007 | December 31, 2006 | December 31, 2005 | December 31, 2004 |
| | (Dollars in millions) | | | |
| **Balance Sheet Data:** | | | | |
| Investments in securities: | | | | |
| Trading.......................................................... | $   48,683 | $   11,514 | $   15,110 | $   35,287 |
| Available-for-sale ...................................... | 315,012 | 378,598 | 390,964 | 532,095 |
| Mortgage loans: | | | | |
| Loans held for sale..................................... | 5,053 | 4,868 | 5,064 | 11,721 |
| Loans held for investment, net of allowance ...... | 394,550 | 378,687 | 362,479 | 389,651 |
| Total assets .................................................... | 839,783 | 843,936 | 834,168 | 1,020,934 |
| Short-term debt ............................................. | 153,146 | 165,810 | 173,186 | 320,280 |
| Long-term debt .............................................. | 608,619 | 601,236 | 590,824 | 632,831 |
| Total liabilities ............................................. | 799,740 | 802,294 | 794,745 | 981,956 |
| Preferred stock.............................................. | 9,008 | 9,108 | 9,108 | 9,108 |
| Total stockholders' equity .............................. | 39,922 | 41,506 | 39,302 | 38,902 |

| | As of | | | |
|---|---|---|---|---|
| | September 30, 2007 | December 31, 2006 | December 31, 2005 | December 31, 2004 |
| **Regulatory Capital Data:** | (Dollars in millions) | | | |
| Core capital[6].............................................. | $   41,713 | $   41,950 | $   39,433 | $   34,514 |
| Total capital[7] ............................................ | 43,798 | 42,703 | 40,091 | 35,196 |
| **Mortgage Credit Book of Business Data:** | | | | |
| Mortgage portfolio[8] ................................... | $  728,578 | $  728,932 | $  737,889 | $  917,209 |
| Fannie Mae MBS held by third parties[9]............ | 2,003,382 | 1,777,550 | 1,598,918 | 1,408,047 |
| Other guarantees[10] ..................................... | 35,508 | 19,747 | 19,152 | 14,825 |
| Mortgage credit book of business ....................... | $  2,767,468 | $  2,526,229 | $  2,355,959 | $2,340,081 |

| | For the Nine Months Ended September 30, | | For the Year Ended December 31, | | |
|---|---|---|---|---|---|
| **Ratios:** | 2007 | 2006 | 2006 | 2005 | 2004 |
| Return on assets ratio[11]* ............................. | 0.18% | 0.49% | 0.42% | 0.63% | 0.47% |
| Return on equity ratio[12]* ............................ | 4.8 | 13.1 | 11.3 | 19.5 | 16.6 |
| Equity to assets ratio[13]* ............................. | 4.8 | 4.8 | 4.8 | 4.2 | 3.5 |
| Dividend payout ratio[14]* ............................ | 120.4 | 24.7 | 32.4 | 17.2 | 42.1 |
| Average effective guaranty fee rate (in basis points)[15]* ...................................... | 22.0 bp | 20.9 bp | 21.8 bp | 21.8 bp | 21.4 bp |
| Credit loss ratio (in basis points)[16]* ............ | 4.0 bp | 1.8 bp | 2.7 bp | 1.9 bp | 1.0 bp |

---

(1)   Amounts for the nine months ended September 30, 2006 that previously were included as a component of "Fee and other income" have been reclassified to "Guaranty fee income" to conform to the current period presentation.

(2)   Consists of trust management income; investment gains (losses), net; debt extinguishment gains (losses), net; losses from partnership investments; and fee and other income.

(3)   Consists of provision for credit losses and foreclosed property expense.

(4)   Unpaid principal balance of Fannie Mae MBS issued and guaranteed by us and acquired by third party investors during the reporting period.  Excludes securitizations of mortgage loans in our portfolio.

(5)   Unpaid principal balance of mortgage loans and mortgage-related securities we purchased for our investment portfolio during the reporting period.  Includes advances to lenders and mortgage-related securities acquired through the extinguishment of debt.

(6)   The sum of (a) the stated value of outstanding common stock (common stock less treasury stock); (b) the stated value of outstanding non-cumulative perpetual preferred stock; (c) paid-in-capital; and (d) retained earnings. Core capital excludes accumulated other comprehensive income (loss).

(7)  The sum of (a) core capital and (b) the total allowance for loan losses and reserve for guaranty losses, less (c) the specific loss allowance (that is, the allowance required on individually-impaired loans).  Total capital has been provided as of June 30, 2007 (the most recent date for which the statutory risk-based capital measure is available).

(8)  Unpaid principal balance of mortgage loans and mortgage-related securities held in our portfolio.

(9)  Unpaid principal balance of Fannie Mae MBS held by third-party investors. The principal balance of resecuritized Fannie Mae MBS is included only once in the reported amount.

(10)  Includes single family and multifamily credit enhancements that we provide and that are not otherwise reflected in the table.

(11)  Annualized net income available to common stockholders divided by average total assets during the period.

(12)  Annualized net income available to common stockholders divided by average outstanding common equity during the period.

(13)  Average stockholders' equity divided by average total assets during the period.

(14)  Common dividend payments divided by net income available to common stockholders for the period.

(15)  Annualized guaranty fee income as a percentage of average outstanding Fannie Mae MBS and other guaranties during the period.

(16)  Annualized charge-offs, net of recoveries and annualized foreclosed property expense, as a percentage of the average total mortgage credit book of business during the period.  Effective January 1, 2007, we have excluded any initial losses recorded pursuant to Statement of Position No. 03-3, *Accounting for Certain Loans or Debt Securities Acquired in a Transfer*, on loans purchased from trusts from our credit losses when the purchase price of delinquent loans that we purchase from Fannie Mae MBS trusts exceeds the fair value of the loans at the time of purchase.  We have revised our presentation of credit losses for the three and nine months ended September 30, 2006 to conform to the current period presentation.  Refer to "Risk Management—Credit Risk Management—Mortgage Credit Risk Management—Credit Losses" in the Third Quarter 10-Q for more information regarding this change in presentation.

**Note:**

\*  Average balances for purposes of the ratio calculations are based on beginning and end of period balances, respectively.

## PREVIOUS ISSUANCES OF PREFERRED STOCK

We are authorized by the Charter Act to have preferred stock on such terms and conditions as our Board of Directors may prescribe. Effective October 16, 2007, our Board of Directors amended our bylaws to authorize us to issue up to 700,000,000 shares of preferred stock. To date, we have issued the following:

- on March 1, 1996, 7,500,000 shares of 6.41% Non-Cumulative Preferred Stock, Series A (stated value $50 per share) (the "Series A Preferred Stock");

- on April 12, 1996, 7,500,000 shares of 6.50% Non-Cumulative Preferred Stock, Series B (stated value $50 per share) (the "Series B Preferred Stock");

- on September 20, 1996, 5,000,000 shares of 6.45% Non-Cumulative Preferred Stock, Series C (stated value $50 per share) (the "Series C Preferred Stock");

- on September 30, 1998, 3,000,000 shares of 5.25% Non-Cumulative Preferred Stock, Series D (stated value $50 per share) (the "Series D Preferred Stock");

- on April 15, 1999, 3,000,000 shares of 5.10% Non-Cumulative Preferred Stock, Series E (stated value $50 per share) (the "Series E Preferred Stock");

- on March 20, 2000, 13,800,000 shares of Variable Rate Non-Cumulative Preferred Stock, Series F (stated value $50 per share) (the "Series F Preferred Stock");

- on August 8, 2000, 5,750,000 shares of Variable Rate Non-Cumulative Preferred Stock, Series G (stated value $50 per share) (the "Series G Preferred Stock");

- on April 6, 2001, 8,000,000 shares of 5.81% Non-Cumulative Preferred Stock, Series H (stated value $50 per share) (the "Series H Preferred Stock");

- on October 28, 2002, 6,000,000 shares of 5.375% Non-Cumulative Preferred Stock, Series I (stated value $50 per share) (the "Series I Preferred Stock");

- on November 26, 2002, 14,000,000 shares of Variable Rate Non-Cumulative Preferred Stock, Series J (stated value $50 per share) (the "Series J Preferred Stock");

- on March 18, 2003, 8,000,000 shares of Variable Rate Non-Cumulative Preferred Stock, Series K (stated value $50 per share) (the "Series K Preferred Stock");

- on April 29, 2003, 6,900,000 shares of 5.125% Non-Cumulative Preferred Stock, Series L (stated value $50 per share) (the "Series L Preferred Stock");

- on June 10, 2003, 9,200,000 shares of 4.75% Non-Cumulative Preferred Stock, Series M (stated value $50 per share) (the "Series M Preferred Stock");

- on September 25, 2003, 4,500,000 shares of 5.50% Non-Cumulative Preferred Stock, Series N (stated value $50 per share) (the "Series N Preferred Stock");

- on December 30, 2004, 25,000 shares of Non-Cumulative Convertible Preferred Stock, Series 2004-1 (stated value $100,000 per share) (the "Series 2004-1 Preferred Stock");

- on December 30, 2004, 50,000,000 shares of Non-Cumulative Preferred Stock, Series O (stated value $50 per share) (the "Series O Preferred Stock");

- on September 28, 2007, 40,000,000 shares of Variable Rate Non-Cumulative Preferred Stock, Series P (stated value $25 per share) (the "Series P Preferred Stock");

- on October 4, 2007, 15,000,000 shares of 6.75% Non-Cumulative Preferred Stock, Series Q (stated value $25 per share) (the "Series Q Preferred Stock"); and

- on November 21, 2007, 20,000,000 shares of 7.625% Non-Cumulative Preferred Stock, Series R (stated value $25 per share) (the "Series R Preferred Stock").

We redeemed all of our outstanding Series A Preferred Stock on March 1, 2001, all of our outstanding Series B Preferred Stock on February 28, 2002, all of our outstanding Series C Preferred Stock on July 31, 2002, all of our outstanding Series J Preferred Stock on February 28, 2007, and all of our outstanding Series K Preferred Stock on April 2, 2007. In this Offering Circular, we collectively refer to the Series D Preferred Stock through Series I Preferred Stock, the Series L Preferred Stock through the Series R Preferred Stock and the 2004-1 Preferred Stock as the "Outstanding Preferred Stock."

## DESCRIPTION OF THE PREFERRED STOCK

**General**

The Preferred Stock will have the terms set forth in the Certificate of Designation of Terms of Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series S (the "Certificate of Designation") attached as Exhibit A to this Offering Circular.

A duly authorized committee of our Board of Directors will authorize us to issue the Preferred Stock. Without the consent of the holders of the Preferred Stock, the Board may increase the authorized number of shares of Preferred Stock and "re-open" this series at any time by issuing additional shares of the Preferred Stock at prices to be determined at that time.

Computershare Trust Company, N.A., will be the transfer agent, dividend disbursing agent, and registrar for the shares of Preferred Stock.

**The obligations of Fannie Mae under the terms of the Preferred Stock are obligations of Fannie Mae only and are not those of the United States or of any agency or instrumentality thereof.**

**Dividends**

(a)     General

Dividends on shares of the Preferred Stock will not be mandatory. If you own shares of the Preferred Stock you will be entitled to receive non-cumulative, quarterly cash dividends that will accrue from and including December 11, 2007 and will be payable on March 31, June 30, September 30, and December 31 of each year (each a "Dividend Payment Date"), beginning March 31, 2008.  However, dividends are payable only if declared by our Board of Directors (or a designated committee of the Board) in its sole discretion, out of funds legally available for dividend payments. Dividends that are not declared for a Dividend Payment Date will not accrue on the Preferred Stock. The ability of the Board of Directors to declare dividends may be restricted by OFHEO.

If a Dividend Payment Date is not a Business Day, we will pay dividends (if declared) on the Preferred Stock on the next Business Day, without interest from that Dividend Payment Date to the date of actual payment. A "Business Day" is any day other than a Saturday, Sunday, or other day on which banking institutions in New York, New York are authorized or required by law to close. We will make dividend payments to holders of record on the record date established by our Board of Directors, which will be no earlier than 45 days or later than 10 days prior to the applicable Dividend Payment Date.

No adjustment in respect of the amount of dividends payable on the Preferred Stock will be made in the event of a change to the dividends-received deduction under the Code.

(b)     Fixed Rate Period

For each Dividend Period from December 11, 2007 to but excluding December 31, 2010 (each such Dividend Period, a "Fixed Rate Dividend Period"), dividends on shares of the Preferred Stock will accrue at a rate of 8.25% per annum. If declared, the initial dividend, which will be for the period from and including the date of issuance to but excluding March 31, 2008, will be $0.6302 per share and will be payable on March 31, 2008.  Thereafter, the "Dividend Period" relating to a Dividend Payment Date will be the period from and including the preceding Dividend Payment Date to but excluding the related Dividend Payment Date.  If declared, quarterly dividends for each full Fixed Rate Dividend Period will be $0.5156 per share.

We will compute dividends payable on the Preferred Stock for any Fixed Rate Dividend Period less than a full Fixed Rate Dividend Period on the basis of a 360-day year consisting of twelve 30-day months, with the dividend for such partial Fixed Rate Dividend Period computed by dividing the per annum dividend rate by 360, and multiplying that amount by the number of days in such partial Fixed Rate Dividend Period (using the 30 day month, 360 day year convention) and the stated value of $25 per share, the product of which will be rounded to the fourth digit after the decimal point.  (If the fifth digit to the right of the decimal point is five or greater, the fourth digit will be rounded up by one.) Dividends payable on the Preferred Stock for each full Fixed Rate Dividend Period will be computed by dividing the per annum dividend rate by four, and multiplying the result by the stated value per share of $25, the product of which will be rounded to the fourth digit after the decimal point (if the fifth digit to the right of the decimal point is five or greater, the fourth digit will be rounded up by one).

(c)        Floating Rate Period

For the Dividend Period beginning on December 31, 2010 and for each Dividend Period thereafter (each such Dividend Period, a "Floating Rate Dividend Period"), quarterly dividends will accrue at a variable rate equal to the greater of (i) 7.75% per annum and (ii) 3-Month LIBOR plus 4.23% per annum and if declared, will be payable quarterly on each Dividend Payment Date commencing on March 31, 2011. We will determine 3-Month LIBOR for each Floating Rate Dividend Period two London Business Days prior to the first day of such Floating Rate Dividend Period (such date, a "LIBOR Determination Date").  A "London Business Day" is any day, other than a Saturday or Sunday, on which banks are open for business in London.

We will compute dividends payable on the Preferred Stock for any full or partial Floating Rate Dividend Period on the basis of the actual number of days elapsed during that period and a 360-day year. The dividend for a Floating Rate Dividend Period will be computed by dividing the per annum dividend rate applicable to such period by 360, and multiplying by the actual number of days elapsed in such Floating Rate Dividend Period and the stated value of $25 per share, the product of which will be rounded to the fourth digit after the decimal point.  (If the fifth digit to the right of the decimal point is five or greater, the fourth digit will be rounded up by one.)

"3-Month LIBOR" will be calculated as follows:

(1)        the rate (expressed as a percentage per annum) for U.S. dollar deposits having a three-month maturity that appears on Reuters Screen LIBOR01 as of 11:00 a.m. (London time) on the related LIBOR Determination Date.  "Reuters Screen LIBOR01" means the display designated as "Reuters Screen LIBOR01 Page" or such other page as may replace Reuters Screen LIBOR01 Page on that service or such other service or services as may be nominated by the British Bankers' Association as the information vendor for the purpose of displaying London interbank offered rates for U.S. dollar deposits. If at least two rates appear on the Reuters Screen LIBOR01, the rate on the LIBOR Determination Date will be the arithmetic mean of such rates;

(2)        if the rate specified in clause (1) above cannot be identified on the related LIBOR Determination Date, then the Calculation Agent will request the principal London offices of five leading banks (which may include affiliates of the Underwriters) in the London interbank market selected by the Calculation Agent (after consultation with Fannie Mae, if Fannie Mae is not then acting as Calculation Agent) to provide those banks' offered quotations (expressed as percentages per annum) to prime banks in the London interbank market for deposits in U.S. dollars having a three-month maturity as of 11:00 a.m. (London time) on such LIBOR Determination Date.  If at least two quotations are provided, then 3-Month LIBOR will be the arithmetic mean determined by the Calculation Agent of the quotations obtained (and, if five quotations are provided, eliminating the highest quotation (or in the event of equality, one of the highest) and the lowest quotation (or in the event of equality, one of the lowest));

21

(3)      if fewer than two quotations are provided as requested in clause (2) above, then the Calculation Agent will request five major banks (which may include affiliates of the Underwriters) in New York, New York selected by the Calculation Agent (after consultation with Fannie Mae, if Fannie Mae is not then acting as Calculation Agent) to provide those banks' offered quotations (expressed as percentages per annum) to leading European banks for loans having a three-month maturity in U.S. dollars as of 11:00 a.m. (New York City time) on such LIBOR Determination Date.  If at least two quotations are provided, then 3-Month LIBOR will be the arithmetic mean determined by the Calculation Agent of the quotations obtained (and, if five quotations are provided, eliminating the highest quotation (or in the event of equality, one of the highest) and the lowest quotation (or in the event of equality, one of the lowest)); and

(4)      if fewer than two quotations are so provided as requested in clause (3) above, then 3-Month LIBOR as of such LIBOR Determination Date will be 3-Month LIBOR determined for the immediately preceding Dividend Period.  If the applicable Dividend Period is the first Floating Rate Period beginning on December 31, 2010, then 3-Month LIBOR will be the rate for deposits in U.S. dollars having a three-month maturity that appeared, as of 11:00 a.m. (London time) on the most recent London Business Day preceding the LIBOR Determination Date for which the rate was displayed on Reuters Screen LIBOR01 with respect to deposits commencing on the second London Business Day following that date.

The Calculation Agent's determination of the 3-Month LIBOR and the dividend rate will be final and binding absent manifest error.

**Preferences and Limitations**

The Preferred Stock will rank prior to our common stock with respect to the payment of dividends as set forth in the Certificate of Designation. As a result, unless dividends have been declared and paid or set apart on the Preferred Stock for the then-current quarterly Dividend Period, no dividend may be declared or paid or set apart for payment on our common stock (or on any other stock ranking junior to the Preferred Stock). The Preferred Stock will rank equally with respect to dividends with our Outstanding Preferred Stock.

Dividends on the Preferred Stock will not be cumulative. If we do not pay a dividend on the Preferred Stock, you will have no claim in respect of such non-payment so long as no dividend is paid on our common stock, any of our other stock ranking junior to the Preferred Stock or any of the Outstanding Preferred Stock for the then-current quarterly Dividend Period.  When dividends are not paid in full upon the Preferred Stock and our Outstanding Preferred Stock and any other stock of equal priority as to the payment of dividends, all dividends declared upon shares of the Preferred Stock and our Outstanding Preferred Stock and any other stock of equal priority as to the payment of dividends will be declared pro rata so that the amount of dividends declared thereon in all cases bear to each other the same ratio that accrued dividends per share of Preferred Stock (but without accumulation of any undeclared dividends for prior periods) and such other stock bear to each other.

Our Board of Directors may, in its discretion, choose to pay dividends on the Preferred Stock without the payment of any dividends on our common stock.

No dividends may be declared or paid or set apart for payment on any shares of the Preferred Stock if at the same time any default exists in the payment of dividends on any outstanding class or series of our stock ranking prior to the Preferred Stock with respect to the payment of dividends.  There is currently no class or series of our stock which ranks prior to the Preferred Stock with respect to the payment of dividends.   Additionally, during periods when we defer payment of interest on our subordinated debt securities, we are not permitted to declare or pay dividends, or redeem, purchase, or acquire, any shares of the Preferred Stock or any of the Outstanding Preferred Stock.

As a holder of Preferred Stock, you will not be entitled to any dividends, whether payable in cash or property, other than as described above and will not be entitled to interest, or any sum in lieu of interest, in respect of any dividend payment.

See also "Regulatory Capital Matters" beginning on page 25 of this Offering Circular for a description of certain regulatory restrictions on our payment of dividends.

**Optional Redemption**

The Preferred Stock will not be redeemable prior to December 31, 2010. On that date, and on each fifth anniversary thereafter, we may redeem the Preferred Stock, in whole or in part, out of legally available funds. The redemption price will be $25 per share plus an amount equal to the dividend for the then-current quarterly Dividend Period (whether or not declared but without accumulation of any undeclared dividends for prior periods) accrued to but excluding the date of redemption. The amount of dividends per share payable at redemption will be calculated in accordance with the dividend calculation method. If we redeem less than all of the outstanding shares of the Preferred Stock, we will select shares to be redeemed by lot or pro rata (as nearly as possible) or by any other method that we deem equitable.

We will give notice of any such redemption by written or electronic means to holders of Preferred Stock not less than 30 days before the redemption date. Each notice will state the number of shares of Preferred Stock to be redeemed, the redemption price, the redemption date and the place at which Preferred Stock certificates should be presented for redemption.

On and after the redemption date, dividends on the Preferred Stock called for redemption will cease to accrue and the Preferred Stock called for redemption will no longer be deemed outstanding, and all rights of the holders of those shares shall cease, except for the right to receive the redemption amount.

Holders of the Preferred Stock will have no right to require Fannie Mae to redeem the Preferred Stock.

**Liquidation Rights**

If we voluntarily or involuntarily dissolve, liquidate or wind-up our business, then, after payment or provision for our liabilities to creditors and the expenses of such dissolution, liquidation or winding up, the holders of the outstanding shares of the Preferred Stock will be entitled to receive, out of assets available for distribution to stockholders, the amount of $25 per share plus an amount equal to the dividend for the then-current quarterly Dividend Period (whether or not declared but without accumulation of any undeclared dividends for prior periods) accrued to but excluding the liquidation date before any payment or distribution of assets is made to holders of our common stock or any of our other stock ranking junior to the Preferred Stock. If our assets available for distribution in such event are insufficient to pay in full all of the holders of the Preferred Stock and our Outstanding Preferred Stock and any other stock of equal priority upon liquidation, then the assets will be distributed pro rata, based on the respective preferential amounts of such preferred stock.

Notwithstanding the foregoing, holders of Preferred Stock will not be entitled to be paid any amount in respect of our dissolution, liquidation or winding up until holders of our debt securities and any class or series of our stock ranking prior to the Preferred Stock have been paid all amounts to which such classes or series are entitled. There is currently no class or series of our stock ranking prior to the Preferred Stock with respect to liquidation rights.

Neither the sale of all or substantially all of our property and assets, nor our merger, consolidation or business combination into or with any other entity, shall be deemed to be a dissolution, liquidation or winding up of Fannie Mae for the purposes of these provisions on liquidation rights.

23

**Additional Preferred Stock**

We have the right to issue additional shares of Preferred Stock and to issue additional classes or series of preferred stock that rank prior to, on parity with, or junior to the Preferred Stock with respect to dividends, liquidation rights, or otherwise, without the consent of the holders of the Preferred Stock.

**No Voting Rights; Amendments**

Except as described below, holders of Preferred Stock will not have voting rights.

Without the consent of the holders of the Preferred Stock, we will have the right to amend the Certificate of Designation to cure any ambiguity, correct or supplement any term which may be defective or inconsistent with any other term or to make any other provisions so long as the amendment does not materially and adversely affect the interest of the holders of the Preferred Stock. Increasing the authorized amount of the Preferred Stock or issuing a series of preferred stock ranking prior to, on parity with, or junior to the Preferred Stock will not be deemed to be materially and adversely affecting the interests of the holders of the Preferred Stock.

Otherwise, we may only amend the Certificate of Designation with the consent of the holders of at least two-thirds of the outstanding shares of the Preferred Stock, with each holder being entitled to one vote per share.

**No Preemptive Rights and No Conversion**

Holders of Preferred Stock will not have any preemptive rights to purchase or subscribe for any other shares, rights, options or other securities of Fannie Mae, and will not have the right to convert or exchange their shares of Preferred Stock into any other Fannie Mae securities.

**New York Stock Exchange Listing**

We will apply to list the Preferred Stock on the NYSE under the symbol "FNMprS". If approved for listing, we expect trading of the Preferred Stock on the NYSE to commence by December 31, 2007.

# REGULATORY CAPITAL MATTERS

## General

We are subject to capital adequacy requirements established by the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 (the "1992 Act"). OFHEO monitors our performance with respect to our regulatory capital standards by classifying our capital adequacy not less than quarterly.

The following are the relevant capital classification definitions and requirements:

## Core Capital

"Core capital" is defined as the sum of the stated value of outstanding common stock (common stock less treasury stock), the stated value of our outstanding preferred stock, paid-in capital, and retained earnings.  Core capital excludes accumulated other comprehensive income (loss).

## Total Capital

"Total capital" is defined as the sum of our core capital and our total allowance for loan losses and reserve for guaranty losses, less the specific loan allowance (that is, the allowance required on individually-impaired loans).

## Minimum Capital Requirements

OFHEO's minimum capital standard ties our capital requirements to the size of our book of business. For purposes of the statutory minimum capital requirement, we are in compliance if our core capital equals or exceeds our minimum capital requirement.

