**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FAIRHOLME FUNDS, INC., *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 13-cv-1053-RCL |
| FEDERAL HOUSING FINANCE AGENCY, *et al.*, | |
| Defendants. | |
| ARROWOOD INDEMNITY COMPANY, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 13-cv-1439-RCL |
| FEDERAL NATIONAL MORTGAGE ASSOCIATION, *et al.*, | |
| Defendants. | |

**SUPPLEMENTAL MEMORANDUM OF LAW OF PLAINTIFFS FAIRHOLME FUNDS, INC., FAIRHOLME FUND, BERKLEY INSURANCE COMPANY, ACADIA INSURANCE COMPANY, ADMIRAL INDEMNITY COMPANY, ADMIRAL INSURANCE COMPANY, BERKLEY REGIONAL INSURANCE COMPANY, CAROLINA CASUALTY INSURANCE COMPANY, MIDWEST EMPLOYERS CASUALTY INSURANCE COMPANY, NAUTILUS INSURANCE COMPANY, PREFERRED EMPLOYERS INSURANCE COMPANY, ARROWOOD INDEMNITY COMPANY, ARROWOOD SURPLUS LINES INSURANCE COMPANY, AND FINANCIAL STRUCTURES LIMITED IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND MOTIONS FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT ON ADMINISTRATIVE PROCEDURE ACT CLAIMS**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 4

I.      Defendants' Decision To Adopt the Sweep Amendment Violates the APA ...................... 4

      A.      Defendants' Sole Justification for the Sweep Amendment Is Wholly Inadequate. ................................................................................................... 4

      B.      Directing a Company To Disgorge Its Entire Net Worth Every Quarter Is the Antithesis of Placing It in a "Sound and Solvent Condition." ................................................................................................... 5

      C.      FHFA Violated the APA by Acting at Treasury's Direction. ................................. 7

II.     FHFA's Motion To Dismiss Plaintiffs' Fiduciary Duty Claims Lacks Merit ...................... 10

      A.      Plaintiffs' Fiduciary Duty Claims Are Not Barred by HERA's Subrogation Provision. .................................................................................... 11

      B.      Plaintiffs' Fiduciary Duty Claims Are Not Preempted. ....................................... 16

III.    The Complaints Properly and Adequately Plead Claims for Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing. ................................................................................................................ 25

      A.      HERA Does Not Deprive Plaintiffs of Their Contractual Rights. ......................... 26

      B.      The Sweep Amendment Breaches Plaintiffs' Express and Implied Contractual Right to Dividends and a Liquidation Preference. ............................ 28

      C.      The Sweep Amendment Grants the Government Stock Residual Rights that Are a Characteristic of Common Stock, but Improperly Provides for the Distribution of Such Residual Rights Ahead of Distribution to Preferred Shareholders. ................................................................ 30

      D.      FHFA Breached Plaintiffs' Contractual Voting Rights. ....................................... 32

E.      Plaintiffs Have Stated a Claim for Breach of the Implied Duty of Good Faith and Fair Dealing...............................................................................37

F.      Plaintiffs' Suit Is Not Barred Because the Companies Have Not Declared a Dividend on Plaintiffs' Stock. ...........................................................44

CONCLUSION.............................................................................................................................45

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*A & E Supply Co. v. Nationwide Mut. Fire Ins. Co.*, 798 F.2d 669 (4th Cir. 1986)......................25

*Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126 (Del. Ch. 2009)..........................37, 41, 43

*Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020 (Del. Ch. 2006)............35, 36, 43

*Amazon.com, Inc. v. Hoffman*, No. 2239, 2009 WL 2031789 (Del. Ch. June 30, 2009) ..................................................................................................................36

*Amirsaleh v. Board of Trade of N.Y., Inc.*, No. 2822, 2008 WL 4182998 (Del. Ch. Sept. 11, 2008) ......................................................................................37, 43

*Blue Chip Capital Fund II Ltd. P'ship v. Tubergen*, 906 A.2d 827 (Del. Ch. 2006) ...................11

*Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988) ..............................................................17, 22

*Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618 (Del. Ch. 2013) .........................................14

*Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000) ........................................19, 23

*Delta Sav. Bank v. United States*, 265 F.3d 1017 (9th Cir. 2001) ................................................15

*Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434 (Del. 2005)...................................25, 37, 44

*E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436 (Del. 1996) ..............................37, 41

*Eisenberg v. Chicago Milwaukee Corp.*, 537 A.2d  1051 (Del. Ch. 1987) ...................................11

*Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443 (E.D. Va. 2009) .................................26

*Esther Sadowsky Testamentary Trust v. Syron*, 639 F. Supp. 2d 347 (S.D.N.Y. 2009) ......................................................................................................16, 22, 26

*First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279 (Fed. Cir. 1999) ..............................................................................................12, 14, 15

*Gatz v. Ponsoldt*, No. 174, 2004 WL 3029868 (Del. Ch. Nov. 5, 2004)................................13, 14

*Gentile v. Rossette*, 906 A.2d 91 (Del. 2006) ....................................................................12, 13, 14

*Gibralter Fin. Corp. v. Federal Home Loan Bank Bd.*, No. 89-3489, 1990 WL 394298 (C.D. Cal. June 15, 1990) .............................................................20, 21, 24

*Glinert v. Wickes Companies*, 16 Del. J. Corp. L. 764, No. 10407, 1990 WL 34703 (Del. Ch. 1990) ...............................................................................................42

*Grayson v. Imagination Station, Inc.*, No. 5051, 2010 WL 3221951 (Del. Ch. Aug. 16, 2010) ..................................................................................................13

*Grimes v. Donald*, 673 A.2d 1207 (Del. 1996), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) ..........................................................13

*Historic Green Springs, Inc. v. Brandy Farm, Ltd.*, 32 Va. Cir. 98 (1993)....................25, 40, 42

*In re Delphi Fin. Grp. S'holder Litig.*, No. 7144, 2012 WL 729232 (Del. Ch. March 6, 2012)...........................................................................................38, 39

*In re Fed. Home Loan Mortg. Corp. Derivative Litig.*, 643 F. Supp. 2d 790 (E.D. Va. 2009) ................................................................................................................16

*In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, ERISA Litig.*, 629 F. Supp. 2d 1 (D.D.C. 2009) ..............................................................................................15, 16

*In re Franklin Nat'l Bank Sec. Litig.*, 445 F. Supp. 723 (E.D.N.Y. 1978), supplemented by 449 F. Supp. 574 ..........................................................................21

*In re Louisville Gas & Elec. Co.*, 77 F. Supp. 176 (D. Del. 1948) ........................31

*Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377 (Del. Ch. 1999) .................11

*Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584 (Del. Ch. 1986) .........................11

*Kellmer v. Raines*, 674 F.3d 848 (D.C. Cir. 2012) ...........................14, 15, 26

*Kuroda v. SPJS Holdings, LLC*, 971 A.2d 872 (Del. Ch. 2009).................................26

*Len v. Fuller*, No. 15352, 1997 WL 305833 (Del. Ch. May 30, 1997) .......................31

*MCG Capital Corp. v. Maginn*, No. 4521, 2010 WL 1782271 (Del. Ch. May 5, 2010) .......................................................................................................11

*McKinley v. Federal Hous. Fin. Agency*, No. 10-cv-1165, D.E. 18-1 (D.D.C. Sept. 16, 2011) .................................................................................................6, 27

*NAMA Holdings, LLC v. World Market Ctr. Venture, LLC*, 948 A.2d 411 (Del. Ch. 2007).......................................................................................................34

*Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153 (Del. 2010) .......................................36

*Pareto v. FDIC*, 139 F.3d 696 (9th Cir. 1998) ........................................................26

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Raines*, 534 F.3d 779 (D.C. Cir. 2008) ............................................................................................20

*Plaintiffs in All Winstar-Related Cases v. United States*, 44 Fed. Cl. 3 (1999)......................12, 27

*Quadrangle Offshore (Cayman), LLC v. Kenetech Corp.*, No. 16362, 1998 WL 778359 (Del. Ch. Oct. 21, 1998).................................................................41, 42, 45

*QVT Fund LP v. Eurohypo Capital Funding LLC I*, No. 5881, 2011 WL 2672092 (Del. Ch. July 8, 2011)...................................................31, 40, 41, 44, 45

*San Antonio Fire & Police Pension Fund v. Bradbury*, No. 4446, 2010 WL 4273171 (Del. Ch. Oct. 28, 2010).........................................................................13

*Shenandoah Life Ins. Co. v. Valero Energy Corp.*, 14 DEL. J. CORP. L. 396 (Del. Ch. 1988)...................................................................................................36, 43

*Suess v. FDIC*, 770 F. Supp. 2d 32 (D.D.C. 2011) .................................................20, 24

*Sunrise Continuing Care, LLC v. Wright*, 671 S.E.2d 132 (Va. 2009) .......................25

*Telvest, Inc. v. Olson*, 1979 WL 1759 (Del. Ch. 1979) .............................................31

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004)......................12, 13, 14

iv

*Virginia Vermiculite, Ltd. v. W.R. Grace & Co.–Conn.*, 156 F.3d 535 (4th Cir. 1998) ...............................................................................................37, 39, 40, 43

*VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606 (Del. 2003) .........................................25

*Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788 (D.C. Cir. 1984) ...............................10

*Wilson v. Holyfield*, 313 S.E.2d 396 (Va. 1984).........................................................................35

*Winn v. Aleda Constr. Co.*, 315 S.E.2d 193 (Va. 1984) .............................................................34

## Statutes and Regulations

12 U.S.C. § 1451 ........................................................................................................................19

12 U.S.C. § 1451(c) ...................................................................................................................17

12 U.S.C. § 1452(a)(1)..........................................................................................................17, 19

12 U.S.C. § 1723(b) ..............................................................................................................17, 19

12 U.S.C. § 1821 ........................................................................................................................21

12 U.S.C. § 1821(d)(2)(A)(i) .................................................................................................14, 26

12 U.S.C. § 1823(d)(3)(A) ..........................................................................................................21

12 U.S.C. § 1823(d)(3)(C) ..........................................................................................................21

12 U.S.C. § 4617(a)(7)..................................................................................................................7

12 U.S.C. § 4617(b)(2)(A)...................................................................................................5, 11, 27

12 U.S.C. § 4617(b)(2)(D)......................................................................................................5, 23

12 U.S.C. § 4617(b)(2)(J)(ii) .......................................................................................................22

12 U.S.C. § 4617(b)(11)(E) .........................................................................................................23

12 U.S.C. § 4617(c)(1)(D) ...........................................................................................................27

12 C.F.R. § 1237.9(a)(4)..............................................................................................................27

12 C.F.R. § 1710.10 ...............................................................................................................18, 19

12 C.F.R. § 1710.10(a)................................................................................................................18

12 C.F.R. § 1710.10(b)(1)............................................................................................................18

Office of Federal Housing Enterprise Oversight, *Corporate Governance*, 67 Fed. Reg. 38,361 (Final Rule, June 4, 2002) ...................................................................18, 19

## Other

Black's Law Dictionary (9th ed. 2009)........................................................................32

Edward J. DeMarco, Acting Director, FHFA, Remarks at the American Mortgage Conference: The Conservatorships of Fannie Mae and Freddie Mac (Sept. 19, 2011) ...........................................................................................................................6

Edward J. DeMarco, Acting Director, FHFA, Remarks: Getting Our House in Order (Oct. 24, 2013) .................................................................................6

Fannie Mae, 2011 Annual Report (Form 10-K) (Feb. 29, 2012) ....................................9

Fannie Mae, 2012 Annual Report (Form 10-K) (Apr. 2, 2013) ......................................7

Fannie Mae, Second Quarter Report (Form 10-Q) (Aug. 8, 2012) ................................9

Fannie Mae, 2013 Annual Report (Form 10-K) (Feb. 21, 2014)....................................7

Fannie Mae Bylaws, Corporate Governance Practices & Procedures, Art. 1, § 1.05, *available at* www.fanniemae.com/resources/file/aboutus/pdf/bylaws.pdf ..............19, 20

Fannie Mae Bylaws, Corporate Governance Practices & Procedures, Art. 6, § 6.02(a)(i) ...................................................................................................20

Fannie Mae Bylaws, Corporate Governance Practices & Procedures, Art. 4, § 4.18....................20

Fannie Mae, Cert. Design. of Series P Preferred Stock, § 2(a)...............................................28, 29

Fannie Mae, Cert. Design. of Series P Preferred Stock, § 2(b) ...............................................30, 44

Fannie Mae, Cert. Design. of Series P Preferred Stock, § 4(a).....................................................28

Fannie Mae, Cert. Design. of Series P Preferred Stock, § 7(b) ........................................29, 32, 33

Fannie Mae, Cert. Design. of Series P Preferred Stock, § 7(c)....................................................32

FEDERAL HOUSING FINANCE AGENCY, 2008 ANNUAL REPORT TO CONGRESS (May 18, 2009) ....................................................................................................6

