# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FAIRHOLME FUNDS, INC., on behalf of its
series The Fairholme Fund,
4400 Biscayne Boulevard, Suite 900
Miami, FL 33137

THE FAIRHOLME FUND, a series of
Fairholme Funds, Inc.,
4400 Biscayne Boulevard, Suite 900
Miami, FL 33137

BERKLEY INSURANCE COMPANY,
475 Steamboat Road
Greenwich, CT 06830

ACADIA INSURANCE COMPANY,
One Acadia Commons
Westbrook, ME 04092

ADMIRAL INDEMNITY COMPANY,
301 Route 17 North, Suite 900
Rutherford, NJ 07070

ADMIRAL INSURANCE COMPANY,
7233 East Butherus Drive
Scottsdale, AZ 85260

BERKLEY REGIONAL INSURANCE
COMPANY,
11201 Douglas Avenue
Urbandale, IA 50322

CAROLINA CASUALTY INSURANCE
COMPANY,
11201 Douglas Avenue
Urbandale, IA 50322

MIDWEST EMPLOYERS CASUALTY
INSURANCE COMPANY,
14755 North Outer Forty Drive, Suite 300
Chesterfield, MO 63017

NAUTILUS INSURANCE COMPANY,
7233 East Butherus Drive
Scottsdale, AZ 85260

Civil Action No. 13-1053

1

PREFERRED EMPLOYERS INSURANCE
COMPANY,
9797 Aero Drive, Suite 200
San Diego, CA 92108

                Plaintiffs,

   v.

THE FEDERAL HOUSING FINANCE
AGENCY, in its capacity as Conservator of the
Federal National Mortgage Association and the
Federal Home Loan Mortgage Corporation,
Constitution Center
400 7th Street, S.W.
Washington, D.C. 20024

MELVIN L. WATT, in his official capacity as
Director of the Federal Housing Finance
Agency,
Constitution Center
400 7th Street, S.W.
Washington, D.C. 20024

FEDERAL NATIONAL MORTGAGE
ASSOCIATION,
3900 Wisconsin Avenue, NW,
Washington, D.C. 20016

FEDERAL HOME LOAN MORTGAGE
CORPORATION,
8200 Jones Branch Drive,
McLean, Virginia 22102

                Defendants.

## AMENDED COMPLAINT FOR DECLARATORY
## AND INJUNCTIVE RELIEF AND DAMAGES

Plaintiffs Fairholme Funds, Inc., The Fairholme Fund, Berkley Insurance Company,

Acadia Insurance Company, Admiral Indemnity Company, Admiral Insurance Company,

Berkley Regional Insurance Company, Carolina Casualty Insurance Company, Midwest

Employers Casualty Insurance Company, Nautilus Insurance Company, Preferred Employers Insurance Company (collectively, "Plaintiffs"), allege as follows:

## I.
## INTRODUCTION

1.      This suit challenges the 2012 expropriation and effective nationalization of two of the Nation's largest and most profitable companies—Fannie Mae and Freddie Mac (the "Companies"). In August 2012, Fannie's and Freddie's conservator, the Federal Housing Finance Agency ("FHFA"), acquiesced in Treasury's plan to fundamentally change Treasury's securities from fixed-rate dividend preferred stock that would have entitled Treasury to receive approximately $19 billion in 2013, to different stock that entitles Treasury to receive quarterly "dividend" payments equal to each Company's net worth, less a small and diminishing capital buffer. In substance, that change—known as the Net Worth Sweep—nullified the investments of all shareholders other than Treasury, transformed Treasury's preferred stock investment into 100% of the Companies' common stock, and amounted to a purchase of securities long after Treasury's authority to make such purchases had expired in 2009.

2.      The Net Worth Sweep has netted Treasury an astonishing windfall of more than *$130 billion* and has forced the Companies to operate with almost no capital and in an inherently unsound condition. For decades, federal conservators have exercised powers under statutory schemes indistinguishable from the one at issue here. Yet, no conservator has ever before operated its ward for the exclusive benefit of the federal government. The Net Worth Sweep is an unprecedented expropriation of private property that Congress did not authorize and that violates the statutory, contractual, and common law rights of Plaintiffs and the Companies' other shareholders.

## II.
## JURISDICTION AND VENUE

3.      Count I of this action arises under the Administrative Procedure Act ("APA"), 5

U.S.C. §§ 551-706, and/or the Housing and Economic Recovery Act of 2008 ("HERA"), PUB. L.

NO. 110-289, 122 Stat. 2654 (2008) (codified at 12 U.S.C. §§ 1455, 1719, 4617).  The Court has

subject-matter jurisdiction over this claim under 28 U.S.C. § 1331.  The Court is authorized to

issue the non-monetary relief sought with respect to this claim pursuant to 5 U.S.C. §§ 702, 705,

and 706.  The Court has subject matter jurisdiction over Counts II-V under 28 U.S.C. § 1367.

This Court also has subject matter jurisdiction over all Counts under 12 U.S.C. § 1452(f).

4.      Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial

portion of the transactions and wrongs complained of, including the defendants' primary

participation in the wrongful acts detailed herein, occurred in this district. Most of the

Defendants reside in or maintain executive offices in this district, and Defendants have engaged

in numerous activities and conducted business here, which had an effect in this district.

## III.
## PARTIES

5.      Plaintiff Fairholme Fund is a mutual fund that owns preferred stock in both

Fannie and Freddie.  Like all of the Companies' preferred shareholders, Fairholme is entitled to a

contractually specified, non-cumulative dividend from the Companies in preference to dividends

on common stock.  Ownership of the preferred stock also entitles Fairholme to a contractually

specified liquidation preference.  The preferred stock is junior to Treasury's senior preferred

stock.  If valid, the Net Worth Sweep expropriates the value of Fairholme's preferred stock by

eliminating any prospect of a return of principal (i.e., the liquidation preference) or any return on

its principal (i.e., in the form of dividends).  Fairholme is a series of Fairholme Funds, Inc., a

Maryland corporation headquartered in Florida. When Fairholme acquired its shares, it did so in

expectation that it was acquiring all of the associated economic rights of the seller. Fairholme's principal place of business is 4400 Biscayne Boulevard, Suite 900, Miami, Florida 33137.

6.     W.R. Berkley Corporation owns directly or indirectly the following plaintiffs: Berkley Insurance Company, Acadia Insurance Company, Admiral Indemnity Company, Admiral Insurance Company, Berkley Regional Insurance Company, Carolina Casualty Insurance Company, Midwest Employers Casualty Insurance Company, Nautilus Insurance Company, Preferred Employers Insurance Company (collectively, the "Berkley Plaintiffs").  The Berkley Plaintiffs are insurance companies.

7.     Plaintiff Berkley Insurance Company is a Delaware corporation headquartered in Greenwich, Connecticut.

8.     Plaintiff Acadia Insurance Company is a New Hampshire corporation headquartered in Westbrook, Maine.

9.     Plaintiff Admiral Indemnity Company is a Delaware corporation headquartered in Rutherford, New Jersey.

10.     Plaintiff Admiral Insurance Company is a Delaware corporation headquartered in Scottsdale, Arizona.

11.     Plaintiff Berkley Regional Insurance Company is a Delaware Corporation headquartered in Urbandale, Iowa.

12.     Plaintiff Carolina Casualty Insurance Company is an Iowa corporation headquartered in Urbandale, Iowa.

13.     Plaintiff Midwest Employers Casualty Insurance Company is a Delaware corporation headquartered in Chesterfield, Missouri.

14.     Plaintiff Nautilus Insurance Company is an Arizona corporation headquartered in Scottsdale, Arizona.

15.     Plaintiff Preferred Employers Insurance Company is a California Corporation headquartered in San Diego, California.

16.     At all times relevant hereto, Fannie and Freddie preferred shares have been owned either by the Berkley Plaintiffs or by Berkley Insurance Company. The shares of Fannie and Freddie preferred stock were initially acquired by the Berkley Plaintiffs, but the shares were later transferred to Berkeley Insurance Company. When these transfers of shares were made among the various Berkley Plaintiffs, the Berkley Plaintiffs' expectation was that all rights in the shares would transfer to the Berkley entities acquiring them. Furthermore, when the Berkley Plaintiffs originally acquired their shares, they had a reasonable expectation that a new class of securities in the Companies (or an amendment to an existing class of securities) would not wipe out all of the Companies' existing equity. Berkley Insurance Company has continuously owned Fannie preferred shares since January 2005 and Freddie preferred shares since December 2009, and it had a reasonable expectation when it acquired its shares that a new class of securities in the Companies (or an amendment to an existing class of securities) would not wipe out its shares.

17.     Defendant FHFA is, and was at all relevant times, an independent agency of the United States Government subject to the Administrative Procedure Act. *See* 5 U.S.C. § 551(1). FHFA was created on July 30, 2008, pursuant to HERA. FHFA is located at Constitution Center, 400 7th Street, S.W., Washington, D.C. 20024.

18.     Defendant Melvin L. Watt is the Director of FHFA. His official address is Constitution Center, 400 7th Street, S.W., Washington, D.C. 20024. He is being sued in his official capacity. In that capacity, Director Watt has overall responsibility for the operation and

management of FHFA. Director Watt, in his official capacity, is therefore responsible for the conduct of FHFA that is the subject of this Complaint and for the related acts and omissions alleged herein.

19.     Defendant Fannie Mae is a federally chartered corporation with its principal executive offices located at 3900 Wisconsin Avenue, NW, Washington, D.C. 20016.

20.     Defendant Freddie Mac is a federally chartered corporation with its principal executive offices located at 8200 Jones Branch Drive, McLean, Virginia 22102.

## IV.
## FACTUAL ALLEGATIONS

### Fannie and Freddie

21.     Fannie is a for-profit, stockholder-owned corporation organized and existing under the Federal National Mortgage Act. Freddie is a for-profit, stockholder-owned corporation organized and existing under the Federal Home Loan Corporation Act. The Companies' business includes purchasing and guaranteeing mortgages originated by private banks and bundling the mortgages into mortgage-related securities that can be sold to investors.

22.     Fannie and Freddie are owned by private shareholders and their securities are publicly traded. Fannie was chartered by Congress in 1938 and originally operated as an agency of the Federal Government. In 1968, Congress reorganized Fannie into a for-profit corporation owned by private shareholders. Freddie was established by Congress in 1970 as a wholly-owned subsidiary of the Federal Home Loan Bank System. In 1989, Congress reorganized Freddie into a for-profit corporation owned by private shareholders.

23.     Before being forced into conservatorship, both Fannie and Freddie had issued common stock and several series of preferred stock. The several series of preferred stock of the Companies are in parity with each other with respect to their claims on income (i.e., dividend

payments) and claims on assets (i.e., liquidation preference or redemption price), but they have priority over the Companies' common stock for these purposes. The holders of common stock are entitled to the residual economic value of the firms.

### Fannie and Freddie Are Forced into Conservatorship

24.     The Companies were well-positioned to weather the decline in home prices and financial turmoil of 2007 and 2008. While banks and other financial institutions involved in the mortgage markets had heavily invested in increasingly risky mortgages in the years leading up to the financial crisis, Fannie and Freddie had taken a more conservative approach such that the mortgages they insured (primarily 30-year fixed rate conforming mortgages) were far safer than those held by the nation's largest banks. And although both Companies recorded losses in 2007 and the first two quarters of 2008—losses that largely reflected a *temporary* decline in the market value of their holdings caused by declining home prices—both Companies continued to generate enough cash to easily pay their debts and retained billions of dollars of capital that could be used to cover any future losses. Neither Company was in danger of insolvency.

