## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| FAIRHOLME FUNDS, INC., et al., | |
| *Plaintiffs*, | Case No. 1:13-cv-1053-RCL |
| v. | **ORAL ARGUMENT REQUESTED** |
| THE FEDERAL HOUSING FINANCE AGENCY, et al., | |
| *Defendants.* | |
| ARROWOOD INDEMNITY COMPANY, et al., | |
| *Plaintiffs*, | Case No. 1:13-cv-1439-RCL |
| v. | **ORAL ARGUMENT REQUESTED** |
| FEDERAL NATIONAL MORTGAGE ASSOCATION, et al., | |
| *Defendants.* | |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINTS

DENTONS US LLP

Drew W. Marrocco (Bar No. 453205)
1301 K Street, NW
Suite 600, East Tower
Washington, DC 20005-3364
Tel.: (202) 408-6400
Fax: (202) 408-6399
drew.marrocco@dentons.com

*Counsel for Plaintiffs*
*Arrowood Indemnity Company,*
*Arrowood Surplus Lines Insurance Company, and*
*Financial Structures Limited*

Charles J. Cooper (Bar No. 248070)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601
ccooper@cooperkirk.com

*Counsel for Plaintiffs Fairholme Funds*
*Inc., et al.*

*[Additional Counsel on Inside Cover]*

Michael H. Barr (pro hac vice)
Richard M. Zuckerman (pro hac vice)
1221 Avenue of the Americas
New York, New York 10020
Tel.: (212) 768-6700
Fax: (212) 768-6800
michael.barr@dentons.com
richard.zuckerman@dentons.com

*Counsel for Plaintiffs*
*Arrowood Indemnity Company,*
*Arrowood Surplus Lines Insurance Company, and*
*Financial Structures Limited*

David H. Thompson (Bar No. 450503)
Vincent J. Colatriano (Bar No. 429562)
Peter A. Patterson (Bar No. 998668)
Brian W. Barnes (Bar No. 1018419)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601
dthompson@cooperkirk.com
vcolatriano@cooperkirk.com
ppatterson@cooperkirk.com
bbarnes@cooperkirk.com

*Counsel for Plaintiffs Fairholme Funds*
*Inc., et al.*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ........................................................................................................ iii

INTRODUCTION ......................................................................................................................... 1

STATEMENT OF FACTS ............................................................................................................ 2

    A.    Fannie Mae and Freddie Mac. ...................................................................... 2

    B.    Fannie and Freddie Are Forced into Conservatorship and Subjected to the Purchase Agreements. ............................................................................... 3

    C.    Unwarranted Accounting Decisions Artificially Increase the Companies' Draws from Treasury, but the Companies Nonetheless Return to Sustained Profitability. ................................................................................................. 5

    D.    FHFA and Treasury Impose the Third Amendment, Thereby Expropriating Plaintiffs' Investments in the Companies. ................................................... 7

    E.    Plaintiffs Challenge the Third Amendment. ............................................... 10

STANDARD OF REVIEW .......................................................................................................... 12

ARGUMENT ............................................................................................................................... 12

I.    The Third Amendment Breached Plaintiffs' Contractual Right to a Liquidation Preference. .......................................................................................................... 12

    A.    Plaintiffs May Rely on the Doctrine of Anticipatory Breach. ................... 12

    B.    The Junior Preferred Stock Certificates of Designation Do Not Permit the Companies to Eliminate Plaintiffs' Right to a Liquidation Preference. ...... 16

II.    The Third Amendment Violated the Implied Covenant of Good Faith and Fair Dealing. ................................................................................................................. 20

    A.    Plaintiffs' Contracts with the Companies Include an Implied Covenant that the Companies Will Not Wipe Out Plaintiffs' Investments. ...................... 20

    B.    Even If the Companies Could Eliminate Plaintiffs' Investments Under Other Circumstances, They Were Bound by an Implied Covenant Not to Do So Just as They Entered a Period of Sustained Profitability. ............................... 24

i

C.     Neither HERA nor the Original PSPAs Altered Plaintiffs' Contracts in a Manner that Authorized the Companies to Wipe Out Private Shareholders ........31

III.   Both Fannie and Freddie Shareholders May Bring Direct Claims for Breach of Fiduciary Duty. ....................................................................................................36

A.     Delaware Law Supports Fannie Shareholders' Direct Claims for Breach of Fiduciary Duty. ..........................................................................................37

B.     Virginia Law Supports Freddie Shareholders' Direct Claims for Breach of Fiduciary Duty. ..........................................................................................41

C.     HERA Does Not Preempt Plaintiffs' Direct Fiduciary Duty Claims. ..................43

CONCLUSION..............................................................................................................45

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                    **Page**

*Abella v. Universal Leaf Tobacco Co., Inc.*, 546 F. Supp. 795 (E.D. Va. 1982)...........................42

*Acceptance Ins. Cos. v. United States*, 84 Fed. Cl. 111 (2008) ...............................................29

*Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126 (Del. Ch. 2009)................................20, 24

*ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*,
   50 A.3d 434 (Del. Ch. 2012)...............................................................................................31

*Ascom Hasler Mailing Sys., Inc. v. United States Postal Serv.*,
   885 F. Supp. 2d 156 (D.D.C. 2012) ....................................................................................29

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................................12

*Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988) ...................................................................43

*California Housing Securities, Inc. v. United States*, 959 F.2d 955 (Fed. Cir. 1992) ..................29

*Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618 (Del. Ch. 2013) .........................................38

*Centex Corp. v. United States*, 395 F.3d 1283 (Fed. Cir. 2005) .................................................30

*Central States, Se. & Sw. Areas Pension Fund v. Basic American Indus., Inc.*,
   252 F.3d 911 (7th Cir. 2001) ..............................................................................................13

*Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003) ...........................................30

*De Csepel v. Republic of Hungary*, 714 F.3d 591 (D.C. Cir. 2013) .............................................12

*Dubroff v. Wren Holdings, LLC*, 2011 WL 5137175 (Del. Ch. Oct. 28, 2011) ............................40

*\*Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434 (2005)....................................................20

*E.I. DuPont Nemours & Co. v. Pressman*, 679 A.2d 446 (1996)..................................................24

*El Paso Pipeline GP Co., LLC v. Brinckerhoff*, 152 A.3d 1248 (Del. 2016) ...............................39

*Fairfax-Falls Church Cmty. Servs. Bd. v. Herron*, 230 Va. 390 (1985)..................................15, 16

*First Nationwide Bank v. United States*, 431 F.3d 1342 (Fed. Cir. 2005)....................................30

*Gatz v. Ponsoldt*, 925 A.2d 1265 (Del. 2007) ...........................................................................40

*Gentile v. Rossette*, 906 A.2d 91 (Del. 2006) .......................................................................39, 40

*Gibralter Fin. Corp. v. Federal Home Loan Bank Bd.*,
   1990 WL 394298 (C.D. Cal. June 15, 1990) .......................................................................43

*Golden Pacific Bancorp v. United States*, 15 F.3d 1066 (Fed. Cir. 1994) ..............................23, 29

*Historic Green Springs, Inc. v. Brandy Farm, Ltd.*,
   32 Va. Cir. 98, 1993 WL 13029827 (1993).......................................................................23, 27

*\*In re Delphi Financial Group Shareholder Litigation*,
   2012 WL 729232 (Del. Ch. Mar. 6, 2012) ........................................................................21, 22

*Local Oklahoma Bank, N.A. v. United States*, 452 F.3d 1371 (Fed. Cir. 2006) ...........................30

*Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*, 62 A.3d 62 (Del. Ch. 2013) ...........15

*Middleburg Training Ctr., Inc. v. Firestone*, 477 F. Supp. 2d 719 (E.D. Va. 2007) ....................31

*Milstead v. Bradshaw*, 1997 WL 33616661 (Va. Cir. Ct. Oct. 3, 1997) .......................................42

*New York Life Ins. Co. v. Viglas*, 297 U.S. 672 (1936) ...............................................................13

*Orban v. Field*, 1993 WL 547187 (Del. Ch. Dec. 30, 1993) ........................................................18

*Pagliara v. Federal Home Loan Mortg. Corp.*, 203 F. Supp. 3d 678 (E.D. Va. 2016)................42

\*Perry Capital LLC v. Lew*, 70 F. Supp. 3d 208 (D.D.C. 2014).....................................10, 27, 28, 37

\*Perry Capital LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017) ........................................... *passim*

*QVT Fund LP v. Eurohypo Capital Funding LLC*,
   2011 WL 2672092 (Del. Ch. July 8, 2011)........................................................................23, 24

\*Remora Invstments, LLC v. Orr*, 277 Va. 316, 673 S.E.2d 845 (Va. 2009)...........................41, 42

*Suess v. FDIC*, 770 F. Supp. 2d 32 (D.D.C. 2011) .......................................................................43

\*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004) .................................37

*U.S. Inspect Inc. v. McGreevy*, 2000 WL 33232337 (Va. Cir. Ct. Nov. 27, 2000) ......................42

*United States v. Insurance Co. of N. America*, 131 F.3d 1037 (D.C. Cir. 1997)..........................37

*United States v. Winstar Corp.*, 518 U.S. 839 (1996)...................................................................29

\*Virginia Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535 (4th Cir. 1998) ..............20, 22, 23

## **Statutes**

12 U.S.C.

   § 1455(*l*)(1)(C)...............................................................................................................32

   § 1455(*l*)(4) ...............................................................................................................17, 33

   § 1719(g)(4) ...............................................................................................................17, 33

   § 1719(g)(1)(C)...............................................................................................................32

   § 4617(a)(1) ....................................................................................................................15

   § 4617(b)(2)(D)...............................................................................................................44

   § 4617(b)(2)(G)...............................................................................................................33

   § 4617(b)(11)(E)...............................................................................................33, 34, 44

   § 4617(d) .........................................................................................................................34

12 C.F.R. § 1237.5(b) ..................................................................................................................34

DEL. CODE tit. 8,

   § 151(a) ......................................................................................................................17, 19

   § 151(c) .............................................................................................................................21

   § 151(g)......................................................................................................................18, 19

\* § 242(b) .................................................................................................17, 18, 19

§ 394 ........................................................................................................................32

VA. CODE

§ 13.1-638 ..............................................................................................................21

§ 13.1-708(A)(6) ...................................................................................................18

Housing and Economic Recovery Act of 2008, Pub. L. No. 110-289, 122 Stat. 2654 ................32

Conservatorship and Receivership, 76 Fed. Reg. 35,724 (June 20, 2011) ..............................3, 44

## **Other**

4 CORBIN ON CONTRACTS (1951) ..........................................................................13, 14

Allen C. Goolsby & Louanna O. Heuhsen, *Corporate and Business Law*,
40 U. RICH. L. REV. 165 (2005) ........................................................................19

*Doctrine of Anticipatory Breach as Applicable to a Contract which the Complaining Party
Has Fully Performed*, 105 A.L.R. 460 (1936) .........................................................14

*FHFA Fact Sheet, Questions and Answers on Conservatorship*, https://goo.gl/nz8Vvd .........3, 35

FHFA, TABLE 2: DIVIDENDS ON ENTERPRISE DRAWS FROM TREASURY,
https://goo.gl/vHl8V0 ..........................................................................................10

*Oversight Hearing to Examine Recent Treasury and FHFA Actions Regarding the Housing
GSEs: Hearing before the H. Comm. on Fin. Servs.*, 110th Cong. (2008) ......................35, 36

Press Release, Statement of FHFA Director James B. Lockhart at News Conference
Announcing Conservatorship of Fannie Mae and Freddie Mac (Sept. 7, 2008),
https://goo.gl/GwYrS5 ........................................................................................36

R. FRANKLIN BALOTTI & JESSE A. FINKELSTEIN, DEL. L. OF CORP. AND BUS. ORG. ....................18

RESTATEMENT (SECOND) OF CONTRACTS ....................................................................14

## INTRODUCTION

Every investor who buys stock in a corporation does so with the understanding that the investment will succeed if the corporation succeeds. That is the fundamental bargain struck by for-profit businesses and their shareholders, and enforcing this bargain is one of the central concerns of the law of corporations. Where preferred stock is at issue, the law holds the corporation to its basic commitment both by vigorously enforcing shareholder contract rights and by imposing on management fiduciary duties of loyalty and care.

