**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FAIRHOLME FUNDS, INC., *et al*., | |
| Plaintiffs, | |
| v. | Civil No. 13-1053 (RCL) |
| FEDERAL HOUSING FINANCE AGENCY, *et al.*, | |
| Defendants. | |
| ARROWOOD INDEMNITY COMPANY, *et al.*, | |
| Plaintiffs, | |
| v. | Civil No. 13-1439 (RCL) |
| FEDERAL NATIONAL MORTGAGE ASSOCIATION, *et al.*, | |
| Defendants. | |
| In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations | |
| _____ | Miscellaneous No. 13-01288 (RCL) |
| This document relates to: ALL CASES | |

**REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**
**AMENDED COMPLAINTS ON REMAND BY DEFENDANTS**
**FEDERAL HOUSING FINANCE AGENCY AS CONSERVATOR**
**FOR FANNIE MAE AND FREDDIE MAC, FHFA DIRECTOR**
**MELVIN L. WATT, AND FANNIE MAE AND FREDDIE MAC**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

ARGUMENT.........................................................................................................................3

I.   The Limits on the Anticipatory Breach Doctrine Bar All of Plaintiffs' Contract-
     Related Claims ..........................................................................................................3

     A.   Plaintiffs' Claims for Breach of Contract and Breach of a Purported Implied
          Covenant Are Claims for Anticipatory Breach that Must Be Dismissed ....................4

     B.   Plaintiffs' Contrary Arguments Are Wholly Without Merit.......................................6

II.  Plaintiffs' Claims for Breach of Contract Regarding Liquidation Preferences Fail
     for Additional Reasons ............................................................................................11

     A.   The Third Amendment Did Not Alter Plaintiffs' Stock Certificates or Alter
          Their Conditional Right to a Liquidation Preference ...............................................11

     B.   Amending Treasury's Stock Certificates Did Not Breach Plaintiffs' Right to a
          Liquidation Preference .............................................................................................14

III. Plaintiffs Fail to State a Claim for Breach of the Implied Covenant of Good Faith
     and Fair Dealing with Respect to Liquidation Preferences and Dividends.........................17

     A.   The Implied Covenant Cannot Be Used to Create New Duties or Contradict
          the Contract ..............................................................................................................17

     B.   Even if There Were Contract Gaps to Fill, Plaintiffs Cannot Plausibly Allege
          that They Reasonably Expected that an Implied Covenant Would Bar the
          Third Amendment.....................................................................................................20

          1.   Shareholders in Two of the Most Highly Regulated Companies in the Country,
               with Public Missions and an Implicit Government Guarantee, Cannot Plausibly
               Allege that They Reasonably Expected that an Implied Covenant Would Bar the
               Third Amendment.............................................................................................21

          2.   The Shareholder Contract Left No Room for Reasonable Expectations that the
               Enterprises Would Be Operated in the Interests of the Shareholders or that the
               Enterprises Would Issue Dividends or Distribute Funds at Liquidation to
               Plaintiffs ..........................................................................................................22

IV.  Plaintiffs' Breach of Fiduciary Duty Claims Fail as a Matter of Law ...............................26

     A.   HERA Preempts Plaintiffs' Claims for Breach of Fiduciary Duty ..........................26

     B.   Even if Not Preempted, the Freddie Mac Shareholders' Claims for Breach of
          Fiduciary Duty, Whether Considered Direct or Derivative, Fail to State a
          Claim........................................................................................................................29

      C.     The Fannie Mae Shareholders' Claims for Breach of Fiduciary Duty Are Derivative and for that Reason Must Be Dismissed .................................................. 31

V.    Plaintiffs' State Law Claims Attacking the Treasury Stock Certificates Fail ..................... 37

VI.   Plaintiffs' Claims that Are Explicitly Barred by the D.C. Circuit's Decision Should Be Dismissed. ........................................................................................................ 39

CONCLUSION ........................................................................................................................ 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1st Stop Health Services, Inc. v. Dep't of Med. Assistance Servs.*,
756 S.E.2d 183 (Va. Ct. App. 2014) ..................................................................6

*ACP Master, Ltd. v. Sprint Corp.*,
No. CV 8508-VCL, 2017 WL 3421142 (Del. Ch. July 21, 2017) .........................33

*Amazon.com, Inc. v. Hoffman*,
No. 2239, 2009 WL 2031789 (Del. Ch. June 30, 2009) ......................................19

*Andrews v. Fed. Home Loan Bank of Atlanta*,
998 F.2d 214 (4th Cir. 1993) ..........................................................................29

*Barnett Bank of Marion Cty., N.A. v. Nelson*,
517 U.S. 25 (1996) .......................................................................................28

*DCG & T ex rel. Battaglia/Ira v. Knight*,
68 F. Supp. 3d 579 (E.D. Va. 2014) ................................................................30

*Bell v. Hood*,
327 U.S. 678 (1946) ......................................................................................11

*Benchmark Capital Partners IV, LP v. Vague*,
2002 WL 1732423 (Del. Ch. Ct. July 15, 2002), *aff'd*, 822 A.2d 396 (Del.
2003)...........................................................................................................16

*Bove v. Cmty. Hotel Corp.*,
249 A.2d 89 (R.I. 1969).................................................................................22

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001) ......................................................................................28

*Caspian Select Credit Master Fund Ltd. V. Gohl*,
2015 WL 5718592 (Del. Ch. Sept. 28, 2015) ...................................... 33,34, 35

*Chamison v. HealthTrust, Inc. Hosp. Co.*,
735 A.2d 912 (Del. Ch. 1999).........................................................................19

*Citibank (S. Dakota), N.A. v. FDIC*,
857 F. Supp. 976 (D.D.C. 1994) .....................................................................13

*Conn Aire, Inc. v. J.C. Leasing*,
1990 WL 209580 (6th Cir. 1990)....................................................................13

*In re Delphi Fin. Grp. S'holder Litig.*,
    2012 WL 729232 (Del. Ch. Mar. 6, 2012) ...........................................................................24

*Dietrichson v. Knott*,
    No. CV 11965-VCMR, 2017 WL 1400552 (Del. Ch. Apr. 19, 2017)....................................34

*Dunlap v. State Farm Fire & Cas. Co.*,
    878 A.2d 434 (Del. 2005) ............................................................................................ 17, 20

*E.I. du Pont de Nemours & Co. v. FDIC*,
    32 F.3d 592 (D.C. Cir. 1994)...............................................................................................29

\* *Edwards v. Deloitte & Touche, LLP*,
    No. 16-21221-CIV, 2017 WL 1291994 (S.D. Fla. Jan. 18, 2017)................................... 15, 35

\* *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*,
    152 A.3d 1248 (Del. 2016) ............................................................................... 33, 34, 35, 37

*Eldridge v. Gordon Bros. Grp., LLC*,
    2011 WL 3439180 (D. Mass. Aug. 4, 2011) .......................................................................19

*English v. Gen. Elec. Co.*,
    496 U.S. 72 (1990) ...............................................................................................................26

*F5 Capital v. Pappas*,
    856 F.3d 61 (2d Cir. 2017) ..................................................................................................34

\* *Fairfax-Falls Church Cmty. Services Bd. v. Herren*,
    337 S.E.2d 741 (Va. 1985) ................................................................................................6, 7

*Fed. Hous. Fin. Agency v. City of Chicago*,
    962 F. Supp. 2d 1044 (N.D. Ill. 2013)..................................................................................27

*Firestone v. Wiley*,
    485 F. Supp. 2d 694 (E.D. Va. 2007)...................................................................................22

*Freeland v. Iridium World Communications, Ltd.*,
    233 F.R.D. 40 (D.D.C. 2006)...............................................................................................10

*Garcia v. Wachovia Mortg. Corp.*,
    676 F. Supp. 2d 895 (C.D. Cal. 2009)..................................................................................28

*Gen. Tech. Applications, Inc. v. Exro Ltda.*,
    388 F.3d 114 (4th Cir. 2004) ...............................................................................................30

*Gentile v. Rossette*,
    906 A.2d 91 (Del. 2006) ...........................................................................................*passim*

*Gerber v. Enters. Prods. Holdings, LLC,*
    67 A.3d 400 (Del. 2013), *overruled on other grounds by Winshall v. Viacom*
    *Int'l, Inc.*, 76 A.3d 808 (Del. 2013) .................................................................20

*Gibraltar Fin. Corp. v. Fed. Home Loan Bank Bd.,*
    1990 WL 394298 (C.D. Cal. June 15, 1990) ....................................................29

* *Glenn v. Fay,*
    281 F. Supp. 3d 130, 139 (D.D.C. 2017) ................................................*passim*

*Glinert v. Wickes Companies, Inc.,*
    16 Del. J. Corp. L. 764 (Del. Ch.), *aff'd* 586 A.2d 1201 (Del. 1990) .................23

*Goldman v. Postal Telegraph,*
    52 F. Supp. 763 (D. Del. 1943) ......................................................................22

*Gutierrez v. Wells Fargo Bank, NA,*
    704 F.3d 712 (9th Cir. 2012) ..........................................................................28

*In re Ionosphere Clubs, Inc.,*
    17 F.3d 600 (2d Cir. 1994) .......................................................................35, 37

*Ivanhoe Partners v. Newmont Mining Corp.,*
    535 A.2d 1334 (Del. 1987) .............................................................................36

*Mass. v. FHFA,*
    54 F. Supp. 3d 94 (D. Mass. 2014) .................................................................27

* *Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH,*
    62 A.3d 62 (Del. Ch. 2013) ...............................................................................7

*Moses v. Apple Hosp. Reit Inc.,*
    No. 14-CV-3131 DLI SMG, 2015 WL 1014327 (E.D.N.Y. Mar. 9, 2015) ...........30

*Nemec v. Schrader,*
    991 A.2d 1120 (Del. 2010) ..................................................................1, 17, 20

* *Perry Capital LLC v. Lew,*
    70 F. Supp. 3d 208 (D.D.C. 2014) .............................................................21, 33

* *Perry Capital v. Mnuchin,*
    864 F.3d 591 (D.C. Cir. 2017) ................................................................*passim*

*Protas v. Cavanagh,*
    No. CIV.A. 6555-VCG, 2012 WL 1580969 (Del. Ch. May 4, 2012) ...................35

*QVT Fund LP et al. v. Eurohypo Cap. Funding LLC I,*
    2011 WL 2672092 (Del. Ch. July 8, 2011) ......................................................24

\* *Remora Inv., L.L.C. v. Orr*,
   277 Va. 316, 673 S.E.2d 845 (2009) ............................................................ 30, 31

*Saxton v. FHFA*,
   245 F. Supp. 3d 1063 (N.D. Iowa 2017) .................................................. 27, 34, 36

*Schlosser & Dennis, LLC v. Traders Alley, LLC*,
   2017 WL 2894845 (Del. Super. Ct. July 6, 2017) ............................................... 6

*Schroeter v. Bartlett Syndicate Bldg. Corp.*,
   63 P.2d 824 (1936) ............................................................................................ 22

*Skillstorm, Inc. v. Elec. Data Sys., LLC*,
   666 F. Supp. 2d 610 (E.D. Va. 2009) ................................................................ 17

*STAAR Surgical Co. v. Waggoner*,
   588 A.2d 1130 (Del. 1991) ................................................................................ 25

*Starr Int'l Co. v. Fed. Reserve Bank*,
   906 F. Supp. 2d 202 (S.D.N.Y. 2012), *aff'd*, 742 F.3d 37 (2d Cir. 2014) ............ 36

*State National Bank v. Lew*,
   795 F.3d 48 (D.C. Cir. 2015) ........................................................................ 9, 10

*Suess v. FDIC*,
   770 F. Supp. 2d 32 (D.D.C. 2011) .................................................................... 29

