**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FAIRHOLME FUNDS, INC., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> THE FEDERAL HOUSING FINANCE AGENCY, *et al.*, <br><br> Defendants. | Civil No. 13-1053 (RCL) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
FAIRHOLME PLAINTIFFS' MOTION TO COMPEL
<u>COMPLIANCE WITH SUBPOENA TO THE U.S. TREASURY</u>**

Charles J. Cooper
*Counsel of Record for Plaintiffs*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
ccooper@cooperkirk.com

*Of Counsel:*
David H. Thompson
Vincent J. Colatriano
Peter A. Patterson
Brian W. Barnes
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................... 1

BACKGROUND ............................................................................................................ 3

ARGUMENT .................................................................................................................. 6

      A.     Fairholme's Subpoena Seeks Clearly Relevant Information. .................................. 7

      B.     The Requested Discovery Will Not Subject Treasury To Undue Burden. ............ 15

CONCLUSION ............................................................................................................. 22

## TABLE OF AUTHORITIES

**Cases**                                                                                      **Page**

*Alabama Aircraft Indus., Inc. v. Boeing Co.,*
    No. 2:11-cv-03577-RDP, 2016 WL 9781825 (N.D. Ala. Feb 25, 2016)....................15, 17, 18

*\*Buzzfeed, Inc. v. U.S. Dep't of Justice*, 318 F. Supp. 3d 347
    (D.D.C. 2018) ...........................................................................................................6, 16, 19

*Chevron Corp. v. Donziger*, No. 11 Civ. 0691(LAK),
    2013 WL 1087236 (S.D.N.Y. 2013)......................................................................................17

*Cornell v. Columbus McKinnon Corp.*, 2015 WL 4747260
    (N.D. Cal. Aug. 11, 2015)......................................................................................................17

*\*Fairholme Funds, Inc. v. Federal Housing Finance Agency*,
    No. 13-1288, 2018 WL 4680197
    (D.D.C. Sept. 28, 2018) .............................................1, 7, 8, 9, 10, 11, 12, 14, 20

*\*Flatow v. The Islamic Republic of Iran*, 196 F.R.D. 203 (D.D.C. 2000),
    *rev'd in part on other grounds*, 305 F.3d 1249 (D.C. Cir. 2002) .....................................15, 16

*In re Denture Cream Prod. Liab. Litig.*, 292 F.R.D. 120 (D.D.C. 2013) ....................................6, 7

*In re Exxon Valdez*, 142 F.R.D. 380 (D.D.C. 1992) .....................................................................17

*In re First American Corp.*, 184 F.R.D. 234 (S.D.N.Y. 1998).....................................................18

*In re Micron Tech., Inc. Sec. Litigation*, 264 F.R.D. 7 (D.D.C. 2010) ...........................................6

*In re Photochromic Lens Antitrust Litigation*,
    No. 8:10-MD-2173, 2012 WL 12904391 (M.D. Fla. 2012)...................................................18

*In re Subpoenas to Folliard*, 2012 WL 907763 (D.D.C. March 6, 2012) ...................................18

*Linder v. Calero-Portocarrero*, 180 F.R.D. 168 (D.D.C. 1998) .................................................17

*Millennium TGA, Inc. v. Comcast Cable Communications LLC*,
    286 F.R.D. 8 (D.D.C. 2012).................................................................................................15

*Phillip M. Adams & Associates, L.L.C. v. Fujitsu Ltd.*,
    No. 13-cv-02188-SI, 2010 WL 1064429 (D. Utah 2010).....................................................17

*United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951) ........................................................4

*\*Watts v. Sec. Exchange Comm.*, 482 F.3d 501 (D.C. Cir. 2007) ...............................6, 17, 18, 19

*Wells Fargo Bank, N.A. v. Konover*, 259 F.R.D. 206 (D. Conn. 2009).......................................17

*Zelaya v. UNICCO Service Co.*, 682 F.Supp.2d 28 (D.D.C. 2010).................................................7

**Administrative Materials and Rules of Court**

31 C.F.R. 1.11(d)(3)...........................................................................................................................4

FED. R. CIV. P.
    26(b)(1) .........................................................................................................................6, 15
    26(b)(2)(C).................................................................................................................15, 21

**<u>Other</u>**

Dept. of Justice, FY 2018 Agency Financial Report, I-9, https://bit.ly/2XR7M59................16

Plaintiffs Fairholme Funds, Inc., et al. ("Fairholme") respectfully submit this memorandum in support of their motion, pursuant to Rule 45 of the Federal Rules of Civil Procedure, to compel compliance by the United States Department of the Treasury ("Treasury") with certain of the requests for production ("RFPs") included within the document subpoena served on Treasury on or around April 3, 2019.  (A copy of the subpoena (with supporting documentation) is attached hereto as Attachment A.)  In particular, and as described more fully below, Fairholme seeks an order compelling Treasury to produce non-privileged documents that are responsive to the following RFPs (and that were not previously produced in this or related litigation):  RFPs 1-8, 10-14, 15(a)-(d), 16-26, and 29-30.

Pursuant to Local Civil Rule 7(m), counsel for Fairholme confirm that we have discussed the issues raised by this motion with counsel for Treasury in a good faith effort to determine whether there is any opposition to the relief sought and to narrow areas of disagreement relating to Treasury's obligations in responding to the subpoena.  The parties were not able to reach agreement.  Fairholme therefore anticipates that this motion will be opposed by Treasury.

## PRELIMINARY STATEMENT

In its decision last year, this Court granted in part and denied in part Defendants' motion to dismiss.  As relevant here, the Court denied the motion to dismiss Fairholme's claim that the "Net Worth Sweep," implemented under the August 2012 Third Amendment to the Preferred Stock Purchase Agreements (the "PSPAs") between Fannie Mae and Freddie Mac (the "Companies") and Treasury, breached the Companies' obligations to Fairholme (and other private shareholders) under the implied covenant of good faith and fair dealing.  *Fairholme Funds, Inc. v. Federal Housing Finance Agency*, No. 13-1288, 2018 WL 4680197 (D.D.C. Sept. 28, 2018).  Following the Court's ruling, the parties commenced discovery, which is ongoing.  In addition to discovery targeted at the remaining Defendants (the Companies and the Federal Housing Finance Agency ("FHFA")),

1

Fairholme's discovery efforts included service of a document subpoena on Treasury.  That sub-poena sought documents that are directly relevant to both Fairholme's implied covenant claim and defenses to that claim that Defendants have indicated they intend to assert, including documents relating to issues that this Court identified in its decision as potentially relevant to that claim.

