# ATTACHMENT A

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| Fairholme Funds, Inc., et al. | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.  1:13-cv-1053-RLW |
| | ) | |
| Federal Housing Finance Agency, et al. | ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                      Brent McIntosh, General Counsel, Department of Treasury

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See attached requests for production.

| Place: 1500 Pennsylvania Ave., NW., Washington, DC 20220 | Date and Time: 05/03/2019 |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:      04/03/2019

|  CLERK OF COURT | | |
|---|---|---|
| | OR | /s/ Vince Colatriano |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*  Fairholme Funds, Inc., et al. _____ , who issues or requests this subpoena, are:

Vince Colatriano, 1523 New Hampshire Ave., NW., Washington DC 20036, vcolatriano@cooperkirk.com, 202-220-9656

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   1:13-cv-1053-RLW

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)*

on *(date)*                              .

☐ I served the subpoena by delivering a copy to the named person as follows:

_____                    on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $      0.00          .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
     **(i)** is a party or a party's officer; or
     **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
     **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
     **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
     **(i)** fails to allow a reasonable time to comply;
     **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
     **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
     **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
     **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

     **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
     **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
     **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
     **(i)** expressly make the claim; and
     **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FAIRHOLME FUNDS, INC., *et al.*, | |
| Plaintiffs, | Civil No. 13-1053 (RCL) |
| v. | |
| THE FEDERAL HOUSING FINANCE AGENCY, *et al.*, | |
| Defendants. | |
| ARROWOOD INDEMNITY COMPANY, *et al.*, | |
| Plaintiffs, | Civil No. 13-1439 (RCL) |
| v. | |
| FEDERAL NATIONAL MORTGAGE ASSOCATION, *et al.*, | |
| Defendants. | |
| In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations | Miscellaneous No. 13-1288 (RCL) |
| This document related to: ALL CASES | |

## <u>FAIRHOLME PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION TO THE DEPARTMENT OF THE TREASURY</u>

Pursuant to Rules 26 and 34, the Fairholme Plaintiffs hereby propound upon the Department of the Treasury ("Treasury") the following Requests for Production. Treasury is requested to produce and/or to permit Plaintiffs to inspect and to copy each of the requested documents that might be in its possession, custody, or control, or those which are in the possession, custody, or control of its attorneys, agents, or representatives. Document

1

production should be delivered to the offices of Cooper & Kirk, PLLC, 1523 New Hampshire Ave., N.W., Washington, D.C. 20036, or at any other location to which counsel mutually agree.

## DEFINITIONS

As used herein, the following terms shall have the following meanings:

1.    "Companies" refers to the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac) collectively.

2.    "Defendants" refers to the Federal Housing Finance Agency (FHFA)  and the Companies.

3.    "Communication" means any meeting, conversation (face-to-face, telephonic, or otherwise), discussion, telex message, cable, correspondence, message, electronic mail, voice mail, exchange, provision or relay of a document, or other occurrence whereby thoughts, opinions, data, or other information are transmitted between or among more than one person, or through any photographic, mechanical, electrical or electronic device or devices for receiving, transmitting, or storing data or other information.

4.    "Document(s)" should be construed in the broadest sense permissible, and includes all "writings," "recordings," and "photographs," as those terms are defined in Rule 1001 of the Federal Rules of Evidence, as well as all "communications" as defined above. Accordingly, "document(s)" includes, but is not limited to, all written, printed, recorded or graphic matter, photographic matter, sound reproductions, electronic mail, or other retrievable data (whether recorded, taped, or coded electrostatically, electromagnetically, optically or otherwise on hard drive, diskette, compact disk, primary or backup tape, audio tape or video tape) from whatever source derived and however and by whomever prepared, produced, reproduced, disseminated or made. Without limiting the generality of the foregoing, "document(s)" includes the original and any non-identical copy and also every draft and

2

proposed draft of all correspondence, internal memoranda, notes of meetings, telegrams, telexes, facsimiles, electronic mail, reports, transcripts or notes of telephone conversations, diaries, notebooks, minutes, notes, tests, reports, analyses, studies, testimony, speeches, worksheets, maps, charts, diagrams, computer printouts, and any other writings or materials of any nature whatsoever, whether or not divulged to other parties, together with any attachments thereto and enclosures therewith. In addition, the word "document(s)" encompasses all forms and manifestations of electronically or optically coded, stored, and/or retrievable information, including but not limited to "email," "voice mail," digital images and graphics, digital or analog audiotapes and files, and digital or analog videotapes and files.

5.      "Person" means and refers to not only natural persons, but also firms, partnerships, associations, corporations, subsidiaries, divisions, departments, joint ventures, proprietorships, syndicates, trusts, groups, and organizations; federal, state, or local government or government agencies, offices, bureaus, departments, entities, including any court (or judge or other officer thereof); other legal, business, or government entities; and all subsidiaries, affiliates, divisions, departments, branches, and other units thereof or any combination thereof. "Person" includes the present and former officers, executives, partners, directors, trustees, employees, attorneys, agents, representatives, and all other persons acting or purporting to act on behalf of the person and also its subsidiaries.

6.      "PSPAs" refers to the Senior Preferred Stock Purchase Agreements under which the Department of the Treasury agreed to provide the Companies with funding in exchange for, *inter alia*, Government Stock and warrants to purchase 79.9% of the Companies' common stock.

7.      "Government Stock" refers to the Senior Preferred Stock that Treasury received from the Companies pursuant to the PSPAs.

8.      "Net Worth Sweep" refers to the provision of the Third Amendment to the

3

PSPAs that requires the Companies to pay to Treasury each quarter their entire net worth, less a small capital reserve.

9.      "Models" refers to any and all models, assumptions, data, and analyses.

10.     "Profitability" refers to any and all information relating to the Companies' financial performance, prospects, income, and liabilities, including both their profits and losses.

11.     "Projections" refers to any and all financial projections, stress tests, forecasts, and any other evaluations of the Companies' financial condition and/or profitability.

12.     The word "including" shall have its ordinary meaning and shall mean "including but not limited to" and shall not indicate limitation to the examples or items mentioned.

13.     The words or phrases "reflect," "refer," or "relate to"—or any tense or combination of those words or phrases—mean reflecting, referring to, relating to, regarding, discussing, concerning, constituting, mentioning, pertaining to, alluding to, or associated with.

14.     The singular of each word shall be construed to include its plural and vice versa, and the root word and all derivations (*i.e.*, "ing," "ed," etc.) shall be construed to include each other.

15.     The words "and" as well as "or" shall be construed both conjunctively as well as disjunctively.

16.     The word "each" shall be construed to include "every" and vice versa.

17.     The word "any" shall be construed to include "all" and vice versa.

18.     The present tense shall be construed to include the past tense and vice versa.

19.     The "knowledge," "information," "possession," "custody," and "control" of a person shall be construed to include such person's agents, representatives, and attorneys.

