# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FAIRHOLME FUNDS, INC., *et al.*,<br><br>                Plaintiffs,<br><br>     v.<br><br>THE FEDERAL HOUSING FINANCE<br>AGENCY, *et al.*,<br><br>                Defendants. | Civil No. 13-1053 (RCL) |

## FAIRHOLME PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO COMPEL COMPLIANCE WITH SUBPOENA TO THE U.S. TREASURY

Dated:   August 16, 2019

Respectfully submitted,

Charles J. Cooper
*Counsel of Record for Plaintiffs*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
ccooper@cooperkirk.com

*Of Counsel:*
David H. Thompson
Vincent J. Colatriano
Peter A. Patterson
Brian W. Barnes
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ....................................................................................................ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 4

      A.      Fairholme's Subpoena Seeks Clearly Relevant Information. ................................... 4

      B.      The Requested Discovery Will Not Subject Treasury To Undue Burden. ............... 9

CONCLUSION .................................................................................................................. 18

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                                                                  <u>Page</u>

*Alabama Aircraft Indus., Inc. v. Boeing Co.*,
    No. 2:11-cv-03577-RDP, 2016 WL 9781825 (N.D. Ala. Feb 25, 2016)................................. 15

*\*Fairholme Funds, Inc. v. Federal Housing Finance Agency*,
    No. 13-1288, 2018 WL 4680197 (D.D.C. Sept. 28, 2018) ..................................... 4, 6

*Flatow v. The Islamic Republic of Iran*, 196 F.R.D. 203 (D.D.C. 2000),
    *rev'd in part on other grounds*, 305 F.3d 1249 (D.C. Cir. 2002) ...................................... 14, 15

*In re Photochromic Lens Antitrust Litigation*, No. 8:10-MD-2173,
    2012 WL 12904391 (M.D. Fla. 2012) ....................................................................... 16

*In re Subpoenas to Intel Corporation*, No. 4:17-mc-80159-KAW,
    2018 WL 1035794 (N.D. Cal. Feb. 23, 2018) .......................................................... 17

*Millennium TGA, Inc. v. Comcast Cable Communications LLC*,
    286 F.R.D. 8 (D.D.C. 2012) ................................................................................. 9

*Phillip M. Adams & Associates, L.L.C. v. Fujitsu Ltd.*, No. 13-cv-02188-SI,
    2010 WL 1064429 (D. Utah 2010) ........................................................................ 16

*Swase v. West Valley City*, No. 2:13-cv-768 DN, 2015 WL 7756094
    (D. Utah Dec. 1, 2015) ........................................................................................ 17

<u>Rules</u>

Fed. R. Civ. P.
    26(b)(1) .............................................................................................................. 16, 17
    26(b)(2)(C) ............................................................................................................ 13

# INTRODUCTION[1]

In seeking to avoid having to produce even a single document in response to the document subpoena served upon it by Plaintiffs Fairholme Funds, Inc., et al. ("Fairholme"), the U.S. Department of the Treasury ("Treasury") makes a number of bogus legal arguments and demonstrably inaccurate factual assertions. But perhaps what is most notable about Treasury's opposition to Fairholme's motion to compel is what Treasury *doesn't* say.

Among the points that Treasury fails to dispute, and thus (mostly by silence but in a few instances expressly) concedes, are the following: (1) Treasury was a principal party to the Preferred Stock Purchase Agreements (the "PSPAs"), the third amendment to which (the Net Worth Sweep) is the central focus of Fairholme's claim for breach of the implied covenant of good faith and fair dealing; (2) Treasury had a direct and significant role in the adoption of the Net Worth Sweep; (3) Treasury was the prime beneficiary of the Net Worth Sweep, which essentially entitles Treasury to all future equity distributions by Fannie Mae and Freddie Mac (the "Companies"); (4) Treasury has already benefited enormously from the Net Worth Sweep, as it has been paid hundreds of billions of dollars in dividends to which it would not have otherwise been entitled; (5) Treasury's interests (both financial and otherwise) are directly and significantly implicated by the relief Fairholme and other plaintiffs seek on the implied covenant claim; (6) the issues raised in this litigation implicate important questions of concern not just to the litigating parties, but to the U.S. Government and the public at large; (7) for many of the above reasons, Treasury undoubtedly has information in its possession that relates directly to the adoption, implementation, and effects

---

[1] We cite herein to our Memorandum of Points and Authorities in Support of Fairholme Plaintiffs' Motion to Compel Compliance with Subpoena to the U.S. Treasury (Doc. 103-1) as "Motion" or "Mot.," and to Treasury's Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion to Compel Third-Party Discovery (Doc. 106) as "Opposition" or "Opp."

of the Net Worth Sweep; (8) this Court, in allowing the implied covenant claim to proceed, specifi-
cally discussed issues relating to Treasury's conduct, knowledge, and financial interests; and (9)
the stakes in this litigation are enormous, and dwarf even the highest conceivable estimates of the
resources that Treasury might need to devote to responding to Fairholme's subpoena.

Given all of these undisputed, and indisputable, facts, one would think that Treasury would
recognize its obligation, even as a non-litigant in the current proceedings, to at least work in a
meaningful way to determine whether it possesses materials that are responsive to the valid sub-
poena served upon it.  But Treasury has flatly refused to do so.  Its position continues to be that it
need not undertake *any* efforts to search for and produce documents responsive to the requests for
production ("RFPs") that are the subject of this Motion.  It attempts to support its untenable posi-
tion with assertions about the relevance of the requested information, and the burden supposedly
imposed by those requests, that do not withstand serious scrutiny.

We have demonstrated that the subpoena seeks materials that are clearly relevant to the is-
sues raised by the implied covenant claim.  Indeed, we specifically tied each of the RFPs to issues
that this Court has identified, *at times with direct references to Treasury itself*, as implicated in the
analysis of that claim.  *See* Mot. at 8-12.  Treasury all but ignores its own starring role in matters
concerning the Net Worth Sweep, as well as this Court's guidance concerning the issues that need
to be explored in the implied covenant analysis, and instead basically contents itself with making
the unremarkable point that the implied covenant claim runs against the Companies and the Fed-
eral Housing Finance Agency ("FHFA") rather than it.  But this argument is a non sequitur:  it
does not follow from the fact that Treasury is not a *defendant* on the implied covenant claim either
that it had no involvement in the relevant events underlying that claim, or that it has no infor-
mation in its possession that are pertinent to the analysis and resolution of that claim.  Because
Treasury played a central role in the events at issue in this litigation, and because Fairholme seeks

2

materials that relate directly to matters that are central to the merits of the implied covenant claim, Fairholme easily carries its burden of demonstrating the relevance of the documents sought.

Treasury's arguments regarding undue burden fare no better.  It relies heavily on its contention, which it repeats again and again, that Fairholme has failed to take steps to mitigate Treasury's burden or to account for the discovery that took place in related litigation in the Court of Federal Claims ("CFC").  But this contention, in addition to glossing over the fact that the CFC discovery was (as stressed on numerous occasions *by the Government*) limited in scope, is also false, as Fairholme's subpoena emphasizes that Fairholme does not seek to duplicate the CFC discovery, and Fairholme has made clear that it was willing to work with Treasury to address any legitimate burden concerns.  Treasury also relies heavily on conclusory assertions regarding the effort it would take to search for and produce responsive materials, assertions that are entitled to little if any weight since Treasury has refused to even engage with Fairholme on topics, such as the identification of custodians and search terms, that would allow the parties to better gauge the resources which Treasury might actually need to devote to responding to the subpoena.

