# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FAIRHOLME FUNDS, INC., *et al*., | |
| Plaintiffs, | |
| v. | Civil No. 13-1053 (RCL) |
| FEDERAL HOUSING FINANCE AGENCY, *et al.*, | |
| Defendants. | |
| In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations | |
| _____ | Miscellaneous No. 13-1288 (RCL) |
| This document relates to: ALL CASES | |

## MOTION FOR SUMMARY JUDGMENT
### BY DEFENDANTS FEDERAL HOUSING FINANCE AGENCY AS CONSERVATOR FOR FANNIE MAE AND FREDDIE MAC, FHFA ACTING DIRECTOR SANDRA L. THOMPSON, AND FANNIE MAE AND FREDDIE MAC

Defendants Federal Housing Finance Agency ("FHFA" or "Conservator"), as Conservator for the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac," and together with Fannie Mae, the "Enterprises,"), Sandra L. Thompson, in her official capacity as Acting Director of FHFA, and the Enterprises hereby move for summary judgment as to all claims in the above-captioned actions for the reasons set forth in the Memorandum in Support filed with this motion.  A proposed order granting the relief requested by this motion is also being filed with this motion.

Pursuant to Local Rule 7(f), FHFA, Director Thompson, and the Enterprises respectfully request oral argument on this motion.

Dated: March 21, 2022

Respectfully submitted,

 /s/ Howard N. Cayne
Howard N. Cayne (D.C. Bar # 331306)
Asim Varma (D.C. Bar # 426364)
David B. Bergman (D.C. Bar # 435392)
Ian S. Hoffman (D.C. Bar # 983419)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave NW
Washington, D.C. 20001
(202) 942-5000
Howard.Cayne@arnoldporter.com
Asim.Varma@arnoldporter.com
David.Bergman@arnoldporter.com
Ian.Hoffman@arnoldporter.com

*Attorneys for Defendant Federal Housing
Finance Agency and Acting Director Sandra L.
Thompson*

 /s/ Michael J. Ciatti
Michael J. Ciatti (D.C. Bar #467177)
KING &SPALDING LLP
1700 Pennsylvania Ave. N.W.
Washington, DC 20006
Tel: (202) 626-5508
Fax: (202) 626-3737
mciatti@kslaw.com

*Attorney for the Federal Home Loan
Mortgage Corp.*

 /s/ Meaghan VerGow
Meaghan VerGow (D.C. Bar # 977165)
O'MELVENY &MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
Tel: (202) 383-5300
Fax: (202) 383-5414
mvergow@omm.com

*Attorney for the Federal National Mortgage
Association*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FAIRHOLME FUNDS, INC., *et al*., | |
| Plaintiffs, | |
| v. | Civil No. 13-1053 (RCL) |
| FEDERAL HOUSING FINANCE AGENCY, *et al.*, | |
| Defendants. | |
| In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations | |
| _____ | Miscellaneous No. 13-1288 (RCL) |
| This document relates to: ALL CASES | |

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS FEDERAL HOUSING FINANCE AGENCY AS CONSERVATOR FOR FANNIE MAE AND FREDDIE MAC, FHFA ACTING DIRECTOR SANDRA L. THOMPSON, AND FANNIE MAE AND FREDDIE MAC

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS ................................................................................................. 5

PROCEDURAL HISTORY ............................................................................................... 9

STANDARD OF REVIEW .............................................................................................. 10

ARGUMENT .................................................................................................................. 11

I.     The Supreme Court's Unanimous Holding in *Collins* that the Conservator's
       Execution of the Third Amendment Was Reasonable Defeats Plaintiffs' Implied
       Covenant Claim ................................................................................................. 11

II.    Plaintiffs' Implied Covenant Claim Fails Because the Contract, Which Incorporated
       HERA, Authorized the Third Amendment and Left No
       Gaps to Fill ........................................................................................................ 17

III.   Plaintiffs' Implied Covenant Claim Fails Because Plaintiffs Cannot Prove
       Any Harm Caused by the Third Amendment ...................................................... 20

       A.     Plaintiffs' Expectation Damages Theory Is Built on an Unsupported And
              Erroneous Assumption that the Enterprises Could Pay Down the Treasury
              Liquidation Preference in the Absence of the Third Amendment ................. 20

       B.     Plaintiffs Cannot Prove with Reasonable Certainty the Fact of Damages
              or that the Third Amendment Caused the Alleged Damages ........................ 24

IV.    Plaintiffs' Alternative Request for Restitution for Preferred Stockholders Fails
       Because It Is Barred as a Matter of Law ............................................................ 31

       A.     Section 4617(f) Bars Plaintiffs' Alternative Request for Restitution ........... 32

       B.     Plaintiffs' Alternative Request for Restitution Is Barred For the Additional
              Reason That It Would Result in a Windfall for the Preferred Shareholders ....... 34

CONCLUSION ............................................................................................................... 37

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Admiral Fin. Corp. v. United States*,
  378 F.3d 1336 (Fed. Cir. 2004)................................................................37

*Allied Capital Corp. v. GC-Sun Holdings L.P.*,
  910 A.2d 1020 (Del. Ch. 2006)................................................................12

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)................................................................11

*ASB Allegiance Real Est. Fund v. Scion Breckenridge Managing Member, LLC*,
  50 A.3d 434 (Del. Ch. 2012)................................................................24

*Athridge v. Aetna Cas. & Sur. Co.*,
  604 F.3d 625 (D.C. Cir. 2010)................................................................11

*Bluebonnet Sav. Bank FSB v. United States*,
  67 Fed. Cl. 231 (2005)................................................................27

*Budinich v. Bank United, FSB*,
  No. CV-157833, 2016 WL 6892096 (D.N.J. Mar. 14, 2016)................................................................33

*Citizens Fin. Servs. v. United States*,
  64 Fed. Cl. 498 (2005)................................................................27

*Collins v. Mnuchin*,
  938 F.3d 553 (5th Cir. 2019)................................................................13

*Collins v. Yellen*,
  141 S. Ct. 1761 (2021)................................................................*passim*

*Cornerstone Therapy Servs., Inc. v. Reliant Post Acute Care Sols., LLC*,
  No. 2:16-cv-00018, 2018 WL 1370863 (W.D. Va. Mar. 16, 2018)................................................................27

*DG BF, LLC v. Ray*,
  No. CV 2020-0459-MTZ, 2021 WL 776742 (Del. Ch. Mar. 1, 2021)................................................................19

*DV Realty Advisors LLC v. Policemen's Annuity & Benefit Fund of Chicago*,
  75 A.3d 101 (Del. 2013)................................................................19

*eCommerce Indus., Inc. v. MWA Intel., Inc.*,
  No. CV 7471-VCP, 2013 WL 5621678 (Del. Ch. Sept. 30, 2013)................................................................24, 27

*Fairholme Funds, Inc. v. FHFA,
No. CV 13-1053, 2018 WL 4680197 (D.D.C. Sept. 28, 2018) ...................................... passim

Fairholme Funds, Inc. v. United States
--- F.4th ---, 2022 WL 518222 (Fed. Cir. Feb. 22, 2022) ...................................10, 18

Fairholme Funds, Inc. v. United States,
147 Fed. Cl. 1 (2019) ...........................................................................................36

Fed. Trade Comm'n v. Lanier L., LLC,
No. 3:14-CV-786-J-34PDB, 2015 WL 9598794 (M.D. Fla. Dec. 8, 2015) ...........................33

Fletcher Int'l, Ltd. v. Ion Geophysical Corp.,
No. CV 5109-CS, 2013 WL 6327997 (Del. Ch. Dec. 4, 2013) .............................................26

Florsheim Co. v. Miller,
575 F. Supp. 84 (E.D. Tex. 1983) ......................................................................................33

Frank Brunckhorst Co., LLC v. Coastal Atlantic, Inc.,
542 F. Supp. 2d 452 (E.D. Va. 2008) ...............................................................................25

*Glaxo Grp. Ltd. v. DRIT LP,
248 A.3d 911 (Del. 2021) ..................................................................................................17, 18

Griggs v. E.I. DuPont de Nemours & Co.,
385 F.3d 440 (4th Cir. 2004) .............................................................................................33

Hansen Bancorp, Inc. v. United States,
367 F.3d 1297 (Fed. Cir. 2004) ........................................................................................35

Henkel of Am., Inc. v. Bell,
825 F. App'x 243 (6th Cir. 2020) .....................................................................................33

Heritage Handoff Holdings, LLC v. Fontanella,
No. CV 16-691-RGA, 2018 WL 3580287 (D. Del. July 25, 2018)........................................19

Jacobs v. FHFA,
908 F.3d 884 (3rd Cir. 2018) ............................................................................................5

Kronenberg v. Katz,
872 A.2d 568 (Del. Ch. 2004)............................................................................................27

Land & Marine Remediation, Inc. v. BASF Corp.,
No. 2:11CV239, 2012 WL 2415552 (E.D. Va. June 26, 2012)............................................17

Ne. Sav., F.A. v. United States,
91 Fed. Cl. 264 (2010) .......................................................................................................27

iii

*Nemec v. Shrader,*
991 A.2d 1120 (Del. 2010) ................................................................................12

*Old Dominion Elec. Co-op. v. Ragnar Benson, Inc.,*
No. 305-CV-034, 2006 WL 2252514 (E.D. Va. Aug. 4, 2006)................................19

*Old Stone Corp. v. United States,*
63 Fed. Cl. 65 (2004) ........................................................................................37

*Paul v. Deloitte & Touche, LLP,*
974 A.2d 140 (Del. 2009) ..................................................................................36

*Perry Cap. LLC v. Lew,*
70 F. Supp. 3d 208 (D.D.C. 2014)........................................................................9

*Perry Cap. LLC v. Mnuchin,*
864 F.3d 591 (D.C. Cir. 2017) ................................................................. *passim*

*Phoenix Light SF Ltd. v. Bank of New York Mellon,*
No. 14-CV-10104 (VEC), 2020 WL 2765044 (S.D.N.Y. May 28, 2020)................23

*\*Policemen's Annuity & Benefit Fund of Chicago v. DV Realty Advisors LLC,*
No. CIV.A. 7204-VCN, 2012 WL 3548206 (Del. Ch. Aug. 16, 2012)...................19

*Preferred Inv. Servs., Inc. v. T & H Bail Bonds, Inc.,*
No. CV 5886VCP, 2013 WL 3934992 (Del. Ch. July 24, 2013) ..........................36

*Projects Mgmt. Co. v. Dyncorp Int'l, LLC,*
No. 1:13–cv–331, 2014 WL 1248075 (E.D. Va. Mar. 26, 2014) ..........................36

*Pulte Home Corp. v. Parex, Inc.,*
265 Va. 518 (2003) ...........................................................................................29

*R.K. Chevrolet, Inc. v. Hayden,*
253 Va. 50 (1997) .............................................................................................29

