# **EXHIBIT BB**

**North America** United States



**Deutsche Bank**

*Securitization*

*Global Markets Research*

14 March 2012

# The Outlook
## In MBS and Securitized Products

**Resi: The path of US support for Fannie Mae, Freddie Mac** .................... Page 4
*Unlimited US Treasury support for the agencies likely ends this year. Then a new and less certain path begins.*

**CRE: Could CMBS loans become fully recourse?** ..................................... Page 8
*A recent court decision on a small loan which was securitized over ten years ago has the potential to challenge the main tenets of the CMBS market – the non-recourse nature of the loans.*

**Consumer ABS: Opportunities in equipment ABS** ............................... Page 10
*The strong price performance of high-quality equipment ABS has been supported by strengthening credit fundamentals in the sector*

### Relative Value / ALM Strategies

**Servicer based opportunities and risks in the Consumer Relief Program**
.................................................................................................... Page 12
*What the settlement could mean for investors in non agency*

### Sector Analysis

**Agency MBS: Putting a price on LTV** ...................................................... Page 15
*HARP loans with the highest LTV still show the best value*

**Rates: Underwriting the recovery** .......................................................... Page 19
*We continue to expect the Fed to "underwrite" the recovery by maintaining monetary stimulus though the balance of the year. This leaves us constructive and in the mode of buying dips.*

**Economics: Labor market begins to blossom** ......................................... Page 23
*The February employment report was solid as both headline and private payrolls each topped 200k for the third month in a row*

---

***Deutsche Bank 2012 MBS and Securitization Conference***
***Tuesday, March 27, 2012, New York City***
***Featured speakers: Rick Reider, BlackRock and Edward DeMarco, Federal Housing Finance Agency***

***Call your sales representative for an invitation***

---

## Market Update

### Research Team

**Coordinators**

**Steven Abrahams**, Residential MBS
**Harris Trifon**, Commercial RE
**Elen Callahan**, Consumer ABS

**Residential MBS**
Steven Abrahams
(+1) 212 250-3125
steven.abrahams@db.com

Ying Shen
(+1) 212 250-1158
ying.shen@db.com

Doug Bendt
(+1) 212 250-5442
douglas.bendt@db.com

Richard Mele
(+1) 212 250-0031
richard.mele@db.com

Jeff Ryu
(+1) 212 250-3984
jeff.ryu@db.com

Jason Wu
(+1) 212 250-6157
jason.wu@db.com

**Commercial Real Estate**
Harris Trifon
(+1) 212 250-5893
harris.trifon@db.com

David Zhou
(+1) 212 250-1952
david-j.zhou@db.com

**Consumer and Esoteric ABS**
Elen Callahan
(+1) 212 250-8161
elen.callahan@db.com

Douglas W. Runte
(+1) 212 250-9319
douglas.runte@db.com

**Prepayment and Default Modeling**
Ying Shen
(+1) 212 250-1158
ying.shen@db.com

Jason Wu
(+1) 212 250-6157
jason.wu@db.com

**Portfolio Strategies**
Christopher Helwig
(+1) 212 250-3033
christopher.helwig@db.com

**Rates**
Dominic Konstam
(+1) 212 250-9753
dominic.konstam@db.com

**Economics**
Joseph LaVorgna
(+1) 212 250-7329
joseph.lavorgna@db.com

---

Deutsche Bank Securities Inc.

All prices are those current at the end of the previous trading session unless otherwise indicated. Prices are sourced from local exchanges via Reuters, Bloomberg and other vendors. Data is sourced from Deutsche Bank and subject companies. Deutsche Bank does and seeks to do business with companies covered in its research reports. Thus, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision. DISCLOSURES AND ANALYST CERTIFICATIONS ARE LOCATED IN APPENDIX 1. MICA(P) 146/04/2011.

*MBS and Securitized Products*

Deutsche Bank

# 2012 MBS and Securitization Conference

*Passion to Perform*

**Tuesday, March 27, 2012**

| | |
|---|---|
| **Trump SoHo** | **SoHo Ballrooms, 3rd Floor** |
| **246 Spring Street** | **New York, NY 10013** |

| | |
|---|---|
| 12:30 – 1:00 pm | **Registration** |
| 1:00 – 5:00 pm | **Business Sessions** |

**Welcome and Opening Remarks**
*Jeff Mayer*, Managing Director, Head of Corporate & Investment Bank North America, Deutsche Bank

**Keynote Speaker**
*Rick Rieder*, CIO, Fundamental Fixed Income Portfolios, BlackRock

**Europe, the US Economy & Beyond**
*Torsten Slok*, Managing Director, Chief International Economist, Deutsche Bank

**Securitized Credit Panel: The New Capital Paradigm**
| | |
|---|---|
| Moderator: | *Harris Trifon*, Director, Head of Commercial Real Estate Debt Research, Deutsche Bank |
| Traders: | *Ben Solomon*, Managing Director, Head of US CMBS Secondary Trading, Deutsche Bank |
| | *Pius Sprenger*, Managing Director, Co-Head of Structured Products Trading, Deutsche Bank |
| Clients: | *Randy Robertson*, Head of Securitized Assets, BlackRock |
| | *Andy Solomon*, Head of Commercial Real Estate Debt, Angelo Gordon |

**Networking Break**

**Agency MBS Panel: The New Impact of Regulation & Politics**
| | |
|---|---|
| Moderator: | *Steve Abrahams*, Managing Director, Head of MBS and Securitization Research, Deutsche Bank |
| Traders: | *Chris Babu*, Managing Director, Co-Head of Agency CMO and Derivative Trading, Deutsche Bank |
| | *Troy Dixon*, Managing Director, Co-Head of Structured Products Trading, Deutsche Bank |
| Clients: | *Gary Kain*, President & CIO, American Capital Agency Corp. |
| | *Alan Galishoff*, Managing Director and Portolio Manager, Millennium Partners |
| | *Kurt Weisenfluh*, Head of US Rates and Agency Mortgages, BlackRock Model-Based Fixed Income Portfolio Management |

**Perspectives from Washington, DC**
*Edward DeMarco*, Acting Director, Federal Housing Finance Agency

| | |
|---|---|
| 5:00 – 6:30 pm | **Networking Reception** |
| | SoHi Room, 46th Floor |



FHFA-DDC-0048933

14 March 2012    The Outlook

**Deutsche Bank** ◪

# Triple-A generic secondary market spread indications

| Data on this page as of 3/9/12 | Average life bucket | | | | | |
|---|---|---|---|---|---|---|
| | 1yr | 2yr | 3yr | 5yr | 7yr | 10yr |
| **US floating-rate spreads (bp) to LIBOR** | | | | | | |
| Credit cards (1-month) | -- | 7 | 10 | 23 | 30 | 40 |
| Student loan FFELP (3-month) | 20 | 35 | 45 | 70 | 95 | 115 |
| Student loan private credit (3-month) | -- | 150 | -- | -- | 325 | -- |
| Home equity loan (HEL) ARM Seq (Note: vs. 1, 3, 6yr) | 350 | -- | 750 | 975 | -- | -- |
| **US fixed-rate spreads (bp) to swaps** | | | | | | |
| Autos (Note: 1yr auto vs. EDSF) | 1 | 10 | 27 | -- | -- | -- |
| Wrapped auto (subprime) | -- | 85 | -- | -- | -- | -- |
| Credit cards | -- | 4 | 12 | 24 | 33 | 43 |
| CMBS cash AAA | -- | -- | -- | 175 | 185 | 155 |
| Home equity loan (HEL) | -- | 475 | 725 | 975 | 1000 | 1075 |
| Equipment | 10 | 25 | 35 | -- | -- | -- |
| **US fixed-rate spreads (bp) to Treasuries** | | | | | | |
| Autos | -- | 35.3 | 53.5 | -- | -- | -- |
| Credit cards | -- | 29.3 | 38.5 | 49.8 | 53.3 | 51 |
| Home equity loan (HEL) | -- | 500.3 | 751.5 | 1000.8 | 1020.3 | 1083 |
| **Agency (nominal spreads to Treasuries) (bp)** | | | | | | |
| Agency MBS - Curr Cpn (15yr) | -- | -- | -- | 112 | -- | -- |
| Agency MBS - Curr Cpn (30yr) (vs. 7.5yr) | -- | -- | -- | -- | 148 | -- |
| **Other (bp)** | | | | | | |
| Industrial single-A corporate spreads (to UST) | -- | 33.8 | 47.0 | 73.2 | -- | 111 |

# MBS, CMBS and ABS spread charts

**US floating-rate spreads (bp)**



— 2yr Card (LIBOR)  — 2yr SL (LIBOR)  — 3yr HEL ARM SEQ (rt axis)
Card and HEL ARM spreads to 1m LIBOR; student loan spreads to 3m LIBOR

**US fixed-rate spreads to swaps (bp)**



— 3yr Auto  — 5yr Card  — 5yr CMBS  — 5yr HEL (rt axis)
Three-year auto spreads are for prime benchmark autos

**US fixed-rate ABS spreads to Treasuries (bp)**



— 2yr Auto  — 5yr Credit card  — 5yr HEL (rt axis)
Spread charts reflect generic secondary triple-A levels for each asset class.
*Source for all is Deutsche Bank, except Corporates (to UST), which is Bloomberg Finance LP.*

**Agency MBS – CC LIBOR option adjusted spread (bp)**




For detailed sector data, please refer to the
companion document, *The Outlook: Data Addendum.*

---

FHFA-DDC-0048934

**Deutsche Bank**

## RESI

# The path of US support for Fannie Mae, Freddie Mac

December 31 of this year marks the scheduled end to unlimited US Treasury support for Fannie Mae and Freddie Mac. Limited support begins the next day in amounts likely to be around $125 billion for Fannie Mae and $150 billion for Freddie Mac. The agencies will need that support along with reserves and income to cover future losses on mortgage-backed securities, repay debt and pay dividends on preferred stock issued to the US Treasury. In his letter to Congress last month, the acting director of the Federal Housing Finance Agency wrote that "it is clear that the draws [Fannie Mae and Freddie Mac] have taken from the Treasury are so large they cannot be repaid under any foreseeable scenarios." Both Fannie Mae and Freddie Mac have subsequently said that the need to pay dividends to Treasury creates "significant uncertainty about our long-term financial sustainability." That uncertainty puts both their MBS and debt at risk.

