# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| FAIRHOLME FUNDS, INC., et al., | |
| *Plaintiffs*, | Case No. 1:13-cv-1053-RCL |
| v. | **ORAL ARGUMENT REQUESTED** |
| THE FEDERAL HOUSING FINANCE AGENCY, et al., | |
| *Defendants.* | |
| IN RE FANNIE MAE/FREDDIE MAC SENIOR PREFERRED STOCK PURCHASE AGREEMENT CLASS ACTION LITIGATIONS | Case No. 1:13-cv-1288-RCL |
| *Defendants.* | **ORAL ARGUMENT REQUESTED** |

## PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION
## FOR PARTIAL SUMMARY JUDGMENT

Eric L. Zagar (*Pro Hac Vice*)
KESSLER TOPAZ MELTZER
   & CHECK, LLP
280 King of Prussia Rd.
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
ezagar@ktmc.com

*Co-Lead Counsel for the Class*

Charles J. Cooper (Bar No. 24870)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C.  20036
Telephone:  202.220.9600
Facsimile:  202.220.9601
ccooper@cooperkirk.com

*Counsel for Plaintiffs Fairholme Funds, Inc.,
et al.*

*[Additional Counsel on Inside Cover]*

Hamish P.M. Hume (Bar No. 449914)
Samuel Kaplan (Bar No. 463350)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave. NW
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
hhume@bsfllp.com
skaplan@bsfllp.com

Michael J. Barry (*Pro Hac Vice*)
GRANT & EISENHOFER, P.A.
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100
mbarry@gelaw.com

Adam Wierzbowski (*Pro Hac Vice*)
BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
adam@blbglaw.com

*Co-Lead Counsel for the Class*

David H. Thompson (Bar No. 450503)
Vincent J. Colatriano (Bar No. 429562)
Peter A. Patterson (Bar No. 998668)
Brian W. Barnes (Bar No. 1018419)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C.  20036
Telephone:  202.220.9600
Facsimile:  202.220.9601
dthompson@cooperkirk.com
vcolatriano@cooperkirk.com
ppatterson@cooperkirk.com
bbarnes@cooperkirk.com

*Counsel for Plaintiffs Fairholme Funds, Inc.,
et al.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ........................................................................................................1

FACTUAL BACKGROUND ............................................................................................3

     A.    The Preferred Share Purchase Agreements and periodic commitment fee..............3

     B.    The deadline for setting the fee is extended once and then expires. ........................5

     C.    Plaintiffs challenge the Third Amendment. ...........................................................8

STANDARD OF REVIEW ...............................................................................................9

ARGUMENT ..............................................................................................................10

I.    The provisions of the PSPAs that provide for a periodic commitment fee are too indefinite to be enforceable under New York law. ............................................................10

II.    The periodic commitment fee could not be charged under the Companies' charters, which prohibit Treasury from collecting fees with regard to the Companies' securities. ..........................................................................................................17

III.    The contractual deadline for setting a periodic commitment fee from 2011 through 2015 had expired. ...........................................................................................................22

CONCLUSION ...........................................................................................................26

i

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page**

*166 Mamaroneck Ave. Corp. v. 151 E. Post Rd. Corp.*, 575 N.E.2d 104 (N.Y. 1991) ..........12, 13

*Bank of Am., N.A. v. Gulnick*, 95 N.Y.S.3d 639 (N.Y. App. Div. 2019) ......................................23

*Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318 (N.Y. 2007) ...........................................................13, 25

*Benevento v. RJR Nabisco, Inc.*,
    No. 89 Civ. 6266 (PKL), 1994 WL 577010 (S.D.N.Y. Oct. 20, 1994) ..................................15

*Bernstein v. 1995 Assocs.*, 586 N.Y.S.2d 115 (N.Y. App. Div. 1992) ..............................11, 13, 14

*Braun v. United States*, 531 F. Supp. 3d 130 (2021) ....................................................................18

*Cent. Fed. Sav., F.S.B. v. Nat'l Westminster Bank, U.S.A.*,
    574 N.Y.S.2d 18 (N.Y. App. Div. 1991) ...............................................................................10

*Cobble Hill Nursing Home, Inc. v. Henry and Warren Corp.*,
    548 N.E.2d 203 (N.Y. 1989)..........................................................................................10, 12

*Comptroller of City of N.Y. v. Bank of N.Y. Mellon Corp.*,
    158 N.Y.S.3d 10 (N.Y. App. Div. 2021) ...............................................................................23

*Cooper Square Realty, Inc. v. A.R.S. Mgmt., Ltd.*,
    581 N.Y.S.2d 50 (N.Y. App. Div. 1991) ...............................................................................12

*De Madariaga v. Union Bancair Privee*, 103 A.D.3d 591 (N.Y. App. Div. 2013).....................14

*DerOhannsian v. City of Albany*, 975 N.Y.S.2d 188 (N.Y. App. Div. 2013)................................12

*Express Indus. and Terminal Corp. v. N.Y. Dep't of Transp.*,
    715 N.E.2d 1050 (N.Y. 1999).................................................................................................10

*Fairholme Funds, Inc. v. FHFA*, 2018 WL 4680197 (D.D.C. Sept. 28, 2018) ..........................8, 9

*Foros Advisors LLC v. Digital Globe, Inc.*, 333 F. Supp. 3d 354 (S.D.N.Y. 2018)...............14, 15

*Four Eights, LLC v. Salem*, 194 S.W.3d 484 (Tenn. Ct. App. 2005) ...........................................11

*Genus Med. Tech. LLC v. U.S. FDA*, 994 F.3d 631 (D.C. Cir. 2021) ..........................................21

*Gibbons Ranches, L.L.C. v. Bailey*, 857 N.W.2d 809 (Neb. 2015) ..............................................12

*Glanzer v. Keilin & Bloom*, 281 A.D.2d 371 (N.Y. App. Div. 2001) ..........................................14

*Griffin v. Griffin*, 699 P.2d 407 (Colo. 1985) ..............................................................................12

*Ins. Indus. Consultants, Inc. v. Essex Inv., Inc.*,
    549 S.E.2d 788 (Ga. Ct. App. 2001)......................................................................................15

*Interoil LNG Holdings, Inc. v. Merrill Lynch PNG LNG Corp.*,
    874 N.Y.S.2d 439 (N.Y. App. Div. 2009) ............................................................................14

*iTech U.S., Inc. v. Renaud*, 5 F.4th 59 (D.C. Cir. 2021) ..............................................................19

*Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher,
  417 N.E.2d 541 (N.Y. 1981) ................................................................10, 12

Mercury Bay Boating Club Inc. v. San Diego Yacht Club,
  557 N.E.2d 87 (N.Y. 1990) .............................................................................23

Mogulescu v. 255 W. 98th St. Owners Corp.,
  523 N.Y.S.2d 801 (N.Y. App. Div. 1988) .......................................................23

Moss v. Moss, 463 S.E.2d 9 (Ga. 1995) ................................................................12

Navar, Inc. v. Fed. Bus. Council, 784 S.E.2d 296 (Va. 2016) ..............................12

Perry Capital LLC v. Lew, 70 F. Supp. 3d 208 (D.D.C. 2014) ...............................8

Perry Capital LLC v. Mnuchin, 864 F.3d 591 (D.C. Cir. 2017) ..............................8

Playoff Corp. v. Blackwell, 300 S.W.3d 451 (Tex. Ct. App. 2009)........................14

Sardis v. Frankel, 113 A.D.3d 135 (N.Y. App. Div. 2014) ...................................11

