REDACTED VERSION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| FAIRHOLME FUNDS, INC., et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>THE FEDERAL HOUSING FINANCE AGENCY, et al.,<br><br>*Defendants.* | Case No. 1:13-cv-1053-RCL |
| IN RE FANNIE MAE/FREDDIE MAC SENIOR PREFERRED STOCK PURCHASE AGREEMENT CLASS ACTION LITIGATIONS<br><br>*Defendants*. | Case No. 1:13-cv-1288-RCL |

**PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Rule 7(h), Plaintiffs respectfully submit the following statement of undisputed material facts.

1. In September 2008, the Federal Housing Finance Administration (FHFA), acting as conservator of the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac), entered into the Preferred Stock Purchase Agreements (PSPAs) with the U.S. Department of the Treasury. FHFA-DDC-0127948 (Fannie Mae) (attached as Exhibit 1); FHFA-DDC-0136991 (Freddie Mac) (attached as Exhibit 2).

2. As part of the transaction, the Treasury Department received senior preferred stock in both companies. FHFA-DDC-0337320 (Fannie Mae) (attached as Exhibit 3); FHFA-DDC-

0337376 (Freddie Mac) (attached as Exhibit 4).

3. The PSPAs contain a provision entitled "*Periodic Commitment Fee*." Ex. 1 at § 3.2; Ex. 2 at § 3.2. That provision contains a subsection that provides the following:

> (b) The Periodic Commitment Fee is intended to fully compensate Purchaser for the support provided by the ongoing Commitment following December 31, 2009. The amount of the Periodic Commitment Fee shall be set not later than December 31, 2009 with respect to the ensuing five-year period, shall be reset every five years thereafter and shall be determined with reference to the market value of the Commitment as then in effect. The amount of the Periodic Commitment Fee shall be mutually agreed by Purchaser and Seller, subject to their reasonable discretion in consultation with the Chairman of the Federal Reserve; <u>provided</u>, that Purchaser may waive the Periodic Commitment Fe for up to one year at a time, in its sole discretion, based on adverse conditions in the United States mortgage market.

Ex. 1 at § 3.2(b); Ex. 2 at § 3.2(b).

4. James Lockhart was the FHFA Director in September 2008 and signed the PSPAs on behalf of Fannie and Freddie. Lockhart Dep. 27:9–15 (attached as Exhibit 5). He was asked during a deposition: "At the time that this deal was being put together, was there any discussion regarding how that periodic commitment fee would be set?" *Id.* at 129:14–16. He responded: "Not that I remember, no." *Id.* at 129:17. During the same deposition, he was also asked: "Was there any discussion, around the time the PSPAs were put together, regarding an estimated amount of the periodic commitment fee?" *Id.* at 130:11–13. He responded: "I don't remember any discussions about the estimated amount." *Id.* at 130:14 –15.

5. Egbert Perry served as a member of Fannie Mae's Board of Directors in August 2012. Perry Dep. 16:11–13 (attached as Exhibit 6). He was asked during a deposition: "Was there

ever any discussion at Fannie Mae about how that periodic commitment fee would be priced if it were imposed?" *Id.* at 26:12–14. He responded: "Not to my knowledge, nothing I'm aware of." *Id.* at 26:19–20.

6. Ross Kari served as the Chief Financial Officer for Freddie Mac in August 2012. Kari Dep. 30:9–31:23 (attached as Exhibit 7). During his deposition, Mr. Kari testified: "[A]s far as I knew, should Treasury impose the commitment fee, the amount was uncertain." *Id.* at 146:24–147:1.

7. On December 24, 2009, Treasury and FHFA agreed to amend the PSPAs so that § 3.2(b) read:

> The Periodic Commitment Fee is intended to fully compensate Purchaser for the support provided by the ongoing Commitment following December 31, 2010. The amount of the Periodic Commitment Fee shall be set not later than December 31, 2010 with respect to the ensuing five-year period, shall be reset every five years thereafter and shall be determined with reference to the market value of the Commitment as then in effect. The amount of the Periodic Commitment Fee shall be mutually agreed by Purchaser and Seller, subject to their reasonable discretion and in consultation with the Chairman of the Federal Reserve; provided, that Purchaser may waive the Periodic Commitment Fee for up to one year at a time, in its sole discretion, based on adverse conditions in the United States mortgage market.

FHFA-DDC-0003646 (Fannie Mae) (attached as Exhibit 8); FHFA-DDC-0018682 (Freddie Mac) (attached as Exhibit 9).

