REDACTED VERSION

# EXHIBIT 24

Page 1

1            UNITED STATES DISTRICT COURT

          FOR THE DISTRICT OF COLUMBIA

2

       _____

3                                      )

     In re Fannie Mae/Freddie Mac      )Miscellaneous No.

4    Senior Preferred Stock            )13-1288(RCL)

     Purchase Agreement Class          )

5    Action Litigation                 )CLASS ACTION

                                       )

6                                      )

                                       )

7    This document relates to:         )

                                       )

8    ALL CASES                         )

       _____

9

10

11

12         Remote Videotaped Deposition of

13            Mukarram Attari, Ph.D.

14            February 14, 2022

15               8:04 a.m.

16

17

18

19

20

     Reported by:  Bonnie L. Russo

21   Job No. 5075692

22

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Protected Information to Be Disclosed Only in Accordance With Protective Order

Page 2

1         Remote Videotaped Deposition of Mukarram

2         Attari, Ph.D.  held through:

3

4

5

6                     Veritext Legal Solutions

7                     1250 I Street, N.W.

8                     Washington, D.C.

9

10

11

12

13

14

15

16

17

18

19         Pursuant to Notice, when were present on behalf

20         of the respective parties:

21

22

1      A.    Because you can have a wider range

2  of outcomes over a longer time, time horizon,

3  and you need to take that into account as a

4  provider of the commitment.

5      Q.    Okay.  And under the PSPAs, does the

6  periodic commitment fee get renegotiated every

7  five years?

8      A.    Yes.

9      Q.    And why isn't that relevant to the

10  analysis of whether the periodic commitment fee

11  should be treated as being on a commitment that

12  lasts forever as opposed to a commitment that

13  lasts for five years?

14      A.    I mean, if you recall a while back,

15  you were asking questions about what the

16  commitment fee would have been in 2008 and

17  whether there would even have been a provider

18  of the commitment.  So if you make an

19  indefinite commitment, there is no guarantee

20  that you can -- after the first five years, you

21  can price the commitment such that you are

22  going to break even on the commitment.  There

Page 256

1       might be states of the world where -- where you

2       can charge a commitment fee that ensures you

3       break even.  There will be other situations

4       where the commitment has a negative value,

5       and -- and all of that kind of needs to be

6       reflected in the fact that this is an

7       indefinite commitment.  It's not that at the

8       end of five years treasury gets -- has the

9       option of saying we walk away or we continue.

10          Q.   And -- and I know -- or I think I've

11      got this right.  You don't think that the

12      comparison to these bank loan commitments or --

13      that that's an apt analogy to the treasury

14      funding commitment; is that right?

15          A.   Yes, that's right.

16          Q.   Are there any analogies that you

17      think are apt?

18          A.   Sitting here, no.

19          Q.   Okay.  So this is basically -- for

20      purposing of valuing the periodic commitment

21      fee, this is unlike any other financial

22      transaction.  There is not something we can

Page 257

1        analogize to; is that true?

2              A.    Correct.

3              Q.    And -- okay.  Let's talk a little

4        bit about the FDIC analogy if we could.  And

5        let me start by just asking you sort of a

6        hypothetical.

7                    Consider a bank that would fail

8        without FDIC deposit insurance.  For a bank

9        like that, would it be reasonable for the FDIC

10       to charge a premium that is equal to all of the

11       bank's profits?

12             A.    When you say a bank that would fail

13       absent the FDIC deposit insurance, what do you

14       mean?

15             Q.    I mean, if the FDIC canceled or

16       terminated deposit insurance, there would be an

17       immediate run on the bank.  The bank wouldn't

18       be able to pay all its depositors, and it would

19       go out of business.

20             A.    That is probably true of every bank

21       in the U.S.

22             Q.    All right.  And consider any such

1       bank, would it be reasonable for the FDIC to

2       charge a premium on its deposit insurance equal

3       to all the profits of the bank?

4           A.    Well, as I know the FDIC deposit

5       insurance is different than the commitment.

6       It's -- it's banks pulling their resources, you

7       know, by paying into a fund that -- that

8       guarantees the deposits of the bank.  So, you

9       know, it's -- it's a different mechanism.

10          Q.    Okay.  And I understand you don't

11      think that this is a good comparison, but my

12      question was:  Would it be reasonable for the

13      FDIC to charge a premium equal to all of the

14      bank's profits if without the deposit insurance

15      the bank would go out of business?

16          A.    Well, it would be reasonable for a

17      private investor to -- to charge all of the

18      profits if without -- if the bank had no equity

19      and it was providing the equity that allowed

20      the bank to continue in business.

21              MR. BARNES:  Okay.  And, John, let's

22      look at Tab 33.  This is UST00335981.  This