REDACTED VERSION

# EXHIBIT 28

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF COLUMBIA
 3     In re Fannie Mae/Freddie      )
       Mac Senior Preferred          )No. 13-1288 (RCL)
 4     Stock Purchase Agreement      )
       Class Action Litigations      )
 5     ------------------------------)
       This document relates to:     )
 6     ALL CASES                     )
       ------------------------------)
 7
 8                      - - -
 9           Wednesday, September 8, 2021
10                      - - -
11       **CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**
12
13       REMOTE VIDEOTAPED Deposition of ANJAN THAKOR,
14   PH.D., beginning at 9:14 a.m., before Nancy J. Martin,
15   a Registered Merit Reporter, Certified Shorthand
16   Reporter.  All parties appeared remotely.
17
18
19
20
21
22
```

Page 90

1  it's an option.  It's not a forward contract to engage
2  in borrowing.
3      So because it's an option, it's only
4  exercised when it's favorable for the borrower to do
5  so, and the bank is essentially charging a fee for
6  that up front.  So whether you want to call it risk or
7  compensation for providing ex-post subsidized
8  financing under the commitment, that's just semantics,
9  but there is a compensation for that.
10     Q. How did you determine that the compensation
11 for the Treasury commitment would not be that
12 different from the traditional bank loan commitment?
13     MR. GLUCK:  Object to the form.
14     THE WITNESS:  Well, what I indicated in my
15 report is that essentially both are commitments to
16 provide funding in the future at predetermined
17 terms -- right? -- and essentially at the option of
18 the borrower.  And so the structure is very similar.
19 The difference, of course, is the actual security
20 that's issued if the commitment is taken down.
21     But other than that, even though there's a
22 lot of similarities, as I indicated -- so the -- and

Page 91

1  we have this extensive literature on bank loan
2  commitments which provides a lot of insights for
3  empirically and theoretically on how something like
4  the PCF should be set; right?
5      I mean banks have been practicing setting
6  these fees for decades, and we have in the research
7  well-known methodologies that are available for
8  determining what these fees should be to make sure the
9  bank has adequate compensation for all of the risks
10 that it's taking that I just described to you in my
11 previous response.
12     So that becomes a very useful and rich source
13 of information to inform one on how the PCF ought to
14 be set, what sort of market value-based approach one
15 could use.  It's not the only one that I rely on in my
16 report, but I think it's a very valuable source of
17 information for the determination of the PCF.  And so
18 it provides you one benchmark -- right -- among many.
19 BY MS. VARMA:
20     Q. And how did you determine how much weight to
21 give each of your benchmarks?
22     MR. GLUCK:  Objection to form.

Page 92

1      THE WITNESS:  I don't follow the question.
2  BY MS. VARMA:
3      Q. Well, you have three methodologies.  How did
4  you choose which one to use or how much weight to give
5  to each one?
6      A. Well, it's not like I'm computing a weighted
7  average of what's suggested by the three
8  methodologies.  That's not the approach.  What I'm
9  doing is I'm saying, "Look, if you look at the data on
10 commercial bank loan commitments and if you look at
11 the data that Treasury itself provided to over 700
12 banks under the CPP of TARP, and if you look at how
13 the Treasury and New York Fed dealt with AIG, you're
14 in the same time period as the GSEs.  But based on
15 those analyses, there is really no justification for
16 Treasury to charge a PCF if the idea is for Treasury
17 to be compensated adequately for having provided the
18 commitment.
19     So there the implication is that the PCF
20 should actually be zero.  And then I go on to say
21 well, but if for legal reasons or whatever, in terms
22 of how the contract is interpreted, if one were to

Page 93

1  say, "No, we need a positive PCF to be charged to the
2  GSEs, then I go to the third part of my analysis,
3  which is that Federal Deposit Insurance does provide
4  us with some valuable information on how one can think
5  about setting a PCF.
6      But, you know, it's like apples and oranges.
7  I can't take a weighed average of these.
8      Q. Okay.  So correct me if I'm wrong, but you
9  relied on the benchmarks of the loan commitment
10 analysis, bank loan commitment analysis, and the other
11 government contracts during the financial crisis to
12 come to the conclusion that the PCF should be zero;
13 correct?
