## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| BERKLEY INSURANCE CO., et al., *Plaintiffs*, v. THE FEDERAL HOUSING FINANCE AGENCY, et al., *Defendants.* | Case No. 1:13-cv-1053-RCL |
| IN RE FANNIE MAE/FREDDIE MAC SENIOR PREFERRED STOCK PURCHASE AGREEMENT CLASS ACTION LITIGATIONS _____ This document relates to: ALL CASES | Case No. 1:13-mc-1288-RCL |

## PLAINTIFFS' PRETRIAL STATEMENT

Pursuant to the Court's Seventh Amended Scheduling Order (ECF No. 160) and LCvR 16.5, Plaintiffs hereby submit their Pretrial Statement.

## I.   STATEMENT OF THE CASE

This case consists of both a class action brought by plaintiffs Joseph Cacciapalle, Michelle M. Miller, Timothy J. Cassell, and Barry P. Borodkin (the "Class Plaintiffs") against defendants Federal Housing Finance Agency ("FHFA"), Federal National Mortgage Association ("Fannie Mae"), and Federal Home Loan Mortgage Corporation ("Freddie Mac," and together with Fannie Mae, "Defendants" or the "Companies"), and an individual action brought by Berkley Insurance Company, Acadia Insurance Company, Admiral Indemnity Company, Admiral Insurance Company, Berkley Regional Insurance Company, Carolina Casualty Insurance Company, Midwest Employers Casualty Insurance Company, Nautilus Insurance Company, and Preferred

Employers Insurance Company (the "Berkley Plaintiffs") against the same defendants.  Class Plaintiffs and the Berkley Plaintiffs (collectively "Plaintiffs") are holders of junior preferred stock of Fannie Mae and Freddie Mac and common stock of Freddie Mac.  The Plaintiffs commenced their respective actions in 2013, challenging the Third Amendment to Amended and Restated Senior Preferred Stock Purchase Agreements ("PSPAs") between FHFA (in its capacity as Conservator for the Companies) and the United States Department of the Treasury ("Treasury"), dated August 17, 2012 (the "Third Amendment").

Fannie Mae and Freddie Mac are private, shareholder-owned for-profit corporations created by Congress to increase liquidity and stability in the secondary market for home mortgages. In July 2008, in response to a crisis in the housing and mortgage markets, Congress enacted the Housing and Economic Recovery Act of 2008 ("HERA"), which enumerated specific circumstances under which the newly-created FHFA could place Fannie Mae and Freddie Mac into conservatorship or receivership and granted Treasury temporary authority to provide financial assistance by purchasing securities in the Companies.

On September 6, 2008, FHFA placed the Companies into conservatorship.  The conservatorships did not modify any contractual rights held by the Companies' investors.  Indeed, FHFA expressly stated that Fannie's and Freddie's stockholders "continue to retain all rights in the stock's financial worth," and FHFA's then-Director testified to Congress that "shareholders are still in place; both the preferred and common shareholders have an economic interest in the companies" and that "going forward there may be some value" in that interest.

FHFA explained to investors at the time that the conservatorships were "intended to have a limited duration" and the "objective" of the conservatorships was to "return the entit[ies] to normal business operations."  FHFA publicly stated that the conservatorships would last only

"until [the Companies] are stabilized" and promised that once the Companies had been restored to a "safe and solvent condition," "the Director will issue an order terminating the conservatorship." These statements were consistent with the text of HERA, which charged FHFA as conservator with "preserv[ing] and conserv[ing] [the Companies'] assets and property" and managing them in a manner that would restore them to a "sound and solvent condition." *See* 12 U.S.C. § 4617(b)(2)(D).

When Fannie Mae and Freddie Mac were placed into conservatorship, FHFA and Treasury entered into materially identical PSPAs with each Company.  Under the PSPAs, Treasury permitted Fannie Mae and Freddie Mac to draw up to $100 billion each from Treasury when needed to avoid a negative net worth.  In return, Treasury received shares of a new class of preferred stock that was senior to all other equity in Fannie Mae and Freddie Mac.  This new stock carried a liquidation preference of $1 billion for each Company that would increase dollar-for-dollar by the amount Fannie Mae and Freddie Mac drew from Treasury's funding commitment. The terms of the senior preferred stock entitled Treasury to an annual dividend.  If paid in cash, the dividend was 10 percent of the liquidation preference; if Fannie Mae and Freddie Mac declined to declare cash dividends, then the liquidation preference would increase at a rate of 12 percent per year until all past, unpaid dividends from prior quarters were declared and paid.  In addition, Treasury also received warrants that gave Treasury the right to purchase 79.9% of each Company's common stock for a nominal price.

After the Companies were placed into conservatorship, FHFA directed the Companies to book substantial loss reserves—recording anticipated mortgage loan losses before they were actually incurred—and required the Companies to eliminate from their balance sheets the value of deferred tax assets that would only be of use if the Companies became profitable (i.e., generated

positive taxable income).  These write-downs caused the on-paper value of Treasury's investment in the Companies to expand dramatically, as the Companies were forced to take draws to make up for the paper losses.  With these massive losses, the Companies were forced to take further draws on Treasury's funding commitment just to pay the required quarterly dividend to Treasury.  This, in turn, increased the value of Treasury's liquidation preference.  By mid-2012, Treasury had invested approximately $189 billion in senior preferred stock.

By 2012, Fannie Mae, Freddie Mac, FHFA, and Treasury understood that the Companies were on course to achieve sustained profitability.  Internal documents from the Companies, FHFA, and Treasury demonstrate that all were projecting the Companies to achieve positive net worth and sustainable profitability beginning in 2012, and to eliminate any need to take substantial additional draws from Treasury in the future.  Fannie Mae's and Freddie Mac's positive projections also signaled that the Companies would be able to reverse the write-downs taken against their deferred tax assets, worth approximately $100 billion, which would immediately add billions of dollars of net worth to the Companies.

