# Exhibit C

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FAIRHOLME FUNDS, INC., *et al.*,<br><br>      Plaintiffs,<br><br>v.<br><br>FEDERAL HOUSING FINANCE AGENCY, *et al.*,<br><br>      Defendants. | Civil No. 13-1053 (RCL) |
| In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations<br><br>_____<br><br>This document relates to:<br>ALL CASES | Miscellaneous No. 13-1288 (RCL) |

## **DEFENDANTS' PROPOSED STIPULATIONS OF FACT**

1. Congress created the Federal National Mortgage Association ("Fannie Mae") in 1938 and the Federal Home Loan Mortgage Corporation ("Freddie Mac") (together with Fannie Mae, the "Enterprises") in 1970 to support the Nation's home mortgage system by increasing the funds available to lend to borrowers and thus increasing home ownership. *See* 12 U.S.C. § 1716 *et seq.* (Fannie Mae Charter); 12 U.S.C. § 1451 *et seq.* (Freddie Mac Charter).

2. By 2007, Fannie Mae's and Freddie Mac's mortgage portfolios had a combined value of approximately $5 trillion and accounted for almost half of the Nation's mortgage market.

3. In July 2008, Congress enacted a federal law called the Housing and Economic Recovery Act of 2008 ("HERA"). *See* 122 Stat. 2654, 12 U.S.C. § 4501 et seq.

4. Congress enacted HERA in 2008 to address the concern that, as a result of the financial crisis of 2008, Fannie Mae's and Freddie Mac's financial condition would imperil the national economy.

5. HERA created the Federal Housing Finance Agency (or "FHFA") and established it as Fannie Mae's and Freddie Mac's regulator.

6. HERA empowered the Director of FHFA to place Fannie Mae and/or Freddie Mac into conservatorship or receivership.

7. On September 6, 2008, FHFA's Director appointed FHFA as conservator of Fannie Mae having determined that the appointment of a conservator was justified pursuant to HERA, 12 U.S.C. § 4617(a)(3).

8. On September 6, 2008, FHFA's Director appointed FHFA as conservator of Freddie Mac having determined that the appointment of a conservator was justified pursuant to HERA, 12 U.S.C. § 4617(a)(3).

9. The Board of Directors of Fannie Mae consented, by resolution, to the appointment of a conservator pursuant to HERA, 12 U.S.C. § 4617(a)(3)(I).

10. The Board of Directors of Freddie Mac consented, by resolution, to the appointment of a conservator pursuant to HERA, 12 U.S.C. § 4617(a)(3)(I).

11. On September 7, 2008, FHFA, acting as conservator of Fannie Mae, and the United States Department of the Treasury (or "Treasury") entered into a Senior Preferred Stock Purchase Agreement, or "SPSPA."

12. On September 7, 2008, FHFA, acting as conservator of Freddie Mac, and Treasury entered into a separate Senior Preferred Stock Purchase Agreement, or "SPSPA" (the SPSPA for Fannie Mae and the SPSPA for Freddie Mac are collectively the "SPSPAs").

13. Under the SPSPAs, Treasury agreed to invest up to $100 billion (the "Treasury Commitment") in each Enterprise as needed to ensure that every quarter each Enterprise maintained a positive net worth. SPSPAs § 2.1. An Enterprise had a positive net worth if the Enterprise's assets exceeded liabilities as determined by Generally Accepted Accounting Principles ("GAAP").

14. If an Enterprise's liabilities exceeded its assets in any quarter, the Enterprise was required to draw on the Treasury Commitment to make its net worth positive. SPSPAs § 2.2.

15. By maintaining a positive net worth, the Enterprises avoided the trigger under HERA for placing the Enterprises into mandatory receivership. 12 USC § 4617(a)(4).

16. In return for the Treasury Commitment, Treasury received one million shares in a newly-created class of non-voting stock in each Enterprise, known as Senior Preferred Stock. SPSPAs § 3.1. The terms of the Senior Preferred Stock for each Enterprise were contained in a document called the Certificate of Designation of Terms of Variable Liquidation Preference Senior Preferred Stock, Series 2008-2, referred to here as the "Treasury Stock Certificate."

