# EXHIBIT B

Page 1

1                    UNITED STATES DISTRICT COURT

                    FOR THE DISTRICT OF COLUMBIA

2

         _____

3                                        )

         In re Fannie Mae/Freddie Mac )Miscellaneous No.

4        Senior Preferred Stock        )13-1288(RCL)

         Purchase Agreement Class      )

5        Action Litigation             )CLASS ACTION

                                       )

6                                      )

                                       )

7        This document relates to:     )

                                       )

8        ALL CASES                     )

         _____

9

10

11

12               Remote Videotaped Deposition of

13                      SUSAN HARTMAN

14                     August 23, 2022

15                       8:41 a.m.

16

17

18

19

20

21

         Reported by:  Bonnie L. Russo

22       Job No. 5367728

1          Q.    And do you go by Dr. Hartman?

2          A.    I don't.  I'm not sure where that

3     came from.  I was going to point that out.

4          Q.    Very good.  I --

5          A.    I do not have a doctorate.

6          Q.    I hadn't seen a Ph.D. on your CV,

7     but just wanted to confirm because I heard

8     someone say it before we got started.

9                So is Ms. Hartman okay for today?

10         A.    That's fine.

11         Q.    Great.  Have you been deposed

12    before?

13         A.    Yes.

14         Q.    Okay.  How many times?

15         A.    I think roughly 20.

16         Q.    When -- when was the most recent

17    time you were deposed?

18         A.    About a year ago.

19         Q.    Okay.  And of those roughly 20

20    times, were -- were those cases in which you

21    were either a plaintiff or a defendant as a

22    party to the lawsuit, or were those cases where

1    you were serving some role as a -- as a

2    witness?

3         A.    I was not a party to the lawsuits.

4    It was part of my business.

5         Q.    Okay.  And in -- in those cases

6    where you were deposed before, were you serving

7    as an -- as an expert and being deposed as an

8    -- as an expert for one of the litigants?

9         A.    Yes.

10        Q.    Okay.  In -- in all 20 of the cases

11   where -- 20 or so cases where you have been

12   deposed previously, were all of those

13   situations where you were serving as an expert

14   for one of the parties in the litigation?

15        A.    Yes, although I would say they

16   weren't all litigations.  Sometimes I have

17   testified in investigations.

18        Q.    Okay.  Well, whether it was

19   litigation or investigation, arbitration, any

20   sort of legal proceeding where you have

21   testified before, it's always been as an expert

22   for one of the parties involved in the legal

Page 11

1       proceeding?

2              A.    That's correct.

3              Q.    Okay.  Have you ever testified at a

4       trial?

5              A.    Yes.

6              Q.    Okay.  How many times?

7              A.    Again, probably roughly 20.

8              Q.    Okay.  Roughly -- would you say that

9       is roughly the same 20 or so cases in which you

10      were also deposed?

11             A.    Not one for one.  Some cases

12      settled.  Some cases, there were a deposition

13      before trial.

14             Q.    Okay.  In the 20 or so cases where

15      you have testified at a trial, were all of

16      those situations where you were serving and

17      testifying as an expert on behalf of one of the

18      parties to the matter?

19             A.    Yes.

20             Q.    Okay.  So you have never testified

21      in a -- in a deposition or an investigation or

22      a trial or any other legal proceeding in any

Page 12

1      capacity other than as an expert for one of the

2      parties?

3            A.    That's correct.

4            Q.    Okay.  And have you always been paid

5      for your work as an expert in those other

6      matters?

7            A.    Yes.

8            Q.    Okay.  And have you served as an

9      expert for parties in legal proceedings in

10     other cases where you didn't give any

11     testimony, either at a deposition or

12     investigation or trial or any other proceeding?

13           A.    I'm sorry, could you repeat the

14     question.

15           Q.    Sure.  In addition to the various

16     matters you have already described in which you

17     testified as an expert, have you also served as

18     an expert in other cases where you didn't give

19     any testimony?

