# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| FAIRHOLME FUNDS, INC., *et al*., | |
| Plaintiffs, | |
| v. | Civil No. 13-1053 (RCL) |
| FEDERAL HOUSING FINANCE AGENCY, *et al.*, | |
| Defendants. | |
| In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations | |
| _____ | Miscellaneous No. 13-1288 (RCL) |
| This document relates to: ALL CASES | |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' OMNIBUS MOTION IN LIMINE

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................... 1

ARGUMENT ............................................................................................................................. 2

I.      Opposition to Motion In Limine No. 1: Shareholder Reasonable Expectations
        Are Relevant Under a Two-Prong Test, and Are Informed by the Total Mix
        of Information Available to Shareholders in August 2012 ............................................. 2

        A.      The Applicable "Time of Contracting" Is Near the Execution
                of the Third Amendment in August 2012 ............................................................. 4

        B.      Plaintiffs Misstate the Elements of an Implied Covenant Claim ......................... 8

                1.      The Implied Covenant Is a Two-Prong Inquiry ....................................... 8

                2.      The Inquiry into Shareholders' Reasonable Expectations Considers
                        Only Information Available to Shareholders, Whereas the Inquiry
                        into Arbitrariness or Unreasonableness Also Considers Non-Public
                        Information Known to FHFA at the Time of the Third Amendment ....... 14

        C.      The Reasonable Expectations of Shareholders Are Informed by the
                "Total Mix" of Information Available to Shareholders ....................................... 15

II.     Opposition to Motion In Limine No. 2: Security Analyst Reports are
        Admissible For Multiple Non-Hearsay Purposes ......................................................... 22

        A.      Analyst Reports Are Not Hearsay ...................................................................... 23

        B.      Analyst Reports Are Not Improper Lay Opinion Testimony .............................. 24

        C.      Analyst Reports Are Relevant to Determining Whether the Third
                Amendment Violated Shareholders' Reasonable Expectations
                at the Time of Contracting ................................................................................. 24

        D.      Analyst Reports Are Relevant to Determining Whether
                the Third Amendment Was Arbitrary or Unreasonable ....................................... 27

        E.      Any Concerns About How the Jury Will Use the Analyst Reports
                Is Easily Resolved With an Appropriate Limiting Instruction ............................ 30

III.    Opposition to Motion In Limine No. 3: Defendants Do Not Intend to
        Affirmatively Present Evidence Or Argument Regarding Dismissed
        Claims or Court Decisions Other than *Collins*, Which Is Squarely Relevant ................ 30

IV.     Opposition to Motion In Limine No. 4: Defendants Do Not Intend to Present
        Affirmative Evidence or Argument that Any Plaintiffs or Class Members
        Purchased Their Stock After August 17, 2012, or that Shareholders Who
        Bought After the Third Amendment Would Receive a Windfall ..................................... 31

V.    Opposition to Motion in Limine No. 5: Plaintiffs' Attempt to
      Cherry-Pick Subjective Expectations Evidence by Excluding
      Mr. Berkowitz's Testimony Lacks Merit.............................................................. 33

            1.    Shareholder Testimony Regarding Personal
                  Expectations Is Irrelevant .......................................................... 34

            2.    If the Court Permits Plaintiffs' Representatives to Testify
                  Regarding Their Personal Expectations, the Court Should
                  Permit Defendants to Present the Testimony of Mr. Berkowitz
                  to Avoid Unfair Prejudice ............................................................ 37

VI.   Motion In Limine No. 6: Defendants May Present Evidence and Argument
      Concerning the Makeup of the Class in Appropriate Circumstances. ............................ 40

CONCLUSION.............................................................................................................. 41

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Baker v. SeaWorld Ent., Inc.*,
    423 F. Supp. 3d 878 (S.D. Cal. 2019) ...................................................................29

*Barnes v. District of Columbia*,
    278 F.R.D. 14 (D.D.C. 2011) ................................................................................36

*In re Bristol Myers Squibb Co. Sec. Litig.*,
    586 F.Supp.2d 148 (S.D.N.Y. 2008) ....................................................................26

*California Pub. Employees' Ret. Sys. v. Chubb Corp.*,
    No. CIV. NO. 00-4285, 2002 WL 33934282 (D.N.J. June 26, 2002) ...................21

*Carrow v. Slaughter*,
    No. CIVAU408-05-062, 2010 WL 5550679 (Del. C. P. Dec. 2, 2010) ................14

*In re Chase Bank USA, N.A. CHECK LOAN Cont. Litig.*,
    274 F.R.D. 286 (N.D. Cal. 2011) ........................................................9, 13, 14, 27

*Chrysler Corp. v. Brown*,
    441 U.S. 281 (1979) ................................................................................................6

*Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*,
    708 A.2d 989 (Del. 1998) .....................................................................................21

*Collins v. Yellen*,
    141 S. Ct. 1761 (2021) ................................................................................2, 30, 31

*DeMarco v. Robertson Stephens*,
    318 F.Supp.2d 110 (S.D.N.Y. 2004) ....................................................................26

*Deposit Guar. Nat. Bank. v. Roper*,
    445 U.S. 326 (1980) ..............................................................................................34

*Dunkin' Donuts Inc. v. Romanias*,
    No. 00-cv-1886, 2002 WL 32955492 (W.D. Pa. May 29, 2002) ..........................33

*Dunlap v. State Farm Fire & Cas. Co.*,
    878 A.2d 434 (Del. 2005) .....................................................................................12

*Fairholme Funds, Inc. v. FHFA*,
    No. CV 13-1053 (RCL), 2018 WL 4680197 (D.D.C. Sept. 28, 2018)........................... *passim*

iv

*Grae v. Corr. Corp. of Am.*,
  No. 3:16-CV-2267, 2021 WL 1100431 (M.D. Tenn. Mar. 17, 2021) ..............................28, 30

*Greenhouse v. MCG Cap. Corp.*,
  392 F.3d 650 (4th Cir. 2004) ..................................................................................................25

*GWO Litig. Trust v. Sprint Solutions, Inc.*,
  No. CV N17C-06-356 PRW, 2018 WL 5309477 (Del. Super. Ct. Oct. 25, 2018) ..................................................................................................................................20

*Harvey Prop. Mgt. Co., Inc. v. The Travelers Indem. Co.*,
  No. 2:12-cv-1536, 2016 WL 8199740 (D. Ariz. May 12, 2016)...........................................33

*In re ICN/Viratek Sec. Litig.*,
  No. 87 CIV 4296, 1996 WL 34448146 (S.D.N.Y. July 15, 1996) .........................................36

*Kapps v. Torch Offshore, Inc.*,
  379 F.3d 207 (5th Cir. 2004) ..................................................................................................21

*Low v. Trump Univ., LLC*,
  No. 3:10-cv-940, 2016 WL 6732110 (S.D. Cal. Nov. 15, 2016)......................................36, 39

*Mathews v. Kidder, Peabody & Co.*,
  260 F.3d 239 (3d Cir. 2001)....................................................................................................21

*Miller v. HCP & Co.*,
  No. CV 2017-0291-SG, 2018 WL 656378 (Del. Ch. Feb. 1, 2018) .......................................14

*Miller v. HCP Trumpet Invs., LLC*,
  No. 107, 2018, 2018 WL 4600818 (Del. Sept. 20, 2018) .......................................................14

*Nemec v. Shrader*,
  991 A.2d 1120 (Del. 2010) .......................................................................................... *passim*

*Perez v. Mortg. Bankers Ass'n*,
  575 U.S. 92 (2015)......................................................................................................................6

*Perry Cap. LLC v. Mnuchin*,
  864 F.3d 591 (D.C. Cir. 2017) ..................................................................................... *passim*

*In re Prempro Prod. Liab. Litig.*,
  No. 4:03cv1507, 2007 WL 3217470 (E.D. Ark. Oct. 26, 2007)............................................33

*Quaak v. Dexia, S.A.*,
  445 F. Supp. 2d 130 (D. Mass. 2006) ....................................................................................26

*Rodriguez v. SGLC Inc.*,
  No. 2:08-CV-01971, 2013 WL 6844549 (E.D. Cal. Dec. 24, 2013) ......................................37

*Roussell et al. v. Brinker International Inc.*,
  No. H-05-3733, 2009 WL 595978 (S.D. Tex. Mar. 6, 2009) ...........................................37, 38

*Smith v. Circuit City Stores, Inc.*,
  286 F.Supp.2d 707 (E.D. Va. 2003) .........................................................................................21

*Smith v. Riverwalk Ent. LLC*,
  No. CIV.A.05-1416, 2008 WL 5136055 (W.D. La. Aug. 21, 2008).......................................33

*STAAR Surgical Co. v. Waggoner*,
  588 A.2d 1130 (Del. 1991) .......................................................................................................5

*In re Trex Co., Inc. Sec. Litig.*,
  454 F. Supp. 2d 560 (W.D. Va. 2006) .....................................................................................21

*\*TWA Res. v. Complete Prod. Servs., Inc.*,
  No. CIV.A. N11C-08100 (MMJ), 2013 WL 1304457 (Del. Super. Ct. Mar. 28,
  2013) ................................................................................................................................ *passim*

*TWA Res. v. Complete Prod. Servs., Inc.*,
  No. CV N11C-08-100 MMJ, 2013 WL 4045920 (Del. Super. Ct. July 30,
  2013) ..........................................................................................................................12, 13, 27

*United Paperworkers Int'l Union v. Int'l Paper Co.*,
  985 F.2d 1190 (2d Cir. 1993)..........................................................................................16, 21

*United States Sec. & Exch. Comm'n v. ITT Educ. Servs., Inc.*,
  No. 115CV00758JMSMJD, 2018 WL 3008632 (S.D. Ind. June 15, 2018) ....................29, 30

*In re Vivendi Universal, S.A. Sec. Litig.*,
  765 F. Supp.2d 512 (S.D.N.Y. 2011)......................................................................................39

*Whirlpool Fin. Corp. v. GN Holdings, Inc.*,
  67 F.3d 605 (7th Cir. 1995) ....................................................................................................21

*Whole Foods Mkt. Grp., Inc. v. Wical Ltd. P'ship*,
  No. 1:17-CV-01079-RCL, 2019 WL 6910168 (D.D.C. Oct. 22, 2019) ..................................23

**Statutes**

12 U.S.C. § 1455......................................................................................................................8

12 U.S.C. § 1719......................................................................................................................8

12 U.S.C. § 4511(b)(2) .............................................................................................................6

12 U.S.C. § 4526......................................................................................................................6

8 Del. Code Ann. § 104 ...........................................................................................................5

8 Del. Code Ann. § 151(g) ............................................................................................5

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-
    203, § 1304, 124 Stat 1376, 2134 ...........................................................................8

**Regulations**

12 C.F.R. § 1236.1 ........................................................................................................7

12 C.F.R. § 1236.4 ........................................................................................................8

12 C.F.R. § 1236.5 ......................................................................................................7, 8

76 Fed. Reg. 35724 (June 20, 2011) (effective July 20, 2011) (to be codified at 12
    C.F.R. §§ 1229, 1237 (§ 1237.12)) ..........................................................................8

77 Fed. Reg. 33950–64 (June 8, 2012) (effective August 7, 2012) (to be codified
    at 12 C.F.R. § 1236) ................................................................................................6

**Rules**

Fed. R. Evid. 402 .......................................................................................................33

Fed. R. Evid. 403 ....................................................................................................30, 33

Fed. R. Evid. 801(c) ...................................................................................................23

## PRELIMINARY STATEMENT

All six of Plaintiffs' motions in limine should be denied.

