**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| FAIRHOLME FUNDS, INC., *et al.,* | |
| Plaintiffs, | Case No. 1:13-cv-1053-RCL |
| v. | |
| THE FEDERAL HOUSING FINANCE AGENCY, *et al.,* | |
| Defendants. | |
| IN RE FANNIE MAE/FREDDIE MAC SENIOR PREFERRED STOCK PURCHASE AGREEMENT CLASS ACTION LITIGATIONS _____ This document relates to: ALL CASES | Miscellaneous No. 1:13-mc-1288-RCL |

**PLAINTIFFS' REPLY BRIEF TO DEFENDANTS' MEMORANDUM IN OPPOSITION TO OMNIBUS MOTION IN LIMINE**

## <u>TABLE OF CONTENTS</u>

I.    Motion in Limine 1 Should Be Granted ................................................................. 1

      A.    As Defendants Have Conceded, The Court Must Consider Nonpublic
           Information In Determining Whether Defendants' Conduct Was Arbitrary
           Or Unreasonable. ........................................................................................ 3

      B.    Defendants Misstate the Relevance of Time of Contracting and How
           Contractual Expectations Are Determined. ................................................. 4

           1.    Defendants Advance a Legally Irrelevant Understanding of
                 Contractual Expectations .............................................................. 4

           2.    Defendants Should Not Be Permitted To Tell The Jury That
                 Contractual Expectations Are Defined By All Public Information
                 In Existence A Moment Before The Net Worth Sweep Was
                 Announced. ................................................................................... 5

II.   Motion *In Limine* No. 2 to Exclude Analysts Reports Should Be Granted ........... 9

      A.    Analyst Reports Are Irrelevant and Inadmissible If Offered in Connection
           With Reasonable Contractual Expectations. ............................................. 10

      B.    Analyst Reports Are Also Inadmissible Hearsay and Lay Opinion If
           Offered to Show That FHFA Did Not Engage In Arbitrary and
           Unreasonable Conduct. ............................................................................. 11

      C.    Defendants' Proffered Non-Hearsay Basis For Admitting Analyst Reports
           Would Require Defendants to Proffer Testimony That They Are Not
           Capable of Providing. ............................................................................... 14

      D.    The Prejudicial Impact of the Analyst Reports Would Substantially
           Outweigh Their Probative Value. ............................................................ 15

III.  Motion in Limine No. 3 Concerning *Collins v. Yellen* Should Be Granted.......... 16

IV.   The Court Should Grant Plaintiffs' Fourth and Fifth Motions in Limine and
      Exclude Mr. Berkowitz's Testimony as Well as References to Class Members
      Who Purchased Their Shares After the Net Worth Sweep Was Announced. ...... 17

CONCLUSION.................................................................................................................... 20

## **TABLE OF AUTHORITIES**

**Cases**

*Amerisource Corp. v. RxUSA Int'l, Inc.*,
 2009 WL 235648 (E.D.N.Y. Jan. 30, 2009) ................................................................. 12

*Baker v. SeaWorld Ent., Inc.*,
 423 F. Supp. 3d 878 (S.D. Cal. 2019) .......................................................................... 13

*Barnes v. District of Columbia*,
 278 F.R.D. 14 (D.D.C. 2011) ........................................................................................ 19

*Champagne Metals v. Ken-Mac Metals, Inc.*,
 2004 WL 7318834 (W.D. Okla. June 15, 2004) .......................................................... 12

*Collins v. Yellen*,
 141 S. Ct. 1761 (2021) ............................................................................................. 16, 17

*Fairholme Funds, Inc. v. FHFA*,
 2018 WL 4680197 (D.D.C. Sept. 28, 2018) ................................................................ 2, 3

*Gerber v. Enterprise Products Holding, LLC*,
 67 A.3d 400 (Del. 2013) ................................................................................................. 8

*Grae v. Corr. Corp. of Am.*,
 2021 WL 1100431 (M.D. Tenn. Mar. 17, 2021) ........................................................... 13

*GWO Litig Trust v. Sprint Solutions, Inc.*,
 2018 WL 5309477 (Del. Super. Ct. Oct. 25, 2018) ........................................................ 8

*Kapps v. Torch Offshore, Inc.*,
 379 F.3d 207 (5th Cir. 2004) ........................................................................................ 8

*United States Sec. & Exch. Comm'n v. ITT Educ. Servs., Inc.*,
 2018 WL 3008632 (S.D. Ind. June 15, 2018) .............................................................. 13

**Statutes**

12 U.S.C. § 4617(f) ..................................................................................................... 17

I.     **Motion in Limine 1 Should Be Granted**

Motion in Limine 1 seeks to prohibit Defendants from introducing evidence or making arguments to the jury that contradict the legal standard set forth in the Court's 2018 opinion for determining Plaintiffs' reasonable contractual expectations.  Defendants oppose the motion by attempting unsuccessfully to defend their proposed legal standard.  Because Defendants' legal standard is untenable and squarely foreclosed by this Court's prior opinion and its September 23 summary judgment ruling, Plaintiffs' motion should be granted.

