```
 1                   BEFORE THE UNITED STATES DISTRICT COURT
                          FOR THE DISTRICT OF COLUMBIA
 2

 3       FAIRHOLME FUNDS, INC., et al.,   .
                                          .
 4               Plaintiffs,              .
                                          .
 5           vs.                          .  Case Number 13-cv-1053
                                          .
 6       FEDERAL HOUSING FINANCE AGENCY, .
         et al.,                          .
 7                                        .
                 Defendants.              .
 8       - - - - - - - - - - - - - - - - -
         In re FANNIE MAE/FREDDIE MAC     .  Case Number 13-mc-1288
 9       SENIOR PREFERRED STOCK PURCHASE .
         AGREEMENT CLASS ACTION           .  Washington, D.C.
10       LITIGATIONS.                     .  October 17, 2022
         - - - - - - - - - - - - - - - - -   10:22 a.m.
11

12                   TRANSCRIPT OF JURY TRIAL, MORNING SESSION
                       BEFORE THE HONORABLE ROYCE C. LAMBERTH
13                         UNITED STATES DISTRICT JUDGE

14       APPEARANCES:

15       For Berkley Plaintiffs:        BRIAN BARNES, ESQ.
                                        Cooper & Kirk, PLLC
16                                      1523 New Hampshire Avenue Northwest
                                        Washington, D.C. 20036
17
         For Class Plaintiffs:          LEE RUDY, ESQ.
18                                      Kessler Topaz Meltzer & Check, LLP
                                        280 King of Prussia Road
19                                      Radnor, Pennsylvania 19087

20                                      HAMISH HUME, ESQ.
                                        KENYA DAVIS, ESQ.
21                                      Boies Schiller Flexner LLP
                                        1401 New York Avenue Northwest
22                                      Washington, D.C. 20005

23

24                          -- continued --

25
```

```
 1    APPEARANCES (CONTINUED):

 2                                ROBERT KRAVETZ, ESQ.
                                  Bernstein Litowitz Berger &
 3                                   Grossmann LLP
                                  1251 Avenue of the Americas
 4                                New York, New York 10020

 5    For Defendant Federal
      Housing Finance Agency:     JONATHAN STERN, ESQ.
 6                                DAVID BERGMAN, ESQ.
                                  IAN HOFFMAN, ESQ.
 7                                Arnold & Porter Kaye Scholer LLP
                                  601 Massachusetts Avenue Northwest
 8                                Washington, D.C. 20001

 9

10    Official Court Reporter:    SARA A. WICK, RPR, CRR
                                  United States District Court
11                                  for the District of Columbia
                                  333 Constitution Avenue Northwest
12                                Room 4704-B
                                  Washington, D.C. 20001
13                                202-354-3284

14    Proceedings recorded by stenotype shorthand.
      Transcript produced by computer-aided transcription.
15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2          (Call to order of the court.)
 3              COURTROOM DEPUTY:  Your Honor, we are on the record
 4      for consolidated cases 13 Miscellaneous Case 1288, and 13 Civil
 5      Case 1053, Fannie Mae versus Freddie Mac and -- sorry, Fairholme
 6      Funds, Incorporated versus Federal Housing Finance Agency,
 7      et al.
 8          Counsel, please identify yourselves for the record.
 9              MR. STERN:  Good morning, Your Honor.  Jonathan Stern
10      for the defendants.
11              MR. HUME:  Good morning, Your Honor.  Hamish Hume for
12      the plaintiffs.  My colleagues --
13              THE COURT:  We will do that on the record in a minute.
14          The list I was handed by counsel this morning to go with
15      the voir dire questions, I need some work on the list, if you
16      all can work on that before I bring the panel or while we're
17      bringing the panel.
18          Plaintiffs' counsel are listed and defendants' counsel are
19      listed, but they are listed separately.  Whoever was working on
20      the list, I didn't get this until this morning, but the firms
21      should be beside the name of each counsel so that when I read it
22      to the jury, I read the name and the firm.
23          In addition, it has class plaintiffs listed.  Michelle
24      Miller is actually not a plaintiff.  She can be a class
25      representative.  But I don't really care if I read it that way
```

1   to the jury panel as a class plaintiff; she is a class

2   plaintiff.  She's not a named plaintiff.  But I can read it that

3   way.

4       But then it only lists Berkley Insurance Company in the

5   statement of the case.  I'm reading the names of a number of

6   other insurance companies.  So I assume we should identify those

7   in this as well.  So whoever is working on the list should add

8   in those other insurance companies as well in this list, because

9   I'm asking the jurors if they know any of these companies and

10  lawyers.  That's a part of what the purpose of voir dire is.  So

11  whoever is putting together this list.

12          MR. RUDY:  Thank you, Your Honor.  Lee Rudy for

13  plaintiffs.  We have been collaborating with counsel, and we

14  will get a new copy, I guess to your law clerk.

15          THE COURT:  E-mail it to my clerk, and I can read from

16  that as we're going through the voir dire.

17          MR. RUDY:  We will do that promptly.  Thank you.

18          THE COURT:  If both of you will work on who the

19  counsel are.  And then I am not giving any identification of the

20  witnesses.  If you want me to give any identification of them, I

21  could.  What I usually do in trial is just read the name.  I'm

22  going to say to the -- what I normally say to the jurors is, If

23  you recognize any name, just write the number of the -- the

24  person's name down, and I will follow up with you in the

25  follow-up of whether that person is the person who is a witness,

1    and let them describe who the person is, if they know by that

2    name.

3         If you want me to do any identification, I can add it at

4    the time I read the name, but normally, this is the way I would

5    read the witness names.

6         If there are any other questions about this before I move

7    to the other questions on the voir dire --

8              MR. STERN:  It's a separate issue, Your Honor.  So at

9    the Court's pleasure.

10             THE COURT:  Whoever is working on the list, we have a

11   panel.  54 out of 55 have been sent to us by the jury office.

12   So we're ready to bring them in.

13        On the voir dire questions themselves, I had a couple of

14   changes I decided to make.  On question 6, I have a rewording

15   that I would like to make from your original wording, if you

16   have your voir dire there.

17        I would change the wording to say, "Do you have any strong

18   feelings or beliefs about whether government officials generally

19   try their best to serve the public interest?"  And that's a more

20   logical way to follow up, rather than just a yes or no to that

21   question.

22        On question 7, I would also change that wording to, "This

23   case will involve testimony of witnesses who are government

24   employees and others who are not.  Do you consider yourself any

25   more or less likely to believe witnesses who are current or

1  former government employees than those who are not government

2  employees?"

3      And I think that will be more likely to be answerable by

4  yes or no.

5      On question 10, I would just add the word, "Do you have any

6  strong opinions, positive or negative, about the influence of

7  large corporations?"  So I would just add the word "strong" to

8  question 10.

9      I would add a new question 12 and renumber the following

10  questions.  I assume that y'all overlooked or thought it would

11  be covered in 12A, but I would rather ask a separate question.

12  "Do you know now or have you in the past owned stock in Fannie

13  Mae or Freddie Mac?"  I think if they have an answer to that, we

14  should service that and make sure everybody thinks specifically

15  of that, and we should service if anyone actually has that.  So

16  I would propose to make that just a separate question before we

17  just ask the -- if you have any stock, make that a separate

18  question.  So that would be 12, and we will renumber everything

19  else from there on to 13 and have what you have there.

20      I thought about -- unless you all disagree, I would rather

21  on what would then be 13F say, "Do you believe that investing in

22  the stock market is like gambling?" rather than "Do you agree?"

23  I think it's more, I guess -- rather than agree.  I mean,

24  "agree" is sort of suggesting.  Maybe "believe" would be a

25  better way to word it.

1          So 13F then would say, "Do you believe that investing in

2   the stock market is like gambling?"  So they can say yes or no

3   to it.  And when I read the question, I'll say, If you have yes

4   to any of those, jot down the number.

5          The only other one I would -- 26, which I thought would

6   be -- well, I do have one change to 21.  To make it a yes or no,

7   I would say, "Do you own your home?"  The way you had it all

8   worded was, "Do you own or rent?"  If you change it to, "Do you

9   own your home?" that's a yes or no.

10         And on 26, I would change the wording, "Do you have any

11  strong views on class action lawsuits, the parties to such

12  lawsuits, whether plaintiffs or defendants or their lawyers?"

13  which would get us a yes or no and would lead to logical

14  follow-up that might lead to disqualification or give you a

15  basis for voir dire that could lead to disqualification.

16         So if any of you want to object to any of those changes

17  that I propose to make in the voir dire, I will hear your

18  objections.

19              MR. STERN:  Your Honor, good morning again.  Jonathan

20  Stern for the defendants.

21         No objection to those questions, Your Honor.  We do have an

22  agreed-upon request for one additional question.  I don't know

23  whether the Court wants to hear that now or --

24              THE COURT:  Now is good.

25              MR. STERN:  Your Honor, in whatever -- I suspect this

1    is a question that the Court has asked many times.  So in

2    whatever form the Court wishes to put the question, the parties

3    have agreed that it would be helpful to add a question to the

4    effect of, "Have you read or heard anything about this case?"

