```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
 2     - - - - - - - - - - - - - - - x
       FAIRHOLME FUNDS, INC., et al.,
 3                                    CA No: 1:13-cv-01053-RCL
                     Plaintiffs,
 4                                    Washington, D.C.
                                      Tuesday, October 18, 2022
 5     vs.                            9:37 a.m.

 6     FEDERAL HOUSING FINANCE AGENCY,
       ET AL.,
 7
                     Defendants.
 8     - - - - - - - - - - - - - - - x
       IN RE: FANNIE MAE/FREDDIE MAC  Case Number 1:13-cv-1288
 9     SENIOR PREFERRED STOCK PURCHASE
       AGREEMENT CLASS ACTION
10     LITIGATIONS

11     _____

12            TRANSCRIPT OF JURY TRIAL - MORNING SESSION
             HELD BEFORE THE HONORABLE ROYCE C. LAMBERTH
13                   UNITED STATES DISTRICT JUDGE

       _____

14     APPEARANCES:

15     For the Berkley Plaintiffs:   CHARLES COOPER, ESQ.
                                     DAVID THOMPSON, ESQ.
16                                   VINCENT COLATRIANO, ESQ.
                                     PETER PATTERSON, ESQ.
17                                   BRIAN BARNES, ESQ.
                                     COOPER & KIRK, PLLC
18                                   1523 New Hampshire Avenue, NW
                                     Washington, D.C. 20036
19
       For Class Plaintiffs:         ERIC ZAGAR, ESQ.
20                                   KESSLER TOPAZ MELTZER & CHECK
                                     280 King of Prussia Road
21                                   Radnor, Pennsylvania 19087

22                                   HAMISH HUME, ESQ.
                                     SAMUEL KAPLAN, ESQ.
23                                   BOIES SCHILLER FLEXNER LLP
                                     1401 New York Avenue Northwest
24                                   Washington, D.C. 20005

25     (CONTINUED ON NEXT PAGE)
```

```
 1    APPEARANCES (CONTINUED):

 2    For Class Plaintiffs:        MICHAEL J. BARRY, ESQ.
                                   GRANT & EISENHOFER, P.A.
 3                                 123 Justison Street
                                   Wilmington, Delaware 19801
 4
                                   ADAM WIERZBOWSKI, ESQ.
 5                                 BERNSTEIN LITOWITZ BERGER &
                                   GROSSMANN LLP
 6                                 1251 Avenue of the Americas
                                   New York, New York 10020
 7

 8    For Defendant Federal
      Housing Finance Agency:      ASIM VARMA, ESQ.
 9                                 HOWARD CAYNE, ESQ.
                                   DAVID BERGMAN, ESQ.
10                                 IAN HOFFMAN, ESQ.
                                   ARNOLD & PORTER KAYE SCHOLER
11                                 601 Massachusetts Avenue NW
                                   Washington, D.C. 20001
12
      For Federal Home Loan
13    Mortgage Company:            MICHAEL CIATTI, ESQ.
                                   KING & SPALDING LLP
14                                 1700 Pennsylvania Avenue NW
                                   Washington, D.C. 20006
15
      For Federal National
16    Mortgage Association:        MEAGHAN VERGOW, ESQ.
                                   O'MELVENY & MYERS LLP
17                                 1625 I Street Northwest
                                   Washington, D.C. 20006
18

19    Court Reporter:             Lisa A. Moreira, RDR, CRR
                                   Official Court Reporter
20                                 U.S. Courthouse, Room 6718
                                   333 Constitution Avenue, NW
21                                 Washington, DC  20001
                                   (202) 354-3187
22

23

24

25
```

```
 1                        P R O C E E D I N G S
 2            THE COURTROOM DEPUTY:  Your Honor, we're on the
 3    record for Consolidated Cases 13-mc-1288 and 13-cv-1053, In
 4    Re: Fannie Mae vs. Freddie Mac, et al.
 5            Counsel, please approach the lectern and identify
 6    yourselves for the record, starting with the plaintiff.
 7            MR. HUME:  Good morning, Your Honor; Hamish Hume,
 8    representing the class plaintiffs.  I can introduce my
 9    fellow co-counsel very briefly.  With me at counsel table is
10    Mr. Eric Zagar; Sam Kaplan; Mr. Richard Gluck; and our trial
11    technician, the most important person in the courtroom,
12    Kevin DeRita, and representing the Berkeley plaintiffs,
13    Brian Barnes.
14            There are other colleagues here, including Kenya
15    Davis, Lee Rudy, Robert Kravetz, and Michael Barry, in the
16    first row there.
17            THE COURT:  All right.  Thank you.  Good morning.
18            MR. HOFFMAN:  Good morning, Your Honor; Ian
19    Hoffman on behalf of the defendants.  I'm joined this
20    morning by Mr. Jonathan Stern also from Arnold & Porter,
21    Mr. David Bergman, Ms. Asim Varma, Mr. Stanton Jones.  Also
22    Ms. Allison Gardner is with us this morning.
23            THE COURT:  Okay.  Good morning.  Let me talk to
24    the clerk one minute first.  We're going to have an issue
25    with one juror, but we'll take that after I finish this.
```

```
1              I have gone over the deposition objections at some
2    length, and what I propose to do is go ahead and -- I've
3    studied those, and I don't think further argument on them
4    will help, so I'm going to go ahead and rule on the
5    deposition objections, which I think will expedite things so
6    we don't keep the jury waiting at 10:00.  Both sides were
7    very helpful in their briefing on the issues.
8              On the defendants' objection to the Susan
9    McFarland deposition excerpts that have been designated on
10   the first series, which is 92:15 to 93:04, the defendant's
11   objections is overruled.
12             Whether Fannie Mae's CFO believed the company was
13   in imminent danger of collapse is potentially relevant to
14   the question of whether FHFA acted in a manner consistent
15   with shareholder expectations.  Letting her later testimony
16   about what she thought might happen in the future would cure
17   whatever prejudice or confusion that the ambiguous term
18   "death spiral" might cause, I find.
19             As to the second objection on 148:10 to 151:2,
20   defendant's objection is sustained.
21             While it's possible that plaintiffs could offer
22   this testimony simply to show that Fannie Mae's CEO and CFO
23   were not consulted before FHFA agreed to the third
24   amendment, it also goes into detail about why McFarland
25   believed Treasury would not want a buildup in capital at the
```

1    GSEs.  That could potentially confuse the jury into thinking

2    that McFarland had personal knowledge of Treasury's

3    position, which might lend credence to the idea that FHFA

4    adopted that position.  For that reason, the testimony is

5    likely to be substantially more prejudicial than probative.

6           The third objection for 157:17 to 159:14 I will

7    sustain in part and overrule in part.  The objection to

8    158:4 to 10 will be sustained.  The objection to 157:17 to

9    159:14 sustained in part and overruled in part.

10           Most of the passage amounts to McFarland's

11    speculation as to what Treasury's reasoning might have been.

12    However, 158:4 to 10 beginning "I just sat down with him"

13    and ending "not so distant future" is based on McFarland's

14    personal knowledge of things she told Treasury, so I won't

15    exclude that specific part of the passage.

16           As to plaintiffs' objections to 201:3 to 201:18,

17    202:6 to 202:12, 203:13 to 203:21, 203:23 to 204:5, and

18    204:18 to 205:18 of the McFarland deposition, plaintiffs'

19    objections are overruled.

20           Defendants are not offering those for the truth of

21    the matter asserted in the articles.  They're offering it to

22    facilitate her testimony at the deposition that those were

23    her beliefs at the time.  It's not hearsay, therefore.

24           Turning to the Timothy Mayopoulos deposition.  The

25    defendants' objection is sustained.  Mayopoulos did not

 1  claim to have any personal knowledge of what factors the

 2  negotiators considered, political or otherwise; and his own

 3  opinion about approaching the negotiations as political is

 4  irrelevant since there's no allegation that he was, in fact,

 5  involved.

 6          Defendant's objection to the deposition excerpts

 7  from David Benson are overruled.

 8          Defendant's objection to the -- Benson wouldn't

 9  have had to work for Treasury to have personal knowledge of

10  what it was getting out of the third amendment.

11          As a matter of fact -- as a matter of net

12  dividends, it appears the math he agreed to in the preceding

13  questioning was correct, so that questioning does not make

14  what follows substantially prejudicial.

15          As to the deposition of Donald Layton, the

16  plaintiffs' objection is overruled.

17          Defendants can offer the testimony about Layton's

18  conversations with what is Credit Suisse for the nonhearsay

19  purpose of showing its effect on his state of mind.  That's

20  consistent with my decision on the motion in limine to

21  exclude the securities analysts' reports because here

22  there's some evidence that a key player, Freddie Mac's CEO,

23  actually considered Credit Suisse's concerns and relayed

24  that information to FHFA; and it's relevant to the question

25  of whether FHFA acted in good faith on the information it

 1   had at the time, which, in turn, is relevant to whether FHFA

 2   violated its shareholders' reasonable expectations, even if

 3   those expectations were formed no later than December 24,

 4   2009.

 5            As for Rule 403, plaintiffs have not identified

 6   the prejudice or confusion that they say would result from

 7   this testimony.

 8            So with those rulings, the Court, I think, has

 9   ruled on all objections to the depositions.

10            And with that, you'll be able to mark up the

11   depositions with what's admissible and what's not.  And

12   since that may affect what you're saying in your openings, I

13   hope that will give you the guidance that you can get

14   through your openings without any further problems.

15            Yesterday you filed the joint motion to dismiss

16   Sandra Thompson in the Berkeley case, and that -- I will

17   issue an order granting that.

18            You also, this morning at 7:30, filed a joint

19   statement of undisputed facts, and I will also grant that

20   motion as well.

21            So hopefully that will lead you to where you can

22   go forward with your openings with those rulings this

23   morning.

24            I have the preliminary jury instructions that you

25   all had proposed and agreed upon.  I think the only

```
1    difference, then, on those preliminary instructions is there
2    was some dispute about whether I should do something in
3    preliminary instructions about class actions.  It really
4    would not be my practice to talk about class actions at this
5    stage.  I would save that.  It's probably too much to throw
6    at the jury in preliminary instructions, I think, and I
7    think the better practice would be to save that for the
8    closing instructions.
9            We're going to give them so much this morning
10   anyway, I think with preliminary instructions as you had
11   them originally proposed is what I would read.  I don't see
12   any problem with any of those.  And I think trying to get
13   into explaining class actions, you all have got enough to do
14   with what you're going to throw at them this morning in your
15   opening statements, so I'll decline that part.
16           And otherwise I'll give everything you've proposed
17   in your preliminary instructions.
18           So with those thoughts, I'll take any other issues
19   you all want to raise before we get into the problems with
20   Juror 2.
21           MR. GLUCK:  Your Honor, Richard Gluck for the
22   plaintiffs.
23           One issue.  We had a typo in the agreed upon
24   Instruction No. 3, and I corrected that.  The typo was we
25   had referred to the common shareholders of Fannie Mae, and
```

 1     it's actually the preferred that are at issue, so I have the

 2     revised instruction on that.

 3               THE COURT:  Okay.

 4               MR. GLUCK:  And one other issue on the preliminary

 5     instructions.  We had proposed that the Court instruct the

 6     jury before opening statements that the timing of purchases

 7     is irrelevant, which is consistent with the Court's ruling

 8     on the motions in limine and its instruction, Page 35.  And

 9     we ask that that be given as a preliminary instruction as

10     well as at the end of the case, and we would request that

11     the Court do that.

12               THE COURT:  Okay.  Have you got a proposal there?

13               MR. GLUCK:  I do, Your Honor.  It's in the

14     materials -- it's under the section with the plaintiffs'

15     proposed instructions in the submission we made, the joint

16     submission we made on Friday.  It's in there.

17               THE COURT:  Okay.

18               MR. GLUCK:  I can also hand up a copy.

19               MR. JONES:  Good morning, Your Honor; Stanton

20     Jones on behalf of the plaintiffs.  Could I be heard quickly

21     on the last point that counsel raised?

22               THE COURT:  Sure.

23               MR. JONES:  This is plaintiffs' Instruction

24     No. 35.  It's titled "Timing of Purchases is Irrelevant."

25               I think, if you just read it, it largely is just

1      reciting an issue that the jury doesn't need to be informed

2      about.  It's a sort of legal issue in the background of the

3      case.

4              But Your Honor has already ruled on the in limine

5      motions that the jury won't learn about the timing of any

6      shareholders' purchase, so instructing the jury that as a

7      legal matter the timing of the purchases is irrelevant seems

8      like it would cause more confusion than anything else and is

9      unnecessary.

10             THE COURT:  Then I'll decline it in the

11     preliminaries, and I'll rule on it at the time of finals.

12             MR. JONES:  Thank you.

13             MR. HOFFMAN:  Good morning, again, Your Honor; Ian

14     Hoffman on behalf of the defendants.

15             Two more issues to bring to the Court's attention.

16     I'll try to do it swiftly.

17             We appreciate Your Honor's rulings on -- all the

18     detailed deposition designations.  One other deposition

19     designation related issue has arisen, and it's about a

20     video deposition that plaintiffs intend to play today of

21     Mr. Cacciapalle, who is one of the shareholder class

22     representatives.

23             The parties met and conferred, meticulously cut it

24     down, and we were informed, I believe, Sunday evening that

25     the plaintiffs wish to edit the video and rearrange the

1     clips that we have agreed are not objectionable and to put

2     them in a different narrative order.

3          We told them we'd consider it.  And the next day

4     we told them that we, you know, politely decline; that the

5     deposition video should just play in the same order in which

6     the deposition was taken, just as if it were in court; and

7     for plaintiffs to chop it up and edit it like, you know, out

8     of sequence is -- we're not aware of any sort of authority

9     for that when the other party is objecting, at least.  So we

10    think it should just be played in the normal sequence as it

11    was -- as the deposition happened.

