1           BEFORE THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA
2

3   FAIRHOLME FUNDS, INC., et al.,   .
                                     .
4           Plaintiffs,              .
                                     .
5       vs.                          .  Case Number 13-cv-1053
                                     .
6   FEDERAL HOUSING FINANCE AGENCY,  .
    et al.,                          .
7                                    .
            Defendants.              .
8   - - - - - - - - - - - - - - - -
    In re FANNIE MAE/FREDDIE MAC     .  Case Number 13-mc-1288
9   SENIOR PREFERRED STOCK PURCHASE  .
    AGREEMENT CLASS ACTION           .  Washington, D.C.
10  LITIGATIONS.                     .  October 18, 2022
    - - - - - - - - - - - - - - - -     2:19 p.m.
11

12          TRANSCRIPT OF JURY TRIAL, AFTERNOON SESSION
                BEFORE THE HONORABLE ROYCE C. LAMBERTH
13                UNITED STATES DISTRICT JUDGE

14

    APPEARANCES:
15
    For Berkley Plaintiffs:      BRIAN BARNES, ESQ.
16                               Cooper & Kirk, PLLC
                                 1523 New Hampshire Avenue Northwest
17                               Washington, D.C. 20036

18  For Class Plaintiffs:        LEE RUDY, ESQ.
                                 Kessler Topaz Meltzer & Check, LLP
19                               280 King of Prussia Road
                                 Radnor, Pennsylvania 19087
20
                                 HAMISH HUME, ESQ.
21                               SAMUEL KAPLAN, ESQ.
                                 KENYA DAVIS, ESQ.
22                               Boies Schiller Flexner LLP
                                 1401 New York Avenue Northwest
23                               Washington, D.C. 20005

24

25                       -- continued --

1    APPEARANCES (CONTINUED):

2                                    ROBERT KRAVETZ, ESQ.
                                     Bernstein Litowitz Berger &
3                                       Grossmann LLP
                                     1251 Avenue of the Americas
4                                    New York, New York 10020

5    For Defendant Federal
     Housing Finance Agency:        JONATHAN STERN, ESQ.
6                                    ASIM VARAMA, ESQ.
                                     DAVID BERGMAN, ESQ.
7                                    IAN HOFFMAN, ESQ.
                                     ROBERT JONES, ESQ.
8                                    Arnold & Porter Kaye Scholer LLP
                                     601 Massachusetts Avenue Northwest
9                                    Washington, D.C. 20001

10

11   Official Court Reporter:       SARA A. WICK, RPR, CRR
                                     United States District Court
12                                      for the District of Columbia
                                     333 Constitution Avenue Northwest
13                                   Room 4704-B
                                     Washington, D.C. 20001
14                                   202-354-3284

15   Proceedings recorded by stenotype shorthand.
     Transcript produced by computer-aided transcription.
16

17

18

19

20

21

22

23

24

25

# C O N T E N T S

## OPENINGS

Opening Statement by Defense........................... 321

## TESTIMONY

SUSAN PARK HARTMAN      Direct Examination.............. 378

## EXHIBITS RECEIVED

JX-1................................................... 377
PX-1-1 through 1-40................................... 377
PX-2B................................................. 377
PX-2C................................................. 378
PX-2E................................................. 378
PX-5A and 5C through O............................... 378
PX-213, 222, 223..................................... 378

```
 1                     P R O C E E D I N G S

 2          (Call to order of the court.)

 3          (Jury not present.)

 4          THE COURT:  While the jury is on the way, I wanted to

 5     again apologize to plaintiffs' counsel.  I had been told that

 6     all the jurors were here before we started that fiasco.  So I

 7     apologize about the delay.  I did not realize that one of the

 8     jurors was not present when we started this.  I'm sorry about

 9     that delay in getting started.  If I had known that, we could

10     have gotten her on her way earlier.

11          Who is going to open for the defendants?

12          MR. STERN:  Jonathan Stern for the defendants, Your

13     Honor.  I will be opening for the defense.

14          THE COURT:  The jurors should be here shortly.

15          Do you have your first witness ready?  We'll break after

16     their opening.

17          MR. HUME:  (Nodded head.)

18          THE COURT:  Okay.  We'll stop at 5:00, but I would

19     still like to get a witness started anyway.

20          I should have said all of the jurors but number 2.  I knew

21     number 2 wasn't here.

22          (Jury entered courtroom.)

23          THE COURT:  You may be seated.

24          All right.  Good afternoon, ladies and gentlemen.  The

25     defendants will make their opening statement at this time.
```

1              MR. STERN:  Thank you, Your Honor.

2         Good afternoon, members of the jury.  I hope you had a good

3    lunch.

4         My name is Jonathan Stern, and I represent the defendants

5    in the case, and I am going to use the same lingo that Judge

6    Lamberth used and that Mr. Hume used, and I'm going to refer to

7    those defendants as FHFA, Fannie Mae, and Freddie Mac.

8         And I would like to begin by acknowledging a few things

9    that Mr. Hume said.  We're going to disagree about an awful lot,

10   and in fact, I'm going to spend most of my time up here today

11   disagreeing with most of what you heard this morning.

12        But we do agree on one thing.  Mr. Hume was absolutely

13   right about this.  I would like to join Mr. Hume, along with my

14   colleagues at counsel table, in thanking all of you for your

15   service.  It is -- jurors watch lawyers; lawyers watch jurors.

16   It is obvious to me already that you have been and will be very

17   attentive to the evidence you hear and to the arguments and

18   statements you hear from counsel, and I join Mr. Hume in saying

19   that we are very, very grateful for your time and attention.

20   And I know that you will pay very close attention to the

21   evidence in this case.

22        So I'm going to get right to it.  What will that evidence

23   show?  The evidence in this case is going to show you that when

24   FHFA agreed to the Third Amendment and the net worth sweep, FHFA

25   was taking action to protect the United States housing market.

FHFA was taking action to protect the United States economy. And FHFA was taking action to protect the American public.

And you're going to learn that FHFA had an obligation to act in the public interest.  And the evidence will show you that when FHFA put the public interest first, when FHFA agreed to the Third Amendment and the net worth sweep ahead of the interests of private shareholders to save the economy, that action was completely reasonable.

And that, members of the jury, is going to be the key to this case, because the evidence will show you that any reasonable shareholder would have known that FHFA was going to act in the public interest, even if that meant private shareholders might lose money or dividends.

And you will learn that when FHFA acted as conservator and agreed to the Third Amendment and the net worth sweep, that action in the public interest was completely in line with shareholders' reasonable expectations.

You are going to learn that reasonable shareholders knew that they shouldn't expect dividends, because not a single shareholder, not one, not a single shareholder of Fannie and Freddie had received a penny of dividends for years before the Third Amendment went into effect.  Shareholders knew that FHFA as conservator could make decisions in the public interest, even at shareholder expense.

Now, Mr. Hume talked to you about Mr. DeMarco, and I'm

going to talk about Mr. DeMarco, too.  Mr. DeMarco was the

acting director of FHFA from 2009 to 2013.  And the evidence is

going to show you that Mr. DeMarco had a Ph.D. in economics, and

he was a dedicated public servant for decades.  You will learn

that he served during the administrations of four presidents,

two Republicans and two Democrats.  And you will learn that he

was in charge.  He made the key decisions at FHFA, including the

decision to enter into the Third Amendment and the net worth

sweep.

       And you're going to learn what Mr. DeMarco did and why he

did it, and you're not going to learn it from some memo that

somebody else wrote about some meeting that he went to.  You're

going to learn it from Mr. DeMarco himself, because he is going

to come testify to you.  And you will learn from his testimony

the enormous risks and uncertainties that he faced and the

enormous responsibilities that he had.

       And you will learn from the evidence that Mr. DeMarco did

what he believed was the right thing to do, to carry out the

mission that the law told him to carry out.

       You will learn that he wasn't pursuing some rogue policy

agenda, a private goal of his.  You're going to learn that he

was doing what the law told him to do and what he reasonably

believed was in the best interests of the American people.

       One program note about Mr. DeMarco before I go on.

Mr. DeMarco is going to be called as a witness during the

plaintiffs' part of the case.  As I think you know, the way this
is going to work is, first, the plaintiffs get to go first
because they have the burden of proof to prove everything that
they need to prove by a preponderance of the evidence.  And
because they have that burden of proof, they get first dibs on
presenting evidence.

So what is going to happen next in the trial is that the
plaintiffs will be presenting evidence during -- we call it the
plaintiffs' case-in-chief.  Then the defense gets to go.

And ordinarily, we would call Mr. DeMarco in our case when
it was our turn.  But the plaintiffs have decided that they want
to call Mr. DeMarco in their case, and they have every right to
do that.  But in order to make things more efficient, instead of
having Mr. DeMarco testify during the plaintiffs' part of the
case and have him go home and you sit here and wait to hear from
him again in the defense part of the case, we have decided by
agreement, with His Honor's endorsement and ruling, to present
Mr. DeMarco's testimony all at once.

So when he comes to you during the plaintiffs' part of the
case, you will hear him answer questions from Mr. Hume or his
colleagues, and you will hear him answer questions from me.

I'm also going to talk to you this afternoon about what the
evidence will show about FHFA and Fannie Mae and Freddie Mac,
and I'm going to talk to you about what the evidence will show
about the actions Mr. DeMarco took to save the economy and why

1     he took them.

2          And to do that, I'm going to ask you to travel back in time

3     with me, because as Mr. Hume pointed out in his comments and as

4     you will learn from the evidence, the key events in this case,

5     in fact, the only important events in this case, happened over a

6     decade ago.  They started in 2008, give or take, and the key

7     event for you, of course, is the Third Amendment, and that

8     happened on August 17th, 2012.  So that's the time that we're

9     going to travel back to.

10          But before we take that trip back in time, I want to talk

11     with you for just a few minutes about Fannie Mae and Freddie Mac

12     and why what they do is so critical to the housing market and to

13     the entire United States economy.  So let me start with them.

14          What will you learn about Fannie Mae and Freddie Mac?  For

15     starters, you will learn they're not like most companies.  You

16     will hear them referred to -- and in fact, you already have.

17     His Honor referred to them this way in his preliminary

18     instructions, Mr. Hume in his opening statement referred to them

19     this way, and that is, as government-sponsored enterprises.  And

20     that means what it says.  It means that they are companies that

21     are sponsored by the government.

22          And another point of agreement with Mr. Hume, they were

23     created by Congress, Fannie Mae way back in 1938 and Freddie Mac

24     in 1970.  And the evidence is going to show you, members of the

25     jury, that unlike other companies, Congress didn't set up Fannie

1   and Freddie just as regular companies to make money for their

2   shareholders.  Congress gave Fannie and Freddie what we call a

3   public mission, and that public mission is right there in the

4   corporate charters granted by Congress.

5        Can I get slide 1.

6        So the corporate charters are -- you all have screens in

7   front of you; right?  You're looking down there, and I'm

8   pointing up there.

9        The corporate charters are the documents by which

10  Congress -- the official legal documents by which Congress

11  created Fannie Mae and Freddie Mac.  And the charters are going

12  to come into evidence.  You're going to get to see them.

13       But number 1, and it's not an accident that it's number 1,

14  number 1, "Provide stability in the secondary market for

15  residential mortgages."  And I'm going to explain what the

16  evidence will show you about what that means, but that's the

17  public mission in both charters.

18       It doesn't say number 1, make profits for shareholders.  It

19  doesn't say number 1, get dividends to shareholders.  It says,

20  "Provide stability in the secondary market for residential

21  mortgages," and that is the public mission.  And Congress gave

22  that public mission even though Fannie and Freddie are also

23  private companies that could make money for their shareholders.

24       I'm going to get to this in a few minutes, and Mr. Hume

25  touched on it.  But there came a time later on when Congress

took action to make clear that FHFA as conservator could manage
Fannie and Freddie in the public interest to execute that public
mission, even at the expense of private shareholders.

And the evidence will show you that Fannie and Freddie --
and I'm going to call them Fannie and Freddie just for
shorthand.  The evidence is going to show you that Fannie and
Freddie's public mission was and is today critically important
to the entire United States economy, because you will learn that
Fannie or Freddie own or guarantee more than half of the
mortgages in this country and that Fannie and Freddie are the
critical bridge that provides money to the mortgage market that
allows more people to buy homes, money that makes safe and
affordable housing available to all Americans and their
families.

So what are you going to learn about how Fannie and Freddie
carry out this public mission, and what are you going to learn
about how they provide stability and support the housing market?
How do they help home buyers get access to affordable mortgages?

You're going to learn that Fannie and Freddie don't make
home loans directly to people who want to buy homes.  Fannie and
Freddie aren't banks.  Fannie is down here -- their offices are
down here in downtown D.C.  For example, you can't walk in and
say, Hi, I would like to see the person in charge of mortgages
because I would like a mortgage.

So what do they do?  Why were they so important to the

1   nation's economy back in 2008 and 2012 and to this very day?

2   I'm going to try and break this down for you.

3       We have a slide -- slide 2, please.

4       Okay.  So a home buyer goes to a lender.  This person up

5   here is a borrower.  They go to the lender, the bank-looking

6   thing on the left, to buy a home.  The bank makes the loan, and

7   the homeowner takes that money and goes to buy a home, and the

8   bank holds a mortgage on the home.

9       I didn't quite follow the slide, but you get the idea.  I

10  don't know why the principal interest is at the bottom.

11      The borrower goes to the bank; they get the mortgage.  They

12  want to buy a $200,000 house.  They get $160,000 from the bank.

13  They have $40,000 of their own for a down payment.  They buy the

14  home.

15      The bank then holds a mortgage on that home, and the

16  homeowner, of course, then owes the bank the money and pays the

17  bank over time -- I think we're all familiar with this

18  concept -- usually by a mortgage payment, monthly mortgage

19  payment.  And ordinarily, part of that payment is what is called

20  the principal, a portion of the amount of the actual loan, and

21  part of that payment is interest on the loan.  I think we all

22  know how that works.

23      And just to get our vocabulary down, when witnesses are

24  talking in this trial about the primary mortgage market, they're

25  talking about what's on this slide.  They're talking about the

mortgage market that involves regular people going to get a loan to buy a house.

There's also something called the secondary mortgage market, and this is where Fannie and Freddie come in.  This is kind of complicated stuff.  I'm going to try and help break it down with slide 3.

So you saw from those charters that Fannie and Freddie's public mission is to provide stability for the secondary mortgage market.  And the right side of this slide is about the secondary mortgage market.

The evidence will show you that if the bank wants to, the bank can sell the mortgage.  Right?  So homeowner came in.  They got the money.  The bank has the mortgage on the house.  The bank can actually sell that mortgage to Fannie and Freddie.  Okay?  So that's the top.  The bank sells the mortgage.  Fannie and Freddie get the mortgage.

What does the bank get?  The bank gets money.  Fannie and Freddie is buying the mortgage.  And the evidence will show you that that money going from Fannie to Freddie back to the bank is really important, because when the bank sells the mortgage to Fannie and Freddie and gets money coming back in, the bank has more money that it can use to make loans to more people looking to buy a home.  And that's what keeps the primary mortgage market going.

So the bank sells the mortgage to Fannie and Freddie.  They

get money.  That money is now sitting there.  So when the next
borrower/homeowner comes in to get a loan to buy a house, the
bank has the money to lend them.

That's what helps homeowners get affordable mortgages.
That's what keeps homeownership accessible to many Americans and
their families.  That's what helps people who want to buy a home
actually be able to do it.  It's Fannie and Freddie sending
money to the bank in exchange for buying the mortgage.

Now, Fannie and Freddie, they've bought this mortgage from
the bank.  What happens next?  Mr. Hume was right.  Sometimes,
Fannie and Freddie keep some of those mortgages for themselves,
but sometimes -- and for those mortgages, when a home buyer
makes their monthly mortgage payment, the payment that would
have gone to the bank now goes directly to Fannie and Freddie,
because they're sitting there with the mortgage in their hand.

But the evidence will show that that's not the main
business of Fannie and Freddie, and this is where it gets a
little more complicated.  The main business of Fannie and
Freddie is to do what's called securitize the mortgages and sell
the securities to investors.

And let me break that down a little bit more.  Securitizing
the mortgages means combining lots of individual mortgages.
Remember, the banks are selling mortgages to Fannie Mae and
Freddie Mac, and Fannie Mae and Freddie Mac are accumulating
these mortgages.  And when they securitize them, they combine a

whole lot of mortgages, hundreds, sometimes thousands, into a

package that's called a security.  And that particular security,

that bundle of mortgages that Fannie and Freddie have bought

from the bank, is sometimes called a mortgage-backed security.

Okay?

So now we've got the money from Fannie and Freddie to the

bank; Fannie and Freddie has the mortgages.  They put them in a

big bag.  That's a security that is mortgage-backed.  So what do

they do with that mortgage-backed security?  They sell those

securities to people that I'm going to call investors.

And I want to make my language clear here, because when

we're talking about this mortgage market and we're talking about

investors, we're talking about people that buy the

mortgage-backed securities.  We're not talking about the

shareholders of Fannie Mae and Freddie Mac.  That's a completely

different set of people.  Those are people who own shares in

Fannie Mae and Freddie Mac, and I'm going to get to that.  What

we're talking about here are the people that buy these

mortgage-backed securities.

Now, what those investors get is a steady stream of

payments, because remember, this all starts with a borrower and

a homeowner.  They make a monthly payment.  That monthly

payment, when the bank sells the mortgage to Fannie and Freddie,

is in Fannie and Freddie's hands, but when Fannie and Freddie

sell those mortgages to the investors, now it's going to be in

1    the investors' hands.

2         So if you're an investor in a mortgage-backed security,

3    every month, you get the monthly payment, or at least a portion

4    of it.  Some of it comes out.  You get the monthly payment that

5    the homeowner is paying.

6         And there's something really special about these

7    mortgage-backed securities that's very important for this case,

8    because when the investors buy those securities, those packages

9    of mortgages from Fannie and Freddie that Fannie and Freddie got

10   from the bank, the investors get a special guarantee from Fannie

11   and Freddie.  And what's that guarantee?  If the homeowner can't

12   make the mortgage payments, the investor still gets paid, and

13   Fannie and Freddie covers any loss to the investors if the

14   borrower doesn't make a mortgage payment.

15        So let's see how that works.  All right?  Borrower is

16   supposed to pay $200.  And Fannie and Freddie, the bank sells

17   that mortgage, and now Fannie and Freddie are supposed to be

18   getting that $200, or most of it.  Fannie and Freddie package

19   five of those together into a mortgage-backed security, and now

20   some investor every month is going to get five times $200.  They

21   get $1,000.  But that only works so long as the homeowner is

22   actually making the payments.

23        So what happens if the homeowner doesn't make the payments?

24   The investor still gets the money.  If the homeowner can only

25   pay half of that, the investor gets that $100, and Fannie Mae

and Freddie Mac make up the rest.  Fannie Mae and Freddie Mac guarantee to the investors that they will get the full amount.

So you see what happens.  People stop paying their mortgages, but Fannie and Freddie still have to pay the investors, because the investors have a guarantee.  And that's going to be a really important part of this case as you listen to the evidence, and I'm going to come back to it.

And let me tell you, ladies and gentlemen, this is complicated stuff.  I think I speak for Mr. Hume.  We're both doing our best to try to make it understandable first to ourselves and then to you.

But here's the good news.  We are going to call expert witnesses, and they are going to be your teachers, and they are going to explain to you in more detail, and we hope helpfully, what we're trying to summarize here.

So I'm going to move off of this for just a minute to talk for a moment about the plaintiffs in this case.  They are shareholders in Fannie Mae and Freddie Mac.  They are not the buyers of mortgage-backed securities.  They are people who own a share of Fannie Mae or Freddie Mac.  And I think we all know, and the evidence will show, that what it means to own a share of stock is that you have a little piece of ownership in the company.

And I want to make an important point, because with all due respect to Mr. Hume, I think that he may have gotten this wrong

this morning.  So in this context, if you buy a share of

stock -- you're just a person.  You buy a share of stock in a

company.  You're buying a little piece of that company.  But you

are investing in the company.  You're not making a loan, you are

giving money to the company.  In return, you're getting a piece

of that company.  It's not a loan that the company can pay back

to you.  It is your share of ownership in that company.

Now, I'm going to talk more about dividends later, but if

you get a dividend, that is what economists sometimes refer to

as a return on your investment.  It is not the company paying

back a loan.  You still have your entire share of stock, and it

has its entire value whether you get a dividend or not.  But I'm

going to talk more about that later when I talk about the

Treasury commitment that you heard about this morning.

Going back to the shareholders in Fannie Mae and Freddie

Mac for just a moment, when Fannie Mae and Freddie Mac become --

I'm sorry.  When a shareholder buys a share of stock, they enter

into a contract with -- I will just use Fannie Mae, buys a share

of stock in Fannie Mae.  You become, as a shareholder, a party,

a fancy legal word for someone in a contract or agreement, with

Fannie Mae.  But it's not the kind of contract that we might be

thinking of.  It's not a contract where you sit down and you say

I'll buy your -- let's have a -- we're going to have a contract

for me to buy your car, and I'm going to give you $100, and

you're going to sell me your car, and you say, Well, that's not

1   going to work, you can give me $1,000, and you can have the car.

2   And you go back and forth, and when you're done, you have a

3   contract.  You have an agreement that you've negotiated.

4       That's not how it works when you buy a share of stock.

5   When you buy a share of stock, you become a party to the

6   contract, even if you did not negotiate it.  And that contract,

7   as we're going to see and as His Honor told you in his

8   preliminary instructions, includes not only the original

9   contract agreement, it includes other things, and in the case of

10  the contracts in this case, the contracts between Fannie Mae and

11  its shareholders and Freddie Mac and its shareholders, that

12  contract includes not only the original document, the stock

13  certificate, it also includes other things, including federal

14  laws that relate to that contract.

15      I want you to try to tuck that away, because I'm going to

16  come back to it in a few minutes.

17      So what do you get when you buy a share of stock?  Well,

18  you now own a little piece of the company.  And what can you do

19  with that?  Whatever you want.  You can hold it.  You can sell

20  it.  You can trade it.  You can buy low, sell high.  If you're

21  not so fortunate, you might buy high, sell low.  You can trade

22  the shares.  The price may go up or down.  The company may not

23  do well.  The company may do very well.  But it's always up to

24  the shareholders to buy, hold, or sell.

25      Shareholders in this case, members of the jury, they had

1    the right and ability to do all of those things, both before and

2    after the Third Amendment.  The Third Amendment had nothing to

3    do with the right or ability of shareholders to hold their

4    stocks, to sell them, and if they did sell them and made a

5    profit, they had every right to keep that profit, both before

6    the Third Amendment and after.

7        I want to say one other thing right now about owning a

8    share of stock generally and Fannie Mae and Freddie Mac in

9    particular.  Dividends, you've heard a lot about dividends.  I'm

10    going to respectfully disagree with Mr. Hume, and I'm going to

11    show you what I believe the evidence will show you about this.

12        No shareholder in any company has an absolute right to a

13    dividend.  It doesn't exist unless there's some special

14    agreement like there was with Treasury in this case.  But Fannie

15    Mae stockholders and Freddie Mac stockholders did not have an

16    absolute right to a dividend.

17        And that's nothing unusual, ladies and gentlemen, because

18    you're going to hear from the expert witnesses that that's

19    standard practice, that companies don't have an obligation to

20    issue dividends to their shareholders, even when things are

21    going well.

22        So a private company may be making a big huge profit, and

23    they can decide to issue a dividend if they want, but they can

24    also decide to take that profit and buy a new plant or a new

25    truck or a new something else.  It's up to the company to decide

 1   whether or not to issue a dividend.

 2        And importantly, ladies and gentlemen, shareholders know

 3   that going in.  And the shareholders of Fannie and Freddie Mac

 4   knew that going in.  They knew that it was up to the companies

 5   whether or not to issue dividends.  And as I say, I'm going to

 6   pick up on that in a few minutes.

 7        Now, I would like to take us back in time.  I would like to

 8   take us back to 2007, 15 years ago.  And what the evidence is

 9   going to show you is that banks and other financial

10   institutions, by late 2007, had begun losing hundreds of

11   millions of dollars.  And by the summer of 2008, the evidence

12   will show you, millions, millions of people are losing their

13   jobs.  Businesses are failing left and right, not just small

14   businesses, but giant companies that played a big role in the

15   economy.  Some of you may remember some of these names.  Lehman

16   Brothers, Merrill Lynch, Bear Stearns, AIG.  Some those names

17   may be familiar to you.  Those are big financial institutions

18   that were -- didn't make it through, some of them didn't make it

19   at all through the financial crisis.

20        And you'll learn that by the end of July 2008, banks had

21   lost hundreds of billions, that's hundreds of billions with a B,

22   and the stock market and the people who bought stocks were

23   getting crushed.  And the evidence is going to show you that the

24   reasons behind the 2008 financial crisis were complicated.

25   Experts have written entire books trying to explain how the

economy got to that point in 2008 where there was a very real
risk that the entire economy could collapse.

But one thing is clear.  What's clear is that one of the
big causes of the financial crisis had to do with the mortgage
market that we've been talking about and the housing market,
because the evidence will show you that housing prices had
peaked in 2006, and then they went down farther and faster than
anyone had expected.  And as a result, a huge number of people
who had bought homes in the early 2000s had mortgages that were
now underwater.  You may be familiar with that term.  When a
mortgage is underwater, that means that people owed more on the
mortgage than the house was worth.

That created massive problems for banks and other
institutions that owned the mortgages, because now the banks
hold these mortgages.  People can't make the payments.  And the
house that secures the mortgage isn't even worth the payments
left on the mortgage.  But most of all, it created terrible
problems for the people who were stuck in those mortgages, many
of whom lost their jobs and their incomes.

And you will learn, members of the jury, that that
situation also created a huge, huge problem for Fannie and
Freddie.  Because remember, Fannie and Freddie were in the
business of guaranteeing those mortgage-backed securities.  They
had to continue paying the investors even though Fannie and
Freddie weren't getting the mortgages anymore because those

1    homeowners and borrowers had defaulted.

2        And the evidence will show you, members of the jury, that

3    in 2008 alone, a single year, Fannie and Freddie lost more than

4    $100 billion.  That is a staggering amount of money.  And the

5    evidence will show you things were getting worse.  The economy

6    and the housing market continues to tumble down.  And you will

7    learn that it was so bad that people were afraid Fannie and

8    Freddie might go under.  And people were worried if that

9    happened, the mortgage market would likely freeze up, and that

10   would have ripple effects all across the economy.  Banks

11   wouldn't be able to give mortgages to people who want to buy

12   homes, and it also means that banks would get stuck with those

13   mortgages that aren't getting paid.  That puts banks in big, big

14   trouble.

15       And that's not just a threat to the banks.  That's a threat

16   to the entire economy.  Because if the housing market collapsed,

17   it would bring down the entire economy with it.  You will learn

18   if the banks fail, people in companies can't get loans for their

19   businesses, and that puts those businesses at risk.  And if

20   businesses fail, employees lose their jobs, and then they can't

21   pay their mortgages.  And then there's this vicious cycle that

22   threatens the entire economy.

23       The expert testimony in the case, members of the jury, is

24   going to show you that this risk to the housing market and to

25   Fannie and Freddie was something the experts call systemic risk,

1    like risk to the system.  And what that meant was the entire

2    economy was at risk if something wasn't done to support Fannie

3    and Freddie and to support the housing market.

4        And the evidence will show you that by July 2008, the

5    situation had gotten so critical that the federal government had

6    to step in.  The federal government had to step in to save

7    Fannie and Freddie, to save the housing market, and to save the

8    economy.

9        So what needed to happen for the federal government to step

10    in?  Is this just a decision that can be made in some office

11    somewhere?  Not at these prices.  What had to happen was

12    Congress had to pass a law, and that's what they did.  Congress

13    passed a law, and the president signed it on July 30th of 2008.

14        Through some magic of technology, this slide is going to

15    grow as we go along.

16        The first thing we see on the slide is July 30, 2008.  What

17    you see there is the law that was passed was called the Housing

18    and Economic Recovery Act of 2008.  And the connection between

19    the housing market and the economy is right there in the title.

20    It says "The Housing and Economic Recovery Act of 2008" because

21    Congress knew that economic recovery depended on supporting the

22    housing market.

23        Can we go back one more time?

24        You see in parentheses and quotation marks, it says "HERA."

25    I'm going to be referring to this law a couple more times.  I'm

1   going to call it HERA, partly because that's what people do in

2   Washington.  They call things by their initials, and partly

3   because Housing and Economic Recovery Act of 2008 is a mouthful.

4   So we're going to call that HERA.

5        Now we can go to slide 5, please.  Okay.

6        So this is HERA.  HERA did a lot of things, but one of the

7   most important things that it did was to create FHFA, one of my

8   clients here in the case.  And through HERA, Congress and the

9   president gave FHFA the job of making sure that Fannie and

10  Freddie stayed in business.  HERA gave FHFA the job of making

11  sure Fannie and Freddie could provide a stable source of funding

12  in the housing market, a stable source of funding to make safe,

13  affordable housing available for low- and moderate-income

14  families.

