```
1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
2
        - - - - - - - - - - - - - - - x
3       FAIRHOLME FUNDS, INC., et al.,
                                          CA No: 1:13-cv-01053-RCL
4                    Plaintiffs,
                                          Washington, D.C.
5                                         Wednesday, October 19, 2022
        vs.                               2:15 p.m.
6
        FEDERAL HOUSING FINANCE AGENCY,
7       et al.,
8                    Defendants.
        - - - - - - - - - - - - - - - x
9       IN RE: FANNIE MAE/FREDDIE MAC    Case Number 1:13-cv-1288
        SENIOR PREFERRED STOCK PURCHASE
10      AGREEMENT CLASS ACTION
        LITIGATIONS
11
12      _____
13             TRANSCRIPT OF JURY TRIAL - AFTERNOON SESSION
              HELD BEFORE THE HONORABLE ROYCE C. LAMBERTH
14                   UNITED STATES DISTRICT JUDGE
        _____
15      APPEARANCES:
16      For the Berkley Plaintiffs:   BRIAN BARNES, ESQ.
                                      COOPER & KIRK, PLLC
17                                    1523 New Hampshire Avenue, NW
                                      Washington, D.C. 20036
18
        For Class Plaintiffs:         LEE D. RUDY  ESQ.
19                                    KESSLER TOPAZ MELTZER & CHECK
                                      280 King of Prussia Road
20                                    Radnor, Pennsylvania 19087
21                                    HAMISH HUME, ESQ.
                                      KENYA DAVIS, ESQ.
22                                    SAMUEL KAPLAN, ESQ.
                                      BOIES SCHILLER FLEXNER LLP
23                                    1401 New York Avenue Northwest
                                      Washington, D.C. 20005
24
        (CONTINUED ON NEXT PAGE)
25
```

```
 1    APPEARANCES (CONTINUED):

 2    For Class Plaintiffs:          RICH GLUCK, ESQ.
                                     ROBERT KRAVETZ, ESQ.
 3                                   BERNSTEIN LITOWITZ BERGER &
                                     GROSSMANN LLP
 4                                   1251 Avenue of the Americas
                                     New York, New York 10020
 5

 6    For Defendant Federal
      Housing Finance Agency:        JONATHAN STERN, ESQ.
 7                                   ASIM VARMA, ESQ.
                                     DAVID BERGMAN, ESQ.
 8                                   IAN HOFFMAN, ESQ.
                                     STANTON JONES, ESQ.
 9                                   ARNOLD & PORTER KAYE SCHOLER
                                     601 Massachusetts Avenue NW
10                                   Washington, D.C. 20001

11

12    Court Reporter:               Lisa A. Moreira, RDR, CRR
                                    Official Court Reporter
13                                  U.S. Courthouse, Room 6718
                                    333 Constitution Avenue, NW
14                                  Washington, DC  20001
                                    (202) 354-3187
15

16

17

18

19

20

21

22

23

24

25
```

```
1                        I N D E X

2
    WITNESS                                          PAGE
3
    SUSAN HARTMAN
4        (By Mr. Stern)...................................548
         (By Ms. Davis)...................................562
5
    MICHELLE MILLER
6        (By Mr. Rudy)....................................578
         (By Mr. Hoffman).................................585
7
    TIMOTHY J. CASSEL
8        (By Mr. Rudy)....................................590
         (By Mr. Hoffman).................................594
9
    EDWARD LINEKIN
10       (By Mr. Barnes)..................................600
         (By Mr. Hoffman).................................610
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S
2            THE COURT:  The jury's right behind me.  It will
3    be here shortly.
4            MR. RUDY:  Judge, before the class representatives
5    testify, I had spoken yesterday about a potential
6    instruction.  I don't intend to make any argument on it, but
7    we have an agreed instruction with defendants that maybe I
8    could hand up while you could look at it, and then I would
9    ask, if it's okay with the Court, that you would read it to
10   the jury before the class representatives testify.
11           THE COURT:  Okay.  Hand it to my clerk.
12           (Pause)
13           MR. HOFFMAN:  No objection from the defense.
14           (Jury enters courtroom)
15           THE COURT:  Mr. Stern, you may proceed in your
16   cross-examination.
17           MR. STERN:  Thank you, Your Honor.
18                    SUSAN HARTMAN, Resumed
19                 CROSS-EXAMINATION, Continued
20   BY MR. STERN:
21   Q.  Good afternoon, Ms. Hartman.
22           I want to go backwards to the topic we touched on
23   before the break.  I apologize for going backwards.  And I'm
24   going to turn us to the Joint Statement of Disputed Facts.
25           And then, just as a program note for His Honor and
```

1    for you, Ms. Hartman, and for the members of our jury, I've

2    got about ten or 15 more minutes of questions, tops, get

3    into some numbers, but then I'll be done.  But I'd like to

4    start with the joint statement.

5              MR. STERN:  If we could pull that up to Paragraph

6    18, please.

7    Q.  So I had asked you a question along these lines, and

8    this is something that you read on direct examination.  And

9    if you'll bear with me, with the Court's permission, I'll

10   read it again.

11             Paragraph 18, "For quarters in which an

12   Enterprise's liabilities exceed its assets" -- liabilities

13   exceed its assets -- "under GAAP, the PSPAs allow the

14   Enterprises to draw upon the Treasury's Commitment in an

15   amount equal to the difference between liabilities and

16   assets."

17             I want to ask you a question, and again, I'd like

18   you to let me know.  If this can be answered based on your

19   general knowledge, great; if not, if it requires some

20   specialized knowledge, let me know that, and I will move on.

21   Okay?

22   A.  Okay.

23   Q.  So the question is, just reading the plain English here,

24   the "draw on the Treasury's Commitment" happens when the

25   enterprise owes more money than it has.  Right?

1          That's what it means for liabilities to exceed

2     assets.  Is that right?

3     A.  That's correct.

4     Q.  And one colloquial way to describe that state of affairs

5     is being in the red, right?

6     A.  Colloquially, yes.

7     Q.  And so what this means is, in a quarter when there's a

8     draw --

9               MS. DAVIS:  Objection.

10              THE COURT:  Overruled.

11    Q.  -- we know -- again, just based on your general

12    understanding, we know that if there's a draw, that is a

13    quarter in which the enterprise was in the red, correct?

14    A.  It's a quarter in which the liabilities exceeded the

15    assets.

16    Q.  Okay.  A quarter in which they owed more than they

17    had --

18    A.  Correct.

19    Q.  -- right?

20              And you also read Paragraph 17, which has a

21    reference to "positive net worth."  Do you see that?

22              MR. STERN:  Can you pull up 17.

23    Q.  Do you see that reference, "positive net worth"?

24    A.  Yes.

25    Q.  And, again, as a matter of your general understanding,

1    when liabilities exceed assets, that's a circumstance of

2    negative net worth, correct?

3    A.  Yes.

4    Q.  Okay.  Now, I want to get into some numbers for a few

5    minutes, and we're just going to use your charts and your --

6    your Excel sheet and your numbers.

7            MR. STERN:  So can we get -- I think this is the

8    right one -- PX-0005-J, as in Jonathan.

9    Q.  Okay.  So we're back to Fannie Mae draws from the

10   Treasury Commitment, correct?

11   A.  Correct.

12   Q.  And it says at the top, "Quarterly and Cumulative," and

13   what that means is -- and, again, this is an Excel

14   spreadsheet that you and your team prepared, correct?

15   A.  Yes.

16   Q.  All right.  Quarterly draws means the amount drawn in a

17   three-month period, a calendar quarter, right?

18   A.  Yes.

19   Q.  So, for example, when it says 2009 Q1, and it -- by the

20   way, up at the top it says "In Billions of USD Unless

21   Otherwise Noted."  Is that right?

22   A.  Yes.

23   Q.  So what that means is if we see the number 15.2 for

24   Q1 --

25           MR. STERN:  Thank you.  My aging eyes.

```
1    Q.  If we see the number 15.2 for Q1, that means there was a
2    $15.2 billion draw for the period of January through March
3    of 2009.  Is that -- am I understanding your Excel
4    spreadsheet correctly?
5    A.  Yes.
6    Q.  All right.  So -- and if we start with that one, that
7    shows that in that quarter Fannie Mae's liabilities exceeded
8    its assets by $15.2 billion, correct?
9    A.  Yes.
10   Q.  That's not a good state of affairs, is it?
11            I'll withdraw that question.  I'll withdraw it.
12            So the next quarter, Q2 2009, Fannie Mae had to
13   draw $19 billion from the Treasury Commitment, correct?
14   A.  Correct.
15   Q.  So now we're up to 30 -- and, again, that means that in
16   that quarter Fannie Mae's liabilities, what it owed,
17   exceeded its assets, what it had, by $19 billion, correct?
18   A.  Yes.
19   Q.  So we're up to $34.2 billion in the first six months of
20   2009, correct?
21   A.  Yes.
22   Q.  Q3 2009, Fannie had to draw 10.7 -- I'm sorry, $10.7
23   billion more from the Treasury Commitment, correct?
24   A.  Correct.
25   Q.  And that's on top of the $34.2 billion that Fannie Mae
```

1    had to get from Treasury in the first six months of 2009,

2    correct?

3    A.  Correct.

4    Q.  So we're up to $44.9 -- check my math for me -- we're up

5    to $44.9 billion for the first nine months of 2009, correct?

6    A.  Correct.

7    Q.  And then, to round out 2009, in the next quarter, Q4

8    2009, Fannie Mae had to draw $15 billion more, correct?

9    A.  Yes.

10   Q.  And that, again, means that in that quarter alone Fannie

11   owed $15 billion more than it had, right?

12   A.  Yes.

13   Q.  And what they're doing, as you know from your general

14   knowledge based on the Joint Statement of Disputed Facts, is

15   that 15 -- the idea of drawing that $15 billion is to get

16   them to the point where they're even; in other words, where

17   their liabilities do not exceed their assets, correct?

18   A.  Yes.

19   Q.  And then in the next quarter, Q1 2010, Fannie Mae had to

20   draw $15.3 billion, right?

21   A.  Yes.

22   Q.  And I'm going to shorten up my questions just in the way

23   I'm asking them.  If you need me to ask the long version,

24   let me know.

25           Next quarter, Q2 2010, $8.4 billion, right?

```
 1    A.   Yes.

 2    Q.   Next quarter, Q3 2010, $1.5 billion?

 3    A.   Yes.

 4    Q.   Q4 2010, $2.5 billion?

 5    A.   Yes.

 6    Q.   And now we're in 2011.  Q1, Fannie Mae had to draw $2.6

 7    billion, correct?

 8    A.   Correct.

 9    Q.   In the next quarter, Q2 2011, Fannie Mae, its

10    liabilities exceeded its assets by $8.5 billion, and they

11    had to take that draw, right?

12    A.   Yes.

13    Q.   Q3 2011, Fannie Mae drew $5.1 billion, right?

14    A.   Yes.

15    Q.   Q4 2011, Fannie Mae had to draw $7.8 billion because in

16    that one quarter alone their liabilities exceeded their

17    assets by $7.8 billion, right?

18    A.   Yes.

19    Q.   Okay.  So now, last one, next quarter, Q1 2012, Fannie

20    Mae's not in the black, right?  They're still in the red?

21    A.   Their liabilities exceeded their assets.

22    Q.   Okay.  Their liabilities exceeded their assets by $4.6

23    billion, right?

24    A.   Yes.

25    Q.   So that means that for every single quarter from the
```

1    first quarter of 2009 through the first quarter of 2012 for

2    Fannie Mae, whether we look quarter by quarter or

3    cumulatively, Fannie Mae's assets exceeded its -- I'm sorry,

4    liabilities exceeded its assets for every quarter throughout

5    that entire period, correct?

6    A.  Yes.

7    Q.  All right.  Now, let's look at the next column over.

8    That's "Cumulative Draws."  Do you see that one?

9    A.  Yes.

10   Q.  And am I correct that the "Quarterly Draw" column is

11   draw by quarter, and the "Cumulative Draw" column adds them

12   up as we go along?  Is that correct?  Right?

13   A.  That's correct.

14   Q.  So just to elaborate on that for a minute.  2009 Q1 is

15   15.2.  That's the first cumulative draw because we're going

16   from zero to 15.2, right?

17   A.  Yes.

18   Q.  Then, the next quarter, the quarterly draw is 19.  And

19   the way we get the cumulative draw is to add the first

20   quarter, 15.2, and the second quarter, 19, and that gets us

21   34.2, correct?

22   A.  Correct.

23   Q.  And it keeps going like that.  34.2 plus 10.7 is 44.9,

24   and so forth, correct?

25   A.  Yes.

1   Q.  So what this shows is -- and we see that highlighted

2   116.1.

3   A.  Yes.

4   Q.  What this shows is that from the first quarter of 2009

5   through and including March of 2012 -- let me withdraw that

6   question and put this just in terms of the calendar.

7           From January 1, 2009, through March 31st of 2012,

8   a draw had to be taken every quarter, right?

9   A.  Yes.

10  Q.  And if you add them all up, you get $116.1 billion that

11  Fannie had to draw from the Treasury Commitment, correct?

12  A.  Correct.

13  Q.  So let's go to PX-0005-K.

14          Now, this is the same concept, different entity,

15  right?  Quarterly and cumulative draws from the Treasury

16  Commitment, but this one's Freddie Mac instead of Fannie

17  Mae, correct?

18  A.  Yes.

19  Q.  And if we look at the fourth quarter of 2008, this shows

20  a quarterly draw of $13.8 billion, right?

21  A.  Yes.

22  Q.  Now, if we look at --

23          MR. STERN:  Can you highlight, Mr. Salazar, 2008

24  Q4 to 2012 Q1 -- or Q2.  Make it Q2.

25          Or make it Q1 to match up with what I was just

 1   talking about.  I apologize.  Through Q1.  Okay.

 2   Q.  So I'm going to get back to the actual numbers in just a

 3   minute, but unlike Fannie Mae where there was a number for

 4   every -- well, Fannie Mae, there was a number for every one

 5   of those quarters, right?  An actual number?

 6   A.  For the quarters you highlighted?

 7   Q.  Yes.  On the Fannie Mae spreadsheet, there was a number

 8   for every quarter.

 9   A.  I don't remember if there was a number in Q4 2008 for

10   Fannie Mae.

11   Q.  Okay.

12         MR. STERN:  Can you move it to Q1 2009.

13   Q.  Good point.

14         MR. STERN:  No, Q1 2009 -- I'm sorry, Jorge, Q1

15   2009 through Q -- perfect.

16   Q.  So there were numbers for every one of those numbers on

17   the Fannie spreadsheet, right?

18   A.  Yes.

19   Q.  And that's because Fannie had to take a draw every

20   single quarter, right?

21   A.  Yes.

22   Q.  Here we have some hyphens or dashes or lines or

23   something for some of the quarters on the Freddie Mac

24   version, right?

25   A.  Yes.

1    Q.  Because there were some quarters where Freddie didn't

2    have to take a draw, right?

3    A.  Correct.

4    Q.  So now let's go through the list.  In the fourth quarter

5    of 2008 you weren't sure whether Fannie took a draw, but we

6    knew that Freddie took a draw, right?  The $13.8 billion?

7    A.  Yes.

8    Q.  And that means that in that quarter Freddie's

9    liabilities exceeded its assets -- they owed more than they

10   had -- to the tune of $13.8 billion, right?

11   A.  Yes.

12   Q.  In the next quarter, Q1 2009, Freddie's liabilities

13   exceeded its assets by $30.8 billion, correct?

14   A.  Yes.

15   Q.  They had to go to Treasury -- to the Treasury Commitment

16   and take $30.8 billion of that Treasury money just to draw

17   even, right?

18   A.  Yes.

19   Q.  So -- and overall, what your chart shows is that for

20   2008, 2009, and 2011, Freddie Mac took draws from Treasury

21   for at least two quarters of '8, '9, and '11.

22        MR. STERN:  You can lose the highlighting, Jorge.

23   Q.  If you need some highlighting, let us know, but it may

24   be easier without that.  I'm going to ask the question

25   again.  I left out 2010.

1              For 2008, 2009, and 2011 -- I'm sorry.

2              For 2008, 2009, 2010, and 2011, Freddie took money

3      from that Treasury Commitment for at least two quarters each

4      year, correct?

5      A.  Not for 2008.

6      Q.  Oh, I'm sorry.  I meant to say '9, '10, and '11, at

7      least two quarters each year.

8      A.  Yes.

9      Q.  And then we know that the only quarter we have on here

10     for 2008 is Q4, and they took a draw in that quarter, right?

11     A.  Correct.

12     Q.  And for that period of Q4 2008 through the end of 2011,

13     Freddie Mac had to draw $71.2 billion, correct?

14     A.  Yes.

15     Q.  And what that means is over that period of time Freddie

16     Mac had to go to that Treasury Commitment -- the money that

17     the United States Treasury was making available from federal

18     government money -- and take $71.2 billion just to break

19     even, correct?

20     A.  Yes.

21     Q.  Now, just to put some of these things together -- and I

22     just have a few more minutes.

23              Before the net worth sweep, Fannie Mae and Freddie

24     Mac had not paid a single dollar to shareholders in

25     dividends for 14 or 15 quarters in a row, correct?  That's

```
1    what we saw before.

2    A.  Yes.

3    Q.  So even before the net worth sweep happened no share

4    had seen a dividend at all for those 14 or 15 quarters,

5    correct?

6    A.  I missed part of that.  Could you repeat the question?

7    Q.  That tells us that before the net worth sweep ever

8    happened, for 14 or 15 quarters no share had ever seen a

9    dividend?

10   A.  Not ever, but during this time period, yes.

11   Q.  Right, during that time period.

12          And during that same time period, from 2008 to the

13   time of the net worth sweep in August of 2012, Fannie and

14   Freddie had to draw billions of dollars from the Treasury

15   Commitment; is that right?

16   A.  Yes.

17   Q.  And, in fact, the total comes to over $187 billion, if

18   you put Fannie and Freddie together, correct?

19   A.  I'd have to see the other chart.

20          MR. STERN:  Can we pull up the other chart.

21   Q.  Which chart would you like to see?  We'll pull it up.

22   A.  The Fannie Mae chart, the same -- the drawdowns.

23          MR. STERN:  I think the Fannie chart was 5J,

24   Jorge.

25   Q.  So you need to see 5J and 5K so you can do the math?
```

```
 1    A.  Uh-huh.

 2    Q.  Got it.  And then I'll ask the question again.

 3              (Pause)

 4    Q.  So I think the number you're looking for in the Fannie

 5    chart -- tell me if I'm wrong -- is 116.1.

 6    A.  That's right.

 7    Q.  And if we go back to the Freddie chart --

 8              MR. STERN:  Sorry, Jorge, can we get it?

 9    Q.  Well, we just looked at that one.  That was the 71.2; is

10    that right?

11    A.  That's correct.

12    Q.  So if we add 116.1 and 71.2, we get 187.3?

13    A.  That's correct.

14    Q.  Okay.  So going back to my question that during this

15    period from 2008 to the time of the net worth sweep in

16    August of 2012 -- so we're talking about the period before

17    the net worth sweep in August 2012 going back to 2008, so

18    we're talking about those four years.  During that period of

19    time, Fannie and Freddie together had to take over $187

20    billion of Treasury federal government money just to break

21    even, correct?

22    A.  Yes.

23              MR. STERN:  Thank you, Your Honor.  I have no

24    further questions.

25              Thank you, Ms. Hartman.
```

```
1                      REDIRECT EXAMINATION
2    BY MS. DAVIS:
3    Q.  Good afternoon, Ms. Hartman.
4    A.  Good afternoon.
5    Q.  Again, I'm Kenya Davis for the plaintiffs.  Let's start
6    at the beginning of the cross-examination.
7              Mr. Stern asked you about prior expert testimony
8    in connection with the financial crisis.  Did you need to
9    have given any prior expert testimony on the financial
10   crisis to perform the calculations on the spreadsheets that
11   you used here in this case --
12   A.  No.
13   Q.  -- to create any of the charts?
14   A.  No.
15   Q.  I'm going to direct your attention to Plaintiffs'
16   Exhibit 5A, which has already been admitted.
17             Can you tell us what Plaintiffs' Exhibit 5A is.
18   A.  This is the index of the Excel spreadsheet that we
19   created.
20   Q.  And would this document indicate the scope of your
21   assignment as a summary witness in this case in terms of
22   what you were asked to gather?
23   A.  Yes, although I don't believe it includes the Case-
24   Shiller index.
25   Q.  And after you were given this assignment for this case,
```

1    did you and your team work together on that assignment?

2    A.  Yes.

3    Q.  As you sit here today, did you complete the task in your

4    assignment?

5    A.  Yes.

6    Q.  You have your Excel spreadsheets there before you --

7    A.  Yes.

8    Q.  -- in your binder?  Thank you.

9            You also have the PowerPoints that you helped to

10   formulate for the purposes of this case, correct?

11   A.  Yes.

12   Q.  Is there anything about your analysis that you would

13   question after having heard from Mr. Stern?  Is there

14   anything that you want to correct about your analysis or

15   anything that you don't feel confident about when it comes

16   to your summaries as you sit here today?

