1               BEFORE THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
2

3    FAIRHOLME FUNDS, INC., et al.,  .
                                     .
4              Plaintiffs,           .
                                     .  Case Number 13-cv-1053
5         vs.                        .
                                     .
6    FEDERAL HOUSING FINANCE AGENCY, .
     et al.,                         .
7                                    .
               Defendants.           .
8    - - - - - - - - - - - - - - - -
     IN RE FANNIE MAE/FREDDIE MAC    .  Case Number 13-mc-1288
9    SENIOR PREFERRED STOCK PURCHASE .
     AGREEMENT CLASS ACTION          .  Washington, D.C.
10   LITIGATIONS.                    .  October 20, 2022
     - - - - - - - - - - - - - - - -    10:03 a.m.
11

12           TRANSCRIPT OF JURY TRIAL, MORNING SESSION
               BEFORE THE HONORABLE ROYCE C. LAMBERTH
13                 UNITED STATES DISTRICT JUDGE

14   APPEARANCES:

15   For Berkley Plaintiffs:      BRIAN BARNES, ESQ.
                                  Cooper & Kirk, PLLC
16                                1523 New Hampshire Avenue Northwest
                                  Washington, D.C. 20036
17
     For Class Plaintiffs:        LEE RUDY, ESQ.
18                                Kessler Topaz Meltzer & Check, LLP
                                  280 King of Prussia Road
19                                Radnor, Pennsylvania 19087

20                                HAMISH HUME, ESQ.
                                  SAMUEL KAPLAN, ESQ.
21                                KENYA DAVIS, ESQ.
                                  Boies Schiller Flexner LLP
22                                1401 New York Avenue Northwest
                                  Washington, D.C. 20005
23

24                       -- continued --

25

```
 1    APPEARANCES (CONTINUED):

 2                                ROBERT KRAVETZ, ESQ.
                                  Bernstein Litowitz Berger &
 3                                    Grossmann LLP
                                  1251 Avenue of the Americas
 4                                New York, New York 10020

 5    For Defendant Federal
      Housing Finance Agency:     JONATHAN STERN, ESQ.
 6                                ASIM VARMA, ESQ.
                                  HOWARD CAYNE, ESQ.
 7                                DAVID BERGMAN, ESQ.
                                  IAN HOFFMAN, ESQ.
 8                                ROBERT JONES, ESQ.
                                  Arnold & Porter Kaye Scholer LLP
 9                                601 Massachusetts Avenue Northwest
                                  Washington, D.C. 20001
10

11

12    Official Court Reporter:    SARA A. WICK, RPR, CRR
                                  United States District Court
13                                  for the District of Columbia
                                  333 Constitution Avenue Northwest
14                                Room 4704-B
                                  Washington, D.C. 20001
15                                202-354-3284

16    Proceedings recorded by stenotype shorthand.
      Transcript produced by computer-aided transcription.
17

18

19

20

21

22

23

24

25
```

C O N T E N T S

TESTIMONY

EDWARD DEMARCO          Direct Examination.............. 636

EXHIBITS RECEIVED

PX-205.............................................. 647
PX-259.............................................. 669
PX3-A1.............................................. 691
PX-111.............................................. 697

P R O C E E D I N G S

     (Call to order of the court.)

     (Jury not present.)

     COURTROOM DEPUTY:  Your Honor, we are again on the
record for consolidated related cases 13-mc-1288 and 13-cv-1053,
in re Fannie Mae, Freddie Mac.

     Counsel, please identify yourselves for the record.  Thank
you.

     MR. HUME:  Good morning, Your Honor.  Hamish Hume for
the plaintiffs.

     And before the jury is impaneled, I would like to just
address one or two things.

     MR. STERN:  Good morning, Your Honor.  Jonathan Stern
for the defendants, and my colleagues will introduce themselves
as they speak, if that's acceptable to the Court and the court
reporter.  Thank you, Your Honor.

     THE COURT:  Go ahead, Mr. Hume.  I have one matter I
need to rule on as well.

     MR. HUME:  Yes, Your Honor.  Hamish Hume, for the
record.

     There are two or three things, Your Honor.  In general,
counsel have been getting along very well, and I have been
inspired by the courteousness and civility with which we're
doing this, but yesterday was not a great day, and there were a
couple of things that happened.

1       I wasn't here in court.  I regret that.  I was preparing

2  for today.

3       We had an agreement -- we had a one-minute discussion about

4  witnesses that did not mention the word "expert."  My

5  understanding of the regular rule under Rule 702/703 is an

6  expert is entitled to give an opinion on the evidence, and

7  experts routinely sit in trial, and you need to --

8       MR. STERN:  I apologize for interrupting.  May I talk

9  to Mr. Hume for one moment?  This may not be necessary.

10      MR. HUME:  I would like to make clear for the record,

11  because there was injury done, some prejudice to our case.

12      And we had a -- the word "expert" was not used.  The

13  request was should we have the normal witness rule, because he

14  saw witnesses here.  And I said I think we should, but this is

15  opening.  For opening, they're allowed to stay.  And then my

16  colleague, Mr. Barnes, said but they're also parties and party

17  representatives are allowed to see everything.  I said, well,

18  that's true, but otherwise, I think it should apply.

19      That was it.  So I did not understand that to apply to

20  experts, and it was very brief.

21      And we wanted Professor Dharan to see everything the

22  summary witness did.  Now, he is familiar with it, but I ask

23  that he be entitled when he testifies to comment on what the

24  summary witness put in.  That's the first thing.  Mr. Stern has

25  apologized and said that we had a misunderstanding, and I accept

1    and respect that.  But it did do prejudice to our case.

2        Number 2, there were at least three exhibits yesterday with

3    the summary witness that were not objected to; we were told no

4    objection.  And then when they were presented, there was an

5    objection.

6        This is a summary witness who was presenting arithmetic.

7    One thing we should not be fighting and squabbling about in this

8    case are the numbers.

9        But it's important.  There are a lot of numbers.  That's

10   why we had a summary witness.  There's ten years of numbers or

11   more.  And she summarized them meticulously, precisely so that

12   it could be shown to the jury clearly and not scrambling around

13   with 58 10-Ks.

14       And they did a great job messing that up, and it's not as

15   clear as it should be right now.  It's not in evidence.  And I'm

16   going to do it with Mr. DeMarco.  I'm going to get the

17   demonstratives that show the arithmetic into evidence.

18       I wanted to preview that.  I hope that will be acceptable,

19   because I think the jury needs to know the numbers in a way that

20   is intelligible and clear.

21       The third thing is, there's at least one exhibit, maybe a

22   few, that are things I intend to show the witness that there may

23   be a dispute over.  I think we all want to avoid a huge dispute

24   in front of the jury.  So what I will endeavor to do is use them

25   after a break and try to do everything in the first -- maybe we

```
1   will go an hour or so and have a break, and I will try not to
2   use any of those, and then we may need to discuss those before
3   the next session.
4          THE COURT:  All right.
5          MR. HUME:  Thank you, Your Honor.
6          MR. STERN:  Your Honor, I will be brief, but I would
7   ask to put some things on the record.
8       First, I want to echo what Mr. Hume said.  We have been
9   getting along well.  I hope the Court has seen the evidence of
10  that.
11      Here's what happened, Your Honor:  Mr. Hume and I had a
12  brief hallway conversation.  We agreed that the rule on
13  witnesses would apply.  In my experience, that means that the
14  rule on witnesses applies to all witnesses unless there's a
15  specific agreement under Rule 615(c) that a witness would
16  qualify under that provision as an exception to the rule.  We
17  didn't have that discussion, and that's on us.  Maybe we should
18  have been more precise in how we were talking to each other.
19  But I then presumed that our agreement was that the rule would
20  apply in full.
21      Mr. Hume and I spoke last night.  I explained from my
22  perspective what happened in court, because he wasn't here, and
23  I said if there was a misunderstanding, I apologize, but this
24  was my point of view.  Mr. Hume expressed his point of view.
25  And we agreed that it was unspoken in the conversation and we
```

1    were making assumptions across each other.

2         I then told Mr. Hume that I did not have an objection to

3    his expert sitting in court today, that if he wanted to make

4    that agreement, that's fine.

5         So that's that situation, Your Honor.

6         And with respect to whether or not other witnesses can

7    comment on Ms. Hartman's testimony, if that's an issue, we will

8    deal with it during the examination.

9         With respect to the demonstratives yesterday, Your Honor, I

10   know Mr. Hume wasn't here, but as the Court knows, those

11   demonstratives came into evidence.  The fact that they were

12   unobjected to did not mean that they could be offered into

13   evidence without the proper litany and foundation.

14        Before the break, counsel, in my estimation, did not

15   proceed according to the rules.  The Court sustained my

16   objections.  After the break, Counsel did proceed consistent

17   with my understanding of the rules, and I didn't make a single

18   objection to any of those demonstratives.

19        So I apologize for taking the Court's time with this sort

20   of thing, Your Honor, but Mr. Hume, having made his record, I

21   thought it was incumbent upon me to make mine.

22        Thank you, Your Honor.

23             THE COURT:  I appreciate it.  I did review last night

24   the Ugoletti objections, and those are overruled.

25        I will tell you how I view the objections to the Ugoletti

1    deposition.  He's being asked whether he agrees with the

2    statements about FHFA's position in the meeting agenda, not

3    whether he knows anything about the agenda, the meeting, or the

4    people at it.  So there's no personal knowledge at issue.

5        And the document itself, I find, falls under the

6    803(8)(A)(i) as a public record setting out -- and I know the

7    defendants don't agree with this, but I find it falls under

8    803(8)(A)(i) as a public record setting out the agency's

9    activities because it's simply a meeting agenda.

10        The point of the language in my motions in limine ruling

11    about memorializing Treasury activities as they ostensibly occur

12    was to distinguish between deliberations or advice on the one

13    hand and records of agency activities on the other, not to draw

14    a strict line between retrospective and prospective records.

15        Meeting agendas, I find, are just the kind of records that

16    are routinely admitted as public records, even though they're

17    necessarily written before the meeting has happened.

18        So I overrule the defendants' objection to the Ugoletti

19    deposition, and it may be played as it was recorded and as

20    you've already agreed upon with the exception of that one

21    objection.

22        So we're ready for the jury?

23        How long does this run?

24            MR. HUME:  Hamish Hume for the plaintiffs.

25        If the question was how long will the Ugoletti deposition

 1    be, about 20 minutes, I believe.

 2              THE COURT:  And then we will go on to DeMarco.

 3              UNIDENTIFIED SPEAKER:  Yes, Your Honor.

 4         (Jury entered courtroom.)

 5              THE COURT:  Good morning, ladies and gentlemen.  We

 6    have one more short deposition to play before we get to the next

 7    witness.

 8         Plaintiffs may proceed.

 9              MS. DAVIS:  Good morning, Your Honor.  Kenya Davis for

10    the plaintiffs.

11         We would now like to present the deposition of Mario

12    Ugoletti.  Thank you.

13         (Video deposition of Mario Ugoletti played.)

14              MR. HUME:  Hamish Hume for the plaintiffs.

15         Plaintiffs call as their next witness Mr. Edward DeMarco.

16         EDWARD DEMARCO, WITNESS FOR THE PLAINTIFFS, SWORN

17              MR. HUME:  Your Honor, may we approach with the

18    witness binder?

19              THE COURT:  Yes.

20              MR. HUME:  I think the volume of the witness binders

21    reflects inclusion of complete copies of SEC filings rather than

22    excerpts.  So I apologize for that.

23                        DIRECT EXAMINATION

24              BY MR. HUME:

25    Q.   Good morning, Mr. DeMarco.  My name is Hamish Hume, and I

1    represent the plaintiffs in this case.

2    A.    Good morning, Mr. Hume.

3    Q.    Thank you for appearing today.

4          Now, Mr. DeMarco, you were the acting director of the FHFA

5    in August of 2012; correct?

6    A.    Correct.

7    Q.    And it was your decision to agree to the net worth sweep;

8    correct?

9    A.    Yes.

10   Q.    And am I correct that you made the final decision to agree

11   to the net worth sweep in August of 2012?

12   A.    The final decision, yes.

13   Q.    And am I correct that while you were the final

14   decisionmaker, Mario Ugoletti was the point person on the actual

15   negotiations with the Treasury Department?

16   A.    Yes.

17   Q.    And am I correct, Mr. DeMarco, that the reason you agreed

18   to the net worth sweep was to address the concern that the

19   enterprises were going to have to borrow money from Treasury in

20   order to pay the 10 percent dividend to Treasury, and those

21   borrowings would then reduce the amount of the Treasury

22   commitment?  Is that the reason that you agreed to the net worth

23   sweep?

24   A.    Yes, that was the central concern.

25   Q.    That was the reasoning.  And am I also correct that from

1   your perspective, the net worth sweep was not agreed to in order

2   to demonstrate a wind-down of the enterprises; is that correct?

3   A.   No, it's not to demonstrate that.  It was to do what we

4   said in the previous question.  It was to assure the stability

5   of the companies through the remaining Treasury commitment.

6   Q.   So it was not done for a wind-down?  It was not done to

7   demonstrate or begin a wind-down; correct?

8   A.   I was aware that wind-down was something that both the

9   Treasury Department, the administration, and members of Congress

10  were actively advocating for and was one of the risks that I was

11  considering in the context of this decision.

12  Q.   But am I correct that you did not agree to the net worth

13  sweep in order to demonstrate wind-down?

14  A.   It was not to demonstrate wind-down, whatever that means.

15  Q.   I just want to make sure that the record is clear.  Can

16  you -- you can look at tab 1 of your binder.  It should be the

17  deposition from 2015.

18       Actually, we can just play a clip.  Can you play the 2015

19  deposition clip?

20           COURTROOM DEPUTY:  Exhibit number?

21           MR. HUME:  It's a deposition.  It's not an exhibit.

22  Are we permitted to play the deposition?

23           THE COURT:  If there's no objection.

24           MR. STERN:  No objection, Your Honor.

25       (Video played.)

```
 1              BY MR. HUME:
 2     Q.   And I just wanted to confirm, that was truthful and
 3     accurate testimony; correct?
 4     A.   Yes.
 5     Q.   Now, with regard to the circular draw, the issue of -- I'm
 6     going to use the phrase -- if I use the phrase "circular draw,"
 7     will you understand that to mean the concern you described of
 8     having to borrow money from Treasury -- the enterprises having
 9     to borrow money from Treasury in order to pay the 10 percent
10     dividend and thereby eroding or reducing the amount of the
11     Treasury capital commitment?
12          If I use the phrase "circular draw" to refer to that, will
13     you understand that?
14     A.   Except I would not use the term that they were borrowing
15     from Treasury.  They were drawing down on the Treasury
16     commitment in order to pay the dividend to the Treasury
17     Department.
18     Q.   Fair enough; fair enough.  I didn't mean to have a
19     difference of meaning by that.  So when I use the term "circular
20     draw," what I mean is they are drawing on the capital commitment
21     from Treasury in order to pay the 10 percent dividend and
22     thereby reducing the capital commitment, and that's what you and
23     I will understand the words "circular draw" to mean; is that
24     fair?
25     A.   Yes.
```

```
1    Q.    Okay.  Thank you.  So with regard to that, am I correct
2    that in the first quarter of 2012, Fannie Mae made profits that
3    were greater than the amount of the 10 percent dividend?
4    A.    I recall that Fannie Mae did not take a draw, so yes.
5    Q.    And am I correct that Freddie Mac in the first quarter of
6    2012 made profits that were virtually identical in amount to the
7    circular -- to the 10 percent dividend amount?
8    A.    That's my recollection.  I believe they had a small draw.
9    Q.    And in the second quarter of 2012, am I correct that Fannie
10   Mae made profits that were greater than the amount of the
11   10 percent dividend?
12   A.    Yes.
13   Q.    And am I correct that in the second quarter of 2012, Fannie
14   Mae made -- Freddie Mac also made profits greater than the
15   amount of the 10 percent dividend?
16   A.    Yes.
17   Q.    And am I also correct that -- and am I correct that the
18   second quarter results that we just discussed, with income for
19   both GSEs over the 10 percent dividend amount, those were known
20   and had been publicly released before you agreed to a net worth
21   sweep; correct?
22   A.    Yes.
23   Q.    And am I correct that by the end of 2012, both GSEs, both
24   Fannie Mae and Freddie Mac, had made income that was
25   substantially greater than the amount that the 10 percent
```

1    dividend was for that year?

2    A.   I'm not sure about the characterization of "substantially."

3    I don't remember all the details of the financials for the full

4    year, sir.

5        But yes, they earned more money in 2012, and so there was

6    only -- one company took a modest draw in one quarter.  That's

7    my recollection.

8    Q.   Okay.  Could we put up -- I would like to put up a

9    demonstrative slide which shows a callout from the SEC filings

10   for 2012.  Could we put up demonstrative slide 21, please.

11       Demonstrative slide 21 shows a callout from the SEC filing

12   10-K for Fannie Mae for 2012 that says, "Our net income" --

13            THE COURT:  I don't have a plaintiffs' exhibit number,

14   or what are we showing in terms of --

15            MR. HUME:  It's a demonstrative of the 2012 10-K,

16   which isn't an exhibit in the case, Your Honor.

17            THE COURT:  In terms of whether I'm showing it to the

18   jury --

19            MR. HUME:  I wouldn't have thought there's an

20   objection.  I showed this in the opening statement, and it's a

21   callout from an exhibit that is going into evidence.

22            MR. STERN:  Your Honor, for the record, there's no

23   objection.

24            BY MR. HUME:

25   Q.   So Mr. DeMarco, this demonstrative shows that Fannie's

1    profits -- "net income of 17.2 billion in 2012 is the largest in
2    our history."
3         Do you see that?
4    A.   I do.
5    Q.   Do you then see it says, "We were not required to draw
6    funds from Treasury under the senior preferred stock purchase
7    agreement for any quarter of 2012, and during 2012, we paid
8    Treasury 11.6 billion in senior preferred stock dividends."
9         Do you see that?
10   A.   I do.
11   Q.   So obviously, the $17.2 billion was higher than the 11.6;
12   correct?
13   A.   Yes.
14   Q.   I'd use the word "substantially."  Would you agree with
15   that?
16   A.   That's a substantial amount, yes.
17   Q.   Can we put up demonstrative slide 22.
18        COURTROOM DEPUTY:  Counsel, can I get you for the
19   record to move the exhibits in so that I have a record of what's
20   being shown?
21        MR. STERN:  Actually, Your Honor, if I may, and I
22   don't think there's a dispute about this, if these are being
23   used just as demonstratives -- we would object to their
24   admission as substantive evidence.  If for the purpose of the
25   record they need to be moved, we don't object to their coming in

1    as demonstrative evidence.

2              COURTROOM DEPUTY:  Thank you.

3              MR. HUME:  Is it, therefore, okay for me to proceed

4    without moving it into evidence, or would you like me to move it

5    into evidence?

6              COURTROOM DEPUTY:  I want to make sure the record is

7    clear so that the jury only sees what is moved in.

8              MR. HUME:  We would like these two slides to go into

9    evidence.

10             MR. STERN:  We object to their admission as

11   substantive evidence.  We don't object to the jury seeing this

12   exhibit right now to aid in the understanding of Mr. DeMarco's

13   testimony.

14             MR. HUME:  That's fine.  Then we will withdraw the

15   move.  Can we put it on the screen so the jury can see it?

16             THE COURT:  All right.

17             MR. HUME:  Can we go back to slide 21.

18             COURTROOM DEPUTY:  21 was shown.

19             MR. HUME:  It was shown to the jury?

20             COURTROOM DEPUTY:  Yes.

21             MR. HUME:  Oh, okay.  Thank you.

22             BY MR. HUME:

23   Q.   So slide 22, we can go back to, is a similar slide for

24   Freddie Mac that shows the net income for 2012 of 16 billion as

25   being higher than the dividend amount of 7.2 billion.

1     Do you see that?

2  A.   I do.

3  Q.   And I realize that you made the decision in August, but in

4  August, the first two quarters had shown net income for each of

5  the enterprises that was higher than the amount of the dividend;

6  correct?

7  A.   With the exception of the one quarter of Freddie Mac that

8  we've mentioned, yes.

9  Q.   Okay.  But in the second quarter, they were both higher;

10 correct?

11 A.   Yes.

12 Q.   So would you agree with me that at least in 2012, there was

13 not a circular draw problem?  Would you agree with that?

14 A.   I would agree that the way the financial results worked

15 out, that there was not a circular draw except for that modest

16 draw of Freddie Mac in the one quarter.  Yes, I would agree with

17 that.

18 Q.   Okay.  And do you recall -- you remained acting director

19 until the very end of 2013 or early 2014; correct?

20 A.   Early 2014, yes, sir.

21 Q.   Okay.  And so do you recall that in 2013, both Fannie Mae

22 and Freddie Mac recorded extremely large income, tens of

23 billions of dollars, combined over $130 billion?  Do you recall

24 that?

25 A.   I do.

```
1    Q.   And do you recall that because of the net worth sweep, they

2    had to sweep all of that to the Treasury?  Do you recall that?

3    A.   I do.

4    Q.   And do you recall that if they had stayed with the

5    10 percent dividend, their total dividend in 2013 would have

6    been approximately $18.9 billion?

7                MR. STERN:  Objection to the relevance of these events

8    after August 27 -- August 17th, 2012.

9                THE COURT:  Overruled.

10               BY MR. HUME:

11   Q.   Do you recall that, Mr. DeMarco?

12   A.   No, sir.  I believe that in 2013, that the payments to

13   Treasury, if we had not executed the Third Amendment, would have

14   included the 10 percent dividend, and a periodic commitment fee

15   would have been in place.  So that would have been the combined

16   payment.

17   Q.   I'm going to ask you about the periodic commitment fee

18   shortly.  All I'm asking is, in terms of the dividend amount on

19   senior preferred stock, do you recall that it would have been

20   about 18.9 billion?

21   A.   Yes.

22   Q.   And instead, under the net worth sweep, it was about

23   130 billion; correct?

24   A.   I'll take the number as you say it.

25   Q.   Okay.  Now, as things actually turned out, there would not
```

1    have been a circular draw problem.  Would you agree with that?

2    A.   Other things equal in that year, that's correct.

3    Q.   Now --

4    A.   Yes, except for the -- yes, that's correct.

5    Q.   Going back to the summer of 2012, do you recall -- did you

6    have regular meetings with the secretary of the Treasury,

7    Timothy Geithner?

8    A.   In the summer of 2012?  I'm sorry.  What's the time frame

9    you were asking about?

10   Q.   Yes.

11   A.   Yes.

12   Q.   And I assume in those meetings, you didn't -- do you recall

13   ever making a misrepresentation to the secretary of the

14   Treasury?

15   A.   No.

16   Q.   Could we please pull up PX-205.  And this has been admitted

17   into evidence.  So it should be going on the screen.

18        Now, Mr. DeMarco, PX-205, Plaintiffs' Exhibit 205, is a

19   memorandum written by a Treasury Department employee named

20   Michael Stegman.

21        Do you know Michael Stegman?

22   A.   Yes, I do.

23             COURTROOM DEPUTY:  I'm sorry.  You said 205?

24             MR. HUME:  There was a dispute over it right before

25   trial began, and the Court ruled that it could come into

1    evidence.

2          It may not have been moved into evidence, Ms. Jenkins.  So

3    I'm now going to move for the admission of PX-205.  All prior

4    objections to it have been overruled.

