```
1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
2
    - - - - - - - - - - - - - - - x
3   FAIRHOLME FUNDS, INC., et al.,
                                    CA No: 1:13-cv-01053-RCL
4              Plaintiffs,
                                    Washington, D.C.
5   vs.                            Friday, October 21, 2022
                                    2:15 p.m.
6
    FEDERAL HOUSING FINANCE AGENCY,
7   et al.,
8              Defendants.
    - - - - - - - - - - - - - - - x
9   IN RE: FANNIE MAE/FREDDIE MAC   Case Number 1:13-cv-1288
    SENIOR PREFERRED STOCK PURCHASE
10  AGREEMENT CLASS ACTION
    LITIGATIONS
11
12  _____

13            TRANSCRIPT OF JURY TRIAL - MORNING SESSION
        HELD BEFORE THE HONORABLE ROYCE C. LAMBERTH
14                UNITED STATES DISTRICT JUDGE
    _____

15  APPEARANCES:

16  For the Berkley Plaintiffs:    BRIAN BARNES, ESQ.
                                    COOPER & KIRK, PLLC
17                                  1523 New Hampshire Avenue, NW
                                    Washington, D.C. 20036
18
    For Class Plaintiffs:          LEE D. RUDY  ESQ.
19                                  KESSLER TOPAZ MELTZER & CHECK
                                    280 King of Prussia Road
20                                  Radnor, Pennsylvania 19087

21                                  HAMISH HUME, ESQ.
                                    KENYA DAVIS, ESQ.
22                                  SAMUEL KAPLAN, ESQ.
                                    BOIES SCHILLER FLEXNER LLP
23                                  1401 New York Avenue Northwest
                                    Washington, D.C. 20005
24
    (CONTINUED ON NEXT PAGE)
25
```

```
 1    APPEARANCES (CONTINUED):

 2    For Class Plaintiffs:        RICH GLUCK, ESQ.
                                   ROBERT KRAVETZ, ESQ.
 3                                 BERNSTEIN LITOWITZ BERGER &
                                   GROSSMANN LLP
 4                                 1251 Avenue of the Americas
                                   New York, New York 10020
 5

 6    For Defendant Federal
      Housing Finance Agency:      JONATHAN STERN, ESQ.
 7                                 ASIM VARMA, ESQ.
                                   DAVID BERGMAN, ESQ.
 8                                 IAN HOFFMAN, ESQ.
                                   STANTON JONES, ESQ.
 9                                 ARNOLD & PORTER KAYE SCHOLER
                                   601 Massachusetts Avenue NW
10                                 Washington, D.C. 20001

11

12    Court Reporter:             Lisa A. Moreira, RDR, CRR
                                  Official Court Reporter
13                                U.S. Courthouse, Room 6718
                                  333 Constitution Avenue, NW
14                                Washington, DC  20001
                                  (202) 354-3187
15

16

17

18

19

20

21

22

23

24

25
```

I N D E X

WITNESS                                                      PAGE

**EDWARD DeMARCO, Resumed**

    (By Mr. Stern)....................................875
    (By Mr. Hume).....................................937

```
 1                     P R O C E E D I N G S
 2            THE COURT:  All right.  We're back on the record
 3      in the Fannie Mae/Freddie Mac trial.  I understand counsel
 4      had a preliminary matter before the witness resumes the
 5      stand.
 6            MR. STERN:  Yes, Your Honor.
 7            I apologize.  Mr. Hume and I thought that we had a
 8      negotiated resolution, and nobody's fault, but we've sort of
 9      talked past each other again, and that just became apparent.
10      We're working together in good faith, but I need just a few
11      minutes to reorient myself.  If we're successful, it will
12      take all of the remaining issues -- objection issues, at
13      least -- with respect to Mr. DeMarco, off the table.
14            Thank you, Your Honor.
15            (Pause)
16            MR. STERN:  Sorry, Your Honor, we're almost there,
17      and in the end this will save the Court some time, I hope.
18            THE COURT:  I'm sorry?
19            MR. STERN:  We're almost there, and in the end, I
20      hope we'll save the Court some time.
21            (Pause)
22            MR. STERN:  Your Honor, thank you very much.
23            Late last night -- and I don't mean to cast any
24      aspersions, Your Honor.  That's how things go in trial, as
25      the Court knows.
```

1          Late last night we received some proposed exhibits

2     that the plaintiffs told us they intended to use in their

3     further examination of Mr. DeMarco.  Those exhibits were not

4     previously on the exhibit list.

5          My concern was, among many others, that, as the

6     Court, I hope, would presume, I've been scrupulously

7     avoiding contact with Mr. DeMarco, and my concern, among

8     many others, was that I would not have any opportunity to

9     talk to him about these documents.

10          We have reached an agreement, and the plaintiffs

11     are going to offer or are reserving the right to offer

12     PX500.  That is an exhibit not previously on their exhibit

13     list.  We will not object to the admission of that document

14     subject to an agreement that we just made.

15          And without getting into all of the details, we

16     have reached an agreement on what part -- it's a letter from

17     Mr. DeMarco to Congress, and we have -- dated January 20,

18     2012.  It relates, Your Honor, to principal reduction.  It

19     does not relate to the net worth sweep.  Principal reduction

20     has been a topic in the case.  It's been a topic of

21     examination, but, without getting into details, not

22     centrally relevant, if I could use that phrase.

23          We've reached an agreement, and Mr. Hume has

24     identified the parts of the document he intends to question

25     about.  We don't object to that.  And we've made some other

 1    agreements that I don't need to belabor on the record

 2    because they're basically the withdrawal of objections, so

 3    it's absence of further argument before Your Honor.

 4            And there are a couple of other features to this

 5    agreement, Your Honor, that I'd like to put on the record.

 6            One is, while we have agreed on what's inbounds

 7    and what's out of bounds, stuff happens, and I have reserved

 8    the right to object if I believe that Mr. Hume is going out

 9    of bounds.  I have no reason to think he will do that, but

10    just in case, I've reserved that right.

11            And also, while we haven't quite addressed this,

12    Your Honor, with this one-appearance approach, on one model

13    what I'm doing now is tantamount to my direct, and I would

14    be entitled to a redirect.  I am going to ask the Court for

15    an opportunity to ask questions after Mr. Hume asks

16    questions.  I don't anticipate --

17            THE COURT:  I agree.  I think you can.

18            MR. STERN:  Understood, Your Honor.  Thank you,

19    Your Honor.

20            THE COURT:  And then he gets the last word, too.

21            MR. STERN:  Whatever the Court directs.

22            THE COURT:  Yes.

23            MR. STERN:  I just want to make sure that Mr. Hume

24    does not object, and I wanted to make sure that I'm not -- I

25    wouldn't run afoul of the Court.

```
 1                THE COURT:  Certainly on this exhibit you
 2      certainly wouldn't be.
 3                MR. STERN:  Thank you, Your Honor.
 4                THE COURT:  And there may be areas where he may
 5      get the last word.  We'll just see.  You all can talk to me,
 6      after you've finished your -- after you've finished your
 7      redirect on what would be cross, if he wants to move to ask
 8      more questions, I can address it again either at the bench
 9      or on the phone.
10                MR. STERN:  Understood, Your Honor.
11                May I have the Court's indulgence for 30 seconds
12      to make sure that Mr. Hume and I are in complete agreement
13      about what I just represented?
14                THE COURT:  Sure.
15                MR. HUME:  Hamish Hume for the plaintiffs, Your
16      Honor.  We are in complete agreement.  Everything Mr. Stern
17      said is accurate.
18                I just -- always a little bit of context.  This
19      was not an attempt to surprise.  This was a new development.
20      And -- but I totally understood, and I really appreciate
21      counsel's effort.  We worked out a compromise.  So that's
22      the deal.
23                THE COURT:  I appreciate it.
24                MR. STERN:  Thank you.
25                MR. HUME:  There is another issue, though,
```

1    unrelated completely, which is we have a document -- I had

2    mentioned this yesterday -- that at some point we'd want to

3    show.  I think we would like to do it when we get to our

4    recross.  It's PX226.  And on that, we haven't really had a

5    chance to discuss it, but I don't think they're going to

6    withdraw their objection.

7              We could also address it -- if Mr. Stern has about

8    an hour, I assume we'll take a little break, so we could try

9    to resolve it then.  And if we don't, before impanelling the

10   jury the second time, we could try to address it.

11             THE COURT:  Yes.

12             MR. STERN:  Your Honor, Jonathan Stern for the

13   defendants.

14             Your Honor, I think we're talking about

15   Exhibit PX226.

16             MR. HUME:  Yes.

17             MR. STERN:  That's just been confirmed by

18   plaintiffs' counsel.

19             We do maintain our objection to this.  So long as

20   we have an opportunity to address it before it's used, we

21   don't see a pressing need to address it now.  We'll defer to

22   the Court.

23             THE COURT:  All right.

24             (Jury enters courtroom)

25             THE COURT:  Good morning, ladies and gentlemen.

```
 1              You may be seated.  Mr. DeMarco will resume the
 2     stand.
 3              Good morning, Mr. DeMarco.
 4              THE WITNESS:  Good morning, Your Honor.
 5              THE COURT:  Mr. Stern, you may proceed.
 6              MR. STERN:  Thank you, Your Honor.
 7              The Court's indulgence.
 8              (Pause)
 9              MR. STERN:  Thank you, Your Honor.
10              Good morning, members of the jury.
11                    EDWARD DeMARCO, Resumed
12                      CROSS-EXAMINATION
13     BY MR. STERN:
14     Q.  Good morning, Mr. DeMarco.
15     A.  Good morning, Mr. Stern.
16     Q.  Mr. DeMarco, I want to pick up on -- I want to go back
17     to the strategic plan for just a moment.  That's DX394.  I
18     ended a little too soon.  I meant to ask you a follow-up
19     question.
20              MR. STERN:  The Court's indulgence.
21              (Telephone interruption)
22              MR. STERN:  I'm so sorry, Your Honor.  "Spam
23     Likely" was that caller.
24     Q.  Going to the -- if we could go to Page 5 of the exhibit,
25     going to No. 3, you said yesterday that, at least as I
```

1    understood your testimony in response to Mr. Hume's question

2    about principal reduction -- I'm paraphrasing, and you can

3    correct me if I'm wrong; and I'm sure Mr. Hume will rise to

4    correct me if I'm wrong -- you said something like I had a

5    better idea or there was a better way or something like

6    that.  Do you recall that response to Mr. Hume?

7    A.  Yes.

8    Q.  And yesterday I asked you whether this No. 3 related to

9    that better idea.  Remember that?

10   A.  Yes.

11   Q.  But I didn't ask you what the better idea was or what

12   the better ideas were.  So could you please elaborate on

13   your response to Mr. Hume that you had a better idea.

14   A.  Yes.  Under the -- what the Treasury Department was

15   trying to get me to do with regard to principal reduction,

16   it would have resulted in a reduction in payment to the

17   borrower of a certain amount -- I'm sorry, I don't remember

18   the exact percentage -- and the underwater amount or most of

19   the underwater amount of the borrower's mortgage balance

20   would have been forgiven.  It would have been erased.  And

21   the government -- Fannie Mae, Freddie Mac, hence Treasury,

22   hence the taxpayer -- would have taken that loss.

23           What we were doing instead was coming up with a

24   lower monthly payment for the borrower relative to what this

25   Treasury plan would have called for, so the monthly payment

1    the borrower was going to be asked to make was lower than

2    under the Treasury plan.

3            We were taking the underwater amount of their

4    mortgage loan and setting it aside in what technically is

5    called a second lien.  And so basically what that meant is

6    we were setting aside the underwater portion of the

7    principal balance saying:  You don't have to make any

8    payment on it.  You don't have to pay it down.  But over

9    time, if the market recovers, and this loan modification

10   allows you to be successful in staying in your home and

11   start making monthly payments again, then whenever down the

12   road you want to refinance your mortgage or you want to sell

13   your house, we'll then look at what house prices are at that

14   point and what the paydown is, and if you're back above

15   water, and this loan modification allowed you to

16   successfully stay in your home, Fannie Mae and Freddie Mac,

17   hence Treasury, hence the taxpayer, could benefit from that

18   upside because that principal balance that had been set

19   aside would get paid off when the loan itself gets paid off

20   and the house is sold.

21   Q.  And -- I'll just leave it at that.  Thank you,

22   Mr. DeMarco.

23           I want to go to another document that is dated

24   around the time -- the Strategic Plan is dated February 21,

25   2012; is that right?

1    A.  Yes.

2    Q.  And at around that time you -- and I mean you -- well,

3    let me just -- I'm going to come back to this in a few

4    minutes.

5            But am I correct in understanding that with

6    respect to the direct negotiations with Treasury over the

7    Third Amendment, you and Mr. Ugoletti were the two people

8    involved from FHFA in the direct negotiations?

9    A.  In the direct negotiations with Treasury, yes.

10   Q.  Okay.  And at around this time you were having -- you, I

11   mean you personally -- were having interaction with Treasury

12   on topics related to the Third Amendment, right?

13   A.  Yes.

14   Q.  And so in the January time frame we're talking about

15   seven months before the Third Amendment was actually agreed

16   to.

17   A.  Yes.

18   Q.  And would it be fair to say -- and I'm just focused on

19   you personally -- that -- or you and Mr. Ugoletti -- were

20   having dialogue, and I mean that in its broadest sense,

21   speaking, writing, communications with Treasury over that

22   entire period, at least intermittently, with respect to the

23   Third Amendment?

24   A.  Yes.

25   Q.  Okay.  That's just stage setting for PX149.

1          Before you comment on this substantively,

2     Mr. DeMarco, let me just ask you to describe what this is.

3     A.  This is a PowerPoint that my staff prepared for me in

4     preparation for going to have a meeting with Secretary

5     Geithner January 19th.  It was a follow-up to an earlier

6     meeting I'd had that month with the Secretary.

7               MR. STERN:  Your Honor, I'd move PX149.

8               MR. HUME:  No objection, Your Honor.

9               THE COURT:  You're moving in plaintiffs' -- you're

10    adding a defendant number?

11              MR. STERN:  It does not -- it's identified as a

12    plaintiffs' exhibit, Your Honor.  We can get --

13              THE COURT:  There's a plaintiffs' number on it.

14              MR. STERN:  We can get it a DX number.

15              THE COURT:  All right.  It will be in evidence.

16              MR. STERN:  Thank you, Your Honor.

17    Q.  Mr. DeMarco, let's start on the first page of the slide,

18    which is Page 2 of the exhibit, and actually on this

19    particular exhibit the exhibit pages match up with the slide

20    numbers.  So it's Page 2 of the exhibit and Page 2 of the

21    slide.

22              Tell us, just briefly, what the context is of

23    this -- so let's go back to the title page.  I'm sorry.

24              So this says "Mortgage Market Issues:  Discussion

25    With Treasury Secretary Geithner."

1          Is this a transcript of some discussion with

2    Secretary Geithner?  What is this document?

3    A.  This is a document prepared in advance of that meeting

4    to use as a discussion guide --

5    Q.  Okay.

6    A.  -- in the meeting.

7    Q.  And was it intended to be shared with Treasury and

8    Secretary Geithner, or was this just your internal document?

9    A.  It was meant to be shared.

10   Q.  Do you know if it ever was shared?

11   A.  I assume it was.  I don't recall, but I assume it was.

12   Q.  So now go to the Page 2, Slide 2.  It refers to a

13   meeting on January 6, 2012?

14   A.  Yes.

15   Q.  And it refers to "Housing Market Issues."

16          Did those -- just as a general matter, did those

17   issues include consideration of some of the items that later

18   became part of the Third Amendment, including the net worth

19   sweep?

20   A.  Yes.

21   Q.  Okay.  So what was going on with this document,

22   according to this background page?

23   A.  We had had a preliminary meeting on January 6th.  He had

24   asked me to go back and think about some issues and what it

25   is that I felt FHFA could do, and this was a follow-up

1    meeting to that.  And there were a range of topics we were

2    intending to discuss based on the prior conversation on

3    January 6th.

4    Q.  And the third paragraph refers to a "dialogue."

5    According to this document, what was the purpose of that

6    dialogue, continued dialogue?

7    A.  The purpose was to make sure that as the Treasury

8    Department was moving ahead with its housing agenda, and I'm

9    moving ahead, you know, with the companies in

10   conservatorship, and we have a range of things for which we

11   have shared responsibility, that I want to make sure that

12   we're engaged in a constructive discussion about how this

13   goes.  That included both assisting homeowners as well as

14   preparing for the future state of the housing finance

15   system.

16   Q.  And it refers to "improved outcomes from homeowners,

17   neighborhoods, markets, and taxpayers."  It does not refer

18   to shareholders, does it, Mr. DeMarco?

19   A.  No.

20   Q.  And is that a reflection of the priority that the public

21   interest had over the shareholders' interest, or is it a

22   reflection of something else?

23   A.  Well, it's a reflection that I'm focused on the public

24   interest.

25   Q.  Let's go to Page 5, which is also Slide 5.  And

1    understanding that the members of the jury have heard about

2    some of these things both from you and other witnesses, and

3    we don't want to be too repetitive, with that warning, could

4    you please walk us through what this page is talking about.

5    A.   So this page is listing a series of issues associated

6    with the Treasury, the PSPA, the Treasury Support Agreement.

7    Q.   And what is it?  Walk us through each bullet, if you

8    would.

9    A.   Sure.  So the first one is acknowledging to the Treasury

10   Secretary that -- what we both realize, that at the end of

11   this calendar year -- we're now in January, but at the end

12   of the year in December that the remaining amount of funding

13   under the Treasury Commitment is going to be capped.  That's

14   the first one.

15          The second bullet is noting that some market

16   participants -- so this would be investors in the debt and

17   mortgage-backed securities of Fannie Mae and Freddie Mac --

18   have begun raising questions.  We are hearing this; that is,

19   whether the remaining commitment is going to be sufficient

20   to justify making long-term investments in the securities

21   issued by Fannie Mae and Freddie Mac.

22          The third bullet notes that projections at FHFA

23   show that the draws are leveling off, but more adverse house

24   price paths as well as operational changes at Fannie and

25   Freddie could lead to dividends eating into future cap

1    space.  And that's something we covered yesterday with

2    regard to the October 2011 stress test projections.

3            The next bullet, Bullet 4, acknowledges that --

4    the existence of the periodic commitment fee, that the

5    periodic commitment fee has been waived to date.  But

6    particularly in light of the prior bullet, the setting of

7    this fee, I'm anticipating that if we set this fee, and now

8    there's an additional obligation beyond the fixed 10 percent

9    dividend, that could impact the stability of the companies.

10           And then the final bullet is saying -- me saying

11   to the Treasury Secretary:  I'm ready to work with you on

12   making changes to the Treasury Stock Purchase Agreement that

13   will add stability to the market.  And then I'm saying:

14   Look, let's get a working group together; let's come up with

15   a set of ideas; and let's set a timeline to wrap this up

16   before the second quarter.  So I had hoped that this would

17   be done before the end of June.

18   Q.  And while I think this may be quite evident by now, just

19   to make sure the record is clear, why was the stability of

20   the market important?

21   A.  I mean, that was the whole point of creating the

22   conservatorship.  If we lost stability in the financial

23   market, that was going to directly and negatively affect the

24   ability of families that wanted to buy a home, wanted to get

25   a mortgage, from having access to credit.  It also would

1    have risked mortgage rates going up as a result of that.

2         That was why the companies were put in

3    conservatorship in 2008, and why, as conservator, I was

4    continually concerned about anything that would lead to the

5    market having concerns about the reliability of the Treasury

6    Commitment over the long term.  Because that would then

7    start, you know, either -- either or both reducing the

8    amount of credit available or increasing the cost of that

9    credit to homeowners.

10        MR. STERN:  The Court's indulgence.

11        (Pause)

12        MR. STERN:  I'll move on to something else for

13   right now, Your Honor.

14   Q.  Mr. DeMarco, thank you.  You just referred back to the

15   FHFA 2011 projections, and I just want to go back to -- and

16   those are different from the Freddie Mac projections that

17   Mr. Hume showed you, right?

18   A.  Yes.

19   Q.  So I just want to go back to those projections for one

20   moment to ask you about one thing.

21        MR. STERN:  Can we get DX346, please.  This is in

22   evidence, Your Honor.

23        And if we could go to Page 4 of the exhibit.

24   Q.  So do you see in that second paragraph, Mr. DeMarco, the

25   bolded sentence or sentences?

```
1    A.  Yes.

2    Q.  The first one refers to three scenarios.  And I didn't

3    ask you -- we don't need to go into the detail that's in the

4    document, but just generally, if it can be answered

5    generally, were those three scenarios of a type that you

6    were familiar with?

7    A.  Yes.

8    Q.  And what were they --

9    A.  Basically --

10   Q.  -- as a matter of their type?

11   A.  Yes.  So sort of a better outcome, you know, a base-case

12   outcome, sort of middle of the road, and then the worst-case

13   outcome or stress outcome.

14   Q.  So let's take the top first.  What's the best-case

15   scenario?  What is that used for?  Why is it in there?

16   A.  So we're trying to get a sort of general sense of a

17   range of outcomes that could occur over the next several

18   years.  And the better -- the best case in this is -- I

19   don't want to say "best," but certainly the better, you

20   know, the positive case is house prices improve at an

21   accelerating rate that's better than expected.

22   Q.  And what does "base case" mean generally, and what did

23   it mean in this context?

24   A.  So you think about a distribution of outcomes.  It's

25   more the middle outcome.  So that's -- in this case, it's
```

 1    going to be some modest increase in house prices.

 2    Q.  And what's the third scenario?

 3    A.  The third scenario is, you know, a more negative

 4    scenario, in which case house prices are declining, and so

 5    that creates more adverse credit conditions.

 6    Q.  And I'm sure the jury is familiar with the phrase "worst

 7    case scenario."  Is that what we're talking about?

 8    A.  Not necessarily "worst case," but definitely a stress

 9    case.

10    Q.  That's what I was about to ask you.  This third scenario

11    is sometimes referred to as the stress case?

12    A.  It can be, yes.

13    Q.  And what is -- at least as you use the term, what is a

14    stress case?

15    A.  So a stress case is when an economic environment turns

16    negative.  Bad things are happening in the economy that

17    affect the financial performance and results of Fannie Mae

18    and Freddie Mac because in large parts it's affecting

19    homeowners and their ability to make payments on their

20    mortgage.

21    Q.  So of these three scenarios -- I'll call it better case,

22    base case, and worst case or stress case -- if one of them

23    was the most important to you -- well, let me ask you this

24    way.

25              Which of those was the most important to you in

1    shaping your decisions about the issues that ultimately led

2    to the Third Amendment in the net worth sweep?

3    A.  Clearly the worst case or stress case scenario.

4    Q.  And why was the stress case most important to you?

5    A.  Because I've got a fundamental responsibility to ensure

6    the stability and liquidity of this market so that no matter

7    what happens down the road, that there's resiliency in how

8    we're operating these conservatorships so that the mortgage

9    market will continue to be liquid and will continue to

10   function, not that investors start to question whether

11   Fannie Mae and Freddie Mac are going to be capable of

12   fulfilling their obligations down the road.

13   Q.  I want to leapfrog ahead in time, and then I'm going to

14   come back.

15            But the leapfrog is to the day after or the day

16   of, actually, the execution of the Third Amendment.  And

17   what was that date?

18   A.  August 17th.

19   Q.  Now, you've talked about market confidence, and you've

20   just talked about the importance of letting the market know

21   that things were going to be taken care of.  And I'm not

22   going to further paraphrase, but you've just given that

23   testimony; is that right?

24   A.  Yes.

25            MR. STERN:  So skipping ahead, can we pull up

 1    DX549, please.

 2    Q.  Without getting into the details, can you just describe

 3    what we are looking at.

 4    A.  We are looking at a Barclays report with the --

 5    summarizing the initial thought of Barclays, being a major

 6    investment bank and bank, providing immediate thoughts and

 7    market response to the announcement about the Third

 8    Amendment.

 9              MR. HUME:  Judge, I have an objection to

10    questioning on this document.  We had --

11              MR. STERN:  Your Honor, I tried very hard.  We

12    tried hard.  I'll pass on this for right now.

13              MR. HUME:  And we will discuss it at the break.

14              MR. STERN:  Yeah.

15              MR. HUME:  Thank you.

16              MR. STERN:  I'll now go back in time.

17    Q.  And I want to clear something up that may have gotten

18    lost yesterday because of some back-and-forth between

19    counsel.

20              Am I correct in understanding again that, as far

21    as direct negotiations with Treasury, the only people

22    involved were you and Mr. Ugoletti; is that right?

23    A.  Yes.

24    Q.  Okay.  But I also -- it's also my understanding -- and

25    correct me if I'm wrong -- that there were internal

```
1    discussions at FHFA about various issues that ended up

2    informing your decision-making process, is that right --

3    A.  Yes.

4    Q.  -- that were not direct negotiations with Treasury,

5    correct?

6    A.  Yes.

7              MR. STERN:  All right.  I want to -- can we pull

8    up Exhibit 247.  Oh, I'm sorry.  PX247.

9              I apologize, Ms. Jenkins -- I mean, Mr. Salazar.

10   Q.  Am I correct that this is an email from Mr. Ugoletti to

11   you and some other people?

12   A.  Yes.

13   Q.  And those other people are all FHFA people; is that

14   right?

15   A.  Yes.

16   Q.  And there's a cc, and that's also an FHFA person,

17   correct?

18   A.  Yes.

19   Q.  And it says, before the text even begins, "Close Hold."

20   What does that mean?

21   A.  That meant --

22   Q.  What did it mean in this context?

23   A.  It means that this was not to be further distributed.

24   Q.  Okay.  And why would something be under a close hold?

25   A.  Because of the sensitive nature of the information.
```

1              I mean, in this particular case, this is

2     information that could be market-moving, and so it needed to

3     be kept with the people that were directly involved in these

4     discussions.  It was not to be shared.

5              MR. STERN:  Your Honor, I'd move 247, please.

6     Plaintiffs' Exhibit 247.

7              MR. HUME:  No objection.

8              THE COURT:  Received.

9              MR. STERN:  I'm sorry, I started talking about

10    this before the members of the jury could see it, as I was

11    just reminded by my colleagues.  But now I believe it's up

12    for everyone to see.

13    Q.  So, again, this is from Mr. Ugoletti to you and other

14    people at FHFA, right?  That's where we were.

15    A.  Yes.

16    Q.  All right.  And you were talking about "Close Hold," and

17    you say "could be market-moving."  I don't want to get into

18    a lot of detail about this, so if I'd be permitted some

19    leeway by the Court, I would put it to you this way, and you

20    can either agree or disagree.

21             You were worried that this is the kind of document

22    that, if it got outside of FHFA to the public, someone could

23    take advantage of this information to do something in the

24    market that would be unfair to everybody else, sort of like

25    insider information.  Is that the general idea?

1          MR. HUME:  Objection; leading, Your Honor.

2          MR. STERN:  Well, I asked for some leeway.

3          THE COURT:  Overruled.

4          MR. HUME:  I'm trying not to make that objection.

5          MR. STERN:  Is that overruled, Your Honor?

6          THE COURT:  I said overruled.

7          MR. STERN:  Oh, I'm sorry, Your Honor.  I didn't

8    hear you.

9    A.  Yes.

10   Q.  So coming back to the document itself, it says, "As

11   a heads up, there appears to be a renewed push to move

12   forward the PSPA amendments.  I have not seen" -- and this

13   is Mr. Ugoletti talking, right?

14   A.  Yes.

15   Q.  "I have not seen the proposed documents yet, but my

16   understanding is that largely the same as previous versions

17   we had reviewed in terms of net income sweep, eliminating

18   the commitment fee, faster portfolio wind down, and a de

19   minimis safe harbor for ordinary course transactions."

20          I want to focus on the language "the same as

21   previous versions we had reviewed."  Is it your

22   understanding that the "we" in that email refers to the

23   group of people who received -- I'm sorry, the "we" in that

24   sentence refers to the group of people in this email?

25   A.  Yes.

1   Q.  Okay.  Can you please just identify by job title or

2   brief job description who these people are.

3   A.  So in the "To" line, after myself, Alfred Pollard is the

4   general counsel.  Mark Laponsky was the senior counsel that

5   worked for Mr. Pollard.  Jeffrey Spohn was the head of the

6   office of conservatorship operations.  Jon Greenlee was the

7   head of the division of supervision for Fannie and Freddie.

8   Pat Lawler was our chief economist.  Wanda DeLeo was our

9   former chief accountant, was at this time, I believe, the

10  head of the division that I used to run.  Nick Satriano I

11  believe at this point was now the chief accountant.

12  Q.  And what about...?

13  A.  Ms. Brown, Jan Brown was my secretary.

14  Q.  All right.  So the reference to previous versions we had

15  reviewed, then, I would take it to be Mr. Ugoletti referring

16  to the fact that this group had been involved in related

17  communications and had previously reviewed versions of the

18  document?

19  A.  Yes.

20  Q.  Okay.  I want to move on to talk about the Third

21  Amendment itself and the process by which you reached --

22  decided to reach agreement.

