```
 1                  BEFORE THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
 2

 3      FAIRHOLME FUNDS, INC., et al.,   .
                                         .
 4             Plaintiffs,               .
                                         .  Case Number 13-cv-1053
 5           vs.                         .
                                         .
 6      FEDERAL HOUSING FINANCE AGENCY,  .
        et al.,                          .
 7                                       .
               Defendants.               .
 8      - - - - - - - - - - - - - - - -
        In re FANNIE MAE/FREDDIE MAC     .  Case Number 13-mc-1288
 9      SENIOR PREFERRED STOCK PURCHASE  .
        AGREEMENT CLASS ACTION           .  Washington, D.C.
10      LITIGATIONS.                     .  October 21, 2022
        - - - - - - - - - - - - - - - -     1:38 p.m.
11

12              TRANSCRIPT OF JURY TRIAL, AFTERNOON SESSION
                  BEFORE THE HONORABLE ROYCE C. LAMBERTH
13                   UNITED STATES DISTRICT JUDGE

14      APPEARANCES:

15      For Berkley Plaintiffs:      BRIAN BARNES, ESQ.
                                     Cooper & Kirk, PLLC
16                                   1523 New Hampshire Avenue Northwest
                                     Washington, D.C. 20036
17
        For Class Plaintiffs:        LEE RUDY, ESQ.
18                                   ERIC ZAGAR, ESQ.
                                     Kessler Topaz Meltzer & Check LLP
19                                   280 King of Prussia Road
                                     Radnor, Pennsylvania 19087
20
                                     HAMISH HUME, ESQ.
21                                   SAMUEL KAPLAN, ESQ.
                                     KENYA DAVIS, ESQ.
22                                   Boies Schiller Flexner LLP
                                     1401 New York Avenue Northwest
23                                   Washington, D.C. 20005

24

25                        -- continued --
```

```
 1    APPEARANCES (CONTINUED):

 2                              MICHAEL J. BARRY, ESQ.
                                Grant & Eisenhofer, P.A.
 3                              123 Justison Street
                                Seventh Floor
 4                              Wilmington, Delaware 19801

 5                              ROBERT KRAVETZ, ESQ.
                                Bernstein Litowitz Berger &
 6                                Grossmann LLP
                                1251 Avenue of the Americas
 7                              New York, New York 10020

 8    For Defendant Federal
      Housing Finance Agency:   JONATHAN STERN, ESQ.
 9                              HOWARD CAYNE, ESQ.
                                DAVID BERGMAN, ESQ.
10                              IAN HOFFMAN, ESQ.
                                ROBERT JONES, ESQ.
11                              Arnold & Porter Kaye Scholer LLP
                                601 Massachusetts Avenue Northwest
12                              Washington, D.C. 20001

13

14    Official Court Reporter:  SARA A. WICK, RPR, CRR
                                United States District Court
15                                for the District of Columbia
                                333 Constitution Avenue Northwest
16                              Room 4704-B
                                Washington, D.C. 20001
17                              202-354-3284

18    Proceedings recorded by stenotype shorthand.
      Transcript produced by computer-aided transcription.
19

20

21

22

23

24

25
```

C O N T E N T S

TESTIMONY

EDWARD DEMARCO          Redirect Examination............ 987
                       Recross-Examination............ 1058

EXHIBITS RECEIVED

PX-33 and PX-34........................................ 1012

PX-223................................................. 1024

PX-304................................................. 1034

PX-500................................................. 1044

PX-254................................................. 1046

PX-284................................................. 1048

PX-122, PX-186, PX-190, PX-197, PX-209, PX-216, PX-244,

PX-253, PX-327, PX-340, PX-348, PX-353, PX-370, PX-471,

PX-474, and PX-479..................................... 1067

```
 1                       P R O C E E D I N G S

 2            (Call to order of the court.)

 3            (Jury not present.)

 4                 THE COURT:  The witness can come forward.  The jury is

 5       on the way.

 6            (Jury entered courtroom.)

 7                 THE COURT:  You may be seated.

 8            Mr. Hume, you may proceed.

 9                 MR. HUME:  Thank you, Judge Lamberth.  Hamish Hume for

10       the record.

11          EDWARD DEMARCO, WITNESS FOR THE PLAINTIFFS, RESUMED STAND

12                      REDIRECT EXAMINATION (Continued)

13                 BY MR. HUME:

14       Q.   Good afternoon, Mr. DeMarco.  We are going to pick right

15       back up with PX-213, which is at tab 38 of the binder and which

16       your counsel showed you and which we looked at a little bit

17       before the break.

18            In the section of that document called "GSE strategy

19       update," the document recounts a discussion by Dave Benson.

20            Do you see that?

21       A.   I do.

22       Q.   Okay.  And halfway down that paragraph, it begins with the

23       words, "Dave focused."

24            Do you see where that is?

25       A.   I do.
```

 1    Q.   It says, "Dave focused" -- we can highlight this sentence.

 2         "Dave focused on the GSEs' return to profitability as a key

 3    factor in building public support for the conservatorship."

 4         Do you see that?

 5    A.   I do.

 6    Q.   The next sentence says, "Current projections show" -- we

 7    can highlight this too, please.

 8         "Current projections show that cumulative GSE dividends

 9    paid will surpass cumulative GSE Treasury draws by 2020."

10         Do you see that?

11    A.   Yes, I do.

12    Q.   And then the next sentence, which we've seen, it says, "He

13    referred to the next eight years as likely to be the golden

14    years of GSE earnings."

15         Do you see that?

16    A.   I do.

17    Q.   Okay.  Now let's look at the results or the projections

18    underlying this starting on page 19 of 120 of the document, if

19    we could.

20         Here, you see the title of the slide is "Strategic enabler:

21    Profitable GSEs"?  Do you see that?

22         Sorry.  If you look at the screen, you should be on page 19

23    of the slides, of the document.

24    A.   Yes.

25    Q.   And you see the top line says "Strategic enabler:

1   Profitable GSEs"?

2   A.   Yes.

3   Q.   And you see that this document is talking about both Fannie

4   Mae and Freddie Mac?  It's not only Fannie Mae; correct?

5   A.   Yes.

6   Q.   Okay.  And you see that the gray line, if you see the bars

7   at the top, it says "cumulative infusion."

8        Do you see that?

9   A.   Yes.

10  Q.   And that refers to the amount that's been drawn down from

11  the Treasury commitment; correct?

12  A.   Yes.

13  Q.   And you see that those bars go up pretty quickly in 2008

14  and '9, '10, and '11.

15       Do you see that?

16  A.   Yes.

17  Q.   But do you see that under this projection, it stays

18  basically flat from 2011 all the way through to 2022?  Do you

19  see that?

20  A.   Yes.

21  Q.   And then the blue chart is the cumulative dividend

22  payments.

23       Do you see that?

24  A.   I do.

25  Q.   And do you see how the blue chart starts really small but

1    then goes steadily up and up and surpasses the gray chart in

2    2020?  Do you see that?

3    A.   Yes, I do.

4    Q.   And at the bottom, it says, "The cumulative dividends from

5    both GSEs exceed government investment by 2020 in baseline

6    scenario."

7         Do you see that?

8    A.   Yes, I do.

9    Q.   Okay.  Now, I think there's more detail on the next page,

10   which shows projected profits compared to the Treasury dividend.

11   And Fannie Mae is on the top, Freddie Mac on the bottom.  I

12   would like to direct your attention first to the Freddie Mac

13   numbers, so if we could blow up that part.  Thank you.

14        So on the Freddie Mac projections, he has comprehensive

15   income on the top line.

16        Do you see that?

17   A.   Yes.

18   Q.   And you see that right next to that -- or right underneath

19   that is a line saying "preferred dividend payment"?

20   A.   Yes.

21   Q.   And you know that that refers to the Treasury 10 percent

22   dividend; correct?

23   A.   Yes.

24   Q.   Okay.  So in 2012, you see that Freddie Mac's comprehensive

25   income is 7.3, which is just over the preferred dividend payment

1   of 7.2.

2        Do you see that?

3   A.   Yes, I do.

4   Q.   And do you see that under these projections, these baseline

5   scenario projections, you can go all the way out to 2022, and in

6   every year, they are projecting Freddie Mac to have

7   comprehensive income above the preferred dividend payment.

8        Do you see that?

9   A.   Yes, I do.

10  Q.   And let's look at what the net effect of that is.  If we

11  look at the bottom line, it says, "Remaining funding under the

12  SPSPA."

13       Do you see that?

14  A.   Yes.

15  Q.   That's how much is left on the commitment; correct?

16  A.   Correct.

17  Q.   And that's really the focus, because as I understand your

18  testimony, your concern is that if that remaining commitment,

19  once the cap comes into effect, if it's getting eroded or

20  shrinking, that can trigger uncertainty and unhappiness or even

21  panic in the financial markets with the MBS securities and the

22  like; correct?

23  A.   Yes.

24  Q.   So in -- under this projection, it's -- that amount

25  starts -- the projected amount starts the cap leaving remaining

1  funding of 148.3 billion.

2      Do you see that?

3  A.   Yes.

4  Q.   And then because there was no need to do any draws because

5  profits were more than the dividend, by this projection, it has

6  the remaining funding commitment at the end of the 10-year

7  period, 2022, also at 148.3.

8      Do you see that?

9  A.   Yes.

10  Q.   Okay.  Now, let's look at Fannie Mae.  Fannie Mae is a

11  little bit different in the sense that if you look at the

12  comprehensive income line and the preferred dividend payment

13  line, some years the income is above the dividend, some years it

14  is below the dividend, so there is the need to do some

15  borrowing.

16      Can you see that just by quickly scanning your eyes through

17  it?

18  A.   Yes.

19         MR. STERN:  Objection to "borrowing," Your Honor.

20         BY MR. HUME:

21  Q.   When I say borrowing, I mean drawing down on.  It's a

22  locution that's more easy for me, but that's all I mean.  I

23  don't mean to recharacterize the document, the deal to be

24  different from what it is.

25  A.   Understood.

1   Q.   But the point being, here, there is some draws needed in

2   some years and not in other years; correct?

3   A.   Yes.

4   Q.   Okay.  But let's look at what the bottom line is.  The

5   remaining funding, that's how much is the commitment.

6        And by the way, let me just pause.  At the end of 2012,

7   it's a little complicated, because instead of the cap being a

8   fixed number, there was a formula; correct?

9   A.   There was.

10  Q.   And so the formula was something like 200 billion plus

11  whatever had been borrowed during the time of the Second

12  Amendment minus net worth or something like that; correct?

13  A.   Correct.

14  Q.   And so I think these are estimates of what the cap would

15  be, and they may have slightly changed to the end numbers.  So I

16  don't want to represent that these are precisely what they ended

17  up being, but they're what was being estimated here.

18       Do you understand?

19  A.   Understood.

20  Q.   Okay.  Thank you.  So under this projection, the cap was

21  124.8 in 2012, and the projection would show that at the end of

22  202, because there would have been some draws, it's projected to

23  be 118.3.

24       Do you see that?

25  A.   Yes, I do.

1    Q.   And so that is a difference -- that reflects that under

2    these projections, the draws would have been, if my math is

3    correct, 6.5 billion; correct?

4    A.   I'm sorry.  Say that last again.

5    Q.   Just the math, if the commitment went from 124.8 and was

6    projected to go down to 118.3, that reflects a prediction or

7    projection of draws on the commitment of 6.5 billion?

8    A.   It's reflecting that based upon the path of draws that are

9    forecast here, that at the end of 2022, the end of this year,

10   that the amount of commitment remaining is 118.

11   Q.   That's right.  And it's 118.3, which is less than 124.8,

12   because there's been a draw-down on the --

13   A.   Yes.

14   Q.   -- commitment by $6 and a half billion; correct?

15   A.   Yes.

16   Q.   And so I'm going to -- I don't think this is the kind of

17   case where you're going to squabble with me over arithmetic.

18   We're just going to show -- because I want to kind of try to put

19   this all together to show what it shows, and recognizing it's a

20   projection from July of 2012.  Okay?

21   A.   Understood.

22   Q.   So Mr. DeRita, if you can pull up both charts.

23        This is Freddie on the bottom, Fannie on the top.  I want

24   to add up those commitment numbers, what this projection was

25   showing the commitment was in 2012 versus what it was projected

1    to be in 2022 under these projections.

2         So can we do the math?  I think Mr. DeRita is pretty

3    amazing and can pull up a calculator.  There he is.

4         So we're going to add the 2012 commitment numbers, add

5    124.8.  That's the commitment for Fannie Mae in this projection,

6    correct, in 2012?

7    A.   Yes.

8    Q.   So we're going to add that to the commitment shown, the

9    remaining funding shown for Freddie Mac, 148.3.

10        Do you see that?

11   A.   Yes.

12   Q.   And the total is 273.1.

13        Do you see that?

14   A.   Yes, I do.

15   Q.   You can make a mental note of that, or I can give you a

16   piece of paper, but it's 273.1.  Okay?

17   A.   Okay.

18   Q.   So let's just see now what it goes to in 2022.  It's for

19   Fannie Mae projected to go down a bit to 118.3.

20        Do you see that?

21   A.   Yes.

22   Q.   And we're going to add the Freddie Mac one, which stays the

23   same as 148.3, and the total of those is 266.6.

24        Do you see that?

25   A.   Yes, I do.

Q.   Okay.  Thank you.  But I'd just like to show to make sure

visually what this chart is showing, what this projection is

showing is made clear.  I'd like to show a demonstrative that

our expert put together that we modified slightly and put

together and showed in our opening.  This is purely a

demonstrative.  If we can show demonstrative 35.  And I have a

clicker.

     So here's what those two numbers show.  We have the light

blue number reflects -- the light blue color reflects the

remaining unused funding.  That's the commitment that hasn't

been drawn upon.

     Does that make sense?

A.   Yes.

Q.   And the dark blue number is the projected draws in the

future.

     Does that make sense?  Do you see that in the key?

A.   Yes.

Q.   Okay.  So we start -- you recognize that number, 273.1?

A.   Yes.

Q.   That's what the Benson projection showed was the total

commitment that would be available to both Fannie and Freddie in

2012; correct?

A.   Yes.

Q.   And then the Benson projection showed that over the next 10

years, under his projections in July of 2012, this is what would

1    happen.   6.5 billion would be drawn, and the remaining

2    commitment would be 266.6.

3         Do you see that?

4    A.   Yes, I do.

5    Q.   So you would agree with me that this demonstrative

6    accurately summarizes what is shown in the Benson projections of

7    July 2012?

8    A.   Yes, the arithmetic follows.

9    Q.   We can take that down.   Thank you, Mr. DeRita.

10        Before the break, I was trying to ask you about your plans,

11   and I was trying to show a clip, and it was the wrong clip.   It

12   was 100 percent my fault.   Mr. DeRita had the right clip; I had

13   the wrong thing in my mind.

14        I think I understand your testimony, but I would like to

15   just be 100 percent sure.   So I would like to just ask you to

16   turn to your deposition from 2020, which is tab 2 of your

17   binder, tab 2 of your binder, page 113.   If it's okay, we can

18   show this on the screen just for ease of reference for the jury.

19   Page 113 of the 2020 deposition.

20        Are you at page 113, Mr. DeMarco?

21   A.   Yes, I am.

22   Q.   And if you look at line 3, the question is, "I believe in

23   your prior deposition, when shown a lot of company

24   projections" --

25                COURTROOM DEPUTY:   Are you presenting this to the

1    jury?

2              MR. HUME:  Well, I think the practice has been to show

3    the jury deposition transcripts even though they're not exhibits

4    just so they can follow what's being shown, unless there's an

5    objection.

6              MR. STERN:  I defer to Ms. Jenkins.  There's no

7    objection.  And to the Court, of course.

8              THE COURT:  There's no objection.  So you can show it.

9              COURTROOM DEPUTY:  Okay.

10             BY MR. HUME:

11   Q.   So this is page 113 of your 2020 deposition.  You did have

12   two.  And on line 3, the question begins:

13        "Question:  I believe in your prior deposition, when shown

14   a lot of company projections which were much more favorable

15   in -- in 2012 than in prior years, one of your responses was in

16   not considering those projections the fact that the companies

17   didn't really know the plans you had and weren't accounting for

18   that; is that correct?

19        "Answer:  Yes."

20        Do you see that?

21   A.   Yes.

22   Q.   And was that truthful and accurate testimony?

23   A.   Yes.

24   Q.   And you're not saying anything different today?

25   A.   No.

1    Q.   And under those plans referenced there, your plans included

2    the GSEs having their revenue going down; correct?

3    A.   Yes.

4    Q.   Okay.  And those plans --

5    A.   It also included the GSEs paying a periodic commitment fee

6    as required under the PSPA.

7    Q.   Okay.  But your plans also faced some uncertainty as to

8    whether they would happen; correct?

9    A.   Yes.

10   Q.   Okay.  And your plans, to some extent anyway, are laid

11   out -- aren't your plans reflected in the strategic plan you

12   sent to Congress in February 2012?

13   A.   Yes.

14   Q.   Okay.  And let's take a quick look at that.  That's PX-154,

15   which is also Defendant Exhibit 394.  We will just use the PX

16   version, tab 30 of your binder if you want to look at the hard

17   copy.

18              THE COURT:  What's the exhibit number?

19              MR. HUME:  Would you like us to use the one in

20   evidence?

21              COURTROOM DEPUTY:  Which one is that?  I'm sorry.

22              MR. HUME:  Mr. DeRita, can you pull up DX-394.  We

23   don't need to burden the jury with two versions of the same

24   document.  Great.  This one actually has a cover page, it seems.

25              BY MR. HUME:

1   Q.   So this is your strategic plan submitted to Congress on

2   February 21st, 2012; correct?

3   A.   Yes.

4   Q.   Okay.  Let's go to what I have as page 2, if you would just

5   scroll down a little, Mr. DeRita.  Keep going.

6        Here, we've got the three things:  Build, contract,

7   maintain.

8        Do you see that?

9   A.   Yes.

10  Q.   And under the "contract" part, it says "gradually

11  contract"; correct?

12  A.   Yes, it does.

13  Q.   And so it wasn't going to be something sudden.  It was

14  going to be gradual over many, many years; correct?

15  A.   Yes.

16  Q.   Okay.  Now, if we could go to page 9 of the plan, and this

17  is of the plan -- if you look at the little -- keep going.  I

18  think we're going to need to go to -- yeah, that's exactly

19  right.  Thank you, Mr. DeRita.

20       At the top of the page 9, 12 of the exhibit, the top

21  paragraph says, "Unlike" -- are you with me on this document,

22  Mr. DeMarco?

23  A.   Yes.

24  Q.   It says, "Unlike the banking industry, there are not

25  thousands of potential firms ready to step into the business of

mortgage securitization.  Indeed, outside of the securitization

available through the Government National Mortgage Association

(Ginnie Mae) for loans primarily backed by FHA, there is little

else in place today to assume the secondary market functions

served by the enterprises."

       Do you see that?

A.   Yes.

Q.   And was that a correct statement when made in this plan?

A.   Yes.

Q.   So it wasn't going to be easy to shrink these enterprises

given what was stated here; correct?

A.   It was going to be gradual.

Q.   And it was going to be difficult and uncertain; correct?

A.   Every day is difficult and uncertain in this environment.

Q.   That's certainly true this week.  Thank you, Mr. DeMarco.

       My point is -- and it hasn't happened; correct?  Up to

today, the enterprises have actually grown, not shrunk; correct?

A.   They have been allowed to grow.

Q.   And I mean, you did say that even on your watch -- you said

that you were going to have a plan, but even on your watch, in

2013, they made record profits; correct?

A.   They did.

Q.   Did you say --

A.   Most of that was the reversal of the allowance, yes.

Q.   Well, let's take a look at that.  We can look at the actual

1    10-Ks in you want.  They're in the binder, or we can pull them

2    up.  They are in the binder.  We can put this exhibit down.

3        In 2013, Fannie Mae had comprehensive income of $84.8

4    billion; correct?

5    A.    Okay.

6    Q.    Yes?

7    A.    I'm taking your word for it, Mr. Hume.  I don't have the

8    security filings.  I'll trust that you're reading the right

9    number to me.

10   Q.    And the deferred tax asset was 50 billion of that?

11   A.    Yes.

12   Q.    And so they still had profit outside of that of 34 billion;

13   correct?

14   A.    Yeah, that would be the arithmetic.

15   Q.    And in 2012, they had 17.7 billion, which they said was

16   their largest profit ever; right?

17   A.    Right.  That was reversing loan loss allowances.

18   Q.    Well, but that's the point.  These losses that they took in

19   these terrible years of 2009, '10, and '11, were in part,

20   weren't they, write-downs of asset values because of fear about

21   the future and the uncertainty of people paying their mortgages;

22   correct?

23   A.    It was based upon the market conditions at the time, yes.

24   Q.    Yes.  And as market conditions changed, the accounting

25   rules require you to reflect that change in your assets, which

1    means either writing them down or writing them up, leading to

2    big losses and big gains; correct?

3    A.   That's correct, and this was also due in part to a great

4    deal of the effort we were doing in conservatorship to assist

5    borrowers and a lot of extraordinary action by the government.

6    Q.   Isn't it also true that for your plan to ultimately be

7    fulfilled, the ultimate work would have to be done by Congress;

8    correct?

9    A.   My strategic plan is quite clear.  It says the last chapter

10   of the conservatorship is to be written by Congress.

11   Q.   Right.  But you've said several times in your testimony

12   with Mr. Stern, you said that part of your thinking was informed

13   by the fact that there were numerous bills, I think you said

14   three bills on Congress and a proposal from the Treasury

15   Department, all of which -- they were different, but they had

16   one thing in common:  Shrinking the GSEs; correct?

17   A.   Yes.

18   Q.   But it required legislation; correct?  Let me rephrase

19   that.  Excuse me.

20        You talked about three proposed bills and a Treasury

21   proposal; correct?

22   A.   We talked about multiple bills in Congress, and we talked

23   about the Treasury plan, all of which talked about wind-down.

24   It was the FHFA strategic plan that talked about gradually

25   shrinking the footprint, and that was something that I could do

1    without legislation.

2    Q.   There were some things you could do without, some things

3    you couldn't; correct?

4    A.   Correct.

5    Q.   Okay.  At that time, summer of 2012, President Obama is in

6    the White House; correct?

7    A.   Yes.

8    Q.   And the Republicans control the House; correct?

9    A.   I believe so.  Yeah, that's right.

10   Q.   Did it strike you as a time of particularly productive

11   bipartisan unity where they were going to get together and pass

12   legislation together?

13   A.   Actually, the Senate bill was a bipartisan bill that was

14   supported by both the leader --

15   Q.   Did it pass?

16   A.   It did.  It actually passed through the Senate Banking

17   Committee and went to the Senate floor.

18   Q.   Did it pass into law?

19   A.   No, it did not.

20   Q.   Now, I would like to move on to another subject.

21        First of all, I think I understood you to say this, maybe

22   it was in a deposition.  You became the acting director when

23   again?  Do you remember exactly when?

24   A.   I believe the official date is either September 1st or one

25   of the very first days of September of 2009.  The acting -- the

1   prior director actually had left in mid-August, and I was

2   effectively taking over then.  But the official date is either

3   September 1st or September 6th or something like that.

4   Q.   That's fine.  The question I had was, isn't it true that

5   the practice of Fannie Mae and Freddie Mac drawing down from the

6   Treasury commitment in order to pay the Treasury 10 percent

7   dividend, the circular draw, that practice had been established

8   before you became acting director; correct?

9   A.   Yes.

10  Q.   And so you didn't really ever have occasion, did you --

11  because that practice was therefore proceeding on its own when

12  you took over?  That's what was happening?

13  A.   That's correct.

14  Q.   So you didn't -- it was never brought to your attention

15  whether there was a decision to be made when there's a quarter

16  where there's not enough income to pay the dividend whether

17  instead of doing a circular draw you can instead just not pay

18  the dividend?  That decision was never presented to you as

19  something you had to decide; correct?

20  A.   That's correct.

21  Q.   Okay.  And do you have a clear recollection in your head

22  from -- moving forward to the summer of 2012, August of 2012

23  when you agreed to the net worth sweep, do you have a clear

24  recollection of whether you at that time were aware of the --

25  what the details in the contract said about the ability to have,

1    when you can't pay the dividend in cash, to pay it in kind and

2    have the dividend rate then change from 10 percent to 12

3    percent?  Do you have a clear recollection whether you knew

4    about that at the time?

5    A.    I expect I did know about that.

6    Q.    You say you expect you did know.

7    A.    You're asking me do I have a clear recollection of a very

8    particular thing over ten years ago.

9    Q.    I understand that.

10   A.    And I'm trying to answer truthfully.

11   Q.    I appreciate that.

12   A.    I believe I was familiar with the 12 percent provision

13   regarding the dividend.

14   Q.    Okay.  But it is true, isn't it, that you don't remember it

15   ever coming up as a discussion point when you were discussing

16   the net worth sweep; correct?

17   A.    That is correct.

18   Q.    Okay.  I may have misheard, but I thought I heard testimony

19   earlier where you said that it was discussed and considered but

20   rejected because of the difference between 12 percent and

21   10 percent when you were discussing the net worth sweep, but

22   that's not what happened, is it?

23   A.    I believe we were discussing why wasn't that made an

24   option, and I was trying to explain the wording of the PSPA and

25   why it was not considered to be an option.

Q.   Okay, but that's where things get tricky in these proceedings.  It's one thing to say you don't recall having a discussion that didn't come up.  Okay?  That's what you said in your deposition, which we can look at.

A.   Right.

Q.   Is that correct?

A.   Yes.

Q.   Okay.  See, that's clear, and I could move on, except for what you said a minute ago and what you said when Mr. Stern was asking it.  Because what you said there was you were explaining why it wasn't a viable alternative.  That's a different thing than saying you don't recall it ever coming up or being discussed.  Those are two different things.

          MR. STERN:  Objection to the prefatory speeches, Your Honor.

          MR. HUME:  Well, I need to know which one the witness is saying.

          THE WITNESS:  We did not discuss the 12 percent as an option when we were negotiating the Third Amendment.

          BY MR. HUME:

Q.   Okay.  So you are not testifying that it was considered and rejected at the time, considered as a viable -- considered whether it was a viable alternative and rejected because it was 12 percent versus 10?  You just don't recall it ever coming up; correct?

