```
1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
2
       - - - - - - - - - - - - - - - x
3      FAIRHOLME FUNDS, INC., et al.,
                                        CA No: 1:13-cv-01053-RCL
4                    Plaintiffs,
                                        Washington, D.C.
5                                       Monday, October 24, 2022
       vs.                              2:22 p.m.
6
       FEDERAL HOUSING FINANCE AGENCY,
7      et al.,
8                    Defendants.
       - - - - - - - - - - - - - - - x
9      IN RE: FANNIE MAE/FREDDIE MAC    Case Number 1:13-cv-1288
       SENIOR PREFERRED STOCK PURCHASE
10     AGREEMENT CLASS ACTION
       LITIGATIONS
11
12     _____
13            TRANSCRIPT OF JURY TRIAL - AFTERNOON SESSION
            HELD BEFORE THE HONORABLE ROYCE C. LAMBERTH
14                   UNITED STATES DISTRICT JUDGE
       _____
15     APPEARANCES:
16     For the Berkley Plaintiffs:   BRIAN BARNES, ESQ.
                                      COOPER & KIRK, PLLC
17                                    1523 New Hampshire Avenue, NW
                                      Washington, D.C. 20036
18
       For Class Plaintiffs:         LEE D. RUDY  ESQ.
19                                    KESSLER TOPAZ MELTZER & CHECK
                                      280 King of Prussia Road
20                                    Radnor, Pennsylvania 19087
21                                    HAMISH HUME, ESQ.
                                      KENYA DAVIS, ESQ.
22                                    SAMUEL KAPLAN, ESQ.
                                      BOIES SCHILLER FLEXNER LLP
23                                    1401 New York Avenue Northwest
                                      Washington, D.C. 20005
24
       (CONTINUED ON NEXT PAGE)
25
```

```
1     APPEARANCES (CONTINUED):

2     For Class Plaintiffs:        RICH GLUCK, ESQ.
                                   ROBERT KRAVETZ, ESQ.
3                                  BERNSTEIN LITOWITZ BERGER &
                                   GROSSMANN LLP
4                                  1251 Avenue of the Americas
                                   New York, New York 10020
5

6     For Defendant Federal
      Housing Finance Agency:      JONATHAN STERN, ESQ.
7                                  ASIM VARMA, ESQ.
                                   DAVID BERGMAN, ESQ.
8                                  IAN HOFFMAN, ESQ.
                                   STANTON JONES, ESQ.
9                                  ARNOLD & PORTER KAYE SCHOLER
                                   601 Massachusetts Avenue NW
10                                 Washington, D.C. 20001

11

12    Court Reporter:             Lisa A. Moreira, RDR, CRR
                                  Official Court Reporter
13                                U.S. Courthouse, Room 6718
                                  333 Constitution Avenue, NW
14                                Washington, DC  20001
                                  (202) 354-3187
15

16

17

18

19

20

21

22

23

24

25
```

I N D E X

WITNESS                                                    PAGE

**BALA DHARAN, Ph.D., Resumed**

    (By Mr. Hume).....................................1239
    (By Mr. Bergman).................................1285

1    P R O C E E D I N G S

2         THE COURT:  All right.  Counsel, you may proceed.

3         MR. HUME:  Thank you, Judge Lamberth.

4         Good afternoon, members of the jury.

5         Good afternoon, Professor Dharan.

6              BALA DHARAN, Ph.D., Resumed

7              DIRECT EXAMINATION, Continued

8    BY MR. HUME:

9    Q.  Before the lunch break, we were talking about DTAs, one

10   of the more accounting-centric terms.  Can you just -- a few

11   refreshers.  It's been the lunch break.  We covered a lot

12   this morning.  Can you remind the jury, what is a DTA?

13   A.  What I said earlier is DTA is a kind of an asset.  It's

14   an asset because the company has losses in some earlier

15   periods.  When they make money in the future, they can

16   deduct those losses against their income in the future.

17   That means no tax to be paid, and that's the benefit.  So

18   that's actually reported as DTA.

19   Q.  And what does "DTA" stand for?

20   A.  Deferred tax assets.

21   Q.  Okay.  And again, just to recap briefly, why was it

22   important to your analysis of whether or not the net worth

23   sweep was necessary to do in August of 2012?

24   A.  It's important because the amount of DTA is quite large.

25   As of, let's say, middle of 2012, we are talking about

```
1    approximately $100 billion in the two enterprises' financial
2    statement.  That's a lot of money.  A lot of --
3    Q.  100?
4    A.  $100 billion, approximately.
5         And so -- and they're all not on the balance sheet
6    at that point because they're all being basically turned
7    down because of not expecting profits in earlier years.
8         But as of 2012 things were starting to change, and
9    once it becomes likely that you're going to be making money
10   or what they call -- accountants call "more likely than
11   not," then all this DTA has to come back to their balance
12   sheet, and that's a lot of net worth that's going to be
13   added.
14        And the whole issue about the net worth sweep was
15   that they're all concerned about the circular draw, and it's
16   going to deplete the net worth -- I'm sorry, it's going to
17   deplete the Treasury funding.  But once you have the net
18   worth, you don't need to draw on Treasury, even if your
19   income is not enough to cover the dividend.
20   Q.  Okay.  And just to be clear, when you say "they were all
21   concerned," to be clear, have you seen documents from August
22   or July of 2012, before August 17th, actually showing that
23   FHFA, Fannie, or Freddie were all concerned about the
24   circular draw and eating into the Treasury Commitment?
25   A.  Not at all.  I think I probably didn't state it the
```

1    way -- exactly the way I wanted.

2             In the testimony that I saw, in the --

3    for example, in the declaration for Mr. Ugoletti and

4    Mr. DeMarco's testimony, there they were expressing that was

5    the main reason why.

6    Q.  In other words, in the reasons FHFA has given after the

7    fact --

8             MR. BERGMAN:  Objection to leading.

9             MR. HUME:  I'm simply clarifying.

10   Q.  What is the basis -- where did you form your

11   understanding of the FHFA's reason for agreeing to the net

12   worth sweep, from information before or after August 17th?

13   A.  These are declarations or deposition testimony after the

14   2012 period.

15   Q.  Now, I believe -- and then one other thing.  You said

16   something before the lunch break about the extent to which

17   people at FHFA or the GSEs knew --

18   A.  Right.

19   Q.  -- about the possibility of writing up the DTAs, the

20   deferred tax assets --

21   A.  Right.

22   Q.  -- and thus increasing net worth.  Do you recall that?

23   A.  Yes.

24   Q.  And what was your testimony?  What did you see?

25   A.  So what I was mentioning before lunch is, first of all,

1    the GSEs were looking at DTA potentially diversing.  I

2    showed some documents where the GSEs were talking about it.

3          And then I showed a couple of documents where the

4    GSEs are expressing that to FHFA.  And then I think where we

5    left off is that FHFA also internally was aware and knew

6    that DTA might get restored to full value.

7          I think that's what I'm showing them under.

8    Q.  And we're going to get to that in one second.

9          One last question on the accounting rules and

10   principles.  For certain kinds of assets like the DTAs, when

11   it becomes more likely than not that there will be profits

12   that are taxable that you can use the DTA against, make --

13   be valuable, in the accounting rules, is it discretionary or

14   is it that the rules really, once the facts are there,

15   require you to write things up?

16   A.  They require writing things up.  There are a couple of

17   other conditions.  They have been met already.  So now the

18   only ones remaining are expecting future profit on a

19   consistent basis.

20         So once that is also satisfied, everything is

21   checked off, and the accounting rule says now the DTA needs

22   to come back to the balance sheet.

23         MR. HUME:  Let's look at Plaintiffs' Exhibit 259,

24   the actual document, please.  Thank you.

25         And we started at the bottom here.  If we could

1   blow up the bottom email.  This is in evidence.

2          THE COURTROOM DEPUTY:  Did we move it in?  I don't

3   think so.

4          MR. HUME:  If there's --

5          THE COURTROOM DEPUTY:  It is.  That's right.

6   You're right.

7          MR. HUME:  It's in?

8          THE COURTROOM DEPUTY:  Uh-huh.

9          MR. HUME:  Okay.  Thank you, Ms. Jenkins.

10  Q.  Do you see, Professor Dharan, that the date is August

11  14, 2012?

12  A.  Yes.

13  Q.  And do you recall that the net worth sweep was announced

14  on the morning of August 17th?

15  A.  Yes.

16  Q.  So it was signed either the 16th or 17th, 2012?

17  A.  Right.

18  Q.  Do you recall that?

19         Now, this is an email from James Griffin to Nick

20  Satriano.  Do you see that?

21  A.  Yes.

22  Q.  And what has your review of the evidence told you about

23  who those people are?

24  A.  Mr. Satriano was the -- basically the chief accountant

25  for FHFA.  He was the head of the accounting group.

1    And Mr. Griffin was also in the accounting group

2  reporting to him, to Mr. Satriano.

3  Q.  Okay.  And you see the subject is "SPSPA Meeting."  Do

4  you see that?

5  A.  Yes.

6  Q.  And you understand, as the jury's been told, sometimes

7  the agreement between Treasury and the GSEs is called SPSPA

8  or PSPA.  It refers to the stockholder agreement between

9  Treasury and Fannie and Freddie.

10  A.  Yes.

11  Q.  Now, the first sentence of this email says, "The meeting

12  with Ed went well."  Do you see that?

13  A.  Yes.

14  Q.  Were you in court when I showed this to Mr. DeMarco?

15  A.  I think I was.

16  Q.  And do you recall him agreeing that was likely a

17  reference to Ed DeMarco?

18  A.  Yes.

19  Q.  So Mr. Griffin says, "The meeting with Ed went well."

20  He then says, "The amendment is expected to be made public

21  sometime on Friday."  Do you see that?

22  A.  Yes.

23  Q.  And he says, "The enterprises" -- do you understand that

24  to mean Fannie Mae and Freddie Mac?

25  A.  Yes.

1    Q.  He says, "The enterprises will be informed tomorrow of

2    the changes."  Do you see that?

3    A.  Yes.

4    Q.  And is it your understanding that the enterprises

5    learned about the net worth sweep two days before it was

6    signed --

7              MR. BERGMAN:  Objection to leading.

8    Q.  -- and announced?

9              Do you have an understanding of when they learned?

10   A.  My understanding, based on Mr. David Benson's deposition

11   that I read, or testimony, is that he did not know until

12   then.  He was the head of -- he was, you know, head of

13   Fannie Mae.  So this is consistent with that.

14   Q.  Okay.  Now, let's look at the next email, if we could.

15   Mr. Satriano's reply that day says, "Hi, any discussion of

16   reaching out to the auditors?  Given the changes, should be

17   fine."  Do you see that?

18   A.  Yes.

19   Q.  Okay.  And let's look at Mr. Griffin's reply to that

20   also an August 14, 2012, same day that he's reporting about

21   the meeting with Ed.  Do you see that?

22   A.  Yes.

23   Q.  "Nick," it says --

24             MR. HUME:  You don't need to highlight the first

25   two.

1    Q.  "There was not.  I do not think there would be a going

2    concern issue."  Do you see that?

3    A.  Yes.

4    Q.  And the next sentence is what I wanted to focus you on.

5    It says, "There was a question about rerecording certain

6    deferred tax assets that had been written-off."  Do you see

7    that?

8    A.  Yes.

9    Q.  Did you consider this in your analysis and your

10   opinions?

11   A.  Yes, because it shows that FHFA knew on August 14th that

12   the DTA, deferred tax assets, being released back to the

13   balance sheet was something that they were aware of.

14   Q.  What does the next sentence say?

15   A.  The next sentence says that this was discussed by the

16   boards, the two enterprises' boards, at the last meeting

17   based on the view that they were going to be profitable

18   going forward.

19   Q.  And did you review that in the work you did to reach

20   your opinions in this case?

21   A.  Yes.

22   Q.  Was it relevant to that -- to those opinions?

23   A.  Yes.

24   Q.  And how?  Can you explain how it was relevant.

25   A.  Well, it's relevant because this means that -- to me,

1    what it means is that the FHFA was aware, knew, that the

2    deferred tax assets are going to be brought back to the

3    balance sheet, magnitude anywhere from $70 billion to $100

4    billion for the two enterprises.  So that would really

5    indicate that the risk of net worth being negative and

6    having to draw on the Treasury is essentially gone, and

7    that's something they knew at the time.

8             And, again, just to complete the answer, so that

9    means that they knew it, and they still went ahead and did

10   the net worth sweep like two days later, or three days

11   later.

12   Q.  Does it show that the boards of Fannie Mae and Freddie

13   Mac discussed the deferred tax asset issue?

14   A.  Yes, it did.  It shows that here.  Is shows that the

15   boards discussed it, and FHFA was aware of it.

16   Q.  And the reason they were discussing re-recording these

17   deferred tax assets was what?

18   A.  Because they were expecting to be profitable going

19   forward.  That's one of the last conditions that needed to

20   be checked off before the deferred tax assets could come

21   back to the balance sheet.

22   Q.  And when the deferred tax asset comes back to the

23   balance sheet, what does that do to net worth?

24   A.  It goes up by an exact corresponding amount.

25   Q.  And what were the -- what was the order of magnitude

1    roughly?  What are we talking about here?

2    A.  Roughly -- again, they were predicting some amounts.

3    The actuals were a little bit different, but probably

4    approximately about $100 billion that they were

5    anticipating, anywhere from $70 billion to $100 billion for

6    the two enterprises together.

7    Q.  They knew that was possible; they're discussing that?

8    A.  That's right.

9    Q.  And once that happens or if there's a chance of that

10   happening, what does that do to this concern of sometimes

11   not having profits enough to pay the 10 percent dividend and

12   having to borrow or draw down from Treasury to pay the

13   dividend?  What does it do to that concern?

14   A.  It makes that concern go away.  For example, if -- let's

15   say Fannie Mae had -- they have to pay approximately, say,

16   $12 billion in dividends.  And if they had $13 billion in

17   comprehensive income, they are good; but if they had $11

18   billion instead of $12 billion that they need to pay -- I'm

19   rounding the numbers a little bit -- then the net worth is

20   available to dip into.

21        So the net worth is acting like a savings account.

22   It's like a buffer.  It's like a foundation.  So if you

23   don't have enough profits to pay the dividends, you can then

24   use the net worth to make up for the shortfall.  So now we

25   are talking about 50, 60, $70 billion going to the balance

1   sheet providing a huge amount of the base from which one can

2   draw on this.

3   Q.  Would it allow them, if they needed to, for cash, to

4   borrow cash from someone charging a lesser interest rate

5   than 10 percent to pay Treasury?  Could they do that?

6   A.  They could potentially do that since the net worth is

7   often a factor that lenders look at in terms of deciding the

8   stability of the company.

9   Q.  Did you look at -- earlier you showed some testimony of

10  Susan McFarland talking about the deferred tax assets.  Do

11  you recall that?

12  A.  That's right.

13  Q.  Do you also have a slide showing whether she told

14  Treasury about the deferred tax assets?

15  A.  Yes, I have one last slide on this topic where I show

16  that Ms. McFarland also told the Treasury.

17  Q.  So what does this Slide 55 show?

18  A.  So this is from Ms. McFarland's deposition testimony,

19  and so she's answering a question -- the question is does

20  this -- there's a description of an email.

21  Q.  What's the date of the email she's being asked about?

22  A.  August 7, 2012, ten days before the net worth sweep was

23  agreed to.

24  Q.  Okay.

25  A.  And it says, "Does this relate to the meeting that you

1    described earlier that took place at Treasury on the eve of

2    the net worth sweep where you spoke to Ms. Miller about

3    deferred tax assets and other things?"

4           And she replied -- and Ms. Miller, we saw earlier,

5    in one of the emails, she's the Undersecretary in the

6    Treasury Department.

7           So her answer was, "This relates to the

8    presentation that was being prepared for my use in the

9    meeting with Treasury on the 9th with Mary Miller and others

10   to update them on our financial results forecast.  And while

11   the meeting materials didn't express in writing the deferred

12   tax allowance issue, I in that meeting articulated that

13   orally to Treasury."

14   Q.  And the "it" is what?

15   A.  "It" meaning --

16   Q.  Or the "that," sorry.

17   A.  "That" meaning the deferred tax assets coming back to

18   the balance sheet.

19   Q.  And we've seen -- have we seen documents where it was

20   being discussed with FHFA?  Is that what we just saw?

21   A.  Yes.  So far we have seen documents covering all the --

22   all these different ways.  GSEs discussing it; GSEs and the

23   FHFA discussing it; FHFA discussing it; and GSEs telling the

24   Treasury.

25   Q.  What are you showing on Slide 56?

1   A.  So, again, this is just summarizing that FHFA knew of

2   the potential amount as well.  And so that's the purpose of

3   this, just to summarize the points that we have been looking

4   at.

5          Again, as of mid-2012 the total DTA amounts for

6   the two enterprises was close to $100 billion.  And so FHFA

7   knew that the reversal of these allowances would increase

8   the net worth of Fannie Mae and Freddie Mac.  And that also

9   means that that would eliminate any perceived need to borrow

10  or draw from Treasury even if the comprehensive income was

11  less than 10 percent dividend.

12         So that's just a summary I wanted to provide to

13  just put it all together, just to make sure that we see the

14  connection between DTA and net worth sweep.  Any increase in

15  DTA as a result of getting rid of the valuation allowance

16  means DTA goes up, and that means that net worth goes up,

17  and so that eliminates the circular draw problem pretty

18  much.

19  Q.  And did you have this slide prepared to show what your

20  testimony is on this issue?

21  A.  Yes.  This is my testimony, correct.

22  Q.  Let's turn them off for a second, and just, before we

23  leave deferred tax assets, which may be the most technical

24  accounting, but I don't think -- hopefully it's not too

25  technical.  Here's a couple of questions for you.

1      As someone who spent 43 years in the field of

2   finance and accounting, is it your expert opinion that the

3   financial and accounting professionals at Fannie Mae and

4   Freddie Mac --

5           MR. BERGMAN:  Objection to leading.

6           THE COURT:  Overruled.

7   Q.  -- in August 2012 should have understood that there was

8   a real possibility of the deferred tax asset allowances

9   being reversed and the assets increasing in value in the

10  tens of billions of dollars?

11  A.  Yes, they should -- they were aware of it.

12  Q.  My first question was:  In your opinion as an expert,

13  before you think about what you've seen, in --

14  A.  Oh, got it.

15  Q.  -- in your opinion as an expert in finance and

16  accounting, should a finance and accounting professional

17  working on Fannie or Freddie in August of 2012 have been

18  aware of this?

19  A.  They should have been.  It's required as part of the

20  accounting rules.

21  Q.  And based on the evidence that you've reviewed, were the

22  finance and accounting people at Fannie, Freddie, and FHFA

23  aware of the possibility that the deferred tax assets could

24  come back on the balance sheet, increasing net worth by tens

25  of billions of dollars?

```
1              MR. BERGMAN:  Objection, Your Honor.  That part's
2     not expert testimony.
3              THE COURT:  Sustained.
4     Q.  You've reviewed the evidence, correct?
5     A.  Yes.  Yes, I have.
6     Q.  The evidence relevant to your expert opinion?
7     A.  It is relevant.
8     Q.  And what does the evidence you've reviewed about what
9     they knew about the deferred tax assets --
10             MR. BERGMAN:  Same objection.
11    Q.  -- what relevance does it have to your expert opinion?
12             THE COURT:  That's sustained.  That's the jury's
13    province.
14             MR. HUME:  Thank you.  We'll come back to the
15    presentation.
16    Q.  I think we're at Point 6 out of six points.
17    A.  Yes.  So this is the final point.
18    Q.  We're getting into the home stretch.
19    A.  Yeah.  Again, just to quickly look at where we have come
20    through.  We talked about the actuals.  We talked about the
21    structural improvements and the projections reflecting that,
22    and the size of the available Treasury funding much greater
23    than expected, potential draws; and, moreover, once the DTA
24    write-up takes place, even that will be not needed.  So
25    that's really where we are.
```

 1              But what I wanted to also mention as part of my

 2      analysis is did FHFA look at all of these issues in terms of

 3      impact, in terms of consequences, and also did they consider

 4      any alternatives?  Did they write some memos to describe

 5      what this problem is and what they are trying to do?  And

 6      that's what I'm going to summarize, my analysis on this last

 7      point.

 8      Q.  So what slides did you make on this?

 9      A.  So I did not see any of these types of analysis --

10              MR. BERGMAN:  Your Honor, objection.  I'm sorry.

11      But this now looks like a recitation of evidence and facts,

12      and not an application of expert opinion.

13              MR. HUME:  Your Honor, in Professor Dharan's

14      rebuttal report, he analyzes the alternatives that existed

15      to the net worth sweep to address any possible problem.  I

16      can cite the specific paragraphs.  It is part of his expert

17      opinion.

18              MR. BERGMAN:  May we confer by phone, Your Honor?

19              (The following is a bench conference

20               held outside the hearing of the jury)

21              MR. BERGMAN:  Thank you, Your Honor; David Bergman

22      for FHFA.  I'm trying to draw a distinction between just

23      rehearsing the evidence.

24              If Dr. Dharan has some specific expert opinions

25      about a particular alternative, that may be fair game, and

1     that may have been disclosed.  But for him to just walk

2     through the evidence of what FHFA did or did not do is not

3     expert opinion, I don't believe.

4              MR. HUME:  This is Mr. Hume, Your Honor.  An

5     expert is allowed, under Rules 702 and 703, to comment on

6     the evidence if it is relevant to his opinion.  His opinion

7     is whether the net worth sweep was necessary in August 2012,

8     as you've heard for the last few hours, and what was and was

9     not considered by FHFA at the time is relevant to that

10    opinion of whether this was something that was reasonably

11    necessary to do.

12             THE COURT:  What is the question?

13             MR. HUME:  The question -- all I intend -- this

14    is -- all I intend to do very briefly here is ask him what

15    evidence he saw about the extent of what was considered by

16    FHFA at the time and what the alternatives were that he, as

17    an expert, believes existed and whether he saw any analysis

18    of those alternatives and whether that informed his opinion.

19             THE COURT:  Go ahead.

20                 (This is the end of the bench conference)

21             MR. HUME:  Thank you, Your Honor.

22             Why don't we go to Slide 60, if we could.

23    BY MR. HUME:

24    Q.  Professor Dharan, as part of your expert analysis in

25    this case, did you look at what potential alternatives might

1    have existed to the extent that FHFA was worried or

2    concerned about a circular draw leading to the erosion of

3    the Treasury Commitment?  Did you analyze what possible

4    courses of action they might have considered?

5    A.  Well, I did.  I didn't -- my plan was not to list all

6    the potential available alternatives, but I wanted to at

7    least consider some of the more obvious ones, more easily --

8    things that I can think of easily, were they considered by

9    FHFA.  That's what I've done on this slide.

10   Q.  And can you briefly summarize what the alternatives

11   are --

12   A.  Okay.

13   Q.  -- identified here.

14   A.  So first of all, there was no need to do anything since

15   none of the internal projections were saying that they were

16   going to need Treasury draw in 2012, maybe even 2013 and

17   beyond.  So already by July 2013.  So there was no problem

18   in the first place; there was no circular draw problem.

19           To the extent they wanted to consider the circular

20   draw problem, they could have waited until 2013 to see if

21   the trends that they were seeing in 2012 were reinforced and

22   were they continuing into 2013.  And that's the second

23   alternative.  And that was available.  The time was

24   certainly not a constraint here.

25           The third one, we talked a little bit earlier

1   about the option to pay dividends in the form of additional

2   liquidation preference, and that's often described as paid

3   in kind or payment in kind.  So we often abbreviate that as

4   PIK.  So if I say "PIK," that's what I mean, the dividends

5   are paid in kind, meaning as additional liquidation

6   preference.

7          That rate was available to Fannie Mae and Freddie

8   Mac already, and so any of the quarters where they had

9   comprehensive income not enough to cover the dividend, they

10  could have just issued additional -- the difference in the

11  form of additional liquidation preference.

12         The advantage to that --

13  Q.  Oh, please, keep going.

14  A.  Sorry.

15         The advantage to that is it does not -- that's the

16  Treasury Commitment.  So the way these SPSAs are written,

17  this amount is a different amount.  It goes to the

18  liquidation preference, but it does not reduce the Treasury

19  Commitment.  So that really solves the problem, if there is

20  one, on circular dividend.

21         And then I have some additional alternatives also

22  I considered that are typically what businesses would

23  consider, and these are -- they could have paid lesser of

24  the 10 percent on the net worth in those years where the net

25  worth is not sufficient to pay the 10 percent, with the

1    shortfall to be paid later with interest.  And they could

2    have also negotiated or adopted a modified dividend policy

3    if the Treasury Commitment was really eroding in subsequent

4    years.

5            And similarly, they could have adopted a modified

6    dividend policy with any excess over the 10 percent amount

7    treated as a redemption of principal.

8    Q.  And so the record is clear, are you saying that -- do

9    you have an opinion on whether there was a problem that

10   required one of these alternatives?

11   A.  No, my conclusion already --

12           MR. BERGMAN:  Objection.  Objection, Your Honor.

13   I'm sorry.

14           THE COURT:  Overruled.

15           MR. BERGMAN:  He was -- perhaps on the phone?

16           THE COURT:  I overruled the objection.

17           MR. BERGMAN:  Okay.

18   Q.  I think you've given -- can you just quickly answer?

19   A.  Yes.  I was going to say I had already concluded that

20   there was no problem and that there was no need to do

21   anything, but I just wanted to recite some of the possible

22   alternatives that a typical enterprise would have answered.

23           When there's a problem, the first thing companies

24   do is to consider to develop alternatives to evaluate and

25   then gather information and then try to analyze them.  So

1  define the problem; go out and identify some alternatives

2  you can use to solve it; find any data you need; analyze

3  these alternatives; and then choose the best alternatives.

4  So that's the best business decision process.

5          And I didn't really see any evidence that FHFA had

6  documented any of these alternatives and analyzed them.

7          MR. HUME:  Could we move to Slide 58, please.

8  Q.  And in considering whether they considered these

9  alternatives, did you look at the evidence of the extent to

10  which FHFA actually consulted with Fannie Mae and Freddie

11  Mac themselves?

12  A.  Yes, I did.

13          As I said, the decision process involves not only

14  developing alternatives, but also gathering information to

15  analyze them.  But what I saw in evidence is FHFA did not

16  consult with management of Fannie Mae and Freddie Mac.  We

17  saw an email just a few moments ago that they were only

18  going to inform the GSEs just 48 hours before the net worth

19  sweep was executed.

20  Q.  What about within FHFA itself?  What did you see in

21  terms of the extent to which they analyzed the problem or

22  potential problem and addressed alternatives, and how is

23  that relevant to your opinion?

24  A.  This is a quick summary of what I guess I didn't see.  I

25  didn't see any documents that showed FHFA analyzed what is

1    the potential impact of the net worth sweep.  There were no

2    FHFA memos on this.

3            They did not analyze the projections to determine

4    whether the net worth sweep was needed, whether there was --

5    whether it would cause the GSEs to pay more or pay less.

6            And they also -- one thing that I was surprised is

7    that they did not update the projections that they had made

8    internally in October 2011.

9            As I described earlier, all the economic

10   turnaround, all the inflection point was happening in

11   January, February, March, April, June.  All of those months,

12   April, May, and June.  But FHFA did not update any of the

13   financial projections.

14           We saw -- I was here when the testimony was shown

15   that the head of the financial modeling, Ms. Naa Awaa Tagoe,

16   she said she was not aware of the net worth sweep.

17           So those were really quite a surprising set of

18   data for me.

19   Q.  And can you just briefly explain how those surprising

20   data points informed or influenced your expert opinion in

21   this case.

22   A.  Yes.  As I said, first of all, the net worth sweep was

23   not -- I'm sorry, the Treasury draw -- depleting the

24   Treasury Commitment was not a problem to begin with, but to

25   the extent you want to do something -- you want to consider

1    these alternatives and analyze the data and gather the

2    information, update the information, none of this was done.

3    So not only was the net worth sweep not necessary, there

4    was -- and was completely unprecedented, huge, and it was

5    done without these types of typical business analyses I

6    would expect.

7    Q.   So I think we've now gone through all six points, and

8    I'm going to spare you and the jury a recitation of what

9    they were --

10   A.   Okay.

11   Q.   -- because I think you've gone through them very

12   thoroughly.  But there are one or two points I wanted to ask

13   you about before we finished.

14            First, did you -- I think I asked earlier --

15   review both of Mr. DeMarco's depositions in this case in

16   exploring the issues you were asked to explore and reaching

17   the opinions you were asked --

18   A.   Yes, I did.

19   Q.   -- or the questions you were asked?

20   A.   Yes, I did.

21   Q.   And do you recall Mr. DeMarco saying that the net worth

22   sweep he was asked was the net worth sweep designed to

23   demonstrate wind down?  Do you recall him being asked that

24   question?

25   A.   Yes.

 1    Q.  Do you recall what his answer was?

 2    A.  You mean the purpose of the net worth sweep?

 3    Q.  Do you recall --

 4          MR. BERGMAN:  Objection.

 5          THE COURT:  Overruled.

 6    Q.  How about we do it -- I want to ask you a question about

 7    a specific thing in the deposition.

 8    A.  Okay.

 9    Q.  It takes 30 seconds.  It's DeMarco Clip 2015.

10          MR. BERGMAN:  Your Honor, could we have a phone

11    proffer on what is happening?

12          MR. HUME:  I'm sorry?

13          MR. BERGMAN:  I'm asking if we could have a phone

14    proffer on what's happening -- what's going on with this --

15    what you're trying to accomplish with this video clip.

16          MR. HUME:  I'm asking -- should I go to the phone,

17    sir?

18          (The following is a bench conference

19           held outside the hearing of the jury)

20          MR. BERGMAN:  Thank you; David Bergman for

21    defendants.  I'm just -- I'm confused by what the purpose of

22    playing this video clip may be.

23          MR. HUME:  I intend to ask the witness to comment

24    on evidence he has reviewed in forming his opinions as to

25    whether the net worth sweep was reasonably necessary and

1    what the purpose of it was.

2              And it's a 30-second clip.  There's one document

3    relevant to it, and that's it.

4              And then I simply have a few questions about the

5    impact of the sweep, which is part of his report, and then

6    I'll be done.

7              MR. BERGMAN:  Mr. DeMarco appeared at trial.  The

8    jury's heard him at trial.  If there was an effort to

9    impeach him through deposition testimony, that should have

10   been done when Mr. DeMarco was on the stand.

11             MR. HUME:  I'm sorry.  Fair enough.

12             This clip from the deposition was played during

13   Mr. DeMarco's trial testimony.  This is not new.  This is a

14   question he was asked at trial, and this is a deposition

15   clip he was shown at trial and that he said was truthful.

16             MR. BERGMAN:  And what is the expert testimony

17   required for this?

18             MR. HUME:  Why does the expert --

19             MR. BERGMAN:  What expert opinion, sorry, is he --

20             MR. HUME:  He is not going to give any opinion

21   about the credibility of anybody, including Mr. DeMarco.  I

22   can assure you of that.

23             MR. BERGMAN:  So it sounds to me, Your Honor, like

24   this is not part of the expert testimony that Dr. Dharan

25   should be presenting.

```
 1              MR. HUME:  He's listed -- this deposition is

 2    listed as one of the materials he considered in reaching his

 3    opinions.

 4              THE COURT:  Go ahead.

 5              MR. BERGMAN:  Thank you.

 6                  (This is the end of the bench conference)

 7              MR. HUME:  We can play the 2015 clip, please.

 8              (Video playing)

 9    BY MR. HUME:

10    Q.  And Mr. Dharan, Professor Dharan, did the net worth

11    sweep -- let me ask you this first.

12              MR. HUME:  Can we show PX259.

13    Q.  And you reviewed Mr. DeMarco's deposition --

14    A.  Yes.

15    Q.  -- in formulating your opinions?

16    A.  Both depositions, yes.

17    Q.  And PX259 we showed earlier.  Do you recall, just to

18    refresh your recollection --

19    A.  Yes.

20    Q.  -- the bottom email from Mr. Griffin to Mr. Satriano --

21    A.  Right.

22    Q.  -- in the accounting department?

23              Do you recall seeing this?

24    A.  Yes.

25    Q.  The date is August 14, 2012.  Do you see that?
```

```
1    A.  Right.

2    Q.  And the first sentence is, "The meeting with Ed went

3    well."  Do you see that?

4    A.  Yes.

5    Q.  So Mr. Griffin is writing an email on August 14th saying

6    "The meeting with Ed went well."  Do you see that?

7    A.  Yes.

8    Q.  Okay.  So now let's go to the top email where

9    Mr. Griffin responds to Mr. Satriano's question.  And this

10   is, again, Mr. Griffin writing answering the question about

11   the auditors.

12            And we looked at these sentences about the

13   deferred tax assets?

14   A.  Right.

15   Q.  Do you recall that?

16   A.  Yes, just a moment ago.  Yes.

17   Q.  And he reports in this email that "Jeff indicated both

18   of the Boards had discussed this" -- "this" being the

19   deferred tax assets -- "at the last meeting."  Do you see

20   that?

21   A.  Yes.

22   Q.  "Based on the view that they were going to be profitable

23   going forward."  Do you see that?

24   A.  Yes.

25   Q.  Now, when I showed this to you earlier, I didn't ask you
```

1    about the next sentence.

2    A.  Okay.

3    Q.  But it says, "I do not think that makes sense given the

4    amendments are designed to demonstrate wind down."  Do you

5    see that?

6    A.  Yes.

7    Q.  Does that evidence in any way support the FHFA's

8    position that the net worth sweep was designed to address

9    the circular dividend problem and the erosion of the

10   Treasury Commitment?

11          MR. BERGMAN:  Objection.

12   Q.  That was the question you were asked.

13   A.  Yes.  The circular dividend is an entirely different --

14   it's a financial problem.  Circular dividend is really all

15   about are there going to be enough Treasury Commitments to

16   cover any potential draws as a result of circular draw.

