1           BEFORE THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLUMBIA

2

3   FAIRHOLME FUNDS, INC., et al.,  .
                        .

4          Plaintiffs,      .
                        .  Case Number 13-cv-1053

5      vs.                .
                        .

6   FEDERAL HOUSING FINANCE AGENCY, .
   et al.,                  .

7                        .
          Defendants.      .

8   - - - - - - - - - - - - - - - - -
   In re FANNIE MAE/FREDDIE MAC   .  Case Number 13-mc-1288

9   SENIOR PREFERRED STOCK PURCHASE .
   AGREEMENT CLASS ACTION      .  Washington, D.C.

10  LITIGATIONS.             .  October 25, 2022
   - - - - - - - - - - - - - - - - -  10:11 a.m.

11

12        TRANSCRIPT OF JURY TRIAL, MORNING SESSION
         BEFORE THE HONORABLE ROYCE C. LAMBERTH

13           UNITED STATES DISTRICT JUDGE

14  APPEARANCES:

15  For Berkley Plaintiffs:     BRIAN BARNES, ESQ.
                         Cooper & Kirk, PLLC

16                         1523 New Hampshire Avenue Northwest
                         Washington, D.C. 20036

17

18  For Class Plaintiffs:       LEE RUDY, ESQ.
                         Kessler Topaz Meltzer & Check, LLP

19                         280 King of Prussia Road
                         Radnor, Pennsylvania 19087

20                         HAMISH HUME, ESQ.

21                         KENYA DAVIS, ESQ.
                         Boies Schiller Flexner LLP

22                         1401 New York Avenue Northwest
                         Washington, D.C. 20005

23

24                 -- continued --

25

```
1    APPEARANCES (CONTINUED):

2    For Defendant Federal
     Housing Finance Agency:      JONATHAN STERN, ESQ.
3                                 DAVID BERGMAN, ESQ.
                                  ROBERT JONES, ESQ.
4                                 Arnold & Porter Kaye Scholer LLP
                                  601 Massachusetts Avenue Northwest
5                                 Washington, D.C. 20001

6

7    Official Court Reporter:     SARA A. WICK, RPR, CRR
                                  United States District Court
8                                   for the District of Columbia
                                  333 Constitution Avenue Northwest
9                                 Room 4704-B
                                  Washington, D.C. 20001
10                                202-354-3284

11   Proceedings recorded by stenotype shorthand.
     Transcript produced by computer-aided transcription.
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

C O N T E N T S

TESTIMONY

BALA DHARAN                 Cross-Examination............... 1369
                            Redirect Examination........... 1377


SUSAN MCFARLAND -
DEPOSITION TESTIMONY    Direct Examination............. 1398
                            Cross-Examination............... 1444


EXHIBITS RECEIVED

DX-299, DX-329, DX-344, DX-365, DX-418, DX-469.......... 1372

PX-269............................................... 1391

PX-509............................................... 1394

PX-424............................................... 1396

PX-135, PX-121, PX-147, PX-213, PX-223, PX-222, PX-229,

PX-238, PX-248, PX-453, PX-480, PX-481, PX-483, PX-469,

PX-473, PX-490, PX-488................................ 1417

```
1                    P R O C E E D I N G S

2          (Call to order of the court.)

3          (Jury entered courtroom.)

4          MR. STERN:  Good morning, Your Honor.  Jonathan Stern

5   for the defendants.

6          May we go to the phone for a very, very brief housekeeping

7   matter?

8               THE COURT:  All right.

9          (Bench conference.)

10              MR. STERN:  Your Honor, I'm sorry to do this with the

11  jury in the box, but we're taking something off the Court's

12  plate.  On Sunday night, the Class Plaintiffs filed a motion

13  entitled "Class Plaintiffs' Motion in Limine to Preclude

14  Defendants from Offering Deposition Testimony of Timothy Bowler

15  and Jeffrey Foster Into Evidence."  That's ECF number 234.

16         The defendants are not going to offer that testimony.  So

17  this motion is now moot.  I don't know whether the plaintiffs

18  want to withdraw it or the Court wants to deny it as moot, but

19  however the Court handles it, it's no longer an issue.

20              MR. HUME:  Your Honor, this is Hamish Hume for the

21  plaintiffs.

22         I also am happy to withdraw or have it denied as moot.  I

23  would only note for the Court's record, we filed a second

24  motion, I believe at the same time, for the admissibility of a

25  document, PX-226, and that motion is still live.  So it needs to
```

1  be addressed.

2          MR. STERN:  And we will be filing an opposition to

3  that.  We don't need to take the jury's time with that now, but

4  the first one's moot.

5          MR. HUME:  On the depositions, you can treat it as

6  withdrawn, Your Honor, or deny as moot.

7          THE COURT:  I will just deny it as moot, and then we

8  will deal with the other motion when we get to it.

9      (End of bench conference.)

10         THE COURT:  The witness can come forward.

11     Good morning, ladies and gentlemen.  The witness will

12  resume the stand.  We had not completed cross of the expert that

13  was on the stand.

14     You may proceed, Mr. Bergman.

15         MR. BERGMAN:  Good morning, Your Honor.  Thank you.

16  David Bergman for defendants.

17     BALA DHARAN, WITNESS FOR THE PLAINTIFFS, RESUMED STAND

18                 CROSS-EXAMINATION (Continued)

19         BY MR. BERGMAN:

20  Q.   Yesterday, I said we would talk about the periodic

21  commitment fee.  So I will start with that.

22     The Federal Reserve is the central bank of the United

23  States; correct?

24  A.   Yes.

25  Q.   And the Federal Reserve is often called the Fed; right?

1   A.    Yes.

2   Q.    The Fed has a number of responsibilities, including to

3   maintain stability of the financial system; right?

4   A.    Yes.

5   Q.    And the Fed has the responsibility to prevent bank panics,

6   like the runs on banks from The Great Depression era; right?

7   A.    I'm sure, yes.

8   Q.    And one of the responsibilities of the Fed is to contain

9   systemic risk; correct?

10   A.    I don't know the full list, but it sounds right.

11   Q.    And the Fed manages the nation's money supply; right?

12   A.    Yes.

13   Q.    The Federal Reserve is one of the most important

14   governmental actors in terms of influence on the economy;

15   correct?

16   A.    Certainly.

17   Q.    And the chair of the Federal Reserve is the top person at

18   the Fed; right?

19   A.    I think so.  I'm not an expert on how it's organized, but

20   I'm assuming that is the case.

21   Q.    And appointed by the president; correct?

22   A.    Yes.

23   Q.    To be chair of the Federal Reserve is a prestigious and

24   demanding position, isn't it?

25   A.    Definitely.

1   Q.   The periodic commitment fee was to be set by FHFA and

2   Treasury in consultation with the chairman of the Federal

3   Reserve; correct?

4   A.   Yes.

5   Q.   And that's --

6   A.   There are other terms, but those are some of the terms.

7   Q.   It was to be set by FHFA and Treasury in consultation with

8   the chairman of the Federal Reserve -- chair of the Federal

9   Reserve; correct?  And that's the person we've been talking

10  about, the chair of the Federal Reserve?

11  A.   Yes.

12  Q.   You have made no attempt to calculate the value of the

13  periodic commitment fee; correct?

14  A.   Correct.

15  Q.   And you have made no attempt to calculate what you believe

16  Treasury and FHFA, in consultation with the chair of the Federal

17  Reserve, would have determined to be the amount of the periodic

18  commitment fee; correct?

19  A.   Yes.  I mean, the amount is supposed to be determined based

20  on the market value at the time.  So it had to be done in real-

21  time at that time.  I obviously haven't done that since I'm now

22  here in 2021, '22.

23  Q.   You haven't tried to calculate what the periodic commitment

24  fee would have been set at if Treasury, FHFA, and the chair of

25  the Federal Reserve had consulted at any time in the past;

1  correct?

2  A.   Well, the answer is no, but I'm saying, I don't think I'm

3  able -- anyone can do it today since it was supposed to be done

4  by negotiating between these parties back in whatever time

5  period we were talking about.

6  Q.   And Treasury sent seven letters to FHFA, each one waiving

7  the periodic commitment fee for a period of three months;

8  correct?

9  A.   I don't know the exact number of letters, but they sent --

10  I have seen several of them.

11       MR. BERGMAN:   Okay.  And I believe this is without

12  objection, Your Honor.  I would move the admission into evidence

13  of -- I think one letter is already in evidence, so I will move

14  the others.  They are DX-299, DX-329, DX-344, DX-365, DX-418,

15  and DX-469.

16       THE COURT:   What was the very first one?

17       MR. HUME:   Just one moment, Your Honor.

18    I don't think that we object, but I would just like to see

19  a copy and confirm that they are what we think they are.

20       THE COURT:   I didn't get the number of the very first

21  one.

22       COURTROOM DEPUTY:   299.

23       MR. HUME:   No objection, Your Honor.

24       THE COURT:   They're all received without objection.

25       (Exhibits DX-299, DX-329, DX-344, DX-365, DX-418 and DX-469

1  received into evidence.)

2          MR. BERGMAN:  Thank you.

3          BY MR. BERGMAN:

4  Q.   We will pull up for you, Doctor, DX-469, and this is the

5  waiver letter dated June 25, 2012.  This is the last waiver

6  letter before the Third Amendment; correct?

7  A.   That seems correct, yes.

8  Q.   And you reviewed this in connection with your work in this

9  case; correct?

10 A.   Yes.  I've seen all of these letters.  I can't recall any

11 particular one.

12 Q.   Okay.  And do you recall that Treasury stated -- I'm in the

13 middle paragraph.  It says, "By this letter, please be advised

14 that Treasury waives, for the third quarter of" -- "CY" is

15 calendar year 2012; is that correct?

16 A.   Yes.

17 Q.   "Waives for the third quarter of CY 2012 the PCF payable by

18 each enterprise."

19          That's the periodic commitment fee; right?

20 A.   Yes.

21 Q.   And it says, "Treasury takes this step due to the continued

22 fragility of the mortgage market and the belief that the

23 imposition of the PCF at this time would not fulfill its

24 intended purpose of generating increased compensation to the

25 American taxpayer."

1       Right?

2   A.   Yes.

3   Q.   And then in the next paragraph, it says, "Treasury will

4   re-evaluate the situation during the next calendar quarter."

5       That would be the next three months?

6   A.   Yes.

7   Q.   "To determine whether the PCF should then be set."

8       And it says, "Treasury remains committed to protecting

9   taxpayers and ensuring that future positive earnings of the

10  enterprises are returned to taxpayers as compensation for their

11  investment."

12      Correct?

13  A.   Yes.

14  Q.   Dr. Dharan, after the net worth sweep, if Fannie or Freddie

15  had negative net worth or zero net worth for a quarter, then

16  Fannie or Freddie would owe nothing to Treasury; correct?

17  A.   Under the net worth sweep provisions?

18  Q.   Yes.

19  A.   If they had negative net worth, there would not be a

20  payment to Treasury.

21  Q.   And under the net worth sweep, the periodic commitment fee

22  is suspended; correct?

23  A.   Suspended, correct.

24  Q.   And after the net worth sweep, if Fannie or Freddie had

25  positive net worth but not enough to pay what would have been

1  the 10 percent dividend, they would only owe the amount of their

2  net worth; correct?

3  A.   If the amount of net worth is less than the 10 percent

4  dividend?

5  Q.   Yes.

6  A.   Yes.

7  Q.   So they would pay less under the net worth sweep than under

8  the 10 percent dividend; correct?

9  A.   If the net worth was less than 10 percent, correct,

10  10 percent dividend.

11  Q.   And under this scenario, after the net worth sweep, Fannie

12  and Freddie would not have to draw from the Treasury commitment

13  to pay a dividend; correct?

14  A.   If the -- I think the answer is a little more nuanced.  I

15  have to give a longer answer than yes or no to that.

16  Q.   A longer answer to after the net worth sweep, Fannie and

17  Freddie would not have to draw from the Treasury commitment to

18  pay a dividend?

19  A.   Yes, I think so.  Is your question about paying dividend?

20  Q.   Yes.

21  A.   I thought you just asked about drawing from Treasury,

22  period.

23  Q.   No.  Would not have to draw from the Treasury commitment to

24  pay a dividend; correct?

25  A.   To pay dividend, they would not have to draw from Treasury,

1   but they would have to draw from Treasury if the net worth

2   becomes negative.

3   Q.   And under the net worth sweep, Fannie and Freddie never owe

4   more in dividends than they have in net worth; correct?

5   A.   Can you repeat that?

6   Q.   Yes.  Under the net worth sweep, Fannie and Freddie never

7   owe more in dividends to Treasury than they have in net worth;

8   correct?

9   A.   Yes.

10  Q.   And so under the net worth sweep, if Fannie or Freddie made

11  $1 in a quarter, the dividend they owe Treasury in that quarter

12  would be $1; right?

13  A.   Yes.

14  Q.   And if the 10 percent dividend in a year would have been

15  $10 billion but the company made only $1, under the net worth

16  sweep, the dividend would be $1; right?

17  A.   That's what I just said.

18  Q.   And now, after the net worth sweep, the shareholders still

19  have their shares; correct?

20  A.   Yes.

21  Q.   They can hold on to their shares to see if the share price

22  increases; right?

23  A.   I mean, I can only answer the first question you had.  They

24  still have the shares.  It's up to them to hold on or not.

25  Q.   Yes.  They can decide; is that right?

```
 1    A.    They can at any time decide.

 2    Q.    And they can decide to sell their shares if they want to;

 3    right?

 4    A.    I would think so.

 5    Q.    And if the shareholders sell their shares for more than

 6    what they paid for them, then the shareholders get to keep all

 7    the profits from that sale; right?

 8    A.    If they -- if the selling price is more than the purchase

 9    price?  Is that your question?

10    Q.    Yes.

11    A.    Yes, that would be the normal case.

12    Q.    And the shareholders keep 100 percent of their profits if

13    they sell the shares for more than they bought them for; right?

14    A.    It's got capital gains, but they will get to keep that,

15    minus any tax owed on that.

16              MR. BERGMAN:  That's all I have.  Thank you, Your

17    Honor.  Thank you, Doctor.

18              THE COURT:  Redirect?

19                        REDIRECT EXAMINATION

20              BY MR. HUME:

21    Q.    Good morning, Dr. Dharan.  Good morning, ladies and

22    gentlemen of the jury.  Good morning, Your Honor.  Hamish Hume

23    for the plaintiffs.

24         Yesterday, Mr. Bergman showed you portions of Plaintiffs'

25    Exhibit 2C.
```

1    Can we pull that up, Mr. DeRita, please.  It's in evidence.

2    Mr. Bergman compared some things in the document with the

3    slide that you prepared to show portions.

4    Do you recall that?

5    A.   Yes.

6    Q.   Professor Dharan, were you trying to hide from the jury

7    anything that was in this document?

8    A.   No.  These are already exhibits.

9    Q.   And let's look at some of the things that Mr. Bergman

10   didn't show you that also were not on your slide.

11   A.   Okay.  Correct.

12   Q.   First question -- can we blow up the first question and

13   answer.

14   Do you see the question is, "What is a conservatorship?"

15   A.   Can you repeat?

16   Q.   Do you see the question is, "What is a conservatorship?"

17   A.   Yes.

18   Q.   And you see the answer is, "A conservatorship is the legal

19   process in which a person or entity is appointed to establish

20   control and oversight of a company to put it in a sound and

21   solvent condition."

22   Do you see that?

23   A.   Yes.

24   Q.   And what is it again that you were telling the jury

25   yesterday about the word "solvent"?  What's its relationship to

1    net worth?

2    A.   Solvent usually means a positive net worth, meaning the

3    assets are greater than liabilities, and the net worth is

4    positive and maybe providing a foundation.

5    Q.   So is putting a company in a solvent condition consistent

6    or inconsistent with having a net worth sweep that sweeps the

7    whole net worth out to Treasury each quarter?

8    A.   It's inconsistent.  It's the opposite of making it a

9    solvent condition.

10   Q.   I don't think this was in your demonstrative slide.  Were

11   you trying to hide it?

12   A.   I was not trying to hide it.

13   Q.   Is this consistent or inconsistent with the opinion you

14   gave the jury yesterday?

15   A.   This is consistent with opinion.

16   Q.   Let's look at the second question and the answer.  This was

17   also not in your demonstrative slide.

18        Was the demonstrative slide able to put every single thing

19   in this document in?

20   A.   Not at all.  There's no way I could do that.

21   Q.   Okay.

22   A.   I was just trying to highlight a few words.  But the

23   overall exhibit I understood was available to the jury.

24   Q.   And you've reviewed the whole exhibit?

25   A.   I reviewed the whole thing.

1    Q.   And is the whole exhibit consistent with what you were

2    trying to show in your slide?

3    A.   Yes, very much.

4    Q.   The second question is, "What is a conservator?"

5         Do you see that?

6    A.   Yes.

7    Q.   And it says, "Answer:  A conservator is the person or

8    entity appointed to oversee the affairs of a company for the

9    purpose of bringing the company back to financial health."

10        Do you see that?

11   A.   Yes.

12   Q.   And then it says, "In this instance, the Federal Housing

13   Finance Agency has been appointed by its director to be the

14   conservator of the company."

15        And "the company" here is -- there's one for Fannie and one

16   for Freddie.  You understand that?

17   A.   Yes.

18   Q.   In accordance with the reform act, which it cites, and the

19   other statute, which it cites, and then it says, "To keep the

20   company in a safe and solvent financial condition."

21        Do you see that?

22   A.   Yes.

23   Q.   You didn't put that in your slide?

24   A.   I highlighted a few items but not all the items.  This is a

25   long nine-page -- this is a three-page document.  I didn't

1    highlight all of it.

2    Q.   Mr. Bergman didn't show you this either.  Is this

3    consistent or inconsistent with the opinion you're giving?

4    A.   It's consistent with my opinion.

5    Q.   Is having -- is being in a safe and solvent financial

6    condition consistent or inconsistent with having a net worth

7    sweep?

8    A.   It's the opposite.  As I said, to be safe means to operate

9    in a business -- normal business condition for a financial

10   institution, and solvent means having a positive net worth.

11   It's one of the most important things that one looks for in a

12   solvent company, financial institution, and this is -- the net

13   worth sweep is the opposite of that.

14   Q.   Can we look at the second page, please.  I'm going to show

15   you another question and answer Mr. Bergman didn't show you.

16       If we go down to the question, "What are the powers of the

17   conservator?"  And highlight the third question on the page

18   there and the answer.

19       Do you see it says, "What are the powers of the

20   conservator?"  Do you see that question?

21   A.   Yes.

22   Q.   Do you see the answer, "The FHFA as conservator may take

23   all actions necessary and appropriate to, one, put the company

24   in a sound and solvent condition"?  Do you see that?

25   A.   Yes.

Q.   And again, what's the relationship of being solvent to
having net worth to the net worth sweep?  Can you explain?

A.   Again, solvent usually -- a solvent financial institution
means they have a positive net worth.  They have assets greater
than liabilities.  So net worth has to be there.  As I said
yesterday, it's the foundation that companies, banks and
financial institutions, use to express their ability to
continue.

     And the net worth sweep takes it all the way.  Every
quarter, whatever the net worth is, it's completely sent over to
the Treasury as dividends, so that net worth comes down to zero,
although as I said, there was a minimum $3 billion going down to
zero over five years.  So it's the opposite of leaving the
enterprises in a solvent condition.

Q.   Can we look at the question and answer Mr. Bergman did show
you, the one that starts at the bottom of page 1 and runs over
to the top of page 2.  It starts at the bottom of page 1 and
going back up -- this is the one that Mr. Bergman showed, "What
are the goals of the conservatorship?"  And show it with the
answer.  There's two paragraphs in the answer.  Let's get both
of them, please.

     This says, "What are the goals of the conservatorship?"
     Do you see that?

A.   Yes.

Q.   The answer says, "The purpose of appointing the conservator

1   is to preserve and conserve the company's assets and property

2   and to put the company in a sound and solvent condition."

3        Do you see that?

4   A.   Yes.

5   Q.   And that's the part you highlighted?

6   A.   I showed that.

7   Q.   The first sentence of the answer, do you see that?

8   A.   Yes.

9   Q.   Do you think it's a part of the answer, or is it just

10  relevant to the answer?

11  A.   It is the answer that the Q and A is giving.

12  Q.   The next sentence, which wasn't in your slide and

13  Mr. Bergman showed you, says, "The goals of the conservatorship

14  are to help restore confidence in the company, enhance its

15  capacity to fulfill its mission, and mitigate the systemic risk

16  that has contributed directly to the instability in the current

17  market."

18       Do you see that?

19  A.   Yes.

20  Q.   Then it goes on to talk about no reason for concern on the

21  operations, the company's operation will not be impaired,

22  business will continue without interruption.

23       Do you see that?

24  A.   Yes.

25  Q.   Is any of that that we just looked at inconsistent with the

1    opinion you gave to the jury?

2    A.    No.   They're all consistent with the opinion I gave.

3    Q.    Does any of that part of the answer something that you

4    think would make a reasonable shareholder reading this in

5    September 2008 expect something like the net worth sweep?

6              MR. BERGMAN:   Objection; beyond the scope.

7              THE COURT:   Overruled.

8              THE WITNESS:   Not at all.   This is not something that

9    indicates in any way that there will be a net worth sweep in the

10   future.

11             BY MR. HUME:

12   Q.    That's PX-2C.   Would you like the jury to read that

13   document to understand your opinion, the whole document?

14   A.    Absolutely.   It's only three pages.

15   Q.    I think this version is a shorter version, but there are

16   other ones.   You would like them to read the whole thing?

17   You're not trying to only show them parts?

18   A.    Right; correct.

19   Q.    Now, we can take it down, moving to a separate thing.

20        Mr. Bergman asked you about your opinion that the net worth

21   sweep was unprecedented.

22        Do you remember that?

23   A.    Yes.

24   Q.    And then he compared that to the unprecedented -- what he

25   said was an unprecedented amount of Treasury commitment of

1  funding.

2      Do you remember that questioning?

3  A.  Yes.

4  Q.  Here's my question:  When the Treasury made its commitment

5  to provide $400 billion or more in funding with the Second

6  Amendment, at that time, in December 2009, did the Treasury tell

7  FHFA and Fannie and Freddie that in exchange it was going to

8  demand a net worth sweep?  Have you seen any evidence of that?

9  A.  I didn't see it in any such -- any document.  I didn't see

10  any such indication or statement.

11  Q.  So the net worth sweep demanded by Treasury in exchange for

12  its unprecedented funding, did you see any evidence of that?

13  A.  No.

14  Q.  Did the net worth sweep come later?

15  A.  It came much later, about two and a half years later.

16  Q.  Now, Mr. Bergman also showed you different versions of the

17  projections of future performance by Fannie Mae and Freddie Mac.

18      Do you recall that?

19  A.  Yes.

20  Q.  I think when I was examining you, we looked at PX-213 and

21  PX-218, which were two versions.

22  A.  Right.

23  Q.  Do you remember that?

24  A.  Yes.

25  Q.  Do you remember that one of those was sent to Mr. DeMarco?

1    A.    Yes.

2    Q.    Was that relevant to why you chose to look at that one?

3    A.    Yes, because what I was examining as a part of these six

4    points that I was describing yesterday was whether FHFA was

5    aware of what the GSE managements were saying about the future

6    of the company, the projections.  So I wanted to look at the

7    documents that were sent, that were a part of e-mail chains

8    where I could identify that FHFA was receiving them or was

9    commenting on them.  So that was the reason to select.

10         And moreover, the line that I was focusing on, which is the

11   amount of net worth available -- I'm sorry, amount of Treasury

12   funding available, was more or less the same line in these

13   versions.

14   Q.    So let's look first at, I believe -- and I may have

15   misspoken.  I think the two versions you were looking at when I

16   examined you were 213 -- PX-213 and PX-216.

17   A.    Okay.

18   Q.    And I think they showed you 218.  Let's start with 213, if

19   we can put that up.

20         And this is the version that is sent -- do you see the "to"

21   line is to Edward DeMarco?  Do you see that?

22   A.    Yes.

23   Q.    This is dated July 13, 2012.

24         Do you see that?

25   A.    Right.

1    Q.    Can we highlight who it's to?  Okay.

2         This version also has the cover e-mail, which talks about

3    what Mr. Benson said when he presented his analysis in the

4    golden years of earnings.

5         Do you remember that?

6    A.    Golden years, correct.

7    Q.    We don't need to go back to that.  I would like to look at

8    page 14 of the PowerPoint, I think it is, the next page, the

9    next page, back one, back one, back one.

10        You looked at this slide?

11   A.    Yes.

12   Q.    And you talked about how the gray bars didn't really move

13   much, showing they weren't projecting additional infusions from

14   Treasury of any material amount?

15   A.    Exactly.  That was the purpose of showing both this slide

16   and the table.

17   Q.    And so the next slide, if we look at it, can you tell again

18   the jury, which was the line showing the remaining funding, the

19   amount left on the commitment?

20   A.    I had highlighted that yesterday.  That's the last

21   line, "remaining funding under SPSPA," and that's for both

22   Fannie Mae and Freddie Mac, and I had also highlighted the

23   amounts yesterday.

24   Q.    Mr. Bergman kept bringing you to the number of residual

25   equity.  Did you rely on that when you were giving your

1    testimony to the jury before he examined you?

2    A.    No.   I was focusing on the -- I was really explaining how

3    the remaining funding was unchanged, was more or less unchanged,

4    or very little was used.   That's what I was showing with this

5    slide.

6    Q.   Can we look at what the number is for Freddie Mac,

7    remaining funding, at 2012.

8         What is that number?  Can you tell the jury?

9         In the bottom line, Mr. DeRita.

10   A.    For Freddie Mac, it was $148.3 billion.

11   Q.    You can blow it up, if it's possible.

12        And what is it on this chart at the end of 2022, according

13   to the projection?

14   A.    The same, 148.3 billion, showing no further draw from the

15   Treasury for 10 years.

16   Q.    And then what does it show on the top for Fannie Mae for

17   those two numbers?

18   A.    So for Fannie Mae, I highlighted the 124.8 billion and the

19   118.3 billion in 2022.  And then the difference between the two

20   is 6.5 billion, which is the amount of draw, 6.5 billion in ten

21   years.   That's what I was highlighting yesterday.

22   Q.    And then you made a demonstrative exhibit showing what that

23   looked like in terms of remaining funding.

24        Do you recall that?

25   A.    Yes, I did; I do.

1   Q.   Mr. DeRita, do you have those slides?  We can show it in a

2   minute if they're not ready.  Why don't we instead pull up

3   PX-218, which is the document Mr. Bergman showed you.  Can we do

4   that, please?

5        So this is PX-218, the actual document from the board

6   meeting at Fannie Mae on July 19, 2012.

7        Do you see that?

8   A.   Yes.

9   Q.   If we go to page 19 of this document, do you see that page?

10  A.   Yes.

11  Q.   This page doesn't have any disclaimer about subject to

12  verification or anything, does it?

13  A.   It doesn't have any of those.

14  Q.   Does this show the same thing you were trying to show the

15  jury?

16  A.   Exactly the same thing.

17  Q.   And the next page --

18  A.   Yes.  Sorry.

19  Q.   -- can we now look at the numbers on the bottom first for

20  the remaining funding under Treasury.

21       What are the numbers here for Fannie Mae?

22  A.   Again, the highlighted numbers that I showed are exactly

23  the same, 148.3 billion in 2012, 148.3 in 2022, no draw in ten

24  years, which is what I was showing to the jury.

25  Q.   And what about for Fannie Mae?  Let's look at those.  Here

1  we have in 2012, what is it?

2  A.   Yes.  124.8 billion in 2012, and 118 point --

3  Q.   The 2022 number is a little lower.  Do you see the 2022

4  number?

5  A.   Yes.  116.1 billion.

6  Q.   Does that impact your analysis in any way?

7  A.   Not at all.  Again, the difference is -- compared to the

8  amount available shows that there is simply no risk of running

9  out of the Treasury draw even in ten years, let alone immediate.

10 Q.   Now, if the Court will permit, because Mr. Bergman showed

11 Professor Dharan this different version of the projections than

12 he looked at and we've now had a chance to look at that, I'd

13 like to now show two more versions.

14      One is PX-269.  Could you bring that up, please,

15 Mr. DeRita.

16      PX-269, if you look at the top e-mail, this is an e-mail

17 from Judith Dunn at Fannie Mae dated August 15, 2012.

18      Do you see that?  Do you see that?

19 A.   Yes, I do.

20 Q.   So this is after the July 19th board meeting.

21      Do you see that?

22          MR. BERGMAN:  Objection.  Is this admitted in

23 evidence?

24          MR. HUME:  I'd like to move for admission of PX-269.

25          THE COURT:  What's the number?