Our statutory minimum capital requirement is generally equal to the sum of:

- 2.50% of on-balance sheet assets;

- 0.45% of the unpaid principal balance of outstanding Fannie Mae MBS held by third parties; and

- up to 0.45% of other off-balance sheet obligations, which may be adjusted by the Director of OFHEO under certain circumstances.

Each quarter, as part of its capital classification announcement, OFHEO publishes our standing relative to the statutory minimum capital requirement and the OFHEO-directed minimum capital requirement, which is defined as a 30% surplus over the statutory minimum capital requirement.

## Critical Capital Requirement

The critical capital standard requires us to hold an amount of core capital that is generally equal to the sum of (i) 1.25% of aggregate on-balance sheet assets, (ii) 0.25% of the sum of outstanding Fannie Mae MBS held by third parties, and (iii) up to 0.25% of other aggregate off-balance sheet obligations, which may be adjusted by the Director of OFHEO under certain circumstances.

## Risk-Based Capital Requirement

OFHEO's risk-based capital standard ties our capital requirements to the risk in our book of business, as measured by a stress test model. The stress test simulates our financial performance over a ten-year period of severe economic conditions characterized by both extreme interest rate movements and

high mortgage default rates. Simulation results indicate the amount of capital required to survive this prolonged period of economic stress without new business or active risk management action. In addition to this model-based amount, the risk-based capital requirement includes a 30% surcharge to cover unspecified management and operations risks. Our total capital base is used to meet our risk-based capital requirement.

Each quarter, OFHEO runs a detailed profile of our book of business through the stress test simulation model. The model generates cash flows and financial statements to evaluate our risk and measure our capital adequacy during the ten-year stress horizon. As part of its quarterly capital classification announcement, OFHEO makes these stress test results publicly available.

**Classification and Dividends**

The statutory capital framework incorporates two different assessments of capital- a minimum capital requirement and a risk based capital requirement. The 1992 Act requires us to maintain sufficient capital to meet both of these requirements in order to be classified as "adequately capitalized." OFHEO is permitted or required to take remedial action if we fail to meet our capital requirements, depending on which requirement we fail to meet. Even if we meet our capital requirements, OFHEO has the ability to take certain actions if it determines that we are engaging in conduct that could result in a rapid depletion of our core capital, or if the value of the property securing mortgage loans we hold or have securitized has decreased significantly. In addition, under the OFHEO consent order, we are currently required to maintain a 30% capital surplus over our statutory minimum capital requirement. See "Capital Restoration Plan and OFHEO-Directed Minimum Capital Requirement" in our 2006 10-K.

We are subject to continuous examination by OFHEO to ensure that we are operating in a safe and sound manner. If we fail to meet the risk-based capital standard but meet the minimum capital standard, we cannot be classified higher than "undercapitalized." If we fail to meet the risk-based capital standard and the minimum capital requirement, but exceed the critical capital requirement, we cannot be classified higher than "significantly undercapitalized." If we fail to meet the risk-based capital standard and the critical capital standard, we must be classified as "critically undercapitalized."

When we are classified as adequately capitalized, we generally can pay a dividend on our common or preferred stock or make other capital distributions (which includes common stock repurchases and preferred stock redemptions) without prior OFHEO approval, so long as the payment would not decrease total capital to an amount less than our risk-based capital requirement and would not decrease our core capital to an amount less than our minimum capital requirement. However, because we are currently subject to the OFHEO consent order, we are required to obtain OFHEO's prior approval of certain capital transactions that could have the effect of reducing our capital surplus below an amount equal to 30% more than our statutory minimum capital requirement.  Additionally, under the OFHEO consent order, we are required to submit a written report to OFHEO detailing the rationale and process for any proposed capital distribution prior to making such distribution.

If we were classified as undercapitalized, we would be prohibited from making a capital distribution that would result in our being reclassified as significantly undercapitalized or critically undercapitalized.  We also would be required to submit a capital restoration plan for OFHEO approval, which could adversely affect our ability to make capital distributions.

If we were classified as significantly undercapitalized, we would be prohibited from making any capital distribution that would result in our being reclassified as critically undercapitalized. We would otherwise be able to make a capital distribution only if OFHEO determined that the distribution would: (a) enhance our ability to meet the risk-based capital standard and the minimum capital standard promptly; (b) contribute to our long-term financial safety and soundness; or (c) otherwise be in the public interest. Also under this classification, OFHEO could take action to limit our growth, require us to acquire new capital or restrict us from activities that create excessive risk. We also would be required to submit a

26

capital restoration plan for OFHEO approval, which could adversely affect our ability to make capital distributions.

If we were classified as critically undercapitalized, OFHEO would be required to appoint a conservator for us, unless OFHEO made a written finding that such appointment could have certain serious adverse effects and the public interest would be better served with other enforcement actions and the Secretary of the Treasury concurred in that determination. We would be able to make a capital distribution only if OFHEO determined that the distribution would: (a) enhance our ability to meet the risk-based capital standard and the minimum capital standard promptly; (b) contribute to our long-term financial safety and soundness; or (c) otherwise be in the public interest.

**Performance Against Capital Standards**

To ensure compliance with each of our regulatory capital requirements, we maintain different levels of capital surplus for each capital requirement. Quarterly changes in economic conditions (such as interest rates, spreads and home prices) can materially impact the calculated risk-based capital requirement, as was the case in 2006. As a consequence, we generally seek to maintain a larger surplus over the risk-based capital requirement to ensure continued compliance.

While we are able to reasonably estimate the size of our book of business and therefore our minimum capital requirement, the amount of our reported core capital holdings at each period end is less certain. Changes in the fair value of our derivatives may result in significant fluctuations in our capital holdings from period to period. Accordingly, we target a surplus above the statutory minimum capital requirement and OFHEO-directed minimum capital requirement to accommodate a wide range of possible valuation changes that might adversely impact our core capital base.

The following table displays our regulatory capital classification measures as of September 30, 2007 and December 31, 2006.

| | As of | |
| --- | --- | --- |
| | September 30, 2007[1] | December 31, 2006 |
| | (Dollars in millions) | |
| Core capital[2] | $41,713 | $41,950 |
| Statutory minimum capital[3] | 30,303 | 29,359 |
| Surplus of core capital over required minimum capital | 11,410 | 12,591 |
| Surplus of core capital percentage over required minimum capital[4] | 37.7% | 42.9% |
| Core capital[2] | $41,713 | $41,950 |
| OFHEO-directed minimum capital[5] | 39,393 | 38,166 |
| Surplus of core capital over OFHEO-directed minimum capital | 2,319 | 3,784 |
| Surplus of core capital percentage over OFHEO-directed minimum capital[6] | 5.9% | 9.9% |
| Total capital[7] | $43,798 | $42,703 |
| Statutory risk-based capital[8] | 10,225 | 26,870 |
| Surplus of total capital over required risk-based capital | $33,573 | $15,833 |
| Surplus of total capital percentage over required risk-based capital[9] | 328.3% | 58.9% |
| Core capital[2] | $41,713 | $41,950 |
| Statutory critical capital[10] | 15,682 | 15,149 |
| Surplus of core capital over required critical capital | $26,031 | $26,801 |
| Surplus of core capital percentage over required critical capital[11] | 166.0% | 176.9% |

---

(1) Statutory risk-based capital and total capital measures have been provided as of June 30, 2007 (the most recent date for which the statutory risk-based capital measure is available) and December 31, 2006. The regulatory capital classification measures as of September 30, 2007 provided in this table represent amounts that have been submitted to OFHEO for their certification and are subject to their review and approval. They do not represent OFHEO's announced capital classification measures.

(2) The sum of (a) the stated value of our outstanding common stock (common stock less treasury stock); (b) the stated value of our outstanding non-cumulative perpetual preferred stock; (c) our paid-in capital; and (d) our retained earnings. Core capital excludes accumulated other comprehensive income (loss).

(3) Generally, the sum of (a) 2.50% of on-balance sheet assets; (b) 0.45% of the unpaid principal balance of outstanding Fannie Mae MBS held by third parties; and (c) up to 0.45% of other off-balance sheet obligations, which may be adjusted by the Director of OFHEO under certain circumstances (See 12 CFR 1750.4 for existing adjustments made by the Director of OFHEO).

(4) Defined as the surplus of core capital over statutory minimum capital expressed as a percentage of statutory minimum capital.

(5) This requirement was effective as of September 30, 2005, and is defined as a 30% surplus over the statutory minimum capital requirement. We are currently required to maintain this surplus under the OFHEO consent order until such time as the Director of OFHEO determines that the requirement should be modified or allowed to expire, taking into account factors such as the resolution of accounting and internal control issues.

(6) Defined as the surplus of core capital over the OFHEO-directed minimum capital expressed as a percentage of the OFHEO-directed minimum capital.

(7) The sum of (a) core capital and (b) the total allowance for loan losses and reserve for guaranty losses, less (c) the specific loss allowance (that is, the allowance required on individually-impaired loans). The specific loss allowance totaled $51 million as of June 30, 2007 and $106 million as of December 31, 2006.

(8) Defined as the amount of total capital required to be held to absorb projected losses flowing from future adverse interest rate and credit risk conditions specified by statute (see 12 CFR 1750.13 for conditions), plus 30% mandated by statute to cover management and operations risk.

(9) Defined as the surplus of total capital over statutory risk-based capital expressed as a percentage of statutory risk based capital.

(10) Generally, the sum of (a) 1.25% of on-balance sheet assets; (b) 0.25% of the unpaid principal balance of outstanding Fannie

Mae MBS held by third parties; and (c) up to 0.25% of other off-balance sheet obligations, which may be adjusted by the Director of OFHEO under certain circumstances.

(11)   Defined as the surplus of core capital over statutory critical capital, expressed as a percentage of statutory critical capital.

For each quarter of 2005 and 2006, we have been classified by OFHEO as adequately capitalized. On September 27, 2007, OFHEO announced that we were classified as adequately capitalized as of June 30, 2007 (the most recent quarter for which OFHEO has published its capital classification). Because we have not yet prepared audited consolidated financial statements for any periods after December 31, 2006, OFHEO's capital classifications for periods after December 31, 2006 are based on our estimates of our financial condition as of those periods and remain subject to revision.

# LEGALITY OF INVESTMENT

You should consult with your own legal advisors to determine whether the shares of Preferred Stock constitute legal investments for you, any investment limitations, and whether the Preferred Stock is eligible to be used as collateral for borrowings. In addition, financial institutions should consult their legal advisors or regulators in determining the appropriate treatment of the shares of Preferred Stock under risk-based capital or similar rules. An institution under the jurisdiction of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, the National Credit Union Administration, or any other federal or state agency with similar authority should review any applicable regulations, policy statements and guidelines before purchasing or pledging shares of the Preferred Stock.

# UNITED STATES TAXATION

The Preferred Stock and payments thereon generally are subject to taxation. Therefore, you should consider the tax consequences of owning Preferred Stock before acquiring it.

In the opinion of Dewey & LeBoeuf LLP, our special tax counsel, the following discussion correctly describes the principal aspects of the U.S. federal income tax treatment of U.S. Persons (as defined below) that are beneficial holders of the Preferred Stock ("Shareholders"). This discussion does not address the U.S. federal income tax treatment of Shareholders that are not U.S. Persons. This discussion is based on the Code, its legislative history, existing and proposed Treasury regulations, revenue rulings and judicial decisions, changes to any of which subsequent to the date of this Offering Circular may affect, possibly on a retroactive basis, the tax consequences described herein.

The discussion contained under this heading was not intended or written to be used, and cannot be used, for the purpose of avoiding United States federal tax penalties.  This discussion was written to support the promotion or marketing of the transactions or matters addressed in this Offering Circular. You should seek advice based on your particular circumstances from an independent tax advisor.

This summary discusses only the Preferred Stock purchased in this offering and held as a capital asset (within the meaning of federal tax law). This discussion does not purport to address all of the U.S. federal income tax consequences that may be applicable to particular investors in light of their individual circumstances or to Shareholders subject to special rules, such as dealers in securities, tax-exempt organizations, life insurance companies, persons liable for alternative minimum tax, persons that hold the Preferred Stock as part of a straddle or a hedging or conversion transaction, certain financial institutions and certain securities traders. In addition, this discussion does not address taxes imposed by any state, local or foreign taxing jurisdiction. In all cases, investors are advised to consult their own tax advisors regarding the U.S. federal tax consequences to them of holding, owning and disposing of Preferred Stock, as well as any tax consequences arising under the laws of any state or other taxing jurisdiction.

For purposes of this discussion, "U.S. Person" generally means (1) a citizen or individual resident of the United States, (2) a corporation, or other entity treated as a corporation for United States federal income tax purposes organized in or under the laws of the United States, any State thereof or the District of Columbia, (3) an estate the income of which is includible in its gross income for U.S. federal income tax purposes without regard to its source, or (4) a trust if a court within the United States is able to exercise primary supervision over its administration and at least one U.S. Person has the authority to control all substantial decisions of the trust.  If a partnership holds Preferred Stock, the tax treatment of a partner will generally depend upon the status of the partner and the activities of the partnership. Partnerships acquiring, holding or disposing of Preferred Stock, and partners in such partnerships, are encouraged to consult their own tax advisors.

**Dividends**

Dividends declared and paid on the Preferred Stock will be dividends for U.S. federal income tax purposes to the extent paid out of our current or accumulated earnings and profits, as determined for federal income tax purposes, and, except as described below, will be taxable as ordinary income. Although we expect that our current and accumulated earnings and profits will be such that all dividends paid with respect to the Preferred Stock will qualify as dividends for federal income tax purposes, we cannot guarantee that result. Our accumulated earnings and profits and our current earnings and profits in future years will depend in significant part on our future profits or losses, which we cannot accurately predict. To the extent that the amount of any dividend paid on a share of Preferred Stock exceeds our current or accumulated earnings and profits for federal income tax purposes attributable to that share, the dividend will be treated first as a return of capital (rather than as ordinary income) and will be applied against and reduce the Shareholder's adjusted tax basis in that share of Preferred Stock. The amount of any such dividend in excess of the Shareholder's adjusted tax basis will then be taxed as capital gain. For purposes of the remainder of this discussion, it is assumed that dividends paid with respect to the Preferred Stock will constitute dividends for U.S. federal income tax purposes.

Dividends received by Shareholders that are corporations generally will be eligible for the 70-percent dividends-received deduction under section 243 of the Code. The 70-percent dividends-received deduction will not be available with respect to a dividend received on Preferred Stock that a Shareholder has held for 45 days or less (including the day of disposition, but excluding the day of acquisition) during the 91-day period beginning on the day which is 45 days before the date on which the Preferred Stock becomes ex-dividend. The length of time that a corporate Shareholder is deemed to have held stock for these purposes is reduced by periods during which the Shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales or other similar transactions. The aggregate dividends-received deduction allowed a corporate Shareholder cannot exceed 70 percent of its taxable income (with certain adjustments). Moreover, the dividends-received deduction may be reduced if the stock is "debt financed." Stock is "debt financed" if a corporate Shareholder incurs indebtedness "directly attributable" to a "portfolio stock" investment in another company, which would include an investment in the Preferred Stock.

Individual U.S. Shareholders generally are subject to a reduced maximum tax rate of 15 percent on dividends received in taxable years beginning on or before December 31, 2010, after which date the rate applicable to dividends is scheduled to return to the rate generally applicable to ordinary income. The rate reduction does not apply to dividends received to the extent that the individual U.S. holder elects to treat the dividends as "investment income," which may be offset against investment expense. Furthermore, the rate reduction does not apply to dividends that are paid to Shareholders with respect to Preferred Stock that is held by the Shareholder for 60 days or less during the 121-day period beginning on the date which is 60 days before the date on which the Preferred Stock becomes ex-dividend. The length of time that a Shareholder is deemed to have held stock for these purposes is reduced by periods during which the Shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales or other similar transactions. Investors are advised to consult their own tax advisors regarding the implications of these rules in light of their particular circumstances.

**Dispositions, Including Redemptions**

Any sale, exchange, redemption (except as discussed below) or other disposition of the Preferred Stock generally will result in taxable gain or loss equal to the difference between the amount realized upon the disposition and the Shareholder's adjusted tax basis in the Preferred Stock. Such gain or loss will be capital gain or loss and will be long-term capital gain or loss if the holding period for the Preferred Stock exceeds one year. Tax rates on capital gain for individual Shareholders vary depending on each Shareholder's income and holding period for the Preferred Stock.  Individual U.S. Shareholders are subject to a reduced maximum tax rate of 15 percent on long term capital gain realized in taxable years

beginning on or before December 31, 2010, after which date the maximum rate is scheduled to return to the rate generally applicable to long term capital gains. Shareholders that are individuals should contact their own tax advisors for more information or for the capital gains tax rate applicable to specific shares of Preferred Stock. The deduction of capital losses is subject to certain limitations.

A redemption of Preferred Stock may be treated as a dividend, rather than as payment in exchange for the Preferred Stock, unless the redemption (i) is "not essentially equivalent to a dividend" with respect to the Shareholder within the meaning of section 302(b)(1) of the Code; (ii) "is in complete redemption of all of the stock" of Fannie Mae held by the Shareholder as described in section 302(b)(3) of the Code; or (iii) otherwise meets the requirements of one of the other exceptions from dividend treatment provided in section 302(b) of the Code. In applying these rules, the Shareholder must take into account not only the Preferred Stock and our other stock that it owns directly, but also the Preferred Stock and our other stock that it constructively owns within the meaning of section 318 of the Code. Because of the complex nature of these rules, each Shareholder should consult its tax advisor to determine whether a redemption of Preferred Stock will be treated as a dividend or as payment in exchange for the Preferred Stock. If the redemption payment is treated as a dividend, the rules discussed above under "Dividends" apply.

**Information Reporting and Backup Withholding**

Payments of dividends on shares of Preferred Stock and payments of proceeds upon the sale or redemption of Preferred Stock generally are required to be reported to the Internal Revenue Service except in the case of a beneficial holder that is an "exempt recipient." Individuals generally are not exempt recipients, whereas corporations and certain other entities generally are exempt recipients.

Backup withholding of U.S. federal income tax may apply to payments made with respect to shares of Preferred Stock, as well as to payments of proceeds from the sale of shares of Preferred Stock, to Shareholders that are not exempt recipients and that fail to provide certain identifying information (such as the taxpayer identification number of the Shareholder) in the manner required.

**The U.S. federal income tax discussion set forth above is included for general information only and may not be applicable depending upon a Shareholder's particular situation. Each Shareholder should consult its own tax advisor with respect to the tax consequences to it of the ownership and disposition of the Preferred Stock, including the tax consequences under the tax laws of the United States, states, localities, countries other than the United States and any other taxing jurisdiction and the possible effects of changes in such tax laws.**

# UNDERWRITING

Under the terms set forth in the underwriting agreement (the "Underwriting Agreement"), we have agreed to sell to each of the underwriters named below, and the underwriters, for whom Lehman Brothers Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated (the "Representatives") are acting as representatives, have severally agreed to purchase, the number of shares of Preferred Stock set forth below:

| Underwriter | Number of Shares |
|---|---|
| Lehman Brothers Inc. .............................................................................. | 100,800,000 |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated ........................................................................ | 100,800,000 |
| Goldman, Sachs & Co. ............................................................................ | 22,400,000 |
| J.P. Morgan Securities Inc. ...................................................................... | 22,400,000 |
| Banc of America Securities LLC .............................................................. | 5,600,000 |
| Bear, Stearns & Co. Inc. .......................................................................... | 5,600,000 |
| Citigroup Global Markets Inc. .................................................................. | 5,600,000 |
| Deutsche Bank Securities Inc. .................................................................. | 5,600,000 |
| Morgan Stanley & Co. Incorporated ........................................................ | 5,600,000 |
| UBS Securities LLC ................................................................................ | 5,600,000 |
| Total ............................................................................................ | 280,000,000 |

The Underwriting Agreement requires the Underwriters to purchase all the Preferred Stock offered hereby if any is purchased.

The Underwriters propose to offer the Preferred Stock to the public at the initial public offering price set forth on the cover page of this Offering Circular, and may reoffer the Preferred Stock to certain dealers at such price less a concession of not more than $0.15 per share. The Underwriters may allow, and the dealers may reallow, a discount not in excess of $0.075 per share on sales to certain other dealers. After the initial offering, the public offering price, concession and discount may be changed.

Prior to this offering, there has been no public market for the Preferred Stock. We will apply to list the Preferred Stock on the NYSE under the symbol "FNMprS." If accepted for listing, we expect that trading of the Preferred Stock on the NYSE will commence by December 31, 2007. The Representatives have advised us that they intend to make a market in the Preferred Stock prior to the commencement of trading on the NYSE, but they are not obligated to do so and may discontinue any such market making at any time without notice. There is no assurance that the Preferred Stock will be accepted for listing on the NYSE.

In the Underwriting Agreement, we and the Underwriters have agreed to indemnify each other against and contribute toward certain liabilities.

We have engaged Lehman Brothers to provide certain advisory services in connection with the offering of the Preferred Stock.

The Underwriters and certain affiliates thereof engage in transactions with and perform services for us in the ordinary course of business.

The Underwriters may engage in certain transactions that stabilize the price of the Preferred Stock. These transactions may include entering stabilizing bids, which means the placing of a bid or the effecting of a purchase for the purpose of pegging, fixing or maintaining the price of the Preferred Stock. Neither we nor the Underwriters make any representation or prediction as to the direction or magnitude of

any effect that the transactions described above may have on the price of the Preferred Stock. The Underwriters are not required to engage in any of these transactions. When so doing, the Underwriters act on their own behalf and not as our representatives. Any such transactions, if commenced, may be discontinued at any time.

The expenses of the offering that are payable by us are estimated to be approximately $255,000 (exclusive of any underwriting discount and advisory fees).

## RATINGS

We expect that Moody's will assign the Preferred Stock a rating of Aa3 and a rating outlook of stable. An issue which is rated "Aa" is considered by Moody's to be "of high quality" and "subject to very low credit risk." The numerical modifier "3" indicates that the issue ranks in the lower end of the generic rating category of "Aa." According to Moody's a "rating outlook is an opinion regarding the likely direction of a rating over the medium term."

We expect that S&P will assign the Preferred Stock a rating of "AA–" and a rating outlook of negative. An issue which is rated "AA" is considered by S&P to differ "from the highest-rated obligations only to a small degree." According to S&P, "the obligor's capacity to meet its financial commitment on the obligation is very strong." The modifier "–" indicates that the issue ranks in the lower end of the generic rating category "AA." According to S&P, a "rating outlook assesses the potential direction of a long-term credit rating over the intermediate term (typically six months to two years)."

We expect that Fitch will assign the Preferred Stock a rating of "AA–". An issue which is rated "AA" is considered by Fitch to be of "very high credit quality." According to Fitch, this rating indicates a "very strong capacity for payment of financial commitments." The modifier "–" indicates that the issue ranks in the lower end of the generic rating category "AA."

A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning rating organization.

## INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The consolidated financial statements of Fannie Mae and consolidated entities and management's report on the effectiveness of internal control over financial reporting as of December 31, 2006 included in Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2006, incorporated by reference in this offering circular, have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their reports appearing therein.

## VALIDITY OF THE PREFERRED STOCK

The validity of the Preferred Stock will be passed upon for us by Sidley Austin LLP, New York, New York, and for the Underwriters by Sullivan & Cromwell LLP, Washington, D.C. Certain U.S. federal income tax matters will be passed upon for us by Dewey & LeBoeuf LLP, Washington, D.C.

# FORWARD-LOOKING STATEMENTS

This Offering Circular contains forward-looking statements, which are statements about matters that are not historical facts. In addition, our senior management may from time to time make forward-looking statements orally to analysts, investors, the news media and others. Forward-looking statements often include words such as "expects," "anticipates," "intends," "plans," "believes," "seeks," "estimates," "would," "should," "could," "may," or similar words.

Forward-looking statements reflect our management's expectations or predictions of future conditions, events or results based on various assumptions and management's estimates of trends and economic factors in the markets in which we are active, as well as our business plans. They are not guarantees of future performance. By their nature, forward-looking statements are subject to risks and uncertainties. Our actual results and financial condition may differ, possibly materially, from the anticipated results and financial condition indicated in these forward-looking statements. There are a number of factors that could cause actual conditions, events or results to differ materially from those described in the forward-looking statements contained in this report, including those factors described in the "Risk Factors" section of this Offering Circular, the 2006 10-K, and the Third Quarter 10-Q.