FEDERAL HOUSING FINANCE AGENCY, 2009 ANNUAL REPORT TO CONGRESS (May 25, 2010) ....................................................................................................6

FEDERAL HOUSING FINANCE AGENCY, A STRATEGIC PLAN FOR ENTERPRISE CONSERVATORSHIP 7 (Feb. 21, 2012) ...........................................................................6

Freddie Mac, 2010 Annual Report (Form 10-K) (Feb 24, 2011) ..................................4

Freddie Mac, 2012 Annual Report (Form 10-K) (Feb. 28, 2013) ..................................7

Freddie Mac, Second Quarter Report (Form 10-Q) (Aug. 7, 2012) ..............................9

Freddie Mac, 2013 Annual Report (Form 10-K) (Feb. 27, 2014) ..................................7

Freddie Mac Bylaws, Corporate Governance Practices & Procedures, Art. 11, § 11.3, *available at* www.freddiemac.com/governance/pdf/bylaws_1009.pdf ........................20

Press Release, Dep't of Treasury, *Treasury Department Announces Further Steps To Expedite Wind Down of Fannie Mae and Freddie Mac* (Aug. 17, 2012), www.treasury.gov/press-center/press-releases/Pages/tg1684.aspx .........................2, 8, 31, 32

Press Release, Federal Housing Finance Agency, *FHFA Announces $1.25 Billion Settlement with Morgan Stanley* (Feb. 7, 2014), www.fhfa.gov/webfiles/26029 /MorganStanleySettlement020714F.pdf ..........................................................................9, 10

Press Release, Federal Housing Finance Agency, *FHFA Recovers Nearly $8 Billion for Taxpayers in 2013* (Jan. 2, 2014), www.fhfa.gov/webfiles/25926/ FHFARecoveryLitigation010214Final.pdf..............................................................................9

Thomas H. Stanton, *Government-Sponsored Enterprises: Mercantilist Companies in the Modern World* (2002), *available at* http://thomas-stanton.com/wp/wp-content/uploads/2012/06/GSEs-mercantilist-companies-AEI-press-2002.pdf.......................18

## INTRODUCTION

The question in this case is whether two federal agencies may collude to expropriate for the Federal Government the entire economic value of publicly traded, investor-owned companies generating hundreds of billions of dollars in profits.  The central purpose of this separate brief is to demonstrate that, quite apart from the APA violation detailed at length in our principal brief on that subject, APA Br. (March 21, 2014), the Sweep Amendment also flatly violated the fiduciary and contract duties owed to Plaintiffs under state law.  We also offer here some supplemental points on the APA violation that we believe warrant the Court's consideration.

At bottom, all of Defendants' violations of law, both federal and state, flow from the Government's determination in 2012, just as Fannie and Freddie were on the verge of generating record-breaking profits, that its original deal entitling it to be fully repaid its investment with interest, and (after payment of dividends to the preferred shareholders) also be paid 79.9% of those profits, was not good enough—it wanted *all* the profits.  In private moments, Treasury has been candid about its priorities in dealing with Fannie and Freddie, acknowledging in internal documents "the Administration's commitment to ensure existing common equity holders *will not have access to any positive earnings* from the [Companies] in the future."  T0202 (emphasis added).  For its part, FHFA has since at least 2011 publicly said that it is managing its conservatorships of Fannie and Freddie for the benefit of taxpayers without regard to the interests of other shareholders.  *See* FHFA2394; FHFA2688.  In view of such statements, the true purpose behind the Sweep Amendment—which by the end of the month will have resulted in a return of nearly $203 billion on Treasury's $187 billion investment—is perfectly apparent.

But rather than owning up to the obvious motive for their actions, Treasury and FHFA insist that the Sweep Amendment was required to arrest a "downward spiral" caused by the Com-

panies drawing from (and depleting) Treasury's funding commitment to pay dividends to Treasury under the Government Stock's original dividend structure.  But this explanation is plainly pretextual.  First, it was clear when the Sweep was announced in August of 2012 that the Companies had already returned to profitability and that, far from needing additional financing, they would be able to pay Treasury's dividend in cash for the foreseeable future.  The Companies' potential to generate enormous income was obvious to anyone who examined their balance sheets in the summer of 2012, and, as the Companies' conservator and controlling shareholder, FHFA and Treasury were no doubt among the first to understand the breathtaking profits the Companies were soon to report.

Defendants' explanation is also belied by the fact that the original terms of the Government Stock specifically provide that the Companies are not required to pay Treasury a *cash* dividend *at all*, much less if doing so required a draw on Treasury's funding commitment.  Rather, the Companies have at all times had the discretion to pay Treasury's dividends "in kind"—with additional senior preferred stock—by increasing the Government Stock liquidation preference. The only logical explanation for the Sweep Amendment, then, is that it (in Treasury's words) ensures that Fannie and Freddie "will be wound down" and that, in the meantime, "every dollar of earnings that Fannie Mae and Freddie Mac generate will be used to benefit taxpayers."  Press Release, Dep't of Treasury, *Treasury Department Announces Further Steps To Expedite Wind Down of Fannie Mae and Freddie Mac* (Aug. 17, 2012) [hereinafter "Treasury Press Release of Aug. 17, 2012"], www.treasury.gov/press-center/press-releases/Pages/tg1684.aspx.  Defendants' proffered rationale for the Sweep Amendment thus rests on two demonstrably false premises: (1) that the Companies could not afford to pay cash dividends on the Government Stock without threatening to deplete Treasury's funding commitment, and (2) that they were required to pay

cash dividends in the first place.  It would be arbitrary and capricious for an administrative agency to reach either of those conclusions, and Defendants' "downward spiral" theory depends on both.

But quite apart from the requirements of the APA, Defendants' decision to transfer to the Federal Government the Companies' entire net worth in perpetuity is a flagrant violation of both FHFA's fiduciary duties to the Companies' private shareholders and those shareholders' contract rights.  Amidst hundreds of pages of briefing, the Court should not lose sight of the fact that this is a simple case when the Sweep Amendment is considered in light of every manager's fiduciary duty of loyalty.  Just as the Companies returned to profitability, their conservator (an agency of the Federal Government) agreed to transfer to the controlling shareholder (another agency of the Federal Government) the entire economic value of all other shareholders' interests.  Such self-dealing is a quintessential violation of the fiduciary duty of loyalty.  The merits of Plaintiffs' contract claims are no less clear: they and other preferred shareholders are entitled to contractually-specified dividend rights and a liquidation preference.  The Federal Government's agreement with itself unilaterally extinguished those rights.  Thus, whether viewed through the lens of administrative, corporate, or contract law, there can be only one conclusion: the Sweep Amendment manifests a willful disregard for the law by federal officials and cannot be sustained.

As troubling as the Sweep Amendment's patent illegality is the Government's guile in imposing it on an unsuspecting investing public.  Contrast the private, undisclosed decision of Treasury officials, quoted above, to ensure that the Companies' stockholders are deprived of "any positive earnings," with the Government's public assurances when Fannie and Freddie were placed in "temporary" conservatorship by FHFA in September 2008.  The purpose of the conservatorship, FHFA announced, was "to put the Compan[ies] in a sound and solvent condition,"

3

FHFA0027, with "the objective of returning the entities to normal business operations,"

FHFA0015–16.  And FHFA specifically vowed that the property rights of existing stockholders

would be preserved.  Here is what the agency said: "During the conservatorship, the company's

stock will continue to trade. . . . Stockholders will continue to retain all rights in the stock's fi-

nancial worth . . . ."  FHFA0028.  Plaintiffs and countless other stockholders took the govern-

ment at its word.

 There is no precedent for something like this, at least in America, and the question here is

whether our law will allow it to stand.

## ARGUMENT

## I.     Defendants' Decision To Adopt the Sweep Amendment Violates the APA

 Plaintiffs' principal argument for why they are entitled to summary judgment on their

APA claims is presented in a separate filing on that subject.  APA Br. (March 21, 2014).  We

offer here three points that further demonstrate Plaintiffs' entitlement to summary judgment on

their APA claims.

### A.     Defendants' Sole Justification for the Sweep Amendment Is Wholly Inade-
quate.

 Defendants' only explanation for why they adopted the Sweep Amendment is that it was

necessary to "end[ ] the practice of drawing down the Treasury commitment to pay dividends to

Treasury."  FHFA Br. 4; *see also id.*, at 15–17, 23–26, 65–70; Treas. Br. 5, 13, 16–17, 24, 50–

55.  But as explained above, thanks to the payment in kind provision of the Purchase Agree-

ments, the Companies were under no obligation to declare cash dividends on the Government

Stock in the first place.  *See supra* 2; *see also* APA Br. 9, 66–67; FHFA1866 (Freddie, 2010 An-

nual Report (Form 10-K) at 42 (Feb. 24, 2011)) ("The liquidation preference will increase . . . if

we do not pay dividends owed on the senior preferred stock in cash.").  FHFA has dismissed

4

Plaintiffs' invocation of that provision as "pure second-guessing of the *means* by which the Conservator took action to address a problem," FHFA Opp. 23 n.12, and Treasury observes that it need not consider "every alternative device and thought conceivable by the mind of man," Treas. Br. 54 (quoting *Laclede Gas Co. v. FERC*, 873 F.2d 1494, 1498 (D.C. Cir. 1989)).  Such answers largely misapprehend the payment in kind provision's significance.  To be sure, paying Treasury's dividend in kind was an obvious and superior alternative to the Sweep Amendment that it was arbitrary and capricious for Defendants to ignore.  *See* APA Br. 79–82.  But the more fundamental point is that the "problem" Defendants sought to address through the Sweep Amendment was not a problem they actually faced—it was a convenient fiction invented to rationalize their nationalization of two of the most profitable companies in our nation.

Indeed, even if there were a concern about a "downward spiral" threatening the Companies' long-term financial health at all—and there are reasons for serious doubt on that score, as Plaintiffs' separate APA Brief explains, APA Br. 67–68, 75–79—the threat was entirely of Defendants' own making. The only problem was FHFA's inexplicable policy of ordering the Companies to declare cash dividends in excess of their net worth.  To avert further such unnecessary draws on Treasury's funding commitment, FHFA needed only change its dividend policy, something that the original terms of the Purchase Agreement expressly authorized it to do.

## B.  Directing a Company To Disgorge Its Entire Net Worth Every Quarter Is the Antithesis of Placing It in a "Sound and Solvent Condition."

HERA requires FHFA to operate the conservatorships so as to place the Companies "in a sound and solvent condition."  12 U.S.C. § 4617(b)(2)(D).  Consistent with that statutory charge, FHFA explained shortly after the conservatorships were announced that the purpose of the con-

servatorship is "to keep the Compan[ies] in a safe and solvent financial condition."  FHFA0026.

Over the years, the agency has made numerous statements to similar effect.[1]

Yet despite its frequent acknowledgements of its obligation to see that the Companies

remain "sound and solvent," FHFA repudiated that obligation when it agreed to the Sweep

Amendment.  At the core of American regulation of financial institutions are capital require-

ments, with capital defined as the excess of assets over liabilities.  Such capital serves as a buffer

against the inevitable vicissitudes of the economic cycle that affect all financial institutions.  In-

stitutions with sufficient capital are deemed safe, and those without capital are deemed unsound.

The Sweep Amendment condemns the Companies into the ranks of the undercapitalized on a

---

[1] An FHFA internal memorandum written shortly before the conservatorships were im-
posed explains that the "[s]tatutory [p]urpose" of conservatorship is to give the agency "[b]road
authority . . . to (i) take any actions deemed necessary to put long term structural and operational
improvements into place and (ii) carry on the business of the entity and preserve and conserve its
assets and property."  *See* Joint Status Report, Attachment A at 2, *McKinley v. FHFA*, No. 10-cv-
1165 (D.D.C. Sept. 16, 2011).  *See also, e.g.*, FHFA0770 (FHFA, 2008 ANNUAL REPORT TO
CONGRESS 79 (May 18, 2009)) ("Conservatorship is a statutory process designed to restore safety
and soundness while carrying on the business of a regulated entity and preserving and conserving
its assets and property."); Edward J. DeMarco, Acting Director, FHFA, Remarks: Getting Our
House in Order at 5 (Oct. 24, 2013) ("As conservator, FHFA is responsible for taking actions
necessary to put the Enterprises in a sound and solvent condition, and preserving and conserving
the assets of the Enterprises."); FHFA2394 (Edward J. DeMarco, Acting Director, FHFA, Re-
marks at the American Mortgage Conference: The Conservatorships of Fannie Mae and Freddie
Mac at 2 (Sept. 19, 2011)) ("FHFA has a statutory responsibility as conservator of the Enterpris-
es to 'take such action as may be: necessary to put the regulated entity in a sound and solvent
condition; and appropriate to carry on the business of the regulated entity and preserve and con-
serve the assets and property of the regulated entity.' "); FHFA1306 (FHFA, 2009 ANNUAL RE-
PORT TO CONGRESS 99 (May 25, 2010)) ("The statutory role of FHFA as conservator requires
FHFA to take actions to preserve and conserve the assets of the Enterprises and restore them to
safety and soundness."); FHFA2688 (FHFA, A STRATEGIC PLAN FOR ENTERPRISE CONSERVA-
TORSHIP 7 (Feb. 21, 2012)) ("FHFA has a statutory responsibility to ensure each Enterprise 'op-
erates in a safe and sound manner.' ").  *Cf.* T0178 (Memo from L. Sachs, Counselor to the Secre-
tary, to T. Geithner, Secretary of Treasury at 4 (Dec. 22, 2009)) ("The GSEs operate under a
strict conservatorship with FHFA responsible for supervising the companies with a 'preservation
of assets' mandate.").

permanent basis.  It is difficult to imagine a regulatory action more calculated to undermine the "soundness and solvency" of a financial institution than the Sweep Amendment.