25.     During the summer of 2008, both Treasury Secretary Henry Paulson and Office of Federal Housing and Enterprise Oversight ("OFHEO") Director James Lockhart publicly stated that Fannie and Freddie were financially healthy. For example, on July 8, 2008, Director Lockhart told CNBC that "both of these companies are adequately capitalized, which is our highest criteria." Two days later, on July 10, Secretary Paulson testified to the House Committee on Financial Services that Fannie's and Freddie's "regulator has made clear that they are adequately capitalized." And on July 13, Director Lockhart issued a statement emphasizing that "the Enterprises $95 billion in total capital, their substantial cash and liquidity portfolios, and their experienced management serve as strong supports for the Enterprises' continued

operations." An analysis of Freddie's financial condition in August 2008 for FHFA by BlackRock supported these assessments and stated that Freddie's "long-term solvency does not appear endangered – we do not expect Freddie Mac to breach critical capital levels even in stress case."

26.     Despite the Companies' comparatively strong financial position amidst the crisis, Treasury initiated a long-term policy of seeking to seize control of Fannie and Freddie and operate them for the exclusive benefit of the federal government. To that end, during the summer of 2008, Treasury officials promoted short-selling of the Companies' stock by leaking word to the press that Treasury might seek to place the Companies into conservatorship. On July 21, 2008, Treasury Secretary Paulson personally delivered a similar message to a select group of investment managers during a private meeting at Eton Park Capital Management. Although at odds with Treasury's on-the-record statements to the press, the leaks and tips had the intended effect of manipulating the market prices of the Companies' securities—driving down the Companies' stock prices and creating a misperception among investors that the Companies were in financial distress.

27.     Also during the summer of 2008, Treasury pressed Congress to pass what became the Housing and Economic Recovery Act of 2008 ("HERA"). HERA created FHFA (which succeeded to the regulatory authority over Fannie and Freddie previously held by OFHEO) and authorized FHFA, under certain statutorily prescribed and circumscribed conditions, to place the Companies into either conservatorship or receivership.

28.     In authorizing FHFA to act as conservator under specified circumstances, Congress took FHFA's conservatorship mission verbatim from the Federal Deposit Insurance Act ("FDIA"), *see* 12 U.S.C. § 1821(d)(2)(D), which itself incorporated a long history of

financial supervision and rehabilitation of troubled entities under common law. HERA and the FDIA, as well as the common law concept on which both statutes draw, treat conservatorship as a process designed to stabilize a troubled institution with the objective of returning it to normal business operations. Like any conservator, when FHFA acts as a conservator under HERA it has a fiduciary duty to safeguard the interests of the Companies and *all* their shareholders. *See* 12 U.S.C. § 4617(b)(2)(D).

29.     Consistent with HERA's statutory mandates, FHFA has repeatedly acknowledged that "[t]he purpose of conservatorship is to preserve and conserve each company's assets and property and to put the companies in a sound and solvent condition" and "[t]o fulfill the statutory mandate of conservator, FHFA must follow governance and risk management practices associated with private-sector disciplines." FHFA, REPORT TO CONGRESS 2009 at i, 99 (May 25, 2010); *see also* FHFA 2009 Annual Report to Congress at 99 (May 25, 2010), http://goo.gl/DqVE2w ("The statutory role of FHFA as conservator requires FHFA to take actions to preserve and conserve the assets of the Enterprises and restore them to safety and soundness."); FHFA Strategic Plan at 7 (Feb. 21, 2012), http://goo.gl/kket7D (acknowledging HERA's " 'preserve and conserve' mandate"). Other documents prepared by FHFA and Treasury state that "FHFA as conservator is required to preserve assets," that one of the "[l]egal [c]onstraints" imposed on FHFA is its "mandate[ ] to 'conserve assets,' " that FHFA has a "conservatorship mandate[ ]" "to place the companies in a sound and stable condition," and that "FHFA has a responsibility to take such actions as may be necessary to put the Enterprises in a sound and solvent condition and to preserve and conserve their assets and property." Mario Ugoletti, the FHFA official primarily responsible for negotiating the Net Worth Sweep, has

likewise said under oath that conserving the Companies' assets is "a fundamental part of conservatorship."

30.     Under HERA, conservatorship is a status distinct from receivership, with very different purposes, responsibilities, and restrictions. When acting as a receiver, but *not* when acting as a conservator, FHFA is authorized and obliged to "place the regulated entity in liquidation and proceed to realize upon the assets of the regulated entity." *Id*. § 4617(b)(2)(E). The only "post-conservatorship outcome[ ] . . . that FHFA may implement today under existing law," by contrast, "is to reconstitute [Fannie and Freddie] under their current charters." Letter from Edward J. DeMarco, Acting Director, FHFA, to Chairmen and Ranking Members of the Senate Committee on Banking, Housing, and Urban Affairs and to the House Committee on Financial Services 7 (Feb. 2, 2010). In other words, receivership is aimed at winding down a company's affairs and liquidating its assets, while conservatorship aims to rehabilitate it and return it to normal operation. This distinction between the purposes and authorities of a receiver and a conservator is a well-established tenet of financial regulation and common law.

31.     In promulgating regulations governing its operations as conservator versus receiver of the Companies, FHFA specifically acknowledged the distinctions in its statutory responsibilities as conservator and as receiver: "A conservator's goal is to continue the operations of a regulated entity, rehabilitate it and return it to a safe, sound and solvent condition." 76 Fed. Reg. at 35,730. In contrast, when FHFA acts as a receiver, the regulation specifically provides that "[t]he Agency, as receiver, *shall* place the regulated entity in liquidation . . . ." 12 C.F.R. § 1237.3(b) (emphasis added).  Internal FHFA documents from 2008 reflect the same understanding of conservatorship, describing it as "a statutory process to stabilize a troubled institution which is intended to have a limited duration and has as its

objective to return the entity to normal business operations once stabilized" and "a legal process to stabilize a troubled institution with the objective of returning the [Companies] to normal business operations."

32.     On September 6, 2008, FHFA—at the instruction of Treasury—directed the Companies' boards to consent to conservatorship. Given that the Companies were not in financial distress and were in no danger of defaulting on their debts, the Companies' directors were given a Hobson's choice: face intense scrutiny from federal agencies for rejecting conservatorship or submit to the demands of Treasury and FHFA (the "Agencies"). The Agencies ultimately obtained the Companies' consent by threatening to seize them if they did not acquiesce and by informing them that the Agencies had already selected new CEOs and had teams ready to move in and take control.

33.     In publicly announcing the conservatorship, FHFA committed itself to operate Fannie and Freddie as a fiduciary until they are stabilized. As FHFA acknowledged, the Companies' stock remains outstanding during conservatorship and "continue[s] to trade," *FHFA Fact Sheet, Questions and Answers on Conservatorship* 3, and Fannie's and Freddie's stockholders "continue to retain all rights in the stock's financial worth," *id.* Director Lockhart testified before Congress that Fannie's and Freddie's "shareholders are still in place; both the preferred and common shareholders have an economic interest in the companies" and that "going forward there may be some value" in that interest. Sept. 25, 2008, Hearing, U.S. House of Representatives, Committee on Financial Servs, H.R. Hrg. 110-142 at 29-30, 34.

34.     FHFA also emphasized that the conservatorship was temporary: "Upon the Director's determination that the Conservator's plan to restore the [Companies] to a safe and solvent condition has been completed successfully, the Director will issue an order terminating

12

the conservatorship." *FHFA Fact Sheet, Questions and Answers on Conservatorship* 2. Investors were entitled to rely on these official statements of the purposes of the conservatorship, and public trading in Fannie's and Freddie's stock was permitted to, and did, continue.

35.     In short, the Companies were not in financial distress when they were forced into conservatorship. The Companies' boards acquiesced to conservatorship based on the understanding that FHFA, like all federal conservators in the past, would operate the Companies as a fiduciary with the goal of preserving and conserving their assets and managing them in a safe and solvent manner. And in publicly announcing the conservatorships, FHFA confirmed that the Companies' private shareholders continued to hold an economic interest that would have value, particularly as the Companies generated profits in the future.

### FHFA and Treasury Enter into the Purchase Agreements

36.     On September 7, 2008, Treasury and FHFA, acting in its capacity as conservator of Fannie and Freddie, entered into the Preferred Stock Purchase Agreements ("PSPAs"). The PSPAs are materially identical for both Companies. Under the original agreements, Treasury committed to provide up to $100 billion to each Company to ensure that it maintained a positive net worth. For quarters in which either Company's liabilities exceed its assets under Generally Accepted Accounting Principles, the PSPAs authorize draws upon Treasury's commitment in an amount equal to the difference between liabilities and assets.

37.     In return for Treasury's funding commitment, FHFA agreed to provide Treasury with several forms of consideration that together would entitle Treasury to much—but not all—of the Companies' accumulated capital and future profits. With the Companies still able to raise additional funding in the capital markets and at no risk of failing to generate enough cash to cover

13

their expenses, this was an extraordinarily one-sided agreement that the Companies would not have agreed to had they still been under private management.

38.     Under the PSPAs, Treasury received several forms of consideration in return for its funding commitment. First, FHFA agreed to grant Treasury warrants to purchase 79.9% of the common stock of each Company at a nominal price. Exercising these warrants would entitle Treasury to up to 79.9% of all future profits of the Companies, subject to the Companies' obligation to satisfy their dividend obligations with respect to their preferred stock and to share the remaining 20.1% of those profits with private common shareholders. As Treasury noted at the time, the warrants "provide[d] potential future upside to the taxpayers." Action Memorandum for Secretary Paulson (Sept. 7, 2008).

39.     As further consideration for Treasury's funding commitment, Treasury also received 1 million shares of senior preferred stock ("Government Stock") in each Company. Treasury's Government Stock in each Company had an initial liquidation preference of $1 billion. This liquidation preference increases by one dollar for each dollar the Companies draw on Treasury's funding commitment. In the event that the Companies liquidate, Treasury is entitled to recover the full amount of the liquidation preference before any other preferred or common shareholder receives anything.

40.     In addition to payments in the event that the Companies are liquidated, the Government Stock also entitled Treasury to receive, at the Companies' election, either: (i) a quarterly cumulative cash dividend equal to 10% of the value of Treasury's outstanding liquidation preference per year; or (ii) a 12% increase in the amount of Treasury's liquidation preference. If the Companies decided not to pay the dividend in cash, the resulting increase in the size of Treasury's liquidation preference would amount to an in-kind dividend payment of additional

Government Stock. After any such in-kind dividend payment, the PSPAs provided that the dividend rate would increase to 12% (payable either in cash or in kind, as just described) until such time as full cumulative dividends were paid in cash, at which point the rate would return to 10%. Thus, the Companies never were required to pay a cash dividend to Treasury but rather had the discretion to pay dividends in kind. Moreover, there was never any risk that the Companies would become insolvent due to the payment of cash dividends since it would have been illegal under state law for either Company to pay a dividend that would have caused it to become insolvent.