In this respect, Plaintiffs—investors in Fannie Mae and Freddie Mac (the "Companies")—are no different from shareholders in any other company. Fannie and Freddie offered preferred stock on the financial markets, and Plaintiffs purchased their shares, with the understanding among all involved that these Companies would operate for profit and with a view to the interests of their shareholders. Neither the 2008 financial crisis nor the Housing and Economic Recovery Act of 2008 ("HERA") altered the fundamental relationship between the Companies and their private shareholders. And while regulators in 2008 forced Fannie and Freddie to accept a bailout, the terms of that bailout diluted but did not eliminate Plaintiffs' shares.

With Plaintiffs' interest in the Companies having survived the financial crisis, they had every reason to expect—and a legally enforceable right to insist—that they maintain their position in the capital structure as the Companies' fortunes improved. Instead, the Federal Housing Finance Agency ("FHFA") acted to effectively extinguish Plaintiffs' shares just as it became clear that these shares had value and that the Companies were entering what one Fannie official described as "golden years" of financial success. And far from taking this extraordinary action as part of a bid to *improve* the Companies' capital position, FHFA treated denying private shareholders the benefit of their bargain as an end in itself to be pursued even at the cost of permanently *impairing*

the Companies' capacity to raise and retain capital. This was a stark violation of the Companies' contractual and fiduciary duties, and Plaintiffs are entitled to damages and restitution as a result.

## STATEMENT OF FACTS

### A.      Fannie Mae and Freddie Mac.

This Nation's multi-trillion-dollar housing finance market, and familiar features of that market such as readily available 30-year fixed rate mortgages, are built on the foundation of two companies—Fannie Mae and Freddie Mac. Because of their federal charters, Fannie Mae and Freddie Mac are sometimes called "government-sponsored enterprises," but that is a misnomer; each is a for-profit, privately-owned entity. The Companies do not themselves originate mortgages but instead insure and securitize them, thus providing liquidity to the residential mortgage market that has made home ownership possible for millions of American families. Am. Compl. for Declaratory & Inj. Relief & Damages ¶¶ 21-22 (Feb. 1, 2018), *Fairholme Funds, Inc. v. FHFA*, No. 13-1053, Doc. 75 ("Fairholme Compl."); First Am. Compl for Declaratory & Inj. Relief & Damages ¶¶ 17-18, *Arrowood v. FHFA*, No. 13-1439 (Nov. 9, 2017), ECF No. 73-1 ("Arrowood Compl.").

Unlike other financial institutions involved in the housing finance system that were affected by the 2008 financial crisis, the Companies took a relatively conservative approach to investing in risky mortgages issued during the national run-up in home prices from 2004 to 2007. As a result, the Companies remained in a comparatively strong financial condition in 2008. Fairholme Compl. ¶¶ 24-25, 32; Arrowood Compl. ¶¶ 20-21, 28.

As mortgage insurers, Fannie and Freddie are designed to generate ample cash to cover their operating expenses. Throughout the financial crisis and the years that followed, the Companies were capable of meeting their obligations to insureds and creditors and of absorbing any losses as a result of the financial downturn. Fairholme Compl. ¶ 53; Arrowood Compl. ¶ 48.

2

**B.      Fannie and Freddie Are Forced into Conservatorship and Subjected to the Purchase Agreements.**

Despite the Companies' sound financial position in 2008, FHFA and Treasury forced the Companies into conservatorship on September 6, 2008. Fairholme Compl. ¶ 32; Arrowood Compl. ¶ 28. At the time, even though the Companies were stable, FHFA stated that under HERA the purpose of the conservatorship was to restore confidence in and stabilize the Companies with the objective of returning them to "normal business operations." Fairholme Compl. ¶ 31; Arrowood Compl. ¶ 27; *see also* Conservatorship and Receivership, 76 Fed. Reg. 35,724, 35,730 (June 20, 2011) (FHFA regulation stating that "[a] conservator's goal is to continue the operations of a regulated entity, rehabilitate it and return it to a safe, sound and solvent condition"); Fairholme Compl. ¶ 29; Arrowood Compl. ¶ 25. FHFA also publicly confirmed that conservatorship is necessarily temporary and represented that it would act as conservator only until the Companies were stabilized. Fairholme Compl. ¶ 34 ("Upon the Director's determination that the Conservator's plan to restore the [Companies] to a safe and solvent condition has been completed successfully, the Director will issue an order terminating the conservatorship." (quoting *FHFA Fact Sheet, Questions and Answers on Conservatorship* 2)); Arrowood Compl. ¶ 30. Consistent with the uniform practice of the FDIC and other federal regulators that had acted as conservators in the past, investors expected FHFA to exercise its conservatorship powers to conserve the Companies' assets.

Treasury then exercised its temporary authority under HERA to enter agreements with FHFA to purchase equity in the Companies ("Preferred Stock Purchase Agreements" or "PSPAs"). Fairholme Compl. ¶ 36; Arrowood Compl. ¶ 32. The PSPAs allowed the Companies to draw up to $100 billion each from Treasury as needed to avoid a negative net worth—an amount that was subsequently increased to allow the Companies to draw unlimited sums from Treasury until the end of 2012, and thereafter capped at the amount drawn from 2010 through 2012, plus $200 billion

per Company. Fairholme Compl. ¶ 47; Arrowood Compl. ¶ 42. These increases in the amount of available Treasury funding would not have been necessary but for improper accounting adjustments imposed on the Companies by FHFA that are discussed in greater detail below.

In return for Treasury's funding commitment, FHFA agreed that the Companies would provide several forms of consideration. First, the PSPAs created a new class of securities with very favorable terms to the Government, known as Senior Preferred Stock ("Government Stock"). For each Company, the Government Stock had an initial liquidation preference of $1 billion, an amount that would increase by one dollar for every dollar drawn on Treasury's funding commitment. Fairholme Compl. ¶ 39; Arrowood Compl. ¶ 34.[1] The original PSPAs also provided for the Companies to pay quarterly dividends on the outstanding Government Stock liquidation preference. These dividends could be paid in cash, at an annual rate of 10%, or in kind, at an annual rate of 12%, by adding to the liquidation preference the amount of dividends due—an option Treasury and the Companies repeatedly acknowledged. Fairholme Compl. ¶¶ 40-43; Arrowood Compl. ¶¶ 35-38; *see Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 601 (D.C. Cir. 2017) (observing that Government Stock entitled Treasury to "quarterly dividends that the Companies could either pay at a rate of 10% of Treasury's liquidation preference or a commitment to increase the liquidation preference by 12%"). Opting to pay the dividends in kind would not have reduced the amount available under Treasury's funding commitment. Fairholme Compl. ¶ 44; Arrowood Compl. ¶ 39.

Second, FHFA agreed that the Companies would issue warrants entitling Treasury to buy 79.9% of their common stock at a nominal price. Beyond the already handsome 10% dividends and the $2 billion upfront fee, the common stock warrants gave Treasury unlimited "upside" via

---

[1] If the Companies liquidate, Treasury's liquidation preference entitles it to receive the sum specified before more junior preferred and common shareholders receive anything.

4

participation in the Companies' profitability, but this upside would be *shared* with the Companies' other shareholders of common stock (and would be junior to the shareholders of preferred stock). Fairholme Compl. ¶ 38; Arrowood Compl. ¶ 33.

Third, the PSPAs provided for the Companies to pay Treasury a quarterly market-based periodic commitment fee. Fairholme Compl. ¶ 45; Arrowood Compl. ¶ 40. Treasury consistently waived this fee, and it could only be set with the agreement of the Companies at a market rate. Fairholme Compl. ¶¶ 45, 83; Arrowood Compl. ¶¶ 40, 77. Freddie forecasted its "sensitivity" to imposition of the periodic commitment fee beginning in 2013 at $0.4 billion per year. Fairholme Compl. ¶ 83; Arrowood Compl. ¶ 77.

The original PSPAs diluted, but did not eliminate, the economic interests of the Companies' private shareholders. As FHFA's Director assured Congress shortly after the agreements were signed, the Companies' "shareholders are still in place," and "both the preferred and common shareholders have an economic interest in the companies," which "going forward . . . may [have] some value." Fairholme Compl. ¶ 33; Arrowood Compl. ¶ 29.

### C.   Unwarranted Accounting Decisions Artificially Increase the Companies' Draws from Treasury, but the Companies Nonetheless Return to Sustained Profitability.

Under FHFA's control, the Companies were forced to dramatically write down the estimated value of their assets and based on these estimates to incur substantial non-cash accounting losses in the form of loan loss reserves and write-offs of deferred tax assets.[2] FHFA's wildly pessimistic assumptions about potential future losses were wholly unwarranted. Fairholme Compl.

---

[2] Loan loss reserves reduce reported net worth to reflect anticipated future losses. Fairholme Compl. ¶ 50; Arrowood Compl. ¶ 45. Deferred tax assets are used to reduce taxable income on future earnings. The book value of a tax asset depends on the likelihood that the corporation will earn sufficient income to use the tax asset. Fairholme Compl. ¶ 49; Arrowood Compl. ¶ 44.

¶¶ 48-52; Arrowood Compl. ¶¶ 43-47. By the end of June 2012, FHFA and Treasury had forced Fannie and Freddie to draw $161 billion from Treasury to make up for the paper losses caused by these accounting decisions, even though there was no indication that the Companies' actual cash expenses could not be met by their cash receipts. Of the total $187 billion drawn, $26 billion was drawn to immediately pay unnecessary dividends to Treasury. Fairholme Compl. ¶ 53; Arrowood Compl. ¶ 48.

As a result of these and other actions, Treasury's liquidation preference swelled to $189 billion. But it was apparent that the Companies' private shares still had value. The Companies were thriving in mid-2012, paying the artificially inflated dividends on the Government Stock in cash without drawing additional capital from Treasury. *See* Fairholme Compl. ¶¶ 56-58; Arrowood Compl. ¶¶ 51-53. And based on the improving housing market and the high quality of the newer loans backed by the Companies, FHFA and Treasury knew the Companies would enjoy stable profitability for the foreseeable future and thus would begin to rebuild significant amounts of capital. Fairholme Compl. ¶¶ 54-57; Arrowood Compl. ¶¶ 49-52. For example, minutes of a July 2012 Fannie management meeting indicating that the Company was entering a period of "golden years" of earnings were circulated broadly within FHFA, and projections attached to those minutes showed that Fannie expected its cumulative dividend payments to Treasury to exceed its total draws by 2020 and that over $115 billion of Treasury's commitment would remain available after 2022. Fairholme Compl. ¶¶ 54, 62; Arrowood Compl. ¶¶ 49, 57. Similar projections were shared with Treasury on August 9, 2012—less than two weeks before the Third Amendment (described below) was announced. Fairholme Compl. ¶ 57; Arrowood Compl. ¶ 52.

FHFA and Treasury also knew that the Companies would soon reverse many of the non-cash accounting losses previously imposed upon them. Indeed, at an August 9, 2012 meeting, just

eight days before the Third Amendment was imposed, Fannie's Chief Financial Officer told senior Treasury officials that release of the valuation allowance on Fannie's deferred tax assets would likely occur in mid-2013 and would generate profits in the range of $50 billion—a prediction that proved to be remarkably accurate. *See* Fairholme Compl. ¶ 65; Arrowood Compl. ¶ 60. This $50 billion reversal was not included in the projections from the month before. Treasury was keenly interested in the deferred tax assets, which would have catalyzed the Companies' capital rebuilding process; indeed, it had discussions of the deferred tax assets with its financial consultant as early as May 2012, and a key item on Treasury's agenda for the August 9 meeting was how quickly Fannie forecasted releasing its reserves. *See* Fairholme Compl. ¶¶ 64-65; Arrowood Compl. ¶¶ 59-60.