*SunTrust Mortg., Inc. v. Mortgages Unlimited, Inc.*,
   No. 3:11CV861-HEH, 2012 WL 1942056 (E.D. Va. May 29, 2012) ................... 20

*Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*,
   No. 1668N, 2006 WL 2521426 (Del. Ch. Aug. 25, 2006) ................................... 36

\* *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
   845 A.2d 1031 (Del. 2004) ............................................................................ 31, 37

*VTR, Inc. v. Goodyear Tire & Rubber Co.*,
   303 F. Supp. 773 (S.D.N.Y. 1969) .................................................................... 19

*Ward's Equip., Inc. v. New Holland N. Am., Inc.*,
   254 Va. 379 (1997) ............................................................................................ 17

*Wenzel v. Knight*,
   No. 3:14-cv-432, 2015 WL 222182 (E.D. Va. Jan. 14, 2015) ............................. 30

*West Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*,
   2009 WL 458779 (Del. Ch. Feb. 23, 2009) ....................................................... 12

*Wyeth v. Levine*,
555 U.S. 555 (2009) ........................................................................28

**Rules and Statutes**

12 U.S.C.
§ 1455(f) ...................................................................... 15, 38
§ 1718(a) ................................................................ 15, 16, 38
§ 1719(g)(1)(B)(iii) ...............................................................36
§ 1719(g)(1)(C)(i) ..................................................................36
§ 4617(a)(7) ...........................................................................27
* § 4617(b)(2)(J)(ii) .......................................................... 18, 26
§ 4617(f) ..................................................................................8

8 Del. Code.
§ 242(b)(1) ............................................................................16
§ 242(b)(2) ...................................................................... 15, 16

Va. Code Ann.
§ 13.1-708(A)(4) ...................................................................17
§ 13.1-708(A)(6) ...................................................................16

**Other Authorities**

12 C.F.R.
§ 1237.12(a) ...........................................................................25
§ 1237.12(b) ...........................................................................25
* § 1710.10(b)(1) ...................................................................38

3 Williston on Contracts § 7:21 ...............................................25

Fannie Mae, Quarterly Report (Form 10-Q) (Aug. 8, 2012), http://goo.gl/bGLVXz..................26

FHFA, Dividends on Enterprise Draws from Treasury,
https://www.fhfa.gov/DataTools/Downloads/Documents/Market-Data/Table_2.pdf............................................................26

Freddie Mac, Quarterly Report (Form 10-Q) (Aug. 7, 2017), http://goo.gl/2dbgey ...................26

Order List, *available at* https://www.supremecourt.gov/orders/courtorders/022018zor_fd9g.pdf ...............................................................39

* Restatement (Second) of Contracts § 253 ...........................................6, 8

# INTRODUCTION

Plaintiffs' oppositions fail to overcome the multitude of independently dispositive reasons why both the old and new claims pled in their amended complaints on remand fail to state valid claims and must be dismissed.

Plaintiffs' contract and implied covenant counts fail to state viable claims under the state law governing anticipatory repudiation. The gravamen of all the breach claims advanced by Plaintiffs on remand is that the Third Amendment will make it impossible for the Enterprises to perform certain alleged obligations, express or implied, to pay liquidation preferences or dividends to shareholders at some indeterminate point in the future that may or may not ever occur. While the anticipatory repudiation doctrine enables plaintiffs to sue for breach before the time for performance in some circumstances, that doctrine is subject to the "major limitation" that it does not apply to unilateral contracts, such as for the future payment of money, like the future dividends and liquidation distributions claimed here. *Glenn v. Fay*, 281 F. Supp. 3d 130, 139 (D.D.C. 2017). Plaintiffs cite no case law supporting their contention that Delaware and Virginia would not follow this established common-law limitation, or that this Court can or should ignore it to avoid what Plaintiffs see as "harsh" results.

But these are far from the only reasons the contract-based claims fail. Plaintiffs concede that nothing in the Third Amendment would reduce their priority vis-à-vis other classes of stock in a liquidation distribution. In the event a liquidation ever were to occur, the only performance owed by the Enterprises under the shareholder contract would be to adhere to the order of preferences established by that contract, not to guarantee that a surplus will be there for holders of any particular class of stock.

Additional, independent grounds also bar Plaintiffs' claim under the implied covenant of good faith and fair dealing, a "limited and extraordinary legal remedy." *Nemec v. Schrader*, 991

A.2d 1120, 1128 (Del. 2010).  Plaintiffs maintain that the implied covenant compels the Conservator to "operate the Enterprises . . . with a view to the interests of their shareholders." Ind. Br. at 1.  But Plaintiffs do not contest that HERA's provisions regarding the Enterprises, which constitute an integral part of the shareholder contract upon which they base their claims, expressly authorize the Conservator to act in the "best interests of FHFA and the Companies— and *not* those of the Companies' shareholders."  *Perry Capital v. Mnuchin*, 864 F.3d 591, 608 (D.C. Cir. 2017) (emphasis in original).  It is black-letter law that the implied covenant is a device for filling interstitial gaps in exceedingly narrow circumstances, not for overriding or supplementing such actual terms of the underlying contract.

Moreover, Plaintiffs have not plausibly alleged that the reasonable expectations of the Enterprises and shareholders under their contract excluded the possibility that private shareholders might not receive dividends or a distribution in a liquidation following an extraordinary government rescue like the one undertaken by Treasury.  Indeed, Plaintiffs do not challenge the placement of the Enterprises into conservatorship and the pre-Third Amendment preferred stock purchase agreements, which from the date of their original execution in 2008 (and without regard to the Third Amendment): (1) precluded payment of dividends to common or junior preferred shareholders, (2) placed Treasury and its nearly $200 billion liquidation preference ahead of any distribution to such shareholders, and (3) required payment of billions of dollars to Treasury every quarter in dividends that did not and could not pay down Treasury's liquidation preference.  Plaintiffs' acknowledgment that the pre-Third Amendment regime was within the reasonable expectations of the parties is fatal to their claims that the Third Amendment somehow transgressed the implied covenant.

Further, HERA preempts Plaintiffs' breach-of-fiduciary-duty claims.  Plaintiffs' own briefs acknowledge that they seek to use state law to impose a duty on the Conservator—to consider the interests of private shareholders when making decisions—that is fundamentally inconsistent with HERA, making this a textbook case for preemption.  Moreover, notwithstanding Plaintiffs' relabeling of their fiduciary duty claims as direct, the unmistakable derivative character of those claims mandates their dismissal under the D.C. Circuit's holding in this case that derivative claims are barred by HERA's transfer-of-shareholder-rights provision. And the claim against Freddie Mac must be dismissed because *direct* breach-of-fiduciary-duty claims do not even exist under Virginia law—a point to which Plaintiffs' only answer is to speculate that the Virginia Supreme Court might change its mind someday.

Finally, Plaintiffs' oppositions do nothing to salvage their new post-remand claims that the dividend specified in the post-Third Amendment Treasury stock certificates violates Delaware and Virginia statutes.  The regulation and stock certificate language on which Plaintiffs rely for application of state law each make clear that state law yields to the Enterprises' charters, the stock certificates themselves, and federal law in the event of any inconsistency.  Even if state law did apply, Plaintiffs cite no case law supporting their novel reading of the statutes in question.  These claims, like the others, simply have no merit and the amended complaints should be dismissed in their entirety, with prejudice.

## ARGUMENT

## I.     The Limits on the Anticipatory Breach Doctrine Bar All of Plaintiffs' Contract-Related Claims

Plaintiffs fail to state claims for breach of contractual or implied covenant obligations to pay them liquidation preferences or dividends for a multitude of reasons, not least that the claimed contractual rights do not exist and are not supported by the reasonable expectations of

the parties.  But there is a threshold issue that is dispositive of all of these claims:  Because they all rest on the notion that the Enterprises have made it impossible for themselves to perform alleged obligations that would not come due, if at all, until some point in the future, they all sound in anticipatory repudiation.  As discussed in Defendants' opening brief, anticipatory repudiation is subject to the longstanding common-law limitation that it does not apply to unilateral contracts in which one side (here, the shareholders) has already performed its end of the bargain and the allegedly repudiated performance consists of monetary payments.

**A.**  **Plaintiffs' Claims for Breach of Contract and Breach of a Purported Implied Covenant Are Claims for Anticipatory Breach that Must Be Dismissed**

The amended complaints fail to state a claim for breach of contractual obligations, express or implied, to pay either liquidation preferences in the event of a future liquidation of the Enterprises, or  dividends (which cannot currently be paid to Plaintiffs, regardless of the Third Amendment) at some similarly unknown point in the future.  The gravamen of all of Plaintiffs' contract-based claims is that the Third Amendment constituted an anticipatory repudiation of those alleged contractual obligations.[1]  However, as this Court recently held, "the doctrine of anticipatory repudiation is inapplicable to all unilateral contracts for future payment of money only."  *Glenn*, 281 F. Supp. 3d at 140.  As the Court explained:

---

[1]     Although the D.C. Circuit discussed anticipatory repudiation specifically in connection with Plaintiffs' claims for breach of an express contractual right to a liquidation preference, it is manifest that Plaintiffs' claims for breach of the implied covenant also must be treated as anticipatory repudiation claims.  The common thread running through all these claims is that the Third Amendment means that Plaintiffs will not receive certain contractual benefits to which they speculate they might otherwise be entitled at some unknown time *in the future*, not that the Conservator has presently deprived them of a current right to a liquidation preference or dividend.  Indeed, even before the Third Amendment, under the original (unchallenged) PSPAs, dividends could not be paid to Plaintiffs during conservatorship.  That is why, when they first surfaced the anticipatory repudiation theory in their D.C. Circuit reply brief, Plaintiffs explained that "the Third Amendment constitutes an anticipatory repudiation of the contractual provisions governing both dividends and liquidation distributions."  Cl. Pl. D.C. Cir. Reply at 14 (internal quotation marks omitted).

4

> [T]here is a major limitation to the doctrine of anticipatory repudiation. Traditionally, the doctrine does not apply to unilateral contracts. (*Smyth v. United States*, 302 U.S. 329, 58 S.Ct. 248, 82 L.Ed. 294 (1937) ("[T]he rule of law is settled that the doctrine of anticipatory breach has in general no application to unilateral contracts, and particularly to such contracts for the payment of money only.")). This limitation applies not only to contracts that were unilateral at their outset, but also to " 'bilateral contracts that have become unilateral by full performance on one side.' " (23 WILLISTON ON CONTRACTS § 63:60 (quoting *Phelps v. Herro*, 215 Md. 223, 137 A.2d 159 (1957)); *see also* 23 WILLISTON ON CONTRACTS § 63:61 ("[W]hen a bilateral contract has become a unilateral obligation by full performance on one side, anticipatory repudiation of that obligation does not permit the immediate filing of an action.")). Thus, the Seventh Circuit describes the limitation in this way: "if the payee has completely performed his side of the contract and is just awaiting payment, he can't declare a breach and sue for immediate payment just because he has reason (even compelling reason) to doubt that the other party will pay when due. (*Cent. States, Se. & Sw. Areas Pension Fund v. Basic Am. Indus., Inc.*, 252 F.3d 911 (7th Cir. 2001)).

*Id.* at 139.

Thus, this Court held that a lawyer's disavowal of contractual obligations to share a potential monetary recovery with co-counsel was not actionable until the judgment was actually collected and the time for performance arrived. *Id.* at 140. The applicable contracts were unilateral, and were clear that the eventual payment "was contingent and due 'upon collection and to the extent of collection only.'" *Id.* Thus, "the defendants' performance" under the agreements was "due only upon and to the extent of collection," and "the defendants' anticipatory repudiation of the Agreements in 2010 could not give rise to a cause of action for breach of contract." *Id.* Rather, "defendants did not breach the Agreements until they refused to pay Mr. Glenn *following collection* of the *Peterson* judgments." *Id.* (emphasis added).