Although Treasury may no longer be a defendant in this action, it is no mere bystander in the dispute over the Net Worth Sweep.  As noted, Treasury is a party to the PSPAs.  Treasury played a direct and significant role in the adoption of the Net Worth Sweep.  And Treasury is the prime beneficiary of the Net Worth Sweep, which essentially entitles Treasury to *all* future equity distributions made by the Companies, whether in the form of dividends or liquidation payments.  In fact, Treasury has already benefited from the Net Worth Sweep to the tune of hundreds of bil-lions of dollars in dividends to which it would not have otherwise been entitled.  Furthermore, Treasury's interests are directly and substantially implicated by the relief Fairholme and other plaintiffs seek on the implied covenant claim.  If Fairholme prevails on that claim, Defendants could be liable for tens or hundreds of billions of dollars in damages, payment of which would likely reduce, by a similar amount, future dividend payments to Treasury from the Companies.

In short, Treasury was one of the architects of the Net Worth Sweep and has a direct, and massive, stake in the litigation and resolution of the implied covenant claim.  It has nevertheless decided that, with one very limited exception pertaining to a single RFP, it need not search for or produce *any* documents requested under the subpoena.[1]  It has decided effectively to excuse itself entirely from the discovery process notwithstanding Fairholme's efforts to work with it to reduce

---

[1] And, with respect to that single RFP, which Treasury chose to re-interpret narrowly, Treasury's search for responsive materials, about which it has divulged no details, conveniently yielded zero documents.

the scope of its document production obligations (as described more fully below).  And it has attempted to justify its defiance of the subpoena by invoking its non-party status and making boilerplate, conclusory, and unsupported assertions of burden.

Treasury cannot in this manner avoid its obligation to provide relevant documents in a dispute that not only raises important questions of public concern but also directly implicates its own interests.  Fairholme's subpoena (especially as limited by this motion) seeks clearly relevant information that is proportionate to the needs of this case, and Treasury cannot sustain its burden of demonstrating that compliance with the subpoena would impose upon it any undue burden.  This Court should therefore compel compliance with the subpoena.

## BACKGROUND

This Court issued its decision allowing the implied covenant claim to proceed in September 2018.  The parties subsequently negotiated a schedule for fact discovery and exchanged initial disclosures.  Fact discovery commenced near the end of 2018, and Fairholme at that time served document requests on FHFA and the Companies.  The parties then negotiated over the scope of Defendants' obligations to search for and produce responsive documents.  FHFA has recently begun producing documents pursuant to the parties' agreement, and Fairholme anticipates that the Companies will soon begin producing documents as well.

Because of the extremely high likelihood that Treasury possessed relevant materials that were not in the possession of FHFA or the Companies, on April 3 of this year, Fairholme issued a subpoena to Treasury.  That subpoena included 37 RFPs seeking documents that were for the most part created between July 2008 and January 2014.  *See* Attachment A.  Fairholme took steps in the subpoena to minimize any duplication of discovery relating to the Net Worth Sweep that had previously been undertaken by Treasury.  Thus, Fairholme made clear that it was not seeking documents previously produced in discovery in litigation concerning the Net Worth Sweep pending in

3

the U.S. Court of Federal Claims ("CFC").[2]  *Id.*  Fairholme also made clear that with respect to sixteen of the RFPs, which were similar to RFPs that Fairholme had served as part of the limited CFC discovery, it was seeking only documents that had not been reviewed in connection with the CFC discovery.  *Id.*  And, in compliance with Treasury's "*Touhy*" regulations, 31 C.F.R. 1.11(d)(3),[3] Fairholme included with the subpoena a declaration of counsel demonstrating, among other things, its need for the requested records, why its requests were reasonably tailored to seek relevant information, and why the materials sought were not reasonably available from other sources.  *See* Attachment A (Declaration of Vincent J. Colatriano).

After seeking and obtaining Fairholme's agreement to an extension of the deadline to respond to the subpoena, Treasury, acting through counsel from the Department of Justice, responded by letter dated May 10, 2019.  (A copy of the letter is attached hereto as Attachment B.) Treasury stated that it would agree to search for and produce documents responsive to only one request (RFP 19), though it also unilaterally chose to shorten the time period for which it would search for records responsive to that request.  Treasury "denie[d]" the remaining requests, meaning it flatly refused to search for records responsive to 36 of Fairholme's 37 RFPs.

The parties subsequently engaged in "meet and confer" discussions, and exchanged additional correspondence, in an attempt to resolve their dispute, or at least narrow their differences, over the subpoena.  (Copies of this correspondence are attached hereto as Attachments C-F.)  In connection with this effort, Fairholme offered to completely drop 10 RFPs and to drop part of another.  Fairholme also provided additional explanations of the relevance of the requested records

---

[2] The CFC had authorized jurisdictional discovery related to issues raised by the United States in its motion to dismiss that action.  Although FHFA, Treasury, and the Companies produced a significant volume of documents in connection with the CFC discovery, that discovery, as discussed below, was limited to certain discrete topics and specific time periods.

[3] *See United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951).

4

and made clear that it was willing to limit its remaining requests in a manner that was substantially similar to the compromise it had reached with FHFA regarding similar document requests.  *See, e.g.*, Attachment C.

By email dated June 21, 2019, Treasury completely rebuffed Fairholme's efforts at compromise.  *See* Attachment F.  Relying heavily on its non-party status and claiming that Fairholme had not shown a "particularized need" for the requested records, Treasury took the exact same position it had taken originally:  *i.e.*, a flat refusal to search for *any* records responsive to 36 of the 37 RFPs.  And as for the one request (RFP 19) with respect to which it had agreed to conduct a search (based on its own chosen time period), Treasury announced that its search had yielded no responsive documents.  *Id.*  Treasury has to date provided no details at all about its search (*e.g.*, which files it had searched, the identity of the custodians (if any) whose electronically stored information had been searched, which search terms or other search method had been employed).[4]

Although Treasury expressed a willingness to "work with" Fairholme once Fairholme identified "particular" Treasury documents from "particular time periods" that had not already been produced, it suggested that further discussions would be appropriate only after FHFA completed its entire document production and Fairholme had completed its review of that production.  *Id.*  Given the compressed discovery schedule, as well as Treasury's unreasonable position regarding its obligations under the subpoena and its refusal to alter that position in *any* respect during the course of the parties' negotiations over the past six-plus weeks, it is apparent that further efforts to resolve this dispute without the guidance of the Court would be futile.