## INSTRUCTIONS

1.      Pursuant to Rule 26(e)(1), these Requests are continuing in nature and Treasury shall provide supplemental answers and documents, which will augment or modify any answers contained in its responses.

2.      Each Request herein constitutes a request for each document referred to or a true, complete, and legible copy thereof.

3.      Each Request seeks documents that are in any way in Treasury's possession, custody, or control from any source, wherever situated, including, but not limited to, the files, records, and documents to which Treasury has access, including all documents in the possession, custody, or control of contractors, experts, or consultants.

4.      A document is deemed to be in Treasury's "control" if Treasury or its attorneys have the right to secure the document or a copy thereof from another person or entity having actual possession of the document.

5.      If a requested document was, but no longer is, in Treasury's possession, custody, or control, Treasury shall identify the document, its current location, and the person who has possession, custody, or control of the document. If such information is unavailable, Treasury shall identify the last known location and person who had possession, custody, or control of the document and explain the reason for and circumstances under which the document left Treasury's possession, custody, or control.

6.      If any of the documents requested herein has been destroyed, Treasury shall furnish a list identifying each such document, its author and addressee, each person to whom copies of the documents were furnished or to whom the contents thereof were communicated, a summary of the substance of the document, the date (or approximate date) upon which it was destroyed, and the reason it was destroyed.

7.      If Treasury does not answer any Request or part thereof, on the basis of privilege, it shall provide with respect to each such document the following:

    a. The date of the document;

    b. The number of pages comprising the document and a description of any identifying marks or designations (*e.g.*, Bates numbers) if any, on the document;

    c. The nature of the document (letter, memorandum, spreadsheet, presentation, report, etc.);

    d. A description of the subject matter of the document;

    e. A list of all attachments or enclosures to the document;

    f. The name(s) of the author(s) and of any recipient(s) of the document;

    g. The name and address of any person who is not included in response to subpart (f) with respect to such document and who has access to or has seen, read, or heard any portion of the material in the document; and

    h. The nature of the privilege asserted.

8.      For each Request or part of a Request that Treasury refuses to answer on grounds of burdensomeness, Treasury shall explain in as much detail as possible the basis for its contention.

9.      If Treasury objects to any Request, or a portion of any Request, it must produce all documents covered by the Request, or portion of the Request, not subject to the objection. Similarly, if Treasury objects to production of a document, it must produce the parts of the document that are not subject to objection, redacting and clearly indicating the parts of the document that are subject to the objection.

10.     Treasury shall produce all documents as they are kept in the usual course of

6

business and label them to correspond to the categories in the request.

11.    Except where otherwise noted, these document requests are limited to documents created between July 1, 2008 and January 31, 2014.

12.    Requests for Production 1 through 16 seek only documents that counsel for the United States and/or FHFA did not review as part of discovery in *Fairholme Funds, Inc. v. United States*, No. 13-465 (Fed. Cl.).

13.    These document requests do not seek documents produced to the plaintiffs as part of discovery in *Fairholme Funds, Inc. v. United States*, No. 13-465 (Fed. Cl.).

## REQUESTS FOR PRODUCTION

**REQUEST NO. 1:** Any and all projections concerning the Companies and the assumptions, data, and analyses relating to those projections—

a.  Produced, reviewed, or provided to the United States in connection with the Companies' conservatorships;

b.  Prepared by Moody's Corporation, Grant Thornton, or the Companies; or

c.  Relating to the expected profitability of the Companies.

**RESPONSE:**

**REQUEST NO. 2:** Any and all documents relating to scenarios in which Treasury would have received more in some quarters or other time periods under the Net Worth Sweep than it would have received under the original terms of the PSPAs.

**RESPONSE:**

**REQUEST NO. 3:** Any and all documents relating to any valuations of Treasury's warrants to purchase the Companies' common stock.

**RESPONSE:**

7

**REQUEST NO. 4:** Any and all documents relating to the decision to leave the Companies' existing capital structure in place during conservatorship.

**RESPONSE:**

**REQUEST NO. 5:** Any and all documents relating to the standards or factors for determining when, whether, or how to terminate the conservatorships of the Companies.

**RESPONSE:**

**REQUEST NO 6:** Any and all documents relating to Treasury's authority to prevent termination of the conservatorships by withholding consent to termination of the conservatorships.

**RESPONSE:**

**REQUEST NO. 7:** Any and all documents relating to the commitment or intent of FHFA and/or the United States to ensure that existing equity holders will not have access to positive earnings from the Companies, including the development of this policy and actions taken pursuant to this policy.

**RESPONSE:**

**REQUEST NO. 8:** Any and all documents relating to development of policies and actions taken pursuant to those policies to implement the goal of contracting the size of the Companies or reducing their role in the mortgage market.

**RESPONSE:**

**REQUEST NO. 9:** Any and all documents relating to the wind up and/or wind down of the Companies.

**RESPONSE:**

8

**REQUEST NO. 10:** Any and all documents reflecting communications between FHFA and/or Treasury, on the one hand, and the Companies' board members and executives, on the other hand, relating to the following subjects: the decision to place the Companies in conservatorship, the terms of the PSPAs, amendments to the PSPAs, the practice of making draws on Treasury's funding commitment to fund dividends on Government Stock, the Periodic Commitment Fees authorized by the PSPAs, FHFA's strategic plan for the conservatorships released in February 2012, and termination of the conservatorships.

**RESPONSE:**

**REQUEST NO. 11:** Any and all documents reflecting communications between FHFA and Treasury relating to the following subjects: the decision to place the Companies in conservatorship, the terms of the PSPAs, amendments to the PSPAs, the practice of making draws on Treasury's funding commitment to fund dividends on Government Stock, the Periodic Commitment Fees authorized by the PSPAs, FHFA's strategic plan for the conservatorships released in February 2012, and termination of the conservatorships.

**RESPONSE:**

**REQUEST NO. 12:** Any and all documents relating to whether and to what extent the Companies have paid cash dividends to Treasury in order to advance the interests of taxpayers or to prioritize the financial interests of Treasury over the interests of other shareholders.

**RESPONSE:**

**REQUEST NO. 13:** Any and all documents relating to the decision to adopt the Net Worth Sweep.

**RESPONSE:**

**REQUEST NO. 14:** Any and all documents relating to the factors or considerations

taken into account when the Net Worth Sweep was imposed and the purposes of the Net Worth Sweep, such as but not limited to:

    a.  Helping to ensure the Companies' financial stability;

    b.  Fully capturing benefits for taxpayers;

    c.  Acting upon the commitment that the Companies will be wound down and not allowed to return to the market in their prior form; and

    d.  Eliminating the need for the Companies to continue to make draws on Treasury's funding commitment to pay cash dividends on the Government Stock.