But even if Treasury's assertions regarding burden were taken at face value, they do not come close to establishing that complying with Fairholme's subpoena would impose on it an *undue* burden, especially considering the stakes of this litigation to the parties, to the public, *and to Treasury itself*.  Significantly, when confronted with this undisputed fact, Treasury chooses to bury its head in the sand, suggesting that its multi-billion dollar interest in the litigation should play no role in the assessment of whether the subpoena subjects it to a burden that is "undue."  That it is perhaps understandable that Treasury wants the Court to ignore its significant interest in this litigation does not make Treasury's position legally or logically correct.

## ARGUMENT

### A.      Fairholme's Subpoena Seeks Clearly Relevant Information

Treasury does not dispute that relevance is defined expansively under Rule 26, and that that broad relevance standard fully applies to third party discovery.  *See* Mot. at 7.  In our Motion, we demonstrated how Fairholme's RFPs seek information that is relevant to the merits of the implied covenant claim and to asserted defenses to that claim.  *Id.* at 7-14.  We did this, in large part, by addressing the very issues that this Court identified, in its 2018 ruling on Defendants' motion to dismiss, as pertinent to the consideration and resolution of the implied covenant claim, and show-ing how each of our RFPs seeks information directly concerning one or more of those issues.  *Id.* at 8-12.  And we noted that several of the factual questions identified by the Court as relevant to the implied covenant analysis were *explicitly* tied to Treasury's conduct or to information in Treas-ury's possession.  *Id.  See, e.g., Fairholme Funds, Inc. v. Federal Housing Finance Agency*, No. 13-1288, 2018 WL 4680197, at *11 (D.D.C. Sept. 28, 2018) (whether "at the time the Third Amendment was enacted, the [Companies], FHFA, and ***Treasury*** understood that the [Companies] were about to achieve sustained profitability") (emphasis added); *id.* (whether "the Third Amend-ment permitted ***the Treasury*** to reap enormous benefits in exchange for no new investment") (em-phasis added); *id.* at *10 (whether the Companies "receive[d] value in exchange for providing sen-ior shareholders [in this case, ***Treasury***], with enhanced disbursement rights").

Treasury has no answer to this detailed discussion connecting our requests to the issues identified by this Court.  In fact, Treasury does not even see fit to address, in its relevance argu-ment, *any* of Fairholme's actual RFPs, let alone attempt to show why any particular RFP is not rea-sonably tailored to seek information pertaining to the issues identified by the Court.  Rather than address this Court's own detailed analysis of the implied covenant claim, Treasury simply asserts,

with little explanation, that our reading of the Court's opinion "is overstated." Opp. at 15. Treasury's failure to seriously grapple with this Court's own analysis of the issues and questions raised by the implied covenant claim speaks volumes about its superficial approach to relevance.

Treasury's primary relevance argument is that "[b]ecause Treasury is not a party to the contract between Plaintiffs and the [Companies], and therefore has no contractual duty to Plaintiffs, Treasury's conduct is inherently irrelevant to Plaintiffs' [implied covenant] claim." Opp. at 14. Treasury's conclusion simply does not logically follow from its premise. The fact that Treasury is not a party to the contract between the Companies and their private shareholders explains why Treasury is not a *defendant* with respect to the implied covenant claim. But that fact hardly establishes that Treasury's "conduct" with respect to the Net Worth Sweep—the event that constitutes the alleged breach of the implied covenant—is "inherently irrelevant" to Fairholme's claim, much less that information in Treasury's possession about the adoption, implementation, and effects of the Net Worth Sweep is "inherently irrelevant." Treasury's argument, taken to its logical conclusion, would mean that third party discovery would almost be never appropriate; after all, third parties rarely themselves face liability on the claims raised in the actions in which discovery from them is sought.

Regardless of whether Treasury itself faces direct liability for the Net Worth Sweep, it was a party to the PSPAs and was a central participant in the events leading to the adoption of the Third Amendment to the PSPAs. Far from a passive bystander, Treasury was a principal architect, and prime beneficiary, of the Net Worth Sweep, and worked closely with FHFA on issues relating to the Companies and the PSPAs. *See* Mot. at 8. Indeed, Treasury was a central participant in the initial adoption of the PSPAs themselves, which put it in a position to work on other issues that are directly implicated in the analysis of the implied covenant claim. For example, under the original PSPAs, Treasury received stock warrants that would allow it to share in the future profitability of

5

the Companies, but only after junior preferred shareholders and together with other common share-holders.  Treasury documents relating to the origin of this feature of the PSPAs would undoubtedly reveal information relevant to the question of shareholder expectations.  And, as discussed below, Treasury also had a direct role in decision-making concerning the implementation of provisions in the PSPAs concerning the so-called periodic commitment fee, which has become a significant aspect of the Defendants' anticipated defenses to the implied covenant claim. Treasury's direct involvement in matters involving the Companies, the PSPAs, FHFA's interactions with the Companies, and especially the Net Worth Sweep thus confirms that it is extremely likely that Treasury possesses documents that relate directly to the central questions of whether the Net Worth Sweep "violated the reasonable expectations of the parties" and whether Defendants "acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that [Plaintiffs] reasonably expected." *Fairholme*, 2018 WL 4680197 at \*7 (citations omitted).

Contrary to Treasury's argument, Opp. at 16, the fact that the analysis of the implied covenant claim is in part an objective inquiry supports Fairholme's position.  *See* Mot. at 14.  Treasury was not some neutral distant observer of the Companies and the FHFA whose views would be unlikely to be probative of any assessment of the reasonable expectations of the parties.  Rather, as noted, Treasury was a key participant in the formulation, adoption, and implementation of the Net Worth Sweep, it took a keen interest in matters concerning the financial health and prospects of the Companies while they were under conservatorship and operating under the PSPAs to which it was a party, it worked closely with the FHFA on matters involving the Companies and the PSPAs, and it was privy to much if not all of the same non-public information about the Companies' financial condition and prospects that was available to FHFA at all relevant times.  In light of these facts, none of which are in serious dispute, there can be little doubt that responsive Treasury documents,

6

including its internal communications and analyses, are relevant to any analysis of whether the imposition of the Net Worth Sweep amounted to objectively arbitrary or unreasonable action that frustrated the fruits of the bargain between plaintiffs and the Companies/FHFA.

Notably, none of the decisions cited by Treasury that discuss the implied covenant of good faith and fair dealing address issues concerning the scope of discovery on claims alleging the breach of the implied covenant.[2]  None of these decisions hold, or can even be read to hint, that a third party who helps orchestrate the conduct or transaction that is alleged to breach the implied covenant, and who benefits substantially from that breach, is immune from discovery simply by virtue of the fact that the third party does not itself owe a duty of good faith and fair dealing.  They certainly cannot be read to suggest that information in the possession of such a third party regarding that conduct/transaction or its effects is "inherently irrelevant."

The relevance of the Treasury materials sought by Fairholme is also confirmed by those Treasury documents that have already been produced in the CFC litigation, several of which were discussed in the Motion.  *See* Mot. at 21-22 n.17.  As it does elsewhere, Treasury refuses to engage with this argument on anything other than a superficial level.  Its only response is that the CFC litigation involved different claims, and that the Government is a party to that litigation.  Opp. at 15. As discussed, Treasury's status as a litigant or non-litigant has little if any bearing on the relevance analysis.  And the fact that the CFC litigation involves different causes of action and legal theories overlooks the clear connection between the produced Treasury documents and the issues and questions implicated by the implied covenant claim.  Those documents include, for example, internal

---

[2] *See* Opp. at 13-14, 16 (discussing *Evans v. GEICO Gen. Ins. Co.*, 2015 WL 137269 (E.D. Va. Jan. 9, 2015); *Boulden v. Albiorix, Inc.*, 2013 WL 396254 (Del. Ch. Jan. 31, 2013); *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434 (Del. 2005); *The Chemours Co. TT, LLC v. ATI Titanium LLC*, 2016 WL 4054936 (Del. July 27, 2016); and *Gloucester Holding Corp. v. U.S. Tape & Sticky Prods., LLC*, 832 A.2d 116 (Del. Ch. 2003)).