*Riggs Nat'l Bank of Washington, D.C. v. Linch,*
36 F.3d 370 (4th Cir. 1994) ...............................................................................19

*Roadmaster Indus., Inc. v. Columbia Mfg. Co.,*
893 F. Supp. 1162 (D. Mass. 1995) ....................................................................33

*S'holder Representative Servs. LLC v. Medidata Sols., Inc.,*
No. CV 19-1312-RGA, 2020 WL 972618 (D. Del. Feb. 24, 2020) .......................19

*Saks Fifth Ave., Inc. v. James, Ltd.,*
272 Va. 177 (2006) ...........................................................................................24

iv

*Standard Federal Bank v. United States*,
  62 Fed. Cl. 265 (2004) ........................................................................................27

*Stockton East Water District v. United States*,
  133 Fed. Cl. 204 (2017) ...............................................................................26, 27

*Sunrise Continuing Care, LLC v. Wright*,
  671 S.E.2d 132 (Va. 2009)..................................................................................26

*TWA Res. v. Complete Prod. Servs., Inc.*,
  No. CIV.A. N11C-08100 (MMJ), 2013 WL 1304457 (Del. Super. Ct.
  Mar. 28, 2013)......................................................................................................12

*Vergara v. Apple REIT Nine, Inc.*,
  No. 19-cv-02027 (DLI) (RML), 2020 WL 8673038 (E.D.N.Y. Mar. 31, 2020).....................18

*WSFS Fin. Corp. v. Great Am. Ins. Co.*,
  No. CVN18C09088, 2019 WL 2323839 (Del. Super. Ct. May 31, 2019) .............................29

**Statutes**

12 U.S.C. § 4617(a)(4)...............................................................................................7

*12 U.S.C. § 4617(b)(2)(J)(ii) .........................................................................*passim*

12 U.S.C. § 4617(f)..................................................................................................32

**Rules**

Fed. R. Civ. P. 56(a) ...............................................................................................10

**Other Authorities**

E. Allan Farnsworth & Zachary Wolfe, Farnsworth on Contracts § 12.08
  (4th ed. 2018)................................................................................................35, 37

*Reference Manual on Sci. Evid. at 433 (3d ed.), 2011 WL 7724259 ...................................21, 25

Restatement (Second) of Contracts § 351 (1981) ................................................28, 29

Restatement (Second) of Torts § 871 (1979) ............................................................33

Restatement (Third) of Restitution and Unjust Enrichment § 37 ..............................33

Restatement (Third) of Restitution and Unjust Enrichment § 54 (2011).............33, 35, 36

Restatement (Third) of Restitution and Unjust Enrichment § 54 cmts.........................35

## INTRODUCTION

This case arises out of the continuing consequences of one of the greatest financial crises in our country's history.  In response to the crisis, the government took unprecedented (and successful) efforts to assure the stability of a critical component of the country's economy—the secondary mortgage market.  Plaintiffs, who are shareholders of Fannie Mae and Freddie Mac (the "Enterprises"), now seek to second-guess the Federal Housing Finance Agency's ("FHFA") execution of the Third Amendment to the Preferred Stock Purchase Agreements ("Third Amendment") with the U.S. Department of Treasury.  After nine years of litigation—including numerous decisions by the circuit courts of appeals, and now the United States Supreme Court, holding that the Third Amendment was both authorized and a reasonable exercise of FHFA's broad statutory powers—it is time to end this case.

Plaintiffs' sole remaining claim is for breach of the implied covenant of good faith and fair dealing arising under Delaware and Virginia law, which this Court has held is contained in the Enterprises' contracts with shareholders.  The United States Supreme Court's ruling in *Collins v. Yellen*, 141 S. Ct. 1761 (2021), along with the undisputed facts adduced in discovery, compel summary judgment in Defendants' favor for four independent reasons.

First, the Supreme Court unanimously held in *Collins* that FHFA—exercising its "expansive authority in its role as a conservator"—"reasonably viewed [the Third Amendment] as more certain to ensure market stability" than "the shareholders' suggested strategy."  *Id*. at 1776–77.  This holding alone forecloses Plaintiffs' implied covenant claim.

When this Court denied Defendants' motion to dismiss the implied covenant claim—nearly three years before the *Collins* decision—it stated that "[w]hile some of Defendants' argument is compelling, none of it permits the Court to grant dismissal of Plaintiffs' implied covenant claims *at this stage*."  *Fairholme Funds, Inc. v. FHFA*, No. CV 13-1053, 2018 WL

4680197, at *12 (D.D.C. Sept. 28, 2018) (emphasis added).  According to the Court, "[t]he question" for liability "is whether Defendants exercised their discretion [to enter the Third Amendment] arbitrarily or unreasonably."  *Id*. at *13.  This Court, noting that motions to dismiss "are to be granted sparingly and with caution," held that "[a]t this stage in the proceedings," Plaintiffs' allegations "could support a finding that Defendants exercised their discretion arbitrarily or unreasonably."  *Id.* at *13–14.  Now, at the summary judgment stage, Plaintiffs' claim cannot proceed.

The Supreme Court's decision in *Collins* has foreclosed any argument that FHFA acted unreasonably when entering into the Third Amendment.  After accepting the *Collins* shareholder plaintiffs' factual allegations as true—allegations that are in all material respects identical to those presented here—the Supreme Court ruled unanimously that the Conservator acted reasonably in executing the Third Amendment.  Relying on the broad authority granted to FHFA under the Housing and Economic Recovery Act of 2008 ("HERA"), the Supreme Court held that "[t]he facts alleged in the complaint demonstrate that the FHFA chose a path of rehabilitation that was designed to serve public interests by ensuring Fannie Mae's and Freddie Mac's continued support of the secondary mortgage market."  *Collins*, 141 S. Ct. at 1776.  In rejecting the *Collins* plaintiffs' claims that FHFA had exceeded its authority under HERA by executing the Third Amendment, the Supreme Court held that "[t]he nature of the conservatorship authorized by [HERA] permitted the Agency to reject the shareholders' suggested strategy in favor of one that the Agency *reasonably viewed* as more certain to ensure market stability."  *Id.* at 1777 (emphasis added); *see also id.* (FHFA "could have *reasonably concluded* that [the Third Amendment] was in the best interests of members of the public who rely on a stable secondary mortgage market.") (emphasis added).

2

This Supreme Court holding in *Collins* conclusively mandates a negative answer to the dispositive "question" announced by this Court for determining Defendants' liability *vel non* on Plaintiffs' implied covenant claim.  Simply stated, the Supreme Court's definitive ruling that that FHFA acted reasonably in agreeing to the Third Amendment negates Plaintiffs' ability to prove a necessary fact: that "Defendants exercised their discretion [to execute the Third Amendment] arbitrarily or unreasonably." *Fairholme Funds*, 2018 WL 4680197, at *13.  Further, because the facts alleged here are materially identical to those alleged in *Collins*, even if Plaintiffs could prove those facts at trial (and they cannot), FHFA's conduct would still be reasonable as a matter of law in light of *Collins*, precluding any finding that FHFA acted arbitrarily or unreasonably. Unsurprisingly, both the facts alleged in Plaintiffs' complaints and the facts adduced in discovery are consistent with the Supreme Court's conclusion in *Collins* that the Conservator acted "reasonably" in executing the Third Amendment.  Accordingly, under *Collins* as applied to the factual record in this case, the implied covenant claim fails and summary judgment is warranted.

Second, Plaintiffs' implied covenant claim fails as a matter of law because *Collins* necessarily establishes that the Conservator acted within the scope of its contractual discretion under the shareholder contract when it executed the Third Amendment.  Where a contract authorizes one party to take an action and defines the scope of a parties' discretion under the contract, there is no gap to fill and accordingly no implied covenant applies.  Here, HERA is incorporated into the shareholder contract, including HERA's "best interests" provision.  *See* 12 U.S.C. § 4617(b)(2)(J)(ii) ("The Agency may, as conservator or receiver-- . . . take any action authorized by this section, which the Agency determines is in the best interests of the regulated entity or the Agency.").  Thus, the Conservator's statutory and contractual discretion conferred by HERA's "best interests" clause are the same, and the Supreme Court's conclusion in *Collins*

that FHFA acted within the scope of that discretion requires rejection of Plaintiffs' implied covenant claim here.

Third, Plaintiffs cannot meet their burden to prove with reasonable certainty that the Third Amendment harmed shareholders, and even if they could, no such harm was foreseeable. Plaintiffs attempt to demonstrate their injury by positing a but-for world without the Third Amendment. But Plaintiffs' but-for world assumes away much more than the Third Amendment, and therefore fails to isolate the purported impact of the Third Amendment on shareholders. Since well before the Third Amendment and continuing to this day, the Treasury stock certificates have barred the Enterprises from paying down Treasury's liquidation preference. Plaintiffs have never challenged this feature of the Treasury stock certificates. However, Plaintiffs attempt to establish harm by assuming a but-for world that hinges on the assumption that Treasury would have agreed to allow the Enterprises to pay down Treasury's liquidation preference, which stood at $189.5 billion at the time the Third Amendment was executed. The assumption is not grounded in the record and is speculative. Indeed, the only reference in the record is that Treasury had previously *not* agreed to FHFA's request to allow the Enterprises the option to pay down the Treasury liquidation preference. Without this assumption, Plaintiffs' theory that they were harmed by the Third Amendment and suffered the damages they seek falls apart. Defendants are thus entitled to summary judgment on this basis as well.

Fourth, Plaintiffs' request for rescission and restitution on behalf of preferred shareholders, as an alternative to standard expectation damages, fails as a matter of law. That claim seeks equitable relief that 12 U.S.C. § 4617(f) bars. Plaintiffs ask this Court to rescind and unwind all preferred shareholder contracts with the Enterprises and return the parties to the status

quo ante before the stock was issued—refunding the issuance price to the current shareholder (totaling over $28 billion) and requiring the Conservator to accept the return of stock certificates issued as far back as 1996.  However, the Supreme Court's holding in *Collins* forecloses such relief as Section 4617(f) bars a court from compelling the Conservator to distribute Enterprise capital to shareholders.

Moreover, Plaintiffs' request for rescission and restitution also fails as a matter of law because restoring the shareholders to their financial positions years before the 2008 financial crisis would result in a massive and inequitable windfall to the preferred shareholders.  It is a well-established legal principle that stockholders knowingly assume the risk of market decline when they purchase stock.  By August 2012, *before* the Third Amendment was executed, the preferred shares' market value was significantly less than their issuance price due to a variety of factors, including the overwhelming losses incurred by the Enterprises.  Even Plaintiffs concede that under their own flawed damages model the preferred shareholders would recover more if awarded rescission and restitution than the value of their stock before the alleged breach. Rescission and restitution is an equitable remedy and awarding it here would be highly inequitable.

Therefore, for each of these reasons, Defendants are entitled to summary judgment.