Many observers around the agency mortgage market have assumed that the US Treasury will extend unlimited support for Fannie Mae and Freddie Mac before the December 31 deadline. Unlimited support would allow the agencies to continue covering dividends and any other costs. But a close reading of the legislation that authorizes Treasury support suggests that Treasury may not be able to extend unlimited support without approval by Congress. Although Treasury has not confirmed that interpretation, other senior government officials and executives of other government-sponsored enterprises similarly understand that Treasury cannot readily extend unlimited support. That interpretation is also shared by a senior mortgage insurance executive and a Washington lawyer that has analyzed US support for the agencies. Given divisions in Congress over the future of the agencies and the lack of any legislative progress on reform, easy Congressional approval seems unlikely.

An inability to extend unlimited backing could force the Treasury to consider other means for relieving financial pressure on the agencies. The most likely relief would come from suspending the annual 10% dividend that the agencies will owe to the Treasury on its holdings of preferred stock, which currently stand at $188 billion. That would likely allow the agencies to easily service their MBS and debt. But it might also come with political costs.

Uncertainty over US financial backing for Fannie Mae and Freddie Mac and their ability to service securities could

widen spreads and reduce liquidity in MBS and debt as expiration of unlimited support approaches. It is a risk that all MBS portfolios need to anticipate.

**The authority for Treasury support**

Congress first gave the US Treasury authority to support Fannie Mae and Freddie Mac in the Housing and Economic Recovery Act of 2008, enacted July 30. Section 1117 of the bill gave the Treasury authority to buy unlimited amounts of Fannie Mae and Freddie Mac obligations but set a deadline for exercising that authority of December 31, 2009.

On September 7, 2008, the US put the agencies into conservatorship under the Federal Housing Finance Agency, and each agency signed a Senior Preferred Stock Purchase Agreement (PSPA) with the Treasury, which was restated and amended on September 26, 2008. The restated agreement allowed each agency to draw up to $100 billion to cover any quarterly losses as calculated under GAAP. With every draw, the agency would issue a like amount of preferred stock to the Treasury. The preferred stock paid a 10% annual dividend.

On May 6, 2009, the agencies and the Treasury amended the PSPA again, this time raising the maximum draw to $200 billion.

Then on December 24, 2009, shortly before the unlimited purchase authority expired, the agencies and the Treasury amended the PSPA again. This amended version authorized the Treasury to provide up to $200 billion of support for each agency and to cover an unlimited amount of losses in 2010, 2011 and 2012. The agencies subsequently have interpreted the agreement as requiring Treasury to reduce the $200 billion in support available after 2012 by any amounts drawn in 2008 or 2009. Since Fannie Mae drew $75.2 billion from the Treasury in those years, it's filings with the SEC show it expects to have $124.8 billion in support left. Since Freddie Mac drew $50.7 billion, it expects to have $149.3 billion.

Since the agencies and the Treasury have modified the PSPA three times, many observers assume the parties could modify it again and extend unlimited loss coverage beyond 2012. However, the original December 31, 2009, deadline for authorizing purchases looks likely to prevent

FHFA-DDC-0048935

14 March 2012    The Outlook                                          Deutsche Bank

that extension. The original legislation authorizing Treasury support and the PSPA both give the Treasury and the agencies broad rights to modify other parts of the existing agreement.  But extending purchase authority likely will take an act of Congress.

**Dividend pressure**

Limited US support for the agencies and the need to pay dividends to Treasury eventually could leave both agencies weakened.  Fannie Mae has said that it does not expect to earn profits in excess of its annual dividend obligation "for the indefinite future."  Freddie Mac has noted that it is unlikely to regularly generate enough income to cover its annual dividends to the Treasury.  The PSPA requires the agencies to issue more preferred stock to the Treasury to cover any shortfall in dividend payments. As a result, the obligation to the Treasury grows as a compounded rate, something noted before by my colleague in rates strategy, Dan Sorid.

The timing for when Fannie Mae and Freddie Mac might exhaust Treasury support depends on the fixed amount available after 2012, the amount of preferred stock held by the Treasury and the ability of the agencies to cover the preferred dividend with revenue from guaranteeing MBS and from their investment portfolios.  Some of these things are easy to estimate while others require stylized assumptions.

The simplest but least likely scenario would require the agencies to cover their preferred dividends without access to revenue, which is substantial and likely to remain so beyond 2012. This scenario also assumes that the two agencies breakeven on all other activities. Nevertheless, this scenario shows the most potential stress on the agencies and sets a lower bound to Treasury support. For Fannie Mae, the FHFA last October projected that the agency would cumulatively draw $142 billion in preferred stock by the end of 2012.  With an expected $124.8 billion in fixed support after 2012, servicing the preferred stock would exhaust Treasury support by the end of 2020 (Figure 1, No Income).  For Freddie Mac, the FHFA projected a cumulative draw of $76 billion.  With $149.3 billion in fixed support, the preferred dividend would exhaust support by the end of 2025 (Figure 2, No Income).



Figure 1: The potential impact of preferred dividends on Treasury backstop for Fannie Mae

Source: FHFA; Deutsche Bank



Figure 2: The potential impact of preferred dividends on Treasury backstop for Freddie Mac

Source: FHFA; Deutsche Bank

A more realistic scenario would allow the agencies to draw revenue from their guarantee and investment businesses.  Estimating that likely revenue requires a host of assumptions.

The guarantee businesses at both agencies look very healthy.  Both agencies hold sizable reserves against foreseeable losses, which reduce the burden on future revenue to cover those losses.  Fannie Mae holds $93.2 billion in reserves, and Freddie Mac $39.7 billion.  The quality of newly guaranteed loans also has increased dramatically, with both borrower credit score and debt-to-income ratio showing higher averages and higher lower bounds. The average loan-to-value ratio ranges around 70.

FHFA-DDC-0048936

**Deutsche Bank**

Recent books of guarantees arguably are among the best ever written by the agencies. Both agencies also have raised new guarantee fees in recent years, even though recent changes to the Home Affordable Refinance Program have reduced some of them. Based on discussions with major servicers, the average new guarantee fee going to the agencies is approaching 40 bp. The FHFA plans to raise guarantee fees further. Nevertheless, both agencies hold large legacy guarantee books with lower average fees. For Fannie Mae, if it kept its balance of guaranteed loans and MBS steady at the current $3.1 trillion and took in a conservative 25 bp of fees with 8 bp of expenses for losses and administration, the revenue would extend the life of Treasury support from 2020 to 2023 (Figure 1, G-fee Income Only). For Freddie Mac, if its balance of guarantees stayed at the current $2.1 trillion, the life of Treasury support would extend from 2025 to 2030 (Figure 2, G-fee Income Only).

The investment portfolios at each agency face a different future. The PSPA requires each portfolio to shrink by 10% annually starting at $900 billion in 2010. The limit today has fallen to $729 billion. Traditionally, these portfolios have provided the bulk of agency revenue, often exceeding two-thirds of the total before the financial crisis. But much of that revenue depended on a spread between funding and assets unlikely to prevail in the future. The composition of the portfolio also has changed, with non-agency securities and unsecuritized loans making up a larger percentage. Revenues from the portfolios are probably hardest to estimate. One reasonable assumption is that the agencies keep the portfolio balances roughly in line with the required limits and that the portfolios deliver the roughly 60 bp of option-adjusted spread targeted in the past. For Fannie Mae, adding portfolio revenue under these assumptions to guarantee revenue further extends the life of Treasury support from 2025 to 2029 (Figure 1, G-fee and Portfolio Income). For Freddie Mac, the portfolio revenue extends Treasury support from 2030 to 2037 (Figure 2, G-fee and Portfolio Income).

**Market implications**

For MBS investors, diminishing Treasury support raises the risk that the agencies one day might face challenges in covering MBS losses. The high quality of current loans and the prospect of rising guarantee fees should allow the agencies to cover losses in most scenarios. The risk becomes greater in a housing market catastrophe, such as the one that started in the US after 2006. Although it is difficult to know how much support investors might consider enough, recent Sequoia Mortgage Trust securitizations provide one of the few benchmarks. SEMT 2011-2, for example, securitized fixed-rate loans with a weighted average loan-to-value of 59, a credit score of 773 and a loan size of $799,000. Fitch, the only agency that reviewed the transaction, required subordination of 7.4% to rate the most senior class 'AAA.' On agency loans, the higher loan-to-value ratio and the lower average loan balance might require more subordination. For Fannie Mae, the $124.8 billion in support likely at the start of next year is equal to only 4.04% of its guaranteed loans and MBS. Including Fannie Mae's $93.2 billion in loss reserves, that percentage rises to 7.05%. For Freddie Mac, it's $149.3 billion in support amounts to 7.22% of guaranteed loans and MBS. Adding its $39.7 billion in reserves brings the percentage to 9.14%. Those percentages would likely fall along with remaining Treasury support as the agencies paid preferred dividends. Presumably, investors would begin trading agency MBS to progressively wider spreads.

Beyond MBS, concerns about Treasury support could also affect money markets, where the Fed's latest data show that agency MBS and CMOs collateralize $757 billion or 43.4% of total tri-party repo. Agency debt collateralizes another $117 billion or 6.7% of the total. Margin requirements and lending spreads might rise, reducing liquidity and further widening spreads in these products.

Investors in agency debt already differentiate shorter debt from longer. As late as mid-2007, all Fannie Mae and Freddie Mac debt traded at yields below the swap curve. Since the crisis started, only issues with maturities of five years or less have traded that tight. The prospect of falling Treasury support might lead MBS investors in the same direction.

**Possible solutions**

If Treasury and the agencies want to avoid the possible market implications of diminishing Treasury support, then the parties to the PSPA could elect to amend it and defer or reduce the dividend. Deferring the dividend would almost surely leave the agencies with enough guarantee and investment revenue to cover MBS losses and manage portfolio funding. If the dividend continued to accrue while deferred, it might still pose risk to the agencies if the US ever chose to reinstate payment. If the dividend did not accrue, then the agencies might build up enough capital over time to return full principal. Alternatively, the parties could reduce the dividend to a level that the agencies would be able to cover comfortably with guarantee and investment income. That level would likely vary for Fannie Mae and Freddie Mac, with Fannie Mae needing a larger reduction. Based on the stylized assumptions used here for projecting guarantee and investment revenue, a 5% dividend might be manageable for both agencies.

FHFA-DDC-0048937

**Deutsche Bank**

If deferring or reducing the preferred dividend proved politically unpalatable, then the agencies might have to consider selling parts of their investment portfolios now held at a gain. That could slow the compounding of the preferred dividend in the near term, but it would also likely reduce investment revenues in the long term. Beyond the impact on the agencies' balance sheet, sales could also put pressure on the secondary market to absorb the supply.

**Trading scenarios**

The political risks of deferring or reducing the PSPA dividend might lead the current administration to wait until after this year's elections to address the issues. In the mean time, investor attention to US support for Fannie Mae and Freddie Mac will likely grow as the expiration of unlimited backing approaches. Spreads and liquidity for the agencies' MBS and debt could become choppy.