Schreiber v. Delia, 635 N.Y.S.2d 876 (N.Y. App. Div. 1995) ..............................14

Shays v. FEC, 528 F.3d 914 (D.C. Cir. 2008) ......................................................20

Smith v. Hartogensis, 541 F. Supp. 3d 1 (D.D.C. 2021).........................................9

Spirits of St. Louis Basketball Club, L.P. v. Denver Nuggets, Inc.,
  922 N.Y.S.2d 349 (N.Y. App. Div. 2011) .......................................................23

SS-II, LLC v. Bridge Street Assocs., 977 A.2d 189 (Conn. 2009) ........................12

Structured Capital Solutions, LLC v. Commerzbank AG,
  177 F. Supp. 3d 816 (S.D.N.Y. 2016)..............................................................14

*Teutul v. Teutul, 912 N.Y.S.2d 664 (N.Y. App. Div. 2010)...........................11, 14

Utility Solid Waste Activities Grp. v. EPA, 901 F.3d 414 (D.C. Cir. 2018) ..........21

## Statutes

12 U.S.C.

  § 1452 (1988)....................................................................................................18
  § 1452 (2018)....................................................................................................18
  *§ 1455(i)..............................................................................................18, 19, 20
  § 1455(i) note "References in Text" ................................................................18
  § 1455(l).............................................................................................................21
  § 1455(l)(1)(A)...................................................................................................21
  § 1455(l)(1)(C)(i)...............................................................................................21
  § 1455(l)(1)(C)(iv).............................................................................................21
  § 1455(l)(2)(B)............................................................................................21, 22
  § 1719(c) ............................................................................................................20
  *§ 1719(f)..............................................................................................18, 19, 20

§ 1719(g) ...................................................................................................................21

§ 1719(g)(1)(A) ..........................................................................................................21

§ 1719(g)(1)(C)(i) .......................................................................................................21

§ 1719(g)(1)(C)(iv) .....................................................................................................21

§ 1719(g)(2)(B) .....................................................................................................21, 22

§ 4516 .........................................................................................................................19

Financial Institutions Reform, Recovery, and Enforcement Act, Pub. L. No. 101-73,
    § 731(c)(1), 103 Stat. 183 (1989) ...........................................................................18

Housing and Community Development Act, Pub. L. No. 100-242,
    § 441, 101 Stat. 1815 (1988) ..................................................................................18

## **Rule**

FED. R. CIV. P. 56(a) ......................................................................................................9

## **Other Authorities**

1 WILLISTON ON CONTRACTS § 4:29 (4th ed. Nov. 2021 update) .................................11

Richard L. Shockley & Anjan V. Thakor, *Bank Loan Commitment Contracts: Data, Theory, and
Tests*, 29 J. OF MONEY, CREDIT AND BANKING 517 (1997) .......................................16

## INTRODUCTION

This case concerns whether the August 2012 Net Worth Sweep violated the implied covenant of good faith and fair dealing between shareholders and Fannie and Freddie and, if so, what damages are owed. Plaintiffs will demonstrate at trial that shareholders could not have reasonably expected that the Companies would agree to transfer 100% of their profits in perpetuity to the U.S. Treasury, regardless of amount and without receiving anything meaningful in return. The Court, however, can simplify the issues for trial by resolving now an issue of law that is relevant to both liability and damages—specifically, the enforceability of section 3.2(b) of the agreements governing the terms of assistance between Treasury and the Companies.

Section 3.2(b) refers to a Periodic Commitment Fee to be paid to Treasury in addition to the other forms of compensation required by the agreements. The agreements did not, however, set the fee amount or provide clearly for a method of determining what it should be. Instead, they left it for future determination, providing that the fee was "intended to fully compensate Treasury for the support provided by the ongoing Commitment" and was to "be determined with reference to the market value of the Commitment as then in effect" and "mutually agreed by" Treasury and the Companies "subject to their reasonable discretion and in consultation with the Chairman of the Federal Reserve." The agreement also required Treasury and the Companies to set the amount of the fee by December 31, 2009 (later amended to December 31, 2010). However, Treasury and the Companies never did so. Under the terms of the agreements, the next opportunity to set the amount of the fee was "five years thereafter" or December 31, 2015—several years after the Net Worth Sweep and well after the Companies would have been restored to profitability. The parties have retained experts who disagree about the periodic commitment fee's implications for both liability

1

and the calculation of damages, and the amount of the fee would need to be determined at trial if the provision is deemed enforceable.

The periodic commitment fee provision presents an antecedent question of law, however, that should be resolved now. On its face, the provision is an "agreement to agree" in the future on a fee amount. Under black letter law—including New York law, which governs the interpretation of the relevant contracts—this agreement to agree is indefinite and thus unenforceable as a matter of law. Here, that conclusion is only underscored by what little the provision *does* say about setting the fee—namely, that the amount should "be determined with reference to the market value." The provision provides no objective criteria, no methodology, and no extrinsic source for determining this "market value," and the context of the agreement does not readily lend itself to a calculation of "market value."

Separately, the provision was also unenforceable under federal law. In the Companies' charters, Congress prohibited the Executive Branch from imposing fees on securities issued by Fannie Mae and Freddie Mac. The periodic commitment fee does precisely that. The text of the relevant provisions demonstrates that the fee is also unlawful under federal law.

Finally, even if the fee were enforceable, FHFA and Treasury did not set a fee amount for the five-year period from 2011 through 2015. The agreements required them to mutually agree to a fee amount by December 31, 2010, "for the ensuing five years." Under the terms of the agreements, the next opportunity to impose a fee was "five years thereafter."

The Court should grant Plaintiffs' motion for summary judgment and hold that the periodic commitment fee was unenforceable as a matter of law, thus eliminating the parties' dispute over the periodic commitment fee from the list of issues that must be decided at trial. Alternatively, the

Court should rule as a matter of law that the fee could not be charged until January 2016 at the earliest.

## FACTUAL BACKGROUND

### A.    The Preferred Share Purchase Agreements and periodic commitment fee.

Fannie and Freddie are regulated by the Federal Housing Finance Agency (FHFA). During the 2008 housing market downturn, FHFA exercised statutory authority granted by the Housing and Economic Recovery Act (HERA) to take the Companies into conservatorship. The following day, FHFA, acting on behalf of the Companies as their conservator, agreed to permit Treasury to purchase the Companies' securities. Treasury and FHFA memorialized this agreement for each company in the Preferred Stock Purchase Agreements (PSPAs). *See* Ex. 1, FHFA-DDC-0127948 (Fannie Mae); Ex. 2, FHFA-DDC-0136991 (Freddie Mac); Statement of Undisputed Material Facts ¶ 1 ("Undisputed Facts").

Under the PSPAs, Treasury permitted the Companies to draw up to $100 billion each when needed to avoid a negative net worth. PSPAs § 2.1. In return, Treasury received several forms of consideration. First, it received shares of a new class of preferred stock that was senior to all other equity in the Companies. Ex. 3, FHFA-DDC-0337320 (Fannie Mae); Ex. 4, FHFA-DDC-0337376 (Freddie Mac) ("Stock Certificates"); *see also* Undisputed Facts ¶ 2. This new stock carried a liquidation preference—*i.e.*, the amount Treasury would be repaid if FHFA liquidated the Companies—of $1 billion for each company. PSPAs § 3.1. That preference would increase dollar-for-dollar by the amount the Companies drew from Treasury's funding commitment. *Id.* § 3.3.