8. Mario Ugoletti stated in a sworn declaration that he served as the "Special Advisor to the Office of the Director of the Federal Housing Finance Agency," that his "responsibilities include[d] advising FHFA's Acting Director Edward DeMarco concerning the Senior Preferred Stock Purchase Agreements," and that he "serve[d] as the primary liaison with

Treasury concerning the PSPAs and any amendments to the PSPAs." Ugoletti Decl. ¶ 1 (attached as Exhibit 10). On October 12, 2010, Mr. Ugoletti received an email from an FHFA employee named Scott Smith who wrote: "As I read the SPSPA, Treasury will need to set the Periodic Commitment Fee not later than Dec. 31, 2010—to apply for the ensuing 5-year period. It can then waive the fee (anew each year), but the fee needs to be set—I don't think the agreement as written allows for postponing setting the fee." FHFA-DDC-0410672 (attached as Exhibit 11). On November 23, 2010, Mr. Ugoletti received another email from Mr. Smith that included the following statement: "On the possibility of not setting the fee this year, given the waiver authority—I think it's not clear that given the fee is to be in place for 5 years that we might not run into a legal issue on that option (plus the language in the Agreement seems to suggest it must be set this year)." FHFA-DDC-0246140 (attached as Exhibit 12).

9. On December 29, 2010, the Department of Treasury sent a letter to the Acting Director of FHFA that included the following statement: "By this letter, please be advised that Treasury waives, for the first quarter of Calendar Year (CY) 2011, the PCF payable by each Enterprise." FHFA-DDC-0019279 (attached as Exhibit 13). Treasury sent similar letters purporting to waive the periodic commitment fee for each subsequent quarter of 2011 and the first two quarters of 2012. FHFA00062216 (attached as Exhibit 14); FHFA00029342 (attached as Exhibit 15); FHFA00029332 (attached as Exhibit 16); FHFA00013323 (attached as Exhibit 17); FHFA00029144 (attached as Exhibit 18).

10. In August 2011, a Senior Manager at Grant Thornton LLP emailed two Treasury officials, Jeff Foster and Beth Mlynarczyk. UST00406207 (attached as Exhibit 19). The Senior

Manager asked: "Is there any literature you can forward to me that expresses Treasury's most recent position on charging quarterly commitment fees for the PSPA?" *Id.* Mr. Foster responded: "We don't really have any literature. We've just elected to waive for each of the past three quarters (and it was not set previously)." *Id.*

11. In September 2011, the U.S. Securities and Exchange Commission asked Fannie Mae to "revise future filings to quantify the quarterly commitment fee or disclose how the fee will be determined" for purposes of SEC filings. FNM-FAIRHOLME-0122519 (attached as Exhibit 20). Fannie Mae's response included the following statement: "At this time, we have not received a notification from Treasury regarding the amount of the quarterly commitment fee or more specific information regarding how the commitment fee will be determined." *Id.*

12. On August 17, 2012, FHFA and Treasury agreed to amend the PSPAs, and § 3.2(b) of the amended PSPAs included the following statement:

> Notwithstanding anything to the contrary in paragraphs (a), (b), or (c) above, and in consideration of the modification made to the Senior Preferred Stock effective September 30, 2012, for each quarter commencing January 1, 2013, and continuing for as long as paragraph 2 of the Senior Preferred Stock remains in form and content substantially the same as the form and content of the Senior Preferred Stock in effect on September 30, 2012, no Periodic Commitment Fee shall be set, accrue, or be payable.

FHFA-DDC-0054967 (Fannie Mae) (attached as Exhibit 21); FHFA-DDC-0054959 (Freddie Mac) (attached as Exhibit 22).

13. Jim Parrott served as a senior advisor in the White House, where he "focused on housing policy and housing finance policy," including "GSE reform." Parrott Dep. 45:9–46:1 (attached as Exhibit 23). During a deposition, he was asked if he had "considered," "back

in the time period" of the August 2012 amendment, "how you would value" the periodic commitment fee. *Id.* at 99:1–21. He responded: "So all I can say is, I don't recall considering how to value the commitment fee back then." *Id.* at 100:14–16.

14. At his deposition, Defendants' expert, Dr. Mukarram Attari, was asked: "So this is basically—for purpos[es] of valuing the periodic commitment fee, this is unlike any other financial transaction. There is not something we can analogize to; is that true?" Attari Dep. 256:19–257:1 (attached as Exhibit 24). He responded: "Correct." *Id.* at 257:2.