14     A. Correct.
15     Q. Okay.  But if you had to come up with a
16 number, you relied on the FDIC insurance premium
17 methodology?
18     A. That's correct.
19     Q. Okay.  Thank you.  Let's talk about the FDIC
20 methodology first since that's what yields a number.
21     A. Uh-huh.
22     Q. Paragraph 19, I think, is where the number

Page 266

1  Q. Do you think they would have the ability to
2  raise private capital as long as Treasury's -- that
3  the amount that they had drawn down on Treasury had
4  not been redeemed?  In other words, as long as
5  191 billion was still Treasury's outstanding interest?
6      MR. GLUCK:  Object to form.
7      THE WITNESS:  Well, I think it goes back to
8  something that I said earlier in my response to one of
9  your questions, which is it depends on a multitude of
10 factors, you know, one of which is what's the
11 financial condition of the GSEs at the time.
12     Second is what's a forward looking forecast.
13     The third is what sort of clarity is provided
14 by Treasury and FHFA in terms of future actions;
15 right?
16     So it kind of depends on whether, as an
17 investor, I can look at the set of circumstances that
18 are in place and get some sort of assurance about the
19 actions of the different parties involved in the
20 future, and then I can condition the provision of
21 private capital and the pricing based on that.
22     So I don't think that it's a necessary

Page 267

1  condition that Treasury should be completely out
2  before private capital can be raised.  That's the
3  point.
4  BY MS. VARMA:
5  Q. Okay.  So let's go back to slide 4.  Let's
6  assume that the actual world actually does come out to
7  be the way these projections are on Slide 14.
8     Do you think that the equity and the rate of
9  return or earnings that Fannie and Freddie were
10 getting in 2022 would be sufficient for them to go out
11 into the market and raise private capital?
12     MR. GLUCK:  Objection to form.
13     THE WITNESS:  I'm sorry.  Which slide are you
14 referring to now?
15 BY MS. VARMA:
16 Q. 14.  Let's assume this is what the real world
17 ended up to be.
18 A. Okay.  So if the real world ended up looking
19 like it does on Slide 14, at what point -- do you mean
20 in 2022 could they raise capital?  Is that what --
21 Q. Yes.
22 A. Again, you know, outside of the scope of my

Page 268

1  report, but I would think that, you know, there's a
2  set of conditions under which they could; right?  So
3  it depends on the assumptions you make about how
4  Treasury and FHFA communicate their intent with
5  respect to future actions related to the GSEs to the
6  market and the clarity at which that message is
7  communicated.
8     So there is a set of circumstances in which,
9  if Treasury wanted the GSEs to raise private capital,
10 it would be possible.
11 Q. Are you familiar with the amendments to the
12 PSPAs since the third amendment?
13 A. I have not focused on those amendments.  I'm
14 aware that there were some changes made after that,
15 but that's not the focus of my analysis.
16 Q. Do you know if any of those amendments now
17 permit the GSEs to pay down the drawn amounts?
18     MR. GLUCK:  Object to the form.
19     THE WITNESS:  I mean like I said, I have not
20 studied those.  So, you know, I can't speak to that.
21 BY MS. VARMA:
22 Q. It seems from Slide 14 that Fannie's earnings

Page 269

1  were around 10 percent, or that's what they were
2  projecting anyway.
3     Would that be a fair interpretation?
4     MR. GLUCK:  Objection to form.
5     THE WITNESS:  10 percent of what?
6  BY MS. VARMA:
7  Q. Well, they were barely able to pay the
8  10 percent dividend; correct?
9     MR. GLUCK:  Object to the form.
10    THE WITNESS:  Yeah.  Based on these
11 numbers -- right? -- yeah, they just -- they don't
12 have too much of a margin at the 10 percent absent
13 additional draws.  But as you can see, they are
14 projecting not much of a change in the remaining
15 funding under the PSPA until, you know, you get to the
16 out years, and then it begins to decline.
17 BY MS. VARMA:
18 Q. Given all the various agreements that you've
19 looked at, the CPP, AIG, as well as the bank loan
20 commitments, would it be fair to say that the Treasury
21 agreement with the GSEs is unique?