On August 17, 2012, despite the positive prospects of the Companies, FHFA and Treasury adopted the Third Amendment to the PSPAs.  The Third Amendment replaced the 10% dividend with a variable dividend equal to 100% of each Company's entire net worth (the "Net Worth Sweep"), except for a small capital reserve that would shrink to zero by 2018.  Thus, each quarter, rather than the 10% dividend, Fannie Mae and Freddie Mac would have to pay their entire positive net worth to Treasury, which precluded the Companies from recapitalizing and exiting conservatorship.  This so-called "Net Worth Sweep" also completely eliminated the private shareholders' ability to realize the benefits of their contractual rights to dividends and liquidation distributions.  Internal Treasury documents demonstrate that the purpose of the Net Worth Sweep

was to ensure that *all* future income from the Companies would be paid directly to Treasury, leaving nothing for the private shareholders.

The Companies' performance after the implementation of the Third Amendment lived up to the pre-amendment projections. Fannie Mae reversed its deferred tax asset valuation allowance in the first quarter of 2013 and Freddie Mac followed shortly thereafter in the third quarter of 2013. The reversal of the valuation allowances caused a massive non-cash increase of net worth for both Companies, which caused Fannie Mae to pay $59.4 billion as a dividend to Treasury in the second quarter of 2013, and Freddie Mac to pay $30.4 billion as a dividend to Treasury in the fourth quarter of 2013. Both Companies have reported billions of dollars in comprehensive income since 2012, and each has needed to take only one Treasury draw since 2012, both of which occurred in 2018 due to accounting adjustments that resulted from a reduction in the Companies' corporate tax rates. If it were not for the Third Amendment stripping the Companies of their net worth, they would not have needed to take any draws since 2012. As a result of the Third Amendment's Net Worth Sweep, Fannie Mae and Freddie Mac paid cash dividends to Treasury from 2013-18 that were approximately $124 billion larger than the maximum they would have been under the original 10% dividend. That excess cash could have been used to repay Treasury the principal amount that was borrowed, which would have reduced the amount of the 10% dividend and allowed Fannie Mae and Freddie Mac to fully repay Treasury and return to sound and solvent operations.

In December 2017, Treasury and FHFA executed letter agreements allowing Fannie Mae and Freddie Mac to retain $3 billion of reserve capital (which would otherwise have shrunk to zero in 2018 and thus been swept to Treasury as part of the Net Worth Sweep). However, this agreement made clear that the $3 billion in reserve capital belonged to Treasury by increasing Treasury's liquidation preference in its senior preferred stock for each GSE by $3 billion (for a

total of a $6 billion transfer to Treasury's benefit).

In 2019 and 2021, Treasury and FHFA executed subsequent letter agreements that allowed Fannie Mae and Freddie Mac to finally start retaining and building up additional capital, beginning with the third quarter of 2019. Under these agreements, the GSEs no longer had to sweep their net worth to Treasury in cash each quarter; instead, however, the Treasury's liquidation preference was increased by the amount that each GSE's net worth increased each quarter. Thus, Treasury still received the increase in net worth each quarter, but as an increase in its liquidation preference rather than as cash dividend.

Consequently, from 2013 through to the second quarter of 2022, Treasury has received over $245.9 billion in Net Worth Sweep cash dividends, and over $84.3 billion in increased liquidation preference corresponding to GSE net worth increases – for a total of over $330 billion since the Net Worth Sweep became effective on January 1, 2013. That is over $150 billion more than the most Treasury would have received under the original 10% dividend. In fact, it is an even larger excess than that, because if there had been no Net Worth Sweep, the GSEs could have started in 2013 to repay the amounts borrowed from Treasury, which in turn would have reduced their 10% dividend, which in turn would have allowed them to use more cash to repay Treasury. Had that occurred, the GSEs would have fully repaid Treasury, with interest, many years ago.

While FHFA has asserted that the Net Worth Sweep was not intended to enrich Treasury or to provide more in dividend payments than would have been owed under the 10% dividend, no documents produced by FHFA or Treasury indicate any negative reaction or surprise in response to the massive windfall Treasury received, which suggests that a massive transfer of wealth from the Companies' shareholders to Treasury was the expected and intended outcome of the Third Amendment.

Plaintiffs allege that Defendants violated the implied covenant of good faith and fair dealing inherent in the certificates of designation of Fannie Mae and Freddie Mac junior preferred stock and Freddie Mac common stock.   Plaintiffs allege that Defendants did so by entering into the Third Amendment and agreeing to replace the fixed 10% dividend with the Net Worth Sweep at a time when Defendants knew that Fannie Mae and Freddie Mac were on the cusp of achieving profitability and would no longer need to draw on Treasury's funding commitment to pay the 10% dividend.

This Court has subject matter jurisdiction over these actions by virtue of 12 U.S.C. §§ 1452(c), (f), 1723a(a), and 4617.  In addition, this Court has subject matter jurisdiction over the class action under 28 U.S.C. § 1332(d)(2)(A) in that Plaintiffs and Defendants are citizens of different states and the matter in controversy exceeds $5 million, exclusive of interest and costs. The Court additionally has subject matter jurisdiction over the Berkley action under 28 U.S.C. § 1367.

## II.   <u>PLAINTIFFS' CLAIMS</u>

Plaintiffs contend that by entering into the Third Amendment and agreeing to the Net Worth Sweep with the purpose and effect of depriving Plaintiffs and members of the classes of any possibility of receiving dividends or a liquidation preference, each of Fannie Mae and Freddie Mac, and FHFA as their conservator, violated the implied covenant of good faith and fair dealing inherent in the certificates of designation of Fannie Mae and Freddie Mac junior preferred stock and Freddie Mac common stock.  Pursuant to the implied covenant of good faith and fair dealing, Fannie Mae, Freddie Mac, and FHFA were obligated not to take actions that were arbitrary and unreasonable in a manner that violated the reasonable expectations of shareholders.  Plaintiffs assert that Defendants' decision to enter into the Third Amendment violated the implied covenant and deprived Plaintiffs and members of the classes of the benefits of their bargain, i.e., their ability

to receive dividends and a liquidation preference, and thereby caused the Plaintiffs and members of the classes to suffer billions of dollars of damages.