17. The SPSPAs, and their associated Treasury Stock Certificates, entitled Treasury to:

   a. a $1 billion senior liquidation preference in each Enterprise—a priority right above all other stockholders to receive distributions from assets if the Enterprise was liquidated—with a dollar-for-dollar increase in that liquidation preference each time the Enterprise drew on the Treasury Commitment (SPSPAs § 3.1, 3.3);

b. an annual cash dividend (paid quarterly) of 10% of Treasury's outstanding liquidation preference, or if not paid in cash, an increase of the liquidation preference at a rate of 12% of Treasury's liquidation preference from each Enterprise (Treasury Stock Certificate ¶ 2);

c. warrants allowing Treasury to purchase up to 79.9% of each Enterprise's common stock at a nominal price (SPSPA §§ 1, 3.1), if it chose to do so; and

d. a quarterly Periodic Commitment Fee from each Enterprise that was "intended to fully compensate Treasury for the support provided by the ongoing Commitment: The amount of this fee would be set by December 31, 2009, through mutual agreement between FHFA and Treasury, with reference to the market value of the Commitment as then in effect" and in consultation with the Chairman of the Federal Reserve, and the Enterprises were required to begin paying the fee on March 31, 2010, though Treasury could waive payment of the fee on an annual basis, in its sole discretion, based on adverse conditions in the mortgage market (SPSPA § 3.2).

18. Treasury waived the Periodic Commitment Fee for 2010, 2011, and 2012.

19. The SPSPAs barred the Enterprises from making any distributions to Enterprise stockholders—including dividends—without Treasury's consent. SPSPAs § 5.1.

20. On September 7, 2008, FHFA's Director, acting as conservator of Fannie Mae and Freddie Mac, announced that the Enterprises would not pay any dividends on the common stock or on any series of outstanding preferred stock. Fannie Mae 2008 10-K, internal page 76; Freddie Mac 2008 10-K, internal page 54.

21. No common stock or junior preferred stock dividends have been paid by the Enterprises during conservatorship.

22. On May 6, 2009, FHFA, acting as conservator of the Enterprises, and Treasury amended the SPSPAs in what is referred to as the "First Amendment" to the SPSPAs. Among other things, the First Amendment increased the total amount of the Treasury Commitment to each Enterprise to $200 billion.

23. On December 24, 2009, FHFA, acting as conservator of the Enterprises, and Treasury amended the SPSPAs in what is referred to as the "Second Amendment" to the SPSPAs. Among other things, the Second Amendment temporarily removed the cap on the amount of the Treasury Commitment to each Enterprise, making it unlimited to prevent insolvency through December 31, 2012, and provided that a cap on the Treasury Commitment would be reimposed as of January 1, 2013.

24. The Second Amendment also extended the date for Treasury to set the Periodic Commitment Fee, from December 31, 2009, to December 31, 2010.

25. None of the plaintiffs are challenging the SPSPAs, the First or Second Amendments, or the decision to place the Enterprises into conservatorship.

26. Under the SPSPAs, the Enterprises are prohibited from paying down the Treasury liquidation preference except in limited circumstances. Fannie 10-Q for 2Q 2012 at p. 54; Freddie 10-Q for 2Q 2012 at p. 89. Those limited circumstances are termination of the Treasury Commitment, addition of dividends or periodic commitment fees to the liquidation preference in lieu of the Enterprises paying those obligations in cash, or issuance of new Enterprise shares. Treasury Stock Certificate §§ 3(a), 4(a). Those limited circumstances have never, in fact,

occurred.  Neither the First Amendment nor Second Amendment altered this feature of the SPSPAs.

27.     In the first quarter of 2012, Fannie Mae recorded comprehensive income (*i.e.*, earnings) of $3.1 billion, compared to a comprehensive loss of $6.3 billion in the first quarter of 2011; and Freddie Mac recorded comprehensive income of $1.8 billion, compared to a comprehensive income of $2.7 billion in the first quarter of 2011.

28.     In the second quarter of 2012, Fannie Mae recorded comprehensive income of $5.4 billion, compared to a comprehensive loss and net loss of $2.9 billion for the second quarter of 2011; and Freddie Mac recorded comprehensive income of $2.9 billion, compared to a comprehensive loss of $1.1 billion for the second quarter of 2011.