20           A.    Yes.

21           Q.    Okay.  And were you always paid in

22     connection with those matters as well?

 1     this case?

 2         A.    I believe it was Michael Barry.  My

 3     -- my firm was already doing some work on this

 4     case in -- on another capacity, so the first

 5     person I spoke to was either Michael Barry or

 6     Sam Kaplan.

 7         Q.    Okay.  And that's Dr. Joseph Mason

 8     who is affiliated with your firm, BVA Group, is

 9     also an expert for the plaintiffs in this case.

10            Is that -- that's what you are

11     referring to?

12         A.    Yes.

13         Q.    Okay.  And am -- am I understanding

14     correctly that Dr. Mason was already involved

15     in the case working as an expert for the

16     plaintiffs at the time that Mr. Barry or Mr.

17     Kaplan reached out to you about the case?

18         A.    That's my understanding, yes.

19         Q.    Okay.  When, to the best of your

20     recollection, did they first reach out to you

21     about this case?

22         A.    It -- it hasn't been that long.  It

1      has only been a few months but I couldn't tell

2      you a date.

3            Q.    Okay.  Order of magnitude, four

4      months, five months, six months?

5            A.    Somewhere between four and six would

6      be my best remembrance.

7            Q.    Okay.  And -- and did they initially

8      ask you to serve as a summary witness?  Was

9      that their opening request?

10           A.    Yes.

11           Q.    Okay.  Did -- did they tell you or

12     do you have any understanding of why you were

13     asked to serve as a summary witness in this

14     case?

15           A.    My understanding is they needed a

16     summary witness to consolidate a lot of

17     materials that are publicly available and

18     present them in summary fashion.

19           Q.    Before they reached out to you in

20     the last four to six months or so to ask you to

21     serve as a summary witness in this case, did

22     you have any connection before that to this

Page 20

1        and your team at BVA Group about this case?

2            A.    No.

3            Q.    Okay.  Plaintiffs have said that you

4        will testify about a number of different topics

5        or issues in this case.

6                  Are you aware of that?

7            A.    Yes.

8            Q.    Who determined what topics you will

9        testify about?

10           A.    Counsel.

11           Q.    Plaintiffs' counsel did?

12           A.    Yes.

13           Q.    They -- they just came and told you

14       which issues they would like you to testify

15       about?

16           A.    Yes.  They told me what information

17       they would like consolidated.

18           Q.    You did not prepare any expert

19       report in this case, right?

20           A.    Correct.

21           Q.    Were you ever asked to prepare an

22       expert report in this case?

1        School and you are also a CPA, right?

2             A.    Correct.

3             Q.    Okay.  For your analyses in this

4        case, did you rely on any of your specialized

5        expertise either as an MBA or CPA or otherwise?

6             A.    No.

7             Q.    Other than your role as a summary

8        witness in this case, do you have any prior

9        experience or done any prior work relating to

10       Fannie Mae, Freddie Mac or FHFA?

11            A.    No.

12            Q.    Okay.  Have you done any other prior

13       work relating to the 2008 housing and financial

14       crisis?

15            A.    No.

16            Q.    None?

17            A.    None.

18            Q.    You are a partner at BVA Group,

19       right?

20            A.    Correct.

21            Q.    And BVA is an expert consulting

22       firm; is that right?

1          Q.    Including for the time that you

2     spend testifying at trial as a summary witness

3     in this case?

4          A.    Yes.

5          Q.    Okay.  You are billing -- you are

6     charging the plaintiffs $850 an hour for your

7     time at today's deposition?

8          A.    Yes.

9          Q.    Do you have a written agreement with

10    plaintiffs or plaintiffs' counsel relating to

11    your work in this case, like, an engagement or

12    retainer agreement or letter?

13         A.    Yes.

14         Q.    Okay.  When was that -- do you

15    recall when was that signed?

16         A.    A few months ago.  I don't know

17    exactly.

18         Q.    Okay.  And you mentioned that you

19    have a team of people at BVA Group working with

20    you; is that right?