*First*, Plaintiffs seek to exclude various forms of evidence and argument regarding shareholder expectations on the theory that they are contrary to the applicable legal standards. (MIL #1).  But, in doing so, Plaintiffs misstate those standards in every relevant respect: Plaintiffs' implied covenant claim has two elements, requiring them to prove both that the Third Amendment was arbitrary or unreasonable *and* that it violated shareholders' reasonable expectations; the applicable "time of contracting" for purposes of evaluating shareholders' reasonable expectations is near the execution of the Third Amendment in August 2012; and the reasonable expectations of shareholders are informed by all public information available to shareholders at the time of contracting, and not just by information that itself constitutes a change in the shareholder contract.  Under these correct legal standards, Plaintiffs' first motion in limine should be denied.

*Second*, Plaintiffs seek to preclude Defendants from introducing into evidence, except through experts, any market-analyst reports, including pre-Third Amendment analyst reports that expressed concern about the erosion of the Treasury commitment.  (MIL #2).  Contrary to Plaintiffs' arguments, the analyst reports are not hearsay because they are not offered for their truth; rather, they are offered as evidence of both the reasonable expectations of shareholders and whether FHFA acted reasonably in agreeing to the Third Amendment.  Nor do they constitute improper lay opinion.  In any case, any concern about the jury's use of the reports can be resolved with an appropriate limiting instruction.

*Third*, Plaintiffs seek to exclude the testimony of Bruce Berkowitz on the ground that his testimony is irrelevant.  (MIL #5).  Defendants agree.  Defendants designated Mr. Berkowitz's

deposition testimony conditionally, in the event the Court denies Defendants' pending motion in limine to exclude all shareholder testimony regarding shareholder expectations, in which case Mr. Berkowitz's testimony would be equally relevant to that of the Class representative shareholders. Further, in those circumstances, Mr. Berkowitz's testimony would be important to prevent juror confusion regarding the makeup of the Class. As Plaintiffs state, the Class "consist[s] of investors large and small, institutions and individuals, wealthy and not wealthy, sophisticated (however defined) and unsophisticated." Pls. Omnibus Motion in Limine ("Mot.") 25. Mr. Berkowitz's testimony would be relevant because it would help the jury understand this very point by presenting a balanced perspective of the types of shareholders in the Classes.

*Fourth*, Plaintiffs seek to preclude Defendants from presenting evidence or argument on a variety of issues for which Defendants do not intend to affirmatively present evidence or argument, with the exception that Defendants may choose to affirmatively present evidence related to the Supreme Court's decision in *Collins v. Yellen*, 141 S. Ct. 1761 (2021). (MIL ## 3, 4, 6). As explained further below, Defendants reserve the right to present such evidence or argument in rebuttal to Plaintiffs' presentation, or if Plaintiffs otherwise open the door to doing so.

## ARGUMENT

**I.     Opposition to Motion In Limine No. 1: Shareholder Reasonable Expectations Are Relevant Under a Two-Prong Test, and Are Informed by the Total Mix of Information Available to Shareholders in August 2012**

Plaintiffs' first motion in limine rests on a fundamental mischaracterization of the legal standards applicable to their claim for breach of the implied covenant of good faith and fair dealing. Their positions on the applicable legal standards are inconsistent with the D.C. Circuit's 2017 decision in this case, this Court's 2018 decision on Defendants' motion to dismiss, and the

relevant state laws on which the claim is based.  Plaintiffs' positions also make little practical sense and would lead to absurd results.

To prevail on their implied covenant claim, Plaintiffs must prove two elements.  First, Plaintiffs must prove that the Third Amendment violated shareholders' "reasonable expectations" at "the time of contracting."  *See Perry Cap. LLC v. Mnuchin* ("*Perry II*"), 864 F.3d 591, 631 (D.C. Cir. 2017) (describing the "correct legal standard" as "whether the Third Amendment violated the reasonable expectations of the parties"); *Fairholme Funds, Inc. v. FHFA*, No. CV 13-1053 (RCL), 2018 WL 4680197, at *8 (D.D.C. Sept. 28, 2018) ("the determinative factor for the implied covenant claims is the reasonable expectations of the parties at the time of contracting").  Because their claim is that the Third Amendment deprived them of dividends, Plaintiffs must prove, among other things, that it was not within shareholders' reasonable expectations at the time of contracting that Fannie Mae and Freddie Mac would pay no dividends in the foreseeable future.  This element requires an evaluation of the basis for shareholder expectations at the time of contracting, which includes the terms of the shareholder contract itself as well as publicly available information in the marketplace at that time.  *See Perry II*, 864 F.3d at 631 (directing the district court to consider, *inter alia*, HERA, the PSPAs, and "pertinent statements by the FHFA" at the time of contracting); *Fairholme*, 2018 WL 4680197, at *9, *12 (considering the same factors and others, including "the events surrounding the placement of the GSEs into conservatorship" and "the nature of the GSEs as highly regulated entities").

Second, Plaintiffs must prove that FHFA as Conservator acted arbitrarily or unreasonably by entering into the Third Amendment on behalf of Fannie Mae and Freddie Mac.  *See Fairholme*, 2018 WL 4680197, at *13 ("The question is whether Defendants exercised their

discretion arbitrarily or unreasonably in a way that frustrated Plaintiffs' expectations under the contract."). If FHFA's conduct as Conservator was consistent with the law or the shareholder contract, including the terms of HERA, then that conduct was not arbitrary or unreasonable. *See id*. at *9 (holding that "corporate conduct consistent with the law or the amended shareholder contract is not arbitrary or unreasonable behavior, such that it would give rise to an implied covenant claim").

The Parties' disagreements regarding the relevant legal standards boil down to three issues: (1) what is the applicable "time of contracting" for purposes of defining shareholders' reasonable expectations, (2) what kinds of information and evidence are appropriate for determining the reasonable expectations of a hypothetical reasonable shareholder at that time, and (3) whether the inquiry into shareholders' reasonable expectations implicates any expectation other than a singular expectation that FHFA, as Conservator, would not act arbitrarily or unreasonably. As explained below, Plaintiffs are on the wrong side of the law on all three issues. Their first motion in limine should be denied.

## A.    The Applicable "Time of Contracting" Is Near the Execution of the Third Amendment in August 2012

Plaintiffs argue that the Court should exclude any evidence or argument about what happened in the first four years of the conservatorships, from September 2008 to August 2012. *See* Mot. 7–12. This is because, according to Plaintiffs, the applicable "time of contracting" is either the date the conservatorships were instituted (September 6, 2008), *id.* at 6, or "at the latest," the date of the Second Amendment to the PSPAs (December 24, 2009). *Id*. at 12. Plaintiffs contend that the shareholder contracts remained static after 2009, and thus shareholders' reasonable expectations could not be affected by any developments or circumstances in the years leading up to the Third Amendment. That is incorrect. Evidence of

4

the circumstances surrounding the Enterprises between 2009 and August 2012 is highly relevant to the issue of shareholder expectations because the time of contracting in this case is near the execution of the Third Amendment—it is *not* fixed as of December 24, 2009.[1]

      As this Court has recognized, "investor contracts are, by design, flexible and subject to change," and shareholder contract rights "do not rest upon an unchangeable base." *Fairholme*, 2018 WL 4680197, at *9 (citations omitted).  Thus, "[f]or an investor contract, the time of contracting for the purposes of the implied covenant inquiry must be the time of the most recent change in contract—whether by amendment or change in law." *Id*.  Plaintiffs are correct that the Second Amendment was *a change* to the contract; it just was not *the most recent change* prior to the Third Amendment.[2]  Plaintiffs' argument overlooks the fact that there were several "change[s] in contract" after 2009, including one near the execution of the Third Amendment in August 2012.

---

[1]     In granting Plaintiffs' unopposed motion for class certification, the Court referred to its 2018 decision on the motion to dismiss as identifying "the date of the Recovery Act's enactment and FHFA's appointment as conservator as the barometer to evaluate the parties' reasonable expectations."  ECF No. 138 at 16 (in No. 1:13-MC-1288).  While those events did impact shareholder expectations, this Court's 2018 decision did not hold that either of those events constitutes the most recent "time of contracting" before the Third Amendment.  The Court also gave no indication that it intended to make such a finding in the context of the unopposed class certification motion, in which this issue was not briefed.  Moreover, it would not be feasible for both events to constitute the "time of contracting," as they occurred five weeks apart, on July 31, 2008, and September 6, 2008, respectively.  In addition, the PSPAs and the certificates of designation for Treasury's Senior Preferred Shares, which also had a major impact on shareholder expectations, were not executed until September 7, 2008.  Finally, as described in the text, even Plaintiffs acknowledge that the time of contracting is at least as late as December 24, 2009.

[2]     Under settled law, when a corporation issues new shares or amends the terms of existing shares, it "amends the certificate of incorporation and fundamentally alters the contract *between all of the parties*." *STAAR Surgical Co. v. Waggoner*, 588 A.2d 1130, 1136 (Del. 1991) (emphasis added) (citing 8 Del. Code Ann. §§ 104, 151(g)).

As this Court has explained, "an investor's contract with the corporation includes . . . the corporate laws under which the corporation is formed and regulated." *Fairholme*, 2018 WL 4680197, at *8. The shareholder contract is therefore amended by "changes in the law affecting the nature of the corporation, its governance, and its relationship with shareholders." *Id.* And key here, Fannie Mae and Freddie Mac "were chartered by Congress and [are] subject to extensive federal regulation," which "may well inform how a shareholder expects the corporation[s] to behave under their contract[s]." *Id.* at *9, *12; *see also Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) ("Rules issued through the notice-and-comment process are often referred to as 'legislative rules' because they have the 'force and effect of law.'") (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302–03 (1979)).[3]

Just ten days before the execution of the Third Amendment, Plaintiffs' shareholder contracts were amended by a federal regulation that took effect on August 7, 2012, that, among other things, prohibited the Enterprises (post-conservatorship) from paying dividends to shareholders in certain circumstances. *See* Prudential Management and Operations Standards, 77 Fed. Reg. 33950–64 (June 8, 2012) (effective August 7, 2012) (to be codified at 12 C.F.R. § 1236). This regulation amended the shareholder contract because it "affect[s] the nature of the corporation, its governance, and its relationship with shareholders." *Fairholme*, 2018 WL 4680197, at *9. The regulation imposes mandatory standards on Fannie Mae and Freddie Mac related to their management, operation, and governance. *See* 12 C.F.R. § 1236.1. It authorizes

---

[3]       Plaintiffs do not contest that a regulation is a type of change in law that can amend the shareholder contract. As this Court has explained, a reasonable shareholder expects that Fannie Mae and Freddie Mac will act in accordance with changes in law. *Fairholme*, 2018 WL 4680197, at *9. And this is true regardless of whether the change in law is made by statute or regulation, as both impose legally binding obligations on the companies. *See* 12 U.S.C. §§ 4511(b)(2), 4526 (authorizing FHFA to issue regulations for Fannie Mae and Freddie Mac).