According to Defendants, Plaintiffs cannot win this case unless they satisfy two independent tests:

(1) First, Plaintiffs must establish that the Net Worth Sweep violated reasonable expectations that are rooted not simply in the contractual documents or governing law, but that instead reflect any and all publicly available information in existence as of August 17, 2012.  At the same time, Defendants insist that this inquiry must ignore all nonpublic information, and must ignore whether Defendants' conduct was arbitrary or unreasonable.

(2) Second, if and only if Plaintiffs can pass the first test, then they must show that the Net Worth Sweep was arbitrary or unreasonable once all the nonpublic information is taken into account.

This understanding of contractual expectations, their content, and the role they play in analyzing implied covenant claims is legally untenable.  This Court's September 23 summary judgment ruling correctly and specifically rejected the notion that there are two separate and independent tests, holding as follows in its September 23 decision:  "Whether defendants acted reasonably and whether they violated plaintiffs' reasonable expectations are not two separate prongs; rather, the former is determined *in reference* to the latter."  ECF 188 at 11.  The

recognition that arbitrariness is part of the inquiry into whether contractual expectations have been violated also was evident from the Court's prior rulings, including its prior statement that "while Plaintiffs could ***reasonably expect*** the GSEs to exercise discretion as it relates to dividends, they ***could not expect*** the GSEs to extinguish the possibility of dividends ***arbitrarily or unreasonably***." *Fairholme Funds, Inc. v. FHFA*, 2018 WL 4680197, *10 (D.D.C. Sept. 28, 2018) (emphasis added).

It follows that Plaintiffs are wrong that only public information may be considered in determining whether shareholders' contractual expectations have been violated. Rather, a finding that Defendants exercised their contractual discretion in an arbitrary or unreasonable fashion shows that reasonable expectations have been violated. Further, Defendants have already conceded that nonpublic information must be considered in the analysis of whether Defendants' conduct was arbitrary or unreasonable. ECF 184 at 15.

Finally, Defendants are wrong that shareholders' contractual expectations are comprised of any and all public information available as of the Net Worth Sweep. Instead, this Court has held that it is the contracts themselves, HERA, the PSPAs, and the public statements made when the conservatorships were imposed that form the sources of contractual expectations. *Id*. Defendants' contrary understanding derives from their misleading use of the term "expectations" and their disregard for the sources of *contractual* expectations that this Court previously identified and its reasons for relying on those sources. Defendants thus should be precluded from arguing that contractual expectations are formed by all public information in existence as of August 17, 2012.

### A. As Defendants Have Conceded, The Court Must Consider Nonpublic Information In Determining Whether Defendants' Conduct Was Arbitrary Or Unreasonable.

In concluding that the question of whether conduct was arbitrary is part of the same singular inquiry of whether it violated shareholder expectations, this Court necessarily confirmed that this inquiry must include consideration of non-public information. Defendants themselves have conceded that nonpublic information must be considered in connection with the inquiry into whether the Net Worth Sweep was arbitrary or unreasonable, and there could be no basis for contending otherwise. ECF 188 at 15. Defendants are therefore wrong that only public information is relevant to determining whether shareholder expectations have been violated, and they should be precluded from making such an argument to the jury.

This inevitable conclusion was evident from this Court's 2018 decision when it considered both public information and nonpublic information in assessing whether Plaintiffs had adequately alleged that the Net Worth Sweep had thwarted Plaintiffs' reasonable contractual expectations. *See Fairholme Funds, Inc. v. FHFA*, No. 13-cv-1053, 2018 WL 4680197 at **10-11. Defendants nowhere address this Court's discussion of such evidence and thus nowhere attempt to reconcile their flawed understanding with the Court's opinion.

Further, this Court's reliance on those allegations was plainly correct. Any other conclusion would permit arbitrary conduct that could only be established in whole or in part with evidence known only to the breaching party. No matter how conclusive the evidence that the breaching party arbitrarily exercised discretion conferred by the contract, the breaching party could respond, "Well you didn't know that. Only we did." As shown previously, Defendants' only answer to this point is doublespeak—specifically, that the "reasonable-conduct prong of the test protects against this risk." *See* ECF 168, Reply to Defendants' Opposition to Plaintiffs' Motion to Exclude the Opinions of Professor S.P. Kothari at 7. Defendants thereby ignore their

own argument that the so-called reasonable conduct prong is only relevant if the plaintiff cannot satisfy the reasonable expectations prong. *Id*.

### B. Defendants Misstate the Relevance of Time of Contracting and How Contractual Expectations Are Determined.

#### 1. Defendants Advance a Legally Irrelevant Understanding of Contractual Expectations

Defendants blur two different understandings of the word "expectations"—only one of which is relevant here. The one that is relevant is Plaintiffs' reasonable *contractual* expectations—*i.e.*, what shareholders reasonably expect under their *contract*. That standard is normative, rooted in contract and the governing law, and is based on the expectation that Defendants would exercise their discretionary contractual performance in a reasonable, non-arbitrary way.