5              THE COURT:  All right.

6              MR. STERN:  Thank you, Your Honor.

7              THE COURT:  What I was going to do for the statement

8    of the case was read the statement of the case that you have in

9    the agreed-upon instruction number 3.  That's where I was

10   getting the -- I was using for the list of plaintiffs and the

11   list of insurance companies.  It's on what was in that statement

12   of the case, in jury instruction number 3.

13             MR. RUDY:  Lee Rudy again for plaintiffs.

14      We have no objection to Your Honor's amendments to the

15   questions, nor to the proposed additional question.  Thank you.

16             THE COURT:  Okay.  With that, then, if somebody would

17   send the amended list of names to the clerk, I will tell the

18   clerk to bring the jury in.  The clerk is going to start lining

19   the jury up in the hallway.

20      (Pause.)

21             MR. STERN:  Your Honor, there is one other matter that

22   the Court asked counsel to meet and confer about.  We're just

23   concluding that.  We can defer now regarding the number of

24   jurors we would suggest.  If I may have the Court's indulgence

25   for just one moment, I can report.

1          Your Honor, we're close but not quite in agreement.  The

2    defense would request ten jurors.  I won't belabor it, Your

3    Honor, but given the COVID situation, the flu situation, we're

4    coming into fall, we just think it would be more prudent to seat

5    ten.

6          I will leave it at that unless the Court wishes to hear

7    further.

8                    THE COURT:  No.

9                    MR. STERN:  I defer to my colleagues.

10                    MR. RUDY:  Hello, Your Honor.  We would typically be

11    at eight.  We recognize under these unusual circumstances,

12    surrounded by plexiglass, that perhaps it makes sense to add at

13    least one.  We were inclined to say nine.  But we would take

14    Your Honor's guidance.  You are more familiar with how much

15    attrition you have during a two-week expected trial.  Our

16    inclination would be nine unless you strongly suggest we go to

17    ten.

18                    THE COURT:  I will see how voir dire goes.

19                    MR. RUDY:  I'm sorry?

20                    THE COURT:  I will see how voir dire is going to get a

21    better feel.

22                    MR. RUDY:  As to peremptories --

23                    THE COURT:  I will tell you beforehand what we are

24    going to do about peremptories.

25                    MR. RUDY:  Thank you, Your Honor.

```
1              MR. STERN:  Thank you, Your Honor.

2              THE COURT:  I also will have a chance to talk to some

3    other judges today about how the most recent selections have

4    gone.  There were, I think, three trials last week.  They have

5    some more recent experience than mine.  There have not been the

6    problems we were anticipating with some even more recent

7    selections.

8          Just to be clear, the final voir dire questions are what

9    I'm going to be using, but where it has breakout subparts, those

10   are just to be used as follow-up.  Those will not be read to the

11   entire panel.  Those are just the follow-ups, as you all had

12   suggested in the original voir dire.

13             MR. STERN:  Excuse me, Your Honor.  May I be heard

14   briefly?

15         The additional question that the parties agreed upon that

16   we understood the Court to have approved wasn't on the list.  I

17   wanted to make sure You Honor was still intending to ask it,

18   about having heard or read anything about the case.

19             THE COURT:  I didn't hear you.

20             MR. STERN:  I'm sorry, Your Honor.  The parties had

21   jointly requested and we understood the Court to have approved

22   an additional question -- oh, it's on there.  I apologize, Your

23   Honor.

24             THE COURT:  It's question 1 right after I read the

25   statement of the case.
```

```
1          MR. STERN:  As my mother used to say, if it was a

2   snake, it would have bit me.

3          THE COURT:  It may not be best to read it then because

4   their eyes would have glazed over by then from the statement of

5   the case probably.

6       Maybe that will wake them up.  No offense to you guys.

7          MR. RUDY:  Your Honor, may I ask a question about mask

8   wearing?  Ms. Jenkins indicated this morning that perhaps at

9   counsel table --

10         THE COURT:  I'm going to explain to the jury when they

11  come in that only the person speaking at the podium or the

12  witness will not have their mask on.  Everyone else will have

13  their mask on.

14         MR. RUDY:  I thought she said something about at

15  counsel table it was okay for us to remove them, but if that's,

16  obviously, not the case, then --

17         THE COURT:  No.  Jurors in my past cases were not

18  comfortable with that.

19     (Pause.)

20     (Jury panel entered courtroom.)

21         COURTROOM DEPUTY:  Your Honor, this is the jury panel.

22         THE COURT:  All right.  Good morning, ladies and

23  gentlemen.  I'm Judge Lamberth.  I'm going to be presiding over

24  this trial.  It's a civil trial.  I first want to tell you that

25  I welcome you here for the selection of this jury.  This is what
```

1  we call the voir dire process, where I'm going to ask you a

2  series of questions that will bear upon your willingness and

3  ability to serve as fair and impartial jurors in the trial of

4  this case.

5      I'm going to have the clerk give you the oath in just a

6  moment to well and faithfully answer my questions truthfully.

7  We will go through a series of questions here, and I'm going to

8  have you write down the question number on questions that we

9  might follow up on individually.  I don't mean to embarrass

10  anyone by any question I ask, and I'm going to have some

11  questions where your answer might otherwise taint the jury

12  panel, depending upon your answers, or might otherwise involve

13  personal information.  So I'm going to have everyone outside the

14  courtroom while I question each of you individually before we

15  end up seating the jury panel.

16      I will say that we are under COVID restrictions.  Although

17  our courthouse today moved to mask-optional in the hallways and

18  other parts of the building, each judge is deciding what they

19  will do in their courtroom.  My juries have been very

20  comfortable since we restarted jury trials with the jurors

21  wearing and everyone wearing masks in the courtroom, except me

22  because I'm here behind plexiglass, and the lawyers speaking at

23  the podium can take their mask off when they're actually

24  speaking because they can be heard better.  The witness on the

25  witness stand is behind plexiglass.  So the witness, while

1    speaking at the witness stand, can take their mask off.  But

2    otherwise, everybody in the courtroom wears their mask,

3    including the jury.

4        So it's a little inconvenient to some.  Some people don't

5    believe in the mask mandate, but I have presided over a number

6    of trials since we restarted trials after all the COVID closure

7    that we had, and I haven't had a jury yet who has come down with

8    COVID.  Knock on wood.  I haven't had any problems.  My juries

9    have appreciated the fact that we go the extra mile.

10       I've had epidemiological experts and air experts in this

11   courtroom.  This courtroom is actually one of the safest in the

12   building because the air circulation in this courtroom is very

13   good.  So the air flow is good.  So we believe -- we're going to

14   try to do everything we can to make this a safe environment for

15   you during the trial.

16       If you're seated on this jury, we're doing everything we

17   can to make this safe here today.  I want us to all go home

18   safely.  I certainly want to go home safely.  I'm sure all of

19   you want to leave here safely as well.  And I assure you, if

20   you're seated on this jury, I'm going to make every effort to

21   make sure we all leave here safely.

22       It's an unusual time in our country going through this and

23   still preserving the right to jury trials.  This case has been

24   delayed, many cases have been delayed in this court because of

25   COVID.  We're trying to go forward as best we can and get jury

1    trials going forward as best we can.

2         We've been overwhelmed in this district with just a few

3    January 6 cases, as you may read in the newspapers.  And from

4    your point of view, you may have wanted one today.  You didn't

5    draw that one.  You drew another one today.  So you may or may

6    not be relieved.  But in any event, the case you drew will be

7    interesting.  It is a trial that we expect to go about two

8    weeks, and I will ask you at the end if you have any special

9    hardship that would be imposed, and I will talk to you

10   individually if you have a hardship and have problems serving

11   two weeks.  It will be an interesting trial, I think.  It's a

12   civil case.

13        First, I will ask the clerk to please give the oath to the

14   prospective members of the jury panel.

15             COURTROOM DEPUTY:  Ladies and gentlemen of the panel,

16   please stand and raise your right hand.  Thank you.

17        (Jury panel sworn.)

18             COURTROOM DEPUTY:  Thank you.  You may be seated.

19             THE COURT:  All right.  Ladies and gentlemen, this is

20   a class action brought by plaintiffs Joseph Cacciapalle,

21   Michelle Miller, Timothy J. Cassell, and Barry Borodkin on

22   behalf of the common and preferred shareholders of the Federal

23   Home Loan Mortgage Corporation, normally called Freddie Mac, and

24   the common shareholders of the Federal National Mortgage

25   Association, normally called Fannie Mae.  I will explain in more

1    detail what a class action is.