12         I'll let plaintiffs' counsel address that as well.

13         But there's one other issue that Mr. Jones will

14    address but I wanted to set up for the Court; that, per the

15    parties' agreement, we exchanged demonstratives in our

16    slides that each side is going to raise in opening, and

17    there is a -- we discovered last night that there is a

18    document, a Treasury document, that's objected to and hotly

19    contested.  Its admissibility is hotly contested.  That's

20    featured prominently in plaintiffs' opening, and so we

21    object to that being shown to the jury because we object to

22    the admissibility of the document.

23         Mr. Jones is prepared to argue that, if plaintiffs

24    insist on continuing to present that to the jury, and I

25    believe they do.

1          So the video issue, Your Honor, the video

2     sequencing issue for Mr. Cacciapalle's deposition and

3     defendants' objection to the use of the Treasury document in

4     plaintiffs' opening statement is all the issues we have.

5          I believe plaintiffs want to move in a number of

6     documents that are not objected to, but I'll let them speak

7     to that.

8          THE COURT:  Okay.

9          MR. HOFFMAN:  Thank you, Your Honor.

10         THE COURT:  All right.

11         MR. RUDY:  Good morning, Your Honor; Lee Rudy for

12    the plaintiffs.  I'm going to quickly respond to this,

13    quote, chopping up of the video.

14         As counsel referenced, the Cacciapalle video was

15    meticulously negotiated over a long period of time, and it's

16    been trimmed down to about 11 minutes.  A lot of good work

17    was done.  And when we reached the agreed-to set of clips,

18    which is not that much, I made the proposal that we should

19    reorder them so that the topics that are being talked about

20    are being talked about at the same time.

21         So, for example, Mr. Cacciapalle was shown his

22    account statement, which will be the best evidence of the

23    fact that he owned preferred shares in Fannie and Freddie.

24    He was asked about that in Pages 38 to 39 and then again at

25    Pages 48 to 50.

1          So it's a three-page document where Page 1 is

2     talked about, and then ten pages later Pages 2 and 3 are

3     talked about.  I suggested we put those things together so

4     it makes more sense to the jury listening to this.

5          He's asked about the conservator being appointed

6     on Page 44; and then again on Page 53 to 58 he's asked

7     questions about the conservator.

8          He's asked about the terms of the PSPAs, the

9     agreements.  He was asked about that on Pages 47 and then on

10    Page 58.

11         So I'm suggesting we group those together.  Those

12    are the three edits that I'm suggesting that we make.

13         The idea that plaintiffs, in the presentation of

14    their case, should be bound by the order in which defendants

15    asked their questions in an all-day deposition when we've

16    trimmed it down to 11 minutes, it's -- frankly, to me, it's

17    preposterous.  I think it's our case.  We get to present the

18    evidence in the order that we want to.

19         It's, in fact, more misleading to do it the way

20    they want to do it where you have a freestanding quote that

21    is then contradicted or clarified by a later quote.  It's

22    more misleading to do it this way.  It's way less misleading

23    to put the same topics together.

24         If Your Honor wants to see it, I can show you a

25    transcript of what they want and what we want.  But,

1    frankly, I think this is a nonissue.  And the clips are all

2    agreed to and stipulated that they're all admissible.

3            You didn't hear defendants say that there was

4    something misleading about grouping them the way I want to

5    group them.  What they seem to want to do is the way that

6    the deposition-taker argued it -- you know, presented it to

7    Mr. Cacciapalle, which frankly is a little bit disjointed,

8    should be the way we're bound to present our evidence to the

9    jury, and I don't think he has any authority for it.  It's a

10   Rule 403 question.

11           It's more misleading the way they want to do it.

12   It's less misleading the way we want to do it.

13           So I'd leave it at that, Your Honor.

14           MR. HOFFMAN:  I don't want to belabor it, Your

15   Honor, because I think you understand the issues.

16           It's an 11-minute video.  It's hard to understand

17   how going from one topic in the first few minutes and then

18   revisiting it a few minutes later would be that prejudicial

19   or confusing.

20           It is plaintiffs' case.  Plaintiffs have chosen

21   to present the deposition testimony.  And so if they're

22   going to play the deposition testimony that admittedly --

23   Mr. Bergman took the deposition, then it needs to be just

24   played in the sequence in which it was taken, Your Honor.

25   Thank you.

```
 1              THE COURT:  All right.  That objection is
 2    overruled, and the plaintiffs can play it in the way that
 3    makes logical sense in terms of presentation of the
 4    evidence.
 5              The objection to showing a demonstrative that is
 6    objected to and the Court hasn't ruled on its admission is
 7    sustained.
 8              MR. HUME:  Judge Lamberth, Hamish Hume for the
 9    plaintiffs.
10              I would think we -- our understanding is you may
11    have just ruled on the objected exhibit.  We would like to
12    be heard with brief argument on that because we actually
13    think the Court already ruled on this, these particular
14    exhibits, in the motion in limine.
15              THE COURT:  I didn't hear any argument on it.  You
16    have someone who wanted to argue that?
17              MR. HUME:  Yes.  Could we, please?
18              THE COURT:  Okay.
19              MR. HUME:  Mr. Zagar will present our argument.
20              MR. ZAGAR:  Thank you, Your Honor; Eric Zagar for
21    the plaintiffs.
22              In Your Honor's order from a few days ago on
23    motions in limine, Your Honor considered this specific
24    document, PX205.  And what Your Honor said in that
25    order was, in considering the issue of whether it was a
```

1    public record, Your Honor said:  Defendants offer no

2    persuasive explanation as to why that document, PX205, or

3    others like it would not be a record setting out an agency's

4    activities --

5                 THE COURT:  What is the document?

6                 MR. ZAGAR:  Excuse me?

7                 THE COURT:  What is the document?

8                 MR. ZAGAR:  The document is one of the ones that

9    Mr. Hume showed in the argument.  It was a memorandum -- it

10   was an email form recording what happened at a meeting

11   between Secretary Geithner and Mr. DeMarco.

12                THE COURT:  Can you show it to me?

13                MR. ZAGAR:  Can we turn on the --

14                THE COURT:  It's the one that I was shown in the

15   hearing?

16                MR. ZAGAR:  It was.

17                THE COURT:  So I recall it.

18                MR. ZAGAR:  And we can bring it up in a moment.  I

19   can hand up a copy, if Your Honor would like to see it.

20                So Your Honor referenced this document in the

21   order.

22                THE COURT:  I did.  And I did, in my order,

23   indicate that this is exactly the kind of document that I

24   thought would be admissible.

25                MR. ZAGAR:  Correct, Your Honor.

```
1                    THE COURT:  Yes.

2                    MR. ZAGAR:  And so defendants are now arguing that

3       despite Your Honor's ruling, that it contains some embedded

4       hearsay that makes it inadmissible.

5                    Well, A, that's inconsistent with Your Honor's

6       order; and, B, that's not how the rule works.  There's a

7       case --

8                    THE COURT:  I'll reverse my ruling.  I think this

9       is going to be admitted when it's offered.

10                    MR. ZAGAR:  Thank you, Your Honor.

11                    THE COURT:  I'll let you all argue against it, if

12       you want to, but I don't think you've got a prayer.

13                    Go ahead.  This is exactly what I was talking

14       about in my opinion.

15                    MR. JONES:  Thank you, Your Honor.

16                    THE COURT REPORTER:  Could you state your name,

17       please.

18                    MR. JONES:  Stanton Jones for the defendants.

19                    So two points, Your Honor.  You did reference this

20       document and indicated a view that it was a public record.

21       We would just like to reiterate the first point.  We don't

22       think it's a public record.

23                    The Fifth Circuit's decision in the Isuzu case,

24       which Your Honor said was the law on this, is that

25       preliminary or interim evaluative opinions of agency staff
```

1     members do not fall under this branch of the public records

2     exception.  There's extensive case law supporting that view,

3     and this document is full of preliminary deliberations and

4     opinions by an agency staff member.  It reports that someone

5     no longer thinks that certain benefits are worth the cost.

6     Someone's shrinking view may signal a decision.  A policy

7     drift may indicate that someone is beginning to sense a

8     view.

9             Almost everything reported in this document is

10    preliminary and at a deliberative stage.  It is not

11    reporting activities that the agency has already conducted

12    in a retrospective way.  Right?  This is not like OSHA

13    reporting:  We conducted 432 on-site safety inspections; we

14    issued 29 citations for safety violations.

15            These are deliberative, ongoing, predecisional

16    discussions by agency staff members that do not satisfy the

17    public records exception.  So that's the first point we

18    wanted to make.

19            The second point, Your Honor, is that even if this

20    document did qualify as a public record under 803(8), it

21    contains multiple layers of hearsay.  And of course under

22    Rule 805, when a document contains multiple levels or layers

23    of hearsay, each layer needs to independently satisfy an

24    exception.

25            The plaintiffs cited in their in limine briefing

1    one case from the Seventh Circuit, the *In Re: Oil Spill* case

2    from some years ago, indicating that 803(8) public records

3    exception is a multilevel exception that knocks out all of

4    the levels of hearsay.  But the Seventh Circuit itself in

5    subsequent rulings, primarily *Jordan v. Binns*, which is at

6    712 F. 3d 1123, Seventh Circuit 2013, the Seventh Circuit

7    clarified that that's not what *In Re: Oil Spill* means at all

8    and, in fact, reaffirms, consistent with the decisions of I

9    believe every circuit, that even in a public record under

10   803(8), the Rule of 805, that additional layers of hearsay

11   need to satisfy their own exceptions independently to be

12   admitted still applies.  And this document on its face

13   contains multiple layers of hearsay.

14           It is Mr. Stegman, then a Treasury employee,

15   writing in an email that the secretary provided an overview

16   of his and your previous day's meeting with Ed DeMarco.

17   This is the essence of the discussion that took place.  So

18   on its face, Mr. Stegman is reporting what someone else,

19   then Secretary Geithner, reportedly told him about a meeting

20   that he had had with someone else.  That's multiple layers

21   of hearsay.

22           And we don't think the document is a public record

23   at all for the reasons I explained.  But even if it were,

24   the additional layers of hearsay do not satisfy any

25   exception, and the plaintiffs haven't even argued that they

1    do.

2              Their only argument is that 803(8) is a multilevel

3    exception that knocks out all layers of hearsay, and that's

4    simply incorrect as a matter of law.

5              THE COURT:  Okay.  Good luck on appeal.

6              MR. JONES:  Thank you, Your Honor.

7              THE COURT:  Let me talk to counsel about this jury

8    issue on the headset.

9              Actually, we can wait just a minute until the

10   clerk gets back from talking to the other jurors.

11             MR. GLUCK:  Your Honor, may I just approach and

12   hand the clerk the jury instructions?

13             THE COURT:  Yes.

14             (Pause)

15             MR. JONES:  Your Honor, Stanton Jones again.  At

16   any convenient time there was one other point that the

17   parties wanted to present to the Court jointly about the

18   jury instructions for reading to the jury this morning.

19             THE COURT:  Okay.

20             MR. JONES:  Okay.  In the agreed upon instructions

21   that we submitted, both parties, defendants and plaintiffs,

22   are in agreement that this morning we would like the Court

23   to read Instruction No. 2, which is titled "Preliminary

24   Instruction."

25             THE COURT:  Yes, it's from 223, 223.1.

```
1            MR. JONES:  Correct.  So you would read

2    Instruction No. 2, titled "Preliminary Instruction."

3            THE COURT:  Right.

4            MR. JONES:  The parties are in agreement that we

5    would like you also to read to the jury, now that it's

6    empaneled, No. 3, "Statement of the Case."  And I understand

7    you read that to the room full of prospective jurors

8    yesterday --

9            THE COURT:  Yes.

10           MR. JONES:  -- but the parties are in agreement to

11   read it today.  Thank you.

12           THE COURT:  All right.  And the corrected type

13   that was just handed to me is from the --

14           MR. JONES:  Correct.

15           THE COURT:  Yes.

16           MR. HUME:  I'm sorry, Judge Lamberth, you wanted

17   to attend to that juror issue.  There was one ruling on

18   deposition testimony that was, as we heard it, premised on a

19   factual assertion or assumption that my partner, Mr. Kaplan,

20   in two minutes or less would like to address.

21           THE COURT:  I can't hear you.

22           MR. HUME:  My partner, Mr. Kaplan, would just like

23   to address just one ruling on the depositions objection.

24           THE COURT:  Okay.

25           MR. KAPLAN:  Thank you, Your Honor.  Very briefly.
```

1          In Your Honor's ruling on Mr. Layton in the Credit

2     Suisse meeting, I understood Your Honor to say that --

3          THE COURT:  Which deposition?

4          MR. KAPLAN:  Mr. Layton's deposition testimony

5     about meetings with Credit Suisse.

6          THE COURT:  Right.

7          MR. KAPLAN:  My understanding was -- or I heard

8     Your Honor to say, and I apologize if I misunderstood --

9     that Your Honor's ruling was in part premised on the idea

10     that he might have conveyed it to somebody else.  So he

11     might have conveyed it to somebody else at FHFA, in which

12     case it could have informed their decision-making.

13          The testimony -- Your Honor, there's no indication

14     that he told anyone at FHFA, and I don't believe there was

15     going to be any testimony in this case that he did.  It was

16     just a meeting between him and another Freddie Mac employee

17     and these representatives from Credit Suisse.

18          Mr. Layton speculates that they may have been

19     making the rounds, but he didn't have any personal knowledge

20     that they did.  So I don't believe that there's going to be

21     that connection of a communication with the decision-maker

22     in this case, and I wanted to raise it now orally.

23          We could, of course, make this more clear for Your

24     Honor in writing, but because Your Honor was concerned about

25     people making decisions in reliance on the Court's ruling

1    with respect to --

2              THE COURT:  I wasn't relying on what he told them,

3    but I was relying on -- I thought Freddie Mac's CEO

4    considered Credit Suisse's concerns, not that he told them.

5              MR. KAPLAN:  Well, the Freddie Mac CEO -- what I

6    was referring to, Your Honor, is I thought there was a

7    reference in Your Honor's ruling to the -- to passing it on.