15       And in order for them to be able to do that job, HERA gave

16  FHFA and its director a lot of powers.  And one of those powers

17  is very important to the issues that you're going to be asked to

18  decide in this case, and that was the power to put Fannie and

19  Freddie into something called conservatorship.

20       Can we get the next slide?  Oh, I'm sorry.  Stay on this

21  slide.  I apologize.

22       I would like to stop to talk about conservatorship.  I'm

23  going to tell you a little bit more about what it means in this

24  case, but let me tell what you it doesn't mean.  This is not

25  like Britney Spears.  This is not somebody taking charge of some

individual person's personal financial affairs.  This is an
authorization for FHFA essentially to manage and run the
business of Fannie and Freddie.

And you're going to learn that the first director of FHFA
was a man named James Lockhart.  And you heard Mr. Hume refer to
him this morning, and you're going to hear from Mr. Lockhart.
You're going to hear his testimony.  He's going to be one of the
witnesses who is going to be testifying by deposition.  Mr. Hume
talked about that.

I will just say another brief program note.  Some of the
witnesses you hear are going to come into court, they're going
to sit on the witness stand, and the lawyers are going to ask
them questions, they're going to give answers, and you're going
to hear their testimony.  That's going to be sworn testimony
under oath.

Some of the witnesses you're going to hear from testified
before the trial started in what's called a deposition, and some
of the witnesses are going to talk to you that way.  But that
testimony, same thing.  Lawyers ask questions, they give
answers, and those answers are under oath.

So Mr. Lockhart is one of the witnesses that you're going
to hear from by deposition.  And you're going to learn that when
he became conservator in 2008, he hit the ground running.  And
the evidence will show you, ladies and gentlemen, members of the
jury, that Mr. Lockhart knew that things were bad, and he knew

they were getting worse, for Fannie, for Freddie, for the
housing market, for the entire U.S. economy.

Fannie and Freddie and Mr. Lockhart were watching the
situation very closely in July and August of 2008, and
Mr. Lockhart was overseeing Fannie and Freddie, and he saw
firsthand that Fannie and Freddie were not in safe and sound
financial condition.  There's not going to be any dispute,
members of the jury, that by the fourth quarter of 2008, Fannie
and Freddie were insolvent.  And what that means is that they
both had what accountants and economists call negative net
worth.

And if that sounds bad, that's because it is.  The evidence
will show that negative net worth means that the companies'
liabilities were more than their assets.  In a nutshell, they
were in the red.  But not just in the red, members of the jury.
The evidence will show you that Fannie and Freddie were on the
verge of collapse.

The money that the shareholders had invested in Fannie and
Freddie, you saw that $33.2 billion that Mr. Hume put up there.
That was completely gone in 2008.  It had nothing to do with the
Third Amendment.  It was because the economy was collapsing and
because of the financial crisis.  And the evidence will show you
that without the support that they ended up getting from
Treasury, Fannie and Freddie would have gone under.

So under HERA, the director of FHFA was legally authorized

1    to put Fannie and Freddie into conservatorship.  And that's

2    exactly what Director Lockhart did.

3         Can we get the timeline to show this next date.

4         September 6, 2008, FHFA's director, Mr. Lockhart, put

5    Fannie and Freddie into conservatorship.  He became the

6    conservator.  And what that meant was that FHFA and Mr. Lockhart

7    assumed all the powers of Freddie and Fannie's corporate

8    management and their boards of directors.  FHFA, as conservator

9    under Mr. Lockhart, essentially got the power to run Fannie and

10   Freddie's business.  And when Mr. Lockhart, as conservator, got

11   those powers, he got another very important power and a very

12   important responsibility, and that important responsibility is

13   at the heart of this case.

14        The Recovery Act was clear that when FHFA became

15   conservator, they were specifically authorized to act in the

16   best interests of the public.  The Recovery Act, HERA, was

17   crystal clear that when FHFA became conservator, instead of

18   looking out only for the interests of the shareholders, Congress

19   and the president gave FHFA the power and the responsibility to

20   look beyond making money for the shareholders, even to look

21   beyond making money for Fannie and Freddie.  FHFA got the power

22   and the responsibility to make decisions and take actions that

23   were in the best interest of the public.

24        Can we get slide 7.

25        So this is from HERA.  This is a quote from HERA.  "The

agency," that's FHFA, "may, as conservator, take any action which the agency determines is in the best interests of the regulated entity," Fannie or Freddie, "or FHFA." So if FHFA decides there is something in the best interest of the public, then they can take that action, even if it isn't in the best interest of Fannie Mae or Freddie Mac or their shareholders.

And Mr. Lockhart is going to tell you in his deposition testimony that the most important thing -- he's going to say this point blank. The most important thing for FHFA to do was not to make profits for shareholders. The most important thing for FHFA to do as conservator was to protect the housing market and to protect the interests of the taxpayers and to protect the interests of the public.

Now, you will remember that even before conservatorship started in 2008, Fannie and Freddie had that public mission to support the secondary mortgage market that was in their corporate charters. When FHFA became conservator, that public mission became even more important, because you will learn that HERA, the law, told FHFA and everyone else that now that you're the conservator, you can and you must run Fannie and Freddie for the benefit not just of private shareholders, you must run Fannie and Freddie in the best interests of the public who rely on the secondary mortgage market.

HERA, that new law in 2008, told FHFA that its number 1 job was to make decisions and take actions that were in the best

1    interest of the public, not just the shareholders of Fannie and

2    Freddie.

3        Another point, members of the jury, about HERA and

4    conservatorship that's going to be very, very important when I

5    talk to you in a few minutes about the plaintiffs' legal claim.

6    First of all, HERA was not a secret.  The conservatorship was

7    not a secret.  The power and responsibility of the conservator

8    to act in the public interest, even if it wasn't in the

9    shareholders' interests, was not a secret, not even close.

10   Front page news, and the shareholders knew all about it.

11       And you'll remember that I told you that the evidence will

12   show that when a shareholder buys Fannie and Freddie stock,

13   they're entering into that agreement, that contract that's the

14   subject of the case.  You will also learn that when HERA became

15   the law, HERA became part of that shareholder contract.  That

16   means that once FHFA took over as conservator, shareholders were

17   in an agreement with Fannie and Freddie that told those

18   shareholders that FHFA had the power to act in the public

19   interest, not just in the shareholders' interests.

20       So what are the first things that Mr. Lockhart does to try

21   to keep the housing market from collapsing -- you know, I will

22   get to that in a minute.

23       Court's indulgence.  Excuse me, members of the jury.

24   Excuse me, Your Honor.

25       So what did Mr. Lockhart do to try to keep the housing

market from collapsing?  First, he had to do something to stop
the bleeding.  So for starters, he eliminated all dividends to
shareholders.

Can we get slide 8, please.

This is the statement that Mr. Hume put up on the board,
and it says -- this is the September 7th statement by
Mr. Lockhart right after the conservatorship came into being.
And he says, "In order to conserve capital," I'm skipping some
words, "the common stock and preferred stock dividends will be
eliminated."  And those are the dividends that are at issue in
this case, the dividend, the common stock and preferred stock
dividends that we've been talking about here.

Director Lockhart, September 7, 2008, eliminated all
dividends.  I'm going to ask you to keep your eye on the ball,
ladies and gentlemen, members of the jury.  What is the date up
here?  Is it August 17th, 2012?  Does that say Third Amendment
eliminated dividends?  Does that say net worth sweep eliminated
dividends?  No.  It says September 7, 2008, under the power that
he had under HERA, Director Lockhart eliminated all dividends.

Let me pause here for just a minute, because I wanted to go
back to something I noted just a little bit earlier.  The
defendants are going to show you and the plaintiffs' own expert
witnesses are going to agree that companies don't have to issue
dividends.  They can decide to issue dividends, as I said
earlier, but they can also decide not to issue dividends.  And

1   as I said a minute ago, that's true of all companies, and it was

2   true of Fannie and Freddie Mac.

3        You may recall His Honor in his instructions to you this

4   morning and actually yesterday, when we had a lot more of your

5   former prospective jurors here, Judge Lamberth referred to the

6   Fannie and Freddie stock certificates as a part of the

7   shareholder contract.

8        So can we pull up the stock certificate.  This is one of

9   the stock certificates -- let me back up for a minute.  I'm

10  sorry.  Can we get slide 11.

11       So in addition to the statement that Director Lockhart

12  made, which told everybody in the world, including all the

13  shareholders of Fannie and Freddie, that dividends were being

14  eliminated, Fannie and Freddie both made securities filings that

15  said the same thing.

16       So let me first talk about what they say, and then we will

17  talk about what they are.  In these securities filings, just

18  like Director Lockhart had told all the shareholders of Fannie

19  and Freddie back in 2008 that the conservator has eliminated

20  stock dividends, these filings said the same thing.

21       I'm going to be talking more about securities filings.  So

22  let me digress for just a moment.  You see it says 2008 10-K,

23  and at the top, it says "SEC filings."  SEC stands for

24  Securities and Exchange Commission.  Without getting into too

25  much detail, that's the government agency that regulates a lot

of things having to do with the stock market.  And publicly

traded companies, that is, companies where people can buy stock,

are required to make reports to the SEC to say what's going on

in their company.  And these reports are completely public, and

they're really important, and they are taken very, very

seriously.

And because they are taking so seriously, there are laws

that say if a company says -- when a company makes one of these

filings, it has to be signed by senior executives of the

company, and if what they say in that thing is wrong and they

knew it was wrong, they can go to jail.

So when a company puts something in one of these filings,

you can take it to the bank.  No pun intended.  It's something

that you know that the company is taking very seriously.

So here is the public statement in this important filing

where Fannie and Freddie are telling everyone just what Director

Lockhart said, as of September 2008:  No more dividends.

So let's go to slide 12.

So here's what he said, and I want to read the rest of it.

It says, "The common stock and preferred stock dividends will be

eliminated, but the common and all preferred stocks will

continue to remain outstanding."

So that means if you're a Fannie and Freddie shareholder,

you know two things:  One, forget about your dividends, they're

gone as of September 6, 2008, and the other thing you know is,

1    the good news is, your stock will continue to remain

2    outstanding.  That means Fannie and Freddie weren't taking --

3    ripping your stock shares out of your hands.  If you're a Fannie

4    or Freddie shareholder, you still have your stock.  And if you

5    want to sell it and make a profit, that's money that you keep.

6    That's got nothing to do with the dividends.

7         So Director Lockhart is telling all the shareholders, no

8    more dividends, but the stock is yours to keep.

9         So when Mr. Hume put up the slide before that said that

10   the -- I'm paraphrasing, that the worth of the -- that Fannie

11   and Freddie shareholders would retain the value of their shares

12   as that value is determined by the market, that's what we're

13   talking about here.  You keep your share.  And if the market

14   says you can sell it for a lot of money and make a profit, more

15   power to you, go ahead and sell it and keep your profit.

16        So what else did HERA accomplish?  What else did

17   Mr. Lockhart accomplish?  Well, he needed to get some financial

18   support for Fannie and Freddie, a lot of financial support and

19   fast.  But there was a problem.  Director Lockhart figured that

20   to get that job done in the short term, Fannie and Freddie would

21   each need to have $100 billion available to draw on.  That's how

22   serious things were.  That's how much support Fannie and Freddie

23   needed to keep from going under.

24        And the evidence will show you that because of the state of

25   the housing market and because of the overall economy, nobody,

1    no bank or other financial institution, was going to make $200

2    billion available to Fannie and Freddie.  The evidence will show

3    that there was only one place where Fannie and Freddie were

4    going to be able to get that kind of money committed to them:

5    The federal government.  And you're going to hear directly from

6    Director Lockhart that Fannie and Freddie needed that money from

7    the federal government, from the Treasury Department, for Fannie

8    and Freddie even to survive.

9         Now, Congress knew when they passed the Recovery Act, when

10   they passed HERA, that Fannie and Freddie were going to need

11   federal government financial support.  So in the law, Congress

12   said that Treasury could buy Fannie and Freddie stock as a way

13   for the government to get Fannie and Freddie the financial

14   support that they needed, the financial support that the

15   American economy needed, the kind of financial support that the

16   American public needed to keep the entire economy from crashing

17   down.

18        And I want to pause here for just a moment, because what

19   I'm about to talk about are the preferred stock purchase

20   agreements, the PSPAs that Mr. Hume talked about this morning.

21   But I want to make one thing really clear.  What happened in

22   those agreements is the federal government, through the Treasury

23   Department, got all this money to Fannie and Freddie not as a

24   loan.  Mr. Hume referred to this commitment of money as a loan

25   that could be paid back.  That's not what it was.  It was an

1    investment.

2         And as you're going to hear in round 1, Treasury made a

3    $100 billion investment in Fannie and Freddie.  It was not a

4    loan that could be repaid.  And when the Treasury Department got

5    its dividend, that wasn't paying down a loan.  That was a return

6    on investment.  Just when a regular person buys a share of stock

7    and they get a dividend, it's not a loan they've made that's

8    getting paid back.  It's an investment that they've made, and

9    they're getting a return on that investment if the company

10   decides to issue a dividend.

11        So the evidence will show that on the very next day after

12   FHFA became the conservator, FHFA and Treasury signed off on

13   what are called the preferred stock purchase agreements.  That's

14   PSPA for short.  One for Fannie, one for Freddie.

15        Can we get slide 13, please.

16        We're filling in our timeline some more.  That's

17   September 7, and what happened was -- and I'm going to show you

18   the documents themselves in a minute.  Treasury agreed to pay

19   each enterprise up to $100 billion in funding.  In return,

20   Fannie and Freddie had to pay dividends of 10 percent, and at

21   some point, they had to pay a periodic commitment fee.  FHFA

22   also announced that dividends would be eliminated.

23        So can we get slide 14, please.  Okay.

24        Here's the first PSPA.  Here's how the money got from

25   Treasury to Fannie and Freddie to save the housing market and

save the economy.  Pretty simple.  100 billion to Fannie and Freddie as an investment, and in return for that, they got stock.

The evidence will show you that the main point of the PSPA was to make that $100 billion available to Fannie and Freddie, a $200 billion total commitment from the federal government to stand behind Fannie and Freddie in return for stock.

And why did they do this?  Because remember, there's those investors out there who bought the mortgage-backed securities, and they have been told Fannie and Freddie have guaranteed your investment.

But they're looking at Fannie and Freddie and saying wait a minute, Fannie and Freddie are hemorrhaging money, they're going broke, what about that guarantee that I had?  What Congress did and what Treasury did by allowing Fannie and Freddie -- by purchasing that stock was to support Fannie and Freddie to the tune of $100 billion each so that those investors would know that their guarantee was safe, to make sure Fannie and Freddie could continue to support the housing market.

So that $200 billion, that Treasury commitment, was money that was there as a safety net, a safety net for the economy, for the housing market, for the American public.

You also know that under the PSPAs, Treasury was entitled to what's called a fixed dividend payment every quarter.  And it wasn't optional.  It was mandatory.  So that meant that every

quarter, every three months, Fannie and Freddie had to pay

10 percent of the amount of the commitment that they had used.

So the $100 billion, they get $100 billion because that's what

Treasury invested.  But that $100 billion was in a separate

pile.  And as they used that $100 billion, if they used it, the

amount that they used each quarter would be subject to this

mandatory 10 percent dividend.

So for example, by the end of the first quarter, the first

three months of 2009, Fannie had drawn $34.2 billion for the

commitment.  So the dividend for the next year alone, based just

on that quarter, came to about $3.5 billion.  And that dividend

went to the Treasury Department and to the American taxpayer as

a return on investment for the portion of the Treasury

commitment that Fannie and Freddie had actually used, the

Treasury commitment which was public funds that Treasury had

committed to Fannie and Freddie.

So I call the 10 percent dividend a fixed dividend.  What

does that mean, and why is it important for the case?  Well,

that means that under the 2008 PSPAs, Fannie and Freddie had to

pay that dividend every quarter, whether they made a profit in

that quarter or not.  And as I will explain in a few minutes and

as the evidence will show, the fixed part of that dividend, the

fact that it was 10 percent every quarter had to be paid, played

a crucial role in how the Third Amendment and the net worth

sweep came to be.

1    So Treasury got the 10 percent dividend, and they also got

2    something called a liquidation preference.  I'm going to make a

3    confession right now.  You heard Mr. Hume talk about the

4    liquidation preference.  You also heard him talk about deferred

5    tax assets, that accounting concept.  Well, I'm not even going

6    to try.  I'm going to do better.  We're going to bring you a

7    gentleman named Nicholas Satriano.  He is the chief accountant

8    for FHFA.  He really understands this stuff, and he is going to

9    come testify, and he is going to explain to you some of the

10   particulars of some of these accounting concepts, including the

11   DTAs.  There's also going to be discussion by other witnesses

12   about the liquidation preference.

13       But I'm going to move on to something else that Mr. Hume

14   talked about, and that's the periodic commitment fee, sometimes

15   referred to as the PCF.  And I want to distinguish between two

16   things.

17       So you have the dividend, and that's 10 percent of the

18   amount of the commitment that is actually used.  I'll simplify

19   the numbers.  $100 commitment, $10 used, $1 dividend.  So that's

20   based on what's used.

21       The PCF is a fee to which Treasury was entitled just for

22   having made the money available.  Treasury says, Look, we're

23   giving you $200 billion of the taxpayers' money.  In addition to

24   some return on that investment in the form of the dividend,

25   we're entitled to a fee just for being the people, really the

people, the American people who stepped up and made this money
available to you.  So its purpose was to compensate Treasury and
the taxpayer for the portion of the commitment that wasn't used
but was available if it was needed.

So Mr. Hume is right.  The PCF hasn't been paid yet.  It
was supposed to be paid in every quarter starting in 2010.  And
FHFA and Treasury agreed to figure out when the time came what
the amount of that PCF would be.

But you'll learn from the testimony, ladies and gentlemen,
that whatever the actual number is, whatever the exact number
is, the PCF would be huge, because it would have to compensate
Treasury and the American taxpayer for making hundreds of
billions of dollars available to Fannie and Freddie and
compensate the Treasury and the American taxpayer for putting
hundreds of billions of dollars of taxpayer money at risk.  So
the value of this PCF is enormous.

And the evidence will show you that everyone expected that
the PCF would be so huge that Treasury agreed every quarter to
waive it.  So what does that mean?  That means that Treasury
every three months was entitled to say, Okay, let's sit down,
figure out a number for the PCF, and we want to get paid.

But Treasury agreed not to do that, and you're going to
learn why.  It wasn't out of the goodness of Treasury's heart.
Treasury agreed not to do that because they knew that the number
would be so huge, Fannie and Freddie wouldn't be able to pay it,

that it wouldn't be a benefit to the American taxpayer to charge
Fannie and Freddie something that they couldn't afford to pay.
But the PCF was still out there every quarter for Treasury to
charge if they decided to collect it.

One more important about the PSPAs that's important.  The
conservator had already suspended dividend payments to Fannie
and Freddie before the PSPAs.  Right?  We saw that; first thing
he did.  The PSPAs also said that as long as Treasury had this
thing called the liquidation preference, which someone else is
going to explain to you, they had the right to veto dividend
payments to shareholders.

So the shareholders found out at the -- as soon as the
conservatorship started, no more dividends, and then when the
first PSPA went into effect and they said not only aren't you
entitled to dividends now, you will never be entitled to
dividends unless and until Treasury agrees.  And this, ladies
and gentlemen, had nothing to do with the Third Amendment,
absolutely nothing to do with the Third Amendment or the net
worth sweep.

Now, these preferred stock purchase agreements weren't a
secret.  Far from it.  Shareholders knew in 2008 that FHFA and
Treasury had entered into this agreement.  They knew without
that support Fannie and Freddie were at grave risk.  They knew
without that support Fannie and Freddie would be gone and all
their shares with it.

1      Now, these PSPAs, like HERA, are also considered to be a

2  part of the shareholder contract.  So when you're thinking about

3  what does the contract say, you have to include the PSPA.  The

4  shareholders were a part of an agreement that told them

5  everything that the PSPA said, including the fact that Treasury

6  had the right to veto dividends.

7      So let's take a look at our timeline again.  So now we're

8  in November of 2008.  The plaintiffs aren't complaining -- and

9  you heard Mr. Hume say this.  They're not complaining about the

10  conservatorship.  Their legal claim is not about whether the

11  conservatorship was reasonable.  They're not complaining about

12  Mr. Lockhart eliminating all of their dividends in 2008.

13  They're not saying that was unreasonable.  They're not

14  complaining that Treasury had the right to veto dividends.

15  They're not saying that was unreasonable.  And in fact, all of

16  those things are actually a part of the contract they entered

17  into.

18      Their legal claim is not whether about any of those actions

19  were unreasonable, and the evidence will show that all of those

20  actions, in fact, were reasonable, completely reasonable because

21  FHFA had the right and the obligation to take those actions to

22  protect the best interests of the public and by virtue of HERA

23  and the PSPAs actually becoming a part of the shareholders

24  contract.  It's right in the shareholder contract.

25      Now, in 2009, the PSPAs were amended twice.  I'm not going

to get into all the details.  But the upshot of those amendments
was to increase the amount of the Treasury commitment to provide
even more support, because it turns out that $200 billion wasn't
nearly enough.  They had to be amended in -- first, May 6 of
2009, slide 15 -- sorry, same slide at the top.

They had to be amended May 6, 2009, to double the
commitment.  So instead of $100 billion per for a total of
200 billion, now it's 200 per for a total of 400 billion.

They were amended again because even that wasn't enough.
That's how much trouble Fannie and Freddie were in.
$400 billion from Treasury was not enough to ensure that they
would be supported.

So on December 24, 2009, it was a Christmas present.
Mr. DeMarco is now the acting director.  And he signed the
Second Amendment, and in the Second Amendment, Treasury and FHFA
agreed to this.  Treasury said, You know what?  No cap on the
commitment.  You can draw as much as you need to keep yourself
out of trouble until December 31st, 2012, when the cap goes back
into place.

And that cap, members of the jury, that was looming, that
was going to go into place December 31, 2012, became a key and
very problematic fact.  And I'm going to explain why in just a
minute.

Because even after the conservatorship went into place, the
economy continued to be in trouble.  In other words, imposing

the conservatorship in September of 2008 was not poof, it's magic, the economy is fine again because of the conservatorship. Far from it.

Can we get the next slide, 15.  Oh, next click.  I'm sorry. Okay.

We see that from September of 2008 to August of 2012, just taking Fannie as an example, Fannie drew $116.1 billion from the Treasury commitment.  Now, remember, they draw from the commitment in a quarter when they have negative net worth.  So in order to get themselves -- whatever they need to get themselves to the black, that's when they take a draw, and whether they need to get that -- need that to get into the black because of their operating losses or paying the dividend, unless they can get themselves into the black without the commitment, they need to take a draw.

And what we see is that Fannie took $116.1 billion and Freddie drew a total of $71.3 billion, because that's how much they needed because that's the kind of losses they were suffering.  The evidence is going to show you that from 2012 to -- 2007 to 2012, Fannie and Freddie lost over $100 billion. So going into 2012 from 2007, Fannie and Freddie had lost over $100 billion.

What did that mean for the draws?  What did that mean for this fixed 10 percent dividend?  Well, it meant that as Fannie and Freddie were losing more and more money, they still had to

1    pay that 10 percent.  But they didn't have the money to pay the

2    10 percent.  So what did they do?  They hit up the commitment

3    for the money to pay the dividend, which then increased the

4    dividend for the next quarter.

5        It's like borrowing money to pay your credit card debt.

6    The hole just keeps getting deeper and deeper.  And when Fannie

7    and Freddie had to draw from the commitment to pay the

8    10 percent that was based on what they had already drawn from

9    the commitment, that was a huge problem.

10        And the evidence is going to show you, the witnesses are

11    going to refer to this as the circular draw, and the circular

12    draw became the thing that threatened the entire housing market

13    and the entire economy, because this is what happened.  In order

14    to pay the 10 percent, they had to draw down on the commitment

15    just to pay the dividend.  And that would increase the

16    liquidation preference, and that would increase the dividend.

17        So you get the idea.  They're borrowing money to pay for

18    the dividend that is based on the amount of money that they are

19    borrowing.  So everything is going in exactly the wrong

20    direction.

21        So -- and the reason that was happening was because the

22    payment was fixed at 10 percent, whether Fannie or Freddie can

23    pay or not, and as they lost more and more money, they had to

24    make more draws, which meant more 10 percent payments, which

25    meant more draws.  That's, obviously, not a good situation, not

for Fannie and Freddie, not for the housing market, not for the American public.

So now we're in 2009, 2010, 2011, and the economy is still in a perilously fragile condition.  There's a 2011 government report on the financial crisis that you will see that said more than 26 million Americans were out of work.  Millions of people had lost their homes.  And FHFA was staring down that December 31st, 2012, cap, because once it was hit it couldn't be re-upped.  So what came out of the commitment couldn't be replaced.  So if these draws continued, the commitment would get smaller and smaller, and that was called erosion of the commitment.  And it was a huge problem, because Fannie and Freddie were continuing to lose money.

So here we are in 2012.  Fannie and Freddie and the housing market and the American people are facing this huge problem, Fannie and Freddie losing more and more money, stuck with having to pay this 10 percent fixed dividend every quarter.

That brings us to August of 2012 and the Third Amendment.  The Third Amendment and the net worth sweep, members of the jury, is the only FHFA action that the plaintiffs are challenging by their legal claim in this case.  I told you all the things they're not challenging:  Elimination of dividends in 2008, Treasury veto, getting all the money, taxpayer money from Treasury to FHFA, to Fannie and Freddie.

They're not making the legal claim that those actions were

unreasonable, and they weren't.  They were actions and decisions by people in the government who were making tough decisions in tough times and doing their best to look out for the public interest.

So when the plaintiffs' witnesses, who are law professors -- I'm sorry.  They're not law professors.  They're some other kind of professor, accounting or whatever it is or finance.  When they get up here and say, Well, I'm a professor, and this is what I would do, well, that's not the same thing as being in the hot seat.  That's not the same thing as having to make decisions with the entire U.S. economy at risk.

But before I talk more about the Third Amendment, I want to talk with you about what the evidence will show you about what Mr. DeMarco and FHFA and the country were facing in August of 2012, because you heard Mr. Hume use phrases like "turn the corner" and "things were getting better."

But you're going to learn, members of the jury, that the economy wasn't close to being out of the woods of the economic crisis.  And Mr. DeMarco is going to tell you that as conservator, he's going to be very direct about this, putting money into the pockets of Fannie and Freddie shareholders wasn't a priority, because under HERA Mr. DeMarco's most important goal wasn't to make profits for shareholders.  FHFA's most important goal and most important job was to protect the public interest by making sure that that Treasury commitment was preserved and

1  that it didn't get eroded by these circular draws.

2      Mr. DeMarco is going to tell you that FHFA knew that Fannie

3  and Freddie had lost hundreds of billions of dollars in the five

4  years before August 17, 2012, the date of the net worth sweep.

5  He's going to tell you that he knew that the Treasury commitment

6  had to be doubled from that $200 billion to $400 billion and

7  then it had to be made unlimited.

8      But he's also going to tell you, I knew the party's over

9  December 31, 2012; that cap was going to go back into place.

10  He's also going to tell you that he knew that that periodic

11  commitment fee was still out there hanging over Fannie and

12  Freddie's head.  He knew that the circular draws put the

13  Treasury commitment at risk, and if there was too much erosion,

14  the markets would lose confidence in Fannie and Freddie.  And if

15  that happened, the housing market, which had been on such thin

16  ice, would destabilize.  And he knew that if the housing market

17  went under, it could bring down the entire economy.

18      Most important of all, members of the jury -- and you will

19  get a chance to evaluate Mr. DeMarco from however many feet away

20  you are, live and in person.  Most important of all, Mr. DeMarco

21  knew what he didn't know.  He knew that the long-term future was

22  unpredictable.  He knew that he had to guard against the risk

23  that unpredictable events could take the housing market right

24  back to where it was in 2007 and 2008.

25      That's what Mr. DeMarco knew.  Those were the facts as he

knew them, and those were solid facts.  And as for Fannie and
Freddie's future earnings, Mr. DeMarco was concerned.  And to be
clear, he knew about the financial projections that suggested
that Fannie and Freddie might start making profits somewhere
down the line.  He knew that the enterprises themselves were
optimistic about their prospects.

So he knew -- and I will talk about this right now
actually, but he knew about some of those projections.  He knew
about the positive performance in the first two quarters of
2012.  He knew, for example, about that golden years projection.
Mr. Hume put that up on the slide.  It was Mr. Benson who said
that he expected that the next eight years were going to be
golden years.

But I'm going to ask you again, ladies and gentlemen, keep
your eye on the ball.  Listen closely to the testimony, as I
know you will.  And when you get these documents, look at them
carefully.  The lawyers, in our statements today and our closing
arguments, are going to help direct your attention to what we
think is important.  But you're the judges of what's important.
I'm just asking you to pay close attention.

You will see in that golden years projection, even under
Mr. Benson's golden years, Fannie Mae was going to be making
circular draws for years to come.  That was a part of the
so-called golden years.

But that's not really the point.  The point is this:  The

evidence will show that after years and years of brutal losses
for the enterprises, there were some glimmers of hope in early
2012.  There's no dispute that the first two quarters were good.
There's also no dispute that for the previous 12 quarters things
were really bad, and for the previous 12 quarters, Fannie and
Freddie had to take draws to cover their operating losses and
their dividend payments.