17   A.  No, there's not.

18   Q.  I'm going to direct your attention to Plaintiffs'

19   Exhibits 4G and 4H.

20           Mr. Stern asked you questions about the payment of

21   Fannie and Freddie dividends, correct?

22   A.  Yes.

23   Q.  Now, let's first start with -- actually, let's start

24   with 4H, so that would be the next one, Plaintiffs' 4H.

25           In Plaintiffs' 4H, does it list the payment of

564

1    dividends for Freddie Mac?

2    A.  Yes.

3    Q.  Over what time period?

4    A.  From Q1 1989 through Q2 2008.

5    Q.  I know we've asked you to do a lot of on-the-stand

6    calculations, but for purposes of this examination, could

7    you count the number of consecutive quarters that Freddie

8    Mac paid a dividend between 1989 and the second quarter of

9    2008.

10   A.  Sure.  78.

11   Q.  And is 78 larger than 14?

12   A.  Yes.

13   Q.  I'm going to direct your attention to Plaintiffs'

14   Exhibit 4G.

15        Does Plaintiffs' Exhibit 4G list the payment of

16   dividends for Fannie Mae?

17   A.  Yes.

18   Q.  What time period does it cover?

19   A.  Q1 1977 through Q3 2008.

20   Q.  And I'm going to ask you to count the number of

21   consecutive quarters in which Freddie Mac paid a dividend

22   between 1989 and the second quarter of 2008 -- 1977, I'm

23   sorry, between 1977 and the second quarter of 2008.

24   A.  127.

25   Q.  127.  Is 127 larger or smaller than 14?

 1    A.   Larger.

 2    Q.   I mean than 15?

 3    A.   Larger.

 4    Q.   Thank you.

 5              I want to direct your attention to Plaintiffs' 2C.

 6    Do you see that document?

 7    A.   Yes.

 8    Q.   And Mr. Stern showed you this document as well and asked

 9    you to read a portion of it, correct?

10    A.   Yes.

11    Q.   Now, again, you had no role in deciding which portions

12    of documents that you would read before the jury here today,

13    correct?

14    A.   Correct.

15    Q.   But there were some other portions that he didn't ask

16    you to read for the record so I'm going to direct your

17    attention to Question No. 2 -- a question on Page 2, the

18    first full question.

19              "QUESTION:  When will the conservatorship period

20    end?"

21              Could you read the answer.

22    A.   "ANSWER:  Upon the Director's determination that the

23    Conservator's plan to restore the Company to a safe and

24    solvent condition has been completed successfully, the

25    Director will issue an order terminating the

 1   Conservatorship.  At present, there is no exact time frame

 2   that can be given as to when this Conservatorship may end."

 3   Q.  I also want you to look at the last paragraph of that

 4   document.  It's on Page 3.  The question asks:  "Can the

 5   company be dissolved?"

 6        Can you read the answer.

 7   A.  "ANSWER:  Although the company may be liquidated as

 8   explained above, by statute the Charter of the Company must

 9   be transferred to a new entity and can only be dissolved by

10   an Act of Congress."

11   Q.  And you weren't asked that question on cross, right?

12   A.  No.

13        MS. DAVIS:  Let's go to Plaintiffs' Exhibit 213.

14   Q.  Do you recall Mr. Stern asking you certain questions

15   about certain passages of this document that you didn't

16   read?

17   A.  Yes.

18   Q.  I want to direct your attention to a passage that

19   Mr. Stern did ask you to read.

20        There on Page 2, there's a paragraph that starts

21   with "Financial Forecast Update."  Do you see that?  And

22   Mr. Stern asked you to read in the middle of the paragraph

23   "given this large change from the prior forecast."

24        But I want you to start reading from the beginning

25   of the paragraph up until the point that Mr. Stern asked you

1    to read.  Can you read that passage for the ladies and

2    gentlemen of the jury.

3    A.  "Ann Gehring discussed highlights of the latest

4    financial forecast.  She noted that Q2's record projected

5    income of $6.2 billion (since reduced to $5.5 billion) was

6    twice the first quarter's and was all due to improved

7    credit-related expenses.  A planned new loss model release

8    should make Q3 and Q4 results look better than previously

9    forecast.  Comprehensive income is now expected to be

10   sufficient to cover the dividend obligation throughout 2012.

11   Small Treasury draws are forecast through 2013.  Cumulative

12   2012 through 2016 income is now forecast at $56.6 billion,

13   $12.3 billion higher than the last projection."

14   Q.  And now I want you to go to the last sentence he had you

15   read that starts with "Terry Edwards reminded members," and

16   read that through the rest of the passage.

17   A.  Start with "Terry Edwards"?

18   Q.  Uh-huh, please.

19   A.  "Terry Edwards reminded members that a 1 percent change

20   in home price projections produces a $6 to $7 billion income

21   delta.  As regards home prices, Ann said that Fannie Mae's

22   projections have been shown to be consistently more accurate

23   than other sources.  Terry noted that the housing market

24   seems to be improving despite the fact the shadow inventory

25   is still massive.  Quote, It's as if the market is saying

1      that it's going to remain out there and not grow through,

2      end quote.  Susan McFarland added that Jon Greenlee believes

3      that a more conservative approach to projecting future

4      market conditions may be warranted given the limited number

5      of improved data points."

6      Q.  Am I correct that you read here that there was a

7      reference to a 1 percent change in home prices producing a

8      $6 to $7 billion income change?

9      A.  Yes.

10     Q.  Let's go to Plaintiffs' Exhibit 5Q.

11            Now, did you download the Case-Shiller from a

12     public website, the index from a public website?

13     A.  Yes.

14     Q.  Is this public information, public government-issued

15     information, or is it internal Fannie Mae or Freddie Mac

16     information?

17     A.  It's public information, not internal to Fannie Mae or

18     Freddie Mac.

19     Q.  So anyone can access this information, correct?

20     A.  Yes.

21     Q.  Did you have any reason to question the accuracy of the

22     information from the public website?

23     A.  No.

24     Q.  In reference to the government chart, what does the

25     chart depict regarding the housing index starting --

1          MR. STERN:  Objection, Your Honor.  She didn't

2     testify it was a government chart.  She just testified it

3     wasn't a Fannie internal chart.

4          THE COURT:  Sustained.

5     Q.  Ms. Hartman, were you able to access the website for the

6     Shiller index on a public website?

7     A.  Yes.

8     Q.  What does the chart here depict regarding the housing

9     index starting in February 2012 through August of 2012?

10    A.  An increase in the home price index from -- during that

11    time period.

12    Q.  Now, Mr. Stern made a point that there would be no way

13    for someone to predict the future of what housing prices

14    would have been in 2012; is that correct?  Do you remember

15    him saying that?

16    A.  No, not exactly those words.

17    Q.  He made a reference to you haven't -- if you were able

18    to see the future, that you would be in the casino as

19    opposed to being here with us.

20    A.  Correct.

21    Q.  Okay.  But looking at this chart, in April or May of

22    2012 would one have been able to pull down this information

23    from the website and see the trend that's noted in February

24    of 2012?

25    A.  In May of 2012 someone could pull down this information

1    through May of 2012.

2    Q.  And what would they have seen according to this chart

3    that's in front of us?

4    A.  An increase in home prices from February 2012 through

5    May 2012.

6    Q.  What about in June of 2012?  Would they have been able

7    to do the same thing?

8    A.  Yes.

9    Q.  July of 2012?

10   A.  Yes.

11          MR. STERN:  Objection to "the same thing," Your

12   Honor.  I'd ask the question be clarified.

13          MS. DAVIS:  Certainly.

14   Q.  In June of 2012 would they have been able to see the

15   increase in the housing index that we are seeing here on

16   this chart today?

17          MR. STERN:  Objection, Your Honor.

18          THE COURT:  Sustained.

19   Q.  Ms. Hartman, this website that you visited, the public

20   website that you visited, were you able to put dates into

21   that website?

22   A.  Yes.

23   Q.  Was there any restriction on the dates that you could

24   put into that website?

25   A.  I didn't try.  I assume it would not let you put dates

1    into the future.

2    Q.  But you could put dates from the past?

3    A.  Yes.

4    Q.  Okay.  And so presumably, if you had put dates in just

5    as you did to have this chart in June of 2012, do you have

6    any reason to believe you would not have been able to get

7    the information from the national home price index that we

8    are seeing here today on this chart?

9    A.  You'd be able to get the information through June of

10   2012.

11   Q.  And do you have any reason to believe that the upward

12   trend that we see here on this chart today would not have

13   been present?

14          MR. STERN:  Objection, Your Honor; beyond the

15   scope --

16          THE COURT:  Sustained.

17          MR. STERN:  Objection, Your Honor, beyond the

18   scope.

19          THE COURT:  Sustained.

20          MR. STERN:  I'm sorry.  I didn't hear.

21          MS. DAVIS:  Withdrawn.

22   Q.  In August of 2012 how many months of data would have

23   been available from February of 2012 to August?

24   A.  Seven.

25   Q.  In January of 2013 how much -- how many months of data

1    in the home price index would have been available at that

2    time?

3              MR. STERN:  Your Honor, January of 2013 is beyond

4    the scope of this exhibit and the cross-examination.

5              THE COURT:  Sustained.

6              MS. DAVIS:  Withdrawn.

7    Q.  Ms. Hartman, would you be able to put in January 2013 as

8    a date in this index?

9    A.  Yes.  Today I would.

10   Q.  And this public website that you were able to access,

11   that anyone can access, did it have any dates that were

12   missing when you looked for the dates that you put in?

13             So, for instance, just to be clear for the record,

14   there was no missing data between February and August of

15   2012?

16   A.  No, there was not.

17   Q.  And, again, when was the Third Amendment in this --

18             THE COURT:  How do you know, if you didn't put it

19   in?  How do you answer that, if you didn't put it in?

20             THE WITNESS:  If you can repeat the question?  Not

21   your question, her question.

22             THE COURT:  She asked you if you know there was no

23   missing data for those other dates.  But you said you didn't

24   put those dates in.  So how do you know?

25             THE WITNESS:  We put the dates in that are on this

 1    chart.  Nothing --

 2              THE COURT:  Each of those months?

 3              THE WITNESS:  Yes.

 4              THE COURT:  You did put in each of those months?

 5              THE WITNESS:  Yes, the range.

 6              THE COURT:  So you saw those dates, not just this

 7    end date?

 8              THE WITNESS:  This chart goes from January 2012, I

 9    believe, through August 17th of 2012, so that's the date

10    range we put into the Case-Shiller index website.

11              THE COURT:  All right.

12    Q.  And, again, what was the date of the net worth sweep?

13    A.  For it to begin?  January 1, 2013.

14    Q.  And when was it authorized?

15    A.  I believe August 2012.

16    Q.  Now let's look at Plaintiffs' Exhibit 5G -- I mean, 5J,

17    I'm sorry.  You were asked a few questions about this chart.

18              When you analyzed this financial data, did you

19    know from that financial data whether Fannie Mae took draws

20    in 2009 because they lost income or because of certain

21    accounting measures?

22    A.  Could you rephrase the question?

23              MR. STERN:  Objection.

24              THE COURT:  Overruled.

25              MR. STERN:  Your Honor, this is -- if I may, this

1    is testimony about accounting, which the witness is not here

2    to give.

3              MS. DAVIS:  Your Honor, this is well within the

4    range of questions that defense asked on cross.

5              MR. STERN:  I didn't ask --

6              MS. DAVIS:  He asked her to characterize why the

7    draw -- he asked her to characterize why the draw happened.

8    We're asking just to clarify what it is that she based her

9    answer on.

10             THE COURT:  All right.

11   Q.  So again, Ms. Hartman, do you know whether Fannie Mae

12   took draws in 2009 because they lost income or because of

13   certain accounting measures?

14   A.  Those two are correlated.  I can't answer that question.

15   Q.  So you weren't asked to analyze why it is the draws were

16   taken, correct?

17   A.  That's correct.

18   Q.  You were asked to analyze the amount for the draws.  Is

19   that correct?

20   A.  That's correct.

21   Q.  And you did not provide an expert opinion on that topic,

22   correct?

23   A.  Correct.

24   Q.  And when I say "that topic," I mean the reason behind

25   the draws.

```
1    A.  That's correct.

2    Q.  Now, you were asked questions about -- and we'll just

3    start with Plaintiffs' 5J.  Mr. Stern took you through those

4    draws from each quarter all the way up until Quarter 1 of

5    2012.  Do you see that?

6    A.  Yes.

7    Q.  What was the draw in Quarter 2 of 2012?

8    A.  Zero.

9    Q.  More importantly, what was the amount left for the

10   Treasury Commitment in Quarter 2 of 2012?

11   A.  $124.8 billion.

12   Q.  And what was the amount left for Treasury Commitment in

13   Quarter 1 of 2012?

14   A.  $124.8 billion.

15   Q.  And if I understand your answer from before, the amount

16   left from Treasury Commitment is the amount left for the

17   enterprise to be able to draw down from; is that correct?

18   A.  That's correct.

19   Q.  So $124 billion was still left for them to draw down?

20   A.  Yes.

21   Q.  Let's now look at Plaintiffs' Exhibit 5K.  Mr. Stern

22   asked you to look at the drawdowns from 2008 all the way

23   down to Quarter 4 of 2011.  I think that's where he stopped,

24   so that's where we'll start.

25              Quarter 1 of 2012, what's the quarterly draw?
```

1    A.  $0.1 billion.

2    Q.  And Quarter 2 of 2012, what's the quarterly draw?

3    A.  Zero.

4    Q.  And the amount left from the Treasury Commitment at

5    Quarter 1 of 2012?

6    A.  $149.3 billion.

7    Q.  And in Quarter 2 of 2012?

8    A.  $149.3 billion.

9    Q.  And that was the amount remaining that Freddie Mac could

10   draw from from Treasury, correct?

11   A.  Correct.

12   Q.  And he at some point had you calculate, or he calculated

13   it, the amount of the total draw from Fannie Mae and Freddie

14   Mac over that time to Treasury.  So we're going to pull back

15   up Plaintiffs' 4B.

16           How much did Fannie Mae and Freddie Mac draw down

17   from Treasury?

18   A.  $191.4 billion.

19   Q.  And how much has been -- what amount has been

20   transferred to Treasury so far?

21   A.  $385.3 billion.

22   Q.  And is that number static?

23   A.  No, that could continue to grow.

24   Q.  It continues to grow until this day, correct?

25   A.  Yes.

1          MS. DAVIS:  I have no further questions.

2          THE COURT:  All right.  You can step down.

3          Next witness.

4          MR. RUDY:  Your Honor, this is Ms. Michelle Miller

5     the plaintiffs call.

6          THE COURT:  Okay.

7          MR. RUDY:  And I've asked you to --

8          THE COURT:  Ladies and gentlemen, as I mentioned

9     yesterday, one issue you'll be asked to decide in this case

10    is whether the defendants took actions that reasonably or

11    arbitrarily frustrated or interfered with the reasonable

12    contractual expectations of shareholders.  In determining

13    the reasonable expectations of shareholders, the question is

14    not whether individually -- any individual shareholder

15    actually expected whatever they expected.  For this reason

16    you have not heard testimony from individual shareholders,

17    including any of the named plaintiffs, about their

18    individual expectations or other individuals' details about

19    their specific purchases.

20          You should not draw any inferences, positive or

21    negative, from the fact that neither party presented

22    testimony from an individual shareholder about their

23    individual expectations, but the plaintiffs have a right to

24    testify.  They're the plaintiffs in the case, or they're

25    class representatives.  So you will be hearing testimony

 1 | from them.

 2 |       The next witness, Michelle Miller, is one of those

 3 | plaintiffs and a class representative that is being called.

 4 | So that instruction just goes along with that testimony so

 5 | you don't expect questions I've instructed they can't ask.

 6 |       MR. RUDY:  Thank you, Your Honor.  And so should

 7 | Ms. Miller come to the witness stand?

 8 |       THE COURT:  Yes.

 9 |       Ms. Miller, you'll take the oath first, and you

10 | can remove your mask while you're on the witness stand so

11 | everybody can hear you better.  Face the clerk right here.

12 |       MR. RUDY:  Your Honor, there are some papers over

13 | here.  Can I take those?

14 |       THE COURT:  Yes.

15 |            MICHELLE MILLER, Sworn

16 |             DIRECT EXAMINATION

17 | BY MR. RUDY:

18 | Q.  Good afternoon, Ms. Miller.

19 | A.  Good afternoon.

20 | Q.  Ms. Miller, are you one of the lead plaintiffs appointed

21 | by the Court to represent the class of Freddie Mac

22 | stockholders?

23 | A.  Yes.

24 | Q.  Where do you live?

25 | A.  St. Louis, Missouri.

1    Q.  What do you do for a living?

2    A.  I am a licensed administrator for an assisted living

3    facility in St. Louis.

4    Q.  And what does that position entail?

5    A.  So in the state of Missouri, you have to be licensed for

6    an assisted living, so I provide the oversight of the care

7    of the seniors that are in our community.

8    Q.  And can you give the ladies and gentlemen of the jury a

9    little bit about your educational background.

10   A.  So I have my bachelor's degree from the University of

11   Missouri St. Louis.

12   Q.  And what did you do employment-wise when you graduated

13   from college?

14   A.  So after I graduated, I worked for Sunset Ford for 10

15   years in their building, which handled titling and contracts

16   for Ford; and they were a local Ford dealer.  And then after

17   that, I worked for the family-owned company of Delmar

18   Gardens, of which I've been there 24 years.

19   Q.  And what roles have you served in at Delmar Gardens?

20   A.  So I started off at Delmar Gardens as an accounts

21   receivable, accounts payable, HR person; and then I became

22   the assistant director; and then the last four years I've

23   been the licensed administrator of their assisted living.

24   Q.  And do you manage other employees in the position as

25   director?

```
 1   A.  I do.  I have approximately 105 employees that are under
 2   me.
 3   Q.  What kind of jobs generally are those people that you're
 4   managing?
 5   A.  So you have food service that takes care of all the
 6   dietary needs of the residents.  You have maintenance, who
 7   takes care of the facilities, and housekeeping that cleans
 8   the apartments and the common areas.  You have
 9   administration that takes care of the building and the HR
10   and just day-to-day operations of the building; and then, of
11   course, the assisted living, which will administer medicines
12   and care for the residents that are in the building, and
13   activities that provide social events for the residents that
14   are in our building.
15   Q.  I'm going to ask you a little bit about your investing
16   history.  Do you invest in the stock market?
17   A.  I do.
18   Q.  Would you consider yourself an expert investor?
19   A.  No.
20   Q.  What would you consider yourself?
21   A.  Basic beginner.
22   Q.  How do you determine which companies you invest in?
23   A.  I choose to invest in companies that I'm familiar with
24   their name and also that pay a dividend because I don't
25   believe in buying and selling.  I just believe in holding on
```

1   and having the dividends reinvest.

2   Q.  At some point did you purchase the securities of Freddie

3   Mac?

4   A.  I did.

5   Q.  How many shares did you buy?

6   A.  500.

7   Q.  And did you buy common shares or preferred shares?

8   A.  Common.

9   Q.  And do you still hold those 500 shares today?

10   A.  I do.

11   Q.  Were you aware that, as part of putting Freddie Mac into

12   conservatorship, in 2008 the U.S. Treasury invested billions

13   of dollars in Freddie Mac by buying senior preferred shares?

14   A.  I do.

15   Q.  And what was your understanding of Freddie Mac's

16   obligation to pay its dividend on that investment?

17   A.  As I understood it, they were required to pay 10 percent

18   of the amount that they borrowed back annually.

19   Q.  Are you aware that on August 17, 2012, the FHFA and

20   Freddie Mac agreed to what is called the Third Amendment

21   with a net worth sweep?

22   A.  Yes.

23   Q.  Is it fair to say that much of what you understand about

24   that you've learned from your lawyers and in conversations

25   with your lawyers?

1   A.  That is correct.

2   Q.  Okay.  So I don't want you to disclose anything that

3   your lawyers have told you, but let me just ask you very

4   generally what you understand the Third Amendment to be.

5   A.  So that the agreement had changed from the 10 percent to

6   100 percent of the profits.

7   Q.  Sometime in 2013 did you retain my law firm to file

8   litigation relating to the net worth sweep?

9   A.  I did.

10  Q.  And what motivated you to file that lawsuit?

11  A.  Because I felt like the shareholders had been harmed.  I

12  had been harmed by that decision.

13  Q.  And in what way do you feel like you were harmed?

14  A.  There were no more dividends, and the price had kind of

15  remained stagnant.

16          MR. HOFFMAN:  Objection, Your Honor.  Your Honor,

17  objection.

18          THE COURT:  I didn't hear that.

19          MR. HOFFMAN:  Objection, Your Honor.

20          (The following is a bench conference

21           held outside the hearing of the jury)

22          MR. HOFFMAN:  Your Honor, Ian Hoffman on behalf of

23  defendants.  Your Honor, this Court has already ruled that

24  the lost dividends theory is out of the case, and that the

25  only theory on which plaintiffs may proceed is the theory of

1  lost value on the day of the Third Amendment, and she's

2  testified that she believes she was harmed because she lost

3  dividends, which is contrary to the claim that's in this

4  case, Your Honor.