5                THE COURT:  It's received.

6          (Exhibit PX-205 received into evidence.)

7                MR. HUME:  My apologies, Ms. Jenkins.

8                MR. STERN:  Your Honor, just for the record, we know

9    the Court's spoken on this, but for the record, we would object

10   to this one.

11         Your Honor, may we go to the phone for just a minute on a

12   technical matter?  I apologize.

13               THE COURT:  Yes.

14         (Bench conference.)

15               MR. STERN:  Thank you, Your Honor.  Our realtime

16   connection is not working.  I don't want to interrupt Mr. Hume

17   too much, but it's behind.

18         Oh, now it's working.  I apologize, Your Honor.

19               MR. HUME:  Your Honor, may I speak?

20         This is an obvious attempt to interrupt the most important

21   testimony in the case.

22               MR. STERN:  Your Honor, if I may, I'm a little hard of

23   hearing myself.  I rely on the realtime.  I'm not -- I don't

24   have anything else to say in response to that.

25         (End of bench conference.)

```
 1              BY MR. HUME:
 2    Q.    Sorry, Mr. DeMarco.  Before the break requested by your
 3    counsel, you had testified that in 2012, you recall in the
 4    second quarter both Fannie Mae and Freddie Mac had profits above
 5    the 10 percent dividend amount; correct?
 6    A.    I'm sorry.  I got distracted, Counsel.
 7    Q.    That's why I'm trying to bring everyone back to where we
 8    were.  So sorry about that.
 9          Before the break requested by your counsel, do you recall
10    testifying that in 2012, in the second quarter, Fannie Mae and
11    Freddie Mac had profits higher than the 10 percent dividend
12    amount?  Correct?
13    A.    Yes.
14    Q.    And you recall that as things actually turned out, putting
15    aside the periodic commitment fee, which I promise we're going
16    to talk about, the profits that Fannie Mae and Freddie Mac made
17    in the future after 2012 were higher than the 10 percent
18    dividend amount; right?
19    A.    As it turned out, yes.
20    Q.    Okay.  And we were talking about you having meetings with
21    the Treasury secretary, Mr. Geithner.  Remember?
22    A.    I had meetings with the Treasury secretary, yes.
23    Q.    And you never made any misrepresentations to the secretary
24    of the Treasury; correct?
25    A.    No.
```

1    Q.    PX-205 -- Plaintiffs' Exhibit 205 is a memorandum written

2    by a Treasury employee, Mr. Stegman, whom you know; correct?

3    A.    Yes.

4    Q.    And it's June 25, 2012.  So that's a little less than two

5    months before you signed the net worth sweep; correct?

6    A.    Yes.

7    Q.    The first sentence says, "The secretary" -- that's the

8    secretary of the Treasury -- "provided an overview of his and

9    your previous day's meeting with Ed DeMarco."

10        Do you see that?

11   A.    I do.

12   Q.    The next sentence says, "This is the essence of the

13   discussion that took place."

14        Do you see that?

15   A.    I do.

16   Q.    We will scroll down, if we could, in the document to the

17   fifth bullet point there, and in that fifth bullet point -- you

18   don't need to highlight this part.  Let's just read it for

19   context.

20        It says, "Through weeks of negotiating the terms of

21   possible amendments to the PSPAs."  Let's stop there.

22        PSPAs refers to the Treasury's preferred stock purchase

23   agreement; correct?

24   A.    Yes.

25   Q.    Okay.  So it says after weeks of negotiating possible

1   amendments -- and of course, the amendments were what ended up

2   in the Third Amendment; correct?

3   A.   Yes.

4   Q.   So after weeks of negotiating the Third Amendment, it says,

5   "He never" -- this is talking about you, Mr. DeMarco.  "He never

6   questioned the need to adjust the dividend schedule this year."

7        Do you see that?

8   A.   I do.

9   Q.   The next sentences says, "Since the secretary raised the

10  possibility of a PR covenant, DeMarco no longer sees the urgency

11  of amending the PSPAs this year."

12       Do you see that?

13  A.   I do.

14  Q.   Let's pause there.  What is a PR covenant?  Is it a

15  principal reduction?

16  A.   It is.

17  Q.   Is a principal reduction essentially when the holders of

18  the mortgage, Fannie Mae and Freddie Mac or other institutions

19  or the government, somebody says, you, homeowner, we're going to

20  reduce how much money you owe, we're going to reduce the

21  principal on your mortgage, for certain homeowners?

22  A.   Yes.

23  Q.   So it goes on and says, "He," Mr. DeMarco, "has raised two

24  competing reasons for this new position."

25       Do you see that?

1   A.   I do.

2   Q.   And then let's look at this carefully.  Number 1 -- let's

3   highlight this.

4       Number 1, "The GSEs will be generating large revenues over

5   the coming years, thereby enabling them to pay the 10 percent

6   annual dividend well into the future even with the caps."

7       Do you see that?

8   A.   I do.

9   Q.   Did you tell Secretary Geithner in June 2012 that the GSEs

10  will be generating large revenues over the coming years, thereby

11  enabling them to pay the 10 percent annual dividend well into

12  the future even with the caps?

13  A.   No, I don't recall saying that, but what I do recall --

14  what I do recall was what's in that second sentence.  "The

15  secretary raised the possibility of a principal reduction

16  covenant."

17      These were two matters that we were in discussions with the

18  Treasury Department about at the same time.  To me, they were

19  separate matters, and I was not interested in putting the

20  principal reduction covenant in what we had been talking about

21  on the discussion of the Third Amendment, and that's what I was

22  resisting.

23  Q.   You were very focused on not doing the principal reduction

24  covenant; is that correct?

25  A.   That's correct.

1    Q.   I'm going to come back to that in a second.  I want to come

2    back to getting a very clear answer on this statement that's

3    highlighted on PX-205.

4         The question for you is -- and please try with a yes, no,

5    or I don't know -- did you tell the Treasury secretary in

6    June 2012 that the GSEs will be generating large revenues over

7    the coming years, thereby enabling them to pay the 10 percent

8    annual dividend well into the future even with the caps?

9    A.   No, I don't recall saying that.

10   Q.   I would like you to turn to your deposition from 2020,

11   which is at tab 2 of your binder.

12             MR. HUME:  But again, Your Honor, I would request

13   permission to just simply play the deposition clip, which is

14   ED-20.8, so that we can show the deposition testimony.

15             THE COURT:  Without objection.

16        (Video played.)

17             BY MR. HUME:

18   Q.   Now, Mr. DeMarco, that was a long answer.  Some of it, I'm

19   going to come back to.

20        Put the exhibit back on the screen, PX-205, with number 1

21   highlighted.

22        But in that answer, which was the same question I asked a

23   moment ago, whether you told Mr. Geithner, Treasury Secretary

24   Geithner what's written in this memo.  Your answer was, "I don't

25   recall."  "I don't recall exactly what was said."

1          MR. STERN:  The testimony will speak for itself.  I

2     object to the characterization.

3          THE COURT:  Overruled.

4          BY MR. HUME:

5     Q.   I have the written transcript here.  It's at tab 2 of the

6     binder.  We can play it again.  But the answer that you gave

7     when that question was asked in your deposition was, "I don't

8     recall exactly what I told them."

9          Was that truthful and accurate testimony that you gave in

10    the deposition?

11    A.   Yes.

12    Q.   Okay.  So today, I asked you the same question twice, and

13    you answered -- the transcript will show you answered, "No, I

14    don't recall exactly" or something, but you first put the word

15    "no."

16         I want the record to be clear here.  And you know you're

17    under oath; correct?

18    A.   I do.

19    Q.   In the deposition, you said you don't recall; correct?

20    A.   That's what I said, and I believe that's what I said here.

21    I actually thought my answer was quite the same as what I gave

22    in the prior deposition.  Different words, maybe a shorter

23    answer this time around, but I don't -- I'm not seeing the

24    inconsistency that you are seeing.  I'm sorry, Mr. Hume.

25    Q.   Okay.  One more time.

1    A.    Okay.

2    Q.    Is the answer to the question -- the question is whether

3    you said to Mr. Geithner what is highlighted on PX-205 as

4    number 1.  The question is, did you say that to Mr. Geithner?

5    A.    I don't believe I did, no.  Look, this sentence says, "The

6    GSEs will be generating large revenues."  I do not know what the

7    GSEs will be generating, especially in terms of revenues.

8    Q.    Mr. DeMarco, I'm not asking you to characterize it or argue

9    about what you meant when you said it, if you said it.  All

10   we're talking about right now is whether you said it.  You've

11   now said three times that you didn't say it.  In deposition you

12   said "I don't recall."

13        I would like to show you another clip from your 2020

14   deposition.  If counsel wants to read along, it's at 2020

15   deposition, line -- 219:12.  Again, it goes on for a while, to

16   220:18.  It's not that long, about a minute.  Clip ED-2010,

17   please.

18        This is from your sworn deposition, and it's showing this

19   same document.

20        (Video played.)

21             BY MR. HUME:

22   Q.    So in the deposition, twice you said, "I don't recall."

23   A.    Right.

24   Q.    Was that truthful and accurate testimony?

25   A.    Yes.

1    Q.   But today, you say, "No, I don't believe I did."

2    A.   I'm sorry, sir.  To say "I don't believe I did" and "I

3    don't recall," I'm not finding as big a distinction as you are.

4    I do not recall exactly what I said at that meeting over ten

5    years ago.

6    Q.   So is it your testimony you don't see a big distinction

7    between "no, I don't believe I did" and "I don't recall what I

8    said"?  You don't see a big distinction between that?

9    A.   No, sir.

10   Q.   Am I correct that your focus and what you do recall is

11   trying to prevent the Treasury secretary from including in the

12   Third Amendment a requirement that Fannie and Freddie engage in

13   principal reduction?

14   A.   That is correct.

15   Q.   And you do recall that?

16   A.   I do recall that that was the thrust of this discussion,

17   and that was my objective.  His objective was he wanted it in,

18   and we were negotiating both of these matters, and I did not

19   want it in.

20   Q.   But this memo -- this memo says, "Since the secretary

21   raised the possibility of a PR covenant," you no longer see the

22   urgency.

23        Do you see that sentence?

24   A.   I do.

25   Q.   And it says you raised two competing reasons.

1    Do you see that?

2    A.   I do.

3    Q.   And the reasons that you give -- that this memo says you

4    gave, those reasons don't have anything to do with principal

5    reduction, do they?

6    A.   No.

7    Q.   Okay.  So the memo says you're resisting this amendment for

8    reasons different from principal reduction, but your

9    recollection is that what you really cared about was resisting

10   principal reduction; correct?

11   A.   Yes.

12   Q.   And again, principal reduction, what was it they wanted you

13   to do?  The Treasury Department with Secretary Geithner wanted

14   you as the conservator for Fannie Mae and Freddie Mac to engage

15   in some kind of principal reduction, which would basically

16   forgive certain amounts of homeowner loans, the principal on the

17   mortgage; is that right?

18   A.   That's correct.

19   Q.   What did they want -- do you recall how much they wanted

20   you to do or for which homeowners?

21   A.   They wanted it to do for homeowners that were missing

22   payments on their mortgages and were underwater on their

23   mortgages.

24   Q.   To be underwater on your mortgage means --

25   A.   It means that the principal balance, what you owe, is

1    greater than what the current market value of the house is.

2    Q.   So in other words, if you buy a house for $200,000 with a

3    $180,000 mortgage and the house value drops to 150,000, you're

4    underwater?  The house is now worth less than the principal on

5    your mortgage; correct?

6    A.   Yes.

7    Q.   And what Secretary Geithner wanted was for you as the

8    conservator for Fannie Mae and Freddie Mac to go get Fannie Mae

9    and Freddie Mac to go to homeowners who were in that situation

10   and reduce the principal to some amount, I don't know, maybe

11   reduce it to the home value, forgive their loans to the amount

12   of certain amounts of their principal; correct?

13   A.   Correct.

14   Q.   And you didn't want to do that?

15   A.   No.

16   Q.   And that is what you most remember about this meeting with

17   Mr. Geithner reflected in this memo; correct?

18   A.   In the context of the Third Amendment, yes, that's correct.

19   Q.   And you weren't going to let them put that in the Third

20   Amendment; correct?

21   A.   We are having negotiations over both of these, sir.  As I

22   already said, I did not believe it appropriate, nor did I want

23   the principal reduction to become a covenant in the Third

24   Amendment.

25   Q.   And you won that battle?  It didn't go into the Third

1    Amendment, did it?

2    A.   It did not.

3    Q.   And after that, they didn't -- the Treasury Department

4    didn't succeed in getting you to agree to principal reduction in

5    some other way, did they?

6    A.   No, they did not.

7    Q.   And so were you basically negotiating over principal

8    reduction by making these statements?

9    A.   As I said, I don't recall exactly what I said or how this

10   discussion went.  What I recall was this was taking an ongoing

11   series of discussions I was having with the Treasury secretary

12   over principal reduction, and it was now trying to join it to an

13   even longer standing discussion I had been having with the

14   Treasury secretary over our mutual desire to have this Third

15   Amendment.

16        And whatever his reason was for wanting to now bring these

17   two together, I did not feel like that was the appropriate thing

18   to do, and I wanted to deal with these issues separately.

19   Q.   But it was more important to you to not agree to principal

20   reduction than it was to not have the net worth sweep; is that

21   fair?

22   A.   No.  Both were important to me, and I got both.  This is a

23   negotiation where I've got to know what the other party, you

24   know, is trying to do and what they're seeking, and I'm trying

25   to carry out my responsibilities the way I saw them and what was

1    in -- in the public interest as I was -- felt like I was

2    supposed to carry it out.  We were negotiating on both of these

3    matters, and we had a lot of discussions on them, and I

4    believed -- I had my position with respect to principal

5    reduction, and I stuck to it.

6    Q.   Would you have made either of these two statements to the

7    secretary of the Treasury if you didn't believe them to be true?

8    A.   First of all, this is a -- Mr. Stegman was not at this

9    meeting.  He's reflecting the essence of what he understood

10    Treasury Secretary Geithner to be saying as a summary of these

11    discussions.

12        Over the course of this meeting where we're talking about

13    both the Third Amendment and about principal reduction, I'm sure

14    a range of things came up.  I don't recall what the specifics of

15    them were.  I do recall that I did not want principal reduction

16    in the Third Amendment, and I wanted the Third Amendment done.

17    Q.   Wasn't the resistance -- wasn't your desire to resist

18    principal reduction a higher priority for you?

19    A.   Both were important to me, sir, and I was working on both

20    of them.

21    Q.   I would like to turn you back to your 2020 deposition, the

22    rest of the part of ED-2010.

23        Are you able to pull it back up where we stopped?

24        MR. STERN:  I'm sorry, Your Honor.  May I get a page

25    and line?

1          MR. HUME:  Yes.  We would start, then, on page 220,

2    line 1, until 220, line 18.

3          (Video played.)

4          BY MR. HUME:

5    Q.   Was that truthful and accurate testimony, sir?

6    A.   Yes.

7    Q.   Sir, did you not believe that principal reduction,

8    forgiving principal for homeowners, was in the public interest?

9    A.   No, I did not.

10   Q.   And do you recall writing an extensive letter, seven- or

11   eight-page letter to Congress in July of 2012 telling them why

12   you opposed principal reduction?

13   A.   I do.

14   Q.   Okay.  Do you remember giving testimony to Congress about

15   why you opposed principal reduction?

16   A.   Yes.

17   Q.   And do you remember Treasury Secretary Geithner sending you

18   a letter on the same day you wrote to Congress, July 31st, 2012,

19   telling you how badly and how much he and the Treasury

20   Department wanted you to agree to principal reduction, homeowner

21   loan forgiveness?

22   A.   Yes, I recall that.

23   Q.   Who did you have working for you at FHFA on principal

24   reduction?  Was there anyone else looking at an analysis of why

25   you -- the reasons you didn't want to do it?

1    A.   I had a number of people working on this issue for me for

2    quite some time, yes.

3    Q.   What did they do for you on this issue of principal

4    reduction?

5    A.   They did a great deal of analysis in terms of the potential

6    impact of principal forgiveness on the financial results and the

7    financial impact of this.  We modeled out what this would cost

8    the companies and what it would net cost the taxpayer.  And we

9    considered the behavioral impacts of this decision on the

10   broader market and on the broader book of business that Fannie

11   Mae and Freddie Mac had.

12        So there was a great deal of analysis that was done.  There

13   were quite a number of people that were involved.  There was a

14   lot of discussions with the Treasury Department.  And I put all

15   this out there in July of 2012.

16   Q.   Do you recall whether anyone at the FHFA produced any memos

17   or data studies in their analysis of principal reduction?

18   A.   Yes.

19   Q.   Do you recall whether there was a single memo analyzing the

20   pros and cons of agreeing to the net worth sweep?

21   A.   No, I don't recall.  I don't recall there was one.

22            MR. HUME:  Your Honor, it might be a good time for a

23   break right now.

24            THE COURT:  All right.  We can take a short break.

25        (Jury exited courtroom.)

 1          (Recess taken from 11:12 a.m. to 11:30 a.m.)

 2          (Jury entered courtroom.)

 3              THE COURT:  Counsel, you may proceed.

 4              MR. HUME:  Thank you, Judge Lamberth.  For the record,

 5     Hamish Hume for the plaintiffs.

 6              BY MR. HUME:

 7     Q.    Mr. DeMarco, you understand you are still under oath;

 8     correct?

 9     A.    Yes.

10     Q.    In your testimony earlier, you mentioned something about

11     the periodic commitment fee.

12          Do you recall that?

13     A.    Yes.

14     Q.    And you thought that if there hadn't been a net worth

15     sweep, you think there would have been a periodic commitment fee

16     imposed in 2013; correct?

17     A.    Yes.

18     Q.    Is it correct that in 2010 and '11 and '12, at least the

19     first part of '12, the periodic commitment fee had been waived

20     by the Treasury Department?

21     A.    Yes.

22     Q.    And is it correct that it had been waived because of the

23     fragility of the mortgage market?

24     A.    Yes.

25     Q.    Does that mean your belief that they would have imposed a

1  periodic commitment fee in 2013 reflects -- you believed in

2  August 2012 that they were going to impose a periodic commitment

3  fee if you didn't do the net worth sweep; correct?

4  A.   Let's step back.  So yes, the Treasury Department described

5  this fragility of the market and talked about the fact that

6  because the companies were drawing on the commitment in order to

7  pay the dividend, that there was no point to imposing the

8  periodic commitment fee as well, because there was no income

9  there to pay it.

10 Q.   Right.  But in August 2012 when you agreed to the net worth

11 sweep, did you believe that if you didn't agree to the net worth

12 sweep, in 2013 there would likely be a periodic commitment fee?

13 A.   Yes.

14 Q.   And was that belief based in part on the fact that you

15 believed there was not going to be an ongoing fragility in the

16 mortgage market?

17 A.   No.

18 Q.   But didn't you say that Treasury had waived the periodic

19 commitment fee because of the ongoing fragility in the mortgage

20 market?

21 A.   Yes, because we were talking about the years 2010, '11, and

22 '12.

23 Q.   But things had changed by 2012 so that they would have

24 imposed the fee; correct?

25 A.   Things were changing, yes.

1    Q.   Things were changing in the summer of 2012?

2    A.   Yes.

3    Q.   Now, you said earlier that you did not believe the net

4    worth sweep was done to demonstrate a wind-down; correct?

5    A.   Yes.

6    Q.   Would it surprise you if your colleagues at the FHFA

7    thought, any of them, that the net worth sweep was done to

8    demonstrate a wind-down?

9    A.   It would not surprise me that they would make reference to

10   wind-down, because that was something that was being publicly

11   discussed by the administration and by Congress, and there were

12   bills being drafted and had already been posed to accomplish

13   that outcome.  And as I said earlier in my testimony, that was

14   one of the risks that I was concerned about that caused me to

15   want to have this Third Amendment.

16   Q.   Let me ask you this:  You didn't do the net worth sweep in

17   order to effectuate and ensure a wind-down, did you?

18   A.   No.  I did it for the reasons we've already discussed, to

19   preserve the commitment for all the various risks that we were

20   looking at and uncertainties going out into the future, of

21   which, you know, a wind-down or even a public debate about a

22   wind-down was one of the risks that I was concerned about.

23   Q.   But you did it because of the concern over the circular

24   draw; correct?

25   A.   Because the circular draw would reduce the remaining

commitment, and the remaining commitment was all the capital
that was backing these two companies and their $5 trillion worth
of securities traded in the market, and I could not have a
potential event that would cause the market to question whether
that remaining commitment was sufficient to support these
securities, these mortgage-backed securities that are going to
last for up to 30 years.

And so any time -- any downturn, anything that would risk
the further draws on that commitment that would erode the
commitment was going to weaken the remaining capital support
behind these companies and risk the housing finance system.

Q.   Mr. DeMarco, can you tell me the question you were just
answering?

A.   I was answering your question about the commitment fee.

Q.   That wasn't the question I asked.

A.   Well, I'm sorry.  Would you please restate the question, if
I didn't answer it.

Q.   Please just answer my question.

A.   Okay.

Q.   And not give a speech.  You're going to get a chance to
testify when your counsel asks you questions.

My question was whether the net worth sweep was done to
demonstrate a wind-down.  Earlier, you said not from your
standpoint; is that correct?

A.   That's what I said.

1    Q.   And therefore --

2               MR. STERN:  Your Honor, if I may, the question was,

3    "But you did it because of the concern over the circular draw;

4    correct?"  And he answered, "Because the circular draw,"

5    et cetera.

6               MR. HUME:  It wasn't about the commitment fee.  And

7    what I was talking about is circular draw versus wind-down, and

8    that's the question.

9               THE WITNESS:  The circular -- to understand --

10              MR. HUME:  There's no question pending.  Okay?

11              THE WITNESS:  Fine.

12              BY MR. HUME:

13   Q.   Here's the question I want to ask, which I think the answer

14   is clear from your perspective:  You weren't doing the net worth

15   sweep, were you, because you thought they were going to make a

16   lot of money and have a huge increase in assets and look really

17   healthy and be able to pay the 10 percent dividend and build

18   capital on top of it and you could see that happening and that's

19   why you did the net worth sweep?

20        That's not what happened, is it, from your perspective?

21   A.   No, that is not why I did the net worth sweep.

22   Q.   And one of the reasons they made so much money and had such

23   an increase in net worth in 2013 was because they removed the

24   write-downs on the deferred tax assets, increasing their value

25   by tens of billions of dollars; correct?

1    A.    Yes.

2    Q.    And you testified in your deposition that you did not know

3    anything about the deferred tax asset issue when you agreed to

4    the net worth sweep; correct?

5    A.    I would have to look at exactly what I said.  I was aware

6    of the deferred tax asset, because it had been on the balance

7    sheet for -- since early in the conservatorship.

8    Q.    Well, if I could ask you to turn on -- in your binder to

9    your first deposition.

10              MR. STERN:  Sorry, Mr. Hume.  Is that May of 2015?

11              MR. HUME:  Actually, I'd like --

12              BY MR. HUME:

13   Q.    Your deposition should be at tab 1 of your binder.

14         Do you see that?

15   A.    Yes.

16   Q.    I would like you to turn to the bottom of page 116 and top

17   of page 117.  Do you see you're giving an answer there -- if you

18   go to page 116, line 4, do you see the question begins "okay"?