23          Let me first ask you about potential alternatives

24  to the net worth sweep.  Right?

25          Just to orient everyone, you have talked about

1    your reasons for believing in the net worth sweep.  You

2    talked about circular draws.  I'm not going to go back over

3    all of that, but Mr. Hume asked you a question about

4    alternatives to the Third Amendment.

5                 MR. STERN:  If I could have the Court's

6    indulgence.

7    Q.  I'm going to read you what I believe was a question and

8    answer from yesterday's proceedings.  Okay?  And this will

9    be a question by Mr. Hume and obviously your answer.

10               "QUESTION:  When you were discussing the net worth

11   sweep and the Third Amendment, did you ever make any effort

12   to negotiate a provision that would address the scenario of

13   what should happen if Fannie and Freddie end up making very

14   large profits, very big increases in net worth, and that

15   could ensure that something irrational wouldn't happen; in

16   other words, something -- a provision that would address the

17   profitability that they actually had?  Did you ever attempt

18   to negotiate such a provision?"

19               Your answer was "No."

20               Is that your recollection of the testimony?

21   A.  Yes.

22   Q.  Now, Mr. Hume didn't ask you the question I'm about to

23   ask you.  Why didn't you attempt to negotiate such a

24   provision?

25   A.  Because based on my understanding of both the existing

1    PSPA where my counterparty was starting from, that this

2    was -- that -- I'm sorry, let me step back.

3              At this point Fannie Mae and Freddie Mac had --

4    have drawn $190 billion.

5    Q.  At this point?  What point?

6    A.  When we were negotiating the Third Amendment.  All

7    right?  $180 billion, $190 billion.  The focus of both the

8    administration, publicly stated, as well as members of

9    Congress was winding down the companies.

10             But more than that, the companies have been

11   operating now for several years in conservatorship; and, as

12   I have stated repeatedly, the only thing that allowed them

13   to operate was having the support of the Treasury Department

14   backed by essentially the taxpayer.  And so the Treasury

15   Department is the only one bearing downside risk, and the

16   only one available to -- you know, is there to take the, you

17   know, whatever upside.  But what we're not focused on --

18   Q.  What you say "upside," what does that mean in this --

19   A.  That if things turn -- that if markets perform better.

20   Think about those stress -- those paths we had.

21             Well, suppose house prices do get better.  Right?

22   Well, the Treasury is there, you know, with the dividend and

23   the commitment fee to absorb that.  But also on the down

24   side they absorb all of that as well.  They are the only

25   effective risk-bearer in these companies at this point in

```
 1    time.
 2    Q.  So why didn't you opt -- why didn't you negotiate the
 3    kind of provision that Mr. Hume described?
 4    A.  I saw no need for it.
 5    Q.  What do you mean, you saw no need?
 6    A.  Because the Treasury was the effective shareholder in
 7    these companies at this point in time so that what we did
 8    negotiate, you know, covered all of these scenarios.  It was
 9    no -- I saw no need for there to be a separate scenario for
10    a stronger outcome.
11    Q.  And let me ask you about some other potential
12    alternatives.  Why not just reduce -- if the circular draws
13    were the result of inability to pay a 10 percent dividend,
14    why not reduce it to 5 percent?
15    A.  So, among other things, I understood from the Treasury
16    Department that they were under an obligation not to
17    compromise a claim.  That is a technical term for their
18    obligation.
19              They couldn't simply say, "Okay, we signed the
20    contract saying that we were going to get 10 percent."  They
21    couldn't simply go back later and say, "Okay, we're going to
22    make that 5 percent."
23    Q.  Only if you have an informed understanding, do you have
24    an understanding of why they couldn't do that?
25    A.  My understanding was what they conveyed to me.
```

1    Q.  Okay.  So another alternative might be -- you talked

2    about the payment-in-kind, right?

3    A.  Yes.

4    Q.  The 12 percent.  And tell us, again, why was that not --

5    did you consider that to be a feasible alternative?

6    A.  No.

7    Q.  Why not?

8    A.  No.  Because -- first because the way the contract was

9    written, there was a requirement to pay it in cash.  And the

10   only -- the language about the payment-in-kind stated

11   explicitly that it was only to kick in if there was a

12   failure to make the 10 percent cash payment as required by

13   the agreement.

14           And furthermore, if one were to go to 12 percent,

15   that is now increasing the liquidation preference of

16   Treasury.  So Treasury now owes -- is owed even more, and

17   it's going to increase future dividend obligations because

18   the liquidation preference is what the dividend's based on,

19   so now future dividends are going to be even higher.  And

20   ultimately the agreement still requires that these future

21   dividends be paid back in cash.

22   Q.  So just one more.  The jury has seen data.  I'm not

23   going to remember the exact number.  But the data shows that

24   at the time of the execution of the Third Amendment there

25   was still over $100 billion remaining on the Treasury

1    Commitment, right?  Are you aware of that?

2    A.  Yes.

3    Q.  Okay.  What about this?  Since there's $189 billion -- I

4    don't remember what the number was.  It was over $100

5    billion.

6          Since there's over $100 billion still left on the

7    commitment, why not just wait to see whether it erodes and

8    how far it erodes, and, if it keeps going, do something

9    later?  Why wasn't that an alternative as opposed to -- even

10   say the net worth sweep was a good idea.  Let's say

11   everybody agreed on that.  One alternative might be, well,

12   okay, we're good with the net worth sweep, but you don't

13   have to do it now.  What would your response to that be?

14   A.  Two.

15         The first is that the latest we could do this is

16   the end of December, because that's when the commitment's

17   going to be capped.  And the second is what we learned in

18   the market -- market reaction to the Treasury Commitment

19   that gave rise to both the First Amendment and the Second

20   Amendment is you can't get close to using up the remaining

21   commitment before the market starts to adversely respond.

22         And the reason for this is pretty basic.  Right?

23   Fannie Mae and Freddie Mac are issuing mortgage-backed

24   securities with a 30-year life to it.  So if I'm an

25   investor, if these companies are in conservatorship, and I'm

1    purchasing a mortgage-backed security today -- let's say

2    it's July of 2012 -- and it's got a 30-year life to it, I

3    need to make -- I need to know, if I'm going to have

4    confidence in making that investment, that this Treasury

5    Commitment has enough behind it.  There's enough there that

6    whatever future outcomes there are, whatever bad economic

7    conditions, whatever war breaks out, whatever pandemic ends

8    up happening down in the future that could disrupt financial

9    markets, there's enough commitment there that can absorb

10   this so that I have the confidence in purchasing this

11   mortgage-backed security.

12            So those are the two reasons why this needed to

13   be done.  And it needed to be done timely rather than just

14   wait -- playing a wait-and-see game.

15   Q.  So in terms of what -- we've talked about projections

16   and possible future outcomes, and there's been a reference,

17   both in my -- Mr. Hume's questions and my questions, to

18   Mr. Benson's golden years projections.

19   A.  Yes.

20   Q.  You're smiling because you've heard that a lot.

21   A.  I have.

22            MR. STERN:  Okay.  I want to pull up -- I'd ask

23   that we pull up, please -- it's 213.  It is PX213.

24            The Court's indulgence, please.

25            (Pause)

1              MR. STERN:  Let me get started while somebody's

2      finding me a copy.  This is already in evidence, Your Honor.

3      Q.  So this is an email from Mr. Martin Bradford [sic].

4      He's at FHFA.  What does he do?

5      A.  Brad Martin worked in the office of conservatorship

6      operations.

7      Q.  That's under you?

8      A.  That's under me, yes.

9      Q.  At this point everybody was under you?

10     A.  Everybody was under me --

11     Q.  Okay.

12     A.  -- in the hierarchical sense of an organization.

13     Q.  And everybody -- without going name by name, everybody

14     on this email -- it's dated July 13, 2012; is that right?

15     A.  Yes.

16     Q.  Everybody on this email is an FHFA person?

17     A.  Yes.

18     Q.  Okay.  And this is an account by Mr. Bradford [sic] of a

19     Fannie Mae executive management meeting on July 9, 2012; is

20     that right?

21     A.  Yes.

22     Q.  And do you know why Mr. Bradford is the one writing this

23     email?

24     A.  He's the one that attended the meeting.

25     Q.  Okay.  And is he reporting back to the group on what

1  happened there?

2  A.  Yes, he is.

3  Q.  So in the first sentence it refers to Tim Mayopoulos.

4  Can you please -- the jury has heard this, but could you

5  please remind us all who Tim Mayopoulos was or what his role

6  and job was on July 13, 2012.

7  A.  He was the CEO of Fannie Mae.

8  Q.  And in the second paragraph there's a heading that

9  says -- I'm sorry.

10            There's a heading that says "GSE Strategy Update."

11  Do you see that?

12  A.  Yes.

13  Q.  Okay.  And it says, "Dave Benson walked through a draft

14  copy of next week's Board strategy planning discussion

15  intended to review areas where Fannie might facilitate the

16  ongoing secondary market transition."

17            So the jury's heard about the secondary mortgage

18  market.  Is that what "secondary market" refers to here?

19  A.  Yes.

20  Q.  And so this is Mr. Benson anticipating a meeting of the

21  Fannie Mae board; is that right?

22  A.  Yes.

23  Q.  And just -- am I correct that, as a matter of general

24  corporate organization, you have the management of the

25  company that does things day-to-day; is that right?

1    A.  Yes.

2    Q.  And then the board has responsibilities for overseeing

3    management in various areas of operations.  Is that

4    generally true?

5    A.  Generally.

6    Q.  Okay.  So this is management getting ready for a meeting

7    with the board, right?

8    A.  Yes.

9    Q.  All right.  So I don't know if we've -- you've

10   actually -- if the members of the jury have seen this yet,

11   but if we go down in that paragraph, it says, "Dave focused

12   on the GSEs return to profitability as a key factor in

13   building public support for the conservatorship."

14           And, again, who is -- who is Dave Benson?  Is he

15   FHFA, or is he Fannie?

16   A.  He's an executive at Fannie Mae.

17   Q.  Okay.  Is he -- and I apologize for using these terms,

18   but is he below Mr. Mayopoulos in that corporate hierarchy?

19   A.  Yes.

20   Q.  Okay.  And he is -- he goes on to say, "Current

21   projections show that cumulative GSE dividends paid will

22   surpass cumulative GSE Treasury draws by 2020."  Do you see

23   that?

24   A.  I do.

25   Q.  And when he says "cumulative GSE dividends," do you

1    understand him to be referring to Fannie or Freddie or both?

2    A.   Fannie.

3         Oh, well he's saying GSEs, so maybe he's including

4    Freddie.

5    Q.   You personally don't know?

6    A.   I don't know.

7    Q.   Okay.

8    A.   He could be referring to --

9    Q.   If he's talking about Freddie, he's talking about a

10   place he doesn't even work at, right?

11   A.   Correct, yes.

12   Q.   And he says that -- he says that "current projections

13   show that dividends will exceed draws by 2020."

14        So he's trying to project eight years out into the

15   future; is that right?

16   A.   That would be eight years later, yes.

17   Q.   Okay.  So then -- here's the punch line -- he says --

18   "he referred to the next 8 years as likely to be 'the golden

19   years of GSE earnings.'"

20        Are you aware of whether those projections

21   projected no draws at all for those eight years?

22   A.   They did not.

23   Q.   Did they project any draws?

24   A.   They did.

25   Q.   So he's calling them "the golden years," even though

 1     they include having to take draws?

 2     A.  Yes.

 3     Q.  Okay.  So now let's go to the next page.  Do you see the

 4     paragraph that says "Financial Forecast Update"?

 5     A.  Yes.

 6     Q.  And it says, "Ann Gehring discussed highlights of the

 7     latest financial forecast."

 8              Do you know who Ann Gehring was?

 9     A.  I don't remember her position.  She was a Fannie Mae

10     employee.

11     Q.  And then there's more discussion, and I don't mean to be

12     leaving anything out strategically -- and Mr. Hume will have

13     a chance to ask questions about this document, and the

14     members of the jury will have an opportunity to read the

15     whole thing -- but I'm going to skip down to sort of the

16     middle of the paragraph, the sentence that begins, "given

17     this large change."

18     A.  I see it.

19     Q.  So well -- well, going to the top, if I could for just a

20     moment, the second sentence says that Ms. Gehring noted that

21     Q2's record projected outcome of $6.2 billion since reduced

22     to $5.5 billion.  Do you see that?

23     A.  I do.

24     Q.  And that's saying the original forecast, whenever that

25     was, was $6.2 billion, and by the time of this meeting

1    they've knocked it down already to $5.5 billion; is that

2    right?

3    A.  That's what it looks like, yes.

4    Q.  Okay.  So then it goes on to say that "Cumulative 2012-

5    '16 income is now forecast at $56.6 billion, $12.3 billion

6    higher than the last projection."  Do you see that?

7    A.  Yes.

8    Q.  Okay.  Then it says, "Given this large change from the

9    prior forecast, Tim Mayopoulos wondered whether the Board

10   might question the credibility of the management's financial

11   projections."

12              And "credibility" means believability in this

13   context?

14   A.  Yes.

15   Q.  So what's going on here?  The CEO, what's he saying?

16   A.  He's saying this is a substantial change from what we

17   have been projecting, and the board may wonder how credible

18   is it that this quickly you've changed your outlook about

19   what future income might be.

20   Q.  And just so we're not hiding the ball, it turns out

21   things did get much better ultimately, right?

22   A.  It did.

23   Q.  Okay.  But at this point in terms of projections, the

24   CEO is saying:  I'm the CEO, and I wonder whether the board

25   is going to believe in this.  Right?

1    A.  Yes.

2    Q.  All right.  And then, at least as reported by

3    Mr. Bradford, Mr. Mayopoulos went on to say, "He noted that

4    the models seemed to lag or underestimate both downturns and

5    upturns."  Right?

6    A.  Yes.

7    Q.  What does that mean?

8    A.  It means that when you're doing a financial model, you

9    know, there are times -- if the market conditions are

10   changing, you know -- think about what we were saying

11   earlier about house prices.  If you start to get a, you

12   know, shift in the direction or trend of that, the models

13   can be, you know, slower; they miss, you know, picking that

14   up, both upside and downside.

15   Q.  And let's go to...

16           MR. STERN:  Can we get DX476, please.

17   Q.  So we looked at this yesterday.  This is Fannie Mae's

18   Q2, second quarter, Form 10-Q, their securities filing.  And

19   this is dated August 8, 2012, I believe.

20           MR. STERN:  Can we go to the signature page on

21   this, which will have the date, Mr. Salazar.  Thank you.

22   Q.  This is dated August 8, 2012.  And this -- this is a

23   document we saw yesterday, right?  And it talked about --

24           MR. STERN:  Let's go to Page 16 and the last

25   paragraph.  Can we blow up that last paragraph.

1    Q.  Without reading the whole thing all over again, this is

2    the part in the filing that says:  We do not expect to

3    generate net income in excess of the dividend obligation

4    over the long term.  Is that right?

5    A.  Yes.

6    Q.  So we saw -- and this is signed by Susan McFarland,

7    right, the executive vice president?

8    A.  Yes, chief financial officer.

9    Q.  And we saw the CEO questioning those rosier forecasts.

10   And then, when they actually had to make the filing in

11   August of 2012 and a senior executive had to sign the bottom

12   line, that's what it said, right?

13   A.  Yes.

14   Q.  So let's just look at a few other securities filings, if

15   we could.

16           MR. STERN:  Can we get DX367.  Let's go to --

17   Q.  This is a Form 10-K from Fannie; is that right?

18   A.  Yes.

19   Q.  And this -- a 10-K is an annual securities filing; is

20   that right?

21   A.  Yes.

22           MR. STERN:  Let's go to the signature -- I'm

23   sorry, I'd move this, Your Honor, DX3667.

24           THE COURT:  Without objection it's received.

25           MR. STERN:  Can we go to the signature page of

1      this one, Mr. Salazar.

2      Q.   I'm sorry, is this a Freddie or a Fannie?

3      A.   This is Fannie.

4      Q.   And it's dated February 29, 2012; is that right?

5      A.   Yes.

6      Q.   So let's go to Page 8.  And the paragraph --

7              MR. STERN:  Can you go to the top of this page,

8      please, Mr. Salazar.

9              I'm sorry, Your Honor.  May I just have just a

10     moment?

11             (Pause)

12             MR. STERN:  Can we get the date again?  I may have

13     the wrong one.  I'm sorry, everybody.

14             The date, Mr. Salazar?

15             I apologize to the members of the jury.  I

16     apologize to the Court.  If I could have just one moment.

17             (Pause)

18             MR. STERN:  I have to take it all back.

19             Can I get DX369.

20             Okay.  Now I move DX369, Your Honor.  I apologize.

21             THE COURT:  Without objection, it's received.

22     Q.   So okay, let's rewind, Mr. DeMarco.

23             This is a 10-K.  Is this Freddie or Fannie?

24     A.   Freddie.

25     Q.   Okay.  And let's go to the date page.  And we see that

1    this is dated March 9, 2012, right?

2    A.  Yes.

3    Q.  Okay.  So this is during the year you've started

4    discussions with Treasury in January, and we're now in March

5    of that year; is that right?

6    A.  Yes.

7    Q.  Okay.  So now let's go to Page 8.  Page 8 of the

8    document, I think.  How about Page 8 of the exhibit?

9    A.  Okay.  Now I've got it.

10   Q.  See that paragraph that says "Our annual dividend

11   obligation"?

12   A.  Yes.

13   Q.  What does that say about -- what is Freddie saying in

14   its SEC filing about their ability to pay the dividend?

15   A.  So at this point it's saying that the dividend

16   obligation as it is now computed, so 10 percent of what

17   they've drawn, is going -- is -- exceeds their annual

18   historical earnings in all but one period.  So it's saying

19   just this dividend obligation alone exceeds what we've

20   historically earned at all times except for once.

21   Q.  And without -- I don't want to take the time to march

22   through a 440-page document.  Do you know one way or the

23   other whether this kind of language appears once or more

24   than once in these filings?

25   A.  More than once.

 1              MR. STERN:  All right.  So now let's get DX367.

 2      Now let's go to Page --

 3      Q.  This is Fannie or Freddie?

 4      A.  Fannie Mae.

 5      Q.  And this is the one from February 29, 2012, right?

 6      A.  Yes.

 7      Q.  All right.  Let's go to page -- I have page numbers.  I

 8      don't know if they're in the exhibit or the document.

 9              Let's start with Page 15 of the exhibit.

10              MR. STERN:  Okay, blow up the first paragraph,

11      would you please, Mr. Salazar.

12      Q.  Okay.  So that first paragraph says, "December 31, 2011,

13      the aggregate liquidation preference on the senior preferred

14      stock will be $117.1 billion, which will require an

15      annualized dividend payment of $11.7 billion.  The amount of

16      the dividend payment exceeds our reported annual net income

17      for every year since our inception."

18              And this is a Fannie document?

19      A.  Yes.

20      Q.  So what would be the year of Fannie's inception?

21      A.  1938.

22      Q.  And what does it mean when they say "the amount of this

23      dividend payment exceeds our reported annual net income for

24      every year since our inception"?

25      A.  It says since 1938 to the present time they had never

1      earned that much money in a given year, and now they owe

2      that much money as an annual dividend to the Treasury

3      Department.

4              MR. STERN:  Let's go to Page 65, please.  The

5      second paragraph.

6      Q.  Do you see in the middle of that paragraph it says, or a

7      few sentences down, "The prospective $111.7 billion annual

8      dividend obligation exceeds our" -- same sentence --

9      "reported annual net income for every year since our

10     inception.  Our ability to maintain a positive net worth has

11     been and continues to be adversely affected by market

12     conditions."

13              What does that mean?

14     A.  It means that their positive net worth is, of course,

15     only at this point based on the Treasury draws, and they're

16     saying, looking at economic conditions at this point,

17     maintaining a positive net worth continues to be harmed by

18     the adverse economy and adverse housing market.

19     Q.  And keep reading.

20     A.  "To the extent we have a negative net worth as of the

21     end of future fiscal quarters, we expect that FHFA will

22     request on our behalf additional funds from Treasury under

23     the senior preferred purchase agreement."

24     Q.  And what does that mean?  Is that talking about draws?

25     A.  It means that -- it's talking about draws.

1          MR. STERN:  All right.  Let's go to the next

2     paragraph.

3     A.  "In addition" -- I'm sorry.

4     Q.  Do you see the last sentence, "The substantial

5     dividend" -- is that the last or the second-to-last

6     sentence?

7          MR. STERN:  Same page.  Mr. Salazar, could you

8     just go back to what you just had for me.  All right.  The

9     paragraph that begins "In addition," can you make that a

10    little bigger.

11    Q.  All right.  Towards the bottom, "The substantial

12    dividend obligations and potentially substantial quarterly

13    commitment fees," is that reference to "quarterly commitment

14    fees" a reference to what we've been referring to as the PCF

15    or periodic commitment fee, if you know?

16    A.  Yes, it is.

17    Q.  And it's saying that it's potentially substantial; is

18    that right?

19    A.  Yes.

20    Q.  And what does that tell you about what Fannie Mae

21    believed may be the case with the periodic commitment fee?

22    A.  That they were getting to a point where a commitment fee

23    may be charged, and they expected it to be a substantial

24    obligation in addition to the already substantial 10 percent

25    dividend.

1    Q.  Can you please read that last sentence in its entirety

2    and tell us what you think it means.

3    A.  "The substantial dividend obligations and potentially

4    substantial quarterly commitment fees on the senior

5    preferred stock, coupled with our effective inability to pay

6    down draws under the Senior Preferred Stock Purchase

7    Agreement, will continue to strain our financial resources

8    and have an adverse impact on our results of operations,

9    financial condition, liquidity and net worth, both in the

10   short and long term."

11   Q.  And what -- I asked you what that means to you.  The

12   much better question is, first of all, is this something you

13   would have reviewed back in 2012 when you were thinking

14   about how to deal with the issue of circular draws?

15   A.  Yes.

16   Q.  And would this have had any influence on your decision-

17   making?

18   A.  It certainly would have affirmed my understanding of the

19   conditions we were facing.

20   Q.  Now, Mr. DeMarco, for the sake of the Court's and the

21   jury's time and patience, I'm not going to go through all of

22   these things.  But I'm going to ask you -- I'm just going to

23   pull them up, and we're going to look at the first page,

24   okay, of some other filings.

25            MR. STERN:  Can I get DX369.  Did we do that one

 1    already?  I think we did.

 2                THE COURTROOM DEPUTY:  Yes, you just did.

 3                MR. STERN:  Okay.  So let's go to DX420.

 4    Q.  This is a Fannie Mae 2012 First Quarter 10-Q?

 5    A.  Yes.

 6                MR. STERN:  I'd move DX420, Your Honor.

 7                THE COURT:  Received without objection.

 8                MR. STERN:  Can we get just the signature page and

 9    the date, Mr. Salazar, so the jury knows what this is dated.

10    Q.  So this is May 9, 2012?

11    A.  Yes.

12                MR. STERN:  Let's get DX421, please.

13    Q.  Let me just go backwards, without going into the

14    document.  Can you tell us whether DX420 -- in DX420 Fannie

15    Mae was saying, with respect to its future expectations, the

16    same sorts of things as in we do not expect to generate net

17    income or comprehensive income in excess of our annual

18    dividend operation?

19    A.  This is Freddie Mac's 10-Q, but it's going to say

20    that -- it's going to have that message regarding Freddie

21    Mac.

22                MR. STERN:  Okay.  Let's get DX420, please.

23                THE COURT:  We already did 420.  This is 421.

24                MR. STERN:  I'm sorry, that was 421.  I apologize,

25    Your Honor.

```
 1                    Can we pull up 420's --

 2                    THE COURT:  '21.

 3                    MR. STERN:  -- signature page, please.

 4     Q.  Is this Fannie or Freddie --

 5                    THE COURT:  He was moving 421 then.  I already

 6     received 420.

 7                    MR. STERN:  I'm sorry, Your Honor?

 8                    THE COURT:  I already received 420.  You're moving

 9     421 in, and I'm receiving it as well.  So you want to

10     display 421's signature page?

11                    MR. STERN:  Right, so 420 and 421 are in, Your

12     Honor?

13                    Thank you, Your Honor.

14     Q.  So this is 420, and it's dated May 9, 2012?

15     A.  Yes.

16     Q.  Did you review this during that time period?

17     A.  Yes.

18     Q.  And does it contain those same sorts of statements along

19     the lines of the one I just referred to?

20     A.  Yes, it does.

21                    MR. STERN:  477, please.

22     Q.  I want to pause on this one for just a moment actually.

23                    MR. STERN:  Let's go to the last -- the signature

24     and date page.

25     Q.  So this is dated August 7, 2012, right?
```

```
 1    A.  Yes.

 2    Q.  It's a Freddie filing?

 3    A.  Yes.

 4    Q.  And, again, we have a very senior executive --

 5    A.  Yes.

 6    Q.  -- signing off on this?

 7    A.  Yes.

 8    Q.  Do you know who Mr. Kari is?

 9    A.  He's the chief financial officer.

10    Q.  All right.  So let's -- so this is ten days before you

11    make the final decision to enter into the Third Amendment,

12    correct?

13    A.  It's ten days before we sign it, yes.

14    Q.  So let's go -- and this is for the quarter ending June

15    30, 2012, right?

16    A.  Yes.

17    Q.  So let's go to Page 14.

18              THE COURT:  It's received without objection.

19              MR. STERN:  Oh, I apologize, Your Honor.

20              THE COURTROOM DEPUTY:  It was in yesterday.  It

21    came in yesterday.  This came in yesterday.

22              MR. STERN:  I understand from Ms. Jenkins it's

23    already in, Your Honor.

24    Q.  Let's go to Page 14.  And I know we went over another

25    part of this document, but let's look at Page 14, the
```

1    paragraph that says, "Long-Term Financial Sustainability."

2    A.  Yes.

3    Q.  And Page 14 is right up front in this document, right?

4    It's in sort of a summary section?

5    A.  Yes.

6    Q.  So the things that come up front in these sections in

7    securities filings, do they tend to be the more important or

8    the less important things that the company is trying to get

9    out there in the market and tell the SEC?

10   A.  The more important.

11   Q.  So in long-term financial stability [sic], read that

12   second paragraph -- well, what's the first sentence?

13   A.  "There is significant uncertainty as to our long-term

14   financial sustainability."

15   Q.  And then there's a quote from you; is that right?

16   A.  Yes, there is.

17   Q.  That -- and does that quote from you mean they're just

18   adopting blindly what you said?

19   A.  No.  They're reporting what I said.

20   Q.  And what does the next paragraph say?

21   A.  Then they're providing their view.  "We expect to

22   request additional draws under the Purchase Agreement in

23   future periods.  Over time, our dividend obligation to

24   Treasury will increasingly drive future draws."

25   Q.  Keep going.

1    A.  Keep going?

2              "Although we may experience period-to-period

3    variability in earnings and comprehensive income, it is

4    unlikely that we will generate net income or comprehensive

5    income in excess of our annual dividends payable to Treasury

6    over the long term."

7              MR. STERN:  Your Honor, may I just, to make sure

8    the record's complete, get DX421 -- which is in evidence but

9    I didn't actually put it up on the screen -- to get the

10   signature page and the date?

11             So if we could call up 421 just for that limited

12   purpose.

13             THE COURT:  I've received it.

14             MR. STERN:  Yes, you did, Your Honor.  I just want

15   to get the signature and date out loud, if I may?

16             Go to the last -- the signature and date page,

17   please.

18             THE COURT:  All right.

19   Q.  So we see that that one's dated May 3, 2012; is that

20   right, Mr. DeMarco?

21   A.  Yes.

22   Q.  And signed, again, by Mr. Kari?

23   A.  Yes.

24             MR. STERN:  Okay.  We can take that down.  And we

25   can be done for now with the securities filings.

1   Q.  But with respect to -- going back to this idea of

2   projections and predicting the future, there were in 2012,

3   the members of the jury have heard, two positive net worth

4   quarters at the beginning of 2012, right?  You're aware of

5   that?

6   A.  For one company.

7   Q.  Which company?

8   A.  Fannie Mae.

9   Q.  Okay.  And the jury has already heard that that came

10  after 14, give or take, negative net worth quarters; is that

11  right?

12  A.  That's about right, yes.

13  Q.  The fact that those two positive net worth quarters come

14  after those 14 negative net worth quarters, did that have

15  any bearing on your thought process with regard to the Third

16  Amendment and the net worth sweep?

17  A.  No.

18  Q.  Elaborate on that, if you would.  Why not?

19  A.  Because I was certainly pleased to see that they were --

20  that they had had positive income in those quarters.

21          But as described in these securities filings, as

22  described in my strategic plan and other places, I had --

23  you know, I had to be concerned about potential negative

24  conditions in the future; and those negative conditions

25  could be driven by a number of potential factors.

1          And in order to ensure my fundamental

2     responsibility for the stability of these companies and

3     hence the stability and liquidity of the country's housing

4     finance system, while the fact that we had had a couple of

5     good quarters was great news, it was not something that I

6     could rely upon, like oh, wow, we've turned the corner and

7     we're never turning back.  And the companies themselves, you

8     know, in these securities filings, as we've just gone

9     through, believed the same.