1    A.    Correct.

2    Q.    Okay.  Thank you.  Now, I want to ask you about how the

3    mechanics work, because I think when you were asked in

4    deposition -- isn't it true that when you were first asked about

5    this in your 2015 deposition, you weren't actually sure how it

6    worked, because you hadn't -- because no one had ever brought it

7    to your attention; isn't that correct?

8    A.    Mr. Hume, I would ask you to refresh me on what it is I

9    said in a deposition that was seven years ago.

10   Q.    That's fair enough, Mr. DeMarco.  That's totally fair.

11   It's in your -- tab 2 of your binder, your 2015 deposition.  And

12   it is on page 201.

13   A.    Mr. Hume, with respect, you said tab 2.  Did you mean tab

14   1, or did you mean tab 2?

15   Q.    You're 100 percent right.  Thank you.  Tab 1 is the 2015

16   deposition.  Thank you.

17   A.    And now what page would you like me to look at?

18   Q.    201.  And there's a discussion about this, but if you look

19   to line 9, the question was -- are we allowed to show this?

20        "Question:  But I'm not asking what the market reaction is.

21   I'm just asking the mechanics of this.  The funding commitment

22   remains untouched and undiminished in a quarter in which the

23   companies fail to pay a 10 percent cash dividend and increase

24   the liquidation preference by 12 percent; correct?"

25        There's an objection.

1  "Answer:  Because this is something that I had not -- I

2  don't recall discussing, for me to be able to answer that

3  question with certainty would require consultation with people

4  that understand the legal framework of this document."

5  Do you see that?

6  A.  Yes.

7  Q.  Was that truthful and accurate testimony?

8  A.  Yes.

9  Q.  Okay.  So all I'm saying is, is it now -- because of the

10 lawsuit, is it clear to you that what happens under the

11 agreement, under the certificates of designation with Treasury,

12 that if no cash dividend is declared, then in that quarter, the

13 amount of that cash dividend is added to the liquidation

14 preference automatically?  Do you understand that?

15 A.  Yes.

16 Q.  And it's actually added at that 10 percent rate, but then

17 from that point forward, the dividends accrue at 12 percent

18 until that amount that was unpaid gets paid down; is that

19 correct?

20 Would it help to see the contract?

21 A.  Well, it might, because I would have thought you would have

22 said that the liquidation preference went up by 12 percent.

23 Q.  Well, a lot of people have said that in this case, but

24 that's -- I think it's pretty clear that's not how it works.

25 That is a detail --

1          MR. STERN:  Objection to the editorial comments, Your

2     Honor.

3          MR. HUME:  I didn't mean that to counsel.  People on

4     both sides have.  I'm sorry.  I apologize if that was the

5     implication.

6          BY MR. HUME:

7     Q.   But there was a statement -- I think that's a detail.

8     That's not what I was trying to get at.

9          Counsel asked you when he was discussing this yesterday and

10    he was referring to my questioning which said that if you do

11    this payment in kind, if you don't pay the cash dividend and,

12    therefore, instead of any cash gone and instead of a circular

13    draw, Treasury's liquidation preference goes up, forget about

14    whether it's 10 percent or 12 percent.

15         Then I said, isn't it true that if you have enough cash in

16    the next quarter, you can pay it down, you can repay that

17    increase in liquidation preference?

18         Is that your understanding?

19    A.   Without 100 percent certainty, yes, that is my

20    understanding.

21    Q.   Okay.  Because counsel had you say that Treasury doesn't

22    let you pay them back.  And while I know it's true Treasury

23    doesn't let the GSEs --

24         MR. STERN:  Objection.  That mischaracterizes my

25    question to Mr. DeMarco, Your Honor.

1            MR. HUME:  The record will show what it shows.

2            BY MR. HUME:

3     Q.   I understood you to testify that it was just not possible

4     to pay Treasury back.

5            THE COURT:  I don't think you rule on objections.

6     Pick up the phone.

7        (Bench conference.)

8            THE COURT:  If the objection is you mischaracterized a

9     question, I think I decide if you did.

10           MR. HUME:  I apologize, Judge Lamberth.

11           THE COURT:  What was the objection now?

12           MR. STERN:  That was the objection, Your Honor, that

13    he mischaracterized my question.  I did not put it to

14    Mr. DeMarco that Treasury wouldn't allow it.  I put it to

15    Mr. DeMarco that Treasury had the right to veto.

16           THE COURT:  The objection is sustained.

17           MR. STERN:  Your Honor, I move to strike the answer,

18    then.

19           MR. HUME:  That's fine.

20        (End of bench conference.)

21           THE COURT:  The last answer is stricken.  The question

22    can be rephrased.  I sustained the objection.

23           BY MR. HUME:

24    Q.   I think the best thing to do is take a quick look at the

25    actual contract.  It's PX-33.  Remarkably, I'm not sure this is

1    in evidence.

2              COURTROOM DEPUTY:  It's not.

3              MR. HUME:  It's not?  This is the certificate of

4    designation for the Treasury preferred stock.  This one is with

5    Fannie Mae, I believe.  And it's PX-33, and I'm sure there's no

6    objection.  So I move for it to be admitted in evidence.

7              MR. STERN:  No objection, Your Honor.

8              MR. HUME:  And while we're at it, PX-34 is the

9    essentially identical certificate of designation between

10   Treasury and Freddie Mac.  And so I would move that that also be

11   admitted into evidence.

12             THE COURT:  They're both received without objection.

13        (Exhibits PX-33 and PX-34 received into evidence.)

14             BY MR. HUME:

15   Q.   Mr. DeMarco, do you see page 2 of this certificate of

16   designation is titled "dividends"?

17   A.   Yes.

18   Q.   Paragraph (a) talks about what happens each dividend period

19   and payment date, and there's some technical jargon there.  The

20   second paragraph on the next page says what happens if declared.

21   Do you see that sentence, "if declared"?

22   A.   Yes.

23   Q.   It says how much, what it will be, what period it will

24   cover right from the beginning there, through and including

25   December 31, 2008.

1        Do you see that?

2    A.   Yes, I see that.

3    Q.   Okay.  I think that's just to set the context.  You can

4    feel free to read it more, if you wish.  But I want to focus on

5    paragraph (b) and then (c).  Let's pull up just (b) first, if we

6    could.

7        Paragraph 2(b) of the designation says, "To the extent not

8    paid pursuant to Section 2(a) above, dividends on the senior

9    preferred stock shall accrue and shall be added to the

10   liquidation preference pursuant to Section 8, whether or not

11   there are funds legally available for the payment of such

12   dividends and whether or not dividends are declared."

13       Do you see that?

14   A.   Yes.

15   Q.   So that's saying, you know -- normally, in corporate

16   America and for the private shareholders here, as we've all

17   learned, the company -- it's normally within the discretion of

18   the company whether to declare a dividend; correct?

19   A.   For common shareholders, yes.

20   Q.   Right, for common.  But here it's saying that even if they

21   don't declare it, it's going to accrue, and if you don't pay it,

22   it's just going to be added to the liquidation preference;

23   correct?

24   A.   Yes.

25   Q.   And the liquidation preference is the number that

1    determines how big the dividend's going to be, because you pay

2    10 percent of that each year; correct?

3    A.    That's correct.

4    Q.    Okay.  And it also says how much Treasury gets out of the

5    liquidation preference if the entities are actually dissolved

6    and sold off?

7    A.    Correct, in advance of any of the other shareholders.

8    Q.    All right.  Now, would you agree with me, Mr. DeMarco, that

9    if for whatever reason there's no cash available, let's say,

10   Fannie Mae and Freddie Mac just don't pay a dividend to Treasury

11   one quarter, then they've failed to pay?  That's a failure to

12   pay; correct?

13   A.    Correct.

14   Q.    If they choose not to pay, that's a failure to pay;

15   correct?

16   A.    Correct.

17   Q.    Okay.  So this says what happens.  If that's what happens,

18   the amount of that dividend, if it was going to be $10 billion,

19   that's added to the liquidation preference; correct?

20   A.    Yes.

21   Q.    It says "pursuant to Section 8."  So let's quickly look at

22   Section 8.  Section 8 is called "liquidation rights and

23   preference."

24          Do you see that?

25   A.    Yes.

1  Q.   Okay.  (a) is a long provision.   (b) defines liquidation

2  preference.   It starts at $1 billion per share.

3       Do you see that?

4       It says $1,000 per share, but somewhere it's got to say --

5  oh, it's $1,000 per share, but it must be a million shares;

6  right?

7  A.   Yes.

8  Q.   So there are a number of subprovisions in the definition of

9  liquidation preference.

10      Do you see that?

11 A.   Yes.

12 Q.   And subprovision (iii) on the next page says -- well, to

13 make it make sense, we need to have the first part of the

14 sentence.   My fault.   Let's have liquidation -- let's have the

15 first sentence of (b), shall be a number of things, and one of

16 the things it will be is, under (iii), "increased on the

17 dividend payment date if the company fails to pay in full the

18 dividend payable for the dividend period ending on such date by

19 an amount per share equal to the aggregate amount of unpaid

20 dividends divided by the number of shares of senior preferred

21 stock."

22      Do you see that?

23 A.   I do.

24 Q.   Okay.  Now, let's look at paragraph 3.

25 A.   Sorry.  Which section are we in now?

1   Q.   Big paragraph 3 on page 3 of the document.  Paragraph 3

2   says "optional pay-down of liquidation preference."

3        Do you see that?

4   A.   Yes.

5   Q.   Now, the first sentence says "following termination," and

6   it has a lot of language about how in general Fannie Mae and

7   Freddie Mac can only repay the liquidation preference, repay

8   Treasury when the termination -- when the commitment is

9   terminated; correct?  That's the general rule?

10  A.   That's the rule.

11  Q.   That's the general rule, okay.  But if you go down about 11

12  lines to the sentence that begins on the left side of

13  the -- "prior to termination," do you see that?

14  A.   I do.

15  Q.   "Prior to termination of the commitment" -- so this is an

16  exception to the general rule -- "and subject to any limitations

17  which may be imposed by law and the provisions below, the

18  company may pay down the liquidation preference of all

19  outstanding shares of the senior preferred stock pro rata at any

20  time out of funds legally available therefor, but only to the

21  extent of, one, accrued and unpaid dividends previously added to

22  the liquidation preference pursuant to Section 8 below."

23       Do you see that?

24  A.   Yes.

25  Q.   So isn't that saying that if you don't pay a dividend in

1    cash because you don't have the cash or you don't have income,

2    for whatever reason, if you don't pay it, it gets added to the

3    liquidation preference; correct?  That's the first part of what

4    we looked at?

5    A.    That appears to be the first part of that.

6    Q.    And then the second part is, if you later have the ability

7    to repay that, you can repay it and pay it back down; correct?

8    A.    Yes.

9    Q.    Okay.  So let's just, if we could, see if we understand how

10   this works, because it seems complicated, but I actually don't

11   think it's all that complicated.  We made some demonstratives,

12   which we shared with your counsel, that I would like to show on

13   the payment in kind.  Can we pull those up, please, Mr. DeRita.

14        Now, this is a slide your counsel showed during opening

15   statements and again during, I believe, his testimony -- his

16   questioning of you yesterday.

17        Do you remember this slide?

18   A.    Actually, I don't remember seeing this.

19   Q.    Maybe he didn't show it to you.  I withdraw.  The point is,

20   he showed it during opening.

21        And it shows the circular draw problem that has been so

22   central to what we've been talking about in this case, which as

23   I understand it, you see it has Fannie Mae and Freddie Mac on

24   the left; right?

25   A.    Yes.

1  Q.   I just want to walk through it.  It has the Treasury on the

2  right; correct?

3  A.   Yes.

4  Q.   And then it shows that they have to pay the 10 percent cash

5  dividend, but if they don't have the money, they have to draw

6  down from Treasury to pay the dividend and this sort of vicious

7  circle; correct?  That's what it shows?

8  A.   Yes.

9  Q.   Okay.  And on the right-hand side, it shows the effect of

10  that is it reduces the commitment and increases the liquidation

11  preference?

12  A.   Okay.

13  Q.   Do you see that?

14  A.   Yes.

15  Q.   And what you don't want to have happen is have that

16  commitment reduced and eroded once you have the caps because

17  that makes the financial markets jittery; correct?

18  A.   Right.

19  Q.   Okay.  What I did is simply change the colors to colors

20  that I -- I actually think I'm -- the defendants are going to

21  like this part, which is just because it matches colors used by

22  my expert, our expert, light blue for the commitment, okay, but

23  it's the same thing, and black for the liquidation preference,

24  and the same thing on the left.

25       So what they're showing -- I'm going to show the circular

draw.  I'm also going to animate it because I think it makes

their point, your point even more vividly.

     What they're saying is if you have a circulation draw, this

happens:  Liquidation preference up, Treasury commitment down;

correct?

A.    If you have a draw, yes.

Q.    If you have a circular draw, that's what happens?

A.    Yes.

Q.    Okay.  And that's what you're trying to avoid; correct?

A.    Yes.

Q.    Okay.  Now, we just went through the payment in kind under

those certificates of designation, paragraphs 2(b) and (c),

3(a), which we read.  You recall that?

A.    Yes.

Q.    Yes?

A.    Yes.

Q.    Okay.  So here, instead of doing a circular draw, what

happens is you can't pay the dividend.  Fannie and Freddie can't

pay it.  They don't have the income, or they don't have the

income for the whole thing, which is more likely since they

would have some income.  But let's assume the worst.  They have

no income.  So they can't pay it.  So they do the payment in

kind.  Whether it's 10 or 12 percent is not the point.  I'm

going to show it both ways.  But they do the payment in kind,

and here's what happens.

1          MR. STERN:  Your Honor, I would object.  There is no

2     10 percent payment in kind provision.

3          MR. HUME:  We're going to show it with the 12 percent.

4     We just went through it, Your Honor.  I think it's clear.  The

5     initial payment is at the cash dividend amount, and then after

6     that --

7          MR. STERN:  Your Honor, I maintain the objection.

8     This is factually incorrect and will not be supported by the

9     evidence.

10          MR. HUME:  Well, then I think it's a disputed fact.

11     BY MR. HUME:

12     Q.   Mr. DeMarco, do you understand what I'm showing here?  Did

13     you understand that when I showed you paragraph 2(b), it said

14     that if you couldn't pay a dividend, it would immediately accrue

15     to the liquidation preference?

16     A.   Yes.

17     Q.   Okay.  So that's all I'm showing here.  And I'm going to

18     show it with the 12 percent because I knew there would be a

19     dispute about this.  I'm going to show it both ways.  Okay?

20          So I am not asking you to accept -- I am not asking you --

21     I am not trying to get your testimony to accept that it's

22     10 percent.  That will be for the judge or others to decide or

23     the jury if it's a fact in dispute.  I don't think anything is

24     really going to turn on that.

25          The point is, I'm just trying to show what will happen.

1    Okay?  When that happens, let's watch the liquidation

2    preference.

3         It goes up; correct?  Do you see that?

4    A.   Yes.

5    Q.   But over here on the Treasury commitment, it does not

6    change; correct?

7    A.   That's what I see, yes.

8    Q.   That part I do care about.  Do you agree that's accurate?

9    A.   I agree.

10   Q.   Okay.  Now, we switched to 12 percent.  If in the next

11   quarter you can repay, you repay the amount, and the liquidation

12   preference went down.  Did you see that?  Because you repaid it.

13   You remember that?

14   A.   Yes.

15   Q.   So that's how it would work; correct?

16   A.   Yes.

17   Q.   And when that happens, there's also no change to the

18   commitment; correct?

19   A.   Yes.

20   Q.   Okay.  And let's say you -- and the rate would fall back to

21   10 percent when that happens, correct, if you had the money to

22   pay it down; correct?

23   A.   Yes.

24   Q.   All right.  Now, what happens if things aren't going well

25   and you can't do that?  Let's see what happens then.  Well,

 1   first, no change.  But what happens if you add the 12 percent

 2   payment in kind?  Liquidation preference goes up.  No change to

 3   the commitment.

 4        Do you see that?

 5   A.   I do.

 6   Q.   Now let's say what if you can't pay it down.  You're going

 7   to have to do it again the following quarter.  You see that

 8   liquidation preference went up even more; right?  Did you see

 9   that?

10   A.   I did.

11   Q.   But this commitment that you're worried about and the

12   financial markets care about, no change.

13        Do you see that?

14   A.   Yep.

15   Q.   And that's how it would work; correct?

16   A.   I believe so.

17   Q.   Now, in addition to not considering allowing those

18   provisions to address any concern over the circular draw, there

19   are other things you didn't consider.  For example, I think we

20   established yesterday, but just to confirm, you did not ever try

21   to negotiate a provision that would address the scenario where

22   Fannie and Freddie had massive profits of the kind they've

23   actually had and it would then calibrate or change the net worth

24   sweep if that happened; correct?

25   A.   Not as a unique situation, no, meaning that --

```
 1   Q.    You didn't negotiate that --
 2   A.    We didn't negotiate that as a scenario, no, that's correct.
 3   Q.    And you did not try to negotiate a rate, a dividend rate
 4   that was not -- that was different from either 10 percent or the
 5   net worth sweep?  You didn't try to negotiate a different rate?
 6   A.    That's right.  As I testified previously, I was aware from
 7   Treasury that they had --
 8   Q.    Was that the 10 percent or net worth?  Correct?
 9   A.    That's what we negotiated on, right.
10   Q.    And you never tried to negotiate a provision where the net
11   worth sweep would kick in only if the circular draw problem,
12   assuming it happened, caused that commitment, that light blue
13   box, that commitment to shrink by some threshold amount, not
14   just a billion or two or 5 billion, but, I don't know,
15   20 billion, 50 billion?  You didn't try to negotiate a provision
16   where the net worth sweep would only kick in if that erosion of
17   the commitment hit a certain threshold?  You didn't try to do
18   that, did you?
19   A.    No, we did not.
20   Q.    Okay.  And you didn't try to negotiate a provision that
21   would say how about you have the dividend change from 10 percent
22   to the lesser of 10 percent or the net worth, and if the net
23   worth is less than 10 percent, then the GSEs must pay that
24   shortfall back with interest as soon as they're able?  You
25   didn't negotiate a provision or try to negotiate a provision
```

1    like that, did you?

2    A.   I'm not entirely sure I followed that, but no.

3    Q.   And also, I think this is clear, Mr. DeMarco, but you

4    didn't try to negotiate just for a little more time to see how

5    things would play out?  You didn't try to do that, did you?

6    A.   No.

7    Q.   And if I could just quickly look at PX-223, PX-223 is a

8    Fannie Mae board meeting minutes, I believe.  It has "agenda" on

9    it.  It has a number of things redacted for nonresponsive.  No

10   implication should be taken from that.  It's dated July 20,

11   2012.

12        Do you see that?

13   A.   I do.

14            MR. HUME:  I think 223 may not be in evidence, and so

15   I would move for it to be admitted.  I don't think there's an

16   objection.

17            MR. STERN:  No objection.

18            THE COURT:  Received.

19        (Exhibit PX-223 received into evidence.)

20            BY MR. HUME:

21   Q.   I wanted to quickly show you something on page 7 of 48 of

22   this exhibit, Mr. DeMarco.

23        Do you see that on the screen?

24   A.   Okay.

25   Q.   This is an executive summary of the board meeting.

1    Do you see that?

2    A.   Okay.

3    Q.   And if you look at the fifth bullet point down, the fifth

4    bullet point says -- that was also my mistake.  I told you

5    fourth, but it's fifth.

6        If we look at the fifth bullet point, it says, "Full year

7    2012 projection continues to be favorable to plan, primarily

8    driven by lower credit-related expenses resulting from an

9    improved book profile, higher national house prices and REO

10   values, as well as the low interest rate environment impact on

11   the individually impaired reserve."

12       Do you see that?

13   A.   I do.

14   Q.   And the next sentence says -- please highlight this.  It

15   says, "2012 comprehensive income is expected to be sufficient to

16   cover the dividend obligations for the full year."

17       Do you see that sentence?

18   A.   I do.

19   Q.   And so on July 20, 2012, that's what Fannie Mae was saying

20   internally; correct?

21   A.   It appears to be, yes.

22   Q.   And so you were shown a lot of SEC filings.

23       Do you recall that?

24   A.   I do.

25   Q.   The SEC filings -- first of all, you weren't learning the

1  information in the SEC filings from the SEC filings for the

2  first time like an outsider, were you?

3  A.   I'm sorry.  I'm not sure what you mean by that.

4  Q.   Well, all I'm saying is, as the head of the conservator who

5  is in charge of the management and oversight of these two

6  companies, you had access to a lot more information than just

7  what was in the SEC filings; correct?

8  A.   Yes.

9  Q.   For example, you had access to documents like this?  I

10  don't know whether this particular one was sent to you.  Or like

11  the Benson projections, Exhibit 213, you had access to

12  information that doesn't go into an SEC report; correct?

13  A.   Certainly.

14  Q.   Yes.  Okay.  And the SEC reports generally are intended to

15  report the actual facts about the income for that period of

16  time, correct, on the balance sheet?

17  A.   Yes.

18  Q.   And then they have to be very careful to identify risks;

19  correct?

20  A.   Yes, they do.

21  Q.   And isn't it true that they generally have to be

22  conservative, because if they get too optimistic, then people

23  can get misled or they claim they're misled and then try to sue;

24  correct?

25  A.   That's a question better directed to an accountant that

1    knows what these specific rules are.  I do know that SEC filing

2    carries a great -- a heavy dose of expectation about the

3    accuracy and validity of the statements that are there and

4    penalties for misstating.

5    Q.   You had concerns about the long term; correct?

6    A.   Yes, I did, near term and long term.

7    Q.   Okay.  But near term, at least this document, the board of

8    directors of Fannie Mae is saying for 2012 we're not going to

9    need to draw because our dividend is above -- our income is

10   above the dividend?  That's what this is saying; correct?

11   A.   Okay.  That's what it's saying.

12   Q.   So Fannie Mae, you could have waited, and if Freddie Mac

13   was the same, you could have waited because they weren't

14   imminently about to draw down that year on the commitment;

15   correct?

16   A.   As we've discussed before, the ability to make this change

17   was ended at the end of December of 2012.  We are now in

18   August of 2012 when we make this decision.  We're over halfway

19   through the year.  Right?

20       So I just want to be clear, when you say I could have

21   waited, I want to be clear that this decision needed to be made

22   by then, and frankly, we had started this negotiation in January

23   and had largely agreed upon it months before we actually end up

24   executing on it.  But yes.

25       So we need to -- I don't want to be understood as agreeing

1  to I could have waited until 2013 or 2014 or whatever.

2  Q.   Well, I'll be very specific about what I'm asking.  I'll

3  try to be more precise.  What I'm saying is that there was no

4  imminent expectation of having to draw anything for either

5  Fannie Mae or Freddie Mac in August 2012 for the next two

6  quarters; correct?

7  A.   I believe that's correct.  You're asking me to remember at

8  that time what the projections were.  But given this, yes, I

9  will accept that.

10  Q.   All right.  Now, could I quickly show you PX-304?  By the

11  way, we got this in evidence?  Yes.  Okay.  PX-304.

12       PX-304 is an FHFA document from September 10, 2012.

13       Do you see that?

14  A.   I do.  What tab are we at, Mr. Hume?

15  Q.   I'm sorry?

16  A.   What tab are we at?

17  Q.   Oh, this is one of the few I don't have a tab for.  This,

18  it's possible, is not in the binder.  I apologize.  I apologize,

19  Counsel.  This one is not in the binder, but we do have it

20  electronically.  If there's an objection, I understand, and we

21  will --

22            MR. STERN:  It's not admitted.  If I could just --

23            MR. HUME:  I think that's fair.  Maybe we should just

24  move on, and we can deal with this later unless counsel or my

25  colleagues think there's an easier way to deal with it.  It's

1    not essential at this point.  We can move it into evidence with

2    another witness.

3              BY MR. HUME:

4    Q.   I will just ask, Ms. Tagoe was the one in charge of

5    financial modeling at FHFA; correct?

6    A.   Yes.

7    Q.   And Ms. Tagoe is -- you did not ask her to update her -- to

8    do a new set of projections between October 2011 and the

9    decision to do the net worth sweep in August 2012; correct?

10             MR. STERN:  Asked and answered, Your Honor.

11             MR. HUME:  That's true.  It has been, but I was

12   setting the context for the next question.

13             BY MR. HUME:

14   Q.   I just want to be clear for the record, it is not, I

15   assume, the case that the reason you didn't ask Ms. Tagoe and

16   her group to update projections, that is not in any way a

17   reflection on a lack of confidence in her or her team's

18   capability to do useful and competent projections?

19   A.   Certainly not.

20   Q.   Okay.  Did she generally -- is she someone you worked

21   closely with while you were there?

22   A.   Yes.

23   Q.   Did you have a high opinion of her?

24   A.   Did I have?

25   Q.   Did you have a high opinion of her, her professional

1    capabilities?

2    A.    Yes, I did and do.

3    Q.    Okay.  Thank you very much.

4          We do have -- perhaps I could give counsel Exhibit PX-304

5    and ask them to look at this, and perhaps we can get to this in

6    a second.  Thank you.  There are a few things we can hopefully

7    do while counsel looks at that, and I'm not going to go too much

8    longer.

9          I would like -- on a separate topic, you were asked

10   questions -- again, like I started in my examination, you were

11   asked about feeling proud of the net worth sweep because you

12   think it helped the enterprises; correct?

13   A.    I believe I said I was proud of the performance of FHFA

14   during my tenure as acting director.  That was the context of

15   the answer and my statement about that.

16   Q.    And I understand there were a lot of other things you had

17   to do while you were there.

18   A.    Yes, there certainly were.

19   Q.    What I would like to show you is PX-460.  Now, this one is

20   also not in the binder, but this is just a 10-K, and I believe

21   there's a defendant exhibit, the 2012 10-K for Fannie Mae, I

22   believe.

23         Is there an objection to my asking one question about one

24   paragraph in that?

25              COURTROOM DEPUTY:  Plaintiffs' 460 is already in.

1    MR. HUME:  It's in evidence?

2    COURTROOM DEPUTY:  Yes.

3    MR. STERN:  No objection, Your Honor.

4    BY MR. HUME:

5    Q.   PX-460 is simply the SEC -- you were shown a lot of SEC

6    filings.  This may have been one of them.  This is for the 2012

7    year, which is obviously after the net worth sweep had been

8    agreed upon and it was going to take effect in the first quarter

9    of 2013; correct?