17   That's a finance question.  It's a finance question

18   requiring a finance and accounting analysis.

19   Q.  Okay.

20   A.  And this one is a different type of a problem -- issue,

21   completely unrelated.

22   Q.  Well -- and Mr. DeMarco said that the amendments were

23   not designed to demonstrate wind down, correct?

24   A.  Yes.

25          MR. BERGMAN:  Objection.

1    THE COURT:  Sustained.

2    Q.  Did -- what did Mr. DeMarco say about whether or not the

3    net worth sweep was designed to demonstrate wind down?

4    MR. BERGMAN:  Objection.

5    A.  In the deposition he said that was not the -- he was not

6    viewing it that way.  This was not designed to demonstrate

7    wind down.

8    Q.  This document written by Mr. Griffin, an accountant who

9    had just been in a meeting with Mr. DeMarco, says "The

10   amendments are designed to demonstrate wind down."  Do you

11   see that?

12   MR. BERGMAN:  Objection.

13   THE COURT:  Sustained.

14   Q.  Have you seen any evidence in this case in formulating

15   your expert opinions that the net worth sweep was designed

16   to ensure that Fannie Mae and Freddie Mac would not make

17   large profits and build capital?

18   A.  Well, mostly in terms of these types of emails talking

19   about the wind down.  That's where I've seen those.

20   Q.  Now, did you, in your original analysis -- well, first

21   of all, before we finish wind down.  Did you do some very

22   simple compilation of numbers to show whether or not Fannie

23   Mae and Freddie Mac actually did shrink or wind down?

24   A.  Yes, I did.

25   MR. HUME:  Could we quickly go back to the slides.

 1    Q.  What does Slide 63 show, Professor Dharan?

 2    A.  I just wanted to see what the effect of the net worth

 3    sweep was, the impact, in terms of issues like this wind

 4    down.

 5          What we actually see is that the GSEs, in fact,

 6    grew during this time period, grew in terms of their market

 7    share, in terms of the total assets that they have.

 8          So on this page I'm showing what happened to the

 9    GSEs between 2010 and 2021.  The total assets have grown.

10    They were around $3 trillion in 2012; now they are over $4

11    trillion in Fannie Mae.

12          They went from $2 trillion dollars to $3 trillion

13    for Freddie Mac.  These are trillions of dollars.

14    Q.  So have they wound down, or have they shrunk?

15    A.  They have grown.

16    Q.  What does Slide 64 show?

17    A.  Consistent with the earlier slide, I also wanted to look

18    at the market share of Fannie Mae and Freddie Mac and also

19    the third such agency.  All together what is the market

20    share?  Mostly Fannie Mae and Freddie Mac.

21          And it used to be it was around -- before the

22    credit crisis, it was in the 40 to 50 percent range.  There

23    were other market participants.

24          By 2012 it was already around 90 percent, over 90

25    percent, and it remains at over -- around 95 percent as of

1   2021.

2           So, in other words, 95 percent of all the

3   mortgages being bought and securitized are being done by the

4   two GSEs, the agencies, which -- and also includes a third

5   GSE, but these are the agencies.

6   Q.  Do you recall in Mr. DeMarco's strategic plan of

7   February 2012 there was that paragraph saying there are not

8   thousands of people trying to get into this market?  Do you

9   recall that?

10  A.  Something like that, yes.

11  Q.  Is that consistent with what you're showing on this

12  slide?

13  A.  What this is showing is they didn't -- that did not

14  happen.  There's nobody coming in.  It's still Fannie Mae

15  and Freddie Mac predominantly.

16  Q.  I'd like to very quickly bounce back to Slide 17.  Do

17  you recall Slide 17?

18          You put this together, Professor Dharan, just to

19  show the write-downs and write-ups?

20  A.  Yes, just to show all the provisions and write-downs and

21  write-ups.

22  Q.  But does this also show the amount of comprehensive

23  income that Fannie Mae and Freddie Mac have made since

24  January 1, 2012?

25  A.  Yes, it does.

```
1    Q.  How much have they made?

2    A.  Since 2012, they have made $206 billion for Fannie Mae,

3    and $131 billion for Freddie Mac.

4    Q.  So a total of over $330 in billion?

5    A.  A total of over $337 billion.

6    Q.  And has that, in sum or substance, been swept to

7    Treasury under the net worth sweep?

8    A.  That was the main impact of net worth sweep.  This

9    entire comprehensive income effectively -- in sort of going

10   to the net worth and staying there, it went -- they went to

11   the net worth and then were paid off as dividends to

12   Treasury.

13   Q.  Now, at least during the period where the net worth

14   sweep was in cash through 2018, would it have helped or hurt

15   Fannie Mae and Freddie Mac to have had the cash and capital

16   inside rather than sweeping it to Treasury?

17   A.  They would have preferred to keep the cash.  Like any

18   normal business, they would rather have the cash to do other

19   things with it.

20   Q.  Is it possible that if they had had that cash their

21   performance could have been even better?

22   A.  It's possible.

23        MR. HUME:  Could we go to Slide 65.

24   Q.  And very briefly, in your original report and analysis

25   in this case, in addition to giving the opinions on the two
```

```
 1   questions you explained to the jury today, did you also look
 2   at what the impact of the net worth sweep was?
 3   A.  Yes.
 4   Q.  And in your rebuttal report, did you address the
 5   question of the impact, in particular in 2013, when the DTAs
 6   were written up and Fannie and Freddie had to pay the value
 7   of those write-ups to Treasury --
 8   A.  Yes.
 9   Q.  -- in the net worth sweep?
10   A.  I did.
11   Q.  Can you explain what it is you were showing in the
12   illustrations --
13   A.  Okay.
14   Q.  -- on this chart.
15   A.  So in 2013, that was the year Fannie Mae brought back
16   the deferred tax asset in the first quarter of 2013.
17   Q.  Hang on.  When did they do it?
18   A.  In the first quarter of 2013.
19   Q.  So Fannie Mae increased its net worth from a deferred
20   tax asset allowance change in the first quarter, is that
21   what you're saying?
22   A.  In the first quarter of 2013.
23   Q.  And what was the first quarter that the net worth sweep
24   came into effect?
25   A.  That was the same quarter.  The same quarter in which
```

1    the net worth sweep came into effect also was the quarter in

2    which Fannie Mae concluded that it was more likely than not

3    that they would have consistent profits, and they brought

4    the deferred tax asset back to the balance sheet.

5    Q.  Do you remember approximately the value of the Fannie

6    Mae deferred tax assets that were added to net worth in the

7    first quarter of 2013?

8    A.  Approximately $50 billion for Fannie Mae and -- I'll

9    mention also Freddie Mac, which happened a little later.

10   Q.  $50 billion for Fannie -- that's 5-0 -- approximately?

11   A.  Five-zero billion dollars.

12   Q.  Is that roughly the same number the chief financial

13   officer, Susan McFarland, had predicted?

14   A.  That's pretty close to what she had said in her --

15   Q.  And what happened --

16   A.  -- email communication.

17   Q.  In the first quarter of 2013, they increased their net

18   worth by $50 billion for the deferred tax asset.  What

19   happened in that first quarter?  What did they have to do?

20   A.  Well, because the net worth sweep says anything that

21   goes into the net worth, subject to a $3 billion starting

22   number, they all had to go to Treasury as dividend.  So that

23   entire $50 billion had to be swept up to the Treasury and

24   paid off in cash as cash dividends.

25   Q.  And then what about Freddie Mac?  What happened with

 1    their preferred tax asset?

 2    A.   Freddie Mac also brought the DTA back to the balance

 3    sheet, or in accounting language the DTA valuation elements

 4    was released.   That's how they normally would say it.

 5              But I'm just informally saying DTA was brought

 6    back to the balance sheet.   And that happened in the third

 7    quarter of 2013.

 8              So first quarter, Fannie Mae; third quarter of

 9    2013, Freddie Mac.   And that amount was 24 -- approximately

10    $24 billion.

11    Q.   Okay.   And so what does this slide illustrate?   If you

12    combined the two --

13    A.   Combine --

14    Q.   -- is that $74 billion?

15    A.   Yes.   So this slide is showing that the $74 billion went

16    from the GSEs, that's on the left.   All of the $74 billion

17    is related to DTA coming back to the balance sheet, and they

18    all were paid to Treasury as dividend.

19    Q.   How did they pay?

20              THE REPORTER:   One at a time.

21              MR. HUME:   My apologies.   That's my fault.

22    A.   What's the question again?

23    Q.   In your rebuttal report you said something about them

24    borrowing.

25    A.   Yes.

1    Q.  What does this slide show?

2    A.  The second half of the slide shows at least some portion

3    of the $74 billion was -- they had to borrow this.  $74

4    billion is a lot of money.

5            So these enterprises went to the private market

6    and took some loans.  The amount is not exactly disclosed so

7    I'm not able to get the amount, but they did borrow from the

8    private markets and paid that as part of the $74 billion to

9    Treasury in cash dividends.

10   Q.  So they had to borrow from someone else to help pay

11   treasury the net worth sweep dividend because these deferred

12   tax assets went up?

13   A.  Yes.

14   Q.  Now, I think we showed this earlier.  In measuring

15   impact, you looked at 2013.  Is that what this slide shows?

16   A.  Right.

17   Q.  Now, did you also look at -- in your original report you

18   had a chart showing the impact over -- through 2018.

19   A.  That's correct.

20   Q.  Do you recall that?

21   A.  Yes.

22   Q.  And do you recall there was a difference of over $123

23   billion?

24   A.  Yes.

25   Q.  Now, have you looked at what the summary witness

1    presented to the jury in this case?

2    A.  Yes, I did.

3    Q.  And have you used some of that information to just bring

4    your measurement of impact, your analysis and summary of

5    impact, up to date?

6    A.  Yes, I did.

7    Q.  So what does this slide show on Slide --

8    A.  So, again, in my initial analysis I looked all the way

9    to the end of 2018.  The summary witness data go all the way

10   to second quarter 2022, which I'm using here.  I think I'm

11   really using the same slide as the summary witness used.

12          So the total net worth sweep cash dividends paid

13   to Treasury by this time is 2013 to 2019 was $245.9 billion.

14          Then after 2019, the dividends are being paid in

15   the form of increases in liquidation preference, and that is

16   adding another $84.3 billion to Treasury's value.

17          So those are the two.

18   Q.  So just before you move on, since the third quarter of

19   2019 is the net worth sweep being paid not in cash but as a

20   payment-in-kind?

21   A.  Effectively it's being paid as a payment-in-kind,

22   exactly right.

23   Q.  By increasing the liquidation preference?

24   A.  That is correct.

25   Q.  Which is very similar to the idea --

```
 1                    MR. BERGMAN:  Objection.

 2   Q.  -- you talked about a minute ago.

 3                    MR. BERGMAN:  Object to leading.

 4                    THE COURT:  Overruled.

 5   A.  Yes.

 6   Q.  So if we add these two numbers up, that's what we got?

 7   How much?

 8   A.  If we add the two numbers up, that's the total value

 9   that has been transferred to Treasury, one in the form of

10   cash dividend and the other in the form of increase in

11   liquidation preference.  So together that's $330.2 billion.

12   Q.  Now, I want to be careful here.  You said total value

13   transferred.  Do you mean total, or do you mean total under

14   the net worth sweep?

15   A.  This is only under the net worth sweep.  There was also

16   some value transferred before.  This is only under the net

17   worth sweep.

18   Q.  So this is total since the net worth sweep took effect

19   on January 1, 2013?

20   A.  Correct.

21   Q.  Did you compare that $330 billion to what would have

22   been paid if it had stayed at the 10 percent dividend?

23   A.  Yes, I did.  And this is something I had already done

24   out of my work up to 2018, and then I used the additional

25   data from the summary witness.
```

```
 1              So if you see the next line here, that's the
 2    dividend that would have been paid to Treasury under the 10
 3    percent dividend of the Second Amendment and before.  So
 4    that's the previous one.
 5    Q.  Which is -- isn't that essentially -- it was $18.9
 6    billion?
 7    A.  Approximately $18 billion.  And so you're looking at
 8    $180 billion.
 9    Q.  Nine and a half years, because you go through the second
10    quarter of 2022?
11    A.  Correct.
12    Q.  So that's the arithmetic on that?
13    A.  Exactly.
14    Q.  And so what does the difference show?
15    A.  So the difference is $150.2 billion in excess value that
16    has been sent to Treasury under the net worth sweep.
17    Q.  Now --
18              MR. HUME:  We're almost done.
19    Q.  -- there is -- you mentioned earlier, when you
20    summarized the terms of the SPSPA or the PSPA, this thing
21    called the periodic commitment fee.
22    A.  Yes.
23    Q.  Are you familiar with that?
24    A.  Yes.
25    Q.  And did you look at the terms of that in the contract?
```

1   A.  Yes.

2   Q.  Now, we have another expert who is addressing it, but

3   you at least addressed it to some degree in your work in

4   this case, so can you explain what your opinion is on

5   that --

6   A.  Yeah.

7   Q.  -- and what you're showing here in this slide.

8   A.  Yes.  So I had listed, mainly to see if the net worth

9   sweeps, the magnitude of amount transferred -- whether it

10  was 2013, or 2013 to 2018 that I had looked at, or 2013 to

11  all the way to 2022, second quarter, regardless of the time

12  period, the amounts are really large.  $110 billion all the

13  way to $150 billion.

14          So I wanted to know if the periodic commitment fee

15  would justify -- would be something that would justify this

16  level of transfer of value.

17  Q.  And what was your conclusion?

18  A.  My conclusion is the periodic commitment fee could not

19  reasonably have been equal to this amount of net worth

20  sweep; so that $150 billion is just too large an amount.

21  Q.  And what are these quotes that you have on the first two

22  bullet points?  Where do those quotes come from?

23  A.  These are some of the terms that I described earlier in

24  a previous slide.  So the periodic commitment fee had to be

25  mutually agreed, you know, exercising reasonable discretion

1    and to determine market value.  I didn't see any of these

2    with respect to the net worth sweep.  There was no market

3    value calculation or mutually agreed reasonable discretion.

4          Market value is something that was not done.  It

5    had to be done in consultation with the chairman of the

6    Federal Reserve for this periodic commitment fee.  The net

7    worth sweep, I didn't see any evidence that the chairman of

8    the Federal Reserve was consulted or brought in.

9          And so those really are completely different types

10   of, you know, provisions.  I just don't see how periodic

11   commitment fee is the reason for the net worth sweep.

12   Q.  Okay.  Very briefly, two exhibits I'd like to make sure

13   we get into evidence that come from the summary witness.

14   You did review the summary witness's evidence?

15   A.  Yes.

16   Q.  And you understand that the summary witness was not an

17   expert.  Do you understand that?

18   A.  Yes.

19   Q.  But she is a competent -- she could be an expert in

20   other cases, but she's not an expert in this case.

21          MR. BERGMAN:  Objection.

22          MR. HUME:  Okay.  I'm sorry.  I'm sorry.

23   Withdrawn.

24          MR. BERGMAN:  Move to strike.

25   Q.  You understand that she was in this case simply

1   presenting a summary of factual arithmetic information.  Do

2   you understand that?

3   A.  Yes.

4   Q.  And could you turn to Tab 8 of your binder, which has

5   Exhibit 4F.

6   A.  8?  Okay.

7   Q.  Do you see on Exhibit 4F in front of you -- it doesn't

8   say "4F" on it, but do you see in front of you an exhibit

9   showing the amounts invested by private preferred

10  shareholders in 2007 and 2008?

11  A.  Yes.

12  Q.  And what is the number?

13  A.  So it says the total amounts invested by private

14  preferred shareholders into Fannie Mae and Freddie Mac in

15  2007 and 2008 is $19.7 billion.

16  Q.  And what does it say the total amount of dividends are

17  that were paid on the shares that were issued for that

18  investment?

19  A.  The total dividends paid to private preferred

20  shareholders issued for 2007 and 2008 investments is $1.1

21  billion.

22          MR. HUME:  Your Honor, we move for admission into

23  evidence as a summary of the information summarized by the

24  summary witness Plaintiffs' Exhibit 4F.

25          THE COURTROOM DEPUTY:  It's in.  4F is in.

```
 1                    MR. HUME:  4F is in?

 2                    THE COURTROOM DEPUTY:  Yes.

 3                    MR. HUME:  Okay.  I'm happy to learn that.

 4      Q.  Would you turn to Tab 11 of your binder.

 5      A.  Okay.

 6      Q.  Tab 11 shows -- is another exhibit from the summary

 7      witness showing the total amounts invested by private

 8      preferred shareholders.  This is total, not limited to time.

 9                    What does it show about the total amount invested?

10      A.  Yes.  This is -- the total amount invested by private

11      preferred shareholders into Fannie Mae and Freddie Mac is

12      $33.2 billion.

13      Q.  And what does this summary exhibit show was the total

14      amount of dividends paid to all those private preferred

15      shareholders?

16      A.  $5.1 billion.

17                    MR. HUME:  Your Honor, I move for admission of

18      Exhibit 4AA.

19                    MR. BERGMAN:  No objection.

20                    THE COURT:  Received.

21                    MR. HUME:  Can we just make sure we're showing it

22      so we have the right exhibit?  Because I'm a little worried

23      about the confusion.

24      Q.  Is that 4A on the right?  That's what's at Tab 11 of

25      your binder, Professor Dharan?
```

1    A.  Tab 11 is the one -- that's the one that's in my Tab 11.

2    Q.  That's 4AA.

3            And could you look at Tab 8 of your binder and

4    look at the Exhibit 4F.

5            MR. HUME:  And, Mr. DeRita, can you put Exhibit 4F

6    on the screen to make sure we have that correctly

7    identified.

8    Q.  Is what you're seeing on the screen what's now been

9    admitted at Plaintiffs' Exhibit 4F?

10   A.  Yes.

11   Q.  And it shows that in 2007 and 2008 private preferred

12   shareholders invested $19.7 billion?

13   A.  Yes.

14   Q.  And it shows the total dividends on private preferred

15   shares issued for those investments of $1.1 billion?

16   A.  Yes.

17   Q.  Now, can we go back to Professor Dharan's -- and you

18   understand that those dividends paid to the private

19   preferred shareholders stopped when the conservatorship

20   began?

21   A.  Yes.

22   Q.  And that none have been paid since then?

23   A.  Yes.

24   Q.  I think you have only two more slides that summarize the

25   total value sent to Treasury.

```
 1    A.   Yes.

 2    Q.   Can you explain that.

 3    A.   Exactly.  These are numbers I've been mentioning that

 4    was put in a slide and summarizes the data.

 5    Q.   Does this also come from the summary witness's work?

 6    A.   Yes, these two graphs.

 7    Q.   So what does this show?

 8    A.   Okay.  So the first bar shows before the net worth sweep

 9    approximately $55 billion -- $55.2 billion was sent to

10    Treasury based on the 10 percent dividend.

11         And then after the net worth sweep there were two

12    kinds of transfers.  One is cash dividend paid all the way

13    up to 2019; and then from 2019 onward, the increase in

14    liquidation preference paid in kind, essentially dividends

15    are being paid in kind, that's about $84 billion, adding up

16    to $330.2 billion.

17         So $55 billion before the net worth sweep, and

18    $330.2 billion after the net worth sweep.

19    Q.   Now, is the net worth sweep over, or are they still

20    paying in kind on the liquidation preference?

21    A.   As of -- I believe they are still paying in kind.  This

22    data are as of the second quarter of 2022.

23    Q.   As of June 30th of this year?

24    A.   June 30th.

25    Q.   And then what is on the far-right column?
```

 1    A.  It just adds the two numbers to show the total value

 2    sent to Treasury, which is the $385.4 billion.

 3    Q.  And did you make a slide that compared that number to

 4    the total amount that Fannie Mae and Freddie Mac had drawn

 5    down on, that Treasury had put into Fannie and Freddie in

 6    cash?

 7    A.  Yes.  That's the last slide I have there.

 8           So this graph shows the total amount drawn by

 9    Fannie Mae and Freddie Mac under the conservatorship is

10    $191.4 billion.  And then the number on the right is the one

11    I just showed.  The total value sent to Treasury is $385.4

12    billion.

13    Q.  And the amount drawn is cash that Treasury put into

14    Fannie and Freddie, yes?

15    A.  Yes.

16    Q.  And the value on the right hand is the cash Treasury has

17    received and the increases in liquidation preference as net

18    worth sweep?

19    A.  Yes.

20    Q.  And in addition to that on the right, Treasury also has

21    just the liquidation preference it has from the borrowings,

22    from the drawdowns?

23    A.  Yes.  The 191.4, I'm not sure 100 percent of it is cash,

24    but almost all of it is cash.

25    Q.  There's $2 billion that was --

1    A.  $2 billion that was not cash.

2              MR. HUME:  Professor Dharan, thank you very much.

3    I have no more questions at this time.

4              THE COURT:  We'll take a ten-minute recess.

5              (Jury exits courtroom)

6              (Recess taken)

7              THE COURT:  The defendant may cross-examine.

8              MR. BERGMAN:  Thank you, Your Honor; David Bergman

9    for defendants.

10                        CROSS-EXAMINATION

11   BY MR. BERGMAN:

12   Q.  Dr. Dharan, quick question right at the outset.  I want

13   to make sure I'm pronouncing your name correctly.  Is it

14   Dharan?

15   A.  Dharan.

16   Q.  Dharan.  I apologize in advance if I don't get it quite

17   right.  I've had it in my head a little differently here for

18   a while.

19              Dr. Dharan, you've never held a position in

20   government; is that correct?

21   A.  Yes.

22   Q.  You've never served in government at all?

23   A.  Yes.

24   Q.  And am I right you have never set public policy?

25   A.  Yes.

```
 1    Q.  And you have never implemented public policy, right?

 2    A.  Can you repeat that again.  What's the question again?

 3    Q.  You have never implemented public policy, correct?

 4    A.  Yes.

 5    Q.  You have no experience regulating financial

 6    institutions, correct?

 7    A.  Yes.

 8    Q.  And you have no expertise in regulating financial

 9    institutions, correct?

10    A.  Expertise in regulating?

11    Q.  Yes.

12    A.  No, I don't have that.  I mean, I'm not a -- I'm not a

13    regulator.

14    Q.  Yes.  And you also have no expertise in regulating

15    financial institutions?

16    A.  I don't know what that means.  My expertise is in

17    finance and accounting and economics.

18    Q.  Okay.  I asked you in your deposition, "Do you have any

19    expertise or experience regulating financial institutions?"

20    And you answered "No."  Is that correct?

21    A.  That's correct, but I'm saying that I don't know what

22    that really means.

23    Q.  You have never been a conservator, right?

24    A.  Correct.

25    Q.  And am I right you have no experience working with a
```

1    conservator?

2    A.  Correct.

3    Q.  You presented a slide just a few minutes ago that shows

4    what Fannie and Freddie would have paid in 2013 to 2022

5    under the 10 percent dividend as compared to what was

6    actually paid under the net worth sweep, right?

7    A.  Yes.

8    Q.  And those were actual numbers using hindsight, correct?

9    A.  Yes.

10   Q.  You testified this morning, I think, that this slide

11   shows, as it turns out and it ended up, that the net worth

12   sweep was greater than the 10 percent dividend, right?

13   A.  Yes.

14   Q.  Those are your words?  That's hindsight again, right?

15   A.  Yes, that's probably right.

16   Q.  And your slides you just addressed a few minutes ago,

17   they do not include a periodic commitment fee at all, right?

18   A.  Yes.

19   Q.  We'll come back to the periodic commitment fee in a

20   little bit.

21          You do not have a slide that shows how much Fannie

22   and Freddie will earn from 2023 to 2033, do you?

23   A.  From '23 to '33, no, I don't have that slide.

24   Q.  You haven't even tried to do that, have you?

25   A.  I haven't been asked to do that, no.

1    Q.  And you don't have a crystal ball so you couldn't do it,

2    could you?

3    A.  As an assignment, if somebody says can you do it?

4    Q.  If somebody told you, "Can you tell me exactly what

5    Fannie and Freddie are going to make from 2023 to 2033 so

6    that ten years from now, when we come back, it's going to

7    line up," you couldn't do that, right?

8    A.  I could do the forecast as an assignment, and then we'd

9    have to see wait and see what the actuals are.

10   Q.  We'd have to wait and see what the actuals are, right?

11   A.  That's for everybody.  Yes.

12   Q.  And you don't know whether housing prices are going to

13   go up or down next year.

14   A.  We can only make forecasts.

15   Q.  And you don't know whether housing prices are going to

16   go up or down in 2025, correct?

17   A.  You mean, the actual numbers?

18   Q.  Yes.

19   A.  Nobody knows.

20   Q.  Doctor, Fannie and Freddie are a very critical part of

21   the economy, aren't they?

22   A.  Yes.

23   Q.  They support that U.S. housing market, correct?

24   A.  Yes.

25   Q.  And the housing market is about between one-fifth and

 1    one-seventh of the U.S. economy; is that right?

 2    A.  Yes.

 3    Q.  Is it fair to say the housing market is one of the most

 4    important components of the U.S. economy?

 5    A.  Yes.

 6    Q.  And if Fannie and Freddie were to fail, the consequences

 7    for the U.S. economy would be terrible, right?

 8    A.  If they were allowed to fail, yes.

 9    Q.  It would be terrible, right?

10    A.  I would think so, yes.

11    Q.  If Fannie and Freddie defaulted on their guarantees of

12    mortgage-backed securities, about $5 trillion dollars in

13    guarantees, right?

14    A.  Pretty large amount, yes.

15    Q.  And that would be -- that would be very bad for all of

16    us, right?

17    A.  Yes.

18    Q.  In your opinion, the net worth sweep was not necessary,

19    correct?

20    A.  Correct.

21    Q.  And sometimes in your report I see "necessary,"

22    sometimes "reasonably necessary," sometimes "financially

23    necessary."  I think this morning you, too, said "sometimes

24    necessary," "reasonably necessary."  They're synonyms.  They

25    mean the same thing, right, "necessary" and "reasonably

1  necessary"?

2  A.  To me, "reasonably necessary" is the more normal way to

3  say it, but every now and then I do say "necessary."

4  Q.  And you do not have an opinion whether the net worth

5  sweep was just plain reasonable, correct?

6  A.  Well, my question was to address the financial

7  accounting issues as an expert in those domains, and so

8  "reasonably necessary" brings into the finance and

9  accounting questions addressing issues like circular draw;

10  and so that's what I addressed in my report.

11  Q.  And when I asked you at deposition whether you would use

12  the term "just plain reasonable," you said, "I'm not

13  independently using the word 'reasonable.'  I wouldn't use

14  the word 'reasonable,' you know, independent, hanging on its

15  own type manner."

16          That was true, correct?

17          MR. HUME:  Objection, Your Honor.  Just objecting

18  if counsel is going to show the deposition rather than

19  recite from it.

20          MR. BERGMAN:  Sure.

21  Q.  It's -- Dr. Dharan, do you remember that testimony?

22  A.  I know the series of questions, maybe a couple dozen

23  questions you had, but I don't remember exactly what I said.

24  Q.  Okay.  It's a fact that you are not independently using

25  the word "reasonable" in the context of your opinions here,

1    correct?

2    A.   In the context of this case, the way I look at the issue

3    of "reasonable" is that's for you to argue to the jury as

4    opposed to me.

5              What I'm bringing is the finance and accounting

6    aspects of the question, and that's why I'm using carefully

7    the phrase "reasonably necessary," so I can distinguish

8    that.

9    Q.   Doctor, if I wanted to walk out of this courtroom back

10   behind me, I could walk out through either of those two

11   swinging doors, assuming they're unlocked, right, left or

12   right; is that correct?

13   A.   Yes.

14   Q.   And either would be reasonable.  That's a reasonable way

15   for me to leave the courtroom, either door, correct?

16   A.   There may be other doors, but yes.

17   Q.   But that's reasonable, to use those back doors and to

18   use either one?

19   A.   I don't know what the other alternatives are.  You have

20   to give -- the word "reasonable," as I have said before, has

21   to -- is in the context of some decision or context of other

22   aspects to consider.

23              So if you -- for example, if you say "I have a

24   choice of leaving by opening those doors and going or just

25   crashing through the wall to go out," then you can say

1    between these two which is reasonable.  Then we have to use

2    some criteria to make the judgment.

3    Q.  Okay.  If those doors are both working, it would be

4    reasonable for me to walk out of either of them, right?

5    A.  If your intent is to go out, it will be -- that's what

6    you will do.

7    Q.  And it would not be necessary for me to walk out of the

8    left door if the right door is also working, right?

9    A.  I don't know what that means.

10   Q.  I wouldn't need to walk out the left door if I could

11   also walk out the right door, correct?

12   A.  I really don't understand the analogy.  Maybe you might

13   have to give me some more.

14   Q.  Okay.

15   A.  Yes.

16   Q.  You would agree it's reasonable for me to walk out of

17   either door, left or right, but it's not necessary for me to

18   walk out of either particular door left or right, correct?

19   A.  I just -- this is just totally unrelated to accounting

20   and finance.

21          But as I said, you know, you have to start with

22   the context.  You have to ask:  What is my goal?  And, you

23   know:  What are the alternatives?  And you go through an

24   analysis in a business context.

25   Q.  And one difference between "necessary" and "reasonable"

1    is that there can be more than one reasonable option,

2    correct?

3    A.  The "necessary" here is in the finance context that I'm

4    using.  So is it reasonably necessary for the financial

5    objectives, such as trying to avoid the draw down of the

6    Treasury Commitment?  So in that context "reasonably

7    necessary" captures the "necessary" part.  And so I think --

8    I need the context to use these words.

9    Q.  You do not have the opinion that the net worth sweep was

10   done for an improper reason, correct?

11               MR. HUME:  Objection; vague.

12               THE COURT:  Overruled.

13   A.  I'm mainly looking at what they said, what FHFA

14   personnel, Mr. DeMarco and also Mr. Ugoletti, said

15   Mr. DeMarco and Mr. Ugoletti.  And in those contexts I

16   analyzed, but I'm not looking at any legal issues like

17   proper, improper.  Those are legal terms that I don't use.

18   Q.  Doctor, in your second deposition, April 6, 2022, Page

19   216, Lines 14 to 21, I asked you:

20               "Are you offering an opinion whether the net worth

21   sweep was taken for an improper reason or an improper

22   motive, if you prefer?"

23               And you answered, "My opinions are all stated

24   right in the report, and I don't have an opinion about

25   improper reasons at all in my report."

1   A.  Correct.

2   Q.  And that was true?

3   A.  Yes.

4   Q.  And so as you sit here today, you do not have the

5   opinion that the net worth sweep was done for an improper

6   reason, correct?

7   A.  Correct.

8           Again, the reason is I interpret the word

9   "proper," "improper," as legal terms, and I don't bring

10  those into my analysis.

11  Q.  You didn't tell me that at the deposition, did you?

12  A.  The answer is the same.  I did not -- I did not express

13  an opinion about "improper" in my report.

14  Q.  And you do not have an opinion that the net worth sweep

15  was done for an improper motive, correct?

16  A.  Right.  But I'm just explaining that the word

17  "improper," I understand it as a legal term, not an

18  accounting and finance term.

19  Q.  You do not have the opinion that transferring earnings

20  to Treasury -- that is the net worth sweep -- was improper,

21  correct?

22  A.  Yes.  Again, I don't use that word "improper" in my

23  conclusions.

24  Q.  You do not have a direct opinion about whether the

25  shareholders should have expected FHFA to be indifferent to

1   the interests of the shareholders, right?

2   A.  Can you repeat the question again?  I'm not sure I

3   follow it.

4   Q.  Yes.

5   A.  Yes.

6   Q.  You do not have a direct opinion about whether the

7   shareholders of Fannie and Freddie should have expected FHFA

8   to be indifferent to the interests of the shareholders,

9   correct?

10  A.  Yes.  That's a little complicated to answer, but I would

11  say it really depends on what role of FHFA we are looking at

12  in answering that.

13  Q.  I asked you, again at your April 6, 2022, deposition,

14  Page 227, Lines 1 to 7.  I said, "Do you have an opinion as

15  to whether the shareholders should have expected FHFA to be

16  indifferent to the interest of the shareholders?"

17              MR. HUME:  Just a minute before you answer.

18              I've been doing this a while, maybe not as long

19  as Mr. Bergman, but I've never seen a witness cross-examined

20  on a deposition without giving counsel a copy.  We'll have

21  to --

22              MR. BERGMAN:  Sure.

23              MR. HUME:  Does the witness have a copy?

24              MR. BERGMAN:  Would you like a copy, sir?

25              MR. HUME:  I have never seen a witness cross-

```
1    examined with the deposition without giving him the

2    deposition.

3              THE COURT:  Don't make comments like that.

4              You want the witness to have the deposition; he

5    asked the witness if he wanted it.

6              Do you want it?

7              THE WITNESS:  Yes.

8              THE COURT:  All right.

9              MR. BERGMAN:  Certainly.

10             THE COURT:  Comments like that you make to the

11   Court, not in front of the jury.  You know better, Mr. Hume.

12             MR. HUME:  Sorry, Your Honor.

13             THE COURT:  Totally improper.

14             MR. BERGMAN:  May I approach the witness, Your

15   Honor?

16             THE COURT:  Yes.

17   Q.  Doctor, if you look at the April 6, 2022, deposition,

18   you can read along with me, Page 227, Lines 1 through 7.

19   It's the top of the page.

20   A.  Can you repeat the -- 227?

21   Q.  227.  And it's at the top, Lines 11 through 7.  And as I

22   said:  "Do you have an opinion as to whether the

23   shareholders should have expected FHFA to be indifferent to

24   the interests of the shareholders?"

25             And you said, "I don't have a direct opinion on
```

```
 1    that."

 2    A.  Yes.

 3    Q.  Is that correct?

 4    A.  That's not the end of the sentence.

 5    Q.  Yes.

 6    A.  It continues, yes.

 7    Q.  "I don't have a direct opinion on that.  Again, simply

 8    because I don't want to be getting into these very complex

 9    legal questions about FHFA's role.  I'm not here to opine on

10    the terms of the way you phrased the question."

11             That was true?

12    A.  And it continues further, too, yes.

13    Q.  Do you feel you need to read more?  You don't think that

14    adequately responded to the question?

15    A.  No, I think the next paragraph is critical.  "As I just

16    said a moment ago, it depends on which role of the FHFA we

17    are talking about."

18    Q.  All right, sir.

19             You have no real opinion about the provision of

20    HERA that the conservator may operate the enterprises in the

21    best interests of the agency, correct?

22    A.  Is this in the deposition you're asking a question?

23    Q.  I'm asking you a question that you have answered before,

24    yes, sir.

25    A.  Yes.  Can you tell me where it is?
```

1    Q.   I'd rather you just give me an answer --

2    A.   Okay.

3    Q.   -- to the question as you can -- best you can right now.

4         You have no real opinion about the provision of

5    HERA that the conservator may operate the enterprise in the

6    best interests of the agency, right?