```
 1              MR. HUME:  PX-269.
 2              MR. BERGMAN:  I'm sorry, Your Honor.  One second,
 3    please.
 4         No objection.  Thank you.
 5              THE COURT:  Received.
 6         (PX-269 received into evidence.)
 7              MR. HUME:  Thank you, Your Honor.
 8              BY MR. HUME:
 9    Q.   You see the date is August 15, 2012, after the July 19
10    board meeting?
11    A.   Yes.
12    Q.   And you see that Ms. Dunn is sending this e-mail to Timothy
13    Mayopoulos?
14         Do you see that?
15    A.   Yes.
16    Q.   And you recall that he was either the president or CEO of
17    Fannie Mae at the time?
18    A.   Correct.
19    Q.   And it says "attachments:  Treasury slides" with the
20    word "final" in the file name.
21         Do you see that?
22    A.   Yes.
23    Q.   So let's look at what's attached here.  If we go to page 9
24    of the exhibit, we see the same chart we were looking at?
25    A.   The same chart as we most recently looked at.
```

Q.   So can you tell Mr. DeRita what to look at to see if those

numbers on the remaining funding, let's see if they've changed.

A.   Yeah, we can look at -- for Freddie Mac, we can start with,

for 2012, the remaining funding for 2012 was 149.3.  This is in

billions.  And in 2022, it's still 149.3 billion.  So the total

amount is unchanged, just like the earlier slides.

Q.   And now let's look at Fannie Mae, what they're saying.

A.   For Fannie Mae, the amount is 124.8 billion in 2012 and

116.1 billion, which is again a small change -- a little

different from the original one, but given the 125 billion

available, they had used so little in this projection over ten

years.

Q.   Is this document showing something similar or different

from the document you relied on when you were explaining your

testimony and your opinions to the jury?

A.   Very similar.

Q.   Is it consistent or inconsistent with the opinion you gave

the jury?

A.   It is consistent, and I had seen this document in forming

my opinion.

Q.   And this document was sent to the Treasury by Fannie Mae?

A.   I think that's what I saw in the first cover page, from the

name of the --

Q.   Can we look at PX-509, please.  You don't have it?  Okay.

We took the liberty, and I'm not sure we're ready to do it, to

1    take the slides you made and have the graphics vendor make a

2    version for these other documents.

3         I don't know if Mr. DeRita has that.  We have a hard copy

4    of PX-509.  I will give a copy to counsel.

5         Your Honor, may I approach to give the witness a copy?

6         Ms. Jenkins, may I provide this to the witness, PX-509?

7              COURTROOM DEPUTY:  That's fine.

8              MR. HUME:  It's not in evidence yet.

9              COURTROOM DEPUTY:  I know.

10             BY MR. HUME:

11   Q.   PX-509, Professor Dharan, is an August 7, 2012, e-mail from

12   Nicole Frazier to Timothy Mayopoulos.

13        Do you see that?

14   A.   Yes.

15   Q.   Again, the attachment says "Treasury slides."

16        Do you see that?

17   A.   Yes.

18   Q.   And it says, "Attached is a draft of the discussion

19   materials for your meeting with the Treasury on Thursday."

20        Do you see that?

21   A.   Yes.

22   Q.   And so does it look like somebody is sending this to the

23   president or CEO of Fannie Mae for his meeting with the Treasury

24   Department?

25   A.   That's what I'm reading this as.

1   Q.   And let's look at page 9 of this document.

2        Before we do that, Your Honor, Judge Lamberth, may I move

3   PX-509 into evidence?

4              MR. BERGMAN:  No objection.

5              THE COURT:  Received.

6        (PX-509 received into evidence.)

7              BY MR. HUME:

8   Q.   On page 9, do you see that this has the same -- we're not

9   able to put it up on the screen for the jury, but do you see it

10  has the same projections that were in the other document?

11  A.   Same type of projections, yes.

12  Q.   Of several other exhibits?

13  A.   Yes.

14  Q.   What does this one show in terms of remaining funding?  Is

15  it the same or different?

16  A.   Okay.  So again, I will read the Freddie Mac first, just to

17  make sure we are consistent.

18       So the remaining funding available under SPSPA for 2012 is

19  105.2 billion, and then in 2022, 148.3 billion.  So it might

20  be -- the 105.2 might be -- may be intended as 148.3, so

21  essentially unchanged once again.

22  Q.   So again, are these projections consistent or inconsistent

23  with the opinion you gave the jury?

24  A.   They're consistent -- very much consistent with the

25  opinion.

1  Q.   Just explain again, if you would, why the line on these

2  projections showing the amount of remaining funding, the

3  remaining amount of the Treasury commitment, why was that

4  important to your expert opinion in this case?

5  A.   Because the expert opinion, one of my questions was the

6  financial question, this whole question of circular draw, is

7  this going to be a problem and is it going to exhaust the

8  available Treasury funding, and if so -- because that was the

9  reason given by FHFA for doing the net worth sweep, so the

10  circular draw is going to be a big problem, we are going to run

11  out of Treasury funding.

12       So these documents show the Treasury funding remaining.

13  That's what really matters, not the total amount drawn, but the

14  amount remaining from 2012 onward, that was so large, and these

15  projections are showing that it's either unused by Freddie Mac

16  or used a little bit by Fannie Mae over a ten-year period, but

17  leaving almost all of it still available in ten years.

18       So that means that the circular draw is -- is not a

19  problem.  It's just not an issue.  It was not an issue that was

20  highlighted by Fannie Mae.  It was not an issue that was

21  presented to Treasury by Fannie Mae either.

22  Q.   Mr. Bergman also showed you some language in the SEC

23  filings, the 10-Q, 10-K.

24  A.   Yes.

25  Q.   Do you recall that?

1    A.    Yes.

2    Q.    Did you -- did he show you or have you otherwise seen in

3    any SEC filing from 2012 by Fannie Mae or Freddie Mac where they

4    disclosed the risk -- are they supposed to disclose the risks

5    they think the companies face?

6    A.    Yes, they're supposed to disclose potential risk that

7    shareholders should be aware of.  So they give a long list,

8    three, four pages long, lots of bullet points.

9    Q.    Did you see any disclosure of the risk -- of a risk that

10   there could be a material erosion of that available funding

11   amount from the Treasury commitment?  Did you see that?

12   A.    No, they did not have that.

13          MR. HUME:  Your Honor, I have no more questions, but I

14   did neglect yesterday, and Counsel has graciously agreed not to

15   object to my just moving into evidence Professor Dharan's

16   curriculum vitae, PX-424.

17          THE COURT:  Plaintiffs' 424?

18          MR. HUME:  424.

19          MR. BERGMAN:  No objection.

20          MR. HUME:  Perhaps I ought to just simply have the

21   witness authenticate it for the record.

22          THE COURT:  All right.

23          MR. BERGMAN:  There is no objection, Your Honor.

24          THE COURT:  Received.

25          (PX-424 received into evidence.)

1    BY MR. HUME:

2    Q.   Could you, Professor Dharan, simply confirm for the record

3    that PX-424 is an accurate resume of yours?

4    A.   It looks like it.

5    Q.   Can you confirm?

6    A.   It's very long.  So I'm not reading every page.

7    Q.   Can you confirm by looking at it that it's what you

8    prepared as your resume?

9    A.   Yes.

10         MR. HUME:  No further questions.  Thank you, Your

11   Honor.

12         THE COURT:  All right.  You can step down.

13      Next witness.

14         MR. RUDY:  Good morning, Your Honor.  We're going to

15   be presenting deposition testimony in the format of having

16   someone sit on the stand and doing it in that format.  I think

17   earlier, you promised the jury this would put them to sleep.  So

18   I think we will be able to test that hypothesis.

19      So we're calling Susan McFarland, or an actor playing

20   Susan McFarland.

21         THE COURT:  All right.  She's going to read this as

22   though she's the witness.  The witness is not available.  In

23   civil cases, the subpoena power of the court is 100 miles,

24   generally.  In criminal cases, I can order anybody in the

25   country to appear, but in civil cases, we have more limited

```
 1    power to order witnesses to appear.
 2            MR. RUDY:  Your Honor, one other clarifying note:  I
 3    will be asking a series of questions, and then one of the
 4    defense lawyers will be asking a series as well.
 5            THE COURT:  Okay.
 6        (Deposition testimony of Susan McFarland read into the
 7    record as follows.)
 8                        DIRECT EXAMINATION
 9        AS READ BY MR. RUDY:
10    Q.   Would you state your name for the record.
11    A.   Susan McFarland.
12    Q.   When did you graduate from college?
13    A.   1983.
14    Q.   Okay.  And where did you go?
15    A.   Texas A&M University.
16    Q.   And what was your degree in?
17    A.   A bachelor of business administration in accounting.
18            THE COURT:  If this was real life, I would say, Why
19    would you go to Texas A&M?  It's not real life, so I have to
20    resist my normal comment.
21            AS READ BY MR. RUDY:
22    Q.   And after you graduated from A&M, where did you go?
23    A.   I came to Houston to work with Deloitte Haskins & Sells.
24    Q.   And what were you doing for Deloitte?
25    A.   I was an auditor.
```

1  Q.    Okay.  And what kind of -- type of companies did you audit?

2  A.    Predominantly financial institutions and governmental

3  entities.

4  Q.    What sort of governmental entities?

5  A.    The Port of Houston, the City of College Station, Humble

6  Independent School District, and Kathy Independent School

7  District.

8  Q.    Okay.  And then what sort of financial institutions?

9  A.    It was -- the largest one I worked on was the Bank of the

10  Southwest, which ultimately became mBank, mBank Houston.

11  Q.    Okay.

12  A.    That ultimately became a part of Bank One.

13  Q.    Okay.  And how long did you stay on with Deloitte?

14  A.    I left Deloitte in February of 1986.

15  Q.    Okay.  And where did you go after that?

16  A.    To work for what was then mBank Houston, one of my clients,

17  my largest client.

18  Q.    Okay.  And how long did you stay on with mBank?

19  A.    Well, mBank failed and was put into receivership with the

20  FDIC in March of 1989.  It subsequently was acquired by Bank One

21  January 1st of 1990.  I continued on through that and then thus

22  became an employee of Bank One.

23  Q.    Uh-huh.

24  A.    I then did several different roles in finance with the

25  retail bank and ultimately became the CFO of the retail bank for

1    Bank One.

2    Q.   Would that have been in the '90s or --

3    A.   It would have been like '99, 2000, somewhere in that

4    vicinity.  I'm sure I could look in my records and give you a

5    precise date.

6    Q.   Close enough.  Okay.  So continue on.

7    A.   And then I left Bank One in the fall of 2002 to join

8    Capital One.

9    Q.   Okay.  And how -- and what was your role at Capital One?

10   A.   Initially, I was chief financial officer for all of the

11   operations and infrastructure and administrative groups, as well

12   as CFO for the legal entity bank.

13   Q.   Go ahead.  And how long did you stay with Capital One?

14   A.   Until I left in 2011 to join Fannie Mae.

15        Now, my role when I left Capital One, I was executive vice

16   president of finance, principal accounting officer.  I was in

17   charge of all accounting, tax, corporate finance, which was all

18   the planning and forecasting, procurement, offshore risk, and a

19   few other odds and ends.

20   Q.   Did you have any contact with anyone at FHFA while you were

21   going through the hiring process?

22   A.   Yes.

23   Q.   And do you happen to remember who that was?

24   A.   I met with Acting Director DeMarco.

25   Q.   Okay.  And what did he tell you?

A.   Well, it was a part of the, you know -- a part of the
meeting was for him to, if you will, interview me and determine
whether he was comfortable with the company hiring me as CFO.
And part of it was for me to benefit from, you know, gaining his
perspective on the situation with the GSEs at that point in time
and what the expectations of a CFO of the GSEs might be with
respect to that.

Q.   Okay.  What were the expectations?

A.   Well, I can say my primary goal.  I really came in thinking
about three key things I wanted to accomplish or have -- you
know, make a material positive impact on.

   One, first and foremost, was to improve the financial
performance of the enterprise.  Quite frankly, that's what a CFO
should do, whether at Fannie Mae or any other entity.

   Two, there was a lot of conversation at the time and debate
about the future of the housing market and, you know, the roles
of the GSEs, and I was interested in being a part of that debate
and conversation and perhaps might provide some perspective or
ideation that might be useful.

   And then lastly, in the conversations that I have had with
individuals at Fannie Mae, it was clear to me that there were
some antiquated infrastructure that exists within the company
and certainly within the financial organization.  There was an
opportunity to improve that infrastructure and make things go a
lot easier and more efficient to operate on a go-forward basis.

1    Q.    And when did you leave Fannie Mae?

2    A.    Mid-2013.

3    Q.    And why did you leave?

4    A.    A number of different reasons.  I felt like, one, the first

5    objective of improving the financial performance had been

6    improved -- had been achieved, that Fannie Mae was on strong

7    financial footing and had been delivering profits consistently

8    for several quarters in all of the forecasts we were preparing

9    and that I was reviewing, and it looked like it was going in a

10   very positive direction financially.

11          Two, it was clear, because of other political priorities,

12   the timeline on housing reform was going to be well into the

13   future.  And so if you were going to be able to have a

14   meaningful part in that, you would be -- need to be in it for

15   the long haul, for a long time.  So that obviously causes one to

16   ask a question of, Okay, to be or not to be.

17          We had kicked off a number of infrastructure improvement

18   projects, and those were underway on the third piece.

19          So that on the professional side.

20   Q.    Okay.  And do you recall whether the FHFA essentially

21   instructed Fannie Mae, This is how it will be accounted for?

22   A.    My recollection is that there was open conversation, and

23   after all involvement and input from all parties, being the

24   enterprises, FHFA, and I presume Treasury, a decision was made

25   and a conclusion reached, and we were not uncomfortable with

1    that conclusion.

2    Q.    So were there instances where someone at FHFA provided a

3    directive to Fannie Mae about an accounting item?

4    A.    No.  And quite frankly, if they had directed me, if I

5    didn't agree with that, that it was the appropriate accounting,

6    I would not have done it.

7    Q.    Okay.

8    A.    My integrity as an accountant, as a CPA, is far more

9    important.  I would never do anything that was not correct,

10   period.

11   Q.    Okay.  And now, one of your -- do you have people who

12   worked for you at Fannie Mae who were responsible for putting

13   together projections of profitability?

14   A.    Yes.

15   Q.    Who headed up that team?

16   A.    Anne Gehring was head of planning.

17   Q.    And -- sorry.

18   A.    So she and her team prepared and compiled the forecasts

19   with inputs from a variety of areas from Fannie Mae.

20   Q.    Who would provide her with input?

21   A.    Probably one of the most significant inputs, which was our

22   loan loss projections, came from Lesley Deich, who was also a

23   direct report of mine that headed the modeling and analytics

24   group.  And that's where we would analyze and model out our loan

25   loss expectations.  That was a significant contributor to the

1  forecast.

2       Anne also had finance -- members of her finance team that

3  were assigned to all of the different areas of Fannie Mae, and

4  they, in working with management in those areas, would provide

5  input into the forecasts based on their area of responsibility.

6  So, you know, multifamily would provide its projections on what

7  its portfolio was expected to do over time, and that would be an

8  input in the process.  Single family would provide expectations

9  of volumes and G fees and rates and a sundry other key factors

10  that would then be used to build the forecast, as an example.

11  Q.   In light of this process where you have different managers

12  feeding into the team that worked for you to put together these

13  projections, would it be fair to say that an outsider trying to

14  project Fannie Mae's profitability would not have had access to

15  the type of detailed information that your team had access to?

16  A.   It would be very difficult for someone to have access to

17  all the information that we clearly had access to inside the

18  company.

19  Q.   Do you think your team was making the best projections of

20  anyone who was trying to forecast Fannie's future profitability?

21  A.   Yes.  In hindsight, I think that proved out to be the case,

22  proved to be so.

23  Q.   Okay.  Now, why was Fannie Mae producing these projections?

24  A.   It was a normal -- I produced quarterly forecasts at Bank

25  One.  I produced quarterly forecasts at Capital One.  It's a

1   fairly normal thing that large enterprises do in order for

2   management to have a perspective on what the future of the

3   company might be, and that might make decisions and actions that

4   management may take or want to take.  It can also help inform

5   other constituents as to what the expectations of performance

6   would be for a company.

7        So Fannie Mae was no different from the companies I had

8   worked for previously.  So we -- we would prepare forecasts on a

9   quarterly basis and then update the FHFA and the Treasury on

10  what our expectations for the performance were.

11       Also, those forecasts might inform disclosures that we

12  might want to make within our public filings.

13  Q.   In 2012, did anyone at Treasury tell you that your

14  projections at Fannie Mae were too optimistic?

15  A.   No.

16  Q.   Did anyone at FHFA in 2012 tell you that Fannie Mae's

17  projections were too optimistic?

18  A.   No.

19  Q.   What is a stress test?

20  A.   Okay.  In a general sense, a stress test would be to put

21  different assumptions in.  Normally, if you're stressing them,

22  you're generally stressing them to the negative, so put more

23  conservative assumptions in and determine how much that might

24  impact future performance if in the event the stress scenario or

25  stress event were to come to pass.

1    There was an official term, stress test, that was used as a

2    part of the target process with banks that I am very familiar

3    with, because we performed those stress tests at Capital One,

4    and I was in charge of forecasting.  So I had responsibility or

5    participation in that process.  But it falls within that same

6    kind of generic definition.

7    Q.    And now, you have mentioned loan loss reserves as being an

8    important component of Fannie's future profitability.

9          What were other key drivers behind Fannie's profitability?

10   A.    Yeah, I said loan losses.

11   Q.    Oh.

12   A.    So you project loan losses.  Part of how that then shows up

13   in the results is how you set your reserves.  Part of it is just

14   your expectation of charge-offs on loans.  The loan loss

15   incorporates reserve settings, as well as charge-off activities,

16   as well as costs associated with loan workouts.

17   Q.    So other than those loan losses, what are the other key

18   drivers that were behind Fannie's profitability in 2012?

19   A.    What the level of G fees would be over time, what the

20   volume of new originations would be over those same periods of

21   time, what the value of the owned portfolios is, the investment

22   portfolio and the valuations might be over time dependent on

23   market movements and costs while -- you know, costs were not

24   insignificant at Fannie Mae.

25         When you look at costs or expenses, not interest expense,

1  noninterest expense, I want to be very clear on that.  It is

2  actually a relatively small piece of Fannie Mae's financial

3  position.  So we did spend time, you know, projecting

4  noninterest expense.  You need a holistic picture, but it was

5  not a significant mover of the bottom-line profit of the

6  company.

7  Q.   Okay.  And the housing market, was that relevant?

8  A.   The housing market was very relevant in projecting your

9  loan losses --

10  Q.   Okay.

11  A.   -- and to some extent a little bit on what you expect

12  origination activity to be in the future.

13  Q.   Okay.  Now, you mentioned noninterest expense.  Let's talk

14  about interest expense.

15  A.   Yes.

16  Q.   That was the big expense for Fannie Mae?

17  A.   Correct; correct.

18  Q.   Okay.  And that -- so Fannie's cost of capital would be

19  important in terms of projecting future profitability; is that

20  right?

21  A.   Fannie had no capital.  So I want to be clear, based on the

22  nature -- you know, pre-Third Amendment, the capital levels were

23  de minimis because up until shortly before that time, Fannie was

24  having to draw to stay positive with positive net worth.

25  Subsequent to the amendment, the amendment capped the amount of

1  retained capital that the enterprise had.

2      Having said that, noninterest expense is really the cost of

3  funding the assets of the company, most notably the -- the owned

4  investment portfolio and the on -- the guarantee loan book of

5  business and the multifamily loans.  But a lot of the interest

6  expenses associated with that was more or less set and locked in

7  at the time those loans were originated.  So that was not a

8  difficult time to forecast.

9  Q.  Okay.

10  A.  It was large, but not a difficult -- a hugely difficult

11  forecasting item.  It did not require a significant amount of

12  judgment.

13  Q.  Okay.  And during this time period, you know, from

14  graduation at A&M through the end of your tenure at Capital One,

15  did you ever encounter the concept of a deferred tax asset?

16  A.  Yes.

17  Q.  So you knew what that was?

18  A.  Yes.

19  Q.  What is a deferred tax asset?

20  A.  Basically timing differences between when you recognize

21  items for tax purposes versus when you recognize items for GAAP

22  earning purposes.

23  Q.  Is one example of that a net operating loss carryforward?

24  A.  It can be.

25  Q.  Okay.  And when you arrived -- when did you arrive at

1   Fannie Mae?

2   A.   The middle of 2011.

3   Q.   Okay.  And when you arrived, did Fannie Mae have net

4   operating loss carryforwards?

5   A.   Yes.

6   Q.   And was there a reserve on its balance sheet against those

7   net operating loss carryforwards?

8   A.   Yes.

9   Q.   Okay.  And was that because at the time the company had

10  made a decision that it was more likely than not they wouldn't

11  be able to use the NOLs?

12  A.   Correct.

13  Q.   Yeah.  And was your reaction when you learned -- you

14  learned of a Third Amendment a couple of days beforehand; is

15  that right?

16  A.   Correct.

17  Q.   All right.  And what was your reaction to it?  Did you

18  think it was the effective nationalization of the companies?

19  A.   No, I didn't view it as nationalizing.  It borders on that,

20  I can see, but I had shortly before that had a meeting with

21  Treasury whereby we reviewed our forecasts.  I had expressed a

22  view that I believed we were now in sustainable profitability,

23  that we would be able to deliver sustainable profits over time.

24       I even mentioned the possibility that it could get to a

25  point in the not-so-distant future where the factors might exist

```
 1    whereby the allowance on the deferred tax asset would be

 2    released.  We're not there yet, but, you know, you could see

 3    positive things occurring.

 4         So when the amendment went into place, part of my reaction

 5    was that they did that in response to my communication of our

 6    forecasts and the implication of those forecasts, that it was

 7    probably a desire not to allow capital to build up within the

 8    enterprise and not to allow the enterprises to recapitalize

 9    themselves.