Factors that could cause actual conditions, events or results to differ materially from those expressed in any forward-looking statements include, among others:

- our expectation that housing market weakness will continue in 2007 and 2008;

- our projections for mortgage originations and mortgage debt outstanding ("MDO") growth for 2007 and 2008;

- our estimates regarding our 2007 business results and market share;

- our expectations that our single-family guaranty book of business will grow at a faster rate than the rate of overall MDO growth, and our guaranty fee income will continue to increase;

- our expectation that our net interest yield will remain relatively stable for the remainder of 2007;

- our expectation that our accounting for changes in the fair value of our derivatives and our trading securities will continue to be a major driver of volatility in our earnings, in our stockholders' equity and in our regulatory capital;

- our expectation that our losses on certain guaranty contracts will increase significantly for 2007 as compared with 2006;

- our expectation that other-than-temporary impairment on investment securities will be significantly lower in 2007 as compared with 2006;

- our expectation that we will reduce our administrative expenses by more than $200 million in 2007;

- our expectation that our ongoing operations costs will be reduced to approximately $2 billion in 2008;

- our expectation that our credit-related expenses and credit losses will significantly increase for 2007 and 2008;

- our expectation that our credit loss ratio will be within our normal historical range of 4 to 6 basis points in 2007, and will increase above this range in 2008;

- our belief that our delinquencies and foreclosures will increase for the remainder of 2007 and in 2008;

- our belief that our sources of liquidity will remain adequate to meet both our short-term and long-term funding needs;

- our estimate of the effect of hypothetical declines in home prices on our credit losses;

- our estimate of the effect of hypothetical changes in interest rates on the fair value of our financial instruments; and

- our belief that our remaining material weaknesses will be remediated by December 31, 2007 and that we will have effective disclosure controls and procedures by December 31, 2007.

Investors are cautioned not to place undue reliance on forward-looking statements in this Offering Circular or that we make from time to time, and to consider carefully the factors discussed in the "Risk Factors" section of this Offering Circular, the 2006 10-K and the Third Quarter 10-Q in evaluating these forward-looking statements. These forward-looking statements are representative only as of the date they are made, and we undertake no obligation to update any forward-looking statement as a result of new information, future events or otherwise except as required under the federal securities laws.

**Exhibit A**

**Certificate of Designation of Terms of**
**Fixed-to-Floating Rate Non-cumulative Preferred Stock, Series S**

**CUSIP: 313586752**

## 1.   Designation, Par Value and Number of Shares.

The designation of the series of preferred stock of the Federal National Mortgage Association ("Fannie Mae") created by this resolution shall be "Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series S" (the "Series S Preferred Stock"), and the number of shares initially constituting the Series S Preferred Stock is 280,000,000, which number of shares may be increased by the Board of Directors of Fannie Mae, or a duly authorized committee thereof, in accordance with Section 7 below.  Shares of Series S Preferred Stock will have no par value and a stated value of $25 per share. Shares of Series S Preferred Stock will have no stated maturity date, and, subject to Section 3 below, will be perpetual.  The Board of Directors of Fannie Mae, or a duly authorized committee thereof, in its sole discretion, may reduce the number of shares of Series S Preferred Stock, provided such reduction is not below the number of shares of Series S Preferred Stock then outstanding.

## 2.   Dividends.

(a)     For each Dividend Period from December 11, 2007 to but excluding December 31, 2010 (each such Dividend Period, a "Fixed Rate Dividend Period"), holders of outstanding shares of Series S Preferred Stock (each individually a "Holder", or collectively, the "Holders") shall be entitled to receive, ratably, when, as and if declared by the Board of Directors, in its sole discretion, out of funds legally available therefor, non-cumulative cash dividends at a rate of 8.25% per annum per share of Series S Preferred Stock.  Dividends on the Series S Preferred Stock shall accrue from and include December 11, 2007 and will be payable when, as and if declared by the Board of Directors quarterly on March 31, June 30, September 30 and December 31 of each year (each, a "Dividend Payment Date"), commencing on March 31, 2008.  If a Dividend Payment Date is not a Business Day, the related dividend (if declared) will be paid on the next succeeding Business Day with the same force and effect as though paid on the Dividend Payment Date, without any increase to account for the period from such Dividend Payment Date through the date of actual payment.  A "Business Day" shall mean any day other than a Saturday, Sunday, or a day on which banking institutions in New York, New York are authorized or required by law to close.  Dividends will be paid to Holders on the record date fixed by the Board of Directors or a duly authorized committee thereof, which will be no earlier than 45 days or later than 10 days prior to the applicable Dividend Payment Date.

If declared, the initial dividend, which will be for the period from and including the date of issuance to but excluding March 31, 2008, will be $0.6302 per share and will be payable on March 31, 2008.  Thereafter, if declared, quarterly dividends for each Fixed Rate Dividend Period will be $0.5156 per share. The "Dividend Period" relating to a Dividend Payment Date will be the period from and including the preceding Dividend Payment Date (or, in the case of the initial dividend, December 11, 2007) to but excluding such Dividend Payment Date. For each Fixed Rate Dividend Period that is less than a full Fixed Rate Dividend Period, dividends payable on the Series S Preferred Stock will be computed on the basis of a 360 day year consisting of twelve 30 day months, with the dividend for such partial Fixed Rate Dividend Period computed by dividing the per annum dividend rate by 360, and multiplying that amount by the number of days in such partial Fixed Rate Dividend Period (using the 30 day month, 360 day year convention) and the stated value of $25 per share, the product of which will be rounded to the fourth digit after the decimal point.  (If the fifth digit to the right of the decimal point is

A-1

five or greater, the fourth digit will be rounded up by one.)  Dividends payable on the Series S Preferred Stock for each full Fixed Rate Dividend Period will be computed by dividing the per annum dividend rate by four, and multiplying the result by the stated value per share of $25, the product of which will be rounded to the fourth digit after the decimal point. (If the fifth digit to the right of the decimal point is five or greater, the fourth digit will be rounded up by one.)

(b)      For the Dividend Period beginning on December 31, 2010 and for each Dividend Period thereafter (each such Dividend Period, a "Floating Rate Dividend Period"), Holders of outstanding shares of Series S Preferred Stock shall be entitled to receive, ratably, when, as and if declared by the Board of Directors, in its sole discretion, out of funds legally available therefor, non-cumulative quarterly dividends which will accrue at a per annum rate equal to the greater of (i) 7.75% and (ii) the sum of 3-Month LIBOR plus 4.23%.  On December 31, 2010 and each March 31, June 30, September 30 and December 31 thereafter, the previously applicable dividend rate will be replaced and the dividend rate for the Floating Rate Dividend Period beginning on such date will be determined in accordance with the immediately preceding sentence.  Dividends on the Series S Preferred Stock for Floating Rate Dividend Periods will be payable when, as and if declared by the Board of Directors on March 31, June 30, September 30 and December 31 of each year (each, a "Dividend Payment Date"), commencing on March 31, 2011.  If a Dividend Payment Date is not a Business Day, the related dividend (if declared) will be paid on the next succeeding Business Day with the same force and effect as though paid on the Dividend Payment Date, without any increase to account for the period from such Dividend Payment Date through the date of actual payment.  Dividends will be paid to Holders on the record date fixed by the Board of Directors or a duly authorized committee thereof, which will be no earlier than 45 days or later than 10 days prior to the applicable Dividend Payment Date.

In determining the dividend rate for any Floating Rate Dividend Period, 3-Month LIBOR for such Floating Rate Dividend Period will be calculated by the Calculation Agent on the second London Business Day immediately preceding the first day of such Floating Rate Dividend Period (each a "LIBOR Determination Date").  A "London Business Day" is defined as any day on which commercial banks are open for business (including dealings in foreign exchange and deposits in U.S. dollars) in London, England.

Dividends payable on the Series S Preferred Stock for any full or partial Floating Rate Dividend Period will be computed based on the actual number of days elapsed during that period and a 360 day year, with the dividend for such Floating Rate Dividend Period computed by dividing the per annum dividend rate applicable to that Floating Rate Dividend Period by 360, and multiplying that amount by the actual number of days elapsed in such Floating Rate Dividend Period and the stated value of $25 per share, the product of which will be rounded to the fourth digit after the decimal point.  (If the fifth digit to the right of the decimal point is five or greater, the fourth digit will be rounded up by one.)  If Fannie Mae redeems the Series S Preferred Stock during a Floating Rate Dividend Period, the dividend that would otherwise be payable for the then current quarterly Floating Rate Dividend Period will be included in the redemption price of the shares redeemed and will not be separately payable.

"3-Month LIBOR" is as follows:

(1)      the rate (expressed as a percentage per annum) for U.S. dollar deposits having a three-month maturity that appears on Reuters Screen LIBOR01 as of 11:00 a.m. (London time) on the related LIBOR Determination Date.  "Reuters Screen LIBOR01" means the display designated as "Reuters Screen LIBOR01 Page" or such other page as may replace Reuters Screen LIBOR01 Page on that service or such other service or services as may be nominated by the British Bankers' Association as the information vendor for the purpose of displaying London interbank offered rates for U.S. dollar deposits.

If at least two rates appear on the Reuters Screen LIBOR01, the rate on the LIBOR Determination Date will be the arithmetic mean of such rates;

(2)     if the rate specified in clause (1) above cannot be identified on the related LIBOR Determination Date, then the Calculation Agent will request the principal London offices of five leading banks (which may include affiliates of the Underwriters) in the London interbank market selected by the Calculation Agent (after consultation with Fannie Mae, if Fannie Mae is not then acting as Calculation Agent) to provide those banks' offered quotations (expressed as percentages per annum) to prime banks in the London interbank market for deposits in U.S. dollars having a three-month maturity as of 11:00 a.m. (London time) on such LIBOR Determination Date.  If at least two quotations are provided, then 3-Month LIBOR will be the arithmetic mean determined by the Calculation Agent of the quotations obtained (and, if five quotations are provided, eliminating the highest quotation (or in the event of equality, one of the highest) and the lowest quotation (or in the event of equality, one of the lowest));

(3)     if fewer than two quotations are provided as requested in clause (2) above, then the Calculation Agent will request five major banks (which may include affiliates of the Underwriters) in New York, New York selected by the Calculation Agent (after consultation with Fannie Mae, if Fannie Mae is not then acting as Calculation Agent) to provide those banks' offered quotations (expressed as percentages per annum) to leading European banks for loans having a three-month maturity in U.S. dollars as of 11:00 a.m. (New York City time) on such LIBOR Determination Date.  If at least two quotations are provided, then 3-Month LIBOR will be the arithmetic mean determined by the Calculation Agent of the quotations obtained (and, if five quotations are provided, eliminating the highest quotation (or in the event of equality, one of the highest) and the lowest quotation (or in the event of equality, one of the lowest)); and

(4)     if fewer than two quotations are so provided as requested in clause (3) above, then 3-Month LIBOR as of such LIBOR Determination Date will be 3-Month LIBOR determined for the immediately preceding Dividend Period.  If the applicable Dividend Period is the first Floating Rate Period beginning on December 31, 2010, then 3-Month LIBOR will be the rate for deposits in U.S. dollars having a three-month maturity that appeared, as of 11:00 a.m. (London time) on the most recent London Business Day preceding the LIBOR Determination Date for which the rate was displayed on Reuters Screen LIBOR01 with respect to deposits commencing on the second London Business Day following that date.

The Calculation Agent's determination of the 3-Month LIBOR and the dividend rate will be final and binding absent manifest error.

(c)     No dividend (other than dividends or distributions paid in shares of, or options, warrants or rights to subscribe for or purchase shares of, the common stock of Fannie Mae or any other stock of Fannie Mae ranking, as to the payment of dividends and the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, junior to the Series S Preferred Stock) may be declared or paid or set apart for payment on Fannie Mae's common stock (or on any other stock of Fannie Mae ranking, as to the payment of dividends, junior to the Series S Preferred Stock) unless dividends have been declared and paid or set apart (or ordered to be set apart) on the Series S Preferred Stock for the then-current quarterly Dividend Period; provided, however, that the foregoing dividend preference shall not be cumulative and shall not in any way create any claim or right in favor of the Holders of Series S Preferred Stock in the event that dividends have not been declared or paid or set apart (or ordered to be set apart) on the Series S Preferred Stock in respect of any prior Dividend Period. If the full dividend on the Series S Preferred Stock is not paid for any quarterly Dividend Period (including a dividend that is not paid because regulatory approval is not granted), the Holders of Series S Preferred Stock will have no claim in respect of the unpaid amount so long as no dividend (other than those referred to above) is paid on Fannie

A-3

Mae's common stock (or any other stock of Fannie Mae ranking, as to the payment of dividends, junior to the Series S Preferred Stock) for such Dividend Period.

(d)     The Board of Directors of Fannie Mae, or a duly authorized committee thereof, may, in its discretion, choose to pay dividends on the Series S Preferred Stock without the payment of any dividends on Fannie Mae's common stock (or any other stock of Fannie Mae ranking, as to the payment of dividends, junior to the Series S Preferred Stock).

(e)     No full dividends shall be declared or paid or set apart for payment on any stock of Fannie Mae ranking, as to the payment of dividends, on a parity with the Series S Preferred Stock for any period unless full dividends have been declared and paid or set apart for payment on the Series S Preferred Stock for the then-current quarterly Dividend Period. When dividends are not paid in full upon the Series S Preferred Stock and all other classes or series of stock of Fannie Mae, if any, ranking, as to the payment of dividends, on a parity with the Series S Preferred Stock, all dividends declared upon shares of Series S Preferred Stock and all such other stock of Fannie Mae will be declared pro rata so that the amount of dividends declared per share of Series S Preferred Stock and all such other stock will in all cases bear to each other the same ratio that accrued dividends per share of Series S Preferred Stock (but without, in the case of any non-cumulative preferred stock, accumulation of unpaid dividends for prior Dividend Periods) and such other stock bear to each other.

(f)     No dividends may be declared or paid or set apart for payment on any shares of Series S Preferred Stock if at the same time any arrears exist or default exists in the payment of dividends on any outstanding class or series of stock of Fannie Mae ranking, as to the payment of dividends, prior to the Series S Preferred Stock.

(g)     Holders of Series S Preferred Stock will not be entitled to any dividends, whether payable in cash or property, other than as herein provided and will not be entitled to interest, or any sum in lieu of interest, in respect of any dividend payment.

**3.     Optional Redemption.**

(a)     The Series S Preferred Stock shall not be redeemable prior to December 31, 2010.  On that date, and on each fifth anniversary thereafter, subject to (x) the notice provisions set forth in Section 3(b) below, (y) the receipt of any required regulatory approvals and (z) any further limitations which may be imposed by law, Fannie Mae may redeem the Series S Preferred Stock, in whole or in part, out of funds legally available therefor, at the redemption price of $25 per share plus an amount equal to the amount of the dividend (whether or not declared) for the then-current quarterly Dividend Period accrued to but excluding the date of such redemption, but without accumulation of unpaid dividends on the Series S Preferred Stock for prior Dividend Periods. The amount of dividends per share payable at redemption will be calculated in accordance with Section 2(b) above.  If less than all of the outstanding shares of Series S Preferred Stock are to be redeemed, Fannie Mae will select the shares to be redeemed from the outstanding shares not previously called for redemption by lot or pro rata (as nearly as possible) or by any other method that the Board of Directors of Fannie Mae, or a duly authorized committee thereof, in its sole discretion deems equitable.

(b)     In the event Fannie Mae shall redeem any or all of the Series S Preferred Stock as aforesaid, Fannie Mae will give written or electronic notice of any such redemption to Holders of Series S Preferred Stock not less than 30 days prior to the date fixed by the Board of Directors of Fannie Mae, or duly authorized committee thereof, for such redemption. Each such notice will state: (1) the number of shares of Series S Preferred Stock to be redeemed and, if fewer than all of the shares of Series S Preferred Stock held by a Holder are to be redeemed, the number of shares to be redeemed from such Holder; (2)

the redemption price; (3) the redemption date; and (4) the place at which a Holder's certificate(s) representing shares of Series S Preferred Stock must be presented upon such redemption. Failure to give notice, or any defect in the notice, to any Holder of Series S Preferred Stock shall not affect the validity of the proceedings for the redemption of shares of any other Holder of Series S Preferred Stock being redeemed.

(c)      Notice having been given as herein provided, from and after the redemption date, dividends on the Series S Preferred Stock called for redemption shall cease to accrue and such Series S Preferred Stock called for redemption will no longer be deemed outstanding, and all rights of the Holders thereof as registered holders of such shares of Series S Preferred Stock will cease. Upon surrender in accordance with said notice of the certificate(s) representing shares of Series S Preferred Stock so redeemed (properly endorsed or assigned for transfer, if the Board of Directors of Fannie Mae, or a duly authorized committee thereof, shall so require and the notice shall so state), such shares shall be redeemed by Fannie Mae at the redemption price aforesaid. Any shares of Series S Preferred Stock that shall at any time have been redeemed shall, after such redemption, be cancelled and not reissued. In case fewer than all the shares represented by any such certificate are redeemed, a new certificate shall be issued representing the unredeemed shares without cost to the Holder thereof.

(d)      The Series S Preferred Stock will not be subject to any mandatory redemption, sinking fund or other similar provisions. In addition, Holders of Series S Preferred Stock will have no right to require redemption of any shares of Series S Preferred Stock.

**4.**      **Liquidation Rights.**

(a)      Upon any voluntary or involuntary dissolution, liquidation or winding up of Fannie Mae, after payment or provision for the liabilities of Fannie Mae and the expenses of such dissolution, liquidation or winding up, the Holders of outstanding shares of the Series S Preferred Stock will be entitled to receive out of the assets of Fannie Mae or proceeds thereof available for distribution to stockholders, before any payment or distribution of assets is made to holders of Fannie Mae's common stock (or any other stock of Fannie Mae ranking, as to the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, junior to the Series S Preferred Stock), the amount of $25 per share plus an amount, determined in accordance with Section 2 above, equal to the dividend (whether or not declared) for the then-current quarterly Dividend Period accrued to but excluding the date of such liquidation payment, but without accumulation of unpaid dividends on the Series S Preferred Stock for prior Dividend Periods.

(b)      If the assets of Fannie Mae available for distribution in such event are insufficient to pay in full the aggregate amount payable to Holders of Series S Preferred Stock and holders of all other classes or series of stock of Fannie Mae, if any, ranking, as to the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, on a parity with the Series S Preferred Stock, the assets will be distributed to the Holders of Series S Preferred Stock and holders of all such other stock pro rata, based on the full respective preferential amounts to which they are entitled (but without, in the case of any noncumulative preferred stock, accumulation of unpaid dividends for prior Dividend Periods).

(c)      Notwithstanding the foregoing, Holders of Series S Preferred Stock will not be entitled to be paid any amount in respect of a dissolution, liquidation or winding up of Fannie Mae until holders of any classes or series of stock of Fannie Mae ranking, as to the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, prior to the Series S Preferred Stock have been paid all amounts to which such classes or series are entitled.

(d)     Neither the sale, lease or exchange (for cash, shares of stock, securities or other consideration) of all or substantially all of the property and assets of Fannie Mae, nor the merger, consolidation or combination of Fannie Mae into or with any other entity or the merger, consolidation or combination of any other entity into or with Fannie Mae, shall be deemed to be a dissolution, liquidation or winding up, voluntary or involuntary, for the purposes of this Section 4.

(e)     After payment of the full amount of the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae to which they are entitled pursuant to paragraphs (a), (b) and (c) of this Section 4, the Holders of Series S Preferred Stock will not be entitled to any further participation in any distribution of assets by Fannie Mae.

**5.      No Conversion or Exchange Rights.**

The Holders of shares of Series S Preferred Stock will not have any rights to convert such shares into or exchange such shares for shares of any other class or classes, or of any other series of any class or classes, of stock or obligations of Fannie Mae.

**6.      No Pre-Emptive Rights.**

No Holder of Series S Preferred Stock shall be entitled as a matter of right to subscribe for or purchase, or have any pre-emptive right with respect to, any part of any new or additional issue of stock of any class whatsoever, or of securities convertible into any stock of any class whatsoever, or any other shares, rights, options or other securities of any class whatsoever, whether now or hereafter authorized and whether issued for cash or other consideration or by way of dividend.

**7.      Voting Rights; Amendments.**

(a)     Except as provided below, the Holders of Series S Preferred Stock will not be entitled to any voting rights, either general or special.

(b)     Without the consent of the Holders of Series S Preferred Stock, Fannie Mae will have the right to amend, alter, supplement or repeal any terms of this Certificate or the Series S Preferred Stock (1) to cure any ambiguity, or to cure, correct or supplement any provision contained in this Certificate of Designation that may be defective or inconsistent with any other provision herein or (2) to make any other provision with respect to matters or questions arising with respect to the Series S Preferred Stock that is not inconsistent with the provisions of this Certificate of Designation so long as such action does not materially and adversely affect the interests of the Holders of Series S Preferred Stock; provided, however, that any increase in the amount of authorized or issued Series S Preferred Stock or the creation and issuance, or an increase in the authorized or issued amount, of any other class or series of stock of Fannie Mae, whether ranking prior to, on a parity with or junior to the Series S Preferred Stock, as to the payment of dividends or the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, or otherwise, will not be deemed to be materially and adversely affect the interests of the Holders of Series S Preferred Stock.

(c)     Except as set forth in paragraph (b) of this Section 7, the terms of this Certificate or the Series S Preferred Stock may be amended, altered, supplemented, or repealed only with the consent of the Holders of at least two-thirds of the shares of Series S Preferred Stock then outstanding, given in person or by proxy, either in writing or at a meeting of stockholders at which the Holders of Series S Preferred Stock shall vote separately as a class. On matters requiring their consent, Holders of Series S Preferred Stock will be entitled to one vote per share.

A-6

(d)     The rules and procedures for calling and conducting any meeting of Holders (including, without limitation, the fixing of a record date in connection therewith), the solicitation and use of proxies at such a meeting, the obtaining of written consents, and any other aspect or matter with regard to such a meeting or such consents shall be governed by any rules that the Board of Directors of Fannie Mae, or a duly authorized committee thereof, in its discretion, may adopt from time to time, which rules and procedures shall conform to the requirements of any national securities exchange on which the Series S Preferred Stock are listed at the time (if so listed).

**8.     Additional Classes or Series of Stock.**

The Board of Directors of Fannie Mae, or a duly authorized committee thereof, shall have the right at any time in the future to authorize, create and issue, by resolution or resolutions, one or more additional classes or series of stock of Fannie Mae, and to determine and fix the distinguishing characteristics and the relative rights, preferences, privileges and other terms of the shares thereof. Any such class or series of stock may rank prior to, on a parity with or junior to the Series S Preferred Stock as to the payment of dividends or the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, or otherwise.

**9.     Priority.**

For purposes of this Certificate of Designation, any stock of any class or series of Fannie Mae shall be deemed to rank:

(a)     Prior to the shares of Series S Preferred Stock, either as to the payment of dividends or the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, if the holders of such class or series shall be entitled to the receipt of dividends or of amounts distributable upon dissolution, liquidation or winding up of Fannie Mae, as the case may be, in preference or priority to the Holders of shares of Series S Preferred Stock.

(b)     On a parity with shares of Series S Preferred Stock, either as to the payment of dividends or the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, whether or not the dividend rates or amounts, dividend payment dates or redemption or liquidation prices per share, if any, be different from those of the Series S Preferred Stock, if the holders of such class or series shall be entitled to the receipt of dividends or of amounts distributable upon dissolution, liquidation or winding up of Fannie Mae, as the case may be, in proportion to their respective dividend rates or amounts or liquidation prices, without preference or priority, one over the other, as between the holders of such class or series and the Holders of shares of Series S Preferred Stock.

(c)     Junior to shares of Series S Preferred Stock, either as to the payment of dividends or the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, if such class shall be common stock of Fannie Mae or if the Holders of shares of Series S Preferred Stock shall be entitled to the receipt of dividends or of amounts distributable upon dissolution, liquidation or winding up of Fannie Mae, as the case may be, in preference or priority over the holders of such class or series.

(d)     The shares of Preferred Stock of Fannie Mae designated "5.25% Non-Cumulative Preferred Stock, Series D" (the "Series D Preferred Stock"), "5.10% Non-Cumulative Preferred Stock, Series E" (the "Series E Preferred Stock"), "Variable Rate Non-Cumulative Preferred Stock, Series F" (the "Series F Preferred Stock"), "Variable Rate Non-Cumulative Preferred Stock, Series G" (the "Series G Preferred Stock"), "5.81% Non-Cumulative Preferred Stock, Series H" (the "Series H Preferred Stock"), "5.375% Non-Cumulative Preferred Stock, Series I" (the "Series I Preferred Stock"), "5.125% Non-Cumulative Preferred Stock, Series L" (the "Series L Preferred Stock"), "4.75% Non-Cumulative

Preferred Stock, Series M" (the "Series M Preferred Stock"), "5.50% Non-Cumulative Preferred Stock, Series N" (the "Series N Preferred Stock"), "Non-Cumulative Preferred Stock, Series O" (the "Series O Preferred Stock"), "Non-Cumulative Convertible Series 2004-1 Preferred Stock" (the "Series 2004-1 Preferred Stock"), "Variable Rate Non-Cumulative Preferred Stock, Series P" (the "Series P Preferred Stock"), "6.75% Non-Cumulative Preferred Stock, Series Q" (the "Series Q Preferred Stock"), and "7.625% Non-Cumulative Preferred Stock, Series R" (the "Series R Preferred Stock") shall be deemed to rank on a parity with shares of Series S Preferred Stock as to the payment of dividends and the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae. Accordingly, the holders of record of Series D Preferred Stock, the holders of record of Series E Preferred Stock, the holders of record of Series F Preferred Stock, the holders of record of Series G Preferred Stock, the holders of record of Series H Preferred Stock, the holders of record of Series I Preferred Stock, the holders of record of Series L Preferred Stock, the holders of record of Series M Preferred Stock, the holders of record of Series N Preferred Stock, the holders of record of Series 2004-1 Preferred Stock, the holders of record of Series O Preferred Stock, the holders of record of Series P Preferred Stock, the holders of record of Series Q Preferred Stock, the holders of record of Series R Preferred Stock, and the Holders of Series S Preferred Stock shall be entitled to the receipt of dividends and of amounts distributable upon dissolution, liquidation or winding up of Fannie Mae, as the case may be, in proportion to their respective dividend rates or amounts or liquidation prices, without preference or priority, one over the other.