As a result of the Sweep Amendment, the Companies are today just one unprofitable quarter away from insolvency despite generating the largest net income in their history.  That income—$132.7 billion in 2013 alone—would have been more than enough to ensure the Companies' financial health for decades to come, even under pessimistic assumptions.  *See* Fannie, 2013 Annual Report (Form 10-K) at 2 (Feb. 21, 2014) (reporting 2013 net income of $84.0 billion); Freddie, 2013 Annual Report (Form 10-K) at 1 (Feb. 27, 2014) (reporting 2013 net income of $48.7 billion); *see also* Fannie, 2012 Annual Report (Form 10-K) at 1 (Apr. 2, 2013) (reporting net income of $17.2 billion); Freddie, 2012 Annual Report (Form 10-K) at 3 (Feb. 28, 2013) (reporting net income of $11.0 billion).  That FHFA chose to forego that financial cushion in favor of a government bonanza representing just under one percent of the Nation's annual gross domestic product is a flagrant violation of the agency's duties as conservator.

## C.    FHFA Violated the APA by Acting at Treasury's Direction.

To ensure that other federal agencies could not seize control of the Companies and operate them for their own purposes, Congress mandated that when FHFA acts as conservator it "shall not be subject to the direction or supervision of any other agency of the United States."  12 U.S.C. § 4617(a)(7).  Plaintiffs allege that FHFA violated that provision of HERA by agreeing to the Sweep Amendment at Treasury's direction.  *See* Fairholme Compl. ¶ 92.  Despite that well-pleaded allegation, neither Defendant offered any response.  Unlike Defendants, the Court cannot simply ignore the possibility that Treasury officials occupied seats on both sides of the table when they "negotiated" the Sweep Amendment.

Tellingly, even the woefully inadequate "Document Compilation" that FHFA cannot bring itself to call an administrative record strongly supports Plaintiffs' contention that FHFA failed to act independently when it agreed to the Sweep Amendment.  Nothing in that compilation indicates that FHFA undertook its own analysis of the probable effects of the Sweep Amendment or attempted to negotiate a more favorable deal for the Companies.  Indeed, the near-total absence of internal FHFA documents included in its Document Compilation suggests that the agency did not give much thought to the Sweep Amendment at all.  If it had, it no doubt would have realized that the "problem" Treasury hypothesized as a justification for the Sweep Amendment—the need to end the practice of drawing on the government's funding commitment to pay dividends on Government Stock—was not a problem at all because the size of the commitment could have been readily preserved by making dividend payments in kind rather than cash.  FHFA's evident failure to grasp this rudimentary fact strongly suggests that it did not consider itself at liberty to reject Treasury's proposal in any event.

Treasury's Administrative Record points to the same conclusion.  Treasury officials invented the net-worth sweep concept, decided to adopt it without any apparent input from FHFA, and publicly took credit when the Sweep Amendment was announced.  *See* T3775–3802, 3833–3862, 3883–3894, 3895–3903 (Treasury presentations); Treasury Press Release of Aug. 17, 2012.  The record indicates that the Sweep Amendment was *Treasury's* "[p]roposed solution" to the Companies' supposed financial problems.  *See* T3901; *cf.* T0202 (acknowledging "the Administration's commitment to ensure existing common equity holders will not have access to any positive earnings from the [Companies] in the future").  Indeed, apart from Acting Director De-Marco's signature on the agreements that consummated the Sweep Amendment and the revelation that FHFA turned over models that Treasury demanded, *see* T3836, 3889, 3900, 4341,

Treasury's record gives no indication that FHFA participated in deliberations over the Sweep Amendment in any way. The only reasonable inference is that Treasury told FHFA to agree to the Sweep Amendment and that FHFA did so without exercising its independent judgment.

But perhaps the strongest evidence that FHFA acted at Treasury's behest when it agreed to the Sweep Amendment is the Sweep Amendment itself: the amendment transfers to Treasury, in perpetuity, every penny that the Companies earn while leaving the principal of the Companies' obligation to Treasury untouched; it was entered into at the precise moment when the Companies were returning to profitability; and it provides the Companies with no relief from their obligation to pay cash dividends that they did not already enjoy. FHFA would no doubt have understood all this had it exercised its independent judgment, for it should have been clear that the recognition of deferred tax assets,[2] the release of loan loss reserves,[3] and proceeds from legal settlements[4] would all soon make substantial contributions to the Companies' net worth.

---

[2] Deferred tax assets, such as net operating loss carryforwards, reflect the present value of a company's ability to avoid paying taxes on future income. Under standard financial accounting rules, deferred tax assets only contribute to a company's net worth if, in the judgment of management, it is more likely than not that the company will have enough taxable income to be able to use them. For that reason, deferred tax assets are written down (reducing net worth) if management concludes that they will probably not be used and written back up (increasing net worth) if management concludes that they will probably be used after all. *See* FHFA3737 (Freddie, Second Quarter Report (Form 10-Q) at 149 (Aug. 7, 2012)) (reporting deferred tax assets available but not included in net worth of $34.7 billion); T2705 (Fannie, 2011 Annual Report (Form 10-K) at F-76 (Feb. 29, 2012)) (reporting deferred tax assets available but not included in net worth of $64.1 billion).

[3] Loan loss reserves are accounting entries companies make to cover estimated losses due to defaults on mortgages and other loans. Making these entries reduces a company's net worth and reversing them increases it. *See* FHFA3930 (Fannie, Second Quarter Report (Form 10-Q) at 85 (Aug. 8, 2012)) (reporting loan loss reserve reducing net worth by $63.4 billion); FHFA3632 (Freddie, 2012 Second Quarter Report at 44) (reporting loan loss reserve reducing net worth by $35.8 billion)

[4] *See* Press Release, FHFA, *FHFA Recovers Nearly $8 Billion for Taxpayers in 2013* (Jan. 2, 2014), www.fhfa.gov/webfiles/25926/FHFARecoveryLitigation010214Final.pdf; Press Release, FHFA, *FHFA Announces $1.25 Billion Settlement with Morgan Stanley* (Feb. 7, 2014), www.fhfa.gov/webfiles/26029/MorganStanleySettlement020714F.pdf.

And that is to say nothing of the real and very substantial profits the Companies were poised to earn from their core businesses of guaranteeing and securitizing mortgages as the housing market recovered.  Only a conservator that has given up the will to exercise its independent judgment could agree to forfeit so much.[5]

## II.      FHFA's Motion To Dismiss Plaintiffs' Fiduciary Duty Claims Lacks Merit.

Plaintiffs allege that FHFA engaged in egregious self-dealing when it adopted the Sweep Amendment.  Far from acting in the interest of Fannie, Freddie, and all of their shareholders, FHFA, an agency of the Federal Government, colluded with Treasury, another agency of the Federal Government, to sweep *all* of Fannie's and Freddie's profits to Treasury in perpetuity— no matter how vastly those profits exceed the Government's investment.

FHFA does not seriously dispute that such wanton self-dealing would violate the fiduciary duty of loyalty under the law of Delaware and Virginia if the duty applies to FHFA's operation of Fannie and Freddie and is enforceable by Plaintiffs.  Nor could it.  Siphoning off a corporation's profits for one's own benefit is the consummate breach of fiduciary duty.  And by February 2012, FHFA had publicly acknowledged that it was operating Fannie and Freddie for the exclusive benefit of "taxpayers," without any regard for the Companies' other shareholders.  *See* FHFA2688 (FHFA Strategic Plan).

---

[5] Even the incomplete record Defendants submitted provides ample basis for the Court to conclude that Defendants violated the APA when they imposed the Sweep Amendment.  But if the Court disagrees, at a minimum Plaintiffs have demonstrated their entitlement to supplementation of the record and limited discovery under Rules 12(d) and 56(d).  *See* Plaintiffs' Memorandum in Support of Motion for Supplementation of the Administrative Records and Limited Discovery, at 14–27 (Feb. 12, 2014), Doc. 32.  The Court cannot grant summary judgment for the Defendants without first ensuring that the complete administrative record has been disclosed.  *See Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984).

FHFA argues, however, that Plaintiffs' suit is barred by HERA's subrogation provision and that Plaintiffs' fiduciary duty claims are preempted by federal law.[6]  As demonstrated below, these arguments lack merit and provide no basis for dismissing Plaintiffs' fiduciary duty claims.

### A.  Plaintiffs' Fiduciary Duty Claims Are Not Barred by HERA's Subrogation Provision.

FHFA first argues that 12 U.S.C. § 4617(b)(2)(A)(i)—under which FHFA, when it places an entity in conservatorship or receivership, steps into the shoes "of the regulated entity, and of any stockholder, officer, or director of such regulated entity"—bars any claim Fannie and Fred-

---

[6] In a footnote, FHFA cites Delaware cases for the proposition that "holders of preferred stock, such as Fairholme, cannot assert breach of fiduciary duty claims."  FHFA Br.47, n.27.  Delaware law is clear, however, that those who control a corporation owe fiduciary duties to preferred shareholders.  *See, e.g.*, *Eisenberg v. Chicago Milwaukee Corp.*, 537 A.2d 1051, 1062 (Del. Ch. 1987) ("CMC's directors are fiduciaries for the Preferred stockholders, whose interests they have a duty to safeguard, consistent with the fiduciary duties owed by those directors to CMC's other shareholders and to CMC itself.").  Specifically, while preferred shareholders are not owed fiduciary duties "with respect to matters relating to preferences or limitations that distinguish preferred stock from common," they are owed fiduciary duties when the "right asserted is not to a preference as against the common stock but rather a right shared equally with the common."  *Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 594 (Del. Ch. 1986); *see also Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 386–87 (Del. Ch. 1999) ("Whether a given claim asserted by preferred stockholders is governed by contract or fiduciary duty principles . . . depends on whether the dispute arises from rights and obligations created by contract or from 'a right or obligation that is not by virtue of a preference but is shared equally with the common.' ").

It is true that Plaintiffs' contract claims allege that that the Sweep Amendment breached their contractual rights as preferred shareholders—rights that are not shared with the common stockholders.  Plaintiffs' fiduciary duty claims, by contrast, seek to vindicate the fiduciary duty of loyalty owed equally to the common shareholders as well as Plaintiffs, all of whom were injured when FHFA engaged in self-dealing that expropriated the entire net worth of Fannie and Freddie.  *See Jackson Nat'l Life Ins.*, 741 A.2d at 388 ("Delaware courts have not hesitated to state that a fiduciary duty of loyalty is one such right shared equally between the common and preferred stockholders.").  The cases cited by FHFA reflect the same distinction, dismissing fiduciary claims where it is determined "that (1) the same facts underlie the plaintiff's implied contract claim also form the basis of his fiduciary duty claim, ***and that (2) the duty sought to be enforced arose out of the parties' contractual, as opposed to their fiduciary, relationship.***"  *Blue Chip Capital Fund II Ltd. P'ship v. Tubergen*, 906 A.2d 827, 832–33 (Del. Ch. 2006) (emphasis added); *see also MCG Capital Corp. v. Maginn*, No. 4521, 2010 WL 1782271, at *15 (Del. Ch. May 5, 2010).

die would otherwise have for breach of fiduciary duty, FHFA Br. 46–47, as well as shareholders'
right to bring a derivative action to assert such a claim, *id*. at 47–53. But courts have not applied
such subrogation provisions to bar *direct* shareholder actions, such as the claim for breach of fi-
duciary duty Fairholme asserts here. *See First Hartford Corp. Pension Plan & Trust v. United
States*, 194 F.3d 1279, 1293, 1287–88 (Fed Cir. 1999); *Plaintiffs in All Winstar-Related Cases v.
United States*, 44 Fed. Cl. 3, 9–10 (1999); *see also* APA Br. at 25–27; *infra* at 26–27. Indeed,
FHFA does not even argue that HERA's subrogation provision would bar Plaintiffs' fiduciary
duty claims if those claims are direct rather than derivative in nature.