41.     FHFA officials repeatedly confirmed their understanding that the PSPAs were designed to allow the Companies to pay the Government Stock dividends in kind—with additional Government Stock—rather than in cash. A document attached to a September 16, 2008, email between FHFA officials expressly states that PSPA dividends may be "paid in-kind." Another FHFA document says that Treasury's Government Stock pays "10 percent cash dividend (12 percent payment-in-kind)." In an internal October 2008 email to Mr. Ugoletti—who was then a Treasury official, but later moved to FHFA and was a key point of contact with Treasury in the development of the Net Worth Sweep—another Treasury official indicated that Treasury's consultant wanted to know "whether we expect [Fannie and Freddie] to pay the preferred stock dividends in cash or to just accrue the payments." Mr. Ugoletti did not forget about this feature of the PSPAs when he moved to FHFA. Indeed, he acknowledged the option to pay dividends "in kind" in an email that he sent the very day the Net Worth Sweep was announced.

42.     Treasury likewise understood the PSPAs to permit in kind dividend payments. Upon entering the PSPAs Treasury released a fact sheet stating that, "[t]he senior preferred stock shall accrue dividends at 10% per year. The rate shall increase to 12% if, in any quarter, the dividends are not paid in cash . . . ." U.S. TREASURY DEP'T OFFICE OF PUB. AFFAIRS, FACT SHEET:

TREASURY SENIOR PREFERRED STOCK PURCHASE AGREEMENT (Sept. 7, 2008), https://goo.gl/ynb3TC. In an October 2008 email to Treasury and FHFA officials, a Treasury consultant sought to clarify whether Fannie and Freddie "intend[ed] to pay cash at 10 percent or accrue at 12 percent as a matter of policy." An internal Treasury document says that the dividend rate "may increase to the rate of 12 percent if, in any quarter, the dividends are not paid in cash." And in 2012, as Treasury contemplated replacing the existing dividend structure with the Net Worth Sweep, Treasury told the SEC that the dividend rate on the original PSPAs would be 12% "if elected to be paid in kind." Treasury Presentation to SEC, GSE Preferred Stock Purchase Agreements (PSPA), Overview and Key Considerations at 9, June 13, 2012.

43.     The Companies shared this understanding of the terms of their agreements with Treasury. Fannie's and Freddie's CFOs have testified that they were aware of the payment-in-kind option. Various Freddie documents say that "[t]he dividend becomes 12% if Freddie Mac is unable to pay the dividend through organic income," that "[t]he senior preferred stock will pay quarterly cumulative dividends at a rate of 10% per year or 12% in any quarter in which dividends are not paid in cash," and that Treasury's stock "[p]ays quarterly cumulative dividend rate at 10% per year, or 12% in any quarter in which dividends are not paid in cash." Similarly, Fannie documents say that Treasury's senior preferred stock "has an annual dividend rate of 10%, which could increase to 12% if not paid in cash," and that "[i]f at any time . . . the Company does not pay the cash dividends in a timely manner, . . . the annual dividend rate will be 12%."

44.     An in-kind dividend payment would not have decreased the amount of Treasury's remaining funding commitment because only when the Companies receive "funding under the Commitment" does the commitment's size decrease. PSPA § 1. Thus, as the Congressional Research Service has acknowledged, under the PSPAs' original terms the

16

Companies could "pay a 12% annual senior preferred stock dividend indefinitely." N. Eric Weiss, Cong. Research Serv., RL34661, Fannie Mae's and Freddie Mac's Financial Problems (Aug. 10, 2012). In other words, because of the payment-in-kind option, there was no risk that the PSPAs would force Fannie and Freddie to exhaust Treasury's funding commitment to facilitate the payment of dividends.

45.     Finally, the PSPAs provided for the Companies to pay Treasury a quarterly periodic commitment fee "intended to fully compensate [Treasury] for the support provided by the ongoing Commitment." PSPA § 3.2(a). The periodic commitment fee was to be set for five-year periods by agreement of the Companies and Treasury, but Treasury had the option to waive it for up to a year at a time. Treasury repeatedly exercised this option and never deemed it necessary to receive a periodic commitment fee under the PSPAs. Even if the fee had been charged, the Companies were always free under the express terms of the PSPAs to pay the fee in-kind with additional senior preferred stock rather than in cash, a fact that Freddie's auditor recognized. *See* PSPA § 3.2(c) ("At the election of Seller, the Periodic Commitment Fee may be paid in cash or by adding the amount thereof ratably to the liquidation preference of each outstanding share of Senior Preferred Stock . . . .").

46.     The PSPAs were "structure[d]" to "enhance the probability of both Fannie Mae and Freddie Mac ultimately repaying amounts owed." Action Memorandum for Secretary Paulson (Sept. 7, 2008). Nevertheless, while Treasury's commitment remains outstanding, Fannie and Freddie generally are prohibited from paying down amounts added to the liquidation preference due to draws from Treasury's commitment. *See* Fannie and Freddie Government Stock Certificates § 3(a). The PSPAs also prohibit Fannie and Freddie from declaring and paying dividends on any

securities junior to Treasury's Government Stock unless full cumulative dividends have been paid to Treasury on its Government Stock for the then-current and all past dividend periods.

47.    On May 6, 2009, FHFA and Treasury amended the PSPAs to increase Treasury's funding commitment to each Company from $100 billion to $200 billion. On December 24, 2009—one week before Treasury's temporary statutory authority to purchase the Companies' securities expired—the agencies again amended the terms of Treasury's funding commitment. Instead of resetting the commitment at a specific dollar amount, the second amendment established a formula to allow Treasury's total commitment to each Company to exceed (but not fall below) $200 billion depending upon any net worth deficiencies experienced in 2010, 2011, and 2012, and any surplus existing as of December 31, 2012.

### The Agencies Force Accounting Changes to Increase the Companies' Draws From Treasury

48.    Beginning in the third quarter of 2008—when FHFA took control of the Companies as conservator—the Companies suddenly began to make wildly pessimistic and unrealistic assumptions about their future financial prospects. Those assumptions triggered adjustments to the Companies' balance sheets, most notably write-downs of significant tax assets and the establishment of large loan loss reserves, which caused the Companies to report non-cash losses. Although reflecting nothing more than faulty accounting assumptions about the Companies' future prospects and having no effect on the cash flow the Companies were generating, these non-cash losses temporarily decreased the Companies' reported net worth by hundreds of billions of dollars. For example, in the first year and a half after imposition of the conservatorship, Fannie reported $127 billion in losses, but only $16 billion of that amount reflected actual credit-related losses.

18

49.     By the end of 2011, the Companies' reported net worth had fallen by $100 billion as a result of the decision made shortly after imposition of the conservatorship to write down the value of their deferred tax assets. A deferred tax asset is an asset that may be used to offset future tax liability. Under Generally Accepted Accounting Principles, if a company determines that it is unlikely that some or all of a deferred tax asset will be used, the company must establish a "valuation allowance" in the amount that is unlikely to be used. In other words, a company must write down a deferred tax asset if it is unlikely to be used to offset future taxable profits. Shortly after FHFA took control of the Companies, FHFA made the assumption that the Companies would *never again* generate taxable income and that their deferred tax assets were therefore worthless. That flawed decision dramatically reduced the Companies' reported net worth.

50.     The decision to designate excessive loan loss reserves was another important factor in the artificial decline in the Companies' reported net worth during the early years of conservatorship. Loan loss reserves are an entry on the Companies' balance sheets that reduces their reported net worth to reflect anticipated losses on the mortgages they own. Beginning when FHFA took control of the Companies in the third quarter of 2008 and continuing through 2009, the Companies were forced to provision additional loan loss reserves far in excess of the credit losses they were actually experiencing. The extent to which excess loan loss reserve provisioning reduced the Companies' reported net worth is dramatically illustrated by the following chart, which compares the Companies' loan loss reserve provisioning to their actual credit losses since 2006. As the chart shows, FHFA caused the Companies to make grossly excessive loan loss reserve provisions in 2008 and 2009.



**Loan Loss Reserve Provisions vs. Credit Expenses**

Source: Company Financials
   (1) Credit losses based on net charge-offs (charge-offs less recoveries), plus foreclosed property expense.
       Charge-offs taken in relation to credit-impaired loans of Fannie Mae have been reversed, and replaced with
       ultimately realized
   (2) Provisions shown include stated provisions, plus foreclosed property expense for Fannie Mae, and REO
       expense and Transfers for Freddie Mac. Note, stated provisions based on provisions only and excludes
       impact of provision reversals

     51.     Despite the fact that the Companies' mortgage portfolios were safer than the

similar portfolios held by banks involved in the mortgage business, banks were much more

accurate—and, with the consent of their regulators, far less aggressive—in reducing their

reported net worth to reflect expected loan losses. The following chart illustrates this fact:



52.     The accounting decisions that were primarily responsible for the Companies'
reported losses during the early years of conservatorship were never justified, and over time this
fact became increasingly clear. In June 2011, FHFA officials observed in an email exchange that
Freddie was taking loan loss reserves in excess of what its own financial models supported but
that Freddie would "face some hard questioning from FHFA" if it sought "to take down the
reserves in the current clime." In November 2011, a Treasury consultant that had reviewed
Fannie financial projections previously used to justify loan loss reserve and deferred tax asset
decisions observed that "actual net losses were typically lower than predicted in the optimistic
and base cases . . . and far lower than forecasted in the stress cases."

53.     To date, the Companies have drawn a total of $187 billion from Treasury, in large
part to fill the holes in the Companies' balance sheets created by these non-cash losses imposed
under FHFA's conservatorship. Including Treasury's initial $1 billion liquidation preference in

each Company, Treasury's liquidation preference for its Government Stock amounts to approximately $117 billion for Fannie and approximately $72 billion for Freddie. Approximately $26 billion of these combined amounts were drawn simply to pay the 10% dividend payments owed to Treasury. (In other words, FHFA requested draws to pay Treasury this $26 billion in cash that was not otherwise available rather than electing to pay the dividends in kind. Had the dividends been paid in kind, FHFA would not have had to draw from—and, consequently, reduce the remaining size of—Treasury's commitment to pay them.) Thus, Treasury actually disbursed approximately $161 billion to the Companies, a sum that primarily reflected temporary changes in the valuation estimates of assets and liabilities. The Companies' actual losses were never so severe that they would have had a negative net worth absent their excessively pessimistic treatment of deferred tax assets and loan loss reserves.

### The Companies Return to Profitability and Stability

54.     By 2012, the Companies were well-positioned to continue generating profits for the foreseeable future. Fannie's and Freddie's financial results are strongly influenced by home prices. And as FHFA's own Home Price Index shows, the market reached its bottom in 2011:



55.     The improving housing market was coupled with stricter underwriting standards

at Fannie and Freddie. As a result—and as the Agencies recognized—conforming loans

originated after 2008 and insured by Fannie and Freddie had dramatically lower serious

delinquency rates than loans issued between 2005 and 2008. As early as June 2011, a Treasury

official observed that "[a]s Fannie and Freddie continue to work through their legacy book of

business, the actual realized losses are expected to decline significantly." An internal Treasury

document similarly observed that the Companies' losses during the early years of

conservatorship "are almost entirely attributable to loans that were originated and guaranteed

before conservatorship" and that "[t]he 2006, 2007, and 2008 vintages account for over 70% of

all credit losses."