### D.     FHFA and Treasury Impose the Third Amendment, Thereby Expropriating Plaintiffs' Investments in the Companies.

By August 2012, FHFA and Treasury fully understood that the Companies were about to generate huge profits, far in excess of the dividends owed on the Government Stock. *See* Fairholme Compl. ¶¶ 54-66; Arrowood Compl. ¶¶ 49-61. Not content with Treasury receiving the dividends that would be paid on the Government Stock, FHFA and Treasury secretly resolved "to ensure existing common equity holders will not have access to any positive earnings from the [Companies] in the future." Fairholme Compl. ¶ 92; Arrowood Compl. ¶ 85. Therefore, on August 17, 2012, just days after the Companies announced robust second quarter earnings indicating that they had earned more than enough to pay Treasury's dividends in cash without making a draw from the funding commitment, FHFA and Treasury adopted the Third Amendment to the PSPAs to ensure, as Treasury put it, that "every dollar of earnings that Fannie Mae and Freddie Mac generate will be used to benefit taxpayers." Fairholme Compl. ¶ 91; Arrowood Compl. ¶ 84. The Third Amendment accomplishes this objective by adopting the "Net Worth Sweep," which replaces the prior

dividend structure with one that requires Fannie and Freddie to pay Treasury their entire net worth on a quarterly basis, minus a small capital buffer. Fairholme Compl. ¶ 67; Arrowood Compl. ¶ 62.[3] The Third Amendment also suspended operation of the periodic commitment fee, but, as explained above, the fee had consistently been waived and was projected to be a relatively modest amount in any event. FHFA and Treasury thus nationalized the Companies and expropriated not just their future earnings but also their retained capital, thereby depriving the private shareholders of all of their economic rights.

FHFA has claimed, both publicly and before the courts, that the Third Amendment was necessary to prevent the Companies from falling into a purported "death spiral" in which the Companies' increasing dividend obligations to Treasury would consume Treasury's remaining funding commitment. *See* Fairholme Compl. ¶ 98; Arrowood Compl. ¶ 91. But, as explained above, at all times prior to the Third Amendment, the PSPAs permitted the Companies to pay dividends in kind; they were never required to pay cash dividends, let alone to do so by drawing on Treasury's funding commitment.

More important, the "death spiral" narrative cannot be squared with internal government documents and testimony obtained through discovery in other litigation. Just weeks before the Third Amendment was announced, then-FHFA Acting Director Edward DeMarco privately told Treasury Secretary Timothy Geithner that changing the structure of the dividend on Treasury's

---

[3] Under the original terms of the Third Amendment, this capital buffer was scheduled to fall to zero in 2018. On December 21, 2017, FHFA and Treasury amended the PSPAs for a fourth time to permit each Company to retain a $3 billion capital reserve starting in the fourth quarter of 2017. *See* Letter Agreement (Dec. 21, 2017), https://goo.gl/Ms89wa. This "Fourth Amendment" has no bearing on any of the claims before this Court. Treasury is still entitled to the Companies' entire net worth in the event of a liquidation because upon liquidation they are entitled to both a Net Worth Sweep dividend and their liquidation preference. Indeed, FHFA and Treasury explicitly added $3 billion to Treasury's liquidation preference for each Company, ensuring that Treasury ultimately remains entitled to all of the Companies' net worth. *See id.*

Government Stock was unnecessary because the Companies "will be generating large revenues over the coming years, thereby enabling them to pay the 10% annual dividend well into the future even with the caps." Fairholme Compl. ¶ 68; Arrowood Compl. ¶ 63. Consistent with that understanding, a Treasury official observed on August 13, 2012 that the public explanation that the Third Amendment was necessary to preserve Treasury's funding commitment "doesn't hold water." Fairholme Compl. ¶ 69; Arrowood Compl. ¶ 64. Moreover, the Third Amendment was imposed *after* the Companies had returned to stable profitability, and *just days after* Treasury learned that they were on the verge of reporting tens of billions of dollars in profits that would far exceed their existing dividend obligations. Fairholme Compl. ¶¶ 54-66; Arrowood Compl. ¶¶ 49-61. Indeed, the *same day* that Fannie's Chief Financial Officer told senior Treasury officials that Fannie anticipated making accounting adjustments that would cause it to report an additional $50 billion in profits within the next year, an FHFA official wrote that Treasury was making a "renewed push" to impose the Third Amendment. Fairholme Compl. ¶ 70; Arrowood Compl. ¶ 65.

The available evidence thus makes clear that the Third Amendment was adopted not out of concern that the Companies would earn too little, but rather out of concern that the Companies would earn *too much* and complicate the Administration's plans to prevent their private shareholders from recouping their investment principal, let alone any return on that investment. Indeed, an internal Treasury document finalized the day before the Sweep was announced specifically identified the Companies' "improving operating performance" and the "potential for near-term earnings to *exceed* the 10% dividend" as support for imposing the Net Worth Sweep through the Third Amendment. Fairholme Compl. ¶ 70; Arrowood Compl. ¶ 65 (emphasis added). And after the Third Amendment was finalized, a senior White House advisor involved in that process wrote to a Treasury official that "we've closed off [the] possibility that [Fannie and Freddie] ever[ ] go

9

(pretend) private again." Fairholme Compl. ¶ 73; Arrowood Compl. ¶ 68. Treasury "talking points" prepared on August 15, 2012 similarly explained that "[b]y taking all [the Companies'] profits going forward, we are making clear that the GSEs will *not* ever be allowed to return to profitable entities." Fairholme Compl. ¶ 70; Arrowood Compl. ¶ 65. Mr. DeMarco likewise testified that he had no intention of allowing the Companies to emerge from conservatorship under what he viewed as "flawed" charters. Fairholme Compl. ¶ 90; Arrowood Compl. ¶ 83.

As FHFA expected, the Third Amendment has resulted in massive and unprecedented payments to the government. From the fourth quarter of 2012 (the first fiscal quarter subject to the Third Amendment's Net Worth Sweep) through the fourth quarter of 2017, the Companies generated over $217 billion in comprehensive income. But rather than using that income to prudently build capital reserves and prepare to exit conservatorship, the Companies have instead been forced to pay substantially all of it as "dividends" to Treasury—$124 billion more than Treasury would have received under the original PSPAs. *See* FHFA, TABLE 2: DIVIDENDS ON ENTERPRISE DRAWS FROM TREASURY, https://goo.gl/vHl8V0. Altogether, Treasury has recouped nearly $88 billion *more* than it disbursed to the Companies. Yet, FHFA and Treasury insist that the outstanding liquidation preference has not decreased by a single penny and that Treasury has the right to all of the Companies' net worth *in perpetuity*.

### E. Plaintiffs Challenge the Third Amendment.

Plaintiffs own preferred shares of Fannie and Freddie stock that rank in preference behind Treasury's Government Stock with respect to both dividends and payments during any liquidation. Fairholme Compl. ¶¶ 5-16; Arrowood Compl. ¶¶ 6-12. On July 10, 2013, Plaintiffs filed suit challenging the Third Amendment under the Administrative Procedure Act and as a breach of the Companies' contractual and fiduciary duties. This Court dismissed all of Plaintiffs' claims, 70 F. Supp. 3d 208 (D.D.C. 2014), and on appeal the D.C. Circuit affirmed in part and reversed in part,

864 F. 3d 591 (D.C. Cir. 2017). Specifically, although the D.C. Circuit agreed with this Court's conclusion that Plaintiffs' claims were barred by 12 U.S.C. § 4617(f) to the extent that they sought injunctive relief, 864 F.3d at 604-16, it ruled that the Court had erred in its rationale for dismissing some of Plaintiffs' contract claims, *id.* at 629-33.

With respect to Plaintiffs' claims for breach of contract based on their right to receive a liquidation preference if the Companies are wound down, the D.C. Circuit determined that these claims are ripe under the doctrine of anticipatory breach. 864 F.3d at 632. The D.C. Circuit also ruled that, although the Companies have discretion not to declare dividends on Plaintiffs' stock, that does not defeat Plaintiffs' claims that the Third Amendment violated the implied covenant of good faith and fair dealing by making it impossible for shareholders other than Treasury to ever receive dividends or payments during liquidation. *Id.* at 630-31. The D.C. Circuit explained that Plaintiffs' implied covenant claims should be assessed based on "whether the Third Amendment violated the reasonable expectations of the parties." *Id.* at 631. Having clarified the law on these points, the D.C. Circuit remanded Plaintiffs' liquidation preference and implied covenant claims so that this Court could determine whether Plaintiffs "stated claims for breach of contract and breach of the implied covenant . . . in the first instance." *Id.* at 633.

Following remand, Plaintiffs sought and obtained leave to amend their complaints. *See* Order (Feb. 1, 2018), Doc. 73 (granting motion for leave to amend complaint); Order Approving Stipulation (Feb. 1, 2018), Doc. 72 (approving stipulation establishing Document 67-1 as operative complaint in *Fairholme*). The amended complaints introduce new factual allegations based on discovery taken in the Court of Federal Claims, where Plaintiffs and other shareholders are chal-lenging the Third Amendment as a taking. The amended complaints also introduce two new types of claims that Plaintiffs had not previously asserted: direct claims for breach of fiduciary duty that

seek damages and claims that the Third Amendment causes Treasury's senior preferred stock to have features that are impermissible under Delaware and Virginia corporation law.

## STANDARD OF REVIEW

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court " 'must accept as true all material allegations of the complaint, drawing all reasonable inferences from those allegations in plaintiffs' favor.' " *De Csepel v. Republic of Hungary*, 714 F.3d 591, 597 (D.C. Cir. 2013) (quoting *LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011)).

## ARGUMENT

I.   **The Third Amendment Breached Plaintiffs' Contractual Right to a Liquidation Preference.**

A.   **Plaintiffs May Rely on the Doctrine of Anticipatory Breach.**

As FHFA acknowledges, the D.C. Circuit held that Plaintiffs' breach of contract claim with respect to their liquidation rights is ripe under the doctrine of anticipatory breach. *See Perry Capital*, 864 F.3d at 633. FHFA nevertheless argues that Plaintiffs are foreclosed from asserting their anticipatory breach claim because the doctrine purportedly does not apply when the breach involves the repudiation of an obligation to pay money at a future date and the non-breaching party has already performed its part of the contract. *See* Mot. to Dismiss Complaints on Remand by FHFA at 15-17 (Jan. 10, 2018), Doc. 68 ("FHFA Br."). FHFA's argument lacks merit.

First, as the Class Plaintiffs explain in Section I.A of their brief, at bottom FHFA is arguing

that Plaintiffs' contract claim is not ripe. The D.C. Circuit has already resolved this issue in Plaintiffs' favor, *Perry Capital*, 864 F.3d at 632-33, and this Court is bound by that ruling.[4]

Second, even if this Court were free to reexamine this issue after the D.C. Circuit's ruling, FHFA would still be mistaken because the contractual right Plaintiffs assert that FHFA has repudiated is not simply the right to be paid a particular sum of money at a future date, as would be the case in an annuity contract or a loan agreement. Instead, Plaintiffs allege that FHFA has repudiated their contractual right as junior preferred shareholders to a *preference* in the event of liquidation, not to a specific sum of money. *See, e.g.*, Fairholme Compl. ¶ 121; Arrowood Compl. ¶ 112. After the Net Worth Sweep, Plaintiffs no longer occupy the same position in the liquidation waterfall as they once did because it is no longer possible for them to receive a dime upon liquidation. While the words on their stock certificates have not changed, the practical effect of the Net Worth Sweep is no different than if FHFA had deleted their liquidation preference entirely.

Third, the limitation on anticipatory breach that FHFA cites should not be applied to bar Plaintiffs' claims in this case even if it were potentially applicable as a general matter to the contractual rights at issue here. As the Restatement acknowledges, that limitation has "been subjected to considerable criticism, and instances of its actual application are infrequent." RESTATEMENT (SECOND) OF CONTRACTS § 253, comment d. *See, e.g.*, *New York Life Ins. Co. v. Viglas*, 297 U.S. 672, 680-81 (1936) (Cardozo, J.) ("The ascertainment of this relation calls for something more than the mechanical application of a uniform formula."); *Central States, Se. & Sw. Areas Pension Fund v. Basic American Indus., Inc.*, 252 F.3d 911, 915 (7th Cir. 2001) (Posner, J.) (characterizing limitation as a "dubious rule" the rationale for which "eludes our understanding"); 4 CORBIN ON

---

[4] Plaintiffs join the arguments advanced by the Class Plaintiffs on this issue as well as the Class Plaintiffs' other arguments relating to the liquidation preference contract claim. *See* Brief for Class Plaintiffs, No. 13-1288 (Feb. 16, 2018) ("Class Plaintiffs Br.").