The same "major limitation" is fatal to all of Plaintiffs' contract and implied covenant claims here. Plaintiffs do not have any further performance obligations to the corporations under

5

their shareholder contracts, making those contracts unilateral.[2]  And like the agreements in

*Glenn*, the shareholder contracts are clear that any dividends or liquidation preferences could be

paid, if at all, only at some distant time in the future.  *See infra* Section II.A.  Thus, even if the

Third Amendment could be construed as an anticipatory repudiation in 2012 of contractual

obligations to pay (or, in the case of dividends, an exercise of discretion to consider paying)

unknown sums of money to shareholders at some unknown future date, it "could not give rise to

a cause of action for breach of contract."  *Glenn*, 281 F. Supp. 3d at 140.

### B.   Plaintiffs' Contrary Arguments Are Wholly Without Merit

Plaintiffs do not seriously dispute that Virginia and Delaware, both of which generally

follow the Restatement (Second) of Contracts,[3] adhere to the same "established limit" this Court

applied in *Glenn*:  "an obligor's repudiation alone . . . gives rise to no claim for damages at all if

he has already received all the agreed exchange for it."  Restatement § 253, comment c.  The

Virginia Supreme Court has unequivocally adopted the limitation:  "There is no cause of action

for the anticipatory repudiation of [unilateral] contracts," full stop.  *Fairfax-Falls Church*

*Community Services Board v. Herren*, 337 S.E.2d 741, 744 (Va. 1985).  Plaintiffs' argument that

this principle was "superfluous" dicta (Ind. Br. at 15-16) is wrong:  *Herren* squarely rejected the

plaintiffs' claims due to the absence of a cause of action for anticipatory repudiation of unilateral

---

[2]    Class Plaintiffs assert in a footnote that their performance "will not be complete" until the time of liquidation, in the sense that a shareholder has to own the stock in order to receive a distribution in liquidation.  Cl. Br. at 15 n.9.  But if simply retaining the right to receive contractual performance by another were sufficient to prevent a contract from being unilateral, no contract would ever be unilateral.  In other words, Plaintiffs' logic would simply read this "major limitation" on anticipatory repudiation out of existence.  That is not the law.

[3]    *See 1st Stop Health Services, Inc. v. Dep't of Med. Assistance Servs.*, 756 S.E.2d 183, 190 n.4 (Va. Ct. App. 2014) ("Our Supreme Court often has cited the Second Restatement as authoritative . . . ."); *Schlosser & Dennis, LLC v. Traders Alley, LLC*, 2017 WL 2894845, at *6 (Del. Super. Ct. July 6, 2017) ("The Delaware Supreme Court has previously looked to the Restatement (Second) of Contracts . . . .").

contracts.  *See* 337 S.E.2d at 744.  Plaintiffs also protest that "the case should not be interpreted

to hold that this rule applies without exception," Ind. Br. at 15, but they cite no authority that

Virginia has adopted any exceptions, let alone the particular exceptions they invoke here.

As for Delaware, Plaintiffs acknowledge that Delaware courts recognize anticipatory

breach as actionable when an obligor repudiates a duty and "the aggrieved party elects, *before*

*completion of his or her performance*, to consider the obligor's repudiation to be a present

breach."  *Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*, 62 A.3d 62, 78 n.102 (Del.

Ch. 2013) (emphasis added; internal quotation marks omitted).  Plaintiffs' only response is to

argue that this case does not explicitly reject the different, broader rule they propose.  Ind. Br. at

15 (pointing out the case does not say "anticipatory breach can *never* occur after the aggrieved

party has performed").  But Plaintiffs offer no basis to conclude that a Delaware court would

alter the existing articulation of Delaware standards for and limits on anticipatory repudiation,

which comport with the longstanding common-law rule reflected in the Restatement and leading

treatise and adopted by, among others, this Court and the Supreme Court of Virginia.

Fairholme and Arrowood contend, with no citations to any authority, that this limit on

anticipatory repudiation applies only when the repudiated future promise is to pay "a specific

sum of money" like an annuity contract or promissory note, and not when the amount is

indeterminate.  Ind. Br. at 13.  However, the limit is not confined to promises to pay a sum

certain or, indeed, promises to pay money at all.  It applies to anticipatory repudiation of *any*

type of unilateral contract.  Indeed, in *Glenn* this Court applied the limitation to a future payment

obligation—a proportion of whatever amount might ultimately be collectible on a judgment

against the Government of Iran—that was inherently speculative and contingent when the

obligation was entered into and when the repudiation occurred.  *See Glenn*, 281 F. Supp. 3d at

133 (emphasizing that "the prospects for recovery upon judgments entered in these cases [were] extremely remote").  If anything, it makes *more* sense—not less—to apply the established limit when the repudiated obligation has unknown timing and value because it serves to "avoid[] difficult problems of forecasting damages."  Restatement (Second) Contracts § 253, comment (d).

Plaintiffs seek refuge in a suggestion in the Restatement that "harsh results" from the limitations on anticipatory breach can sometimes be avoided "by making available other types of relief, such as a declaratory judgment or restitution."  Restatement § 253, comment d.  However, Plaintiffs cite no case law applying or even mentioning this purported exception, and Defendants have found none.  Moreover, the D.C. Circuit made clear that it "remand[ed] the contract-based claims *only insofar as they seek damages* because the pleas for equitable relief [including declaratory judgment and restitution] are barred by 12 U.S.C. § 4617(f)."  864 F.3d at 633 n.27 (emphasis added).  In a similar vein, Plaintiffs quote the Restatement for the proposition that "'the limitation might yield on a showing of manifest injustice, as where the refusal to pay is not in good faith.'"  Ind. Br. at 14 (quoting Restatement § 253, comment d).  But again, they cite no case law, and they cropped the quote, which actually says "[t]he degree to which the limitation might yield . . . is unclear."  *See* Restatement § 253, comment d.

Lacking a viable response on the merits, Plaintiffs primarily insist that this Court is barred altogether from considering whether they meet the common-law standards governing anticipatory repudiation claims.  According to Plaintiffs, the D.C. Circuit's holding that Class Plaintiffs' anticipatory breach claims were ripe under Article III and federal prudential considerations relieves all of the Plaintiffs of having to comply with the established limit that one cannot sue for anticipatory breach of a unilateral contract before the time performance is due.

That is wrong as well. For one thing, as discussed below, the amended complaints omit the allegations that the D.C. Circuit considered indispensable to ripeness. In any event, ripeness is a jurisdictional and prudential issue entirely distinct from whether plaintiffs state a claim under applicable substantive law, and a holding on ripeness in no way forecloses examination of whether the allegations state a claim.

The Panel held that the Class Plaintiffs' contract claims for damages were ripe because those plaintiffs alleged that the Third Amendment "immediately diminished the value of their shares." *Perry Capital*, 864 F.3d at 632; *see also id.* at 633 n.26 (crediting allegation in class complaint that securities "had substantial market value . . . that [was] swiftly dissipated in the wake of the Third Amendment"). The Court specifically contrasted the presence of such allegations in the Class Plaintiffs' then-operative complaint with *State National Bank v. Lew*, 795 F.3d 48, 56 (D.C. Cir. 2015), where the court held claims for present loss in share price were unripe because of a lack of allegations about the diminution in value. 864 F.3d at 632.

On remand, however, Class Plaintiffs removed all allegations about diminution in stock price from their amended complaint. Similarly, the Fairholme and Arrowood Plaintiffs make no such allegations.[4] It bears mention that the shares are, in fact, worth far more now than immediately prior to the Third Amendment, and that Plaintiffs have retained their shares through at least November 1, 2017.[5] But whatever the reason that Plaintiffs decided to eliminate all of

---

[4]    The D.C. Circuit did not consider whether Fairholme's and Arrowood's contract claims were ripe because, in its original opinion, it found those claims not to have been preserved for appeal. Upon a request by Fairholme and Arrowood for leniency, the Circuit amended its opinion to state that in its discretion those claims would be treated as preserved. *See Perry Capital*, 864 F.3d at 617. The Circuit did not, however, go so far as to consider whether the contract claims alleged by Fairholme and Arrowood were ripe or whether those complaints included the allegations that led the Circuit to find the Class Plaintiffs' claims ripe. The Fairholme and Arrowood amended complaints on remand contain no such allegations.

[5]    For example, Freddie Mac's common stock, owned by Class Plaintiffs Miller and Cassell, was valued at $3.09 per share on November 1, 2017 (the date Class Plaintiffs filed their motion

Footnote continued on next page

their prior allegations about share prices or diminution in the value of their shares, the complaints as they now stand closely resemble the unripe complaint in *State National Bank*, rather than the claims the D.C. Circuit understood Plaintiffs to be making in their previous complaints.

Accordingly, the contract-related claims in the current complaints are not ripe.  And Plaintiffs certainly cannot invoke the D.C. Circuit's ripeness holding with respect to the prior complaints when Plaintiffs themselves have removed the underpinning for that holding.

More importantly, the Circuit in no way prejudged the merits of Plaintiffs' contract claims when it held (based on the withdrawn allegations) that the claims were ripe.  Rather, the Circuit emphasized that "[o]ur holding that the claims are ripe sheds no light on the merit of those claims" and that this Court must decide "in the first instance" whether Plaintiffs have adequately pled the elements.  864 F.3d at 633.  After all, "'[t]he ripeness doctrine generally deals with when a federal court can or should decide a case.'"  *Id.* at 632 (quoting *Am. Petrol Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012)).  Ripeness "is a justiciability doctrine that is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.'"  *Id.* at 633 n.27 (quoting *La. Pub. Serv. Comm'n v. FERC*, 522 F.3d 378, 397 (D.C. Cir. 2008)).  "[E]ven in its prudential aspect," ripeness is purely "a threshold inquiry that does *not* involve adjudication on the merits."  *Id.* (quoting *In re Aiken Cty.*, 645 F.3d 428, 434 (D.C. Cir. 2011)) (emphasis added).

---

Footnote continued from previous page

for leave to file their Second Amended Complaint), more than *ten times* its price of $0.30 on the day before the Third Amendment was announced.  *See* http://www.nasdaq.com/symbol/fmcc/historical.  All Plaintiffs allege that they continued to own their stock at the time the amended complaints were filed.  The Court may take judicial notice of publicly available stock prices.  *See Freeland v. Iridium World Communications, Ltd.*, 233 F.R.D. 40, 43 n 3 (D.D.C. 2006)

That makes ripeness an entirely distinct inquiry from whether the complaint "fail[s] to state a cause of action on which petitioners could actually recover" under the governing substantive law. *Bell v. Hood*, 327 U.S. 678, 682 (1946) (emphasizing that a court may have jurisdiction yet find the complaint "fail[s] to state a cause of action on which petitioners could actually recover"). Rather than a federal court gatekeeping mechanism like the ripeness rule, the limits on the anticipatory breach doctrine are part of the cause of action itself. The Circuit's ripeness holding (even assuming it is still applicable given the withdrawal of the allegations underlying it) did not and could not negate the separate limits that applicable state substantive law places on Plaintiffs' claims. Plaintiffs' attempt to pass off the Circuit's jurisdictional ruling as a ruling on the merits is particularly misguided because Plaintiffs waited "until their reply brief" on appeal to even bring up anticipatory repudiation, *id.* at 633 n.26, far too late for the Court to receive adequate briefing on the contours of such a claim.

Thus, the Court should dismiss all of Plaintiffs' breach of contract claims, whether based on express terms or an implied covenant, as barred by the established limitation on anticipatory repudiation.