---

[4] Fairholme has requested this information from Treasury.  Fairholme reserves the right to file an appropriate motion should Treasury not provide information demonstrating that it conducted an adequate search for materials responsive to this RFP (as construed by Treasury).

## ARGUMENT

The Federal Rules of Civil Procedure govern, and provide the standards for resolving, motions to compel compliance with subpoenas issued to non-parties, including when the subpoenant is a federal agency.  *See Watts v. Sec. Exchange Comm.*, 482 F.3d 501, 508 (D.C. Cir. 2007) (explaining that "a challenge to an agency's refusal to comply with a Rule 45 subpoena should proceed and be treated . . . as a Rule 45 motion to compel").[5]  When deciding a motion to compel, the Court must first consider whether the discovery sought is relevant to any party's claim or defense. *In re Denture Cream Prod. Liab. Litig.*, 292 F.R.D. 120, 123 (D.D.C. 2013); *see also* FED. R. CIV. P. 26(b)(1) (defining the scope of discovery).  If the requested information is relevant, the Court must then assess objections that the subpoena "call[s] for privileged matter or would cause an undue burden." *Watts*, 482 F.3d at 508.  In weighing these objections, "[t]he burden lies on the party resisting discovery to show that the documents requested are either unduly burdensome or privileged." *In re Micron Tech., Inc. Sec. Litigation*, 264 F.R.D. 7, 9 (D.D.C. 2010).  *See also Buzzfeed, Inc. v. U.S. Dep't of Justice*, 318 F. Supp. 3d 347, 356 (D.D.C. 2018).[6]

These standards weigh heavily in favor of granting this motion.  Fairholme's requests seek

---

[5] Thus, although Treasury relied heavily, in "denying" Fairholme's RFPs, on its incorrect assertion that Fairholme had failed to comply with standards set out in Treasury's *Touhy* regulation, that regulation has little if any bearing on this Court's analysis of its obligation to enforce a duly-issued subpoena.  *See id.* at 509 ("[T]hough an agency regulation may provide the method by which an agency head will comply with or oppose a subpoena, the legal basis for any opposition to the subpoena must derive from an independent source of law such as a governmental privilege or the rules of evidence or procedure.") (alteration in original) (quoting 9 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 45.05[1][b] (3d ed. 2006)).

[6] The present dispute is more concerned not with any assertions of privilege by Treasury but rather with whether Treasury can meet its burden on the burdensomeness issue.  Although Treasury has speculated that documents responsive to several RFPs may be protected by the deliberative process privilege or the attorney-client privilege, *see* Attachment  B, Treasury has not claimed that any of the RFPs call exclusively for the production of privileged information.  In addition, should the Court grant this motion, Treasury would retain the opportunity to assert privilege with respect to particular responsive documents (subject, of course, to its ability to adequately support any such privilege assertion).

information that is plainly relevant to the implied covenant claim and thus to the resolution of this multi-billion dollar dispute that directly implicates not only the parties' interests, but also Treasury's own interests and the public interest. And despite its conclusory assertions to the contrary, Treasury cannot satisfy its obligation to demonstrate that compliance with Fairholme's subpoena, especially as limited by Fairholme in its negotiations with Treasury and this motion,[7] would be unduly burdensome.

### A.   Fairholme's Subpoena Seeks Clearly Relevant Information

Rule 26(b)(1) defines the scope of discovery as including "any nonprivileged matter that is relevant to any party's claim or defense." This relevance standard is construed just as broadly when discovery is sought from nonparties as when it is sought from an opposing party. *See Denture Cream*, 292 F.R.D. at 123. Furthermore, when determining relevance, "the general rule . . . is to favor broad disclosure." *Zelaya v. UNICCO Service Co.*, 682 F.Supp.2d 28, 32 (D.D.C. 2010) (internal quotation marks omitted); *see also Denture Cream*, 292 F.R.D. at 123 ("For purposes of discovery, relevance is liberally construed.").

In denying the motion to dismiss the implied covenant claim, this Court provided critical guidance on the factual issues that are relevant to resolution of that claim. The overarching question is whether the Net Worth Sweep " 'violated the reasonable expectations of the parties,' " *Fairholme*, 2018 WL 4680197 at *7 (quoting *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 631 (D.C. Cir. 2017)), which question involves consideration of, among other things, whether the contracting party "acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected." *Id.* (citation and internal quotation marks omitted). All of the

---

[7] As noted, Fairholme is willing, for purposes of this motion, to drop more than a quarter of its requests: RFPs 9, 15(e), 27-28, and 31-37.

RFPs for which Fairholme seeks an order compelling compliance are relevant to this question, Defendants' defenses to the implied covenant claim, and/or the damages or other relief to which Fairholme would be entitled should it prevail on that claim.

The Court identified a number of subsidiary factual issues that relate directly to the analysis of the implied covenant claim. Several of those factual questions were explicitly tied to Treasury's conduct or to information in Treasury's possession. And even those questions that were not expressly linked to Treasury nevertheless implicate information in Treasury's possession, especially when one considers Treasury's critical role under the PSPAs and in the imposition of the Net Worth Sweep, and its close working relationship with FHFA in connection with matters involving the Companies and their conservatorships. All of the relevant RFPs correlate directly or indirectly to these factual issues. The questions identified by the Court include:

- ***What the Companies' private shareholders should have reasonably expected in 2008 when the Housing and Economic Recovery Act was enacted and the Companies were forced into conservatorship.*** *Fairholme*, 2018 WL 4680197 at *9. RFPs directed to this issue include the following: RFP 3 (valuation of Treasury warrants)[8]; RFP 4 (decision to leave Companies' capital structure in place during conservatorship); RFP 5 (standards for termination of conservatorships); RFP 6 (Treasury's authority to prevent termination of conservatorships); RFP 7 (FHFA's and Government's commitment to deprive shareholders of access to positive earnings); RFP 8 (policies and actions to contract Companies and reduce their role in mortgage market); RFP 10 (communications between FHFA/Treasury and the Companies about various topics, including the decision to place the Companies in conservatorship, the PSPAs, funding of Treasury dividends, the periodic commitment fee ("PCF"), FHFA's strategic plan for the conservatorships, and termination of conservatorships); RFP 11 (communications between FHFA and Treasury about the topics covered by RFP 10); RFP 12 (whether Treasury dividends were to advance taxpayer interests and/or prioritize Treasury's financial interest); RFP 18 (the PCF and related decisions); RFP 20 (the Companies' deferred tax assets and loan loss reserves); RFP 21 (decision to award Treasury warrants); RFP 22 (Treasury dividends); RFP 23 (redemption of Treasury stock and reduction of Treasury liquidation preference); RFP 26 (communications between FHFA and Treasury regarding the Companies' deferred tax assets and loan loss reserves); RFP 29 (com-

---

[8] In summarizing and paraphrasing its RFPs, Fairholme does not intend to alter their terms.

munications with shareholders regarding the conservatorships); RFP 30 (communications with shareholders regarding Companies' pre-conservatorship prospects).