**RESPONSE:**

**REQUEST NO. 15:** Any and all documents reflecting communications relating to the Net Worth Sweep between FHFA, Treasury, the Office of Management and Budget, and/or the White House and:

    a.  Fannie and Freddie Boards of Directors and Executives;

    b.  The Companies' lawyers;

    c.  The Companies' auditors;

    d.  Rating agencies or other market analysts;

    e.  Anyone who at the time of the communication was not employed by the federal government, including but not limited to Peter Wallison, Alex Pollock, and Edward Pinto.

**RESPONSE:**

**REQUEST NO. 16:** Any and all documents reflecting communications between members of the Federal Housing Finance Oversight Board (FHFA Director, Treasury Secretary, HUD

10

Secretary, and SEC Chair) or their staffs, or any other person acting at their direction, relating to the imposition of the Net Worth Sweep.

**RESPONSE:**

**REQUEST NO. 17:** Any and all projections relating to the second amendment to PSPAs.

**RESPONSE:**

**REQUEST NO. 18:** Any and all documents relating to the Periodic Commitment Fee authorized by the PSPAs, including without limitation the decision about whether to charge the Periodic Commitment Fee and the costs the Companies were expected to incur in paying the Periodic Commitment Fee.

**RESPONSE:**

**REQUEST NO. 19:** Any and all documents reflecting communications relating to the Periodic Commitment Fee between, on the one hand, Treasury, the Office of Management and Budget, and/or the White House, and, on the other hand, the Federal Reserve Board.

**RESPONSE:**

**REQUEST NO. 20:** Any and all documents relating to the Companies' deferred tax assets and the Companies' loan loss reserves.

**RESPONSE:**

**REQUEST NO. 21:** Any and all documents relating to the decision to compensate Treasury for its financial commitment by awarding it warrants to purchase 79.9% of the Companies' common stock.

**RESPONSE:**

**REQUEST NO. 22:** Any and all documents relating to Government Stock dividends, including without limitation: the circular practice of requesting draws on Treasury's funding commitment to pay cash dividends to Treasury, requests to make draws on Treasury's funding commitment, the provisions of the PSPAs that permit the Companies to add Government Stock dividends to Treasury's liquidation preference rather than paying those dividends in cash, and authorizations to declare dividends during the conservatorships pursuant to 12 C.F.R. § 1237.12.

**RESPONSE:**

**REQUEST NO. 23:** Any and all documents relating to whether and under what circumstances the Companies could redeem the Government Stock or pay down the size of the Government Stock's liquidation preference.

**RESPONSE:**

**REQUEST NO. 24:** Any and all documents prepared in anticipation of or otherwise relating to meetings between FHFA and Treasury concerning amendments to the PSPAs.

**RESPONSE:**

**REQUEST NO. 25:** Any and all documents relating to the effect of the Net Worth Sweep on the Companies' profitability.

**RESPONSE:**

**REQUEST NO. 26:** Any and all documents reflecting communications between FHFA and Treasury relating to the Companies' loan loss reserves and accounting treatment of the Companies' loan loss reserves, and the Companies' deferred tax assets and accounting treatment of the Companies' deferred tax assets.

**RESPONSE:**

**REQUEST NO. 27:** Any and all documents reflecting communications between

12

Treasury and the Justice Department relating to the Net Worth Sweep.

**RESPONSE:**

**REQUEST NO. 28:** Any and all documents relating to whether proposals to alter the structure of dividends on the Government Stock would constitute a compromise of claim.

**RESPONSE:**

**REQUEST NO. 29:** Any and all documents relating to communications with the Companies' private shareholders relating to the conservatorships, including the impact of the conservatorship on shareholder rights.

**RESPONSE:**

**REQUEST NO. 30:** Any and all documents relating to communications with the Companies' private shareholders relating to the Companies' financial prospects prior to the imposition of conservatorship on September 6, 2008.

**RESPONSE:**

**REQUEST NO. 31:** Any and all documents relating to communications between FHFA and Treasury relating to the Companies' financial condition from July 1, 2008 through September 7, 2008.

**RESPONSE:**

**REQUEST NO. 32:** Any and all documents relating to FHFA Director James Lockhart's statements in July 2008 that the Companies were adequately capitalized.

**RESPONSE:**

**REQUEST NO. 33:** Any and all documents created from July 1, 2008 through September 7, 2008 relating to communications with anyone else outside the federal government,

13

including the media, relating to the potential for placing the Companies into conservatorship.

**RESPONSE:**

**REQUEST NO. 34:** Any and all documents relating to the meeting attended by Treasury Secretary Henry Paulson at Eaton Park Capital Management on July 21, 2008.

**RESPONSE:**

**REQUEST NO. 35:** Any and all documents relating to the decision to place the Companies into conservatorship.

**RESPONSE:**

**REQUEST NO. 36:** Any and all documents relating to the negotiation of the original PSPAs.

**RESPONSE:**

**REQUEST NO. 37:** Any and all documents relating to Treasury's authority to agree to amendments to the terms of the PSPAs after December 31, 2009.

**RESPONSE:**


Date:   April 3, 2019                                      Respectfully submitted,

                                                          s/ Charles J. Cooper
                                                          Charles J. Cooper
                                                          *Counsel of Record for Plaintiffs*
                                                          COOPER & KIRK, PLLC
                                                          1523 New Hampshire Avenue, N.W.
                                                          Washington, D.C. 20036
                                                          (202) 220-9600
                                                          (202) 220-9601 (fax)
                                                          ccooper@cooperkirk.com

                                                          *Of Counsel:*
                                                          David H. Thompson
                                                          Vincent J. Colatriano

Peter A. Patterson
Brian W. Barnes
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FAIRHOLME FUNDS, INC., *et al.*,<br><br>         Plaintiffs,<br><br>    v.<br><br>THE FEDERAL HOUSING FINANCE AGENCY, *et al.*,<br><br>         Defendants. | Civil No. 13-1053 (RCL) |
| ARROWOOD INDEMNITY COMPANY, *et al.*,<br><br>         Plaintiffs,<br>    v.<br><br>FEDERAL NATIONAL MORTGAGE ASSOCATION, *et al.*,<br><br>         Defendants. | Civil No. 13-1439 (RCL) |
| In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations<br><br>_____<br><br>This document related to:<br>ALL CASES | Miscellaneous No. 13-1288 (RCL) |

## DECLARATION OF VINCENT J. COLATRIANO

I, Vincent J. Colatriano, hereby declare, based on personal knowledge as follows:

1. I am counsel for the plaintiffs in *Fairholme Funds, Inc. v. FHFA*, No. 13-1053. The Plaintiffs in this case own stock issued by Fannie Mae and Freddie Mac ("the Companies").