Treasury documents, including memoranda recounting conversations between senior officials at Treasury and the FHFA, discussing the Companies' earnings prospects, their ability to pay dividends to Treasury under the pre-Net Worth Sweep PSPAs, and the expected impact of the Net Worth Sweep on future dividends to be paid to Treasury.  Mot. at 21-22 n.17 (discussing UST00533645, UST00533618, UST00406545).  These are some of the very issues identified by this Court as pertinent to the resolution of the implied covenant claim.  Indeed, the Complaint repeatedly and expressly references internal Treasury documents when making the detailed factual allegations that this Court concluded were sufficient to allege a claim for breach of the implied covenant.  *See, e.g.*, Compl. ¶¶ 41, 42, 55, 70, 92, 102.  Given Treasury's central role in events pertaining to the Net Worth Sweep, its status as the prime beneficiary of the Net Worth Sweep, and its close working relationship with FHFA, there is little doubt that the additional discovery sought by Fairholme from Treasury will yield more relevant information.

Finally, Treasury acknowledges that a number of the RFPs at issue seek information pertaining to defenses raised against the implied covenant claim and/or to damages issues.  Opp. at 17.  For example, as we've noted, Mot. at 13, at least four of the requests (RFPs 10-11, 18-19) seek documents concerning the determination of the periodic commitment fee ("PCF") that, under the terms of the PSPAs, Treasury could have sought to charge the Companies in appropriate circumstances.  Treasury does not even attempt to challenge these RFPs on relevance grounds, but instead tries to change the subject by referring to the same non-relevance objections it raises with respect to other RFPs, which we address below.  *Id.*  Treasury is therefore left with the hollow complaint that "only a handful" of RFPs seek documents relating to defenses and damages, as though that fact somehow excuses Treasury from responding to these clearly relevant requests.  *Id.*  (We note, in any event, that far from a handful, Fairholme identified eight such RFPs (Mot. at 13-14)).  Thus, even if the Court credits Treasury's relevance arguments concerning the remaining RFPs—which

8

it should not—the relevance of these RFPs is unchallenged.[3]

## B.   The Requested Discovery Will Not Subject Treasury To Undue Burden

Because the Treasury subpoena seeks relevant information, Treasury can avoid compliance only by carrying its "heavy burden to show that the subpoena should not be enforced." *Millennium TGA, Inc. v. Comcast Cable Communications LLC*, 286 F.R.D. 8, 11 (D.D.C. 2012) (citing *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 403 (D.C. Cir. 1984)).  It attempts to do so by arguing that complying with the subpoena would impose an undue burden.  Opp. at 17-25.  Because its arguments are premised on conclusory, unsupported, and misleading factual assertions and on a misreading of legal principles and precedents, Treasury does not come close to discharging its "heavy burden."

1.     While Treasury makes a number of arguments with respect to burden, they are all built upon the same foundation:  Treasury's contention that Fairholme has made absolutely no attempt generally to mitigate the burden of subpoena compliance, and that Fairholme has specifically refused to account for the limited discovery that took place in the CFC litigation.  Treasury is so fond of this point that it repeats it over and over and over again.[4]  But repetition does not make

---

[3] Treasury did agree to search for some PCF-related documents responsive to one of these requests (RFP 19), though it later reported that its narrow, date-restricted search yielded no documents.  Mot. at 13 n.10.  Treasury has never explained why it chose to treat RFP 19 differently from the other RFPs seeking information concerning the PCF.  In any event, its agreement to conduct at least a superficial search for records responsive to RFP 19 further confirms the relevance of materials relating to the PCF, which is likely to become one of FHFA's central defenses to the implied covenant claim.

[4] *See, e.g.,* Opp. at 2 ("Plaintiffs have taken *no* steps to mitigate or even acknowledge the obvious burden their discovery requests impose on Treasury") (emphasis in original); *id.* ("Plaintiffs impose all of these burdens without even attempting to account for the discovery they have already received in the [CFC]"); *id.* at 8 (Plaintiffs make "no effort to tailor their current requests to account for the discovery [they] already received"); *id.* at 10 ("Plaintiffs remained fundamentally unwilling to tailor their requests in any respect to account for the fact that Treasury is no longer a party to this action or to acknowledge that, to the extent that any Treasury documents are relevant, Plaintiffs have already received over 32,000 Treasury documents"); *id.* ("Plaintiffs expressed no willingness to limit their requests to particular topics or time frames unaccounted for by

this demonstrably untrue contention true.

As even a cursory review of the subpoena and the parties' correspondence makes clear, Fairholme has at all times been cognizant of burden issues and has tried to work with Treasury to address any legitimate concerns it may have on this score. *See generally* Mot. at 4-5, 19-20 (describing Fairholme's efforts to address burden issues). Fairholme took steps in the subpoena itself to minimize any duplication of previous discovery relating to the Net Worth Sweep. The subpoena specifically notes that Fairholme is *not* seeking documents previously produced in discovery in the CFC litigation. *See* Mot. Att. A. Fairholme also made clear that with respect to sixteen of the RFPs, it was seeking only documents that had not been reviewed in connection with the CFC discovery. *Id.*[5] In addition, during the parties' subsequent discussions, Fairholme completely dropped ten of its RFPs (and part of another) in an attempt to mitigate the burden on Treasury, and it made clear that it stood ready and willing to continue to work with Treasury. *See* Mot. at 19.[6]

In short, the primary foundations on which Treasury builds much of its undue burden argument—that Fairholme has been indifferent to Treasury's burden and seeks to wastefully duplicate

---

the discovery Plaintiffs already have obtained"); *id.* at 19 ("Plaintiffs have not [accounted for the prior discovery], however, and their efforts to duplicate prior CFC discovery is another factor pointing to the unreasonableness of [their] position"); *id.* at 21 (referring to "Plaintiffs' unwillingness to tailor their requests in any meaningful way"); *id.* at 24 ("Plaintiffs insist on seeking documents … from a five-and-a-half-year period, with no accounting for Treasury's prior document productions").

[5] Although Treasury eventually acknowledges, in a single sentence buried in a footnote on page 22 of its Opposition, these features of Fairholme subpoena, it never attempts to reconcile this acknowledgement with its repeated, strident, and inaccurate accusations that Fairholme has made no attempt to account for, and avoid duplication of, the CFC discovery.

[6] Treasury's suggestion that Fairholme has been unwilling to work to mitigate its burden is not only inaccurate, it is also ironic. Fairholme's efforts to work with Treasury stand in stark contrast to Treasury's intransigence. Treasury's position has not moved one inch since its initial response to the subpoena, when it flatly refused to search for *any* records responsive to 36 of the 37 RFPs. Since that time, Treasury has continued to completely rebuff Fairholme's efforts at compromise. *See* Mot. at 5.

the CFC discovery—are unsound. Treasury's remaining arguments are similarly unfounded.

2.      In addition to ignoring Fairholme's efforts to minimize duplication of the CFC dis-

covery, Treasury also overstates the scope of that discovery, characterizing it as "broad indeed"

and suggesting that the topics and time frames covered by that discovery were sufficient to address

any relevant questions concerning the implied covenant claim. Opp. at 18. This argument runs

counter to the Government's own repeated insistence that the CFC discovery was limited in scope,

and was not intended to constitute full merits discovery. We noted in our Motion, and Treasury

does not dispute, that Government lawyers, on more than one occasion, specifically relied on the

limited scope of the CFC discovery to instruct deponents not to answer questions directly relating

to topics covered by the Treasury subpoena. Mot. at 20. These were not isolated instances. In its

filings in the CFC litigation, and at status conferences, Government lawyers repeatedly stressed

that merits discovery would come later (assuming the plaintiffs survived the Government's motion

to dismiss).[7] It is problematic, to say the least, for Treasury to now characterize the CFC discov-

ery as something very different from how it described it, and conducted it, at the time.