## STATEMENT OF FACTS

Congress created Fannie Mae and Freddie Mac to increase home ownership by increasing the funds available to lend to borrowers.  The Enterprises purchase mortgages, pool the mortgages into mortgage-backed securities (MBS), and sell them to investors guaranteeing payment of principal and interest.  *See* Defendants' Statement of Material Undisputed Facts ¶ 1 (hereinafter "SMUF").  By doing so, the Enterprises "relieve mortgage lenders of the risk of default and free up their capital to make more loans."  *Jacobs v. FHFA,* 908 F.3d 884, 887 (3rd

Cir. 2018).  This, in turn, increases the liquidity and stability of America's home lending market and promotes access to mortgage credit.  SMUF ¶ 1.

When the financial crisis hit, the Enterprises suffered significant and unprecedented losses.  In 2008 alone, Fannie Mae and Freddie Mac lost more than they had earned in the previous 37 years combined.  SMUF ¶ 4.  In July 2008, in response to the crisis, Congress enacted the Housing and Economic Recovery Act of 2008 ("HERA").  SMUF ¶ 5.  HERA created FHFA, established it as the Enterprises' regulator, and empowered it to place the Enterprises into conservatorship or receivership.  *Id*.  HERA also amended the charters of the Enterprises by granting the U.S. Department of the Treasury ("Treasury") temporary authority to fund the Enterprises by purchasing Enterprise stock.  *Id*.

On September 6, 2008, FHFA's Director placed both Fannie Mae and Freddie Mac into conservatorships to stem the ongoing deterioration of the secondary mortgage market and doubts about the Enterprises' ability to absorb further losses.  SMUF ¶ 6.  The next day, Treasury entered into Senior Preferred Stock Purchase Agreements (the "PSPAs") with FHFA as Conservator on behalf of the Enterprises.  Under the PSPAs, Treasury committed to invest up to $100 billion in each Enterprise as needed to ensure that the Enterprises maintained a positive net worth (the Treasury "Commitment").  *Id*.  In exchange for that extraordinary capital commitment, Treasury received one million senior preferred shares in each company (the "Treasury Stock").  *Id*. ¶ 7.  The Treasury Stock entitled Treasury to several forms of consideration, including: (i) a $1 billion senior liquidation preference—a priority right above all other stockholders, whether preferred or otherwise, to receive distributions from assets if the entities were liquidated; (ii) a dollar-for-dollar increase in that liquidation preference each time Fannie or Freddie drew upon the Treasury Commitment; (iii) quarterly dividends that the

Companies could either pay with cash at a rate of 10% of Treasury's liquidation preference or with an increase of the liquidation preference at a rate of 12% of Treasury's liquidation preference; (iv) warrants allowing Treasury to purchase up to 79.9% of Fannie's and Freddie's common stock; and (v) periodic commitment fees over and above any dividends. *Id*.

The Enterprises' losses continued after being placed in conservatorships and the Enterprises' pre-conservatorship equity was exhausted by the end of 2008 such that in the absence of the Treasury Commitment, HERA would have required that FHFA place the Enterprises into mandatory receivership. *See* SMUF ¶ 11; 12 U.S.C. § 4617(a)(4). In order to keep the Enterprises operational, and to avoid exhausting the finite Treasury Commitment that was originally capped at $100 billion for each Enterprise, FHFA and Treasury twice amended the PSPAs to increase the total amount of that Commitment. In May 2009, Treasury agreed to double the Commitment to $200 billion for each company. SMUF ¶ 11. Seven months later, in a Second Amendment to the PSPAs, FHFA and Treasury agreed to temporarily remove entirely the cap on the Treasury's Commitment, making it unlimited until the end of 2012, after which time the Commitment would again become fixed. *Id*.

Between 2008 and 2012, the Enterprises continued to draw on the Treasury Commitment, compelled by quarter after quarter of negative net worth—that is, insolvency. By the middle of 2012, the Enterprises together had drawn over $187 billion on the Treasury Commitment. SMUF ¶ 14. Because Treasury was entitled to receive annually 10% of the total amount drawn, which the Enterprises paid through quarterly dividends, the more money the Enterprises drew, the larger their dividend obligations became. The Enterprises also consistently lacked the cash to pay the contractually-required 10% dividend, and they began the practice of "circular" dividend payments—drawing funds from Treasury's Commitment just to hand those funds back to

Treasury as a part of their quarterly dividend.  SMUF ¶ 12; *see also Fairholme*, 2018 WL 4680197 at *3.  This too grew the size of the Treasury liquidation preference and thus the subsequent dividend obligations.  By mid-2012, Fannie Mae's annual dividend obligation was $11.7 billion and Freddie Mac's annual dividend obligation was $7.2 billion.  SMUF ¶ 14.  For Fannie Mae this dividend amount exceeded its annual historical income for every year since its inception.  *Id*.  And for Freddie Mac, this dividend amount exceeded its annual historical income in every year but one.  *Id*.

Under the PSPAs, the Treasury Commitment was to become fixed in January 2013. SMUF ¶¶ 11–12.  FHFA knew that if the circular dividends continued, they would have eroded the Treasury Commitment starting in January 2013.  *Id*. ¶¶ 12–17.  Erosion of the Treasury Commitment would have been detrimental to the Enterprises, and in turn, the overall secondary mortgage market.  SMUF ¶ 13.  Since its execution, the Treasury Commitment has allowed the Enterprises to continue to operate and maintain liquidity in the secondary mortgage market, satisfy their obligations—including to holders of Enterprise debt—and provide confidence to purchasers of the guaranteed MBS.  *Id*.  Erosion of the Commitment, or a risk of a future erosion, would diminish the Enterprises' ability to issue debt and MBS investors' confidence in the Enterprises' ability to honor their guarantees, thereby decreasing the value of the Enterprises' guarantee.  The consequence would have jeopardized the liquidity of the housing finance market. *Id*.

In August 2012, the FHFA and Treasury amended the PSPAs for a third time, averting the risk that the Enterprises would exhaust the Treasury Commitment because of "circular" draws to pay the dividends.  SMUF ¶¶ 19–20.  The Third Amendment replaced the 10% fixed-rate dividend with a variable dividend based on the Enterprises' net worth, calculated on a

quarterly basis.  *Id.* ¶ 19.  In addition, the Third Amendment suspended the Enterprises'

obligations to pay periodic commitment fees for so long as the variable/net worth dividend

formula remained in effect.  Through that new dividend formula, the Enterprises would never

again draw on the Treasury Commitment just to make their quarterly dividend payments, thereby

precluding any dividend-driven threat to the Commitment.  SMUF ¶ 20.  Thus, the Conservator

chose a path designed to ensure the Enterprises' continued support of the secondary mortgage

market, with the Third Amendment maximizing the remaining amount of the Treasury

Commitment that would be available to backstop the Enterprises' operations in quarters when

earnings were insufficient to meet their obligations.  SMUF ¶ 20; *Collins*, 141 S. Ct. at 1776–77.

## PROCEDURAL HISTORY

In 2013, Plaintiffs—a collection of institutional and individual holders of Enterprise

shares issued prior to the conservatorships—brought these actions challenging the Third

Amendment on a variety of grounds.  Certain of the Plaintiffs (the Class Plaintiffs) brought this

action on behalf of themselves and putative classes of Enterprise shareholders (No. 1:13-mc-

1288), while the Fairholme Plaintiffs brought this action on behalf of themselves only (No. 1:13-

cv-1053).  Plaintiffs alleged that, in executing the Third Amendment, FHFA breached the

Administrative Procedure Act, and FHFA and the Enterprises breached the terms of their

shareholder contracts with the Enterprises and their state law fiduciary duties.  Plaintiffs also

alleged that FHFA and the Enterprises breached an implied covenant of good faith and fair

dealing inherent in their stock certificates.

In 2014, this Court dismissed Plaintiffs' claims in their entirety.  *See Perry Cap. LLC v.

Lew*, 70 F. Supp. 3d 208 (D.D.C. 2014) ("*Perry I*").  On appeal, the D.C. Circuit affirmed in part

and reversed in part, remanding some of Plaintiffs' claims, including the implied covenant claim,

in 2017.  *See Perry Cap. LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017) ("*Perry II*").  On

remand, Plaintiffs amended their complaints with additional claims.  *See* ECF No. 71 in

1:13mc1288 (Second Amended Consolidated Class Action and Derivative Complaint), ECF No.

75 in 1:13cv1053 (Fairholme Amended Complaint).  Defendants again moved to dismiss, and

this Court dismissed all of Plaintiffs' claims, save one:  the claim for breach of the implied

covenant of good faith and fair dealing in the contracts that shareholders have with the

Enterprises.  *See Fairholme Funds*, 2018 WL 4680197, at *17.

On June 23, 2021, the United States Supreme Court issued its decision in *Collins v.*

*Yellen*, 141 S. Ct. 1761 (2021), another shareholder action challenging the Third Amendment

under Administrative Procedure Act and constitutional theories.  In pertinent part, the Supreme

Court unanimously held that FHFA, in its capacity as conservator, acted within its statutory

powers and functions under the Housing and Economic Recovery Act of 2008 ("HERA") in

executing the Third Amendment, and thus 12 U.S.C. § 4617(f) barred the shareholders' claims

seeking equitable relief with respect to the Third Amendment.  *Id*. at 1777–78.

On December 8, 2021, this Court granted Plaintiffs' unopposed motion for class

certification, certifying three classes of Enterprise shareholders and appointing class counsel.

*See* ECF Nos. 138, 139 (1:13mc1288).

On February 22, 2022, the Federal Circuit issued its decision in *Fairholme Funds, Inc. v.*

*United States* --- F.4th ---, 2022 WL 518222 (Fed. Cir. Feb. 22, 2022), the parallel litigation

originally filed in the Court of Federal Claims by Enterprise shareholders.  The Federal Circuit

dismissed all shareholder claims brought against the United States based on the execution of the

Third Amendment.

## STANDARD OF REVIEW

A court may grant summary judgment where a movant "shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  Courts must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor."  *Athridge v. Aetna Cas. & Sur. Co.*, 604 F.3d 625, 629 (D.C. Cir. 2010) (internal quotation marks and citations omitted).  To show that a dispute is "genuine," the nonmoving party must present evidence "such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id.* at 249–50 (citations omitted).  A mere "scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252.

## ARGUMENT

I.      **The Supreme Court's Unanimous Holding in *Collins* that the Conservator's Execution of the Third Amendment Was Reasonable Defeats Plaintiffs' Implied Covenant Claim**

The Supreme Court's unanimous ruling in *Collins* requires summary judgment be entered in favor of Defendants on Plaintiffs' implied covenant claim.  In *Collins*, the Supreme Court answered in Defendants' favor the precise question this Court identified as necessary to resolve Plaintiffs' implied covenant claim: whether FHFA acted arbitrarily or unreasonably in agreeing to the Third Amendment.  *See Fairholme Funds*, 2018 WL 4680197, at *13 (framing "[t]he question" necessary to make a liability determination as "whether Defendants exercised their discretion arbitrarily or unreasonably in a way that frustrated Plaintiffs' expectations under the contract").  Assuming the truth of factual allegations materially identical to those advanced in this case, the Supreme Court ruled that the Conservator's execution of the Third Amendment was reasonable.  In particular, the Supreme Court held that FHFA "reasonably concluded" that the Third Amendment furthered the public interest in a stable secondary mortgage market, and that FHFA was thus authorized to execute the Third Amendment.  *Collins*, 141 S. Ct. at 1777.