Nevertheless, Fannie Mae and Freddie Mac remain critical to US mortgage finance, and Washington seems unlikely to risk weakening investor confidence in the safety of their MBS and debt. The two agencies, for the nine months through September of last year, guaranteed more than 64% of all new mortgage originations. With banks and other private capital likely to come back slowly to mortgage lending, policymakers almost certainly need Fannie Mae and Freddie Mac to help bridge the transition. Look for Treasury and the agencies to restructure the PSPA dividend after the November elections, and for spreads and liquidity to improve sharply.

\* \* \*

**The view in rates**

As the prospects of immediate crisis in Greece recede and the indications of steady if modest growth in the US continues, longer US yields should rise. An end to QE2 without promise of QE3 should also nudge up yields. My colleague Peter Hooper argues that the Fed is unlikely to launch QE3 unless unemployment rises or inflation expectations fall, neither of which seem likely. Researchers from the Bank for International Settlements

estimated on Monday that the Fed's current buy program ultimately will trim 10-year yields by 85 bp. If the program ends, additions to the stock of 10-year Treasury debt should slowly lift yields. Of course, there is ongoing risk of recession in Europe exceeding expectations and risk that continuing weakness in US housing keeps growth slow. But forces for higher yields still look likely to prevail.

**The view in spread markets**

Most spread products, MBS included, continue to hold their ground because carry has trumped other risk factors. But MBS have good prospects if rates do move higher. In that case, actual mortgage rates to borrowers should move up very slowly as originators try to hold rates down and keep the pipeline full. The last few weeks have started to show that trend. That should reduce extension risk in MBS and help their performance relative to most rates benchmarks.

MBS investors still have time to position for HARP, which should push up prepayments sharply in March and April. Preferences, among others:

- Long specified pools, short TBA
- Long 2010 and 2011 pools, short pre-May 2009
- Long 15-year TBA pools, short 30-year

**The view in mortgage credit**

The S&P/Case-Shiller 20-City Index finished 2011 at a new low, but most of that was the usual winter slowdown. Prices should still slide in 2012, but declines in distressed inventory should ease some of the pressure on housing.

*Steven Abrahams (+1) 212 250-3125*

FHFA-DDC-0048938

14 March 2012    The Outlook

**Deutsche Bank** ◨

## CRE
# Could CMBS loans become fully recourse?

*Published concurrently with March 14, 2012, CMBS A recent court decision on a small loan which was securitized over ten years ago has the potential to challenge the main tenets of the CMBS market – the non-recourse nature of the loans. Throughout the years there have been numerous examples of borrowers both large and small taking advantage of the non-recourse provision to remove them from underperforming properties or situations. In fact an argument could be made that the non-recourse provisions found in CMBS loan agreements has been one of the major reasons for the market's success over nearly the last two decades. In the note below, we trace through events which led to the court case in question, the case itself and the various scenarios which could play out from here.*

**The property and workout process**
The Cherryland Center loan ($8.7mm original balance) was securitized in the GMACC 2002-C3 transaction and carried a 6.28% interest rate. The collateral for the loan was a 164k sf anchored retail property in Traverse City, MI. The property like so many others got into trouble when the occupancy began to fall and pushed the DSCR below 1.0x. The full details of the workout process are detailed below.

| Workout Timeline | |
|---|---|
| Date | Event |
| Dec-08 | Transferred to special servicer, DSCR reported to be 1.11x |
| Jan-09 | Borrower indicates payment will not be made in 2009 |
| Sep-09 | Payment is not made as DSC turned negative |
| Nov-09 | Borrower requests interest-only payments in 2010 |
| Mar-10 | Servicer pursues foreclosure |
| Aug-10 | Asset is foreclosed on but former borrower contests receiver during 6 month statuary redemption |
| Sep-10 | McKinley appointed the receiver |
| Nov-10 | Occupany drops from 83% to 36% |
| Jan-11 | Appraised value falls to $3.9mm from 4.95mm a year before and $12.3mm at issuance |
| Mar-11 | BOVs are ordered, redemption period ends |
| Jun-11 | Occupany increased to 64%, property is listed for sale |
| Oct-11 | Occupancy increased to 82% when Big Lots moves in, asset declared non-recoverable |

Source: Deutsche Bank

**Legal Arguments**
Once the asset fell into default, the Trust took the unique approach to secure proceeds through arguing the Borrower failed to keep the SPE solvent and was therefore liable for the deficiency judgment. Below is a short summary of the Wells Fargo Bank, NA v. Cherryland Mall Limited Partnership case.

Trust – The Borrower was liable for the deficiency because the non-recourse/SPE covenants were breached. The covenants required the Borrower to remain solvent and pay its debts. Therefore, because the Borrower became delinquent on the loan the covenants were breached.

Borrower – The covenants were not breached because the SPE term was not properly defined in the loan agreement and as a result, they maintained their status as an SPE and the Guaranty was not applicable. An alternative argument which was also used centered on the principle that the intent of the Guaranty was to prevent insolvency as a result of "bad boy" acts and not a decline in the value of the property.

Court of Appeals – sided with the Trust. They did not think that the loan agreement properly defined the SPE. The Court found that the list of covenants in the loan agreement were commonly found in other CMBS loan agreements and were considered SPE covenants. The Court analyzed loan documents with similar or identical provisions to the loan agreement in question as the basis for the decision. Regarding the Borrower's second argument (ie. intent), the Court rejected this as well because the documents only started that any failure to remain solvent was a violation and did not specify the manner an insolvency occurred.

**Potential paths**
What happens next is impossible to say but there are a few possibilities. The first is that the Michigan Supreme Court agrees to take the case and eventually reverses the lower court's ruling. There is a briefing scheduled next week to discuss the merits of the case after which a decision will be made whether to proceed or not. Of course, the Court could also agree to take the case and agree with the current opinion. A third possibility is that a newly introduced bill becomes law and effectively nullifies the ruling. The fourth scenario and worst outcome from a borrowers perspective is similar cases are brought in other states and their courts agree with Michigan's.

FHFA-DDC-0048939

14 March 2012    The Outlook

**Deutsche Bank** ⊘

Although there are a myriad of outcomes, *we view all of this as a positive for CMBS* investors, especially those invested further out the legacy credit curve. We believe *the fear of some CMBS loans turning into recourse will allow special servicers to exert much more leverage in the negotiation process.* More equity contributions on modified loans are likely and in some cases borrowers will come out of pocket to cure defaults or prevent defaults where it is viewed as a lower cost option (as opposed to letting a loan become delinquent and have a Trust pursue full recourse due to the Cherryland decision).

The subset of loans which are impacted for now is limited to those secured by properties in Michigan. However, the number of loans is actually smaller. Why? *The crux of the issue is how the loan agreements were written and each originator uses a slightly different template.* For example, the language in the loan agreement used at DB would not be open to the same outcome as the Cherryland case due to the way the SPE solvency covenant is defined. Specifically the clause states: *Borrower has been, is, and intends to remain solvent and Borrower has paid and intends to pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets; provided that the foregoing shall not require any direct or indirect member, partner or shareholder of Borrower to make any additional capital contributions to Borrower.*

While it is extremely difficult to estimate how much of the CMBS universe or even how many loans secured by Michigan properties use language most similar to the DB version or the Cherryland language (Archon was the originator), we can identify a potential sample. There are potentially at least $1B of loans which are at risk and if other states adopt a similar stance, perhaps upwards of $5B. Keep in mind, the delinquency rate on CMBS loans secured by Michigan properties is about 50% higher than the CMBS universe at over 13%. In the chart below we

detail the origination volumes and delinquent loan totals for the largest originators excluding DB. Depending on which of the scenarios outlined above comes to fruition, we will update our analysis and potential exposure list.



**Figure 3: Michigan CMBS origination volumes and delinquencies**

*Source: Deutsche Bank, Intex*

*Harris Trifon (+1) 212 250-5893*
*Dave Zhou (+1) 212 250-1952*

FHFA-DDC-0048940

14 March 2012    The Outlook                                            **Deutsche Bank**

## CONSUMER ABS
# Opportunities in equipment ABS

Equipment ABS has benefitted from the robust demand of new issue high-quality short ABS. This was particularly evident with the highly successful $998.8 million John Deere Owner Trust (JDOT) 2012-A, which was heavily subscribed and very broadly distributed. The deal was offered in four tranches and priced quite favorably compared to an earlier offering from the JDOT shelf (see Figure 4). Additionally, as a testament to the demand for paper in this sector, JDOT 2012-A compared very favorably to recently priced prime triple-A auto ABS. For example, the 2-year triple-A JDOT 2012-A priced 3bp tighter than a recently issued 2-year triple-A from Honda (HAROT 2012-1) and 4 bp tighter than the 3-year triple-A class from the same deal.

| Figure 4: JDOT 2012-A pricing strong market demand for ABS paper underpinned by strengthening credit fundamentals in the sector | | | | | | | |
|---|---|---|---|---|---|---|---|
| Date | Deal | CI | Ratings (M/S/F) | Size | OWAL | Index | Spd |
| 2/22/12 | JDOT 2012-A | A1 | P-1/-/F-1+ | 304 | 0.4 | ILibor | -24 |
| | | A2 | Aaa/-/AAA | 255 | 1.1 | EDSF | 8 |
| | | A3 | Aaa/-/AAA | 343 | 2.2 | ISwaps | 15 |
| | | A4 | Aaa/-/AAA | 97 | 3.3 | ISwaps | 24 |
| 4/13/11 | JDOT 2011-A | A1 | P-1/-/F-1+ | 334 | 0.4 | ILibor | -4 |
| | | A2 | Aaa/-/AAA | 333 | 1.1 | EDSF | 20 |
| | | A3 | Aaa/-/AAA | 340 | 2.2 | ISwaps | 25 |
| | | A4 | Aaa/-/AAA | 99 | 3.3 | ISwaps | 35 |

*Source: Deutsche Bank; Thomson Reuters*

Secondary market spreads on equipment ABS tightened for all credit ratings in 2011 and are currently at or near per-recession levels. For example, the secondary market offering spread on a generic triple-A 2-year tightened by 37% YOY and is currently at 25 bp, while a 2-year single-A trades a spread of 130 bp, which is about 4% tighter YOY. Both levels were last seen in 2007.

The strong price performance is also reflected in the shrinking spread differential between autos and

equipment ABS[1]. Figure 5 plots the pick-up from top-tier 3-year auto ABS to top-tier 3-year equipment ABS at various rating categories.