The terms of the senior preferred stock also entitled Treasury to a quarterly dividend. Stock Certificates § 2. The amount of the dividend varied depending on whether the Companies paid it

3

in cash. *Id.* § 2(c). If paid in cash, the dividend was 10 percent of the liquidation preference; if the Companies declined to declare cash dividends, then the liquidation preference would increase at a rate of 12 percent per year until all past but unpaid dividends from prior quarters were declared and paid. *See id.* § 2(a), (c).

In addition to the senior preferred stock and its corresponding dividend and liquidation preference, Treasury also received warrants that gave Treasury the right to purchase 79.9% of each company's common stock for a nominal price. *See* PSPAs § 1 (defining the "Warrant"), § 3.1.

Lastly, the PSPAs referred to something labeled the "Periodic Commitment Fee" (or "PCF"). *See id.* § 3.2; Undisputed Facts ¶ 3. Specifically, § 3.2(b) of the PSPAs stated:

> The Periodic Commitment Fee is intended to fully compensate Purchaser for the support provided by the ongoing Commitment following December 31, 2009. The amount of the Periodic Commitment Fee shall be set not later than December 31, 2009 with respect to the ensuing five-year period, shall be reset every five years thereafter and shall be determined with reference to the market value of the Commitment as then in effect. The amount of the Periodic Commitment Fee shall be mutually agreed by Purchaser and Seller, subject to their reasonable discretion and in consultation with the Chairman of the Federal Reserve; <u>provided</u>, that Purchaser may waive the Periodic Commitment Fee for up to one year at a time, in its sole discretion, based on adverse conditions in the United States mortgage market.

This provision left the amount of the fee to be determined later: "The amount of the Periodic Commitment Fee shall be mutually agreed" by Treasury (the "Purchaser") and FHFA (the "Seller"), "subject to their reasonable discretion and in consultation with the Chairman of the Federal Reserve." *Id.* Section 3.2(b) established a deadline, however, for initially setting the fee, requiring the parties to agree no later than December 31, 2009. *See id.* That "mutually agreed"

upon fee would then apply for "the ensuing five-year period" until it was "reset" again at the end of that five years for another five-year period. *Id.*

To the officials responsible for authorizing and implementing the PSPAs, the calculation of the periodic commitment fee was a mystery. Although § 3.2(b) stated that the fee "shall be determined with reference to the market value of the Commitment," it provided no other direction besides requiring further negotiations between the parties and consultation with the Chairman of the Federal Reserve. The FHFA Director in 2008—who signed the PSPAs on behalf of the Companies—testified that he did not "remember" "any discussion regarding how the periodic commitment fee would be set" when the PSPAs were "being put together." Ex. 5, Lockhart Dep. 129:14–17; *see also id.* at 130:11–15 ("I don't remember any discussions about the estimated amount" for the periodic commitment fee.); Undisputed Facts ¶ 4. A member of Fannie Mae's Board of Directors stated that, to his knowledge, there was no "discussion at Fannie Mae about how th[e] periodic commitment fee would be priced." Ex. 6, Perry Dep. 26:12–20; Undisputed Facts ¶ 5. A former CFO for Freddie Mac testified that, "as far as [he] knew, should Treasury impose the commitment fee, the amount was uncertain." Ex. 7, Kari Dep. 146:24–147:1; Undisputed Facts ¶ 6.

An amendment to the PSPAs in May 2009 offered no additional clarity. Instead, the amendment primarily increased the total amount the Companies could draw from Treasury. It did not modify any provisions related to the periodic commitment fee.

### B.   The deadline for setting the fee is extended once and then expires.

Toward the end of 2009, the December 31 deadline for setting the periodic commitment fee was fast approaching. *See* PSPAs § 3.2(b). On December 24, 2009, one week before the

5

deadline, Treasury and FHFA agreed to extend the deadline one year for setting the fee. *See* Ex. 8, FHFA-DDC-0003646 (Fannie Mae); Ex. 9, FHFA-DDC-0018682 (Freddie Mac) ("Second Amendment"); Undisputed Facts ¶ 7. The PSPAs therefore now stated: "The amount of the Periodic Commitment Fee shall be set not later than December 31, 2010 with respect to the ensuing five-year period." Second Amendment § 8 (amending PSPAs § 3.2(b)). The Second Amendment otherwise left § 3.2(b) untouched—that provision still required that the fee amount be "mutually agreed by" the Companies and Treasury "in consultation with the Chairman of the Federal Reserve."

The first half of 2010 came and went. With the deadline again looming, officials at Treasury and FHFA began discussing how to deal with the periodic commitment fee. In October, one FHFA official wrote Mario Ugoletti, the advisor to the FHFA Director concerning the PSPAs. *See* Ex. 10, Ugoletti Decl. ¶ 2; Undisputed Facts ¶ 8. In his email, the official wrote: "As I read the [PSPAs], Treasury will need to set the Periodic Commitment Fee not later than Dec. 31, 2010— to apply for the ensuing 5-year period. It can then waive the fee (anew each year), but the fee needs to be set—I don't think the agreement as written allows for postponing setting the fee." Ex. 11, FHFA-DDC-0410672; Undisputed Facts ¶ 8. The following month, the same official reiterated to Mr. Ugoletti that any periodic commitment fee for the following five years needed to be set by the contractual deadline: "On the possibility of not setting the fee this year, given the waiver authority—I think its [sic] not clear that given the fee is to be in place for 5 years that we might not run into a legal issue on that option (plus the language in the Agreement seems to suggest it must be set this year)." Ex. 12, FHFA-DDC-0246140; Undisputed Facts ¶ 8. Nonetheless, the

parties failed to set the fee amount by "December 31, 2010 with respect to the ensuing five-year period." Second Amendment § 8.

Instead, two days before the deadline expired, Treasury sent a letter to FHFA purporting to "waive[], for the first quarter of Calendar Year (CY) 2011, the PCF payable by each Enterprise." Ex. 13, FHFA-DDC-0019279; Undisputed Facts ¶ 9. On December 31, 2010, the deadline passed with no fee having been set. Despite the failure of Treasury and FHFA to mutually agree on an amount for the ensuing five years, Treasury continued sending letters to FHFA quarterly, purporting to "waive" the fee. *See, e.g.*, Ex. 14, FHFA00062216; Undisputed Facts ¶ 9.

Over the next eighteen months, the periodic commitment fee remained a mystery. In August 2011, when one of Treasury's private consulting firms asked for "any literature" that "expresses Treasury's most recent position on charging quarterly commitment fees for the PSPA," a Treasury official responded: "We don't really have any literature. We've just elected to waive for each of the past three quarters (and it was not set previously)." *See* Ex. 19, UST00406207; Undisputed Facts ¶ 10. In September 2011, the SEC directed Fannie Mae to "revise future filings to quantify the quarterly commitment fee or disclose how the fee will be determined." *See* Ex. 20, FNM-FAIRHOLME-0125519; Undisputed Facts ¶ 11. Fannie Mae responded: "At this time, we have not received a notification from Treasury regarding the amount of the quarterly commitment fee or more specific information regarding how the commitment fee will be determined." *See* Ex. 20, FNM-FAIRHOLME-0125519; Undisputed Facts ¶ 11. By August 2012, the fee had never been set, and Treasury had never attempted to charge it.