15. Timothy Mayopoulos was named CEO of Fannie Mae in June 2012. Mayopoulos Dep. 15:1–10 (attached as Exhibit 25). During a deposition, he was asked: "And you're not aware if anyone at Fannie Mae attempted to estimate how much the [periodic commitment] fee would be?" *Id.* at 200:21–201:1. He responded: "I'm not aware of that. As I say, I'm not sure that it was subject to estimation because there was no formula for it. It was at the discretion of the Treasury Department." *Id.* at 201:2–5.

16. David Benson served as Chief Financial Officer of Fannie Mae. Benson Dep. 16:8–17:2 (attached as Exhibit 26). During a deposition, he was asked: "How would one go about determining the market value of the commitment?" *Id.* at 120:9–10. He responded: "I do not know how they would do that." *Id.* at 120:13–14.

17. Plaintiffs' expert, Professor Anjan Thakor, submitted an expert report discussing three methodologies for calculating the market value of the periodic commitment fee and concluding that the market value of the fee was zero. *See* Thakor Expert Report ¶¶ 33–51 (attached as Exhibit 27). At his deposition, Professor Thakor was asked about how he analyzed the three methodologies in his expert report, and he responded:

> Well, it's not like I'm computing a weighted average of what's suggested by the three methodologies. That's not the approach. What I'm doing is I'm saying, 'Look, if you look at the data on commercial bank loan commitments and if you look at the data that Treasury itself provided to over 700 banks under the CPP of TARP, and if you look at how the Treasury and New York Fed dealt with AIG, you're in the same time period as the GSEs. But based on those analyses, there is really no justification for Treasury to charge a PCF if the idea is for Treasury to be compensated adequately for having provided the commitment.
>
> So there, the implication is that the PCF should actually be zero.

Thakor Dep. 92:3–20 (attached as Exhibit 28). He was also asked: "Given all the various agreements that you've looked at, the CPP, AIG, as well as the bank loan commitments, would it be fair to say that the Treasury agreement with the GSEs is unique," meaning, "there's no other agreement like it"? *Id.* at 269:18–270:3. He answered: "Well, if you're talking about the terms of the agreement, the actual state of the agreement, the warrants, and the position from the PCF that was never implemented, yes, it was different than other agreements, but that's been one of the points in my report is that the all-in cost implied by that agreement was substantially higher than what was imposed on any of the other participants in these government capital support programs." *Id.* at 270:5–13.

18. Defendants' expert Dr. Mukarram Attari submitted an expert report disagreeing with Professor Thakor's methodology and concluding that the periodic commitment fee entitled Treasury to all the Companies' profits. *See* Attari Expert Report ¶¶ 104–09, 125–39 (attached as Exhibit 29).

19. FHFA responded to an interrogatory with the following statement: "The PCF was intended to 'fully compensate' taxpayers for the value of Treasury support, without which the

Enterprises could not continue to operate. In 2010, Congress enacted the Pay It Back Act, which earmarked payment of the PCF solely for deficit reduction purposes, implying that the PF was anticipated to be substantial and reflecting that its suspension represented a valuable benefit for the Enterprises." FHFA Response to Interrogatories at 4 (attached as Exhibit 30).

Dated: March 21, 2022

Respectfully submitted,

By: s/ Charles J. Cooper
Charles J. Cooper (Bar No. 24870)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601
ccooper@cooperkirk.com

David H. Thompson (Bar No. 450503)
Vincent J. Colatriano (Bar No. 429562)
Peter A. Patterson (Bar No. 998668)
Brian W. Barnes (Bar No. 1018419)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601
dthompson@cooperkirk.com
vcolatriano@cooperkirk.com
ppatterson@cooperkirk.com
bbarnes@cooperkirk.com

*Counsel for Plaintiffs Fairholme Funds Inc., et al.*

*/s/ Eric L. Zagar* .
Eric L. Zagar (*Pro Hac Vice*)
KESSLER TOPAZ MELTZER
& CHECK, LLP
280 King of Prussia Rd.

Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
ezagar@ktmc.com

Hamish P.M. Hume (Bar No. 449914)
Samuel Kaplan (Bar No. 463350)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave. NW
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
hhume@bsfllp.com
skaplan@bsfllp.com

Michael J. Barry (*Pro Hac Vice*)
GRANT & EISENHOFER, P.A.
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100
mbarry@gelaw.com

Adam Wierzbowski (*Pro Hac Vice*)
BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
adam@blbglaw.com

*Co-Lead Counsel for the Class*