22     MR. GLUCK:  Object to the form.

68 (Pages 266 - 269)

Page 270

1  THE WITNESS: What do you mean by "unique"?
2  BY MS. VARMA:
3  Q. That there's no other agreement like it.
4  MR. GLUCK: Object to the form.
5  THE WITNESS: Well, if you're talking about
6  the terms of the agreement, the actual state of the
7  agreement, the warrants, and the position from the PCF
8  that was never implemented, yes, it was different than
9  the other agreements, but that's been one of the
10 points in my report is that the all-in cost implied by
11 that agreement was substantially higher than what was
12 imposed on any of the other participants in these
13 government capital support programs.
14 BY MS. VARMA:
15 Q. And it was substantially different than the
16 other agreements, even starting in 2008, wasn't it,
17 the Treasury agreement with the GSEs?
18 MR. GLUCK: Object to the form.
19 THE WITNESS: Yeah. I mean more similar to
20 some of the terms initially offered to AIG before they
21 were renegotiated, but obviously, you know, not
22 identical in every detail.

Page 271

1  BY MS. VARMA:
2  Q. Right. Do you intend to opine that the
3  initial 10 percent rate charged by Treasury for the
4  dividend in 2008 was unreasonable?
5  MR. GLUCK: Object to the form.
6  THE WITNESS: Well, what I'm opining on is
7  the PCF; right? I wasn't asked to assess the
8  "reasonableness" of the dividends. What I'm opining
9  is that you have to look at these things on an all-in
10 cost basis, and the dividend is obviously one
11 component of the all-in cost.
12 So while my assignment was to examine the
13 PCF. The PCF is not something that stands on its own.
14 It's a component of the all-in cost.
15 And so from that standpoint, obviously I have
16 to look at what the dividend payment is and what it is
17 relative to other market benchmarks that I've examined
18 in my report. So I'm not commenting or opining
19 individually on the setting of the dividend payment,
20 but rather, I'm opining that, given the all-in cost
21 implied by the dividend payment and the warrants, it
22 appears that Treasury was compensated more than

Page 272

1  adequately if we use the market benchmarks as
2  indicators of adequate compensation for providing
3  capital support during this time.
4  And therefore the PCF is unnecessarily -- so
5  it's linked to what the setting of what the dividend
6  payment was, but I'm not opining separately on the
7  dividend payments. So...
8  BY MS. VARMA:
9  Q. Okay. You are opining, however, on the
10 all-in, if you will -- that's what you called it, the
11 all-in cost, as of the end of 2012; correct?
12 A. Correct.
13 MR. GLUCK: Object to the form.
14 BY MS. VARMA:
15 Q. Okay. And as of the end of 2012, treasury
16 was entitled to the 10 percent dividend pursuant to
17 the PSPAs; correct?
18 A. Yes. As per the PSPA, correct.
19 Q. And Treasury was entitled to a PCF; correct?
20 MR. GLUCK: Object to the form.
21 THE WITNESS: They were in a position to
22 charge a PCF or waive it at their discretion in

Page 273

1  consultation with the chairman of the Federal Reserve
2  and FHFA to set a reasonable number.
3  BY MS. VARMA:
4  Q. Okay. And as of the end of 2012, the
5  Treasury did not permit Fannie and Freddie to pay down
6  the drawn amounts from the Treasury commitment;
7  correct?
8  MR. GLUCK: Object to the form.
9  THE WITNESS: Okay. So we switched gears.
10 So we're not talking about the PCF. We're talking
11 about whether or not the GSEs were allowed to pay back
12 with the third amendment? So is it --
13 BY MS. VARMA:
14 Q. Yes. I'm going back to what are you assuming
15 the terms of the PSPA to be in January 2013. And we
16 know that there was no way to permit -- there was no
17 permission for the GSEs to pay down the drawn amount,
18 and there still isn't. So your estimation of the PCF
19 really has nothing to do with whether there was a way
20 to pay down the PCF; correct? Am I summarizing your
21 testimony correctly?
22 MR. GLUCK: Object to the form.

69 (Pages 270 - 273)