## III.   <u>STATEMENT OF DEFENSES</u>

No claim has been brought against Plaintiffs.  Thus, Plaintiffs assert no defenses.

## IV.   <u>PLAINTIFFS' SCHEDULE OF WITNESSES</u>

### A.   Witnesses Plaintiffs Expect to Present at Trial

#### 1.   Joseph Cacciapalle (100 Glenbrook Rd., Freehold, NJ 07728)

Joseph Cacciapalle is a class representative who holds shares of Fannie Mae junior preferred stock and Freddie Mac junior preferred stock.  Plaintiffs expect to present Mr. Cacciapalle's deposition testimony designated in Section VI below, regarding his ownership of Fannie Mae junior preferred stock and Freddie Mac junior preferred stock and his reasonable expectations as a stockholder.

#### 2.   Timothy Cassell (2462 Berwick Blvd., Columbus, OH  43209)

Timothy Cassell is a class representative who holds shares of Freddie Mac common stock. Mr. Cassell is expected to testify about his ownership of Freddie Mac common stock and his reasonable expectations as a stockholder.  His direct testimony should take less than one hour.

#### 3.   Michelle Miller (4602 Ringer Road, St. Louis, MO 63129)

Michelle Miller is a class representative who holds shares of Freddie Mac common stock. Ms. Miller is expected to testify about her ownership of Freddie Mac common stock and her reasonable expectations as a stockholder.  Her direct testimony should take less than one hour

#### 4.   Edward Linekin (25 Flat Rock Drive, Ridgefield, CT  06887)

Edward Linekin is Senior Vice President of W.R. Berkley Corp / Berkley Insurance Co., one of the Berkley Plaintiffs.  Mr. Linekin is expected to testify about W.R. Berkley Corp / Berkley Insurance Co.'s ownership of Fannie Mae junior preferred stock and Freddie Mac junior preferred

stock and its reasonable expectations as a stockholder.  His direct testimony should take approximately one hour.

### 5.      Susan Hartman (Summary Witness) (BVA Group, 405 Lexington Ave., Floor 9, New York, NY 10174)

Susan Hartman is a Partner at BVA Group.  Ms. Hartman will be presented as a summary witness pursuant to Federal Rule of Evidence 1006 and is expected to provide a summary of financial results of Fannie Mae and Freddie Mac and contractual documents concerning the junior preferred stock and senior preferred stock.  Her direct testimony should last approximately three hours.

### 6.      Prof. Bala Dharan* (Berkley Research Group, LLC, 99 High Street, 27th Floor, Boston, MA 02110)

Prof. Bala Dharan is an expert witness retained by Plaintiffs to provide an analysis of whether the Net Worth Sweep (1) was reasonably necessary to avoid insolvency or other significant financial harm to Fannie Mae and Freddie Mac at the time of the Third Amendment, or (2) otherwise advanced, or was consistent with, FHFA's stated purpose of restoring Fannie Mae and Freddie Mac to a sound and solvent financial condition.  Prof. Dharan will testify regarding these topics and his economic and historical analysis supporting his conclusions that:

i.      The Net Worth Sweep could not reasonably have been viewed as necessary to avoid insolvency or other significant financial harm to Fannie Mae and Freddie Mac at the time of the Third Amendment;

ii.      The Net Worth Sweep could not reasonably have been understood as advancing the purpose of restoring Fannie Mae and Freddie Mac to a sound and solvent financial condition;

iii.    The Net Worth Sweep could only reasonably have been viewed as a means to transfer value from shareholders to Treasury and to financially weaken Fannie Mae and Freddie Mac;

iv.    The full restoration of the value of the deferred tax assets ("DTAs") by Fannie Mae and Freddie Mac in their respective balance sheets so shortly after the Net Worth Sweep further makes clear that the Net Worth Sweep was unnecessary; and

v.    The restoration of the DTAs vastly increased Fannie Mae's and Freddie Mac's net worth and further foreclosed any risk of insolvency or a circular draw.  Fannie Mae and Freddie Mac had evaluated the restoration of the DTAs prior to the Net Worth Sweep, and even the possibility that the DTAs might be restored undermines any suggestion that the Net Worth Sweep was justified.

Prof. Dharan's direct testimony should last approximately three hours.

### 7.    Prof. Anjan Thakor* (Washington University in St. Louis, Olin Business School, Campus Box 1133, One Brookings Drive, St. Louis, MO 63130)

Prof. Anjan Thakor is an expert witness retained by Plaintiffs to provide an analysis of (1) what, if any, commercially reasonable methods would have been available to set a periodic commitment fee ("PCF") under the PSPAs between Fannie Mae and Freddie Mac and Treasury; and (2) in light of that conclusion, what an appropriate fee would have been (if any) if there had been no Third Amendment to the PSPAs.  Prof. Thakor will testify regarding these topics and his economic and historical analysis supporting his conclusions that:

i.    The PCF language in the PSPAs is uncharacteristic of other commitment fee contracts and does not provide a clear and readily ascertainable method for determining the fee;

ii.     Internal documents reflected that certain Treasury officials did not view the provision as having a particular meaning;

iii.    Given the terms of the PSPAs and the stated goal of providing full compensation to Treasury, no PCF was necessary or appropriate;

iv.    However, if any PCF was legally required, a fee of 2.5 to 45 basis points (0.025% to 0.45%) on any undrawn portion of the Treasury commitment would have been appropriate, based on Prof. Thakor's review of:

    a.     Commercial loan commitments;

    b.     Assistance Treasury provided to other entities during the financial crisis as part of Troubled Asset Relief Program and the bailout of American International Group, Inc.; and

    c.     Federal deposit insurance premiums paid by large financial institutions.

v.     Ultimately, the dividend rate paid by Fannie Mae and Freddie Mac well exceeds these rates, Treasury was well compensated for the commitment it provided, and therefore no additional PCF was warranted.

Prof. Thakor's direct testimony should last approximately three hours.