29.     By August 2012, Fannie Mae's annual dividend obligation to Treasury under the SPSPAs was $11.7 billion.

30.     By August 2012, Freddie Mac's annual dividend obligation under the SPSPAs was $7.2 billion.

31.     As of August 17, 2012, Fannie Mae had drawn $116.1 billion from the Treasury Commitment.

32.     As of August 17, 2012, Freddie Mac had drawn $71.3 billion from the Treasury Commitment.

33.     In its 10-Q covering the second quarter of 2012 and filed on August 8, 2012, Fannie Mae stated (at pages 12-13, 83): "Although we may experience period-to-period volatility in earnings and comprehensive income, we do not expect to generate net income or comprehensive income in excess of our annual [10%] dividend obligation to Treasury over the long term."

34. In its 10-Q covering the second quarter of 2012 and filed on August 7, 2012, Freddie Mac stated (at pages 10, 92): "Although we may experience period-to-period variability in earnings and comprehensive income, it is unlikely that we will generate net income or comprehensive income in excess of our annual [10%] dividends payable to Treasury over the long term."

35. On August 17, 2012, FHFA, acting as conservator of the Enterprises, and Treasury entered into what is referred to as the "Third Amendment" to the SPSPAs.

36. The Third Amendment amended the SPSPAs by replacing the fixed 10% dividend with a quarterly variable dividend equal the positive net worth, if any, of Fannie Mae and Freddie Mac, exceeding a specified buffer amount. Third Amendment §§ 2-3. That buffer amount was originally set at $3 billion but would decline by $600 million in each year until reaching zero in 2018. This aspect of the Third Amendment is known as the "Net Worth Sweep."

37. In addition, the Third Amendment suspended the Enterprises' obligations to pay periodic commitment fees for so long as the variable/net worth dividend formula remained in effect.

38. As of the execution of the Third Amendment, neither Fannie Mae nor Freddie Mac paid any periodic commitment fees.

39. Pursuant to the terms of the SPSPAs, as of January 1, 2013, the maximum amount of remaining funding to Fannie Mae under the Treasury Commitment was $117.6 billion.

40. Pursuant to the terms of the SPSPAs, as of January 1, 2013, the maximum amount of remaining funding to Freddie Mac under the Treasury Commitment was $140.5 billion.

41. On December 21, 2017, FHFA, acting as conservator of the Enterprises, and Treasury entered into a Letter Agreement revising certain provisions of the SPSPAs. Among other things, the Letter Agreement again permitted the Enterprises to retain net earnings up to $3 billion, quarterly, as a capital reserve. Accordingly, each Enterprise would each pay Treasury quarterly dividends equal to the amount that its positive net worth exceeded $3 billion.

42. On September 27, 2019, FHFA, acting as conservator of the Enterprises, and Treasury entered into a second Letter Agreement revising certain provisions of the SPSPAs. Among other things, the second Letter Agreement increased the capital reserve for Fannie Mae to $25 billion and the capital reserve for Freddie Mac to $20 billion. Accordingly, Fannie Mae would pay Treasury quarterly dividends equal to the amount that its positive net worth exceeded $25 billion, and Freddie Mac would pay Treasury quarterly dividends equal to the amount that its positive net worth exceeded $20 billion. This Letter Agreement also stated that the liquidation preference for each Enterprise would increase by the amount of capital reserve.

43. On January 14, 2021, FHFA, acting as conservator of the Enterprises, and Treasury entered into a third Letter Agreement revising the terms of the SPSPAs. Among other things, that Letter Agreement suspended the cash dividend owed in order to permit each Enterprise to retain earnings until it satisfied the requirements of the 2020 Enterprise capital rule. Jan. 14, 2021 Letter Agreement at 2-6. The liquidation preference for each Enterprise increased each quarter by the amount in earnings each Enterprise was permitted to retain as a result of the cash dividend being suspended.

44. As of December 31, 2021, Fannie Mae had paid Treasury $181.4 billion in dividends, had taken $119.8 in cumulative Treasury draws, and had $113.9 billion in remaining Treasury Commitment. Fannie Mae 2021 10-K, internal page 15.

45.     As of December 31, 2021, Freddie Mac had paid Treasury $119.7 billion in dividends, had taken $71.6 billion in cumulative Treasury draws, and had $140.2 billion in remaining Treasury Commitment.  Freddie Mac 2021 10-K, internal pages 109-110.