21         A.    That's correct.

22         Q.    How many people is that?

Page 32

1        not as an expert, as a summary witness in this
2        case?
3              A.    Yes.
4              Q.    Okay.  And -- and how much do you
5        all charge the plaintiffs for those folks'
6        time?
7              A.    I think anywhere from 300 to 650 an
8        hour.
9              Q.    And do you know, either specifically
10       or just order of magnitude, how many hours have
11       those four people spent working, supporting you
12       in this case?
13             A.    I don't know.
14             Q.    Okay.  Do you have any sense for how
15       much you have invoiced the plaintiffs for the
16       time of those four people so far?
17             A.    I don't.
18             Q.    You would have to consult the -- the
19       invoices?
20             A.    Correct.
21             Q.    Okay.  Even order of magnitude, do
22       you have any sense, hundreds of dollars,

Page 53

1       word, does this list of topics that you are

2       going to address at trial match or line up with

3       your understanding of the topics that you are

4       going to address at trial?

5           A.    Everything except No. 3.  I don't

6       know that there was a discussion about HERA and

7       the date it was adopted, but that is easy to

8       look up, and No. 7, I was not asked by counsel

9       to look into the deferred tax asset issue.

10          Q.    Okay.  You -- on No. 7, am I right,

11      you have not been asked by plaintiffs' counsel

12      to look into the deferred tax assets or DTA

13      issue?

14          A.    Correct.

15          Q.    And have you looked into that issue,

16      the DTA issue?

17          A.    No.

18          Q.    Do you have any plans to look into

19      it?

20          A.    No.

21          Q.    Okay.  Do you have any plans to

22      offer any testimony at trial as a summary

Page 54

1              witness or otherwise about DTAs?

2                   A.    No.

3                   Q.    Have you -- have you been asked to

4              look at or testify about anything related to

5              loan loss reserves in this case?

6                   A.    No.

7                   Q.    Have you been asked to look at or

8              testify about anything relating to GAAP?

9                   A.    No.

10                  Q.    You are familiar with GAAP as a CPA,

11             sure.

12                  A.    Yes.

13                  Q.    Okay.  And you haven't been asked or

14             look at or testify to anything relating to GAAP

15             in this case?

16                  A.    That's correct.

17                  Q.    Okay.  Have you been asked to look

18             at or testify about anything relating to the

19             relationship between FHFA and Fannie or Freddie

20             with respect to accounting matters?

21                  A.    Could you be more specific.

22                  Q.    Have you ever heard or seen claims

Page 55

1       or statements that FHFA forced Fannie or

2       Freddie to take certain -- or to take or make

3       certain accounting decisions?

4              A.    I have not looked into that.

5              Q.    Okay.  Have you been asked to look

6       into anything like that?

7              A.    No.

8              Q.    Do you have plans to look into those

9       issues?

10             A.    No.

11             Q.    Okay.  Other than No. 7 in this list

12      of topics in the -- in the July 8, 2022 e-mail

13      from Mr. Barry, and the question of whether the

14      date HERA was adopted, was one of the dates you

15      looked at in Topic 3, other than those two

16      items, does this list otherwise accurately and

17      completely describe the topics that you are

18      planning to cover in your testimony at trial?

19             A.    Yes, it does.

20             Q.    Other than what is listed here, are

21      there any other topics or issues that you are

22      planning to address in your testimony at trial

Page 65

1          Q.    Okay.  Who identified the particular
2     documents here that you're going to offer into
3     evidence and -- and read certain portions of
4     them out loud?
5          A.    Plaintiffs' counsel.
6          Q.    Okay.  And who identified which
7     portions of these documents you'll read?
8          A.    Plaintiffs' counsel.
9          Q.    Did you have any input -- did -- did
10    you or -- or anyone at BVA Group have any input
11    in selecting the particular documents listed
12    here that you will offer into evidence and read
13    certain portions out loud?
14         A.    No, we did not.
15         Q.    Did you or anyone at BVA Group have
16    any input in selecting the particular portions
17    of these documents that you will read out loud
18    at trial?
19         A.    No, we did not.
20         Q.    Have you been told which portions of
21    these documents you'll read out loud?
22         A.    Yes.