FHFA to determine if either Fannie Mae or Freddie Mac is out of compliance with a standard and establishes a series of escalating actions FHFA can take to bring the Enterprise back into compliance with that standard. Ultimately, the regulation authorizes FHFA to impose sanctions on the Enterprise for noncompliance. *Id.* § 1236.5. These sanctions can include prohibiting the Enterprise from redeeming or repurchasing capital stock, *prohibiting the Enterprise from paying dividends to shareholders*, prohibiting the Enterprise from increasing its average total assets, or requiring the Enterprise to increase its ratio of core capital to assets. *Id.* § 1236.5(a)(1)–(6).

Plaintiffs assert that this regulation cannot constitute the time of contracting because it purportedly "has nothing to do with the shareholder contracts, and cannot be read to amend them [, and] has nothing to do with any aspect of the shareholder structure for the GSEs." Mot. 12. But that is not the test outlined by this Court in its 2018 opinion. Rather, it is whether a change in law "affect[s] the nature of the corporation, its governance, [or] its relationship with shareholders." *Fairholme*, 2018 WL 4680197, at *9. The regulation at issue plainly does that. Plaintiffs cite no support for their argument that the change in law must be tied to the particular dispute in question in order to constitute the "time of contracting" for purposes of the implied covenant inquiry. In any event, Plaintiffs are simply wrong that this regulation had "nothing to do with the shareholder contracts." Mot. 12. This regulation affected the central issue in this case—the Enterprises' future ability to pay dividends to shareholders. Before this regulation took effect, Fannie Mae's and Freddie Mac's ability to pay dividends did not depend on their compliance with the standards set forth in the regulation. But under the regulation it does. *See* 12 C.F.R. §§ 1236.4–5. A federal regulation that conditions a company's ability to pay

dividends on compliance with particular standards plainly affects that company's relationship with its shareholders.[4]

Accordingly, the applicable "time of contracting" for purposes of evaluating shareholders' reasonable expectations was near the execution of the Third Amendment in August 2012—it was not frozen in time after December 24, 2009.

## B. Plaintiffs Misstate the Elements of an Implied Covenant Claim

### 1. The Implied Covenant Is a Two-Prong Inquiry

The parties also disagree on whether Plaintiffs' implied covenant claim has two elements or only one. The resolution of this issue is critical to assessing when and how public information, as well as non-public information known only to FHFA, is relevant to this case. As discussed in more detail below, the implied covenant claim has two elements and Defendants agree that public information is relevant to both elements. However, non-public information known only to FHFA is relevant only to one of the elements—whether FHFA acted reasonably

---

[4]     Several additional changes in law (both statutory and regulatory) between December 24, 2009, and August 17, 2012, also amended the shareholder contract because they affected the nature of the Enterprises, their governance, and their relationship with shareholders. These changes include, *inter alia*, the Dodd-Frank Wall Street Reform and Consumer Protection Act, which became effective on July 21, 2010, and amended the charters of both Enterprises. *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 1304, 124 Stat 1376, 2134; *Fairholme*, 2018 WL 4680197, at *1, *13 (explaining that 12 U.S.C. §§ 1719, 1455, the two relevant provisions amended by Dodd-Frank, are part of Fannie Mae's and Freddie Mac's charters, respectively). The changes also include an FHFA regulation that became effective on July 20, 2011, which stated that there will be no capital distributions (including dividends) while the Enterprises are in conservatorship, except as authorized by FHFA's Director. *See* Conservatorship and Receivership, 76 Fed. Reg. 35724, at 35736 (June 20, 2011) (effective July 20, 2011) (to be codified at 12 C.F.R. §§ 1229, 1237 (§ 1237.12)). While these changes also amended the shareholder contract and updated the time of contracting well after December 24, 2009, the most recent changes in law before the Third Amendment came just before the execution of the Third Amendment itself in August 2012, as described in the text above.

or arbitrarily—and not to whether the Third Amendment violated shareholders' reasonable expectations.

Citing the Delaware Supreme Court's decision in *Nemec*, this Court has explained that "[c]ourts 'will only imply contract terms when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected.'" *Fairholme*, 2018 WL 4680197, at *7 (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010)).  Courts applying *Nemec* have held this requires a two-prong inquiry: (1) whether the challenged conduct frustrated the reasonable expectations of the parties, and (2) whether the challenged conduct was arbitrary or unreasonable.  *See TWA Res. v. Complete Prod. Servs., Inc.* ("*TWA I*"), No. CIV.A. N11C-08100 (MMJ), 2013 WL 1304457, at *10–11 (Del. Super. Ct. Mar. 28, 2013); *see In re Chase Bank USA, N.A. CHECK LOAN Cont. Litig.*, 274 F.R.D. 286, 290–91 (N.D. Cal. 2011) (evaluating the parties' reasonable expectations and whether the complained-of conduct was arbitrary or unreasonable as separate prongs).  To prevail on their claim, Plaintiffs must satisfy both prongs. *See TWA I*, 2013 WL 1304457, at *11 ("If [Plaintiff] succeeds in demonstrating that its reasonable expectations under the [agreement] have been thwarted, in order to benefit from the implied covenant of good faith and fair dealing, [Plaintiff] next must prove that Defendants have acted arbitrarily or unreasonably." (citing *Nemec*, 991 A.2d at 1126)).

Despite caselaw to the contrary, Plaintiffs contend that their claim has only one element, namely whether the complained-of conduct was arbitrary or unreasonable.  Mot. 14–15.  As support for this view, Plaintiffs cite only the above-quoted line from *Nemec* and then assert, without further citation, that "[t]he case law . . . shows that the inquiry into arbitrariness and expectations is unitary."  *Id.* at 15.  Plaintiffs simply ignore *TWA I* and other cases showing that

the inquiries into arbitrariness and expectations are separate prongs, both of which must be satisfied for them to prevail.

Plaintiffs' unitary test, asking only whether the complained-of conduct was arbitrary or unreasonable, is also inconsistent with the D.C. Circuit's and this Court's articulation of the applicable standard. In *Perry II*, the D.C. Circuit remanded Plaintiffs' implied covenant claim so it could be "evaluate[d] under the correct legal standard, namely, whether the Third Amendment violated the reasonable expectations of the parties." *Perry II*, 864 F.3d at 631. This Court also explained that the implied covenant inquiry "hinges on the parties' 'reasonable expectations at the time of contracting.'" *Fairholme*, 2018 WL 4680197, at *7 (quoting *Nemec*, 991 A.2d at 1126)); *see* Opinion Granting Pls.' Uncontested Mot. for Class Certification, ECF No. 138 at 17 (No. 1:13-mc-1288) (explaining that "whether the Third Amendment violated the implied covenant of good faith and fair dealing" "will require determining whether the Third Amendment violated the reasonable expectations of the parties"). Then, at length, this Court considered how various factual allegations might impact reasonable expectations before concluding that "Plaintiffs plausibly allege that they could not have reasonably expected their right to dividends and liquidation preferences to be extinguished by the Third Amendment." *Fairholme*, 2018 WL 4680197, at *10–14.

If, as Plaintiffs contend, the implied covenant claim inquires only whether FHFA's execution of the Third Amendment was arbitrary or unreasonable, then the Court would have had no reason to address the reasonable expectations of shareholders, what informs those expectations, and how various developments may have affected those expectations. For example, this Court stated that "HERA undoubtedly impacted the Plaintiffs' reasonable expectations," "the highly-regulated nature of [the Enterprises] . . . may well inform how a

10

shareholder expects the corporation to behave under their contract," and that pertinent statements of FHFA are "important to the implied covenant analysis [because] [t]hey inform what Plaintiffs reasonably believed." *Id.* at *12, *14. The Court also repeatedly made clear that its opinion was based upon the allegations being considered under the motion-to-dismiss standard. *See, e.g.*, *id.* at *12 (noting that, "[w]hile some of Defendants' argument [that the language of HERA and the PSPAs demonstrate that Plaintiffs could reasonably expect the Net Worth Sweep] is compelling, none of it permits the Court to grant dismissal of Plaintiffs' implied covenant claims *at this stage*" (emphasis added)); *id.* at *14 (noting that "[m]otions to dismiss pleadings are not favored" before concluding that "*[a]t this stage in the proceedings*, plaintiffs plausibly allege that they could not have reasonably expected their rights to dividends and liquidation preferences to be extinguished by the Third Amendment" (emphasis added)). None of this discussion would make sense if reasonable expectations were not an element of the implied covenant claim that Plaintiffs must prove by the preponderance of the evidence at trial. Indeed, if Plaintiffs' one-prong test were correct, the Court could have focused singularly on whether FHFA's conduct was arbitrary or unreasonable, without even addressing shareholders' expectations. In this regard, the prior pronouncements of both the D.C. Circuit and this Court refute Plaintiffs' assertion that arbitrariness is the singular inquiry.

Plaintiffs' reliance on *Nemec* is also misplaced. Immediately following the sentence Plaintiffs rely on, the Delaware Supreme Court stated that "[w]hen conducting this analysis, *we must assess the parties' reasonable expectations* at the time of contracting and not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal." *Nemec*, 991 A.2d at 1126 (emphasis added). *Nemec* provides no support for Plaintiffs' position that the jury is not to assess, and that Plaintiffs are not required to prove, that

the Third Amendment violated shareholders' reasonable expectations.  To the contrary, it supports Defendants' position.

Plaintiffs' one-prong implied covenant test is also contrary to other decisions applying *Nemec*, which have held that it requires the plaintiffs to prove two distinct prongs.  In *TWA I*, the court expressly held that an implied covenant claim implicates two separate jury questions. *First*, "[i]n order to augment the [contract] through the implied covenant of good faith and fair dealing, [Plaintiff] . . . must prove that Defendants' conduct frustrated the *reasonable expectations of the parties* to the [contract]."  *TWA I*, 2013 WL 1304457, at *10 (emphasis added) (citing *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005)); *see Nemec*, 991 A.2d at 1126 ("we must assess the parties' reasonable expectations at the time of contracting").  As part of this element, "the jury must consider whether this case involves developments that could not have been anticipated, rather than developments that the parties simply failed to consider."[5]  *TWA I*, 2013 WL 1304457, at *10; *Nemec*, 991 A.2d at 1126 ("The implied covenant only applies to developments that could not be anticipated, not developments that the parties simply failed to consider—particularly where the contract authorizes the Company to act exactly as it did here."); *id.* at 1125 (explaining that the implied covenant will infer contractual terms to handle developments or gaps that "*neither* party anticipated" (emphasis added)).