Defendants, by contrast, use the word "expectations" as an essentially amorphous concept that is untethered from the contract and instead asks something akin to whether a reasonable shareholder could have ***predicted*** "something like" the Net Worth Sweep based on all public information available as of the moment before the Sweep was announced. Defendants argue that failing to consider all publicly available information in determining Plaintiffs' "expectations" is akin to assuming shareholders are "blind" to the world around them. To the contrary, it reveals that Defendants are misusing the word "expectations." The correct understanding is rooted in what the shareholder has a right to expect from their counterparty under the ***contract***. A counterparty does not get a free pass by lowering expectations through their post-contracting conduct, or by pointing to news reports.

Were it otherwise, Defendants could have eliminated shareholders' contractual expectations by issuing a press release in advance of the Net Worth Sweep with the headline: "Arbitrary Effort To Wipe Out All Shareholder Right To Profits Coming Soon:  Stay Tuned

With Appropriately Lowered Expectations."  Such an understanding of the word "expectations" has no foundation in law.  It is a gimmick of Defendants designed to warp the definition of expectations so as to confuse the jury.

> **2.  Defendants Should Not Be Permitted To Tell The Jury That Contractual Expectations Are Defined By All Public Information In Existence A Moment Before The Net Worth Sweep Was Announced.**

The case law holds that contractual expectations are set at the "time of contracting," and this Court "set the date of the Recovery Act's enactment and the FHFA's appointment as conservator as the barometer to evaluate the parties' reasonable expectations."  ECF 138 at *16 (Memorandum Opinion granting motion for class certification).[1]  *See Fairholme Funds*, 2018 WL 4680197, at *9 (holding that "time of contracting" in this case includes enactment of HERA and imposition of conservatorship and PSPAs).  This Court also undertook an extensive analysis of the ***sources*** that can inform contractual expectations, and identified the sources as the contracts themselves, HERA, the PSPAs, and pertinent public statements made by FHFA at the time of the conservatorships.  *Id.* at *9.

Nevertheless, Defendants claim the "time of contracting" must be August 17, 2012 – i.e., the time the Net Worth Sweep was executed.  They reference regulatory guidelines promulgated just prior to the Net Worth Sweep, assert that these guidelines should be viewed as the "time of

---

[1] This Court's September 23 ruling on Plaintiffs' partial motion for summary judgment states in connection with a different issue that the "relevant time of 'contracting' for purposes of evaluating plaintiffs' implied covenant claim is the time immediately before enactment of the Third Amendment."  ECF 188 at 26 n.9.  The difference between this date and the Recovery Act is not material so long as it is recognized that shareholders' reasonable expectations are defined with reference to the sources identified in this Court's prior opinion.  The parties agree that changes in the law impact contractual expectations, and regardless, Defendants have not identified any post-Recovery Act law that actually changed contractual expectations.  The time of contracting thus only would become relevant under Defendants' untenable view that shareholders' contractual expectations are defined by any and all public information that happens to be available when a regulation is enacted.

contracting," and then use this contrivance to argue that shareholders' contractual expectations should be defined by any and all publicly available information available as of the date the Net Worth Sweep.

Defendants are wrong. The guidelines Defendants cite are entirely irrelevant to this case. Defendants attempt to portray them as relevant because they provide that the conservator can order the GSEs not to pay dividends if the operational guidelines are violated. This is nonsense. This case has been pending since 2013. Yet Defendants have never once suggested that these guidelines support their position that shareholders reasonably expected the Net Worth Sweep (even under Defendants' incorrect understanding of reasonable expectations). Their purported "expert" on contractual expectations mentions everything from analyst reports to HERA to newspaper articles to securities filings, yet never once mentions these guidelines as bearing on shareholders' contractual expectations. Nor does Defendants' opposition attempt to show that the regulations actually impacted contractual expectations in any material way. If the regulations themselves do not alter shareholders' contractual expectations in any material way, there could be no basis for arguing that public information available at the time does so.

Moreover, even if Defendants had identified a law that did alter shareholder contractual expectations in a material way, contractual expectations would be defined by reference to the law, not by any and all public information that happened to be available at the time. Contractual expectations are not defined by an evolving set of publicly available information. Instead, consistent with the D.C. Circuit's decision in *Perry II*, this Court's 2018 motion to dismiss opinion analyzed the contracts, the law, and certain FHFA public statements that informed the contemporaneous understanding of the change in legal status that FHFA had initiated in putting the GSEs into conservatorship.

6

Defendants assert that these are not the exclusive sources for contractual expectations. They argue, for example, that there is no logical reason to limit the pertinent statements of public officials that were contemporaneous to the conservatorship to the ones identified in Plaintiffs' complaint. To begin with, this is a straw man. Defendants are not arguing that contractual expectations should incorporate other 2008 sources from the time of the conservatorship that are similar in kind to those identified by the Court. Instead, they are arguing that contractual expectations should be defined by all manner of public information available as of the Net Worth Sweep in August 2012 (including analyst reports, SEC filings, and news articles, *see* Opp. at 26) simply because an irrelevant regulation happened to be issued around the same time.