2         In addition to the class action plaintiffs, the plaintiffs

3    also include several insurance companies, including plaintiff

4    Berkley Insurance Company.  When I refer to the class action

5    plaintiffs, I mean plaintiffs Joseph Cacciapalle, Michelle

6    Miller, Timothy J. Cassell, and Barry Borodkin, and the class of

7    shareholders they represent.  When I refer to the WR Berkley

8    plaintiffs, I mean plaintiff Berkley Insurance Company and the

9    other insurance companies who are plaintiffs in the case.  When

10   I refer to the plaintiffs, I mean the class action plaintiffs

11   and the WR Berkley plaintiffs together.

12        The defendants in the case are the Federal Housing Finance

13   Agency, which I will refer to FHFA, Fannie Mae, and Freddie Mac.

14   Fannie Mae and Freddie Mac are sometimes referred to as

15   government-sponsored enterprises, or GSEs, or sometimes called

16   the companies.  FHFA is the conservator of Fannie Mae and

17   Freddie Mac and is sometimes referred to as the conservator.

18   When I refer to the defendants, I mean FHFA, Fannie Mae or

19   Freddie Mac together.

20        Fannie Mae and Freddie Mac are government-sponsored

21   enterprises created by Congress to promote access to home

22   mortgages by increasing liquidity and stability in the secondary

23   market for home mortgages.  While Fannie Mae and Freddie Mac are

24   government-sponsored, they are also publicly traded companies

25   that issued both common and preferred stock over the years.  As

I explained earlier, plaintiffs in this case are holders of
common and/or junior preferred stock in Fannie Mae and/or
Freddie Mac.  Shareholders are treated by the law as having
contracts with the companies whose stock they hold.

A shareholder's contract with the corporation includes not
only documents such as stock certificate, certificates of
designations, the corporate charter and bylaws, but also the
corporate law under which the corporation is formed and
regulated.  For Fannie Mae and Freddie Mac, changes to federal
law, that is, those affecting the government and of the GSEs and
their relationships with their shareholders, amend or inform the
investor contract.

In this case, the plaintiffs claim that the defendants
breached something called the implied covenant of good faith and
fair dealing in plaintiff shareholder contracts with Fannie Mae
and Freddie Mac.  Defendants deny plaintiffs' claim.

After the close of the evidence, I will instruct you
further about the legal standard for proving a breach of the
implied covenant.  But for now, you should understand that the
implied covenant is something that is an unwritten law, an
unwritten part of every contract, including the shareholder
contracts held by the plaintiffs.

The question of whether that implied covenant is breached
depends on whether the defendants took actions that unreasonably
or arbitrarily frustrated or interfered with the reasonable

1    contractual expectations of shareholders.  I will provide more

2    detailed instructions at the end of the case before you

3    deliberate.

4         First of all, from that statement of the case, have you

5    read or heard anything about this case?  Put down number 1 if

6    you've read or heard anything about the case.  If it's yes, just

7    put number 1.  If it's no, you don't have to put anything down.

8         Next, I'm going to read you a list of the parties to the

9    case.  That will be question number 2, and if you know any

10   parties to the case, you will put down number 2.  And then I

11   will read you a list of the lawyers in the case.  You will also

12   put number 2 if you know any of the lawyers in the case.

13        All right.  The parties -- as I said, the class

14   representatives are Joseph Cacciapalle.  I'm probably not

15   pronouncing it right -- Barry P. Borodkin, Timothy J. Cassell,

16   and Michelle Miller.  Those are the class representatives.

17        So if any of you, to your knowledge, any of your family or

18   close friends are acquainted with any of those four or any of

19   their spouses, parents, or children, put down number 2.

20        I will also read you a list of the plaintiff insurance

21   companies.  So if you know or, to your knowledge, any of your

22   family or close friends know any of these insurance companies or

23   been insured by them or dealt with them, put down number 2 also.

24        Berkley Insurance Company, Acadia Insurance Company,

25   Admiral Indemnity Company, Admiral Insurance Company, Berkley

1   Regional Insurance Company, Carolina Casualty Insurance Company,

2   Midwest Employers Casualty Insurance Company, Nautilus Insurance

3   Company, Preferred Employers Insurance Company.

4        Now, I also said that the defendants in the case, and you

5   will put down number 2 if you or a member of your family or

6   friends know any of these:  Federal Housing Finance Agency,

7   Federal National Mortgage Association, and Federal Home Loan

8   Mortgage.  That's basically Freddie Mac and Fannie Mae.

9        All right.  Now let me introduce the plaintiffs' counsel.

10   I will have them stand as I introduce each of them just so you

11   know who they are.

12        First, the plaintiffs' counsel, Hamish Hume from Boies

13   Schiller Flexner.  Any of you recognize him or have any dealings

14   with that law firm?  You can also list that as number 2, and I

15   will follow up when I talk to you individually.

16        Kenya Davis from the same law firm is standing now.  These

17   lawyers will pull their mask down so you can see their face.  If

18   you recognize any of them, or if you've dealt with Boies

19   Schiller before.  Samuel Kaplan from the same firm is now

20   standing -- he's not here.  Okay.  Samuel Kaplan from the same

21   firm, though, will be in the case.

22        Next will be Lee D. Rudy, Kessler Topaz Meltzer & Check.

23   Any of you know Mr. Rudy, your family or friends, to your

24   knowledge, know Mr. Rudy?  All right.

25        Robert Kravetz from Bernstein Litowitz Berger & Grossmann.

1    Thank you, Mr. Kravetz.  Rich Gluck from Bernstein, the same

2    firm.  He's not here.  Okay.  Any of you recognize that name,

3    Rich Gluck, put down number 2.

4         Brian Barnes from Cooper & Kirk, if any of you know

5    Mr. Barnes.  Okay.

6         Defendants' counsel, and put down number 2 if you recognize

7    any of these.  We will start with Jonathan Stern from Arnold &

8    Porter, Ian Hoffman from Arnold & Porter.  Stanton Jones from

9    Arnold & Porter.  He's not here?  Okay.  Jonathan Stern, I got.

10   Arnold & Porter, okay.  Asim Varma from Arnold & Porter and

11   David Bergman from Arnold & Porter.  All of those, put down

12   number 2 if you recognize any of those parties or counsel.

13        Now, number 3 will be -- that's misnumbered there.  Are you

14   personally acquainted with any witnesses, you or a member of

15   your family or close friend?  I'm going to read you the names of

16   the people we expect to be called as witnesses.  Some of them

17   may or may not be called.  Some may be called by deposition

18   where their deposition will be read to you.

19        I will read you the names.  If you recognize any of these

20   names, I will ask you when I talk to you individually who the

21   person is that you know by name, and I can have you -- I'm going

22   to see if it's the same person that's actually being called as a

23   witness.

24        Edward Linekin, Edward DeMarco.  This will be number 3, if

25   you recognize any of these names.  David Benson, Timothy

1   Mayopoulos, Susan McFarland, Donald Layton, Ross Kari, James

2   Lockhart, Mario Ugoletti.  Next one, I will spell the whole

3   name, Naa Awaa Tagoe, N-a-a first name, A-w-a-a second name,

4   T-a-g-o-e.  If you know her, I want to know you.  I'm interested

5   to meet her myself.

6       Bala Dharan.  I actually happen to know that's an expert

7   witness who is going to be testifying.  The next one is Anjan

8   Thakor.  The next one is an expert witness, too, Joseph Mason.

9   The next one is Susan Hartman.  The next one is Nicholas

10  Satriano.  Another expert witness, Mukarram, M-u-k-a-r-r-a-m,

11  last name Attari, A-t-t-a-r-i.

12      Next one is another expert witness, Shri, S-h-r-i, middle

13  name Prakash, P-r-a-k-a-s-h, Kothari, K-o-t-h-a-r-i.  So you see

14  we're going to have a number of expert witnesses here.

15      The next one is Jeffrey Alan Foster.  Next is David

16  Moffett.  Next is Jim Parrot.  Next is Egbert Perry, and the

17  last is Timothy Bowler.

18      If you recognize any of those names, put down number 3, if

19  you would, on the list.

20      The next question is, do any of you know any of the other

21  potential jurors?  In other words, do any of you know each other

22  other than through jury service?  If so, write down number 4 on

23  your card, and I will follow up about who you know.

24      Number 5, have you or anyone close to you ever worked for a

25  government agency or a government contractor?  If you have,

1    write down number 5, and I will follow up what agency or

2    contractor you worked for and when.  We have a printout from the

3    jury office of what your current employment is, but we may not

4    necessarily know where you might have worked in the government

5    in the past.  That's number 5, if you work now or in the past

6    have worked for the government.

7         Number 6, do you have any strong feelings or beliefs about

8    the government in general, any particular government agency, or

9    government officials that might make it difficult for you to

10   serve as a fair and impartial juror in this case?  That's number

11   6.

12        Number 7, do you have any strong feelings or beliefs about

13   whether government officials generally try their best to serve

14   the public interest?  That's number 7.