8              With respect to Mr. Layton's --

9              THE COURT:  No, I was relying on the Credit --

10   that Credit Suisse was something that the CEO used or relied

11   on or thought about, not that he told him.

12             MR. KAPLAN:  I see.  So in that case, Your Honor,

13   the only point we would make is that the -- that Mr. DeMarco

14   is the decision-maker in this case, and Freddie Mac -- and

15   the evidence will show that Freddie Mac and Fannie were not

16   even consulted about the net worth sweep until the day

17   before.

18             THE COURT:  Right.  I understand.

19             MR. KAPLAN:  Okay.  Thank you, Your Honor.

20             (The following is a bench conference

21              held outside the hearing of the gallery)

22             THE COURT:  This is Juror No. 2, who is a big

23   problem.  She had to leave yesterday saying that she had no

24   way to arrange for anyone to pick up her child.  She then

25   had a conversation with my clerk about she could not be here

1   before 10:30 today because she can't leave her child until

2   after 10:00, and this will be a problem every day.

3          And then she said in later conversations with my

4   clerk last night that there is no way she can arrange for

5   anyone else on any Friday to ever take her child, so she can

6   never sit on Friday.

7          And my clerk told her she would need to put this

8   in writing to ask to be excused then.  And she agreed to

9   write a letter to me last night, but she would not arrive

10  here today until after 10:30 because she can't take her

11  child until after 10:00.

12         So we can recess until 10:30 and hold overtures

13  here and have no end result of them, probably having to

14  excuse her, or if you want to, we can just excuse her.  And

15  we have enough in the panel, and we'll go forward with nine.

16         But she -- I had a hard time accepting that she

17  could not find anyone in her family or friends to do things

18  on Friday, but she is unwilling to do that.  My clerk was a

19  single mother at some time, and my clerk is more sympathetic

20  to her than I have been, I will admit.

21         So counsel want to consult about that and give me

22  your views.

23         MR. RUDY:  Your Honor, this is Lee Rudy for

24  plaintiffs.  Can I just ask you a question before we

25  consult, which is, are there other jurors who are indicating

1    that they may not show up?  Because there was a man, I

2    believe -- one of jurors was making noises yesterday.  Are

3    we -- would we be left with nine, if this juror is excused,

4    or would we potentially be left with less than nine?

5            THE COURT:  He did not raise anything today.  He

6    said, as he was leaving yesterday, that he forgot he was

7    going to go on a trip sometime, and he did not raise

8    anything other than that.  And I don't know of anyone else

9    who is seeking to be excused.

10           MR. RUDY:  Again, Lee Rudy.  And that gentleman is

11   here today?

12           THE COURT:  Yes.

13           MR. RUDY:  I'd just like to confer with my team.

14   Thank you.

15           (Pause)

16           MR. RUDY:  Lee Rudy for plaintiffs.  The

17   plaintiffs are fine with Your Honor excusing Juror No. 2.

18   We understand the hardship she's presenting.

19           MR. STERN:  Your Honor, Jonathan Stern for the

20   defendants.  We would prefer to keep her.  The Court had

21   decided to start at ten and now we'd be starting with nine,

22   but we would defer to the Court's judgment.

23           THE COURT:  All right.  We'll go ahead and release

24   her, and I'll go ahead and start with nine.  I don't think

25   trying to force someone in this posture will do anything but

1    result in a contempt finding that I don't think the Court

2    wants to be in the posture of.

3              MR. STERN:  Sorry, Your Honor.

4              (This is the end of the bench conference)

5              THE COURT:  I'll give the jury instructions and

6    then openings.  Have you all talked about the length of time

7    for openings?

8              MR. HUME:  Your Honor, I think our opening may be

9    on the order of about an hour and a half.  Thank you.

10             THE COURT:  That was more than I was anticipating.

11             MR. STERN:  Probably about the same -- Jonathan

12   Stern for the defendants, Your Honor.  Probably about the

13   same for us, with a little bit of leeway, but in that

14   general zone.

15             THE COURT:  Okay.

16             MR. STERN:  Thank you, Your Honor.

17             (Pause)

18             (The following is a bench conference

19              held outside the hearing of the gallery)

20             THE COURT:  It turns out that Juror No. 7, who was

21   the other one that left early yesterday, did not report this

22   morning.

23             The CSO had reported that all were here except No.

24   2.  That turns out to be incorrect.  No. 7 was not here when

25   we went to seat them.

1          No. 7 now claims that she did not get the message

2   last night.  She now claims that she did not know to report

3   and did not report, and she's now more than 45 minutes away.

4   So I suppose there's no alternative but to simply wait until

5   she reports.

6          MR. STERN:  Agreed, Your Honor.  We agree.

7          MR. RUDY:  For plaintiffs, Lee Rudy.  We agree.

8          (This is the end of the bench conference)

9          THE COURT:  Due to the unavailability of one

10  juror, we'll be in recess for about 45 minutes.

11          (Recess taken)

12          THE COURT:  The juror's here, and they'll be in

13  shortly.  We'll take the lunch break at 1:00.

14          Well, hopefully.  I guess it depends on how long

15  these instructions take.

16          (Pause)

17          (Jury enters courtroom)

18          THE COURT:  You may be seated.

19          All right.  Good morning, ladies and gentlemen.

20  At this time I'll ask the clerk to please give you the oath

21  as members of the jury in this case.

22          (Jury sworn)

23          THE COURT:  Before we begin the trial, I want to

24  briefly describe how the trial will work and some important

25  legal rules.  I'll give you more detailed instructions at

1    the end of the trial after you've heard the evidence and

2    before you start your deliberations.  Those instructions

3    will be read to you, but they'll also be given to you in

4    writing so you have them with you during your deliberations.

5            Your responsibility as jurors is to determine the

6    facts in this case and to apply those facts consistent with

7    the legal principles that I will explain to you.

8            You, and only you, are the judges of the facts.

9    You alone determine the weight of the evidence, including

10   the believability of each witness.

11           My responsibility is to conduct this trial in a

12   fair and efficient manner.

13           Your sworn duties as jurors is to accept and apply

14   the law as I explain it to you.

15           You may not take anything I may say or do as any

16   indication of my opinion as to how you should decide the

17   facts or what your verdict should be.

18           To help you remember, you may take notes for your

19   personal use.  Your notes are only an aid to your memory.

20   They're not evidence.  Those jurors who do not take notes

21   should rely on their own memory of the evidence.

22           Whether you take notes or not is entirely up to

23   you.  Some people find that taking notes helps them remember

24   testimony in evidence.  Others find that it distracts them

25   from listening to and watching the witnesses.  You should

1    make your own choice about -- because each of us knows best

2    how we take in and remember information.  You will not have

3    a transcript to be able to use during your deliberations, so

4    you have to rely on your own memory and recollection of the

5    evidence.

6             In case you do want to take notes, we've provided

7    each of you with a notebook and a pen for each of you to

8    use.  Please take any notes in the notebook that you have

9    there in your folder.

10            If you take notes, you can take your notebook back

11   with you into the jury room at the end of the trial to

12   review while you deliberate.  On breaks, you can leave your

13   notebooks there on your chairs or overnight either on your

14   chair or in your deliberation room.  We will keep them safe

15   and secure.

16            At the end of the trial, after you deliver your

17   verdict, your notebooks will be collected.  The pages of

18   notes will be torn up and destroyed.  No one will ever look

19   at any notes you've taken.

20            You may feel free to write whatever you wish in

21   your notebook.  You could write "The judge is a jerk,"

22   whatever you want to write in there.  I'm not going to read

23   them.  Nobody else is going to read them.  They're just for

24   your own use, whatever you want to take notes about.

25   They're just for your own personal use.

1          You must pay careful attention to the evidence and

2     testimony of all the witnesses before you because, as I

3     said, you won't have any transcripts or summaries of the

4     testimony available to you during your deliberations.

5     You'll have to rely on your own memory and recollection and

6     your notes, if you choose to take any.

7          I will explain some of the legal terminology,

8     including the burden of proof.

9          Plaintiffs are the ones who started the lawsuit.

10    Defendants are the persons that plaintiffs have sued.

11         Plaintiffs must prove the factual basis for their

12    claims is more likely true than not true.  This burden of

13    proof is called the preponderance of the evidence standard.

14    Although there are multiple plaintiffs and defendants, you

15    should consider the evidence concerning each plaintiff and

16    each defendant separately.

17         The lawyers may object from time to time to

18    questions, exhibits, and statements.  You must not hold such

19    objections against the lawyer who makes them or the party

20    the lawyers represent.  A lawyer has a responsibility to

21    object to evidence offered or argument he or she considers

22    inappropriate.

23         If I overrule an objection to a question, it means

24    only that the law permits the witness to answer the

25    question.  It's still up to you to decide how much weight,

1    if any, the answer is entitled to.

2              If I sustain an objection, you should not hold it

3    against the lawyer who asked the question.  It only means

4    that the law does not permit the witness to answer the

5    question.  You should ignore the question.  You must not

6    guess what the answer to the question would have been.

7              If a question is asked and answered, and I've then

8    ruled that the answer should be stricken, you may not

9    consider either the question or the answer in your

10   deliberations.

11             Sometimes the lawyers' questions suggest the

12   existence of a fact, but the lawyers' question alone is not

13   evidence.  It's the witness's testimony that's the evidence.

14             As I mentioned, you must decide this case solely

15   on the evidence presented here within the four walls of this

16   courtroom.  This means that during the trial you must not

17   conduct any independent investigation or research about this

18   case.  For example, you cannot use the Internet to research

19   the facts or the law or the people involved in the case.

20   Research includes something as simple or seemingly as

21   harmless as getting a definition of a legal term over the

22   Internet or from a dictionary.

23             I want to explain why you should not conduct any

24   of your own investigation or research.

25             All parties have a right to have the case decided

1    only on the evidence and legal rules that they know about

2    and to which they have a chance to respond.  Relying on

3    information you get outside this courtroom will be unfair

4    because the parties will not have a chance to refute,

5    correct, or explain it.  Unfortunately, information we get

6    over the Internet or from other sources may be incomplete or

7    misleading or just plain wrong.

8         It's up to you to decide whether to credit any

9    information presented in court, and only the evidence

10   presented in court may be considered.  If evidence or legal

11   information has not been presented in court, you may not

12   rely on it.

13        You're not permitted to discuss this case with

14   anyone until you begin your deliberations after I give you

15   the final instructions.  This means that until the case is

16   submitted to you, you may not talk about it with family

17   members, friends, or even with your fellow jurors.  You

18   should not communicate about the case by any means, in

19   person, over the phone, using the Internet, including

20   emailing, texting, blogging, or using social media such as

21   Facebook or Twitter.

22        The only communication you should have is with the

23   jury as a whole once your deliberations begin.  This is

24   because we want you to keep an open mind, not make any

25   decisions until you've heard all the evidence and talked

1    with your fellow jurors as a group.

2             When we take our first recess or when you leave

3    the court at the end of today, you can call home or work and

4    tell them you've been selected for the jury and how long it

5    will last.  And undoubtedly they'll ask what kind of case

6    you're sitting on.  Tell them it's a civil case, but nothing

7    else.  When the case is over, you may discuss any part of it

8    with anyone, if you wish to do so.

9             As part of the prohibition against communicating

10   with others, you may not speak with the parties, their

11   lawyers, or the witnesses.  Please do not be offended if a

12   lawyer or party does not respond if you say hello, if you

13   happen to see them in the courthouse or elevator or

14   downstairs in the basement in the dining room or wherever.

15   They're under instruction from me not to communicate with

16   you in any way under any circumstances.

17            It's unlikely, but if someone tries to talk to you

18   about the case, you should refuse to do so and immediately

19   let me know by writing a note and giving it to the clerk.

20   Do not tell the other jurors.  Let me know.  I'll bring it

21   in to discuss it outside the hearing of the other jurors.

22            Similarly, if during the trial you unexpectedly

23   realize you know someone involved in the case or something

24   about the facts, raise your hand immediately and ask to

25   speak to me, and I'll talk to you about it.

1            There may be reports in the newspapers or on

2      television or in other media concerning this case or facts

3      relating to this case during the trial.  If there is any

4      such media coverage, you may be tempted to read, listen to,

5      or watch it.  You must not do so.  That is because you must

6      decide this case solely on the evidence presented in this

7      courtroom.

8            If any publicity about this trial or relating to

9      these issues in this trial inadvertently comes to your

10     attention during trial, do not discuss it with other jurors

11     or anyone else.  Just let me or the courtroom clerk know as

12     soon after it happens as you can, and I'll talk to you about

13     it then.

14           As I talked to you yesterday during the jury

15     selection process, this is a class action brought by

16     plaintiffs Joseph Cacciapalle, Michelle Miller, Timothy J.

17     Cassell, and Barry P. Borodkin on behalf of the common and

18     preferred shareholders of the Federal Home Loan Mortgage

19     Corporation, normally called Freddie Mac, and the preferred

20     shareholders of the Federal National Mortgage Association,

21     normally called Fannie Mae.

22           I'll explain in more detail later what a class

23     action is.

24           In addition to the class action plaintiffs, the

25     plaintiffs also include several insurance companies,

1     including plaintiff Berkeley Insurance Company.  When I

2     refer to the class action plaintiffs, I mean the plaintiffs

3     Joseph Cacciapalle, Michelle Miller, Timothy J. Cassell, and

4     Barry B. Borodkin and the classes of shareholders they

5     represent.  When I refer to W.R. Berkeley plaintiffs, I mean

6     plaintiff Berkeley Insurance Company and the other insurance

7     companies who are plaintiffs in this case.

8            When I refer to "plaintiffs," I mean the class

9     action plaintiffs and the W.R. Berkeley plaintiffs together.

10           The defendants in the case are the Federal Housing

11    Finance Agency, which I'll refer to as FHFA, Fannie Mae, and

12    Freddie Mac.

13           Fannie Mae and Freddie Mac are sometimes referred

14    to as government-sponsored enterprises, or GSEs, or

15    sometimes as the companies.