    And as it turns out, those glimmers of hope were justified.
And there's no dispute about that.  We're not going to quarrel
and quibble about the amount of dividends that were paid to
Treasury after 2012.  They are what they are.

    But that evidence will show you, members of the jury,
something you already know.  You probably know the expression
hindsight is 20/20.  So it's really easy to sit here today in
2022, it was easy in 2019, 2017, whenever it was, to say, Look,
all the things we said back in early 2012 have come true.

    But it's only after the fact that we know that those hopes
in early 2012 turned out to be right.  And most importantly of
all, members of the jury, as you will hear from Mr. DeMarco,
hope isn't a strategy.  Mr. DeMarco had to be very, very careful
given the very, very high stakes.  He knew that things can seem
to be going well right up to the point where they collapse like
they did in 2008.  And he will explain to you that that was not
a gamble he could take with the life of the American economy and
the housing market.

1    And Mr. DeMarco will also tell you that he knew that

2    despite some of their optimistic projections, Fannie and Freddie

3    had said in their securities filings -- can we get number 18,

4    slide 18, please.

5    So these are the securities filings again, these important

6    documents filed with the Securities and Exchange Commission.

7    These are filings in August of 2012 from Fannie and Freddie.

8    And we don't see Mr. Benson's golden years that he did for some

9    PowerPoint presentation.  We see what the senior executives of

10   those companies were saying, knowing that this better be right

11   or else they would be in big trouble.

12   And what do they say?  They say, "Our expectation that

13   although we may experience period to period volatility," that

14   means changes, "in earnings and comprehensive income, we will

15   not generate net income or comprehensive income in excess of our

16   annual dividend obligation to Treasury over the long term."

17   So they are saying that over the long term, we will

18   continue to not be able to meet the fixed dividend as long as

19   that's in place and that we will have to take more draws and

20   create that circular draw erosion risk to the economy.

21   And Freddie Mac says essentially the same thing.  "It is

22   unlikely that we will generate net income or comprehensive

23   income in excess of our annual dividends payable to Treasury."

24   So they were reporting to the SEC -- what they reported to

25   the SEC confirmed the danger of that circular draw erosion, that

it was very real.  Actually, let me get -- no, we can keep it on
this one.  It was very real and posed a real threat to the
American housing market and economy.

And you will learn that because of the unpredictable
future, Mr. DeMarco was focused on what he is going to call and
what other witnesses are going to call in the case the stress
scenario.  And that's a term that economists and other people in
business use when they're talking about planning for the future.

And the stress case scenario is the scenario where things
don't come up roses, where things go bad because of some
unpredictable event.  Who knows what could happen in a few
years?  I don't know.  Think of something wild and crazy that we
might have been thinking about back in 2008, like oh, a global
pandemic.  Who would have thought such a thing?  But that's
exactly the kind of thing that Mr. DeMarco had to be concerned
about, predicting the unpredictable.

So considering the stakes, he had to consider the stress
case scenario.  That wasn't only reasonable, members of the
jury, it was vital, and it was vital for Mr. DeMarco to make the
decisions and take the actions he did.  And he's going to tell
you what he had to think about about what was at stake, and he's
going to tell you what the process was.  He's going to tell you
that he analyzed this issue deeply.  He thought deeply about it.
And he came to what he thought was the right decision for the
economy.  And he's going to tell you that he had to think about

1    whether he could afford to take any risk with the fate of the

2    economy hanging in the balance.

3         The evidence will show you, there's no dispute, that the

4    circular draws were eroding the Treasury commitment.  And

5    there's no dispute that that erosion put the economy at risk.

6    The evidence is going to show you, members of the jury, that by

7    agreeing to the Third Amendment and the net worth sweep,

8    Mr. DeMarco and FHFA, acting as conservator, completely

9    eliminated that risk.  They took it down to zero.

10        Mr. DeMarco is going to explain that he understood and

11   understood deeply that FHFA was given the responsibility to act

12   in the public interest first and foremost.  He's going to tell

13   you that that meant that he had to figure out a way to eliminate

14   the circular draws and the problem of erosion.

15        So how did the Third Amendment work?  How did the Third

16   Amendment and the net worth sweep eliminate that risk of

17   circular draws?  Well, the key to the Third Amendment is that it

18   changed the way that Fannie and Freddie made dividend payments

19   to Treasury.  The Third Amendment eliminated the risk of

20   circular draws and eliminated that risk completely, because the

21   real problem had been the fixed dividend.  You remember that the

22   evidence will show that the fixed dividend required payments

23   from Fannie and Freddie of 10 percent, even in quarters when

24   they couldn't cover those payments on their own and then had to

25   draw on the Treasury commitment to pay the dividend.

1       Mr. DeMarco is going to tell you that he knew that if he

2   could get rid of the fixed dividend, he could eliminate the

3   circular draw problem.  And that's exactly what the Third

4   Amendment and the net worth sweep did.  The Third Amendment and

5   the net worth sweep eliminated that problem by eliminating the

6   fixed dividend and replacing it with what we call a variable

7   dividend.  And under that variable dividend, this is how it

8   worked:  Fannie and Freddie paid Treasury a cash dividend equal

9   to their earnings, their profits every quarter.  And it's that

10  variable dividend that is sometimes called the net worth sweep.

11      And the thing about the variable dividend is this:  The

12  quarterly profits of Fannie and Freddie would always count as

13  payment in full of the dividend even in quarters when Fannie and

14  Freddie had no earnings at all.  In a quarter like that, instead

15  of having to pay 10 percent of what they had drawn, Fannie and

16  Freddie wouldn't have to pay a dime.

17      So the variable dividend or net worth sweep completely

18  eliminated the risk of those circular draws.  It completely

19  eliminated the risk of that erosion of the commitment.  It

20  completely eliminated the risk that that erosion posed to the

21  United States housing market and economy.  The Third Amendment

22  and the net worth sweep made certain that the enterprises,

23  Fannie Mae and Freddie Mac, could meet those dividend

24  obligations without ever having to take a draw to make a

25  dividend payment.

1      Mr. DeMarco knew that at the time the Third Amendment was

2  put into place Fannie and Freddie owed Treasury a combined

3  $19 million a year, and eliminating that obligation dramatically

4  improved the GSE's financial position.  And he will tell you

5  that eliminating that obligation was critically important to

6  Fannie and Freddie's public mission.

7      And he's also going to tell you there was another very

8  important feature to the Third Amendment, and that relates to

9  this periodic commitment fee.  Because as we've seen, Treasury

10  had waived, had given up its right each quarter to collect that

11  periodic commitment fee, but it hadn't given up its right to

12  collect the periodic commitment fee altogether.

13      Can we get slide 19.

14      So this letter is one of the letters that Treasury sent to

15  waive for that quarter or give up their right to the PCF.  But

16  they're really clear.  They say, "Please be advised that

17  Treasury waives for the first quarter," this one is for

18  2011, "of calendar year 2011 the PCF payable by each

19  enterprise."  And it goes on to say that "any net income from

20  the enterprises through the end of 2011 is forecast to be

21  returned to taxpayers already.  Accordingly, Treasury believes

22  that the imposition of the PCF at this time would not provide

23  additional net proceeds to the taxpayers."

24      And it goes on to say, "Treasury remains committed to

25  protecting taxpayers and ensuring that future positive earnings

1    of the enterprises are returned to the taxpayers."  That's what

2    the PCF was about.

3        So under the terms of the Third Amendment, Treasury is

4    saying to Fannie and Freddie, Don't worry about it.  As long as

5    you're paying the variable dividend under the net worth sweep,

6    the PCF will be suspended altogether, done -- not a

7    quarter-by-quarter waiver, suspended as long as the variable

8    dividend is in place.

9        So, ladies and gentlemen, just a few minutes now, if I may,

10   on the plaintiffs' specific legal claim.

11       As His Honor explained -- and let me say this:  I'm going

12   to talk a little bit about the plaintiffs' legal claim, and I

13   believe Mr. Hume did also.  I'm sure Mr. Hume would join me to

14   say that when I say I want to be as clear as I can possibly be,

15   that the instructions on the law are going to come from His

16   Honor, and those are the instructions that will guide your

17   deliberations.  And I'm going to make just a few comments, with

18   the understanding that His Honor will be instructing you on the

19   law, and those instructions will be what control your

20   deliberations and your decision.

21       So what's the one legal claim?  As His Honor explained in

22   his instructions and will explain further, as he told us, it's

23   called the breach of the implied covenant of good faith and fair

24   dealing.  That's a lot of legal words.  Their claim is that by

25   agreeing to the Third Amendment and the net worth sweep, FHFA

violated the shareholders' contracts with Fannie and with

Freddie.  They claim that by agreeing to the Third Amendment and

the net worth sweep, FHFA acted unreasonably, in a way that

frustrated what the law calls the reasonable expectations of the

shareholders based on those shareholders' contracts with Fannie

and Freddie.

Let me take just a minute to break that down.  I've already

talked with you about the evidence that will show FHFA and

Mr. DeMarco acted reasonably when they agreed to the Third

Amendment and the net worth sweep, and now I would like to spend

just my last few minutes talking with you about shareholders'

reasonable expectations under their contracts with Fannie Mae

and Freddie Mac.

Because as we've seen, we know that the shareholders

entered into a contract when they bought shares of Fannie and

Freddie stock, and we also know that those shareholders'

contracts include a number of different things.  So I'm going to

touch on some of those and how they relate to the reasonable

expectations of the shareholders.

They include a document called the stock certificate.  Can

we get the stock certificate?

So here is language from one of the stock certificates.

When you buy the stock, you get the certificate.  And it says

shareholders "will be entitled to receive, ratably, when, as and

if declared by the board of directors in its sole discretion" a

1    dividend.

2         That means that the shareholder contract itself says you

3    don't have a right to a dividend.  What it tells shareholders is

4    you will get a dividend if the board of directors declares one.

5    And that phrase "in its sole discretion" means that that

6    decision is completely and only up to the board of directors.

7    If they decide for whatever reason not to issue a dividend, you

8    know going into buying this stock that you're not going to get

9    one.

10        We also know that the provisions of HERA count as a part of

11   the contract, and the provisions of the PSPAs count as a part of

12   the contract, and so do the events of September of 2008, and so

13   does the fact that Fannie and Freddie are regulated by the

14   government.

15        So it will be within the shareholders' reasonable

16   expectations that things could happen as a result of the fact

17   that Fannie and Freddie are regulated by the government.

18        And the evidence will show that when you put all of this

19   together, it's crystal clear that it was completely within the

20   shareholders' reasonable expectations that Mr. DeMarco would

21   take action in the public interest, even if that action might

22   harm the shareholders financially.

23        And it's crystal clear that when FHFA agreed to the Third

24   Amendment and the net worth sweep, that was completely

25   reasonable and was consistent with the reasonable expectations

1   of the shareholders.

2      The evidence will show you that the shareholders' stock

3   certificates told them they didn't have any absolute right to a

4   dividend and that they would only get them if the company

5   decided to issue them.  That, too, was a part of what was in the

6   reasonable expectations of the shareholders.

7      So slide 22, please.

8      So putting all of this together, ladies and gentlemen, we

9   respectfully submit that the evidence shows that the plaintiffs

10   will not be able to meet their burden of proof to show that

11   Mr. DeMarco and FHFA, in doing what the law told them to do, was

12   acting unreasonably, and we believe that the plaintiffs will not

13   be able to meet their burden of proof to show that those actions

14   were not within the reasonable expectations of the shareholders,

15   because it was totally reasonable, there's no dispute, that

16   every circular draw eroded the Treasury commitment.  There's no

17   dispute that the erosion of the Treasury commitment put the

18   housing market and the entire economy at risk.

19      The evidence will show you that Mr. DeMarco analyzed those

20   facts with all of his knowledge and all of his experience, and

21   he will tell you that based on that knowledge and his years of

22   dealing with these issues, FHFA could not afford to take the

23   risk that those circular draws would continue to erode the

24   commitment and risk the stakes for the housing economy -- for

25   the housing market, the economy, and the American people.

1          And that's about all I have to say, ladies and gentlemen.

2     I just want to touch very briefly on damages.  There was some

3     discussion of damages by Mr. Hume.

4          It's our respectful submission to you, and at the end of

5     the case I'm going to come back before you and ask you to return

6     a verdict that says that FHFA is not liable, so that means that

7     damages aren't an issue.  But you will hear testimony about

8     damages, and you will evaluate that as you see fit.

9          And that, ladies and gentlemen, is what we expect the

10    evidence in the case to show.

11         I will end where I started.  I want to thank you very much

12    for the attention and time that you've paid to Mr. Hume today,

13    to me today, and the attention we know you will pay to the

14    evidence in the case and His Honor's instructions.

15         And we respectfully submit to you that when you've

16    considered that evidence and the arguments of counsel and the

17    instructions of the Court, you will render a verdict in favor of

18    FHFA, Fannie, and Freddie.  And I thank you very much.

19              THE COURT:  All right.  Thank you very much, Counsel.

20         We're going to take just a ten-minute recess for

21    everybody's convenience.  We do want to get the first witness

22    started today.  We will stop at 5:00, but we will get the first

23    witness started today.  So we will have a short recess.

24         (Jury exited courtroom.)

25         (Recess taken from 4:00 p.m. to 4:20 p.m.)

```
 1              (Jury not present.)

 2                   MS. DAVIS:  Good afternoon, Your Honor.  Kenya Davis

 3         for the plaintiffs.

 4            There are some exhibits that we would like to pre-admit.

 5         Would this be an appropriate time to do it?

 6                   THE COURT:  Sure.

 7                   MS. DAVIS:  JX-1 is the stipulation that has been

 8         agreed to by the parties, the joint statement of undisputed

 9         facts.

10                   THE COURT:  Received.

11            (Plaintiffs' Exhibit JX-1 received into evidence.)

12                   MS. DAVIS:  PX-11 through 140.

13                   THE COURT:  What is that?

14                   MS. DAVIS:  That is the certificate --

15                   THE COURT:  What was the number again?

16                   MS. DAVIS:  PX-11 through 140.  Those are the 40

17         certificates of designation.

18                   THE COURT:  Without objection, they're received.

19                   MR. HOFFMAN:  No objection.

20            (Plaintiffs' Exhibits PX-1-1 through 1-40 received into

21         evidence.)

22                   MS. DAVIS:  And I'm only offering ones that are not

23         objected to.  Next would be PX-2B.

24                   MR. HOFFMAN:  No objection.

25            (Plaintiffs' Exhibit PX-2B received into evidence.)
```

```
 1              MS. DAVIS:  PX-2C.

 2              THE COURT:  Okay.  Received.

 3         (Plaintiffs' Exhibit PX-2C received into evidence.)

 4              MS. DAVIS:  Thank you.  PX-2E.

 5              THE COURT:  Received.

 6         (Plaintiffs' Exhibit PX-2E received into evidence.)

 7              MS. DAVIS:  PX-5A and then 5C through O.

 8              THE COURT:  They're received.

 9         (Plaintiffs' Exhibits PX-5A and PX-5C through O received

10    into evidence.)

11              MS. DAVIS:  PX-213, PX-222, and 223.

12              THE COURT:  All right.  Those are all received.

13         (Plaintiffs' Exhibits PX-213, PX-222, and PX-223 received

14    into evidence.)

15              MR. HOFFMAN:  No objection for the record, Your Honor.

16         (Jury entered courtroom.)

17              THE COURT:  You may be seated.

18         Plaintiffs will call their first witness.  Ms. Davis?

19              MS. DAVIS:  Thank you, Your Honor.

20         The plaintiffs call Susan Hartman.

21         SUSAN PARK HARTMAN, WITNESS FOR THE PLAINTIFFS, SWORN

22                        DIRECT EXAMINATION

23              BY MS. DAVIS:

24    Q.  Good afternoon.

25    A.  Good afternoon.
```

1    Q.   In a loud, clear voice, could you please give us your name

2    and spell it for the record.

3    A.   Susan Park Hartman.

4    Q.   Are you employed, Ms. Hartman?

5    A.   Yes, I am.

6    Q.   Where are you employed?

7    A.   I work with FTI Consulting.

8    Q.   Could you please tell the ladies and gentlemen of the jury

9    your occupation.

10   A.   I'm a certified public accountant and a certified fraud

11   examiner.

12   Q.   Now, today --

13         MR. STERN:  Your Honor, objection, based on the

14   Court's earlier ruling.

15         COURTROOM DEPUTY:  Counsel, I can't hear you.

16         MR. STERN:  Objection, based on the Court's earlier

17   ruling and the commitment of counsel.

18         MS. DAVIS:  That is the limit of our inquiry; if

19   counsel is concerned about a potential voir dire, that is the

20   end of it.

21         THE COURT:  You may proceed.

22         MS. DAVIS:  Thank you, Your Honor.

23         BY MS. DAVIS:

24   Q.   Ms. Hartman, just to be clear with the ladies and gentlemen

25   of the jury, you are not testifying as an expert today; correct?

1    A.    Correct.

2    Q.    Today, you're testifying as a summary witness; is that

3    correct?

4    A.    Yes.

5    Q.    Can you describe for the ladies and gentlemen of the jury

6    what you are here to do today?

7    A.    I'm here to summarize and explain financial data related to

8    Freddie Mae and Fannie Mac.

9    Q.    Your ability to summarize those documents for the ladies

10   and gentlemen of the jury, is that consistent with your skill as

11   a forensic accountant?

12   A.    It's consistent with my skill to summarize data and ensure

13   the accuracy of the data.

14   Q.    And why is that?

15   A.    My background is looking at large data sets, paying

16   attention to detail, and ensuring accuracy.

17   Q.    Now, you've described that you are going to be summarizing

18   financials and possibly public filings.  What types of

19   information are in -- what types of public filings are you going

20   to be summarizing for the jury?

21   A.    We reviewed the publicly available filings for both Freddie

22   Mae and Fannie Mac.  They're required to publish a 10-Q

23   quarterly and a 10-K annually that basically describes their

24   financial state and various financial details of the operations.

25   We also looked at some offering memoranda, some certificates of

1    designation, and we utilized a database called Bloomberg.

2    Q.   And where do those filings have to be filed?

3    A.   With the SEC, Securities and Exchange Commission.

4    Q.   Thank you so much.  As we go through the examination, I may

5    have you explain some of those acronyms that us Washington

6    people often use.  So thank you.

7         Now, what materials did you gather for -- in preparation

8    for your testimony today?

9    A.   I gathered the -- we created an index of spreadsheets that

10   summarize the data and then a PowerPoint -- in Excel and then a

11   PowerPoint presentation that graphically shows that data.

12   Q.   Okay.  Did you do it all by yourself?

13   A.   No.  I had a team working with me.

14   Q.   And what documents did you identify that needed to be

15   pulled for this particular case?

16   A.   Again, the publicly available filings, the 10-Ks, the 10-Qs

17   for both Fannie Mae, Freddie Mac, offering circulars,

18   certificates of designation, and information, statements from

19   Freddie Mac as well as information in the Bloomberg database.

20   Q.   Just for the benefit of the ladies and gentlemen of the

21   jury, can you tell us approximately how many documents you had

22   to analyze for purposes of summarizing here today?

23   A.   There were over 55,000 pages of documents.

24   Q.   Now, following your review of these voluminous documents,

25   did you produce anything?

1   A.   Yes.

2   Q.   What did you produce?

3   A.   We produced Excel spreadsheets and then a PowerPoint

4   presentation with graphical depictions of that underlying data.

5   Q.   Okay.  Now, what you have in front of you is a witness

6   binder that has what's been already marked and admitted PX-5A,

7   or Plaintiffs' 5A, and then Plaintiffs' 5C through 50.  If you

8   could just give a quick look to that to make sure that it's the

9   same as the Excel sheet that you prepared.

10      Is it the same as the Excel spreadsheet that you prepared

11   for this case?

12   A.   Yes, it is.

13   Q.   Okay.  At this time, we're going to just give a quick

14   preview to the jury of those exhibits.  So I would ask to

15   display 5C first.  And note these are spreadsheets that are

16   admitted evidence already into the record, and we just want to

17   quickly talk to the jury about how you gathered this

18   information.

19      So looking at 5C, which has previously been admitted, can

20   you tell the ladies and gentlemen of the jury what's depicted

21   here?

22   A.   This shows the dividends paid by Fannie Mae and Freddie Mac

23   to the shareholders from 1996 through 2008.

24   Q.   And what was the source of your information in order to be

25   able to provide this summary exhibit?

A.   The quarterly and annual publicly filed financial

statements and the annual report information statements for

Freddie Mac.

Q.   And how are you able to remember what information you

relied upon in order to prepare each one of these summary

exhibits, of which there are several?

A.   We always make notes at the bottom of the Excel spreadsheet

so we know where the data came from.

Q.   And that's what's depicted here as "sources and notes"?

A.   That's correct.

Q.   Okay.  Thank you.

Now we're going to quickly move to 5D.  Can you tell us

what's depicted here?

A.   This shows all of the series --

THE COURT:  That is what number?  5D?

MS. DAVIS:  Yes.

BY MS. DAVIS:

Q.   Can you tell us what's depicted here?

A.   This shows all the series of preferred stock for Fannie Mae

that were outstanding at the time of the conservatorship.

Q.   And your source here?

A.   These are also from the 10-Ks, the 10-Qs, and stock

offering circulars.

Q.   And just to cut down on confusion, I see at the top of your

document, of your Excel spreadsheet, there's a note that

1    says "Exhibit 3.A."

2        Can you tell us what that is?

3    A.   That's the number we used internally for our spreadsheets

4    to keep track of them.

5    Q.   And so that has no bearing on the litigation exhibits;

6    correct?

7    A.   Correct.

8    Q.   Okay.  Thank you.

9        Now, can we get 5E.  Tell us what's depicted here.

10   A.   This shows the various series of preferred stock that were

11   outstanding for Freddie Mac at the time of the conservatorship.

12              THE COURT:  What is being displayed?  5 what?

13              MS. DAVIS:  5E, as in Edward.

14              BY MS. DAVIS:

15   Q.   Okay.  5F, as in Frank, what is depicted here?

16   A.   This shows the amount of dividends paid for Fannie Mae

17   during the time period.

18   Q.   Okay.  5G, as in George?

19   A.   This shows the amount of dividends paid by Freddie Mac from

20   1997 through 2008.

21   Q.   And just -- if we could pull the exhibits up just a bit to

22   show the source there.

23       How did you source this document?

24   A.   This came from the Bloomberg database and also from the

25   publicly available filings.

1   Q.   Now, 5H is what I would like displayed next.

2      What is depicted here?

3   A.   This shows the combined cash dividends paid by both Fannie

4  Mae and Freddie Mac to the U.S. Treasury Department.

5   Q.   Okay.  And what year does that start?

6   A.   2008.

7   Q.   I'm showing you what's been previously admitted as 5I,

8  PX-5I.

9      What is this document?

10  A.   This shows again the total cash dividends paid by Fannie

11  Mae and Freddie Mac to the U.S. Treasury Department but reported

12  on a year-to-date basis.

13  Q.   Next, could you show 5J.

14     What's depicted here?

15  A.   This shows the amount that Fannie Mae drew down from the

16  Treasury commitment both quarterly and cumulatively during the

17  time period.

18  Q.   And is that organized by date?

19  A.   Yes, by quarter.

20  Q.   Okay.  Thank you.

21     5K -- Exhibit 5K, please.

22  A.   This shows the amount that Freddie Mac drew down both by

23  quarter and cumulatively on the Treasury commitment, shown by

24  quarter.

25  Q.   Just a few more here.

1          Exhibit PX-5L?

2     A.    This shows for Freddie Mae and Fannie Mac the change to the

3     liquidation preference for the Treasury over time by quarter.

4     Q.    And again, you and your team put together these Excel

5     spreadsheets; is that correct?

6     A.    That's correct.

7     Q.    PX-5M.

8     A.    This exhibit shows the total cash dividends paid by Fannie

9     Mae and Freddie Mac to Treasury and also the increases in the

10    liquidation preference by the amount of net worth as a

11    substitute for cash dividends.

12    Q.    And next, PX-5N, as in Nancy, what does this show?

13    A.    This shows for both Fannie Mae and Freddie Mac the amount

14    of comprehensive income those entities reported in their

15    publicly available filings.

16    Q.    And lastly, PX-5O.

17    A.    This shows the comprehensive income of Fannie Mae and

18    Freddie Mac reported on a year-to-date basis.

19    Q.    I want you to go back to your binder and look at Exhibits

20    PX-4A through PX-Y.

21          Having reviewed that, is this a static version of the

22    PowerPoint presentation that you prepared based on the

23    information that came from your Excel file that you've just

24    shown us?

25    A.    Yes, it is.

1          MS. DAVIS:  Your Honor, at this time plaintiffs would

2    like to present PX-4A through PX-4Y simply as a demonstrative at

3    this time.

4          THE COURT:  Any objection?

5          MR. STERN:  No objection, Your Honor.

6          THE COURT:  All right.  Proceed.

7          MS. DAVIS:  Thank you, Your Honor.

8          BY MS. DAVIS:

9    Q.   Again, just to be clear for the ladies and gentlemen of the

10   jury, the exhibits that we went through, now we can show them in

11   the pretty colors; is that right?

12   A.   That's correct.

13   Q.   All right.  So let's start with the first slide.  Can you

14   tell us what's depicted in this slide?

15   A.   This shows the amounts invested by private preferred

16   shareholders into Fannie Mae for all the series of preferred

17   stock that were in existence or outstanding at the time of the

18   conservatorship.

19   Q.   Okay.  Let's take a step back.  Can you tell us what

20   private preferred shareholders -- what did you mean when you

21   wrote that?

22   A.   Private means nongovernment.  Just individuals,

23   nongovernment entities that bought Fannie Mae preferred stock

24   shares.

25        Preferred means -- there's different types of stock.

```
 1   Preferred is a type of stock that has more rights than common
 2   stock, which is a different level of stock.
 3   Q.    And shareholders?
 4   A.    Shareholders means investors into Fannie Mae; they gave
 5   money to Fannie Mae in return for the preferred stock.
 6   Q.    Now we're going to look at each column in this exhibit.
 7   Okay?  So the first is the security type.  Can you tell us what
 8   that is?
 9   A.    That's the name of the specific series of preferred stock
10   in Fannie Mae.
11   Q.    And there's a security type for each of these stocks that
12   are issued; is that correct?
13   A.    That's correct.
14   Q.    Okay.  Next, can you tell us, what is the CUSIP?
15   A.    CUSIP is the unique identifying number for that specific
16   series of preferred stock.
17   Q.    And each one has a different identifier; is that correct?
18   A.    That's correct.
19   Q.    Ticker symbol, what is that?
20   A.    Ticker symbol, again, is a unique identifier for that
21   series of preferred stock.  If you wanted to look up where it
22   was trading or any information in the newspaper or on Yahoo!
23   Finance, the ticker symbol is what you would use.
24   Q.    Okay.  Now, next is the date of issuance.  What does that
25   tell us?
```

1    A.   That's the date that this particular series of preferred

2    stock was issued.

3    Q.   And last but not least, the amount invested, what is that

4    showing us?

5    A.   That shows, if we're looking at the top line, the total

6    amount that these investors paid into Fannie Mae in return for

7    preferred stock.  For the first line, that's $150 million.

8    Q.   So just so we're clear, as we start to talk about each --

9    as we start to talk about these different shares that have been

10   issued, the different series of shares that have been issued,

11   each one should have this information; is that correct?

12   A.   That's correct.

13   Q.   And that's true for Fannie Mae and for Freddie Mac; right?

14   A.   Yes.

15   Q.   Out of an abundance of caution, to be very, very clear,

16   that $150 million is what's invested into Fannie Mae when

17   somebody buys this Series D; is that right?

18   A.   That's the total amount for the series.

19   Q.   Total amount for all of the shareholders?

20   A.   Correct.

21   Q.   Okay.  I got it.

22        To be clear, you analyzed data for each one of these

23   series; is that right?

24   A.   Yes.

25             THE COURT:  In that Series D, then, in other words, a

1    number of certificates could be issued to different

2    shareholders?  It's not one shareholder; it could be a number of

3    shareholders?

4              THE WITNESS:  It's a number of shareholders.

5              THE COURT:  Stock certificates that have a Series D.

6              THE WITNESS:  That's correct.

7              THE COURT:  And so was -- how do you figure out --

8    what did the share cost?  They would vary all over the lot or

9    what?

10             THE WITNESS:  I think they're probably consistent.

11   People probably buy more than one share at a time.  They have an

12   offering memorandum that details the particulars of this series

13   of preferred stock and a certificate of designation.

14             THE COURT:  Repeat that so the jury can hear it into

15   the microphone.

16             THE WITNESS:  I'm sorry.  There's documentation

17   regarding each series of preferred stock.  There's an offering

18   memorandum.  There's something called a certificate of

19   designation which outlines the terms at which these investors

20   are buying a share or multiple shares of this series of

21   preferred stock.

22             MS. DAVIS:  In light of the Court's question, may I

23   have the Court's indulgence just a moment?