5  MR. RUDY:  Your Honor, this is Lee Rudy for

6  plaintiffs.  The theory of damages that the Court has ruled

7  upon is not what she's being asked about.  Your Honor

8  specifically ruled that she was allowed to testify about why

9  she brought the lawsuit and how she feels she was harmed, so

10  that's why she gave the answer that she gave.

11  MR. HOFFMAN:  Your Honor, Ian Hoffman again, I'm

12  looking at the transcript.

13  The question was:  "And in what way do you feel

14  you were harmed?"

15  "ANSWER:  There were no more dividends, and the

16  price had kind of remained stagnant."

17  THE COURT:  If the parties want me to instruct the

18  jury that they can't consider that, you can persist on the

19  question; otherwise, you need to revise your question.

20  MR. RUDY:  Your Honor, I'm trying to follow the

21  Court's order very carefully.  Would you like me to just ask

22  the question:  Do you believe that the stock price has

23  suffered as a result of -- something leading like that.

24  THE COURT:  I think you'd be better off, yes.

25  MR. RUDY:  Okay.  Thank you, Your Honor.

1                    MR. HOFFMAN:  Your Honor, Ian Hoffman again.  We

2       move to strike the testimony that she was harmed -- she

3       believes that she was harmed because there were no more

4       dividends.

5                    THE COURT:  Granted.

6                        (This is the end of the bench conference)

7                    THE COURT:  That last answer is going to be

8       stricken.  He's going to reask the question a different way,

9       so just go ahead.

10      BY MR. RUDY:

11      Q.  Ms. Miller, is it correct that you believe that the

12      stock price of your holdings of Freddie Mac common stock has

13      suffered as a result of the Third Amendment?

14      A.  Yes.

15      Q.  To be clear, are you here suing about anything that

16      happened in 2008, '9, '10, or '11?

17      A.  No.

18      Q.  Why did you want to serve as a class representative in

19      this case?

20      A.  I wanted to represent the other people just like myself

21      that had been harmed by that decision.

22      Q.  And what have you been asked to do in serving as a class

23      representative?

24      A.  So I have been asked to read over numerous pieces of

25      material about the case.  I've met with attorneys, and then

1    I flew here to Washington, D.C., to give my testimony.

2              MR. RUDY:  Thank you.  I have nothing further.

3              THE COURT:  Mr. Hoffman.

4                      CROSS-EXAMINATION

5    BY MR. HOFFMAN:

6    Q.  Good afternoon, Ms. Miller.

7    A.  Good afternoon.

8    Q.  Let's talk about what stock you own.  You own common

9    stock in Freddie Mac, correct?

10   A.  Correct.

11   Q.  You do not own any preferred stock in Freddie Mac,

12   right?

13   A.  That is correct.

14   Q.  And you do not own any preferred stock in Fannie Mae

15   either, right?

16   A.  That is correct.

17   Q.  So the only shares that you hold that are relevant to

18   this case are Freddie Mac common stock, right?

19   A.  That is correct.

20   Q.  Let's talk about your shareholder contract.  You

21   understand that there's a stock certificate for the Freddie

22   Mac common stock that you own, right?

23   A.  Correct.

24   Q.  And you understand that that stock certificate addresses

25   dividends, right?

1      A.  Correct.

2              MR. HOFFMAN:  Let's pull up PX-0001-1, which is in

3      evidence, Your Honor.

4              MR. RUDY:  Your Honor, I'm going to object.  This

5      is beyond the scope of the direct.

6              THE COURT:  Let me see what the question is.

7              MR. HOFFMAN:  Your Honor, I'm going to ask her

8      about the contents of her shareholder contract.

9              The question is this, so let's focus in on Section

10     2, "Dividends."

11             MR. RUDY:  Note my objection, Your Honor.

12             THE COURT:  Let's do it here.

13             (The following is a bench conference

14              held outside the hearing of the jury)

15             MR. HOFFMAN:  Your Honor, she has testified that

16     she believes she was harmed by a breach of the implied

17     covenant in this contract, and this goes to the contents of

18     the contract that she believes that has been breached, the

19     associated implied covenant with it.  But we believe it's

20     fair game, Your Honor.

21             MR. RUDY:  Your Honor, she didn't say anything

22     about that.  She said she was harmed because her stock

23     prices suffered.

24             THE COURT:  The objection's overruled.

25             (This is the end of the bench conference)

```
 1              MR. HOFFMAN:  Mr. Salazar, let's go ahead and pull

 2    up PX1-1.  And let's focus in on Section 2 of this PX1-1.

 3    BY MR. HOFFMAN:

 4    Q.  Ms. Miller, you understand this to be Freddie Mac's

 5    common stock certificate, right?

 6              MR. RUDY:  Objection.  If she knows.

 7              THE COURT:  Overruled.  Go ahead.

 8    Q.  I'm sorry, Ms. Miller, I couldn't hear your answer.

 9    A.  I've never read that before.

10    Q.  So, Ms. Miller, I'll ask you to take a look at the first

11    sentence here, Section 2 of the Freddie Mac common stock

12    certificate.  It says, "The holders of outstanding shares of

13    Common Stock shall be entitled to receive, ratably,

14    dividends (in cash, stock, or other property), when, as and

15    if declared by the Board of Directors out of assets legally

16    available therefor."

17              Did I read that correctly, Ms. Miller?

18    A.  Yes, you did.

19              MR. HOFFMAN:  The Court's indulgence, Your Honor.

20    One moment.

21              THE COURT:  All right.

22              (Pause)

23              MR. HOFFMAN:  Thank you, Ms. Miller.  I have no

24    further questions.

25              MR. RUDY:  Can we be heard?
```

1          (The following is a bench conference

2           held outside the hearing of the jury)

3          MR. RUDY:  Your Honor, there seems to be a bit of

4     a sword-and-shield problem here with Mr. Hoffman objecting

5     to my asking her if she was harmed by losing dividends.

6          You sustained his objection.  I wasn't allowed to

7     ask her if she was complaining about the loss of dividends.

8     And then he showed her a document that says you shouldn't

9     feel aggrieved by losing your dividends.

10         I feel like I should clearly be allowed to now

11    redirect her and say:  Are you complaining about the fact

12    that the net worth sweep took away your dividends?

13         MR. HOFFMAN:  Your Honor, this case is --

14    plaintiffs' theory is about the lost prospect of dividends,

15    and Your Honor has ruled over and over again about the harm.

16    The question that Your Honor sustained was directed to what

17    is the harm that has come of this.

18         Obviously, Your Honor, whether the -- whether and

19    what the shareholders expected about dividends and the

20    arbitrariness and unreasonableness is still live, Your

21    Honor.  So it's perfectly fair what was asked, Your Honor.

22         Let's not go back on anything that Your Honor

23    struck.  It doesn't open the door to anything about how she

24    was harmed.

25         MR. RUDY:  Your Honor, Lee Rudy again.  That

1    answer, respectfully, is nonsensical.  The witness was asked

2    by me:  How were you harmed?  She said:  Because I lost my

3    dividends, and the stock price suffered.

4         Your Honor, at the defendants' request, made me

5    rephrase the question to eliminate all reference to

6    dividends.  The only purpose of possibly showing the exhibit

7    that he just showed was to say that you shouldn't have

8    expected dividends.

9         How has he not opened the door?  The door is wide

10   open.  And I want to ask one follow-up question.

11        MR. HOFFMAN:  Your Honor, Ian Hoffman again.  Your

12   Honor already ruled that they can -- that what was fair game

13   on the Court's ruling was the contents of the shareholder

14   contract.

15        Your Honor, I only asked her the contents of the

16   shareholder contract.  I asked her if I read it correctly.

17   I showed her the contract.  She testified about it.

18        There's nothing -- I haven't opened the door for

19   anything, Your Honor, because all I did was ask her to read

20   the contents of the shareholder contract, Page 18 of Your

21   Honor's opinion.  This doesn't open the door to anything,

22   whether it's what was testified to earlier or about the lost

23   dividends theory, which is out of the case, Your Honor.  She

24   simply read the contents of her contract.

25        MR. RUDY:  The relevance of -- Lee Rudy again.

1    The relevance of having her read it was only that she

2    shouldn't have expected dividends, otherwise there's no

3    relevance to that document.  I have nothing further.

4            THE COURT:  We're not going to have a donnybrook

5    over dividends, otherwise I just have to instruct them that

6    dividends are not part of damages.  If the plaintiffs want

7    that instruction, go ahead.

8            MR. RUDY:  Your Honor, I'll leave it alone.

9            (This is the end of the bench conference)

10           THE COURT:  Any other questions?

11           MR. RUDY:  Nothing further.  Thank you,

12   Ms. Miller.

13           THE COURT:  Okay.  You may step down.

14           Next witness.

15           MR. RUDY:  Plaintiffs call Timothy Cassell.

16           May I, Your Honor?

17           THE COURT:  Yes.

18               TIMOTHY J. CASSELL, Sworn

19                  DIRECT EXAMINATION

20   BY MR. RUDY:

21   Q.  Good afternoon, Mr. Cassell.

22   A.  Good afternoon.

23   Q.  Mr. Cassell, are you one of the lead plaintiffs

24   appointed by the Court to represent the class of Fannie and

25   Freddie stockholders?

```
 1    A.  I am.

 2    Q.  And where do you live?

 3    A.  Columbus, Ohio.

 4    Q.  Can you tell the jury a little bit about your

 5    educational background.

 6              THE COURT:  I'm sorry, give us your full name for

 7    the record first.

 8              THE WITNESS:  I'm sorry?

 9              THE COURT:  Give us your full name for the record

10    first.

11              THE WITNESS:  Full name is Timothy James Cassell.

12              THE COURT:  Go ahead.

13    BY MR. RUDY:

14    Q.  Could you give the Court a little bit of your

15    educational background.

16    A.  I completed two and a half years of college at Michigan

17    State University.

18    Q.  And what was your first job after you left college?

19    A.  My first job after I left college would have been sales

20    for Monsanto.

21    Q.  And how long did you do that?

22    A.  Probably five and a half years, give or take.

23    Q.  And after you left Monsanto, what did you do?

24    A.  The wholesale career changed 180 and I went into the

25    carpenters' union.
```

1    Q.  And how long did you work as a carpenter?

2    A.  Seven and a half years.

3    Q.  And after you -- after that, what did you do next for

4    employment?

5    A.  I was elected as state representative and represented

6    the 63rd District in Ohio.

7    Q.  And where is the 63rd District in Ohio?

8    A.  Northeast corridor of Ohio.

9    Q.  And what was your term of office?

10   A.  One term, two years, 2005 and '6.

11   Q.  And after you left office, what did you do for

12   employment?

13   A.  I did a brief stint at the Ohio School Facilities

14   Commission, and then opened up a lobbying firm.

15   Q.  And do you still manage that lobbying firm today?

16   A.  I do.

17   Q.  Does your firm employ other people?

18   A.  We do, depending on the client.  Right now we carry

19   three employees.

20   Q.  At some point you purchased securities of Freddie Mac;

21   is that correct?

22   A.  That's correct.

23   Q.  And how many shares did you buy?

24   A.  1,000 common shares.

25   Q.  And do you still hold those thousand common shares

1    today?

2    A.  I do.

3    Q.  Are you aware that on August 17, 2012, FHFA and Freddie

4    Mac agreed to what is called the Third Amendment or the net

5    worth sweep?

6    A.  I am.

7    Q.  And is it fair to say that much of what you know about

8    that you've learned from counsel?

9    A.  Yes.

10   Q.  So I'm not going to -- I'm going to ask you not to

11   disclose any privileged information, but I'll just ask you,

12   could you describe what you understand the Third Amendment

13   to be.

14   A.  The Third Amendment was a total sweep of all profits of

15   both companies.

16   Q.  At some point in 2013 did you decide to file litigation

17   challenging the net worth sweep?

18   A.  I did.

19   Q.  And was that decision motivated in part, if at all, by

20   the effect on the stock price of -- yes or no -- of your

21   share price?

22   A.  Yes.

23   Q.  Why did you agree to serve as a class representative?

24   A.  I believe that I was well-suited, being a state

25   representative and understanding the responsibilities of

 1   representing others, that I would do well in representing

 2   the classes.

 3             MR. RUDY:  Nothing further, Your Honor.

 4             MR. HOFFMAN:  The Court's indulgence, Your Honor,

 5   for one moment.

 6             (Pause)

 7                        CROSS-EXAMINATION

 8   BY MR. HOFFMAN:

 9   Q.  Good afternoon, Mr. Cassell.

10   A.  Good afternoon.

11   Q.  Let's talk about what stock you own.  So you own common

12   stock?  Freddie Mac, right?

13   A.  Yes.

14   Q.  You don't own any preferred stock in Freddie Mac; is

15   that right?

16   A.  No preferred stock.

17   Q.  And you don't own any stock in Fannie Mae; is that

18   right?

19   A.  No.

20   Q.  So the only stock that you own that's relevant to this

21   case is Freddie Mac common; is that right?

22   A.  That is correct.

23             MR. HOFFMAN:  Thank you, Mr. Cassell.  I have no

24   further questions.

25             THE COURT:  Okay.  You can step down.

```
1                 THE WITNESS:  Thank you.

2                 THE COURT:  Next witness.

3                 MR. RUDY:  Your Honor, at this point we'd like to

4      play a short video deposition of Mr. Cacciapalle.

5                 THE COURT:  Okay.

6                 MR. RUDY:  So before we do that, there's one

7      exhibit I wanted to just see if we --

8                 THE COURT:  Let's let the jury take their

9      afternoon recess, and we can talk about the rest of the

10     afternoon.

11                We'll take ten minutes for the jury.

12                (Jury exits courtroom)

13                THE COURT:  We can do this off the record.

14                (Discussion off the record)

15                (Recess taken)

16                MR. RUDY:  Your Honor, if I may?  I have just two

17     very brief housekeeping matters.

18                One is there's a jury instruction about the use of

19     depositions -- use of deposition evidence that, if Your

20     Honor is willing, we think this might be a good time to give

21     that instruction.  I have a copy of it with me --

22                THE COURT:  Okay.

23                MR. RUDY:  -- if I could hand it up.  And I'll

24     tell you it's in ECF No. 224, and it's Instruction No. 13

25     agreed to with the defendants.
```

```
 1                    And the second --
 2                    THE COURT:  You can bring your witness in, too, so
 3       he can be on the stand.
 4                    MR. RUDY:  Well, it's going to be a video that
 5       we're playing.
 6                    THE COURT:  I'm sorry?
 7                    MR. RUDY:  We're playing a video.  So do you want
 8       the next witness to come in?
 9                    THE COURT:  Oh, he's through?
10                    MR. RUDY:  Yes.  The witness we're about to do
11       will be an 11-minute video deposition that we'll play.
12                    And the other brief housekeeping matter is in that
13       video is an embedded exhibit number -- it's Plaintiffs'
14       Exhibit 346 -- that I'd like to move into evidence with no
15       objection from defendants.
16                    THE COURT:  Okay.
17                    MR. HOFFMAN:  That's confirmed.  No objection,
18       Your Honor.
19                    THE COURT:  Okay.
20                    (Jury enters courtroom)
21                    THE COURT:  The next witness is going to appear by
22       deposition.  Let me give you a quick instruction about that.
23                    The deposition is the testimony of a person taken
24       before trial.  The witness is placed under oath and swears
25       to tell the truth.  Lawyers for each party may ask
```

1     questions.  The court reporter is present and records the

2     questions and answers.

3          During the trial you'll hear deposition testimony

4     that will be read from the deposition transcript or

5     presented by videotape.  You should give deposition

6     testimony the same fair and impartial consideration you give

7     any other testimony.  You should not give more weight or

8     less weight to deposition testimony just because the witness

9     did not testify in court.

10          In these COVID days, we do take a lot more

11    depositions and introduce them in evidence to avoid as much

12    travel as we might otherwise have, and juries actually are

13    more used to this deposition testimony.

14          You have to weigh it just like you do any other

15    testimony.  It's up to you who you believe and who you don't

16    believe.  I'll give you a lot of instructions about that at

17    the end, but you take it just as all the witnesses here on

18    the witness stand.  They are asked questions and are cross-

19    examined just like they were here in court, but they'll be

20    on the TV screen.

21          The old method was a lawyer would read the

22    questions and a paralegal, or somebody like that, would read

23    the answers; and jurors were out like flies, it would be so

24    boring.  Juries would always fall asleep.  So actually the

25    new method of videotapes is a little better, and jurors

```
 1   don't fall asleep quite as quickly.  We'll see how long

 2   these depositions are.

 3              Okay, Mr. Rudy.

 4              MR. RUDY:  Your Honor, and just for the record, we

 5   are going to have one of those so we'll see if it puts them

 6   to sleep.

 7              But right now we're going to be playing a video.

 8   It's about 11 minutes long, and it's of Mr. Joseph

 9   Cacciapalle, one of the class representatives.

10              THE COURT:  One of the class representatives?

11   This will be short.

12              (Video deposition being played)

13              MR. RUDY:  That's it for the video, Your Honor.

14              THE COURT:  Okay.  Any other questions?

15              And what's that exhibit number?

16              MR. RUDY:  PX346 was embedded in the video.

17              THE COURT:  All right.  It's received without

18   objection.

19              All right.  Any cross?

20              MR. HOFFMAN:  No, Your Honor.

21              THE COURT:  Okay.

22              MR. HOFFMAN:  Of the video, you mean?  No, Your

23   Honor.

24              THE COURT:  Next witness.

25              MR. BARNES:  Your Honor, I'm Brian Barnes of
```

1    Cooper & Kirk for the Berkeley plaintiffs.  The next witness

2    is Edward Linekin.

3            And while Mr. Linekin takes the stand, if I could,

4    I'd like to put a question to the Court, if I may, over the

5    telephone.

6            (The following is a bench conference

7             held outside the hearing of the jury)

8            MR. BARNES:  Your Honor, this is Brian Barnes

9    again for the Berkeley plaintiffs.  I confess to a little

10   bit of uncertainty as to the scope of what the witnesses are

11   permitted to say with respect to dividends, and I just want

12   to make sure that I don't cross the line.

13           I had planned to ask the witness what, if any,

14   effect the conservatorship in the Third Amendment had on the

15   potential for receiving dividends in the future for these

16   shares, but if that is not something that the Court thinks

17   is on the right side of the line, I'd like to know it so I

18   don't ask the question.

19           THE COURT:  The defendant objected, and I said if

20   you want to persist in that, I would instruct the jury --

21   not necessarily now, but at the time of instructions I would

22   instruct the jury that that cannot be part of the damages

23   being considered.

24           So I don't know.  I think Mr. Rudy decided it was

25   better not to ask the question.

1          MR. BARNES:  Understood, Your Honor.  Thank you

2     very much for clarifying.

3               (This is the end of the bench conference)

4                    EDWARD LINEKIN, Sworn

5                    DIRECT EXAMINATION

6     BY MR. BARNES:

7     Q.  Good afternoon, Mr. Linekin.

8     A.  Good afternoon.

9     Q.  Mr. Linekin, can you please tell us where you work.

10    A.  W.R. Berkley Corporation.

11    Q.  And what is W.R. Berkley Corporation?

12    A.  W.R. Berkeley is a property and casualty insurance

13    company, insurance holding company, predominantly focused on

14    business lines, commercial lines.

15    Q.  And can you briefly describe your educational and

16    professional background.

17    A.  I went to grammar school and high school in Queens, New

18    York, where I grew up.  After that, I went to state college

19    in Upstate New York, in Cortland.  I worked while I was

20    going to school.

21              After graduating in '86, I started working in

22    Manhattan at Chemical Bank where I started pursuing my

23    master's degree, my MBA degree.

24              From there, I went over to another shop called

25    Home Capital, which was more of a small boutique investment

1     shop.  I completed my master's degree at night there.

2          And then started working on my Chartered Financial

3     Analyst degree, which is -- it's really a specialist

4     designation for the investment management industry.  So

5     that's a three-year program.  They give a test once per

6     year.  And once you pass one test, you can proceed to the

7     following.

8          I got the CFA degree in '96, and started working

9     at W.R. Berkeley Corp., where I'm at now, the prior year, in

10    1995.  So I've been there 27 years.

11    Q.  And can you tell us about the positions you've held at

12    W.R. Berkley Corporation.

13    A.  I've held a lot of positions at Berkeley.

14          I started out as a corporate bond analyst,

15    eventually moved to overseeing the corporate bond portfolio.

16          In addition to that, I was given the government

17    bond portfolio to oversee; in addition to that as well, the

18    preferred stock portfolio.  So I was managing those for a

19    long period of time.

20          Kind of passed on the responsibilities for the

21    corporates and the governments, management of those

22    portfolios, and now I oversee all of the international

23    assets of the Berkeley Corp. in addition to managing the

24    preferred stock portfolio.