19   Do you see that?

20         Would it be possible, Ms. Jenkins, to show the deposition

21   that I'm showing to the witness on the screen?  It's not coming

22   into evidence, but we just want the jury to be able to see what

23   was said in deposition.

24              MR. STERN:  Objection, Your Honor.  If there's going

25   to be a question that the transcript relates to, we don't have

1    any objection.

2            THE COURT:  The objection is you don't have a question

3    it's relating to.

4            MR. HUME:  I'm sorry?

5            THE COURT:  His objection is sustained.  If you're

6    laying a foundation to impeach, you need the question it's

7    relating to.

8            MR. HUME:  The question was whether Mr. DeMarco --

9    whether it was brought to his attention before he agreed to the

10   Third Amendment that there was a possibility of taking away the

11   write-downs on the deferred tax assets so they would increase in

12   value.

13           BY MR. HUME:

14   Q.   Was that brought to your attention before you agreed to the

15   Third Amendment?

16   A.   The possibility of it happening?

17   Q.   Yes.

18   A.   As I said, I was aware of the deferred tax asset, and I was

19   aware it was something that had to be attested to on a quarterly

20   basis.  And no, it was not in my awareness at the time I agreed

21   to the Third Amendment that this was -- would be happening as

22   quickly as it did, no.

23   Q.   It was not brought to your attention?

24   A.   No.

25   Q.   Then I don't need to show the deposition, but I would like

1    to show PX-259.  And Ms. Jenkins, this is -- there's no

2    objection to this coming into evidence, and I would, therefore,

3    move for it to be admitted.

4              MR. STERN:  That's correct that there's no objection,

5    Your Honor.

6              THE COURT:  259 is received, then, and can be

7    displayed.

8         (Exhibit PX-259 received into evidence.)

9              MR. HUME:  Thank you.

10             BY MR. HUME:

11   Q.   PX-259 -- the Exhibit 6 is from a deposition.  So that gets

12   multiple numbers.  But this is PX-259.  If we start at the

13   bottom, these e-mails go chronologically bottom up.  Can we show

14   the first e-mail from Mr. Griffin to Mr. Satriano.

15             August 14th.  Do you see this date, Mr. DeMarco?

16   A.   I do.

17   Q.   August 14th, 2012.

18             Who is Mr. Griffin, James Griffin?

19   A.   He worked in the Office of the Chief Accountant.

20   Q.   Chief accountant at FHFA?

21   A.   Yes.

22   Q.   He's sending an e-mail to Mr. Satriano.  Who is

23   Mr. Satriano?

24   A.   His boss.

25   Q.   At the FHFA?

1    A.    I believe so, yes.

2    Q.    And the subject of the meeting, "SPSPA meeting."

3          Do you see that?

4    A.    I do.

5    Q.    That refers to the Treasury's senior preferred stock

6    agreement; correct?

7    A.    Yes.

8    Q.    Sometimes it's SPSPA, sometimes it's just PSPA, but it

9    means the same thing; correct?

10   A.    Correct.

11   Q.    He says in that first sentence, "The meeting with Ed went

12   well."

13         Do you see that?

14   A.    Yes.

15   Q.    So do you believe you would have had a meeting with

16   Mr. Griffin and Mr. Satriano about the amendments to the senior

17   preferred stock agreement with Treasury around about the time of

18   August 14th, 2012?

19   A.    Well, it appears from the context that I had a discussion

20   or meeting with Mr. Griffin.  It's less clear that Mr. Satriano

21   was there since Mr. Griffin is summarizing this for

22   Mr. Satriano.

23   Q.    I would agree with that.  Thank you.

24         The next sentence says, "The amendment is expected to be

25   made public some time on Friday."

1      Do you see that?

2  A.   I do.

3  Q.   And that's talking about the Third Amendment; right?

4  A.   Yes.

5  Q.   The next sentence says, "The enterprises will be informed

6  tomorrow of the changes, and FHFA will work with them to ensure

7  a consistent communication message."

8      Do you see that?

9  A.   I do.

10 Q.   And is it accurate that Fannie Mae and Freddie Mac were

11 told about the Third Amendment and the net worth sweep on

12 Wednesday, August 15th, 2012, two days before it was announced

13 publicly?

14 A.   That's my recollection, yes.

15 Q.   They weren't told before that; correct?

16 A.   No.

17 Q.   Okay.  Can we now go just quickly to the middle e-mail from

18 Mr. Satriano.  He responds by saying, "Hi.  Any discussion of

19 reaching out to the auditors?"

20     This clearly shows he was not at the meeting; correct?

21 A.   That appears, yes.

22 Q.   It appears Mr. Satriano was asking about what was discussed

23 at the meeting; correct?

24 A.   Correct.

25 Q.   Let's go to what the response to this is from Mr. Griffin.

1    You can blow up the top e-mail.

2    Mr. Griffin writes back to his boss, Mr. Satriano.  He

3    says "There was not."  He then says -- we don't need to

4    highlight the next thing about the going concern.  We can come

5    back to that if we need to.

6    The third sentence says, "There was a question about

7    rerecording certain deferred tax assets that had been written

8    off."

9    Do you see that?

10   A.   I do.

11   Q.   So this document, written the day of the meeting or day

12   after, whatever, right around the time of the meeting, records

13   that Mr. Griffin understood there was a discussion at the

14   meeting he attended with you about rerecording certain deferred

15   tax assets that had been written off; correct?

16   A.   It says there's some question about it.  I don't recall the

17   question or what it was, but --

18   Q.   All I'm saying is this -- would you agree with me this

19   document shows there was a discussion at a meeting you attended

20   about rerecording certain deferred tax assets that had been

21   written off?

22   A.   That appears to be what it says.

23   Q.   So the e-mail -- would you agree with me that the e-mail is

24   better evidence of what you were told at the time than your

25   memory?

1    A.   Well, I mean, I've seen this e-mail, and I'm telling you I

2    don't recall, you know, discussing this particular issue.

3    Q.   Well, is it possible you just forgot?

4    A.   It's possible.

5    Q.   And was it ever -- you don't remember it being a big deal

6    one way or the other --

7    A.   No.

8    Q.   -- when you agreed to the net worth sweep; correct?

9    A.   Correct.

10   Q.   But this e-mail does show that it was brought to your

11   attention; correct?

12   A.   There was a question.  I don't know who had the question.

13   It's not even clear whether it was actually in this meeting, but

14   there's a question about it, and we don't know what the question

15   is.

16   Q.   The next sentence may tell us something about that.  The

17   next sentence in Mr. Griffin's e-mail is, "Jeff indicated that

18   both of the boards had discussed this at the last meeting based

19   on the view that they were going to be profitable going

20   forward."

21        Do you see that?

22   A.   I do.

23   Q.   Now, from the context of this e-mail and the meeting that

24   you had -- I think I may have had the wrong inference because I

25   don't know the people as well as you do in this case -- who do

1    you think that Jeff refers to?

2    A.   My guess is it refers to Jeff Spohn, who was the director

3    of conservatorship operations.

4    Q.   So somebody who worked at FHFA?

5    A.   Yes.

6    Q.   I think I said in opening that I was guessing it might be

7    Jeff Foster at Treasury.  I think that was wrong.  I just didn't

8    know.  So it was Jeff Spohn, is it?

9    A.   Yes.

10   Q.   At FHFA, okay.  And he was director of conservatorship

11   operations?

12   A.   Yes.

13   Q.   So would he attend the board meetings of Fannie Mae and

14   Freddie Mac?

15   A.   Yes, he would.

16   Q.   And so when he says that -- when Jeff Spohn says that both

17   of the boards had discussed this at the last meeting, that means

18   the board of Fannie Mae and Freddie Mac had discussed the issue

19   of rerecording certain deferred tax assets that had been written

20   off; correct?

21   A.   Based upon thoughts that they would be profitable in the

22   future.  The boards, they had to make a determination about this

23   every quarter when they prepared the financial statements.  So I

24   would expect the boards to have discussed it because it's a part

25   of what they had to do and a part of the process.

1    Q.   Well, but it's one thing to have it as a perfunctory part
2    of the process when you know you're losing money as in 2009,
3    2010, and 2011.  But it's quite another, isn't it, wouldn't you
4    agree with me, when you suddenly say, whoa, we're going to be
5    profitable, and we get to write these assets up, adding tens of
6    billions of dollars to our net worth?  That's a big deal;
7    wouldn't you agree?
8    A.   It would be if you thought that's what was going to happen,
9    yes.
10   Q.   And it did happen in 2013; correct?
11   A.   It did.
12   Q.   And for Fannie Mae, it actually happened in the first
13   quarter of 2013; correct?
14   A.   It did.
15   Q.   And the number -- Fannie Mae, because of the deferred tax
16   asset, added $50 billion to its net worth in the first quarter
17   of 2013; correct?
18   A.   It did.
19   Q.   And Freddie Mac, in the third quarter of 2013, added over
20   20 billion, I think 23 billion, to its net worth because of the
21   deferred tax asset; is that correct?
22   A.   I believe that's right.
23   Q.   So we're talking about $74 billion between them that was
24   added to their net worth in 2013 because of the deferred tax
25   asset issue; correct?

1    A.   It was reversed and reported through income, yes.

2    Q.   And all that value that was added to their net worth had to

3    be swept to Treasury in cash because of the net worth sweep;

4    correct?

5    A.   Yes, it did.

6    Q.   And the reason those assets were written up and added

7    $74 billion to the balance sheets, to the net worth of Fannie

8    Mae and Freddie Mac, is precisely because the accountants and

9    finance people at Fannie Mae and Freddie Mac made the judgment

10   that they were going to be profitable going forward; correct?

11   A.   Right.  Those judgments were made in 2013, in the

12   conclusion of those quarters that you referenced.

13   Q.   First I want a clear answer.  The reason the $74 billion is

14   added to the balance sheet and the net worth is based on a

15   judgment that accountants and finance professionals make about

16   future profitability; correct?

17   A.   Yes.

18   Q.   Okay.  And they were discussing that judgment in the summer

19   of 2012, including before the net worth sweep was agreed;

20   correct?

21   A.   Well, this appears that there was a discussion going.  We

22   don't know anything about the context or the timing of it.  But

23   yes, as I said, it had to be reviewed on a quarterly basis.

24   Q.   It did have to be reviewed on a quarterly basis, but in

25   this quarterly review, the board of directors of Fannie Mae and

1    Freddie Mac discussed it, quote, based on the view that they

2    were going to be profitable going forward, end quote; correct?

3    A.    Yes, that's what it says.

4    Q.    That's a little different than just discussing it when you

5    know you can't do anything, but when you think you're going to

6    be profitable going forward, then you're in a position where you

7    can -- where you actually have to, under the accounting rules,

8    write it up; correct?

9    A.    Yes, you can start to anticipate and -- you know, when

10   those conditions have been satisfied.

11   Q.    Now, are you aware that the chief financial officer of

12   Fannie Mae, Susan McFarland -- do you know who she is?

13   A.    I remember Susan.

14   Q.    Did you know her personally?

15   A.    I had meetings with her while I was the acting director,

16   yes.

17   Q.    Are you aware of the fact that she has testified under oath

18   in this case that she told both FHFA and Treasury that she

19   thought there was a chance -- that she told them before the net

20   worth sweep was agreed that -- are you aware of the fact that

21   she has testified that she told both FHFA and Treasury before

22   they agreed to the net worth sweep that there was a chance the

23   deferred tax asset was going to be written up based on future

24   profit -- expectations of future profitability?  Are you aware

25   of that?

1    A.    I'm aware that there was some testimony from

2    Susan McFarland.  Exactly what she said, I don't recall.  That's

3    her testimony from some time ago.

4    Q.    You don't have any basis to believe her testimony would not

5    be credible, do you?

6    A.    Well, I have a basis to believe it's inconsistent with the

7    securities filings that Ms. McFarland had overseen for that very

8    quarter.

9    Q.    Okay.  Her testimony is that she thought it was going to be

10   possible, not that it had happened yet.

11         Do you understand that?

12   A.    Okay.  That's a clarification I believe you just made.  So

13   it's possible.

14   Q.    Yes.  And it's possible that it would be on the order of

15   $50 billion?  Are you aware that she said that?

16   A.    I don't recall the -- what she said about the amount, but

17   that would be the amount because that's how much was in the

18   reserve.

19   Q.    In your deposition, you were reluctant -- when you were

20   first asked about this -- you knew this was a big issue as soon

21   as it happened, didn't you, in 2013?

22   A.    Yes, I did.

23   Q.    Let me ask you this:  When it happened in 2013 and

24   $74 billion was added to the balance sheets of Fannie Mae and

25   Freddie Mac, who then on top of that had 50 or 60 billion in

1    profits and had to sweep $130 billion to Treasury because of the

2    net worth sweep, did you talk to anyone about, jeez, that's not

3    really what we had in mind?

4    A.    No.

5    Q.    When you were first asked about this deferred tax asset in

6    your deposition, you were reluctant to talk about it; right?

7    A.    I'm sorry.  I don't know what you're referring to.

8    Q.    Well, I'm referring to what you said in your deposition,

9    that you were reluctant to talk about it because you're not an

10   accountant; correct?

11   A.    Oh, about the technicalities of it, yeah, probably so.  I'm

12   not an accountant.

13   Q.    But you understand it; correct?

14   A.    I understand the basics of it.

15   Q.    And who would you look to for accounting advice at the

16   FHFA?

17   A.    The Office of the Chief Accountant.

18   Q.    And who heads that office?

19   A.    I believe at this time it was Nick Satriano.

20   Q.    And was Mr. Griffin somebody who worked for him?

21   A.    Who worked for him, yes.

22   Q.    Would you also look to Mr. Griffin for advice?

23   A.    Certainly.

24   Q.    Do you remember talking to either of them before you agreed

25   to the net worth sweep about the deferred tax assets?

1    A.    No, I don't.

2    Q.    Can you tell the jury what your Ph.D. thesis was?

3    A.    It was on how tax rules influence the portfolio allocation

4    decisions of commercial banks.

5    Q.    So you understand the importance of taxes to financial

6    performance; correct?

7    A.    I have some understanding of it, yes, sir.

8    Q.    Did you ask -- can you tell the jury who Ms. Naa Awaa Tagoe

9    was?

10   A.    Naa Awaa Tagoe headed up one of our offices in the Division

11   of Housing, Mission, and Goals.  She oversaw a lot of the

12   financial reporting and financial modeling.

13   Q.    How many people work for her, roughly?

14   A.    It's a long time ago.  I'm going to guess maybe, I don't

15   know, 15, 20.

16   Q.    And were the people who worked for her finance experts and

17   economists?

18   A.    Yes.

19   Q.    And did they take the projections that Fannie Mae and

20   Freddie Mac had and perform certain stress tests and modeling

21   exercises with them?

22   A.    They would oversee stress tests that Fannie and Freddie

23   did.  They did some of their own modeling work.  They would

24   examine what it was being produced by Fannie and Freddie and

25   would do their own work, yes.

1   Q.   And every year in October, they produced a new set of

2   projections for Fannie Mae and Freddie Mac; correct?

3   A.   This was a particular exercise that was done at that time,

4   yes.

5   Q.   And they would release that publicly?

6   A.   Yes, we did.

7   Q.   So at the time you agreed to the net worth sweep, the last

8   such projections they had done was in October 2011; correct?

9   A.   That's correct.

10  Q.   And you didn't ask Ms. Tagoe -- is it Tagoe?

11  A.   Tagoe.

12  Q.   My apologies.  You didn't ask Ms. Tagoe to do a new set of

13  projections before you agreed to the net worth sweep; correct?

14  A.   I don't believe I did.  No, I did not.

15  Q.   Who else would you go to at FHFA if you wanted to know what

16  the future performance of Fannie Mae and Freddie Mac was likely

17  to be?

18  A.   That would be the primary office, and I would also consult

19  with our chief economist.

20  Q.   So Ms. Tagoe would be one person you would consult;

21  correct?

22  A.   Yes.

23  Q.   And the other person?

24  A.   Pat Lawlor was the chief economist.

25  Q.   Pat?

1   A.    Lawlor.

2   Q.    Did you go to Mr. Lawlor and ask him to give you a set of

3   projections for Fannie's and Freddie's future performance before

4   you agreed to the net worth sweep?

5   A.    No.

6   Q.    Did you really -- was anyone else substantively involved in

7   the negotiations over the net worth sweep other than you and

8   Mr. Ugoletti?

9   A.    So in terms of negotiating with the Treasury Department,

10  that would have primarily been me and Mr. Ugoletti.

11  Mr. Ugoletti was also -- there were other folks at FHFA that

12  were aware of these negotiations and assisting him.

13  Q.    Did Mr. Ugoletti, was he -- was his title special advisor

14  to you?

15  A.    Yes, it was.  I believe that's what it was.

16  Q.    And have you worked with him at the Treasury Department?

17  A.    Yes, I have.

18  Q.    Did you become friends with him there?

19  A.    Yes.

20  Q.    And did you hire him when you became acting director?

21  A.    Yes, I did.

22  Q.    So you became acting director at FHFA and hired him from

23  Treasury to come over to FHFA; correct?

24  A.    That's correct.

25  Q.    And then I think we heard -- well, I won't represent it,

1    but I think -- is it correct that while he was at FHFA, he also

2    for some period of time spent half of his time working for

3    Treasury and half for FHFA?  Is that correct?

4    A.   Yes.  When he first came to the agency, we had a temporary

5    agreement with Treasury for him to provide assistance to the

6    Department.

7    Q.   Now, going back to these deferred tax assets, they added

8    $74 billion to the balance sheets of Fannie Mae and Freddie Mac,

9    $74 billion of net worth before they were swept.

10       Would you agree with me -- if I can ask you a hypothetical

11   question, had there been no net worth sweep, would you agree

12   with me that that $74 billion added to the balance sheet would

13   have eliminated any concern over the circular draw?

14   A.   No.

15   Q.   But you would have $74 billion of assets now.  Let's take

16   it one step at a time.  Okay?  I may know where you're going

17   with that, but I have a little hard time understanding it.

18       $74 billion added to the balance sheet of the two GSEs.

19   Once they have a positive net worth of over 50 billion for

20   Fannie or 23 billion for Freddie, if they had a particular

21   quarter of earnings where, unlike 2012 and 2013, but just

22   hypothetically if they had a quarter where their earnings are

23   less than the 10 percent dividend amount, with all that positive

24   net worth on their balance sheet, they wouldn't have to draw

25   down on that expensive Treasury capital commitment that cost

1    them 10 percent.  They could go and borrow money from the

2    private bond market at a very low interest rate if they needed

3    to or take it from other assets to pay any shortfall.

4        Correct?

5            MR. STERN:  I'm going to object to the form of the

6    question, Your Honor.

7            BY MR. HUME:

8    Q.   Is the question clear?

9    A.   No, actually, it's not.  You're saying as an alternative --

10   maybe if you could restate it, and then I will see if I've got

11   it.  Try again.

12   Q.   Okay.  And if you would for this question assume there's no

13   periodic commitment fee, and I promise you I'm going to ask you

14   lots of questions on the periodic commitment fee and so is your

15   counsel.  But for this question, assume there's no periodic

16   commitment fee and no net worth sweep, just the same deal in

17   2013 that they had in 2012, the 10 percent dividend.  Okay?  Is

18   the assumption clear?

19   A.   It is.

20   Q.   Okay.  Now, you're at the end of 2013, and you've got --

21   Fannie Mae has a net worth of over $50 billion, and just to make

22   it simple, we will just stick with one.  At that point, if,

23   let's say, in the first quarter of 2014 they have quarterly

24   profit that is less than the 10 percent dividend amount -- that

25   was the problem before 2012 that gave rise to the circular draw;

1    correct?

2    A.    Correct.

3    Q.    But in 2014 if that had happened and they had all that net

4    worth on their balance sheet, they wouldn't have to borrow from

5    Treasury or draw down from Treasury to pay the shortfall on the

6    dividend; correct?

7    A.    That is correct.

8    Q.    Because with the positive net worth, they could dip into

9    other reserves or borrow money from the bond market and get the

10   cash that way; correct?

11   A.    They would be able to reduce their -- that net worth

12   balance as a way of funding the dividend, yes.

13   Q.    Right.  And with 50 billion of net worth, I think the

14   annual 10 percent dividend for Fannie Mae, had there been no net

15   worth sweep, would have been $11.7 billion.  I ask you to accept

16   that assumption for my question.

17        So even if you had zero profit, that $50 billion net worth

18   gives you a big cushion for over four years of zero profit.

19   They can dig into that without a circular draw; correct?

20        MR. STERN:  At this point, Your Honor, I'd object to a

21   completely counterfactual hypothetical being put to a fact

22   witness.

23        THE COURT:  Overruled.

24        THE WITNESS:  So I would be, in my position, very

25   cautious about making that kind of assertion.  Fannie Mae and

1    Freddie Mac between them entered 2008 with $70 billion of

2    capital, and a year later, they're both drawing from the

3    Treasury of the United States.

4         So that may seem like a big number, but in the kinds of

5    risks and market movements that I have to be aware of and I have

6    to be planning for, I would not say that, well, there's

7    50 billion there, we're going to draw 11, that's no big deal.

8    Q.   Look, we're going to talk about uncertainty, too.  What

9    you're saying, if I understood your testimony just now, is

10   you're reluctant to agree with me because of all the

11   uncertainties that you had to deal with at the time; correct?

12   A.   I'm taking issue with the characterization that I thought I

13   heard regarding the relativity of these amounts.

14   Q.   What I'm -- I'm simply trying to explain the mechanics to

15   the jury, the effect of increasing net worth and what it would

16   have been.  That's all I'm trying to do.

17   A.   Yes.

18   Q.   And I think you said that increase in net worth would allow

19   them to fund any shortfall they might have and thereby avoid the

20   circular draw; correct?

21   A.   Yes.

22   Q.   Now, let's go back to the origins of all of this.  Am I

23   correct that you personally can't remember whose idea the net

24   worth sweep was?  Is that correct?

25   A.   Yes, that is correct.  Where exactly it originated or who

1   it originated with first, I would not be able to say with

2   certainty.

3   Q.   But it's your testimony that you agreed to it because of

4   the circular draw problem; correct?

5   A.   I agreed -- I'm sorry.  That I agreed to the net worth

6   sweep because of the circular draw?  Yes.

7   Q.   Okay.  Now, am I also correct that while you don't remember

8   exactly who came up with it first, you have some recollection

9   that when it first came up it came up in connection with the

10  periodic commitment fee?

11  A.   Yes.

12  Q.   And am I correct that at the time -- and that around the

13  first time -- you don't remember exactly when, but it was sort

14  of early 2012 that you think it may have first come up; is that

15  correct?

16  A.   The notion of a net worth sweep being tied to the periodic

17  commitment fee?  No, that was earlier.

18  Q.   Okay.  But it would have come up -- in 2012 when it came

19  up --

20  A.   It did.  It came up very early -- it started 2012 when we

21  were beginning discussions of the Third Amendment.  Yes, it came

22  up.

23  Q.   But your recollection was that the net worth sweep would

24  be -- it made intuitive sense to you that Treasury should get a

25  net worth sweep as the periodic commitment fee; correct?

1    A.    In the conditions we were at at that time, yes.

2    Q.    When you say "at that time," I just want to make sure,

3    because now there's some uncertainty in the record.