10          MR. STERN:  And I'm about to get to my last topic

11     area, Your Honor, which will be the Third Amendment itself

12     and how it worked.

13     Q.  But before I do that, Mr. Hume asked you yesterday

14     whether there was a memo relating to your process in

15     reaching your decisions about the Third Amendment.  You had

16     a very succinct one-word answer, and that answer was "No."

17     Do you remember that?

18     A.  Yes, I do.

19     Q.  And you were also asked whether there were any documents

20     about the pros and cons.  Remember that?

21     A.  Yes.

22     Q.  And you said there weren't; is that right?

23     A.  Yes.

24     Q.  I'd like you to explain to the jury why not.  Why

25     weren't there such documents?

1            And I'd like you to explain what your process was

2     in analyzing and thinking about and coming to the conclusion

3     that the Third Amendment and the net worth sweep were

4     something that you believed was vital to the public

5     interest.

6     A.  So, to me, this was pretty simple and straightforward.

7     I was continuing to be concerned about the stability, long-

8     term stability, of these companies in conservatorship and

9     hence the country's housing finance system.  I needed to

10    ensure that as the companies continued to operate in

11    conservatorship, whatever happened, that we had enough

12    resilience here under this Treasury agreement that was

13    going -- our last chance to change it was going to be the

14    end of this year, that there was enough resilience to last

15    through whatever the future held.

16            I was focused on a very particular thing regarding

17    this net worth sweep so that we did not reduce this

18    remaining commitment in a way that would adversely affect

19    the future state, and so there wasn't, in that sense, a lot

20    of different things to go -- to consider.  That was my

21    objective.

22            To be a little more clear, though, to your

23    question, Mr. Stern, about what it is that I'm concerned

24    about, we've already -- we've gone through at length these

25    circular draws.  But I'm concerned that, as we go forward in

1    the future, even beyond what is stated in these companies'

2    securities filings, I'm concerned about -- there could be

3    adverse market conditions, right?  The economy could turn.

4    We could have another recession.  House prices could start

5    to go down.  I don't know if that's going to happen or when.

6    It's happening now.  But I had to be concerned about that.

7          The second thing I had to be concerned about was

8    basically let's call it the public policy arena, that the

9    administration had issued a paper in 2011 saying we're

10   proposing three potential outcomes for this conservatorship,

11   these conservatorships.  And in every one of those outcomes

12   the Treasury Department definitively said:  We're going to

13   wind down Fannie Mae and Freddie Mac.

14         And I had already experienced, in 2011, some of

15   the disruption that could take place as there is a public

16   policy discussion about what it means to wind these

17   companies down.  And I also know and have talked about that

18   there was legislation pending to actually effect the

19   resolution of these conservatorships, the wind-down of these

20   companies.  That's the second thing I'm concerned about.

21         The third thing I'm concerned about is I'm

22   implementing the strategic plan in which I'm talking about

23   gradually shrinking the footprint of these companies.  And I

24   know that with the gradual shrinking of the footprint of

25   these companies, that their revenue will go down because

1    we're shrinking their market activity, and that's going to

2    reduce their profitability.

3           I don't know how long we're going to be doing this

4    in conservatorship, but I need to make sure that this

5    Treasury Commitment is resilient to all of these risks so

6    that we don't put at risk -- like happened in 2008, we don't

7    put at risk the stability of the country's housing finance

8    system and the liquidity in that market to make sure that

9    homeowners are going to be able to get mortgages when they

10   want to.

11   Q.  So understanding all of those issues, did you just come

12   up with this in your own head, or were you acting based on

13   information that was coming to you from various sources?

14   A.  I'm acting on information coming to me from a variety of

15   sources.

16   Q.  And just briefly, what kind of information from what

17   sources?  I'm trying to get at your process here.

18   A.  Yes.

19   Q.  We understand your objectives.  You articulated them, I

20   would editorialize eloquently, but I'm trying to get at the

21   process and the kind of information you considered and why

22   there's no memo.

23   A.  Okay.  So the process is I am gathering -- I'm

24   testifying before Congress.  I'm getting direct input from

25   leading members of Congress.  I'm engaged in ongoing

1    discussions in 2011 and 2012 with the Treasury Secretary and

2    his senior staff about their goals for ending the

3    conservatorships, winding down these companies and moving

4    on.

5            I'm getting input from my director of

6    conservatorship operations and his staff that are regularly,

7    let's say, embedded with the senior management team at

8    Fannie Mae and Freddie Mac and are regularly providing

9    reports to me about the conditions and concerns there.  I'm

10   getting input from my supervision team.  I'm getting input

11   from -- we talked about Naa Awaa Tagoe and Wanda DeLeo and

12   folks like that who have offices who are overseeing what's

13   going on in the market and so forth.  I've got Mr. Ugoletti

14   as my senior advisor who is very experienced in these

15   things.

16           And then finally I've got myself.  Right?  That I

17   have been -- this is not -- I didn't come into this position

18   cold.  I've spent most of my professional career thinking

19   about the country's housing finance system and the roles

20   that Fannie Mae and Freddie Mac play and the kind of risk

21   and market uncertainties that can emerge here.

22   Q.  And why didn't you write a big memo about all of that?

23   A.  I didn't think I needed to.

24   Q.  And why not?

25   A.  Because we had been negotiating this and working it out,

 1    and I've been talking directly to my senior staff.  And at

 2    the end of the day, you know, when Treasury was ready to

 3    move, there was very little time at that point to move to

 4    get it done.

 5    Q.  Now, let's -- and one other thing on process.  You say

 6    that you didn't ask for recommendations from Fannie or

 7    Freddie.  Why not?

 8    A.  All the negotiations and amendments over the stock

 9    purchase agreements from the original one, the First

10    Amendment, Second Amendment, Third Amendment, were all done

11    between FHA as conservator and the Treasury Department, and

12    I felt like that was our responsibility.

13            But there's a couple of other things here.

14            I am meeting weekly or every other week with the

15    CEOs of these companies, and so I am having exchanges with

16    them in which I am hearing from them what their concerns

17    are.  And I have -- I may be able to take account of what

18    they're looking at and the things that they're looking at,

19    and I'm able to ask some questions that help inform me as

20    I'm making judgments, not just about this, but across an

21    array of conservatorship responsibilities, so I have -- I

22    have that input as well.

23            Oh, and I'm sorry, one other thing, Mr. Stern,

24    with regard to this is that there is -- there are issues

25    about sort of disclosures and leaks.  We've talked about

1    this in part, and I'm obviously concerned about that as

2    well.

3    Q.  Understood.

4            All right.  Now, let's move to the Third Amendment

5    itself, okay?

6            MR. STERN:  Can we get DX539.

7    Q.  What is this?

8    A.  This is the press release that FHFA put out on the day

9    that the Third Amendments were signed.  It's our

10   announcement of it.

11           MR. STERN:  So can we go to Page 2, please.

12           Excuse me, one sec.

13   Q.  Let's stay on this page, "Link to FHFA Strategic Plan."

14           Is that the strategic plan you've testified about?

15   A.  Yes.  That was issued in February of this year, February

16   of 2012.

17   Q.  And why would you -- did you review this press release

18   before it went out?

19   A.  I did.

20   Q.  Why would you link or direct someone else to link the

21   strategic plan to the announcement of the Third Amendment?

22           THE COURTROOM DEPUTY:  It's not in.

23           MR. STERN:  Oh, I apologize.  Thank you.

24           "Move it in so the jury can see it."

25           Your Honor, I move DX539.

```
 1              MR. HUME:  No objection.

 2              THE COURT:  Received.

 3              MR. STERN:  Now -- thank you, Ms. Jenkins.

 4              THE COURTROOM DEPUTY:  You're welcome.

 5   Q.  Why would you link or direct someone else to link the

 6   strategic plan to the announcement of the Third Amendment?

 7   A.  As you see in the -- I don't know, maybe it's the second

 8   sentence of the press statement -- that these steps, meaning

 9   the steps we took to amend the PSPA, "reaffirm our

10   commitment to move forward with the components of the

11   strategic plan for the Conservatorships of Fannie and

12   Freddie, which include building for the future, gradually

13   contracting their operations, and maintaining foreclosure

14   prevention activities and credit availability."

15              So I'm making direct reference to how this Third

16   Amendment is consistent with our commitment that I announced

17   in February of that year that we were doing these things,

18   and so it was logical to link the strategic plan so people

19   would know what he's talking about.  There it is right

20   there, and they can pull up that to learn more.

21   Q.  So did you see a sort of continuum or a connected series

22   of events over time from the January strategic plan to the

23   August 3rd amendment?

24   A.  Yes.

25   Q.  And you talked -- I'm not going to repeat everything you
```

1    said, but you talked about all the information you gathered

2    and the meetings you had and all that stuff from January to

3    August.  Was that also part of this connected series of

4    events, at least in your mind?

5    A.  Yes.

6                MR. STERN:  So let's go to Page 2.  The second

7    page.  There we go.

8    Q.  Can you please -- this was the description of the key

9    terms of the Third Amendment; is that right?

10   A.  Yes.

11   Q.  Don't guess.

12   A.  I'm sorry?

13   Q.  Don't guess.  You said yes?  I thought you said "I

14   guess."

15   A.  So does this press release provide it?  Yeah.

16   Q.  So we're on Page 2, right?

17   A.  Yes.

18   Q.  This is your statement.

19   A.  It's my statement?

20   Q.  Right?

21   A.  Yes.

22   Q.  We're oriented together?

23   A.  I'm sorry, Mr. Stern, yes, we are.

24   Q.  Okay.  And does this part of the statement summarize or

25   recite the key terms of the Third Amendment?

1    A.  It gets to the key term, yes.

2    Q.  All right.  So let's -- why don't you walk us through

3    the key terms of the Third Amendment as you understood them

4    and as you publicized them on August 17, 2012, using this

5    document.

6    A.  Okay.  So the key term here is that we took the current

7    fixed dividend -- that is the fixed 10 percent dividend that

8    was leading to the circular draws -- and we were replacing

9    that.  We were replacing it with a variable dividend; that

10   is, the dividend could change in amount from quarter to

11   quarter, and that that variable dividend was going to be

12   based on the net worth of the company.  And by doing so, as

13   I say here, we'll ensure stability, capture benefits for the

14   taxpayers, and eliminate the need to continue to borrow from

15   Treasury to pay dividends; that is, we were eliminating the

16   circular draw issue.

17   Q.  So -- and the circular draw issue -- the jury's already

18   heard a lot about this, but just to be clear.  The circular

19   draw issue, the danger was that it would lead to erosion of

20   the commitment, right?

21   A.  Yes.

22   Q.  So in your mind, did the Third Amendment eliminate the

23   risk that the Treasury Commitment would be eroded by the

24   payment of dividends?

25   A.  Yes, and that's what the next sentence gets at.

1    Q.   Okay.  Go ahead.

2    A.   "As Fannie Mae and Freddie Mac shrink, the continued" --

3    which is from the prior sentence about the strategic plan,

4    that had been the goal.

5              "As Fannie Mae and Freddie Mac shrink, the

6    continued payment of a fixed dividend could have called into

7    question the adequacy of the financial commitment contained

8    in the PSPAs.  In addition, the faster reduction in the

9    retained mortgage portfolio will further reduce risk

10   exposure and simplify the operations of Fannie and Freddie."

11             That's important here, too, because another

12   important component part of this agreement is we were

13   shrinking their retained portfolio, that was the investment

14   assets that they maintained on their balance sheet, which

15   was actually generating a considerable amount of their

16   earnings.

17   Q.   If we go to the second paragraph, why don't you read

18   that to us, and tell the members of the jury why you

19   thought -- what this means and why you thought it was

20   important to convey.

21   A.   All right.  It says, "These changes provide certainty to

22   Fannie Mae, Freddie Mac, and market participants as they

23   continue to perform their critical mission of providing

24   liquidity and stability to the country's housing market.

25   The steps today are also important as Congress and

1    policymakers contemplate the future of Fannie Mae and

2    Freddie Mac."

3            So breaking that down, the first sentence is

4    saying that Fannie Mae and Freddie Mac themselves, including

5    their senior executives, look, we've removed this concern

6    that you've been talking about about the potential erosion

7    of the commitment.  We're also informing market

8    participants, which would include the investors in their

9    debt securities and MBS, that the concern that we've been

10   hearing about, could this commitment erode, we've taken care

11   of that, and that's going to give the stability to allow

12   Fannie and Freddie to continue to meet their mission of

13   liquidity and stability of the market.

14           The second sentence is going to what's going on in

15   the policy arena, which is Congress is developing

16   legislation to wind down Fannie Mae and Freddie Mac,

17   recognizing that the Treasury Department's already sent a

18   report to Congress calling for the wind-down of Fannie Mae

19   and Freddie Mac.  And I'm saying that as they contemplate

20   this future, as they contemplate housing finance reform and

21   winding down the companies, these steps are going to be

22   important to allowing that kind of transition to take place

23   without a disruption to the housing finance system.

24   Q.  And I have just a few more questions sort of about

25   concept, but before I get to those, just a question about

1    mechanics.

2         If Fannie or Freddie -- under the net worth sweep,

3    if Fannie or Freddie have negative net worth or zero net

4    worth in a given quarter, would they have to pay any

5    dividend at all to Treasury under the Third Amendment?

6    A.  No.

7    Q.  Okay.  Now, one of the things that the members of the

8    jury have seen that you've talked about is safety and

9    soundness.  How is the Third Amendment -- and one of the

10   conservator's purposes was to assure safety and soundness of

11   the enterprises; is that right?

12   A.  Yes.

13   Q.  How is the Third Amendment consistent with that

14   commitment?  I won't use that word, because we're using it

15   someplace else.

16        How does safety and soundness -- how is the Third

17   Amendment consistent with assuring or helping to assure

18   safety and soundness?

19   A.  It was important because it provided the stability that

20   if we ended up in a negative situation where for whatever

21   the reason a company's not earning enough money to pay what

22   had been that fixed dividend, that that was not going to

23   erode the capital support behind these companies, that

24   investors wouldn't have to worry about that.  So it was

25   important to the stability and the safety and soundness -- a

1    fundamental part of safety and soundness is having enough

2    sufficient capital.  That's why I did not want to erode the

3    remaining Treasury Commitment because that Treasury

4    Commitment was the capital that was allowing Fannie Mae and

5    Freddie Mac to operate.

6    Q.  The jury has heard a lot about the public interest.  Can

7    you please just summarize for us how the operation -- the

8    mechanics and the effect of the Third Amendment -- serves

9    the public interest, if it did?

10   A.  It did by providing this sense of stability to how the

11   market -- that is, the investors in debt and mortgage-backed

12   securities of Fannie Mae and Freddie Mac should understand

13   the resiliency of this Treasury Commitment going forward.

14   Q.  Mr. DeMarco, I'm near the end now, so I want to ask you

15   to examine your life.

16         Looking back now, knowing how history has played

17   out, what is your thinking about the way FHFA operated

18   Fannie and Freddie in conservatorship during your years at

19   FHFA?

20   A.  I think what FHFA accomplished during my four and a half

21   years of being acting director was substantial.  It's

22   something I'm very proud of.  I'm very proud of the people

23   at FHFA for what they got done.

24         We took over as conservator of Fannie Mae and

25   Freddie Mac during one of the darkest periods of time in our

1    country's economic history.  We took over the two companies

2    that were central to the country's housing market and were

3    central to what was causing this great recession, and we

4    brought stability to those companies.  We brought terrific

5    aid and assistance to homeowners, and we saved many of them

6    from losing their homes, and we brought -- we did something

7    that is unprecedented.  It had never been done like this

8    before, to bring that stability, to stabilize these

9    companies, to create global confidence in them so that our

10   country's housing finance system would operate, and to set

11   the stage for our policymakers, for lawmakers in the

12   administration to do their job of figuring a path forward

13   with these companies.

14        Now, we're still on that path, but I think that

15   what we did during this period has brought tremendous

16   stability to the market and to these two companies.

17        So I'll leave it there.

18   Q.  Last one.  Do you think that the Third Amendment was the

19   right thing to do in the public interest?

20   A.  I absolutely do.

21        MR. STERN:  Nothing further at this time, Your

22   Honor.

23        THE COURT:  All right.  We'll take our morning

24   recess before we hear from the plaintiffs for further

25   questioning.

```
 1              (Jury exits courtroom)

 2              (Recess taken)

 3              MR. HUME:  Judge, we have an issue before the

 4     witness comes and the jury comes.

 5              THE COURT:  Let's do it on the phone.

 6              (The following is a bench conference

 7               held outside the hearing of the gallery)

 8              MR. HUME:  Judge Lamberth, I mentioned earlier and

 9     yesterday and this morning, there's one document, PX226,

10     that defendants are objecting to and that we wish to use in

11     this examination and to get -- and to move into evidence,

12     and we're prepared to present brief argument on that.

13              MR. STERN:  We do object to 226, Your Honor.

14              MR. HUME:  Okay.  So should we proceed with that

15     and perhaps the witness can sequester in the hallway

16     briefly?

17              THE COURT:  Yes.  I think he's still in the hall

18     now, so go ahead.

19              MR. HUME:  Okay.  Thank you.  Can we do it at the

20     podium, Your Honor, so we can show the document?

21              THE COURT:  Yes.

22                  (This is the end of the bench conference)

23              THE COURT:  The witness is in the hallway.  Let

24     him know.

25              MR. KAPLAN:  Good morning, Your Honor; Sam Kaplan
```

1    for the plaintiffs.

2           Your Honor, the document in question is, as

3    Mr. Hume said, Exhibit 226.  It's a Treasury email.  It's

4    both -- the objection, I believe, is hearsay.

5           It's not being admitted for the truth of the

6    matter asserted but rather for state of mind, intent, and,

7    it's, in fact -- the recent testimony over just the last 20

8    minutes demonstrates its significant relevance.  They talked

9    about the PX --

10          THE COURT:  Let's have the witness wait outside.

11          Oh, okay.

12          MR. KAPLAN:  PX247 is where Mr. Ugoletti says

13   there appears to be a renewed push to move forward on the

14   PSPA amendments.

15          On July 31st there is an email from Timothy Bowler

16   of Treasury to Jeff Foster that says, "really makes sense to

17   push the net worth sweep this quarter."  That was just after

18   the second quarter -- the very good second quarter earnings

19   results, which it's our contention in this case is the exact

20   opposite of what you would expect.

21          THE COURT:  Can I see the document?

22          MR. KAPLAN:  I'm sorry?

23          THE COURT:  Can I see the document?

24          MR. KAPLAN:  Oh, absolutely.  Can we put it on the

25   screen, please.  226.

```
1                    Oh, I can pass it up, Your Honor.

2              THE COURT:  Okay.  He'll pass it up.

3              (Pause)

4              THE COURT:  Okay.  What is it you're going to do?

5              MR. KAPLAN:  The document would be admitted to

6    show Treasury's state of mind, that they were intending to

7    push for the Third Amendment following the excellent second

8    quarter results, and that led to Mr. Ugoletti saying, "There

9    appears to be a renewed push to move forward on the PSPA

10   amendments."

11             So it's squarely within Your Honor's order --

12             THE COURT:  What does that have to do with this

13   witness?

14             MR. KAPLAN:  Oh, with this witness, Your Honor?

15   Actually, Mr. Hume can describe what he intends to do with

16   this witness.

17             MR. HUME:  Your Honor, the witness has testified

18   that he did not have time -- couldn't negotiate for more

19   time.  And he's also testified that his concern was not

20   having enough profit to meet the --

21             THE COURT:  He's never seen this document, right?

22             MR. HUME:  But what he saw is Mr. Ugoletti's email

23   from a week later saying "there's a renewed push."

24             THE COURT:  I can't hear you.

25             MR. HUME:  What he saw is an email where
```

```
 1    Mr. Ugoletti says "there's a renewed push" for the sweep,

 2    which is obviously from Treasury.  And the question -- and

 3    that push was because they were making profits, which this

 4    witness has testified was not the reason that they were

 5    doing the sweep because they're making profits.

 6              The reason they're doing the sweep is because they

 7    were worried they wouldn't make profits to pay the dividend.

 8    It's the opposite.  So it's to give context to the timing

 9    and the speed with which this was done.

10              Once that email was sent, that sent into a chain

11    of motion of very rapid events that this witness -- and it's

12    the opposite of what he's testified would happen.

13              THE COURT:  He's never seen this email?  It's not

14    to him?

15              MR. HUME:  It's not to him.

16              THE COURT:  The objection's sustained.

17              You can bring the witness.

18              (Pause)

19              (Jury enters courtroom)

20              THE COURT:  You may be seated.

21              All right, Mr. Hume, you may proceed.

22                        REDIRECT EXAMINATION

23    BY MR. HUME:

24    Q.  Good afternoon, Mr. DeMarco.  This is Hamish Hume again

25    for the plaintiffs.
```

1    A.  Nice to see you, Mr. Hume.

2    Q.  It's almost good afternoon.

3    A.  Almost now.

4    Q.  Now, Mr. DeMarco, at the end of your testimony just now

5    you told the jury that even with the benefit of hindsight,

6    looking back at it, you're proud of the Third Amendment,

7    correct?

8    A.  Yes, I am.

9    Q.  Okay.  Now, I'd like to show something -- you agreed

10   with me yesterday that the dividends paid under the net

11   worth sweep in 2013 were approximately $130 billion.  Do you

12   remember that?

13   A.  Okay, yes.

14          MR. HUME:  Can I put up, please, our opening

15   slide, a demonstrative exhibit that was shown to the jury.

16   It was Demonstrative Slide 16 from our opening.

17   Q.  And what this shows is -- what the dividend would have

18   been under the 10 percent dividend was $18.9 billion?  Do

19   you see that?

20   A.  I do.

21   Q.  And what the dividend actually was under the net worth

22   sweep in 2013 was $130.1 billion.  Do you see that?

23   A.  Yes, I do.

24   Q.  And the arithmetic shows that the difference is $111.2

25   billion.  Do you see that?

1   A.  Yes, I do.

2   Q.  Now, as I understand what your testimony is, your focus

3   was on the safety and soundness of these enterprises so that

4   the mortgage-backed security market and the bond market

5   wouldn't get jittery and unhappy, correct?

6   A.  Yes.

7   Q.  Okay.  So if there had been a stress scenario that

8   emerged in 2013 or '14 or '15, something really bad had

9   happened, would it have been better for the GSEs, Fannie Mae

10  and Freddie Mac, to have had both the Treasury Capital

11  Commitment and $111 billion, or just the commitment without

12  the $111 billion?

13          It would be a lot better for them to have both,

14  wouldn't it?

15  A.  It would.  But as we discussed yesterday, this

16  assumption you are not --

17  Q.  I didn't ask -- you can explain to your counsel all --

18          MR. STERN:  May he be allowed to finish his

19  answer, Your Honor?

20          MR. HUME:  Well, you were interrupting him.  You

21  were leading him.  I just want an answer to my question.

22          THE WITNESS:  Okay.

23  Q.  Your counsel is going to get another chance.  Okay?  I

24  understand you think the Periodic Commitment Fee is worth

25  infinity, which is what you were about to say, I believe.

 1              My point is Fannie Mae and Freddie Mac would have

 2      been better with that $111 billion, especially in a stress

 3      scenario, correct?

 4      A.  That would be the arithmetic, yes, sir.

 5      Q.  Now, your counsel spent a lot of time yesterday talking

 6      about what happened in 2008 and 2009 and 2010 and 2011, and

 7      I just want to be perfectly clear.  You do understand that

 8      what this case is about is the decision you made in August

 9      2012, correct?

10      A.  Yes, I do.

11      Q.  Okay.  Now, you also said several times yesterday that

12      things were very, very different in 2012 than 2008.

13              I just want to be very clear.  It's not your

14      testimony, is it, that things were looking worse for Fannie

15      Mae and Freddie Mac in August of 2012 than they were looking

16      for them in September 2008?  Is that your testimony?

17      A.  No.

18      Q.  Things were looking a lot better for them.

19              They'd been through a lot.  They'd been through

20      hell.  I understand that.  But the arrow was pointing up in

21      August 2012, and it was pointing down in September 2008,

22      correct?

23      A.  Yes.

24      Q.  Now, there was also a lot of stuff said yesterday, and

25      you were shown documents saying in conservatorship the

1    conservator does not operate the enterprises for the benefit

2    of shareholders.  Do you recall that?

3    A.  Yes, I do.

4    Q.  They don't run it to maximize profits for shareholders,

5    correct?

6    A.  Yes.

7    Q.  Now, again, just so it's clear, you do understand that

8    our claim in this case is not that you had a duty to

9    maximize profits for shareholders.  Do you understand --

10   that's not our claim.  Do you understand that?

11   A.  Yes.

12   Q.  Do you understand that our claim is that we had a

13   contract, and that under that contract you couldn't

14   arbitrarily or unreasonably extinguish even the possibility

15   of future dividends?  You understand that's our claim?

16           MR. STERN:  Objection, Your Honor, to that

17   characterization of the claim.

18           THE COURT:  Sustained.

19           MR. STERN:  Move to strike the question.

20           MR. HUME:  I'll move on, Your Honor.

21   Q.  Now, you also testified yesterday that -- at least I

22   believe -- that there were lots and lots and lots of

23   meetings about the net worth sweep with lots and lots of

24   people.  Do you recall that?

25   A.  I said there were a series of meetings.

1   Q.  About the net worth sweep?

2   A.  About the net worth sweep.

3   Q.  Okay.  With many people, not just with you and

4   Mr. Ugoletti?

5   A.  Many people from the Treasury Department, yes.

6   Q.  Many people involved in meetings about the net worth

7   sweep, correct?

8   A.  Yes, there were meetings about the net worth sweep.

9   Q.  Okay.  But other than Mr. Ugoletti's email saying

10  there's a renewed push on August 16th, there's no -- let's

11  just make sure the record is clear again.  There are no

12  memos analyzing the pros and cons of whether to do the net

13  worth sweep, correct?

14  A.  Yes.  That's what I said yesterday.

15  Q.  And there are no emails with long analysis of whether or

16  not to do the net worth sweep, correct?

17  A.  Correct.

18  Q.  And there are no emails back and forth between FHFA and

19  Treasury saying -- negotiating whether or not to do the net

20  worth sweep, correct?

21  A.  Correct.

22  Q.  Okay.  And you realize that in this case there's been

23  thousands of documents produced.  We've had extensive

24  discovery.  So if those existed, they would have been

25  presented.  And you weren't shown anything like that,

1   correct?

2   A.  That's correct.

3   Q.  Now, you said you began discussing the net worth sweep

4   in 2011.  Am I correct?

5   A.  I began discussing the Third Amendment in 2011.

6   Q.  Okay.  But I think you said --

7   A.  Yes.

8   Q.  You said that 2011 was when you think the net worth

9   sweep idea first arose?

10  A.  The first time I recall and we have record of written-

11  down discussion of net worth sweep goes back to 2010.

12  Q.  Okay.  And you were accepting of the idea of the net

13  worth sweep when it was first raised, correct?

14  A.  I was accepting of it -- when it was first raised, I

15  can't say for sure, but I certainly was accepting of it by

16  the -- during the duration of our discussions of the Third

17  Amendment.

18  Q.  Okay.  And you were shown, both yesterday and today,

19  DX346.

20          MR. HUME:  And why don't we just bring it up to

21  refresh everyone's recollection.  DX346.  It may take a

22  second -- thank you very much, Mr. DeRita.

23  Q.  DX346 is an FHFA update of projections.  Do you see

24  that?  This is something Ms. Tagoe's group would have done?

25  A.  Yes.

1   Q.  Okay.  And the date on this, it was for release October

2   27, 2011, correct?

3   A.  Correct.

4   Q.  Okay.  And you were shown in this document all sorts of

5   stress scenarios that look really bad, bad stress scenarios

6   in which the draws would have been really bad, correct?

7   A.  Not all sorts.  I believe we've talked about there were

8   three.

9   Q.  Okay.  But one of the three that you were shown, your

10   client -- your counsel showed you the stress scenarios with

11   bad results, correct?

12          MR. STERN:  Objection, Your Honor.

13   A.  I don't actually recall that we went through the

14   specifics of the results.  We did discuss that there were

15   three paths that were evaluated and being reported in this

16   release.

17   Q.  That's fine.  The point is, there's stress, baseline,

18   and optimistic, right?  There are three?

19   A.  Yes.

20   Q.  Okay.  And it's also correct, isn't it, that between --

21   if I understood your testimony, the whole reason your

22   counsel showed you this both yesterday and today is this is

23   part of what you relied on in agreeing to the net worth

24   sweep, correct?

25   A.  This is part of the information set that I'm using, yes.

1    Q.  Okay.  And am I correct -- isn't it true that between

2    this October 2011 projection and the August 17, 2012,

3    signing of the net worth sweep, you never asked Ms. Tagoe to

4    update these projections, correct?

5    A.  That's correct.

6    Q.  And isn't it also true that you knew that things were

7    getting better in 2012?

8    A.  I was observing the market improving, yes.

9    Q.  Okay.  You knew that the mortgage market was improving,

10   correct?