10   A.   That's correct.

11   Q.   So on page 54 of the exhibit, 54 of 441, I wanted to direct

12   your attention to just one paragraph.  The paragraph a third of

13   the way down the page that begins with the word "because," do

14   you see that?

15       So this is a disclosure of Fannie Mae in the SEC report

16   after the net worth sweep had been agreed.

17       It says, "Because we are permitted to retain only a limited

18   and decreasing amount of capital reserves through 2017, we may

19   not have sufficient reserves to avoid a net worth deficit if we

20   experience a comprehensive loss in a future quarter."

21       Do you see that?

22   A.   I do.

23   Q.   The next sentence says, "In addition, beginning in 2018, we

24   are not permitted to retain any capital reserves against losses

25   in subsequent quarters."

1    Do you see that?

2    A.    I do.

3    Q.    And then the next -- after the semicolon, it

4    says, "Therefore, if we have a comprehensive loss for a quarter,

5    we will also have a net worth deficit for that quarter."

6    Do you see that?

7    A.    Yes.

8    Q.    Well, isn't it true that that's saying that because of the

9    net worth sweep, we don't have a buffer, we don't have a

10   cushion, and if we have a loss, we're going to go negative?

11   Isn't that what it says?  We're going to have a negative net

12   worth because we're going to have zero cushion under this net

13   worth sweep; correct?

14   A.    It is saying, yes.

15   Q.    Okay.  And then it says, "For any quarter for which we have

16   a net worth deficit, we will be required to draw funds from

17   Treasury under the senior preferred stock purchase agreement in

18   order to avoid being placed into receivership."

19   Do you see that?

20   A.    Yes.

21   Q.    And, of course, when you have to draw funds from Treasury,

22   it also increases your -- well, it doesn't under this.  So I

23   will withdraw that.

24   But it is actually the case, isn't it, that in 2018 they

25   had to draw -- you don't have personal knowledge of that,

1    perhaps -- because of the change in the taxes?  Do you know

2    that?

3    A.   I don't recall the timing of that or the amount.

4    Q.   I will withdraw it.  Just wait a moment, if you would, to

5    see if I have another question on that.  Can you pull that back

6    up just for a minute.

7         I wanted to make sure this was clear.  The way the net

8    worth sweep worked was that it allowed the enterprises, each of

9    them, to keep 3 billion of capital and sweep all the net worth

10   above that in the first year; correct?

11   A.   That's correct.

12   Q.   And then each year thereafter until 2018, that capital

13   amount would shrink by 600 million; correct?

14   A.   Yes.

15   Q.   And that way, by 2018, that reserve capital would shrink to

16   zero; correct?

17   A.   Yes.

18   Q.   Okay.  And that's reflected here as well; correct?

19   A.   Yes.

20           MR. HUME:  Okay.  Now, I'm going to move on to

21   something else.  I will just check with counsel on PX-304.  Are

22   you prepared to address that?

23           MR. STERN:  No objection.

24           MR. HUME:  Thank you very much.  So let's quickly look

25   at PX-304, if we could.

1    THE COURT:  304 is received without objection.

2    (Exhibit PX-304 received into evidence.)

3    MR. HUME:  Thank you, Your Honor.

4    BY MR. HUME:

5  Q.   PX-304 is entitled "FHFA scenarios" and is dated

6  September 10, 2012.

7    Do you see that, Mr. DeMarco?

8  A.   Yes.

9  Q.   But it also has a Fannie Mae logo on it in the bottom

10  right.

11    Do you see that?

12  A.   Yes.

13  Q.   Again, we're sometimes having trouble here.  Can you tell

14  from looking at this, and you don't have a hard copy so we can

15  page through it, but can you tell if this is produced by

16  Ms. Tagoe's group or by Fannie Mae or by a combination of the

17  two?

18  A.   I believe it's produced by Fannie Mae using assumptions

19  that Ms. Tagoe's group would have given them.

20  Q.   And is that the way it normally worked, is that Fannie Mae

21  and Freddie Mac would do their own projections, and then

22  Ms. Tagoe's group would sort of pressure test them by having

23  them rerun them with different inputs or assumptions?  Is that

24  what happened?

25  A.   I don't remember all the details of this, but I do know for

```
1    the annual stress test, she gave them a series of assumptions to

2    apply to their models.

3    Q.   Because she would do an annual stress test --

4    A.   Yes, which we've reviewed previously.

5    Q.   Okay.  Page 20 of 24 is what I would like to look at.  On

6    this page, we have "FHFA base scenario versus September board of

7    directors forecast."

8         Do you see that up top?

9    A.   I do.

10   Q.   Now, remember, this is September 2012, so it's after the

11   net worth sweep has been agreed to; correct?

12   A.   Yes.

13   Q.   And what this shows is FHFA base -- first of all, on the

14   bottom, do you see there's a footnote that says "FHFA base

15   scenario and the September 2012 board forecast," which they're

16   comparing, "reflect actual results through July 2012"?  Do you

17   see that?

18   A.   Yes.

19   Q.   So that means those results would have been available in

20   August of 2012; correct?

21   A.   Probably, yes.

22   Q.   Okay.  And so what it shows, it shows revenues.  It shows

23   losses and expenses, expenses and total expenses and other

24   losses, and then there's a net income line and a final

25   comprehensive income line.
```

1    Do you see that?

2  A.   Yes, I do.

3  Q.   At the comprehensive income line, the FHFA base scenario is

4  $65.1 billion at the bottom there.

5    Do you see that?

6  A.   I do.

7  Q.   And the September board of directors comprehensive income

8  is $62.4 billion.

9    Do you see that?

10  A.   I do.

11  Q.   And so in fact, the FHFA baseline scenario is more

12  favorable than what Fannie Mae's September board of directors

13  were projecting; correct?

14  A.   By a modest amount, yes.

15  Q.   Okay.  And you see at the top, it says "cumulative FY12 to

16  FY16"?  Do you see that?

17  A.   I do.

18  Q.   So this is a projection for 2012, 2013, 2014, 2015, 2016,

19  five years; correct?

20  A.   That's what it reads, yes.

21  Q.   I always have a hard time when it's something like between

22  12 and 16.  Does that mean four or five.  But I believe this

23  means five.

24  A.   I believe so as well.

25  Q.   Okay.  So I don't know if you remember, and we can look up

1    the number, but the dividend to Treasury in 2012 for Fannie Mae

2    was either 11.6 or 11.7 million.  It was going to annualize to

3    11.7 for 2013.

4    A.   Probably billion.

5    Q.   Okay.  And so if you have five times 11.7, that is less

6    than 65.1, the FHFA number; correct?

7    A.   Yes.

8    Q.   So this is projecting comprehensive income over the next

9    five years that was higher than the amount of the 10 percent

10    dividend; correct?

11    A.   Using the base case assumptions.

12    Q.   In the base case, in the base case.  Correct?

13    A.   Yes.

14    Q.   Thank you.  We can take that document down.

15        Now, counsel did ask you some questions again about

16    principal reduction.  I have just one or two very quick

17    questions on that.

18        You had a disagreement with Treasury -- in my examination

19    of you, it came out that there was a disagreement between you

20    and Secretary Geithner in June of 2012 over principal reduction;

21    correct?

22    A.   Yes.

23    Q.   Okay.  And in fact, you were negotiating with him.  He

24    wanted to put it in the Third Amendment; you didn't want it in

25    the Third Amendment?

1   A.   That's correct.

2   Q.   Okay.  And you testified with counsel's questioning that

3   you thought you had a better plan than what the Treasury

4   Department under Secretary Geithner wanted; correct?

5   A.   Yes.  It wasn't a plan.  It was what we were actually

6   doing.

7   Q.   What you were doing in August of 2012; correct?

8   A.   Yes.

9   Q.   So he disagreed with you about that plan?

10  A.   He did.

11  Q.   He didn't think it was a better plan; correct?

12  A.   Correct.

13  Q.   Okay.  And is it true that you had also articulated that

14  plan in writing to other officials in the government?  You had

15  written a letter to Congress about that plan?

16  A.   I had written a letter to Congress explaining my decision

17  to stay with what we were doing rather than adopting the

18  principal reduction alternative that the Treasury was proposing.

19  Q.   Okay.  So I want to show you one document, and I only want

20  to show you one or two things in it.  Okay?  It is PX-500.

21       Please do not show it to the jury, because it's not in

22  evidence.  Thank you.

23            MR. STERN:  And Your Honor, I don't think Mr. Hume

24  would object to my suggesting that the answers to these

25  questions will be strictly limited to the questions that are

1    asked.

2           MR. HUME:  Not at all.

3           BY MR. HUME:

4    Q.  This should be brief, Mr. DeMarco.  This is a letter dated

5    January 20, 2012, from the Federal Housing Finance Agency.

6        Do you see that?

7    A.  I do.

8           MR. HUME:  May I approach?

9           MR. STERN:  With redactions, please.

10          MR. HUME:  We don't have it redacted.

11          BY MR. HUME:

12    Q.  We will do it this way, Mr. DeMarco.  I just want to show

13    you that this is signed by you.  I think it's on the second or

14    third page.

15          MR. STERN:  We will stipulate to that, Your Honor.

16          MR. HUME:  Okay.  Thank you.

17          COURTROOM DEPUTY:  What was the exhibit number?

18          MR. HUME:  This letter dated January 20, 2012, from

19    the Federal Housing Finance Agency to a committee at Congress

20    was signed by Mr. DeMarco, and defense counsel has stipulated to

21    that.

22       I'm sorry if I misheard your question, Ms. Jenkins.

23          COURTROOM DEPUTY:  It's not in.

24          MR. HUME:  I'm going to move it in shortly.

25          MR. STERN:  This is by agreement, Your Honor.

```
 1              MR. HUME:  Can we not show the witness the physical

 2     document?

 3              MR. STERN:  So long as the witness -- yes.

 4              BY MR. HUME:

 5     Q.   Mr. DeMarco, your counsel has graciously made an agreement

 6     on how we should show this.  So please don't in your answer read

 7     things or talk about things that aren't strictly asked.  Okay?

 8     A.   All right.

 9              MR. HUME:  I'm going to approach and hand it to the

10     witness, if I may.

11              MR. STERN:  It may be a hand redaction or --

12              MR. HUME:  Sure.

13              MR. STERN:  Thank you.

14              BY MR. HUME:

15     Q.   There's very little about this document that I need to ask

16     you about.

17     A.   Okay.

18     Q.   It's going to come into evidence with a few redactions,

19     which is why we're being so careful and lawyerly about this.

20     Okay?

21          May I approach?

22              THE COURT:  Yes.

23              BY MR. HUME:

24     Q.   Mr. DeMarco, can you see that you signed this letter of

25     January 20th, 2012, on the third page?
```

 1              MR. STERN:  We stipulate to that, Your Honor.

 2              THE WITNESS:  Okay.

 3              MR. STERN:  Your Honor, we will stipulate to that.

 4      It's a little odd.

 5              BY MR. HUME:

 6      Q.   So Mr. DeMarco, in general, just one or two general

 7      questions, would you agree with me that this is a letter you

 8      sent to Congress addressing the question of principal reduction

 9      that I was just asking you about a moment ago?

10      A.   It appears to be a letter I sent --

11              MR. STERN:  Yes or no, if he can, Your Honor.

12              BY MR. HUME:

13      Q.   It's yes or no.

14      A.   I'm sorry.  Repeat the question.

15      Q.   The question is simply whether in general this letter is a

16      letter you sent to a congressional committee containing the

17      FHFA's analysis or some of its analysis on this issue of how

18      best to go about principal reduction.

19      A.   Yes.

20      Q.   And does the letter attach several pages of analysis that

21      the FHFA had done?

22      A.   Yes.

23      Q.   Okay.  And in the third paragraph underneath the words

24      "statutory requirements," could I just direct you to one

25      sentence there.

1  A.   Okay.

2  Q.   In the second sentence of that paragraph, it says, "First,

3  FHFA has a statutory responsibility as conservator to preserve

4  and conserve the assets and the property of the regulated

5  entities."

6       Do you see that?

7  A.   I do.

8  Q.   So that goal or responsibility of preserving and conserving

9  the assets and property of the regulated entities was still

10  relevant in 2012; correct?

11  A.   Yes.

12  Q.   On the second page, I would like to refer you to the second

13  full paragraph.  Do you see the paragraph beginning "another

14  factor"?

15  A.   Yes.

16  Q.   It says, "Another factor to consider is that nearly 80

17  percent of enterprise underwater borrowers were current on their

18  mortgages as of June 30, 2011."

19       Do you see that?

20  A.   I do.

21  Q.   It then says in parentheses, "Even for more deeply

22  underwater borrowers, those with mark-to-market loan-to-value

23  ratios above 115 percent, 74 percent are current," end

24  parentheses.

25       Do you see that?

1    A.   I do.

2    Q.   I'm not going to ask you to unpack that, but just walking

3    through one more sentence.  It then says, "This trend contrasts

4    with nonenterprise loans where many underwater borrowers are

5    delinquent."

6         Do you see that?

7    A.   I do.

8    Q.   Just to make sure I understand the general gist of that

9    paragraph, is the following a fair characterization, yes or no,

10   if you can:  Is what you're saying there in substance that one

11   reason why you at FHFA, you were taking the position as acting

12   director of FHFA of not wanting to do principal reduction as

13   requested by Secretary Geithner but to do it your own different

14   way was because even underwater borrowers were -- a high

15   percentage of them relatively were staying current on their

16   mortgages and were actually able to pay?  Things were getting

17   better or things were not that bad, they were coping, they were

18   going in the right direction; is that basically right?

19   A.   Had you not gone to that last part of it, the answer is

20   yes.

21   Q.   Okay.  So it's yes that they were staying current and

22   that's what you were -- the last part of it you would take out

23   is that --

24   A.   Your commentary about market conditions.

25            MR. HUME:  Your Honor, we would like to move PX-500 --

1   we asked about the analysis.  We will move PX-500 into evidence,

2   Your Honor.

3            MR. STERN:  No objection.  We would publish it to the

4   jury at a later time after redactions, Your Honor.

5            MR. HUME:  Yes.

6            THE COURT:  Received as redacted.

7       (Exhibit PX-500 received into evidence.)

8            BY MR. HUME:

9   Q.   I would like to show you PX-246, which I think is, it

10  certainly should be, in your binder, and we can pull it up on

11  the screen, and I believe it's in evidence.

12      Is PX-246 in evidence, Ms. Jenkins?

13           COURTROOM DEPUTY:  One second.  No.

14           MR. HUME:  No, this is not.  I would like PX-247.

15           COURTROOM DEPUTY:  Yes.

16           MR. HUME:  Which is in the binder.  My apologies,

17  members of the jury.  We try to be as smooth as we can, but it's

18  not always perfect, to say the least, and it's my fault.

19           BY MR. HUME:

20  Q.   You were shown this by counsel for the defendants,

21  Mr. Stern, and it's an e-mail from Mario Ugoletti to you on

22  August 9, 2012.

23      Do you see that?

24  A.   Yes.

25  Q.   And this is the one that says "close hold."

1       Do you remember that?

2   A.   Yes.

3   Q.   "PSPA alert," do you see that, subject?

4   A.   Yes.

5   Q.   And just highlight the date, 8/9/2012.

6        So this is eight days before the net worth sweep is

7   announced; correct?

8   A.   Yes.

9   Q.   It was announced on August 17th, 2012.  Do you remember

10  whether you signed it on the 17th or the 16th?

11  A.   I do not recall.

12  Q.   Okay.  The first sentence says -- Mr. Ugoletti writing to

13  you and others at the FHFA, says, "As a heads-up, there appears

14  to be a renewed push to move forward on PSPA amendments."

15       Do you see that?

16  A.   I do.

17  Q.   Mr. Stern went through the rest of the paragraph with you.

18  I just wanted to ask you this question:  Was it your

19  understanding when you received this that that renewed push came

20  from Treasury?

21  A.   Yes.

22  Q.   Okay.  I would like to show you PX -- oh, one other

23  question about this.  August 9th, 2012, can we show the date

24  again?  That would have been two days or -- one or two days

25  after Fannie Mae and Freddie Mac publicly released their second

1    quarter earnings showing profits above the 10 percent dividend

2    amount; correct?

3    A.   Yes.

4    Q.   Okay.  I'd then like to show PX-254.  This is an e-mail --

5    is this in evidence?

6             COURTROOM DEPUTY:  No.

7             MR. HUME:  May I move PX-254 into evidence.

8             MR. STERN:  No objection.

9             THE COURT:  Received.

10        (Exhibit PX-254 received into evidence.)

11            BY MR. HUME:

12   Q.   This is an e-mail from Mary Miller to you on August 12,

13   2012.

14        Do you see that?

15   A.   Yes.

16   Q.   It's an e-mail chain.  And Ms. Miller was under secretary

17   for domestic finance; correct?

18   A.   Yes.

19   Q.   She's quite a senior person at the Department of Treasury?

20   A.   Yes, she was.

21   Q.   Okay.  If we could scroll down to the bottom part, the

22   first e-mail in the chain, we see Mary Miller, August 12,

23   2:15 p.m.  It's a Sunday.  And she says -- it's to you.  Let's

24   highlight who it is to.

25        Do you see all that, Mr. DeMarco?

1  A.   Yes, I do.

2  Q.   The first sentence says, "I'm sure you are aware of the

3  work going on with the PSPA agreements."

4       Do you see that?

5  A.   Yes.

6  Q.   And she's talking about the Third Amendment?

7  A.   Yes.

8  Q.   And the net worth sweep; correct?

9  A.   Yes.

10 Q.   The next sentence says, "I thought it would be good if we

11 touched base to discuss communication with the GSEs around

12 this."

13 A.   Yes.

14 Q.   And the GSEs were told on the 15th about the net worth

15 sweep?

16 A.   That's my recollection.

17 Q.   The next sentence says, "I did not want to disturb your

18 vacation time, but I am available any time to discuss this."

19      Do you see that?

20 A.   Yes.

21 Q.   Could you just tell us where -- excuse me.

22      Can you tell us, do you recall being on vacation at this

23 time?

24 A.   Yes, I do.

25 Q.   And were you at the beginning or end of your vacation?  Do

1    you recall?

2    A.    That would have been the end.

3    Q.    Okay.  So do you know when you came back from vacation?

4    A.    The normal pattern would have been I got home the -- got

5    back the day before this e-mail.  So I was on vacation when the

6    previous exhibit you put up from August 9th from Mr. Ugoletti

7    about the renewed push, I was on vacation at that time.

8    Q.    Understood.  Thank you.  I would now like to quickly show

9    PX-284.  I do not have much longer.  I know I've been going for

10   a while.

11       PX-284, if we look at the top, it's an e-mail from

12   August 17th.  If we go a little bit further down, please, in the

13   e-mail -- could I move PX-284 into evidence, please.  It's a

14   Freddie Mac e-mail.

15            MR. STERN:  Court's indulgence.  No objection, Your

16   Honor.

17            THE COURT:  Received.

18       (Exhibit PX-284 received into evidence.)

19            MR. HUME:  Thank you.

20            BY MR. HUME:

21   Q.    The e-mail here on the screen from Sharon McHale to Don

22   Layton at Freddie Mac, do you see that?

23   A.    I do.

24            MR. STERN:  I'm sorry, Mr. Hume, if I missed it.  Is

25   there a tab number?

```
 1              MR. HUME:  53.

 2              MR. STERN:  Thank you.

 3              BY MR. HUME:

 4   Q.   And this e-mail, the subject is "Treasury announcement."

 5        Do you see that, Mr. DeMarco?

 6   A.   Yes.

 7   Q.   And Ms. McHale writes to -- and Don Layton was the CEO of

 8   Freddie Mac at the time?

 9   A.   Yes, he was.

10   Q.   Do you know who Sharon McHale was?

11   A.   I believe she was in the communications department.

12   Q.   At Freddie Mac?

13   A.   At Freddie Mac.

14   Q.   And the subject is "Treasury announcement."

15        Do you see that?

16   A.   Yes.

17   Q.   And she says, "Don, you've probably already seen this, but

18   wanted to make sure you saw how Treasury was characterizing

19   this."

20        Do you see that?

21   A.   Yes.

22   Q.   And then it starts -- it seems like she may have pasted in

23   the Treasury press release, because it says, "Treasury

24   Department announces further steps to expedite wind-down of

25   Fannie Mae and Freddie Mac."
```

 1          Do you see that?

 2     A.   Yes.

 3     Q.   Do you recall seeing the Treasury announcement of the net

 4     worth sweep on August 17th, 2012?

 5     A.   I do.

 6     Q.   And -- okay.  Let's just scroll down and see what else it

 7     says.

 8          The next sentence says, "Modifications to preferred stock

 9     purchase agreements will make sure that every dollar of earnings

10     Fannie Mae and Freddie Mac generate will benefit taxpayers."

11          Do you see that?

12     A.   I do.

13     Q.   And when it says "taxpayers," that's the same as saying

14     Treasury; correct?

15     A.   Yes.

16     Q.   And if we could scroll down a little further, Mr. DeRita.

17     Thank you.

18          The first paragraph says, "The U.S. Department of the

19     Treasury today" -- you don't need to highlight this.

20          Just following along with me, Mr. DeMarco, "The U.S.

21     Department of the Treasury today announced a set of

22     modifications to the preferred stock purchase agreements between

23     the Treasury Department and the Federal Housing Finance Agency,

24     as conservator of Fannie Mae and Freddie Mac, the

25     government-sponsored enterprises or GSEs.  That will help

1    expedite the wind-down of Fannie Mae and Freddie Mac."

2         Can you highlight that, please.  Okay.

3         That wasn't your understanding of why you were doing the

4    net worth sweep, was it?

5    A.   No.

6    Q.   It then says, comma, "make sure that every dollar of

7    earnings each firm generates is used to benefit taxpayers."

8         Do you see that?

9    A.   I do.

10   Q.   Okay.  Thank you with that exhibit.

11        Do you recall that when the announcement came out -- you

12   saw that was before 9:00 a.m. on Friday, August 17th?

13   A.   I'm sorry?

14   Q.   Do you see the e-mail is before 9:00 a.m.?

15   A.   Yes.

16   Q.   Do you see that?

17   A.   I do.

18   Q.   And do you recall -- I don't know if you do.  Do you recall

19   that the price of the Fannie Mae and Freddie Mac preferred stock

20   and common stock plummeted dramatically after that release?

21   Correct?

22   A.   I do not recall that.  I do recall that their debt and MBS

23   spreads improved.

24   Q.   Okay.  So you don't have any recollection of the stock

25   dropping?

1   A.   You asked me did I recall it dropping by half or whatever

2   the word you said, and I don't.

3   Q.   Okay.

4   A.   So --

5   Q.   Okay.  That's fine.  Thank you.

6       Now, you testified when I began questioning you yesterday

7   that the net worth sweep was not agreed to in order to

8   demonstrate wind-down from your perspective; correct?

9   A.   From my perspective.

10  Q.   It was not?

11  A.   Correct.

12       MR. STERN:  Your Honor, I object as beyond the scope

13  of my examination.  I didn't get into wind-down.  I have not

14  made any of these objections yet, but --

15       MR. HUME:  I have one question, Your Honor, and he has

16  full redirect, one document to show him on this question.  And

17  he did show the press release.  He showed the GSE press release,

18  but he didn't show the Treasury press release.  So I think it's

19  well within the scope.

20       THE COURT:  What's your next question?

21       MR. HUME:  What's that?

22       THE COURT:  What's your next question?

23       BY MR. HUME:

24  Q.   It's one question from a document, PX-259, which we showed

25  at the beginning of our questioning, which is an e-mail chain

1   from Mr. Griffin to Mr. Satriano on Tuesday, August 14th.  If we

2   go to the bottom -- do you remember me showing you this

3   document, Mr. DeMarco?

4   A.   I do.

5   Q.   It begins say by saying "the meeting with Ed went well."

6        Do you see that?

7   A.   Yes.

8   Q.   And that's a meeting that Mr. Griffin attended with you;

9   correct?

10  A.   Yes.

11  Q.   And then if we scroll up to the top, because remember

12  there's a question about the deferred tax assets and the boards,

13  Mr. Griffin reports to Mr. Satriano, there was a question about

14  rerecording certain deferred tax assets.

15       Do you see that?

16  A.   I do.

17  Q.   It then says, "Jeff indicated both of the boards discussed

18  this at the last meeting based on the view that they were going

19  to be profitable going forward."

20       Do you see that?

21  A.   I do.

22  Q.   Mr. Griffin then says, "I do not think that makes sense

23  given the amendments are designed to demonstrate wind-down."

24       Do you see that?

25  A.   I do.

1   Q.   Now, Mr. Griffin had just had a meeting with you about the

2   Third Amendment; correct?

3   A.   Yes.

4   Q.   And now he's telling Mr. Satriano that he does not think it

5   makes sense to write up the net worth of Fannie Mae and Freddie

6   Mac because the Third Amendment and the net worth sweep are

7   designed to demonstrate wind-down; correct?  That's what it

8   says?

9   A.   That's what it says.

10   Q.   Thank you.  No more questions on that topic.

11        Now, again, you made a number of comments about SEC

12   reports.  We talked about that and that it doesn't show all the

13   internal projections; correct?

14        The SEC reports, it doesn't show everything the company is

15   doing internally about its projections; correct?

16   A.   Correct.

17   Q.   Okay.  So it's not a completely full and comprehensive

18   picture of everything that management is aware of internally;

19   correct?

20   A.   The SEC filing?

21   Q.   Correct.

22   A.   No.

23   Q.   And if we can just pull up PX-205, PX-205 is in evidence.

24   Just as a reminder, it is a memorandum --

25              MR. STERN:  Your Honor, I didn't go anywhere near this

1   in my examination.  I object.

2         MR. HUME:  It's my last question.

3         THE COURT:  Sustained.

4         MR. HUME:  No further questions.

5         MR. STERN:  Your Honor, I do have redirect.

6         THE COURT:  We will take a short recess.

7   (Jury exited courtroom.)

8         THE COURT:  You can step down.

9   Why don't you give counsel a short proffer of what your

10  redirect is, because I might want to have some discussion.  When

11  we're getting into redirect, sometimes I want a proffer myself,

12  but maybe you all can talk about --

13        MR. STERN:  I am happy to make the proffer now.

14        THE COURT:  You all may be able to do it yourself with

15  me or with me.  I don't care.

16        MR. STERN:  Your Honor, I'm going to -- the one

17  question Mr. Hume asked about -- he made the point that we're

18  here about 2012 --

19        THE COURT:  You need to speak into the microphone.

20        MR. STERN:  I'm sorry.  Thank you.  Jonathan Stern for

21  defendants.