7    A.   Yes.  If I remember, I said it's in the HERA.  I

8    don't -- these are not things that we express an opinion on.

9    These are in the HERA.

10   Q.   And, similarly, with respect to the provision of HERA

11   that the conservator may act in the best interests of FHFA,

12   you do not have a way to interpret what it means and how it

13   plays out in this particular case, right?

14   A.   No, I read what's in the HERA, but my questions were to

15   address the finance question in this case about the circular

16   draw exhausting or eroding the Treasury Commitment.

17   Q.   Yes.  Thank you.

18        But you do not have a way to interpret what HERA

19   means when it says that the conservator may act in the best

20   interests of FHFA, correct?

21   A.   I don't have to interpret it.  It is what it is, and

22   it's there.  I don't need to interpret that.

23   Q.   And, Doctor, you do not have an opinion about whether

24   the shareholders of the enterprises should have expected

25   FHFA to act for the benefit of the shareholders, correct?

1    A.  Again, I think I gave a longer answer, but, again, it

2    depends on the role and the particular context.

3         When I look at the context of making a large

4    decision where you look at alternatives, you define the

5    problem, and you collect the information.  In that context I

6    have an understanding of how management would perform, and

7    so I do express opinion on that process.

8    Q.  If you'll turn with me, Doctor, to the April 6, 2022,

9    deposition, Page 226, Line 11.

10        I asked, "Do you have an opinion as to whether the

11   shareholders of the enterprises should have expected FHFA to

12   act for the benefit of the shareholders?"

13        And you answered, "That's clearly outside the

14   scope of my work."

15        That's the complete answer, correct?

16   A.  Yes.

17   Q.  And that was correct?

18   A.  Yes, because as I said just now, my focus is on the

19   finance question in this case, finance and accounting

20   question.

21        When I think of the problem addressed to me as a

22   finance and accounting problem, basically is there going to

23   be a significant financial harm as a result of the net worth

24   sweep, and that's a finance question.  Will there be a

25   financial harm?  And that's what I looked at.

1    Q.  Dr. Dharan, you used a PowerPoint slide in your

2    questioning on direct, and it depicted portions of the FHFA

3    Q&A fact sheet from September 7, 2008.  Do you recall that?

4    A.  Yes.

5            MR. BERGMAN:  And let's put up, if we can, Jorge,

6    Slide 10 from the Doctor's demonstratives.

7    Q.  And you'll see you've highlighted the question, really

8    just the word, "What are the goals of this conservatorship?"

9    And you highlighted the word "goals," correct?

10   A.  Yes.

11   Q.  And then your slide includes a one-sentence answer that

12   starts, "The purpose of appointing the Conservator," and

13   then you have highlighted in yellow "preserve and conserve"

14   and "sound and solvent."

15           So you've got the "goals" highlighted, and

16   "preserve and conserve" and "sound and solvent" highlighted,

17   correct?

18   A.  Yes.

19   Q.  And then it cuts off there, and then you see sort of in

20   pale gray is the word "the," and then that's it, right?

21   A.  Yes.

22   Q.  Let's look at PX2C, which is the fact sheet itself.  And

23   at the bottom of that 2C -- this is in evidence -- we can

24   see is the question that you excerpted, "What are the goals

25   of this conservatorship?"

 1          And if we go to Page 2, it has the beginning, "The

 2     purpose of appointing," and then that's what you put in

 3     there.

 4          And then there's an answer to the actual question,

 5     "What are the goals of the conservatorship?"  Right?  It

 6     says, "The goals of the conservatorship are to help restore

 7     confidence in the Company, enhance its capacity to fulfill

 8     its mission, and mitigate the systemic risk that has

 9     contributed directly to the instability in the current

10     market."

11          That sentence does not appear anywhere on your

12     PowerPoint slide, correct?

13     A.  But it's in the exhibit.  I didn't highlight it.

14     Q.  You didn't even include it on your PowerPoint, right?

15     You not only didn't highlight it, you can't find that on

16     your slide.

17          The fact sheet, Doctor, was written in September

18     2008 at a time when the Treasury Commitment was $100 billion

19     for each of Fannie and Freddie, right?

20     A.  Yes.

21     Q.  The expectation in September 2008 was that the $100

22     billion for each of Fannie and Freddie would be more than

23     enough, correct?

24     A.  I don't know what the expectations were, but that was

25     the amount in the initial contract.

1    Q.  And back in September 2008, did you think that the

2    Treasury Commitment of $100 billion for each of Fannie and

3    Freddie would be sufficient?

4    A.  Well, you're asking me did I think?

5    Q.  Yes.

6    A.  I didn't examine that as part of my analysis.

7    Q.  Did you think about it in 2008?

8    A.  We are talking September 2008?

9    Q.  Yes.

10   A.  And your question is, did I go back to September 2008

11   and ask:  Is $100 billion sufficient?  Is that your

12   question?

13   Q.  That's a good question.  That's not mine, but go ahead

14   with that.

15   A.  No, I don't know what your question is.

16   Q.  Okay.

17   A.  I don't understand.

18   Q.  So in 2008 --

19   A.  Okay.

20   Q.  -- were you -- as an economist, an accountant, did you

21   think -- you were aware, presumably, of what was going on.

22   Did you think:  Well, $100 billion for Fannie and Freddie

23   would not be enough?  Or did you think:  Well, that's more

24   than enough?

25   A.  I didn't really have occasion to ask that question.

1    Q.  Okay.  And sitting here today you haven't tried to put

2    yourself back in time to 2008 and ask yourself whether that

3    $100 billion in September 2008, at that time, without

4    hindsight, would have seemed like enough?  You haven't done

5    that analysis?

6    A.  I have not been asked to do that analysis.

7           See, the problem is September 2008, the

8    conservatorship had just been started, and the deferred tax

9    asset write-off had not yet taken place.  It was a

10   predeferred tax write-off error.  So maybe the $100 billion

11   was enough for that.  Once the deferred tax write-offs took

12   place, you had to increase the amount.

13   Q.  Yes.  You've commented a lot on the evidence you heard.

14   Did you hear evidence that, in fact, people thought that the

15   $100 billion in 2008, September 2008, would be sufficient?

16   A.  The evidence in this case?

17   Q.  Yes.

18   A.  I mainly focused on the 2012 time period for the

19   question I was asked, but I didn't see anything about 2008,

20   the question that you asked.

21   Q.  Okay.  And so with 20/20 hindsight, we know, in fact,

22   that the $100 billion in September 2008 turned out to be

23   insufficient, correct?

24   A.  Well, I haven't done the analysis on that, but based on

25   what I know for now, it's mainly driven -- it was mainly

1    driven by the large write-offs in the deferred tax asset

2    which lowered the net worth, and that was the reason to

3    increase the --

4    Q.  In May 2009, nine months into the conservatorship, FHFA

5    and Treasury agreed to double the size of the Treasury

6    Commitment from $100 billion to $200 billion for each of

7    Fannie and Freddie, correct?

8    A.  Yes.

9    Q.  And you didn't give any thought at that time, whether

10   that surprised you or was expected.  That was just not on

11   your mind.  Is that right?

12           MR. HUME:  Objection, Your Honor.  I think it's

13   vague whether the question is about what the witness thought

14   in May 2009 or whether the witness has an expert opinion now

15   about May 2009.

16           I'd ask for that to be clarified.

17           THE COURT:  Overruled.

18           You can answer.

19   A.  Again, as part of this case, this analysis, I didn't

20   have to go to May 2009 and ask -- and answer the question

21   you're asking, which is was $200 billion sufficient.  Those

22   would require a lot of analysis, which I haven't done,

23   because that was not the place I was focusing it.  The focus

24   is on 2012 and immediate prior period like 2011.

25   Q.  And back in 2009, as an academic or expert or anything,

1    were you thinking about these issues?  Did you consider

2    whether the Treasury Commitment was sufficient as of May

3    2009?

4    A.  No.

5    Q.  Doctor, Treasury's commitment to Fannie and Freddie,

6    it's obviously a very large amount of support, right?

7    A.  Yes.

8    Q.  In fact, you are not aware of any other regulated

9    financial institution that has received a commitment from

10   Treasury anywhere near the magnitude of the commitment to

11   Fannie and Freddie, correct?

12   A.  I would think so.  There are other banks and other

13   financial institutions that have received large Treasury

14   support.  I don't know the amount for AIG.  That was quite

15   large as well.

16          But apart from AIG, I'm not sure other banks got

17   anywhere near this amount.

18   Q.  You were asked about the capital arrangements relating

19   to the Third Amendment, and you said, "In my experience, it

20   was totally unprecedented, I think," is what you testified.

21   Is that correct?

22   A.  You mean the net worth sweep?

23   Q.  Yes.

24   A.  Yes.

25   Q.  And a $400 billion commitment of taxpayer money to save

1    two failing, insolvent companies is also unprecedented,

2    isn't it?

3    A.  Well, yes.  The magnitude is certainly unprecedented.

4          As I said, AIG might have been in the $100 billion

5    range.  I don't remember the exact amount.  But apart from

6    AIG and the Fannie Mae and Freddie Mac cases, nothing else

7    comes close.

8    Q.  And, in fact, AIG doesn't really compare to Fannie Mae

9    and Freddie Mac in terms of the magnitude either, correct?

10   A.  Again, I don't want to just say off the top of my head

11   what the magnitude was.  It was quite large.

12   Q.  The only reason that Fannie Mae and Freddie Mac could

13   operate at all was because of the Treasury Commitment

14   starting in 2008, correct?

15   A.  I would think so.

16   Q.  I want to turn to an item that you focused on on your

17   direct testimony, and that's projections.  And particularly,

18   you spent a lot of time with the Dave Benson projections

19   from July 6, 2012, correct?

20   A.  Yes.

21   Q.  Mr. Benson was, I think you said, senior -- was a senior

22   executive vice president at Fannie in July of 2012, right?

23   A.  Yes.

24   Q.  There's more than one of those, correct?

25          Mr. Benson had no role at Freddie Mac, right?

```
1    A.  Yes.

2    Q.  He -- am I correct he was not an employee of Freddie

3    Mac, right?

4    A.  Yes.  I'm not 100 percent sure, but my facts -- I

5    don't -- I don't disagree with you totally.

6    Q.  Okay.

7    A.  Yes.

8    Q.  And as far as you know, Mr. Benson had no access to

9    internal Freddie Mac documents, right?

10   A.  That I don't know, but I was told -- I saw in the

11   documents that they were sharing, Freddie Mac and Fannie

12   Mae, through the FHFA sometimes and directly, the financial

13   models and other assumptions between them.

14   Q.  Mr. Benson was not the CEO of Fannie Mae, right?

15   A.  He was not the CEO.  He was the executive vice

16   president.

17   Q.  And he wasn't an employee of Freddie Mac at all.  I

18   think you said that Timothy Mayopoulos was the CEO of Fannie

19   Mae at the time; is that right?

20   A.  I said I don't know for sure, but he was the president,

21   and I don't know if he was the CEO.

22   Q.  Okay.  And Susan McFarland, you spoke quite a bit about

23   her.  She was the chief financial officer of Fannie Mae at

24   the time?

25   A.  That's my recollection.  Again, these are all facts that
```

1      can be checked out.

2      Q.   Okay.  But the projections that you relied on were

3      Mr. Benson's projections, correct?

4      A.   These were the projections presented by Mr. Benson to

5      the board of directors.  I would think the processing role

6      was Mr. Benson working together with the finance and

7      accounting team.

8      Q.   You don't know that?

9      A.   "I would think," I said.

10     Q.   Yes.

11              MR. BERGMAN:  Let's pull up your Slide 42, Jorge,

12     with no clicks.  Just the first thing that pops up, I think.

13     Q.   And this is a slide that you made but is based on --

14     it's just basically taking the data from Mr. Benson's

15     projections; is that right?

16     A.   Yes.

17     Q.   And this is based -- you've got it sourced on a slide

18     that Mr. Benson included in his July 6, 2012, projections,

19     right?

20     A.   That's my recollection, yes.

21     Q.   Okay.  Now, your slide is a little bit different than

22     his, correct?

23     A.   I remember it needed the recreating because it was not

24     copied properly, yes.

25     Q.   Let's take a look at Mr. Benson's July 6th projections.

1   They've been admitted as Trial Exhibit PX213.

2           MR. BERGMAN:  And, Jorge, if we could pull up

3   Exhibit Page 20 on 213.

4   Q.  Okay.  That is -- it's Slide 14 at the bottom, Doctor.

5   Do you see that?

6   A.  Yes.

7           MR. BERGMAN:  And I'm going to challenge the

8   technology a little bit.  Is it possible to put those side

9   by side, Jorge?

10          Thank you.

11  Q.  Okay.  Now, your slide, Doctor, is on the left of the

12  screen, and the -- Mr. Benson's is on the right.  And a

13  couple of things leap right out.

14          Mr. Benson's slide has a mark of "Draft" in the

15  top-right corner, correct?

16  A.  Yes.

17  Q.  And your slide doesn't have that?

18  A.  Yes.

19  Q.  And Mr. Benson's slide says "Verification And Review in

20  Progress," right?

21  A.  Yes.

22  Q.  Your slide does not have that?

23  A.  Yes.

24  Q.  If we go -- well, let me -- so we can tell -- there's

25  verification and review is in progress.  Am I right, you did

1   absolutely nothing to verify the draft Benson July 6th

2   projections before presenting them to the jury; is that

3   correct?

4   A.  Can you repeat that?  I'm not sure I got the hang of it.

5   Q.  Yes.  Am I correct that you did absolutely nothing to

6   verify the draft Benson July 6th projections before

7   presenting them to the jury today?

8   A.  Well, I'm presenting the actual exhibit used by

9   Mr. Benson.  I'm just repeating that exhibit here.

10          I'm showing the exhibit Mr. Benson showed to the

11   board of directors and shared with FHFA.

12   Q.  And you didn't do anything to verify Mr. Benson's data?

13   A.  I haven't seen anything that says this was wrong or the

14   projections that they made were incorrect.  There were some

15   small additional drafts that had small changes in the

16   numbers, but this is the essence of those drafts as well.

17          MR. BERGMAN:  Let's now just focus on PX213,

18   Jorge, please, and go to the first slide.  And we'll see

19   that at the top of PX213 on Page 1 -- sorry, first page of

20   the slides.  My apologies.

21   Q.  Okay.  And you see that this is a strategic planning

22   session, board of directors, David Benson, and it says

23   at the top, "Draft," and then under that it says, "as of

24   7/6" -- July 6th -- "6 p.m.," right?

25   A.  Yes.

1    Q.  And so this, you understand, was a draft of July 6th,

2    6:00 p.m., to be used at a July 19th board of directors

3    strategic planning session?

4    A.  Right.

5    Q.  And you know that Mr. Benson was deposed in this case,

6    right?

7    A.  Yes.

8    Q.  And you reviewed his deposition carefully?

9    A.  I reviewed it, but I don't recall all the details so you

10   have to show me, if you have any questions.

11   Q.  Okay.  Fair enough.

12          And even before you wrote your expert report back

13   in 2021 you read Mr. Benson's deposition, correct?

14   A.  I think so.

15   Q.  It's in your relied upon documents, right?

16   A.  I think so.

17   Q.  So do you recall that Mr. Benson said about these

18   projections -- this is in his February 28, 2020

19   deposition.  If you want to read along, you're welcome to.

20   It's in the binder in front of you, but hopefully I'll be

21   clear.

22          It's Page 178, Lines 16 through 20.  Mr. Benson

23   testified --

24   A.  Are you asking me to refer to my testimony or

25   Mr. Benson's?

1    Q.  No, this is Mr. Benson.  So do you recall that Mr.

2    Benson testified:  "You've asked if it" -- these

3    projections -- "was the best estimate."

4            And he said, "It wasn't.  The purpose of this

5    wasn't necessarily to go through the kind of rigor that one

6    would typically go through in terms of the way we would do

7    our official forecast."

8            You knew that, right?  You knew that these

9    projections were not rigorous and were not the best effort?

10           MR. HUME:  May I just object, Your Honor?

11           We didn't -- counsel, we do not have a copy of the

12   binder.

13           THE COURT REPORTER:  You're talking away from me.

14           MR. HUME:  We did not have a copy of the binder

15   counsel is using to examine the witness.  I think we now do.

16           What page are we on on the Benson deposition?

17           MR. BERGMAN:  178, Lines 16 to 20.

18   Q.  So, Doctor, do you understand that Mr. Benson testified

19   that these July 6th projections that you relied upon were

20   not his best estimate, and they were not the product of the

21   kind of rigor that he would usually use with official

22   estimates?

23   A.  What I remember is that these are presentations made to

24   the board.  This is a strategic planning session.  So for

25   that purpose, he had prepared the slides.

1    That's all I know for sure.

2   Q.  And Mr. Benson also testified, Page 178, line 20, he

3   said, "These projections are more of a call it an unofficial

4   long-term forecast which, by the way, is not usual for us,

5   to do a 10-year forecast.  That's outside the bounds of what

6   we would typically do."

7    You knew that, right?

8   A.  Yes, I remember that.

9   Q.  And do you remember that Mr. Benson, on Page 176, Lines

10  2 to 4, described these projections as part of a, quote,

11  "marketing spin"?  Do you remember that?

12  A.  I don't remember that, but if you showed the deposition,

13  I'll be happy to read it.

14  Q.  Yes.  So you have it up there, and maybe I'll just --

15  A.  Do I have it up here?

16  Q.  You should.

17  A.  Okay.

18  Q.  It's in that binder I think behind yours.

19  A.  Okay.  Give me a second.

20    Okay.  Which page?

21  Q.  If you go to 176, Line 2, and you'll see -- take your

22  time.  Mr. Benson said he was trying to give the board

23  something they could use as a, quote, marketing spin to

24  portray Fannie and Freddie in the most favorable light,

25  right?

```
 1    A.  Can I read it?

 2    Q.  Yes, please.

 3    A.  Not just what you -- I wanted to get the place where you

 4    are.

 5    Q.  Yes.  176, Lines 2 through 9.

 6    A.  Page 176, Line...?

 7    Q.  2 through 9.  And the question is:  Do you remember this

 8    testimony and description of the document you were relying

 9    on?

10    A.  (Witness reviews document) So if I understand -- I'm

11    just making sure I understand the context of these

12    questions.

13           He was asked, "And to what extent, if any, did you

14    think the GSEs making combined dividend payments in excess

15    of Treasury's investment was a significant event?"

16           So the question is --

17    Q.  I think we're on a different page, Doctor.

18           All right.

19    A.  I needed to understand what the answer was to understand

20    the question also.

21    Q.  Okay.

22    A.  Okay?

23    Q.  Let me move on.  It doesn't matter if you remember it or

24    not.  The fact is that you relied on these July 6th draft

25    projections.
```

```
 1              Now, you are aware, I assume --
 2   A.  Can I say that I used the draft July projection in my
 3   report --
 4   Q.  Yes.
 5   A.  -- as evidence of what management was conveying to the
 6   FHFA at that time.  So these projections were sent over to
 7   the FHFA.  That was the reason for me to use that.
 8   Q.  And you presented them to the jury, correct?
 9   A.  Pardon?
10   Q.  You presented those projections to the jury?
11   A.  This was realtime communications between the
12   enterprises -- between, in this case, Fannie Mae and FHFA.
13   That's the reason I was using it.
14   Q.  Okay.  Let me see if we can get PX218, which has not, I
15   don't believe, been admitted yet.  This is July 19, 2012,
16   board meeting packet.  And this includes a revised set of
17   slides.
18              I believe, Dr. Dharan, that you are familiar with
19   this document, correct?
20   A.  Can you show me what you want me to see so that I can
21   focus on it?
22   Q.  Yes.  If you just -- we'll start with just the title
23   page, and then, if we can go to Page 6 of 53 on the
24   document, you'll see the Benson slide deck, no longer marked
25   "draft."
```

```
 1              MR. BERGMAN:  Jorge, is that possible?

 2   Q.  Okay.  Do you see that that's the slide deck for the

 3   July 19, 2012, board meeting?

 4              MR. BERGMAN:  I seek the admission of PX218,

 5   please.

 6              MR. HUME:  No objection.

 7              THE COURT:  With the defense exhibit number or

 8   what?

 9              MR. BERGMAN:  I'm sorry, Your Honor?

10              THE COURT:  Are you moving it in as a defense

11   exhibit?  It's a plaintiffs' exhibit.

12              MR. BERGMAN:  Yes, if the Court -- if it's

13   acceptable to the Court, we'll just move it in under the

14   PX218 number.  But if you'd like us to remark it, certainly,

15   Your Honor, we'll do that, remark it.

16              MR. HUME:  We have no objection either way, Your

17   Honor.

18              THE COURT:  All right.  Received.

19   Q.  So this is an updated version of -- well, let's -- I'm

20   sorry.  Turn to Page 20 of 53.  And you'll see this is an

21   updated version of the Slide 14 of the Benson projections

22   that you used with the jury today, correct?

23   A.  Yes.

24   Q.  And this version doesn't say "Draft" correct?

25   A.  It doesn't say "Draft."
```

1    Q.  And it doesn't say "Verification and Review in Progress"

2    anymore, right?

3    A.  Right.

4    Q.  Let's compare these July 19th projections right here to

5    the July 6th draft projections that you relied upon and

6    presented to the jury today.

7              MR. BERGMAN:  And is it possible to put those up

8    at the same time, Jorge?

9    Q.  While we're waiting, let me try and narrate a little

10   bit.  The July 6, 2012, draft projections that are your

11   slide that you presented to the jury today, do you recall

12   those showed that Freddie will have residual equity?

13             And you testified residual equity is the same as

14   net worth, right?

15   A.  Yes.  I didn't testify today, but that's true.

16   Q.  And residual equity, net worth, retained earnings, all

17   the same concept?

18   A.  No.

19   Q.  No?

20   A.  Residual equity, I can probably go with that as net

21   worth.

22             Retained earnings is a very different concept.

23   Q.  Okay.  Residual equity and net worth?

24   A.  We'll stay with that.

25   Q.  Okay.  So if we look on the left -- we just lost it.

1           The 2006 draft that you put on your slide is on

2       the left.  And on the right -- oh, no, wait a second.

3           All right.  On the right is the draft from the

4       July 6th Benson projections.  Those were "Draft," and that's

5       what you presented to the jury today, correct?

6       A.  Again, I presented it in the context of what was

7       communicated to FHFA --

8       Q.  Yes.

9       A.  -- from Fannie Mae.  And also we had Susan McFarland

10      commenting on it.  So that was the reason to use it.

11          So it's -- I relied on both of these sets, so it's

12      not like I only relied on one of them.

13      Q.  And so if we look at the Freddie Mac line for residual

14      equity -- and that's the same as net worth -- and if you

15      look on the far right, 2022, it shows $25.2 billion for the

16      Freddie Mac net worth in 2022, right?

17      A.  I really -- I'm sorry.  I really cannot read it off the

18      screen.

19      Q.  Maybe we can put it up on the screen, just it, and not

20      have the compare, and we'll flip back and forth.

21          And this is -- again, it's in your demonstrative,

22      but maybe you recall.  Does it sound right to you, 25.2 --

23      there we go, $25.2 billion is the residual equity for

24      Freddie Mac 2022, correct?

25      A.  Okay.  I see it now.

1    Q.  And that's the number that was in all the slides that

2    you presented today, right?

3              MR. HUME:  Objection.

4    A.  I was mainly focusing on the -- my question was about

5    the funding and the use of the funding, so I was focusing on

6    the funding cap and the remaining funding.  Those are the

7    ones I was highlighting.

8    Q.  And if we look at the correction, the July 19th -- so

9    it's not even two weeks later.  The July 19th slide for

10   Freddie Mac, Dave Benson projections, and we look at the

11   residual equity 2022, it's $6.3 billion?

12   A.  Yes.

13   Q.  Not $25.2 billion, right?

14   A.  Yes.

15   Q.  That's a big difference.  That's $18.9 billion

16   difference, I believe.

17   A.  Right.  Again, the focus of my analysis that I presented

18   to the jury was the last line here, which is the remaining

19   funding available under SPSPA, how much of the funding is

20   still unused.

21              And if I remember right, the same conclusion here,

22   148.3.  It doesn't change all the way down.  It remains at

23   148.3.  So zero dollars were used in ten years.  And that's

24   what I'd shown earlier also.

25   Q.  Okay.  The final July 19th projections that are still

```
 1    ten-year projections are out of the ordinary course of what

 2    Mr. Benson normally would do, right?  Correct?

 3    A.  Yeah.  Mainly I've seen three, five years, yes.

 4    Q.  And the July 19th version shows that Freddie Mac's net

 5    worth is less than one-third of what you presented in your

 6    slide today to the jury, correct?

 7              MR. HUME:  Objection, Your Honor.  That

 8    mischaracterizes what Dr. Dharan presented.

 9              THE COURT:  The objection's overruled.

10              The witness can answer.

11              THE WITNESS:  Okay.

12    A.  Yes.  Can you repeat the question, please?

13              MR. BERGMAN:  I'll withdraw the question.

14    Q.  Doctor, the July 19th projection here shows only $6.3

15    billion in residual equity or net worth for Freddie Mac, and

16    for Fannie Mae it shows zero net worth, correct?

17    A.  Can you highlight it?  Okay.  Wait a minute.

18    Q.  Yes, it's --

19              MR. BERGMAN:  Jorge, will you pull up the Fannie

20    Mae on the July 19th.

21    Q.  And you'll see the residual equity line in 2021 and 2022

22    shows 0.0, correct?

23    A.  Yes.

24    Q.  And as I promised, we'll talk about the periodic

25    commitment fee in a bit.  But I'll just note here, the
```

1    periodic commitment fee is not considered at all in these

2    projections, right?

3    A.  Again, these projections -- I haven't seen all the

4    things they put into it and didn't put in, but there's no

5    line for DTA, and there's no line for credit loss

6    separately.  So it's a very -- as you described earlier,

7    Mr. Benson also described, it's an overview level that was

8    presented to the board, the FHFA.

9    Q.  And if Fannie Mae or Freddie Mac was going to have to

10   pay a periodic commitment fee any time between 2012 and 2022

11   on this chart, that would require an adjustment to the net

12   worth of the companies, correct?  A downward adjustment?

13   A.  How much was it?  What did you mention?  Any amount, or

14   are you referring to a particular amount?

15   Q.  Yes.  If there was any amount above zero, it was going

16   to have to come out of these figures, correct?

17   A.  Well, as of 2012, when they were making the projection,

18   they did not include the periodic commitment fee.

19   Q.  And if a periodic commitment fee had been charged and

20   paid between 2012 and 2022, all of these numbers would have

21   to be adjusted downward, correct?

22   A.  I would think so.  But, again, these projections are

23   based on what they were trying to forecast.  This is their

24   forecast.  This is not my forecast.  This is their forecast

25   presented to FHFA.

1    Q.  And that you've presented today to the jury?

2    A.  I was presenting it in order to explain that the

3    projections were shared with FHFA.

4    Q.  The July 6th draft and the July 19th final, neither of

5    those includes a stress scenario, correct?

6    A.  They don't use that term.  I think it sounds like -- I

7    think somewhere I saw the wording that it's a base case,

8    base scenario.

9    Q.  I think you testified to that earlier, right?  These are

10   base case projections.

11   A.  Correct.

12   Q.  You were aware that Freddie Mac actually did its own

13   internal projections -- and I'll show you one from May 2012.

14   A.  Okay.

15   Q.  It has a stress case.

16            MR. BERGMAN:  And this is not yet admitted.  I'll

17   move it.  DX451.

18            And if we could put that up for Dr. Dharan just to

19   see.

20            THE COURT:  No objection.  It's received.

21            MR. HUME:  Just a minute, Your Honor.  We just

22   received the document.

23            THE COURT:  All right.

24            MR. HUME:  I'm just looking and checking with my

25   colleagues.

1         (Pause)

2         MR. HUME:  Your Honor, may we briefly engage on

3    the phone?

4         (The following is a bench conference

5          held outside the hearing of the jury)

6         MR. HUME:  Judge Lamberth, this is Hamish Hume.

7         The parties have been exchanging exhibits in

8    advance on witnesses.  This was not in what was exchanged.

9         We also have a list of the exhibits we expect to

10   use at trial.  Both parties had very long initial lists and

11   cut them down.  This is not on the reduced list.

12        So this is simply a document that is not on a list

13   of documents that my colleagues are using to track whether

14   we object or do not object.

15        MR. BERGMAN:  Your Honor, David Bergman for

16   defendants.  I believe this is the same as PX119, which I

17   believe is on plaintiffs' reduced list; so we're happy to

18   use that version, if that would be satisfactory.

19        And with respect to -- we haven't been exchanging

20   cross documents, I don't believe, but I didn't know I was

21   going to use that until this morning.  So that's the delay.

22        MR. HUME:  I'll have to check with my colleagues

23   on the plaintiffs' exhibit version.

24        Our basic position has been if there's a plaintiff

25   exhibit that is an FHFA document, and we don't use it -- we

 can use it because it's a party admission. If we choose not to use it, it's hearsay unless it meets another exception.

MR. BERGMAN: Your Honor --

MR. HUME: I know Your Honor is annoyed with me, and I apologize for what I did earlier. I did not intend to curry favor with the jury, but I will note it is very unusual. There was no witness binder exchanged. There were questions asked about deposition transcripts without showing the witness the deposition transcript, and it made a difference between it was -- incomplete answers were being represented.

And now we're being shown documents that we haven't been told about, so it's just very hard for me to respond on the fly. I apologize.

THE COURT: I understand.

Do you want to see if you -- do you want to look at one now? Do you want to see if you object?

MR. HUME: PX119, is that the PX version?

MR. BERGMAN: Yes.

MR. HUME: The Court's indulgence for two minutes. Let me try to resolve this.

(Pause)

MR. HUME: Judge, my colleagues inform me that we objected to this document, and they withdrew the document. So we're not prepared to -- we object to its admission, and

```
 1    we had thought they had withdrawn it.

 2              MR. BERGMAN:  Your Honor, David Bergman, a couple

 3    of reactions.

 4              One is a factual matter.  I didn't understand that

 5    they'd withdrawn it, so we'll have to look into that.

 6              But in any event, I think we're permitted to

 7    cross-examine an expert with this kind of material, and I'm

 8    not seeking to introduce it for the truth of the matter.

 9              This goes to first testing the expert's opinion;

10    and, second, the expert has said that these materials being

11    available to FHFA should have affected their state of mind.

12              THE COURT:  What is this document that you're

13    trying to show him?

14              MR. BERGMAN:  This is a Freddie Mac 2012

15    corporate forecast three-year outlook dated May 22, 2012.

16    So it's very similar in nature to the kinds of documents

17    that Dr. Dharan presented this morning and this afternoon.

18              THE COURT:  All right.  The objection will be

19    overruled.

20              MR. BERGMAN:  Thank you.

21                  (This is the end of the bench conference)

22              MR. BERGMAN:  Are we permitted to display this

23    document?

24              Thank you, Your Honor.

25              THE COURT:  Defendants' 451 is received.
```

1   BY MR. BERGMAN:

2   Q.  Dr. Dharan, DX451 is a corporate forecast three-year

3   outlook for Freddie Mac.  I'm assuming you're familiar with

4   all manner of forecasts like this from this case; is that

5   true?

6   A.  I believe you showed me this in my deposition.

7   Q.  Yes.  And you didn't present that to the Court today,

8   but I'll direct you to look, please, at Page 9 of 28.  And

9   we'll pull that up.

10           Well, first, this is a Freddie Mac -- this is

11  their own internal projections and the like, correct?

12  A.  Yes.  This is a Freddie Mac projection made by the

13  financial planning and analysis group.

14  Q.  And this is the kind of document that you have been

15  talking about throughout your testimony, correct?

16  A.  This is what again?

17  Q.  The nature of document that you've been focused on,

18  correct?

19  A.  Yes.  I've seen this document.

20  Q.  And if we look at Page 9 of 28, you can see at the top,

21  "Cumulative Treasury Draws through 2014," and it says

22  "Projected Cumulative Treasury Draws through 2014 under a

23  range of scenarios, including the Stress Case, is between

24  $71 billion and $194 billion."  Correct?

25  A.  Yes.

1   Q.  That's very different than the draft projections that

2   the nonFreddie employee, Mr. Benson, had going out ten

3   years, correct?

4   A.  Well, they are different.

5   Q.  And you didn't present these in your analysis today?

6   A.  I was presenting documents that showed what Fannie Mae

7   was telling FHFA.  That's the focus of my presentation.

8   What did Fannie Mae tell and what did FHFA hear from Fannie

9   Mae and Freddie Mac?

10          In that context, Ms. McFarland also had used that

11  exhibit in her deposition to make the comment that I showed.

12  I was showing that.

13          Again, the idea is to show the communication

14  between these enterprises and FHFA.