10    Q.   With whom at Treasury did you have this meeting?

11    A.   So the -- which meeting?

12    Q.   The one you just referenced where --

13    A.   Where I had the discussion about the forecasts?

14    Q.   Yes.

15    A.   So it was common practice for us to meet with Treasury on a

16    quarterly basis to review our results from the past quarter and

17    to update them on our forecasts, our updated forecasts.  And

18    that meeting, I don't remember every specific person in the

19    meeting.  I was there.  Tim Mayopoulos, who was CEO of Fannie

20    Mae, was there.  Dave Benson, I think, would have been there.

21    He was the treasurer of Fannie Mae at the time.  That would have

22    been normal for him to have been in attendance.  Mary Miller,

23    the Secretary of the Treasury, was there.  Tim --

24    Q.   Bowler?

25    A.   Thank you.  I believe he was there.  He was normally at
```

1    those meetings.  I believe there was a gentleman, and I can't

2    remember his name, who used to work at Fannie Mae that was now

3    at Treasury that was like a financial analyst.  I think he was

4    there, because he knew part of the topic we wanted to talk about

5    was these projections.

6         And then there was probably other members of, excuse me,

7    FHFA, the U.S. Treasury, and Fannie Mae to talk about some other

8    topics that were going to be covered in that meeting.  Normally,

9    we reviewed financials, but there were -- there might be one,

10   two, three other topics that would be discussed.  And both

11   Fannie Mae and Treasury would make sure they had the personnel

12   around the table to facilitate those conversations.  I don't

13   remember in this particular meeting what those topics were and

14   who those individuals were.

15   Q.   Okay.  So would it be fair to say there were at least five

16   or six Treasury officials at this meeting?

17   A.   Probably, yes.

18   Q.   Okay.  And did the meeting take place at Treasury?

19   A.   Yes, it did.

20   Q.   And was this within less than a month before the net worth

21   sweep?

22   A.   I believe it was the week before.

23   Q.   Okay.

24   A.   It was very -- it was within the week or two.  It was very

25   close to.

1    Q.   And would this -- how would this have been set up?

2    A.   Normally, Dave Benson was our primary sort of liaison

3    between the company and the Treasury.  And these meetings were

4    generally scheduled the day -- you know, because they were -- we

5    had the regular kind of quarterly meetings, and there might be

6    some other meetings of, you know, specific topics that would

7    occur between those meetings, between those other meetings.

8         I don't know -- I can't recollect exactly, you know,

9    whether we would initiate setting it up or Treasury would

10   initiate setting it up.  I don't know how the logistics all

11   worked out.

12   Q.   And when you were making your presentation, did you have a

13   PowerPoint you were using?

14   A.   A few pages, yes, from a PowerPoint.

15   Q.   Did you ever have a similar type of conversation with

16   anyone at the FHFA about the deferred tax asset prior to the

17   Third Amendment?

18   A.   Yes.

19   Q.   Okay.  Tell me about that meeting.

20   A.   Well, I don't -- so just as we -- you know, we had a

21   formally -- a formal quarterly sit-down with Treasury, we had

22   more regular interactions with the individuals at FHFA.

23        So one, either Jeff Spohn and/or Brad Martin would attend

24   our executive committee meetings.  So generally, anything I was

25   going to say to Treasury I was already telling the executive

1    committee, and Brad or Jeff would have been present at those

2    meetings.  And as such, my reviews of actuals and forecasts and

3    even the raising of the potential that the allowance might be

4    reversed in the not-so-distant future, I would have mentioned it

5    in an executive committee meeting, and Jeff and/or Brad would

6    have been present to hear that.

7    Q.   Just to be clear on that, that would have been within a

8    month of the Third Amendment?

9    A.   It would have been prior to that.

10   Q.   Yes.

11   A.   Because it's all part of the discussions we have through

12   the quarter-end close process and forecast preparation and board

13   prep and all that kind of stuff that takes place in that cycle.

14   Q.   Just so the record's clear, when you say "prior to that,"

15   what period would that have been?

16   A.   Well, it would have been probably -- I would suspect that

17   it was something that occurred in July would be my -- because of

18   the timing, you know.  You're closing the books for the second

19   quarter.  We're prepping for the upcoming board meetings,

20   getting the forecasts done, letting the team know when the

21   results are coming out for the quarter.  All those kinds of

22   conversations would happen internal at Fannie Mae before we

23   would ever have that conversation with Treasury.

24   Q.   Okay.  And I'm sorry I interrupted you.  You described

25   these --

A.   And then with the -- we all -- so we cannot file our Q

unless DeMarco gave us permission to file the Q.  So drafts of

our filings were also provided to FHFA first.  They had the

opportunity to provide feedback, and then we could incorporate

that feedback and then got approval for the final filings.

We also had a press release that would go along with --

when we filed a Q, we would go out with a press release.

There's where you might see a little more color.  Normally, it

would be a quote for the CEO, like Tim, and a quote from me, and

we would also preclear that press release with FHFA before

issuing the press release.

As far as -- I believe during 2012, I began to signal --

there began to be some public communication as to our view that

things were starting to look good and starting to head in a

positive direction.  I would have to refresh my memory through

documents as to the timing of what I said and when, but I know

through the course of early 2012 and throughout that summer the

messaging was getting a bit more and more positive that we were

sending out.  And certainly, FHFA was aware of our

communications, our external communications in that regard.

As far as the deferred tax asset, I don't recollect that we

had some big formal meeting to break the news to them.  Okay?  I

believe that was just something that we talked about in the

normal course of keeping them informed about kind of what we're

seeing.

1       And so Jeff Spohn and/or Brad Martin would attend our board

2   meetings.  So they would also hear the same comments I was

3   making to Treasury I was making to board.

4   Q.   Okay.  In the same timetable?

5   A.   I don't remember exactly when the board meetings were

6   within that window, but it would have been board meetings

7   shortly before that that I would have reviewed this very same

8   information.

9   Q.   Okay.  And when you say that you would have had dialogue

10  with people at FHFA about the deferred tax assets, with who

11  would you have had that dialogue?  Would that have been Mario

12  Ugoletti?

13  A.   Yeah.  So early on, it's probably through the chief

14  accountant's office of the FHFA, because it's a technical

15  accounting matter.

16  Q.   And do you happen to recall --

17  A.   I can pick him out of a line-up.

18  Q.   Okay.  We will show you some names later on.

19  A.   I tell you, ask me a number, I can probably give it to you.

20  People's names.  It would have started there.  Eventually, there

21  were conversations with Director DeMarco and key direct reports

22  of his, but that -- the -- those -- the DeMarco conversations

23  occurred when we were actually in the serious mode of

24  potentially -- when we were looking -- when we did a full

25  analysis at the end of the second quarter, no release.  We did a

full analysis at the end of the third quarter, no release.  When

we were doing the analysis for the fourth quarter of 2012, we

started to get to a point where we were tipping towards release.

And that's when I began to have conversations with more senior

folks at FHFA on it.

I mean, in general, I put it on people's radar screens that

it's something that could happen in the not-so-distant future.

I will say that I believe Mary Miller asked me in this meeting

about how large it would be and did I have any idea of when.

Q.   Yeah.

A.   And I believe my response was around 50 billion, but that

that could be larger or smaller, depending on when.  The further

out in time it is, the smaller it probably would be.  It is part

of the evidence that it might be good.  So the further out in

time that it would be released, the smaller the release size

would be.  But I said probably in the $50 billion range and

probably in some time mid-2013 at that time when I met with them

in late July, early August of 2012.

Q.   And FHFA was on notice that you had sent this message to

Treasury?

A.   Yes.

Q.   And they were on notice of that fact before the Third

Amendment; is that right?

A.   Yes.

Q.   Okay.  Did you take notes of this meeting?

1   A.   No, I don't generally take notes in these types of

2   meetings.

3   Q.   Would there have been anyone on your team who would

4   typically take notes in those meetings?

5   A.   No one from my team was present.  In other words, nobody

6   from the finance team was present at the meeting other than me.

7           MR. RUDY:  Your Honor, I want to pause.  There's

8   several documents that we're going to be moving in and showing

9   the witness.  I know these are all consented to by defendants,

10   and I will give Ms. Jenkins a list.

11       It's PX-135, 121, 147, 213, 223, 222, 229, 238, 248, 453,

12   480, 481, 483, 469, 473, 490, and 488.  I believe these are all

13   with consent from defendants.

14           MR. BERGMAN:  Yes, Your Honor.

15           THE COURT:  Without objection, they are all admitted.

16       (PX-135, PX-121, PX-147, PX-213, PX-223, PX-222, PX-229,

17   PX-238, PX-248, PX-453, PX-480, PX-481, PX-483, PX-469, PX-473,

18   PX-490, and PX-488 received into evidence.)

19           MR. RUDY:  Mr. DeRita will be displaying them as if

20   the witness was testifying live.

21           AS READ BY MR. RUDY:

22   Q.   Okay.  Ms. McFarland, I'm going to be showing you some

23   documents today, and you're free to sort of flip through them.

24   But I will generally be directing your attention to a specific

25   passage.

1        I would like to ask the court reporter to mark as

2    Plaintiffs' Exhibit 135.

3        All right.  So these are minutes of a meeting of the board

4    of directors of Fannie Mae on November 18, 2011.  We can see

5    that in the third paragraph that Jeff Spohn of the FHFA was

6    there, and we can see that in that same paragraph that you were

7    there.

8        And if you would be kind enough to turn to page 3087, it's

9    the carryover paragraph, and it's four lines from the bottom of

10   that carryover paragraph.

11       It says, "The board discussed longer-term forecasting and

12   key sensitivities, as well as the ability to utilize net

13   operating losses for tax purposes."

14       Is this a reflection of the fact that the board was briefed

15   on the ability of the companies to use their NOLs?

16   A.   Is it up?  Yeah.  It's a reference to under what conditions

17   might be some or all of the DTABs be good.

18   Q.   Okay.

19   A.   And I don't remember the specifics that we had discussed at

20   that point in time other than that it was -- it's a material

21   item for the company.  So it is something that we would

22   periodically, you know, review and discuss in normal course.

23   And then obviously, as we got closer to, you know, the potential

24   to release the allowance, those discussions picked up.

25   Q.   Okay.  When you said might be to the good, that's a way of

1    saying that the valuation allowance might be reversed?

2    A.   Yes; correct.

3    Q.   In any event, now, you said "periodically."  Was the DTVA

4    when you first got there being reviewed on at least a quarterly

5    basis?

6    A.   It would be.  From an accounting perspective, we reviewed

7    it every quarter, because we have to make a determination every

8    quarter whether or not the allowance should stay on or be

9    released.

10   Q.   And who on your team was advising you on that issue?

11   A.   Well, so Vickie Lyons was head of tax at the time we really

12   started, you know -- later in my time there.  I can't remember

13   if she was head of tax at the start.  Okay?  She worked under

14   Chryssa Halley.  Chryssa Halley was a senior accounting manager

15   reporting directly to me.  Chryssa had significant tax

16   experience herself.  So she was heavily involved in all of the

17   discussions around the DTVA.

18       And most of my conversations around the DTVA involved Greg

19   Fink as comptroller, Chryssa Halley, sometimes Kirk Silva, who

20   is the accounting policy manager, and then Vickie Lyons, who is

21   head of tax.

22   Q.   Okay.  So then would they -- someone then brief the board

23   on this issue as to whether the deferred tax valuation allowance

24   was going to be reversed?

25   A.   On a quarterly basis, we wouldn't necessarily explicitly

1    say, you know, cover that with the board.  We would talk to the

2    board if, in the event we thought there was something of note

3    that we should bring to the attention of -- or if members of the

4    board happened to ask questions about it.

5         Normally, you know, I would be there, and if it were asked

6    in the audit committee, it was normal for Greg Fink as

7    comptroller to be at most of the audit committees.  But at full

8    board, Greg may or may not have been there.

9         When we got to the point where we were beginning to signal

10   that things were going in a direction that that might be

11   possible, I did have Chryssa come and review the deferred tax

12   asset, what it was, you know, a key -- sort of a board education

13   piece, as well as talk about the key types of factors that the

14   company would need to look at in making a determination as to

15   whether or not the allowance should be kept or released.

16        And then again, as we moved through that process and got

17   closer to making the determination to release it, Chryssa

18   continued to have interactions with the board on the subject.

19   Q.   And was the process one of collaboration between the

20   individuals you've mentioned, you know, thinking about that,

21   looking at the relevant factors, applying those factors to the

22   facts as they saw it, and then reaching a group agreement?

23   A.   Yes.

24   Q.   Okay.  And did initially the FHFA say we don't want you

25   making the reversal when you were initially inclined to do so?

1  A.   When we first -- when I first brought it up, sort of

2  brought it up that there was a possibility in the not-so-distant

3  future, there wasn't a whole lot of don't do it.  It was more of

4  keep us informed.

5  Q.   Okay.

6  A.   It was a thanks for the heads-up type of -- I'm

7  paraphrasing.  But when we started to see the momentum of the

8  positives building and getting to a level where the timings

9  might be sooner than I had previously signalled -- because

10  remember, I had kind of said, oh, mid-2013.  And when we started

11  to assess it in the normal course of what we do every quarter

12  for the fourth quarter of 2012, we started to go whoa, wait a

13  minute.  We had begun to see a lot of those positives -- a

14  number of the positives increase and the magnitude of those

15  positives increase.

16      So if you think about it as a scale and you've got

17  positives weighing on one side of the scale and negatives on the

18  other, we started to see tilting.  FHFA, I began to get the

19  impression that they would rather we not release at the end of

20  2012.

21  Q.   Because of the impact on the funding commitment?

22  A.   Yes.

23  Q.   Now, the periodic commitment fee, do you recall there being

24  any discussion while you were at Fannie Mae about the amount of

25  the periodic commitment fee?

1    A.   The main discussions were that they were continuing to

2    waive our need to pay the commitment fee.

3    Q.   Okay.  Was the commitment fee regarded by yourself as

4    akin -- not the commitment fee, but the commitment itself as

5    akin to a line of credit?

6    A.   Yeah.  I mean, obviously, the preferred stock purchase

7    agreement provides for funding -- access to funding in the event

8    certain conditions exist.  One could say it's not dissimilar to

9    some forms -- you can call it a line of credit, or you can call

10   it an LC, a letter of credit, because it's a little bit more if

11   you draw in the event certain conditions exist.  Whereas, a line

12   of credit is open-ended as to where one can draw and pay down

13   what-not on it.

14       So yeah, the commitment fee would probably be very similar

15   to fees that you would see structured into those types of

16   instruments.

17   Q.   And are those types of fees generally calculated as a

18   percentage of the outstanding commitment?

19   A.   I would say for letters of credit and lines of credit in

20   the normal ordinary course of banks' dealings with customers,

21   since I have a lot of banking experience, that would be a

22   customary structure.

23   Q.   Okay.

24   A.   Yes.

25   Q.   All right.  Did anyone at FHFA or Treasury tell you that

1    the periodic commitment fee would be incalculably large if they

2    didn't waive it?

3    A.    No.

4    Q.    Okay.  And now I'd like to mark this next exhibit as

5    Plaintiffs' Exhibit 121.  This document says, "Senior Preferred

6    Stock Purchase Agreement:  Treasury Draw Projections,"

7    October 24, 2011, Financial Planning and Analysis."

8         Who is in charge of the financial planning and analysis of

9    Fannie at this time?

10   A.    I believe it was Anne Gehring reporting to me.

11   Q.    And then if we turn to page -- I'm going to refer to these

12   numbers, these little numbers at the bottom right -- 105135.

13   It's the 13th.

14   A.    Okay.

15   Q.    And it shows projections of total net income.  And if we

16   look at 2020 out through 2026, in this document, Fannie is

17   projecting profits of about 10 billion a year; right?

18   A.    Yes, this document says that.

19   Q.    Okay.  And do you believe as of October 2011 that that was

20   a reasonable long-term projection of profitability for Fannie?

21   A.    Yes.

22   Q.    And if we look at this, is it fair to say that you at this

23   time, October 2011, really thought that 2013 and then maybe

24   going into 2014 was going to be a turning point for Fannie's

25   profitability?

A.   The projections that existed at that time, based on this
document, show that profitability starts to show up in 2013.   I
mean, that's what this particular forecast indicated.

Q.   Yes.  Do you recall anyone at FHFA ever criticizing any of
the projections of future profitability that Fannie was making
in 2011 and 2012 up through the time of the net worth sweep?

A.   My recollection is that there wasn't criticism.  There were
questions.  There were cautions.  In other words, you know,
let's not forget that -- you know, that a lot of bad things have
happened.  Right?

     And you know, with some history in mind, when the declines
were occurring, the degradations were occurring, the company was
having a hard time keeping up with the face of the degradations.
As a result, the forecasts that the company had been producing
prior to my arrival -- and I'm basing this on what I had been
told, so I don't know if it's relevant here or not -- that the
actual outcomes tended to be a little worse than what the
company had been projecting.

     But when I got there, we focused very heavily on trying to
continue to improve the quality of the forecasts.  And I think
if you look at the actual results vis-à-vis a lot of the
forecasts that we were producing, you would see the results and
forecasts being more in alignment.  In fact, it improved over
time.

     Having had experience at other companies, that's not

1    unusual that it's hard to catch up with trends, whether that's

2    negative trends or positive trends.  So if some things are going

3    bad, sometimes it's hard to catch up with how bad.

4         And, you know, but on the flip side, when things start to

5    turn good, sometimes it's hard to catch up with how fast and the

6    magnitude of the tail winds and how much things are going to

7    improve and just how fast.  So that's not a unique thing to

8    Fannie Mae.

9         I just remember there being some general discussions about,

10    you know, are we -- you know, let's not forget that there have

11    been times in the past where the forecast didn't reflect all the

12    badness that ultimately occurred.  Right?

13    Q.   And if someone had come to you on the eve of the net worth

14    sweep and said to you, I think Fannie Mae is going to lose

15    $13 billion in 2012, do you think that would have been an

16    unreasonable statement of future probability as of August 2012?

17    A.   In the first quarter -- here's where my numbers

18    recollection comes in versus my names recollection.  I believe

19    we made 2- to $3 billion in the first quarter of '12.  I think

20    Fannie Mae was $6 billion in the second quarter of 2012.  I'm

21    sure we can go look at publicly available documents to determine

22    whether I was right or not.

23         So let's say the total profit to date after June 30th was

24    8- to $9 billion.  So if someone said we're going to lose

25    13 billion, that would mean we would have to have a pretty big

1       loss, a substantial loss during the latter part of the year that

2       would have had to have been greater than the loss we had for all

3       of 2011.

4           I -- certainly, that was not what we were expecting.

5       That's not anywhere close to what our projections were showing.

6       They -- that was not in any way, shape, or form what we had

7       reviewed with Treasury and FHFA at that point in time.

8           So if someone had come to me, I would say, Okay, tell me

9       what I missed.  What is it that you think is going to happen in

10      the last few months of the year that's going to completely wipe

11      out the profits we've already posted, and then, you know, take

12      it another further 13 billion in the red?

13          I would have had a hard time.  I can't think of situations

14      that could happen that would cause that outcome to be so.

15      Q.   Okay.  If you were making an important financial decision

16      for Fannie Mae's future on the date of the net worth sweep,

17      would you have relied on projections from September 30th of

18      2011?

19      A.   The reason we did updates to the forecast quarterly were so

20      we could have, you know, fairly current perspectives from which

21      to make decisions on.

22      Q.   Why was it important to have a fairly current perspective?

23      A.   The situation was very fluid.  A lot of things were

24      changing and quickly.  So things could become very dated very

25      quickly in that particular environment at that particular time.

1  So it was very important to ensure we were picking up goods and

2  bads that were happening as quick as we could, we recognize

3  them, and we could consume them into our projections.

4  Q.   So but you said there were goods and bad.  If we look at

5  the period from September 30th, 2011, to the date of the net

6  worth sweep, the goods outweighed the bad insofar as -- you

7  know, these projections that Fannie put together in Plaintiffs'

8  Exhibit 121 showed a projected loss of $2 billion or so for

9  2012, and yet, you had -- and had made almost 8 billion halfway

10  through the year; is that right?

11  A.   There were a lot of things that moved in a positive

12  direction between September of 2011 and late July, early

13  August 2012.  You can look at publicly available information.

14  Look at the home price index as it was published out there and

15  how much those changed during that period of time.

16      Fannie does produce its own home price index, but you can

17  look at nonpublished information, and you can see improvements

18  in projections coming from third parties during that period of

19  time.  You can look at average loss statistics on different

20  work-out situations.  You can look at how much G fees changed

21  during that period of time.

22      If you look at what existed in September '11 and you

23  compared it to what existed in mid- to later summer of 2012,

24  there's a number of key factors that moved in a positive

25  direction during that period.

Q.   Okay.  And those positive developments outweighed any

negative developments in that time period on balance?

A.   Our forecast attempted to incorporate all of those changes,

good and bad.  And the outcomes, you can see, improved.  So the

collective, if you -- so if you said we added up all the puts

and takes in a quantifying fashion, then the net benefits

outweighed the net negatives.

Q.   So Fannie Mae has, I think it was your words, no capital

essentially on its balance sheet in 2011, and yet, they're

making dividends payments, is that right, to the government?

A.   Yes.

Q.   And was there ever any discussion at Fannie Mae that we

don't have any capital and yet we're being forced to make

dividend payments?  Did anyone ever discuss that somewhat

anomalous state of affairs?

A.   There was conversation about the -- our irony and the fact

that we had to draw money to pay it right back to Treasury.  So

we had to borrow money from Treasury to pay them their dividends

for a period of time where the company was not profitable.

Q.   Although you did say there was -- you mentioned an irony.

Who were those discussions with?  Tim Mayopoulos?

A.   I mean, what I would call these was kind of hallway

conversation types of things.  And it wasn't just a single

conversation.  It could be relatively junior people at the

company, you know, anybody that was sort of familiar with the

1    mechanics of how it worked.  There's certainly a number of

2    individuals that kind of took notice of the fact that there was

3    this sort of, you know, like a hamster on the wheel.  You borrow

4    to pay to borrow to pay.  And the more we borrowed to pay, the

5    more we had to pay in dividends, because the more we -- the

6    amount we drew up on -- the more the amount we drew on went up

7    and the more dividend, you know.  So it had compounding dividend

8    implications.

9    Q.    And at the time of the net worth sweep, did you feel that

10   Fannie Mae was in a death spiral?

11   A.    No, I did not think Fannie Mae was in a death spiral in

12   mid-August 2012.

13   Q.    Why not?

14   A.    The company was making money.  The projections that I had

15   been involved in and reviewed and felt comfortable with seemed

16   to indicate that there was a good chance that the company would

17   continue to make money.  There were a lot of things that were

18   improving within the company, and I felt the company was on a

19   positive trajectory.

20   Q.    So the next one is going to be Plaintiffs' Exhibit 147.

21   This is an e-mail from January 12, 2012.  The subject is "Fannie

22   Mae Executive Management Meeting of January 9, 2012."  And then

23   if we turn to the second page under "2012 financial plan," it

24   says, "Susan McFarland started discussion of the draft 2012 plan

25   by highlighting that the financial base case project a

1    $1.5 billion profit."

2         And then three or four sentences later, it says, "Susan

3    said the plan reflects the view that the company is at an

4    inflection point in the credit cycle, the loss allowance, and

5    credit-related expenses projected to fall compared to 2011."

6         What do you mean by an "inflection point"?

7    A.   That the company had been -- the way the