**10.     Transfer Agent, Dividend Disbursing Agent and Registrar.**

Fannie Mae hereby appoints Computershare Trust Company, N.A., as its initial transfer agent, dividend disbursing agent and registrar for the Series S Preferred Stock. Fannie Mae may at any time designate an additional or substitute transfer agent, dividend disbursing agent and registrar for the Series S Preferred Stock.

**11.     Notices.**

Any notice provided or permitted by this Certificate of Designation to be made upon, or given or furnished to, the Holders of Series S Preferred Stock by Fannie Mae shall be made by first-class mail, postage prepaid, to the addresses of such Holders as they appear on the books and records of Fannie Mae or by other written or electronic means to designated accounts of such Holders. Such notice shall be deemed to have been sufficiently made upon deposit thereof in the United States mail or electronic transmission to a designated account of the Holder. Notwithstanding anything to the contrary contained herein, in the case of the suspension of regular mail service or by reason of any other cause it shall be impracticable, in Fannie Mae's judgment, to give notice by mail, or if Fannie Mae has reason to believe other notification means would be ineffective, then such notification may be made, in Fannie Mae's discretion, by publication in a newspaper of general circulation in The City of New York or by hand delivery to the addresses of Holders as they appear on the books and records of Fannie Mae.

**Receipt and acceptance of a share or shares of the Series S Preferred Stock by or on behalf of a Holder shall constitute the unconditional acceptance by such Holder (and all others having beneficial ownership of such share or shares) of all of the terms and provisions of this Certificate of Designation. No signature or other further manifestation of assent to the terms and provisions of this Certificate of Designation shall be necessary for its operation or effect as between Fannie Mae and the Holder (and all such others).**



**280,000,000 Shares**

**Fixed-to-Floating Rate Non-Cumulative
Preferred Stock, Series S
(stated value $25 per share)**
————————————

**OFFERING CIRCULAR**
————————————

**LEHMAN BROTHERS
MERRILL LYNCH & CO.**
————————————

**GOLDMAN, SACHS & CO.
JPMORGAN**
————————————

**BANC OF AMERICA SECURITIES LLC
BEAR, STEARNS & CO. INC.
CITI
DEUTSCHE BANK SECURITIES
MORGAN STANLEY
UBS INVESTMENT BANK**

December 6, 2007

# Exhibit B

**OFFERING CIRCULAR**

**240,000,000 Shares
Fixed-to-Floating Rate
Non-Cumulative
Perpetual Preferred Stock**



# Freddie Mac

**Dividend Rate:**

From the issue date through
December 31, 2012: 8.375% per annum

For the period beginning January 1, 2013: Dividend Rate: The higher of (x) 3-Month LIBOR plus 4.16% per annum and (y) 7.875% per annum

Dividend Rate Reset Frequency: Quarterly

**Payment Dates:** March 31, June 30, September 30 and December 31, beginning March 31, 2008

**Optional Redemption:** On December 31, 2012, and on each fifth anniversary thereafter

**Liquidation Preference:** $25 per share plus dividends for the then-current dividend period

**Issue Date:** December 4, 2007

**Listing:** New York Stock Exchange

An investment in the Preferred Stock involves risks. See *Risk Factors* beginning on page 9 of this Offering Circular, on page 10 of our Information Statement dated March 23, 2007 and on page 74 of our November 20, 2007 Information Statement Supplement (as defined herein). We are incorporating the latter two documents by reference in this Offering Circular.

**We alone are responsible for our obligations under and for making payments on the Preferred Stock. The Preferred Stock is not guaranteed by, and is not a debt or obligation of, the United States or any federal agency or instrumentality other than Freddie Mac.**

| | Initial Public Offering Price(1) | Underwriting Discount | Proceeds to Freddie Mac(1)(2) |
|---|---|---|---|
| Per Share . . . . . . . . . . . . . . . . . . . . . . . . | $25.00 | $0.375 | $24.625 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . | $6,000,000,000 | $90,000,000 | $5,910,000,000 |

(1) Plus any accrued dividends from December 4, 2007.
(2) Before deducting estimated expenses of $300,000.

*Joint Book-Running Managers*

## LEHMAN BROTHERS        GOLDMAN, SACHS & CO.

*Senior Co-Lead Manager*

## BEAR, STEARNS & CO. INC.

*Co-Managers*

BANC OF AMERICA SECURITIES LLC
CITI
CREDIT SUISSE
DEUTSCHE BANK SECURITIES
MORGAN STANLEY
UBS INVESTMENT BANK

**The date of this Offering Circular is November 29, 2007.**

In this Offering Circular, we refer to the Fixed-to-Floating Rate Non-Cumulative Perpetual Preferred Stock as the **"Preferred Stock."**

**The Underwriters may engage in transactions that affect the price of the Preferred Stock, including stabilizing and short-covering transactions and the imposition of a penalty bid, in connection with the offering. For a description of these activities, see *Underwriting*.**

## ADDITIONAL INFORMATION

You should read this Offering Circular together with:

- the Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions for the Preferred Stock (the **"Certificate of Designation"**), which will be in substantially the form attached as *Appendix A* to this Offering Circular;

- our Information Statement and Annual Report to Shareholders dated March 23, 2007 (the **"Information Statement"**);

- our Information Statement Supplements dated March 23, 2007, April 12, 2007, May 1, 2007, June 7, 2007, June 14, 2007 (two Information Statement Supplements for such date), July 19, 2007, July 25, 2007, August 30, 2007 (two Information Statement Supplements for such date), September 7, 2007, September 19, 2007, September 27, 2007, September 28, 2007, November 9, 2007, November 20, 2007 (two Information Statement Supplements for such date) and November 27, 2007 (collectively, the **"Information Statement Supplements"**); and

- our Proxy Statement dated May 7, 2007 (the **"Proxy Statement"**).

This Offering Circular incorporates the Information Statement, the Information Statement Supplements and the Proxy Statement by reference, which means that we are disclosing information to you by referring to them rather than by providing you with separate copies. The information contained in the Information Statement, Information Statement Supplements and Proxy Statement is considered part of this Offering Circular. We also publish periodic reports containing financial information and supplements to the Information Statement. You can obtain copies of any of these documents by contacting us at:

**Freddie Mac**
**Investor Relations Department**
**Mailstop 486**
**8200 Jones Branch Drive**
**McLean, Virginia 22102-3110**
**Telephone: 703-903-3883 or 1-800-FREDDIE (800-373-3343)**
**e-mail: shareholder@freddiemac.com**

The Information Statement, Information Statement Supplements and Proxy Statement are also available on the "Investor Relations" page of our Internet Website (**http://www.freddiemac.com**). Although this information is available on our website, none of the other information on or hyperlinked from our website is incorporated by reference into this Offering Circular. You should rely only on the information included or specifically incorporated by reference in this Offering Circular in deciding whether to make an investment in the Preferred Stock. We have not authorized anyone to provide you with any different or additional information.

---

**Because of applicable securities law exemptions, we have not registered the Preferred Stock with any federal or state securities commission. No securities commission has reviewed this Offering Circular.**

**Dividends paid on the Preferred Stock have no exemption under U.S. federal law from U.S. federal, state or local taxation. For a discussion of relevant U.S. federal income tax considerations associated with an investment in the Preferred Stock, see *Certain U.S. Federal Income Tax Consequences*.**

**Some jurisdictions may by law restrict the distribution of this Offering Circular and the offer, sale and delivery of the Preferred Stock. Persons who receive this Offering Circular should know about and observe any such restrictions.**

# SUMMARY

*This summary contains selected information about the Preferred Stock. You should refer to the remainder of this Offering Circular for further information.*

**Issuer** . . . . . . . . . . . . . . . . . . . . . . . . . . . Federal Home Loan Mortgage Corporation or **"Freddie Mac,"** a stockholder-owned government-sponsored enterprise.

**Securities Offered** . . . . . . . . . . . . . . . . . 240,000,000 shares of Fixed-to-Floating Rate Non-Cumulative Perpetual Preferred Stock with a $25 per share liquidation preference.

**Dividends:**

*For the period from the issue date through December 31, 2012:*

    **Fixed Dividend Rate** . . . . . . . 8.375% per annum. Dividends will accrue from but not including the issue date.

*For the period beginning January 1, 2013:*

    The higher of (x) 3-month LIBOR plus 4.16% per annum and (y) 7.875% per annum. Dividends will accrue at such rate from and including January 1, 2013 and will reset quarterly. For information about how and when 3-month LIBOR will be determined, see *Description of the Preferred Stock — Dividends — Determination of 3-Month LIBOR*.

    **Calculation Agent** . . . . . . . . . Freddie Mac

**Frequency** . . . . . . . . . . . . . . . . . . . . . . . We will pay non-cumulative dividends quarterly, when, as and if declared by our Board of Directors.

**Payment Dates** . . . . . . . . . . . . . . . . . . . We will pay dividends, if declared, on March 31, June 30, September 30 and December 31 of each year, or by the next business day, beginning March 31, 2008.

**Preferences** . . . . . . . . . . . . . . . . . . . . . . The Preferred Stock will receive a preference over our common stock and any other junior stock as to dividends and distributions upon liquidation. The Preferred Stock will rank equally with our other currently outstanding series of preferred stock as to dividends and distributions upon liquidation.

**Maturity** . . . . . . . . . . . . . . . . . . . . . . . . . Perpetual.

**Optional Redemption** . . . . . . . . . . . . . . The Preferred Stock is not redeemable prior to December 31, 2012. On December 31, 2012 and on each fifth anniversary thereafter, we will have the option to redeem the Preferred Stock, in whole or in part, at the price of $25 per share plus the amount that would otherwise be payable as the dividend for the quarterly dividend period that ends on the redemption date, accrued through and including the redemption date, whether or not declared. We will give notice of optional redemption by mail to

3

|  | holders of the Preferred Stock to be redeemed from 30 days to 60 days before the redemption date. |
|---|---|
| **Liquidation Rights** . . . . . . . . . . . . . . . | If Freddie Mac is dissolved or liquidated, you will be entitled to receive, out of any assets available for distribution to our stockholders, up to $25 per share of Preferred Stock plus the dividend for the then-current quarterly dividend period accrued through and including the liquidation payment date, whether or not declared. |
| **Voting Rights** . . . . . . . . . . . . . . . . . . . | None, except in the case of specified changes in the terms of the Preferred Stock. |
| **Preemptive and Conversion Rights** . . . | None. |
| **Ratings** . . . . . . . . . . . . . . . . . . . . . . . . | We expect that the Preferred Stock will be rated Aa3 (negative) by Moody's Investors Service, Inc. (**"Moody's"**), AA− (negative) by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. (**"S&P"**), and A+ by Fitch Ratings (**"Fitch"**). See *Ratings*. |
| **Use of Proceeds** . . . . . . . . . . . . . . . . . | The capital raised from the sale of the Preferred Stock will be used to bolster our capital base in light of actual and anticipated losses necessitated by accounting requirements under generally accepted accounting principles (**"GAAP"**) and help us meet the 30% surplus going forward. We expect to deploy such proceeds for the purchase of residential mortgages or mortgage-related securities (subject to regulatory constraints), for the financing of growth in our mortgage guarantee business and for other corporate purposes consistent with evolving business and market conditions. See *Regulatory Capital*. |
| **Transfer Agent, Dividend Disbursing Agent and Registrar** . . . . . . . . . . . . . | Computershare Trust Company, N.A. |
| **Exchange Listing** . . . . . . . . . . . . . . . . | The Preferred Stock has been approved for listing on the New York Stock Exchange (the **"NYSE"**). |
| **CUSIP Number:** . . . . . . . . . . . . . . . . . | 313400624 |

## FORWARD-LOOKING STATEMENTS

We regularly communicate information concerning our business activities to investors, securities analysts, the news media and others as part of our normal operations. Some of these communications, including this Offering Circular, include "forward-looking statements" pertaining to our current expectations and objectives for financial reporting, remediation efforts, future business plans, economic and market conditions, market share, credit losses, prepayments, results of operations and financial condition stated in conformity with GAAP and on a fair value basis, and market trends and developments. Forward-looking statements are often accompanied by, and identified with, terms such as "objective," "expect," "trend," "assumptions," "judgments," "estimate," "ultimate," "believe," "ability," "models," "outlook," "initiatives," and similar phrases. These statements are not historical facts, but rather represent our expectations based on current information, plans, judgments, assumptions, estimates and projections. Forward-looking statements involve known and unknown risks, uncertainties and other factors, some of which are beyond our control. You should not unduly rely on our forward-looking statements, including those contained in this Offering Circular, the Information Statement or the Information Statement Supplements. All risks, uncertainties and other factors described in this Offering Circular, the Information Statement and the Information Statement Supplements should be considered in relying on any forward-looking statements. Actual results may differ materially from the expectations expressed in these and other forward-looking statements we make as a result of various factors, including, but not limited to, those factors described in the *Risk Factors* section of this Offering Circular and the comparably captioned sections in the Information Statement and the Information Statement Supplements incorporated by reference herein and:

- changes in applicable legislative or regulatory requirements, including regulation of the subprime or non-traditional mortgage product markets, enactment of government-sponsored enterprise (**"GSE"**) oversight legislation, changes to our charter, changes to affordable housing goals regulation, changes to regulatory capital requirements or the exercise or assertion of regulatory or administrative authority beyond historical practice;

- our ability to effectively identify, assess, evaluate, manage, mitigate or remediate control deficiencies and risks, including material weaknesses and significant deficiencies, in our internal control over financial reporting and disclosure controls and procedures;

- our ability to effectively implement our business strategies and manage the risks in our business, including our efforts to improve the supply and liquidity of, and demand for, our products;

- our ability to effectively identify and manage interest-rate and other market risks, including the levels and volatilities of interest rates, as well as the shape and slope of the yield curves;

- our ability to effectively identify and manage credit risk and/or changes to the credit environment;

- volatility of reported results due to changes in the fair value of certain instruments or assets;

- changes to legislative, regulatory or voluntary limits on the growth of any aspect of our business activities, including our retained portfolio;

- changes in our judgments, assumptions, forecasts or estimates regarding rates of growth in our business, spreads we expect to earn, required capital levels and the timing and impact of capital transactions;

- our ability to effectively manage and implement changes, developments or impacts of accounting or tax standards and interpretations or changes to our accounting policies or estimates;

- the availability of debt financing and equity capital in sufficient quantity and at attractive rates to support growth in our retained portfolio, to refinance maturing debt and to meet regulatory capital requirements;

- changes in pricing, valuation or other methodologies, models, assumptions, judgments, estimates and/or other measurement techniques or their respective reliability;

- changes in general regional, national or international economic, business or market conditions and competitive pressures, including consolidation of mortgage originators, employment rates and home price appreciation;

- changes in mortgage-to-debt option-adjusted spreads;

- the availability of options, interest-rate and currency swaps and other derivative financial instruments of the types and quantities and with acceptable counterparties needed for investment funding and risk management purposes;

- the rate of growth in total outstanding U.S. residential mortgage debt and the size of the U.S. residential mortgage market;

- preferences of originators in selling into the secondary market;

- borrower preferences for fixed-rate mortgages or adjustable-rate mortgages;

- changes to our underwriting and disclosure requirements or investment standards for mortgage-related products;

- investor preferences for mortgage loans and mortgage-related and debt securities compared to other investments;

- the ability of our financial, accounting, data processing and other operating systems or infrastructure and those of our vendors to process the complexity and volume of our transactions;

- incomplete or inaccurate information provided by customers and counterparties, or adverse changes in the financial condition of our customers and counterparties;

- the occurrence of a major natural or other disaster in geographic areas in which portions of our total mortgage portfolio are concentrated;

- other factors and assumptions described in the Information Statement, including in *Management's Discussion and Analysis of Financial Condition and Results of Operations* and the Information Statement Supplements;

- our assumptions and estimates regarding the foregoing and our ability to anticipate the foregoing factors and their impacts; and

- market reactions to the foregoing.

We undertake no obligation to update forward-looking statements we make to reflect events or circumstances after the date of this Offering Circular, or to reflect the occurrence of unanticipated events.

## FREDDIE MAC

Freddie Mac is a stockholder-owned company chartered by Congress in 1970 under the Federal Home Loan Mortgage Corporation Act (the **"Freddie Mac Act"**) to stabilize the nation's residential mortgage markets and expand opportunities for homeownership and affordable rental housing.

Our mission is to provide liquidity, stability and affordability to the U.S. housing market. We fulfill our mission by purchasing residential mortgages and mortgage-related securities in the secondary mortgage market. We are one of the largest purchasers of mortgage loans in the U.S. We purchase mortgages and bundle them into mortgage-related securities that can be sold to investors. We can use the proceeds to purchase additional mortgages from primary market mortgage lenders, thus providing them with a continuous flow of funds. We also purchase mortgage loans and mortgage-related securities for our investments portfolio. We finance our purchases for our investments portfolio and manage associated interest-rate and other market risks primarily by issuing a variety of debt instruments in the capital markets.

Though we are chartered by Congress, our business is funded completely with private capital. We are responsible for making payments on our securities. Neither the U.S. government nor any other agency or instrumentality of the U.S. government is obligated to fund our mortgage purchase or financing activities or to guarantee our securities and other obligations.

Our mission is defined in our charter:

- to provide stability in the secondary market for residential mortgages;

- to respond appropriately to the private capital market;

- to provide ongoing assistance to the secondary market for residential mortgages (including activities relating to mortgages on housing for low- and moderate-income families involving a reasonable economic return that may be less than the return earned on other activities) by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing; and

- to promote access to mortgage credit throughout the U.S. (including central cities, rural areas and other underserved areas) by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing.

Our principal offices are located in McLean, Virginia. We have additional offices in Washington, D.C.; Reston, Virginia; Atlanta, Georgia; Chicago, Illinois; Dallas, Texas; New York, New York; and Woodland Hills, California.

## RISK FACTORS

*Prospective purchasers of the Preferred Stock should consider carefully the risk factors set forth below, in the Information Statement beginning on page 10, and in the November 20, 2007 Information Statement Supplement (as defined below) beginning on page 74, as well as all other information contained or incorporated by reference in this Offering Circular, in evaluating an investment in the Preferred Stock.*

### Risks Related to Our Business

**Market uncertainty and volatility may adversely affect our business, profitability and results of operations.**

The mortgage credit markets experienced difficult conditions and volatility during the first nine months of 2007 and these markets continue to experience rapid deterioration during the fourth quarter of 2007, with accompanying higher expected defaults. These deteriorating conditions in the mortgage market have resulted in a decrease in availability of corporate credit and liquidity within the mortgage industry and have caused disruptions to normal operations of major mortgage originators, including some of our largest customers. These conditions resulted in less liquidity, greater volatility, widening of credit spreads and a lack of price transparency. We operate in these markets and are subject to potential adverse effects on our results of operations and financial position due to our activities involving securities, mortgages, derivatives and other mortgage commitments with our customers. As we have previously announced, unless conditions in the credit markets improve significantly, our fair value returns will continue to be negative. Our expectations for the fourth quarter of 2007 are, as of this date, assuming that market conditions do not substantially change from our expectations and no changes in our accounting policies occur, commensurate with our results for the quarter ended September 30, 2007.

While it is difficult to predict how long these conditions will exist and how our markets or products will ultimately be affected, these factors could adversely impact our business and results of operations, as well as our ability to provide liquidity to the mortgage markets.

**Market and operational risks may adversely affect our capital management.**

Mortgage market conditions and volatility are also adversely affecting our capital, including our ability to meet the 30% mandatory target capital surplus directed by the Office of Federal Housing Enterprise Oversight (**"OFHEO"**). Factors that could adversely affect the adequacy of our capital for future periods include GAAP net losses; continued declines in home prices; increases in our credit and interest-rate risk profiles; adverse changes in interest-rate or implied volatility; adverse option-adjusted spread (**"OAS"**) changes; legislative or regulatory actions that increase capital requirements; or changes in accounting practices or standards.

As a result of the impact of these items on our GAAP net income and in order to meet the 30% mandatory target capital surplus and respond to regulatory concerns, as well as to have the flexibility to effectively manage our business, we have taken several actions including raising additional capital in this offering and reducing our fourth quarter common stock dividend by 50%. If these measures are not sufficient to help us meet the 30% mandatory target capital surplus, then we may consider additional measures in the future such as limiting growth or reducing the size of our

retained portfolio, slowing purchases into our credit guarantee portfolio, issuing additional preferred stock, issuing common stock and considering further reductions in our common stock dividends.

Our ability to execute any of these actions or their effectiveness may be limited and we might not be able to meet the 30% mandatory target capital surplus. If we are not able to meet the 30% mandatory target capital surplus, OFHEO may, among other things, seek to require us to (a) submit a plan for remediation or (b) implement other remedial steps. In addition, OFHEO has discretion to reduce our capital classification by one level if OFHEO determines that we are engaging in conduct OFHEO did not approve that could result in a rapid depletion of core capital or determines that the value of property subject to mortgage loans we hold or guarantee has decreased significantly. See *Regulation and Supervision — Office of Federal Housing Enterprise Oversight — Capital Standards* in our November 20, 2007 Information Statement Supplement relating to our financial report for the three and nine months ended September 30, 2007 (the **"November 20, 2007 Information Statement Supplement"**) and *Note 10: Regulatory Capital — Classification* to our consolidated financial statements in the Information Statement for information regarding additional potential actions OFHEO may seek to take against us.

**We continue to experience delays in our financial reporting.**

Since the restatement and revision of our financial results for 2000, 2001 and 2002, we have had to face many challenging and complex accounting and financial reporting issues, including ongoing controls remediation and systems re-engineering and development. We fell behind in our annual financial reporting for the years ended December 31, 2002, 2003, 2004 and 2005. We face continuing challenges because of the control deficiencies in our accounting infrastructure and the operational complexities of our business. Any of these events could have an adverse effect on the trading value of the Preferred Stock. For further information, see *Management's Discussion and Analysis of Financial Condition and Results of Operations — Risk Management — Operational Risks — Internal Control over Financial Reporting* in the Information Statement and in the *Management's Discussion and Analysis of Financial Condition and Results of Operations — Controls and Procedures* in the November 20, 2007 Information Statement Supplement.

**We have material weaknesses and other deficiencies in our internal controls.**

We have discovered, and may in the future discover, material weaknesses and significant deficiencies in our internal controls that require remediation. Because of the continued material weaknesses and significant deficiencies, our management determined that, as of December 31, 2006, our internal control over financial reporting was not effective. A number of factors may impede our efforts to remediate our material weaknesses and significant deficiencies, including: the complexity associated with the interdependent nature of the remediation activities; uncertainty regarding the quality and sustainability of newly established controls; and potentially ineffective compensating controls. Failure to effectively and timely implement the remediation plan we have undertaken to correct the identified deficiencies in our internal control over financial reporting could similarly adversely affect our business. A failure to establish and maintain an adequate control environment could result in a material error in our reported financial results, loss of market confidence in our reported results and additional delays in our financial reporting timeline. Any of these outcomes could have a material adverse effect on our business and on the trading price of our securities, and could result in additional regulatory measures. For further information, see *Management's Discussion and Analysis of Financial Condition and Results of Operations — Risk Management —*

*Operational Risks — Internal Control over Financial Reporting* in the Information Statement and *Management's Discussion and Analysis of Financial Condition and Results of Operations — Controls and Procedures* in the November 20, 2007 Information Statement Supplement.

Further, OFHEO could seek to require us to implement a remediation plan, hold additional capital or take other actions. Effective as of July 1, 2006, we voluntarily limited the growth of our retained portfolio to no more than 2.0% annually (and 0.5% quarterly on a cumulative basis) based on its carrying value as reported in our minimum capital report to OFHEO filed on July 28, 2006, which was $710.3 billion. This voluntary, temporary growth limit was undertaken in response to a request from OFHEO. On September 19, 2007, OFHEO provided an interpretation regarding the calculation methodology of the voluntary temporary growth limit. The interpretation changed the measuring methodology for the growth limit from the value of our retained portfolio, as calculated in conformity with GAAP, to the unpaid principal balance (**"UPB"**) of the retained portfolio. Any net increase in delinquent loan balances in the retained portfolio after September 30, 2007 will not be counted for purposes of determining our compliance with the growth limit. According to OFHEO's interpretation, the new portfolio limit for the third quarter of 2007 is $735.0 billion UPB. For the fourth quarter of 2007, the quarterly growth limit of 0.5 percent is doubled to 1.0 percent, and the 2.0 percent per annum limit remains in place. Consequently, the quarterly growth limit would be $742.4 billion as of December 31, 2007. Beginning October 1, 2007, quarterly compliance with the growth limit will be determined based on the cumulative average month-end portfolio balances beginning July 2007 (until it becomes and remains a 12-month moving average) compared to the applicable quarterly growth limit. For purposes of this calculation, OFHEO's interpretation sets the beginning value for the month of July 2007 at $725 billion.