Although FHFA argues otherwise, FHFA Br. 46, n.26, Plaintiffs have properly alleged
direct claims for breach of fiduciary duty. As FHFA acknowledges, "whether a stockholder's
claim is derivative or direct" depends "*solely* on the following questions: (1) who suffered the
alleged harm (the corporation or the suing stockholders, individually); and (2) who would re-
ceive the benefit of any recovery or other remedy (the corporation or the stockholders, individu-
ally)?" *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004). Plain-
tiffs' claims easily satisfy both prongs of this test.

Plaintiffs' claims easily qualify as direct under the first prong because it "is not depend-
ent on an injury to [either] corporation." *Id.* at 1036. Indeed, even if FHFA's implausible asser-
tion that the Sweep Amendment somehow benefitted Fannie and Freddie were correct, *see, e.g*.,
FHFA Br. at 15–19, Plaintiffs (and all other shareholders apart from Treasury) were still injured
by the Sweep Amendment, which destroyed the value of their investments in Fannie and Freddie
through the transfer of the entities' entire net worth to a single, dominant shareholder. *Cf. Gen-
tile v. Rossette*, 906 A.2d 91, 102–03 (Del. 2006) ("Although the corporation suffered harm (in

12

the form of a diminution of its net worth), the minority shareholders also suffered a harm that was unique to them and independent of any injury to the corporation.").

Given that Plaintiffs' claims easily qualify as direct under the first prong, "[t]he second prong of the analysis should logically follow." *Tooley*, 845 A.2d at 1036. FHFA nevertheless maintains that Plaintiffs' claims are derivative because they seek to invalidate the Sweep Amendment, an agreement to which Fannie and Freddie are parties. FHFA Br. 46, n.26 (citing *In re M & F Worldwide Corp. S'holders Litig.*, 799 A.2d 1164, 1173–74 (Del. Ch. 2002)). But courts have routinely recognized that shareholder actions to invalidate agreements to which corporations are parties may be direct. *See, e.g.*, *Grimes v. Donald*, 673 A.2d 1207, 1213 (Del. 1996), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000); *Tooley*, 845 A.2d at 1038 (citing *Grimes* with approval); *Grayson v. Imagination Station, Inc.*, No. 5051, 2010 WL 3221951, at *6 (Del. Ch. Aug. 16, 2010); *San Antonio Fire & Police Pension Fund v. Bradbury*, No. 4446, 2010 WL 4273171, at *9 (Del. Ch. Oct. 28, 2010); *see also Gatz v. Ponsoldt*, No. 174, 2004 WL 3029868, at *7–8 (Del. Ch. Nov. 5, 2004) (recognizing claim to unwind a transaction affecting one shareholder class's liquidation rights as direct because those shareholders would uniquely benefit from unwinding the transaction). Indeed, "courts have been more prepared to permit the plaintiff to characterize the action as direct when the plaintiff is seeking only injunctive or prospective relief." *Grimes*, 673 A.2d at 1213. The Fairholme Plaintiffs, moreover, have expressly limited their fiduciary duty claim to seek only "equitable and declaratory relief" aimed at unwinding the Sweep Amendment and eliminating its harmful effect on Plaintiffs' interests in Fannie and Freddie. Fairholme Compl. at 42; *id.* ¶ 146(c)–(g). In short, Plaintiffs' breach of fiduciary duty claims are direct because, however the relief affects Fannie and Freddie, Plaintiffs would benefit from the requested relief in a way that is unique

13

from Fannie and Freddie, since the relief would restore the balance of value between Treasury's holdings and the other classes of stock.[7]

Even if Plaintiffs' claims were derivative, moreover, they would not be barred by HERA's subrogation provision because Plaintiffs retain their right to sue when FHFA has a manifest conflict of interest.  In other words, FHFA obviously cannot and did not succeed to shareholders' causes of action against FHFA *itself*.

The uniform weight of precedent—including a decision by the D.C. Circuit and all of the decisions cited by Defendants that are on point—makes clear that shareholders of an entity in conservatorship or receivership retain the right to bring suit where, as here, the federal conservator or receiver has a "manifest conflict of interest."  *Kellmer*, 674 F.3d 848, 850 (D.C. Cir. 2012) (citing *First Hartford*, 194 F.3d at 1296); *see also* APA Br. at 27–28.

In *First Hartford*, a shareholder of a mutual savings bank placed in receivership by the FDIC pursuant to FIRREA brought suit against the United States alleging that certain actions taken by the FDIC had, *inter alia*, breached the Government's contract with the bank.  *See* 194 F.3d at 1282–86.  Relying on 12 U.S.C. § 1821(d)(2)(A)(i), a provision of FIRREA that is materially indistinguishable from the subrogation provision of HERA urged by Defendants here, the Court of Federal Claims held that the FDIC as receiver had the exclusive right to bring suit for the shareholder's injuries.  *See id*. at 1294.  The Federal Circuit, however, reversed.  While it

---

[7] This is not to say that the Plaintiffs in the Consolidated Action have not properly pled a derivative claim.  It is not uncommon that the same improper action by one who controls a corporation "can give rise both to a direct claim and a derivative claim." *Grimes*, 673 A.2d at 1212; *see, e.g.*, *Gatz*, 925 A.2d at 1278 ("claim could have been brought either as a direct or as a derivative claim"); *Gentile*, 906 A.2d at 99 (holding that claim "was both derivative and direct"); *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 656–59 (Del. Ch. 2013); *see also Tooley*, 845 A.2d at 1036 (distinguishing "individual action for injuries affecting [stockholder's] legal rights as a stockholder" from derivative action seeking redress for "an injury caused to the corporation *alone*" (emphasis added)).

agreed "that, *as a general proposition*, the FDIC's statutory receivership authority includes the right to control the prosecution of legal claims on behalf of the insured depository institution now in its receivership," *id*. at 1295 (emphasis added), the Federal Circuit held that given "the manifest conflict of interest of the FDIC, First Hartford [i.e., the shareholder plaintiff] has standing to raise those claims," *id*. at 1296.  As the court explained, "in the circumstances presented in this case, the FDIC was asked to decide on behalf of the depository institution in receivership whether it should sue the federal government based upon a breach of contract, which, if proven, was caused by the FDIC itself."  *Id*.  Accordingly, it faced a "conflict of interest . . . in determining whether to bring suit."  *Id.*; *see also id*. at 1283 (finding standing to sue "because of the FDIC's conflict of interest by which it is both alleged to have caused the breach and controls the depository institution").

Other courts have consistently followed *First Hartford*.  For example, in *Delta Savings Bank v. United States*, the Ninth Circuit followed *First Hartford* in recognizing "a common-sense, conflict of interest exception to the commands of FIRREA."  265 F.3d 1017, 1024 (9th Cir. 2001).  It thus permitted a shareholder, rather than the FDIC as receiver, to bring suit against one of the FDIC's "closely-related, sister agencies."  *Id*.  And in the specific context of HERA, even the authorities on which Defendants' principally rely—including the D.C. Circuit's decision in *Kellmer*—recognize a "conflict of interest exception" to the general subrogation rule urged by Defendants here.  *See Kellmer*, 674 F.3d at 850 ("[A]bsent a manifest conflict of interest by the conservator not at issue here, the statutory language bars shareholder derivative actions."); *see also id*. (citing *First Hartford*); *In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, ERISA Litig.*, 629 F. Supp. 2d 1, 4 n.5 (D.D.C. 2009) ("[C]ourts have recognized an exception whereby a conflict between the conservator or receiver and the defendant saves a derivative

plaintiff's standing . . . ."); *In re Fed. Home Loan Mortg. Corp. Derivative Litig.*, 643 F. Supp. 2d 790, 798 (E.D. Va. 2009) ("Absent a showing of a clear conflict of interest similar to the conflicts at issue in *First Hartford* and *Delta Savings*, the plaintiffs lack standing to pursue these claims."); *Esther Sadowsky Testamentary Trust v. Syron*, 639 F. Supp. 2d 347, 350 (S.D.N.Y. 2009) ("The Trust's argument concerning *Delta Savings Bank* . . . is unconvincing.  In that case, substitution would have resulted in the FDIC stepping into a case against a government agency with which it had close ties.  The Trust has pointed to no such conflict of interest here . . . ."); *see also id.* at 351 (finding "no apparent conflict in the FHFA's substitution" for shareholders where suit was "against former officers and directors" and there were "no claims against any governmental agency").

In this case, Plaintiffs challenge the Sweep Amendment—an "agreement" between FHFA, as conservator of Fannie and Freddie, and the Department of Treasury, an agency which has acquired a direct interest in Fannie and Freddie and with which FHFA has closely coordinated its actions as conservator.  It cannot plausibly be disputed that FHFA has a "manifest conflict of interest" within the meaning of *First Hartford*, *Kellmer*, and the numerous other authorities recognizing this common-sense exception, and that Plaintiffs, rather than FHFA, are thus the proper parties to seek redress for the injury inflicted on them by the Sweep Amendment.

### B.    Plaintiffs' Fiduciary Duty Claims Are Not Preempted.

In the alternative, FHFA contends that the Plaintiffs' fiduciary duty claims are preempted by Fannie's and Freddie's charters and by HERA.  *See* FHFA Br. 54–56.  But there is no conflict between those provisions of federal law and the State fiduciary duties Plaintiffs invoke.  Absent such a conflict, FHFA must comply with both.

16

1.     To be sure, Fannie and Freddie are federally chartered corporations subject to federal law in many respects.  But FHFA fails to identify any conflict between the federal laws governing these entities and the fiduciary duties imposed by state law.  FHFA notes that although Fannie and Freddie are private corporations owned by shareholders, they are charged by federal law with public purposes, including providing "stability in the secondary market for residential mortgages," providing "ongoing assistance to the secondary market for residential mortgages," and promoting "access to mortgage credit throughout the Nation."  FHFA Br. 54 (quoting 12 U.S.C. §§ 1716, 1451 note).  Fannie's and Freddie's federal charters, however, require them to pursue these and other policies "within the limitations of law and regulation."  12 U.S.C. 1452(a)(1); *accord* 12 U.S.C. § 1723(b).  There can be no doubt that these limits include those imposed by state fiduciary duty law.  Indeed, Freddie's federal charter explicitly defines "law" as used in this provision to "includ[e] any law of the United States or of *any State*." 12 U.S.C. § 1451(c) (emphasis added).[8]

In all events, the public mandates identified by FHFA are entirely consistent with state law fiduciary duties, including the duty of loyalty.  Certainly nothing in Congress's specification of these public purposes in any way suggests that those who control Fannie and Freddie— whether their Boards of Directors or the FHFA—are free to engage in the wanton self-dealing at issue here.  Indeed, it is simply implausible that Congress intended to authorize those who control these entities to loot their balance sheets at will and with impunity.  Conversely, the duty of loyalty does not prevent Fannie and Freddie from achieving their statutory public purposes.  In short, though the state law duty "is not identical" to Fannie's and Freddie's statutory purposes, it is also "not contrary" to those purposes.  *Boyle v. United Techs. Corp.*, 487 U.S. 500, 509 (1988).

---

[8] Although Fannie's charter does not explicitly define "law," there is no reason to think a different meaning was intended.

Because it is possible for Fannie and Freddie to "comply with both [their federal] obligations and the state-prescribed duty," *id*., the statutory purposes cited by FHFA provide no basis for preemption.[9]

Nor do the federal regulations cited by FHFA in any way preempt Fannie's and Freddie's duty of loyalty.  To the contrary, these provisions demonstrate that this duty is *not* preempted. FHFA invokes 12 C.F.R. § 1710.10, *see* FHFA Br. 54 n.31, which allows Fannie and Freddie to choose whether to follow, *inter alia*, "the corporate governance practices and procedures of the law of the jurisdiction in which the principal office of the Enterprise is located, as amended" (Freddie's choice) or "Delaware General Corporation Law, Del. Code Ann. tit. 8, as amended" (Fannie's choice).  *Id*. § 1710.10(b)(1).  Once that choice is made, however, the regulation mandates that "each Enterprise *shall* follow" that law unless inconsistent "with applicable chartering acts and other Federal law, rules, and regulations" or "the safe and sound operations of the enterprise."  *Id*. § 1710.10(a)–(b)(1) (emphasis added).   Because FHFA has failed to identify any federal law, rule, or regulation that conflicts with the fiduciary duty of loyalty owed by those who operate Fannie and Freddie, this regulation *preserves* rather than preempts this duty.