56.     Other FHFA and Treasury documents further support this understanding of the

Companies' financial prospects in 2012.  A presentation sent to senior Treasury officials in

February 2012 indicated that "Fannie and Freddie could have the earnings power to provide

taxpayers with enough value to repay Treasury's net cash investments in the two entities." The Companies' financial performance and outlook only further improved in the months that followed.  Meeting minutes circulated widely within FHFA in July 2012 recount that Fannie's Treasurer "referred to the next 8 years as likely to be 'the golden years of GSE earnings.' " During the weeks leading up to the Net Worth Sweep, a report circulated among senior FHFA officials said that the agency deserved a "high five" for the Companies' strong financial outlook. Around the same time, a Treasury official observed that Freddie's second quarter 2012 results were "very positive." A Treasury official also wrote that Fannie's second quarter 2012 performance was "much stronger than we thought."

57.     On August 9, 2012—eight days before the Net Worth Sweep was announced—Treasury Under Secretary Mary Miller and other senior Treasury officials involved with the Net Worth Sweep met with the senior executives of both Fannie and Freddie. During Treasury's meeting with Fannie's management, Treasury was presented with projections showing the Company earning an average of more than $11 billion per year from 2012 through 2022 and having over $116 billion left of Treasury's funding commitment at the end of that time period. Those projections, which are reproduced below, demonstrate that the most up-to-date information that was before Treasury in August 2012 showed that even if the Companies continued to pay dividends on Treasury's stock in cash, there was no threat to Treasury's funding commitment under the PSPAs:

## Annual Detail of Cumulative Dividends and SPSPA Draws

**Fannie Mae** ($ in Billions)

| | 2008-2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Comprehensive Income | | 11.6 | 7.5 | 11.0 | 12.5 | 13.9 | 13.2 | 12.2 | 11.4 | 10.5 | 10.5 | 10.5 |
| Preferred Dividend Payment | 19.8 | 11.6 | 11.8 | 12.1 | 12.2 | 12.2 | 12.2 | 12.2 | 12.2 | 12.2 | 12.3 | 12.5 |
| Residual Equity | 0.0 | 0.0 | 0.0 | 0.0 | 0.2 | 1.8 | 2.8 | 2.7 | 1.9 | 0.5 | 0.0 | 0.0 |
| Cumulative Dividends | 19.8 | 31.4 | 43.2 | 55.3 | 67.6 | 79.8 | 92.1 | 104.3 | 116.6 | 128.8 | 141.1 | 153.6 |
| Cumulative SPSPA Draws | (116.1) | (116.1) | (119.0) | (121.2) | (121.5) | (121.5) | (121.5) | (121.5) | (121.5) | (121.5) | (122.9) | (124.3) |
| Cumulative Dividends Less Draws | (96.3) | (84.7) | (75.8) | (65.9) | (53.9) | (41.7) | (29.4) | (17.2) | (4.9) | 7.3 | 18.3 | 28.8 |
| SPSPA Funding Cap | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 |
| Remaining Funding under SPSPA | 124.8 | 124.8 | 122.0 | 119.7 | 119.5 | 119.5 | 119.5 | 119.5 | 119.5 | 119.5 | 118.1 | 116.7 |

Note: 2012-2016 figures from Fannie Mae July BOD corporate forecast. 2017-2022 figures are based on simplifying assumptions derived from trends observed within the 2012-2016 horizon.

**Freddie Mac** ($ in Billions)

| | 2008-2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Comprehensive Income | | 11.6 | 7.5 | 8.2 | 8.6 | 9.0 | 8.7 | 8.3 | 7.7 | 7.1 | 6.7 | 6.5 |
| Preferred Dividend Payment | 16.3 | 7.4 | 7.4 | 7.4 | 7.4 | 7.4 | 7.4 | 7.4 | 7.4 | 7.4 | 7.4 | 7.4 |
| Residual Equity | 0.0 | 0.0 | 0.4 | 1.7 | 3.5 | 5.6 | 6.9 | 7.9 | 8.1 | 7.9 | 7.2 | 6.3 |
| Cumulative Dividends | 16.3 | 23.7 | 31.1 | 38.4 | 45.8 | 53.2 | 60.6 | 68.0 | 75.4 | 82.8 | 90.2 | 97.6 |
| Cumulative SPSPA Draws | (72.2) | (116.1) | (73.0) | (73.0) | (73.0) | (73.0) | (73.0) | (73.0) | (73.0) | (73.0) | (73.0) | (73.0) |
| Cumulative Dividends Less Draws | (55.9) | (92.4) | (41.9) | (34.5) | (27.1) | (19.7) | (12.3) | (4.9) | 2.5 | 9.9 | 17.3 | 24.7 |
| SPSPA Funding Cap | 220.5 | 221.3 | 221.3 | 221.3 | 221.3 | 221.3 | 221.3 | 221.3 | 221.3 | 221.3 | 221.3 | 221.3 |
| Remaining Funding under SPSPA | 148.3 | 105.2 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 |

Note: 2012-2022 figures are based on simplifying assumptions derived from Fannie Mae forecast trends and observed relationships between key Fannie Mae and Freddie Mac performance metrics. Reported 2011 results re-aligned as necessary to correspond to Fannie Mae management reporting.

Note: Numbers may not foot due to rounding

7

Confidential Commercial Information - Confidential Treatment and FOIA Exemption Requested



58.    By 2012, Fannie and Freddie began generating consistent profits notwithstanding their overstated loss reserves and the write-down of their deferred tax assets. Fannie has not drawn on Treasury's commitment since the fourth quarter of 2011, and Freddie has not drawn on Treasury's commitment since the first quarter of 2012. In fact, in the first two quarters of 2012, the Companies posted sizable profits totaling more than $11 billion.

59.     As a result of Fannie's and Freddie's return to sustained profitability, it was clear that the overly pessimistic accounting decisions weighing down the Companies' balance sheets would have to be reversed. Indeed, by early August 2012, the Agencies knew that Fannie and Freddie were poised to generate massive profits well in excess of the Companies' dividend obligations to Treasury.

60.     The Agencies were aware that the Companies' provisioning for loan loss reserves greatly exceeded their reported losses. These excess loss reserves artificially depressed the Companies' net worth, and reversing them would cause a corresponding increase in their reported net worth. Fannie told FHFA in April 2012 that updated financial models were "likely to result in a further decline of the [loan loss] allowance as they will include recent history that reflects improved performance." A May 2012 Freddie loan loss review report shared with FHFA indicated that Freddie's credit losses were expected to peak in mid-2012 and then improve. Similarly, on July 19, 2012, a Treasury official had observed that the release of loan loss reserves could "increase the [Companies'] net [worth] substantially." A July 2012 FHFA presentation showed that starting in 2008 the Companies had set aside loan loss reserves far in excess of their actual losses. A Treasury document from early August 2012 observed that the Companies were about to report "[r]ecord earnings" that would be "driven by [a] large credit loss reserve release."

61.     Deferred tax assets were another key driver of the massive profits that the Agencies anticipated that the Companies would soon generate when the Net Worth Sweep was announced. Established principles of financial accounting specified that the valuation allowances on the Companies' deferred tax assets would have to be released if the Companies concluded that it was more likely than not that they would generate taxable income and therefore be able to use the deferred tax assets. By mid-2012, Fannie and Freddie had combined deferred tax asset

valuation allowances of nearly $100 billion—enough to pay the dividends on Treasury's senior preferred stock for multiple years even if the Companies did not generate any other profits. Fannie knew as early as 2011 that its valuation allowance would inevitably be reversed; the only question was the timing.

62.     By the time the Net Worth Sweep was announced, it was clear to FHFA that the Companies would soon reverse the valuation allowances for their deferred tax assets. On July 13, 2012, Bradford Martin, Principal Advisor in FHFA's Office of Conservatorship Operations, sent numerous senior FHFA officials, including Director DeMarco and Mr. Ugoletti, a set of financial projections that had been prepared by Fannie. These projections were very similar to those Fannie's senior management would later share with Treasury at their August 9, 2012, meeting. The Fannie projections that Mr. Martin circulated within FHFA included the following slide, which shows that the Companies were expected to generate substantial income in the coming years:



63.     Elsewhere in the same document, Fannie expressly assumed that it would not be paying taxes in the coming years despite generating substantial taxable income because it would be able to use its deferred tax assets.  And if Fannie was to use its deferred tax assets, it would inevitably be required under basic principles of financial accounting to release the offsetting valuation allowance. FHFA knew this. Ms. McFarland testified that in July 2012 she mentioned the potential release of the valuation allowance at a Fannie executive committee meeting attended by FHFA, and she also testified that FHFA knew about a statement she made to Treasury Under Secretary Miller on August 9, 2012, regarding the potential release of the valuation allowance. Moreover, accountants from FHFA were monitoring the Companies' treatment of their deferred tax assets, and FHFA knew that the Companies' audit committees were assessing the status of the valuation allowances on a quarterly basis.

64.     Treasury was also focused on the deferred tax assets issue.  A May 2012 meeting agenda indicates that by that time Treasury and Grant Thornton were discussing "[r]eturning the deferred tax asset to the GSE balance sheets."  And handwritten notes on a Grant Thornton document produced by Treasury displaying Freddie's results through the first quarter of 2012 say that Freddie could release its valuation allowance "probably [in] 2013, 2014." It is hardly surprising that Treasury and Grant Thornton were discussing this issue in 2012.  Even unduly pessimistic projections Grant Thornton had prepared for Treasury in November 2011 showed that the Companies would generate combined profits of over $20 billion in 2014, with profits then gradually declining to a long-term annual figure of roughly $13.5 billion. As Treasury and Grant Thornton well understood, such substantial profits would have inevitably led to the reversal of the Companies' valuation allowances.

65.     Treasury was particularly focused on the deferred tax assets issue in the days leading up to the Net Worth Sweep.  One of Treasury's top agenda items heading into its August 9 meeting with Fannie senior management was "how quickly [the Company] forecast[s] releasing credit reserves." During the August 9 meeting, Fannie CFO Susan McFarland informed Treasury that the criteria for reversing the deferred tax assets valuation allowance could be met in the not-so-distant future. When asked for more specifics by Under Secretary Miller, Ms. McFarland stated that the reversal would be "probably in the 50-billion-dollar range and probably sometime mid 2013," an assessment that proved remarkably accurate. A note written on a presentation Freddie officials gave to Treasury on August 9 also says to "expect material release of loan loss reserves in the future."

66.     In addition to the release of loan loss reserves and deferred tax assets valuation allowances, Fannie and Freddie also had sizeable assets in the form of claims and suits brought

29

by FHFA as conservator relating to securities law violations and fraud in the sale of private-label securities to Fannie and Freddie between 2005 and 2007. In 2013 and 2014, the Companies recovered over $18 billion from financial institutions via settlements of such claims and suits. The Companies, FHFA, and Treasury knew in August 2012 that the Companies would reap substantial profits from such settlements.

### FHFA and Treasury Amend the PSPAs
### To Expropriate Private Shareholders' Investment

67.     On August 17, 2012, days after the Companies had announced their return to profitability and just as it was becoming clear that they had regained the earnings power to redeem Treasury's Government Stock and exit conservatorship, FHFA and Treasury amended the PSPAs for a third time. The third amendment imposed the Net Worth Sweep, under which the Companies are required to pay Treasury a quarterly dividend starting in 2013 and continuing forever that is equal to their entire net worth, less a small capital buffer that decreases by $600 million every year and reaches zero starting in 2018. Thus, rather than paying Treasury a fixed 10% cash or 12% in kind dividend, the Companies are now required to pay Treasury *all*— 100%—of their comprehensive income and retained assets in perpetuity. Since the Net Worth Sweep guarantees that Treasury will receive all of the Companies' comprehensive income anyway, the third amendment suspended the periodic commitment fee.