CONTRACTS 872-73 (1951) ("[A] plaintiff should not be deprived of his remedy in damages for an anticipatory repudiation merely because the promised performance is similar in character to the performance that is required by the judicial remedy that is commonly given for all kinds of breaches of contract."); *Doctrine of Anticipatory Breach as Applicable to a Contract which the Complaining Party Has Fully Performed*, 105 A.L.R. 460 (1936) ("From his own examination of the cases the writer is unable to state upon what substantial reason the limitation in question may be said to rest."). Multiple rationales identified by the Restatement allow the Court to "avoid[ ] harsh results [of the] limitation" in this case. RESTATEMENT (SECOND) OF CONTRACTS § 253.

For one, the Court can "mak[e] available other types of relief, such as a declaratory judgment or restitution." *Id.* § 253, comment d. "[O]n a repudiation, the injured party is entitled to restitution for any benefit that he has conferred on the other party by way of part performance or reliance." *Id.* § 373. While this general rule does not apply when the injured party "has performed all of his duties under the contract and no performance by the other party remains due other than payment of a definite sum of money for that performance," *id.*, this exception is inapplicable here because Plaintiffs' contracts do not specify a definite sum of money that they are owed. At a minimum, then, Plaintiffs should be entitled to seek a restitutionary remedy for FHFA's anticipatory breach.

For another, the Restatement suggests that "the limitation might yield on a showing of manifest injustice, as where the refusal to pay is not in good faith." *Id.* § 253, comment d. Plaintiffs' complaints are replete with allegations that, in adopting the Net Worth Sweep, FHFA and Treasury acted in bad faith for the purpose, among others, of ensuring that Plaintiffs' contractual rights would be rendered valueless. *See, e.g.*, Fairholme Compl. ¶¶ 70-71, 73, 76, 91-93; Arrowood Compl. ¶¶ 65-66, 68, 71, 84-86.

The injustice of applying the limitation is particularly manifest here because FHFA, the very party that allegedly has repudiated Plaintiffs' contractual rights in bad faith, also controls if and when the liquidation process will be triggered. *See* 12 U.S.C. § 4617(a)(1). The Court should not place into FHFA's hands the sole authority to control when, if at all, it will be required to answer for its alleged wrongdoing.

FHFA cites several cases for the proposition that Plaintiffs should not be able to rely on anticipatory breach, but those cases do not require the result FHFA seeks. Only two of FHFA's cases are from the relevant jurisdictions, the state courts of Delaware (relevant with respect to Fannie) and Virginia (relevant with respect to Freddie). The Delaware Chancery case does not come close to establishing the existence of the broad limitation posited by FHFA. In dicta in a parenthetical in a footnote, the case quotes a treatise for the proposition that an anticipatory breach may occur "before completion of [the aggrieved party's] performance." *Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*, 62 A.3d 62, 78 n.102 (Del. Ch. 2013). This passing citation hardly establishes as a matter of Delaware law that anticipatory breach can *never* occur after the aggrieved party has performed. The Virginia Supreme Court case does state the general proposition that "[t]here is no cause of action for the anticipatory repudiation of [unilateral] contracts." *Fairfax-Falls Church Cmty. Servs. Bd. v. Herron*, 230 Va. 390, 395 (1985). But the case should not be interpreted to hold that this rule applies without exception, including in cases like this one presenting very different facts than *Fairfax-Falls Church Community Services Board*, which involved the alleged repudiation of employment contracts and did not address the possibility of a restitutionary remedy or the effect of bad faith on the part of the breaching party. What is more, this broad statement was superfluous to the outcome of the case, which held that the plaintiffs could not recover under their contract claims because (a) their contracts were constitutional under

15

Virginia law only to the extent that they entitled the plaintiffs to payment for services already rendered, and (b) it was undisputed that the plaintiffs already had been paid for such services. *See id.*

For these reasons, Plaintiffs should be permitted to proceed with their claim for anticipatory breach.

### B.   The Junior Preferred Stock Certificates of Designation Do Not Permit the Companies to Eliminate Plaintiffs' Right to a Liquidation Preference.

FHFA's contention that the original terms of the junior preferred stock certificates allowed the Companies to eliminate entirely Plaintiffs' liquidation preference rights does not withstand scrutiny. *See* FHFA Br. 17-18, 21-23. For two independent reasons, the Third Amendment violated Plaintiffs' contractual liquidation preference rights.

First, Plaintiffs' contracts with the Companies do not permit the Companies to effectively eliminate Plaintiffs' liquidation preference rights by awarding *all* of the Companies' positive net worth in liquidation to a more senior equity investor. To be sure, the junior preferred stock certificates allow the Companies to issue more senior preferred stock and specify that holders of the junior preferred stock are not entitled to liquidation preference payments until the owners of any more senior preferred stock "have been paid all amounts to which [they] are entitled." FHFA Br., Ex. C § 4(c), Doc. 68-3. But there is a fundamental difference between issuing a new class of senior preferred stock that receives fixed liquidation preference payments ahead of Plaintiffs and *effectively extinguishing* Plaintiffs' liquidation preference rights by amending the terms of existing preferred stock to guarantee that Plaintiffs will receive nothing no matter how profitable the Companies become. After the Companies' debts are paid in any liquidation, the Third Amendment entitles Treasury to *everything* that remains, and FHFA is simply wrong when it declares that this amendment to Treasury's senior preferred stock "did not eliminate Plaintiffs' contractual right to

16

be paid in liquidation." FHFA Br. 17; *see Perry Capital*, 864 F.3d at 629 ("[T]he Third Amend-ment makes it impossible" for private shareholders "to receive . . . a liquidation preference.").

Second, Plaintiffs' contracts with the Companies do not permit the Companies to diminish the value of Plaintiffs' liquidation preference rights by *amending* the terms of other investors' outstanding shares. In arguing otherwise, FHFA heavily relies on provisions of the junior preferred stock certificates that say holders are not entitled to vote on the "creation and issuance" of more senior preferred stock because the issuance of such stock is deemed not to "materially and ad-versely affect the interests" of junior preferred shareholders. FHFA Br., Ex. C § 7(b); *see* FHFA Br. 17-18. But Plaintiffs here do not complain about the "creation and issuance" of new senior preferred stock but about an *amendment* to the terms of Treasury's preexisting senior preferred stock. Indeed, by the time the Third Amendment was imposed, Treasury's statutory authority to purchase newly created and issued shares in the Companies had expired. *See* 12 U.S.C. §§ 1719(g)(4), 1455(*l*)(4). FHFA suggests there is no meaningful difference between issuing new stock and amending the terms of existing stock, but basic principles of corporation law treat these two types of action as fundamentally distinct.

As FHFA acknowledges, Delaware and Virginia law deem the terms of a preferred stock certificate (often called a "certificate of designations") to be part of the corporation's certificate of incorporation. FHFA Br. 29 (citing *STAAR Surgical Co. v. Waggoner*, 588 A.2d 1130, 1136 (Del. 1991)). The general rule in Delaware is that any amendment to the certificate of incorporation must be put to a shareholder vote, DEL. CODE tit. 8, § 242(b), but there is a narrow exception to this rule that allows a board of directors to *create and issue* a new class or series of stock, *id.* § 151(a). Critically, under Delaware law the board of directors can only *amend* the terms of a certificate of designations (and thus alter the certificate of incorporation without shareholder approval) if there

17

are no shares of the relevant class of stock outstanding. *See id.* § 151(g). Amendments to the terms of a certificate of designations with *outstanding* shares are subject to the general rule that the certificate of incorporation cannot be changed except by shareholder vote. *See* R. FRANKLIN BALOTTI & JESSE A. FINKELSTEIN, DEL. L. OF CORP. AND BUS. ORG. § 8.12 (explaining that board of directors may only amend terms of stock without shareholder vote "[w]here no shares of [the] class or series of stock authorized under [the] certificate of designations have been issued"); *see also id.* § 8.11. Furthermore, where an amendment to the certificate of incorporation would "affect" a particular subset of shareholders "adversely," those shareholders have the right to vote on the amendment as a class "*whether or not entitled to vote thereon by the certificate of incorporation*." DEL. CODE tit. 8, § 242(b) (emphasis added); *see Orban v. Field*, 1993 WL 547187, at *8 (Del. Ch. Dec. 30, 1993). The Delaware Legislature's decision to distinguish between issuing new shares and amending existing shares makes sense. While Boards of Directors sometimes need to act quickly to raise capital by issuing new shares at a market price, there is seldom need to swiftly amend the terms of existing shares. Moreover, amendments to shares the corporation has already issued are far more likely to involve self-dealing—a fact that this case illustrates.

Virginia law takes a slightly different approach to shareholder voting rights in this context, entitling adversely affected shareholders to vote as a class on both the issuance of new more senior shares and amendments to existing shares "[e]xcept as otherwise provided in the articles of incorporation." VA. CODE § 13.1-708(A)(6). Freddie's certificate of incorporation, as amended by Plaintiffs' Freddie preferred stock certificates of designation, does provide otherwise with respect to "[t]he creation and issuance of any other class or series of stock." FHFA Br., Ex. D § 9(h)(ii), Doc. 68-4. But because Freddie's certificate of incorporation is silent as to *amendments* to the terms of existing shares, the default rule applies and Freddie's Board of Directors cannot alter the

18

terms of outstanding shares without approval by adversely affected shareholders. *See generally* Allen C. Goolsby & Louanna O. Heuhsen, *Corporate and Business Law*, 40 U. RICH. L. REV. 165, 182-83 (2005).

Once these features of corporation law are set forth, the correct interpretation of the junior preferred stock certificate voting provisions on which FHFA relies becomes clear. Those provisions deny junior preferred shareholders the power to veto "the creation and issuance" of new classes or series of stock, thus preserving the board's power to unilaterally amend the certificate of incorporation by issuing new shares under DEL. CODE tit. 8, § 151(a) and (g). But nothing in the junior preferred stock certificates purports to give the boards authority to *amend* the terms of stock certificates with *outstanding* shares, and for good reason. Under Delaware law, adversely affected shareholders have an absolute contractual right to vote on such amendments even if their stock certificates or some other portion of the certificate of incorporation purports to say otherwise. DEL. CODE tit. 8, § 242(b)(2).[5] Thus, even if the Companies were free to extinguish Plaintiffs' liquidation preference rights by issuing *new* senior preferred stock with features identical to those of Treasury's senior preferred stock under the Third Amendment (they were not), the Companies could not accomplish the same result by *amending* the terms of Treasury's existing stock. It follows that FHFA breached Plaintiffs' contracts with the Companies when it amended the terms of Treasury's senior preferred stock to effectively eliminate Plaintiffs' liquidation preference rights.[6]

---

[5] Although appearing in a state statute, this right is ultimately contractual. As FHFA acknowledges, statutes that concern general principles of state corporation law form part of the contract between shareholders and the corporation. *See* FHFA Br. 26-27 (citing, *inter alia*, *In re Activision Blizzard, Inc. Stockholder Litig.*, 124 A.3d 1025, 1050 & n.11 (Del. Ch. 2015)).

[6] In addition to naming FHFA, Fannie, and Freddie as defendants, Arrowood named FHFA Director Watt, in his official capacity, as a defendant on claims seeking money damages (some of which claims also seek injunctive relief). Defendants have moved to dismiss Arrowood's claims for money damages against Director Watt, on the basis of sovereign immunity. FHFA Br. 18. Arrowood hereby withdraws its claims for money damages against Director Watt.

## II.     The Third Amendment Violated the Implied Covenant of Good Faith and Fair Dealing.

### A.     Plaintiffs' Contracts with the Companies Include an Implied Covenant that the Companies Will Not Wipe Out Plaintiffs' Investments.

The covenant of good faith and fair dealing is implied in every contract and protects against parties "frustrat[ing] the 'overarching purpose' of the contract by taking advantage of their position to control implementation of the agreement's terms." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (2005). Thus, "[w]hen a contract confers discretion on one party, the implied covenant requires that the discretion be used reasonably and in good faith." *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146-47 (Del. Ch. 2009); *accord Virginia Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535, 542 (4th Cir. 1998). In other words, a party may not "act[ ] arbitrarily or unreasonably" when exercising its contractual discretion. *Perry Capital*, 864 F.3d at 631 (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010)).