## II.  Plaintiffs' Claims for Breach of Contract Regarding Liquidation Preferences Fail for Additional Reasons

### A.  The Third Amendment Did Not Alter Plaintiffs' Stock Certificates or Alter Their Conditional Right to a Liquidation Preference

Even if Plaintiffs' liquidation preference claims were not precluded by limits on anticipatory repudiation, they would fail for other reasons. Both before and after the Third Amendment, Plaintiffs had a conditional contract right to receive payments upon liquidation of the Enterprises *if and to the extent that funds are available after satisfying obligations to more senior stakeholders*. Plaintiffs concede that the Third Amendment did not change the terms of Plaintiffs' shareholder contract with respect to the liquidation preference. Cl. Br. at 16-17

(admitting that the distribution "'waterfall' may formalistically remain in place"). The Third Amendment does not subordinate Plaintiffs to more junior stockholders; it does not create new stockholders more senior than Plaintiffs (although such action would not be a breach of contract in any event); and it does not remove Plaintiffs from their place in the liquidation waterfall.

With no argument that the Third Amendment violates the express terms of the shareholder contract, Plaintiffs contend that the Third Amendment makes it impossible for there to be any proceeds available to them upon a liquidation. Cl. Br. at 19. But even if true, that would not be a breach of Plaintiffs' contract right to a particular level of seniority for potential liquidation payments. *See* Ex. C §§ 4(a), (c) (Fannie Preferred); Ex. D § 7(a), (b) (Freddie Preferred); Ex. E § 8(a), (b) (Freddie Common). Plaintiffs contractually accepted the risk that there would be no proceeds available upon liquidation in the event a liquidation of Fannie or Freddie ever were to occur. Their stock certificates expressly state that more senior creditors and other obligations would be paid first, and that Plaintiffs would receive a distribution only if there were funds available.[6] Thus, full performance under the shareholder contract may result in no distribution to Plaintiffs.

The two cases on which Plaintiffs chiefly rely to support their "impossibility" theory are plainly inapposite. *West Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, merely recites that "a party may repudiate through a voluntary and affirmative act rendering

---

[6]   *See* Ex. C § 4 (c) (Fannie Mae preferred shareholders "***will not be entitled to be paid any amount*** in respect of a dissolution, liquidation or winding up of Fannie Mae until holders of any classes or series of stock of Fannie Mae ranking, as to the distribution of assets . . . prior to [the preferred shareholders] have been paid all amounts to which such classes or series are entitled"); Ex. D § 7 (b) ("upon the dissolution, liquidation or winding up of Freddie Mac, [preferred shareholders] ***shall not be entitled to be paid any amounts . . . unless and until*** the holders of any classes or series of stock of Freddie Mac ranking prior upon liquidation . . . shall have been paid all amounts to which such classes or series are entitled."); Ex. E § 8(b) ("upon the dissolution, liquidation or winding up," Freddie Mac common stockholders "***shall not be entitled to be paid any amounts . . . unless and until***" shares with higher priority in liquidation have been paid) (all emphases added).

performance apparently or actually impossible," but the breach addressed in that case involved the contract party's refusal "to close [on the underlying real estate transaction] without [its counter-party's] agreement to different terms" from those included in their agreement.  2009 WL 458779, at *5 (Del. Ch. Feb. 23, 2009).  Similarly, *Citibank (S. Dakota), N.A. v. FDIC*, briefly discusses another decision in which a party was found to have repudiated its obligations under a covenant not to compete.  857 F. Supp. 976, 982 n.5 (D.D.C. 1994) (discussing *Conn Aire, Inc. v. J.C. Leasing*, 1990 WL 209580, at *4 (6th Cir. 1990)).  In *Conn Aire*, the party promised "to not permit any other air charter businesses to use [its] facilities" but then divested itself of those facilities without "expressly delegat[ing] that obligation when it sold its operations." *Conn Aire*, 1990 WL 209580, at *4.  *Conn Aire* reasoned that "by conveying all of its interest in the terminal facility, the defendant divested itself of the ability to perform its obligations under the covenant not to compete," and held that "an apparent inability to perform an obligation may constitute a breach, if the inability to perform arises from the voluntary affirmative act of the promisor." *Id.* at 5.  But here the Third Amendment does not divest the Enterprises "of the ability to perform [their] obligations" because the Enterprises are still able to provide Plaintiffs with their contractual right to a position in the liquidation waterfall, and the shareholder contract expressly permits (indeed, requires) that there will be no liquidation distributions to Plaintiffs unless and until the distributions due to more senior shares are satisfied.

The D.C. Circuit held, with respect to Plaintiffs' dividend claims, that "the plaintiffs have not shown their certificates guarantee that more senior shareholders will not exhaust the funds available for distribution as dividends." *Perry Capital*, 864 F.3d at 630.  That holding applies with equal force to the liquidation preference claims.  Plaintiffs' certificates do not guarantee that more senior shareholders will not exhaust the funds available for distribution in a liquidation

preference.  Because Plaintiffs do not have a contractual guarantee that assets will be available on liquidation after more senior stakeholders are paid, it would be no breach of contract for the Conservator to take actions that would leave Plaintiffs with no distribution at liquidation.

**B.      Amending Treasury's Stock Certificates Did Not Breach Plaintiffs' Right to a Liquidation Preference**

Plaintiffs complain that the Third Amendment was *not* "the 'creation and issuance' of new senior preferred stock," which Plaintiffs concede is authorized under the shareholder contract, but instead was an "*amendment* to the terms of Treasury's *preexisting* senior preferred stock." Ind. Br. at 17.  Plaintiffs contend that the distinction between an issuance and an amendment matters because, they say, Plaintiffs have a right to vote with respect to such an amendment.  Ind. Br. at 17, 19 (absent Plaintiffs' consent through shareholder vote, their "contracts with the Companies do not permit the Companies to diminish the value of Plaintiffs' liquidation preference rights by *amending* the terms of other investors' outstanding shares," even if the Enterprises "could . . . accomplish the same result" through the issuance of new shares).

Plaintiffs' argument fails for multiple reasons.  Chief among them, *the D.C. Circuit has held that Plaintiffs had no contractual right to vote on the Third Amendment.  See Perry Capital*, 864 F.3d at 629 (Plaintiffs are "guarantee[d] only the right to vote on certain changes to [their stock] certificates," and that right to vote does not encompass a right to vote on the Third Amendment because it "was *not* an 'alteration, supplementation or repeal of . . . provisions'" in Plaintiffs' stock certificates).  This express holding of the D.C. Circuit in this case is dispositive of the issue and no further analysis is required.

In any event, Plaintiffs are wrong in arguing that certain provisions of Delaware and Virginia statutory law are incorporated into the shareholder contracts to create broader voting rights than those conferred by the stock certificates.  Ind. Br. at 17-18.  Federal law, not state

law, governs the scope of Plaintiffs' voting rights, including with respect to votes on amendments to the Enterprises' charters or other shares.

The Enterprises' federal statutory charters expressly empower the Enterprises' boards of directors to prescribe "the terms and conditions" of preferred shares, 12 U.S.C. §§ 1718(a), 1455(f), and the Enterprises' bylaws—themselves issued pursuant to federal law—specify that the voting powers of preferred shares are those designated by the Enterprises' boards.  Fannie Mae Bylaws, Section 2.02; Freddie Mac Bylaws, Section 2.3.  Although Fannie Mae and Freddie Mac have elected to follow Delaware and Virginia law, respectively, in certain limited circumstances, the inclusion of state corporate law into the shareholder contract is only "[f]or issues not addressed by the charter or federal law."  *Edwards v. Deloitte & Touche, LLP*, No. 16-21221-CIV, 2017 WL 1291994, at *6 (S.D. Fla. Jan. 18, 2017).  Here, the Enterprises' charters do address the terms and conditions of preferred stock, which include the terms relating to voting power, and there is thus no gap to be filled by the state statutes on which Plaintiffs rely.  *See infra* Section V.  Accordingly, the state statutes do not confer any broader voting rights on Plaintiffs, and they cannot support a breach of contract claim.

Further, even if the state statutes applied to the Enterprises, nothing in them would give Plaintiffs a right to vote on the Third Amendment.  Plaintiffs assert that 8 Del. Code. § 242(b)(2) requires a class vote on any "amendment to the certificate of incorporation" that "would 'affect' [Plaintiffs] 'adversely.'"  Ind. Br. at 17, 18.  But Plaintiffs misconstrue the statute.  Section 242(b)(2) actually states that "[t]he holders of the outstanding shares of a class shall be entitled to vote as a class upon a proposed amendment [to the corporate charter]" only if, in pertinent part, "the amendment would . . . ***alter or change the powers, preferences, or special rights of***

*the shares of such class* so as to affect them adversely." 8 Del. Code. § 242(b)(2) (emphasis added).[7]

The Third Amendment did not "alter or change" the only liquidation right Plaintiffs contracted to receive, which is the right to payment of liquidation proceeds "before any payment or distribution of assets is made to holders of Fannie Mae's common stock (or any other stock of Fannie Mae ranking, as to the distribution of assets upon dissolution liquidation or winding up of Fannie Mae, junior to the Series T Preferred Stock)." FHFA MTD, Ex. C at § 4(a). Well-established Delaware law holds that where, as here, "the terms and powers of [a] particular class of junior security have not themselves been changed," shareholders have no right to a class vote, even when their shares have been "adversely affected" or "burden[e]d" by the preferences of more senior shares. *Benchmark Capital Partners IV, LP v. Vague*, 2002 WL 1732423, at *13 (Del. Ch. Ct. July 15, 2002), *aff'd*, 822 A.2d 396 (Del. 2003) (although in a "general sense," "the financial and economic rights of the holders of junior securities are adversely affected" by a senior shares' priority preference, the "particular rights have not been modified").

The same reasoning applies with respect to Virginia law that, according to Plaintiffs, is purportedly incorporated into the shareholder contract. The Virginia statute expressly subordinates itself to provisions in the articles of incorporation, Va. Code Ann. § 13.1-708(A)(6), which means here that Section 2.3 of the Freddie Mac Bylaws controls, and it permits the Third

---

[7]   Section 242(b)(1) also does not apply here because it governs only shareholder votes on amendments to a certificate of incorporation where "the stockholders [are] entitled to vote thereon." 8 Del. Code. § 242(b)(1). This provision does not confer any rights to vote that are not provided in the certificate of incorporation. Fannie Mae's certificate of incorporation is its federal charter, which provides that "[t]he corporation may have preferred stock on such terms and conditions as the board of directors shall prescribe." 12 U.S.C. § 1718(a). The terms prescribed are specified in Plaintiffs' certificates of designation, and, as the D.C. Circuit has held, the rights provided to Plaintiffs do *not* include a right to vote on the Third Amendment. *See Perry Capital*, 864 F.3d at 629.

Amendment without a class vote.  Further, like the Delaware statute, in those instances where Virginia law applies, it limits class votes to amendments to articles of incorporation that "[c]*hange* the rights, preferences, or limitations of all or part of *the shares of the class*."  Va. Code Ann. § 13.1-708(A)(4) (emphasis added).  The Third Amendment makes no such changes.

### III.   Plaintiffs Fail to State a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing with Respect to Liquidation Preferences and Dividends

#### A.   The Implied Covenant Cannot Be Used to Create New Duties or Contradict the Contract

Plaintiffs do not contest that the implied covenant of good faith and fair dealing "is a limited and extraordinary legal remedy."  *Nemec*, 991 A.2d at 1128.  It "cannot be the vehicle for rewriting an unambiguous contract in order to create duties that do not otherwise exist."  *Ward's Equip., Inc. v. New Holland N. Am., Inc.*, 254 Va. 379, 385 (1997).[8]  But "creating duties that do not otherwise exist" is precisely what Plaintiffs seek to do with their claims for breach of an implied covenant.