- ***Whether and to what extent the Companies "receive[d] value in exchange for providing [Treasury] with enhanced disbursement rights" through the Net Worth Sweep.*** *Id.* at *10.  RFPs directed to this issue include the following:  RFP 1 (projections of the expected profitability of the Companies); RFP 2 (Treasury dividend scenarios); RFP 3 (valuation of Treasury warrants); RFP 10 (communications between FHFA/Treasury and the Companies); RFP 11 (communications between FHFA and Treasury); RFP 12 (whether Treasury dividends were to advance taxpayer interests and/or prioritize Treasury's financial interest); RFP 13 (decision to adopt the Net Worth Sweep); RFP 14 (factors considered when Net Worth Sweep was imposed and purposes of Net Worth Sweep); RFP 15 (Treasury communications with rating agencies, market analysts, and Companies' boards, lawyers, and auditors regarding the Net Worth Sweep); RFP 16 (Federal Housing Finance Oversight Board ("FHFOB," of which the Treasury Secretary is a member) communications regarding the Net Worth Sweep); RFP 17 (projections relating to the second amendment to the PSPAs); RFP 18 (the PCF and related decisions); RFP 21 (decision to award Treasury warrants); RFP 22 (Treasury dividends); RFP 23 (redemption of Treasury stock and reduction of Treasury liquidation preference); RFP 24 (meetings between FHFA and Treasury regarding PSPA amendments); RFP 25 (effect of Net Worth Sweep on Companies' profitability).

- ***Whether, when the Net Worth Sweep was imposed, "the [Companies], FHFA, and Treasury understood that the [Companies] were about to achieve sustained profitability."*** *Id.* at *11.  RFPs directed to this issue include the following:  RFP 1 (profitability projections); RFP 2 (Treasury dividend scenarios); RFP 3 (valuation of Treasury warrants); RFP 7 (commitment to deprive shareholders of access to positive earnings); RFP 8 (contraction of Companies); RFP 10 (communications between FHFA/Treasury and the Companies); RFP 11 (communications between FHFA and Treasury); RFP 12 (whether Treasury dividends were to advance taxpayer interests and/or prioritize Treasury's financial interest); RFP 13 (decision to adopt the Net Worth Sweep); RFP 14 (factors and purposes of Net Worth Sweep); RFP 15 (Treasury communications regarding the Net Worth Sweep); RFP 16 (FHFOB communications regarding the Net Worth Sweep); RFP 20 (deferred tax assets and loan loss reserves); RFP 21 (decision to award Treasury warrants); RFP 24 (meetings between FHFA and Treasury regarding PSPA amendments); RFP 25 (effect of Net Worth Sweep on Companies' profitability); RFP 26 (communications regarding deferred tax assets and loan loss reserves); RFP 29 (communications with shareholders regarding the conservatorships).

- ***Whether, when the Net Worth Sweep was imposed, "FHFA knew [that the Companies'] profitability would permit [them] to pay the 10% dividend" under the original PSPAs "without the necessity of drawing from the Treasury."*** *Id.*  RFPs directed to this issue include the following:  RFP 1 (profitability projections); RFP 2 (Treasury dividend scenarios); RFP 8 (contraction of Companies); RFP 10 (communications between FHFA/Treasury and the Companies); RFP 11 (communications between FHFA and Treasury); RFP 12 (whether Treasury dividends were to

9

advance taxpayer interests and/or prioritize Treasury's financial interest); RFP 13 (decision to adopt the Net Worth Sweep); RFP 14 (factors and purposes of Net Worth Sweep); RFP 15 (Treasury communications regarding the Net Worth Sweep); RFP 16 (FHFOB communications regarding the Net Worth Sweep); RFP 17 (second amendment projections); RFP 18 (the PCF and related decisions); RFP 20 (deferred tax assets and loan loss reserves); RFP 22 (Treasury dividends); RFP 24 (meetings between FHFA and Treasury regarding PSPA amendments); RFP 25 (effect of Net Worth Sweep on Companies' profitability); RFP 26 (communications regarding deferred tax assets and loan loss reserves).

- ***Whether the Net Worth Sweep "permitted the Treasury to reap enormous benefits in exchange for no new investment." Id.*** RFPs directed to this issue include the following:  RFP 1 (profitability projections); RFP 2 (Treasury dividend scenarios); RFP 3 (valuation of Treasury warrants); RFP 7 (commitment to deprive shareholders of access to positive earnings); RFP 10 (communications between FHFA/Treasury and the Companies); RFP 11 (communications between FHFA and Treasury); RFP 12 (whether Treasury dividends were to advance taxpayer interests and/or prioritize Treasury's financial interest); RFP 13 (decision to adopt the Net Worth Sweep); RFP 14 (factors and purposes of Net Worth Sweep); RFP 15 (Treasury communications regarding the Net Worth Sweep); RFP 16 (FHFOB communications regarding the Net Worth Sweep); RFP 17 (second amendment projections); RFP 18 (the PCF and related decisions); RFP 21 (decision to award Treasury warrants); RFP 22 (Treasury dividends); RFP 23 (redemption of Treasury stock and reduction of Treasury liquidation preference); RFP 24 (meetings between FHFA and Treasury regarding PSPA amendments).

- ***Whether Plaintiffs "could reasonably expect that the [Companies] themselves—through the FHFA—would give away all of Plaintiffs' residual rights to dividends and liquidation surplus in exchange for no investment and no meaningful consideration at a time when the [Companies] were highly profitable." Id.*** at *12. RFPs directed to this issue include the following:  RFP 1 (profitability projections); RFP 2 (Treasury dividend scenarios); RFP 3 (valuation of Treasury warrants); RFP 4 (Companies' capital structure); RFP 7 (commitment to deprive shareholders of access to positive earnings); RFP 8 (contraction of Companies); RFP 10 (communications between FHFA/Treasury and the Companies); RFP 11 (communications between FHFA and Treasury); RFP 12 (whether Treasury dividends were to advance taxpayer interests and/or prioritize Treasury's financial interest); RFP 13 (decision to adopt the Net Worth Sweep); RFP 14 (factors and purposes of Net Worth Sweep); RFP 15 (Treasury communications regarding the Net Worth Sweep); RFP 16 (FHFOB communications regarding the Net Worth Sweep); RFP 17 (second amendment projections); RFP 18 (the PCF and related decisions); RFP 20 (deferred tax assets and loan loss reserves); RFP 21 (decision to award Treasury warrants); RFP 22 (Treasury dividends); RFP 23 (redemption of Treasury stock and reduction of Treasury liquidation preference); RFP 24 (meetings between FHFA and Treasury regarding PSPA amendments); RFP 25 (effect of Net Worth Sweep on Companies' profitability); RFP 26 (communications regarding deferred tax assets and loan loss reserves).