2. The Plaintiffs allege, among other things, that the so-called "Net Worth Sweep"—an August 2012 amendment to the Preferred Stock Purchase Agreements ("PSPAs") between the

1

Department of the Treasury and the Companies—breached the Companies' obligations to Plaintiffs under the implied covenant of good faith and fair dealing.

3.   The Net Worth Sweep entitles Treasury to all future positive earnings and liquidation preference payments made by the Companies. Plaintiffs allege that its practical effect is thus to nullify the investments of the Companies' other shareholders, including Plaintiffs.

4.   On September 28, 2018, the District Court denied the portion of a motion to dismiss filed by the Defendants that sought dismissal of Plaintiffs' implied covenant claims. The District Court's opinion is available at 2018 WL 4680197. After the District Court ruled, the parties commenced discovery.

5.   The District Court's opinion on the motion to dismiss provides guidance on the factual issues that are relevant to Plaintiffs' implied covenant claims. The relevant subjects identified by the District Court include:

   a.   What the Companies' private shareholders should have reasonably expected in 2008 when the Housing and Economic Recovery Act was enacted and the Companies were forced into conservatorship. *Id.* at *9.

   b.   Whether and to what extent the Companies "receive[d] value in exchange for providing [Treasury] with enhanced disbursement rights" through the Net Worth Sweep. *Id.* at *10.

   c.   Whether, when the Net Worth Sweep was imposed, "the [Companies], FHFA, and Treasury understood that the [Companies] were about to achieve sustained profitability." *Id.* at *11.

   d.   Whether, when the Net Worth Sweep was imposed, "FHFA knew that [the Companies'] profitability would permit [them] to pay the 10% dividend" under the

original PSPAs "without the necessity of drawing from Treasury." *Id.*

e. Whether the Net Worth Sweep "permitted Treasury to reap enormous benefits in exchange for no new investment." *Id.*

f. Whether Plaintiffs "could reasonably expect that the [Companies] themselves— through the FHFA—would give away all of Plaintiffs' residual rights to dividends and liquidation surplus in exchange for no investment and no meaningful consideration at a time when the [Companies] were highly profitable." *Id.* at *12.

g. How "the events surrounding the placement of the [Companies] into conservatorship" affected "the reasonable expectations of the parties." *Id.*

h. Whether Defendants "exercised their discretion arbitrarily or unreasonably in a way that frustrated the Plaintiffs' expectations under the contract." *Id.* at *13.

i. Whether the threat of a "downward spiral" of circular dividend payments that FHFA and Treasury have pointed to as a the reason for the Net Worth Sweep "was merely pretextual." *Id.*

j. Whether private shareholders in 2008 reasonably expected the conservatorships to be temporary. *Id.* at *14.

6. In addition to the topics identified in the District Court's opinion, interrogatory responses produced by FHFA make clear that FHFA intends to raise a number of defenses to Plaintiffs' claims that implicate additional factual issues. A copy of those interrogatory responses is attached to this declaration as Exhibit A. Issues raised by the interrogatory responses include the amount of the periodic commitment fee that Treasury could have charged the Companies under the PSPAs prior to the Net Worth Sweep and whether the Companies were expected to reduce the size of their operations such that they could not have paid Treasury a 10% cash dividend

under the PSPAs prior to the Net Worth Sweep.

7.  The requests for production being served upon Treasury concurrently with this declaration are reasonably tailored to seek evidence relevant to the foregoing topics and other relevant topics identified in the District Court's motion to dismiss decision and FHFA's interrogatory responses.

8.  The materials sought in the requests for production directed to Treasury are not reasonably available from any other source. Although Treasury is no longer a party to the DDC action, it is a party to the PSPAs and directly participated in the decision to impose the Net Worth Sweep. Plaintiffs previously obtained discovery from Treasury in related litigation in the Court of Federal Claims, but that jurisdictional discovery was limited to certain discrete topics and specific time periods. As illustrated by the foregoing discussion, the merits discovery necessary for Plaintiffs to fully pursue their implied covenant claims goes beyond those discrete topics and time periods.

9.  The discovery Plaintiffs seek from Treasury is proportionate to the needs of the case. If Plaintiffs prevail on their implied covenant claims, which have survived a motion to dismiss, the Defendants could be liable for tens or hundreds of billions of dollars in damages. Payment of those damages could reduce the future dividend payments Treasury receives from the Companies by a similar amount.  Given the stakes of the case, the seriousness of Plaintiffs' claims, and Treasury's interest in the case's outcome, the costs Treasury would incur in fully responding to Plaintiffs' requests are justified.

I declare under penalty of perjury under the law of the United States that the foregoing is true and correct.

Date:  4/3/19

Vincent J. Colatriano

# EXHIBIT A

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

FAIRHOLME FUNDS, INC., *et al.*,

       Plaintiffs,

     v.

FEDERAL HOUSING FINANCE AGENCY, *et al.*,

       Defendants.

Civil No. 13-1053 (RCL)

## OBJECTIONS AND RESPONSES TO FAIRHOLME PLAINTIFFS'
## FIRST SET OF INTERROGATORIES TO FHFA

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant Federal Housing Finance Agency ("FHFA"), by and through its undersigned counsel, hereby provides the following Objections and Responses to Fairholme Plaintiffs' First Set of Interrogatories to FHFA, in the above-captioned action.

The following responses are based upon the diligent investigation conducted by FHFA to date and represent a good-faith effort to respond to the Interrogatories. Discovery is ongoing, and FHFA reserves the right to amend, supplement, correct, or clarify its responses if it obtains other or additional information, and to interpose additional general and specific objections if warranted.

## GENERAL OBJECTIONS

FHFA objects generally to the Interrogatories on the following grounds. All responses set forth herein are subject to and without waiver of any of these General Objections:

1.    FHFA generally objects to the Interrogatories, including the Instructions and Definitions, to the extent they purport to impose any obligations on FHFA in excess of or in

conflict with those required by the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the District of Columbia ("Local Rules"), and applicable law.

2.      FHFA generally objects to the Interrogatories, including the Instructions and Definitions, to the extent the information sought is protected by the attorney-client privilege or the attorney work product doctrine, or is otherwise privileged and/or immune from discovery. Any inadvertent disclosure of information protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or protection is not intended to constitute, and should not be considered as, a waiver of such privilege or protection.

3.      FHFA generally objects to the Interrogatories as premature to the extent that they call for or require expert opinion or other development of the record.