Equally problematic is Treasury's revisionist history regarding the limited time frame cov-

---

[7] *See, e.g.,* Defendant's Reply in Support of Motion for Protective Order at 16, *Fairholme Funds, Inc. v. United States* (Ct. Fed. Cl., No. 13-465) (filed June 17, 2014) (copy attached hereto as Attachment A) ("Although discovery in the context of the merits of a case is 'broadly construed,' this case is in a very different posture. The Court here has authorized narrow discovery that is (1) sufficient to respond to certain aspects of the Government's motion to dismiss; and (2) limited to specific topics."); Status Conference Transcript at 19, *Fairholme Funds, Inc. v. United States* (Ct. Fed. Cl., No. 13-465) (May 7, 2014) (copy attached hereto as Attachment B) ("[T]he Court issued, on February 26th, an order granting limited discovery .... We are not in full-blown merits discovery at this stage of the litigation."); Status Conference Transcript at 13-14, *Fairholme Funds, Inc. v. United States* (Ct. Fed. Cl., No. 13-465) (June 19, 2014) (copy attached hereto as Attachment C) ("And by definition, in advance of a motion to dismiss, discovery should be limited to the narrow scope of the issues on which discovery is required. This is not the normal situation under Rule 26 where you—you know, all relevant documents to the case should be produced.").

ered by the CFC discovery.  The date ranges that were ultimately used in connection with the Government's CFC document productions were not selected, as Treasury now suggests, to cover all of the time frames relevant to the merits of the litigation, but were instead a product of negotiation and compromise between the parties (and, in some instances, an effort by the CFC to split the difference between the parties' positions).  Treasury also conveniently ignores that the CFC discovery, unlike full merits discovery, was not intended to cover *any* issues relating to damages or other remedies.  As we noted in our Motion (at 13-14), because Fairholme and other plaintiffs continue to suffer from the Net Worth Sweep, documents relating to such damages/remedy issues that postdate the August 2012 implementation of the Third Amendment, and the cut-off date used for purposes of the CFC discovery, are both relevant and outside the scope of that previous discovery. Notably, Treasury does not address this point in its Opposition.

Along similar lines, Treasury makes much of the fact that some of the RFPs in the Treasury subpoena are similar to RFPs served in connection with the CFC discovery.  Opp. at 18-19.  This observation should be unsurprising rather than a call for alarm, as both actions concern issues arising from the adoption and implementation of the Net Worth Sweep.  In fact, it would be strange if there were *not* some overlap in wording between the requests served in that action and this one. More importantly, however, any such overlap does not support Treasury's contention that the discovery Fairholme now seeks is duplicative of the CFC discovery or unreasonably cumulative.  For one thing, Treasury ignores the specific steps Fairholme has taken to ensure that Treasury is not called upon to duplicate its CFC discovery efforts.  Moreover, in focusing on the initial CFC RFPs, Treasury ignores that the parties subsequently engaged in extensive negotiations, over the course of several months, regarding the scope of the Government's obligation to respond to those RFPs. The parties ultimately reached an agreement pursuant to which Fairholme, in the spirit of compromise and in recognition of the Government's concerns about the scope of the discovery that had

been authorized, agreed to abandon several relevant RFPs and not to challenge the Government's refusal to produce documents responsive to several other relevant requests. *See* Letter from David Thompson to Gregg Schwind (October 6, 2014) (copy attached hereto as Attachment D). To take one important example, Treasury was specifically relieved from any obligation to respond to RFPs seeking documents relating to what are now critical questions concerning decisions and analyses regarding the imposition and determination of the periodic commitment fee that Treasury could in appropriate circumstances attempt, under the PSPAs, to charge the Companies. *Id.*

For these and other reasons, it is simply not the case that the Treasury subpoena seeks to improperly duplicate the CFC discovery or is unreasonably cumulative of earlier discovery. In fact, it is disingenuous, in light of the positions taken by the Government during the CFC discovery, for Treasury now to suddenly resist relevant, non-duplicative discovery on the grounds that Plaintiffs should be content with the limited discovery they were previously allowed to take.

3.      Treasury again complains that "several" of Fairholme's RFPs seek information that Fairholme should be able to obtain from FHFA, and it again suggests that Fairholme should await the completion of document discovery by the parties before seeking documents from Treasury. Opp. at 19-20. Treasury never adequately explains why the existence of some overlap between "several" RFPs served on both it and FHFA justifies Treasury's refusal to produce *any* documents. More importantly, any such overlap does not establish that the discovery Fairholme seeks from Treasury is "unreasonably cumulative or duplicative." FED. R. CIV. P. 26(b)(2)(C). Treasury's suggestion that Fairholme complete its review of Defendant document productions that are still far from complete before Treasury can be required to search for and produce a single document is manifestly unreasonable. Fact discovery is scheduled to close only a few months from now, on November 26, and expert discovery is scheduled to commence shortly thereafter. Because there is

very little chance that deferring Treasury's subpoena compliance will meaningfully reduce Treasury's discovery obligations, given the virtual certainty that Treasury possesses relevant, responsive, and important information that is not in the possession of the parties, any theoretical benefit arising from the reduction of overlap between the parties' document productions and Treasury's own is far outweighed by the prejudice that would result if Treasury were allowed to continue to indefinitely evade its obligation to comply with a valid subpoena.

4.     As we have noted (Mot. at 18), the fact that limited document discovery has already been conducted in the CFC litigation, as well as the pendency of other litigation challenging the Net Worth Sweep, further underscores that requiring Treasury to produce documents in this action would impose only a moderate marginal burden upon it.  While Treasury resists this point, Opp. at 24, it does not dispute one crucial fact bearing upon the undue burden analysis:  it is not starting from scratch.  Much of the burden imposed in connection with traditional third-party discovery stems from initial efforts to collect and preserve potentially relevant material.  But Treasury already completed much if not all of the work associated with that document collection effort in connection with the CFC litigation.  While, to be sure, if this Motion is granted, Treasury would still need to search its document collection for responsive materials and conduct a privilege review, at least one important and time-consuming task has already been accomplished.  In this respect as well, Treasury is not similarly situated to most non-litigants.

5.     In arguing that compliance with the subpoena would be unduly burdensome and disproportionate to the needs of this case, Treasury relies on a conclusory declaration that, for the most part, merely parrots the buzzwords of the federal rules without providing any meaningful support for its assertions of undue burden.  *See* Declaration of Michelle A. Dickerman (Opp. Ex. B).  This does not satisfy Treasury's burden to provide a detailed, concrete demonstration that compliance with the subpoena would be unduly burdensome.  *See Flatow v. The Islamic Republic*

14

*of Iran*, 196 F.R.D. 203, 207 (D.D.C. 2000) (showing of burden "must be specific"), *rev'd in part on other grounds*, 305 F.3d 1249 (D.C. Cir. 2002); *Alabama Aircraft Indus., Inc. v. Boeing Co.*, No. 2:11-cv-03577-RDP, 2016 WL 9781825, at *5 (N.D. Ala. Feb 25, 2016) (stressing "the need for specificity in a non-party's showing of 'undue burden'").  Moreover, Treasury's assertion that it would take "hundreds of hours" to review its records for responsive material, Opp. at 18, 21, is entitled to little weight, since Treasury has not even attempted to engage with Fairholme on the types of questions (such as the development of search terms and protocols and the identification of document custodians) that would determine the size of the document collection that would need to be reviewed.[8]

But even were the Court to take Treasury's estimate at face value, it would not even approach satisfying its burden of demonstrating that compliance with the subpoena would impose an *undue* burden upon it.  As discussed in our Motion (at 16-20), several factors weigh conclusively against the notion that Treasury would suffer an undue burden if it were to comply with the subpoena.  Among these considerations are the importance of the issues raised by this litigation, both to the parties and to the public, the enormous stakes in this litigation, and the relief to which Fairholme and other plaintiffs would be entitled were they to prevail on the implied covenant claim,

---

[8] Treasury's estimate is based on "its experience with the parallel CFC litigation."  Opp. at 21.  Of course, if Treasury's suggestion that the CFC discovery already covered all relevant topics and time frames is correct, then presumably a reasonably tailored search focused on materials that were not produced in connection with the CFC discovery would be unlikely to return nearly as many new documents for Treasury to review.