11

Because reasonable conduct cannot breach the implied covenant as a matter of law, Plaintiffs cannot prove a central element of their claim, entitling Defendants to summary judgment.

The implied covenant is a "cautious enterprise," whereby courts "infer[] contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated." *Fairholme Funds, Inc. v. FHFA*, No. CV 13-1053 (RCL), 2018 WL 4680197, at *7 (D.D.C. Sept. 28, 2018) (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010)). Indeed, the implied covenant "is a limited and extraordinary legal remedy" (*Nemec*, 991 A.2d at 1128), that should be applied "rarely, and only in narrow circumstances." *Allied Capital Corp. v. GC-Sun Holdings L.P.*, 910 A.2d 1020, 1032 (Del. Ch. 2006). Most significant here, courts may use the implied covenant to fill gaps in a contract only when a party acts "*arbitrarily or unreasonably*, thereby frustrating the fruits of the bargain that the asserting party reasonably expected." *Fairholme Funds*, 2018 WL 4680197, at *7 (emphasis added) (quoting *Nemec*, 991 A.2d 1120 at 1126).[1]

In *Collins*, a unanimous Supreme Court expressly held that the execution of the Third Amendment was a reasonable exercise of FHFA's authority under HERA—including under the

---

[1] A breach of implied covenant claim involves a two-pronged inquiry: (1) whether the defendant acted arbitrarily and unreasonably, *and* (2) whether the defendant acted in a way that was not reasonably expected by the plaintiff. *See Fairholme Funds*, 2018 WL 4680197, at *13; *TWA Res. v. Complete Prod. Servs., Inc.*, No. CIV.A. N11C-08100 (MMJ), 2013 WL 1304457, at *10–11 (Del. Super. Ct. Mar. 28, 2013). Plaintiffs must satisfy both prongs of the test to prevail on their claim. *See TWA Res.*, 2013 WL 1304457 at *11 ("If [Plaintiff] succeeds in demonstrating that its reasonable expectations under the [agreement] have been thwarted, in order to benefit from the implied covenant of good faith and fair dealing, [Plaintiff] next must prove that Defendants have acted arbitrarily or unreasonably." (citing *Nemec*, 991 A.2d at 1126)). Because *Collins* establishes that Plaintiffs fail to satisfy the first prong (arbitrary and unreasonable), this Court need not address the second prong (reasonable expectations) to grant summary judgment. In all events, there is also ample evidence that market participants, including major analysts in published reports, anticipated that FHFA and Treasury might agree to revise the PSPA dividend structure, including via a mechanism by which all of the Enterprises' profits would be paid to Treasury. *See* SMUF ¶ 16.

"best interests" provision. *Collins*, 141 S. Ct. at 1776–78. The Court so ruled even after accepting the allegations in the *Collins* complaint as true, holding that FHFA "reasonably concluded" that the Third Amendment furthered its public mission to maintain a stable secondary mortgage market. *Id*. at 1777.[2] The Supreme Court reached this conclusion by evaluating in detail whether FHFA's execution of the Third Amendment fit within the scope of FHFA's authority under HERA to fulfill its public mission. The Court first observed that HERA "authorizes [FHFA] to act . . . 'in the best interests of the regulated entity *or the Agency* . . . and, by extension, the public it serves.'" *Id*. at 1776 (emphasis in original). This provision thus allows FHFA to "subordinate the best interests of the [Enterprises] to its own best interests and those of the public." *Id*. at 1785.

The Supreme Court described in detail the Third Amendment's benefits to the secondary mortgage market: "The facts alleged in the complaint demonstrate that the FHFA chose a path of rehabilitation that was *designed to serve public interests* by ensuring Fannie Mae's and Freddie Mac's continued support of the secondary mortgage market." *Id*. at 1776 (emphasis added). The Court recited the Enterprises' historical inability to afford the 10% dividend payments and the risk of erosion of the Treasury commitment due to dividends and circular draws. "If things had proceeded as they had in the past, there was a realistic possibility that the companies would have consumed some or all of the remaining capital commitment in order to pay their dividend obligations, which were themselves increasing in size every time the companies made a draw." *Id*. at 1777. *Collins* observed that "[t]he third amendment eliminated this risk by replacing the fixed-rate dividend formula with a variable one. Under the new

---

[2]    *See also Collins v. Mnuchin*, 938 F.3d 553, 563 (5th Cir. 2019) (reviewing dismissal of APA claim under Rule 12(b)(6)); *Collins*, 141 S. Ct. at 1175–76 (affirming dismissal of the shareholders' statutory claim).

formula, the companies would never again have to use capital from Treasury's commitment to pay their dividends.  And that, in turn, ensured that all of Treasury's capital was available to backstop the companies' operations during difficult quarters."  *Id*.  The Court thus concluded: "[w]hether or not this new arrangement was in the best interests of the companies or their shareholders, the FHFA could have reasonably concluded that it was in the best interests of members of the public who rely on a stable secondary mortgage market."  *Id*.

*Collins* leaves Plaintiffs no path to establish that FHFA "exercised [its] discretion arbitrarily or unreasonably" in executing the Third Amendment, and therefore Plaintiffs cannot prevail on their implied covenant claim.  Under HERA, FHFA is authorized to further its public mission—facilitating operation of the secondary mortgage market, and the Third Amendment did just that.  The Supreme Court held that FHFA exercised its statutory authority "reasonably" when it executed the Third Amendment.  *Collins*, 141 S. Ct. at 1776–78.  Indeed, the Supreme Court rejected the shareholder plaintiffs' argument in that case that the Third Amendment "did not actually serve the best interests of the FHFA or the public," setting up and knocking down each of the plaintiffs' critiques of the Third Amendment—the very same critiques that form the basis of the Plaintiffs' claim here.  *See id*. at 1777-78.

For example, the Supreme Court assumed as true the plaintiffs' allegation that the Enterprises "were on the precipice of a financial uptick and that they would soon have been in a position not only to pay cash dividends, but also to build up capital buffers to absorb future losses."  *Id*.  The Supreme Court also recognized that, under the facts alleged, the Third Amendment "made certain that [the Enterprises] would never be able to build up their own capital buffers, pay back Treasury's investment, and exit conservatorship."  *Id*. at 1777.  Nevertheless, the Supreme Court concluded that HERA permitted FHFA to pursue an

14

amendment that "the Agency *reasonably viewed* as more certain to ensure market stability" than the "shareholders' suggested strategy," which FHFA was permitted "to reject" under HERA. *Id.* (emphasis added). The Court explained that the shareholders' strategy was "dependent on speculative projections about future earnings, and recent experience had given the FHFA reasons for caution. . . . With the aim of more securely ensuring market stability, the FHFA did not exceed the scope of its conservatorship authority by deciding on what it viewed as a less risky approach." *Id.*

The allegations here are materially identical to those the Supreme Court considered, assumed true, and rejected as insufficient in *Collins*. Thus, the Supreme Court's holding that FHFA acted reasonably in executing the Third Amendment applies with full force here, and is dispositive of Plaintiffs' implied covenant claim.

Moreover, although this Court need not look beyond *Collins* to grant summary judgment in favor of Defendants, the evidence adduced in discovery—when viewed in conjunction with *Collins*—confirms there is no genuine dispute of material fact. Indeed, the discovery record is fully consistent with—and provides additional support for—the Supreme Court's conclusion that the Conservator's decision to execute the Third Amendment was reasonable. For example, in *Collins*, the Supreme Court explained that the Conservator chose the Third Amendment "[w]ith the aim of more securely ensuring market stability … [by] deciding on what it viewed as a less risky approach" that was "more certain to ensure market stability." *Collins*, 141 S. Ct. at 1777. In this case, deposition testimony by Edward DeMarco—FHFA's Acting Director at the time the Third Amendment was executed—confirms that the Third Amendment addressed FHFA's concerns about "several major uncertainties," including the possibility of a "further downturn or

a subsequent downturn in the economy and in the housing markets." SMUF ¶ 18 (quoting Ex. DD, DeMarco Dep. at 61 (Dec. 21, 2020)).

Similarly, the Supreme Court explained that the Third Amendment "was adopted at a time when the companies' liabilities had consistently exceeded their assets over at least the prior three years . . . . [T]he companies had repeatedly been unable to make their fixed quarterly dividend payments without drawing on Treasury's capital commitment . . . [and] the cap on Treasury's capital commitment was scheduled to be reinstated at the end of the year." *Collins*, 141 S. Ct. at 1777. Again, Mr. DeMarco testified that FHFA knew there were additional risks to the Enterprises' ability to meet their dividend obligations over and above the obvious market-related risks. FHFA under his direction was "on a path, as conservator, to shrink the footprints of the companies, which is going to reduce their income, and . . . the Treasury Department, is actively advocating for the wind-down of these companies, and . . . in Congress, there is nobody saying we want to keep these companies as they are." SMUF ¶ 18 (quoting Ex. DD, DeMarco Dep. at 247 (Dec. 21, 2020)). Thus, there were additional risks at play for FHFA beyond those the Supreme Court relied on in *Collins*.

Further, there is also no genuine issue of fact that the Third Amendment eliminated the risk that the Enterprises would need to draw on the Treasury commitment to pay dividends. SMUF ¶ 20. It is also undisputed that many major market analysts responded positively to the Third Amendment, explaining how it mitigated concerns about the sufficiency of the Treasury Commitment. *Id.* ¶ 22. Fitch Ratings observed that the Third Amendment "alleviate[d] potential concerns about a breach of the [Treasury] support cap, which kicks in next year [in 2013] under the funding agreement with Treasury." *Id.* Moody's called the Third Amendment "a credit positive" because it "ensures that each company will have sufficient contingent capital under its

Capital Agreement with the US Treasury." *Id*. Barclays stated that the Third Amendment "puts to rest any worries about [Enterprise] credit risk even in intermediate/longer maturities" (*id*.), and Guggenheim Partners concluded that "Fannie and Freddie will be on a *stronger financial footing*" because of the Third Amendment. *Id*. (emphasis added).

Thus, although the Court need not look beyond *Collins*, the evidence adduced in discovery is consistent with the Supreme Court's conclusions and fully supports judgment in favor of Defendants on Plaintiffs' implied covenant claim.