**Figure 5: The spread pick-up from auto ABS to equipment ABS shrank through 2011**

*Source: Deutsche Bank*

In certain cases secondary market spreads on autos are trading wider to comparable equipment ABS. Over the past 12 months the pick-up for double-A and triple-B rated bonds shrank by 52 bp and 35 bp, respectively, as this part of the curve has represented the sweet spot of strong credit fundamentals and healthy yield. Today double-A secondary equipment trades 2 bp through autos while triple-B equipment is flat to autos of similar tenor and rating[2]. Although performance has been stable, we think the current level of pick-up in these rating categories is not sustainable as the market is deeper and issuance volume much greater for auto ABS than for equipment ABS. For 3-year paper, we find the triple-A and single-A rating categories more compelling. The pick-up for triple-A and single-A bonds also tightened during this period, but to a lesser extent. Currently investors can pick up 30 bp by trading out of 3-year single-A autos and into comparable equipment ABS. The pick-up from triple-A autos to equipment is 10 bp.

The strong price performance has been underpinned by strengthening credit fundamentals in the sector, which in turn have been supported by a slowly recovering economy. Figure 6 charts the average losses of the

---

[1] Equipment lease ABS are compared to auto ABS because they, too, offer low prepayment risk and comparable average life and structure,
[2] Historically, equipment ABS has traded wider than autos given the size of the two markets. As of YE 2011, there were $118 billion of auto ABS outstanding. There were $14.9 billion of equipment ABS outstanding – Source: SIFMA

FHFA-DDC-0048941

14 March 2012   The Outlook

**Deutsche Bank**

Equipment Leasing and Finance Association[3]'s Monthly Leasing Index. In January, average charge-offs as a percentage of net receivables fell to 0.5%, from 0.7% in December and from 0.9% one-year ago. This positive performance has been reflected in securitized pools. According to the Fitch Equipment ABS Index, total 60+ delinquencies for Fitch-rated equipment ABS stood at 27 bp in January 2012, a 72% decrease from the level one year ago. The three-month moving average for this metric currently stands at 25 bp.

**Figure 6: Average Losses (Charge-offs) as a % of net receivables - YOY comparison**



*Source: Equipment Leasing and Finance Association – Monthly Leasing and Finance Index January 2012*

We expect that collateral performance and issuance volume will continue to improve modestly and to the extent that the recovery and the improving tone in the US labor market continues. Figure 7 shows that overall new business volume for January 2012 was $5.1 billion, up 21% year-over year. Furthermore, recent data shows that while big companies are cautious about hiring, smaller companies are more optimistic (see Figure 8). This bodes well for an increase in the leasing and business activity of small businesses and for an increase in volume and collateral diversity in small and mid-ticket equipment lease ABS.

**Figure 7: New Business Volume ($ billion) - YOY Comparison**



*Source: Equipment Leasing and Finance Association – Monthly Leasing and Finance Index January 2012*

**Figure 8:Increased hiring of small businesses supports small & mid-ticket businesses**



*As found in the presentation Deutsche Bank, "US Employment Outlook: Labor Market on Sustained Improving Trend," March 2012. Source JOLTS, DB Global Markets Research*

In 2011, there were $10.2 billion of equipment ABS, a 31% increase over 2010's volume, but still well below the peak levels of 2003/2005 (see Figure 9). Volume was led by CNH, with 29% market share, GE Capital, with 27% and John Deere, with 11%. So far this year, we've seen $2.4 billion of new issue volume with ABS from John Deere, GE Capital and Volvo[4].

**Figure 9: Equipment ABS volume expanded by 31% in 2011. 2012 volume so far stays apace with 2011 YOY**

*Source: Deutsche Bank*

***Elen Callahan (+1) 212 250-8161***

---

[3] The Equipment Leasing and Finance Association's (ELFA) Monthly Leasing and Finance Index (MLFI-25), which reports economic activity for the $628 billion equipment finance sector.

[4] As of this writing, CNH Capital America LLC is in the market with its first public retail term ABS of the year.

FHFA-DDC-0048942

**Deutsche Bank**

RELATIVE VALUE / ALM STRATEGIES
# Servicer based opportunities and risks in the Consumer Relief Program

The details of yesterday's filing in the foreclosure settlement were consistent with the points we outlined in last week's piece *Details of the AG Settlement Revealed*. Now that the dust has settled, we try to predict how servicers might apply principal modifications to isolate both potential opportunities and risks.

In setting forth a framework for these opportunities, we think there are three likely outcomes. The first outcome we will call investor positive where a servicer will modify portfolio loans exclusively. In the instance where the first lien resided in a securitized trust and a modified second lien was in portfolio the likely outcomes would be the following:

- Bonds lower in the capital structure would benefit most from reperforming delinquent loans and writing down portfolio 2nd liens outside of the trust

- Senior bonds in prime jumbo and Alt-a securitizations would benefit from lower severities on redefaults. Downside to senior investors would be that deals would be releveraged from a credit perspective by reperforming borrowers.

- Subprime last cash flows would benefit from lower severities as result of modification of portfolio seconds, resulting in lower severities.

- Subprime current pay bonds would be negatively impacted as loans would be removed from the DQ bucket, diminishing potential cashflow from liquidations available to deleverage those tranches.

The second outcome we will call investor negative where a servicer will modify loans in securitized trusts. In an investor negative construct the likely outcomes would be the following:

- Bonds lower in the capital structure would be written down much faster as a result of principal reductions, significantly curtailing potential cash flow to those classes.

- Senior bonds in prime jumbo and Alt-a will be negatively impacted. Wiping out subordinate tranches faster would preclude seniors from deleveraging as result of voluntary prepayments

- Subprime seniors would be negatively impacted as the principal reductions would effectively be instantaneous liquidations at 100% severity.

The third outcome is a neutral or 'safe harbor' outcome, where there is likely little potential impact to bond holders.

Next we look at where potential opportunities may exist for investors to benefit from a potential "investor positive" construct. First we took the securitized private label balances by each of the five servicers and broke them down by collateral type and serious delinquency. Then for those loans greater than 60+ days delinquent we looked at what percentage of those loans had second liens behind them as seen in Figure 10 below. The rationale being if we are able to ascertain what servicers will likely modify only portfolio loans, then we can see what sectors are most exposed to those second liens that could be modified.

| Figure 10: Percentage of Second Liens behind Seriously delinquent securitized loans | | | | | |
|---|---|---|---|---|---|
| | | UPB | 60+ | w 2nd | % of Total DQ w/2nd |
| Prime | Chase | 45,590 | 6,874 | 1,402 | 20% |
| | B of A | 25,594 | 4,412 | 840 | 19% |
| | Citi | 4,411 | 269 | 4 | 1% |
| | Wells | 51,744 | 5,354 | 1,899 | 35% |
| | GMAC | 5,320 | 442 | 132 | 30% |
| Alt-A | Chase | 38,462 | 12,279 | 3,330 | 27% |
| | B of A | 61,960 | 26,424 | 9,514 | 36% |
| | Citi | 3,896 | 691 | 83 | 12% |
| | Wells | 21,487 | 5,354 | 1,885 | 35% |
| | GMAC | 24,016 | 7,208 | 3,308 | 46% |
| Subprime | Chase | 28,004 | 12,562 | 3,683 | 29% |
| | B of A | 18,639 | 10,946 | 2,266 | 21% |
| | Citi | 55 | 3 | 0 | 6% |
| | Wells | 20,861 | 9,013 | 2,046 | 23% |
| | GMAC | 1,269 | 370 | 65 | 18% |

Source: Deutsche Bank, Core Logic

For reasons we will explain in greater detail below, we believe that Wells, Chase and Citi are likely to take an investor friendly approach to the modifications, while B of A could have a more investor negative approach, GMAC/Ally would likely be investor neutral.

Bonds backed by Wells' prime jumbo and Alt-a loans have the greatest percentage of 2nd liens behind them at 35%

FHFA-DDC-0048943

14 March 2012    The Outlook                                                    Deutsche Bank

followed by Chase subprime and Alt-a loans at 29% and 27% respectively. Given the dollar price leverage in Alt-a and subprime relative to prime jumbo, we would tend to favor expressing the investor friendly view in those asset classes.

In the analysis below we attempt to gauge potential servicer behavior.

## Investor Positive

### Wells Fargo

As stated last week, it appears based on the language in Wells 10-K that they will exclusively target portfolio loans. In the section of the release which references their obligations under the Consumer Relief Program, Wells explicitly states that the expanded principal reduction modifications on first and second liens will be executed on loans *owned and serviced by Wells Fargo.*" This appears to effectively remove any of the guess work around predicting their behavior with regards to the settlement and there should be some opportunity for investors given Wells' position.

While impossible to know for certain how the other servicers will approach the modifications, the data in Figure 11 below may provide some insight to potential behavior.

### Figure 11: Settlement Liability, Portfolio and Securitization Exposures by Servicer

| | | Chase | B ofA | Citi | Wells | GMAC |
|---|---|---|---|---|---|---|
| Total Servicing Platform | Borrower Relief Settlement Interest | $4,210 | $8,580 | $1,790 | $4,340 | $200 |
| | Principal Modification Settlement | $3,675 | $7,636 | $1,411 | $3,400 | $185 |
| | UPB of Total Servicing | 1,168,170 | 1,768,260 | 534,400 | 1,821,830 | 379,420 |
| | Non Agency & Portfolio | 731,274 | 1,055,298 | 307,066 | 931,502 | 225,755 |
| | Closed End Liens 30-89 Days DQ (Serviced) | 8,368 | 14,691 | 2,158 | 17,322 | 5,157 |
| | Closed End Liens > 90 Days DQ (Serviced) | 49,404 | 94,686 | 1,335 | 5,795 | 10,084 |
| Portfolio | 1-4 Family 1st Liens | 137,294 | 293,700 | 114,366 | 252,991 | 14,307 |
| | Open Ended HELs | 86,698 | 104,066 | 27,482 | 95,717 | 2,639 |
| | Closed End 2nds | 7,888 | 18,038 | 2,069 | 13,268 | 1,676 |
| | Total OBS Resi | 231,880 | 415,799 | 143,911 | 361,071 | 18,622 |
| | % of NPLs/ Total Loans | 7.75% | 4.32% | 4.44% | 3.91% | 1.15% |
| | Loan Loss Allowance | 27,609 | 33,873 | 30,115 | 19,372 | 722 |
| | % Loan Loss Reserves to Modification Amt | 13% | 23% | 5% | 18% | 26% |

Source: Deutsche Bank, SNL, FDIC

### JP Morgan Chase

One other potentially likely candidate to modify portfolio loans would be JP/Chase. This is likely a result of two factors. First, JP has the largest percentage of nonperforming loans of the top five servicers with 7.75% of total loans in the nonperforming bucket. While it seems reasonable that given these modifications would result in

a positive NPV result for JP and that they would get credit towards the settlement for these modifications that there may be motivation to focus on portfolio loans rather than trust loans. Secondly, the $3.6 billion which JP must allocate to principal reductions is only 13% of their current loan loss allowance, leaving them potentially well positioned to focus on portfolio loans.