On August 17, 2012, FHFA and Treasury adopted the Third Amendment to the PSPAs. Ex. 21, FHFA-DDC-0054967 (Fannie Mae); Ex. 22, FHFA-DDC-0054959 (Freddie Mac) ("Third

Amendment"); Undisputed Facts ¶ 12. A senior White House advisor on housing finance policy testified that he did not "recall considering how to value the commitment fee" at the time. Ex. 23, Parrott Dep. 100:11–16; Undisputed Facts ¶ 13. The Third Amendment drastically overhauled the PSPAs' dividend structure. *See* Third Amendment § 3 (amending ¶ 2(c) of the Stock Certificates). Instead of the 10% cash or 12% in-kind dividend, the Third Amendment required the Companies to pay all their net worth (minus a small capital buffer) to Treasury every single quarter. *See id.* ("Net Worth Sweep"). The Third Amendment also prohibited the charging of a periodic commitment fee so long as the Net Worth Sweep was in effect. *See id.* § 4 (amending PSPAs § 3.2(b)).

## C.    Plaintiffs challenge the Third Amendment.

In 2013, Plaintiffs filed suit challenging the Net Worth Sweep as a breach of the implied covenant of good faith and fair dealing, among other grounds. This Court dismissed all of Plaintiffs' claims, *Perry Capital LLC v. Lew*, 70 F. Supp. 3d 208 (D.D.C. 2014), and on appeal the D.C. Circuit affirmed in part and reversed in part, *Perry Capital LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017). On remand, Plaintiffs amended their complaints, and Defendants filed a renewed motion to dismiss. The Court dismissed some of Plaintiffs' claims but held that they stated a claim for breach of the implied covenant of good faith and fair dealing. *Fairholme Funds, Inc. v. FHFA*, 2018 WL 4680197, at *7–14 (D.D.C. Sept. 28, 2018).

The implied covenant prohibits parties to a contract from acting "arbitrarily or unreasonably." *Id.* at *7. Thus, even when a contractual provision grants discretion to one of the contracting parties, that party breaches the implied covenant if it exercises its discretion in an arbitrary or unreasonable manner. *Id.* The standard for judging whether a party's action has

8

violated the implied covenant is whether the action was within "the reasonable expectations of the parties." *Id.* (internal quotation marks omitted).

A key question presented in this case relevant to liability is whether the Third Amendment's Net Worth Sweep—taking all the Companies' profits every quarter—was within "the reasonable expectations of the parties" at the time it was adopted. Defendants have stated that the periodic commitment fee was "anticipated to be substantial," Ex. 30, FHFA Resp. to Inter. at 4; Undisputed Facts ¶ 19, arguing that the Net Worth Sweep could have been reasonably expected in part due to that fee.

Given the significance of the periodic commitment fee to the parties' overall dispute and in the interest of simplifying the issues that must be decided at trial, Plaintiffs move for partial summary judgment to seek a ruling that would establish a narrow but important proposition: At the time of the Third Amendment, the contractual provision of the PSPAs that provided for a periodic commitment fee was unenforceable as a matter of law. In the alternative, Plaintiffs move for a partial summary judgment ruling that the fee could not have been charged until 2016 at the earliest.

## STANDARD OF REVIEW

A "party may move for summary judgment" on "part of" a "claim." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* "The Court views the evidence in the light most favorable to the non-moving party." *Smith v. Hartogensis*, 541 F. Supp. 3d 1, 9 (D.D.C. 2021).

**ARGUMENT**

**I.    The provisions of the PSPAs that provide for a periodic commitment fee are too indefinite to be enforceable under New York law.**

Except where federal law provides otherwise, interpretation of the PSPAs is governed by New York law. *See* PSPAs § 6.4. In New York, "[f]ew principles are better settled in the law of contracts than the requirement of definiteness." *Cobble Hill Nursing Home, Inc. v. Henry and Warren Corp.*, 548 N.E.2d 203, 206 (N.Y. 1989). "If an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract." *Id.* Thus, "a mere agreement to agree in which a material term is left for future negotiations, is unenforceable." *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 417 N.E.2d 541, 543 (N.Y. 1981).

This doctrine serves two purposes. First, a court cannot determine when a contract has been breached if it is unable to "determine what the agreement is." *Cobble Hill*, 548 N.E.2d at 206. Second, "the requirement of definiteness assures that courts will not impose contractual obligations when the parties did not intend to conclude a binding agreement." *Id.* (citing Restatement (Second) of Contracts § 33 (1981)). Therefore, to "create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Express Indus. and Terminal Corp. v. N.Y. Dep't of Transp.*, 715 N.E.2d 1050, 1053 (N.Y. 1999). The question of definiteness is "properly determined on a motion for summary judgment." *Cent. Fed. Sav., F.S.B. v. Nat'l Westminster Bank, U.S.A.*, 574 N.Y.S.2d 18, 19 (N.Y. App. Div. 1991).

While the boundaries of the indefiniteness doctrine are not always clear, courts consistently treat a contractual provision as unenforceable under this doctrine if it expressly contemplates further negotiations between the parties. An illustrative case is the New York Supreme Court

10

Appellate Division's decision in *Teutul v. Teutul*, 912 N.Y.S.2d 664 (N.Y. App. Div. 2010). There, a contract gave one party the option to purchase the other party's shares in a private company "for fair market value, as determined by a procedure to be agreed to by the parties as soon as practicable." *Teutul*, 912 N.Y.S.2d at 665. The court acknowledged that "a price term of 'fair market value' in and of itself may be 'sufficiently precise' in that generally fair market value can 'be determined objectively.'" *Id.* (quoting *Bernstein v. 1995 Assocs.*, 586 N.Y.S.2d 115, 115 (N.Y. App. Div. 1992)). But in the contract at issue, the court explained, the parties "went further and expressly agreed to later agree on a procedure for determining the shares' fair market value." *Id.* Because "the parties merely agreed to later agree on a procedure for determining fair market value," the court held that the contract was unenforceable. *Id.* at 665–66.

*Teutul* is not an outlier. In another case, the New York Supreme Court's Appellate Division ruled that a purported contract setting the price of an apartment "depend[ing] on the parties' ability to reach agreement upon such matters as the fair appraised value of the apartment and the value of its occupancy" was unenforceable for lack of definiteness. *Sardis v. Frankel*, 113 A.D.3d 135, 145–46 (N.Y. App. Div. 2014). A leading contract law treatise recognizes that "if an essential element" of a contract "is reserved for the future agreement of both parties, as a general rule, the promise can give rise to no legal obligation until such future agreement." 1 WILLISTON ON CONTRACTS § 4:29 (4th ed. Nov. 2021 update). Courts in many jurisdictions have recognized and applied this rule. *E.g.*, *Four Eights, LLC v. Salem*, 194 S.W.3d 484, 486 (Tenn. Ct. App. 2005) (Although "'fair market value' has a common meaning," a "provision that 'Fair Market Value must be determined by the Lessor and Lessee, negotiating in good faith'" "made an 'agreement to agree' to something in the future, and such agreements have generally been held unenforceable,

both in this jurisdiction and others.").[1]

Under a straightforward application of this principle, the provision of the PSPAs that called for the Companies to pay a periodic commitment fee were unenforceable. The *amount* of the fee was indisputably material, for "[p]rice is a material term of a contract" under New York law. *DerOhannsian v. City of Albany*, 975 N.Y.S.2d 188, 191 (N.Y. App. Div. 2013); *see also Cooper Square Realty, Inc. v. A.R.S. Mgmt., Ltd.*, 581 N.Y.S.2d 50, 51 (N.Y. App. Div. 1991). The PSPAs expressly left that material term to be determined via later negotiations by the parties: "The amount of the Periodic Commitment Fee shall be mutually agreed by Purchaser and Seller, subject to their reasonable discretion and in consultation with the Chairman of the Federal Reserve." *See* PSPAs § 3.2(b). This provision—requiring future mutual agreement to determine the fee amount—is "a mere agreement to agree, in which" the amount "is left for future negotiations." *Joseph Martin, Jr., Delicatessen*, 417 N.E.2d at 543. Therefore, it is not "legally enforceable." *Cobble Hill*, 548 N.E.2d at 206.