### 8.    Prof. Joseph Mason* (BVA Group, 405 Lexington Ave., Floor 9, New York, NY 10174)

Prof. Joseph Mason is an expert witness retained by Plaintiffs to provide an analysis of the damages suffered by Plaintiffs as a result of the Net Worth Sweep. In particular, Prof. Mason conducted an analysis of the present value of the future dividend streams that would have been payable to shareholders "but for" the Third Amendment and its Net Worth Sweep. Prof. Mason found that the shareholders suffered damages that can be reasonably estimated as follows:

i.   $10.3 billion of damages suffered by private preferred stock shareholders in Fannie Mae;

ii.  $5.9 billion of damages suffered by private preferred stock shareholders in Freddie Mac; and

iii. $11.0 billion of damages suffered by private common stock shareholders in Freddie Mac.

Prof. Mason will testify regarding these topics and his economic and historical analysis supporting his conclusions and the assumptions he made for purposes of his "but for" analysis in which the Third Amendment's Net Worth Sweep was never implemented.   Those "but for" assumptions include:

i.   Based on a review of projections and housing market data, Fannie Mae and Freddie Mac were projected to, and did, make enough income to repay Treasury;

ii.  Treasury would have allowed repayment of the senior preferred dividends; and

iii. Consistent with historical practice, Fannie Mae and Freddie Mac would have resumed paying dividends only after fully repaying Treasury and meeting regulatory capital requirements.

Prof. Mason's direct testimony should last approximately three hours.

**9.     Susan McFarland (162 W. Shore Drive, Montgomery, TX  77356)**

Susan McFarland was the Chief Financial Officer of Fannie Mae at the time of the Third Amendment.   Plaintiffs expect to present Ms. McFarland's deposition testimony designated in Section VI below.

### 10. James B. Lockhart (5 Alden Road, Greenwich, CT 06831)

James B. Lockhart was the Director of FHFA when Fannie Mae and Freddie Mac were placed into Conservatorship. Plaintiffs expect to present Mr. Lockhart's deposition testimony designated in Section VI below.

### 11. Edward DeMarco (422 Barlow Place, Bethesda, MD 20814)

Edward DeMarco was the Acting Director of FHFA at the time of the Third Amendment. Mr. DeMarco is expected to testify regarding his role at FHFA, his knowledge of Fannie Mae and Freddie Mac and their financial condition, the purposes and goals of the Conservatorship, his expectations regarding the Conservatorship at the time of the Third Amendment, the negotiation of the Third Amendment, and the purposes and goals of the Third Amendment. Mr. DeMarco's direct testimony should last approximately three hours.

### 12. Mario Ugoletti (14496 Sedona Drive, Gainesville, VA 20155)

Mario Ugoletti was Special Advisor to Acting Director Edward DeMarco at FHFA at the time of the Third Amendment. Mr. Ugoletti is expected to testify regarding his role at FHFA, his knowledge of Fannie Mae and Freddie Mac and their financial condition, the purposes and goals of the Conservatorship, his expectations regarding the Conservatorship at the time of the Third Amendment, the negotiation of the Third Amendment, and the purposes and goals of the Third Amendment. Mr. Ugoletti's direct testimony should last approximately three hours.

### B. Individuals Plaintiffs May Call if the Need Arises or May Call for Rebuttal

### 1. David Benson (7602 Glenbrook Road, Bethesda, MD 20814)

David Benson is the current President of Fannie Mae and was Executive Vice President of Capital Markets at the time of the Third Amendment. Mr. Benson is expected to testify regarding his role with Fannie Mae and his knowledge of Fannie Mae's and Freddie Mac's operations,

projections, and financial condition.  If called by Plaintiffs, Mr. Benson's direct testimony should last approximately three hours.

> ### 2.      Timothy Mayopoulos (12 Masterton Road, Bronxville, NY  10708)

Timothy Mayopoulos was the Chief Executive Officer of Fannie Mae at the time of the Third Amendment.  Plaintiffs expect to present Mr. Mayopoulos' deposition testimony designated in Section VI below

> ### 3.      Donald Layton (84 Trinity Pass Road, Pound Ridge, NY  10576)

Donald Layton was the Chief Executive Officer of Freddie Mac at the time of the Third Amendment.  Plaintiffs expect to present Mr. Layton's deposition testimony designated in Section VI below.

> ### 4.      Naa Awaa Tagoe (10425 Fernwood Road, Bethesda, MD  20817)

Naa Awaa Tagoe was Senior Associate Director of the Office of Financial Analysis, Modeling and Simulations at FHFA at the time of the Third Amendment.  Plaintiffs expect to present Ms. Tagoe's 30(b)(6) deposition testimony on behalf of FHFA, designated in Section VI below.

> ### 5.      Ross Kari (13443 Triflorium, Sisters, OR  97759)

Ross Kari was the Chief Financial Officer of Freddie Mac at the time of the Third Amendment.  Plaintiffs expect to present Mr. Kari's deposition testimony designated in Section VI below.

## V.    PLAINTIFFS' LIST OF EXHIBITS

Plaintiffs' list of exhibits is attached hereto as Exhibit A-1.  Plaintiffs expect to offer the highlighted exhibits into evidence at trial, and may offer the un-highlighted exhibits into evidence at trial.

Additionally, attached hereto as Exhibit A-2 and marked "PX-SW-####" is a list of

materials relied on to produce summary exhibits PX-0004 and PX-0005.  Plaintiffs are including these exhibits (which have been previously provided to Defendants) out of an abundance of caution, but Plaintiffs anticipate and intend that introduction of the summary exhibits will preclude the need to introduce these exhibits except where the exhibit is relevant for a purpose that is outside the scope of the summary witness' testimony.