Page 67

```
 1          A.    No.
 2          Q.    Okay.  Do you have any understanding
 3     of why these particular documents were chosen
 4     by the plaintiffs' counsel for you to offer
 5     into evidence and read certain portions of them
 6     out loud at trial?
 7          A.    I do not.
 8          Q.    They never told you?
 9          A.    No.
10          Q.    You never asked?
11          A.    No.
12          Q.    Okay.  Do you have any understanding
13     of how the plaintiffs' counsel went about
14     choosing which portions of each of these
15     documents you will read out loud at trial?
16          A.    No.
17          Q.    They never told you?
18          A.    No.
19          Q.    And you ever asked?
20          A.    No.
21          Q.    So what happened was the plaintiffs'
22     counsel identified these documents without any
```

1          input from you, identified specific portions of

2          the documents that they want you to read out

3          loud at trial, again without any input from

4          you, and you've -- you've looked at the

5          documents, you've read the parts that they want

6          you to -- to read into the record, and you're

7          planning to read those portions out loud at

8          trial, but not offer any additional testimony

9          about those documents.

10                 Is that all right?

11         A.    That's correct.

12         Q.    Okay.  Ju- -- just being given a

13         document with some of the text highlighted or

14         underlined and -- and reading it out loud, it

15         doesn't require -- well, anyone who can read

16         English could do that, right?

17         A.    Correct.

18         Q.    Okay.  Do you have any understanding

19         of why the plaintiffs are -- are paying $850 an

20         hour for you to just read documents out loud at

21         trial?

22         A.    I don't have an understanding of

Page 69

1          that.

2                 Q.    All right.   Seems like a good gig.

3                       MR. JONES:   We've been going about

4          an hour.

5                       Do you want to take a short break or

6          keep going?   Totally -- I leave it totally to

7          y'all.

8                       THE WITNESS:   I would like to take a

9          short break if that's all right.

10                      MR. JONES:   Absolutely.   When --

11         whenever you like.

12                      How long -- it's 10 -- I have 10:43.

13                      Do you want to take 5 minutes, 10

14         minutes, 15 minutes?

15                      THE WITNESS:   10 minutes is fine.

16                      MR. JONES:   Let's -- Michael, can we

17         come back on at 10:55?

18                      MR. BARRY:   That's fine with me.

19         Thank you.

20                      MR. JONES:   Excellent.

21                      THE VIDEOGRAPHER:   The time is 9:43.

22         This ends Unit 1.

Page 83

1          A.    No.

2          Q.    They never asked you?

3          A.    No.

4          Q.    I mean, they never told you?

5          A.    No.

6          Q.    And you never asked?

7          A.    No.

8          Q.    Okay.  Unlike some of the other

9     topics that we look at that were listed in this

10    e-mail, this description of your testimony

11    about the certificates of designation under

12    Topic 1, it does not say that you are going to

13    read certain portions or any portions of the

14    certificates into the record, correct?

15         A.    Correct.

16         Q.    Okay.  And -- and is that your

17    understanding, that you're not going to read

18    out loud into the record any portions of the

19    certificates of designation, you're just going

20    to explain certain of the terms in your own

21    words?