*Second*, "[i]f [Plaintiff] succeeds in demonstrating that the reasonable expectations under the [contract] have been thwarted, in order to benefit from the implied covenant of good faith

---

[5]     *TWA I* places this question within the reasonable expectations prong.  *See TWA I*, 2013 WL 1304457, at *10; *see also TWA Res. v. Complete Prod. Servs., Inc. ("TWA II")*, No. CV N11C-08-100 MMJ, 2013 WL 4045920, at *4 (Del. Super. Ct. July 30, 2013).

12

and fair dealing, [Plaintiff] next must prove that Defendants have acted arbitrarily or unreasonably." *TWA I*, 2013 WL 1304457, at *11 (citing *Nemec*, 991 A.2d at 1126); *see also TWA II* , 2013 WL 4045920, at *6–8 (same).

 *TWA I* and *TWA II* hold that the reasonable expectations of the shareholders and the reasonableness of the challenged conduct are distinct inquiries. The former inquiry focuses on the parties' expectations at time of contracting. *See TWA I*, 2013 WL 1304457, at *9; *TWA II*, 2013 WL 4045920, at *5–8. The latter inquiry examines the challenged conduct and defendant's reasons for it. *See TWA II*, 2013 WL 4045920, at *6–8 (finding that defendants' conduct was arbitrary and unreasonable after considering and rejecting the justifications given by defendants for their actions); *TWA I*, 2013 WL 1304457, at *11. This conceptual distinction may be illustrated by, for example, a scenario wherein two parties have the same reasonable expectations at the time of contracting, but one party's actions in response to unanticipated subsequent events (*e.g.*, a financial crisis or a pandemic) are contrary to those initial expectations but nonetheless reasonable. *See, e.g.*, *TWA I*, 2013 WL 1304457, at *11 (stating that a question of material fact existed on the second-prong regarding whether defendants' actions were reasonable "in response to economic realities").

 The court in *In re Chase Bank USA, N.A. CHECK LOAN Cont. Litig.*—relying on both *Dunlap* and *Nemec*—similarly held that the plaintiffs' implied covenant claim entailed two prongs that included consideration of reasonable expectations at the time of contracting. 274 F.R.D. 286, 290 (N.D. Cal. 2011). *Chase Bank* separately analyzed the two prongs in resolving a motion for class certification, confirming that the prongs are distinct and subject to distinct proof. *See id.* at 290–91. The court first concluded that "the determination of whether Chase's conduct was 'arbitrary or unreasonable,' . . . presents a common issue of both fact and law." *Id.* at 290.

In reaching this conclusion, the court explained that:  (1) "Chase's internal records indicate that each member of the proposed class was subjected to the same discretionary act," and (2) "that Chase made its decision for uniform reasons."  *Id.* at 290.  The court then considered whether the putative class members' reasonable expectations also presented a common issue of law and fact. *Id.* at 290–91; *see also Carrow v. Slaughter*, No. CIVAU408-05-062, 2010 WL 5550679, at *5 (Del. C. P. Dec. 2, 2010) (considering reasonable expectations apart from the arbitrary and unreasonable prong); *Miller v. HCP & Co.*, No. CV 2017-0291-SG, 2018 WL 656378, at *12 (Del. Ch. Feb. 1, 2018), *aff'd sub nom. Miller v. HCP Trumpet Invs., LLC*, No. 107, 2018, 2018 WL 4600818 (Del. Sept. 20, 2018) (Table) (same).

Accordingly, to prevail on their implied covenant claims, Plaintiffs must prove by a preponderance of the evidence *both* that the Third Amendment violated the reasonable expectations of shareholders *and* that FHFA's decision to execute the Third Amendment was arbitrary or unreasonable.

      **2.**      **The Inquiry into Shareholders' Reasonable Expectations Considers Only Information Available to Shareholders, Whereas the Inquiry into Arbitrariness or Unreasonableness Also Considers Non-Public Information Known to FHFA at the Time of the Third Amendment**

Plaintiffs assert that "Defendants also plan to argue to the jury that Plaintiffs' claims must fail unless they can show that the Net Worth Sweep was inconsistent with the publicly available information in August 2012, while ignoring all nonpublic information known to Defendants." Mot. 13.  This misconstrues Defendants' position and builds on the disagreement over whether Plaintiffs' claim has two elements or one.  Defendants' position is straightforward.  First, in determining whether the Third Amendment violated the reasonable expectations of shareholders, the jury should consider only public information that was actually available to shareholders.

Second, in determining whether the Third Amendment was arbitrary or unreasonable—which focuses on FHFA's conduct and the reasons for it—the jury may consider non-public information that was available to FHFA.  Thus, contrary to Plaintiffs' assertion, Defendants do not intend to argue that non-public information known by FHFA at the time of the Third Amendment is irrelevant to Plaintiffs' implied covenant claim— it is relevant, but only as to the second element of the implied covenant claim.

While relevant to the arbitrariness prong of Plaintiffs' implied covenant claim, non-public information unavailable to shareholders is not relevant to determining the objective reasonable expectations of shareholders.  It almost goes without saying that if information was not known by or available to a shareholder, then it could not possibly inform shareholders' reasonable expectations.  This is consistent with the information considered by this Court in evaluating reasonable expectations at the motion-to-dismiss stage.  *See Fairholme*, 2018 WL 4680197, at *10–15.  There is no support for evaluating the reasonable expectations of shareholders based on non-public information that was unavailable to shareholders.

### C.   The Reasonable Expectations of Shareholders Are Informed by the "Total Mix" of Information Available to Shareholders

The Parties' third dispute over the applicable legal standards involves the scope of information that may inform the reasonable expectations of shareholders.

All public information available to shareholders at the time of contracting is relevant to determining the reasonable expectations of shareholders.  This is because all public information available to shareholders can inform what the hypothetical reasonable shareholder knew, believed, and, ultimately, expected.  A reasonable shareholder would not be blind to the world around them, but rather would consider available public information in forming their reasonable expectations.  This standard is logically consistent, easy to administer, and mirrors the "total

mix" standard used in securities fraud cases to determine what a reasonable investor is presumed to be aware of.  *See, e.g.*, *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993) (explaining that a reasonable investor considers the "total mix" of information, which is broadly defined to include "information already in the public domain and facts known or reasonably available to the shareholders" (citation omitted)).

Defendants' position is also consistent with the D.C. Circuit's and this Court's prior decisions, which make clear that the reasonable expectations of a hypothetical reasonable shareholder are informed by a number and variety of sources.  These sources include stock certificates (*i.e.*, certificates of designation), the corporate charter, bylaws, and HERA. *Fairholme*, 2018 WL 4680197, at *8–9.  Reasonable expectations are also informed by federal laws and regulations affecting the governance of the GSEs and their relationship with their shareholders.  *Id.* at *9.  Other sources that inform reasonable expectations include the PSPAs, amendments to the PSPAs, and the stock certificates of other classes of stock in the company. *Id.* at *13–14.  In addition to being informed by these sources, the hypothetical reasonable shareholder also "reasonably expects that the shareholder contract may be amended" and takes into account the fact that Fannie Mae and Freddie Mac "operate as highly regulated corporations" when forming expectations.  *Fairholme,* 2018 WL 4680197, at *9 (examining "the nature of the GSEs as highly regulated entities in determining the reasonable expectations of the parties").

Reasonable expectations are informed by other sources as well.  They are informed by "pertinent statements by the FHFA."  *Id.* at *9; *see also Perry II*, 864 F.3d at 631; Opinion Granting Pls.' Uncontested Mot. for Class Certification, ECF No. 138 at 18 (No. 1:13-mc-1288) (explaining that proof of reasonable expectations includes "the FHFA's public statements").

Further, "the events surrounding the placement of the GSEs into conservatorship" is part of the reasonable expectations analysis. *Fairholme,* 2018 WL 4680197, at *12; *see* Opinion Granting Pls.' Uncontested Mot. for Class Certification, ECF No. 138 at 18 (No. 1:13-mc-1288) (noting, in discussing proof of reasonable expectations, "the circumstances surrounding this dispute" as being susceptible to generalized proof).  All of these sources are among the public information available to shareholders that informs their reasonable expectations.

Furthermore, both the D.C. Circuit and this Court made clear that the sources they identified as informing reasonable expectations were not meant to be exhaustive or exclusive. *See Perry II*, 864 F.3d at 631 (directing the district court to consider, "*inter alia*," three categories of information in evaluating reasonable expectations (emphasis added)); Opinion Granting Pls.' Uncontested Mot. for Class Certification, ECF No. 138 at 18 (No. 1:13-mc-1288) (noting that, in "examining the reasonable expectations of the contracting parties," the proof of those expectations will "include, *but not be limited to*, the Recovery Act's enactment, the FHFA's appointment as conservator, and the FHFA's public statements" (emphasis added)). Other developments and circumstances, beyond those discussed by the D.C. Circuit and this Court, may be relevant to determining shareholders' reasonable expectations.

Plaintiffs advance an unduly narrow view, contending that the reasonable expectations of shareholders can be informed *only* by information that itself constitutes a change in the shareholder contract.  Mot. 11.  That view is incorrect for numerous reasons.  *First*, it is at odds with the D.C. Circuit's and this Court's prior pronouncements, which make clear that reasonable expectations are informed by a number of disparate sources and not just the collection of documents making up the shareholder contracts.  *See, e.g.*, *Fairholme*, 2018 WL 4680197, at *9 (holding that "pertinent statements by the FHFA"—which are not changes to the shareholder

17

contracts—inform shareholders' reasonable expectations); *Perry II*, 864 F.3d at 631 (same).
Indeed, Plaintiffs acknowledge that "statements FHFA made when conservatorship was imposed
in September 2008" inform expectations, before asserting that that "[p]ublic statements of
FHFA" are not "relevant to determining or defining the reasonable contractual expectations of
shareholders."  Mot. 10–11.