More fundamentally, Defendants ignore why the D.C. Circuit and this Court chose the contract, HERA, and contemporaneous statements about the purpose of the conservatorship, rather than random analyst reports. Those sources inform contractual expectations because they either are part of the contract or are changes in law that directly impact the relevant contractual expectations. As explained in *Perry II* and this Court's opinion, shareholders anticipate that the law will change and are understood to incorporate that expectation into their contract. *Fairholme Funds*, 2018 WL 4680197, at *9 (changes in contracts may come with amendments to the contracts and "may also come in the form of changes in law affecting the nature of the corporation, its governance, and its relationship with shareholders"). The time of contracting thus changes as the law changes to ensure the consistency of the contracts with the law. *Id.* That same rationale manifestly does not apply to any and all public information available any time a new regulation is passed. Such an understanding of the word "expectations" has no foundation in law and would allow Defendants to avoid liability simply by announcing the Net Worth Sweep in advance of executing it. Defendants have no response to this.

Defendants further reveal the flaws of their position by trying to co-opt the "total mix" of information that applies in a securities-fraud case. They ignore that the issue in a securities-fraud case differs markedly from the issue in this case. As reflected in Defendants' authority, a materiality analysis in a securities-fraud case asks whether knowing the truth would have made a difference to a reasonable investor considering the issue at the time of the wrong in light of all information available at the time. *See Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 213 (5th Cir. 2004) (a "fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in making an investment decision").

By contrast, the purpose of an implied covenant analysis is to determine what shareholders would have agreed to at the time of contracting had they considered the issue "at the time of contracting." For a contract that confers discretion, shareholders reasonably expect that a contracting party will exercise their discretion reasonably, and "what is 'arbitrary' or 'unreasonable' depends on the parties' ***original contracting expectations***, not a 'free-floating' duty applied ***at the time of the wrong***." *See generally Gerber v. Enterprise Products Holding, LLC*, 67 A.3d 400, 419 (Del. 2013) (emphasis added); *see also id.*, 67 A.3d at 419-20 (finding that lower court erred in "improperly conflat[ing] two distinct concepts" and in "ignore[ing] the temporal distinction between them"). Even the case law relied on by Defendants confirms that the most that is relevant to contractual expectations is the "*background* of the parties *agreements*," not just a free-floating inquiry into all public information. *See GWO Litig Trust v. Sprint Solutions, Inc.*, No. CV N17C-06-356, 2018 WL 5309477, at *6 (Del. Super. Ct. Oct. 25, 2018) (cited at page 20 of Defendants' brief). This means changes in the law and contract and statements by a contracting party (FHFA) that illuminate the meaning of those changes. It does

not mean, as Defendants advocate, an evolving set of public information that *postdates* the contract.

Defendants' proposed standard also is neither "logically consistent" and "easy to administer" as Defendants claim. Rather, as reflected in Plaintiffs' detailed discussion in the motion to exclude Professor Kothari's testimony, Defendants' proffered expert testimony on "reasonable expectations" consists of a clip-job summary of selected public information over time followed by conclusory statements that shareholders reasonably expected the Net Worth Sweep. *See* Dkt. 157, Memorandum of Law in Support of Plaintiffs' Motion in Limine to Exclude the Opinions of Professor S.P. Kothari at 5-17; Dkt. 168, Reply to Defendants' Opposition to Plaintiffs' Motion to Exclude the Opinions of Professor S.P. Kothari at 5-15. It offers no underlying methodology and is merely an effort to have an expert mouth an alternate narrative of public information that does not address the GSEs' internal information and that is based on a legally irrelevant conception of expectations. Further, he does not purport to measure contractual expectations of the Net Worth Sweep—*i.e.* of a deliberate giveaway of 100% of the GSEs' profits in perpetuity for no consideration for reasons that were entirely arbitrary. Instead, he purports to measure expectations of what he refers to as "something like" the Net Worth Sweep by which he means any scenario that could have resulted in no dividends. This is not an "easy to administer" standard. It is a free-form, amorphous analysis untethered to any coherent methodology and based on an incorrect legal standard.

## II.   Motion *In Limine* No. 2 to Exclude Analysts Reports Should Be Granted

Plaintiffs seek to preclude Defendants from offering securities analyst reports into evidence. The analyst reports are hearsay, constitute improper lay expert testimony, and any negligible probative value is substantially outweighed by unfair prejudice. *See* Omnibus MIL at 15-17. Defendants contend that the analyst reports are not hearsay because they will be offered

not for the truth of the matters asserted therein, but rather to demonstrate that they were part of the "total mix" of information that (they mistakenly claim) informed reasonable contractual expectations, and that they are "highly relevant" to whether FHFA acted arbitrarily or unreasonably. *See* Opposition at 23. Both of Defendants' purported "non-hearsay purposes" are invalid. The Court should exclude the analyst reports.

### A. Analyst Reports Are Irrelevant and Inadmissible If Offered in Connection With Reasonable Contractual Expectations.