15        Number 8, this case will involve testimony by witnesses who

16   are government employees and others who are not.  Do you

17   consider yourself any more or less likely to believe witnesses

18   who are current or former government employees than those who

19   are not government employees?

20        Let me run through that again.  This case is going to

21   involve testimony by witnesses who are government employees and

22   others who are not.  Do you consider yourself any more or less

23   likely to believe witnesses who are current or former government

24   employees than those who are not government employees?  That was

25   number 8.

1       Number 9, do you have any views about expert witnesses,
2   either in general or in particular areas?
3       Number 10, have you or a close family member ever worked
4   for a large corporation?
5       Number 11, do you have any strong opinions, positive or
6   negative, about the influence of large corporations on the U.S.
7   economy?  That was number 11.
8       Number 12, have you ever owned your own business?  If you
9   say yes, I will follow up on you individually.
10      Number 13, do you now or have you ever in the past owned
11  stock in Fannie Mae and Freddie Mac?  That's number 13.  Do you
12  now or have you in the past owned stock in Fannie Mae or Freddie
13  Mac?
14      Number 14, do you now or have you in the past invested in
15  the financial stock market?
16      Number 15, have you or someone close to you ever gained or
17  loss a significant amount of money in the stock market or in
18  real estate?  That one was 15.
19      Number 16, have you or someone close to you ever been a
20  victim of fraud or any type of wrongdoing in the securities,
21  real estate, or financial industries?  You or someone close to
22  you ever been a victim of fraud or any type of wrongdoing in the
23  securities, real estate, or financial industries?  That's 16.
24      17, do you have any views on the causes of the 2008
25  financial crisis?  You will hear a lot of testimony in this

1    trial about the underlying cause of what happened here was in

2    that 2008 financial crisis and what happened to Fannie Mae and

3    Freddie Mac there.  So if you have any views about that, I would

4    like to explore those with you individually in question 17.

5         And 18 then is, do you have any strong views about

6    corporations that accepted federal bailout funds to stay afloat

7    during that financial turndown -- downturn in 2008?  That's 18.

8         19 is a very specific question.  Have you ever had any

9    financial or mortgage dealings with Freddie Mac or Fannie Mae?

10        20, are you familiar with the term government-sponsored

11   entity?

12        21, do you have any personal experience with or are you

13   familiar with conservatorship?

14        22, have you or someone close to you had any experience in

15   the following fields:  Banking, finance, economics, securities,

16   underwriting, and real estate?

17        So the let me go through that one again.  Have you or

18   someone close to you had any experience in the following fields:

19   Banking, finance, economics, securities, underwriting, real

20   estate?  That's 22.

21        23, do you own your own home?

22        24, have you or someone else close to you experienced a

23   foreclosure?

24        25, have you ever been a party in a civil lawsuit?

25        26, have you ever served on a jury?

1   27, have you ever been involved in a civil legal dispute as

2   a party or witness?

3   28, do you have any strong views on class action lawsuits,

4   the parties to such lawsuits, whether plaintiffs or defendants,

5   or their lawyers?

6   29, have you ever served in the military?

7   30, I will give you a little time on.  Do you belong to any

8   social or professional organizations?  Think about that one.

9   Any social or professional organizations.

10  31, we don't have to go through it right now, but you can

11  think about this one as well for a little bit.  Do you have a

12  medical reason or personal hardship that would make it difficult

13  for you to serve as a juror in the trial in this case?  I will

14  discuss it with you separately and individually.  Write 31 if

15  you do.

16  And then 32 is, do you have any other information that you

17  feel would be important to share that would impact your ability

18  to serve as a fair and impartial juror in the trial of this

19  case?  At the end, we want to be comfortable that you will be a

20  fair and impartial juror, but we want you to feel like this is a

21  case where you can be a fair and impartial juror if you were

22  seated in the trial of this case as well.

23  So if you have any information that would help us -- you

24  know, we've been doing this for 200 years in our country now,

25  and we believe going through this process and letting the

1   lawyers have a say in who is seated so they have peremptory

2   challenges they can exercise at the end as well gives us a way

3   to have a fair and impartial jury picked for the trial in this

4   case.  And the lawyers can also see how this is done and can

5   participate as well.  So that's why we do it this way.  We've

6   been doing it for 200 years.  We've made it through this far.

7   We've made it through COVID.  So hopefully, we will make it

8   through this.

9        We will collect your cards, and I will talk to each of you

10   individually before we pick the jury here.  It will take us a

11   while because this individual process takes a while.  So y'all

12   be patient.  We may not get it done before lunch.  So we will

13   break for an hour at lunchtime, and we will get through this

14   process as soon as we can today.  Be patient.  Thank you very

15   much for your cooperation.

16        Don't talk about the case.  Don't let anyone talk to you

17   about the case in the meantime.  Don't Twitter or tweet or do

18   anything like that.  Once I get the jury, I will give you full

19   instructions.  But you can't talk to anyone about the case.

20   Don't let anyone talk to you about the case.  Don't let anyone

21   come up and say anything about this case until I get the jury

22   picked.  I will give the jury itself plenty of instructions, but

23   in the meantime, don't let anyone approach you.  Don't let

24   anyone talk to you about the case.  Don't talk to each other

25   about the case until I get the jury picked.  Then I will give

1    that jury plenty of instructions about don't Twitter, tweet, or

2    do anything about this case until I get the jury.

3         Thank you very much, ladies and gentlemen, for your

4    cooperation.  I will have the clerk show you where to sit in the

5    meantime, and we will start talking with you individually.

6         COURTROOM DEPUTY:  Ladies and gentlemen, if I can

7    please have you place your four-digit jury number on the back of

8    the index card.  After you place the number on the index card,

9    please pass it down to the end of the row.

10        If you all can stand and follow me.

11        (Jury panel exited courtroom.)

12        MR. HUME:  Your Honor, if it's okay with the Court, I

13   may excuse myself.  My colleagues will be handling the jury

14   selection.

15        THE COURT:  Sure.

16        MR. HUME:  Thank you, Judge.

17        THE COURT:  All right.  We will be in a ten-minute

18   recess.  We will start the first 14 in ten minutes.

19        (Recess taken from 11:39 a.m. to 12:03 p.m.)

20        COURTROOM DEPUTY:  Your Honor, this is juror number

21   0472.

22        (Prospective juror steps up.)

23        THE COURT:  You had worked for a government agency or

24   government contractor.  What was that?

25        PROSPECTIVE JUROR:  I have worked for Mitre and

1    NorTel.  Both of those are government contractors.  And I've

2    worked for DHS, CFPB, and FDIC.

3              THE COURT:  What was that?

4              PROSPECTIVE JUROR:  DHS, CFPB, and FDIC.

5              THE COURT:  What were they?

6              PROSPECTIVE JUROR:  As government agencies?  CFPB,

7    Consumer Financial Protection Bureau --

8              THE COURT:  I'm sorry.  Speak into the microphone.

9              PROSPECTIVE JUROR:  CFPB, Consumer Financial

10   Protection Bureau.

11             THE COURT:  When did you work there?

12             PROSPECTIVE JUROR:  2011 to 2016.

13             THE COURT:  What was your position?

14             PROSPECTIVE JUROR:  Privacy analyst.

15             THE COURT:  What did you do?

16             THE WITNESS:  Compliance with e-government, SISMA, and

17   Privacy Act.

18             THE COURT:  And what did you do with Mitre?

19             PROSPECTIVE JUROR:  Mitre, I did privacy as well with

20   a bunch of different federal agencies.

21             THE COURT:  What kind of privacy issues did you have?

22             PROSPECTIVE JUROR:  A lot of it was setting up the

23   privacy offices at the different federal agencies.