16           FHFA is the conservator of Fannie Mae and Freddie

17    Mac and is sometimes referred to as "the conservator."

18           When I refer to "defendants," I mean FHFA, Fannie

19    Mae, and Freddie Mac together.

20           Fannie Mae and Freddie Mac are government-

21    sponsored enterprises created by Congress to promote access

22    to home mortgages by increasing liquidity and stability in

23    the secondary market for home mortgages.  While Fannie Mae

24    and Freddie Mac are government-sponsored, they're also

25    publicly traded companies that issued both common and

1    preferred stock over the years.

2           As I explained earlier, plaintiffs in this case

3    are holders of common and/or generally preferred stock in

4    Fannie Mae and/or Freddie Mac.  Shareholders are treated by

5    the law as having contracts with the companies whose stock

6    they hold.  A shareholder's contract with the corporation

7    includes not only documents such as stock certificates,

8    certificate of designations, the corporate charter and

9    bylaws, but also the corporate law under which the

10   corporation is formed and regulated.

11          For Fannie Mae and Freddie Mac, changes to federal

12   law -- that is, those affecting the governance of the GSEs

13   and their relationship with their shareholders -- amend or

14   inform the investor contract.

15          In this case, plaintiffs claim that the defendants

16   breached something called the applied covenant of good faith

17   and fair dealing in plaintiffs' shareholder contracts with

18   Fannie Mae and Freddie Mac.

19          Defendants deny the plaintiffs' claim.

20          After the close of the evidence, I will instruct

21   you further about the legal standard for proving a breach of

22   the implied covenant, but for now you should understand that

23   the implied covenant is something that is an unwritten part

24   of every contract, including the shareholder contracts held

25   by the plaintiffs.

1            The question of whether that implied covenant is

2      breached depends on whether the defendants took actions that

3      unreasonably or arbitrarily frustrated or interfered with

4      the reasonable contractual expectations of shareholders.

5            I'll provide more detailed instructions at the end

6      of the case and before you deliberate.

7            So at this time, before we break for lunch, the

8      plaintiffs will make their opening statement.

9            Mr. Hume.

10           MR. HUME:  Members of the jury, this case is about

11     what happens when very powerful people exercise their power

12     in a way that is arbitrary, that is unreasonable in the

13     extreme, and that causes -- and is taken with total and

14     utter disregard and indifference for the harm that it causes

15     to other people.  And the question in the case is whether at

16     least sometimes, under some circumstances, there can be a

17     remedy when that happens.

18           The evidence in this case will show that senior

19     officials at two government agencies got together and

20     decided to change the terms of a contract in a way that gave

21     the government a windfall of over $150 billion, and

22     simultaneously that destroyed valuable contractual rights of

23     private citizens.

24           Now, this case is going to give you an inside look

25     at how momentous decisions are made in our financial system

1   and by the government agencies that lie at the center of

2   that system.

3          The case involves something that happened in 2012,

4   August 2012.  That's when this exercise of power occurred

5   that the case is all about.  But to understand it, we need

6   to go back to 2008 to understand what happened.

7          As many or maybe all of you may vividly remember,

8   there was a terrible financial crisis in 2008, and a lot of

9   people got hurt.  And at that time the government intervened

10  to assist many financial institutions, including Fannie Mae

11  and Freddie Mac, whom you heard the judge describe earlier;

12  two of the largest companies in the world that were created

13  to support the home mortgage market.

14         The government created an agency called the

15  Federal Housing Finance Agency.  You'll hear that called as

16  FHFA.  And the FHFA became, in September 2008, the

17  conservator for Fannie Mae and Freddie Mac.  It took control

18  of them.

19         And the FHFA said at that time that the purpose of

20  the conservatorship was to preserve and conserve the assets

21  of Fannie Mae and Freddie Mac, to stabilize them, to bring

22  them back to financial health, and then to return them to

23  normal business operations and return them to shareholders.

24  That was the plan.

25         And to do that, in September 2008, the FHFA

1   entered into an agreement with the United States Treasury.

2   Really what it did is it entered into an agreement on behalf

3   of Fannie Mae and Freddie Mac.  It became like the

4   management and the board of directors for Fannie Mae and

5   Freddie Mac.  So it entered agreements by Fannie and Freddie

6   with the Treasury that provided funding for Fannie Mae and

7   Freddie Mac to help them in the crisis.

8         And the terms of that original deal were this.

9   The Treasury Department received -- it became a stockholder

10  itself.  It received senior preferred stock that gave it a

11  dividend of 10 percent every year of the amount that had

12  been borrowed.  Very similar to a 10 percent loan.  Whatever

13  was borrowed, Fannie and Freddie would have to pay 10

14  percent of that back to the Treasury each year.

15        The Treasury also got what are called stock

16  warrants to buy 80 percent -- 79.9 percent of all the common

17  stock of Fannie and Freddie for virtually nothing.  Like

18  less than $72,000 for common stock worth potentially

19  billions and never less than hundreds of millions.  That's

20  what the Treasury got.  That was the original deal.

21        And the plaintiffs here are not challenging that

22  deal.  That was an emergency.  The Treasury was providing a

23  critical source of financing during a terrible crisis, and

24  we're not challenging that.

25        What we're challenging, what brings us here today,

1    is what happened four years later, in August 2012.

2          Now, at that time the financial markets had

3    recovered, stabilized.  The housing market was bouncing

4    back, which is critical to Fannie and Freddie, as you'll

5    learn.  And Fannie Mae and Freddie Mac had really turned the

6    corner and were making profits again, large profits, very

7    large profits, and were on track to start to pay the

8    government back the money it had borrowed, to resume normal

9    business operations, and then potentially eventually get out

10   of conservatorship and fulfill those goals that were

11   announced in September 2008.  They weren't quite there yet,

12   but they were well on their way.

13         And the evidence is going to show that individual

14   officials at the FHFA didn't want that to happen, and they

15   made a deal with the Treasury to change that original

16   contract.  And they changed the contract.  They changed that

17   10 percent dividend on the senior preferred stock, 10

18   percent of the amount borrowed, they changed it to 100

19   percent of the net worth of Fannie Mae and Freddie Mac every

20   quarter of every year forever.  Didn't provide for an

21   ending.  That's why we're here.

22         They called it the net worth sweep.  That's their

23   words in the documents.  It's not what we're inventing.

24   They called it the net worth sweep because that's what it

25   did.  It swept all the net worth; whatever positive value

1    Fannie or Freddie had would be swept to the Treasury every

2    quarter.

3           Now, I'm going to step back and introduce a little

4    bit who the parties are, and I'm going to tell you about the

5    legal standard in a minute.

6           We represent the plaintiffs in this case, who are

7    the shareholders of Fannie Mae and Freddie Mac.  And our

8    claim is that this action, this net worth sweep, violated

9    the contractual rights of the private shareholders.  And the

10   consequences of that net worth sweep, the impact of it --

11   it's been in place since 2012.  Really it took effect

12   January 1, 2013.  The impact is that it has transferred over

13   $150 billion more to the Treasury than the Treasury would

14   have gotten under the 10 percent dividend.

15          Let me be specific.  Since January 1, 2013, this

16   net worth sweep has transferred $330 billion to the Treasury

17   in value.  The 10 percent dividend would have been $180

18   billion at most.  If they allowed themselves to be repaid,

19   it could have gone way down.  So that's $150 billion

20   difference; 330 minus 180, that's where the 150 comes from.

21   And we'll walk through that a little later.

22          So that's what we're here for.  That is the action

23   that we say was arbitrary, was unreasonable, and was taken

24   with total and utter disregard and indifference to how it

25   harmed the private shareholders.

1          The defendants in this case, as the judge told

2    you, are -- the main defendant is the FHFA because it made

3    the decision to do this.  And as you'll learn, the decision

4    was really made just by two people, two gentlemen.

5          The head of the FHFA at that time was a man named

6    Edward DeMarco, who was the acting director.  Some of you

7    may know sometimes you have a head of a government agency

8    who isn't confirmed by the Senate.  They work -- they're

9    called the acting director.  That's what he was.

10          And then he had a special advisor named Mario

11   Ugoletti.

12          And the evidence will show they really didn't

13   consult anyone else.

14          The evidence will also show that they spent many

15   years working together at the United States Treasury, which

16   was the other side of this deal.  And the evidence will show

17   that Mr. Ugoletti negotiated the original deal for Treasury,

18   the original 2008 deal.

19          Now, I do want to talk about the legal standard,

20   and then I have some more detailed preview, if you will, of

21   the evidence you're going to see which I can show on slides

22   on the screens.  But before I do that, there are a few

23   niceties that I'd like to indulge in just for a minute.

24          We're going to spend a lot of time together, and

25   we're incredibly grateful for it.  I have a team I want to

1    introduce very briefly.

2          First of all, I haven't even introduced myself.

3    My name is Hamish Hume.  I'm one of the lawyers representing

4    the class of shareholders, preferred shareholders and common

5    shareholders.  I'll describe exactly which ones in a bit.

6          With me on my team -- I could never do this alone,

7    believe me -- are my partner Kenya Davis, my colleague Lee

8    Rudy -- you're going to see these people with other

9    witnesses -- my partner Sam Kaplan.

10          You've heard the judge say that there's also a

11    group of companies litigating right alongside the class.

12    They have the exact same claim.  We're working all together.

13    It's like one team.  Mr. Barnes, Brian Barnes, represents

14    the Berkeley Insurance Companies.

15          I did want to -- and I should have done this

16    first -- introduce you to the class representatives.  Two of

17    them are here today.

18          Mr. Cacciapalle, the lead plaintiff who started

19    this case a long time ago, he's a little infirm and elderly.

20    He's going to appear in this case through a video

21    deposition.

22          I'll explain how that works.  It's sworn testimony

23    out of court where all the lawyers are present, and it's

24    shown on video.

25          But with us today are two of the class

1   representatives who you'll hear live.  Mr. Timothy Cassell

2   is here, and Ms. Michelle Miller is also here.  And they

3   have the awesome responsibility, as we do, of representing

4   these classes of shareholders, which number in the thousands

5   or tens of thousands.

6          Also here today is Mr. Edward Linekin from the

7   Berkeley Insurance Company.  He will also testify in this

8   case as the plaintiff representative for Berkeley.  He's a

9   senior executive at the company and the party representative

10   in this case.

11          Most importantly, none of this is going to be

12   possible without Mr. Kevin DeRita, who is our trial

13   technician.  And as you see -- as you all saw when we

14   started, sometimes in trials logistics are the biggest

15   challenge and the most important things.  We don't want to

16   waste anyone's time.  We want to be efficient and put on the

17   evidence, as the defendants will, as clearly as we can.

18          And finally, before I go back to the evidence and

19   the law, I do want to say thank you.  I know the defense

20   lawyers, who are excellent lawyers, will share in this and

21   say it as well, that what you're doing is incredible.

22          And I know it's a burden.  We know it's a huge

23   disruption -- a huge disruption -- to your lives, an

24   imposition on your lives, to have to put everything aside

25   and come in here and serve on a jury.  And in some sense I'm

1    sorry for that.

2           On the other hand, we're incredibly grateful for

3    it.  And I hope that -- it's an incredible public service.

4    I know it's very frequent in D.C. that you're called upon to

5    do this like clockwork, but it is an awesome public service.

6    And if you step back for a moment, particularly from our

7    perspective where we have this huge problem, we have a huge

8    disagreement, a lot of money at stake; and no matter how

9    nice we are to each other, we have a huge disagreement.

10          And how does our system solve that problem?  It's

11   you, the people, who do it.

12          So we work very hard, and it's inspiring to watch,

13   so thank you.

14          Now, I would like to show you some of the evidence

15   and some slides.  I know we're getting into the lunch hour.

16   I'm going to try to be quick, but bear with me because

17   there's some important evidence that I want to preview for

18   you.  So I hope these logistics may work.

19          I think there will be slides on both the screens

20   that you have as well as when Ms. Jenkins is ready to turn

21   it on, the big screen there, if it's easier to look there as

22   well.

23          So first, just some background.  You are going to

24   hear about preferred shareholders and common shareholders.

25   We represent both, as I'll explain.

1          The reason it's important to do this is, first of

2     all, anyone can be either.  The word "preferred" can

3     sometimes throw people off.  You don't have to be any kind

4     of special person to own preferred.  It's just two different

5     ways of buying stock.  And both of them are bought by a

6     whole range of people; individual people like you've seen,

7     banks, small businesses, pension funds, investment funds,

8     lots of different kinds of people.

9          And in this case it's irrelevant who all those

10    people are.  I just want to make sure that you know that it

11    can be anyone, anyone who can invest.

12         Now, there are some differences, and this is

13    mostly just for background.  But a preferred shareholder is

14    preferred in this sense:  they come first in line.  When

15    there are dividends to be paid, which are the distributions

16    of the profits of the company, they have to go first to the

17    preferred shareholders.  You can't pay it out to the common

18    until you pay the preferred.

19         Also, while preferred shareholders' dividend is a

20    fixed percentage of the investment they made, it's also like

21    a debt instrument.  And if you remember, when I was talking

22    about the original deal with Treasury, it was senior

23    preferred stock.  It was a kind of preferred and got a 10

24    percent interest rate on its investment.  So it is kind of

25    like debt in that way.

1              And if there is a liquidation, which means -- a

2     liquidation is when you're going out of business and you

3     sell everything.  And when you do that, whatever money you

4     get from selling everything goes first to the creditors,

5     then to the preferred shareholders, and only last, if

6     there's anything left over, to the common shareholders.

7              So common shareholders, there is a rule here, too.

8     You can't pay some common shareholders and not pay others.

9     They all get treated equally.  You can't have a -- even if

10    you have a really powerful common shareholder, you don't get

11    to pay them dividends and not anyone else.