24             THE COURT:  Yes.

25             MS. DAVIS:  Thank you, Your Honor.

```
1              BY MS. DAVIS:
2     Q.   So to be clear, the amount that's invested by all of the
3     shareholders who buy this particular series is what's reflected
4     in the amount invested; correct?
5     A.   Correct.
6     Q.   Okay.  Now I want to draw your attention to the bottom of
7     the slide, the 19.130 billion.
8          Do you see that?
9     A.   Yes.
10    Q.   Okay.  What is that telling us?
11    A.   That shows, for all of the series of preferred stock
12    depicted here, all of the ones outstanding at the time of the
13    conservatorship, a total of $19.13 billion was invested into
14    Fannie Mae.
15    Q.   Okay.  And I'm going to direct --
16              THE COURT:  By preferred shareholders?
17              THE WITNESS:  By private preferred shareholders.
18              THE COURT:  Private preferred shareholders, okay.
19              BY MS. DAVIS:
20    Q.   And only into Fannie Mae is what we're looking at?
21    A.   Only Fannie Mae on this slide.
22    Q.   Okay.  Now we're going to go down and focus on the
23    series -- the different series that were issued in 2007 and
24    2008.
25         Do you see that?
```

```
 1   A.    Yes.

 2   Q.    We've kind of isolated it with a cute little box.  All

 3   right?

 4   A.    Yes.

 5   Q.    Now, how much was invested at that time?

 6   A.    $11.13 billion.

 7   Q.    And what percentage of the total of amount invested in

 8   Fannie Mae by this group of shareholders, how much of that is a

 9   percentage of the total?

10   A.    58 percent of the total of $19.13 billion was invested in

11   2007 and 2008.

12   Q.    Okay.  Thank you.

13         Now I'm taking you to the next slide, which is technically

14   4C.  Tell us what this slide shows.

15   A.    This slide shows the series of preferred stocks into

16   Freddie Mac that were outstanding at the time of the

17   conservatorship.

18   Q.    And do the columns tell us the same thing about the

19   information that's given for each series?

20   A.    Yes.

21   Q.    So for instance, here, the first one, 5.1 percent preferred

22   stock, due 12/31/2049, even though it doesn't say "series," it

23   is in fact a group of shares --

24              MR. STERN:  Objection; leading, Your Honor.

25              THE COURT:  I didn't hear you.
```

1          MR. STERN:  I'm sorry.  Objection to leading, Your

2     Honor.

3          THE COURT:  Overruled.

4          BY MS. DAVIS:

5     Q.   It is, in fact, one of the series of shares that are

6     offered for the shareholders; is that correct?

7     A.   Correct.

8     Q.   Okay.  The information is the same as to the CUSIP?

9     A.   Yes.

10    Q.   The ticker symbol?

11    A.   Yes.

12    Q.   Date of issuance?

13    A.   Yes.

14    Q.   And the amount invested?

15         MR. STERN:  Same objection for leading, Your Honor.

16    It's direct examination.

17         THE COURT:  Overruled.

18         THE WITNESS:  Yes.

19         BY MS. DAVIS:

20    Q.   You said that this was the amount -- these were shares or

21    series that were outstanding.  What do you mean by that?

22    A.   I mean that the shareholders still held this preferred

23    stock.

24    Q.   Now I want to direct your attention to the bottom, to the

25    $14.109 billion.  Can you tell us what that number refers to?

1    A.    The 14.109 billion is the total amount for these designated

2    series of preferred stock that was invested into Freddie Mac.

3    Q.    And then I'm directing your attention to 2007 in

4    particular.  What was the amount there?

5    A.    $8.6 billion was invested in 2007.

6    Q.    And that was what percentage of the total amount invested?

7    A.    The 8.6 billion was 61 percent of the 14.109 billion.

8    Q.    Okay.  So for both Fannie Mae and Freddie Mac, how much

9    total were invested by shareholders?

10   A.    The total of both Fannie Mae and Freddie Mac private

11   preferred shareholder investment was $33.2 billion.

12   Q.    Just to be clear, that's for the shares that are

13   outstanding; is that correct?

14   A.    That's correct.

15   Q.    And of that, how much came from shareholders who invested

16   in 2007 and 2008?

17   A.    $19.7 billion.

18   Q.    And you calculated how much those investors actually

19   received in dividends, didn't you?

20   A.    Yes.

21   Q.    And what did you find, those 2007 through 2008?

22   A.    The total dividends that were paid to the private --

23        MR. STERN:  Your Honor, may I be heard on the phone?

24        THE COURT:  Yes.

25        (Bench conference.)

1          MR. STERN:  I have a slightly different kind of

2     leading objection.  And that is, the question is being asked,

3     and the answer is being put on the screen before the testimony

4     has come from the witness.

5          So in other words, the question was, What was the total

6     amount invested by private preferred shareholders?  And before

7     the witness answered the question, 19.7 billion came up on the

8     screen, which tells the witness what the answer is.  I have no

9     objection to the demonstrative, but the information could come

10    in an answer to a question before it's flashed on the screen.

11         THE COURT:  I agree.  We can't do anything about this

12    now, but the next one, you can do.

13         (End of bench conference.)

14         BY MS. DAVIS:

15    Q.   You indicated that the dividend -- just to reorient us, the

16    dividend is at 1.1 billion; is that correct?

17    A.   Yes.

18    Q.   What do you mean by dividend?  When you wrote dividend,

19    what did you mean?

20    A.   Dividends are the amount the preferred shareholders receive

21    as a return on their investment into the entities.

22    Q.   Next we're going to talk about certificates of designation.

23    Can you tell us what a certificate of designation is?

24    A.   The certificate of designation outlines the terms between

25    the investors and the entities for their purchase of the

```
 1   preferred stock.
 2   Q.   How many certificates of designation did you examine in
 3   this case?
 4   A.   40.
 5   Q.   Did you review all of them?
 6   A.   Yes.
 7              THE COURT:  What was your answer?
 8              THE WITNESS:  Yes.
 9              THE COURT:  The answer to the question before.  How
10   many did you examine?
11              THE WITNESS:  I couldn't hear.
12              MS. DAVIS:  I can ask it again, Your Honor.
13              BY MS. DAVIS:
14   Q.   How many certificates of designation did you examine for
15   this case?
16   A.   40.
17              THE COURT:  40, okay.
18              BY MS. DAVIS:
19   Q.   I'm handing you what's been premarked for identification,
20   and pre-admitted, PX-11 through PX-140.
21              COURT REPORTER:  PX-11 through PX-140?
22              MS. DAVIS:  It's labeled PX-11 through PX-140, a
23   series.
24              MR. STERN:  Your Honor, for the record, it's 1-1.
25              MS. DAVIS:  Correct.
```

1      BY MS. DAVIS:

2   Q.   Ms. Hartman, do you recognize those documents?

3   A.   Yes, I do.

4   Q.   What are they?

5   A.   Certificates of designation for Fannie Mae and Freddie Mac.

6   Q.   So we're going to go back to the first slide that we looked

7   at that listed all of the outstanding private preferred

8   shareholders for Fannie Mae.

9        Do you see that on your screen?

10  A.   Yes.

11  Q.   And I'm going to direct your attention to PX-1-26 there in

12  your pile.

13       Do you see it?

14  A.   Yes.

15  Q.   So would this be the certificate of designation that each

16  buyer of these shares in this first series, Series D -- is this

17  the certificate of designation that they would have received?

18  A.   Yes.

19  Q.   So for each of the series for Fannie Mae that are

20  outstanding, would there be a certificate of designation

21  assigned to them?

22  A.   Yes.

23  Q.   Upon reviewing those certificates of designation, all 40,

24  did you find that each of them was the same?

25  A.   No.

1  Q.   What can you tell us about those terms?

2  A.   Certain terms were different, percentage of the dividend

3  payment, various other things, but the underlying terms were

4  consistent.

5  Q.   So now we're going to do something a little different.  The

6  parties to this case, the plaintiffs and defendants, have agreed

7  to stipulate to certain undisputed facts about these

8  certificates of designation.  At this time, I would like to

9  direct your attention to JX-1, the joint stipulation of facts

10  that's already in evidence.  Your Honor has already admitted it.

11          THE COURT:  All right.

12          BY MS. DAVIS:

13  Q.   I'm going to direct you to paragraph 7.  Could you read

14  that paragraph for the ladies and gentlemen of the jury.

15  A.   "Each of the series of shares, which plaintiffs hold and

16  are at issue in this case -- all of the junior preferred shares

17  issued by both of the enterprises and common shares issued by

18  Freddie Mac -- are governed by documents called certificates of

19  designation.  Each of these certificates of designation entitle

20  the shareholders to the payment of dividends if declared by the

21  boards of the respective enterprises.  The certificates of

22  designation do not require the board of either enterprise to

23  declare dividends.  The preferred stock dividends, if declared

24  by the enterprises' board of directors, are calculated based on

25  a percentage of the stock's face value.  If the board of either

enterprise declares a dividend, the certificates of designation

establish an order in which the dividends on the various series

must be paid.  All dividends must be paid to all preferred

shareholders before any dividends are paid on any common shares.

The certificates of designation also provide an order in which

the holders of the various series of shares may share in any

distribution of assets upon liquidation of the enterprise."

Q.   To be clear, the enterprises that are referred to here are

what enterprises?

A.   Fannie Mae and Freddie Mac.

Q.   Please display slide 6.

     Can you describe for the ladies and gentlemen of the jury

what's shown here in slide 6.

A.   This slide shows that dividends were paid to the private

shareholders in Fannie Mae every quarter from 1997 through the

third quarter of 2008.

Q.   Now, what did you investigate, whether with Fannie Mae or

Freddie Mac, to find out if in fact they did pay those dividends

to shareholders?

A.   We used the Bloomberg database.

Q.   And can you tell us why you used the Bloomberg database?

A.   It goes back farther in time than some of the filings, and

it's a reliable source that people use for investor information.

Q.   Okay.  Now, to be clear, you said that this chart reflects

dividends paid to private shareholders.  Is that common or

1    preferred?

2    A.   Common.

3    Q.   And why did you examine common shareholders for this

4    purpose?

5    A.   That's what was available, and if the common shareholders

6    were paid based on the stipulation we just read, the preferred

7    shareholders had to also have received dividends.

8    Q.   So finding the information about the common shareholders

9    told you what about the preferred shareholders' dividends?

10   A.   That the preferred shareholders also received dividends for

11   each of the quarters displayed here.

12   Q.   Now moving us to the next slide, which for the record is

13   PX-4H, what does this slide show?

14   A.   This slide shows that the private shareholders in Freddie

15   Mac received dividends every quarter from 1989 through the

16   second quarter of 2008.

17   Q.   Okay.  And was that every quarter?

18   A.   Every quarter.

19   Q.   Were there any quarters missing when you were doing your

20   research?

21   A.   No.

22            THE COURT:  Freddie Mac didn't become a public company

23   until '89; is that right?

24            THE WITNESS:  That's correct.

25            THE COURT:  They're Johnny Come Lately in terms of the

1    two companies.

2            BY MS. DAVIS:

3    Q.   Again, is this showing us dividends for preferred

4    shareholders or for common shareholders?

5    A.   Common.

6    Q.   And so what does this tell us about what was paid to

7    preferred shareholders?

8    A.   As long as the common shareholders were paid dividends,

9    which they were, the preferred shareholders had to have received

10   dividends as well.

11   Q.   And this slide and the previous one, when does this

12   information end?  When does it end in terms of what you're

13   showing us?

14   A.   This slide goes through the second quarter of 2008.

15   Q.   And back to the Fannie Mae slide --

16   A.   I believe that was through the third quarter of 2008.

17   Q.   What have these private shareholders received since 2008 --

18   since the last quarter -- the third quarter of 2008 for Fannie

19   Mae and the second quarter of 2008 for Freddie Mac?

20   A.   They've received nothing since then.

21   Q.   So that would be zero?

22   A.   That means zero.

23           MS. DAVIS:  Court's indulgence.

24           BY MS. DAVIS:

25   Q.   I have just one point of clarity, and then we will be ready

 1   to take that break until tomorrow.

 2         Just to be clear on the Fannie Mae slide for dividends,

 3   what's the start date for that slide?

 4   A.   The first quarter of 1977.

 5   Q.   And again, this was pulled from Bloomberg; correct?

 6   A.   Correct.

 7         MS. DAVIS:  Thank you so much.  We will be ready to

 8   start again tomorrow.  Thank you, Your Honor.

 9         THE COURT:  We will see you all at 10:00 tomorrow.

10   Don't talk about the case.  Don't let anyone talk to you about

11   the case.  Have a nice evening.  We will start at 10:00

12   tomorrow.  Probably just take your notes with you and leave them

13   in the jury room.  It would be easier to make sure nobody gets

14   access to them.

15         (Jury exited courtroom.)

16         THE COURT:  You can step down.

17         THE WITNESS:  Thank you.

18         THE COURT:  If you all don't have anything else to

19   raise, you all have shared with each other who is the next

20   witness.  You haven't shared it with me.  So share it with me.

21         MR. RUDY:  Your Honor, I would anticipate -- this is

22   Lee Rudy for plaintiffs.

23         THE COURT:  I'm sorry?

24         MR. RUDY:  Lee Rudy for plaintiffs.  I'm not the next

25   witness.

1    I would anticipate that after this witness we would be

2  hearing from Michelle Miller, who is one of the class

3  representatives; Timothy Cassell, who is another one of the

4  class representatives; and be showing a short video of

5  Mr. Cacciapalle's deposition, who is the third and final class

6  representative who will be testifying.  Those are all relatively

7  short examinations that would begin after Ms. Hartman finishes.

8         THE COURT:  And then where do you go?

9         MR. RUDY:  I'm not sure.  If I could confer with my

10  team.

11         THE COURT:  You all can be seated in the audience.

12         MR. HUME:  Hamish Hume for the plaintiffs, Your Honor.

13    In addition to what Mr. Rudy said, Mr. Linekin for the

14  Berkley Plaintiffs will testify tomorrow.

15         THE COURT:  Who is he?

16         MR. HUME:  He's the party representative for the

17  Berkley Insurance plaintiff and the person with personal

18  knowledge of their investment.

19    The other testimony tomorrow, time permitting, would all be

20  by deposition, and there are a couple of potentials on that, but

21  they're all deposition.

22         THE COURT:  Okay.  Anything you all want to raise

23  tonight?

24         MR. HUME:  Well, just to preview, our plan, and we've

25  discussed this with defense counsel, is for Mr. DeMarco to

```
 1   appear Thursday morning.  And we have -- we did make an
 2   arrangement to resolve the issue of the examination by
 3   defendants.  That agreement is they will have four hours on the
 4   record in cross, regardless of how long we take.  I do not
 5   anticipate that ours will go that long.  And there will be no
 6   scope objections.
 7            THE COURT:  Okay.
 8            MR. HUME:  I will ask presumably to reserve for
 9   redirect or recross, whatever you want to call it.  Thank you.
10            THE COURT:  Okay.  Thank you.
11        Anything else you all want to raise?
12            MR. STERN:  Not for the defendants.  Thank you.
13            THE COURT:  Mr. Rudy can't resist.
14            MR. RUDY:  You're right, Your Honor.  I think the
15   plaintiffs are going to be asking you for an instruction, and I
16   can't specify it right now.  I'm going to try to work with
17   defendants to come to an agreed instruction.
18        But in light of the plaintiffs' testimony that you're going
19   to be hearing and the fact that Your Honor has ruled to truncate
20   that testimony, I think it would be reasonable for the jury to
21   understand that they're not allowed to say certain things and
22   that their testimony will be truncated by order of the Court,
23   not because -- I would love to ask them, What did you think was
24   going to happen?  Did you ever expect the Third Amendment?  Did
25   you ever think you'd lose your dividends?
```

1         I know I can't do that.

2               THE COURT:  See if you all can't agree on some

3    wording.

4               MR. RUDY:  And if not, I will present it tomorrow

5    morning.  Thank you.

6               THE COURT:  I will see you all tomorrow.

7         (Proceedings adjourned at 5:03 p.m.)

8

9    - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

10

11               CERTIFICATE OF OFFICIAL COURT REPORTER

12

13         I, Sara A. Wick, certify that the foregoing is a

14   correct transcript from the record of proceedings in the

15   above-entitled matter.

16

17

18   /s/ Sara A. Wick                    October 19, 2022

19   SIGNATURE OF COURT REPORTER         DATE

20

21

22

23

24

25

**$**

**$1,000** [2] - 332:21, 335:1
**$10** [1] - 355:19
**$100** [16] - 332:25, 334:24, 339:4, 350:21, 352:3, 352:19, 353:5, 353:17, 354:3, 354:4, 354:5, 355:19, 359:7, 360:20, 360:22
**$11.13** [1] - 392:6
**$14.109** [1] - 393:25
**$150** [2] - 389:7, 389:16
**$160,000** [1] - 328:12
**$19** [1] - 371:3
**$19.13** [2] - 391:13, 392:10
**$200** [9] - 332:16, 332:18, 332:20, 351:1, 353:6, 353:20, 355:23, 359:3, 364:6
**$200,000** [1] - 328:12
**$40,000** [1] - 328:19
**$400** [2] - 359:11, 364:6

**'**

**'89** [1] - 400:23

**/**

**/s** [1] - 405:18

**1**

**1** [9] - 326:5, 326:13, 326:14, 326:18, 326:19, 345:24, 352:2, 355:19
**1-1** [1] - 396:24
**1-40** [1] - 377:20
**1-40............................
..........** [1] - 319:10
**1.1** [1] - 395:16
**10** [17] - 352:20, 354:2, 354:7, 354:17, 354:23, 355:1, 355:17, 360:24, 361:1, 361:2, 361:8, 361:14, 361:22, 361:24, 362:17, 369:23, 370:15
**10-K** [2] - 348:22, 380:23

**10-Ks** [2] - 381:16, 383:22
**10-Q** [1] - 380:22
**10-Qs** [2] - 381:16, 383:22
**100** [1] - 353:1
**10020** [1] - 318:4
**10:00** [2] - 402:9, 402:11
**11** [1] - 348:10
**116.1** [2] - 360:7, 360:16
**12** [3] - 349:18, 366:4, 366:5
**12/31/2049** [1] - 392:22
**1251** [1] - 318:3
**13** [1] - 352:15
**13-cv-1053** [1] - 317:5
**13-mc-1288** [1] - 317:8
**14** [1] - 352:23
**14.109** [2] - 394:1, 394:7
**140** [2] - 377:12, 377:16
**1401** [1] - 317:22
**15** [3] - 337:8, 359:5, 360:4
**1523** [1] - 317:16
**17** [1] - 364:4
**17th** [2] - 325:8, 347:16
**18** [3] - 317:10, 367:3, 367:4
**19** [2] - 371:13, 405:18
**19.130** [1] - 391:7
**19.7** [2] - 394:17, 395:7
**19087** [1] - 317:19
**1938** [1] - 325:23
**1970** [1] - 325:24
**1977** [1] - 402:4
**1989** [1] - 400:15
**1996** [1] - 382:23
**1997** [2] - 384:20, 399:15

**2**

**2** [3] - 320:20, 320:21, 328:3
**20/20** [1] - 366:14
**200** [2] - 359:8
**20001** [2] - 318:9, 318:13
**20005** [1] - 317:23
**2000s** [1] - 338:9
**20036** [1] - 317:17
**2006** [1] - 338:7
**2007** [11] - 337:8,

337:10, 360:20, 360:21, 364:24, 391:23, 392:11, 394:3, 394:5, 394:16, 394:21
**2008** [51] - 325:6, 328:1, 337:11, 337:20, 337:24, 338:1, 339:3, 340:4, 340:13, 340:16, 340:18, 340:20, 341:3, 342:23, 343:4, 343:8, 343:20, 344:4, 345:15, 345:24, 347:13, 347:18, 348:19, 348:22, 349:17, 349:25, 354:19, 357:21, 358:8, 358:12, 360:1, 360:6, 362:23, 364:24, 366:23, 368:13, 374:12, 382:23, 384:20, 385:6, 391:24, 392:11, 394:16, 394:21, 399:16, 400:16, 401:14, 401:16, 401:17, 401:18, 401:19
**2009** [7] - 323:2, 354:9, 358:25, 359:5, 359:6, 359:13, 362:3
**2010** [2] - 356:6, 362:3
**2011** [5] - 362:3, 362:4, 371:18, 371:20
**2012** [21] - 325:8, 328:1, 347:16, 359:18, 359:21, 360:6, 360:19, 360:20, 360:21, 362:8, 362:14, 362:18, 363:15, 364:4, 364:9, 365:10, 366:3, 366:11, 366:16, 366:18, 367:7
**2013** [1] - 323:2
**2017** [1] - 366:15
**2019** [1] - 366:15
**202-354-3284** [1] - 318:14
**2022** [3] - 317:10, 366:15, 405:18
**22** [1] - 375:7
**222** [1] - 319:13
**223** [1] - 378:11

**223............................
..........** [1] - 319:13
**24** [1] - 359:13
**26** [1] - 362:6
**280** [1] - 317:19
**2:19** [1] - 317:10

**3**

**3** [1] - 329:6
**3.5** [1] - 354:11
**3.A** [1] - 384:1
**30** [1] - 340:16
**30th** [1] - 340:13
**31** [2] - 359:21, 364:9
**31st** [2] - 359:18, 362:8
**321** [1] - 319:4
**33.2** [2] - 343:19, 394:11
**333** [1] - 318:12
**34.2** [1] - 354:9
**377** [3] - 319:10, 319:10, 319:11
**378** [5] - 319:7, 319:11, 319:12, 319:12, 319:13

**4**

**40** [5] - 377:16, 396:4, 396:16, 396:17, 397:23
**400** [1] - 359:8
**4704-B** [1] - 318:13
**4:00** [1] - 376:25
**4:20** [1] - 376:25
**4C** [1] - 392:14

**5**

**5** [2] - 341:5, 384:12
**5.1** [1] - 392:21
**50** [1] - 382:7
**55,000** [1] - 381:23
**58** [1] - 392:10
**5:00** [2] - 320:18, 376:22
**5:03** [1] - 405:7
**5A** [1] - 382:7
**5C** [5] - 319:12, 378:7, 382:7, 382:15, 382:19
**5D** [2] - 383:12, 383:15
**5E** [2] - 384:9, 384:13
**5F** [1] - 384:15
**5G** [1] - 384:18
**5H** [1] - 385:1
**5I** [1] - 385:7
**5J** [1] - 385:13

**5K** [2] - 385:21

**6**

**6** [6] - 344:4, 349:25, 359:4, 359:6, 399:11, 399:13
**601** [1] - 318:8
**61** [1] - 394:7

**7**

**7** [5] - 344:24, 347:13, 347:18, 352:17, 398:13
**71.3** [1] - 360:17
**7th** [1] - 347:6

**8**

**8** [1] - 347:4
**8.6** [2] - 394:5, 394:7

**A**

**ability** [3] - 336:1, 336:3, 380:9
**able** [10] - 330:7, 339:11, 341:15, 351:4, 356:25, 367:18, 375:10, 375:13, 382:25, 383:4
**above-entitled** [1] - 405:15
**absolute** [3] - 336:12, 336:16, 375:3
**absolutely** [2] - 321:12, 357:18
**abundance** [1] - 389:15
**access** [2] - 327:18, 402:14
**accessible** [1] - 330:5
**accident** [1] - 326:13
**accomplish** [2] - 350:16, 350:17
**accordingly** [1] - 371:21
**accountant** [1] - 355:7, 379:10, 380:11
**accountants** [1] - 343:10
**accounting** [3] - 355:5, 355:10, 363:7
**accumulating** [1] - 330:24
**accuracy** [2] - 380:13, 380:16

**acknowledging** [1] - 321:8
**acronyms** [1] - 381:5
**act** [6] - 322:4, 322:12, 344:15, 346:8, 346:18, 369:11
**Act** [6] - 340:18, 340:20, 341:3, 344:14, 344:16, 351:9
**acted** [3] - 322:14, 373:3, 373:9
**acting** [4] - 323:2, 359:14, 369:8, 375:12
**ACTION** [1] - 317:9
**action** [11] - 321:25, 322:1, 322:2, 322:7, 322:16, 327:1, 345:1, 345:5, 362:20, 374:21
**actions** [10] - 324:25, 344:22, 345:25, 358:18, 358:20, 358:21, 362:25, 363:1, 368:20, 375:13
**actual** [2] - 328:20, 356:10
**addition** [3] - 348:11, 355:23, 403:13
**additional** [1] - 371:23
**adjourned** [1] - 405:7
**administrations** [1] - 323:5
**admit** [1] - 377:4
**admitted** [6] - 382:6, 382:16, 382:19, 385:7, 396:20, 398:10
**advised** [1] - 371:16
**affairs** [1] - 342:1
**afford** [1] - 357:2, 369:1, 375:22
**affordable** [4] - 327:13, 327:18, 330:4, 341:13
**afraid** [1] - 339:7
**AFTERNOON** [1] - 317:12
**afternoon** [6] - 320:24, 321:2, 324:22, 377:2, 378:24, 378:25
**agency** [3] - 345:1, 345:2, 348:25
**AGENCY** [1] - 317:6
**Agency** [1] - 318:5
**agenda** [1] - 323:21
**ago** [3] - 325:6, 337:8,

348:1
**agree** [4] - 321:12, 347:23, 395:11, 405:2
**agreed** [14] - 321:24, 322:5, 322:15, 352:18, 356:7, 356:18, 356:22, 356:24, 359:16, 373:9, 374:23, 377:8, 398:6, 404:17
**agreeing** [3] - 369:7, 372:25, 373:2
**AGREEMENT** [1] - 317:9
**agreement** [11] - 324:17, 325:22, 334:20, 335:3, 335:9, 336:14, 346:13, 346:17, 357:22, 358:4, 404:3
**agreements** [4] - 351:20, 351:22, 352:13, 357:20
**agrees** [1] - 357:16
**ahead** [2] - 322:6, 350:15
**aided** [1] - 318:15
**AIG** [1] - 337:16
**al** [2] - 317:3, 317:6
**allowed** [1] - 404:21
**allowing** [1] - 353:15
**allows** [1] - 327:12
**alone** [2] - 339:3, 354:10
**altogether** [2] - 371:12, 372:6
**amended** [4] - 358:25, 359:4, 359:6, 359:9
**Amendment** [35] - 321:24, 322:6, 322:15, 322:22, 323:8, 325:7, 336:2, 336:6, 343:21, 347:16, 354:24, 357:17, 357:18, 359:15, 362:18, 362:19, 363:12, 369:7, 369:15, 369:16, 369:17, 369:19, 370:4, 370:21, 371:1, 371:8, 372:3, 372:25, 373:2, 373:10, 374:24, 404:24
**amendments** [1] - 359:1
**American** [15] - 322:2, 323:23, 351:15,

351:16, 353:22, 354:12, 356:1, 356:12, 356:14, 357:1, 362:2, 362:15, 366:24, 368:3, 375:25
**Americans** [3] - 327:13, 330:5, 362:6
**Americas** [1] - 318:3
**amount** [30] - 328:20, 333:2, 339:4, 354:2, 354:6, 355:18, 356:8, 359:2, 361:18, 366:10, 384:16, 384:19, 385:15, 385:22, 386:10, 386:13, 389:3, 389:6, 389:18, 389:19, 391:2, 391:4, 392:7, 393:14, 393:20, 394:1, 394:4, 394:6, 395:6, 395:20
**amounts** [1] - 387:15
**analyze** [1] - 381:22
**analyzed** [2] - 368:23, 375:19, 389:22
**announced** [1] - 352:22
**annual** [4] - 367:16, 367:23, 383:1, 383:2
**annually** [1] - 380:23
**answer** [7] - 324:20, 324:21, 395:3, 395:8, 395:10, 396:7, 396:9
**answered** [1] - 395:7
**answers** [3] - 342:13, 342:20
**anticipate** [3] - 402:21, 403:1, 404:5
**anyway** [1] - 320:19
**apologize** [3] - 320:5, 320:7, 341:21
**appear** [1] - 404:1
**APPEARANCES** [2] - 317:14, 318:1
**appropriate** [1] - 377:5
**arguments** [3] - 321:17, 365:18, 376:16
**Arnold** [1] - 318:8
**arrangement** [1] - 404:2
**ASIM** [1] - 318:6
**assets** [3] - 343:14, 355:5, 399:7
**assigned** [1] - 397:21
**assumed** [1] - 344:7

**attention** [12] - 321:19, 321:20, 365:18, 365:20, 376:12, 376:13, 380:16, 391:6, 393:24, 394:3, 397:11, 398:9
**attentive** [1] - 321:17
**audience** [1] - 403:11
**August** [8] - 325:8, 343:4, 347:16, 360:6, 362:18, 363:15, 364:4, 367:7
**authorization** [1] - 342:2
**authorized** [2] - 343:25, 344:15
**available** [14] - 327:13, 341:13, 350:21, 351:2, 353:5, 355:22, 356:2, 356:4, 356:13, 380:21, 381:16, 384:25, 386:15, 400:5
**Avenue** [5] - 317:16, 317:22, 318:3, 318:8, 318:12
**awful** [1] - 321:9