25    Q.  And can you generally describe Berkeley's approach to

1    investing.

2              MR. HOFFMAN:  Objection, Your Honor.

3              THE COURT:  Overruled.

4    A.  Very conservative.  I mean, the reason for the

5    investment department's, you know, being is to make sure

6    that the money is there to pay claims.  So as a general

7    framework, it's a very conservative investment operation.

8    Q.  And you mentioned the preferred stock portfolio.  Can

9    you explain what that is.

10   A.  So preferred stock, it's -- it occupies the space

11   between common and corporate debt, and I would say probably

12   closer to corporate debt in that preferred stock pays a

13   coupon or a dividend similar to the way a corporate bond

14   pays a coupon on a security.  So it's usually a fixed

15   obligation where, you know, if you invest $100 and at 5

16   percent, you're getting a 5 percent return annually, very

17   similar to how a bond works.

18   Q.  And are there limits on the kinds of investors that can

19   purchase preferred stock?

20   A.  No.  No, they can be individuals, corporations,

21   institutions.  No, there's no limits.

22   Q.  And can you generally describe your day-to-day job

23   responsibilities.

24   A.  It's varied over the years in the long time since I've

25   been doing it.  I'd say from the very high level, it's to

1       make sure you understand the risk of what's going on within

2       the portfolio, which that entails following geopolitics,

3       obviously reading the newspapers, you know, various economic

4       releases that might be coming out; in addition to the more

5       micro things like reading analysts' reports, SEC filings,

6       things like that.

7       Q.  And you mentioned there analyst reports.  Can you

8       explain what those are.

9       A.  Analyst reports are just that, they're reports that

10      analysts, usually working at investment banks, generate and

11      send out to try to generate trades for the most part.

12      Q.  And can you generally describe how you use analysts

13      reports when making investment decisions for Berkeley.

14      A.  Cautiously.  You know, there's -- like, I guess, any

15      space in the economy, there are good analysts, and there are

16      not-so-good analysts.

17              In addition to that, at the investment banks

18      there's certain conflicts of interest that exist that limit

19      what an analyst really can say.  So, in other words, if

20      there's someone on the investment banking side --

21              MR. HOFFMAN:  If I may object?  This is expert

22      testimony.  He's not designated as an expert.  He's

23      testifying about his analysis and how the investing works,

24      Your Honor.  This is expert testimony.

25              MR. BARNES:  I think this is permissible under

1     Rule 701, Your Honor.  It's based upon his observations.

2              THE COURT:  As long as you keep it short.

3              MR. BARNES:  Understood, Your Honor.

4     A.  In essence, there's just conflicts of interest so that

5     the analyst really can't say if he -- in this particular

6     case I'm explaining, if he doesn't like the company, the

7     investment banker would not be happy about that because

8     it would affect his relationship with the CEO of that

9     company.

10             So you have to be very careful when you use

11    analysts' reports.  It's my experience that when the

12    analysts are leaning in one direction, go the other way.

13    Q.  And, Mr. Linekin, does Berkeley own shares of Fannie Mae

14    and Freddie Mac preferred stock?

15    A.  We do.

16    Q.  Are you familiar with the number of shares that Berkeley

17    owns?

18    A.  I am.

19    Q.  And I'd like you to take a look at a document that's not

20    yet in evidence.  It's Plaintiffs' Exhibit 462.

21             Mr. Linekin, is this a document -- is this

22    document a record that Berkeley keeps in the course of its

23    regularly conducted business activities?

24    A.  It is.

25    Q.  And is maintaining records of Berkeley's holdings part

1    of Berkeley's routine investment activities?

2    A.  It is.

3    Q.  Does this document accurately reflect the number of

4    Fannie and Freddie shares that Berkeley currently owns?

5    A.  It does.

6              MR. BARNES:  Your Honor, I'd move that this

7    document be admitted into evidence.

8              MR. HOFFMAN:  No objection, Your Honor.

9              THE COURT:  Received.

10             What was the number?

11             MR. BARNES:  It's Plaintiffs' Exhibit 462.

12   Q.  Mr. Linekin, can you briefly describe the corporate

13   structure of W.R. Berkeley Co.

14   A.  So Berkeley Corp. is a property and casualty holding

15   company.  And what that means is -- you can view it like an

16   umbrella with all the subsidiaries underneath.  And I

17   believe we have 56 different subsidiaries right now

18   underneath that umbrella, but it all, you know, goes back up

19   to the parent.

20   Q.  And which, if any, of the Berkeley subsidiaries

21   currently own Fannie and Freddie preferred shares?

22   A.  Berkeley Insurance Company.

23   Q.  Mr. Linekin, are you familiar with the provision of the

24   preferred stock purchase agreements concerning a periodic

25   commitment fee?

```
1     A.  I am.

2     Q.  Can you briefly describe your understanding of that

3     provision.

4               MR. HOFFMAN:  Your Honor, may I object, Your

5     Honor, and be heard?  May I be heard?

6               (The following is a bench conference

7                 held outside the hearing of the jury)

8               MR. HOFFMAN:  Your Honor, Ian Hoffman on behalf of

9     the defendants.  Your Honor's order was very clear on the

10    scope of the plaintiffs' testimony, including from Berkeley.

11    Your Honor ruled that they can testify that they own GSE

12    stock.  They can testify about the loss of dividend rights,

13    why they brought this lawsuit, the contents of the

14    shareholder contract, their background, and the basic facts

15    giving rise to their claims.

16              He's already testified to his background and that

17    he owns GSE stock, but this is going into the -- his views

18    on the periodic commitment fee.  He's already testified

19    about the relevancy of analysts' reports.  This is far

20    beyond the scope of this Court's order, which limited the

21    plaintiffs' testimony.

22              MR. BARNES:  Your Honor, Brian Barnes for the

23    Berkeley plaintiffs.  As Mr. Hoffman just said, one of the

24    things that is clearly within the scope of what the Court

25    has said Mr. Linekin and the other plaintiffs can testify
```

1    about is the terms of the shareholder contracts.  The Court

2    has also ruled that the PSPAs themselves are a part of those

3    contracts, and so I think this is clearly permissible.

4         I'll also represent to the Court we're not going

5    to delve deep into Mr. Linekin's views.  I just wanted to

6    establish that he has a foundational knowledge of what the

7    periodic commitment fee is, and then I'll add one or two

8    additional questions, and that will be the end of it on this

9    particular topic.

10        MR. HOFFMAN:  My main concern, Your Honor, is the

11   relevance in light of the Court's ruling that his individual

12   expectations are -- cannot be testified about.  So laying a

13   foundation as to what he understood about the PCF is just

14   going to go to his expectations, Your Honor.

15        MR. BARNES:  And I'll just represent to the

16   Court -- or to explain where we're going with this, I'm

17   going to ask Mr. Linekin -- if there had been no Third

18   Amendment, and the periodic commitment fee had been set

19   to equal all of the company's profits, I'm going to ask

20   Mr. Linekin, what, if anything, Berkeley would have done.

21        And I expect that Mr. Linekin will say that

22   Berkeley would have filed a lawsuit.

23        MR. HOFFMAN:  Your Honor, that would be pure

24   speculation and contrary to the whole theory of damages that

25   the Court has limited us to.  It would be far beyond the

 1    scope of the limited testimony this Court's already ruled is

 2    proper for these plaintiffs.

 3              THE COURT:   The objection's sustained.

 4                   (This is the end of the bench conference)

 5    BY MR. BARNES:

 6    Q.  Mr. Linekin, how many shares of Fannie and Freddie

 7    preferred stock does Berkeley own?

 8    A.  10.7 million, I believe.  A little above that.

 9    Q.  And now I'd like you to take a look at Plaintiffs'

10    Exhibit 2C.  And that's a document that's already in

11    evidence.

12              And at the bottom of the first page there's a

13    question there.  It says, "What are the goals of this

14    conservatorship?"

15              And if you would, read the first paragraph of the

16    answer at the top of the second page.

17    A.  "The purpose of appointing the Conservator is to

18    preserve and conserve the Company's assets and property and

19    to put the Company in a sound and solvent condition.  The

20    goals of the Conservatorship are to help restore confidence

21    in the Company, enhance its capacity to fulfill its mission,

22    and mitigate the systemic risk that is contributed directly

23    to the instability in the current market."

24    Q.  And then there's another question just below that one

25    that says, "When will the Conservatorship period end?"

 1          Could you read the answer to that question.

 2     A.  "Upon the Director's determination that the

 3     Conservator's plan to restore the Company to a safe and

 4     solvent condition has been completed successfully, the

 5     Director will issue an order terminating the

 6     Conservatorship.  At present, there is no exact time

 7     frame that can be given as to when this Conservatorship may

 8     end."

 9     Q.  Mr. Linekin, can you please explain to the jury why

10     Berkeley filed this lawsuit.

11     A.  The FHFA didn't do what they said they were going to do.

12     I mean, in essence, just as that paragraph indicated, their

13     goal was to preserve and -- or I should say what they said

14     they were going to do was conserve and preserve the assets

15     and nurture Fannie and Freddie back to a safe and solvent

16     condition.  It did not do that.

17          As a matter of fact, they went in the opposite

18     direction, and they took every dollar of cash flow, every

19     dollar of profits from 2012 into perpetuity, or 2013,

20     January 1, 2013, into perpetuity.  And that's -- that's not

21     consistent with what the FHFA said to us.

22          MR. BARNES:  No further questions.

23          MR. HOFFMAN:  The Court's indulgence for one

24     moment, Your Honor.

25          (Pause).

```
1                        CROSS-EXAMINATION

2    BY MR. HOFFMAN:

3    Q.  Good afternoon, Mr. Linekin.

4    A.  Good afternoon.

5    Q.  If we could pick back up where Mr. Barnes left off, and

6    let's take a look at PX2C.

7              MR. HOFFMAN:  We'll look at Page 3 of that,

8    Mr. Salazar.

9    Q.  And I'm going to focus on the question, it's the second

10   full question on the page that starts with "What happens to

11   the Company's stock during the Conservatorship?"

12             MR. HOFFMAN:  Mr. Salazar, if you could call that

13   out.

14   A.  During the conservatorship --

15   Q.  I can read it for you.  I'll ask the question.  Thank

16   you for trying to help me out.  I appreciate it.

17   A.  Sorry.

18   Q.  The question here, just for the record, is:  "What

19   happens to the Company's stock during the Conservatorship?"

20             Did I read that right?

21   A.  "What happens to the Company's stock during the

22   Conservatorship?"  Yes.

23   Q.  "ANSWER:  During the Conservatorship, the Company's

24   stock will continue to trade.  However, by statute, the

25   powers of the stockholders are suspended until the
```

1    Conservatorship is terminated.  Stockholders will continue

2    to retain all rights in the stock's financial worth; as such

3    worth is determined by the market."

4           Did I read that correctly, Mr. Linekin?

5    A.  You did.

6    Q.  And you work for an insurance company, right?

7    A.  I do.

8    Q.  W.R. Berkeley Insurance?

9    A.  Correct.

10   Q.  And your company sells business and commercial

11   insurance, right?

12   A.  Yes.

13   Q.  And your company also invests in stocks and bonds?

14   A.  It does.  Mostly bonds, but yes, stocks as well.

15   Q.  And your insurance company currently owns a little over

16   10.7 million shares of Fannie and Freddie preferred shares;

17   is that right?

18   A.  That is correct.

19           MR. HOFFMAN:  No further questions, Your Honor.

20           Thank you, Mr. Linekin.

21           THE COURT:  Anything else?

22           Okay.  You can step down.

23           Next witness.

24           MR. RUDY:  Your Honor, it's movie time again.  We

25   have about a 35-minute-long video of Mr. Lockhart that we're

1      going to be playing.

2                    THE COURT:  Okay.  This will be the deposition of

3      Mr. Lockhart, who is a former director.

4                    (Video deposition being played)

5                    THE COURT:  That's it?

6                    MR. RUDY:  That's all we have for today, Your

7      Honor.

8                    THE COURT:  Okay.  Don't talk about the case.

9      Don't let anyone talk to you about the case.  Leave your

10     notes here overnight in the jury room, and I'll see you all

11     tomorrow morning at 10:00.

12                   Don't Twitter or Tweet either.  Don't read

13     anything about the case.

14                   I'll see you all tomorrow.  Have a nice evening.

15     Hopefully it's not too cold tonight like it was last night.

16                   (Jury exits courtroom)

17                   THE COURT:  I'll talk to counsel off the record at

18     the bench about our schedule.

19                   (Whereupon the hearing was

20                    adjourned at 5:05 p.m.)

21

22

23

24

25

1          **CERTIFICATE OF OFFICIAL COURT REPORTER**

2

3                  I, LISA A. MOREIRA, RDR, CRR, do hereby

4     certify that the above and foregoing constitutes a true and

5     accurate transcript of my stenographic notes and is a full,

6     true and complete transcript of the proceedings to the best

7     of my ability.

8          Dated this 19th day of October, 2022.

9

10                                    /s/Lisa A. Moreira, RDR, CRR
                                      Official Court Reporter
11                                    United States Courthouse
                                      Room 6718
12                                    333 Constitution Avenue, NW
13                                    Washington, DC 20001

14

15

16

17

18

19

20

21

22

23

24

25

**$**

**$100** [1] - 602:15
**$124** [1] - 575:19
**$15** [3] - 553:8,
  553:11, 553:15
**$187** [2] - 560:17,
  561:19
**$19** [2] - 552:13,
  552:17

**'**

**'10** [2] - 559:6, 584:16
**'11** [3] - 558:21, 559:6,
  584:16
**'6** [1] - 592:10
**'86** [1] - 600:21
**'96** [1] - 601:8

**/**

**/s/Lisa** [1] - 613:10

**0**

**0.1** [1] - 576:1

**1**

**1** [9] - 556:7, 567:19,
  568:7, 573:13,
  575:4, 575:13,
  575:25, 576:5,
  609:20
**1,000** [1] - 592:24
**1.5** [1] - 554:2
**10** [3] - 579:14,
  581:17, 582:5
**10.7** [5] - 552:22,
  555:23, 608:8,
  611:16
**100** [1] - 582:6
**10020** [1] - 546:4
**105** [1] - 580:1
**10:00** [1] - 612:11
**11** [1] - 598:8
**11-minute** [1] - 596:11
**116.1** [4] - 556:2,
  556:10, 561:5,
  561:12
**12.3** [1] - 567:13
**124.8** [2] - 575:11,
  575:14
**1251** [1] - 546:4
**127** [2] - 564:24,
  564:25
**13** [1] - 595:24
**13.8** [3] - 556:20,
  558:6, 558:10
**14** [5] - 559:25, 560:4,

560:8, 564:11,
  564:25
**1401** [1] - 545:23
**149.3** [2] - 576:6,
  576:8
**15** [6] - 549:2, 553:15,
  559:25, 560:4,
  560:8, 565:2
**15.2** [7] - 551:23,
  552:1, 552:2, 552:8,
  555:15, 555:16,
  555:20
**15.3** [1] - 553:20
**1523** [1] - 545:17
**17** [4] - 550:20,
  550:22, 581:19,
  593:3
**17th** [1] - 573:9
**18** [3] - 549:6, 549:11,
  589:20
**180** [1] - 591:24
**187.3** [1] - 561:12
**19** [3] - 545:5, 555:18,
  555:20
**19087** [1] - 545:20
**191.4** [1] - 576:18
**1977** [3] - 564:19,
  564:22, 564:23
**1989** [3] - 564:4,
  564:8, 564:22
**1995** [1] - 601:10
**19th** [1] - 613:8
**1:13-cv-01053-RCL** [1]
  - 545:3
**1:13-cv-1288** [1] -
  545:9

**2**

**2** [10] - 565:17, 566:20,
  575:7, 575:10,
  576:2, 576:7,
  586:10, 587:2,
  587:11
**2.5** [1] - 554:4
**2.6** [1] - 554:6
**20001** [3] - 546:10,
  546:14, 613:13
**20005** [1] - 545:23
**20036** [1] - 545:17
**2005** [1] - 592:10
**2008** [21] - 556:19,
  556:23, 557:9,
  558:5, 558:20,
  559:1, 559:2, 559:5,
  559:10, 559:12,
  560:12, 561:15,
  561:17, 564:4,
  564:9, 564:19,
  564:22, 564:23,

575:22, 581:12,
  584:16
**2009** [22] - 551:19,
  552:3, 552:12,
  552:20, 552:22,
  553:1, 553:5, 553:7,
  553:8, 555:1,
  555:14, 556:4,
  556:7, 557:12,
  557:14, 557:15,
  558:12, 558:20,
  559:1, 559:2,
  573:20, 574:12
**2010** [6] - 553:19,
  553:25, 554:2,
  554:4, 558:25, 559:2
**2011** [9] - 554:6,
  554:9, 554:13,
  554:15, 558:20,
  559:1, 559:2,
  559:12, 575:23
**2012** [41] - 554:19,
  555:1, 556:5, 556:7,
  556:24, 560:13,
  561:16, 561:17,
  567:10, 567:12,
  569:9, 569:14,
  569:22, 569:24,
  569:25, 570:1,
  570:4, 570:5, 570:6,
  570:9, 570:14,
  571:5, 571:10,
  571:22, 571:23,
  572:15, 573:8,
  573:9, 573:15,
  575:5, 575:7,
  575:10, 575:13,
  575:25, 576:2,
  576:5, 576:7,
  581:19, 593:3,
  609:19
**2013** [9] - 567:11,
  571:25, 572:3,
  572:7, 573:13,
  582:7, 593:16,
  609:19, 609:20
**2016** [1] - 567:12
**202** [1] - 546:14
**2022** [2] - 545:5, 613:8
**213** [1] - 566:13
**224** [1] - 595:24
**24** [1] - 579:18
**27** [1] - 601:10
**280** [1] - 545:19
**2:15** [1] - 545:5
**2C** [2] - 565:5, 608:10

**3**

**3** [2] - 566:4, 610:7
**30** [1] - 552:15

**30.8** [2] - 558:13,
  558:16
**31st** [1] - 556:7
**333** [2] - 546:13,
  613:12
**34.2** [4] - 552:19,
  552:25, 555:21,
  555:23
**346** [1] - 596:14
**35-minute-long** [1] -
  611:25
**354-3187** [1] - 546:14
**385.3** [1] - 576:21

**4**

**4** [1] - 575:23
**4.6** [1] - 554:22
**44.9** [3] - 553:4, 553:5,
  555:23
**462** [2] - 604:20,
  605:11
**4B** [1] - 576:15
**4G** [3] - 563:19,
  564:14, 564:15
**4H** [4] - 563:19,
  563:24, 563:25

**5**

**5** [2] - 602:15, 602:16
**5.1** [1] - 554:13
**5.5** [1] - 567:5
**500** [2] - 581:6, 581:9
**56** [1] - 605:17
**56.6** [1] - 567:12
**5:05** [1] - 612:20
**5A** [2] - 562:16, 562:17
**5G** [1] - 573:16
**5J** [4] - 560:23,
  560:25, 573:16,
  575:3
**5K** [2] - 560:25, 575:21
**5Q** [1] - 568:10

**6**

**6** [2] - 567:20, 568:8
**6.2** [1] - 567:5
**601** [1] - 546:9
**63rd** [2] - 592:6, 592:7
**6718** [2] - 546:13,
  613:12

**7**

**7** [2] - 567:20, 568:8
**7.8** [2] - 554:15,
  554:17
**701** [1] - 604:1
**71.2** [4] - 559:13,

559:18, 561:9,
  561:12
**78** [2] - 564:10, 564:11

**8**

**8** [1] - 558:21
**8.4** [1] - 553:25
**8.5** [1] - 554:10

**9**

**9** [3] - 558:21, 559:6,
  584:16

**A**

**ability** [1] - 613:7
**able** [9] - 569:5,
  569:17, 569:22,
  570:6, 570:14,
  570:20, 571:6,
  571:9, 572:7,
  572:10, 575:17
**access** [4] - 568:19,
  569:5, 572:10,
  572:11
**according** [1] - 570:2
**accounting** [3] -
  573:21, 574:1,
  574:13
**accounts** [2] - 579:20,
  579:21
**accuracy** [1] - 568:21
**accurate** [2] - 567:22,
  613:5
**accurately** [1] - 605:3
**Act** [1] - 566:10
**ACTION** [1] - 545:10
**actions** [1] - 577:10
**activities** [3] - 580:13,
  604:23, 605:1
**actual** [2] - 557:2,
  557:5
**add** [4] - 555:19,
  556:10, 561:12,
  607:7
**added** [1] - 568:2
**addition** [5] - 601:16,
  601:17, 601:23,
  603:4, 603:17
**additional** [1] - 607:8
**addresses** [1] - 585:24
**adds** [1] - 555:11
**adjourned** [1] - 612:20
**administer** [1] -
  580:11
**administration** [1] -
  580:9
**administrator** [2] -
  579:2, 579:23