4          At what time?

5    A.    So you're asking about it in the discussion of the Third

6    Amendment, and yes, so at the -- when we begin discussing the

7    Third Amendment where the amount drawn is already about

8    $190 billion and creating a considerable dividend requirement at

9    the 10 percent.

10         But it's more than that.  It's looking at the plain

11   language of what the original stock purchase agreement required

12   with regard to the commitment fee.  So the plain language was

13   that it was -- the commitment fee was supposed to compensate

14   Treasury for the value of the support to the companies that the

15   commitment provided.

16         And so when we're in 2012 and the companies have run

17   through their shareholder equity, they've run through

18   $190 billion worth of draw from the Treasury, these companies

19   are operating only because of that commitment being there and

20   the market's reliance on that commitment.

21         And so what's the value of that support reflected by the

22   commitment?  It's the fact that these companies are allowed to

23   turn on the lights and continue operating.

24   Q.    So if I understand what you're saying, it was your view at

25   the time you agreed to the Third Amendment that the net worth

```
 1    sweep would be a reasonable periodic commitment fee; correct?
 2    A.   Yes.
 3    Q.   And it was your view when you first heard about a net worth
 4    sweep idea, you first understood it in the context of being a
 5    periodic commitment fee; correct?
 6    A.   That's my recollection.
 7    Q.   And when you first heard about it as a periodic commitment
 8    fee, it made intuitive sense to you?
 9    A.   Yes.
10    Q.   And it seemed reasonable to you?
11    A.   Yes.
12    Q.   For the reasons you've said?
13    A.   Yes.
14    Q.   Okay.  But is it also true that you never had anyone at
15    FHFA go through an exercise to calculate what a reasonable
16    periodic commitment fee would be?
17    A.   No, I did not have cause to.
18    Q.   When you say you "did not have cause to," is that because
19    the net worth sweep wasn't done as a periodic commitment fee?
20    A.   It's because the Treasury was using its option to waive the
21    commitment fee.  We waived it first through the Second
22    Amendment, and then Treasury on a quarterly basis was waiving
23    it.  That was their right to do.
24    Q.   And so because of that, you never had anyone at FHFA
25    calculate or run a model or try to quantify what a reasonable
```

1    periodic commitment fee would be; is that correct?

2    A.   That's correct.

3    Q.   Is the reason you thought the entire net worth of the

4    enterprises in perpetuity could go to Treasury as a periodic

5    commitment fee because, in your view, Treasury is what was

6    keeping them afloat?

7    A.   Yes.

8    Q.   And that was true in September 2008, too, wasn't it?

9    A.   In September of 2008?

10   Q.   In September, October 2008 when they first came in, isn't

11   it your view that Treasury was needed to keep them going and

12   keep them in business?

13   A.   It was our view that the Treasury commitment was necessary

14   to help provide stability to these companies, yes.

15   Q.   Okay.  But at that time -- and at that time they wrote into

16   the agreement, you referenced this, and put in plain contractual

17   language what the periodic commitment fee should be; correct?

18   A.   What it should be based on.

19   Q.   What it should be based on.  But they didn't say -- and

20   we're going to look at it in a second.  But they didn't say in

21   that agreement, Because we're coming in and saving you, the

22   periodic commitment fee should be your entire net worth forever?

23   A.   It did not say that.

24   Q.   Let's look at what it does say.  I'm going to need a little

25   help from my team.  It's PX something.  One is from Fannie Mae

 1   and one from Freddie Mac.

 2        The language is the same; correct?

 3        Let's look at the periodic commitment fee.  I'm quite

 4   certain it's not objected to.

 5             MR. STERN:  What is the exhibit number?

 6             MR. HUME:  Let's go with 3-A1.  If there's no

 7   objection, I move for the admission of PX-3-A1.

 8             MR. STERN:  No objection.

 9             THE COURT:  Received.

10        (Exhibit PX-3-A1 received into evidence.)

11             BY MR. HUME:

12   Q.   Just for clarity, there was an agreement right away, like

13   September 7th, 2008, and then they just did a revised amended

14   and restated one September 26th, 2008.

15        Do you recall that?

16   A.   I do.

17   Q.   Okay.  So this is the amended and restated September 6th,

18   2008.

19        Do you see that?

20   A.   Yes.

21   Q.   Okay.  This one is with Fannie Mae, but there's an

22   identical one with Freddie Mac; correct?

23   A.   Yes.

24   Q.   So let's look at the language they put into the actual

25   agreement on the periodic commitment fee.  3.1 is the initial

1    commitment fee.

2         Can you blow that up for a second?

3         The initial commitment fee -- in consideration of the

4    commitment -- and the commitment is Treasury making its capital

5    available to the enterprise, to Fannie Mae and Freddie Mac;

6    right?

7    A.   Yes, to keep them from becoming -- being insolvent.

8    Q.   Okay.  And in consideration of that, the initial commitment

9    fee was one that gave them the senior preferred stock, 1 million

10   shares, with an initial value -- it's called a liquidation

11   preference -- of $1 billion; correct?

12   A.   Correct.

13   Q.   The liquidation preference of the senior preferred stock

14   means that if the company is dissolved and they go out of

15   business and sell all their assets, after you pay the creditors,

16   next in line is Treasury with its senior preferred stocks

17   liquidation preference.  It comes before all the other

18   shareholders.  Right?

19   A.   That's correct.

20   Q.   And they started with $1 billion value before providing --

21   before any money is borrowed or drawn down?

22   A.   Right.

23   Q.   And if I say "borrowed," I'm not trying to trick or make a

24   record.  I mean drawn down.  Okay?

25   A.   Okay.

Q.   All right.  So they have -- that was the initial commitment

fee, $1 billion per enterprise; correct?

A.   Yes.

Q.   2 billion total, okay.

     So 3.2 then talks about the periodic commitment fee.  Let's

see what that says.  It says that it shall be paid commencing

March 31, 2010, on a quarterly basis.  But I think the language

you're remembering and I'm remembering is in 3.2(b).

     And by the way, I don't want you to think -- you have the

document in your binder in case you want to look for context at

anything else.

A.   Thank you.

Q.   It's at tab 11 in your binder.  I apologize they're so big

because we put the full SEC things in, but that's okay.

     So 3.2(b) says, "The periodic commitment fee," and I think

this is the part you're remembering, "is intended to fully

compensate purchaser" -- that's the Treasury Department, right?

A.   Yes.

Q.   "To fully compensate Treasury for the support provided by

the ongoing commitment following December 31, 2009."

     Do you see that?

A.   Yes.

Q.   The next goes to timing in the next sentence.  It's on a

five-year basis.  It's reset every five years.

     Do you see that?

```
 1    A.    I do.

 2    Q.    The third sentence says "the amount."  Let's highlight

 3    that.

 4          "The amount of the periodic commitment fee shall be

 5    mutually agreed."

 6          Do you see that?

 7    A.    I do.

 8    Q.    "Mutually agreed by purchaser and seller."

 9          Purchaser is Treasury; right?

10    A.    Yes.

11    Q.    And seller is Fannie Mae and Freddie Mac?

12    A.    Yes.

13    Q.    Controlled by the FHFA?

14    A.    Controlled by, so it's really the -- so it's reflected

15    through the conservator.

16    Q.    Okay.  So it's got to be mutually agreed, though; right?

17    A.    Yes.

18    Q.    Treasury can't just say here it is.  You have to agree?

19    A.    That's correct.

20    Q.    And then it says "subject to their reasonable discretion."

21          Do you see that?

22    A.    I do.

23    Q.    That means it's got to be -- both Treasury and FHFA have to

24    exercise reasonable discretion in deciding what it should be?

25    A.    Yes.
```

1   Q.   And then it says "and in consultation with the chairman of

2   the Federal Reserve."

3        Do you see that?

4   A.   Yes.

5   Q.   So it doesn't say, at the time that Treasury was saving the

6   GSEs according to what many people think and, I assume, what you

7   think -- you think Treasury saved them in September 2008?

8   A.   It saved the MBS holders and the bondholders of Fannie Mae

9   and Freddie Mac, yes.

10  Q.   At the time where Treasury was so critical, they didn't say

11  the periodic commitment fee is going to be the future of your

12  net worth for all time, did they?

13  A.   No.

14  Q.   They said it had to be mutually agreed, reasonable

15  discretion, and in consultation with the Fed; right?

16  A.   And it had to fully compensate the purchaser.

17  Q.   Can you answer my question?  It says it has to be mutually

18  agreed, in reasonable discretion, and in consultation with the

19  Fed?

20  A.   That's what it says.

21  Q.   It also says in the sentence I skipped over -- this is why

22  you need a team at trial.  It says that it "shall be determined

23  with reference to the market value of the commitment."

24       Do you see that?

25  A.   Yes.

1    Q.   "As then in effect."

2         Do you see that?

3    A.   I do.

4    Q.   Can we underline "market value."

5         So at that time Treasury was doing something exceptional in

6    September 2008; correct?

7    A.   Yes.

8    Q.   It was doing something that many people thought no one in

9    the private market would or could do; correct?

10   A.   Yes.

11   Q.   Yes?

12   A.   Yes.

13   Q.   Nevertheless, when they said what the periodic commitment

14   fee would be, they said it would be based on the market value;

15   correct?

16   A.   Market value of the commitment.

17   Q.   Okay.  Now, you never had anyone at FHFA try to implement

18   this language to actually calculate what the market value of the

19   commitment would be using their reasonable discretion and

20   judgment, did you?

21   A.   No.

22   Q.   Okay.  We can take that down, please.

23        There were, however -- actually, do you remember in your

24   second deposition that you were designated to give testimony as

25   the corporate representative of the FHFA?  Do you remember that?

1   A.   Yes.

2   Q.   And one of the topics you were designated to testify on was

3   what, if any, analysis the FHFA had done on the periodic

4   commitment fee.

5        Do you recall that?

6   A.   I don't recall the details of what it was I was designated

7   for, but okay, I will accept that.

8   Q.   Thank you.  And the record can show that as needed.  But

9   you were.

10       And you testified there that you were not aware of anyone

11  at FHFA ever calculating, quantifying, or modeling what a

12  periodic commitment fee might be.

13       Do you remember that?

14  A.   Yes.  I think that's what I said here, yes.

15  Q.   But in fact, there does appear to be some work done in the

16  documents, if we can just look at PX-111, please.

17       PX-111 probably also I need to move into evidence and I

18  believe has no objection.

19            MR. STERN:  No objection, Your Honor.

20            MR. HUME:  We move for PX-111 to be admitted, Your

21  Honor.

22            THE COURT:  All right.  Plaintiffs' 111 is received.

23       (Exhibit PX-111 received into evidence.)

24            BY MR. HUME:

25  Q.   PX-111, Mr. DeMarco, is an FHFA scenario forecast.

```
 1          Do you see that?

 2     A.   I do.

 3     Q.   This is dated September 9, 2011.

 4          Do you see that?

 5     A.   I do.

 6     Q.   Above the date, it says "financial planning and analysis."

 7          Do you see that?

 8     A.   I do.

 9     Q.   And that is the office or the department within FHFA headed

10     by Ms. Tagoe; right?

11     A.   Tagoe, yes.

12     Q.   She would have been the head of this office at that time in

13     2011; right?

14     A.   Yes.

15     Q.   If you could turn to page 10 of 13 in this exhibit, and I

16     think we're doing the exhibit numbers in black there, page 10 of

17     13.  There's an earnings sensitivity for Freddie Mac on this

18     document.

19          Do you see that?

20     A.   Okay.

21     Q.   Do you see it says "earnings sensitivity" at the top?

22     A.   It says "earnings sensitivity."  It's got Freddie Mac's

23     logo.  So I assume this is something prepared by Freddie Mac.

24     Q.   By the way, again, you have the document in your binder.

25     One of my colleagues can tell us what tab it's at.  But this is
```

1    really the only page I wanted to show you, but feel free to look

2    at the whole thing.

3         The last of the four bullet points here says, "Our

4    sensitivity to a commitment fee based on remaining commitment

5    available beginning in 2013 of $149 billion shows that a 25 BPS

6    fee results in a $0.4 billion annual impact."

7         Do you see that?

8    A.   I do.

9    Q.   Now, let's try to unpack this.

10        Please leave that up.  Thank you.

11        It's referring to a commitment fee.  Do you see that?

12   A.   I do.

13   Q.   You would understand that to be the periodic commitment

14   fee; correct?

15   A.   Likely, yes.

16   Q.   So this is doing some kind of sensitivity analysis to a

17   commitment fee; correct?

18   A.   There's sensitivity to a commitment fee, yes.

19   Q.   But it's also modeling what a commitment fee might be;

20   correct?

21   A.   No, it's not modeling it.  It's assuming one.

22   Q.   Okay.  It's assuming one.  And the commitment fee it's

23   assuming is a 25 BPS fee.

24        Do you see that?

25   A.   Yes, I do.

1   Q.   Let's make sure that's clear to the jury.  BPS means basis
2   points; correct?
3   A.   Yes, it does.
4   Q.   And a basis point, 100 basis points is 1 percent; correct?
5   A.   That's correct.
6   Q.   So 25 basis points is 0.25 percent?
7   A.   Yes, it is.
8   Q.   And so a commitment fee of 25 basis points -- and they're
9   multiplied against 149.  That's the amount of the Treasury
10  commitment that has not been drawn upon; correct?
11  A.   That sounds right.
12  Q.   And so when you multiply 0.25 percent against that, it
13  would mean $400 million a year; correct?
14  A.   Yes.
15  Q.   And that's to all of us a lot of money, obviously, and to
16  you and most normal people.  But to Fannie Mae and Freddie Mac,
17  that's a whole lot less than their entire net worth; correct?
18  A.   At this time they have no net worth.
19  Q.   Oh, okay.  At that time, yes, but --
20  A.   All they have is the $149 billion commitment.
21  Q.   Okay.  But would you agree with me that $400 million a year
22  in perpetuity going forward, as long as the commitment is there,
23  is way less, way less than the amount they have paid to Treasury
24  under the net worth sweep?
25  A.   It is way less than what they have paid to Treasury?  Well,

1    yes, of course.

2    Q.   In 2013, they paid $130 billion to Treasury under the net

3    worth sweep; correct?

4    A.   Yes, I believe those are the numbers we went through

5    earlier.

6    Q.   And the dividend, if it had stayed at the 10 percent

7    dividend, would have been about 18.9 billion; correct?

8    A.   Right.

9    Q.   So you're not saying that difference of 111 billion would

10   have been a reasonable periodic commitment fee, are you?

11   A.   I'm saying -- I haven't said anything.  I'm just trying to

12   answer your questions.

13        You're showing me a 25 basis-point fee on 149 billion.  So

14   how to understand what's 25 basis points on this commitment fee,

15   so this commitment, this 149 billion, is how much capital

16   remains to support the business activities of Fannie Mae and

17   Freddie Mac.  They are assuming that the compensation to

18   Treasury for putting up that $150 billion should be one quarter

19   of 1 percent.

20        This is an equity position that the Treasury Department is

21   taking in this company, and they're modeling a one quarter of

22   one percent return on that equity investment.  That is nowhere

23   near the ballpark of what equity returns look like in our

24   financial markets.

25   Q.   So translated, if I understand what you just said, is you

1  think the assumption in Ms. Tagoe's group's analysis here of 25

2  basis points is unreasonable?

3  A.    First of all, let's clarify.  It appears to me from what

4  you're presenting to me this is not Ms. Tagoe's analysis.  This

5  is reporting a Freddie Mac analysis and that Freddie Mac, in

6  doing this earnings sensitivity sheet, has said, Okay, we

7  realize we may have a commitment fee in the future, let's

8  suppose that it's 25 basis points, here's what it produces.

9  Q.    All I'm saying is --

10  A.    That's what this is.

11  Q.    Your point is, whoever did it, you think 25 basis points is

12  an unreasonable assumption?  You don't think it would be that?

13  It would be higher than that?

14  A.    Yes.  25 basis points to compensate for an equity position

15  is a very low rate of return.

16  Q.    But you've never negotiated a periodic commitment fee, have

17  you?

18  A.    We negotiated the periodic commitment fee in the context of

19  negotiating the Third Amendment, because it was part of -- part

20  of the Third Amendment was switching from the Second that had a

21  fixed 10 percent and the prospect of this periodic commitment

22  fee to waiving the commitment fee and changing the dividend.

23  That was the package that was in the Third Amendment.

24  Q.    We put up the language from the contract on the periodic

25  commitment --

1    A.   We did, yes.

2    Q.   -- and we looked through everything that has to be done to

3    set it, and you agreed that that wasn't done, that it -- there

4    was never a periodic commitment fee that was negotiated and

5    agreed with the chairman of the Fed using reasonable discretion

6    and getting to the market value.

7         You agree that didn't happen; correct?

8    A.   Correct.  You look at the language of the Third Amendment,

9    and it waives the -- it suspends the periodic commitment fee.

10   Q.   I understand that you -- the Third Amendment waives the

11   periodic commitment fee.  My question was, you didn't ever

12   actually set a periodic commitment fee; correct?

13   A.   No, we did not.

14   Q.   Okay.  And you haven't set one --

15             THE COURT:  You got rid of it?

16             THE WITNESS:  We got rid of it in the Third Amendment.

17             THE COURT:  Right.

18             BY MR. HUME:

19   Q.   That's different.  And what I'm saying is, you don't

20   consider yourself an expert on periodic commitment fees, do you?

21   A.   I'm not sure what an expert on a periodic commitment fee --

22   Q.   You never worked for a bank or someone where you had to set

23   a periodic commitment fee?

24   A.   I don't think I've ever seen a periodic commitment fee of

25   this type anywhere else before.

1    Q.   But you also haven't done -- worked at a private sector

2    lending institution where you had to negotiate a periodic

3    commitment fee, even if it was a different kind, have you?

4    A.   No.  But at a bank, as you say, that would be in the form

5    of a loan.  This is in the form of an equity stake.

6    Q.   You have not done it?

7    A.   I have not done it, no.

8    Q.   Now let's talk about --

9             THE COURT:  Are we at a good breaking point?

10            MR. HUME:  This is a subject matter change.  So we can

11   break now.

12            THE COURT:  I have a criminal matter I have to attend

13   to.

14        So we will take our lunch break now and come back at 1:30.

15   Don't talk about the case.  Don't let anyone talk about the

16   case.  And I will handle this criminal matter.

17        (Jury exited courtroom.)

18        (Recess taken at 12:27 p.m.)

19        (Afternoon session reported by Lorraine Herman and bound

20   under separate cover.)