11   A.  Yes, that's what I just said.

12   Q.  Okay.  And you knew that the companies' projections were

13   improving?

14   A.  We've gone over that, yes.

15   Q.  Okay.  And you knew that they had had --

16          MR. HUME:  If we can just put up Opening

17   Demonstrative 520.  Let me just show Slide 20.

18   Q.  You knew that in both the first quarter and second

19   quarter of 2012 they had profits in excess of the dividend

20   amount, correct?

21   A.  So that's two companies, two quarters.  I believe one of

22   the companies took a small draw one of those quarters.

23   Q.  Okay.  But in the second quarter Fannie Mae's income was

24   $5.4 billion, larger than the $2.9 billion dividend?

25   A.  Yes, I see that.

1    Q.  And for Freddie Mac in the second quarter, it was $2.9

2    billion.  Larger than the $1.8 billion, correct?

3    A.  Yes.

4    Q.  And in the first quarter, Fannie was larger and Freddie

5    was about equal or just a little bit below, correct?

6    A.  Yes.

7    Q.  Okay.  Now, you also knew that in 2012 there were lots

8    of documents talking about the ways in which the financial

9    projections for the companies were improving, correct?

10   A.  Yes.

11   Q.  And, in fact, some of the documents showing that things

12   were predicting an upswing and a return to profitability go

13   back to 2011.  Isn't that true?

14   A.  I'm sorry, would you repeat that question?  I want to

15   make sure.

16   Q.  Yes.  Isn't it true that even in 2011 the companies were

17   starting to predict and the FHFA was starting to predict

18   that things were going to get better?

19   A.  That things were improving, yes.

20   Q.  Okay.  And isn't one of the reasons for that that one of

21   the things the conservator, FHFA, had done during 2008 and

22   '9 and '10 was to improve underwriting standards, correct?

23   A.  Yes.

24   Q.  And because of those improved underwriting standards,

25   isn't it true that the quality of the loans that were on the

1    books of Fannie Mae and Freddie Mac were getting better over

2    time, correct?

3    A.  Yes.

4    Q.  And that, in turn, would lead to better financial

5    performance in the future, correct?

6    A.  Other things equal, yes.

7            MR. HUME:  Okay.  Now, can we look at PX107,

8    please.  You can take down the demonstratives.

9    Q.  PX107, which, by the way, is at Tab 23 of your binder,

10   if you prefer to look at the hard copy.

11   A.  Okay.

12   Q.  I'd like to be as efficient as possible, so we can also

13   just look at the screen.

14           This is a March 10 -- this is PX107, sir?  Is this

15   PX107?

16           Oh, I think what it is is the cover email is from

17   July 2011, but it attaches the March 2011 update of Freddie

18   Mac FHFA forecast.  Do you see that?

19   A.  I see it.

20           THE COURTROOM DEPUTY:  It's not in.

21           MR. HUME:  It's not in?

22           THE COURTROOM DEPUTY:  No.

23           MR. HUME:  Okay.  Thank you, Ms. Jenkins.

24           I believe there's no objection.  May I move PX107

25   into evidence?

1          MR. STERN:  No objection.

2   Q.  So, again, sorry, that was a little messy.

3          It's a July 2011 email attaching the March 2011

4   update to the Freddie Mac forecast.  Do you see that?

5   A.  I see the cover you have up there, yes, sir.

6   Q.  Okay.  And, again, you can -- you've opened it to Tab

7   23.  So you have the document in front of you?

8   A.  I do.

9   Q.  Okay.  Good.  We're going to look at the last two pages,

10  which is Page 14 or 15.  If we can go there first.

11         Now, there is showing -- by the way, can you tell

12  from this document whether this was done by Ms. Tagoe's

13  group or by Freddie Mac or by both of them in conjunction

14  with one another, or can you not tell?

15  A.  I cannot tell, though it has the bearings of something

16  that was produced by Freddie Mac.

17  Q.  Okay.  But the cover page does refer to FHFA as well,

18  correct?

19  A.  It does not.  It says -- it says Freddie Mac's forecast

20  scenarios.

21  Q.  Okay.  So here's what their forecast shows.

22         MR. HUME:  If we can, first of all, blow up Bullet

23  Point 3.

24  Q.  Do you see it says, "Beginning in 2012 no further draw

25  is required, as total comprehensive income is sufficient to

1    meet our dividend obligation and net worth increases to $6.6

2    billion"?  Do you see that?

3    A.  I do.

4    Q.  Okay.  Now, let's look at the details underlying that.

5              If we can look at the comprehensive income line,

6    do you see that?  Line 16.  That's showing their

7    comprehensive income, right?  Do you see that?

8    A.  Yes.

9    Q.  And you see that Line 20 shows the senior preferred

10   dividend to Treasury.  Do you see that?

11   A.  I do.

12   Q.  And you understand that's the 10 percent dividend,

13   right?

14   A.  Yes.

15   Q.  Okay.  So if we look at 2012, what they're forecasting,

16   they're forecasting 10.5, which is higher than the 7.1,

17   correct?

18   A.  Yes.

19   Q.  And then in 2013 they're forecasting $10.1 billion,

20   which is higher than the dividend, correct?

21   A.  Yes.

22   Q.  And even taking into account the terrible year they had

23   in 2010 and the not great year in 2011, over the whole

24   period their income is higher than the dividend, correct?

25   A.  Well, it's not including 2010, but yes.

1    Q.  Okay.  It includes 2011.  Sorry.

2         Do you see that?

3    A.  I do.

4         MR. HUME:  Okay.  Can we look at what's on Page

5    15, please.

6    Q.  This is the base case.  Do you see it says "Base Case

7    Balance Sheet, 2011 to 2013"?

8    A.  I do.

9    Q.  And again let's just look at that top line.

10        MR. HUME:  Can we see the top line first, the very

11   top sentence there.

12   A.  Yes.

13   Q.  Do you see how it says, "Net worth returns to positive

14   in 2012 and projects to be approximately $7 billion in

15   2013"?

16   A.  I see that.

17   Q.  And you were meeting with these CEOs every week, you

18   said.  Right?

19   A.  Every week, every other week; it varied.

20   Q.  All right, so -- all right.

21        So let's go -- this is the balance sheet.  Do you

22   see that?

23   A.  Yes.

24   Q.  And you see at the bottom here they have assets on a

25   balance sheet, right?

1    A.   Yes.

2    Q.   And then you have liabilities, right?  And liabilities

3    then include shareholder equity, which is the net worth,

4    basically, correct?

5    A.   Correct.

6    Q.   Okay.  So the shareholder equity or deficit that's

7    projected here is -- first of all, the actual is negative in

8    2010 by $400 million.  Do you see that?

9    A.   I do.

10   Q.   And then they project a slight positive in -- actually,

11   it's, I think, partly a forecast, partly actual results of

12   80 in 2011.  Do you see that?

13   A.   I do.

14   Q.   And you see that 2012 was positive $3.5 billion.  Do you

15   see that?

16   A.   I do.

17   Q.   And 2013 is positive $6.5 billion.  Do you see that?

18   A.   I do.

19   Q.   Okay.  So that's -- that was March 2011.

20             Now, let's look at PX111 to see --

21   A.   It's March 2011 under their base case, just to be --

22   Q.   Under their base case.

23             PX111 is now September 2011.  Do you see that?

24   A.   I do.

25   Q.   And this, if you want to look at it, is at Tab 24 of

1    your binder.  And let's look at Page 12 of 13.

2              Again, what do they say here in their third bullet

3    point?  Again, this is their base case results and their

4    base case.  "Beginning in 2012, no further draw is required,

5    as total comprehensive income is sufficient to meet our

6    dividend obligation, and net worth increases to $10.6

7    billion."  Do you see that?

8    A.  I do.

9    Q.  Do you remember from the last one the net worth went up

10   to $6.5 billion?

11   A.  Yup.

12   Q.  Yes?

13   A.  Yes.

14   Q.  So the base case is showing -- is improving even during

15   2011, correct?

16   A.  Yes.

17   Q.  Okay.  And let's just look at the details underlying

18   that very briefly.

19             Again, Line 16 shows the income in the base case

20   in 2012 was $11.8 billion.  That's higher than the dividend

21   by over $4 billion.

22             2013, base case projects higher income than the

23   dividend.

24             2014, the base case is $10.8 billion, higher than

25   the dividend.

```
 1                  Do you see that?
 2   A.  I do.
 3   Q.  Okay.  Now, let's quickly look at the last page, which I
 4   think shows the equity again.
 5                  In the base case, what does it say about net worth
 6   in that top sentence?
 7   A.  "Net worth returns to positive by the end of 2012 and
 8   projects to be approximately $10.6 billion in 2014."
 9   Q.  Okay.  We can move on from there.
10                  And you would agree with me, Mr. DeMarco -- those
11   were 2011 -- that the companies' projections were better in
12   2012 than in 2011, correct?
13   A.  I believe they were.
14   Q.  Let's look at just three or four of these documents.
15                  MR. HUME:  PX147.  By the way, was PX111 put in
16   evidence?  PX147, is this in evidence?
17                  THE COURTROOM DEPUTY:  No.
18                  MR. HUME:  I don't think there's an objection.  We
19   move for PX147 to be put into evidence.
20                  MR. STERN:  No objection, Your Honor, but if I
21   could solicit a tab number in the binder?
22                  MR. HUME:  Yes.  I can give you that.  Tab 29.
23   Sorry about that.
24                  THE COURT:  147 is received without objection.
25                  MR. HUME:  I'm sorry, Your Honor?
```

```
 1                    THE COURT:  Received.

 2                    MR. HUME:  Thank you, Your Honor.

 3      BY MR. HUME:

 4      Q.  If we could briefly look at the "To" line up here.  This

 5      is an email sent to you, Mr. DeMarco, and others at FHFA,

 6      correct?

 7      A.  Yes.

 8      Q.  And Jeffrey Spohn, the second person, he attended the

 9      board meetings of both Fannie Mae and Freddie Mac, correct?

10      A.  Oftentimes, yes.

11      Q.  And this is from Bradford Martin, Brad Martin, on

12      January 12, 2012.  Do you see that?

13      A.  Yes, I do.

14      Q.  And the subject is "Fannie Mae Executive Management

15      Meeting on January 9, 2012."  Do you see that?

16      A.  Yes.

17      Q.  Okay.  Now, if we scroll down a little bit to try to be

18      efficient.  Like your counsel, I'm just going to skip things

19      for efficiency.

20                    Let's go to the next page, Page 2.  You know that

21      Susan McFarland is the chief -- was at that time chief

22      financial officer of Fannie Mae, correct?

23      A.  Yes.

24      Q.  So this paragraph says "2012 Financial Plan."

25                    MR. HUME:  You don't need to highlight.
```

1    Q.  "Susan McFarland started discussion of the draft 2012

2    plan."  Do you see that?

3    A.  I do.

4    Q.  Just go down five or six lines where it says, "Susan

5    said the plan" --

6              MR. HUME:  And highlight this.

7    Q.  "Susan said the plan reflects --

8              MR. HUME:  Let's highlight the sentence.

9    Q.  -- "reflects the view that the company is at an

10   'inflection point' in the credit cycle with the loss

11   allowance and credit-related expenses projected to fall

12   compared to 2011."

13             Do you see that?

14   A.  I do.

15   Q.  And you understand that if the loss allowance and

16   credit-related expenses are projected to fall, that means

17   profits are expected to go up, correct?

18   A.  Yes.  But it's important to understand that the loss

19   allowance is not a core recurring earning.

20             If you're reducing a loss allowance, that's a one-

21   time adjustment.  It's not reflecting that this is an

22   ongoing improvement in profitability you're going to see in

23   future quarters.

24   Q.  But it's a one-time improvement that gives you a little

25   bit of time, if it's going to happen, correct?  Because it's

1    going to give you capital, a buffer, correct?

2    A.  It's recorded as income in the quarter in which the loss

3    allowance reserve is reversed, yes.

4    Q.  And one of the --

5    A.  And that goes to income, and it goes to the bottom line.

6    Q.  And it goes to net worth, correct?

7    A.  Yes.

8             MR. HUME:  Let's look next at PX196.

9             PX196, which is at Tab 34 of the binder, we'd like

10   to move into evidence.  I don't believe there's an

11   objection.

12            THE COURT:  Without objection, 196 is received.

13            MR. STERN:  No objection, Your Honor.

14   Q.  This is -- if we can just quickly look -- a May 29,

15   2012, email from Andre Galeano of FHFA to a number of people

16   including Nick Satriano at FHFA.  Do you see that?

17            I'm sorry --

18   A.  No, it's addressed to Mr. Galeano.

19   Q.  Exactly.  It addressed to Mr. Galeano from Mr. -- how is

20   it pronounced?

21   A.  Bjarnason.

22   Q.  Okay.  Thank you.

23            This email, if we can go through, I think, the

24   second paragraph.  Could you tell us who Mr. Bjarnason is.

25   A.  Mr. Bjarnason, I believe, worked in the office of the

1    chief accountant.

2    Q.  Office of the chief accountant?

3    A.  Yes.

4    Q.  At the FHFA?

5    A.  Yes.

6    Q.  This email says, "I'd appreciate if you would give me a

7    jingle when you have a moment so I can explain what I was

8    hoping to get out of these two items."

9              And this is May 29, 2012.

10             "Briefly, however, what I was looking for goes

11   right to the heart of the Fannie/Freddie difference."

12             Do you see that?

13   A.  Yes.

14   Q.  Okay.  And he goes forward to say, "The issue is not

15   just forward home prices."  Do you see that?

16   A.  Yes.

17   Q.  "It includes the favorable forward looking home price

18   curve which will reduce expected defaults."  Do you see

19   that?

20   A.  I do.

21   Q.  Okay.  It then goes on -- if we skip the next sentence,

22   he says, "There is also a large 03" --

23             MR. HUME:  Can we have the paragraph back up.

24   Q.  It says, "There is also the large 03-3 loan population

25   on the books at very look accounting book values" -- I think

1    that must be a typo, meaning "low" -- "many of which have

2    reperformed."  Do you see that?

3    A.  Yes.

4    Q.  Do you know what "03-3 loan population" is referring to?

5    A.  No.

6    Q.  Okay.  "The large discount from par, often referred to

7    as the shadow ALL" -- do you understand "ALL" to refer to

8    allowance for loan loss?

9    A.  Yes.

10   Q.  Okay.

11            -- "will amortize into income or come into income

12   in a lump sum."  Do you see that?

13   A.  Yes.

14   Q.  And it references HARP.

15            And this last sentence is what I really want to

16   bring your attention to.  It says, "What with Fannie Mae's

17   forecasts showing an upward price curve beginning after

18   2012, we should not be surprised if Fannie Mae begins a

19   roaring recovery, fuelled in large part by drawing down

20   their $70 billion allowance for loan loss and the 03-3

21   loans."  Do you see that?

22   A.  I do.

23   Q.  Do you recall people telling you at FHFA or at the

24   enterprises that you should not be surprised if they have a

25   roaring recovery?

```
 1      A.  I don't.

 2             MR. HUME:  Let's move on to PX213, which I believe

 3      your counsel showed you, and I believe it's in evidence.

 4             THE COURTROOM DEPUTY:  It's in, Counsel.

 5             THE COURT:  What was the number here?

 6             MR. HUME:  PX213.

 7             THE COURT:  Okay.  Any objection?

 8             THE COURTROOM DEPUTY:  It's in.

 9             MR. STERN:  I believe it's in evidence, Your

10      Honor.  No objection.

11      Q.  Now, PX213 is a document you were shown, and you've

12      heard about.  If we just can look at the subject -- the

13      address line.

14             It's, again, from Brad Martin on July 13, 2012.

15      Do you see that?

16      A.  Yes.

17      Q.  And you see that you are the first recipient on the

18      email?

19      A.  Yes.

20      Q.  And the subject is "Fannie Mae Executive Management

21      Meeting" --

22      A.  Yes.

23      Q.  -- on July 9, 2012.

24             And now your counsel went through this.  The first

25      paragraph begins with Tim Mayopoulos, and he was the CEO at
```

1    the time, correct?

2    A.  Yes.

3    Q.  And then, if we scroll down to the paragraph that your

4    counsel went through, it talks about what Dave Benson

5    showed.  Now, Dave Benson at that time was the senior

6    executive vice president for capital markets, and then he

7    then became the chief financial officer, correct?

8    A.  I believe that was his path in Fannie.

9    Q.  And he refers in this -- let me just cut to the chase

10   here, if I can, Mr. DeMarco.  We're going to look at the

11   projections.  There's an attached PowerPoint.

12            And this is, again, at Tab 38 of your binder.

13   It's over 100 pages.  I'll get you to the specific pages

14   that has this PowerPoint.

15            It talks about the golden years of earnings.  It

16   says a lot of really good things.  And it projects, as we'll

17   see, no need for a draw by Freddie Mac, and a very small

18   need for a draw by Fannie over the next ten years.

19            Now, do you recall testifying that you didn't

20   consider this -- this or similar kinds of projections --

21   because they didn't take into account your plans for the

22   enterprises?  Correct?

23   A.  Yes.

24   Q.  And yet the plans -- when I asked you yesterday, "Did

25   you have secret plans?" you said, "No, it wasn't a secret.

1    It was in my strategic plan that I sent to Congress."

2    Correct?

3    A.  Yes.

4    Q.  Okay.  So now this is Mr. Benson.  He made the

5    projections, okay?  And this is what he said when he

6    explained the work he was doing.

7            He says the discussion was divided into three

8    sections.  A, recap of current open questions.  Okay?

9            B.

10           MR. HUME:  Let's just highlight B.

11   Q.  "The strategic goal of building a new infrastructure

12   (the 'engine on the bench') plus integration of surrounding

13   securitization functions."  Do you see that?

14   A.  Yes.

15   Q.  That comes straight out of your strategic plan, doesn't

16   it?

17   A.  Yes.

18   Q.  You had three things:  build, maintain, contract.

19   Right?

20   A.  Yes.

21   Q.  And this is the build part, correct?

22   A.  Yes.

23   Q.  So Mr. Benson knew your plans, right?

24   A.  He did.

25   Q.  Okay.  So then his projections took into account your

```
 1    plans.
 2    A.   That's not quite how I understand this, saying the
 3    discussion that they had -- their strategy planning
 4    discussion had three broad topics -- right? -- and one of
 5    which was this building a new infrastructure.  It's not
 6    indicating to me that this has to do with how that reflects
 7    in the financials.
 8    Q.   You think he would discuss all these things and then
 9    completely disregard them when he made his projections?  Is
10    that your testimony?
11    A.   No, sir, it's not.
12               I'm saying that what I am reading here, and the
13    way I'm reading it, is not the same as you.
14    Q.   How long had Mr. Benson worked at Fannie Mae?  Do you
15    know?
16    A.   I don't.
17    Q.   You said yesterday he had been removed, but he's still
18    there.  He's president, correct?
19    A.   Fannie Mae has announced a new president.
20    Q.   Okay.  Isn't it true -- isn't it possible that
21    Mr. Benson knew a little bit more about Fannie Mae's
22    business than you did?
23    A.   Mr. Benson knew a lot about Fannie Mae.  Mr. Benson may
24    not have known everything that Fannie Mae's conservator was
25    doing or thinking.
```

1    Q.   Okay.  Which means he must have been doing or thinking

2    something that wasn't in your strategic plan, correct?  That

3    you sent to Congress, correct?

4    A.   This is an ongoing series of activities.

5    Q.   I'm not saying it's -- you can't have something

6    different.  I'm just saying yesterday under oath you said

7    you didn't have any other plans, and your plans were all in

8    the strategic plan you sent to Congress.

9              Now are you saying you did have other plans that

10   were evolving that were in your head?

11   A.   No.  I'm saying a strategic plan is a road map; it's not

12   a detailed timeline and list of activities that one's going

13   to take.  It says:  This is the direction we're going.

14   Here's the road map.  There's lots to be still spelled out

15   about this.

16             Some were going on a faster pace than others.  I

17   was actually setting, for the companies, for the senior

18   executives of the companies, annual performance plans where

19   there were -- what did we call it?  There was some name we

20   gave it.  It was basically these are the things we expect

21   you to accomplish; and, in fact, the compensation of

22   executives like Mr. Benson was tied to the annual

23   achievement or not of these various, you know, more specific

24   sets of tasks.

25   Q.   But let's just cut to the chase again.  What you told me

1    yesterday, and what you testified in deposition, is that the

2    reason you didn't consider these projections by Mr. Benson

3    or other projections showing no serious circular draw

4    problem was they didn't take into account your plans,

5    correct?

6    A.  No, I don't believe that's the way I put it.

7            I believe what I said was that my understanding

8    was that the projections that are in -- attached to this

9    Brad Martin email do not assume the kind of shrinkage of the

10   business and so forth that was outlined in the strategic

11   plan.

12   Q.  Mr. Benson -- Mr. DeMarco, you testified under oath that

13   the reason you didn't consider these projections is because

14   they didn't reflect your plans in which revenues were going

15   to be going down, correct?

16   A.  Yes.

17   Q.  You're not saying anything different now, are you?

18   A.  I'm not.

19   Q.  It sounded like you were.

20   A.  I'm not trying to.  No.

21           MR. HUME:  Can we play Clip 12, please.

22   Q.  I want to make sure this is abundantly clear.  This is

23   what you were asked in deposition after these projections

24   were shown to you.

25           (Video playing)

 1                    MR. HUME:  Can we have audio.

 2               (Video playing)

 3                    MR. HUME:  We'll come back to the clip.  I don't

 4     think that's the right clip.  We'll work on it.  That's not

 5     the right clip.  It's okay.

 6     Q.  Let's come back to PX213, Mr. DeMarco.  I want to look

 7     at what Mr. Benson said at the time.

 8                    THE COURT:  I'm sorry, we're going to have to come

 9     back to it at 1:30.  I have a criminal matter I have to do

10     now.

11                    So don't talk about the case.  Don't let anyone

12     talk to you about the case.  I'll see you all back at 1:30.

13               (Lunch recess taken).

14

15

16

17

18

19

20

21

22

23

24

25

1          <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

2

3              I, LISA A. MOREIRA, RDR, CRR, do hereby

4    certify that the above and foregoing constitutes a true and

5    accurate transcript of my stenographic notes and is a full,

6    true and complete transcript of the proceedings to the best

7    of my ability.

8          Dated this 21st day of October, 2022.

9

10                                   <u>/s/Lisa A. Moreira, RDR, CRR</u>
                                     Official Court Reporter
11                                   United States Courthouse
                                     Room 6718
12                                   333 Constitution Avenue, NW
13                                   Washington, DC 20001

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$100** [3] - 896:25, 897:4, 897:6
**$111** [3] - 939:11, 939:12, 940:2
**$130** [1] - 938:11
**$180** [1] - 894:7
**$189** [1] - 897:3
**$190** [2] - 894:4, 894:7
**$400** [1] - 951:8
**$70** [1] - 958:20

## '

**'10** [1] - 946:22
**'14** [1] - 939:8
**'15** [1] - 939:8
**'16** [1] - 904:5
**'21** [1] - 914:2
**'engine** [1] - 961:12
**'inflection** [1] - 955:10
**'the** [1] - 902:18

## /

**/s/Lisa** [1] - 966:10

## 0

**03** [1] - 957:22
**03-3** [3] - 957:24, 958:4, 958:20

## 1

**1.8** [1] - 946:2
**10** [10] - 883:8, 895:13, 895:20, 896:12, 908:16, 911:24, 928:7, 938:18, 947:14, 949:12
**10-K** [3] - 906:17, 906:19, 907:23
**10-Q** [3] - 905:18, 913:4, 913:19
**10.1** [1] - 949:19
**10.5** [1] - 949:16
**10.6** [2] - 952:6, 953:8
**10.8** [1] - 952:24
**100** [1] - 960:13
**10020** [1] - 868:4
**11.7** [1] - 909:15
**11.8** [1] - 952:20
**111.2** [1] - 938:24
**111.7** [1] - 910:7
**117.1** [1] - 909:14
**12** [5] - 896:4, 896:14, 952:1, 954:12, 964:21
**12.3** [1] - 904:5

## 2

**1251** [1] - 868:4
**13** [4] - 899:14, 900:6, 952:1, 959:14
**130.1** [1] - 938:22
**14** [7] - 915:17, 915:24, 915:25, 916:3, 918:10, 918:14, 948:10
**1401** [1] - 867:23
**147** [1] - 953:24
**15** [3] - 909:9, 948:10, 950:5
**1523** [1] - 867:17
**16** [4] - 905:24, 938:16, 949:6, 952:19
**16th** [1] - 942:10
**17** [2] - 928:4, 945:2
**17th** [1] - 887:18
**18.9** [1] - 938:18
**19087** [1] - 867:20
**1938** [2] - 909:21, 909:25
**196** [1] - 956:12
**19th** [1] - 879:5
**1:13-cv-01053-RCL** [1] - 867:3
**1:13-cv-1288** [1] - 867:9
**1:30** [2] - 965:9, 965:12

## 2

**2** [9] - 879:18, 879:20, 880:12, 925:11, 927:6, 927:16, 954:20
**2.9** [2] - 945:24, 946:1
**20** [4] - 871:17, 935:7, 945:17, 949:9
**20001** [3] - 868:10, 868:14, 966:13
**20005** [1] - 867:23
**20036** [1] - 867:17
**2008** [7] - 884:3, 922:6, 940:6, 940:12, 940:16, 940:21, 946:21
**2009** [1] - 940:6
**2010** [5] - 940:6, 943:11, 949:23, 949:25, 951:8
**2011** [29] - 883:2, 884:15, 909:12, 921:9, 921:14, 923:1, 940:6, 943:4, 943:5, 943:8, 944:2, 945:2, 946:13, 946:16, 947:17,

948:3, 949:23, 950:1, 950:7, 951:12, 951:19, 951:21, 951:23, 952:15, 953:11, 953:12, 953:17
**2012** [51] - 871:18, 877:25, 880:13, 898:2, 899:14, 899:19, 900:6, 904:4, 905:19, 905:22, 906:11, 907:4, 908:1, 909:5, 912:13, 913:4, 913:10, 914:14, 914:25, 915:15, 917:19, 918:2, 918:4, 923:1, 925:16, 928:4, 940:9, 940:12, 940:15, 940:21, 945:2, 945:7, 945:19, 946:7, 948:24, 949:15, 950:14, 951:14, 952:4, 952:20, 953:7, 953:12, 954:12, 954:15, 954:24, 955:1, 956:15, 957:9, 958:18, 959:14, 959:23
**2013** [8] - 938:11, 938:22, 939:8, 949:19, 950:7, 950:15, 951:17, 952:22
**2014** [2] - 952:24, 953:8
**202** [1] - 868:14
**2020** [2] - 901:22, 902:13
**2022** [2] - 867:5, 966:8
**21** [2] - 867:5, 877:24
**213** [1] - 898:23
**21st** [1] - 966:8
**226** [3] - 934:13, 935:3, 935:25
**23** [2] - 947:9, 948:7
**24** [1] - 951:25
**247** [3] - 889:8, 890:5, 890:6
**27** [1] - 944:2
**280** [1] - 867:19
**29** [3] - 907:4, 909:5, 953:22, 956:14, 957:9
**2:15** [1] - 867:5

## 3

**3** [4] - 875:25, 876:8, 917:19, 948:23
**3.5** [1] - 951:14
**30** [2] - 873:11, 915:15
**30-year** [2] - 897:24, 898:2
**31** [1] - 909:12
**31st** [1] - 935:15
**333** [2] - 868:13, 966:12
**34** [1] - 956:9
**354-3187** [1] - 868:14
**38** [1] - 960:12
**3rd** [1] - 926:23

## 4

**4** [3] - 883:3, 884:23, 952:21
**420** [5] - 913:23, 914:6, 914:8, 914:11, 914:14
**420's** [1] - 914:1
**421** [6] - 913:23, 913:24, 914:5, 914:9, 914:11, 917:11
**421's** [1] - 914:10
**440-page** [1] - 908:22
**477** [1] - 914:21

## 5

**5** [5] - 875:24, 881:25, 895:14, 895:22
**5.4** [1] - 945:24
**5.5** [2] - 903:22, 904:1
**520** [1] - 945:17
**56.6** [1] - 904:5

## 6

**6** [1] - 880:13
**6.2** [2] - 903:21, 903:25
**6.5** [2] - 951:17, 952:10
**6.6** [1] - 949:1
**601** [1] - 868:9
**65** [1] - 910:4
**6718** [2] - 868:13, 966:12
**6th** [2] - 880:23, 881:3