22  Here's a preview for the Court and Mr. Hume.  Mr. Hume made

23  the point that we're here about 2012, not '8, '9, '10, '11.  I

24  have one question about that.

25        THE COURT:  Okay.

1      MR. STERN:  One question about SEC filings.

2   Mr. Hume read a question and answer from the transcript,

3   but he did not read the complete answer.

4      THE COURT:  Okay.  You're in the ballpark.

5      MR. STERN:  And then one question, it's about the

6   liquidation preference.  It relates to the rest of that

7   sentence, one question about that.

8      THE COURT:  Okay.

9      MR. STERN:  Mr. Hume elicited from Mr. DeMarco that

10  there were no imminent expectations of a draw for the first two

11  quarters of 2012.  One question about that.

12  One question about stress case and its significance to

13  Mr. DeMarco.

14  Then just two more questions, Your Honor.  One, Mr. Hume

15  asked Mr. DeMarco questions about what would happen if things

16  went bad, what would happen if they went good and went bad.  I

17  have one question that could evolve into maybe two or three.

18  And then I have one question about -- maybe more than one,

19  but one small area about how the net worth sweep works, which is

20  something that Mr. Hume went into directly, and that would be

21  it.

22      THE COURT:  Okay.  All right.  I give up, but you all

23  have about beat this horse to death.

24      MR. STERN:  I understand, Your Honor.  This horse is

25  lying on the floor already.

1    MR. ZAGAR:  If I may, Your Honor.  Eric Zagar for the

2    plaintiffs.

3    Once Mr. DeMarco is finally dismissed, the next order of

4    business will be some more video depositions.

5    THE COURT:  I figured.

6    MR. ZAGAR:  In these depositions, there are some

7    documents that have not yet been admitted.  So I would like to

8    do that before they're played.

9    Thank you, Your Honor.

10   (Recess taken from 3:07 p.m. to 3:19 p.m.)

11   (Jury not present.)

12   THE COURT:  You can bring in Mr. DeMarco.

13   MR. STERN:  Your Honor, I'm sorry.  We may have missed

14   this.  You would like us to bring in the witness?  Thank you,

15   Your Honor.

16   (Jury entered courtroom.)

17   THE COURT:  You may be seated.  Now, if this were the

18   defense case, they would have an opportunity to ask a few more

19   questions on what we call redirect.  Then if it were back in the

20   plaintiffs' case, there would have been the opportunity for the

21   plaintiff to ask a few more possible questions in re-redirect.

22   So I've gone through with them how limited their questions

23   hopefully will be, and we will try to wind this up in just a few

24   more minutes.

25   Mr. Stern?

1      MR. STERN:  Thank you, Your Honor, and I will indeed

2   be limited.

3                      RECROSS-EXAMINATION

4      BY MR. STERN:

5   Q.   Mr. DeMarco, during his examination of you, Mr. Hume

6   discussed with you various projections that were discussed at

7   internal management meetings at Fannie and, I think, some at

8   Freddie.

9        Do you recall those questions and answers?

10  A.   Yes.

11  Q.   And discussions about projections in particular, do you

12  recall those questions and answers?

13  A.   Yes.

14  Q.   And we've also spent a lot of quality time with SEC filings

15  over the last few days; right?

16  A.   Yes, we have.

17  Q.   All right.  As between SEC filings from a company signed by

18  its senior executives under pain of civil and criminal penalties

19  and comments made at those kinds of meetings, which would you

20  give more weight to as expressing the views of the company?

21  A.   The SEC filings.

22  Q.   You were asked by Mr. Hume -- Mr. Hume in a question

23  pointed out to you that during my questioning you had talked a

24  lot about events of 2008, 2009, 2010, 2011, and Mr. Hume asked

25  you whether you understood that this case was about 2012, and

1   you said yes.

2          Do you recall those questions and answers?

3   A.   Yes.

4   Q.   My question to you is, did the events of 2008, 2009, 2010,

5   and 2011 inform your thinking in 2012 and in particular your

6   thinking about agreeing to the net worth sweep?

7   A.   Yes.

8   Q.   Mr. Hume reviewed with you testimony that you gave at your

9   2015 deposition.

10         Do you recall those questions?

11  A.   Yes.

12  Q.   And is that at tab 1 of your binder?

13  A.   The binder has been removed, but it was tab 1 of the

14  binder, yes.

15         MR. STERN:  Can I borrow your -- thank you very much,

16  Mr. Hume.  I appreciate that.

17         May I approach, Your Honor?

18             THE COURT:  Yes.

19             BY MR. STERN:

20  Q.   So if you could go to that transcript, tab 1.

21  A.   Okay.

22  Q.   Are you there?

23  A.   Yes.

24  Q.   Okay.  Mr. Hume --

25  A.   I'm sorry, Mr. Stern.  Which page are we on?

1    Q.   I'm getting there.

2    A.   I'm sorry.

3    Q.   Mr. Hume reviewed with you testimony that began at page

4    201, line 9.

5    A.   Okay.

6    Q.   And the question that Mr. Hume recited read as follows --

7    Court's indulgence.

8         The question was, "But I'm not asking what the market

9    reaction is.  I'm just asking what the mechanics of the funding

10   commitment -- of this funding commitment remains untouched and

11   undiminished in a quarter in which the companies fail to pay a

12   10 percent cash dividend and increase the dividend preference --

13   the liquidation preference by 12 percent."

14        And Mr. Hume read with you the first four lines of your

15   answer, but your answer went on.  So I'm going to -- would you

16   please read your complete -- well, let me put it this way.

17   Withdrawn.

18        Mr. Hume read with you the first part of your answer where

19   you say you "don't recall discussing -- for me to be able to

20   answer that question with certainty would require consultation

21   with people that understand the general -- the legal framework

22   of this document."

23        Do you see that?  That's what you testified to earlier?

24   A.   Yes.

25   Q.   But your answer continued, and you did give what you

1    referred to as your general understanding; is that right?

2    A.    Yes.

3    Q.    Can you read that part of the answer picking up with the

4    word "and" at line 22 of page 201 and going to the end of that

5    answer on page 202.  And keep your voice up, if you would,

6    Mr. DeMarco.

7    A.    "And so my general understanding is that the penalty would

8    have resulted in a higher liquidation preference, and ultimately

9    that higher amount, that that would have to have been paid in

10   cash at some point in the future.  But it -- it would not have

11   reduced the amount of capital draw left."

12   Q.    Thank you.  You testified in response to questions from

13   Mr. Hume that -- I'm sorry.  With respect to the first two

14   quarters of 2013, just to orient us, you had an exchange with

15   Mr. Hume about those two quarters.

16         And as I noted your testimony, you testified in response to

17   Mr. Hume's question to the effect that you had no imminent

18   expectation of a draw for the next two quarters.

19         Do you remember that testimony?

20   A.    I believe so, yes.

21   Q.    And was that a reference to the first two quarters of 2013?

22   A.    That's what we were talking about.

23   Q.    What influence, if any, did the fact that you did not have

24   an imminent expectation of a draw for those two quarters have on

25   your thinking about entering into the -- agreeing to the net

1   worth sweep?

2   A.   It did not enter into it.

3   Q.   Why not?

4   A.   Because I was looking at the long-term resiliency of the

5   commitment and of these companies under a whole array of

6   possible outcomes.

7   Q.   So when you say longer term, how much longer term than two

8   quarters were you trying to think about?

9   A.   Every time the companies issued a new 30-year mortgage

10   backed security, I had a responsibility to make sure that

11   commitment was resilient for the life of that security.

12   Q.   So 30 years is 120 quarters; is that right?

13   A.   That's a long time.

14   Q.   Okay.  Mr. Hume showed you a variety of projections that

15   were -- from Fannie and Freddie that were based on base case

16   scenarios.  In my questions to you, we had talked about the

17   three scenarios.

18       Is the base case scenario the scenario that was principally

19   driving your thinking and decisionmaking about agreeing to the

20   net worth sweep?

21   A.   No.

22   Q.   What was the scenario that was driving your thinking and

23   decisionmaking?

24   A.   The negative scenario, the worst case or, you know, bad

25   outcome, the stress scenario.

1  Q.   And just briefly, why not the -- why the stress scenario

2  and not the base scenario?

3  A.   Because I had a responsibility to ensure that the country's

4  housing finance system could withstand bad outcomes that I

5  couldn't foresee or predict but that could happen.  That's why.

6  Q.   Mr. Hume asked you some questions about how the dividends

7  that Fannie and Freddie would pay would be different with and

8  without the net worth sweep.

9       Do you recall that?

10  A.   Yes.

11  Q.   So I would like to ask you about that.  Before the net

12  worth sweep, if Fannie and Freddie had negative net worth in a

13  given quarter, they would still owe the full 10 percent dividend

14  to Treasury; is that right?

15  A.   Yes.

16  Q.   And that's because the 10 percent dividend was fixed?

17  A.   Yes.

18  Q.   And in that situation where Fannie and Freddie's net worth

19  in a quarter was negative, they would have to draw on the

20  Treasury commitment to pay the fixed 10 percent dividend; right?

21  We've reviewed all that?

22  A.   Yes.

23  Q.   Now, let's talk about after the net worth sweep.  After the

24  net worth sweep, if Fannie or Freddie have negative worth or

25  zero net worth for a quarter, how much do they owe in a

1    dividend?

2    A.   Nothing.

3    Q.   And what if Fannie and Freddie had a positive net worth for

4    a given quarter but it wasn't enough to pay a 10 percent

5    dividend?  Under the net worth sweep, how much would they owe in

6    dividends in that quarter?

7    A.   Only the amount of the net worth minus whatever buffer they

8    were permitted to retain.

9    Q.   And would they have to draw on the Treasury commitment to

10   pay their dividend obligations --

11   A.   No.

12   Q.   -- under that -- let me finish the question.

13   A.   I'm sorry.

14   Q.   Under that scenario after the net worth sweep?

15   A.   No.

16   Q.   And under the net worth sweep, do Fannie or Freddie ever

17   owe more in dividends than they have in net worth?

18   A.   No.

19   Q.   So what if Fannie or Freddie makes $1 in a quarter, just

20   $1?  How much would they owe in dividends in that quarter?

21   A.   $1.

22   Q.   What if the 10 percent would have been 10 billion but only

23   $1 is their net worth?  How much would they owe?

24   A.   $1.

25   Q.   Okay.  Last question, Mr. DeMarco, for me.  Mr. Hume asked

1    you questions about what would happen if things went well.

2         Do you recall those questions?

3    A.   Yes.

4    Q.   And he suggested some questions where things might not have

5    gone so well.  But I want to ask you directly.

6         If based on economic conditions, before the Third Amendment

7    and before the net worth sweep, if the market lost confidence in

8    the Treasury commitment as a backstop to keep the lights on at

9    Fannie and Freddie, as I believe you've put it, what might

10   happen?  Why was this something that you were so worried about?

11   A.   Because if the market lost confidence in the resiliency of

12   that commitment, they would stop buying mortgage-backed

13   securities issued by Fannie Mae and Freddie Mac.  That would

14   greatly erode the liquidity of the mortgage market, making it

15   very difficult and also very expensive for a potential home

16   buyer to be able to get a mortgage.

17   Q.   And what impact might that have on the entire U.S. economy?

18   A.   Then that would drive down house prices, because people

19   wouldn't be able to borrow to buy houses, and that would have

20   then knock-on effects on the whole economy.  We certainly saw in

21   2008 the effect on the whole economy that a disruption in the

22   housing market could have.

23   Q.   And am I -- do I understand correctly that you agreed to

24   the net worth sweep to prevent all that from happening?

25   A.   Yes.

1          MR. STERN:  No further questions, Your Honor.

2          MR. HUME:  No further questions, Your Honor.

3          THE COURT:  Okay.  Mr. DeMarco, you may step down.

4          THE WITNESS:  Thank you, Your Honor.

5          THE COURT:  The plaintiffs want to -- what do you want

6     to do next?

7          MR. ZAGAR:  Thank you, Your Honor.  Eric Zagar for the

8     plaintiffs.

9          So what we have next, we have two video depositions.  Each

10    one of them is just shy of an hour and a half.  We might not

11    even have time for one; we probably don't have time for both.

12         But for convenience, there are 16 documentary exhibits that

13    are referred to in these depositions, and we would like to move

14    these in now.  I have copies of all of them.  I'm happy to hand

15    them up if Your Honor wants to see them.  But I can just go

16    through the numbers if that's preferred.

17         THE COURT:  Okay.

18         MR. ZAGAR:  And counsel will correct me.  I believe

19    these are -- there's no objections.

20         THE COURT:  Okay.

21         MR. ZAGAR:  So we have PX-122 -- these are all PXs --

22    186, 190, 197, 209, 216, 244, 253, 327, 340, 348.

23         THE COURT:  Slow down a little bit.  340, then?

24         MR. ZAGAR:  340, 348, 353, 370, 471, 474, and 479.

25         THE COURT:  Okay.  Without objection, they're all

1    received.

2        (Exhibits PX-122, PX-186, PX-190, PX-197, PX-209, PX-216,

3    PX-244, PX-253, PX-327, PX-340, PX-348, PX-353, PX-370, PX-471,

4    PX-474, and PX-479 received into evidence.)

5            THE COURT:  And the first video is who?

6            MS. DAVIS:  Good afternoon, Your Honor.  Kenya Davis

7    for the plaintiffs.

8        We will present now the deposition testimony of Naa Awaa

9    Tagoe.  Last name is spelled T-a-g-o-e.  She's the deputy

10   director of the Division of Housing Mission and Goals for the

11   Federal Housing Finance Agency, FHFA.

12           THE COURT:  Okay.

13       (Video deposition of Naa Awaa Tagoe played.)

14           MR. HUME:  I apologize to the members of the jury and

15   the Court.  This is Hamish Hume for the plaintiffs.

16       Also -- I know that it's late on a Friday -- our estimate

17   is that this will finish at five minutes after 5:00.  So we have

18   about 20 more minutes.  I'm very sorry for the technical

19   difficulties.

20       Thank you.

21       (Video played.)

22           MR. HUME:  This is Hamish Hume again for the

23   plaintiffs.

24       We will hopefully get this ironed out shortly.  I do want

25   to assure the jury and the Court that we did do trial runs of

1    this, and it worked fine.  We will find out what the problem is

2    to avoid it in the future.

3         We're almost done.  Thank you.

4         (Video played.)

5              MR. HUME:  Hamish Hume for the plaintiffs, Your Honor.

6    So that concludes Ms. Tagoe's deposition testimony.

7              THE COURT:  All right.  Ladies and gentlemen of the

8    jury, thank you for your patience.  That concludes our day.

9    Don't talk about the case.  Don't let anyone talk to you about

10   the case.  Have a nice weekend.  I will see you all at 10:00 on

11   Monday.  Don't Twitter or tweet or any of those things.

12        Leave your notes in the jury room, if you would.  Have a

13   nice weekend.

14        (Jury exited courtroom.)

15        (Discussion off the record.)

16        (Proceedings adjourned at 5:15 p.m.)

17

18

19

20

21

22

23

24

25

1   CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Sara A. Wick, certify that the foregoing is a

4   correct transcript from the record of proceedings in the

5   above-entitled matter.

6

7

8   /s/ Sara A. Wick_____          October 22, 2022_____

9   SIGNATURE OF COURT REPORTER          DATE

## $

**$1** [2] - 1064:21, 1064:24
**$1,000** [2] - 1015:4, 1015:5
**$10** [1] - 1014:18

## '

**'10** [3] - 989:14, 1002:19, 1055:23
**'11** [3] - 989:14, 1002:19, 1055:23

## /

**/s** [1] - 1069:8

## 1

**1** [9] - 1008:14, 1008:15, 1015:2, 1059:12, 1059:13, 1059:20, 1064:19, 1064:20, 1064:23
**10** [31] - 990:21, 996:24, 1005:6, 1006:2, 1006:21, 1007:24, 1008:23, 1009:16, 1010:14, 1014:2, 1018:4, 1019:23, 1020:2, 1020:22, 1021:21, 1023:4, 1023:8, 1023:21, 1023:22, 1023:23, 1028:12, 1034:6, 1037:9, 1046:1, 1060:12, 1063:13, 1063:16, 1063:20, 1064:4, 1064:22
**10-K** [2] - 1030:20, 1030:21
**10-Ks** [1] - 1002:1
**10-year** [1] - 992:6
**100** [4] - 997:12, 997:15, 1008:15, 1010:19
**10020** [1] - 985:7
**1012** [1] - 986:8
**1024** [1] - 986:9
**1034** [1] - 986:10
**1044** [1] - 986:11
**1046** [1] - 986:12
**1048** [1] - 986:13
**1058** [1] - 986:4
**1067** [1] - 986:16
**10:00** [1] - 1068:10
**11** [1] - 1016:11

**11.6** [1] - 1037:2
**11.7** [3] - 1037:2, 1037:3, 1037:5
**113** [4] - 997:17, 997:19, 997:20, 998:11
**115** [1] - 1042:23
**118** [1] - 994:10
**118.3** [4] - 993:23, 994:6, 994:11, 995:19
**12** [19] - 1000:20, 1006:2, 1006:12, 1006:20, 1007:18, 1007:24, 1008:24, 1009:17, 1009:22, 1010:14, 1019:23, 1020:3, 1020:18, 1021:10, 1022:1, 1036:22, 1046:12, 1046:22, 1060:13
**120** [2] - 988:18, 1062:12
**123** [1] - 985:3
**124.8** [4] - 993:21, 994:5, 994:11, 995:5
**1251** [1] - 985:6
**13-cv-1053** [1] - 984:4
**13-mc-1288** [1] - 984:8
**1401** [1] - 984:22
**148.3** [4] - 992:1, 992:7, 995:9, 995:23
**14th** [1] - 1053:1
**1523** [1] - 984:16
**15th** [1] - 1047:14
**16** [2] - 1036:22, 1066:12
**16th** [1] - 1045:10
**17.7** [1] - 1002:15
**17th** [5] - 1045:9, 1045:10, 1048:12, 1050:4, 1051:12
**186** [1] - 1066:22
**19** [2] - 988:18, 988:22
**190** [1] - 1066:22
**19087** [1] - 984:19
**197** [1] - 1066:22
**19801** [1] - 985:4
**1:38** [1] - 984:10
**1st** [2] - 1004:24, 1005:3

## 2

**2** [7] - 997:16, 997:17, 1000:4, 1008:11, 1008:13, 1008:14, 1012:15
**2(a** [1] - 1013:8
**2(b** [3] - 1013:7,

1019:12, 1020:13
**20** [7] - 1023:15, 1024:10, 1025:19, 1035:5, 1039:5, 1039:18, 1067:18
**200** [1] - 993:10
**20001** [2] - 985:12, 985:16
**20005** [1] - 984:23
**20036** [1] - 984:16
**2008** [5] - 989:13, 1012:25, 1058:24, 1059:4, 1065:21
**2009** [4] - 1002:19, 1004:25, 1058:24, 1059:4
**201** [4] - 1008:12, 1008:18, 1060:4, 1061:4
**2010** [2] - 1058:24, 1059:4
**2011** [5] - 989:18, 1029:8, 1042:18, 1058:24, 1059:5
**2012** [52] - 990:24, 993:6, 993:21, 994:20, 994:25, 995:4, 995:6, 996:22, 996:25, 997:7, 998:15, 999:12, 1000:2, 1002:15, 1004:5, 1005:22, 1024:11, 1025:7, 1025:15, 1025:19, 1027:8, 1027:17, 1027:18, 1028:5, 1028:12, 1029:9, 1030:21, 1031:6, 1034:6, 1035:10, 1035:15, 1035:16, 1035:20, 1036:18, 1037:1, 1037:20, 1038:7, 1039:5, 1039:18, 1040:25, 1042:10, 1044:22, 1045:9, 1045:23, 1046:13, 1050:4, 1055:18, 1055:23, 1056:11, 1058:25, 1059:5
**2013** [8] - 1001:21, 1002:3, 1028:1, 1031:9, 1036:18, 1037:3, 1061:14, 1061:21
**2014** [2] - 1028:1, 1036:18
**2015** [5] - 1008:5, 1008:11, 1008:15, 1036:18, 1059:9

**2016** [1] - 1036:18
**2017** [1] - 1031:18
**2018** [4] - 1031:23, 1032:24, 1033:12, 1033:15
**202** [2] - 993:22, 1061:5
**202-354-3284** [1] - 985:17
**2020** [6] - 988:9, 990:2, 990:5, 997:16, 997:19, 998:11
**2022** [8] - 984:10, 989:18, 991:5, 992:7, 994:9, 995:1, 995:18, 1069:8
**209** [1] - 1066:22
**20th** [1] - 1040:25
**21** [1] - 984:10
**213** [1] - 1026:11
**216** [1] - 1066:22
**21st** [1] - 1000:2
**22** [2] - 1061:4, 1069:8
**223** [1] - 1024:14
**24** [1] - 1035:5
**244** [1] - 1066:22
**253** [1] - 1066:22
**266.6** [2] - 995:23, 997:2
**273.1** [3] - 995:12, 995:16, 996:18
**280** [1] - 984:19
**2:15** [1] - 1046:23

## 3

**3** [7] - 997:22, 998:12, 1015:24, 1016:1, 1033:9
**3(a** [1] - 1019:13
**30** [3] - 999:16, 1042:18, 1062:12
**30-year** [1] - 1062:9
**304** [1] - 1034:1
**31** [1] - 1012:25
**327** [1] - 1066:22
**333** [1] - 985:15
**34** [1] - 1002:12
**340** [3] - 1066:22, 1066:23, 1066:24
**348** [2] - 1066:22, 1066:24
**35** [1] - 996:6
**353** [1] - 1066:24
**370** [1] - 1066:24
**38** [1] - 987:15
**394** [1] - 999:15
**3:07** [1] - 1057:10
**3:19** [1] - 1057:10

## 4

**441** [1] - 1031:11
**460** [1] - 1030:25
**4704-B** [1] - 985:16
**471** [1] - 1066:24
**474** [1] - 1066:24
**479** [1] - 1066:24
**48** [1] - 1024:21

## 5

**5** [1] - 1023:14
**50** [2] - 1002:10, 1023:15
**53** [1] - 1049:1
**54** [1] - 1031:11
**5:00** [1] - 1067:17
**5:15** [1] - 1068:16

## 6

**6** [1] - 994:14
**6.5** [3] - 994:3, 994:7, 997:1
**600** [1] - 1033:13
**601** [1] - 985:11
**62.4** [1] - 1036:8
**65.1** [2] - 1036:4, 1037:6
**6th** [1] - 1005:3

## 7

**7** [1] - 1024:21
**7.2** [1] - 991:1
**7.3** [1] - 990:25
**74** [1] - 1042:23

## 8

**8** [6] - 1013:10, 1014:21, 1014:22, 1016:22, 1055:23
**8/9/2012** [1] - 1045:5
**80** [1] - 1042:16
**84.8** [1] - 1002:3

## 9

**9** [7] - 989:14, 1000:16, 1000:20, 1008:19, 1044:22, 1055:23, 1060:4
**987** [1] - 986:4
**9:00** [2] - 1051:12, 1051:14
**9th** [2] - 1045:23, 1048:6

## A

**a.m** [2] - 1051:12, 1051:14
**ability** [3] - 1005:23, 1017:6, 1027:16
**able** [7] - 1009:2, 1023:24, 1043:16, 1055:14, 1060:19, 1065:16, 1065:19
**above-entitled** [1] - 1069:5
**accept** [3] - 1020:20, 1020:21, 1028:9
**access** [3] - 1026:6, 1026:9, 1026:11
**accountant** [1] - 1026:25
**accounting** [2] - 998:17, 1002:24
**accrue** [4] - 1009:17, 1013:9, 1013:21, 1020:14
**accrued** [1] - 1016:21
**accuracy** [1] - 1027:3
**accurate** [3] - 998:22, 1009:7, 1021:8
**accurately** [1] - 997:6
**acting** [5] - 1004:22, 1004:25, 1005:8, 1030:14, 1043:11
**action** [1] - 1003:5
**ACTION** [1] - 984:9
**actual** [4] - 1001:25, 1011:25, 1026:15, 1035:16
**add** [6] - 994:24, 995:4, 995:8, 995:22, 1022:1
**added** [7] - 1009:13, 1009:16, 1013:9, 1013:22, 1014:19, 1016:21, 1017:2
**addition** [2] - 1022:17, 1031:23
**address** [3] - 1022:18, 1022:21, 1033:22
**addressing** [1] - 1041:8
**adjourned** [1] - 1068:16
**admitted** [5] - 1012:6, 1012:11, 1024:15, 1028:22, 1057:7
**adopting** [1] - 1038:17
**advance** [1] - 1014:7
**afternoon** [2] - 987:14, 1067:6
**AFTERNOON** [1] - 984:12

**Agency** [5] - 985:8, 1039:5, 1039:19, 1050:23, 1067:11
**AGENCY** [1] - 984:6
**agenda** [1] - 1024:8
**aggregate** [1] - 1015:19
**ago** [4] - 1006:8, 1007:9, 1008:9, 1041:9
**agree** [5] - 997:5, 1014:8, 1021:8, 1021:9, 1041:7
**agreed** [7] - 1005:23, 1027:23, 1031:8, 1031:16, 1035:11, 1052:7, 1065:23
**agreeing** [4] - 1027:25, 1059:6, 1061:25, 1062:19
**AGREEMENT** [1] - 984:9
**agreement** [4] - 1009:11, 1032:17, 1039:25, 1040:5
**agreements** [3] - 1047:3, 1050:9, 1050:22
**aided** [1] - 985:18
**al** [2] - 984:3, 984:6
**alert** [1] - 1045:3
**allow** [1] - 1011:14
**allowance** [1] - 1001:24
**allowances** [1] - 1002:17
**allowed** [3] - 1001:18, 1008:19, 1033:8
**allowing** [1] - 1022:17
**almost** [1] - 1068:3
**alternative** [3] - 1007:11, 1007:23, 1038:18
**amazing** [1] - 995:3
**Amendment** [8] - 993:12, 1007:19, 1037:24, 1037:25, 1047:6, 1054:2, 1054:6, 1065:6
**amendments** [2] - 1045:14, 1053:23
**America** [1] - 1013:16
**Americas** [1] - 985:6
**amount** [21] - 989:10, 991:24, 991:25, 994:10, 1009:13, 1009:18, 1014:18, 1015:19, 1020:5, 1021:11, 1023:13, 1031:18, 1033:3,