15  Q.  And to be clear, DX451, the Freddie Mac forecasting

16  document, that was created by Freddie Mac, not by Dave

17  Benson, correct?

18  A.  Even the one by David Benson, as I said, I don't know

19  who created it.  He presented it.

20  Q.  DX451 was created by Freddie Mac, correct?

21  A.  Yes.

22  Q.  The stress scenario is important, correct?

23  A.  It's certainly information financial institutions will

24  take into account.

25  Q.  Mr. DeMarco's thinking and decision-making were driven

1    by the stress scenario, right?

2            MR. HUME:  Objection; lacks foundation.

3    Q.  Dr. Dharan, you were here when Mr. DeMarco testified?

4    A.  Yes.

5    Q.  And you heard him say that the stress scenario was

6    driving his thinking and decision-making; is that true?

7    A.  I don't remember the exact words.

8    Q.  In fact, in the U.S., the federal financial regulators

9    use stress case to determine whether to permit a bank to pay

10   dividends or permit them to hire or make mergers, right?

11   A.  I'm familiar with that, yes.

12   Q.  Correct?

13   A.  I think so.  But, again, I don't have all the details

14   and what the current status is.  But after the credit

15   crisis, there was a period when that was implemented.

16   Q.  And in your first deposition, September 11, 2021, at

17   Page 164, Line 25, you testified, "I know in the U.S. the

18   federal financial regulators use stress case" --

19   A.  Right.

20   Q.  -- "to determine whether to permit a bank to pay

21   dividends or whether to permit them to hire or to make

22   mergers."  Is that correct?

23   A.  Yes.  Again, I don't know today's situation, but they

24   adopted that after 2008.

25   Q.  You have no experience --

1    A.  "They" meaning the regulators.

2    Q.  Okay.  You have no experience in how a conservator

3    should view projections, right?

4              MR. HUME:  Objection; vague.

5              THE COURT:  Overruled.

6    A.  I mean, the conservator is taking all the inputs.

7    Projections are part of that.

8    Q.  And you have no experience in how a conservator should

9    view projections, right?

10   A.  Are you saying, by "experience," have I worked as a

11   conservator?  Is that the same question as before?

12             I have not worked as a conservator.

13   Q.  Okay.  And so you have no experience in how a

14   conservator should view projections, right?

15   A.  As I said, I have not worked as a conservator.

16   Q.  And you have no expertise in how a conservator should

17   use projections, right?

18             MR. HUME:  Objection.

19   A.  Again, the answer, as I said, in my depositions as well,

20   depends on the role that I'm looking at, which is the

21   management making decisions on a pretty huge magnitude,

22   unprecedented sizes, and the kind of inputs they would use.

23   And I'm just focusing on the communications, the information

24   shared by the enterprises with FHFA, and the projections are

25   part of that.

1   Q.  Dr. Dharan, in your first deposition, September 11,

2   2021, Page 296, Line 5 --

3   A.  What's the page number?

4   Q.  296, Line 5.  I asked you, "Do you have any experience

5   or expertise as to how a conservator views projections?"

6        And your answer was, "Again, I haven't even

7   expressed an opinion on what they should do with this

8   information, and I don't -- I don't really see, you know,

9   that type of analysis in my report either."

10        Was that truthful testimony?

11   A.  That's what I was saying a minute ago, too.  Right.

12   Q.  You have no opinion on what the conservator should have

13   done with any of the projections here, correct?

14   A.  Again, in my second deposition, what I said about this

15   is looking at the conservator's role here as stepping into

16   the management of Fannie Mae and Freddie Mac, I'm looking at

17   a large-scale decision, a huge decision, to get rid of the

18   net worth for pretty much the future.  I was describing the

19   management process that a typical company would use.

20        So that is the context in which I was describing

21   what inputs the conservator would use.

22   Q.  Sir, in your deposition you testified that you haven't

23   even expressed an opinion on what the conservator should do

24   with any of the projections, correct?

25   A.  Yes.

1    Q.  And is that still your opinion today?

2    A.  That is still the opinion.  My point is that the

3    conservator is not the focus of my answer in the second

4    deposition.

5         Just to clarify, the conservator here has two

6    roles.  Right?  The FHFA has two roles:  one as a

7    conservator, the other as a regulator.

8         In the role of the conservator, the FHFA is making

9    this very large business decision, finance decision, on net

10   worth sweep; and I do look at what a typical management

11   would do to make that decision.

12   Q.  Sir, respectfully, the question was limited to the

13   conservator, correct?

14   A.  Yes.

15   Q.  And you understood that?

16   A.  Right.

17   Q.  And that's how you answered, correct?

18   A.  Yes.

19   Q.  And so you have no opinion on what the conservator here

20   should have done with any of the projections here, correct?

21   A.  About "the should have done" part, yes.

22   Q.  And you have no expertise concerning how much weight a

23   conservator should put on a stress scenario as compared to

24   other scenarios, correct?

25   A.  Is this another question you had in the deposition?

1    You're going to make me say something and then you're going

2    to show the deposition?

3            If you can help me where the question is, I can

4    try to familiarize myself.

5    Q.  I'm trying to get your best testimony, so I'd like you

6    to just answer the question as best you can now.

7    A.  Okay.

8    Q.  And it's:  You have no expertise concerning how much

9    weight a conservator should put on a stress scenario as

10   compared to other scenarios, correct?

11   A.  I have no expertise on what a conservator should do.  In

12   the perfect world, the stress scenario would be considered

13   along with the other scenarios.

14   Q.  And you have no expertise concerning how much weight a

15   conservator should put on a stress scenario as compared to

16   other scenarios, right?

17   A.  I don't have the expertise, but I don't think there are

18   rules like that.

19   Q.  And because you have not been a conservator, you have no

20   expertise, sitting in the chair of a conservator, to

21   consider how much weight a conservator should put on a

22   stress scenario as compared to other scenarios, correct?

23   A.  On the -- sitting on the chair?  I'm not sure I

24   understand what the question is asking me to do.

25           Is it a different question from the previous

1    question, or is it the same?  I'm not even sure I

2    understand.

3    Q.  You have no expertise sitting in the chair of a

4    conservator, correct?

5    A.  Yes.  You already asked, and I already answered that.

6    Q.  And you have no expertise sitting in the chair of a

7    conservator to consider how much weight to put on a stress

8    scenario as compared to other scenarios, right?

9    A.  For a conservator, I don't have that.

10           As I said, my experience is working with

11   companies, and I've seen that a large financial decision,

12   massive financial decision, typically would be done under

13   certain decision-making processes, and that's the experience

14   I bring to table here.

15   Q.  Dr. Dharan, you testified that the first and second

16   quarters of 2012 were two good quarters in a row.  Do you

17   recall that?

18   A.  For Fannie Mae?

19   Q.  I think you said it for both.

20   A.  No, for Freddie Mac, the first quarter income was the

21   same, approximately the same, as the dividend.

22           For Fannie Mae, it was greater than dividend.

23   Q.  Okay.  So Freddie Mac needed to take a draw in the first

24   quarter of 2012, correct?

25   A.  A very small amount.  I forget the amount, but it's in

1    the millions.

2    Q.  And Fannie Mae, in the first two quarters of 2012, did

3    not need to take a draw?

4    A.  Right.

5    Q.  And a quarter is 90 days; is that right?

6    A.  Three months.

7    Q.  Three months.

8            Fannie Mae took draws for 13 consecutive quarters

9    before the first quarter of 2012, correct?

10   A.  I think so.  I'm pretty sure, but I don't -- I mean,

11   this is factual information, so I don't need to be the

12   person to say it.  But that's my recollection.

13   Q.  Four-plus years, correct?

14   A.  I believe so.

15   Q.  And every one of those draws eroded the Treasury

16   Commitment, correct?

17   A.  Again, don't hold me to knowing that every single

18   quarter they drew, but they certainly drew a lot.

19   Q.  And every draw eroded the Treasury Commitment?

20   A.  Every draw was done by taking the Treasury Commitment,

21   drawing from there to pay the dividend.

22   Q.  And that eroded the Treasury Commitment, correct?

23   A.  Yes.

24           Again, let me correct myself.  So from 2008 to

25   December of 2009 every draw eroded the Treasury Commitment.

```
 1    Q.  And after 2009 it continued to --

 2    A.  After 2009, the way the Treasury Commitment was defined

 3    was different.  They used a different formula so that the

 4    draws in that time period, if I recall, did not affect the

 5    maximum amount at that point.

 6    Q.  You're distinguishing that there was not a hard cap from

 7    the terms of the second amended PSPA?

 8    A.  Yes.

 9    Q.  And so the hard cap comes back January 1, 2013?

10    A.  Correct.

11    Q.  And January 1, 2013, is when erosion of the Treasury

12    Commitment is a big problem, correct?

13    A.  My analysis showed that according to the -- so I agree

14    with all the factual part of what you said.

15    Q.  Okay.

16    A.  But as far as January was the "big problem" part, that

17    was my question asked; and I've been analyzing, and I've

18    been presenting my results on that.

19    Q.  January 1, 2013, is when, in your view, erosion -- draws

20    would erode the commitment?  If there were draws after

21    January 1, 2013, without the Third Amendment, they would

22    erode the commitment, correct?

23    A.  If there were draws to pay the cash dividend, yes.  If

24    they paid it in payment-in-kind, then they would not erode

25    the Treasury Commitment cap.
```

1  Q.  You had a slide that you put up of a statement from

2  Susan McFarland, the CFO of Fannie Mae.  And she said she

3  believes that Fannie would be able to deliver sustainable

4  profits over time, correct?

5  A.  Yes.

6  Q.  And at this same time Ms. McFarland signed and certified

7  Fannie Mae's SEC filings, correct?

8  A.  I mean, at the same time meaning -- I don't want to say

9  literally same day, but around the same time, yes.

10  Q.  And you didn't present any of those SEC filings today to

11  the jury, correct?

12  A.  They are all in public domain.

13  Q.  You've testified on behalf of the SEC, I think you said,

14  one time; is that right?

15  A.  Yes, only once.

16  Q.  And that means the SEC hired you and paid you to testify

17  for them; is that right?

18  A.  Yes.

19  Q.  And was that in a litigation?

20  A.  Litigation.

21  Q.  Okay.  So you didn't work at the SEC, but you were an

22  outside expert testifier; is that right?

23  A.  Yes.

24  Q.  In any event, you're quite familiar with what the jury

25  has referred to -- has heard referred to as SEC filings,

1   such as the 10-Qs and the 10-Ks?

2   A.  Yes.

3   Q.  And you know that companies take their SEC filings very

4   seriously, correct?

5   A.  I mean, they should.  They normally do.  It goes through

6   a long process of review by management, review by attorneys,

7   the in-house corporate counsel, and then presented to the

8   audit committee, shared with the auditor, and then submitted

9   to the SEC.

10  Q.  So 10-Ks and 10-Qs go through a lot of process, as

11  you've just described; is that right?

12  A.  Something like that, yes.

13  Q.  And they are reviewed and verified before they are

14  filed, correct?

15  A.  I don't know about the "verified" part.  They're

16  audited.  The 10-K is audited, portions of 10-K.  And 10-Q

17  is unaudited.

18  Q.  And when they're filed, senior executives have to

19  certify them, correct?

20  A.  For certain companies, they have to certify -- the CEO

21  and the CFO have to sign a certification.

22  Q.  Let's look at a few of the SEC filings here.  And we'll

23  start with the 2012 third quarter 10-Q filing for Fannie

24  Mae.  It's DX476.

25          MR. BERGMAN:  And Ms. Jenkins will correct me, but

1    I think it's admitted.

2              THE COURTROOM DEPUTY:  One second.

3              MR. BERGMAN:  Second quarter.  Did I say first?

4              THE COURTROOM DEPUTY:  Yes, it's in.

5    Q.  I think I misspoke.  This is the -- well, let me -- yes,

6    this is the second quarter for the period ended June 30,

7    2012, correct?

8    A.  Yes.

9    Q.  And let's look at the signature pages.  If we go to Page

10   175 of 178 -- and that will come up for you, Doctor,

11   hopefully.

12             And we can see this is dated August 8, 2012, and

13   it is signed by Timothy Mayopoulos, and he is identified as

14   President and Chief Executive Officer of Fannie Mae,

15   correct?

16   A.  Yes.

17   Q.  And if we go to the next page, Page 176 of 178, we'll

18   see that it's also signed August 8, 2012, by Susan

19   McFarland, Executive Vice President and Chief Financial

20   Officer of Fannie Mae.  Correct?

21   A.  Yes.

22   Q.  So they both -- the CEO and the CFO both signed?

23   A.  Yes.

24   Q.  And if these SEC filings were not accurate,

25   Mr. Mayopoulos and Ms. McFarland could be subject to

1   penalties and punishment, correct?

2   A.   That's a legal question.   But when you say "accurate" --

3   let me give a layperson's view of it.

4        There are portions of 10-Q and 10-K that are

5   financial statements and financial reports, and those are

6   coming from financial systems of the company.   So they were

7   accurate in that context as presenting what is the system

8   properly -- accurately to the public, but there are a lot of

9   assumptions and a lot of forecasts made in making those.

10       And so as long as management has done a good job

11  of making those forecasts, I think they are protected from

12  the -- what you are talking about with respect to if they

13  turn out to be different, you know, they won't be punished

14  for that.

15  Q.   Okay.   As long as they've done a good job.   And these

16  are -- they're called certifying officers.   If you look on

17  No. 5, the registrant's other certifying officer, that's --

18  Ms. McFarland is one, and Mr. Mayopoulos is the other,

19  right?

20  A.   Yes.

21  Q.   And if we go to Page 87, ninth bullet, it says, "Our

22  expectation that although we may experience period-to-period

23  volatility in earnings and comprehensive income, we will not

24  generate net income or comprehensive income in excess of our

25  annual dividend obligation to Treasury over the long term."

1    That's right, isn't it?

2    A.  Yes.

3    Q.  And if we go to the 12th bullet, it says, "Our

4    expectation that we will receive additional draws under the

5    senior preferred stock purchase agreement, which will

6    further increase the dividends we owe to Treasury on the

7    senior preferred stock," right?

8    A.  Yes.

9    Q.  And that means that Fannie expects that it will not be

10   able to pay the 10 percent dividend to Treasury over the

11   long term, right?

12   A.  Repeat that question.  I just want to make sure -- the

13   wordings are very carefully --

14   Q.  I apologize.  I think I just jumped right over.

15          If we go back to the ninth bullet, "We will not

16   generate net income or comprehensive income in excess of our

17   annual dividend obligation."  And then the next -- Bullet 12

18   says, "We will receive additional draws which will further

19   increase the dividends."

20          That means that they're not going to be able to

21   make enough to pay the Treasury dividend and will have to

22   take additional draws, which will make the dividend higher,

23   correct?

24   A.  Again, these are very nuanced wordings, so, you know,

25   there are lots of messages being conveyed.

1          The way I read it -- and, again, this is the way

2    they wrote it as well.  In the first one that you

3    highlighted, if you don't mind highlighting again, they're

4    saying we will not generate -- our expectation -- this is a

5    risk factor.  If you look at all the things they are

6    reporting here, they're reporting all of the future-oriented

7    aspects of their business that are part of the financial

8    statements.

9          And it's a long list, by the way.  If you don't

10   mind showing to the jury the entire list, it goes to like

11   three or four pages, two or three pages of bullet points

12   after bullet points.

13          And what they're saying here is that they will not

14   generate net income in excess of annual dividends.

15          But they are not saying that they are going to run

16   out of Treasury funding cap.  I don't see them saying in a

17   bullet here that they will be potentially violating the

18   funding cap and running out of that.  That type of a risk is

19   not presented.

20          So when you ask -- with respect to your question,

21   it's hard for me to say that the joint result of these two

22   is that they're going to run out of funding cap.

23   Q.  As you pointed out to me, there, in fact, was no cap at

24   this time, correct?  The Treasury Commitment was not capped?

25   A.  But the cap is coming.  This is a long-term forecast.

```
 1    Q.  Yes.  And it's --
 2    A.  Let me make sure I got the answer right.
 3              This is not just for 2012.  They are talking about
 4    long term.  And the cap is coming back on December 31, 2012.
 5    And they are not putting a bullet here -- a bullet point
 6    here saying that they are going to run out of the Treasury
 7    funding cap, which is what the circular draw problem is all
 8    supposed to be about.
 9              So they are not saying that when they take these
10    additional draws under the senior preferred stock purchase
11    agreement they will reach a point that will immediately
12    result in a funding cap running out, which would be a big
13    risk factor they would have presented here.  I don't see
14    that.
15              They also don't talk about the risk of net worth
16    sweep happening.  I don't see that.
17              So it's hard for me to say that these two really
18    are saying that they will never make money type of thing.
19    Q.  The statement here is in the forward-looking statement
20    section; is that correct?
21    A.  I believe so.  I don't remember the exact title, but
22    that's correct.
23    Q.  When you say it's in the risk section, is that what you
24    mean by that, the forward-looking statement section, or is
25    that different?
```

1   A.  It includes -- the forward-looking statements and risk

2   statements sometimes in the 10-Q are mixed.  In 10-K, they

3   are kept separate.

4   Q.  And these kind of forward-looking statements or risks,

5   if you will -- that we will not generate income sufficient

6   to pay the dividend obligation, that we expect to receive

7   additional draws, that those draws will increase the

8   dividends, those are appropriate disclosures in the risk

9   section or the forward-looking statement section; is that

10  true?

11  A.  Again --

12          MR. HUME:  Objection.  If counsel's going to

13  ask --

14          THE COURT:  Sustained.

15          MR. BERGMAN:  I'll rephrase.  Thank you.

16  Q.  Are these disclosures in the section that you would

17  expect they should be in?

18  A.  They're -- again, in a 10-Q they are not usually as well

19  organized as 10-K.  So I can't say they should be right

20  here.

21          But companies take great effort in 10-K and 10-Q

22  to both present the assumptions that they are relying on in

23  making their financial statements and also the risk factors

24  that investors should be aware of.  And they're protected,

25  especially if these are presented in the form of forward-

1344

```
 1    looking statements, like they are here.  The SEC says:  As
 2    long as you're doing your job in presenting them, they don't
 3    have to be right.  I mean, you don't have to -- the SEC
 4    doesn't come back five years later and say:  You said this,
 5    and this happened.  They are protected from that.
 6              MR. BERGMAN:  Your Honor, I'm happy --
 7              THE COURT:  Is this a good time to stop?
 8              MR. BERGMAN:  Thank you.
 9              THE COURT:  See you all at 5:00 tomorrow.  Don't
10    talk about the case.  Have a nice evening.  I'll see you all
11    at 5:00 tomorrow.
12              THE COURT REPORTER:  You said 5:00.
13              THE COURT:  10:00 tomorrow, not 5:00.  Thank you.
14              (Jury exits courtroom)
15              THE COURT:  I'll talk to you all at the bench off
16    the record.
17                    (Whereupon the hearing was
18                     adjourned at 5:06 p.m.)
19
20
21
22
23
24
25
```

1

<u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

2

3          I, LISA A. MOREIRA, RDR, CRR, do hereby

4    certify that the above and foregoing constitutes a true and

5    accurate transcript of my stenographic notes and is a full,

6    true and complete transcript of the proceedings to the best

7    of my ability.

8          Dated this 24th day of October, 2022.

9

10                              <u>/s/Lisa A. Moreira, RDR, CRR</u>
                                Official Court Reporter
11                              United States Courthouse
                                Room 6718
12                              333 Constitution Avenue, NW
                                Washington, DC 20001
13

14

15

16

17

18

19

20

21

22

23

24

25

# $

**$100** [17] - 1240:1, 1240:4, 1247:3, 1248:4, 1248:5, 1251:6, 1301:18, 1301:21, 1302:2, 1302:11, 1302:22, 1303:3, 1303:10, 1303:15, 1303:22, 1304:6, 1306:4
**$11** [1] - 1248:17
**$110** [1] - 1278:12
**$12** [2] - 1248:16, 1248:18
**$123** [1] - 1274:22
**$13** [1] - 1248:16
**$131** [1] - 1270:3
**$150** [2] - 1278:13, 1278:20
**$18** [1] - 1277:7
**$180** [1] - 1277:8
**$194** [1] - 1326:24
**$200** [2] - 1304:6, 1304:21
**$206** [1] - 1270:2
**$24** [1] - 1273:10
**$330** [2] - 1270:4, 1276:21
**$337** [1] - 1270:5
**$400** [1] - 1305:25
**$50** [4] - 1272:8, 1272:10, 1272:18, 1272:23
**$55** [2] - 1283:9, 1283:17
**$70** [3] - 1247:3, 1248:5, 1248:25
**$71** [1] - 1326:24
**$74** [6] - 1273:14, 1273:15, 1273:16, 1274:3, 1274:8
**$84** [1] - 1283:15

**'23** [1] - 1287:23
**'33** [1] - 1287:23
**'reasonable** [2] - 1290:13, 1290:14

# /

**/s/Lisa** [1] - 1345:10

# 0

**0.0** [1] - 1320:22

# 1

**1** [9] - 1269:24, 1276:19, 1295:14, 1296:18, 1310:19, 1335:9, 1335:11, 1335:19, 1335:21
**1.1** [2] - 1280:20, 1282:15
**10** [13] - 1248:11, 1249:5, 1251:11, 1257:24, 1257:25, 1258:6, 1276:22, 1277:2, 1283:10, 1287:5, 1287:12, 1300:6, 1340:10
**10-K** [6] - 1337:16, 1339:4, 1343:2, 1343:19, 1343:21
**10-Ks** [2] - 1337:1, 1337:10
**10-Q** [6] - 1337:16, 1337:23, 1339:4, 1343:2, 1343:18, 1343:21
**10-Qs** [2] - 1337:1, 1337:10
**10-year** [1] - 1313:5
**100** [3] - 1240:3, 1284:23, 1307:4
**10020** [1] - 1237:4
**10:00** [1] - 1344:13
**11** [9] - 1281:4, 1281:6, 1281:24, 1282:1, 1296:21, 1299:9, 1328:16, 1330:1
**12** [1] - 1340:17
**1251** [1] - 1237:4
**12th** [1] - 1340:3
**13** [1] - 1334:8
**14** [6] - 1243:11, 1245:20, 1264:25, 1293:19, 1309:4, 1316:21
**1401** [1] - 1236:23
**148.3** [2] - 1319:22, 1319:23
**14th** [2] - 1246:11, 1265:5
**150.2** [1] - 1277:15
**1523** [1] - 1236:17
**16** [2] - 1311:22, 1312:17
**164** [1] - 1328:17
**16th** [1] - 1243:16
**17** [2] - 1269:16, 1269:17
**175** [1] - 1338:10
**176** [5] - 1313:9,

1313:21, 1314:5, 1314:6, 1338:17
**178** [5] - 1311:22, 1312:17, 1313:2, 1338:10, 1338:17
**17th** [4] - 1240:22, 1241:12, 1243:14, 1243:16
**18.9** [2] - 1277:5, 1319:15
**19** [2] - 1315:15, 1316:3
**19.7** [2] - 1280:15, 1282:12
**19087** [1] - 1236:20
**191.4** [2] - 1284:10, 1284:23
**19th** [9] - 1311:2, 1317:4, 1319:8, 1319:9, 1319:25, 1320:4, 1320:14, 1320:20, 1322:4
**1:13-cv-01053-RCL** [1] - 1236:3
**1:13-cv-1288** [1] - 1236:9

# 2

**2** [8] - 1268:12, 1284:25, 1285:1, 1301:1, 1313:10, 1313:21, 1314:5, 1314:7
**20** [5] - 1309:3, 1311:22, 1312:17, 1313:2, 1316:20
**20/20** [1] - 1303:21
**20001** [3] - 1237:10, 1237:14, 1345:13
**20005** [1] - 1236:23
**20036** [1] - 1236:17
**2006** [1] - 1318:1
**2007** [4] - 1280:10, 1280:15, 1280:20, 1282:11
**2008** [22] - 1280:10, 1280:15, 1280:20, 1282:11, 1300:3, 1301:18, 1301:21, 1302:1, 1302:7, 1302:8, 1302:10, 1302:18, 1303:2, 1303:3, 1303:7, 1303:15, 1303:19, 1303:22, 1306:14, 1328:24, 1334:24
**2009** [9] - 1304:4, 1304:14, 1304:15, 1304:20, 1304:25,

1305:3, 1334:25, 1335:1, 1335:2
**2010** [1] - 1268:9
**2011** [2] - 1260:8, 1304:24
**2012** [44] - 1239:23, 1239:25, 1240:8, 1240:22, 1241:14, 1243:11, 1243:16, 1245:20, 1249:22, 1252:7, 1252:17, 1255:7, 1256:16, 1256:21, 1264:25, 1268:10, 1268:24, 1269:7, 1269:24, 1270:2, 1303:18, 1304:24, 1306:19, 1306:22, 1308:18, 1315:15, 1316:3, 1317:10, 1321:10, 1321:17, 1321:20, 1322:13, 1325:14, 1325:15, 1333:16, 1333:24, 1334:2, 1334:9, 1337:23, 1338:7, 1338:12, 1338:18, 1342:3, 1342:4
**2013** [24] - 1256:16, 1256:17, 1256:20, 1256:22, 1271:5, 1271:15, 1271:16, 1271:18, 1271:22, 1272:7, 1272:17, 1273:7, 1273:9, 1274:15, 1275:13, 1276:19, 1278:10, 1287:4, 1335:9, 1335:11, 1335:19, 1335:21
**2014** [2] - 1326:21, 1326:22
**2015** [2] - 1262:9, 1264:7
**2018** [5] - 1270:14, 1274:18, 1275:9, 1276:24, 1278:10
**2019** [5] - 1275:13, 1275:14, 1275:19, 1283:13
**202** [1] - 1237:14
**2020** [1] - 1311:18
**2021** [6] - 1268:9, 1269:1, 1311:13, 1320:21, 1328:16, 1330:2
**2022** [18] - 1236:5, 1275:10, 1277:10, 1278:11, 1283:22, 1287:4, 1293:18,

1295:13, 1296:17, 1299:8, 1318:15, 1318:16, 1318:24, 1319:11, 1320:21, 1321:10, 1321:20, 1345:8
**2023** [2] - 1287:22, 1288:5
**2025** [1] - 1288:16
**2033** [2] - 1287:22, 1288:5
**21** [1] - 1293:19
**213** [1] - 1309:3
**216** [1] - 1293:19
**22** [1] - 1325:15
**226** [1] - 1299:9
**227** [4] - 1295:14, 1296:18, 1296:20, 1296:21
**24** [2] - 1236:5, 1273:9
**245.9** [1] - 1275:13
**24th** [1] - 1345:8
**25** [1] - 1328:17
**25.2** [4] - 1318:15, 1318:22, 1318:23, 1319:13
**259** [1] - 1242:23
**28** [3] - 1311:18, 1326:8, 1326:20
**280** [1] - 1236:19
**296** [2] - 1330:2, 1330:4
**2:22** [1] - 1236:5
**2C** [1] - 1300:23

# 3

**3** [3] - 1268:10, 1268:12, 1272:21
**30** [2] - 1262:9, 1338:6
**30-second** [1] - 1263:2
**30th** [2] - 1283:23, 1283:24
**31** [1] - 1342:4
**33.2** [1] - 1281:12
**330.2** [4] - 1276:11, 1283:16, 1283:18
**333** [2] - 1237:13, 1345:12
**354-3187** [1] - 1237:14
**385.4** [2] - 1284:2, 1284:11

# 4

**4** [2] - 1268:10, 1313:10
**40** [1] - 1268:22
**42** [1] - 1308:11
**43** [1] - 1252:1

**451** [1] - 1325:25
**48** [1] - 1259:18
**4A** [1] - 1281:24
**4AA** [2] - 1281:18, 1282:2
**4F** [9] - 1280:5, 1280:7, 1280:8, 1280:24, 1280:25, 1281:1, 1282:4, 1282:5, 1282:9

**5**

**5** [4] - 1289:12, 1330:2, 1330:4, 1339:17
**5-0** [1] - 1272:10
**5.1** [1] - 1281:16
**50** [2] - 1248:25, 1268:22
**53** [2] - 1315:23, 1316:20
**55** [1] - 1249:17
**55.2** [1] - 1283:9
**56** [1] - 1250:25
**58** [1] - 1259:7
**5:00** [4] - 1344:9, 1344:11, 1344:12, 1344:13
**5:06** [1] - 1344:18

**6**

**6** [10] - 1253:16, 1293:18, 1295:13, 1296:17, 1299:8, 1306:19, 1308:18, 1310:24, 1315:23, 1317:10
**6.3** [2] - 1319:11, 1320:14
**60** [2] - 1248:25, 1255:22
**601** [1] - 1237:9
**63** [1] - 1268:1
**64** [1] - 1268:16
**65** [1] - 1270:23
**6718** [2] - 1237:13, 1345:12
**6:00** [1] - 1311:2
**6th** [10] - 1308:25, 1310:1, 1310:6, 1310:24, 1311:1, 1312:19, 1314:24, 1317:5, 1318:4, 1322:4

**7**

**7** [5] - 1249:22, 1295:14, 1296:18,

1296:21, 1300:3
**7/6** [1] - 1310:24
**702** [1] - 1255:5
**703** [1] - 1255:5

**8**

**8** [5] - 1280:4, 1280:6, 1282:3, 1338:12, 1338:18
**84.3** [1] - 1275:16
**87** [1] - 1339:21

**9**

**9** [4] - 1314:5, 1314:7, 1326:8, 1326:20
**90** [3] - 1268:24, 1334:5
**95** [2] - 1268:25, 1269:2
**9th** [1] - 1250:9

**A**

**abbreviate** [1] - 1257:3
**ability** [1] - 1345:7
**able** [4] - 1274:7, 1336:3, 1340:10, 1340:20
**absolutely** [2] - 1310:1, 1310:5
**academic** [1] - 1304:25
**acceptable** [1] - 1316:13
**access** [1] - 1307:8
**accomplish** [1] - 1262:15
**according** [1] - 1335:13
**account** [2] - 1248:21, 1327:24
**accountant** [3] - 1243:24, 1267:8, 1302:20
**accountants** [1] - 1240:10
**accounting** [25] - 1239:10, 1242:9, 1242:13, 1242:21, 1243:25, 1244:1, 1251:24, 1252:2, 1252:3, 1252:16, 1252:20, 1252:22, 1264:22, 1266:18, 1273:3, 1286:17, 1290:7, 1290:9, 1291:5, 1292:19, 1294:18, 1299:19,

1299:22, 1308:7
**accounting-centric** [1] - 1239:10
**accurate** [4] - 1338:24, 1339:2, 1339:7, 1345:5
**accurately** [1] - 1339:8
**act** [4] - 1298:11, 1298:19, 1298:25, 1299:12
**acting** [1] - 1248:21
**action** [1] - 1256:4
**ACTION** [1] - 1236:10
**actual** [5] - 1242:24, 1287:8, 1288:17, 1301:4, 1310:8
**actuals** [4] - 1248:3, 1253:20, 1288:9, 1288:10
**add** [2] - 1276:6, 1276:8
**added** [2] - 1240:13, 1272:6
**adding** [2] - 1275:16, 1283:15
**addition** [2] - 1270:25, 1284:20
**additional** [12] - 1257:1, 1257:5, 1257:10, 1257:11, 1257:21, 1276:24, 1310:15, 1340:4, 1340:18, 1340:22, 1342:10, 1343:7
**address** [5] - 1254:15, 1266:8, 1271:4, 1290:6, 1298:15
**addressed** [5] - 1259:22, 1278:3, 1287:16, 1290:10, 1299:21
**addressing** [2] - 1278:2, 1290:9
**adds** [1] - 1284:1
**adequately** [1] - 1297:14
**adjourned** [1] - 1344:18
**adjusted** [1] - 1321:21
**adjustment** [2] - 1321:11, 1321:12
**admission** [5] - 1280:22, 1281:17, 1316:4, 1324:1, 1324:25
**admitted** [5] - 1282:9, 1309:1, 1315:15, 1322:16, 1338:1
**adopted** [3] - 1258:2, 1258:5, 1328:24

**advance** [2] - 1285:16, 1323:8
**advantage** [2] - 1257:12, 1257:15
**affect** [1] - 1335:4
**affected** [1] - 1325:11
**AFTERNOON** [1] - 1236:12
**afternoon** [3] - 1239:4, 1239:5, 1325:17
**agencies** [2] - 1269:4, 1269:5
**Agency** [1] - 1237:6
**AGENCY** [1] - 1236:6
**agency** [3] - 1268:19, 1297:21, 1298:6
**ago** [7] - 1259:17, 1265:16, 1276:2, 1287:3, 1287:16, 1297:16, 1330:11
**agree** [2] - 1292:16, 1335:13
**agreed** [4] - 1249:23, 1278:25, 1279:3, 1304:5
**agreeing** [2] - 1241:11, 1244:16
**agreement** [4] - 1244:7, 1244:8, 1340:5, 1342:11
**AGREEMENT** [1] - 1236:10
**ahead** [4] - 1247:9, 1255:19, 1264:4, 1302:13
**AIG** [2] - 1305:14, 1305:16, 1306:4, 1306:6, 1306:8
**al** [2] - 1236:3, 1236:7
**allow** [1] - 1249:3
**allowance** [3] - 1250:12, 1251:15, 1271:20
**allowances** [2] - 1251:7, 1252:8
**allowed** [2] - 1255:5, 1289:8
**almost** [2] - 1277:18, 1284:24
**alternative** [2] - 1254:25, 1256:23
**alternatives** [22] - 1254:4, 1254:14, 1255:16, 1255:18, 1255:25, 1256:6, 1256:10, 1257:21, 1258:10, 1258:22, 1258:24, 1259:1, 1259:3, 1259:6, 1259:9, 1259:14,