8    allowance-for-loan-loss process works is, you're not only

9    recognizing actual losses on loans that you are resolving in the

10   current period; you're building reserves for expected future

11   losses on loans not yet resolved.  So in some ways, you get a

12   double headwind.  You have a large amount of actual losses

13   hitting at the same time you're building reserves for future

14   losses.

15        My inflection point was kind of referring to the fact that

16   we were starting to see tilting the other way, whether the

17   actual losses were going to begin to improve.  And as a result,

18   you would begin to see reductions in allowance over time because

19   the amount of expectation of future losses would be less than

20   what we had -- you know, because we had already worked through a

21   bunch of it.  As time goes by, you start to work through those.

22   As you work through those, they're actual losses.  The actual

23   charge-offs taken in a period would begin to be lower than what

24   they were in the same period the previous year.  Instead of

25   having allowance build, we might have allowance reductions.

1    Q.    So you could get a double tailwind?

2    A.    Correct.

3    Q.    And you did that?

4    A.    Yes, we did.

5    Q.    Okay.  We will move on to our next exhibit, which is

6    Plaintiffs' Exhibit 213.

7          So this is an e-mail from Brad Martin.  And was he at FHFA?

8    A.    Yes.

9    Q.    And it's dated July 13th, 2012.

10         Do you see that?

11   A.    Yes.

12   Q.    And he is describing a Fannie Mae executive management

13   meeting on July 9th, 2012.

14         Do you see that?

15   A.    Yes.

16   Q.    Okay.  Let's turn to the first attachment.  And these don't

17   have Bates numbers, but the first deck of PowerPoints has a

18   cover sheet that says "Strategic Planning Session, Board of

19   Directors," you know, "David Benson, July 19, 2012."  This is as

20   of July 6th at 6:00 p.m.

21         And then if we go to the 14th page of this deck, these are

22   projections for Fannie and Freddie out through 2022.

23         Do you see that?

24   A.    Yes.

25   Q.    And in terms of the earnings, it's showing Fannie earning,

1    you know, from 2014 on, you know, a minimum of close to

2    $11 billion; right?

3    A.    Yes.

4    Q.    And so were these earning projections, did they reflect

5    that positive momentum you referenced a moment ago?

6    A.    They would be -- I mean, it's consistent with that, yes.

7    Q.    And by this time, it was clear Fannie had returned to

8    stable profitability; is that right?

9    A.    I wouldn't say it was clear.  I would say we had a lot

10    of -- I would say that we had positive earnings.  We were seeing

11    a lot of positive movement in key attributes important to the

12    business.  Those all seemed to bode well.

13        But when you say "clear," that makes me -- I would

14    interpret the term "clear," that it was, you know, a sure thing.

15    And --

16    Q.    A high probability, would you say?

17    A.    I would say it's probable.

18    Q.    Okay.

19    A.    You know, I have to be -- I feel it's important as a

20    finance executive to make sure that you rarely take extreme

21    positions on things, because all too often in life and in

22    business stuff happens, and thus, you have to be open to the

23    fact that things could play out, you know, a bit differently.

24        But my job is to put forth what I think is the most likely

25    case.  So I would say, you know, definitely more likely than not

1    that we would have sustained probability -- sustained

2    profitability --

3    Q.   Okay.

4    A.   -- in accounting vernacular.

5    Q.   So let's go to our next one, which is Plaintiffs'

6    Exhibit 223.  This says "Board Meeting, July 20, 2012, Fannie

7    Mae Headquarters, Agenda."

8         If you want a minute just to look at it, that's fine, but

9    my question is going to be about page 258, which just says "1"

10   on the bottom of it.  Yeah, it's that page.

11        And the second paragraph from the bottom says, "The current

12   five-year forecast is for the years 2012 to 2016, and cumulative

13   forecasted comprehensive income is expected to be $56.6 billion,

14   which is $12.3 billion higher than the May board of directors

15   forecast for that period, primarily due to an improved credit

16   outlook."

17        And this is yet another indication that Fannie's prospects

18   were improving, you know, in July 2012; is that right?  Was that

19   your sense?

20   A.   Yes.  It's an indication that our expectations from the

21   prior forecast to the current forecast we're now discussing had

22   improved.

23   Q.   Okay.  And the improved credit outlook, how did that

24   mechanically translate into increased earnings?  Was there going

25   to be a reversing of the loan loss provisions?

1    A.   It would have shown up in lower actual charge-offs.

2    Q.   Okay.

3    A.   Probably a higher level of loan loss reserve decline over

4    that five-year period.

5    Q.   Okay.

6    A.   So release.

7    Q.   Okay.

8    A.   And it also could show up in foreclosed asset expense

9    improvements.  There are other aspects of the P&L, the financial

10   statements, that could be positively impacted by the lower cost

11   of loan work-outs --

12   Q.   Okay.

13   A.   -- if you have fewer loans that need working out.

14   Q.   And FHFA would have been aware of the estimates since they

15   were made aware at board meetings; is that right?

16   A.   Because this was presented at a board meeting and it was

17   normal for Jeff Spohn or Brad Martin to be present at board

18   meetings, you know -- I am sure that the minutes of the board

19   meeting document who was present.  It would be normal for a

20   member of FHFA to be present.

21   Q.   If we look at slide 11 of the PowerPoint deck, which is

22   page 270, the title of the slide is "The Company is Projected to

23   Achieve Sustainable Profitability Beginning 2012."

24        And what was the basis for that statement?

25   A.   I would draw your attention to the net income and

comprehensive income lines that are shaded.  And as you will

see, there are projected profits in all five years of the

five-year forecast period.

Q.   Okay.  So the next one is Plaintiffs' Exhibit 222.  So

these are minutes of a meeting of the board of directors of

Fannie Mae dated July 20, 2012.

If we turn to the last page of the document, it says in the

last paragraph, "The board discussed key sensitivities and

assumptions in the multi-year forecast and drivers to

credit-related expenses that might impact the forecast.  Of

these, changes to home prices had the most significant impact on

the company's net worth over a five-year time frame."

Was that an accurate statement?

A.   Yes.

Q.   Okay.  And -- but why were home prices the most -- why did

they have the most significant impact?

A.   Because the revenue streams were more stable because they

were based predominantly on the book of business that already

existed and didn't -- in other words, Fannie Mae earns revenue

off of long-term assets.  So the vast majority of Fannie Mae's

revenue in a given period is based upon business already

produced and on the books and isn't sensitive to new business

coming on in, you know, future periods.

Expenses, as I mentioned earlier, are noninterest --

expenses, as I mentioned earlier, noninterest expenses were not

1    a huge item on the financial performance of the company.  At

2    this point in time, credit losses were substantial and was the

3    most volatile or variable, and the single biggest driver of

4    credit losses or expectation of credit losses is home prices,

5    because that directly affects the severity of any loans that you

6    have to go to foreclosure, because the value you're going to get

7    for the home -- as you know, you sell to recover some part of

8    the loan amount.  It's going to be higher or lower.  It can

9    affect the borrower's ability to refinance their home, to sell

10   out of their home, in other words to take actions that could

11   help them make good on the mortgage.

12       So home prices is the single biggest but not only, the

13   single biggest variable on what the expectations for credit

14   losses would be.

15   Q.   And our next one is going to be Plaintiff Exhibit 229.  So

16   this says "Minutes of the Audit Committee of the Board of

17   Directors of Fannie Mae, August 6, 2012."

18       Again, my apologies for my ignorance, but what does an

19   audit committee do?  What is its function?

20   A.   The audit committee is one of the committees of the board,

21   and they focus on generally matters of risks and controls and

22   financial performance.  So for instance, that would be the

23   committee that the internal auditor would report out to on their

24   work and findings and any issues that they identified that they

25   thought rose to the level of the board.

1   The chief compliance officer, you know, so think of

2   different individuals that sit in some kind of risk or control

3   position or position responsible for risks and controls, would

4   generally report out to the audit committee.

5   Q.   Okay.  And we can see on this that you were present, it

6   says in the third paragraph, second line.

7       Then in the last sentence of that third paragraph, it says,

8   "Jeff Spohn, Brad Martin, and James Giffin of the Federal

9   Housing Finance Agency (FHFA) also participated in the call."

10      Is that consistent with the practice you have been

11  describing today that FHFA would participate in audit committee

12  meetings?

13  A.   Yes.

14  Q.   Okay.  Now, if we turn to the third page of this document,

15  it says that -- under "single family loan loss," about halfway

16  through, there's a sentence that says, "The improvement to

17  actual home prices in the second quarter was greater than

18  forecast, and our expectations for the future continue to be

19  conservative as compared to other forecasts such as Moody's and

20  Case-Shiller."

21      When it says "conservative" here, does that mean expecting

22  not as much increase in price as Case-Shiller?

23  A.   It means that our projections showed less improvement in

24  speed and less -- or both the magnitude and timing of those, and

25  ours would be less improvements and slower timing and

1    improvement.

2    Q.   Was that conservative by design?  In the sense when you

3    were putting in your projections in 2012, were you trying to,

4    you know, not be -- you know, see the world through rose-colored

5    glasses but try to be conservative?

6    A.   Really, we developed our own price -- home price index.  So

7    Doug Duncan was our chief economist.

8    Q.   Okay.

9    A.   Doug also reported to me.  He would -- they would prepare a

10   home price forecast that incorporated not only externally

11   available data, say, for instance, a Moody's, Case-Shiller could

12   leverage, but also benefited from the significant information

13   that we had inside of Fannie Mae.

14        And, you know, Fannie Mae had the single largest population

15   of mortgage performance data of anybody, given that we had the

16   largest book of business.  So we tried to incorporate all of

17   that.  We compared it to third-party data points like the

18   Case-Shiller index as a sanity check.  We wanted to ensure that

19   if we were materially different, we needed to then ask ourselves

20   why and use it as a devil's advocate, is there anything that we

21   might need to change or modify.

22        And what we found was that in these comparison points, that

23   we -- our projections tended to be more conservative than some

24   of those third-party projections.

25   Q.   Okay.

A.   And we were comfortable in allowing that to be so.  It's a
little bit of walk into good news, run into bad.  So we -- while
we were very encouraged by the amount of improvement that we had
seen, we didn't want to get out -- you know, as I like to say or
an attempted snow skier, we didn't want to get out over our
skis.  If you're a skier, you know what can happen then.  Let's
reflect improvement, but let's not, you know, go hog wild with
that improvement.

Q.   Let's move to page 5.  It says at the top, "The committee
discussed the press release and the importance of highlighting
the aggregate and quarterly amounts paid to U.S. Treasury
Department pursuant to the senior preferred stock purchase
agreement."

     What was the importance of highlighting, you know, that?

A.   A lot of the media or the -- what was sort of playing out
in the press was that the GSEs continued, you know, to require
government assistance and draw moneys from the taxpayers.  And
what was -- what didn't appear to be as well-understood was the
dividend payments that was going on and the amount of the draw
that was really then to pay the dividend versus the amount of
the draw that was really there to cover the losses of the
enterprise.

Q.   Yes.

A.   And the board felt it was important to try to make that
clearer so that people understood, could understand the drivers,

1    if you will, of the draw and the amount of moneys that were

2    really -- you know, how much net cash, if you will, had really

3    moved versus gross.

4    Q.   Okay.  And then if we go -- skip three sentences, you can

5    see a sentence that says, "The board discussed the status of

6    communications with Acting Director DeMarco regarding the

7    company's results and expectations, including the possibility of

8    a public statement from the Board and the optimal timing of such

9    a statement."

10        Do you recall what the status of communications with

11   DeMarco were at this point about financial results?

12   A.   I know that Phil Laskawy, who was chairman of the board at

13   that time, would -- there was some discussion as to whether the

14   board should try to -- whether there were other means to get

15   information or perspective into a more public domain.

16        And so I -- my recollection is that there wasn't a, We're

17   going to do this and we're going to tell DeMarco.  It was more

18   of I think he wanted to discuss with DeMarco some things that

19   the board was thinking about doing or would like to do.

20        I just sat down with them -- to the Treasury and said I

21   think we're sustaining profitable.  The numbers were

22   decent-sized.  I also put on the radar that there was a

23   possibility of a deferred tax allowance release that could be

24   sitting in the not-so-distant future.

25   Q.   Okay.  Next one is Plaintiffs' Exhibit 238.  So this is an

1  e-mail from Nicola Frazier dated August 7, 2012, to you and

2  Mr. Benson and Mr. Mayopoulos and others.  The subject

3  Is "Draft:  Treasury Meeting Discussion Materials, Treasury

4  Slides 8, 9, 12, Version 9."

5      Does this relate to the meeting that you described earlier

6  that took place on the eve of the net worth sweep where you

7  spoke to Ms. Miller about deferred tax assets and other things?

8  A.  This relates to the presentation that was being prepared

9  for use in the meeting with Treasury on the 9th with Mary Miller

10  and others at Treasury to update them on our financial results

11  forecast.

12      And while the meeting materials didn't express in writing

13  the deferred tax allowance issue, I in that meeting articulated

14  that orally to Treasury.

15  Q.  Okay.  And you can put that to the side.

16      Let's look at Plaintiffs' Exhibit 248.  So take a moment,

17  Ms. McFarland, to look through this, and my question is whether

18  this is the PowerPoint presentation that was provided to

19  Treasury at the meeting.

20  A.  Yes, although I think you -- so you had asked earlier.  I

21  think you didn't think you had the presentation.

22  Q.  Exactly.

23  A.  This is it, although this is the update.  So from time to

24  time, presentations, whether that's Treasury or board or

25  whatever, this looks like it has some updates.  Normally, those

1    updates are minor corrections.  Maybe it's spellings or, you

2    know -- I can't tell you what got changed.  But clearly, we met

3    with them on August 9th.  So the version I would have used would

4    have been the version that existed on August 9th, not the

5    updated version as of August 15th.  I'm not aware of substantive

6    changes made in the documents.  In all material respects,

7    probably the information here is the same material I reviewed

8    with Treasury.

9            THE COURT:  Before we go into that, let's go and take

10   our morning break.  Just take ten minutes, and we will try to

11   get through most of these documents you've got before we take

12   our lunch break.  We will take a convenience break right now for

13   ten minutes.

14        (Jury exited courtroom.)

15        (Recess taken from 11:46 a.m. to 12:07 p.m.)

16        (Jury entered courtroom.)

17            THE COURT:  You may be seated.

18        You may proceed.

19            MR. RUDY:  Thank you, Your Honor.

20            AS READ BY MR. RUDY:

21   Q.   Okay.  And so -- and you walked them through each of the

22   slides, the Treasury officials who were present?

23   A.   I walked Treasury through the financial slides.

24   Q.   The financial slides?  Okay.

25   A.   Correct.

1    Q.    Including the projections of future profitability?

2    A.    Yes.

3    Q.    Okay.  And what was their reaction to the projections of

4    future profitability?

5    A.    I remember there being a few questions asked that I would

6    put more in the category of seek to understand.

7    Q.    Okay.

8    A.    And I do think there was a little bit of question around

9    well, you know, what could cause the outcomes to be, you know,

10   different than this.  And I believe I gave them a brief update

11   of some sensitivity analyses we do, which we kind of do on a

12   recurring basis.

13        But there wasn't any expression of -- I want to be careful

14   here.  Generally, in our meetings with Treasury, they wanted to

15   hear a lot more from us than they were giving.

16   Q.    Yes.  I understand.

17   A.    They kept things fairly close to the vest, if you will.

18   Q.    Yes.

19   A.    So this was not untypical of that.  But they asked me a few

20   questions.  Sometimes from the questions they ask, you can kind

21   of get a sense of what's on their mind.  That is where, you

22   know, Mary did ask me -- when I brought up the deferred tax

23   asset allowance valuation, you know, she asked me that question

24   as an example.

25

1                        CROSS-EXAMINATION

2          AS READ BY MR. BERGMAN:

3    Q.   Good afternoon, Ms. McFarland.  I represent the defendant

4    in this action.

5          I think you testified earlier that one source of

6    recapitalization would be retained earnings.  In your view, what

7    amount of capital, if any, would Fannie Mae need to be deemed

8    adequately capitalized?

9    A.   You know, we did do some what I call back-of-the-envelope

10   work on that, and, you know, I -- I would have to -- I don't

11   remember the exact numbers.  I think you would probably be

12   looking at something in the high single-digit percent of assets,

13   you know, something in the 7 to 8 percent of asset range.

14         And I could work the math backwards and come up with a --

15   what that means in dollars.  It would certainly be at a higher

16   level than what Fannie would require to have in capital

17   preconservatorship -- it would certainly be at a level higher

18   than what Fannie would require to have in capital

19   preconservatorship.

20   Q.   Do you recall being interviewed by media outlets following

21   Fannie Mae's release of the 10-K for the second quarter of 2012

22   on or around August 8th, 2012?

23   A.   If August 8th was the date we released the 10-Q, then I

24   would have done media interviews on August 8th.  That would have

25   been normal.  I don't recollect the date we filed the Q.

1    Q.    Do you recognize -- what's been handed to you is what's

2    been marked for identification as Plaintiffs' Exhibit 453.  It's

3    a filing for Fannie Mae, the Form 10-Q.

4          And do you recognize this document?

5    A.    Yes.

6    Q.    Okay.  And this is the -- is this the 10-K for Fannie Mae

7    for the second quarter of 2012?

8    A.    Yes.

9    Q.    Okay.  And was this released on or around August 7th, 2012?

10   A.    I would have to look here.  I should be able to -- it's

11   dated August 8, 2012.

12   Q.    Thank you for clarifying.  Is this the 10-Q that was

13   released on or around August 8th, 2012?

14   A.    Yes.

15   Q.    Okay.  And just for the record, on the page that's marked

16   for identification as page 191, at the very end --

17   A.    Page 191.  Let me get to that.

18         Okay.  Yes, my certification.

19   Q.    This is a certification, and you certified the truth and

20   accuracy of the 10-Q; is that correct?

21   A.    Yes.

22   Q.    And that was done in your capacity as a CFO?

23   A.    Yes.

24   Q.    Okay.  And having reviewed what's been marked as

25   Plaintiffs' Exhibit 453, does this refresh your recollection

1    that the 10-Q was released on August 8th, 2012?

2    A.   Yes.

3    Q.   What's been handed to you is what's been marked for

4    identification as Plaintiffs' Exhibit 480.  This is a

5    re-printout of a *Wall Street Journal* article dated August 8th,

6    2012.

7        And do you recall being interviewed by *The Wall Street*

8    *Journal*?

9    A.   Yes.

10   Q.   If you look on page -- it's the third page of the article.

11   There's a third paragraph down.  There's a quote.  It

12   says, "It's hard for me to envision that we would be able to

13   make enough every quarter to cover the dividend payment, said

14   Ms. McFarland, even though she said it was possible."

15       Did you, in fact, make that statement, that it would be

16   hard for you to envision that Fannie Mae would be able to make

17   enough every single quarter to cover the dividend payment?

18   A.   Yes.

19   Q.   Now, was that accurate at the time you made it?

20   A.   Yes.  If you look, the dividend payment at that point in

21   time was around 3 billion a quarter.  So in order to make enough

22   in that quarter to make the -- you would have to say that not

23   only would you be profitable every quarter, that you would make

24   at least 3 billion a quarter.

25       And any company that I have been involved in has some

1    degree of volatility of the amount of earnings on a quarterly

2    basis.  If you isolate earnings in a given quarter -- what I was

3    trying to get at is not to expect that every quarter would be

4    3 billion plus.

5    Q.   It's not $3 billion plus.  Isn't it correct that Fannie Mae

6    would be required -- I'm sorry.

7         If it's not 3 billion plus, isn't it correct that Fannie

8    Mae would be required to draw down on its commitment?

9    A.   So the structure -- the document we went over before where

10   I sent to Director DeMarco that we would not need to draw

11   basically calculated the difference between net assets and

12   liabilities.  And so if our net assets and liabilities were

13   positive -- because as you may remember, at the end of the

14   second quarter, we ended up with a net positive of 2 point

15   something billion net positive.  That was just sitting there.

16        So say the next quarter we make 2 billion, not 3 billion.

17   We would still have the 2 billion, plus the 2 billion we started

18   the quarter with.  We would have net assets of over 4 billion,

19   which would be sufficient enough to make the dividend payment

20   without the draw.

21        It just depends on prior to the Third Amendment what the

22   cumulative net asset value was going into that quarter, plus the

23   earnings from that quarter, to determine whether or not the

24   summation of that was sufficient enough to cover the 3 billion

25   or so dividend payment requirement.

1    But, you know -- I guess, you know, you could work

2    scenarios that could show you under some scenario that in a

3    given quarter you might need to borrow.

4    Q.   What's been handed to you, Ms. McFarland, is what's been

5    marked for identification as Plaintiffs' Exhibit 481.

6    On or around August 8, 2012, do you remember speaking with

7    Reuters?

8    A.   Reuters would be a normal media outlet that I would

9    normally speak with.

10   Q.   Now, if you look at the second paragraph from the bottom of

11   the first page, it says, "Although Fannie Mae did not need

12   taxpayer funds this quarter to cover required 10 percent

13   dividend payments, McFarland says she expects there may be

14   periods where the company's income would not be sufficient

15   enough to meet the requirements."

16   Was that an accurate statement?

17   A.   Yes.

18   Q.   And with respect to the housing prices, if you look at the

19   exhibit on the fifth paragraph from the top, the paragraph

20   starting, "McFarland called the second quarter housing prices

21   normal seasonal improvement and said she did not expect to see

22   this kind of trend continue.  There is a high likelihood that we

23   will see home prices come down in the latter half of the year,

24   she said.  Because of that, the company does not expect its

25   financial results to be as strong in the latter half of the year

1   as compared to the first half."

2       Did that accurately reflect information given to Reuters?

3   A.   Yes.  There are normal seasonal fluctuations in home

4   prices.  And so certain quarters tend to see -- your high-

5   selling periods and buying periods tend to see a greater benefit

6   than your low-selling buying periods.  So that's the gist of

7   what I was trying to get across.

8   Q.   Okay.  Now, was that also true, that as of August 8, 2012,

9   that Fannie Mae did not expect its financial results to be as

10  strong in the latter half of the year compared to the first

11  half?

12  A.   I believe the financial projections that we were showing --

13  I could pull the documents.  So we had already made 8 or

14  9 billion year to date.  And I think our total projection at

15  that point that we reviewed for the year is 11 billion.  I can

16  pull it out and refer to it.

17      So you can work the simple math.  9 billion year to date

18  subtracted from what the full year was was a much smaller number

19  than 9 billion.  But even with those projections, we were

20  comfortable with the representation that we gave Treasury that

21  we felt like we were now in a period of sustained profitability.

22  Q.   That's not exactly what you said or what's reflected in

23  this article; isn't that correct?

24  A.   What this is saying is the magnitude of our profits for the

25  latter half of the year might not be as large as the magnitude

1    of our profits year to date for the first half of the year.

2    We're still going to be profitable.

3    Q.   And in the last paragraph on that page, it says, "A lot of

4    things are out of our control with the economy being soft, she

5    said.  We have to be a bit cautious before we declare a

6    permanent victory and we will be able to sustain profits quarter

7    in and quarter out."

8         Was that a true statement when you made it?

9    A.   Yes.

10   Q.   What's been handed to you, what it is -- is what's been

11   marked for identification as Plaintiffs' Exhibit 483.  It's a

12   re-printout of a story from *The Washington Post* dated

13   August 9th, 2012.

14        Do you remember speaking with reporters from *The Washington*

15   *Post* on or around August 8th or 9th, 2012?

16   A.   I don't.

17   Q.   Sure.  Let's see if we can refresh your recollection.

18        If you look at the fourth paragraph from the top, "The

19   magnitude of the home price improvement that we saw was greater

20   than we would have expected from normal seasonal upticks.  So

21   that's encouraging, said Susan McFarland, Fannie Mae's chief

22   financial officer, in a statement.  But I don't think we're