**We may be unable to manage effectively all of the risks to which we are subject.**

Our business is exposed to operational risks, interest-rate and other market risks and credit risks. We are also exposed to other risks, such as those described in the *Risk Factors* sections of the Information Statement and the November 20, 2007 Information Statement Supplement, including reputation risk, legislation and regulatory risk and risks related to implementing our business strategies. As described in *Management's Discussion and Analysis of Financial Condition and Results of Operations — Risk Management* in the Information Statement, and in *Management's Discussion and Analysis of Financial Condition and Results of Operations — Controls and Procedures* in the November 20, 2007 Information Statement Supplement, we continue to face a number of significant operational risks, including material weaknesses and other significant deficiencies in our internal control over financial reporting. These operational risks may expose us to financial loss, may delay or interfere with our ability to return to and sustain timely financial reporting, or may result in other adverse consequences to our business and the trading value of our securities. Our retained portfolio activities expose us to interest-rate risk and other market risks arising primarily from the uncertainty as to when borrowers will repay the outstanding principal balance of mortgage loans and mortgage-related securities, known as prepayment risk, and the resulting potential mismatch in the timing of our receipt of cash flows on our assets versus the timing of our obligation to make payments on our liabilities. Our credit guarantee activities also expose us to interest-rate risk because changes in interest rates can cause fluctuations in the fair value of our existing credit guarantee portfolio. Our credit guarantee portfolio also is subject primarily to two types of credit risk — mortgage credit risk and institutional credit risk. Mortgage credit risk is the risk that a borrower will fail to make timely payments on a mortgage or security we own or guarantee.

Institutional credit risk is the risk that a counterparty that has entered into a business contract or arrangement with us will fail to meet its obligations. Furthermore, there is no assurance that we will be able to manage effectively any reductions in the credit quality of our retained portfolio due to deteriorating conditions in the mortgage and credit markets. For further information, see *Risk Factors* and *Management's Discussion and Analysis of Financial Condition and Results of Operations — Risk Management* in the Information Statement and *Management's Discussion and Analysis of Financial Condition and Results of Operations — Controls and Procedures* in the November 20, 2007 Information Statement Supplement.

**We depend on our institutional counterparties to provide services that are critical to our business and our results of operations or financial condition may be adversely affected if one or more of our institutional counterparties are unable to meet their obligations to us.**

We face the risk that one or more of the institutional counterparties that has entered into a business contract or arrangement with us may fail to meet its obligations. Our primary exposures to institutional counterparty risk are with:

- our mortgage loan insurers;

- mortgage seller/servicers;

- issuers, guarantors or third party providers of credit enhancements on non-Freddie Mac mortgage-related securities held in our retained portfolio;

- mortgage investors and originators;

- issuers, guarantors and insurers of investments held in our cash and investments portfolio; and

- derivatives counterparties.

In some cases, our business with institutional counterparties is concentrated. A significant failure by a major institutional counterparty could have a material adverse effect on our retained portfolio, cash and investments portfolio or credit guarantee activities. See *Note 15: Concentration of Credit and Other Risks* in the November 20, 2007 Information Statement Supplement for additional information. As of September 30, 2007, our ten largest mortgage seller/servicers represented approximately 78% of our single-family mortgage purchase volume. We are exposed to the risk that we could lose purchase volume to the extent these arrangements are terminated or modified or replaced from other lenders or if these lenders fail to comply with mortgage underwriting standards. We are also exposed to risk relating to the potential insolvency or non-performance of mortgage insurers that insure mortgages we purchase or guarantee. The top seven of our third-party mortgage insurers on which we rely for credit enhancements on our single-family, guaranteed mortgage portfolio accounted for approximately 99% of our overall coverage. As of November 22, 2007, the credit rating of Mortgage Guaranty Insurance Corporation (MGIC), the third party mortgage insurer that insures the largest portion of our overall coverage, was downgraded from "AA" to "AA−". Some of our counterparties also may become subject to serious liquidity problems affecting, either temporarily or permanently, the viability of their business plans, which likely would adversely affect their ability to meet their obligations to us. The challenging market conditions have adversely affected and are expected to continue to adversely affect the liquidity and financial condition of a number of our counterparties, including some seller/servicers. Some of our

12

largest seller/servicers have experienced ratings downgrades and liquidity constraints. We have terminated our arrangements with certain mortgage seller/servicers during the first nine months of 2007 because of their failure to meet our eligibility requirements. Further terminations of our arrangements with mortgage sellers could adversely affect our purchase volume. A default by a counterparty with significant obligations to us could adversely affect our ability to conduct our operations efficiently and at cost-effective rates, which in turn could adversely affect our results of operations or our financial condition.

**We are subject to mortgage credit risk and increased credit costs related to these risks could adversely affect our financial condition and/or results of operations.**

We are exposed to mortgage credit risk within our total mortgage portfolio, which consists of mortgage loans, mortgage participation certificates, or PCs, Structured Securities and other mortgage guarantees we have issued in our guarantee business. Mortgage credit risk is the risk that a borrower will fail to make timely payments on a mortgage or security we own or guarantee. Factors that affect the level of our mortgage credit risk include the credit profile of the borrower, the features of the mortgage loan, the type of property securing the mortgage and local and regional economic conditions. Borrowers under the mortgage loans on our balance sheets and underlying our guarantees may fail to make required payments of principal and interest on those loans, exposing us to the risk of credit losses.

The proportion of higher risk mortgage loans that were originated in the market during the last four years increased significantly. We have increased our securitization volume of non-traditional mortgage products, such as interest-only loans as well as loans originated with lower documentation in the last two years in response to the prevalence of these products within the origination market. Total non-traditional mortgage products, including those designated as Alt-A and interest-only loans, made up approximately 33% and 24% of our single-family mortgage purchase volume in the nine months ended September 30, 2007 and 2006, respectively. Consequently, our increased purchases of these mortgages and issuances of guarantees on them expose us to greater credit risks. We expect to experience increased delinquencies and credit losses, which will likely reduce our earnings in future periods and could adversely affect our results of operations or financial condition.

**Changes in OAS could materially impact our fair value of net assets.**

OAS is an estimate of the yield spread between a given security and an agency debt yield curve. The OAS between the mortgage and agency debt sectors can significantly affect the fair value of our net assets. The fair value impact of changes in OAS for a given period represents an estimate of the net unrealized increase or decrease in the fair value of net assets arising from net fluctuations in OAS during that period. We do not attempt to hedge or actively manage the impact of changes in mortgage-to-debt OAS. Changes in market conditions, including changes in interest rates, may cause fluctuations in the OAS. A widening of the OAS on a given asset typically causes a decline in the current fair value of that asset, but may increase the number of attractive opportunities to purchase new assets for our retained portfolio. See *Management's Discussion and Analysis of Financial Condition and Results of Operations — Consolidated Fair Value Balance Sheets Analysis — Discussion of Fair Value Results* in our November 20, 2007 Information Statement Supplement. Consequently, a widening of the OAS may adversely affect current earnings or financial condition. Conversely, a narrowing or tightening of the OAS typically causes an increase in the current fair value of that asset, but may reduce the number of attractive opportunities to purchase

new assets for our retained portfolio. Consequently, a tightening of the OAS may adversely affect future earnings or financial condition. See *Management's Discussion and Analysis of Financial Condition and Results of Operations — Consolidated Fair Value Balance Sheets Analysis — Discussion of Fair Value Results* in our November 20, 2007 Information Statement Supplement for a more detailed description of the impacts of changes in mortgage-to-debt OAS.

**The loss of business volume from key lenders could result in a decline in our market share and revenues.**

Our business depends on our ability to acquire a steady flow of mortgage loans from the originators of those loans. We purchase a significant percentage of our single-family mortgages from several large mortgage originators. During the nine months ended September 30, 2007, approximately 78% of our guaranteed mortgage securities issuances originated from purchase volume associated with our ten largest customers. Two of our customers each accounted for greater than 10% of our mortgage securitization volume for the nine months ended September 30, 2007. We enter into mortgage purchase volume commitments with many of our customers that are renewed annually and provide for a minimum level of mortgage volume that these customers will deliver to us. One of our customers, which accounted for more than 10% of our mortgage purchase volume for the nine months ended September 30, 2007, reduced its minimum mortgage volume commitments to us upon renewal of its contract at July 1, 2007. In addition, ABN Amro Mortgage Group, Inc., which accounted for more than 8% of our guaranteed securitization volume for the six months ended June 30, 2007, was acquired and, as a result, the contract was not renewed when it expired in the third quarter of 2007. The mortgage industry has been consolidating and a decreasing number of large lenders originate most single-family mortgages. The loss of business from any one of our major lenders, or their failure to meet our eligibility requirements, could adversely affect our market share, our revenues and the performance of our guaranteed mortgage-related securities.

**Regulation and initiatives regarding non-traditional and subprime mortgage products may adversely affect our profitability or our ability to achieve our affordable housing goals and subgoals.**

The actions we are taking in connection with the Interagency Guidance and the Subprime Statement are described in *Management's Discussion and Analysis of Financial Condition and Results of Operations — Quantitative and Qualitative Disclosures About Market Risk — Credit Risks — Mortgage Credit Risk — Guidance on Non-traditional Mortgage Product Risks and Subprime Mortgage Lending* in our November 20, 2007 Information Statement Supplement. These changes to our underwriting and disclosure requirements and investment standards could reduce the number of these mortgage products available to us for purchase. Reductions in our purchases of these mortgage products may adversely affect our profitability and are likely to make it more difficult to achieve our affordable housing goals and subgoals. Furthermore, in April 2007, we announced that we will purchase up to $20 billion in fixed-rate and hybrid ARM products from lender customers that will provide these lenders with more mortgage products to offer subprime borrowers. These initiatives may also adversely affect our profitability or our ability to achieve our affordable housing goals and subgoals.

**We rely on internal models for financial accounting and reporting purposes, to make business decisions and to manage risks, and our business could be adversely affected if those models fail to produce reliable results.**

We make significant use of business and financial models for financial accounting and reporting purposes and to manage risk. The information used in these models is also used in making business decisions relating to our strategies, initiatives, transactions and products. Models are inherently imperfect predictors of actual results because they are based on assumptions about future performance. Our models could produce unreliable results for a number of reasons, including invalid or incorrect assumptions underlying the models or incorrect data being used by the models. The valuations, risk metrics, amortization results and loan loss reserve estimations produced from our internal models may be different from actual results. For more information on operational risks related to our internal models for financial accounting and reporting purposes, see *Risk Factors — We rely on internal models for financial accounting and reporting purposes, to make business decisions, and to manage risks, and our business could be adversely affected if those models fail to produce reliable results* in our Information Statement.

**Risks Related to the Preferred Stock**

**The Preferred Stock is subordinated to our senior obligations.**

The Preferred Stock is subordinated to our senior obligations, including our subordinated debt consisting primarily of Freddie SUBS® securities. The terms of the Freddie SUBS® securities that we have outstanding provide for the deferral of interest payments under certain specified circumstances of financial distress and, during those deferral periods, prohibit the payment of dividends on our stock, including the Preferred Stock. Additionally, we are not permitted to declare or pay dividends on the Preferred Stock if any arrears or defaults exist in the payment of dividends on any outstanding class or series of our stock ranking prior to the Preferred Stock with respect to the payment of dividends. As of the date of this Offering Circular, we have no outstanding class or series of stock that ranks senior to the Preferred Stock.

**There is no existing trading market for the Preferred Stock.**

The Preferred Stock is a new issue of securities with no established trading market. Although the Preferred Stock has been approved for listing on the NYSE, an active market for the Preferred Stock may not develop or be sustained in the future. We cannot make assurances to you regarding the liquidity of, or trading markets for, the Preferred Stock.

## USE OF PROCEEDS

The capital raised from the sale of the Preferred Stock will be used to bolster our capital base in light of actual and anticipated losses necessitated by GAAP accounting requirements and help us meet the 30% surplus going forward. We expect to deploy such proceeds for the purchase of residential mortgages or mortgage-related securities (subject to regulatory constraints), for the financing of growth in our mortgage guarantee business and for other corporate purposes consistent with evolving business and market conditions. See *Regulatory Capital*.

## CAPITALIZATION

The following table shows our capitalization at September 30, 2007:

- on an actual basis; and

- pro forma to give effect to the sale of the Preferred Stock offered hereby.

This information should be read together with our consolidated financial statements and other financial information set forth in the Information Statement and our unaudited consolidated financial statements and other financial information set forth in the November 20, 2007 Information Statement Supplement. We engage in financing transactions and issue or repurchase debt obligations on an ongoing basis, all of which cause our total capitalization to change. Therefore, on any date after September 30, 2007, our total capitalization will differ (perhaps substantially) from the figures contained in this capitalization table. See *Risk Factors — Risks Related to Our Business — We continue to experience delays in our financial reporting*.

| | September 30, 2007 | |
| | Actual | Pro Forma[1] |
| | (dollars in millions) | |
| Debt securities, net | | |
| Senior debt: | | |
| Due within one year | $261,127 | $261,127 |
| Due after one year | 468,903 | 468,903 |
| Subordinated Borrowings | 5,232 | 5,232 |
| Total debt securities, net | 735,262 | 735,262 |
| Stockholders' Equity[2][3][4]: | | |
| Variable Rate, Non-Cumulative Preferred Stock, $1.00 par value and $50.00 redemption value[5] | 250 | 250 |
| 5.81% Non-Cumulative Preferred Stock, $1.00 par value and $50.00 redemption value[6] | 150 | 150 |
| 5% Non-Cumulative Preferred Stock, $1.00 par value and $50.00 redemption value[7] | 400 | 400 |
| Variable Rate, Non-Cumulative Preferred Stock, $1.00 par value and $50.00 redemption value[8] | 220 | 220 |
| 5.1% Non-Cumulative Preferred Stock, $1.00 par value and $50.00 redemption value[8] | 400 | 400 |
| 5.3% Non-Cumulative Preferred Stock, $1.00 par value and $50.00 redemption value[9] | 200 | 200 |
| 5.1% Non-Cumulative Preferred Stock, $1.00 par value and $50.00 redemption value[10] | 150 | 150 |
| 5.79% Non-Cumulative Preferred Stock, $1.00 par value and $50.00 redemption value[11] | 250 | 250 |
| Variable Rate, Non-Cumulative Preferred Stock, $1.00 par value and $50.00 redemption value[12] | 287 | 287 |
| Variable Rate, Non-Cumulative Preferred Stock, $1.00 par value and $50.00 redemption value[13] | 325 | 325 |
| Variable Rate, Non-Cumulative Preferred Stock, $1.00 par value and $50.00 redemption value[14] | 230 | 230 |
| 5.81% Non-Cumulative Preferred Stock, $1.00 par value and $50.00 redemption value[15] | 173 | 173 |
| Variable Rate, Non-Cumulative Preferred Stock, $1.00 par value and $50.00 redemption value[16] | 201 | 201 |
| 6% Non-Cumulative Preferred Stock, $1.00 par value and $50.00 redemption value[17] | 173 | 173 |
| 5.7% Non-Cumulative Preferred Stock, $1.00 par value and $50.00 redemption value[18] | 300 | 300 |
| 5.81% Non-Cumulative Preferred Stock, $1.00 par value and $50.00 redemption value[19] | 300 | 300 |
| Variable Rate, Non-Cumulative Preferred Stock, $1.00 par value and $50.00 redemption value[20] | 750 | 750 |
| 6.42% Non-Cumulative Preferred Stock, $1.00 par value and $50.00 redemption value[21] | 250 | 250 |
| 5.9% Non-Cumulative Preferred Stock, $1.00 par value and $25.00 redemption value[22] | 500 | 500 |
| 5.57% Non-Cumulative Preferred Stock, $1.00 par value and $25.00 redemption value[22] | 1,100 | 1,100 |
| 5.66% Non-Cumulative Preferred Stock, $1.00 par value and $25.00 redemption value[23] | 500 | 500 |
| 6.02% Non-Cumulative Preferred Stock, $1.00 par value and $25.00 redemption value[24] | 500 | 500 |
| 6.55% Non-Cumulative Preferred Stock, $1.00 par value and $25.00 redemption value[25] | 500 | 500 |
| Fixed-to-Floating Rate Non-Cumulative Preferred Stock, $1.00 par value and $25.00 redemption value[26] | — | 6,000 |
| Common stock, $0.21 par value | 152 | 152 |
| Additional paid-in capital | 961 | 871 |
| Retained earnings | 29,607 | 29,607 |
| Accumulated other comprehensive income (loss), net of taxes | (8,823) | (8,823) |
| Treasury stock, at cost | (4,186) | (4,186) |
| Total stockholders' equity | 25,820 | 31,730 |
| Total capitalization | $761,082 | $766,992 |

(1) "Pro Forma" reflects anticipated proceeds of $5.9 billion from the issuance of 240 million shares of the Preferred Stock, and the deduction of $300,000 in estimated transaction costs. The actual transaction costs may differ. "Pro Forma" does not reflect any debt transactions since September 30, 2007.

(2) Preferred stock amounts reflect redemption values as shown. Costs associated with the issuance of preferred stock are included in additional paid-in capital.

(3) As long as the capital monitoring framework established by OFHEO in January 2004 remains in effect, any preferred stock redemption will require prior approval by OFHEO. See *Note 10: Regulatory Capital* to our consolidated financial statements included in the Information Statement for more information.

(4) All classes of preferred stock are perpetual and non-cumulative, and carry no significant voting rights or rights to purchase additional Freddie Mac stock or securities.

(5) Optional redemption on or after June 30, 2001.
(6) Optional redemption on or after October 27, 1998.
(7) Optional redemption on or after March 31, 2003.
(8) Optional redemption on or after September 30, 2003.
(9) Optional redemption on or after October 30, 2000.
(10) Optional redemption on or after March 31, 2004.
(11) Optional redemption on or after June 30, 2009.
(12) Optional redemption on December 31, 2004 and on December 31 every five years thereafter.
(13) Optional redemption on March 31, 2003 and on March 31 every two years thereafter.
(14) Optional redemption on March 31, 2003 and on March 31 every year thereafter.
(15) Optional redemption on or after March 31, 2011.
(16) Optional redemption on June 30, 2003 and on June 30 every two years thereafter.
(17) Optional redemption on or after June 30, 2006.
(18) Optional redemption on or after December 31, 2006.
(19) Optional redemption on or after March 31, 2007.
(20) Optional redemption on or after June 30, 2011.
(21) Optional redemption on or after September 30, 2011.
(22) Optional redemption on or after December 31, 2011.
(23) Optional redemption on or after March 31, 2012.
(24) Optional redemption on or after June 30, 2012.
(25) Optional redemption on or after September 30, 2017.
(26) Optional redemption on December 31, 2012 and on December 31 every five years thereafter.

See *Notes 8* and *9* to the consolidated financial statements included in the Information Statement and *Notes 7* and *8* to the unaudited consolidated financial statements included in the November 20, 2007 Information Statement Supplement for further information about our debt securities, subordinated borrowings and stockholders' equity.

## SELECTED FINANCIAL DATA AND OTHER OPERATING MEASURES

The following table sets forth, for the periods and dates indicated, our selected consolidated financial data and other operating measures, which have been derived from and should be read in conjunction with our annual consolidated financial statements, including those incorporated in this Offering Circular by reference to the Information Statement and our unaudited consolidated financial statements for the nine months ended September 30, 2007 included in the November 20, 2007 Information Statement Supplement.

We have material weaknesses and other deficiencies in our internal control environment. On any date after September 30, 2007, our financial information may differ (perhaps substantially) from the data contained in this table. See *Risk Factors — Risks Related to Our Business — We continue to experience delays in our financial reporting* and *— We have material weaknesses and other deficiencies in our internal controls.*

| | At or for the Nine Months Ended September 30, | | At or for the Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|---|
| | **2007** | **2006** | **2006** | **2005** | **2004** | **2003** | **2002** |
| | (dollars in millions, except share-related amounts) | | | | | | |
| **Income Statement Data** | | | | | | | |
| Net interest income | $ 2,938 | $ 3,262 | $ 4,235 | $ 5,370 | $ 9,137 | $ 9,498 | $ 9,525 |
| Non-interest income (loss) | (937) | 1,458 | 915 | 199 | (3,039) | (244) | 7,154 |
| Net income (loss) before cumulative effect of changes in accounting principles | (1,476) | 2,691 | 2,211 | 2,189 | 2,937 | 4,816 | 10,090 |
| Cumulative effect of changes in accounting principles, net of taxes | — | — | — | (59) | — | — | — |
| Net income (loss) | (1,476) | 2,691 | 2,211 | 2,130 | 2,937 | 4,816 | 10,090 |
| Net income (loss) available to common stockholders | $ (1,768) | $ 2,496 | $ 1,936 | $ 1,907 | $ 2,727 | $ 4,600 | $ 9,851 |
| Earnings (loss) per common share before cumulative effect of changes in accounting principles: | | | | | | | |
| Basic | $ (2.70) | $ 3.63 | $ 2.84 | $ 2.84 | $ 3.96 | $ 6.69 | $ 14.22 |
| Diluted | (2.70) | 3.63 | 2.84 | 2.83 | 3.94 | 6.68 | 14.17 |
| Earnings (loss) per common share after cumulative effect of changes in accounting principles: | | | | | | | |
| Basic | $ (2.70) | $ 3.63 | $ 2.84 | $ 2.76 | $ 3.96 | $ 6.69 | $ 14.22 |
| Diluted | (2.70) | 3.63 | 2.84 | 2.75 | 3.94 | 6.68 | 14.17 |
| Dividends per common share | $ 1.50 | $ 1.41 | $ 1.91 | $ 1.52 | $ 1.20 | $ 1.04 | $ 0.88 |
| Weighted average common shares outstanding (in thousands): | | | | | | | |
| Basic | 653,825 | 686,651 | 680,856 | 691,582 | 689,282 | 687,094 | 692,727 |
| Diluted | 653,825 | 688,130 | 682,664 | 693,511 | 691,521 | 688,675 | 695,116 |
| **Balance Sheet Data** | | | | | | | |
| Total assets | $792,873 | $827,197 | $813,081 | $806,222 | $795,284 | $803,449 | $752,249 |
| Senior debt due within one year | 261,127 | 299,654 | 294,861 | 288,532 | 282,303 | 295,262 | 244,429 |
| Senior debt due after one year | 468,903 | 464,367 | 452,677 | 454,627 | 443,772 | 438,738 | 415,662 |
| Subordinated debt due after one year | 5,232 | 5,886 | 6,400 | 5,633 | 5,622 | 5,613 | 5,605 |
| Miscellaneous liabilities[1] | 31,510 | 27,640 | 30,326 | 29,290 | 30,662 | 30,420 | 52,914 |
| Minority interests in consolidated subsidiaries | 281 | 621 | 516 | 949 | 1,509 | 1,929 | 2,309 |
| Stockholders' equity | 25,820 | 29,031 | 28,301 | 27,191 | 31,416 | 31,487 | 31,330 |
| **Ratios** | | | | | | | |
| Return on average assets[2] | (0.2)% | 0.4% | 0.3% | 0.3% | 0.4% | 0.6% | 1.4% |
| Return on common equity[3] | (11.8) | 14.5 | 8.6 | 7.7 | 10.2 | 17.2 | 47.2 |
| Return on total equity[4] | (7.3) | 12.8 | 8.0 | 7.3 | 9.3 | 15.3 | 39.6 |
| Dividend payout ratio on common stock[5] | N/A | 39.1 | 67.7 | 56.4 | 30.7 | 15.6 | 6.2 |
| Equity to assets ratio[6] | 3.4 | 3.4 | 3.4 | 3.7 | 3.9 | 4.0 | 3.7 |
| Preferred stock to core capital ratio[7] | 23.4 | 15.1 | 16.9 | 12.8 | 13.2 | 14.0 | 15.9 |

(1) Includes: (a) Due to PC investors; (b) Accrued interest payable; (c) Guarantee obligation; (d) Derivative liabilities, net at fair value; (e) Reserve for guarantee losses on PCs; and (f) Other liabilities, as presented on our consolidated balance sheets.

(2) Year-to-date computations are computed as annualized year-to-date net income (loss) divided by the simple average of the beginning and ending balances of total assets.

(3) Year-to-date computations are computed as annualized year-to-date net income (loss) available to common stockholders divided by the simple average of the beginning and ending balances of stockholders' equity, net of preferred stock (at redemption value).

(4) Year-to-date computations are computed as annualized year-to-date net income (loss) divided by the simple average of the beginning and ending balances of stockholders' equity.

(5) Year-to-date computations are computed as year-to-date common stock dividends declared divided by year-to-date net income available to common stockholders. For the nine months ended September 30, 2007, net income (loss) available to common stockholders was a loss, thus this calculation is not applicable.