Nor is FHFA's failure to identify such a conflict in any way surprising: when it promulgated the corporate governance regulation of which this provision is part, the Government made clear that "the regulation neither supplants nor displaces traditional standards of corporate governance as commonly defined by State laws regarding the relationships of corporate board mem-

---

[9] As one commentator has explained, "the purpose of an investor-owned company is to make profits for its shareholders.  The principle does not change when an investor-owned company is an instrumentality of a government. . . . The legal rights of shareholders are enforceable in court.  Directors and officers of an investor-owned instrumentality are subject to personal liability for breaching their fiduciary duties."  Thomas H. Stanton, *Government-Sponsored Enterprises: Mercantilist Companies in the Modern World* 79 (2002), *available at* http://thomas-stanton.com/wp/wp-content/uploads/2012/06/GSEs-mercantilist-companies-AEI-press-2002.pdf**.**

bers and management to shareholders and other stakeholders," but instead "explicitly clarifies the applicability of such standards to the Enterprises."  Office of Federal Housing Enterprise Oversight, *Corporate Governance*, 67 Fed. Reg. 38,361, 38,363 (Final Rule, June 4, 2002).[10]  As the Government further clarified, the regulation contemplated not that federal law would negate existing state law fiduciary duties but rather that it might impose *additional* requirements on Fannie and Freddie.  *See id*. at 38,367 ("election of a State law . . . is directed, in line with the need to protect shareholders and promote corporate purposes; adherence to Federal standards for safe and sound operations pursuant to a separate and distinct regulatory regime are set forth as well").  In short, 12 C.F.R. 1710.10 was intended not to displace State corporate law, but to ensure that the "companies and their boards" would "operate with an eye toward both Federal and State law and regulation."  *Id*.[11]

Fannie's bylaws likewise confirm that the fiduciary duties of those who operate it are not preempted.  FHFA invokes Section 1.05, *see* FHFA Br. 56 n.32.  But that provision simply implements 12 C.F.R. 1710.10, providing that "to the extent not inconsistent with the Charter Act and other Federal law, rules, and regulations, the corporation has elected to follow the applicable

---

[10] *See also id*. at 38,364 (regulation intended to provide "certainty to shareholders and other stakeholders as to the body of corporate law applicable to each Enterprise"); *id*. at 38,368 ("The body of law and legal precedents thereunder elected by the Enterprises pursuant to § 1710.10, to the extent not inconsistent with applicable Federal rules, set forth standards of conduct of board members with respect to shareholders."); *cf*. *id*. at 38,367 (related regulatory provision "not intended to affect the potential exposure of board members to shareholder actions under applicable standards of State law"); *id*. at 38,366 ("the concept of conflict of interest is a fundamental concept widely understood under traditional precepts of corporate law").

[11] 12 U.S.C. §§ 1451, 1452(a)(1), 1723(b), cited above, as well as 12 C.F.R. 1710.10 and the explanatory material in the Federal Register, demonstrate the futility of FHFA's purported reservation of "the right to argue that any claims concerning the Enterprises' corporate governance may arise only under federal law, not state law."  FHFA Br. 53, n.30.  Sweeping preemption of this sort arises only "[w]hen Congress intends federal law to 'occupy the field,'" *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000), and the statutes and regulation that we have cited foreclose any such inference that Fannie's and Freddie's charters or related federal law were so intended.

corporate governance practices and procedures of the Delaware General Corporation Law, as the same may be amended from time to time." Fannie Mae Bylaws, Corporate Governance Practices & Procedures, Art. 1, § 1.05, *available at* www.fanniemae.com/resources/file/aboutus/pdf/ bylaws.pdf.[12] And other provisions of Fannie's bylaws make clear that the fiduciary duties of those who operate it are not preempted. *See id*. Art. 6, § 6.02(a)(i) (Fannie will not indemnify officers and directors for "any breach of such person's duty of loyalty to the corporation or its stockholders"); *id*. Art. 4, § 4.18 (bylaw limiting directors' liability "does not affect the availability of equitable remedies for breach of fiduciary duties"); *cf. Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Raines*, 534 F.3d 779, 783 n.1 (D.C. Cir. 2008) ("The parties have agreed throughout the litigation that Delaware law applies to the analysis in this case of the demand requirement and the directors' potential liability. That is because the relevant Fannie statute and regulation have been applied so as to incorporate Delaware General Corporation Law.").

2. Nor does HERA preempt the fiduciary duty of loyalty owed by those who operate Fannie and Freddie when FHFA steps into the shoes of the Companies' officers and directors as conservator or receiver. Indeed, in the closely analogous context of FIRREA, Judge Facciola recently concluded that "as [r]eceiver, the FDIC also has a fiduciary responsibility to [the seized institution's] shareholders." *Suess v. FDIC*, 770 F. Supp. 2d 32, 38 (D.D.C. 2011); *cf. also, e.g.*,

---

[12] Freddie has adopted a similar bylaw:

> The corporate governance practices and procedures of the Corporation shall comply with the Corporation's enabling legislation and other Federal law, rules, and regulations, and shall be consistent with the safe and sound operation of the Corporation. To the extent not inconsistent with the foregoing, the Corporation shall follow the corporate governance practices and procedures of the law of the Commonwealth of Virginia, including without limitation the Virginia Stock Corporation Act . . . .

Freddie Mac Bylaws, Corporate Governance Practices & Procedures, Art. 11, § 11.3, *available at* www.freddiemac.com/governance/pdf/bylaws_1009.pdf. The certificate of designation for common and preferred stock cited by FHFA, *see* FHFA Br. 56 n.32, is to similar effect.

*Gibralter Fin. Corp. v. Federal Home Loan Bank Bd.*, No. 89-3489, 1990 WL 394298, at *3 (C.D. Cal. June 15, 1990) ("In imposing the conservatorship upon the Associations, the Defendants exceeded their normal regulatory and supervisory activities and assumed control of the operations of those institutions.  Under these circumstances [plaintiff], as a shareholder of the Associations, may state a claim for breach of fiduciary duty."); *In re Franklin Nat'l Bank Sec. Litig.*, 445 F. Supp. 723, 731, 733–34 (E.D.N.Y. 1978), *supplemented by* 449 F. Supp. 574 (similar).

Congress has likewise recognized that the FDIC is subject to fiduciary duties when it acts as a conservator or receiver.  In statutorily authorizing the FDIC in its corporate capacity as insurer of bank deposits to acquire assets from the FDIC as conservator or receiver, Congress provided that FDIC corporate would "have all of the rights, powers, privileges, and authorities of the Corporation as receiver" with respect to those assets.  12 U.S.C. § 1823(d)(3)(A).  Congress made clear, however, that "[i]n exercising any right, power, privilege, or authority described in subparagraph (A), the Corporation *shall continue to be subject to the fiduciary duties and obligations of the Corporation as receiver* to claimants against the insured depository institution in receivership."  *Id.* § 1823(d)(3)(C) (emphasis added).  This statute thus makes clear that Congress understood that the FDIC was subject to fiduciary duties when acting as conservator or receiver pursuant to 12 U.S.C. § 1821.  Since FHFA's powers as conservator or receiver are closely modeled after those of the FDIC, it follows that it too is subject to fiduciary duties when it exercises those powers.

In all events, FHFA has failed to identify any conflict between any provision of HERA and the fiduciary duty of loyalty imposed by state law.  As Plaintiffs explain, *see* APA Br. at 46–74; *supra* at 5-10, FHFA exceeded its authority and indeed contravened HERA in implementing

the Sweep Amendment.  HERA cannot plausibly be understood to preempt claims for breach of

fiduciary duty that arise from such unauthorized action.[13]

Furthermore, although FHFA points to various provisions of HERA authorizing FHFA as

Conservator to "carry on the business" of Fannie and Freddie, FHFA Br. 54 & n.31 (citing vari-

ous provisions of HERA and its implementing regulations), as well as FHFA's "[i]ncidental

powe[r]" to "take any action authorized by this section, which the Agency determines is in the

best interests of the regulated entity or the Agency," 12 U.S.C. § 4617(b)(2)(J)(ii), these provi-

sions cannot reasonably be construed to authorize—let alone require—the sort of gross self-

dealing at issue in this case.  Nor does the prohibition on self-dealing imposed by the fiduciary

duty of loyalty prevent FHFA from exercising these or other legitimate powers as conservator.

Accordingly, the provisions of HERA cited by FHFA do not preempt the duty of loyalty here.

*See Boyle*, 487 U.S. at 509.

3.     Finally, FHFA argues that Plaintiffs' fiduciary duty claims are preempted because

"application of state law would frustrate specific objectives of federal legislation."  FHFA Br. 55

(quoting *Boyle*, 487 U.S. at 507).  In particular, FHFA claims that the Sweep Amendment "is

consistent with, and undertaken to promote, the public missions in the charters and HERA" and

that "[t]o the extent that Plaintiffs allege that state-law fiduciary duties prohibit the Conservator

---

[13] For this reason, the court's statement in *Esther Sadowski Testamentary Trust* that "[i]n HERA, Congress did not intend that acts lying fully within the FHFA's discretion as Conservator of Freddie would violate some residual fiduciary duty owed to the shareholders" is wholly inapposite here.  639 F. Supp. 2d at 351.  Indeed, the court's statement suggests that acts exceeding FHFA's authority may well violate fiduciary duties.  In all events, the court in that case simply held that FHFA did not breach any fiduciary duty by substituting itself for shareholders as plaintiff in a suit against Freddie's former directors.  *See id.* (finding "no conflict or fiduciary breach in [FHFA's] substitution into this case").  That case did not involve a shareholder claim against FHFA, let alone allegations of self-dealing like those present here.  *Cf. id.* (finding "no apparent conflict in the FHFA's substitution" for shareholders where suit was "against former officers and directors" and there were "no claims against any governmental agency").

from entering the Third Amendment, the alleged fiduciary duty to shareholders would be in direct conflict with the Conservator's duty to support the public missions of the Enterprises and Plaintiffs' fiduciary duty claims would be preempted by federal law."  FHFA Br. 56.

While preemption usually occurs where "it is impossible . . . to comply with both state and federal law"—which, as we have demonstrated, is not the case here—it is true that on occasion courts also find preemption "where under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Crosby*, 530 U.S. at 372–73 (alterations in original).  But to establish preemption of this sort, FHFA must offer far more than the cursory assertions set forth in its brief.  As the Supreme Court has explained, "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects."  *Id*.  "If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield . . . ."  *Id*.

FHFA has made no such showing here.  As we have demonstrated, *see* APA Br. at 36–74; *supra* at 5-10, the Sweep Amendment was not authorized by—and in fact violated—HERA.  Furthermore, the general statutory provisions cited by FHFA suggest no overriding purpose that would be frustrated by the fiduciary duty of loyalty.  Other provisions of HERA, moreover, reinforce this duty.  *See, e.g*., 12 U.S. § 4617(b)(2)(D) (authorizing FHFA, as conservator, to take actions "necessary to put the regulated entity in a sound and solvent condition" and to "preserve and conserve the assets and property of the regulated entity"); *id*. § 4617(b)(11)(E) (obliging FHFA, when exercising its authority as conservator or receiver to dispose of a regulated entity's assets, to, *inter alia*, "(i) maximize[e] the net present value return from the sale or disposition of

23

such assets" and "(ii) minimize[e] the amount of any loss realized in the resolution of cases").

Indeed, far from preempting the fiduciary duty owed to shareholders, these provisions arguably

operate to create additional statutory duties to those individuals, as another court has found in the

closely analogous context of FIRREA. *See Suess*, 770 F. Supp. 2d at 38 ("As Receiver, there-

fore, the FDIC has a statutory responsibility to [the seized entity's] shareholders").

> More generally, as the court in *Gibralter Financial* held in analogous circumstances,
>
> Notwithstanding the important public policy function served by FSLIC, nothing in the statutory or regulatory scheme would indicate the need to permit FSLIC to function in its capacity as conservator with impunity, leaving all shareholders in a financial institution bereft of the protections provided by the fiduciary duties imposed upon those who control such institutions.

1990 WL 394298, at * 3.  Surely the same is true here as well.

In all events, as Plaintiffs have demonstrated, *see* APA Br. at 51–73; *supra* at 4-5, the

available evidence suggests that the Sweep Amendment was not in fact implemented to further

FHFA's statutory mission of stabilizing Fannie and Freddie (as FHFA claims), but rather to ex-

propriate the enormous profits these companies were expected to earn for the foreseeable future.

*See* Fairholme Compl. ¶¶ 10–12; 64–81, 104.  In addition, the available evidence also corrobo-

rates Plaintiffs' allegations, *see id*. ¶¶ 79–80, that Treasury and FHFA failed even to consider

other reasonable alternatives that would have accomplished FHFA's asserted objective without

self-dealing of the sort alleged here.  *See* APA Br. at 79–82.[14]  FHFA's claim that any fiduciary

duties must yield if they would pose an obstacle to the Sweep Amendment would thus require

the court to disregard both Plaintiffs' allegations and the available evidence and to accept

---

[14] Plaintiffs have argued that the Court should order supplementation of the administrative record with additional materials relevant to the purpose of the Sweep Amendment and permit discovery into that issue under Rule 56(d) in view of FHFA's reliance on disputed facts in its motion to dismiss.  *See* Fairholme Discovery Motion at 14-–20, 27-–34.  The additional materials are likely to provide further support for their fiduciary duty claims.