68.     Far from imposing the Net Worth Sweep because the Companies were at risk of depleting Treasury's funding commitment, the Agencies adopted the Net Worth Sweep when they did because they knew that the Companies had returned to sustained profitability.  Indeed, when the Net Worth Sweep was announced in August 2012, the risk that the Companies would need to draw on Treasury funds if they decided to pay Treasury's dividends in cash was at its lowest point since the start of the conservatorships. Mr. DeMarco explicitly recognized this fact

during a June 24, 2012, meeting with Treasury Secretary Geithner. A memo prepared by Treasury staff following that meeting recounted that "[t]hrough weeks of negotiating terms of possible amendments to the PSPAs, [Mr. DeMarco] never questioned the need to adjust the dividend schedule this year. Since the Secretary raised the possibility of a [principal reduction] covenant, DeMarco no longer sees the urgency of amending the PSPAs this year." One of Mr. DeMarco's stated reasons for being willing to delay the PSPA amendments was that "the GSEs will be generating large revenues over the coming years, thereby enabling them to pay the 10% annual dividend well into the future even with the caps."

69.     Communications within FHFA and Treasury in the months leading up to the Net Worth Sweep further confirm the fact that the Companies were expected to generate sufficient income in the coming years to pay Treasury's 10% dividend in cash. FHFA and Treasury documents indicate that the Companies' debt investors regarded Treasury's funding commitment as sufficient. As Treasury prepared its public explanation that the "10 percent dividend was likely to be unstable," a Treasury official privately observed on August 13, 2012, that this explanation "[d]oesn't hold water" because the Companies' "business won't reduce in the immediate future." Another Treasury official observed that same day that Treasury's receipts under the Net Worth Sweep "will likely exceed the amount that would have been paid if the 10% was still in effect." A July 20, 2012, email from a Treasury official similarly recognized the possibility that restructuring the dividend would lead to "a better outcome" for Treasury in light of projections about the Companies' future profitability.

70.     Rather than concern over exhausting Treasury's funding commitment, the "risk" that worried the Agencies was that the Companies would recognize extraordinary profits that would allow them to begin rebuilding capital and position themselves to exit conservatorship and

provide a return on private shareholders' investments. FHFA and Treasury had decided that Fannie and Freddie would *not* be allowed to exit conservatorship in their current form, contrary to HERA's requirements. The Agencies recognized that allowing Fannie and Freddie to rebuild their capital levels would make that decision more difficult to maintain. Thus, Treasury explained in talking points dated August 15, 2012, that "[b]y taking all of their profits going forward, we are making clear that the GSEs will *not* ever be allowed to return to profitable entities." A document prepared for internal Treasury use and dated August 16, 2012, listed the Companies' "improving operating performance" and the "potential for near-term earnings to exceed the 10% dividend" as reasons for the timing of the Net Worth Sweep. An internal Treasury document prepared on July 30, 2012, similarly said that the Net Worth Sweep should be announced shortly after August 7, when the "GSEs will report very strong earnings . . . that will be in-excess of the 10% dividend to be paid to Treasury," and on August 1, 2012, a Treasury official emphasized that the Net Worth Sweep should be announced in mid-August because the Companies "[e]arnings will be in excess of current 10% dividend paid to Treasury." And on August 9, 2012—the very day that Fannie's senior management told Treasury that they expected to report substantial profits in the near future—FHFA perceived a "renewed push" from Treasury to implement the Net Worth Sweep.

71.     Communications involving White House official Jim Parrott show that the Net Worth Sweep was intended to keep Fannie and Freddie under the government's control and to frustrate private investors' contractual rights and expectation that they would receive a return on their investments if the Companies generated substantial profits. Mr. Parrott worked closely with Treasury in the development and rollout of the Net Worth Sweep, and at the time he was a senior advisor at the National Economic Council. The day after the Net Worth Sweep was announced,

he emailed Treasury officials congratulating them on achieving an important policy goal: "Team Tsy, You guys did a remarkable job on the PSPAs this week. You delivered a policy change of enormous importance that's actually being recognized as such by the outside world . . ., and as a credit to the Secretary and the President." What Treasury had accomplished, Mr. Parrott's emails make clear, was guaranteeing that Fannie and Freddie would remain under government control and never again be run for the benefit of their private shareholders.

72.     Other communications involving Mr. Parrott further underscore the same point. At 8:30 a.m. on August 17, Mr. Parrott wrote an email to Alex Pollock, Peter Wallison, and Edward Pinto offering "to walk you through the changes we're announcing on the pspas today. Feel like fellow travelers at this point so I owe it to you." Pollock, Wallison, and Pinto had written a policy paper for the American Enterprise Institute in 2011 recommending that "Fannie Mae and Freddie Mac should be eliminated as government-sponsored enterprises (GSEs) over time." Also on August 17, Mr. Wallison was quoted in Bloomberg saying the following: "The most significant issue here is whether Fannie and Freddie will come back to life because their profits will enable them to re-capitalize themselves and then it will look as though it is feasible for them to return as private companies backed by the government. . . . What the Treasury Department seems to be doing here, and I think it's a really good idea, is to deprive them of all their capital so that doesn't happen." In an email to Wallison that evening, Mr. Parrott stated, "Good comment in Bloomberg—you are exactly right on substance and intent."

73.     Similarly, in an email to a Treasury official on the day the Net Worth Sweep was announced, Mr. Parrott stated that "we've closed off [the] possibility that [Fannie and Freddie] ever[ ] go (pretend) private again." The very same day, Mr. Parrott received an email from a market analyst stating that the Net Worth Sweep "should lay to rest permanently the idea that the

outstanding privately held pref[erred stock] will ever get turned back on." He forwarded the email to Treasury officials and commented that "all the investors will get this very quickly."

74.     Another email Mr. Parrott sent makes the same point: "We are making sure that each of these entities pays the taxpayer back *every dollar of profit they make*, not just a 10% dividend" and that "[t]he taxpayer will thus ultimately collect more money with the changes."

75.     This understanding of the purpose and effect of the Net Worth Sweep is further supported by the deposition testimony of Ms. McFarland. She testified that she believed that the Agencies imposed the Net Worth Sweep in response to what she had told Treasury on August 9, and she thought the Net Worth Sweep's purpose "was probably a desire not to allow capital to build up within the enterprises and not to allow the enterprises to recapitalize themselves." According to Ms. McFarland, Fannie "didn't believe that Treasury would be too fond of a significant amount of capital buildup inside the enterprises." Mr. Ugoletti also emphasized this point, writing to Mr. DeMarco and other FHFA officials on August 17, 2012, that "other than a transitory buffer, [the Net Worth Sweep] does not allow the Enterprises to build up retained surplus, which may give the impression that they are healthy institutions."

76.     As Treasury stated when the Net Worth Sweep was announced, the dividend sweep of all of the Companies' net worth requires that "every dollar of earnings that Fannie Mae and Freddie Mac generate will be used to benefit taxpayers." Press Release, U.S. Dep't of the Treasury, Treasury Department Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac (Aug. 17, 2012). Wiping out the Companies' private shareholders was among the Net Worth Sweep's contemplated purposes.  Accordingly, Mr. Ugoletti testified that he was not surprised "that the preferred stock got hammered the day the Net Worth Sweep was announced."

77.     In return for the benefits of the Net Worth Sweep, Treasury did not incur any risk that its net dividend receipts from the Companies would decline in quarters when the Companies did not earn enough to pay the 10% dividend in cash. Prior to the Net Worth Sweep, the Companies' net dividend payments to Treasury never exceeded their net worth—to the extent the Companies' net worth fell short of Treasury's 10% dividend, Treasury made up the difference by paying itself additional dividends via circular draws on its funding commitment. Indeed, it is impossible for the Companies' net dividend payments to Treasury to decline as a result of a change that forces them to hand over their net assets and all future profits in perpetuity. The Agencies fully understood this point when they imposed the Net Worth Sweep. As a draft question and answer document prepared by Treasury on August 13, 2012, explains, "[b]y sweeping the full income of the GSEs each quarter, Treasury will receive no less from the GSEs as we would have under the previous 10 percent dividend."

78.     The Net Worth Sweep fundamentally changed the nature of Treasury's investment in the Companies. Instead of quarterly dividend payments at an annual rate of 10% (if paid in cash) or 12% (if paid in kind) of the total amount of Treasury's liquidation preference, the Net Worth Sweep entitles Treasury to quarterly payments of *all—100%*—of the Companies' existing net worth and future profits. Beginning January 1, 2013, the Companies have been required to pay Treasury a quarterly dividend equal to their *entire net worth*, minus a capital reserve amount that starts at $3 billion and decreases to $0 by January 1, 2018.

79.     Forcing the Companies to operate in this inherently unsafe and unsound condition also increases their borrowing costs, which is a major expense for both Companies. As former Acting Director DeMarco has acknowledged, if the Companies are highly leveraged and have a

relatively small amount of capital then, all other things being equal, their cost of borrowing will be higher.

80.     The Net Worth Sweep is particularly egregious because it makes the Companies extraordinary outliers in financial regulation. All other financial institutions are required to retain minimum levels of capital that ensure that they can withstand the vicissitudes of the economic cycle and are prohibited from paying dividends when they are not adequately capitalized. The Companies, in contrast, are not allowed to retain capital but instead must pay their entire net worth over to Treasury as a quarterly dividend. In other words, whereas other financial institutions are subject to *minimum* capital standards, the Net Worth Sweep makes the Companies subject to a capital *maximum*—any amount of retained capital that they hold in excess of a small and diminishing capital buffer is swept to Treasury on a quarterly basis. Director Watt has described the Companies' capital position after the Net Worth Sweep as "especially irresponsible" and said that the Companies' inability to build capital reserves under the Net Worth Sweep as a "serious risk" that erodes investor confidence in the Companies because they have "no ability to weather quarterly losses."

81.     This dramatic departure from accepted practices is demonstrated by the following chart, which compares the equity to assets ratio of Fannie and Freddie to that maintained by other large insurers:



**Capital Strength: Equity to Assets of Fannie and Freddie vs. Large Insurers**

82.     FHFA understood that stripping capital out of a financial institution is the antithesis of operating it in a sound manner. Indeed, former Acting Director DeMarco has testified that capital levels are "a key component of the safety and soundness of a regulated financial institution" and that, as a general matter, he thought that there should be more capital in the Companies to increase their safety and soundness.

83.     The third amendment to the PSPAs also provides that the Companies will not have to pay a periodic commitment fee under the PSPAs while the Net Worth Sweep is in effect. But Treasury had consistently waived the periodic commitment fee before the Net Worth Sweep, and it could only set the amount of such a fee with the agreement of the Companies and at a market rate. And as a Freddie document shows, that rate would have been, at most, a small fraction of the outstanding amount of Treasury's commitment. This is how Freddie forecasted its

"sensitivity" to imposition of a periodic commitment fee: "Our sensitivity to a commitment fee based on remaining commitment available beginning in 2013 of $149 billion shows that a 25 bps fee results in a $0.4 billion annual impact on Stockholders' Equity." That approach to calculating the amount of the periodic commitment fee reflects standard industry practice, which is to set such fees as a small percentage of the lender's financial exposure. Indeed, an early draft of the PSPAs would have set the amount of the fee as a percentage of the amount by which the Companies' liabilities exceeded their assets.