The "overarching purpose" of the junior preferred shareholders' contracts with the Companies is clear: in exchange for one-time contributions of capital (in most instances $25 per share), junior preferred shareholders and their successors would receive liquidation preference payments (if the Companies were wound down) and preferred dividends ahead of common shareholders (if the Companies generated profits). FHFA makes much of the fact that the original terms of Plaintiffs' stock certificates gave the Companies discretion to issue new, more senior classes of preferred stock that would receive liquidation preference payments and dividends ahead of Plaintiffs. FHFA Br. 21-23. But as with any discretionary authority under a contract, the Companies were not free to exercise that discretion to arbitrarily or unreasonably deny Plaintiffs the benefit of their bargain. And in any case, Plaintiffs here challenge an *amendment* to the terms of Treasury's already existing shares, not an issuance of new shares. As discussed above, nothing in the Companies' certificates of incorporation or background legal principles gave the Companies discretion to

amend Treasury's outstanding shares in a manner that adversely affected Plaintiffs.

This analysis is confirmed by the fact that Plaintiffs' stock certificates entitle them to a *preference* over common shareholders with respect to dividends and liquidation payments. The purpose of that preference was to assure preferred investors that they would not be deprived of their investments if the Companies had residual equity value. The parties did not contemplate that the Companies could exercise their discretion to issue new shares in a manner that would permit another class of equity investors to take the entire residual value of the Companies—no matter how large—before owners of Plaintiffs' preferred shares received anything.

Moreover, even if the contracting parties could have contemplated the possibility of an arms-length transaction resulting in the Companies issuing new shares that would result in another class of equity investors taking the entire residual value of the Companies (and they could not have), they could not have contemplated the possibility of the Companies doing so in a blatantly *self-dealing* transaction with an entity *statutorily barred* from investing in the them.

Thus, irrespective of FHFA's reasons for imposing the Third Amendment, this was an exercise of discretion that Plaintiffs' contracts with the Companies did not allow. Indeed, Delaware and Virginia law do not even permit corporations to issue "preferred" shares that entitle the owners to the full residual value of the firm and are therefore functionally equivalent to common stock. *See* DEL. CODE tit. 8, § 151(c); VA. CODE § 13.1-638. Plaintiffs adopt and incorporate by reference the arguments advanced by the Class Plaintiffs on this issue.

Moreover, FHFA's argument that the Companies' right to create new securities forecloses Plaintiffs' implied covenant claims cannot be squared with the Delaware Chancery Court's decision *In re Delphi Financial Group Shareholder Litigation*, 2012 WL 729232 (Del. Ch. Mar. 6, 2012) (unpublished). In that case, the company charter provided that the controlling shareholder

was not entitled to a control premium upon the sale of the company, but the charter also included a general provision that the charter may be amended. *Id.* at *1, *15. When an outside investor offered to purchase the company, the controlling shareholder refused to agree to the sale unless the charter was amended to allow him to receive a control premium. *Id.* at *1. The minority shareholders claimed that the charter provision about the control premium contained an implied covenant that it would not be amended, notwithstanding the charter provision allowing for amendments to the charter. *Id.* at *14, *17. On a motion for a preliminary injunction, the court found that the plaintiffs established a likelihood of success on the merits for their implied covenant claim. *Id.* at *17. The court explained that the record suggested that the minority shareholders bought their stock "with the understanding that the Charter structured the corporation in such a way that denied [the controlling shareholder] a control premium," and that the controlling shareholder violated that covenant when he demanded an amendment to the charter. *Id.* In this case, shareholders likewise bought the stock "with the understanding that the [stockholder agreement] structured the corporation in such a way that" denied the Companies the right to wholly extinguish their dividend and liquidation rights, notwithstanding the provision that the Companies could create new senior stock. *Id.* Such an expectation is not far-fetched; indeed, no reasonable investor would have purchased the shares otherwise.

The contours of the implied duty of good faith and fair dealing are substantially similar in Virginia. For example, in *Virginia Vermiculite*, a case similar to *In re Delphi*, the plaintiff sold a mine to the defendant in exchange for a lump sum of money and royalties on any mineral extracted from the land. 156 F.3d at 537. The contract provided that the defendant would retain "sole discretion" over whether to mine the land. *Id.* at 538. But then, in an alleged effort to monopolize the market and prevent the mine from falling into the hands of a competitor, the defendant donated

22

the land to an environmental group that opposed mining. *Id.* The plaintiff alleged that the defendant breached the implied duty of good faith and fair dealing, and the Fourth Circuit held that the plaintiff had stated a claim for relief. *Id.* at 541-42. Applying Virginia law, the Fourth Circuit explained that the defendant's contractual right to exercise its "sole discretion" over use of the mine contained an implicit agreement that the defendant would make the decision in good faith and not transfer the land to an environmental group opposed to mining. *Id.* at 542; *see also Historic Green Springs, Inc. v. Brandy Farm, Ltd.*, 32 Va. Cir. 98, 1993 WL 13029827, at \*4 (1993).

Moreover, in the specific context of the dividend and liquidation rights of preferred shareholders, courts have refused to dismiss claims for breach of the implied covenant of good faith and fair dealing that are materially indistinguishable from Plaintiffs' claims in this case. For example, in *QVT Fund LP v. Eurohypo Capital Funding LLC*, a company with a duty to pay a dividend to preferred shareholders whenever it was profitable entered into a "domination agreement" that allowed the company to transfer all annual profits to the dominating firm. 2011 WL 2672092, at \*4 (Del. Ch. July 8, 2011). The plaintiffs, preferred shareholders in the company, conceded that the transfer of all profits to the dominating firm prevented the company from having accounting "profit" that triggered its duty to pay a dividend, but the plaintiffs nonetheless argued that the company breached the implied covenant of good faith and fair dealing. *Id.* at \*14. Specifically, the plaintiffs argued that the contractual agreement to pay a dividend when the company was profitable contained an implied promise to operate the company for a profit and for the benefit of the shareholders. *Id.* The plaintiffs alleged that the company was not profitable because it had transferred all profits to the dominating company. *Id.* The Delaware Chancery Court denied the company's motion to dismiss, explaining that, although the contract did not explicitly state that the company could not enter into a domination agreement, the court could not "rule out the possibility that the

23

Bank's action of entering into the Domination Agreement might not have been foreseeable to the [company's] U.S. investors, who reasonably might have expected the Bank to remain a profit-seeking entity and not take action deliberately to change that status." *Id.*

Plaintiffs' implied covenant claims survive for the same reason those in *QVT Fund* survived. Plaintiffs have alleged that their contracts, both explicitly and implicitly, require that the Companies will be run as profit-seeking ventures for the benefit of all classes of shareholders, including the private preferred shareholders. The Companies (and FHFA, as Conservator) had discretion whether to declare a dividend or issue new senior shares of preferred stock, but they had to make those decisions in good faith and with an eye to operating profitable Companies for the benefit of all shareholders. *See Airborne Health*, 984 A.2d at 146-47 (the implied covenant requires a discretion-exercising party to act reasonably and in good faith). Moreover, no reasonable investor would have anticipated that Fannie and Freddie would attempt to eliminate entirely the value of their shares in a self-dealing transaction purporting to amend the terms of another class of stock. Nor would anyone have invested in the Companies if they had understood that the Companies could unilaterally extinguish the investment by simply agreeing to pay *all* of their profits, forever, to a single investor. *See E.I. DuPont Nemours & Co. v. Pressman*, 679 A.2d 446, 443 (1996) (in cases of unanticipated developments, the court must ask what the parties likely would have done had they considered the issue involved).

### B.     Even If the Companies Could Eliminate Plaintiffs' Investments Under Other Circumstances, They Were Bound by an Implied Covenant Not to Do So Just as They Entered a Period of Sustained Profitability.

As explained above, the circumstances under which the Third Amendment was imposed and FHFA's reasons for taking this step are ultimately of no moment; neither the express terms of Plaintiffs' contracts with the Companies nor the implied covenant of good faith and fair dealing allowed the Companies to effectively extinguish Plaintiffs' dividend and liquidation preference

24

rights by guaranteeing that Plaintiffs will receive nothing—no matter how profitable the Companies become. Nevertheless, the specific circumstances under which the Third Amendment was adopted further show that this action violated the implied covenant. Even assuming for the sake of argument that the Companies could eliminate the economic value of private shareholders' investments as part of an effort to raise additional capital during a period of economic distress, that is not what happened when FHFA imposed the Third Amendment in August 2012. For several reasons, the specific facts alleged in the amended complaints leave no doubt that FHFA breached the implied covenant.

First, the Third Amendment was imposed at a time when FHFA knew that the Companies were on the verge of generating the largest profits in their history. The amended complaints allege in detail that the "losses" the Companies reported during the early years of conservatorship were the result of erroneous accounting decisions imposed on them by FHFA. Fairholme Compl. ¶¶ 48-53; Arrowood Compl. ¶¶ 43-48. Just days before the Third Amendment was consummated, Fannie's Chief Financial Officer told Treasury that the reversal of some of these decisions was likely to generate roughly $50 billion in profits for her Company in 2013 alone. Fairholme Compl. ¶ 65; Arrowood Compl. ¶ 60. And while FHFA and Treasury both publicly claimed that the Third Amendment was necessary to prevent the Companies from exhausting available Treasury funding under the prior dividend arrangement, FHFA Acting Director DeMarco privately told Treasury Secretary Geithner that there was in fact no need for the Third Amendment because the Companies "will be generating large revenues over the coming years, thereby enabling them to pay the 10% annual dividend well into the future." Fairholme Compl. ¶ 68; Arrowood Compl. ¶ 63. When Plaintiffs' junior preferred shares were issued, none of the parties envisioned or would have agreed that the Companies could exercise their discretion to issue new senior preferred stock in a manner

that would effectively wipe out existing shareholders just before the Companies reported tens of billions of dollars in profits, much less that they would exercise a non-existent discretion to unilaterally amend existing securities to accomplish the same result. Irrespective of FHFA's reasons for imposing the Third Amendment, it did not have discretion under the contracts to eliminate Plaintiffs' economic interest in the Companies when the Companies were thriving. This was obvious and understood by many players on all sides.

Second, whatever the scope of the Companies' contractual authority to *raise* capital by diluting junior preferred shareholders, the implied covenant of good faith and fair dealing did not allow FHFA to deprive existing shareholders of the benefits of their stock as an end in itself to be pursued even when doing so would *starve* the Companies of capital. As a key White House official involved in the Third Amendment explained, one of the central purposes of the Third Amendment was to "lay to rest permanently the idea that the outstanding privately held pref[erred stock] will ever get turned back on." Fairholme Compl. ¶ 73; Arrowood Compl. ¶ 68; *see also* Fairholme Compl. ¶ 92, Arrowood Compl. ¶ 85 (quoting Treasury official who acknowledged the "Administration's commitment to ensure existing common equity holders will not have access to any positive earnings from the [Companies] in the future"). While other corporations view dilution of existing shareholders as an evil that is sometimes necessary when additional capital is needed, FHFA regarded the elimination of any chance that private shareholders might someday receive dividends or liquidation preference payments as an important goal that it was willing to pursue even though doing so would impair the Companies' ability to ever raise capital again. Fairholme Compl. ¶¶ 93-95; Arrowood Compl. ¶¶ 86-88. But for the Third Amendment, the Companies would today have $124 billion on their balance sheets that has instead been paid to Treasury as "dividends." *See* Fairholme Compl. ¶ 107; Arrowood Compl. ¶ 99. FHFA fully understood and

expected that the Third Amendment would have this effect on the Companies' capital position. It thus violated the implied covenant of good faith and fair dealing by exercising its discretion in a manner that "not only completely disregard[ed] [Plaintiffs'] interests and welfare, but actually work[ed] directly to injure [Plaintiffs'] interest in the agreement." *Historic Green Springs*, 1993 WL 13029827, at *4.

Third, FHFA could have achieved the publicly stated purpose of the Third Amendment—preventing Treasury's remaining funding commitment from being exhausted by dividend payments to Treasury—in a different manner that would not have deprived Plaintiffs of the economic benefits of their stock. As FHFA, Treasury, and the Companies all repeatedly acknowledged, the original PSPAs gave the Companies discretion not to declare cash dividends on Treasury's senior preferred stock but instead to pay Treasury's dividends "in kind" by adding to Treasury's liquidation preference. Fairholme Compl. ¶¶ 40-43; Arrowood Compl. ¶¶ 35-38. Declining to declare cash dividends and instead paying Treasury "in kind" would not have reduced the remaining amount of Treasury's funding commitment. Fairholme Compl. ¶ 44; Arrowood Compl. ¶ 39. The very same language in Plaintiffs' stock certificates that the D.C. Circuit held makes dividends on Plaintiffs' stock discretionary—entitling shareholders to dividends "when, as and if declared by the Board," *Perry Capital*, 864 F.3d at 629—also appears in the PSPAs, FHFA Br., Ex. G § 2(a), Doc. 68-7.[7] And while the D.C. Circuit ruled that FHFA could not be enjoined to exercise its discretion to pay Treasury's dividends in kind, 864 F.3d at 610, Plaintiffs are entitled to contract damages and restitution for FHFA's failure to choose a readily available and costless alternative that would not have deprived private shareholders of the benefit of their bargain.