As an initial matter, as set forth above, the shareholder contract gives Plaintiffs no absolute right to a particular liquidation amount, or to receive funds upon liquidation in any amount.  It merely provides Plaintiffs with a preference in the line of creditors and shareholders who may receive payments on liquidation, if such payments are available.  The implied covenant cannot be used to create an extra-contractual guarantee that there will in fact be payments available for Plaintiffs upon liquidation.

---

[8]   *See also Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) (implied covenant does not create a "free-floating duty . . . unattached to the underlying legal document"); *Skillstorm, Inc. v. Elec. Data Sys., LLC*, 666 F. Supp. 2d 610, 620 (E.D. Va. 2009) (implied covenant does not permit a party to "attempt to rewrite" a contract term that later "proves unfavorable to [him].").

Further, Plaintiffs seek to invoke an implied covenant to replace the Conservator's express statutory authority to act in the best interests of the Enterprises or the Agency—which is incorporated into the contract itself (*see* FHFA MTD Br. at 26-29)—with a duty to "consider" the interests of the private shareholders and act to maximize their economic interests. Ind. Br. at 1, 33, 43; Cl. Br. at 41-42.  Plaintiffs do not clearly define this purported duty to "consider," but they alternatively, and contradictorily, claim that (i) the duty requires the Conservator to "operate [the Enterprises] . . . with a view to the interests of their shareholders," Ind. Br. at 1, and (ii) "considering" Plaintiffs' interests need not interfere with the Conservator's authority to "consider" the Agency's interests.  Ind. Br. at 33, 43.  Neither of Plaintiffs' conflicting positions has merit.

First, Plaintiffs' contention that the Conservator is required, by an implied covenant, to operate the Enterprises "with a view to the interests of their shareholders" is directly contrary to the shareholder contract, which incorporates HERA and authorizes the Conservator to act in the "best interests of the regulated entity or the Agency," with no mention of the interests of the shareholders.  *Perry Capital*, 864 F.3d at 608 (HERA "refers only to the best interests of FHFA and the Companies—and *not* those of the Companies' shareholders or creditors"); 12 U.S.C. § 4617(b)(2)(J)(ii).  Indeed, Plaintiffs' repeated accusations of "self-dealing," *see, e.g.*, Ind. Br. at 18, 21, 24, demonstrate that they are simply attacking, and seeking to limit, FHFA's contractual authority to act in what the Conservator determines to be the best interests of the Agency or the Enterprises.  Because the contract clearly delineates the right of the Conservator to act in the Enterprises' or Agency's interests, no judicially created implied covenant may be invoked to impose different duties.

Second, Plaintiffs' assertion that the Conservator must simultaneously "consider" the interests of the shareholders and the Agency—and that it *can* do so without compromising its ability to act in the best interests of the Agency or the Enterprises—is plainly wrong, as evidenced by the plain language of HERA and this litigation.  Plaintiffs' characterization of the Conservator's authority is far too limited.  HERA does not merely authorize the Conservator to "*consider*" the interests of the Agency, or to weigh them "along with the interests of [Plaintiffs]." Ind. Br. at 43.  HERA, as incorporated into the shareholder contract, authorizes the Conservator to *act* in the interests of the Agency or the Enterprises, without, as confirmed by the D.C. Circuit panel in this case,  consideration of "those of the Companies' shareholders."

The Conservator cannot be subjected to a supposed implied covenant that would impose new and different duties.  *See, e.g.*, *VTR, Inc. v. Goodyear Tire & Rubber Co.*, 303 F. Supp. 773, 778 (S.D.N.Y. 1969) ("As to acts and conduct authorized by the express provisions of the contract, no covenant of good faith and fair dealing can be implied which forbids such acts."); *Eldridge v. Gordon Bros. Grp., LLC*, 2011 WL 3439180, at *13 (D. Mass. Aug. 4, 2011) ("The implied covenant has no application here not only because Plaintiffs cannot show that the liquidation of the company could not be anticipated, but also because express provisions of the LLC Agreement address the conduct of the alleged wrong" and "grant[] [defendant] the authority" and "unilateral right to liquidate New K's assets," thereby "[l]eav[ing] no interstitial space in which doctrine of the implied covenant might operate").  And the implied covenant cannot be used to contradict the express contract.  *See Amazon.com, Inc. v. Hoffman*, No. 2239, 2009 WL 2031789, at *4 (Del. Ch. June 30, 2009) (rejecting implied covenant claims where express contract terms contradicted the implied duty sought to be imposed); *Chamison v.*

*HealthTrust, Inc. Hosp. Co.*, 735 A.2d 912, 920-21 (Del. Ch. 1999) (implied covenant cannot be contrary to the "spirit" of the agreement).

> **B.      Even if There Were Contract Gaps to Fill, Plaintiffs Cannot Plausibly Allege that They Reasonably Expected that an Implied Covenant Would Bar the Third Amendment**

Given the Conservator's clear contractual authority to act in the best interests of the Enterprises or the Agency, the implied covenant does not apply here.  But even if it did, the implied covenant could not be used to thwart the Third Amendment.  "The covenant is best understood as a way of implying terms in the agreement, whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions."  *Dunlap*, 878 A.2d at 441 (internal quotation marks and citations omitted).  The implied covenant asks "what the parties would have agreed to themselves had they considered the issue in their original bargaining positions at the time of contracting."  *Gerber v. Enters. Prods. Holdings, LLC*, 67 A.3d 400, 418-19 (Del. 2013), *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013), *as corrected* (Oct. 8, 2013).  This analysis hinges on the parties' "reasonable expectations at the time of contracting."  *Nemec*, 991 A.2d at 1126; *see also Dunlap*, 878 A.2d at 442 (implied covenant "ensures the parties' 'reasonable expectations' are fulfilled") (citation omitted); *SunTrust Mortg., Inc. v. Mortgages Unlimited, Inc.*, No. 3:11CV861-HEH, 2012 WL 1942056, at *3 (E.D. Va. May 29, 2012) (under Virginia law, implied covenant includes "consistency with the justified expectations of the other party [to a contract]") (citation omitted).[9]  Here, the Enterprises are in conservatorships, and the Conservator, imbued with the rights, titles, powers, and privileges of the companies, their officers, directors, and shareholders,

---

[9]      As explained in FHFA's motion to dismiss at 24 n.9, there may be differences between the analysis of reasonable expectations under the implied covenant and for purposes of takings claims.

is authorized to act in the best interests of the Agency or the Enterprises.  Thus, as a matter of

law, the only reasonable expectations that a shareholder could have had included the possibility

of actions that could dilute, delay, or even eliminate the chance that the private shareholders

would receive dividends or distributions in the event of liquidation.

> 1. **Shareholders in Two of the Most Highly Regulated Companies in the Country, with Public Missions and an Implicit Government Guarantee, Cannot Plausibly Allege that They Reasonably Expected that an Implied Covenant Would Bar the Third Amendment**

Plaintiffs offer no resistance to the fact that, even before the conservatorships, Fannie

Mae and Freddie Mac were as highly regulated as any companies in the Nation.  They were

subject to close supervision, changing regulatory regimes, and public missions from the time of

their creation.  As this Court noted, the Enterprises uniquely benefitted from an implicit

government guarantee, but investors in that circumstance must take the bitter with the sweet:

Because of the key role the government-sponsored Enterprises play in the national economy,

"[f]or decades . . . the [Enterprises] have been under the watchful eye of regulatory agencies and

subject to conservatorship or receivership largely at the government's discretion."  *Perry Capital*

*LLC v. Lew*, 70 F. Supp. 3d 208, 244 (D.D.C. 2014).

Thus, the possibility of a conservatorship in the event of financial calamity—with a

Conservator succeeding to all rights, titles, powers, and privileges of shareholders and officers,

and operating the Enterprises in the interests of the Agency—was a risk the shareholders

assumed.  Indeed, Plaintiffs repeatedly represent that they do not challenge the conservatorships

themselves.  But Plaintiffs challenge the *consequences* of conservatorship.  That is untenable.

Given that the Plaintiffs are deemed to have notice of the conservatorships and PSPAs

themselves, shareholders could not have reasonably expected that an implied covenant would

offer them protections in conservatorship beyond those found in the plain terms of the

shareholder contract. *See, id.* at 244-45; FHFA MTD Br. at 24-26.

> ### 2. The Shareholder Contract Left No Room for Reasonable Expectations that the Enterprises Would Be Operated in the Interests of the Shareholders or that the Enterprises Would Issue Dividends or Distribute Funds at Liquidation to Plaintiffs

Plaintiffs argue that not "all federal laws that might impact the [Enterprises]" are

incorporated into the shareholder contract. Cl. Br. at 32. Plaintiffs attack a straw man. FHFA

does not contend that "*all* federal laws" are part of the shareholder contract. But the law is clear

that the shareholder contracts incorporate certain laws, whether state or federal, and as amended

over time, addressing the nature of the corporation, its governance, and its relationship with

shareholders. *See* FHFA MTD Br. at 26-27; *see also Bove v. Cmty. Hotel Corp.*, 249 A.2d 89,

96 (R.I. 1969) (legislative enactments concerning the "relationship between the stockholder and

the corporation or between the stockholders *inter sese*" may "alter or amend the charters of

corporations"); *Schroeter v. Bartlett Syndicate Bldg. Corp.*, 63 P.2d 824, 824 (1936) (laws that

form part of the contract and may be changed include those that "affect[] . . . the interrelations of

the corporation and its stockholders"). When such laws are enacted or amended, they form part

of, and amend, the shareholder contract. *See, e.g., Goldman v. Postal Telegraph*, 52 F. Supp.

763, 769 (D. Del. 1943) ("Since the corporation is the creature of the state, and since the

corporation law is part of the corporate charter . . . it is self-evident that the state has the right to

reserve to itself . . . the power to change the contract between the corporation and its

stockholders"); *Bove*, 249 A.2d at 97-98 ("to be sure, the stockholder's contractual rights have

been altered, but in each instance the alterations are permitted by the stockholder's contract into

which the law reads the reserved power to amend or repeal" the corporation law); *Firestone v.

Wiley*, 485 F. Supp. 2d 694, 705 (E.D. Va. 2007) ("the [Virginia Stock Corporation Act] is

deemed part of the contract between a corporation and its shareholders" and plaintiff thus "agreed to [the Act's] forum selection provision" by becoming a stockholder).  For the garden-variety corporation, those laws are state laws because most corporations are chartered pursuant to state laws that give the corporation existence.  The Enterprises, however, were chartered by Congress and are subject to a federal conservatorship regime that speaks directly to the relationship between the Enterprises in conservatorship and their shareholders.  Thus, when HERA was enacted—and provided that the Conservator may act in the best interests of the Enterprises or the Agency—that corporate law governing the relationship between the Enterprises and their shareholders became part of, and amended, the shareholder contract.

With that backdrop, it is clear that no shareholder could have expected, at the time of the last substantive change to the shareholder contract (which includes the provision of HERA authorizing the Conservator to act in the best interests of the Enterprises or the Agency) that an implied covenant could bar the Third Amendment or require the Conservator to prioritize shareholder interests over those of the Enterprises or the Agency.

Similarly, given the express contractual right of the Enterprises in conservatorship to issue more senior stock that would dilute or even extinguish Plaintiffs' interests, without their consent or approval, Plaintiffs cannot plausibly allege that an implied covenant would impose limitations on the Conservator to prohibit the Third Amendment.  Plaintiffs argue that amendments to shares are different than the issuance of new shares, but it would defy logic to find that an implied covenant prohibits *amending* shares to result in the same effect that Plaintiffs concede would be expressly permitted if effectuated by *issuing new* shares.  *See Glinert v. Wickes Cos., Inc.*, 16 Del. J. Corp. L. 764, 778-80 (Del. Ch. 1990), *aff'd*, 586 A.2d 1201 (Del. 1990) (refusing to invoke implied covenant where there were no plausible allegations that the

"parties would have regarded another form of corporate transaction that *accomplished the same thing* [as had been expressly allowed] . . . as implicitly forbidden" (emphasis added)).