- ***How "the events surrounding the placement of the [Companies] into conservatorship" affected "the reasonable expectations of the parties." Id.*** RFPs directed to this issue include the following: RFP 3 (valuation of Treasury warrants); RFP 4 (Companies' capital structure); RFP 5 (standards for termination of conservatorships); RFP 6 (Treasury's authority to prevent termination of conservatorships); RFP 7 (commitment to deprive shareholders of access to earnings); RFP 8 (contraction of Companies); RFP 10 (communications between FHFA/ Treasury and the Companies); RFP 11 (communications between FHFA and Treasury); RFP 20 (deferred tax assets and loan loss reserves); RFP 21 (decision to award Treasury warrants); RFP 22 (Treasury dividends); RFP 23 (redemption of Treasury stock and reduction of Treasury liquidation preference); RFP 26 (communications regarding deferred tax assets and loan loss reserves); RFP 29 (communications with shareholders regarding the conservatorships); RFP 30 (communications with shareholders regarding Companies' pre-conservatorship prospects).

- ***Whether Defendants "exercised their discretion arbitrarily or unreasonably in a way that frustrated Plaintiffs' expectations under the contract." Id.*** at *13. RFPs directed to this issue include the following: RFP 1 (profitability projections); RFP 2 (Treasury dividend scenarios); RFP 3 (valuation of Treasury warrants); RFP 4 (Companies' capital structure); RFP 7 (commitment to deprive shareholders of access to positive earnings); RFP 8 (contraction of Companies); RFP 10 (communications between FHFA/Treasury and the Companies); RFP 11 (communications between FHFA and Treasury); RFP 12 (whether Treasury dividends were to advance taxpayer interests and/or prioritize Treasury's financial interest); RFP 13 (decision to adopt the Net Worth Sweep); RFP 14 (factors and purposes of Net Worth Sweep); RFP 15 (Treasury communications regarding the Net Worth Sweep); RFP 16 (FHFOB communications regarding the Net Worth Sweep); RFP 17 (second amendment projections); RFP 18 (the PCF and related decisions); RFP 20 (deferred tax assets and loan loss reserves); RFP 21 (decision to award Treasury warrants); RFP 22 (Treasury dividends); RFP 23 (redemption of Treasury stock and reduction of Treasury liquidation preference); RFP 24 (meetings between FHFA and Treasury regarding PSPA amendments); RFP 25 (effect of Net Worth Sweep on Companies' profitability); RFP 26 (communications regarding deferred tax assets and loan loss reserves); RFP 29 (communications with shareholders regarding the conservatorships).

- ***Whether the threat of a "downward spiral" of circular dividend payments that FHFA and Treasury have pointed to as the reason for the Net Worth Sweep "was merely pretextual." Id.*** RFPs directed to this issue include the following: RFP 1 (profitability projections); RFP 2 (Treasury dividend scenarios); RFP 3 (valuation of Treasury warrants); RFP 7 (commitment to deprive shareholders of access to positive earnings); RFP 10 (communications between FHFA/Treasury and the Companies); RFP 11 (communications between FHFA and Treasury); RFP 12 (whether Treasury dividends were to advance taxpayer interests and/or prioritize Treasury's financial interest); RFP 13 (decision to adopt the Net Worth Sweep); RFP 14 (factors and purposes of Net Worth Sweep); RFP 15 (Treasury communi-

11

cations regarding the Net Worth Sweep); RFP 16 (FHFOB communications regarding the Net Worth Sweep); RFP 17 (second amendment projections); RFP 20 (deferred tax assets and loan loss reserves); RFP 21 (decision to award Treasury warrants); RFP 22 (Treasury dividends); RFP 23 (redemption of Treasury stock and reduction of Treasury liquidation preference); RFP 24 (meetings between FHFA and Treasury regarding PSPA amendments); RFP 26 (communications regarding deferred tax assets and loan loss reserves).

- ***Whether the Companies would need to draw on Treasury's funds to pay dividends, and whether the Companies could repay Treasury for its investment under the pre-Third Amendment dividend structure." Id.*** RFPs directed to this issue include the following:  RFP 1 (profitability projections); RFP 2 (Treasury dividend scenarios); RFP 3 (valuation of Treasury warrants); RFP 8 (contraction of Companies); RFP 10 (communications between FHFA/Treasury and the Companies); RFP 11 (communications between FHFA and Treasury); RFP 12 (whether Treasury dividends were to advance taxpayer interests and/or prioritize Treasury's financial interest); RFP 13 (decision to adopt the Net Worth Sweep); RFP 14 (factors and purposes of Net Worth Sweep); RFP 15 (Treasury communications regarding the Net Worth Sweep); RFP 16 (FHFOB communications regarding the Net Worth Sweep); RFP 17 (second amendment projections); RFP 20 (deferred tax assets and loan loss reserves); RFP 21 (decision to award Treasury warrants); RFP 22 (Treasury dividends); RFP 23 (redemption of Treasury stock and reduction of Treasury liquidation preference); RFP 24 (meetings between FHFA and Treasury regarding PSPA amendments); RFP 26 (communications regarding deferred tax assets and loan loss reserves).

- ***Whether private shareholders in 2008 reasonably expected the conservatorships to be temporary. Id.*** at *14.  RFPs directed to this issue include the following: RFP 1 (profitability projections); RFP 4 (Companies' capital structure); RFP 5 (standards for termination of conservatorships); RFP 6 (Treasury's authority to prevent termination of conservatorships); RFP 7 (commitment to deprive shareholders of access to positive earnings); RFP 8 (contraction of Companies); RFP 10 (communications between FHFA/Treasury and the Companies); RFP 11 (communications between FHFA and Treasury); RFP 29 (communications with shareholders regarding the conservatorships); RFP 30 (communications with shareholders regarding Companies' pre-conservatorship prospects).