4.      FHFA generally objects to the Interrogatories to the extent that they present issues of law.

5.      FHFA reserves all objections as to competency, relevance, materiality, privilege, or admissibility of all evidence proffered in any subsequent proceeding in, or trial of, this or any other action for any purpose whatsoever. Nothing in these Objections and Responses should be taken as an admission that: (a) FHFA accepts or admits the existence of any fact(s) set forth or assumed by the Interrogatories; or (b) documents or information responsive to any particular Interrogatory exist or are in FHFA's possession. FHFA's responses to all or any part of an Interrogatory are not intended to be, and shall not be, a waiver by FHFA of all or any part of any objection(s) to that Interrogatory.

2

## SPECIFIC OBJECTIONS AND RESPONSES

**INTERROGATORY NO. 1: Identify the reasons why FHFA believes its position should prevail concerning whether the Net Worth Sweep was arbitrary, unreasonable, or inconsistent with the reasonable expectations of the private holders of the Companies' junior preferred and common stock, and identify all evidence on which FHFA may rely to support its position.**

**ANSWER:** In addition to its General Objections, FHFA objects to Interrogatory No. 1 on the grounds that it is premature to the extent that Interrogatory No. 1 implicates (i) expert opinion and analysis that will be provided per the scheduling order, and (ii) evidence in the possession of Plaintiffs or third parties that has not yet been subject to discovery.

Subject to and without waiving the forgoing specific objection and General Objections, FHFA states the following based on the current state of its knowledge, belief, and understanding:

The PSPAs, which define the terms of Treasury's support, are necessary for the Enterprises' continued operations. Holders of Enterprise debt and mortgage-backed securities rely on this Treasury commitment. By August 2012, Treasury had infused close to $190 billion in the Enterprises and had an ongoing commitment to infuse another $258 billion, if needed, to avoid the Enterprises being placed into receivership. The Third Amendment adjusted how Treasury was compensated for the commitment. The 10% dividend plus periodic commitment fee to which Treasury was entitled was replaced with a net worth dividend and the commitment fee was suspended so long as the net worth dividend was in place. Accordingly, under the Third Amendment, if an Enterprise's net worth is negative or zero at the end of a given quarter, it pays no dividend to Treasury. If an Enterprise's net worth is positive, it pays that amount less the capital buffer. Under this variable formula, the dividend component of Treasury's compensation

turns out to be smaller in some quarters than it would have been under the prior fixed percentage, larger in others.

The Third Amendment was neither arbitrary nor unreasonable. It was publicly reported to Congress, which implicitly ratified it in the Consolidated Appropriations Act, 2016 (the "Act")[1]; it fell squarely within FHFA's statutory authority and powers, including FHFA's express statutory authority pursuant to HERA to act in the best interests of the Enterprises or the Agency; and it achieved an array of benefits.

By way of example and without limitation, the Third Amendment provided the following benefits:

- Suspended the Periodic Commitment Fee ("PCF") "for so long as" the net worth dividend was in place. The PCF was intended to "fully compensate" taxpayers for the value of Treasury support, without which the Enterprises could not continue to operate. In 2010, Congress enacted the Pay It Back Act, which earmarked payment of the PCF solely for deficit reduction purposes, implying that the PCF was anticipated to be substantial and reflecting that its suspension represented a valuable benefit for the Enterprises. *See, e.g.*, 12 U.S.C. § 1455 note (Pub. L. No. 111-203, Title XIII, § 1304(d), July 21, 2010, 124 Stat. 2134).

- Replaced a fixed $19 billion annual dividend obligation, which was historically greater than the Enterprises' annual net income, with a variable dividend capped at amounts less than the Enterprises' annual net income, even if annual net income were zero. In their August 2012 SEC filings, the Enterprises explained that, under the pre-Third Amendment

---

[1]  H.R. 2029, 114th Cong. § 702, Tit. VII, Div. O (enacted Dec. 18, 2015). In the Act, Congress expressly referenced the revisions to the PSPAs that became effective on August 17, 2012 by virtue of the Third Amendment in the "Definitions" provision of Section 702(a). Moreover, Section 702 of the Act limited Treasury's ability to dispose of its preferred shares until Jan. 1, 2018, but left Treasury's other rights intact, such as Treasury's entitlement under the Third Amendment to the net worth dividend. *Id.* § 702(b).

fixed dividend regime, they "d[id] not expect to generate net income or comprehensive

income in excess of our annual dividend obligation to Treasury over the long term." *See*

Fannie Mae, Quarterly Report (Form 10-Q), at 12 (Aug. 8, 2012), http://goo.gl/Wi664E;

Freddie Mac, Quarterly Report (Form 10-Q), at 10 (Aug. 7, 2012), http://goo.gl/2dbgey

(similar).

- Ensured that there could never be any risk that the Enterprises would be unable to pay the

    Treasury dividend from current earnings, even as there was a potential that the

    Enterprises would shrink, resulting in reduced income, thereby making the Enterprises

    more stable and secure.

- Preserved and conserved the Enterprises' assets and protected their safety and soundness

    by ensuring an ongoing financial lifeline from Treasury. *See* Statement of FHFA Acting

    Director Edward J. DeMarco, August 17, 2012 ("The steps taken today between the

    Federal Housing Finance Agency (FHFA), as conservator of Fannie Mae and Freddie

    Mac, and the U.S. Department of the Treasury to amend the Preferred Stock Purchase

    Agreements (PSPAs) are important for ensuring stability in the housing finance market").

    The Third Amendment was also consistent with the reasonable expectations of

shareholders that FHFA would operate the Enterprises within the full scope of its statutory

authority for the benefit of the Enterprises or the Agency and without attempting to accrue

capital to support dividends for private shareholders. Among the facts and circumstances that

supported and formed the reasonable expectations in August 2012 concerning the Third

Amendment are the following:

- In July 2008, Congress enacted the Housing and Economic Recovery Act of 2008

    ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654. HERA established FHFA as a new

federal agency to supervise and regulate the Enterprises and authorized the Director of

FHFA to place the Enterprises into conservatorship. 12 U.S.C. § 4617(a)(2). HERA

also granted the Secretary of the Treasury temporary authority to infuse money into the

Enterprises by purchasing Enterprise obligations and securities through December 31,

2009. Pub. L. No. 110-289 § 1117.

- On September 6, 2008, FHFA's Director appointed FHFA as Conservator of the

  Enterprises. FHFA as Conservator "immediately succeed[s] to … all rights, titles,

  powers, and privileges of the regulated entity, and of any stockholder." 12 U.S.C.

  § 4617(b)(2)(A). As Conservator, FHFA may "take any [authorized action], which the

  Agency determines is in the best interests of the [Enterprises] or the Agency." *Id.*

  § 4617(b)(2)(J).

- On September 7, 2008, the Director of FHFA issued a statement that all dividends to

  common and preferred shareholders were eliminated. Statement of FHFA Director James

  B. Lockhart at News Conference Announcing Conservatorship of Fannie Mae and Freddie

  Mac, *available at* https://www.fhfa.gov/Media/PublicAffairs/Pages/Statement-of-FHFA-

  Director-James-B--Lockhart-at-News-Conference-Annnouncing-Conservatorship-of-

  Fannie-Mae-and-Freddie-Mac.aspx ("[I]n order to conserve over $2 billion in capital every

  year, the common stock and preferred stock dividends will be eliminated").