Moreover, Fairholme has offered to explore with Treasury the possible use of document review protocols and procedures, such as so-called Technology Assisted Review and predictive coding, that were not widely available or considered very reliable at the time Treasury produced records in the CFC litigation.  Because the use of such procedures could further reduce the time needed for Treasury to identify and review potentially responsive documents, Treasury's use of an estimate based on its experience reviewing documents five years ago is of questionable value in the undue burden analysis.

which dwarf not only the resources that Treasury might need to devote to complying with the subpoena, but the Department of Justice's entire operating budget.  These considerations on their own amply support the rejection of Treasury's claim of undue burden.  But other important considerations are Treasury's own significant financial, policy, and programmatic interests in the resolution of this litigation, as well as its own substantial and direct involvement in the events that surrounded the adoption and implementation of the Net Worth Sweep.  Mot. at 17-18.

Treasury does not challenge or dispute the factual basis or accuracy of *any* of these considerations.  In fact, it simply ignores most of them.  But it does fiercely resist any consideration by the Court of its own multi-billion dollar interest in the resolution of this litigation.  According to Treasury, its enormous financial interest in the litigation is irrelevant to the issues currently before the Court, because we rely "almost exclusively" on decisions addressing cost-shifting issues arising under Rule 45 rather than decisions addressing the separate question of whether a third party should be compelled to comply with a subpoena in the first place.  Opp. at 23.  This argument fails for multiple reasons.  First, Treasury's use of the word "almost" is telling, as several of the decisions we cited do indeed make clear that a third party's interest in the subject matter of the litigation is a pertinent consideration in the analysis of whether subpoena compliance would impose an undue burden.[9]  Second, Treasury does not dispute that Rule 26 standards do apply to the undue burden analysis here, and those standards include consideration of such issues as "the importance of the issues at stake in the action, the amount in controversy, … the parties' resources, … and whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R.

---

[9] *See, e.g., In re Photochromic Lens Antitrust Litigation*, No. 8:10-MD-2173, 2012 WL 12904391, *3 (M.D. Fla. 2012) (noting, in compelling subpoena response, that non-party subpoenant had "a substantial financial interest in the lawsuit"); *Phillip M. Adams & Associates, L.L.C. v. Fujitsu Ltd.*, No. 13-cv-02188-SI, 2010 WL 1064429, at *4 (D. Utah 2010) ("Leading authorities say factors considered in determination of undue burden on a nonparty may include . . . the interest, if any of the nonparty in the final outcome of the litigation.").

Civ. P. 26(b)(1).  *See* Opp. at 17-18 (citing Rule 26(b) standards as relevant to the undue burden inquiry for third party subpoenas).  Third, Treasury never explains why it is appropriate for the Court to consider such factors as the stakes of the litigation in assessing undue burden, but it is somehow a bridge too far for the Court to also consider the subpoenant's own direct stake in those stakes in considering whether it should be compelled to comply with a valid subpoena.

The fact that Treasury has understandable reasons for hoping that the Court ignores Treasury's interest in the resolution of the implied covenant claim in its undue burden analysis does not make its position on this issue any less illogical.  It is no wonder that Treasury can cite to no decision that holds or suggests that a third party's substantial financial interest in litigation cannot be considered by a court when it analyzes whether the third party must comply with a subpoena.[10]

Ultimately, Treasury's undue burden argument is built upon a strawman:  that Fairholme is proceeding as though Treasury is a litigating party to whom the protections of Rule 45 do not apply.  *See* Opp. at 22.  Fairholme is not ignoring Rule 45; it has complied with that rule and will continue to do so.  We agree that the protections accorded to third parties under Rule 45 apply to Treasury.  Unlike Treasury, however, we do not believe that those protections require the Court to completely blind itself to Treasury's enormous financial and other interests in the subject matter of this litigation, and the significant and direct role it played in the events that spawned this litigation,

---

[10] The two decisions Treasury does cite are of no help to it.  In *Swase v. West Valley City*, No. 2:13-cv-768 DN, 2015 WL 7756094, *1-2 (D. Utah Dec. 1, 2015), the district court ruled simply that a request by a subpoenant to seek its compliance costs was premature when the court had not yet ruled on separate motions to quash the subpoena.  The "central arguments" in those motions to quash concerned whether the subpoena sought information protected by privilege.  *Id.* at *1.  Obviously, the considerations underlying Rule 45's cost-shifting provisions would be largely if not entirely irrelevant to such a privilege analysis.  But these considerations are, for the reasons discussed, very relevant to an undue burden analysis.  And there is no indication that the district court in *In re Subpoenas to Intel Corporation*, No. 4:17-mc-80159-KAW, 2018 WL 1035794 (N.D. Cal. Feb. 23, 2018), was even asked to consider, in ruling on subpoena compliance issues, the subpoenant's financial interest, much less that it refused to do so.

in assessing whether Treasury should be expected to comply with a valid subpoena seeking relevant and important information concerning a claim raised in that litigation that has survived a motion to dismiss.  None of the principles underlying Rule 45 (or any other rule for that matter), and no decision or other authority of which we are aware, supports Treasury's position here.

## **CONCLUSION**

For the reasons discussed herein and in the Motion, the Court should compel Treasury to fully and adequately respond to Fairholme's subpoena, as limited by the Motion.

Dated:   August 16, 2019                                    Respectfully submitted,

s/ Charles J. Cooper
Charles J. Cooper
*Counsel of Record for Plaintiffs*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
ccooper@cooperkirk.com

*Of Counsel:*
David H. Thompson
Vincent J. Colatriano
Peter A. Patterson
Brian W. Barnes
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)

ATTACHMENT A

No. 13-465C
(Judge Sweeney)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FAIRHOLME FUNDS, INC., *et al.*,

Plaintiffs,

v.

UNITED STATES,

Defendant.

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR PROTECTIVE ORDER

STUART F. DELERY
Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

KENNETH M. DINTZER
Acting Deputy Director
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044

June 17, 2014                    Attorneys for Defendant

privileged communications between Treasury and the Department of Justice. A61. Request 17 demands communications with Fannie Mae, Freddie Mac, and rating agencies, and market analysts. A62-63. Request 18 demands all communications between members of the Federal Housing Finance Oversight Board. A63.

On their face, these requests go well beyond the relationship between FHFA and Treasury, as well as the time frame for the core issue in plaintiffs' case, the August 2012 Third Amendment to the stock agreements. Plaintiffs declare that "the question whether FHFA should be considered the United States for purposes of the Tucker Act poses a 'fact-intense inquiry.'" Pls.' Opp. at 23 (quoting February 26 Order at 3). That is not a reason to transform the specific question of "whether the FHFA acted at the direct behest of the Treasury" (February 26 Order at 3) into a wide-ranging investigation. The context of this case is framed by plaintiffs' complaint, which challenges *only* the August 2012 Third Amendment. Plaintiffs are not entitled to every document ever exchanged between FHFA and Treasury in hopes of finding a shard of evidence to support their theory that FHFA did Treasury's bidding when it agreed to the Third Amendment.