## II.   Plaintiffs' Implied Covenant Claim Fails Because the Contract, Which Incorporated HERA, Authorized the Third Amendment and Left No Gaps to Fill

Plaintiffs' breach of implied covenant claim fails for a separate reason: this Court held that the shareholder contract incorporates HERA, and the Supreme Court held that HERA "authorized" the Conservator to execute the Third Amendment. *Collins*, 141 S. Ct. at 1777. Thus, the shareholder contract authorized FHFA to execute the Third Amendment.

As recently confirmed by the Delaware Supreme Court, the implied covenant cannot "modify or negate an unrestricted contractual right authorized by an agreement." *Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 921 (Del. 2021); *accord Land & Marine Remediation, Inc. v. BASF Corp.*, No. 2:11CV239, 2012 WL 2415552, at *12 (E.D. Va. June 26, 2012) (applying Virginia law).[3] Here, the shareholder contract incorporates HERA's terms. On remand following the D.C. Circuit's decision in *Perry Capital*, this Court addressed the nature of the Plaintiffs' shareholder contract and found that "investor contracts with corporations are different" from traditional contracts because they "include[] not only documents such as the

---

[3]    *See Perry II*, 864 F.3d at 626 n.24 (applying Delaware and Virginia law); *Fairholme Funds*, 2018 WL 4680197, at *2 (same, observing "The GSEs hence enacted bylaws in which they elected to follow a chosen state's law—Delaware law for Fannie Mae and Virginia law for Freddie Mac.").

stock certificate, certificate of designations, the corporate charter, and bylaws, but also the corporate law under which the corporation is formed and regulated." *Fairholme*, 2018 WL 4680197, at *8. "Changes to these [shareholder] contracts may . . . come in the form of changes in law," and for the Enterprises, the relevant law includes HERA. *Id*. at *8–9. As such, the Court held that "changes to federal law—*i.e.*, those affecting the governance of the [Enterprises] and their relationship with their shareholders—amend or inform the investor contract." *Id*. at *9. Thus, HERA is a fundamental part of the shareholder contract.

Further, in *Collins*, the Supreme Court held that HERA "authorized" the Conservator to execute the Third Amendment, notwithstanding its alleged impact on the shareholders, because HERA permits FHFA to "subordinate" the best interests of the company (and thus the company's shareholders) to "its own best interests and those of the public." *Collins*, 141 S. Ct. at 1785; *see also Fairholme Funds*, 2022 WL 518222, at *12 ("HERA expressly authorized the FHFA, as conservator, to act in ways which were not designed to benefit either the Enterprises *or* its shareholders" (emphasis in original)). Because HERA—and thus the shareholder contract— "authorized" FHFA to execute the Third Amendment, there is no "gap to fill in the Agreement[s]" and the implied covenant is inapplicable. *Glaxo*, 248 A.3d at 921; *see also id*. at 920–21 (distinguishing between exercise of express, unrestricted contractual rights and discretionary contractual rights); *Vergara v. Apple REIT Nine, Inc.*, No. 19-cv-02027 (DLI) (RML), 2020 WL 8673038, at *6 (E.D.N.Y. Mar. 31, 2020) (summarizing Virginia law as recognizing the same distinction).

Moreover, while the implied covenant applies when a contract confers discretion on one party (*see Perry II*, 864 F.3d at 631), the implied covenant does *not* apply where the contract defines the scope of discretion that that party may exercise. *See DG BF, LLC v. Ray*, No. CV

2020-0459-MTZ, 2021 WL 776742, at *15 (Del. Ch. Mar. 1, 2021) ("An essential predicate for the application of the implied covenant is the existence of a gap in the relevant agreement. . . . Even [when a contract confers discretion on one party], the implied covenant does not come into play *when the scope of discretion is specified*, because in that instance, there is no gap." (emphasis added) (internal quotation marks and citations omitted)).[4]  Contracts can define the scope of discretion in a variety of ways, including by "identify[ing] factors that the decision-maker can consider" or "provid[ing] a contractual standard for evaluating the decision." *Policemen's Annuity*, 2012 WL 3548206, at *11.  For such contracts, courts can evaluate whether the party acted within its contractually defined discretion without resort to the implied covenant.[5]

Here, HERA defines the scope of any discretion conferred on FHFA by the shareholder contract.  Indeed, the Supreme Court in *Collins* specifically evaluated whether the Conservator's

---

[4]    *See also Policemen's Annuity & Benefit Fund of Chicago v. DV Realty Advisors LLC*, No. CIV.A. 7204-VCN, 2012 WL 3548206, at *12 (Del. Ch. Aug. 16, 2012) ("When a contract provision states how a grant of discretion is to be exercised, there is no place for the implied covenant in that provision."), *aff'd sub nom. DV Realty Advisors LLC v. Policemen's Annuity & Benefit Fund of Chicago*, 75 A.3d 101 (Del. 2013); *Old Dominion Elec. Co-op. v. Ragnar Benson, Inc.*, No. 305-CV-034, 2006 WL 2252514, at *9 (E.D. Va. Aug. 4, 2006) (under Virginia law, implied covenant applies only to "unfettered discretion of one party," and not when the discretion is "expressly fettered" by the contract) (quoting *Riggs Nat'l Bank of Washington, D.C. v. Linch*, 36 F.3d 370, 373 (4th Cir. 1994)).

[5]    *See, e.g.*, *S'holder Representative Servs. LLC v. Medidata Sols., Inc.*, No. CV 19-1312-RGA, 2020 WL 972618, at *5 (D. Del. Feb. 24, 2020) (dismissing implied covenant claim because the contract "expressly delineated the limits of Defendant's discretion" by stating defendant could operate the business "in any manner in which [Defendant] deems appropriate in its sole and good faith discretion"); *Heritage Handoff Holdings, LLC v. Fontanella*, No. CV 16-691-RGA, 2018 WL 3580287, at *3 and n.1 (D. Del. July 25, 2018) (rejecting implied covenant claim at summary judgment because the contract required the parties to act "reasonably" in request documents from the other, which "appropriately states the scope of the party's discretion"); *Policemen's Annuity*, 2012 WL 3548206, at *12 (implied covenant did not apply where contract allowed removal of managing partner if limited partners "in good faith determine that such removal is necessary for the *best interest of the [Limited] Partnership*" (emphasis added)).

execution of the Third Amendment fit within the scope of its discretion under the "best interests" provision, and held that it squarely did. *Collins*, 141 S. Ct. at 1776–78. HERA's best interests clause is word-for-word part of the shareholder contract, which necessarily means that when the Conservator acted within the scope of its statutory discretion, it acted within its contractual discretion as well. Thus, the Conservator had both statutory and contractual authority to "subordinate" shareholder interests in favor of the public interest. *Id.* at 1785. This is fatal to Plaintiffs' claim.

Because the contract, incorporating HERA, left no gaps to fill, Plaintiffs' implied covenant claim fails as a matter of law.

## III. Plaintiffs' Implied Covenant Claim Fails Because Plaintiffs Cannot Prove Any Harm Caused by the Third Amendment

Defendants are also entitled to summary judgment for the separate and independent reason that Plaintiffs cannot prove with reasonable certainty that they were harmed by the Third Amendment, or that the alleged harm resulting from the Third Amendment was foreseeable. This is because Plaintiffs' theory that shareholders were harmed and their corresponding damages model is entirely dependent upon an assumption unsupported by any record evidence— namely, that in the absence of the Third Amendment, Treasury would have agreed to allow the Enterprises to pay down the Treasury liquidation preference. With this baseless assumption removed, Plaintiffs cannot prove damages, entitling Defendants to summary judgment.

### A. Plaintiffs' Expectation Damages Theory Is Built on an Unsupported And Erroneous Assumption that the Enterprises Could Pay Down the Treasury Liquidation Preference in the Absence of the Third Amendment

Through their damages expert, Dr. Joseph Mason, Plaintiffs purport to demonstrate the fact of harm from the Third Amendment, as well as the quantum of damages resulting therefrom. Plaintiffs posit a "but-for" world absent the Third Amendment in which the Enterprises

eventually would have begun paying dividends to private shareholders sometime between 2029 and 2032.  *See* Mason Report ¶¶ 12, 31 (Aug. 27, 2021) (attached as **Exhibit MM**).[6]  Plaintiffs then calculate the present value of those forgone, future dividends and call them expectation (or benefit of the bargain) damages suffered by shareholders.  *See id*.

But Plaintiffs' theory is built on a chain of speculative assumptions about how the Enterprises, in the but-for world, would satisfy a host of other financial obligations in the decades following the execution of the Third Amendment before beginning to pay dividends to shareholders.  *See* Ex. MM ¶ 42 (Mason Report).[7]  The most egregious—and fundamental—of Plaintiffs' assumptions is that Treasury would have agreed to allow the Enterprises to pay down the Treasury liquidation preference beginning in January 2013.

It is undisputed that the Treasury stock certificates, as originally issued by the Enterprises, have never allowed the Enterprises to pay down the Treasury liquidation preference. *See* SMUF ¶ 8 (citing Treasury Stock Cert. § 3(a): "the Company may pay down the Liquidation

---

[6]     *See* Reference Manual on Sci. Evid. at 433 (3d ed.), 2011 WL 7724259, at *5 (A "but-for scenario hypothesizes the absence of that wrongdoing, that is, performance consistent with the expectations of the parties.  Expectation damages are an amount sufficient to give the plaintiff the same economic value the plaintiff would have received if the defendant had fulfilled the promise or bargain.").

[7]     In particular, in Plaintiffs' but-for world, the Enterprises must make enough profits to do *all* of the following before paying dividends to the shareholders: (1) pay 10% dividends to Treasury (totaling approximately $19 billion per year as of August 2012), (2) pay periodic commitment fees to Treasury, (3) pay off Treasury's outstanding liquidation preference (totaling approximately $187 billion as of August 2012), and (4) build up and maintain capital reserves sufficient to meet regulatory capital levels set by FHFA.  *See* Ex. MM at ¶ 42 (Mason Report) ("This analysis assumes that earnings of the [Enterprises] are not 'swept' by the Treasury, but that earnings above the SPS [10% dividend] coupons and [periodic] commitment fees (if any) are used to pay down the SPS [liquidation preference] and then build capital, after which such earnings are available to pay dividends.").  Plaintiffs assert the Enterprises would satisfy all of these obligations and begin paying dividends to private shareholders between 2029 and 2032. *See* Ex. MM at Ex. 1 (Mason Report).

Preference . . . *but only to the extent of*" periodic commitment fees and dividends previously added to the liquidation preference and not paid in cash (emphasis added)).[8]  Further, the Enterprises' inability to pay down the Treasury liquidation preference was well known to the market.  In its quarterly financial statement issued the week before the Third Amendment was executed, Fannie Mae stated: "*we are not permitted to pay down the liquidation preference* of the outstanding shares of [Treasury] senior preferred stock except to the extent of (1) accrued and unpaid dividends previously added to the liquidation preference and not previously paid down; and (2) quarterly commitment fees previously added to the liquidation preference and not previously paid down."  SMUF ¶ 9 (quoting Ex. G at p.54 (Fannie 10-Q for 2Q 2012)) (emphasis added).  Freddie Mac similarly stated: "Under the [PSPA], our ability to repay the liquidation preference of the senior preferred stock is limited and *we will not be able to do so* for the foreseeable future, if at all."  SMUF ¶ 9 (quoting Ex. H at p.89 (Freddie 10-Q for 2Q 2012)) (emphasis added).