### Citi

We maintain some reservations about Citi given the size of their settlement obligation relative to the total amount of delinquent non agency exposure. It is disproportionately large and therefore any level of trust modifications would likely have an impact on investors. That being said, given Citi's allowance of roughly $30 billion, they appear to be more than adequately reserved to focus on portfolio loans to fulfill their $1.4 billion principal modification obligation under the settlement.

### Investor Negative

### Bank of America

Of the five servicers, it appears on the surface that Bank of America may be the most likely to modify trust loans. As reported in the Wall Street Journal last Friday, B of A reached a separate deal with the agencies to provide deeper than anticipated principal reductions to reduce its penalties by up to $850 million. Their principal modification commitment of the settlement would be in excess of 23% of BAC's loan loss allowance as of December 31. While Wells was transparent with their intention to modify only portfolio loans in their 10K, Bank of America made no such assurances in their statement on Friday when the news was released about the magnitude of the principal reductions. Potential upside in Countrywide bonds from numerous lawsuits and repurchase clams could be significantly mitigated if not completely negated if B of A begins modifying loans in the trusts.

### Neutral

### GMAC/Ally

Given the rather nominal amount of principal modifications ($185 million) relative to the total outstanding exposure of GMAC serviced non agency loans, it is hard to imagine a scenario where either portfolio or trust mods would have a large scale impact on investors in those securities. That being said, the size of the settlement is significant relative to their overall loan loss allowance of $722 million.

FHFA-DDC-0048944

**Deutsche Bank**

**Conclusion**

There appear to be potential alpha opportunities resultant from the AG settlement. While the vast majority of Wells issuance was in the jumbo prime sector, lower dollar price WFMBS seniors and mezzanine cash flows could provide better than expected returns as underlying loans are deleveraged in the event of the extinguishment of second lien principal. Additionally, JPMAC shelf subprime could provide equally good if not better returns given the incrementally higher dollar price leverage in subprime. For now, we would proceed with caution on CWALT bonds until Bank of America's course of action becomes clearer.

*Christopher Helwig (+1) 212 250-3033*

FHFA-DDC-0048945

14 March 2012    The Outlook

**Deutsche Bank**

# SECTOR ANALYSIS
# Putting a price on LTV

## Agency MBS

With the Home Affordable Refinance Program (HARP) likely to drive prepayments up sharply in the next few months, more pools backed by HARP loans will come flowing into the agency MBS market. The market already recognizes some of the value in these pools since HARP borrowers can only go through the program once, leaving them with limited refinancing opportunities afterwards. Within the MHA sector, higher LTV pools look attractive in valuation relative to lower LTV pools. Furthermore, MHA pools and CMOs appear to be attractive alternatives to rates and corporate debts.

### Limited refinancing options for HARP borrowers

MHA pools have been issued since the summer of 2009, shortly after the launch of HARP. HARP allows a borrower with a high LTV to refinance through the program only if the loan was originated before May 31, 2009. Since every loan refinanced through HARP has an origination date that falls past the eligibility deadline, a borrower can only go through the program once. Since all HARP borrowers have estimated loan-to-value ratios above 80%, they face limited alternatives for refinancing a second time. And as the LTV of the HARP loan goes up, those alternatives approach zero.

As a result of limited refinancing options, HARP pools have prepaid slowly and consistently. Figure 12 shows the historical prepayments for 2010 MHA pools compared to the 2010 conventional cohorts. While low mortgage rates helped drive the 2010 conventional speeds up above 20 CPR for 4.0%s and 4.5%s late last year, prepayments on MHA pools remained in the single digits.

Some of the prepayment differences are due to the weaker credit profiles of MHA borrowers. For example, MHA borrowers tend to have slightly lower FICO scores as seen in Figure 13. For 2010 4.5%s, for example, average FICO on MHA pools range from 744 to 747, which is 11 to 14 points lower than the 758 credit score of the 2010 vintages. In addition, 4.5%s MHA pools tend to have higher gross WACs by a few basis points. However, those differences do not fully explain the large prepayment gap between the two, and the main driver of the prepayment differences looks to be from the limited refinancing alternatives of HARP borrowers.

**Figure 12: Prepayments for MHA pools have shown muted response to refinancing**









Source: CPRCDR, Deutsche Bank

Since MHA pools show a muted refinancing response to low mortgage rates, turnover plays a larger role in their prepayments. And within the turnover, default-related turnover makes up a large portion of their pay-downs due to weaker credit profiles of the borrowers. Based on Freddie Mac's supplemental data, buyouts made up 2% and 7% of Freddie Mac conventional 30-year 4.5%s and 5.0%s prepayments in February, respectively. Meanwhile, they were nearly 67% of prepayments for 4.5%s and 5.0%s in the Freddie Mac U6 program, which is comprised of 105% to 125% LTV HARP loans. Lower credit quality borrowers should lead to larger default-related turnover, as well as larger overall turnover, in MHA pools compared to conventionals. Thus, a better convexity profile of MHA pools comes from both the refinancing and the turnover side.

FHFA-DDC-0048946

14 March 2012    The Outlook                                                          Deutsche Bank

### Figure 13: Collateral characteristics of MHA pools, 9 March 2012

|  | Amt | WAC | WALA | WAOLS |  | CPR hist | | |
|---|---|---|---|---|---|---|---|---|
|  | ($BN) | (%) | (mth) | ($K) | FICO | 1M | 3M | 6M |
| **FN 30Y 2010 4.0%** | | | | | | | | |
| FNCL | 108.2 | 4.50 | 15 | 258 | 767 | 17.9 | 20.1 | 18.2 |
| MHA: 80-90 LTV | 2.9 | 4.50 | 15 | 276 | 761 | 4.9 | 6.1 | 5.6 |
| MHA: 90-95 LTV | 1.0 | 4.52 | 15 | 271 | 762 | 3.1 | 3.7 | 3.6 |
| MHA: 95-100 LTV | 0.4 | 4.53 | 15 | 267 | 760 | 2.7 | 2.7 | 3.1 |
| MHA: 100-105 LTV | 0.3 | 4.50 | 15 | 262 | 757 | 2.6 | 1.9 | 1.9 |
| CQ: 105+ LTV | 0.2 | 4.56 | 15 | 229 | 756 | 0.3 | 1.1 | 1.6 |
| **FN 30Y 2010 4.5%** | | | | | | | | |
| FNCL | 108.0 | 4.94 | 20 | 245 | 758 | 20.5 | 22.6 | 20.5 |
| MHA: 80-90 LTV | 2.5 | 4.92 | 16 | 268 | 747 | 4.3 | 6.9 | 6.2 |
| MHA: 90-95 LTV | 1.1 | 4.93 | 16 | 264 | 744 | 3.3 | 3.0 | 3.3 |
| MHA: 95-100 LTV | 0.9 | 4.97 | 16 | 260 | 745 | 5.2 | 4.4 | 4.1 |
| MHA: 100-105 LTV | 0.6 | 4.96 | 16 | 254 | 747 | 2.5 | 4.3 | 3.8 |
| CQ: 105+ LTV | 1.0 | 5.03 | 17 | 245 | 748 | 4.7 | 4.9 | 4.3 |
| **FN 30Y 2010 5.0%** | | | | | | | | |
| FNCL | 52.5 | 5.36 | 21 | 227 | 738 | 16.4 | 17.7 | 16.3 |
| MHA: 80-90 LTV | 0.5 | 5.37 | 16 | 268 | 721 | 8.4 | 7.4 | 6.9 |
| MHA: 90-95 LTV | 0.4 | 5.38 | 16 | 262 | 725 | 11.3 | 9.3 | 6.4 |
| MHA: 95-100 LTV | 0.4 | 5.38 | 17 | 260 | 726 | 6.4 | 6.4 | 6.2 |
| MHA: 100-105 LTV | 0.4 | 5.40 | 16 | 249 | 729 | 6.4 | 6.3 | 6.5 |
| CQ: 105+ LTV | 1.5 | 5.49 | 20 | 252 | 739 | 6.8 | 6.0 | 5.5 |

*Source: Deutsche Bank*

**Pay-ups on MHA have appreciated since last summer**

The market has warmed to this prepayment profile and the pay-up on MHA pools has appreciated as a result. Last summer, MHA pools traded at or below HLB levels but they have rallied higher since then (Figure 14). This is due to the strong call protection displayed by MHA pools during last fall's refi wave and better comfort with the prepayment behaviors of the borrowers. In addition, higher pay-ups also reflect the diminished risks from re-HARPing, given that the latest changes to the program have excluded this option, as well as recent weaknesses in TBA dollar rolls.

### Figure 14: Pay-ups on MHA pools have appreciated to loan balance pool levels, 20 July 2011 – 1 March 2012



*Source: Deutsche Bank*

**High LTV MHA pools look attractive**

Within the MHA sector, HARP pools with the highest LTVs have the lowest actual-to-theoretical pay-up ratios and hence, show the best relative value (Figure 15). Theoretical pay-ups are computed by running MHA pools at same OAS as TBAs and then subtracting the resulting prices from the TBA price. Pools that show the lowest ratios of actual to theoretical pay-up offer the cheapest valuation. For 80-to-90 LTV MHA 4.5%s, the current pay-up of $1-26 is 339% of the theoretical pay-up of $0-17, while this ratio drops to 100% for 100-105 LTV MHA 4.5%s and to 80% for CQ 4.5%s.

The good relative value in the highest LTV pools arguably comes from MBS investors' reluctance to give up carry for convexity. Based on the model speed, TBA 4.5%s offer 2.65% yield for 3.0 years of negative convexity. In comparison, the CQ offers higher yield at 3.04% while having better convexity of -0.6 years. Other 4.5% MHA pools fall in between those two.