But even if § 3.2(b) of the PSPAs did not expressly call for further negotiations between the parties, it would still be too indefinite to be enforced because it provides no "methodology for

---

[1] *See also, e.g.*, *Griffin v. Griffin*, 699 P.2d 407, 408-09, 411 (Colo. 1985) (en banc) (provision stating that an action "shall be selected jointly" "merely agreed to negotiate and reach agreement at some future time" and thus was "unenforceable" (cleaned up)); *SS-II, LLC v. Bridge Street Assocs.*, 977 A.2d 189, 197-99 (Conn. 2009) (provision stating that a price "adjustment shall be mutually determined" by the parties "constituted an agreement to agree" and was not enforceable); *Moss v. Moss*, 463 S.E.2d 9, 9–10 (Ga. 1995) (provision stating "that the method of appraising the property would be agreed upon by the attorneys" was "unenforceable" because no "method of appraisal was agreed upon"); *Gibbons Ranches, L.L.C. v. Bailey*, 857 N.W.2d 809, 812 (Neb. 2015) ("When an agreement stipulates that certain terms shall be settled later by the parties, such terms do not become binding unless and until they are settled by later agreement."); *Navar, Inc. v. Fed. Bus. Council*, 784 S.E.2d 296, 300 (Va. 2016) ("It is well settled under Virginia law that agreements to negotiate at some point in the future are unenforceable.").

determining" the periodic commitment fee "within the four corners" of the contract and does not "invite recourse to an objective extrinsic event, condition or standard on which the amount was made to depend." *See 166 Mamaroneck Ave. Corp. v. 151 E. Post Rd. Corp.*, 575 N.E.2d 104, 106 (N.Y. 1991) (cleaned up). For example, the PSPAs do not set "the price to be paid" at a "fair market value" that may "be determined objectively." *Bernstein*, 586 N.Y.S.2d at 117. Although § 3.2(b) states that the periodic commitment fee amount should "be determined *with reference to* the market value of the Commitment," it does not set the amount *at* "the market value of the Commitment." The very next sentence makes this clear—requiring that the fee amount be "mutually agreed" upon "in consultation with the Chairman of the Federal Reserve." If the fee amount were simply "the market value," then there would be no need for a later mutual agreement or consultation. And a "reading of the contract should not render any portion meaningless." *Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 324 (N.Y. 2007). Thus, rather than use "market value" as the "objective" measure for the fee amount, *166 Mamaroneck Ave.*, 575 N.E.2d at 106, the PSPAs instead make the "market value" merely one factor the parties must consider when "consult[ing] with the Chairman of the Federal Reserve" and "mutually agree[ing]" on an amount. PSPAs § 3.2(b).

Moreover, even if § 3.2(b) required the fee amount to be set *at* "the market value of the Commitment," the provision would still be too indefinite to be enforced because it provides no "methodology for determining" such market value "within the four corners" of the contracts. *See 166 Mamaroneck Ave. Corp.*, 575 N.E.2d at 106. In some contexts, such as a contract for the rental of office space, a term setting the price to be paid at the "fair market value" may be sufficiently definite because the "fair market value" of office space can "be determined objectively." *Bernstein*,

586 N.Y.S.2d at 117. The same goes for a price for liquid natural gas that "can be supplied from public price indices," *Interoil LNG Holdings, Inc. v. Merrill Lynch PNG LNG Corp.*, 874 N.Y.S.2d 439, 440 (N.Y. App. Div. 2009), or a commercial mortgage rate to be set at "current commercial loan rates," *Schreiber v. Delia*, 635 N.Y.S.2d 876, 877 (N.Y. App. Div. 1995).

But inferring an appropriate methodology for determining "market value" is not possible in other contexts. For example, "any determination as to the fair market value" of shares in "a closely held corporation" necessarily "involves a certain degree of inexact valuation and subjectivity, making the *procedure* by which fair market value is determined of particular importance." *Teutul*, 912 N.Y.S.2d at 665; *see also Playoff Corp. v. Blackwell*, 300 S.W.3d 451, 456 (Tex. Ct. App. 2009) ("[J]ust because 'fair market value'" may be "sufficiently definite as a contract term in some contexts does not mean that every contract containing the phrase is sufficiently definite to be enforced."). As the Southern District of New York explained when applying New York law, if the market rate is a "range" that "var[ies] with the overall economic benefits achieved by the transaction," this measure is "not fixed and invariable" and thus not a definite contract term. *Structured Capital Solutions, LLC v. Commerzbank AG*, 177 F. Supp. 3d 816, 824 n.3 (S.D.N.Y. 2016) (provision for "market based fee arrangement" was indefinite when "usual range for fees in structured finance transactions is 1 to 10%, varying with the overall economic benefit achieved by the transaction" (cleaned up)).[2] Thus, before this Court could even

---

[2] *See also, e.g.*, *Glanzer v. Keilin & Bloom*, 281 A.D.2d 371, 371–72 (N.Y. App. Div. 2001) ("market rate" for compensation of "senior investment advisors" was "too indefinite to permit enforcement"); *De Madariaga v. Union Bancair Privee*, 103 A.D.3d 591, 591 (N.Y. App. Div. 2013) (promise to pay "severance package 'consistent with the severance packages paid to' other 'senior executives'" was "too indefinite to permit enforcement" (internal quotation marks omitted)); *Foros Advisors LLC v. Digital Globe, Inc.*, 333 F. Supp. 3d 354, 361–62 (S.D.N.Y.

reach the question of determining the "market value" of Treasury's funding commitment at trial, it would first need to determine the *methodology* for determining that market value—something the PSPAs themselves do not specify.

The need to determine whether Treasury has been fully compensated with reference to the Commitment only further complicates the inquiry. As noted, the periodic commitment fee provision states that the fee "is intended to fully compensate Purchaser for the support provided by the ongoing Commitment." PSPAs § 3.2(b). Thus, any analysis of whether Treasury is "fully compensate[d]" requires valuing the other forms of compensation Treasury received in return for its financial support of Fannie and Freddie—including the dividends on Treasury's senior preferred stock, the initial liquidation preference associated with that stock, and the value of Treasury's warrants to purchase 79.9% of the Companies' common stock for a nominal price. The lack of any guidance in the PSPAs on how to make this complex determination only adds to the indefiniteness of the periodic commitment fee provision.

Although the Court need not look beyond the terms of the PSPAs themselves to conclude that the periodic commitment fee provision is too indefinite to be enforced, this conclusion is buttressed by the evidence that was produced in discovery. FHFA Director James Lockhart, who signed the PSPAs on behalf of Fannie and Freddie in 2008, testified that he did not "remember" "any discussion regarding how th[e] periodic commitment fee would be set" when the PSPAs were

---

2018) (applying New York law, price "with reference to 'customary terms and conditions'" for financial advisors was indefinite due to "wide range" of services and prices); *Benevento v. RJR Nabisco, Inc.*, No. 89 Civ. 6266 (PKL), 1994 WL 577010, at *7 & n.5 (S.D.N.Y. Oct. 20, 1994) (price term of "comparable investment banking standards" was indefinite); *Ins. Indus. Consultants, Inc. v. Essex Inv., Inc.*, 549 S.E.2d 788, 792–93 (Ga. Ct. App. 2001) ("fair market rental rate and fair market escalations . . . within the Northwest office submarket" was indefinite because "no objective method of ascertaining the fair market rental rate is given").