## VI.    PLAINTIFFS' DEPOSITION DESIGNATIONS

Plaintiffs designate the following segments from the depositions set forth below:

### 1.    Deposition of Joseph Cacciapalle (January 28, 2021)

- 9:8–15
- 12:18–13:2
- 16:22–17:5
- 25:7–8
- 25:17–26:1
- 31:3–14
- 34:3–18
- 38:8–10
- 38:20–40:12
- 47:5–50:2
- 51:4–51:16
- 53:8–54:5
- 54:21–56:9
- 57:19–58:14
- 60:15–61:10
- 61:17–64:1
- 68:3–18
- 75:16–77:2
- 78:8–79:18
- 82:19–21
- 83:3–11
- 92:11–94:3
- 99:11–100:18

### 2.    Deposition of James B. Lockhart (January 31, 2021)

- 35:13 – 36:6
- 37:19–21
- 60:16 – 61:13

- 64:20 – 65:1
- 65:10–15
- 66:1–9
- 93:1–12
- 96:17–19
- 97:7–11
- 97:21 – 98:3
- 98:9–12
- 100:22 – 101:9
- 102:19–21
- 104:2–15
- 107:8–19

### 3. Deposition of Naa Awaa Tagoe (December 16, 2020)

- 15:17–16:24
- 17:16–19:20
- 25:19–32:16
- 32:25–33:8
- 34:5–12
- 35:3–21
- 36:2–39:21
- 40:22–42:17
- 43:20–47:12
- 49:1–9
- 50:1–54:19
- 60:5–62:11
- 64:8–13
- 67:20–69:14
- 74:12–75:8
- 76:23–77:14
- 80:4–8
- 80:19–81:12
- 86:11–87:13
- 88:3–10
- 89:5–90:8
- 90:20–93:25
- 94:25–99:25
- 100:23–101:8
- 102:17–20
- 104:25–107:13
- 108:15–109:14
- 110:5–13
- 112:5–114:25

- 115:16–116:23
- 120:11–14
- 121:18–122:18
- 125:14–25
- 126:5–128:21
- 129:12–130:7
- 131:9–132:14
- 133:11–135:4
- 136:22–137:10
- 137:21–138:3
- 138:14–139:4
- 139:10–24
- 140:12–141:15
- 142:19–143:13
- 154:8–156:13
- 158:6–16
- 160:4–21
- 161:21–162:5
- 162:12–165:19
- 169:5–11
- 175:6–176:7
- 178:24–179:25
- 181:2–16
- 183:10–184:13
- 193:19–194:25
- 196:2–8
- 214:12–215:16
- 219:2–222:21
- 230:14–21
- 243:18–244:10
- 248:1–250:3
- 250:18–252:9

### 4.      Deposition of Ross Kari (July 10, 2015)

- 58:12 – 59:24
- 112:21 – 113:9
- 141:3 – 142:18
- 143:14-144:3
- 145:15 – 147:25
- 150:5 – 151:3
- 157:20 – 158:9
- 160:21 – 161:9
- 165:19 – 166:6

- 172:7 – 174:18
- 206:3-21

### 5.      Deposition of Egbert Perry (January 14, 2016)

- 20:8 – 21:18
- 26:12-20
- 34:19 – 35:4
- 57:1-12
- 81:1 – 83:20
- 84:14 – 86:18
- 87:13 – 88:8
- 89:19 – 91:7
- 94:3 – 95:14
- 100:17 – 102:19
- 114:2-20

### 6.      Deposition of Jeffrey Alan Foster (July 14, 2015)

- 29:14-15
- 29:19-22
- 30:3-7
- 50: 2-51:21
- 52:2-6
- 57:20-58:1
- 58:4-5
- 58:8-10
- 58:12-14
- 58:16
- 59:8-10
- 59:16-17
- 59:20-60:6
- 94:1-8
- 95:14-22
- 96:10-15
- 97:16-21
- 98:10-12
- 107:12-16
- 133:9-13
- 229:16-20
- 230:1-7
- 238:22-239:3
- 239:5-239:14
- 240:10-241:5

### 7.      Deposition of David Moffett (February 20, 2020)

- 28:13-14
- 28:17-21
- 33:2-5
- 53:6-10
- 66:1-4
- 66:6-7

### 8.      Deposition of Jim Parrot (January 20, 2016)

- 46:15-47-7
- 47:10-15
- 54:19-21
- 55:4-7
- 99:1-3
- 99:12-19
- 103:14-17
- 103:21-104:7
- 151:11-13
- 187:17-18

### 9.      Deposition of David Benson (February 28, 2020)

- 12:5-7 – 13:17-16:2
- 91:7-93:15
- 222:8-12
- 17:3-21:10
- 21:11-24:11
- 17:3-21:10
- 27:19-32:19
- 36:19-37:11
- 37:9-40:9
- 40:17-41:11
- 46:14-51:21
- 52:9-53:15
- 68:18-73:5
- 73:7-19
- 75:11-13
- 78:13-80:15
- 81:17-87:15
- 87:9-91:2
- 97:21-99:15
- 103:11-14

- 133:18-136:16
- 142:14-145:5
- 148:8-150:21
- 158:16-159:17
- 160:5-162:13
- 170:17-172:13
- 173:7-177:21
- 180:18-181:7
- 183:3-8
- 183:22-184:15
- 186:15-190:1
- 200:1-203:22
- 204:14-206:5
- 212:11-213:10
- 214:19-218:13
- 222:19-223:7
- 230:18-234:21
- 253:10-258:3
- 266:6-267:6
- 267:19-268:8
- 268:11-269:8

## 10.    Deposition of Donald Layton (January 7, 2021)

- 11:7-13:1
- 38:22-41:13
- 41:14-45:3
- 45:21-46:15
- 47:4-51:19
- 92:7-93:10
- 102:12-106:15
- 106:17-116:20
- 122:4-131:16
- 134:5-138:13
- 139:19-143:12
- 147:21-149:4
- 154:4-160:16
- 187:12-188:10
- 196:22-197:16
- 212:3-11