22         A.    I can't remember if this has changed

Page 84

1       since this document.  It may have, but I can't
2       remember.
3           Q.    Okay.  Well, at least as of the time
4       of -- of this document, which the plaintiffs'
5       counsel wrote, the -- the plan as of this time
6       was -- was just for you to describe certain of
7       the terms in the certificates of designation
8       using the language in red there that the
9       plaintiffs' counsel wrote, right?
10          A.    That's correct.
11          Q.    Okay.  Other than just reading what
12      the plaintiffs' counsel wrote here in red for
13      you to say about the certificates of
14      designation, are you planning to offer any
15      other testimony or analysis or summary of the
16      certificates of designation?
17          A.    I'm willing to ask -- answer
18      questions about which Certificate of
19      Designation to the extent I've reviewed them.
20          Q.    Okay.  Other than what is disclosed
21      here under Topic 1 in this e-mail, which the
22      plaintiffs' counsel wrote regarding your

1       portions of those documents into the record,

2       you're not going to read portions of the

3       certificates of designation into the record,

4       but -- but you are effectively going to read or

5       recite what the plaintiffs' counsel have

6       written here about certain terms of the

7       certificates, right?

8            A.   Yes, I'm going to discuss certain

9       terms of the certificates.

10           Q.   Okay.  And -- and you're going to

11      explain those terms of the certificates, which

12      the plaintiffs' counsel identified, and you're

13      going to explain them in the manner in which

14      they are described here in the July 29th

15      e-mail, right?

16                MR. BARRY:  Objection.

17                THE WITNESS:  Yes.

18                A summary of what the terms are,

19      certain terms.

20                BY MR. JONES:

21           Q.   Okay.  You're going to provide what

22      you describe as a summary of certain terms, the

Page 108

1    underlying and I looked at the underlying

2    documentation to confirm dates of each of these

3    events.

4          Q.    Okay.  So other than looking at

5    underlying documentation for each event to

6    confirm the date in order to put them in

7    chronological order, this timeline is not

8    otherwise a summary of any other document or

9    source?

10          A.    Other than what it shows to be,

11    which is the timeline of certain events.

12          Q.    Okay.  It is just a chronological

13    timeline of events that were selected by the

14    plaintiffs' counsel without any input from you?

15          A.    Correct.

16          Q.    Okay.  Do you know who wrote the

17    description of each event in this -- in this

18    timeline graphic?

19          A.    I do not know the answer to that.

20          Q.    Okay.  Possible that your staff were

21    involved?

22          A.    Yes.

Page 110

1    Amendment" and "Executed," and then there is a

2    separate entry for:  "Third Amendment's Net

3    Worth Sweep Takes Effect."

4              Do you see that?

5         A.   Yes.

6         Q.   Okay.  Are there any events that you

7    considered, you or your staff considered

8    including in this timeline but ultimately did

9    not include?

10        A.   No.

11        Q.   Okay.  You and your staff just

12   didn't have any input at all on what particular

13   events either are or are not included on this

14   timeline, right?

15             These events were just given to you

16   and you found their dates and included them,

17   right?

18        A.   Correct.

19        Q.   This timeline doesn't include

20   anything about the periodic commitment fee or

21   the PCF under the PSPAs; is that right?

22        A.   Yes.

1          description that the plaintiffs wrote -- the

2          plaintiffs' counsel wrote of your testimony on

3          that topic, right?

4                A.     Yes.

5                Q.     Okay.  Have you -- have you read

6          this description written by the plaintiffs'

7          counsel of your testimony about the PSPAs and

8          the various amendments before?

9                A.     Yes, I have.

10               Q.     Was that about a month ago when you

11         -- when you first received this -- this list?

12               A.     Yes, I have read them several times.

13               Q.     Okay.  This topic, just testifying

14         about the PSPAs and the various amendments to

15         them, it doesn't involve any calculation or

16         computation, right?  It doesn't involve any

17         data?

18               A.     Correct.

19               Q.     Okay.  These are just shareholder

20         agreements between treasury and each of -- of

21         Fannie and Freddie and various amendments to

22         those shareholder agreements and you have read

Page 117

1      them and you are going to effectively

2      paraphrase them in your testimony; is that

3      right?

4           A.    That's correct.

5           Q.    Sorry, I didn't hear.

6           A.    Sorry.  That's correct.

7           Q.    Okay.  You have read the PSPAs and

8      all of the amendments; is that right?