     *Second*, "pertinent statements by the FHFA" should include all pertinent public
statements by FHFA.  Plaintiffs opportunistically attempt to limit the holding that "pertinent
statements by the FHFA" inform reasonable expectations to apply only to "statements made
when the conservatorship was imposed in September 2008."  Mot. 10.  But Plaintiffs provide no
basis for inferring such a limitation, and there is none.  This Court and the D.C. Circuit imposed
no such limitation on what they defined as "pertinent statements."  *See Fairholme* 2018 WL
4680197, at *9, *14; *Perry II*, 864 F.3d at 631; Opinion Granting Pls.' Uncontested Mot. for
Class Certification, ECF No. 138 at 18 (No. 1:13-mc-1288).[6]  Nor would Plaintiffs' imagined
temporal limitation make sense.  The statements Plaintiffs wish to present to the jury were made
*after* the Enterprises were placed into conservatorship, *after* the PSPAs were signed, and *after*
the Certificates of Designation for the Treasury shares had been executed.  There is no logical
reason why only statements made in September 2008, but not statements made before the next
contract amendment, would inform shareholder reasonable expectations.  In fact, the statements
made close in time to the Third Amendment or the applicable time of contracting may be the
*most* relevant in informing shareholder reasonable expectations.  Therefore, the category of

---

[6]    Although it is true that the specific statements referenced in the prior opinions occurred in
September 2008, that merely reflects the fact that those were the statements Plaintiffs alleged in
their complaint. *See, e.g.*, Fairholme Am. Compl. ¶¶ 34-35, ECF No. 74 (No. 1:13-cv-01053);
Class Am. Compl ¶¶ 7, 40, ECF No. 71 (No. 1:13-mc-1288).

"pertinent statements of the FHFA" should include *all* pertinent statements of FHFA prior to the time of contracting.

*Third*, reasonable expectations are based not just on statements by FHFA, but upon on other pertinent public statements as well.  It is for the jury to decide what impact the public statements of other entities would have on reasonable expectations.  For example, FHFA as Conservator stepped into the shoes of Fannie and Freddie when it became their conservator, the shareholder contracts are with Fannie and Freddie, and the PSPAs and their Amendments are, therefore, agreements between Treasury and each Enterprise.  *See Fairholme*, 2018 WL 4680197, at *12.  Based on these facts, public statements of Fannie and Freddie are no less pertinent than statements made by FHFA to shareholders' reasonable expectations.  Indeed, a primary purpose of many of Fannie's and Freddie's public statements (*e.g.*, SEC filings, offering circulars) is the disclosure of information *to investors*.  Likewise, public statements by Treasury officials would also inform reasonable expectations, as Treasury's consent was required for the companies to declare any dividends during conservatorship or for the companies to exit conservatorship (except through receivership).

*Fourth*, there is no required form in which a statement must be made for it to inform reasonable expectations.  For example, this Court considered how reasonable expectations were informed by both statements by FHFA's Director at a press conference (later issued as a press release) as well as statements in a factsheet with "Questions and Answers on Conservatorship." *Id.* at *14.  It is for the jury to decide how much weight to give any particular statement in informing reasonable expectations.

*Fifth*, because "the events surrounding the placement of the GSEs into conservatorship" are part of the reasonable expectations analysis, so too would be the events and circumstances

surrounding the First Amendment and the Second Amendment to the PSPAs. *Id.* at *12. Indeed, the only logical limiting principle is that reasonable expectations are informed by events and circumstances as of the time of contracting. This understanding of the implied covenant is supported by *GWO Litig. Trust v. Sprint Solutions, Inc.*, No. CV N17C-06-356 PRW, 2018 WL 5309477 (Del. Super. Ct. Oct. 25, 2018). There, the court explained that an implied covenant claim involves a factual inquiry to "discern the parties' 'reasonable expectation[s]' given the factual backdrop of the case." *Id.* at *6. The court went on to explain that "when assessing the parties' expectations, the Court must consider the totality of the convoluted factual background of [the parties' agreements]." *Id.* at *7. So too here. The full factual background of the events and circumstances at the time of contracting is relevant to determining reasonable expectations.

*Sixth*, putting this all together, determining the reasonable expectations of a hypothetical reasonable shareholder is akin to a totality of the circumstances test—the hypothetical reasonable shareholder is presumed to be aware of, and have considered, all relevant information available to that shareholder at the time of contracting. After all, trying to determine "what the parties would have agreed to themselves had they considered the issue in their original bargaining positions at the time of contracting," *Fairholme*, 2018 WL 4680197, at *7, or trying to determine whether "this case involves developments that could not have been anticipated, rather than developments that the parties simply failed to consider," *TWA I*, 2013 WL 1304457, at *10, is necessarily an expansive inquiry that will require the jury to determine what the parties would have agreed to at the time of contracting and what they could have (and could not have) anticipated. *Cf. Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998) (noting that the implied covenant inquiry is likely to be "fact-intensive").

This conception of what informs a hypothetical reasonable shareholder's reasonable expectations is consistent with the concept of the "reasonable investor" in securities fraud cases. In securities fraud cases, the question is whether an untrue statement is material, with materiality determined by an objective, reasonable investor standard. *See United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993). A reasonable investor is deemed to be aware of, and have considered, the "total mix" of information. *Id.* at 1198-99; *Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 610 (7th Cir. 1995) ("A reasonable investor is presumed to have information in the public domain, and therefore [plaintiff] is imputed with constructive knowledge of that information."). And the total mix of information has been defined as "information already in the public domain and facts known or reasonably available to the shareholders." *Id.* at 1199; *see Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 216 (5th Cir. 2004) ("The 'total mix' of information normally includes information that is and has been in the readily available general public domain and facts known or reasonably available to the shareholders."). This includes, for example, SEC filings related to the companies. *See California Pub. Employees' Ret. Sys. v. Chubb Corp.*, No. CIV. NO. 00-4285, 2002 WL 33934282, at *24 (D.N.J. June 26, 2002) ("The reasonable investor is 'presumed to have read prospectuses, quarterly reports and other information relating to their investments.'" (quoting *Mathews v. Kidder, Peabody & Co.*, 260 F.3d 239, 252 (3d Cir. 2001))); *In re Trex Co., Inc. Sec. Litig.*, 454 F. Supp. 2d 560, 582 (W.D. Va. 2006) (holding that "[a] reasonable investor is charged with knowledge of all public statements made about Home Depot during the class period"). The "total mix" also includes news articles. *See, e.g.*, *Smith v. Circuit City Stores, Inc.*, 286 F.Supp.2d 707, 721 (E.D. Va. 2003) (considering news articles directly related to the defendant and observing that "[d]isclosure of information already publicly available does not

21

materially alter the 'total mix' of available information").  And the "total mix" also includes, as discussed *infra*, analyst reports.  Like a reasonable investor, the hypothetical reasonable shareholder here for purposes of the implied covenant inquiry should be deemed to be aware of the total mix of information at the time of contracting.  There is no other rational way to give effect to the reasonable expectations analysis regarding these two highly-regulated companies whose investor contracts are frequently subject to change.

***

For the foregoing reasons, Plaintiffs' Motion in Limine No. 1 should be denied.  The applicable time of contracting was near the execution of the Third Amendment in August 2012.  The implied covenant is a two-prong inquiry, requiring the Plaintiffs to prove both that the complained-of action violated the reasonable expectations of shareholders at the time of contracting and that the complained-of action was arbitrary or unreasonable, and non-public information known only to FHFA is relevant to the second prong of the test but not the first prong.  Finally, the reasonable expectations of shareholders are informed not just by the terms of their contracts, but by the total mix of public information available to shareholders.

## II. Opposition to Motion In Limine No. 2: Security Analyst Reports are Admissible For Multiple Non-Hearsay Purposes

Plaintiffs next seek to exclude "statements from securities analyst reports discussing aspects of the GSEs' financial condition, such as the GSEs' ability to pay dividends," arguing that analyst reports are hearsay, that they constitute improper lay opinion, and that their probative value is substantially outweighed by the risk of undue prejudice and jury confusion.  Mot. 15.  In doing so, Plaintiffs seek broadly to "preclude Defendants from offering such reports into evidence for their truth or for purposes of examining or cross-examining other witnesses."  *Id.* at 17–18.  Plaintiffs do not, however, seek to "to preclude Defendants' expert witnesses from

22

referring to analyst reports where Defendants can establish the foundation required for experts to rely on otherwise inadmissible evidence, and in connection with presenting expert testimony that is otherwise admissible." *Id.* at 17.  Contrary to Plaintiffs' arguments, the analyst reports at issue are not hearsay or improper lay opinions, they are relevant for multiple purposes, and their probative value outweighs any conceivable prejudice to Plaintiffs, especially with an appropriate limiting instruction.

### A.    Analyst Reports Are Not Hearsay

The analyst reports are not hearsay because Defendants do not intend to present them for the truth of the matter asserted.  *See* Fed. R. Evid. 801(c) (defining hearsay as an out of court statement "offer[ed] in evidence to prove the truth of the matter asserted in the statement"); *Whole Foods Mkt. Grp., Inc. v. Wical Ltd. P'ship*, No. 1:17-CV-01079-RCL, 2019 WL 6910168, at *1 (D.D.C. Oct. 22, 2019) ("[I]n order for [a] report to be hearsay, it must be offered for its truth value.").  Instead, Defendants intend to admit analyst reports for two non-hearsay purposes. First, analyst reports are part of the "total mix" of information that informs the reasonable expectations of the hypothetical reasonable shareholder, regardless of whether their contents are true.  Second, analyst reports are highly relevant to the determination of whether FHFA acted arbitrarily or unreasonably.  Analyst reports preceding the Third Amendment expressed concern about erosion of the Treasury commitment and negative consequences that could result if those concerns were not addressed.  Defendants were aware of those reports, they informed FHFA's decision to enter into the Third Amendment, and the Third Amendment addressed the concerns expressed in the analyst reports.  Thus, regardless of whether those analyst reports were true or the opinions they expressed well-founded, the reports are relevant to the reasonableness of the Third Amendment, and at a minimum are admissible as non-hearsay for their effect on the

decision-making process to enter into the Third Amendment.  Further, the probative value of the analyst reports far exceeds risk of undue prejudice or jury confusion, as they go to the heart of the disputed issues in this case, and any concerns can be adequately addressed through a limiting instruction.

**B.      Analyst Reports Are Not Improper Lay Opinion Testimony**

Plaintiffs also contend that the contents of the analyst reports constitute improper lay opinion.  Mot.  at 16–17.  However, as discussed below, Defendants are seeking to admit the analyst reports for non-hearsay purposes.  Defendants are not seeking to admit any analyst reports for the truth of the matter asserted, let alone seeking to admit them as expert testimony or lay opinion testimony.  What matters in this case is not whether the analysts are in fact experts, whether the contents of their reports are true, or whether their predictions and opinions are well-founded.  Instead, what matters is that the fact of the analyst reports and what they said informed the reasonable expectations of the hypothetical reasonable shareholder and they are probative to whether the Third Amendment was arbitrary or unreasonable and as a factor in FHFA's decision to enter into the Third Amendment.