Defendants first contend that analyst reports are relevant because they are "part of the 'total mix' of information that informs the reasonable expectations of the hypothetical reasonable shareholder, regardless of whether their contents are true." Opp. at 23. This argument should be rejected for the same reasons Motion in Limine 1 should be granted—namely, it rests on a legally irrelevant understanding of shareholder expectations that is fundamentally flawed on multiple levels, including that it ignores the basic contractual expectation that the Defendants would not exercise their contractual discretion arbitrarily or unreasonably. Shareholders' reasonable contractual expectations are determined not by the "total mix" of information available in the market as of the date of the wrong, but rather by the specific sources of information this Court identified in its 2018 opinion. *See* Section I(A), above. Hence, the entire premise for Defendants' first intended "non-hearsay" use of analyst reports is contrary to the law of the case and legally untenable.

Furthermore, it makes no sense to assert that the reports could somehow be relevant to contractual expectations "regardless of whether they are true or not." Opp. at 26-27. Defendants do not and cannot explain why "the hypothetical reasonable shareholder" should or would pay any attention to analyst reports if the contents of the reports were indisputably untrue. Defendants themselves contend that "[a]nalyst reports are **important sources of information** about the

companies of which a hypothetical reasonable shareholder would be aware, and **which should inform their beliefs and expectations**." Opp. at 26 (emphasis added).  This assertion reveals that Defendants fully intend to rely on these documents ***for their truth***.  The hypothetical reasonable shareholder serves as an alias for the views Defendants want the jury to adopt as true.  Thus, even apart from the legal irrelevance of Defendants' conception of reasonable contractual expectations, the analyst reports would be inadmissible hearsay because Defendants would necessarily be offering them for the truth of the matters asserted therein.

Finally, contrary to Defendants' argument, it is ***not*** "for the jury to determine how much or how little weight any given analyst report would have on the reasonable expectations of a hypothetical reasonable shareholder."  Opp. at 27.  Rather, it is for the ***Court*** to determine the sources of information that "inform[] the reasonable expectations of the hypothetical reasonable shareholder."  The Court has done so and has determined that analyst reports are not among the pertinent sources of information. *Fairholme*, 2018 WL 4680197 at \*9.  Accordingly, the Court should not permit Defendants to introduce them into evidence.

### B. Analyst Reports Are Also Inadmissible Hearsay and Lay Opinion If Offered to Show That FHFA Did Not Engage In Arbitrary and Unreasonable Conduct.

Also meritless is Defendants' argument that analyst reports are not lay opinions and are "admissible as non-hearsay evidence because they demonstrate that there were specific market concerns that the Third Amendment directly addressed."  Opp. at 27.  According to Defendants:

> One reason why the Third Amendment was not arbitrary or unreasonable is that there were concerns, expressed publicly by analysts, that the potential for erosion of the Treasury commitment once the commitment became capped at the end of 2012 could have adverse effects on Fannie, Freddie, and the economy.  The Third Amendment addressed those concerns.  The existence of those concerns and the Third Amendment's response to them is evidence that the Third Amendment was not arbitrary or unreasonable.

Opp. at 27.  *See also* Opp. at 28 ("the evidence at trial will demonstrate that FHFA monitored analyst reports, that FHFA was aware of a number of analysts who were concerned about erosion of the Treasury commitment, and that these concerns were factors in FHFA's decision to enter into the Third Amendment.").

Like the first "non-hearsay" rationale, this rationale again seeks to use the analyst reports for the truth of the statements contained therein.  To justify the Net Worth Sweep, Defendants seek to use the "concerns" stated in the analysts' reports to prove that those concerns were true and valid, and hence a reasonable justification for the Sweep.  This use of the reports is relevant only if the statements of concern in the reports are truthful.  The analyst reports would therefore be offered for the truth of the matters asserted therein, *i.e.*, they would be hearsay, for which there is no applicable exception.[2]

Defendants' argument that "[f]or this purpose, the *truth* of any analyst reports is irrelevant," Opp. at 27-28, is untrue.  FHFA would not have "[taken] their concerns seriously and acted in a way that addressed their concerns," Opp. at 29, if FHFA did not believe the analysts

---

[2] F.R.E. 803(3) and the case law interpreting it make clear that the analysts' statements of "concern" that Defendants seek to offer into evidence are inadmissible.  The rule provides that "a statement of the declarant's then-existing state of mind (such as motive, intent, or plan)" is "not excluded by the rule against hearsay," but the exception does not apply to "a statement of memory or belief to prove the fact remembered or believed."  F.R.E. 803(3).  Cases interpreting F.R.E. 803(3) uniformly hold that statements explaining *why* the declarant held a particular belief or opinion are inadmissible.  *See, e.g., Amerisource Corp. v. RxUSA Int'l, Inc.*, No. 02-CV-2514 (JMA), 2009 WL 235648, at *2 (E.D.N.Y. Jan. 30, 2009) (explaining that F.R.E. 803(3) "does not permit the witness to relate any of the declarant's statements as to why [the declarant] held the particular state of mind, or what [the declarant] might have believed that would have induced the state of mind."); *Champagne Metals v. Ken-Mac Metals, Inc.*, No. CIV-02-528-C, 2004 WL 7318834, at *3 (W.D. Okla. June 15, 2004) ("Hearsay statements of [declarants'] representatives may be considered for the non-hearsay purpose of showing the state of mind of [declarants'] decision makers (to the extent relevant), but not for the purpose of showing why [declarants] were concerned."), *reversed on other grounds,* 458 F.3d 1073, 1081 (10th Cir. 2006).  Hence, the analysts' statements about why they (purportedly) were concerned about the erosion of the Treasury commitment are inadmissible hearsay.