24             THE COURT:  Ever have any dealings with Fannie Mae or

25   Freddie Mac?

```
 1                   PROSPECTIVE JUROR:  No.
 2                   THE COURT:  And after your employment there, where did
 3       you end up?
 4                   PROSPECTIVE JUROR:  So, FDIC, and then now I'm at
 5       CIBC.
 6                   THE COURT:  What is that?
 7                   PROSPECTIVE JUROR:  It's a bank, Canadian Imperial
 8       Bank of Commerce.
 9                   THE COURT:  When did you go there?
10                   PROSPECTIVE JUROR:  September of this year.
11                   THE COURT:  What did you do at FDIC?
12                   PROSPECTIVE JUROR:  Privacy.
13                   THE COURT:  Privacy, same thing?  Okay.
14            And a close family member or you work for a large
15       corporation.  That's you now?
16                   PROSPECTIVE JUROR:  Yeah.  I worked for Sony.
17                   THE COURT:  And is FDIC a corporation?
18                   PROSPECTIVE JUROR:  It's an independent government
19       agency.
20                   THE COURT:  It's really a government agency?
21                   PROSPECTIVE JUROR:  Yeah.
22                   THE COURT:  14, invest in the stock market.
23                   PROSPECTIVE JUROR:  Just 401(k), traditional, and Sony
24       stock.
25                   THE COURT:  And what?
```

```
 1              PROSPECTIVE JUROR:  Sony stock.
 2              THE COURT:  What is that?
 3              PROSPECTIVE JUROR:  Stock from Sony, so companies that
 4      I work at.
 5              THE COURT:  Oh, okay.  Your 401(k)s were in like
 6      mutual funds and things like that?
 7              PROSPECTIVE JUROR:  Yeah.  Target --
 8              THE COURT:  Not actually picking stocks yourself?
 9              PROSPECTIVE JUROR:  No.
10              THE COURT:  Anyone close to you gained or lost
11      significant money in the stock market or real estate?
12              PROSPECTIVE JUROR:  Oh, I think I just interpreted
13      that as my dad works in real estate, and so that's how he has
14      his retirement income.
15              THE COURT:  You're familiar with the term
16      government-sponsored entity?
17              PROSPECTIVE JUROR:  Just from work.
18              THE COURT:  Okay.  In what way?
19              PROSPECTIVE JUROR:  I guess doing privacy impact
20      assessments for CFPB and having to explain when it's a
21      government agency or when it's a GSE or for FDIC, the
22      independent federal agency.
23              THE COURT:  Do you have any strong views about the
24      legitimacy or viability of such an entity?
25              PROSPECTIVE JUROR:  No.
```

1          THE COURT:  You or someone close to you have

2    experience in banking, finance, economics, security

3    underwriting, real estate?  You obviously have someone else,

4    too.

5          PROSPECTIVE JUROR:  Yeah, the fact that I was at CFPB

6    and FDIC and now at a bank.

7          THE COURT:  Do you think that would have any affect on

8    your ability to be a fair and impartial juror here?

9          PROSPECTIVE JUROR:  No.

10         THE COURT:  You've been on a jury before?

11         PROSPECTIVE JUROR:  Yes.

12         THE COURT:  What was the last one?

13         PROSPECTIVE JUROR:  Civil trial, auto/pedestrian

14   accident.

15         THE COURT:  How long ago was that?

16         PROSPECTIVE JUROR:  2008.

17         THE COURT:  And that was in this court or across the

18   street?

19         PROSPECTIVE JUROR:  No, D.C.

20         THE COURT:  The jury reached a verdict?

21         PROSPECTIVE JUROR:  Yes.

22         THE COURT:  Anything about that experience have any

23   affect on your ability to be a fair and impartial juror here?

24         PROSPECTIVE JUROR:  No.

25         THE COURT:  Were you the foreperson?

```
 1                    PROSPECTIVE JUROR:  Yes.

 2                    THE COURT:  You were?  Okay.  You were elected by the

 3        other jurors?

 4                    PROSPECTIVE JUROR:  Yes.

 5                    THE COURT:  Was that a six-person or --

 6                    PROSPECTIVE JUROR:  I don't remember.

 7                    THE COURT:  Have you been on more than one jury?

 8                    PROSPECTIVE JUROR:  No.

 9                    THE COURT:  Any social or professional organizations?

10                    PROSPECTIVE JUROR:  Just the professional

11        organizations.  So ABA because I'm a lawyer, IAPP because it's

12        privacy professionals, and (ISC)², which is information security

13        professionals.

14                    THE COURT:  Where did you go to law school?

15                    PROSPECTIVE JUROR:  Georgetown.

16                    THE COURT:  And other than working at government and

17        for these government entities, where else did -- did you

18        practice anywhere else?

19                    PROSPECTIVE JUROR:  No.  I've only practiced now at

20        CIBC.

21                    THE COURT:  Do you have any hardship that would make

22        it difficult to serve?

23                    PROSPECTIVE JUROR:  Just that this Friday, my husband

24        is on work travel.  So I would have to pick up a kid.

25                    THE COURT:  I couldn't hear you.
```

1          PROSPECTIVE JUROR:  My husband is on work travel this

2     Friday and Monday.  So I would have to pick up a kid.

3          THE COURT:  Okay.  What time is that?

4          PROSPECTIVE JUROR:  5:00, 5:30.

5          THE COURT:  Oh, okay.  We can accommodate that.

6       Any follow-up by either side?

7          MS. DAVIS:  Court's indulgence.

8          THE COURT:  If so, you will need to use this system.

9          COURTROOM DEPUTY:  Counsel, if you have a follow-up

10    question, can you just raise your hand to notify us?

11      (Bench conference.)

12          MR. BARNES:  Could the Court clarify when this

13    prospective juror went to the FDIC?  The FDIC filed an amicus

14    brief in this case in mid-2016.

15          THE COURT:  Any others?

16          MR. RUDY:  Yes, Your Honor.  I think question 23 was

17    checked, and I don't believe Your Honor followed up on that.  It

18    deals with homeownership.

19          THE COURT:  Anyone else from defendants?

20          MR. STERN:  I apologize.  Yes, we just have one

21    request, Your Honor, and that is if you could ask the

22    prospective juror what it is she does at CIBC, which is her

23    current employer.

24      (End of bench conference.)

25          THE COURT:  I overlooked one question.  You own your

```
1    home.  You said yes.  Tell me a little more about that.

2                PROSPECTIVE JUROR:  I have a two-bedroom condo here in

3    D.C.

4                THE COURT:  Okay.  And you have a mortgage on that?

5                PROSPECTIVE JUROR:  Yes.

6                THE COURT:  Who is it with?

7                PROSPECTIVE JUROR:  Wells Fargo.

8                THE COURT:  Okay.  When you were at FDIC?

9                PROSPECTIVE JUROR:  2019 until July -- or August 2022.

10               THE COURT:  Okay.  You never heard anything about this

11   case during the time you were there?

12               PROSPECTIVE JUROR:  No.

13               THE COURT:  Okay.  What do you do at your current job?

14               PROSPECTIVE JUROR:  Privacy.

15               THE COURT:  And what kind of stuff do you do?

16               PROSPECTIVE JUROR:  So compliance with the California

17   Privacy Rights Act, GDPR, all the privacy notices no one reads.

18               THE COURT:  Okay.  Thank you very much.

19               PROSPECTIVE JUROR:  Sure.

20               THE COURT:  Are we saying go back -- do we stay in our

21   courtroom over here until the end of the voir dire?

22        Okay.  Don't discuss the case yet.

23               (Prospective juror steps down.)

24               THE COURT:  We'll go to 886.

25        Part of the delay in the copying was that many of the
```

1    jurors did not write their numbers on the front of the cards.

2    So these were copied this way.  I told the clerks to copy the

3    others and write the numbers on the front so the copying would

4    be expedited.

5          (Prospective juror steps up.)

6          THE COURT:  You can take your mask off while we're

7    talking here.  I have a few follow-up questions.

8       You work for the GPO?

9          PROSPECTIVE JUROR:  No.  Actually, I have a brother in

10   France that worked there.

11         THE COURT:  How long ago was that?

12         PROSPECTIVE JUROR:  About 15 years.

13         THE COURT:  How long was he there?

14         PROSPECTIVE JUROR:  He's retired.  But he's been there

15   about -- he worked there about 15 years.

16         THE COURT:  Okay.  His employment there have any

17   affect on your ability to be a fair juror here?

18         PROSPECTIVE JUROR:  It just says did you have anybody.

19   No, it wouldn't affect that, no.

20         THE COURT:  Okay.  Any strong feelings or beliefs

21   about whether government officials try their best to serve the

22   public interest?

23         PROSPECTIVE JUROR:  Yes.  Unfortunately, I do believe

24   that there's just a lot of corruption, and so I'm kind of

25   suspect about different things people say just because of the

1    corruption that's involved.

2              THE COURT:  Do you think that would have any affect on

3    your ability to be a fair juror in this case, to decide whether

4    that's what happened in this case or not?

5              PROSPECTIVE JUROR:  No, it wouldn't.

6              THE COURT:  Do you have any strong opinions, positive

7    or negative, about the impact of large corporations on the U.S.

8    economy?

9              PROSPECTIVE JUROR:  I'm pretty much the same.  It's

10   just a big moneymaking, and I think that's it.  No one cares

11   about the common person.  It's just a big moneymaking thing,

12   yeah.

13             THE COURT:  Any views about expert witness, either in

14   general or in particular areas?

15             PROSPECTIVE JUROR:  No.

16             THE COURT:  Have you in the past invested in the

17   financial or stock market?  And you put that one down.

18             PROSPECTIVE JUROR:  Yes, I'm currently invested in it,

19   yes.

20             THE COURT:  What was that?

21             PROSPECTIVE JUROR:  With my 401(k).  Plus, I have

22   Amazon, McDonald's stock, Zoom stock, Apple stock.

23             THE COURT:  Okay.  Did you pick the stocks yourself,

24   or did you have --

25             PROSPECTIVE JUROR:  No, I picked them myself, with the

1   exception of the 401(k).  It was just a package that the company

2   provided, but all the other stocks, I picked myself.