12             And the dividends are not limited to a fixed

13    percent.  The dividends are the profits of the company.  And

14    they could -- they're unlimited.  They could be as high as

15    the profits will bear, will justify.

16             The common shareholders own the residual value in

17    a liquidation, as I said a moment ago.  They are the owners.

18    They are the ultimate owners of the companies.

19             Now, here are the classes we represent, and I want

20    to -- you'll notice, and you may have heard the judge say

21    this, for Freddie Mac, we represent both the preferred

22    shareholders and the common shareholders.

23             For Fannie Mae, we only represent the preferred

24    shareholders.  And let me just explain why so there's not

25    any confusion.

1          The common shareholders of Fannie Mae didn't get a

2   contract.  The other -- all the other ones did.  And I'll

3   show what I mean by that in a second.

4          So all of these shareholders, how did they become

5   shareholders?  Again, the government created these

6   enterprises.  It created Fannie Mae in 1938 in the New Deal.

7   And in 1968 the government decided it wanted the Fannie Mae

8   off its balance sheet and it wanted it to be operated with

9   private money, and so it went out and it issued stock, and

10   it got money from private investors so it could operate.  So

11   it fulfilled the public mission, but using private

12   investment to get money.

13          Freddie Mac was created in 1970, and right from

14   the get-go went out as a company that sold shares to private

15   investors, and that's how it operated.

16          So since '68 and '70 until 2008 these companies

17   were financed and fulfilling their mission with money from

18   private investors.

19          And to illustrate that -- and this didn't all

20   happen at the same time, as I'll explain, but what happened

21   is the shareholders put money in, and in exchange they got a

22   contract.  They get a certificate that is treated by law as

23   a contract.

24          The Fannie Mae common, for somewhat technical

25   reasons, didn't get that, but these three groups did, and

1     that's why they're the ones we represent.

2                   Now, I also should say, just going back -- you

3     heard this -- they are called government-sponsored

4     enterprises.  And you'll see the term "GSEs."  Now, what

5     this slide is showing -- I said it didn't all happen at the

6     same time.  Preferred shareholders, the preferred

7     shareholders we represent made their investments between

8     1996 and 2008, and the total amount of money all the

9     preferred shareholders for both Fannie Mae and Freddie Mac

10    put into Fannie Mae and Freddie Mac is $33.2 billion.

11    That's what they put in.

12                   And in exchange, they got the contract, the

13    certificate, that entitled them to dividends.

14                   The dividends they were paid before September 2008

15    totaled right around $5 billion, and then stopped in

16    September 2008 when they went into conservatorship in the

17    crisis.

18                   So what does that mean?  I'll tell you.  This is

19    not exactly the way a financial expert would look at this

20    because you're supposed to keep getting dividends forever;

21    it's not just getting repaid back.  But even if you

22    disregard that and pretend, well, let's treat the 5 billion

23    as a repayment, they still have $28.2 billion they put in

24    that was stranded there in Fannie Mae and Freddie Mac.

25    That's just the simple flows of money.

1          Now, a subset of that group -- I'm going to show

2     you another very similar slide, and I want to be clear.

3     It's not confusing.  A subgroup of this invested right at

4     the end, in 2007 and 2008.  And the reason this is important

5     is that the government agency, the FHFA and its predecessor

6     agency -- in 2007 the housing crisis was already starting.

7     People were worried that housing prices.  The bubble was

8     bursting, and so the regulator, the government, essentially

9     the FHFA and its predecessor, went to Fannie Mae and Freddie

10    Mac and said:  You have to go out and raise some capital.

11    You need money.  We're worried about your balance sheet.

12    We're worried about the housing market.

13         And so they did.  This is before the

14    conservatorship.  And they raised a lot.  $19.7 billion of

15    the 33 I told you about, two-thirds of that, almost $20

16    billion went in in those last two years, 2007 and '08, in

17    the crisis to help them, to help Fannie and Freddie in the

18    crisis in exchange for a contract.

19         The dividends paid for these investors on these

20    shares was a total of 1.1.

21         So the math would say these people stranded 18.6,

22    if you look at it that way, which is not really -- you're

23    supposed to keep getting the dividends, and you're not paid

24    down.

25         But I want to say now, we aren't asking for those

1    numbers as damages.  We're asking for a small fraction of

2    that.  In case you're wondering, I'm going to get to that.

3    But it's an important fact to explain the overall fairness

4    and facts of what happened here.

5           So these are the three shareholder classes we

6    represent.

7           And now we get to September 2008.  And, as I said,

8    there was a crisis, a terrible crisis.  And the FHFA becomes

9    the conservator, which I'm going to illustrate like this.

10   Here's what happened.

11          It takes total control of Fannie Mae and Freddie

12   Mac.  And I put a little padlock.  I mean, the law says they

13   get all the powers of the management, of the board.  They

14   control the companies.  And then they said -- I'll show you

15   what they said in a second about the goal, but one thing I'd

16   like to emphasize right now is that the law also said that

17   when this happened, September 6, 2008, the law said:  You,

18   the conservator, FHFA, if you want, can cancel any of the

19   contracts that Fannie Mae and Freddie Mac have.  You have to

20   do it in a reasonable period of time after September 6,

21   2008, but you can do it.  And if you do it, if you cancel

22   it -- it can be any kind of contract, a contract with the

23   cleaning service, a contract with the financial consultant,

24   whatever -- you do it quickly, in a reasonable time, and

25   then that person can sue under the special provisions to get

 1   damages.

 2          The point is, they didn't do that for these

 3   contracts.  The shares were not cancelled.  They were left

 4   outstanding.

 5          They did, of course, turn off the dividends.  They

 6   used to pay a dividend like clockwork every quarter for

 7   decades.  That's why they were such a popular investment,

 8   because they were very stable for many decades.

 9          Of course, in the crisis, in the conservatorship,

10   they eliminated that to get them healthy again.  But they

11   also said:  The shares stay outstanding and retain their

12   rights; we're just not paying you dividends right now.  And

13   let me show you some examples of that.

14          Freddie Mac, for example, in an SEC filing five

15   days after this conservatorship says "The holders of Freddie

16   Mac's existing common stock and preferred stock (other than

17   senior preferred stock)" -- that's the Treasury -- "will

18   retain all their rights in the financial worth of those

19   instruments, as such worth is determined by the market."

20          They weren't canceling them.  They weren't

21   terminating the contracts.

22          The FHFA, right at that time, September 6th or

23   7th, 2008, published a fact sheet of questions and answers

24   about what this conservatorship was, what's the purpose of

25   it.  This is a document you'll see, I think, several times

1    in the case.

2                What is a conservator?

3                They answered:  "A conservator is the person or

4    entity" -- here FHFA -- "appointed to oversee the affairs of

5    the Company for the purpose of bringing the Company back to

6    financial health."

7                The reason I'm showing you this is when you fast

8    forward to August 2012 they say they take 100 percent of the

9    net worth every quarter.  That's not the same as working the

10   company back to financial health.

11               It says "The company" -- because they put out two

12   of these, one for Fannie Mae and one for Freddie Mac.

13   They're identical.

14               The next question, they say:  "What are the goals

15   of the conservatorship?"

16               I mentioned this earlier.  "The purpose of

17   appointing the conservator is to preserve and conserve the

18   Company's assets and property and to put the Company in a

19   sound and solvent condition."

20               Again, the evidence will show that the net worth

21   sweep does the opposite of preserve and conserve the assets.

22   It sends them all to Treasury.

23               When will it end?  When will the conservatorship

24   period end?

25               Answer:  "Upon the Director's determination that

1    the Conservator's plan to restore the Company to a safe and

2    solvent" -- "solvent" means you've got money, you've got net

3    worth.  Being solvent means you've got net worth.  You've

4    got assets more than liabilities.  Once we get there and

5    that's been completed successfully, the director of the FHFA

6    will issue an order terminating the conservatorship.

7         The evidence will show it was supposed to be

8    temporary.  They were supposed to build up their capital,

9    get back to health and back to normal.

10         The conservatorship is still in place.  That was

11   2008.  That was more than 14 years ago.  And the net worth

12   sweep sent all their assets to Treasury.

13         Now, here's another example of what is said at

14   the time of the conservatorship, and this is important

15   because this is by a person named Edward DeMarco.  You may

16   remember I told you his name.  At this point in time, in

17   October 2008, he was a very senior deputy director, I

18   believe, at the FHFA.  He wasn't the director then.  He

19   became the acting director later because President Obama's

20   choice couldn't get confirmed in the Senate, and therefore

21   Mr. DeMarco, sort of by default, as the most senior deputy,

22   was the acting director.

23         And what he writes here in October 2008 is -- he'd

24   given a speech about the conservatorship.  He says, "Here

25   you go -- my slides and notes from my talk."  So this is

1    Mr. DeMarco, a very central person in this case.

2              And here's what he's sending to his colleagues at

3    FHFA.  Here's what he says about conservatorship in that

4    slide deck:  "Conservatorship is defined as a statutory

5    process to stabilize a troubled institution which is

6    intended to have a limited duration and has as its objective

7    to return the entity to normal business operations once

8    stabilized."

9              Limited duration, get them back to normal business

10   operations.

11             And then, look, the next sentence:

12   "Conservatorship statutes provide" -- that's laws --

13   "provide broad authority for a conservator to operate the

14   institution until it is stabilized and then returned to the

15   shareholders."  "The shareholders" being the people we

16   represent; a very important sentence.

17             You'll notice on some of these slides, most of

18   them, there's a long complicated looking number, PX-0002-E.

19   It's a fancy way of saying Plaintiff's Exhibit 2E.  I think

20   I'm the one responsible for giving the complicated numbers,

21   but they are exhibits that are coming into evidence.  All

22   the exhibits that you see in this presentation are coming

23   into evidence.  They will be in evidence.  They are some of

24   the most important evidence you'll see.

25             So that's what they said in September 2008.  And

1  now, let's go back and try with a picture to show what I

2  described at the beginning with the original view, the deal

3  we don't complain about in September 2008.

4          Again, you've got the conservatorship over here.

5  FHFA controlling them.  And you've got the contracts with

6  our shareholders that have not been cancelled.

7          Now, September 2008, we need help from the

8  Treasury.  They enter into a new contract.  It's a

9  shareholder contract.  Remarkably, the United States

10 Treasury became a shareholder.  It became the senior

11 preferred shareholder.

12         Here's what it said.  "Senior preferred stock:

13 Annual dividend of 10 percent of the total investment."

14         It was actually a little more than that because

15 the senior preferred stock they got was worth $1 billion for

16 each Fannie and Freddie right off the bat as a kind of

17 initial commitment, like thank you for helping us, you get a

18 billion dollars each, and then everything you invest goes on

19 top of that.

20         So if Treasury -- if Fannie borrowed $10 billion,

21 the senior preferred stock was worth $11 billion, and the 10

22 percent dividend was 10 percent of $11 billion.  That's just

23 how it works.  You'll hear about that initial commitment

24 fee.

25         And they also gave Treasury these stock warrants,

1    the right to buy 79.9 percent of common stock for virtually

2    nothing.

3              The way it would work is the company would issue a

4    whole bunch of new common stock, and the private common

5    stockholders will be shrunk to owning 20 percent, and the

6    Treasury would own 80 percent.  And it would cost almost

7    nothing.  $72,000 for both Fannie and Freddie to own 80

8    percent of both Fannie and Freddie, multibillion dollar

9    companies that have something like $5 trillion of assets.

10             Now, they were in trouble now, but if they

11   recovered, that would be worth billions, if not tens of

12   billions, for $72,000.

13             We're not complaining about any of that.  That was

14   the deal.  In fact, it's helpful to us, this deal, to

15   explain that we still had rights.  As I said, they didn't

16   cancel our contracts.

17             And if you think about it, the fact that Treasury

18   was a shareholder that owned -- that could own most but not

19   all of the common stock was a way of saying, yes, you

20   private shareholders will still own some.  And if Treasury,

21   under this deal, wanted a dividend of more than the 10

22   percent senior dividend, all they had to do was exercise the

23   warrant on the common stock, and they'd get 80 percent.

24   They'd have to share a little bit, but they'd get most of

25   it.  That was the original deal.

1        Now, four years later -- like I said, August 2012,
2    this is what the case is about -- housing markets recovered.
3    Financial markets recovered.  And Fannie and Freddie record
4    a profit in -- first quarter, big profit; second quarter,
5    even bigger profit.  And they were known, released, and
6    right after they came out with those big profits, they
7    changed the deal.  Watch that 10 percent, total investment,
8    changes to this.  The net worth sweep.  That's what the case
9    is about.

10        And when that happened, if the Treasury is getting
11    100 percent of the net worth forever, that has an obvious
12    impact on the shareholder contracts owned by the private
13    shareholders.  This is the impact.  Those rights to
14    potential dividends, they go away.

15        Beforehand you at least had the potential right.
16    You had the right to potential dividends.  If things went
17    well -- no guarantees.  We're not saying there was a
18    guarantee.  What we're saying is if things had gone well,
19    there was the right to a potential dividend.  And that is
20    valuable because these are huge companies, and these
21    shareholders had put in, as you saw, $35 billion and only
22    gotten 5 back.

23        But that all goes away.  It really goes away, and
24    that contract is as good as worthless.  That's why I show it
25    crumpled up on the ground there.  That was the impact of the

1    net worth sweep, and that's what we're here about.

2              Now, I'm going to have just a little bit of fun

3    with this.  My friends at the defendants were nice not to

4    object.  This is not evidence, but just to show what's

5    happening.

6              The money comes into the GSEs.  It comes in to

7    Fannie and Freddie.  And there it goes, sweep to the

8    Treasury.  The money comes in, sweep.  It doesn't matter how

9    much comes in.  Sweep.  Net worth sweep.  $330 billion has

10   been transferred in value.

11             There's a little wrinkle.  They change how they do

12   it from cash to a payment in kind -- I'll explain that --

13   but $330 billion at 10 percent dividend would have been 180

14   at the most, and that's assuming they wouldn't let Fannie

15   and Freddie repay the loan.