# B

**backed** [11] - 331:4, 331:8, 331:9, 331:14, 331:19, 332:2, 332:7, 332:19, 333:19, 338:23, 353:9
**background** [1] - 380:15
**bad** [5] - 339:7, 342:25, 343:12, 366:5, 368:10
**bag** [1] - 331:8
**balance** [1] - 369:2
**ball** [2] - 347:14, 365:15
**bank** [30] - 328:5, 328:6, 328:8, 328:11, 328:12, 328:15, 328:16, 328:17, 329:11, 329:12, 329:13, 329:14, 329:15, 329:17, 329:19, 329:20, 329:21, 329:25, 330:3, 330:8, 330:10, 330:14, 331:4, 331:7, 331:23,

332:10, 332:16, 349:13, 351:1
**bank-looking** [1] - 328:5
**banks** [11] - 327:21, 330:23, 337:9, 337:20, 338:13, 338:14, 339:10, 339:12, 339:13, 339:15, 339:18
**BARNES** [1] - 317:15
**based** [11] - 354:10, 355:20, 361:8, 361:18, 373:5, 375:21, 379:13, 379:16, 386:22, 398:24, 400:6
**basis** [2] - 385:12, 386:18
**Bear** [1] - 337:16
**bearing** [1] - 384:5
**became** [11] - 342:23, 344:5, 344:14, 344:17, 345:17, 345:18, 346:14, 346:15, 352:12, 359:21, 361:12
**become** [4] - 334:16, 334:19, 335:5, 400:22
**becoming** [1] - 358:23
**BEFORE** [2] - 317:1, 317:12
**begin** [2] - 321:8, 403:7
**begun** [1] - 337:10
**behind** [2] - 337:24, 353:7
**believes** [1] - 371:21
**Bench** [1] - 394:25
**bench** [1] - 395:13
**benefit** [3] - 345:21, 357:1, 381:20
**Benson** [1] - 365:11
**Benson's** [2] - 365:22, 367:8
**Berger** [1] - 318:2
**BERGMAN** [1] - 318:6
**Berkley** [3] - 317:15, 403:14, 403:17
**Bernstein** [1] - 318:2
**best** [11] - 323:23, 333:10, 344:16, 344:23, 345:2, 345:4, 345:5, 345:22, 345:25, 358:22, 363:3
**better** [3] - 355:6, 363:16, 367:10
**between** [4] - 335:10,

340:18, 355:15, 395:24
**beyond** [2] - 344:20, 344:21
**big** [8] - 331:8, 336:22, 337:14, 337:17, 338:4, 339:13, 367:11
**billion** [43] - 339:4, 343:19, 350:21, 351:2, 352:3, 352:19, 353:1, 353:5, 353:6, 353:17, 353:20, 354:3, 354:4, 354:5, 354:9, 354:11, 355:23, 359:3, 359:7, 359:8, 359:11, 360:7, 360:16, 360:17, 360:20, 360:22, 364:6, 391:7, 391:13, 392:6, 392:10, 393:25, 394:1, 394:5, 394:7, 394:11, 394:17, 395:7, 395:16
**billions** [5] - 337:21, 356:13, 356:15, 364:3
**binder** [2] - 382:6, 386:19
**bit** [5] - 330:21, 341:23, 347:21, 372:12, 384:21
**black** [3] - 360:11, 360:12, 360:14
**blank** [1] - 345:9
**bleeding** [1] - 347:2
**Bloomberg** [6] - 381:1, 381:19, 384:24, 399:20, 399:21, 402:5
**board** [7] - 347:5, 373:25, 374:4, 374:6, 398:22, 398:24, 398:25
**boards** [2] - 344:8, 398:21
**Boies** [1] - 317:22
**books** [1] - 337:25
**borrower** [5] - 328:5, 328:11, 331:21, 332:14, 332:15
**borrower/ homeowner** [1] - 330:2
**borrowers** [1] - 339:1
**borrowing** [3] - 361:5, 361:17, 361:19

**bottom** [4] - 328:10, 383:7, 391:6, 393:24
**bought** [7] - 330:9, 331:3, 337:22, 338:9, 353:9, 373:15, 387:23
**box** [1] - 392:2
**breach** [1] - 372:23
**break** [6] - 320:15, 328:2, 329:5, 330:21, 373:7, 402:1
**BRIAN** [1] - 317:15
**bridge** [1] - 327:11
**brief** [1] - 342:10
**briefly** [1] - 376:2
**bring** [3] - 339:17, 355:6, 364:17
**brings** [1] - 362:18
**Britney** [1] - 341:25
**broke** [1] - 353:14
**Brothers** [1] - 337:16
**brutal** [1] - 366:1
**bundle** [1] - 331:3
**burden** [4] - 324:3, 324:5, 375:10, 375:13
**business** [7] - 330:17, 330:18, 338:23, 341:10, 342:3, 344:10, 368:8
**businesses** [5] - 337:13, 337:14, 339:19, 339:20
**buy** [30] - 327:12, 327:20, 328:6, 328:7, 328:12, 328:13, 329:2, 329:23, 330:2, 330:6, 331:13, 331:18, 332:8, 334:1, 334:2, 334:23, 334:24, 335:4, 335:5, 335:17, 335:20, 335:21, 335:24, 336:24, 339:11, 349:2, 351:12, 373:23, 390:11, 391:3
**buyer** [3] - 328:4, 330:12, 397:16
**buyers** [2] - 327:18, 333:19
**buying** [5] - 329:18, 330:8, 334:3, 374:8, 390:20
**buys** [5] - 334:17, 334:18, 346:12, 352:6, 389:17
**BY** [16] - 378:23,

379:23, 383:17, 384:14, 387:8, 391:1, 391:19, 393:4, 393:19, 395:14, 396:13, 396:18, 397:1, 398:12, 401:2, 401:24

## C

**Cacciapalle's** [1] - 403:5
**calculated** [2] - 394:18, 398:24
**calendar** [1] - 371:18
**cap** [5] - 359:16, 359:18, 359:20, 362:8, 364:9
**capital** [1] - 347:8
**car** [3] - 334:24, 334:25, 335:1
**card** [1] - 361:5
**careful** [1] - 366:20
**carefully** [1] - 365:17
**carry** [3] - 323:18, 323:19, 327:16
**case** [43] - 321:5, 321:21, 321:23, 322:10, 324:1, 324:9, 324:10, 324:12, 324:15, 324:20, 325:4, 325:5, 332:7, 333:6, 333:17, 335:9, 335:10, 335:25, 336:14, 339:23, 341:8, 341:18, 341:24, 344:13, 346:14, 347:11, 354:18, 362:21, 368:6, 368:9, 368:18, 376:5, 376:10, 376:14, 381:15, 382:11, 396:3, 396:15, 398:6, 398:16, 402:10, 402:11
**Case** [2] - 317:5, 317:8
**case-in-chief** [1] - 324:9
**cash** [5] - 370:8, 385:3, 385:10, 386:8, 386:11
**Cassell** [1] - 403:3
**causes** [1] - 338:4
**caution** [1] - 389:15
**certain** [4] - 370:22, 398:2, 398:7, 404:21

**certificate** [13] - 335:13, 348:8, 373:20, 373:21, 373:23, 377:14, 390:13, 390:18, 395:23, 395:24, 397:15, 397:17, 397:20
**CERTIFICATE** [1] - 405:11
**certificates** [20] - 348:6, 348:9, 373:22, 375:3, 377:17, 380:25, 381:18, 390:1, 390:5, 395:22, 396:2, 396:14, 397:5, 397:23, 398:8, 398:18, 398:19, 398:21, 399:1, 399:5
**certified** [2] - 379:10
**certify** [1] - 405:13
**challenging** [2] - 362:21, 362:22
**chance** [1] - 364:19
**change** [1] - 386:2
**changed** [1] - 369:18
**changes** [1] - 367:14
**charge** [5] - 323:7, 327:23, 341:25, 357:1, 357:4
**chart** [1] - 399:24
**charters** [7] - 326:4, 326:6, 326:9, 326:11, 326:17, 329:7, 345:17
**Check** [1] - 317:18
**chief** [2] - 324:9, 355:7
**Christmas** [1] - 359:13
**circular** [15] - 361:11, 364:1, 364:12, 365:23, 367:20, 367:25, 369:4, 369:14, 369:17, 369:20, 370:3, 370:18, 375:16, 375:23
**circulars** [2] - 381:17, 383:23
**claim** [10] - 346:5, 358:10, 358:18, 362:21, 362:25, 372:10, 372:12, 372:21, 372:24, 373:2
**clarity** [1] - 401:25
**CLASS** [1] - 317:9
**class** [3] - 403:2, 403:4, 403:5

**Class** [1] - 317:18
**clear** [23] - 327:1, 331:11, 338:3, 344:14, 344:17, 351:21, 365:3, 371:16, 372:14, 374:19, 374:23, 379:1, 379:24, 387:9, 389:8, 389:15, 389:22, 391:2, 394:12, 399:8, 399:24, 402:2
**click** [1] - 360:4
**clients** [1] - 341:8
**close** [4] - 321:20, 346:9, 363:18, 365:20
**closely** [2] - 343:4, 365:15
**closing** [1] - 365:17
**collapse** [3] - 338:2, 343:17, 366:22
**collapsed** [1] - 339:16
**collapsing** [3] - 343:21, 346:21, 347:1
**colleagues** [2] - 321:14, 324:21
**collect** [3] - 357:4, 371:10, 371:12
**colors** [1] - 387:11
**Columbia** [1] - 318:12
**COLUMBIA** [1] - 317:1
**column** [1] - 388:6
**columns** [1] - 392:18
**combine** [1] - 330:25
**combined** [2] - 371:2, 385:3
**combining** [1] - 330:22
**coming** [1] - 329:21
**comments** [2] - 325:3, 372:17
**Commission** [3] - 348:24, 367:6, 381:3
**commitment** [42] - 334:14, 351:24, 352:21, 353:6, 353:20, 354:2, 354:10, 354:14, 354:15, 355:14, 355:18, 355:19, 356:3, 359:2, 359:7, 359:17, 360:8, 360:9, 360:14, 361:2, 361:7, 361:9, 361:14, 362:9, 362:10, 362:12, 363:25, 364:5, 364:11, 364:13,

369:4, 369:25, 370:19, 371:9, 371:11, 371:12, 375:16, 375:17, 375:24, 379:17, 385:16, 385:23
**committed** [3] - 351:4, 354:16, 371:24
**common** [15] - 347:9, 347:11, 349:20, 349:21, 388:1, 398:17, 399:4, 399:25, 400:2, 400:3, 400:5, 400:8, 401:4, 401:5, 401:8
**companies** [15] - 325:15, 325:20, 325:25, 326:1, 326:23, 336:19, 337:4, 337:14, 339:18, 347:23, 348:1, 349:2, 367:10, 401:1
**companies'** [1] - 343:13
**company** [24] - 333:23, 334:3, 334:4, 334:5, 334:6, 334:7, 334:10, 335:18, 335:22, 335:23, 336:12, 336:22, 336:25, 349:4, 349:8, 349:10, 349:12, 349:14, 352:9, 375:4, 400:22
**compensate** [3] - 356:2, 356:11, 356:14
**complaining** [4] - 358:8, 358:9, 358:11, 358:14
**completely** [14] - 322:8, 322:16, 331:15, 343:20, 349:4, 358:20, 369:8, 369:20, 370:17, 370:18, 370:20, 374:6, 374:19, 374:24
**complicated** [4] - 329:5, 330:18, 333:9, 337:24
**comprehensive** [5] - 367:14, 367:15, 367:22, 386:14, 386:17
**computer** [1] - 318:15
**computer-aided** [1] - 318:15

**concept** [2] - 328:18, 355:5
**concepts** [1] - 355:10
**concerned** [3] - 365:2, 368:15, 379:19
**condition** [2] - 343:7, 362:4
**confer** [1] - 403:9
**conference** [2] - 394:25, 395:13
**confession** [1] - 355:3
**confidence** [1] - 364:14
**confirmed** [1] - 367:25
**confusion** [1] - 383:24
**Congress** [16] - 325:23, 325:25, 326:2, 326:4, 326:10, 326:21, 326:25, 340:12, 340:21, 341:8, 344:18, 351:9, 351:11, 353:14
**connection** [1] - 340:18
**conservator** [20] - 322:14, 322:23, 327:1, 342:23, 344:6, 344:8, 344:10, 344:15, 344:17, 345:1, 345:11, 345:17, 345:20, 346:7, 346:16, 348:19, 352:12, 357:6, 363:20, 369:8
**conservatorship** [19] - 341:19, 341:22, 344:1, 344:5, 345:14, 346:4, 346:6, 347:7, 357:13, 358:10, 358:11, 359:24, 360:1, 360:2, 383:20, 384:11, 387:18, 391:13, 392:17
**conserve** [1] - 347:8
**consider** [1] - 368:17
**considered** [2] - 358:1, 376:16
**considering** [1] - 368:17
**consistent** [5] - 374:25, 380:10, 380:12, 390:10, 398:4
**Constitution** [1] - 318:12
**Consulting** [1] - 379:7

**context** [1] - 334:1
**continue** [6] - 338:24, 349:22, 350:1, 353:19, 367:18, 375:23
**continued** [3] - 317:25, 359:25, 362:10
**CONTINUED** [1] - 318:1
**continues** [1] - 339:6
**continuing** [1] - 362:13
**contract** [23] - 334:18, 334:20, 334:21, 334:22, 334:23, 335:3, 335:6, 335:9, 335:12, 335:14, 346:13, 346:15, 348:7, 358:2, 358:3, 358:16, 358:24, 373:15, 374:2, 374:11, 374:12
**contracts** [6] - 335:10, 373:1, 373:5, 373:12, 373:17
**control** [1] - 372:19
**convenience** [1] - 376:21
**Cooper** [1] - 317:16
**corner** [1] - 363:16
**corporate** [5] - 326:4, 326:6, 326:9, 344:7, 345:17
**Correct** [1] - 396:25
**correct** [28] - 379:25, 380:1, 380:3, 383:10, 384:6, 384:7, 386:5, 386:6, 387:12, 388:12, 388:13, 388:17, 388:18, 389:11, 390:6, 391:4, 391:5, 393:6, 393:7, 394:13, 394:14, 395:16, 400:24, 402:5, 402:6, 405:14
**cost** [1] - 390:8
**counsel** [8] - 320:5, 321:14, 321:18, 376:16, 379:15, 379:17, 379:19, 403:25
**Counsel** [1] - 376:19
**count** [3] - 370:12, 374:10, 374:11
**country** [2] - 327:10, 363:14
**couple** [2] - 340:25,

403:20
**course** [2] - 325:7, 328:16
**COURT** [55] - 317:1, 320:4, 320:14, 320:18, 320:23, 376:19, 377:6, 377:10, 377:13, 377:15, 377:18, 378:2, 378:5, 378:8, 378:12, 378:17, 379:21, 383:15, 384:12, 387:4, 387:6, 389:25, 390:5, 390:7, 390:14, 390:24, 391:16, 391:18, 392:25, 393:3, 393:17, 394:24, 395:11, 396:7, 396:9, 396:17, 396:21, 398:11, 400:22, 400:25, 402:9, 402:16, 402:18, 402:23, 403:8, 403:11, 403:15, 403:22, 404:7, 404:10, 404:13, 405:2, 405:6, 405:11, 405:19
**court** [2] - 320:2, 342:11
**Court** [4] - 318:11, 318:11, 376:17, 404:22
**Court's** [6] - 346:23, 379:14, 379:16, 390:22, 390:23, 401:23
**COURTROOM** [1] - 379:15
**courtroom** [4] - 320:22, 376:24, 378:16, 402:15
**covenant** [1] - 372:23
**cover** [2] - 366:6, 369:24
**covers** [1] - 332:13
**crashing** [1] - 351:16
**crazy** [1] - 368:12
**create** [2] - 341:7, 367:20
**created** [6] - 325:23, 326:11, 338:13, 338:17, 338:21, 381:9
**credit** [1] - 361:5
**crisis** [6] - 337:19, 337:24, 338:4,

343:22, 362:5, 363:19
**critical** [3] - 325:12, 327:11, 340:5
**critically** [2] - 327:7, 371:5
**cross** [1] - 404:4
**CRR** [1] - 318:11
**crucial** [1] - 354:24
**crushed** [1] - 337:23
**crystal** [3] - 344:17, 374:19, 374:23
**cumulatively** [2] - 385:16, 385:23
**CUSIP** [3] - 388:14, 388:15, 393:8
**cut** [1] - 383:24
**cute** [1] - 392:2
**cycle** [1] - 339:21

### D

**D.C** [6] - 317:9, 317:17, 317:23, 318:9, 318:13, 327:22
**damages** [4] - 376:2, 376:3, 376:7, 376:8
**danger** [1] - 367:25
**data** [9] - 380:7, 380:12, 380:13, 380:15, 381:10, 381:11, 382:4, 383:8, 389:22
**database** [5] - 381:1, 381:19, 384:24, 399:20, 399:21
**DATE** [1] - 405:19
**date** [10] - 344:3, 347:15, 364:4, 385:12, 385:18, 386:18, 388:24, 389:1, 393:12, 402:3
**DAVID** [1] - 318:6
**dAVIS** [1] - 379:23
**DAVIS** [40] - 317:21, 377:2, 377:7, 377:12, 377:14, 377:16, 377:22, 378:1, 378:4, 378:7, 378:11, 378:19, 378:23, 379:18, 379:22, 383:16, 383:17, 384:13, 384:14, 387:1, 387:7, 387:8, 390:22, 390:25, 391:1, 391:19, 393:4, 393:19, 395:14, 396:12,

396:13, 396:18, 396:22, 396:25, 397:1, 398:12, 401:2, 401:23, 401:24, 402:7
**Davis** [2] - 377:2, 378:18
**dealing** [2] - 372:24, 375:22
**debt** [1] - 361:5
**decade** [1] - 325:6
**decades** [1] - 323:4
**December** [5] - 359:13, 359:18, 359:21, 362:8, 364:9
**decide** [7] - 336:23, 336:24, 336:25, 341:18, 347:24, 347:25, 374:7
**decided** [4] - 324:11, 324:16, 357:4, 375:5
**decides** [2] - 345:4, 352:10
**decision** [5] - 323:8, 340:10, 368:24, 372:20, 374:6
**decisions** [8] - 322:23, 323:7, 344:22, 345:25, 363:1, 363:2, 363:11, 368:20
**declare** [1] - 398:23
**declared** [3] - 373:25, 398:20, 398:23
**declares** [2] - 374:4, 399:1
**dedicated** [1] - 323:4
**deeper** [2] - 361:6
**deeply** [3] - 368:23, 369:11
**defaulted** [1] - 339:1
**Defendant** [1] - 318:5
**defendants** [10] - 320:11, 320:12, 320:25, 321:4, 321:7, 347:22, 398:6, 404:3, 404:12, 404:17
**Defendants** [1] - 317:7
**defense** [4] - 320:13, 324:9, 324:16, 403:25
**Defense**.................... ...... [1] - 319:4
**deferred** [1] - 355:4
**delay** [2] - 320:7, 320:9
**deliberations** [2] - 372:17, 372:20

**DeMarco** [36] - 322:25, 323:1, 323:3, 323:10, 323:13, 323:17, 323:24, 323:25, 324:10, 324:12, 324:14, 324:25, 359:14, 363:14, 363:19, 364:2, 364:19, 364:20, 364:25, 365:2, 366:19, 366:20, 367:1, 368:5, 368:15, 368:19, 369:8, 369:10, 370:1, 371:1, 373:9, 374:20, 375:11, 375:19, 403:25
**DeMarco's** [2] - 324:18, 363:22
**Democrats** [1] - 323:6
**demonstrative** [2] - 387:2, 395:9
**Department** [6] - 351:7, 351:23, 352:4, 354:12, 385:4, 385:11
**depended** [1] - 340:21
**depicted** [10] - 382:20, 383:9, 383:13, 383:18, 384:9, 384:15, 385:2, 385:14, 387:14, 391:12
**depictions** [1] - 382:4
**deposition** [7] - 342:8, 342:17, 342:22, 345:7, 403:5, 403:20, 403:21
**DEPUTY** [1] - 379:15
**describe** [2] - 380:5, 399:12
**described** [1] - 380:17
**describes** [1] - 380:23
**designated** [1] - 394:1
**designation** [21] - 377:17, 381:1, 381:18, 390:13, 390:19, 395:22, 395:23, 395:24, 396:2, 396:14, 397:5, 397:15, 397:17, 397:20, 397:23, 398:8, 398:19, 398:22, 399:1, 399:5
**despite** [1] - 367:2
**destabilize** [1] - 364:16
**detail** [3] - 333:14,

348:25, 380:16
**details** [3] - 359:1, 380:24, 390:12
**determined** [1] - 350:12
**determines** [1] - 345:2
**dibs** [1] - 324:5
**different** [12] - 331:16, 373:17, 387:25, 388:2, 388:17, 389:9, 389:10, 390:1, 391:23, 395:1, 398:2, 398:5
**digress** [1] - 348:22
**dime** [1] - 370:16
**dire** [1] - 379:19
**Direct** [1] - 319:7
**DIRECT** [1] - 378:22
**direct** [8] - 363:20, 365:18, 391:15, 393:16, 393:24, 397:11, 398:9, 398:13
**directing** [1] - 394:3
**direction** [1] - 361:20
**directly** [3] - 327:20, 330:14, 351:5
**Director** [8] - 344:2, 347:19, 348:11, 348:18, 349:16, 350:7, 350:19, 351:6
**director** [7] - 323:2, 341:16, 342:4, 343:25, 344:4, 347:13, 359:14
**directors** [5] - 344:8, 373:25, 374:4, 374:6, 398:24
**disagree** [2] - 321:9, 336:10
**disagreeing** [1] - 321:11
**discretion** [2] - 373:25, 374:5
**discussed** [1] - 403:25
**discussion** [2] - 355:11, 376:3
**display** [2] - 382:15, 399:11
**displayed** [3] - 384:12, 385:1, 400:11
**dispute** [8] - 343:7, 366:3, 366:4, 366:9, 369:3, 369:5, 375:15, 375:17
**distinguish** [1] - 355:15
**distribution** [1] - 399:7

**District** [2] - 318:11, 318:12
**DISTRICT** [3] - 317:1, 317:1, 317:13
**dividend** [63] - 334:9, 334:12, 336:13, 336:16, 336:23, 337:1, 347:11, 352:5, 352:7, 352:10, 353:24, 354:7, 354:10, 354:11, 354:17, 354:20, 354:22, 355:1, 355:17, 355:19, 355:24, 357:6, 357:10, 360:13, 360:24, 361:3, 361:4, 361:15, 361:16, 361:18, 362:17, 366:7, 367:16, 367:18, 369:18, 369:21, 369:22, 369:25, 370:2, 370:6, 370:7, 370:8, 370:10, 370:11, 370:13, 370:17, 370:23, 370:25, 372:5, 372:8, 374:1, 374:3, 374:4, 374:7, 375:4, 395:15, 395:16, 395:18, 398:2, 399:1
**dividends** [66] - 322:13, 322:19, 322:21, 326:19, 334:8, 336:9, 336:20, 337:5, 347:2, 347:9, 347:10, 347:12, 347:14, 347:17, 347:18, 347:19, 347:24, 347:25, 348:13, 348:20, 349:17, 349:20, 349:24, 350:6, 350:8, 352:20, 352:22, 357:13, 357:15, 357:16, 358:6, 358:12, 358:14, 362:22, 366:10, 367:23, 382:22, 384:16, 384:19, 385:3, 385:10, 386:8, 386:11, 394:19, 394:22, 395:20, 398:20, 398:23, 399:2, 399:3, 399:4, 399:14, 399:18, 399:25, 400:7,

400:9, 400:10, 400:15, 401:3, 401:8, 401:10, 402:2, 404:25
**document** [5] - 335:12, 373:20, 383:25, 384:23, 385:9
**documentation** [1] - 390:16
**documents** [12] - 326:9, 326:10, 352:18, 365:16, 367:6, 380:9, 381:14, 381:21, 381:23, 381:24, 397:2, 398:18
**dollars** [4] - 337:11, 356:13, 356:15, 364:3
**done** [4] - 335:2, 340:2, 350:20, 372:6
**double** [1] - 359:6
**doubled** [1] - 364:6
**down** [27] - 326:7, 327:21, 327:22, 328:2, 328:13, 328:23, 329:6, 330:21, 334:22, 335:22, 338:7, 339:6, 339:17, 351:17, 352:5, 356:20, 361:14, 362:7, 364:17, 365:5, 366:9, 373:7, 383:24, 385:15, 385:22, 391:22, 402:16
**downtown** [1] - 327:22
**dramatically** [1] - 371:3
**draw** [16] - 350:21, 359:17, 360:8, 360:11, 360:15, 361:7, 361:11, 361:12, 361:14, 367:20, 367:25, 369:25, 370:3, 370:24, 375:16, 391:6
**drawn** [3] - 354:9, 361:8, 370:15
**draws** [15] - 360:23, 361:24, 361:25, 362:10, 364:1, 364:12, 365:23, 366:6, 367:19, 369:4, 369:14, 369:17, 369:20,

370:18, 375:23
**drew** [4] - 360:7, 360:17, 385:15, 385:22
**DTAs** [1] - 355:11
**due** [2] - 333:24, 392:22
**during** [7] - 323:5, 323:25, 324:8, 324:14, 324:19, 384:17, 385:16

## E

**early** [4] - 338:9, 366:2, 366:16, 366:18
**earnings** [5] - 365:2, 367:14, 370:9, 370:14, 371:25
**easier** [1] - 402:13
**easy** [2] - 366:14, 366:15
**Economic** [3] - 340:18, 340:20, 341:3
**economic** [2] - 340:21, 363:18
**economics** [1] - 323:3
**economists** [3] - 334:9, 343:10, 368:7
**economy** [41] - 322:1, 322:7, 324:25, 325:13, 327:8, 328:1, 337:15, 338:1, 338:2, 339:5, 339:10, 339:16, 339:17, 339:22, 340:2, 340:8, 340:19, 343:2, 343:21, 350:25, 351:15, 351:16, 353:1, 353:21, 359:25, 360:2, 361:13, 362:3, 363:11, 363:18, 364:17, 366:24, 367:20, 368:3, 368:25, 369:2, 369:5, 370:21, 375:18, 375:24, 375:25
**Edward** [1] - 384:13
**effect** [2] - 322:22, 357:14
**effects** [1] - 339:10
**efficient** [1] - 324:13
**eight** [1] - 365:12
**either** [2] - 398:22, 398:25

eliminate [3] - 369:13, 369:16, 370:2
**eliminated** [17] - 347:2, 347:10, 347:13, 347:17, 347:19, 348:14, 348:19, 349:21, 352:22, 369:9, 369:19, 369:20, 370:5, 370:18, 370:19, 370:20
**eliminating** [4] - 358:12, 370:5, 371:3, 371:5
**elimination** [1] - 362:22
**employed** [2] - 379:4, 379:6
**employees** [1] - 339:20
**End** [1] - 395:13
**end** [8] - 337:20, 354:8, 371:20, 376:4, 376:11, 379:20, 401:12
**ended** [1] - 343:23
**endorsement** [1] - 324:17
**enormous** [3] - 323:15, 323:16, 376:16
**ensure** [2] - 359:11, 380:12
**ensuring** [2] - 371:25, 380:16
**enter** [2] - 323:8, 334:17
**entered** [5] - 320:22, 357:22, 358:16, 373:15, 378:16
**entering** [1] - 346:13
**enterprise** [5] - 352:19, 371:19, 398:22, 399:1, 399:7
**enterprises** [10] - 325:19, 365:5, 366:2, 370:22, 371:20, 372:1, 398:17, 398:21, 399:8, 399:9
**enterprises'** [1] - 398:24
**entire** [17] - 325:13, 327:8, 334:11, 334:12, 337:25, 338:2, 339:16, 339:17, 339:22, 340:1, 343:2, 351:16, 361:12, 361:13, 363:11,

364:17, 375:18
**entities** [4] - 386:14, 387:23, 395:21, 395:25
**entitle** [1] - 398:19
**entitled** [8] - 353:23, 355:21, 355:25, 356:20, 357:15, 373:24, 405:15
**entity** [1] - 345:3
**equal** [1] - 370:8
**erode** [1] - 375:23
**eroded** [2] - 364:1, 375:16
**eroding** [1] - 369:4
**erosion** [9] - 362:11, 364:13, 367:20, 367:25, 369:5, 369:14, 370:19, 370:20, 375:17
**ESQ** [11] - 317:15, 317:18, 317:20, 317:21, 317:21, 318:2, 318:5, 318:6, 318:6, 318:7, 318:7
**essentially** [3] - 342:2, 344:9, 367:21
**establish** [1] - 399:2
**et** [2] - 317:3, 317:6
**evaluate** [2] - 364:19, 376:8
**evening** [1] - 402:11
**event** [2] - 325:7, 368:11
**events** [4] - 325:4, 325:5, 364:23, 374:12
**evidence** [69] - 321:17, 321:21, 321:22, 321:23, 322:4, 322:10, 323:2, 323:17, 324:4, 324:6, 324:8, 324:23, 324:24, 325:4, 325:24, 326:12, 326:16, 327:4, 327:6, 329:11, 329:18, 330:16, 333:7, 333:21, 336:11, 337:8, 337:11, 337:23, 338:6, 339:2, 339:5, 340:4, 342:24, 343:12, 343:16, 343:22, 346:11, 350:24, 351:2, 352:11, 353:4, 354:22, 356:17, 358:19, 360:19, 361:10,