**admitted** [2] - 562:16, 605:7
**affairs** [2] - 550:4, 552:10
**affect** [1] - 604:8
**afternoon** [17] - 548:21, 562:3, 562:4, 578:18, 578:19, 585:6, 585:7, 590:21, 590:22, 594:9, 594:10, 595:9, 595:10, 600:7, 600:8, 610:3, 610:4
**AFTERNOON** [1] - 545:12
**Agency** [1] - 546:6
**AGENCY** [1] - 545:6
**aggrieved** [1] - 588:9
**aging** [1] - 551:25
**agree** [1] - 593:23
**agreed** [4] - 548:7, 581:20, 593:4, 595:25
**agreement** [1] - 582:5
**AGREEMENT** [1] - 545:10
**agreements** [1] - 605:24
**ahead** [5] - 584:9, 587:1, 587:7, 590:7, 591:12
**al** [2] - 545:3, 545:7
**allow** [1] - 549:13
**allowed** [3] - 583:8, 588:6, 588:10
**alone** [3] - 553:10, 554:16, 590:8
**Amendment** [10] - 572:17, 581:20, 582:4, 583:1, 584:13, 593:4, 593:12, 593:14, 599:14, 607:18
**Americas** [1] - 546:4
**amount** [12] - 549:15, 551:16, 574:18, 575:9, 575:12, 575:15, 575:16, 576:4, 576:9, 576:13, 576:19, 581:18
**analysis** [3] - 563:12, 563:14, 603:23
**analyst** [6] - 601:3, 601:14, 603:7, 603:9, 603:19, 604:5
**analysts** [5] - 603:10, 603:12, 603:15, 603:16, 604:12

**analysts'** [3] - 603:5, 604:11, 606:19
**analyze** [2] - 574:15, 574:18
**analyzed** [1] - 573:18
**Ann** [2] - 567:3, 567:21
**annually** [2] - 581:18, 602:16
**answer** [12] - 565:21, 566:6, 572:19, 574:9, 574:14, 575:15, 583:10, 584:7, 587:8, 589:1, 608:16, 609:1
**ANSWER** [4] - 565:22, 566:7, 583:15, 610:23
**answered** [1] - 549:18
**answers** [2] - 597:2, 597:23
**apartments** [1] - 580:8
**apologize** [2] - 548:23, 557:1
**appear** [1] - 596:21
**APPEARANCES** [2] - 545:15, 546:1
**appointed** [2] - 578:20, 590:24
**appointing** [1] - 608:17
**appreciate** [1] - 610:16
**approach** [2] - 568:3, 601:25
**April** [1] - 569:21
**arbitrarily** [1] - 577:11
**arbitrariness** [1] - 588:20
**areas** [1] - 580:8
**argument** [1] - 548:6
**ARNOLD** [1] - 546:9
**ASIM** [1] - 546:7
**asleep** [2] - 597:24, 598:1
**assets** [21] - 549:12, 549:13, 549:16, 550:2, 550:15, 551:1, 552:8, 552:17, 553:17, 554:10, 554:17, 554:21, 554:22, 555:3, 555:4, 558:9, 558:13, 587:15, 601:23, 608:18, 609:14
**assignment** [4] - 562:21, 562:25, 563:1, 563:4
**assistant** [1] - 579:22

**assisted** [4] - 579:2, 579:6, 579:23, 580:11
**associated** [1] - 586:19
**assume** [1] - 570:25
**attention** [6] - 562:15, 563:18, 564:13, 565:5, 565:17, 566:18
**attorneys** [1] - 584:25
**August** [11] - 560:13, 561:16, 561:17, 569:9, 571:22, 571:23, 572:14, 573:9, 573:15, 581:19, 593:3
**authorized** [1] - 573:14
**available** [4] - 559:17, 571:23, 572:1, 587:16
**Avenue** [1] - 545:17, 545:23, 546:4, 546:9, 546:13, 613:12
**avoid** [1] - 597:11
**aware** [3] - 581:11, 581:19, 593:3

**B**

**bachelor's** [1] - 579:10
**background** [6] - 579:9, 591:5, 591:15, 600:16, 606:14, 606:16
**backwards** [2] - 548:22, 548:23
**Bank** [1] - 600:22
**banker** [1] - 604:7
**banking** [1] - 603:20
**banks** [2] - 603:10, 603:17
**BARNES** [13] - 545:16, 598:25, 599:8, 600:1, 600:6, 603:25, 604:3, 605:6, 605:11, 606:22, 607:15, 608:5, 609:22
**Barnes** [4] - 598:25, 599:8, 606:22, 610:5
**Barnes)...................
............600** [1] - 547:10
**based** [5] - 549:18, 550:11, 553:14, 574:8, 604:1
**basic** [2] - 580:21,

606:14
**bear** [1] - 549:9
**became** [1] - 579:21
**BEFORE** [1] - 545:13
**begin** [1] - 573:13
**beginner** [1] - 580:21
**beginning** [2] - 562:6, 566:24
**behalf** [2] - 582:22, 606:8
**behind** [2] - 548:2, 574:24
**believes** [5] - 568:2, 583:2, 584:3, 586:16, 586:18
**below** [1] - 608:24
**bench** [11] - 582:20, 584:6, 586:13, 586:25, 588:1, 590:9, 599:6, 600:3, 606:6, 608:4, 612:18
**BERGER** [1] - 546:3
**BERGMAN** [1] - 546:7
**Berkeley** [22] - 599:1, 599:9, 600:12, 601:9, 601:13, 601:23, 603:13, 604:13, 604:16, 604:22, 605:4, 605:13, 605:14, 605:20, 605:22, 606:10, 606:23, 607:20, 607:22, 608:7, 609:10, 611:8
**Berkeley's** [3] - 601:25, 604:25, 605:1
**Berkley** [4] - 545:16, 600:10, 600:11, 601:12
**BERNSTEIN** [1] - 546:3
**best** [1] - 613:6
**better** [5] - 567:8, 578:11, 583:24, 597:25, 599:25
**between** [6] - 549:15, 564:8, 564:22, 564:23, 572:14, 602:11
**beyond** [6] - 571:14, 571:17, 572:3, 586:5, 606:20, 607:25
**billion** [45] - 552:2, 552:8, 552:13, 552:17, 552:19, 552:23, 552:25, 553:5, 553:8, 553:11, 553:15,

553:20, 553:25, 554:2, 554:4, 554:7, 554:10, 554:13, 554:15, 554:17, 554:23, 556:10, 556:20, 558:6, 558:10, 558:13, 558:16, 559:13, 559:18, 560:17, 561:20, 567:5, 567:12, 567:13, 567:20, 568:8, 575:11, 575:14, 575:19, 576:1, 576:6, 576:8, 576:18, 576:21
**billions** [2] - 560:14, 581:12
**Billions** [1] - 551:20
**binder** [1] - 563:8
**bit** [6] - 579:9, 580:15, 588:3, 591:4, 591:14, 599:10
**black** [1] - 554:20
**Board** [1] - 587:15
**BOIES** [1] - 545:22
**bond** [5] - 601:14, 601:15, 601:17, 602:13, 602:17
**bonds** [2] - 611:13, 611:14
**boring** [1] - 597:24
**borrowed** [1] - 581:18
**bottom** [1] - 608:12
**boutique** [1] - 600:25
**breach** [1] - 586:16
**breached** [1] - 586:18
**break** [3] - 548:23, 559:18, 561:20
**Brian** [3] - 598:25, 599:8, 606:22
**BRIAN** [1] - 545:16
**brief** [3] - 592:13, 595:17, 596:12
**briefly** [3] - 600:15, 605:12, 606:2
**bring** [1] - 596:2
**brought** [2] - 583:9, 606:13
**building** [5] - 579:15, 580:9, 580:10, 580:12, 580:14
**business** [3] - 600:14, 604:23, 611:10
**buy** [3] - 581:5, 581:7, 592:23
**buying** [2] - 580:25, 581:13
**BY** [12] - 548:20, 562:2, 578:17,

616

584:10, 585:5,
587:3, 590:20,
591:13, 594:8,
600:6, 608:5, 610:2

# C

**CA** [1] - 545:3
**Cacciapalle** [2] -
595:4, 598:9
**calculate** [1] - 576:12
**calculated** [1] - 576:12
**calculations** [2] -
562:10, 564:6
**calendar** [2] - 551:17,
556:6
**cannot** [2] - 599:22,
607:12
**capacity** [1] - 608:21
**Capital** [1] - 600:25
**care** [5] - 579:6, 580:5,
580:7, 580:9, 580:12
**career** [1] - 591:24
**careful** [1] - 604:10
**carefully** [1] - 583:21
**carpenter** [1] - 592:1
**carpenters'** [1] -
591:25
**carry** [1] - 592:18
**case** [18] - 562:11,
562:21, 562:25,
563:10, 577:9,
577:24, 582:24,
583:4, 584:19,
584:25, 585:18,
588:13, 589:23,
594:21, 604:6,
612:8, 612:9, 612:13
**Case** [4] - 545:9,
562:23, 568:11,
573:10
**Case-Shiller** [2] -
568:11, 573:10
**cash** [1] - 587:14,
609:18
**casino** [1] - 569:18
**CASSEL** [1] - 547:7
**Cassel** [6] - 590:15,
590:21, 590:23,
591:11, 594:9,
594:23
**CASSELL** [1] - 590:18
**casualty** [2] - 600:12,
605:14
**cautiously** [1] - 603:14
**CEO** [1] - 604:8
**certain** [5] - 566:14,
566:15, 573:20,
574:13, 603:18
**certainly** [1] - 570:13

**CERTIFICATE** [1] -
613:1
**certificate** [4] -
585:21, 585:24,
587:5, 587:12
**certify** [1] - 613:4
**CFA** [1] - 601:8
**challenging** [1] -
593:17
**change** [4] - 566:23,
567:19, 568:7, 568:8
**changed** [2] - 582:5,
591:24
**characterize** [2] -
574:6, 574:7
**chart** [22] - 558:19,
560:19, 560:20,
560:21, 560:22,
560:23, 561:5,
561:7, 568:24,
568:25, 569:2,
569:3, 569:8,
569:21, 570:2,
570:16, 571:5,
571:8, 571:12,
573:1, 573:8, 573:17
**charter** [1] - 566:8
**chartered** [1] - 601:2
**charts** [2] - 551:5,
562:13
**CHECK** [1] - 545:19
**check** [1] - 553:4
**Chemical** [1] - 600:22
**choose** [1] - 580:23
**circumstance** [1] -
551:1
**claim** [1] - 583:3
**claims** [2] - 602:6,
606:15
**clarified** [1] - 570:12
**clarify** [1] - 574:8
**clarifying** [1] - 600:2
**CLASS** [1] - 545:10
**class** [11] - 548:4,
548:10, 577:25,
578:3, 578:21,
584:18, 584:22,
590:24, 593:23,
598:9, 598:10
**Class** [2] - 545:18,
546:2
**classes** [1] - 594:2
**cleans** [1] - 580:7
**clear** [3] - 572:13,
584:15, 606:9
**clearly** [3] - 588:10,
606:24, 607:3
**clerk** [2] - 548:11,
578:11
**client** [1] - 592:18

**closer** [1] - 602:12
**Co** [1] - 605:13
**cold** [1] - 612:15
**college** [5] - 579:13,
591:16, 591:18,
591:19, 600:18
**colloquial** [1] - 550:4
**colloquially** [1] - 550:6
**COLUMBIA** [1] - 545:1
**Columbus** [1] - 591:3
**column** [3] - 555:7,
555:10, 555:11
**coming** [1] - 603:4
**commercial** [2] -
600:14, 611:10
**commission** [1] -
592:14
**Commitment** [14] -
549:14, 551:10,
552:13, 552:23,
556:11, 556:16,
558:15, 559:3,
559:16, 560:15,
575:10, 575:12,
575:16, 576:4
**commitment** [5] -
549:24, 605:25,
606:18, 607:7,
607:18
**Common** [1] - 587:13
**common** [14] - 580:8,
581:7, 581:8,
584:12, 585:8,
585:18, 585:22,
587:5, 587:11,
592:24, 592:25,
594:11, 594:21,
602:11
**community** [1] - 579:7
**companies** [3] -
580:22, 580:23,
593:15
**Company** [6] - 565:23,
566:8, 605:22,
608:19, 608:21,
609:3
**company** [12] - 566:5,
566:7, 579:17,
600:13, 604:6,
604:9, 605:15,
611:6, 611:10,
611:13, 611:15
**company's** [3] -
607:19, 610:11,
610:21
**Company's** [3] -
608:18, 610:19,
610:23
**complaining** [2] -
588:7, 588:11

**complete** [2] - 563:3,
613:6
**completed** [4] -
565:24, 591:16,
601:1, 609:4
**comprehensive** [1] -
567:9
**concept** [1] - 556:14
**concern** [1] - 607:10
**concerning** [1] -
605:24
**condition** [4] - 565:24,
608:19, 609:4,
609:16
**conditions** [1] - 568:4
**conducted** [1] -
604:23
**conference** [10] -
582:20, 584:6,
586:13, 586:25,
588:1, 590:9, 599:6,
600:3, 606:6, 608:4
**confess** [1] - 599:9
**confidence** [1] -
608:20
**confident** [1] - 563:15
**confirmed** [1] - 596:17
**conflicts** [2] - 603:18,
604:4
**Congress** [1] - 566:10
**connection** [1] - 562:8
**consecutive** [2] -
564:7, 564:21
**conservative** [3] -
568:3, 602:4, 602:7
**Conservator** [1] -
608:17
**conservator's** [1] -
565:23
**Conservator's** [1] -
609:3
**conservatorship** [16] -
565:19, 566:1,
566:2, 581:12,
599:14, 608:14,
608:20, 608:25,
609:6, 609:7,
610:11, 610:14,
610:19, 610:22,
610:23, 611:1
**conserve** [2] - 608:18,
609:14
**consider** [3] - 580:18,
580:20, 583:18
**consideration** [1] -
597:6
**considered** [1] -
599:23
**consistent** [1] -
609:21

**consistently** [1] -
567:22
**constitutes** [1] - 613:4
**Constitution** [2] -
546:13, 613:12
**contents** [7] - 586:8,
586:17, 589:13,
589:15, 589:20,
589:24, 606:13
**continue** [3] - 576:23,
610:24, 611:1
**CONTINUED** [2] -
545:24, 546:1
**Continued** [1] - 548:19
**continues** [1] - 576:24
**contract** [10] - 585:20,
586:8, 586:17,
586:18, 589:14,
589:16, 589:17,
589:20, 589:24,
606:14
**contracts** [3] - 579:15,
607:1, 607:3
**contractual** [1] -
577:12
**contrary** [2] - 583:3,
607:24
**contributed** [1] -
608:22
**conversations** [1] -
581:24
**Cooper** [1] - 599:1
**COOPER** [1] - 545:16
**copy** [1] - 595:21
**Corp** [3] - 601:9,
601:23, 605:14
**corporate** [6] - 601:14,
601:15, 602:11,
602:12, 602:13,
605:12
**corporates** [1] -
601:21
**Corporation** [3] -
600:10, 600:11,
601:12
**corporations** [1] -
602:20
**correct** [80] - 550:3,
550:13, 550:18,
551:2, 551:10,
551:11, 551:14,
552:8, 552:13,
552:14, 552:17,
552:20, 552:23,
552:24, 553:2,
553:3, 553:5, 553:6,
553:8, 553:17,
554:7, 554:8, 555:5,
555:10, 555:12,
555:13, 555:21,

555:22, 555:24, 556:11, 556:12, 556:17, 558:3, 558:13, 559:4, 559:11, 559:13, 559:19, 559:25, 560:5, 560:18, 561:11, 561:13, 561:21, 563:10, 563:14, 563:21, 565:9, 565:13, 565:14, 568:6, 568:19, 569:14, 569:20, 574:16, 574:17, 574:19, 574:20, 574:22, 574:23, 575:1, 575:17, 575:18, 576:10, 576:11, 576:24, 582:1, 584:11, 585:9, 585:10, 585:13, 585:16, 585:19, 585:23, 586:1, 592:21, 592:22, 594:22, 611:9, 611:18

**correctly** [4] - 552:4, 587:17, 589:16, 611:4
**correlated** [1] - 574:14
**corridor** [1] - 592:8
**Cortland** [1] - 600:19
**counsel** [2] - 593:8, 612:17
**count** [2] - 564:7, 564:20
**coupon** [2] - 602:13, 602:14
**course** [2] - 580:11, 604:22
**COURT** [69] - 545:1, 548:2, 548:11, 548:15, 550:10, 569:4, 570:18, 571:16, 571:19, 572:5, 572:18, 572:22, 573:2, 573:4, 573:6, 573:11, 573:24, 574:10, 577:2, 577:6, 577:8, 578:8, 578:14, 582:18, 583:17, 583:24, 584:5, 584:7, 585:3, 586:6, 586:12, 586:24, 587:7, 587:21, 590:4, 590:10, 590:13, 590:17, 591:6,

591:9, 591:12, 594:25, 595:2, 595:5, 595:8, 595:13, 595:22, 596:2, 596:6, 596:9, 596:16, 596:19, 596:21, 598:10, 598:14, 598:17, 598:21, 598:24, 599:19, 602:3, 604:2, 605:9, 608:3, 611:21, 612:2, 612:5, 612:8, 612:17, 613:1
**Court** [16] - 546:12, 546:12, 548:9, 578:21, 582:23, 583:6, 590:24, 591:14, 599:4, 599:16, 606:24, 607:1, 607:4, 607:16, 607:25, 613:11
**court** [3] - 597:1, 597:9, 597:19
**court's** [2] - 606:20, 608:1
**Court's** [7] - 549:9, 583:21, 587:19, 589:13, 594:4, 607:11, 609:23
**Courthouse** [2] - 546:13, 613:11
**courtroom** [4] - 548:14, 595:12, 596:20, 612:16
**covenant** [2] - 586:17, 586:19
**cover** [2] - 564:18, 567:10
**COVID** [1] - 597:10
**create** [1] - 562:13
**created** [1] - 562:19
**credit** [1] - 567:7
**credit-related** [1] - 567:7
**crisis** [2] - 562:8, 562:10
**cross** [8] - 548:16, 562:6, 566:11, 572:4, 574:4, 597:18, 598:19, 599:12
**CROSS** [4] - 548:19, 585:4, 594:7, 610:1
**cross-examination** [3] - 548:16, 562:6, 572:4
**CROSS-EXAMINATION** [4] -

548:19, 585:4, 594:7, 610:1
**CRR** [3] - 546:12, 613:3, 613:10
**Cumulative** [1] - 551:12
**cumulative** [6] - 555:8, 555:11, 555:15, 555:19, 556:15, 567:11
**cumulatively** [1] - 555:3
**current** [1] - 608:23

## D

**D.C** [5] - 545:4, 545:17, 545:23, 546:10, 585:1
**damages** [4] - 583:6, 590:6, 599:22, 607:24
**dashes** [1] - 557:22
**data** [7] - 568:5, 571:22, 571:25, 572:14, 572:23, 573:18, 573:19
**date** [4] - 572:8, 573:7, 573:9, 573:12
**Dated** [1] - 613:8
**dates** [11] - 570:20, 570:23, 570:25, 571:2, 571:4, 572:11, 572:12, 572:23, 572:24, 572:25, 573:6
**DAVID** [1] - 546:7
**Davis** [1] - 562:5
**DAVIS** [10] - 545:21, 550:9, 562:2, 566:13, 570:13, 571:21, 572:6, 574:3, 574:6, 577:1
**Davis)........................
.............562** [1] -
547:4
**day-to-day** [2] -
580:10, 602:22
**days** [1] - 597:10
**DC** [2] - 546:14, 613:13
**dealer** [1] - 579:16
**debt** [2] - 602:11, 602:12
**decide** [2] - 577:9, 593:16
**decided** [1] - 599:24
**deciding** [1] - 565:11
**decision** [3] - 582:12, 584:21, 593:19

**decisions** [1] - 603:13
**declared** [1] - 587:15
**deep** [1] - 607:5
**defendant** [1] - 599:19
**Defendant** [1] - 546:6
**Defendants** [1] - 545:8
**defendants** [6] -
548:7, 577:10, 582:23, 595:25, 596:15, 606:9
**defendants'** [1] -
589:4
**defense** [2] - 548:13, 574:4
**degree** [6] - 579:10, 600:23, 601:1, 601:3, 601:8
**Delmar** [3] - 579:17, 579:19, 579:20
**delta** [1] - 567:21
**delve** [1] - 607:5
**department's** [1] -
602:5
**depict** [2] - 568:25, 569:8
**deposition** [13] -
595:4, 595:19, 596:11, 596:22, 596:23, 597:3, 597:4, 597:5, 597:8, 597:13, 598:12, 612:2, 612:4
**depositions** [3] -
595:19, 597:11, 598:2
**describe** [8] - 550:4, 593:12, 600:15, 601:25, 602:22, 603:12, 605:12, 606:2
**designated** [1] -
603:22
**designation** [1] -
601:4
**despite** [1] - 567:24
**details** [1] - 577:18
**determination** [2] -
565:22, 609:2
**determine** [1] - 580:22
**determined** [1] - 611:3
**determining** [1] -
577:12
**dietary** [1] - 580:6
**difference** [1] - 549:15
**different** [3] - 556:14, 584:8, 605:17
**DIRECT** [3] - 578:16, 570:19, 600:5
**direct** [8] - 549:8, 562:15, 563:18,