21

22

23

24

25

```
 1                  CERTIFICATE OF OFFICIAL COURT REPORTER

 2

 3           I, Sara A. Wick, certify that the foregoing is a

 4     correct transcript from the record of proceedings in the

 5     above-entitled matter.

 6

 7

 8     /s/ Sara A. Wick                    October 20, 2022

 9     SIGNATURE OF COURT REPORTER         DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## $

**$130** [3] - 644:23, 679:1, 701:2
**$149** [2] - 699:5, 700:20
**$150** [1] - 701:18
**$180,000** [1] - 657:3
**$190** [2] - 688:8, 688:18
**$200,000** [1] - 657:2
**$400** [2] - 700:13, 700:21
**$50** [4] - 675:16, 678:15, 684:21, 685:17
**$70** [1] - 686:1
**$74** [9] - 675:23, 676:7, 676:13, 678:24, 683:8, 683:9, 683:12, 683:15, 683:18

## '

**'11** [2] - 662:18, 663:21
**'12** [3] - 662:18, 662:19, 663:22

## /

**/s** [1] - 705:8

## 0

**0.25** [2] - 700:6, 700:12
**0.4** [1] - 699:6

## 1

**1** [13] - 638:16, 651:2, 651:4, 652:20, 654:4, 660:2, 667:13, 692:9, 692:11, 692:20, 693:2, 700:4, 701:19
**10** [28] - 637:20, 639:9, 639:21, 640:3, 640:7, 640:11, 640:15, 640:19, 640:25, 645:5, 645:14, 648:5, 648:11, 648:17, 651:5, 651:11, 652:7, 666:17, 683:23, 684:1, 684:17, 684:24, 685:14, 688:9,

698:15, 698:16, 701:6, 702:21
**10-K** [2] - 641:12, 641:15
**10-Ks** [1] - 632:13
**100** [1] - 700:4
**10020** [1] - 628:4
**10:03** [1] - 627:10
**11** [2] - 686:7, 693:13
**11.6** [2] - 642:8, 642:11
**11.7** [1] - 685:15
**111** [2] - 697:22, 701:9
**116** [2] - 667:16, 667:18
**117** [1] - 667:17
**11:12** [1] - 662:1
**11:30** [1] - 662:1
**1251** [1] - 628:3
**12:27** [1] - 704:18
**13** [2] - 698:15, 698:17
**13-cv-1053** [2] - 627:4, 630:5
**13-mc-1288** [2] - 627:8, 630:5
**130** [1] - 645:23
**1401** [1] - 627:22
**149** [3] - 700:9, 701:13, 701:15
**14th** [2] - 669:15, 669:17, 670:18
**15** [1] - 680:15
**150,000** [1] - 657:3
**1523** [1] - 627:16
**15th** [1] - 671:12
**16** [1] - 643:24
**17.2** [2] - 642:1, 642:11
**17th** [1] - 645:8
**18** [1] - 660:2
**18.9** [3] - 645:6, 645:20, 701:7
**19087** [1] - 627:19
**1:30** [1] - 704:14

## 2

**2** [4] - 632:2, 652:11, 653:5, 693:4
**20** [5] - 627:10, 636:1, 675:20, 680:15, 705:8
**20001** [2] - 628:9, 628:14
**20005** [1] - 627:22
**20036** [1] - 627:16
**2008** [9] - 686:1, 690:8, 690:9, 690:10, 691:13, 691:14, 691:18,

695:7, 696:6
**2009** [2] - 675:2, 693:20
**2010** [4] - 662:18, 663:21, 675:3, 693:7
**2011** [4] - 675:3, 681:8, 698:3, 698:13
**2012** [43] - 637:5, 637:11, 640:2, 640:6, 640:9, 640:13, 640:23, 641:5, 641:10, 641:12, 641:15, 642:1, 642:7, 643:24, 644:12, 645:8, 646:5, 646:8, 648:3, 648:10, 648:17, 649:4, 651:9, 652:6, 660:11, 660:18, 661:15, 663:2, 663:10, 663:23, 664:1, 669:17, 670:18, 671:12, 676:19, 683:21, 684:17, 684:25, 687:14, 687:18, 687:20, 688:16
**2013** [21] - 644:19, 644:21, 645:5, 645:12, 662:16, 663:1, 663:12, 666:23, 675:10, 675:13, 675:17, 675:19, 675:24, 676:11, 678:21, 678:23, 683:21, 684:17, 684:20, 699:5, 701:2
**2014** [4] - 644:19, 644:20, 684:23, 685:3
**2015** [3] - 638:17, 638:18, 667:10
**202-354-3284** [1] - 628:15
**2020** [4] - 652:10, 654:13, 654:14, 659:21
**2022** [2] - 627:10, 705:8
**205** [3] - 646:18, 646:23, 649:1
**21** [4] - 641:10, 641:11, 643:17, 643:18
**219:12** [1] - 654:15
**22** [2] - 642:17, 643:23
**220** [2] - 660:1, 660:2
**220:18** [1] - 654:16

**23** [2] - 675:20, 683:20
**25** [11] - 649:4, 699:5, 699:23, 700:6, 700:8, 701:13, 701:14, 702:1, 702:8, 702:11, 702:14
**259** [1] - 669:6
**26th** [1] - 691:14
**27** [1] - 645:8
**280** [1] - 627:18

## 3

**3-A1** [1] - 691:6
**3.1** [1] - 691:25
**3.2** [1] - 693:5
**3.2(b** [1] - 693:15
**3.2(b)** [1] - 693:8
**30** [1] - 665:7
**31** [2] - 693:7, 693:20
**31st** [1] - 660:18
**333** [1] - 628:13

## 4

**4** [1] - 667:18
**4704-B** [1] - 628:14

## 5

**5** [1] - 665:2
**50** [4] - 678:25, 683:19, 685:13, 686:7
**58** [1] - 632:13

## 6

**6** [1] - 669:11
**60** [1] - 678:25
**601** [1] - 628:9
**615(c** [1] - 633:15
**636** [1] - 629:4
**647** [1] - 629:7
**669** [1] - 629:8
**691** [1] - 629:9
**697** [1] - 629:10
**6th** [1] - 691:17

## 7

**7.2** [1] - 643:25
**702/703** [1] - 631:5
**7th** [1] - 691:13

## 8

**803(8)(A)(i** [2] - 635:6, 635:8

## 9

**9** [1] - 698:3

## A

**a.m** [3] - 627:10, 662:1
**able** [5] - 659:23, 666:17, 667:22, 685:11, 687:1
**above-entitled** [1] - 705:5
**accept** [3] - 631:25, 685:15, 697:7
**acceptable** [2] - 630:15, 632:18
**accomplish** [1] - 664:12
**according** [2] - 634:15, 695:6
**Accountant** [2] - 669:19, 679:17
**accountant** [3] - 669:20, 679:10, 679:12
**accountants** [2] - 676:8, 676:15
**accounting** [2] - 677:7, 679:15
**accurate** [5] - 639:3, 653:9, 654:24, 660:5, 671:10
**acting** [5] - 637:4, 644:18, 677:15, 682:20, 682:22
**ACTION** [1] - 627:9
**actively** [1] - 638:10
**activities** [4] - 635:9, 635:11, 635:13, 701:16
**actual** [2] - 637:14, 691:24
**added** [10] - 675:16, 675:19, 675:24, 676:2, 676:6, 676:14, 678:24, 683:7, 683:12, 683:18
**adding** [1] - 675:5
**address** [2] - 630:12, 637:18
**adjust** [1] - 650:6
**administration** [2] - 638:9, 664:11
**admission** [4] - 642:24, 643:10, 647:3, 691:7
**admitted** [4] - 635:16, 646:16, 669:3, 697:20

**advice** [3] - 635:12,
679:15, 679:22
**advisor** [1] - 682:13
**advocating** [1] -
638:10
**afloat** [1] - 690:6
**Afternoon** [1] - 704:19
**AGENCY** [1] - 627:6
**Agency** [1] - 628:5
**agency** [2] - 635:13,
683:4
**agency's** [1] - 635:8
**agenda** [3] - 635:2,
635:3, 635:9
**agendas** [1] - 635:15
**ago** [4] - 652:23,
655:5, 678:3, 680:14
**agree** [25] - 635:7,
637:7, 637:10,
638:12, 642:14,
644:12, 644:13,
644:14, 644:16,
646:1, 658:4,
658:19, 660:20,
663:11, 670:23,
672:18, 672:23,
675:4, 675:7,
683:10, 683:11,
686:10, 694:18,
700:21, 703:7
**agreed** [31] - 633:12,
633:25, 635:20,
637:17, 637:22,
638:1, 640:20,
663:10, 667:3,
668:9, 668:14,
668:20, 673:8,
676:19, 677:20,
677:22, 679:24,
681:7, 681:13,
682:4, 687:3, 687:5,
688:25, 694:5,
694:8, 694:16,
695:14, 695:18,
703:3, 703:5
**agreeing** [1] - 661:20
**agreement** [14] -
631:3, 633:15,
633:19, 634:4,
642:7, 649:23,
670:6, 670:17,
683:5, 688:11,
690:16, 690:21,
691:12, 691:25
**AGREEMENT** [1] -
627:9
**agrees** [1] - 635:1
**ahead** [1] - 630:17
**aid** [1] - 643:12
**aided** [1] - 628:16

**al** [2] - 627:3, 627:6
**allocation** [1] - 680:3
**allow** [1] - 686:18
**allowed** [3] - 631:15,
631:17, 688:22
**alternative** [1] - 684:9
**amended** [2] - 691:13,
691:17
**amending** [1] - 650:11
**Amendment** [30] -
645:13, 650:2,
650:4, 651:21,
655:12, 657:18,
657:20, 657:24,
658:1, 658:15,
659:13, 659:16,
664:15, 668:10,
668:15, 668:21,
671:3, 671:11,
687:21, 688:6,
688:7, 688:25,
689:22, 702:19,
702:20, 702:23,
703:8, 703:10,
703:16
**amendment** [2] -
656:7, 670:24
**amendments** [4] -
649:21, 650:1,
670:16
**Americas** [1] - 628:3
**amount** [27] - 637:21,
639:10, 640:3,
640:6, 640:7,
640:10, 640:15,
640:19, 640:25,
642:16, 643:25,
644:5, 645:18,
648:5, 648:12,
648:18, 657:10,
657:11, 678:16,
678:17, 683:23,
684:24, 688:7,
694:2, 694:4, 700:9,
700:23
**amounts** [3] - 656:16,
657:12, 686:13
**analysis** [10] - 660:24,
661:5, 661:12,
661:17, 697:3,
698:6, 699:16,
702:1, 702:4, 702:5
**analyzing** [1] - 661:19
**announced** [1] -
671:12
**annual** [5] - 651:6,
651:11, 652:8,
685:14, 699:6
**answer** [15] - 652:2,
652:18, 652:22,

652:24, 653:6,
653:21, 653:23,
654:2, 665:17,
665:18, 666:13,
667:17, 676:13,
695:17, 701:12
**answered** [3] -
653:13, 666:4
**answering** [2] -
665:13, 665:14
**anticipate** [1] - 677:9
**apologies** [2] - 647:7,
681:12
**apologize** [7] - 631:8,
633:23, 634:19,
636:22, 647:12,
647:18, 693:13
**apologized** [1] -
631:25
**appear** [1] - 697:15
**APPEARANCES** [2] -
627:14, 628:1
**appearing** [1] - 637:3
**applies** [1] - 633:14
**apply** [4] - 631:18,
631:19, 633:13,
633:20
**appreciate** [1] -
634:23
**approach** [1] - 636:17
**appropriate** [2] -
657:22, 658:17
**argue** [1] - 654:8
**arithmetic** [2] - 632:6,
632:17
**Arnold** [1] - 628:8
**aside** [1] - 648:15
**ASIM** [1] - 628:6
**assertion** [1] - 685:25
**asset** [8] - 667:3,
667:6, 668:18,
675:16, 675:21,
675:25, 677:23,
679:5
**assets** [14] - 666:16,
666:24, 668:11,
672:7, 672:15,
672:20, 674:19,
675:5, 676:6,
679:25, 683:7,
683:15, 684:3,
692:15
**assistance** [1] - 683:5
**assisting** [1] - 682:12
**assume** [5] - 646:12,
684:12, 684:15,
695:6, 698:23
**assuming** [4] -
699:21, 699:22,
699:23, 701:17

**assumption** [4] -
684:18, 685:16,
702:1, 702:12
**assumptions** [1] -
634:1
**assure** [1] - 638:4
**attempt** [1] - 647:20
**attend** [2] - 674:13,
704:12
**attended** [2] - 672:14,
672:19
**attention** [4] - 668:9,
668:14, 668:23,
673:11
**attested** [1] - 668:19
**auditors** [1] - 671:19
**August** [12] - 637:5,
637:11, 644:3,
644:4, 645:8, 663:2,
663:10, 669:15,
669:17, 670:18,
671:12
**available** [2] - 692:5,
699:5
**Avenue** [5] - 627:16,
627:22, 628:3,
628:9, 628:13
**avoid** [2] - 632:23,
686:19
**Awaa** [2] - 680:8,
680:10
**aware** [13] - 638:8,
667:5, 668:18,
668:19, 677:11,
677:17, 677:20,
677:24, 678:1,
678:15, 682:12,
686:5, 697:10
**awareness** [1] -
668:20

# B

**backed** [1] - 665:6
**backing** [1] - 665:2
**badly** [1] - 660:19
**balance** [11] - 656:25,
667:6, 676:7,
676:14, 678:24,
683:8, 683:12,
683:18, 683:24,
685:4, 685:12
**ballpark** [1] - 701:23
**bank** [2] - 703:22,
704:4
**banks** [1] - 680:4
**BARNES** [1] - 627:15
**Barnes** [1] - 631:16
**based** [10] - 663:14,
673:18, 674:21,

676:14, 677:1,
677:23, 690:18,
690:19, 696:14,
699:4
**basics** [1] - 679:14
**basis** [19] - 668:20,
676:23, 676:24,
678:4, 678:6,
689:22, 693:7,
693:24, 700:1,
700:4, 700:6, 700:8,
701:13, 701:14,
702:2, 702:8,
702:11, 702:14
**basis-point** [1] -
701:13
**battle** [1] - 657:25
**became** [2] - 682:20,
682:22
**become** [2] - 657:23,
682:18
**becoming** [1] - 692:7
**BEFORE** [2] - 627:1,
627:12
**began** [1] - 646:25
**begin** [2] - 638:7,
688:6
**beginning** [2] -
687:21, 699:5
**begins** [1] - 667:18
**behavioral** [1] - 661:9
**behind** [2] - 647:17,
665:11
**belief** [2] - 662:25,
663:14
**Bench** [1] - 647:14
**bench** [1] - 647:25
**Berger** [1] - 628:2
**BERGMAN** [1] - 628:7
**Berkley** [1] - 627:15
**Bernstein** [1] - 628:2
**better** [1] - 672:24
**between** [6] - 635:12,
635:14, 655:7,
655:8, 675:23, 686:1
**big** [10] - 655:3, 655:6,
655:8, 673:5, 675:6,
678:20, 685:18,
686:4, 686:7, 693:13
**billion** [47] - 642:1,
642:8, 642:11,
643:24, 643:25,
644:23, 645:6,
645:20, 645:23,
675:16, 675:20,
675:23, 676:7,
676:13, 678:15,
678:24, 678:25,
679:1, 683:8, 683:9,
683:12, 683:15,

683:18, 683:19,
683:20, 684:21,
685:13, 685:15,
685:17, 686:1,
686:7, 688:8,
688:18, 692:11,
692:20, 693:2,
693:4, 699:5, 699:6,
700:20, 701:2,
701:7, 701:9,
701:13, 701:15,
701:18
**billions** [3] - 644:23,
666:25, 675:6
**bills** [1] - 664:12
**binder** [9] - 636:18,
638:16, 652:11,
653:6, 667:8,
667:13, 693:10,
693:13, 698:24
**binders** [1] - 636:20
**black** [1] - 698:16
**blow** [2] - 672:1, 692:2
**board** [3] - 674:13,
674:18, 676:25
**boards** [4] - 673:18,
674:17, 674:22,
674:24
**Boies** [1] - 627:21
**bond** [2] - 684:2,
685:9
**bondholders** [1] -
695:8
**book** [1] - 661:10
**borrow** [6] - 637:19,
639:8, 639:9, 684:1,
685:4, 685:9
**borrowed** [2] - 692:21,
692:23
**borrowing** [1] -
639:14
**borrowings** [1] -
637:21
**boss** [2] - 669:24,
672:2
**bottom** [3] - 667:16,
669:13
**bound** [1] - 704:19
**BPS** [3] - 699:5,
699:23, 700:1
**break** [10] - 632:25,
633:1, 634:14,
634:16, 648:2,
648:9, 661:23,
661:24, 704:11,
704:14
**breaking** [1] - 704:9
**BRIAN** [1] - 627:11
**brief** [3] - 631:20,
633:6, 633:12

**bring** [2] - 648:7,
658:16
**broader** [2] - 661:10
**brought** [4] - 668:9,
668:14, 668:23,
673:10
**build** [1] - 666:17
**bullet** [2] - 649:17,
699:3
**business** [4] - 661:10,
690:12, 692:15,
701:16
**buy** [1] - 657:2
**BY** [19] - 636:24,
639:1, 641:24,
643:22, 645:10,
648:1, 652:17,
653:4, 654:21,
660:4, 662:6,
666:12, 667:12,
668:13, 669:10,
684:7, 691:11,
697:24, 703:18

# C

**calculate** [3] - 689:15,
689:25, 696:18
**calculating** [1] -
697:11
**callout** [3] - 641:9,
641:11, 641:21
**capital** [10] - 639:11,
639:20, 639:22,
665:1, 665:10,
666:18, 683:25,
686:2, 692:4, 701:15
**caps** [3] - 651:6,
651:12, 652:8
**cared** [1] - 656:9
**carefully** [1] - 651:2
**carry** [2] - 658:25,
659:2
**Case** [2] - 627:4, 627:8
**case** [11] - 631:11,
632:1, 632:8, 637:1,
641:16, 647:21,
673:25, 677:18,
693:10, 704:15,
704:16
**cases** [1] - 630:5
**cash** [2] - 676:3,
685:10
**caused** [1] - 664:14
**cautious** [1] - 685:25
**CAYNE** [1] - 628:6
**central** [1] - 637:24
**certain** [5] - 650:21,
656:16, 657:12,
672:7, 672:14,

672:20, 674:19,
680:20, 691:4
**certainly** [1] - 679:23
**certainty** [1] - 687:2
**CERTIFICATE** [1] -
705:1
**certify** [1] - 705:3
**cetera** [1] - 666:5
**chairman** [2] - 695:1,
703:5
**chance** [3] - 665:20,
677:19, 677:22
**change** [1] - 704:10
**changed** [1] - 663:23
**changes** [1] - 671:6
**changing** [3] - 663:25,
664:1, 702:22
**characterization** [3] -
641:2, 653:2, 686:12
**characterize** [1] -
654:8
**Check** [1] - 627:18
**Chief** [2] - 669:19,
679:17
**chief** [4] - 669:20,
677:11, 681:19,
681:24
**chronologically** [1] -
669:13
**circular** [21] - 639:5,
639:6, 639:12,
639:19, 639:23,
640:7, 644:13,
644:15, 646:1,
664:23, 664:25,
666:3, 666:4, 666:7,
666:9, 683:13,
684:5, 685:19,
686:20, 687:4, 687:6
**civility** [1] - 630:23
**clarification** [1] -
678:12
**clarify** [1] - 702:3
**clarity** [1] - 691:12
**Class** [1] - 627:17
**CLASS** [1] - 627:9
**clear** [14] - 631:10,
632:15, 632:20,
638:15, 643:7,
652:2, 653:16,
666:14, 670:20,
673:13, 676:13,
684:8, 684:18, 700:1
**clearly** [2] - 632:12,
671:20
**clip** [5] - 638:18,
638:19, 652:13,
654:13, 654:16
**colleague** [1] - 631:16
**colleagues** [3] -

630:14, 664:6,
698:25
**COLUMBIA** [1] - 627:1
**Columbia** [1] - 628:13
**combined** [2] -
644:23, 645:15
**coming** [7] - 642:25,
651:5, 651:10,
652:7, 667:21,
669:2, 690:21
**commencing** [1] -
693:6
**comment** [2] - 631:23,
634:7
**commercial** [1] -
680:4
**commitment** [99] -
637:22, 638:5,
639:11, 639:16,
639:20, 639:22,
645:14, 645:17,
648:15, 662:11,
662:15, 662:19,
663:1, 663:2, 663:6,
663:8, 663:12,
663:19, 664:19,
665:1, 665:5, 665:9,
665:10, 665:14,
666:6, 683:25,
684:13, 684:14,
684:16, 687:10,
687:17, 687:25,
688:12, 688:13,
688:15, 688:19,
688:20, 688:22,
689:1, 689:5, 689:7,
689:16, 689:19,
689:21, 690:1,
690:5, 690:13,
690:17, 690:22,
691:3, 691:25,
692:1, 692:3, 692:4,
692:8, 693:1, 693:5,
693:15, 693:20,
694:4, 695:11,
695:23, 696:13,
696:16, 696:19,
697:4, 697:12,
699:4, 699:11,
699:13, 699:17,
699:18, 699:19,
699:22, 700:8,
700:10, 700:20,
700:22, 701:10,
701:14, 701:15,
702:7, 702:16,
702:18, 702:21,
702:22, 702:25,
703:4, 703:9,
703:11, 703:12,

703:20, 703:21,
703:23, 703:24,
704:3
**communication** [1] -
671:7
**companies** [10] -
638:5, 661:8, 663:6,
665:2, 665:11,
688:14, 688:16,
688:18, 688:22,
690:14
**company** [3] - 641:6,
692:14, 701:21
**compensate** [5] -
688:13, 693:17,
693:19, 695:16,
702:14
**compensation** [1] -
701:17
**competing** [2] -
650:24, 655:25
**complete** [1] - 636:21
**completely** [1] -
685:21
**computer** [1] - 628:16
**computer-aided** [1] -
628:16
**concern** [7] - 637:18,
637:24, 639:7,
664:23, 666:3,
672:4, 683:13
**concerned** [2] -
664:14, 664:22
**conclusion** [1] -
676:12
**conditions** [2] -
677:10, 688:1
**conference** [2] -
647:14, 647:25
**confirm** [1] - 639:2
**Congress** [5] - 638:9,
660:11, 660:14,
660:18, 664:11
**connection** [2] -
647:16, 687:9
**cons** [1] - 661:20
**conservator** [3] -
656:14, 657:8,
694:15
**conservatorship** [3] -
667:7, 674:3, 674:10
**consider** [1] - 703:20
**considerable** [1] -
688:8
**consideration** [2] -
692:3, 692:8
**considered** [1] - 661:9
**considering** [1] -
638:11
**consistent** [2] -

634:16, 671:7
**consolidated** [1] - 630:5
**Constitution** [1] - 628:13
**consult** [2] - 681:18, 681:20
**consultation** [3] - 695:1, 695:15, 695:18
**context** [9] - 638:11, 649:19, 657:18, 670:19, 673:23, 676:22, 689:4, 693:10, 702:18
**continue** [1] - 688:23
**continued** [1] - 627:24
**CONTINUED** [1] - 628:1
**contract** [1] - 702:24
**contractual** [1] - 690:16
**controlled** [2] - 694:13, 694:14
**conversation** [2] - 633:12, 633:25
**Cooper** [1] - 627:15
**copies** [1] - 636:21
**corporate** [1] - 696:25
**correct** [142] - 637:5, 637:6, 637:8, 637:10, 637:13, 637:17, 637:25, 638:2, 638:7, 638:12, 639:3, 640:1, 640:5, 640:9, 640:13, 640:17, 640:21, 640:23, 642:12, 644:6, 644:10, 644:19, 645:23, 646:2, 646:4, 648:5, 648:12, 648:24, 649:2, 649:5, 649:23, 650:2, 651:24, 651:25, 653:17, 653:19, 655:10, 655:14, 656:10, 656:18, 657:5, 657:12, 657:13, 657:17, 657:18, 657:20, 662:8, 662:16, 662:18, 662:22, 663:3, 663:24, 664:4, 664:24, 665:24, 666:4, 666:25, 667:4, 669:4, 670:6, 670:9, 670:10, 671:15,

671:20, 671:23, 671:24, 672:15, 673:8, 673:9, 673:11, 674:20, 675:10, 675:13, 675:17, 675:21, 675:25, 676:4, 676:10, 676:16, 676:20, 677:2, 677:8, 679:10, 679:13, 680:6, 681:2, 681:8, 681:9, 681:13, 681:21, 682:23, 682:24, 683:1, 683:3, 684:4, 685:1, 685:2, 685:6, 685:7, 685:10, 685:19, 686:11, 686:20, 686:23, 686:24, 686:25, 687:4, 687:7, 687:12, 687:15, 687:25, 689:1, 689:5, 690:1, 690:2, 690:17, 691:2, 691:22, 692:11, 692:12, 692:19, 693:2, 694:19, 696:6, 696:9, 696:15, 699:14, 699:17, 699:20, 700:2, 700:4, 700:5, 700:10, 700:13, 700:17, 701:3, 701:7, 703:7, 703:8, 703:12, 705:4