## 7

**7** [2] - 914:25, 950:14
**7.1** [1] - 949:16

## 8

**8** [7] - 902:18, 905:19, 905:22, 907:6, 908:7, 908:8
**80** [1] - 951:12

## 9

**9** [7] - 899:19, 908:1, 913:10, 914:14, 946:22, 954:15, 959:23

## A

**ability** [5] - 883:24, 886:19, 908:14, 910:10, 966:7
**able** [3] - 922:9, 924:17, 924:19
**about..** [1] - 892:12
**absence** [1] - 872:3
**absolutely** [2] - 933:20, 935:24
**absorb** [3] - 894:23, 894:24, 898:9
**abundantly** [1] - 964:22
**accelerating** [1] - 885:21
**accepting** [3] - 943:12, 943:14, 943:15
**access** [1] - 883:25
**accomplish** [1] - 963:21
**accomplished** [1] - 932:20
**according** [2] - 880:22, 881:5
**account** [6] - 899:18, 924:17, 949:22, 960:21, 961:25, 964:4
**accountant** [4] - 892:9, 892:11, 957:1, 957:2
**accounting** [1] - 957:25
**accurate** [2] - 873:17, 966:5
**achievement** [1] - 963:23
**acknowledges** [1] - 883:3
**acknowledging** [1] - 882:9
**acting** [3] - 922:12, 922:14, 932:21
**ACTION** [1] - 867:10
**activities** [3] - 926:14,

963:4, 963:12
**activity** [1] - 922:1
**actual** [2] - 951:7,
951:11
**add** [1] - 883:13
**adding** [1] - 879:10
**addition** [4] - 911:3,
911:9, 911:24, 929:8
**additional** [3] - 883:8,
910:22, 916:22
**address** [8] - 873:8,
874:7, 874:10,
874:20, 874:21,
893:12, 893:16,
959:13
**addressed** [3] -
872:11, 956:18,
956:19
**adequacy** [1] - 929:7
**adjustment** [1] -
955:21
**administration** [3] -
894:8, 921:9, 933:12
**admission** [1] - 871:13
**admitted** [2] - 935:5,
936:5
**adopting** [1] - 916:18
**advance** [1] - 880:3
**advantage** [1] - 890:23
**adverse** [6] - 882:23,
886:5, 910:18,
912:8, 921:3
**adversely** [3] - 897:21,
910:11, 920:18
**advisor** [1] - 923:14
**affect** [3] - 883:23,
886:17, 920:18
**affected** [1] - 910:11
**affecting** [1] - 886:18
**affirmed** [1] - 912:18
**afoul** [1] - 872:25
**afternoon** [2] - 937:24,
938:2
**AGENCY** [1] - 867:6
**Agency** [1] - 868:6
**agenda** [1] - 881:8
**aggregate** [1] - 909:13
**agree** [3] - 872:17,
890:20, 953:10
**agreed** [4] - 872:6,
878:15, 897:11,
938:9
**agreeing** [1] - 944:23
**Agreement** [1] -
916:22
**agreement** [16] -
871:10, 871:14,
871:16, 871:23,
872:5, 873:12,
873:16, 882:6,

883:12, 892:22,
896:13, 896:20,
910:23, 912:7,
920:12, 929:12
**AGREEMENT** [1] -
867:10
**agreements** [2] -
872:1, 924:9
**ahead** [6] - 881:8,
881:9, 887:13,
887:25, 929:1,
934:18
**aid** [1] - 933:5
**al** [2] - 867:3, 867:7
**Alfred** [1] - 892:3
**ALL** [2] - 958:7
**allow** [1] - 930:11
**allowance** [7] -
955:11, 955:15,
955:19, 955:20,
956:3, 958:8, 958:20
**allowed** [3] - 877:15,
894:12, 939:18
**allowing** [2] - 930:22,
932:4
**allows** [1] - 877:10
**almost** [4] - 870:16,
870:19, 938:2, 938:3
**alone** [1] - 908:19
**alternative** [4] - 896:1,
896:5, 897:9, 897:11
**alternatives** [3] -
892:23, 893:4,
895:12
**amend** [1] - 926:9
**Amendment** [40] -
878:7, 878:12,
878:15, 878:23,
880:18, 887:2,
887:16, 888:8,
892:21, 893:4,
893:11, 894:6,
896:24, 897:19,
897:20, 915:11,
918:16, 919:11,
919:15, 920:3,
924:10, 925:4,
925:21, 926:6,
926:16, 927:9,
927:25, 928:3,
928:22, 931:5,
931:9, 931:13,
931:17, 932:8,
933:18, 936:7,
938:6, 943:5, 943:17
**amendment** [2] -
924:10, 926:23
**amendments** [4] -
891:12, 924:8,
935:14, 936:10

**Amendments** [1] -
925:9
**Americas** [1] - 868:4
**amortize** [1] - 958:11
**amount** [11] - 876:17,
876:18, 876:19,
877:3, 882:12,
884:8, 909:15,
909:22, 928:10,
929:15, 945:20
**analysis** [1] - 942:15
**analyzing** [2] - 920:2,
942:12
**Andre** [1] - 956:15
**Ann** [2] - 903:6, 903:8
**announced** [2] -
926:16, 962:19
**announcement** [4] -
888:7, 925:10,
925:21, 926:6
**annual** [12] - 906:19,
908:10, 908:17,
909:16, 909:23,
910:2, 910:7, 910:9,
913:17, 917:5,
963:18, 963:22
**annualized** [1] -
909:15
**answer** [7] - 893:8,
893:9, 893:19,
919:16, 939:19,
939:21
**answered** [1] - 885:4
**anticipate** [1] - 872:16
**anticipating** [2] -
883:7, 900:20
**apologize** [9] - 870:7,
889:9, 901:17,
907:15, 907:16,
907:20, 913:24,
915:19, 925:23
**apparent** [1] - 870:9
**appearance** [1] -
872:12
**APPEARANCES** [2] -
867:15, 868:1
**appreciate** [3] -
873:20, 873:23,
957:6
**approach** [1] - 872:12
**arbitrarily** [1] - 941:14
**area** [1] - 919:11
**areas** [3] - 873:4,
900:15, 901:3
**arena** [2] - 921:8,
930:15
**argument** [1] - 872:3,
934:12
**arithmetic** [2] -
938:24, 940:4

**ARNOLD** [1] - 868:9
**arose** [1] - 943:9
**array** [1] - 924:21
**arrow** [1] - 940:20
**articulated** [1] -
922:19
**aside** [3] - 877:4,
877:6, 877:19
**ASIM** [1] - 868:7
**aspersions** [1] -
870:24
**asserted** [1] - 935:6
**assets** [2] - 929:14,
950:24
**assistance** [1] - 933:5
**assisting** [1] - 881:13
**associated** [1] - 882:5
**assume** [4] - 874:8,
880:11, 964:9
**assumption** [1] -
939:16
**assure** [2] - 931:10,
931:17
**assuring** [1] - 931:17
**attached** [2] - 960:11,
964:8
**attaches** [1] - 947:17
**attaching** [1] - 948:3
**attempt** [3] - 873:19,
893:17, 893:23
**attended** [2] - 899:24,
954:8
**attention** [1] - 958:16
**audio** [1] - 965:1
**August** [13] - 887:18,
905:19, 905:22,
906:11, 914:25,
926:23, 927:3,
928:4, 940:8,
940:15, 940:21,
942:10, 945:2
**availability** [1] -
926:14
**available** [2] - 884:8,
894:16
**Avenue** [1] - 867:17,
867:23, 868:4,
868:9, 868:13,
966:12
**avoiding** [1] - 871:7
**Awaa** [1] - 923:11
**aware** [3] - 897:1,
902:20, 918:4

**B**

**back-and-forth** [1] -
888:18
**backed** [7] - 882:17,
894:14, 897:23,

898:1, 898:11,
932:11, 939:4
**background** [1] -
880:22
**backwards** [1] -
913:13
**bad** [7] - 886:16,
898:6, 939:8, 944:5,
944:6, 944:11
**balance** [7] - 876:19,
877:7, 877:18,
929:14, 950:7,
950:21, 950:25
**ball** [1] - 904:20
**bank** [2] - 888:6
**Barclays** [2] - 888:4,
888:5
**BARNES** [1] - 867:16
**base** [14] - 885:11,
885:22, 886:22,
950:6, 951:21,
951:22, 952:3,
952:4, 952:14,
952:19, 952:22,
952:24, 953:5
**base-case** [1] - 885:11
**based** [6] - 881:2,
893:25, 896:18,
910:15, 922:12,
928:12
**baseline** [1] - 944:17
**basic** [1] - 897:22
**bearer** [1] - 894:25
**bearing** [2] - 894:15,
918:15
**bearings** [1] - 948:15
**became** [3] - 870:9,
880:18, 960:7
**BEFORE** [1] - 867:13
**began** [2] - 943:3,
943:5
**beginning** [4] - 918:4,
948:24, 952:4,
958:17
**begins** [5] - 889:19,
903:16, 911:9,
958:18, 959:25
**begun** [1] - 882:18
**behalf** [1] - 910:22
**behind** [2] - 898:5,
931:23
**belabor** [1] - 872:1
**believability** [1] -
904:12
**below** [2] - 901:18,
946:5
**bench** [3] - 873:8,
934:6, 934:22
**bench'** [1] - 961:12
**benefit** [3] - 877:17,

938:5, 941:1
**benefits** [1] - 928:13
**Benson** [15] - 900:13,
900:20, 901:14,
960:4, 960:5, 961:4,
961:23, 962:14,
962:21, 962:23,
963:22, 964:2,
964:12, 965:7
**Benson's** [1] - 898:18
**BERGER** [1] - 868:3
**BERGMAN** [1] - 868:7
**Berkley** [1] - 867:16
**BERNSTEIN** [1] -
868:3
**best** [4] - 885:14,
885:18, 885:19,
966:6
**best-case** [1] - 885:14
**better** [24] - 876:5,
876:9, 876:11,
876:12, 876:13,
885:11, 885:18,
885:19, 885:21,
886:21, 894:19,
894:21, 904:21,
912:12, 939:9,
939:13, 940:2,
940:18, 945:7,
946:18, 947:1,
947:4, 953:11
**between** [5] - 888:18,
924:11, 942:18,
944:20, 945:1
**beyond** [2] - 883:8,
921:1
**big** [2] - 893:14,
923:22
**bigger** [1] - 911:10
**billion** [39] - 894:4,
894:7, 896:25,
897:3, 897:5, 897:6,
903:21, 903:22,
903:25, 904:1,
904:5, 909:14,
909:15, 910:7,
938:11, 938:18,
938:22, 938:25,
939:11, 939:12,
940:2, 945:24,
946:2, 949:2,
949:19, 950:14,
951:14, 951:17,
952:7, 952:10,
952:20, 952:21,
952:24, 953:8,
958:20
**binder** [5] - 947:9,
952:1, 953:21,
956:9, 960:12

**bit** [5] - 873:18, 946:5,
954:17, 955:25,
962:21
**Bjarnason** [3] -
956:21, 956:24,
956:25
**blindly** [1] - 916:18
**blow** [3] - 905:25,
909:10, 948:22
**Board** [2] - 900:14,
904:9
**board** [6] - 900:21,
901:2, 901:7,
904:17, 904:24,
954:9
**BOIES** [1] - 867:22
**bolded** [1] - 884:25
**bond** [1] - 939:4
**book** [1] - 957:25
**books** [2] - 947:1,
957:25
**borrow** [1] - 928:14
**borrower** [3] - 876:17,
876:24, 877:1
**borrower's** [1] -
876:19
**bottom** [4] - 906:11,
911:11, 950:24,
956:5
**bounds** [2] - 872:7,
872:9
**Bowler** [1] - 935:15
**Brad** [4] - 899:5,
954:11, 959:14,
964:9
**Bradford** [5] - 899:3,
899:18, 899:22,
905:3, 954:11
**break** [2] - 874:8,
888:13
**breaking** [1] - 930:3
**breaks** [1] - 898:7
**BRIAN** [1] - 867:16
**brief** [2] - 892:2,
934:12
**briefly** [6] - 879:22,
922:16, 934:16,
952:18, 954:4,
957:10
**bring** [4] - 933:8,
937:17, 943:20,
958:16
**broad** [1] - 962:4
**broadest** [1] - 878:20
**brought** [4] - 933:4,
933:6, 933:15
**brown** [2] - 892:13
**buffer** [1] - 956:1
**build** [2] - 961:18,
961:21

**building** [4] - 901:13,
926:12, 961:11,
962:5
**bullet** [7] - 882:7,
882:15, 882:22,
883:3, 883:6,
883:10, 952:2
**Bullet** [1] - 883:3,
948:22
**business** [2] - 962:22,
964:10
**buy** [1] - 883:24
**BY** [3] - 875:13,
937:23, 954:3

## C

**CA** [1] - 867:3
**calendar** [1] - 882:11
**caller** [1] - 875:23
**cannot** [1] - 948:15
**cap** [1] - 882:25
**capable** [1] - 887:11
**capital** [6] - 931:23,
932:2, 932:4,
939:10, 956:1, 960:6
**capped** [2] - 882:13,
897:17
**capture** [1] - 928:13
**care** [2] - 887:21,
930:10
**career** [1] - 923:18
**case** [42] - 871:20,
872:10, 885:11,
885:12, 885:14,
885:18, 885:20,
885:22, 885:25,
886:4, 886:7, 886:8,
886:9, 886:11,
886:14, 886:15,
886:21, 886:22,
887:3, 887:4, 890:1,
911:21, 935:19,
940:8, 941:8,
942:22, 950:6,
951:21, 951:22,
952:3, 952:4,
952:14, 952:19,
952:22, 952:24,
953:5, 965:11,
965:12
**Case** [1] - 867:9
**cash** [3] - 896:9,
896:12, 896:21
**cast** [1] - 870:23
**causing** [1] - 933:3
**cc** [1] - 889:16
**central** [2] - 933:2,
933:3
**centrally** [1] - 871:22

**CEO** [6] - 900:7,
904:15, 904:24,
906:9, 959:25
**CEOs** [2] - 924:15,
950:17
**certain** [1] - 876:17
**certainly** [6] - 873:1,
873:2, 885:19,
912:18, 918:19,
943:15
**certainty** [1] - 929:21
**CERTIFICATE** [1] -
966:1
**certify** [1] - 966:4
**chain** [1] - 937:10
**chance** [4] - 874:5,
903:13, 920:13,
939:23
**change** [5] - 903:17,
904:8, 904:16,
920:13, 928:10
**changed** [1] - 904:18
**changes** [3] - 882:24,
883:12, 929:21
**changing** [1] - 905:10
**characterization** [1] -
941:17
**charged** [1] - 911:23
**chase** [2] - 960:9,
963:25
**CHECK** [1] - 867:19
**chief** [10] - 892:8,
892:9, 892:11,
906:8, 915:9,
954:21, 957:1,
957:2, 960:7
**circular** [9] - 893:2,
895:12, 912:14,
920:25, 928:8,
928:16, 928:17,
928:18, 964:3
**claim** [6] - 895:17,
941:8, 941:10,
941:12, 941:15,
941:17
**Class** [2] - 867:18,
868:2
**CLASS** [1] - 867:10
**clear** [9] - 883:19,
888:17, 920:22,
928:18, 940:7,
940:13, 941:7,
942:11, 964:22
**clearly** [1] - 887:3
**client** [1] - 944:10
**Clip** [1] - 964:21
**clip** [3] - 965:3, 965:4,
965:5
**Close** [1] - 889:19
**close** [3] - 889:24,

**890:16, 897:20
**cold** [1] - 923:18
**colleagues** [1] -
890:11
**COLUMBIA** [1] - 867:1
**coming** [5] - 876:23,
891:10, 920:2,
922:13, 922:14
**comment** [1] - 879:1
**Commitment** [10] -
882:13, 884:6,
897:1, 897:18,
898:5, 922:5,
928:23, 932:3,
932:4, 932:13
**commitment** [25] -
882:19, 883:4,
883:5, 891:18,
894:23, 897:7,
897:21, 898:9,
911:13, 911:15,
911:21, 911:22,
912:4, 920:18,
926:10, 926:16,
928:20, 929:7,
930:7, 930:10,
931:14, 939:11,
939:24
**commitment's** [1] -
897:16
**communications** [2] -
878:21, 892:17
**companies** [31] -
881:9, 883:9, 884:2,
894:9, 894:10,
894:25, 895:7,
897:25, 919:2,
919:7, 920:8,
920:10, 921:17,
921:20, 921:23,
921:25, 923:3,
924:15, 930:21,
931:23, 933:1,
933:4, 933:9,
933:13, 933:16,
945:21, 945:22,
946:9, 946:16,
963:17, 963:18
**companies'** [3] -
921:1, 945:12,
953:11
**company** [6] - 900:25,
916:8, 918:6, 918:7,
928:12, 955:9
**company's** [1] -
931:21
**compared** [1] - 955:12
**compensation** [1] -
963:21
**complete** [4] - 873:12,

873:16, 917:8, 966:6
**completely** [2] - 874:1,
962:9
**component** [1] -
929:12
**components** [1] -
926:10
**comprehensive** [7] -
913:17, 917:3,
917:4, 948:25,
949:5, 949:7, 952:5
**compromise** [2] -
873:21, 895:17
**computed** [1] - 908:16
**concept** [1] - 930:25
**concern** [5] - 871:5,
871:7, 930:5, 930:9,
936:19
**concerned** [11] -
884:4, 918:23,
920:7, 920:23,
920:25, 921:2,
921:6, 921:7,
921:20, 921:21,
925:1
**concerns** [3] - 884:5,
923:9, 924:16
**conclusion** [1] - 920:2
**condition** [1] - 912:9
**conditions** [10] -
886:5, 898:7, 905:9,
910:12, 910:16,
912:19, 918:24,
921:3, 923:9
**conference** [2] -
934:6, 934:22
**confidence** [4] -
887:19, 898:4,
898:10, 933:9
**confirmed** [1] - 874:17
**Congress** [10] -
871:17, 894:9,
922:24, 922:25,
929:25, 930:15,
930:18, 961:1,
963:3, 963:8
**conjunction** [1] -
948:13
**connected** [2] -
926:21, 927:3
**cons** [2] - 919:20,
942:12
**conservator** [6] -
884:3, 924:11,
932:24, 941:1,
946:21, 962:24
**conservator's** [1] -
931:10
**conservatorship** [16] -
881:10, 883:22,

884:3, 892:6,
894:11, 897:25,
899:5, 901:13,
920:8, 920:11,
921:10, 922:4,
923:6, 924:21,
932:18, 940:25
**conservatorships** [4]
- 887:8, 921:11,
921:19, 923:3
**Conservatorships** [1]
- 926:11
**consider** [5] - 896:5,
920:20, 960:20,
964:2, 964:13
**considerable** [1] -
929:15
**consideration** [1] -
880:17
**considered** [1] -
922:21
**consistent** [3] -
926:16, 931:13,
931:17
**constitutes** [1] - 966:4
**Constitution** [2] -
868:13, 966:12
**constructive** [1] -
881:12
**contact** [1] - 871:7
**contain** [1] - 914:18
**contained** [1] - 929:7
**contemplate** [3] -
930:1, 930:19,
930:20
**contention** [1] -
935:19
**context** [6] - 873:18,
879:22, 885:23,
889:22, 904:13,
937:8
**continually** [1] - 884:4
**continue** [6] - 887:9,
912:7, 928:14,
929:23, 930:12
**continued** [4] - 881:6,
920:10, 929:2, 929:6
**CONTINUED** [2] -
867:24, 868:1
**continues** [2] -
910:11, 910:17
**continuing** [1] - 920:7
**continuum** [1] -
926:21
**contract** [5] - 895:20,
896:8, 941:13,
961:18
**contracting** [1] -
926:13
**conversation** [1] -

881:2
**convey** [1] - 929:20
**conveyed** [1] - 895:25
**COOPER** [1] - 867:16
**copy** [3] - 899:2,
900:14, 947:10
**core** [1] - 955:19
**corner** [1] - 919:6
**corporate** [2] - 900:24,
901:18
**correct** [69] - 876:3,
876:4, 878:5,
888:20, 888:25,
889:5, 889:10,
889:17, 900:23,
902:11, 915:12,
938:7, 939:5, 940:3,
940:9, 940:22,
941:5, 942:7,
942:13, 942:16,
942:17, 942:20,
942:21, 943:1,
943:2, 943:4,
943:13, 944:2,
944:3, 944:6,
944:11, 944:20,
944:24, 945:1,
945:4, 945:5,
945:10, 945:20,
946:2, 946:5, 946:9,
946:22, 947:2,
947:5, 948:18,
949:17, 949:20,
949:24, 951:4,
951:5, 952:15,
953:12, 954:6,
954:9, 954:22,
955:17, 955:25,
956:1, 956:6, 960:1,
960:7, 960:22,
961:2, 961:21,
962:18, 963:2,
963:3, 964:5, 964:15
**cost** [1] - 884:8
**Counsel** [1] - 959:4
**counsel** [14] - 870:3,
874:18, 888:19,
892:4, 939:17,
939:23, 940:5,
944:10, 944:22,
954:18, 959:3,
959:24, 960:4
**counsel's** [1] - 873:21
**counterparty** [1] -
894:1
**country's** [8] - 919:3,
920:9, 922:7,
923:19, 929:24,
933:1, 933:2, 933:10
**couple** [3] - 872:4,

919:4, 924:13
**coupled** [1] - 912:5
**course** [2] - 891:19,
910:14
**COURT** [55] - 867:1,
870:2, 870:18,
872:17, 872:20,
872:22, 873:1,
873:4, 873:14,
873:23, 874:11,
874:23, 874:25,
875:5, 879:9,
879:13, 879:15,
890:8, 891:3, 891:6,
906:24, 907:21,
913:7, 913:23,
914:2, 914:5, 914:8,
915:18, 917:13,
917:18, 926:2,
933:23, 934:5,
934:17, 934:21,
934:23, 935:10,
935:21, 935:23,
936:2, 936:4,
936:12, 936:21,
936:24, 937:13,
937:16, 937:20,
941:18, 953:24,
954:1, 956:12,
959:5, 959:7, 965:8,
966:1
**Court** [13] - 868:12,
868:12, 870:17,
870:20, 870:25,
871:6, 872:14,
872:21, 872:25,
874:22, 890:19,
907:16, 966:11
**Court's** [7] - 873:11,
875:7, 875:20,
884:10, 893:5,
898:24, 912:20
**Courthouse** [2] -
868:13, 966:11
**courtroom** [3] -
874:24, 934:1,
937:19
**COURTROOM** [9] -
913:2, 915:20,
925:22, 926:4,
947:20, 947:22,
953:17, 959:4, 959:19
**cover** [3] - 947:16,
948:5, 948:17
**covered** [2] - 883:1,
895:8
**create** [1] - 933:9
**creates** [1] - 886:5
**creating** [1] - 883:21
**credibility** [2] -

904:10, 904:12
**credible** [1] - 904:17
**credit** [8] - 883:25,
884:8, 884:9, 886:5,
926:14, 955:10,
955:11, 955:16
**credit-related** [2] -
955:11, 955:16
**criminal** [1] - 965:9
**critical** [1] - 929:23
**cross** [1] - 873:7
**CROSS** [1] - 875:12
**CROSS-
EXAMINATION** [1] -
875:12
**CRR** [3] - 868:12,
966:3, 966:10
**cumulative** [4] -
901:21, 901:22,
901:25, 904:4
**Current** [1] - 901:20
**current** [3] - 902:12,
928:6, 961:8
**curve** [1] - 957:18,
958:17
**cut** [2] - 960:9, 963:25
**cycle** [1] - 955:10

# D

**D.C** [4] - 867:4,
867:17, 867:23,
868:10
**danger** [1] - 928:19
**darkest** [1] - 932:25
**data** [2] - 896:22,
896:23
**date** [12] - 883:5,
887:17, 905:21,
907:12, 907:14,
907:25, 913:9,
914:24, 917:10,
917:15, 917:16,
944:1
**dated** [12] - 871:17,
877:23, 877:24,
899:14, 905:19,
905:22, 907:4,
908:1, 913:9,
914:14, 914:25,
917:19
**Dated** [1] - 966:8
**Dave** [5] - 900:13,
901:11, 901:14,
960:4, 960:5
**DAVID** [1] - 868:7
**DAVIS** [1] - 867:21
**day-to-day** [1] -
895:9
**days** [2] - 915:10,

915:13
**DC** [2] - 868:14, 966:13
**de** [1] - 891:18
**deal** [2] - 873:22, 912:14
**debt** [3] - 882:16, 930:9, 932:11
**December** [3] - 882:12, 897:16, 909:12
**decided** [1] - 892:22
**decision** [4] - 889:2, 912:16, 915:11, 940:8
**decision-making** [1] - 889:2
**decisions** [2] - 887:1, 919:15
**declining** [1] - 886:4
**defaults** [1] - 957:18
**Defendant** [1] - 868:6
**defendant** [1] - 879:10
**defendants** [2] - 874:13, 934:10
**Defendants** [1] - 867:8
**defer** [1] - 874:21
**deficit** [1] - 951:6
**definitely** [1] - 886:8
**definitively** [1] - 921:12
**DeLeo** [2] - 892:8, 923:11
**DeMarco** [27] - 869:3, 870:13, 871:3, 871:7, 871:17, 875:1, 875:3, 875:11, 875:14, 875:16, 877:22, 879:2, 879:17, 881:18, 884:14, 884:24, 907:22, 912:20, 917:20, 932:14, 937:24, 938:4, 953:10, 954:5, 960:10, 964:12, 965:6
**demonstrates** [1] - 935:8
**demonstrative** [1] - 938:15
**Demonstrative** [2] - 938:16, 945:17
**demonstratives** [1] - 947:8
**Department** [8] - 876:14, 881:8, 894:13, 894:15, 895:16, 910:3, 921:12, 924:11

**department** [1] - 942:5
**department's** [1] - 930:17
**deposition** [2] - 964:1, 964:23
**DEPUTY** [9] - 913:2, 915:20, 925:22, 926:4, 947:20, 947:22, 953:17, 959:4, 959:8
**DeRita** [1] - 943:22
**describe** [3] - 879:2, 888:2, 936:15
**described** [3] - 895:3, 918:21, 918:22
**description** [2] - 892:2, 927:8
**detail** [2] - 885:3, 890:18
**detailed** [1] - 963:12
**details** [3] - 871:15, 871:21, 888:2, 949:4, 952:17
**developing** [1] - 930:15
**development** [1] - 873:19
**dialogue** [4] - 878:20, 881:4, 881:6
**difference** [2] - 938:24, 957:11
**different** [5] - 884:16, 920:20, 940:12, 963:6, 964:17
**direct** [10] - 872:13, 878:6, 878:8, 878:9, 888:21, 889:4, 922:24, 925:20, 926:5, 926:15
**direction** [2] - 905:12, 963:13
**directly** [3] - 883:23, 890:3, 924:1
**director** [2] - 923:5, 932:21
**directs** [1] - 872:21
**disagree** [1] - 890:20
**disclosures** [1] - 924:25
**discount** [1] - 958:6
**discovery** [1] - 942:24
**discuss** [5] - 874:5, 881:2, 888:13, 944:14, 962:8
**discussed** [2] - 903:6, 939:15
**discussing** [3] - 893:10, 943:3, 943:5
**Discussion** [1] - 879:24

**discussion** [11] - 880:1, 880:4, 881:12, 900:14, 903:11, 921:16, 943:11, 955:1, 961:7, 962:3, 962:4
**discussions** [5] - 889:1, 890:4, 908:4, 923:1, 943:16
**display** [1] - 914:10
**disregard** [1] - 962:9
**disrupt** [1] - 898:8
**disruption** [2] - 921:15, 930:23
**distributed** [1] - 889:23
**distribution** [1] - 885:24
**DISTRICT** [3] - 867:1, 867:1, 867:13
**divided** [1] - 961:7
**dividend** [43] - 883:9, 894:22, 895:13, 896:17, 906:3, 908:10, 908:14, 908:15, 908:19, 909:15, 909:16, 909:23, 910:2, 910:8, 911:5, 911:12, 911:25, 912:3, 913:18, 916:23, 928:7, 928:9, 928:10, 928:11, 929:6, 931:5, 931:22, 937:7, 938:17, 938:18, 938:21, 945:19, 945:24, 949:1, 949:10, 949:12, 949:20, 949:24, 952:6, 952:20, 952:23, 952:25
**dividend's** [1] - 896:18
**dividends** [11] - 882:25, 896:19, 896:21, 901:21, 901:25, 902:13, 917:5, 928:15, 928:24, 938:10, 941:15
**division** [2] - 892:7, 892:10
**document** [35] - 871:13, 871:24, 874:1, 877:23, 880:2, 880:3, 880:8, 880:21, 881:5, 885:4, 888:10, 890:21, 891:10,

892:18, 903:13, 905:23, 908:8, 908:22, 909:8, 909:18, 913:14, 915:25, 916:3, 928:5, 934:9, 934:20, 935:2, 935:21, 935:23, 936:5, 936:21, 944:4, 948:7, 948:12, 959:11
**documents** [9] - 871:9, 891:15, 919:19, 919:25, 940:25, 942:23, 946:8, 946:11, 953:14
**done** [12] - 883:17, 898:13, 917:25, 924:4, 924:10, 932:23, 933:7, 937:9, 943:24, 946:21, 948:12
**down** [32] - 877:8, 877:11, 887:7, 887:12, 891:18, 894:9, 894:23, 898:8, 901:11, 903:15, 904:1, 910:7, 912:6, 917:24, 921:5, 921:13, 921:17, 921:19, 921:25, 923:3, 930:3, 930:16, 930:18, 930:21, 940:21, 943:11, 947:8, 954:17, 955:4, 958:19, 960:3, 964:15
**downside** [2] - 894:15, 905:14
**downturns** [1] - 905:4
**draft** [2] - 900:13, 955:1
**draw** [9] - 928:16, 928:17, 928:19, 945:22, 948:24, 952:4, 960:17, 960:18, 964:3
**drawing** [1] - 958:19
**drawn** [2] - 894:4, 908:17
**draws** [18] - 882:23, 893:2, 895:12, 901:22, 902:13, 902:21, 902:23, 903:1, 910:15, 910:24, 910:25, 912:6, 912:14,