1033:13, 1036:14, 1037:9, 1046:2, 1061:9, 1061:11, 1064:7
**analysis** [4] - 1041:17, 1041:20, 1044:1
**animate** [1] - 1019:1
**announced** [3] - 1045:7, 1045:9, 1050:21
**announcement** [4] - 1049:4, 1049:14, 1050:3, 1051:11
**announces** [1] - 1049:24
**annual** [2] - 1035:1, 1035:3
**annualize** [1] - 1037:2
**Answer** [2] - 998:19, 1009:1
**answer** [16] - 1006:10, 1009:2, 1011:17, 1011:21, 1030:15, 1040:6, 1043:19, 1056:2, 1056:3, 1060:15, 1060:18, 1060:20, 1060:25, 1061:3, 1061:5
**answered** [1] - 1029:10
**answers** [4] - 1038:24, 1058:9, 1058:12, 1059:2
**anyway** [1] - 999:10
**apologies** [1] - 1044:16
**apologize** [5] - 1010:4, 1011:10, 1028:18, 1067:14
**APPEARANCES** [2] - 984:14, 985:1
**apply** [1] - 1035:2
**appreciate** [2] - 1006:11, 1059:16
**approach** [4] - 1039:8, 1040:9, 1040:21, 1059:17
**area** [1] - 1056:19
**arithmetic** [3] - 994:17, 997:8, 1002:14
**Arnold** [1] - 985:11
**array** [1] - 1062:5
**articulated** [1] - 1038:13
**asset** [2] - 1002:10, 1002:20
**assets** [5] - 1002:25, 1042:4, 1042:9, 1053:12, 1053:14

**assist** [1] - 1003:4
**Association** [1] - 1001:2
**assume** [3] - 1001:4, 1019:21, 1029:15
**assuming** [1] - 1023:12
**assumptions** [4] - 1034:18, 1034:23, 1035:1, 1037:11
**assure** [1] - 1067:25
**attach** [1] - 1041:20
**attended** [1] - 1053:8
**attention** [4] - 990:12, 1005:14, 1008:7, 1031:12
**August** [17] - 1005:1, 1005:22, 1027:18, 1028:5, 1029:9, 1035:20, 1038:7, 1044:22, 1045:9, 1045:23, 1046:12, 1046:22, 1048:6, 1048:12, 1050:4, 1051:12, 1053:1
**automatically** [1] - 1009:14
**available** [7] - 996:21, 1001:2, 1013:11, 1014:9, 1016:20, 1035:19, 1047:18
**Avenue** [5] - 984:16, 984:22, 985:6, 985:11, 985:15
**avoid** [4] - 1019:9, 1031:19, 1032:18, 1068:2
**Awaa** [2] - 1067:8, 1067:13
**aware** [4] - 1005:24, 1023:6, 1047:2, 1054:18

## B

**backed** [3] - 1001:3, 1062:10, 1065:12
**backstop** [1] - 1065:8
**bad** [5] - 1043:17, 1056:16, 1062:24, 1063:4
**balance** [1] - 1026:16
**ballpark** [1] - 1056:4
**Banking** [1] - 1004:16
**banking** [1] - 1000:24
**BARNES** [1] - 984:15
**BARRY** [1] - 985:2
**bars** [2] - 989:6, 989:13
**base** [11] - 1035:6,

1035:13, 1035:14, 1036:3, 1037:11, 1037:12, 1047:11, 1062:15, 1062:18, 1063:2
**based** [5] - 994:8, 1002:23, 1053:18, 1062:15, 1065:6
**baseline** [3] - 990:5, 991:4, 1036:11
**beat** [1] - 1056:23
**became** [2] - 1004:22, 1005:8
**BEFORE** [2] - 984:1, 984:12
**began** [2] - 1052:6, 1060:3
**beginning** [5] - 1012:24, 1031:23, 1042:13, 1047:25, 1052:25
**begins** [5] - 987:22, 998:12, 1016:12, 1031:13, 1053:5
**below** [3] - 992:14, 1016:17, 1016:22
**Bench** [1] - 1011:7
**bench** [1] - 1011:20
**benefit** [2] - 1050:10, 1051:7
**Benson** [5] - 987:19, 996:20, 996:24, 997:6, 1026:11
**Berger** [1] - 985:5
**BERGMAN** [1] - 985:9
**Berkley** [1] - 984:15
**Bernstein** [1] - 985:5
**best** [2] - 1011:24, 1041:18
**better** [4] - 1026:25, 1038:3, 1038:11, 1043:17
**between** [7] - 1006:20, 1012:9, 1029:8, 1036:21, 1037:19, 1050:22, 1058:17
**beyond** [1] - 1052:12
**big** [4] - 1003:2, 1014:1, 1016:1
**bill** [1] - 1004:3
**billion** [21] - 992:1, 993:10, 994:3, 994:7, 994:14, 997:1, 1002:4, 1002:10, 1002:12, 1002:15, 1014:18, 1015:2, 1023:14, 1023:15, 1033:9, 1036:4, 1036:8, 1037:4, 1064:22

**bills** [4] - 1003:13, 1003:14, 1003:20, 1003:22
**binder** [15] - 987:15, 997:17, 999:16, 1002:1, 1002:2, 1008:11, 1028:18, 1028:19, 1030:20, 1044:10, 1044:16, 1059:12, 1059:13, 1059:14
**bipartisan** [2] - 1004:11, 1004:13
**bit** [5] - 987:16, 992:11, 995:19, 1048:12, 1066:23
**black** [1] - 1018:23
**blow** [1] - 990:13
**blue** [7] - 989:21, 989:25, 996:9, 996:14, 1018:22, 1023:12
**board** [7] - 1024:8, 1024:25, 1027:7, 1035:6, 1035:15, 1036:7, 1036:12
**boards** [2] - 1053:12, 1053:17
**Boies** [1] - 984:22
**book** [1] - 1025:9
**borrow** [2] - 1059:15, 1065:19
**borrowed** [1] - 993:11
**borrowers** [5] - 1003:5, 1042:17, 1042:22, 1043:4, 1043:14
**borrowing** [3] - 992:15, 992:19, 992:21
**bottom** [10] - 990:4, 990:11, 991:11, 993:4, 994:23, 1034:9, 1035:14, 1036:4, 1046:21, 1053:2
**box** [1] - 1023:13
**break** [2] - 987:17, 997:10
**BRIAN** [1] - 984:15
**brief** [1] - 1039:4
**briefly** [1] - 1063:1
**bring** [2] - 1057:12, 1057:14
**brought** [2] - 1005:14, 1008:6
**buffer** [2] - 1032:9, 1064:7
**build** [1] - 1000:6
**building** [1] - 988:3

**bullet** [3] - 1025:3, 1025:4, 1025:6
**burden** [1] - 999:23
**business** [2] - 1000:25, 1057:4
**buy** [1] - 1065:19
**buyer** [1] - 1065:16
**buying** [1] - 1065:12
**BY** [30] - 987:13, 992:20, 998:10, 999:25, 1007:20, 1010:6, 1011:2, 1011:23, 1012:14, 1020:11, 1024:20, 1029:3, 1029:13, 1031:4, 1034:4, 1039:3, 1039:11, 1040:4, 1040:14, 1040:23, 1041:5, 1041:12, 1044:8, 1044:19, 1046:11, 1048:20, 1049:3, 1052:23, 1058:4, 1059:19

**C**

**c)** [1] - 1013:5
**calculator** [1] - 995:3
**calibrate** [1] - 1022:23
**cap** [5] - 991:19, 991:25, 993:7, 993:14, 993:20
**capabilities** [1] - 1030:1
**capability** [1] - 1029:18
**capital** [6] - 1031:18, 1031:24, 1033:9, 1033:12, 1033:15, 1061:11
**caps** [1] - 1018:16
**care** [3] - 1021:8, 1022:12, 1055:15
**careful** [2] - 1026:18, 1040:19
**carries** [1] - 1027:2
**case** [17] - 994:17, 1009:23, 1017:22, 1029:15, 1032:24, 1037:11, 1037:12, 1056:12, 1057:18, 1057:20, 1058:25, 1062:15, 1062:18, 1062:24, 1068:9, 1068:10
**Case** [2] - 984:4, 984:8
**cash** [14] - 1006:1, 1008:23, 1009:12, 1009:13, 1010:11,

1010:12, 1010:15, 1014:9, 1017:1, 1018:4, 1020:5, 1060:12, 1061:10
**caused** [1] - 1023:12
**CAYNE** [1] - 985:9
**central** [1] - 1017:22
**CEO** [1] - 1049:7
**certain** [2] - 1023:17, 1053:14
**certainly** [6] - 1001:15, 1026:13, 1029:19, 1030:18, 1044:10, 1065:20
**certainty** [3] - 1009:3, 1010:19, 1060:20
**certificate** [3] - 1012:3, 1012:9, 1012:15
**CERTIFICATE** [1] - 1069:1
**certificates** [2] - 1009:11, 1019:12
**certify** [1] - 1069:3
**chain** [3] - 1046:16, 1046:22, 1052:25
**change** [12] - 1002:25, 1006:2, 1018:19, 1021:6, 1021:17, 1022:1, 1022:2, 1022:12, 1022:23, 1023:21, 1027:16, 1033:1
**changed** [2] - 993:15, 1002:24
**chapter** [1] - 1003:9
**characterization** [1] - 1043:9
**characterizing** [1] - 1049:18
**charge** [2] - 1026:5, 1029:4
**chart** [4] - 989:21, 989:25, 990:1, 996:2
**charts** [1] - 994:22
**Check** [1] - 984:18
**check** [1] - 1033:21
**choose** [17] - 1014:14
**circle** [1] - 1018:7
**circular** [9] - 1005:7, 1005:17, 1010:12, 1017:21, 1018:25, 1019:7, 1019:17, 1022:18, 1023:11
**circulation** [1] - 1019:3
**civil** [1] - 1058:18
**claim** [1] - 1026:23
**Class** [1] - 984:17
**CLASS** [1] - 984:9

**clear** [15] - 996:3, 1003:9, 1005:21, 1005:23, 1006:3, 1006:7, 1007:8, 1009:10, 1009:24, 1020:4, 1024:3, 1027:20, 1027:21, 1029:14, 1033:7
**clicker** [1] - 996:7
**clip** [3] - 997:11, 997:12
**close** [1] - 1044:25
**closely** [1] - 1029:21
**colleagues** [1] - 1028:25
**color** [1] - 996:9
**colors** [3] - 1018:19, 1018:21
**COLUMBIA** [1] - 984:1
**Columbia** [1] - 985:15
**combination** [1] - 1034:16
**coming** [3] - 1006:15, 1007:12, 1007:24
**comma** [1] - 1051:6
**commentary** [1] - 1043:24
**comments** [3] - 1010:1, 1054:11, 1058:19
**commitment** [42] - 989:11, 991:15, 991:18, 992:6, 993:5, 994:5, 994:7, 994:10, 994:14, 994:24, 994:25, 995:4, 995:5, 995:8, 996:10, 996:21, 997:2, 999:5, 1005:6, 1008:21, 1016:8, 1016:15, 1018:10, 1018:16, 1018:22, 1019:4, 1021:5, 1021:18, 1022:3, 1022:11, 1023:12, 1023:13, 1023:17, 1027:14, 1060:10, 1062:5, 1062:11, 1063:20, 1064:9, 1065:8, 1065:12
**Committee** [1] - 1004:17
**committee** [2] - 1039:19, 1041:16
**common** [4] - 1003:16, 1013:19, 1013:20, 1051:20
**communication** [1] - 1047:11

**communications** [1] - 1049:11
**companies** [6] - 998:16, 1008:23, 1026:6, 1060:11, 1062:5, 1062:9
**company** [9] - 997:23, 998:14, 1013:17, 1013:18, 1015:17, 1016:18, 1054:14, 1058:17, 1058:20
**compared** [1] - 990:10
**comparing** [1] - 1035:16
**competent** [1] - 1029:18
**complete** [2] - 1056:3, 1060:16
**completely** [1] - 1054:17
**complicated** [3] - 993:7, 1017:10, 1017:11
**comprehensive** [13] - 990:14, 990:24, 991:7, 992:12, 1002:3, 1025:15, 1031:20, 1032:4, 1035:25, 1036:3, 1036:7, 1037:8, 1054:17
**computer** [1] - 985:18
**computer-aided** [1] - 985:18
**concern** [2] - 991:18, 1022:18
**concerns** [1] - 1027:5
**concludes** [2] - 1068:6, 1068:8
**conditions** [4] - 1002:23, 1002:24, 1043:24, 1065:6
**conference** [2] - 1011:7, 1011:20
**confidence** [3] - 1029:17, 1065:7, 1065:11
**confirm** [1] - 1022:20
**Congress** [10] - 999:12, 1000:1, 1003:7, 1003:10, 1003:14, 1003:22, 1038:15, 1038:16, 1039:19, 1041:8
**congressional** [1] - 1041:16
**conservative** [1] - 1026:22
**conservator** [3] - 1026:4, 1042:3,

1050:24
**conservatorship** [3] -
988:3, 1003:4,
1003:10
**conserve** [1] - 1042:4
**conserving** [1] -
1042:8
**consider** [2] -
1022:19, 1042:16
**considered** [5] -
1006:19, 1006:25,
1007:21, 1007:22
**considering** [2] -
998:16, 1022:17
**Constitution** [1] -
985:15
**consultation** [2] -
1009:3, 1060:20
**containing** [1] -
1041:16
**context** [3] - 1013:3,
1029:12, 1030:14
**Continued** [1] -
987:12
**continued** [2] -
984:25, 1060:25
**CONTINUED** [1] -
985:1
**continues** [1] - 1025:7
**contract** [6] - 1000:6,
1000:10, 1000:11,
1005:25, 1009:20,
1011:25
**contrasts** [1] - 1043:3
**control** [1] - 1004:8
**convenience** [1] -
1066:12
**Cooper** [1] - 984:15
**copies** [1] - 1066:14
**coping** [1] - 1043:17
**copy** [2] - 999:17,
1034:14
**corporate** [1] -
1013:15
**correct** [134] - 989:4,
989:11, 990:22,
991:15, 991:16,
991:22, 993:2,
993:8, 993:12,
993:13, 994:3,
994:14, 995:6,
996:22, 998:18,
999:2, 999:8,
1000:2, 1000:11,
1000:14, 1001:8,
1001:11, 1001:13,
1001:16, 1001:17,
1001:21, 1002:4,
1002:13, 1002:22,
1003:2, 1003:3,

1003:8, 1003:16,
1003:18, 1003:21,
1004:3, 1004:4,
1004:6, 1004:8,
1005:8, 1005:13,
1005:19, 1005:20,
1006:16, 1006:17,
1007:6, 1007:25,
1008:1, 1008:7,
1008:24, 1009:19,
1013:18, 1013:23,
1014:2, 1014:3,
1014:7, 1014:12,
1014:13, 1014:15,
1014:16, 1014:19,
1016:9, 1017:3,
1017:7, 1018:2,
1018:7, 1018:17,
1019:5, 1019:9,
1021:3, 1021:6,
1021:15, 1021:18,
1021:21, 1021:22,
1022:15, 1022:24,
1023:2, 1023:8,
1025:20, 1026:7,
1026:12, 1026:16,
1026:19, 1026:24,
1027:5, 1027:10,
1027:15, 1028:6,
1028:7, 1029:5,
1029:9, 1030:12,
1031:9, 1031:10,
1032:13, 1033:10,
1033:11, 1033:13,
1033:16, 1033:18,
1035:11, 1035:20,
1036:13, 1036:19,
1037:6, 1037:10,
1037:12, 1037:21,
1038:1, 1038:4,
1038:7, 1038:11,
1038:12, 1042:10,
1045:7, 1046:2,
1046:17, 1047:8,
1050:14, 1051:21,
1052:8, 1052:11,
1053:9, 1054:2,
1054:7, 1054:13,
1054:15, 1054:16,
1054:19, 1054:21,
1066:18, 1069:4
**correctly** [1] - 1065:23
**Counsel** [1] - 1028:19
**counsel** [16] - 987:16,
1010:3, 1010:9,
1010:21, 1017:12,
1017:14, 1028:24,
1030:4, 1030:7,
1033:21, 1037:15,
1039:20, 1040:5,
1044:20, 1055:9,

1066:18
**counsel's** [1] - 1038:2
**country's** [1] - 1063:3
**course** [2] - 998:7,
1032:21
**Court** [6] - 985:14,
985:14, 998:7,
1055:22, 1067:15,
1067:25
**COURT** [43] - 984:1,
987:4, 987:7, 998:8,
999:18, 1011:5,
1011:8, 1011:11,
1011:16, 1011:21,
1012:12, 1024:18,
1034:1, 1040:22,
1044:6, 1046:9,
1048:17, 1052:20,
1052:22, 1055:3,
1055:6, 1055:8,
1055:14, 1055:19,
1055:25, 1056:4,
1056:8, 1056:22,
1057:5, 1057:12,
1057:17, 1059:18,
1066:3, 1066:5,
1066:17, 1066:20,
1066:23, 1066:25,
1067:5, 1067:12,
1068:7, 1069:1,
1069:9
**court** [1] - 987:2
**Court's** [2] - 1048:15,
1060:7
**COURTROOM** [11] -
997:25, 998:9,
999:21, 1012:2,
1030:25, 1031:2,
1039:17, 1039:23,
1044:13, 1044:15,
1046:6
**courtroom** [4] - 987:6,
1055:7, 1057:16,
1068:14
**cover** [3] - 999:24,
1012:24, 1025:16
**credit** [1] - 1025:8
**credit-related** [1] -
1025:8
**criminal** [1] - 1058:18
**CRR** [1] - 985:14
**cumulative** [6] -
988:8, 988:9, 989:7,
989:21, 990:4,
1036:15
**current** [6] - 988:6,
988:8, 1042:17,
1042:23, 1043:15,
1043:21
**cushion** [2] - 1032:10,

1032:12

**D**

**D.C** [5] - 984:9,
984:16, 984:23,
985:12, 985:16
**dark** [1] - 996:14
**date** [7] - 1004:24,
1005:2, 1012:19,
1015:17, 1015:18,
1045:5, 1045:23
**DATE** [1] - 1069:9
**dated** [4] - 1024:10,
1034:5, 1039:4,
1039:18
**Dave** [4] - 987:19,
987:23, 988:1, 988:2
**DAVID** [1] - 985:9
**DAVIS** [2] - 984:21,
1067:6
**Davis** [1] - 1067:6
**days** [5] - 1004:25,
1045:6, 1045:24,
1058:15
**deal** [4] - 992:23,
1003:4, 1028:24,
1028:25
**death** [1] - 1056:23
**debt** [1] - 1051:22
**December** [2] -
1012:25, 1027:17
**decide** [3] - 1005:19,
1011:9, 1020:22
**decision** [6] -
1005:15, 1005:18,
1027:18, 1027:21,
1029:9, 1038:16
**decisionmaking** [2] -
1062:19, 1062:23
**declare** [2] - 1013:18,
1013:21
**declared** [4] -
1009:12, 1012:20,
1012:21, 1013:12
**decreasing** [1] -
1031:18
**deeply** [1] - 1042:21
**Defendant** [2] - 985:8,
999:15
**defendant** [1] -
1030:21
**Defendants** [1] -
984:7
**defendants** [3] -
1018:20, 1044:20,
1055:21
**defense** [2] - 1039:20,
1057:18
**defer** [1] - 998:6

**deferred** [3] - 1002:10,
1053:12, 1053:14
**deficit** [3] - 1031:19,
1032:5, 1032:16
**defines** [1] - 1015:1
**definition** [1] - 1015:8
**Delaware** [1] - 985:4
**delinquent** [1] -
1043:5
**DEMARCO** [2] - 986:4,
987:11
**DeMarco** [33] -
987:14, 997:20,
1000:22, 1001:15,
1008:10, 1010:25,
1011:14, 1011:15,
1012:15, 1014:8,
1020:12, 1024:3,
1024:22, 1034:7,
1039:4, 1039:12,
1039:20, 1040:5,
1040:24, 1041:6,
1046:25, 1049:5,
1050:20, 1053:3,
1056:9, 1056:13,
1056:15, 1057:3,
1057:12, 1058:5,
1061:6, 1064:25,
1066:3
**demonstrate** [3] -
1052:8, 1053:23,
1054:7
**demonstrative** [4] -
996:3, 996:6, 997:5
**demonstratives** [1] -
1017:11
**department** [1] -
1049:11
**Department** [7] -
1003:15, 1038:4,
1046:19, 1049:24,
1050:18, 1050:21,
1050:23
**deposition** [17] -
997:16, 997:19,
997:23, 998:3,
998:11, 998:13,
1004:22, 1007:4,
1008:4, 1008:5,
1008:9, 1008:11,
1008:16, 1059:9,
1067:8, 1067:13,
1068:6
**depositions** [4] -
1057:4, 1057:6,
1066:9, 1066:13
**deputy** [1] - 1067:9
**DEPUTY** [11] - 997:25,
998:9, 999:21,
1012:2, 1030:25,

1031:2, 1039:17, 1039:23, 1044:13, 1044:15, 1046:6
**DeRita** [9] - 994:22, 995:2, 997:9, 997:12, 999:22, 1000:5, 1000:19, 1017:13, 1050:16
**designation** [6] - 1009:11, 1012:4, 1012:9, 1012:16, 1013:7, 1019:12
**designed** [2] - 1053:23, 1054:7
**detail** [3] - 990:9, 1009:25, 1010:7
**details** [2] - 1005:25, 1034:25
**determines** [1] - 1014:1
**difference** [2] - 994:1, 1006:20
**different** [11] - 992:11, 992:24, 998:24, 1003:15, 1007:11, 1007:13, 1023:4, 1023:5, 1034:23, 1043:13, 1063:7
**difficult** [3] - 1001:13, 1001:14, 1065:15
**difficulties** [1] - 1067:19
**direct** [3] - 990:12, 1031:11, 1041:24
**directed** [1] - 1026:25
**direction** [1] - 1043:18
**directly** [2] - 1056:20, 1065:5
**director** [6] - 1004:22, 1005:1, 1005:8, 1030:14, 1043:12, 1067:10
**directors** [4] - 1027:8, 1035:7, 1036:7, 1036:12
**disagreed** [1] - 1038:9
**disagreement** [2] - 1037:18, 1037:19
**disclosure** [1] - 1031:15
**discretion** [1] - 1013:17
**discuss** [3] - 1007:18, 1047:11, 1047:18
**discussed** [6] - 1006:19, 1007:13, 1027:16, 1053:17, 1058:6
**discussing** [6] - 1006:15, 1006:21,

1006:23, 1009:2, 1010:9, 1060:19
**Discussion** [1] - 1068:15
**discussion** [5] - 987:19, 1006:15, 1007:3, 1008:18, 1055:10
**discussions** [1] - 1058:11
**dismissed** [1] - 1057:3
**dispute** [2] - 1020:19, 1020:23
**disputed** [1] - 1020:10
**disruption** [1] - 1065:21
**dissolved** [1] - 1014:5
**DISTRICT** [3] - 984:1, 984:1, 984:13
**District** [2] - 985:14, 985:15
**disturb** [1] - 1047:17
**divided** [1] - 1015:20
**dividend** [49] - 989:21, 990:10, 990:19, 990:22, 990:25, 991:7, 992:5, 992:12, 992:13, 992:14, 1005:7, 1005:16, 1005:18, 1006:1, 1006:2, 1006:13, 1008:23, 1009:12, 1009:13, 1010:11, 1012:18, 1013:18, 1014:10, 1014:18, 1015:17, 1015:18, 1016:25, 1018:5, 1018:6, 1019:18, 1020:5, 1020:14, 1023:3, 1023:21, 1025:16, 1027:9, 1027:10, 1037:1, 1037:10, 1046:1, 1060:12, 1063:13, 1063:16, 1063:20, 1064:1, 1064:5, 1064:10
**dividend's** [1] - 1014:1
**dividends** [13] - 988:8, 990:4, 1009:17, 1012:16, 1013:8, 1013:12, 1015:20, 1016:21, 1063:6, 1064:6, 1064:17, 1064:20
**Division** [1] - 1067:10
**document** [20] - 987:18, 987:19,

988:18, 988:23, 989:3, 992:23, 999:24, 1000:21, 1009:4, 1016:1, 1027:7, 1028:12, 1037:14, 1038:19, 1040:2, 1040:15, 1052:16, 1052:24, 1053:3, 1060:22
**documentary** [1] - 1066:12
**documents** [2] - 1026:9, 1057:7
**dollar** [2] - 1050:9, 1051:6
**domestic** [1] - 1046:17
**Don** [3] - 1048:21, 1049:7, 1049:17
**done** [3] - 1003:7, 1041:21, 1068:3
**dose** [1] - 1027:2
**down** [42] - 987:22, 989:10, 992:21, 994:6, 994:12, 995:19, 997:9, 999:2, 1000:5, 1002:2, 1003:1, 1003:23, 1005:5, 1009:18, 1010:16, 1016:2, 1016:11, 1016:18, 1017:7, 1018:6, 1019:4, 1021:12, 1021:22, 1022:6, 1025:3, 1027:14, 1031:13, 1037:14, 1046:21, 1048:12, 1049:24, 1050:6, 1050:16, 1051:1, 1052:8, 1052:13, 1053:23, 1054:7, 1055:8, 1065:18, 1066:3, 1066:23
**downs** [1] - 1002:20
**dramatically** [1] - 1051:20
**draw** [25] - 994:12, 1005:7, 1005:17, 1010:13, 1017:21, 1018:5, 1019:1, 1019:3, 1019:6, 1019:7, 1019:17, 1022:18, 1023:11, 1027:9, 1027:14, 1028:4, 1032:16, 1032:22, 1032:25, 1056:10, 1061:11, 1061:18, 1061:24, 1063:19, 1064:9

**draw-down** [1] - 994:12
**drawing** [2] - 992:21, 1005:5
**drawn** [3] - 989:10, 996:11, 997:1
**draws** [8] - 988:9, 992:4, 993:1, 993:22, 994:2, 994:7, 994:8, 996:14
**drive** [1] - 1065:18
**driven** [1] - 1025:8
**driving** [2] - 1062:19, 1062:22
**dropping** [2] - 1051:25, 1052:1
**due** [1] - 1003:3
**during** [7] - 993:11, 1017:14, 1017:15, 1017:20, 1030:14, 1058:5, 1058:23
**DX-394** [1] - 999:22