1259:22, 1261:1, 1291:19, 1292:23, 1299:4
**amended** [1] - 1335:7
**Amendment** [2] - 1277:3, 1305:19
**amendment** [2] - 1244:20, 1335:21
**amendments** [3] - 1266:4, 1266:22, 1267:10
**Americas** [1] - 1237:4
**amount** [34] - 1239:24, 1247:24, 1249:1, 1251:2, 1257:17, 1258:6, 1269:22, 1273:9, 1274:6, 1274:7, 1278:9, 1278:19, 1278:20, 1280:16, 1281:9, 1281:10, 1281:14, 1284:4, 1284:8, 1284:13, 1289:14, 1301:25, 1303:12, 1305:6, 1305:14, 1305:17, 1306:5, 1321:13, 1321:14, 1321:15, 1333:25, 1335:5
**amounts** [6] - 1248:2, 1251:5, 1278:12, 1280:9, 1280:13, 1281:7
**analogy** [1] - 1292:12
**analyses** [1] - 1261:5
**analysis** [25] - 1239:22, 1246:9, 1254:2, 1254:6, 1254:9, 1255:17, 1255:24, 1266:18, 1267:20, 1270:24, 1275:4, 1275:8, 1292:24, 1294:10, 1302:6, 1303:5, 1303:6, 1303:24, 1304:19, 1304:22, 1319:17, 1326:13, 1327:5, 1330:9, 1335:13
**analyze** [6] - 1256:3, 1258:25, 1259:2, 1259:15, 1260:3, 1261:1
**analyzed** [4] - 1259:6, 1259:21, 1259:25, 1293:16
**analyzes** [1] - 1254:14
**analyzing** [1] - 1335:17
**announced** [2] -

1243:13, 1245:8
**annoyed** [1] - 1324:4
**annual** [3] - 1339:25,
 1340:17, 1341:14
**answer** [21] - 1247:8,
 1250:7, 1258:18,
 1262:1, 1294:12,
 1295:10, 1295:17,
 1298:1, 1299:1,
 1299:15, 1300:11,
 1301:4, 1304:18,
 1304:20, 1314:19,
 1320:10, 1329:19,
 1330:6, 1331:3,
 1332:6, 1342:2
**answered** [7] -
 1258:22, 1286:20,
 1293:23, 1297:23,
 1299:13, 1331:17,
 1333:5
**answering** [3] -
 1249:19, 1265:10,
 1295:12
**answers** [1] - 1324:10
**anticipating** [1] -
 1248:5
**apart** [2] - 1305:16,
 1306:5
**apologies** [2] -
 1273:21, 1310:20
**apologize** [4] -
 1285:16, 1324:5,
 1324:14, 1340:14
**appear** [1] - 1301:11
**APPEARANCES** [2] -
 1236:15, 1237:1
**appeared** [1] - 1263:7
**application** [1] -
 1254:12
**appointing** [2] -
 1300:12, 1301:2
**approach** [1] -
 1296:14
**appropriate** [1] -
 1343:8
**April** [6] - 1260:11,
 1260:12, 1293:18,
 1295:13, 1296:17,
 1299:8
**argue** [1] - 1291:3
**arithmetic** [2] -
 1277:12, 1280:1
**ARNOLD** [1] - 1237:9
**arrangements** [1] -
 1305:18
**articulated** [1] -
 1250:12
**ASIM** [1] - 1237:7
**aspects** [3] - 1291:6,
 1291:22, 1341:7

**asset** [12] - 1239:13,
 1239:14, 1247:13,
 1247:22, 1252:8,
 1271:16, 1271:20,
 1272:4, 1272:18,
 1273:1, 1303:9,
 1304:1
**assets** [22] - 1239:20,
 1241:20, 1242:10,
 1246:6, 1246:12,
 1247:2, 1247:17,
 1247:20, 1249:10,
 1249:14, 1250:3,
 1250:17, 1251:23,
 1252:9, 1252:23,
 1253:9, 1265:13,
 1265:19, 1268:7,
 1268:9, 1272:6,
 1274:12
**assignment** [2] -
 1288:3, 1288:8
**assume** [1] - 1315:1
**assuming** [2] -
 1291:11, 1326:3
**assumptions** [3] -
 1307:13, 1339:9,
 1343:22
**assure** [1] - 1263:22
**attorneys** [1] - 1337:6
**audit** [1] - 1337:8
**audited** [2] - 1337:16
**auditor** [1] - 1337:8
**auditors** [2] - 1245:16,
 1265:11
**August** [16] - 1239:23,
 1240:21, 1240:22,
 1241:12, 1243:10,
 1243:14, 1245:20,
 1246:11, 1249:22,
 1252:7, 1252:17,
 1255:7, 1264:25,
 1265:5, 1338:12,
 1338:18
**available** [7] -
 1248:20, 1253:22,
 1256:6, 1256:23,
 1257:7, 1319:19,
 1325:11
**Avenue** [6] - 1236:17,
 1236:23, 1237:4,
 1237:9, 1237:13,
 1345:12
**avoid** [1] - 1293:5
**Awa** [1] - 1260:15
**aware** [13] - 1242:5,
 1246:13, 1247:1,
 1247:15, 1252:11,
 1252:18, 1252:23,
 1260:16, 1302:21,
 1305:8, 1315:1,

1322:12, 1343:24

# B

**backed** [1] - 1289:12
**bad** [1] - 1289:15
**BALA** [2] - 1238:3,
 1239:6
**balance** [14] - 1240:5,
 1240:11, 1242:22,
 1246:13, 1247:3,
 1247:21, 1247:23,
 1248:25, 1250:18,
 1252:24, 1272:4,
 1273:2, 1273:6,
 1273:17
**ball** [1] - 1288:1
**bank** [2] - 1328:9,
 1328:20
**banks** [2] - 1305:12,
 1305:16
**bar** [1] - 1283:8
**BARNES** [1] - 1236:16
**base** [4] - 1249:1,
 1322:7, 1322:8,
 1322:10
**based** [9] - 1245:10,
 1246:17, 1252:21,
 1265:22, 1283:10,
 1303:24, 1308:13,
 1308:17, 1321:23
**basic** [1] - 1323:24
**basis** [2] - 1241:10,
 1242:19
**becomes** [2] - 1240:9,
 1242:11
**BEFORE** [1] - 1236:13
**began** [1] - 1282:20
**begin** [1] - 1260:24
**beginning** [1] - 1301:1
**behalf** [1] - 1336:13
**behind** [2] - 1291:10,
 1313:18
**believes** [1] - 1255:17,
 1336:3
**bench** [7] - 1254:19,
 1255:20, 1262:18,
 1264:6, 1323:4,
 1325:21, 1344:15
**benefit** [3] - 1239:17,
 1298:25, 1299:12
**Benson** [3] - 1306:18,
 1306:21, 1306:25,
 1307:8, 1307:14,
 1308:4, 1308:6,
 1308:18, 1310:1,
 1310:6, 1310:9,
 1310:10, 1310:22,
 1311:5, 1311:17,
 1311:22, 1312:1,

1312:2, 1312:16,
 1312:18, 1313:2,
 1313:9, 1313:22,
 1315:24, 1316:21,
 1318:4, 1319:10,
 1320:2, 1321:7,
 1327:2, 1327:17,
 1327:18
**Benson's** [10] -
 1245:10, 1308:3,
 1308:14, 1308:25,
 1309:12, 1309:14,
 1309:19, 1310:12,
 1311:13, 1311:25
**BERGER** [1] - 1237:3
**Bergman** [6] -
 1254:21, 1262:20,
 1285:8, 1295:19,
 1323:15, 1325:2
**BERGMAN** [64] -
 1237:7, 1241:8,
 1245:7, 1252:5,
 1253:1, 1253:10,
 1254:10, 1254:18,
 1254:21, 1258:12,
 1258:15, 1258:17,
 1262:4, 1262:10,
 1262:13, 1262:20,
 1263:7, 1263:16,
 1263:19, 1263:23,
 1264:5, 1266:11,
 1266:25, 1267:4,
 1267:12, 1276:1,
 1276:3, 1279:21,
 1279:24, 1281:19,
 1285:8, 1285:11,
 1290:20, 1295:22,
 1295:24, 1296:9,
 1296:14, 1300:5,
 1308:11, 1309:2,
 1309:7, 1310:17,
 1312:17, 1316:1,
 1316:4, 1316:9,
 1316:12, 1317:7,
 1320:13, 1320:19,
 1322:16, 1323:15,
 1324:3, 1324:19,
 1325:2, 1325:14,
 1325:20, 1325:22,
 1326:1, 1337:25,
 1338:3, 1343:15,
 1344:6, 1344:8
**Bergman)**....................
 ...................**1285** [1] -
 1238:5
**Berkley** [1] - 1236:16
**BERNSTEIN** [1] -
 1237:3
**best** [13] - 1259:3,
 1259:4, 1297:21,

1298:3, 1298:6,
 1298:11, 1298:19,
 1312:3, 1312:9,
 1312:20, 1332:5,
 1332:6, 1345:6
**better** [2] - 1270:21,
 1296:11
**between** [16] - 1244:7,
 1244:8, 1251:14,
 1254:22, 1268:9,
 1288:25, 1292:1,
 1292:25, 1307:13,
 1315:11, 1315:12,
 1321:10, 1321:20,
 1324:10, 1326:23,
 1327:14
**beyond** [1] - 1256:17
**big** [4] - 1319:15,
 1335:12, 1335:16,
 1342:12
**billion** [81] - 1240:1,
 1240:4, 1247:3,
 1247:4, 1248:4,
 1248:5, 1248:16,
 1248:18, 1248:25,
 1251:6, 1270:2,
 1270:3, 1270:4,
 1270:5, 1272:8,
 1272:10, 1272:11,
 1272:18, 1272:21,
 1272:23, 1273:10,
 1273:14, 1273:15,
 1273:16, 1274:3,
 1274:4, 1274:8,
 1274:23, 1275:13,
 1275:16, 1276:11,
 1276:21, 1277:6,
 1277:7, 1277:8,
 1277:15, 1278:12,
 1278:13, 1278:20,
 1280:15, 1280:21,
 1281:12, 1281:16,
 1282:12, 1282:15,
 1283:9, 1283:15,
 1283:16, 1283:17,
 1283:18, 1284:2,
 1284:10, 1284:12,
 1284:25, 1285:1,
 1301:18, 1301:22,
 1302:2, 1302:11,
 1302:22, 1303:3,
 1303:10, 1303:15,
 1303:22, 1304:6,
 1304:21, 1305:25,
 1306:4, 1318:15,
 1318:23, 1319:11,
 1319:13, 1319:15,
 1320:15, 1326:24
**billions** [2] - 1252:10,
 1252:25

**binder** [9] - 1280:4, 1281:4, 1281:25, 1282:3, 1311:20, 1312:12, 1312:14, 1313:18, 1324:7
**bit** [9] - 1248:3, 1248:19, 1256:25, 1287:20, 1307:22, 1308:21, 1309:8, 1317:10, 1320:25
**blow** [1] - 1243:1
**board** [9] - 1308:5, 1310:11, 1310:22, 1311:2, 1312:24, 1313:22, 1315:16, 1316:3, 1321:8
**boards** [4] - 1246:16, 1247:12, 1247:15
**Boards** [1] - 1265:18
**BOIES** [1] - 1236:22
**borrow** [6] - 1248:12, 1249:4, 1251:9, 1274:3, 1274:7, 1274:10
**borrowing** [1] - 1273:24
**borrowings** [1] - 1284:21
**bottom** [5] - 1242:25, 1243:1, 1264:20, 1300:23, 1309:4
**bought** [1] - 1269:3
**bounce** [1] - 1269:16
**bounds** [1] - 1313:5
**break** [3] - 1239:9, 1239:11, 1241:16
**BRIAN** [1] - 1236:16
**briefly** [7] - 1239:21, 1255:14, 1256:10, 1260:19, 1270:24, 1279:12, 1323:2
**bring** [3] - 1275:3, 1294:9, 1333:14
**bringing** [1] - 1291:5
**brings** [1] - 1290:8
**brought** [6] - 1247:2, 1271:15, 1272:3, 1273:2, 1273:5, 1279:8
**buffer** [1] - 1248:22
**build** [1] - 1267:17
**bullet** [9] - 1278:22, 1339:21, 1340:3, 1340:15, 1341:11, 1341:12, 1341:17, 1342:5
**Bullet** [1] - 1340:17
**business** [6] - 1259:4, 1261:5, 1270:18, 1292:24, 1331:9,

1341:7
**businesses** [1] - 1257:22
**BY** [5] - 1239:8, 1255:23, 1264:9, 1285:11, 1326:1

# C

**CA** [1] - 1236:3
**calculation** [1] - 1279:3
**cannot** [1] - 1318:17
**cap** [12] - 1319:6, 1335:6, 1335:9, 1335:25, 1341:16, 1341:18, 1341:22, 1341:23, 1341:25, 1342:4, 1342:7, 1342:12
**capacity** [1] - 1301:7
**capital** [3] - 1267:17, 1270:15, 1305:18
**capped** [1] - 1341:24
**captures** [1] - 1293:7
**careful** [1] - 1276:12
**carefully** [3] - 1291:6, 1311:8, 1340:13
**case** [25] - 1246:20, 1255:25, 1260:21, 1261:15, 1267:14, 1270:25, 1275:1, 1278:4, 1279:20, 1279:25, 1291:2, 1298:13, 1298:15, 1299:19, 1303:16, 1304:19, 1311:5, 1315:12, 1322:7, 1322:10, 1322:15, 1326:4, 1328:9, 1328:18, 1344:10
**Case** [2] - 1236:9, 1326:23
**cases** [2] - 1279:20, 1306:6
**cash** [21] - 1249:3, 1249:4, 1270:14, 1270:15, 1270:17, 1270:18, 1270:20, 1272:24, 1274:9, 1275:12, 1275:19, 1276:10, 1283:12, 1284:6, 1284:13, 1284:16, 1284:23, 1284:24, 1285:1, 1335:23
**centric** [1] - 1239:10
**CEO** [6] - 1307:14, 1307:15, 1307:18, 1307:21, 1337:20,

1338:22
**certain** [4] - 1242:10, 1246:5, 1333:13, 1337:20
**certainly** [6] - 1256:24, 1296:9, 1306:3, 1316:14, 1327:23, 1334:18
**CERTIFICATE** [1] - 1345:1
**certification** [1] - 1337:21
**certified** [1] - 1336:6
**certify** [3] - 1337:19, 1337:20, 1345:4
**certifying** [2] - 1339:16, 1339:17
**CFO** [3] - 1336:2, 1337:21, 1338:22
**chair** [4] - 1332:20, 1332:23, 1333:3, 1333:6
**chairman** [2] - 1279:5, 1279:7
**challenge** [1] - 1309:7
**chance** [1] - 1248:9
**change** [3] - 1240:8, 1271:20, 1319:22
**changes** [2] - 1245:2, 1245:16, 1310:15
**charged** [1] - 1321:19
**charging** [1] - 1249:4
**chart** [3] - 1271:14, 1274:18, 1321:11
**CHECK** [1] - 1236:19
**check** [1] - 1323:22
**checked** [2] - 1242:21, 1247:20, 1308:1
**checking** [1] - 1322:24
**chief** [5] - 1243:24, 1272:12, 1307:23, 1338:14, 1338:19
**choice** [1] - 1291:24
**choose** [2] - 1259:3, 1324:1
**circular** [14] - 1240:15, 1240:24, 1251:17, 1256:2, 1256:18, 1256:19, 1257:20, 1266:9, 1266:13, 1266:14, 1266:16, 1290:9, 1298:15, 1342:7
**cite** [1] - 1254:16
**clarified** [1] - 1304:16
**clarify** [1] - 1331:5
**clarifying** [1] - 1241:9
**CLASS** [1] - 1236:10
**Class** [2] - 1236:18, 1237:2

**clear** [5] - 1240:20, 1240:21, 1258:8, 1311:21, 1327:15
**clearly** [1] - 1299:13
**clicks** [1] - 1308:12
**Clip** [1] - 1262:9
**clip** [6] - 1262:15, 1262:22, 1263:2, 1263:12, 1263:15, 1264:7
**close** [3] - 1251:6, 1272:14, 1306:7
**colleagues** [4] - 1322:25, 1323:13, 1323:22, 1324:23
**collect** [1] - 1299:5
**COLUMBIA** [1] - 1236:1
**column** [1] - 1283:25
**combine** [1] - 1273:13
**combined** [2] - 1273:12, 1314:14
**coming** [5] - 1250:17, 1269:14, 1273:17, 1339:6, 1341:25, 1342:4
**comment** [3] - 1255:5, 1262:23, 1327:11
**commented** [1] - 1303:13
**commenting** [1] - 1318:10
**comments** [2] - 1296:3, 1296:10
**commitment** [19] - 1277:21, 1278:14, 1278:18, 1278:24, 1279:6, 1279:11, 1287:17, 1287:19, 1305:5, 1305:9, 1305:10, 1305:25, 1320:25, 1321:1, 1321:10, 1321:18, 1321:19, 1335:20, 1335:22
**Commitment** [23] - 1240:24, 1256:3, 1257:16, 1257:19, 1258:3, 1260:24, 1266:10, 1293:6, 1298:16, 1301:18, 1302:2, 1304:6, 1305:2, 1306:13, 1334:16, 1334:19, 1334:20, 1334:22, 1334:25, 1335:2, 1335:12, 1335:25, 1341:24
**commitments** [1] - 1266:15

**committee** [1] - 1337:8
**communicated** [1] - 1318:7
**communication** [2] - 1272:16, 1327:13
**communications** [2] - 1315:11, 1329:23
**companies** [4] - 1258:23, 1306:1, 1321:12, 1333:11, 1337:3, 1337:20, 1343:21
**company** [4] - 1239:14, 1249:8, 1330:19, 1339:6
**Company** [1] - 1301:7
**compare** [4] - 1276:21, 1306:8, 1317:4, 1318:20
**compared** [7] - 1284:3, 1287:5, 1331:23, 1332:10, 1332:15, 1332:22, 1333:8
**competent** [1] - 1279:19
**compilation** [1] - 1267:22
**complete** [3] - 1247:8, 1299:15, 1345:6
**completely** [3] - 1261:4, 1266:21, 1279:9
**complex** [1] - 1297:8
**complicated** [1] - 1295:10
**components** [1] - 1289:4
**comprehensive** [8] - 1248:17, 1251:10, 1257:9, 1269:22, 1270:9, 1339:23, 1339:24, 1340:16
**concept** [2] - 1317:17, 1317:22
**concern** [4] - 1246:2, 1248:10, 1248:13, 1248:14
**concerned** [4] - 1240:15, 1240:21, 1240:23, 1256:2
**concerning** [3] - 1331:22, 1332:8, 1332:14
**concluded** [2] - 1258:19, 1272:2
**conclusion** [4] - 1258:11, 1278:17, 1278:18, 1319:21

conclusions [1] - 1294:23
conditions [2] - 1242:17, 1247:19
confer [1] - 1254:18
conference [6] - 1254:19, 1255:20, 1262:18, 1264:6, 1323:4, 1325:21
confidence [1] - 1301:7
confused [1] - 1262:21
confusion [1] - 1281:23
connection [1] - 1251:14
consecutive [1] - 1334:8
consequences [2] - 1254:3, 1289:6
conservator [34] - 1286:23, 1287:1, 1297:20, 1298:5, 1298:11, 1298:19, 1329:2, 1329:6, 1329:8, 1329:11, 1329:12, 1329:14, 1329:15, 1329:16, 1330:5, 1330:12, 1330:21, 1330:23, 1331:3, 1331:5, 1331:7, 1331:8, 1331:13, 1331:19, 1331:23, 1332:9, 1332:11, 1332:15, 1332:19, 1332:20, 1332:21, 1333:4, 1333:7, 1333:9
Conservator [1] - 1300:12
conservator's [1] - 1330:15
conservatorship [8] - 1282:19, 1284:9, 1300:8, 1300:25, 1301:5, 1301:6, 1303:8, 1304:4
conserve [2] - 1300:13, 1300:16
consider [11] - 1246:9, 1254:3, 1256:7, 1256:19, 1257:23, 1258:24, 1260:25, 1291:22, 1305:1, 1332:21, 1333:7
considered [9] - 1255:9, 1255:15, 1256:4, 1256:8, 1257:22, 1259:8,

1264:2, 1321:1, 1332:12
considering [1] - 1259:8
consistent [5] - 1242:19, 1245:13, 1268:17, 1269:11, 1272:3
constitutes [1] - 1345:4
Constitution [2] - 1237:13, 1345:12
constraint [1] - 1256:24
consult [1] - 1259:16
consultation [1] - 1279:5
consulted [2] - 1259:10, 1279:8
context [17] - 1290:25, 1291:2, 1291:21, 1292:22, 1292:24, 1293:3, 1293:6, 1293:8, 1299:2, 1299:3, 1299:5, 1314:11, 1318:6, 1327:10, 1330:20, 1339:7
contexts [1] - 1293:15
CONTINUED [2] - 1236:24, 1237:1
continued [1] - 1335:1
Continued [1] - 1239:7
continues [2] - 1297:6, 1297:12
continuing [1] - 1256:22
contract [2] - 1277:25, 1301:25
contributed [1] - 1301:9
conveyed [1] - 1340:25
conveying [1] - 1315:5
COOPER [1] - 1236:16
copied [1] - 1308:24
copy [5] - 1295:20, 1295:23, 1295:24, 1312:11, 1312:14
corner [1] - 1309:15
corporate [3] - 1325:15, 1326:2, 1337:7
correct [118] - 1251:21, 1253:4, 1266:23, 1274:19, 1275:24, 1276:20, 1277:11, 1285:20, 1286:3, 1286:6, 1286:9, 1286:20,

1286:21, 1286:24, 1287:2, 1287:8, 1288:16, 1288:23, 1289:19, 1289:20, 1290:5, 1290:16, 1291:1, 1291:12, 1291:15, 1292:11, 1292:18, 1293:2, 1293:10, 1294:1, 1294:6, 1294:7, 1294:15, 1294:21, 1295:9, 1297:3, 1297:21, 1298:20, 1298:25, 1299:15, 1299:17, 1300:9, 1300:17, 1301:12, 1301:23, 1303:23, 1304:7, 1305:11, 1305:21, 1306:9, 1306:14, 1306:19, 1306:24, 1307:2, 1308:3, 1308:22, 1309:15, 1310:3, 1310:5, 1311:13, 1315:8, 1315:19, 1316:22, 1316:24, 1318:5, 1318:24, 1320:2, 1320:6, 1320:16, 1320:22, 1321:12, 1321:16, 1321:21, 1322:5, 1322:11, 1326:11, 1326:15, 1326:18, 1326:24, 1327:3, 1327:17, 1327:20, 1327:22, 1328:12, 1328:22, 1330:13, 1330:24, 1331:13, 1331:17, 1331:20, 1331:24, 1332:10, 1332:22, 1333:4, 1333:24, 1334:9, 1334:13, 1334:16, 1334:22, 1334:24, 1335:10, 1335:12, 1335:22, 1336:4, 1336:7, 1336:11, 1337:4, 1337:14, 1337:19, 1337:25, 1338:7, 1338:15, 1338:20, 1339:1, 1340:23, 1341:24, 1342:20, 1342:22
correction [1] - 1319:8
correctly [2] - 1282:6, 1285:13
corresponding [1] - 1247:24
counsel [6] - 1239:2, 1290:18, 1295:20, 1312:11, 1312:15,

1337:7
counsel's [1] - 1343:12
couple [6] - 1242:3, 1242:16, 1251:25, 1290:22, 1309:13, 1325:2
course [1] - 1320:1
courses [1] - 1256:4
COURT [43] - 1236:1, 1239:2, 1252:6, 1253:3, 1253:12, 1255:12, 1255:19, 1258:14, 1258:16, 1262:5, 1264:4, 1267:1, 1267:13, 1276:4, 1281:20, 1285:4, 1285:7, 1293:12, 1296:3, 1296:8, 1296:10, 1296:13, 1296:16, 1304:17, 1312:13, 1316:7, 1316:10, 1316:18, 1320:9, 1322:20, 1322:23, 1324:15, 1325:12, 1325:18, 1325:25, 1329:5, 1343:14, 1344:7, 1344:9, 1344:12, 1344:13, 1344:15, 1345:1
court [1] - 1244:14
Court [7] - 1237:12, 1237:12, 1296:11, 1316:12, 1316:13, 1326:7, 1345:11
Court's [1] - 1324:20
Courthouse [2] - 1237:13, 1345:11
courtroom [4] - 1285:5, 1291:9, 1291:15, 1344:14
COURTROOM [7] - 1243:2, 1243:5, 1243:8, 1280:25, 1281:2, 1338:2, 1338:4
cover [3] - 1240:19, 1257:9, 1266:16
covered [1] - 1239:11
covering [1] - 1250:21
crashing [1] - 1291:25
created [3] - 1327:16, 1327:19, 1327:20
credibility [1] - 1263:21
credit [3] - 1268:22, 1321:5, 1328:14
crisis [2] - 1268:22, 1328:15

criteria [1] - 1292:2
critical [2] - 1288:20, 1297:15
cross [5] - 1285:7, 1295:19, 1295:25, 1323:20, 1325:7
CROSS [1] - 1285:10
CROSS-EXAMINATION [1] - 1285:10
cross-examine [2] - 1285:7, 1325:7
cross-examined [1] - 1295:19
CRR [3] - 1237:12, 1345:3, 1345:10
crystal [1] - 1288:1
cumulative [2] - 1326:21, 1326:22
current [2] - 1301:9, 1328:14
curry [1] - 1324:6
cut [1] - 1323:11
cuts [1] - 1300:19

**D**

D.C [4] - 1236:4, 1236:17, 1236:23, 1237:10
data [10] - 1259:2, 1260:18, 1260:20, 1261:1, 1275:9, 1276:25, 1283:4, 1283:22, 1308:14, 1310:12
date [4] - 1243:10, 1249:21, 1264:25, 1275:5
dated [2] - 1325:15, 1338:12
Dated [1] - 1345:8
Dave [3] - 1306:18, 1319:10, 1327:16
David [8] - 1245:10, 1254:21, 1262:20, 1285:8, 1310:22, 1323:15, 1325:2, 1327:18
DAVID [1] - 1237:7
DAVIS [1] - 1236:21
days [5] - 1245:5, 1247:10, 1249:22, 1334:5
DC [2] - 1237:14, 1345:13
December [2] - 1334:25, 1342:4
deciding [1] - 1249:7
decision [14] - 1259:4,

1259:13, 1291:21,
1299:4, 1327:25,
1328:6, 1330:17,
1331:9, 1331:11,
1333:11, 1333:12,
1333:13
**decision-making** [3] -
1327:25, 1328:6,
1333:13
**decisions** [1] -
1329:21
**deck** [2] - 1315:24,
1316:2
**declaration** [1] -
1241:3
**declarations** [1] -
1241:13
**deduct** [1] - 1239:16
**defaulted** [1] -
1289:11
**Defendant** [1] - 1237:6
**defendant** [1] - 1285:7
**defendants** [3] -
1262:21, 1285:9,
1323:16
**Defendants** [1] -
1236:8
**defendants'** [1] -
1325:25
**defense** [2] - 1316:7,
1316:10
**deferred** [29] -
1239:20, 1241:20,
1246:6, 1246:12,
1247:2, 1247:13,
1247:17, 1247:20,
1247:22, 1249:10,
1249:14, 1250:3,
1250:11, 1250:17,
1251:23, 1252:8,
1252:23, 1253:9,
1265:13, 1265:19,
1271:16, 1271:19,
1272:4, 1272:6,
1272:18, 1274:11,
1303:8, 1303:11,
1304:1
**define** [2] - 1259:1,
1299:4
**defined** [1] - 1335:2
**degree** [1] - 1278:3
**delay** [1] - 1323:21
**deliver** [1] - 1336:3
**DeMarco** [13] -
1244:14, 1244:17,
1261:21, 1262:9,
1263:7, 1263:10,
1263:21, 1266:22,
1267:2, 1267:9,
1293:14, 1293:15,

1328:3
**DeMarco's** [6] -
1241:4, 1261:15,
1263:13, 1264:13,
1269:6, 1327:25
**demonstrate** [6] -
1261:23, 1266:4,
1266:23, 1267:3,
1267:6, 1267:10
**demonstrative** [1] -
1318:21
**demonstratives** [1] -
1300:6
**Department** [1] -
1250:6
**department** [1] -
1264:22
**depicted** [1] - 1300:2
**deplete** [2] - 1240:16,
1240:17
**depleting** [1] -
1260:23
**deposed** [1] - 1311:5
**deposition** [39] -
1241:13, 1245:10,
1249:18, 1262:7,
1263:9, 1263:12,
1263:14, 1264:1,
1264:13, 1267:5,
1286:18, 1290:11,
1290:18, 1293:18,
1294:11, 1295:13,
1295:20, 1296:1,
1296:2, 1296:4,
1296:17, 1297:22,
1299:9, 1311:8,
1311:13, 1311:19,
1312:16, 1313:12,
1324:8, 1324:9,
1326:6, 1327:11,
1328:16, 1330:1,
1330:14, 1330:22,
1331:4, 1331:25,
1332:2
**depositions** [3] -
1261:15, 1264:16,
1329:19
**DEPUTY** [7] - 1243:2,
1243:5, 1243:8,
1280:25, 1281:2,
1338:2, 1338:4
**DeRita** [1] - 1282:5
**describe** [1] - 1254:4
**described** [8] -
1250:1, 1257:2,
1260:9, 1278:23,
1313:10, 1321:6,
1321:7, 1337:11
**describing** [2] -
1330:18, 1330:20

**description** [2] -
1249:20, 1314:8
**designed** [8] -
1261:22, 1266:4,
1266:8, 1266:23,
1267:3, 1267:6,
1267:10, 1267:15
**details** [2] - 1311:9,
1328:13
**determine** [4] -
1260:3, 1279:1,
1328:9, 1328:20
**develop** [1] - 1258:24
**developing** [1] -
1259:14
**DHARAN** [2] - 1238:3,
1239:6
**Dharan** [26] - 1239:5,
1243:10, 1254:24,
1255:24, 1263:24,
1264:10, 1268:1,
1269:18, 1281:25,
1285:2, 1285:12,
1285:14, 1285:15,
1285:16, 1285:19,
1290:21, 1300:1,
1315:18, 1320:8,
1322:18, 1325:17,
1326:2, 1328:3,
1330:1, 1333:15
**Dharan's** [2] -
1254:13, 1282:17
**difference** [8] -
1257:10, 1274:22,
1277:14, 1277:15,
1292:25, 1319:15,
1319:16, 1324:10
**different** [16] - 1248:3,
1250:22, 1257:17,
1266:13, 1266:20,
1279:9, 1308:21,
1314:17, 1317:22,
1327:1, 1327:4,
1332:25, 1335:3,
1339:13, 1342:25
**differently** [1] -
1285:17
**dip** [1] - 1248:20
**DIRECT** [1] - 1239:7
**direct** [7] - 1294:24,
1295:6, 1296:25,
1297:7, 1300:2,
1306:17, 1326:8
**directly** [2] - 1301:9,
1307:12
**directors** [4] - 1308:5,
1310:11, 1310:22,
1311:2
**disagree** [1] - 1307:5
**disclosed** [2] - 1255:1,

1274:6
**disclosures** [2] -
1343:8, 1343:16
**discretion** [2] -
1278:25, 1279:3
**discretionary** [1] -
1242:13
**discussed** [5] -
1246:15, 1247:13,
1247:15, 1250:20,
1265:18
**discussing** [5] -
1247:16, 1248:7,
1250:22, 1250:23
**discussion** [1] -
1245:15
**display** [1] - 1325:22
**distinction** [1] -
1254:22
**distinguish** [1] -
1291:7
**distinguishing** [1] -
1335:6
**DISTRICT** [3] - 1236:1,
1236:1, 1236:13
**diversing** [1] - 1242:1
**dividend** [33] -
1240:19, 1248:11,
1248:13, 1251:11,
1257:9, 1257:20,
1258:2, 1258:6,
1266:9, 1266:13,
1266:14, 1272:22,
1273:18, 1274:11,
1276:10, 1276:22,
1277:2, 1277:3,
1283:10, 1283:12,
1287:5, 1287:12,
1314:14, 1333:21,
1333:22, 1334:21,
1335:23, 1339:25,
1340:10, 1340:17,
1340:21, 1340:22,
1343:6
**dividends** [21] -
1248:16, 1248:23,
1257:1, 1257:4,
1270:11, 1272:24,
1274:9, 1275:12,
1275:14, 1280:16,
1280:19, 1281:14,
1282:14, 1282:18,
1283:14, 1328:10,
1328:21, 1340:6,
1340:19, 1341:14,
1343:8
**Doctor** [8] - 1298:23,
1299:8, 1301:17,
1309:4, 1309:11,
1312:18, 1314:17,

1338:10
**doctor** [6] - 1288:20,
1291:9, 1293:18,
1296:17, 1305:5,
1320:14
**doctor's** [1] - 1300:6
**document** [18] -
1242:24, 1263:2,
1267:8, 1314:8,
1314:10, 1315:19,
1315:24, 1322:22,
1323:12, 1323:25,
1324:24, 1325:12,
1325:23, 1326:14,
1326:17, 1326:19,
1327:16
**documented** [1] -
1259:6
**documents** [14] -
1240:21, 1242:2,
1242:3, 1250:19,
1250:21, 1259:25,
1307:9, 1307:11,
1311:15, 1323:13,
1323:20, 1324:12,
1325:16, 1327:6
**dollars** [7] - 1252:10,
1252:25, 1268:12,
1268:13, 1272:11,
1289:12, 1319:23
**domain** [1] - 1336:12
**domains** [1] - 1290:7
**done** [23] - 1256:9,
1261:2, 1261:5,
1263:6, 1263:10,
1269:3, 1276:23,
1277:18, 1279:4,
1279:5, 1293:10,
1294:5, 1294:15,
1303:4, 1303:24,
1304:22, 1330:13,
1331:20, 1331:21,
1333:12, 1334:20,
1339:10, 1339:15
**door** [7] - 1291:15,
1292:8, 1292:10,
1292:11, 1292:17,
1292:18
**doors** [5] - 1291:11,
1291:16, 1291:17,
1291:24, 1292:3
**double** [1] - 1304:5
**down** [19] - 1240:7,
1248:12, 1261:23,
1266:4, 1266:23,
1267:3, 1267:7,
1267:10, 1267:19,
1267:21, 1267:23,
1268:4, 1268:14,
1284:5, 1288:13,