23   going to see this level of earnings repeat itself quarter in and

24   quarter out."

25        Do you remember making such a statement?

1    A.   This could have been taken from a press release.  That's

2    why I don't know whether this was a -- they picked something up

3    out of our official press release or whether they picked

4    something up from something I said in an interview with them.

5    Q.   Okay.

6    A.   That's why I'm expressing uncertainty.

7    Q.   Whether or not there was an oral interview or a written

8    statement, you know, was this -- was the quote that's attributed

9    to you here one that you made?

10   A.   Yes.

11   Q.   And was it one that you believed was true at the time you

12   made it?

13   A.   Yes.  We made $6 billion in the second quarter, and I

14   didn't think people should take 6 billion times 4 and assume

15   that we were going to make $24 billion a year.  That would be

16   incorrect.  That was the main thing that we would try to ensure

17   that people didn't get ahead of themselves on.

18        I don't think the company, other than in the quarter --

19   other than in 2013 when the DTA allowance was released, I don't

20   think the company had made $24 billion.  17 billion maybe, if

21   memory serves me correct.

22   Q.   I want to turn back to the -- earlier, I gave you a copy of

23   the 10-K from the second quarter of 2012 --

24   A.   Uh-huh.

25   Q.   -- but I have some excerpts from earlier Qs that I meant to

1  ask you about.

2      What's been handed to you, Ms. McFarland, is what's been

3  marked as Plaintiffs' Exhibit 469.  I will represent that these

4  are excerpts from Fannie Mae's 10-K for the year 2011.

5  A.   Uh-huh.  Yes.

6  Q.   Okay.  Now, if you look on what's on page 21, so I think

7  it's the second page in --

8          THE COURT:  I'm sorry.  What was the exhibit number

9  there?

10         MR. BERGMAN:  Plaintiffs' exhibit 469.

11         THE COURT:  Okay.

12         AS READ BY MR. BERGMAN:

13  Q.   What's been handed to you, Ms. McFarland, is what's been

14  marked as Plaintiffs' Exhibit 469.  I will represent that these

15  are excerpts from Fannie Mae's 10-K for the year 2011.

16  A.   Uh-huh.  Yes.

17  Q.   Okay.  Now, if you look on what's on page 21, so I think

18  it's the second page in, in italics is a third

19  paragraph, "uncertainty regarding our long-term sustainability

20  and future status."  There's a statement, "We do not expect to

21  earn profits in excess of our annual dividend obligation to

22  Treasury for the indefinite future."

23      Now, was that an accurate statement when it was made?

24  A.   Yes.

25  Q.   Also, there's a sentence, "We expect to request additional

1  draws under the senior stock purchase agreement in future

2  periods, which will further increase the dividends we owe to

3  Treasury on the senior preferred stock."

4      Was that a true statement when it was made?

5  A.   Yes.

6  Q.   It also says, "We expect that over time our dividend

7  obligation to Treasury will constitute an increasing portion of

8  our future draws under the senior purchase stock agreement."

9      That was also a true statement when it was made; correct?

10  A.   Yes.

11  Q.   "Finally, as a result of these factors, there is a

12  significant uncertainty about our long-term financial

13  sustainability."

14      You would also agree that that was a true statement when

15  made; correct?

16  A.   Yes.

17  Q.   What's been handed to you, Ms. McFarland, is what's been

18  marked for identification as Plaintiffs' Exhibit 473.  It is --

19  these are excerpts from a Form 10-K for the quarterly period

20  ended March 31st, 2012, for Fannie Mae.

21  A.   Yes.

22  Q.   If you look at -- I guess on page 11.  So it's, I guess,

23  the second page.  There's again a -- the last paragraph has an

24  italics text, "uncertainty regarding our future status and

25  long-term financial sustainability."  It says, "We expect to

1    request additional draws under the senior preferred stock

2    purchase agreement in future periods, which will further

3    increase the dividends we owe to Treasury under the senior

4    preferred stock."

5         Do you see that?

6    A.   Yes.

7    Q.   Okay.  That's a similar statement, if not the same

8    statement, that was made in the 10-Q; is that correct?

9    A.   Correct.

10   Q.   Okay.  And that statement was truthful and accurate when it

11   was made, wasn't it?

12   A.   Correct, because our financial forecasts at that time,

13   while they may have shown some profits in certain quarters, the

14   amount of those profits and the effects on our net assets in

15   some periods would have required a draw at least to pay for some

16   of the dividend.

17        So at that point in time, based on the forecasts that we

18   were looking at at that point, that was a true statement.

19   Q.   Okay.  And it says, "Although we may experience

20   period-to-period volatility and earnings in comprehensive

21   income, we don't expect to generate net income or comprehensive

22   income in excess of our annual dividend to Treasury over the

23   long term."

24        Now, that was also a similar statement to the one made in

25   the 10-Q; is that correct?

1   A.   Correct.  And that was based on the forecasts that existed

2   at that point in time.

3   Q.   Right.  And based on those forecasts and based on all the

4   other information you had, that statement was a true statement

5   when it was made; correct?

6   A.   Correct.

7   Q.   And if you look at page 81, I will represent that these

8   bullet points are forward-looking statements that were made in

9   the 10-Q.  If you look towards the middle of the page, in the --

10  there's a bullet point that has some -- it looks like -- there's

11  some space, but there's a statement that says, "We will not

12  generate net income or comprehensive income in excess of our

13  annual dividend responsibility to Treasury over the long term."

14       And that was consistent with what was stated before,

15  correct, in the 10-Q?

16  A.   Correct.

17  Q.   And that statement was also true when it was made; isn't

18  that right?

19  A.   Correct.

20  Q.   Okay.  Now, if you look back to the second quarter 10-Q,

21  this was released on August 8th, 2012; is that right?

22  A.   Correct.  Let me pull that back out, please.

23  Q.   Sure.

24  A.   Okay.

25  Q.   And this is Plaintiffs' Exhibit 453.  If you look on

1    page 12.

2    A.    Uh-huh.

3    Q.    Okay.  There's also a paragraph "uncertainty regarding our

4    future status and ability to pay dividends to the Treasury."

5        Do you see -- I guess five lines down, it says, "Although

6    we may experience period-to-period volatility in earnings in

7    comprehensive income, we don't expect to generate income or

8    comprehensive income in excess of our annual dividend obligation

9    to Treasury over the long term."

10       That was a true statement when it was made; correct?

11   A.    It was based on the projections.  I mean, you -- we've

12   reviewed the projections.

13   Q.    Was that not a true statement when it was made?

14   A.    No, it's -- it was a true statement.  I wouldn't put

15   anything in a document that wasn't a true statement.  But you

16   will see that the nature of the disclosure changed in this

17   quarter, and we began to talk about some things differently in

18   this quarter than we had been historically, because this is when

19   the improving -- the momentum and the magnitude of the

20   improvements began to pick up, and we wanted to begin to make

21   some adjustments to our disclosures accordingly.

22       Also, I want to be clear.  We're talking about we may not

23   make enough to pay the dividends.  Basically what we're trying

24   to say is we may not need to draw to cover loss, net income or

25   net losses, but we still have a dividend obligation.  So that

1    may constitute the need to -- the amount that we have to satisfy

2    in dividend payments may be that we wouldn't have sufficient

3    ability to cover that.  Because you will see we added some

4    things about what we expect in some future quarters, we will be

5    able to generate a net profit.

6    Q.   What's been handed to you is Plaintiffs' Exhibit 490.

7         Do you recognize this document?

8    A.   It was posted when I was on vacation, but I am familiar

9    with the general information contained in it.

10   Q.   Did you -- having reviewed this, did you disagree at the

11   time with any of the statements made in Mr. Mayopoulos's post?

12   A.   I didn't review it prior to its posting because I was on

13   vacation.

14   Q.   After?

15   A.   After the fact?  Okay.  I'm sorry.

16   Q.   After reviewing Mr. Mayopoulos's blog post when you, I

17   guess, returned from vacation, were there any statements in the

18   blog post with which you disagreed?

19   A.   He's making three key points.  The first two are consistent

20   with the perspective that Treasury provided us when they

21   communicated the amendment to us.  The third is something that

22   we -- as we talked over the pros and cons of the change, that

23   was a pro that we thought of in discussing the net worth sweep

24   or the Third Amendment.

25   Q.   My question was, did you disagree with any of his

1  statements?

2  A.   I don't disagree with any of those three statements.

3  Q.   Ms. McFarland, what's been handed to you is what's been

4  marked for identification as Plaintiffs' Exhibit 488.

5       Do you remember receiving -- sorry.

6       Were you on the operating committee?

7  A.   Yes.

8  Q.   Okay.  Mr. Mayopoulos sent an e-mail to the operating

9  committee dated August 17th, 2012.  In the third paragraph, he

10  says, "I will keep you posted on my approach.  In the interim, I

11  want to encourage you to reinforce my blog message with your

12  employees that this announcement does not purport to wind down

13  the GSEs.  As I note in my blog post, the only thing being wound

14  down is the portfolio."

15       That's a true statement, that the wind-down refers to the

16  portfolio; isn't that correct?

17  A.   You're asking me to interpret it just like any reader would

18  interpret it?

19  Q.   I am asking -- my question was, I think, you -- I believe

20  you said that you were familiar with the agreement prior to

21  August 17th, 2012, when this e-mail was sent.

22       Is that correct?

23  A.   Correct.

24  Q.   Now, with respect to your familiarity with the agreement

25  and the provisions concerning the portfolio reduction, was

1    anything in Mr. Mayopoulos's e-mail inconsistent with your

2    understanding of that portion of the Third Amendment?

3    A.   As it relates to the reduction of the retained portfolio

4    and that constitutes some amount of winding down the GSEs, I

5    agree.  In fact, I refer to -- even in our original 2013 goals

6    that we set up with FHFA that there was some criteria by which

7    to reduce that portfolio.

8         This just amped it up, and I said that I thought that was

9    an example of winding down the GSE.  This would be very

10   consistent with that.

11             MR. BERGMAN:  That's it, Your Honor.  Thank you.

12             MR. RUDY:  I assume our actor can be excused?

13             THE COURT:  Okay.  I've got to do January 6 at lunch.

14   So we will take our luncheon recess now, and we will come back

15   at -- let's come back at 1:30.

16        Don't talk about the case.  Don't let anyone talk to you

17   about the case.  I will see you all at 1:30.

18        (Jury exited courtroom.)

19             MR. STERN:  Your Honor, excuse me.  Jonathan Stern for

20   the defendants.

21        May I be heard just for one moment on a procedural point?

22             THE COURT:  Yes.

23             MR. STERN:  This morning, I said that, with respect to

24   the outstanding motion, that an opposition would be filed.  As

25   not infrequently happens, Your Honor, my team was ahead of me.

1    As of that moment, it had already been filed.  I wanted to make

2    sure the Court and its staff were aware.

3              THE COURT:  Okay.

4              MR. STERN:  Thank you, Your Honor.

5         (Recess taken at 12:30 p.m.)

6         (Afternoon session reported by Lorraine Herman and bound

7    under separate cover.)

CERTIFICATE OF OFFICIAL COURT REPORTER


I, Sara A. Wick, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Sara A. Wick_____          October 25, 2022_____

SIGNATURE OF COURT REPORTER              DATE

## $

**$10** [1] - 1376:15
**$11** [1] - 1432:2
**$13** [1] - 1425:15
**$24** [2] - 1451:15, 1451:20
**$400** [1] - 1385:5
**$50** [1] - 1416:16

## '

**'11** [1] - 1427:22
**'12** [1] - 1425:19
**'22** [1] - 1371:22
**'90s** [1] - 1400:2
**'99** [1] - 1400:3

## /

**/s** [1] - 1461:8

## 1

**1** [7] - 1376:11, 1376:12, 1376:15, 1376:16, 1382:16, 1382:17, 1433:9
**1.5** [1] - 1430:1
**10** [9] - 1375:1, 1375:3, 1375:8, 1375:9, 1375:10, 1376:14, 1388:15, 1423:17, 1448:12
**10-K** [7] - 1395:23, 1444:21, 1445:6, 1451:23, 1452:4, 1452:15, 1453:19
**10-Q** [11] - 1395:23, 1444:23, 1445:3, 1445:12, 1445:20, 1446:1, 1454:8, 1454:25, 1455:9, 1455:15, 1455:20
**100** [2] - 1377:12, 1397:23
**105.2** [1] - 1394:19, 1394:20
**105135** [1] - 1423:12
**10:11** [1] - 1365:10
**11** [3] - 1434:21, 1449:15, 1453:22
**116.1** [2] - 1390:5, 1392:9
**118** [1] - 1390:2
**118.3** [1] - 1388:19
**11:46** [1] - 1442:15
**12** [3] - 1429:21, 1441:4, 1456:1
**12.3** [1] - 1433:14

**121** [3] - 1417:11, 1423:5, 1427:8
**124.8** [3] - 1388:18, 1390:2, 1392:8
**125** [1] - 1392:10
**12:07** [1] - 1442:15
**12:30** [1] - 1460:5
**13** [3] - 1386:23, 1425:25, 1426:12
**13-cv-1053** [1] - 1365:4
**13-mc-1288** [1] - 1365:8
**135** [1] - 1418:2
**1369** [1] - 1367:3
**1372** [1] - 1367:9
**1377** [1] - 1367:3
**1391** [1] - 1367:10
**1394** [1] - 1367:11
**1396** [1] - 1367:12
**1398** [1] - 1367:5
**13th** [2] - 1423:13, 1431:9
**14** [1] - 1387:8
**1401** [1] - 1365:21
**1417** [1] - 1367:15
**1444** [1] - 1367:6
**147** [2] - 1417:11, 1429:20
**148.3** [6] - 1388:10, 1388:14, 1389:23, 1394:19, 1394:20
**149.3** [2] - 1392:4, 1392:5
**14th** [1] - 1431:21
**15** [2] - 1390:17, 1391:9
**1523** [1] - 1365:16
**15th** [1] - 1442:5
**17** [1] - 1451:20
**17th** [2] - 1458:9, 1458:21
**18** [1] - 1418:4
**19** [4] - 1389:6, 1389:9, 1391:9, 1431:19
**19087** [1] - 1365:19
**191** [2] - 1445:16, 1445:17
**1983** [1] - 1398:13
**1986** [1] - 1399:14
**1989** [1] - 1399:20
**1990** [1] - 1399:21
**19th** [1] - 1390:20
**1:30** [2] - 1459:15, 1459:17
**1st** [1] - 1399:21

## 2

**2** [7] - 1382:17, 1425:19, 1427:8, 1447:14, 1447:16, 1447:17
**20** [2] - 1433:6, 1435:6
**2000** [1] - 1400:3
**20001** [2] - 1366:5, 1366:9
**20005** [1] - 1365:22
**2002** [1] - 1400:7
**20036** [1] - 1365:16
**2008** [1] - 1384:5
**2009** [1] - 1385:6
**2011** [15] - 1400:14, 1409:2, 1418:4, 1423:7, 1423:19, 1423:23, 1424:6, 1426:3, 1426:18, 1427:5, 1427:12, 1428:9, 1430:5, 1452:4, 1452:15
**2012** [67] - 1373:5, 1373:15, 1373:17, 1386:23, 1388:7, 1389:6, 1389:23, 1390:1, 1390:2, 1390:17, 1391:9, 1392:4, 1392:8, 1393:11, 1394:18, 1395:14, 1396:3, 1405:13, 1405:16, 1406:18, 1414:12, 1414:17, 1416:2, 1416:18, 1421:12, 1421:20, 1424:6, 1425:15, 1425:16, 1425:20, 1427:9, 1427:13, 1427:23, 1429:12, 1429:21, 1429:22, 1429:23, 1429:24, 1431:9, 1431:13, 1431:19, 1433:6, 1433:12, 1433:18, 1434:23, 1435:6, 1436:17, 1438:3, 1441:1, 1444:21, 1444:22, 1445:7, 1445:9, 1445:11, 1445:13, 1446:1, 1446:6, 1448:6, 1449:8, 1450:13, 1450:15, 1451:23, 1453:20, 1455:21, 1458:9, 1458:21
**2013** [4] - 1423:23, 1424:2, 1451:19, 1459:5

**2014** [2] - 1423:24, 1432:1
**2016** [1] - 1433:12
**202-354-3284** [1] - 1366:10
**2020** [1] - 1423:16
**2021** [1] - 1371:22
**2022** [10] - 1365:10, 1388:12, 1388:19, 1389:23, 1390:3, 1392:5, 1394:19, 1431:22, 1461:8
**2026** [1] - 1423:16
**21** [2] - 1452:6, 1452:17
**213** [4] - 1386:16, 1386:18, 1417:11, 1431:6
**218** [1] - 1386:18
**222** [2] - 1417:11, 1435:4
**223** [2] - 1417:11, 1433:6
**229** [2] - 1417:11, 1436:15
**234** [1] - 1368:15
**238** [2] - 1417:11, 1440:25
**24** [1] - 1423:7
**248** [2] - 1417:11, 1441:16
**25** [3] - 1365:10, 1373:5, 1461:8
**258** [1] - 1433:9
**270** [1] - 1434:22
**280** [1] - 1365:18
**299** [1] - 1372:22
**2C** [1] - 1377:25

## 3

**3** [9] - 1382:12, 1425:19, 1446:21, 1446:24, 1447:4, 1447:5, 1447:7, 1447:16, 1447:24
**3087** [1] - 1418:8
**30th** [3] - 1425:23, 1426:17, 1427:5
**31st** [1] - 1453:20
**333** [1] - 1366:8

## 4

**4** [2] - 1447:18, 1451:14
**424** [2] - 1396:17, 1396:18
**453** [2] - 1417:11, 1445:2, 1445:25,

1455:25
**469** [4] - 1417:12, 1452:3, 1452:10, 1452:14
**4704-B** [1] - 1366:9
**473** [2] - 1417:12, 1453:18
**480** [2] - 1417:12, 1446:4
**481** [2] - 1417:12, 1448:5
**483** [2] - 1417:12, 1450:11
**488** [2] - 1417:12, 1458:4
**490** [2] - 1417:12, 1457:6

## 5

**5** [1] - 1439:9
**50** [1] - 1416:11
**56.6** [1] - 1433:13

## 6

**6** [5] - 1425:20, 1436:17, 1451:13, 1451:14, 1459:13
**6.5** [2] - 1388:20
**601** [1] - 1366:4
**6:00** [1] - 1431:20
**6th** [1] - 1431:20

## 7

**7** [3] - 1393:11, 1441:1, 1444:13
**7th** [1] - 1445:9

## 8

**8** [8] - 1425:24, 1427:9, 1441:4, 1444:13, 1445:11, 1448:6, 1449:8, 1449:13
**81** [1] - 1455:7
**8th** [8] - 1444:22, 1444:23, 1444:24, 1445:13, 1446:1, 1446:5, 1450:15, 1455:21

## 9

**9** [10] - 1391:23, 1394:1, 1394:8, 1425:24, 1429:22, 1441:4, 1449:14,

1449:17, 1449:19
**9th** [6] - 1431:13,
1441:9, 1442:3,
1442:4, 1450:13,
1450:15

---

## A

**A&M** [4] - 1398:15,
1398:19, 1398:22,
1408:14
**a.m** [2] - 1365:10,
1442:15
**ability** [6] - 1382:7,
1418:12, 1418:15,
1436:9, 1456:4,
1457:3
**able** [12] - 1372:3,
1379:18, 1394:9,
1397:18, 1402:13,
1409:11, 1409:23,
1445:10, 1446:12,
1446:16, 1450:6,
1457:5
**above-entitled** [1] -
1461:5
**absolutely** [1] -
1384:14
**access** [5] - 1404:14,
1404:15, 1404:16,
1404:17, 1422:7
**accomplish** [1] -
1401:10
**accordance** [1] -
1380:18
**according** [1] -
1388:12
**accordingly** [1] -
1456:21
**accountant** [1] -
1403:8
**accountant's** [1] -
1415:14
**accounted** [1] -
1402:21
**accounting** [10] -
1398:17, 1400:16,
1400:17, 1403:3,
1403:5, 1415:15,
1419:6, 1419:14,
1419:20, 1433:4
**accuracy** [1] - 1445:20
**accurate** [6] - 1397:3,
1435:13, 1446:19,
1448:16, 1452:23,
1454:10
**accurately** [1] -
1449:2
**Achieve** [1] - 1434:23
**achieved** [1] - 1402:6

**acquired** [1] - 1399:20
**act** [1] - 1380:18
**Acting** [2] - 1400:24,
1440:6
**ACTION** [1] - 1365:9
**action** [1] - 1444:4
**actions** [3] - 1381:23,
1405:3, 1436:10
**activities** [1] - 1406:15
**activity** [1] - 1407:12
**actor** [2] - 1397:19,
1459:12
**actors** [1] - 1370:14
**actual** [10] - 1389:5,
1424:17, 1424:21,
1430:9, 1430:12,
1430:17, 1430:22,
1434:1, 1437:17
**actuals** [1] - 1413:2
**added** [2] - 1428:5,
1457:3
**additional** [3] -
1387:13, 1452:25,
1454:1
**addressed** [1] -
1369:1
**adequately** [1] -
1444:8
**adjustments** [1] -
1456:21
**administration** [1] -
1398:17
**administrative** [1] -
1400:11
**admissibility** [1] -
1368:24
**admission** [2] -
1372:12, 1390:24
**admitted** [2] -
1390:22, 1417:15
**advised** [1] - 1373:13
**advising** [1] - 1419:10
**advocate** [1] - 1438:20
**affairs** [2] - 1380:8,
1428:15
**affect** [1] - 1436:9
**affects** [1] - 1436:5
**Afternoon** [1] - 1460:6
**afternoon** [1] - 1444:3
**AGENCY** [1] - 1365:6
**Agency** [3] - 1366:2,
1380:13, 1437:9
**Agenda** [1] - 1433:7
**aggregate** [1] -
1439:11
**ago** [1] - 1432:5
**agree** [3] - 1403:5,
1453:14, 1459:5
**agreed** [1] - 1396:14
**Agreement** [1] -

1423:6
**AGREEMENT** [1] -
1365:9
**agreement** [8] -
1420:22, 1422:7,
1439:13, 1453:1,
1453:8, 1454:2,
1458:20, 1458:24
**ahead** [3] - 1400:13,
1451:17, 1459:25
**aided** [1] - 1366:11
**akin** [2] - 1422:4,
1422:5
**al** [2] - 1365:3, 1365:6
**alignment** [1] -
1424:23
**allow** [2] - 1410:7,
1410:8
**allowance** [16] -
1410:1, 1413:3,
1418:24, 1419:1,
1419:8, 1419:23,
1420:15, 1430:4,
1430:8, 1430:18,
1430:25, 1440:23,
1441:13, 1443:23,
1451:19
**allowance-for-loan-
loss** [1] - 1430:8
**allowing** [1] - 1439:1
**almost** [2] - 1395:17,
1427:9
**alone** [1] - 1390:9
**amendment** [4] -
1407:25, 1410:4,
1457:21
**Amendment** [10] -
1373:6, 1385:6,
1407:22, 1409:14,
1412:17, 1413:8,
1416:23, 1447:21,
1457:24, 1459:2
**American** [1] -
1373:25
**amount** [35] - 1371:17,
1371:19, 1375:1,
1375:3, 1384:25,
1386:11, 1387:14,
1387:19, 1388:20,
1390:8, 1392:6,
1392:8, 1395:2,
1395:3, 1395:13,
1395:14, 1396:11,
1407:25, 1408:11,
1421:24, 1429:6,
1430:12, 1430:19,
1436:8, 1439:3,
1439:19, 1439:20,
1440:1, 1444:7,
1447:1, 1454:14,

**1457:1, 1459:4**
**amounts** [2] -
1387:23, 1439:11
**amped** [1] - 1459:8
**analyses** [1] - 1443:11
**analysis** [6] - 1387:3,
1390:6, 1415:25,
1416:1, 1416:2,
1423:8
**Analysis** [1] - 1423:7
**analyst** [1] - 1411:3
**analytics** [1] - 1403:23
**analyze** [1] - 1403:24
**Anne** [1] - 1423:10
**anne** [2] - 1403:16,
1404:2
**announcement** [1] -
1458:12
**annual** [4] - 1452:21,
1454:22, 1455:13,
1456:8
**anomalous** [1] -
1428:15
**answer** [20] - 1372:2,
1375:14, 1375:15,
1375:16, 1376:23,
1378:13, 1378:18,
1379:16, 1381:15,
1381:18, 1381:22,
1382:15, 1382:20,
1382:25, 1383:7,
1383:9, 1383:10,
1383:11, 1384:3
**Answer** [1] - 1380:7
**antiquated** [1] -
1401:22
**apologies** [1] -
1436:18
**appear** [3] - 1397:25,
1398:1, 1439:18
**APPEARANCES** [2] -
1365:14, 1366:1
**applying** [1] - 1420:21
**appointed** [4] -
1370:21, 1378:19,
1380:8, 1380:13
**appointing** [1] -
1382:25
**approach** [2] - 1393:5,
1458:10
**appropriate** [2] -
1381:23, 1403:5
**approval** [1] - 1414:5
**area** [1] - 1404:5
**areas** [3] - 1403:19,
1404:3, 1404:4
**Arnold** [1] - 1366:4
**arrival** [1] - 1424:15
**arrive** [1] - 1408:25
**arrived** [2] - 1408:25,

1409:3
**article** [3] - 1446:5,
1446:10, 1449:23
**articulated** [1] -
1441:13
**AS** [6] - 1398:9,
1398:21, 1417:21,
1442:20, 1444:2,
1452:12
**aspects** [1] - 1434:9
**assess** [1] - 1421:11
**asset** [10] - 1408:15,
1408:19, 1410:1,
1412:16, 1414:21,
1420:12, 1434:8,
1443:23, 1444:13,
1447:22
**assets** [12] - 1379:3,
1382:4, 1383:1,
1408:3, 1415:10,
1435:20, 1441:7,
1444:12, 1447:11,
1447:12, 1447:18,
1454:14
**assigned** [1] - 1404:3
**assistance** [1] -
1439:17
**associated** [2] -
1406:16, 1408:6
**assume** [2] - 1451:14,
1459:12
**assuming** [1] -
1370:20
**assumptions** [3] -
1405:21, 1405:23,
1435:9
**attached** [1] - 1391:23
**Attached** [1] - 1393:18
**attachment** [2] -
1393:15, 1431:16
**attachments** [1] -
1391:19
**attempt** [2] - 1371:12,
1371:15
**attempted** [2] -
1428:3, 1439:5
**attend** [2] - 1412:23,
1415:1
**attendance** [1] -
1410:22
**attention** [3] -
1417:24, 1420:3,
1434:25
**attributed** [1] - 1451:8
**attributes** [1] -
1432:11
**Audit** [1] - 1436:16
**audit** [7] - 1399:1,
1420:6, 1420:7,
1436:19, 1436:20,

1437:4, 1437:11
**auditor** [2] - 1398:25, 1436:23
**August** [27] - 1390:17, 1391:9, 1393:11, 1416:18, 1425:16, 1427:13, 1429:12, 1436:17, 1441:1, 1442:3, 1442:4, 1442:5, 1444:22, 1444:23, 1444:24, 1445:9, 1445:11, 1445:13, 1446:1, 1446:5, 1448:6, 1449:8, 1450:13, 1450:15, 1455:21, 1458:9, 1458:21
**authenticate** [1] - 1396:21
**available** [13] - 1379:23, 1386:11, 1386:12, 1390:8, 1392:11, 1394:18, 1395:8, 1395:17, 1396:10, 1397:22, 1425:21, 1427:13, 1438:11
**Avenue** [4] - 1365:16, 1365:21, 1366:4, 1366:8
**average** [1] - 1427:19
**aware** [7] - 1386:5, 1396:7, 1414:19, 1434:14, 1434:15, 1442:5, 1460:2

**B**

**bachelor** [1] - 1398:17
**back-of-the-envelope** [1] - 1444:9
**backwards** [1] - 1444:14
**bad** [7] - 1424:9, 1425:3, 1427:4, 1427:6, 1428:4, 1439:2
**badness** [1] - 1425:12
**bads** [1] - 1427:2
**BALA** [2] - 1367:3, 1369:17
**balance** [3] - 1409:6, 1428:2, 1428:9
**bank** [5] - 1369:22, 1370:5, 1399:25, 1400:12
**Bank** [7] - 1399:9, 1399:12, 1399:20, 1399:22, 1400:1,

1400:7, 1404:24
**banking** [1] - 1422:21
**banks** [3] - 1370:6, 1382:6, 1406:2
**banks'** [1] - 1422:20
**BARNES** [1] - 1365:15
**bars** [1] - 1387:12
**base** [1] - 1429:25
**based** [11] - 1371:19, 1404:5, 1407:21, 1424:1, 1435:18, 1435:21, 1454:17, 1455:1, 1455:3, 1456:11
**basing** [1] - 1424:15
**basis** [8] - 1401:25, 1405:9, 1410:16, 1419:5, 1419:25, 1434:24, 1443:12, 1447:2
**Bates** [1] - 1431:17
**became** [4] - 1399:10, 1399:12, 1399:22, 1399:25
**become** [1] - 1426:24
**becomes** [1] - 1376:2
**BEFORE** [2] - 1365:1, 1365:12
**beforehand** [1] - 1409:14
**began** [6] - 1414:12, 1414:13, 1416:4, 1421:18, 1456:17, 1456:20
**begin** [4] - 1430:17, 1430:18, 1430:23, 1456:20
**Beginning** [1] - 1434:23
**beginning** [1] - 1420:9
**begun** [1] - 1421:13
**behind** [2] - 1406:9, 1406:18
**belief** [1] - 1373:22
**Bench** [1] - 1368:9
**bench** [1] - 1369:9
**benefit** [2] - 1401:4, 1449:5
**benefited** [1] - 1438:12
**benefits** [1] - 1428:6
**Benson** [5] - 1387:3, 1410:20, 1412:2, 1431:19, 1441:2
**BERGMAN** [18] - 1366:3, 1369:15, 1369:19, 1372:11, 1373:2, 1373:3, 1377:16, 1384:6, 1390:22, 1391:2,

1394:4, 1396:19, 1396:23, 1417:14, 1444:2, 1452:10, 1452:12, 1459:11
**Bergman** [16] - 1369:14, 1366:14, 1377:24, 1378:2, 1378:9, 1381:2, 1381:15, 1382:15, 1382:18, 1383:13, 1384:20, 1385:16, 1387:24, 1389:3, 1390:10, 1395:22
**Berkley** [1] - 1365:15
**best** [1] - 1404:19
**between** [9] - 1372:4, 1388:19, 1408:20, 1412:3, 1412:7, 1420:19, 1427:12, 1447:11
**beyond** [1] - 1384:6
**big** [4] - 1395:10, 1407:16, 1414:22, 1425:25
**biggest** [3] - 1436:3, 1436:12, 1436:13
**billion** [54] - 1376:15, 1382:12, 1385:5, 1388:10, 1388:14, 1388:18, 1388:19, 1388:20, 1389:23, 1390:2, 1390:5, 1392:5, 1392:8, 1392:9, 1392:10, 1394:19, 1416:16, 1423:17, 1425:15, 1425:19, 1425:20, 1425:24, 1425:25, 1426:12, 1427:8, 1427:9, 1430:1, 1432:2, 1433:13, 1433:14, 1446:21, 1446:24, 1447:4, 1447:5, 1447:7, 1447:15, 1447:16, 1447:17, 1447:18, 1447:24, 1449:14, 1449:15, 1449:17, 1449:19, 1451:13, 1451:14, 1451:15, 1451:20
**billions** [1] - 1392:5
**bit** [8] - 1395:16, 1407:11, 1414:18, 1422:10, 1432:23, 1439:2, 1443:8, 1450:5
**blog** [4] - 1457:16, 1457:18, 1458:11, 1458:13

**blow** [2] - 1378:12, 1388:11
**board** [34] - 1389:5, 1390:20, 1391:10, 1413:12, 1413:19, 1415:1, 1415:3, 1415:5, 1415:6, 1418:3, 1418:11, 1418:14, 1419:22, 1420:1, 1420:2, 1420:4, 1420:8, 1420:12, 1420:18, 1433:14, 1434:15, 1434:16, 1434:17, 1434:18, 1435:5, 1435:8, 1436:20, 1436:25, 1439:24, 1440:5, 1440:12, 1440:14, 1440:19, 1441:24
**Board** [4] - 1431:18, 1433:6, 1436:16, 1440:8
**bode** [1] - 1432:12
**Boies** [1] - 1365:21
**book** [3] - 1408:4, 1435:18, 1438:16
**books** [2] - 1413:18, 1435:22
**borders** [1] - 1409:19
**borrow** [4] - 1428:18, 1429:3, 1429:4, 1448:3
**borrowed** [1] - 1429:4
**borrower's** [1] - 1436:9
**bottom** [10] - 1382:16, 1382:17, 1388:9, 1389:19, 1407:5, 1418:9, 1423:12, 1433:10, 1433:11, 1448:10
**bottom-line** [1] - 1407:5
**bought** [1] - 1377:13
**bound** [1] - 1460:6
**Bowler** [2] - 1368:14, 1410:24
**box** [1] - 1368:11
**Brad** [7] - 1412:23, 1413:1, 1413:5, 1415:1, 1431:7, 1434:17, 1437:8
**break** [4] - 1414:22, 1442:10, 1442:12
**BRIAN** [1] - 1365:15
**brief** [3] - 1368:6, 1419:22, 1443:10
**briefed** [1] - 1418:14
**bring** [2] - 1390:14,

1420:3
**bringing** [2] - 1380:9, 1387:24
**brought** [3] - 1421:1, 1421:2, 1443:22
**build** [3] - 1404:10, 1410:7, 1430:25
**building** [3] - 1421:8, 1430:10, 1430:13
**bullet** [3] - 1396:8, 1455:8, 1455:10
**bunch** [1] - 1430:21
**business** [11] - 1381:9, 1383:22, 1398:17, 1408:5, 1432:12, 1432:22, 1435:18, 1435:21, 1435:22, 1438:16
**buying** [2] - 1449:5, 1449:6
**BY** [14] - 1369:19, 1373:3, 1377:20, 1384:11, 1391:8, 1393:10, 1394:7, 1397:1, 1398:9, 1398:21, 1417:21, 1442:20, 1444:2, 1452:12

**C**

**calculate** [3] - 1371:12, 1371:15, 1371:23
**calculated** [2] - 1422:17, 1447:11
**calendar** [2] - 1373:15, 1374:4
**cannot** [1] - 1414:1
**capacity** [2] - 1383:15, 1445:22
**capital** [11] - 1377:14, 1407:18, 1407:21, 1407:22, 1408:1, 1410:7, 1428:8, 1428:13, 1444:7, 1444:16, 1444:18
**Capital** [7] - 1400:8, 1400:9, 1400:13, 1400:15, 1404:25, 1406:3, 1408:14
**capitalized** [1] - 1444:8
**capped** [1] - 1407:25
**careful** [1] - 1443:13
**carryforward** [1] - 1408:23
**carryforwards** [2] - 1409:4, 1409:7
**carryover** [2] - 1418:9,

1418:10