(6) Year-to-date computations are calculated as the simple average of the beginning and ending balances of stockholders' equity divided by the simple average of the beginning and ending balances of total assets.

(7) Ratio computed as preferred stock, at redemption value divided by core capital. See "Note 10: Regulatory Capital" in our 2006 Information Statement for more information regarding core capital.

## RECENT DEVELOPMENTS

**New York Attorney General Investigation**

On November 6, 2007, the N.Y. Attorney General sent us a draft of a letter demanding that we either retain an independent examiner to investigate Washington Mutual Inc.'s appraisal practices, the appraisals relating to our mortgage purchases from Washington Mutual, and appraisals conducted by First American Corporation and its subsidiary, eAppraiseIT, or immediately cease and desist from purchasing or securitizing Washington Mutual loans and any loans supported by First American or eAppraiseIT appraisals. We have agreed to cooperate fully with the N.Y. Attorney General in appointing an independent examiner. The letter also gave notice of the issuance to us of a subpoena, which we have now received, for information regarding appraisals and property valuations as they relate to our mortgage purchases and securitizations. At this time it is unknown whether the results of this investigation will adversely affect our relationship with these counterparties. For information on our counterparty risk, see *Risk Factors — Risks Related to Our Business — We depend on our institutional counterparties to provide services that are critical to our business and our results of operations or financial condition may be adversely affected if one or more of our institutional counterparties are unable to meet their obligations to us.*

**Putative Class Action Suit**

On November 21, 2007, a putative class action lawsuit was filed in the U.S. District Court for the Southern District of New York against Freddie Mac and certain of its current and former officers. The plaintiff alleges that from August 1, 2006 through November 19, 2007 (the **"Class Period"**), the defendants violated federal securities laws by making false and misleading statements about Freddie Mac's business, risk management, and the procedures we put into place to protect Freddie Mac from problems in the mortgage industry, and by failing to disclose adverse facts known to them about Freddie Mac. The complaint was filed purportedly on behalf of a class comprised of all persons who purchased Freddie Mac common stock during the Class Period, and seeks an award of unspecified damages, costs, attorneys' fees, and equitable/injunctive relief. At present, it is not possible to determine the likelihood of loss or the range of loss presented by this lawsuit, assuming the class becomes certified.

**Legislative Developments**

We face a highly uncertain regulatory environment in light of GSE regulatory oversight legislation currently under consideration in Congress. The House of Representatives passed GSE regulatory oversight legislation on May 22, 2007. This legislation would give our regulator substantial authority to assess our safety and soundness and to regulate our portfolio investments, including requiring reductions in those investments, consistent with our mission and safe and sound operations. This legislation includes provisions that would increase the regulator's authority to require us to maintain higher minimum and risk-based capital levels and, for 2007 through 2011, require us to make an annual contribution to an affordable housing fund in an amount equal to 1.2 basis points of the average aggregate UPB of our Total mortgage portfolio. This legislation also includes provisions that would give our regulator enhanced authority to regulate our business activities, which could constrain our ability to respond quickly to a changing marketplace. See *Regulation and Supervision — GSE Regulatory Oversight Legislation* in the Information Statement for more information regarding this bill. We cannot predict the prospects for the enactment, timing

or content of any final legislation. Furthermore, in the current environment, we may be subject to further Congressional hearings about our operations, practices and mission. The provisions of this legislation could have a material adverse effect on our ability to fulfill our mission, future earnings, stock price and stockholder returns, rate of growth of fair value of net assets attributable to common stockholders and our ability to recruit and retain qualified officers and directors.

## DESCRIPTION OF THE PREFERRED STOCK

The Preferred Stock will have the terms shown in the Certificate of Designation attached as *Appendix A* to this Offering Circular. The following is a summary of those terms.

### General

Section 306(f) of the Freddie Mac Act authorizes us to issue an unlimited number of shares of preferred stock. The shares of Preferred Stock we are offering will have a par value of $1.00 per share and will be created by the Certificate of Designation.

Computershare Trust Company, N.A., will be the transfer agent, dividend disbursing agent and registrar for the Variable Rate Preferred Stock.

### Authorized Issuance

Our Board of Directors has authorized us to issue the shares of Preferred Stock. The authorized number of shares may be increased at any time without the consent of the holders of the Preferred Stock. We may "reopen" this offering at any time by offering additional shares of the Preferred Stock at prices to be determined at that time.

### Dividends

*General*

Dividends on shares of the Preferred Stock are not mandatory. If you own shares of the Preferred Stock, you will be entitled to receive non-cumulative, quarterly cash dividends which will accrue at the applicable dividend rate from but not including the original date of issuance and will be payable on March 31, June 30, September 30 and December 31 of each year (each, a **"Dividend Payment Date"**), beginning on March 31, 2008. However, dividends are payable only if declared by our Board of Directors in its sole discretion, out of funds legally available for dividend payments. Dividends not declared for any Dividend Payment Date will not accrue thereafter.

If a Dividend Payment Date is not a Business Day, the related dividend will be paid not later than the next Business Day with the same effect as though paid on the Dividend Payment Date, without any increase to account for the period from the Dividend Payment Date through the date of actual payment. If a Dividend Payment Date falls on a Saturday, a Sunday or a holiday, we customarily pay the related dividend on the immediately preceding Business Day without any decrease to account for the period from the date of actual payment through such weekend day or holiday. **"Business Day"** means a day other than (a) Saturday or Sunday, (b) a day on which New York City banks are closed or (c) a day on which our offices are closed. We will make dividend payments to holders of record on the record date established by our Board of Directors, which will be from 10 to 45 days before the applicable Dividend Payment Date.

20

The Certificate of Designation does not require us to make any dividend adjustment as a result of changes in the dividends-received deduction under the Internal Revenue Code of 1986.

If we redeem the Preferred Stock, we will include the dividend that would otherwise be payable for the Dividend Period that ends on the redemption date, accrued through and including the redemption date, whether or not declared, in the redemption price of the shares redeemed. We will not pay this dividend to you separately.

### Fixed Rate Period

For each Dividend Period from December 4, 2007 through December 31, 2012 (the **"Fixed Rate Period"**), dividends on shares of the Preferred Stock will accrue at an annual rate of 8.375% or $2.09375 per share. If declared, the initial dividend, which will be for the period from but not including the original date of issuance through and including March 31, 2008, will be $0.67465 per share. Thereafter, the **"Dividend Period"** relating to a Dividend Payment Date will be the period from but not including the preceding Dividend Payment Date through and including the related Dividend Payment Date.

For the Fixed Rate Period, we will compute the amount of dividends payable on the Preferred Stock for any period shorter than a full Dividend Period on the basis of twelve 30-day months and a 360-day year. We will compute any dividends payable on the Preferred Stock for each full Dividend Period for the Fixed Rate Period by dividing the annual dividend by four.

### Floating Rate Period

For the Dividend Period beginning on January 1, 2013 and for each Dividend Period thereafter (the **"Floating Rate Period"**), dividends will accrue from Dividend Period to Dividend Period at a variable rate equal to the higher of (x) 3-Month LIBOR plus 4.16% per annum and (y) 7.875% per annum. We will determine 3-Month LIBOR for each Floating Rate Period two London Business Days (defined as any day, other than a Saturday or Sunday, on which banks are open for business in London) prior to the first day of such Dividend Period (each, a **"LIBOR Determination Date"**).

For each Dividend Period during the Floating Rate Period, we will compute the amount of dividends payable on the Preferred Stock on the basis of the actual number of days elapsed during that period and a 360-day year.

### Determination of 3-Month LIBOR

We determine **"3-Month LIBOR"** as follows:

1. 3-Month LIBOR for any Dividend Period during the Floating Rate Period will be the rate (expressed as a percentage per annum) for Eurodollar deposits having a three-month maturity that appears on Reuters Screen LIBOR01 as of 11:00 a.m. (London time) on the related LIBOR Determination Date. **"Reuters Screen LIBOR01"** means the display designated as "Reuters Screen LIBOR01 Page" or such other page as may replace Reuters Screen LIBOR01 Page on that service or such other service or services as may be nominated by the British Bankers' Association as the information vendor for the purpose of displaying London interbank offered rates for Eurodollar deposits. If at least two rates appear on the Reuters Screen LIBOR01, the rate on the LIBOR Determination Date will be the arithmetic mean of such rates;

2. If such rate does not appear on Reuters Screen LIBOR01 as of 11:00 a.m. (London time) on the related LIBOR Determination Date, Freddie Mac will request the principal London offices of four leading banks in the London interbank market to provide such banks' offered quotations (expressed as percentages per annum) to prime banks in the London interbank market for Eurodollar deposits having a three-month maturity as of 11:00 a.m. (London time) on such LIBOR Determination Date. If at least two quotations are provided, 3-Month LIBOR will be the arithmetic mean (if necessary rounded upwards to the nearest whole multiple of 1/128 of 1%) of such quotations;

3. If fewer than two such quotations are provided as requested in clause 2. above, Freddie Mac will request four major New York City banks to provide such banks' offered quotations (expressed as percentages per annum) to leading European banks for loans in Eurodollars as of 11:00 a.m. (New York time) on such LIBOR Determination Date. If at least two such quotations are provided, 3-Month LIBOR will be the arithmetic mean (if necessary rounded upwards to the nearest whole multiple of 1/128 of 1%) of such quotations; and

4. If fewer than two such quotations are provided as requested in clause 3. above, 3-Month LIBOR will be the 3-Month LIBOR determined with respect to the Dividend Period immediately preceding such current Dividend Period. If the applicable Dividend Period for which fewer than two such quotations are provided is the Dividend Period beginning on January 1, 2013, then 3-Month LIBOR will be the rate for Eurodollar deposits having a three-month maturity that appeared, as of 11:00 a.m. (London time) on the most recent London Business Day preceding the LIBOR Determination Date for which the rate was displayed on Reuters Screen LIBOR01.

If the rate for Eurodollar deposits having a three-month maturity that initially appears on Reuters Screen LIBOR01 as of 11:00 a.m. (London time) on the related LIBOR Determination Date is superseded on Reuters Screen LIBOR01 by a corrected rate before 12:00 noon (London time) on such LIBOR Determination Date, the corrected rate as so substituted on the applicable page will be the applicable 3-Month LIBOR for such LIBOR Determination Date.

In the absence of clear error, our determination of 3-Month LIBOR and the dividend rate will be final and binding. You can obtain 3-Month LIBOR and the dividend rates for the current and preceding Dividend Periods by contacting our Investor Relations Department as shown on page 2.

*Preferences and Limitations*

The Preferred Stock will rank prior to our Common Stock with respect to the payment of dividends, as provided in the Certificate of Designation. We will not declare or pay any dividend on our Common Stock or any of our other junior stock unless dividends have been declared and paid or set apart, or ordered to be set apart, on the Preferred Stock for the then-current Dividend Period. The Preferred Stock will rank equally with respect to dividends with our currently outstanding classes of Preferred Stock (the **"Existing Preferred Stock"**), which are listed in Section 1 of the Certificate of Designation and in the table under *Capitalization* in this Offering Circular.

Dividends on the Preferred Stock are not cumulative. If we do not pay a dividend on the Preferred Stock for any Dividend Period, the holders of the Preferred Stock will have no claim to a

payment for that Dividend Period as long as we do not pay a dividend for that Dividend Period on our Common Stock, any of our other junior stock or the Existing Preferred Stock.

Our Board of Directors may, in its discretion, choose to pay dividends on the Preferred Stock without paying dividends on our Common Stock.

We have offered and sold subordinated debt which we refer to as Freddie SUBS securities. As of the date of this Offering Circular, we have a total of approximately $4.4 billion in Freddie SUBS outstanding. The most recent issuance of Freddie SUBS took place in December 2006. The terms of the Freddie SUBS that we have issued provide for the deferral of interest payments under certain specified circumstances of financial distress. The terms of the Freddie SUBS also prohibit the payment of dividends on our stock, including the Preferred Stock, during any period when we have deferred paying interest on our subordinated debt.

We will not declare or pay any dividends on the Preferred Stock if at the same time any arrears or default exists in the payment of dividends on any outstanding class or series of our stock ranking prior to the Preferred Stock with respect to the payment of dividends. At the time of issuance of the Preferred Stock, no class or series of our stock ranking prior to the Preferred Stock will exist.

Holders of shares of the Preferred Stock will not be entitled to any dividends, whether payable in cash or other property, other than as described above and will not be entitled to interest, or any sum in lieu of interest, in respect of any dividend payment.

See *Regulatory Capital* below for a description of possible regulatory restrictions on our ability to pay dividends.

**Optional Redemption**

The Preferred Stock will not be redeemable prior to December 31, 2012. On December 31, 2012 and on each fifth anniversary thereafter, we may redeem the Preferred Stock, in whole or in part, out of legally available funds. The redemption price will be $25.00 per share plus an amount equal to the amount of the dividend that would otherwise be payable for the Dividend Period that ends on the redemption date, accrued through and including the redemption date, whether or not declared. If we redeem less than all of the outstanding shares of the Preferred Stock, we will select shares to be redeemed by lot or pro rata (as nearly as possible) or by any other method which we deem equitable.

We will give notice of optional redemption by mail to holders of the Preferred Stock from 30 days to 60 days before the redemption date. Each notice will state the number of shares of Preferred Stock being redeemed, the redemption price, the redemption date and the place at which a holder's Preferred Stock certificates must be presented for such redemption.

On and after the redemption date, the shares of Preferred Stock called for redemption will no longer be deemed outstanding, and all rights of the holders of those shares will cease, other than the right to receive the redemption price for such redeemed shares.

The terms of our currently offered subordinated debt prohibit us from redeeming our stock, including the Preferred Stock, during any period when we have deferred paying interest on our subordinated debt.

See *Regulatory Capital* below for a description of possible regulatory restrictions on our ability to redeem the Preferred Stock.

### No Preemptive Rights and No Conversion

As a holder of Preferred Stock, you will not have any preemptive rights to purchase or subscribe for any other shares, rights, options or other securities. You will not have any right to convert your shares into or exchange your shares for any other class or series of our stock or obligations.

### No Voting Rights

Section 306(f) of the Freddie Mac Act prohibits the holders of Preferred Stock from voting for the election of any member of our Board of Directors. Except as described under *Amendments* below, as a holder you will not be entitled to vote.

### Liquidation Rights

If we voluntarily or involuntarily dissolve, liquidate or wind up our business, then, after payment of or provision for our liabilities to creditors and the expenses of our dissolution, liquidation or winding up, the holders of the outstanding shares of the Preferred Stock will be entitled to receive out of our assets available for distribution to stockholders, before any payment or distribution is made on the Common Stock or any other junior stock, $25.00 per share plus an amount equal to the dividend for the then-current quarterly Dividend Period accrued through and including the liquidation payment date, whether or not declared.

In the event of our dissolution, liquidation or winding up, the rights of the Preferred Stock to receive distributions rank equally with those of the Existing Preferred Stock. If our assets available for distribution to shareholders are insufficient to pay in full the aggregate amount payable to holders of the Preferred Stock, the Existing Preferred Stock and any other class or series of stock of equal priority upon liquidation, the assets will be distributed to the holders of the Preferred Stock, the Existing Preferred Stock and such other stock pro rata, based on the amounts to which they are entitled.

Notwithstanding the foregoing, holders of the Preferred Stock will not be entitled to be paid any amount in respect of our dissolution, liquidation or winding up until holders of any classes or series of our stock ranking prior to the Preferred Stock upon liquidation have been paid all amounts to which they are entitled.

Our consolidation, merger or combination with or into any other corporation or entity, or the sale of all or substantially all of our property or business, will not constitute a liquidation, dissolution or winding up for purposes of these provisions on liquidation rights.

### Additional Classes or Series of Stock

We will have the right to create and issue additional classes or series of stock ranking prior to, equally with or junior to the Preferred Stock, as to dividends, liquidation or otherwise, without the

consent of holders of the Preferred Stock. As of the date of this Offering Circular, we have no outstanding class or series of stock or other equity security that ranks senior to the Preferred Stock as to dividends and distributions upon our dissolution, liquidation or winding up.

**Amendments**

Without the consent of the holders of the Preferred Stock, we will have the right to amend the Certificate of Designation to cure any ambiguity, to correct or supplement any term which may be defective or inconsistent with any other term or to make any other provisions so long as the amendment does not materially and adversely affect the interests of the holders of the Preferred Stock. Otherwise, we may amend the Certificate of Designation only with the consent of the holders of at least two-thirds of the outstanding shares of Preferred Stock. On matters requiring consent, each holder will be entitled to one vote per share.

## REGULATORY CAPITAL

**Regulatory Capital Standards**

The Federal Housing Enterprises Financial Safety and Soundness Act of 1992 (the **"GSE Act"**) established minimum, critical and risk-based capital standards for us.

Those standards determine the amounts of core capital and total capital that we must maintain to meet regulatory capital requirements. Core capital consists of the par value of outstanding common stock (common stock issued less common stock held in treasury), the par value of outstanding non-cumulative, perpetual preferred stock, additional paid-in capital and retained earnings, as determined in accordance with GAAP. Total capital includes core capital and general reserves for mortgage and foreclosure losses and any other amounts available to absorb losses that OFHEO includes by regulation.

*Minimum Capital*

The minimum capital standard requires us to hold an amount of core capital that is generally equal to the sum of 2.50% of aggregate on-balance sheet assets and approximately 0.45% of the sum of outstanding mortgage-related securities we guaranteed and other aggregate off-balance sheet obligations. As discussed below, in 2004 OFHEO implemented a framework for monitoring our capital adequacy, which includes a mandatory target capital surplus of 30% over the capital requirement determined under the minimum capital standard.

*Critical Capital*

The critical capital standard requires us to hold an amount of core capital that is generally equal to the sum of 1.25% of aggregate on-balance sheet assets and approximately 0.25% of the sum of outstanding mortgage-related securities we guaranteed and other aggregate off-balance sheet obligations.

*Risk-Based Capital*

The risk-based capital standard requires the application of a stress test to determine the amount of total capital that we must hold to absorb projected losses resulting from adverse interest-rate and

credit-risk conditions specified by the GSE Act and adds 30% additional capital to provide for management and operations risk. The adverse interest-rate conditions prescribed by the GSE Act include one scenario in which 10-year Treasury yields rise by as much as 75% (up-rate scenario) and one in which they fall by as much as 50% (down-rate scenario). The credit risk component of the stress tests simulates the performance of our mortgage portfolio based on loss rates for a benchmark region. The criteria for the benchmark region are established by the GSE Act and are intended to capture the credit-loss experience of the region that experienced the highest historical rates of default and severity of mortgage losses for two consecutive origination years.

**Classification**

OFHEO monitors our performance with respect to the three regulatory capital standards by classifying our capital adequacy not less than quarterly.

To be classified as "adequately capitalized," we must meet both the risk-based and minimum capital standards. If we fail to meet the risk-based capital standard, we cannot be classified higher than "undercapitalized." If we fail to meet the minimum capital requirement but exceed the critical capital requirement, we cannot be classified higher than "significantly undercapitalized." If we fail to meet the critical capital standard, we must be classified as "critically undercapitalized." In addition, OFHEO has discretion to reduce our capital classification by one level if OFHEO determines that we are engaging in conduct OFHEO did not approve that could result in a rapid depletion of core capital or determines that the value of property subject to mortgage loans we hold or guarantee has decreased significantly.

When we are classified as adequately capitalized, we generally can pay a dividend on our common or preferred stock or make other capital distributions (which includes common stock repurchases and preferred stock redemptions) without prior OFHEO approval so long as the payment would not decrease total capital to an amount less than our risk-based capital requirement and would not decrease our core capital to an amount less than our minimum capital requirement. However, because we are currently subject to the regulatory capital monitoring framework described below, we are required to obtain OFHEO's prior approval of certain capital transactions, including common stock repurchases, redemption of any preferred stock, payment of dividends on preferred stock above stated contractual rates, or any action that is likely to impair our ability to manage the target capital surplus established under that framework.

If we were classified as undercapitalized, we would be prohibited from making a capital distribution that would reduce our core capital to an amount less than our minimum capital requirement. We also would be required to submit a capital restoration plan for OFHEO approval, which could adversely affect our ability to make capital distributions.

If we were classified as significantly undercapitalized, we would be prohibited from making any capital distribution that would reduce our core capital to less than the critical capital level. We would otherwise be able to make a capital distribution only if OFHEO determined that the distribution would: (a) enhance our ability to meet the risk-based capital standard and the minimum capital standard promptly; (b) contribute to our long-term financial safety and soundness; or (c) otherwise be in the public interest. Also under this classification, OFHEO could take action to limit our growth, require us to acquire new capital or restrict us from activities that create excessive risk. We also would be required to submit a capital restoration plan for OFHEO approval, which could adversely affect our ability to make capital distributions.

If we were classified as critically undercapitalized, OFHEO would be required to appoint a conservator for us, unless OFHEO made a written finding that it should not do so and the Secretary of the Treasury concurred in that determination. We would be able to make a capital distribution only if OFHEO determined that the distribution would: (a) enhance our ability to meet the risk-based capital standard and the minimum capital standard promptly; (b) contribute to our long-term financial safety and soundness; or (c) otherwise be in the public interest.

## Performance Against Regulatory Capital Standards

OFHEO has never classified us as other than "adequately capitalized," the highest possible classification, reflecting our consistent compliance with the minimum, critical and risk-based capital requirements.

The following table summarizes our regulatory capital requirements and surpluses[1]:

|  | September 30, 2007 | December 31, 2006 |
|---|---|---|
|  | (in millions) | |
| Minimum capital requirement | $26,190 | $25,844 |
| Core capital | 34,643 | 36,170 |
| Minimum capital surplus | 8,453 | 10,326 |
| Critical capital requirement | $13,461 | $13,237 |
| Core capital | 34,643 | 36,170 |
| Critical capital surplus | 21,182 | 22,933 |
| Risk-based capital requirement[2] | N/A | $15,320 |
| Total capital[2] | N/A | 36,742 |
| Risk-based capital surplus[2] | N/A | 21,422 |
| Minimum capital requirement plus 30% add-on | $34,047 | $33,597 |
| Core capital | 34,643 | 36,170 |
| Surplus | 596 | 2,573 |

(1) OFHEO is the authoritative source of the capital calculations that underlie our capital classifications. The values for September 30, 2007 reflect the amounts we reported to OFHEO.

(2) OFHEO determines the amounts reported with respect to our risk-based capital requirement. Amounts for September 30, 2007 are not yet available.

Factors that could adversely affect the adequacy of our regulatory capital for future periods include declines in GAAP income; increases in our risk profile; changes in the economic environment, such as large interest-rate or implied volatility moves or home-price declines; changes in option-adjusted spreads; legislative or regulatory action that could increase capital requirements or changes in or adoption of new accounting standards. See *Note 1: Summary of Significant Accounting Policies — Recently Issued Accounting Standards, Not Yet Adopted* to our consolidated financial statements included in the Information Statement and the comparably captioned section in the November 20, 2007 Information Statement Supplement for more information. In particular, interest-rate levels or implied volatility can affect the amount of our core capital, even if we were economically well hedged against interest-rate changes, because certain gains or losses are recognized through GAAP earnings while other offsetting gains or losses may not be. Changes in option-adjusted spreads and credit spreads can also affect the amount of our core capital, because option-adjusted spreads are a factor in the valuation of our guaranteed mortgage portfolio and credit spreads impact our related credit items. For additional information, see *Risk Factors — Competitive and Market Risks — Higher credit losses and increased expected future credit costs could adversely affect our financial condition and/or results of operations* in the Information Statement.

**Regulatory Capital Monitoring Framework**

In a letter dated January 28, 2004, OFHEO created a framework for monitoring our capital due to our higher operational risk, including our inability to produce timely financial statements in accordance with GAAP. The letter directed that we maintain a mandatory target capital surplus of 30% over our minimum capital requirement, subject to certain conditions and variations; that we submit weekly reports concerning our capital levels; and that we obtain prior approval of certain capital transactions.

Our failure to meet the mandatory target capital surplus would result in an OFHEO inquiry regarding the reason for such failure. If OFHEO were to determine that we had acted unreasonably regarding our compliance with the framework, as set forth in OFHEO's letter, OFHEO could seek to require us to submit a remedial plan or take other remedial steps.

In addition, under this framework, we are required to obtain prior written approval from the Director of OFHEO before engaging in certain capital transactions, as described above. We must also submit a written report to the Director of OFHEO after the declaration, but before the payment, of any dividend on our common stock. The report must contain certain information on the amount of the dividend, the rationale for the payment and the impact on our capital surplus.

This framework will remain in effect until the Director of OFHEO determines that it should be modified or expire. OFHEO's letter indicated that this determination would consider our resumption of timely financial and regulatory reporting that complies with GAAP, among other factors.

## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The Preferred Stock and payments on it are generally subject to taxation by the United States and other taxing jurisdictions to the same extent as stock of any other corporation. The following discussion addresses certain U.S. federal income tax consequences that may result from ownership of the Preferred Stock by an investor who holds the Preferred Stock as a capital asset.