24

FHFA's self-serving description of the Sweep Amendment's purpose and necessity. At a minimum, factual disputes such as these cannot properly be resolved in the context of a motion to dismiss.

For all of these reasons, this Court should reject FHFA's motion to dismiss Plaintiffs' fiduciary duty claims.

## III.   The Complaints Properly and Adequately Plead Claims for Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing.

Plaintiffs' shareholder agreement confers a right to a contractually-specified dividend and liquidation preference. Fairholme Compl. ¶¶ 34, 122, 131; Arrowood Compl. ¶¶ 33–35, 136, 140–41. The contract also provides that no dividend may be paid on common stock unless dividends have been declared on Plaintiffs' preferred stock for the then-current quarterly dividend period. *Id.* And the parties' performance under the contract is subject to an implied covenant of good faith and fair dealing. Fairholme Compl. ¶¶ 34, 130; Arrowood Compl. ¶¶ 33–35, 140. *See also Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 440–42 (Del. 2005); *Historic Green Springs, Inc. v. Brandy Farm, Ltd.*, 32 Va. Cir. 98, at *3 (1993); *A & E Supply Co. v. Nationwide Mut. Fire Ins. Co.*, 798 F.2d 669, 676 (4th Cir. 1986). The complaints allege that these contractual rights exist, that FHFA breached them, and that Plaintiffs were injured as a result. *See* Fairholme Compl. ¶¶ 121–35; Arrowood Compl. ¶¶ 37, 41, 136–138, 140–142.[15] Plaintiffs

---

[15] Delaware law governs the claims against FHFA as conservator of Fannie, and Virginia law governs the claims against FHFA as conservator of Freddie. As relevant to Plaintiffs' claims here, the standards under Delaware and Virginia law are essentially identical. To state a claim for breach of contract, Plaintiffs must allege (1) the existence of a legally enforceable contractual obligation, (2) breach of that obligation, and (3) injury or damage caused by the breach. *Sunrise Continuing Care, LLC v. Wright*, 671 S.E.2d 132, 135 (Va. 2009); *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). To state a claim for breach of the implied covenant of good faith and fair dealing, Plaintiffs must allege (1) the existence of an implied contractual obligation, (2) breach of that obligation, and (3) injury or damage caused by the breach.

have thus discharged their modest burden at the motion-to-dismiss stage, and FHFA's arguments to the contrary all fail.

### A.      HERA Does Not Deprive Plaintiffs of Their Contractual Rights.

FHFA initially argues that under 12 U.S.C. § 4617(b)(2)(A), FHFA as conservator succeeded to all the rights and privileges of stockholders, and thus Plaintiffs no longer hold the contractual rights they seek to vindicate.  FHFA Br. at 36–38.  As an initial matter, even if section 4617(b)(2)(A) applied, Plaintiffs' contract claims could still proceed given FHFA's manifest conflict of interest here.  *See supra* at 14-16.

Moreover, HERA does not bar the contract claims in this case because they are *direct* rather than derivative claims.  Indeed, all of the cases cited by the Government where a court held that private shareholders' claims belonged to the receiver involved derivative claims rather than direct claims like those at issue here.  *See Kellmer*, 674 F.3d at 850–51; *Pareto v. FDIC*, 139 F.3d 696, 700 (9th Cir. 1998) (noting FIRREA's analogue to section 4617(b)(2)(A) "vests all rights and powers of a stockholder of the bank to bring a derivative action in the FDIC"); *Esther Sadowsky*, 639 F. Supp. 2d at 350 (noting court substituted FHFA for private shareholder, where shareholder brought a derivative suit and did not argue that the FHFA had a manifest conflict of interest).

Direct claims and claims where the recovery would be distributed to the shareholder are not barred by the statute.  As the Government notes, cases interpreting FIRREA are particularly instructive because FIRREA has a statutory provision, 12 U.S.C. § 1821(d)(2)(A)(i), identical to

---

*Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 449 (E.D. Va. 2009); *Kuroda v. SPJS Holdings, LLC*, 971 A.2d 872, 888 (Del. Ch. 2009).

section 4617(b)(2)(A) of HERA.[16]  And courts interpreting the analogous FIRREA provision have held that, notwithstanding that provision, shareholders have standing to assert direct claims for breach of contract and even "derivative" claims where the recovery would be distributed to the shareholder.  *See, e.g.*, *Plaintiffs in All Winstar-Related Cases*, 44 Fed. Cl. at 9–11.

Moreover, HERA and FHFA's implementing regulations themselves identify certain rights retained by shareholders, making clear that section 4617(b)(2)(A) does not supplant all shareholder rights.  For example, section 4617(c)(1)(D) provides for payment by FHFA as receiver of "[a]ny obligation to shareholders or members arising as a result of their status as shareholder or members" after specified higher priority claims are paid.  *See also* 12 C.F.R. § 1237.9(a)(4) (same).  And when FHFA acts not as receiver but as conservator, FHFA has previously recognized that shareholders retain additional rights as well.  *See* Joint Status Report, Attachment A at 3, *McKinley v. FHFA*, No. 10-cv-1165, D.E. 18-1 (D.D.C. Sept. 16, 2011) ("The appointment of the FHFA as receiver—*as opposed to conservator*—terminates all rights and claims that the stockholders . . . have against the assets or charter of the regulated entity or the Agency arising as a result of their status as stockholders . . . except for their right to payment, resolution or other satisfaction of their claims." (emphasis added)).

Finally, FHFA's actions belie its contention that it has succeeded to all shareholder rights to dividends and a liquidation preference.  For example, FHFA expressly suspended payment of dividends to private shareholders of Fannie and Freddie during conservatorship.  But if FHFA had in fact succeeded to the shareholders' contractual dividend rights, any payment of dividends

---

[16] FIRREA provides that the FDIC "shall, as conservator or receiver, and by operation of law, succeed to . . . all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder, member, accountholder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution . . . ."  12 U.S.C. § 1821(d)(2)(A)(i).

would have been to FHFA itself, not to shareholders.  FHFA then would have had no need to an-

nounce *to itself* that it was halting the payment of dividends.  Moreover, FHFA entered into con-

tractual agreements with Treasury—a *shareholder* in the Companies—that provided Treasury

with dividend and liquidation rights, and FHFA has paid billions of dollars in dividends pursuant

to those agreements.  If the Government's assertion were correct, Treasury's dividend rights

would belong to FHFA, and there would have been absolutely no reason amend the Purchase

Agreements.  Moreover, the logic of FHFA's arguments suggests it is improperly paying divi-

dends to Treasury because those dividend rights belong to *FHFA*, not Treasury.

### B.    The Sweep Amendment Breaches Plaintiffs' Express and Implied Contractu-al Right to Dividends and a Liquidation Preference.

FHFA devotes much of its presentation on the breach of contract claims to a discussion

of Plaintiffs' voting rights.  FHFA argues that Plaintiffs had no right to vote on amendments to

other stock, and because the Companies could *create new classes of senior preferred shares*

without the consent of the preferred shareholders, they also impliedly could *amend classes of*

*preferred existing stock* to achieve the same result.  FHFA Br. at 39–41, 42–45.  This argument

fails on its own terms, as Plaintiffs discuss in subsection D below.  But it also fails for the more

fundamental reason that it sidesteps the gravamen of Plaintiffs' complaint—namely, that even

though FHFA had the right to issue new classes of preferred stock that were senior to existing

classes of stock, FHFA had no right to issue a new (or amend an existing) class of preferred

stock in a manner that *repudiates and extinguishes* the preferred shareholders' rights to priority

dividends and a liquidation preference.  Fairholme Compl. ¶¶ 34, 123, 125, 127, 133–35; Ar-

rowood Compl. ¶¶ 33–35, 137–38, 141–42.

The relevant stock certificates expressly provide that holders of the stock "will be entitled

to receive, when, as and if declared by the Board of Directors of [the Company], . . . in its sole

discretion out of funds legally available therefor, non-cumulative quarterly dividends" at a speci-fied rate. *See, e.g.*, Fannie, Cert. Design. of Series P Preferred Stock, § 2(a).[17]  The stock certifi-cates also provide that "[u]pon any voluntary or involuntary dissolution, liquidation or winding up" of the Company, the stockholder is entitled to receive "the amount of [a stated value] per share plus an amount, determined in accordance with Section 2 above, equal to the dividend . . . for the then-current quarterly Dividend Period . . . ." *Id.* § 4(a).

Plaintiffs and other preferred stockholders thus have the right to have the Companies op-erated in a manner such that during times of economic prosperity their Boards of Directors will have the ability and opportunity to declare a preferred dividend and the right, during times of economic failure, to a liquidation preference.  The fact that it is unknown whether the Companies will enjoy prosperity or failure does not mean their dividend and liquidation rights are contin-gent.  FHFA breached those contractual rights when it entered into the Sweep Amendment.  The Government emphasizes that the Companies have discretion whether to declare a dividend or enter liquidation, but this is beside the point: whether Plaintiffs' contractual rights will be *exer-cised* is contingent, but the *existence of those rights* is not contingent.  The Sweep Amendment ensures that the Companies will *never* declare a dividend on Plaintiffs' stock and will *never* have "funds legally available therefor."  Fannie, Cert. Design. of Series P Preferred Stock, § 2(a); *see* Fairholme Compl. ¶¶ 64–68; Arrowood Compl. ¶¶ 72–81.  Plaintiffs' existing rights to preferred dividends and a liquidation preference thus no longer have any economic value because of the Sweep Amendment.  Plaintiffs' challenge to the Sweep Amendment is therefore ripe, for even if it is uncertain when the Companies might have otherwise declared a dividend, the injury for the

---

[17] The Fannie Series P agreement is used as a representative sample, but the voting rights provisions are identical or substantially the same for all relevant series of preferred shares in both Fannie and Freddie.

permanent destruction of Plaintiffs' right to receive a preferred dividend is not contingent and was complete the moment the Government entered into the Sweep Amendment.

To be sure, Plaintiffs' stockholder agreements entitled the Companies to issue additional shares of preferred stock senior to existing shares.  *See, e.g.*, Fannie, Cert. Design. of Series P Preferred Stock, § 7(b).  But the Sweep Amendment does much more: it creates Government Stock that *effectively extinguishes* all pre-existing stock in the Companies.  The value of the preferred shares rests in their rights to priority dividends and a liquidation preference, but the Sweep Amendment ensures that the preferred shareholders will *never* receive a dividend or liquidation preference.  The right to create new senior preferred stock does not include the right to destroy Plaintiffs' preferred shares, and no reasonable investor would have agreed to a provision allowing the Board to extinguish its property rights in such a manner.  Fairholme Compl. ¶¶ 127, 134; Arrowood Compl. ¶¶ 137, 141.  FHFA, accordingly, breached the stockholder agreements when it violated this express and implied provision of the stockholder agreements.

**C.    The Sweep Amendment Grants the Government Stock Residual Rights that Are a Characteristic of Common Stock, but Improperly Provides for the Distribution of Such Residual Rights Ahead of Distribution to Preferred Shareholders.**

Viewed another way, the Sweep Amendment effectively converted the Government Stock into common stock.  The dividend payments on the Government Stock under the Sweep Amendment therefore represent a distribution to the common shareholder ahead of and in violation of the contractual rights of Plaintiffs and other preferred shareholders.  *See, e.g.*, Fannie, Cert. Design. of Series P Preferred Stock, § 2(b) (no dividend may be paid to common shareholders unless dividends have been declared and paid to the preferred shareholders for the then-current quarterly dividend period).

It is well-settled that "securities are not classified merely by the label attached to them, but rather through an analysis of their functional characteristics." *See QVT Fund LP v. Eurohypo Capital Funding LLC I*, No. 5881, 2011 WL 2672092, at \*10 (Del. Ch. July 8, 2011) (unpublished). "Therefore, even though the [stockholder documents] do not refer to the [Government Stock] as [common] shares, this Court still must examine the legal rights of the holders of such securities to determine whether such a classification reasonably might be warranted." *See id. See also Telvest, Inc. v. Olson*, 1979 WL 1759, at \*7 (Del. Ch. 1979) (unpublished) (granting a preliminary injunction against the issuance of so-called "preferred stock" in part because the corporation had the power to issue only preferred stock but the issued stock more closely resembled in many ways common stock); *In re Louisville Gas & Elec. Co.*, 77 F. Supp. 176, 178 (D. Del. 1948) (explaining that under Delaware law "the nature of the security must be determined from its rights and character and not its name," and concluding that stock denominated "common stock" was in fact preferred stock).