84.     Moreover, the PSPAs say that the purpose of the periodic commitment fee was to compensate Treasury for its ongoing support in the form of the commitment to invest in the Companies' Government Stock. By the time of the Net Worth Sweep, the 10 percent return on the Government Stock and the warrants for 79.9 percent of the common stock provided a more than adequate return on the government's stand-by commitment, and thus any additional fee would have been inappropriate. Given the Companies' return to robust profitability, the market rate for the periodic commitment fee for every year since 2012 would have been zero. Finally, even if a market-rate fee had been agreed between Treasury and FHFA and imposed pursuant to the PSPAs, the Companies had sufficient market power to pass the entire amount of this fee through to their customers—as the Companies do for other operating and financing costs— without affecting profitability or the value of the Companies' equity securities.

86.     Furthermore, on information and belief, FHFA agreed to the Net Worth Sweep only at the insistence and under the direction and supervision of Treasury. The Net Worth Sweep was a Treasury initiative and reflected the culmination of Treasury's long-term plan to seize the Companies and see that they were operated for the exclusive benefit of the federal government. Mr. Parrott has testified that the Net Worth Sweep was imposed through "a Treasury-driven

process." It was Treasury that informed the Companies just days before the Net Worth Sweep that it was forthcoming, and a meeting addressing the Net Worth Sweep was held at Treasury during which a senior Treasury official announced the changes. Secretary Geithner apparently believed that even before the Net Worth Sweep was imposed, "we had already effectively nationalized the GSEs . . ., and could decide how to carve up, dismember, sell or restructure those institutions." Plaintiff's Corrected Post-Trial Proposed Findings of Fact 26.2.1(a), *Starr Int'l Co. v. United States*, No. 1:11-cv-779-TCW (Fed. Cl. March 2, 2015), ECF No. 430.

87.     The Net Worth Sweep is just one example of the significant influence Treasury has exerted over FHFA from the beginning of the conservatorship. As Fannie's auditor observed during the first quarter of 2012, "the US Treasury" is able "to direct the Company's business." Indeed, Secretary Paulson has written that "seizing control" of Fannie and Freddie, an action that is statutorily reserved to FHFA, was an action "I took." HENRY M. PAULSON, JR., ON THE BRINK xiv (2d ed. 2013). Congressional Budget Office Assistant Director for Financial Analysis Deborah Lucas told Congress that the Companies are subject to "ownership and control by the Treasury." *Fannie Mae, Freddie Mac & FHA: Taxpayer Exposure in the Housing Markets: Hearing Before the H. Comm. on the Budget*, 112th Cong. 15 (2011). And Secretary Geithner, who was president of the Federal Reserve Bank of New York when the original PSPAs were signed, understood the federal takeover of Fannie and Freddie to be a "Treasury operation."

88.     The Net Worth Sweep is an element of Treasury's broader plan to eliminate the Companies and transform the housing finance market. Indeed, a housing finance reform plan drafted by Treasury in early 2012 listed "restructur[ing] the PSPAs to allow for variable dividend payment based on positive net worth"—i.e., implementing a net worth sweep—as among the first steps to take in transitioning to Treasury's desired outcome. Other elements of that plan

included the development of a single securitization utility to be used by both Fannie and Freddie—and by other entities once Fannie and Freddie are eliminated. FHFA has made the development of such a utility a key initiative of the conservatorships, providing further evidence that FHFA is operating according to Treasury's playbook.

89.     Treasury, however, lacks the authority to impose such direction and supervision, and FHFA lacks the authority to submit to it. HERA expressly provides that "[w]hen acting as conservator, . . . [FHFA] shall not be subject to the direction or supervision of any other agency of the United States . . . ." 12 U.S.C. § 4617(a)(7). Yet Treasury officials intimately involved in the development of the Net Worth Sweep testified that they could not recall Treasury making any backup or contingency plans to prepare for any possibility that FHFA would reject the Net Worth Sweep proposal.

90.     Contrary to statutory authority, both Treasury and FHFA understood the Net Worth Sweep to be a step toward the liquidation, not the rehabilitation, of the Companies. Indeed, Acting Director DeMarco stated that he had no intention of returning Fannie and Freddie to private control under charters that he considered "flawed." Mr. Ugoletti also said during his deposition that FHFA's objective "was not for Fannie and Freddie Mac to emerge from conservatorship." HERA does not contemplate that FHFA will operate a perpetual conservatorship that is entirely contingent on the hope of unspecified legislative action at some point in the future. Yet communications between FHFA and Treasury indicate that by January 2012 the Agencies shared the common goal of providing the public and financial markets with a clear plan to wind the Companies down. All this was in stark contrast to FHFA's then-Acting Director's statement two years prior to the Net Worth Sweep that, absent legislative action, "the only [post-conservatorship option] that FHFA may implement today under existing law is to

reconstitute [Fannie and Freddie] under their current charters." February 2, 2010 Letter of Acting Director DeMarco to Chairmen and Ranking Members of the Senate Committee on Banking, Housing, and Urban Affairs and the House Committee on Financial Services.

91.      Statements by both FHFA and Treasury provide further confirmation that the Net Worth Sweep violates FHFA's statutory duties as conservator. Treasury, for example, said the Net Worth Sweep would "expedite the wind down of Fannie Mae and Freddie Mac," and it emphasized that the "quarterly sweep of every dollar of profit that each firm earns going forward" would make "sure that every dollar of earnings that Fannie Mae and Freddie Mac generate will be used to benefit taxpayers." Press Release, U.S. Dep't of the Treasury, Treasury Department Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac (Aug. 17, 2012). Indeed, Treasury emphasized that the Net Worth Sweep would ensure that the Companies "will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form." *Id*.

92.      Unbeknownst to the public, as early as December 2010, an internal Treasury memorandum acknowledged the "Administration's commitment to ensure existing common equity holders will not have access to any positive earnings from the [Companies] in the future." Action Memorandum for Secretary Geithner (Dec. 20, 2010). Just weeks later, however, in another internal document the author of this memorandum acknowledged that "the path laid out under HERA and the Paulson Treasury when [the Companies] were put into conservatorship in September 2008" was for Fannie and Freddie to "becom[e] adequately capitalized" and "exit conservatorship as private companies" with "existing common shareholders" being "substantially diluted"—but not eliminated. Information Memorandum for Secretary Geithner (Jan. 4, 2011). The memorandum also acknowledged that any threat to Treasury's funding

commitment from dividend payments potentially could be addressed by "converting [Treasury's] preferred stock into common or cutting or deferring payment of the dividend (under legal review)." *Id.* In other words, the problem Treasury was purportedly trying to solve with the Net Worth Sweep, a cash dividend too high to be serviced by earnings, could be addressed by other means already known to Treasury, such as cutting or deferring payment of the dividend. Of course, given the payment-in-kind option, this "problem" was wholly illusory because Fannie and Freddie were never required to pay cash dividends in the first place.

93.     FHFA Acting Director Edward DeMarco informed a Senate Committee that the "recent changes to the PSPAs, replacing the 10 percent dividend with a net worth sweep, reinforce the notion that the [Companies] will not be building capital as a potential step to regaining their former corporate status." Edward J. DeMarco, Acting Director, FHFA, Statement Before the U.S. Sen. Comm. on Banking & Urban Affairs 3 (Apr. 18, 2013). In its 2012 report to Congress, FHFA explained that it had begun "prioritizing [its] actions to move the housing industry to a new state, one without Fannie Mae and Freddie Mac." FHFA, 2012 REP. at 13. Thus, according to FHFA, the Net Worth Sweep "ensures all the [Companies'] earnings are used to benefit taxpayers" and "reinforces the fact that the [Companies] will not be building capital." *Id.* at 1, 13. In short, the Net Worth Sweep plainly is central to FHFA's plan to "wind[ ] up the affairs of Fannie and Freddie," Remarks of Edward J. DeMarco, Getting Our House in Order at 6 (Wash., D.C., Oct. 24, 2013), and thus cannot be reconciled with the agency's statutory obligations as conservator of Fannie and Freddie.

94.     While waiting for Congress to take action on Fannie and Freddie, FHFA has resolved to operate the Companies for the benefit of the federal government rather than for the benefit of the Companies themselves and their private stakeholders. The Net Worth Sweep is

only the most blatant manifestation of this decision, which is reflected in numerous additional FHFA statements and actions. In short, while HERA directs FHFA to operate the Companies with a view toward rebuilding their capital and returning them to private control, FHFA has resolved to operate Fannie and Freddie with a view toward "minimiz[ing] losses on behalf of taxpayers." FHFA, A STRATEGIC PLAN FOR ENTERPRISE CONSERVATORSHIPS: THE NEXT CHAPTER IN A STORY THAT NEEDS AN ENDING 7 (Feb. 21, 2012)—a goal that ignores a simple reality: no such losses have been incurred, as Treasury has recouped over $275 billion to date, a profit of over $88 billion (and counting). Indeed, FHFA has made clear that its "overriding objectives" are to operate Fannie and Freddie to serve the federal government's policy goals of "[g]etting the most value for taxpayers and bringing stability and liquidity to housing finance . . . ." *Id.* at 21. Director Watt summed up the situation succinctly when stating that he does not "lay awake at night worrying about what's fair to the shareholders" but rather focuses on "what is responsible for the taxpayers."

95.    Following FHFA's lead, Fannie's management has publicly acknowledged that it does not routinely consider the interests of private shareholders when operating the company. Timothy Mayopoulos, Fannie's CEO, said that his company's management is "not looking to maximize profits for investors" and that he is "less interested in what happens to Fannie Mae as a legal entity." Fannie has also expressly disavowed any fiduciary duty to its private shareholders in its SEC filings. *See* Fannie Mae 2014 Annual Report at 1 (Form 10-K) (Feb. 20, 2015), http://goo.gl/36p2j6 ("Our directors do not have any fiduciary duties to any person or entity except to the conservator and, accordingly, are not obligated to consider the interests of the company, [or] the holders of our equity or debt securities . . . unless specifically directed to do so by the conservator.").

**FHFA and Treasury Offer Pretextual Explanations for the Net Worth Sweep**

96.     The foregoing factual allegations are based in large measure on documents produced by the United States in parallel litigation in the Court of Federal Claims ("CFC"). While Plaintiffs' suit in this Court was pending but before discovery in the CFC case commenced, FHFA and Treasury submitted evidence to this Court and made representations about the Net Worth Sweep that have proven to be highly misleading and, in some instances, outright false.