---

[7] Plaintiffs submit that the D.C. Circuit's analysis of this language is inconsistent with this Court's earlier determination that the original PSPAs required the Companies to pay Treasury's dividends in cash. *See Perry Capital LLC v. Lew*, 70 F. Supp. 3d 208, 216 n.7 (D.D.C. 2014).

27

It is clear that none of the original parties to Plaintiffs' contracts contemplated that the Companies could exercise their contractual discretion in a way that would wipe out the value of these investments at a time when the Companies were highly profitable or that the Companies might do so purely for the purpose of depriving investors of the benefit of their bargain. Perhaps recognizing the force of these points, FHFA attempts to shift the focus from what the amended complaints allege actually happened to hypothetical scenarios that FHFA says investors should have foreseen. Investors should have anticipated from the beginning, we are told, that highly regulated companies with a public mission might find themselves in financial distress and that during a period of economic turmoil their privately held stock could become worthless. FHFA Br. 24-26. But FHFA's argument elides the fact that the Third Amendment was imposed in August 2012—at a time when FHFA knew the Companies had returned to stable profitability—not during the financial crisis of 2008.

To be sure, this Court's previous opinion concluded in the context of a takings claim brought by other shareholders that the Third Amendment was not inconsistent with those shareholders' "reasonable investment-backed expectations" *Perry Capital*, 70 F. Supp. 3d at 244-45.[8] But whether shareholders had a reasonable investment-backed expectation that the Government would not deprive them of their property for purposes of the Takings Clause is completely distinct from the issue here: whether shareholders had a reasonable expectation at the time of contracting that the Companies would not exercise their discretion to deprive shareholders of their contractual

---

[8] Plaintiffs have never pressed takings claims in this Court, and this Court's ruling with respect to takings claims pressed by other shareholders is not law of the case with respect to Plaintiffs.

rights as shareholders when the Companies were entering a period of sustained and robust profit-ability.[9] The principal cases cited in the Court's takings analysis do not support a finding that such an expectation would have been unreasonable. *Golden Pacific Bancorp v. United States*, 15 F.3d 1066 (Fed. Cir. 1994), and *California Housing Securities, Inc. v. United States*, 959 F.2d 955 (Fed. Cir. 1992), hold that shareholders cannot bring a takings claim when a financial institution is seized for the kind of unsafe or unsound practices that have traditionally been regulated and that an investor could reasonably foresee leading to such a seizure. These decisions do not hold that shareholders of regulated financial institutions should expect the government to leverage its control over an entity in conservatorship to eliminate the contract rights of shareholders at a time when the entity is robustly profitable and not in financial distress. *Cf. Ascom Hasler Mailing Sys., Inc. v. United States Postal Serv.*, 885 F. Supp. 2d 156, 196 (D.D.C. 2012) ("[T]he fact that a claimant participates in a highly regulated field 'does not necessarily mean that such property owner *never* has a reasonable investment-backed expectation in its right to develop and utilize its property.' " (quoting *Norman v. United States*, 63 Fed. Cl. 231, 265 (2004)); *Acceptance Ins. Cos. v. United States*, 84 Fed. Cl. 111, 117 (2008) ("[M]ere participation in a heavily regulated environment does not bar a plaintiff from showing that it has a property interest . . . .").

FHFA's argument that the regulated nature of the financial industry forecloses Plaintiffs' implied covenant claims is also contrary to how the Federal Circuit dealt with similar implied covenant claims in the wake of *United States v. Winstar Corp.*, 518 U.S. 839 (1996). In the *Winstar* litigation, financial regulators induced healthy banks to take on the debts of distressed banks by promising the acquiring banks favorable treatment with respect to certain tax and regulatory capital

---

[9] It is clear that shareholders' contract rights survived into conservatorship for, as the D.C. Circuit held, apart from limited circumstances not applicable here "the Companies' contractual obligations . . . remain in force" during conservatorship. *Perry Capital LLC*, 864 F.3d at 630.

issues. After Congress enacted legislation aimed at withdrawing the favorable treatment regulators had promised, the Federal Circuit held that a number of the acquiring banks could sue the Government for violating the implied covenant of good faith and fair dealing. *Local Oklahoma Bank, N.A. v. United States*, 452 F.3d 1371, 1376-77 (Fed. Cir. 2006); *Centex Corp. v. United States*, 395 F.3d 1283, 1304-07 (Fed. Cir. 2005); *First Nationwide Bank v. United States*, 431 F.3d 1342, 1349-51 (Fed. Cir. 2005). In so ruling, the Federal Circuit repeatedly rejected arguments that the acquiring banks had "a reasonable expectation that [unfavorable] legislation might be enacted" that would deprive them of the key benefits of their contracts with the Government. *Local Oklahoma Bank*, 452 F.3d at 1377. The plaintiff banks in the *Winstar* cases were no less heavily regulated than Fannie and Freddie, but that did not prevent them from forming a reasonable expectation that they would receive the benefits for which they had bargained. *See Cienega Gardens v. United States*, 331 F.3d 1319, 1334 (Fed. Cir. 2003) (*Winstar* "showed that the abrogation by legislation of clear, unqualified contract rights requires a remedy, even in a highly regulated industry, there banking, because the contracts embodied the commitments of the contracting parties").

Despite hundreds of conservatorships and receiverships over the decades, never before the Third Amendment had a federal conservator or receiver used its powers to nationalize a financial institution for the exclusive benefit of the federal government at a time when the institution was highly profitable. Even if the original parties to the contracts had foreseen the creation of FHFA and the enactment of HERA, they would not have reasonably anticipated that this agency, standing in the shoes of the Companies, might eliminate private shareholders' investments at a time when it was clear that the Companies had the long-term capacity to generate income well in excess of their debts and other obligations.

C.     **Neither HERA nor the Original PSPAs Altered Plaintiffs' Contracts in a Manner that Authorized the Companies to Wipe Out Private Shareholders.**

As FHFA acknowledges, claims for breach of the implied covenant of good faith and fair dealing are evaluated by reference to the parties' expectations "at the time of contracting." FHFA Br. 24 n.9 (quoting *Nemec*, 991 A.2d at 1126). The Delaware Chancery Court has explained that an implied covenant claim asks whether "the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant." *See ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 50 A.3d 434, 440 (Del. Ch. 2012). Accordingly, the Court must not ask "what duty the law should impose on the parties given their relationship at the time of the wrong, but rather what the parties would have agreed to themselves had they considered the issue in their original bargaining positions at the time of contracting." *Id.*

Under this framework, the critical question is what the Companies and investors expected when Plaintiffs' shares were originally issued—not what the expectations were after HERA was enacted and the original PSPAs were signed. However, whether the expectations are gauged as of the date when Plaintiffs' shares were originally issued, or as of a date after the enactment of HERA and execution of the original PSPAs, the conclusion is the same: The Third Amendment violated the covenant of good faith and fair dealing.

FHFA proposes that the entirety of HERA should be understood as amending and forming a part of Plaintiffs' contracts with the Companies. FHFA Br. 26-29. But the only cases FHFA cites to support this argument say that "*general corporation laws of the state of incorporation*" are part of the contract between the shareholder and the corporation. *Middleburg Training Ctr., Inc. v. Firestone*, 477 F. Supp. 2d 719, 725 (E.D. Va. 2007). The Delaware Legislature has codified this principle in a statute that says that the state's General Corporation Law "and all amendments

31

thereof shall be a part of the charter or certificate of incorporation of every corporation." DEL. CODE tit. 8, § 394. While these authorities show that generally applicable Delaware and Virginia statutes concerning the law of corporations form part of Plaintiffs' contracts with the Companies, it does not follow that all of HERA—including provisions of that law that govern FHFA's statutory authority during conservatorship—modified Plaintiffs' contracts. *Cf. Perry Capital*, 864 F.3d at 630 (rejecting argument that HERA "preempted" Plaintiffs' implied covenant of good faith and fair dealing claims). To the contrary, when Congress enacted HERA it specified which provisions would appear in the Companies' federal charters. *See* HERA, Pub. L. No. 110-289, § 1117, 122 Stat. 2654 (amending 12 U.S.C. § 1719 (Fannie charter) and 12 U.S.C. § 1455 (Freddie charter)). It is, at most, only those provisions of HERA, not the rest of the statute or the entirety of the U.S. Code, that are properly understood as included in Plaintiffs' contracts with the Companies and informing Plaintiffs' expectations about how the Companies would exercise their discretion.

Once the focus is placed on HERA's amendments to the Companies' charters, it is apparent that those amendments only confirmed the parties' prior understanding that the Companies were to be operated as private, for-profit businesses and that in no event were the Companies authorized to wipe out Plaintiffs' shares by selling Treasury new senior preferred stock in August 2012 (or by amending Treasury's existing shares to accomplish the same result). Before investing in the Companies pursuant to their charters as amended by HERA, Treasury was required to consider, among other things, the Companies' "plan[s] for the orderly resumption of private market funding or capital market access," and "[t]he need to maintain the [Companies'] status as [ ] private share-holder-owned" entities. 12 U.S.C. §§ 1719(g)(1)(C), 1455(*l*)(1)(C). These provisions make clear that when Congress amended the charters to authorize Treasury to invest in the Companies, it did

not radically alter the basic contractual relationship between the Companies and their private share-holders.

Moreover, Treasury's authority to purchase new shares in the Companies pursuant to the charters expired on December 31, 2009, 12 U.S.C. §§ 1719(g)(4), 1455(*l*)(4), and it follows that Plaintiffs had a reasonable expectation that they would not have the value of their shares diluted by additional Treasury investments after that date. As discussed above, background principles of Delaware and Virginia corporation law did not allow either Company's Board of Directors to *amend* a stock certificate of designations (and thus the certificate of incorporation) without approval from all classes of adversely affected shareholders. *See supra* 17-19. And while the Companies' charters and Plaintiffs' stock certificates gave the Boards of Directors unilateral authority to *create and issue* new classes of stock, that was no longer an option with respect to Treasury in August 2012 due to the sunsetting of Treasury's authority to purchase the Companies' shares.

Even if provisions of HERA that did not amend the Companies' charters were a part of Plaintiffs' contracts with the Companies, HERA still would not alter the basic contractual relationship between the Companies and their private shareholders. FHFA points to a provision of HERA that the D.C. Circuit understood to permit the conservator to consider its own "best interests" when operating the Companies. FHFA Br. 29 (citing 12 U.S.C. § 4617(b)(2)(J)); *see Perry Capital*, 864 F.3d at 607-08. But permitting FHFA to consider its own interests does not alter the contracts to permit the Companies to actively thwart the interests of their private shareholders in a bad faith effort to deprive these investors of the benefit of their bargain. The provision of HERA that authorizes the conservator to "transfer or sell any asset or liability" of the entities under its control likewise does not change the analysis. 12 U.S.C. § 4617(b)(2)(G). When the conservator undertakes such transfers, it is required to seek to "maximize[ ] the net present value return from the sale

or disposition of such assets." *Id.* § 4617(b)(11)(E).