The Institutional Plaintiffs rely on two unpublished decisions to argue that implied covenant claims may be viable despite the express contract right to issue more senior stock. Ind. Br. at 21-24. Neither case is apposite. *In re Delphi* offers no support to Plaintiffs at all. In that case, the court denied plaintiffs' motion for a preliminary injunction and explicitly refused to rule on whether plaintiffs had made out a claim for breach of the implied covenant. *In re Delphi Fin. Grp. S'holder Litig.*, 2012 WL 729232 at *17 (Del. Ch. Mar. 6, 2012) ("I need not decide at this preliminary stage whether the rights of the stockholder class here sound in breach of contract as well as breach of fiduciary duty."). Thus, the court did not even reach the issue for which Plaintiffs rely on the case.

Similarly, *QVT* is readily distinguished from the instant action. There, the court denied a motion to dismiss plaintiffs' implied covenant claims because the complaint alleged "sufficient facts" to "identify a specific implied obligation . . . to protect [plaintiffs] in the event that the Bank ceased being a profit-seeking enterprise." *QVT Fund LP et al. v. Eurohypo Cap. Funding LLC I*, 2011 WL 2672092 at *14 (Del. Ch. July 8, 2011). Here, by contrast, there are no facts to identify an implied obligation to operate during conservatorship as a profit-seeking enterprise for the benefit of Plaintiffs or ensure that funds would be available for distribution upon liquidation. Indeed, the contract expressly authorizes the issuance of more senior securities, acknowledges that Plaintiffs' rights to liquidation payments are contingent, and permits the Conservator to act in the best interests of the Agency or the Enterprises, with no mention of shareholder interests (other than to provide them a place in line for potential distributions).

Moreover, Plaintiffs could not have expected that they would receive dividends in light of the conservatorship regulations—issued in June 2011 and incorporated into the shareholder contract pre-Third Amendment—which provide that, "[e]xcept as provided in paragraph (b) of this section, a regulated entity shall make no capital distribution while in conservatorship." 12 C.F.R. § 1237.12(a).[10]  Along the same lines, shareholders were on notice that the PSPAs and the first two amendments to them—all of which Plaintiffs do not challenge and accept as proper and controlling—also amended the shareholder contract and gave Treasury broad rights, including to approve or veto any dividends.  *See STAAR Surgical*, 588 A.2d at 1136 (preferred stock "amends the certificate of incorporation and fundamentally alters the contract between all of the parties").

Plaintiffs repeatedly attempt to distinguish stock issuance from amendment by arguing that the former is typically accompanied by a material benefit to the company, while the Third Amendment purportedly provided the Enterprises with "no meaningful consideration."  *See, e.g.*, Cl. Br. at 21-22, 23 n.15, 24, 26; Ind. Br. at 24-25.  It is far from clear what Plaintiffs mean by "meaningful" consideration or how their definition relates to the legal requirement of a peppercorn.  *See, e.g.*, 3 Williston on Contracts § 7:21 ("the law will not inquire into the adequacy of consideration" because "that the relative value or worth of the exchange is unequal is irrelevant").  But if Plaintiffs are asserting that the Third Amendment provided no legally sufficient consideration, they are plainly incorrect, and such an allegation need not be accepted as true because it is contradicted by the terms of the Third Amendment itself and other facts and documents incorporated into the complaints or of which judicial notice is appropriate.  For

---

[10]   Paragraph (b) provides that the Director may authorize a capital distribution under certain circumstances that are in the *public interest* or contribute to *long-term safety and soundness*. 12 C.F.R. § 1237.12(b).  There is no provision to consider the shareholders' interests when determining whether to authorize dividends.

example, by June 30, 2012, without accounting for the Periodic Commitment Fee equal to the market value of Treasury's historic commitment, the Enterprises' $19 billion annual dividend obligation to Treasury exceeded the Enterprises' historical annual earnings.[11]

\* \* \*

In short, every aspect of the regulatory background, implied government guarantees, purpose, history, and public missions of the Enterprises, and express terms of the shareholder contract made clear that, in the circumstances presented, the Conservator had broad authority and discretion to act in the best interests of the Enterprises or the Agency, even if doing so would reduce or eliminate Plaintiffs' likelihood of receiving dividends or liquidation payments.

## IV.   Plaintiffs' Breach of Fiduciary Duty Claims Fail as a Matter of Law

### A.   HERA Preempts Plaintiffs' Claims for Breach of Fiduciary Duty

Plaintiffs' efforts to avoid HERA's preemption of their state law breach of fiduciary duty claims are unavailing.  The question of preemption is one of congressional intent that requires statutory interpretation.  *English v. Gen. Elec. Co.*, 496 U.S. 72, 78 (1990).  Nothing in HERA indicates that Congress intended to make the Conservator's powers subject to state tort law limitations.

The Conservator's powers are enumerated in federal law.  Congress expressly stated that FHFA "may take any action *authorized by this section* which *the Agency determines* is in the best interests of the regulated entity or the Agency."  12 U.S.C. § 4617(b)(2)(J)(ii) (emphasis

---

[11]     *See* Fannie Mae, Quarterly Report (Form 10-Q), at 4 (Aug. 8, 2012), http://goo.gl/bGLVXz Freddie Mac, Quarterly Report (Form 10-Q), at 8 (Aug. 7, 2017), http://goo.gl/2dbgey.  Indeed, in 2015 and 2016, the Enterprises' dividend payments under the Third Amendment amounted to less than the ten percent fixed dividend that would have been required pre-Third Amendment. *See* FHFA, Dividends on Enterprise Draws from Treasury, https://www.fhfa.gov/DataTools/Downloads/Documents/Market-Data/Table_2.pdf.  Freddie Mac, for instance, paid dividends to Treasury of approximately $5.5 billion in 2015 pursuant to the Third Amendment, *see id.*, but under the ten percent fixed dividend model, Freddie Mac would have been obligated to pay Treasury dividends of $7.2 billion.

added).  The D.C. Circuit has held that the Third Amendment was "an[] action authorized by

HERA"; that is, it was within the Conservator's statutory power.  Indeed, the D.C. Circuit

specifically held that "[HERA] refers only to the best interests of FHFA and the Companies—

and *not* those of the Companies' shareholders or creditors."  *Perry Capital*, 864 F.3d at

608.  Thus, Congress provided that the Conservator make the determination whether statutorily

authorized actions are in the regulated entities' or the Conservator's best interests.

Similarly, 12 U.S.C. § 4617(a)(7), which provides that when acting as conservator FHFA

"shall not be subject to the direction or supervision of . . . any State in the exercise of the rights,

powers, and privileges of the Agency," "aims to protect the integrity of FHFA's operations as

conservator against outside influences."  *Saxton v. FHFA*, 245 F. Supp. 3d 1063, 1077 (N.D.

Iowa 2017).  "In other words, § 4617(a)(7) specifically functions to remove obstacles to FHFA's

exercise of conservator powers—*i.e.* to preserve FHFA's interests, not those of GSE

shareholders.  Indeed, "HERA as a whole 'refers only to the best interests of FHFA and the

[GSEs—and not those of the [GSEs'] shareholders' . . . 'the purpose of § 4617(a)(7) 'is to

provide a preemption defense *for FHFA in its role as conservator.*'"  *Id.* at 1077 (alterations and

emphasis in original) (quoting *Perry Capital*, 848 F.3d at 1089, and *Robinson v. FHFA*, 223 F.

Supp. 3d 659, 668 (E.D. Ky. 2016), *aff'd*, 876 F.3d 220 (6th Cir. 2017)).[12]

Plaintiffs concede that they seek to affect FHFA's determination of the Enterprises' or

the Agency's best interests and thereby limit by state law the exercise of the Conservator's

---

[12]  *See also Fed. Hous. Fin. Agency v. City of Chicago*, 962 F. Supp. 2d 1044, 1059–60 (N.D.
Ill. 2013) (HERA preempts Chicago ordinance because it conflicts with FHFA's ability to "take
action as may be appropriate to carry on [the GSEs' business] and preserve and conserve [their]
assets and property without being subject to the direction or supervision of any other agency of
the United States or any State.") (internal quotation marks and citation omitted); *Mass. v. FHFA*,
54 F. Supp. 3d 94, 101 n.8 (D. Mass. 2014) (Congress intended FHFA to "exercise [its] rights,
powers, and privileges" as Conservator without being "subject to the direction or supervision of
any other agency of the United States or *any State.*").

federal statutory authority:  "Plaintiffs argue . . . that, in addition to considering the interests of

Treasury and the Enterprises, Defendants were required by state law to consider, in good faith,

the interests of private shareholders."  Cl. Br. at 41.  Plaintiffs do not explain what they mean by

"consider" shareholders' interests.  On the one hand, Plaintiffs repeatedly disclaim any assertion

that the Conservator must prioritize shareholders' interests over those of the Agency.  *See, e.g.*,

Cl. Br. at 41 ("We do not contend, as FHFA would have it, that shareholder interests were

entitled to primacy no matter what."); Ind. Br. at 43 (stating that it is "entirely possible" for

FHFA to "consider in good faith the interests of Fannie's and Freddie's shareholders *along with*

the interests of the other constituencies Congress has authorized FHFA to consider" (emphasis in

original)).  But at the same time, Plaintiffs suggest that the Conservator must "operate [the

Enterprises] . . . with a view to the interests of their shareholders" and "with an eye to operating

profitable Companies for the benefit of [Plaintiffs]."  Ind. Br. at 1, 24.

    HERA preempts any such limitation on Conservator power.[13]  *See, e.g.*, *Barnett Bank of*

*Marion Cty., N.A. v. Nelson*, 517 U.S. 25, 33 (1996) (action expressly authorized by federal

legislation preempted state law barring action because Congress would not want states to forbid

or significantly impair the exercise of power granted by Congress); *Gutierrez v. Wells Fargo*

---

[13]   Plaintiffs contend that a presumption against preemption applies in this case.  Cl. Opp. at
40.  However, the presumption only applies where there is "historic presence of state law."
*Wyeth v. Levine*, 555 U.S. 555, 565 n.3 (2009).  Plaintiffs here seek to regulate conduct between
a federal statutory conservator and the federally chartered conserved entities'
shareholders.  Policing a federal statutory conservator is not a field which States have
traditionally occupied such as to warrant a presumption against finding federal preemption of a
state-law cause of action.  *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347-48
(2001), (no presumption against preemption where the relationship between a federal agency and
the entity it regulates is inherently federal in character because the relationship originates from,
is governed by, and terminates according to federal law); *Garcia v. Wachovia Mortg. Corp.*, 676
F. Supp. 2d 895 (C.D. Cal. 2009) ("because there has been a history of significant federal
presence in national banking, the presumption against preemption of state law is
inapplicable).  Regardless, even if the presumption against preemption applied, it is overcome by
the text and structure of HERA and its implementing regulations, which unambiguously provide
that the Conservator alone chooses among the actions authorized by HERA.

*Bank, NA*, 704 F.3d 712, 725 (9th Cir. 2012) ("good faith limitation applied through California's Unfair Competition Law is preempted when applied in a manner that prevents or significantly interferes" with federally authorized power of national bank); *Andrews v. Fed. Home Loan Bank of Atlanta*, 998 F.2d 214, 220 (4th Cir. 1993) (ruling that state claims were preempted by Federal Home Loan Bank Act because they "would plainly conflict with the discretion accorded the Bank by Congress.").