In addition to its clear and direct connection to the liability questions specifically identified by this Court, the information Fairholme seeks is also directly relevant to FHFA's and the Compa-

nies' anticipated defenses to the implied covenant claim.  For example, FHFA's interrogatory responses[9] establish that FHFA intends to raise a number of defenses, including defenses premised upon (1) the amount of the periodic commitment fee ("PCF") that Treasury could have sought to charge the Companies under the PSPAs prior to the Net Worth Sweep and (2) the question of whether the Companies were expected to reduce the size of their operations such that they could not have generated sufficient earnings to pay Treasury a 10% cash dividend under the PSPAs prior to the Net Worth Sweep.  Several of the RFPs speak directly to these issues.  *See, e.g.*, RFPs 1-2 (financial projections); RFP 8, 10-11 (policies and actions taken to reduce Companies' size and role in mortgage markets, including FHFA's strategic plan for the conservatorships); RFPs 10-11, 18-19 (documents related to, *inter alia*, the PCF).[10]

Finally, information related to damages suffered by Fairholme and other plaintiffs as a result of the Net Worth Sweep, and the relief to which they may be entitled should they prevail on the implied covenant claim, are also undeniably relevant.  For example, to the extent Treasury possesses documents analyzing the effect of the Net Worth Sweep on the Companies' profitability or value, or comparing dividend scenarios with and without the Net worth Sweep, those documents speak directly to damages/remedy issues.  Fairholme was thus well within its rights to request such

---

[9] A copy of FHFA's interrogatory responses was provided to Treasury along with the subpoena and is an exhibit to the Colatriano Declaration included in Attachment A.

[10] Although Treasury agreed to search for some PCF-related documents, it chose to limit its search to only those documents responsive to RFP 19, which focused solely on documents reflecting communications with the Federal Reserve Board about the PCF.  It refused to search for any other documents related to this issue, which is shaping up to constitute one of FHFA's central defenses to the implied covenant claim.  Treasury also re-wrote the time frame governing its search for documents responsive to RFP 19, refusing to search for any documents created after August 31, 2012, which was only a few weeks after the Net Worth Sweep was imposed.  Thus, PCF-related documents created during 2013-14, a period during which the Net Worth Sweep operated to transfer more than one hundred billion dollars from the Companies directly into Treasury's coffers, were unilaterally declared off limits by Treasury.

clearly relevant information.  *See, e.g.*, RFP 25 (effect of Net Worth Sweep on Companies' profitability); RFP 2 (Treasury dividend scenarios); RFP 3 (valuation of Treasury warrants).  And because Fairholme and other plaintiffs continue to suffer from the Net Worth Sweep, documents relating to such damages/remedy issues that post-date the August 2012 implementation of the Third Amendment are also relevant.

Treasury has suggested that because the plaintiff shareholders had agreements with the Companies and/or FHFA-as-conservator rather than with it, internal Treasury documents are not relevant to the implied covenant claim.  This suggestion reflects an extremely, and inappropriately, crabbed view of relevance.  Because Treasury was a party to the PSPAs, and was a key player in the adoption of the Third Amendment to the PSPAs that allegedly resulted in the Companies' and FHFA's breach of the implied covenant, its own internal communications and analyses of issues relating to whether the imposition of the Net Worth Sweep amounted to arbitrary or unreasonable action that frustrated the fruits of the bargain between plaintiffs and the Companies/FHFA are pertinent.  And because the analysis is at least in part an objective one, focusing on the parties' "reasonable" expectations, probative documents are not limited to those detailing the contracting parties' subjective views.  Given Treasury's central role in the events at issue, and its access to much of the same non-public information about the Companies that was available to FHFA, it cannot seriously contend that its own documents assessing such information in connection with its consideration of issues relevant to the implied covenant claim are irrelevant to the objective inquiry into liability questions.  It is thus no wonder that this Court, as discussed above, identified issues relating to information *in Treasury's possession* as relevant to liability.  *See, e.g.*, *Fairholme*, 2018 WL 4680197 at *11 (discussing whether, when the Net Worth Sweep was imposed, "Treasury understood that the [Companies] were about to achieve sustained profitability").  Moreover, as noted above, Treasury analyses of issues relating to the Companies' value and profitability are relevant

14

to damages issues as well.

In short, there can be no serious debate over whether the subpoena seeks information that is relevant to the implied covenant claim and defenses to that claim.

### B.    The Requested Discovery Will Not Subject Treasury To Undue Burden.

Because the Treasury subpoena seeks relevant information, Treasury can avoid compliance only by carrying its "heavy burden to show that the subpoena should not be enforced." *Millennium TGA, Inc. v. Comcast Cable Communications LLC*, 286 F.R.D. 8, 11 (D.D.C. 2012) (citing *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 403 (D.C. Cir. 1984)).  In the circumstances of this case, Treasury must demonstrate that compliance with the subpoena would be unduly burdensome.  Treasury cannot make such a showing.

To evaluate whether requested discovery creates an undue burden, courts must consider whether the discovery sought is "unreasonably cumulative or duplicative," whether it "can be obtained from some other source that is more convenient, less burdensome, or less expensive," and whether it is "proportional to the needs of the case." *See* FED. R. CIV. P. 26(b)(1), 26(b)(2)(C).  The subpoenant cannot satisfy its burden through vague, conclusory, or unsupported assertions, but must instead provide a detailed, concrete showing that compliance with the subpoena would be unduly burdensome.  *See, e.g.*, *Flatow v. The Islamic Republic of Iran*, 196 F.R.D. 203, 207 (D.D.C. 2000) (showing of burden "must be specific"), *rev'd in part on other grounds*, 305 F.3d 1249 (D.C. Cir. 2002); *Alabama Aircraft Indus., Inc. v. Boeing Co.*, No. 2:11-cv-03577-RDP, 2016 WL 9781825, at *5 (N.D. Ala. Feb 25, 2016) (stressing "the need for specificity in a non-party's showing of 'undue burden'").

Significantly, to date Treasury has provided *nothing but* vague, conclusory, and unsupported assertions on the burden issue.  It has not provided *any* details regarding the resources and effort it would need to devote to searching for and producing responsive information.  Indeed,

there is no indication that Treasury has even seriously investigated where documents responsive to the subpoena might be found, how searches would be conducted, or how long a review of documents returned by such searches would take, much less weighed the costs of such efforts against the likely value of the information sought. Treasury's heavy reliance on conclusory assertions of burden is reason alone to grant this motion. *Cf. Flatow*, 196 F.R.D. at 208 (criticizing Treasury for failing to "properly address the question of burdensomeness").