- On September 7, 2008, FHFA as Conservator acting on behalf of the Enterprises entered

  into two materially identical Senior Preferred Stock Purchase Agreements (together

  "PSPAs") with Treasury -- one for Fannie Mae and one for Freddie Mac. The Amended

  and Restated Agreements dated September 26, 2008 and subsequent amendments are

6

available at https://www.fhfa.gov/Conservatorship/Pages/Senior-Preferred-Stock-Purchase-Agreements.aspx.

- The PSPAs were the last resort after it became apparent that no infusions of capital from the private sector were forthcoming to save the Enterprises. *See Oversight Hearing to Examine Recent Treasury and FHFA Actions Regarding the Housing GSEs Before the H. Comm. on Financial Services,* 110th Cong., at 5 (Sep. 25, 2008) (statement of James B. Lockhart III, Director, Federal Housing Finance Agency), currently *available at* https://www.fhfa.gov/Media/PublicAffairs/Pages/Statement-of-James-B-Lockhart-III-Director-FHFA-Before-The-US-Senate-Committee-on-Banking-Housing-and-Urban-Affairs.aspx. ("After substantial effort and communication with market participants, each company reported to FHFA and to Treasury that it was unable to access capital markets to bolster its capital position without Treasury financing. FHFA's and Treasury's own discussions with investment bankers and investors corroborated this conclusion."). The PSPAs provided the market with assurances that Treasury would provide a backstop to the Enterprises. *See id.* at 5-6 ("In the absence of access to new capital, the only alternative left to the firms was to cease new business and shed assets in a weak market. That would have been disastrous for the mortgage markets as mortgage rates would have continued to move higher and, in turn, disastrous for the Enterprises as the prices of their securities would have fallen and credit losses would have increased."); Timothy F. Geithner, Secretary, U.S. Dep't of the Treasury, Written Testimony Before the H. Comm. on Financial Services (Mar. 23, 2010), currently *available at* http://www.treasury.gov/press-center/press-releases/Pages/tg603.aspx ("In 2007, the GSEs reported combined losses of over $5 billion . . . The GSEs ultimately reported combined 2008 losses in excess of $108 billion. . . Both companies were severely

undercapitalized and would not have been able to meet their obligations without the intervention and financial support of the government."). Only with the PSPAs and the market assurance they provided were the Enterprises able to remain in operation.

- The PSPAs provided that the Enterprises would draw funds from Treasury against the commitment only after the Enterprises exhausted all of their stockholder equity and had a negative net worth (defined as liabilities exceeding assets). If Enterprise liabilities exceeded assets for 60 days, the provision for mandatory receivership in the HERA would be triggered. The PSPAs were designed so that the Enterprises could draw funds from Treasury in amounts necessary to cure their negative net worth and bring their capital to zero.

- The PSPAs gave Treasury an expansive bundle of rights and entitlements in exchange for the capital backstop that Treasury provided, without which the Enterprises would have been placed into receivership. The Treasury Senior Preferred Stock in each Enterprise had an initial face value of $1 billion, which increases by any amount that the Enterprises draw from Treasury under the Treasury Commitment. Further, the Treasury Senior Preferred Stock has a liquidation preference so that Treasury has priority over any other preferred or common shareholders in the event of a liquidation — that is, Treasury is entitled to the value of its Senior Preferred Stock (initial face value plus any amounts drawn from Treasury by the Enterprises, without reduction for dividends or other amounts that the Enterprises might pay to Treasury) before any other shareholders — preferred or common — are paid anything in liquidation. Treasury also received warrants to acquire 79.9% of the common stock of the Enterprises for a nominal payment.

8

- The PSPAs included provisions for payments from the Enterprises to Treasury, commensurate with the enormous risks and financial commitments that Treasury assumed. The Enterprises were to pay a 10% annual dividend together with a PCF that was "intended to fully compensate [Treasury] for the support provided by the ongoing Commitment." Amended and Restated Agreements, § 3.2(b) (Sept. 26, 2008). The PSPAs provided that the amount of the PCF to be imposed beginning January 2010 "shall be determined with reference to the market value of the Commitment as then in effect." *Id.* The PSPAs gave Treasury the right, in its sole discretion, to waive the PCF for a year at a time "based on adverse conditions in the United States mortgage market." *Id.* Treasury exercised this right to waive the PCF for 2010 and 2011, years in which the Enterprises had insufficient funds to pay even the 10% dividend, let alone an additional PCF. As the Freddie Mac 2011 10K disclosed: "(Treasury has waived the fee for all quarters of 2011 and the first quarter of 2012). Treasury has indicated that it remains committed to protecting taxpayers and ensuring that our future positive earnings are returned to taxpayers as compensation for their investment."

- The PSPAs also precluded the Enterprises from paying dividends to shareholders without Treasury's consent. In addition, the PSPAs barred the Enterprises from exiting conservatorship, other than through receivership, without Treasury's consent.

- By the end of 2008, all shareholder equity had been exhausted and the Enterprises drew on the Treasury commitment to avoid mandatory receivership. *See* FHFA Data as of November 5, 2014 on Treasury and Federal Reserve Purchase Programs for GSE & Mortgage-Related Securities at 2, currently *available at* https://www.fhfa.gov/DataTools/Downloads/Documents/Market-

Data/TSYFEDPP_NOV2014r.pdf (Freddie Mac draw of $13.8 billion for third quarter

2008; Fannie Mae draw of $15.2 billion for fourth quarter 2008). The operations of the

conservatorships and obligations of the Conservator were fully disclosed in the

Enterprises' SEC filings.

For example, the Fannie Mae 2008 10K stated:

**Management Strategy As of February 26, 2009:** Directed to provide liquidity,
stability and affordability in the mortgage market and immediately provide additional
assistance to this market and the struggling housing market, and to the extent not in
conflict with our mission, to maintain positive net worth. No longer managed with a
strategy to maximize common shareholder returns. Focus on foreclosure prevention . . .

Similarly, the Freddie Mac 2008 10-K stated:

*Conservatorship*
On September 6, 2008, the Director of the Federal Housing Finance Agency, or FHFA,
appointed FHFA as our Conservator. Upon its appointment, the Conservator immediately
succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any
stockholder, officer or director of Freddie Mac with respect to Freddie Mac and its
assets.

| Topic | Before Conservatorship | After Conservatorship |
|---|---|---|
| Managing for the Benefit of Stockholders | • Maximize common stockholder value over the long term<br>• Fulfill our mission of providing liquidity, stability and affordability to the mortgage market | • No longer managed with a strategy to maximize common stockholder returns<br>• Maintain positive net worth and fulfill our mission of providing liquidity, stability and affordability to the mortgage market<br>• Focus on returning to long-term profitability if it does not adversely affect our ability to maintain net worth or fulfill our mission or other initiatives, as directed by our Conservator |

• In May 2009, FHFA and Treasury entered the First Amended PSPA. This Amendment

increased the Treasury commitment to $200 billion for each Enterprise.