Plaintiffs misleadingly refer to the liberal relevance standard in RCFC 26, Pls.' Opp. at 25, but that standard has no application here. Although discovery in the context of the merits of a case is "broadly construed," this case is in a very different posture. The Court here has authorized narrow discovery that is (1) sufficient to respond to certain aspects of the Government's motion to dismiss; and (2) limited to specific topics. This is not surprising, given

document, FHFA's February 2012 Strategic Plan, states: "FHFA has reported on numerous occasions that, with taxpayers providing the capital supporting Enterprise operations, this 'preserve and conserve' mandate directs FHFA to minimize losses on behalf of taxpayers." *See* http://www.fhfa.gov/AboutUs/Reports/ReportDocuments/20120221_StrategicPlanConservatorsh ips_508.pdf, at 7.

16

that it is widely recognized that discovery while a motion to dismiss is pending should be "narrow as possible." *Lakeland Partners, LLC v. United States*, 88 Fed. Cl. 124, 138 (2009).

For these reasons, with respect to the subject of whether FHFA acted at the behest of Treasury in executing the Third Amendment, the Court should limit plaintiffs to the responsive materials identified in Requests 11, 14, and 16. Discovery beyond this is improper.

## C.  Summary

In sum, the Government respectfully requests that the Court limit discovery in accordance with the following chart. The scope of discovery identified below will facilitate production of all documents required to resolve the issues identified by the Court without encroaching on core internal decision-making processes. This table takes into consideration the document search terms and custodians that have been under discussion by the parties. *See* Pls.' Opp. at 26-27. In accordance with ordinary document production practices, all documents will be reviewed for both responsiveness and privilege. We respectfully request that the Court enter a protective order striking the remainder of plaintiffs' document requests.

17

ATTACHMENT B

1                  UNITED STATES COURT OF FEDERAL CLAIMS

2

3

4    FAIRHOLME FUNDS, INC., ET AL.,)

5              Plaintiffs,          ) Case No.

6                   vs.             ) 13-465C

7    THE UNITED STATES OF AMERICA, )

8              Defendant.           )

9

10

11

12                       Courtroom 8

13            Howard T. Markey National Courts Building

14                   717 Madison Place, N.W.

15                      Washington, D.C.

16                  Wednesday, May 7, 2014

17                       11:00 a.m.

18                     Status Conference

19

20

21           BEFORE:   THE HONORABLE MARGARET M. SWEENEY

22

23

24

25   Elizabeth M. Farrell, CERT, Digital Transcriber

Fairholme Funds, Inc., et al. v. USA                    5/7/2014

1   any way, to construe that I think there isn't jurisdiction.
2   I don't have anything in front of me at the moment other than
3   the Government's motion to dismiss, not that I, in any way,
4   think that's a frivolous filing, but that's why it's
5   essential that Plaintiffs have their day in court.
6                So, in any event, please proceed.
7                MR. SCHWIND:  Thank you, Your Honor.  And, again,
8   just getting to the update.  As the Court is aware, the Court
9   issued, on February 26th, an order granting limited
10  discovery, and Mr. Cooper acknowledged this morning that that
11  discovery is, in fact, limited.  We are not in full-blown
12  merits discovery at this stage of the litigation.  The Court,
13  thereafter, issued orders establishing a discovery schedule
14  and certain processes as to how we're to get through the
15  schedule and granted Plaintiffs' request that that discovery
16  end on 31 July of this year, a very aggressive schedule that,
17  again, Plaintiffs insisted on.
18               THE COURT:  Well, let me just say this:  If --
19  because the Government has perhaps -- at least from what I
20  understand -- a more narrow view of what would be appropriate
21  for discovery and, not surprisingly, Plaintiffs may have a
22  contrary view, if we need to enlarge the discovery schedule
23  to accommodate the Government in order to produce documents
24  to complete the taking of depositions, I certainly will allow
25  that.  So, the parties should know that the discovery

ATTACHMENT C

```
 1                    UNITED STATES COURT OF FEDERAL CLAIMS

 2

 3

 4    FAIRHOLME FUNDS, INC., ET AL.,)

 5              Plaintiffs,         ) Case No.

 6                   vs.            ) 13-465C

 7    THE UNITED STATES OF AMERICA, )

 8              Defendant.          )

 9

10

11

12                            Courtroom 4

13              Howard T. Markey National Courts Building

14                     717 Madison Place, N.W.

15                        Washington, D.C.

16                    Thursday, June 19, 2014

17                         11:00 a.m.

18              Defendant's Motion for Protective Order

19

20

21              BEFORE:   THE HONORABLE MARGARET M. SWEENEY

22

23

24

25    Elizabeth M. Farrell, CERT, Digital Transcriber
```

Fairholme Funds, Inc., et al. v. USA

13
6/19/2014

1           THE COURT:  The date of the third amendment?

2           MS. HOSFORD:  Yes.

3           Moving on to the second issue that we raised in our

4    motion, we would ask that the Court limit the proposed scope

5    of discovery to the issues that were actually raised in the

6    February 26th order.  And as we've set forth in our motion

7    and in the chart that we attached to our reply, we have

8    agreed to provide documents on whether FHFA was an agent and

9    arm of the Treasury in response to requests 1, 11, 14 and 16.

10   But the other requests that are grouped under requests

11   relating to whether FHFA is the United States vastly exceed

12   the scope of that issue.

13           Like we are willing to produce anything that bears

14   on the relationship between the two agencies, but we are not

15   going to respond to any and all documents reflecting

16   communications between Treasury and the Justice Department,

17   which has no relevance to that issue, or documents relating

18   to whether -- FHFA's determination that it's obligated to

19   maximize Treasury's return on its investment.

20           Obviously, many of those documents are also going

21   to be privileged, but they're not even responsive to the

22   Court's order, which was a pre -- you know, the Court ordered

23   this discovery, as the Court knows, in advance of a motion to

24   dismiss.  And by definition, in advance of a motion to

25   dismiss, discovery should be limited to the narrow scope of

Fairholme Funds, Inc., et al. v. USA

1   the issues on which the discovery is required.  This is not
2   the normal situation under Rule 26 where you -- you know, all
3   relevant documents to the case should be produced.

4           So, therefore, we've suggested that we will respond
5   to request 1A and request 4 and for the date range of July 1
6   to December 31st, 2008.

7           The question about whether FHFA -- I'm sorry.  On
8   the question of the solvency of the enterprises and
9   expectations of profitability at the time of the
10  conservatorship, we would respond to requests 1A and 4
11  because they're directly responsive to the Court's order.
12  The first one is financial projections in the possession of
13  FHFA and/or Treasury in connection with the conservatorship,
14  and the second one is documents relating to the decision to
15  leave the GSE's existing capital structure in place.  That's
16  exactly what the Court ordered in the order and that's
17  exactly what we're willing to produce documents on, and
18  within a reasonable time frame, July 1st to December 31st,
19  2008.

20          Now, in their opposition brief, Plaintiffs claim
21  that they had actually suggested that they were looking for
22  documents regarding the solvency of the enterprises, not only
23  in 2008, but throughout basically the conservatorships and
24  focusing on 2012.  But if you read their motion for discovery
25  and the declaration attached thereto, there was no mention of

ATTACHMENT D

**Vince Colatriano**

| | |
|---|---|
| **From:** | Schwind, Gregg (CIV) <Gregg.Schwind@usdoj.gov> |
| **Sent:** | Tuesday, October 14, 2014 2:18 PM |
| **To:** | David Thompson |
| **Cc:** | Vince Colatriano; Brian Barnes; Hosford, Elizabeth (CIV) |
| **Subject:** | RE: 10-6-14 Letter to DOJ Re Agreement on RFPs (clean) (1 40pm)-1.pdf |
| **Attachments:** | 10-6-14 Letter to DOJ Re Agreement on RFPs (clean) (1 40pm)-1.pdf |

David:

The revised letter dated October 6, 2014, accurately captures the parties' agreement with respect to plaintiffs' April 7, 2014 requests for production. I note that the pdf of the letter that you signed and sent contains two residual redline edits (see attached). Neither is significant or affects our agreement.