In his initial report, Dr. Mason assumed without support or explanation that the Enterprises would be permitted to pay down the Treasury liquidation preference in the but-for world beginning in January 2013.  *See* Ex. MM  ¶ 42 (Mason Report).  When asked at his deposition the basis for this assumption, Dr. Mason testified that he "didn't see anything in the PSPAs that prohibited such paydown of the liquidation preference."  Deposition of Joseph Mason at 86 (Sept. 16, 2021) ("Mason 2021 Dep.") (excerpts attached as **Exhibit NN**).  He also testified that he "asked the [Plaintiffs'] attorneys in these matters for guidance on this, and my understanding and also my reading of PSPAs, suggest that they're silent on paying down the

---

[8]     While the Treasury stock certificates do require pay down of the liquidation preference in certain narrow circumstances, none of those circumstances is present here.  *See* SMUF ¶ 8.

liquidation preference." *Id.* Dr. Mason's understanding is clearly incorrect, and that is fatal to Plaintiffs' claims. As explained above, the Treasury stock certificate is not "silent on paying down the liquidation preference"; it expressly states that pay down is limited to situations that do not apply here.[9]

In his rebuttal report, Dr. Mason did not acknowledge his error. Rather, he rationalized his assumption by stating that "Treasury would be in favor of an SPS paydown" in the but-for world because it would have been "in the[ir] positive interest" and "consistent with historical governmental precedent." Mason Reply Report ¶ 108 (Mar. 1, 2022) (attached as **Exhibit OO**). This is mere conjecture. Dr. Mason identifies no record evidence to support his opinion that Treasury believed it was in its "positive interest" to permit pay down. Further, just because a course of action may have been one of the courses of action that might be in Treasury's interest does not mean that there was a reasonable certainty that Treasury would have taken that course of action in the but-for world. Dr. Mason's cursory opinion only touches on the former, not the latter.

In his deposition testimony, Dr. Mason acknowledged that, "[i]n the real world, certainly Treasury has not permitted paydown." Deposition of Joseph Mason at 101-02 (Mar. 16, 2022) (emphasis added) ("Mason 2022 Dep.") (excerpts attached as **Exhibit PP**). But he took the view that Treasury might agree to permit pay down if only Treasury were asked: "*I don't know that they [Treasury] were even asked to allow paydown, to be honest.*" *Id.* (emphasis added).

---

[9]   This is not the first time Dr. Mason's attempt to calculate a but-for world has been infected with erroneous assumptions. In *Phoenix Light SF Ltd. v. Bank of New York Mellon*, No. 14-CV-10104 (VEC), 2020 WL 2765044, at *3 (S.D.N.Y. May 28, 2020), the court excluded one of Dr. Mason's damages calculations where an assumption in Dr. Mason's "but-for" model was "not grounded in reality" and, thus, its inclusion in the model "corrupted its output beyond reason."

In fact, the undisputed record evidence shows that FHFA *did* ask Treasury to allow for

pay down and Treasury *did not accept* the request.  Specifically, in 2009, in the course of the

negotiations around both the First and Second Amendments, FHFA asked Treasury to amend the

PSPAs to allow for a voluntary pay down of their liquidation preferences.  SMUF ¶ 10 (citing

TREASDDC00002323 and 2324 (Feb. 25, 2009 letter from A. Pollard to S. Albrecht) (proposing

a "simple revision to each [Treasury stock] Certificate, easing the impediments to optional pay

down" of the liquidation preference); FHFA-DDC-0402385 and 2386 (Dec. 3, 2009 e-mail from

S. Smith to R. Covino, M. Ugoletti) (similar, proposing revisions to allow Enterprises to pay

down liquidation preference "at any time")).  Treasury did not agree to these requests, and the

First and Second Amendments did not amend the PSPAs to allow pay down of the liquidation

preference.  SMUF ¶ 10.  Dr. Mason's apparent ignorance of these undisputed facts confirms that

Plaintiffs' damages theory is built on an erroneous foundation.

### B.   Plaintiffs Cannot Prove with Reasonable Certainty the Fact of Damages or that the Third Amendment Caused the Alleged Damages

Under Delaware and Virginia law, to prevail on a claim for breach of the implied

covenant of good faith and fair dealing, a plaintiff must prove with "reasonable certainty" both

"the existence of damages" and that those damages "flowed from the defendant's violation of the

contract."  *eCommerce Indus., Inc. v. MWA Intel., Inc.*, No. CV 7471-VCP, 2013 WL 5621678,

at *13 (Del. Ch. Sept. 30, 2013); *Saks Fifth Ave., Inc. v. James, Ltd.*, 272 Va. 177, 188 (2006)

(plaintiff bears the "burden of proving with reasonable certainty the amount of damages and the

cause from which they resulted" (quotation marks and citation omitted)).[10]  Here, Plaintiffs'

---

[10]   Plaintiffs alleging a breach of the implied covenant of good faith and fair dealing is contractual in nature must prove damages in the same manner as for a breach of contract claim. *See ASB Allegiance Real Est. Fund v. Scion Breckenridge Managing Member, LLC*, 50 A.3d 434, 445 (Del. Ch. 2012) ("[A] claim for breach of the implied covenant is a contract claim, requires proof of breach-of-contract elements, and yields contract remedies"), *rev'd on other*

baseless assumption that the Enterprises would have been allowed to pay down the liquidation

preferences in their but-for world results in Plaintiffs' damages theory failing to meet multiple

legal requirements necessary to survive summary judgment.

    <u>No Reasonably Certain Causation</u>.  There is no genuine dispute of fact over the issue of

causation because Plaintiffs have not isolated the alleged harm caused by the Third Amendment,

as opposed to alleged harm caused by the pre-Third Amendment prohibition on pay down of the

liquidation preferences, which Plaintiffs have never challenged.  *See Perry II*, 864 F.3d at 609

(observing plaintiffs "accept that the original Stock Agreements and the First and Second

Amendments fit comfortably within FHFA's statutory authority as conservator" and describing

them as "*unchallenged and thus presumptively proper*" (emphasis added)).

    When attempting to prove damages with a but-for model, the model must isolate the

purported harm flowing from the alleged breach.  A "but-for scenario hypothesizes the absence

of that wrongdoing, that is, performance consistent with the expectations of the parties.

Expectation damages are an amount sufficient to give the plaintiff the same economic value the

plaintiff would have received if the defendant had fulfilled the promise or bargain."  Reference

Manual on Sci. Evid. at 433 (3d ed.), 2011 WL 7724259, at *5.  However, the but-for world

must "differ[] from what actually happened *only with respect to the harmful act*" in order to

"isolate the loss of value caused by the harmful act and exclude any change in the plaintiff's

value arising from other sources."  *Id*. (emphasis added).  Indeed, courts "will not award

expectancy damages where the plaintiff has not produced sufficient evidence to perform the

---

*grounds*, 68 A.3d 665 (Del. 2013); *Frank Brunckhorst Co., LLC v. Coastal Atlantic, Inc.*, 542 F.
Supp. 2d 452, 462 (E.D. Va. 2008) (Under Virginia law, breach of implied covenant "only gives
rise to a breach of contract claim").

necessary comparison between the breach and non-breach worlds." *Stockton East Water District v. United States*, 133 Fed. Cl. 204, 220 (2017) (citation and internal quotation marks omitted).

Here, the Plaintiffs' but-for world does *not* differ from what actually happened *only* with respect to the Third Amendment. Rather, Plaintiffs' but-for world *also* assumes a new agreement between Treasury and FHFA to allow the Enterprises to voluntarily pay down the Treasury liquidation preferences beginning in January 2013. Plaintiffs' but-for world is thus fundamentally flawed and legally deficient because it does not isolate the alleged harm caused by the Third Amendment, as opposed to the inability of the Enterprises to pay down the Treasury liquidation preferences.[11]

No Reasonably Certain Damages. There is also no genuine dispute of fact over whether Plaintiffs can prove the fact of damages with reasonable certainty—they cannot. "Damages that are contingent, speculative, and uncertain are not recoverable because they cannot be established with reasonable certainty." *Sunrise Continuing Care, LLC v. Wright*, 671 S.E.2d 132, 135 (Va. 2009) (reversing jury verdict in favor plaintiff on breach of contract claim where plaintiff had "failed to present sufficient evidence upon which the jury could base an award of damages without resorting to speculation or conjecture"); *see also Fletcher Int'l, Ltd. v. Ion Geophysical Corp.*, No. CV 5109-CS, 2013 WL 6327997, at *17 (Del. Ch. Dec. 4, 2013) (plaintiffs must show "the injuries suffered are not speculative or uncertain") (citation and internal quotation

---

[11] The Third Amendment and an agreement with Treasury to allow pay down of the liquidation preferences are not alternatives. As noted, FHFA requested Treasury allow pay down in 2009, before the Third Amendment (and Treasury did not agree). Further, Plaintiffs concede that a pay down mechanism is independent of the Third Amendment. Plaintiffs' liability expert Dr. Bala Dharan opines that there were multiple alternatives to the Third Amendment that FHFA and Treasury could have undertaken and that would have been reasonable. But none of those alternatives identified by Dr. Dharan include or depend upon a pay down of liquidation preferences by the Enterprises. *See* Dharan Rebuttal Report (Mar. 1, 2022) ¶¶ 31-38 (attached as **Exhibit QQ**).

marks omitted).  Accordingly, courts routinely grant summary judgment in favor of defendants

on breach of contract or implied covenant claims where the plaintiff has failed to prove damages

with reasonable certainty.  *See, e.g.*, *Cornerstone Therapy Servs., Inc. v. Reliant Post Acute Care

Sols., LLC*, No. 2:16-cv-00018, 2018 WL 1370863, at *5 (W.D. Va. Mar. 16, 2018) (granting

summary judgment in favor of defendant where plaintiff "cannot prove any reasonably certain

pecuniary loss resulting from [defendant]'s violation of the [contract]"); *Kronenberg v. Katz*, 872

A.2d 568, 609 (Del. Ch. 2004) (same, where "[i]n the discovery record, [claimant] has failed to

proffer any tangible evidence of concrete damage" resulting from the breach).

 Courts consistently reject attempts to prove damages using but-for worlds that are based

on speculation or lack evidentiary support.  For example, in *Standard Federal Bank v. United

States*, the plaintiff assumed—without evidence—that the bank would have invested additional

capital in the but-for world in the same manner as in the real world, and thus would have

achieved a similar rate of return.  62 Fed. Cl. 265, 286 (2004).  The court found these

assumptions unwarranted, held plaintiff's damages methodology was "deficient as a matter of

law," and granted summary judgment in defendant's favor on various breach of contract claims.