---

FHFA-DDC-0048947

14 March 2012    The Outlook

Deutsche Bank

### Figure 15: Fair valuations on MHA pool pay-up, 9 March 2012

| MHA type | price | Actual Pay-up | Theo. Pay-up | % of Theo. value |
|---|---|---|---|---|
| FN 30Y 4.0% TBA | 105-03+ | | | |
| MHA: 80-90 LTV | 106-03+ | 1-00 | 0-13+ | 251% |
| MHA: 90-95 LTV | 106-11+ | 1-08 | 1-02 | 118% |
| MHA: 95-100 LTV | 106-13+ | 1-10 | 1-23 | 76% |
| MHA: 100-105 LTV | 106-19+ | 1-16 | 2-09 | 66% |
| CQ: 105+ LTV | 106-23+ | 1-20 | 3-07+ | 50% |
| FN 30Y 4.5% | 106-12+ | | | |
| MHA: 80-90 LTV | 108-06+ | 1-26 | 0-17 | 339% |
| MHA: 90-95 LTV | 108-18+ | 2-06 | 1-17 | 142% |
| MHA: 95-100 LTV | 108-24+ | 2-12 | 1-30+ | 122% |
| MHA: 100-105 LTV | 108-30+ | 2-18 | 2-18 | 100% |
| CQ: 105+ LTV | 109-04+ | 2-24 | 3-14+ | 80% |
| FN 30Y 5.0% | 107-28 | | | |
| MHA: 80-90 LTV | 109-24 | 1-28 | 1-28 | 100% |
| MHA: 90-95 LTV | 110-04 | 2-08 | 2-27 | 79% |
| MHA: 95-100 LTV | 110-10 | 2-14 | 3-09 | 74% |
| MHA: 100-105 LTV | 110-16 | 2-20 | 3-30 | 67% |
| CQ: 105+ LTV | 110-20 | 2-24 | 4-28+ | 56% |

Source: YieldBook; Deutsche Bank

Another approach to pool valuation is through comparison of carry offered by specified pools to TBAs. Monthly carry advantage of different MHA pools over TBA can be divided into pay-up levels to compute break-even months, which measures how quickly pay-ups will be returned. For CQ 4.5%s, monthly carry adds up to around 10.2/32s, or around 6/32s better than TBAs (Figure 16). At those levels, the monthly carry will recoup the pay-up in 15 months.

### MHA pools look attractive to rates and corporate debts

MHA pools also look like good alternatives to high quality corporate debt. Indicative yields on AA seven-year corporate debt are around 1.84%. In comparison, CQ 4.5%s yields around 3.04%, offering 120 bp of additional yield over the AA corporate with similar durations.  Given the better convexity profile of MHA pools compared to TBAs, this trade gives up on much less on convexity than it would have with TBAs.

### Figure 16: MHA pools offer carry advantage to TBAs

| | PRICE | b/e CPR | Monthly Carry (32s) | Carry Adv. (32s) | Pay-up (32s) | b/e months |
|---|---|---|---|---|---|---|
| FN 4.0 TBA | 105.13 | 23.1 | 6.3 | | | |
| MHA: 80-90 LTV | 106.95 | 10.5 | 7.6 | 1.4 | 32 | 23 |
| MHA: 90-95 LTV | 107.32 | 6.4 | 8.4 | 2.1 | 40 | 19 |
| MHA: 95-100 LTV | 107.51 | 4.7 | 8.8 | 2.5 | 42 | 17 |
| MHA: 100-105 LTV | 107.70 | 3.7 | 8.9 | 2.6 | 48 | 18 |
| CQ: 105+ LTV | 107.88 | 3.2 | 8.9 | 2.7 | 52 | 19 |
| FN 4.5 TBA | 106.39 | 34.0 | 4.3 | | | |
| MHA: 80-90 LTV | 107.39 | 12.0 | 8.5 | 4.2 | 58 | 14 |
| MHA: 90-95 LTV | 107.64 | 7.6 | 9.4 | 5.1 | 70 | 14 |
| MHA: 95-100 LTV | 107.70 | 6.2 | 9.7 | 5.4 | 76 | 14 |
| MHA: 100-105 LTV | 107.89 | 5.0 | 9.9 | 5.6 | 82 | 15 |
| CQ: 105+ LTV | 108.02 | 3.5 | 10.2 | 5.9 | 88 | 15 |

Source: Bloomberg Finance LP; Deutsche Bank

CMOs off of HARP loans also look attractive to rates. Figure 17 highlights the total return profile of FHR 3996 TB, a 2.25% sequential off of Freddie Mac U6 4.5%s, compared to a duration-neutral portfolio of two-year and ten-year Treasuries. In a base case, the CMO returns around 2.5% for the year, or nearly 70 bp better than the duration-neutral portfolio of two-year and ten-year Treasuries (Figure 17). The return profile of CMO holds well in a 50 bp rally and 50 bp sell-off scenarios.

### Figure 17: One-year total return profile of sequential off of high LTV pools



Source: Yieldbook; Deutsche Bank

Similar to other call-protected paper, one risk of owning MHA pools is in the rate sell-off; as refinancings slow, call-protection offered by MHA pools becomes less valuable. However, primary mortgage rates have been fairly sticky at around 4.0%, and the spread between primary and secondary mortgage rates widened to almost 100 bps

---

FHFA-DDC-0048948

**Deutsche Bank**

from a longer-term average of 60 bps as rates have rallied. Thus, any rate sell-off will likely compress this spread first and primary mortgage rates will likely trail the sell-off in rates.

**Jeff Ryu (+1) 212 250-3984**

Deutsche Bank Securities Inc.

FHFA-DDC-0048949

14 March 2012    The Outlook

**Deutsche Bank** <span>█</span>

S E C T O R   A N A L Y S I S
# Underwriting the recovery

## Rates

We continue to expect the Fed to "underwrite" the recovery by maintaining monetary stimulus though the balance of the year. This is much more likely to be accomplished through a "Twist2" program sterilized through reverse repo than it is via a new round of unsterilized asset purchases. The purpose of the policy tool is to crowd investors out of Treasuries and into riskier credit instruments. Credit growth shows signs of having accelerated, particularly in C&I loans, but the Fed will likely want to see a consistent pattern of credit creation before risking what might otherwise be a premature withdrawal of stimulus. We continue to see the greater risk to the recovery as being too little, rather than too much, policy accommodation.

From an historical perspective, current relative valuations of bonds and equities appear anomalous. If Treasuries are right, then equity values appear too high; if equities are right, then Treasury yields appear too low by as much as 50 bp. The risk to lower equities is a weaker balance sheet and potential additional precautionary savings. The risk to higher Treasury yields is that the incentive to invest in riskier credit instruments will be undermined, disrupting the portfolio balance channel. This too would likely ultimately undermine risky asset values. In a vacuum, one would expect the relative pricing anomaly to resolve itself through higher Treasury rates, lower equity valuations, or both. In the absence of resurgent credit creation, none of these are acceptable to the Fed. One might think of Twist2 as a third way for the Fed that maintains incentives for credit creation, provides some additional stimulus for the FOMC doves, yet placates the hawks on the FOMC by avoiding further expansion of the monetary base.

In the absence of credit creation, the larger monetary base coupled with a constant multiplier results in capital chasing the prices of the existing stock of assets higher. In the presence of credit creation, new assets are created at a more or less constant pricing structure. The risk of a premature withdrawal of stimulus – before credit creation is on stronger footing - is essentially that of a "levered" decrease in risky asset prices to their pre-stimulus levels.

One of the primary implications of this environment is that volatility should remain generally low, particularly at the long end of the curve. To trade back to the lows of the recent range, or indeed to trade to new lows, would

require activity data to roll over, or a new shock from Europe. We expect neither in the short run. At the same time, we expect the Fed to effectively cap yields in order to safeguard the economic incentives for further portfolio shifts into riskier assets.

There are headwinds to the Fed's task of maintaining the current yield structure. The first is the declining share of foreign ownership in the Treasury market. Foreign official ownership of the Treasury market fell 1.3% in Q4, and has fallen to 33% from the peak in mid 2009 – a decline of 5%. This is a reflection of slower growth and the resulting slower accumulation of reserves by structural current account surplus countries.



**Figure 18: Declining foreign official ownership of Treasuries**

Source: Deutsche Bank

It is likely that this is but the beginning of a more secular trend stemming from the resolution of structural imbalances. As public and private sector savings increase in the US, the current account deficit declines, and foreign accumulation of dollars slows, the Treasury market will transition from an internationally financed market to a domestically financed market.

This could prove disruptive, particularly given the apparent slowdown in China. A steady decrease in reserve accumulation, particularly if accompanied by an erosion of the dollar's share of reserve holdings, could create additional upward pressure on Treasury yields.

FHFA-DDC-0048950

14 March 2012     The Outlook

**Deutsche Bank**

**Figure 19: Chinese reserve growth as function of real GDP growth**



Source: Deutsche Bank

**Figure 20: Cumulative Distribution of Prices, unconditional and conditioned on 3% ULC increase**



Source: Deutsche Bank

For this reason additional Fed ownership of the Treasury market, particularly at the long end of the curve, could prove beneficial as a smoothing mechanism as the US transitions to a domestically financed market.

We do not think that the concentration of risk on the Fed's balance sheet, and the likely losses that will result when rates can climb sustainably, is a limiting factor in Fed action. The Fed's net income more than doubled from the beginning of the financial crisis to the end of 2010 due to the increase in the size of the balance sheet, itself an artefact of achieving its dual mandate. By the same logic, losing that windfall – and likely even more – should similarly be construed as an externality of achieving the mandate.

A second potential headwind to the Fed is inflation. Payroll revisions and falling productivity have resulted in a significant increase in unit labor costs. However, ULC increases need not spill directly over into higher inflation. The key issue is pricing power. In the presence of pricing power, higher ULC could simply be passed along to consumers in the form of higher prices. However, in the absence of pricing power, if corporations attempt to defend profit margins, given higher ULC and falling productivity the reaction of corporations could be slow hiring or even reduced headcount.

Superficially, significant increases in ULCs do produce higher inflation. We analyzed this by looking at quarterly price and ULC data for unit gross value added data. 50% of quarterly y/y changes to prices in the quarter following the observation of ULC since 1970 were 2% or less. However, when one conditions the data on a 3% increase or greater in ULCs, 50% of the price increases in the next quarter were 6% or less. The data, however, depend heavily on the inflationary environment of the 1970s. We would argue that the 1970s were substantially different with regard to Fed credibility, wage indexing, and other considerations. Indeed, the Fed has more recently enhanced its credibility with an explicit target. Pricing power was far more muted (<2%) in 2000 and 2007-2008.

Turning to profitability, we repeat the same analysis. In the case of profits, historically 40% of the quarterly data consisted of decreases to profit margins, subject to the same lag as the price analysis. However, given a 3% increase in ULC, 60% of the time profit margins fell in the following quarter.

**Figure 21: Cumulative distribution of profits, unconditionally and conditioned on 3% increase in ULC**



Source: Deutsche Bank

FHFA-DDC-0048951

Deutsche Bank

The risk scenario is that slower global growth and increased household savings limit the ability of corporations to pass along price increases to consumers, and in response corporations cut labor input in response to falling productivity and higher costs.   This could lengthen the time required for the economy to absorb excess capacity and actually extend the period for which the Fed must continue to underwrite credit creation and, more broadly, the recovery.