"being put together." Ex. 5, Lockhart Dep. 129:14–17; Undisputed Facts ¶ 4. Nor was the methodology for calculating a market value of Treasury's funding commitment apparent to the Companies' executives. The CEO of Fannie Mae from 2012 to 2018 stated that he did not think the periodic commitment fee "was subject to estimation because there was no formula for it." Ex. 25, Mayopoulos Dep. 201:2–4; Undisputed Facts ¶ 15. When Fannie Mae's then-Chief Financial Officer (and now President) was asked how one would "go about determining the market value of the commitment," he responded: "I do not know how they would do that." Ex. 26, Benson Dep. 120:9–14; Undisputed Facts ¶ 16.

Expert testimony confirms that the periodic commitment fee provision is indefinite. Plaintiffs' expert on this issue, who wrote the leading article on loan commitment fees and has examined thousands of such contractual provisions for his scholarly work, testified that the PSPAs were "different than" all "the other agreements" he has reviewed. Ex. 28, Thakor Dep. 270:5–9; Undisputed Facts ¶ 17; *see* Richard L. Shockley & Anjan V. Thakor, *Bank Loan Commitment Contracts: Data, Theory, and Tests*, 29 J. OF MONEY, CREDIT AND BANKING 517 (1997) (analyzing thousands of bank loan commitments). Likewise, Defendants' expert testified that, "for purpos[es] of valuing the periodic commitment fee, this is unlike any other financial transaction," and "[t]here is not something we can analogize to." Ex. 24, Attari Dep. 256:19–257:2; Undisputed Facts ¶ 14.

The range of fees and methodologies that the competing experts say is reasonable underscores this conclusion. Once instructed to assume that the periodic commitment fee provision was enforceable and would not simply be treated as a pretext to funnel money to Treasury unrooted in any objective standard, Plaintiffs' expert pointed to the closest and most appropriate sources for determining the fee that were available, including commercial bank loan commitments, banks that

received funding from Treasury as part of the TARP program, and the federal government's 2008 bailout of AIG, and he determined that "the PCF should actually be zero." Ex. 28, Thakor Dep. 92:19—0; Undisputed Facts ¶ 17; *see also* Ex. 27, Thakor Expert Report ¶¶ 33–51. Defendants' expert, by contrast, simply claims that the fee would entitle Treasury to all of the Companies' profits. Ex. 29, Attari Expert Report ¶¶ 104–09, 125–39; *see* Undisputed Facts ¶ 18.

In sum, the periodic commitment fee provision is indefinite and thus unenforceable in more ways than one. First, and most simply, the provision is, on its face, an agreement to negotiate further over the fee's amount. That fact alone warrants summary judgment for Plaintiffs on this question. Alternatively, even if the PSPAs had set the periodic commitment fee at a "market value," they provide no methodology for assessing "market value" nor any other components from which the amount of the fee could be determined. In this context, the lack of any contractually specified methodology for discerning market value, and the lack of any guidance on how such data might be used to determine the amount of the fee, makes the periodic commitment fee provision fatally indefinite and unenforceable. The Court should therefore hold that the periodic commitment fee provision was unenforceable when the Net Worth Sweep was imposed in August 2012.

## II.    The periodic commitment fee could not be charged under the Companies' charters, which prohibit Treasury from collecting fees with regard to the Companies' securities.

Two federal statutory provisions, one for Fannie Mae and one for Freddie Mac, prohibit Treasury from collecting fees with regard to the Companies' issuance of preferred stock. The statutory text for Fannie Mae provides:

> **Prohibition on assessment or collection of fee or charge by United States**
>
> Except for fees paid pursuant to section 1723a(g) of this title

> and assessments pursuant to section 4516 of this title, no fee or charge may be assessed or collected by the United States (including any executive department, agency, or independent establishment of the United States) on or with regard to the purchase, acquisition, sale, pledge, issuance, guarantee, or redemption of any mortgage, asset, obligation, trust certificate of beneficial interest, or other security by the corporation. No provision of this subsection shall affect the purchase of any obligation by the Secretary of the Treasury pursuant to subsection (c).

12 U.S.C. § 1719(f).

The text for Freddie Mac is materially identical:

> **Prohibition on assessment or collection of fee or charge by United States**
>
> Except for fees paid pursuant to sections 1452(c)[3] and 1455(c) of this title and assessments pursuant to section 4516 of this title, no fee or charge may be assessed or collected by the United States (including any executive department, agency, or independent establishment of the United States) on or with regard to the purchase, acquisition, sale, pledge, issuance, guarantee, or redemption of any mortgage, asset, obligation, or other security by the Corporation. No provision of this subsection shall affect the purchase of any obligation by any Federal home loan bank pursuant to section 1452(a) of this title.

12 U.S.C. § 1455(i).

Together, §§ 1455(i) and 1719(f) each provide that "no fee or charge may be assessed or

---

[3] The U.S. Code notes that the textual cross-reference in § 1455(i) to § "1452(c)" is mistaken. *See* 12 U.S.C. § 1455(i) note "References in Text." Specifically, Congress created the cross-reference to § "1452(c)" in 1988. *See* Housing and Community Development Act, Pub. L. No. 100-242, § 441, 101 Stat. 1815, 1921 (1988). At that time, § 1452(c) was present-day § 1452(d). *Compare* 12 U.S.C. § 1452 (1988), *with* 12 U.S.C. § 1452 (2018). Later, Congress "redesignated" that section as "section 1452(d)." Financial Institutions Reform, Recovery, and Enforcement Act, Pub. L. No. 101-73, § 731(c)(1), 103 Stat. 183, 431 (1989). But Congress did not update the textual cross-reference in § 1455(i) after this redesignation. *See* 12 U.S.C. § 1455(i) note "References in Text." Thus, § 1455(i) should be read to refer to § 1452(d). *See Braun v. United States*, 531 F. Supp. 3d 130, 137 (2021) (Public laws govern over the U.S. Code).

collected by the United States (including any executive department, agency, or independent establishment of the United States) on or with regard to" the "issuance" of any "security by" Fannie and Freddie.

These fee provisions prohibit Treasury from collecting the periodic commitment fee. Statutory interpretation centers on the "ordinary meaning" of the text. *iTech U.S., Inc. v. Renaud*, 5 F.4th 59, 63 (D.C. Cir. 2021). Here, the statutory provisions prohibit (1) "fees" (2) that are "with regard to" any "security" "issued" by the Companies and (3) are "assessed or collected by" the United States, including an "executive department" or "agency" of the United States. The periodic commitment fee checks all three boxes. First, the periodic commitment fee is—by its own terms— a "fee." Second, the PSPAs make clear the fee is "with regard to" the Government Stock, which is a "security" "issued" by the Companies. Third, under the PSPAs, the fee is "collected by" the Treasury Department, which is an "executive department" of the United States. The periodic commitment fee thus falls squarely within the prohibitions in §§ 1455(i) and 1719(f).

Congress created a number of exceptions to these fee prohibitions, but it did not create one authorizing Treasury to collect a periodic commitment fee. First, for both Companies, the fee prohibitions exempt "assessments pursuant to [12 U.S.C. §] 4516." 12 U.S.C. §§ 1455(i), 1719(f). The assessments of § 4516 are the fees the Companies pay to fund FHFA. *See id.* § 4516. The periodic commitment fee—a fee supposedly payable to Treasury—is not a § 4516 assessment used to fund FHFA, so this exception does not apply.