## 11.    Deposition of Susan McFarland (July 15, 2015)

- 5:9–12

- 8:22–25
- 15:1–22
- 16:20–19:3
- 28:21–29:14
- 30:1–17
- 30:22–31:23
- 32:19–33:21
- 34:5–35:5
- 40:5–41:15
- 42:22–43:3
- 43:13–47:15
- 47:25–48:12
- 48:24–49:14
- 51:6–53:7
- 54:20–58:17
- 58:23–60:3
- 58:7–9
- 58:13–16
- 65:5–8
- 65:14–66:23
- 69:13–70:16
- 71:16–73:2
- 73:24–75:4
- 75:19–78:1
- 78:7–79:23
- 80:3–81:13
- 81:22–82:21
- 82:24–84:2
- 84:20–86:5
- 87:22–88:17
- 89:15–90:10
- 91:20–96:17
- 97:12–99:7
- 100:13–102:12
- 104:12–106:13
- 106:21–108:4
- 109:5–110:8
- 113:22–115:15
- 116:22–118:23
- 126:10–129:6
- 131:22–134:8
- 137:21–139:4
- 140:24–143:6
- 144:24–146:20

- 147:21–151:2
- 157:17–159:14
- 159:24–162:12
- 162:19–167:19
- 173:19–174:17
- 177:7–178:22
- 187:8–189:5
- 190:4–15

### 12.    Deposition of Timothy Mayopoulos (March 10, 2020)

- 14:4-22
- 15:1-10
- 43:8 – 45:1
- 49:6 – 52:7
- 55:8 – 56:2
- 60:4 – 63:7
- 67:15 – 68:4
- 69:4 – 76:22
- 83:4 – 101:10
- 112:10 – 117:10
- 117:12 – 118:6
- 118:22 – 119:8
- 120:12 – 121:18
- 122:1 – 11
- 127:15 – 128:11
- 134:17 – 135:16
- 136:4 – 136:12
- 140:17 – 141:2
- 142:4 – 153:10
- 155:20 – 157:20
- 159:9 – 162:12
- 162:14 – 164:15
- 165:14 – 167:2
- 167:19 – 169:11
- 182:22 – 183:16
- 190:9 – 193:10
- 195:6 – 196:3
- 196:5 – 199:16
- 222:19 – 223:19
- 223:20 – 224:20
- 225:2 – 226:21
- 235:16 – 236:9
- 241:14 – 20

- 241:21 – 243:1
- 244:3 – 245:5
- 247:8 – 18
- 248:1 – 249:5
- 249:20 – 250:1
- 250:8 – 251:16
- 259:3 – 260:3
- 260:8 – 265:5

## VII.    PLAINTIFFS' ITEMIZATION OF DAMAGES

Plaintiffs claims total damages in the amounts as set forth below:

1.      Plaintiffs seek expectancy damages arising from Defendants' breaches as a result of the Net Worth Sweep based on Fannie Mae's and Freddie Mac's realized performance up to the second quarter of 2021 and projected performance thereafter.  This method seeks to measure the net present value of future dividends that Fannie Mae and Freddie Mac shareholders would have earned but for the Net Worth Sweep based on Prof. Mason's conservative assumptions.  Under this method of expectancy damages, assuming no periodic commitment fee, damages are $10.321 billion for owners of the Fannie Mae Preferred, $5.887 billion for owners of the Freddie Mac Preferred, and $11.002 billion for owners of the Freddie Mac Common.  In a scenario where the Court determines that a periodic commitment fee would have been imposed, damages are $9.357 billion for owners of the Fannie Mae Preferred, $5.337 billion for owners of the Freddie Preferred, and $9.288 billion for owners of the Freddie Mac Common.[1]

---

[1] Prof. Mason also calculated a second method of expectancy damages based only on Fannie Mae and Freddie Mac projections as of August 2012, rather than using actual results to Q2 2021. Plaintiffs do not believe this method constitutes the most economically accurate method of computing damages.  This method yields damages of $3.645 billion for owners of the Fannie Preferred (including $1.434 billion in pre-judgment interest), $1.966 billion for owners of the Freddie Preferred (including $731 million in pre-judgment interest), and $1.886 billion for owners of the Freddie Common (including $3.489 billion in pre-judgment interest).

2.      As an alternative measure, Plaintiffs also asked Prof. Mason to evaluate damages for the junior preferred stock holders based on a restitution theory under which Defendants would disgorge the net benefits they have received under the shareholder contracts, which would be unwound in their entirety.  Plaintiffs would receive the present value as of August 2012 (the date of the Net Worth Sweep) of the sums initially paid for shares ("issuer-received cash flows"), and Fannie Mae and Freddie Mac would receive the present value as of the same date of dividends it paid since issuance ("purchaser-received cash flows").  Damages are equal to the issuer-received cash flows minus the purchaser-received cash flows, which amounts to $16.337 billion for owners of the Fannie Preferred prior to the application of prejudgment interest and $26.939 billion after the application of prejudgment interest, and $11.809 billion for owners of the Freddie Preferred prior to the application of prejudgment interest and $20.989 billion after the application of prejudgment interest.

3.      Plaintiffs also seek reimbursement of attorneys' fees and expenses.  Counsel will present the Court with an application for attorneys' fees and costs after trial.

## VIII.   PLAINTIFFS' PROPOSED STIPULATIONS OF FACT

1.      Congress created Fannie Mae in 1938 and Freddie Mac (together, the "Enterprises") in 1970 to support the Nation's home mortgage system by increasing the funds available to lend to borrowers and thus increasing home ownership.

2.      The Enterprises purchase mortgages, pool them into mortgage-backed securities, and sell them to investors guaranteeing payment of principal and interest.  By creating this secondary mortgage market, the Companies increase liquidity for private banks, which enables them to make additional loans to individuals for home purchases.

3.      The Enterprises have issued common stock and numerous series of non-cumulative preferred stock (the "Preferred Stock"), all of which are publicly traded.

4.      Of the Fannie Mae Preferred Stock currently outstanding, the earliest series was issued in September 1998 (Fannie Mae, Series D (FDDXD)), and the latest series was issued in May 2008 (Fannie Mae, Series T (FNMAT)).

5.      Of the Freddie Mac Preferred Stock currently outstanding, the earliest series was issued in April 1996 (Freddie Mac, Series I (FMCCI)), and the latest series was issued in December 2007 (Freddie Mac, Series KJ (FMCKJ)).