9           A.    Yes.

10          Q.    Okay.  So for each agreement, for

11     each PSPA and each amendment, there is one for

12     Fannie and one for Freddie, right?

13          A.    Yes.

14          Q.    Okay.  And for each agreement and

15     each amendment, the Fannie version and the

16     Freddie version are virtually substantively

17     identical other than just changing their names,

18     right?

19               MR. BARRY:  Objection.  Lacks

20     foundation.  It's also not correct.

21               THE WITNESS:  Yes, except for one

22     letter agreement, I believe changes the capital

Page 121

1           A.    That's right.

2           Q.    Okay.  Am I correct in understanding

3     that your explanation of those terms, those

4     specific agreement or amendment terms that the

5     plaintiffs' counsel asked you to specifically

6     highlight, your descriptions of them, your

7     paraphrasing of them will be consistent with

8     what the plaintiffs' counsel have written here

9     about them, right?

10          A.    Yes.

11          Q.    In -- in paraphrasing -- well,

12    strike that.

13                In focusing on certain terms of the

14    PSPAs and amendments that the plaintiffs'

15    counsel direct you to and paraphrasing those

16    specific terms in your testimony, are you

17    relying on any specialized training or

18    knowledge or expertise or education or

19    familiarity with these types of documents?

20          A.    No.

21          Q.    Okay.  Any -- any layperson could do

22    this, could just be handed these documents,

1       wrote that you will offer into evidence the

2       Form 8-K filed by Freddie Mac on September 11,

3       2008, and will read certain portions into the

4       record?

5            A.    Yes.

6            Q.    Okay.  So this is one of the

7       documents that we talked about earlier where

8       you were just going to offer this document into

9       evidence and read certain portions of it that

10      the plaintiffs' counsel direct into the record,

11      right?

12           A.    Correct.

13           Q.    And you are not going to offer any

14      other testimony about this document?

15           A.    Correct.

16           Q.    Okay.  Have you -- have you received

17      a copy of this document before?

18           A.    Yes.

19           Q.    Did you read it?

20           A.    I -- that one may be -- I think I

21      received that recently.  I have not read it

22      yet.

Page 213

1      will offer into evidence 12 U.S.C. Section 4617
2      and will read into the record the following
3      subsections of that statute:  (A)(1) and (2)
4      and (b)(1), (b)(2)(A) through (D), (G), and
5      (H).
6                  Did I read that correctly?
7          A.    Yes.
8          Q.    Okay.  What is 12 U.S.C. Section
9      4617 in your understanding?
10         A.    I do not know.
11         Q.    Okay.  Do you know what U.S.C.
12     stands for?
13         A.    United States Supreme Court?
14         Q.    No.
15         A.    Oh.
16         Q.    It stands for United States Code.
17     That -- so the -- the thing that you are going
18     to testify about here at trial in a couple of
19     months is a -- is a federal statute.  It's 12
20     U.S. Code Section 4617.  It's a part of the
21     Housing and Economic Recovery Act of 2008.
22                  Were you familiar with that before

Page 251

1          compares Fannie and Freddie's year-over-year

2          comprehensive income for Q1 and Q2 2012

3          compared to the same quarters in 2011?

4               A.    It's more -- sorry -- 2008 through

5          2012 and then 2013 going forward comparing that

6          comprehensive -- comprehensive income of which

7          those quarters would be a subset.

8               Q.    Okay.  So the -- you would -- you

9          are saying that from that graphic it would

10         include the figures that would allow you to

11         draw the comparison that is described here, the

12         year-over-year comparison between Q1 and Q2

13         2012 versus 2011?

14              A.    It's -- the way it's presented in

15         the graphic is broader than that.  It's years

16         2008 through 2012 and then 2013 to the present,

17         but that encompasses these quarters we're

18         talking about.  But it doesn't directly compare

19         them the way this paragraph does.

20              Q.    Okay.  Do you know anything about

21         why plaintiffs want you to compare the

22         year-over-year comprehensive income for Fannie

Page 252

1        and Freddie specifically in the first and

2        second quarters of 2012 compared to 2011?