**C.      Analyst Reports Are Relevant to Determining Whether the Third Amendment Violated Shareholders' Reasonable Expectations at the Time of Contracting**

As previously discussed, *supra* in Section I.B. to succeed on their implied covenant claim, Plaintiffs must prove that "the Third Amendment violated the reasonable expectations of the parties."  *Perry II*, 864 F.3d at 631.  Because this is an objective inquiry, in evaluating the expectations of shareholders, the relevant inquiry is determining what were the reasonable expectations of an objective hypothetical reasonable shareholder, and then, whether those expectations were violated.

The reasonable expectations inquiry—especially in investor contracts which are, "by design, flexible and subject to change" without negotiation between the parties—will frequently be wide-reaching and fact-intensive.  Something informs reasonable expectations when it "informs what [the objective reasonable shareholder] believed" at the time of contracting. *Fairholme*, 2018 WL 4680197, at *14.  Determining the expectations and beliefs of a hypothetical reasonable shareholder necessarily requires consideration of the information upon which those expectations and beliefs are based.  As discussed, *supra* in Section I.C., what informs the expectations of an objective reasonable shareholder should be, like the reasonable investor standard, the "total mix" of information available to a shareholder.

Importantly, the sources identified by this Court and the D.C. Circuit that inform beliefs and expectations of shareholders do not exist in a vacuum, unaffected by other pertinent publicly available information.  As this Court has recognized, context matters.  That is why this Court has previously made reference to "the circumstances surrounding this dispute," Uncontested Mot. for Class Certification, ECF No. 138 at 18 (No. 1:13-mc-1288), or "the events surrounding the placement of the GSEs into conservatorship" as being relevant to informing reasonable expectations, *Fairholme*, 2018 WL 4680197, at *12.  Statements of FHFA can only be fully understood by, and cannot be divorced from, the context in which they are made.  Without context, the reasonable shareholder would be like an ostrich with its head buried in the sand, popping up to read the latest FHFA statement or publication, before quickly burying it again to ensure that its beliefs are not polluted by the context in which those statements were made.  *See Greenhouse v. MCG Cap. Corp.*, 392 F.3d 650, 656 (4th Cir. 2004) ("It is important to note that a 'reasonable investor' is neither an ostrich, hiding her head in the sand from relevant information, nor a child, unable to understand the facts and risks of investing.").  That is why the

only viable standard for reasonable expectations is that the reasonable shareholder considers the "total mix" of information to form beliefs and, ultimately, reasonable expectations.

The total mix of information includes, but is not limited to, news articles and analyst reports, and a reasonable investor is deemed to be aware of, and to have read, relevant news articles and analyst reports. *See DeMarco v. Robertson Stephens*, 318 F.Supp.2d 110, 118 (S.D.N.Y. 2004) (finding "it is entirely reasonable that investors would consider analyst recommendations as part of the 'total mix' of information available when making purchases"); *Quaak v. Dexia, S.A.*, 445 F. Supp. 2d 130, 142 (D. Mass. 2006) (holding that a recommendation in an analyst report coupled with financial data, "to a reasonable investor, would have altered the total mix of information available"); *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 161 n.7 (S.D.N.Y. 2008) (citing analysts' reports "'to show whether and when information was provided to the market' such that the reports contributed to the total mix of information available to investors" (citation omitted)).  In the same way that the reasonable investor is deemed to be aware of analyst reports when purchasing shares in a company, so too should a reasonable shareholder at the time of contracting.  Analyst reports are important sources of information about the companies of which a hypothetical reasonable shareholder would be aware, and which should inform their beliefs and expectations, regardless of the truth of the contents of the reports.  Therefore, analyst reports should inform the reasonable expectations of a hypothetical reasonable shareholder.

Accordingly, as it relates to the reasonable expectations prong, analyst reports are not hearsay because they are not being offered for the truth of the matter asserted.  Rather— regardless of whether they are true or not and regardless of whether they are conveying any expert opinion—they are being offered as part of the total mix of publicly available information

that informs the reasonable expectations of the hypothetical reasonable shareholder.  And it is for the jury to determine how much or how little weight any given analyst report would have on the reasonable expectations of a hypothetical reasonable shareholder.

### D.  Analyst Reports Are Relevant to Determining Whether the Third Amendment Was Arbitrary or Unreasonable

Analyst reports are also admissible as non-hearsay evidence because they demonstrate that there were specific market concerns that the Third Amendment directly addressed, and because those concerns were known to FHFA when it entered into the Third Amendment.

To prevail on their implied covenant claim, Plaintiffs must prove that FHFA acted "arbitrarily or unreasonably" in executing the Third Amendment.  *Fairholme*, 2018 WL 4680197, at *7 (quoting *Nemec*, 991 A.2d at 1126); *see TWA I*, 2013 WL 1304457, at *4. Whether FHFA's actions were "arbitrary or unreasonable" is determined in reference to what FHFA did and why.  *See TWA II*, 2013 WL 4045920, at *6–8 (finding that defendants' conduct was arbitrary and unreasonable after considering and rejecting the justifications given by defendants for their actions); *Chase Bank*, 274 F.R.D. at 290 (concluding that commonality was satisfied for class certification on the arbitrary and unreasonable prong of an implied covenant claim by looking at defendant's actions and the reasons for defendant's actions).

Analyst reports are highly relevant evidence regarding whether the Third Amendment was arbitrary or unreasonable.  One reason why the Third Amendment was not arbitrary or unreasonable is that there were concerns, expressed publicly by analysts, that the potential for erosion of the Treasury commitment once the commitment became capped at the end of 2012 could have adverse effects on Fannie, Freddie, and the economy.  The Third Amendment addressed those concerns.  The existence of those concerns and the Third Amendment's response to them, is evidence that the Third Amendment was not arbitrary or unreasonable.  For this

27

purpose, the *truth* of any analyst reports is irrelevant.  Rather, their relevance is based "on the fact that the analysts are influences and barometers of the market." *Grae v. Corr. Corp. of Am.*, No. 3:16-CV-2267, 2021 WL 1100431, at \*4 (M.D. Tenn. Mar. 17, 2021); *see id.* ("Even if an analyst's view of a company is entirely mistaken, if that analyst's views are taken seriously by investors, the analysis may be reflected in the stock price.").  Therefore, analyst reports are highly relevant evidence to show that the Third Amendment addressed the concerns expressed therein and, thus, was not arbitrary or unreasonable.

Further, the evidence at trial will demonstrate that FHFA monitored analyst reports, that FHFA was aware of a number of analysts who were concerned about erosion of the Treasury commitment, and that these concerns were factors in FHFA's decision to enter into the Third Amendment.  *See, e.g.*, Ugoletti Dep. 124:18–125:5 (excerpts attached as **Exhibit A**); DeMarco Dep. (2020) 40:17-41:14; 58:19-62:17; 92:1-21; 300:9-302:6 (excerpts attached as **Exhibit B**); **PX0351** at 6-8 (sworn declaration from FHFA official explaining how FHFA monitored the market forecasts predicting the exhaustion of Treasury's funding commitment).  For example, a Barclays analyst report in December 2011 worried that the cap on the commitment taking effect could pose a "threat to global financial stability."  **DX0364** at 5.  The author of that analyst report made a point to email a copy of it to FHFA and, in the email, emphasized his concerns and noted that his concerns were shared by other analysts.  **DX0380**.  At trial, former FHFA officials will testify that FHFA monitored analyst reports and explain why they monitored them, the impact that they believed analyst reports could have on the market, and how analyst reports impacted the decision by FHFA to enter into the Third Amendment.  Pre-Third Amendment FHFA documents also demonstrate that analyst reports played a role in FHFA's decision to enter into the Third Amendment.  *See* **DX-0381** at 6 (January 2012 FHFA PowerPoint about possible amendments to

the PSPAs, noting that "[s]ome market participants have begun to raise questions regarding whether [the amount of Treasury's commitment] will be sufficient to justify continued investment in Enterprise securities").  Further, the importance of analyst reports is demonstrated by the fact that FHFA monitored the reactions of analysts to the Third Amendment to see if it addressed their concerns.  *See* **DX-0549**.

Since analyst reports formed part of the basis for FHFA's decision to enter into the Third Amendment—and FHFA's reasons for entering into the Third Amendment are the key issue in determining whether that decision was arbitrary or unreasonable—the admissibility of the analyst reports is a paradigmatic example of evidence being offered not for the truth of the matter asserted, but for the state of mind and effect on the listener.  *See United States Sec. & Exch. Comm'n v. ITT Educ. Servs.*, Inc., No. 115CV00758JMSMJD, 2018 WL 3008632, at *6 (S.D. Ind. June 15, 2018) (holding that written reports of financial analysts were "relevant to the issues of what Defendants knew and their state of mind—key issues in this case."); *see also Baker v. SeaWorld Ent., Inc.*, 423 F. Supp. 3d 878, 927 (S.D. Cal. 2019) (overruling hearsay objection to articles and analyst reports because they were offered "not for the truth of the matter asserted in the reports and articles, but rather to demonstrate how the market understood and interpreted [defendant's] disclosures").  Regardless of the truth value of the analyst reports, the reliability of their prediction, or whether these analysts were taken seriously by the market, these analyst reports are nonetheless relevant because FHFA took their concerns seriously and acted in a way that addressed their concerns.

Therefore, the analyst reports are admissible as non-hearsay evidence that the Third Amendment was not arbitrary or unreasonable.

E.      **Any Concerns About How the Jury Will Use the Analyst Reports Is Easily
Resolved With an Appropriate Limiting Instruction**

Finally, Plaintiffs raise a Rule 403 objection to the admission of analyst reports.  Mot. 17.

Such concerns could easily be addressed by an appropriate limiting instruction, as multiple

courts have held in admitting analyst reports for non-hearsay purposes.  *See, e.g.*, *ITT Educ.

Servs.*, 2018 WL 3008632, at *6 (explaining that, because analyst reports were being offered for

a limited purpose and not for the truth of the matter asserted, the other party may request a

limiting instruction); *Grae*, 2021 WL 1100431, at *4 (noting that any jury confusion about how

they are to use analyst reports can be addressed with a curative instruction).  Plaintiffs provide no

reason why a limiting instruction would not be sufficient to address their concerns, especially

given the central role of analyst reports in this case.

III.     **Opposition to Motion In Limine No. 3: Defendants Do Not Intend to Affirmatively
Present Evidence Or Argument Regarding Dismissed Claims or Court Decisions
Other Than *Collins*, Which Is Squarely Relevant**

Plaintiffs' third motion in limine seeks to "preclude Defendants from making reference

to, or introducing testimony or other evidence concerning, the dismissal of any claims in this

action or decisions in this or any related case."  Mot. 18.  Specifically, Plaintiffs seek to preclude

any reference to the decisions in the related *Collins* litigation, including the Supreme Court's

decision in *Collins*, 141 S. Ct. 1761.

First, as it relates to the prior dismissal of claims in this action, Defendants do not intend

to affirmatively introduce any such evidence or make any such argument unless Plaintiffs do so

first or otherwise open the door to such evidence or argument.