truly had the concerns expressed in their reports.  Nor can FHFA credibly dispute that it wants the jury to draw that inference.  Consequently, the truth of those concerns, and the truth of the underlying basis for those concerns, is central to the purpose for which Defendants say they intend to offer the reports into evidence.  That purpose runs afoul of the rule against hearsay, and therefore the Court should not permit it.

Moreover, the cases on which Defendants rely do not support their argument.  Indeed, the court in *Grae v. Corr. Corp. of Am.*, No. 3:16-CV-2267, 2021 WL 1100431 (M.D. Tenn. Mar. 17, 2021), held "[t]here is little doubt that the analysts' statements are hearsay and could not be offered for their truth—that is, as, effectively, ready-made expert testimony that was not made in court and that is not subject to cross examination."  *Id. at* *3.  The issue in *Grae*, a securities fraud case, was whether an expert witness could "include discussion of the analysts' statements as part of explaining her own view," *id*. at *4, and the court held that she could do so under F.R.E. 703.  *Id*.  *Grae* in no way supports the admissibility of analyst reports in the present case. Far from it, Plaintiffs specifically distinguished between the purpose of the motion—excluding the analyst reports from being admitted as evidence—and reliance on them by Defendants' expert Dr. Attari if the proper foundation can be provided.

Further, in *United States Sec. & Exch. Comm'n v. ITT Educ. Servs., Inc.*, No. 115CV00758JMSMJD, 2018 WL 3008632, at *6 (S.D. Ind. June 15, 2018), another securities fraud case, the court held that "emails from, to, and between Defendants attaching and discussing written reports of financial analysts," ***not*** the reports themselves, were admissible as evidence of the defendants' state of mind.  *Id*.  And in *Baker v. SeaWorld Ent., Inc.*, 423 F. Supp. 3d 878 (S.D. Cal. 2019), also a securities fraud case, the court held that analyst reports were admissible "to demonstrate how the market understood and interpreted SeaWorld's disclosure," *id.* at 927,

13

not as evidence of the defendants' state of mind, let alone as evidence of facts that supposedly justify defendants' actions.  None of the cited cases provides a basis for admitting analyst reports here to show the reasonableness of Defendants' actions.

### C. Defendants' Proffered Non-Hearsay Basis For Admitting Analyst Reports Would Require Defendants to Proffer Testimony That They Are Not Capable of Providing.

Defendants' claim of a bona fide non-hearsay purpose also fails because the claim that it is relevant to FHFA's state of mind would require Defendants to identify specific reports that the decisionmaker was aware of and relied upon at the time for reasons that were independent of the truth of the statements made therein.  Defendants have failed to demonstrate any basis for doing so.  Instead, Acting Director DeMarco has identified himself as the sole decision-maker for the Net Worth Sweep, and at his deposition in 2015, could only identify one analyst report that he recalled as informing his analysis prior to the Net Worth Sweep.   *See* Ex. A, DeMarco Dep. (2015) at 242:21-243:12; Ex. B, DeMarco Dep. (2020). at 17:6-18:2.

Defendants' opposition actually provides additional justifications for granting Plaintiffs' motion.  Defendants attempt to justify the admission of particular analyst reports with assertions that "*FHFA* monitored analyst reports" and "believed them to be important" and because "*FHFA* took their concerns seriously and acted in a way that addressed those concerns."  These assertions are highly imprecise.  Further, they appear to introduce a second level of hearsay through generalized summaries of analyst reports and through documents that summarize the content of other documents.  *See*, *e.g.*, Defs. Opposition at 29 (referring to a January 2012 Power Point stating that "some market participants have begun to raise questions . . . .").  Adding additional levels of hearsay is not a ground for admitting evidence.  It provides additional grounds for excluding it.

**D. The Prejudicial Impact of the Analyst Reports Would Substantially Outweigh Their Probative Value.**

Even if the analyst reports had a relevant non-hearsay purpose, which they do not, the unfair prejudice of admitting them into evidence would substantially outweigh whatever minimal probative value they might have.  Defendants offer the pro forma assertion that a curative jury instruction would resolve all ills, yet they fail to identify what such an instruction would look like, and the reality is that (as shown above) Defendants' own explanations sound like they are offering the documents for their truth.  Any probative value of the documents is further diminished by the fact that many of them were written in different years and well in advance of the Net Worth Sweep.  And given that Defendants have failed to allege a credible purpose that does not depend on the documents' truth, Defendants have failed to make any case that any report has a non-hearsay purpose with a probative value that is not substantially outweighed by the near inevitability that the jury would construe these documents as offered for their truth.