3           THE COURT:  Did you have somebody advising you what to

4   pick, or how did you pick those?

5           PROSPECTIVE JUROR:  Just my personal research,

6   reading, Googling it, and doing my own personal research on

7   them.

8           THE COURT:  How did you go about deciding what to

9   pick?

10          PROSPECTIVE JUROR:  Well, I subscribe to Motley Fool.

11  So Motley Fool, periodically they come out with suggestions or

12  stocks that you should try to get into at this point.  And then

13  I would just go attend different seminars and basically do my

14  own research on different stocks.

15          THE COURT:  How important were dividends to you when

16  you were deciding about investing in stock?

17          PROSPECTIVE JUROR:  I'm sorry, Judge.  Can you --

18          THE COURT:  How important were dividends to you when

19  you were deciding to invest in stock?  Did you look at the

20  question of what dividends they were paying?

21          PROSPECTIVE JUROR:  Basically, looking at the track

22  record from their history and just seeing that basically they

23  have been doing the performing for so many years.  So I just

24  figure if you have such a good track record, then maybe I can go

25  ahead and allow you to invest my money, especially if they have

1    a good track record.

2              THE COURT:  That was the main thing you were looking

3    for?

4              PROSPECTIVE JUROR:  Yes, yes.

5              THE COURT:  Have you ever traded in cryptocurrency, or

6    wanted to trade in cryptocurrency?

7              PROSPECTIVE JUROR:  No, I don't know anything about

8    that.

9              THE COURT:  You believe that investing in the stock

10   market is like gambling?

11             PROSPECTIVE JUROR:  Actually, no, because I'm actually

12   investing in a company.  I'm not taking that type of risk of

13   just putting my money away.  So that's why I research companies,

14   and I only invest in a company that I believe in.

15             THE COURT:  And how did you do?

16             PROSPECTIVE JUROR:  Not good right now, but I have --

17   like for McDonald's, when I first got them, it was maybe about

18   15 or something a share.  Now they're 250.  So I did pretty well

19   with them.

20             THE COURT:  You did okay.

21             PROSPECTIVE JUROR:  Yeah.

22             THE COURT:  Okay.  You own your own home?

23             PROSPECTIVE JUROR:  Yes, I do, in the District.

24             THE COURT:  You have a mortgage?

25             PROSPECTIVE JUROR:  No, I don't.

```
 1              THE COURT:  You own it outright now?

 2              PROSPECTIVE JUROR:  Yes.

 3              THE COURT:  You have a hardship that would make it

 4    difficult for you to serve?

 5              PROSPECTIVE JUROR:  Yes.  My brother currently is

 6    undergoing treatment for radiation and chemo.  He has

 7    fourth-stage throat cancer.  So I provide transportation.  He

 8    receives treatment at Washington Hospital Center on Mondays and

 9    Fridays.  So he doesn't have any family except for me and my

10    sister.  We both work.  So I have to provide transportation for

11    him.

12              THE COURT:  Would she be able to fill in on the days

13    you are on jury duty?

14              PROSPECTIVE JUROR:  We both work for the same company.

15    So we kind of try to take different turns.  If I drop him off,

16    she picks him up, and vice versa.  So my job has allowed me to

17    kind of work through my lunch to be able to take him, and then I

18    come back, and I have to make up my time.

19              THE COURT:  Okay.  Any other information that would be

20    important to share about your ability to be a fair juror?

21              PROSPECTIVE JUROR:  Just I know from what I've read

22    about Fannie Mae that they have been as far as people of color

23    and how that, from what I've read, the discriminatory things

24    that they have done to people of color.  So I don't really know

25    if I can be impartial just because of the knowledge that I have
```

1   of Fannie Mae.

2         THE COURT:  Okay.  What is your knowledge that you've

3   read about it?

4         PROSPECTIVE JUROR:  Well, just how that in different

5   areas, people of color have been given a high interest rate, and

6   even many times, they haven't been given a mortgage at all, that

7   they have been so unfair to people of color, not even giving

8   them a mortgage -- not even giving them a loan, rather.

9         THE COURT:  Would you be able to set that aside, or do

10  you think that would be hard to set aside?

11        PROSPECTIVE JUROR:  I think that would be hard.

12     (Bench conference.)

13        MR. STERN:  Your Honor, Jonathan Stern for defendants.

14  In light of those last responses, I don't know what the Court's

15  inclination here is.  I do have a couple of follow-ups.  But it

16  seems to me they may not be necessary given the juror's last

17  remarks, but obviously, I don't want to presume anything.

18        THE COURT:  What do plaintiffs say?

19        MS. DAVIS:  Kenya Davis for the plaintiffs.  Thank

20  you, Your Honor.  I would ask the Court to ask her whether or

21  not -- I know she said she would have a difficulty, but we would

22  ask if she could indeed follow the Court's instructions to put

23  her feelings that she's expressed aside in order to be able to

24  decide this case fairly, and see what her response is to that

25  before taking that next step.

1          THE COURT:  I think that's in effect what I just asked
2     her.  So she will be struck.
3          MR. STERN:  Thank you, Your Honor.
4          MS. DAVIS:  Thank you, Your Honor.
5       (End of bench conference.)
6          THE COURT:  You can go with the clerk, and she will
7     give you further instructions.
8       (Prospective juror steps down.)
9          THE COURT:  291.
10      (Prospective juror steps up.)
11         THE COURT:  You work for a government agency, or
12    someone close to you did?
13         PROSPECTIVE JUROR:  For?
14         THE COURT:  You work for a government agency?
15         PROSPECTIVE JUROR:  Yes.  I work for the Food and Drug
16    Administration, FDA.  I'm a physician.
17         THE COURT:  Okay.  How long have you been there?
18         PROSPECTIVE JUROR:  Less than a year, about four
19    months.
20         THE COURT:  What did you do before that?
21         PROSPECTIVE JUROR:  I was a professor at George
22    Washington University in internal medicine.
23         THE COURT:  Okay.  And you've invested in the stock
24    market?
25         PROSPECTIVE JUROR:  Yes.

1          THE COURT:  Did you pick the stock yourself, or was

2     this in a 401(k)?

3          PROSPECTIVE JUROR:  I have a broker.

4          THE COURT:  Okay.  Where is your broker?

5          PROSPECTIVE JUROR:  His name is -- gosh, I have to

6     think of his last name.  Can I --

7          THE COURT:  That's okay.

8          PROSPECTIVE JUROR:  It's blanking on me.

9          THE COURT:  Were you picking the stock yourself?

10         PROSPECTIVE JUROR:  No, he does.

11         THE COURT:  You accepted his recommendations?

12         PROSPECTIVE JUROR:  Correct, yeah.

13         THE COURT:  When you were picking stock, did you rely

14    on dividends as a part of your investment decision, or were you

15    just relying on his recommendations, or how did you --

16         PROSPECTIVE JUROR:  I typically rely on his

17    recommendations.

18         THE COURT:  So dividends weren't something you

19    necessarily took into account?

20         PROSPECTIVE JUROR:  Not personally.

21         THE COURT:  Okay.  And you're looking at long range?

22         PROSPECTIVE JUROR:  Correct.  I have one for a shorter

23    range, but most of my money is in IRAs.

24         THE COURT:  How did you do overall?

25         PROSPECTIVE JUROR:  Overall, I've done quite well.

```
 1              THE COURT:  Have you ever traded in cryptocurrency or

 2      wanted to do cryptocurrency?

 3              PROSPECTIVE JUROR:  No.

 4              THE COURT:  Not interested in that?

 5              PROSPECTIVE JUROR:  No.

 6              THE COURT:  You believe investing in the stock market

 7      is like gambling?

 8              PROSPECTIVE JUROR:  No.

 9              THE COURT:  You've done okay?

10              PROSPECTIVE JUROR:  Yes.  I think with solid

11      investments, yeah.

12              THE COURT:  And mostly, the decisions on what you put

13      your money in were really coming from the broker's advice?

14              PROSPECTIVE JUROR:  Mostly, yes, but investing in

15      solid companies that I approve of.

16              THE COURT:  Okay.  You own your own home.

17              PROSPECTIVE JUROR:  I do.

18              THE COURT:  Do you have a mortgage?

19              PROSPECTIVE JUROR:  I do.

20              THE COURT:  And who is it with?

21              PROSPECTIVE JUROR:  It is with Quicken Loans, and I

22      actually own two homes, and I have another home with Wells

23      Fargo.

24              THE COURT:  With?

25              PROSPECTIVE JUROR:  Wells Fargo.
```

1          THE COURT:  And you've been in a civil lawsuit?

2          PROSPECTIVE JUROR:  I have, as a physician.  I wasn't

3   personally named, but I was a part of a group of physicians that

4   were.