16             Sometimes it's good to have pictures.  Sometimes

17   words.  Here are the words.  Same thing.

18             What did Treasury have and what did the private

19   shareholders have before the net worth sweep?

20             Treasury had a lot.  It had a right to 10 percent

21   dividends on that senior preferred, and it had the right to

22   additional dividends by exercising those common stock

23   warrants, 80 percent.

24             What did the plaintiffs have?  The plaintiffs

25   still had something important.  They had the right to

1    dividends under certain conditions, if things got better.

2    If things got better, as they were hoping and as was

3    planned.

4          Example:  As I said before, if Treasury wanted

5    dividends beyond that 10 percent, it was clear how they

6    could get them.  Exercise the warrants.  Take 80 percent.

7    But if you do that, remember what I started with, you can't

8    treat -- you can't just pay one common shareholder and not

9    the others.  So if they get paid a dividend on their 80

10   percent, the private shareholders that own the other 20

11   percent, they're going to get a dividend.

12         And remember the other thing.  If the common

13   stockholders get a dividend, the preferred have to get a

14   dividend.  So those private preferreds would have to get a

15   dividend.

16         So if an extra dividend was paid, Treasury would

17   get almost all of it, but the private shareholders would

18   have to get something.  Those bullets say what I just said.

19         Now, what about after the net worth sweep?  August

20   17, 2012, that's when they signed it.  After the net worth

21   sweep?  Simple.  They get everything.  Everything.  No

22   matter how much money they make.

23         What do the plaintiffs have at this point?  Zero.

24   A valuable right to dividends; contingent, sure,

25   conditional, sure, but valuable.  Now they go to zero.  No

1    matter how much -- again, no matter how much is made, they

2    go to zero.

3          All right.  I'm going to take a little break.  I'm

4    afraid we're not done, but I want to just -- you may be

5    wondering there must be something he's not telling me.

6    There must be a reason for this.

7          So I want to tell you the reason the government

8    gave, the FHFA gave, the defendant gave.  I want to tell it

9    to you, and then I want to show it to you.

10          They said the reason was that Fannie Mae and

11    Freddie Mac couldn't afford to pay that 10 percent dividend,

12    that this was designed to help Fannie Mae and Freddie Mac

13    because the 10 percent dividend was so large.  And it was a

14    big amount.  They said Fannie Mae and Freddie Mac's profits

15    were less than the 10 percent dividend so they couldn't pay

16    it, so actually the net worth sweep isn't so bad because

17    it's helping them out.  What they were having to do was

18    borrow more money from the Treasury to pay the 10 percent

19    dividend.  That's what they said.

20          Let's look at how they said it.

21          I told you earlier there were really two people

22    who made this decision, Acting Director Ed DeMarco and his

23    special advisor Mario Ugoletti, who had been at Treasury

24    with him.

25          When this case began way back in 2013, if you can

1   believe it, the FHFA, as the defendant, put in a declaration

2   from Mario Ugoletti to explain why they did this, and why it

3   was justified, and no one should be complaining about it.

4   He said a couple of things.

5          One is because of the reason I just said.  He said

6   they weren't able to pay the 10 percent dividend, so the

7   intention -- oh, and the net worth sweep was in something

8   called the Third Amendment.  That original agreement was

9   amended two times before this to increase the amount of

10  money that Treasury was lending.  You'll hear more about

11  that, but the key thing is the Third Amendment contained the

12  net worth sweep.

13         And they said -- he said, look, the intention of

14  this Third Amendment was not to give Treasury more money.

15  He said the amendment would not do that.

16         Now, remember I told you about that $150 billion

17  extra, excess, that Treasury got?  But he said this.

18         Now, I want to show you the impact in the very

19  first year.

20         The net worth sweep was agreed and publicly

21  announced on August 17, 2012, and there was a big reaction

22  to it, as you'll see later.  But it first took effect -- the

23  first time the dividend changed to the sweep was the first

24  quarter of 2013, January 1, 2013, to March 31st.  That's the

25  first quarter of the year.  And then here's what happened

 1    for that whole first year of 2013 on the next slide.

 2              First I'm going to show you what the dividend to

 3    Treasury would have been if there had been no change, if

 4    they didn't do the net worth sweep.  If it had been the 10

 5    percent dividend, they would have had to pay this $18.9

 6    billion.  That's a lot of money.  That's what they would

 7    have paid if there had not been the net worth sweep.

 8              Instead, under the net worth sweep, this is just

 9    how much they paid just in 2013.  Just in 2013 they paid

10    $130.1 billion to Treasury.  Just in 2013.  The excess they

11    paid that year as 111.  And it's gone up, as I told you.

12    It's gone up to 150.

13              To be sure, this was the most dramatic year.  But

14    that's important to notice because you know how sometimes

15    you can tell what a person's thinking or what they intended,

16    sometimes, by how they react to things?  How did they react?

17    What does that tell you?

18              What you will not see in this case are emails or

19    memos saying:  Oh, my goodness, what happened?  This isn't

20    what we had in mind.  You know, Director DeMarco, Acting

21    Director DeMarco, did he make a mistake?  Can we go back to

22    Treasury and renegotiate this?  This doesn't seem fair.

23    This isn't what we had in mind.  You're not going to see

24    anything like that.

25              Let's go back to the declaration.  Maybe we've

1    missed something.

2         Mr. Ugoletti -- this is when the case began,

3    sworn under oath filed with this court -- he says by

4    mid-2012 -- sorry -- the amount of the dividend had grown so

5    large, 11.7 and 7.2, that it appeared unlikely that either

6    of the enterprises would be able to meet that amount

7    consistently without drawing additional funds from Treasury.

8         That phrase you'll hear, "drawing additional

9    funds," it means borrowing.  See, what Treasury did is they

10   gave a line of credit effectively -- well, it's going to be

11   called a commitment.  First it was 100 billion per

12   enterprise, then it went up to 200 billion per enterprise,

13   and then it went up higher than that, and then it ended up

14   at a number that was the result of a complicated formula,

15   and you're going to learn a lot about that.

16        But the point is, they were worried, or at least

17   he says they were worried that the amount of money Treasury

18   had made available to be borrowed was going to get eaten up,

19   eaten up, because Fannie and Freddie couldn't afford to pay

20   the 10 percent, and they were borrowing more.

21        So you borrow more, and then you have -- and then

22   you have to pay even more the next time.  You can

23   understand.  It doesn't -- it can be terrible.  And that was

24   happening in 2009 and '10 and '11.

25        It happened then, but it wasn't happening in 2012.

1    It wasn't happening in 2012.

2         Here he goes explaining more.  This is his -- the

3    reason I'm showing you this, somewhat painstakingly, is this

4    is the FHFA's explanation.  The evidence will show this is

5    their explanation for why they agreed to the net worth

6    sweep.  Because FHFA shared the concerns that the 10 percent

7    annual dividend to Treasury would reduce the amount of the

8    Treasury commitment.  In other words, we'd have to keep

9    borrowing against that line of credit, and there would be

10   less and less available.  That was their stated reason.

11        He says:  Those concerns undermine the whole

12   purpose because the purpose of the agreement was to make

13   everyone who invests in the securities, the mortgage-backed

14   securities Fannie and Freddie issue, calm.  That's what it

15   was for.

16        And so that's what the word "concerns" is talking

17   about.  Let's make sure that everybody knows there's lots of

18   money to borrow from Treasury.  And if we start shrinking

19   it, maybe people will get worried.  That's what he says the

20   reason is.  We can't shrink it.

21        This is the key paragraph, 18, "To resolve these

22   concerns, we agree to the Third Amendment," which is where

23   the net worth sweep is.

24        So those are the terms that gave rise to it.

25   Okay?  It's clear.  That's what they said the reason was.

1          Now, what are the facts?  PX205 is one of the most

2     important documents in the case.  It's a memo at the United

3     States Treasury Department from June 25, 2012.  We're

4     talking six or seven weeks before the net worth sweep was

5     signed.  That was signed on August 17th, announced on August

6     17th.

7          The memo documents a meeting between the

8     secretary -- that is the Secretary of the Treasury,

9     Secretary Geithner at that time -- had a meeting with Ed

10    DeMarco, the acting director at FHFA the day before.  This

11    is the essence of the discussion that took place.

12         So this person who wrote this received a summary

13    from the secretary of the treasury and said:  This is a

14    meeting.  Here's what happened.  I met with DeMarco.  Here's

15    what happened.

16         And in this memo it says that "since the secretary

17    raised this thing about a PR covenant," which I'll come back

18    to, "DeMarco no longer sees the urgency of amending the

19    PSPAs."

20         The PSPAs, that's the name for the agreement.

21    That's the name for the contract FHFA and Treasury did back

22    in 2008.  You'll see that all the time.  That's what it is.

23         This is saying, six weeks before, or whatever that

24    is, seven weeks, the head of the FHFA is saying there's no

25    rush.  We don't need to rush into this.

1          And why?

2          Two reasons.  But look at the first.  "The GSEs

3    will be generating large revenues over the coming years,

4    thereby enabling them to pay the 10 percent annual dividend

5    well into the future even with the caps."

6          That's the opposite of what Mr. Ugoletti said in

7    his declaration.  That's what the evidence will show, that

8    they had the ability to pay the 10 percent.  That's what

9    this says, and it says that Acting Director DeMarco told the

10   Treasury secretary that.

11         But it's not just this.  Let's look at what

12   actually the results were.

13         First quarter of 2012, Fannie Mae had income for

14   the quarter of $3.1 billion.  That was larger than the $2.9

15   billion dividend.  This is quarterly.  That's the quarterly

16   amount of the dividend, the quarterly amount of income.

17   They had more income above the dividend.

18         Freddie Mac in the first quarter, equal, $1.8

19   billion.  That was the dividend amount.  Again, the opposite

20   of Ugoletti.  They weren't borrowing to pay the dividend in

21   2012.

22         And the second quarter is way better.  Fannie,

23   $5.4 billion; way larger than the $2.9 dividend.  Freddie,

24   $2.9 billion; way larger than the $1.8 dividend.

25         They were finally turning the corner.  They were

1    making money above even that incredibly expensive 10 percent

2    dividend, and they would then be able to keep that and build

3    capital, build net worth, and fulfill the goals of the

4    conservatorship.

5            Look for the whole year.  Look what was happening.

6    In 2012 their net income, Fannie Mae, was $17.2 billion, the

7    largest in our history.  I'll come back to why that was.

8            We were not required to draw funds from Treasury

9    under the senior preferred stock for any quarter of 2012,

10   and they paid their $11.6 billion in dividends.  Their

11   profits were way higher, way higher than the dividend

12   amount.

13           Freddie was the same; 2012 profits, $16 billion,

14   way more than the dividend.

15           Okay.  So what's going on?  Were they just getting

16   lucky?  Did DeMarco and Ugoletti conclude this is just a

17   lucky year, lucky quarter?  It's not going to last.  We'll

18   never be able to pay the dividend.

19           No, that's not what the evidence is going to show.

20   There's a lot more.

21           You will hear from a financing and accounting

22   expert for the plaintiffs in Dr. Bala Dharan.  He has

23   studied all of the information that was available to the

24   FHFA and Freddie Mac and Fannie Mae when this decision was

25   made.

1          And what he is going to explain is it wasn't just

2     the good results they were having right there in the moment,

3     but there were structural improvements happening, a lot of

4     which has to do with the fact that the losses they had are

5     because people were in a panic about whether Americans were

6     going to pay their mortgage.  Because, if you remember, home

7     values had gone down, and some people had mortgages higher

8     than their home values.  It's called being under water.  And

9     people were worried they would stop paying their mortgage,

10    default, and there's a foreclosure.  It's a disaster for

11    Fannie Mae and Freddie Mac.

12          You'll learn more about how their business works,

13    but that's -- and so what the accountants were doing in 2009

14    and '10, the FHFA was saying:  Write down the value of your

15    assets because they're very unstable.  We don't know what's

16    going to happen.

17          So they had these losses for accounting reasons.

18    But what were they saying in 2012?  Professor Dharan has

19    gone back and studied what the finance people were saying,

20    what were in their documents, what were in their projections

21    before August 17, 2012.  And there's a lot of interesting

22    stuff that he will explain.

23          But first, the housing market was recovering.

24    This was known at the time.

25          Let me be more precise.  This was known at the

1    time.  It had gone way up from February to August.  And when

2    the housing market goes up, it's way better for Fannie and

3    Freddie.  Everyone feels more confident.  Those assets are

4    worth more money.

5              Now, a few technical accounting things.  G-Fees

6    are guarantee fees.  Professor Dharan will explain this, but

7    it's a major source of revenue for Fannie Mae and Freddie

8    Mac.

9              What they do is the bank gives you a mortgage to

10   buy a house.  The bank now has a piece of paper that says

11   you have to pay them monthly payments.  That's worth a lot.

12             But what the bank does is it goes and it sells it

13   to Fannie Mae or Freddie Mac and gets cash so they can make

14   more loans.  That's the basic idea of what Fannie and

15   Freddie do.  And then Fannie takes that mortgage piece of

16   paper, packages -- sometimes it holds it.  Sometimes it

17   sells it to investors in what's called a mortgage-backed

18   security.  But they guarantee that it will pay, and then

19   they get paid a fee for that guarantee.

20             So G-Fees are a huge source of revenue for them.

21   And because they have a unique position in the market, they

22   were going up.  They were going up in 2012, and they were

23   projected to keep going up.

24             Now, the other side of the equation is credit

25   losses.  If credit's bad, if people are getting bad loans,

1   liar loans, they're not paying their mortgage, that's bad

2   news for Fannie Mae and Freddie Mac.

3            But everything was getting better.  The vintages

4   on the mortgages -- a word normally used for wine.  How old

5   were they?  Were they from good years or bad years?  In

6   years when people were being more diligent about how their

7   mortgages were issued, they were getting way better.  So the

8   losses are going down.  Revenues going up, losses are going

9   down, it means higher profits.