363:13, 366:1, 366:12, 369:3, 369:6, 369:22, 373:8, 374:18, 375:2, 375:9, 375:19, 376:10, 376:14, 376:16, 377:11, 377:21, 377:25, 378:3, 378:6, 378:10, 378:14, 382:16, 398:10
**exact** [1] - 356:10
**exactly** [4] - 344:2, 361:19, 368:15, 370:3
**EXAMINATION** [1] - 378:22
**examination** [3] - 381:4, 393:16, 404:2
**Examination............** . [1] - 319:7
**examinations** [1] - 403:7
**examine** [4] - 396:2, 396:10, 396:14, 400:3
**examiner** [1] - 379:11
**example** [4] - 327:22, 354:8, 360:7, 365:10
**Excel** [8] - 381:10, 382:3, 382:9, 382:10, 383:7, 383:25, 386:4, 386:23
**excess** [2] - 367:15, 367:23
**exchange** [1] - 330:8
**Exchange** [3] - 348:24, 367:6, 381:3
**excuse** [2] - 346:23, 346:24
**execute** [1] - 327:2
**executives** [2] - 349:9, 367:9
**exhibit** [5] - 382:25, 384:1, 386:1, 386:8, 388:6
**Exhibit** [5] - 377:11, 377:25, 378:3, 378:6, 385:21
**EXHIBITS** [1] - 319:9
**exhibits** [6] - 377:4, 382:14, 383:6, 384:5, 384:21, 387:10
**Exhibits** [4] - 377:20, 378:9, 378:13, 386:19
**exist** [1] - 336:13

**existence** [1] - 387:17
**exited** [2] - 376:24, 402:15
**expect** [3] - 322:19, 376:9, 404:24
**expectation** [1] - 367:12
**expectations** [9] - 322:17, 373:4, 373:12, 373:19, 374:16, 374:20, 374:25, 375:6, 375:14
**expected** [3] - 338:8, 356:17, 365:12
**expense** [2] - 322:24, 327:3
**experience** [2] - 367:13, 375:20
**expert** [5] - 333:12, 336:18, 339:23, 347:22, 379:25
**experts** [2] - 337:25, 339:25
**explain** [12] - 326:15, 333:14, 337:25, 354:21, 355:9, 357:10, 359:22, 366:23, 369:10, 372:22, 380:7, 381:5
**explained** [2] - 372:11, 372:21
**expression** [1] - 366:13
**eye** [2] - 347:14, 365:15

## F

**face** [1] - 398:25
**faced** [1] - 323:15
**facing** [2] - 362:15, 363:14
**fact** [15] - 321:10, 325:5, 325:16, 354:23, 358:5, 358:15, 358:20, 359:22, 366:17, 374:13, 374:16, 392:23, 393:5, 399:18, 404:19
**facts** [6] - 364:25, 365:1, 375:20, 377:9, 398:7, 398:9
**fail** [2] - 339:18, 339:20
**failing** [1] - 337:13
**fair** [1] - 372:23
**FAIRHOLME** [1] - 317:3

**faith** [1] - 372:23
**familiar** [3] - 328:17, 337:17, 338:10
**families** [3] - 327:14, 330:6, 341:14
**fancy** [1] - 334:20
**Fannie** [219] - 321:7, 322:20, 324:23, 325:11, 325:14, 325:23, 325:25, 326:2, 326:11, 326:22, 327:2, 327:4, 327:5, 327:6, 327:9, 327:10, 327:15, 327:19, 327:20, 327:21, 329:4, 329:7, 329:14, 329:15, 329:17, 329:19, 329:21, 329:25, 330:7, 330:9, 330:11, 330:14, 330:17, 330:18, 330:23, 330:24, 331:3, 331:6, 331:7, 331:15, 331:17, 331:23, 331:24, 332:9, 332:10, 332:13, 332:16, 332:17, 332:18, 332:25, 333:1, 333:4, 333:18, 333:20, 334:15, 334:16, 334:18, 334:19, 334:21, 335:10, 336:8, 336:14, 337:3, 338:21, 338:22, 338:24, 339:3, 339:7, 339:25, 340:2, 340:7, 341:9, 341:11, 341:18, 342:3, 343:1, 343:3, 343:5, 343:6, 343:8, 343:16, 343:18, 343:24, 344:1, 344:5, 344:9, 344:21, 345:3, 345:6, 345:15, 345:20, 345:22, 346:1, 346:12, 346:17, 348:2, 348:6, 348:13, 348:14, 348:18, 349:16, 349:23, 350:2, 350:3, 350:10, 350:18, 350:20, 350:22, 351:2, 351:3, 351:6, 351:7, 351:10,

351:12, 351:13, 351:23, 352:3, 352:14, 352:20, 352:25, 353:1, 353:5, 353:7, 353:10, 353:12, 353:13, 353:15, 353:16, 353:18, 354:1, 354:9, 354:14, 354:16, 354:19, 356:13, 356:25, 357:2, 357:6, 357:23, 357:24, 359:10, 360:7, 360:16, 360:20, 360:21, 360:24, 361:6, 361:22, 362:1, 362:12, 362:14, 362:16, 362:24, 363:21, 364:2, 364:11, 364:14, 365:1, 365:4, 365:22, 366:5, 367:2, 367:7, 369:18, 369:23, 370:8, 370:12, 370:13, 370:15, 370:23, 371:2, 371:6, 372:4, 373:1, 373:5, 373:12, 373:15, 374:13, 374:17, 376:18, 380:8, 380:22, 381:17, 382:22, 383:19, 384:16, 385:3, 385:10, 385:15, 386:2, 386:8, 386:13, 386:17, 387:16, 387:23, 388:4, 388:5, 388:10, 389:6, 389:13, 389:16, 391:14, 391:20, 391:21, 392:8, 394:8, 394:10, 397:5, 397:8, 397:19, 399:10, 399:15, 399:17, 401:15, 401:18, 402:2
**FANNIE** [1] - 317:8
**Fannie's** [1] - 344:7
**far** [2] - 357:21, 360:3
**fast** [1] - 350:19
**faster** [1] - 338:7
**fate** [1] - 369:1
**favor** [1] - 376:17
**feature** [1] - 371:8
**Federal** [1] - 318:5

**FEDERAL** [1] - 317:6
**federal** [9] - 335:13, 340:5, 340:6, 340:9, 351:5, 351:7, 351:11, 351:22, 353:6
**fee** [8] - 352:21, 355:14, 355:21, 355:25, 364:11, 371:9, 371:11, 371:12
**feet** [1] - 364:19
**few** [12] - 321:8, 325:11, 326:24, 335:16, 337:6, 346:5, 354:21, 368:11, 372:9, 372:17, 373:11, 385:25
**FHFA** [61] - 321:7, 321:24, 322:1, 322:2, 322:3, 322:5, 322:11, 322:14, 322:22, 323:2, 323:7, 324:23, 327:1, 341:7, 341:9, 341:10, 341:16, 342:2, 342:4, 343:25, 344:6, 344:8, 344:14, 344:17, 344:19, 344:21, 345:1, 345:3, 345:9, 345:11, 345:17, 345:19, 345:24, 346:16, 346:18, 352:12, 352:21, 355:8, 356:7, 357:21, 358:21, 359:15, 362:7, 362:20, 362:24, 363:14, 364:2, 369:8, 369:11, 372:25, 373:3, 373:8, 374:23, 375:11, 375:22, 376:6, 376:18
**FHFA's** [2] - 344:4, 363:23
**fiasco** [1] - 320:6
**figure** [4] - 356:7, 356:21, 369:13, 390:7
**figured** [1] - 350:19
**file** [1] - 386:23
**filed** [2] - 367:6, 381:2, 383:1
**filing** [1] - 349:15
**filings** [18] - 348:14, 348:17, 348:20,

348:21, 348:23, 349:9, 349:12, 367:3, 367:5, 367:7, 380:18, 380:19, 380:21, 381:2, 381:16, 384:25, 386:15, 399:22
**filling** [1] - 352:16
**final** [1] - 403:5
**Finance** [2] - 318:5, 388:23
**finance** [1] - 363:8
**FINANCE** [1] - 317:6
**financial** [22] - 337:9, 337:17, 337:19, 337:24, 338:4, 342:1, 343:7, 343:22, 350:17, 350:18, 351:1, 351:11, 351:13, 351:14, 351:15, 362:5, 365:3, 371:4, 380:7, 380:24, 383:1
**financially** [1] - 374:22
**financials** [1] - 380:18
**fine** [1] - 360:2
**finishes** [1] - 403:7
**first** [33] - 320:15, 322:5, 324:2, 324:5, 333:10, 340:16, 342:4, 346:6, 346:20, 347:1, 348:16, 352:24, 354:8, 357:7, 357:14, 359:4, 365:9, 366:3, 369:12, 371:17, 376:21, 376:22, 378:18, 382:15, 387:13, 388:7, 389:7, 392:21, 397:6, 397:16, 402:4
**firsthand** [1] - 343:6
**fit** [1] - 376:8
**five** [3] - 332:19, 332:20, 364:3
**fixed** [11] - 353:24, 354:17, 354:22, 360:24, 361:22, 362:17, 367:18, 369:21, 369:22, 370:2, 370:6
**flashed** [1] - 395:10
**Flexner** [1] - 317:22
**focus** [1] - 391:22
**focused** [1] - 368:5
**follow** [1] - 328:9
**following** [1] - 381:24
**FOR** [2] - 317:1, 378:21

**forecast** [1] - 371:20
**foregoing** [1] - 405:13
**foremost** [1] - 369:12
**forensic** [1] - 380:11
**forget** [1] - 349:24
**form** [1] - 355:24
**former** [1] - 348:5
**forth** [1] - 335:2
**fortunate** [1] - 335:21
**four** [2] - 323:5, 404:3
**fourth** [1] - 343:8
**fragile** [1] - 362:4
**Frank** [1] - 384:15
**fraud** [1] - 379:10
**Freddie** [197] - 321:7, 322:21, 324:23, 325:11, 325:14, 325:23, 326:1, 326:2, 326:11, 326:22, 327:2, 327:4, 327:5, 327:9, 327:10, 327:15, 327:19, 327:21, 329:4, 329:14, 329:16, 329:18, 329:19, 329:21, 329:25, 330:7, 330:9, 330:11, 330:14, 330:17, 330:19, 330:24, 331:3, 331:6, 331:7, 331:15, 331:17, 331:23, 331:24, 332:9, 332:11, 332:13, 332:16, 332:17, 332:18, 333:1, 333:4, 333:18, 333:20, 334:15, 334:16, 335:11, 336:8, 336:15, 337:3, 338:22, 338:25, 339:3, 339:8, 339:25, 340:3, 340:7, 341:10, 341:11, 341:19, 342:3, 343:1, 343:3, 343:5, 343:6, 343:9, 343:16, 343:19, 343:24, 344:1, 344:5, 344:7, 344:21, 345:3, 345:6, 345:15, 345:20, 345:22, 346:2, 346:12, 346:17, 348:2, 348:6, 348:13, 348:14, 348:19, 349:16, 349:23, 350:2, 350:4,

350:11, 350:18,
350:20, 350:22,
351:2, 351:3, 351:6,
351:8, 351:10,
351:12, 351:13,
351:23, 352:3,
352:14, 352:20,
352:25, 353:2,
353:5, 353:7,
353:10, 353:12,
353:13, 353:15,
353:16, 353:18,
354:1, 354:14,
354:16, 354:19,
356:13, 356:25,
357:2, 357:7,
357:23, 357:24,
359:10, 360:17,
360:20, 360:21,
360:25, 361:7,
361:22, 362:1,
362:13, 362:14,
362:16, 362:24,
363:21, 364:3,
364:14, 365:4,
366:6, 367:2, 367:7,
367:21, 369:18,
369:23, 370:8,
370:12, 370:14,
370:16, 370:23,
371:2, 372:4, 373:2,
373:6, 373:13,
373:16, 374:13,
374:17, 376:18,
380:8, 380:21,
381:17, 381:19,
382:22, 383:3,
384:11, 384:19,
385:4, 385:11,
385:22, 386:2,
386:9, 386:13,
386:18, 389:13,
392:16, 394:2,
394:8, 394:10,
397:5, 398:18,
399:10, 399:18,
400:14, 400:22,
401:19
**Freddie's** [7] - 327:7,
329:7, 331:24,
344:10, 364:12,
365:2, 371:6
**freeze** [1] - 339:9
**front** [3] - 326:7,
346:10, 382:5
**frustrated** [1] - 373:4
**FTI** [1] - 379:7
**full** [2] - 333:2, 370:13
**funding** [3] - 341:11,
341:12, 352:19

**FUNDS** [1] - 317:3
**funds** [1] - 354:15
**future** [5] - 364:21,
365:2, 368:5, 368:8,
371:25

## G

**gamble** [1] - 366:24
**gather** [1] - 381:7
**gathered** [2] - 381:9,
382:17
**generally** [1] - 336:8
**generate** [2] - 367:15,
367:22
**gentleman** [1] - 355:7
**gentlemen** [22] -
320:24, 333:8,
336:17, 337:2,
342:24, 347:15,
356:9, 357:17,
365:14, 372:9,
375:8, 376:1, 376:9,
379:8, 379:24,
380:5, 380:10,
381:20, 382:20,
387:9, 398:14,
399:12
**George** [1] - 384:18
**giant** [1] - 337:14
**given** [5] - 366:21,
369:11, 371:10,
371:11, 392:19
**glimmers** [2] - 366:2,
366:8
**global** [1] - 368:13
**goal** [3] - 323:21,
363:22, 363:24
**golden** [6] - 365:10,
365:13, 365:21,
365:22, 365:24,
367:8
**goodness** [1] - 356:23
**governed** [1] - 398:18
**government** [16] -
325:19, 325:21,
340:5, 340:6, 340:9,
348:25, 351:5,
351:7, 351:11,
351:13, 351:22,
353:6, 362:4, 363:2,
374:14, 374:17
**government-
sponsored** [1] -
325:19
**granted** [1] - 326:4
**graphical** [1] - 382:4
**graphically** [1] -
381:11
**grateful** [1] - 321:19

**grave** [1] - 357:23
**Grossmann** [1] -
318:3
**ground** [1] - 342:23
**group** [2] - 392:8,
392:23
**grow** [1] - 340:15
**GSE's** [1] - 371:4
**guarantee** [7] - 327:9,
332:10, 332:11,
333:2, 333:5,
353:14, 353:18
**guaranteed** [1] -
353:10
**guaranteeing** [1] -
338:23
**guard** [1] - 364:22
**guide** [1] - 372:16

## H

**half** [2] - 327:9, 332:25
**HAMISH** [1] - 317:20
**Hamish** [1] - 403:12
**Hampshire** [1] -
317:16
**hand** [1] - 330:15
**handing** [1] - 396:19
**hands** [3] - 331:24,
332:1, 350:3
**hanging** [2] - 364:11,
369:2
**harm** [1] - 374:22
**HARTMAN** [2] - 319:7,
378:21
**Hartman** [5] - 378:20,
379:3, 379:4,
379:24, 397:2
**hartman** [1] - 403:7
**head** [2] - 320:17,
364:12
**hear** [21] - 321:17,
321:18, 324:15,
324:20, 324:21,
325:16, 336:18,
342:6, 342:7,
342:11, 342:14,
342:16, 342:22,
351:5, 352:2,
366:19, 376:7,
379:15, 390:14,
392:25, 396:11
**heard** [9] - 321:11,
334:14, 336:9,
342:5, 355:3, 355:4,
358:9, 363:15,
394:23
**hearing** [2] - 403:2,
404:19
**heart** [2] - 344:13,

356:23
**held** [1] - 393:22
**help** [3] - 327:18,
329:5, 365:18
**helpfully** [1] - 333:14
**helps** [2] - 330:4,
330:6
**hemorrhaging** [1] -
353:13
**HERA** [25] - 340:24,
341:1, 341:4, 341:6,
341:8, 341:10,
341:15, 343:25,
344:16, 344:25,
345:19, 345:24,
346:3, 346:6,
346:14, 346:15,
347:19, 350:16,
351:10, 358:1,
358:22, 363:22,
374:10
**Hi** [1] - 327:23
**high** [3] - 335:20,
335:21, 366:21
**himself** [1] - 323:13
**hindsight** [1] - 366:14
**hit** [3] - 342:23, 361:2,
362:8
**HOFFMAN** [4] - 318:7,
377:19, 377:24,
378:15
**hold** [5] - 335:19,
335:24, 336:3,
338:15, 398:15
**holders** [1] - 399:6
**holds** [2] - 328:8,
328:15
**hole** [1] - 361:6
**home** [12] - 324:15,
327:18, 327:20,
328:4, 328:6, 328:7,
328:8, 328:14,
328:15, 329:23,
330:6, 330:12
**homeowner** [9] -
328:7, 328:16,
329:12, 331:22,
332:5, 332:11,
332:21, 332:23,
332:24
**homeowners** [2] -
330:4, 339:1
**homeownership** [1] -
330:5
**homes** [5] - 327:12,
327:20, 338:9,
339:12, 362:7
**Honor** [31] - 320:13,
321:1, 325:17,
335:7, 346:24,

348:3, 372:11,
372:16, 372:18,
372:21, 377:2,
378:15, 378:19,
379:13, 379:22,
387:1, 387:5, 387:7,
390:25, 392:24,
393:2, 393:15,
394:23, 396:12,
396:24, 398:10,
402:8, 402:21,
403:12, 404:14,
404:19
**Honor's** [2] - 324:17,
376:14
**HONORABLE** [1] -
317:12
**hope** [5] - 321:2,
333:14, 366:2,
366:8, 366:20
**hopes** [1] - 366:17
**hot** [1] - 363:10
**hours** [1] - 404:3
**house** [6] - 328:12,
329:2, 329:13,
330:2, 338:12,
338:16
**housing** [35] - 321:25,
325:12, 327:13,
327:17, 338:5,
338:6, 339:6,
339:16, 339:24,
340:3, 340:7,
340:19, 340:22,
341:12, 341:13,
343:2, 345:11,
346:21, 346:25,
350:25, 352:25,
353:19, 353:22,
361:12, 362:1,
362:14, 364:15,
364:16, 364:23,
366:25, 368:3,
370:21, 375:18,
375:24, 375:25
**Housing** [4] - 318:5,
340:17, 340:20,
341:3
**HOUSING** [1] - 317:6
**huge** [10] - 336:22,
338:8, 338:21,
356:11, 356:18,
356:25, 361:9,
362:12, 362:15
**Hume** [33] - 321:6,
321:9, 321:12,
321:13, 321:18,
322:25, 324:20,
325:3, 325:18,
325:22, 326:24,

330:10, 333:9,
333:25, 336:10,
342:5, 342:8,
343:19, 347:5,
350:9, 351:20,
351:24, 355:3,
355:13, 356:5,
358:9, 363:15,
365:11, 372:13,
376:3, 376:12,
403:12
**HUME** [6] - 317:20,
320:17, 403:12,
403:16, 403:24,
404:8
**hundreds** [7] - 331:1,
337:10, 337:21,
356:12, 356:15,
364:3

## I

**IAN** [1] - 318:7
**ice** [1] - 364:16
**idea** [2] - 328:9,
361:17
**identification** [1] -
396:19
**identifier** [2] - 388:17,
388:20
**identify** [1] - 381:14
**identifying** [1] -
388:15
**implied** [1] - 372:23
**important** [32] - 325:5,
327:7, 327:25,
329:20, 332:7,
333:6, 333:24,
341:7, 341:17,
344:11, 344:12,
345:8, 345:9,
345:10, 345:18,
346:4, 349:5,
349:15, 354:18,
357:5, 363:22,
363:23, 363:24,
364:18, 364:20,
365:19, 367:5,
371:5, 371:8
**importantly** [2] -
337:2, 366:18
**imposing** [1] - 359:25
**imposition** [1] -
371:22
**improved** [1] - 371:4
**INC** [1] - 317:3
**include** [3] - 358:3,
373:17, 373:20
**includes** [4] - 335:8,
335:9, 335:12,

335:13
**including** [5] - 323:7,
335:13, 348:12,
355:10, 358:5
**income** [9] - 341:13,
367:14, 367:15,
367:22, 367:23,
371:19, 386:14,
386:17
**incomes** [1] - 338:19
**increase** [3] - 359:2,
361:15, 361:16
**increased** [1] - 361:3
**increases** [1] - 386:9
**index** [1] - 381:9
**indicated** [1] - 395:15
**individual** [2] -
330:22, 342:1
**individuals** [1] -
387:22
**indulgence** [3] -
346:23, 390:23,
401:23
**information** [16] -
380:19, 381:18,
381:19, 382:18,
382:24, 383:2,
383:4, 386:23,
388:22, 389:11,
392:19, 393:8,
395:9, 399:23,
400:8, 401:12
**initials** [1] - 341:2
**inquiry** [1] - 379:18
**insolvent** [1] - 343:9
**instance** [1] - 392:21
**instead** [4] - 324:13,
344:17, 359:7,
370:14
**institution** [1] - 351:1
**institutions** [3] -
337:10, 337:17,
338:14
**instructing** [1] -
372:18
**instruction** [2] -
404:15, 404:17
**instructions** [9] -
325:18, 335:8,
348:3, 372:15,
372:16, 372:19,
372:22, 376:14,
376:17
**Insurance** [1] - 403:17
**intended** [1] - 349:13
**interest** [18] - 322:4,
322:5, 322:12,
322:16, 322:23,
327:2, 328:10,
328:21, 344:23,

345:4, 345:6, 346:1,
346:8, 346:19,
363:4, 363:24,
369:12, 374:21
**interests** [11] - 322:6,
323:23, 344:16,
344:18, 345:2,
345:12, 345:13,
345:22, 346:9,
346:19, 358:22
**internally** [1] - 384:3
**invested** [18] - 343:18,
354:4, 387:15,
389:3, 389:16,
391:2, 391:4,
391:13, 392:5,
392:7, 392:10,
393:14, 394:2,
394:5, 394:6, 394:9,
394:15, 395:6
**investigate** [1] -
399:17
**investing** [1] - 334:4
**investment** [13] -
334:10, 352:1,
352:3, 352:6, 352:8,
352:9, 353:2,
353:11, 354:13,
355:24, 394:11,
395:21, 403:18
**investor** [6] - 332:2,
332:12, 332:20,
332:24, 332:25,
399:23
**investors** [19] -
330:20, 331:10,
331:13, 331:20,
331:25, 332:8,
332:10, 332:13,
333:2, 333:5,
338:24, 353:9,
353:17, 388:4,
389:6, 390:19,
394:18, 395:25
**investors'** [1] - 332:1
**involves** [1] - 329:1
**isolated** [1] - 392:2
**issuance** [2] - 388:24,
393:12
**issue** [15] - 336:20,
336:23, 337:1,
337:5, 347:10,
347:23, 347:24,
347:25, 352:10,
368:23, 374:7,
375:5, 376:7,
398:16, 404:2
**issued** [8] - 388:12,
389:2, 389:10,
390:1, 391:23,

398:17
**issues** [2] - 341:17,
375:22
**itself** [1] - 374:2

## J

**jail** [1] - 349:11
**James** [1] - 342:5
**job** [6] - 341:9, 341:10,
341:15, 345:24,
350:20, 363:24
**jobs** [3] - 337:13,
338:19, 339:20
**Johnny** [1] - 400:25
**join** [3] - 321:13,
321:18, 372:13
**joint** [2] - 377:8, 398:9
**JONATHAN** [1] -
318:5
**Jonathan** [2] - 320:12,
321:4
**JONES** [1] - 318:7
**JUDGE** [1] - 317:13
**Judge** [2] - 321:5,
348:5
**judges** [1] - 365:19
**July** [5] - 337:20,
340:4, 340:13,
340:16, 343:4
**junior** [1] - 398:16
**jurors** [7] - 320:6,
320:8, 320:14,
320:20, 321:15,
348:5
**JURY** [1] - 317:12
**Jury** [6] - 320:3,
320:22, 376:24,
377:1, 378:16,
402:15
**jury** [37] - 320:4,
321:2, 322:9,
325:25, 335:25,
338:20, 339:2,
339:23, 342:25,
343:8, 343:15,
346:3, 346:23,
347:15, 359:20,
362:20, 363:17,
364:18, 366:12,
366:19, 368:19,
369:6, 379:8,
379:25, 380:5,
380:10, 380:20,
381:21, 382:14,
382:17, 382:20,
387:10, 390:14,
398:14, 399:12,
402:13, 404:20
**justified** [1] - 366:8

**JX-1** [3] - 377:7,
377:11, 398:9
**JX-1**...........................
......................... [1] -
319:10

## K

**KAPLAN** [1] - 317:21
**Kaye** [1] - 318:8
**keep** [15] - 330:11,
336:5, 346:21,
346:25, 347:14,
350:5, 350:8,
350:13, 350:15,
350:23, 351:16,
359:17, 365:14,
368:1, 384:4
**keeps** [3] - 329:23,
330:5, 361:6
**Kenya** [1] - 377:2
**Kenya** [1] - 377:2
**KENYA** [1] - 317:21
**Kessler** [1] - 317:18
**key** [6] - 322:9, 323:7,
325:4, 325:6,
359:21, 369:17
**kind** [9] - 329:5,
334:21, 351:4,
351:15, 360:18,
363:7, 368:15,
392:2, 395:1
**King** [1] - 317:19
**Kirk** [1] - 317:16
**knowing** [1] - 367:10
**knowledge** [3] -
375:20, 375:21,
403:18
**known** [2] - 320:9,
322:11
**knows** [1] - 368:11
**KRAVETZ** [1] - 318:2

## L

**labeled** [1] - 396:22
**ladies** [22] - 320:24,
333:8, 336:17,
337:2, 342:24,
347:15, 356:9,
357:16, 365:14,
372:9, 375:8, 376:1,
376:9, 379:8,
379:24, 380:5,
380:9, 381:20,
382:20, 387:9,
398:14, 399:12
**LAMBERTH** [1] -
317:12
**Lamberth** [2] - 321:6,
348:5

**language** [2] - 331:11, 373:22
**large** [1] - 380:15
**last** [3] - 373:11, 389:3, 401:18
**lastly** [1] - 386:16
**late** [1] - 337:10
**Lately** [1] - 400:25
**law** [16] - 323:19, 323:22, 340:12, 340:13, 340:17, 340:25, 345:19, 345:24, 346:15, 351:11, 363:5, 363:6, 372:15, 372:19, 373:4, 375:11
**laws** [2] - 335:14, 349:7
**lawyers** [5] - 321:15, 342:12, 342:19, 365:17
**leading** [4] - 392:24, 393:1, 393:15, 395:2
**learn** [31] - 322:3, 322:14, 322:18, 323:4, 323:6, 323:10, 323:11, 323:13, 323:14, 323:17, 323:20, 323:21, 325:4, 325:14, 325:15, 327:8, 327:15, 327:16, 327:19, 337:20, 338:20, 339:7, 339:17, 342:4, 342:22, 345:18, 346:14, 356:9, 356:23, 363:17, 368:4
**least** [2] - 332:3, 389:3
**leave** [1] - 402:12
**Lee** [2] - 402:22, 402:24
**LEE** [1] - 317:18
**left** [3] - 328:6, 337:13, 338:17
**legal** [11] - 326:10, 334:20, 346:5, 358:10, 358:18, 362:21, 362:25, 372:10, 372:12, 372:21, 372:24
**legally** [1] - 343:25
**Lehman** [1] - 337:15
**lend** [1] - 330:3
**lender** [2] - 328:4, 328:5
**letter** [1] - 371:14
**letters** [1] - 371:14

**level** [1] - 388:2
**liabilities** [1] - 343:14
**liable** [1] - 376:6
**life** [1] - 366:24
**light** [2] - 390:22, 404:18
**likely** [1] - 339:9
**limit** [1] - 379:18
**line** [4] - 322:16, 365:5, 389:5, 389:7
**Linekin** [1] - 403:13
**lingo** [1] - 321:5
**liquidation** [8] - 355:2, 355:4, 355:12, 357:9, 361:16, 386:3, 386:10, 399:7
**listed** [1] - 397:7
**listen** [2] - 333:6, 365:15
**litigation** [1] - 384:5
**LITIGATIONS** [1] - 317:10
**Litowitz** [1] - 318:2
**live** [1] - 364:20
**LLP** [4] - 317:18, 317:22, 318:3, 318:8
**loan** [13] - 328:6, 328:20, 328:21, 329:1, 330:2, 334:4, 334:6, 334:11, 351:24, 352:4, 352:5, 352:7
**loans** [3] - 327:20, 329:22, 339:18
**Lockhart** [25] - 342:5, 342:6, 342:21, 342:25, 343:3, 343:5, 344:2, 344:4, 344:6, 344:9, 344:10, 345:7, 346:20, 346:25, 347:7, 347:13, 347:19, 348:11, 348:18, 349:17, 350:7, 350:17, 350:19, 351:6, 358:12
**long-term** [1] - 364:21
**Look** [2] - 355:22, 366:15
**look** [9] - 344:20, 358:7, 363:3, 365:16, 382:8, 386:19, 388:6, 388:21
**looked** [2] - 380:25, 397:6
**looking** [9] - 326:7, 328:5, 329:22, 344:18, 353:12,