564:13, 565:5, 565:16, 566:18, 586:5
**directed** [1] - 588:16
**direction** [2] - 604:12, 609:18
**directly** [1] - 608:22
**director** [4] - 565:25, 579:22, 579:25, 612:3
**Director** [1] - 609:5
**Director's** [2] - 565:22, 609:2
**Directors** [1] - 587:15
**disclose** [2] - 582:2, 593:11
**discussed** [1] - 567:3
**Discussion** [1] -
595:14
**disputed** [2] - 548:24, 553:14
**dissolved** [2] - 566:5, 566:9
**DISTRICT** [3] - 545:1, 545:1, 545:13
**district** [2] - 592:6, 592:7
**dividend** [9] - 560:4, 560:9, 564:8, 564:21, 567:10, 580:24, 581:16, 602:13, 606:12
**Dividends** [1] - 586:10
**dividends** [27] -
559:25, 563:21, 564:1, 564:16, 581:1, 582:14, 582:24, 583:3, 583:15, 584:4, 585:25, 587:14, 588:5, 588:7, 588:9, 588:12, 588:14, 588:19, 589:3, 589:6, 589:8, 589:23, 590:2, 590:5, 590:6, 599:11, 599:15
**document** [13] -
562:20, 565:6, 565:8, 566:4, 566:15, 588:8, 590:3, 604:19, 604:21, 604:22, 605:3, 605:7, 608:10
**documents** [1] -
565:12
**dollar** [1] - 559:24, 609:18, 609:19
**dollars** [2] - 560:14, 581:13

618

**done** [2] - 549:3, 607:20
**donnybrook** [1] - 590:4
**door** [5] - 588:23, 589:9, 589:18, 589:21
**down** [10] - 569:22, 569:25, 575:17, 575:19, 575:23, 576:16, 577:2, 590:13, 594:25, 611:22
**download** [1] - 568:11
**draw** [40] - 549:14, 549:24, 550:8, 550:12, 552:2, 552:13, 552:22, 553:8, 553:20, 554:6, 554:11, 554:15, 555:10, 555:11, 555:15, 555:18, 555:19, 556:8, 556:11, 556:20, 557:19, 558:2, 558:5, 558:6, 558:16, 559:10, 559:13, 560:14, 574:7, 575:7, 575:17, 575:19, 575:25, 576:2, 576:10, 576:13, 576:16, 577:20
**drawdowns** [2] - 560:22, 575:22
**drawing** [1] - 553:15
**drawn** [1] - 551:16
**draws** [12] - 551:9, 551:16, 555:8, 556:15, 558:20, 567:11, 573:19, 574:12, 574:15, 574:18, 574:25, 575:4
**drew** [1] - 554:13
**due** [1] - 567:6
**during** [12] - 560:10, 560:11, 560:12, 561:14, 561:18, 569:10, 597:3, 610:11, 610:14, 610:19, 610:21, 610:23

**E**

**easier** [1] - 558:24
**ECF** [1] - 595:24
**economic** [1] - 603:3
**economy** [1] - 603:15

**educational** [4] - 579:9, 591:5, 591:15, 600:15
**EDWARD** [2] - 547:9, 600:4
**Edward** [1] - 599:2
**Edwards** [3] - 567:15, 567:17, 567:19
**effect** [2] - 593:20, 599:14
**either** [2] - 585:15, 612:12
**elaborate** [1] - 555:14
**elected** [1] - 592:5
**eliminate** [1] - 589:5
**embedded** [2] - 596:13, 598:16
**employ** [1] - 592:17
**employees** [3] - 579:24, 580:1, 592:19
**employment** [3] - 579:12, 592:4, 592:12
**employment-wise** [1] - 579:12
**end** [14] - 559:12, 565:20, 566:2, 568:2, 573:7, 584:6, 586:25, 590:9, 597:17, 600:3, 607:8, 608:4, 608:25, 609:8
**English** [1] - 549:23
**enhance** [1] - 608:21
**entail** [1] - 579:4
**entails** [1] - 603:2
**enterprise** [3] - 549:25, 550:13, 575:17
**Enterprise's** [1] - 549:12
**Enterprises** [1] - 549:14
**enters** [2] - 548:14, 596:20
**entire** [1] - 555:5
**entitled** [1] - 587:13
**entity** [2] - 556:14, 566:9
**equal** [2] - 549:15, 607:19
**ESQ** [12] - 545:16, 545:18, 545:21, 545:21, 545:22, 546:2, 546:2, 546:6, 546:7, 546:7, 546:8, 546:8
**essence** [2] - 604:4, 609:12

**establish** [1] - 607:6
**et** [2] - 545:3, 545:7
**evening** [1] - 612:14
**events** [1] - 580:13
**eventually** [1] - 601:15
**evidence** [7] - 586:3, 595:19, 596:14, 597:11, 604:20, 605:7, 608:11
**exact** [2] - 566:1, 609:6
**exactly** [1] - 569:16
**examination** [5] - 548:16, 549:8, 562:6, 564:6, 572:4
**EXAMINATION** [8] - 548:19, 562:1, 578:16, 585:4, 590:19, 594:7, 600:5, 610:1
**examined** [1] - 597:19
**example** [1] - 551:19
**exceed** [5] - 549:12, 549:13, 550:1, 551:1, 553:17
**exceeded** [1] - 550:14, 552:7, 552:17, 554:10, 554:16, 554:21, 554:22, 555:3, 555:4, 558:9, 558:13
**Excel** [5] - 551:6, 551:13, 552:3, 562:18, 563:6
**Exhibit** [12] - 562:16, 562:17, 564:14, 564:15, 566:13, 568:10, 573:16, 575:21, 596:14, 604:20, 605:11, 608:10
**exhibit** [5] - 572:4, 589:6, 595:7, 596:13, 598:15
**Exhibits** [1] - 563:19
**exist** [1] - 603:18
**exits** [2] - 595:12, 612:16
**expect** [2] - 578:5, 607:21
**expectations** [6] - 577:12, 577:13, 577:18, 577:23, 607:12, 607:14
**expected** [6] - 567:9, 577:15, 588:19, 589:8, 590:2
**expenses** [1] - 567:7
**experience** [1] - 604:11

**expert** [7] - 562:7, 562:9, 574:21, 580:18, 603:21, 603:22, 603:24
**explain** [4] - 602:9, 603:8, 607:16, 609:9
**explained** [1] - 566:8
**explaining** [1] - 604:6
**eyes** [1] - 551:25

**F**

**face** [1] - 578:11
**facilities** [2] - 580:7, 592:13
**facility** [1] - 579:3
**fact** [5] - 560:17, 567:24, 577:21, 588:11, 609:17
**facts** [3] - 548:24, 553:14, 606:14
**fair** [6] - 581:23, 586:20, 588:21, 589:12, 593:7, 597:6
**FAIRHOLME** [1] - 545:3
**fall** [2] - 597:24, 598:1
**familiar** [3] - 580:23, 604:16, 605:23
**family** [1] - 579:17
**family-owned** [1] - 579:17
**Fannie** [1] - 551:9, 552:7, 552:12, 552:16, 552:22, 552:25, 553:8, 553:10, 553:19, 554:6, 554:9, 554:13, 554:15, 554:19, 555:2, 555:3, 556:11, 556:16, 557:3, 557:4, 557:7, 557:10, 557:17, 557:19, 558:5, 559:23, 560:13, 560:18, 560:22, 560:23, 561:4, 561:19, 563:21, 564:16, 567:21, 568:15, 568:17, 569:3, 573:19, 574:11, 576:13, 576:16, 585:14, 590:24, 594:17, 604:13, 605:4, 605:21, 608:6, 609:15, 611:16
**FANNIE** [1] - 545:9
**far** [3] - 576:20,

606:19, 607:25
**February** [5] - 569:9, 569:23, 570:4, 571:23, 572:14
**federal** [2] - 559:17, 561:20
**Federal** [1] - 546:6
**FEDERAL** [1] - 545:6
**fee** [4] - 605:25, 606:18, 607:7, 607:18
**felt** [1] - 582:11
**few** [3] - 551:4, 559:22, 573:17
**FHFA** [4] - 581:19, 593:3, 609:11, 609:21
**file** [3] - 582:7, 582:10, 593:16
**filed** [2] - 607:22, 609:10
**filings** [1] - 603:5
**Finance** [1] - 546:6
**FINANCE** [1] - 545:6
**financial** [8] - 562:8, 562:9, 566:21, 567:4, 573:18, 573:19, 601:2, 611:2
**firm** [4] - 582:7, 592:14, 592:15, 592:17
**first** [19] - 552:19, 553:1, 553:5, 555:1, 555:15, 555:19, 556:4, 563:23, 565:18, 567:6, 578:9, 587:10, 591:7, 591:10, 591:18, 591:19, 608:12, 608:15
**five** [1] - 591:22
**fixed** [1] - 602:14
**flew** [1] - 585:1
**FLEXNER** [1] - 545:22
**flies** [1] - 597:23
**flow** [1] - 609:18
**focus** [2] - 586:9, 587:2, 610:9
**focused** [1] - 600:13
**follow** [2] - 583:20, 589:10
**follow-up** [1] - 589:10
**following** [7] - 582:20, 586:13, 588:1, 599:6, 601:7, 603:2, 606:6
**food** [1] - 580:5
**FOR** [1] - 545:1
**Ford** [3] - 579:14, 579:16

589:12
**Forecast** [1] - 566:21
**forecast** [5] - 566:23, 567:4, 567:9, 567:11, 567:12
**foregoing** [1] - 613:4
**former** [1] - 612:3
**formulate** [1] - 563:10
**forth** [1] - 555:24
**foundation** [1] - 607:13
**foundational** [1] - 607:6
**four** [2] - 561:18, 579:22
**fourth** [2] - 556:19, 558:4
**frame** [2] - 566:1, 609:7
**framework** [1] - 602:7
**Freddie** [47] - 556:16, 557:23, 558:1, 558:6, 558:20, 559:2, 559:13, 559:15, 559:23, 560:14, 560:18, 561:7, 561:19, 563:21, 564:1, 564:7, 564:21, 568:15, 568:18, 576:9, 576:13, 576:16, 578:21, 581:2, 581:11, 581:13, 581:15, 581:20, 584:12, 585:9, 585:11, 585:18, 585:21, 587:4, 587:11, 590:25, 592:20, 593:3, 594:12, 594:14, 594:21, 604:14, 605:4, 605:21, 608:6, 609:15, 611:16
**Freddie's** [2] - 558:8, 558:12
**front** [1] - 570:3
**frustrated** [1] - 577:11
**fulfill** [1] - 608:21
**full** [6] - 565:18, 591:6, 591:9, 591:11, 610:10, 613:5
**FUNDS** [1] - 545:3
**future** [5] - 568:3, 569:13, 569:18, 571:1, 599:15

### G

**GAAP** [1] - 549:13
**game** [2] - 586:20,

589:12
**gardens** [1] - 579:18
**Gardens** [2] - 579:19, 579:20
**gather** [1] - 562:22
**Gehring** [1] - 567:3
**general** [5] - 549:19, 550:11, 550:25, 553:13, 602:6
**generally** [5] - 580:3, 582:4, 601:25, 602:22, 603:12
**generate** [2] - 603:10, 603:11
**gentlemen** [3] - 567:2, 577:8, 579:8
**geopolitics** [1] - 603:2
**given** [7] - 562:9, 562:25, 566:2, 566:23, 568:4, 601:16, 609:7
**GLUCK** [1] - 546:2
**goal** [1] - 609:13
**goals** [2] - 608:13, 608:20
**government** [6] - 559:18, 561:20, 568:14, 568:24, 569:2, 601:16
**government-issued** [1] - 568:14
**governments** [1] - 601:21
**graduated** [2] - 579:12, 579:14
**graduating** [1] - 600:21
**grammar** [1] - 600:17
**granted** [1] - 584:5
**great** [1] - 549:19
**Greenlee** [1] - 568:2
**grew** [1] - 600:18
**GROSSMANN** [1] - 546:3
**grow** [3] - 568:1, 576:23, 576:24
**GSE** [2] - 606:11, 606:17
**guess** [1] - 603:14

### H

**half** [3] - 591:16, 591:22, 592:2
**HAMISH** [1] - 545:21
**Hampshire** [1] - 545:17
**hand** [3] - 548:8, 548:11, 595:23
**handled** [1] - 579:15

**happy** [1] - 604:7
**harm** [2] - 588:15, 588:17
**harmed** [14] - 582:11, 582:12, 582:13, 583:2, 583:9, 583:14, 584:2, 584:3, 584:21, 586:16, 586:22, 588:5, 588:24, 589:2
**Hartman** [8] - 548:21, 549:1, 561:25, 562:3, 569:5, 570:19, 572:7, 574:11
**HARTMAN** [2] - 547:3, 548:18
**hear** [5] - 571:20, 578:11, 582:18, 587:8, 597:3
**heard** [5] - 563:13, 577:16, 587:25, 606:5
**hearing** [7] - 577:25, 582:21, 586:14, 588:2, 599:7, 606:7, 612:19
**held** [7] - 582:21, 586:14, 588:2, 599:7, 601:11, 601:13, 606:7
**HELD** [1] - 545:13
**help** [2] - 608:20, 610:16
**helped** [1] - 563:9
**hereby** [1] - 613:2
**high** [2] - 600:17, 602:25
**higher** [1] - 567:13
**highlight** [1] - 556:23
**highlighted** [2] - 556:1, 557:6
**highlighting** [2] - 558:22, 558:23
**highlights** [1] - 567:3
**history** [1] - 580:16
**Hoffman** [8] - 582:22, 583:11, 584:1, 585:3, 588:4, 589:11, 606:8, 606:23
**HOFFMAN** [35] - 546:8, 548:13, 582:16, 582:19, 582:22, 583:11, 584:1, 585:5, 586:2, 586:7, 586:15, 587:1, 587:3, 587:19, 587:23, 588:13, 589:11,

594:4, 594:8, 594:23, 596:17, 598:20, 598:22, 602:2, 603:21, 605:8, 606:4, 606:8, 607:10, 607:23, 609:23, 610:2, 610:7, 610:12, 611:19
**Hoffman)**................. .................**585** [1] - 547:6
**Hoffman)**................. .................**594** [1] - 547:8
**Hoffman)**................. .................**610** [1] - 547:10
**hold** [3] - 581:9, 585:17, 592:25
**holders** [1] - 587:12
**holding** [3] - 580:25, 600:13, 605:14
**holdings** [2] - 584:12, 604:25
**Home** [1] - 600:25
**home** [7] - 567:20, 567:21, 568:7, 569:10, 570:4, 571:7, 572:1
**Honor** [82] - 548:17, 548:25, 561:23, 569:1, 570:12, 570:17, 571:14, 571:17, 572:3, 573:25, 574:3, 577:4, 578:6, 578:12, 582:16, 582:19, 582:22, 582:23, 583:4, 583:5, 583:7, 583:11, 583:20, 583:25, 584:1, 586:3, 586:4, 586:7, 586:11, 586:15, 586:20, 586:21, 587:19, 588:3, 588:13, 588:15, 588:16, 588:18, 588:21, 588:22, 588:25, 589:4, 589:11, 589:12, 589:15, 589:19, 589:23, 590:8, 590:16, 594:3, 594:4, 595:3, 595:16, 595:20, 596:18, 598:4, 598:13, 598:20, 598:23, 598:25,

599:8, 600:1, 602:2, 603:24, 604:1, 604:3, 605:6, 605:8, 606:4, 606:5, 606:8, 606:11, 606:22, 607:10, 607:14, 607:23, 609:24, 611:19, 611:24, 612:7
**Honor's** [2] - 589:21, 606:9
**HONORABLE** [1] - 545:13
**hopefully** [1] - 612:15
**housekeeping** [3] - 580:7, 595:17, 596:12
**housing** [6] - 546:6, 567:23, 568:25, 569:8, 569:13, 570:15
**HOUSING** [1] - 545:6
**HR** [2] - 579:21, 580:9
**HUME** [1] - 545:21
**hyphens** [1] - 557:22

### I

**Ian** [5] - 582:22, 583:11, 584:1, 589:11, 606:8
**IAN** [1] - 546:8
**idea** [1] - 553:15
**impartial** [1] - 597:6
**implied** [2] - 586:16, 586:19
**importantly** [1] - 575:9
**improved** [2] - 567:6, 568:5
**improving** [1] - 567:24
**IN** [2] - 545:1, 545:9
**INC** [1] - 545:3
**includes** [1] - 562:23
**including** [3] - 556:5, 577:17, 606:10
**income** [7] - 567:5, 567:9, 567:12, 567:20, 568:8, 573:20, 574:12
**increase** [3] - 569:10, 570:4, 570:15
**index** [12] - 562:18, 562:24, 568:12, 568:25, 569:6, 569:9, 569:10, 570:15, 571:7, 572:1, 572:8, 573:10
**indicate** [1] - 562:20
**indicated** [1] - 609:12
**individual** [6] - 577:14,

577:16, 577:18,
577:22, 577:23,
607:11
**individually** [1] -
577:14
**individuals** [1] -
602:20
**individuals'** [1] -
577:18
**indulgence** [3] -
587:19, 594:4,
609:23
**industry** [1] - 601:4
**inferences** [1] -
577:20
**information** [11] -
568:14, 568:15,
568:16, 568:17,
568:19, 568:22,
569:22, 569:25,
571:7, 571:9, 593:11
**instability** [1] - 608:23
**instance** [1] - 572:13
**instead** [1] - 556:16
**institutions** [1] -
602:21
**instruct** [4] - 583:17,
590:5, 599:20,
599:22
**instructed** [1] - 578:5
**Instruction** [1] -
595:24
**instruction** [7] - 548:6,
548:7, 578:4, 590:7,
595:18, 595:21,
596:22
**instructions** [2] -
597:16, 599:21
**Insurance** [1] - 605:22
**insurance** [6] -
600:12, 600:13,
611:6, 611:8,
611:11, 611:15
**intend** [1] - 548:6
**interest** [2] - 603:18,
604:4
**interfered** [1] - 577:11
**internal** [3] - 568:15,
568:17, 569:3
**international** [1] -
601:22
**introduce** [1] - 597:11
**inventory** [1] - 567:24
**invest** [4] - 580:16,
580:22, 580:23,
602:15
**invested** [1] - 581:12
**investing** [3] - 580:15,
602:1, 603:23
**investment** [11] -

581:16, 600:25,
601:4, 602:5, 602:7,
603:10, 603:13,
603:17, 603:20,
604:7, 605:1
**investor** [1] - 580:18
**investors** [1] - 602:18
**invests** [1] - 611:13
**issue** [3] - 565:25,
577:9, 609:5
**issued** [1] - 568:14

## J

**James** [1] - 591:11
**January** [8] - 552:2,
556:7, 571:25,
572:3, 572:7, 573:8,
573:13, 609:20
**job** [3] - 591:18,
591:19, 602:22
**jobs** [1] - 580:3
**joint** [3] - 548:24,
549:4, 553:14
**Jon** [1] - 568:2
**JONATHAN** [1] - 546:6
**Jonathan** [1] - 551:8
**JONES** [1] - 546:8
**Jorge** [4] - 557:14,
558:22, 560:24,
561:8
**Joseph** [1] - 598:8
**judge** [1] - 548:4
**JUDGE** [1] - 545:13
**July** [1] - 570:9
**June** [4] - 570:6,
570:14, 571:5, 571:9
**juries** [2] - 597:12,
597:24
**jurors** [2] - 597:23,
597:25
**JURY** [1] - 545:12
**jury** [23] - 548:10,
548:14, 549:1,
565:12, 567:2,
579:8, 582:21,
583:18, 586:14,
588:2, 591:4, 595:8,
595:11, 595:12,
595:18, 596:20,
599:7, 599:20,
599:22, 606:7,
609:9, 612:10,
612:16
**jury's** [1] - 548:2

## K

**KAPLAN** [1] - 545:22
**KAYE** [1] - 546:9
**keep** [1] - 604:2

**keeps** [2] - 555:23,
604:22
**Kenya** [1] - 562:5
**KENYA** [1] - 545:21
**KESSLER** [1] - 545:19
**kind** [4] - 580:3,
582:14, 583:16,
601:20
**kinds** [1] - 602:18
**King** [1] - 545:19
**Kirk** [1] - 599:1
**KIRK** [1] - 545:16
**knowledge** [4] -
549:19, 549:20,
553:14, 607:6
**knows** [1] - 587:6
**KRAVETZ** [1] - 546:2