**cost** [3] - 661:7, 661:8, 683:25
**counsel** [10] - 630:7, 630:22, 634:14, 642:18, 648:3, 648:9, 654:14, 662:3, 665:21, 684:15
**Counsel** [2] - 634:16, 648:6
**counterfactual** [1] - 685:21
**couple** [1] - 630:25
**course** [3] - 650:1, 659:12, 701:1
**COURT** [30] - 627:1, 630:17, 633:4, 634:23, 636:2, 636:5, 636:19, 638:23, 641:13, 641:17, 643:16, 645:9, 647:5, 647:13, 652:15, 653:3, 661:24,

662:3, 668:2, 668:5, 669:6, 685:23, 691:9, 697:22, 703:15, 703:17, 704:9, 704:12, 705:1, 705:9
**Court** [7] - 628:12, 628:12, 630:15, 633:9, 634:10, 634:15, 646:25
**court** [5] - 630:2, 630:15, 631:1, 633:22, 634:3
**Court's** [2] - 634:19, 647:9
**courteousness** [1] - 630:23
**COURTROOM** [8] - 630:4, 638:20, 642:18, 643:2, 643:6, 643:18, 643:20, 646:23
**courtroom** [4] - 636:4, 661:25, 662:2, 704:17
**covenant** [7] - 650:10, 650:14, 651:16, 651:20, 651:24, 655:21, 657:23
**cover** [1] - 704:20
**creating** [1] - 688:8
**credible** [1] - 678:5
**creditors** [1] - 692:15
**criminal** [2] - 704:12, 704:16
**critical** [1] - 695:10
**CRR** [1] - 628:12
**current** [1] - 657:1
**cushion** [1] - 685:18

## D

**D.C** [5] - 627:9, 627:16, 627:22, 628:9, 628:14
**data** [1] - 661:17
**DATE** [1] - 705:9
**date** [2] - 669:15, 698:6
**dated** [1] - 698:3
**DAVID** [1] - 628:7
**Davis** [1] - 636:9
**DAVIS** [2] - 627:21, 636:9
**day's** [1] - 649:9
**days** [1] - 671:12
**deal** [9] - 634:8, 658:18, 661:5, 661:12, 673:5, 675:6, 684:16,

686:7, 686:11
**debate** [1] - 664:21
**December** [1] - 693:20
**deciding** [1] - 694:24
**decision** [6] - 637:7, 637:10, 637:12, 638:11, 644:3, 661:9
**decisionmaker** [1] - 637:14
**decisions** [1] - 680:4
**Defendant** [1] - 628:5
**Defendants** [1] - 627:7
**defendants** [2] - 630:14, 635:7
**defendants'** [1] - 635:18
**deferred** [16] - 666:24, 667:3, 667:6, 668:11, 668:18, 672:7, 672:14, 672:20, 674:19, 675:15, 675:21, 675:24, 677:23, 679:5, 679:25, 683:7
**deliberations** [1] - 635:12
**DEMARCO** [2] - 629:4, 636:16
**DeMarco** [21] - 632:16, 636:2, 636:15, 636:25, 637:4, 637:17, 641:25, 645:11, 646:18, 648:2, 649:9, 650:5, 650:10, 650:23, 652:18, 654:8, 662:7, 665:12, 668:8, 669:15, 697:25
**DeMarco's** [1] - 643:12
**demonstrate** [8] - 638:2, 638:3, 638:7, 638:13, 638:14, 664:4, 664:8, 665:23
**demonstrative** [7] - 641:9, 641:10, 641:11, 641:15, 641:25, 642:17, 643:1
**demonstratives** [5] - 632:17, 634:9, 634:11, 634:18, 642:23
**department** [1] - 698:9
**Department** [16] - 637:15, 638:9, 639:17, 646:19,

651:18, 656:13, 658:3, 660:20, 661:14, 662:20, 663:4, 682:9, 682:16, 683:6, 693:17, 701:20
**deposition** [34] - 635:1, 635:19, 635:25, 636:6, 636:11, 636:13, 638:17, 638:19, 638:21, 638:22, 652:10, 652:13, 652:14, 653:7, 653:10, 653:19, 653:22, 654:11, 654:14, 654:15, 654:18, 654:22, 659:21, 667:2, 667:9, 667:13, 667:20, 667:23, 668:25, 669:11, 678:19, 679:6, 679:8, 696:24
**DEPUTY** [8] - 630:4, 638:20, 642:18, 643:2, 643:6, 643:18, 643:20, 646:23
**described** [2] - 639:7, 663:4
**designated** [3] - 696:24, 697:2, 697:6
**desire** [2] - 658:14, 659:17
**details** [2] - 641:3, 697:6
**determination** [1] - 674:22
**determined** [1] - 695:22
**Dharan** [1] - 631:21
**difference** [2] - 639:19, 701:9
**different** [5] - 653:22, 656:8, 677:4, 703:19, 704:3
**dig** [1] - 685:19
**dip** [1] - 685:8
**DIRECT** [1] - 636:23
**Direct** [1] - 629:4
**director** [7] - 637:4, 644:18, 674:2, 674:10, 677:15, 682:20, 682:22
**directors** [1] - 676:25
**discretion** [6] - 694:20, 694:24, 695:15, 695:18, 696:19, 703:5

**discuss** [1] - 633:2
**discussed** [9] -
640:18, 664:11,
664:18, 671:22,
673:18, 674:17,
674:18, 674:24,
677:1
**discussing** [4] -
673:2, 676:18,
677:4, 688:6
**discussion** [13] -
631:3, 633:17,
649:13, 651:21,
655:16, 658:10,
658:13, 670:19,
671:18, 672:13,
672:19, 676:21,
688:5
**discussions** [6] -
651:17, 658:11,
659:3, 659:11,
661:14, 687:21
**displayed** [1] - 669:7
**dispute** [4] - 632:23,
642:22, 646:24
**dissolved** [1] - 692:14
**distinction** [3] - 655:3,
655:6, 655:8
**distinguish** [1] -
635:12
**distracted** [1] - 648:6
**DISTRICT** [3] - 627:1,
627:1, 627:13
**District** [2] - 628:12,
628:13
**dividend** [35] - 637:20,
639:10, 639:16,
639:21, 640:3,
640:7, 640:11,
640:15, 640:19,
641:1, 643:25,
644:5, 645:5,
645:14, 645:18,
648:5, 648:11,
648:18, 650:6,
651:6, 651:11,
652:8, 663:7,
666:17, 683:23,
684:17, 684:24,
685:6, 685:12,
685:14, 688:8,
701:6, 701:7, 702:22
**dividends** [1] - 642:8
**Division** [1] - 680:10
**document** [8] - 635:5,
649:16, 654:19,
672:11, 672:19,
693:10, 698:18,
698:24
**documents** [1] -
697:16
**dollars** [3] - 644:23,
666:25, 675:6
**done** [18] - 631:11,
638:6, 659:16,
661:12, 664:4,
664:7, 665:22,
681:3, 681:8,
689:19, 697:3,
697:15, 703:2,
703:3, 704:1, 704:6,
704:7
**down** [21] - 638:2,
638:6, 638:7, 638:8,
638:13, 638:14,
639:15, 649:16,
664:4, 664:8,
664:10, 664:17,
664:21, 664:22,
665:23, 666:7,
683:25, 685:5,
692:21, 692:24,
696:22
**downs** [2] - 666:24,
668:11
**downturn** [1] - 665:8
**drafted** [1] - 664:12
**draw** [29] - 635:13,
639:5, 639:6,
639:12, 639:20,
639:23, 640:4,
640:8, 641:6, 642:5,
644:13, 644:15,
644:16, 646:1,
664:24, 664:25,
666:3, 666:4, 666:7,
683:13, 683:24,
684:25, 685:5,
685:19, 686:7,
686:20, 687:4,
687:6, 688:18
**drawing** [4] - 639:15,
639:20, 663:6, 686:2
**drawn** [4] - 688:7,
692:21, 692:24,
700:10
**draws** [1] - 665:9
**drops** [1] - 657:3
**during** [2] - 634:8,
642:7

**E**

**e-mail** [10] - 669:14,
669:22, 671:17,
672:1, 672:23,
673:1, 673:10,
673:17, 673:23
**e-mails** [1] - 669:13
**early** [5] - 644:19,
644:20, 667:7,
687:14, 687:20
**earned** [1] - 641:5
**earnings** [6] - 683:21,
683:22, 698:17,
698:21, 698:22,
702:6
**echo** [1] - 633:8
**economist** [2] -
681:19, 681:24
**economists** [1] -
680:17
**Ed** [2] - 649:9, 670:11
**ED-20.8** [1] - 652:14
**ED-2010** [2] - 654:16,
659:22
**Edward** [1] - 636:15
**EDWARD** [2] - 629:4,
636:16
**effect** [2] - 686:15,
696:1
**effectuate** [1] - 664:17
**eight** [1] - 660:11
**eight-page** [1] -
660:11
**either** [2] - 659:6,
679:24
**eliminated** [1] -
683:13
**employee** [2] - 646:19,
649:2
**enabling** [3] - 651:5,
651:11, 652:7
**end** [4] - 640:23,
644:19, 677:2,
684:20
**End** [1] - 647:25
**endeavor** [1] - 632:24
**ended** [1] - 650:1
**engage** [2] - 655:12,
656:14
**ensure** [2] - 664:17,
671:6
**entered** [3] - 636:4,
662:2, 686:1
**enterprise** [2] - 692:5,
693:2
**enterprises** [6] -
637:19, 638:2,
639:8, 644:5, 671:5,
690:4
**entire** [3] - 690:3,
690:22, 700:17
**entitled** [3] - 631:6,
631:23, 705:5
**equal** [1] - 646:2
**equity** [6] - 688:17,
701:20, 701:22,
701:23, 702:14,
704:5
**erode** [1] - 665:9
**eroding** [1] - 639:10
**especially** [1] - 654:7
**ESQ** [12] - 627:15,
627:17, 627:20,
627:20, 627:21,
628:2, 628:5, 628:6,
628:6, 628:7, 628:7,
628:8
**essence** [2] - 649:12,
659:9
**essentially** [1] -
650:17
**estimation** [1] -
634:14
**et** [3] - 627:3, 627:6,
666:5
**event** [1] - 665:4
**events** [1] - 645:7
**evidence** [24] - 631:6,
632:15, 632:17,
633:9, 634:11,
634:13, 641:21,
642:24, 643:1,
643:4, 643:5, 643:9,
643:11, 646:17,
647:1, 647:2, 647:6,
667:22, 669:2,
669:8, 672:24,
691:10, 697:17,
697:23
**exactly** [10] - 652:25,
653:8, 653:14,
655:4, 658:9, 667:5,
678:2, 686:25,
687:8, 687:13
**examination** [1] -
634:8
**EXAMINATION** [1] -
636:23
**Examination.............**
[1] - 629:4
**examine** [1] - 680:24
**except** [3] - 639:14,
644:15, 646:4
**exception** [3] -
633:16, 635:20,
644:7
**exceptional** [1] -
696:5
**excerpts** [1] - 636:22
**executed** [1] - 645:13
**exercise** [3] - 681:3,
689:15, 694:24
**exercises** [1] - 680:21
**exhibit** [11] - 632:21,
638:20, 638:21,
641:13, 641:16,
641:21, 643:12,
652:20, 691:5,
698:15, 698:16
**Exhibit** [7] - 646:18,
647:6, 649:1, 669:8,
669:11, 691:10,
697:23
**EXHIBITS** [1] - 629:6
**exhibits** [2] - 632:2,
642:19
**exited** [2] - 661:25,
704:17
**expect** [1] - 674:24
**expectations** [1] -
677:24
**expected** [1] - 670:24
**expensive** [1] - 683:25
**experience** [1] -
633:13
**expert** [6] - 631:4,
631:6, 631:12,
634:3, 703:20,
703:21
**experts** [3] - 631:7,
631:20, 680:16
**explain** [1] - 686:14
**explained** [1] - 633:21
**expressed** [1] -
633:24
**extensive** [1] - 660:10
**extremely** [1] - 644:22

**F**

**fact** [8] - 634:11,
663:5, 663:14,
677:17, 677:20,
685:21, 688:22,
697:15
**fair** [4] - 639:18,
639:24, 658:21
**FAIRHOLME** [1] -
627:3
**falls** [2] - 635:5, 635:7
**familiar** [1] - 631:22
**Fannie** [44] - 630:6,
640:2, 640:4, 640:9,
640:13, 640:24,
641:12, 644:21,
648:4, 648:10,
648:16, 650:18,
655:12, 656:14,
657:8, 661:10,
671:10, 674:13,
674:18, 675:12,
675:15, 676:7,
676:9, 676:25,
677:12, 678:24,
680:19, 680:22,
680:24, 681:2,
681:16, 683:8,
683:20, 684:21,

685:14, 685:25, 690:25, 691:21, 692:5, 694:11, 695:8, 700:16, 701:16
**FANNIE** [1] - 627:8
**Fannie's** [2] - 641:25, 682:3
**Fed** [3] - 695:15, 695:19, 703:5
**Federal** [2] - 628:5, 695:2
**FEDERAL** [1] - 627:6
**fee** [71] - 645:14, 645:17, 648:15, 662:11, 662:15, 662:19, 663:1, 663:3, 663:8, 663:12, 663:19, 663:24, 665:14, 666:6, 684:13, 684:14, 684:16, 687:10, 687:17, 687:25, 688:12, 688:13, 689:1, 689:5, 689:8, 689:16, 689:19, 689:21, 690:1, 690:5, 690:17, 690:22, 691:3, 691:25, 692:1, 692:3, 692:9, 693:2, 693:5, 693:15, 694:4, 695:11, 696:14, 697:4, 697:12, 699:4, 699:6, 699:11, 699:14, 699:17, 699:18, 699:19, 699:22, 699:23, 700:8, 701:10, 701:13, 701:14, 702:7, 702:16, 702:18, 702:22, 703:4, 703:9, 703:11, 703:12, 703:21, 703:23, 703:24, 704:3
**fees** [1] - 703:20
**felt** [1] - 659:1
**few** [1] - 632:22
**FHFA** [28] - 637:4, 660:23, 661:16, 664:6, 669:20, 669:25, 671:6, 674:4, 674:10, 677:18, 677:21, 679:16, 681:15, 682:11, 682:22, 682:23, 683:1,

683:3, 689:15, 689:24, 694:13, 694:23, 696:17, 696:25, 697:3, 697:11, 697:25, 698:9
**FHFA's** [1] - 635:2
**fifth** [2] - 649:17
**fighting** [1] - 632:7
**filing** [1] - 641:11
**filings** [3] - 636:21, 641:9, 678:7
**final** [3] - 637:10, 637:12, 637:13
**finance** [4] - 665:11, 676:9, 676:15, 680:16
**Finance** [1] - 628:5
**FINANCE** [1] - 627:6
**financial** [10] - 644:14, 661:6, 661:7, 674:23, 677:11, 680:5, 680:12, 698:6, 701:24
**financials** [1] - 641:3
**fine** [3] - 634:4, 643:14, 666:11
**first** [31] - 631:24, 632:25, 633:8, 640:2, 640:5, 644:4, 649:7, 653:14, 659:8, 662:19, 667:9, 669:14, 670:11, 675:12, 675:16, 676:13, 678:20, 679:5, 683:4, 684:23, 687:1, 687:8, 687:9, 687:13, 687:14, 689:3, 689:4, 689:7, 689:21, 690:10, 702:3
**five** [2] - 693:24
**five-year** [1] - 693:24
**fixed** [1] - 702:21
**Flexner** [1] - 627:21
**focus** [1] - 655:10
**focused** [1] - 651:23
**folks** [1] - 682:11
**following** [1] - 693:20
**FOR** [2] - 627:1, 636:16
**forecast** [1] - 697:25
**foregoing** [1] - 705:3
**forever** [1] - 690:22
**forgive** [2] - 656:16, 657:11
**forgiveness** [2] - 660:21, 661:6
**forgiving** [1] - 660:8

**forgot** [1] - 673:3
**form** [3] - 684:5, 704:4, 704:5
**forward** [5] - 673:20, 676:10, 677:2, 677:6, 700:22
**Foster** [1] - 674:7
**foundation** [2] - 634:13, 668:6
**four** [2] - 685:18, 699:3
**fragility** [4] - 662:23, 663:5, 663:15, 663:19
**frame** [1] - 646:8
**Freddie** [45] - 630:6, 640:5, 640:14, 640:24, 643:24, 644:7, 644:16, 644:22, 648:4, 648:11, 648:16, 650:18, 655:12, 656:14, 657:8, 657:9, 661:11, 671:10, 674:14, 674:18, 675:19, 676:8, 676:9, 677:1, 678:25, 680:20, 680:22, 680:24, 681:2, 681:16, 683:8, 683:20, 686:1, 691:1, 691:22, 692:5, 694:11, 695:9, 698:17, 698:22, 698:23, 700:16, 701:17, 702:5
**Freddie's** [1] - 682:3
**free** [1] - 699:1
**Friday** [1] - 670:25
**friends** [1] - 682:18
**front** [1] - 632:24
**full** [3] - 633:20, 641:3, 693:14
**fully** [3] - 693:16, 693:19, 695:16
**fund** [1] - 686:19
**funding** [1] - 685:12
**FUNDS** [1] - 627:3
**funds** [1] - 642:6
**future** [13] - 648:17, 651:6, 651:12, 652:8, 664:20, 674:22, 676:16, 677:23, 677:24, 681:16, 682:3, 695:11, 702:7

**G**

**Geithner** [12] - 646:7, 648:21, 651:9, 652:23, 652:24, 654:3, 654:4, 656:13, 657:7, 657:17, 659:10, 660:17
**general** [1] - 630:21
**generating** [5] - 651:4, 651:10, 652:6, 654:6, 654:7
**gentlemen** [1] - 636:5
**Goals** [1] - 680:11
**government** [1] - 650:19
**great** [4] - 630:24, 632:14, 661:5, 661:12
**greater** [5] - 640:3, 640:10, 640:14, 640:25, 657:1
**Griffin** [11] - 669:14, 669:18, 670:16, 670:20, 670:21, 671:25, 672:2, 672:13, 679:20, 679:22
**Griffin's** [1] - 673:17
**Grossmann** [1] - 628:3
**group's** [1] - 702:1
**GSEs** [9] - 640:19, 640:23, 651:4, 651:9, 652:6, 654:6, 654:7, 683:18, 695:6
**guess** [2] - 674:2, 680:14
**guessing** [1] - 674:6

**H**

**half** [2] - 683:2, 683:3
**hallway** [1] - 633:12
**Hamish** [6] - 630:9, 630:19, 635:24, 636:14, 636:25, 662:5
**HAMISH** [1] - 627:20
**Hampshire** [1] - 627:16
**hand** [1] - 635:13
**handle** [1] - 704:16
**hard** [2] - 647:22, 683:17
**Hartman's** [1] - 634:7
**head** [1] - 698:12
**headed** [2] - 680:10, 698:9

**heads** [1] - 679:18
**healthy** [1] - 666:17
**heard** [4] - 682:25, 686:13, 689:3, 689:7
**hearing** [1] - 647:23
**help** [2] - 690:14, 690:25
**Herman** [2] - 704:19
**hi** - 671:18
**higher** [8] - 642:11, 643:25, 644:5, 644:9, 648:11, 648:17, 659:18, 702:13
**highlight** [4] - 649:18, 651:3, 672:4, 694:2
**highlighted** [3] - 652:3, 652:21, 654:3
**hire** [1] - 682:20
**hired** [1] - 682:22
**history** [1] - 642:2
**HOFFMAN** [1] - 628:7
**holders** [2] - 650:17, 695:8
**home** [1] - 657:11
**homeowner** [3] - 650:19, 656:16, 660:20
**homeowners** [5] - 650:21, 656:20, 656:21, 657:9, 660:8
**Honor** [36] - 630:4, 630:9, 630:13, 630:16, 630:19, 630:21, 633:5, 633:6, 633:11, 634:5, 634:9, 634:20, 634:22, 636:3, 636:9, 636:17, 638:24, 641:16, 641:22, 642:21, 647:8, 647:11, 647:15, 647:18, 647:19, 647:22, 652:12, 659:24, 661:22, 666:2, 667:24, 669:5, 684:6, 685:20, 697:19, 697:21
**HONORABLE** [1] - 627:12
**hope** [2] - 632:18, 633:9
**hour** [1] - 633:1
**house** [4] - 657:1, 657:2, 657:3, 657:4
**housing** [1] - 665:11
**Housing** [2] - 628:5, 680:11

HOUSING [1] - 627:6
HOWARD [1] - 628:6
huge [2] - 632:23,
666:16
HUME [53] - 627:20,
630:9, 630:19,
631:10, 633:5,
635:24, 636:14,
636:17, 636:20,
636:24, 638:21,
639:1, 641:15,
641:19, 641:24,
643:3, 643:8,
643:14, 643:17,
643:19, 643:21,
643:22, 645:10,
646:24, 647:7,
647:19, 648:1,
652:12, 652:17,
653:4, 654:21,
660:1, 660:4,
661:22, 662:4,
662:6, 666:6,
666:10, 666:12,
667:11, 667:12,
668:4, 668:8,
668:13, 669:9,
669:10, 684:7,
691:6, 691:11,
697:20, 697:24,
703:18, 704:10
Hume [19] - 630:9,
630:17, 630:19,
631:9, 633:8,
633:11, 633:21,
633:24, 634:2,
634:10, 634:20,
635:24, 636:14,
636:25, 637:2,
647:16, 653:24,
662:5, 667:10
hypothetical [2] -
683:10, 685:21
hypothetically [1] -
683:22

I

IAN [1] - 628:7
idea [2] - 686:23,
689:4
identical [2] - 640:6,
691:22
identify [1] - 630:7
impact [3] - 661:6,
661:7, 699:6
impacts [1] - 661:9
impaneled [1] -
630:11
impeach [1] - 668:6

implement [1] -
696:17
importance [1] - 680:5
important [5] - 632:9,
647:20, 658:19,
658:22, 659:19
impose [1] - 663:2
imposed [2] - 662:16,
662:25, 663:24
imposing [1] - 663:7
IN [1] - 627:8
INC [1] - 627:3
included [1] - 645:14
including [2] - 655:11,
676:19
inclusion [1] - 636:21
income [9] - 640:18,
640:24, 641:12,
642:1, 643:24,
644:4, 644:22,
663:8, 676:1
inconsistency [1] -
653:24
inconsistent [1] -
678:6
increase [4] - 666:16,
666:23, 668:11,
686:18
increasing [2] -
666:24, 686:15
incumbent [1] -
634:21
indicated [1] - 673:17
inference [1] - 673:24
influence [1] - 680:3
informed [1] - 671:5
initial [5] - 691:25,
692:3, 692:8,
692:10, 693:1
injury [1] - 631:11
insolvent [1] - 692:7
inspired [1] - 630:23
instead [1] - 645:22
institution [1] - 704:2
institutions [1] -
650:18
intelligible [1] -
632:20
intend [1] - 632:22
intended [1] - 693:16
interest [3] - 659:1,
660:8, 684:2
interested [1] - 651:19
interrupt [2] - 647:16,
647:20
interrupting [1] -
631:8
introduce [1] - 630:14
intuitive [2] - 687:24,
689:8

investment [1] -
701:22
involved [2] - 661:13,
682:6
issue [11] - 634:7,
635:4, 639:5, 661:1,
661:3, 667:3, 673:2,
674:18, 675:25,
678:20, 686:12
issues [1] - 658:18
itself [2] - 635:5, 653:1

J

James [1] - 669:18
jeez [1] - 679:2
Jeff [6] - 673:17,
674:1, 674:2, 674:7,
674:8, 674:16
Jenkins [4] - 647:2,
647:7, 667:20, 669:1
job [1] - 632:14
join [1] - 658:12
Jonathan [1] - 630:13
JONATHAN [1] -
628:5
JONES [1] - 628:8