916:22, 916:24, 920:25, 928:8, 944:6
**drive** [1] - 916:24
**driven** [1] - 918:25
**duration** [1] - 943:16
**during** [9] - 908:3, 914:16, 932:18, 932:20, 932:25, 933:15, 943:16, 946:21, 952:14
**duty** [1] - 941:8
**DX** [1] - 879:14
**DX346** [4] - 884:21, 943:19, 943:21, 943:23
**DX3667** [1] - 906:23
**DX367** [2] - 906:16, 909:1
**DX369** [3] - 907:19, 907:20, 912:25
**DX394** [1] - 875:17
**DX420** [5] - 913:3, 913:6, 913:14, 913:22
**DX421** [2] - 913:12, 917:8
**DX476** [1] - 905:16
**DX539** [2] - 925:6, 925:25
**DX549** [1] - 888:1

**E**

**earned** [2] - 908:20, 910:1
**earning** [2] - 931:21, 955:19
**earnings** [6] - 902:19, 908:18, 917:3, 929:16, 935:18, 960:15
**eating** [1] - 882:25
**economic** [4] - 886:15, 898:6, 910:16, 933:1
**economist** [1] - 892:8
**economy** [3] - 886:16, 910:18, 921:3
**editorialize** [1] - 922:20
**EDWARD** [2] - 869:3, 875:11
**effect** [2] - 921:18, 932:8
**effective** [3] - 894:25, 895:6, 912:5
**efficiency** [1] - 954:19
**efficient** [2] - 947:12, 954:18
**effort** [2] - 873:21, 893:11

**eight** [3] - 902:14, 902:16, 902:21
**either** [4] - 873:8, 884:7, 890:20
**elaborate** [2] - 876:12, 918:18
**eliminate** [2] - 928:14, 928:22
**eliminating** [2] - 891:17, 928:15
**eloquently** [1] - 922:20
**email** [22] - 889:10, 891:22, 891:24, 899:3, 899:14, 899:16, 899:23, 935:3, 935:15, 936:22, 936:25, 937:10, 937:13, 942:9, 947:16, 948:3, 954:5, 956:15, 956:23, 957:6, 959:18, 964:9
**emails** [2] - 942:15, 942:18
**embedded** [1] - 923:7
**emerge** [1] - 923:21
**emerged** [1] - 939:8
**employee** [1] - 903:10
**end** [14] - 870:17, 870:19, 882:10, 882:11, 883:17, 893:13, 897:16, 910:21, 920:14, 924:2, 932:14, 934:22, 938:4, 953:7
**ended** [3] - 875:18, 889:1, 931:20
**ending** [2] - 915:14, 923:2
**ends** [1] - 898:7
**engaged** [2] - 881:12, 922:25
**ensure** [5] - 887:5, 893:15, 919:1, 920:10, 928:13
**enter** [1] - 915:11
**enterprises** [5] - 931:11, 939:3, 941:1, 958:24, 960:22
**enters** [2] - 874:24, 937:19
**entire** [1] - 878:22
**entirety** [1] - 912:1
**entitled** [1] - 872:14
**environment** [1] - 886:15
**equal** [2] - 946:5, 947:6

**equity** [1] - 951:3, 951:6, 953:4
**erased** [1] - 876:20
**erode** [3] - 930:10, 931:23, 932:2
**eroded** [1] - 928:23
**erodes** [2] - 897:7, 897:8
**erosion** [2] - 928:19, 930:6
**especially** [1] - 940:2
**ESQ** [12] - 867:16, 867:18, 867:21, 867:21, 867:22, 868:2, 868:2, 868:6, 868:7, 868:7, 868:8, 868:8
**essentially** [1] - 894:14
**et** [2] - 867:3, 867:7
**evaluated** [1] - 944:15
**events** [3] - 926:22, 927:4, 937:11
**evidence** [12] - 879:15, 884:22, 899:2, 917:8, 934:11, 947:25, 953:16, 953:19, 956:10, 959:3, 959:9
**evident** [1] - 883:18
**evolving** [1] - 963:10
**exact** [3] - 876:18, 896:23, 935:19
**exactly** [1] - 956:19
**examination** [3] - 871:3, 871:21, 934:11
**EXAMINATION** [2] - 875:12, 937:22
**examine** [1] - 932:15
**exceed** [1] - 902:13
**exceeds** [5] - 908:17, 908:19, 909:16, 909:23, 910:8
**excellent** [1] - 936:7
**except** [1] - 908:20
**excess** [4] - 906:3, 913:17, 917:5, 945:19
**exchanges** [1] - 924:15
**excuse** [1] - 925:12
**execution** [2] - 887:16, 896:24
**executive** [8] - 899:19, 901:16, 906:7, 906:11, 915:4, 954:14, 959:20, 960:6
**executives** [3] - 930:5,

963:18, 963:22
**exhibit** [15] - 871:4, 871:12, 873:1, 875:24, 879:12, 879:18, 879:19, 879:20, 884:23, 908:8, 909:8, 909:9, 938:15
**Exhibit** [4] - 874:15, 889:8, 890:6, 935:3
**exhibits** [2] - 871:1, 871:3
**existed** [1] - 942:24
**existence** [1] - 883:4
**existing** [1] - 893:25
**exits** [1] - 934:1
**expect** [6] - 906:2, 910:21, 913:16, 916:21, 935:20, 963:20
**expectations** [1] - 913:15
**expected** [4] - 885:21, 911:23, 955:17, 957:18
**expenses** [2] - 955:11, 955:16
**experience** [1] - 917:2
**experienced** [2] - 921:14, 923:14
**explain** [4] - 919:24, 920:1, 939:17, 957:7
**explained** [1] - 961:6
**explicitly** [1] - 896:11
**exposure** [1] - 929:10
**extensive** [1] - 942:23
**extent** [1] - 910:20
**extinguish** [1] - 941:14

## F

**facilitate** [1] - 900:15
**facing** [1] - 912:19
**fact** [6] - 892:16, 918:13, 919:4, 935:7, 946:11, 963:21
**factor** [1] - 901:12
**factors** [1] - 918:25
**failure** [1] - 896:12
**fair** [1] - 878:18
**FAIRHOLME** [1] - 867:3
**faith** [1] - 870:10
**fall** [2] - 955:11, 955:16
**familiar** [2] - 885:6, 886:6
**families** [1] - 883:24

**FANNIE** [1] - 867:9
**Fannie** [73] - 870:3, 876:21, 877:16, 882:17, 882:21, 882:24, 886:17, 887:11, 892:7, 893:13, 894:3, 897:23, 899:19, 900:7, 900:15, 900:21, 901:15, 901:16, 902:1, 902:2, 903:9, 905:17, 906:17, 907:2, 907:3, 907:23, 909:3, 909:4, 909:18, 911:20, 913:4, 913:14, 914:4, 918:8, 921:13, 923:8, 923:20, 924:6, 926:11, 929:2, 929:5, 929:10, 929:22, 930:1, 930:4, 930:12, 930:16, 930:18, 931:2, 931:3, 932:4, 932:12, 932:18, 932:24, 939:9, 940:1, 940:14, 945:23, 946:4, 947:1, 954:9, 954:14, 954:22, 958:16, 958:18, 959:20, 960:8, 960:18, 962:14, 962:19, 962:21, 962:23, 962:24
**Fannie's** [1] - 909:20
**Fannie/Freddie** [1] - 957:11
**far** [2] - 888:20, 897:8
**faster** [3] - 891:18, 929:8, 963:16
**fault** [1] - 870:8
**favorable** [1] - 957:17
**feasible** [1] - 896:5
**features** [1] - 872:4
**February** [6] - 877:24, 907:4, 909:5, 925:15, 926:17
**FEDERAL** [1] - 867:6
**Federal** [1] - 868:6
**fee** [10] - 883:4, 883:5, 883:7, 891:18, 894:23, 911:15, 911:21, 911:22, 939:24
**fees** [3] - 911:13, 911:14, 912:4

**felt** [2] - 880:25, 924:12
**few** [5] - 870:10, 878:3, 906:14, 910:7, 930:24
**FHA** [1] - 924:11
**FHFA** [30] - 878:8, 880:25, 882:22, 884:15, 889:1, 889:13, 889:16, 890:14, 890:22, 899:4, 899:16, 901:15, 910:21, 925:8, 925:13, 932:17, 932:19, 932:20, 932:23, 942:18, 943:23, 946:17, 946:21, 947:18, 948:17, 954:5, 956:15, 956:16, 957:4, 958:23
**figuring** [1] - 933:12
**filing** [6] - 905:18, 906:2, 906:10, 906:19, 908:14, 915:2
**filings** [8] - 906:14, 908:24, 912:24, 916:7, 917:25, 918:21, 919:8, 921:2
**final** [2] - 883:10, 915:11
**finally** [1] - 923:16
**finance** [8] - 881:14, 919:4, 920:9, 922:7, 923:19, 930:20, 930:23, 933:10
**Finance** [1] - 868:6
**FINANCE** [1] - 867:6
**financial** [17] - 883:22, 886:17, 898:8, 903:7, 904:10, 905:8, 906:8, 912:7, 912:9, 915:9, 916:11, 916:14, 929:7, 946:8, 947:4, 954:22, 960:7
**Financial** [3] - 903:4, 916:1, 954:24
**financials** [1] - 962:7
**fine** [1] - 944:17
**finish** [1] - 939:18
**finished** [2] - 873:6
**first** [27] - 879:17, 882:9, 882:14, 885:2, 885:14, 892:23, 896:8, 897:15, 900:3, 909:10, 909:12,

912:12, 912:23, 916:12, 930:3, 943:9, 943:10, 943:13, 943:14, 945:18, 946:4, 948:10, 948:22, 950:10, 951:7, 959:17, 959:24
**First** [3] - 897:19, 913:4, 924:9
**fiscal** [1] - 910:21
**five** [1] - 955:4
**fixed** [5] - 883:8, 928:7, 929:6, 931:22
**FLEXNER** [1] - 867:22
**focus** [3] - 891:20, 894:7, 939:2
**focused** [5] - 878:18, 881:23, 894:17, 901:11, 920:16
**folks** [1] - 923:12
**follow** [3] - 875:18, 879:5, 880:25
**follow-up** [3] - 875:18, 879:5, 880:25
**following** [2] - 934:6, 936:7
**footprint** [2] - 921:23, 921:24
**FOR** [1] - 867:1
**Forecast** [1] - 903:4
**forecast** [9] - 903:7, 903:24, 904:5, 904:9, 947:18, 948:4, 948:19, 948:21, 951:11
**forecasting** [3] - 949:15, 949:16, 949:19
**forecasts** [2] - 906:9, 958:17
**foreclosure** [1] - 926:13
**foregoing** [1] - 966:4
**forgiven** [1] - 876:20
**form** [2] - 905:18, 906:17
**former** [1] - 892:9
**forth** [4] - 888:18, 923:13, 942:18, 964:10
**forward** [10] - 891:12, 920:25, 926:10, 932:13, 933:12, 935:13, 936:9, 957:14, 957:15, 957:17
**foster** [1] - 935:16
**four** [2] - 932:20, 953:14

**frame** [1] - 878:14
**Freddie** [57] - 876:21, 877:16, 882:17, 882:21, 882:25, 884:16, 886:18, 887:11, 892:7, 893:13, 894:3, 897:23, 902:1, 902:4, 902:9, 907:2, 907:23, 907:24, 908:13, 909:3, 913:19, 913:20, 914:4, 915:2, 921:13, 923:8, 923:20, 924:7, 926:12, 929:2, 929:5, 929:10, 929:22, 930:2, 930:4, 930:12, 930:16, 930:19, 931:2, 931:3, 932:5, 932:12, 932:18, 932:25, 939:10, 940:1, 940:15, 946:1, 946:4, 947:1, 947:17, 948:4, 948:13, 948:16, 948:19, 954:9, 960:17
**Friday** [1] - 867:5
**front** [3] - 916:3, 916:6, 948:7
**fuelled** [1] - 958:19
**fulfilling** [1] - 887:12
**full** [1] - 966:5
**function** [1] - 887:10
**functions** [1] - 961:13
**fundamental** [3] - 887:5, 919:1, 932:1
**funding** [1] - 882:12
**FUNDS** [1] - 867:3
**funds** [1] - 910:22
**furthermore** [1] - 896:14
**future** [25] - 881:14, 882:25, 896:17, 896:19, 896:20, 898:6, 898:8, 898:16, 902:15, 904:19, 910:21, 913:15, 916:23, 916:24, 918:2, 918:24, 920:15, 920:19, 921:1, 926:12, 930:1, 930:20, 941:15, 947:5, 955:23

## G

**Galeano** [3] - 956:15,

956:18, 956:19
**gallery** [1] - 934:7
**game** [1] - 898:14
**gathered** [1] - 927:1
**gathering** [1] - 922:23
**Gehring** [3] - 903:6, 903:8, 903:20
**Geithner** [4] - 879:5, 879:25, 880:2, 880:8
**general** [5] - 880:16, 885:16, 890:25, 892:4, 900:23
**generally** [5] - 885:4, 885:5, 885:22, 901:4, 901:5
**generate** [3] - 906:3, 913:16, 917:4
**generating** [1] - 929:15
**gentlemen** [1] - 874:25
**given** [4] - 887:22, 903:16, 910:1, 931:4
**Given** [1] - 904:8
**global** [1] - 933:9
**GLUCK** [1] - 868:2
**goal** [2] - 929:4, 961:11
**goals** [1] - 923:2
**golden** [4] - 898:18, 902:18, 902:25, 960:15
**government** [1] - 876:21
**gradual** [1] - 921:24
**gradually** [2] - 921:23, 926:12
**great** [3] - 919:5, 933:3, 949:23
**Greenlee** [1] - 892:6
**GROSSMANN** [1] - 868:3
**group** [7] - 883:14, 891:23, 891:24, 892:16, 899:25, 943:24, 948:13
**GSE** [5] - 900:10, 901:21, 901:22, 901:25, 902:19
**GSEs** [3] - 901:12, 902:3, 939:9
**guess** [3] - 927:11, 927:13, 927:14
**guide** [1] - 880:4

## H

**half** [1] - 932:20
**hall** [1] - 934:17
**hallway** [2] - 934:15,

934:23
**Hamish** [2] - 873:15, 937:24
**HAMISH** [1] - 867:21
**Hampshire** [1] - 867:17
**harbor** [1] - 891:19
**hard** [3] - 888:11, 888:12, 947:10
**harmed** [1] - 910:17
**HARP** [1] - 958:14
**head** [5] - 892:5, 892:7, 892:10, 922:12, 963:10
**heading** [2] - 900:8, 900:10
**heads** [1] - 891:11
**hear** [3] - 891:8, 933:24, 936:24
**heard** [9] - 882:1, 898:20, 900:4, 900:17, 918:3, 918:9, 928:18, 932:6, 959:12
**hearing** [4] - 882:18, 924:16, 930:10, 934:7
**hearsay** [1] - 935:4
**heart** [1] - 957:11
**HELD** [1] - 867:13
**held** [2] - 920:15, 934:7
**hell** [1] - 940:20
**help** [1] - 924:19
**helping** [1] - 931:17
**hence** [6] - 876:21, 876:22, 877:17, 919:3, 920:9
**hereby** [1] - 966:3
**hiding** [1] - 904:20
**hierarchical** [1] - 899:12
**hierarchy** [1] - 901:18
**higher** [8] - 896:19, 904:6, 949:16, 949:20, 949:24, 952:20, 952:22, 952:24
**highlight** [4] - 954:25, 955:6, 955:8, 961:10
**highlights** [1] - 903:6
**hindsight** [1] - 938:5
**historical** [1] - 908:18
**historically** [1] - 908:20
**history** [2] - 932:16, 933:1
**HOFFMAN** [1] - 868:8
**Hold** [1] - 889:19
**hold** [2] - 889:24,

890:16
**home** [5] - 877:10, 877:16, 883:24, 957:15, 957:17
**homeowners** [6] - 881:13, 881:16, 884:9, 886:19, 922:9, 933:5
**homes** [1] - 933:6
**Honor** [63] - 870:6, 870:14, 870:16, 870:22, 870:24, 871:18, 872:3, 872:5, 872:12, 872:18, 872:19, 873:3, 873:10, 873:16, 874:12, 874:14, 875:4, 875:6, 875:9, 875:22, 879:7, 879:8, 879:12, 879:16, 884:13, 884:22, 888:11, 890:5, 891:1, 891:5, 891:7, 899:2, 906:23, 907:9, 907:20, 913:6, 913:25, 914:7, 914:12, 914:13, 915:19, 915:23, 917:7, 917:14, 919:11, 925:25, 933:22, 934:13, 934:20, 934:25, 935:2, 936:1, 936:14, 936:17, 939:19, 941:16, 941:20, 944:12, 953:20, 953:25, 954:2, 956:13, 959:10
**Honor's** [1] - 936:11
**HONORABLE** [1] - 867:13
**hope** [3] - 870:17, 870:20, 871:6
**hoped** [1] - 883:16
**hoping** [1] - 957:8
**hour** [1] - 874:8
**house** [10] - 877:13, 877:20, 882:23, 885:20, 886:1, 886:4, 894:21, 905:11, 921:4
**housing** [14] - 868:6, 880:15, 881:8, 881:14, 910:18, 919:3, 920:9, 922:7, 923:19, 929:24, 930:20, 930:23,

933:2, 933:10
**HOUSING** [1] - 867:6
**Hume** [22] - 870:7,
871:23, 872:8,
872:15, 872:23,
873:12, 873:15,
876:3, 876:6,
876:13, 884:17,
893:3, 893:9,
893:22, 895:3,
903:12, 919:13,
935:3, 936:15,
937:21, 937:24,
938:1
**HUME** [49] - 867:21,
873:15, 873:25,
874:16, 879:8,
888:9, 888:13,
888:15, 890:7,
891:1, 891:4, 926:1,
934:3, 934:8,
934:14, 934:19,
936:17, 936:22,
936:25, 937:15,
937:23, 938:14,
939:20, 941:20,
943:20, 945:16,
947:7, 947:21,
947:23, 948:22,
950:4, 950:10,
953:15, 953:18,
953:22, 953:25,
954:2, 954:3,
954:25, 955:6,
955:8, 956:8,
957:23, 959:2,
959:6, 961:10,
964:21, 965:1, 965:3
**Hume's** [2] - 876:1,
898:17
**Hume)**.........................
...............**937** [1] -
869:5

## I

**IAN** [1] - 868:8
**idea** [9] - 876:5, 876:9,
876:11, 876:13,
890:25, 897:10,
918:1, 943:9, 943:12
**ideas** [2] - 876:12,
883:15
**identified** [2] - 871:24,
879:11
**identify** [1] - 892:1
**immediate** [1] - 888:6
**impact** [2] - 883:9,
912:8
**impanelling** [1] -
874:9

**implementing** [1] -
921:22
**importance** [1] -
887:20
**important** [15] -
883:20, 886:23,
886:25, 887:4,
916:7, 916:8,
916:10, 929:11,
929:12, 929:20,
929:25, 930:22,
931:19, 931:25,
955:18
**improve** [2] - 885:20,
946:22
**improved** [2] - 881:16,
946:24
**improvement** [2] -
955:22, 955:24
**improving** [6] - 945:8,
945:9, 945:13,
946:9, 946:19,
952:14
**IN** [2] - 867:1, 867:9
**inability** [2] - 895:13,
912:5
**inbounds** [1] - 872:6
**INC** [1] - 867:3
**inception** [4] - 909:17,
909:20, 909:24,
910:10
**include** [5] - 880:17,
903:1, 926:12,
930:8, 951:3
**included** [1] - 881:13
**includes** [2] - 950:1,
957:17
**including** [5] - 880:18,
902:3, 930:4,
949:25, 956:16
**income** [25] - 891:17,
904:5, 904:19,
906:3, 909:16,
909:23, 910:9,
913:17, 917:3,
917:4, 917:5,
918:20, 945:23,
948:25, 949:5,
949:7, 949:24,
952:5, 952:19,
952:22, 956:2,
956:5, 958:11
**increase** [2] - 886:1,
896:17
**increases** [3] - 893:14,
949:1, 952:6
**increasing** [2] - 884:8,
896:15
**increasingly** [1] -
916:24

**indicating** [1] - 962:6
**indulgence** [6] -
873:11, 875:7,
875:20, 884:10,
893:6, 898:24
**infinity** [1] - 939:25
**influence** [1] - 912:16
**inform** [1] - 924:19
**information** [10] -
889:25, 890:2,
890:23, 890:25,
922:13, 922:14,
922:16, 922:21,
927:1, 944:25
**informed** [1] - 895:23
**informing** [2] - 889:2,
930:7
**infrastructure** [2] -
961:11, 962:5
**initial** [1] - 888:5
**input** [5] - 922:24,
923:5, 923:10,
924:22
**insider** [1] - 890:25
**instead** [1] - 876:23
**integration** [1] -
961:12
**intended** [3] - 871:2,
880:7, 900:15
**intending** [2] - 881:2,
936:6
**intends** [2] - 871:24,
936:15
**intent** [1] - 935:6
**interaction** [1] -
878:11
**interest** [7] - 881:21,
881:24, 920:5,
932:6, 932:9, 933:19
**intermittently** [1] -
878:22
**internal** [2] - 880:8,
888:25
**interrupting** [1] -
939:20
**interruption** [1] -
875:21
**investment** [3] -
888:6, 898:4, 929:13
**investments** [1] -
882:20
**investor** [1] - 897:25
**investors** [5] - 882:16,
887:10, 930:8,
931:24, 932:11
**involved** [5] - 878:8,
888:22, 890:3,
892:16, 942:6
**irrational** [1] - 893:15
**issue** [7] - 873:25,

912:14, 928:16,
928:17, 928:19,
934:3, 957:14
**issued** [3] - 882:21,
921:9, 925:15
**issues** [10] - 870:12,
880:15, 880:17,
880:24, 882:5,
887:1, 889:1,
922:11, 924:24
**Issues** [1] - 879:24
**issuing** [1] - 897:23
**items** [2] - 880:17,
957:8
**itself** [5] - 877:19,
891:10, 892:21,
919:11, 925:5

## J

**Jan** [1] - 892:13
**January** [12] - 871:17,
878:14, 879:5,
880:13, 880:23,
881:3, 882:11,
908:4, 926:22,
927:2, 954:12,
954:15
**Jeff** [1] - 935:16
**Jeffrey** [2] - 892:5,
954:8
**Jenkins** [4] - 889:9,
915:22, 926:3,
947:23
**jingle** [1] - 957:7
**jittery** [1] - 939:5
**job** [4] - 892:1, 892:2,
900:6, 933:12
**Jon** [1] - 892:6
**JONATHAN** [1] - 868:6
**Jonathan** [1] - 874:12
**JONES** [1] - 868:8
**judge** [2] - 888:9,
934:3
**Judge** [1] - 934:8
**JUDGE** [1] - 867:13
**judgments** [1] -
924:20
**July** [9] - 898:2,
899:14, 899:19,
900:6, 935:15,
947:17, 948:3,
959:14, 959:23
**June** [2] - 883:17,
915:14
**jury** [24] - 874:10,
874:24, 875:10,
882:1, 886:6,
890:10, 896:22,
900:4, 901:10,

903:14, 907:15,
913:9, 918:3, 918:9,
919:24, 925:24,
929:18, 931:8,
932:6, 934:1, 934:4,
937:19, 938:5,
938:15
**JURY** [1] - 867:12
**jury's** [3] - 900:17,
912:21, 928:17
**justify** [1] - 882:20

## K

**KAPLAN** [7] - 867:22,
934:25, 935:12,
935:22, 935:24,
936:5, 936:14
**Kaplan** [1] - 934:25
**Kari** [2] - 915:8,
917:22
**KAYE** [1] - 868:9
**keep** [3] - 910:19,
916:25, 917:1
**keeps** [1] - 897:8
**KENYA** [1] - 867:21
**kept** [1] - 890:3
**KESSLER** [1] - 867:19
**key** [5] - 901:12,
927:8, 927:25,
928:1, 928:3, 928:6
**kick** [1] - 896:11
**kind** [10] - 890:21,
895:3, 896:2,
896:10, 908:23,
922:16, 922:21,
923:20, 930:22,
964:9
**kinds** [1] - 960:20
**King** [1] - 874:12
**KIRK** [1] - 867:16
**knocked** [1] - 904:1
**knowing** [1] - 932:16
**known** [1] - 962:24
**knows** [2] - 870:25,
913:9
**KRAVETZ** [1] - 868:2

## L

**ladies** [1] - 874:25
**lag** [1] - 905:4
**Lamberth** [1] - 934:8
**LAMBERTH** [1] -
867:13
**language** [3] - 891:20,
896:10, 908:23
**Laponsky** [1] - 892:4
**large** [8] - 886:18,
893:14, 903:17,
904:8, 957:22,

957:24, 958:6,
958:19
**largely** [1] - 891:16
**larger** [3] - 945:24,
946:2, 946:4
**last** [22] - 870:23,
871:1, 872:20,
873:5, 904:6,
905:24, 905:25,
911:4, 911:5, 912:1,
914:23, 917:16,
919:10, 920:13,
920:14, 933:18,
935:7, 948:9, 952:9,
953:3, 958:15
**late** [2] - 870:23, 871:1
**latest** [2] - 897:15,
903:7
**Lawler** [1] - 892:8
**lawmakers** [1] -
933:11
**lead** [4] - 882:25,
884:4, 928:19, 947:4
**leading** [4] - 891:1,
922:25, 928:8,
939:21
**leaks** [1] - 924:25
**leapfrog** [2] - 887:13,
887:15
**learn** [1] - 926:20
**learned** [1] - 897:17
**least** [7] - 870:13,
875:25, 878:22,
886:13, 905:2,
927:4, 941:21
**leave** [2] - 877:21,
933:17
**leaving** [1] - 903:12
**led** [2] - 887:1, 936:8
**LEE** [1] - 867:18
**leeway** [2] - 890:19,
891:2
**left** [1] - 897:6
**legislation** [2] -
921:18, 930:16
**length** [1] - 920:24
**less** [1] - 916:8
**letter** [1] - 871:16
**letting** [1] - 887:20
**leveling** [1] - 882:23
**liabilities** [2] - 951:2
**lien** [1] - 877:5
**life** [3] - 897:24, 898:2,
932:15
**light** [1] - 883:6
**likely** [1] - 902:18
**Likely** [1] - 875:23
**limited** [1] - 917:11
**line** [9] - 892:3,
902:17, 906:12,

949:5, 950:9,
950:10, 954:4,
956:5, 959:13
**Line** [1] - 949:6, 949:9,
952:19
**lines** [2] - 914:19,
955:4
**Link** [1] - 925:13
**link** [5] - 925:20,
926:5, 926:18
**liquid** [1] - 887:9
**liquidation** [3] -
896:15, 896:18,
909:13
**liquidity** [6] - 887:6,
912:9, 919:3, 922:8,
929:24, 930:13
**Lisa** [1] - 868:12
**LISA** [1] - 966:3
**list** [3] - 871:4, 871:13,
963:12
**listing** [1] - 882:5
**LITIGATIONS** [1] -
867:10
**LITOWITZ** [1] - 868:3
**LLP** [2] - 867:22, 868:3
**loan** [8] - 877:4, 877:9,
877:15, 877:19,
957:24, 958:4,
958:8, 958:20
**loans** [2] - 946:25,
958:21
**logical** [1] - 926:18
**Long-Term** [1] - 916:1
**long-term** [3] - 882:20,
916:11, 916:13
**look** [29] - 877:13,
883:14, 906:14,
912:23, 915:25,
930:5, 944:5, 947:7,
947:10, 947:13,
948:9, 949:4, 949:5,
949:15, 950:4,
950:9, 951:20,
951:25, 952:1,
952:17, 953:3,
953:14, 954:4,
956:8, 956:14,
957:25, 959:12,
960:10, 965:6
**looked** [1] - 905:17
**looking** [12] - 888:3,
888:4, 910:16,
924:18, 932:16,
938:6, 940:14,
940:15, 940:18,
957:10, 957:17
**looks** [1] - 904:3
**losing** [1] - 933:6
**loss** [8] - 876:22,

955:10, 955:15,
955:18, 955:20,
956:2, 958:8, 958:20
**lost** [2] - 883:22,
888:18
**loud** [1] - 917:15
**low** [1] - 958:1
**lower** [2] - 876:24,
877:1
**lump** [1] - 958:12
**Lunch** [1] - 965:13