# E

**e-mail** [13] - 1044:21, 1046:4, 1046:12, 1046:16, 1046:22, 1048:5, 1048:11, 1048:13, 1048:14, 1048:21, 1049:4, 1051:14, 1052:25
**earnings** [4] - 988:14, 1046:1, 1050:9, 1051:7
**ease** [1] - 997:18
**easier** [1] - 1028:25
**easy** [2] - 992:22, 1001:10
**economic** [1] - 1065:6
**economy** [3] - 1065:17, 1065:20, 1065:21
**Ed** [1] - 1053:5
**editorial** [1] - 1010:1
**EDWARD** [2] - 986:4, 987:11
**effect** [6] - 991:10, 991:19, 1018:9, 1031:8, 1061:17, 1065:21
**effectively** [1] - 1005:2
**effects** [1] - 1065:20
**effort** [1] - 1003:4
**eight** [2] - 988:13, 1045:6
**Eisenhofer** [1] - 985:2
**either** [6] - 1003:1, 1004:24, 1005:2, 1023:4, 1028:4,

1037:2
**electronically** [1] - 1028:20
**elicited** [1] - 1056:9
**enabler** [2] - 988:20, 988:25
**end** [12] - 992:6, 993:6, 993:15, 993:21, 994:9, 1027:17, 1027:23, 1042:23, 1047:25, 1048:2, 1061:4
**End** [1] - 1011:20
**ended** [2] - 993:16, 1027:17
**ending** [1] - 1015:18
**ensure** [1] - 1063:3
**enter** [1] - 1062:2
**entered** [2] - 987:6, 1057:16
**entering** [1] - 1061:25
**enterprise** [1] - 1042:17
**enterprises** [6] - 1001:5, 1001:10, 1001:17, 1030:12, 1033:8, 1050:25
**entire** [1] - 1065:17
**entirely** [1] - 1024:2
**entities** [3] - 1014:5, 1042:5, 1042:9
**entitled** [2] - 1034:5, 1069:5
**environment** [2] - 1001:14, 1025:10
**equal** [1] - 1015:19
**ERIC** [1] - 984:18
**Eric** [2] - 1057:1, 1066:7
**erode** [1] - 1065:14
**eroded** [2] - 991:19, 1018:16
**erosion** [1] - 1023:16
**ESQ** [13] - 984:15, 984:17, 984:18, 984:20, 984:21, 984:21, 985:2, 985:5, 985:8, 985:9, 985:9, 985:10, 985:10
**essential** [1] - 1029:1
**essentially** [1] - 1012:9
**established** [2] - 1005:7, 1022:20
**estimate** [1] - 1067:16
**estimated** [1] - 993:17
**estimates** [1] - 993:14
**et** [2] - 984:3, 984:6
**events** [2] - 1058:24,

1059:4
**evidence** [25] -
999:20, 1012:1,
1012:6, 1012:11,
1012:13, 1020:9,
1024:14, 1024:19,
1028:11, 1029:1,
1031:1, 1034:2,
1038:22, 1040:18,
1044:1, 1044:7,
1044:11, 1044:12,
1046:5, 1046:7,
1046:10, 1048:13,
1048:18, 1054:23,
1067:4
**evolve** [1] - 1056:17
**exactly** [2] - 1000:18,
1004:23
**examination** [5] -
1030:10, 1037:18,
1052:13, 1055:1,
1058:5
**EXAMINATION** [2] -
987:12, 1058:3
**Examination............**
[1] - 986:4
**Examination............**
[1] - 986:4
**example** [2] - 1022:19,
1026:9
**exceed** [1] - 990:5
**except** [1] - 1007:8
**exception** [1] -
1016:16
**exchange** [1] -
1061:14
**excuse** [2] - 1003:19,
1047:21
**executing** [1] -
1027:24
**executive** [1] -
1024:25
**executives** [1] -
1058:18
**Exhibit** [8] - 999:15,
1024:19, 1026:11,
1030:4, 1034:2,
1044:7, 1046:10,
1048:18
**exhibit** [9] - 999:18,
1000:20, 1002:2,
1024:22, 1030:21,
1031:11, 1039:17,
1048:6, 1051:10
**EXHIBITS** [1] - 986:7
**Exhibits** [2] - 1012:13,
1067:2
**exhibits** [2] - 998:3,
1066:12
**exited** [2] - 1055:7,

1068:14
**expect** [2] - 1006:5,
1006:6
**expectation** [4] -
1027:2, 1028:4,
1061:18, 1061:24
**expectations** [1] -
1056:10
**expected** [1] - 1025:15
**expedite** [2] -
1049:24, 1051:1
**expenses** [4] - 1025:8,
1035:23
**expensive** [1] -
1065:15
**experience** [1] -
1031:20
**expert** [2] - 996:4,
1018:22
**explain** [1] - 1006:24
**explaining** [2] -
1007:10, 1038:16
**expressing** [1] -
1058:20
**extent** [3] - 999:10,
1013:7, 1016:21
**extraordinary** [1] -
1003:5
**eyes** [1] - 992:16

# F

**faced** [1] - 999:7
**fact** [7] - 998:16,
1003:13, 1020:10,
1020:23, 1036:11,
1037:23, 1061:23
**factor** [3] - 988:3,
1042:14, 1042:16
**facts** [1] - 1026:15
**factually** [1] - 1020:8
**fail** [2] - 1008:23,
1060:11
**failed** [1] - 1014:11
**fails** [1] - 1015:17
**failure** [2] - 1014:11,
1014:14
**fair** [4] - 1008:10,
1028:23, 1043:9
**FAIRHOLME** [1] -
984:3
**fall** [1] - 1021:20
**familiar** [1] - 1006:12
**FANNIE** [1] - 984:8
**Fannie** [48] - 989:3,
989:4, 990:11,
992:10, 994:23,
995:5, 995:19,
996:21, 1002:3,
1005:5, 1012:5,

1014:10, 1016:6,
1017:23, 1019:18,
1022:22, 1024:8,
1025:19, 1027:8,
1027:12, 1028:5,
1030:21, 1031:15,
1034:9, 1034:16,
1034:18, 1034:20,
1036:12, 1037:1,
1045:25, 1049:25,
1050:10, 1050:24,
1051:1, 1051:19,
1054:5, 1058:7,
1062:15, 1063:7,
1063:12, 1063:18,
1063:24, 1064:3,
1064:16, 1064:19,
1065:9, 1065:13
**fault** [3] - 997:12,
1015:14, 1044:18
**favorable** [3] - 998:14,
1025:7, 1036:12
**fear** [1] - 1002:20
**February** [2] - 999:12,
1000:2
**FEDERAL** [1] - 984:6
**Federal** [5] - 985:8,
1039:5, 1039:19,
1050:23, 1067:11
**fee** [1] - 999:5
**few** [7] - 1028:17,
1030:6, 1040:18,
1057:18, 1057:21,
1057:23, 1058:15
**FHA** [1] - 1001:3
**FHFA** [17] - 1003:24,
1028:12, 1029:5,
1030:13, 1034:5,
1035:6, 1035:13,
1035:14, 1036:3,
1036:11, 1037:6,
1041:21, 1042:3,
1043:11, 1043:12,
1045:13, 1067:11
**FHFA's** [1] - 1041:17
**fifth** [4] - 1025:3,
1025:5, 1025:6
**figured** [1] - 1057:5
**filing** [2] - 1027:1,
1054:20
**filings** [11] - 1002:8,
1025:22, 1025:25,
1026:1, 1026:7,
1031:6, 1056:1,
1058:14, 1058:17,
1058:21
**final** [1] - 1035:24
**finally** [1] - 1057:3
**finance** [2] - 1046:17,
1063:4

**Finance** [5] - 985:8,
1039:5, 1039:19,
1050:23, 1067:11
**FINANCE** [1] - 984:6
**financial** [4] - 991:21,
1018:17, 1022:12,
1029:5
**fine** [4] - 1005:4,
1011:19, 1052:5,
1068:1
**finish** [2] - 1064:12,
1067:17
**firm** [1] - 1051:7
**firms** [1] - 1000:25
**first** [27] - 990:12,
1004:21, 1004:25,
1008:4, 1013:5,
1015:13, 1015:15,
1016:5, 1017:3,
1017:5, 1022:1,
1025:25, 1026:2,
1031:8, 1033:10,
1035:13, 1042:2,
1045:12, 1046:22,
1047:2, 1050:18,
1056:10, 1060:14,
1060:18, 1061:13,
1061:21, 1067:5
**five** [4] - 1036:19,
1036:22, 1036:23,
1037:5, 1037:9,
1067:17
**fixed** [3] - 993:8,
1063:16, 1063:20
**flat** [1] - 989:18
**Flexner** [1] - 984:22
**floor** [2] - 1004:17,
1056:25
**Floor** [1] - 985:3
**focus** [2] - 991:17,
1013:4
**focused** [3] - 987:23,
988:1, 988:2
**follow** [1] - 998:4
**followed** [1] - 1024:2
**following** [4] - 1016:5,
1022:7, 1043:9,
1050:20
**follows** [2] - 997:8,
1060:6
**footnote** [1] - 1035:14
**footprint** [1] - 1003:25
**FOR** [2] - 984:1,
987:11
**forecast** [3] - 994:9,
1035:7, 1035:15
**foregoing** [1] - 1069:3
**foresee** [1] - 1063:5
**forget** [1] - 1010:13
**formula** [2] - 993:8,

993:10
**forward** [5] - 987:4,
1005:22, 1009:17,
1045:14, 1053:19
**four** [2] - 1036:22,
1060:14
**fourth** [1] - 1025:5
**framework** [2] -
1009:4, 1060:21
**frankly** [1] - 1027:22
**Freddie** [42] - 989:4,
990:11, 990:12,
990:14, 990:24,
991:6, 994:23,
995:9, 995:22,
996:21, 1005:5,
1012:10, 1014:10,
1016:7, 1017:23,
1019:18, 1022:22,
1027:12, 1028:5,
1034:21, 1045:25,
1048:14, 1048:22,
1049:8, 1049:12,
1049:13, 1049:25,
1050:10, 1050:24,
1051:1, 1051:19,
1054:5, 1058:8,
1062:15, 1063:7,
1063:12, 1063:24,
1064:3, 1064:16,
1064:19, 1065:9,
1065:13
**Freddie's** [1] -
1063:18
**free** [1] - 1013:4
**Friday** [2] - 1051:12,
1067:16
**fulfilled** [1] - 1003:7
**full** [7] - 1015:17,
1025:6, 1025:16,
1042:13, 1052:16,
1054:17, 1063:13
**functions** [1] - 1001:4
**funding** [9] - 991:11,
992:1, 992:6, 993:5,
995:9, 996:10,
1008:21, 1060:9,
1060:10
**funds** [4] - 1013:11,
1016:20, 1032:16,
1032:21
**FUNDS** [1] - 984:3
**future** [5] - 996:15,
1002:21, 1031:20,
1061:10, 1068:2
**FY12** [1] - 1036:15
**FY16** [1] - 1036:16

## G

gains [1] - 1003:2
Geithner [3] - 1037:20, 1038:4, 1043:13
general [11] - 1016:6, 1016:9, 1016:11, 1016:16, 1041:6, 1041:15, 1043:8, 1060:21, 1061:1, 1061:7
generally [3] - 1026:14, 1026:21, 1029:20
generate [1] - 1050:10
generates [1] - 1051:7
gentlemen [1] - 1068:7
Ginnie [1] - 1001:3
gist [1] - 1043:8
given [6] - 1001:11, 1028:8, 1034:19, 1053:23, 1063:13, 1064:4
goal [1] - 1042:8
Goals [1] - 1067:10
golden [1] - 988:13
government [4] - 990:5, 1003:5, 1038:14, 1050:25
Government [1] - 1001:2
government-sponsored [1] - 1050:25
graciously [1] - 1040:5
gradual [2] - 1000:14, 1001:12
gradually [2] - 1000:10, 1003:24
Grant [1] - 985:2
gray [2] - 989:6, 990:1
Great [1] - 999:24
great [2] - 1003:3, 1027:2
greatly [1] - 1065:14
Griffin [5] - 1053:1, 1053:8, 1053:13, 1053:22, 1054:1
Grossmann [1] - 985:6
group [4] - 1029:16, 1034:16, 1034:19, 1034:22
grow [1] - 1001:18
grown [1] - 1001:17
GSE [5] - 987:18, 988:8, 988:9,

988:14, 1052:17
GSEs [11] - 988:21, 989:1, 990:5, 999:2, 999:5, 1003:16, 1010:23, 1023:23, 1047:11, 1047:14, 1050:25
GSEs' [1] - 988:2

## H

half [3] - 994:14, 1052:1, 1066:10
halfway [2] - 987:22, 1027:18
HAMISH [1] - 984:20
Hamish [4] - 987:9, 1067:15, 1067:22, 1068:5
Hampshire [1] - 984:16
hand [4] - 1018:9, 1040:9, 1040:11, 1066:14
happy [2] - 1055:13, 1066:14
hard [3] - 999:16, 1034:14, 1036:21
head [2] - 1005:21, 1026:4
heads [1] - 1045:13
heads-up [1] - 1045:13
heard [1] - 1006:18
heavy [1] - 1027:2
help [2] - 1009:20, 1050:25
helped [1] - 1030:12
high [3] - 1029:23, 1029:25, 1043:14
higher [4] - 1025:9, 1037:9, 1061:8, 1061:9
highlight [7] - 988:1, 988:7, 1025:14, 1045:5, 1046:24, 1050:19, 1051:2
hit [1] - 1023:17
HOFFMAN [1] - 985:10
hold [1] - 1044:25
home [2] - 1048:4, 1065:15
Honor [43] - 992:19, 1007:15, 1010:2, 1010:25, 1011:12, 1011:17, 1012:7, 1020:1, 1020:4, 1020:7, 1029:10, 1031:3, 1034:3,

1038:23, 1039:15, 1039:25, 1041:1, 1041:3, 1041:11, 1043:25, 1044:2, 1044:4, 1048:16, 1052:12, 1052:15, 1054:25, 1055:5, 1055:16, 1056:14, 1056:24, 1057:1, 1057:9, 1057:13, 1057:15, 1058:1, 1059:17, 1066:1, 1066:2, 1066:4, 1066:7, 1066:15, 1067:6, 1068:5
HONORABLE [1] - 984:12
hopefully [3] - 1030:6, 1057:23, 1067:24
horse [2] - 1056:23, 1056:24
hour [1] - 1066:10
House [2] - 1004:6, 1004:8
house [2] - 1025:9, 1065:18
houses [1] - 1065:19
Housing [6] - 985:8, 1039:5, 1039:19, 1050:23, 1067:10, 1067:11
HOUSING [1] - 984:6
housing [2] - 1063:4, 1065:22
HOWARD [1] - 985:9
Hume [34] - 987:8, 987:9, 1002:7, 1008:8, 1008:13, 1028:14, 1038:23, 1048:24, 1055:17, 1055:22, 1056:2, 1056:9, 1056:14, 1056:20, 1058:5, 1058:22, 1058:24, 1059:8, 1059:16, 1059:24, 1060:3, 1060:6, 1060:14, 1060:18, 1061:13, 1061:15, 1062:14, 1063:6, 1064:25, 1067:15, 1067:22, 1068:5
HUME [73] - 984:20, 987:9, 987:13, 992:20, 998:2, 998:10, 999:19, 999:22, 999:25, 1007:16, 1007:20, 1010:3, 1010:6, 1011:1, 1011:2,

1011:10, 1011:19, 1011:23, 1012:3, 1012:8, 1012:14, 1020:3, 1020:10, 1020:11, 1024:14, 1024:20, 1028:23, 1029:3, 1029:11, 1029:13, 1031:1, 1031:4, 1033:20, 1033:24, 1034:3, 1034:4, 1039:2, 1039:3, 1039:8, 1039:10, 1039:11, 1039:16, 1039:18, 1039:24, 1040:1, 1040:4, 1040:9, 1040:12, 1040:14, 1040:23, 1041:5, 1041:12, 1043:25, 1044:5, 1044:8, 1044:14, 1044:16, 1044:19, 1046:7, 1046:11, 1048:19, 1048:20, 1049:1, 1049:3, 1052:15, 1052:21, 1052:23, 1055:2, 1055:4, 1066:2, 1067:14, 1067:22, 1068:5
Hume's [1] - 1061:17

## I

IAN [1] - 985:10
identical [1] - 1012:9
identify [1] - 1026:18
iii [2] - 1015:12, 1015:16
immediately [1] - 1020:14
imminent [4] - 1028:4, 1056:10, 1061:17, 1061:24
imminently [1] - 1027:14
impact [2] - 1025:10, 1065:17
impaired [1] - 1025:11
implication [2] - 1010:5, 1024:10
imposed [1] - 1016:17
improved [2] - 1025:9, 1051:23
INC [1] - 984:3
included [2] - 999:1, 999:5
including [1] - 1012:24
income [20] - 990:15, 990:25, 991:7,

992:12, 992:13, 1002:3, 1005:16, 1017:1, 1019:19, 1019:20, 1019:21, 1019:22, 1025:15, 1026:15, 1027:9, 1035:24, 1035:25, 1036:3, 1036:7, 1037:8
incorrect [1] - 1020:8
increase [3] - 1008:23, 1010:17, 1060:12
increased [1] - 1015:16
increases [2] - 1018:10, 1032:22
indeed [2] - 1001:1, 1058:1
indicated [1] - 1053:17
individually [1] - 1025:11
indulgence [2] - 1048:15, 1060:7
industry [1] - 1000:24
influence [1] - 1061:23
inform [1] - 1059:5
information [3] - 1026:1, 1026:6, 1026:12
informed [1] - 1003:12
infusion [1] - 989:7
initial [1] - 1020:5
inputs [1] - 1034:23
instead [6] - 993:7, 1005:17, 1010:12, 1019:17
intended [1] - 1026:14
interest [2] - 1023:24, 1025:10
internal [1] - 1054:13, 1058:7
internally [3] - 1025:20, 1054:15, 1054:18
investment [1] - 990:5
ironed [1] - 1067:24
issue [1] - 1041:17
issued [2] - 1062:9, 1065:13

## J

January [4] - 1027:22, 1039:5, 1039:18, 1040:25
jargon [1] - 1012:19
Jeff [1] - 1053:17
Jenkins [3] - 998:6,

1039:22, 1044:12
jittery [1] - 1018:17
Jonathan [1] - 1055:20
JONATHAN [1] - 985:8
JONES [1] - 985:10
Judge [2] - 987:9, 1011:10
JUDGE [1] - 984:13
judge [1] - 1020:22
July [6] - 994:20, 996:25, 997:7, 1024:10, 1025:19, 1035:16
June [2] - 1037:20, 1042:18
jury [14] - 987:3, 987:4, 997:18, 998:1, 998:3, 999:23, 1020:23, 1038:21, 1044:4, 1044:17, 1067:14, 1067:25, 1068:8, 1068:12
JURY [1] - 984:12
Jury [5] - 987:6, 1055:7, 1057:11, 1057:16, 1068:14
Justison [1] - 985:3

**K**

KAPLAN [1] - 984:21
Kaye [1] - 985:11
keep [5] - 1000:5, 1000:17, 1033:9, 1061:5, 1065:8
KENYA [1] - 984:21
Kenya [1] - 1067:6
Kessler [1] - 984:18
key [2] - 988:2, 996:16
kick [2] - 1023:11, 1023:16
kind [11] - 994:16, 994:18, 1006:1, 1010:11, 1017:13, 1019:11, 1019:23, 1019:24, 1020:2, 1022:2, 1022:22
kinds [1] - 1058:19
King [1] - 984:19
Kirk [1] - 984:15
knock [1] - 1065:20
knock-on [1] - 1065:20
knowledge [1] - 1032:25
knows [1] - 1027:1
KRAVETZ [1] - 985:5

1019:20
limitations [1] - 1016:16
limited [4] - 1031:17, 1038:25, 1057:22, 1058:2
line [16] - 988:25, 989:6, 990:15, 990:19, 991:11, 992:12, 992:13, 993:4, 997:22, 998:12, 1008:19, 1035:24, 1035:25, 1036:3, 1060:4, 1061:4
lines [2] - 1016:12, 1060:14
liquidation [30] - 1008:24, 1009:13, 1009:22, 1010:13, 1010:17, 1013:10, 1013:22, 1013:25, 1014:5, 1014:19, 1014:22, 1015:1, 1015:9, 1015:14, 1016:2, 1016:7, 1016:18, 1016:22, 1017:3, 1018:10, 1018:23, 1019:4, 1020:15, 1021:1, 1021:11, 1022:2, 1022:8, 1056:6, 1060:13, 1061:8
liquidity [1] - 1065:14
LITIGATIONS [1] - 984:10
Litowitz [1] - 985:5
LLP [4] - 984:18, 984:22, 985:6, 985:11
loan [1] - 1002:17, 1042:22
loan-to-value [1] - 1042:22
loans [2] - 1001:3, 1043:4
locution [1] - 992:22
logo [1] - 1034:9
long-term [1] - 1062:4
look [27] - 988:17, 988:22, 991:10, 991:11, 992:10, 992:11, 993:4, 997:22, 999:14, 999:16, 1000:17, 1001:25, 1007:4, 1008:17, 1008:18, 1011:24, 1014:21, 1015:24, 1024:7, 1025:3, 1025:6,

**L**

lack [1] - 1029:17
ladies [1] - 1068:7
laid [1] - 999:10
LAMBERTH [1] - 984:12
Lamberth [2] - 987:9, 1011:10
language [1] - 1016:6
largely [1] - 1027:23
largest [1] - 1002:16
last [10] - 994:4, 1003:9, 1011:21, 1043:19, 1043:22, 1053:18, 1055:2, 1058:15, 1064:25, 1067:9
late [1] - 1067:16
law [2] - 1004:18, 1016:17
lawsuit [1] - 1009:10
lawyerly [1] - 1040:19
Layton [2] - 1048:22, 1049:7
leader [1] - 1004:14
leading [1] - 1003:1
learned [1] - 1013:17
learning [1] - 1025:25
least [2] - 1027:7, 1044:18
leave [1] - 1068:12
leaving [1] - 991:25
LEE [1] - 984:17
left [6] - 991:15, 1005:1, 1016:12, 1017:24, 1018:24, 1061:11
legal [2] - 1009:4, 1060:21
legally [2] - 1013:11, 1016:20
legislation [3] - 1003:18, 1004:1, 1004:12
less [3] - 994:11, 1023:23, 1037:5
lesser [1] - 1023:22
letter [10] - 1038:15, 1038:16, 1039:4, 1039:18, 1040:24, 1041:7, 1041:10, 1041:15, 1041:16, 1041:20
life [1] - 1062:11
light [4] - 996:8, 996:9, 1018:22, 1023:12
lights [1] - 1065:8
likely [2] - 988:13,

1030:5, 1033:24, 1035:5, 1036:25, 1048:11
looked [2] - 987:16, 1017:4
looking [2] - 1034:14, 1062:4
looks [1] - 1030:7
loss [4] - 1002:17, 1031:20, 1032:4, 1032:10
losses [5] - 1002:18, 1003:2, 1031:24, 1035:23, 1035:24
lost [2] - 1065:7, 1065:11
low [1] - 1025:10
lower [1] - 1025:8
lying [1] - 1056:25

**M**

MAC [1] - 984:8
Mac [28] - 989:4, 990:11, 990:12, 990:14, 991:6, 995:9, 995:22, 1005:5, 1012:10, 1014:10, 1016:7, 1017:23, 1027:12, 1028:5, 1034:21, 1045:25, 1048:14, 1048:22, 1049:8, 1049:12, 1049:13, 1049:25, 1050:10, 1050:24, 1051:1, 1051:19, 1054:6, 1065:13
Mac's [1] - 990:24
Mae [34] - 989:4, 990:11, 992:10, 995:5, 995:19, 1001:3, 1002:3, 1005:5, 1012:5, 1014:10, 1016:6, 1017:23, 1024:8, 1025:19, 1027:8, 1027:12, 1028:5, 1030:21, 1031:15, 1034:9, 1034:16, 1034:18, 1034:20, 1037:1, 1045:25, 1049:25, 1050:10, 1050:24, 1051:1, 1051:19, 1054:5, 1065:13
Mae's [1] - 1036:12
MAE/FREDDIE [1] - 984:8
mail [13] - 1044:21,

1046:4, 1046:12, 1046:16, 1046:22, 1048:5, 1048:11, 1048:13, 1048:14, 1048:21, 1049:4, 1051:14, 1052:25
maintain [2] - 1000:7, 1020:7
management [3] - 1026:5, 1054:18, 1058:7
Mario [1] - 1044:21
mark [1] - 1042:22
mark-to-market [1] - 1042:22
market [11] - 1001:4, 1002:23, 1002:24, 1008:20, 1042:22, 1043:24, 1060:8, 1065:7, 1065:11, 1065:14, 1065:22
markets [3] - 991:21, 1018:17, 1022:12
Mary [1] - 1046:12, 1046:22
Massachusetts [1] - 985:11
massive [1] - 1022:22
matches [1] - 1018:21
math [3] - 994:2, 994:5, 995:2
matter [1] - 1069:5
MBS [2] - 991:21, 1051:22
McHale [3] - 1048:21, 1049:7, 1049:10
mean [9] - 992:21, 992:22, 992:23, 1001:19, 1008:13, 1008:14, 1010:3, 1026:3, 1036:22
meaning [1] - 1022:25
means [3] - 1003:1, 1035:19, 1036:23
mechanics [3] - 1008:3, 1008:21, 1060:9
meeting [6] - 1024:8, 1024:25, 1053:5, 1053:8, 1053:18, 1054:1
meetings [2] - 1058:7, 1058:19
Meltzer [1] - 984:18
members [2] - 1044:17, 1067:14
memorandum [1] - 1054:24
mental [1] - 995:15
MICHAEL [1] - 985:2