1288:16, 1293:5,
1319:22, 1323:11
**downs** [1] - 1269:19,
1269:20
**downward** [1] -
1321:12, 1321:21
**dozen** [1] - 1290:22
**Dr** [14] - 1254:24,
1263:24, 1285:12,
1285:19, 1290:21,
1300:1, 1315:18,
1320:8, 1322:18,
1325:17, 1326:2,
1328:3, 1330:1,
1333:15
**draft** [15] - 1309:14,
1310:1, 1310:6,
1311:1, 1314:24,
1315:2, 1315:25,
1316:25, 1317:5,
1317:10, 1318:1,
1318:3, 1318:4,
1322:4, 1327:1
**Draft** [2] - 1310:23,
1316:24
**drafts** [2] - 1310:15,
1310:16
**draw** [24] - 1240:15,
1240:18, 1240:24,
1247:6, 1248:12,
1249:2, 1251:10,
1251:17, 1254:22,
1256:2, 1256:16,
1256:18, 1256:20,
1260:23, 1266:16,
1290:9, 1293:5,
1298:16, 1333:23,
1334:3, 1334:19,
1334:20, 1334:25,
1342:7
**drawdowns** [1] -
1284:22
**drawing** [1] - 1334:21
**drawn** [3] - 1284:4,
1284:8, 1284:13
**Draws** [2] - 1326:21,
1326:22
**draws** [14] - 1253:23,
1266:16, 1334:8,
1334:15, 1335:4,
1335:19, 1335:20,
1335:23, 1340:4,
1340:18, 1340:22,
1342:10, 1343:7
**drew** [2] - 1334:18
**driven** [3] - 1303:25,
1304:1, 1327:25
**driving** [1] - 1328:6
**DTA** [21] - 1239:12,
1239:13, 1239:18,

1239:19, 1239:24,
1240:11, 1242:1,
1242:6, 1242:12,
1242:21, 1246:12,
1251:5, 1251:14,
1251:15, 1251:16,
1253:23, 1273:2,
1273:3, 1273:5,
1273:17, 1321:5
**DTAs** [4] - 1239:9,
1241:19, 1242:10,
1271:5
**during** [3] - 1263:12,
1268:6, 1270:13
**DX451** [4] - 1322:17,
1326:2, 1327:15,
1327:20
**DX476** [1] - 1337:24

**E**

**earn** [1] - 1287:22
**earnings** [4] -
1294:19, 1317:16,
1317:22, 1339:23
**easily** [2] - 1256:7,
1256:8
**eating** [1] - 1240:24
**economic** [1] - 1260:9
**economics** [1] -
1286:17
**economist** [1] -
1302:20
**economy** [4] -
1288:21, 1289:1,
1289:4, 1289:7
**Ed** [6] - 1244:12,
1244:17, 1244:19,
1245:21, 1265:2,
1265:6
**effect** [4] - 1268:2,
1271:24, 1272:1,
1276:18
**effectively** [2] -
1270:9, 1275:21
**effort** [3] - 1263:8,
1312:9, 1343:21
**either** [11] - 1243:16,
1291:10, 1291:14,
1291:15, 1291:18,
1292:4, 1292:17,
1292:18, 1306:9,
1316:16, 1330:9
**elements** [1] - 1273:3
**eliminate** [1] - 1251:9
**eliminates** [1] -
1251:17
**email** [12] - 1243:1,
1243:19, 1244:11,
1245:14, 1249:20,

1249:21, 1259:17,
1264:20, 1265:5,
1265:8, 1265:17,
1272:16
**emails** [2] - 1250:5,
1267:18
**employee** [3] - 1307:2,
1307:17, 1327:2
**end** [5] - 1255:20,
1264:6, 1275:9,
1297:4, 1325:21
**ended** [2] - 1287:11,
1338:6
**engage** [1] - 1323:2
**enhance** [1] - 1301:7
**ensure** [1] - 1267:16
**enterprise** [2] -
1258:22, 1298:5
**enterprises** [13] -
1244:23, 1245:1,
1245:4, 1247:4,
1248:6, 1251:6,
1274:5, 1297:20,
1298:24, 1299:11,
1315:12, 1327:14,
1329:24
**enterprises'** [2] -
1240:1, 1246:16
**entire** [3] - 1270:9,
1272:23, 1341:10
**entirely** [1] - 1266:13
**equal** [1] - 1278:19
**equity** [10] - 1317:12,
1317:13, 1317:16,
1317:20, 1317:23,
1318:14, 1318:23,
1319:11, 1320:15,
1320:21
**erode** [3] - 1335:20,
1335:22, 1335:24
**eroded** [4] - 1334:15,
1334:19, 1334:22,
1334:25
**eroding** [2] - 1258:3,
1298:16
**erosion** [4] - 1256:2,
1266:9, 1335:11,
1335:19
**error** [1] - 1303:10
**especially** [1] -
1343:25
**ESQ** [12] - 1236:16,
1236:18, 1236:21,
1236:21, 1236:22,
1237:2, 1237:2,
1237:6, 1237:7,
1237:7, 1237:8,
1237:8
**essence** [1] - 1310:16
**essentially** [3] -

1247:6, 1277:5,
1283:14
**estimate** [2] - 1312:3,
1312:20
**estimates** [1] -
1312:22
**et** [2] - 1236:3, 1236:7
**evaluate** [1] - 1258:24
**eve** [1] - 1250:1
**evening** [1] - 1344:10
**event** [3] - 1314:15,
1325:6, 1336:24
**evidence** [26] - 1243:1,
1243:22, 1252:21,
1253:4, 1253:6,
1253:8, 1254:11,
1254:23, 1255:2,
1255:6, 1255:15,
1259:5, 1259:9,
1259:15, 1262:24,
1266:7, 1267:14,
1279:7, 1279:13,
1279:14, 1280:23,
1300:23, 1303:13,
1303:14, 1303:16,
1315:5
**exact** [4] - 1247:24,
1306:5, 1328:7,
1342:21
**exactly** [7] - 1241:1,
1274:6, 1275:22,
1277:13, 1283:3,
1288:4, 1290:23
**EXAMINATION** [2] -
1239:7, 1285:10
**examine** [4] - 1285:7,
1302:6, 1312:15,
1325:7
**examined** [2] -
1295:19, 1296:1
**example** [3] - 1241:3,
1248:14, 1291:23
**exception** [1] - 1324:2
**excerpted** [1] -
1300:24
**excess** [6] - 1258:6,
1277:15, 1314:14,
1339:24, 1340:16,
1341:14
**exchanged** [2] -
1323:8, 1324:7
**exchanging** [2] -
1323:7, 1323:19
**executed** [1] - 1259:19
**Executive** [1] -
1338:14
**executive** [3] -
1306:22, 1307:15,
1338:19
**executives** [1] -

1337:18
**exercising** [1] -
1278:25
**exhausting** [1] -
1298:16
**Exhibit** [10] - 1242:23,
1280:5, 1280:7,
1280:24, 1281:18,
1282:4, 1282:5,
1282:9, 1309:1,
1309:3
**exhibit** [14] - 1280:8,
1281:6, 1281:13,
1281:22, 1301:13,
1310:8, 1310:9,
1310:10, 1316:7,
1316:11, 1323:23,
1323:25, 1327:11
**exhibits** [1] - 1279:12,
1323:7, 1323:9
**existed** [3] - 1254:14,
1255:17, 1256:1
**exits** [2] - 1285:5,
1344:14
**expect** [4] - 1261:6,
1323:9, 1343:6,
1343:17
**expectation** [4] -
1301:21, 1339:22,
1340:4, 1341:4
**expectations** [1] -
1301:24
**expected** [9] -
1244:20, 1253:23,
1294:25, 1295:7,
1295:15, 1296:23,
1298:24, 1299:11,
1304:10
**expecting** [3] - 1240:7,
1242:18, 1247:18
**expects** [1] - 1340:9
**experience** [13] -
1286:5, 1286:19,
1286:25, 1305:19,
1328:25, 1329:2,
1329:8, 1329:10,
1329:13, 1330:4,
1333:10, 1333:13,
1339:22
**expert** [30] - 1252:2,
1252:12, 1252:15,
1253:2, 1253:6,
1254:12, 1254:12,
1254:16, 1254:24,
1255:3, 1255:5,
1255:17, 1255:24,
1260:20, 1263:16,
1263:18, 1263:19,
1263:24, 1267:15,
1278:2, 1279:17,

1279:19, 1279:20,
1290:7, 1304:14,
1304:25, 1311:12,
1325:7, 1325:10,
1336:22
**expert's** [1] - 1325:9
**expertise** [15] -
1286:8, 1286:10,
1286:14, 1286:16,
1286:19, 1329:16,
1330:5, 1331:22,
1332:8, 1332:11,
1332:14, 1332:17,
1332:20, 1333:3,
1333:6
**explain** [6] - 1246:24,
1260:19, 1271:11,
1278:4, 1283:2,
1322:2
**explained** [1] - 1271:1
**explaining** [1] -
1294:16
**explore** [1] - 1261:16
**exploring** [1] -
1261:16
**express** [4] - 1250:11,
1294:12, 1298:8,
1299:7
**expressed** [2] -
1330:7, 1330:23
**expressing** [2] -
1241:4, 1242:4
**extent** [8] - 1241:16,
1255:15, 1256:1,
1256:19, 1259:9,
1259:21, 1260:25,
1314:13

## F

**fact** [13] - 1241:7,
1268:5, 1290:24,
1300:3, 1300:22,
1301:17, 1303:14,
1303:21, 1305:8,
1306:8, 1314:24,
1328:8, 1341:23
**factor** [3] - 1249:7,
1341:5, 1342:13
**factors** [1] - 1343:23
**facts** [4] - 1242:14,
1254:11, 1307:4,
1307:25
**factual** [4] - 1280:1,
1325:4, 1334:11,
1335:14
**fail** [2] - 1289:6,
1289:8
**failing** [1] - 1306:1
**fair** [4] - 1254:25,

1263:11, 1289:3,
1311:11
**FAIRHOLME** [1] -
1236:3
**familiar** [5] - 1277:23,
1315:18, 1326:3,
1328:11, 1336:24
**familiarize** [1] - 1332:4
**Fannie** [79] - 1240:23,
1244:9, 1244:24,
1245:13, 1247:12,
1248:15, 1251:8,
1252:3, 1252:17,
1252:22, 1257:7,
1259:10, 1259:16,
1267:16, 1267:22,
1268:11, 1268:18,
1268:20, 1269:14,
1269:23, 1270:2,
1270:15, 1271:6,
1271:15, 1271:19,
1272:2, 1272:5,
1272:8, 1272:10,
1273:8, 1280:14,
1281:11, 1284:4,
1284:5, 1284:9,
1284:14, 1287:4,
1287:21, 1288:5,
1288:20, 1289:6,
1289:11, 1295:7,
1301:19, 1301:22,
1302:2, 1302:22,
1304:7, 1305:5,
1305:11, 1306:6,
1306:8, 1306:12,
1306:22, 1307:11,
1307:14, 1307:18,
1307:23, 1313:24,
1315:12, 1318:9,
1320:16, 1320:19,
1321:9, 1327:6,
1327:8, 1330:16,
1333:18, 1333:22,
1334:2, 1334:8,
1336:2, 1336:3,
1336:7, 1337:23,
1338:14, 1338:20,
1340:9
**FANNIE** [1] - 1236:9
**far** [5] - 1250:21,
1283:25, 1307:8,
1318:15, 1335:16
**far-right** [1] - 1283:25
**fault** [1] - 1273:21
**favor** [1] - 1324:6
**favorable** [1] -
1313:24
**February** [3] -
1260:11, 1269:7,
1311:18

**FEDERAL** [1] - 1236:6
**federal** [4] - 1279:6,
1279:8, 1328:8,
1328:18
**Federal** [1] - 1237:6
**fee** [13] - 1277:21,
1278:14, 1278:18,
1278:24, 1279:6,
1279:11, 1287:17,
1287:19, 1320:25,
1321:1, 1321:10,
1321:18, 1321:19
**few** [7] - 1239:10,
1255:8, 1259:17,
1263:4, 1287:3,
1287:16, 1337:22
**FHFA** [59] - 1240:23,
1241:6, 1241:17,
1242:4, 1242:5,
1243:25, 1246:11,
1247:1, 1247:15,
1250:20, 1250:23,
1251:1, 1251:6,
1252:22, 1254:2,
1254:22, 1255:2,
1255:9, 1255:16,
1256:1, 1256:9,
1259:5, 1259:10,
1259:15, 1259:20,
1259:25, 1260:2,
1260:12, 1293:13,
1294:25, 1295:7,
1295:11, 1295:15,
1296:23, 1297:16,
1298:11, 1298:20,
1298:25, 1299:11,
1300:2, 1304:4,
1307:12, 1310:11,
1315:6, 1315:7,
1315:12, 1318:7,
1321:8, 1321:25,
1322:3, 1323:25,
1325:11, 1327:7,
1327:8, 1327:14,
1329:24, 1331:6,
1331:8
**FHFA's** [3] - 1241:11,
1266:7, 1297:9
**field** [1] - 1252:1
**fifth** [1] - 1288:25
**figures** [1] - 1321:16
**filed** [2] - 1337:14,
1337:18
**filing** [1] - 1337:23
**filings** [6] - 1336:7,
1336:10, 1336:25,
1337:3, 1337:22,
1338:24
**final** [3] - 1253:17,
1319:25, 1322:4

**FINANCE** [1] - 1236:6
**finance** [20] - 1252:2,
1252:15, 1252:16,
1252:22, 1266:17,
1266:18, 1286:17,
1290:8, 1291:5,
1292:20, 1293:3,
1294:18, 1298:15,
1299:19, 1299:22,
1299:24, 1308:6,
1331:9
**Finance** [1] - 1237:6
**financial** [31] - 1240:1,
1250:10, 1252:3,
1260:13, 1260:15,
1266:14, 1272:12,
1286:5, 1286:8,
1286:15, 1286:19,
1290:6, 1293:4,
1299:23, 1299:25,
1305:9, 1305:13,
1307:12, 1307:23,
1326:13, 1327:23,
1328:8, 1328:18,
1333:11, 1333:12,
1338:19, 1339:5,
1339:6, 1341:7,
1343:23
**financially** [1] -
1289:22
**fine** [1] - 1245:17
**finish** [1] - 1267:21
**finished** [1] - 1261:13
**first** [37] - 1241:25,
1244:11, 1245:24,
1252:12, 1256:14,
1256:18, 1258:23,
1260:22, 1261:14,
1264:11, 1265:2,
1267:20, 1271:16,
1271:18, 1271:20,
1271:22, 1271:23,
1272:7, 1272:17,
1272:19, 1273:8,
1278:21, 1283:8,
1308:12, 1310:18,
1310:19, 1325:9,
1326:10, 1328:16,
1330:1, 1333:15,
1333:20, 1333:23,
1334:2, 1334:9,
1338:3, 1341:2
**five** [3] - 1272:11,
1320:3, 1344:4
**five-zero** [1] - 1272:11
**FLEXNER** [1] -
1236:22
**flip** [1] - 1318:20
**fly** [1] - 1324:14
**focus** [8] - 1246:4,

1299:18, 1304:23,
1310:17, 1315:21,
1319:17, 1327:7,
1331:3
**focused** [3] - 1303:18,
1306:16, 1326:17
**focusing** [4] -
1304:23, 1319:4,
1319:5, 1329:23
**follow** [1] - 1295:3
**following** [3] -
1254:19, 1262:18,
1323:4
**FOR** [1] - 1236:1
**forecast** [12] -
1250:10, 1288:8,
1312:7, 1313:4,
1313:5, 1321:23,
1321:24, 1325:15,
1326:2, 1341:25
**forecasting** [1] -
1327:15
**forecasts** [4] -
1288:14, 1326:4,
1339:9, 1339:11
**foregoing** [1] - 1345:4
**forget** [1] - 1333:25
**form** [7] - 1241:10,
1257:1, 1257:11,
1275:15, 1276:9,
1276:10, 1343:25
**forming** [1] - 1262:24
**formula** [1] - 1335:3
**formulating** [1] -
1264:15, 1267:14
**forth** [1] - 1318:20
**forward** [9] - 1246:18,
1247:19, 1265:23,
1342:19, 1342:24,
1343:1, 1343:4,
1343:9, 1343:25
**forward-looking** [5] -
1342:19, 1342:24,
1343:1, 1343:4,
1343:9
**foundation** [2] -
1248:22, 1328:2
**four** [2] - 1334:13,
1341:11
**four-plus** [1] - 1334:13
**Freddie** [74] - 1240:23,
1244:9, 1244:24,
1247:12, 1251:8,
1252:4, 1252:17,
1252:22, 1257:7,
1259:10, 1259:16,
1267:16, 1267:23,
1268:13, 1268:18,
1268:20, 1269:15,
1269:23, 1270:3,

1270:15, 1271:6, 1272:9, 1272:25, 1273:2, 1273:9, 1280:14, 1281:11, 1284:4, 1284:5, 1284:9, 1284:14, 1287:4, 1287:22, 1288:5, 1288:20, 1289:6, 1289:11, 1295:7, 1301:19, 1301:22, 1302:3, 1302:22, 1304:7, 1305:5, 1305:11, 1306:6, 1306:9, 1306:12, 1306:25, 1307:2, 1307:9, 1307:11, 1307:17, 1313:24, 1317:12, 1318:13, 1318:16, 1318:24, 1319:10, 1320:4, 1320:15, 1321:9, 1322:12, 1325:14, 1326:3, 1326:10, 1326:12, 1327:9, 1327:15, 1327:16, 1327:20, 1330:16, 1333:20, 1333:23

**Friday** [1] - 1244:21
**front** [4] - 1280:7, 1280:8, 1296:17, 1311:20
**fulfill** [1] - 1301:7
**full** [2] - 1242:6, 1345:5
**funding** [13] - 1240:17, 1253:22, 1319:5, 1319:6, 1319:19, 1341:16, 1341:18, 1341:22, 1342:7, 1342:12
**FUNDS** [1] - 1236:3
**future** [5] - 1239:15, 1239:16, 1242:18, 1330:18, 1341:6
**future-oriented** [1] - 1341:6

## G

**game** [1] - 1254:25
**gather** [2] - 1258:25, 1261:1
**gathering** [1] - 1259:14
**generate** [5] - 1339:24, 1340:16, 1341:4, 1341:14, 1343:5
**given** [4] - 1241:6, 1245:16, 1258:18,

1266:3
**GLUCK** [1] - 1237:2
**goal** [1] - 1292:22
**goals** [6] - 1300:8, 1300:9, 1300:15, 1300:24, 1301:5, 1301:6
**government** [2] - 1285:20, 1285:22
**graph** [1] - 1284:8
**graphs** [1] - 1283:6
**gray** [1] - 1300:20
**great** [1] - 1343:21
**greater** [3] - 1253:22, 1287:12, 1333:22
**grew** [2] - 1268:6
**Griffin** [8] - 1243:19, 1244:1, 1244:19, 1264:20, 1265:5, 1265:9, 1265:10, 1267:8
**Griffin's** [1] - 1245:19
**GROSSMANN** [1] - 1237:3
**group** [3] - 1243:25, 1244:1, 1326:13
**grown** [2] - 1268:9, 1268:15
**GSE** [1] - 1269:5
**GSEs** [15] - 1241:17, 1242:1, 1242:2, 1242:4, 1244:7, 1250:22, 1250:23, 1259:18, 1260:5, 1268:5, 1268:9, 1269:4, 1273:16, 1314:14
**guarantees** [2] - 1289:11, 1289:13
**guess** [1] - 1259:24

## H

**half** [2] - 1274:2, 1277:9
**Hamish** [1] - 1323:6
**HAMISH** [1] - 1236:21
**Hampshire** [1] - 1236:17
**hand** [1] - 1284:16
**hang** [2] - 1271:17, 1310:4
**hanging** [1] - 1290:14
**happy** [4] - 1281:3, 1313:13, 1323:17, 1344:6
**hard** [5] - 1324:13, 1335:6, 1335:9, 1341:21, 1342:17
**harm** [2] - 1299:23,

1299:25
**head** [6] - 1243:25, 1245:12, 1260:15, 1285:17, 1306:10
**hear** [2] - 1303:14, 1327:8
**heard** [5] - 1255:8, 1263:8, 1303:13, 1328:5, 1336:25
**hearing** [4] - 1254:20, 1262:19, 1323:5, 1344:17
**hearsay** [1] - 1324:2
**HELD** [1] - 1236:13
**held** [4] - 1254:20, 1262:19, 1285:19, 1323:5
**help** [3] - 1274:10, 1301:6, 1332:3
**helped** [1] - 1270:14
**HERA** [7] - 1297:20, 1298:5, 1298:7, 1298:9, 1298:10, 1298:14, 1298:18
**hereby** [1] - 1345:3
**hi** [1] - 1245:15
**higher** [1] - 1340:22
**highlight** [4] - 1245:24, 1301:13, 1301:15, 1320:17
**highlighted** [6] - 1300:7, 1300:9, 1300:13, 1300:15, 1300:16, 1341:3
**highlighting** [2] - 1319:7, 1341:3
**hindsight** [4] - 1287:8, 1287:14, 1303:4, 1303:21
**hire** [2] - 1328:10, 1328:21
**hired** [1] - 1336:16
**HOFFMAN** [1] - 1237:8
**hold** [1] - 1334:17
**home** [1] - 1253:18
**Honor** [30] - 1253:1, 1254:10, 1254:13, 1254:18, 1254:21, 1255:4, 1255:21, 1258:12, 1262:10, 1263:23, 1280:22, 1281:17, 1285:8, 1290:17, 1296:12, 1296:15, 1304:12, 1312:10, 1316:9, 1316:15, 1316:17, 1320:7, 1322:21, 1323:2, 1323:15, 1324:3, 1324:4,

1299:25
1344:6
**HONORABLE** [1] - 1236:13
**hopefully** [3] - 1251:24, 1311:20, 1338:11
**hours** [2] - 1255:8, 1259:18
**house** [1] - 1337:7
**housing** [6] - 1237:6, 1288:12, 1288:15, 1288:23, 1288:25, 1289:3
**HOUSING** [1] - 1236:6
**huge** [4] - 1249:1, 1261:4, 1329:21, 1330:17
**HUME** [64] - 1236:21, 1239:3, 1239:8, 1241:9, 1242:23, 1243:4, 1243:7, 1243:9, 1245:24, 1253:14, 1254:13, 1255:4, 1255:13, 1255:21, 1255:23, 1259:7, 1262:12, 1262:16, 1262:23, 1263:11, 1263:18, 1263:20, 1264:1, 1264:7, 1264:9, 1264:12, 1267:25, 1270:23, 1273:21, 1277:18, 1279:22, 1280:22, 1281:1, 1281:3, 1281:17, 1281:21, 1282:5, 1285:2, 1290:17, 1293:11, 1295:17, 1295:23, 1295:25, 1296:12, 1304:12, 1312:10, 1312:14, 1316:6, 1316:16, 1319:3, 1320:7, 1322:21, 1322:24, 1323:2, 1323:6, 1323:22, 1324:4, 1324:18, 1324:20, 1324:23, 1328:2, 1329:4, 1329:18, 1343:12
**Hume** [3] - 1255:4, 1296:11, 1323:6
**Hume)........................**
**...............1239** [1] - 1238:4
**hurt** [1] - 1270:14

## I

**IAN** [1] - 1237:8

**idea** [2] - 1275:25, 1327:13
**identified** [3] - 1256:13, 1282:7, 1338:13
**identify** [1] - 1259:1
**illustrate** [1] - 1273:11
**illustrations** [1] - 1271:12
**immediate** [1] - 1304:24
**immediately** [1] - 1342:11
**impact** [11] - 1254:3, 1260:1, 1263:5, 1268:3, 1270:8, 1271:2, 1271:5, 1274:15, 1274:18, 1275:4, 1275:5
**impeach** [1] - 1263:9
**implemented** [3] - 1286:1, 1286:3, 1328:15
**important** [4] - 1239:22, 1239:24, 1289:4, 1327:22
**improper** [3] - 1293:10, 1293:17, 1293:21, 1293:25, 1294:5, 1294:9, 1294:13, 1294:15, 1294:17, 1294:20, 1294:22, 1296:13
**improvements** [1] - 1253:21
**IN** [2] - 1236:1, 1236:9
**in-house** [1] - 1337:7
**INC** [1] - 1236:3
**include** [3] - 1287:17, 1301:14, 1321:18
**included** [1] - 1308:18
**includes** [5] - 1269:4, 1300:11, 1315:16, 1322:5, 1343:1
**including** [2] - 1263:21, 1326:23
**income** [15] - 1239:16, 1240:19, 1248:17, 1251:10, 1257:9, 1269:23, 1270:9, 1333:20, 1339:23, 1339:24, 1340:16, 1341:14, 1343:5
**incomplete** [1] - 1324:10
**incorrect** [1] - 1310:14
**increase** [9] - 1251:7, 1251:14, 1276:10, 1283:13, 1303:12, 1304:3, 1340:6,

1355

1340:19, 1343:7
**increased** [2] -
1271:19, 1272:17
**increases** [2] -
1275:15, 1284:17
**increasing** [4] -
1241:22, 1252:9,
1252:24, 1275:23
**independent** [1] -
1290:14
**independently** [2] -
1290:13, 1290:24
**indicate** [1] - 1247:5
**indicated** [1] - 1265:17
**indifferent** [4] -
1294:25, 1295:8,
1295:16, 1296:23
**indulgence** [1] -
1324:20
**inflection** [1] -
1260:10
**influenced** [1] -
1260:20
**inform** [2] - 1259:18,
1324:23
**informally** [1] - 1273:5
**information** [13] -
1241:12, 1258:25,
1259:14, 1261:2,
1275:3, 1280:1,
1280:23, 1299:5,
1327:23, 1329:23,
1330:8, 1334:11
**informed** [3] - 1245:1,
1255:18, 1260:20
**initial** [3] - 1275:8,
1301:25, 1323:10
**inputs** [3] - 1329:6,
1329:22, 1330:21
**inside** [1] - 1270:16
**insolvent** [1] - 1306:1
**instability** [1] - 1301:9
**instead** [1] - 1248:18
**institution** [1] - 1305:9
**institutions** [6] -
1286:6, 1286:9,
1286:15, 1286:19,
1305:13, 1327:23
**insufficient** [1] -
1303:23
**intend** [4] - 1255:13,
1255:14, 1262:23,
1324:5
**intent** [1] - 1292:5
**interest** [3] - 1249:4,
1258:1, 1295:16
**interests** [7] - 1295:1,
1295:8, 1296:24,
1297:21, 1298:6,
1298:11, 1298:20

**internal** [4] - 1256:15,
1307:9, 1322:13,
1326:11
**internally** [2] - 1242:5,
1260:8
**interpret** [5] - 1294:8,
1298:12, 1298:18,
1298:21, 1298:22
**introduce** [1] - 1325:8
**invested** [6] - 1280:9,
1280:13, 1281:7,
1281:9, 1281:10,
1282:12
**investment** [2] -
1280:18, 1314:15
**investments** [2] -
1280:20, 1282:15
**investors** [1] -
1343:24
**involves** [1] - 1259:13
**issue** [7] - 1240:14,
1246:2, 1247:13,
1250:12, 1251:20,
1266:20, 1291:2
**issued** [4] - 1257:10,
1280:17, 1280:20,
1282:15
**issues** [7] - 1254:2,
1261:16, 1268:3,
1290:7, 1290:9,
1293:16, 1305:1
**item** [1] - 1306:16
**itself** [2] - 1259:20,
1300:22

### J

**James** [1] - 1243:19
**January** [8] - 1260:11,
1269:24, 1276:19,
1335:9, 1335:11,
1335:16, 1335:19,
1335:21
**Jeff** [1] - 1265:17
**Jenkins** [2] - 1243:9,
1337:25
**job** [3] - 1339:10,
1339:15, 1344:2
**joint** [1] - 1341:21
**JONATHAN** [1] -
1237:6
**JONES** [1] - 1237:8
**Jorge** [8] - 1300:5,
1308:11, 1309:2,
1309:9, 1310:18,
1316:1, 1317:8,
1320:19
**JUDGE** [1] - 1236:13
**judge** [2] - 1323:6,
1324:23

**Judge** [1] - 1239:3
**judgment** [1] - 1292:2
**July** [28] - 1240:22,
1256:17, 1306:19,
1306:22, 1308:18,
1308:25, 1310:1,
1310:6, 1310:24,
1311:1, 1311:2,
1312:19, 1314:24,
1315:2, 1315:15,
1316:3, 1317:4,
1317:5, 1317:10,
1318:4, 1319:8,
1319:9, 1319:25,
1320:4, 1320:14,
1320:20, 1322:4
**jumped** [1] - 1340:14
**June** [5] - 1260:11,
1260:12, 1283:23,
1283:24, 1338:6
**JURY** [1] - 1236:12
**jury** [27] - 1239:4,
1239:12, 1254:20,
1261:8, 1262:19,
1271:1, 1275:1,
1285:5, 1291:3,
1296:11, 1310:2,
1310:7, 1315:8,
1315:10, 1316:22,
1317:6, 1317:11,
1318:5, 1319:18,
1320:6, 1322:1,
1323:5, 1324:6,
1336:11, 1336:24,
1341:10, 1344:14
**jury's** [3] - 1244:6,
1253:12, 1263:8
**justify** [2] - 1278:15

### K

**KAPLAN** [1] - 1236:22
**KAYE** [1] - 1237:9
**keep** [2] - 1257:13,
1270:17
**KENYA** [1] - 1236:21
**kept** [1] - 1343:3
**KESSLER** [1] -
1236:19
**kind** [17] - 1239:13,
1257:3, 1257:5,
1275:20, 1275:21,
1283:14, 1283:15,
1283:20, 1283:21,
1312:5, 1312:21,
1325:7, 1326:14,
1329:22, 1335:24,
1343:4
**kinds** [3] - 1242:10,
1283:12, 1325:16

**King** [1] - 1236:19
**KIRK** [1] - 1236:16
**knowing** [1] - 1334:17
**knows** [1] - 1288:19
**KRAVETZ** [1] - 1237:2

### L

**lacks** [1] - 1328:2
**Lamberth** [2] - 1239:3,
1323:6
**LAMBERTH** [1] -
1236:13
**language** [1] - 1273:3
**large** [14] - 1239:24,
1267:17, 1278:12,
1278:20, 1289:14,
1299:3, 1304:1,
1305:6, 1305:13,
1305:15, 1306:11,
1330:17, 1331:9,
1333:11
**large-scale** [1] -
1330:17
**last** [9] - 1242:9,
1246:16, 1247:19,
1249:15, 1254:6,
1255:8, 1265:19,
1284:7, 1319:18
**layperson's** [1] -
1339:3
**leading** [5] - 1241:8,
1245:7, 1252:5,
1256:2, 1276:3
**leap** [1] - 1309:13
**learn** [1] - 1281:3
**learned** [2] - 1245:5,
1245:9
**least** [4] - 1256:7,
1270:13, 1274:2,
1278:3
**leave** [2] - 1251:23,
1291:15
**leaving** [1] - 1291:24
**LEE** [1] - 1236:18
**left** [10] - 1242:5,
1273:16, 1291:11,
1292:8, 1292:10,
1292:17, 1292:18,
1309:11, 1317:25,
1318:2
**legal** [6] - 1293:16,
1293:17, 1294:9,
1294:17, 1297:9,
1339:2
**lenders** [1] - 1249:7
**less** [2] - 1251:11,
1260:5, 1320:5
**lesser** [1] - 1249:4,
1257:23

**level** [2] - 1278:16,
1321:7
**light** [1] - 1313:24
**likely** [5] - 1240:9,
1240:10, 1242:11,
1244:16, 1272:2
**limited** [2] - 1281:8,
1331:12
**Line** [5] - 1299:9,
1313:21, 1328:17,
1330:2, 1330:4
**line** [8] - 1277:1,
1288:7, 1313:2,
1318:13, 1319:18,
1320:21, 1321:5
**Line..** [1] - 1314:6
**Lines** [1] - 1293:19,
1295:14, 1296:18,
1296:21, 1311:22,
1312:17, 1313:9,
1314:5
**liquidation** [11] -
1257:2, 1257:5,
1257:11, 1257:18,
1275:15, 1275:23,
1276:11, 1283:14,
1283:20, 1284:17,
1284:21
**LISA** [1] - 1345:3
**Lisa** [1] - 1237:12
**list** [7] - 1256:5,
1323:9, 1323:11,
1323:12, 1323:17,
1341:9, 1341:10
**listed** [3] - 1264:1,
1264:2, 1278:8
**lists** [1] - 1323:10
**literally** [1] - 1336:9
**litigation** [2] -
1336:19, 1336:20
**LITIGATIONS** [1] -
1236:10
**LITOWITZ** [1] - 1237:3
**LLP** [2] - 1236:22,
1237:3
**loans** [1] - 1274:6
**long-term** [2] - 1313:4,
1341:25
**look** [35] - 1242:23,
1245:14, 1245:19,
1249:7, 1249:9,
1253:19, 1254:2,
1255:25, 1259:9,
1268:17, 1271:1,
1274:17, 1277:25,
1282:3, 1282:4,
1291:2, 1296:17,
1299:3, 1299:4,
1300:22, 1308:25,
1317:25, 1318:13,