**Case** [6] - 1365:4, 1365:8, 1437:20, 1437:22, 1438:11, 1438:18
**case** [9] - 1370:20, 1373:9, 1377:11, 1395:4, 1404:21, 1429:25, 1432:25, 1459:16, 1459:17
**Case-Shiller** [4] - 1437:20, 1437:22, 1438:11, 1438:18
**cases** [3] - 1397:23, 1397:24, 1397:25
**cash** [1] - 1440:2
**catch** [3] - 1425:1, 1425:3, 1425:5
**category** [1] - 1443:6
**causes** [1] - 1402:15
**cautions** [1] - 1424:8
**cautious** [1] - 1450:5
**central** [1] - 1369:22
**CEO** [4] - 1391:16, 1393:23, 1410:19, 1414:9
**certain** [4] - 1422:8, 1422:11, 1449:4, 1454:13
**certainly** [7] - 1370:16, 1401:23, 1414:19, 1426:4, 1429:1, 1444:15, 1444:17
**CERTIFICATE** [1] - 1461:1
**certification** [2] - 1445:18, 1445:19
**certified** [1] - 1445:19
**certify** [1] - 1461:3
**CFO** [6] - 1399:25, 1400:12, 1401:3, 1401:6, 1401:13, 1445:22
**chains** [1] - 1386:7
**chair** [6] - 1370:17, 1370:23, 1371:8, 1371:10, 1371:16, 1371:24
**chairman** [3] - 1371:2, 1371:8, 1440:12
**chance** [2] - 1390:12, 1429:16
**change** [3] - 1392:9, 1438:21, 1457:22
**changed** [5] - 1392:2, 1427:15, 1427:20, 1442:2, 1456:16
**changes** [3] - 1428:3, 1435:11, 1442:6

changing [1] - 1426:24
**charge** [7] - 1400:17, 1406:4, 1406:14, 1406:15, 1423:8, 1430:23, 1434:1
**charge-off** [1] - 1406:15
**charge-offs** [3] - 1406:14, 1430:23, 1434:1
**chart** [3] - 1388:12, 1391:24, 1391:25
**Check** [1] - 1365:18
**check** [1] - 1438:18
**chief** [5] - 1400:10, 1415:13, 1437:1, 1438:7, 1450:21
**chose** [1] - 1386:2
**Chryssa** [6] - 1419:14, 1419:15, 1419:19, 1420:11, 1420:17
**circular** [3] - 1395:6, 1395:10, 1395:18
**cites** [2] - 1380:18, 1380:19
**City** [1] - 1399:5
**civil** [2] - 1397:23, 1397:25
**clarifying** [2] - 1398:2, 1445:12
**CLASS** [1] - 1365:9
**Class** [3] - 1365:17, 1368:12, 1368:13
**clear** [11] - 1401:21, 1402:11, 1407:1, 1407:21, 1413:7, 1413:14, 1432:7, 1432:9, 1432:13, 1432:14, 1456:22
**clearer** [1] - 1439:25
**clearly** [2] - 1404:17, 1442:2
**client** [1] - 1399:17
**clients** [1] - 1399:16
**close** [6] - 1400:6, 1411:25, 1413:12, 1426:5, 1432:1, 1443:17
**closer** [2] - 1418:23, 1420:17
**closing** [1] - 1413:18
**collaboration** [1] - 1420:19
**collective** [1] - 1428:5
**college** [1] - 1398:12
**College** [1] - 1399:5
**color** [1] - 1414:8
**colored** [1] - 1438:4
**COLUMBIA** [1] -

1365:1
**Columbia** [1] - 1366:8
**comfortable** [4] - 1401:3, 1429:15, 1439:1, 1449:20
**coming** [3] - 1413:21, 1427:18, 1435:23
**comment** [1] - 1398:20
**commenting** [1] - 1386:9
**comments** [1] - 1415:2
**commitment** [27] - 1369:21, 1371:1, 1371:13, 1371:18, 1371:23, 1372:7, 1373:19, 1374:21, 1375:12, 1375:17, 1375:23, 1384:25, 1385:4, 1387:19, 1395:3, 1396:11, 1421:21, 1421:23, 1421:25, 1422:2, 1422:3, 1422:4, 1422:14, 1422:18, 1423:1, 1447:8
**committed** [1] - 1374:8
**committee** [12] - 1412:24, 1413:1, 1413:5, 1420:6, 1436:19, 1436:20, 1436:23, 1437:4, 1437:11, 1439:9, 1458:6, 1458:9
**Committee** [1] - 1436:16
**committees** [2] - 1420:7, 1436:20
**common** [1] - 1410:15
**communicated** [1] - 1457:21
**communication** [2] - 1410:5, 1414:13
**communications** [4] - 1414:20, 1440:6, 1440:10
**companies** [7] - 1382:6, 1396:5, 1399:1, 1405:7, 1409:18, 1418:15, 1424:25
**company** [40] - 1376:15, 1378:20, 1379:5, 1380:8, 1380:9, 1380:14, 1380:15, 1380:20, 1381:12, 1381:23, 1383:2, 1383:14,

1386:6, 1401:3, 1401:22, 1404:18, 1405:3, 1405:6, 1407:6, 1408:3, 1409:9, 1412:3, 1418:21, 1420:14, 1424:12, 1424:14, 1424:18, 1428:19, 1428:25, 1429:14, 1429:16, 1429:18, 1430:3, 1430:7, 1436:1, 1446:25, 1448:24, 1451:18, 1451:20
**Company** [1] - 1434:22
**company's** [5] - 1383:1, 1383:21, 1435:12, 1440:7, 1448:14
**compared** [9] - 1378:2, 1384:24, 1390:7, 1427:23, 1430:5, 1437:19, 1438:17, 1449:1, 1449:10
**comparison** [1] - 1438:22
**compensation** [2] - 1373:24, 1374:10
**compiled** [1] - 1403:18
**completed** [1] - 1369:12
**completely** [2] - 1382:10, 1426:10
**compliance** [1] - 1437:1
**component** [1] - 1406:8
**compounding** [1] - 1429:7
**comprehensive** [7] - 1433:13, 1435:1, 1454:20, 1454:21, 1455:12, 1456:7, 1456:8
**comptroller** [2] - 1419:19, 1420:7
**computer** [1] - 1366:11
**computer-aided** [1] - 1366:11
**concept** [1] - 1408:15
**concern** [1] - 1383:20
**concerning** [1] - 1458:25
**conclusion** [2] - 1402:25, 1403:1
**condition** [9] -

1378:21, 1379:5, 1379:9, 1380:20, 1381:6, 1381:9, 1381:24, 1382:14, 1383:2
**conditions** [3] - 1418:16, 1422:8, 1422:11
**conference** [2] - 1368:9, 1369:9
**confidence** [1] - 1383:14
**confirm** [4] - 1372:19, 1397:2, 1397:5, 1397:7
**connection** [1] - 1373:8
**cons** [1] - 1457:22
**consent** [1] - 1417:13
**consented** [1] - 1417:9
**conservative** [6] - 1405:23, 1437:19, 1437:21, 1438:2, 1438:5, 1438:23
**conservator** [7] - 1380:4, 1380:7, 1380:14, 1381:17, 1381:20, 1381:22, 1382:25
**conservatorship** [6] - 1378:14, 1378:16, 1378:18, 1382:19, 1382:22, 1383:13
**conserve** [1] - 1383:1
**consistent** [19] - 1379:5, 1379:13, 1379:15, 1380:1, 1381:3, 1381:4, 1381:6, 1384:2, 1392:17, 1392:19, 1394:17, 1394:22, 1394:24, 1432:6, 1437:10, 1455:14, 1457:19, 1459:10
**consistently** [1] - 1402:7
**constituents** [1] - 1405:5
**constitute** [1] - 1453:7, 1457:1
**constitutes** [1] - 1459:4
**Constitution** [1] - 1366:8
**consultation** [3] - 1371:2, 1371:7, 1371:16
**consulted** [1] - 1371:25

**consume** [1] - 1427:3
**contact** [1] - 1400:20
**contain** [1] - 1370:8
**contained** [1] - 1457:9
**continue** [7] - 1382:8, 1383:22, 1400:6, 1424:20, 1429:17, 1437:18, 1448:22
**continued** [5] - 1365:24, 1373:21, 1399:21, 1420:18, 1439:16
**Continued** [1] - 1369:18
**CONTINUED** [1] - 1366:1
**continuing** [1] - 1422:1
**contributed** [1] - 1383:16
**contributor** [1] - 1403:25
**control** [3] - 1378:20, 1437:2, 1450:4
**controls** [2] - 1436:21, 1437:3
**convenience** [1] - 1442:12
**conversation** [8] - 1401:15, 1401:18, 1402:22, 1412:15, 1413:23, 1428:16, 1428:23, 1428:24
**conversations** [7] - 1401:20, 1411:12, 1413:22, 1415:21, 1415:22, 1416:4, 1419:18
**Cooper** [1] - 1365:15
**copy** [5] - 1372:19, 1393:3, 1393:4, 1393:5, 1451:22
**corporate** [1] - 1400:17
**correct** [62] - 1369:23, 1370:9, 1370:15, 1370:21, 1371:3, 1371:9, 1371:13, 1371:14, 1371:18, 1372:1, 1372:8, 1373:6, 1373:7, 1373:9, 1373:15, 1374:12, 1374:16, 1374:22, 1374:23, 1375:2, 1375:8, 1375:9, 1375:13, 1375:24, 1376:4, 1376:8, 1376:19, 1378:11, 1384:18, 1387:6, 1391:18,

1403:9, 1407:17, 1409:12, 1409:16, 1419:2, 1431:2, 1442:25, 1445:20, 1447:5, 1447:7, 1449:23, 1451:21, 1453:9, 1453:15, 1454:8, 1454:9, 1454:12, 1454:25, 1455:1, 1455:5, 1455:6, 1455:15, 1455:16, 1455:19, 1455:22, 1456:10, 1458:16, 1458:22, 1458:23, 1461:4
**corrections** [1] - 1442:1
**cost** [3] - 1407:18, 1408:2, 1434:10
**costs** [4] - 1406:16, 1406:23, 1406:25
**Counsel** [1] - 1396:14
**counsel** [1] - 1393:4
**country** [1] - 1397:25
**couple** [1] - 1409:14
**course** [5] - 1414:17, 1414:24, 1418:22, 1421:11, 1422:20
**Court** [6] - 1366:7, 1366:7, 1368:18, 1368:19, 1390:10, 1460:2
**court** [3] - 1368:2, 1397:23, 1418:1
**COURT** [29] - 1365:1, 1368:8, 1369:7, 1369:10, 1372:16, 1372:20, 1372:24, 1377:18, 1384:7, 1390:25, 1391:5, 1394:5, 1396:17, 1396:22, 1396:24, 1397:12, 1397:21, 1398:5, 1398:18, 1417:15, 1442:9, 1442:17, 1452:8, 1452:11, 1459:13, 1459:22, 1460:3, 1461:1, 1461:9
**Court's** [2] - 1368:11, 1368:23
**COURTROOM** [3] - 1372:22, 1393:7, 1393:9
**courtroom** [4] - 1368:3, 1442:14, 1442:16, 1459:18
**cover** [12] - 1387:2, 1392:22, 1420:1, 1431:18, 1439:21,

1446:13, 1446:17, 1447:24, 1448:12, 1456:24, 1457:3, 1460:7
**covered** [1] - 1411:8
**CPA** [1] - 1403:8
**credit** [15] - 1422:5, 1422:9, 1422:10, 1422:12, 1422:19, 1430:4, 1430:5, 1433:15, 1433:23, 1435:10, 1436:2, 1436:4, 1436:13
**credit-related** [2] - 1430:5, 1435:10
**criminal** [1] - 1397:24
**criteria** [1] - 1459:6
**criticism** [1] - 1424:7
**criticizing** [1] - 1424:4
**cross** [1] - 1369:12
**Cross** [2] - 1367:3, 1367:6
**CROSS** [1] - 1369:18, 1444:1
**CROSS-EXAMINATION** [2] - 1369:18, 1444:1
**Cross-Examination............** [2] - 1367:3, 1367:6
**CRR** [1] - 1366:7
**cumulative** [2] - 1433:12, 1447:22
**current** [6] - 1383:16, 1426:20, 1426:22, 1430:10, 1433:11, 1433:21
**curriculum** [1] - 1396:16
**customary** [1] - 1422:22
**customers** [1] - 1422:20
**CY** [2] - 1373:14, 1373:17
**cycle** [2] - 1413:13, 1430:4

---

**D**

**D.C** [5] - 1365:9, 1365:16, 1365:22, 1366:5, 1366:9
**data** [3] - 1438:11, 1438:15, 1438:17
**date** [10] - 1391:9, 1400:5, 1425:23, 1426:16, 1427:5, 1444:23, 1444:25, 1449:14, 1449:17,

1450:1
**DATE** [1] - 1461:9
**dated** [11] - 1373:5, 1386:23, 1390:17, 1426:24, 1431:9, 1435:6, 1441:1, 1445:11, 1446:5, 1450:12, 1458:9
**Dave** [2] - 1410:20, 1412:2
**David** [2] - 1369:16, 1431:19
**DAVID** [1] - 1366:3
**DAVIS** [1] - 1365:20
**days** [1] - 1409:14
**de** [1] - 1407:23
**deal** [1] - 1369:8
**dealings** [1] - 1422:20
**death** [2] - 1429:10, 1429:11
**debate** [2] - 1401:15, 1401:17
**December** [1] - 1385:6
**decent** [1] - 1440:22
**decent-sized** [1] - 1440:22
**decide** [3] - 1376:25, 1377:1, 1377:2
**decision** [3] - 1402:24, 1409:10, 1426:15
**decisions** [2] - 1405:3, 1426:11
**deck** [3] - 1431:17, 1431:21, 1434:21
**declare** [1] - 1450:5
**decline** [1] - 1434:3
**declines** [1] - 1424:11
**deemed** [1] - 1444:7
**Defendant** [1] - 1366:2
**defendant** [1] - 1444:3
**Defendants** [2] - 1365:7, 1368:14
**defendants** [6] - 1368:5, 1368:16, 1369:16, 1417:9, 1417:13, 1459:20
**defense** [1] - 1398:4
**deferred** [12] - 1408:15, 1408:19, 1410:1, 1412:16, 1414:21, 1415:10, 1419:23, 1420:11, 1440:23, 1441:7, 1441:13, 1443:22
**definitely** [2] - 1370:25, 1432:25
**definition** [1] - 1406:6
**degradations** [2] -

1424:12, 1424:13
**degree** [2] - 1398:16, 1447:1
**Deich** [1] - 1403:22
**deliver** [1] - 1409:23
**delivering** [1] - 1402:7
**Deloitte** [4] - 1398:23, 1398:24, 1399:13, 1399:14
**demand** [1] - 1385:8
**demanded** [1] - 1385:11
**demanding** [1] - 1370:24
**DeMarco** [11] - 1385:25, 1386:21, 1400:24, 1414:2, 1415:21, 1415:22, 1440:6, 1440:11, 1440:17, 1440:18, 1447:10
**demonstrative** [4] - 1379:10, 1379:17, 1379:18, 1388:22
**denied** [1] - 1368:22
**deny** [3] - 1368:18, 1369:6, 1369:7
**Department** [2] - 1393:24, 1439:12
**dependent** [1] - 1406:22
**DEPOSITION** [1] - 1367:5
**deposition** [2] - 1397:15, 1398:6
**Deposition** [1] - 1368:14
**depositions** [1] - 1369:5
**Depression** [1] - 1370:6
**DEPUTY** [3] - 1372:22, 1393:7, 1393:9
**DeRita** [7] - 1378:1, 1388:9, 1389:1, 1390:15, 1392:1, 1393:3, 1417:19
**described** [2] - 1413:24, 1441:5
**describing** [3] - 1386:4, 1431:12, 1437:11
**design** [1] - 1438:2
**desire** [1] - 1410:7
**detailed** [1] - 1404:15
**determination** [3] - 1419:7, 1420:14, 1420:17
**determine** [5] - 1374:7, 1401:2,

1405:23, 1425:21, 1447:23
**determined** [2] - 1371:17, 1371:19
**developed** [1] - 1438:6
**developments** [2] - 1428:1, 1428:2
**devil's** [1] - 1438:20
**DHARAN** [2] - 1367:3, 1369:17
**Dharan** [6] - 1374:14, 1377:21, 1378:6, 1390:11, 1393:11, 1397:2
**Dharan's** [1] - 1396:15
**dialogue** [2] - 1415:9, 1415:11
**difference** [3] - 1388:19, 1390:7, 1447:11
**differences** [1] - 1408:20
**different** [15] - 1385:16, 1390:11, 1392:10, 1392:13, 1394:15, 1399:24, 1402:4, 1404:3, 1404:11, 1405:7, 1405:21, 1427:19, 1437:2, 1438:19, 1443:10
**differently** [2] - 1432:23, 1456:17
**difficult** [4] - 1404:16, 1408:8, 1408:10
**digit** [1] - 1444:12
**Direct** [1] - 1367:5
**direct** [2] - 1403:23, 1415:21
**DIRECT** [1] - 1398:8
**directed** [1] - 1403:4
**directing** [1] - 1417:24
**direction** [5] - 1402:10, 1414:15, 1420:10, 1427:12, 1427:25
**directive** [1] - 1403:3
**directly** [3] - 1383:16, 1419:15, 1436:5
**director** [1] - 1380:13
**Director** [4] - 1400:24, 1415:21, 1440:6, 1447:10
**directors** [3] - 1418:4, 1433:14, 1435:5
**Directors** [2] - 1431:19, 1436:17
**disagree** [3] - 1457:10, 1457:25,

1458:2
**disagreed** [1] - 1457:18
**disclaimer** [1] - 1389:11
**disclose** [2] - 1396:4, 1396:6
**disclosed** [1] - 1396:4
**disclosure** [2] - 1396:9, 1456:16
**disclosures** [2] - 1405:11, 1456:21
**discuss** [3] - 1418:22, 1428:14, 1440:18
**discussed** [6] - 1411:10, 1418:11, 1418:19, 1435:8, 1439:10, 1440:5
**discussing** [2] - 1433:21, 1457:23
**discussion** [6] - 1393:18, 1410:13, 1421:24, 1428:12, 1429:24, 1440:13
**Discussion** [1] - 1441:3
**discussions** [6] - 1413:11, 1418:24, 1419:17, 1422:1, 1425:9, 1428:21
**displaying** [1] - 1417:19
**dissimilar** [1] - 1422:8
**distant** [5] - 1409:25, 1413:4, 1416:7, 1421:2, 1440:24
**District** [4] - 1366:7, 1366:8, 1399:6, 1399:7
**DISTRICT** [3] - 1365:1, 1365:1, 1365:13
**dividend** [31] - 1375:1, 1375:4, 1375:8, 1375:10, 1375:13, 1375:18, 1375:19, 1375:24, 1375:25, 1376:11, 1376:14, 1376:16, 1428:14, 1429:7, 1439:19, 1439:20, 1446:13, 1446:17, 1446:20, 1447:19, 1447:25, 1448:13, 1452:21, 1453:6, 1454:16, 1454:22, 1455:13, 1456:8, 1456:25, 1457:2
**dividends** [10] - 1376:4, 1376:7, 1382:11, 1428:10,

1428:18, 1429:5, 1453:2, 1454:3, 1456:4, 1456:23
**Doctor** [2] - 1373:4, 1377:17
**document** [28] - 1368:25, 1378:2, 1378:7, 1379:19, 1380:25, 1384:13, 1385:9, 1389:3, 1389:5, 1389:9, 1392:13, 1392:14, 1392:19, 1392:21, 1394:1, 1394:10, 1423:5, 1423:16, 1423:18, 1424:2, 1434:19, 1435:7, 1437:14, 1445:4, 1447:9, 1456:15, 1457:7
**documents** [10] - 1386:7, 1393:2, 1395:12, 1414:16, 1417:8, 1417:23, 1425:21, 1442:6, 1442:11, 1449:13
**dollars** [1] - 1444:15
**domain** [1] - 1440:15
**done** [7] - 1371:20, 1371:21, 1372:3, 1403:6, 1413:20, 1444:24, 1445:22
**double** [2] - 1430:12, 1431:1
**Doug** [2] - 1438:7, 1438:9
**down** [17] - 1381:16, 1382:11, 1382:12, 1384:19, 1397:12, 1412:21, 1422:12, 1440:20, 1446:11, 1447:8, 1448:23, 1456:5, 1458:12, 1458:14, 1458:15, 1459:4, 1459:9
**Dr** [2] - 1374:14, 1377:21
**Draft** [1] - 1441:3
**draft** [2] - 1393:18, 1429:24
**drafts** [1] - 1414:2
**Draw** [1] - 1423:6
**draw** [26] - 1375:12, 1375:17, 1375:23, 1375:25, 1376:1, 1388:14, 1388:20, 1389:23, 1390:9, 1395:6, 1395:10, 1395:18, 1407:24, 1422:11, 1422:12,

1428:17, 1434:25, 1439:17, 1439:19, 1439:21, 1440:1, 1447:8, 1447:10, 1447:20, 1454:15, 1456:24
**drawing** [1] - 1375:21
**drawn** [1] - 1395:13
**draws** [3] - 1453:1, 1453:8, 1454:1
**drew** [2] - 1429:6
**driver** [1] - 1436:3
**drivers** [4] - 1406:9, 1406:18, 1435:9, 1439:25
**DTA** [1] - 1451:19
**DTABs** [1] - 1418:17
**DTVA** [3] - 1419:3, 1419:17, 1419:18
**due** [2] - 1373:21, 1433:15
**Duncan** [1] - 1438:7
**Dunn** [2] - 1390:17, 1391:12
**during** [8] - 1374:4, 1408:13, 1414:12, 1426:1, 1427:15, 1427:18, 1427:21, 1427:25
**DX-299** [3] - 1367:9, 1372:14, 1372:25
**DX-329** [3] - 1367:9, 1372:14, 1372:25
**DX-344** [3] - 1367:9, 1372:14, 1372:25
**DX-365** [3] - 1367:9, 1372:14, 1372:25
**DX-418** [3] - 1367:9, 1372:14, 1372:25
**DX-469** [3] - 1372:15, 1372:25, 1373:4
**DX-469........** [1] - 1367:9

## E

**e-mail** [12] - 1386:7, 1387:2, 1390:16, 1391:12, 1393:11, 1429:21, 1431:7, 1441:1, 1458:8, 1458:21, 1459:1
**early** [4] - 1414:17, 1415:13, 1416:18, 1427:12
**earn** [1] - 1452:21
**earning** [3] - 1408:22, 1431:25, 1432:4
**earnings** [12] - 1374:9, 1387:4, 1431:25,

1432:10, 1433:24, 1444:6, 1447:1, 1447:2, 1447:23, 1450:23, 1454:20, 1456:6
**earns** [1] - 1435:19
**easier** [1] - 1401:25
**ECF** [1] - 1368:15
**economist** [1] - 1438:7
**economy** [2] - 1370:14, 1450:4
**education** [1] - 1420:12
**Edward** [1] - 1386:21
**effective** [1] - 1409:18
**effects** [1] - 1454:14
**efficient** [1] - 1401:25
**either** [5] - 1381:2, 1391:16, 1395:15, 1395:21, 1412:23
**employee** [1] - 1399:22
**employees** [1] - 1458:12
**encounter** [1] - 1408:15
**encourage** [1] - 1458:11
**encouraged** [1] - 1439:3
**encouraging** [1] - 1450:21
**End** [1] - 1369:9
**end** [8] - 1388:12, 1408:14, 1413:12, 1415:25, 1416:1, 1421:19, 1445:16, 1447:13
**ended** [3] - 1422:12, 1447:14, 1453:20
**ends** [1] - 1400:19
**enhance** [1] - 1383:14
**ensure** [3] - 1427:1, 1438:18, 1451:16
**ensuring** [1] - 1374:9
**entered** [2] - 1368:3, 1442:16
**enterprise** [5] - 1373:18, 1401:13, 1408:1, 1410:8, 1439:22
**enterprises** [5] - 1374:10, 1382:14, 1402:24, 1405:1, 1410:8
**entities** [2] - 1399:3, 1399:4
**entitled** [2] - 1368:13, 1461:5

**entity** [4] - 1378:19, 1380:8, 1400:12, 1401:14
**envelope** [1] - 1444:9
**environment** [1] - 1426:25
**envision** [2] - 1446:12, 1446:16
**equity** [1] - 1387:25
**era** [1] - 1370:6
**erosion** [1] - 1396:10
**ESQ** [7] - 1365:15, 1365:17, 1365:20, 1365:20, 1366:2, 1366:3, 1366:3
**essentially** [3] - 1394:21, 1402:20, 1428:9
**establish** [1] - 1378:19
**estimates** [1] - 1434:14
**et** [2] - 1365:3, 1365:6
**evaluate** [1] - 1374:4
**eve** [2] - 1425:13, 1441:6
**event** [6] - 1405:24, 1405:25, 1419:3, 1420:2, 1422:7, 1422:11
**eventually** [1] - 1415:20
**evidence** [15] - 1372:12, 1372:13, 1373:1, 1378:1, 1385:8, 1385:12, 1390:23, 1391:6, 1393:8, 1394:3, 1394:6, 1396:15, 1396:25, 1416:14, 1417:18
**Evidence** [1] - 1368:15
**exact** [2] - 1372:9, 1444:11
**exactly** [7] - 1387:15, 1389:16, 1389:22, 1412:8, 1415:5, 1441:22, 1449:22
**EXAMINATION** [4] - 1369:18, 1377:19, 1398:8, 1444:1
**Examination..........** [1] - 1367:3
**Examination............** [1] - 1367:5
**Examination............** [2] - 1367:3, 1367:6
**examined** [2] - 1386:16, 1388:1

**examining** [2] - 1385:20, 1386:3
**example** [4] - 1404:10, 1408:23, 1443:24, 1459:9
**excerpts** [4] - 1451:25, 1452:4, 1452:15, 1453:19
**excess** [4] - 1452:21, 1454:22, 1455:12, 1456:18
**exchange** [2] - 1385:7, 1385:11
**excuse** [2] - 1411:6, 1459:19
**excused** [1] - 1448:13
**Executive** [1] - 1429:22
**executive** [6] - 1400:15, 1412:24, 1412:25, 1413:5, 1431:12, 1432:20
**exhaust** [1] - 1395:7
**exhibit** [10] - 1379:23, 1379:24, 1380:1, 1388:22, 1391:24, 1423:4, 1431:5, 1448:19, 1452:8, 1452:10
**Exhibit** [22] - 1377:25, 1418:2, 1423:5, 1427:8, 1429:20, 1431:6, 1433:6, 1435:4, 1436:15, 1440:25, 1441:16, 1445:2, 1445:25, 1446:4, 1448:5, 1450:11, 1452:3, 1452:14, 1453:18, 1455:25, 1457:6, 1458:4
**EXHIBITS** [1] - 1367:8
**Exhibits** [1] - 1372:25
**exhibits** [2] - 1378:8, 1394:12
**exist** [3] - 1409:25, 1422:8, 1422:11
**existed** [6] - 1424:1, 1427:22, 1427:23, 1435:19, 1442:4, 1455:1
**exists** [1] - 1401:22
**exited** [2] - 1442:14, 1459:18
**expect** [13] - 1384:5, 1407:11, 1447:3, 1448:21, 1448:24, 1449:9, 1452:20, 1452:25, 1453:6, 1453:25, 1454:21,

1456:7, 1457:4
**expectation** [3] - 1406:14, 1430:19, 1436:4
**expectations** [10] - 1401:6, 1401:8, 1403:25, 1404:8, 1405:5, 1405:10, 1433:20, 1436:13, 1437:18, 1440:7
**expected** [4] - 1404:7, 1430:10, 1433:13, 1450:20
**expecting** [2] - 1426:4, 1437:21
**expects** [1] - 1448:13
**expense** [8] - 1406:25, 1407:1, 1407:4, 1407:13, 1407:14, 1407:16, 1408:2, 1434:8
**expenses** [7] - 1406:25, 1408:6, 1430:5, 1435:10, 1435:24, 1435:25
**experience** [5] - 1419:16, 1422:21, 1424:25, 1454:19, 1456:6
**expert** [4] - 1369:12, 1370:19, 1395:4, 1395:5
**explain** [2] - 1382:2, 1395:1
**explaining** [2] - 1388:2, 1392:14
**explicitly** [1] - 1419:25
**express** [2] - 1382:7, 1441:12
**expressed** [1] - 1409:21
**expressing** [1] - 1451:6
**expression** [1] - 1443:13
**extent** [1] - 1407:11
**external** [1] - 1414:20
**externally** [1] - 1438:10
**extreme** [1] - 1432:20

## F

**face** [2] - 1396:5, 1424:13
**facilitate** [1] - 1411:12
**fact** [10] - 1416:22, 1418:14, 1424:23, 1428:16, 1429:2, 1430:15, 1432:23,

1446:15, 1457:15, 1459:5
**factors** [7] - 1404:9, 1409:25, 1420:13, 1420:21, 1427:24, 1453:11
**facts** [1] - 1420:22
**failed** [1] - 1399:19
**fair** [3] - 1404:13, 1411:15, 1423:22
**FAIRHOLME** [1] - 1365:3
**fairly** [4] - 1405:1, 1426:20, 1426:22, 1443:17
**fall** [2] - 1400:7, 1430:5
**falls** [1] - 1406:5
**familiar** [4] - 1406:2, 1428:25, 1457:8, 1458:20
**familiarity** [1] - 1458:24
**family** [2] - 1404:8, 1437:15
**Fannie** [98] - 1374:14, 1374:16, 1374:24, 1375:11, 1375:16, 1376:3, 1376:6, 1376:10, 1380:15, 1385:7, 1385:17, 1387:22, 1388:16, 1388:18, 1389:6, 1389:21, 1389:25, 1390:17, 1391:17, 1392:7, 1392:8, 1392:21, 1393:23, 1395:16, 1395:20, 1395:21, 1396:3, 1400:14, 1401:14, 1401:21, 1402:1, 1402:6, 1402:21, 1403:3, 1403:12, 1403:19, 1404:3, 1404:14, 1404:23, 1405:7, 1405:14, 1405:16, 1406:24, 1407:2, 1407:16, 1407:21, 1407:23, 1409:1, 1409:3, 1410:19, 1410:21, 1411:2, 1411:7, 1411:11, 1413:22, 1418:4, 1421:24, 1423:9, 1423:16, 1423:20, 1424:5, 1425:8, 1425:14, 1425:20, 1426:16, 1427:7, 1427:16, 1428:8, 1428:12,

1429:10, 1429:11, 1429:21, 1431:12, 1431:22, 1431:25, 1432:7, 1433:6, 1435:6, 1435:19, 1435:20, 1436:17, 1438:13, 1438:14, 1444:7, 1444:16, 1444:18, 1444:21, 1445:3, 1445:6, 1446:16, 1447:5, 1447:7, 1448:11, 1449:9, 1450:21, 1452:4, 1452:15, 1453:20
**FANNIE** [1] - 1365:8
**Fannie's** [7] - 1404:20, 1406:8, 1406:9, 1406:18, 1407:18, 1423:24, 1433:17
**far** [3] - 1403:8, 1414:12, 1414:21
**fashion** [1] - 1428:6
**fast** [2] - 1425:5, 1425:7
**FDIC** [1] - 1399:20
**February** [1] - 1399:14
**Fed** [6] - 1369:25, 1370:2, 1370:5, 1370:8, 1370:11, 1370:18
**Federal** [14] - 1366:2, 1369:22, 1369:25, 1370:13, 1370:17, 1370:23, 1371:2, 1371:8, 1371:10, 1371:16, 1371:25, 1380:12, 1437:8
**FEDERAL** [1] - 1365:6
**fee** [15] - 1369:21, 1371:1, 1371:13, 1371:18, 1371:24, 1372:7, 1373:19, 1374:21, 1421:23, 1421:25, 1422:2, 1422:3, 1422:4, 1422:14, 1423:1
**feedback** [2] - 1414:4, 1414:5
**feeding** [1] - 1404:12
**fees** [5] - 1404:9, 1406:19, 1422:15, 1422:17, 1427:20
**felt** [5] - 1402:4, 1429:15, 1429:18, 1439:24, 1449:21
**few** [7] - 1379:22, 1380:24, 1400:19, 1412:14, 1426:10, 1443:5, 1443:19

**fewer** [1] - 1434:13
**FHFA** [38] - 1371:1,
1371:7, 1371:16,
1371:24, 1372:6,
1381:22, 1385:7,
1386:4, 1386:8,
1395:9, 1400:20,
1402:20, 1402:24,
1403:2, 1405:9,
1405:16, 1411:7,
1412:16, 1412:22,
1414:3, 1414:10,
1414:19, 1415:10,
1415:14, 1416:5,
1416:19, 1418:5,
1420:24, 1421:18,
1422:25, 1424:4,
1426:7, 1431:7,
1434:14, 1434:20,
1437:9, 1437:11,
1459:6
**fifth** [1] - 1448:19
**file** [3] - 1391:20,
1414:1, 1414:2
**filed** [6] - 1368:12,
1368:23, 1414:7,
1444:25, 1459:24,
1460:1
**filing** [3] - 1369:2,
1396:3, 1445:3
**filings** [4] - 1395:23,
1405:12, 1414:3,
1414:5
**final** [2] - 1391:20,
1414:5
**finally** [1] - 1453:11
**finance** [7] - 1399:24,
1400:16, 1400:17,
1404:2, 1417:6,
1432:20
**Finance** [3] - 1366:2,
1380:13, 1437:9
**FINANCE** [1] - 1365:6
**Financial** [1] - 1423:7
**financial** [36] - 1370:3,
1380:9, 1380:20,
1381:5, 1381:9,
1381:12, 1382:3,
1382:7, 1395:6,
1399:2, 1399:8,
1400:10, 1401:12,
1401:23, 1402:5,
1402:7, 1407:2,
1411:3, 1423:8,
1426:15, 1429:23,
1429:25, 1434:9,
1436:1, 1436:22,
1440:11, 1441:10,
1442:23, 1442:24,
1448:25, 1449:9,

1449:12, 1450:22,
1453:12, 1453:25,
1454:12
**financially** [1] -
1402:10
**financials** [1] - 1411:9
**findings** [1] - 1436:24
**fine** [2] - 1393:7,
1433:8
**Fink** [2] - 1419:19,
1420:6
**first** [26] - 1369:4,
1372:16, 1372:20,
1376:23, 1378:12,
1383:7, 1386:14,
1389:19, 1392:22,
1394:16, 1401:12,
1402:4, 1414:3,
1419:4, 1421:1,
1425:17, 1425:19,
1431:16, 1431:17,
1448:11, 1449:1,
1449:10, 1450:1,
1457:19
**five** [8] - 1382:13,
1411:15, 1433:12,
1434:4, 1435:2,
1435:3, 1435:12,
1456:5
**five-year** [4] -
1433:12, 1434:4,
1435:3, 1435:12
**Flexner** [1] - 1365:21
**flip** [2] - 1417:23,
1425:4
**fluctuations** [1] -
1449:3
**fluid** [1] - 1426:23
**focus** [1] - 1436:21
**focused** [1] - 1424:19
**focusing** [2] -
1386:10, 1388:2
**folks** [1] - 1416:5
**following** [1] -
1444:20
**follows** [1] - 1398:7
**footing** [1] - 1402:7
**FOR** [2] - 1365:1,
1369:17
**forced** [1] - 1428:13
**forecast** [19] - 1404:1,
1404:10, 1404:20,
1408:8, 1413:12,
1424:3, 1425:11,
1426:19, 1428:3,
1433:12, 1433:15,
1433:21, 1435:3,
1435:9, 1435:10,
1437:18, 1438:10,
1441:11

**forecasted** [1] -
1433:13
**forecasting** [4] -
1400:18, 1406:4,
1408:11, 1418:11
**forecasts** [24] -
1402:8, 1403:18,
1404:5, 1404:24,
1404:25, 1405:8,
1405:11, 1409:21,
1410:6, 1410:13,
1410:17, 1413:2,
1413:20, 1424:14,
1424:20, 1424:22,
1424:23, 1437:19,
1454:12, 1454:17,
1455:1, 1455:3
**foreclosed** [1] -
1434:8
**foreclosure** [1] -
1436:6
**foregoing** [1] - 1461:3
**foremost** [1] - 1401:12
**forget** [2] - 1424:9,
1425:10
**Form** [2] - 1445:3,
1453:19
**form** [1] - 1426:6
**formal** [2] - 1412:21,
1414:22
**formally** [1] - 1412:21
**format** [2] - 1397:15,
1397:16
**forming** [1] - 1392:19
**forms** [1] - 1422:9
**forth** [1] - 1432:24
**forward** [3] - 1369:10,
1401:25, 1455:8
**forward-looking** [1] -
1455:8
**Foster** [1] - 1368:15
**foundation** [2] -
1379:4, 1382:6
**four** [3] - 1396:8,
1418:9, 1430:2
**fourth** [3] - 1416:2,
1421:12, 1450:18
**fragility** [1] - 1373:22
**frame** [1] - 1435:12
**frankly** [2] - 1401:13,
1403:4
**Frazier** [2] - 1393:12,
1441:1
**Freddie** [19] - 1374:14,
1374:16, 1374:24,
1375:12, 1375:17,
1376:3, 1376:6,
1376:10, 1380:16,
1385:7, 1385:17,
1387:22, 1388:6,

1388:10, 1392:3,
1394:16, 1395:15,
1396:3, 1431:22
**free** [1] - 1417:23
**fulfill** [2] - 1373:23,
1383:15
**full** [5] - 1370:10,
1415:24, 1416:1,
1420:7, 1449:18
**function** [1] - 1436:19
**funding** [23] - 1385:1,
1385:5, 1385:12,
1386:12, 1387:18,
1387:21, 1388:3,
1388:7, 1388:23,
1389:20, 1392:2,
1392:4, 1394:14,
1394:18, 1395:2,
1395:8, 1395:11,
1395:12, 1396:10,
1408:3, 1421:21,
1422:7
**FUNDS** [1] - 1365:3
**funds** [1] - 1448:12
**future** [35] - 1374:9,
1384:10, 1385:17,
1386:5, 1401:16,
1402:13, 1404:20,
1405:2, 1405:24,
1406:8, 1407:12,
1407:19, 1409:25,
1413:4, 1416:7,
1421:3, 1424:5,
1425:16, 1426:16,
1430:10, 1430:13,
1430:19, 1435:23,
1437:18, 1440:24,
1443:1, 1443:4,
1452:20, 1452:22,
1453:1, 1453:8,
1453:24, 1454:2,
1456:4, 1457:4

---

**G**

---

**GAAP** [1] - 1408:21
**gaining** [1] - 1401:4
**gains** [1] - 1377:14
**Gehring** [2] - 1403:16,
1423:10
**general** [4] - 1405:20,
1416:6, 1425:9,
1457:9
**generally** [10] -
1397:24, 1405:22,
1412:4, 1412:24,
1417:1, 1417:24,
1422:17, 1436:21,
1437:4, 1443:14
**generate** [4] -

1454:21, 1455:12,
1456:7, 1457:5
**generating** [1] -
1373:24
**generic** [1] - 1406:6
**gentleman** [1] -
1411:1
**gentlemen** [2] -
1369:11, 1377:22
**Giffin** [1] - 1437:8
**gist** [1] - 1449:6
**given** [7] - 1392:10,
1395:9, 1435:21,
1438:15, 1447:2,
1448:3, 1449:2
**glasses** [1] - 1438:5
**go-forward** [1] -
1401:25
**goal** [1] - 1401:9
**goals** [4] - 1382:19,
1382:22, 1383:13,
1459:5
**golden** [2] - 1387:4,
1387:6
**goods** [3] - 1427:1,
1427:4, 1427:6
**government** [2] -
1428:10, 1439:17
**governmental** [3] -
1370:14, 1399:2,
1399:4
**graciously** [1] -
1396:14
**graduate** [1] - 1398:12
**graduated** [1] -
1398:22
**graduation** [1] -
1408:14
**graphics** [1] - 1393:1
**gray** [1] - 1387:12
**Great** [1] - 1370:6
**greater** [6] - 1379:3,
1382:4, 1426:2,
1437:17, 1449:5,
1450:19
**Greg** [3] - 1419:18,
1420:6, 1420:8
**gross** [1] - 1440:3
**group** [2] - 1403:24,
1420:22
**groups** [1] - 1400:11
**GSE** [2] - 1386:5,
1459:9
**GSEs** [6] - 1401:5,
1401:6, 1401:17,
1439:16, 1458:13,
1459:4
**guarantee** [1] - 1408:4
**guess** [5] - 1448:1,
1453:22, 1456:5,

1457:17

# H

**half** [8] - 1385:15, 1448:23, 1448:25, 1449:1, 1449:10, 1449:11, 1449:25, 1450:1
**halfway** [2] - 1427:9, 1437:15
**Halley** [3] - 1419:14, 1419:19
**hallway** [1] - 1428:22
**HAMISH** [1] - 1365:20
**Hamish** [2] - 1368:20, 1377:22
**Hampshire** [1] - 1365:16
**hamster** [1] - 1429:3
**handed** [9] - 1445:1, 1446:3, 1448:4, 1450:10, 1452:2, 1452:13, 1453:17, 1457:6, 1458:3
**handles** [1] - 1368:19
**happy** [1] - 1368:22
**hard** [8] - 1393:3, 1424:13, 1425:1, 1425:3, 1425:5, 1426:13, 1446:12, 1446:16
**Haskins** [1] - 1398:23
**haul** [1] - 1402:15
**head** [5] - 1403:16, 1414:14, 1419:11, 1419:13, 1419:21
**headed** [2] - 1403:15, 1403:23
**Headquarters** [1] - 1433:7
**heads** [1] - 1421:6
**heads-up** [1] - 1421:6
**headwind** [1] - 1430:12
**health** [1] - 1380:9
**hear** [3] - 1413:6, 1415:2, 1443:15
**heard** [1] - 1459:21
**heavily** [2] - 1419:16, 1424:19
**help** [3] - 1383:14, 1405:4, 1436:11
**Herman** [1] - 1460:6
**herself** [1] - 1419:16
**hide** [3] - 1378:6, 1379:11, 1379:12
**high** [4] - 1432:16, 1444:12, 1448:22, 1449:4

**higher** [5] - 1433:14, 1434:3, 1436:8, 1444:15, 1444:17
**highlight** [4] - 1379:22, 1381:1, 1381:17, 1387:1
**highlighted** [7] - 1380:24, 1383:5, 1387:20, 1387:22, 1388:18, 1389:22, 1395:20
**highlighting** [4] - 1388:21, 1429:25, 1439:10, 1439:14
**hindsight** [1] - 1404:21
**hiring** [2] - 1400:21, 1401:3
**historically** [1] - 1456:18
**history** [1] - 1424:11
**hitting** [1] - 1430:13
**hog** [1] - 1439:7
**hold** [2] - 1376:21, 1376:24
**holistic** [1] - 1407:4
**home** [15] - 1427:14, 1427:16, 1435:11, 1435:15, 1436:4, 1436:7, 1436:9, 1436:10, 1436:12, 1437:17, 1438:6, 1438:10, 1448:23, 1449:3, 1450:19
**Honor** [26] - 1368:4, 1368:10, 1368:20, 1369:6, 1369:15, 1372:12, 1372:17, 1372:23, 1377:17, 1377:22, 1391:2, 1391:7, 1393:5, 1394:2, 1396:13, 1396:23, 1397:11, 1397:14, 1398:2, 1417:7, 1417:14, 1442:19, 1459:11, 1459:19, 1459:25, 1460:4
**HONORABLE** [1] - 1365:12
**housekeeping** [1] - 1368:6
**housing** [6] - 1401:16, 1402:12, 1407:7, 1407:8, 1448:18, 1448:20
**HOUSING** [1] - 1365:6
**Housing** [3] - 1366:2, 1380:12, 1437:9
**Houston** [4] -

1398:23, 1399:5, 1399:10, 1399:16