This discussion does not discuss all of the U.S. federal income tax consequences that may be relevant to an investor in light of its particular circumstances or to an investor subject to special rules, such as certain financial institutions, insurance companies, certain former citizens or residents of the United States, traders in securities that elect to use a mark-to-market method of accounting for their securities holdings, dealers in securities, investors holding the Preferred Stock as part of a hedging transaction, straddle, conversion transaction or synthetic security transaction, investors whose functional currency is not the U.S. dollar, tax-exempt persons, or regulated investment companies.

This discussion does not purport to address all rules which may apply to particular investors. Investors are encouraged to consult their own tax advisors regarding the U.S. federal, state, local and foreign tax considerations applicable to an investment in the Preferred Stock.

This discussion reflects current U.S. federal income tax laws and Treasury regulations and administrative and judicial interpretations. Changes to any of these that occur after the date of this Offering Circular may affect the tax consequences that we describe herein.

For this purpose, a U.S. person is an individual who is a citizen or resident of the United States for U.S. federal income tax purposes, a corporation, partnership or other type of entity organized

under the laws of the United States or any state or the District of Columbia (other than a partnership that is not treated as a U.S. person under any applicable Treasury regulations), an estate whose income is subject to U.S. federal income tax regardless of its source, or a trust if a court within the United States is able to exercise primary supervision of the administration of the trust and one or more U.S. persons have the authority to control all substantial decisions of the trust. Notwithstanding the preceding sentence, to the extent provided in Treasury regulations, certain trusts in existence on August 20, 1996, and treated as U.S. persons prior to such date, that elect to continue to be treated as U.S. persons, also will be U.S. persons. A non-U.S. person is an individual, corporation, estate or trust that is not a U.S. person.

## U.S. Persons

### Dividends

Distributions on the Preferred Stock which are paid out of current earnings and profits, or earnings and profits accumulated after 1984 (as determined for U.S. federal income tax purposes), generally constitute dividends taxable as ordinary income. To the extent that the amount of any distribution paid on a share of Preferred Stock exceeds the current and accumulated earnings and profits attributable to that share, such excess will be treated first as a return of capital (rather than as ordinary income) and will be applied against and reduce the holder's adjusted tax basis in that share of Preferred Stock. Any such amount in excess of the holder's adjusted tax basis will then be taxed as capital gain. For purposes of the remainder of this discussion, it is assumed that dividends paid with respect to the Preferred Stock will constitute dividends for U.S. federal income tax purposes.

Dividends received by corporations generally will be eligible for the dividends-received deduction. The dividends-received deduction is available only with respect to a dividend received on stock held for more than 45 days (or more than 90 days in the case of a preferred stock dividend attributable to periods aggregating in excess of 366 days), including the day of disposition but not the day of acquisition. This holding period must be satisfied during the 91-day period (or the 181-day period in the case of a preferred stock dividend attributable to periods aggregating in excess of 366 days) beginning on the date which is 45 (90) days before the date on which the stock becomes ex-dividend with respect to the dividend. The length of time that a corporate shareholder is deemed to have held stock for these purposes is reduced for periods during which the shareholder's risk of loss with respect to the stock is diminished by reason of the shareholder's position in certain options, contracts to sell, short sales or other similar transactions. The amount of such deduction generally will equal 70 percent of the amount of the dividends received, subject to reduction in certain events, including where a holder has indebtedness outstanding that is directly attributable to an investment in the Preferred Stock. For this purpose, indebtedness is not directly attributable to an investment in the Preferred Stock merely because a depository institution receives deposits in the ordinary course of its business.

For purposes of the corporate alternative minimum tax, alternative minimum taxable income is increased by 75 percent of the amount by which a corporation's adjusted current earnings exceeds its alternative minimum taxable income prior to the addition of the applicable tax preference item. The amount of any dividend that is included in a corporate shareholder's adjusted current earnings will generally not be reduced by any dividends-received deduction otherwise allowable with respect to that dividend.

Dividends received by individuals generally are subject to a reduced maximum tax rate of 15 percent through December 31, 2010, after which date the rate applicable to dividends is scheduled to return to the rate generally applicable to ordinary income. The rate reduction does not apply to dividends received to the extent that the individual shareholder elects to treat the dividends as "investment income," which may be offset against investment expenses. Furthermore, the rate reduction does not apply to dividends that are paid to individual shareholders with respect to Preferred Stock that is held for 60 days or less during the 121-day period beginning on the date which is 60 days before the date on which the Preferred Stock becomes ex-dividend. Individual shareholders should consult their own tax advisors regarding the implications of these rules in light of their particular circumstances.

*Dispositions, Including Redemptions*

Any sale, exchange, redemption (except as discussed below) or other disposition of the Preferred Stock generally will result in taxable gain or loss equal to the difference between the amount received and the shareholder's adjusted tax basis in the Preferred Stock. Such gain or loss generally will be capital gain or loss and will be long-term capital gain or loss if the holding period for the Preferred Stock exceeds one year. Tax rates on capital gain for individuals vary depending on each individual's income and holding period for the Preferred Stock. Long-term capital gain realized by individuals is subject to a reduced maximum tax rate of 15 percent through December 31, 2010, after which date the maximum rate is scheduled to return to the rate generally applicable to long-term capital gains. Individual shareholders should contact their own tax advisors for more information or for the capital gains tax rate applicable to specific shares of Preferred Stock.

Under Section 302 of the Internal Revenue Code of 1986 (the **"Code"**), however, a payment made in redemption of Preferred Stock may be treated as a dividend, rather than as payment in exchange for the Preferred Stock if the redemption (i) does not result in a "complete termination" of such holder's equity interest in Freddie Mac and (ii) is "essentially equivalent to a dividend" with respect to the holder. In determining whether a payment made in redemption of Preferred Stock results in a "complete termination" or is "not essentially equivalent to a dividend," the holder must take into account not only the Preferred Stock and other stock of Freddie Mac that it owns directly, but also the Preferred Stock and other stock of Freddie Mac that it constructively owns within the meaning of Section 318 of the Code.

A redemption payment made to a holder will result in a "complete termination" if either (i) the holder owns none of our stock either actually or constructively immediately after the Preferred Stock is redeemed or (ii) the holder actually owns none of our stock immediately after the redemption and, with respect to stock constructively owned, is eligible to waive, and effectively waives, constructive ownership of all such stock. A holder wishing to satisfy the "complete termination" test through waiver of attribution should consult its own tax advisors. A redemption payment made to a holder will be "essentially equivalent to a dividend" if it does not result in a "meaningful reduction" in the holder's proportionate stock interest in the company. Because of the ambiguities in applying this rule, each holder should consult its own tax advisor to determine whether a payment made in redemption of Preferred Stock will be treated as a dividend or as payment in exchange for the Preferred Stock. If the redemption payment is treated as a dividend, the rules discussed above under *Dividends* apply.

*Information Reporting and Backup Withholding*

Payments of dividends on shares of Preferred Stock held of record by U.S. persons other than corporations and other exempt holders are required to be reported to the Internal Revenue Service (the **"IRS"**).

Backup withholding of U.S. federal income tax may apply to payments made with respect to shares of Preferred Stock, as well as payments of proceeds from the sale of shares of Preferred Stock, to holders that are not "exempt recipients" and that fail to provide certain identifying information (such as the taxpayer identification number of the holder) in the manner required. Individuals generally are not exempt recipients, whereas corporations and certain other entities generally are exempt recipients.

**Non-U.S. Persons**

*Dividends*

Generally, distributions treated as dividends as described above paid to a non-U.S. person with respect to the Preferred Stock will be subject to a 30% U.S. withholding tax, or such lower rate as may be specified by an applicable income tax treaty, unless the dividends are (i) effectively connected with a trade or business carried on by the non-U.S. person within the United States (and the non-U.S. person provides the payor with an IRS Form W-8ECI (or other applicable form)) and (ii) if an income tax treaty applies, attributable to a U.S. permanent establishment or, in the case of an individual, a fixed base maintained by the non-U.S. person. Dividends effectively connected with such trade or business, and, if an income tax treaty applies, attributable to such permanent establishment, will generally be subject to U.S. federal income tax on a net basis at applicable individual or corporate rates. A non-U.S. person that is a corporation may be subject to a "branch profits tax" at a 30% rate (or such lower rate as may be specified by an applicable income tax treaty) on the deemed repatriation from the United States of its "effectively connected earnings and profits," subject to certain adjustments. Under applicable Treasury regulations, a non-U.S. person (including, in certain cases of non-U.S. persons that are entities, the owner or owners of such entities) will be required to satisfy certain certification requirements in order to claim a reduced rate of withholding pursuant to an applicable income tax treaty.

*Dispositions, Including Redemptions*

A non-U.S. person generally will not be subject to U.S. federal income or withholding tax on gain realized on the sale or exchange of the Preferred Stock so long as:

- the gain is not effectively connected with a U.S. trade or business of the holder (or, if a tax treaty applies, the gain is not attributable to a U.S. permanent establishment or, in the case of an individual, a fixed base maintained by such non-U.S. person); and

- in the case of a non-resident alien individual, such holder is not present in the United States for 183 or more days in the taxable year of the sale or disposition and certain other conditions are met.

*Information Reporting and Backup Withholding*

Payment of dividends, and the tax withheld with respect thereto, is subject to information reporting requirements. These information reporting requirements apply regardless of whether

31

withholding was reduced or eliminated by an applicable income tax treaty or withholding was not required because the dividends were effectively connected with a trade or business in the United States conducted by the non-U.S. person. Copies of the information returns reporting such dividends and withholding may also be made available under the provisions of an applicable income tax treaty or agreement to the tax authorities in the country in which the non-U.S. person resides. U.S. backup withholding will generally apply on payment of dividends to non-U.S. persons unless such non-U.S. persons furnish to the payor an IRS Form W-8BEN (or other applicable form), or otherwise establish an exemption.

Payment by a U.S. office of a broker of the proceeds of a sale of the Preferred Stock is subject to both backup withholding and information reporting unless the non-U.S. person, or beneficial owner thereof, as applicable, certifies that it is a non-U.S. person on IRS Form W-8BEN (or other applicable form), or otherwise establishes an exemption. Subject to exceptions, backup withholding and information reporting generally will not apply to a payment of proceeds from the sale of the Preferred Stock if such sale is effected through a foreign office of a broker.

Any amount withheld under the backup withholding rules from a payment to a holder is allowable as a credit against such holder's U.S. federal income tax, which may entitle the holder to a refund, provided that the holder timely provides the required information to the IRS. Moreover, certain penalties may be imposed by the IRS on a holder who is required to furnish information but does not do so in the proper manner. Holders are urged to consult their own tax advisors regarding the application of backup withholding in their particular circumstances and the availability of and procedure for obtaining an exemption from backup withholding under current Treasury regulations.

**Circular 230**

Any U.S. federal tax discussion included in this Offering Circular (1) is not intended or written to be used, and cannot be used, to avoid any U.S. federal tax penalties, and (2) was written to support the promotion or marketing of the transaction or matter addressed by this Offering Circular. Any taxpayer receiving this Offering Circular should seek advice from an independent tax advisor based on the taxpayer's particular circumstances.

**LEGAL INVESTMENT CONSIDERATIONS**

You should consult your own legal advisors to determine whether the shares of Preferred Stock constitute legal investments for you and whether the shares of Preferred Stock can be used as collateral for borrowings. In addition, financial institutions should consult their legal advisors or regulators in determining the appropriate treatment of the shares of Preferred Stock under risk-based capital or similar rules.

If you are subject to legal investment laws and regulations or to review by regulatory authorities, you may be subject to restrictions on investing in the shares of Preferred Stock. Institutions regulated by the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, the National Credit Union Administration, the Department of the Treasury or any other federal or state agency with similar authority should review any applicable regulations, policy statements and guidelines before purchasing or pledging the shares of Preferred Stock.

# UNDERWRITING

## General

Under the terms of an underwriting agreement (the **"Underwriting Agreement"**), we have agreed to sell to the Underwriters named below, and the Underwriters, for whom Lehman Brothers Inc. and Goldman, Sachs & Co. are acting as representatives, have severally agreed to purchase from us, the shares of Preferred Stock opposite their names.

| Underwriter | Number of Shares of Preferred Stock |
|---|---|
| Lehman Brothers Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 101,560,000 |
| Goldman, Sachs & Co. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 101,560,000 |
| Bear, Stearns & Co. Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16,240,000 |
| Banc of America Securities LLC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,440,000 |
| Citigroup Global Markets Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,440,000 |
| Credit Suisse Securities (USA) LLC . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,440,000 |
| Deutsche Bank Securities Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,440,000 |
| Morgan Stanley & Co. Incorporated . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,440,000 |
| UBS Securities LLC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,440,000 |
| Total   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 240,000,000 |

The Underwriting Agreement requires the Underwriters to take and pay for all of the shares of Preferred Stock, if any are taken.

## Discounts

The Underwriters propose to offer a portion of the Preferred Stock directly to the public at the initial offering price shown on the cover page of this Offering Circular, plus accrued dividends, if any, from but not including December 4, 2007, and a portion to certain dealers at that price less a concession of not more than $0.225 per share. The Underwriters may allow, and the dealers may reallow, a concession of not more than $0.100 per share on sales to certain brokers and dealers. After the initial offering of the shares, the Underwriters may vary the offering prices and other selling terms.

## Listing

Until this offering, there has been no public market for the Preferred Stock. The Preferred Stock has been approved for listing on the NYSE. Trading of the Preferred Stock on the NYSE is expected to commence within a fourteen-day period after the initial delivery of the Preferred Stock. The Underwriters have advised us that they intend to make a market in the Preferred Stock prior to the commencement of trading on the NYSE, but are not obliged to do so and may discontinue any such market making at any time without notice.

## Stabilization

In connection with the offering, the Underwriters may purchase and sell the Preferred Stock in the open market. These transactions may include stabilizing transactions and purchases to cover syndicate short positions created in connection with the offering. Stabilizing transactions consist of certain bids or purchases for the purpose of preventing or retarding a decline in the market price of the Preferred Stock. Syndicate short positions involve the sale by the Underwriters of a greater

number of shares of Preferred Stock than they are required to purchase from us in the offering. The Underwriters also may impose a penalty bid, whereby selling concessions allowed to syndicate members or other broker-dealers for securities sold in the offering for their account may be reclaimed by the syndicate if such shares of Preferred Stock are repurchased by the Underwriters in stabilizing or covering transactions. These activities may stabilize, maintain or otherwise affect the market price of the Preferred Stock, which may be higher than the price that might otherwise prevail in the open market; and these activities, if commenced, may be discontinued at any time. These transactions may be effected in the over-the-counter market or otherwise.

**Selling Restrictions**

*European Union Area*

In relation to each member state of the European Economic Area (Iceland, Norway and Liechtenstein in addition to member states of the European Union) which has implemented the Prospectus Directive (each, a "relevant member state"), each underwriter has represented and agreed that with effect from and including the date on which the Prospectus Directive is implemented in that relevant member state (the "relevant implementation date") it has not made and will not make an offer of Preferred Stock to the public in that relevant member state prior to the publication of a prospectus in relation to the Preferred Stock which has been approved by the competent authority in that relevant member state or, where appropriate, approved in another relevant member state and notified to the competent authority in that relevant member state, all in accordance with the Prospectus Directive, except that it may, with effect from and including the relevant implementation date, make an offer of Preferred Stock to the public in that relevant member state at any time:

- to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

- to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year, (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts;

- to fewer than 100 natural or legal persons (other than qualified investors as defined in the Prospectus Directive) subject to obtaining the prior consent of the representatives for such offer; or

- in any other circumstances which do not require the publication by us of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of Preferred Stock to the public" in relation to any Preferred Stock in any relevant member state means the communication in any form and by any means of sufficient information on the terms of the offer and the Preferred Stock to be offered so as to enable an investor to decide to purchase or subscribe for the Preferred Stock, as the same may be varied in that member state by any measure implementing the Prospectus Directive in that member state and the expression "Prospectus Directive" means Directive 2003/71/EC and includes any relevant implementing measure in each relevant member state.

*United Kingdom*

Each underwriter has represented and agreed that:

- it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity within the meaning of Section 21 of the Financial Services and Markets Act 2000 (the **"FSMA"**) received by it in connection with the issue or sale of the Preferred Stock in circumstances in which Section 21(1) of the FSMA does not apply to us; and

- it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the Preferred Stock in, from or otherwise involving the United Kingdom.

*Hong Kong*

The Preferred Stock may not be offered or sold by means of any document other than (i) in circumstances which do not constitute an offer to the public within the meaning of the Companies Ordinance (Cap. 32, Laws of Hong Kong), or (ii) to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made thereunder, or (iii) in other circumstances which do not result in the document being a "prospectus" within the meaning of the Companies Ordinance (Cap. 32, Laws of Hong Kong), and no advertisement, invitation or document relating to the Preferred Stock may be issued or may be in the possession of any person for the purpose of issue (in each case whether in Hong Kong or elsewhere), which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the laws of Hong Kong) other than with respect to Preferred Stock which is or is intended to be disposed of only to persons outside Hong Kong or only to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made thereunder.

*Japan*

The Preferred Stock has not been and will not be registered under the Securities and Exchange Law of Japan (the **"Securities and Exchange Law"**), and the underwriter has agreed that it will not offer or sell any Preferred Stock, directly or indirectly, in Japan or to, or for the benefit of, any resident of Japan (which term, as used herein, means any person resident in Japan, including any corporation or other entity organized under the laws of Japan), or to others for re-offering or resale, directly or indirectly, in Japan or to a resident of Japan, except pursuant to an exemption from the registration requirements of, and otherwise in compliance with, the Securities and Exchange Law and any other applicable laws, regulations and ministerial guidelines of Japan.

*Singapore*

This Offering Circular has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this Offering Circular and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the Preferred Stock may not be circulated or distributed, nor may the Preferred Stock be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 274 of the Securities and Futures Act,

Chapter 289 of Singapore (the **"SFA"**), (ii) to a relevant person, or any person pursuant to Section 275(1A), and in accordance with the conditions, specified in Section 275 of the SFA or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Where the Preferred Stock is subscribed or purchased under Section 275 by a relevant person which is: (a) a corporation (which is not an accredited investor) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or (b) a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary is an accredited investor, shares, debentures and units of shares and debentures of that corporation or the beneficiaries' rights and interest in that trust shall not be transferable for 6 months after that corporation or that trust has acquired the Preferred Stock under Section 275 except: (1) to an institutional investor under Section 274 of the SFA or to a relevant person, or any person pursuant to Section 275(1A), and in accordance with the conditions, specified in Section 275 of the SFA; (2) where no consideration is given for the transfer; or (3) by operation of law.

**Lock-Up Agreement**

For a period of 90 days after the date of this Offering Circular, Freddie Mac has agreed not to, without the prior written consent of Lehman Brothers Inc. and Goldman, Sachs & Co., directly or indirectly, sell, offer to sell, grant any option for the sale of or otherwise dispose of, or enter into any swap or any other agreement or any other transaction that transfers, in whole or in part, the economic consequences of ownership of any common or preferred stock or any security convertible into or exchangeable into or exercisable for stock in Freddie Mac (except for (i) the Preferred Stock offered hereby or (ii) the issuance of shares of common stock pursuant to reservations, agreements or compensation or benefit plans referred to in this Offering Circular or the documents incorporated by reference herein); provided, however, that Freddie Mac may, directly or indirectly, sell, offer to sell, grant any option for the sale of, or otherwise dispose of, or enter into any swap or any other agreement or any other transaction that transfers, in whole or in part, the economic consequences of ownership of, shares of any such stock or security within 90 days from the date of this Offering Circular without obtaining the prior written consent of Lehman Brothers Inc. and Goldman, Sachs & Co. if (i) Freddie Mac is specifically required to do so by OFHEO or by any law specifically requiring such sale, offer, grant or other disposition of Freddie Mac stock or securities (each, a **"Mandatory Sale"**) and (ii) prior to such Mandatory Sale and immediately upon receiving notice that such Mandatory Sale would be required, Freddie Mac shall provide Lehman Brothers Inc. and Goldman, Sachs & Co. with written notice setting out the details of such Mandatory Sale, including the authority requiring the sale, the anticipated sale date, the amount, number and type of shares involved, the type of offering and any other information deemed relevant by Freddie Mac.

**Indemnification**

We and the Underwriters have agreed to indemnify each other against certain liabilities in connection with the offering and sale of the Preferred Stock and to contribute to any payments that the Underwriters may be required to make for these liabilities.

**Conflicts**

Some of the Underwriters and dealers or their agents may engage in transactions with us and perform services for us in the ordinary course of business.

## RATINGS

We expect that Moody's will assign the Preferred Stock a rating of Aa3 and a rating outlook of negative. An issue which is rated "Aa" is considered by Moody's to be "of high quality" and "subject to very low credit risk." The numerical modifier "3" indicates that the issue ranks in the lower end of the generic rating category of "Aa." According to Moody's a "rating outlook is an opinion regarding the likely direction of a rating over the medium term."

We expect that S&P will assign the Preferred Stock a rating of AA− and a rating outlook of negative. An issue which is rated "AA" is considered by S&P to differ "from the highest-rated obligations only to a small degree." According to S&P, "the obligor's capacity to meet its financial commitment on the obligation is very strong." The modifier "−" indicates that the issue ranks in the lower end of the generic rating category "AA." According to S&P, a "rating outlook assesses the potential direction of a long-term credit rating over the intermediate term (typically six months to two years)"; a rating outlook of "negative" means that a rating may be lowered over this period.

We expect that Fitch will assign the Preferred Stock a rating of A+. An issue that is rated "A+" is considered by Fitch to be of "high credit quality." According to Fitch, this rating indicates that the "capacity for payment of financial commitments is considered strong." The modifier of "+" indicates that the issue ranks at the higher end of the major rating category of "A."

A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning rating organization.

## INDEPENDENT ACCOUNTANTS

The consolidated financial statements as of December 31, 2006 and December 31, 2005 and for each of the three years in the period ended December 31, 2006, incorporated by reference into this Offering Circular, have been audited by PricewaterhouseCoopers LLP, independent accountants, as stated in their report with respect thereto.

## LEGAL MATTERS

Kevin I. MacKenzie, Esq., Vice President and Deputy General Counsel — Securities, will render an opinion on the legality of the Preferred Stock. As of November 27, 2007, Mr. MacKenzie beneficially owned less than 0.01% of the outstanding shares of Freddie Mac's common stock. Shearman & Sterling LLP is special tax counsel to Freddie Mac on tax matters concerning the Preferred Stock. Sidley Austin LLP is representing the Underwriters on legal matters concerning the Preferred Stock.

Appendix A

## FREDDIE MAC

### CERTIFICATE OF CREATION, DESIGNATION, POWERS, PREFERENCES, RIGHTS, PRIVILEGES, QUALIFICATIONS, LIMITATIONS, RESTRICTIONS, TERMS AND CONDITIONS
### of
### FIXED-TO-FLOATING RATE NON-CUMULATIVE PERPETUAL PREFERRED STOCK
#### (Par Value $1.00 Per Share)

I, KEVIN I. MACKENZIE, Assistant Secretary of the Federal Home Loan Mortgage Corporation, a government-sponsored enterprise of the United States of America ("Freddie Mac" or the "Corporation"), do hereby certify that, pursuant to authority vested in the Board of Directors of Freddie Mac by Section 306(f) of the Federal Home Loan Mortgage Corporation Act, as amended (12 U.S.C. §1455(f)), the Board of Directors adopted Resolution FHLMC 2007-27 on November 26, 2007, which resolution is now, and at all times since such date has been, in full force and effect, and that the Chairman and Chief Executive Officer, pursuant to the authority delegated to him by such resolution, approved the final terms of the public issuance and sale of the preferred stock of Freddie Mac designated above.