Because the Government Stock is entitled to *all* the profits of the Companies, it possesses the defining characteristic of common stock: a right to the "residual value of the firm." *See Len v. Fuller*, No. 15352, 1997 WL 305833, at \*4 (Del. Ch. May 30, 1997) (unpublished) (citing Frank Easterbrook & Daniel Fischel, *Voting in Corporate Law*, 26 J.L. & ECON. 395 (1983)). "Preferred stock," in contrast, has "special 'voting powers, . . . designations, preferences and relative, participating, optional or other special rights' *superior to the common stock* . . . ." *Id.* at 38–39 (alteration in original) (emphasis added) (quoting DEL. CODE ANN. tit. 8, § 151(a)). The Government Stock, however, does not have "preferences . . . *superior to*" the original common stock (or Plaintiffs' preferred shares) because the original common stock and the junior preferred shares *no longer have any rights whatsoever.* The definition of preferred shares plainly pre-

sumes they are *preferred to something*, but under the Sweep Amendment, the Government stock is effectively the *only stock* of the Companies. And when a class of stock is the *only* stock, it is by definition common stock. *See* BLACK'S LAW DICTIONARY 1552 (9th ed. 2009) (explaining that "[c]ommon stock is often called capital stock if it is the corporation's only class of stock outstanding"). Indeed, Treasury's declared purpose when it enacted the Sweep Amendment was to nullify the rights of private shareholders and to ensure that "*every dollar of earnings that Fannie Mae and Freddie Mac generate will be used to benefit taxpayers*," not shareholders. Fairholme Compl. ¶ 65; Arrowood Compl. ¶ 75 (quoting Treasury Press Release of Aug. 17, 2012 (emphasis added)).

Accordingly, because Treasury has received billions of dollars in dividends *ahead of* Plaintiffs' preferred stock, FHFA has violated the contractual provision that common stock shall not receive a dividend before Plaintiffs' preferred stock receives its contractually-specified dividend. *See* Fairholme Compl. ¶¶ 34, 65–67, 75–76, 82–83, 121–35; Arrowood Compl. ¶¶ 33–35, 72–85, 135–42; Fannie, Cert. Design. of Series P Preferred Stock, § 2(b).

### D. FHFA Breached Plaintiffs' Contractual Voting Rights.

The terms of Plaintiffs' stock certificates require the Companies to receive the consent of shareholders of at least two-thirds of the outstanding shares to amend the terms of the certificates in a manner that "materially and adversely affect[s] the interests of the holders" of the shares. *See, e.g.*, Fannie, Cert. Design. of Series P Preferred Stock, § 7(b)–(c). The preferred stock certificates further provide:

> [A]ny increase in the amount of authorized or issued Series P Preferred Stock or the creation and issuance, or an increase in the authorized or issued amount, of any other class or series of stock of Fannie Mae, whether ranking prior to, on a parity with or junior to the Series P Preferred Stock, as to the payment of dividends or the distribution of assets upon dissolution, liquidation or winding up of

Fannie Mae, or otherwise, will not be deemed to materially and adversely affect the interests of the Holders of Series P Preferred Stock.

*Id.* § 7(b).

The preferred stock certificates thus entitle the Companies, without shareholder consent, to issue a new class of preferred stock, or to increase the issued amount of another class of preferred stock, even if it ranks prior to an existing class of preferred stock as to dividends and liquidation preferences.  But the Companies are not entitled to issue a new class of preferred stock or to amend the terms of another class of preferred stock, so as to *extinguish* an existing class of preferred stock.  FHFA breached this contractual agreement when it entered into the Sweep Amendment, an amendment[18] to the Government Stock that *extinguished* Plaintiffs' contractual rights without Plaintiffs' consent.

1.     FHFA argues that although Plaintiffs have a right to vote on certain amendments to *their own stock*, Plaintiffs have no right to vote on amendments to *other* classes of stock. FHFA Br. at 39–40.  Not so.  The Sweep Amendment amended (indeed, extinguished) Plaintiffs' stock, and Plaintiffs had a contractual right to vote on those amendments regardless of whether the impairment of their rights was literally written into their stock certificate or effectively

---

[18] It cannot be disputed that the Sweep Amendment *either* created a new security *or* amended an existing one (it plainly did not increase the authorized or issued amount of an existing class of stock).  Plaintiffs primary contention is, as demonstrated in their APA brief, that the Sweep Amendment so fundamentally changed the nature of the securities that they must be regarded as new securities.  Accordingly, the Sweep Amendment clearly exceeded Treasury's statutory authority and should be remedied pursuant to the APA.  Alternatively, even if the Sweep Amendment merely amended the existing securities, it breached Plaintiffs' contractual voting rights (in addition to exceeding FHFA and Treasury's authority under HERA for the various reasons set forth above and in the APA brief).  At the current, preliminary stages of this litigation, Plaintiffs have properly pled both characterizations of the Sweep Amendment in the alternative. *Compare* Fairholme Compl. ¶¶ 9, 104 *with id.* ¶ 126.  *See also* FHFA Br. at 37 (conceding Plaintiffs alleged that "the Third Amendment amended the shareholders' stock certificates in a material way that triggered their voting rights").  In all events, regardless of whether it created a new security, the Sweep Amendment breached the contract by extinguishing Plaintiffs' dividend and liquidation rights, as demonstrated above.

brought about through an amendment to a different class of stock.  The broad right to vote on amendments that "materially and adversely affect the interests of the Holders of Series P Preferred Stock" would mean nothing under FHFA's cramped reading.

Indeed, FHFA's argument that Plaintiffs' voting rights extend only to amendments to their own shareholder agreement would render superfluous section 7(b)'s proviso that "the creation and issuance . . . of any other class or series of stock of Fannie Mae . . . will not be deemed to materially and adversely affect the interests of the Holders of this stock."  If Plaintiffs' voting rights extend only to amendments to their own shareholder agreement, then it would have been wholly superfluous and unnecessary for the parties to provide that the creation of new classes of senior stock (which would not involve the literal amendment of Plaintiffs' shareholder agreement) does not materially alter Plaintiffs' shares.  "Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court."  *NAMA Holdings, LLC v. World Market Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007).[19]  The better and more natural reading of the contract—the reading that comports with the realities of the corporate world—is that alterations to the terms of other stock certificates may indeed "materially and adversely affect" Plaintiffs' rights as shareholders within the meaning of section 7(b).

2.    Because the stockholder contract entitles FHFA to *create new senior securities* without shareholder consent, FHFA contends that the contract also impliedly permits FHFA to unilaterally *amend existing securities*.  FHFA Br. 40–41, *see also id.* 43–45.  As an initial matter, it is noteworthy that FHFA does not suggest that the Sweep Amendment created *new* Govern-

---

[19] *See also Winn v. Aleda Constr. Co.*, 315 S.E.2d 193, 195 (Va. 1984) ("No word or clause will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words aimlessly.").

ment Stock, because to do so would concede that Treasury exceeded its authority by purchasing securities of Fannie and Freddie after the expiration of its temporary authority to do so under HERA.  Accordingly, FHFA's defense against the breach of contract claims necessarily rests on the suggestion that the right to create new stock implicitly includes the right to amend existing stock.

FHFA's argument, however, contradicts the clear terms of the preferred stock certificate. As discussed above, the contract contains a general right of shareholders to vote on any matter that impairs the contract.  The contract then contains an exception whereby the Company may act unilaterally where its action does not "materially and adversely affect the interests" of the stockholder, and states that "the creation and issuance" of new stock does not "materially and adversely affect the interests" of the stockholder.  The exception permitting the Companies to issue new stock necessarily reserves the right to vote in other circumstances, such as the right to vote on any *amendments* to other stock that would "materially and adversely affect" the preferred shareholders' interests.

The Government asks the Court to rewrite the contract to read that "the creation and issuance . . . of any other class or series of stock*, or the amendment of any existing stock* . . . will not be deemed to materially and adversely affect the interests of the [preferred shareholder]." But "it is the duty of the court to construe a contract *as written*," *Wilson v. Holyfield*, 313 S.E.2d 396, 398 (Va. 1984) (emphasis added), and the Court must not "twist and torture the unambiguous terms of the [contract] under the guise of construing them to give [FHFA] a right for which it did not bargain."  *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1032 (Del. Ch. 2006) (holding that a shareholder agreement prohibiting a company from incurring "indebtedness for borrowed money" does not also (expressly or impliedly) prohibit the company from in-

curring indebtedness for *equity investments*).  *See also Amazon.com, Inc. v. Hoffman*, No. 2239, 2009 WL 2031789, at *4 (Del. Ch. June 30, 2009) (unpublished) (where contract provides that an anti-dilution provision applies if shares are issued at a price less than $1.36, the contract does not implicitly provide anti-dilution rights if shares are sold at a price equal to or greater than $1.36); *Shenandoah Life Ins. Co. v. Valero Energy Corp.*, 14 DEL. J. CORP. L. 396, 410 (Del. Ch. 1988) (unpublished) (debenture that prohibited the issuer from redeeming the debt by issuing new debt "implicitly reserved the right to redeem the debt with equity").  And to the extent this Court finds any ambiguity in the contract, the Court should "apply the doctrine of *contra proferentem* against the drafting party and interpret the contract in favor of [Plaintiffs as] the non-drafting party."  *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010).

       3.      FHFA suggests that it would be "absurd or nonsensical" for this Court to distinguish between the creation of new securities and the amendment of existing securities.  FHFA Br. at 40–41.  But FHFA's invitation for this Court to inquire into the motives of the parties is foreclosed by the rule that "speculation on the intention of the original parties is only appropriate when a contract is silent with respect to the subject matter at issue."  *Allied Capital*, 910 A.2d at 1034 (holding that contract prohibiting "indebtedness for borrowed money" does not also prohibit indebtedness for equity, regardless of whether permitting the latter effectively allows the circumvention of the former prohibition).  In all events, it is not particularly difficult to understand that an agreement to preserve a corporation's traditional ability to affect the value of existing stock incidentally through the creation of new securities is not tantamount to an agreement to grant the corporate directors carte blanch to unilaterally alter, and even extinguish, existing contractual relationships as they see fit.

In sum, the Sweep Amendment breached the shareholder agreement because it impaired Plaintiffs' stock rights without affording Plaintiffs an opportunity to vote on the Sweep Amendment.

**E.** **Plaintiffs Have Stated a Claim for Breach of the Implied Duty of Good Faith and Fair Dealing.**

The covenant of good faith and fair dealing is implied in every contract and protects against parties "frustrat[ing] the 'overarching purpose' of the contract by taking advantage of their position to control implementation of the agreement's terms." *Dunlap*, 878 A.2d at 442. The implied covenant is particularly important in two types of cases. First, "[w]hen a contract confers discretion on one party, the implied covenant requires that the discretion be used reasonably and in good faith." *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146–47 (Del. Ch. 2009).[20] Second, the implied covenant is important when there is an unanticipated development with respect to which the parties did not negotiate, in which case the court "ask[s] what the parties likely would have done if they had considered the issue involved." *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 443 (Del. 1996). Whether FHFA violated the implied covenant demands a "fact-intensive" inquiry into the motivations behind FHFA's actions. *Dunlap*, 878 A.2d at 442.

1. Plaintiffs' contractual rights to a preferred dividend and liquidation preference contain several implied provisions, including that: (1) the Companies will not create new stock (or amend existing stock)—whether labeled "senior" or otherwise—that will *wholly extinguish*

---

[20] *See also Virginia Vermiculite, Ltd. v. W.R. Grace & Co.–Conn.*, 156 F.3d 535, 542 (4th Cir. 1998) (explaining the "basic principle of contract law in Virginia" that "a party may not exercise contractual *discretion* in bad faith, even when such discretion is vested solely in that party"); *Amirsaleh v. Board of Trade of N.Y., Inc.*, No. 2822, 2008 WL 4182998, at *8 (Del. Ch. Sept. 11, 2008) (unpublished) ("The implied covenant is particularly important in contracts that endow one party with discretion in performance," in which case the implied covenant "requires that the 'discretion-exercising party' make that decision in good faith.").

Plaintiffs' rights, (2) the Companies will be operated for a profit and the benefit of all shareholders, (3) the Companies will decide in good faith whether to grant a dividend, and (4) the Companies will not effectively liquidate themselves in a manner designed to deprive Plaintiffs of their liquidation preference.  Plaintiffs have alleged a breach of these implied agreements, Fairholme Compl. ¶¶ 129–35; Arrowood Compl. ¶¶ 139–42, and FHFA's arguments that Plaintiffs cannot prevail under the applicable "fact-intensive" inquiry, *see Dunlap*, 878 A.2d at 442, is an argument more appropriate for a motion for summary judgment than a motion to dismiss.

2.      FHFA argues that Plaintiffs' claim for breach of the implied covenant is foreclosed by the contractual provision that the Companies may unilaterally issue new senior stock. FHFA Br. at 44.  As an initial matter, as discussed above, the right to unilaterally issue new senior preferred stock does not include the right to unilaterally amend existing preferred stock.  Nor does the Companies' right to issue a new class of preferred stock that ranks higher than an existing class of preferred stock as to dividends and liquidation preference include the right to *extinguish* the existing preferred stock altogether.