97.     On December 17, 2013, FHFA filed in this Court a "Document Compilation" that it said reflected "the considerations and views FHFA as Conservator took into account in connection with execution of the [Net Worth Sweep]." FHFA Notice of Filing Document Compilation at 2 (Dec. 17, 2013), Doc. 24. The centerpiece of this document compilation was a sworn declaration from Mr. Ugoletti, purportedly based on his "personal knowledge of the facts." Paragraph 20 of Mr. Ugoletti's declaration stated that "[a]t the time of the negotiation and execution of the [Net Worth Sweep], [FHFA] and the Enterprises had not yet begun to discuss whether or when the Enterprises would be able to recognize any value to their deferred tax assets. Thus, neither [FHFA] nor Treasury envisioned at the time of the Third Amendment that Fannie Mae's valuation allowance on its deferred tax assets would be reversed in early 2013." This statement—made by Mr. Ugoletti under oath—is false. Through discovery in the CFC, Plaintiffs obtained an email chain dated three days before the Net Worth Sweep was announced in which FHFA officials recounted what the Companies had told them about the potential write up of deferred tax assets and discussed how such a write up could implicate the planned amendment to the PSPAs. Ms. McFarland, Fannie's CFO at the time of the Net Worth Sweep, testified that she or other senior Fannie officials had discussed the potential write up of the

deferred tax assets with officials at both Agencies. When asked about the deferred tax assets issue during his CFC deposition, Mr. Ugoletti responded: "I don't know who else in FHFA or what they knew about the potential for that." Mr. Ugoletti further indicated that he did not know what Treasury thought about this issue.

98.     Paragraph 16 of Mr. Ugoletti's declaration states that FHFA agreed to the Net Worth Sweep due to its "concerns that the 10% annual dividend to Treasury would reduce the amount of the Treasury commitment starting in 2013." But as discussed above, less than two months before the Net Worth Sweep was announced, FHFA's Acting Director told Secretary Geithner that there was no need to amend the structure of Treasury's dividend because "the GSEs will be generating large revenues over the coming years, thereby enabling them to pay the 10% annual dividend well into the future even with the caps." Like so many documents that discredit the Agencies' pretextual factual narrative, the Treasury memorandum recounting this critical conversation between the heads of the two agencies was omitted from the Agencies' prior evidentiary submissions to this Court.

99.     Paragraph 9 of Mr. Ugoletti's declaration represents that the Net Worth Sweep was justified as a mechanism for relieving the Companies of the periodic commitment fee: "It was clear by [2011] that, given the risks of the Enterprises and the enormity of the Treasury commitment, the value of the [period commitment fee] was incalculably large." But Mr. Ugoletti testified during his CFC deposition that he did not know whether anyone at Treasury or FHFA shared his view that the fee was incalculably large and could not recall discussing his view with anyone at either agency. Mr. Ugoletti also testified that he is neither "an expert on periodic commitment fees," nor "in the business of calculating" such fees, and that he did not know whether anyone at FHFA or Treasury ever tried to calculate the value of the periodic

45

commitment fee. When asked about this issue during his CFC deposition, Mr. DeMarco testified that he could not recall anyone at FHFA attempting to quantify what the periodic commitment fee would have been in the absence of the Net Worth Sweep.

100.     The administrative record Treasury submitted to this Court on December 17, 2013, Doc. 23, suffered from similar flaws. Treasury represented that its administrative record included all "nonprivileged information considered by Treasury in entering into the August 17, 2012, Third Amendment." Bowler Decl. ¶ 3, Doc. 23-1. But absent from Treasury's administrative record was any reference to the fact that Ms. McFarland had told senior Treasury officials nine days before the Net Worth Sweep was announced that her Company expected to report roughly $50 billion in profits within the next year.

101.     Rather than acknowledging that it expected the Net Worth Sweep to significantly increase the dividends the Companies would pay to Treasury, Treasury's administrative record included a set of financial projections dated June 13, 2012, that purported to show that the Companies were not expected to generate sufficient profits to be able to pay the 10% dividend without making further draws on Treasury's funding commitment. But documents obtained through the CFC discovery later revealed that these "June 13, 2012" projections were actually taken verbatim from reports a Treasury consultant had prepared in November 2011 using data from September of that year. As discussed above, Treasury was in possession of far more accurate, up-to-date, and positive financial projections when it imposed the Net Worth Sweep in August 2012.

102.     Information obtained through the CFC discovery also discredits the Agencies' basic contention that, despite the payment in kind option, the Net Worth Sweep was necessary to arrest a "downward spiral" in which the Companies would exhaust Treasury's funding

commitment by paying cash dividends on Treasury's Government Stock. When asked during his deposition, Jeff Foster, a Treasury official intimately involved in the development of the Net Worth Sweep, could not identify any "problems of the circularity [in dividend payments that] would have remained had the [payment-in-kind] option been adopted." Notes produced by Treasury's consultant describe the Companies' choice between paying dividends in cash at a 10% rate or in kind at a 12% rate as a "[p]urely economic" decision. An October 2008 email to Mr. Ugoletti indicated that Treasury's consultant Grant Thornton wanted to know "whether we expect [Fannie and Freddie] to pay the preferred stock dividends in cash or to just accrue the payments."  An internal Treasury document explicitly recognized this point: "To the extent that required dividend payments exceed net income, FHFA, as conservator, could consider not declaring dividends pursuant to the certificates of designation for the preferred shares, so that draws on the PSPAs are not used to pay dividends, preserving as much funding as possible to cover any unanticipated losses at Fannie Mae and Freddie Mac." Likewise, a draft question and answer document circulated among Treasury officials on July 20, 2012, stated that Treasury would be "in a better position" after the Net Worth Sweep because "the GSEs would be making a binding contractual commitment to turn over profits to taxpayers, as opposed to the current discretionary dividend." Another draft of the same document recognized that "[d]ividends . . . are discretionary; the Board must declare a dividend, which can only be paid if the GSE is profitable."

### The Federal Government Reaps Massive Profits from Its Investment
### In the Companies Due to the Net Worth Sweep

103.     The Net Worth Sweep has proven to be immensely profitable for the federal government. The table below lists only the dividends Fannie and Freddie have paid under the Net

Worth Sweep, and it does not include the $55.2 billion in dividends paid to Treasury before that time:

**Dividend Payments Under the Net Worth Sweep**
**(in billions)**

|  | Fannie | Freddie | Combined |
|---|---|---|---|
| **2013** | $82.4 | $47.6 | $130.0 |
| **2014** | $20.6 | $19.6 | $40.2 |
| **2015** | $10.3 | $5.5 | $15.8 |
| **2016** | $9.7 | $4.9 | $14.6 |
| **2017**[1] | $8.3 | $6.7 | $15.0 |
| **Total** | $131.3 | $84.3 | $215.6 |

104.      As the above chart shows, the Companies have paid Treasury over $215 billion in "dividends" under the Net Worth Sweep. Had they instead been paying 10% cash dividends, they would have paid Treasury approximately $85 billion. The following chart shows how imposition of the Net Worth Sweep dramatically increased the size of the Companies' dividend payments to Treasury:

---

[1] Net Worth Sweep dividend payments through the first two quarters of 2017. As of this writing, Freddie had reported third quarter 2017 comprehensive income of $4.7 billion and Fannie had not yet reported its third quarter results.



105.     Had the Companies used their quarterly profits in excess of Treasury's 10% dividend to retire Treasury's senior preferred stock, Treasury's senior preferred stock would have already been fully redeemed. But rather than using the Companies' massive profits to rebuild capital or reduce their dividend obligations to Treasury, the Net Worth Sweep required the Companies to simply gift these funds over to Treasury in exchange for nothing. As explained above, FHFA knew that the Net Worth Sweep would result in this massive financial windfall for the federal government.

106.     As the Agencies anticipated, Fannie's 2013 net income included the release of over $50 billion of the company's deferred tax assets valuation allowance. The release of this

valuation allowance underscores Fannie's financial strength, as it demonstrates Fannie's expectation that it will generate sizable taxable income moving forward. Freddie's 2013 earnings also reflect the Company's decision to release a sizeable (in excess of $20 billion) deferred tax assets valuation allowance.

107.    But for the Net Worth Sweep, Fannie and Freddie would have $130 billion of additional capital to cushion them from any future downturn in the housing market and to reassure debtholders of the soundness of their investments. Instead, because of the Net Worth Sweep, the Companies are required to operate at the edge of insolvency, with no prospect of ever generating value for private shareholders, rendering the Companies fundamentally unsafe and unsound and more likely to require an additional—albeit entirely avoidable—government bailout in the future.

108.    The dramatically negative impact of the Net Worth Sweep on the Companies' private shareholders is demonstrated by Fannie's results in the first quarter of 2013. At the end of the first quarter Fannie's net worth stood at $62.4 billion. Under the prior versions of the PSPAs, if Fannie chose to declare a cash dividend it would have been obligated to pay Treasury a dividend of only $2.9 billion, and the balance—$59.5 billion—would have been credited to its capital. Private shareholders would have been entitled to a share of any additional amount of that residual capital paid out to Treasury in dividends. The Net Worth Sweep, however, required Fannie to pay Treasury $59.4 billion, while private shareholders were left with nothing.

109.    The fundamental nature of the change in Treasury's investment resulting from the Net Worth Sweep is illustrated by the facts that Treasury is now effectively Fannie's and Freddie's *sole* equity shareholder and that Treasury's securities in the Companies are now effectively equivalent to 100% of the Companies' common stock. After giving effect to the Net Worth Sweep, Treasury has both the right to receive all profits of the Companies as well as

control over the manner in which the Companies conduct business. Accordingly, following the Net Worth Sweep, Treasury's Government Stock should be characterized in a manner consistent with its economic fundamentals as 100% of the Companies' common stock. Indeed, the Government Stock must be deemed as common or voided altogether because, by definition, preferred stock must have preferences over other classes of stock. *See* 8 Del. Code tit.8, § 151(c); Va. Code § 13.1-638(C)(4). After the Net Worth Sweep, of course, the economic rights of other classes of Fannie and Freddie stock have been effectively eliminated, leaving nothing for the Government Stock to have preference over. The Government Stock simply takes *everything*.

## CLAIMS FOR RELIEF

## COUNT I

### FHFA's Conduct Exceeded Its Statutory Authority As Conservator

110.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

111.    The APA requires the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations" or that are "without observance of procedure required by law." 5 U.S.C. § 706(2)(C), (D). In addition to the limitations established under the APA, FHFA's authority as conservator of the Companies is strictly limited by statute. *See* 12 U.S.C. § 4617(b)(2)(D).

112.    The Net Worth Sweep is inimical to the very definition of what it means to be a conservator, which is a term with a well-established meaning in financial regulation. A conservator is charged with seeking to rehabilitate the company under its control, not to operate the company for its own benefit while stripping it of its assets.

113.    The Net Worth Sweep contravenes the statutory command that FHFA as conservator must undertake those actions "necessary to put the [Companies] in a sound and solvent condition" and "appropriate to carry on the business of the [Companies] and preserve and

51

conserve [their] assets and property." 12 U.S.C. § 4617(b)(2)(D). Indeed, rather than seeking to put the Companies in a "sound and solvent" condition and to preserve and conserve the Companies' assets and property, FHFA has expropriated the Companies' entire net worth for the benefit of the federal government, to the detriment of private shareholders such as Plaintiffs.

114.    The Net Worth Sweep also contravenes the statutory command that "as conservator or receiver in connection with any sale or disposition of assets" of the Companies, FHFA "shall conduct its operations in a manner which . . . maximizes the net present value return from the sale or disposition of such assets" and "ensures adequate competition and fair and consistent treatment of offerors." In entering into the Net Worth Sweep, FHFA abandoned this statutory charge to maximize the return on the Companies' assets and did not permit offerors other than Treasury to bid on the assets the Net Worth Sweep dissipates.