Moreover, a separate provision of HERA confirms that the statute did not alter the basic nature of Plaintiffs' contract rights. That provision states that "within a reasonable period following" its appointment as conservator FHFA "may disaffirm or repudiate any contract" the Companies executed before conservatorship "the performance of which the conservator . . . determines to be burdensome," 12 U.S.C. § 4617(d)(1)-(2). As the D.C. Circuit explained, it follows from this provision that Congress did not intend for its conferral of conservatorship powers on FHFA to preempt or otherwise displace the Companies' pre-conservatorship contractual obligations apart from this repudiation provision: "That the Recovery Act permits the FHFA in some circumstances to repudiate contracts the Companies concluded before the conservatorship indicates that the Companies' contractual obligations *otherwise remain in force*." *Perry Capital*, 864 F.3d at 630 (emphasis added). And it is undisputed that FHFA did not rely, and could not have relied, on this provision to repudiate Plaintiffs' contracts at the time of the Net Worth Sweep. *See* 12 C.F.R. § 1237.5(b). Even if FHFA could have relied on the repudiation provision, that provision makes FHFA liable to pay damages to the affected party. 12 U.S.C. § 4617(d)(3). At a minimum, then, shareholders had a reasonable expectation that they could recover damages for any action taken by FHFA as conservator to extinguish their contract rights.[10]

Neither did the original PSPAs alter the fundamental relationship between the Companies and their private shareholders. *See* FHFA Br. 29-30. Unlike the Third Amendment, the original

---

[10] The fact that the D.C. Circuit found the Net Worth Sweep to be within the conservator's statutory authority does not change this fact. All that means is that Plaintiffs cannot obtain equitable relief by operation of 12 U.S.C. § 4617(f). (Plaintiffs, of course, disagree with this holding and are seeking Supreme Court review.) As the arguments in the text indicate, however, nothing in HERA undermines Plaintiffs' expectation that they could sue for damages if the conservator took an action that breached their contract rights.

PSPAs diluted but did not eliminate the dividend and liquidation preference rights of the Companies' private shareholders. This is reinforced by Treasury's acquisition of warrants to purchase 79.9% of the Companies' common stock as part of the initial deal, for the warrants would only have value if the existing junior preferred and common stock also had value. If anything, the fact that private shareholders were not completely wiped out during the financial crisis of 2008 gave them additional reason to believe that they would not be deprived of their investments after the Companies had returned to sustained profitability in 2012. And while FHFA emphasizes that the original PSPAs gave Treasury authority to prevent the Companies from declaring dividends (but not making liquidation preference payments) *during conservatorship*, FHFA Br. 29, FHFA itself emphasized at the time that conservatorship was temporary: "Upon the Director's determination that the Conservator's plan to restore the [Companies] to a safe and solvent condition has been completed successfully, the Director will issue an order terminating the conservatorship[s]." Fairholme Compl. ¶ 34 (quoting *FHFA Fact Sheet, Questions and Answers on Conservatorship* 2); Arrowood Compl. ¶ 30.

Other statements by FHFA from 2008 further reinforce the reasonableness of private investors' expectation that their ability to receive dividends and liquidation preference payments would not be eliminated just as the Companies returned to stable and long-term profitability. FHFA said on the day the original PSPAs were announced that the Companies' common and junior preferred stock was still outstanding and would "continue to trade," *FHFA Fact Sheet, Questions and Answers on Conservatorship*, https://goo.gl/nz8Vvd, and FHFA further said that Fannie's and Freddie's stockholders "continue to retain all rights in the stock's financial worth," *id.* A few weeks later, FHFA Director Lockhart testified before Congress that Fannie's and Freddie's "shareholders are still in place; both the preferred and common shareholders have an economic interest in the

companies" and that "going forward there may be some value" in that interest. *Oversight Hearing to Examine Recent Treasury and FHFA Actions Regarding the Housing GSEs: Hearing before the H. Comm. on Fin. Servs.*, 110th Cong. 29-30, 34 (2008). These statements are consistent with HERA and the original PSPAs, and they show that the Companies' private shareholders had good reason to anticipate that their dividend and liquidation preference rights would have value when the Companies recovered.

FHFA attempts to dull the force of these and similar statements it made about the nature and effect of conservatorship by misleadingly quoting Director Lockhart's statement that "common stock and preferred stock dividends will be eliminated." Press Release, Statement of FHFA Director James B. Lockhart at News Conference Announcing Conservatorship of Fannie Mae and Freddie Mac (Sept. 7, 2008), https://goo.gl/GwYrS5; FHFA Br. 30. But this is what Director Lockhart said: "[I]n order to conserve over $2 billion in capital every year, the common stock and preferred stock dividends will be eliminated, *but the common and all preferred stocks will continue to remain outstanding*." *Id.* (emphasis added). Understood in context, it is clear that Director Lockhart was only saying that FHFA had temporarily suspended dividend payments during conservatorship—not that the PSPAs or HERA had permanently nullified the contractual right of junior preferred shareholders to receive a liquidation preference or to receive a dividend if any is declared on common stock (or its equivalent). [11]

## III.   Both Fannie and Freddie Shareholders May Bring Direct Claims for Breach of Fiduciary Duty

Fairholme and Arrowood, as shareholders of Fannie and Freddie, have properly brought

---

[11] Plaintiffs join the arguments made by the Class Plaintiffs with respect to the implied covenant of good faith and fair dealing.

direct claims for breach of fiduciary duty.[12] There is no basis for Defendants' argument that those claims should be dismissed because they could only be brought as derivative claims (and thus could only be brought by FHFA itself) or are preempted.[13]

### A. Delaware Law Supports Fannie Shareholders' Direct Claims for Breach of Fiduciary Duty.

Under Delaware law (which governs the breach of fiduciary duty claims of Fannie share-holders), the determination of

> whether a stockholder's claim is derivative or direct . . . must turn solely on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004). Moreover, "[a]lthough each question is framed in terms of exclusive alternatives (either the corporation or the stockholders), some injuries affect both the corporation and the stockholders," and thus give

---

[12] Defendants argue that the D.C. Circuit's decision bars Fairholme's direct claim for breach of fiduciary duty. FHFA Br. 31-32. That is incorrect. In its initial complaint in this case, Fairholme asserted a breach of fiduciary duty claim seeking only equitable relief. *See* Doc. 1 ¶¶ 136-145. This Court dismissed that claim on two alternative grounds: first, that it was barred by HERA's prohibition on equitable relief against the conservator, and, second, that although pleaded as a direct claim it was properly considered derivative. *See Perry Capital LLC*, 70 F. Supp.3d at 229 n.24. The D.C. Circuit held that Fairholme had forfeited this claim on appeal by failing to raise the second, alternative holding in its opening brief. *See Perry Capital LLC*, 864 F.3d at 617. Critically, however, this Court held that Fairholme's fiduciary breach claim was de-rivative because it sought equitable relief that "would flow first and foremost to the [GSEs]." *Perry Capital LLC*, 70 F. Supp.3d at 229 n.24. In its amended complaint, by contrast, Fairholme asserts a breach of fiduciary duty claim seeking *damages* that would flow directly to *itself*. *See* Fair-holme Compl. ¶¶ 132-141, 153(e). Because this Court's prior holding was premised on the equi-table nature of the relief sought, neither it nor the D.C. Circuit's ruling affirming that holding affects Fairholme's ability to bring a distinct claim for damages. This follows from the very case FHFA cites on this point, which holds that application of both the law of the case doctrine and the mandate rule "is limited to issues that were decided either explicitly or by necessary implication" by the decision in question. *United States v. Insurance Co. of N. America*, 131 F.3d 1037, 1041 (D.C. Cir. 1997). This issue does not affect Arrowood's fiduciary duty claim.

[13] Plaintiffs join in the arguments made by the Class Plaintiffs on breach of fiduciary duty.

rise to both direct and derivative claims. *Carsanaro v. Bloodhound Techs.*, *Inc.*, 65 A.3d 618, 655 (Del. Ch. 2013).

When a fiduciary improperly transfers value *within* a corporation—*from one shareholder group to another, changing their relative positions within the corporation*—the harm is suffered by those individual shareholders who have lost value, and those shareholders thus have a direct claim to recover damages that will go to them directly, not to the corporation. When a fiduciary improperly transfers value from a corporation to an entity outside the corporation—*leaving all shareholders in the same positions relative to each other*—the harm is suffered by the corporation itself, giving rise only to a derivative claim, with any recovery going to the corporation. When a fiduciary's action does both—transferring value from one shareholder group to another, and at the same time draining value from the corporation—the conduct may give rise to both direct and derivative claims.

Here, the Net Worth Sweep transferred value from one group of shareholders to another, *within* the corporation. Before the Net Worth Sweep, there was real value in the common stock and junior preferred stock held by private shareholders—value that was based on, among other things, the reasonable prospect that Fannie and Freddie would be profitable and continue to increase their net worth, the reasonable prospect that they would be in a position to pay dividends, the reasonable prospect that in the event Fannie and Freddie were sold (or forced to liquidate) value would flow to the holders of junior preferred and common stock, and the repeated acknowledgement of FHFA, as Conservator, of its obligation to promote the safety and soundness of the Companies—which would be reflected in the market value of the shares. The Net Worth Sweep transferred all value from the common stock and junior preferred stock to the Treasury-owned senior preferred stock. The Net Worth Sweep eliminated any possibility that Fannie or Freddie

could increase its net worth (because nearly every penny of net worth would be swept away quarterly), eliminated any possibility for the payment of dividends to holders of common stock or junior preferred stock (because there would be no money left to pay such dividends after dividends were paid to Treasury), and eliminated the prospect of any distribution to holders of common or junior preferred stock upon liquidation (because Fannie and Freddie, upon liquidation, would be forced to pay to Treasury *both* a Net Worth Sweep dividend *and* Treasury's inflated liquidation preference, guaranteeing that there would be nothing left to pay shareholders of common or junior preferred stock below Treasury in the waterfall).

And that value—stripped from one group of Fannie and Freddie shareholders—was transferred to Treasury, as the sole shareholder of Fannie and Freddie senior preferred stock. There was thus a transfer of value *from one group of shareholders to another, within* Fannie and Freddie—exactly the breach of fiduciary duty that gives rise to a direct claim. *Gentile v. Rossette*, 906 A.2d 91 (Del. 2006); *El Paso Pipeline GP Co., LLC v. Brinckerhoff*, 152 A.3d 1248 (Del. 2016).

To be sure, the simple fact that a controlling shareholder improperly benefited from a corporate transaction does not give rise to a direct claim. The critical issue is whether the *relative positions of the shareholders within the corporation* remained the same. Thus, in *El Paso Pipeline*, a classic corporate overpayment claim, the plaintiffs alleged that the limited partnership overpaid when it purchased assets of the parent of the general partner. Because the relative ownership stake in the partnership of the general partner and the limited partners was not affected, and because any damages recovered would go to the partnership (and thus benefit all partners, in proportion to their relative ownership stakes), the transaction gave rise only to derivative, and not to direct, claims. *See El Paso Pipeline*, 152 A.3d at 1264. Here, in contrast, Plaintiffs do not allege that FHFA has caused Fannie and Freddie to overpay for one of Treasury's assets, but rather that FHFA has caused

Fannie and Freddie to effectively transfer their rights to a portion of Fannie's and Freddie's equity to Treasury on an ongoing basis. "As a consequence, the public shareholders are harmed, uniquely and individually, to the same extent that the controlling shareholder is (correspondingly) bene-fited." *Gentile*, 906 A.2d at 100; *see also Gatz v. Ponsoldt*, 925 A.2d 1265, 1278 (Del. 2007); *Dubroff v. Wren Holdings, LLC*, 2011 WL 5137175, at *9 (Del. Ch. Oct. 28, 2011) (upholding direct claim based on allegation that "the controller's holdings are not decreased, and the holdings of the minority shareholders are").

The Complaints make crystal clear that Plaintiffs are complaining of the harm done to them, as private shareholders of Fannie and Freddie, and not merely of harm done to Fannie and Freddie as entities. For example, Arrowood's First Amended Complaint alleges:

> Wiping out the Companies' private shareholders was among the Net Worth Sweep's contemplated purposes. Accordingly, Mr. Ugoletti testified that he was not surprised "that the preferred stock got hammered the day the Net Worth Sweep was announced." . . . The fundamental nature of the change in Treasury's invest-ment resulting from the Net Worth Sweep is illustrated by the facts that Treasury is now effectively Fannie's and Freddie's sole equity shareholder and that Treas-ury's securities in the Companies are now effectively equivalent to 100% of the Companies' common stock. After giving effect to the Net Worth Sweep, Treasury has both the right to receive the entire net worth of the Companies as well as control over the manner in which the Companies conduct business. Accordingly, following the Net Worth Sweep, Treasury's Government Stock should be characterized in a manner consistent with its economic fundamentals as 100% of the Companies' common stock. . . . The Government Stock simply takes everything.