The cases cited by Plaintiffs are inapposite because none addresses the preemptive effect of federally authorized power on state law limitations. *E.I. du Pont de Nemours & Co. v. FDIC*, 32 F.3d 592, 595 (D.C. Cir. 1994) (stating only that "[a]s receiver the FDIC has a responsibility to marshal the assets of the bank and to distribute them to the bank's creditors and shareholders"); *Suess v. FDIC*, 770 F. Supp. 2d 32, 38 (D.D.C. 2011) (assuming under pre-FIRREA statute that receiver owes a fiduciary duty to shareholders); *Gibraltar Fin. Corp. v. Fed. Home Loan Bank Bd.*, 1990 WL 394298 (C.D. Cal. June 15, 1990) (examining pre-FIRREA statute that did not provide for the transfer of shareholder rights to the conservator or authorize agency actions in its best interests).

In short, HERA expressly authorizes the Conservator to act in the interests *of the Enterprises or the Agency*, and no state law may interfere with that authority or subordinate it to the interests of the Plaintiffs.

### B. Even if Not Preempted, the Freddie Mac Shareholders' Claims for Breach of Fiduciary Duty, Whether Considered Direct or Derivative, Fail to State a Claim

The D.C. Circuit foreclosed Plaintiffs' ability to pursue derivative breach of fiduciary duty claims. *Perry Capital*, 864 F.3d at 625 ("[HERA] does not permit shareholders to bring derivative suits on behalf of the [Enterprises].").  Plaintiffs thus assert purportedly "direct"

claims against Freddie Mac and argue that Virginia courts have "left open" the issue of whether direct fiduciary duty claims can be pursued under Virginia law.  *See* Ind. Br. at 41-43; Cl. Br. at 38-40.  Plaintiffs are wrong.  The Supreme Court of Virginia has spoken clearly on this issue: "corporate shareholders cannot bring individual, direct suits against officers or directors for breach of fiduciary duty, but instead shareholders must seek their remedy derivatively on behalf of the corporation."  *Remora Inv., L.L.C. v. Orr*, 277 Va. 316, 323, 673 S.E.2d 845, 848 (2009) (citing *Simmons v. Miller*, 261 Va. 561, 544 S.E.2d 666 (2001)); *see also id.* at 324 (rejecting "contention that we have previously approved direct causes of action by individual shareholders").  Accordingly, federal courts consistently interpret Virginia law as prohibiting direct stockholder claims for breach of fiduciary duty.  *See, e.g.*, *Gen. Tech. Applications, Inc. v. Exro Ltda.*, 388 F.3d 114, 119 (4th Cir. 2004) ("Virginia strictly adheres to the derivative-claim rule."); *Moses v. Apple Hosp. Reit Inc.*, No. 14-CV-3131 DLI SMG, 2015 WL 1014327, at *5 (E.D.N.Y. Mar. 9, 2015) ("When a plaintiff attempts to bring a direct claim against an officer or a director of a corporation [under Virginia law], the claim must be dismissed."); *Wenzel v. Knight*, No. 3:14-cv-432, 2015 WL 222182, at *3 (E.D. Va. Jan. 14, 2015) ("In Virginia, shareholders may assert claims of fiduciary breach against corporate directors only through shareholder derivative suits.").

Plaintiffs point out that, in *Remora*, the stockholder plaintiff urged the Supreme Court of Virginia to change the state of the law by adopting Delaware's *Tooley* test, and the court stated that it "need not decide" whether to do so because the plaintiff "would not prevail" even under that test.  673 S.E.2d at 848.  The Supreme Court thus declined to reverse its longstanding rule against direct breach of fiduciary claims.  *See DCG & T ex rel. Battaglia/Ira v. Knight*, 68 F. Supp. 3d 579, 586 (E.D. Va. 2014) ("[A]lthough the Supreme Court discussed the Delaware test

for distinguishing derivative claims from direct claims in *Remora*, the Court explicitly declined to adopt Delaware's framework.  This Court will not impose a test declined by the Supreme Court of Virginia." (citation omitted)).  Plaintiffs' speculation that the Virginia Supreme Court may later adopt *Tooley* does not allow this Court to ignore the current state of the law, and because, as explained below, Plaintiffs' claims also fail under the *Tooley* test, the issue here, as in *Remora,* is moot.  Thus, the Freddie Mac shareholders' fiduciary duty claims must be dismissed.

### C.   The Fannie Mae Shareholders' Claims for Breach of Fiduciary Duty Are Derivative and for that Reason Must Be Dismissed

Even if HERA did not preempt Delaware fiduciary duty law–and it does–Plaintiffs' opposition briefs confirm that the Fannie Mae Plaintiffs' breach of fiduciary duty claims are derivative, not direct, and on that basis must be dismissed.  *Perry Capital*, 864 F.3d at 625.[14]

With respect to the first prong of Delaware's *Tooley* test for distinguishing derivative and direct claims—which asks "who suffered the alleged harm," *Tooley v. Donaldson, Lufkin &*

---

[14]   Fairholme argues that it did not forfeit its fiduciary duty claims on appeal because its current fiduciary duty claims seek money damages, while its earlier fiduciary duty claims sought only injunctive relief.  Ind. Br. at 37 n.12.  But this makes no difference; Fairholme forfeited its claims.  *See* FHFA MTD Br. at 31-32.  On appeal, the D.C. Circuit initially dismissed Fairholme's state common law claims, including its fiduciary duty claims, on the ground that it had forfeited all such claims by failing to adequately address them in the opening brief.  *Perry Capital*, 848 F.3d 1072, 1098.  Fairholme sought rehearing on this issue, asking the D.C. Circuit to rule that all of Fairholme's common law claims be "treated in the same manner as the Class Plaintiffs' common law damages claims."  Fairholme's Pet. for Rehearing at 2 (D.C. Cir. Mar. 24, 2017).  For Fairholme's fiduciary duty claims, this meant allowing Fairholme to seek leave to amend in the district court to plead a direct fiduciary duty claim, as D.C. Circuit already had ruled the Class Plaintiffs could do.  *See id.* at 1108.  The D.C. Circuit granted Fairholme's petition in part, allowing Fairholme to pursue its contract and implied covenant claims in the district court, but reaffirming the holding that Fairholme had forfeited its fiduciary duty claims, adding to the opinion:  "We see no reason to relieve [Fairholme] of the consequences of this forfeiture."  *Perry Capital*, 864 F.3d at 617.  Thus, Fairholme's fiduciary duty claim— irrespective of the relief sought—is forfeited.

*Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004)—Plaintiffs concede that their claims are based

on an allegation that the Third Amendment "caused harm to Fannie and Freddie," and Plaintiffs

admit the Complaints "make allegations about that harm." Ind. Br. at 40; *see also* Cl. Br. at 35

(arguing the alleged harm was not "suffered *only* by the Companies"). Plaintiffs also concede

that the alleged harm to the Enterprises "may well give rise to *derivative* claims for breach of

fiduciary duty." Ind. Br. at 41 (emphasis added); *see also* Cl. Br. at 36 (analogizing cases in

which "the same conduct also damaged the corporation and thus gave rise to a derivative

claim"). These concessions are dispositive: Because Plaintiffs' fiduciary duty claims are based

on alleged harm to the Enterprises, they are derivative.

Plaintiffs nevertheless attempt to wedge their claims into a narrow exception under

Delaware law, in which direct and derivative fiduciary duty claims may arise from the same set

of facts. *See* Cl. Br. at 35-38; Ind. Br. at 39-41. This exception for so called "dual-natured"

claims originates from the Delaware Supreme Court's decision in *Gentile v. Rossette*, 906 A.2d

91, 99 (Del. 2006), in which the court discussed a "species of corporate overpayment claim" (*id.*

at 99). that arises only in "unique circumstances." *El Paso Pipeline GP Co., L.L.C. v.

Brinckerhoff*, 152 A.3d 1248, 1264 (Del. 2016) (en banc). In particular, a shareholder may state

such a dual claim only if:

> (1) a stockholder having majority or effective control causes the
> corporation to issue "excessive" shares of its stock in exchange for
> assets of the controlling stockholder that have a lesser value; and
> (2) the exchange causes an increase in the percentage of the
> outstanding shares owned by the controlling stockholder, and a
> corresponding decrease in the share percentage owned by the
> public (minority) shareholders.

*Gentile*, 906 A.2d at 99-100. Importantly, to state such a claim, the transfer of value to the

majority stockholder must be more than a mere "overpayment"; it must also increase the

majority shareholders' "voting power" to the detriment of the minority shareholders. *Id.*; *see*

*also El Paso Pipeline*, 152 A.3d at 1263 (observing that *Gentile* concerned "transactions that resulted in an improper transfer of both economic value *and* voting power from the minority stockholders to the controlling stockholder" (emphasis in original)).[15]

Here, Plaintiffs' claims simply do not fit the dual-natured claim exception for multiple reasons. First, the Third Amendment did not involve the *issuance* of any new shares, which is an essential element of such a dual claim under *Gentile*. *See ACP Master, Ltd.*, 2017 WL 3421142 at *26 n.206 (declining to apply *Gentile* exception because "no additional shares were issued"); *Caspian Select Credit Master Fund Ltd. V. Gohl*, 2015 WL 5718592, at *4 (Del. Ch. Sept. 28, 2015) (same, because "Plaintiffs do not challenge any stock issuance by [the company]"). Plaintiffs admit that their claims "challenge an *amendment* to the terms of Treasury's already existing shares, *not an issuance of new shares*." Ind. Br. at 20 (second emphasis added); *see also* Cl. Br. at 21 ("[T]he Third Amendment was not the issuance of new stock."); *Perry Capital LLC v. Lew*, 70 F. Supp. 3d 208, 224 (D.D.C. 2014) (finding "Treasury did not purchase new securities under the Third Amendment").

Second, the Third Amendment does not involve the reallocation of voting power from minority stockholders to a controlling stockholder, which is another essential element of dual-natured claims. *See Gentile*, 906 A.2d at 99-100. In *El Paso Pipeline*—the most recent

---

[15]    It bears emphasis that "[w]hether [the dual-natured claim exception under] *Gentile* is still good law is debatable." *ACP Master, Ltd. v. Sprint Corp.*, No. CV 8508-VCL, 2017 WL 3421142, at *26 n.206 (Del. Ch. July 21, 2017). In *El Paso Pipeline*, Justice Strine concurred separately to criticize *Gentile* as a "confusing decision, which muddies the clarity of our law in an important context." *El Paso Pipeline*, 152 A.3d at 1265. Justice Strine observed that *Gentile* is "difficult to reconcile with traditional doctrine," and that while the *El Paso Pipeline* case "d[id] not require us to consider *Gentile*'s ongoing viability . . . we implicitly recognize that *Gentile* undercuts the clarity and coherence that *Tooley* brought to the determination of what claims are derivative." *Id.* This Court thus should decline Plaintiffs' invitation to expand *Gentile* beyond its narrow, "unique circumstances," particularly where such an expansion was specifically rejected by the Delaware Supreme Court in *El Paso Pipeline*.

Delaware Supreme Court decision addressing this issue—the claims involved alleged "expropriation of economic value to a controller" that was "not coupled with any voting rights dilution." 152 A.3d at 1264. The court held the claims to be "exclusively derivative," *id*. at 1265, and specifically "decline[d] the invitation to further expand the universe of claims that can be asserted 'dually'" under *Gentile* to cover alleged "extraction of solely economic value from the minority," without any accompanying dilution of voting rights, *id*. at 1264.[16] Here, neither the original PSPAs nor the Third Amendment affected any stockholder's voting rights in any way, and Plaintiffs do not (and cannot) allege any facts to the contrary. *See Saxton*, 245 F. Supp. 3d at 1072-73 (holding claims challenging Third Amendment derivative due to "absen[ce of] additional allegations that [plaintiff's] voting rights have been diluted").