While none of the factors informing the undue burden analysis supports Treasury's effort to completely evade compliance with the subpoena, several considerations weigh particularly heavily in favor of compelling such compliance. First, the stakes in this litigation are enormous. As discussed, the Net Worth Sweep resulted in the diversion of hundreds of billions of dollars of earnings from the Companies to Treasury. If Fairholme and the other plaintiffs prevail on the implied covenant claim, the relief awarded will almost certainly involve significant sums of money—sums likely to exceed the Department of Justice's entire annual budget.[11] The stakes in this litigation thus dwarf, by many orders of magnitude, any resources that Treasury would devote to responding to the subpoena. *Cf. Buzzfeed*, 318 F. Supp. 3d at 361 (noting that the fact that plaintiffs could seek "substantial sums in compensatory damages" favored compelling disclosure). The scope of the information sought by the subpoena is thus proportional to the needs of this case.[12]

---

[11] In Fiscal Year 2018, the Department of Justice's net cost of operations was $34.4 billion. DEPT. OF JUSTICE, FY 2018 AGENCY FINANCIAL REPORT, I-9, https://bit.ly/2XR7M59. As of the time of the filing of the amended complaint, Treasury had received $130 billion more under the Net Worth Sweep than it could have received under the prior dividend arrangement—a staggering sum that could have otherwise been used to pay back Treasury and eliminate the dividends on Treasury's stock going forward. *See Fairholme* Compl. ¶¶ 105–07 (Doc. 66-1).

[12] *Cf.* FED. R. CIV. P. 26(b)(1) (noting that the proportionality inquiry considers "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit").

16

The second consideration is directly related to the first.  Not only are the stakes of this litigation significant, they are critically important *to Treasury itself*.  The undue burden standard requires courts "to be generally sensitive to the costs imposed on third parties." *Watts*, 482 F.3d at 509.  And even if the Court were to demonstrate such sensitivity by treating Treasury as though it were a prototypical non-party bystander to the litigation, it should still conclude that enforcement of the subpoena is appropriate.  But the truth of the matter is that Treasury is by no means a disinterested bystander.  It is, for all relevant purposes, a "third party" in name only.

"[W]hether the non-party actually has an interest in the outcome of the case" is relevant to determining what discovery costs can reasonably be imposed on it.  *Linder v. Calero-Portocarrero*, 180 F.R.D. 168, 177 (D.D.C. 1998).[13]  Courts have also justified imposing weightier discovery burdens on nonparties when "the non-party was substantially involved in the underlying transaction and could have anticipated that such transaction could potentially spawn litigation or discovery," *Wells Fargo Bank, N.A. v. Konover*, 259 F.R.D. 206, 207 (D. Conn. 2009), or when the nonparty has already been "involved in litigation arising out of the same facts," *Chevron Corp. v. Donziger*, No. 11 Civ. 0691(LAK), 2013 WL 1087236, at *33 n. 261 (S.D.N.Y. 2013).[14]  All of these criteria support treating Treasury as no ordinary nonparty.

As noted, Treasury still has a substantial—indeed, huge—financial interest in this case's

---

[13] *See also Phillip M. Adams & Associates, L.L.C. v. Fujitsu Ltd.*, No. 13-cv-02188-SI, 2010 WL 1064429, at *4 (D. Utah 2010) ("Leading authorities say factors considered in determination of undue burden on a nonparty may include . . . the interest, if any of the nonparty in the final outcome of the litigation.").  *See generally In re Exxon Valdez*, 142 F.R.D. 380, 383-84 (D.D.C. 1992).

[14] *See also Cornell v. Columbus McKinnon Corp.*, 2015 WL 4747260, at *5 (N.D. Cal. Aug. 11, 2015) (Rule 45's protection "was not intended as a mechanism for entities which stand to benefit from certain litigation outcomes to evade discovery costs from their involvement in the underlying acts that gave rise to the lawsuit"); *Ala. Aircraft*, 2016 WL 9781825 at *5 (a non-party has an interest in litigation when it "has a significant, underlying connection to the case and, typically, some sort of financial or reputational stake in the litigation's outcome").

outcome.  *See In re Photochromic Lens Antitrust Litigation*, No. 8:10-MD-2173, 2012 WL

12904391, *3 (M.D. Fla. 2012) (noting, in compelling subpoena response, that while subpoenant

was "not a party in this litigation, it cannot be characterized as a disinterested third party as it owns

fifty-one (51) percent of [defendant], received dividends from [defendant], and therefore has a sub-

stantial financial interest in the lawsuit").  Moreover, Treasury also was (and is) a party to the

PSPAs, and it played a key role in the adoption and imposition of the Net Worth Sweep.  *See* Fair-

holme Compl. ¶ 86 (quoting deposition testimony of White House official who described imposi-

tion of Net Worth Sweep as "a Treasury-driven process"); *cf. Ala. Aircraft*, 2016 WL 9781825, at

*5 (collecting decisions).  As such, Treasury "should have reasonably anticipated being drawn into

subsequent litigation." *In re First American Corp.*, 184 F.R.D. 234, 242 (S.D.N.Y. 1998).  In fact,

Treasury has already been heavily involved in litigation challenging the Net Worth Sweep—de-

fending against dozens of shareholder lawsuits across the country—making the expectation that it

bear a moderate marginal discovery burden even more reasonable.  *Id.  See also In re Subpoenas to

Folliard*, 2012 WL 907763, at *3 (D.D.C. March 6, 2012) ("Where the non-party was involved in

litigation arising out of the same facts or was substantially involved in the underlying transaction,

courts have found the non-party to be interested in the outcome of the litigation.").

    Furthermore, a critical consideration animating *Watts*'s call for sensitivity to third-party

burdens in the context of subpoenas to Government agencies was the concern that "the potential

cumulative effect" of numerous subpoenas in similar litigation might "detriment . . . the smooth

functioning of government operations."  482 F.3d at 509 (citations omitted).  To mitigate this con-

cern, courts are instructed to respect the "government's interest in not being used as a speakers'

bureau for private litigants" while at the same time protecting the "litigant's right to evidence." *Id*.

Because Fairholme does not seek information regarding a purely "private" transaction or general

economic issues, but rather regarding events with respect to which Treasury was a key participant,

compelling production would not turn the Treasury into the type of "speakers' bureau" feared in *Watts*. *Cf. Buzzfeed, Inc. v. U.S. Dep't of Justice*, 318 F.Supp.3d 247, 359 (D.D.C. 2018) (granting motion to compel against government agency after finding that the subpoena would not "open the floodgates to other discovery demands" or cause a substantial cumulative effect).