- In December 2009, FHFA and Treasury entered into the Second Amended PSPA. Under the Second Amendment to the PSPAs, Treasury was obligated to commit any amount of funds necessary to maintain the Enterprises' positive net worth through December 31, 2012, subject to an initial cap of $200 billion for each of the Enterprises plus the amount of draws between January 1, 2010 and December 31, 2012.

- In June 2010, Fannie Mae and Freddie Mac delisted their common and preferred shares on the New York Stock Exchange.

- FHFA reported to Congress in 2010 that the Enterprises' enormous losses "ha[d] exhausted the value of each company's shareholder equity" and they "operate today only with the support of taxpayers." FHFA Letter, Feb. 2, 2010, *available at* https://bit.ly/2yI2488.

- On July 21, 2010, Congress passed the Pay It Back Act, which earmarked payment of the PCF solely for deficit reduction purposes, implying that the PCF was anticipated to be substantial.  12 U.S.C. § 1455 note (Pub. L. No. 111-203, Title XIII, § 1304(d), July 21, 2010, 124 Stat. 2134).

- In November 2010, Treasury released a report which stated that "The U.S. government's investment in and support of the GSEs through the SPSPAs was structured in such a way that ensures that virtually all profits in the company revert to the government in the form of dividends on the preferred shares in Fannie Mae and Freddie Mac. Department of the Treasury, Performance and Accountability Report for Fiscal Year 2010 *available at* http://www.treasury.gov/about/organizational-structure/offices/Mgt/Documents/2010_Treasury_complete_PAR%20Nov30.pdf.

- In June 2011, FHFA reported again to Congress that "the Enterprises have depleted all of their shareholders' equity and are operating with financial support from the Treasury." FHFA further recognized that "Enterprise losses become taxpayer losses" and advised that it would direct the Enterprises operation in conservatorship to "maximize value for taxpayers." FHFA 2010 Annual Report to Congress *available at* https://www.fhfa.gov/AboutUs/Reports/ReportDocuments/2010_AnnualReportToCong ress_N508.pdf.

- In December 2011, DeMarco testified before the House Subcommittee on Oversight and Investigations that the Enterprises' equity holders claims were "subordinate" to taxpayer claims and that "[a]s a practical matter, taxpayers are not likely to be repaid in full, so Enterprise stock lower in priority is not likely to have any value." Statement of Edward J. DeMarco Before the U.S. House of Representatives Subcommittee on Oversight and Investigations *available at* https://financialservices.house.gov/media/pdf/021511demarco.pdf.

- In a February 2012 letter to Congress, Acting Director DeMarco wrote, "[I]t is clear that the draws [Fannie Mae and Freddie Mac] have taken from the Treasury are so large they cannot be repaid under any foreseeable scenarios." *See* Form 10-K for the fiscal year ended December 31, 2011 (Fannie Mae) (citing 2012 letter to Congress accompanying Strategic Plan), *available at* http://goo.gl/zwWczt.

- In February 2012, FHFA released a Strategic Plan to Congress that outlined three goals for the Fannie Mae and Freddie Mac conservatorships, one of which was to "[g]radually contract the Enterprises' dominant presence in the marketplace while simplifying and shrinking their operations." *See* A Strategic Plan for Enterprise Conservatorships: The

Next Chapter in a Story that Needs an Ending at 14, *available at*
http://www.fhfa.gov/AboutUs/Reports/Pages/A-Strategic-Plan-for-Enterprise-
Conservatorships.aspx. The contraction of the Enterprises, which was accelerated by the
shrinkage of the Enterprises' retained portfolio by the Third Amendment, would result in
lower earnings.

- By mid-2012, the amount of the annual 10% dividend had grown so large—$11.7 billion
  for Fannie Mae and $7.2 billion for Freddie Mac—that it appeared unlikely that either of
  the Enterprises would be able to pay that amount consistently from net income. *See*
  Freddie Mac, Quarterly Report (Form 10-Q) at 10, 85 (May 3, 2012), currently *available*
  *at* http://otp.investis.com/clients/us/federal_homeloan/SEC/sec-
  show.aspx?FilingId=8587328&Cik=0001026214&Type=PDF&hasPdf ("Over time, our
  dividend obligation to Treasury will increasingly drive future draws. Although we may
  experience period-to-period variability in earnings and comprehensive income, it is
  unlikely that we will generate net income or comprehensive income in excess of our
  annual dividends payable to Treasury over the long term."); Freddie Mac, Quarterly
  Report (Form 10-Q) at 10, 92 (Aug. 7, 2012), currently *available at*
  http://otp.investis.com/clients/us/federal_homeloan/SEC/sec-
  show.aspx?FilingId=8754131&Cik=0001026214&Type=PDF&hasPdf=1 (same); Fannie
  Mae, Quarterly Report (Form 10-Q) at 11, 81 (May 9, 2012), currently *available at*
  http://www.fanniemae.com/resources/file/ir/pdf/quarterly-annual-
  results/2012/q12012.pdf (same); Fannie Mae, Quarterly Report (Form 10-Q) at 12-13, 83
  (Aug. 8, 2012), currently *available at*

http://www.fanniemae.com/resources/file/ir/pdf/quarterly-annual-results/2012/q22012.pdf (same).

- On August 8, 2012, the week before the Third Amendment passed, Fannie's Chief Financial Officer, Susan McFarland publicly stated "It's hard for me to envision that we would be able to make enough every single quarter to cover the [10%] dividend payment." Nick Timiraos, Wall Street Journal, Fannie Mae Posts Profit as Home Prices Rise, Updated Aug. 8, 2012 6:23 p.m. ET, *available at* https://www.wsj.com/articles/SB10000872396390443991704577576913741014248.