Regards,

Gregg

-----Original Message-----
From: David Thompson [mailto:dthompson@cooperkirk.com]
Sent: Monday, October 06, 2014 6:43 PM
To: Schwind, Gregg (CIV); Hosford, Elizabeth (CIV)
Cc: Vince Colatriano; Brian Barnes
Subject: 10-6-14 Letter to DOJ Re Agreement on RFPs (clean) (1 40pm)-1.pdf

Gregg,

And here's the clean copy that I have executed.

Best regards,
David

Annotations in the attached document can be seen with Acrobat Reader on the computer. To view annotations on iOS device, use compatible app like PDF Expert.

NOTICE: This e-mail is from the law firm of Cooper & Kirk, PLLC ("C&K"), and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you are not an existing client of C&K, do not construe anything in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to C&K in reply that you expect to be held in confidence. If you properly received this e-mail as a client, co-counsel or retained expert of C&K, you should maintain its contents in confidence in order to preserve any attorney-client or work product privilege that may be available to protect confidentiality.

October 6, 2014

**BY EMAIL AND FIRST CLASS MAIL**

Gregg M. Schwind
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U. S. Department of Justice
P.O. Box 480 Ben Franklin Station
Washington, D.C. 20044

        Re: *Fairholme Funds, Inc., et al. v. United States* (No. 13-465C) (Fed. Cl)

Dear Gregg:

On April 7, 2014, Plaintiffs served requests for production ("RFPs") on the Government. The Government served its responses and objections on Plaintiffs on May 2 and moved for a protective order regarding many of Plaintiffs' RFPs on May 30. After extensive negotiations in recent weeks, the parties have reached an agreement regarding the RFPs that remain in dispute. This letter sets forth that agreement.

In addition to the RFPs to which the Government has previously committed to responding (identified in Vince's letter of August 14 and in the chart below), the Government agrees to produce all nonprivileged materials from the dates identified in the Court's July 16, 2014 order (Doc. 72) that are responsive to the following RFPs: 1(a), 1(c), 1(g), 3, 14, 16, 17, and 18. With respect to the portion of RFP 11 that concerns FHFA's February 2012 strategic plan and all of RFP 13, the Government will produce all responsive nonprivileged materials from June 1, 2011 through September 30, 2012. For the remainder of RFP 11, the Government will produce all responsive nonprivileged materials from the dates identified in the Court's July 16 order. The Government further agrees to produce all nonprivileged materials from the relevant date ranges that are responsive to RFP 1(d), except that the Government will not produce models under that request. Under RFP 1(a), the Government will produce not only projections provided to FHFA or Treasury but also projections produced by or reviewed by FHFA or Treasury.

**Vince Colatriano**

| From: | Schwind, Gregg (CIV) <Gregg.Schwind@usdoj.gov> |
|---|---|
| Sent: | Tuesday, October 14, 2014 2:18 PM |
| To: | David Thompson |
| Cc: | Vince Colatriano; Brian Barnes; Hosford, Elizabeth (CIV) |
| Subject: | RE: 10-6-14 Letter to DOJ Re Agreement on RFPs (clean) (1 40pm)-1.pdf |
| Attachments: | 10-6-14 Letter to DOJ Re Agreement on RFPs (clean) (1 40pm)-1.pdf |

David:

The revised letter dated October 6, 2014, accurately captures the parties' agreement with respect to plaintiffs' April 7, 2014 requests for production. I note that the pdf of the letter that you signed and sent contains two residual redline edits (see attached). Neither is significant or affects our agreement.

Regards,

Gregg

-----Original Message-----
From: David Thompson [mailto:dthompson@cooperkirk.com]
Sent: Monday, October 06, 2014 6:43 PM
To: Schwind, Gregg (CIV); Hosford, Elizabeth (CIV)
Cc: Vince Colatriano; Brian Barnes
Subject: 10-6-14 Letter to DOJ Re Agreement on RFPs (clean) (1 40pm)-1.pdf

Gregg,

And here's the clean copy that I have executed.

Best regards,
David


Annotations in the attached document can be seen with Acrobat Reader on the computer. To view annotations on iOS device, use compatible app like PDF Expert.


NOTICE: This e-mail is from the law firm of Cooper & Kirk, PLLC ("C&K"), and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you are not an existing client of C&K, do not construe anything in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to C&K in reply that you expect to be held in confidence. If you properly received this e-mail as a client, co-counsel or retained expert of C&K, you should maintain its contents in confidence in order to preserve any attorney-client or work product privilege that may be available to protect confidentiality.

Total Control Panel                                                                                    Login

October 6, 2014

**BY EMAIL AND FIRST CLASS MAIL**

Gregg M. Schwind
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U. S. Department of Justice
P.O. Box 480 Ben Franklin Station
Washington, D.C. 20044

      Re: *Fairholme Funds, Inc., et al. v. United States* (No. 13-465C) (Fed. Cl)

Dear Gregg:

      On April 7, 2014, Plaintiffs served requests for production ("RFPs") on the Government. The Government served its responses and objections on Plaintiffs on May 2 and moved for a protective order regarding many of Plaintiffs' RFPs on May 30. After extensive negotiations in recent weeks, the parties have reached an agreement regarding the RFPs that remain in dispute. This letter sets forth that agreement.

      In addition to the RFPs to which the Government has previously committed to responding (identified in Vince's letter of August 14 and in the chart below), the Government agrees to produce all nonprivileged materials from the dates identified in the Court's July 16, 2014 order (Doc. 72) that are responsive to the following RFPs: 1(a), 1(c), 1(g), 3, 14, 16, 17, and 18. With respect to the portion of RFP 11 that concerns FHFA's February 2012 strategic plan and all of RFP 13, the Government will produce all responsive nonprivileged materials from June 1, 2011 through September 30, 2012. For the remainder of RFP 11, the Government will produce all responsive nonprivileged materials from the dates identified in the Court's July 16 order. The Government further agrees to produce all nonprivileged materials from the relevant date ranges that are responsive to RFP 1(d), except that the Government will not produce models under that request. Under RFP 1(a), the Government will produce not only projections provided to FHFA or Treasury but also projections produced by or reviewed by FHFA or Treasury.

Gregg M. Schwind
Senior Trial Counsel
September 17, 2014
Page 2

In return, Plaintiffs agree to drop RFPs 1(b), 1(i), 2, 5, 12, 15, and 19. Plaintiffs also abandon their request under RFP 13 for documents from 2008 and their request under RFP 11 for documents from 2008 relating to FHFA's February 2012 strategic plan. Plaintiffs reserve the right to move to compel production of models under RFPs 1(d), 1(e), 1(f), and 1(h) if the projections produced under RFP 1 are not sufficiently detailed to enable meaningful review. Plaintiffs would confer with the Government before filing a motion to compel with respect to any models. Plaintiffs further agree not to move to compel on RFPs 1(j) and 1(k) at this time but reserve the right, after reviewing the productions of Fannie and Freddie, to renew those requests and to move to compel if the parties are not able to reach an agreement.