*Id.* at 298–99.  Likewise, in *eCommerce*, the court rejected the counterclaim plaintiff's damages

calculation because the alleged but-for world "rest[ed] primarily on a flawed assumption" that

the party had certain contractual rights that it did not have despite the breach.  2013 WL

5621678, at *43.[12]

---

[12]  *See also, e.g.*, *Stockton East Water District*, 133 Fed. Cl. at 224–25 (rejecting plaintiff's but-for world because it was "infected" by flawed assumptions and ignored several real world factors that would have been present in the but-for world); *Ne. Sav., F.A. v. United States*, 91 Fed. Cl. 264, 340 (2010) (finding plaintiff's but-for world to be "speculative and implausible" where it relied on assumptions contrary to the evidence); *Citizens Fin. Servs. v. United States*, 64 Fed. Cl. 498, 511 (2005) (rejecting plaintiff's but-for world where key assumptions were contradicted by the evidence or unsupported by evidence); *Bluebonnet Sav. Bank FSB v. United*

Here, Plaintiffs cannot prove the fact of damages with reasonable certainty because the central assumption of their but-for world—an amendment to the PSPAs to allow pay down of the liquidation preference—is erroneous and not supported by record evidence.  Plaintiffs' expert's speculation about whether it was in Treasury's interest in the but-for world to agree to allow pay down does not create a genuine dispute of material fact that would preclude summary judgment in Defendants' favor.  It is undisputed that, both before and after the Third Amendment, Treasury did not allow the Enterprises to pay down the liquidation preference.  In 2009, FHFA asked Treasury to allow pay down and Treasury did not agree—a fact of which Plaintiffs' expert was simply unaware.  *See* SMUF ¶ 10; Ex. PP at 101-02 (Mason 2022 Dep.).  Further, the PSPAs have been amended three times since the Third Amendment, and it is undisputed that the no-pay-down provision has never been altered.  SMUF ¶ 10.  In the most recent amendment (in 2021), the PSPAs were restructured in a manner that substantially *increases* the liquidation preference going forward.  *Id*. ¶ 24.  Plaintiffs cannot reconcile these indisputable real-world facts with Dr. Mason's conclusory assumption of what he believes is in Treasury's interest.[13]

No Foreseeability of Damages.  Plaintiffs also cannot prove the damages they allegedly suffered were foreseeable at the time of contracting.  *See* Restatement (Second) of Contracts

---

*States*, 67 Fed. Cl. 231, 234 (2005) (rejecting assumptions embedded within plaintiff's but-for world because they were inaccurate, which proved "fatal to [the] model's reliability").

[13]     There is also no record support for Plaintiffs' assumption that, in the but-for world, Treasury would have agreed *before January 2013* to allow the Enterprises to pay down the liquidation preference.  The timing of this hypothetical pay down is significant.  Plaintiffs' theory of harm depends upon pay down starting in January 2013 so that in Plaintiffs' but-for world, the Enterprises' profits in excess of the 10% dividend are applied to pay down the liquidation preference.  And as the liquidation preference gets paid down, the amount of the 10% dividend in subsequent quarters decreases.  Accordingly, if pay down were to happen later in the but-for world—sometime after January 2013—it would reduce or eliminate Plaintiffs' damages, because it would lengthen the period before the Enterprises could begin paying dividends to private shareholders.

§ 351 (1981) ("Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made."); *WSFS Fin. Corp. v. Great Am. Ins. Co.*, No. CVN18C09088, 2019 WL 2323839, at *5 (Del. Super. Ct. May 31, 2019) (damages "are not recoverable unless they are foreseeable and are traceable to the wrongful act and result from it"); *R.K. Chevrolet, Inc. v. Hayden*, 253 Va. 50, 56 (1997) (damages recoverable "only if it is determined that the special circumstances" giving rise to those damages were "within the contemplation of the parties to the contract").

Further, the need to prove foreseeability of damages is particularly acute where a plaintiff seeks lost profits or other forms of consequential damages. *See Pulte Home Corp. v. Parex, Inc.*, 265 Va. 518, 527 (2003) (defining consequential damages as: "Such damage, loss, or injury as does not flow directly and immediately from the act of the party, but only from some of the consequences or results of such act" (quoting Black's Law Dictionary)); *WSFS Fin. Corp.*, 2019 WL 2323839, at *4 (consequential damages "are those that result naturally but not necessarily from the wrongful act, because they require the existence of some other contract or relationship"). Damages are consequential when they would not result directly from the defendant's alleged breach alone, but "only upon the happening of an intermediate event." *Pulte Home*, 265 Va. at 527. Consequential damages are foreseeable when they "follow[] from the breach . . . as a result of special circumstances, beyond the ordinary course of events, that the party in breach *had reason to know*" at the time of contracting. Restatement (Second) of Contracts § 351 (1981) (emphasis added).

Here, Plaintiffs seek "lost profits" damages based on "foregone dividends" in the but-for world. Ex. NN at 201–12; 244–45 (Mason 2021 Dep.) (characterizing Plaintiffs' damages as economically equivalent "lost profits, very similar to [a] lost profits case" because the allegedly

lost "profits do reach out into the future").  But the claimed expectancy damages do not flow directly and immediately from the execution of the Third Amendment because they require the occurrence of intermediate events in the but-for world—chief among them, Treasury's agreement to allow the Enterprises to pay down the liquidation preference.

There is no genuine dispute that these damages were *not* foreseeable to the contracting parties—FHFA and the shareholders—at the time of contracting.  There is no record evidence that either party could foresee Treasury allowing the Enterprises to pay down the liquidation preference because, as discussed above, the contractual prohibition on pay down was known to the market (SMUF ¶ 9), and the fact that Treasury did not allow pay down, despite FHFA's request, was known to FHFA (*id*. ¶ 10).  Additionally, Plaintiffs can point to no evidence that, at the time of the execution of the Third Amendment (in August 2012), shareholders reasonably foresaw receiving dividends from the Enterprises nearly two decades later (*i.e*., 2029) because FHFA had announced at the outset of the conservatorships that "the common stock and preferred stock *dividends will be eliminated*." SMUF ¶ 6 (emphasis added).  Further, the PSPAs have always barred the Conservator from "mak[ing] any other distribution" with respect to Enterprise equity interests—including dividends to shareholders—without Treasury's consent.  SMUF ¶ 7 (quoting Ex. E § 5.1 (PSPA)).  Accordingly, there is simply no evidence in the record that the shareholders and FHFA contemplated, in August 2012 (or any other time), that (a) Treasury would agree to allow the Enterprises to begin paying down of the liquidation preference in January 2013, or (b) the Enterprises would be permitted to pay dividends to private shareholders

beginning in or around 2029, despite the suspension of those dividends from 2008 and

Treasury's ability to veto those dividends under the PSPAs.[14]

*       *       *

Plaintiffs' erroneous and unsupported pay down assumption renders their damages theory

factually and legally deficient for multiple reasons.  Because Plaintiffs cannot prove with

reasonable certainty that the execution of the Third Amendment caused them any harm, or that

any such harm was foreseeable at the time of contracting, Defendants are entitled to summary

judgment.

## IV.   Plaintiffs' Alternative Request for Restitution for Preferred Stockholders Fails Because It Is Barred as a Matter of Law

Plaintiffs have asserted that they "may seek restitution damages (or 'rescission' in some

courts) on behalf of current [Enterprise] junior preferred shareholders," as an alternative measure

of damages.  Ex. MM ¶¶ 15, 94 (Mason Report).  The Court need not address this remedy for

Plaintiffs' implied covenant claim because that claim fails for all the reasons discussed above.

*See supra* Sec. I and II.  Indeed, because Plaintiffs cannot establish liability for a breach of the

implied covenant, they cannot prove entitlement to any remedy at all—whether styled as

expectation damages or restitution.  Nevertheless, should the Court reach this issue, it should rule

that Defendants are entitled to summary judgment on Plaintiffs' alternative request for restitution

because that remedy is barred for several independent reasons.

---

[14]     The time period for examining the parties' reasonable expectations is August 2012.  *See Fairholme Funds*, 2018 WL 4680197, at *8 (Defendants "believe Plaintiffs' implied covenant claims must be considered in light of the stockholder contract as it existed *at the time of the alleged breach—i.e.*, at the time of the Third Amendment in August 2012.  This is because, according to Defendants, the parties' reasonable expectations were updated with each amendment to the broad, flexible contract, including the enactment of HERA.  The Court agrees with Plaintiffs in theory, but it is ultimately *Defendants whose position wins out*." (emphasis added) (internal citations omitted)).

A.        **Section 4617(f) Bars Plaintiffs' Alternative Request for Restitution**

Defendants are entitled to summary judgment on Plaintiffs' alternative request for

restitution because it constitutes equitable relief, and HERA's anti-injunction provision, 12

U.S.C. § 4617(f), bars all claims for equitable relief.

According to Plaintiffs, restitution would involve "unwinding the [preferred shareholder]

contracts in their entirety," "requiring the Defendants to disgorge the net benefits they have

received under th[ose] contracts," and requiring all preferred shareholders to return their stock to

the Enterprises and "give up [their] right to the shares."  Ex. MM ¶¶ 94–95 (Mason Report).[15]

Plaintiffs' claim for restitution would require the Enterprises would pay to the current

shareholders the price at which each series of preferred stock was initially issued, less the total

amount of dividends paid on the preferred shares.  The intended effect of this restitution remedy

is to return the contracting parties—the Enterprises and the preferred shareholders—to the

positions they held before entering into the shareholder contracts in the first place.  Plaintiffs

calculate the restitution amount as totaling $47.9 billion, which consists of $28.1 billion for the

shares and $19.7 billion in prejudgment interest (calculated from the date of the alleged breach

on August 17, 2012, through June 2022).[16]

Plaintiffs rightly characterize this form of restitution as "rescission."  *See* Ex. MM ¶ 94

(Mason Report).  "Rescission is the common, shorthand name for a composite remedy (more

---

[15]    Plaintiffs have calculated restitution only for the Enterprises' preferred stockholders, not
for any common stockholders.  *See* Ex. MM at ¶¶ 94–95 (Mason Report).  Further, Dr. Mason
testified that his calculation method involved simply identifying the "value of that which is paid"
(here, the preferred share issuance price), minus that which was received" (here, the dividends
received by the preferred shareholders).  Ex. NN at 233 (Mason 2022 Dep.).