## Risk assets and the end of the Twist

One conundrum of recent financial market performance has been the stubbornly low level of Treasury yields amid solid performance of risk assets, in particular equities. Traditional portfolio theory argues that stocks and bonds tend to move in opposite directions. We believe the reason stocks have done well is precisely because interest rates on risk free assets are low. The Fed has driven investors out of Treasuries into spread product and equities through Operation Twist and Quantitative Easing. In the Twist program, the Fed is absorbing the duration equivalent of $54 billion a month in 10-year notes via long end buying, representing about 45% of the duration supply from the Treasury.



**Figure 22: 10yr Treasury yield around the end of prior QEs (end of QE date set to 0)**

Source: Bloomberg Financial LP and Deutsche Bank

Aggregate data on financial asset demand, shown in the table here from the Fed's Flow of Funds data that came out on Thursday, March 8, paint a less clear picture, as the Fed's duration takeout is not apparent merely from par values. It is notable, however, that among the net buyers of agency and corporate bonds are the duration-hungry pension/insurance sector, which added $68 billion in those two asset categories. (The figures shown here adjust the Flow of Funds data to include each sector's direct holdings of securities as well as indirect holdings via mutual fund investments.) Overall, Treasury assets

grew by more than $300 billion, with a large chunk absorbed by money market funds (classified in our table as "Other U.S. domestic"), which buy bills, and foreigners. Purchases and flows shown here do not differentiate between holdings of Treasury bills, notes, and bonds.



**Figure 23: S&P 500 index around the end of prior QEs (end of QE date set to 0)**

Source: Bloomberg Financial LP and Deutsche Bank

Asset prices nevertheless suggest that QE and the Twist have done their job in crowding investors out of risk free Treasuries into risk assets in search for higher yields. Corporate bonds, mortgages, and stocks have been the prime beneficiaries of the crowding out. US domestic bond fund investors who have an overweight in spread products have been rewarded in solid total return so far this year.

**Figure 24: Demand for U.S. assets over Operation Twist (Q4 '11)**

| | Treasuries | AGY/MBS | Corp | Equity | Cash | Total |
|---|---|---|---|---|---|---|
| Fed | (1) | (37) | 0 | 0 | 35 * | (3) |
| Households * | 51 | (33) | (23) | (101) | 137 | 32 |
| Banks | (7) | 52 | (17) | (2) | (23) | 4 |
| Pension, Insurance | 32 | 23 | 45 | (15) | (4) | 80 |
| Other US Domestic | 176 | (22) | (13) | 4 | 158 | 337 |
| Total Foreign | 75 | (7) | (26) | (11) | 82 | 113 |
| *Private Foreign* | 99 | 3 | (25) | | | |
| *Official Foreign* | (24) | (10) | (1) | | | |
| Total (FF) | 326 | (24) | (34) | (125) | 350 | 527 |

Source: Federal Reserve; Deutsche Bank; Note: Q4 '10 to Q4 '11 difference in Flow of Funds levels, except for equities, which reflect flows; * Additional assets allocated to each sector in proportion to mutual fund holdings. Cash entry for Federal Reserve reflects reserves, with an increase in reserves reflected as a decline in "cash", but is not used in FoF cash total.

Following this logic, it's possible that we see some relative "crowding back" into Treasuries from other assets towards the end of the Twist. The stock market sell-off on Tuesday, March 6 reminded investors of how risky assets suffered towards the end of QE1 and QE2. The S&P 500 index had a local peak shortly after the Fed

FHFA-DDC-0048952

Deutsche Bank ▱

concluded QE1 MBS purchases (tapered), as well as QE2. TIPS breakevens drifted lower, and even deflation scare was priced in after QE1. MBS basis widened, particularly after QE2. Therefore, we believe it's crucial that the Fed continues the Twist in some format in the second half of this year to avoid a downturn in risk assets, as was the case at the end of QE1 and QE2. This becomes more important in light of the fiscal tightening that would take place if Bush-era tax rates were to rise by year end.

**Figure 25: Demand for U.S. assets over 2011**

|  | Treasuries | AGY/MBS | Corp | Equity | Cash | Total |
|---|---|---|---|---|---|---|
| Fed | 642 | (198) | 0 | (26) | (594) | (177) |
| Households * | (128) | (11) | (56) | (142) | 382 | 45 |
| Banks | (33) | 144 | (12) | 1 | 638 | 739 |
| Pension, Insurance | 122 | 65 | 202 | (48) | (2) | 339 |
| Other US Domestic | 172 | 3 | (63) | 9 | (677) | (557) |
| Total Foreign | 291 | (40) | (46) | (32) | 148 | 321 |
| *Private Foreign* | 171 | (28) | (44) | (16) |  | 83 |
| *Official Foreign* | 120 | (12) | (3) | (16) |  | 90 |
| Total (FF) | 1067 | (37) | 24 | (247) | 489 | 1297 |

Source: Federal Reserve; Deutsche Bank; Note: Q4 '10 to Q4 '11 difference in Flow of Funds levels, except for equities, which reflect flows; * Additional assets allocated to each sector in proportion to mutual fund holdings. Cash entry for Federal Reserve reflects reserves, with an increase in reserves reflected as a decline in "cash", but is not used in FoF cash total.

**Dominic Konstam (1) 212 250-9753**
**Alex Li (1) 212 250-5483**
**Aleksandar Kocic (1) 212 250 0376**
**Stuart Sparks (1) 212 250 0332**
**Daniel Sorid (1) 212 250 1407**
**Steven Zeng (1) 212 250 9373**

FHFA-DDC-0048953

**Deutsche Bank**

SECTOR ANALYSIS
# Labor market begins to blossom

## Economics

**Summary:** *The February employment report was solid as both headline and private payrolls each topped 200k for the third month in a row. Despite a 0.2% increase in the participation rate, the unemployment rate was steady at 8.3%. The factory workweek and temporary hiring, which are two leading indicators of the labor market, showed further advancement. Finally, the consistent pattern of upward revisions to private payrolls remained in place. This speaks of continued understatement of household wages and salaries.*

**Employment gains are running at their fastest pace in nearly six years.** Nonfarm payrolls increased +227k in February after December and January were revised up by a cumulative 61k. The December and January increases now stand at +223k and +284k, respectively. The February gain therefore produces a three-month moving average of +245k, up from +221k previously. Excluding the government's temporary 2010 Census hires, the last three months have seen the strongest payroll gains since the three months ending May 2006 (+260k). Private payrolls were up +233k, after rising a revised +285k in January, as the rate of government job loss has slowed markedly over the past several months. This is due to a dramatic improvement in state and local tax revenue.

The gains in employment were fairly broad-based in February, although they were not as widespread as January when the diffusion index of private payrolls hit 70.3% (the highest reading since January 1998). The February diffusion index came in at a decent 57.9%, but the three-month moving average actually rose nearly one point to 64.0% from 63.2% previously. Goods employment was up +24k, led by a +31k increase in manufacturing, the fifth gain in a row and the 15th increase in the last 16 months. The 0.1 hour increase in the factory workweek to 41.9 hours lifted the series to its highest reading since January 1998. Combined with the aforementioned increase in manufacturing employment, the index of manufacturing hours increased +0.5% in February following a +0.9% increase in January. Rising factory jobs and hours point toward another solid gain in manufacturing production; and this in turn points to further large inventory building, an important catalyst for current quarter growth.

**Weather may not have been a factor.** The weakest part of the goods sector was construction, where employment declined -13k, the first decline since last October. This should mitigate some concern that unseasonably warm winter weather is temporarily lifting employment. Another leading indicator of the labor market, temp hiring, jumped 45k in February, the largest increase since January 2010

(+58K). Often, if companies are unsure about future economic demand, they employ "temps" before committing to more permanent hires. The fact that temp hiring is improving in an environment of healthier underlying job gains suggests to us that we could see a step-up in nonfarm payroll gains later this spring.

**Service-sector hiring is growing, too.** Private service-sector employment was up +209k after rising +202k previously. These are the first back-to-back 200k-plus gains since March-April 2011. In February, education and health services were up +71k while leisure and hospitality services rose +44k, and professional and business services excluding temps increased a decent +37k. However, there is some concern these service sector jobs in particular and the broad improvement in hiring will fade next quarter, similar to what happened last year and the year before. We are more sanguine for a couple of reasons. One, the economy is much healthier today than either last year or the year before. For example, initial jobless claims are hovering near four-year lows; corporate profits have attained new cyclical highs and households have had two more years to deleverage. Two, the European crisis flared up significantly in 2010 and to a similar extent in 2011, which also experienced massive global manufacturing supply disruptions owing to the Japanese tsunami/earthquake. Food and energy costs were also rising at a much faster rate last year. Barring another exogenous shock, we believe the labor market is finally on a sustainable upward path. The fact that employment gains are understated makes us even more confident in the outlook.

**Payroll gains are still undercounted.** Despite the ongoing upward revisions to private payrolls, we believe the numbers are still being undercounted. This is due to the fact that household employment is surging—it rose +428k in February and has risen almost 2 million in the past six months, about 800k faster than the 1.2 million increase in nonfarm payrolls. This meant that even though the labor force participation rate edged up 0.2 to 63.9%, because household unemployment reversed a string of declines and rose a small 48k, the unemployment rate was steady at 8.3%. Based on what we are seeing in claims, the unemployment rate is likely to resume its descent again next month. We expect average hourly earnings, which were up just 0.1% in February, the fourth such gain in a row, to turn higher, matching what has been a 3.5% gain already seen in total compensation per hour.

*Joseph A. LaVorgna (212) 250-7329*

FHFA-DDC-0048954

Deutsche Bank

# Appendix 1

## Important Disclosures

Additional information available upon request

**For disclosures pertaining to recommendations or estimates made on a security mentioned in this report, please see the most recently published company report or visit our global disclosure look-up page on our website at** http://gm.db.com/ger/disclosure/DisclosureDirectory.eqsr**.**

## Analyst Certification

The views expressed in this report accurately reflect the personal views of the undersigned lead analyst(s). In addition, the undersigned lead analyst(s) has not and will not receive any compensation for providing a specific recommendation or view in this report. Steve Abrahams/Harris Trifon/Elen Callahan

### Deutsche Bank debt rating key

**Buy:** These bonds are expected to outperform other issues in the sector/industry group over the next three to six-month period.
**Hold:** These bonds are fairly valued currently. If owned, no need to sell, but we await events/ releases/ conditions that would make the bond attractive enough for us to upgrade. In the interim, the bond will likely perform as well as the average issue in the sector/industry group.
**Sell:** There exists a significant likelihood that these bonds will underperform relative to other issues in their sector/industry group, at least over the next three months.