Second, the prohibition on fees does not apply to fees paid when Treasury purchases the Companies' *debt*. *See id.* § 1455(i) (exempting fees paid pursuant to Treasury's purchase of obligations under § 1455(c); § 1719(f) (stating that the fee prohibition does not apply to Treasury's

19

purchase of obligations under § 1719(c)). The periodic commitment fee—a fee provided for in connection with Treasury's purchase of the Companies' equity *stock*—is not a fee paid on Treasury's purchase of a *debt* obligation, so this exemption does not apply either.

Third, the fee prohibitions exempt fees paid to federal banks or banks designated as depositaries of public money for serving as the Companies' depositary, custodian, or agent. *See id.* § 1455(i) (exempting fees paid pursuant to § 1452(d), *see* footnote 2, *supra*); § 1719(f) (exempting fees paid pursuant to § 1723a(g)). The periodic commitment fee is not paid to Treasury as a depositary of the Companies' money, so this exemption likewise does not apply.

Lastly, for Freddie Mac, § 1455(i) also includes an exemption for fees paid in relation to "the purchase of any obligation by any Federal home loan bank." *Id.* § 1455(i). Treasury is not a "Federal home loan bank," and the periodic commitment fee is not a fee in relation to the purchase of a debt "obligation," so this exemption is similarly inapplicable.

In sum, with textually specified exceptions, §§ 1455(i) and 1719(f) prohibit the federal government, including its executive departments like Treasury, from collecting any fees in relation to securities issued by the Companies. Those provisions enumerate specific exceptions, but the periodic commitment fee does not fall within any of them. When "Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent, none of which is present here." *Shays v. FEC*, 528 F.3d 914, 934 (D.C. Cir. 2008) (internal quotation marks omitted). Therefore, a periodic commitment fee payable to Treasury on the Government Stock issued by the Companies is prohibited by §§ 1455(i) and 1719(f).

In addition, the specific provisions prohibiting Treasury from collecting fees on securities

issued by the Companies govern the more general provisions authorizing Treasury to purchase securities. For both Fannie and Freddie, Congress authorized Treasury to temporarily purchase securities issued by the Companies "on such terms and conditions as the Secretary may determine." *See id.* §§ 1455(*l*)(1)(A) (Freddie), 1719(g)(1)(A) (Fannie). This general authorization to purchase securities on the Treasury Secretary's "terms and conditions" is subject to the more specific prohibition on a particular type of "term" or "condition" the Secretary may impose—a "fee" on the securities. *See Genus Med. Tech. LLC v. U.S. FDA*, 994 F.3d 631, 638 (D.C. Cir. 2021) (applying "the old and familiar rule that the specific governs the general" (internal quotation marks omitted)). Moreover, when Congress enacted this provision, it did not add it to the list of exceptions in the text of §§ 1455(i) and 1719(f). Nor did Congress include any other language to suggest that this general provision is an exception—such as, "Notwithstanding § 1719(f) . . . ." Congress's failure to create such an express exception is particularly significant because Treasury's authority to invest in the Companies under §§ 1455(*l*) and 1719(g) is limited to purchasing securities issued by the Companies "under any section of this chapter," and the fee prohibitions that appear in §§ 1455(i) and 1719(f) apply to all such securities.

The surrounding statutory context confirms this reading of both provisions. *See Utility Solid Waste Activities Grp. v. EPA*, 901 F.3d 414, 441 (D.C. Cir. 2018) (courts should "not construe statutory phrases in isolation" (internal quotation marks omitted)). The relevant subsections authorizing Treasury's purchase of securities issued by the Companies, 12 U.S.C. §§ 1455 (*l*) and 1719(g), contemplate Treasury being compensated in one of three ways—through "preferences or priorities" on the securities, *id.* §§ 1455(*l*)(1)(C)(i), 1719(g)(1)(C)(i); through "repayment" of Treasury, *id.* §§ 1455(*l*)(1)(C)(iv), 1719(g)(1)(C)(iv); or through the "sale" of the

securities, *Id.* §§ 1455(*l*)(2)(B), 1719(g)(2)(B). None of these forms of compensation include "fees" charged in relation to the securities. Thus, the provision authorizing Treasury's purchase of the Companies' securities does not contemplate a separate "fee" charged on those securities— which comports with the prohibition on such "fees" in the more specific statutory provisions of §§ 1455(i) and 1719(f).

In sum, federal law prohibits Treasury from charging the periodic commitment fee.

## III.   The contractual deadline for setting a periodic commitment fee from 2011 through 2015 had expired.

Even if the periodic commitment fee provision were initially enforceable, the deadline for setting the fee from 2011 through 2015 had expired in December 2010. At the time of the Third Amendment, the PSPAs established a deadline of December 31, 2010, to set the amount of the fee through 2015: "The amount of the Periodic Commitment Fee shall be set not later than December 31, 2010 with respect to the ensuing five-year period" and "shall be reset every five years thereafter." PSPAs § 3.2(b). In addition, once a periodic commitment fee was set, § 3.2(b) permitted Treasury to "waive" the fee "for up to one year at a time." *Id.*

This structure made sense because it balanced certainty and flexibility. The Companies needed certainty for purposes of financial planning, so the PSPAs guaranteed them the stability of a five-year periodic commitment fee that could not be changed or "reset" until "five years thereafter." But Treasury retained flexibility to help the Companies avoid future financial difficulties by retaining the ability to waive the fee, "in its sole discretion, based on adverse conditions in the United States mortgage market." *Id.* § 3.2(b). The text of § 3.2(b) establishes a procedure to serve these two purposes. Indeed, this is precisely how FHFA officials read the PSPAs. *See* Ex. 11, FHFA-DDC-0410672; Ex. 12, FHFA-DDC-0246140; Undisputed Facts ¶ 8.

22

The relevant provision—stating that the fee "*shall* be set not later than December 31, 2010 with respect to the ensuing five-year period"—created a mandatory requirement that the fee amount for years 2011 through 2015, if any, be set by the deadline. The word "shall" is mandatory language. *See Spirits of St. Louis Basketball Club, L.P. v. Denver Nuggets, Inc.*, 922 N.Y.S.2d 349, 351–52 (N.Y. App. Div. 2011) ("By utilizing the word 'shall,'" an agreement makes the action "mandatory."); *Comptroller of City of N.Y. v. Bank of N.Y. Mellon Corp.*, 158 N.Y.S.3d 10, 12 (N.Y. App. Div. 2021) (construing "shall" as "mandatory language" in a statute); *Mogulescu v. 255 W. 98th St. Owners Corp.*, 523 N.Y.S.2d 801, 803 (N.Y. App. Div. 1988) (agreement "employ[ed] the word 'shall' to express mandatory directions"); *Mercury Bay Boating Club Inc. v. San Diego Yacht Club*, 557 N.E.2d 87, 101-02 (N.Y. 1990) ("The words 'shall be preserved' " in a trust were "mandatory, not precatory."). In contrast, the word "'may' is ordinarily read as permissive language." *Bank of Am., N.A. v. Gulnick*, 95 N.Y.S.3d 639, 641 (N.Y. App. Div. 2019).

The text of Section 3.2(b) stated that the periodic commitment fee amount "shall be set not later than December 31, 2010 with respect to the ensuing five-year period" until it could be "reset" "five years thereafter." This was a mandatory obligation, meaning that, if there was going to be a periodic commitment fee amount from 2011 through 2015, the parties were *required* to set it by December 31, 2010. Once the deadline passed and the fee amount was never set, the next opportunity to set a fee under § 3.2(b) was "five years thereafter."