6.      No Preferred Stock has been issued by the Enterprises since the conservatorships began in September 2008.

7.      The Preferred Stock entitles the holder to quarterly dividends, if declared by the Enterprises' board of directors, that are calculated based on a percentage of the stock's face value.

8.      A financial crisis leading to the "Great Recession" began in the summer of 2007. The Great Recession led Congress and financial regulators to enact multiple, systemic reforms. One of those reforms was the enactment of HERA in July 2008.

9.      HERA established the FHFA, which is responsible, among other things, "for the effective supervision, regulation, and housing mission oversight" of the Enterprises.   HERA empowered FHFA to place the Enterprises into conservatorship or receivership under certain circumstances.

10.     HERA also amended the charters of the Enterprises by granting Treasury temporary authority to fund the Enterprises by purchasing Enterprise stock.

11.     On September 6, 2008, FHFA's Director placed both Enterprises into conservatorship.

12.     On September 7, 2008, FHFA, acting as conservator of Fannie Mae and Freddie Mac, entered into the PSPA with the U.S. Department of the Treasury on behalf of the Enterprises.

13.     In announcing the conservatorship on September 7, 2008, FHFA Director Lockhart stated that "in order to restore the balance between safety and soundness and mission, FHFA has placed Fannie Mae and Freddie Mac into conservatorship.  That is a statutory process designed to stabilize a troubled institution with the objective of returning the entities to normal business operations.  FHFA will act as the conservator to operate the Enterprises until they are stabilized."

14.     When the conservatorships were announced, FHFA's director told the public that "the common and all preferred stocks will continue to remain outstanding."  The Secretary of the Treasury similarly stated that "conservatorship does not eliminate the outstanding preferred stock."

15.     Under the PSPAs, Treasury committed to invest up to $100 billion in each Enterprise as needed to ensure that the Enterprises maintained a positive net worth (the Treasury "Commitment").

16.     For quarters in which an Enterprise's liabilities exceed its assets under Generally Accepted Accounting Principles, the PSPAs authorize draws upon Treasury's Commitment in an amount equal to the difference between liabilities and assets.

17.     In return for Treasury's Commitment under the PSPAs, Treasury received one million shares in a newly created class of securities in the Enterprises, known as Senior Preferred Stock.

18.     The specific terms of the Senior Preferred Stock were contained in the Certificate of Designation of Terms of Variable Liquidation Preference Senior Preferred Stock, Series 2008-2, referred to herein as the "Treasury Stock Certificate."

19.     The PSPAs entitled Treasury to the following consideration for each Enterprise: (i) a $1 billion senior liquidation preference—a priority right above all other stockholders, whether preferred or otherwise, to receive distributions from assets if the entities were liquidated; (ii) a

dollar-for-dollar increase in that liquidation preference each time Fannie Mae or Freddie Mac drew upon the Treasury Commitment; (iii) an annual cash dividend (paid quarterly) of 10% of Treasury's liquidation preference, or if not paid in cash, an increase of the liquidation preference at a rate of 12% of Treasury's liquidation preference; and (iv) warrants allowing Treasury to purchase up to 79.9% of the Enterprises' common stock at a nominal price.

20.     The PSPAs also contain a provision concerning a "periodic commitment fee." No periodic commitment fees were imposed on either Enterprise pursuant to that provision.

21.     The PSPAs also barred the Enterprises from "mak[ing] any other distribution" with respect to Enterprise equity interests—including dividends to shareholders—without Treasury's consent.

22.     The PSPAs were amended on May 6, 2009 (the "First Amendment"). Pursuant to the First Amendment, Treasury doubled the Treasury Commitment for each Enterprise, from $100 billion each ($200 billion total) to $200 billion each ($400 billion total).

23.     The PSPAs were amended again on December 24, 2009 (the "Second Amendment"). The Second Amendment replaced Treasury's $200,000,000,000 commitment for each Enterprise with a new commitment to provide as much funding as the Enterprises needed through December 31, 2012, after which time the cap on the Commitment would be reinstated and fixed pursuant to a formula.

24.     From the outset of the conservatorships in 2008 through the first quarter of 2012, there were some quarters in which the Enterprises lacked the cash necessary to pay the 10% dividend to Treasury.

25.     As such, the Enterprises drew from the Treasury Commitment in order to pay Treasury its quarterly dividend.

26. This circular practice—of drawing on Treasury's Commitment to pay Treasury dividends—increased the size of the liquidation preference, thereby increasing the size of the Enterprises' dividend obligation.

27. By August 2012, Fannie Mae's annual dividend on Treasury's senior preferred stock, if declared and paid in cash, was $11.7 billion and Freddie Mac's annual dividend on Treasury's senior preferred stock, if declared and paid in cash, was $7.2 billion.

28. By August 2012, the Treasury liquidation preferences had grown to a total of approximately $189.4 billion—$117.1 billion for Fannie Mae and $72.3 billion for Freddie Mac.

29. On August 17, 2012, FHFA and Treasury amended the PSPAs a third time (the "Third Amendment").

30. The Third Amendment replaced the fixed 10% dividend with a variable dividend formula tied to each Enterprise's net worth.

31. Under the new dividend formula, the Enterprises were required to pay a dividend equal to the amount, if any, by which their net worth exceeded a pre-determined capital reserve.

32. As of December 31, 2011, Fannie Mae reported a DTA of $64.5 billion that was offset by a valuation allowance of $64.1 billion, resulting in a net DTA of $0.4 billion.

33. As of December 31, 2011, Freddie Mac reported a DTA of $39.2 billion that was offset by a valuation allowance of $35.7 billion, resulting in a net DTA of $3.5 billion.

34. Fannie Mae released its DTA valuation allowance in the first quarter of 2013.

35. Freddie Mac released its DTA valuation allowance in the third quarter of 2013.

36. The reversal of the valuation allowance increased the first quarter 2013 comprehensive income for Fannie Mae by $50.6 billion, resulting in a total quarterly comprehensive income of $59.3 billion.