3                    MR. BARRY:  Objection.  Beyond the

4        scope of her testimony as a summary witness.

5                    THE WITNESS:  I do not know.

6                    BY MR. JONES:

7            Q.    Okay.  They didn't tell you, and you

8        didn't ask?

9            A.    That's correct.

10           Q.    Okay.  Were you -- were you asked to

11       do any other specific comparisons of

12       comprehensive income in any other quarters of

13       any other years besides the first two quarters

14       of 2012 compared to 2011?

15           A.    Not specific quarters over quarters,

16       but as I said, they are encompassed in the

17       broader graphs we put together about

18       comprehensive income from 2008 through 2012

19       versus 2013 though present.

20           Q.    Okay.  The next two paragraphs there

21       in Exhibit 1 identify two more documents that

22       they say plaintiffs' counsel wrote you are

Page 258

```
 1          Q.    So you see here there's a section

 2    starting around the middle of the page that's

 3    labeled "Dividend Obligation on the Senior

 4    Preferred Stock"?

 5          A.    Yes.

 6          Q.    And you understand that refers to

 7    the Freddie Mac, the senior preferred stock

 8    issued to the Treasury Department?

 9          A.    Yes.

10          Q.    Okay.  And the --

11          MR. BARRY:  First, objection to the

12    extent because this exceeds her scope of her

13    testimony as a summary witness.  We didn't

14    designate this for her to read -- read into the

15    record.

16          BY MR. JONES:

17          Q.    The second paragraph there says "The

18    payment of dividends on our," that is Freddie

19    Mac's, "senior preferred stock in cash reduces

20    our net worth."

21          And that's -- that's consistent with

22    your understanding, right, Ms. Hartman?
```

Page 279

1            MR. BARRY:  I just want to clarify

2       that's -- we're not hiding the ball on that

3       one.

4            MR. JONES:  Got it.  Yeah, we got --

5       we got the graphics last week.

6            BY MR. JONES:

7       Q.    I gather plaintiffs' counsel just

8       told you that they want you to introduce this

9       index into evidence and provide some testimony

10      about it?

11      A.    Yes.

12      Q.    Did -- did they tell you anything

13      about why they want that?

14      A.    No.

15      Q.    Okay.  So after they asked you to go

16      -- after they -- after they told you about the

17      existence of this home price index, which you

18      had never heard of before, and asked you to --

19      they asked you to go do some analysis about it

20      and create some graphics; is that right?

21      A.    They introduced us -- us to it and

22      someone from my team pulled the graphic

Page 280

1          directly from the Case-Shiller website.

2               Q.   So the -- the graphics that you

3          produced us to us --

4                    MR. JONES:  Can we just pull those

5          up.

6                    BY MR. JONES:

7               Q.   Are your graphics relating to the

8          home price index pulled directly from the

9          website you -- that is, you didn't create them?

10              A.   Exactly.

11              Q.   Okay.

12                   MR. JONES:  Can we just flip to

13         those.

14                   BY MR. JONES:

15              Q.   Okay.  So this is one of your

16         graphics.  This is Exhibit 3 to the deposition,

17         one of your graphics about the Case-Shiller

18         index; is that right?

19              A.   Correct.

20              Q.   And then can we scroll down.

21                   This is another one?

22              A.   Yes.

Page 281

1          Q.    Are those the only two?

2          A.    Yes.

3          Q.    And these -- these graphics, do I

4     understand correctly you and your team did not

5     create these?  All you did was download them

6     or -- or screen shot them from a website and

7     embed them in your list of graphics here?

8          A.    Yes.

9                But on the website you can put in a

10    date range.  So once you put in the date range

11    the -- the graphic shows up and you can pull it

12    into and that's what we did.

13         Q.    So all you did was plug in a date

14    range to this website and the website then

15    produced this exact graphic, which you have

16    just embedded in your graphics?