Second, as it relates to other decisions in this or any related case (other than *Collins*),

Defendants do not intend to affirmatively introduce or refer to those decisions.  Defendants,

however, reserve the right to do so if Plaintiffs present evidence or argument on this issue, or otherwise open the door to such references.

Third, the Supreme Court's decision in *Collins* is directly relevant to the sole claim at issue in this case.  It not only interprets HERA, which has been incorporated into the shareholder contracts, it also addresses the circumstances surrounding the Third Amendment.  *Collins*, 141 S. Ct. at 1776–77; *see generally* ECF No. 145 (No. 13-mc-1288), ECF No. 148 (No. 1:13-cv-01053) (arguing that *Collins* requires summary judgment in Defendants' favor).  Moreover, Plaintiffs themselves have indicated that they intend to have a "summary witness" present selected portions of HERA at trial.  *See* ECF No. 181 (No. 13-mc-1288), ECF No. 187 (No. 1:13-cv-01053).  Without the ability to cross examine that witness on the Supreme Court's definitive interpretation of HERA in *Collins*, which came in the context of addressing the Third Amendment itself, Defendants would be unduly prejudiced.

Finally, at a minimum, Defendants should be permitted to address *Collins* at trial if Plaintiffs open the door.  Those circumstances may include, for example, if Plaintiffs' expert witnesses opine about FHFA's goals or responsibilities or authorities that are contrary to *Collins* or any prior rulings in this case, or if their fact or expert witnesses otherwise testify about provisions of HERA or other issues addressed by the Supreme Court in *Collins*.

**IV.     Opposition to Motion In Limine No. 4: Defendants Do Not Intend to Present Affirmative Evidence or Argument that Any Plaintiffs or Class Members Purchased Their Stock After August 17, 2012, or that Shareholders Who Bought After the Third Amendment Would Receive a Windfall**

In their fourth motion in limine, Plaintiffs seek to exclude evidence or argument that "any Plaintiff or Class member purchased their shares in the GSEs after August 17, 2012, the date of the Third Amendment, or that any Plaintiff or Class member will receive a windfall should they be awarded damages."  Mot. 21.

31

Defendants do not intend to present any evidence or argument regarding when any Plaintiff or Class member purchased their shares.  However, Plaintiffs have disclosed that they intend to call four Class representatives and a representative of the individual Berkley plaintiffs to testify at trial about their "reasonable expectations as [] stockholder[s]" in the Enterprises.  *See* Pls.' Pretrial Statement at 8 (ECF No. 177 (No. 1:13-mc-1288), ECF No. 183 (No. 1:13-cv-01053)).  If these witnesses are permitted to testify about when they purchased their shares, Defendants should be permitted to introduce evidence and argument as to when other members of the Classes purchased their shares, including some after the Third Amendment, like Mr. Berkowitz of the Fairholme Funds.  Otherwise, the jury will be left with a skewed impression about the makeup of the Classes.  That is, the jury will be led to believe that all the shareholders purchased their stock before the Third Amendment, and none purchased it afterwards. This inaccurate view of the real world could well cause the jury to believe that no one purchased after the Third Amendment because shareholders believed the Third Amendment was harmful.  We, of course, know that is not the case.  *See* Mot. 22 (acknowledging that "Fairholme is a wealthy investor that purchased its GSE stock after the Third Amendment as an investment in this lawsuit").

Likewise, Defendants do not intend to argue that shareholders who purchased their stock after the Third Amendment or who otherwise would receive a damages award in excess of the price they paid for their shares would be receiving a "windfall."  To be clear, however, Defendants reserve their right to present evidence and argument to show that shareholders would receive a windfall for *other* reasons, including but not limited to the reasons set forth in Defendants' Motion for Summary Judgment.  *See, e.g.*, ECF No. 145 (No. 13-mc-1288), ECF No. 148 (No. 1:13-cv-01053), at 34–37 (explaining that Plaintiffs' alternative request for

restitution would result in a windfall for preferred shareholders because the value of their shares was severely diminished before execution of the Third Amendment).[7]

## V.     Opposition to Motion in Limine No. 5: Plaintiffs' Attempt to Cherry-Pick Subjective Expectations Evidence by Excluding Mr. Berkowitz's Testimony Lacks Merit

Plaintiffs' Motion in Limine No. 5—to preclude Defendants from presenting any testimony of Bruce Berkowitz or anyone associated with the Fairholme Funds at trial—is a transparent attempt to cherry-pick subjective shareholder expectations in a case that all agree is governed by an objective test.  Defendants have moved to exclude all such testimony pursuant to Federal Rules of Evidence 402 and 403.[8]  But because that motion remains pending, Defendants conditionally designated the deposition testimony of several shareholder plaintiffs, including the class representatives and Bruce Berkowitz, the principal of the Fairholme Funds.  To be clear, Defendants' position—as stated in its motion in limine—is that both the "subjective expectations [of the shareholder plaintiffs] and the personal experiences and characteristics from which those expectations were derived [] are irrelevant."  ECF No. 177 (No. 1:13-mc-1288), ECF No. 183

---

[7]     The cases cited by Plaintiffs do not stand for any sort of categorical prohibition on the term "windfall."  In one, the motion in limine was unopposed.  *See In re Prempro Prod. Liab. Litig.*, No. 4:03cv1507, 2007 WL 3217470, at *1 (E.D. Ark. Oct. 26, 2007).  In another, the court simply noted that it was granting a motion regarding use of the term "windfall" without discussion.  *See Harvey Prop. Mgt. Co., Inc. v. The Travelers Indem. Co.*, No. 2:12-cv-1536, 2016 WL 8199740, at *2 (D. Ariz. May 12, 2016).  And in the third, the term "windfall" was being used to characterize an "irrelevant" issue disconnected from the damages sought.  *See Dunkin' Donuts Inc. v. Romanias*, No. 00-cv-1886, 2002 WL 32955492, at *1 (W.D. Pa. May 29, 2002).  Other courts have indicated an openness to allowing parties to use the term in appropriate contexts.  *See, e.g.*, *Smith v. Riverwalk Ent. LLC*, No. CIV.A.05-1416, 2008 WL 5136055, at *1 (W.D. La. Aug. 21, 2008) (denying without prejudice a motion in limine to preclude expert testimony that the damages sought would result in an "unearned windfall" where the expert's statement "explains an economic . . . concept" and the testimony would be relevant in certain circumstances).

[8]     *See* ECF No. 177 (No. 1:13-mc-01288), ECF No. 183 (No. 1:13-cv-01053).

33

(No. 1:13-cv-01053), at 8.  But if the Court permits Plaintiffs' four proposed shareholder witnesses to testify at trial, it should also permit Defendants to present the deposition testimony of Mr. Berkowitz, who is also a shareholder and a member of the Class.

Plaintiffs have disclosed that they intend to call three class representatives and an employee of one of the Berkley plaintiffs in the *Fairholme* action to testify about their "reasonable expectations as [] stockholder[s]" in the Enterprises.  *See* Pls.' Pretrial Statement at 8 (ECF No. 177 (No. 1:13-mc-1288), ECF No. 183 (No. 1:13-cv-01053)).  Yet, Plaintiffs ask the Court to exclude any testimony from Mr. Berkowitz, arguing that "evidence of absent class members' expectations is [] irrelevant."  Mot. 23.  Plaintiffs appear to be taking the position that class representatives' expectations are relevant, but that absent class members' expectations are irrelevant.  But that is not the law.  "[T]he right of a litigant to employ Rule 23 is a procedural right only, ancillary to the litigation of substantive claims."  *Deposit Guar. Nat. Bank. v. Roper*, 445 U.S. 326, 332 (1980).  Accordingly, the relevance of a class member's personal expectations cannot turn on whether the class member is a named plaintiff or an absent class member.  Rather, it turns on the nature of the claim.

### 1.    Shareholder Testimony Regarding Personal Expectations Is Irrelevant

Here, the nature of the sole remaining claim—for breach of the implied covenant of good faith and fair dealing—renders any shareholder's personal expectations irrelevant, and thus inadmissible.  As explained in Defendants' pending Motion in Limine to Exclude Testimony Regarding Plaintiffs' Expectations,[9] the key inquiry in this case—"whether the Third Amendment violated the reasonable expectations of the parties"—is an "objective inquiry."  *See*

---

[9]      ECF No. 177 (No. 1:13-mc-1288), ECF No. 183 (No. 1:13-cv-01053).

Opinion Granting Pls.' Uncontested Mot. for Class Certification, ECF No. 138 at 17 (No. 1:13-MC-1288).  And Plaintiffs conceded in their memorandum in support of class certification that "there will be no need for members of the proposed Classes to present evidence that varies from person to person due to the objective nature of the 'reasonable expectations' inquiry."  Pls.' Class Cert. Mem., at 21.[10]  This Court subsequently granted class certification, in part, because "the members' claims invoke a common legal theory" that is "subject to common proof."  Opinion Granting Pls.' Mot. for Class Certification, ECF No. 138 at 11-12 (No. 1:13-mc-1288). Having gained class certification by arguing there was no need to present evidence that varies from person to person, Plaintiffs cannot now seek to introduce such individualized and subjective evidence.

Further, Plaintiffs have failed to offer any indicia of how testimony about personal expectations from a curated sample of four shareholders—in a class action involving thousands of shareholders who own hundreds of millions of shares—can serve as common proof.  And just because this Court found the Class representatives' claims were "typical of the proposed class," that does not mean the Court found the shareholders are representative of the Class as a whole. Rather, the Court recognized that "typicality refers to the nature of the claims of the representative[s], *not* the individual characteristics of the plaintiff[s]."  *Id.* (emphasis added). Thus, the Court *did not* hold that (i) "the factual bases for the class representatives' claims were (or should be assumed to be) identical to the factual bases for the other class members' claims" or (ii) "the class representatives' claims were typical of the claims of a reasonable investor."  *In re ICN/Viratek Sec. Litig.*, No. 87 CIV 4296, 1996 WL 34448146, *3 (S.D.N.Y. July 15, 1996).

---

[10]     ECF No. 132-1 at 21 (No. 1:13-mc-1288).

Nor did the Parties stipulate to a class in which the representatives' personal characteristics and expectations are deemed to be common to all the class members.

*Barnes v. District of Columbia*, 278 F.R.D. 14 (D.D.C. 2011) (Lamberth, J.), is particularly illustrative on the discrete purpose of a Rule 23 typicality finding.  In *Barnes*, the court certified the class—after making a finding that the proposed representatives met the requirements of Rule 23 (including typicality)—but held "[n]o testimony will be permitted that could lead the jury's valuation astray by causing it to believe that the witness' story was typical of the stories of the absent class members." *Id.* at 21.  While the court permitted both parties to introduce testimony from representatives to inform the determination of damages on a class-wide basis, the court noted that in light of the "non-random sample of class members," it would "not permit testimony concerning class members' backgrounds—*e.g.*, their occupations, education levels, criminal histories, family situations, and similar, personal facts." *Id*; *see also id.* ("[S]uch testimony would mislead the jury by causing it to project these witnesses' backgrounds onto the class as whole, even though the backgrounds of the absent class members are likely to differ substantially from those of the witnesses selected by the parties.").