Finally, as Defendants acknowledge, in determining whether FHFA's adoption of the Third Amendment was arbitrary and unreasonable, the jury will consider all the information – public and non-public – known to FHFA at the time.  *See* Opp. at 15.  Analyst reports, by contrast, are based solely on public information.  In particular, analysts did not have access to the information FHFA had regarding the GSEs' internal projections, their expectation of upcoming "golden years" of profitability, and the likelihood that they would need to take few, if any, future draws from Treasury to pay dividends to Treasury (eliminating the so-called circular draw issue).  Admitting analyst reports into evidence would risk misleading the jury into placing undue reliance on the partially-informed views of outside observers rather than evaluating the conduct of FHFA based on all the information available to it when FHFA entered into the Third

Amendment.  Accordingly, in addition to all the other reasons discussed herein and in Motion In Limine No. 2, the Court should exclude the analyst reports under F.R.E. 403.

## III.   Motion in Limine No. 3 Concerning *Collins v. Yellen* Should Be Granted.

Plaintiffs seek to preclude Defendants from referring to, or introducing testimony or other evidence concerning, the dismissal of any claims or any other decisions in this or any related case, including *Collins v. Yellen*, 141 S. Ct. 1761 (2021).  Defendants represent that they do not intend to affirmatively introduce any such evidence or argument or refer to any other decisions, other than *Collins*, unless Plaintiffs "open the door to such references."  Opp. at 31.

As to *Collins*, Defendants contend that they must have the ability to cross-examine Plaintiffs' summary witness "on the Supreme Court's definitive interpretation of HERA in *Collins*."  *Id*.  However, as Plaintiffs have previously explained, they have not decided whether their summary witness, Susan Hartman, will read provisions of HERA into the record, but have merely "reserved the right to do so in the event it proves necessary and appropriate in light of the Court's subsequent rulings."[3]  If Ms. Hartman ultimately does read provisions of HERA, she will recite them verbatim, and her testimony will not include any interpretation of HERA or contain any opinion by Ms. Hartman as to that statute's application to any facts, evidence or claim in this case.  Thus, Defendants will not be prejudiced by Ms. Hartman's reading of HERA, nor is there any need for Defendants to refer to *Collins* in their cross-examination of Ms. Hartman.[4]

Finally, Defendants contend that they "should be permitted to address *Collins* at trial if Plaintiffs open the door" by, for example, having Plaintiffs' experts "opine about FHFA's goals

---

[3] ECF 187, Plaintiffs' Memorandum Of Law In Opposition To Defendants' Motion In Limine To Exclude Evidence And Testimony By Plaintiffs' Proposed "Summary Witness" Susan Hartman, at 31.

[4] Any such cross-examination on this portion of Ms. Hartman's testimony should only address whether she accurately recited the provisions of HERA.

or responsibilities or authorities that are contrary to *Collins* or any prior rulings in this case, or otherwise testify about provisions of HERA or other issues addressed by the Supreme Court in *Collins*." Opp. at 31. But none of Plaintiffs' experts intend to provide any opinion contrary to the rulings in *Collins* or in this case. Nor do any of Plaintiffs' experts or fact witnesses intend to address *Collins*. As this Court recognized in its summary judgment decision issued today (September 23, 2022), in *Collins* the Supreme Court held that 12 U.S.C. § 4617(f) barred plaintiffs' claims that FHFA exceeded its statutory powers, and therefore that decision has no impact on Plaintiffs' implied covenant contractual claim in this case. In short, *Collins* has no relevance here, and any reference to it would be unduly prejudicial to Plaintiffs.

## IV. The Court Should Grant Plaintiffs' Fourth and Fifth Motions in Limine and Exclude Mr. Berkowitz's Testimony as Well as References to Class Members Who Purchased Their Shares After the Net Worth Sweep Was Announced.

Defendants are apparently worried that jurors will feel sympathy for shareholders whose investments were wiped out by the Net Worth Sweep. To try to avoid that outcome, Defendants' first proposal is to muzzle the named plaintiffs via a motion in limine that would prevent them from testifying about virtually anything, including the basic facts of this case. Failing that, Defendants' latest filing reveals their backup plan is to argue to the jury that some of the absent class members are rich and would unfairly profit from a damages award on shares of Fannie and Freddie they purchased after the Net Worth Sweep was announced. The Court should deny Defendants' motion in limine for reasons Plaintiffs explained in our opposition to that motion, and it should likewise bar Defendants from executing their fallback plan of attempting to inflame the jury against Plaintiffs through misleading and irrelevant argument.