5          THE COURT:  What was the outcome there?

6          PROSPECTIVE JUROR:  It's still pending.

7          THE COURT:  Where is it?  In this court or --

8          PROSPECTIVE JUROR:  It's in New York State.

9          THE COURT:  State court in New York?

10          PROSPECTIVE JUROR:  State court, yeah.

11          THE COURT:  And you don't hate all lawyers?

12          PROSPECTIVE JUROR:  No.

13          THE COURT:  You can't say that?  You're under oath.

14          PROSPECTIVE JUROR:  No, I don't hate lawyers, not at

15   all.

16          THE COURT:  Doctors frequently do.  Okay.

17      Involved in a civil legal dispute as a party or witness,

18   was there something other than the one against you?

19          PROSPECTIVE JUROR:  This was the same case as, I

20   guess, a party or part of.

21          THE COURT:  It was a malpractice-type thing?

22          PROSPECTIVE JUROR:  It was malpractice, yes.

23          THE COURT:  What was it all about?

24          PROSPECTIVE JUROR:  Patients at that George Washington

25   University group of physicians didn't, I guess, follow standard

```
 1    of care in her care, and I was a part of that group of
 2    physicians, of probably 20 physicians or so involved in her
 3    care.
 4              THE COURT:  Right.  Okay.  Do you belong to social or
 5    professional organizations?
 6              PROSPECTIVE JUROR:  Medical, like the Obesity Society,
 7    the Society of General Internal Medicine.
 8              THE COURT:  And you were an internist?
 9              PROSPECTIVE JUROR:  I am an internist.
10              THE COURT:  And you are currently an internist?
11              PROSPECTIVE JUROR:  Yes.
12              THE COURT:  Okay.  What are you doing now?
13              PROSPECTIVE JUROR:  So I work at the FDA.  I work in
14    their Office of New Drugs, so regulation of new drugs for
15    cholesterol and obesity management.
16              THE COURT:  Okay.  Good.
17         Medical or personal hardship?
18              PROSPECTIVE JUROR:  It's a personal hardship.  I'm a
19    mom of a two-year-old daughter, and I'm responsible for her
20    child care.  So she goes to day care during the day, but I
21    wouldn't be able to get here until 9:30, maybe 10:00 in the
22    morning, and I need to leave at 3:00.  And I'm responsible to
23    take care of her on Friday.  She's not in school.  I don't have
24    anyone else I can rely on.
25         So that's my hardship.
```

1          THE COURT:  Okay.  Let me see if counsel have any

2     other questions they want to ask.

3          (Bench conference.)

4          MR. STERN:  Your Honor, Jonathan Stern for the

5     defendants.  We don't have any objection to excusing this juror

6     for hardship.  If the Court is not inclined to do that, I may

7     have missed something, but I think that the Court may not have

8     followed up on question 15, been a victim of fraud -- oh, wait.

9          THE COURT:  I didn't, and I will.

10         MR. STERN:  I got my numbers messed up, Your Honor.

11    Whatever 15 was, I don't think the Court followed up.  Again, if

12    the Court is inclined to strike her for hardship, we would not

13    object.

14         THE COURT:  I'm not.

15         MR. RUDY:  Nothing from defendants.  Thank you.

16         (End of bench conference.)

17         THE COURT:  You're someone who's gained or lost a

18    significant amount of money in the stock market or real estate?

19         PROSPECTIVE JUROR:  I would say I've gained through my

20    retirement investments.

21         THE COURT:  That was in the stock market; correct?

22         PROSPECTIVE JUROR:  Correct.

23         THE COURT:  Okay.  Thanks very much.

24         (Prospective juror steps down.)

25         THE COURT:  We'll go to 47.

```
1              COURTROOM DEPUTY:  Juror number 47.  Ma'am, if you can
2    take the seat here next to the judge.
3         (Prospective juror steps up.)
4              THE COURT:  You can take your mask off.  I just have a
5    few follow-ups.
6         You're working for the government?
7              PROSPECTIVE JUROR:  I'm sorry?  You said I'm working
8    for the government?
9              THE COURT:  Uh-huh.
10             PROSPECTIVE JUROR:  Yes.  I work for the D.C.
11   Department of Human Resources.
12             THE COURT:  Department of?
13             PROSPECTIVE JUROR:  Human Resources.
14             THE COURT:  Where?
15             PROSPECTIVE JUROR:  In D.C.
16             THE COURT:  What do you do?
17             PROSPECTIVE JUROR:  I'm a public information officer.
18             THE COURT:  Okay.  How long have you been there?
19             PROSPECTIVE JUROR:  Since 2016.
20             THE COURT:  Okay.  And your mom works for Nationwide
21   Insurance?
22             PROSPECTIVE JUROR:  She used to.  She's now retired.
23             THE COURT:  And your dad for what?
24             PROSPECTIVE JUROR:  Fleet Laboratories, a
25   pharmaceutical --
```

1          THE COURT:  Okay.  And you owned your own business.

2  What was that?

3          PROSPECTIVE JUROR:  So I have a virtual reality.  It's

4  called Dimages.  It's pretty much predominantly like

5  photography, video.

6          THE COURT:  I couldn't hear you.

7          PROSPECTIVE JUROR:  It's called Dimages.  It's

8  primarily videography, photography.

9          THE COURT:  When did you own it?

10          PROSPECTIVE JUROR:  I just opened it last year.

11          THE COURT:  Oh, okay.  And what do they do?

12          PROSPECTIVE JUROR:  It's basically just like

13  photography, like creative design, graphics, and things of that

14  nature.

15          THE COURT:  And what do you sell?

16          PROSPECTIVE JUROR:  I go out and I get video, like do

17  weddings, a number of things, photography and such.

18          THE COURT:  Okay.  And -- but you're still working for

19  D.C. government, too?

20          PROSPECTIVE JUROR:  Correct.

21          THE COURT:  So it's a part-time?

22          PROSPECTIVE JUROR:  Correct.  D.C. government would be

23  my primary source of income.

24          THE COURT:  Okay.  And in the past, you've invested in

25  the stock market?

1    PROSPECTIVE JUROR:  Yes.  I have purchased -- when

2    Facebook was initially offered, I purchased stock with Facebook,

3    and two other things, but I don't recall what they are at the

4    moment.

5    THE COURT:  Okay.  Did you have an advisor that was

6    advising you, or did you pick these stocks on your own, or how

7    did you go about that?

8    PROSPECTIVE JUROR:  I just did it on my own.

9    THE COURT:  How did you decide what to invest in?

10    PROSPECTIVE JUROR:  I was really interested in

11    Facebook when it first came out.

12    THE COURT:  In?

13    PROSPECTIVE JUROR:  It was just simply my own

14    interest.

15    THE COURT:  How did you do?

16    PROSPECTIVE JUROR:  Facebook is doing really well

17    right now.  I haven't sold it yet.

18    THE COURT:  In your investments, how did you look at

19    dividends as a part of what you were deciding when you made an

20    investment decision?  Was that something you looked at, or

21    you're looking at more long range, or what were you looking at?

22    PROSPECTIVE JUROR:  It was really just an experiment.

23    I just purchased it mainly because I liked Facebook.  I thought

24    that it would be promising.  And I haven't -- I don't know

25    anything about, like, finances or anything like that.

```
1              THE COURT:  Have you traded in cryptocurrency or

2    wanted to trade in cryptocurrency?

3              PROSPECTIVE JUROR:  I actually did purchase crypto

4    based off of like Bitcoin -- I mean, Dogecoin.  Just off of

5    that, like the hype of it, I did purchase.  I haven't sold

6    anything, and I know nothing about --

7              THE COURT:  Did you take a bath?

8              PROSPECTIVE JUROR:  I'm sorry?

9              THE COURT:  Did you take a bath?

10             PROSPECTIVE JUROR:  A bath?

11             THE COURT:  Lose a lot of money?

12             PROSPECTIVE JUROR:  Oh, yes, I did.

13             THE COURT:  A lot of people did.

14             PROSPECTIVE JUROR:  I mean, not a lot, but --

15             THE COURT:  I'm sorry?

16             PROSPECTIVE JUROR:  Not a lot.  I didn't invest a lot.

17   I was just playing with it.

18             THE COURT:  Would you do that again?

19             PROSPECTIVE JUROR:  Probably not.

20             THE COURT:  But you did okay on the stock you did?

21             PROSPECTIVE JUROR:  With Facebook, yes.

22             THE COURT:  Do you believe investing in the stock

23   market is like gambling?

24             PROSPECTIVE JUROR:  No.

25             THE COURT:  Because you've done pretty well so far?
```

```
1          PROSPECTIVE JUROR:  I've really just dabbled.  I
2    haven't made it a thing.
3          THE COURT:  Okay.  Have you had any financial or
4    mortgage dealings with Fannie Mae or Freddie Mac?
5          PROSPECTIVE JUROR:  I was trying to remember, but I'm
6    pretty sure that when I purchased my home here in the District,
7    it was a foreclosure -- I know it was a foreclosure, but I'm
8    pretty sure it was with Fannie Mae.
9          THE COURT:  From them?
10         PROSPECTIVE JUROR:  I'm pretty sure.
11         THE COURT:  Who is your mortgage with then?
12         PROSPECTIVE JUROR:  Right now?
13         THE COURT:  No.  When you purchased that one, you
14   bought it with a mortgage, or you took over a mortgage from
15   them, or what?
16         PROSPECTIVE JUROR:  I got a mortgage with Bank of
17   America.
18         THE COURT:  I'm sorry?
19         PROSPECTIVE JUROR:  Bank of America.
20         THE COURT:  You bought it through them?
21         PROSPECTIVE JUROR:  Yes.
22         THE COURT:  So your mortgage was with them?
23         PROSPECTIVE JUROR:  Yes, it is currently.
24         THE COURT:  But it may have come from Freddie Mac or
25   Fannie Mae?
```

1              THE WITNESS:  I believe the house was foreclosed and

2    they had it.