10           Professor Dharan will explain this in more detail,

11  but look at the documents, the exhibits, the evidence that

12  was in play at the time, Fannie Mae's own documents.

13           This is what they predicted for G-Fees.  This is

14  May 2012.  This is before they agreed to the net worth

15  sweep.

16           They projected, hey, that big source of revenue

17  that's so important to us, they're going up.  They're going

18  up.

19           What about credit losses?  Susan McFarland, a very

20  important witness.  Unfortunately, she's going to have to

21  appear by deposition that wasn't videotaped, and it's going

22  to be read to you.  But in January 2012 she told Ed

23  DeMarco -- this is an email from someone else to DeMarco

24  about a meeting with Fannie Mae's senior management in which

25  Susan -- that's Susan McFarland, the chief financial officer

1    at the time -- said the plan, the business plan she was

2    discussing, reflects the view that the company is at an

3    inflection point in the credit cycle with the loss allowance

4    and credit-related expenses projected to fall compared to

5    2011.  "Inflection point" means a big change.  Big change.

6              And they forecasted in March -- again, way before

7    the net worth sweep.  The line going down is an expense

8    line, a loss line.  You want that line to go down.  They

9    were forecasting this in a March 5, 2012, presentation.

10             In March 2012 the board of Fannie Mae prepared a

11   draft letter in which they tried to tell them how well

12   things were going.  Now, this was a draft.  March 19th,

13   here's what they said in the draft to Acting Director

14   DeMarco.  They said, "Fannie Mae expects to be profitable

15   and to be able to substantially repay the government's

16   investment."

17             That's how they thought things were going.  They

18   thought things were going well, really well.  Not what

19   Mr. Ugoletti said; quite different.

20             As you'll learn, this letter wasn't sent until

21   September.  Very strange.  So I'm not saying that Edward

22   DeMarco received the letter, but I am saying it was written

23   and reflected what Fannie Mae thought.

24             And he received lots of other things, which we'll

25   show you, saying similar optimistic projections.  For

1    example, this is now FHFA.  What did they know?

2           FHFA employees, that's why we highlighted the

3    email addresses.  May 9, 2012, again, a couple of months

4    before they agreed to the sweep.  "What with" -- "FNM" is

5    Fannie Mae -- "what with their forecast showing an upward

6    price curve beginning after 2012, we should not be surprised

7    if Fannie Mae begins a roaring recovery."

8           What's he talking about there?  Fuelled in large

9    part by drawing down their roughly $70 billion ALL,

10   allowance for loan losses.

11          They had lost money for accounting reasons because

12   they were forced to take huge what's called on the

13   accounting thing either a reserve or an allowance for a loan

14   loss, where you take your asset and you treat it as being

15   worth much less because people are worried that the future

16   payments of that asset depends on what it made.  So they

17   wrote things way down, lost money, '09 -- '08, '09, '10,

18   '11.

19          And '12, suddenly they realize, whoa, people are

20   paying their mortgages.  Everything is coming back.  Looks

21   like they're on for a roaring recovery.  Inflection point.

22   Things are going well.  We're already making profits, as you

23   saw, and we're predicting more in the future.

24          This is another example, PX211.  It's getting

25   close to lunch so I'm going to speed through this one.  Good

1     news after good news after good news.  Projections for

2     profits.

3                This is an important one.  David Benson.

4                David Benson right now today is the president of

5     Fannie Mae right here in D.C.  At the time in 2012 he was

6     the senior executive vice president for capital markets.

7     He'd also been the treasurer, and he later soon after became

8     the CFO.  Very important guy who is working a lot on the

9     projections of profitability.

10                This email was sent to Mr. DeMarco and

11    Mr. Ugoletti summarizing a Fannie Mae executive management

12    meeting in which Dave Benson gave a GSE strategy update.

13    he had prepared projections for both Fannie Mae and Freddie

14    Mac and studied them out ten years.  And he said -- he

15    referred -- he, Dave Benson, referred to the next eight

16    years as likely to be the golden years of GSE earnings.

17                That's what they were thinking.  They were

18    thinking things were going well, really well.  And they were

19    making more money than that 10 percent dividend, and they

20    were telling FHFA this.  They sent this to Ed DeMarco and

21    Mario Ugoletti.

22                As I said, Susan McFarland is going to -- you're

23    going to hear her deposition read to you.  It didn't get

24    videotaped, unfortunately.  So somebody's going to come

25    in -- not her, because she's not required to come -- and

1    read her testimony.  It's just a preview of how it's going

2    to work.

3              It's very important testimony, what she says, and

4    I'm showing you a little bit of it here, when she looked at

5    the document Dave Benson prepared.  With those projections,

6    she said in reference to that, she said, "I would say it

7    was, you know, definitely more likely than not that we would

8    have sustained profitability."  And that's an important

9    term.

10             Now, what slide number is that?

11             So as good as all this is, and as close as it is

12   to lunch, there's something way better that I have to tell

13   you about.  Unfortunately, it requires a very short

14   discussion of accounting.

15             There's something called a deferred tax asset.

16   Maybe let me show you -- let me show you this first.  I'm a

17   little ahead of myself.

18             And if I could, I would walk over there, but I

19   think -- will you no longer be able to hear me?

20             If I could, what Mario Ugoletti said, remember,

21   was that the amount of money Treasury was making available

22   to borrow was at risk because Fannie and Freddie were having

23   to borrow money to pay the 10 percent dividend because their

24   profits were less than the dividend.  We've seen that's not

25   true, but I want to show you a little more graphically what

1    it all boils down to.

2          In August 2012 the predicted amount of available

3    credit -- you see, what you're going to hear is that for a

4    short period of time -- well, not short, 2010, '11, and '12,

5    it was actually unlimited, and at the end of 2012 there were

6    caps coming back.  It wasn't going to be unlimited.  And it

7    was a bit of a complicated formula how that cap is decided.

8    So you'll see different numbers slightly.

9          But in August they were predicting the cap for

10   both Fannie and Freddie combined was they'd have $273.1

11   billion available to borrow, available to borrow, which

12   means all those investors and their mortgage-backed

13   securities were like, okay, that's cool, they have -- I'm

14   going to get paid because they're not going to go under.

15   They have lots of money they can borrow, if they need to,

16   even if things go bad.

17         And Mario Ugoletti is saying:  Yeah, but they were

18   going to have to borrow to pay the dividend, and that's why

19   we did the net worth sweep.  That's what he was saying.

20         But what were the projections?  What the

21   projections were saying was that here's what they said they

22   would need to borrow over the next ten years, both Fannie

23   and Freddie.  That's what they said they would need to

24   borrow.  Barely makes a dent.

25         Now, as I said, as good as that is and as

1    important as it is, it leaves out one huge thing that's even

2    more important and is a game-changer, and it requires some

3    accounting.  There is something called a deferred tax asset.

4           Here's what it is, as simple as I can try to make

5    it.  Fannie and Freddie pay taxes.  When they make a profit,

6    they pay taxes.  When they have a loss, like any other

7    business -- just like any other business, this is normal

8    accounting -- that loss can be used to offset the income

9    later on, and it becomes worthwhile -- worth it -- worth

10   something as an asset, because if I lose money and I know

11   that later on, when I make money, I can pay less in taxes or

12   maybe even nothing in taxes, that's worth a lot of money.

13   Tax rate's high, especially back then for companies.  It

14   went down later.  So that's an asset.

15          Now, in 2008 and '9 they were so worried -- Fannie

16   Mae had a big -- Fannie and Freddie had big deferred tax

17   assets from their bad years, like combined close to $100

18   billion.  And the FHFA and the auditor said, "Hey, we're

19   worried you're never going to make a profit again, so those

20   assets aren't worth anything.  Let's write them down to

21   almost zero."

22          But what happens when you start to make money

23   again?  When you start to make money again and become

24   profitable, the auditors say, "Not only can you, you must,

25   as a matter of good accounting, write that asset back up

1    because you're going to be able to use it again."  And they

2    were huge.

3              In 2013, Fannie Mae and Freddie Mac increased

4    their deferred tax assets -- they eliminated the reserve, is

5    a better way of thinking of it, in a way that increased

6    their net worth by $74 billion.  Game changer.  No problem

7    with anything about the dividend once that happened.

8              And instead of that happening and eliminating the

9    problem, it was all swept to Treasury in the net worth

10   sweep.  That's why that 2013 dividend is so big.

11             So to simplify, an expectation of sustained

12   profitability, which you've seen they had, leads to the

13   ability to restore the deferred tax assets, which, in 2013,

14   meant increased net worth of $74 billion.

15             Now, as I said, that's a game changer.  If that --

16   if they had not done the net worth sweep, not only did they

17   make more money than their projections, all those

18   projections I showed you from Benson, their actual

19   performance has been better.  That's what the evidence will

20   show.

21             But also they got to write up this huge asset in

22   2013.  Once they do that, they have a huge amount of

23   positive net worth.  They have a cushion of net worth that

24   would mean they'd never have to borrow from Treasury again.

25   Never.

1            There's a snapshot of some of the great documents

2     about expectation of sustained profitability.  That means

3     you increase the deferred tax asset.  Combine all that

4     together, and this is the best we could do, but this is kind

5     of what it would be.  No need to borrow.  You have a

6     cushion.  Your deferred tax asset cushion.  And you can make

7     money and you can build net worth and you can do all the

8     things they said was the goal of this in 2008.

9            I'm going to motor through this because it's late,

10    and you will learn all this evidence.  But the main thing is

11    that's how much it was worth in 2013, and they took it in

12    the first quarter of 2013, Fannie Mae.  They almost took it

13    in the fourth quarter of 2012.

14           So the first quarter the net worth sweep was in

15    effect, Fannie Mae's net worth went up by $50.4 billion.

16           Now, the third bullet's really important.  I'm

17    going to show you that.  She said under oath that in the

18    summer of 2012 she told Treasury this was potentially going

19    to happen.  Potentially.  And she also told FHFA -- I'm

20    going to show you that in a second.

21           Because it's an accounting game, Fannie and

22    Freddie actually had to go borrow from private bondholders

23    to pay all that cash to Treasury.  It was an accounting game

24    for Fannie and Freddie.  It was a cash game for Treasury.

25           Freddie Mac was not as big, because everything

1      about Freddie Mac is normally a little bit smaller, but it's

2      still huge.  They did it in the third quarter of 2013.

3              In August, as an accounting matter -- and this

4      is -- Professor Dharan will tell you what an accountant --

5      what a finance expert would know at that time.  They knew it

6      was likely.  They knew it was possible.  There was a chance.

7      They had to borrow to pay it.

8              Now, remember that declaration from Mr. Ugoletti?

9      It came in in December of 2013.  So these things had already

10     happened.  They were happening in real time.

11             So at the end of his declaration he says this:

12     Well, at the time of the negotiation of the Third

13     Amendment -- that's what has the net worth sweep -- the

14     conservator -- that's FHFA -- and the enterprises -- that's

15     Fannie and Freddie -- had not yet begun to discuss -- had

16     not yet begun to discuss whether or when the enterprises

17     would be able to recognize any value to their deferred tax

18     assets.  So he's saying that as of August 17, 2012, they

19     hadn't started talking about it, and he then says:  Neither

20     FHFA nor Treasury envisioned this.  They didn't know.

21             Well, Susan McFarland, Fannie Mae chief financial

22     officer, under oath in a deposition -- you will hear this,

23     but you will hear it as part of maybe an hour and a half of

24     her testimony, so watch for this part -- "Did you have

25     similar type conversation with anyone at FHFA about the

1    deferred tax asset prior to the Third Amendment?

2         "ANSWER:  "Yes."

3         You'll get the full testimony, but she said

4    "probably in the $50 billion range, probably sometime mid-

5    2013, at that time when I met with them late July, early

6    August 2012."  She remembers telling them.  Before they

7    agreed to the net worth sweep she told the FHFA, contrary to

8    what is in Mr. Ugoletti's declaration.

9         She also told Treasury -- she's shown an email

10   from August 7th talking about a meeting with Treasury.

11   She's asked, "Does this relate to the meeting that you

12   described earlier that took place at Treasury on the eve of

13   the net worth sweep where you spoke to Ms. Miller" -- she

14   was the undersecretary of domestic finance, Ms. Miller,

15   you'll see her in emails -- "about deferred tax assets and

16   other things?"

17        "ANSWER:  This relates to the presentation

18   prepared for my use of the meeting on the 9th" -- that's

19   August 9th -- "with Mary Miller and others at Treasury to

20   update them on our financial results forecast.  And while

21   the meeting materials didn't express in writing the deferred

22   tax asset allowance, I in that meeting articulated that

23   orally to treasury."

24        What's the "it"?  Deferred tax asset -- deferred

25   tax allowance issue.  The accounting game that was a game-

1      changer, that was at this time known to be a potential

2      game-changer.

3                There are documents that show this, too.  It's not

4      just Susan McFarland's testimony.  There are documents.

5                This is an FHFA document discussing a meeting with

6      Ed -- that's Ed DeMarco -- on August 14th.  This document is

7      really interesting for like three different reasons.  Had a

8      meeting with Ed, went well.  Met with Ed DeMarco August

9      14th.  They announced the net worth sweep August 17th just

10     before 9:00 in the morning, so it was about to happen.

11               The amendment -- that's the amendment with the net

12     worth sweep -- is expected to be made public sometime on

13     Friday.  That's the 17th.  It came out just before 9:00 a.m.

14               The enterprises will be informed tomorrow.

15               I know it's late.  I know we want lunch.  Just

16     look at that.  "The enterprises" is Fannie Mae and Freddie

17     Mac.  They're going to be informed on Wednesday, August

18     15th, that there's an amendment that is going to sweep their

19     net worth to Treasury for the rest of all time.  Just a

20     little heads up two days before.

21               The evidence on this point is clear, overwhelming.

22     They weren't told.  They weren't consulted.  Nobody asked

23     them their view.  FHFA did it.