380:15, 382:19, 389:5, 391:20
**looming** [1] - 359:20
**lose** [5] - 322:13, 339:20, 362:13, 364:14, 404:25
**losing** [4] - 337:10, 337:12, 360:25, 362:16
**loss** [1] - 332:13
**losses** [4] - 360:13, 360:18, 366:1, 366:6
**lost** [8] - 337:21, 338:19, 339:3, 360:20, 360:21, 361:23, 362:7, 364:3
**loud** [1] - 379:1
**love** [1] - 404:23
**low** [3] - 335:20, 335:21, 341:13
**lunch** [1] - 321:3
**Lynch** [1] - 337:16

---

# M

**MAC** [1] - 317:8
**Mac** [52] - 321:7, 324:23, 325:11, 325:14, 325:23, 326:11, 330:24, 331:15, 331:17, 333:1, 333:18, 333:20, 334:16, 335:11, 336:8, 336:15, 337:3, 345:6, 348:2, 367:21, 370:23, 373:13, 380:8, 380:22, 381:17, 381:19, 382:22, 383:3, 384:11, 384:19, 385:4, 385:11, 385:22, 386:2, 386:9, 386:13, 386:18, 389:13, 392:16, 394:2, 394:8, 394:10, 397:5, 398:18, 399:10, 399:18, 400:15, 400:22, 401:19
**Mae** [62] - 321:7, 324:23, 325:11, 325:14, 325:23, 326:11, 330:23, 330:24, 331:15, 331:17, 332:25, 333:1, 333:18, 333:20, 334:15, 334:16, 334:18,

334:19, 334:21, 335:10, 336:8, 336:15, 345:6, 365:22, 370:23, 373:12, 380:8, 380:22, 381:17, 382:22, 383:19, 384:16, 385:4, 385:11, 385:15, 386:2, 386:9, 386:13, 386:17, 387:16, 387:23, 388:4, 388:5, 388:10, 389:6, 389:13, 389:16, 391:14, 391:20, 391:21, 392:8, 394:8, 394:10, 397:5, 397:8, 397:19, 399:10, 399:15, 399:17, 401:15, 401:19, 402:2
**MAE/FREDDIE** [1] - 317:8
**magic** [2] - 340:14, 360:2
**main** [3] - 330:16, 330:18, 353:4
**man** [1] - 342:5
**manage** [2] - 327:1, 342:2
**management** [1] - 344:8
**mandatory** [2] - 353:25, 354:7
**marked** [1] - 382:6
**market** [49] - 321:25, 325:12, 326:14, 326:20, 327:11, 327:17, 328:24, 329:1, 329:4, 329:9, 329:10, 329:24, 331:12, 337:22, 338:5, 339:6, 339:9, 339:16, 339:24, 340:3, 340:7, 340:19, 340:22, 341:12, 343:2, 345:11, 345:16, 345:23, 346:21, 347:1, 349:1, 350:12, 350:13, 350:25, 352:25, 353:19, 353:22, 361:12, 362:1, 362:15, 364:15, 364:16, 364:23, 366:25, 368:3, 370:21, 375:18,

375:25
**markets** [1] - 364:14
**marks** [1] - 340:24
**Massachusetts** [1] - 318:8
**massive** [1] - 338:13
**materials** [1] - 381:7
**matter** [1] - 405:15
**mean** [10] - 341:24, 354:18, 356:19, 360:23, 387:20, 393:21, 393:22, 395:18, 395:19
**means** [23] - 325:20, 326:16, 330:22, 333:21, 338:11, 339:12, 341:23, 343:9, 343:13, 346:16, 349:23, 350:2, 354:19, 356:19, 367:14, 374:2, 374:5, 376:6, 387:22, 387:25, 388:4, 401:22
**meant** [8] - 322:12, 340:1, 344:6, 353:25, 360:24, 361:24, 361:25, 369:13
**meet** [4] - 367:18, 370:23, 375:10, 375:13
**meeting** [1] - 323:12
**Meltzer** [1] - 317:18
**members** [21] - 321:2, 322:9, 325:24, 335:25, 338:20, 339:2, 339:23, 342:24, 343:8, 343:15, 346:3, 346:23, 347:15, 359:20, 362:19, 363:17, 364:18, 366:12, 366:19, 368:18, 369:6
**memo** [1] - 323:11
**memoranda** [1] - 380:25
**memorandum** [2] - 390:12, 390:18
**Merrill** [1] - 337:16
**Michelle** [1] - 403:2
**microphone** [1] - 390:15
**might** [7] - 322:13, 334:21, 335:21, 339:8, 365:4, 368:13, 374:21
**Miller** [1] - 403:2
**million** [4] - 362:6,

371:3, 389:7, 389:16
**millions** [4] - 337:11, 337:12, 362:6
**minute** [10] - 333:16, 346:22, 347:20, 348:1, 348:9, 352:18, 353:13, 359:23, 373:7, 376:20
**minutes** [8] - 325:11, 326:24, 335:16, 337:6, 346:5, 354:21, 372:9, 373:11
**missing** [1] - 400:19
**mission** [13] - 323:19, 326:3, 326:17, 326:21, 326:22, 327:3, 327:7, 327:16, 329:8, 345:15, 345:18, 371:6
**moderate** [1] - 341:13
**moderate-income** [1] - 341:13
**moment** [5] - 333:17, 334:16, 348:22, 351:18, 390:23
**money** [49] - 322:13, 326:1, 326:23, 327:11, 327:12, 328:7, 328:16, 329:13, 329:17, 329:19, 329:21, 329:22, 330:1, 330:3, 330:8, 331:6, 332:24, 334:5, 339:4, 343:18, 344:20, 344:21, 350:5, 350:14, 351:4, 351:6, 351:23, 351:24, 352:24, 353:13, 353:20, 355:22, 355:23, 356:1, 356:15, 360:25, 361:1, 361:3, 361:5, 361:17, 361:18, 361:23, 362:13, 362:16, 362:23, 363:21, 388:5
**month** [2] - 332:3, 332:20
**monthly** [6] - 328:18, 330:13, 331:22, 332:3, 332:4
**months** [3] - 354:1, 354:9, 356:20
**morning** [8] - 321:11, 334:1, 334:14,

342:6, 348:4, 351:20, 404:1, 405:5
**mortgage** [49] - 327:11, 327:24, 328:8, 328:11, 328:15, 328:18, 328:24, 329:1, 329:3, 329:9, 329:10, 329:12, 329:13, 329:14, 329:15, 329:16, 329:18, 329:20, 329:23, 329:25, 330:8, 330:9, 330:13, 330:15, 331:4, 331:8, 331:9, 331:12, 331:14, 331:19, 331:23, 332:2, 332:7, 332:12, 332:14, 332:17, 332:19, 333:19, 338:4, 338:11, 338:12, 338:16, 338:17, 338:23, 339:9, 345:16, 345:23, 353:9
**mortgage-backed** [11] - 331:4, 331:8, 331:9, 331:14, 331:19, 332:2, 332:7, 332:19, 333:19, 338:23, 353:9
**mortgages** [7] - 326:15, 326:21, 327:10, 327:18, 327:23, 330:4, 330:11, 330:12, 330:19, 330:22, 330:23, 330:25, 331:1, 331:3, 331:7, 331:25, 332:9, 333:4, 338:9, 338:14, 338:15, 338:18, 338:25, 339:11, 339:13, 339:21
**most** [15] - 321:10, 321:11, 325:15, 332:18, 338:17, 341:7, 345:8, 345:9, 345:10, 363:22, 363:23, 363:24, 364:18, 364:20, 366:18
**mouthful** [1] - 341:3
**move** [3] - 333:16, 355:13, 383:12
**moving** [1] - 400:12

**MR** [25] - 320:12, 320:17, 321:1, 377:19, 377:24, 378:15, 379:13, 379:16, 387:5, 392:24, 393:1, 393:15, 394:23, 395:1, 396:24, 402:21, 402:24, 403:9, 403:12, 403:16, 403:24, 404:8, 404:12, 404:14, 405:4
**MS** [40] - 377:2, 377:7, 377:12, 377:14, 377:16, 377:22, 378:1, 378:4, 378:7, 378:11, 378:19, 378:23, 379:18, 379:22, 379:23, 383:16, 383:17, 384:13, 384:14, 387:1, 387:7, 387:8, 390:22, 390:25, 391:1, 391:19, 393:4, 393:19, 395:14, 396:12, 396:13, 396:18, 396:22, 396:25, 397:1, 398:12, 401:2, 401:23, 401:24, 402:7
**multiple** [1] - 390:20
**must** [4] - 345:20, 345:21, 399:3

**N**

**name** [3] - 321:4, 379:1, 388:9
**named** [2] - 342:5, 355:7
**names** [2] - 337:15, 337:16
**Nancy** [1] - 386:12
**nation's** [1] - 328:1
**nearly** [1] - 359:4
**need** [8] - 324:4, 350:21, 351:10, 359:17, 360:10, 360:12, 360:15
**needed** [10] - 340:9, 350:17, 350:23, 351:6, 351:14, 351:15, 351:16, 356:4, 360:18, 381:14
**negative** [3] - 343:10, 343:13, 360:9
**negotiate** [1] - 335:6

**negotiated** [1] - 335:3
**net** [31] - 321:24, 322:6, 322:15, 323:8, 343:10, 343:13, 347:17, 353:21, 354:24, 357:18, 360:9, 362:19, 364:4, 367:15, 367:22, 369:7, 369:16, 370:4, 370:5, 370:10, 370:17, 370:22, 371:19, 371:23, 372:5, 372:25, 373:3, 373:10, 374:24, 386:10
**never** [1] - 357:15
**New** [4] - 317:16, 317:22, 318:4
**new** [4] - 336:24, 336:25, 345:24
**news** [3] - 333:12, 346:10, 350:1
**newspaper** [1] - 388:22
**next** [23] - 324:7, 330:1, 330:10, 341:20, 344:3, 352:11, 354:10, 360:4, 361:4, 365:12, 377:23, 385:1, 385:13, 386:12, 388:14, 388:24, 392:13, 395:12, 395:22, 400:12, 402:19, 402:24
**nice** [1] - 402:11
**Nicholas** [1] - 355:7
**nobody** [2] - 350:25, 402:13
**nongovernment** [2] - 387:22, 387:23
**Northwest** [4] - 317:16, 317:22, 318:8, 318:12
**note** [4] - 323:24, 342:10, 382:15, 383:25
**noted** [1] - 347:21
**notes** [3] - 383:7, 383:9, 402:12
**nothing** [7] - 336:2, 336:17, 343:20, 350:6, 357:17, 357:18, 401:20
**November** [1] - 358:8
**number** [23] - 320:20, 320:21, 326:13,

326:14, 326:18, 326:19, 338:8, 345:24, 356:10, 356:21, 356:24, 367:3, 373:17, 377:15, 383:15, 384:3, 388:15, 390:1, 390:2, 390:4, 393:25
**Number** [2] - 317:5, 317:8
**numbers** [1] - 355:19
**nutshell** [1] - 343:14

**O**

O.............................
. [1] - 319:12
**oath** [2] - 342:15, 342:20
**objected** [1] - 377:23
**objection** [13] - 377:18, 377:19, 377:24, 378:15, 379:13, 379:16, 387:4, 387:5, 392:24, 393:1, 393:15, 395:2, 395:9
**objections** [1] - 404:6
**obligation** [6] - 322:3, 336:19, 358:21, 367:16, 371:3, 371:5
**obligations** [1] - 370:24
**obvious** [1] - 321:16
**obviously** [1] - 361:25
**occupation** [1] - 379:9
**October** [2] - 317:10, 405:18
**OF** [4] - 317:1, 317:12, 405:11, 405:19
**offered** [1] - 393:6
**offering** [6] - 377:22, 380:25, 381:17, 383:23, 390:12, 390:17
**office** [1] - 340:10
**offices** [1] - 327:21
**official** [1] - 326:10
**Official** [1] - 318:11
**OFFICIAL** [1] - 405:11
**often** [1] - 381:6
**once** [3] - 324:18, 346:16, 362:8
**one** [42] - 320:7, 321:12, 322:20, 323:24, 336:7, 338:3, 340:23, 341:6, 341:7, 341:16, 342:7,

342:21, 348:8,
349:8, 349:12,
349:24, 351:3,
351:21, 352:14,
357:5, 368:2,
371:14, 371:17,
372:21, 373:22,
374:4, 374:9, 383:5,
388:17, 389:11,
389:22, 390:2,
390:11, 392:21,
393:5, 395:12,
401:11, 401:25,
403:2, 403:3
**ones** [2] - 377:22,
391:12
**open** [1] - 320:11
**Opening** [1] - 319:4
**opening** [4] - 320:13,
320:16, 320:25,
325:18
**OPENINGS** [1] - 319:3
**operating** [2] - 360:13,
366:6
**operations** [1] -
380:24
**optimistic** [2] - 365:6,
367:2
**optional** [1] - 353:25
**order** [11] - 320:2,
324:13, 341:15,
347:8, 360:10,
361:13, 382:24,
383:5, 399:2, 399:5,
404:22
**ordinarily** [2] - 324:10,
328:19
**organized** [1] - 385:18
**original** [2] - 335:8,
335:12
**ourselves** [1] - 333:11
**outlines** [2] - 390:19,
395:24
**outstanding** [11] -
349:22, 350:2,
383:20, 384:11,
387:17, 391:12,
392:16, 393:21,
394:13, 397:7,
397:20
**overall** [1] - 350:25
**overruled** [2] - 393:3,
393:17
**overseeing** [1] - 343:5
**owed** [2] - 338:11,
371:2
**owes** [1] - 328:16
**own** [8] - 327:9,
328:13, 331:16,
333:19, 333:21,

335:18, 347:22,
369:24
**owned** [1] - 338:14
**ownership** [2] -
333:22, 334:7
**owning** [1] - 336:7

## P

**p.m** [4] - 317:10,
376:25, 405:7
**package** [2] - 331:2,
332:18
**packages** [1] - 332:8
**page** [1] - 346:10
**pages** [1] - 381:23
**paid** [27] - 332:12,
339:13, 351:25,
352:8, 354:23,
356:5, 356:6,
356:21, 366:10,
370:8, 376:12,
382:22, 384:16,
384:19, 385:3,
385:10, 386:8,
389:6, 394:22,
399:3, 399:4,
399:14, 399:25,
400:6, 401:6, 401:8
**pandemic** [1] - 368:14
**paragraph** [2] -
398:13, 398:14
**paraphrasing** [1] -
350:10
**parentheses** [1] -
340:24
**Park** [1] - 379:3
**PARK** [2] - 319:7,
378:21
**part** [18] - 324:1,
324:14, 324:16,
324:19, 328:19,
328:21, 333:6,
346:15, 348:6,
354:22, 358:2,
358:4, 358:16,
358:23, 365:23,
374:10, 374:11,
375:5
**particular** [6] - 331:2,
336:9, 381:15,
389:1, 391:3, 394:4
**particulars** [2] -
355:10, 390:12
**parties** [2] - 377:8,
398:6
**partly** [2] - 341:1,
341:2
**party** [3] - 334:19,
335:5, 403:16

**party's** [1] - 364:8
**pass** [1] - 340:12
**passed** [4] - 340:13,
340:17, 351:9,
351:10
**pause** [2] - 347:20,
351:18
**pay** [29] - 321:20,
332:16, 332:25,
333:4, 334:6,
339:21, 352:18,
352:20, 352:21,
354:1, 354:20,
356:25, 357:2,
361:1, 361:3, 361:5,
361:7, 361:14,
361:15, 361:17,
361:23, 362:17,
365:20, 369:25,
370:15, 370:16,
376:13, 399:18
**payable** [2] - 367:23,
371:18
**paying** [8] - 332:5,
333:3, 334:10,
338:24, 352:5,
360:13, 372:5,
380:15
**payment** [18] - 328:13,
328:18, 328:19,
328:21, 330:13,
331:22, 331:23,
332:3, 332:4,
332:14, 353:24,
361:22, 370:13,
370:25, 398:3,
398:20
**payments** [13] -
331:21, 332:12,
332:22, 332:23,
338:15, 338:16,
357:6, 357:11,
361:24, 366:7,
369:18, 369:22,
369:24
**pays** [1] - 328:16
**PCF** [14] - 355:15,
355:21, 356:5,
356:8, 356:11,
356:16, 356:18,
356:21, 357:3,
371:15, 371:18,
371:22, 372:2, 372:6
**peaked** [1] - 338:7
**Pennsylvania** [1] -
317:19
**penny** [1] - 322:21
**people** [36] - 323:23,
327:12, 327:20,
329:1, 329:22,

330:6, 331:10,
331:13, 331:16,
331:18, 333:3,
333:19, 337:12,
337:22, 338:8,
338:11, 338:15,
338:18, 339:7,
339:8, 339:11,
339:18, 341:1,
349:2, 355:25,
356:1, 362:6,
362:15, 363:2,
368:7, 375:25,
381:6, 390:11,
399:23
**per** [2] - 359:7, 359:8
**percent** [20] - 352:20,
354:2, 354:7,
354:17, 354:23,
355:1, 355:17,
360:24, 361:1,
361:2, 361:8,
361:14, 361:22,
361:24, 362:17,
369:23, 370:15,
392:10, 392:21,
394:7
**percentage** [5] -
392:7, 392:9, 394:6,
398:2, 398:25
**performance** [1] -
365:9
**perilously** [1] - 362:4
**period** [4] - 367:13,
384:17, 385:17
**periodic** [6] - 352:21,
355:14, 364:10,
371:9, 371:11,
371:12
**permitting** [1] -
403:19
**person** [6] - 327:23,
328:4, 334:2, 352:6,
364:20, 403:17
**person's** [1] - 342:1
**personal** [2] - 342:1,
403:17
**Ph.D** [1] - 323:3
**phone** [1] - 394:23
**phrase** [1] - 374:5
**phrases** [1] - 363:15
**pick** [1] - 337:6
**piece** [4] - 333:22,
334:3, 334:5, 335:18
**pile** [2] - 354:5, 397:12
**place** [8] - 351:3,
359:19, 359:21,
359:24, 364:9,
367:19, 371:2, 372:8
**plaintiff** [1] - 403:17

**PLAINTIFFS** [1] -
378:21
**Plaintiffs** [4] - 317:4,
317:15, 317:18,
403:14
**plaintiffs** [18] - 324:2,
324:8, 324:11,
333:17, 358:8,
362:20, 375:9,
375:12, 377:3,
378:18, 378:20,
387:1, 398:6,
398:15, 402:22,
402:24, 403:12,
404:15
**plaintiffs'** [11] - 320:5,
324:1, 324:9,
324:14, 324:19,
346:5, 347:22,
363:5, 372:10,
372:12, 404:18
**Plaintiffs'** [9] - 377:11,
377:20, 377:25,
378:3, 378:6, 378:9,
378:13, 382:7
**plan** [1] - 403:24
**planning** [1] - 368:8
**plant** [1] - 336:24
**played** [2] - 337:14,
354:23
**PLLC** [1] - 317:16
**pockets** [1] - 363:21
**point** [11] - 325:22,
333:24, 338:1,
345:9, 346:3,
352:21, 353:4,
365:25, 366:22,
401:25
**pointed** [1] - 325:3
**pointing** [1] - 326:8
**policy** [1] - 323:20
**poof** [1] - 360:1
**Porter** [1] - 318:8
**portion** [4] - 328:20,
332:3, 354:13, 356:3
**posed** [2] - 368:2,
370:20
**position** [1] - 371:4
**positive** [2] - 365:9,
371:25
**possibly** [2] - 372:14,
380:18
**potential** [1] - 379:19
**potentials** [1] - 403:20
**power** [9] - 341:18,
344:9, 344:11,
344:19, 344:21,
346:7, 346:18,
347:18, 350:15
**PowerPoint** [5] -

367:9, 381:10, 381:11, 382:3, 386:22
**powers** [4] - 341:16, 344:7, 344:11
**practice** [1] - 336:19
**pre** [2] - 377:4, 396:20
**pre-admit** [1] - 377:4
**pre-admitted** [1] - 396:20
**predicting** [1] - 368:16
**preference** [7] - 355:2, 355:4, 355:12, 357:9, 361:16, 386:3, 386:10
**preferred** [47] - 347:9, 347:11, 349:20, 349:21, 351:19, 352:13, 357:20, 383:19, 384:10, 387:15, 387:16, 387:20, 387:23, 387:25, 388:1, 388:5, 388:9, 388:16, 388:21, 389:1, 389:7, 390:13, 390:17, 390:21, 391:11, 391:16, 391:17, 391:18, 392:15, 392:21, 393:22, 394:2, 394:11, 395:6, 395:20, 396:1, 397:7, 398:16, 398:23, 399:3, 400:1, 400:6, 400:9, 400:10, 401:3, 401:7, 401:9
**PREFERRED** [1] - 317:9
**preliminary** [2] - 325:17, 335:8
**premarked** [1] - 396:19
**preparation** [1] - 381:7
**prepare** [1] - 383:5
**prepared** [3] - 382:9, 382:10, 386:22
**preponderance** [1] - 324:4
**present** [7] - 320:3, 320:8, 324:17, 359:13, 377:1, 387:2, 405:4
**presentation** [4] - 367:9, 381:11, 382:4, 386:22
**presenting** [2] - 324:6, 324:8

**preserved** [1] - 363:25
**president** [3] - 340:13, 341:9, 344:19
**presidents** [1] - 323:5
**presumably** [1] - 404:8
**pretty** [2] - 353:1, 387:11
**preview** [2] - 382:14, 403:24
**previous** [3] - 366:4, 366:5, 401:11
**previously** [2] - 382:19, 385:7
**price** [1] - 335:22
**prices** [2] - 338:6, 340:11
**primary** [2] - 328:24, 329:23
**principal** [2] - 328:10, 328:20
**priority** [1] - 363:22
**private** [20] - 322:7, 322:12, 323:21, 326:23, 327:3, 336:22, 345:21, 387:15, 387:20, 387:22, 391:17, 391:18, 394:10, 394:22, 395:6, 397:7, 399:14, 399:25, 400:14, 401:17
**problem** [9] - 338:21, 350:19, 361:9, 362:12, 362:15, 369:14, 369:21, 370:3, 370:5
**problematic** [1] - 359:22
**problems** [2] - 338:13, 338:18
**proceed** [2] - 379:21, 387:6
**proceedings** [1] - 405:14
**Proceedings** [2] - 318:15, 405:7
**proceeds** [1] - 371:23
**process** [1] - 368:22
**produce** [2] - 381:25, 382:2
**produced** [2] - 318:15, 382:3
**professor** [2] - 363:7, 363:8
**professors** [2] - 363:6
**profit** [8] - 336:5, 336:22, 336:24, 350:5, 350:14,

350:15, 354:20
**profits** [6] - 326:18, 345:10, 363:23, 365:4, 370:9, 370:12
**program** [2] - 323:24, 342:10
**projection** [2] - 365:10, 365:21
**projections** [3] - 365:3, 365:8, 367:2
**proof** [4] - 324:3, 324:5, 375:10, 375:13
**prospective** [1] - 348:5
**prospects** [1] - 365:6
**protect** [8] - 321:25, 322:1, 322:2, 345:11, 345:12, 358:22, 363:24
**protecting** [1] - 371:25
**prove** [2] - 324:3, 324:4
**provide** [7] - 327:17, 329:8, 341:11, 359:2, 371:22, 382:25, 399:5
**Provide** [2] - 326:14, 326:20
**provides** [1] - 327:11
**provisions** [2] - 374:10, 374:11
**Prussia** [1] - 317:19
**PSPA** [6] - 352:14, 352:24, 353:4, 357:14, 358:3, 358:5
**PSPAs** [10] - 351:20, 353:23, 354:19, 357:5, 357:7, 357:8, 358:1, 358:23, 358:25, 374:11
**public** [43] - 322:2, 322:4, 322:5, 322:12, 322:16, 322:23, 323:4, 326:3, 326:17, 326:21, 326:22, 327:2, 327:16, 329:8, 344:16, 344:23, 345:4, 345:13, 345:15, 345:17, 345:22, 346:1, 346:8, 346:18, 349:4, 349:15, 351:16, 353:22, 354:15, 358:22, 362:2, 363:3, 363:24, 369:12,

371:6, 374:21, 379:10, 380:18, 380:19, 400:22
**publicly** [6] - 349:1, 380:21, 381:16, 383:1, 384:25, 386:15
**publish** [1] - 380:22
**pull** [2] - 348:8, 384:21
**pulled** [2] - 381:15, 402:5
**pun** [1] - 349:13
**PURCHASE** [1] - 317:9
**purchase** [4] - 351:19, 352:13, 357:20, 395:25
**purchasing** [1] - 353:16
**purpose** [2] - 356:2, 400:4
**purposes** [1] - 381:22
**pursuing** [1] - 323:20
**put** [16] - 322:5, 331:7, 341:18, 343:19, 344:1, 344:4, 347:5, 350:9, 364:12, 365:11, 369:5, 371:2, 374:18, 375:17, 386:4, 395:3
**puts** [3] - 339:13, 339:19, 349:12
**putting** [3] - 356:14, 363:20, 375:8
**PX** [1] - 386:20
**PX-1-1** [2] - 319:10, 377:20
**PX-1-26** [1] - 397:11
**PX-11** [5] - 377:12, 377:16, 396:20, 396:21, 396:22
**PX-140** [3] - 396:20, 396:21, 396:22
**PX-213** [3] - 319:13, 378:11, 378:13
**PX-222** [2] - 378:11, 378:13
**PX-223** [1] - 378:13
**PX-2B** [2] - 377:23, 377:25
**PX-2B**.......................
..........................[1] -
319:11
**PX-2C** [2] - 378:1, 378:3
**PX-2C**.......................
..........................[1] -
319:11
**PX-2E** [2] - 378:4, 378:6

**PX-2E**.......................
..........................[1] -
319:12
**PX-4A** [2] - 386:20, 387:2
**PX-4H** [1] - 400:13
**PX-4Y** [1] - 387:2
**PX-5A** [4] - 319:12, 378:7, 378:9, 382:6
**PX-5C** [1] - 378:9
**PX-5I** [1] - 385:8
**PX-5L** [1] - 386:1
**PX-5M** [1] - 386:7
**PX-5N** [1] - 386:12
**PX-5O** [1] - 386:16
**PX-Y** [1] - 386:20

## Q

**quarrel** [1] - 366:9
**quarter** [38] - 343:8, 353:24, 354:1, 354:6, 354:8, 354:11, 354:20, 354:21, 354:23, 356:6, 356:18, 357:3, 360:9, 361:4, 362:17, 370:9, 370:14, 371:10, 371:15, 371:17, 372:7, 385:19, 385:23, 385:24, 386:3, 399:15, 399:16, 400:15, 400:16, 400:17, 400:18, 401:14, 401:16, 401:18, 401:19, 402:4
**quarter-by-quarter** [1] - 372:7
**quarterly** [4] - 370:12, 380:23, 383:1, 385:16
**quarters** [8] - 365:9, 366:3, 366:4, 366:5, 369:23, 370:13, 400:11, 400:19
**questions** [4] - 324:20, 324:21, 342:13, 342:19
**quibble** [1] - 366:10
**quick** [2] - 382:8, 382:13
**quickly** [2] - 382:17, 383:12
**quite** [1] - 328:9
**quotation** [1] - 340:24
**quote** [1] - 344:25

# R

**Radnor** [1] - 317:19
**raise** [3] - 402:19, 403:22, 404:11
**ratably** [1] - 373:24
**re** [2] - 317:8, 362:9
**re-upped** [1] - 362:9
**read** [3] - 349:19, 398:13, 400:6
**ready** [3] - 320:15, 401:25, 402:7
**real** [5] - 338:1, 368:1, 368:2, 369:21
**realize** [1] - 320:7
**really** [11] - 329:20, 332:6, 333:6, 349:5, 351:21, 355:8, 355:25, 365:25, 366:5, 366:14, 371:16
**reason** [2] - 361:21, 374:7
**reasonable** [19] - 322:8, 322:11, 322:17, 322:18, 358:11, 358:20, 368:18, 373:4, 373:12, 373:18, 374:15, 374:20, 374:25, 375:6, 375:14, 375:15, 404:20
**reasonably** [2] - 323:22, 373:9
**reasons** [1] - 337:24
**receive** [2] - 373:24, 395:20
**received** [22] - 322:21, 377:10, 377:11, 377:18, 377:20, 377:25, 378:2, 378:3, 378:5, 378:6, 378:8, 378:9, 378:12, 378:13, 394:19, 397:17, 400:7, 400:10, 400:15, 401:9, 401:17, 401:20
**RECEIVED** [1] - 319:9
**recess** [2] - 376:20, 376:23
**Recess** [1] - 376:25
**recognize** [1] - 397:2
**record** [7] - 378:15, 379:2, 382:16, 396:24, 400:12, 404:4, 405:14
**recorded** [1] - 318:15
**Recovery** [6] - 340:18,