## L

**ladies** [3] - 567:1,
577:8, 579:8
**LAMBERTH** [1] -
545:13
**large** [1] - 566:23
**larger** [4] - 564:11,
564:25, 565:1, 565:3
**last** [7] - 554:19,
566:3, 567:13,
567:14, 579:22,
584:7, 612:15
**latest** [1] - 567:3
**law** [1] - 582:7
**lawsuit** [5] - 582:10,
583:9, 606:13,
607:22, 609:10
**lawyer** [1] - 597:21
**lawyers** [4] - 581:24,
581:25, 582:3,
596:25
**laying** [1] - 607:12
**lead** [2] - 578:20,
590:23
**leading** [1] - 583:23
**leaning** [1] - 604:12
**learned** [2] - 581:24,
593:8
**least** [3] - 558:21,
559:3, 559:7
**leave** [2] - 590:8,
612:9
**LEE** [1] - 545:18
**Lee** [3] - 583:5,
588:25, 589:25
**left** [12] - 558:25,
575:9, 575:12,
575:16, 575:19,
576:4, 591:19,
591:23, 591:23,
592:11, 610:5

**legally** [1] - 587:15
**less** [1] - 597:8
**level** [1] - 602:25
**liabilities** [16] -
549:12, 549:15,
550:1, 550:14,
551:1, 552:7,
552:16, 553:17,
554:10, 554:16,
554:21, 554:22,
555:4, 558:9, 558:12
**licensed** [2] - 579:2,
579:5, 579:23
**light** [1] - 607:11
**limit** [1] - 603:18
**limited** [4] - 568:4,
606:20, 607:25,
608:1
**limits** [2] - 602:18,
602:21
**line** [2] - 599:12,
599:17
**LINEKIN** [2] - 547:9,
600:4
**Linekin** [17] - 599:2,
599:3, 600:7, 600:9,
604:13, 604:21,
605:12, 605:23,
606:25, 607:17,
607:20, 607:21,
608:6, 609:9, 610:3,
611:4, 611:20
**Linekin's** [1] - 607:5
**lines** [4] - 549:7,
557:22, 600:14
**liquidated** [1] - 566:7
**LISA** [1] - 613:3
**Lisa** [1] - 546:12
**list** [3] - 558:4, 563:25,
564:15
**litigation** [2] - 582:8,
593:16
**LITIGATIONS** [1] -
545:10
**LITOWITZ** [1] - 546:3
**live** [3] - 578:24,
588:20, 591:2
**living** [5] - 579:1,
579:2, 579:6,
579:23, 580:11
**LLP** [2] - 545:22, 546:3
**lobbying** [2] - 592:14,
592:15
**local** [1] - 579:16
**Lockhart** [2] - 611:25,
612:3
**look** [15] - 548:8,
555:2, 555:7,
556:19, 556:22,
566:3, 567:8,

573:16, 575:21,
575:22, 587:10,
604:19, 608:9,
610:6, 610:7
**looked** [2] - 561:9,
572:12
**looking** [3] - 561:4,
569:21, 583:12
**lose** [1] - 558:22
**losing** [2] - 588:5,
588:9
**loss** [3] - 567:7, 588:7,
606:12
**lost** [8] - 573:20,
574:12, 582:24,
583:1, 583:2,
588:14, 589:2,
589:22
**Louis** [3] - 578:25,
579:3, 579:11

## M

**MAC** [1] - 545:9
**Mac** [31] - 556:16,
557:23, 558:20,
559:13, 559:16,
559:24, 564:1,
564:8, 564:21,
568:15, 568:18,
576:9, 576:14,
576:16, 578:21,
581:3, 581:11,
581:13, 581:20,
584:12, 585:9,
585:11, 585:18,
585:22, 587:11,
592:20, 593:4,
594:12, 594:14,
594:21, 604:14
**Mac's** [2] - 581:15,
587:4
**Mae** [27] - 551:9,
552:12, 552:25,
553:8, 553:19,
554:6, 554:9,
554:13, 554:15,
555:2, 556:17,
557:3, 557:4, 557:7,
557:10, 559:23,
560:22, 564:16,
568:15, 568:17,
573:19, 574:11,
576:13, 576:16,
585:14, 594:17,
604:13
**Mae's** [5] - 552:7,
552:16, 554:20,
555:3, 567:21
**MAE/FREDDIE** [1] -
545:9

**main** [1] - 607:10
**maintaining** [1] - 604:25
**maintenance** [1] - 580:6
**manage** [2] - 579:24, 592:15
**management** [2] - 601:4, 601:21
**managing** [3] - 580:4, 601:18, 601:23
**Manhattan** [1] - 600:22
**March** [3] - 552:2, 556:5, 556:7
**market** [6] - 567:23, 567:25, 568:4, 580:16, 608:23, 611:3
**mask** [1] - 578:10
**Massachusetts** [1] - 546:9
**massive** [1] - 567:25
**master's** [2] - 600:23, 601:1
**match** [1] - 556:25
**material** [1] - 584:25
**math** [2] - 553:4, 560:25
**matter** [3] - 550:25, 596:12, 609:17
**matters** [1] - 595:17
**MBA** [1] - 600:23
**McFarland** [1] - 568:2
**mean** [6] - 565:2, 573:16, 574:24, 598:22, 602:4, 609:12
**means** [12] - 550:1, 550:7, 551:13, 551:16, 551:23, 552:1, 552:15, 553:10, 554:25, 558:8, 559:15, 605:15
**meant** [1] - 559:6
**measures** [2] - 573:21, 574:13
**medicines** [1] - 580:11
**MELTZER** [1] - 545:19
**members** [3] - 549:1, 567:15, 567:19
**mentioned** [3] - 577:8, 602:8, 603:7
**met** [1] - 584:25
**method** [2] - 597:21, 597:25
**MICHELLE** [2] - 547:5, 578:15
**Michelle** [2] - 577:4,

578:2
**Michigan** [1] - 591:16
**micro** [1] - 603:5
**middle** [1] - 566:22
**might** [3] - 595:20, 597:12, 603:4
**Miller** [14] - 577:4, 578:2, 578:7, 578:9, 578:18, 578:20, 584:11, 585:6, 587:4, 587:8, 587:10, 587:17, 587:23, 590:12
**MILLER** [2] - 547:5, 578:15
**million** [2] - 608:8, 611:16
**minute** [2] - 555:14, 557:3
**minutes** [5] - 549:2, 551:5, 559:22, 595:11, 598:8
**missed** [1] - 560:6
**missing** [3] - 572:12, 572:14, 572:23
**mission** [1] - 608:21
**Missouri** [3] - 578:25, 579:5, 579:11
**mitigate** [1] - 608:22
**model** [1] - 567:7
**moment** [3] - 587:20, 594:5, 609:24
**money** [7] - 549:25, 558:16, 559:2, 559:16, 559:18, 561:20, 602:6
**Monsanto** [2] - 591:20, 591:23
**month** [1] - 551:17
**months** [7] - 552:19, 553:1, 553:5, 571:22, 571:25, 573:2, 573:4
**Moreira** [2] - 546:12, 613:10
**MOREIRA** [1] - 613:3
**morning** [1] - 612:11
**most** [1] - 603:11
**mostly** [1] - 611:14
**motivated** [2] - 582:10, 593:19
**move** [5] - 549:20, 557:12, 584:2, 596:14, 605:6
**moved** [1] - 601:15
**movie** [1] - 611:24
**MR** [107] - 548:4, 548:13, 548:17, 548:20, 549:5, 550:22, 551:7,

551:25, 556:23, 557:12, 557:14, 558:22, 560:20, 560:23, 561:8, 561:23, 569:1, 570:11, 570:17, 571:14, 571:17, 571:20, 572:3, 573:23, 573:25, 574:5, 577:4, 577:7, 578:6, 578:12, 578:17, 582:16, 582:19, 582:22, 583:5, 583:11, 583:20, 583:25, 584:1, 584:10, 585:2, 585:5, 586:2, 586:4, 586:7, 586:11, 586:15, 586:21, 587:1, 587:3, 587:6, 587:19, 587:23, 587:25, 588:3, 588:13, 588:25, 589:11, 589:25, 590:8, 590:11, 590:15, 590:20, 591:13, 594:3, 594:4, 594:8, 594:23, 595:3, 595:6, 595:16, 595:23, 596:4, 596:7, 596:10, 596:17, 598:4, 598:13, 598:16, 598:20, 598:22, 598:25, 599:8, 600:1, 600:6, 602:2, 603:21, 603:25, 604:3, 605:6, 605:8, 605:11, 606:4, 606:8, 606:22, 607:10, 607:15, 607:23, 608:5, 609:22, 609:23, 610:2, 610:7, 610:12, 611:19, 611:24, 612:6
**MS** [9] - 550:9, 562:2, 566:13, 570:13, 571:21, 572:6, 574:3, 574:6, 577:1
**must** [1] - 566:8

# N

**name** [4] - 580:24, 591:6, 591:9, 591:11
**named** [1] - 577:17
**national** [1] - 571:7
**necessarily** [1] -

599:21
**need** [5] - 553:23, 558:23, 560:25, 562:8, 583:19
**needs** [1] - 580:6
**negative** [2] - 551:2, 577:21
**net** [15] - 550:21, 550:23, 551:2, 559:23, 560:3, 560:7, 560:13, 561:15, 561:17, 573:12, 581:21, 582:8, 588:12, 593:4, 593:17
**never** [1] - 587:9
**new** [3] - 566:9, 567:7, 597:25
**New** [6] - 545:17, 545:23, 546:4, 600:17, 600:19
**newspapers** [1] - 603:3
**next** [21] - 552:12, 553:7, 553:19, 553:25, 554:2, 554:9, 554:19, 555:7, 555:18, 558:12, 563:24, 577:3, 578:2, 590:14, 592:3, 595:2, 596:8, 596:21, 598:24, 599:1, 611:23
**NEXT** [1] - 545:24
**nice** [1] - 612:14
**night** [2] - 601:1, 612:15
**nine** [1] - 553:5
**nonsensical** [1] - 589:1
**Northeast** [1] - 592:8
**Northwest** [1] - 545:23
**not-so-good** [1] - 603:16
**note** [2] - 548:25, 586:11
**noted** [3] - 567:4, 567:23, 569:23
**Noted** [1] - 551:21
**notes** [2] - 612:10, 613:5
**nothing** [6] - 573:1, 585:2, 589:18, 590:3, 590:11, 594:3
**Number** [1] - 545:9
**number** [17] - 551:23, 552:1, 557:3, 557:4, 557:5, 557:7, 557:9, 561:4, 564:7,

564:20, 568:4, 576:22, 596:13, 598:15, 604:16, 605:3, 605:10
**numbers** [6] - 549:3, 551:4, 551:6, 557:2, 557:16
**numerous** [1] - 584:24
**nurture** [1] - 609:15
**NW** [4] - 545:17, 546:9, 546:13, 613:12

# O

**oath** [2] - 578:9, 596:24
**object** [3] - 586:4, 603:21, 606:4
**objected** [1] - 599:19
**objecting** [1] - 588:4
**objection** [19] - 548:13, 550:9, 569:1, 570:11, 570:17, 571:14, 571:17, 573:23, 582:16, 582:17, 582:19, 586:11, 587:6, 588:6, 596:15, 596:17, 598:18, 602:2, 605:8
**objection's** [2] - 586:24, 608:3
**obligation** [3] - 567:10, 581:16, 602:15
**observations** [1] - 604:1
**obviously** [2] - 588:18, 603:3
**occupies** [1] - 602:10
**October** [2] - 545:5, 613:8
**OF** [3] - 545:1, 545:12, 613:1
**office** [2] - 592:9, 592:11
**OFFICIAL** [1] - 613:1
**official** [1] - 613:11
**Official** [1] - 546:12
**Ohio** [5] - 591:3, 592:6, 592:7, 592:8, 592:13
**old** [1] - 597:21
**ON** [1] - 545:24
**on-the-stand** [1] - 564:5
**once** [2] - 601:5, 601:6
**one** [30] - 550:4, 551:8, 552:6,

554:16, 554:19, 555:8, 557:4, 557:16, 561:9, 563:24, 569:22, 577:9, 578:2, 578:20, 587:20, 589:10, 590:23, 592:10, 594:5, 595:6, 595:18, 598:10, 601:6, 604:12, 606:23, 607:7, 608:24, 609:23
**one's** [1] - 556:16
**open** [3] - 588:23, 589:10, 589:21
**opened** [2] - 589:9, 589:18, 592:14
**operation** [1] - 602:7
**operations** [1] - 580:10
**opinion** [2] - 574:12, 589:21
**opposed** [1] - 569:19
**opposite** [1] - 609:17
**order** [5] - 565:25, 583:21, 606:9, 606:20, 609:5
**Otherwise** [1] - 551:21
**otherwise** [4] - 583:19, 590:2, 590:5, 597:12
**outside** [5] - 582:21, 586:14, 588:2, 599:7, 606:7
**outstanding** [1] - 587:12
**overall** [1] - 558:19
**overnight** [1] - 612:10
**overruled** [5] - 550:10, 573:24, 586:24, 587:7, 602:3
**oversee** [2] - 601:17, 601:22
**overseeing** [1] - 601:15
**oversight** [1] - 579:6
**owed** [4] - 550:16, 552:16, 553:11, 558:9
**owes** [1] - 549:25
**own** [14] - 585:8, 585:11, 585:14, 585:22, 594:11, 594:14, 594:17, 594:20, 604:13, 605:21, 606:11, 608:7
**owned** [1] - 579:17
**owns** [4] - 604:17,

605:4, 606:17, 611:15

## P

**p.m** [2] - 545:5, 612:20
**Page** [5] - 565:17, 566:4, 566:20, 589:20, 610:7
**PAGE** [2] - 545:24, 547:2
**page** [3] - 608:12, 608:16, 610:10
**paid** [3] - 559:24, 564:8, 564:21
**papers** [1] - 578:12
**paragraph** [6] - 566:3, 566:20, 566:22, 566:25, 608:15, 609:12
**Paragraph** [3] - 549:5, 549:11, 550:20
**paralegal** [1] - 597:22
**parent** [1] - 605:19
**part** [8] - 560:6, 581:11, 590:6, 593:19, 599:22, 603:11, 604:25, 607:2
**particular** [2] - 604:5, 607:9
**parties** [1] - 583:17
**party** [2] - 577:21, 596:25
**pass** [1] - 601:6
**passage** [3] - 566:18, 567:1, 567:16
**passages** [1] - 566:15
**passed** [1] - 601:20
**past** [1] - 571:2
**Pause** [4] - 548:12, 561:3, 587:22, 594:6
**Pause)** [1] - 609:25
**pay** [4] - 580:24, 581:16, 581:17, 602:6
**payable** [1] - 579:21
**payment** [2] - 563:20, 563:25, 564:15
**pays** [2] - 602:12, 602:14
**PCF** [1] - 607:13
**Pennsylvania** [1] - 545:20
**people** [3] - 580:3, 584:20, 592:17
**per** [1] - 601:5
**percent** [7] - 567:19, 568:7, 581:17, 582:5, 582:6, 602:16

**perfect** [1] - 557:15
**perfectly** [1] - 588:21
**perform** [1] - 562:10
**period** [17] - 551:17, 552:2, 555:5, 559:12, 559:15, 560:10, 560:11, 560:12, 561:15, 561:16, 561:18, 564:3, 564:18, 565:19, 569:11, 601:19, 608:25
**periodic** [4] - 605:24, 606:18, 607:7, 607:18
**permissible** [2] - 603:25, 607:3
**permission** [1] - 549:9
**permitted** [1] - 599:11
**perpetuity** [2] - 609:19, 609:20
**persist** [2] - 583:18, 599:20
**person** [2] - 579:21, 596:23
**pick** [1] - 610:5
**pieces** [1] - 584:24
**placed** [1] - 596:24
**plain** [1] - 549:23
**plaintiffs** [17] - 562:5, 577:5, 577:17, 577:23, 577:24, 578:3, 578:20, 582:25, 583:6, 590:6, 590:15, 590:23, 599:1, 599:9, 606:23, 606:25, 608:22
**Plaintiffs** [4] - 545:4, 545:16, 545:18, 546:2
**plaintiffs'** [5] - 565:5, 566:13, 588:14, 606:10, 606:21
**Plaintiffs'** [16] - 562:15, 562:17, 563:18, 563:24, 563:25, 564:13, 564:15, 568:10, 573:16, 575:3, 575:21, 576:15, 596:13, 604:20, 605:11, 608:9
**plan** [2] - 565:23, 609:3
**planned** [1] - 567:7, 599:13
**play** [2] - 595:4, 596:11
**played** [2] - 598:12,

612:4
**playing** [4] - 596:5, 596:7, 598:7, 612:1
**PLLC** [1] - 545:16
**plus** [1] - 555:23
**point** [9] - 553:16, 557:13, 566:25, 569:12, 576:12, 581:2, 592:20, 593:16, 595:3
**points** [1] - 568:5
**PORTER** [1] - 546:9
**portfolio** [5] - 601:15, 601:17, 601:18, 601:24, 602:8, 603:2
**portfolios** [1] - 601:22
**portion** [1] - 565:9
**portions** [2] - 565:11, 565:15
**position** [2] - 579:4, 579:24
**positions** [2] - 601:11, 601:13
**positive** [3] - 550:21, 550:23, 577:20
**possibly** [1] - 589:6
**potential** [2] - 548:5, 599:15
**PowerPoints** [1] - 563:9
**powers** [1] - 610:25
**predict** [1] - 569:13
**predominantly** [1] - 600:13
**PREFERRED** [1] - 545:9
**preferred** [17] - 581:7, 581:13, 585:11, 585:14, 594:14, 594:16, 601:18, 601:24, 602:8, 602:10, 602:12, 602:19, 604:14, 605:21, 605:24, 608:7, 611:16
**prepared** [1] - 551:14
**present** [4] - 566:1, 571:13, 597:1, 609:6
**presented** [2] - 577:21, 597:5
**preserve** [3] - 608:18, 609:13, 609:14
**presumably** [1] - 571:4
**previously** [1] - 567:8
**price** [11] - 567:20, 569:10, 571:7, 572:1, 582:14, 583:16, 583:22, 584:12, 589:3,

593:20, 593:21
**prices** [5] - 567:21, 568:7, 569:13, 570:4, 586:23
**privileged** [1] - 593:11
**problem** [1] - 588:4
**proceed** [3] - 548:15, 582:25, 601:6
**proceedings** [1] - 613:6
**produces** [1] - 567:20
**producing** [1] - 568:7
**professional** [1] - 600:16
**profits** [4] - 582:6, 593:14, 607:19, 609:19
**program** [2] - 548:25, 601:5
**projected** [1] - 567:4
**projecting** [1] - 568:3
**projection** [1] - 567:13
**projections** [2] - 567:20, 567:22
**proper** [1] - 608:2
**property** [4] - 587:14, 600:12, 605:14, 608:18
**prospect** [1] - 588:14
**provide** [3] - 574:21, 579:6, 580:13
**provision** [2] - 605:23, 606:3
**Prussia** [1] - 545:19
**PSPAs** [2] - 549:13, 607:2
**public** [9] - 568:12, 568:14, 568:17, 568:22, 569:6, 570:19, 572:10
**pull** [9] - 549:5, 550:22, 560:20, 560:21, 569:22, 569:25, 576:14, 586:2, 587:1
**purchase** [3] - 581:2, 602:19, 605:24
**PURCHASE** [1] - 545:9
**purchased** [1] - 592:20
**purchases** [1] - 577:19
**pure** [1] - 607:23
**purpose** [2] - 589:6, 608:17
**purposes** [2] - 563:10, 564:6
**pursuing** [1] - 600:22
**put** [18] - 556:6,

559:21, 560:18, 570:20, 570:24, 570:25, 571:2, 571:4, 572:7, 572:12, 572:18, 572:19, 572:24, 572:25, 573:4, 573:10, 599:4, 608:19
**puts** [1] - 598:5
**putting** [1] - 581:11
**PX-0001-1** [1] - 586:2
**PX-0005-J** [1] - 551:8
**PX-0005-K** [1] - 556:13
**PX1-1** [2] - 587:2
**PX2C** [1] - 610:6
**PX346** [1] - 598:16

## Q

**Q1** [16] - 551:19, 551:24, 552:1, 553:19, 554:6, 554:19, 555:14, 556:24, 556:25, 557:1, 557:12, 557:14, 558:12, 564:4, 564:19
**Q2** [6] - 552:12, 553:25, 554:9, 556:24, 564:4
**Q2's** [1] - 567:4
**Q3** [5] - 552:22, 554:2, 554:13, 564:19, 567:8
**Q4** [8] - 553:7, 554:4, 554:15, 556:24, 557:9, 559:10, 559:12, 567:8
**Quarter** [8] - 575:4, 575:7, 575:10, 575:13, 575:23, 576:2, 576:5, 576:7
**quarter** [41] - 550:7, 550:13, 550:14, 550:16, 551:17, 552:7, 552:12, 552:16, 553:7, 553:10, 553:19, 553:25, 554:2, 554:9, 554:16, 554:19, 554:25, 555:1, 555:2, 555:4, 555:11, 555:18, 555:20, 556:4, 556:8, 556:19, 557:8, 557:20, 558:4, 558:8, 558:12, 559:9, 559:10, 564:8, 564:22, 564:23,