JUDGE [1] - 627:13
Judge [1] - 662:4
judgment [4] - 676:9,
676:15, 676:18,
696:20
judgments [1] -
676:11
July [3] - 660:11,
660:18, 661:15
June [3] - 649:4,
651:9, 652:6
Jury [3] - 630:3, 636:4,
661:25, 662:2,
704:17
JURY [1] - 627:12
jury [15] - 630:11,
632:12, 632:19,
632:24, 635:22,
641:18, 643:7,
643:11, 643:15,
643:19, 667:22,
680:2, 680:8,
686:15, 700:1

K

KAPLAN [1] - 627:20
Kaye [1] - 628:8
keep [3] - 690:11,
690:12, 692:7
keeping [1] - 690:6
Kenya [1] - 636:9
KENYA [1] - 627:21

Kessler [1] - 627:18
kind [5] - 635:15,
656:15, 685:25,
699:16, 704:3
kinds [1] - 686:4
King [1] - 627:18
Kirk [1] - 627:15
knowledge [1] - 635:4
known [1] - 640:19
knows [2] - 634:10,
635:3
KRAVETZ [1] - 628:2

L

ladies [1] - 636:5
LAMBERTH [1] -
627:12
Lamberth [1] - 662:4
language [10] -
635:10, 688:11,
688:12, 690:17,
691:2, 691:24,
693:7, 696:18,
702:24, 703:8
large [5] - 644:22,
651:4, 651:10,
652:6, 654:6
largest [1] - 642:1
last [7] - 633:21,
634:23, 665:7,
673:18, 674:17,
681:7, 699:3
Lawlor [3] - 681:24,
682:1, 682:2
laying [1] - 668:6
least [4] - 632:2,
632:21, 644:12,
662:18
leave [1] - 699:10
LEE [1] - 627:17
lending [1] - 704:2
less [9] - 649:4, 657:4,
670:20, 683:23,
684:24, 700:17,
700:23, 700:25
letter [3] - 660:10,
660:11, 660:18
lights [1] - 688:23
likely [3] - 663:12,
681:16, 699:15
limine [1] - 635:10
line [7] - 635:14,
654:15, 659:25,
660:2, 667:18,
692:16
liquidation [3] -
692:10, 692:13,
692:17
litany [1] - 634:13

LITIGATIONS [1] -
627:10
Litowitz [1] - 628:2
LLP [4] - 627:18,
627:21, 628:3, 628:8
loan [2] - 660:21,
704:5
loans [2] - 656:16,
657:11
logo [1] - 698:23
look [17] - 638:16,
651:2, 654:5,
666:16, 667:5,
679:15, 679:22,
686:8, 690:20,
690:24, 691:3,
691:24, 693:10,
697:16, 699:1,
701:23, 703:8
looked [1] - 703:2
looking [3] - 660:24,
664:20, 688:10
Lorraine [1] - 704:19
losing [1] - 675:2
low [2] - 684:2, 702:15
lunch [1] - 704:14

M

MAC [1] - 627:8
Mac [40] - 630:6,
640:5, 640:14,
640:24, 643:24,
644:7, 644:16,
644:22, 648:4,
648:11, 648:16,
650:18, 656:14,
657:8, 657:9,
661:11, 671:10,
674:14, 674:18,
675:19, 676:8,
676:9, 677:1,
678:25, 680:20,
681:2, 681:16,
683:8, 686:1, 691:1,
691:22, 692:5,
694:11, 695:9,
698:17, 698:23,
700:16, 701:17,
702:5
Mac's [1] - 698:22
Mae [40] - 630:6,
640:2, 640:4,
640:10, 640:14,
640:24, 641:12,
644:21, 648:4,
648:10, 648:16,
650:18, 656:14,
657:8, 661:11,
671:10, 674:13,

674:18, 675:12,
675:15, 676:8,
676:9, 676:25,
677:12, 678:24,
680:19, 681:2,
681:16, 683:8,
684:21, 685:14,
685:25, 690:25,
691:21, 692:5,
694:11, 695:8,
700:16, 701:16
**MAE/FREDDIE** [1] -
627:8
**mail** [10] - 669:14,
669:22, 671:17,
672:1, 672:23,
673:1, 673:10,
673:17, 673:23
**mails** [1] - 669:13
**March** [1] - 693:7
**Mario** [3] - 636:11,
636:13, 637:14
**market** [18] - 657:1,
661:10, 662:23,
663:5, 663:16,
663:20, 665:3,
665:4, 684:2, 685:9,
686:5, 695:23,
696:4, 696:9,
696:14, 696:16,
696:18, 703:6
**market's** [1] - 688:20
**markets** [1] - 701:24
**Massachusetts** [1] -
628:9
**matter** [6] - 630:17,
647:12, 704:10,
704:12, 704:16,
705:5
**matters** [4] - 651:17,
651:19, 655:18,
659:3
**MBS** [1] - 695:8
**McFarland** [3] -
677:12, 678:2, 678:7
**mean** [9] - 634:12,
639:7, 639:18,
639:20, 639:23,
662:25, 673:1,
692:24, 700:13
**meaning** [1] - 639:19
**means** [9] - 633:13,
638:14, 656:24,
656:25, 670:9,
674:17, 692:14,
694:23, 700:1
**meant** [1] - 654:9
**mechanics** [1] -
686:14
**meeting** [25] - 635:2,

635:3, 635:9,
635:15, 635:17,
649:9, 655:4,
657:16, 659:9,
659:12, 670:2,
670:11, 670:15,
670:20, 671:20,
671:23, 672:11,
672:12, 672:14,
672:19, 673:13,
673:17, 673:23,
674:17
**meetings** [6] - 646:6,
646:12, 648:20,
648:22, 674:13,
677:15
**Meltzer** [1] - 627:18
**members** [1] - 638:9
**memo** [7] - 652:24,
655:20, 656:3,
656:7, 657:17,
661:19
**memorandum** [2] -
646:19, 649:1
**memorializing** [1] -
635:11
**memory** [1] - 672:25
**memos** [1] - 661:16
**mention** [1] - 631:4
**mentioned** [2] - 644:8,
662:10
**message** [1] - 671:7
**messing** [1] - 632:14
**meticulously** [1] -
632:11
**Michael** [2] - 646:20,
646:21
**middle** [1] - 671:17
**might** [5] - 661:22,
674:6, 686:19,
697:12, 699:19
**million** [3] - 692:9,
700:13, 700:21
**mind** [1] - 679:3
**mine** [1] - 634:21
**minute** [3] - 631:3,
647:11, 654:16
**minutes** [1] - 636:1
**misrepresentation** [1]
- 646:13
**misrepresentations**
[1] - 648:23
**missing** [1] - 656:21
**Mission** [1] - 680:11
**misunderstanding** [2]
- 631:25, 633:23
**model** [1] - 689:25
**modeled** [1] - 661:7
**modeling** [7] - 680:12,
680:20, 680:23,

697:11, 699:19,
699:21, 701:21
**modest** [2] - 641:6,
644:15
**moment** [2] - 631:9,
652:23
**money** [12] - 637:19,
639:8, 639:9, 641:5,
650:20, 666:16,
666:22, 675:2,
684:1, 685:9,
692:21, 700:15
**months** [1] - 649:5
**MORNING** [1] - 627:12
**morning** [6] - 630:9,
630:13, 636:6,
636:9, 636:25, 637:2
**mortgage** [10] -
650:18, 650:21,
656:17, 656:24,
657:3, 657:5,
662:23, 663:16,
663:19, 665:6
**mortgage-backed** [1]
- 665:6
**mortgages** [2] -
656:22, 656:23
**most** [3] - 647:20,
657:16, 700:16
**motions** [1] - 635:10
**move** [8] - 642:19,
643:4, 643:15,
647:3, 669:3, 691:7,
697:17, 697:20
**moved** [3] - 642:25,
643:7, 647:2
**movements** [1] -
686:5
**moving** [1] - 643:4
**MR** [74] - 630:9,
630:13, 630:19,
631:8, 631:10,
633:5, 633:6,
635:24, 636:14,
636:17, 636:20,
636:24, 638:21,
638:24, 639:1,
641:15, 641:19,
641:22, 641:24,
642:21, 643:3,
643:8, 643:10,
643:14, 643:17,
643:19, 643:21,
643:22, 645:7,
645:10, 646:24,
647:7, 647:8,
647:15, 647:19,
647:22, 648:1,
652:12, 652:17,
653:1, 653:4,

654:21, 659:24,
660:1, 660:4,
661:22, 662:4,
662:6, 662:2, 666:6,
666:10, 666:12,
667:10, 667:11,
667:12, 667:24,
668:4, 668:8,
668:13, 669:4,
669:9, 669:10,
684:5, 684:7,
685:20, 691:5,
691:6, 691:8,
691:11, 697:19,
697:20, 697:24,
703:18, 704:10
**MS** [1] - 636:9
**multiple** [1] - 669:12
**multiplied** [1] - 700:9
**multiply** [1] - 700:12
**mutual** [1] - 658:14
**mutually** [5] - 694:5,
694:8, 694:16,
695:14, 695:17

---

## N

**Naa** [2] - 680:8, 680:10
**name** [1] - 636:25
**named** [1] - 646:19
**near** [1] - 701:23
**necessarily** [1] -
635:17
**necessary** [2] - 631:9,
690:13
**need** [13] - 630:18,
631:7, 633:2,
642:25, 649:18,
650:6, 668:6,
668:25, 672:3,
672:5, 690:24,
695:22, 697:17
**needed** [3] - 684:2,
690:11, 697:8
**needs** [1] - 632:19
**negotiate** [1] - 704:2
**negotiated** [3] -
702:16, 702:18,
703:4
**negotiating** [8] -
649:20, 649:25,
650:4, 655:18,
658:7, 659:2, 682:9,
702:19
**negotiation** [1] -
658:23
**negotiations** [4] -
637:15, 657:21,
682:7, 682:12
**net** [78] - 637:7,

637:11, 637:18,
637:22, 638:1,
638:12, 640:20,
641:12, 642:1,
643:24, 644:4,
645:1, 645:22,
649:5, 658:20,
661:8, 661:20,
662:14, 663:3,
663:10, 663:11,
664:3, 664:7,
664:16, 665:22,
666:14, 666:19,
666:21, 666:23,
667:4, 671:11,
673:8, 675:6,
675:16, 675:20,
675:24, 676:2,
676:3, 676:7,
676:14, 676:19,
677:19, 677:22,
679:2, 679:25,
681:7, 681:13,
682:4, 682:7, 683:9,
683:11, 683:19,
683:24, 684:16,
684:21, 685:3,
685:8, 685:11,
685:13, 685:14,
685:17, 686:15,
686:18, 686:23,
687:5, 687:16,
687:23, 687:25,
688:25, 689:3,
689:19, 690:3,
690:22, 695:12,
700:17, 700:18,
700:24, 701:2
**never** [9] - 648:23,
650:5, 689:14,
689:24, 696:17,
702:16, 703:4,
703:22
**nevertheless** [1] -
696:13
**New** [4] - 627:16,
627:22, 628:4
**new** [3] - 650:24,
681:1, 681:12
**next** [13] - 633:3,
636:6, 636:15,
649:12, 650:9,
670:24, 671:5,
672:4, 673:16,
673:17, 692:16,
693:23
**Nick** [1] - 679:19
**night** [2] - 633:21,
634:23
**normal** [2] - 631:13,

700:16
**Northwest** [4] -
627:16, 627:22,
628:9, 628:13
**notion** [1] - 687:16
**nowhere** [1] - 701:22
**number** [13] - 632:2,
638:20, 641:13,
645:24, 651:2,
651:4, 652:20,
654:4, 661:1,
661:13, 675:15,
686:4, 691:5
**Number** [2] - 627:4,
627:8
**numbers** [7] - 632:8,
632:9, 632:10,
632:19, 669:12,
698:16, 701:4

**O**

**oath** [3] - 653:17,
662:7, 677:17
**object** [8] - 642:23,
642:25, 643:10,
643:11, 647:9,
653:2, 684:5, 685:20
**objected** [2] - 632:3,
691:4
**Objection** [1] - 667:24
**objection** [21] - 632:4,
632:5, 634:2,
634:18, 635:18,
635:21, 638:23,
638:24, 641:20,
641:23, 645:7,
652:15, 668:1,
668:2, 668:5, 669:2,
669:4, 691:7, 691:8,
697:18, 697:19
**objections** [4] -
634:16, 634:24,
634:25, 647:4
**objective** [2] - 655:17
**obvious** [1] - 647:20
**obviously** [2] -
642:11, 700:15
**occur** [1] - 635:11
**October** [5] - 627:10,
681:1, 681:8,
690:10, 705:8
**OF** [4] - 627:1, 627:12,
705:1, 705:9
**offered** [1] - 634:12
**office** [4] - 679:18,
681:18, 698:9,
698:12
**Office** [2] - 669:19,
679:17

**officer** [1] - 677:11
**offices** [1] - 680:10
**OFFICIAL** [1] - 705:1
**Official** [1] - 628:12
**once** [1] - 683:19
**one** [41] - 630:12,
630:17, 631:3,
631:9, 632:7,
632:21, 635:12,
635:20, 636:6,
638:10, 641:6,
644:7, 644:16,
647:10, 653:25,
661:21, 664:14,
664:22, 666:22,
673:6, 675:1,
680:10, 681:20,
683:16, 684:22,
690:25, 691:1,
691:14, 691:21,
691:22, 692:9,
696:8, 697:2,
698:25, 699:21,
699:22, 701:18,
701:21, 701:22,
703:14
**one-minute** [1] - 631:3
**ongoing** [4] - 658:10,
663:15, 663:19,
693:20
**opening** [4] - 631:15,
641:20, 674:6
**operating** [2] - 688:19,
688:23
**operations** [2] - 674:3,
674:11
**opinion** [1] - 631:6
**opposed** [2] - 660:12,
660:15
**option** [1] - 689:20
**order** [10] - 630:2,
637:20, 638:1,
638:13, 639:9,
639:16, 639:21,
663:6, 664:17,
678:14
**original** [1] - 688:11
**originated** [2] -
686:25, 687:1
**origins** [1] - 686:22
**ostensibly** [1] -
635:11
**otherwise** [1] - 631:18
**outcome** [1] - 664:13
**overrule** [1] - 635:18
**overruled** [5] - 634:24,
645:9, 647:4, 653:3,
685:23
**oversaw** [1] - 680:11
**oversee** [1] - 680:22

**overseen** [1] - 678:7
**overview** [1] - 649:8
**owe** [2] - 650:20,
656:25
**own** [2] - 680:23,
680:25

**P**

**p.m** [1] - 704:18
**package** [1] - 702:23
**page** [9] - 659:24,
660:1, 660:11,
667:16, 667:17,
667:18, 698:15,
698:16, 699:1
**paid** [5] - 642:7, 693:6,
700:23, 700:25,
701:2
**part** [10] - 649:18,
659:22, 662:19,
663:14, 674:24,
674:25, 675:1,
693:16, 702:19
**particular** [3] - 673:2,
681:3, 683:20
**parties** [1] - 631:16
**party** [2] - 631:16,
658:23
**pat** [2] - 681:24,
681:25
**pause** [1] - 650:14
**pay** [13] - 637:20,
639:9, 639:16,
639:21, 651:5,
651:11, 652:7,
663:7, 663:9,
666:17, 684:3,
685:5, 692:15
**payment** [1] - 645:16
**payments** [2] -
645:12, 656:22
**pending** [1] - 666:10
**Pennsylvania** [1] -
627:19
**people** [10] - 635:4,
661:1, 661:13,
673:25, 676:9,
680:13, 680:16,
695:6, 696:8, 700:16
**per** [1] - 693:2
**percent** [31] - 637:20,
639:9, 639:21,
640:3, 640:7,
640:11, 640:15,
640:19, 640:25,
645:5, 645:14,
648:5, 648:17,
648:17, 651:5,
651:11, 652:7,

666:17, 683:23,
684:1, 684:17,
684:24, 685:14,
688:9, 700:4, 700:6,
700:12, 701:6,
701:19, 701:22,
702:21
**perform** [1] - 680:20
**performance** [3] -
680:6, 681:16, 682:3
**perfunctory** [1] -
675:1
**period** [1] - 683:2
**periodic** [50] - 645:14,
645:17, 648:15,
662:11, 662:15,
662:19, 663:1,
663:2, 663:8,
663:12, 663:18,
684:13, 684:14,
684:15, 687:10,
687:16, 687:25,
689:1, 689:5, 689:7,
689:16, 689:19,
690:1, 690:4,
690:17, 690:22,
691:3, 691:25,
693:5, 693:15,
694:4, 695:11,
696:13, 697:3,
697:12, 699:13,
701:10, 702:16,
702:18, 702:21,
702:24, 703:4,
703:9, 703:11,
703:12, 703:20,
703:21, 703:23,
703:24, 704:2
**permission** [1] -
652:13
**permitted** [1] - 638:22
**perpetuity** [2] - 690:4,
700:22
**person** [3] - 637:14,
681:20, 681:23
**personal** [1] - 635:4
**personally** [2] -
677:14, 686:23
**perspective** [4] -
633:22, 638:1,
666:14, 666:20
**Ph.D** [1] - 680:2
**phone** [1] - 647:11
**phrase** [3] - 639:6,
639:12
**place** [2] - 645:15,
649:13
**plain** [3] - 688:10,
688:12, 690:16
**Plaintiffs** [3] - 627:4,

627:15, 627:17
**plaintiffs** [8] - 630:10,
635:24, 636:8,
636:10, 636:14,
636:15, 637:1, 662:5
**PLAINTIFFS** [1] -
636:16
**Plaintiffs'** [2] - 646:18,
649:1
**plaintiffs'** [2] - 641:13,
697:22
**planning** [2] - 686:6,
698:6
**play** [6] - 636:6,
638:18, 638:22,
652:13, 653:6
**played** [6] - 635:19,
636:13, 638:25,
652:16, 654:20,
660:3
**PLLC** [1] - 627:15
**point** [13] - 633:24,
635:10, 637:14,
649:17, 663:7,
684:22, 685:20,
700:4, 701:13,
702:11, 704:9
**points** [10] - 699:3,
700:2, 700:4, 700:6,
700:8, 701:14,
702:2, 702:8,
702:11, 702:14
**Porter** [1] - 628:8
**portfolio** [1] - 680:3
**posed** [1] - 664:12
**position** [7] - 635:2,
650:24, 659:4,
677:6, 685:24,
701:20, 702:14
**positive** [2] - 683:19,
683:23, 685:8
**possibility** [5] -
650:10, 651:15,
655:21, 668:10,
668:16
**possible** [8] - 649:21,
649:25, 667:20,
673:3, 673:4,
678:10, 678:13,
678:14
**potential** [2] - 661:5,
665:4
**PR** [3] - 650:10,
650:14, 655:21
**precise** [1] - 633:18
**precisely** [2] - 632:11,
676:8
**preference** [3] -
692:11, 692:13,
692:17

**preferred** [9] - 642:6, 642:8, 645:19, 649:22, 670:5, 670:17, 692:9, 692:13, 692:16
**PREFERRED** [1] - 627:9
**prejudice** [2] - 631:11, 632:1
**prepared** [2] - 674:23, 698:23
**preparing** [1] - 631:1
**present** [2] - 630:3, 636:11
**presented** [1] - 632:4
**presenting** [2] - 632:6, 702:4
**preserve** [1] - 664:19
**presumed** [1] - 633:19
**prevent** [1] - 655:11
**preview** [1] - 632:18
**previous** [2] - 638:4, 649:9
**primarily** [1] - 682:10
**primary** [1] - 681:18
**principal** [35] - 650:15, 650:17, 650:21, 651:15, 651:20, 651:23, 655:13, 656:4, 656:8, 656:10, 656:12, 656:15, 656:16, 656:25, 657:4, 657:10, 657:12, 657:23, 658:4, 658:7, 658:12, 658:19, 659:4, 659:13, 659:15, 659:18, 660:7, 660:12, 660:15, 660:20, 660:23, 661:3, 661:6, 661:17
**priority** [1] - 659:18
**private** [3] - 684:2, 696:9, 704:1
**problem** [4] - 644:13, 646:1, 684:25, 687:4
**proceed** [5] - 634:15, 634:16, 636:8, 643:3, 662:3
**proceedings** [1] - 705:4
**Proceedings** [1] - 628:16
**process** [2] - 674:25, 675:2
**produced** [4] - 628:16, 661:16, 680:24, 681:1

**produces** [1] - 702:8
**professionals** [1] - 676:15
**Professor** [1] - 631:21
**profit** [4] - 677:24, 684:24, 685:17, 685:18
**profitability** [2] - 676:16, 677:24
**profitable** [6] - 673:19, 674:21, 675:5, 676:10, 677:2, 677:6
**profits** [9] - 640:2, 640:6, 640:10, 640:14, 642:1, 648:4, 648:11, 648:16, 679:1
**projections** [5] - 680:19, 681:2, 681:8, 681:13, 682:3
**promise** [2] - 648:15, 684:13
**proper** [1] - 634:13
**pros** [1] - 661:20
**prospect** [1] - 702:21
**prospective** [1] - 635:14
**provide** [2] - 683:5, 690:14
**provided** [3] - 649:8, 688:15, 693:19
**providing** [1] - 692:20
**provision** [1] - 633:16
**Prussia** [1] - 627:18
**PSPA** [1] - 670:8
**PSPAs** [3] - 649:21, 649:22, 650:11
**public** [7] - 635:6, 635:8, 635:16, 659:1, 660:8, 664:21, 670:25
**publicly** [4] - 640:20, 664:10, 671:13, 681:5
**pull** [2] - 646:16, 659:23
**purchase** [3] - 642:6, 649:22, 688:11
**PURCHASE** [1] - 627:9
**purchaser** [4] - 693:17, 694:8, 694:9, 695:16
**purpose** [1] - 642:24
**put** [16] - 631:24, 633:7, 641:8, 641:10, 642:17, 643:15, 652:20, 653:14, 657:19, 661:14, 685:21,

690:16, 691:24, 693:14, 702:24
**putting** [3] - 648:14, 651:19, 701:18
**PX** [1] - 690:25
**PX-111** [5] - 697:16, 697:17, 697:20, 697:23, 697:25
**PX-111** .....................
........................ [1] -
629:10
**PX-205** [8] - 646:16, 646:18, 647:3, 647:6, 649:1, 652:3, 652:20, 654:3
**PX-205** ......................
........................ [1] -
629:7
**PX-259** [4] - 669:1, 669:8, 669:11, 669:12
**PX-259** .......................
........................ [1] -
629:8
**PX-3-A1** [2] - 691:7, 691:10
**PX3-A1** ......................
........................ [1] -
629:9

**Q**

**qualify** [1] - 633:16
**quantify** [1] - 689:25
**quantifying** [1] -
697:11
**quarter** [22] - 640:2, 640:5, 640:9, 640:13, 640:18, 641:6, 642:7, 644:7, 644:9, 644:16, 648:4, 648:10, 674:23, 675:13, 675:16, 675:19, 678:8, 683:21, 683:22, 684:23, 701:18, 701:21
**quarterly** [7] - 668:19, 676:23, 676:24, 676:25, 684:23, 689:22, 693:7
**quarters** [2] - 644:4, 676:12
**questioned** [1] - 650:6
**questions** [3] -
665:21, 684:14, 701:12
**quickly** [2] - 668:22, 671:17
**quite** [5] - 653:21,

661:2, 661:13, 675:3, 691:3
**quote** [2] - 677:1, 677:2

**R**

**Radnor** [1] - 627:19
**raised** [5] - 650:9, 650:23, 651:15, 655:21, 655:25
**range** [1] - 659:14
**rate** [2] - 684:2, 702:15
**rather** [1] - 636:21
**re** [1] - 630:6
**RE** [1] - 627:8
**reaching** [1] - 671:19
**read** [2] - 649:18, 654:14
**ready** [1] - 635:22
**realize** [2] - 644:3, 702:7
**really** [6] - 656:9, 666:16, 679:3, 682:6, 694:14, 699:1
**realtime** [2] - 647:15, 647:23
**reason** [6] - 637:17, 637:22, 658:16, 676:6, 676:13, 690:3
**reasonable** [11] -
689:1, 689:10, 689:15, 689:25, 694:20, 694:24, 695:14, 695:18, 696:19, 701:10, 703:5
**reasoning** [1] - 637:25
**reasons** [9] - 650:24, 655:25, 656:3, 656:4, 656:8, 660:25, 664:18, 666:22, 689:12
**received** [8] - 647:5, 647:6, 669:6, 669:8, 691:9, 691:10, 697:22, 697:23
**RECEIVED** [1] - 629:6
**Recess** [2] - 662:1, 704:18
**recollection** [7] -
640:8, 641:7, 656:9, 671:14, 687:8, 687:23, 689:6