**M**

**Mac** [35] - 870:3,
876:21, 877:16,
882:17, 882:21,
884:16, 886:18,
887:11, 894:3,
897:23, 913:21,
921:13, 923:8,
923:20, 929:2,
929:5, 929:22,
930:2, 930:4,
930:16, 930:19,
932:5, 932:12,
932:25, 939:10,
940:1, 940:15,
946:1, 947:1,
947:18, 948:4,
948:13, 948:16,
954:9, 960:17
**MAC** [1] - 867:9
**Mac's** [2] - 913:19,
948:19
**Mae** [43] - 876:21,
877:16, 882:17,
882:21, 886:17,
887:11, 894:3,
897:23, 899:19,
900:7, 900:21,
901:16, 903:9,
909:4, 911:20,
913:4, 913:15,
918:8, 921:13,
923:8, 923:20,
929:2, 929:5,
929:22, 930:1,
930:4, 930:16,
930:18, 932:4,
932:12, 932:24,
939:9, 940:1,
940:15, 947:1,
954:9, 954:14,
954:22, 958:18,
959:20, 962:14,
962:19, 962:23
**Mae's** [5] - 905:17,
945:23, 958:16,
962:21, 962:24
**Mae/Freddie** [1] -

870:3
**MAE/FREDDIE** [1] -
867:9
**maintain** [3] - 874:19,
910:10, 961:18
**maintained** [1] -
929:14
**maintaining** [2] -
910:17, 926:13
**major** [1] - 888:5
**management** [7] -
899:19, 900:24,
901:3, 901:6, 923:7,
954:14, 959:20
**management's** [1] -
904:10
**map** [2] - 963:11,
963:14
**March** [7] - 908:1,
908:4, 947:14,
947:17, 948:3,
951:19, 951:21
**march** [1] - 908:21
**Mark** [1] - 892:4
**market** [41] - 877:9,
880:15, 882:15,
883:13, 883:20,
883:23, 884:5,
887:6, 887:9,
887:19, 887:20,
888:7, 890:2,
890:17, 890:24,
897:18, 897:21,
900:16, 900:18,
905:9, 910:11,
910:18, 916:9,
921:3, 922:1, 922:8,
923:13, 923:21,
929:22, 929:24,
930:7, 930:13,
932:11, 933:2,
933:16, 939:4,
945:8, 945:9
**Market** [1] - 879:24
**market-moving** [2] -
890:2, 890:17
**markets** [4] - 881:17,
894:19, 898:9, 960:6
**Martin** [6] - 899:3,
899:5, 954:11,
959:14, 964:9
**Massachusetts** [1] -
868:9
**match** [1] - 879:19
**matter** [7] - 870:4,
880:16, 885:10,
887:6, 900:23,
935:6, 965:9
**maximize** [2] - 941:4,
941:9

**Mayopoulos** [6] -
900:3, 900:5,
901:18, 904:9,
905:3, 959:25
**MBS** [1] - 930:9
**McFarland** [3] - 906:6,
954:21, 955:1
**mean** [19] - 870:23,
878:2, 878:11,
878:20, 883:21,
885:22, 885:23,
889:9, 889:20,
889:22, 890:1,
894:18, 895:5,
903:11, 905:7,
909:22, 910:13,
910:24, 916:17
**meaning** [2] - 926:8,
958:1
**means** [11] - 889:23,
904:12, 905:8,
910:14, 910:25,
912:2, 912:11,
921:16, 929:19,
955:16, 963:1
**meant** [4] - 875:18,
877:5, 880:9, 889:21
**mechanics** [2] - 931:1,
932:8
**meet** [4] - 930:12,
936:20, 949:1, 952:5
**meeting** [16] - 879:4,
879:6, 880:3, 880:6,
880:13, 880:23,
881:1, 899:19,
899:24, 900:20,
901:6, 903:25,
924:14, 950:17,
954:15, 959:21
**meetings** [6] - 927:2,
941:23, 941:25,
942:6, 942:8, 954:9
**MELTZER** [1] - 867:19
**members** [11] -
875:10, 882:1,
890:10, 894:8,
901:10, 903:14,
907:15, 918:3,
922:25, 929:18,
931:7
**memo** [3] - 919:14,
922:22, 923:22
**memos** [1] - 942:12
**mentioned** [2] - 874:2,
934:8
**message** [1] - 913:20
**messy** [1] - 948:2
**middle** [4] - 885:12,
885:25, 903:16,
910:6

**might** [5] - 896:1, 897:11, 900:15, 904:10, 904:19
**million** [1] - 951:8
**mind** [4] - 927:4, 928:22, 935:6, 936:6
**minimis** [1] - 891:19
**minutes** [3] - 870:11, 878:4, 935:8
**miss** [1] - 905:13
**mission** [2] - 929:23, 930:12
**model** [2] - 872:12, 905:8
**models** [2] - 905:4, 905:12
**modest** [1] - 886:1
**modification** [2] - 877:9, 877:15
**moment** [7] - 875:17, 884:20, 903:20, 907:10, 907:16, 914:22, 957:7
**money** [3] - 910:1, 910:2, 931:21
**month** [1] - 879:6
**monthly** [3] - 876:24, 876:25, 877:11
**months** [1] - 878:15
**Moreira** [2] - 868:12, 966:10
**MOREIRA** [1] - 966:3
**morning** [9] - 874:25, 875:3, 875:4, 875:10, 875:14, 875:15, 933:23, 934:9, 934:25
**MORNING** [1] - 867:12
**mortgage** [16] - 876:19, 877:4, 877:12, 882:17, 883:25, 884:1, 886:20, 887:8, 897:23, 898:1, 898:11, 900:17, 929:9, 932:11, 939:4, 945:9
**Mortgage** [1] - 879:24
**mortgage-backed** [6] - 882:17, 897:23, 898:1, 898:11, 932:11, 939:4
**mortgages** [1] - 922:9
**most** [5] - 876:18, 886:23, 886:25, 887:4, 923:18
**motion** [1] - 937:11
**move** [25] - 873:7, 879:7, 884:12, 890:5, 891:11,

892:20, 906:23, 907:20, 913:6, 924:3, 925:4, 925:24, 925:25, 926:10, 934:11, 935:13, 936:9, 941:19, 941:20, 947:24, 953:9, 953:19, 956:10, 959:2
**moving** [8] - 879:9, 881:8, 881:9, 890:2, 890:17, 914:5, 914:8, 923:3
**MR** [138] - 870:6, 870:16, 870:19, 870:22, 872:18, 872:21, 872:23, 873:3, 873:10, 873:15, 873:24, 873:25, 874:12, 874:16, 874:17, 875:6, 875:9, 875:13, 875:20, 875:22, 879:7, 879:8, 879:11, 879:14, 879:16, 884:10, 884:12, 884:21, 887:25, 888:9, 888:11, 888:13, 888:14, 888:15, 888:16, 889:7, 890:5, 890:7, 890:9, 891:1, 891:2, 891:4, 891:5, 891:7, 893:5, 898:22, 899:1, 905:16, 905:20, 905:24, 906:16, 906:22, 906:25, 907:7, 907:12, 907:18, 909:1, 909:10, 910:4, 911:1, 911:7, 912:25, 913:3, 913:6, 913:8, 913:12, 913:22, 913:24, 914:3, 914:7, 914:11, 914:21, 914:23, 915:19, 915:22, 917:7, 917:14, 917:24, 919:10, 925:6, 925:11, 925:23, 926:1, 926:3, 927:6, 933:21, 934:3, 934:8, 934:13, 934:14, 934:19, 934:25, 935:12, 935:22, 935:24, 936:5, 936:14,

936:17, 936:22, 936:25, 937:15, 937:23, 938:14, 939:18, 939:20, 941:16, 941:19, 941:20, 944:20, 944:12, 945:16, 947:7, 947:21, 947:23, 948:1, 948:22, 950:4, 950:10, 953:15, 953:18, 953:20, 953:22, 953:25, 954:2, 954:3, 954:25, 955:6, 955:8, 956:8, 956:13, 957:23, 959:2, 959:6, 959:9, 961:10, 964:21, 965:1, 965:3
**must** [2] - 958:1, 963:1

# N

**Naa** [1] - 923:11
**name** [3] - 899:13, 963:19
**nature** [1] - 889:25
**near** [1] - 932:14
**necessarily** [1] - 886:8
**need** [14] - 870:10, 872:1, 874:21, 885:3, 894:4, 895:5, 895:9, 898:3, 922:4, 928:14, 954:25, 960:17, 960:18
**needed** [5] - 890:2, 898:12, 898:13, 920:9, 923:23
**negative** [10] - 886:3, 886:16, 910:20, 918:10, 918:14, 918:23, 918:24, 931:3, 931:20, 951:7
**negatively** [1] - 883:23
**negotiate** [6] - 893:12, 893:18, 893:23, 895:2, 895:8, 936:18
**negotiated** [1] - 870:8
**negotiating** [1] - 894:6, 923:25, 942:19
**negotiations** [6] - 878:6, 878:8, 878:9, 888:21, 889:4, 924:8
**neighborhoods** [1] - 881:17
**net** [56] - 871:19, 880:18, 887:2, 891:17, 892:24, 893:1, 893:10,

893:14, 897:10, 897:12, 906:3, 909:16, 909:23, 910:9, 910:10, 910:14, 910:17, 910:20, 912:9, 913:16, 917:4, 918:3, 918:10, 918:13, 918:14, 918:16, 920:3, 920:17, 928:12, 931:2, 931:3, 935:17, 938:10, 938:21, 941:23, 942:1, 942:2, 942:6, 942:8, 942:12, 942:16, 942:19, 943:3, 943:8, 943:11, 943:12, 944:23, 945:3, 949:1, 951:3, 952:6, 952:9, 953:5, 953:7, 956:6
**Net** [1] - 950:13
**never** [6] - 909:25, 919:7, 933:7, 936:21, 937:13, 945:3
**New** [4] - 867:17, 867:23, 868:4
**new** [4] - 873:19, 961:11, 962:5, 962:19
**news** [1] - 919:5
**next** [12] - 883:3, 885:17, 900:14, 902:18, 903:3, 911:1, 916:20, 928:25, 954:20, 956:8, 957:21, 960:18
**NEXT** [1] - 867:24
**nice** [1] - 938:1
**nick** [1] - 892:10
**Nick** [1] - 956:16
**night** [2] - 870:23, 871:1
**nobody's** [1] - 870:8
**Northwest** [1] - 867:23
**noted** [2] - 903:20, 905:3
**notes** [2] - 882:22, 966:5
**nothing** [1] - 933:21
**noting** [1] - 882:15
**number** [9] - 879:10, 879:13, 879:14, 896:23, 897:4, 918:25, 953:21, 956:15, 959:5

**Number** [1] - 867:9
**numbers** [2] - 879:20, 909:7
**NW** [4] - 867:17, 868:9, 868:13, 966:12

# O

**oath** [2] - 963:6, 964:12
**object** [5] - 871:13, 871:25, 872:8, 872:24, 934:13
**objecting** [1] - 934:10
**objection** [26] - 870:12, 874:6, 874:19, 879:8, 888:9, 890:7, 891:1, 891:4, 906:24, 907:21, 913:7, 915:18, 926:1, 935:4, 941:16, 944:12, 947:24, 948:1, 953:18, 953:20, 953:24, 956:11, 956:12, 956:13, 959:7, 959:10
**objection's** [1] - 937:16
**objections** [1] - 872:2
**objective** [1] - 920:21
**objectives** [1] - 922:19
**obligation** [12] - 883:8, 895:16, 895:18, 906:3, 908:11, 908:16, 908:19, 910:8, 911:24, 916:23, 949:1, 952:6
**obligations** [4] - 887:12, 896:17, 911:12, 912:3
**observing** [1] - 945:8
**obviously** [3] - 893:9, 925:1, 937:2
**occur** [1] - 885:17
**October** [5] - 867:5, 883:2, 944:1, 945:2, 966:8
**OF** [3] - 867:1, 867:12, 966:1
**offer** [2] - 871:11
**office** [4] - 892:6, 899:5, 956:25, 957:2
**officer** [4] - 906:8, 915:9, 954:22, 960:7
**offices** [1] - 923:12
**OFFICIAL** [1] - 966:1
**Official** [1] - 868:12

official [1] - 966:11
often [1] - 958:6
oftentimes [1] -
954:10
ON [1] - 867:24
once [5] - 908:20,
908:23, 908:24,
908:25, 937:10
one [48] - 872:6,
872:12, 882:9,
882:14, 884:19,
884:20, 885:2,
886:22, 894:15,
894:16, 896:14,
896:22, 897:11,
899:22, 899:24,
907:1, 907:13,
907:16, 908:18,
908:22, 909:5,
912:25, 914:19,
914:22, 918:6,
919:16, 921:11,
924:5, 924:9,
924:23, 925:12,
931:7, 931:9,
932:25, 933:18,
934:9, 944:9,
945:21, 945:22,
946:20, 948:14,
952:9, 955:20,
955:24, 956:4, 962:4
one's [2] - 917:19,
963:12
one-appearance [1] -
872:12
one-time [1] - 955:24
one-word [1] - 919:16
ongoing [4] - 900:16,
922:25, 955:22,
963:4
open [1] - 961:8
opened [1] - 948:6
opening [2] - 938:14,
938:16
Opening [1] - 945:16
operate [5] - 894:13,
920:10, 932:5,
933:10, 941:1
operated [1] - 932:17
operating [2] - 887:8,
894:11
operation [2] - 913:18,
932:7
operational [1] -
882:24
operations [7] - 892:6,
899:6, 901:3, 912:8,
923:6, 926:13,
929:10
opportunity [4] -

871:8, 872:15,
874:20, 903:14
opposed [1] - 897:9
opposite [3] - 935:20,
937:8, 937:12
opt [1] - 895:2
optimistic [1] - 944:18
order [2] - 919:1,
936:11
ordinary [1] - 891:19
organization [2] -
899:12, 900:24
orient [1] - 892:25
oriented [1] - 927:22
original [2] - 903:24,
924:9
outcome [7] - 885:11,
885:12, 885:13,
885:25, 895:10,
903:21
outcomes [7] -
881:16, 885:17,
885:24, 898:6,
898:16, 921:10,
921:11
outlined [1] - 964:10
outlook [1] - 904:18
outside [3] - 890:22,
934:7, 935:10
overruled [3] - 891:3,
891:5, 891:6
overseeing [2] -
901:2, 923:12
owe [1] - 910:1
owed [1] - 896:16
owes [1] - 896:16
own [1] - 922:12

## P

p.m [1] - 867:5
pace [1] - 963:16
PAGE [2] - 867:24,
869:2
Page [26] - 875:24,
879:18, 879:20,
880:12, 881:25,
884:23, 905:24,
907:6, 908:7, 908:8,
909:2, 909:9, 910:4,
915:17, 915:24,
915:25, 916:3,
925:11, 927:6,
927:16, 948:10,
950:4, 952:1, 954:20
page [25] - 879:17,
879:23, 880:22,
882:4, 882:5, 903:3,
905:20, 906:25,
907:7, 907:25,

909:7, 911:7,
912:23, 913:8,
914:3, 914:10,
914:24, 917:10,
917:16, 925:13,
927:7, 948:17,
953:3, 954:20
pages [4] - 879:19,
948:9, 960:13
paid [5] - 877:19,
896:21, 901:21,
938:10
pandemic [1] - 898:7
paper [1] - 921:9
par [1] - 958:6
paragraph [25] -
881:4, 884:24,
900:8, 901:11,
903:4, 903:16,
905:25, 907:6,
908:10, 909:10,
909:12, 910:5,
910:6, 911:2, 911:9,
916:1, 916:12,
916:20, 929:17,
954:24, 956:24,
957:23, 959:25,
960:3
paraphrase [1] -
887:22
paraphrasing [1] -
876:2
part [13] - 871:16,
880:18, 906:2,
915:25, 925:1,
927:3, 927:24,
929:12, 932:1,
944:23, 944:25,
958:19, 961:21
participants [3] -
882:16, 929:22,
930:8
particular [3] - 879:19,
890:1, 920:16
particularly [1] - 883:6
partly [2] - 951:11
parts [2] - 871:24,
886:18
pass [3] - 888:12,
936:1, 936:2
past [1] - 870:9
Pat [1] - 892:8
path [3] - 933:12,
933:14, 960:8
paths [3] - 882:24,
894:20, 944:15
patience [1] - 912:21
Pause [1] - 870:15,
870:21, 875:8,
884:11, 898:25,

907:11, 907:17,
936:3, 937:18
pause [1] - 914:22
pay [9] - 877:8,
895:13, 896:9,
908:14, 912:5,
928:15, 931:4,
931:21, 937:7
payable [1] - 917:5
paydown [1] - 877:14
payment [12] - 876:16,
876:24, 876:25,
877:8, 896:2,
896:10, 896:12,
909:15, 909:16,
909:23, 928:24,
929:6
payment-in-kind [2] -
896:2, 896:10
payments [2] - 877:11,
886:19
PCF [1] - 911:14
pending [1] - 921:18
Pennsylvania [1] -
867:20
people [18] - 878:7,
888:21, 889:11,
889:13, 890:3,
890:14, 891:23,
891:24, 892:2,
926:18, 932:22,
941:24, 942:3,
942:5, 942:6,
956:15, 958:23
percent [13] - 883:8,
895:13, 895:14,
895:20, 895:22,
896:4, 896:12,
896:14, 908:16,
911:24, 928:7,
938:18, 949:12
percentage [1] -
876:18
perfectly [1] - 940:7
perform [2] - 894:19,
929:23
performance [3] -
886:17, 947:5,
963:18
perhaps [1] - 934:15
period [7] - 878:22,
908:18, 914:16,
917:2, 933:15,
949:24
period-to-period [1] -
917:2
periodic [5] - 883:4,
883:5, 911:15,
911:21, 939:24
periods [2] - 916:23,

932:25
permitted [1] - 890:18
person [3] - 889:16,
899:16, 954:8
personally [3] -
878:11, 878:19,
902:5
phone [2] - 873:9,
934:5
phrase [2] - 871:22,
886:6
pick [1] - 875:16
picking [1] - 905:13
place [3] - 902:10,
921:15, 930:22
places [1] - 918:22
Plaintiffs [4] - 867:4,
867:16, 867:18,
868:2
plaintiffs [6] - 871:2,
871:10, 873:15,
933:24, 935:1,
937:25
Plaintiffs' [1] - 890:6
plaintiffs' [4] - 874:18,
879:9, 879:12,
879:13
Plan [1] - 954:24
plan [23] - 875:17,
876:25, 877:2,
877:24, 918:22,
921:22, 925:13,
925:14, 925:21,
926:6, 926:11,
926:18, 926:22,
929:3, 955:2, 955:5,
955:7, 961:1,
961:15, 963:2,
963:8, 963:11,
964:11
planning [2] - 900:14,
962:3
plans [11] - 960:21,
960:24, 960:25,
961:23, 962:1,
963:7, 963:9,
963:18, 964:4,
964:14
play [2] - 923:20,
964:21
played [1] - 932:16
playing [3] - 898:14,
964:25, 965:2
pleased [1] - 918:19
PLLC [1] - 867:16
plus [1] - 961:12
podium [1] - 934:20
Point [1] - 948:23
point [19] - 874:2,
877:14, 883:21,

892:11, 894:3,
894:5, 894:25,
895:7, 899:9,
904:23, 908:15,
910:15, 910:16,
911:22, 924:3,
940:1, 944:17, 952:3
**point'** [1] - 955:10
**pointing** [2] - 940:20,
940:21
**policy** [1] - 921:8,
921:16, 930:15
**policymakers** [2] -
930:1, 933:11
**Pollard** [2] - 892:3,
892:5
**population** [2] -
957:24, 958:4
**PORTER** [1] - 868:9
**portfolio** [3] - 891:18,
929:9, 929:13
**portion** [1] - 877:6
**position** [2] - 903:9,
923:17
**positive** [12] - 885:20,
910:10, 910:14,
910:17, 918:3,
918:13, 918:20,
950:13, 951:10,
951:14, 951:17,
953:7
**possibility** [1] - 941:14
**possible** [3] - 898:16,
947:12, 962:20
**potential** [6] - 892:23,
895:11, 918:23,
918:25, 921:10,
930:6
**potentially** [3] -
911:12, 911:17,
912:3
**PowerPoint** [3] -
879:3, 960:11,
960:14
**predict** [2] - 946:17
**predicting** [2] - 918:2,
946:12
**prefer** [1] - 947:10
**preference** [3] -
896:15, 896:18,
909:13
**PREFERRED** [1] -
867:9
**preferred** [5] - 909:13,
910:23, 912:5,
912:6, 949:9
**preliminary** [2] -
870:4, 880:23
**preparation** [1] - 879:4
**prepared** [3] - 879:3,

880:3, 934:12
**preparing** [1] - 881:14
**present** [2] - 909:25,
934:12
**presented** [1] - 942:25
**president** [4] - 906:7,
960:6, 962:18,
962:19
**press** [4] - 925:8,
925:17, 926:8,
927:15
**pressing** [1] - 874:21
**presume** [1] - 871:6
**pretty** [2] - 897:22,
920:6
**prevention** [1] -
926:14
**previous** [3] - 891:16,
891:21, 892:14
**previously** [3] - 871:4,
871:12, 892:17
**price** [3] - 882:24,
957:17, 958:17
**prices** [8] - 877:13,
885:20, 886:1,
886:4, 894:21,
905:11, 921:4,
957:15
**principal** [6] - 871:18,
871:19, 876:2,
876:15, 877:7,
877:18
**priority** [1] - 881:20
**problem** [1] - 964:4
**proceed** [3] - 875:5,
934:14, 937:21
**proceedings** [2] -
893:8, 966:6
**process** [9] - 889:2,
892:21, 918:15,
919:14, 920:1,
922:17, 922:21,
922:23, 924:5
**produced** [2] - 942:23,
948:16
**professional** [1] -
923:18
**profit** [1] - 936:20
**profitability** [5] -
893:17, 901:12,
922:2, 946:12,
955:22
**profits** [8] - 893:14,
937:3, 937:5, 937:7,
941:4, 941:9,
945:19, 955:17
**project** [3] - 902:14,
902:23, 951:10
**projected** [5] - 902:21,
903:21, 951:7,

955:11, 955:16
**projecting** [1] - 904:17
**projection** [2] - 904:6,
945:2
**projections** [28] -
882:22, 883:2,
884:15, 884:16,
884:19, 898:15,
898:18, 901:21,
902:12, 902:20,
904:11, 904:23,
918:2, 943:23,
945:4, 945:12,
946:9, 953:11,
960:11, 960:20,
961:5, 961:25,
962:9, 964:2, 964:3,
964:8, 964:13,
964:23
**projects** [4] - 950:14,
952:22, 953:8,
960:16
**pronounced** [1] -
956:20
**proposed** [2] - 871:1,
891:15
**proposing** [1] - 921:10
**pros** [2] - 919:20,
942:12
**prospective** [1] -
910:7
**proud** [3] - 932:22,
938:6
**provide** [2] - 927:15,
929:21
**provided** [1] - 931:19
**providing** [5] - 888:6,
916:21, 923:8,
929:23, 932:10
**provision** [5] - 893:12,
893:16, 893:18,
893:24, 895:3
**Prussia** [1] - 867:19
**PSPA** [6] - 882:6,
891:12, 894:1,
926:9, 935:14, 936:9
**PSPAs** [1] - 929:8
**public** [10] - 881:20,
881:23, 890:22,
901:13, 920:4,
921:8, 921:15,
932:6, 932:9, 933:19
**publicized** [1] - 928:4
**publicly** [1] - 894:8
**pull** [7] - 887:25,
889:7, 898:22,
898:23, 912:23,
914:1, 926:20
**punch** [1] - 902:17
**purchase** [4] - 883:12,

910:23, 912:6, 924:9
**PURCHASE** [1] -
867:9
**Purchase** [1] - 916:22
**purchasing** [2] -
898:1, 898:10
**purpose** [3] - 881:5,
881:7, 917:12
**purposes** [1] - 931:10
**push** [9] - 891:11,
935:13, 935:17,
936:7, 936:9,
936:23, 937:1,
937:3, 942:10
**put** [13] - 872:5, 884:2,
890:19, 917:9,
922:6, 922:7, 925:8,
935:24, 938:14,
945:16, 953:15,
953:19, 964:6
**PX** [1] - 935:9
**PX107** [5] - 947:7,
947:9, 947:14,
947:15, 947:24
**PX111** [3] - 951:20,
951:23, 953:15
**PX147** [3] - 953:15,
953:16, 953:19
**PX149** [2] - 878:25,
879:7
**PX196** [2] - 956:8,
956:9
**PX213** [5] - 898:23,
959:2, 959:6,
959:11, 965:6
**PX226** [3] - 874:4,
874:15, 934:9
**PX247** [2] - 889:8,
935:12
**PX500** [1] - 871:12

**Q**

**Q2** [1] - 905:18
**Q2's** [1] - 903:21
**quality** [1] - 946:25
**Quarter** [1] - 913:4
**quarter** [16] - 883:16,
905:18, 915:14,
928:10, 928:11,
931:4, 935:17,
935:18, 936:8,
945:18, 945:19,
945:23, 946:1,
946:4, 956:2
**quarterly** [3] - 911:12,
911:13, 912:4
**quarters** [10] - 910:21,
918:4, 918:10,
918:13, 918:14,

918:20, 919:5,
945:21, 945:22,
955:23
**QUESTION** [1] -
893:10
**questioning** [3] -
888:10, 906:9,
933:25
**questions** [10] -
872:15, 872:16,
873:8, 882:18,
898:17, 903:13,
924:19, 930:24,
961:8
**quickly** [3] - 904:18,
953:3, 956:14
**quite** [3] - 872:11,
883:18, 962:2
**quote** [2] - 916:15,
916:17

**R**

**Radnor** [1] - 867:20
**raised** [2] - 943:13,
943:14
**raising** [1] - 882:18
**range** [3] - 881:1,
881:10, 885:17
**rapid** [1] - 937:11
**rate** [1] - 885:21
**rates** [1] - 884:1
**rather** [2] - 898:13,
935:6
**RDR** [3] - 868:12,
966:3, 966:10
**RE** [1] - 867:9
**reach** [1] - 892:22
**reached** [4] - 871:10,
871:16, 871:23,
892:21
**reaching** [1] - 919:15
**reaction** [1] - 897:18
**read** [5] - 893:7,
903:14, 912:1,
916:11, 929:17
**reading** [4] - 906:1,
910:19, 962:12,
962:13
**ready** [3] - 883:11,
901:6, 924:2
**reaffirm** [1] - 926:9
**realize** [2] - 882:10,
942:22
**really** [8] - 873:20,
874:4, 935:16,
939:8, 944:5, 944:6,
958:15, 960:16
**reason** [8] - 872:9,
897:22, 931:21,

937:4, 937:6, 944:21, 964:2, 964:13
**reasons** [3] - 893:1, 898:12, 946:20
**recap** [1] - 961:8
**received** [14] - 871:1, 890:8, 891:23, 906:24, 907:21, 913:7, 914:6, 914:8, 915:18, 917:13, 926:2, 953:24, 954:1, 956:12
**receiving** [1] - 914:9
**recent** [1] - 935:7
**recess** [2] - 933:24, 965:13
**Recess** [1] - 934:2
**recession** [2] - 921:4, 933:3
**recipient** [1] - 959:17
**recite** [1] - 927:25
**recognizing** [1] - 930:17
**recollection** [2] - 893:20, 943:21
**recommendations** [1] - 924:6
**record** [7] - 870:2, 872:1, 872:5, 883:19, 903:21, 942:11, 943:10
**record's** [1] - 917:8
**recorded** [1] - 956:2
**recovers** [1] - 877:9
**recovery** [2] - 958:19, 958:25
**recross** [1] - 874:4
**recurring** [1] - 955:19
**redirect** [2] - 872:14, 873:7
**REDIRECT** [1] - 937:22
**reduce** [6] - 895:12, 895:14, 920:17, 922:2, 929:9, 957:18
**reduced** [1] - 903:21
**reducing** [1] - 884:7, 955:20
**reduction** [6] - 871:18, 871:19, 876:2, 876:15, 876:16, 929:8
**refer** [3] - 881:17, 948:17, 958:7
**reference** [5] - 892:14, 898:16, 911:13, 911:14, 926:15
**references** [1] - 958:14