**microphone** [1] - 1055:19
**mid** [1] - 1005:1
**mid-August** [1] - 1005:1
**might** [6] - 1009:21, 1055:10, 1065:4, 1065:9, 1065:17, 1066:10
**Miller** [3] - 1046:12, 1046:16, 1046:22
**million** [3] - 1015:5, 1033:13, 1037:2
**mind** [1] - 997:13
**minus** [2] - 993:12, 1064:7
**minute** [2] - 1007:9, 1033:6
**minutes** [4] - 1024:8, 1057:24, 1067:17, 1067:18
**mischaracterized** [2] - 1011:8, 1011:13
**mischaracterizes** [1] - 1010:24
**misheard** [2] - 1006:18, 1039:22
**misled** [2] - 1026:23
**missed** [2] - 1048:24, 1057:13
**Mission** [1] - 1067:10
**misstating** [1] - 1027:4
**mistake** [1] - 1025:4
**modeling** [1] - 1029:5
**models** [1] - 1035:2
**modest** [1] - 1036:14
**modifications** [2] - 1050:8, 1050:22
**modified** [1] - 996:4
**moment** [2] - 1033:4, 1041:9
**Monday** [1] - 1068:11
**money** [2] - 1018:5, 1021:21
**months** [1] - 1027:23
**mortgage** [5] - 1001:1, 1062:9, 1065:12, 1065:14, 1065:16
**Mortgage** [1] - 1001:2
**mortgage-backed** [1] - 1065:12
**mortgages** [3] - 1002:21, 1042:18, 1043:16
**most** [1] - 1001:24
**move** [16] - 1004:20, 1007:8, 1011:17, 1012:6, 1012:10, 1024:15, 1028:24,

1029:1, 1033:20, 1039:24, 1043:25, 1044:1, 1045:14, 1046:7, 1048:13, 1066:13
**moving** [1] - 1005:22
**MR** [124] - 987:9, 987:13, 992:19, 992:20, 998:2, 998:6, 998:10, 999:19, 999:22, 999:25, 1007:14, 1007:16, 1007:20, 1010:1, 1010:3, 1010:6, 1010:24, 1011:1, 1011:2, 1011:10, 1011:12, 1011:17, 1011:19, 1011:23, 1012:3, 1012:7, 1012:8, 1012:14, 1020:1, 1020:3, 1020:7, 1020:10, 1020:11, 1024:14, 1024:17, 1024:20, 1028:22, 1028:23, 1029:3, 1029:10, 1029:11, 1029:13, 1031:1, 1031:3, 1031:4, 1033:20, 1033:23, 1033:24, 1034:3, 1034:4, 1038:23, 1039:2, 1039:3, 1039:8, 1039:9, 1039:10, 1039:11, 1039:15, 1039:16, 1039:18, 1039:24, 1039:25, 1040:1, 1040:3, 1040:4, 1040:9, 1040:11, 1040:12, 1040:13, 1040:14, 1040:23, 1041:1, 1041:3, 1041:5, 1041:11, 1041:12, 1043:25, 1044:3, 1044:5, 1044:8, 1044:14, 1044:16, 1044:19, 1046:7, 1046:8, 1046:11, 1048:15, 1048:19, 1048:20, 1048:24, 1049:1, 1049:2, 1049:3, 1052:12, 1052:15, 1052:21, 1052:23, 1054:25, 1055:2, 1055:4, 1055:5, 1055:13, 1055:16, 1055:20, 1056:1, 1056:5, 1056:9, 1056:24, 1057:1,

1057:6, 1057:13, 1058:1, 1058:4, 1059:15, 1059:19, 1066:1, 1066:2, 1066:7, 1066:18, 1066:21, 1066:24, 1067:14, 1067:22, 1068:5
**MS** [1] - 1067:6
**multiple** [1] - 1003:22
**must** [2] - 1015:5, 1023:23

**N**

**Naa** [2] - 1067:8, 1067:13
**name** [1] - 1067:9
**National** [1] - 1001:2
**national** [1] - 1025:9
**near** [3] - 1027:6, 1027:7, 1054:25
**nearly** [1] - 1042:16
**need** [11] - 992:4, 992:14, 999:23, 1000:18, 1007:16, 1015:13, 1027:9, 1027:25, 1040:15, 1050:19, 1055:19
**needed** [2] - 993:1, 1027:21
**negative** [6] - 1032:10, 1032:11, 1062:24, 1063:12, 1063:19, 1063:24
**negotiate** [11] - 1022:21, 1023:1, 1023:2, 1023:3, 1023:5, 1023:10, 1023:15, 1023:20, 1023:25, 1024:4
**negotiated** [1] - 1023:9
**negotiating** [2] - 1007:19, 1037:23
**negotiation** [1] - 1027:22
**net** [54] - 991:10, 993:12, 1005:23, 1006:16, 1006:21, 1022:23, 1023:5, 1023:8, 1023:10, 1023:16, 1023:22, 1029:9, 1030:11, 1031:7, 1031:16, 1031:19, 1032:5, 1032:9, 1032:11, 1032:12, 1032:16, 1033:7, 1033:9, 1035:11, 1035:24,

1045:6, 1047:8, 1047:14, 1050:3, 1051:4, 1052:7, 1054:5, 1054:6, 1056:19, 1059:6, 1061:25, 1062:20, 1063:8, 1063:11, 1063:12, 1063:18, 1063:23, 1063:24, 1063:25, 1064:3, 1064:5, 1064:7, 1064:14, 1064:16, 1064:17, 1064:23, 1065:7, 1065:24
**never** [3] - 1005:14, 1005:18, 1023:10
**New** [4] - 984:16, 984:22, 985:7
**new** [2] - 1029:8, 1062:9
**next** [25] - 988:6, 988:12, 988:13, 990:9, 990:18, 996:24, 1010:16, 1012:20, 1015:12, 1021:10, 1025:14, 1028:5, 1029:12, 1031:23, 1032:3, 1037:8, 1047:10, 1047:17, 1050:8, 1052:20, 1052:22, 1057:3, 1061:18, 1066:6, 1066:9
**nice** [2] - 1068:10, 1068:13
**nonenterprise** [1] - 1043:4
**nonresponsive** [1] - 1024:9
**normal** [1] - 1048:4
**normally** [3] - 1013:15, 1013:17, 1034:20
**Northwest** [4] - 984:16, 984:22, 985:11, 985:15
**note** [1] - 995:15
**noted** [1] - 1061:16
**notes** [1] - 1068:12
**nothing** [1] - 1064:2
**number** [16] - 993:8, 996:9, 996:14, 996:18, 999:18, 1002:9, 1013:25, 1015:8, 1015:15, 1015:20, 1024:9, 1037:1, 1037:6, 1039:17, 1048:25, 1054:11
**Number** [2] - 984:4,

984:8
**numbers** [6] - 990:13, 993:15, 994:24, 995:4, 996:8, 1066:16
**numerous** [1] - 1003:13

**O**

**Obama** [1] - 1004:5
**object** [4] - 1020:1, 1038:24, 1052:12, 1055:1
**objection** [28] - 992:19, 998:5, 998:7, 998:8, 1007:14, 1008:25, 1010:1, 1010:24, 1011:8, 1011:11, 1011:12, 1011:16, 1011:22, 1012:6, 1012:7, 1012:12, 1020:7, 1024:16, 1024:17, 1028:20, 1030:23, 1031:3, 1033:23, 1034:1, 1044:3, 1046:8, 1048:15, 1066:25
**objections** [3] - 1011:5, 1052:14, 1066:19
**obligations** [2] - 1025:16, 1064:10
**obviously** [1] - 1031:7
**occasion** [1] - 1005:10
**October** [3] - 984:10, 1029:8, 1069:8
**odd** [1] - 1041:4
**OF** [4] - 984:1, 984:12, 1069:1, 1069:9
**OFFICIAL** [1] - 1069:1
**Official** [1] - 985:14
**official** [2] - 1004:24, 1005:2
**officials** [1] - 1038:14
**once** [3] - 991:19, 1018:16, 1057:3
**one** [51] - 995:22, 998:15, 999:19, 999:21, 999:24, 1003:16, 1004:24, 1007:2, 1007:16, 1008:6, 1012:4, 1014:11, 1015:15, 1016:21, 1026:10, 1028:17, 1028:19, 1029:4, 1030:19, 1030:23, 1031:6,

1031:12, 1037:16, 1038:19, 1038:20, 1041:6, 1041:24, 1043:3, 1043:10, 1044:13, 1044:25, 1045:22, 1045:24, 1052:15, 1052:16, 1052:24, 1055:16, 1055:24, 1056:1, 1056:5, 1056:7, 1056:11, 1056:12, 1056:14, 1056:17, 1056:18, 1056:19, 1066:10, 1066:11

**opening** [3] - 996:5, 1017:14, 1017:20
**opinion** [2] - 1029:23, 1029:25
**opportunity** [2] - 1057:18, 1057:20
**optimistic** [1] - 1026:22
**option** [3] - 1006:24, 1006:25, 1007:19
**optional** [1] - 1016:2
**order** [5] - 987:2, 1005:6, 1032:18, 1052:7, 1057:3
**orient** [1] - 1061:14
**outcome** [1] - 1062:25
**outcomes** [2] - 1062:6, 1063:4
**outside** [2] - 1001:1, 1002:12
**outsider** [1] - 1026:2
**outstanding** [1] - 1016:19
**oversight** [1] - 1026:5
**owe** [6] - 1063:13, 1063:25, 1064:5, 1064:17, 1064:20, 1064:23
**own** [3] - 1005:11, 1034:21, 1043:13

**P**

**P.A** [1] - 985:2
**p.m** [5] - 984:10, 1046:23, 1057:10, 1068:16
**page** [30] - 988:18, 988:22, 990:9, 997:17, 997:19, 997:20, 998:11, 999:24, 1000:4, 1000:16, 1000:20, 1008:12, 1008:17, 1012:15, 1012:20, 1015:12, 1016:1,

1024:21, 1031:11, 1031:13, 1034:15, 1035:5, 1035:6, 1039:14, 1040:25, 1042:12, 1059:25, 1060:3, 1061:4, 1061:5
**pages** [1] - 1041:20
**paid** [4] - 988:9, 1009:18, 1013:8, 1061:9
**pain** [1] - 1058:18
**panic** [1] - 991:21
**paper** [1] - 995:16
**paragraph** [20] - 987:22, 1000:21, 1012:18, 1012:20, 1013:5, 1013:7, 1015:24, 1016:1, 1020:13, 1030:24, 1031:12, 1041:23, 1042:2, 1042:13, 1043:9, 1045:17, 1050:18
**paragraphs** [1] - 1019:12
**parentheses** [2] - 1042:21, 1042:24
**part** [16] - 990:13, 1000:10, 1002:19, 1003:3, 1003:12, 1015:13, 1017:3, 1017:5, 1017:6, 1018:21, 1021:8, 1043:19, 1043:22, 1046:21, 1060:18, 1061:3
**particular** [4] - 1006:8, 1026:10, 1058:11, 1059:5
**particularly** [1] - 1004:10
**pass** [3] - 1004:11, 1004:15, 1004:18
**passed** [1] - 1004:16
**pasted** [1] - 1049:22
**path** [1] - 994:8
**patience** [1] - 1068:8
**pattern** [1] - 1048:4
**pause** [1] - 993:6
**pay** [38] - 1005:6, 1005:16, 1005:17, 1006:1, 1008:23, 1010:11, 1010:16, 1010:22, 1011:4, 1013:21, 1014:1, 1014:10, 1014:11, 1014:12, 1014:14, 1015:17, 1016:2, 1016:18, 1016:25,

1017:2, 1017:7, 1018:4, 1018:6, 1019:18, 1019:19, 1019:22, 1020:14, 1021:22, 1022:6, 1023:23, 1043:16, 1060:11, 1063:7, 1063:20, 1064:4, 1064:10
**pay-down** [1] - 1016:2
**payable** [1] - 1015:18
**paying** [2] - 999:5, 1002:21
**payment** [15] - 990:19, 990:25, 991:7, 992:12, 1010:11, 1012:19, 1013:11, 1015:17, 1017:13, 1019:11, 1019:22, 1019:24, 1020:2, 1020:5, 1022:2
**payments** [1] - 989:22
**penalties** [2] - 1027:4, 1058:18
**penalty** [1] - 1061:7
**Pennsylvania** [1] - 984:19
**people** [7] - 1002:21, 1009:3, 1009:23, 1010:3, 1026:22, 1060:21, 1065:18
**per** [4] - 1015:2, 1015:4, 1015:5, 1015:19
**percent** [47] - 990:21, 997:12, 997:15, 1005:6, 1006:2, 1006:3, 1006:12, 1006:20, 1006:21, 1007:18, 1007:24, 1008:15, 1008:23, 1008:24, 1009:16, 1009:17, 1009:22, 1010:14, 1010:19, 1014:2, 1018:4, 1019:23, 1020:2, 1020:3, 1020:18, 1020:22, 1021:10, 1021:21, 1022:1, 1023:4, 1023:8, 1023:21, 1023:22, 1023:23, 1037:9, 1042:17, 1042:23, 1046:1, 1060:12, 1060:13, 1063:13, 1063:16, 1063:20, 1064:4, 1064:22
**percentage** [1] - 1043:15
**perfect** [1] - 1044:18

**performance** [1] - 1030:13
**perhaps** [3] - 1030:4, 1030:5, 1033:1
**period** [5] - 992:7, 1012:18, 1012:23, 1015:18, 1026:15
**periodic** [1] - 999:5
**permitted** [3] - 1031:17, 1031:24, 1064:8
**person** [1] - 1046:19
**personal** [1] - 1032:25
**perspective** [2] - 1052:8, 1052:9
**phone** [1] - 1011:6
**physical** [1] - 1040:1
**pick** [2] - 987:14, 1011:6
**picking** [1] - 1061:3
**picture** [1] - 1054:18
**piece** [1] - 995:16
**place** [1] - 1001:4
**placed** [1] - 1032:18
**plaintiff** [1] - 1057:21
**Plaintiffs** [3] - 984:4, 984:15, 984:17
**PLAINTIFFS** [1] - 987:11
**plaintiffs** [7] - 1057:2, 1066:5, 1066:8, 1067:7, 1067:15, 1067:23, 1068:5
**plaintiffs'** [2] - 1030:25, 1057:20
**plan** [17] - 999:11, 1000:1, 1000:16, 1000:17, 1001:8, 1001:20, 1003:6, 1003:9, 1003:23, 1003:24, 1025:7, 1038:3, 1038:5, 1038:9, 1038:11, 1038:14, 1038:15
**plans** [8] - 997:10, 998:17, 999:1, 999:4, 999:7, 999:10, 999:11
**play** [1] - 1024:5
**played** [4] - 1057:8, 1067:13, 1067:21, 1068:4
**PLLC** [1] - 984:15
**plummeted** [1] - 1051:20
**plus** [1] - 993:10
**point** [17] - 993:1, 1001:16, 1002:18, 1006:15, 1009:17, 1017:19, 1019:2,

1019:23, 1020:25, 1025:3, 1025:4, 1025:6, 1029:1, 1055:17, 1055:23, 1061:10
**pointed** [1] - 1058:23
**Porter** [1] - 985:11
**position** [1] - 1043:11
**positive** [1] - 1064:3
**possible** [4] - 1011:3, 1028:18, 1057:21, 1062:6
**potential** [2] - 1000:25, 1065:15
**practice** [4] - 998:2, 1005:5, 1005:7, 1005:11
**precise** [1] - 1028:3
**precisely** [1] - 993:16
**predict** [1] - 1063:5
**prediction** [1] - 994:6
**prefatory** [1] - 1007:14
**preference** [30] - 1008:24, 1009:14, 1009:22, 1010:13, 1010:17, 1013:10, 1013:22, 1013:25, 1014:5, 1014:19, 1014:23, 1015:2, 1015:9, 1016:2, 1016:7, 1016:18, 1016:22, 1017:3, 1018:11, 1018:23, 1019:4, 1020:15, 1021:2, 1021:12, 1022:2, 1022:8, 1056:6, 1060:12, 1060:13, 1061:8
**PREFERRED** [1] - 984:9
**preferred** [13] - 990:19, 990:25, 991:7, 992:12, 1012:4, 1013:9, 1015:20, 1016:19, 1032:17, 1050:8, 1050:22, 1051:19, 1066:16
**prepared** [1] - 1033:22
**present** [3] - 987:3, 1057:11, 1067:8
**presented** [1] - 1005:18
**presenting** [1] - 997:25
**preserve** [1] - 1042:3
**preserving** [1] - 1042:8
**President** [1] - 1004:5
**press** [4] - 1049:23,

1052:17, 1052:18
**pressure** [1] - 1034:22
**pretty** [3] - 989:13, 995:2, 1009:24
**prevent** [1] - 1065:24
**preview** [1] - 1055:22
**previous** [1] - 1048:6
**previously** [3] - 1016:21, 1023:6, 1035:4
**price** [1] - 1051:19
**prices** [2] - 1025:9, 1065:18
**primarily** [2] - 1001:3, 1025:7
**principal** [6] - 1037:16, 1037:20, 1038:18, 1041:8, 1041:18, 1043:12
**principally** [1] - 1062:18
**private** [1] - 1013:16
**pro** [1] - 1016:19
**problem** [3] - 1017:21, 1023:11, 1068:1
**proceed** [1] - 987:8
**proceeding** [1] - 1005:11
**Proceedings** [2] - 985:18, 1068:16
**proceedings** [2] - 1007:2, 1069:4
**produced** [3] - 985:18, 1034:15, 1034:18
**productive** [1] - 1004:10
**professional** [1] - 1029:25
**proffer** [3] - 1055:9, 1055:11, 1055:13
**profile** [1] - 1025:9
**profit** [2] - 1002:12, 1002:16
**profitability** [1] - 988:2
**profitable** [3] - 988:21, 989:1, 1053:19
**profits** [5] - 990:10, 992:5, 1001:21, 1022:22, 1046:1
**projected** [7] - 990:10, 991:25, 993:22, 994:6, 994:25, 995:19, 996:14
**projecting** [3] - 991:6, 1036:13, 1037:8
**projection** [14] - 989:17, 991:24, 992:5, 993:20, 993:21, 994:7,

994:20, 994:24, 995:5, 996:2, 996:20, 996:24, 1025:7, 1036:18
**projections** [24] - 988:6, 988:8, 988:17, 990:14, 991:4, 991:5, 994:2, 995:1, 996:25, 997:6, 997:24, 998:14, 998:16, 1026:11, 1028:8, 1029:8, 1029:16, 1029:18, 1034:21, 1054:13, 1054:15, 1058:6, 1058:11, 1062:14
**property** [2] - 1042:4, 1042:9
**proposal** [2] - 1003:14, 1003:21
**proposed** [1] - 1003:20
**proposing** [1] - 1038:18
**proud** [2] - 1030:11, 1030:13
**provision** [9] - 1006:12, 1015:1, 1020:2, 1022:21, 1023:10, 1023:15, 1023:20, 1023:25
**provisions** [2] - 1016:17, 1022:18
**Prussia** [1] - 984:19
**PSPA** [5] - 999:6, 1006:24, 1045:3, 1045:14, 1047:3
**public** [1] - 988:3
**publicly** [1] - 1045:25
**publish** [1] - 1044:3
**pull** [9] - 994:22, 995:3, 999:22, 1002:1, 1013:5, 1017:13, 1033:5, 1044:10, 1054:23
**PURCHASE** [1] - 984:9
**purchase** [3] - 1032:17, 1050:9, 1050:22
**purely** [1] - 996:5
**pursuant** [4] - 1013:8, 1013:10, 1014:21, 1016:22
**push** [3] - 1045:14, 1045:19, 1048:7
**put** [10] - 994:18, 996:4, 1002:2, 1011:13, 1011:14,

1037:24, 1048:6, 1060:16, 1065:9
**PX** [2] - 999:15, 1045:22
**PX-122** [3] - 986:14, 1066:21, 1067:2
**PX-154** [1] - 999:14
**PX-186** [2] - 986:14, 1067:2
**PX-190** [2] - 986:14, 1067:2
**PX-197** [2] - 986:14, 1067:2
**PX-205** [1] - 1054:23
**PX-209** [2] - 986:14, 1067:2
**PX-213** [1] - 987:15
**PX-216** [2] - 986:14, 1067:2
**PX-223** [3] - 1024:7, 1024:19
**PX-223.....................
............ [1] -
986:9
**PX-244** [2] - 986:14, 1067:3
**PX-246** [2] - 1044:9, 1044:12
**PX-247** [1] - 1044:14
**PX-253** [2] - 986:15, 1067:3
**PX-254** [3] - 1046:4, 1046:7, 1046:10
**PX-254.....................
............ [1] -
986:12
**PX-259** [1] - 1052:24
**PX-284** [4] - 994:9, 1048:11, 1048:13, 1048:18
**PX-284.....................
............ [1] -
986:13
**PX-304** [8] - 1028:10, 1028:11, 1028:12, 1030:4, 1033:21, 1033:25, 1034:2, 1034:5
**PX-304.....................
............ [1] -
986:10
**PX-327** [2] - 986:15, 1067:3
**PX-33** [4] - 986:8, 1011:25, 1012:5, 1012:13
**PX-34** [2] - 1012:8, 1012:13
**PX-34.....................
............ [1] - 986:8

**PX-340** [2] - 986:15, 1067:3
**PX-348** [2] - 986:15, 1067:3
**PX-353** [2] - 986:15, 1067:3
**PX-370** [2] - 986:15, 1067:3
**PX-460** [2] - 1030:19, 1031:5
**PX-471** [2] - 986:15, 1067:3
**PX-474** [2] - 986:16, 1067:4
**PX-479** [1] - 1067:4
**PX-479.....................
............ [1] - 986:16
**PX-500** [4] - 1038:20, 1043:25, 1044:1, 1044:7
**PX-500.....................
............ [1] -
986:11
**PXs** [1] - 1066:21

## Q

**quality** [1] - 1058:14
**quarter** [21] - 1005:15, 1008:22, 1009:12, 1010:16, 1014:11, 1021:11, 1022:7, 1031:8, 1031:20, 1032:4, 1032:5, 1032:15, 1046:1, 1060:11, 1063:13, 1063:19, 1063:25, 1064:4, 1064:6, 1064:19, 1064:20
**quarters** [10] - 1028:6, 1031:25, 1056:11, 1061:14, 1061:15, 1061:18, 1061:21, 1061:24, 1062:8, 1062:12
**questioning** [6] - 1010:10, 1017:16, 1038:2, 1052:6, 1052:25, 1058:23
**questions** [25] - 1030:10, 1037:15, 1037:17, 1038:25, 1041:7, 1054:10, 1055:4, 1056:14, 1056:15, 1057:19, 1057:21, 1057:22, 1058:9, 1058:12, 1059:2, 1059:10, 1061:12, 1062:16, 1063:6, 1065:1,

1065:2, 1065:4, 1066:1, 1066:2
**quick** [3] - 999:14, 1011:24, 1037:16
**quickly** [8] - 989:13, 992:16, 1014:21, 1024:7, 1024:21, 1028:10, 1033:24, 1048:8
**quite** [2] - 1003:9, 1046:19

## R

**Radnor** [1] - 984:19
**rata** [1] - 1016:19
**rate** [7] - 1006:2, 1009:16, 1021:20, 1023:3, 1023:5, 1025:10
**rather** [1] - 1038:17
**ratios** [1] - 1042:23
**re** [2] - 984:8, 1057:21
**re-redirect** [1] - 1057:21
**reaction** [2] - 1008:20, 1060:9
**read** [10] - 1013:4, 1019:13, 1040:6, 1056:2, 1056:3, 1060:6, 1060:14, 1060:16, 1060:18, 1061:3
**reading** [1] - 1002:8
**reads** [1] - 1036:20
**ready** [1] - 1000:25
**really** [5] - 989:25, 991:17, 998:17, 1005:10, 1020:24
**reason** [4] - 1014:9, 1017:2, 1029:15, 1043:11
**received** [15] - 1012:12, 1012:13, 1024:18, 1024:19, 1034:1, 1034:2, 1044:6, 1044:7, 1045:19, 1046:9, 1046:10, 1048:17, 1048:18, 1067:1, 1067:4
**RECEIVED** [1] - 986:7
**receivership** [1] - 1032:18
**Recess** [1] - 1057:10
**recess** [1] - 1055:6
**recharacterize** [1] - 992:23
**recited** [1] - 1060:6
**recognize** [1] - 996:18

recognizing [1] -
994:19
recollection [6] -
1005:21, 1005:24,
1006:3, 1006:7,
1047:16, 1051:24
record [6] - 987:10,
1001:21, 1011:1,
1029:14, 1068:15,
1069:4
recorded [1] - 985:18
recounts [1] - 987:19
RECROSS [1] -
1058:3
Recross [1] - 986:4
RECROSS-
EXAMINATION [1] -
1058:3
Recross-
Examination..........
. [1] - 986:4
redacted [3] - 1024:9,
1039:10, 1044:6
redaction [1] -
1040:11
redactions [3] -
1039:9, 1040:18,
1044:4
redirect [6] - 1052:16,
1055:5, 1055:10,
1055:11, 1057:19,
1057:21
REDIRECT [1] -
987:12
Redirect [1] - 986:4
reduced [2] - 1018:16,
1061:11
reduces [1] - 1018:10
reduction [6] -
1037:16, 1037:20,
1038:18, 1041:8,
1041:18, 1043:12
refer [1] - 1042:12
reference [2] - 997:18,
1061:21
referenced [1] - 999:1
referred [3] - 988:13,
1061:1, 1066:13
referring [1] - 1010:10
refers [2] - 989:10,
990:21
reflect [2] - 1002:25,
1035:16
reflected [2] - 999:11,
1033:18
reflecting [1] - 994:8
reflection [1] -
1029:17
reflects [4] - 994:1,
994:6, 996:9

refresh [1] - 1008:8
regarding [1] -
1006:13
regulated [2] - 1042:4,
1042:9
rejected [3] - 1006:20,
1007:22, 1007:23
related [1] - 1025:8
relates [1] - 1056:6
relatively [1] - 1043:15
release [5] - 1049:23,
1051:20, 1052:17,
1052:18
released [1] - 1045:25
relevant [1] - 1042:10
Remaining [1] -
991:11
remaining [8] -
991:18, 991:25,
992:6, 993:5,
994:10, 995:9,
996:10, 997:1
remains [2] - 1008:22,
1060:10
remarkably [1] -
1011:25
remember [14] -
1004:23, 1006:14,
1017:17, 1017:18,
1021:13, 1028:7,
1034:25, 1035:10,
1036:25, 1045:1,
1045:9, 1053:2,
1053:11, 1061:19
reminder [1] - 1054:24
removed [1] - 1059:13
renewed [3] -
1045:14, 1045:19,
1048:7
REO [1] - 1025:9
repaid [1] - 1021:12
repay [7] - 1010:16,
1016:7, 1017:7,
1021:11
repeat [1] - 1041:14
rephrase [1] - 1003:18
rephrased [1] -
1011:22
report [3] - 1026:12,
1026:15, 1031:15
REPORTER [2] -
1069:1, 1069:9
Reporter [1] - 985:14
reports [4] - 1026:14,
1053:13, 1054:12,
1054:14
represent [1] - 993:16
Republicans [1] -
1004:8
requested [1] -