1318:15, 1319:8,
1319:10, 1324:16,
1325:5, 1326:8,
1326:20, 1331:10,
1337:22, 1338:9,
1339:16, 1341:5
**looked** [6] - 1265:12,
1274:15, 1274:25,
1275:8, 1278:10,
1299:25
**looking** [16] - 1242:1,
1251:3, 1277:7,
1293:13, 1293:16,
1295:11, 1322:24,
1329:20, 1330:15,
1330:16, 1342:19,
1342:24, 1343:1,
1343:4, 1343:9,
1344:1
**looks** [1] - 1254:11
**loss** [1] - 1321:5
**losses** [2] - 1239:14,
1239:16
**lost** [1] - 1317:25
**lowered** [1] - 1304:2
**lunch** [4] - 1239:9,
1239:11, 1241:16,
1241:25

# M

**Mac** [50] - 1244:24,
1247:13, 1251:8,
1252:4, 1257:8,
1259:11, 1259:16,
1267:16, 1267:23,
1268:13, 1268:18,
1268:20, 1269:15,
1269:23, 1270:3,
1270:15, 1272:9,
1272:25, 1273:2,
1273:9, 1280:14,
1281:11, 1284:4,
1284:9, 1306:6,
1306:9, 1306:12,
1306:25, 1307:3,
1307:9, 1307:11,
1307:17, 1318:13,
1318:16, 1318:24,
1319:10, 1320:15,
1321:9, 1322:12,
1325:14, 1326:3,
1326:10, 1326:12,
1327:9, 1327:15,
1327:16, 1327:20,
1330:16, 1333:20,
1333:23
**MAC** [1] - 1236:9
**Mac's** [1] - 1320:4
**Mae** [52] - 1244:24,
1245:13, 1247:12,

1248:15, 1251:8,
1252:3, 1257:7,
1259:10, 1259:16,
1267:16, 1267:23,
1268:11, 1268:18,
1268:20, 1269:14,
1269:23, 1270:2,
1270:15, 1271:15,
1271:19, 1272:2,
1272:6, 1272:8,
1273:8, 1280:14,
1281:11, 1284:4,
1284:9, 1306:6,
1306:8, 1306:12,
1307:12, 1307:14,
1307:19, 1307:23,
1315:12, 1318:9,
1320:16, 1320:20,
1321:9, 1327:6,
1327:8, 1327:9,
1330:16, 1333:18,
1333:22, 1334:2,
1334:8, 1336:2,
1337:24, 1338:14,
1338:20
**Mae's** [1] - 1336:7
**MAE/FREDDIE** [1] -
1236:9
**magnitude** [8] -
1247:3, 1247:25,
1278:9, 1305:10,
1306:3, 1306:9,
1306:11, 1329:21
**main** [2] - 1241:5,
1270:8
**management** [9] -
1259:16, 1299:6,
1315:5, 1329:21,
1330:16, 1330:19,
1331:10, 1337:6,
1339:10
**manner** [2] - 1290:15,
1326:4
**March** [1] - 1260:11
**mark** [1] - 1309:14
**marked** [1] - 1315:24
**market** [13] - 1268:6,
1268:18, 1268:19,
1268:23, 1269:8,
1274:5, 1279:1,
1279:2, 1279:4,
1288:23, 1288:25,
1289:3, 1301:10
**marketing** [2] -
1313:11, 1313:23
**markets** [1] - 1274:8
**Mary** [1] - 1250:9
**Massachusetts** [1] -
1237:9
**massive** [1] - 1333:12

**material** [1] - 1325:7
**materials** [3] -
1250:11, 1264:2,
1325:10
**matter** [3] - 1314:23,
1325:4, 1325:8
**maximum** [1] - 1335:5
**Mayopoulos** [4] -
1307:18, 1338:13,
1338:25, 1339:18
**McFarland** [11] -
1249:10, 1249:16,
1272:13, 1307:22,
1318:9, 1327:10,
1336:2, 1336:6,
1338:19, 1338:25,
1339:18
**McFarland's** [1] -
1249:18
**mean** [15] - 1244:24,
1257:4, 1262:2,
1276:13, 1286:12,
1288:17, 1289:25,
1305:22, 1329:6,
1334:10, 1336:8,
1337:5, 1342:24,
1344:3
**meaning** [5] - 1250:15,
1250:17, 1257:5,
1329:1, 1336:8
**means** [15] - 1239:17,
1246:25, 1247:1,
1247:9, 1251:9,
1251:16, 1286:16,
1286:22, 1292:9,
1298:12, 1298:19,
1336:16, 1340:9,
1340:20
**measurement** [1] -
1275:4
**measuring** [1] -
1274:14
**Meeting** [1] - 1244:3
**meeting** [14] -
1244:11, 1244:19,
1245:21, 1246:16,
1249:25, 1250:9,
1250:11, 1250:12,
1265:2, 1265:6,
1265:19, 1267:9,
1315:16, 1316:3
**meets** [1] - 1324:2
**MELTZER** [1] -
1236:19
**members** [1] - 1239:4
**memos** [2] - 1254:4,
1260:2
**mention** [3] - 1254:1,
1272:9, 1321:13
**mentioned** [1] -

1277:19
**mentioning** [2] -
1241:25, 1283:3
**mergers** [2] - 1328:10,
1328:22
**messages** [1] -
1340:25
**met** [1] - 1242:17
**mid-2012** [1] - 1251:5
**middle** [1] - 1239:25
**might** [5] - 1242:6,
1255:25, 1256:4,
1292:12, 1306:4
**Miller** [3] - 1250:2,
1250:4, 1250:9
**millions** [1] - 1334:1
**mind** [4] - 1304:11,
1325:11, 1341:3,
1341:10
**mine** [1] - 1302:13
**minute** [6] - 1276:2,
1285:4, 1295:17,
1320:17, 1322:21,
1330:11
**minutes** [3] - 1287:3,
1287:16, 1324:20
**mischaracterizes** [1] -
1320:8
**mission** [1] - 1301:8
**misspoke** [1] - 1338:5
**mitigate** [1] - 1301:8
**mixed** [1] - 1343:2
**modeling** [1] -
1260:15
**models** [1] - 1307:13
**modified** [2] - 1258:2,
1258:5
**moment** [2] - 1265:16,
1297:16
**moments** [1] -
1259:17
**Monday** [1] - 1236:5
**money** [6] - 1239:15,
1240:2, 1240:9,
1274:4, 1305:25,
1342:18
**months** [4] - 1260:11,
1304:4, 1334:6,
1334:7
**Moreira** [2] - 1237:12,
1345:10
**MOREIRA** [1] - 1345:3
**moreover** [1] -
1253:23
**morning** [6] - 1239:12,
1243:14, 1287:10,
1289:23, 1323:21,
1325:17
**mortgage** [1] -
1289:12

**mortgage-backed** [1]
- 1289:12
**mortgages** [1] -
1269:3
**most** [3] - 1251:23,
1289:3, 1313:24
**mostly** [1] - 1267:18,
1268:20
**motive** [1] - 1293:22,
1294:15
**move** [9] - 1243:2,
1259:7, 1275:18,
1279:24, 1280:22,
1281:17, 1314:23,
1316:13, 1322:17
**moving** [1] - 1316:10
**MR** [126] - 1239:3,
1239:8, 1241:8,
1241:9, 1242:23,
1243:4, 1243:7,
1243:9, 1245:7,
1245:24, 1252:5,
1253:1, 1253:10,
1253:14, 1254:10,
1254:13, 1254:18,
1254:21, 1255:4,
1255:13, 1255:21,
1255:23, 1258:12,
1258:15, 1258:17,
1259:7, 1262:4,
1262:10, 1262:12,
1262:13, 1262:16,
1262:20, 1262:23,
1263:7, 1263:11,
1263:16, 1263:18,
1263:19, 1263:20,
1263:23, 1264:1,
1264:5, 1264:7,
1264:9, 1264:12,
1266:11, 1266:25,
1267:4, 1267:12,
1267:25, 1270:23,
1273:21, 1276:1,
1276:3, 1277:18,
1279:21, 1279:22,
1279:24, 1280:22,
1281:1, 1281:3,
1281:17, 1281:19,
1281:21, 1282:5,
1285:2, 1285:8,
1285:11, 1290:17,
1290:20, 1293:11,
1295:17, 1295:22,
1295:23, 1295:24,
1295:25, 1296:9,
1296:12, 1296:14,
1300:5, 1304:12,
1308:11, 1309:2,
1309:7, 1310:17,
1312:10, 1312:14,

1312:17, 1316:1,
1316:4, 1316:6,
1316:9, 1316:12,
1316:16, 1317:7,
1319:3, 1320:7,
1320:13, 1320:19,
1322:16, 1322:21,
1322:24, 1323:2,
1323:6, 1323:15,
1323:22, 1324:3,
1324:4, 1324:18,
1324:19, 1324:20,
1324:23, 1325:2,
1325:14, 1325:20,
1325:22, 1326:1,
1328:2, 1329:4,
1329:18, 1337:25,
1338:3, 1343:12,
1343:15, 1344:6,
1344:8
**mutually** [2] - 1278:25,
1279:3

## N

**Naa** [1] - 1260:15
**name** [1] - 1285:13
**narrate** [1] - 1317:9
**nature** [2] - 1325:16,
1326:17
**near** [2] - 1305:10,
1305:17
**necessarily** [1] -
1312:5
**necessary** [24] -
1239:23, 1255:7,
1255:11, 1261:3,
1262:25, 1289:18,
1289:21, 1289:22,
1289:23, 1289:24,
1289:25, 1290:1,
1290:2, 1290:3,
1290:8, 1291:7,
1292:7, 1292:17,
1292:25, 1293:3,
1293:4, 1293:7
**need** [14] - 1240:18,
1245:24, 1248:18,
1251:9, 1256:14,
1256:16, 1258:20,
1259:2, 1292:10,
1293:8, 1297:13,
1298:22, 1334:3,
1334:11
**needed** [7] - 1247:19,
1249:3, 1253:24,
1260:4, 1308:23,
1314:19, 1333:23
**needs** [1] - 1242:21
**negative** [1] - 1247:5
**negotiated** [1] -

1258:2
**net** [102] - 1239:22,
1240:12, 1240:14,
1240:16, 1240:17,
1241:11, 1241:22,
1243:13, 1245:5,
1247:5, 1247:10,
1247:23, 1248:19,
1248:21, 1248:24,
1249:6, 1249:22,
1250:2, 1251:8,
1251:14, 1251:16,
1252:24, 1254:15,
1255:7, 1257:24,
1259:18, 1260:1,
1260:4, 1260:16,
1260:22, 1261:3,
1261:21, 1261:22,
1262:2, 1262:25,
1264:10, 1266:8,
1267:3, 1267:15,
1268:2, 1270:7,
1270:8, 1270:10,
1270:11, 1270:13,
1271:2, 1271:9,
1271:19, 1271:23,
1272:1, 1272:6,
1272:17, 1272:20,
1272:21, 1274:11,
1275:12, 1275:19,
1276:14, 1276:15,
1276:16, 1276:18,
1277:16, 1278:8,
1278:19, 1279:2,
1279:6, 1279:11,
1283:8, 1283:11,
1283:17, 1283:18,
1283:19, 1284:17,
1287:6, 1287:11,
1289:18, 1290:4,
1293:9, 1293:20,
1294:5, 1294:14,
1294:20, 1299:23,
1304:2, 1305:22,
1317:14, 1317:16,
1317:20, 1317:23,
1318:14, 1318:16,
1320:4, 1320:15,
1320:16, 1321:11,
1330:18, 1331:9,
1339:24, 1340:16,
1341:14, 1342:15
**never** [9] - 1285:19,
1285:22, 1285:24,
1286:1, 1286:3,
1286:23, 1295:19,
1295:25, 1342:18
**new** [1] - 1263:13
**New** [4] - 1236:17,
1236:23, 1237:4

**next** [10] - 1245:14,
1246:4, 1246:14,
1246:15, 1266:1,
1277:1, 1288:13,
1297:15, 1338:17,
1340:17
**NEXT** [1] - 1236:24
**nice** [1] - 1344:10
**nick** [1] - 1245:23
**Nick** [1] - 1243:19
**nine** [2] - 1277:9,
1304:4
**ninth** [2] - 1339:21,
1340:15
**nobody** [2] - 1269:14,
1288:19
**none** [3] - 1256:15,
1261:2, 1282:22
**nonFreddie** [1] -
1327:2
**normal** [2] - 1270:18,
1290:2
**normally** [3] - 1273:4,
1320:2, 1337:5
**Northwest** [1] -
1236:24
**note** [2] - 1320:25,
1324:6
**notes** [1] - 1345:5
**nothing** [3] - 1306:6,
1310:1, 1310:5
**nuanced** [1] - 1340:24
**Number** [1] - 1236:9
**number** [9] - 1272:12,
1272:22, 1280:12,
1284:3, 1284:10,
1316:7, 1316:14,
1319:1, 1330:3
**numbers** [10] -
1248:19, 1267:22,
1276:6, 1276:8,
1283:3, 1284:1,
1287:8, 1288:17,
1310:16, 1321:20
**NW** [4] - 1236:17,
1237:9, 1237:13,
1345:12

## O

**object** [6] - 1276:3,
1312:10, 1323:14,
1324:17, 1324:25
**objected** [1] - 1324:24
**objecting** [1] -
1290:17
**objection** [30] -
1241:8, 1245:7,
1252:5, 1253:1,
1253:10, 1254:10,

1258:12, 1258:16,
1262:4, 1266:11,
1266:25, 1267:4,
1267:12, 1276:1,
1279:21, 1281:19,
1290:17, 1293:11,
1304:12, 1316:6,
1316:16, 1319:3,
1320:7, 1322:20,
1325:18, 1328:2,
1329:4, 1329:18,
1343:12
**objection's** [1] -
1320:9
**objectives** [1] - 1293:5
**obligation** [3] -
1339:25, 1340:17,
1343:6
**obvious** [1] - 1256:7
**obviously** [1] - 1305:6
**occasion** [1] - 1302:25
**October** [3] - 1236:5,
1260:8, 1345:8
**OF** [3] - 1236:1,
1236:12, 1345:1
**offering** [1] - 1293:20
**officer** [4] - 1272:13,
1307:23, 1338:20,
1339:17
**Officer** [1] - 1338:14
**officers** [1] - 1339:16
**official** [3] - 1312:7,
1312:21, 1345:11
**OFFICIAL** [1] - 1345:1
**Official** [1] - 1237:12
**offs** [2] - 1303:11,
1304:1
**often** [3] - 1249:7,
1257:2, 1257:3
**ON** [1] - 1236:24
**once** [8] - 1240:9,
1240:17, 1242:14,
1242:20, 1248:9,
1253:23, 1303:11,
1336:15
**One** [1] - 1273:20
**one** [43] - 1239:9,
1241:15, 1242:8,
1242:9, 1247:19,
1249:1, 1249:15,
1250:5, 1256:25,
1257:20, 1258:10,
1260:6, 1261:12,
1263:2, 1264:2,
1266:20, 1276:9,
1277:4, 1282:1,
1283:12, 1284:10,
1288:25, 1289:1,
1289:3, 1291:18,
1292:25, 1293:1,

1300:11, 1306:24,
1312:5, 1318:12,
1320:5, 1322:13,
1324:17, 1325:4,
1327:18, 1331:6,
1334:15, 1336:14,
1338:2, 1339:18,
1341:2
**one-fifth** [1] - 1288:25
**one-sentence** [1] -
1300:11
**one-seventh** [1] -
1289:1
**one-third** [1] - 1320:5
**ones** [3] - 1242:18,
1256:7, 1319:7
**onward** [1] - 1283:13
**opening** [1] - 1291:24
**operate** [3] - 1297:20,
1298:5, 1306:13
**opine** [1] - 1297:9
**opinion** [47] - 1252:2,
1252:12, 1252:15,
1253:6, 1253:11,
1254:12, 1254:17,
1255:3, 1255:6,
1255:10, 1255:18,
1258:9, 1259:23,
1260:20, 1263:19,
1263:20, 1278:4,
1289:18, 1290:4,
1293:9, 1293:20,
1293:24, 1294:5,
1294:13, 1294:14,
1294:19, 1294:24,
1295:6, 1295:14,
1296:22, 1296:25,
1297:7, 1297:19,
1298:4, 1298:8,
1298:23, 1299:7,
1299:10, 1304:14,
1325:9, 1330:7,
1330:12, 1330:23,
1331:1, 1331:2,
1331:19
**opinions** [12] -
1246:10, 1246:20,
1246:22, 1254:24,
1261:17, 1262:24,
1264:3, 1264:15,
1267:15, 1270:25,
1290:25, 1293:23
**opposed** [1] - 1291:4
**option** [2] - 1257:1,
1293:1
**orally** [1] - 1250:13
**order** [2] - 1247:25,
1322:2
**ordinary** [1] - 1320:1
**organized** [1] -

1343:19
**oriented** [1] - 1341:6
**original** [3] - 1267:20,
1270:24, 1274:17
**outlook** [2] - 1325:15,
1326:3
**outset** [1] - 1285:12
**outside** [6] - 1254:20,
1262:19, 1299:13,
1313:5, 1323:5,
1336:22
**overruled** [10] -
1252:6, 1258:14,
1258:16, 1262:5,
1276:4, 1293:12,
1304:17, 1320:9,
1325:19, 1329:5
**overview** [1] - 1321:7
**owe** [1] - 1340:6
**own** [3] - 1290:15,
1322:12, 1326:11

**P**

**p.m** [4] - 1236:5,
1310:24, 1311:2,
1344:18
**packet** [1] - 1315:16
**PAGE** [2] - 1236:24,
1238:2
**page** [9] - 1268:8,
1296:19, 1310:19,
1312:16, 1313:20,
1314:17, 1315:23,
1330:3, 1338:17
**Page** [20] - 1293:18,
1295:14, 1296:18,
1299:9, 1301:1,
1309:3, 1310:19,
1311:22, 1313:2,
1313:9, 1314:6,
1315:23, 1316:20,
1326:8, 1326:20,
1328:17, 1330:2,
1338:9, 1338:17,
1339:21
**pages** [3] - 1338:9,
1341:11
**paid** [28] - 1239:17,
1257:2, 1257:5,
1257:23, 1258:1,
1270:11, 1272:24,
1273:18, 1274:8,
1275:12, 1275:14,
1275:19, 1275:21,
1276:22, 1277:2,
1280:17, 1280:19,
1281:14, 1282:18,
1282:22, 1283:12,
1283:14, 1283:15,
1287:4, 1287:6,

1321:20, 1335:24,
1336:16
**pale** [1] - 1300:20
**paragraph** [2] -
1269:7, 1297:15
**paragraphs** [1] -
1254:16
**pardon** [1] - 1315:9
**part** [19] - 1252:19,
1254:1, 1254:16,
1255:24, 1263:5,
1263:24, 1274:8,
1288:20, 1293:7,
1302:6, 1304:19,
1313:10, 1329:7,
1329:25, 1331:21,
1335:14, 1335:16,
1337:15, 1341:7
**part's** [1] - 1253:1
**participants** [1] -
1268:23
**particular** [6] -
1254:25, 1271:5,
1292:18, 1298:13,
1299:2, 1321:14
**particularly** [1] -
1306:17
**parties** [2] - 1323:7,
1323:10
**party** [1] - 1324:1
**Pause** [2] - 1323:1,
1324:22
**pay** [21] - 1248:11,
1248:12, 1248:15,
1248:18, 1248:23,
1249:5, 1257:1,
1257:25, 1260:5,
1271:6, 1273:19,
1274:10, 1321:10,
1328:9, 1328:20,
1334:21, 1335:23,
1340:10, 1340:21,
1343:6
**paying** [2] - 1283:20,
1283:21
**payment** [4] - 1257:3,
1275:20, 1275:21,
1335:24
**payment-in-kind** [1] -
1275:20, 1275:21,
1335:24
**payments** [1] -
1314:14
**penalties** [1] - 1339:1
**Pennsylvania** [1] -
1236:20
**people** [5] - 1241:17,
1243:23, 1252:22,
1269:8, 1303:14
**perceived** [1] - 1251:9

**percent** [19] - 1248:11,
1249:5, 1251:11,
1257:24, 1257:25,
1258:6, 1268:22,
1268:24, 1268:25,
1269:2, 1276:22,
1277:3, 1283:10,
1284:23, 1287:5,
1287:12, 1307:4,
1340:10
**perfect** [1] - 1332:12
**perform** [1] - 1299:6
**performance** [1] -
1270:21
**perhaps** [1] - 1258:15
**period** [11] - 1241:14,
1268:6, 1270:13,
1278:12, 1303:18,
1304:24, 1328:15,
1335:4, 1338:6,
1339:22
**period-to-period** [1] -
1339:22
**periodic** [13] -
1277:21, 1278:14,
1278:18, 1278:24,
1279:6, 1279:10,
1287:17, 1287:19,
1320:24, 1321:1,
1321:10, 1321:18,
1321:19
**periods** [1] - 1239:15
**permit** [4] - 1328:9,
1328:10, 1328:20,
1328:21
**permitted** [2] - 1325:6,
1325:22
**person** [1] - 1334:12
**personnel** [1] -
1293:14
**Ph.D** [2] - 1238:3,
1239:6
**phone** [6] - 1254:18,
1258:15, 1262:10,
1262:13, 1262:16,
1323:3
**phrase** [1] - 1291:7
**phrased** [1] - 1297:10
**PIK** [2] - 1257:4
**place** [7] - 1250:1,
1253:24, 1256:18,
1303:9, 1303:12,
1304:23, 1314:3
**plain** [2] - 1290:5,
1290:12
**plaintiff** [1] - 1323:24
**Plaintiffs** [4] - 1236:4,
1236:16, 1236:18,
1237:2
**plaintiffs'** [3] -

1316:11, 1323:17,
1323:23
**Plaintiffs'** [3] -
1242:23, 1280:24,
1282:9
**plan** [2] - 1256:5,
1269:6
**planning** [4] -
1310:21, 1311:3,
1312:24, 1326:13
**play** [1] - 1264:7
**played** [1] - 1263:12
**playing** [2] - 1262:22,
1264:8
**plays** [1] - 1298:13
**PLLC** [1] - 1236:16
**plus** [1] - 1334:13
**Point** [1] - 1253:16
**point** [8] - 1240:6,
1253:17, 1254:7,
1260:10, 1331:2,
1335:5, 1342:5,
1342:11
**pointed** [1] - 1341:23
**points** [8] - 1251:3,
1253:16, 1260:20,
1261:7, 1261:12,
1278:22, 1341:11,
1341:12
**policy** [5] - 1258:2,
1258:6, 1285:24,
1286:1, 1286:3
**pops** [1] - 1308:12
**PORTER** [1] - 1237:9
**portion** [1] - 1274:2
**portions** [3] - 1300:2,
1337:16, 1339:4
**portray** [1] - 1313:24
**position** [3] - 1266:8,
1285:19, 1323:24
**possibility** [3] -
1241:19, 1252:8,
1252:23
**possible** [9] - 1248:7,
1254:15, 1256:3,
1258:21, 1270:20,
1270:22, 1309:8,
1316:1, 1317:7
**potential** [7] - 1251:2,
1253:23, 1255:25,
1256:6, 1259:22,
1260:1, 1266:16
**potentially** [3] -
1242:1, 1249:6,
1341:17
**PowerPoint** [3] -
1300:1, 1301:12,
1301:14
**predeferred** [1] -
1303:10

**predicted** [1] -
1272:13
**predicting** [1] - 1248:2
**predominantly** [1] -
1269:15
**prefer** [1] - 1293:22
**preference** [11] -
1257:2, 1257:6,
1257:11, 1257:18,
1275:15, 1275:23,
1276:11, 1283:14,
1283:20, 1284:17,
1284:21
**preferred** [14] -
1270:17, 1273:1,
1280:9, 1280:14,
1280:19, 1281:8,
1281:11, 1281:14,
1282:11, 1282:14,
1282:19, 1340:5,
1340:7, 1342:10
**PREFERRED** [1] -
1236:9
**prepared** [4] - 1250:2,
1251:19, 1312:25,
1324:25
**present** [4] - 1326:7,
1327:5, 1336:10,
1343:22
**presentation** [3] -
1250:8, 1253:15,
1327:7
**presentations** [1] -
1312:23
**presented** [22] -
1275:1, 1287:3,
1308:4, 1315:8,
1315:10, 1317:6,
1317:11, 1318:5,
1318:6, 1319:2,
1319:17, 1320:5,
1320:8, 1321:8,
1321:25, 1322:1,
1325:17, 1327:19,
1337:7, 1341:19,
1342:13, 1343:25
**presenting** [10] -
1263:25, 1280:1,
1310:2, 1310:7,
1310:8, 1322:2,
1327:6, 1335:18,
1339:7, 1344:2
**preserve** [2] - 1300:13,
1300:16
**president** [5] -
1306:22, 1307:16,
1307:20, 1338:14,
1338:19
**presumably** [1] -
1302:21

**pretty** [6] - 1251:17, 1272:14, 1289:14, 1329:21, 1330:18, 1334:10
**previous** [3] - 1277:4, 1278:24, 1332:25
**prices** [2] - 1288:12, 1288:15
**principal** [1] - 1258:7
**principles** [1] - 1242:10
**private** [11] - 1274:5, 1274:8, 1280:9, 1280:13, 1280:19, 1281:7, 1281:10, 1281:14, 1282:11, 1282:14, 1282:18
**problem** [24] - 1251:17, 1254:5, 1254:15, 1256:17, 1256:18, 1256:20, 1257:19, 1258:9, 1258:20, 1258:23, 1259:1, 1259:21, 1259:22, 1260:24, 1266:9, 1266:14, 1266:20, 1299:5, 1299:21, 1299:22, 1303:7, 1335:12, 1335:16, 1342:7
**proceed** [1] - 1239:2
**proceedings** [1] - 1345:6
**process** [6] - 1259:4, 1259:13, 1299:7, 1330:19, 1337:6, 1337:10
**processes** [1] - 1333:13
**processing** [1] - 1308:5
**product** [1] - 1312:20
**professional** [1] - 1252:16
**professionals** [1] - 1252:3
**Professor** [10] - 1239:5, 1243:10, 1254:13, 1255:24, 1264:10, 1268:1, 1269:18, 1281:25, 1282:17, 1285:2
**proffer** [2] - 1262:11, 1262:14
**profit** [1] - 1242:18
**profitable** [3] - 1246:17, 1247:18, 1265:22
**profits** [7] - 1240:7, 1242:11, 1248:11,

1248:23, 1267:17, 1272:3, 1336:4
**Progress** [2] - 1309:20, 1317:1
**progress** [1] - 1309:25
**projected** [1] - 1326:22
**projection** [4] - 1315:2, 1320:14, 1321:17, 1326:12
**projections** [51] - 1253:21, 1256:15, 1260:3, 1260:7, 1260:13, 1306:17, 1306:18, 1308:2, 1308:3, 1308:4, 1308:15, 1308:18, 1308:25, 1310:2, 1310:6, 1310:14, 1311:18, 1312:3, 1312:9, 1312:19, 1313:3, 1313:10, 1314:25, 1315:6, 1315:10, 1316:21, 1317:4, 1317:5, 1317:10, 1318:4, 1319:10, 1319:25, 1320:1, 1321:2, 1321:3, 1321:22, 1322:3, 1322:10, 1322:13, 1326:11, 1327:1, 1329:3, 1329:7, 1329:9, 1329:14, 1329:17, 1329:24, 1330:5, 1330:13, 1330:24, 1331:20
**promised** [1] - 1320:24
**pronouncing** [1] - 1285:13
**proper** [2] - 1293:17, 1294:9
**properly** [2] - 1308:24, 1339:8
**protected** [3] - 1339:11, 1343:24, 1344:5
**provide** [1] - 1251:12
**providing** [1] - 1249:1
**province** [1] - 1253:13
**provision** [3] - 1297:19, 1298:4, 1298:10
**provisions** [2] - 1269:20, 1279:10
**Prussia** [1] - 1236:19
**PSPA** [3] - 1244:8, 1277:20, 1335:7
**public** [6] - 1244:20,

1285:24, 1286:1, 1286:3, 1336:12, 1339:8
**pull** [4] - 1308:11, 1309:2, 1320:19, 1326:9
**punished** [1] - 1339:13
**punishment** [1] - 1339:1
**PURCHASE** [1] - 1236:9
**purchase** [2] - 1340:5, 1342:10
**purpose** [8] - 1251:2, 1262:2, 1262:21, 1263:1, 1300:12, 1301:2, 1312:4, 1312:25
**put** [22] - 1251:13, 1269:18, 1282:5, 1283:4, 1284:5, 1284:13, 1300:5, 1301:2, 1303:1, 1309:8, 1317:7, 1318:1, 1318:19, 1321:4, 1322:18, 1331:23, 1332:9, 1332:15, 1332:21, 1333:7, 1336:1
**putting** [1] - 1342:5
**PX** [1] - 1324:18
**PX119** [2] - 1323:16, 1324:18
**PX213** [3] - 1309:1, 1310:17, 1310:19
**PX218** [3] - 1315:14, 1316:4, 1316:14
**PX259** [2] - 1264:12, 1264:17
**PX2C** [1] - 1300:22

## Q

**Q&A** [1] - 1300:3
**quarter** [27] - 1271:16, 1271:18, 1271:20, 1271:22, 1271:23, 1271:25, 1272:1, 1272:7, 1272:17, 1272:19, 1273:7, 1273:8, 1275:10, 1275:18, 1277:10, 1278:11, 1283:22, 1333:20, 1333:24, 1334:5, 1334:9, 1334:18, 1337:23, 1338:3, 1338:6
**quarters** [5] - 1257:8, 1333:16, 1334:2, 1334:8

**questioning** [1] - 1300:2
**questions** [13] - 1251:25, 1261:19, 1263:4, 1271:1, 1285:3, 1290:9, 1290:22, 1290:23, 1297:9, 1298:14, 1311:10, 1314:12, 1324:8
**quick** [2] - 1259:24, 1285:12
**quickly** [4] - 1253:19, 1258:18, 1267:25, 1269:16
**quite** [7] - 1239:24, 1260:17, 1285:16, 1305:14, 1306:11, 1307:22, 1336:24
**quote** [2] - 1313:10, 1313:23
**quotes** [2] - 1278:21, 1278:22

## R

**Radnor** [1] - 1236:20
**range** [3] - 1268:22, 1306:5, 1326:23
**rate** [2] - 1249:4, 1257:7
**rather** [4] - 1270:16, 1270:18, 1290:18, 1298:1
**RDR** [3] - 1237:12, 1345:3, 1345:10
**re** [1] - 1247:16
**RE** [1] - 1236:9
**re-recording** [1] - 1247:16
**reach** [2] - 1246:19, 1342:11
**reaching** [3] - 1245:16, 1261:16, 1264:2
**reactions** [1] - 1325:3
**read** [10] - 1245:11, 1296:18, 1297:13, 1298:14, 1311:13, 1311:19, 1313:13, 1314:1, 1318:17, 1341:1
**real** [3] - 1252:8, 1297:19, 1298:4
**really** [21] - 1242:14, 1247:4, 1253:25, 1257:19, 1258:3, 1259:5, 1260:17, 1266:14, 1275:11, 1278:12, 1279:9,

1286:22, 1292:12, 1295:11, 1300:7, 1302:25, 1306:8, 1318:17, 1330:8, 1342:17
**realtime** [1] - 1315:11
**reason** [13] - 1241:5, 1241:11, 1247:16, 1279:11, 1293:10, 1293:21, 1294:6, 1294:8, 1304:2, 1306:12, 1315:7, 1315:13, 1318:10
**reasonable** [15] - 1278:25, 1279:3, 1290:5, 1290:12, 1290:25, 1291:3, 1291:14, 1291:17, 1291:20, 1292:1, 1292:4, 1292:16, 1292:25, 1293:1
**reasonably** [11] - 1255:10, 1262:25, 1278:19, 1289:22, 1289:24, 1289:25, 1290:2, 1290:8, 1291:7, 1293:4, 1293:6
**reasons** [2] - 1241:6, 1293:25
**rebuttal** [3] - 1254:14, 1271:4, 1273:23
**recap** [1] - 1239:21
**receive** [2] - 1340:4, 1340:18, 1343:6
**received** [8] - 1281:20, 1284:17, 1305:9, 1305:13, 1316:18, 1322:20, 1322:22, 1325:25
**recess** [1] - 1285:4
**Recess** [1] - 1285:6
**recitation** [2] - 1254:11, 1261:8
**recite** [2] - 1258:21, 1290:19
**recollection** [4] - 1264:18, 1307:25, 1308:20, 1334:12
**record** [2] - 1258:8, 1344:16
**recording** [1] - 1247:16
**recreating** [1] - 1308:23
**redemption** [1] - 1258:7
**reduce** [1] - 1257:18
**reduced** [2] - 1323:11, 1323:17

**refer** [1] - 1311:24
**reference** [1] -
  1244:17
**referred** [2] - 1336:25
**referring** [1] - 1321:14
**refers** [1] - 1244:8
**reflecting** [1] -
  1253:21
**refresh** [1] - 1264:18
**refreshers** [1] -
  1239:11
**regardless** [1] -
  1278:11
**registrant's** [1] -
  1339:17
**regulated** [1] - 1305:8
**regulating** [5] -
  1286:5, 1286:8,
  1286:10, 1286:14,
  1286:19
**regulator** [2] -
  1286:13, 1331:7
**regulators** [3] -
  1328:8, 1328:18,
  1329:1
**rehearsing** [1] -
  1254:23
**reinforced** [1] -
  1256:21
**relate** [1] - 1249:25
**related** [1] - 1273:17
**relates** [1] - 1250:7
**relating** [1] - 1305:18
**released** [2] - 1246:12,
  1273:4
**relevance** [1] -
  1253:11
**relevant** [9] - 1246:22,
  1246:24, 1246:25,
  1253:6, 1253:7,
  1255:6, 1255:9,
  1259:23, 1263:3
**relied** [7] - 1308:2,
  1311:15, 1312:19,
  1314:24, 1317:5,
  1318:11, 1318:12
**relying** [2] - 1314:8,
  1343:22
**remaining** [3] -
  1242:18, 1319:6,
  1319:18
**remains** [2] - 1268:25,
  1319:22
**remark** [2] - 1316:14,
  1316:15
**remember** [16] -
  1272:5, 1290:21,
  1290:23, 1298:7,
  1306:5, 1308:23,
  1312:23, 1313:8,