**huge** [1] - 1436:1
**hugely** [1] - 1408:10
**Humble** [1] - 1399:5
**Hume** [2] - 1368:20, 1377:22
**HUME** [19] - 1365:20, 1368:20, 1369:5, 1372:17, 1372:23, 1377:20, 1384:11, 1390:24, 1391:1, 1391:7, 1391:8, 1393:8, 1393:10, 1394:7, 1396:13, 1396:18, 1396:20, 1397:1, 1397:10
**hypothesis** [1] - 1397:18

# I

**idea** [1] - 1416:9
**ideation** [1] - 1401:19
**identification** [7] - 1445:2, 1445:16, 1446:4, 1448:5, 1450:11, 1453:18, 1458:4
**identified** [1] - 1436:24
**identify** [1] - 1386:8
**ignorance** [1] - 1436:18
**immediate** [1] - 1390:9
**impact** [7] - 1390:6, 1401:11, 1405:24, 1421:21, 1435:10, 1435:11, 1435:16
**impacted** [1] - 1434:10
**impaired** [1] - 1383:21
**implication** [1] - 1410:6
**implications** [1] - 1429:8
**importance** [2] - 1439:10, 1439:14
**important** [12] - 1370:13, 1381:11, 1395:4, 1403:9, 1406:8, 1407:19, 1426:15, 1426:22, 1427:1, 1432:11, 1432:19, 1439:24
**imposition** [1] - 1373:23
**impression** [1] - 1421:19

**improve** [5] - 1401:12, 1401:24, 1424:20, 1425:7, 1430:17
**improved** [6] - 1402:6, 1424:23, 1428:4, 1433:15, 1433:22, 1433:23
**improvement** [9] - 1402:17, 1437:16, 1437:23, 1438:1, 1439:3, 1439:7, 1439:8, 1448:21, 1450:19
**improvements** [4] - 1427:17, 1434:9, 1437:25, 1456:20
**improving** [4] - 1402:5, 1429:18, 1433:18, 1456:19
**INC** [1] - 1365:3
**incalculably** [1] - 1423:1
**inclined** [1] - 1420:25
**including** [3] - 1370:2, 1440:7, 1443:1
**income** [14] - 1423:15, 1433:13, 1434:25, 1435:1, 1448:14, 1454:21, 1454:22, 1455:12, 1456:7, 1456:8, 1456:24
**inconsistent** [9] - 1379:6, 1379:8, 1379:13, 1381:3, 1381:6, 1383:25, 1392:17, 1394:22, 1459:1
**incorporate** [2] - 1414:4, 1428:3, 1438:16
**incorporated** [1] - 1438:10
**incorporates** [1] - 1406:15
**incorrect** [1] - 1451:16
**increase** [5] - 1421:14, 1421:15, 1437:22, 1453:2, 1454:3
**increased** [2] - 1373:24, 1433:24
**increases** [1] - 1376:22
**increasing** [1] - 1453:7
**indefinite** [1] - 1452:22
**Independent** [2] - 1399:6
**index** [4] - 1427:14, 1427:16, 1438:6,

**1438:18**
**indicate** [1] - 1429:16
**indicated** [1] - 1424:3
**indicates** [1] - 1384:9
**indication** [3] - 1385:10, 1433:17, 1433:20
**individuals** [6] - 1401:21, 1411:14, 1412:22, 1420:20, 1429:2, 1437:2
**inflection** [3] - 1430:4, 1430:6, 1430:15
**influence** [1] - 1370:14
**inform** [2] - 1405:4, 1405:11
**information** [11] - 1404:15, 1404:17, 1415:8, 1427:13, 1427:17, 1438:12, 1440:15, 1442:7, 1449:2, 1455:4, 1457:9
**informed** [2] - 1414:24, 1421:4
**infrastructure** [4] - 1400:11, 1401:22, 1401:24, 1402:17
**infrequently** [1] - 1459:25
**infusions** [1] - 1387:13
**initiate** [2] - 1412:9, 1412:10
**input** [4] - 1402:23, 1403:20, 1404:5, 1404:8
**inputs** [2] - 1403:19, 1403:21
**inside** [2] - 1404:17, 1438:13
**insignificant** [1] - 1406:24
**insofar** [1] - 1427:6
**instability** [1] - 1383:16
**instance** [3] - 1380:12, 1436:22, 1438:11
**instances** [1] - 1403:2
**instead** [2] - 1389:2, 1430:24
**institution** [3] - 1381:10, 1381:12, 1382:3
**institutions** [3] - 1382:7, 1399:2, 1399:8
**instructed** [1] -

1402:21
**instruments** [1] - 1422:16
**integrity** [1] - 1403:8
**intended** [2] - 1373:24, 1394:20
**interactions** [2] - 1412:22, 1420:18
**interest** [3] - 1406:25, 1407:14, 1408:5
**interested** [1] - 1401:17
**interim** [1] - 1458:10
**internal** [2] - 1413:22, 1436:23
**interpret** [3] - 1432:14, 1458:17, 1458:18
**interrupted** [1] - 1413:24
**interruption** [1] - 1383:22
**interview** [3] - 1401:2, 1451:4, 1451:7
**interviewed** [2] - 1444:20, 1446:7
**interviews** [1] - 1444:24
**investment** [3] - 1374:11, 1406:21, 1408:4
**involved** [4] - 1419:16, 1419:18, 1429:15, 1446:25
**involvement** [1] - 1402:23
**irony** [2] - 1428:16, 1428:20
**isolate** [1] - 1447:2
**issue** [7] - 1368:19, 1395:19, 1395:20, 1419:10, 1419:23, 1441:13
**issues** [1] - 1436:24
**issuing** [1] - 1414:11
**italics** [2] - 1452:18, 1453:24
**item** [4] - 1403:3, 1408:11, 1418:21, 1436:1
**items** [4] - 1380:24, 1408:21
**itself** [2] - 1422:4, 1450:23

## J

**James** [1] - 1437:8
**January** [4] - 1399:21, 1429:21, 1429:22, 1459:13

**Jeff** [7] - 1412:23, 1413:1, 1413:5, 1415:1, 1418:5, 1434:17, 1437:8
**Jeffrey** [1] - 1368:15
**Jenkins** [2] - 1393:6, 1417:10
**job** [1] - 1432:24
**join** [2] - 1400:7, 1400:14
**Jonathan** [2] - 1368:4, 1459:19
**JONATHAN** [1] - 1366:2
**JONES** [1] - 1366:3
**Journal** [2] - 1446:5, 1446:8
**Judge** [1] - 1394:2
**JUDGE** [1] - 1365:13
**judgment** [1] - 1408:12
**Judith** [1] - 1390:17
**July** [14] - 1386:23, 1389:6, 1390:20, 1391:9, 1413:17, 1416:18, 1427:12, 1431:9, 1431:13, 1431:19, 1431:20, 1433:6, 1433:18, 1435:6
**June** [2] - 1373:5, 1425:23
**junior** [1] - 1428:24
**jury** [19] - 1368:11, 1377:22, 1378:6, 1378:24, 1379:14, 1379:23, 1384:1, 1384:12, 1387:18, 1388:1, 1388:8, 1389:15, 1389:24, 1392:15, 1392:18, 1394:9, 1394:23, 1397:17, 1442:16
**JURY** [1] - 1365:12
**Jury** [3] - 1368:3, 1442:14, 1459:18
**jury's** [1] - 1369:3

## K

**Kathy** [1] - 1399:6
**Kaye** [1] - 1366:4
**keep** [6] - 1377:6, 1377:12, 1377:14, 1380:19, 1421:4, 1458:10
**keeping** [2] - 1414:24, 1424:13
**KENYA** [1] - 1365:20
**kept** [3] - 1387:24,

1420:15, 1443:17
**Kessler** [1] - 1365:18
**key** [12] - 1401:10, 1404:9, 1406:9, 1406:17, 1415:21, 1418:12, 1420:12, 1420:13, 1427:24, 1432:11, 1435:8, 1457:19
**kicked** [1] - 1402:17
**kind** [14] - 1399:1, 1406:6, 1412:5, 1413:13, 1414:24, 1418:8, 1421:10, 1428:22, 1429:2, 1430:15, 1437:2, 1443:11, 1443:20, 1448:22
**kinds** [1] - 1413:21
**King** [1] - 1365:18
**Kirk** [2] - 1365:15, 1419:19

## L

**ladies** [2] - 1369:11, 1377:21
**Lamberth** [1] - 1394:2
**LAMBERTH** [1] - 1365:12
**language** [1] - 1395:22
**large** [7] - 1395:14, 1405:1, 1408:10, 1416:9, 1423:1, 1430:12, 1449:25
**larger** [1] - 1416:12
**largest** [4] - 1399:9, 1399:17, 1438:14, 1438:16
**Laskawy** [1] - 1440:12
**last** [8] - 1373:5, 1387:20, 1426:10, 1435:7, 1435:8, 1437:7, 1450:3, 1453:23
**lastly** [1] - 1401:20
**late** [2] - 1416:18, 1427:12
**latter** [5] - 1426:1, 1448:23, 1448:25, 1449:10, 1449:25
**lawyers** [1] - 1398:4
**LC** [1] - 1422:10
**learned** [2] - 1409:13, 1409:14
**least** [4] - 1411:15, 1419:4, 1446:24, 1454:15
**leave** [2] - 1402:1,

1402:3
**leaving** [2] - 1382:13, 1395:17
**LEE** [1] - 1365:17
**left** [5] - 1387:19, 1399:14, 1400:7, 1400:14, 1400:15
**legal** [2] - 1378:18, 1400:12
**Lesley** [1] - 1403:22
**less** [11] - 1375:3, 1375:7, 1375:9, 1386:12, 1388:3, 1408:6, 1411:20, 1430:19, 1437:23, 1437:24, 1437:25
**letter** [5] - 1372:13, 1373:5, 1373:6, 1373:13, 1422:10
**letters** [4] - 1372:6, 1372:9, 1373:10, 1422:19
**letting** [1] - 1413:20
**level** [7] - 1406:19, 1421:8, 1434:3, 1436:25, 1444:16, 1444:17, 1450:23
**levels** [1] - 1407:22
**leverage** [1] - 1438:12
**liabilities** [4] - 1379:3, 1382:5, 1447:12
**liaison** [1] - 1412:2
**liberty** [1] - 1392:25
**life** [3] - 1398:18, 1398:19, 1432:21
**light** [1] - 1404:11
**likelihood** [1] - 1448:22
**likely** [3] - 1409:10, 1432:24, 1432:25
**Limine** [1] - 1368:13
**limited** [1] - 1397:25
**line** [13] - 1386:10, 1386:12, 1386:21, 1387:18, 1387:21, 1388:9, 1395:1, 1407:5, 1415:17, 1422:5, 1422:9, 1422:11, 1437:6
**line-up** [1] - 1415:17
**lines** [4] - 1418:9, 1422:19, 1435:1, 1456:5
**list** [3] - 1370:10, 1396:7, 1417:10
**LITIGATIONS** [1] - 1365:10
**live** [2] - 1368:25, 1417:20
**LLP** [3] - 1365:18,

1365:21, 1366:4
**loan** [16] - 1403:22, 1403:24, 1406:7, 1406:10, 1406:12, 1406:14, 1406:16, 1406:17, 1407:9, 1408:4, 1430:8, 1433:25, 1434:3, 1434:11, 1436:8, 1437:15
**loans** [7] - 1406:14, 1408:5, 1408:7, 1430:9, 1430:11, 1434:13, 1436:5
**locked** [1] - 1408:6
**logistics** [1] - 1412:10
**long-term** [5] - 1423:20, 1435:20, 1452:19, 1453:12, 1453:25
**longer-term** [1] - 1418:11
**look** [53] - 1378:9, 1379:16, 1381:14, 1382:15, 1386:2, 1386:6, 1386:14, 1387:7, 1387:17, 1388:6, 1389:19, 1389:25, 1390:12, 1390:16, 1391:23, 1392:1, 1392:3, 1392:7, 1392:24, 1393:22, 1394:1, 1400:4, 1406:25, 1414:14, 1420:14, 1423:16, 1423:22, 1424:21, 1425:21, 1427:4, 1427:13, 1427:14, 1427:17, 1427:19, 1427:20, 1427:22, 1433:8, 1434:21, 1441:16, 1441:17, 1445:10, 1446:10, 1446:20, 1448:10, 1448:18, 1450:18, 1452:6, 1452:17, 1453:22, 1455:7, 1455:9, 1455:20, 1455:25
**looked** [7] - 1383:25, 1385:20, 1387:10, 1388:23, 1390:12, 1391:25, 1402:9
**looking** [8] - 1386:15, 1391:24, 1397:7, 1415:24, 1420:21, 1444:12, 1454:18, 1455:8
**looks** [4] - 1381:11, 1397:4, 1441:25,

1455:10

**Lorraine** [1] - 1460:6
**lose** [2] - 1425:14, 1425:24
**loss** [18] - 1403:22, 1403:25, 1406:7, 1406:14, 1408:23, 1409:4, 1409:7, 1426:1, 1426:2, 1427:8, 1427:19, 1430:4, 1430:8, 1433:25, 1434:3, 1437:15, 1456:24
**losses** [18] - 1406:10, 1406:12, 1406:17, 1407:9, 1418:13, 1430:9, 1430:11, 1430:12, 1430:14, 1430:17, 1430:19, 1430:22, 1436:2, 1436:4, 1436:14, 1439:21, 1456:25
**low** [1] - 1449:6
**low-selling** [1] - 1449:6
**lower** [5] - 1390:3, 1430:23, 1434:1, 1434:10, 1436:8
**lunch** [2] - 1442:12, 1459:13
**luncheon** [1] - 1459:14
**Lyons** [2] - 1419:11, 1419:20

**M**

**Mac** [8] - 1385:17, 1387:22, 1388:6, 1388:10, 1392:3, 1394:16, 1395:15, 1396:3
**MAC** [1] - 1365:8
**Mae** [66] - 1385:17, 1387:22, 1388:16, 1388:18, 1389:6, 1389:21, 1389:25, 1390:17, 1391:17, 1392:7, 1392:8, 1392:21, 1393:23, 1395:16, 1395:20, 1395:21, 1396:3, 1400:14, 1401:14, 1401:21, 1402:1, 1402:6, 1402:21, 1403:3, 1403:12, 1403:19, 1404:3, 1404:23, 1405:7, 1405:14, 1406:24, 1407:16, 1409:1,

1409:3, 1410:20, 1410:21, 1411:2, 1411:7, 1411:11, 1413:22, 1418:4, 1421:24, 1425:8, 1425:14, 1425:20, 1428:8, 1428:12, 1429:10, 1429:11, 1429:22, 1431:12, 1433:7, 1435:6, 1435:19, 1436:17, 1438:13, 1438:14, 1444:7, 1445:3, 1445:6, 1446:16, 1447:5, 1447:8, 1448:11, 1449:9, 1453:20
**Mae's** [9] - 1404:14, 1405:16, 1407:2, 1426:16, 1435:20, 1444:21, 1450:21, 1452:4, 1452:15
**MAE/FREDDIE** [1] - 1365:8
**magnitude** [7] - 1421:14, 1425:6, 1437:24, 1449:24, 1449:25, 1450:19, 1456:19
**mail** [12] - 1386:7, 1387:2, 1390:16, 1391:12, 1393:11, 1429:21, 1431:7, 1441:1, 1458:8, 1458:21, 1459:1
**main** [2] - 1422:1, 1451:16
**maintain** [1] - 1370:3
**majority** [1] - 1435:20
**Management** [1] - 1429:22
**management** [4] - 1404:4, 1405:2, 1405:4, 1431:12
**managements** [1] - 1386:5
**manager** [2] - 1419:14, 1419:20
**managers** [1] - 1404:11
**manages** [1] - 1370:11
**March** [2] - 1399:20, 1453:20
**Mario** [1] - 1415:11
**mark** [2] - 1418:1, 1423:4
**marked** [10] - 1445:2, 1445:15, 1445:24, 1446:3, 1448:5, 1450:11, 1452:3,

1452:14, 1453:18, 1458:4
**market** [7] - 1371:20, 1373:22, 1383:17, 1401:16, 1406:23, 1407:7, 1407:8
**Martin** [5] - 1412:23, 1415:1, 1431:7, 1434:17, 1437:8
**Mary** [4] - 1410:22, 1416:8, 1441:9, 1443:22
**Massachusetts** [1] - 1366:4
**material** [6] - 1387:14, 1396:10, 1401:11, 1418:20, 1442:6, 1442:7
**materially** [1] - 1438:19
**materials** [2] - 1393:19, 1441:12
**Materials** [1] - 1441:3
**math** [2] - 1444:14, 1449:17
**matter** [3] - 1368:7, 1415:15, 1461:5
**matters** [2] - 1395:13, 1436:21
**Mayopoulos** [6] - 1391:13, 1393:12, 1410:19, 1428:21, 1441:2, 1458:8
**Mayopoulos's** [3] - 1457:11, 1457:16, 1459:1
**mBank** [5] - 1399:10, 1399:16, 1399:18, 1399:19
**MCFARLAND** [1] - 1367:5
**McFarland** [17] - 1397:19, 1397:20, 1398:6, 1398:11, 1417:22, 1429:24, 1441:17, 1444:3, 1446:14, 1448:4, 1448:13, 1448:20, 1450:21, 1452:2, 1452:13, 1453:17, 1458:3
**mean** [11] - 1371:19, 1376:23, 1416:6, 1422:6, 1424:3, 1425:25, 1428:22, 1430:6, 1432:6, 1437:21, 1456:11
**meaning** [1] - 1379:2
**meaningful** [1] - 1402:14

**means** [8] - 1379:2, 1381:8, 1381:10, 1382:4, 1395:18, 1437:23, 1440:14, 1444:15
**meant** [1] - 1451:25
**mechanically** [1] - 1433:24
**mechanics** [1] - 1429:1
**media** [4] - 1439:15, 1444:20, 1444:24, 1448:8
**meet** [2] - 1410:15, 1448:15
**Meeting** [3] - 1429:22, 1433:6, 1441:3
**meeting** [31] - 1389:6, 1390:20, 1391:10, 1393:19, 1393:23, 1401:2, 1409:20, 1410:10, 1410:11, 1410:18, 1410:19, 1411:8, 1411:13, 1411:16, 1411:18, 1412:19, 1413:5, 1414:22, 1416:8, 1416:25, 1417:6, 1418:3, 1431:13, 1434:16, 1434:19, 1435:5, 1441:5, 1441:9, 1441:12, 1441:13, 1441:19
**meetings** [18] - 1411:1, 1412:3, 1412:5, 1412:6, 1412:7, 1412:24, 1413:2, 1413:19, 1415:2, 1415:5, 1415:6, 1417:2, 1417:4, 1434:15, 1434:18, 1437:12, 1443:14
**Meltzer** [1] - 1365:18
**member** [1] - 1434:20
**members** [3] - 1404:2, 1411:6, 1420:3
**memory** [2] - 1414:15, 1451:21
**mentioned** [8] - 1406:7, 1407:13, 1409:24, 1413:4, 1420:20, 1428:20, 1435:24, 1435:25
**message** [2] - 1416:19, 1458:11
**messaging** [1] - 1414:18
**met** [3] - 1400:24, 1416:17, 1442:2

**mid** [2] - 1427:23, 1429:12
**mid-2013** [3] - 1402:2, 1416:17, 1421:10
**mid-August** [1] - 1429:12
**middle** [3] - 1373:13, 1409:2, 1455:9
**might** [27] - 1394:19, 1394:20, 1401:6, 1401:18, 1401:19, 1405:3, 1405:11, 1405:12, 1405:23, 1406:22, 1409:25, 1411:9, 1412:5, 1413:3, 1414:8, 1416:14, 1418:17, 1418:25, 1419:1, 1420:10, 1421:9, 1430:25, 1435:10, 1438:21, 1448:3, 1449:25
**miles** [1] - 1397:23
**Miller** [4] - 1410:22, 1416:8, 1441:7, 1441:9
**mind** [2] - 1424:11, 1443:21
**mine** [1] - 1403:23
**minimis** [1] - 1407:23
**minimum** [2] - 1382:12, 1432:1
**minor** [1] - 1442:1
**minus** [1] - 1377:15
**minute** [3] - 1389:2, 1421:13, 1433:8
**Minutes** [1] - 1436:16
**minutes** [5] - 1418:3, 1434:18, 1435:5, 1442:10, 1442:13
**missed** [1] - 1426:9
**mission** [1] - 1383:15
**misspoken** [1] - 1386:15
**mitigate** [1] - 1383:15
**mode** [1] - 1415:23
**model** [1] - 1403:24
**modeling** [1] - 1403:23
**modify** [1] - 1438:21
**moment** [5] - 1372:17, 1432:5, 1441:16, 1459:21, 1460:1
**momentum** [3] - 1421:7, 1432:5, 1456:19
**money** [5] - 1370:11, 1428:17, 1428:18, 1429:14, 1429:17
**moneys** [2] - 1439:17,

1440:1
**month** [2] - 1411:20, 1413:8
**months** [3] - 1372:7, 1374:5, 1426:10
**Moody's** [2] - 1437:19, 1438:11
**moot** [6] - 1368:17, 1368:18, 1368:22, 1369:4, 1369:6, 1369:7
**moreover** [1] - 1386:10
**MORNING** [1] - 1365:12
**morning** [9] - 1368:4, 1369:11, 1369:15, 1377:21, 1377:22, 1397:14, 1442:10, 1459:23
**mortgage** [3] - 1373:22, 1436:11, 1438:15
**most** [13] - 1370:13, 1381:11, 1391:25, 1403:21, 1408:3, 1419:18, 1420:7, 1432:24, 1435:11, 1435:15, 1435:16, 1436:3, 1442:11
**motion** [6] - 1368:12, 1368:17, 1368:24, 1368:25, 1369:8, 1459:24
**Motion** [1] - 1368:13
**move** [7] - 1372:12, 1372:13, 1387:12, 1390:24, 1394:2, 1431:5, 1439:9
**moved** [4] - 1420:16, 1427:11, 1427:24, 1440:3
**movement** [1] - 1432:11
**movements** [1] - 1406:23
**mover** [1] - 1407:5
**moving** [3] - 1384:19, 1396:15, 1417:8
**MR** [51] - 1368:4, 1368:10, 1368:20, 1369:2, 1369:5, 1369:15, 1369:19, 1372:11, 1372:17, 1372:23, 1373:2, 1373:3, 1377:16, 1377:20, 1384:6, 1384:11, 1390:22, 1390:24, 1391:1, 1391:2, 1391:7,

1391:8, 1393:8, 1393:10, 1394:4, 1394:7, 1396:13, 1396:18, 1396:19, 1396:20, 1396:23, 1397:1, 1397:10, 1397:14, 1398:2, 1398:9, 1398:21, 1417:7, 1417:14, 1417:19, 1417:21, 1442:19, 1442:20, 1444:2, 1452:10, 1452:12, 1459:11, 1459:12, 1459:19, 1459:23, 1460:4
**multi** [1] - 1435:9
**multi-year** [1] - 1435:9
**multifamily** [2] - 1404:6, 1408:5

## N

**name** [4] - 1391:20, 1392:23, 1398:10, 1411:2
**names** [3] - 1415:18, 1415:20, 1425:18
**nation's** [1] - 1370:11
**nationalization** [1] - 1409:18
**nationalizing** [1] - 1409:19
**nature** [2] - 1407:22, 1456:16
**necessarily** [1] - 1419:25
**necessary** [1] - 1381:23
**need** [14] - 1369:3, 1387:7, 1402:14, 1407:4, 1420:14, 1422:2, 1434:13, 1438:21, 1444:7, 1447:10, 1448:3, 1448:11, 1456:24, 1457:1
**needed** [1] - 1438:19
**needs** [1] - 1368:25
**negative** [6] - 1374:15, 1374:19, 1376:2, 1405:22, 1425:2, 1428:2
**negatives** [2] - 1421:17, 1428:7
**neglect** [1] - 1396:14
**negotiating** [1] - 1372:4
**net** [76] - 1374:14, 1374:15, 1374:17, 1374:19, 1374:21,

1374:24, 1374:25, 1375:2, 1375:3, 1375:7, 1375:9, 1375:11, 1375:16, 1376:1, 1376:3, 1376:4, 1376:6, 1376:7, 1376:10, 1376:15, 1376:18, 1379:1, 1379:2, 1379:3, 1379:6, 1379:7, 1381:6, 1381:10, 1381:12, 1382:2, 1382:4, 1382:5, 1382:9, 1382:10, 1382:11, 1384:5, 1384:9, 1384:20, 1385:8, 1385:11, 1385:14, 1386:11, 1395:9, 1407:24, 1408:23, 1409:3, 1409:7, 1411:20, 1418:12, 1423:15, 1424:6, 1425:13, 1426:16, 1427:5, 1428:6, 1428:7, 1429:9, 1434:25, 1435:12, 1440:2, 1441:6, 1447:11, 1447:12, 1447:14, 1447:15, 1447:18, 1447:22, 1454:14, 1454:21, 1455:12, 1456:24, 1456:25, 1457:5, 1457:23
**never** [3] - 1376:3, 1376:6, 1403:9
**new** [2] - 1406:20, 1435:22
**New** [2] - 1365:16, 1365:21
**news** [2] - 1414:22, 1439:2
**next** [17] - 1374:3, 1374:4, 1374:5, 1383:12, 1387:8, 1387:9, 1387:17, 1389:17, 1397:13, 1423:4, 1429:20, 1431:5, 1433:5, 1435:4, 1436:15, 1440:25, 1447:16
**Nicola** [1] - 1441:1
**Nicole** [1] - 1393:12
**night** [1] - 1368:12
**nine** [1] - 1380:25
**nine-page** [1] - 1380:25
**nobody** [1] - 1417:5
**NOLs** [2] - 1409:11,

1418:15
**noninterest** [6] - 1407:1, 1407:4, 1407:13, 1408:2, 1435:24, 1435:25
**nonpublished** [1] - 1427:17
**normal** [18] - 1377:11, 1381:9, 1398:20, 1404:24, 1405:1, 1410:22, 1414:24, 1418:22, 1420:6, 1421:11, 1422:20, 1434:17, 1434:19, 1444:25, 1448:8, 1448:21, 1449:3, 1450:20
**normally** [8] - 1405:21, 1410:25, 1411:8, 1412:2, 1414:8, 1420:5, 1441:25, 1448:9
**Northwest** [4] - 1365:16, 1365:21, 1366:4, 1366:8
**not-so-distant** [5] - 1409:25, 1413:4, 1416:7, 1421:2, 1440:24
**notably** [1] - 1408:3
**note** [4] - 1368:23, 1398:2, 1420:2, 1458:13
**notes** [3] - 1416:25, 1417:1, 1417:4
**nothing** [1] - 1374:16
**notice** [3] - 1416:19, 1416:22, 1429:2
**November** [1] - 1418:4
**nuanced** [1] - 1375:14
**Number** [2] - 1365:4, 1365:8
**number** [18] - 1368:15, 1370:2, 1372:9, 1372:20, 1387:24, 1388:6, 1388:8, 1390:3, 1390:4, 1390:25, 1402:4, 1402:17, 1415:19, 1421:14, 1427:24, 1429:1, 1449:18, 1452:8
**numbers** [11] - 1388:17, 1389:19, 1389:21, 1389:22, 1392:2, 1423:12, 1425:17, 1431:17, 1440:21, 1444:11

## O

**object** [2] - 1372:18, 1396:15
**objection** [10] - 1372:12, 1372:23, 1372:24, 1384:6, 1390:22, 1391:4, 1394:4, 1396:19, 1396:23, 1417:15
**objective** [1] - 1402:5
**obligation** [4] - 1452:21, 1453:7, 1456:8, 1456:25
**obviously** [4] - 1371:21, 1402:15, 1418:23, 1422:6
**occur** [1] - 1412:7
**occurred** [3] - 1413:17, 1415:23, 1425:12
**occurring** [3] - 1410:3, 1424:12
**October** [5] - 1365:10, 1423:7, 1423:19, 1423:23, 1461:8
**odds** [1] - 1400:19
**OF** [4] - 1365:1, 1365:12, 1461:1, 1461:9
**offer** [1] - 1368:16
**Offering** [1] - 1368:14
**office** [1] - 1415:14
**officer** [4] - 1400:10, 1400:16, 1437:1, 1450:22
**official** [2] - 1406:1, 1451:3
**Official** [1] - 1366:7
**OFFICIAL** [1] - 1461:1
**officials** [2] - 1411:16, 1442:22
**offs** [3] - 1406:14, 1430:23, 1434:1
**offshore** [1] - 1400:18
**often** [2] - 1369:25, 1432:21
**once** [1] - 1394:21
**One** [13] - 1399:12, 1399:20, 1399:22, 1400:1, 1400:7, 1400:8, 1400:9, 1400:13, 1400:15, 1404:25, 1406:3, 1408:14
**one** [54] - 1370:8, 1370:13, 1372:6, 1372:13, 1372:16, 1372:17, 1372:21, 1373:11, 1380:15,

1381:11, 1381:23,
1382:16, 1382:18,
1385:25, 1386:2,
1387:9, 1390:14,
1391:2, 1392:10,
1394:14, 1395:5,
1398:2, 1398:3,
1399:9, 1399:16,
1401:12, 1402:4,
1402:15, 1403:11,
1403:21, 1408:23,
1410:12, 1411:9,
1412:23, 1417:5,
1420:19, 1421:17,
1422:8, 1422:12,
1429:20, 1433:5,
1435:4, 1436:15,
1436:20, 1440:25,
1444:5, 1451:9,
1451:11, 1454:24,
1459:21
**one's** [1] - 1369:4
**ones** [1] - 1384:16
**onward** [1] - 1395:14
**open** [3] - 1402:22,
1422:12, 1432:22
**open-ended** [1] -
1422:12
**operate** [2] - 1381:8,
1401:25
**operating** [6] -
1408:23, 1409:4,
1409:7, 1418:13,
1458:6, 1458:8
**operation** [1] -
1383:21
**operations** [2] -
1383:21, 1400:11
**opinion** [14] -
1379:13, 1379:15,
1381:3, 1381:4,
1384:1, 1384:2,
1384:13, 1384:20,
1392:17, 1392:20,
1394:23, 1394:25,
1395:4, 1395:5
**opinions** [1] - 1392:15
**opportunity** [2] -
1401:24, 1414:4
**opposite** [4] - 1379:8,
1381:8, 1381:13,
1382:13
**opposition** [2] -
1369:2, 1459:24
**optimal** [1] - 1440:8
**optimistic** [2] -
1405:14, 1405:17
**oral** [1] - 1451:7
**orally** [1] - 1441:14
**order** [5] - 1368:2,

1397:24, 1398:1,
1405:1, 1446:21
**ordinary** [1] - 1422:20
**organization** [1] -
1401:23
**organized** [1] -
1370:19
**original** [2] - 1392:10,
1459:5
**originated** [1] - 1408:7
**origination** [1] -
1407:12
**originations** [1] -
1406:20
**otherwise** [1] - 1396:2
**ought** [1] - 1396:20
**ourselves** [1] -
1438:19
**outcome** [1] - 1426:14
**outcomes** [3] -
1424:17, 1428:4,
1443:9
**outlet** [1] - 1448:8
**outlets** [1] - 1444:20
**outlook** [2] - 1433:16,
1433:23
**outs** [1] - 1434:11
**outsider** [1] - 1404:13
**outstanding** [2] -
1422:18, 1459:24
**outweighed** [1] -
1427:6, 1428:1,
1428:7
**overall** [1] - 1379:23
**overruled** [1] - 1384:7
**oversee** [1] - 1380:8
**oversight** [1] -
1378:20
**owe** [7] - 1374:16,
1375:1, 1376:3,
1376:7, 1376:11,
1453:2, 1454:3
**owed** [1] - 1377:15
**own** [2] - 1427:16,
1438:6
**owned** [2] - 1406:21,
1408:3

---

## P

**P&L** [1] - 1434:9
**p.m** [3] - 1431:20,
1442:15, 1460:5
**page** [45] - 1380:25,
1381:14, 1381:17,
1382:16, 1382:17,
1387:8, 1387:9,
1389:9, 1389:11,
1389:17, 1391:23,
1392:22, 1394:1,

1394:8, 1397:6,
1418:8, 1423:11,
1429:23, 1431:21,
1433:9, 1433:10,
1434:22, 1435:7,
1437:14, 1439:9,
1445:15, 1445:16,
1445:17, 1446:10,
1448:11, 1450:3,
1452:6, 1452:7,
1452:17, 1452:18,
1453:22, 1453:23,
1455:7, 1455:9,
1456:1
**pages** [3] - 1384:14,
1396:8, 1412:14
**paid** [2] - 1377:6,
1439:11
**panics** [1] - 1370:5
**paragraph** [20] -
1373:13, 1373:14,
1418:5, 1418:6,
1418:9, 1418:10,
1433:11, 1435:8,
1437:6, 1437:7,
1446:11, 1448:10,
1448:19, 1450:3,
1450:18, 1452:19,
1453:23, 1456:3,
1458:9
**paragraphs** [1] -
1382:20
**paraphrasing** [1] -
1421:7
**part** [20] - 1383:5,
1383:9, 1384:3,
1386:3, 1386:7,
1399:12, 1401:1,
1401:4, 1401:17,
1402:14, 1406:2,
1406:12, 1406:13,
1410:4, 1411:4,
1413:11, 1416:13,
1426:1, 1436:7
**participate** [1] -
1437:11
**participated** [1] -
1437:9
**participation** [1] -
1406:5
**particular** [5] -
1373:11, 1411:13,
1424:3, 1426:25
**parties** [1] - 1372:4,
1402:23, 1427:18
**parts** [1] - 1384:17
**party** [2] - 1438:17,
1438:24
**pass** [1] - 1405:25
**passage** [1] - 1417:25

**past** [3] - 1371:25,
1410:16, 1425:11
**pause** [1] - 1417:7
**pay** [18] - 1374:25,
1375:7, 1375:13,
1375:18, 1375:24,
1375:25, 1422:2,
1422:12, 1428:17,
1428:18, 1429:4,
1429:5, 1439:20,
1454:15, 1456:4,
1456:23
**payable** [1] - 1373:17
**paying** [1] - 1375:19
**payment** [6] -
1374:20, 1446:13,
1446:17, 1446:20,
1447:19, 1447:25
**payments** [5] -
1428:10, 1428:14,
1439:19, 1448:13,
1457:2
**PCF** [3] - 1373:17,
1373:23, 1374:7
**Pennsylvania** [1] -
1365:19
**people** [6] - 1403:11,
1415:10, 1428:24,
1439:25, 1451:14,
1451:17
**people's** [2] - 1415:20,
1416:6
**percent** [10] - 1375:1,
1375:3, 1375:8,
1375:9, 1375:10,
1376:14, 1377:12,
1444:12, 1444:13,
1448:12
**percentage** [1] -
1422:18
**performance** [9] -
1385:17, 1401:13,
1402:5, 1405:5,
1405:10, 1405:24,
1436:1, 1436:22,
1438:15
**performed** [1] -
1406:3
**perhaps** [2] - 1396:20,
1401:18
**period** [27] - 1372:5,
1372:7, 1375:22,
1395:16, 1403:10,
1408:13, 1413:15,
1427:5, 1427:15,
1427:18, 1427:21,
1427:25, 1428:2,
1428:19, 1430:10,
1430:23, 1430:24,
1433:15, 1434:4,

1435:3, 1435:21,
1449:21, 1453:19,
1454:20, 1456:6
**period-to-period** [2] -
1454:20, 1456:6
**periodic** [11] -
1369:20, 1371:1,
1371:13, 1371:17,
1371:23, 1372:7,
1373:19, 1374:21,
1421:23, 1421:25,
1423:1
**periodically** [2] -
1418:22, 1419:3
**periods** [9] - 1406:20,
1435:23, 1448:14,
1449:5, 1449:6,
1453:2, 1454:2,
1454:15
**permanent** [1] -
1450:6
**permission** [1] -
1414:2
**permit** [1] - 1390:10
**person** [5] - 1370:17,
1371:9, 1378:19,
1380:7, 1410:18
**personnel** [1] -
1411:11
**perspective** [7] -
1401:5, 1401:18,
1405:2, 1419:6,
1426:22, 1440:15,
1457:20
**perspectives** [1] -
1426:20
**Phil** [1] - 1440:12
**phone** [1] - 1368:6
**pick** [2] - 1415:17,
1456:20
**picked** [3] - 1418:24,
1451:2, 1451:3
**picking** [1] - 1427:1
**picture** [1] - 1407:4
**piece** [3] - 1402:18,
1407:2, 1420:13
**place** [4] - 1410:4,
1411:18, 1413:13,
1441:6
**Plaintiff** [1] - 1436:15
**Plaintiffs** [4] - 1365:4,
1365:15, 1365:17,
1368:12
**plaintiffs** [3] -
1368:17, 1368:21,
1377:23
**PLAINTIFFS** [1] -
1369:17
**plaintiffs'** [2] -
1396:17, 1452:10

**Plaintiffs'** [22] - 1368:13, 1377:24, 1418:2, 1423:5, 1427:7, 1429:20, 1431:6, 1433:5, 1435:4, 1440:25, 1441:16, 1445:2, 1445:25, 1446:4, 1448:5, 1450:11, 1452:3, 1452:14, 1453:18, 1455:25, 1457:6, 1458:4

**plan** [3] - 1429:23, 1429:24, 1430:3

**planning** [3] - 1400:18, 1403:16, 1423:8

**Planning** [2] - 1423:7, 1431:18

**plate** [1] - 1368:12

**play** [1] - 1432:23

**playing** [2] - 1397:19, 1439:15

**PLLC** [1] - 1365:14

**plus** [5] - 1447:4, 1447:5, 1447:7, 1447:17, 1447:22

**point** [21] - 1390:2, 1401:5, 1409:25, 1416:3, 1418:20, 1420:9, 1423:24, 1426:7, 1430:4, 1430:6, 1430:15, 1436:2, 1440:11, 1446:20, 1447:14, 1449:15, 1454:17, 1454:18, 1455:2, 1455:10, 1459:21

**points** [6] - 1386:4, 1396:8, 1438:17, 1438:22, 1455:8, 1457:19

**policy** [1] - 1419:20

**political** [1] - 1402:11

**population** [1] - 1438:14

**Port** [1] - 1399:5

**Porter** [1] - 1366:4

**portfolio** [8] - 1404:7, 1406:22, 1408:4, 1458:14, 1458:16, 1458:25, 1459:3, 1459:7

**portfolios** [1] - 1406:21

**portion** [2] - 1453:7, 1459:2

**portions** [2] - 1377:24, 1378:3

**position** [4] - 1370:24,

1407:3, 1437:3

**positions** [1] - 1432:21

**positive** [24] - 1374:9, 1374:25, 1379:2, 1379:4, 1381:10, 1382:4, 1401:11, 1402:10, 1407:24, 1410:3, 1414:15, 1414:18, 1425:2, 1427:11, 1427:24, 1428:1, 1429:19, 1432:5, 1432:10, 1432:11, 1447:13, 1447:14, 1447:15

**positively** [1] - 1434:10

**positives** [5] - 1421:8, 1421:13, 1421:14, 1421:15, 1421:17

**possibility** [4] - 1409:24, 1421:2, 1440:7, 1440:23

**possible** [3] - 1388:11, 1420:11, 1446:14

**Post** [2] - 1450:12, 1450:15

**post** [4] - 1457:11, 1457:16, 1457:18, 1458:13

**posted** [3] - 1426:11, 1457:8, 1458:10

**posting** [1] - 1457:12

**potential** [3] - 1396:6, 1413:3, 1418:23

**potentially** [1] - 1415:24

**power** [2] - 1397:23, 1398:1

**PowerPoint** [5] - 1387:8, 1412:13, 1412:14, 1434:21, 1441:18

**PowerPoints** [1] - 1431:17

**powers** [2] - 1381:16, 1381:19

**practice** [2] - 1410:15, 1437:10

**pre** [1] - 1407:22

**pre-Third** [1] - 1407:22

**precise** [1] - 1400:5

**preclear** [1] - 1414:10

**Preclude** [1] - 1368:13

**preconservatorship** [2] - 1444:17, 1444:19

**predominantly** [2] -

1399:2, 1435:18

**PREFERRED** [1] - 1365:9

**preferred** [5] - 1422:6, 1439:12, 1453:3, 1454:1, 1454:4

**Preferred** [1] - 1423:5

**prep** [1] - 1413:13

**preparation** [1] - 1413:12

**prepare** [2] - 1405:8, 1438:9

**prepared** [4] - 1378:3, 1397:8, 1403:18, 1441:8

**preparing** [1] - 1402:8

**prepping** [1] - 1413:19

**present** [9] - 1413:1, 1413:6, 1417:5, 1417:6, 1434:17, 1434:19, 1434:20, 1437:5, 1442:22

**presentation** [4] - 1412:12, 1441:8, 1441:18, 1441:21

**presentations** [1] - 1441:24

**presented** [3] - 1387:3, 1395:21, 1434:16

**presenting** [1] - 1397:15

**preserve** [1] - 1383:1

**president** [4] - 1370:21, 1391:16, 1393:23, 1400:16

**press** [8] - 1414:6, 1414:7, 1414:10, 1414:11, 1439:10, 1439:16, 1451:1, 1451:3

**prestigious** [1] - 1370:23

**presume** [1] - 1402:24

**pretty** [1] - 1425:25

**prevent** [1] - 1370:5

**previous** [1] - 1430:24

**previously** [2] - 1405:8, 1421:9

**price** [10] - 1376:21, 1377:8, 1377:9, 1427:14, 1427:16, 1437:22, 1438:6, 1438:10, 1450:19

**prices** [9] - 1435:11, 1435:15, 1436:4, 1436:12, 1437:17, 1448:18, 1448:20, 1448:23, 1449:4

**primarily** [1] - 1433:15

**primary** [2] - 1401:9, 1412:2

**principal** [1] - 1400:16

**printout** [2] - 1446:5, 1450:12

**priorities** [1] - 1402:11

**pro** [1] - 1457:23

**probability** [3] - 1425:16, 1432:16, 1433:1

**probable** [1] - 1432:17

**problem** [3] - 1395:7, 1395:10, 1395:19

**procedural** [1] - 1459:21

**proceed** [2] - 1369:14, 1442:18

**Proceedings** [1] - 1366:11

**proceedings** [1] - 1461:4

**process** [10] - 1378:19, 1400:21, 1404:8, 1404:11, 1406:2, 1406:5, 1413:12, 1420:16, 1420:19, 1430:8

**procurement** [1] - 1400:18

**produce** [1] - 1427:16

**produced** [4] - 1366:11, 1404:24, 1404:25, 1435:22

**producing** [3] - 1404:23, 1424:14, 1424:22

**professional** [1] - 1402:19

**Professor** [5] - 1378:6, 1390:11, 1393:11, 1396:15, 1397:2

**profit** [4] - 1407:5, 1425:23, 1430:1, 1457:5

**profitability** [17] - 1403:13, 1404:14, 1404:20, 1406:8, 1406:9, 1406:18, 1407:19, 1409:22, 1423:20, 1423:25, 1424:2, 1424:5, 1432:8, 1433:2, 1443:1, 1443:4, 1449:21

**Profitability** [1] - 1434:23

**profitable** [4] - 1428:19, 1440:21, 1446:23, 1450:2

**profits** [13] - 1377:7, 1377:12, 1402:7, 1409:23, 1423:17, 1426:11, 1435:2, 1449:24, 1450:1, 1450:6, 1452:21, 1454:13, 1454:14

**project** [3] - 1404:14, 1406:12, 1429:25

**Projected** [1] - 1434:22

**projected** [3] - 1427:8, 1430:5, 1435:2

**projecting** [6] - 1387:13, 1407:3, 1407:8, 1407:19, 1423:17, 1424:18

**projection** [4] - 1388:13, 1392:11, 1423:20, 1449:14

**projections** [38] - 1385:17, 1386:6, 1390:11, 1394:10, 1394:11, 1394:22, 1395:2, 1395:15, 1403:13, 1403:22, 1404:6, 1404:13, 1404:19, 1404:23, 1405:14, 1405:17, 1411:5, 1423:15, 1424:1, 1424:5, 1426:5, 1426:17, 1427:3, 1427:7, 1427:18, 1429:14, 1431:22, 1432:4, 1437:23, 1438:3, 1438:23, 1438:24, 1443:1, 1443:3, 1449:12, 1449:19, 1456:11, 1456:12

**Projections** [1] - 1423:6

**projects** [1] - 1402:18

**promised** [1] - 1397:17

**property** [1] - 1383:1

**pros** [1] - 1457:22

**prospects** [1] - 1433:17

**protecting** [1] - 1374:8

**proved** [2] - 1404:21, 1404:22

**provide** [8] - 1385:5, 1393:6, 1401:18, 1403:20, 1404:4, 1404:6, 1404:8, 1414:4

**provided** [4] - 1403:2, 1414:3, 1441:18,

1457:20