The Fixed-to-Floating Rate Non-Cumulative Preferred Stock shall have the following designation, powers, preferences, rights, privileges, qualifications, limitations, restrictions, terms and conditions:

### 1. Designation, Par Value, Number of Shares and Seniority

The class of preferred stock of Freddie Mac created hereby (the "Non-Cumulative Preferred Stock") shall be designated "Fixed-to-Floating Rate Non-Cumulative Perpetual Preferred Stock," shall have a par value of $1.00 per share and shall consist of 240,000,000 shares. The Board of Directors shall be permitted to increase the authorized number of such shares at any time. The Non-Cumulative Preferred Stock shall rank prior to the Voting Common Stock of Freddie Mac (the "Common Stock") to the extent provided in this Certificate and shall rank, as to both dividends and distributions upon liquidation, on a parity with (a) the 6.55% Non-Cumulative Preferred Stock issued on September 28, 2007, (b) the 6.02% Non-Cumulative Preferred Stock issued on July 24, 2007, (c) the 5.66% Non-Cumulative Preferred Stock issued on April 16, 2007, (d) the 5.57% Non-Cumulative Preferred Stock issued on January 16, 2007, (e) the 5.9% Non-Cumulative Preferred Stock issued on October 16, 2006, (f) the 6.42% Non-Cumulative Preferred Stock issued on July 17, 2006, (g) the Variable Rate, Non-Cumulative Preferred Stock issued on July 17, 2006, (h) the 5.81% Non-Cumulative Preferred Stock issued on January 29, 2002, (i) the 5.7% Non-Cumulative Preferred Stock issued on October 30, 2001, (j) the 6% Non-Cumulative Preferred Stock issued on May 30, 2001, (k) the Variable Rate, Non-Cumulative Preferred Stock issued on May 30, 2001 and June 1, 2001, (l) the 5.81% Non-Cumulative Preferred Stock issued on March 23, 2001, (m) the Variable Rate, Non-Cumulative Preferred Stock issued on March 23, 2001, (n) the Variable Rate, Non-Cumulative Preferred Stock issued on January 26, 2001, (o) the Variable Rate, Non-Cumulative Preferred Stock issued on November 5, 1999, (p) the 5.79% Non-Cumulative Preferred Stock issued on July 21, 1999, (q) the 5.1% Non-Cumulative Preferred Stock

issued on March 19, 1999, (r) the 5.3% Non-Cumulative Preferred Stock issued on October 28, 1998, (s) the 5.1% Non-Cumulative Preferred Stock issued on September 23, 1998, (t) the Variable Rate, Non-Cumulative Preferred Stock issued on September 23, 1998 and September 29, 1998, (u) the 5% Non-Cumulative Preferred Stock issued on March 23, 1998, (v) the 5.81% Non-Cumulative Preferred Stock issued on October 27, 1997, and (w) the Variable Rate, Non-Cumulative Preferred Stock issued on April 26, 1996 (collectively, the "Existing Preferred Stock").

## 2. Dividends

(a)  For each Dividend Period from December 4, 2007 through December 31, 2012, holders of outstanding shares of Non-Cumulative Preferred Stock shall be entitled to receive, ratably, when, as and if declared by the Board of Directors, in its sole discretion, out of funds legally available therefor, non-cumulative cash dividends at the annual rate of 8.375%, or $2.09375, per share of Non-Cumulative Preferred Stock. Dividends on the Non-Cumulative Preferred Stock shall accrue from but not including December 4, 2007 and will be payable when, as and if declared by the Board of Directors quarterly on March 31, June 30, September 30 and December 31 of each year (each, a "Dividend Payment Date"), commencing on March 31, 2008. If a Dividend Payment Date is not a "Business Day," the related dividend will be paid not later than the next Business Day with the same force and effect as though paid on the Dividend Payment Date, without any increase to account for the period from such Dividend Payment Date through the date of actual payment. "Business Day" means a day other than (i) a Saturday or Sunday, (ii) a day on which New York City banks are closed, or (iii) a day on which the offices of Freddie Mac are closed.

If declared, the initial dividend, which will be for the period from but not including December 4, 2007 through and including March 31, 2008, will be $0.67465 per share. Thereafter, through December 31, 2012, dividends will accrue from Dividend Period to Dividend Period at a rate equal to 8.375% divided by four; the amount of dividends payable in respect of any shorter period shall be computed on the basis of twelve 30-day months and a 360-day year. Except for the initial Dividend Payment Date, the "Dividend Period" relating to a Dividend Payment Date will be the period from but not including the preceding Dividend Payment Date through and including the related Dividend Payment Date.

(b)  For the Dividend Period beginning on January 1, 2013 and for each Dividend Period thereafter, dividends will accrue from Dividend Period to Dividend Period at a variable per annum rate equal to the higher of (x) the sum of 3-Month LIBOR (as defined in clause (b) below) and 4.16% and (y) 7.875% per annum, with the resulting dividend per share being rounded to the nearest cent (with one-half cent being rounded up). Freddie Mac will calculate the dividend rate for each Dividend Period on and after January 1, 2013 based on 3-Month LIBOR determined as of two London Business Days (defined as any day, other than a Saturday or Sunday, on which banks are open for business in London) prior to the first day of such Dividend Period (each, a "LIBOR Determination Date"). The amount of each dividend payable for any Dividend Period beginning on or after January 1, 2013 shall be computed on the basis of the actual number of days elapsed during such period and a 360-day year.

(c)  Each such dividend shall be paid to the holders of record of outstanding shares of the Non-Cumulative Preferred Stock as they appear in the books and records of Freddie Mac on such record date as shall be fixed in advance by the Board of Directors, not to be earlier than 45 days nor later than 10 days preceding the applicable Dividend Payment Date. No dividends shall be declared or

paid or set apart for payment on the Common Stock or any other class or series of stock ranking junior to or (except as hereinafter provided) on a parity with the Non-Cumulative Preferred Stock with respect to the payment of dividends unless dividends have been declared and paid or set apart (or ordered by the Board of Directors to be set apart) for payment on the outstanding Non-Cumulative Preferred Stock in respect of the then-current Dividend Period; provided, however, that the foregoing dividend preference shall not be cumulative and shall not in any way create any claim or right in favor of the holders of Non-Cumulative Preferred Stock in the event that Freddie Mac shall not have declared or paid or set apart (or the Board of Directors shall not have ordered to be set apart) dividends on the Non-Cumulative Preferred Stock in respect of any prior Dividend Period. In the event that Freddie Mac shall not pay any one or more dividends or any part thereof on the Non-Cumulative Preferred Stock, the holders of the Non-Cumulative Preferred Stock shall not have any claim in respect of such non-payment so long as no dividend is paid on any junior or parity stock in violation of the preceding sentence.

(d) "3-Month LIBOR" means, with respect to any Dividend Period beginning on or after January 1, 2013 (in the following order of priority):

(i) the rate (expressed as a percentage per annum) for Eurodollar deposits having a three-month maturity that appears on Reuters Screen LIBOR01 as of 11:00 a.m. (London time) on the related LIBOR Determination Date. "Reuters Screen LIBOR01" means the display designated as "Reuters Screen LIBOR01 Page" or such other page as may replace Reuters Screen LIBOR01 Page on that service or such other service or services as may be nominated by the British Bankers' Association as the information vendor for the purpose of displaying London interbank offered rates for Eurodollar deposits. If at least two rates appear on the Reuters Screen LIBOR01, the rate on the LIBOR Determination Date will be the arithmetic mean of such rates;

(ii) if such rate does not appear on Reuters Screen LIBOR01 as of 11:00 a.m. (London time) on the related LIBOR Determination Date, Freddie Mac shall request the principal London offices of four leading banks in the London interbank market to provide such banks' offered quotations (expressed as percentages per annum) to prime banks in the London interbank market for Eurodollar deposits having a three-month maturity as of 11:00 a.m. (London time) on such LIBOR Determination Date. If at least two quotations are provided, 3-Month LIBOR shall be the arithmetic mean (if necessary rounded upwards to the nearest whole multiple of 1/128 of 1%) of such quotations;

(iii) if fewer than two such quotations are provided as requested in clause (ii) above, Freddie Mac shall request four major New York City banks to provide such banks' offered quotations (expressed as percentages per annum) to leading European banks for loans in Eurodollars as of 11:00 a.m. (New York time) on such LIBOR Determination Date. If at least two such quotations are provided, 3-Month LIBOR will be the arithmetic mean (if necessary rounded upwards to the nearest whole multiple of 1/128 of 1%) of such quotations; and

(iv) if fewer than two such quotations are provided as requested in clause (iii) above, 3-Month LIBOR shall be the 3-Month LIBOR determined with respect to the Dividend Period immediately preceding such current Dividend Period. If the applicable Dividend Period for which fewer than two such quotations are provided is the Dividend Period beginning on January 1, 2013, then 3-Month LIBOR will be the rate for Eurodollar deposits having a three-

A-3

month maturity that appeared, as of 11:00 a.m. (London time) on the most recent London Business Day preceding the LIBOR Determination Date for which the rate was displayed on Reuters Screen LIBOR01.

If the rate for Eurodollar deposits having a three-month maturity that initially appears on Reuters Screen LIBOR01 as of 11:00 a.m. (London time) on the related LIBOR Determination Date is superseded on Reuters Screen LIBOR01, by a corrected rate before 12:00 noon (London time) on such LIBOR Determination Date, such corrected rate as so substituted on the applicable page shall be the applicable 3-Month LIBOR for such LIBOR Determination Date. Freddie Mac shall act as calculation agent for the determination of 3-Month LIBOR and the dividend rate. In the absence of clear error, Freddie Mac's determination of 3-Month LIBOR and the dividend rate for the applicable Dividend Period will be final and binding.

(e) Notwithstanding any other provision of this Certificate, the Board of Directors, in its discretion, may choose to pay dividends on the Non-Cumulative Preferred Stock without the payment of any dividends on the Common Stock or any other class or series of stock from time to time outstanding ranking junior to the Non-Cumulative Preferred Stock with respect to the payment of dividends.

(f) No dividend shall be declared or paid or set apart for payment on any shares of the Non-Cumulative Preferred Stock if at the same time any arrears or default exists in the payment of dividends on any outstanding class or series of stock of Freddie Mac ranking prior to or (except as provided herein) on a parity with the Non-Cumulative Preferred Stock with respect to the payment of dividends. If and whenever dividends, having been declared, shall not have been paid in full, as aforesaid, on shares of the Non-Cumulative Preferred Stock and on the shares of any other class or series of stock of Freddie Mac ranking on a parity with the Non-Cumulative Preferred Stock with respect to the payment of dividends, all such dividends that have been declared on shares of the Non-Cumulative Preferred Stock and on the shares of any such other class or series shall be paid pro rata, so that the respective amounts of dividends paid per share on the Non-Cumulative Preferred Stock and on such other class or series shall in all cases bear to each other the same ratio that the respective amounts of dividends declared but unpaid per share on the shares of the Non-Cumulative Preferred Stock and on the shares of such other class or series bear to each other.

(g) Holders of shares of the Non-Cumulative Preferred Stock shall not be entitled to any dividends, in cash or in property, other than as herein provided and shall not be entitled to interest, or any sum in lieu of interest, on or in respect of any dividend payment.

### 3. Optional Redemption

(a) The Non-Cumulative Preferred Stock may not be redeemed prior to December 31, 2012. Subject to the notice provisions set forth in Section 3(b) below and to any further limitations which may be imposed by law, Freddie Mac may redeem the Non-Cumulative Preferred Stock, in whole or in part, on December 31, 2012 and on each fifth anniversary thereafter, out of funds legally available therefor, at the redemption price of $25.00 per share plus an amount, determined in accordance with Section 2(a) above, equal to the amount of the dividend, if any, otherwise payable for the Dividend Period that ends on the date of redemption, accrued through and including the date of such redemption, whether or not declared. If less than all of the outstanding shares of the Non-Cumulative Preferred Stock are to be redeemed, Freddie Mac shall select shares to be redeemed from the outstanding shares not previously called for redemption by lot or pro rata (as

nearly as possible) or by any other method which Freddie Mac in its sole discretion deems equitable. If Freddie Mac redeems the Non-Cumulative Preferred Stock, the dividend that would otherwise be payable for the Dividend Period ending on the date of redemption will be included in the redemption price of the shares redeemed and will not be separately payable.

(b)   In the event Freddie Mac shall redeem any or all of the Non-Cumulative Preferred Stock as aforesaid, notice of such redemption shall be given by Freddie Mac by first class mail, postage prepaid, mailed neither less than 30 nor more than 60 days prior to the redemption date, to each holder of record of the shares of the Non-Cumulative Preferred Stock being redeemed, at such holder's address as the same appears in the books and records of Freddie Mac. Each such notice shall state the number of shares being redeemed, the redemption price, the redemption date and the place at which such holder's certificate(s) representing shares of the Non-Cumulative Preferred Stock must be presented for cancellation or exchange, as the case may be, upon such redemption. Failure to give notice, or any defect in the notice, to any holder of the Non-Cumulative Preferred Stock shall not affect the validity of the proceedings for the redemption of shares of any other holder of the Non-Cumulative Preferred Stock being redeemed.

(c)   Notice having been mailed as aforesaid, from and after the redemption date specified therein and upon payment of the consideration set forth in Section 3(a) above, said shares of the Non-Cumulative Preferred Stock shall no longer be deemed to be outstanding, and all rights of the holders thereof as holders of the Non-Cumulative Preferred Stock shall cease, with respect to shares so redeemed, other than the right to receive the redemption price for such redeemed shares.

(d)   Any shares of the Non-Cumulative Preferred Stock which shall have been redeemed shall, after such redemption, no longer have the status of authorized, issued or outstanding shares.

## 4.  No Voting Rights

Except as set forth in Section 9(h) below, the shares of the Non-Cumulative Preferred Stock shall not have any voting powers, either general or special.

## 5.  No Conversion or Exchange Rights

The holders of shares of the Non-Cumulative Preferred Stock shall not have any right to convert such shares into or exchange such shares for any other class or series of stock or obligations of Freddie Mac.

## 6.  No Preemptive Rights

No holder of the Non-Cumulative Preferred Stock shall as such holder have any preemptive right to purchase or subscribe for any other shares, rights, options or other securities of any class of Freddie Mac which at any time may be sold or offered for sale by Freddie Mac.

## 7.  Liquidation Rights and Preference

(a)   Except as otherwise set forth herein, upon the voluntary or involuntary dissolution, liquidation or winding up of Freddie Mac, after payment of or provision for the liabilities of Freddie Mac and the expenses of such dissolution, liquidation or winding up, the holders of the outstanding shares of the Non-Cumulative Preferred Stock shall be entitled to receive out of the assets of Freddie Mac available for distribution to stockholders, before any payment or distribution shall be

made on the Common Stock or any other class or series of stock of Freddie Mac ranking junior to the Non-Cumulative Preferred Stock upon liquidation, the amount of $25.00 per share plus an amount, determined in accordance with Section 2(a) above, equal to the dividend, if any, otherwise payable for the then-current Dividend Period accrued through and including the date of payment in respect of such dissolution, liquidation or winding up, and the holders of the outstanding shares of any class or series of stock of Freddie Mac ranking on a parity with the Non-Cumulative Preferred Stock upon liquidation shall be entitled to receive out of the assets of Freddie Mac available for distribution to stockholders, before any such payment or distribution shall be made on the Common Stock or any other class or series of stock of Freddie Mac ranking junior to the Non-Cumulative Preferred Stock and to such parity stock upon liquidation, any corresponding preferential amount to which the holders of such parity stock may, by the terms thereof, be entitled; provided, however, that if the assets of Freddie Mac available for distribution to stockholders shall be insufficient for the payment of the amount which the holders of the outstanding shares of the Non-Cumulative Preferred Stock and the holders of the outstanding shares of such parity stock shall be entitled to receive upon such dissolution, liquidation or winding up of Freddie Mac as aforesaid, then, subject to paragraph (b) of this Section 7, all of the assets of Freddie Mac available for distribution to stockholders shall be distributed to the holders of outstanding shares of the Non-Cumulative Preferred Stock and to the holders of outstanding shares of such parity stock pro rata, so that the amounts so distributed to holders of the Non-Cumulative Preferred Stock and to holders of such classes or series of such parity stock, respectively, shall bear to each other the same ratio that the respective distributive amounts to which they are so entitled bear to each other. After the payment of the aforesaid amounts to which they are entitled, the holders of outstanding shares of the Non-Cumulative Preferred Stock and the holders of outstanding shares of any such parity stock shall not be entitled to any further participation in any distribution of assets of Freddie Mac.

(b) Notwithstanding the foregoing, upon the dissolution, liquidation or winding up of Freddie Mac, the holders of shares of the Non-Cumulative Preferred Stock then outstanding shall not be entitled to be paid any amounts to which such holders are entitled pursuant to paragraph (a) of this Section 7 unless and until the holders of any classes or series of stock of Freddie Mac ranking prior upon liquidation to the Non-Cumulative Preferred Stock shall have been paid all amounts to which such classes or series are entitled pursuant to their respective terms.

(c) Neither the sale of all or substantially all of the property or business of Freddie Mac, nor the merger, consolidation or combination of Freddie Mac into or with any other corporation or entity, shall be deemed to be a dissolution, liquidation or winding up for the purpose of this Section 7.

## 8. Additional Classes or Series of Stock

The Board of Directors shall have the right at any time in the future to authorize, create and issue, by resolution or resolutions, one or more additional classes or series of stock of Freddie Mac, and to determine and fix the distinguishing characteristics and the relative rights, preferences, privileges and other terms of the shares thereof. Any such class or series of stock may rank prior to or on a parity with or junior to the Non-Cumulative Preferred Stock as to dividends or upon liquidation or otherwise.

**9. Miscellaneous**

(a) Any stock of any class or series of Freddie Mac shall be deemed to rank:

(i) prior to the shares of the Non-Cumulative Preferred Stock, either as to dividends or distributions upon liquidation, if the holders of such class or series shall be entitled to the receipt of dividends or of amounts distributable upon dissolution, liquidation or winding up of Freddie Mac, as the case may be, in preference or priority to the holders of shares of the Non-Cumulative Preferred Stock;

(ii) on a parity with shares of the Non-Cumulative Preferred Stock, either as to dividends or distributions upon liquidation, whether or not the dividend rates or amounts, dividend payment dates or redemption or liquidation prices per share, if any, be different from those of the Non-Cumulative Preferred Stock, if the holders of such class or series shall be entitled to the receipt of dividends or of amounts distributable upon dissolution, liquidation or winding up of Freddie Mac, as the case may be, in proportion to their respective dividend rates or amounts or liquidation prices, without preference or priority, one over the other, as between the holders of such class or series and the holders of shares of the Non-Cumulative Preferred Stock; and

(iii) junior to shares of the Non-Cumulative Preferred Stock, either as to dividends or distributions upon liquidation, if such class or series shall be Common Stock, or if the holders of shares of the Non-Cumulative Preferred Stock shall be entitled to receipt of dividends or of amounts distributable upon dissolution, liquidation or winding up of Freddie Mac, as the case may be, in preference or priority to the holders of shares of such class or series.

(b) Freddie Mac and any agent of Freddie Mac may deem and treat the holder of a share or shares of Non-Cumulative Preferred Stock, as shown in Freddie Mac's books and records, as the absolute owner of such share or shares of Non-Cumulative Preferred Stock for the purpose of receiving payment of dividends in respect of such share or shares of Non-Cumulative Preferred Stock and for all other purposes whatsoever, and neither Freddie Mac nor any agent of Freddie Mac shall be affected by any notice to the contrary. All payments made to or upon the order of any such person shall be valid and, to the extent of the sum or sums so paid, effectual to satisfy and discharge liabilities for moneys payable by Freddie Mac on or with respect to any such share or shares of Non-Cumulative Preferred Stock.

(c) The shares of the Non-Cumulative Preferred Stock, when duly issued, shall be fully paid and non-assessable.

(d) The Non-Cumulative Preferred Stock shall be issued, and shall be transferable on the books of Freddie Mac, only in whole shares, it being intended that no fractional interests in shares of Non-Cumulative Preferred Stock shall be created or recognized by Freddie Mac.

(e) For purposes of this Certificate, the term "Freddie Mac" means the Federal Home Loan Mortgage Corporation and any successor thereto by operation of law or by reason of a merger, consolidation or combination.

(f) This Certificate and the respective rights and obligations of Freddie Mac and the holders of the Non-Cumulative Preferred Stock with respect to such Non-Cumulative Preferred Stock shall be construed in accordance with and governed by the laws of the United States, provided that the law of the Commonwealth of Virginia shall serve as the federal rule of decision in all instances except

where such law is inconsistent with Freddie Mac's enabling legislation, its public purposes or any provision of this Certificate.

(g)  Any notice, demand or other communication which by any provision of this Certificate is required or permitted to be given or served to or upon Freddie Mac shall be given or served in writing addressed (unless and until another address shall be published by Freddie Mac) to Freddie Mac, 8200 Jones Branch Drive, McLean, Virginia 22102, Attn: Vice President and Deputy General Counsel — Securities. Such notice, demand or other communication to or upon Freddie Mac shall be deemed to have been sufficiently given or made only upon actual receipt of a writing by Freddie Mac. Any notice, demand or other communication which by any provision of this Certificate is required or permitted to be given or served by Freddie Mac hereunder may be given or served by being deposited first class, postage prepaid, in the United States mail addressed (i) to the holder as such holder's name and address may appear at such time in the books and records of Freddie Mac or (ii) if to a person or entity other than a holder of record of the Non-Cumulative Preferred Stock, to such person or entity at such address as appears to Freddie Mac to be appropriate at such time. Such notice, demand or other communication shall be deemed to have been sufficiently given or made, for all purposes, upon mailing.

(h)  Freddie Mac, by or under the authority of the Board of Directors, may amend, alter, supplement or repeal any provision of this Certificate pursuant to the following terms and conditions:

(i)  Without the consent of the holders of the Non-Cumulative Preferred Stock, Freddie Mac may amend, alter, supplement or repeal any provision of this Certificate to cure any ambiguity, to correct or supplement any provision herein which may be defective or inconsistent with any other provision herein, or to make any other provisions with respect to matters or questions arising under this Certificate, provided that such action shall not materially and adversely affect the interests of the holders of the Non-Cumulative Preferred Stock.

(ii)  The consent of the holders of at least 66 2/3% of all of the shares of the Non-Cumulative Preferred Stock at the time outstanding, given in person or by proxy, either in writing or by a vote at a meeting called for the purpose at which the holders of shares of the Non-Cumulative Preferred Stock shall vote together as a class, shall be necessary for authorizing, effecting or validating the amendment, alteration, supplementation or repeal of the provisions of this Certificate if such amendment, alteration, supplementation or repeal would materially and adversely affect the powers, preferences, rights, privileges, qualifications, limitations, restrictions, terms or conditions of the Non-Cumulative Preferred Stock. The creation and issuance of any other class or series of stock, or the issuance of additional shares of any existing class or series of stock of Freddie Mac (including the Non-Cumulative Preferred Stock), whether ranking prior to, on a parity with or junior to the Non-Cumulative Preferred Stock, shall not be deemed to constitute such an amendment, alteration, supplementation or repeal.

(iii)  Holders of the Non-Cumulative Preferred Stock shall be entitled to one vote per share on matters on which their consent is required pursuant to subparagraph (ii) of this paragraph (h). In connection with any meeting of such holders, the Board of Directors shall fix a record date, neither earlier than 60 days nor later than 10 days prior to the date of such meeting, and holders of record of shares of the Non-Cumulative Preferred Stock on such record date shall be entitled to notice of and to vote at any such meeting and any adjournment.

The Board of Directors, or such person or persons as it may designate, may establish reasonable rules and procedures as to the solicitation of the consent of holders of the Non-Cumulative Preferred Stock at any such meeting or otherwise, which rules and procedures shall conform to the requirements of any national securities exchange on which the Non-Cumulative Preferred Stock may be listed at such time.

**(i)  RECEIPT AND ACCEPTANCE OF A SHARE OR SHARES OF THE NON-CUMU-LATIVE PREFERRED STOCK BY OR ON BEHALF OF A HOLDER SHALL CONSTITUTE THE UNCONDITIONAL ACCEPTANCE BY THE HOLDER (AND ALL OTHERS HAVING BENEFICIAL OWNERSHIP OF SUCH SHARE OR SHARES) OF ALL OF THE TERMS AND PROVISIONS OF THIS CERTIFICATE. NO SIGNATURE OR OTHER FURTHER MANIFESTATION OF ASSENT TO THE TERMS AND PROVISIONS OF THIS CERTIFI-CATE SHALL BE NECESSARY FOR ITS OPERATION OR EFFECT AS BETWEEN FREDDIE MAC AND THE HOLDER (AND ALL SUCH OTHERS).**

IN WITNESS WHEREOF, I have hereunto set my hand and the seal of Freddie Mac this 4th day of December, 2007.

**[Seal]**

_____

Kevin I. MacKenzie, *Assistant Secretary*

If you intend to purchase the Preferred Stock, you should rely only on the information in this Offering Circular, including the information in the documents that we have incorporated by reference herein. We have not authorized anyone to provide you with different information.

This Offering Circular and the incorporated documents may not be correct after their dates.

We are not offering the Preferred Stock in any jurisdiction that prohibits its offer.

## TABLE OF CONTENTS

| Description | Page |
| --- | --- |
| Additional Information | 2 |
| Summary | 3 |
| Forward-Looking Statements | 5 |
| Freddie Mac | 8 |
| Risk Factors | 9 |
| Use of Proceeds | 16 |
| Capitalization | 16 |
| Selected Financial Data and Other Operating Measures | 18 |
| Recent Developments | 19 |
| Description of the Preferred Stock | 20 |
| Regulatory Capital | 25 |
| Certain U.S. Federal Income Tax Consequences | 28 |
| Legal Investment Considerations | 32 |
| Underwriting | 33 |
| Ratings | 37 |
| Independent Accountants | 37 |
| Legal Matters | 37 |
| Appendix A — Certificate of Designation | A-1 |

**240,000,000 Shares**

# Freddie Mac

**Fixed-to-Floating Rate Non-Cumulative Perpetual Preferred Stock (Liquidation Preference $25.00 Per Share)**



Lehman Brothers

Goldman, Sachs & Co.

Bear, Stearns & Co. Inc.

Banc of America Securities LLC
Citi
Credit Suisse
Deutsche Bank Securities
Morgan Stanley
UBS Investment Bank

**November 29, 2007**