In any event, FHFA's argument that the Companies' right to amend existing or create new securities forecloses, as a matter of law, any implied covenant that rights of existing shareholders will not be wholly extinguished cannot be squared with the Delaware Chancery Court's decision *In re Delphi Financial Group Shareholder Litigation*, No. 7144, 2012 WL 729232 (Del. Ch. March 6, 2012) (unpublished).  In that case, the company charter provided that the controlling shareholder was not entitled to a control premium upon the sale of the company, but the charter also included a general provision that the charter may be amended.  *Id.* at *1, 15.  When an outside investor offered to purchase the company, the controlling shareholder refused to agree to the sale unless the charter was amended to allow him to receive a control premium.  *Id.* at *1.

The minority shareholders claimed that the charter provision about the control premium con-
tained an implied covenant that it would not be amended, notwithstanding the charter provision
allowing for amendments to the charter. *Id.* at *14, 17.  On a motion for a preliminary injunc-
tion, the court found that the plaintiffs established a likelihood of success on the merits for their
implied covenant claim (thus meeting a much higher burden than Plaintiffs face on this motion to
dismiss). *Id.* at *17.  The court explained that the record suggested that the minority sharehold-
ers bought their stock "with the understanding that the Charter structured the corporation in such
a way that denied [the controlling shareholder] a control premium," and that the controlling
shareholder violated that covenant when he demanded an amendment to the charter. *Id.*  In this
case, Plaintiffs have likewise alleged that they bought the stock "with the understanding that the
[stockholder agreement] structured the corporation in such a way that" denied the company the
right to wholly extinguish their dividend and liquidation rights, notwithstanding the provision
that the Companies could create new senior stock.  Such an expectation is not far-fetched; in-
deed, no reasonable investor would have purchased the shares otherwise.

The contours of the implied duty of good faith and fair dealing are substantially similar in
Virginia.  For example, in *Virginia Vermiculite*, a case similar to *In re Delphi*, the Fourth Circuit
applied Virginia law and reversed the grant of a motion to dismiss a contract claim based on the
implied duty of good faith and fair dealing.  156 F.3d at 542.  In that case, the plaintiff sold a
mine to the defendant in exchange for a lump sum of money and royalties on any mineral ex-
tracted from the land. *Id.* at 537.  The contract provided that the defendant would retain "sole
discretion" over whether to mine the land. *Id.* at 538.  But then, in an alleged effort to monopo-
lize the market and prevent the mine from falling into the hands of a competitor, the defendant
donated the land to an environmental group that opposed mining. *Id.*  The plaintiff alleged that

the defendant breached the implied duty of good faith and fair dealing, and the Fourth Circuit

held that the plaintiff had stated a claim for relief. *Id.* at 541–42. The Fourth Circuit explained

that the defendant's contractual right to exercise its "sole discretion" over use of the mine con-

tained an implicit agreement that the defendant would make the decision in good faith and not

transfer the land to an environmental group opposed to mining. *Id.* at 542. *See also Historic*

*Green Springs, Inc. v. Brandy Farm, Ltd.*, 32 Va. Cir. 98, at *4 (1993).

       3.      Moreover, in the specific context of the dividend and liquidation rights of pre-

ferred shareholders, courts have denied motions to dismiss claims for breach of the implied cov-

enant of good faith and fair dealing that are materially indistinguishable from Plaintiffs' claims

in this case. For example, in *QVT Fund*, a company with a duty to pay a dividend to preferred

shareholders whenever it was profitable entered into a German "domination agreement" that al-

lowed the company to transfer all annual profits to the dominating firm. 2011 WL 2672092, at

*4. The plaintiffs, preferred shareholders in the company, conceded that the transfer of all prof-

its to the dominating firm prevented the company from having accounting "profit" that triggered

its duty to pay a dividend, but the plaintiffs nonetheless argued that the company breached the

implied covenant of good faith and fair dealing. *Id.* at *14. Specifically, the plaintiffs argued

that the contractual agreement to pay a dividend when the company was profitable contained an

implied promise to operate the company for a profit and for the benefit of the shareholders. *Id.*

The plaintiffs alleged that the company was not profitable because it had transferred all profits to

the dominating company. *Id.* The Delaware Chancery Court denied the company's motion to

dismiss, explaining that, although the contract did not explicitly state that the company could not

enter into a domination agreement, the court could not "rule out the possibility that the Bank's

action of entering into the Domination Agreement might not have been foreseeable to the [com-

pany's] U.S. investors, who reasonably might have expected the Bank to remain a profit-seeking entity and not take action deliberately to change that status." *Id.*

Plaintiffs' implied covenant claims survive for the same reason those in *QVT Fund* survived. Plaintiffs have alleged that the contract, both explicitly and implicitly, requires that the company will be run as a profit-seeking venture for the benefit of all classes of shareholders, including the private preferred shareholders. The Companies (and FHFA, as conservator) had discretion whether to declare a dividend, but they had to make that decision in good faith and with an eye to operating a profitable company for the benefit of all shareholders. *See Airborne Health*, 984 A.2d at 146–47 (the implied covenant requires a discretion-exercising party to act reasonably and in good faith). Moreover, no reasonable investor would have anticipated that Fannie and Freddie would attempt to eliminate entirely the value of their shares in a self-dealing transaction purporting to amend the terms of another class of stock. Nor would anyone have invested in the Companies if they had understood that the Companies could unilaterally extinguish the investment by simply agreeing to pay *all* of their profits, forever, to a single investor. *See E.I. DuPont*, 679 A.2d at 443 (in cases of unanticipated developments, the court must ask what the parties likely would have done had they considered the issue involved).

In the liquidation context, the Chancery Court held in *Quadrangle Offshore (Cayman), LLC v. Kenetech Corp.*, that "[i]mplicit in [a liquidation preference] provision is that [the company] would refrain from arbitrary and unreasonable conduct which would have the effect of preventing the Preferred Stockholders from receiving the Liquidation Preference." No. 16362, 1998 WL 778359, at *6 (Del. Ch. Oct. 21, 1998) (unpublished) (internal quotation marks omitted). In *Quadrangle*, the defendant company had pursued no business and sold most of its assets to pay creditors, but because the company did not formally declare that it was in liquidation, it

did not pay the preferred shareholders their contractually-specified liquidation preference.  *Id.* at *2.  The preferred shareholders sued for the liquidation preference, arguing that the company violated the implied covenant of good faith and fair dealing.  *Id.*  The court rejected the company's argument that the express contractual provision specifying a liquidation preference foreclosed a claim about an implied covenant with respect to liquidation: "The Certificate does not address the process by which [the company] is to liquidate, which is, after all, the essential factual dispute underlying [the claim for breach of the implied covenant]."  *Id.* at *6.  Likewise, Plaintiffs in this case have stated a claim that the Government violated the implied covenant that the Companies will not effectively liquidate without honoring Plaintiffs' liquidation preference.

In short, Plaintiffs have alleged that FHFA's discretionary power as conservator to declare a dividend or place the Companies in liquidation contained an implied promise that the Companies would be operated for a profit and that the decisions about dividends and liquidation would be made in good faith and with due consideration for the benefit of all shareholders.  The Government violated that implied duty by exercising its discretion in bad faith and "not only completely disregard[ing] [Plaintiffs'] interests and welfare, but actually work[ing] directly to injure [Plaintiffs'] interest in the agreement."  *Historic Green Springs*, 32 Va. Cir. at *4.

4.   FHFA relies upon *Glinert v. Wickes Companies*, 16 DEL. J. CORP. L. 764, No. 10407, 1990 WL 34703 (Del. Ch. 1990) (unpublished), where the Delaware court, applying California law, held that because the company had the contractual right to eliminate the value of stock warrants in a merger where the company *did not* survive, it also by implication could do so in a merger where the company *did* survive.  *Id*. at 778–79.  FHFA relies on this case to elide the distinction between the creation of new stock and the amendment of existing stock.  *See* FHFA Br. at 45.  But as explained earlier, *supra* at 28-30, Plaintiffs' contracts do not provide the Com-

pany the right *under any circumstances* to wholly extinguish the rights of existing preferred shareholders to a dividend and liquidation preference.  And to the extent *Glinert*'s inquiry into subjective intent to contradict the clear terms of a contract was ever part of *Delaware* law (as opposed to California law), it has been overruled by the later published decision in *Allied Capital* that "speculation on the intention of the original parties is only appropriate when a contract is silent with respect to the subject matter at issue."  *Allied Capital*, 910 A.2d at 1034.  *See also Shenandoah Life Ins*, 14 DEL. J. CORP. L. at 410–11.

5.     FHFA argues that Plaintiffs' contract claims fail because the Board has "sole discretion" over whether to grant a dividend.  *See* FHFA Br. at 41.  But discretion not to declare a dividend during any particular quarter or year plainly does not include discretion to eliminate the possibility—for all time—that any Board of the Company will ever be in a position to declare a dividend.  In any event, the heartland of the implied covenant of good faith and fair dealing is a case where the contract confers discretion on one party, in which case the court must scrutinize whether that party acted reasonably and in good faith.  *See, e.g.*, *Airborne Health*, 984 A.2d at 146–47; *Amirsaleh*, 2008 WL 4182998, at *8; *Virginia Vermiculite*, 156 F.3d at 542.  By entering into the Sweep Amendment, FHFA announced that in all future quarters, and without regard to the future profitability of the companies (and indeed with full knowledge and expectation that the companies will be immensely profitable), the Companies would *never* declare a dividend to the private preferred shareholders.  If there is any obligation of good faith and fair dealing that restricts the manner in which a company may treat its preferred shareholders, then FHFA has surely violated it.

At a minimum, whether FHFA violated that covenant depends on a "fact-intensive" in-quiry into the motivations behind FHFA's actions, *Dunlap*, 878 A.2d at 442, and it would be in-appropriate to grant FHFA's motion to dismiss at this time.

**F.    Plaintiffs' Suit Is Not Barred Because the Companies Have Not Declared a Dividend on Plaintiffs' Stock.**

FHFA also argues that Plaintiffs' claims are barred because their right to a dividend is a mere "expectancy," and the Board has not declared a dividend.  FHFA Br. at 41–42.  FHFA's argument fails for at least three reasons.

First, as explained above, Plaintiffs' preferred stock certificates entitle them to concrete and present rights to the *potential* to receive a dividend or a payment upon liquidation according to contractually specified terms.  These rights formed the core of the economic value of the Pre-ferred Stock.  The Sweep Amendment eliminated these rights, and that injury was complete when the Government entered into the Sweep Amendment.

Second, as also explained above, Plaintiffs have alleged that the Sweep Amendment con-verted the Government Stock into common stock and that FHFA's dividend payments under the Sweep Amendment are thus dividend payments to common shareholders.  Accordingly, a divi-dend *has been declared* in favor of common shareholders, which violates the preferred share-holders' express contractual right to their preferred dividend.  *See, e.g.*, Fannie, Cert. Design. of Series P Preferred Stock, § 2(b).

Third, FHFA's argument, if accepted, would bar all claims by preferred shareholders that the Companies improperly declined to declare a dividend or liquidation preference.  Unsurpris-ingly, courts have not adopted FHFA's argument.  For example, in *QVT Fund*, the Chancery Court allowed a suit by preferred shareholders who argued that the company *should have but did not* declare a dividend in their favor, and that the company effectively extinguished its right to a

44

dividend by obligating *all* profits to the dominating company.  2011 WL 2672092, at \*14.  And

in the liquidation context, the Chancery Court held in *Quadrangle* that a breach of contract claim

for a liquidation preference was ripe for review where the plaintiffs alleged that the defendant

company was in de facto liquidation, although not de jure liquidation.  1998 WL 778359, at \*7.

## CONCLUSION

For the foregoing reasons and for the reasons set forth in Plaintiffs' APA brief, this Court

should deny Defendants' motions to dismiss and for summary judgment and should grant Plain-

tiffs' cross-motion for summary judgment on their APA claims.

Respectfully Submitted,

Dated:  March 21, 2014

/s/ Drew W. Marrocco
Drew W. Marrocco, SBN 452305
DENTONS US LLP
1301 K Street, N.W., Suite 600, East Tower
Washington, D.C.  20005
Telephone:  202.408.6400
Facsimile:  202.408.6399

Michael H. Barr (*Pro Hac Vice*)
Richard M. Zuckerman (*Pro Hac Vice*)
Sandra Hauser (*Pro Hac Vice*)
DENTONS US LLP
1221 Avenue of the Americas
New York, N.Y.  10020
Telephone:  212.768.6700
Facsimile:  212.768.6800

*Attorneys for Plaintiffs Arrowood Indemnity Co. et al.*

/s/ Charles J. Cooper
Charles J. Cooper, SBN 24870
Vincent J. Colatriano, SBN 429562
David H. Thompson, SBN 450503
Peter A. Patterson, SBN 998668
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C.  20036
Telephone:  202.220.9600
Facsimile:  202.220.9601

*Attorneys for Plaintiffs Fairholme Funds, Inc. et al.*