115.    Furthermore, FHFA's purpose as conservator is to seek to rehabilitate Fannie and Freddie, but the Net Worth Sweep makes such rehabilitation impossible. Rather, the Net Worth Sweep makes clear that FHFA and Treasury intend to keep Fannie and Freddie in conservatorship indefinitely, operating them for the sole benefit of the federal government, unless Congress passes legislation resolving the situation.

116.    FHFA also acted beyond its authority by re-interpreting its statutory duty as a conservator under HERA to be a duty to taxpayers only and by resolving to hold Fannie and Freddie in a perpetual conservatorship to be operated for the benefit of the federal government.

117.    FHFA's conduct was therefore outside of FHFA's authority under HERA and "in excess of statutory . . . authority" and "without observance of procedure required by law," and Plaintiffs are therefore entitled to relief against FHFA pursuant to 5 U.S.C. §§ 702, 706(2)(C), (D).

## COUNT II

### Breach of Contract Against FHFA, Fannie, and Freddie: Claim for Damages

118.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

119.    As holders of  Preferred Stock in Fannie and Freddie, Plaintiffs have certain contractual rights.  In particular, Plaintiffs are entitled to a contractually specified liquidation preference.

120.    By entering the Net Worth Sweep, FHFA, as conservator for Fannie and Freddie, breached Fannie's and Freddie's obligations to Plaintiffs by nullifying entirely the contractual rights of holders of the Companies' Preferred Stock.  Thus, in addition to exceeding its authority as conservator under HERA, FHFA's agreement to the Net Worth Sweep breached or repudiated Fannie's and Freddie's contracts with Plaintiffs and other holders of the Companies' Preferred Stock.

121.    By essentially expropriating the entirety of the Companies' net worth for the Government, the Net Worth Sweep nullified entirely the contractual right of preferred shareholders to receive a liquidation preference upon the dissolution, liquidation, or winding up of Fannie and Freddie.

122.    Fannie and Freddie—and thus FHFA when acting as conservator for the Companies—are contractually prohibited from unilaterally changing the terms of the Companies' Preferred Stock to materially and adversely affect Plaintiffs' rights as a preferred shareholders.  The Net Worth Sweep violates this prohibition by effectively eliminating the liquidation preference rights associated with Plaintiffs' Preferred Stock.

123.    No provision of Plaintiffs' contracts with Fannie and Freddie reserves the Companies any right to *repudiate* or *nullify entirely* the Companies' contractual obligations to

Plaintiffs and other holders of the Companies' Preferred Stock by granting rights to another class of the Companies' stock.

124.    Thus, by entering the Net Worth Sweep, FHFA both exceeded its statutory authority under HERA and breached Fannie's and Freddie's contracts with holders of Preferred Stock.

## COUNT III

### Breach of Implied Covenant of Good Faith and Fair Dealing
### Against FHFA, Fannie, and Freddie: Claim for Damages

125.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

126.    Implicit in every contract is a covenant of good faith and fair dealing.  The implied covenant requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain.

127.    As holders of  Preferred Stock in Fannie and Freddie, Plaintiffs have certain contractual rights.  In particular, Plaintiffs are entitled to a contractually specified, non-cumulative dividend from the Companies and to a contractually specified liquidation preference

128.    FHFA's agreement to the Net Worth Sweep has arbitrarily and unreasonably prevented Plaintiffs and other holders of the Companies' Preferred Stock from receiving any of the fruits of their bargain.  Again, the Net Worth Sweep replaced the 10% dividend on Treasury's Government Stock with a perpetual requirement that the Companies pay their entire net worth to Treasury.  The Net Worth Sweep thus strips the Companies of their ability to generate and retain funds to distribute as dividends to holders of Preferred Stock.

129.    By essentially expropriating the entirety of the Companies' net worth for the Government, the Net Worth Sweep also nullified entirely the contractual right of preferred

shareholders to receive a liquidation preference upon the dissolution, liquidation, or winding up of Fannie and Freddie.

130.    No provision of Plaintiffs' contracts with Fannie and Freddie reserves the Companies any right to *repudiate* or *nullify entirely* the Companies' contractual obligations to Plaintiffs and other holders of the Companies' Preferred Stock by granting rights to another class of the Companies' stock.

131.    In sum, by destroying the rights of holders of the Companies' Preferred Stock, the Net Worth Sweep repudiates and nullifies entirely the scope, purpose, and terms of the contracts governing the relationships between Fannie and Freddie and their preferred shareholders.  Thus, by entering the Net Worth Sweep, FHFA both exceeded its statutory authority under HERA and breached the implied covenant of good faith and fair dealing.

## COUNT IV

**Breach of Fiduciary Duty Against FHFA, Fannie, and Freddie: Claim for Damages**

132.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

133.    By imposing a conservatorship over Fannie and Freddie, FHFA assumed control of the operations of those institutions.

134.    By taking control over the operations of Fannie and Freddie, FHFA assumed a fiduciary duty, including a duty of loyalty, to Fannie's and Freddie's shareholders, including holders of Preferred Stock.

135.    FHFA used its control over Fannie and Freddie to agree to and implement the Net Worth Sweep, which replaced the 10% dividend on Treasury's Government Stock with a perpetual requirement that the Companies pay their entire net worth to Treasury.

136.     As an agency of the Federal Government, FHFA was interested in, and benefited from, the Net Worth Sweep, which conferred an exclusive benefit upon the Federal Government by essentially expropriating for the Government the entirety of Fannie's and Freddie's net worth.

137.     FHFA had a manifest conflict of interest with respect to the Net Worth Sweep, and that transaction constituted self-dealing.

138.     The Net Worth Sweep, which essentially eliminated the dividend and liquidation preference rights associated with Plaintiffs' Preferred Stock, was neither entirely nor intrinsically fair.

139.     The Net Worth Sweep constituted waste, gross and palpable overreaching, and a gross abuse of discretion.

140.     The Net Worth Sweep did not further any valid business purpose or reasonable business objective of Fannie and Freddie, did not reflect FHFA's good faith business judgment of what was in the best interest of Fannie and Freddie, and was unfair to those institutions and their preferred shareholders.

141.     Thus, by entering the Net Worth Sweep, FHFA both exceeded its statutory authority under HERA and violated its fiduciary duty to Plaintiffs and the other holders of Preferred Stock.

### COUNT V

#### The Net Worth Sweep Violates Delaware Law Against FHFA and Fannie: Claim for Damages and Injunctive Relief

142.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

143.     Pursuant to its enabling legislation, applicable federal law, and Section 1.05 of its bylaws, Fannie has designated that Delaware law controls for purposes of its corporate governance practices and procedures.

144.     Under Delaware law, preferred stock of a corporation cannot be given a cumulative dividend right equal to all the net worth of the corporation in perpetuity. The Net Worth Sweep therefore is an illegal term for any preferred stock instrument, whether or not held by the federal government.

145.     Delaware law allows preferred stockholders to receive dividends "*at such rates*, on such conditions and at such times as shall be stated in the certificate of incorporation or in the [board] resolution . . . ." 8 Del. C. § 151(c) (emphasis added). Preferred stock dividends must be made "payable *in preference to, or in . . . relation to*, the dividends payable on any other class or classes or of any other series of stock[.]" *Id.* (emphasis added). Section 151 does not permit a provision requiring that a series of preferred stock receive a quarterly dividend equal to the entire net worth of a corporation to the necessary exclusion (in perpetuity) of any dividends ever being paid on junior stock. In fact, Section 151(c) specifically contemplates that, after payment of preferential dividends on senior preferred stock, "a dividend on the remaining class or classes or series of stock may then be paid out of the remaining assets of the corporation available for dividends . . . ." *Id.*

146.     Because the Net Worth Sweep diverts, in perpetuity, all of the net worth of Fannie Mae to Treasury, it neither is paid at a "rate" nor is it payable "in preference to" or "in relation to" the dividends payable to other classes or series of stock. The Net Worth Sweep is not paid at a "rate" because Treasury's participation in corporate earnings growth is unlimited, absolute, and perpetual. The Net Worth Sweep is not payable "in preference to" or "in relation to" the dividends payable to other classes or series of stock because it is payable to the absolute, permanent exclusion of dividends to other stockholders. Once the Net Worth Sweep is paid each quarter, there necessarily will be no assets remaining in the Company that would ever be

available for the payment of dividends on any other classes or series of stock regardless of how valuable the Company may become in the future. Accordingly, the Net Worth Sweep violated Delaware law.

147.     Plaintiffs were injured by this violation of Delaware law and accordingly are entitled to damages.

## COUNT VI

### The Net Worth Sweep Violates Virginia Law Against FHFA and Freddie: Claim for Damages and Injunctive Relief

148.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

149.     Pursuant to its enabling legislation and Section 11.3 of its bylaws, Freddie Mac has designated that Virginia law controls for purposes of its corporate governance practices and procedures.

150.     Under Virginia law, preferred stock of a corporation cannot be given a cumulative dividend right equal to all the net worth of the corporation in perpetuity. The Net Worth Sweep therefore is an illegal term for any preferred stock instrument, whether or not held by the federal government.

151.     Virginia law provides that a corporation may authorize "one or more classes or series of shares that . . . *have preference over* any other class or series of shares with respect to distributions [such as dividends]." Va. Code § 13.1-638 (emphasis added). While there is no question that Virginia law permits corporations to establish a dividend "preference" that operates as a priority, it does not permit corporations to establish a dividend preference that operates to preclude all other classes of stockholders from the potential to receive dividends in perpetuity. Accordingly, the Net Worth Sweep violated Virginia law.

152.     Plaintiffs were injured by this violation of Virginia law and accordingly are entitled to damages.

**PRAYER FOR RELIEF**

153.     WHEREFORE, Plaintiffs pray for an order and judgment:

a.     Declaring that the Net Worth Sweep, and its adoption, are not in accordance with and violate HERA within the meaning of 5 U.S.C. § 706(2)(C);

b.     Vacating and setting aside the Net Worth Sweep, including its provision sweeping all of the Companies' net worth to Treasury every quarter;

c.     Enjoining FHFA and its officers, employees, and agents from implementing, applying, or taking any action whatsoever pursuant to the Net Worth Sweep;

d.     Enjoining FHFA and its officers, employees, and agents from acting at the instruction of Treasury or any other agency of the government and from re-interpreting the duties of FHFA as conservator under HERA;

e.     Awarding Plaintiffs damages resulting from the breach of fiduciary duty by FHFA, Fannie, and Freddie;

f.     Awarding Plaintiffs damages resulting from the breach of contract and breach of the implied covenant of good faith and fair dealing by FHFA, Fannie, and Freddie;

g.     Awarding Plaintiffs damages and injunctive relief resulting from the restructuring of dividends on Treasury's senior preferred stock in violation of Delaware and Virginia law;

      h.      Awarding Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action; and

      i.      Granting such other and further relief as this Court deems just and proper.

Date:   November 9, 2017                 Respectfully submitted,

s/ Charles J. Cooper
Charles J. Cooper (Bar No. 248070)
ccooper@cooperkirk.com
David H. Thompson (Bar No. 450503)
Vincent J. Colatriano (Bar No. 429562)
Peter A. Patterson (Bar No. 998668)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)

60