Arrowood Compl. ¶¶ 71, 101; *see also* Fairholme Compl. ¶¶ 76, 109.

To be sure, the Net Worth Sweep also caused harm to Fannie and Freddie, because all economic value was not only transferred from all other shareholders to one shareholder—the Treasury—but was taken out of the Companies; dividends paid to Treasury drained the capital from Fannie and Freddie. The Complaints thus make allegations about that harm. Arrowood Compl. ¶ 99; Fairholme Compl. ¶ 107. Defendants point to these allegations to support their argu-ment that breach of fiduciary duty claims can only be derivative, and not direct. FHFA Br. 35. But

the existence of that harm to Fannie and Freddie, which may well give rise to derivative claims for breach of fiduciary duty, does not negate the fact that the underlying transfer of value was from the private shareholders to Treasury, as the sole holder of senior preferred stock, changing the relative positions of the shareholders within the Companies—giving rise to direct claims.

The second aspect of the *Tooley* test—who would receive the benefit of any recovery—is easily satisfied. Because the injury was sustained by the holders of common and junior preferred stock, any recovery must go to those stockholders, and not to Fannie and Freddie. Indeed, were any recovery paid to Fannie and Freddie, no stockholder (other than Treasury) would benefit from that recovery because, with the Net Worth Sweep in place, to the extent that the recovery increased the net worth of Fannie or Freddie, all of that value would be swept away and paid to Treasury.

Because the fiduciary duty claims of Fannie shareholders are properly pled as direct claims under Delaware law, Defendants' motion to dismiss should be denied.

## B. Virginia Law Supports Freddie Shareholders' Direct Claims for Breach of Fiduciary Duty.

Whether Freddie shareholders may bring direct claims for their injuries is governed by Virginia law. In *Remora Investments, LLC v. Orr*, 277 Va. 316, 673 S.E.2d 845 (Va. 2009), the Virginia Supreme Court discussed the Delaware Supreme Court's decision in *Tooley*, and held that it "need not decide" whether to adopt the *Tooley* analysis as Virginia law, because under the *Tooley* analysis, Remora would not have a direct claim. The Virginia Supreme Court thus held:

> Remora argues that we should adopt the rule established by the Delaware Supreme Court in *Tooley*, providing that . . . "determining whether a stockholder's claim is derivative or direct . . . must turn *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" 845 A.2d at 1033. In determining the "nature of the wrong and to whom the relief should go" the Delaware Supreme Court held a direct action may be maintained by a stockholder if the claimed direct injury is "independent of any alleged injury to the corporation" and the stockholder demonstrates that "the duty breached was owed to the stockholder and that he or she can

41

prevail without showing an injury to the corporation." *Id.* at 1039. . . . We need not decide whether to adopt the analysis employed by the Delaware Supreme Court in *Tooley*, but observe that even under such an approach, Remora would not prevail.

673 S.E.2d at 848 (emphasis added). The Virginia Supreme Court did not merely "observe" that Remora, the aggrieved member of an LLC, would not prevail under the *Tooley* analysis; the Court in fact applied the *Tooley* analysis, and held that Remora could not have a direct claim against Orr (the manager) because "While Orr is the manager, he is also a member. Based upon the allegations recited above, any injury sustained by Remora was also sustained by Orr." *Id.*

While *Remora* has been cited as holding that a shareholder cannot bring a direct claim for breach of fiduciary duty under Virginia law (and Defendants here so argue, FHFA Br. 33), *Remora* did not so hold; instead, the Virginia Supreme Court specifically stated that it need not, and would not, reach that issue. Nor has the Virginia Supreme Court since decided whether or not to adopt the *Tooley* test, or to otherwise set forth the circumstances under which a shareholder may bring a direct claim for breach of fiduciary duty.

In predicting how the Virginia Supreme Court would resolve this issue, this Court should follow the practice of Virginia courts. "Absent controlling precedent from the Virginia Supreme Court," Virginia courts "look[ ] to the decisions of the Supreme Court of Delaware for guidance." *U.S. Inspect Inc. v. McGreevy*, 2000 WL 33232337, at *4 (Va. Cir. Ct. Nov. 27, 2000); *see also Pagliara v. Federal Home Loan Mortg. Corp.*, 203 F. Supp. 3d 678, 689 n.18 (E.D. Va. 2016) ("It is not uncommon for courts interpreting Virginia corporate law to look for guidance from other courts, especially Delaware corporate law."); *Milstead v. Bradshaw*, 1997 WL 33616661, at *6 (Va. Cir. Ct. Oct. 3, 1997) (finding "great persuasive authority" in Delaware cases discussing standing to bring a derivative lawsuit); *Abella v. Universal Leaf Tobacco Co., Inc.*, 546 F. Supp. 795, 799-800 (E.D. Va. 1982) (looking to Delaware for guidance on derivative litigation).

Under that principle, this Court should conclude that the issue that the Virginia Supreme

Court found unnecessary to reach, and therefore reserved in *Remora*—whether Virginia should follow the Delaware Supreme Court's decision in *Tooley*—should be answered "yes." Therefore, the above analysis demonstrating that Fairholme and Arrowood, as Fannie shareholders, have properly asserted claims under Delaware law, also demonstrates that they, as Freddie shareholders, have properly asserted claims under Virginia law.

### C. HERA Does Not Preempt Plaintiffs' Direct Fiduciary Duty Claims.

For the reasons explained by Class Plaintiffs, whose argument on this point we rely on and incorporate by reference, HERA does not preempt Plaintiffs' fiduciary breach claims.

When it took over Fannie and Freddie as Conservator, FHFA stepped into the shoes of their boards and assumed each board's fiduciary duties to its shareholders. *See, e.g.*, *Suess v. FDIC*, 770 F. Supp. 2d 32, 38 (D.D.C. 2011); *Gibralter Fin. Corp. v. Federal Home Loan Bank Bd.*, 1990 WL 394298, at *3 (C.D. Cal. June 15, 1990). Permitting direct fiduciary duty claims is entirely consistent with, and most certainly does not frustrate, the specific objectives of HERA, and thus is not preempted by HERA. *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507 (1988) (state law is preempted by implication only if the application of state law would "frustrate specific objectives" of federal legislation). Thus:

- While the D.C. Circuit has held that HERA authorizes FHFA, as Conservator, to consider its own interests as a government agency, it does not follow that it was a specific objective of HERA that FHFA consider those interests to the exclusion of the interests of Fannie's and Freddie's shareholders. It is entirely possible for FHFA to comply with both HERA and its state-law fiduciary obligations to consider in good faith the interests of Fannie's and Freddie's shareholders *along with* the interests of the other constituencies Congress has authorized FHFA to consider.

43

- It was a specific objective of HERA to put Fannie and Freddie in a "sound and solvent condition," and to "preserve and conserve the[ir] assets and property." 12 U.S.C. § 4617(b)(2)(D). That is why HERA authorized FHFA, as Conservator, to take actions "necessary to put the regulated entity in a sound and solvent condition" and to "preserve and conserve the assets and property of the regulated entity." *Id.* Recognizing that FHFA, as Conservator, has fiduciary duties to Fannie's and Freddie's shareholders does not frustrate FHFA's self-described "statutory mission to restore soundness and solvency to insolvent regulated entities and to preserve and conserve their assets and property." 76 Fed. Reg. at 35,726.

- It was a specific objective of HERA that FHFA, when exercising its authority as conservator to dispose of Fannie's and Freddie's assets, to, among other things, "(i) maximize[e] the net present value return from the sale or disposition of such assets" and "(ii) minimize[e] the amount of any loss realized in the resolution of cases." 12 U.S.C. § 4617(b)(11)(E). Recognizing that FHFA, as Conservator, has fiduciary duties to Fannie's and Freddie's shareholders does not frustrate HERA's specific objective that FHFA maximize the value received from any disposition of Fannie's and Freddie's assets. To the contrary, HERA's statutory objective is the definition of a fiduciary's responsibility when disposing of a ward's assets.

The Complaints clearly allege—and the evidence conclusively supports—that the Net Worth Sweep was not in fact implemented to further FHFA's statutory mission of stabilizing Fannie and Freddie, but rather to see that only one shareholder of Fannie and Freddie—Treasury—would benefit from the enormous profits these Companies were expected to earn. Arrowood Compl. ¶¶ 62-88; Fairholme Compl. ¶¶ 67-102. Permitting Plaintiffs' fiduciary breach claims

therefore would not frustrate the specific objectives of HERA.

The D.C. Circuit's decision on the scope of the Succession Clause is also instructive on the question of implied preemption. In holding that the Succession Clause barred Fannie and Freddie shareholders from bringing derivative claims but did not bar direct claims, the D.C. Circuit stated:

> The Recovery Act thereby transfers to the FHFA all claims a shareholder may bring derivatively on behalf of a Company whilst claims a shareholder may lodge directly against the Company are retained by the shareholder in conservatorship but terminated during receivership. The Act distinguishes between the transfer of rights "with respect to the regulated entity and [its] assets" in the Succession Clause and the termination of rights "against the assets or charter of the regulated entity" in § 4617(b)(2)(K)(i). Rights "with respect to" a Company and its assets are only those an investor asserts derivatively on the Company's behalf. *Cf. Levin v. Miller*, 763 F.3d 667, 672 (7th Cir. 2014) (so interpreting the analogous provision of FIRREA, 12 U.S.C. § 1821(d)(2)(A)(i)). Rights and claims "against the assets or charter of the regulated entity" are an investor's direct claims against and rights to the assets of the Company once it is placed in receivership in order to be liquidated, *see* 12 U.S.C. § 4617(b)(2)(E); that the Recovery Act terminates such rights and claims in receivership indicates that shareholders' direct claims against and rights in the Companies survive during conservatorship.

864 F.3d at 624. The D.C. Circuit's analysis shows that it is difficult indeed for Defendants to argue that permitting direct fiduciary claims would frustrate a specific objective of HERA. By carefully distinguishing "between the transfer of rights 'with respect to the regulated entity and [its] assets' in the Succession Clause and the termination of rights 'against the assets or charter of the regulated entity' in § 4617(b)(2)(K)(i)," *id.*, Congress showed that it expected that the latter shareholder rights would remain in place. Had Congress believed that such direct claims would frustrate HERA's specific objectives, it would not have left those rights in place.[14]

## **CONCLUSION**

For the foregoing reasons, FHFA's motion to dismiss should be denied.

---

[14] Plaintiffs included APA claims and requests for injunctive relief in their complaints to preserve their rights if the Supreme Court agrees to review the D.C. Circuit's decision. They do not dispute that those claims should be dismissed if the D.C. Circuit's decision stands.

Dated: February 16, 2018                              Respectfully submitted,


DENTONS US LLP                                       By: s/ Charles J. Cooper
                                                     Charles J. Cooper (Bar No. 248070)
By:  s/ Drew W. Marrocco                             COOPER & KIRK, PLLC
Drew W. Marrocco (Bar No. 453205)                   1523 New Hampshire Avenue, N.W.
1301 K Street, NW                                    Washington, D.C. 20036
Suite 600, East Tower                                (202) 220-9600
Washington, DC 20005-3364                            (202) 220-9601
Tel.: (202) 408-6400                                 ccooper@cooperkirk.com
Fax: (202) 408-6399
drew.marrocco@dentons.com                            David H. Thompson (Bar No. 450503)
                                                     Vincent J. Colatriano (Bar No. 429562)
Michael H. Barr (pro hac vice)                       Peter A. Patterson (Bar No. 998668)
Richard M. Zuckerman (pro hac vice)                  Brian W. Barnes (Bar No. 1018419)
1221 Avenue of the Americas                          COOPER & KIRK, PLLC
New York, New York 10020                             1523 New Hampshire Avenue, N.W.
Tel.: (212) 768-6700                                 Washington, D.C. 20036
Fax: (212) 768-6800                                  (202) 220-9600
michael.barr@dentons.com                             (202) 220-9601
richard.zuckerman@dentons.com                        dthompson@cooperkirk.com
                                                     vcolatriano@cooperkirk.com
*Counsel for Plaintiffs*                             ppatterson@cooperkirk.com
*Arrowood Indemnity Company,*                        bbarnes@cooperkirk.com
*Arrowood Surplus Lines Insurance Company, and*
*Financial Structures Limited*                       *Counsel for Plaintiffs Fairholme Funds*
                                                     *Inc., et al.*

46