Plaintiffs attempt to distinguish *El Paso Pipeline* as involving a "classic corporate overpayment claim." Ind. Br. at 39. But not only do Plaintiffs ignore the actual holding of *El Paso Pipeline*—that minority voting rights must be adversely affected in order to state a dual-natured claim—Plaintiffs also fail to recognize that their own claims allege that the Enterprises overpaid for the Third Amendment. *See* Cl. Br. at 10 (alleging the Third Amendment provided Treasury an "enormous benefit" of net worth dividends in exchange for "no meaningful consideration of any kind"); *id*. at 21-28 (alleging lack of "meaningful consideration"). Claims based on alleged "overpayment" or "inadequate consideration" are derivative. *See El Paso*

---

[16]    Other decisions are in accord. *See, e.g.*, *F5 Capital v. Pappas*, 856 F.3d 61, 75 (2d Cir. 2017) (declining to apply *Gentile* exception where complaint "does not identify such an impermissible transfer of voting power associated with the [challenged] Transaction"); *Dietrichson v. Knott*, No. CV 11965-VCMR, 2017 WL 1400552, at *5 (Del. Ch. Apr. 19, 2017); ("[Plaintiff] does not allege any dilution of voting power in this case; therefore, [Plaintiff]'s arguments regarding [dual-natured claims] fail."); *Caspian Select*, 2015 WL 5718592, at *5 (declining to apply *Gentile* exception where challenged transaction "did not affect Plaintiffs' voting power").

*Pipeline*, 152 A.3d at 1261; *Protas v. Cavanagh*, No. CIV.A. 6555-VCG, 2012 WL 1580969, at

*8 (Del. Ch. May 4, 2012); *In re Ionosphere Clubs, Inc.*, 17 F.3d 600, 602, 605-06 (2d Cir. 1994)

(holding claims based on transfer of corporate assets to insider for "inadequate consideration" to

be derivative under Delaware law, despite allegation that such transfer made it impossible for

company to pay dividends to preferred stockholders).

Plaintiffs also argue that they may assert a dual-natured claim because the Third

Amendment "transfers value *within* [the] corporation—*from one shareholder group to another*."

Ind. Br. at 38 (emphases in original).  Plaintiffs cite no authority for this statement because it is

wrong.  "[T]he extraction of solely economic value from the minority [stockholders] by a

controlling stockholder" does not alone constitute "direct injury" under *Gentile*; a dilution of

*voting rights* is also required.  *El Paso Pipeline*, 152 A.3d at 1264; *see also Caspian Select*, 2015

WL 5718592, at *4-5.

For these reasons, multiple courts have specifically rejected application of the dual-claim

exception under *Gentile* in lawsuits challenging the Third Amendment.  For example, in

*Edwards*, the court held the stockholders' money damages claims based on the Third

Amendment were exclusively derivative:

> Here, the Third Amendment and Net Worth Sweep did not involve
> the issuance of any new shares let alone "excessive" shares.  Nor
> did the exchange cause an increase in the percentage of
> outstanding shares owned by the Treasury.  Instead, the Third
> Amendment only altered the way in which the Treasury's
> dividends were calculated under the stock purchase agreement.
> Moreover, the Third Amendment in no way affected the Treasury's
> or the Plaintiffs' voting power.  The Plaintiffs claims rest entirely
> on economic harm to the value of their shares.  Thus, their claims
> do "not appear to fit within the narrow 'transactional paradigm'
> identified by the *Gentile* court" and are derivative.

2017 WL 1291994, at *7 (internal citation omitted); *see also Saxton*, 245 F. Supp. 3d at 1072-73 ("Even Plaintiffs' allegation as to expropriation of stock value does not support a direct claim" challenging the Third Amendment).

The same is true here:  because the Third Amendment did not involve the issuance of new stock, and did not affect any stockholder voting rights, Plaintiffs' claims are exclusively derivative.[17]

With respect to the second prong of the *Tooley* test—which asks "who would receive benefit of any recovery or other remedy," *Tooley*, 845 A.2d at 1033—Plaintiffs assert that they are seeking money damages payable directly to stockholders.  Cl. Br. at 36.  But Plaintiffs' prayer for relief is not dispositive.  *See* FHFA MTD Br. at 36-37 (collecting cases).  Here, the opposition briefs confirm that Plaintiffs' fiduciary-duty claims seek to recover damages based on the alleged decline in value of their shares.  *See* Cl. Br. at 15 (asserting the Third Amendment "immediately reduced the value of Plaintiffs' stock"); *id*. at 3 (asserting the "economic value" of Plaintiffs' stock was "wiped out" by the Third Amendment); Ind. Br. at 38 (asserting the Third

---

[17]   The dual-claim exception also does not apply for an additional reason:  Treasury was not a controlling stockholder that owed fiduciary duties to Plaintiffs.  A controlling stockholder either owns a majority of the corporation's voting shares, or it exercises "actual control" over the corporation's affairs.  *Starr Int'l Co. v. Fed. Reserve Bank*, 906 F. Supp. 2d 202, 221-25 (S.D.N.Y. 2012), *aff'd*, 742 F.3d 37 (2d Cir. 2014); *see also Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del. 1987).  Treasury is not and has never been a majority stockholder in the Enterprises, nor does it have any voting rights.  Its rights as a senior preferred stockholder are entirely contractual.  Even "a significant shareholder, who exercises a duly-obtained contractual right that somehow limits or restricts the actions that a corporation otherwise would take, does not become, without more, a 'controlling shareholder' for that particular purpose."  *Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*, No. 1668N, 2006 WL 2521426, at *5 (Del. Ch. Aug. 25, 2006); *see also Starr Int'l*, 906 F. Supp. 2d at 221-25.  Moreover, HERA's requirements that Treasury act to "protect the taxpayer," 12 U.S.C. § 1719(g)(1)(B)(iii), and consider the "need for preferences or priorities regarding payments to the Government," *id.* § 1719(g)(1)(C)(i), negates any suggestion that Treasury owed common-law fiduciary duties to the Enterprises' stockholders.

Amendment affected "the market value of the shares"). Those characterizations confirm that the claims are derivative, not direct. *See El Paso Pipeline*, 152 A.3d at 1264 ("Were [plaintiff] to recover directly for the alleged decrease in the value of the [company]'s assets, the damages would be proportionate to his ownership interest. The necessity of a *pro rata* recovery to remedy the alleged harm indicates that his claim is derivative."); *In re Ionosphere Clubs*, 17 F.3d at 605 ("payment of damages directly to the plaintiff-stockholders for the diminution in the value of their stock would be inappropriate").

Thus, under both prongs of the *Tooley* test, Plaintiffs' fiduciary duty claims are derivative, and therefore barred by HERA.

## V.    Plaintiffs' State Law Claims Attacking the Treasury Stock Certificates Fail

In their amended complaints, *see* Arrowood FAC ¶¶ 133-143; Cl. FAC ¶¶¶ 178-92; Ind. FAC ¶¶ 142-52, Plaintiffs allege for the first time that the Third Amendment violates Delaware and Virginia law related to the regulation of stock certificates. These new claims fail first and foremost because federal law—not state law—governs the Conservator's treatment of preferred stock, including the Third Amendment. FHFA MTD Br. at 38-42.

Plaintiffs wrongly contend that state law governs because a 2002 regulation, 12 C.F.R. § 1710.10(b)(1), issued by FHFA's predecessor, directed the Enterprises to select a state law to govern certain issues of corporate affairs where there is no applicable federal law. Cl. Br. at 43. As explained in FHFA's motion—and ignored by Plaintiffs—that regulation clearly allows the Enterprises to select state law as a gap-filling measure to address corporate governance issues for which the Enterprises' federal charters were "silent." FHFA MTD Br. at 41. Because the Enterprises' charters are not "silent" with respect to preferred stock—they expressly address it,

giving the Enterprises broad discretion to issue preferred stock "on such terms and conditions as the board of directors shall prescribe," 12 U.S.C. §§ 1718(a), 1455(f)—state law does not apply.

Plaintiffs also argue that state law applies because the Treasury stock certificates provide that state law will "serve as the federal rule of decision." Cl. Br. at 43. But Plaintiffs fail to quote the rest of the Treasury stock certificate language, which states: "This Certificate . . . shall be construed in accordance with and *governed by the laws of the United States*, provided that the law of the State of Delaware [or Virginia] shall serve as the federal rule of decision in all instances except where such law is inconsistent with the Company's enabling legislation, its public purposes *or any provision of this Certificate*." FHFA MTD, Ex. G at §10(e) (emphasis added). This plain language means that federal law governs, and that state law is intended to serve only a gap-filling function, consistent with the Enterprises' election of state law for certain limited purposes pursuant to 12 C.F.R. § 1710.10(b)(1). Further, the dividend payable under the Third Amendment is reflected in the Treasury stock certificates themselves. *Id.* at § 2. Thus, any state law that supposedly prohibits that dividend would necessarily be inconsistent with a "provision of this Certificate," and, therefore, would not provide the federal rule of decision. *Id.* at § 10(e). In sum, federal law applies and authorizes the Third Amendment.

In all events, the Third Amendment complies with the Delaware and Virginia statutes upon which Plaintiffs rely. FHFA MTD Br. at 42-45. Plaintiffs' arguments to the contrary merely regurgitate the same inadequate allegations as contained in the amended complaints, and Plaintiffs fail to cite *any* case law or other authority to support their novel claims. *See* Cl. Br. at 44-45.

**VI.    Plaintiffs' Claims that Are Explicitly Barred by the D.C. Circuit's Decision Should Be Dismissed.**

On February 20, 2018, the Supreme Court denied Plaintiffs' respective petitions for certiorari.  Order List, *available at*  https://www.supremecourt.gov/orders/courtorders/ 022018zor_fd9g.pdf.  Plaintiffs do not contest that those claims and forms of relief that were already dismissed by this Court and affirmed by the D.C. Circuit in *Perry Capital*—in particular, APA claims (Fairholme FAC Count I, Arrowood FAC Count I), expressly "derivative" breach of fiduciary duty claims (Class SAC Counts XI and XII), Fairholme's breach of fiduciary duty claim (Fairholme Count IV, *see supra* Section IV.C.), and all requests seeking injunctive or declaratory relief (*see* Prayers for Relief in all amended complaints)— should be dismissed.  Further, Arrowood has withdrawn its claims for money damages against FHFA Director Watt, Ind. Br. at 19 n.6, and those claims also should be dismissed without further ado.

## CONCLUSION

For the foregoing reasons, FHFA, Director Watt, and the Enterprises respectfully request the Court dismiss with prejudice all claims asserted against them in the amended complaints.

Dated:  March 23, 2018

Respectfully submitted,

/s/ Howard N. Cayne
Howard N. Cayne (D.C. Bar # 331306)
Asim Varma (D.C. Bar # 426364)
David B. Bergman (D.C. Bar # 435392)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave NW
Washington, D.C. 20001
(202) 942-5000
Howard.Cayne@arnoldporter.com
Asim.Varma@arnoldporter.com
David.Bergman@arnoldporter.com

*Attorneys for Defendant Federal Housing
Finance Agency and Director Melvin L. Watt*

s/ Michael J. Ciatti
Michael J. Ciatti  (D.C. Bar # 467177)
KING & SPALDING LLP
1700 Pennsylvania Ave. N.W.
Washington, DC 20006
Tel: (202) 626-5508
Fax: (202) 626-3737
mciatti@kslaw.com

*Attorney for the Federal Home Loan
Mortgage Corp.*

s/ Meaghan VerGow
Meaghan VerGow  (D.C. Bar # 977165)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
Tel: (202) 383-5300
Fax: (202) 383-5414
mvergow@omm.com

*Attorney for the Federal National Mortgage
Association*