A third factor weighing heavily against any claim of undue burden is the fact that FHFA has already agreed, after extensive negotiations, to a similar scope of discovery with respect to its own document productions. Fairholme has dropped a number of its RFPs to Treasury in order to better conform the scope of its requests to the type of information that FHFA has agreed to search for and produce, and it has made clear to Treasury that it stands ready and willing to continue to work with Treasury to limit its remaining requests in a manner that is substantially similar to the compromise it reached with FHFA. *See* Attachment C. It is, to say the least, difficult for a massive Government agency such as Treasury, with all the resources at its disposal, to claim undue burden stemming from document production efforts that should not meaningfully deviate from discovery that Treasury's sister agency, and contractual counter-party, has agreed to undertake.

Further reinforcing just how hollow any claim by Treasury of undue burden would ring is the fact that Treasury itself was able to produce documents on many of the same topics covered by Fairholme's subpoena in connection with the jurisdictional discovery allowed in the CFC litigation (and has no doubt already undertaken efforts, in connection with the CFC litigation, to preserve relevant documents). While Treasury may have devoted significant time and resources to those document productions, it can hardly claim, credibly, that engaging in a similar discovery effort in this case would cause it to suffer an undue burden, especially considering that the subpoena makes clear that Fairholme does not seek the reproduction of documents that were produced during the CFC discovery, and that, with respect to those RFPs (RFPs 1-16) that are similar to the discovery

19

allowed in the CFC, Fairholme does not seek documents that were reviewed during the CFC discovery (whether or not such documents were ultimately produced).

While Treasury's previous document productions therefore undercut any claim of undue burden, Treasury may use the CFC jurisdictional discovery as a shield, as it has suggested that that discovery should be sufficient for purposes of this case.  Any such suggestion ignores the fact that the discovery allowed by the CFC was expressly limited to certain topics and time frames.[15]  Indeed, in the CFC, the Department of Justice was aggressive in asserting the limited scope of these topics and timeframes to avoid producing documents or otherwise answering questions relevant to the parties' broader factual disputes. Department of Justice lawyers even went so far as to rely on the limited scope of the CFC discovery to instruct deponents not to answer questions directly relating to several relevant topics covered by the Treasury subpoena.[16]  The fact that, with respect to the topics and time frames on which the CFC allowed discovery, Treasury may have produced a relatively large number of documents does not indicate either that Fairholme does not need discovery as to other topics or time frames or that any such additional discovery would be unduly burdensome for Treasury.  Any argument to the contrary amounts to the notion that the limited CFC jurisdictional discovery turned out, retroactively, to constitute Fairholme's only opportunity for any discovery from Treasury, and foreclosed Fairholme from later conducting full merits discovery on

---

[15] Jurisdictional discovery in the CFC was limited to three topics: the Companies' "future profitability," "whether FHFA is the United States or a private party outside of the Tucker Act," and "when, and how, the conservatorship will end." Order, *Fairholme Funds, Inc. v. United States*, No. 13-465 (Fed. Cl. Feb. 26, 2014), Doc. 32. The federal government's obligation to respond to discovery requests in that case was also limited to two discrete timeframes: April 1, 2008 to December 31, 2008 and June 1, 2011 to September 30, 2012. *See* Order at 3–4, *Fairholme Funds, Inc. v. United States*, No. 13-465 (Fed. Cl. July 16, 2014), Doc. 72.

[16] Because transcripts of these depositions were designated as Protected Information under the terms of the protective order entered in the CFC litigation, we have not attached the excerpts at issue to this brief.  Should the Court desire additional information regarding instances in which Government lawyers instructed witnesses, during the CFC discovery, not to answer questions, we would be happy to file relevant excerpts under seal or to otherwise provide relevant details.

a different claim in a different action in a different court.  To state that proposition is to refute it.

Many of these same considerations demonstrate that Treasury cannot show that the discovery sought is "unreasonably cumulative or duplicative."  FED. R. CIV. P. 26(b)(2)(C).  As noted, Fairholme has taken reasonable steps to minimize duplication between the discovery it seeks from Treasury here and the Treasury's document productions during the CFC jurisdictional discovery, and it remains willing to work with Treasury to address legitimate concerns about overlap between FHFA's and its own document productions.  But Treasury's insistence that the parties defer even further discussions about the subpoena until FHFA completes its entire document production and Fairholme completes its review of that production is not a reasonable method for addressing any concerns about duplication.  Fact discovery is proceeding on a fairly compressed schedule, and FHFA's and the Companies' document productions will likely not be completed for some time.  It will take Fairholme additional time to fully review the materials that are ultimately produced.  Deferring Treasury's document searches and productions until other productions are completed will accomplish nothing except delay.  And there is very little chance that deferring Treasury's subpoena compliance will eliminate or even meaningfully reduce Treasury's discovery obligations.  Given Treasury's obvious and significant financial and programmatic interests in matters involving the Companies and the PSPAs, it is virtually certain that Treasury possesses relevant, responsive, and important information that is not in the possession of the parties.  Notably, Treasury produced important internal documents during the CFC jurisdictional discovery.[17]  These considerations, especially when coupled with the stakes of this litigation (including Treasury's own significant stake

---

[17] *See, e.g.*, UST00533645 (internal Treasury memorandum recounting conversation between Treasury Secretary Geithner and FHFA Acting Director DeMarco in which DeMarco had stated less than two months before Net Worth Sweep was adopted that "the GSEs will be generating large revenues over the coming years, thereby enabling them to pay the 10% annual dividend" without any need to change the PSPAs); UST00533618 (internal Treasury document stating that Net Worth Sweep should be announced shortly after upcoming quarterly reports from Fannie and

in those stakes) and the steps Fairholme has already taken and will continue to take to address any legitimate concerns regarding undue burden, decisively tip the balance in favor of Treasury's prompt compliance with the subpoena.

For all these reasons, Treasury cannot sustain its burden of showing why the Court should totally excuse it from participating in the important and tailored discovery sought by Fairholme.

## **CONCLUSION**

For the foregoing reasons, Fairholme respectfully requests that the Court grant this Motion to Compel.

Dated:   July 12, 2019

Respectfully submitted,

s/ Charles J. Cooper
Charles J. Cooper
*Counsel of Record for Plaintiffs*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
ccooper@cooperkirk.com

*Of Counsel:*
David H. Thompson
Vincent J. Colatriano
Peter A. Patterson
Brian W. Barnes
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)

---

Freddie because the "GSEs will report very strong earnings . . . that will be in-excess of the 10% dividend to be paid to Treasury"); UST00406545, at 2 (internal Treasury document that predicted that over time Net Worth Sweep dividends "will likely exceed the amount that would have been paid if the 10% was still in effect").