Accordingly, by August 2012, the parties' expectations incorporated and reflected, among other things: (i) HERA, including its preemption of fiduciary duties and express authorization for FHFA to act in the interests of the Enterprises or the Agency; (ii) the facts that shareholder equity was exhausted long before the Third Amendment, and the Enterprises were operating solely due to the Treasury commitment; (iii) the fact that the original Treasury agreements were designed to ensure any Enterprise profits would revert to Treasury; (iv) the fact that Treasury was entitled to a substantial PCF to fully compensate taxpayers for the value of the unprecedented and irreplaceable Treasury guarantee that saved the Enterprises from receivership; (v) the fact that the Enterprises were in conservatorships, with dividends to private shareholders eliminated and subject to approval of Treasury; (vi) the fact that the Enterprises were not being managed to maximize shareholder value; (vii) the fact that Treasury's liquidation preference, to which common and preferred shareholders' liquidation preferences were subordinate, was $189 billion; and (viii) the fact that in order for the dividends to private shareholders to even be considered the Enterprises would, after paying dividends and the PCF to Treasury, have to be adequately capitalized. As a result of these facts, the Enterprises' shares were rendered virtually

14

worthless before the Third Amendment, with no prospect that private shareholders would ever receive dividends, and the Third Amendment was consistent with shareholder expectations that Treasury would have access to future earnings of the Enterprises.

In addition to the documents cited above, FHFA will rely on witness testimony, public documents, expert witness testimony and documents that may be produced by plaintiffs and defendants. This evidence will be identified at the appropriate time pursuant to the scheduling order.

**INTERROGATORY NO. 2: Identify the reasons why FHFA believes its position should prevail concerning the proper measure of Plaintiffs' restitution, expectancy, and/or reliance damages, and identify all evidence on which FHFA may rely to support its position.**

**ANSWER:** In addition to its General Objections, FHFA objects to Interrogatory No. 2 as premature to the extent that it raises matters of expert opinion and analysis, which FHFA will disclose at the appropriate time pursuant to the scheduling order, and because Plaintiffs have not yet fully disclosed their purported entitlement to restitution, expectancy, and/or reliance damages. FHFA further objects to this interrogatory as vague and ambiguous as it does not define what is meant by "restitution, expectancy and/or reliance damages" in the context of this matter. FHFA also objects that Interrogatory No. 2 raises issues of law that are not an appropriate subject for interrogatories.

Subject to and without waiving the forgoing specific objections and General Objections, FHFA responds that no damages or other award to Plaintiffs is appropriate or legally permissible in this action and therefore the "proper measure" is by definition zero. See response to Interrogatory No. 1.

**INTERROGATORY NO. 3:** Identify FHFA's position concerning the proper amount of the Periodic Commitment Fee authorized by the PSPAs for every year from 2012 to the present, and identify the reasons why FHFA believes its position should prevail and all evidence on which FHFA may rely to support its position.

**ANSWER:** In addition to its General Objections, FHFA objects to Interrogatory No. 3 to the extent that it is properly the subject of expert testimony. FHFA will respond to this Interrogatory at the appropriate time through expert disclosures.

Subject to and without waiving the forgoing specific objections and General Objections, FHFA states that the PSPAs did not authorize the Periodic Commitment Fee from 2012 to the present. The Periodic Commitment Fee has been suspended for so long as the net worth dividend has been in place. To the extent this Interrogatory is asking for FHFA's position concerning what the amount of the PCF would have been absent the Third Amendment, it is a matter for expert testimony.

**INTERROGATORY NO. 4:** Identify each and every person on whose testimony FHFA may rely and separately describe the substance of each such person's testimony.

**ANSWER:** In addition to the foregoing General Objections, FHFA objects to Interrogatory No. 4 as premature at this stage of the case, in that the parties are in the early stages of discovery and the deadlines to identify fact and expert witnesses have not arrived. FHFA further objects on the basis that Interrogatory No. 4 is overly broad and unduly burdensome, seeks information that is protected by the attorney work product doctrine, and seeks information beyond what is required under the Federal Rules of Civil Procedure.

Subject to and without waiving the foregoing specific objections and General Objections, FHFA refers to and incorporates its Initial Disclosures (served November 5, 2018) and any supplements thereto, which identify the persons FHFA knows to have discoverable information—along with the subjects of that information—that FHFA may use to support its defenses, unless solely for impeachment.

FHFA further states that it may rely upon the testimony Edward DeMarco, who—in addition to the subjects identified in the Initial Disclosures—may, among other things, testify about the matters addressed in his deposition taken on May 7, 2015 in the CFC Litigation.  Mr. DeMarco will provide testimony demonstrating that the Third Amendment was neither arbitrary nor unreasonable and was consistent with the reasonable expectations of shareholders for the reasons described in FHFA's response to Interrogatory No. 1.  Mr. DeMarco may also testify concerning (a) the negotiations that led to the Third Amendment; (b) the reasons FHFA executed the Third Amendment; (c) FHFA's 2012 Strategic Plan; (d) Treasury's entitlements under the pre-Third Amendment PSPAs, including to a periodic commitment fee, dividends, and a liquidation preference; and (e) the payment of dividends by Fannie Mae and Freddie Mac and the decision to suspend dividend payments to non-Treasury shareholders.

FHFA further states that it may rely upon the testimony Mario Ugoletti, who—in addition to the subjects identified in the Initial Disclosures—may, among other things, testify about the matters addressed in his deposition taken on May 15, 2015 in the CFC Litigation.  Mr. Ugoletti will provide testimony demonstrating that the Third Amendment was neither arbitrary nor unreasonable and was consistent with the reasonable expectations of shareholders, for the reasons described in FHFA's response to Interrogatory No. 1.  Mr. Ugoletti may also testify concerning (a) the negotiations that led to the Third Amendment; (b) the reasons FHFA executed

the Third Amendment; (c) FHFA's 2012 Strategic Plan; (d) Treasury's entitlements under the

pre-Third Amendment PSPAs, including to a periodic commitment fee, dividends, and a

liquidation preference; and (e) the payment of dividends by Fannie Mae and Freddie Mac and the

decision to suspend dividend payments to non-Treasury shareholders.

Dated: January 30, 2019                         Respectfully submitted,

                                                /s/ Howard N. Cayne
                                                Howard N. Cayne (D.C. Bar # 331306)
                                                Asim Varma (D.C. Bar # 426364)
                                                David B. Bergman (D.C. Bar # 435392)
                                                ARNOLD & PORTER KAYE SCHOLER LLP
                                                601 Massachusetts Ave NW
                                                Washington, D.C. 20001
                                                (202) 942-5000
                                                Howard.Cayne@arnoldporter.com
                                                Asim.Varma@arnoldporter.com
                                                David.Bergman@arnoldporter.com

                                                *Attorneys for Defendant Federal Housing Finance Agency*

VERIFICATION

I, Christopher H. Dickerson, am Special Supervision Advisor to the Federal Housing Finance Agency. I am the agent of the Federal Housing Finance Agency for the purpose of answering Fairholme Plaintiffs' First Set of Interrogatories. I have read the foregoing interrogatories and the answers to those interrogatories, which are true according to the best of my knowledge, information, and belief. I declare under penalty of perjury that the foregoing is true and correct.

Dated this 31ST day of JANUARY . 2019.

Christopher H. Dickerson