The table below summarizes the parties' agreement with respect to each of the RFPs. To the extent that the table indicates that the Government will produce nonprivileged materials that are responsive to a particular RFP, that means the Government will produce only those responsive and nonprivileged materials (and a detailed log of the responsive documents for which the Government asserts a privilege) that fall within the date ranges established by the Court's July 16 order. In addition to the terms of the Court's July 16 order, the agreement is also subject to the parties' previous agreement as to search terms and document custodians. Finally, the agreement is also subject to plaintiffs' right to seek, and the Government's right to oppose, discovery in the event the Court authorizes full merits discovery.

| RFP | Summary of Request | Parties' Agreement |
|---|---|---|
| 1(a), 1(c), 1(g) | Financial projections associated with Companies' conservatorships; financial projections provided to the Government by Moody's or Grant Thornton; documents relating to scenarios in which Treasury would have received more in some quarters under the Net Worth Sweep than it would have received under the original terms of the PSPAs | Government *will produce* all responsive nonprivileged documents |
| 1(b), 1(i) | Financial projections associated with second amendment to PSPAs; documents relating to guarantee fee increases | Plaintiffs *abandon these requests* |

Gregg M. Schwind
Senior Trial Counsel
September 17, 2014
Page 2

In return, Plaintiffs agree to drop RFPs 1(b), 1(i), 2, 5, 12, 15, and 19.  Plaintiffs also
abandon their request under RFP 13 for documents from 2008 and their request under RFP 11 for
documents from 2008 relating to FHFA's February 2012 strategic plan.  Plaintiffs reserve the
right to move to compel production of models under RFPs 1(d), 1(e), 1(f), and 1(h) if the
projections produced under RFP 1 are not sufficiently detailed to enable meaningful review.
Plaintiffs would confer with the Government before filing a motion to compel with respect to any
models.  Plaintiffs further agree not to move to compel on RFPs 1(j) and 1(k) at this time but
reserve the right, after reviewing the productions of Fannie and Freddie, to renew those requests
and to move to compel if the parties are not able to reach an agreement.

The table below summarizes the parties' agreement with respect to each of the RFPs.  To
the extent that the table indicates that the Government will produce nonprivileged materials that
are responsive to a particular RFP, that means the Government will produce only those
responsive and nonprivileged materials (and a detailed log of the responsive documents for
which the Government asserts a privilege) that fall within the date ranges established by the
Court's July 16 order.  In addition to the terms of the Court's July 16 order, the agreement is also
subject to the parties' previous agreement as to search terms and document custodians.  Finally,
the agreement is also subject to plaintiffs' right to seek, and the Government's right to oppose,
discovery in the event the Court authorizes full merits discovery.

| RFP | Summary of Request | Parties' Agreement |
|---|---|---|
| 1(a), 1(c), 1(g) | Financial projections associated with Companies' conservatorships; financial projections provided to the Government by Moody's or Grant Thornton; documents relating to scenarios in which Treasury would have received more in some quarters under the Net Worth Sweep than it would have received under the original terms of the PSPAs | Government *will produce* all responsive nonprivileged documents |
| 1(b), 1(i) | Financial projections associated with second amendment to PSPAs; documents relating to guarantee fee increases | Plaintiffs *abandon these requests* |

Gregg M. Schwind
Senior Trial Counsel
September 17, 2014
Page 3

| RFP | Summary of Request | Parties' Agreement |
|-----|--------------------|--------------------|
| 1(d) | Financial projections prepared by the Companies and the assumptions, models, data, and analyses relating to those evaluations | Government *will produce* all responsive nonprivileged documents, except that it will not produce models; Plaintiffs reserve the right to move to compel production of models if the projections produced are not sufficiently detailed to enable meaningful review |
| 1(e), 1(f), 1(h) | Models relating to FHFA's October 2010 and 2011 financial projections; models relating to Treasury's May, June, July, and August 2012 projections; models relating to OMB's 2014 financial projections | Government *will not produce* documents; Plaintiffs will not move to compel production at this time but reserve the right to move to compel if projections produced under other RFPs are not sufficiently detailed to enable meaningful review |
| 1(j), 1(k) | Documents relating to the Periodic Commitment Fee; documents relating to significant sources of revenue for the Companies | Government *will not produce* documents; Plaintiffs will not move to compel production at this time but reserve the right to move to compel after reviewing productions from Fannie and Freddie |
| 2 | Documents relating to decision to award Treasury warrants | Plaintiffs *abandon this request* |
| 3 | Documents relating to valuation of Treasury warrants | Government *will produce* all responsive nonprivileged documents |
| 4 | Documents relating to decision to leave Companies' capital structure in place | Government *will produce* all responsive nonprivileged documents |
| 5 | Documents relating to Government Stock dividends | Plaintiffs *abandon this request* |
| 6 | Standards relating to termination of conservatorships | Government *will produce* all responsive nonprivileged documents |
| 7 | Documents relating to commitment to ensure that existing equity holders will not have access to Companies' positive earnings | Government *will produce* all responsive nonprivileged documents |

Gregg M. Schwind
Senior Trial Counsel
September 17, 2014
Page 4

| RFP | Summary of Request | Parties' Agreement |
|-----|--------------------|--------------------|
| 8 | Documents relating to policies to reduce Companies' role in mortgage market and to wind them down | Government *will produce* all responsive nonprivileged documents |
| 9 | Documents reflecting communications between FHFA/Treasury and Companies relating to termination of conservatorships | Government *will produce* all responsive nonprivileged documents |
| 10 | Documents relating to expectation that Companies will not continue as they existed prior to conservatorships | Government *will produce* all responsive nonprivileged documents |
| 11 | Documents reflecting communications between FHFA and Treasury relating to specified subjects | Government *will produce* all responsive nonprivileged documents except that, with respect to documents related to FHFA's 2012 strategic plan, the Government will produce responsive documents only in the date range June 1, 2011 through September 30, 2012; Plaintiffs withdraw their request for documents from 2008 concerning FHFA's strategic plan. |
| 12 | Documents relating to whether and how Companies could buy back Government Stock or reduce liquidation preference | Plaintiffs *abandon this request* |
| 13 | Documents relating to FHFA determination that it is obligated to maximize Treasury's return on investment | Government *will produce* all responsive nonprivileged documents only in the date range June 1, 2011 through September 30, 2012; Plaintiffs withdraw their request for documents from 2008. |
| 14 | Documents relating to decision to enter into Net Worth Sweep | Government *will produce* all responsive nonprivileged documents |
| 15 | Documents reflecting communications between Treasury and DOJ relating to Net Worth Sweep | Plaintiffs *abandon this request* |

Gregg M. Schwind
Senior Trial Counsel
September 17, 2014
Page 5

| RFP | Summary of Request | Parties' Agreement |
|-----|--------------------|--------------------|
| 16 | Documents relating to purposes of Net Worth Sweep and considerations taken into account in connection with this decision | Government *will produce* all responsive nonprivileged documents |
| 17 | Documents reflecting communications regarding Net Worth Sweep between FHFA/Treasury and Companies' boards, executives, lawyers, auditors, ratings agencies, market analysts | Government *will produce* all responsive nonprivileged documents |
| 18 | Documents reflecting communications regarding Net Worth Sweep between members of Federal Housing Finance Oversight Board | Government *will produce* all responsive nonprivileged documents |
| 19 | Documents relating to document preservation efforts | Plaintiffs *abandon this request* |

Furthermore, in accordance with the Court's July 16 order, Plaintiffs reserve the right to seek documents that fall outside the timeframes authorized in this phase of discovery. If the Court allows a second phase of discovery before Plaintiffs respond to the Government's motion to dismiss, then Plaintiffs would have the right to seek additional documents only for those topics on which the Government has agreed to produce documents in connection with the current phase of discovery. The Government reserves the right to oppose a second phase of discovery, and this agreement is without prejudice to its ability to argue for a narrower set of topics if the Court authorizes a second phase.

Finally, this agreement does not resolve the parties' dispute over whether the Government should provide Plaintiffs with hit reports detailing the number of documents returned by each of the Government's ESI searches.

Please confirm your agreement with the terms described in this letter by signifying your agreement in an email or letter.

Sincerely,

Gregg M. Schwind
Senior Trial Counsel
September 17, 2014
Page 6

David H. Thompson
Counsel for Plaintiffs