[16]    Defendants dispute Dr. Mason's calculation of restitution, but it is not necessary to
resolve that dispute because Plaintiffs' alternative request for restitution is barred by Section
4617(f), irrespective of the manner in which it is calculated.

fully, 'rescission and restitution') that combines the avoidance of a transaction and the mutual restoration of performance thereunder."  Restatement (Third) of Restitution and Unjust Enrichment § 54 cmt. a (2011); *see also id*. § 37 cmt. a ("This section describes an alternative remedy for breach of contract that is sometimes called 'restitution' but is more easily recognized under the name 'rescission.'").  "Rescission remains a relatively uncommon remedy for breach of contract."  *Id*. § 37 cmt. a.

Courts consistently recognize that rescission is a form of equitable relief.  *See, e.g.*, *Henkel of Am., Inc. v. Bell*, 825 F. App'x 243, 252 n.5 (6th Cir. 2020) (describing "restitution interest for contract damages" as "resembl[ing] an equitable claim"); *Griggs v. E.I. DuPont de Nemours & Co.*, 385 F.3d 440, 446 (4th Cir. 2004) ("Resort to a court of equity is typically required if effective restitution can be obtained only through the cancellation or amendment of a document."); *Budinich v. Bank United, FSB*, No. CV-157833, 2016 WL 6892096, at *1 n.3 (D.N.J. Mar. 14, 2016) ("Plaintiff's claims for declaratory relief and recission are forms of equitable relief."); *Fed. Trade Comm'n v. Lanier L., LLC*, No. 3:14-CV-786-J-34PDB, 2015 WL 9598794, at *3 (M.D. Fla. Dec. 8, 2015) ("Rescission or reformation of contracts, which seeks to restore parties to a transaction to their status quo, is equitable."); *Roadmaster Indus., Inc. v. Columbia Mfg. Co.*, 893 F. Supp. 1162, 1172 (D. Mass. 1995) ("rescission may be employed as an equitable contract remedy"); *Florsheim Co. v. Miller*, 575 F. Supp. 84, 85 (E.D. Tex. 1983) ("The court can grant equitable relief—by ordering recission of the contract . . . "); *see also* Restatement (Second) of Torts § 871 cmt. f (1979) (noting both the "Restatement, Second, Contracts . . . and the Restatement of Restitution . . . are concerned primarily with *equitable relief*, in the form of cancellation or rescission of a contract entered into or restitution of that of which the plaintiff has been deprived." (emphasis added)).

As this Court and the D.C. Circuit have recognized, Section 4617(f) "prohibit[s] claims for declaratory, injunctive, and other forms of equitable relief as long as [FHFA] is acting within its statutory conservatorship authority." *Perry II*, 864 F.3d at 605–06.  Again, *Collins* is dispositive of the point.  The Supreme Court held that FHFA acted within its powers and functions as Conservator under HERA when it executed the Third Amendment.  *See Collins* 141 S. Ct. at 1775–78; *Perry II*, 864 F.3d at 606–08.

Here, Plaintiffs' claim for restitution necessarily requires simultaneous rescission of all preferred shareholder contracts, resulting in a forced distribution of capital from the Enterprises even though equity attributable to the same preferred shares was exhausted long ago.  *See* Ex. MM ¶¶ 94–95 (Mason Report).  An order granting such relief would "restrain or affect" the Conservator in violation of Section 4617(f).  Indeed, the Conservator "eliminated" all dividends to shareholders in 2008 (SMUF ¶ 6), and the PSPAs bar the Conservator from "mak[ing] any other distribution" with respect to Enterprise equity interests without Treasury's consent.  *Id*. ¶ 7 (quoting Ex. E § 5.1 (PSPA)).  To order the restitution remedy requested by Plaintiffs, the Court would necessarily force the Conservator to act contrary to the terms of the PSPAs.  A forced unwinding of all preferred stock—and a forced distribution of $47.9 billion of the Enterprises' capital, contrary to the Conservator's decision not to distribute capital—is precisely the type of judicial interference Section 4617(f) is designed to avoid.

### B.    Plaintiffs' Alternative Request for Restitution Is Barred For the Additional Reason That It Would Result in a Windfall for the Preferred Shareholders

Restitution is barred for an additional, independent reason: awarding rescission and restitution would force the Enterprises to pay each current preferred shareholder the full purchase price of the shares (less dividends paid on those shares), even though the value of those shares had already dropped significantly before the Third Amendment was executed.  In these

circumstances, awarding rescission and restitution would give the preferred shareholders a massive windfall that would put them in a far better position than if the Third Amendment had never been executed.  The preferred shares were all issued prior to the financial crisis, and thus inherent in the risks associated with the shareholder contract was the risk that comes with equity ownership.  Yet, Plaintiffs' alternative request for restitution would compensate them for all losses suffered as a result of the financial crisis and the imposition of the conservatorships themselves—none of which are being challenged by Plaintiffs as a breach of the shareholder contract.  The law does not allow such an inequitable remedy.

A party seeking rescission and restitution "must show that the unwinding of performance (as opposed to a remedy by money judgment) is both feasible *and equitable* on the facts of the case."  Restatement (Third) of Restitution and Unjust Enrichment § 54 cmt. a (2011) (emphasis added).  As such, "the court must determine whether rescission in place of enforcement [of the contract] serves the interests of justice," and is "equitable under the circumstances."  *Id*. § 54 cmts. b, e.  Indeed, "a central concern of the overall inquiry . . . is the risk of undue prejudice *to the defendant*," and rescission and restitution "will be denied if its effect would be the unjust enrichment of the [plaintiff] at the expense of the [defendant]."  *Id*. § 54 cmts. f, g (emphasis added).

Accordingly, restitution is not available if it would place the non-breaching party in a better position than it would have occupied absent the breach, as that would constitute an "unfair windfall."  *See Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297, 1315 (Fed. Cir. 2004) (explaining that restitution is inappropriate where "the non-breaching party [would] be placed in a better position through the award of damages than if there had been no breach" (internal quotation marks and citation omitted)); E. Allan Farnsworth & Zachary Wolfe, Farnsworth on

Contracts § 12.08 (4th ed. 2018) ("[I]t is a fundamental tenet of the law of contract remedies that

an injured party should not be put in a better position than had the contract been performed.");

*Projects Mgmt. Co. v. Dyncorp Int'l, LLC*, No. 1:13–cv–331, 2014 WL 1248075, at *8 (E.D. Va.

Mar. 26, 2014) (rejecting plaintiff's measure of damages that "would give [plaintiff] an

unwarranted windfall impermissible under federal or Virginia law" and granting summary

judgment in favor of Defendants); *Preferred Inv. Servs., Inc. v. T & H Bail Bonds, Inc.*, No. CV

5886VCP, 2013 WL 3934992, at *21 (Del. Ch. July 24, 2013) ("A non-breaching party . . . is not

entitled to a windfall.") (citing *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146 (Del. 2009)).

Moreover, where the property to be returned by the plaintiff to the defendant to fully unwind the

transaction has "suffered deterioration in value," there is an acute risk of "windfalls . . . resulting

from interim variation in the values being restored."  Restatement (Third) of Restitution and

Unjust Enrichment § 54 cmts. b, g.

      Here, awarding restitution to the preferred shareholders would be manifestly inequitable

and prejudicial to Defendants because it would provide a massive windfall to Plaintiffs,

compensating them for losses that occurred *before* execution of the Third Amendment.  The

preferred shares were issued as early as 1997 and some as late as 2008.[17]  By the time the Third

Amendment was executed in August 2012, the market price of the Enterprises' preferred shares

(that is, the price at which shareholders could sell their shares) had decreased substantially—on

average, over 93%—from the prices at which they were issued (that is, the price at which the

---

[17]    The preferred shares have been bought and sold on the secondary market since their
issuance.  Indeed, some Plaintiffs purchased preferred stock *after* the Third Amendment was
executed in August 2012.  *See Fairholme Funds, Inc. v. United States*, 147 Fed. Cl. 1, 21 and n.9
(2019) (observing that some Berkley Companies that are also plaintiffs in this action "acquired
preferred stock in both Enterprises before and after August 2012" and noting it was unclear
which companies "owned stock in the Enterprises before August 2012").

original shareholders bought their shares).  SMUF ¶ 23.  Indeed, according to Plaintiffs'
calculations, the shareholders' purported restitution award ($47.9 billion total, inclusive of
prejudgment interest) as of June 2022 is nearly double their claimed expectation, or benefit of the
bargain, damages award of $27.2 billion as of June 2022, which Plaintiffs base on a but-for
world in which there was no Third Amendment and thus no alleged breach.  *Compare* Ex. MM
¶ 95, Table 3 (Mason Report, Restitution Damages Summary) to Ex. MM at ¶ 86, Table 1
(Mason Report, Method 1 Damages Summary).

Plaintiffs do not contend that Defendants are responsible for (or should be held liable for)
this pre-Third Amendment reduction in share or contract value, which was attributable to a host
of factors, from the Great Recession and its impact on the Enterprises to the imposition of the
conservatorships.  This would plainly constitute a windfall to Plaintiffs because it would "not
return the [shareholders] to [their] pre-breach position, but to a better position."  *Old Stone Corp.
v. United States*, 63 Fed. Cl. 65, 78 (2004).  It would also violate a "fundamental tenet of the law
of contract remedies" by putting the junior preferred shareholders "in a better position than had
the contract been performed."  Farnsworth on Contracts § 12.08; *see also Admiral Fin. Corp. v.
United States*, 378 F.3d 1336, 1345 (Fed. Cir. 2004) (rejecting investor's request for rescission
and restitution because it would result in a windfall where the value of the investment had
deteriorated before the alleged breach).  Accordingly, Plaintiffs' alternative request for
restitution is unavailable as a matter of law, and the Court should grant summary judgment in
Defendants' favor on this issue.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request the Court grant Defendants'
motion and enter summary judgment in favor of Defendants.

Dated: March 21, 2022

Respectfully submitted,

  /s/ Howard N. Cayne
Howard N. Cayne (D.C. Bar # 331306)
Asim Varma (D.C. Bar # 426364)
David B. Bergman (D.C. Bar # 435392)
Ian S. Hoffman (D.C. Bar # 983419)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave NW
Washington, D.C. 20001
(202) 942-5000
Howard.Cayne@arnoldporter.com
Asim.Varma@arnoldporter.com
David.Bergman@arnoldporter.com
Ian.Hoffman@arnoldporter.com

*Attorneys for Defendant Federal Housing Finance Agency and Acting Director Sandra L. Thompson*

  /s/ Michael J. Ciatti
Michael J. Ciatti (D.C. Bar #467177)
KING &SPALDING LLP
1700 Pennsylvania Ave. N.W.
Washington, DC 20006
Tel: (202) 626-5508
Fax: (202) 626-3737
mciatti@kslaw.com

*Attorney for the Federal Home Loan Mortgage Corp.*

  /s/ Meaghan VerGow
Meaghan VerGow (D.C. Bar # 977165)
O'MELVENY &MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
Tel: (202) 383-5300
Fax: (202) 383-5414
mvergow@omm.com

*Attorney for the Federal National Mortgage Association*

38