FHFA-DDC-0048955

14 March 2012     The Outlook                                                      Deutsche Bank 

# Regulatory Disclosures

## 1. Important Additional Conflict Disclosures

Aside from within this report, important conflict disclosures can also be found at https://gm.db.com/equities under the "Disclosures Lookup" and "Legal" tabs. Investors are strongly encouraged to review this information before investing.

## 2. Short-Term Trade Ideas

Deutsche Bank equity research analysts sometimes have shorter-term trade ideas (known as SOLAR ideas) that are consistent or inconsistent with Deutsche Bank's existing longer term ratings. These trade ideas can be found at the SOLAR link at http://gm.db.com.

## 3. Country-Specific Disclosures

**Australia and New Zealand:** This research, and any access to it, is intended only for "wholesale clients" within the meaning of the Australian Corporations Act and New Zealand Financial Advisors Act respectively.

**Brazil:** The views expressed above accurately reflect personal views of the authors about the subject company(ies) and its(their) securities, including in relation to Deutsche Bank. The compensation of the equity research analyst(s) is indirectly affected by revenues deriving from the business and financial transactions of Deutsche Bank.

**EU countries:** Disclosures relating to our obligations under MiFID can be found at http://www.globalmarkets.db.com/riskdisclosures.

**Japan:** Disclosures under the Financial Instruments and Exchange Law: Company name - Deutsche Securities Inc. Registration number - Registered as a financial instruments dealer by the Head of the Kanto Local Finance Bureau (Kinsho) No. 117. Member of associations: JSDA, Type II Financial Instruments Firms Association, The Financial Futures Association of Japan, Japan Securities Investment Advisers Association. This report is not meant to solicit the purchase of specific financial instruments or related services. We may charge commissions and fees for certain categories of investment advice, products and services. Recommended investment strategies, products and services carry the risk of losses to principal and other losses as a result of changes in market and/or economic trends, and/or fluctuations in market value. Before deciding on the purchase of financial products and/or services, customers should carefully read the relevant disclosures, prospectuses and other documentation. "Moody's", "Standard & Poor's", and "Fitch" mentioned in this report are not registered credit rating agencies in Japan unless "Japan" or "Nippon" is specifically designated in the name of the entity.

**Malaysia:** Deutsche Bank AG and/or its affiliate(s) may maintain positions in the securities referred to herein and may from time to time offer those securities for purchase or may have an interest to purchase such securities. Deutsche Bank may engage in transactions in a manner inconsistent with the views discussed herein.

**Russia:** This information, interpretation and opinions submitted herein are not in the context of, and do not constitute, any appraisal or evaluation activity requiring a license in the Russian Federation.

## Risks to Fixed Income Positions

Macroeconomic fluctuations often account for most of the risks associated with exposures to instruments that promise to pay fixed or variable interest rates. For an investor that is long fixed rate instruments (thus receiving these cash flows), increases in interest rates naturally lift the discount factors applied to the expected cash flows and thus cause a loss. The longer the maturity of a certain cash flow and the higher the move in the discount factor, the higher will be the loss. Upside surprises in inflation, fiscal funding needs, and FX depreciation rates are among the most common adverse macroeconomic shocks to receivers. But counterparty exposure, issuer creditworthiness, client segmentation, regulation (including changes in assets holding limits for different types of investors), changes in tax policies, currency convertibility (which may constrain currency conversion, repatriation of profits and/or the liquidation of positions), and settlement issues related to local clearing houses are also important risk factors to be considered. The sensitivity of fixed income instruments to macroeconomic shocks may be mitigated by indexing the contracted cash flows to inflation, to FX depreciation, or to specified interest rates – these are common in emerging markets. It is important to note that the index fixings may – by construction -- lag or mis-measure the actual move in the underlying variables they are intended to track. The choice of the proper fixing (or metric) is particularly important in swaps markets, where floating coupon rates (i.e., coupons indexed to a typically short-dated interest rate reference index) are exchanged for fixed coupons. It is also important to acknowledge that funding in a currency that differs from the currency in which the coupons to be received are denominated carries FX risk. Naturally, options on swaps (swaptions) also bear the risks typical to options in addition to the risks related to rates movements.

FHFA-DDC-0048956


**Deutsche Bank**

---

### David Folkerts-Landau
Managing Director
Global Head of Research

| Guy Ashton | Marcel Cassard | Stuart Parkinson |
|---|---|---|
| Head | Global Head | Associate Director |
| Global Research Product | Fixed Income Research | Company Research |

| Asia-Pacific | Germany | Americas | Europe |
|---|---|---|---|
| Fergus Lynch | Andreas Neubauer | Steve Pollard | Richard Smith |
| Regional Head | Regional Head | Regional Head | Regional Head |

**Principal Locations**

| **Deutsche Bank AG** **London** 1 Great Winchester Street London EC2N 2EQ Tel: (44) 20 7545 8000 | **Deutsche Bank AG** **New York** 60 Wall Street New York, NY 10005 United States of America Tel: (1) 212 250-2500 | **Deutsche Bank AG** **Hong Kong** Filiale Hongkong Intl. Commerce Centre 1 Austin Road West Kowloon, Hong Kong tel: (852) 2203 8888 | **Deutsche Securities Inc.** **Japan** 2-11-1 Nagatacho Sanno Park Tower Chiyoda-ku, Tokyo 100-6171 Tel: (81) 3 5156 6770 |
|---|---|---|---|
| **Deutsche Bank AG** **Frankfurt** Große Gallusstraße 10-14 60272 Frankfurt am Main Germany Tel: (49) 69 910 00 | **Deutsche Bank Ltd.** Aurora business park 82 bld.2 Sadovnicheskaya street Moscow, 115035 Russia Tel: (7) 495 797-5000 | **Deutsche Bank AG** **Singapore** One Raffles Quay South Tower Singapore 048583 Tel: (65) 6423 8001 | **Deutsche Bank AG** **Australia** Deutsche Bank Place, Level 16 Corner of Hunter & Phillip Streets Sydney NSW 2000 Tel: (61) 2 8258 1234 |

**Deutsche Bank Dubai**
Dubai International Financial Centre
The Gate, West Wing, Level 3
P.O. Box 504 902
Dubai City
Tel: (971) 4 3611 700

**Subscribers to research via email receive their electronic publication on average 1-2 working days earlier than the printed version.**

**If you would like to receive this or any other product via email please contact your usual Deutsche Bank representative.**

**Publication Address:**
Deutsche Bank AG
New York
60 Wall Street
New York, NY 10005
United States of America
Tel: (1) 212 250-2500

**Internet:**
http://gmr.db.com
Ask your usual contact for a username and password.

## Global Disclaimer

The information and opinions in this report were prepared by Deutsche Bank AG or one of its affiliates (collectively "Deutsche Bank"). The information herein is believed to be reliable and has been obtained from public sources believed to be reliable. Deutsche Bank makes no representation as to the accuracy or completeness of such information.

Deutsche Bank may engage in securities transactions, on a proprietary basis or otherwise, in a manner **inconsistent** with the view taken in this research report. In addition, others within Deutsche Bank, including strategists and sales staff, may take a view that is **inconsistent** with that taken in this research report.

Opinions, estimates and projections in this report constitute the current judgement of the author as of the date of this report. They do not necessarily reflect the opinions of Deutsche Bank and are subject to change without notice. Deutsche Bank has no obligation to update, modify or amend this report or to otherwise notify a recipient thereof in the event that any opinion, forecast or estimate set forth herein, changes or subsequently becomes inaccurate. Prices and availability of financial instruments are subject to change without notice. This report is provided for informational purposes only. It is not an offer or a solicitation of an offer to buy or sell any financial instruments or to participate in any particular trading strategy. Target prices are inherently imprecise and a product of the analyst judgement.

As a result of Deutsche Bank's March 2010 acquisition of BHF-Bank AG, a security may be covered by more than one analyst within the Deutsche Bank group. Each of these analysts may use differing methodologies to value the security; as a result, the recommendations may differ and the price targets and estimates of each may vary widely.

In August 2009, Deutsche Bank instituted a new policy whereby analysts may choose not to set or maintain a target price of certain issuers under coverage with a Hold rating. In particular, this will typically occur for "Hold" rated stocks having a market cap smaller than most other companies in its sector or region. We believe that such policy will allow us to make best use of our resources. Please visit our website at http://gm.db.com to determine the target price of any stock.

The financial instruments discussed in this report may not be suitable for all investors and investors must make their own informed investment decisions. Stock transactions can lead to losses as a result of price fluctuations and other factors. If a financial instrument is denominated in a currency other than an investor's currency, a change in exchange rates may adversely affect the investment. Past performance is not necessarily indicative of future results. Deutsche Bank may with respect to securities covered by this report, sell to or buy from customers on a principal basis, and consider this report in deciding to trade on a proprietary basis.

Unless governing law provides otherwise, all transactions should be executed through the Deutsche Bank entity in the investor's home jurisdiction. In the U.S. this report is approved and/or distributed by Deutsche Bank Securities Inc., a member of the NYSE, the NASD, NFA and SIPC. In Germany this report is approved and/or communicated by Deutsche Bank AG Frankfurt authorized by the BaFin. In the United Kingdom this report is approved and/or communicated by Deutsche Bank AG London, a member of the London Stock Exchange and regulated by the Financial Services Authority for the conduct of investment business in the UK and authorized by the BaFin. This report is distributed in Hong Kong by Deutsche Bank AG, Hong Kong Branch, in Korea by Deutsche Securities Korea Co. This report is distributed in Singapore by Deutsche Bank AG, Singapore Branch, and recipients in Singapore of this report are to contact Deutsche Bank AG, Singapore Branch in respect of any matters arising from, or in connection with, this report. Where this report is issued or promulgated in Singapore to a person who is not an accredited investor, expert investor or institutional investor (as defined in the applicable Singapore laws and regulations), Deutsche Bank AG, Singapore Branch accepts legal responsibility to such person for the contents of this report. In Japan this report is approved and/or distributed by Deutsche Securities Inc. The information contained in this report does not constitute the provision of investment advice. In Australia, retail clients should obtain a copy of a Product Disclosure Statement (PDS) relating to any financial product referred to in this report and consider the PDS before making any decision about whether to acquire the product. Deutsche Bank AG Johannesburg is incorporated in the Federal Republic of Germany (Branch Register Number in South Africa: 1998/003298/10). Additional information relative to securities, other financial products or issuers discussed in this report is available upon request. This report may not be reproduced, distributed or published by any person for any purpose without Deutsche Bank's prior written consent. Please cite source when quoting.

**Copyright © 2012 Deutsche Bank AG**