The use of the word "shall" in the context of the PSPAs as a whole confirms this deadline was a mandatory requirement. The PSPAs use the words "may" and "shall" numerous times. A comparison of their usage demonstrates that the drafters of the PSPAs used the word "may" to designate *optional* actions but used the word "shall" to designate *required* actions. The following

23

is a sampling of the types of actions the PSPAs stated "shall" be completed:

- "The liquidation preference of the Senior Preferred Stock <u>shall</u> increase in connection with draws on the Commitment." § 2.1 (emphasis added).

- A request for a draw on the commitment "<u>shall</u> be valid only if it is in writing." § 2.2 (emphasis added).

- "Purchaser <u>shall</u> provide such fund within sixty (60) days." *Id.* (emphasis added).

- "Seller <u>shall</u> sell and issue to Purchaser, and Purchaser <u>shall</u> purchase from Seller" shares of Senior Preferred Stock. § 3.1 (emphasis added).

These actions—which form the heart of the transaction—are clearly mandatory. For example, the Companies did not have *the option* of selling and issuing Senior Preferred Stock once FHFA signed the PSPAs. By stating that these actions "shall" occur, the PSPAs made them mandatory. So too with the periodic commitment fee deadline: If Treasury wanted a fee amount for years 2011 through 2015, the PSPAs required Treasury and FHFA to reach a mutual agreement regarding that amount by December 31, 2010.

In contrast to creating mandatory obligations with the word "shall," the PSPAs created a number of optional or discretionary actions with the word "may"—including within Section 3.2(b) itself:

- "Purchaser <u>may</u> waive the Periodic Commitment Fee for up to one year at a time[.]" § 3.2(b) (emphasis added).

- "At the election of the Seller, the Periodic Commitment Fee <u>may</u> be paid in cash or by adding the amount thereof ratably to the liquidation preference[.]" § 3.2(c) (emphasis added).

- "This Agreement <u>may</u> be waived or amended solely by a writing executed by both of the parties[.]" § 6.3 (emphasis added).

Thus, reading the word "shall" in § 3.2(b) in the context of the entire agreement confirms it sets forth a mandatory deadline.

24

Nor does Section 3.2(b)'s agreement to agree change this understanding of the mandatory deadline. Indeed, a separate agreement to agree within the PSPAs confirms the point. Section 1 of the PSPAs provides that "the Deficiency Amount <u>may</u> be increased above the otherwise applicable amount by the <u>mutual written agreement</u> of the Purchaser and Seller, each acting in its sole discretion." § 1 (emphasis added). In contrast, § 3.2(b), which also creates an agreement to agree, states that the fee amount *shall* be set by December 31, 2010, for the following five years. This comparison shows that when the drafters wanted an *optional* agreement to agree, as opposed to a mandatory deadline, they knew how to create one.

To read the periodic commitment fee deadline as optional would also make another provision in § 3.2(b) superfluous. *Beal Sav. Bank*, 8 N.Y.3d at 324 ("A reading of the contract should not render any portion meaningless."). Specifically, the PSPAs gave Treasury the option to "waive" the fee "for up to one year at a time." § 3.2(b). This provision clearly contemplates the periodic commitment fee being *set* by the deadline and then later "waive[d]" because, unless there is a fee amount to begin with, then there is nothing to "waive." Thus, reading the periodic commitment fee deadline as optional would make this provision essentially meaningless—a contract interpretation that New York law requires the Court to avoid.

In addition, reading the deadline as mandatory comports with the parties' contemporaneous actions. Just one week before the initial deadline was set to expire in 2009, Treasury and FHFA agreed to extend the deadline by one year. Undisputed Facts ¶ 7. There would have been no need for this eleventh-hour extension if, all along, Treasury could have simply "waived" the fee without setting it. And when the extended deadline was approaching, the FHFA employee communicating with Mr. Ugoletti—FHFA's "primary liaison with Treasury concerning the PSPAs and any

amendments to the PSPAs," Ex. 10, Ugoletti Decl. ¶ 1—explained that he interpreted the periodic commitment fee provision precisely this way: "As I read the SPSPA, Treasury will need to set the Periodic Commitment Fee not later than Dec. 31, 2010—to apply for the ensuing 5-year period. It can then waive the fee (anew each year), but the fee needs to be set—I don't think the agreement as written allows for postponing setting the fee," Ex. 11, FHFA-DDC-0410672. Undisputed Facts ¶ 8. As that same employee later reiterated to Mr. Ugoletti, "the language in the Agreement seems to suggest it must be set this year." Ex. 12, FHFA-DDC-0246140; Undisputed Facts ¶ 8.

In sum, the PSPAs created a deadline of December 31, 2010, to set the periodic commitment fee amount for years 2011 through 2015. The parties did not set an amount by the deadline. Under the terms of the PSPAs, there would be no fee "for the ensuing five-year period" until it could be "reset" at the beginning of 2016. Thus, and in addition to the reasons the provision is unenforceable as discussed in Section I and II, the parties could not have set the fee for at least "the ensuing five-year period."

## CONCLUSION

The Court should grant partial summary judgment for Plaintiffs by holding that the provisions of the PSPAs that provided for a periodic commitment fee were unenforceable as a matter of law. In the alternative, the Court should grant partial summary judgment by ruling that because Treasury missed the December 31, 2010, deadline for setting the periodic commitment fee, it could not have been charged until January 2016 at the earliest.

Dated: March 21, 2022                          Respectfully submitted,


                                               By: s/ Charles J. Cooper
                                               Charles J. Cooper (Bar No. 24870)
                                               COOPER & KIRK, PLLC
                                               1523 New Hampshire Avenue, N.W.
                                               Washington, D.C. 20036
                                               (202) 220-9600
                                               (202) 220-9601
                                               ccooper@cooperkirk.com

                                               David H. Thompson (Bar No. 450503)
                                               Vincent J. Colatriano (Bar No. 429562)
                                               Peter A. Patterson (Bar No. 998668)
                                               Brian W. Barnes (Bar No. 1018419)
                                               COOPER & KIRK, PLLC
                                               1523 New Hampshire Avenue, N.W.
                                               Washington, D.C. 20036
                                               (202) 220-9600
                                               (202) 220-9601
                                               dthompson@cooperkirk.com
                                               vcolatriano@cooperkirk.com
                                               ppatterson@cooperkirk.com
                                               bbarnes@cooperkirk.com

                                               *Counsel for Plaintiffs Fairholme Funds
                                               Inc., et al.*

                                               /s/ Eric L. Zagar                    .
                                               Eric L. Zagar (*Pro Hac Vice*)
                                               KESSLER TOPAZ MELTZER
                                                  & CHECK, LLP
                                               280 King of Prussia Rd.
                                               Radnor, PA 19087
                                               Tel: (610) 667-7706
                                               Fax: (610) 667-7056
                                               ezagar@ktmc.com

                                               Hamish P.M. Hume (Bar No. 449914)
                                               Samuel Kaplan (Bar No. 463350)
                                               BOIES SCHILLER FLEXNER LLP
                                               1401 New York Ave. NW
                                               Washington, DC 20005

27

Tel: (202) 237-2727
Fax: (202) 237-6131
hhume@bsfllp.com
skaplan@bsfllp.com

Michael J. Barry (*Pro Hac Vice*)
GRANT & EISENHOFER, P.A.
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100
mbarry@gelaw.com

Adam Wierzbowski (*Pro Hac Vice*)
BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
adam@blbglaw.com

*Co-Lead Counsel for the Class*