37.     The reversal of the valuation allowance increased the third quarter 2013 comprehensive income for Freddie Mac by $23.9 billion, leading to total comprehensive income for that quarter of $30.4.

38.     As a result of the reversal of the valuation allowance on the DTA, Fannie Mae ended its first quarter 2013 with a positive net worth of $62.4 billion and paid $59.4 billion of that net worth as a dividend to Treasury in the second quarter of 2013.

39.     As a result of the reversal of the valuation allowance on the DTA, Freddie Mac ended its third quarter 2013 with a non-cash increase of net worth of $23.9 billion and paid $30.4 billion in its net worth as a dividend to Treasury in the fourth quarter of 2013.

40.     Fannie Mae recognized comprehensive income of $18.8 billion in 2012, $84.8 billion in 2013, $14.7 billion in 2014, $10.6 billion in 2015, and $11.7 billion in 2016.

41.     Fannie Mae has only been required to take one Treasury draw since 2012, which occurred in 2018 for $3.7 billion.  That draw was triggered by a one-time charge relating to the enactment of the Tax Cuts and Job Act of 2017 and did not relate to any financial instability.

42.     Freddie Mac recognized comprehensive income of $16.0 billion in 2012, $51.6 billion in 2013, $9.4 billion in 2014, $5.8 billion in 2015, and $7.1 billion in 2016.

43.     Freddie Mac has only been required to take one Treasury draw since 2012, which occurred in 2018 for $312 million.  That draw was triggered by a one-time charge relating to the enactment of the Tax Cuts and Job Act of 2017 and did not relate to any financial instability.

44.     On December 21, 2017, Treasury and FHFA, acting as Conservator to the Enterprises, entered into letter agreements that changed the terms of the Senior Preferred Stock Certificates in each Enterprise, issued under the PSPAs (the "2017 Letter Agreements").  The 2017 Letter Agreements permitted each Enterprise to retain a $3 billion capital reserve, quarterly.  Under

the 2017 Letter Agreements, each Enterprise paid a dividend to Treasury equal to the amount its net worth at the end of each quarter exceeded $3 billion.  Those terms applied to the December 31, 2017 dividend payment and the dividend payments for each quarter thereafter, until the execution of the September 30, 2019 letter agreements.

45.     On September 30, 2019, Treasury and FHFA, acting as Conservator to the Enterprises, entered into letter agreements that changed the terms of the Senior Preferred Stock Certificates in each Enterprise, issued under the PSPAs (the "2019 Letter Agreements").  The 2019 Letter Agreements permitted each Enterprise to retain earnings beyond the $3 billion capital reserves previously allowed through the 2017 Letter Agreements.  Fannie Mae and Freddie Mac were permitted to maintain capital reserves of $25 billion and $20 billion, respectively.  The 2019 Letter Agreements also provided that the liquidation preferences for Treasury's Senior Preferred Stock would increase by the amount of capital the Enterprises retained each quarter.

46.     On January 14, 2021, Treasury and FHFA, acting as Conservator to the Enterprises, entered into letter agreements that changed the terms of the Senior Preferred Stock Certificates in each Enterprise, issued under the PSPAs (the "2021 Letter Agreements").  The 2021 Letter Agreements further allowed the Enterprises to retain their earnings up to certain thresholds set forth in a new regulatory capital framework.  The 2021 Letter Agreements provide that, in each quarter in which the Enterprises have a positive net worth, the Enterprises' net worth is not paid in cash to Treasury but rather is added to Treasury's liquidation preference with the Enterprises retaining their net worth as capital.

## IX.     PROPOSED VOIR DIRE QUESTIONS

The Parties intend to request jointly that the Court approve a supplemental jury questionnaire to be completed by prospective jurors in advance of jury selection scheduled to begin on October 17, 2022.  The Parties believe that having responses to the supplemental questions will

facilitate, focus and potentially reduce the time spent by the Court and prospective jurors on voir dire.  The Parties have agreed to the attached proposed supplemental juror questionnaire (Exhibit B).  Should the Court decide not to provide the proposed supplemental juror questionnaire to prospective jurors in advance of jury selection, the Parties agree that the proposed supplemental jury questionnaire constitutes their joint proposed voir dire.  If the Court orders that the supplemental questionnaire or voir dire be revised, the Parties would propose to meet and confer to discuss any revisions required by the Court's direction.

**X.      PROPOSED JURY INSTRUCTIONS**

Plaintiffs' proposed jury instructions are attached hereto as Exhibit C.

**XI.     PROPOSED VERDICT FORM**

Plaintiffs' proposed jury verdict form is attached hereto as Exhibit D.

**XII.    REQUEST FOR OTHER RELIEF**

Plaintiffs request no other relief.

Dated: August 19, 2022                          Respectfully submitted,


/s/ Brian W. Barnes                             /s/ Eric L. Zagar
Charles J. Cooper (Bar No. 24870)               Eric L. Zagar (*Pro Hac Vice*)
David H. Thompson (Bar No. 450503)              **KESSLER TOPAZ**
Vincent J. Colatriano (Bar No. 429562)            **MELTZER & CHECK, LLP**
Peter A. Patterson (Bar No. 998668)             280 King of Prussia Rd.
Brian W. Barnes (*Pro Hac Vice*)                Radnor, PA 19087
**COOPER & KIRK, PLLC**                         Tel: (610) 667-7706
1523 New Hampshire Avenue, N.W.                 Fax: (610) 667-7056
Washington, DC 20036                            ezagar@ktmc.com
Tel: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com

*Counsel for Berkley Plaintiffs, et al..*

Hamish P.M. Hume (Bar No. 449914)
Samuel C. Kaplan (Bar No. 463350)
**BOIES SCHILLER FLEXNER LLP**
1401 New York Ave. NW
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
hhume@bsfllp.com
skaplan@bsfllp.com

Michael J. Barry (*Pro Hac Vice*)
**GRANT & EISENHOFER, P.A.**
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100
mbarry@gelaw.com

Adam Wierzbowski (*Pro Hac Vice*)
**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
adam@blbglaw.com

*Co-Lead Counsel for the Class*