17         A.    Correct.

18         Q.    Okay.  So you didn't -- you did not

19    alter it or manipulate it or summarize it in

20    any way.  You just took this graph -- this

21    graphic exactly as the website gave it to you

22    once you put in the date range, and that's what

1         we're looking at now?

2              A.    Correct.

3              Q.    And that's the same for both of

4         these?

5              A.    Yes, just different date ranges.

6              Q.    Okay.  Before this case, had you

7         ever encountered or done any work relating to

8         any other home price index besides the

9         S&P/Case-Shiller?

10             A.    No.

11             Q.    Okay.  So all of your exposure to

12        and familiarity with home price indexes, both

13        this one specifically and all of them

14        generally, is exclusively from your work on

15        this case for the plaintiffs in the last few

16        months, right?

17             A.    Yeah, this is -- my knowledge of

18        this index is the website and pulling these two

19        graphs directly from that website.

20             Q.    Okay.  Does the website allow you to

21        pull different graphs that would show different

22        things other than these two?

Page 283

```
 1          A.    You can change the dates and you can
 2      change whether it's run annually, monthly,
 3      biannually.  I don't know much more than that
 4      about how you can change the fields.
 5          Q.    Did -- did you actually do the work
 6      of sort of inserting the parameters into the
 7      website that produced --
 8              MR. BARRY:  Objection.
 9              THE WITNESS:  I personally did not,
10      but I looked at it with my team.
11              BY MR. JONES:
12          Q.    Okay.  But your understanding is
13      that you could insert different parameters,
14      both different date ranges and also other
15      different parameters and the website would
16      produce for you different graphs; is that
17      right?
18          A.    But they've use the same underlying
19      data.  But depending on date ranges or how you
20      want it calculated, it would look differently.
21          Q.    Okay.  And so these charts, these
22      graphs that appear in your graphics here are
```

Page 284

1     based on the date range parameter and some

2     other parameters that you and your team plugged

3     into the website?

4          A.    No, I believe these both were

5     calculated monthly.

6          Q.    Okay.  Who made the decision about

7     which date range and other parameters to plug

8     into the Case-Shiller index website to produce

9     these graphs?

10          A.    I believe it was plaintiffs'

11     counsel.

12          Q.    Okay.  Did -- did your team actually

13     do this and create these, or did the

14     plaintiffs' counsel create them or just

15     specifically directly how -- to direct you-all

16     how to create them?

17          A.    No, my team created them on the

18     Case-Shiller website.

19          Q.    Okay.  Your team created these

20     graphs on the Case-Shiller website using date

21     range and other para- -- other parameters that

22     were directed to you by the plaintiffs'

Page 285

1      counsel?

2           A.    Yes.

3           Q.    Okay.  Other than what you mentioned

4      earlier about what this home price index is,

5      what else do you plan to tell the jury about

6      these graphics or otherwise about the

7      Case-Shiller index?

8           A.    Just -- like, we just talked about

9      what it is and if asked about what this trend

10     shows.

11          Q.    Okay.  If -- if asked what this

12     trend shows, what would your testimony be?

13          A.    That beginning in 2007, it's up

14     above 180, it dips down below to -- be -- right

15     below 140 in 2012 and then gradually increases

16     into 2022 to above where it was in 2007.

17          Q.    Okay.  Would it also be fair to say

18     that as of early 2012, it -- the trend had been

19     consistently downward since the beginning of

20     your date range parameter here?

21          A.    Yes.

22          Q.    Had been -- it would be fair to say

Page 297

1            A.    No, I'm -- it's a graph.

2            Q.    One of the graphics?

3            A.    Yes.

4            Q.    Okay.

5                  MR. JONES:  All right.  I have no

6       more questions.  Thank you for your time this

7       afternoon.

8                    THE WITNESS:  Thank you.

9                    MR. BARRY:  This deposition is

10      concluded.  Thank you.

11                   THE VIDEOGRAPHER:  The time is 3:27

12      p.m.

13                   We're off the record.

14                   (Whereupon, the proceeding was

15      concluded at 3:27 p.m.)

16

17

18

19

20

21

22