Moreover, as explained in Defendants' pending motion in limine regarding shareholder testimony, courts routinely find that evidence of class members' subjective views or characteristics is irrelevant to an objective inquiry.  *See* ECF No. 177 (No. 1:13-mc-01288), ECF No. 183 (No. 1:13-cv-01053), at 6–7 (collecting cases).  Tellingly, one of the key cases cited by Plaintiffs in their motion seeking to exclude Mr. Berkowitz's testimony—*Low v. Trump Univ., LLC*, No. 3:10-cv-940, 2016 WL 6732110, at *2 (S.D. Cal. Nov. 15, 2016)—is also one of the cases cited by *Defendants* in their Motion in Limine seeking to exclude evidence of *all* shareholder testimony on reasonable expectations.  *See* Mot. 23 (citing *Low* to argue subjective

testimony regarding Fairholme's expectation "is irrelevant when determinations regarding shareholders' reasonable expectations must be made on an objective, class-wide basis").

Accordingly, this Court should exclude all testimony regarding shareholders' subjective expectations and the personal experiences and characteristics from which those expectations were derived.  Such evidence is irrelevant, and thus inadmissible.

> **2.      If the Court Permits Plaintiffs' Representatives to Testify Regarding Their Personal Expectations, the Court Should Permit Defendants to Present the Testimony of Mr. Berkowitz to Avoid Unfair Prejudice**

If the Court permits Plaintiffs' four proposed shareholder witnesses to testify at trial, it would be prejudicial to prevent Defendants from presenting the deposition testimony of Mr. Berkowitz, who is also a shareholder and a member of the class.  Plaintiffs should not be permitted to engage in this type of cherry-picking—namely, seeking to present certain shareholder testimony on subjective expectations but bar other shareholder testimony on reasonable expectations.  *Cf. Rodriguez v. SGLC Inc.*, No. 2:08-CV-01971, 2013 WL 6844549, at *4 (E.D. Cal. Dec. 24, 2013) ("The Court cannot allow Plaintiffs to cherry pick representatives to testify about the . . . conditions experienced by all Plaintiffs without any demonstration to the Court that this testimony is, in fact, representative[.]").

For example, in *Roussell et al. v. Brinker International Inc.*, class plaintiffs similarly moved to exclude testimony about the defendant's practices other than from "the 14 representative witnesses [they] chose to testify at trial."  No. H-05-3733, 2009 WL 595978, at *1 (S.D. Tex. Mar. 6, 2009).  In response, the court held "it d[id] not believe the interests of judicial economy, the caselaw, or Fed. R. Evid. 701 foreclose[d] the presentation of evidence from [others] involved in the case to demonstrate that the 14 representative witnesses are not representative of the class."  *Id.* at *2.  Ultimately, the court denied the motion because plaintiffs'

requested restriction regarding who could testify would "unfairly prejudice [the] [d]efendant by not allowing it to put on its best case." *Id.*. This Court should do the same.  While Plaintiffs accuse Defendants of "attempt[ing] to sway the jury's perception of the composition, wealth, or sophistication of Class members" through the use of Mr. Berkowitz's testimony, Mot. 22, Plaintiffs attempt to do the very same thing by limiting shareholder testimony to class representatives.  For example, Plaintiffs have designated portions of class representative Joseph Cacciapalle's testimony regarding how he has no formal training in investments, does not provide investment advice to others, and acquires investment ideas at home from the newspaper or television.[11]  And Plaintiffs also seek to present trial testimony from class representatives Timothy Cassell and Michelle Miller, *see* Pls.' Pretrial Statement at 8, who similarly invest their own funds without formal training in investing.[12]  None of these shareholders read Director Lockhart's statement announcing the conservatorships, SEC filings of Fannie Mae or Freddie Mac, their operating results or profit projections, or third-party analyst reports about the companies.[13]  Mr. Berkowitz, on the other hand, is a professional investor who reviewed publicly filed reports, investment contracts, HERA, the PSPAs, and amendments to the PSPAs.[14]  It thus

---

[11]     Dep. of Cacciapalle 16:22–17:5 (no formal training), 25:17–26:1 (does not provide investment advice), 34:3–11 (gets ideas at home but does not go searching for ideas) (excerpts attached as **Exhibit C**).

[12]     Dep. of Cassell 11:19–21 (no training in investing) (excerpts attached as **Exhibit D**); Dep. of Miller 11:10–16 (same) (excerpts attached as **Exhibit E**).

[13]     Dep. of Cacciapalle 64:3–14 (SEC filings, operating results, profit projections, and analyst reports); Dep. of Cassell 40:2–5 (unsure if he reviewed any Freddie SEC filings before purchasing shares because it was so long ago), 29:16–30:9 (looks at 10-Ks but does not review 10-Qs), 98:12–18 (unsure if he read Director Lockhart's statement announcing the conservatorship); Dep. of Miller 27:7–15 (analyst reports), 79:8–11 (SEC filings).

[14]     Dep. of Berkowitz 79:1–4 (reports), 84:17–18 (investment contracts), 89:14–90:4 (HERA), 92:9–10 (PSPAs), 92:13 (PSPA amendments) (excerpts attached as **Exhibit F**).

appears that Plaintiffs seek to present a narrative focused on shareholders who invest without formal training in non-professional settings, while excluding more sophisticated, professional investors who also make up parts of the class.  Such a cherry-picked sampling would unfairly skew the jury's perception of the composition, sophistication, and—most significantly— expectations of the class.  *See supra* at 21–22 (citing cases explaining that a hypothetical reasonable investor is presumed to know all relevant public information).  Indeed, there is no basis from the record to determine the actual composition of the class and, more importantly, that such composition matters.  The application of the objective standard does not depend on how representative the class representatives' views of the reasonable expectations actually are of the expectations of shareholders as a class.

The two cases on which Plaintiffs rely are not to the contrary.  *See* Mot. 23.  While those courts excluded absent class member testimony, they did not hold—as Plaintiffs seek here—that both the testimony of class representatives was relevant *and* the testimony of absent class members was irrelevant to an issue of common proof.  *See Low*, 2016 WL 6732110, at *2 (addressing the admissibility of absent class member testimony but not the admissibility of testimony from class representatives); *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp.2d 512, 586 n.63 (S.D.N.Y. 2011) (excluding testimony from absent class members concerning individualized issues).  Indeed, the *Low* case actually supports *Defendants*' motion to exclude evidence of *all* shareholder testimony on reasonable expectations.  *See* ECF No. 177 (No. 1:13-mc-01288), ECF No. 183 (No. 1:13-cv-01053), at 10.

In sum, the Court should exclude all evidence of shareholders' individualized, subjective expectations, as this Court already has held that the key inquiry in this case is an objective one subject to common proof.  However, if the Court permits Plaintiffs' four witnesses to testify

about their subjective expectations, the Court should deny Plaintiffs' Motion in Limine No. 5 and permit Defendants to present evidence of other shareholders' subjective, individualized expectations, including those of Mr. Berkowitz.[15]

## VI.   Motion In Limine No. 6: Defendants May Present Evidence and Argument Concerning the Makeup of the Class in Appropriate Circumstances

In Plaintiffs' sixth motion in limine, they seek to preclude Defendants from introducing any testimony, evidence, or argument about any Plaintiff's or Class member's wealth, sophistication, size, financial wherewithal, investment strategy, status as a hedge fund, or status as an institutional investor.  Mot. 24–26.  Plaintiffs contend that all such information is irrelevant and "highly prejudicial."  *Id.* at 24.

The contours of the evidence Defendants may seek to introduce, or arguments Defendants may seek to make, are largely dependent upon the Court's ruling on Defendants' motion to exclude individualized testimony from individual shareholders.  *See* ECF No. 177 (No. 1:13-mc-01288), ECF No. 183 (No. 1:13-cv-01053).  In addition, as of now, Defendants anticipate that Plaintiffs may seek to present evidence from the shareholder Class representatives and a representative of the Berkley Plaintiffs concerning their personal backgrounds, investment strategy, purpose for investing, and size of their investments, among other things.  This is despite the fact that Plaintiffs' motion in limine asserts that all such testimony is irrelevant.  *See* Mot. 24 ("The wealth or sophistication (or lack thereof) of Class members has no bearing on any element of Plaintiffs' claims."); *id.* ("No facts about Plaintiffs' size, financial wherewithal, investment strategy, or sophistication have any relevance to Plaintiffs' breach of the implied covenant

---

[15]    This reasoning applies with equal force to Defendants' intended use of the deposition testimony of David Shumway on behalf of Arrowwood Indemnity.

claim.").  If the Court determines that such testimony is admissible, Plaintiffs cannot have it both ways.  For example, Plaintiffs cannot seek to offer individual shareholder testimony and argue or suggest that those persons are representative of all shareholders in the Classes, while simultaneously seeking to bar Defendants from rebutting that and demonstrating the shareholders who testify at trial are *not* fully representative of all shareholders in the Classes—*e.g.*, because the Classes also include large, institutional investors and hedge funds.  Therefore, at the very least, Defendants reserve the right to introduce evidence or present argument regarding these issues pending the outcome of Defendants' motion in limine on shareholder testimony, and also if Plaintiffs present evidence or argument on these issues, or otherwise open the door to such evidence or argument.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' motions in limine.

Dated: September 13, 2022

Respectfully submitted,

 /s/ Asim Varma
Asim Varma (D.C. Bar # 426364)
Howard N. Cayne (D.C. Bar # 331306)
David B. Bergman (D.C. Bar # 435392)
Ian S. Hoffman (D.C. Bar # 983419)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave NW
Washington, D.C. 20001
(202) 942-5000
Asim.Varma@arnoldporter.com
Howard.Cayne@arnoldporter.com
David.Bergman@arnoldporter.com
Ian.Hoffman@arnoldporter.com

*Attorneys for Defendant Federal Housing Finance Agency and Director Sandra L. Thompson*

 /s/ Michael J. Ciatti
Michael J. Ciatti (D.C. Bar #467177)
KING & SPALDING LLP
1700 Pennsylvania Ave. N.W.
Washington, DC 20006
Tel: (202) 661-7828
Fax: (202) 626-3737
mciatti@kslaw.com

*Attorney for the Federal Home Loan Mortgage Corp.*

 /s/ Meaghan VerGow
Meaghan VerGow (D.C. Bar # 977165)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
Tel: (202) 383-5300
Fax: (202) 383-5414
mvergow@omm.com

*Attorney for the Federal National Mortgage Association*