In seeking to introduce testimony from Mr. Berkowitz and argument about class members who purchased after the Net Worth Sweep, Defendants are attempting to take

advantage of the fact that, as this Court ruled in 2018, shareholders' implied covenant claims inhere in the securities at issue and are properly asserted by the current holders of Fannie and Freddie stock. *See Fairholme*, 2018 WL 4680197 at *17 ("When a share of stock is sold, the property rights associated with the shares, including any claim for breach of those rights and the ability to benefit from any recovery or other remedy, travel with the shares.") (internal quotation marks omitted). That ruling was correct as a matter of Delaware and Virginia law and consistent with a long American tradition of requiring the issuers of securities to honor their contractual obligations to assignees. *See* Alexander Hamilton, The First Report on Public Credit (Jan. 9, 1790), https://bit.ly/3R97ONj (explaining Treasury Department's decision to pay revolutionary war debts that had been purchased at steep discount by speculators). Further, the results of that ruling—*i.e.*, that subsequent purchasers have the rights of sellers—are entirely irrelevant to this case. Nevertheless, Defendants apparently hope to obtain a favorable result at trial by labeling absent members of the plaintiff class as wealthy speculators attempting to profiteer from the Net Worth Sweep. As Plaintiffs explained in their fourth and fifth motions in limine, such arguments are improper and should be excluded as both irrelevant and unfairly prejudicial.

Further, whatever the parties' various disputes about shareholder contractual expectations in connection with MIL 1 and the extent of the named plaintiffs' testimony, one thing that no one disputes is that it is irrelevant what shareholders expected *after* the Net Worth Sweep when Mr. Berkowitz's fund purchased its shares. Defendants underscore why Mr. Berkowitz's testimony could mislead the jury when they note that he, unlike some of the named plaintiffs, consulted HERA and various other legal documents before deciding to invest in Fannie and Freddie stock. Opp. at 38. The sources of information a reasonable investor would consider when deciding to buy this stock *after* the Net Worth Sweep are obviously very different from the sources that

would be most important to a reasonable investor before Defendants executed the Net Worth

Sweep.  Allowing Defendants to introduce testimony from Mr. Berkowitz on his investment

strategy and the sources he consulted when deciding to purchase shares of Fannie and Freddie in

2013 and later would thus sow confusion and misdirect the jury to facts not relevant to any issue

the jury must decide.

Defendants also miss the mark when they suggest that Mr. Berkowitz's testimony should

be admitted to give the jury a more complete picture of the kinds of people who are members of

the plaintiff class.  Defendants accuse plaintiffs of seeking to present "a narrative focused on

shareholders who invest without formal training in non-professional settings, while excluding

more sophisticated, professional investors who also make up parts of the class." Opp. at 39.  That

is not true.  Class Plaintiffs do not seek to present such a narrative, and Defendants further ignore

the fact that Plaintiffs also intend to present testimony from Edward Linekin of Berkley

Insurance Company—an institutional investor that, unlike Fairholme, owned shares in Fannie

and Freddie during the relevant period for assessing investor expectations (before the Sweep was

executed).  Moreover, Plaintiffs do not dispute that investor expectations in this context must be

assessed according to an objective standard, which makes the actual composition of the class

legally irrelevant.  That distinguishes cases like *Barnes v. District of Columbia*, 278 F.R.D. 14

(D.D.C. 2011), where damages were to be measured in part based upon the actual characteristics

of class members rather than based upon an objective standard.  Nothing about Defendants'

presentation of testimony from named class representatives and a named individual insurance

company plaintiff, according to whatever limitations the Court imposes, could possibly warrant

presenting what all parties agree is irrelevant testimony from a single wealthy absent class

member for a deliberately prejudicial purpose.

19

## CONCLUSION

For the foregoing reasons and those set forth in our opening brief, the Court should grant

the motions in limine contained in Plaintiffs' Omnibus Motion in Limine.

Date: September 23, 2022

Respectfully submitted,

*/s/ Charles J. Cooper*
Charles J. Cooper (Bar No. 24870)
David H. Thompson (Bar No. 450503)
Vincent J. Colatriano (Bar No. 429562)
Peter A. Patterson (Bar No. 998668)
Brian W. Barnes (*Pro Hac Vice*)
**COOPER & KIRK, PLLC**
1523 New Hampshire Avenue, N.W.
Washington, DC 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com
*Counsel for Berkley Plaintiffs, et al.*

*/s/ Hamish P.M. Hume*
Hamish P.M. Hume (Bar No. 449914)
Samuel C. Kaplan (Bar No. 463350)
**BOIES SCHILLER FLEXNER LLP**
1401 New York Ave. NW
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
hhume@bsfllp.com
skaplan@bsfllp.com

Eric L. Zagar (*Pro Hac Vice*)
**KESSLER TOPAZ MELTZER & CHECK, LLP**
280 King of Prussia Rd.
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
ezagar@ktmc.com

Michael J. Barry (*Pro Hac Vice*)
**GRANT & EISENHOFER, P.A.**
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100
mbarry@gelaw.com

Adam Wierzbowski (*Pro Hac Vice*)
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
adam@blbglaw.com
*Co-Lead Counsel for the Class*