3              THE COURT:  When did you buy that?

4              PROSPECTIVE JUROR:  Either 2017 or 2018.

5              THE COURT:  And then you still have the same mortgage

6    with Bank of America now?  You're still paying it off?

7              PROSPECTIVE JUROR:  Uh-huh.

8              THE COURT:  What was that?  A 30-year?

9              PROSPECTIVE JUROR:  I did a 30-year, and then I

10   refinanced within the last year for a 20-year.

11             THE COURT:  And you got a pretty good rate if you did

12   it --

13             PROSPECTIVE JUROR:  I did; I did.

14             THE COURT:  And you've got a vacation planned in

15   November.  What's the date in November?

16             PROSPECTIVE JUROR:  November -- I believe it's

17   November 12th.

18             THE COURT:  Okay.  We'll be done.

19             PROSPECTIVE JUROR:  I also wanted to disclose that

20   I -- I believe there's a question about have I ever served as a

21   juror before.  And I was racking my brain, and I have.

22             THE COURT:  When was that?

23             PROSPECTIVE JUROR:  A long time ago.

24             THE COURT:  What kind of case was that?

25             PROSPECTIVE JUROR:  I don't really remember the

particulars.  I just remember it was something involving like someone shoplifting.

THE COURT:  Okay.  Did that jury reach a verdict?

PROSPECTIVE JUROR:  Yes.  I believe they found him not guilty.

THE COURT:  Okay.  Anything about that experience have any effect on your ability to be a fair juror here?  Was that in this court or across the street?

PROSPECTIVE JUROR:  It was actually in my hometown, Amherst, Virginia.

THE COURT:  Oh, okay.  You were the foreman or not?

PROSPECTIVE JUROR:  No.

THE COURT:  Let me see if counsel have any other questions.

(Bench conference.)

MR. RUDY:  Plaintiffs have no questions.  This is Lee Rudy.

MR. STERN:  Your Honor, Jonathan Stern for the defendants.  We have no request for questions.

(End of bench conference.)

THE COURT:  Thank you very much.

(Prospective juror steps down.)

THE COURT:  We will go to 198.

(Prospective juror steps up.)

THE COURT:  You worked or someone close to you worked

1    for the government?

2              PROSPECTIVE JUROR:  Yes.  I work for the Department of

3    Education.

4              THE COURT:  What do you do there?

5              PROSPECTIVE JUROR:  I work in the communications

6    office.  So I do outreach to associations and advocacy groups.

7              THE COURT:  Okay.  How long have you been there?

8              PROSPECTIVE JUROR:  Six months.

9              THE COURT:  What did you do before that?

10             PROSPECTIVE JUROR:  I worked for an advocacy group

11   with student activists and with faculty.

12             THE COURT:  And you or a close family member work for

13   a large corporation?  That was where you worked before?

14             PROSPECTIVE JUROR:  No.  My father worked in Big

15   Pharma before.

16             THE COURT:  Who does he work for?

17             PROSPECTIVE JUROR:  He worked previously for Bristol

18   Myers Squibb and DuPont.  He currently works for a smaller

19   company.

20             THE COURT:  Do you have any strong opinions, positive

21   or negative, about the influence of large corporations on the

22   economy?

23             PROSPECTIVE JUROR:  Yes.

24             THE COURT:  Okay.  What is that?

25             PROSPECTIVE JUROR:  I guess in general, large

1  corporations have far too much influence on our politics and our

2  economy, usually in ways that don't benefit the consumer.  But I

3  think it varies pretty broadly between whatever market you're

4  looking at.

5  THE COURT:  Okay.  Does that have any affect on your

6  ability to be a fair and impartial juror in a case like this,

7  you think?

8  PROSPECTIVE JUROR:  I hope not.

9  THE COURT:  It could?

10  PROSPECTIVE JUROR:  It could.

11  THE COURT:  You think you could follow my instructions

12  on the law and apply the law fairly, though?

13  PROSPECTIVE JUROR:  Yes.

14  THE COURT:  Okay.  What about your investments in the

15  stock market?  Have you invested in the market?

16  PROSPECTIVE JUROR:  I just have like a 401(k) through

17  work.

18  THE COURT:  So you haven't picked any stock yourself?

19  PROSPECTIVE JUROR:  No, no.

20  THE COURT:  And have you done any cryptocurrency or

21  anything like that?

22  PROSPECTIVE JUROR:  No, no.

23  THE COURT:  Okay.  Do you have any information that

24  would be important for us to share about your ability to serve

25  as a fair and impartial juror here?

1          PROSPECTIVE JUROR:  I don't think I have any concerns

2    about being fair and impartial.  I guess it's just one question

3    on, like, ability to serve.

4          THE COURT:  Yeah.

5          PROSPECTIVE JUROR:  While I'm certainly able to serve

6    for a two-week trial, I would probably prefer not to simply

7    because of things that I have going on at work.  So I'm one of

8    the comms people assigned to the recent debt cancellation

9    announcement, and it's been a little busy this past weekend.  So

10   I would like to be able to work on that project if possible, but

11   happy and willing to serve.

12         THE COURT:  If you have any problems, I guarantee you

13   I can talk to your boss and tell him how important jury service

14   is and how difficult it is to get people to serve, and I promise

15   you I will follow up.  I'm good at talking to bosses.

16     I had a criminal trial where the jury ended up being here

17   for a year and two weeks.  Sears was the employer, and Sears

18   originally told him that he just couldn't do it.  And I ended up

19   talking to the chairman of the board of Sears in Chicago and

20   getting him to believe that they had a civic duty to supply him.

21   And he did, and he was glad by the end of it that Sears was a

22   good citizen.  I convinced him to let him serve, and he let him

23   serve.

24     I told him it was going to be eight months.  It turned out

25   to be a year and two months.  But I had 31 murders in the trial.

1    It was a long trial.  But I stayed in touch with that boss all

2    through it.  He was glad he let him -- he was a regional

3    manager, but it turned out to be a good experience for both

4    sides.

5             PROSPECTIVE JUROR:  I'm glad you intervened.

6             THE COURT:  I promise I will do the same with your

7    boss if you're seated.

8             PROSPECTIVE JUROR:  Okay.  Cool.

9             THE COURT:  Questions from either side?

10       (Bench conference.)

11            MR. RUDY:  Plaintiffs have no questions.

12            MR. STERN:  No questions.

13       (End of bench conference.)

14            THE COURT:  You can step down.

15       (Prospective juror steps down.)

16            THE COURT:  Madam Clerk, can I speak to you for a

17   moment?

18            COURTROOM DEPUTY:  Yes, Your Honor.

19       (Pause.)

20            THE COURT:  We're going to start back at 1164.

21   Apparently, some jurors are anxious to get to lunch.  Okay.  We

22   better make it 2:00, because we're going to have a lot of people

23   hitting the cafeteria at once.  So we will make it 2:00.

24       So you have the first 14, and I take it you all have the

25   next set as well.  We will try to move as quickly as we can to

1    get through the rest at 2:00.

2         Court will be in recess.  Anything else y'all want to raise

3    before I go?

4              MR. RUDY:  Nothing from plaintiffs.

5              THE COURT:  At the end of the day, hopefully, we will

6    get the panel seated.  We won't -- I don't propose to swear them

7    in or do preliminaries before tomorrow.  So at the end of the

8    day, we can talk about any other questions on preliminaries.  We

9    will just try to get through the panel.

10        (Luncheon recess taken.)

11        (Afternoon session reported by Lorraine Herman and bound

12   under separate cover.)

CERTIFICATE OF OFFICIAL COURT REPORTER


        I, Sara A. Wick, certify that the foregoing is a

correct transcript from the record of proceedings in the

above-entitled matter.



/s/ Sara A. Wick_____          October 17, 2022_____

SIGNATURE OF COURT REPORTER              DATE