24               Now, they asked about reaching out to auditors.

25     Mr. Griffin, who is an accountant at FHFA, says there was a

1    question about rerecording certain deferred tax assets that

2    had been written off.  There was a question.  This is email

3    proof that it was discussed, documentary proof from the time

4    that it was discussed, inconsistent with what Mr. Ugoletti

5    said in his declaration.

6         It then says, "Jeff indicated both of the boards

7    had discussed this at the last meeting based on his view

8    they were going to be profitable going forward."

9         Remember what I said?  If you're profitable, you

10   get to write the asset up.

11        So this game-changing fact was discussed at a

12   meeting that Ed DeMarco attended.  And at that meeting Jeff,

13   whom I believe the evidence will show is Jeff Foster from

14   Treasury, but regardless, somebody at the meeting with

15   DeMarco said the boards of Fannie and Freddie -- you don't

16   discuss something at the board unless it's important -- the

17   boards of Fannie Mae and Freddie Mac are discussing writing

18   up their deferred tax assets because they think they're

19   going to be profitable, and they're projecting -- and they

20   are profitable.  At this point they are profitable.  They're

21   profitable, making profits above the 10 percent.

22        So there's that in this document, PX259, and

23   there's the callout on that.  It was discussed at the board

24   meeting.

25        But there's another thing in this document.  The

1    very next sentence he explains -- he's dismissive.  This is

2    an accountant and the FHFA.  "I do not think that makes

3    sense" -- meaning I don't think it makes sense to write up

4    these assets and add all this net worth.  We don't want to

5    add net worth because the amendments, the amendments that

6    have the net worth sweep, the Third Amendment which has the

7    net worth sweep, are designed to demonstrate wind down.

8           What does that mean?  If you were starting to

9    wonder what Mr. Ugoletti's reason -- if his reason wasn't

10   what he said in his declaration, maybe there's something

11   else going on here.  The evidence will show that this

12   decision was motivated by a desire to wind these things

13   down, to put them out of business.

14          Not because of the 10 percent dividend problem and

15   eroding commitment from Treasury, but because two people --

16   or maybe one, Acting Director DeMarco -- had strong views,

17   policy views.  You might say ideological views.  It doesn't

18   really matter if they're right or wrong.  He thought -- he

19   didn't like the idea.

20          The evidence will show that Mr. DeMarco comes from

21   a school of economic thought that doesn't want the

22   government involved in the market in this case.  He doesn't

23   want the mixture of government and private investment that

24   had made these things work, so he wanted to wind them down.

25   Okay.  But here's the problem.  They didn't give that as the

```
 1   reason at the time.
 2           You can look at Mr. Ugoletti's declaration, and
 3   you will not find a single mention of wind down.  You will
 4   not find the point of the net worth sweep is to demonstrate
 5   wind down.  You won't find what's in that email in his
 6   declaration.  It doesn't matter how hard you look.  We've
 7   looked.  It's not in there.
 8           Now, the problem with wind down is it didn't
 9   happen.  And the reason it didn't happen -- this shows their
10   assets are bigger now than ever.  Each year -- it's hard to
11   see, I know, but that's each year I think going back to '08
12   up to the present.  Their assets keep getting bigger.
13           It wasn't realistic.  Wind down requires Congress
14   to act.  Congress was divided.  Different political parties
15   with very different ideas of what should happen.
16           It doesn't matter who's right or wrong in that
17   debate.  All that matters in this case is that it was a
18   highly unrealistic thing, and it was an unreasonable thing
19   to try to do through the net worth sweep because the
20   consequences, if it didn't happen, were catastrophic; the
21   $330 billion that got sent away, $150 billion of excess, the
22   destruction of the private shareholder rights.
23           You can't just assume, well, I want this to
24   happen, and so I'm going to do this, especially since they
25   did no work.  They didn't study it, and the real driver
```

1    seems to have been the United States Treasury.

2           Acting Director DeMarco is the decision-maker.  He

3    worked at Treasury for many years.

4           His point person was Mario Ugoletti, special

5    advisor.  He negotiated the original deal for Treasury.  He

6    arguably had a conflict here because he then negotiated the

7    Third Amendment for FHFA.  No one else at FHFA had any

8    substantive involvement.

9           And the evidence will show there's an email eight

10   days earlier from Ugoletti, Mr. Ugoletti, saying there's a

11   renewed push to do the thing, to do the Third Amendment with

12   the sweep.

13          Why?  Circumstantial evidence could suggest -- you

14   will be the judge -- that it's because Fannie and Freddie

15   had just released their second quarter earnings way above

16   the dividend.  They were making more money than the

17   dividend.  They were showing profitability.  They were

18   telling the world:  We're coming back to life.  Things are

19   going well.  And that's when the renewed push comes to do

20   the sweep.  The opposite of the original reason given, the

21   reason given, in Mr. Ugoletti's declaration.

22          The GSEs did not ask for this.  They were not

23   told.  They were not consulted.  They learned two days

24   before.

25          And Dave Benson, I told you, the current

 1     president, he testified under oath.  He was surprised.

 2              Your Honor, I have a one-minute deposition clip to

 3     show this.  Can we have the clip, please?  This is from his

 4     sworn deposition which you will see in this case.

 5              (Video playing)

 6              MR. HUME:  Remember, these executives for Fannie

 7     Mae and Freddie Mac, they're not trying to help us win this

 8     case.  Fannie Mae and Freddie Mac are defendants.  But they

 9     were kept in the dark.  It's not his fault he didn't know.

10     No one told him.

11              Now, folks, I know you've been patient.  I'm going

12     to finish in five minutes.  I'm going to do a few things

13     real quick.

14              The FHFA did no analysis.  None.  You will not see

15     documents showing them analyzing is this net worth sweep

16     going to be -- is it going to make us pay more or less?

17     Let's try to figure it out.

18              When I said the decision-making by powerful people

19     that the evidence will show was arbitrary, was not

20     reasonable, total disregard for its impact on others, this

21     is the kind of evidence I'm asking you to look for.  No

22     decision memos.  No analysis.  Didn't update its old

23     projections.  Ignored the Fannie Mae and Freddie Mac up-to-

24     date projections.  Knew they were on the verge of this game-

25     changing deferred tax asset, but ignored that, too.

 1              There were so many -- let's say they were worried

 2      about this circular draw, this inability to pay the

 3      dividend.  There were lots of other ways to deal with that.

 4              When Mr. DeMarco testifies, he's not going to want

 5      to help us, but one of the things I think you're going to

 6      hear -- we'll ask him:  Did you ever consider putting a

 7      provision in that says if you make the kind of huge profits

 8      you ended up making that, you know, it could adjust in some

 9      way?  "No, I didn't consider that."  That's what he's going

10      to say.

11              And they didn't ask their own internal modeling

12      team.

13              One other quick clip.  Ms. Naa Awaa Tagoe is going

14      to testify by deposition as well on video.  She was the head

15      of the FHFA's internal modeling group that took all of the

16      information about Fannie and Freddie and stress tested, used

17      credit benchmarks, had economists working for it, and she

18      was the head of it.

19              Play the Tagoe clip, please, very quick.

20              (Video playing)

21              MR. HUME:  Not consulted.

22              I'm going to quickly show you -- 549 is the next,

23      I believe -- the impact.

24              I've shown you this one already.  That was 2013.

25      And to explain the $150 billion I need to explain how they

1    tweaked it three or four times so that instead of it being

2    cash, what they would do is, every time Fannie and Freddie's

3    net worth went up, they would increase the principal amount

4    of the senior preferred stock, what's called its liquidation

5    preference.

6           Remember when I said it's like a 10 percent loan?

7    The principal on that loan is called a liquidation

8    preference, because if there is a liquidation where

9    everything is sold, that's Treasury's preference.  That's

10   what they get out first.

11          So when we get to '17, '19, and '21, to different

12   degrees, what they said is this:  We will now let you start

13   building a little bit of capital, but when you do, we keep

14   it.  We keep the value.  Treasury.

15          So Treasury had a liquidation preference of $191

16   billion.  And they said:  From now on, we're going to do the

17   net worth sweep this way.  You make 10, and our principal on

18   our loan goes up 10.  Let's say you make 50.  Now you've got

19   60 of capital, and that 60 we're going to go increase the

20   principal of our loan.  But if you make even 100, we're

21   going to increase the principal on our loan.

22          So it's like -- it's like the Hotel California.

23   You can check out any time you want, but you can never

24   leave.  We got it all.  Treasury's got it all.  They own

25   whatever net worth Fannie or Freddie are building.

1           So that's how you get to the 150.  Net worth sweep

2     led to cash of 245.9.  That thing I just showed with the

3     increase to liquidation preference is another 84.3.  That's

4     how they got 330 of value.

5           Compare that 330 of value.  What would the 10

6     percent dividend have been?  180 at most.  Less if Treasury

7     had allowed itself to simply be repaid on its loan, then

8     they'd be out of there.  They would have repaid it all, if

9     Treasury had let them do it.  That's the 150.

10          You will hear something about another explanation

11    they try now:  periodic commitment fee.

12          The agreement says they have an initial $2 billion

13    fee, and then they said:  We're going to also have a

14    periodic commitment fee.  It will be set up at the end of

15    December 31, 2009.  It will be based on market value.  It

16    will be mutually agreed.  You can't just impose it,

17    Treasury.  FHFA has to agree.  And it's going to be based on

18    reasonable discretion and in consultation with the chairman

19    of the Fed.

20          You may hear that all of this I've been talking

21    about is somehow justified as a stealth periodic commitment

22    fee, as if the periodic commitment fee could have been this

23    large.  Just think about it this way:  They paid -- they've

24    transferred value of $150 billion excess under the net worth

25    sweep.  You would never pay -- a commitment fee is what you

1    pay someone to make a loan available.  You pay a small

2    percentage.  You would not pay $150 billion to make 250

3    available.  It would be insane.

4            And it never happened.  It was waived in 2009.  It

5    was waived in 2010 and '11, and then it was waived again in

6    the Third Amendment.  It was never agreed, let alone

7    mutually agreed through reasonable discretion and in

8    consultation with the chairman of the Fed.  It didn't

9    happen.

10           And there will be an expert.  The world's leading

11   expert on these commitment fees is going to testify.

12           The last point is what I already said.  It cannot

13   equal the net worth sweep, the market value.

14           Dr. Anjan Thakor will testify.  He'll explain that

15   this would make no sense; that no commitment fee was owed at

16   all given the other terms, or at most a very, very small

17   one.  Nothing that could justify the net worth sweep.

18           Now, I told you I would tell you our damages and

19   that it would be a fraction of the amount of money that the

20   preferred shareholders invested and never got back.  The

21   evidence will show, and the fact is this -- I'll tell you

22   part of this has even been stipulated -- the value of all

23   the shares of the three classes before the net worth sweep

24   was $2.9 billion.

25           They announced a net worth sweep right before 9:00

1    a.m. on August 17th, and look what happened to the value.

2            They announce it.  The value goes down.  A lot.

3    By $1.6 billion.

4            And the arithmetic here they agree with.  They

5    agree the stock price fell, and they agree it fell by $1.6

6    billion.  So that part's agreed.

7            And the reason why should be obvious.  You have

8    just announced that the government is taking 100 percent,

9    and the shareholders are therefore going to get nothing.

10           So that is the measure of the damages we seek in

11   this case.  And you will hear from an expert on that, too,

12   Professor Joe Mason.

13           Now, this is the conduct we're talking about, to

14   bring you back.  They changed that 10 percent to 100.  And

15   this is what it did to our client, to the classes we

16   represent.  That's why we're here.

17           You have been so patient with me.  I'm so

18   grateful.

19           My colleagues for the defendants are going to

20   speak after lunch.  I ask you to give them the same careful

21   attention and fair hearing that you gave us, and I ask you

22   just to remember a couple of things.

23           This case is about what happened in 2012, not

24   2008.  Keep your eye on that $150 billion.  Do they dispute

25   it?  And remember the classes we represent invested $33.2

1    billion and only got $5 billion back.

2         So grateful for your service.  At the end of this

3    case you'll hear all the evidence.  We will come and ask for

4    a verdict that this action violated that unwritten principle

5    in the contract, that implied covenant of good faith that

6    says you cannot arbitrarily and unreasonably destroy the

7    other party's benefit of the bargain, what the other party

8    hopes to get out of the contract.  Even if you have power,

9    you can't exercise the power in an arbitrary and

10   unreasonable way.  That's what the implied covenant says.

11        That's the judgment, verdict, we're going to ask

12   for, and for a judgment of $1.6 billion, with prejudgment

13   interest, which we think the law requires.

14        Thank you.

15        THE COURT:  All right.  Ladies and gentlemen,

16   please have a nice lunch.  We'll come back at 2:15.  Don't

17   talk about the case.  Don't let anyone talk to you about the

18   case.  You can leave your notebooks here on your chairs so

19   you can go straight to lunch downstairs.

20        (Jury exits courtroom)

21        THE COURT:  You all can be seated for a minute.

22   I'm going to give the jurors a minute to get to the

23   elevators first.  I'll let you all sit here for just a

24   minute.

25        (Pause)

1          THE COURT:  We'll resume at 2:15 with the

2     defendants' opening statement as well.

3          If you all would do the courtesy of letting the

4     jurors get on the elevators first, I would appreciate it,

5     and let them get through the lunch line.  The Court will be

6     in recess until 2:15.

7          (Lunch recess taken at 1:22 p.m.)

8

9          **CERTIFICATE OF OFFICIAL COURT REPORTER**

10

11          I, LISA A. MOREIRA, RDR, CRR, do hereby

12     certify that the above and foregoing constitutes a true and

13     accurate transcript of my stenographic notes and is a full,

14     true and complete transcript of the proceedings to the best

15     of my ability.

16     Dated this 18th day of October, 2022.

17

18                              /s/Lisa A. Moreira, RDR, CRR
                                Official Court Reporter
19                              United States Courthouse
                                Room 6718
20                              333 Constitution Avenue, NW
                                Washington, D.C. 20001
21

22

23

24

25