340:20, 341:3, 344:14, 344:16, 351:9
**recovery** [1] - 340:21
**recross** [1] - 404:9
**red** [2] - 343:15
**redirect** [1] - 404:9
**refer** [4] - 321:6, 334:9, 342:5, 361:11
**referred** [7] - 325:16, 325:17, 325:18, 348:5, 351:24, 355:15, 399:8
**referring** [1] - 340:25
**refers** [1] - 393:25
**reflected** [1] - 391:3
**reflects** [1] - 399:24
**regarding** [1] - 390:17
**regardless** [1] - 404:4
**regular** [3] - 326:1, 329:1, 352:6
**regulated** [2] - 345:3, 374:13, 374:17
**regulates** [1] - 348:25
**relate** [2] - 335:14, 373:18
**related** [1] - 380:7
**relates** [1] - 371:8
**relatively** [1] - 403:6
**reliable** [1] - 399:23
**relied** [1] - 383:5
**rely** [1] - 345:22
**remain** [2] - 349:22, 350:1
**remains** [1] - 371:24
**remember** [10] - 330:23, 331:21, 337:15, 338:22, 345:14, 346:11, 353:8, 360:8, 369:21, 383:4
**render** [1] - 376:17
**reorient** [1] - 395:15
**repaid** [1] - 352:4
**repeat** [1] - 390:14
**replaced** [1] - 362:10
**replacing** [1] - 370:6
**report** [2] - 362:5, 383:2
**reported** [4] - 367:24, 385:11, 386:14, 386:18
**Reporter** [1] - 318:11
**REPORTER** [3] - 396:21, 405:11, 405:19
**reporting** [1] - 367:24
**reports** [2] - 349:3, 349:4
**represent** [1] - 321:4

**representative** [2] - 403:6, 403:16
**representatives** [2] - 403:3, 403:4
**Republicans** [1] - 323:6
**require** [1] - 398:22
**required** [3] - 349:3, 369:22, 380:22
**research** [1] - 400:20
**reserve** [1] - 404:8
**residential** [2] - 326:15, 326:20
**resist** [1] - 404:13
**resolve** [1] - 404:2
**respect** [1] - 333:25
**respectful** [1] - 376:4
**respectfully** [3] - 336:10, 375:9, 376:15
**respective** [1] - 398:21
**responsibilities** [1] - 323:16
**responsibility** [6] - 344:12, 344:19, 344:22, 346:7, 369:11
**rest** [2] - 333:1, 349:19
**result** [2] - 338:8, 374:16
**retain** [1] - 350:11
**return** [13] - 334:5, 334:10, 352:5, 352:9, 352:19, 353:2, 353:7, 354:13, 355:24, 376:5, 388:5, 389:6, 395:21
**returned** [2] - 371:21, 372:1
**review** [2] - 381:24, 396:5
**reviewed** [2] - 380:21, 386:21
**reviewing** [1] - 397:23
**rid** [1] - 370:2
**rights** [1] - 388:1
**ripping** [1] - 350:3
**ripple** [1] - 339:10
**risk** [24] - 338:2, 339:19, 339:24, 339:25, 340:1, 340:2, 356:15, 357:23, 363:11, 364:13, 364:22, 367:20, 369:1, 369:5, 369:9, 369:16, 369:19, 369:20, 370:18,

370:19, 370:20, 375:18, 375:23, 375:24
**risks** [1] - 323:15
**Road** [1] - 317:19
**ROBERT** [2] - 318:2, 318:7
**rogue** [1] - 323:20
**role** [2] - 337:14, 354:24
**Room** [1] - 318:13
**room** [1] - 402:13
**roses** [1] - 368:10
**round** [1] - 352:2
**ROYCE** [1] - 317:12
**RPR** [1] - 318:11
**RUDY** [6] - 317:18, 402:21, 402:24, 403:9, 404:14, 405:4
**Rudy** [4] - 402:22, 402:24, 403:13, 404:13
**ruled** [1] - 404:19
**ruling** [2] - 324:17, 379:14, 379:17
**run** [4] - 342:2, 344:9, 345:20, 345:21
**running** [1] - 342:23

# S

**safe** [4] - 327:12, 341:12, 343:6, 353:18
**safety** [2] - 353:21
**SAMUEL** [1] - 317:21
**Sara** [2] - 405:13, 405:18
**SARA** [1] - 318:11
**Satriano** [1] - 355:7
**save** [7] - 322:7, 324:25, 340:6, 340:7, 352:25, 353:1
**saw** [4] - 329:7, 343:5, 343:19, 357:7
**scenario** [4] - 368:7, 368:9, 368:18
**Schiller** [1] - 317:22
**Scholer** [1] - 318:8
**scope** [1] - 404:6
**screen** [4] - 395:3, 395:8, 395:10, 397:9
**screens** [1] - 326:6
**seat** [1] - 363:10
**seated** [3] - 320:23, 378:17, 403:11
**SEC** [6] - 348:23, 349:3, 367:24, 367:25, 381:3
**Second** [2] - 359:15

**second** [3] - 400:16, 401:14, 401:19
**secondary** [7] - 326:14, 326:20, 329:3, 329:8, 329:10, 345:16, 345:23
**secret** [4] - 321:6, 346:7, 346:9, 357:21
**secures** [1] - 338:16
**securities** [14] - 330:20, 331:10, 331:14, 331:19, 332:7, 332:8, 333:19, 338:23, 348:14, 348:17, 348:21, 353:9, 367:3, 367:5
**Securities** [3] - 348:24, 367:6, 381:3
**securitize** [2] - 330:19, 330:25
**securitizing** [1] - 330:21
**security** [9] - 331:2, 331:4, 331:8, 331:9, 332:2, 332:19, 388:7, 388:11
**see** [24] - 326:12, 327:23, 332:15, 333:3, 335:7, 340:16, 340:17, 340:24, 348:22, 360:6, 360:16, 362:5, 365:21, 367:8, 367:9, 376:8, 383:24, 391:8, 391:25, 397:9, 397:13, 402:9, 405:2, 405:6
**seem** [1] - 366:21
**sell** [15] - 329:12, 329:14, 330:19, 331:9, 331:25, 334:25, 335:19, 335:20, 335:21, 335:24, 336:4, 350:5, 350:14, 350:15
**selling** [1] - 330:23
**sells** [5] - 329:15, 329:20, 329:25, 331:23, 332:16
**sending** [1] - 330:7
**SENIOR** [1] - 317:9
**senior** [2] - 349:9, 367:9
**sent** [1] - 371:14
**separate** [1] - 354:4
**September** [10] -

344:4, 347:6,
347:13, 347:18,
349:17, 349:25,
352:17, 360:1,
360:6, 374:12
**series** [30] - 383:14,
383:19, 384:10,
387:16, 388:9,
388:16, 388:21,
389:1, 389:10,
389:18, 389:23,
390:12, 390:17,
390:20, 391:3,
391:11, 391:23,
392:15, 392:19,
392:22, 393:5,
393:21, 394:2,
396:23, 397:16,
397:19, 398:15,
399:2, 399:6
**Series** [4] - 389:17,
389:25, 390:5,
397:16
**serious** [1] - 350:22
**seriously** [3] - 349:6,
349:7, 349:14
**servant** [1] - 323:4
**served** [1] - 323:5
**service** [1] - 321:15
**SESSION** [1] - 317:12
**set** [2] - 325:25,
331:16
**sets** [1] - 380:15
**several** [1] - 383:6
**share** [19] - 333:20,
333:21, 334:1,
334:2, 334:7,
334:11, 334:17,
334:18, 335:4,
335:5, 335:17,
336:8, 350:13,
352:6, 390:8,
390:11, 390:20,
399:6, 402:20
**shared** [2] - 402:19,
402:20
**shareholder** [17] -
322:11, 322:20,
322:24, 334:17,
334:19, 336:12,
346:12, 346:15,
348:7, 349:23,
350:4, 358:2,
358:24, 374:2,
390:2, 394:11
**shareholders** [89] -
322:7, 322:13,
322:18, 322:22,
326:2, 326:18,
326:19, 326:23,

327:3, 331:15,
333:18, 334:15,
335:11, 335:24,
335:25, 336:3,
336:20, 337:2,
337:3, 343:18,
344:18, 344:20,
345:6, 345:10,
345:21, 346:1,
346:10, 346:16,
346:18, 347:3,
348:13, 348:18,
350:7, 350:11,
357:11, 357:12,
357:21, 358:4,
358:23, 363:21,
363:23, 373:5,
373:14, 373:19,
373:24, 374:3,
374:22, 375:1,
375:6, 375:14,
382:23, 387:16,
387:20, 388:3,
388:4, 389:19,
390:2, 390:3, 390:4,
391:3, 391:16,
391:17, 391:18,
392:8, 393:6,
393:22, 394:9,
394:15, 395:6,
395:20, 397:8,
398:20, 399:4,
399:15, 399:19,
399:25, 400:3,
400:5, 400:7, 400:8,
400:10, 400:14,
401:4, 401:7, 401:8,
401:9, 401:17
**shareholders'** [11] -
322:17, 346:9,
346:19, 373:1,
373:5, 373:11,
373:16, 374:15,
374:20, 375:2, 400:9
**shares** [20] - 331:16,
335:22, 350:3,
350:11, 357:25,
373:15, 387:24,
389:9, 389:10,
390:20, 392:23,
393:5, 393:20,
394:12, 397:16,
398:15, 398:16,
398:17, 399:4, 399:6
**sheet** [1] - 382:9
**short** [5] - 350:20,
352:14, 376:23,
403:4, 403:7
**shorthand** [2] -
318:15, 327:6

**shortly** [1] - 320:14
**show** [60] - 321:23,
322:4, 322:10,
323:3, 324:23,
324:24, 325:24,
326:16, 327:4,
327:6, 329:11,
329:18, 330:16,
333:21, 336:11,
337:9, 337:12,
337:23, 338:6,
339:2, 339:5,
339:24, 340:4,
342:24, 343:13,
343:16, 343:22,
344:3, 346:12,
347:22, 350:24,
351:2, 352:11,
352:17, 353:4,
354:22, 356:17,
358:19, 360:19,
361:10, 363:13,
366:1, 366:12,
369:3, 369:6,
369:22, 373:8,
374:18, 375:2,
375:10, 375:13,
375:19, 376:10,
384:22, 385:13,
386:12, 387:10,
400:13
**showing** [5] - 385:7,
389:4, 401:3,
401:13, 403:4
**shown** [3] - 385:23,
386:24, 399:13
**shows** [23] - 375:9,
381:11, 382:22,
383:14, 383:19,
384:10, 384:16,
384:19, 385:3,
385:10, 385:15,
385:22, 386:2,
386:8, 386:13,
386:17, 387:15,
389:5, 391:11,
392:14, 392:15,
399:14, 400:14
**side** [1] - 329:9
**SIGNATURE** [1] -
405:19
**signed** [4] - 340:13,
349:9, 352:12,
359:14
**simple** [1] - 353:1
**simplify** [1] - 355:18
**simply** [1] - 387:2
**single** [3] - 322:19,
322:20, 339:3
**sit** [5] - 324:15,

334:22, 342:12,
356:20, 366:14
**sitting** [2] - 330:1,
330:15
**situation** [4] - 338:21,
340:5, 343:4, 361:25
**skill** [2] - 380:10,
380:12
**skipping** [1] - 347:8
**slide** [45] - 326:5,
328:3, 328:9,
328:25, 329:6,
329:9, 340:14,
340:16, 341:5,
341:20, 341:21,
344:24, 347:4,
348:10, 349:18,
350:9, 352:15,
352:23, 359:5,
360:4, 365:11,
367:4, 371:13,
375:7, 387:13,
387:14, 391:7,
391:21, 392:13,
392:14, 392:15,
397:6, 399:11,
399:13, 399:14,
400:12, 400:13,
400:14, 401:11,
401:14, 401:15,
402:2, 402:3
**slightly** [1] - 395:1
**small** [1] - 337:13
**smaller** [2] - 362:11
**so-called** [1] - 365:24
**sole** [2] - 373:25,
374:5
**solid** [1] - 365:1
**someone** [2] - 334:20,
357:9
**sometimes** [7] -
330:10, 330:12,
331:1, 331:4, 334:9,
355:14, 370:10
**somewhere** [2] -
340:11, 365:4
**soon** [1] - 357:12
**sorry** [10] - 320:8,
334:17, 341:20,
348:10, 359:5,
360:4, 363:6,
390:16, 393:1,
402:23
**sound** [1] - 343:6
**sounds** [1] - 343:12
**source** [7] - 341:11,
341:12, 382:24,
383:21, 384:22,
384:23, 399:23
**sources** [1] - 383:9

**Spears** [1] - 341:25
**special** [3] - 332:6,
332:10, 336:13
**specific** [3] - 372:10,
388:9, 388:15
**specifically** [1] -
344:15
**specify** [1] - 404:16
**spell** [1] - 379:2
**spend** [2] - 321:10,
373:10
**sponsored** [2] -
325:19, 325:21
**spreadsheet** [3] -
382:10, 383:7,
383:25
**spreadsheets** [5] -
381:9, 382:3,
382:15, 384:3, 386:5
**stability** [4] - 326:14,
326:20, 327:17,
329:8
**stable** [2] - 341:11,
341:12
**staggering** [1] - 339:4
**stake** [1] - 368:21
**stakes** [3] - 366:21,
368:17, 375:24
**stand** [2] - 342:12,
353:7
**standard** [1] - 336:19
**stands** [1] - 348:23
**staring** [1] - 362:7
**start** [9] - 325:13,
365:4, 385:5,
387:13, 389:8,
389:9, 402:3, 402:8,
402:11
**started** [11] - 320:6,
320:8, 320:9,
320:19, 325:6,
342:17, 345:15,
357:13, 376:11,
376:22, 376:23
**starters** [2] - 325:15,
347:2
**starting** [1] - 356:6
**starts** [1] - 331:21
**state** [2] - 350:24,
380:24
**statement** [7] -
320:25, 325:18,
347:5, 347:6,
348:11, 349:15,
377:8
**Statement** [1] - 319:4
**statements** [5] -
321:18, 365:17,
381:18, 383:2
**STATES** [2] - 317:1,

317:13
**States** [6] - 318:11, 321:25, 322:1, 325:13, 327:8, 370:21
**static** [1] - 386:21
**stay** [1] - 341:20
**stayed** [1] - 341:10
**steady** [1] - 331:20
**Stearns** [1] - 337:16
**stenotype** [1] - 318:15
**step** [5] - 340:6, 340:9, 387:19, 402:16
**stepped** [1] - 356:1
**Stern** [2] - 320:12, 321:4
**STERN** [13] - 318:5, 320:12, 321:1, 379:13, 379:16, 387:5, 392:24, 393:1, 393:15, 394:23, 395:1, 396:24, 404:12
**still** [11] - 320:19, 332:12, 332:24, 333:4, 334:11, 350:4, 357:3, 360:25, 362:3, 364:11, 393:22
**stipulate** [1] - 398:7
**stipulation** [3] - 377:7, 398:9, 400:6
**STOCK** [1] - 317:9
**stock** [69] - 333:22, 334:2, 334:11, 334:17, 334:19, 335:4, 335:5, 335:12, 335:17, 336:8, 337:22, 346:12, 347:9, 347:11, 348:6, 348:8, 348:9, 348:20, 349:1, 349:2, 349:20, 350:1, 350:3, 350:4, 350:8, 351:12, 351:19, 352:6, 352:13, 353:3, 353:7, 353:16, 357:20, 373:16, 373:20, 373:21, 373:22, 373:23, 374:8, 375:2, 383:19, 383:22, 384:10, 387:17, 387:23, 387:25, 388:1, 388:2, 388:5, 388:9, 388:16, 388:21, 389:2, 389:7, 390:5,

390:13, 390:17, 390:21, 391:11, 392:22, 393:23, 394:2, 396:1, 398:23
**stock's** [1] - 398:25
**stockholders** [2] - 336:15
**stocks** [5] - 336:4, 337:22, 349:21, 388:11, 392:15
**stop** [5] - 320:18, 333:3, 341:22, 347:1, 376:22
**strategy** [1] - 366:20
**stream** [1] - 331:20
**stress** [3] - 368:6, 368:9, 368:17
**stuck** [3] - 338:18, 339:12, 362:16
**stuff** [3] - 329:5, 333:9, 355:8
**subject** [2] - 346:14, 354:6
**submission** [1] - 376:4
**submit** [2] - 375:9, 376:15
**substitute** [1] - 386:11
**suffering** [1] - 360:19
**suggested** [1] - 365:3
**summarize** [5] - 333:15, 380:7, 380:9, 380:12, 381:10
**summarizing** [3] - 380:17, 380:20, 381:22
**summary** [3] - 380:2, 382:25, 383:5
**summer** [1] - 337:11
**support** [17] - 327:17, 340:2, 340:3, 343:23, 345:16, 350:18, 350:22, 351:11, 351:14, 351:15, 353:16, 353:19, 357:23, 357:24, 359:3
**supported** [1] - 359:12
**supporting** [1] - 340:21
**supposed** [3] - 332:16, 332:17, 356:6
**survive** [1] - 351:8
**Susan** [2] - 378:20, 379:3
**SUSAN** [2] - 319:7, 378:21

**suspended** [3] - 357:6, 372:6, 372:7
**sweep** [21] - 321:24, 322:6, 322:15, 323:9, 347:17, 354:25, 357:19, 362:19, 364:4, 369:7, 369:16, 370:4, 370:5, 370:10, 370:17, 370:22, 372:5, 372:25, 373:3, 373:10, 374:24
**sworn** [1] - 342:14
**SWORN** [1] - 378:21
**symbol** [4] - 388:19, 388:20, 388:23, 393:10
**system** [1] - 340:1
**systemic** [1] - 339:25

**T**

**table** [1] - 321:14
**tax** [1] - 355:5
**taxpayer** [7] - 354:12, 356:3, 356:12, 356:14, 356:15, 357:1, 362:23
**taxpayers** [5] - 345:12, 371:21, 371:23, 371:25, 372:1
**taxpayers'** [1] - 355:23
**teachers** [1] - 333:13
**team** [3] - 381:13, 386:4, 403:10
**technically** [1] - 392:13
**technology** [1] - 340:14
**ten** [1] - 376:20
**ten-minute** [1] - 376:20
**term** [6] - 338:10, 350:20, 364:21, 367:16, 367:17, 368:7
**terms** [8] - 372:3, 390:19, 395:24, 398:1, 398:2, 398:3, 400:25, 401:12
**terrible** [1] - 338:17
**testified** [1] - 342:16
**testify** [4] - 323:14, 324:14, 355:9, 403:14
**testifying** [4] - 342:8, 379:25, 380:2, 403:6
**TESTIMONY** [1] -

319:6
**testimony** [17] - 323:14, 324:18, 339:23, 342:7, 342:14, 342:19, 345:8, 356:9, 365:15, 376:7, 381:8, 395:3, 403:19, 404:18, 404:20, 404:22
**thanking** [1] - 321:14
**THE** [65] - 317:1, 317:1, 317:12, 320:4, 320:14, 320:18, 320:23, 376:19, 377:6, 377:10, 377:13, 377:15, 377:18, 378:2, 378:5, 378:8, 378:12, 378:17, 378:21, 379:21, 383:15, 384:12, 387:4, 387:6, 389:25, 390:4, 390:5, 390:6, 390:7, 390:10, 390:14, 390:16, 390:24, 391:16, 391:17, 391:18, 392:25, 393:3, 393:17, 393:18, 394:24, 395:11, 396:7, 396:8, 396:9, 396:11, 396:17, 398:11, 400:22, 400:24, 400:25, 402:9, 402:16, 402:17, 402:18, 402:23, 403:8, 403:11, 403:15, 403:22, 404:7, 404:10, 404:13, 405:2, 405:6
**themselves** [6] - 330:11, 352:18, 360:10, 360:11, 360:14, 365:5
**they've** [4] - 330:9, 352:7, 352:8, 401:20
**thin** [1] - 364:15
**thinking** [3] - 334:22, 358:2, 368:13
**third** [4] - 399:16, 401:16, 401:18, 403:5
**Third** [33] - 321:24, 322:6, 322:15, 322:22, 323:8, 325:7, 336:2, 336:6, 343:21, 347:16,

354:24, 357:17, 357:18, 362:18, 362:19, 363:12, 369:7, 369:15, 369:17, 369:19, 370:3, 370:4, 370:21, 371:1, 371:8, 372:3, 372:25, 373:2, 373:9, 374:23, 404:24
**thousands** [1] - 331:1
**threat** [2] - 339:15, 368:2
**threatened** [1] - 361:12
**threatens** [1] - 339:22
**three** [3] - 354:1, 354:9, 356:20
**Thursday** [1] - 404:1
**ticker** [4] - 388:19, 388:20, 388:23, 393:10
**timeline** [3] - 344:3, 352:16, 358:7
**Timothy** [1] - 403:3
**title** [1] - 340:19
**today** [14] - 321:10, 327:7, 365:17, 366:14, 376:12, 376:13, 376:22, 376:23, 379:12, 379:25, 380:2, 380:6, 381:8, 381:22
**together** [4] - 332:19, 374:19, 375:8, 386:4
**tomorrow** [8] - 402:1, 402:8, 402:9, 402:12, 403:14, 403:19, 405:4, 405:6
**tonight** [1] - 403:23
**took** [6] - 324:25, 325:1, 327:1, 346:16, 360:16, 369:9
**top** [5] - 329:15, 348:23, 359:5, 383:24, 389:5
**Topaz** [1] - 317:18
**total** [19] - 353:6, 359:7, 359:8, 360:17, 385:10, 386:8, 389:5, 389:18, 389:19, 391:13, 392:7, 392:9, 392:10, 394:1, 394:6, 394:9, 394:10, 394:22, 395:5
**totally** [1] - 375:15

**touch** [2] - 373:18, 376:2
**touched** [1] - 326:25
**tough** [2] - 363:2, 363:3
**track** [1] - 384:4
**trade** [2] - 335:20, 335:21
**traded** [1] - 349:2
**trading** - 388:22
**Transcript** [1] - 318:15
**transcript** [1] - 405:14
**TRANSCRIPT** [1] - 317:12
**transcription** [1] - 318:15
**travel** [2] - 325:2, 325:9
**Treasury** [68] - 334:14, 336:14, 343:24, 351:7, 351:12, 351:22, 352:2, 352:4, 352:12, 352:18, 352:25, 353:15, 353:20, 353:23, 354:4, 354:12, 354:13, 354:15, 355:1, 355:21, 355:22, 356:2, 356:7, 356:12, 356:14, 356:18, 356:19, 356:22, 356:24, 357:3, 357:8, 357:16, 357:22, 358:5, 358:14, 359:2, 359:11, 359:15, 359:16, 360:8, 362:23, 362:24, 363:25, 364:5, 364:13, 366:11, 367:16, 367:23, 369:4, 369:19, 369:25, 370:8, 371:2, 371:9, 371:14, 371:17, 371:21, 371:24, 372:3, 375:16, 375:17, 385:4, 385:11, 385:16, 385:23, 386:3, 386:9
**Treasury's** [1] - 356:23
**TRIAL** [1] - 317:12
**trial** [3] - 324:7, 328:24, 342:17
**trip** [1] - 325:10
**trouble** [5] - 339:14, 359:10, 359:18, 359:25, 367:11

**truck** [1] - 336:25
**true** [4] - 348:1, 348:2, 366:16, 389:13
**truncate** [1] - 404:19
**truncated** [1] - 404:22
**try** [8] - 328:2, 329:5, 333:10, 335:15, 346:20, 346:25, 355:6, 404:16
**trying** [2] - 333:15, 337:25
**tuck** [1] - 335:15
**tumble** [1] - 339:6
**tune** [1] - 353:17
**turn** [2] - 324:11, 363:16
**turned** [1] - 366:18
**turns** [2] - 359:3, 366:8
**twice** [1] - 358:25
**two** [7] - 323:6, 349:24, 355:15, 365:9, 366:3, 401:1
**type** [3] - 388:1, 388:7, 388:11
**types** [3] - 380:18, 380:19, 387:25

## U

**U.S** [4] - 343:2, 363:11, 385:4, 385:11
**uncertainties** [1] - 323:15
**under** [18] - 339:8, 342:15, 342:20, 343:24, 343:25, 344:9, 347:18, 347:19, 350:23, 353:23, 354:19, 363:22, 364:17, 365:21, 370:7, 372:3, 372:5, 373:12
**underlying** [2] - 382:4, 398:3
**understandable** [1] - 333:10
**understood** [2] - 369:10, 369:11
**underwater** [2] - 338:10, 338:11
**undisputed** [2] - 377:8, 398:7
**unique** [2] - 388:15, 388:20
**United** [6] - 318:11, 321:25, 322:1, 325:13, 327:8, 370:21

**UNITED** [2] - 317:1, 317:13
**unless** [3] - 336:13, 357:16, 360:13
**unlike** [1] - 325:25
**unlikely** [1] - 367:22
**unlimited** - 364:7
**unpredictable** [5] - 364:22, 364:23, 368:4, 368:11, 368:16
**unreasonable** [4] - 358:13, 358:15, 358:19, 363:1
**unreasonably** [2] - 373:3, 375:12
**unusual** [1] - 336:17
**up** [32] - 321:10, 325:25, 326:8, 328:4, 333:1, 335:22, 335:23, 336:25, 337:4, 337:6, 339:9, 343:19, 343:23, 347:5, 347:15, 348:8, 348:9, 350:9, 352:19, 356:1, 361:2, 363:8, 365:11, 366:22, 368:10, 371:10, 371:11, 371:15, 374:6, 384:21, 388:21, 395:7
**upped** [1] - 362:9
**upshot** [1] - 359:1
**utilized** [1] - 381:1

## V

**value** [5] - 334:12, 350:11, 350:12, 356:16, 398:25
**VARAMA** [1] - 318:6
**variable** [7] - 370:6, 370:7, 370:10, 370:11, 370:17, 372:5, 372:7
**various** [5] - 380:24, 384:10, 398:3, 399:2, 399:6
**vary** [1] - 390:8
**verdict** [2] - 376:6, 376:17
**verge** [1] - 343:17
**version** [1] - 386:21
**veto** [4] - 357:10, 358:6, 358:14, 362:23
**vicious** [1] - 339:21
**video** [1] - 403:4

**violated** [1] - 373:1
**virtue** [1] - 358:22
**vital** [2] - 368:19
**vocabulary** [1] - 328:23
**voice** [1] - 379:1
**voir** [1] - 379:19
**volatility** [1] - 367:13
**voluminous** [1] - 381:24
**vs** [1] - 317:5

## W

**wait** [2] - 324:15, 353:12
**waive** [2] - 356:19, 371:15
**waived** [1] - 371:10
**waiver** [1] - 372:7
**waives** [1] - 371:17
**walk** [1] - 327:22
**wants** [1] - 329:11
**Washington** [7] - 317:9, 317:17, 317:23, 318:9, 318:13, 341:2, 381:5
**watch** [2] - 321:15
**watching** [1] - 343:3
**whole** [1] - 331:1
**WICK** [1] - 318:11
**Wick** [2] - 405:13, 405:18
**wild** [1] - 368:12
**WITNESS** [11] - 378:21, 390:4, 390:6, 390:10, 390:16, 391:17, 393:18, 396:8, 396:11, 400:24, 402:17
**witness** [15] - 320:15, 320:19, 323:25, 342:12, 376:21, 376:23, 378:18, 380:2, 382:5, 395:4, 395:7, 395:8, 402:20, 402:25, 403:1
**witnesses** [13] - 328:23, 333:13, 336:18, 342:8, 342:11, 342:16, 342:18, 342:21, 347:23, 355:11, 361:10, 363:5, 368:6
**woods** [1] - 363:18
**word** [1] - 334:20
**wording** [1] - 405:3
**words** [5] - 347:9,

359:25, 372:24, 389:25, 395:5
**works** [4] - 328:22, 332:15, 332:21, 335:4
**world** [1] - 348:12
**worried** [1] - 339:8
**worry** [1] - 372:4
**worse** [2] - 339:5, 343:1
**worth** [28] - 321:24, 322:6, 322:15, 323:8, 338:12, 338:16, 343:11, 343:13, 347:17, 350:10, 354:24, 357:19, 360:9, 362:19, 364:4, 369:7, 369:16, 370:4, 370:5, 370:10, 370:17, 370:22, 372:5, 372:25, 373:3, 373:10, 374:24, 386:10
**written** [1] - 337:25
**wrote** [3] - 323:12, 387:21, 395:18

## Y

**Yahoo** [1] - 388:22
**year** [7] - 339:3, 354:10, 371:3, 371:18, 385:5, 385:12, 386:18
**year-to-date** [2] - 385:12, 386:18
**years** [15] - 322:21, 337:8, 364:4, 365:10, 365:12, 365:13, 365:21, 365:22, 365:23, 365:24, 366:1, 367:8, 368:12, 375:21
**yesterday** [1] - 348:4
**York** [3] - 317:22, 318:4
**yourself** [2] - 359:17, 381:12

## Z

**zero** [3] - 369:9, 401:21, 401:22