575:4, 575:25
**quarter's** [1] - 567:6
**quarterly** [8] - 551:12, 551:16, 555:10, 555:18, 556:15, 556:20, 575:25, 576:2
**quarters** [13] - 549:11, 557:5, 557:6, 557:23, 558:1, 558:21, 559:3, 559:7, 559:25, 560:4, 560:8, 564:7, 564:21
**queens** [1] - 600:17
**QUESTION** [1] - 565:19
**questions** [21] - 549:2, 553:22, 561:24, 563:20, 566:14, 573:17, 574:4, 575:2, 577:1, 578:5, 587:24, 590:10, 594:24, 597:1, 597:2, 597:18, 597:22, 598:14, 607:8, 609:22, 611:19
**quick** [1] - 596:22
**quickly** [1] - 598:1
**quite** [1] - 598:1
**quote** [2] - 567:25, 568:2

## R

**Radnor** [1] - 545:20
**range** [3] - 573:5, 573:10, 574:4
**ratably** [1] - 587:13
**RDR** [3] - 546:12, 613:3, 613:10
**RE** [1] - 545:9
**read** [33] - 548:9, 549:8, 549:10, 550:20, 565:9, 565:12, 565:16, 565:21, 566:6, 566:16, 566:19, 566:22, 567:1, 567:15, 567:16, 568:6, 584:24, 587:9, 587:17, 589:16, 589:19, 589:24, 590:1, 597:4, 597:21, 597:22, 608:15, 609:1, 610:15, 610:20, 611:4, 612:12
**reading** [4] - 549:23,

566:24, 603:3, 603:5
**really** [3] - 601:3, 603:19, 603:25
**reask** [1] - 584:8
**reason** [6] - 568:21, 571:6, 571:11, 574:24, 577:15, 602:4
**reasonable** [2] - 577:11, 577:13
**reasonably** [1] - 577:10
**receivable** [1] - 579:21
**receive** [1] - 587:13
**received** [2] - 598:17, 605:9
**receiving** [1] - 599:15
**recess** [1] - 595:9
**Recess** [1] - 595:15
**record** [11] - 565:16, 567:4, 572:13, 591:7, 591:9, 595:13, 595:14, 598:4, 604:22, 610:18, 612:17
**records** [2] - 597:1, 604:25
**red** [3] - 550:5, 550:13, 554:20
**REDIRECT** [1] - 562:1
**redirect** [1] - 588:11
**reduced** [1] - 567:5
**reference** [6] - 550:21, 550:23, 568:7, 568:24, 569:17, 589:5
**reflect** [1] - 605:3
**regarding** [2] - 568:25, 569:8
**regards** [1] - 567:21
**regularly** [1] - 604:23
**reinvest** [1] - 581:1
**related** [1] - 567:7
**relating** [1] - 582:8
**relationship** [1] - 604:8
**release** [1] - 567:7
**releases** [1] - 603:4
**relevance** [4] - 589:25, 590:1, 590:3, 607:11
**relevancy** [1] - 606:19
**relevant** [2] - 585:17, 594:20
**remain** [1] - 568:1
**remained** [2] - 582:15, 583:16
**remaining** [1] - 576:9
**remember** [2] - 557:9, 569:14
**reminded** [1] - 567:15,

567:19
**remove** [1] - 578:10
**repeat** [2] - 560:6, 572:20
**rephrase** [2] - 573:22, 589:5
**reporter** [1] - 597:1
**Reporter** [3] - 546:12, 546:12, 613:11
**REPORTER** [1] - 613:1
**reports** [7] - 603:5, 603:7, 603:9, 603:13, 604:11, 606:19
**represent** [5] - 578:21, 584:20, 590:24, 607:4, 607:15
**representative** [6] - 578:3, 584:18, 584:23, 592:5, 593:23, 593:25
**representatives** [5] - 548:4, 548:10, 577:25, 598:9, 598:10
**represented** [1] - 592:5
**representing** [2] - 594:1
**request** [1] - 589:4
**required** [1] - 581:17
**requires** [1] - 549:19
**residents** [3] - 580:6, 580:12, 580:13
**respect** [1] - 599:11
**respectfully** [1] - 589:1
**responsibilities** [3] - 593:25, 601:20, 602:23
**rest** [2] - 567:16, 595:9
**restore** [3] - 565:23, 608:20, 609:3
**restriction** [1] - 570:23
**result** [2] - 583:23, 584:13
**results** [1] - 567:8
**Resumed** [1] - 548:18
**retain** [2] - 582:7, 611:2
**return** [1] - 602:16
**revise** [1] - 583:19
**RICH** [1] - 546:2
**rights** [2] - 606:12, 611:2
**rise** [1] - 606:15
**risk** [2] - 603:1, 608:22
**Road** [1] - 545:19
**ROBERT** [1] - 546:2

**role** [1] - 565:11
**roles** [1] - 579:19
**room** [1] - 612:10
**Room** [2] - 546:13, 613:12
**round** [1] - 553:7
**routine** [1] - 605:1
**row** [1] - 559:25
**ROYCE** [1] - 545:13
**Rudy** [5] - 583:5, 588:25, 589:25, 598:3, 599:24
**RUDY** [38] - 545:18, 548:4, 577:4, 577:7, 578:6, 578:12, 578:17, 583:5, 583:20, 583:25, 584:10, 585:2, 586:4, 586:11, 586:21, 587:6, 587:25, 588:3, 588:25, 589:25, 590:8, 590:11, 590:15, 590:20, 591:13, 594:3, 595:3, 595:6, 595:16, 595:23, 596:4, 596:7, 596:10, 598:4, 598:13, 598:16, 611:24, 612:6
**Rudy).........................
............578** [1] - 547:6
**Rudy).........................
............590** [1] - 547:8
**Rule** [1] - 604:1
**ruled** [8] - 582:23, 583:6, 583:8, 588:15, 589:12, 606:11, 607:2, 608:1
**ruling** [2] - 589:13, 607:11

## S

**safe** [3] - 565:23, 609:3, 609:15
**Salazar** [4] - 556:23, 587:1, 610:8, 610:12
**sales** [1] - 591:19
**SAMUEL** [1] - 545:22
**saw** [2] - 560:1, 573:6
**schedule** [1] - 612:18
**SCHILLER** [1] - 545:22
**SCHOLER** [1] - 546:9
**school** [4] - 592:13, 600:17, 600:20

**scope** [10] - 562:20, 571:15, 571:18, 572:4, 586:5, 599:10, 606:10, 606:20, 606:24, 608:1
**screen** [1] - 597:20
**SEC** [1] - 603:5
**second** [7] - 555:20, 564:8, 564:22, 564:23, 596:1, 608:16, 610:9
**Section** [3] - 586:9, 587:2, 587:11
**securities** [2] - 581:2, 592:20
**security** [1] - 602:14
**see** [22] - 550:21, 550:23, 551:23, 552:1, 555:8, 556:1, 560:19, 560:21, 560:25, 565:6, 566:21, 569:18, 569:23, 570:14, 571:12, 575:5, 586:6, 595:7, 598:1, 598:5, 612:10, 612:14
**seeing** [2] - 570:15, 571:8
**selling** [1] - 580:25
**sells** [1] - 611:10
**send** [1] - 603:11
**senior** [1] - 581:13
**SENIOR** [1] - 545:9
**seniors** [1] - 579:7
**sentence** [2] - 567:14, 587:11
**serve** [2] - 584:18, 593:23
**served** [1] - 579:19
**service** [1] - 580:5
**serving** [1] - 584:22
**SESSION** [1] - 545:12
**set** [1] - 607:18
**seven** [2] - 571:24, 592:2
**shadow** [1] - 567:24
**shall** [1] - 587:13
**share** [3] - 560:3, 560:8, 593:21
**shareholder** [9] - 577:14, 577:22, 585:20, 586:8, 589:13, 589:16, 589:20, 606:14, 607:1
**shareholders** [6] - 559:24, 577:12, 577:13, 577:16,

582:11, 588:19
**shares** [18] - 581:5, 581:7, 581:9, 581:13, 585:17, 587:12, 592:23, 592:24, 592:25, 599:16, 604:13, 604:16, 605:4, 605:21, 608:6, 611:16
**sheet** [1] - 551:6
**shield** [1] - 588:4
**Shiller** [4] - 562:24, 568:11, 569:6, 573:10
**shop** [2] - 600:24, 601:1
**short** [3] - 595:4, 598:11, 604:2
**shorten** [1] - 553:22
**shortly** [1] - 548:3
**showed** [4] - 565:8, 588:8, 589:7, 589:17
**showing** [1] - 589:6
**shown** [1] - 567:22
**shows** [5] - 552:7, 556:1, 556:4, 556:19, 558:19
**side** [2] - 599:17, 603:20
**similar** [2] - 602:13, 602:17
**simply** [1] - 589:24
**single** [3] - 554:25, 557:20, 559:24
**sit** [2] - 563:3, 563:16
**six** [2] - 552:19, 553:1
**sleep** [1] - 598:6
**Small** [1] - 567:11
**small** [1] - 600:25
**smaller** [1] - 564:25
**social** [1] - 580:13
**solvent** [4] - 565:24, 608:19, 609:4, 609:15
**someone** [3] - 569:13, 569:25, 603:20
**sometime** [1] - 582:7
**sorry** [14] - 552:22, 555:3, 557:14, 559:1, 559:6, 561:8, 564:23, 571:20, 573:17, 587:8, 591:6, 591:8, 596:6, 610:17
**sound** [1] - 608:19
**sources** [1] - 567:23
**space** [2] - 602:10, 603:15
**specialist** [1] - 601:3

**specialized** [1] - 549:20
**specific** [1] - 577:19
**specifically** [1] - 583:8
**speculation** [1] - 607:24
**spoken** [1] - 548:5
**spreadsheet** [5] - 551:14, 552:4, 557:7, 557:17, 562:18
**spreadsheets** [2] - 562:10, 563:6
**St** [3] - 578:25, 579:3, 579:11
**stagnant** [2] - 582:15, 583:16
**stand** [6] - 564:5, 578:7, 578:10, 596:3, 597:18, 599:3
**STANTON** [1] - 546:8
**start** [9] - 549:4, 552:6, 562:5, 563:23, 566:24, 567:17, 575:3, 575:24
**started** [6] - 579:20, 600:21, 600:22, 601:2, 601:8, 601:14
**starting** [2] - 568:25, 569:9
**starts** [3] - 566:20, 567:15, 610:10
**state** [7] - 550:4, 552:10, 579:5, 591:17, 592:5, 593:24, 600:18
**statement** [3] - 548:24, 549:4, 553:14
**STATES** [2] - 545:1, 545:13
**States** [2] - 559:17, 613:11
**static** [1] - 576:22
**statute** [2] - 566:8, 610:24
**stenographic** [1] - 613:5
**step** [4] - 577:2, 590:13, 594:25, 611:22
**stern** [12] - 548:15, 562:7, 563:13, 563:20, 565:8, 566:14, 566:19, 566:22, 566:25, 569:12, 575:3, 575:21
**STERN** [25] - 546:6, 548:17, 548:20,

549:5, 550:22, 551:7, 551:25, 556:23, 557:12, 557:14, 558:22, 560:20, 560:23, 561:8, 561:23, 569:1, 570:11, 570:17, 571:14, 571:17, 571:20, 572:3, 573:23, 573:25, 574:5
**Stern)**.......................
.............**548** [1] - 547:4
**still** [7] - 554:20, 567:25, 575:19, 581:9, 588:20, 592:15, 592:25
**stint** [1] - 592:13
**STOCK** [1] - 545:9
**Stock** [1] - 587:13
**stock** [39] - 580:16, 583:22, 584:12, 585:8, 585:9, 585:11, 585:14, 585:18, 585:21, 585:22, 585:24, 586:22, 587:5, 587:11, 587:14, 589:3, 593:20, 594:11, 594:12, 594:14, 594:16, 594:17, 594:20, 601:18, 601:24, 602:8, 602:10, 602:12, 602:19, 604:14, 605:24, 606:12, 606:17, 608:7, 610:11, 610:19, 610:21, 610:24
**stock's** [1] - 611:2
**stockholders** [4] - 578:22, 590:25, 610:25, 611:1
**stocks** [2] - 611:13, 611:14
**stopped** [1] - 575:23
**stricken** [1] - 584:8
**strike** [1] - 584:2
**struck** [1] - 588:23
**structure** [1] - 605:13
**subsidiaries** [3] - 605:16, 605:17, 605:20
**successfully** [2] - 565:24, 609:4
**suffered** [4] - 583:23, 584:13, 586:23, 589:3

**sufficient** [1] - 567:10
**suing** [1] - 584:15
**suited** [1] - 593:24
**summaries** [1] - 563:16
**summary** [1] - 562:21
**sunset** [1] - 579:14
**SUSAN** [2] - 547:3, 548:18
**Susan** [1] - 568:2
**suspended** [1] - 610:25
**sustained** [8] - 569:4, 570:18, 571:16, 571:19, 572:5, 588:6, 588:16, 608:3
**swears** [1] - 596:24
**sweep** [1] - 559:23, 560:3, 560:7, 560:13, 561:15, 561:17, 573:12, 581:21, 582:8, 588:12, 593:5, 593:14, 593:17
**sword** [1] - 588:4
**sword-and-shield** [1] - 588:4
**Sworn** [3] - 578:15, 590:18, 600:4
**systemic** [1] - 608:22

## T

**task** [1] - 563:3
**team** [2] - 551:14, 563:1
**telephone** [1] - 599:5
**ten** [2] - 549:2, 595:11
**term** [2] - 592:9, 592:10
**terminated** [1] - 611:1
**terminating** [2] - 565:25, 609:5
**terms** [2] - 556:6, 562:21, 607:1
**Terry** [4] - 567:15, 567:17, 567:19, 567:23
**test** [2] - 601:5, 601:6
**testified** [8] - 569:2, 583:2, 586:15, 589:17, 589:22, 606:16, 606:18, 607:12
**testify** [9] - 548:5, 548:10, 569:2, 577:24, 583:8, 597:9, 606:11, 606:12, 606:25
**testifying** [1] - 603:23

testimony [21] - 562:7, 562:9, 574:1, 577:16, 577:22, 577:25, 578:4, 584:2, 585:1, 596:23, 597:3, 597:6, 597:7, 597:8, 597:13, 597:15, 603:22, 603:24, 606:10, 606:21, 608:1
THE [78] - 545:1, 545:1, 545:13, 548:2, 548:11, 548:15, 550:10, 569:4, 570:18, 571:16, 571:19, 572:5, 572:18, 572:20, 572:22, 572:25, 573:2, 573:3, 573:4, 573:5, 573:6, 573:8, 573:11, 573:24, 574:10, 577:2, 577:6, 577:8, 578:8, 578:14, 582:18, 583:17, 583:24, 584:5, 584:7, 585:3, 586:6, 586:12, 586:24, 587:7, 587:21, 590:4, 590:10, 590:13, 590:17, 591:6, 591:8, 591:9, 591:11, 591:12, 594:25, 595:1, 595:2, 595:5, 595:8, 595:13, 595:22, 596:2, 596:6, 596:9, 596:16, 596:19, 596:21, 598:10, 598:14, 598:17, 598:21, 598:24, 599:19, 602:3, 604:2, 605:9, 608:3, 611:21, 612:2, 612:5, 612:8, 612:17
themselves [1] - 607:2
theory [7] - 582:24, 582:25, 583:6, 588:14, 589:23, 607:24
therefor [1] - 587:16
thinks [1] - 599:16
Third [10] - 572:17, 581:20, 582:4, 583:1, 584:13, 593:4, 593:12, 593:14, 599:14, 607:17

thousand [1] - 592:25
three [3] - 551:17, 592:19, 601:5
three-month [1] - 551:17
three-year [1] - 601:5
throughout [2] - 555:4, 567:10
TIMOTHY [2] - 547:7, 590:18
Timothy [2] - 590:15, 591:11
titling [1] - 579:15
today [11] - 563:3, 563:16, 565:12, 570:16, 571:8, 571:12, 572:9, 581:9, 592:15, 593:1, 612:6
together [4] - 559:21, 560:18, 561:19, 563:1
tomorrow [2] - 612:11, 612:14
tonight [1] - 612:15
took [11] - 558:5, 558:6, 558:20, 559:2, 559:10, 573:19, 574:12, 575:3, 577:10, 588:12, 609:18
top [4] - 551:12, 551:20, 552:25, 608:16
TOPAZ [1] - 545:19
topic [4] - 548:22, 574:21, 574:24, 607:9
tops [1] - 549:2
total [3] - 560:17, 576:13, 593:14
touched [1] - 548:22
trade [1] - 610:24
trades [1] - 603:11
transcript [4] - 583:12, 597:4, 613:5, 613:6
TRANSCRIPT [1] - 545:12
transferred [2] - 566:9, 576:20
travel [1] - 597:12
treasury [10] - 553:1, 558:15, 558:16, 558:20, 559:17, 561:20, 576:10, 576:14, 576:17, 576:20
Treasury [15] - 551:10, 552:13, 552:23, 556:11, 556:15,

558:15, 559:3, 559:16, 560:14, 567:11, 575:10, 575:12, 575:16, 576:4, 581:12
Treasury's [2] - 549:14, 549:24
trend [2] - 569:23, 571:12
TRIAL [1] - 545:12
trial [2] - 596:24, 597:3
true [2] - 613:4, 613:6
truth [1] - 596:25
try [2] - 570:25, 603:11
trying [2] - 583:20, 610:16
tune [1] - 558:10
turn [1] - 548:24
TV [1] - 597:20
Tweet [1] - 612:12
twice [1] - 567:6
Twitter [1] - 612:12
two [8] - 558:21, 559:3, 559:7, 574:14, 591:16, 592:10, 595:16, 607:7

U

U.S [2] - 546:13, 581:12
umbrella [2] - 605:16, 605:18
uncertainty [1] - 599:10
under [4] - 549:13, 580:1, 596:24, 603:25
underneath [2] - 605:16, 605:18
understood [4] - 581:17, 600:1, 604:3, 607:13
union [1] - 591:25
UNITED [2] - 545:1, 545:13
United [2] - 559:17, 613:11
university [1] - 591:17
University [1] - 579:10
Unless [1] - 551:20
unlike [1] - 557:3
unreasonableness [1] - 588:20
up [26] - 548:8, 549:5, 550:22, 551:20, 552:15, 552:19, 553:4, 553:22, 555:12, 556:10,

556:25, 560:20, 560:21, 566:25, 575:4, 576:15, 586:2, 587:2, 589:10, 592:14, 595:23, 597:15, 600:18, 605:18, 610:5
Update [1] - 566:21
Upstate [1] - 600:19
upward [1] - 571:11
USD [1] - 551:20

V

value [1] - 583:1
varied [1] - 602:24
various [1] - 603:3
VARMA [1] - 546:7
version [2] - 553:23, 557:24
video [11] - 595:4, 596:4, 596:7, 596:11, 596:13, 598:7, 598:13, 598:16, 598:22, 611:25, 612:4
Video [1] - 598:12
videotape [1] - 597:5
videotapes [1] - 597:25
view [1] - 605:15
views [2] - 606:17, 607:5
visited [2] - 570:19, 570:20
vs [1] - 545:5

W

W.R [7] - 600:10, 600:11, 600:12, 601:9, 601:12, 605:13, 611:8
warranted [1] - 568:4
Washington [7] - 545:4, 545:17, 545:23, 546:10, 546:14, 585:1, 613:13
website [12] - 568:12, 568:22, 569:5, 569:6, 569:23, 570:19, 570:20, 570:21, 570:24, 572:10, 573:10
Wednesday [1] - 545:5
weigh [1] - 597:14
weight [2] - 597:7, 597:8

well-suited [1] - 593:24
whole [1] - 607:24
wholesale [1] - 591:24
wide [1] - 589:9
willing [1] - 595:20
wise [1] - 579:12
withdraw [3] - 552:11, 556:5
withdrawn [2] - 571:21, 572:6
witness [20] - 562:21, 574:1, 577:3, 578:2, 578:7, 578:10, 589:1, 590:14, 595:2, 596:2, 596:8, 596:10, 596:21, 596:24, 597:8, 597:18, 598:24, 599:1, 599:13, 611:23
WITNESS [9] - 547:2, 572:20, 572:25, 573:3, 573:5, 573:8, 591:8, 591:11, 595:1
witnesses [2] - 597:17, 599:10
words [3] - 553:16, 569:16, 603:19
works [2] - 602:17, 603:23
worth [17] - 550:21, 550:23, 551:2, 559:23, 560:3, 560:7, 560:13, 561:15, 561:17, 573:12, 581:21, 582:8, 588:12, 593:5, 593:17, 611:2, 611:3

Y

year [5] - 559:4, 559:7, 601:5, 601:6, 601:9
years [10] - 561:18, 579:15, 579:18, 579:22, 591:16, 591:22, 592:2, 592:10, 601:10, 602:24
yesterday [2] - 548:5, 577:9
York [5] - 545:23, 546:4, 600:18, 600:19
yourself [2] - 580:18, 580:20

## Z

**zero** [3] - 555:16, 575:8, 576:3