**record** [22] - 630:5, 630:7, 630:20, 631:10, 633:7, 634:20, 635:6, 635:8, 638:15, 641:22, 642:19,

642:25, 643:6, 647:8, 647:9, 653:16, 662:4, 688:3, 692:24, 697:8, 705:4
**recorded** [2] - 628:16, 635:19, 644:22
**records** [5] - 635:13, 635:14, 635:15, 635:16, 672:12
**reduce** [7] - 637:21, 650:20, 657:10, 657:11, 664:25, 685:11
**reducing** [2] - 639:10, 639:22
**reduction** [27] -
650:15, 650:17, 651:15, 651:20, 651:23, 655:13, 656:5, 656:8, 656:10, 656:12, 656:15, 657:23, 658:4, 658:8, 658:12, 658:20, 659:5, 659:13, 659:15, 659:18, 660:7, 660:12, 660:15, 660:20, 660:24, 661:4, 661:17
**refer** [1] - 639:12
**reference** [2] - 664:9, 695:23
**referenced** [2] -
676:12, 690:16
**referring** [3] - 679:7, 679:8, 699:11
**refers** [4] - 649:22, 670:5, 674:1, 674:2
**reflected** [3] - 657:17, 688:21, 694:14
**reflecting** [1] - 659:9
**reflects** [2] - 636:21, 663:1
**regard** [3] - 639:5, 640:1, 688:12
**regarding** [1] - 686:13
**regret** [1] - 631:1
**regular** [2] - 631:5, 646:6
**related** [1] - 630:5
**relates** [1] - 667:25
**relating** [2] - 668:3, 668:7
**relativity** [1] - 686:13
**release** [1] - 681:5
**released** [1] - 640:20
**relevance** [1] - 645:7
**reliance** [1] - 688:20

**reluctant** [4] - 678:19, 679:6, 679:9, 686:10
**rely** [1] - 647:23
**remained** [1] - 644:18
**remaining** [6] - 638:5, 664:25, 665:1, 665:5, 665:10, 699:4
**remains** [1] - 701:16
**remember** [14] - 641:3, 648:21, 657:16, 660:14, 660:17, 673:5, 677:13, 679:24, 686:23, 687:7, 687:13, 696:23, 696:25, 697:13
**remembering** [3] - 693:8, 693:16
**removed** [1] - 666:23
**reported** [2] - 676:1, 704:19
**REPORTER** [2] - 705:1, 705:9
**reporter** [1] - 630:16
**Reporter** [1] - 628:12
**reporting** [2] - 680:12, 702:5
**represent** [2] - 637:1, 682:25
**representative** [1] - 696:25
**representatives** [1] - 631:17
**request** [2] - 631:13, 652:12
**requested** [2] - 648:2, 648:9
**required** [2] - 642:5, 688:11
**requirement** [2] - 655:12, 688:8
**rerecording** [4] - 672:7, 672:14, 672:20, 674:19
**Reserve** [1] - 695:2
**reserve** [1] - 678:18
**reserves** [1] - 685:9
**reset** [1] - 693:24
**resist** [1] - 659:17
**resistance** [1] - 659:17
**resisting** [3] - 651:22, 656:7, 656:9
**respect** [4] - 632:1, 634:6, 634:9, 659:4
**responds** [1] - 671:18
**response** [2] - 647:24, 671:25
**responsibilities** [1] - 658:25

**rest** [1] - 659:22
**restate** [2] - 665:16, 684:10
**restated** [2] - 691:14, 691:17
**results** [4] - 640:18, 644:14, 661:6, 699:6
**retrospective** [1] - 635:14
**return** [2] - 701:22, 702:15
**returns** [1] - 701:23
**revenues** [5] - 651:4, 651:10, 652:6, 654:6, 654:7
**reversed** [1] - 676:1
**review** [2] - 634:23, 676:25
**reviewed** [2] - 676:23, 676:24
**revised** [1] - 691:13
**rid** [2] - 703:15, 703:16
**rise** [1] - 684:25
**risk** [2] - 665:8, 665:11
**risks** [5] - 638:10, 664:14, 664:19, 664:22, 686:5
**Road** [1] - 627:18
**ROBERT** [2] - 628:2, 628:8
**Room** [1] - 628:14
**roughly** [1] - 680:13
**routinely** [2] - 631:7, 635:16
**ROYCE** [1] - 627:12
**RPR** [1] - 628:12
**RUDY** [1] - 627:17
**rule** [7] - 630:18, 631:5, 631:13, 633:12, 633:14, 633:16, 633:19
**Rule** [2] - 631:5, 633:15
**ruled** [1] - 646:25
**rules** [4] - 634:15, 634:17, 677:7, 680:3
**ruling** [1] - 635:10
**run** [4] - 635:23, 688:16, 688:17, 689:25

## S

**SAMUEL** [1] - 627:20
**SARA** [1] - 628:12
**Sara** [2] - 705:3, 705:8
**satisfied** [1] - 677:10
**Satriano** [10] - 669:14, 669:22, 669:23,

670:16, 670:20, 670:22, 671:18, 671:22, 672:2, 679:19
**saved** [2] - 695:7, 695:8
**saving** [2] - 690:21, 695:5
**saw** [2] - 631:14, 658:25
**scenario** [1] - 697:25
**schedule** [1] - 650:6
**Schiller** [1] - 627:21
**Scholer** [1] - 628:8
**scrambling** [1] - 632:12
**screen** [4] - 643:15, 646:17, 652:20, 667:21
**scroll** [1] - 649:16
**SEC** [4] - 636:21, 641:9, 641:11, 693:14
**Second** [2] - 689:21, 702:20
**second** [11] - 640:9, 640:13, 640:18, 644:9, 648:4, 648:10, 651:14, 652:1, 690:20, 692:2, 696:24
**secretary** [15] - 646:6, 646:13, 648:21, 648:22, 648:23, 649:7, 649:8, 650:9, 651:15, 652:5, 655:11, 655:20, 658:11, 658:14, 659:7
**Secretary** [6] - 651:9, 652:23, 656:13, 657:7, 659:10, 660:17
**sector** [1] - 704:1
**securities** [4] - 665:3, 665:6, 678:7
**see** [49] - 631:17, 631:21, 642:3, 642:5, 642:9, 643:15, 644:1, 649:10, 649:14, 650:7, 650:12, 650:25, 651:7, 655:6, 655:8, 655:21, 655:23, 656:1, 666:18, 667:14, 667:17, 667:18, 667:19, 667:22, 669:15, 670:3, 670:13,

671:1, 671:8, 672:9, 673:21, 684:10, 691:19, 693:6, 693:21, 693:25, 694:6, 694:21, 695:3, 695:24, 696:2, 698:1, 698:4, 698:7, 698:19, 698:21, 699:7, 699:11, 699:24
**seeing** [3] - 643:11, 653:23, 653:24
**seeking** [1] - 658:24
**seem** [1] - 686:4
**sees** [2] - 643:7, 650:10
**sell** [1] - 692:15
**seller** [2] - 694:8, 694:11
**sending** [2] - 660:17, 669:22
**SENIOR** [1] - 627:9
**senior** [8] - 642:6, 642:8, 645:19, 670:5, 670:16, 692:9, 692:13, 692:16
**sense** [2] - 687:24, 689:8
**sensitivity** [7] - 698:17, 698:21, 698:22, 699:4, 699:16, 699:18, 702:6
**sentence** [14] - 649:7, 649:12, 651:14, 654:5, 655:23, 670:11, 670:24, 671:5, 672:6, 673:16, 673:17, 693:23, 694:2, 695:21
**sentences** [1] - 650:9
**separate** [2] - 651:19, 704:20
**separately** [1] - 658:18
**September** [9] - 690:8, 690:9, 690:10, 691:13, 691:14, 691:17, 695:7, 696:6, 698:3
**series** [1] - 658:11
**session** [2] - 633:3, 704:19
**SESSION** [1] - 627:12
**set** [7] - 681:1, 681:12, 682:2, 703:3, 703:12, 703:14, 703:22

**setting** [2] - 635:6, 635:8
**seven** [1] - 660:10
**shall** [3] - 693:6, 694:4, 695:22
**shareholder** [1] - 688:17
**shareholders** [1] - 692:18
**shares** [1] - 692:10
**sheet** [7] - 667:7, 676:14, 683:12, 683:18, 683:24, 685:4, 702:6
**sheets** [3] - 676:7, 678:24, 683:8
**short** [2] - 636:6, 661:24
**shorter** [1] - 653:22
**shortfall** [3] - 684:3, 685:5, 686:19
**shorthand** [1] - 628:16
**shortly** [1] - 645:18
**show** [12] - 632:17, 632:22, 652:14, 653:13, 654:13, 667:20, 668:25, 669:1, 669:13, 673:10, 697:8, 699:1
**showed** [1] - 641:20
**showing** [5] - 641:14, 641:17, 654:18, 667:21, 701:13
**shown** [5] - 632:12, 642:20, 643:18, 643:19, 644:4
**shows** [7] - 641:9, 641:11, 641:25, 643:24, 671:20, 672:19, 699:5
**SIGNATURE** [1] - 705:9
**signed** [1] - 649:5
**similar** [1] - 643:23
**simple** [1] - 684:22
**simply** [3] - 635:9, 652:13, 686:14
**single** [2] - 634:17, 661:19
**sit** [1] - 631:7
**sitting** [1] - 634:3
**situation** [2] - 634:5, 657:9
**skipped** [1] - 695:21
**slide** [7] - 641:9, 641:10, 641:11, 642:17, 643:17, 643:23
**slides** [1] - 643:8

**small** [1] - 640:8
**someone** [1] - 703:22
**sometimes** [2] - 670:8
**soon** [1] - 678:20
**sorry** [13] - 646:8, 646:23, 648:2, 648:6, 648:8, 653:24, 655:2, 659:24, 665:16, 667:10, 668:4, 679:7, 687:5
**sort** [2] - 634:19, 687:13
**sounds** [1] - 700:11
**SPEAKER** [1] - 636:3
**special** [1] - 682:13
**specific** [1] - 633:15
**specifics** [1] - 659:14
**speech** [1] - 665:20
**spent** [1] - 683:2
**Spohn** [3] - 674:2, 674:8, 674:16
**spoken** [1] - 647:9
**SPSPA** [2] - 670:2, 670:8
**squabbling** [1] - 632:7
**stability** [2] - 638:4, 690:14
**stake** [1] - 704:5
**standing** [1] - 658:13
**standpoint** [1] - 665:24
**start** [3] - 660:1, 669:12, 677:9
**started** [2] - 687:20, 692:20
**statement** [2] - 641:20, 652:2
**statements** [4] - 635:2, 658:8, 659:6, 674:23
**STATES** [2] - 627:1, 627:13
**States** [2] - 628:12, 686:3
**stay** [1] - 631:15
**stayed** [2] - 645:4, 701:6
**Stegman** [4] - 646:20, 646:21, 649:2, 659:8
**stenotype** [1] - 628:16
**step** [2] - 663:4, 683:16
**STERN** [23] - 628:5, 630:13, 631:8, 633:6, 638:24, 641:22, 642:21, 643:10, 645:7, 647:8, 647:15, 647:22, 653:1,

659:24, 666:2, 667:10, 667:24, 669:4, 684:5, 685:20, 691:5, 691:8, 697:19
**Stern** [2] - 630:13, 631:24
**stick** [1] - 684:22
**still** [1] - 662:7
**stock** [9] - 642:6, 642:8, 645:19, 649:22, 670:5, 670:17, 688:11, 692:9, 692:13
**STOCK** [1] - 627:9
**stocks** [1] - 692:16
**stop** [1] - 649:21
**stopped** [1] - 659:23
**stress** [2] - 680:20, 680:22
**strict** [1] - 635:14
**stuck** [1] - 659:5
**studies** [1] - 661:17
**subject** [3] - 670:2, 694:20, 704:10
**substantial** [1] - 642:16
**substantially** [3] - 640:25, 641:2, 642:14
**substantive** [2] - 642:24, 643:11
**substantively** [1] - 682:6
**succeed** [1] - 658:4
**suddenly** [1] - 675:4
**sufficient** [1] - 665:5
**summarized** [1] - 632:11
**summarizing** [1] - 670:21
**summary** [6] - 631:22, 631:24, 632:3, 632:6, 632:10, 659:10
**summer** [4] - 646:5, 646:8, 664:1, 676:18
**support** [6] - 665:5, 665:10, 688:14, 688:21, 693:19, 701:16
**suppose** [1] - 702:8
**supposed** [2] - 659:2, 688:13
**surprise** [2] - 664:6, 664:9
**Susan** [3] - 677:12, 677:13, 678:2
**suspends** [1] - 703:9
**sustained** [2] -

634:15, 668:5
**sweep** [51] - 637:7, 637:11, 637:18, 637:23, 638:1, 638:13, 640:21, 645:1, 645:2, 645:22, 649:5, 658:20, 661:20, 662:15, 663:3, 663:11, 663:12, 664:4, 664:7, 664:16, 665:22, 666:15, 666:19, 666:21, 667:4, 671:11, 673:8, 676:3, 676:19, 677:20, 677:22, 679:1, 679:2, 679:25, 681:7, 681:13, 682:4, 682:7, 683:11, 684:16, 685:15, 686:24, 687:6, 687:16, 687:23, 687:25, 689:1, 689:4, 689:19, 700:24, 701:3
**swept** [2] - 676:3, 683:9
**switching** [1] - 702:20
**sworn** [1] - 654:18
**SWORN** [1] - 636:16
**system** [1] - 665:11

**T**

**tab** [6] - 638:16, 652:11, 653:5, 667:13, 693:13, 698:25
**Tagoe** [9] - 680:8, 680:10, 681:10, 681:11, 681:12, 681:20, 698:10, 698:11
**Tagoe's** [2] - 702:1, 702:4
**talks** [1] - 693:5
**tax** [17] - 666:24, 667:3, 667:6, 668:11, 668:18, 672:7, 672:15, 672:20, 674:19, 675:15, 675:21, 675:24, 677:23, 679:5, 679:25, 680:3, 683:7
**taxes** [1] - 680:5
**taxpayer** [1] - 661:8
**team** [2] - 690:25,

695:22
**technical** [1] - 647:12
**technicalities** [1] - 679:11
**temporary** [1] - 683:4
**ten** [2] - 632:10, 655:4
**tens** [3] - 644:22, 666:25, 675:5
**term** [2] - 639:14, 639:19
**terms** [7] - 641:14, 641:17, 645:18, 649:20, 654:7, 661:5, 682:9
**testified** [5] - 648:3, 667:2, 677:17, 677:21, 697:10
**testifies** [1] - 631:23
**testify** [2] - 665:21, 697:2
**testifying** [1] - 648:10
**TESTIMONY** [1] - 629:3
**testimony** [20] - 634:7, 639:3, 643:13, 647:21, 652:14, 653:1, 653:9, 654:24, 655:6, 660:5, 660:14, 662:10, 664:13, 678:1, 678:3, 678:4, 678:9, 686:9, 687:3, 696:24
**tests** [2] - 680:20, 680:22
**THE** [35] - 627:1, 627:1, 627:12, 630:17, 633:4, 634:23, 636:2, 636:5, 636:16, 636:19, 638:23, 641:13, 641:17, 643:16, 645:9, 647:5, 647:13, 652:15, 653:3, 661:24, 662:3, 666:9, 666:11, 668:2, 668:5, 669:6, 685:23, 685:24, 691:9, 697:22, 703:15, 703:16, 703:17, 704:9, 704:12
**themselves** [1] - 630:14
**thereby** [6] - 639:10, 639:22, 651:5, 651:10, 652:7, 686:19
**therefore** [3] - 643:3,

666:1, 669:2
**thesis** [1] - 680:2
**they've** [1] - 688:17
**third** [4] - 632:21, 672:6, 675:19, 694:2
**Third** [29] - 645:13, 650:2, 650:4, 651:21, 655:12, 657:18, 657:19, 657:23, 657:25, 658:14, 659:13, 659:16, 664:15, 668:10, 668:15, 668:21, 671:3, 671:11, 687:21, 688:5, 688:7, 688:25, 702:19, 702:20, 702:23, 703:8, 703:10, 703:16
**thoughts** [1] - 674:21
**three** [3] - 630:21, 632:2, 654:11
**thrust** [1] - 655:16
**tied** [1] - 687:16
**timing** [2] - 676:22, 693:23
**Timothy** [1] - 646:7
**title** [1] - 682:13
**today** [5] - 631:2, 634:3, 637:3, 653:12, 655:1
**together** [1] - 658:17
**tomorrow** [1] - 671:6
**took** [2] - 641:6, 649:13
**top** [5] - 666:18, 667:16, 672:1, 678:25, 698:21
**Topaz** [1] - 627:18
**topics** [1] - 697:2
**total** [2] - 645:5, 693:4
**traded** [1] - 665:3
**transcript** [4] - 653:5, 653:13, 667:25, 705:4
**Transcript** [1] - 628:16
**TRANSCRIPT** [1] - 627:12
**transcription** [1] - 628:16
**translated** [1] - 701:25
**Treasury** [83] - 635:11, 637:15, 637:19, 637:20, 637:21, 638:5, 638:9, 639:8, 639:9, 639:11, 639:15, 639:16, 639:21, 642:6, 642:8, 645:2,

645:13, 646:6, 646:14, 646:19, 648:21, 648:22, 648:24, 649:2, 649:8, 651:18, 652:5, 652:23, 655:11, 656:13, 658:3, 658:11, 658:14, 659:7, 659:10, 660:17, 660:19, 661:14, 662:20, 663:4, 663:18, 670:17, 674:7, 676:3, 677:18, 677:21, 679:1, 682:9, 682:16, 682:23, 683:3, 683:5, 683:25, 685:5, 686:3, 687:24, 688:14, 688:18, 689:20, 689:22, 690:4, 690:5, 690:11, 690:13, 692:4, 692:16, 693:17, 693:19, 694:9, 694:18, 694:23, 695:5, 695:7, 695:10, 696:5, 700:9, 700:23, 700:25, 701:2, 701:18, 701:20

**Treasury's** [2] - 649:22, 670:5

**trial** [3] - 631:7, 646:25, 695:22

**TRIAL** [1] - 627:12

**trick** [1] - 692:23

**trillion** [1] - 665:2

**true** [4] - 631:18, 659:7, 689:14, 690:8

**truthful** [4] - 639:2, 653:9, 654:24, 660:5

**try** [7] - 632:25, 633:1, 652:4, 684:11, 689:25, 696:17, 699:9

**trying** [9] - 648:7, 655:11, 658:12, 658:24, 686:14, 686:16, 692:23, 701:11

**turn** [6] - 652:10, 659:21, 667:8, 667:16, 688:23, 698:15

**turned** [3] - 645:25, 648:14, 648:19

**twice** [2] - 653:12,

654:22

**two** [13] - 630:12, 630:21, 643:8, 644:4, 649:4, 650:23, 651:17, 655:25, 658:17, 659:6, 665:2, 671:12, 683:18

**type** [1] - 703:25

## U

**Ugoletti** [11] - 634:24, 634:25, 635:18, 635:25, 636:12, 636:13, 637:14, 682:8, 682:10, 682:11, 682:13

**uncertainties** [2] - 664:20, 686:11

**uncertainty** [2] - 686:8, 688:3

**under** [14] - 631:5, 633:15, 633:16, 635:5, 635:7, 642:6, 645:22, 653:17, 662:7, 677:7, 677:17, 700:24, 701:2, 704:20

**underline** [1] - 696:4

**understood** [4] - 659:9, 672:13, 686:9, 689:4

**underwater** [3] - 656:22, 656:24, 657:4

**UNIDENTIFIED** [1] - 636:3

**United** [2] - 628:12, 686:3

**UNITED** [2] - 627:1, 627:13

**unless** [1] - 633:14

**unlike** [1] - 683:21

**unobjected** [1] - 634:12

**unpack** [1] - 699:9

**unreasonable** [2] - 702:2, 702:12

**unspoken** [1] - 633:25

**up** [29] - 632:14, 641:8, 641:10, 642:17, 646:16, 650:1, 659:14, 659:23, 665:7, 669:13, 672:1, 675:5, 676:6, 677:8, 677:23, 680:10, 687:8, 687:9, 687:14, 687:18,

687:19, 687:20, 687:22, 692:2, 699:10, 701:18, 702:24

**urgency** [2] - 650:10, 655:22

## V

**value** [16] - 657:1, 657:3, 657:11, 666:24, 668:12, 676:2, 688:14, 688:21, 692:10, 692:20, 695:23, 696:4, 696:14, 696:16, 696:18, 703:6

**various** [1] - 664:19

**VARMA** [1] - 628:6

**versus** [1] - 666:7

**video** [1] - 636:13

**Video** [4] - 638:25, 652:16, 654:20, 660:3

**view** [10] - 633:24, 634:25, 673:19, 677:1, 688:24, 689:3, 690:5, 690:11, 690:13

**virtually** [1] - 640:6

**volume** [1] - 636:20

**vs** [1] - 627:5

## W

**waive** [1] - 689:20

**waived** [4] - 662:19, 662:22, 663:18, 689:21

**waives** [2] - 703:9, 703:10

**waiving** [2] - 689:22, 702:22

**wants** [1] - 654:14

**Washington** [5] - 627:9, 627:16, 627:22, 628:9, 628:14

**weaken** [1] - 665:10

**Wednesday** [1] - 671:12

**weeks** [3] - 649:20, 649:25, 650:4

**whoa** [1] - 675:4

**whole** [2] - 699:2, 700:17

**Wick** [2] - 705:3, 705:8

**WICK** [1] - 628:12

**wind** [14] - 638:2,

638:6, 638:7, 638:8, 638:13, 638:14, 664:4, 664:8, 664:10, 664:17, 664:21, 664:22, 665:23, 666:7

**wind-down** [14] - 638:2, 638:6, 638:7, 638:8, 638:13, 638:14, 664:4, 664:8, 664:10, 664:17, 664:21, 664:22, 665:23, 666:7

**withdraw** [1] - 643:14

**witness** [14] - 631:13, 631:22, 631:24, 632:3, 632:6, 632:10, 632:22, 633:15, 636:7, 636:15, 636:18, 636:20, 667:21, 685:22

**WITNESS** [5] - 636:16, 666:9, 666:11, 685:24, 703:16

**witnesses** [6] - 631:4, 631:14, 633:13, 633:14, 634:6

**won** [1] - 667:25

**word** [4] - 631:4, 631:12, 642:14, 653:14

**words** [3] - 639:23, 653:22, 657:2

**worth** [76] - 637:7, 637:11, 637:18, 637:22, 638:1, 638:12, 640:20, 645:1, 645:22, 649:5, 657:4, 658:20, 661:20, 662:14, 663:3, 663:10, 663:11, 664:4, 664:7, 664:16, 665:2, 665:22, 666:14, 666:19, 666:21, 666:23, 667:4, 671:11, 673:8, 675:6, 675:16, 675:20, 675:24, 676:2, 676:3, 676:7, 676:14, 676:19, 677:20, 677:22, 679:2, 679:25, 681:7, 681:13, 682:4, 682:7, 683:9, 683:11, 683:19, 683:24, 684:16,

684:21, 685:4, 685:8, 685:11, 685:13, 685:15, 685:17, 686:15, 686:18, 686:24, 687:5, 687:16, 687:23, 687:25, 688:18, 688:25, 689:3, 689:19, 690:3, 690:22, 695:12, 700:17, 700:18, 700:24, 701:3

**write** [4] - 666:24, 668:11, 675:5, 677:8

**write-downs** [2] - 666:24, 668:11

**writes** [1] - 672:2

**writing** [1] - 660:10

**written** [12] - 635:17, 646:19, 649:1, 652:24, 653:5, 672:7, 672:11, 672:15, 672:21, 674:19, 676:6, 677:23

**wrote** [2] - 660:18, 690:15

## Y

**year** [10] - 641:1, 641:4, 646:2, 650:6, 650:11, 681:1, 686:2, 693:24, 700:13, 700:21

**years** [9] - 632:10, 651:5, 651:10, 652:7, 655:5, 663:21, 665:7, 685:18, 693:24

**yesterday** [3] - 630:24, 632:2, 634:9

**York** [3] - 627:22, 628:4

**yourself** [1] - 703:20

**yourselves** [1] - 630:7

## Z

**zero** [2] - 685:17, 685:18