**referred** [5] - 884:14, 886:11, 902:18, 914:19, 958:6
**referring** [5] - 892:15, 902:1, 902:8, 911:14, 958:4
**refers** [10] - 880:12, 880:15, 881:4, 881:16, 885:2, 891:22, 891:24, 900:3, 900:18, 960:9
**refinance** [1] - 877:12
**reflect** [1] - 964:14
**reflecting** [1] - 955:21
**reflection** [3] - 881:20, 881:22, 881:23
**reflects** [3] - 955:7, 955:9, 962:6
**reform** [1] - 930:20
**refresh** [1] - 943:21
**regard** [4] - 876:15, 883:2, 918:15, 924:24
**regarding** [2] - 913:20, 920:16
**regularly** [2] - 923:6, 923:8
**relate** [1] - 871:19
**related** [5] - 876:8, 878:12, 892:16, 955:11, 955:16
**relates** [1] - 871:18
**relating** [1] - 919:14
**relative** [1] - 876:24
**release** [5] - 925:8, 925:17, 927:15, 944:1, 944:16
**relevance** [1] - 935:8
**relevant** [1] - 871:22
**reliability** [1] - 884:5
**relied** [1] - 944:23
**rely** [1] - 919:6
**remaining** [7] - 870:12, 882:12, 882:19, 896:25, 897:20, 920:18, 932:3
**remember** [9] - 876:9, 876:17, 896:23, 897:4, 903:9, 919:17, 919:20, 938:12, 952:9
**remind** [1] - 900:5
**reminded** [1] - 890:11
**removed** [2] - 930:5, 962:17
**renewed** [6] - 891:11, 935:13, 936:9, 936:23, 937:1, 942:10

**reorient** [1] - 870:11
**repeat** [2] - 926:25, 946:14
**repeatedly** [1] - 894:12
**reperformed** [1] - 958:2
**repetitive** [1] - 882:3
**replacing** [2] - 928:8, 928:9
**report** [2] - 888:4, 930:18
**reported** [5] - 905:2, 909:16, 909:23, 910:9, 944:15
**REPORTER** [1] - 966:1
**Reporter** [3] - 868:12, 868:12, 966:11
**reporting** [1] - 899:25, 916:19
**reports** [1] - 923:9
**represented** [1] - 873:13
**request** [2] - 910:22, 916:22
**require** [1] - 909:14
**required** [3] - 896:12, 948:25, 952:4
**requirement** [1] - 896:9
**requires** [1] - 896:20
**reserve** [1] - 956:3
**reserved** [2] - 872:7, 872:10
**reserving** [1] - 871:11
**resilience** [2] - 920:12, 920:14
**resiliency** [2] - 887:7, 932:13
**resilient** [1] - 922:5
**resolution** [2] - 870:8, 921:19
**resolve** [1] - 874:9
**resources** [1] - 912:7
**respect** [5] - 870:13, 878:6, 878:22, 913:15, 918:1
**respond** [1] - 897:21
**response** [5] - 876:1, 876:6, 876:13, 888:7, 897:13
**responsibilities** [2] - 901:2, 924:21
**responsibility** [4] - 881:11, 887:5, 919:2, 924:12
**result** [2] - 884:1, 895:13
**resulted** [1] - 876:16
**results** [8] - 886:17,

912:8, 935:19, 936:8, 944:11, 944:14, 951:11, 952:3
**resume** [1] - 875:1
**Resumed** [2] - 869:3, 875:11
**resumes** [1] - 870:4
**retained** [2] - 929:9, 929:13
**return** [2] - 901:12, 946:12
**returns** [2] - 950:13, 953:7
**revenue** [1] - 921:25
**revenues** [1] - 964:14
**reversed** [1] - 956:3
**review** [3] - 900:15, 914:16, 925:17
**reviewed** [5] - 891:17, 891:21, 892:15, 892:17, 912:13
**rewind** [1] - 907:22
**RICH** [1] - 868:2
**rise** [2] - 876:3, 897:19
**risk** [7] - 894:15, 894:25, 922:6, 922:7, 923:20, 928:23, 929:9
**risk-bearer** [1] - 894:25
**risked** [1] - 884:1
**risks** [1] - 922:5
**road** [6] - 877:12, 885:12, 887:7, 887:12, 963:11, 963:14
**Road** [1] - 867:19
**roaring** [1] - 958:19, 958:25
**ROBERT** [1] - 868:2
**role** [1] - 900:5
**roles** [1] - 923:19
**Room** [2] - 868:13, 966:12
**rosier** [1] - 906:9
**ROYCE** [1] - 867:13
**RUDY** [1] - 867:18
**run** [3] - 872:25, 892:10, 941:4

---

**S**

---

**safe** [1] - 891:19
**safety** [7] - 931:8, 931:10, 931:16, 931:18, 931:25, 932:1, 939:3
**sake** [1] - 912:20
**Salazar** [8] - 889:9,

905:21, 907:1, 907:8, 907:14, 909:11, 911:7, 913:9
**Sam** [1] - 934:25
**SAMUEL** [1] - 867:22
**Satriano** [2] - 892:10, 956:16
**save** [2] - 870:17, 870:20
**saved** [1] - 933:5
**saw** [8] - 895:4, 895:5, 895:9, 905:23, 906:6, 906:9, 936:22, 936:25
**scenario** [11] - 885:15, 886:2, 886:3, 886:4, 886:7, 886:10, 887:3, 893:12, 895:9, 939:7, 940:3
**scenarios** [8] - 885:2, 885:5, 886:21, 895:8, 944:5, 944:10, 948:20
**SCHILLER** [1] - 867:22
**SCHOLER** [1] - 868:9
**screen** [3] - 917:9, 935:25, 947:13
**scroll** [2] - 954:17, 960:3
**scrupulously** [1] - 871:6
**seated** [2] - 875:1, 937:20
**SEC** [2] - 908:14, 916:9
**sec** [1] - 925:12
**Second** [2] - 897:19, 924:10
**second** [27] - 874:10, 877:5, 882:15, 883:16, 884:24, 897:17, 900:8, 903:20, 905:18, 910:5, 911:5, 916:12, 921:7, 921:20, 926:7, 927:6, 929:17, 930:14, 935:18, 936:7, 943:22, 945:18, 945:23, 946:1, 954:8, 956:24
**second-to-last** [1] - 911:5
**secondary** [3] - 900:16, 900:17, 900:18
**seconds** [1] - 873:11
**secret** [2] - 960:25
**Secretary** [4] - 879:4,

879:25, 880:2, 880:8
**secretary** [5] - 879:6, 882:10, 883:11, 892:13, 923:1
**section** [1] - 916:4
**sections** [2] - 916:6, 961:8
**securities** [13] - 882:17, 882:20, 897:24, 905:18, 906:14, 906:19, 916:7, 917:25, 918:21, 919:8, 921:2, 930:9, 932:12
**securitization** [1] - 961:13
**security** [3] - 898:1, 898:11, 939:4
**see** [73] - 873:5, 874:21, 884:24, 890:10, 890:12, 897:7, 898:14, 900:11, 901:22, 903:3, 903:18, 903:22, 904:6, 907:25, 908:10, 910:6, 911:4, 917:19, 918:19, 925:24, 926:7, 926:21, 935:21, 935:23, 938:1, 938:19, 938:22, 938:25, 943:23, 945:25, 947:18, 947:19, 948:4, 948:5, 948:24, 949:2, 949:6, 949:7, 949:9, 949:10, 950:2, 950:6, 950:10, 950:13, 950:16, 950:22, 950:24, 951:8, 951:12, 951:14, 951:15, 951:17, 951:20, 951:23, 952:7, 953:1, 954:12, 954:15, 955:2, 955:13, 955:22, 956:16, 957:12, 957:15, 957:18, 958:2, 958:12, 958:21, 959:15, 959:17, 960:17, 961:13, 965:12
**sell** [1] - 877:12
**senior** [15] - 892:4, 906:11, 909:13, 910:23, 912:4, 912:6, 915:4, 923:2,

923:7, 923:14, 924:1, 930:5, 949:9, 960:5, 963:17
**SENIOR** [1] - 867:9
**sense** [6] - 878:20, 885:16, 899:12, 920:19, 932:10, 935:16
**sensitive** [1] - 889:25
**sent** [7] - 930:17, 937:10, 954:5, 961:1, 963:3, 963:8
**sentence** [20] - 884:25, 891:24, 900:3, 903:16, 903:20, 910:8, 911:4, 911:6, 912:1, 916:12, 926:8, 928:25, 929:3, 930:3, 930:14, 950:11, 953:6, 955:8, 957:21, 958:15
**sentences** [2] - 884:25, 910:7
**separate** [1] - 895:9
**September** [3] - 940:16, 940:21, 951:23
**sequester** [1] - 934:15
**series** [5] - 882:5, 926:21, 927:3, 941:25, 963:4
**serious** [1] - 964:3
**serves** [1] - 932:8
**SESSION** [1] - 867:12
**set** [6] - 877:18, 883:7, 883:15, 933:10, 944:25
**sets** [1] - 963:24
**setting** [5] - 877:4, 877:6, 878:25, 883:6, 963:17
**seven** [1] - 878:15
**several** [3] - 885:17, 894:11, 940:11
**shadow** [1] - 958:7
**shaping** [1] - 887:1
**shared** [5] - 880:7, 880:9, 880:10, 881:11, 890:4
**shareholder** [3] - 895:6, 951:3, 951:6
**shareholders** [4] - 881:18, 941:2, 941:4, 941:9
**shareholders'** [1] - 881:21
**sheet** [4] - 929:14, 950:7, 950:21,

950:25
**shift** [1] - 905:12
**short** [1] - 912:10
**show** [8] - 874:3, 882:23, 901:21, 902:13, 934:20, 936:6, 938:9, 945:17
**showed** [5] - 884:17, 944:10, 944:22, 959:3, 960:5
**showing** [6] - 946:11, 948:11, 949:6, 952:14, 958:17, 964:3
**shown** [8] - 938:15, 940:25, 942:25, 943:18, 944:4, 944:9, 959:11, 964:24
**shows** [7] - 896:23, 938:17, 938:24, 948:21, 949:9, 952:19, 953:4
**shrink** [2] - 929:2, 929:5
**shrinkage** [1] - 964:9
**shrinking** [4] - 921:23, 921:24, 922:1, 929:13
**sic** [2] - 899:18, 916:11
**sic]** [1] - 899:3
**side** [1] - 894:24
**sign** [2] - 906:11, 915:13
**signature** [10] - 905:20, 906:22, 906:25, 913:8, 914:3, 914:10, 914:23, 917:10, 917:15, 917:16
**signed** [4] - 895:19, 906:6, 917:22, 925:9
**significant** [2] - 916:13, 935:8
**signing** [2] - 915:6, 945:3
**similar** [1] - 960:20
**simple** [1] - 920:6
**simplify** [1] - 929:10
**simply** [2] - 895:19, 895:21
**situation** [1] - 931:20
**six** [1] - 955:4
**skip** [3] - 903:15, 954:18, 957:21
**skipping** [1] - 887:25
**slide** [4] - 879:17, 879:19, 879:21, 938:15

**Slide** [4] - 880:12, 881:25, 938:16, 945:17
**slight** [1] - 951:10
**slower** [1] - 905:13
**small** [2] - 945:22, 960:17
**smiling** [1] - 898:20
**sold** [1] - 877:20
**solicit** [1] - 953:21
**someone** [3] - 890:22, 925:20, 926:5
**someplace** [1] - 931:15
**sometimes** [1] - 886:11
**soon** [1] - 875:18
**sorry** [29] - 870:16, 870:18, 875:22, 876:17, 879:23, 889:8, 890:9, 891:7, 891:23, 894:2, 900:9, 906:23, 907:2, 907:9, 907:13, 911:3, 913:24, 914:7, 924:23, 927:12, 927:23, 935:22, 946:14, 948:2, 950:1, 953:23, 953:25, 956:17, 965:8
**sort** [10] - 870:8, 885:11, 885:12, 885:16, 890:24, 903:15, 916:4, 924:25, 926:21, 930:24
**sorts** [4] - 913:16, 914:18, 944:4, 944:7
**sounded** [1] - 964:19
**soundness** [7] - 931:9, 931:10, 931:16, 931:18, 931:25, 932:1, 939:3
**sources** [3] - 922:13, 922:15, 922:17
**space** [1] - 883:1
**spam** [1] - 875:22
**speaking** [1] - 878:21
**specific** [2] - 960:13, 963:23
**specifics** [1] - 944:14
**speed** [1] - 937:9
**spelled** [1] - 963:14
**spent** [2] - 923:18, 940:5
**Spohn** [2] - 892:5, 954:8
**squarely** [1] - 936:11

**stability** [21] - 883:9, 883:13, 883:19, 883:22, 887:6, 916:11, 919:2, 919:3, 920:7, 920:8, 922:7, 928:13, 929:24, 930:11, 930:13, 931:19, 931:25, 932:10, 933:4, 933:8, 933:16
**stabilize** [1] - 933:8
**staff** [4] - 879:3, 923:2, 923:6, 924:1
**stage** [2] - 878:25, 933:11
**stand** [2] - 870:5, 875:2
**standards** [2] - 946:22, 946:24
**STANTON** [1] - 868:8
**start** [7] - 877:11, 879:17, 884:7, 887:10, 905:11, 909:9, 921:4
**started** [4] - 890:9, 899:1, 908:3, 955:1
**starting** [3] - 894:1, 946:17
**starts** [1] - 897:21
**state** [4] - 881:14, 920:19, 935:6, 936:6
**statement** [4] - 926:8, 927:18, 927:19, 927:24
**statements** [1] - 914:18
**States** [1] - 966:11
**STATES** [2] - 867:1, 867:13
**stay** [2] - 877:16, 925:13
**staying** [1] - 877:10
**stenographic** [1] - 966:5
**step** [1] - 894:2
**steps** [4] - 926:8, 926:9, 929:25, 930:21
**STERN** [85] - 868:6, 870:6, 870:16, 870:19, 870:22, 872:18, 872:21, 872:23, 873:3, 873:10, 873:24, 874:12, 874:17, 875:6, 875:9, 875:13, 875:20, 875:22, 879:7, 879:11, 879:14, 879:16, 884:10,

884:12, 884:21, 887:25, 888:11, 888:14, 888:16, 889:7, 890:5, 890:9, 891:2, 891:5, 891:7, 893:5, 898:22, 899:1, 905:16, 905:20, 905:24, 906:16, 906:22, 906:25, 907:7, 907:12, 907:18, 909:1, 909:10, 910:4, 911:1, 911:7, 912:25, 913:3, 913:6, 913:8, 913:12, 913:22, 913:24, 914:3, 914:7, 914:11, 914:21, 914:23, 915:19, 915:22, 917:7, 917:14, 917:24, 919:10, 925:6, 925:11, 925:23, 926:3, 927:6, 933:21, 934:13, 939:18, 941:16, 941:19, 944:12, 948:1, 953:20, 956:13, 959:9

**Stern** [1] - 874:12
**stern** [7] - 873:16, 874:7, 875:5, 875:15, 920:23, 924:23, 927:23

**Stern)**............................
...............**875** [1] -
869:4
**still** [7] - 896:20, 896:25, 897:6, 933:14, 934:17, 962:17, 963:14
**STOCK** [1] - 867:9
**stock** [5] - 883:12, 909:14, 912:5, 912:6, 924:8
**straight** [1] - 961:15
**straightforward** [1] -
920:6
**strain** [1] - 912:7
**strategic** [19] - 875:17, 877:24, 918:22, 921:22, 925:13, 925:14, 925:21, 926:6, 926:11, 926:18, 926:22, 929:3, 961:1, 961:11, 961:15, 963:2, 963:8, 963:11, 964:10

**strategically** [1] -
903:12
**Strategy** [1] - 900:10
**strategy** [2] - 900:14, 962:3
**stress** [16] - 883:2, 885:13, 886:8, 886:11, 886:14, 886:15, 886:22, 887:3, 887:4, 894:20, 939:7, 940:2, 944:5, 944:10, 944:17
**strike** [1] - 941:19
**stronger** [1] - 895:10
**stuff** [3] - 872:7, 927:2, 940:24
**subject** [4] - 871:14, 954:14, 959:12, 959:20
**substantial** [10] -
904:16, 911:4, 911:11, 911:12, 911:17, 911:23, 911:24, 912:3, 912:4, 932:21
**substantively** [1] -
879:1
**successful** [2] -
870:11, 877:10
**successfully** [1] -
877:16
**succinct** [1] - 919:16
**sufficient** [4] - 882:19, 932:2, 948:25, 952:5
**sum** [1] - 958:12
**summarize** [2] -
927:24, 932:7
**summarizing** [1] -
888:5
**summary** [1] - 916:4
**supervision** [2] -
892:7, 923:10
**support** [4] - 882:6, 894:13, 901:13, 931:23
**suppose** [1] - 894:21
**surpass** [1] - 901:22
**surprise** [1] - 873:19
**surprised** [2] - 958:18, 958:24
**surrounding** [1] -
961:12
**Susan** [5] - 906:6, 954:21, 955:1, 955:4, 955:7
**Sustainability** [1] -
916:1
**sustainability** [1] -
916:14

**sustained** [2] - 937:16, 941:18
**sweep** [33] - 871:19, 880:19, 887:2, 891:17, 892:24, 893:1, 893:11, 897:10, 897:12, 918:16, 920:3, 920:17, 931:2, 935:17, 937:1, 937:5, 937:6, 938:11, 938:22, 941:23, 942:1, 942:2, 942:7, 942:8, 942:13, 942:16, 942:20, 943:3, 943:9, 943:11, 943:13, 944:24, 945:3
**system** [7] - 881:15, 919:4, 920:9, 922:8, 923:19, 930:23, 933:10

---

# T

**tab** [1] - 953:21
**Tab** [6] - 947:9, 948:6, 951:25, 953:22, 956:9, 960:12
**table** [1] - 870:13
**Tagoe** [2] - 923:11, 945:3
**Tagoe's** [2] - 943:24, 948:12
**taken** [1] - 965:13
**talks** [2] - 960:4, 960:15
**tantamount** [1] -
872:13
**tasks** [1] - 963:24
**taxpayer** [3] - 876:22, 877:17, 894:14
**taxpayers** [2] - 881:17, 928:14
**team** [2] - 923:7, 923:10
**technical** [1] - 895:17
**technically** [1] - 877:4
**Telephone** [1] -
875:21
**ten** [3] - 915:10, 915:13, 960:18
**tend** [1] - 916:7
**term** [12] - 882:20, 884:6, 886:13, 895:17, 906:4, 912:10, 916:11, 916:13, 917:6, 920:8, 928:1, 928:6

**Term** [1] - 916:1
**terms** [7] - 891:17, 898:15, 901:17, 904:23, 927:9, 927:25, 928:3
**terrible** [1] - 949:22
**terrific** [1] - 933:4
**test** [1] - 883:2
**testified** [8] - 925:14, 936:17, 936:19, 937:4, 937:12, 941:21, 964:1, 964:12
**testifying** [2] - 922:24, 960:19
**testimony** [10] - 876:1, 887:23, 893:20, 935:7, 938:4, 939:2, 940:14, 940:16, 944:21, 962:10
**text** [1] - 889:19
**THE** [67] - 867:1, 867:1, 867:13, 870:2, 870:18, 872:17, 872:20, 872:22, 873:1, 873:4, 873:14, 873:23, 874:11, 874:23, 874:25, 875:4, 875:5, 879:9, 879:13, 879:15, 890:8, 891:3, 891:6, 906:24, 907:21, 913:2, 913:7, 913:23, 914:2, 914:5, 914:8, 915:18, 915:20, 917:13, 917:18, 925:22, 926:2, 926:4, 933:23, 934:5, 934:17, 934:21, 934:23, 935:10, 935:21, 935:23, 936:2, 936:4, 936:12, 936:21, 936:24, 937:13, 937:16, 937:20, 939:22, 941:18, 947:20, 947:22, 953:17, 953:24, 954:1, 956:12, 959:4, 959:5, 959:7, 959:8, 965:8
**themselves** [2] -
919:7, 930:4
**they've** [2] - 904:1, 908:17
**thinking** [6] - 912:13, 920:2, 923:18,

932:17, 962:25, 963:1
**Third** [38] - 878:7, 878:12, 878:15, 878:23, 880:18, 887:2, 887:16, 888:7, 892:20, 893:4, 893:11, 894:6, 896:24, 915:11, 918:15, 919:11, 919:15, 920:3, 924:10, 925:4, 925:9, 925:21, 926:6, 926:15, 927:9, 927:25, 928:3, 928:22, 931:5, 931:9, 931:13, 931:16, 932:8, 933:18, 936:7, 938:6, 943:5, 943:16
**third** [7] - 881:4, 882:22, 886:2, 886:3, 886:10, 921:21, 952:2
**thoughts** [1] - 888:6
**thousands** [1] -
942:23
**three** [12] - 885:2, 885:5, 886:21, 921:10, 944:8, 944:9, 944:15, 944:18, 953:14, 961:7, 961:18, 962:4
**tied** [1] - 963:22
**Tim** [4] - 900:3, 900:5, 904:9, 959:25
**timeline** [2] - 883:15, 963:12
**timely** [1] - 898:13
**timing** [1] - 937:8
**Timothy** [1] - 935:15
**title** [2] - 879:23, 892:1
**to..** [1] - 905:15
**today** [4] - 898:1, 929:25, 943:18, 944:22
**together** [3] - 870:10, 883:14, 927:22
**took** [6] - 926:9, 928:6, 932:24, 933:1, 945:22, 961:25
**top** [7] - 885:14, 903:19, 907:7, 950:9, 950:10, 950:11, 953:6
**TOPAZ** [1] - 867:19
**topic** [3] - 871:20, 919:10
**topics** [3] - 878:12,

881:1, 962:4
**total** [2] - 948:25, 952:5
**totally** [1] - 873:20
**towards** [1] - 911:11
**transactions** [1] - 891:19
**TRANSCRIPT** [1] - 867:12
**transcript** [3] - 880:1, 966:5, 966:6
**transition** [2] - 900:16, 930:22
**Treasury** [24] - 876:14, 879:25, 881:7, 882:13, 884:5, 894:13, 894:14, 895:15, 896:25, 897:18, 898:4, 901:22, 908:4, 910:2, 910:22, 916:24, 917:5, 921:12, 922:5, 924:11, 928:23, 932:3, 932:13
**treasury** [34] - 876:21, 876:25, 877:2, 877:17, 878:6, 878:9, 878:11, 878:21, 880:7, 882:6, 882:9, 883:11, 883:12, 888:21, 889:4, 894:22, 895:6, 896:16, 910:15, 920:12, 923:1, 924:2, 928:15, 930:17, 931:5, 935:3, 935:16, 937:2, 939:10, 942:5, 942:19, 949:10
**treasury's** [1] - 936:6
**tremendous** [1] - 933:15
**trend** [1] - 905:12
**trial** [2] - 870:3, 870:24
**TRIAL** [1] - 867:12
**tried** [2] - 888:11, 888:12
**true** [9] - 901:4, 945:1, 945:6, 946:13, 946:16, 946:25, 962:20, 966:4, 966:6
**truth** [1] - 935:5
**try** [3] - 874:8, 874:10, 954:17
**trying** [8] - 876:15, 885:16, 891:4, 902:14, 916:8,

922:17, 922:20, 964:20
**turn** [3] - 894:19, 921:3, 947:4
**turned** [1] - 919:6
**turning** [1] - 919:7
**turns** [2] - 886:15, 904:20
**two** [11] - 878:7, 897:14, 898:12, 918:3, 918:13, 933:1, 933:16, 945:21, 948:9, 957:8
**type** [2] - 885:5, 885:10
**typo** [1] - 958:1

---

**U**

**U.S** [1] - 868:13
**Ugoletti** [12] - 878:7, 878:19, 888:22, 889:10, 890:13, 891:13, 892:15, 923:13, 935:12, 936:8, 937:1, 942:4
**Ugoletti's** [2] - 936:22, 942:9
**ultimately** [3] - 887:1, 896:20, 904:21
**uncertainties** [1] - 923:21
**uncertainty** [1] - 916:13
**under** [23] - 876:14, 877:2, 882:13, 889:24, 895:16, 899:7, 899:8, 899:9, 899:10, 910:22, 912:6, 916:22, 920:12, 931:2, 931:5, 938:10, 938:18, 938:21, 941:13, 951:21, 951:22, 963:6, 964:12
**underestimate** [1] - 905:4
**underlying** [2] - 949:4, 952:17
**understood** [8] - 872:18, 873:10, 873:20, 876:1, 895:15, 925:3, 928:3, 944:21
**underwater** [4] - 876:18, 876:19, 877:3, 877:6
**underwriting** [2] - 946:22, 946:24

**unfair** [1] - 890:24
**unhappy** [1] - 939:5
**United** [1] - 966:11
**UNITED** [2] - 867:1, 867:13
**unlikely** [1] - 917:4
**unprecedented** [1] - 933:7
**unreasonably** [1] - 941:14
**unrelated** [1] - 874:1
**up** [44] - 875:16, 875:18, 876:23, 879:5, 879:19, 880:25, 883:14, 883:15, 884:1, 887:25, 888:17, 889:1, 889:8, 890:11, 891:11, 893:13, 897:20, 898:8, 898:22, 898:23, 905:14, 905:25, 909:10, 912:23, 914:1, 916:3, 916:6, 917:9, 917:11, 922:12, 926:20, 931:20, 936:1, 936:2, 938:14, 940:20, 943:20, 945:16, 948:5, 948:22, 952:9, 954:4, 955:17, 957:23
**Update** [2] - 900:10, 903:4
**update** [4] - 943:23, 945:4, 947:17, 948:4
**upside** [1] - 877:18, 894:17, 894:18, 905:14
**upswing** [1] - 946:12
**upturns** [1] - 905:5
**upward** [1] - 958:17

---

**V**

**values** [1] - 957:25
**variability** [1] - 917:3
**variable** [2] - 928:9, 928:11
**varied** [1] - 950:19
**variety** [1] - 922:14
**various** [4] - 889:1, 901:3, 922:13, 963:23
**VARMA** [1] - 868:7
**versions** [4] - 891:16, 891:21, 892:14, 892:17
**vice** [2] - 906:7, 960:6

**Video** [2] - 964:25, 965:2
**view** [2] - 916:21, 955:9
**vital** [1] - 920:4
**vs** [1] - 867:5

---

**W**

**wait** [4] - 897:7, 898:14, 935:10
**wait-and-see** [1] - 898:14
**waived** [1] - 883:5
**walk** [3] - 882:4, 882:7, 928:2
**walked** [1] - 900:13
**Wanda** [2] - 892:8, 923:11
**wants** [1] - 873:7
**war** [1] - 898:7
**warning** [1] - 882:3
**Washington** [6] - 867:4, 867:17, 867:23, 868:10, 868:14, 966:13
**water** [1] - 877:15
**ways** [1] - 946:8
**week** [5] - 924:14, 936:23, 950:17, 950:19
**week's** [1] - 900:14
**weekly** [1] - 924:14
**welcome** [1] - 926:4
**whole** [5] - 883:21, 903:15, 906:1, 944:21, 949:23
**wind** [6] - 891:18, 921:13, 921:16, 921:19, 930:16, 930:18
**wind-down** [2] - 921:19, 930:18
**winding** [3] - 894:9, 923:3, 930:21
**wish** [1] - 934:10
**withdraw** [1] - 874:6
**withdrawal** [1] - 872:2
**WITNESS** [3] - 869:2, 875:4, 939:22
**witness** [12] - 870:4, 934:4, 934:15, 934:23, 935:10, 936:13, 936:14, 936:16, 936:17, 937:4, 937:11, 937:17
**witnesses** [1] - 882:2
**wonder** [2] - 904:17, 904:24

**wondered** [1] - 904:9
**word** [4] - 872:20, 873:5, 919:16, 931:14
**words** [1] - 893:16
**worried** [2] - 890:21, 937:7
**worry** [1] - 931:24
**worse** [1] - 940:14
**worst** [5] - 885:12, 886:6, 886:8, 886:22, 887:3
**worst-case** [1] - 885:12
**worth** [51] - 871:19, 880:18, 887:2, 892:24, 893:1, 893:10, 893:14, 897:10, 897:12, 910:10, 910:14, 910:17, 910:20, 912:9, 918:3, 918:10, 918:13, 918:14, 918:16, 920:3, 920:17, 928:12, 931:2, 931:3, 931:4, 935:17, 938:11, 938:21, 939:24, 941:23, 942:1, 942:2, 942:6, 942:8, 942:13, 942:16, 942:20, 943:3, 943:8, 943:11, 943:13, 944:23, 945:3, 949:1, 950:13, 951:3, 952:6, 952:9, 953:5, 953:7, 956:6
**wow** [1] - 919:6
**wrap** [1] - 883:15
**write** [1] - 923:22
**writing** [2] - 878:21, 899:22
**written** [2] - 896:9, 943:10

---

**Y**

**year** [14] - 882:11, 882:12, 908:3, 908:5, 909:17, 909:20, 909:24, 910:1, 910:9, 920:14, 925:15, 926:17, 949:22, 949:23
**years** [13] - 885:18, 894:11, 898:18, 902:14, 902:16, 902:18, 902:19,

902:21, 902:25,
932:18, 932:21,
960:15, 960:18
**yesterday** [25] - 874:2,
875:25, 876:8,
883:1, 888:18,
905:17, 905:23,
915:20, 915:21,
919:13, 934:9,
938:10, 939:15,
940:5, 940:11,
940:24, 941:21,
942:14, 943:18,
944:22, 960:24,
962:17, 963:6, 964:1
**yesterday's** [1] - 893:8
**York** [3] - 867:23,
868:4
**yup** [1] - 952:11

## Z

**zero** [1] - 931:3