1043:13
require [3] - 1002:25,
1009:3, 1060:20
required [2] - 999:6,
1003:18, 1032:16
requirements [1] -
1041:24
rerecording [1] -
1053:14
rerun [1] - 1034:23
reserve [2] - 1025:11,
1033:15
reserves [3] -
1031:18, 1031:19,
1031:24
resiliency [2] - 1062:4,
1065:11
resilient [1] - 1062:11
respect [2] - 1008:13,
1061:13
response [2] -
1061:12, 1061:16
responses [1] -
998:15
responsibility [4] -
1042:3, 1042:8,
1062:10, 1063:3
rest [2] - 1045:17,
1056:6
resulted [1] - 1061:8
resulting [1] - 1025:8
results [3] - 988:17,
1035:16, 1035:19
RESUMED [1] -
987:11
retain [3] - 1031:17,
1031:24, 1064:8
return [1] - 988:2
revenue [1] - 999:2
revenues [1] -
1035:22
reversal [1] - 1001:24
reversing [1] -
1002:17
reviewed [4] - 1035:4,
1059:8, 1060:3,
1063:21
right-hand [1] -
1018:9
rights [1] - 1014:22
risks [1] - 1026:18
Road [1] - 984:19
ROBERT [2] - 985:5,
985:10
Room [1] - 985:16
room [1] - 1068:12
ROYCE [1] - 984:12
RPR [1] - 985:14
RUDY [1] - 984:17
rule [5] - 1011:5,

1016:9, 1016:10,
1016:11, 1016:16
rules [2] - 1002:25,
1027:1
runs [1] - 1067:25

S

SAMUEL [1] - 984:21
SARA [1] - 985:14
Sara [2] - 1069:3,
1069:8
Satriano [3] - 1053:1,
1053:13, 1054:4
saw [3] - 1049:18,
1051:12, 1065:20
scanning [1] - 992:16
scenario [16] - 990:6,
991:5, 1022:21,
1023:2, 1035:6,
1035:15, 1036:3,
1036:11, 1062:18,
1062:22, 1062:24,
1062:25, 1063:1,
1063:2, 1064:14
scenarios [3] -
1034:5, 1062:16,
1062:17
Schiller [1] - 984:22
Scholer [1] - 985:11
scope [2] - 1052:12,
1052:19
screen [5] - 988:22,
997:18, 1024:23,
1044:11, 1048:21
scroll [5] - 1000:5,
1046:21, 1050:6,
1050:16, 1053:11
seated [2] - 987:7,
1057:17
SEC [18] - 1025:22,
1025:25, 1026:1,
1026:7, 1026:12,
1026:14, 1027:1,
1031:5, 1031:15,
1054:11, 1054:14,
1054:20, 1056:1,
1058:14, 1058:17,
1058:21
second [9] - 1012:20,
1017:6, 1030:6,
1039:13, 1042:2,
1042:12, 1044:13,
1045:25
Second [1] - 993:11
secondary [1] -
1001:4
Secretary [3] -
1037:20, 1038:4,
1043:13

secretary [1] -
1046:16
section [4] - 987:18,
1013:10, 1014:22,
1015:25
Section [4] - 1013:8,
1014:21, 1014:22,
1016:22
securities [2] -
991:21, 1065:13
securitization [2] -
1001:1
security [3] - 1002:8,
1062:10, 1062:11
see [122] - 987:20,
987:24, 988:4,
988:10, 988:15,
988:20, 988:21,
988:25, 989:3,
989:6, 989:8,
989:13, 989:15,
989:17, 989:19,
989:23, 989:25,
990:2, 990:7,
990:16, 990:18,
990:24, 991:2,
991:4, 991:8,
991:13, 992:2,
992:8, 992:16,
993:24, 995:10,
995:13, 995:18,
995:20, 995:24,
996:16, 997:3,
998:20, 1000:8,
1001:6, 1007:8,
1009:5, 1009:20,
1012:15, 1012:21,
1013:1, 1013:2,
1013:13, 1014:24,
1015:3, 1015:10,
1015:22, 1016:3,
1016:13, 1016:23,
1017:9, 1017:23,
1018:13, 1021:3,
1021:7, 1021:12,
1021:25, 1022:4,
1022:7, 1022:8,
1022:13, 1024:4,
1024:12, 1024:23,
1025:1, 1025:12,
1025:17, 1028:13,
1031:14, 1031:21,
1032:1, 1032:6,
1032:19, 1033:5,
1034:7, 1034:11,
1035:8, 1035:14,
1035:17, 1036:1,
1036:5, 1036:9,
1036:15, 1036:16,
1039:6, 1040:24,

1042:6, 1042:13, 1042:19, 1042:25, 1043:6, 1044:23, 1045:3, 1045:15, 1046:14, 1046:22, 1046:25, 1047:4, 1047:19, 1048:22, 1049:5, 1049:15, 1049:20, 1050:1, 1050:6, 1050:11, 1051:8, 1051:14, 1051:16, 1053:6, 1053:15, 1053:20, 1053:24, 1060:23, 1066:15, 1068:10

**seeing** [2] - 1017:18, 1050:3

**semicolon** [1] - 1032:3

**Senate** [3] - 1004:13, 1004:16, 1004:17

**SENIOR** [1] - 984:9

**senior** [6] - 1013:8, 1015:20, 1016:19, 1032:17, 1046:19, 1058:18

**sense** [6] - 992:11, 996:12, 996:16, 1015:13, 1053:22, 1054:5

**sent** [5] - 999:12, 1026:10, 1041:8, 1041:10, 1041:16

**sentence** [20] - 988:1, 988:6, 988:12, 1012:21, 1015:14, 1015:15, 1016:5, 1016:12, 1025:14, 1025:17, 1031:23, 1041:25, 1042:2, 1043:3, 1045:12, 1047:2, 1047:10, 1047:17, 1050:8, 1056:7

**separate** [1] - 1030:9

**September** [11] - 1004:24, 1004:25, 1005:3, 1028:12, 1034:6, 1035:6, 1035:10, 1035:15, 1036:7, 1036:12

**series** [1] - 1035:1

**served** [1] - 1001:5

**SESSION** [1] - 984:12

**set** [3] - 1013:3, 1029:8, 1050:21

**setting** [1] - 1029:12

**seven** [1] - 1008:9

**Seventh** [1] - 985:3

**several** [2] - 1003:11,

---

1041:20

**shall** [3] - 1013:9, 1015:15

**share** [4] - 1015:2, 1015:4, 1015:5, 1015:19

**shared** [1] - 1017:12

**shareholders** [3] - 1013:16, 1013:19, 1014:7

**shares** [3] - 1015:5, 1015:20, 1016:19

**Sharon** [2] - 1048:21, 1049:10

**sheet** [1] - 1026:16

**short** [2] - 1055:6, 1055:9

**shortfall** [1] - 1023:24

**shorthand** [1] - 985:18

**shortly** [2] - 1039:24, 1067:24

**show** [42] - 988:6, 988:8, 993:21, 994:18, 994:19, 996:1, 996:3, 996:6, 996:8, 997:11, 997:18, 998:2, 998:8, 1008:19, 1011:1, 1017:12, 1017:19, 1018:25, 1019:24, 1020:3, 1020:18, 1020:19, 1020:25, 1024:21, 1028:10, 1030:19, 1038:19, 1038:20, 1038:21, 1039:12, 1040:1, 1040:6, 1044:9, 1045:22, 1045:23, 1046:4, 1048:8, 1052:16, 1052:17, 1052:18, 1054:12, 1054:14

**showed** [10] - 987:16, 996:5, 996:20, 996:24, 1017:14, 1017:20, 1020:13, 1052:17, 1052:24, 1062:14

**showing** [8] - 994:25, 996:2, 996:3, 1018:25, 1020:12, 1020:17, 1046:1, 1053:2

**shown** [9] - 995:8, 995:9, 997:6, 997:23, 998:4, 998:13, 1025:22, 1031:5, 1044:20

**shows** [11] - 990:10,

---

994:19, 1011:1, 1017:21, 1018:4, 1018:7, 1018:9, 1035:13, 1035:22

**shrink** [4] - 1001:10, 1023:13, 1033:13, 1033:15

**shrinking** [3] - 991:20, 1003:16, 1003:25

**shrunk** [1] - 1001:17

**shy** [1] - 1066:10

**side** [2] - 1016:12, 1018:9

**sides** [1] - 1010:4

**SIGNATURE** [1] - 1069:9

**signed** [5] - 1039:13, 1039:20, 1040:24, 1045:10, 1058:17

**significance** [1] - 1056:12

**simply** [3] - 1018:19, 1031:5, 1041:15

**situation** [2] - 1022:25, 1063:18

**slide** [3] - 988:20, 1017:14, 1017:17

**slides** [1] - 988:23

**slightly** [2] - 993:15, 996:4

**slow** [1] - 1066:23

**small** [2] - 989:25, 1056:19

**smooth** [1] - 1044:17

**sold** [1] - 1014:6

**someone** [1] - 1029:20

**sometimes** [2] - 1034:13, 1055:11

**somewhere** [1] - 1015:4

**soon** [1] - 1023:24

**sorry** [18] - 988:22, 994:4, 999:21, 1010:4, 1015:25, 1026:3, 1028:15, 1039:22, 1041:14, 1048:24, 1051:13, 1055:20, 1057:13, 1059:25, 1060:2, 1061:13, 1064:13, 1067:18

**sort** [2] - 1018:6, 1034:22

**specific** [2] - 1027:1, 1028:2

**speeches** [1] - 1007:14

**spelled** [1] - 1067:9

**spent** [1] - 1058:14

---

**sponsored** [1] - 1050:25

**spreads** [1] - 1051:23

**SPSPA** [1] - 991:12

**squabble** [1] - 994:17

**STAND** [1] - 987:11

**start** [1] - 996:18

**started** [2] - 1027:22, 1030:10

**starting** [1] - 988:18

**starts** [5] - 989:25, 991:25, 1015:2, 1049:22

**statement** [3] - 1001:8, 1010:7, 1030:15

**statements** [2] - 1017:15, 1027:3

**STATES** [2] - 984:1, 984:13

**States** [1] - 985:14

**statutory** [2] - 1041:24, 1042:3

**stay** [1] - 1038:17

**staying** [2] - 1043:15, 1043:21

**stays** [2] - 989:17, 995:22

**steadily** [1] - 990:1

**stenotype** [1] - 985:18

**step** [3] - 1000:25, 1055:8, 1066:3

**steps** [1] - 1049:24

**Stern** [7] - 1003:12, 1007:9, 1044:21, 1045:17, 1055:20, 1057:25, 1059:25

**STERN** [47] - 985:8, 992:19, 998:6, 1007:14, 1010:1, 1010:24, 1011:12, 1011:17, 1012:7, 1020:1, 1020:7, 1024:17, 1028:22, 1029:10, 1031:3, 1033:23, 1038:23, 1039:9, 1039:15, 1039:25, 1040:3, 1040:11, 1040:13, 1041:1, 1041:3, 1041:11, 1044:3, 1046:8, 1048:15, 1048:24, 1049:2, 1052:12, 1054:25, 1055:5, 1055:13, 1055:16, 1055:20, 1056:1, 1056:5, 1056:9, 1056:24, 1057:13, 1058:1, 1058:4, 1059:15,

---

1059:19, 1066:1

**still** [3] - 1002:12, 1042:9, 1063:13

**stipulate** [3] - 1039:15, 1041:1, 1041:3

**stipulated** [1] - 1039:20

**STOCK** [1] - 984:9

**stock** [10] - 1012:4, 1013:9, 1015:21, 1016:19, 1032:17, 1050:8, 1050:22, 1051:19, 1051:20, 1051:24

**stop** [1] - 1065:12

**strategic** [4] - 999:11, 1000:1, 1003:9, 1003:24

**Strategic** [2] - 988:20, 988:25

**strategy** [1] - 987:18

**Street** [1] - 985:3

**stress** [5] - 1035:1, 1035:3, 1056:12, 1062:25, 1063:1

**stricken** [1] - 1011:21

**strictly** [2] - 1038:25, 1040:7

**strike** [2] - 1004:10, 1011:17

**subject** [5] - 1004:20, 1016:16, 1045:3, 1049:4, 1049:14

**submitted** [1] - 1000:1

**subprovision** [1] - 1015:12

**subprovisions** [1] - 1015:8

**subsequent** [1] - 1031:25

**substance** [1] - 1043:10

**sudden** [1] - 1000:13

**sue** [1] - 1026:23

**sufficient** [2] - 1025:15, 1031:19

**suggested** [1] - 1065:4

**suggesting** [1] - 1038:24

**summarizes** [1] - 997:6

**summary** [1] - 1024:25

**summer** [2] - 1004:5, 1005:22

**Sunday** [1] - 1046:23

**support** [1] - 988:3

**supported** [2] -

1004:14, 1020:8
**surpass** [1] - 988:9
**surpasses** [1] - 990:1
**sustained** [3] -
1011:16, 1011:22,
1055:3
**sweep** [36] - 1005:23,
1006:16, 1006:21,
1022:24, 1023:5,
1023:11, 1023:16,
1029:9, 1030:11,
1031:7, 1031:16,
1032:9, 1032:13,
1033:8, 1033:9,
1035:11, 1045:6,
1047:8, 1047:15,
1050:4, 1051:4,
1052:7, 1054:6,
1056:19, 1059:6,
1062:1, 1062:20,
1063:8, 1063:12,
1063:23, 1063:24,
1064:5, 1064:14,
1064:16, 1065:7,
1065:24
**switched** [1] - 1021:10
**system** [1] - 1063:4

## T

**T-a-g-o-e** [1] - 1067:9
**tab** [16] - 987:15,
997:16, 997:17,
999:16, 1008:11,
1008:13, 1008:14,
1008:15, 1028:14,
1028:16, 1028:17,
1048:25, 1059:12,
1059:13, 1059:20
**Tagoe** [5] - 1029:4,
1029:7, 1029:15,
1067:9, 1067:13
**Tagoe's** [4] - 1034:16,
1034:19, 1034:22,
1068:6
**talks** [1] - 1012:18
**tax** [3] - 1002:10,
1053:12, 1053:14
**taxes** [1] - 1033:1
**taxpayers** [3] -
1050:10, 1050:13,
1051:7
**team's** [1] - 1029:17
**technical** [2] -
1012:19, 1067:18
**ten** [1] - 1006:8
**tenure** [1] - 1030:14
**term** [7] - 1027:5,
1027:6, 1027:7,
1062:4, 1062:7

**terminated** [1] -
1016:9
**termination** [4] -
1016:5, 1016:8,
1016:13, 1016:15
**terrible** [1] - 1002:19
**test** [3] - 1034:22,
1035:1, 1035:3
**testified** [6] - 1023:6,
1038:2, 1052:6,
1060:23, 1061:12,
1061:16
**testify** [1] - 1011:3
**testifying** [1] -
1007:21
**TESTIMONY** [1] -
986:3
**testimony** [14] -
991:18, 997:14,
998:22, 1003:11,
1006:18, 1009:7,
1017:15, 1020:21,
1059:8, 1060:3,
1061:16, 1061:19,
1067:8, 1068:6
**THE** [47] - 984:1,
984:1, 984:12,
987:4, 987:7,
987:11, 998:8,
999:18, 1007:18,
1011:5, 1011:8,
1011:11, 1011:16,
1011:21, 1012:12,
1024:18, 1034:1,
1040:22, 1041:2,
1044:6, 1046:9,
1048:17, 1052:20,
1052:22, 1055:3,
1055:6, 1055:8,
1055:14, 1055:19,
1055:25, 1056:4,
1056:8, 1056:22,
1057:5, 1057:12,
1057:17, 1059:18,
1066:3, 1066:4,
1066:5, 1066:17,
1066:20, 1066:23,
1066:25, 1067:5,
1067:12, 1068:7
**thereafter** [1] -
1033:12
**therefor** [1] - 1016:20
**therefore** [3] -
1005:11, 1010:12,
1032:4
**they've** [2] - 1014:11,
1022:22
**thinking** [6] - 1003:12,
1059:5, 1059:6,
1061:25, 1062:19,

1062:22
**Third** [7] - 1007:19,
1037:24, 1037:25,
1047:6, 1054:2,
1054:6, 1065:6
**third** [4] - 1031:12,
1039:14, 1040:25,
1041:23
**thousands** [1] -
1000:25
**three** [5] - 1000:6,
1003:14, 1003:20,
1056:17, 1062:17
**threshold** [2] -
1023:13, 1023:17
**timing** [1] - 1033:3
**title** [1] - 988:20
**titled** [1] - 1012:16
**today** [5] - 998:24,
1001:4, 1001:17,
1050:19, 1050:21
**together** [5] - 994:19,
996:4, 996:5,
1004:11, 1004:12
**took** [2] - 1002:18,
1005:12
**top** [11] - 988:25,
989:7, 990:11,
990:15, 994:23,
1000:20, 1035:8,
1036:15, 1048:11,
1053:11
**Topaz** [1] - 984:18
**topic** [2] - 1030:9,
1054:10
**total** [4] - 995:12,
995:23, 996:20,
1035:23
**totally** [1] - 1008:10
**touched** [1] - 1047:11
**Transcript** [1] - 985:18
**transcript** [3] - 1056:2,
1056:20, 1069:4
**TRANSCRIPT** [1] -
984:12
**transcription** [1] -
985:18
**transcripts** [1] - 998:3
**Treasury** [48] - 988:9,
989:11, 990:10,
990:21, 1003:14,
1003:20, 1003:23,
1005:6, 1009:11,
1010:21, 1010:22,
1011:4, 1011:14,
1011:15, 1012:4,
1012:10, 1014:4,
1014:10, 1016:8,
1018:1, 1018:6,
1019:4, 1021:5,

1023:7, 1032:17,
1032:21, 1037:1,
1037:18, 1038:3,
1038:18, 1045:20,
1046:19, 1049:4,
1049:14, 1049:18,
1049:23, 1050:3,
1050:14, 1050:19,
1050:21, 1050:23,
1052:18, 1063:14,
1063:20, 1064:9,
1065:8
**Treasury's** [1] -
1010:13
**trend** [1] - 1043:3
**trial** [1] - 1067:25
**TRIAL** [1] - 984:12
**tricky** [1] - 1007:1
**tried** [1] - 1023:10
**trigger** [1] - 991:20
**trouble** [1] - 1034:13
**true** [11] - 1001:15,
1003:6, 1005:4,
1006:14, 1008:4,
1010:15, 1010:22,
1026:21, 1029:11,
1032:8, 1038:13
**trust** [1] - 1002:8
**truthful** [2] - 998:22,
1009:7
**truthfully** [1] - 1006:10
**try** [14] - 994:18,
1022:20, 1023:3,
1023:5, 1023:15,
1023:17, 1023:20,
1023:25, 1024:4,
1024:5, 1026:23,
1028:3, 1044:17,
1057:23
**trying** [9] - 997:10,
997:11, 1006:10,
1006:24, 1010:8,
1019:9, 1020:21,
1020:25, 1062:8
**Tuesday** [1] - 1053:1
**turn** [2] - 997:16,
1020:24
**tweet** [1] - 1068:11
**Twitter** [1] - 1068:11
**two** [23] - 996:8,
998:12, 999:23,
1007:13, 1023:14,
1026:5, 1028:5,
1034:17, 1037:16,
1038:20, 1041:6,
1045:24, 1056:10,
1056:14, 1056:17,
1061:13, 1061:15,
1061:18, 1061:21,
1061:24, 1062:7,

1066:9

## U

**U.S** [3] - 1050:18,
1050:20, 1065:17
**Ugoletti** [3] - 1044:21,
1045:12, 1048:6
**ultimate** [1] - 1003:7
**ultimately** [2] -
1003:6, 1061:8
**uncertain** [2] -
1001:13, 1001:14
**uncertainty** [3] -
991:20, 999:7,
1002:21
**under** [26] - 989:17,
991:4, 991:11,
991:24, 993:20,
994:1, 995:1,
996:25, 999:1,
999:6, 1000:10,
1009:10, 1009:11,
1015:16, 1019:11,
1032:12, 1032:17,
1032:22, 1038:4,
1046:16, 1058:18,
1062:5, 1064:5,
1064:12, 1064:14,
1064:16
**underlying** [1] -
988:18
**underneath** [1] -
990:18, 1041:23
**understood** [8] -
992:25, 993:19,
994:21, 1004:21,
1011:3, 1027:25,
1048:8, 1058:25
**underwater** [4] -
1042:17, 1042:22,
1043:4, 1043:14
**undiminished** [2] -
1008:22, 1060:11
**unhappiness** [1] -
991:20
**unique** [1] - 1022:25
**United** [1] - 985:14
**UNITED** [2] - 984:1,
984:13
**unity** [1] - 1004:11
**unless** [2] - 998:4,
1028:24
**unlike** [2] - 1000:21,
1000:24
**unpack** [1] - 1043:2
**unpaid** [1] - 1009:18,
1015:19, 1016:21
**untouched** [2] -
1008:22, 1060:10

**unused** [1] - 996:10
**up** [41] - 987:15,
989:13, 990:1,
990:13, 993:17,
994:22, 994:24,
995:3, 999:22,
1001:16, 1002:2,
1003:1, 1006:15,
1007:3, 1007:12,
1007:24, 1009:22,
1010:13, 1011:6,
1013:5, 1017:13,
1019:4, 1021:3,
1022:2, 1022:8,
1027:23, 1033:6,
1035:8, 1036:25,
1044:10, 1045:13,
1048:6, 1053:11,
1054:5, 1054:23,
1056:22, 1057:23,
1061:3, 1061:5,
1066:15
**update** [3] - 987:19,
1029:7, 1029:16
**useful** [1] - 1029:18

## V

**vacation** [6] - 1047:18,
1047:22, 1047:25,
1048:3, 1048:5,
1048:7
**validity** [1] - 1027:3
**value** [1] - 1042:22
**values** [2] - 1002:20,
1025:10
**variety** [1] - 1062:14
**various** [1] - 1058:6
**version** [1] - 999:16
**versions** [1] - 999:23
**versus** [3] - 994:25,
1007:24, 1035:6
**veto** [1] - 1011:15
**viable** [3] - 1007:11,
1007:22, 1007:23
**vicious** [1] - 1018:6
**Video** [2] - 1067:21,
1068:4
**video** [4] - 1057:4,
1066:9, 1067:5,
1067:13
**view** [1] - 1053:18
**views** [1] - 1058:20
**visually** [1] - 996:2
**vividly** [1] - 1019:2
**voice** [1] - 1061:5
**vs** [1] - 984:5

## W

**wait** [1] - 1033:4
**waited** [4] - 1027:12,
1027:13, 1027:21,
1028:1
**walk** [1] - 1018:1
**walking** [1] - 1043:2
**wants** [1] - 1066:15
**Washington** [5] -
984:9, 984:16,
984:23, 985:12,
985:16
**watch** [3] - 1001:19,
1001:20, 1021:1
**ways** [2] - 1019:24,
1020:19
**week** [1] - 1001:15
**weekend** [2] -
1068:10, 1068:13
**weight** [1] - 1058:20
**White** [1] - 1004:6
**whole** [4] - 1019:20,
1062:5, 1065:20,
1065:21
**WICK** [1] - 985:14
**Wick** [2] - 1069:3,
1069:8
**Wilmington** [1] -
985:4
**wind** [8] - 1003:23,
1049:24, 1051:1,
1052:8, 1052:13,
1053:23, 1054:7,
1057:23
**wind-down** [7] -
1003:23, 1049:24,
1051:1, 1052:8,
1052:13, 1053:23,
1054:7
**wish** [1] - 1013:4
**withdraw** [3] -
1017:19, 1032:23,
1033:4
**withdrawn** [1] -
1060:17
**withstand** [1] - 1063:4
**witness** [7] - 987:4,
1007:16, 1029:2,
1040:1, 1040:3,
1040:10, 1057:14
**WITNESS** [4] - 987:11,
1007:18, 1041:2,
1066:4
**word** [4] - 1002:7,
1031:13, 1052:2,
1061:4
**wording** [1] - 1006:24
**words** [2] - 987:23,
1041:23

**works** [3] - 1009:24,
1017:10, 1056:19
**worried** [2] - 1022:11,
1065:10
**worst** [2] - 1019:21,
1062:24
**worth** [53] - 993:12,
1005:23, 1006:16,
1006:21, 1022:23,
1023:5, 1023:8,
1023:11, 1023:16,
1023:22, 1023:23,
1029:9, 1030:11,
1031:7, 1031:16,
1031:19, 1032:5,
1032:9, 1032:12,
1032:13, 1032:16,
1033:8, 1033:9,
1035:11, 1045:6,
1047:8, 1047:14,
1050:4, 1051:4,
1052:7, 1054:5,
1054:6, 1056:19,
1059:6, 1062:1,
1062:20, 1063:8,
1063:12, 1063:18,
1063:23, 1063:24,
1063:25, 1064:3,
1064:5, 1064:7,
1064:14, 1064:16,
1064:17, 1064:23,
1065:7, 1065:24
**write** [2] - 1002:20,
1054:5
**write-downs** [1] -
1002:20
**writes** [1] - 1049:7
**writing** [4] - 1003:1,
1038:14, 1045:12
**written** [3] - 1003:10,
1038:15, 1038:16

## Y

**year** [10] - 991:6,
994:9, 1014:2,
1025:6, 1025:16,
1027:14, 1027:19,
1031:7, 1033:10,
1033:12
**years** [15] - 988:13,
988:14, 992:13,
993:2, 996:25,
998:15, 1000:14,
1002:19, 1006:8,
1008:9, 1036:19,
1037:9, 1062:12
**yesterday** [4] -
1010:9, 1017:16,
1022:20, 1052:6

**York** [3] - 984:22,
985:7
**yourself** [1] - 1055:14

## Z

**Zagar** [2] - 1057:1,
1066:7
**ZAGAR** [7] - 984:18,
1057:1, 1057:6,
1066:7, 1066:18,
1066:21, 1066:24
**zero** [3] - 1032:12,
1033:16, 1063:25