1313:9, 1313:11,
  1313:12, 1314:7,
  1314:23, 1319:21,
  1328:7, 1342:21
**remind** [1] - 1239:12
**repeat** [6] - 1286:2,
  1295:2, 1296:20,
  1310:4, 1320:12,
  1340:12
**repeating** [1] - 1310:9
**rephrase** [1] - 1343:15
**replied** [1] - 1250:4
**reply** [2] - 1245:15,
  1245:19
**report** [14] - 1254:14,
  1263:5, 1270:24,
  1271:4, 1273:23,
  1274:17, 1289:21,
  1290:10, 1293:24,
  1293:25, 1294:13,
  1311:12, 1315:3,
  1330:9
**reported** [1] - 1239:18
**Reporter** [3] -
  1237:12, 1237:12,
  1345:11
**REPORTER** [4] -
  1273:20, 1312:13,
  1344:12, 1345:1
**reporting** [4] - 1244:2,
  1245:20, 1341:6
**reports** [2] - 1265:17,
  1339:5
**represented** [1] -
  1324:11
**require** [4] - 1242:15,
  1242:16, 1304:22,
  1321:11
**required** [3] - 1252:19,
  1258:10, 1263:17
**requiring** [1] - 1266:18
**rerecording** [1] -
  1246:5
**reserve** [2] - 1279:6,
  1279:8
**residual** [10] -
  1317:12, 1317:13,
  1317:16, 1317:20,
  1317:23, 1318:13,
  1318:23, 1319:11,
  1320:15, 1320:21
**resolve** [1] - 1324:21
**respect** [5] - 1279:2,
  1298:10, 1323:19,
  1339:12, 1341:20
**respectfully** [1] -
  1331:12
**respond** [1] - 1324:14
**responded** [1] -
  1297:14

**responds** [1] - 1265:9
**restore** [1] - 1301:6
**restored** [1] - 1242:6
**result** [5] - 1251:15,
  1266:16, 1299:23,
  1341:21, 1342:12
**results** [2] - 1250:10,
  1335:18
**Resumed** [2] - 1238:3,
  1239:6
**retained** [2] - 1317:16,
  1317:22
**reversal** [1] - 1251:7
**reversed** [1] - 1252:9
**review** [7] - 1243:22,
  1246:19, 1261:15,
  1279:14, 1309:25,
  1337:6
**Review** [2] - 1309:19,
  1317:1
**reviewed** [8] -
  1252:21, 1253:4,
  1253:8, 1262:24,
  1264:13, 1311:8,
  1311:9, 1337:13
**reviews** [1] - 1314:10
**revised** [1] - 1315:16
**RICH** [1] - 1237:2
**rid** [2] - 1251:15,
  1330:17
**rigor** [2] - 1312:5,
  1312:21
**rigorous** [1] - 1312:9
**risk** [10] - 1247:5,
  1301:8, 1341:5,
  1341:18, 1342:13,
  1342:15, 1342:23,
  1343:1, 1343:8,
  1343:23
**risks** [1] - 1343:4
**Road** [1] - 1236:19
**ROBERT** [1] - 1237:2
**role** [9] - 1295:11,
  1297:9, 1297:16,
  1299:2, 1306:25,
  1308:5, 1329:20,
  1330:15, 1331:8
**roles** [2] - 1331:6
**Room** [2] - 1237:13,
  1345:12
**roughly** [3] - 1248:1,
  1248:2, 1272:12
**rounding** [1] - 1248:19
**row** [1] - 1333:16
**ROYCE** [1] - 1236:13
**RUDY** [1] - 1236:18
**rule** [1] - 1242:21
**Rules** [1] - 1255:5
**rules** [5] - 1242:9,
  1242:13, 1242:14,

1252:20, 1332:18
**run** [3] - 1341:15,
  1341:22, 1342:6
**running** [2] - 1341:18,
  1342:12

## S

**SAMUEL** [1] - 1236:22
**satisfactory** [1] -
  1323:18
**satisfied** [1] - 1242:20
**Satriano** [4] - 1243:20,
  1243:24, 1244:2,
  1264:20
**Satriano's** [2] -
  1245:15, 1265:9
**save** [1] - 1305:25
**savings** [1] - 1248:21
**saw** [10] - 1241:2,
  1250:4, 1250:20,
  1255:15, 1255:17,
  1259:15, 1259:17,
  1260:14, 1307:10,
  1322:7
**scale** [1] - 1330:17
**scenario** [11] - 1322:5,
  1322:8, 1327:22,
  1328:1, 1328:5,
  1331:23, 1332:9,
  1332:12, 1332:15,
  1332:22, 1333:8
**scenarios** [7] -
  1326:23, 1331:24,
  1332:10, 1332:13,
  1332:16, 1332:22,
  1333:8
**SCHILLER** [1] -
  1236:22
**SCHOLER** [1] - 1237:9
**scope** [1] - 1299:14
**screen** [5] - 1282:6,
  1282:8, 1309:12,
  1318:18, 1318:19
**SEC** [12] - 1336:7,
  1336:10, 1336:13,
  1336:16, 1336:21,
  1336:25, 1337:3,
  1337:9, 1337:22,
  1338:24, 1344:1,
  1344:3
**second** [19] - 1242:8,
  1251:22, 1256:22,
  1274:2, 1275:10,
  1277:9, 1278:11,
  1283:22, 1293:18,
  1313:19, 1318:2,
  1325:10, 1330:14,
  1331:3, 1333:15,
  1335:7, 1338:2,

1338:3, 1338:6
**Second** [1] - 1277:3
**seconds** [1] - 1262:9
**section** [6] - 1342:20,
  1342:23, 1342:24,
  1343:9, 1343:16
**securities** [1] -
  1289:12
**securitized** [1] -
  1269:3
**see** [67] - 1241:24,
  1243:10, 1243:20,
  1244:3, 1244:4,
  1244:12, 1244:21,
  1245:2, 1245:17,
  1245:21, 1246:2,
  1246:6, 1251:13,
  1254:9, 1256:20,
  1259:5, 1259:20,
  1259:24, 1259:25,
  1264:25, 1265:3,
  1265:6, 1265:19,
  1265:23, 1266:5,
  1267:11, 1268:2,
  1268:5, 1277:1,
  1278:8, 1279:1,
  1279:7, 1279:10,
  1280:7, 1280:8,
  1288:9, 1288:10,
  1289:21, 1300:7,
  1300:19, 1300:24,
  1303:7, 1303:19,
  1309:5, 1310:18,
  1310:21, 1313:21,
  1315:14, 1315:20,
  1315:24, 1316:2,
  1316:20, 1318:25,
  1320:21, 1322:19,
  1324:16, 1324:17,
  1326:20, 1330:8,
  1338:12, 1338:18,
  1341:16, 1342:13,
  1342:16, 1344:9,
  1344:10
**seeing** [3] - 1256:21,
  1264:23, 1282:8
**seek** [1] - 1316:4
**seeking** [1] - 1325:8
**SENIOR** [1] - 1236:9
**senior** [6] - 1306:21,
  1337:18, 1340:5,
  1340:7, 1342:10
**sense** [1] - 1266:3
**sent** [6] - 1277:16,
  1282:25, 1283:9,
  1284:2, 1284:11,
  1315:6
**sentence** [9] -
  1244:11, 1246:4,
  1246:14, 1246:15,

1265:2, 1266:1, 1297:4, 1300:11, 1301:11

**sentences** [1] - 1265:12

**separate** [1] - 1343:3

**separately** [1] - 1321:6

**September** [12] - 1300:3, 1301:17, 1301:21, 1302:1, 1302:8, 1302:10, 1303:3, 1303:7, 1303:15, 1303:22, 1328:16, 1330:1

**series** [1] - 1290:22

**seriously** [1] - 1337:4

**served** [1] - 1285:22

**session** [3] - 1310:22, 1311:3, 1312:24

**SESSION** [1] - 1236:12

**set** [3] - 1260:17, 1285:24, 1315:16

**sets** [1] - 1318:11

**seventh** [1] - 1289:1

**share** [3] - 1268:7, 1268:18, 1268:20

**shared** [4] - 1310:11, 1322:3, 1329:24, 1337:8

**shareholders** [20] - 1280:10, 1280:14, 1280:20, 1281:8, 1281:11, 1281:15, 1282:12, 1282:19, 1294:25, 1295:1, 1295:7, 1295:8, 1295:15, 1295:16, 1296:23, 1296:24, 1298:24, 1298:25, 1299:11, 1299:12

**shares** [2] - 1280:17, 1282:15

**sharing** [1] - 1307:11

**sheet** [17] - 1240:5, 1240:12, 1242:22, 1246:13, 1247:3, 1247:21, 1247:23, 1249:1, 1250:18, 1252:24, 1272:4, 1273:3, 1273:6, 1273:17, 1300:3, 1300:22, 1301:17

**shortfall** [2] - 1248:24, 1258:1

**show** [25] - 1247:12, 1249:15, 1249:17, 1251:19, 1264:12, 1267:22, 1268:1, 1268:16, 1269:19,

1269:20, 1269:22, 1274:1, 1275:7, 1277:14, 1281:9, 1281:13, 1283:7, 1284:1, 1290:18, 1311:10, 1315:20, 1322:13, 1325:13, 1327:13, 1332:2

**showed** [16] - 1242:2, 1242:3, 1244:14, 1249:9, 1259:25, 1264:17, 1265:25, 1274:14, 1284:11, 1310:10, 1313:12, 1317:12, 1326:6, 1327:6, 1327:11, 1335:13

**showing** [18] - 1240:22, 1242:7, 1249:13, 1250:25, 1268:8, 1269:11, 1269:13, 1271:11, 1273:15, 1274:18, 1278:7, 1280:9, 1281:7, 1281:21, 1310:10, 1324:8, 1327:12, 1341:10

**shown** [4] - 1260:14, 1263:15, 1319:24, 1324:12

**shows** [18] - 1246:11, 1247:14, 1274:2, 1274:15, 1281:6, 1282:11, 1282:14, 1283:8, 1284:8, 1287:3, 1287:11, 1287:21, 1318:15, 1320:4, 1320:14, 1320:16, 1320:22

**shrink** [1] - 1267:23

**shrunk** [1] - 1268:14

**side** [2] - 1309:8, 1309:9

**sign** [1] - 1337:21

**signature** [1] - 1338:9

**signed** [6] - 1243:16, 1245:6, 1336:6, 1338:13, 1338:18, 1338:22

**significant** [2] - 1299:23, 1314:15

**similar** [2] - 1275:25, 1325:16

**similarly** [2] - 1258:5, 1298:10

**simple** [1] - 1267:22

**simply** [5] - 1241:9, 1263:4, 1279:25, 1297:7, 1323:12

**single** [1] - 1334:17

**sit** [1] - 1294:4

**sitting** [5] - 1303:1, 1332:20, 1332:23, 1333:3, 1333:6

**situation** [1] - 1328:23

**six** [2] - 1253:16, 1261:7

**size** [2] - 1253:22, 1304:5

**sizes** [1] - 1329:22

**slide** [42] - 1249:13, 1249:15, 1251:19, 1256:9, 1268:17, 1269:12, 1273:11, 1273:15, 1274:1, 1274:2, 1274:15, 1275:7, 1275:11, 1278:7, 1278:24, 1283:4, 1284:3, 1284:7, 1287:3, 1287:10, 1287:21, 1287:23, 1300:1, 1300:11, 1301:12, 1301:16, 1308:13, 1308:17, 1308:21, 1309:11, 1309:14, 1309:17, 1309:19, 1309:22, 1310:18, 1315:24, 1316:2, 1317:11, 1318:1, 1319:9, 1320:6, 1336:1

**Slide** [14] - 1249:17, 1250:25, 1255:22, 1259:7, 1268:1, 1268:16, 1269:16, 1269:17, 1270:23, 1275:7, 1300:6, 1308:11, 1309:4, 1316:21

**slides** [8] - 1254:8, 1267:25, 1282:24, 1287:16, 1310:20, 1312:25, 1315:17, 1319:1

**small** [3] - 1310:15, 1333:25

**solve** [1] - 1259:2

**solvent** [2] - 1300:14, 1300:16

**solves** [1] - 1257:19

**someone** [3] - 1249:4, 1252:1, 1274:10

**sometime** [1] - 1244:21

**sometimes** [8] - 1244:6, 1248:10, 1289:21, 1289:22, 1289:23, 1307:12, 1343:2

**somewhere** [1] - 1322:7

**sorry** [16] - 1240:16, 1250:16, 1254:10, 1257:14, 1258:13, 1260:23, 1262:12, 1263:11, 1263:19, 1279:22, 1296:12, 1310:19, 1316:9, 1316:20, 1318:17

**sort** [2] - 1270:9, 1300:19

**sound** [3] - 1300:14, 1300:16, 1318:22

**sounds** [2] - 1263:23, 1322:6

**sourced** [1] - 1308:17

**spare** [1] - 1261:8

**specific** [3] - 1254:16, 1254:24, 1262:7

**spent** [2] - 1252:1, 1306:18

**spin** [2] - 1313:11, 1313:23

**SPSAs** [1] - 1257:16

**SPSPA** [4] - 1244:3, 1244:7, 1277:20, 1319:19

**stability** [1] - 1249:8

**stand** [2] - 1239:19, 1263:10

**STANTON** [1] - 1237:8

**start** [3] - 1292:21, 1315:22, 1337:23

**started** [2] - 1242:25, 1303:8

**starting** [3] - 1240:8, 1272:21, 1306:14

**starts** [1] - 1300:12

**state** [2] - 1240:25, 1325:11

**statement** [6] - 1240:2, 1336:1, 1342:19, 1342:24, 1343:9

**statements** [7] - 1339:5, 1341:8, 1343:1, 1343:2, 1343:4, 1343:23, 1344:1

**States** [1] - 1345:11

**STATES** [2] - 1236:1, 1236:13

**status** [1] - 1328:14

**stay** [1] - 1317:24

**stayed** [1] - 1276:22

**staying** [1] - 1270:10

**stenographic** [1] - 1345:5

**stepping** [1] - 1330:15

**STERN** [1] - 1237:6

**still** [8] - 1247:9, 1269:14, 1283:19, 1283:21, 1319:20, 1319:25, 1331:1, 1331:2

**stock** [3] - 1340:5, 1340:7, 1342:10

**STOCK** [1] - 1236:9

**stockholder** [1] - 1244:8

**stop** [1] - 1344:7

**stopped** [1] - 1282:19

**strategic** [4] - 1269:6, 1310:21, 1311:3, 1312:24

**Stress** [1] - 1326:23

**stress** [13] - 1322:5, 1322:15, 1327:22, 1328:1, 1328:5, 1328:9, 1328:18, 1331:23, 1332:9, 1332:12, 1332:15, 1332:22, 1333:7

**stretch** [1] - 1253:18

**strike** [1] - 1279:24

**structural** [1] - 1253:21

**subject** [3] - 1244:3, 1272:21, 1338:25

**submitted** [1] - 1337:8

**subsequent** [1] - 1258:3

**substance** [1] - 1270:6

**sufficient** [7] - 1257:25, 1302:3, 1302:11, 1303:15, 1304:21, 1305:2, 1343:5

**sum** [1] - 1270:6

**summarize** [4] - 1251:3, 1254:6, 1256:10, 1282:24

**summarized** [2] - 1277:20, 1280:23

**summarizes** [1] - 1283:4

**summarizing** [1] - 1251:1

**summary** [16] - 1251:12, 1259:24, 1274:25, 1275:4, 1275:9, 1275:11, 1276:25, 1279:13, 1279:14, 1279:16, 1280:1, 1280:23, 1280:24, 1281:6, 1281:13, 1283:5

**support** [4] - 1266:7, 1288:23, 1305:6,

1305:14
**supposed** [1] - 1342:8
**surprised** [2] - 1260:6,
1304:10
**surprising** [2] -
1260:17, 1260:19
**Susan** [6] - 1249:10,
1272:13, 1307:22,
1318:9, 1336:2,
1338:18
**sustainable** [1] -
1336:3
**sustained** [5] - 1253:3,
1253:12, 1267:1,
1267:13, 1343:14
**sweep** [66] - 1239:23,
1240:14, 1241:12,
1243:13, 1245:5,
1247:10, 1249:22,
1250:2, 1251:14,
1254:15, 1255:7,
1259:19, 1260:1,
1260:4, 1260:16,
1260:22, 1261:3,
1261:22, 1262:2,
1262:25, 1263:5,
1264:11, 1266:8,
1267:3, 1267:15,
1268:3, 1270:7,
1270:8, 1270:14,
1271:2, 1271:9,
1271:23, 1272:1,
1272:20, 1274:11,
1275:12, 1275:19,
1276:14, 1276:15,
1276:17, 1276:18,
1277:16, 1278:20,
1279:2, 1279:7,
1279:11, 1283:8,
1283:11, 1283:17,
1283:18, 1283:19,
1284:18, 1287:6,
1287:12, 1289:18,
1290:5, 1293:9,
1293:21, 1294:5,
1294:14, 1294:20,
1299:24, 1305:22,
1331:10, 1342:16
**sweeping** [1] -
1270:16
**sweeps** [1] - 1278:9
**swept** [2] - 1270:6,
1272:23
**swinging** [1] - 1291:11
**synonyms** [1] -
1289:24
**system** [1] - 1339:7
**systemic** [1] - 1301:8
**systems** [1] - 1339:6

**T**

**Tab** [7] - 1280:4,
1281:4, 1281:6,
1281:24, 1282:1,
1282:3
**table** [1] - 1333:14
**Tagoe** [1] - 1260:15
**tax** [32] - 1239:17,
1239:20, 1241:20,
1246:6, 1246:12,
1247:2, 1247:13,
1247:17, 1247:20,
1247:22, 1249:10,
1249:14, 1250:3,
1250:12, 1250:17,
1251:23, 1252:8,
1252:23, 1253:9,
1265:13, 1265:19,
1271:16, 1271:20,
1272:4, 1272:6,
1272:18, 1273:1,
1274:12, 1303:8,
1303:10, 1303:11,
1304:1
**taxable** [1] - 1242:12
**taxpayer** [1] - 1305:25
**team** [1] - 1308:7
**technical** [2] -
1251:23, 1251:25
**technology** [1] -
1309:8
**ten** [6] - 1249:22,
1285:4, 1288:6,
1319:23, 1320:1,
1327:2
**ten-minute** [1] -
1285:4
**ten-year** [1] - 1320:1
**tens** [2] - 1252:10,
1252:24
**term** [9] - 1290:12,
1294:17, 1294:18,
1313:4, 1322:6,
1339:25, 1340:11,
1341:25, 1342:4
**terms** [18] - 1239:10,
1249:7, 1254:2,
1254:3, 1259:21,
1267:18, 1268:3,
1268:6, 1268:7,
1277:20, 1277:25,
1278:23, 1293:17,
1294:9, 1297:10,
1306:9, 1312:6,
1335:7
**terrible** [2] - 1289:7,
1289:9
**testified** [13] -
1287:10, 1305:20,

1311:23, 1312:2,
1312:18, 1313:2,
1317:13, 1322:9,
1328:3, 1328:17,
1330:22, 1333:15,
1336:13
**testifier** [1] - 1336:22
**testify** [2] - 1317:15,
1336:16
**testimony** [22] -
1241:2, 1241:4,
1241:13, 1241:24,
1245:11, 1249:9,
1249:18, 1251:20,
1251:21, 1253:2,
1260:14, 1263:9,
1263:13, 1263:16,
1263:24, 1290:21,
1306:17, 1311:24,
1314:8, 1326:15,
1330:10, 1332:5
**testing** [1] - 1325:9
**THE** [54] - 1236:1,
1236:1, 1236:13,
1239:2, 1243:2,
1243:5, 1243:8,
1252:6, 1253:3,
1253:12, 1255:12,
1255:19, 1258:14,
1258:16, 1262:5,
1264:4, 1267:1,
1267:13, 1273:20,
1276:4, 1280:25,
1281:2, 1281:20,
1285:4, 1285:7,
1293:12, 1296:3,
1296:7, 1296:8,
1296:10, 1296:13,
1296:16, 1304:17,
1312:13, 1316:7,
1316:10, 1316:18,
1320:9, 1320:11,
1322:20, 1322:23,
1324:15, 1325:12,
1325:18, 1325:25,
1329:5, 1338:2,
1338:4, 1343:14,
1344:7, 1344:9,
1344:12, 1344:13,
1344:15
**themselves** [1] -
1259:11
**they've** [2] - 1309:1,
1339:15
**thinking** [3] - 1305:1,
1327:25, 1328:6
**third** [5] - 1256:25,
1268:19, 1269:4,
1273:6, 1273:8,
1275:18, 1320:5,

1335:21, 1337:23
**Third** [1] - 1305:19
**thoroughly** [1] -
1261:12
**thousands** [1] -
1269:8
**three** [8] - 1247:10,
1320:3, 1325:15,
1326:2, 1334:6,
1334:7, 1341:11
**three-year** [2] -
1325:15, 1326:2
**throughout** [1] -
1326:15
**Timothy** [2] - 1307:18,
1338:13
**title** [2] - 1315:22,
1342:21
**today** [16] - 1271:1,
1294:4, 1303:1,
1310:7, 1316:22,
1317:6, 1317:11,
1317:15, 1318:5,
1319:2, 1320:6,
1322:1, 1326:7,
1327:5, 1331:1,
1336:10
**today's** [1] - 1328:23
**together** [6] - 1248:6,
1251:13, 1268:19,
1269:18, 1276:11,
1308:6
**tomorrow** [4] - 1245:1,
1344:9, 1344:11,
1344:13
**took** [5] - 1250:1,
1274:6, 1276:18,
1303:11, 1334:8
**top** [8] - 1265:8,
1296:19, 1296:21,
1306:10, 1309:15,
1310:19, 1310:23,
1326:20
**top-right** [1] - 1309:15
**TOPAZ** [1] - 1236:19
**topic** [1] - 1249:15
**total** [25] - 1251:5,
1268:7, 1268:9,
1270:4, 1270:5,
1275:12, 1276:8,
1276:12, 1276:13,
1276:18, 1280:13,
1280:16, 1280:19,
1281:7, 1281:8,
1281:9, 1281:10,
1281:13, 1282:14,
1282:25, 1284:1,
1284:4, 1284:8,
1284:11
**totally** [4] - 1292:19,

1296:13, 1305:20,
1307:5
**track** [1] - 1323:13
**TRANSCRIPT** [1] -
1236:12
**transcript** [3] - 1324:9,
1345:5, 1345:6
**transcripts** [1] -
1324:8
**transfer** [1] - 1278:16
**transferred** [4] -
1276:9, 1276:13,
1276:16, 1278:9
**transferring** [1] -
1294:19
**transfers** [1] - 1283:12
**Treasury** [30] -
1240:24, 1250:1,
1250:6, 1250:9,
1250:13, 1256:3,
1257:16, 1257:18,
1258:3, 1266:10,
1293:6, 1298:16,
1301:18, 1302:2,
1304:5, 1305:2,
1306:13, 1326:21,
1326:22, 1334:15,
1334:19, 1334:20,
1334:22, 1334:25,
1335:2, 1335:11,
1335:25, 1339:25,
1340:6, 1341:24
**treasury** [45] -
1240:17, 1240:18,
1244:7, 1244:9,
1247:6, 1248:12,
1249:5, 1249:14,
1249:16, 1250:24,
1251:10, 1253:22,
1256:16, 1260:23,
1260:24, 1266:15,
1270:7, 1270:12,
1276:10, 1271:7,
1272:22, 1272:23,
1273:18, 1274:9,
1274:11, 1275:13,
1276:9, 1277:2,
1277:16, 1282:25,
1283:10, 1284:2,
1284:5, 1284:11,
1284:13, 1284:16,
1284:20, 1294:20,
1304:5, 1305:10,
1305:13, 1340:10,
1340:21, 1341:16,
1342:6
**treasury's** [3] -
1275:16, 1305:5,
1314:15
**treated** [1] - 1258:7

**trends** [1] - 1256:21
**trial** [6] - 1263:7,
1263:8, 1263:13,
1263:14, 1263:15,
1323:10
**Trial** [1] - 1309:1
**TRIAL** [1] - 1236:12
**tried** [2] - 1287:24,
1303:1
**trillion** [5] - 1268:10,
1268:11, 1268:12,
1289:12
**trillions** [1] - 1268:13
**true** [9] - 1290:16,
1294:2, 1297:11,
1317:15, 1326:5,
1328:6, 1343:10,
1345:4, 1345:6
**truth** [1] - 1325:8
**truthful** [2] - 1263:15,
1330:10
**try** [4] - 1258:25,
1317:9, 1324:21,
1332:4
**trying** [9] - 1254:5,
1254:22, 1262:15,
1269:8, 1293:5,
1313:22, 1321:23,
1325:13, 1332:5
**turn** [7] - 1251:22,
1280:4, 1281:4,
1299:8, 1306:16,
1316:20, 1339:13
**turnaround** [1] -
1260:10
**turned** [2] - 1240:6,
1303:22
**turns** [1] - 1287:11
**two** [33] - 1240:1,
1245:5, 1245:25,
1246:16, 1247:4,
1247:10, 1248:6,
1251:6, 1261:12,
1269:4, 1270:25,
1273:12, 1275:17,
1276:6, 1276:8,
1278:21, 1279:12,
1282:24, 1283:6,
1283:11, 1284:1,
1291:10, 1292:1,
1306:1, 1319:9,
1324:20, 1331:5,
1331:6, 1333:16,
1334:2, 1341:11,
1341:21, 1342:17
**type** [5] - 1266:20,
1290:15, 1330:9,
1341:18, 1342:18
**types** [4] - 1254:9,
1261:5, 1267:18,

1279:9
**typical** [4] - 1258:22,
1261:5, 1330:19,
1331:10
**typically** [4] - 1257:22,
1312:6, 1313:6,
1333:12

## U

**U.S** [7] - 1237:13,
1288:23, 1289:1,
1289:4, 1289:7,
1328:8, 1328:17
**Ugoletti** [3] - 1241:3,
1293:14, 1293:15
**unaudited** [1] -
1337:17
**under** [18] - 1242:7,
1255:5, 1270:7,
1276:13, 1276:15,
1276:16, 1277:2,
1277:16, 1284:9,
1287:5, 1287:6,
1310:23, 1316:13,
1319:19, 1326:22,
1333:12, 1340:4,
1342:10
**undersecretary** [1] -
1250:5
**understood** [2] -
1252:7, 1331:15
**United** [1] - 1345:11
**UNITED** [2] - 1236:1,
1236:13
**unless** [1] - 1324:2
**unlocked** [1] - 1291:11
**unofficial** [1] - 1313:3
**unprecedented** [5] -
1261:4, 1305:20,
1306:1, 1306:3,
1329:22
**unrelated** [2] -
1266:21, 1292:19
**unused** [1] - 1319:20
**unusual** [1] - 1324:7
**up** [35] - 1241:19,
1242:15, 1242:16,
1243:1, 1247:24,
1248:24, 1251:16,
1253:24, 1271:6,
1272:23, 1274:12,
1275:5, 1276:6,
1276:8, 1276:24,
1283:13, 1283:15,
1287:11, 1288:7,
1288:13, 1288:16,
1300:5, 1308:11,
1308:12, 1309:2,
1313:14, 1313:15,

1317:7, 1318:19,
1320:19, 1322:18,
1326:9, 1336:1,
1338:10
**update** [4] - 1250:10,
1260:7, 1260:12,
1261:2
**updated** [2] - 1316:19,
1316:21
**ups** [3] - 1269:19,
1269:21, 1271:7
**usual** [1] - 1313:4

## V

**vague** [3] - 1293:11,
1304:13, 1329:4
**valuable** [1] - 1242:13
**valuation** [2] -
1251:15, 1273:3
**value** [17] - 1242:6,
1252:9, 1271:6,
1272:5, 1275:16,
1276:8, 1276:12,
1276:16, 1277:15,
1278:16, 1279:1,
1279:3, 1279:4,
1282:25, 1284:1,
1284:11, 1284:16
**VARMA** [1] - 1237:7
**verification** [3] -
1309:19, 1309:25,
1317:1
**verified** [2] - 1337:13,
1337:15
**verify** [3] - 1310:1,
1310:6, 1310:12
**version** [7] - 1316:19,
1316:21, 1316:24,
1320:4, 1323:18,
1323:23, 1324:18
**vice** [3] - 1306:22,
1307:15, 1338:19
**video** [2] - 1262:15,
1262:22
**Video** [1] - 1264:8
**view** [7] - 1246:17,
1265:22, 1329:3,
1329:9, 1329:14,
1335:19, 1339:3
**viewing** [1] - 1267:6
**views** [1] - 1330:5
**violating** [1] - 1341:17
**volatility** [1] - 1339:23
**vs** [1] - 1236:5

## W

**wait** [4] - 1288:9,
1288:10, 1318:2,
1320:17

**waited** [1] - 1256:20
**waiting** [1] - 1317:9
**walk** [9] - 1255:1,
1291:9, 1291:10,
1292:4, 1292:7,
1292:10, 1292:11,
1292:16, 1292:18
**wall** [1] - 1291:25
**Washington** [6] -
1236:4, 1236:17,
1236:23, 1237:10,
1237:14, 1345:13
**ways** [1] - 1250:22
**weeks** [1] - 1319:9
**weight** [5] - 1331:22,
1332:9, 1332:14,
1332:21, 1333:7
**welcome** [1] - 1311:19
**whole** [1] - 1240:14
**wind** [10] - 1261:23,
1266:4, 1266:23,
1267:3, 1267:7,
1267:10, 1267:19,
1267:21, 1267:23,
1268:3
**withdraw** [1] - 1320:13
**withdrawn** [3] -
1279:23, 1325:1,
1325:5
**withdrew** [1] - 1324:24
**WITNESS** [3] - 1238:2,
1296:7, 1320:11
**Witness** [1] - 1314:10
**witness** [21] - 1262:23,
1274:25, 1275:9,
1275:11, 1276:25,
1279:13, 1279:16,
1280:24, 1281:7,
1295:19, 1295:23,
1295:25, 1296:4,
1296:5, 1296:14,
1304:13, 1304:14,
1312:15, 1320:10,
1324:7, 1324:9
**witness's** [2] -
1279:14, 1283:5
**witnesses** [1] - 1323:8
**word** [10] - 1290:13,
1290:14, 1290:25,
1291:20, 1294:8,
1294:16, 1294:22,
1300:8, 1300:9,
1300:20
**wording** [1] - 1322:7
**wordings** [2] -
1340:13, 1340:24
**words** [5] - 1241:6,
1269:2, 1287:14,
1293:8, 1328:7
**world** [1] - 1332:12

**worried** [2] - 1256:1,
1281:22
**worth** [99] - 1239:22,
1240:12, 1240:14,
1240:16, 1240:18,
1241:12, 1241:22,
1243:13, 1245:5,
1247:5, 1247:10,
1247:23, 1248:19,
1248:21, 1248:24,
1249:6, 1249:22,
1250:2, 1251:8,
1251:14, 1251:16,
1252:24, 1254:15,
1255:7, 1257:24,
1257:25, 1259:18,
1260:1, 1260:4,
1260:16, 1260:22,
1261:3, 1261:21,
1261:22, 1262:2,
1262:25, 1264:10,
1266:8, 1267:3,
1267:15, 1268:2,
1270:7, 1270:8,
1270:10, 1270:11,
1270:13, 1271:2,
1271:9, 1271:19,
1271:23, 1272:1,
1272:6, 1272:18,
1272:20, 1272:21,
1274:11, 1275:12,
1275:19, 1276:14,
1276:15, 1276:17,
1276:18, 1277:16,
1278:8, 1278:19,
1279:2, 1279:7,
1279:11, 1283:8,
1283:11, 1283:17,
1283:18, 1283:19,
1284:18, 1287:6,
1287:11, 1289:18,
1290:4, 1293:9,
1293:20, 1294:5,
1294:14, 1294:20,
1299:23, 1304:2,
1305:22, 1317:14,
1317:16, 1317:21,
1317:23, 1318:14,
1318:16, 1320:5,
1320:15, 1320:16,
1321:12, 1330:18,
1331:10, 1342:15
**wound** [1] - 1268:14
**write** [12] - 1242:15,
1253:24, 1254:4,
1269:19, 1269:20,
1269:21, 1271:7,
1303:9, 1303:10,
1303:11, 1304:1
**write-downs** [2] -

1269:19, 1269:20

**write-off** [2] - 1303:9, 1303:10

**write-offs** [2] - 1303:11, 1304:1

**write-up** [1] - 1253:24

**write-ups** [3] - 1269:19, 1269:21, 1271:7

**writing** [5] - 1241:19, 1242:16, 1250:11, 1265:5, 1265:10

**written** [5] - 1246:6, 1257:16, 1267:8, 1271:6, 1301:17

**written-off** [1] - 1246:6

**wrote** [2] - 1311:12, 1341:2

## Y

**year** [6] - 1271:15, 1283:23, 1288:13, 1320:1, 1325:15, 1326:2

**years** [11] - 1240:7, 1252:1, 1257:24, 1258:4, 1277:9, 1288:6, 1319:23, 1320:3, 1327:3, 1334:13, 1344:4

**yellow** [1] - 1300:13

**York** [3] - 1236:23, 1237:4

**yourself** [2] - 1303:2

## Z

**zero** [4] - 1272:11, 1319:23, 1320:16, 1321:15