**provides** [1] - 1422:7
**providing** [1] - 1379:4
**provisions** [3] -
1374:17, 1433:25,
1458:25
**Prussia** [1] - 1365:18
**public** [4] - 1405:12,
1414:13, 1440:8,
1440:15
**publicly** [2] - 1425:21,
1427:13
**published** [1] -
1427:14
**pull** [6] - 1373:4,
1378:1, 1389:2,
1449:13, 1449:16,
1455:22
**purchase** [6] - 1377:8,
1422:6, 1439:12,
1453:1, 1453:8,
1454:2
**Purchase** [1] - 1423:6
**PURCHASE** [1] -
1365:9
**purport** [1] - 1458:12
**purpose** [4] - 1373:24,
1380:9, 1382:25,
1387:15
**purposes** [3] -
1408:21, 1408:22,
1418:13
**pursuant** [1] - 1439:12
**put** [19] - 1378:20,
1379:18, 1380:23,
1381:23, 1383:2,
1386:19, 1394:9,
1397:17, 1399:19,
1404:12, 1405:20,
1405:22, 1416:6,
1427:7, 1432:24,
1440:22, 1441:15,
1443:6, 1456:14
**puts** [1] - 1428:5
**putting** [3] - 1379:5,
1403:12, 1438:3
**PX-121** [2] - 1367:13,
1417:16
**PX-135** [3] - 1367:13,
1417:11, 1417:16
**PX-147** [2] - 1367:13,
1417:16
**PX-213** [4] - 1367:13,
1385:20, 1386:16,
1417:16
**PX-216** [1] - 1386:16
**PX-218** [3] - 1385:21,
1389:3, 1389:5
**PX-222** [2] - 1367:13,
1417:16

**PX-223** [2] - 1367:13,
1417:16
**PX-226** [1] - 1368:25
**PX-229** [2] - 1367:13,
1417:16
**PX-238** [2] - 1367:14,
1417:17
**PX-248** [2] - 1367:14,
1417:17
**PX-269** [5] - 1390:14,
1390:16, 1390:24,
1391:1, 1391:6
**PX-269**.....................
............................ [1] -
1367:10
**PX-2C** [1] - 1384:12
**PX-424** [3] - 1396:16,
1396:25, 1397:3
**PX-424**.....................
............................ [1] -
1367:12
**PX-453** [2] - 1367:14,
1417:17
**PX-469** [2] - 1367:14,
1417:17
**PX-473** [2] - 1367:15,
1417:17
**PX-480** [2] - 1367:14,
1417:17
**PX-481** [2] - 1367:14,
1417:17
**PX-483** [2] - 1367:14,
1417:17
**PX-488** [1] - 1417:18
**PX-488**.....................
........... [1] - 1367:15
**PX-490** [2] - 1367:15,
1417:18
**PX-509** [6] - 1392:24,
1393:4, 1393:6,
1393:11, 1394:3,
1394:6
**PX-509**.....................
............................ [1] -
1367:11

## Q

**Qs** [1] - 1451:25
**quality** [1] - 1424:20
**quantifying** [1] -
1428:6
**quarter** [51] - 1373:14,
1373:17, 1374:4,
1374:15, 1376:11,
1379:7, 1382:10,
1410:16, 1413:12,
1413:19, 1413:21,
1415:25, 1416:1,
1416:2, 1419:7,

1419:8, 1421:11,
1421:12, 1425:17,
1425:19, 1425:20,
1437:17, 1444:21,
1445:7, 1446:13,
1446:17, 1446:21,
1446:22, 1446:23,
1446:24, 1447:2,
1447:3, 1447:14,
1447:16, 1447:18,
1447:22, 1447:23,
1448:3, 1448:12,
1448:20, 1450:6,
1450:7, 1450:23,
1450:24, 1451:13,
1451:18, 1451:23,
1455:20, 1456:17,
1456:18
**quarter-end** [1] -
1413:12
**quarterly** [12] -
1404:24, 1404:25,
1405:9, 1410:16,
1412:5, 1412:21,
1419:4, 1419:25,
1426:19, 1439:11,
1447:1, 1453:19
**quarters** [4] - 1402:8,
1449:4, 1454:13,
1457:4
**questioning** [1] -
1385:2
**questions** [9] -
1395:5, 1396:13,
1397:10, 1398:3,
1420:4, 1424:8,
1443:5, 1443:20
**quick** [1] - 1427:2
**quickly** [2] - 1426:24,
1426:25
**quite** [2] - 1401:13,
1403:4
**quote** [4] - 1414:9,
1446:11, 1451:8

## R

**radar** [2] - 1416:6,
1440:22
**Radnor** [1] - 1365:19
**raising** [1] - 1413:3
**range** [2] - 1416:16,
1444:13
**rarely** [1] - 1432:20
**rates** [1] - 1404:9
**rather** [1] - 1421:19
**re** [4] - 1365:8, 1374:4,
1446:5, 1450:12
**re-evaluate** [1] -
1374:4

**re-printout** [1] -
1446:5, 1450:12
**reached** [1] - 1402:25
**reaching** [1] - 1420:22
**reaction** [4] - 1409:13,
1409:17, 1410:4,
1443:3
**read** [5] - 1384:12,
1384:16, 1394:16,
1397:21, 1398:6
**READ** [6] - 1398:9,
1398:21, 1417:21,
1442:20, 1444:2,
1452:12
**reader** [1] - 1458:17
**reading** [3] - 1384:4,
1393:25, 1397:6
**ready** [2] - 1389:2,
1392:25
**real** [3] - 1371:20,
1398:18, 1398:19
**really** [12] - 1387:12,
1388:2, 1395:13,
1401:9, 1408:2,
1419:11, 1423:23,
1438:6, 1439:20,
1439:21, 1440:2
**reason** [4] - 1383:20,
1386:9, 1395:9,
1426:19
**reasonable** [2] -
1384:4, 1423:20
**reasons** [1] - 1402:4
**recapitalization** [1] -
1444:6
**recapitalize** [1] -
1410:8
**received** [9] - 1372:24,
1373:1, 1391:5,
1391:6, 1394:5,
1394:6, 1396:24,
1396:25, 1417:18
**RECEIVED** [1] -
1367:8
**receivership** [1] -
1399:19
**receiving** [1] - 1386:8,
1458:5
**recently** [1] - 1391:25
**Recess** [2] - 1442:15,
1460:5
**recess** [1] - 1459:14
**recognize** [6] -
1408:20, 1408:21,
1427:2, 1445:1,
1445:4, 1457:7
**recognizing** [1] -
1430:9
**recollect** [3] - 1412:8,
1414:21, 1444:25

**recollection** [7] -
1402:22, 1424:7,
1425:18, 1440:16,
1445:25, 1450:17
**record** [7] - 1368:23,
1396:21, 1397:2,
1398:7, 1398:10,
1445:15, 1461:4
**record's** [1] - 1413:14
**recorded** [1] - 1366:11
**records** [1] - 1400:4
**recover** [1] - 1436:7
**recurring** [1] -
1443:12
**red** [1] - 1426:12
**Redirect** [1] - 1367:3
**redirect** [1] - 1377:18
**REDIRECT** [1] -
1377:19
**reduce** [1] - 1459:7
**reduction** [2] -
1458:25, 1459:3
**reductions** [2] -
1430:18, 1430:25
**refer** [3] - 1423:11,
1449:16, 1459:5
**reference** [1] -
1418:16
**referenced** [2] -
1410:12, 1432:5
**referring** [1] - 1430:15
**refers** [1] - 1458:15
**refinance** [1] - 1436:9
**reflect** [4] - 1425:11,
1432:4, 1439:7,
1449:2
**reflected** [1] - 1449:22
**reflection** [1] -
1418:14
**reflects** [1] - 1430:3
**reform** [2] - 1380:18,
1402:12
**refresh** [3] - 1414:15,
1445:25, 1450:17
**regard** [1] - 1414:20
**regarded** [1] - 1422:3
**regarding** [4] -
1440:6, 1452:19,
1453:24, 1456:3
**regular** [2] - 1412:5,
1412:22
**reinforce** [1] - 1458:11
**relate** [1] - 1441:5
**related** [2] - 1430:5,
1435:10
**relates** [2] - 1441:8,
1459:3
**relationship** [2] -
1378:25, 1382:1
**relatively** [2] - 1407:2,

1428:24
**release** [17] - 1414:6,
1414:7, 1414:10,
1414:11, 1415:25,
1416:1, 1416:3,
1416:15, 1418:24,
1420:17, 1421:19,
1434:6, 1439:10,
1440:23, 1444:21,
1451:1, 1451:3
**released** [10] - 1410:2,
1416:15, 1419:9,
1420:15, 1444:23,
1445:9, 1445:13,
1446:1, 1451:19,
1455:21
**relevant** [6] - 1383:10,
1386:2, 1407:7,
1407:8, 1420:21,
1424:16
**relied** [2] - 1392:14,
1426:17
**rely** [1] - 1387:25
**remaining** [14] -
1387:18, 1387:21,
1388:3, 1388:7,
1388:23, 1389:20,
1392:2, 1392:4,
1394:14, 1394:18,
1395:2, 1395:3,
1395:12, 1395:14
**remains** [1] - 1374:8
**remember** [21] -
1384:22, 1385:2,
1385:23, 1385:25,
1387:5, 1400:23,
1410:18, 1411:2,
1411:13, 1415:5,
1418:19, 1419:12,
1421:10, 1425:9,
1443:5, 1444:11,
1447:13, 1448:6,
1450:14, 1450:25,
1458:5
**repeat** [3] - 1376:5,
1378:15, 1450:23
**report** [3] - 1403:23,
1436:23, 1437:4
**reported** [2] - 1438:9,
1460:6
**reporter** [1] - 1418:1
**Reporter** [1] - 1366:7
**REPORTER** [2] -
1461:1, 1461:9
**reporters** [1] -
1450:14
**reporting** [2] -
1419:15, 1423:10
**reports** [1] - 1415:21
**represent** [4] - 1444:3,

1452:3, 1452:14,
1455:7
**representation** [1] -
1449:20
**request** [2] - 1452:25,
1454:1
**require** [4] - 1408:11,
1439:16, 1444:16,
1444:18
**required** [4] - 1447:6,
1447:8, 1448:12,
1454:15
**requirement** [1] -
1447:25
**requirements** [1] -
1448:15
**reserve** [4] - 1406:15,
1409:6, 1434:3
**Reserve** [11] -
1369:22, 1369:25,
1370:13, 1370:17,
1370:23, 1371:3,
1371:8, 1371:9,
1371:10, 1371:17,
1371:25
**reserves** [4] - 1406:7,
1406:13, 1430:10,
1430:13
**residual** [1] - 1387:24
**resist** [1] - 1398:20
**resolved** [1] - 1430:11
**resolving** [1] - 1430:9
**respect** [4] - 1401:7,
1448:18, 1458:24,
1459:23
**respects** [1] - 1442:6
**response** [2] - 1410:5,
1416:11
**responsibilities** [2] -
1370:2, 1370:8
**responsibility** [4] -
1370:5, 1404:5,
1406:4, 1455:13
**responsible** [2] -
1403:12, 1437:3
**restore** [1] - 1383:14
**result** [3] - 1424:14,
1430:17, 1453:11
**results** [10] - 1406:13,
1410:16, 1413:21,
1424:21, 1424:22,
1440:7, 1440:11,
1441:10, 1448:25,
1449:9
**resume** [3] - 1369:12,
1397:3, 1397:8
**RESUMED** [1] -
1382:10
**retail** [2] - 1399:25
**retained** [3] - 1408:1,

1444:6, 1459:3
**returned** [3] - 1374:10,
1432:7, 1457:17
**Reuters** [3] - 1448:7,
1448:8, 1449:2
**revenue** [3] - 1435:17,
1435:19, 1435:21
**reversal** [1] - 1420:25
**reversed** [3] - 1413:4,
1419:1, 1419:24
**reversing** [1] -
1433:25
**review** [4] - 1410:16,
1418:22, 1420:11,
1457:12
**reviewed** [15] -
1373:8, 1379:24,
1379:25, 1409:21,
1411:9, 1415:7,
1419:4, 1419:6,
1426:7, 1429:15,
1442:7, 1445:24,
1449:15, 1456:12,
1457:10
**reviewing** [2] -
1402:9, 1457:16
**reviews** [1] - 1413:2
**risk** [9] - 1370:9,
1383:15, 1390:8,
1396:4, 1396:6,
1396:9, 1400:18,
1437:2
**risks** [3] - 1396:4,
1436:21, 1437:3
**Road** [1] - 1365:18
**ROBERT** [1] - 1366:3
**role** [2] - 1400:9,
1400:15
**roles** [2] - 1399:24,
1401:16
**Room** [1] - 1366:9
**rose** [2] - 1436:25,
1438:4
**rose-colored** [1] -
1438:4
**ROYCE** [1] - 1365:12
**RPR** [1] - 1366:7
**RUDY** [11] - 1365:17,
1397:14, 1398:2,
1398:9, 1398:21,
1417:7, 1417:19,
1417:21, 1442:19,
1442:20, 1459:12
**run** [2] - 1395:10,
1439:2
**running** [1] - 1390:8
**runs** [2] - 1370:6,
1382:16

**S**

**safe** [3] - 1380:20,
1381:5, 1381:8
**sale** [1] - 1377:7
**sanity** [1] - 1438:18
**Sara** [2] - 1461:3,
1461:8
**SARA** [1] - 1366:7
**sat** [1] - 1440:20
**satisfy** [1] - 1457:1
**saw** [3] - 1392:22,
1420:22, 1450:19
**scale** [2] - 1421:16,
1421:17
**scenario** [3] -
1375:11, 1405:24,
1448:2
**scenarios** [1] - 1448:2
**scheduled** [1] -
1412:4
**Schiller** [1] - 1365:21
**Scholer** [1] - 1366:4
**School** [2] - 1399:6
**scope** [1] - 1384:6
**screen** [1] - 1394:9
**screens** [1] - 1416:6
**seasonal** [3] -
1448:21, 1449:3,
1450:20
**seated** [1] - 1442:17
**SEC** [2] - 1395:22,
1396:3
**Second** [1] - 1385:5
**second** [23] - 1368:23,
1379:16, 1380:4,
1381:14, 1391:2,
1413:18, 1415:25,
1425:20, 1429:23,
1433:11, 1437:6,
1437:17, 1444:21,
1445:7, 1447:14,
1448:10, 1448:20,
1451:13, 1451:23,
1452:7, 1452:18,
1453:23, 1455:20
**Secretary** [1] -
1410:23
**see** [76] - 1372:18,
1376:21, 1378:14,
1378:16, 1378:18,
1378:22, 1380:5,
1380:10, 1380:21,
1381:19, 1381:20,
1381:22, 1381:24,
1382:23, 1383:3,
1383:7, 1383:18,
1383:23, 1385:9,
1385:12, 1386:20,
1386:21, 1386:24,

1389:7, 1389:9,
1390:3, 1390:18,
1390:21, 1391:9,
1391:12, 1391:14,
1391:21, 1391:24,
1392:1, 1392:2,
1393:13, 1393:16,
1393:20, 1394:8,
1394:9, 1396:9,
1396:11, 1409:20,
1410:2, 1414:8,
1418:4, 1418:6,
1421:7, 1421:13,
1421:18, 1422:15,
1424:22, 1427:17,
1428:4, 1430:16,
1430:18, 1431:10,
1431:14, 1431:23,
1435:2, 1437:5,
1438:4, 1440:5,
1448:21, 1448:23,
1449:4, 1449:5,
1450:17, 1450:23,
1454:5, 1456:5,
1456:16, 1457:3,
1459:17
**seeing** [2] - 1414:25,
1432:10
**seek** [1] - 1443:6
**select** [1] - 1386:9
**sell** [5] - 1377:2,
1377:5, 1377:13,
1436:7, 1436:9
**selling** [3] - 1377:8,
1449:5, 1449:6
**Sells** [1] - 1398:23
**sending** [3] - 1391:12,
1393:22, 1414:19
**senior** [8] - 1416:4,
1419:14, 1439:12,
1453:1, 1453:3,
1453:8, 1454:1,
1454:3
**SENIOR** [1] - 1365:9
**Senior** [1] - 1423:5
**sense** [4] - 1405:20,
1433:19, 1438:2,
1443:21
**sensitive** [1] - 1435:22
**sensitivities** [2] -
1418:12, 1435:8
**sensitivity** [1] -
1443:11
**sent** [11] - 1372:6,
1372:9, 1382:10,
1385:25, 1386:7,
1386:20, 1392:21,
1416:19, 1447:10,
1458:8, 1458:21
**sentence** [6] - 1383:7,

1383:12, 1437:7,
1437:16, 1440:5,
1452:25
**sentences** [2] -
1430:2, 1440:4
**separate** [2] -
1384:19, 1460:7
**September** [5] -
1384:5, 1426:17,
1427:5, 1427:12,
1427:22
**series** [2] - 1398:3,
1398:4
**serious** [1] - 1415:23
**serves** [1] - 1451:21
**Session** [1] - 1431:18
**session** [1] - 1460:6
**SESSION** [1] -
1365:12
**set** [8] - 1371:1,
1371:7, 1371:24,
1374:7, 1406:13,
1408:6, 1412:1,
1459:6
**setting** [2] - 1412:9,
1412:10
**settings** [1] - 1406:15
**seven** [1] - 1372:6
**several** [5] - 1372:10,
1394:12, 1399:24,
1402:8, 1417:8
**severity** [1] - 1436:5
**shaded** [1] - 1435:1
**shape** [1] - 1426:6
**share** [1] - 1376:21
**shareholder** [1] -
1384:4
**shareholders** [5] -
1376:18, 1377:5,
1377:6, 1377:12,
1396:7
**shares** [6] - 1376:19,
1376:21, 1376:24,
1377:2, 1377:5,
1377:13
**sheet** [3] - 1409:6,
1428:9, 1431:18
**Shiller** [4] - 1437:20,
1437:22, 1438:11,
1438:18
**shorter** [1] - 1384:15
**shorthand** [1] -
1366:11
**shortly** [3] - 1407:23,
1409:20, 1415:7
**show** [22] - 1378:3,
1378:10, 1380:2,
1381:2, 1381:14,
1381:15, 1382:15,
1382:19, 1384:17,

1388:16, 1389:1,
1389:14, 1390:13,
1394:14, 1395:12,
1396:2, 1415:18,
1424:2, 1434:8,
1448:2
**showed** [12] -
1377:24, 1382:18,
1383:6, 1383:13,
1385:16, 1386:18,
1389:3, 1389:22,
1390:10, 1395:22,
1427:8, 1437:23
**showing** [15] -
1387:13, 1387:15,
1387:18, 1388:4,
1388:14, 1388:22,
1389:24, 1392:13,
1395:2, 1395:15,
1417:8, 1417:22,
1426:5, 1431:25,
1449:12
**shown** [2] - 1434:1,
1454:13
**shows** [3] - 1390:8,
1406:12, 1423:15
**side** [4] - 1402:19,
1421:17, 1425:4,
1441:15
**signal** [2] - 1414:12,
1420:9
**signalled** [1] - 1421:9
**SIGNATURE** [1] -
1461:9
**significant** [9] -
1403:21, 1403:25,
1407:5, 1408:11,
1419:15, 1435:11,
1435:16, 1438:12,
1453:12
**Silva** [1] - 1419:19
**similar** [6] - 1392:13,
1392:16, 1412:15,
1422:14, 1454:7,
1454:24
**simple** [1] - 1449:17
**simply** [3] - 1390:8,
1396:20, 1397:2
**single** [10] - 1379:18,
1404:8, 1428:23,
1436:3, 1436:12,
1436:13, 1437:15,
1438:14, 1444:12,
1446:17
**single-digit** [1] -
1444:12
**sit** [3] - 1397:16,
1412:21, 1437:2
**sit-down** [1] - 1412:21
**sitting** [2] - 1440:24,

1447:15
**situation** [3] - 1374:4,
1401:5, 1426:23
**situations** [2] -
1426:13, 1427:20
**six** [2] - 1386:3,
1411:16
**size** [1] - 1416:15
**sized** [1] - 1440:22
**skier** [2] - 1439:5,
1439:6
**skip** [1] - 1440:4
**skis** [1] - 1439:6
**sleep** [1] - 1397:17
**slide** [14] - 1378:3,
1378:10, 1379:10,
1379:17, 1379:18,
1380:2, 1380:23,
1383:12, 1387:10,
1387:15, 1387:17,
1388:5, 1434:21,
1434:22
**slides** [8] - 1389:1,
1391:19, 1392:6,
1393:1, 1393:15,
1442:22, 1442:23,
1442:24
**Slides** [1] - 1441:4
**slower** [1] - 1437:25
**small** [2] - 1392:9,
1407:2
**smaller** [4] - 1416:12,
1416:13, 1416:15,
1449:18
**snow** [1] - 1439:5
**soft** [1] - 1450:4
**solvent** [15] - 1378:21,
1378:25, 1379:2,
1379:5, 1379:9,
1380:20, 1381:5,
1381:10, 1381:12,
1381:24, 1382:1,
1382:3, 1382:14,
1383:2
**someone** [7] -
1397:16, 1403:2,
1404:16, 1419:22,
1425:13, 1425:24,
1426:8
**sometimes** [4] -
1419:19, 1425:3,
1425:5, 1443:20
**somewhat** [1] -
1428:14
**somewhere** [1] -
1400:3
**sooner** [1] - 1421:9
**sorry** [9] - 1368:10,
1386:11, 1391:2,
1403:17, 1413:24,

1447:6, 1452:8,
1457:15, 1458:5
**Sorry** [1] - 1389:18
**sort** [9] - 1399:4,
1399:8, 1412:2,
1417:23, 1420:12,
1421:1, 1428:25,
1429:3, 1439:15
**sound** [3] - 1378:20,
1381:24, 1383:2
**sounds** [1] - 1370:10
**source** [1] - 1444:5
**Southwest** [1] -
1399:10
**space** [1] - 1455:11
**speaking** [2] - 1448:6,
1450:14
**specific** [3] - 1410:18,
1412:6, 1417:24
**specifics** [1] - 1418:19
**speed** [1] - 1437:24
**spellings** [1] - 1442:1
**spend** [1] - 1407:3
**spiral** [2] - 1429:10,
1429:11
**Spohn** [5] - 1412:23,
1415:1, 1418:5,
1434:17, 1437:8
**SPSPA** [2] - 1387:21,
1394:18
**stability** [1] - 1370:3
**stable** [2] - 1432:8,
1435:17
**staff** [1] - 1460:2
**stand** [3] - 1369:12,
1369:13, 1397:16
**STAND** [1] - 1369:17
**start** [6] - 1369:21,
1386:18, 1392:3,
1419:13, 1425:4,
1430:21
**started** [9] - 1415:20,
1416:3, 1419:12,
1421:7, 1421:10,
1421:12, 1421:18,
1429:24, 1447:17
**starting** [4] - 1414:14,
1430:16, 1448:20
**starts** [3] - 1382:16,
1382:17, 1424:2
**state** [2] - 1398:10,
1428:15
**statement** [7] -
1385:10, 1425:16,
1434:24, 1435:13,
1440:8, 1440:9,
1446:15, 1448:16,
1450:8, 1450:22,
1450:25, 1451:8,
1452:20, 1452:23,

1453:4, 1453:9,
1453:14, 1454:7,
1454:8, 1454:10,
1454:18, 1454:24,
1455:4, 1455:11,
1455:17, 1456:10,
1456:13, 1456:14,
1456:15, 1458:15
**statements** [6] -
1434:10, 1455:8,
1457:11, 1457:17,
1458:1, 1458:2
**States** [2] - 1366:7,
1369:23
**STATES** [2] - 1365:1,
1365:13
**Station** [1] - 1399:5
**statistics** [1] - 1427:19
**status** [5] - 1440:5,
1440:10, 1452:20,
1453:24, 1456:4
**statute** [1] - 1380:19
**stay** [5] - 1399:13,
1399:18, 1400:13,
1407:24, 1419:8
**stenotype** [1] -
1366:11
**step** [2] - 1373:21,
1397:12
**Stern** [2] - 1368:4,
1459:19
**STERN** [7] - 1366:2,
1368:4, 1368:10,
1369:2, 1459:19,
1459:23, 1460:4
**still** [8] - 1368:25,
1376:18, 1376:24,
1392:5, 1395:17,
1447:17, 1450:2,
1456:25
**stock** [7] - 1422:6,
1439:12, 1453:1,
1453:3, 1453:8,
1454:1, 1454:4
**STOCK** [1] - 1365:9
**Stock** [1] - 1423:6
**story** [1] - 1450:12
**Strategic** [1] - 1431:18
**streams** [1] - 1435:17
**Street** [2] - 1446:5,
1446:7
**stress** [6] - 1405:19,
1405:20, 1405:24,
1405:25, 1406:1,
1406:3
**stressing** [2] -
1405:21, 1405:22
**strong** [3] - 1402:6,
1448:25, 1449:10
**structure** [2] -

1422:22, 1447:9
**structured** [1] -
1422:15
**stuff** [2] - 1413:13,
1432:22
**subject** [4] - 1389:11,
1420:18, 1429:21,
1441:2
**subpoena** [1] -
1397:23
**subsequent** [1] -
1407:25
**subsequently** [1] -
1399:20
**substantial** [2] -
1426:1, 1436:2
**substantive** [1] -
1442:5
**subtracted** [1] -
1449:18
**sufficient** [4] -
1447:19, 1447:24,
1448:14, 1457:2
**summation** [1] -
1447:24
**summer** [2] - 1414:17,
1427:23
**Sunday** [1] - 1368:12
**sundry** [1] - 1404:9
**supply** [1] - 1370:11
**supposed** [4] -
1371:19, 1372:3,
1396:4, 1396:9
**Susan** [7] - 1397:19,
1397:20, 1398:6,
1398:11, 1429:24,
1430:2, 1450:21
**SUSAN** [1] - 1367:5
**suspect** [1] - 1413:16
**suspended** [2] -
1374:22, 1374:23
**sustain** [1] - 1450:6
**sustainability** [3] -
1452:19, 1453:13,
1453:25
**Sustainable** [1] -
1434:23
**sustainable** [2] -
1409:22, 1409:23
**sustained** [3] -
1433:1, 1449:21
**sustaining** [1] -
1440:21
**sweep** [32] - 1374:14,
1374:17, 1374:21,
1374:24, 1375:7,
1375:11, 1375:16,
1376:3, 1376:6,
1376:10, 1376:16,
1376:18, 1379:6,

1381:7, 1381:13,
1382:2, 1382:9,
1384:5, 1384:9,
1384:21, 1385:8,
1385:11, 1385:14,
1395:9, 1411:21,
1424:6, 1425:14,
1426:16, 1427:6,
1429:9, 1441:6,
1457:23
**sweeps** [1] - 1379:6
**system** [1] - 1370:3
**systemic** [2] - 1370:9,
1383:15

## T

**table** [2] - 1387:16,
1411:12
**tail** [1] - 1425:6
**tailwind** [1] - 1431:1
**talks** [1] - 1387:2
**target** [1] - 1406:2
**tax** [20] - 1377:15,
1400:17, 1408:15,
1408:19, 1408:21,
1410:1, 1412:16,
1414:21, 1415:10,
1418:13, 1419:11,
1419:13, 1419:15,
1419:21, 1419:23,
1420:11, 1440:23,
1442:7, 1441:13,
1443:22
**taxpayer** [2] -
1373:25, 1448:12
**taxpayers** [3] -
1374:9, 1374:10,
1439:17
**team** [12] - 1403:15,
1403:18, 1404:2,
1404:12, 1404:15,
1404:19, 1413:20,
1417:3, 1417:5,
1417:6, 1419:10,
1459:25
**technical** [1] -
1415:14
**ten** [8] - 1388:20,
1389:23, 1390:9,
1392:11, 1395:16,
1395:17, 1442:10,
1442:13
**ten-year** [1] - 1395:16
**tend** [2] - 1449:4,
1449:5
**tended** [2] - 1424:17,
1438:23
**tenure** [1] - 1408:14
**term** [11] - 1406:1,

1418:11, 1423:20,
1432:14, 1435:20,
1452:19, 1453:12,
1453:25, 1454:23,
1455:13, 1456:9
**terms** [7] - 1370:14,
1371:6, 1388:23,
1394:14, 1407:19,
1431:25
**test** [4] - 1397:18,
1405:19, 1405:20,
1406:1
**testified** [1] - 1444:5
**testifying** [1] -
1417:20
**TESTIMONY** [1] -
1367:2, 1367:5
**Testimony** [1] -
1368:14
**testimony** [5] -
1368:16, 1388:1,
1392:15, 1397:15,
1398:6
**tests** [1] - 1406:3
**Texas** [2] - 1398:15,
1398:19
**text** [1] - 1453:24
**THE** [31] - 1365:1,
1365:1, 1365:12,
1368:8, 1369:7,
1369:10, 1369:17,
1372:16, 1372:20,
1372:24, 1377:18,
1384:7, 1384:8,
1390:25, 1391:5,
1394:5, 1396:17,
1396:22, 1396:24,
1397:12, 1397:21,
1398:5, 1398:18,
1417:15, 1442:9,
1442:17, 1452:8,
1452:11, 1459:13,
1459:22, 1460:3
**themselves** [2] -
1410:9, 1451:17
**they've** [1] - 1392:2
**thinking** [3] - 1401:9,
1420:20, 1440:19
**Third** [9] - 1373:6,
1407:22, 1409:14,
1412:17, 1413:8,
1416:22, 1447:21,
1457:24, 1459:2
**third** [17] - 1373:14,
1373:17, 1381:17,
1402:18, 1416:1,
1418:5, 1427:18,
1437:6, 1437:7,
1437:14, 1438:17,
1438:24, 1446:10,

1446:11, 1452:18,
1457:21, 1458:9
**third-party** [2] -
1438:17, 1438:24
**three** [11] - 1372:7,
1374:5, 1380:25,
1384:14, 1396:8,
1401:10, 1411:10,
1430:2, 1440:4,
1457:19, 1458:2
**three-page** [1] -
1380:25
**throughout** [1] -
1414:17
**Thursday** [1] -
1393:19
**tilting** [1] - 1421:18,
1430:16
**Tim** [4] - 1410:19,
1410:23, 1414:9,
1428:21
**timeline** [1] - 1402:12
**timetable** [1] - 1415:4
**timing** [6] - 1408:20,
1413:18, 1414:16,
1437:24, 1437:25,
1440:8
**timings** [1] - 1421:8
**Timothy** [3] - 1368:14,
1391:12, 1393:12
**tipping** [1] - 1416:3
**title** [1] - 1434:22
**today** [3] - 1372:3,
1417:23, 1437:11
**together** [3] - 1403:13,
1404:12, 1427:7
**took** [3] - 1392:25,
1429:2, 1441:6
**top** [7] - 1370:17,
1382:17, 1388:16,
1390:16, 1439:9,
1448:19, 1450:18
**Topaz** [1] - 1365:18
**topic** [1] - 1411:4
**topics** [4] - 1411:8,
1411:10, 1411:13,
1412:6
**total** [5] - 1392:5,
1395:13, 1423:15,
1425:23, 1449:14
**towards** [2] - 1416:3,
1455:9
**trajectory** [1] -
1429:19
**TRANSCRIPT** [1] -
1365:12
**Transcript** [1] -
1366:11
**transcript** [1] - 1461:4
**transcription** [1] -

1366:11
**translate** [1] - 1433:24
**treasurer** [1] - 1410:21
**Treasury** [89] - 1371:2,
1371:7, 1371:16,
1371:24, 1372:6,
1373:12, 1373:14,
1373:21, 1374:3,
1374:8, 1374:16,
1374:20, 1375:12,
1375:17, 1375:21,
1375:23, 1375:25,
1376:1, 1376:7,
1376:11, 1379:7,
1382:11, 1384:25,
1385:4, 1385:6,
1385:11, 1386:11,
1387:14, 1388:15,
1389:20, 1390:9,
1391:19, 1392:21,
1393:15, 1393:19,
1393:23, 1395:3,
1395:8, 1395:11,
1395:12, 1395:21,
1396:11, 1402:24,
1405:9, 1405:13,
1409:21, 1410:10,
1410:15, 1410:23,
1411:3, 1411:7,
1411:11, 1411:16,
1411:18, 1412:3,
1412:9, 1412:21,
1412:25, 1413:23,
1415:3, 1416:20,
1422:25, 1423:6,
1426:7, 1428:17,
1428:18, 1439:11,
1440:20, 1441:3,
1441:9, 1441:10,
1441:14, 1441:19,
1441:24, 1442:8,
1442:22, 1442:23,
1443:14, 1449:20,
1452:22, 1453:3,
1453:7, 1454:3,
1454:22, 1455:13,
1456:4, 1456:9,
1457:20
**treat** [1] - 1369:5
**trend** [1] - 1448:22
**trends** [3] - 1425:1,
1425:2
**TRIAL** [1] - 1365:12
**tried** [2] - 1371:23,
1438:16
**true** [14] - 1449:8,
1450:8, 1451:11,
1453:4, 1453:9,
1453:14, 1454:18,
1455:4, 1455:17,

1456:10, 1456:13, 1456:14, 1456:15, 1458:15
**truth** [1] - 1445:19
**truthful** [1] - 1454:10
**try** [5] - 1438:5, 1439:24, 1440:14, 1442:10, 1451:16
**trying** [14] - 1378:4, 1379:11, 1379:12, 1379:22, 1380:2, 1384:17, 1389:14, 1404:13, 1404:20, 1424:19, 1438:3, 1447:3, 1449:7, 1456:23
**turn** [8] - 1418:8, 1423:11, 1425:5, 1429:23, 1431:16, 1435:7, 1437:14, 1451:22
**turning** [1] - 1423:24
**two** [12] - 1382:20, 1385:15, 1385:21, 1386:15, 1388:17, 1388:19, 1390:13, 1401:15, 1402:11, 1411:10, 1411:24, 1457:19
**type** [5] - 1394:11, 1399:1, 1404:15, 1412:15, 1421:6
**types** [5] - 1417:1, 1420:13, 1422:15, 1422:17, 1428:23
**typically** [1] - 1417:4

## U

**U.S** [2] - 1411:7, 1439:11
**Ugoletti** [1] - 1415:12
**ultimately** [4] - 1399:10, 1399:12, 1399:25, 1425:12
**uncertainty** [5] - 1451:6, 1452:19, 1453:12, 1453:24, 1456:3
**unchanged** [4] - 1388:3, 1392:6, 1394:21
**uncomfortable** [1] - 1402:25
**under** [22] - 1374:17, 1374:21, 1375:7, 1375:11, 1376:3, 1376:6, 1376:10, 1376:15, 1387:21, 1389:20, 1394:18,

1418:16, 1419:13, 1429:23, 1437:15, 1448:2, 1453:1, 1453:8, 1454:1, 1454:3, 1460:7
**understood** [3] - 1379:23, 1439:18, 1439:25
**underway** [1] - 1402:18
**unique** [1] - 1425:7
**UNITED** [2] - 1365:1, 1365:13
**United** [2] - 1366:7, 1369:22
**University** [1] - 1398:15
**unless** [1] - 1414:2
**unprecedented** [4] - 1384:21, 1384:24, 1384:25, 1385:12
**unreasonable** [1] - 1425:16
**untypical** [1] - 1443:19
**unused** [1] - 1395:15
**unusual** [1] - 1425:1
**up** [43] - 1373:4, 1376:24, 1378:1, 1378:12, 1382:18, 1386:19, 1388:11, 1389:2, 1390:14, 1394:9, 1403:15, 1406:12, 1407:23, 1410:7, 1412:1, 1412:9, 1412:10, 1415:17, 1418:16, 1418:24, 1421:1, 1421:2, 1421:6, 1424:2, 1424:6, 1424:13, 1425:1, 1425:3, 1425:5, 1427:1, 1428:5, 1429:6, 1434:1, 1434:8, 1443:22, 1444:14, 1447:14, 1451:2, 1451:4, 1456:20, 1459:6, 1459:8
**upcoming** [1] - 1413:19
**update** [5] - 1405:9, 1410:17, 1441:10, 1441:23, 1443:10
**updated** [2] - 1410:17, 1442:5
**updates** [3] - 1426:19, 1441:25, 1442:1
**upticks** [1] - 1450:20
**useful** [1] - 1401:19

**utilize** [1] - 1418:12

## V

**vacation** [3] - 1457:8, 1457:13, 1457:17
**valuation** [3] - 1419:1, 1419:23, 1443:23
**valuations** [1] - 1406:22
**value** [5] - 1371:12, 1371:20, 1406:21, 1436:6, 1447:22
**variable** [2] - 1436:3, 1436:13
**variety** [1] - 1403:19
**vast** [1] - 1435:20
**vendor** [1] - 1393:1
**verification** [1] - 1389:12
**vernacular** [1] - 1433:4
**version** [9] - 1384:15, 1386:20, 1387:2, 1390:11, 1393:2, 1442:3, 1442:4, 1442:5
**Version** [1] - 1441:4
**versions** [5] - 1385:16, 1385:21, 1386:13, 1386:15, 1390:13
**versus** [4] - 1408:21, 1425:18, 1439:20, 1440:3
**vest** [1] - 1443:17
**vice** [1] - 1400:15
**vicinity** [1] - 1400:4
**Vickie** [2] - 1419:11, 1419:20
**victory** [1] - 1450:6
**view** [5] - 1409:19, 1409:22, 1414:13, 1430:3, 1444:6
**vis-à-vis** [1] - 1424:21
**vitae** [1] - 1396:16
**volatile** [1] - 1436:3
**volatility** [3] - 1447:1, 1454:20, 1456:6
**volume** [1] - 1406:20
**volumes** [1] - 1404:9
**vs** [1] - 1365:5

## W

**wait** [1] - 1421:12
**waive** [2] - 1422:2, 1423:2
**waiver** [1] - 1373:5
**waives** [2] - 1373:14,

1373:17
**waiving** [1] - 1372:6
**walk** [1] - 1439:2
**walked** [2] - 1442:21, 1442:23
**Wall** [2] - 1446:5, 1446:7
**wants** [1] - 1368:18
**Washington** [7] - 1365:9, 1365:16, 1365:22, 1366:5, 1366:9, 1450:12, 1450:14
**ways** [1] - 1430:11
**week** [2] - 1411:22, 1411:24
**weighing** [1] - 1421:17
**well-understood** [1] - 1439:18
**what-not** [1] - 1422:13
**wheel** [1] - 1429:3
**whereas** [1] - 1422:11
**whereby** [2] - 1409:21, 1410:1
**whoa** [1] - 1421:12
**whole** [8] - 1379:7, 1379:24, 1379:25, 1380:1, 1384:13, 1384:16, 1395:6, 1421:3
**Wick** [2] - 1461:3, 1461:8
**WICK** [1] - 1366:7
**wild** [1] - 1439:7
**wind** [2] - 1458:12, 1458:15
**wind-down** [1] - 1458:15
**winding** [2] - 1459:4, 1459:9
**window** [1] - 1415:6
**winds** [1] - 1425:6
**wipe** [1] - 1426:10
**withdraw** [2] - 1368:18, 1368:22
**withdrawn** [1] - 1369:6
**witness** [10] - 1369:10, 1369:11, 1393:5, 1393:6, 1396:21, 1397:13, 1397:22, 1417:9, 1417:20
**WITNESS** [2] - 1369:17, 1384:8
**witnesses** [1] - 1398:1
**word** [2] - 1378:25, 1391:20
**words** [6] - 1379:22,

1417:5, 1424:8, 1428:8, 1435:19, 1436:10
**work-out** [1] - 1427:20
**work-outs** [1] - 1434:11
**workouts** [1] - 1406:16
**works** [1] - 1430:8
**world** [1] - 1438:4
**worse** [1] - 1424:17
**worth** [55] - 1374:14, 1374:15, 1374:17, 1374:19, 1374:21, 1374:24, 1374:25, 1375:2, 1375:3, 1375:7, 1375:9, 1375:11, 1375:16, 1376:1, 1376:3, 1376:4, 1376:6, 1376:7, 1376:10, 1376:15, 1376:18, 1379:1, 1379:2, 1379:3, 1379:6, 1379:7, 1381:6, 1381:10, 1381:13, 1382:2, 1382:4, 1382:5, 1382:9, 1382:10, 1382:11, 1384:5, 1384:9, 1384:20, 1385:8, 1385:11, 1385:14, 1386:11, 1395:9, 1407:24, 1411:20, 1424:6, 1425:13, 1426:16, 1427:6, 1429:9, 1435:12, 1441:6, 1457:23
**wound** [1] - 1458:13
**writing** [1] - 1441:12
**written** [1] - 1451:7

## Y

**year** [26] - 1373:15, 1376:14, 1395:16, 1423:17, 1426:1, 1426:10, 1427:10, 1430:24, 1433:12, 1434:4, 1435:3, 1435:9, 1435:12, 1448:23, 1448:25, 1449:10, 1449:14, 1449:15, 1449:17, 1449:18, 1449:25, 1450:1, 1451:15, 1452:4, 1452:15
**years** [12] - 1382:13, 1385:15, 1387:4, 1387:6, 1388:15,

1388:21, 1389:24,
1390:9, 1392:12,
1395:17, 1433:12,
1435:2
**yesterday** [10] -
1369:20, 1377:24,
1378:25, 1379:14,
1382:6, 1386:4,
1387:20, 1387:23,
1388:21, 1396:14
**York** [1] - 1365:21
**yourself** [1] - 1422:3

## Z

**zero** [3] - 1374:15,
1382:11, 1382:13