1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
2
    - - - - - - - - - - - - - - - x
3   FAIRHOLME FUNDS, INC., et al.,
                                        CA No: 1:13-cv-01053-RCL
4               Plaintiffs,
                                        Washington, D.C.
5                                       Wednesday, October 26, 2022
    vs.                                 10:15 a.m.
6
    FEDERAL HOUSING FINANCE AGENCY,
7   et al.,

8               Defendants.
    - - - - - - - - - - - - - - - x
9   IN RE: FANNIE MAE/FREDDIE MAC    Case Number 1:13-cv-1288
    SENIOR PREFERRED STOCK PURCHASE
10  AGREEMENT CLASS ACTION
    LITIGATIONS
11

12  _____

13        TRANSCRIPT OF JURY TRIAL - MORNING SESSION
        HELD BEFORE THE HONORABLE ROYCE C. LAMBERTH
14             UNITED STATES DISTRICT JUDGE
    _____

15  APPEARANCES:

16  For the Berkley Plaintiffs:    **BRIAN BARNES, ESQ.**
                                   **COOPER & KIRK, PLLC**
17                                 1523 New Hampshire Avenue, NW
                                   Washington, D.C. 20036
18
    For Class Plaintiffs:          **LEE D. RUDY  ESQ.**
19                                 **KESSLER TOPAZ MELTZER & CHECK**
                                   280 King of Prussia Road
20                                 Radnor, Pennsylvania 19087

21                                 **HAMISH HUME, ESQ.**
                                   **KENYA DAVIS, ESQ.**
22                                 **SAMUEL KAPLAN, ESQ.**
                                   **BOIES SCHILLER FLEXNER LLP**
23                                 1401 New York Avenue Northwest
                                   Washington, D.C. 20005
24
    (CONTINUED ON NEXT PAGE)
25

```
 1    APPEARANCES (CONTINUED):

 2    For Class Plaintiffs:        RICH GLUCK, ESQ.
                                   ROBERT KRAVETZ, ESQ.
 3                                 BERNSTEIN LITOWITZ BERGER &
                                   GROSSMANN LLP
 4                                 1251 Avenue of the Americas
                                   New York, New York 10020
 5

 6    For Defendant Federal
      Housing Finance Agency:      JONATHAN STERN, ESQ.
 7                                 ASIM VARMA, ESQ.
                                   DAVID BERGMAN, ESQ.
 8                                 IAN HOFFMAN, ESQ.
                                   STANTON JONES, ESQ.
 9                                 ARNOLD & PORTER KAYE SCHOLER
                                   601 Massachusetts Avenue NW
10                                 Washington, D.C. 20001

11

12    Court Reporter:             Lisa A. Moreira, RDR, CRR
                                  Official Court Reporter
13                                U.S. Courthouse, Room 6718
                                  333 Constitution Avenue, NW
14                                Washington, DC  20001
                                  (202) 354-3187
15

16

17

18

19

20

21

22

23

24

25
```

1  I N D E X

2

WITNESS                                          PAGE

3

ANJAN THAKOR, Ph.D., Resumed

4

5  (By Mr. Kaplan)...................................1614
(By Mr. Jones)....................................1660

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2              THE COURT:  You may be seated.
 3              The witness may resume the stand.
 4              (To the jury) Good morning, ladies and gentlemen.
 5              All right.  Counsel, you may proceed.
 6              MR. KAPLAN:  Thank you, Your Honor.  Good morning.
 7              Kevin, can we have Slide 24, please.
 8                    ANJAN THAKOR, Resumed
 9              DIRECT EXAMINATION, Continued
10   BY MR. KAPLAN:
11   Q.  Professor Thakor, when we last left off, I believe -- is
12   it correct that this slide basically summarizes what we were
13   talking about at the end of the day yesterday?
14   A.  Yes.
15   Q.  And is the bottom line here that the lack of a formula
16   in the contract, the goal of full compensation, the fact
17   that it said "Determined With Reference To 'Market Value,'"
18   and the fact that there was no internal analysis led you to
19   conclude that you needed to look to the best available
20   market comparables?
21   A.  That's correct.
22   Q.  And I believe you testified earlier that -- earlier in
23   the day yesterday that in your view the best available
24   market comparables were commercial loan commitments, the
25   Capital Purchase Program, and compensation paid by AIG or --
```

1    paid by AIG for financial assistance during the financial

2    crisis; is that correct?

3    A.  That's correct, yes.

4    Q.  Now, Professor Thakor, once you have your comparables,

5    what's the method to use the market comparables to determine

6    an appropriate fee?

7    A.  So, as I think I indicated yesterday, what you want to

8    do is -- you don't want to just look at the PCF component in

9    the market comparables.  You want to look at the all-in cost

10   for the entity receiving the capital, and you want to do

11   all-in cost comparison based on that market data with the

12   all-in cost under the PSPA for the GSEs.

13   Q.  And what does all-in compensation mean in the context of

14   the GSE arrangement?

15   A.  Well, you know, as we know from the PSPA and we know

16   from the terms of the contract, there are many components of

17   compensation that Treasury received from the GSEs.  So one

18   was, of course, the upfront fee, a billion dollars each.

19        Then you had the 10 percent annual dividend on the

20   amount drawn down, and then you had the warrants to buy 79.9

21   percent of GSE common stock.  So that's like an option that

22   Treasury has at a nominal strike price, so they could

23   essentially buy the stock with a very small amount of money.

24        And then, the final component is the PCF, which is

25   really the price of the promise that Treasury has made, and

1   that's on the undrawn portion of the commitment.

2   Q.  So before we do that comparison, Professor, and see what

3   you did, do you have just kind of a general example of what

4   you mean by "all-in" costs that may be a little more

5   relatable than the commitments that we're talking about

6   here?

7   A.  Sure.  Since we're talking about Fannie, Freddie, and

8   the housing market, you know, I'll take an example that most

9   of us are familiar with, which is mortgages.

10          So if you want to buy a house, and you want to

11   decide which mortgage lender to go with, and you were doing

12   that comparison shopping, you wouldn't just look at the

13   interest rate on the mortgage.  All right?  You would look

14   for what are the other costs.  Right?  What are the closing

15   costs that I'll have to pay when I sign on the dotted line

16   at closing?  What are the points that I'll have to pay up

17   front?  The more points I pay, the lower the interest rate

18   on the mortgage.

19          I want to look at whether or not I have to pay

20   private mortgage insurance, because that's money, too.  So I

21   want to look at all of those elements of cost and look at

22   the all-in cost as opposed to just zeroing in on the

23   interest rate, on the mortgage.

24          And there -- even there I want to know is it fixed

25   rate?  Is it adjustable rate?  If it's adjustable rate, how

1   is it going to adjust?

2        You want to take a look at all of those things in

3   combination before you determine which lender you'll go

4   with.

5   Q.  And so can you walk us through how this applies to the

6   GSEs.

7   A.  This is exactly what the GSEs are faced with.  Right?

8   They don't just face one element of cost.  They paid an

9   upfront fee.  That's one element of cost.

10        They paid -- they gave warrants to Treasury to buy

11   almost 80 percent of common stock, which is another element

12   of cost.

13        It means that over and above the 10 percent

14   dividend, which is the third element of cost on the

15   preferred stock, once Treasury exercises the warrants, they

16   own 79 percent -- 79.9 percent of the common stock, which

17   means they get 79.9 percent of the dividends on the common

18   stock as well in addition to the 10 percent dividends on the

19   preferred stock.

20        And so all of those are elements of cost just like

21   the elements of cost that I explained in the case of home

22   mortgages.  Right?  So you want to take all of that into

23   account holistically as opposed to focusing on just one

24   element of cost.

25   Q.  Professor, how did the 10 percent rate dividend compare

1   to interest rates that were prevailing at the time of the

2   financial crisis?

3   A.  It was significantly higher.

4          So if you remember what interest rates were

5   like -- and this is a chart just to remind us.  If you go

6   back to January of 2012 and track interest rates through,

7   say, January of 2017, this is the three-month LIBOR that

8   I've shown here.

9          And you can see that it's --

10  Q.  Professor, I don't mean to interrupt, but can you --

11  could you explain what LIBOR is, please.

12  A.  Sure.  So LIBOR stands for London Interbank Offer Rate,

13  and it's the rate that a select group of large banks have to

14  pay to borrow money from other banks within that group.  So

15  it's the short-term borrowing rate for large banks in the

16  interbank lending market.

17  Q.  Now, why is that rate relevant at all when it comes to

18  what the GSEs were paying?

19  A.  So it's relevant because a lot of variable rate

20  contracts in the financial market are actually indexed by

21  LIBOR.

22         By the way, LIBOR comes in many different

23  maturities, from overnight to 12 months.  This is just one

24  example.

25         But we'll see, when we get to AIG, that the

1    assistance that the Federal Reserve Bank of New York gave to

2    AIG was adjusted to -- tied to LIBOR.  In the bank loan

3    commitments data that I'll present we'll see that a lot of

4    bank loan commitments, interest rates, are tied to LIBOR.

5           So it's a very commonly used market index rate to

6    determine what you should pay.

7    Q.  So apologies for interrupting.  Please continue with

8    your explanation of this slide.

9    A.  Right.  So you can see that, you know, in January of

10   2012 the three-month LIBOR is, you know, less than 60 basis

11   points, less than 0.6 percent.  And it keeps falling through

12   January of 2015, when it's, you know, between 20 and 30

13   basis points.  And then it begins to rise, but it never

14   exceeds 1 percent.  So it stayed below 1 percent all through

15   this time.

16   Q.  Now, Professor, just to be clear, are you saying that

17   the GSEs should have just been paying the three-month LIBOR

18   as their dividend?

19   A.  No, no, no.  Of course not.  That's not what I meant to

20   suggest.

21          What I'm saying is that since this is a market

22   benchmark rate to which a lot of contract rates are tied,

23   it's a useful starting point for us to see what market rates

24   were.  And 10 percent is much higher than that, but, you

25   know, for example, you know, AIG was asked to pay, by the

1    New York Fed, LIBOR plus 300 basis points.

2             So it's not LIBOR, but if you had 300 basis

3    points, so 3 percent of this, you're going to be well below

4    the 10 percent rate that the GSEs were paying.  So that's

5    why this is a useful benchmark.

6    Q.  So is it fair to say that what you're really comparing

7    is the mark-up over the benchmark rate?

8    A.  Exactly.  So all of these rates are going to be

9    specified as some mark-up over the benchmark, which is

10   LIBOR.

11   Q.  And the -- so I guess we should ask, how did this mark-

12   up -- and at the moment I'm just asking you at a general

13   level, and then we'll get into the numbering.

14            But how did this mark-up compare as a general

15   matter to what was going on during the financial crisis?

16   A.  Well, I mean, the mark-up obviously was related to the

17   conditions that existed during the crisis.  You know, during

18   times of stress, mark-ups tend to go up to reflect increased

19   risk.

20            But as we'll see in the data, when you look at the

21   mark-ups that were charged to companies like AIG, or in my

22   loan commitment research when I shared the data, we'll see

23   that even if you take the mark-ups into account, you don't

24   get anywhere close to the 10 percent.

25   Q.  All right.  Let's look at the commercial loan

1    commitments first.  Can you tell us what sources you used

2    for your commercial loan commitment analysis?

3    A.  So for that I used the research that's available on loan

4    commitments that is actually -- it's empirical research that

5    is looked at with data on actual loan commitment contracts

6    and how they're priced in the market.  So it goes back to

7    the guidance provided by the PSPA to look for market value.

8    So that's where I turned.

9              And in particular, there are two research papers

10   that I relied on that if -- and all of the experience I've

11   had and the research I've done in this area over the years.

12             MR. KAPLAN:  Your Honor, my clicker appears to be

13   malfunctioning.  May I borrow Professor Thakor's?

14             THE COURT:  Yes.

15             MR. KAPLAN:  Thank you.

16             THE WITNESS:  I don't know if this is working

17   either.

18             MR. KAPLAN:  Neither of these appear to be -- oh,

19   there we go.  I apologize.

20   Q.  So is this what you were talking about just now,

21   Professor?  Your research and experience and your

22   examination of these studies, your own and the 2016 that you

23   ultimately studied, when combined involved tens of thousands

24   of commercial loan commitments?

25   A.  That's correct.

1           So the 2,513 loan commitment contracts refers to

2    my 1997 published paper.

3           The subsequent 2016 paper in the *Journal of*

4    *Finance* examined 32,343 loan commitments.

5    Q.  All right.  So let's look at the data.

6           All right.  Now, in the first two columns, please

7    tell us what we're -- tell us what we're seeing here.

8    A.  So -- yes, sorry.

9           So as I indicated earlier, you know, these

10   contracts are indexed to LIBOR.  And so my 1997 paper shows

11   that the average -- and this is for the largest three

12   categories of commitments -- in the paper the average

13   interest rate on the loans -- so, remember, this is when I

14   take down the loan commitment and actually borrow -- it's

15   the 12-month LIBOR at the time plus 1.08 percent.

16          The average upfront fee -- so think about this as

17   the analog of the billion dollars that the GSEs paid.  That

18   was 21 basis points, so .21 percent.  The ongoing usage fee,

19   which is on the undrawn portion, is 0.26 percent or 26 basis

20   points.

21          The subsequent study, the 2016 study, which

22   studied a different time period and a bigger sample, had the

23   average interest rate as the 12-month LIBOR plus 1.9

24   percent, the average upfront fee of 61 basis points or 0.61

25   percent, and the analog of the PCF, the average ongoing

 1    usage fee, was 0.38 percent.

 2    Q.  Now, Professor, I'm correct that your study was from

 3    '97, and the Saunders/Steffen study was from 2016; is that

 4    correct?

 5    A.  Correct.

 6    Q.  So how do you do a comparison -- because interest rates

 7    change over time, correct?

 8    A.  Right.

 9    Q.  So how do you do a comparison that updates to the

10    financial crisis?

11    A.  So by the way, you know, those studies, the Saunders

12    study, I think the sample goes from late '80s through 2011.

13    It covers the financial crisis.  My paper had a shorter time

14    window.

15         So this is why you don't just state the interest

16    rate.  You state it as LIBOR plus.  Right?

17         So you look at the mark-ups.  And then I can

18    basically take this to any time period, for example, 2012,

19    and ask the question:  Well, what was the 12-month LIBOR in

20    2012?  And I can just plug that into this and then apply the

21    add-ons that the study of these loan commitment contracts

22    indicated to get an indication of what these commitments

23    would have paid had they been issued in August of 2012, the

24    time of the Third Amendment.

25    Q.  All right.  So let's look at how it compared it AIG.  Is

1    that the third column?

2    A.  You mean the GSEs?

3    Q.  I'm sorry, the GSEs, yes.

4    A.  Yes.

5    Q.  So how did the rates compare for the average commercial

6    loan commitments with the PSPAs?

7    A.  Right.  Now, understand that the PSPA did not specify

8    the dividend as a mark-up over LIBOR.  It just said 10

9    percent.  Right?

10           So this is an inference -- the 12-month LIBOR in

11   August of 2012 was about 1.01 percent.  So if you add 1.01

12   percent to 8.99, percent you get 10.  So the 8.99 is my

13   inference of what the mark-up would have been when you took

14   the 10 percent as a given.

15           And so it's as if the GSEs were being charged a

16   mark-up of 8.99 percent when the average loan commitment

17   borrower borrowing in the commercial loan commitment market

18   is paying, you know, 1 to 2 percent.

19   Q.  And then average upfront fee?

20   A.  So the GSEs -- you'll recall I told you each of them

21   paid a billion dollars as an upfront fee.  The initial

22   commitment amount was $100 billion to each that the First

23   Amendment increased to $200 billion.  So if you think about

24   the increased $200 billion amount, then it's half a percent

25   or 50 basis points as the upfront fee; in other words, a

1    percentage of the committed amount.

2            Plus, of course, Treasury had something that banks

3    don't get when there's a loan commitment, which is this

4    warrant to buy 79.9 percent of the common stock, which is --

5    at a very nominal price.  So essentially they were given the

6    right to acquire this common stock whenever they pleased at

7    a very small price.

8    Q.  Now, it says here in the bottom right, Professor, your

9    opinion is zero PCF, but we do see PCFs in the bottom row

10   here, right?  26 basis points for your research, 38 basis

11   points for the subsequent study.

12           Why do you conclude zero PCF in the commercial

13   loan commitment comparison?

14   A.  Right.  I mean, you can see that these borrowers were

15   charged this ongoing usage fee or PCF of 26 and 38 basis

16   points.

17           The reason why I say the PCF in this case is zero

18   is if you just, as a matter of simple approximation, add up

19   the numbers in each column -- strictly speaking you can't do

20   that because they're assessed on different underlying

21   balances, but I think for purposes of illustration that

22   works.

23           You see 2.1 percent plus 0.2 plus 0.26, it's going

24   to come to something like, you know, 2.6, 2.7 percent.

25           If you add up the numbers in the second column,

1    you're going to get something just under 4 percent.  So

2    you're going to get nowhere close to 10 percent plus 50

3    basis points as an upfront fee plus warrants to buy 79.9

4    percent of the common stock.

5            So my point is that if you look at this from an

6    all-in cost perspective, Treasury is fully compensated even

7    without a PCF; so you don't need a positive PCF to provide

8    full compensation to Treasury based on a market value

9    assessment of the compensation on the commitment.

10   Q.  Well, now, Professor, how did the size of the commercial

11   loan commitments in these studies compare with the size of

12   the commitment to the GSEs?

13   A.  So I did consider that.

14           So these commitments, you know, are pretty big.

15   The three largest categories, in my paper, range from

16   roughly $150 million to over $550 million.  That's a lot of

17   money for me.  But -- and there are commitments out there in

18   the billions of dollars as well that banks make.  But

19   clearly that's much smaller than the $200 billion commitment

20   that Treasury made to the GSEs.

21           However, what's interesting is that if you look at

22   my paper, and you look at the data in general on

23   commitments, what it shows is that larger commitments tend

24   to have smaller upfront fees on average.  They are less

25   likely to have a usage fee on the undrawn portion, and the

 1    mark-ups tend to be smaller as well.

 2            So if I extrapolated from this to larger

 3    commitments that were not in the sample, one would get

 4    probably even smaller numbers than what this slide reflects,

 5    even lower prices.  So I view this comparison as actually

 6    being quite conservative.

 7    Q.  When you say -- well, first of all, can you explain just

 8    what you mean by "conservative."

 9    A.  Meaning that if I were to actually extrapolate from that

10    research and say that larger commitments should have lower

11    fees, I would end up with smaller numbers suggested for the

12    compensation that the GSEs should pay Treasury based on just

13    this comparison; and so, in a sense, you know, my conclusion

14    that the PCF should be zero becomes even stronger.

15    Q.  I just want to ask you about the warrants.  Did you, as

16    part of your work, conduct a precise valuation of how much

17    the warrants to purchase 79.9 percent of the common stock

18    were worth?

19    A.  No, I did not.

20    Q.  So how were you able to figure that in?

21    A.  Well, so one of the principles of finance is that

22    warrants can never have any value smaller than zero.  I

23    mean, they can expire worthless at the very end, but

24    generally almost any time prior to exercise a warrant is

25    always going to have positive value.

 1           So I know it's a positive number.  Right?  And

 2      already with 10 percent with the 50 basis points we're well

 3      above the compensation that commercial borrowers are

 4      providing to banks.

 5           However, I also believe that these warrants

 6      actually would have pretty substantial value, and the reason

 7      is three-fold.

 8           One is you remember prior testimony has shown us

 9      that Treasury never set a PCF when the GSEs were considered

10      to be too fragile to pay a PCF, because they didn't want to

11      weaken their financial condition even further, which means

12      that the PCF is going to be set at a time when Treasury

13      deems the GSEs to be financially strong.

14           Well, that's exactly when the warrants are going

15      to have substantial value, because if they're in a good

16      financial condition, then that stock is going to be worth

17      more than when they're weaker, which means that the warrants

18      are going to be worth more.  The higher the value of the

19      stock, the higher the value of the warrants.  Right?  So

20      that's one reason.

21           Secondly, we know that in August of 2012, anybody

22      who studied housing markets and the mortgage market and

23      banking in general, that the forecasts were all pointing in

24      the right direction.  The market was rebounding.  We were

25      heading in the right direction.  A lot of the problems that

1    leapt through the '07-'09 crisis had been sort of cleaned

2    up.  Banks had been recapitalized.  The housing market was

3    stable and recovering.  So, you know, we were on the path to

4    improvement already.  We were not completely out of the

5    woods, but we were on the path to improvement.

6             So that's another reason that the stock of the

7    GSEs would be -- at least at the time that Treasury would

8    set the PCF, the common stock would be worth a lot.

9             And then finally, we know that they were on the

10   verge of restoring the deferred tax loans, which added, from

11   Dr. Dharan's testimony, you know, close to $100 billion in

12   net worth on the balance sheets of the GSEs.

13            So when you take all of these factors into

14   account, you know that these warrants are going to be worth

15   a substantial amount.

16   Q.  Turning to the government assistance terms.  Am I

17   correct that another source you looked at was the Capital

18   Purchase Program?

19   A.  Uh-huh.

20   Q.  Could you describe what the Capital Purchase Program is.

21   A.  Okay.  So during the financial crisis, the -- you know,

22   Congress and the U.S. government were interested in making

23   sure that the entire financial system didn't implode.  So

24   under what's called TARP, which is the Troubled Asset Relief

25   Program, Congress authorized about $700 billion that they

1    gave to Treasury to essentially rescue the financial system.

2            A part of that was something called the Capital

3    Purchase Program or CPP, which essentially resulted in

4    Treasury extending -- infusing capital in about 705 banks to

5    recapitalize the banks.  So the objective of the program was

6    to recapitalize banks whose capital positions had been

7    weakened because of falling house prices.

8            And so -- so under this program each of the banks

9    in the program received capital from Treasury, and what

10   Treasury did is very similar to what they did with the GSEs,

11   is that they purchased cumulative preferred stock, for the

12   most part.  There were some other instruments as well.  But

13   the largest part of CPP was the purchase of cumulative

14   preferred stock in these institutions on which the

15   institutions paid dividends to Treasury.  And that's how

16   they recapitalized them during the crisis.

17           So I studied the terms of the assistance that

18   these banks received from Treasury because, you know, one

19   might argue, look, you know, you looked at bank loan

20   commitments, but the sample period covers years outside of

21   the crisis.  The GSEs received assistance during the crisis.

22   How about something that happened during the crisis?

23           So in this case we've got the same entity

24   providing assistance, Treasury.  It is essentially the same

25   purpose, to rescue and recapitalize these institutions.  And

1   it's essentially the same form; it's in the form of

2   preferred stock purchases by Treasury.

3   Q.  Thank you.

4          So let's look at how the terms compare.  So what

5   do you have in the first column?

6   A.  So I've got the terms of the contracts under the CPP

7   that banks received.  So in exchange for the preferred stock

8   that Treasury purchased in these banks, they had to pay a

9   dividend of 5 percent for the first five years.

10         It stepped up after that, but most of the banks

11   exited the program before it stepped up from 5 to 9.  They

12   had no upfront fee, and there was no right for Treasury to

13   veto redemptions.

14         So the way that these banks essentially exited the

15   program was by redeeming Treasury preferred stock, which

16   means that once they were -- their financial condition had

17   improved, they essentially bought back the stock that

18   Treasury had purchased; and then, when they did that, they

19   were able to exit the program and did not have to pay

20   anymore dividends on that preferred stock to Treasury.

21   Q.  And did they have to pay a PCF?

22   A.  And they paid no PCF.  So this is kind of a direct

23   comparison of the terms that Treasury gave to these banks

24   under the CPP.

25   Q.  All right.  Let's compare it to the GSE compensation.

1   A.   Okay.   So it's sort of 5 percent.   The GSEs paid 10

2   percent, which, you know, at the time of the Third

3   Amendment, given how much of the commitment GSEs had already

4   drawn down, was, between the two of them, an annual dividend

5   of about $18.9 billion.

6   Q.   What about the upfront fee?

7   A.   And then, as I explained earlier, they each paid a

8   billion dollars in an upfront fee, so that's 50 basis points

9   as a percentage of the committed amount, and they gave up

10   warrants for Treasury to acquire 79.9 percent of their

11   common stock.

12   Q.   Did the banks have to give up any warrants of common

13   stock as part of the Capital Purchase Program?

14   A.   No.

15   Q.   Now, what about Treasury's right to veto redemption?

16   A.   So in the case of the GSEs, if they wanted to exit the

17   program by redeeming Treasury preferred stock, Treasury had

18   the right to veto that.   So they could keep them in the

19   program if they did not want them to exit the program.

20   That's a flexibility that the CPP banks had that the GSEs

21   lacked.

22   Q.   And why is that relevant to a comparison of all-in

23   compensation?

24   A.   Well, because if I have the flexibility to redeem my

25   preferred stock and exit the program, then the overall

1   package is less costly to me as a recipient of the

2   assistance than if you said, no, I'm going to restrict you

3   from exiting the program.

4           So, in a sense, even though the numbers here don't

5   reflect that, the lack of that flexibility on the part of

6   the GSEs made the terms of their contract far more expensive

7   than what was given to banks under the CPP.

8   Q.  And another comparison you did, Professor, was AIG; is

9   that correct?

10  A.  That's correct.

11  Q.  Can you describe for us who and what AIG was and why

12  they were in trouble during the financial crisis.

13  A.  All right.  So AIG was the world's largest insurance

14  company at the time of the financial crisis, but they

15  were -- so they did the usual insurance, you know, life

16  insurance, property casualty.  But they also did something

17  that was a relatively new thing in the insurance business,

18  and they were one of the biggest players, if not the biggest

19  player, and that is they wrote CDS contracts against

20  mortgage-backed securities and other debt contracts.

21          So a CDS contract, it stands for credit default

22  swap.  It's just a fancy name for insurance.

23          So if I sell you a CDS contract -- so let's say

24  you own a $100 bond.  And if I sell you a CDS contract, I'm

25  essentially insuring you against default on that bond.  So

1    the bond may be issued by somebody else like, say, IBM.  If

2    IBM defaults on the bond, then I pay you to make up for the

3    loss that you suffered.  That's essentially what a CDS

4    contract is.

5            And AIG was a huge player in the CDS market, and

6    they were writing these contracts against mortgage-backed

7    securities whose values depended on housing prices.  So --

8    and they also held these mortgage-backed securities.  So

9    they had a pretty large mix of businesses, but all of them

10   depended very heavily on what was happening in the housing

11   market.

12   Q.  So -- but I'm correct that AIG did insure quite a lot of

13   things other than credit default swaps.  That's correct,

14   isn't it?

15   A.  That's correct.

16   Q.  So weren't they more, say, diversified than the GSEs

17   were?

18   A.  I mean, you know, if you look at it superficially and

19   just look at all of the subsidiaries that they had, AIG

20   financial products, AIG life insurance, and so on, you would

21   think, oh, well they're in a lot of different markets, and

22   they're doing more than just what the GSEs are focused on,

23   which is mortgages and mortgage-backed securities and

24   securitization.

25           But at the time of the crisis their exposure to

 1    the housing market was so huge, and a lot of the risks

 2    within AIG became highly correlated with each other and with

 3    the housing market, and that's essentially what brought them

 4    down.  They were teetering on the verge of complete collapse

 5    at the time that the Federal Reserve Bank of New York

 6    stepped in and provided assistance, and it was all because

 7    of what was happening in the housing market.  So in that

 8    sense, they were extremely exposed to the market, just like

 9    the GSEs were.

10    Q.  So is this a fair summary, Professor:  AIG was really

11    getting it coming and going.  They were heavily invested.

12    They were insuring housing mortgages effectively.  They were

13    heavily invested in them --

14    A.  Yeah.

15    Q.  -- and they were lending -- or they were borrowing based

16    on their collateral with these types of securities?

17    A.  Yeah, it was like a quadruple whammy.  Right?  I mean,

18    they had -- on their balance sheet with AIG financial

19    products, they were long.  So on the asset side they were

20    holding mortgage-backed securities.  If the price of the --

21    if housing prices fall, the values of the mortgage-backed

22    securities fall.

23         But what happens if your assets fall in value,

24    like your 401(k)?  Well, your equity declines.  Right?  Your

25    net worth is lower.

1    On the liability side, that insured that sold

2    credit default swaps.  As housing prices fall, the

3    liabilities under those CDS contracts go up.  Another source

4    of decline in equity.

5    Then in the life insurance business, they were

6    engaging in what's called securities lending, which is

7    essentially a fancy name for borrowing using securities as

8    collateral.  These securities, most of them were mortgage-

9    backed securities and other asset-backed securities.  As

10   housing prices fell, that collateral also is worth less.

11   So, you know, they were being pummeled from all

12   sides because of these negative shocks to housing prices;

13   not just in the business in which they were selling CDS

14   contracts, but the other businesses as well where they were

15   heavily exposed to the housing market.

16   Q.  Are you familiar with the term "leverage ratio,"

17   Professor Thakor?

18   A.  Yes.

19   Q.  And just very briefly describe what a leverage ratio is.

20   A.  So in the banking context, leverage ratio is essentially

21   the ratio of equity -- I'm not being completely precise, but

22   it's approximately true -- equity to total assets of the

23   financial institution.

24   Q.  How did AIG --

25   A.  It's basically the percentage of assets financed with

1   equity.

2   Q.  How did AIG's leverage ratio, when they received their

3   assistance, compare with the GSE's assistance in 2012 or

4   when -- or afterwards when a PCF would have been set?

5   A.  Right.  So, you know, if you look at AIG back at the

6   time of the crisis, we're talking about September of 2008,

7   the book capital ratio was, I think, north of 6 percent.

8           The GSEs, if you look at them in 2012, late 2012,

9   their positive equity capital or leverage ratios, they were

10  below what would have been required as regulatory minimums.

11          So if you compared those ratios, it looks like AIG

12  has got a higher leverage ratio or higher capital as a

13  percentage of total assets, but I find that a completely

14  meaningless comparison.

15  Q.  Why is that?

16  A.  Because at the time of the crisis prices were so

17  volatile that these sort of book ratios that don't really

18  adjust expeditiously to changing market conditions didn't

19  give you an accurate picture of the financial health of the

20  institution.  So despite having a more than 6 percent equity

21  to total assets ratio, if you looked at the prices of the

22  CDS contracts that others were selling on AIG's debt, they

23  increased like by a factor of four in a very short time.

24  Okay?  Which means that the market was sinking.  AIG was

25  sinking fast because the higher the risk of default, the

1   more expensive that insurance contract is going to be; and

2   the prices of these insurance contracts on AIG debt were

3   just going through the roof.  They were on the verge of

4   collapse, because as underwriters or sellers of the CDS

5   contracts, they had to keep collateral, mostly in the form

6   of cash.

7           So, you know, if I sell you a CDS contract, you

8   have to be assured that I can actually pay you if you

9   experience default.  Right?  So I have to keep some money on

10  reserve.

11          Well, in one day -- I believe it was September

12  15th of '08 -- their credit rating declined from AA minus to

13  below that, and it triggered these covenants in these CDS

14  contracts.  All of a sudden the amount of collateral that

15  they needed went from $8 billion to more than $32 billion in

16  one day.  They didn't have the money to cover these

17  contracts.  They were basically on the verge of collapse had

18  the government not assisted them.

19          So, you know, these book equity ratios during

20  times like this don't mean anything because the market is

21  telling you a different story.

22  Q.  Is it fair to say, Professor, that you've done a little

23  bit of studying of AIG as part of your research and writing

24  on the financial crisis that we talked about yesterday?

25  A.  Yes, I have.

1    Q.  And all of what we've just been talking about for the

2    first few minutes is -- for the last few minutes has been an

3    explanation of why you viewed them as another good

4    comparator with the GSEs for purposes of assessing the all-

5    in compensation?

6    A.  That's correct.

7            I mean, I chose AIG for a number of reasons.  One

8    is that this was a very large assistance package.  New York

9    Feds credit facility, when they stepped in to assist AIG,

10   was $85 billion.  And then later Treasury stepped in with

11   $40 billion of preferred stock assistance.

12           So, you know, it's certainly comparable to the

13   initial assistance extended to each of the GSEs.  So very

14   large, came from essentially the same source -- in this case

15   Treasury, also the New York Fed -- but eventually everything

16   transferred to Treasury, and Treasury's assistance was in

17   the form of preferred stock.  So there are a lot of -- and

18   both were exposed to the same negative shocks in the housing

19   market.  They were both rescued for essentially the same

20   purpose, which is in the interest of financial stability.

21   And that's why I thought this was a good comparison.

22   Q.  All right.  Let's look at what the terms showed.

23           So, first of all, why does it say "New York Fed's

24   assistance to AIG"?

25   A.  So the New York Fed stepped in first, and the initial

1    package was a little bit different from this.  They gave

2    them an $85 billion line of credit.  But within a couple of

3    months they adjusted the terms of the initial contract from

4    what you see on the slide, which is that they could borrow

5    at the three-month LIBOR plus 3 percent.

6            Now, the three-month LIBOR, you know, at this time

7    was a little bit different.  But if you take it to August of

8    2012, which is the time of the Third Amendment, it was 43

9    basis points.  So if you add 0.43 percent to 3 percent, it's

10   3.43 percent.  That's what these contract terms would have

11   allowed them to borrow at in August of 2012.

12   Q.  And how about the PSPAs?

13   A.  Well, again, if you infer the mark-up over the three-

14   month LIBOR, if the three-month LIBOR is 0.43 percent, then

15   the implied mark-up is 9.57 percent to get to 10 percent.

16   Right?  So, again, the GSEs are being charged a mark-up that

17   is, you know, more than three times the mark-up that AIG was

18   effectively charged.

19   Q.  And then the New York -- did AIG have to pay a PCF to

20   the New York Fed?

21   A.  No.  I mean, the PCF to the New York Fed was, I think,

22   in this case 75 basis points because initially they had an

23   eight and a half percent PCF that was negotiated down to 57

24   basis points.

25   Q.  Now, again, Professor, your conclusion again was the

1    zero PCF?

2    A.  That's correct.

3    Q.  But, again, we see here that AIG was paying the 75-

4    basis-point PCF.  Why did you conclude that the most

5    appropriate fee was zero for the GSEs?

6    A.  Right.  So, again, it goes back to the all-in cost

7    concept.  Right?  That if you think about what AIG was

8    paying the New York Fed from an all-in cost perspective,

9    they're paying 3.43 percent plus 57 basis points.  Again, as

10   a rough approximation.

11           So, you know, you're getting something that's, you

12   know, like four and a quarter percent, and by comparison

13   we've got 10 percent that the GSEs are paying -- right? --

14   plus the initial fee that they paid and so on.

15           So, again, Treasury's -- Treasury would be fully

16   compensated -- if we took AIG as a market benchmark, would

17   be fully compensated even with just the 10 percent annual

18   dividend.  They would not need a PCF on top of that.

19   Q.  They also received aid from Treasury; is that correct,

20   Professor?

21   A.  Yes.  A couple of months after the New York Fed

22   assistance, then Treasury came in and gave them $40 billion

23   in preferred stock that was cumulative preferred stock with

24   a 10 percent dividend.

25   Q.  Let me stop you there, Professor.

 1              What is cumulative preferred stock versus

 2    noncumulative preferred stock?

 3    A.   Okay.  So there are many different types of preferred

 4    stocks, but on this dimension there are two types.

 5              One is cumulative preferred stock, which means

 6    that if I miss a dividend payment to the holders of the

 7    preferred stock, I have to make it up.  That's at some

 8    future date.  So I can miss it now, and unlike that, I don't

 9    go bankrupt if I miss a dividend payment.  But in the

10    future, when I'm able to make dividend payments again, I

11    have to make up for the ones that I missed.  Okay?  So it's

12    cumulative.  It has a memory feature.

13              Noncumulative is where, if I miss a dividend

14    payment, I don't need to make it up.  You know, I can

15    just -- at a future point I can resume dividend payments

16    without having to make up the ones that I missed in the

17    past.

18    Q.   And this -- so this was switched to 10 percent

19    noncumulative after four months; is that correct?

20    A.   Yes.  So what happened is that initially Treasury came

21    in with the 10 percent cumulative, and then this -- this was

22    in November.  And I think in March of '09 it was switched to

23    10 percent noncumulative preferred stock.  And then

24    subsequently, I think sometime in early 2011, then the 10

25    percent noncumulative was exchanged for preferred stock that

1    had only a 5 percent dividend.

2    Q.  So noncumulative stock is more advantageous to the

3    borrower; is that correct?

4    A.  Absolutely, because I don't have to make up for any

5    missed dividend payments in the past.  So when I'm in a weak

6    financial condition, I can't make a dividend payment, fine,

7    move on.  In the future, when I'm able to pick up dividend

8    payments, I don't really need to go back and compensate

9    investors for payments that I missed in the past.  So it's

10   more advantageous, everything else held constant.

11   Q.  So what -- and then let's look again at the GSE terms.

12   Was that cumulative -- GSE's dividend, was that cumulative

13   or noncumulative?

14   A.  That was cumulative, yes.

15   Q.  And then was there a PCF that Treasury paid to -- I'm

16   sorry, that the GSE -- that AIG paid to Treasury?

17   A.  No, there was no PCF there.  There was a PCF in the

18   Federal Reserve Bank of New York assistance, as I indicated

19   earlier.

20   Q.  And so, Professor, again, what did you conclude about

21   the appropriate PCF in light of the AIG comparator?

22   A.  So my opinion, this -- you know, when you, again, look

23   at this from an all-in cost basis, I think the PCF should be

24   zero because I believe that Treasury is being fully

25   compensated with the terms of the contract that were in

1  place even before you impose a positive PCF.

2  Q.  Now, you didn't mention the warrants in this instance as

3  a basis for differentiating them.  Can you explain why that

4  is.

5  A.  Yes, because then, when they switched to the 10 percent

6  noncumulative after four months, Treasury also got -- so

7  when the preferred stock was switched to 10 percent

8  noncumulative, I believe at that time Treasury also received

9  warrants on common stock and also the New York Fed

10  assistance had -- it wasn't warrants, but they had earmarked

11  79.9 percent of their stock to be transferred to a trust for

12  the sole benefit of Treasury.  And so that's why I didn't

13  distinguish between the assistance to the GSEs and the

14  assistance to AIG based on the warrant.

15  Q.  You did it based on the dividend, but both had to pay --

16  both had to give up common stock or warrants to purchase

17  common stock?

18  A.  That's correct.

19  Q.  Now, Professor, I think we said -- earlier in your

20  testimony, yesterday, you said that the GSEs had never paid

21  a fee, and that the fee amount had not been set as of the

22  net worth sweep; is that correct?

23  A.  That's correct.

24  Q.  Did you reach a conclusion as to whether the amount of

25  the PCF could have changed if they had set it at some later

1    date, either 2013 or at some later date after that?

2    A.  No.  It doesn't change.

3    Q.  Why is that?

4    A.  Well, a number of reasons.

5           One is that the PCF -- you know, one of the

6    principles, when you look at all of the research and

7    industry practice on these sorts of commitments, is that the

8    PCFs should be higher -- should be lower when the financial

9    strength of the borrowing entity is higher.  Right?  So as

10   you get stronger, the PCF should be smaller.

11          As of -- we know that in August of 2012 the GSEs

12   were in a much stronger financial condition than they were

13   in 2008, when they received assistance from the Treasury,

14   and the outlook for the future was, especially with the

15   reversal of the DTAs, that they would get even stronger, and

16   the housing market was rebounding and so on.

17          So if the PCF was going to be set at some future

18   date, it was going to be even lower than if you assess it in

19   August of 2012, like I have.  Right?  You can't go any lower

20   than zero.  So my conclusion doesn't change.

21          And the other factor that affects the PCF from an

22   all-in cost perspective is the level of interest rates,

23   because that affects how far above market interest rates the

24   10 percent dividend is.  And interest rates, as I showed you

25   earlier, kept falling after August of 2012.

1    And so when you put all of those things together,

2    you see that my conclusion that the PCF should be zero

3    becomes even stronger if you look at -- if you do the

4    assessment at points in time after 2012, August 2012.

5    Q.  So, Professor, you've given -- we've been through your

6    first two opinions that given the terms and the stated goal

7    and all of the things you said, the most appropriate PCF in

8    your view would be zero.  You conclude that it didn't change

9    based on when the PCF was calculated.

10    But you reached one other opinion.  And remind us

11    what you mean by if it were determined that some fee was

12    legally required or otherwise required.  Why are you making

13    that -- why you are you analyzing that?

14    A.  So given my expertise on commitments and the research

15    I've done and my knowledge of industry practices, my opinion

16    is that the PCF should be zero.  But I'm not a lawyer, and,

17    you know, if there is some legal interpretation of the

18    contract which says that you have to charge a positive PCF,

19    then, instead of sort of looking at it from an all-in cost

20    perspective, if I were to just sort of focus on the PCF

21    almost as a tub on its own bottom, then the question is what

22    should that number be, and so I undertook that analysis as

23    well.

24    Q.  And you concluded that it would be between 0.025

25    percent -- that's two and a half basis points -- and 0.45

1   percent -- that's 45 basis points.  And it says "based on

2   premiums charged by the FDIC for deposit insurance."

3          We'll talk about why you reached that conclusion

4   in a second.  But could you first just remind us what the

5   FDIC is and what is does.

6   A.  So FDIC stands for the Federal Deposit Insurance

7   Corporation, and it's a federal agency that basically

8   provides deposit insurance to banks.  If you ever go to a

9   bank branch, and you see that little sign outside that says

10  "FDIC Insured," so on your deposits, there is insurance, so

11  you don't really -- it doesn't matter what the financial

12  condition of the bank is.  Your deposits are protected up to

13  $250,000 in each account.  So that insurance is provided by

14  the FDIC in exchange for a premium that the bank then pays

15  the FDIC.

16  Q.  So the banks pay a premium to the FDIC for the privilege

17  of having this agency insure their depositors; is that

18  correct?

19  A.  Right.  And the FDIC basically sets the premium

20  depending on what's called the reserve ratio, which is how

21  much money it has in its deposit insurance fund account

22  relative to how much it's insuring.

23  Q.  Why did you view this source, Professor, as the most

24  appropriate source if, as you say, a positive PCF had to be

25  charged?

1    A.  Right.  So for a number of reasons.

2              First, the commitment of the federal government

3    here through the FDIC is enormous.  Right?  I mean, they

4    were -- even at the time, August of 2012, I think the amount

5    of insured deposits of the U.S. banking system was $7.5

6    trillion.  So it's huge.  It's one of the biggest

7    liabilities of the federal government.

8              So, you know, you've got -- size is one issue.  So

9    this argument that the $200 billion commitment was

10   unprecedented?  Yes, that's true in that context.  But the

11   government routinely makes enormously large commitments and

12   assumes these continued liabilities as a result of making

13   these commitments.  So that's one.

14             The other is that FDIC deposit insurance is

15   provided for financial stability, which was really the goal

16   of the assistance provided to the GSEs.  It was to stabilize

17   financial markets, and that's why the FDIC provides deposit

18   insurance.  We don't want bank runs.  We want banks to be

19   stable.  We want us, as individuals, to have faith in the

20   banking system.  So that's the other reason.

21             The third is that like the commitment of the

22   Treasury, the FDIC is basically making a promise to banks

23   that if they have a shortfall, meaning if the bank is unable

24   to meet the withdrawal needs of its depositors, the FDIC

25   will step in and make up the shortfall.  Right?  So it's a

 1    promise.

 2              And the insurance is the price of that promise,

 3    just like the commitment by Treasury to the GSEs is a

 4    promise that you can take down the commitment if you need

 5    additional capital, and the PCF is in a sense the price of

 6    that promise.

 7    Q.  Well, are there any banks that have more than $200

 8    billion in insured deposits?

 9    A.  Oh, yes.  You know, we have multi-trillion-dollar banks

10    in the economy.  Right?  So if you look at banks like

11    JPMorgan Chase, Bank of America, and so on, you know,

12    they'll have hundreds and hundreds of billions of dollars in

13    deposits.  You know, 60, 70 percent -- depending on the size

14    of the bank and its location, 60 or 70 percent or more of

15    its total funding comes from deposits, and the bulk of them

16    are insured deposits.

17    Q.  And where did you get the range of 2.5 basis points to

18    45 basis points?

19    A.  So the FDIC has -- it categorizes the institutions that

20    it provides deposit insurance to.  It puts them in different

21    buckets.  And so this is the bucket that corresponds to the

22    large and complex institutions.

23              So these are the largest -- I think it's a group

24    of nine that I picked, the nine largest and most complex

25    institutions in the banking system in the economy.  So --

1    and for these institutions, the FDIC's range for the deposit

2    insurance premium is 2.5 to 45 basis points on the

3    assessment base during this April 2011 to June 2016 time

4    period.

5    Q.  Let's be precise here because you have to apply the 2.5

6    or the 45 to something, right?  That's the assessment base?

7    A.  That's correct.

8    Q.  So what is the assessment base to which it is applied,

9    and why is it, in your view, analogous to the undrawn

10   commitment?

11   A.  Right.  So the assessment of -- just to simplify and

12   step back before I get to the technicalities of the

13   assessment base.

14            If you think about the amount of deposits that the

15   FDIC's insuring, right, that's what -- you know, we can

16   think of the premium as applying to the amount of insurance

17   that's being provided.  Then what we're saying is that --

18   you know, that's not money that the FDIC has given to the

19   banks; it's a promise to extend that funding to the banks if

20   they're incapable of meeting the withdrawal needs of the

21   depositors.  So it's a promise.  Right?  Just like the

22   Treasury's commitment was a promise to let the GSEs draw

23   down under the commitment to meet their capital needs.

24   Right?

25            So it's not money actually given to the banks, but

1     it's a promise to extend that money should the banks need

2     it.  Right?  And that's what the premium is being assessed

3     on.  Okay?

4              So, now, the assessment base -- you know,

5     traditionally it's been, you know, the amount of domestic

6     insured deposits.  Then after the financial crisis and

7     Dodd-Frank, they made an adjustment to it where they said,

8     okay, we're going to define it as total assets minus average

9     tangible equity.  But then they have a whole bunch of

10    adjustments, so it gets pretty complicated.

11             So in the end I said I'll take this stated 2.5 to

12    45 basis points, but let's also see what these institutions

13    actually paid in terms of their premium.  So I looked at

14    these nine institutions during the 2012 time period and what

15    did they pay in insurance premium.

16             And then I took that amount and divided it by the

17    amount of insured deposits that these banks had, and I

18    computed what the premium was as a percentage of insured

19    deposits to make the comparison between the GSEs and insured

20    banks the most transparent.

21    Q.  And is that the next slide?

22    A.  Yes.

23    Q.  And what does that show?

24    A.  So this shows that -- you know, when I looked at the

25    actual data for the nine banks, I saw that what they were

1    paying as a premium as a percentage of insured deposits

2    ranged from 13 to 43 basis points, so it was with an average

3    of 23.  So this is actually the top end of this range.  It's

4    even lower than the 45 basis points that I showed you on the

5    previous slide.

6    Q.  Before we get to our final comparison, Professor, could

7    you tell us if there's anything else related to the FDIC

8    that informed your analysis of an appropriate PCF?

9    A.  Yes.  So the FDIC also has a line of credit through the

10   Treasury that they can access up to -- they can get up to

11   $100 billion in funding from Treasury if they need it.  So

12   if the bank insurance fund gets depleted because of failures

13   and payouts that they have to make on deposit insurance,

14   they have the ability to refurbish that fund by borrowing

15   from Treasury.  And that's basically the rate that is

16   stipulated as the borrowing rate for the U.S. Treasury for

17   instruments of comparable maturity.

18          So I take that -- you know, the ten-year T bond,

19   Treasury bond, is the most commonly used benchmark --

20   right? -- for long maturity bonds.  So if you look at that,

21   you know, I think back in August of 2012 that would have

22   been 1.81 percent.

23          So the FDIC is able to not only -- not only do you

24   have the FDIC insurance that's sold to banks, but the FDIC

25   can also get additional funding from Treasury at 1.81

1    percent as of August 2012.

2    Q.  Is that a fair comparison when the FDIC is the

3    government agency and the GSEs are -- well, they are what

4    they are and people with shares in them and all of that?

5    A.  Well, you know, I don't mean to -- I don't want any of

6    these things to be taken too literally.  I think that, you

7    know, the interpretations have to be nuanced.  But the

8    number is very striking in terms of the difference between

9    the 10 percent and the 1.81 percent.  And so, sure, there

10   are differences.  Right?

11          But the important thing is, this assistance that

12   Treasury is providing has essentially the same goal, which

13   is to make sure that investors and depositors out there

14   don't get concerned about the commitment of the U.S.

15   government preserving financial stability.  And so the idea

16   is, look, don't worry about the bank insurance fund within

17   the FDIC.  That's in pretty good shape.

18          But even if it wasn't, the FDIC can rely on

19   Treasury, which is essentially the message that I believe

20   Treasury was trying to send in the case of the GSEs to the

21   market saying:  Look, don't worry.  There is enough funding.

22   The GSEs are not going to be allowed to fail.  And so it

23   would ensure that we would have confidence and stability in

24   the housing market.

25   Q.  And do the banks benefit from that implicit or, rather

1  here, express guarantee that the federal government provides

2  to the FDIC?

3  A.  Oh, absolutely.  I mean, if you're a bank -- I mean,

4  just imagine, would you put your money in a bank that

5  doesn't have deposit insurance?  I don't offer financial

6  advice, but I wouldn't.

7  And, you know, I mean, the first thing -- if I go

8  to a bank, the first thing I want to look at is FDIC

9  insured, and I want to make sure that if I'm putting my

10  money in that deposit account it says "FDIC Insured."

11  Now, for the bank, the huge advantage is that

12  because of that safety that FDIC insurance offers, I don't

13  demand much of an interest rate.  I mean, I get next to

14  nothing on my deposit account.  Right?

15  Now, I could pull that money out.  I can put it in

16  the stock market.  I can put it in bonds.  I can get a

17  higher return.  But then I recognize that I'm also taking

18  more risk.

19  So if you keep your money in a bank, which is an

20  insured deposit account, the benefit to the bank is that

21  they're paying a lower interest rate to me.  Right?  So they

22  make more money, and I'm willing to accept the lower

23  interest rate because of the safety provided by federal

24  deposit insurance.

25  Q.  Professor, are you aware of any entity during the

1    financial crisis that had to pay for assistance anything

2    close to its full profits?

3    A.  I'm sorry, say that again.

4    Q.  Are you aware of any entity that received assistance

5    during the financial crisis that had to, as compensation,

6    pay anything close to its full profits?

7    A.  No.

8    Q.  Now, if you -- let's look at -- if you took a fee at the

9    top of that FDIC range and applied it to the undrawn

10   commitment that the GSEs had as of the date of the net worth

11   sweep, what would the annual fee be?

12   A.  So we would apply it to the undrawn portion of the

13   commitment.  So if you look at August of 2012, then the

14   undrawn portion of the commitment is about $258 billion,

15   then, drawn down, about 189.

16           So now I'm being conservative in the sense that

17   I'm taking the biggest number in the -- among the set of

18   numbers we saw.  Right?  I could have easily picked 23 basis

19   points or 43 basis points, even at the top end of the rate.

20           So I took 45.  And so 45 basis points is 0.45

21   percent.  So that's -- expressed as a ratio of 1, it's

22   0.0045.  And you multiply that by $258.1 billion, which is

23   the undrawn commitment amount for the GSEs, and you get

24   $1.16 billion as the PCF implied by this analysis.

25   Q.  And this would be on top of all of the other

1    compensation that the GSEs are providing, correct?

2    A.   Right.  So this is on top of the billion-dollar upfront

3    fee that they paid.  This is on top of the 10 percent

4    dividend that they're paying on the drawn portion.

5              So they're on different portions.  Right?  The 10

6    percent is on the amount of the commitment that the GSEs had

7    already drawn down.

8              The PCF -- in this case 45 basis points -- is for

9    the promise, and the promise is to extend up to $258 billion

10   more in funding assistance.  And for that promise alone, not

11   on the actual drawn down amount, they'll be paying 45 basis

12   points, so $1.16 billion per year per GSE.

13   Q.   And the banks don't pay anything more for FDIC insurance

14   other than the premium, correct?

15   A.   Correct.  They just pay the premium.  There's no

16   dividend.  There's no -- there's no upfront fee.  They just

17   pay -- and by the way, as the FDIC's condition gets

18   stronger, as that reserve ratio increases, these numbers

19   that I indicated actually fall.

20             So I picked a pretty high number, but it

21   statutorily falls.  As the FDIC's own reserves get better,

22   they charge banks even less.

23   Q.   This may be the easiest question I've asked you,

24   Professor, but it's $1.16 billion for one year.  We're now

25   in 2022.  So over this ten-year period what would it have

1   been?

2   A.  Well, you multiply 1.16 by 10, you get $11.6 billion as

3   for what they're paying in terms of the PCF over ten years.

4   Q.  All right.  So how did the $1.16 billion compare with

5   what the GSEs paid out under the net worth sweep in the

6   first year of the net worth sweep?

7   A.  Well, there's no comparison.  Right?  Because they were

8   paying essentially all of their net worth to Treasury.  And,

9   you know, the first year, 2013, they paid $111 billion over

10  and above the 10 percent dividend.  Right?

11        And according to Mr. DeMarco's testimony, this is

12  supposed to represent the analog of the PCF.  And what I'm

13  showing is that if you compute the PCF the way that I did,

14  that's $1.16 billion.  This would be a reasonable market-

15  based assessment of what the PCF would be if you just

16  focused on the PCF.

17        You know, just like with banks, they don't pay any

18  other compensation.  It's just the insurance fee.  That's

19  another reason why it's an apt comparison.  You get $1.16

20  billion.

21        So there's no comparison between the 1.16 and the

22  111.  You know, it's almost ten times as big.

23  Q.  Or almost 100 times -- well, not almost 100, but between

24  50 and 100 times?

25  A.  I'm sorry, a hundred times as big.  I misspoke.

1    Q.  What about if you did the comparison over a ten-year

2    period?  What do you see there?

3    A.  Well, if you look at this over a ten-year time period,

4    the PCF is $11.6 billion.  That's a reasonable fee based on

5    the FDIC comparison between 2013 and 2022.

6              Now, if you looked at what the GSEs paid -- now,

7    remember, this is not the total amount of what the GSEs

8    paid.  They made more than this.  This is what they paid

9    over and above the 10 percent dividend, which we already

10   said is substantially higher than what other entities were

11   paying in the market.

12             So the GSEs paid in excess of the 10 percent

13   dividend, $150.2 billion.  Right?  So, you know, we're

14   looking at something that's, you know, 13, 14, 15 times the

15   amount that I would consider a reasonable fee.

16   Q.  So, Professor, you alluded to Acting Director DeMarco

17   and his testimony, which you sat in court for, correct?

18   A.  Yes.

19   Q.  And you heard his testimony about his intuition that an

20   appropriate fee would have been all of the profits of the

21   GSEs.  Is that accurate?  Is that your recollection?

22   A.  Yes.

23   Q.  Could you give us your reaction to that in light of all

24   the analysis and your decades of expertise in this area.

25   A.  Well, I completely disagree with that assessment,

1    especially since neither Mr. DeMarco nor Mr. Ugoletti nor

2    anybody at Treasury did any sort of analysis to quantify

3    what the PCF should be based on the guidance provided by the

4    PSPA.

5              That is something I've attempted to do here.  And

6    I've shown you that if I look at this on an all-in cost

7    basis, the PCF should be zero because Treasury was fully

8    compensated through the other parts of the contract.

9              But even if you insist on focusing narrowly on

10   just the PCF, then you get a PCF that is $1.16 billion, not

11   the entire profit, not the entire net worth of the GSE.

12   That just doesn't make any sense.

13             MR. KAPLAN:  Thank you so much, Professor.  My

14   friend, Mr. Jones, will have some questions for you now.

15             No further questions.

16             THE WITNESS:  Your Honor, may I request a break?

17             THE COURT:  I'm sorry?

18             THE WITNESS:  May I request a break?

19             THE COURT:  Yes.  We'll take a short recess.

20             (Recess taken)

21             THE COURT:  All right.  Mr. Jones, you may cross-

22   examine.

23             MR. JONES:  Good morning, members of the jury.

24   Good morning, Professor Thakor.

25             To begin, I have a couple of exhibit binders.  May

1    I approach the witness and the bench, Your Honor?

2                  THE COURT:  Yes.

3                  MR. JONES:  Thank you.

4           You can see it's a pretty thick binder, but there

5    are a couple of really long deposition transcripts in there

6    that I'm hoping we won't have to look at, so it's not as bad

7    as it may seem.

8                        CROSS-EXAMINATION

9    BY MR. JONES:

10   Q.  Good morning, Professor Thakor.  I'm Stanton Jones, and

11   I represent the defendants.

12          Before we talk about the Periodic Commitment Fee,

13   I wanted to start by just talking about the commitment.

14   A.  Uh-huh.

15   Q.  Because the word "Commitment" in Periodic Commitment

16   Fee, that word refers to the Treasury Commitment, right?

17   The money, taxpayer money, that the Treasury Department had

18   committed to Fannie and Freddie, right?

19   A.  That's correct.

20   Q.  Okay.  And under the original deal, the original PSPAs

21   between Treasury and the enterprises in September 2008, the

22   Treasury Commitment was $100 billion for Fannie and $100

23   billion for Freddie, so a total of $200 billion in American

24   taxpayer money that Treasury committed to these two

25   companies, right?

1    A.  That's correct.

2    Q.  Okay.  And then about eight months later, as things

3    progressed, they had to do the First Amendment to the PSPAs.

4    They had to amend the deal, and that was to double

5    Treasury's commitment from $100 billion for each company to

6    $200 billion for each company.

7           So now we're in May of 2009, and it's a $400

8    billion total commitment of American taxpayer money to the

9    companies, right?

10   A.  Correct.

11   Q.  Okay.  And then, a few months after that, we're at

12   December 2009, and they had to do another amendment, the

13   Second Amendment to the PSPAs, and that one got rid of the

14   cap altogether until the end of 2012.

15          So for the next three years there was no upper

16   limit at all on the amount of American taxpayer money that

17   the Treasury Department had committed to invest in Fannie

18   Mae and Freddie Mac, right?  There was no upper limit for

19   those three years?

20   A.  Right.

21   Q.  Okay.  And so for those three years, from December 2009,

22   the date of the -- the time of the Second Amendment to the

23   PSPAs until December -- the end of December 2012, three

24   years later, if Fannie and Freddie had negative net worth of

25   $300 billion each or $400 billion each or $500 billion

1   each -- any amount, pick any number of hundreds of billions

2   in negative net worth -- the Treasury Department, for those

3   three years, was committed to make up the shortfall, right?

4   A.  I don't know about all of these numbers, but the Second

5   Amendment did remove the cap that you referred to.  So I

6   don't know if these projections of $300 billion, $400

7   billion of negative net worth are, you know, within any sort

8   of reasonable estimate --

9   Q.  Okay.

10  A.  -- during this time period.

11  Q.  Sure.  I'm not -- and to be clear, I'm not offering them

12  as an estimate or a projection.  I'm just asking you.  Your

13  understanding -- you looked at the PSPAs and the amendments,

14  including the Second Amendment, right?

15  A.  Right.

16  Q.  And you understand, you know, that the Second Amendment

17  eliminated the cap, the upper limit on the Treasury

18  Commitment, correct?

19  A.  Yes.

20  Q.  And what that means -- eliminating the cap, no cap, no

21  limit, that means no matter how big, how much negative net

22  worth --

23  A.  Uh-huh.

24  Q.  -- how badly the companies were in the red, the Treasury

25  Commitment was there.  The Treasury Department was committed

1   to put in American taxpayer dollars in any amount,

2   unlimited, for those three years.  Right?

3   A.  Yes.  It's sort of similar to the kinds of commitments

4   we make on things like deposit insurance.

5   Q.  Okay.  But I was right, what I said about the Second

6   Amendment for those three years.  Right?

7   A.  Yes.  They were reassuring the markets that the GSEs

8   would be financially stable, just like we do with deposit

9   insurance.

10  Q.  Okay.  And so then under the Second Amendment to the

11  PSPAs, starting on January 1, 2013, okay -- so the first day

12  of 2013 -- the Treasury Commitment was going to be capped

13  again.  And there was going to be a mathematical formula for

14  figuring it out, but the commitment was still going to be in

15  the hundreds of billions of dollars.  Right?

16  A.  Right.  It would be -- you know, my presumption is that

17  they would cap the commitment instead of PCF in the but-for

18  world in which the net worth sweep does not occur.

19  Q.  Okay.  So just to be clear, I'm not asking you about the

20  but-for world.  I'm asking you understand, from looking at

21  the Second Amendment, that the Second Amendment says that on

22  January 1, 2013, the cap on the Treasury Commitment is going

23  to kick back in --

24  A.  Right.

25  Q.  -- and the cap is going to be -- you had a slide in your

1   slides that said it was going to be -- $258.1 billion was

2   going to be the cap for both companies together starting on

3   January 1, 2013, right?

4   A.  Correct.

5   Q.  Okay.  So starting -- so just so it went from $100

6   billion per company to $200 billion per company, and then it

7   was going to be totally unlimited for three years.  And then

8   on January 1, 2013, it was going to kick back in, and

9   there's a formula that it was going to be $258.1 billion in

10  remaining space on that Treasury Commitment, right?

11  A.  Correct.

12  Q.  Okay.  And so when we talk about the Periodic Commitment

13  Fee, this is the fee that Fannie and Freddie were supposed

14  to pay or that the PSPAs said would be paid for that

15  commitment.  That's the commitment that it's talking about,

16  right?

17  A.  It's the price of the promise.

18  Q.  Okay.  And your -- so here's my question about that.

19  Your opinion about this Periodic Commitment Fee, this fee

20  that Fannie and Freddie were supposed to pay periodically to

21  Treasury for this commitment of hundreds of billions of

22  dollars, your opinion is that that fee should have been zero

23  dollars.  Zero dollars and zero cents.  Nothing.  Right?

24  A.  Based on an all-in cost comparison, it should be zero.

25  And if you want to focus solely on the PCF as a tub on its

1    own bottom, I indicated the two and a half to 45 basis

2    points in my direct testimony and in my reports.

3    Q.  Okay.  Well, I just want to make sure that the jury

4    understands exactly what your opinion is and is not.

5          Your opinion is that the Periodic Commitment Fee,

6    the fee to be paid periodically for the commitment of

7    hundreds of billions of dollars, should have been zero.

8    Zero dollars, zero cents, nothing.  That is your opinion,

9    right?

10   A.  Given the other compensation that Treasury was already

11   receiving under the contract and computing the all-in cost

12   of all of those other forms of compensation.

13         You know, I just want to make sure we're not just

14   talking about the PCF in isolation as if the other forms of

15   compensation did not exist.  That's the all-in cost

16   analysis.

17   Q.  Okay.  The PSPAs, those original PSPAs from September

18   2008, the original deal between Treasury and these

19   companies, they didn't say that the PCF should be zero,

20   right?

21   A.  No, they did not.  I indicated that in my testimony.

22   They did not give me a formula to be able to compute the

23   PCF.  They simply provided some broad guidelines that I used

24   in my analysis.

25   Q.  My question is pretty simple.  They don't say that the

1  PCF should be zero.  They don't say that.

2  A.  They don't say that.  They don't say that it should be

3  100 percent of profits.

4  Q.  Okay.  What they do say is that there will be a PCF, and

5  they describe or talk about how it would be set, how the

6  parties would go about setting it.  That's what the PSPAs

7  say about the PCF, right?

8  A.  Provides the guidelines that I discussed in my direct,

9  yes.

10  Q.  Okay.  And the First Amendment that we talked about,

11  from May of 2009, the one that doubled the Commitment itself

12  from $200 billion for the companies to $400 billion, that

13  First Amendment, that one also doesn't say that the PCF is

14  going to be zero or should be zero, right?  It doesn't say

15  that?

16  A.  It doesn't say that.  It doesn't say it should be 100

17  percent of profits.

18  Q.  Okay.  And then a few months later, the Second Amendment

19  in December of 2009, that's the one that eliminated the

20  upper limit, the cap on the Commitment, so that Treasury was

21  in for however much money Fannie and Freddie needed to stay

22  out of the red, to keep the lights on.  The Second Amendment

23  also didn't say that the PCF should be -- the fee for that

24  commitment should be zero, right?  It didn't say that?

25  A.  It didn't say that.  It didn't say it should be 100

1    percent of profits.

2    Q.   Okay.  And then the Third Amendment, you know, from

3    August 17, 2012, it does -- it suspends the PCF for as long

4    as the net worth sweep is in place, right?

5    A.   Correct.

6    Q.   Okay.  So let's talk a little bit more, make sure that

7    we understand your opinions in this case.

8           So your opinion is that no PCF was necessary or

9    appropriate, or another way of saying that is that the most

10   appropriate PCF was zero, right?

11   A.   Given the all-in cost.

12          I just want to make sure that we understand the

13   completeness of the opinion; that if you look at this based

14   on market value, as the PSPA guides us to, and you look at

15   all of the market value indicators that I provide in my

16   analysis, and then you compute it on an all-in cost basis,

17   yes, it's zero, because Treasury was fully compensated by

18   the other forms of compensation that it received.  It did

19   not need a PCF in addition to be fully compensated.

20   Q.   Right, okay.  So your view, your opinion, is that the

21   Treasury Department was already fully compensated for all

22   this by the 10 percent dividend and some of the other terms,

23   and therefore no PCF was necessary.  The most appropriate

24   PCF, in your view, would have been zero.  That's your

25   opinion, right?

1    A.  Well, 10 percent dividends, warrants to acquire almost

2    80 percent of the common stock, which would then give them

3    80 percent of the dividends on the common stock, plus the

4    upfront fee that they received that was added to the

5    liquidation preference on which the GSEs paid dividends as

6    well, yes.

7    Q.  So in light of all that, all that stuff that you just

8    mentioned, your view is that no PCF was necessary.  Zero PCF

9    would have been the most appropriate, in your view?

10   A.  Well, if you look at the all-in cost of that and compare

11   it to the all-in cost indicated by the other market-value-

12   based comparisons that the PSPA guides us to look at, then

13   Treasury was fully compensated without a positive PCF.

14          And I also indicated that if there was a legal

15   interpretation of the contract which says it should be

16   positive, then I've indicated what that magnitude or range

17   should be.

18   Q.  You are not offering an opinion on whether Treasury

19   would have concluded that the PCF should be zero, correct?

20   A.  I can't read Treasury's mind.  I'm simply saying that I

21   looked at all the internal Treasury documents.  I looked at

22   FHFA documents and testimony.  And they all said they never

23   even tried to set a PCF.  There was no analysis done to

24   determine or quantify a PCF.

25          So, you know, if I had some guidance from there, I

1    would have used it, if I did some sensitivity analysis on

2    what the impact would be with a 25-basis-point PCF.  But

3    they didn't quantify the PCF, and they never set a PCF.  So,

4    you know, that -- looking at all the internal Treasury

5    documents and everything, I could not find a quantification

6    that I could use in my analysis.

7              So then I turned to, you know, use my experience,

8    my expertise, my knowledge of industry practices and turned

9    to market-value comparables that I've spoken extensively

10   about that lead to this all-in cost comparison that I used

11   for my analysis.

12   Q.  Okay.  There was a lot there.

13             You were deposed in this case, right?

14   A.  Twice.

15   Q.  Okay.  And you sat in the chair.  You got asked

16   questions.  You answered them.  You were under oath just

17   like this.  Right?

18   A.  Correct.

19             MR. JONES:  Okay.  Can we pull up Professor

20   Thakor's second deposition.

21   Q.  And, Professor Thakor, you have a copy of this.  It's in

22   your binder.

23   A.  Okay.

24   Q.  It's there.  It's Tab 4 of the binder.

25             This is your deposition from March 25th of this

```
1    year.

2    A.  Which tab?

3    Q.  Tab 4.

4    A.  Okay.

5    Q.  And if you go to Page 89 --

6            MR. JONES:  Can we pull that up on the screen.

7    And actually, can we split-screen Pages 89 and 90 to get the

8    question and the answer?

9    Q.  Okay.  And you were asked this question, "Do you" --

10   it's the same question I just asked you -- "Do you have an

11   opinion on whether Treasury would have concluded that the

12   PCF should have been zero?"

13           And your answer then was, "Yeah, I am not -- yeah.

14   I mean, this is -- this is not part of the scope of my

15   analysis as to what, you know, Treasury would have done.  I

16   think I indicated in my previous responses that, the basis

17   on which I did my analysis."

18           Did I read that correctly?

19   A.  Yes.

20   Q.  Okay.  That was your testimony then, and that was

21   truthful testimony.  You were under oath.

22   A.  It's completely consistent with what I just said.

23   Q.  Okay.  It was a little bit more concise.  I just wanted

24   to make sure that we understand.

25           You are not offering an opinion on whether
```

1    Treasury would have concluded that the PCF was --

2    A.  Right.  I indicated in my response to your question I

3    can't read their minds.

4    Q.  Okay.

5    A.  And I did not see them having done any analysis, so I

6    can only present my own analysis.

7    Q.  Okay.  And you similarly are not offering an opinion on

8    whether FHFA, as conservator, would have concluded that the

9    PCF should be zero, correct?

10   A.  I think I indicated in earlier testimony that the FHFA

11   had not -- similarly, just like Treasury, not attempted a

12   quantification of the PCF.

13          So, you know, all I can see is what they did or

14   did not do.  And what they did not do is attempt a

15   quantification of the PCF.

16          I think I referred to that in my direct testimony

17   as well as in my report.

18   Q.  Okay.  I think that's a little different than the

19   question I'm asking you.

20          I'm asking you:  You, Professor Thakor, are not

21   offering an opinion here about whether FHFA would have

22   concluded that the PCF should be zero.  That's just not one

23   of the opinions that you are offering here.  Right?

24   A.  I cannot read the minds of FHFA.  I can look at what

25   their testimony indicated; that they did not attempt a

1    quantification.  I can look at the PSPA contract and the

2    guidance that it provides to me as an economist to get

3    market-value-based comparisons, which is what I based my

4    analysis on.

5    Q.  Okay.  And the PSPAs, the deal, you know it says that

6    the PCF, this Periodic Commitment Fee, has to be set in

7    consultation with the Chair of the Federal Reserve, right?

8    A.  That's correct.

9    Q.  Okay.  And you are not offering an opinion here on

10   whether the Chair of the Federal Reserve would have

11   concluded that the PCF should be zero, right?  That's not

12   one of the opinions you're offering here?

13   A.  I'm not speaking on behalf of the Chair of the Federal

14   Reserve.  I'm not even speaking on behalf of my own school,

15   which I'm actually required to mention by university law.

16   I'm just speaking for myself.

17   Q.  Okay.  So you're not offering an opinion about whether

18   Treasury and FHFA, in consultation with the Chair of the

19   Fed, would have agreed to set the PCF at zero?  That's not

20   an opinion that you're offering?

21   A.  No.  I'm offering an opinion based on my analysis of

22   market-value-based measures and what the PCF should have

23   been based on the guidance that the PCF provides.

24            Look at market value.  It doesn't say set it at

25   this number.  You can pick any number you want, and the

1    answer would be the same.  You can pick zero; you can put

2    100 percent of profits.

3            And the fact of the matter is the PSPA didn't tell

4    us what the PCF should be, so the answer to any number you

5    can come up with is going to be the same.  They didn't give

6    you a number in the PSPA.  And, as far as I know, the

7    Chairman of the Federal Reserve was not consulted on this

8    issue for setting the PCF.

9            So, you know, that's all I can say.

10   Q.  Okay.  So I think that was a no, you are not offering an

11   opinion here to the jury about whether Treasury and FHFA, in

12   consultation with the Fed, would have agreed to set the PCF

13   at zero.  That's not an opinion you are offering to the

14   jury, right?

15   A.  Well, it all depends on -- so I can't speak for them.  I

16   can't read their minds.

17           All that I'm saying is that -- all I can do is

18   look at the PSPA, the actual contract that was there, use

19   all of my industry knowledge and experience and research and

20   other market-value-based measures, and give economic meaning

21   and content to the contract.

22           And when I give economic meaning and content to

23   the contract, it leads me to conclude that the PCF should be

24   zero.  That doesn't require me to read somebody's mind or

25   try and infer something that is not in the record.

1    Q.  Okay.  Let me just ask you a couple of questions about

2    the Chair of the Fed.  This is a role that you're very

3    familiar with from your academic scholarly work, right?

4    A.  Yes.

5    Q.  The Fed Chair is a really important person in the United

6    States, right?

7    A.  Yes.

8    Q.  Okay.  Some people describe the Chair of the Fed as the

9    second-most powerful person in the United States, right?

10   A.  I've heard that, yes.

11   Q.  Yes.  You've written it in a book, that the Fed Chair is

12   sometimes described as the second-most powerful person in

13   the United States.  It was one of the books that had a

14   little picture of it in your slides earlier.

15   A.  Okay.  Well, thanks for the reminder.

16   Q.  Okay.  The first-most powerful person in the United

17   States, that would be the president, right?

18   A.  Yes.

19   Q.  The president of the United States?

20   A.  Yes.

21   Q.  Okay.  So -- and back in 2012, which we're talking about

22   now, that would have been President Obama, right?

23   A.  Yes.

24   Q.  Okay.  So what we're talking about here, when we talk

25   about the Fed Chair, you're saying President Obama was the

1    most important person in the country, and this Fed Chair who

2    we're talking about -- this guy named Ben Bernanke back

3    then -- is the second-most powerful person in the United

4    States, the most important person.  Right?

5    A.  Right.

6    Q.  Okay.  And so your opinion is that this Fed Chair, the

7    second-most powerful person in the United States right under

8    President Obama at this time, was going to be -- had to be

9    consulted about this negotiation over this fee, this

10   Periodic Commitment Fee, which was supposed to compensate

11   the Treasury Department for this commitment of hundreds of

12   billions of dollars?  And you're going to bring in the Fed

13   Chair, the second-most powerful person in the country, with

14   the secretary of the Treasury and the director of FHFA just

15   to agree that the fee is zero, zero dollars, zero cents?

16   A.  It's not my opinion.  That's what the contract says.

17   Q.  The contract --

18   A.  That's what the PSPA says you're supposed to do.  So

19   don't ask me whether I think it's reasonable or not.  I'm

20   just taking the contract as it was written.

21        If they did not want the Chair of the Federal

22   Reserve to be involved, then why put that in the contract?

23   Q.  Yes, they wanted the Chair -- they required that the

24   Chair of the Federal Reserve be involved because the

25   contract requires it, right?

1    A.  Right.  So then I don't understand your question.

2    Q.  I'm just trying -- I'm just trying to understand your

3    opinion.

4         Your opinion is that they wrote in the contract

5    "We've got to get the second-most powerful person in the

6    United States to come help us negotiate this fee," and then

7    once the Fed Chair comes in, the fee -- it's going to be

8    zero?

9    A.  You're completely misstating my testimony.  When did I

10   say what you just said?

11   Q.  Well, I thought that your opinion is that the PCF -- the

12   appropriate PCF is zero.

13   A.  That is my opinion based on an analysis that gives --

14   that relies on the guidance provided by the PSPA in terms of

15   how to set the Periodic Commitment Fee.

16        So when you look at that guidance and you look at

17   the market-value-based measures that the contract indicates

18   you should look at -- and I shared that with the jury --

19   then you're led to this conclusion based on an all-in cost

20   basis analysis.

21        What Chairman Bernanke would have opined in a

22   meeting with Treasury and FHFA?  You know, I can't speak to

23   that.  I'm not here to speak for Chairman Bernanke.  I mean,

24   he's a person for whom I've enormous respect, but I can't

25   speak for him.

1        I mean, I can only express what my analysis shows

2   based on the guidance provided by the PSPA in terms of how

3   to go about determining a market-value-based PCF and the

4   fact that the contract also says that the Chairman of the

5   Fed should be part of this consultation negotiation.

6        So it's not a clause that I put in.  It's a clause

7   that they put in when they negotiated the contract, and

8   that's all I'm saying.

9   Q.  Yes.  And I'm just trying to understand, you know, how

10  this negotiation might have gone.

11       So we've got -- we've got the Secretary of the

12  Treasury, right?  That's one of the parties here that's

13  going to be negotiating this fee, correct?

14  A.  Yes.

15  Q.  Okay.  And the Secretary of the Treasury is also a very

16  important powerful person, right?

17  A.  I'll concede these are all important powerful people.

18  Q.  The Secretary to the Treasury is fifth in line to the

19  president, right in front of the Attorney General and the

20  head of the U.S. military, right?

21  A.  Sure, sure.

22  Q.  Okay.  So you've got the Secretary of the Treasury,

23  FHFA's director, conservator of Freddie Mae and Freddie Mac,

24  we've brought in the Fed Chair, who is right behind

25  President Obama as the second-most powerful person of the

1    United States, and they're going to get in a room, and

2    they're going to negotiate this fee.  And your view is where

3    they should land is that the fee is zero.  It's nothing.

4    It's zero dollars and zero cents.

5    A.  You keep listing -- I'm sorry, but you're again

6    misstating my testimony.

7          My testimony is based on the analysis that I did

8    based on the PSPA and giving economic content to the

9    contract and the guidance that it provides for setting the

10   PCF.  And based on my knowledge, experience -- knowledge of

11   industry practices, experience, and research, this is what

12   I'm led to.  This is the conclusion that I'm led to, and

13   this is my opinion.

14         You know, what would have happened in a meeting

15   between the Treasury secretary and the Chairman of the Fed,

16   a meeting that did not take place?  You know, I'm not here

17   to speculate about those things.  I can only offer my

18   opinion based on my analysis.

19   Q.  Okay.  We can move on.

20         You testified yesterday that to figure out the

21   PCF, what the PCF could have been, you looked at some

22   comparables; but before you did that, your first instinct

23   was to see what Treasury had said about it, what FHFA had

24   said about it, what Fannie and Freddie had said about it.

25   That was your first instinct, right?

1    A.  Yes.  I wanted to look at the documentary evidence to

2    see what guidance I can get from that, yes.

3    Q.  Okay.  So let's look at what -- let's start with

4    Treasury and what they were saying about the PCF.

5             Treasury waived the PCF, just waived it off for

6    each quarter in 2011 and 2012, right?

7    A.  Yes.

8    Q.  Okay.  And for each of those quarters Treasury sent a

9    letter to FHFA saying:  We're waiving off the PCF for the

10   coming quarter, right?

11   A.  Yes.

12   Q.  And you've reviewed those letters as part of your work

13   in this case, right?

14   A.  Yes.

15             MR. JONES:  Okay.  Can we pull up D --

16   Defendant's -- Exhibit 272, please.  This is in evidence

17   already.

18   Q.  And, Professor Thakor, you have this in your binder.

19   It's Tab 5.

20             There's a few of these waiver letters behind Tab 5

21   in your binder.  They're separated by slip sheets.  So we're

22   going to look at a couple of them.

23             This is -- before we zoom in on anything, just for

24   context, this is the December 29, 2010, letter from the

25   Department of the Treasury to Mr. DeMarco, who at that time

1    is the acting director of FHFA, waiving the PCF for the

2    first quarter of 2011.  Right?

3    A.  Okay.

4    Q.  Do you see that?

5    A.  Yes.

6          MR. JONES:  Okay.  And if we could blow up the

7    second paragraph of the letter there.

8    Q.  So it says -- it begins, "By this letter, please be

9    advised that Treasury waives, for the first quarter of

10   Calendar Year 2011, the PCF payable by each Enterprise."

11         Do you see that?

12   A.  Yes.

13   Q.  Okay.  And "payable," that's just a fancy word for you

14   have to pay it, right?

15   A.  Yes.

16   Q.  Okay.  And the next sentence says, "Treasury takes this

17   step" -- the step of waiving the PCF -- "due to the

18   continued fragility of the mortgage market and the belief

19   that the imposition of the PCF at this time would not

20   fulfill its intended purpose of generating increased

21   compensation to the American taxpayer."

22         Did I read that correctly?

23   A.  Yes.

24   Q.  Okay.  It doesn't say here that Treasury takes this step

25   of waiving the PCF because the PCF should be zero, it should

 1    be set at zero, right?

 2    A.  Right.  It doesn't quantify the PCF.

 3    Q.  It doesn't say that Treasury takes this step of waiving

 4    the PCF because the 10 percent dividend and the warrants and

 5    the initial $1 billion liquidation preference already fully

 6    compensated Treasury without any Periodic Commitment Fee,

 7    right?  It doesn't say that.

 8    A.  Well, like I said, it doesn't quantify the PCF.

 9    Q.  What it does do is it refers to the PCF's, quote,

10    intended purpose of generating increased compensation to the

11    American taxpayer.  Do you see that?

12    A.  Yes.

13    Q.  Okay.  So if the PCF were set at zero, zero dollars and

14    zero cents, it wouldn't generate any increased compensation

15    to the American taxpayer.  That's just mathematically

16    accurate, right?

17    A.  I wouldn't agree with that.

18    Q.  You would or would not?

19    A.  I would not.

20    Q.  You think that if the PCF were set at zero, then the PCF

21    would generate increased compensation to the American

22    taxpayer even though it's zero dollars and zero cents?

23    A.  What I'm saying, again, is take the all-in cost

24    perspective and just think about it as all-in compensation.

25                 The reason why they're waiving the PCF is they

1    think the GSEs are too weak to pay the PCF and it would

2    financially weaken them further, which implies that they

3    would only set the PCF -- determine the PCF and quantify it

4    when the GSEs are much stronger financially.  And the

5    stronger the GSEs are financially, perhaps as a consequence

6    of not imposing the PCF on them at an earlier time, then the

7    higher the value of the warrants to acquire 79.9 percent of

8    GSE common stock.  So that obviously is a very important

9    source of compensation for taxpayers as well.

10          That's why the all-in cost perspective is

11   important, because these things end up being correlated in

12   their valuations.

13          So you have to look at it holistically.  You can't

14   just zero in on the PCF and make statements about what the

15   PCF should be just viewed in isolation.

16   Q.  Okay.  I'm not a finance guy, but if you say that the

17   zero dollar PCF increases compensation for the taxpayer --

18   A.  Because it increases the value of the warrants.

19   Q.  Okay.  The next sentence says, "As currently structured,

20   the Enterprises' required dividend payments to Treasury

21   through the end of Calendar Year 2011 are forecast to be

22   larger than the earnings that the Enterprises are forecast

23   to produce."  Do you see that?

24   A.  Yes.

25   Q.  Okay.  And then it says -- oh, you understand that

1    that's a reference to what the jury has heard about the

2    circular draws when the 10 percent dividend that the

3    enterprises owed to Treasury was more than what they had, so

4    they had to draw on the Treasury Commitment just to pay the

5    dividend money back to Treasury, right?  That's what that's

6    a reference to?

7    A.  That's what the circular dividends refer to.  But, of

8    course, they could have done -- picked dividend payments

9    which would have increased the liquidation preference

10   without necessitating the circular draw.

11   Q.  I didn't ask you anything about that.

12          My question is:  This sentence that I just read,

13   this is a reference to the circular draws when the dividend

14   payments owed to Treasury are larger or here are forecast to

15   be larger than the earnings, right?

16   A.  Well, I mean, it doesn't mention circular draws, but it

17   just says that the required dividends may exceed earnings.

18   And I would think that one option here would be payment-in-

19   kind, PIKs.

20   Q.  Okay.  So that would have been the 12 percent.

21   A.  Correct.

22   Q.  It would -- instead of 10 percent, it would have been 12

23   percent?

24   A.  Correct.

25   Q.  Okay.  In this context, 12 percent is more expensive

1    than 10 percent, right?

2              MR. KAPLAN:  Objection.

3    A.  12 is bigger than 10.  But this would be added to the

4    liquidation preference.  It would not necessitate additional

5    draws.

6    Q.  Then it says, "Therefore, any net income from the

7    Enterprises through end of Calendar Year 2011 is forecast to

8    be returned to the taxpayers already.  Accordingly, Treasury

9    believes that the imposition of the PCF at this time would

10   not provide additional net proceeds for the American

11   taxpayer."  Do you see that?

12   A.  Yes.

13   Q.  Okay.  And it doesn't say "Treasury believes that the

14   imposition of the PCF at this time is unnecessary or

15   inappropriate because Treasury's already fully compensated

16   by the 10 percent dividend and the warrants, et cetera,"

17   right?  It doesn't say that?

18   A.  He's not commenting on a lot of things, so I can mention

19   a lot of things he doesn't say.

20             The point is what is being expressed here is a

21   simple mathematical fact.  Right?  And the mathematical fact

22   is, if my earnings -- if I have to pay a $100 dividend, and

23   my earnings are $90, then all of the $90 would be used to

24   pay the dividends so what is the point of imposing a PCF?

25             There is no money to pay a PCF with because

1    everything that I've earned is going to be paid as a

2    dividend.  That's just a mathematical fact.  And it's -- you

3    know, and then he's linking it to the forecast and saying

4    that's why we're waiving the PCF.  Which is consistent with

5    what I said earlier, that Treasury was waiving the PCF in

6    part because they viewed the financial condition of the GSEs

7    as not being sufficiently strong to absorb the PCF so they

8    never -- they never quantified what the PCF should be.

9    Q.  I see.  So it's a mathematical fact that at this point

10   what this is saying is that Fannie Mae and Freddie Mac, even

11   before the PCF, they already owe the Treasury Department all

12   of the money that they have plus some more, right?

13   A.  Yes.  When earnings are below -- because the dividend

14   payments are based on the drawn down amounts, not on the

15   earnings.  And so in any period in which earnings fall below

16   the dividends that you owe on the preferred stock, then all

17   of the earnings will go towards paying the dividends.

18          So that -- I mean, to me, this doesn't say

19   anything about the quantification of the PCF.

20   Q.  Okay.  It's saying setting the PCF or charging the PCF

21   at this time would have been pointless, like drawing blood

22   from a stone, because Fannie Mae and Freddie Mac already owe

23   the Treasury Department, just in dividends, all of the money

24   that they have, and then they owe some more on top of that.

25   Right?

1    A.  Well, they may not have charged it, but that's not a

2    reason to not quantify the PCF.  Right?

3    Q.  The next sentence says, "Treasury will re-evaluate the

4    situation during the next calendar quarter to determine

5    whether the PCF should then be set."  Do you see that?

6    A.  Yes.

7    Q.  Okay.  And, again, it doesn't say, "There's no need for

8    us to re-evaluate the situation because we, Treasury, have

9    determined that we're already fully compensated by other

10   money," right?  It says, "Treasury will re-evaluate the

11   situation the next calendar quarter," right?

12   A.  Right.  I mean, they could not possibly say what you

13   just said because they've not undertaken any analysis to

14   quantify the PCF, so how would they know that based on an

15   all-in cost Treasury didn't need to charge a positive PCF?

16   They've not even attempted the analysis, by their own

17   admission.

18          So this is just saying, "Okay, next calendar year

19   we'll try and determine the PCF again."  But the actual

20   determination, insofar as the quantification of the PCF, was

21   not done by Treasury, to the best of my knowledge, based on

22   the documents that I've looked at.

23   Q.  Okay.  And so the situation here is just Fannie Mae and

24   Freddie Mac at this time, in 2010 -- so this is under the

25   Second Amendment.  This is before the Third Amendment.

 1              What this is saying is Fannie Mae and Freddie Mac

 2     already owe the Treasury Department all of their net worth.

 3     They owe the Treasury Department all of their net worth

 4     already under the Second Amendment, plus they owe even more

 5     than their net worth in dividends, and so you don't even get

 6     to the PCF?

 7              MR. KAPLAN:  Objection to the form.  It's vague,

 8     and -- Your Honor.

 9              Objection to the form of the question.  It's

10     vague.

11              THE COURT:  Overruled.

12     A.  Can you repeat the question?

13     Q.  Yes.  The question is, the situation here was that

14     Fannie Mae and Freddie Mac, in December 2010, a long time

15     before the Third Amendment, they already owed the Treasury

16     Department all of their net worth.  And then they owed the

17     Treasury Department some more on top of that in dividends,

18     and that's before you even get to the PCF.  Right?

19     A.  But the relevant point of analysis is August of 2012 --

20     right? -- when the GSEs did have positive capital, and the

21     forward-looking forecast for 2013 and even beyond, the way

22     the housing market was and so on, the expectation was that

23     their earnings would improve, and they would be able to pay

24     the dividend.  And when that happened, what should the PCF

25     be based on market-value-based comparisons and based on, you

1   know, the kind of analysis that I've shown you based on

2   market values?  And at that point -- when the GSEs are in a

3   sufficiently strong financial position for Treasury to

4   actually go ahead and quantify the PCF, I'm saying at that

5   point you would have to look at the all-in cost.

6           So looking back at 2008 and '09 and '10, when they

7   didn't have sufficient earnings, is not -- is only part of

8   the story.  What's important is what was happening in August

9   2012.

10  Q.  Okay.  Respectfully, Professor Thakor, I didn't ask you

11  anything about August 2012.  I think I'm entitled to an

12  answer to the questions that I ask you.  But we'll go ahead

13  and move on.  I think the point is made.

14          There's a bunch more of these waiver letters from

15  the Treasury Department.  We're not going to look at all of

16  them.  I think I'm just going to pull up a couple more just

17  to make sure that we see -- make sure how the language goes.

18          MR. JONES:  Can we pull up DX -- Defendant's

19  Exhibit -- 299.

20  Q.  Professor Thakor, this is still behind Tab 5 in your

21  binder.  If you just flip past the little blue sheet, it's

22  the next one.  Do you see that, DX299?

23  A.  Yes, I see it.

24  Q.  Okay.  And this is just the next waiver letter from the

25  Treasury Department to FHFA.  This one's in March 2011.  And

1   in the second paragraph you can see there it says Treasury

2   is waiving the PCF now for the second quarter of 2011,

3   right?

4   A.  Correct.

5   Q.  Okay.  And then we see the same sentence we saw before.

6   It says, "Treasury takes this step due to the continued

7   fragility of the mortgage market and the belief that the

8   imposition of the PCF at this time would not fulfill its

9   intended purpose of generating increased compensation to the

10  American taxpayer."  Do you see that?

11  A.  Yes, I do.

12  Q.  And, again -- we're not going to go through all of

13  these, but, again, this isn't saying "Treasury takes this

14  step of waiving the PCF because, well, the PCF should just

15  be zero, zero dollars, zero cents"; or "We're taking this

16  step of waiving the PCF because we've already got everything

17  we want or need out of the 10 percent dividend," et cetera.

18  It doesn't say anything like that, right?

19  A.  It doesn't say that because they've not undertaken an

20  all-in cost analysis to determine what the PCF should be.

21  By their own admission, they've done no analysis to set the

22  PCF.

23          If they tried to quantify the PCF, I would have

24  loved to see that analysis.

25  Q.  And there's this reference here again to the intended

1    purpose of the PCF to generate increased compensation to the

2    American taxpayer, right?  Do you see that?

3    A.  Right.  But the increased compensation to the taxpayer

4    has to be thought of holistically within the contents of the

5    whole contract, not just the PCF.

6            As I just indicated a couple of minutes back, you

7    can actually increase the value of the warrants if you allow

8    the GSEs to get financially stronger and not impose a PCF.

9    So you impose the PCF when the financial strength is

10   sufficient, which is, I believe, what they wanted to do.

11           But they never modeled or quantified the PCF, so

12   it's impossible for them, in the absence of doing the

13   analysis that I showed you, to make the kinds of statements

14   that I'm making.

15   Q.  Okay.  And then if you look at the last paragraph -- I

16   think it's the same as the one we just looked at -- it's got

17   this language that "Treasury remains committed to

18   protecting" -- sorry.  That "Treasury will re-evaluate the

19   situation the next quarter to determine whether the PCF

20   should then be set."  And it says, "Treasury remains

21   committed to protecting taxpayers and ensuring that future

22   positive earnings of the Enterprises are returned to

23   taxpayers as compensation for their investment."

24           Do you see that language?  And it's the same

25   language that was in the prior waiver letter that we looked

1    at, right?

2    A.  Yes.

3    Q.  Okay.  There's five more of these waiver letters each

4    quarter before the Third Amendment.  They're all already in

5    evidence.  It's DX329, DX344, DX365, DX418, and DX469.

6         We won't bother looking at all of those, but you

7    did look at all of them as part of your work in the case,

8    right?

9    A.  I've looked at all the documents listed in my report.

10   Q.  Okay.  And none of those waiver letters says that the

11   PCF should be set at zero, right?

12   A.  Well, again, the -- as I indicated, Treasury had not

13   done the analysis, and if you don't do the analysis, you

14   can't quantify the PCF to be any specific number, whether

15   it's zero or 100 percent of profits or something in between.

16   And so in the absence of -- in the attempted quantification

17   of the PCF, you can't make that statement.

18        And the fact of the matter is that these

19   communications notwithstanding, the contract says "fully

20   compensate Treasury."  And the economic content I give to

21   that, based on the other parts of that -- of Section 3.2 is,

22   okay, fully compensate Treasury.  And how do you determine

23   full compensation?  Do it with reference to market value.

24        That's exactly what I've done.

25   Q.  Okay.  So that was a no, none of the letters say that

1    the PCF should be set at zero.  But all of those other

2    letters, which we're not going to bore everyone with looking

3    at, you know they all say that the intended purpose of the

4    PCF was to generate increased compensation to the American

5    taxpayer, right?  You recall that?

6    A.  That's what they said.  And I gave you my interpretation

7    of that.

8    Q.  Okay.  Now, let's just look at one more of them, because

9    this is the one that's not in evidence yet.

10            MR. JONES:  Can we pull up DX -- Defendant's --

11   Exhibit 574.

12   A.  Which tab is this?

13   Q.  This is still behind Tab 5.

14   A.  Still in my binder?

15   Q.  This is the last one in Tab 5, DX574.

16            MR. JONES:  And we'd move this one into evidence.

17            THE COURT:  Received without objection.

18            MR. KAPLAN:  Just one moment, Your Honor.  I

19   apologize.

20   A.  Okay.  It's not in my -- you said Tab 5?

21   Q.  Behind Tab 5, and it's DX574.  It's the last one in that

22   tab.

23   A.  Okay.  I see it.

24            MR. KAPLAN:  No objection, Your Honor.

25   Q.  Okay.  This is the Treasury Department's waiver letter

1    from September 28, 2012.  And that's after the Third

2    Amendment, right?  About a month after the Third Amendment?

3    A.  Yes.

4    Q.  Okay.  And you'll recall you said already the Third

5    Amendment suspended the -- got rid of the PCF for as long as

6    the net worth sweep is there, right?

7    A.  Correct.

8    Q.  Okay.  And if we just look at the last paragraph, just

9    to confirm it says that, it says, "This is the last

10   quarterly waiver notice that the Enterprises will receive,

11   as the Third Amendment waives the PCF beginning January 1,

12   2013, for as long as the net worth sweep dividend provision

13   of the senior preferred stock remains in effect."  Do you

14   see that?

15        And that's consistent with your understanding of

16   what the Third Amendment did.  It got rid of the PCF for as

17   long as you have the net worth sweep, right?

18   A.  Yes.

19   Q.  Okay.  And that means that under the Third Amendment,

20   there's no more prospect of any PCF being imposed as long as

21   you've got the net worth sweep, right?

22   A.  Correct.

23   Q.  Okay.  Let's take a look at what Fannie and Freddie were

24   saying about the PCF, because, again, that was one of the

25   things you said it was -- your first instinct was to look at

1   what Treasury was saying about the PCF, and we just looked

2   at a bunch of letters from Treasury.

3          But your other first instinct was to look at what

4   Fannie and Freddie were saying about the PCF, right?

5   A.  So I don't agree with what you just said.  I said my

6   first instinct was to see what they had done in terms of an

7   analysis to determine the PCF, not what they were saying.

8   Q.  Okay.  You --

9   A.  Although I did look at what they were saying.  But what

10  they were saying indicated to me that they had not done any

11  analysis to quantify the PCF.

12          MR. JONES:  Can we pull up Defendant's Exhibit

13  367.

14  Q.  And this is Tab 6 in your binder.

15          MR. JONES:  This is already in evidence.

16          Thank you.

17  Q.  Before I ask you about the document --

18          MR. JONES:  You can leave it up there.  That's

19  fine.

20  Q.  -- you reviewed some of Fannie Mae and Freddie Mac's SEC

21  filings from 2008 and 2012 as part of your work in this

22  case, correct?

23  A.  Yes.

24  Q.  Okay.  You didn't review all the SEC filings from that

25  time period.  You just looked at a few of them, right?

1    A.  Correct.

2    Q.  Okay.  Who picked the ones that you'd look at and the

3    ones you wouldn't look at?  Did you --

4    A.  Well, I did.  You know, there were things that I wanted

5    to look at.

6    Q.  You said you did.  You picked which ones to look at?

7    A.  Yes.  I mean, I decided, then I requested the documents.

8    Q.  Okay.  So this is Fannie Mae's SEC Form 10-K for 2011.

9    And this is the annual filing, right?

10   A.  Yes.

11   Q.  Okay.  This is not one of the ones that you looked at,

12   right?

13   A.  I don't remember all -- I mean, I looked at so many

14   documents so...

15   Q.  Okay.  You, in your expert --

16   A.  I'm not going to remember every document I looked at.

17   Q.  In your expert report you listed the ones you looked at.

18   A.  Okay.

19   Q.  I'll just tell you, this one wasn't on there.  That

20   means you didn't look at it, right?

21   A.  Okay.  I'll take your word for it.

22   Q.  Okay.  Can we turn to Page 65 of the PDF.  And,

23   Professor Thakor, if you want to -- actually, in your binder

24   you have an excerpt that just has this one page.

25   A.  This is the thing which says "Table of Contents"?  Okay.

1    Q.  Yes, it says "Table of Contents" at the top, that's

2    correct.

3            Okay.  So if we can look at the first full

4    paragraph, which is the one in bold, it says, "We expect

5    FHFA to request" -- again, just for context, this is Fannie

6    Mae talking in its Form 10-K annual report that's filed

7    publicly with the Securities and Exchange Commission, right?

8    A.  Uh-huh.  So what's the date of this filing?

9    Q.  It's the -- it says on the cover.  Let's go back to it.

10   A.  2011, okay.

11   Q.  You got it.  It's for the fiscal year ended December 31,

12   2011.  So this is for Form 10-K for 2011, right?

13   A.  Okay.

14   Q.  And it's Fannie Mae talking in here, right?

15   A.  Right.

16           MR. JONES:  Okay.  So now let's go to that Page 65

17   and blow up that first full paragraph again.

18   Q.  And what Fannie Mae said was, "We expect FHFA to request

19   additional funds from Treasury on our behalf to ensure we

20   maintain a positive net worth and avoid mandatory

21   receivership.  The dividends we must pay or that accrue on

22   Treasury's investments are substantial and are expected to

23   increase, and we likely will not be able to fund them

24   through net income."  Do you see that?

25   A.  Right.

1    Q.  Okay.  And then, if we go down below two paragraphs --

2              MR. JONES:  Can we blow up the paragraph that

3    begins, "In addition."

4    Q.  Okay.  And it says, "In addition we" -- Fannie Mae --

5    "were scheduled to begin paying a Quarterly Commitment Fee

6    to Treasury."

7              That's the Periodic Commitment Fee that we've been

8    talking about, right?

9    A.  Uh-huh.

10   Q.  Yes?

11   A.  Yes.

12   Q.  Okay.  It says they were scheduled to begin paying the

13   PCF on March 31, 2011.

14             And then it goes on to say, "Although Treasury has

15   waived the commitment fee for each quarter of 2011 and the

16   first quarter of 2012 due to the continued fragility of the

17   mortgage market and Treasury's belief that the imposition of

18   the fee would not generate increased compensation for

19   taxpayers, Treasury indicated that it will re-evaluate the

20   situation during the next calendar quarter to determine

21   whether the fee should then be set."  Do you see that?

22   A.  Yes.

23   Q.  And that's -- we saw that a minute ago.  That is, in

24   fact, what Treasury had told FHFA, was that in all of those

25   waiver letters that Treasury was waiving the fee for the

1   next quarter, but that Treasury was going to re-evaluate the

2   situation --

3   A.   Uh-huh.

4   Q.   -- to determine whether the fee should then be set,

5   right?

6   A.   Correct.

7   Q.   Okay.  And then it says, "The aggregate liquidation

8   preference and dividend obligations relating to the

9   preferred stock also will increase by the amount of any

10   required dividend on the senior preferred stock that we fail

11   to pay in cash and by the amount of any required commitment

12   fee on the senior preferred stock that we fail to pay."  Do

13   you see that?

14   A.   Yes.

15   Q.   So that -- and that's referring to two different things.

16   It's referring to the dividends that Fannie and Freddie owe

17   to Treasury, and it's also referring to any PCF that Fannie

18   and Freddie are additionally going to owe to Treasury?

19   A.   Uh-huh.

20            MR. KAPLAN:  Object.

21            THE COURT:  Overruled.

22            MR. KAPLAN:  I'm sorry, are you finished with your

23   question?

24            Objection to foundation.

25            THE COURT:  Overruled.

1    A.  What's the question?

2    Q.  My question is, this is referring to two things.  It's

3    referring to the dividend, the 10 percent dividend that

4    Fannie and Freddie had to pay to Treasury, and also to the

5    PCF, any PCF that Fannie and Freddie were going to have to

6    pay to Treasury additionally.  Right?

7    A.  I see, okay.

8    Q.  Okay.  And then the next sentence says -- and this is

9    the one that talks about the PCF more specifically.  It

10   says, "The substantial dividend obligations and potentially

11   substantial quarterly commitment fees will," and it goes on

12   to say "will continue to strain our financial resources."

13        And that reference there to "potentially

14   substantial quarterly commitment fees," that's referring to

15   the PCF, right?

16   A.  I assume it does, yes.

17   Q.  Okay.  And it doesn't say anything in here about the PCF

18   being zero, right?

19   A.  It doesn't say anything about the PCF being any given

20   number because they haven't done the analysis, and we know

21   that.  They haven't done the analysis.  They don't know what

22   that number should be.  They have not quantified it.

23        So as I indicated before, you can say this for

24   zero.  You can say it for any positive number.  You can say

25   it for 100 percent of profits.  It doesn't matter because

1    they have not done any quantification, any analysis, to

2    determine the PCF.

3            But the contract says you're supposed to do it

4    based on market value with negotiations in good faith

5    involving the Chairman of the Fed, and those things were not

6    done.

7    Q.  But what they did say is that the PCF was "potentially

8    substantial and will continue to strain our financial

9    resources and have an adverse impact on our results of

10   operations, financial condition, liquidity and net worth

11   both in the short term and the long term."

12           That's what they did say, right?

13   A.  Well, the document says what it says.  I have no opinion

14   on it.  I just told you that this is something that was

15   written when they had themselves not done any analysis of

16   what the quantification of the PCF should be.

17           So, you know, I have no quarrel with the

18   statement.  It is what it is.  It's just a fact -- you know,

19   it's just a statement in the 10-K.

20           But my analysis refers to what the contract guided

21   us to do -- "us" meaning the negotiating parties -- and

22   based on the economic content that I can give to the

23   contract, using my knowledge of industry practices and my

24   inference of market value, what the PCF should be.  None of

25   that analysis is reflected, as far as I know, in the

1    statement.

2    Q.   Okay.   So that was Fannie.   Now let's look at what

3    Freddie Mac was saying about the PCF.

4            THE COURT:   Okay.   We'll do that at 1:45.   I have

5    a January 6th case I've got to do at lunch.

6            Don't talk about the case.   Don't let anyone talk

7    to you about the case.   I'll see you all back at 1:45.

8            (Jury exits courtroom)

9            THE COURT:   The Court will be in recess here.

10   Thank you all.

11           (Lunch recess taken at 12:40 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

## <u>CERTIFICATE OF OFFICIAL COURT REPORTER</u>

2

3              I, LISA A. MOREIRA, RDR, CRR, do hereby

4    certify that the above and foregoing constitutes a true and

5    accurate transcript of my stenographic notes and is a full,

6    true and complete transcript of the proceedings to the best

7    of my ability.

8         Dated this 26th day of October, 2022.

9

10                              /s/Lisa A. Moreira, RDR, CRR
                                Official Court Reporter
11                              United States Courthouse
                                Room 6718
12                              333 Constitution Avenue, NW
                                Washington, DC 20001
13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$1.16** [7] - 1655:24, 1656:12, 1656:24, 1657:4, 1657:14, 1657:19, 1659:10
**$100** [9] - 1624:22, 1629:11, 1633:24, 1652:11, 1660:22, 1661:5, 1664:5, 1684:22
**$111** [1] - 1657:9
**$150** [1] - 1626:16
**$200** [9] - 1624:23, 1624:24, 1626:19, 1648:9, 1649:7, 1660:23, 1661:6, 1664:6, 1666:12
**$250,000** [1] - 1647:13
**$258** [2] - 1655:14, 1656:9
**$300** [2] - 1661:25, 1662:6
**$32** [1] - 1638:15
**$40** [2] - 1639:11, 1641:22
**$400** [4] - 1661:7, 1661:25, 1662:6, 1666:12
**$500** [1] - 1661:25
**$550** [1] - 1626:16
**$700** [1] - 1629:25
**$85** [2] - 1639:10, 1640:2
**$90** [2] - 1684:23

### '

**'07-'09** [1] - 1629:1
**'08** [1] - 1638:12
**'09** [2] - 1642:22, 1688:6
**'10** [1] - 1688:6
**'80s** [1] - 1623:12
**'97** [1] - 1623:3
**'market** [1] - 1614:17

## /

**/s/Lisa** [1] - 1702:10

## 0

**0.0045** [1] - 1655:22
**0.025** [1] - 1646:24
**0.2** [1] - 1625:23
**0.26** [2] - 1622:19, 1625:23
**0.38** [1] - 1623:1
**0.43** [2] - 1640:9, 1640:14

**0.45** [2] - 1646:25, 1655:20
**0.6** [1] - 1619:11
**0.61** [1] - 1622:24

## 1

**1** [10] - 1619:14, 1624:18, 1655:21, 1663:11, 1663:22, 1664:3, 1664:8, 1681:5, 1693:11
**1.01** [2] - 1624:11
**1.08** [1] - 1622:15
**1.16** [2] - 1657:2, 1657:21
**1.81** [3] - 1652:22, 1652:25, 1653:9
**1.9** [1] - 1622:23
**10** [41] - 1615:19, 1617:13, 1617:18, 1617:25, 1619:24, 1620:4, 1620:24, 1624:8, 1624:12, 1624:14, 1626:2, 1628:2, 1632:1, 1640:15, 1641:13, 1641:17, 1641:24, 1642:18, 1642:21, 1642:23, 1642:24, 1644:5, 1644:7, 1645:24, 1653:9, 1656:3, 1656:5, 1657:2, 1657:10, 1658:9, 1658:12, 1667:22, 1668:1, 1681:4, 1683:2, 1683:22, 1684:1, 1684:3, 1684:16, 1689:17, 1699:3
**10-K** [4] - 1695:8, 1696:6, 1696:12, 1700:19
**100** [9] - 1657:23, 1657:24, 1666:3, 1666:16, 1666:25, 1673:2, 1691:15, 1699:25
**10020** [1] - 1612:4
**10:15** [1] - 1611:5
**11.6** [2] - 1657:2, 1658:4
**111** [1] - 1657:22
**12** [5] - 1618:23, 1683:20, 1683:22, 1683:25, 1684:3
**12-month** [4] - 1622:15, 1622:23, 1623:19, 1624:10
**1251** [1] - 1612:4

**12:40** [1] - 1701:11
**13** [2] - 1652:2, 1658:14
**14** [1] - 1658:14
**1401** [1] - 1611:23
**15** [1] - 1658:14
**150.2** [1] - 1658:13
**1523** [1] - 1611:17
**15th** [1] - 1638:12
**17** [1] - 1667:3
**18.9** [1] - 1632:5
**189** [1] - 1655:15
**19087** [1] - 1611:20
**1997** [2] - 1622:2, 1622:10
**1:13-cv-01053-RCL** [1] - 1611:3
**1:13-cv-1288** [1] - 1611:9
**1:45** [2] - 1701:4, 1701:7

## 2

**2** [1] - 1624:18
**2,513** [1] - 1622:1
**2.1** [1] - 1625:23
**2.5** [4] - 1649:17, 1650:2, 1650:5, 1651:11
**2.6** [1] - 1625:24
**2.7** [1] - 1625:24
**20** [1] - 1619:12
**20001** [3] - 1612:10, 1612:14, 1702:13
**20005** [1] - 1611:23
**20036** [1] - 1611:17
**2008** [6] - 1637:6, 1645:13, 1660:21, 1665:18, 1688:6, 1694:21
**2009** [5] - 1661:7, 1661:12, 1661:21, 1666:11, 1666:19
**2010** [3] - 1679:24, 1686:24, 1687:14
**2011** [16] - 1623:12, 1642:24, 1650:3, 1679:6, 1680:2, 1680:10, 1682:21, 1684:7, 1688:25, 1689:2, 1695:8, 1696:10, 1696:12, 1697:13, 1697:15
**2012** [33] - 1618:6, 1619:10, 1623:18, 1623:20, 1623:23, 1624:11, 1628:21, 1637:3, 1637:8, 1640:8, 1640:11,

1645:11, 1645:19, 1645:25, 1646:4, 1648:4, 1651:14, 1652:21, 1653:1, 1655:13, 1661:14, 1661:23, 1667:3, 1674:21, 1679:6, 1687:19, 1688:9, 1688:11, 1693:1, 1694:21, 1697:16
**2013** [1] - 1645:1, 1657:9, 1658:5, 1663:11, 1663:12, 1663:22, 1664:3, 1664:8, 1687:21, 1693:12
**2015** [1] - 1619:12
**2016** [5] - 1621:22, 1622:3, 1622:21, 1623:3, 1650:3
**2017** [1] - 1618:7
**202** [1] - 1612:14
**2022** [4] - 1611:5, 1656:25, 1658:5, 1702:8
**21** [2] - 1622:18
**23** [2] - 1652:3, 1655:18
**24** [1] - 1614:7
**25-basis-point** [1] - 1669:2
**258.1** [3] - 1655:22, 1664:1, 1664:9
**25th** [1] - 1669:25
**26** [4] - 1611:5, 1622:19, 1625:10, 1625:15
**26th** [1] - 1702:8
**272** [1] - 1679:16
**28** [1] - 1693:1
**280** [1] - 1611:19
**29** [1] - 1679:24
**299** [1] - 1688:19

## 3

**3** [3] - 1620:3, 1640:5, 1640:9
**3.2** [1] - 1691:21
**3.43** [2] - 1640:10, 1641:9
**30** [1] - 1619:12
**300** [2] - 1620:1, 1620:2
**31** [2] - 1696:11, 1697:13
**32,343** [1] - 1622:4
**333** [2] - 1612:13, 1702:12
**354-3187** [1] - 1612:14

**367** [1] - 1694:13
**38** [2] - 1625:10, 1625:15

## 4

**4** [3] - 1626:1, 1669:24, 1670:3
**401(k** [1] - 1635:24
**43** [3] - 1640:8, 1652:2, 1655:19
**45** [11] - 1647:1, 1649:18, 1650:2, 1650:6, 1651:12, 1652:4, 1655:20, 1656:8, 1656:11, 1665:1

## 5

**5** [11] - 1631:9, 1631:11, 1632:1, 1643:1, 1679:19, 1679:20, 1688:20, 1692:13, 1692:15, 1692:20, 1692:21
**50** [5] - 1624:25, 1626:2, 1628:2, 1632:8, 1657:24
**57** [2] - 1640:23, 1641:9
**574** [1] - 1692:11

## 6

**6** [3] - 1637:7, 1637:20, 1694:14
**60** [3] - 1619:10, 1649:13, 1649:14
**601** [1] - 1612:9
**61** [1] - 1622:24
**65** [2] - 1695:22, 1696:16
**6718** [2] - 1612:13, 1702:12
**6th** [1] - 1701:5

## 7

**7.5** [1] - 1648:5
**70** [2] - 1649:13, 1649:14
**705** [1] - 1630:4
**75** [2] - 1640:22, 1641:3
**79** [1] - 1617:16
**79.9** [9] - 1615:20, 1617:16, 1617:17, 1625:4, 1626:3, 1627:17, 1632:10, 1644:11, 1682:7

**8**

**8** [1] - 1638:15
**8.99** [3] - 1624:12, 1624:16
**80** [3] - 1617:11, 1668:2, 1668:3
**89** [2] - 1670:5, 1670:7

**9**

**9** [1] - 1631:11
**9.57** [1] - 1640:15
**90** [1] - 1670:7

**A**

**a.m** [1] - 1611:5
**AA** [1] - 1638:12
**ability** [2] - 1652:14, 1702:7
**able** [8] - 1627:20, 1631:19, 1642:10, 1643:7, 1652:23, 1665:22, 1687:23, 1696:23
**absence** [2] - 1690:12, 1691:16
**absolutely** [2] - 1643:4, 1654:3
**absorb** [1] - 1685:7
**academic** [1] - 1674:3
**accept** [1] - 1654:22
**access** [1] - 1652:10
**according** [1] - 1657:11
**accordingly** [1] - 1684:8
**account** [8] - 1617:23, 1620:23, 1629:14, 1647:13, 1647:21, 1654:10, 1654:14, 1654:20
**accrue** [1] - 1696:21
**accurate** [4] - 1637:19, 1658:21, 1681:16, 1702:5
**acquire** [4] - 1625:6, 1632:10, 1668:1, 1682:7
**acting** [2] - 1658:16, 1680:1
**ACTION** [1] - 1611:10
**actual** [6] - 1621:5, 1651:25, 1656:11, 1673:18, 1686:19
**add** [5] - 1623:21, 1624:11, 1625:18, 1625:25, 1640:9
**add-ons** [1] - 1623:21
**added** [3] - 1629:10,

1668:4, 1684:3
**addition** [4] - 1617:18, 1667:19, 1697:3, 1697:4
**additional** [5] - 1649:5, 1652:25, 1684:4, 1684:10, 1696:19
**additionally** [2] - 1698:18, 1699:6
**adjust** [2] - 1617:1, 1637:18
**adjustable** [2] - 1616:25
**adjusted** [2] - 1619:2, 1640:3
**adjustment** [1] - 1651:7
**adjustments** [1] - 1651:10
**admission** [2] - 1686:17, 1689:21
**advantage** [1] - 1654:11
**advantageous** [2] - 1643:2, 1643:10
**adverse** [1] - 1700:9
**advice** [1] - 1654:6
**advised** [1] - 1680:9
**affects** [2] - 1645:21, 1645:23
**afterwards** [1] - 1637:4
**AGENCY** [1] - 1611:6
**Agency** [1] - 1612:6
**agency** [3] - 1647:7, 1647:17, 1653:3
**aggregate** [1] - 1698:7
**ago** [1] - 1697:23
**agree** [3] - 1675:15, 1681:17, 1694:5
**agreed** [2] - 1672:19, 1673:12
**AGREEMENT** [1] - 1611:10
**ahead** [2] - 1688:4, 1688:12
**aid** [1] - 1641:19
**AIG** [34] - 1614:25, 1615:1, 1618:25, 1619:2, 1619:25, 1620:21, 1623:25, 1633:8, 1633:11, 1633:13, 1634:5, 1634:12, 1634:19, 1634:20, 1635:2, 1635:10, 1635:18, 1636:24, 1637:5, 1637:11, 1637:24, 1638:2, 1638:23,

1639:7, 1639:9, 1639:24, 1640:17, 1640:19, 1641:3, 1641:7, 1641:16, 1643:16, 1643:21, 1644:14
**AIG's** [2] - 1637:2, 1637:22
**al** [2] - 1611:3, 1611:7
**all-in** [29] - 1615:9, 1615:11, 1615:12, 1615:13, 1616:4, 1616:22, 1626:6, 1632:22, 1641:6, 1641:8, 1643:23, 1645:22, 1646:19, 1659:6, 1664:24, 1665:11, 1665:15, 1667:11, 1667:16, 1668:10, 1668:11, 1669:10, 1676:19, 1681:23, 1681:24, 1682:10, 1686:15, 1688:5, 1689:20
**allow** [1] - 1690:7
**allowed** [2] - 1640:11, 1653:22
**alluded** [1] - 1658:16
**almost** [7] - 1617:11, 1627:24, 1646:21, 1657:22, 1657:23, 1668:1
**alone** [1] - 1656:10
**altogether** [1] - 1661:14
**amend** [1] - 1661:4
**Amendment** [29] - 1623:24, 1624:23, 1632:3, 1640:8, 1661:13, 1661:22, 1662:5, 1662:14, 1662:16, 1663:6, 1663:10, 1663:21, 1666:10, 1666:13, 1666:18, 1666:22, 1667:2, 1686:25, 1687:4, 1687:15, 1691:4, 1693:2, 1693:5, 1693:11, 1693:16, 1693:19
**amendment** [2] - 1661:3, 1661:12
**amendments** [1] - 1662:13
**America** [1] - 1649:11
**American** [12] - 1660:23, 1661:8, 1661:16, 1663:1, 1680:21, 1681:11, 1681:15, 1681:21,

1684:10, 1689:10, 1690:2, 1692:4
**Americas** [1] - 1612:4
**amount** [26] - 1615:20, 1615:23, 1624:22, 1624:24, 1625:1, 1629:15, 1632:9, 1638:14, 1644:21, 1644:24, 1648:4, 1650:14, 1650:16, 1651:5, 1651:16, 1651:17, 1655:23, 1656:6, 1656:11, 1658:7, 1658:15, 1661:16, 1662:1, 1663:1, 1698:9, 1698:11
**amounts** [1] - 1685:14
**analog** [3] - 1622:17, 1622:25, 1657:12
**analogous** [1] - 1650:9
**analysis** [43] - 1614:18, 1621:2, 1646:22, 1652:8, 1655:24, 1658:24, 1659:2, 1665:16, 1665:24, 1667:16, 1668:23, 1669:1, 1669:6, 1669:11, 1670:15, 1670:17, 1671:5, 1671:6, 1672:4, 1672:21, 1676:13, 1676:20, 1677:1, 1678:7, 1678:18, 1686:13, 1686:16, 1687:19, 1688:1, 1689:20, 1689:21, 1689:24, 1690:13, 1691:13, 1694:7, 1694:11, 1699:20, 1699:21, 1700:1, 1700:15, 1700:20, 1700:25
**analyzing** [1] - 1646:13
**ANJAN** [2] - 1613:3, 1614:8
**annual** [6] - 1615:19, 1632:4, 1641:17, 1655:11, 1695:9, 1696:6
**answer** [5] - 1670:8, 1670:13, 1673:1, 1673:4, 1688:12
**answered** [1] - 1669:16
**apologies** [1] - 1619:7
**apologize** [2] - 1621:19, 1692:19

**appear** [1] - 1621:18
**APPEARANCES** [2] - 1611:15, 1612:1
**applied** [2] - 1650:8, 1655:9
**applies** [1] - 1617:5
**apply** [3] - 1623:20, 1650:5, 1655:12
**applying** [1] - 1650:16
**approach** [1] - 1660:1
**appropriate** [12] - 1615:6, 1641:5, 1643:21, 1646:7, 1647:24, 1652:8, 1658:20, 1667:9, 1667:10, 1667:23, 1668:9, 1676:12
**approximation** [2] - 1625:18, 1641:10
**April** [1] - 1650:3
**apt** [1] - 1657:19
**area** [2] - 1621:11, 1658:24
**argue** [1] - 1630:19
**argument** [1] - 1648:9
**ARNOLD** [1] - 1612:9
**arrangement** [1] - 1615:14
**ASIM** [1] - 1612:7
**assess** [1] - 1645:18
**assessed** [2] - 1625:20, 1651:2
**assessing** [1] - 1639:4
**assessment** [10] - 1626:9, 1646:4, 1650:3, 1650:6, 1650:8, 1650:11, 1650:13, 1651:4, 1657:15, 1658:25
**asset** [3] - 1629:24, 1635:19, 1636:9
**asset-backed** [1] - 1636:9
**assets** [6] - 1635:23, 1636:22, 1636:25, 1637:13, 1637:21, 1651:8
**assist** [1] - 1639:9
**assistance** [26] - 1615:1, 1619:1, 1629:16, 1630:17, 1630:21, 1630:24, 1633:2, 1635:6, 1637:3, 1639:8, 1639:11, 1639:13, 1639:16, 1639:24, 1641:22, 1643:18, 1644:10, 1644:13, 1644:14, 1645:13, 1648:16, 1653:11,

1655:1, 1655:4,
1656:10
**assisted** [1] - 1638:18
**assume** [1] - 1699:16
**assumes** [1] - 1648:12
**assured** [1] - 1638:8
**attempt** [2] - 1671:14,
1671:25
**attempted** [4] -
1659:5, 1671:11,
1686:16, 1691:16
**Attorney** [1] - 1677:19
**August** [17] - 1623:23,
1624:11, 1628:21,
1640:7, 1640:11,
1645:11, 1645:19,
1645:25, 1646:4,
1648:4, 1652:21,
1653:1, 1655:13,
1667:3, 1687:19,
1688:8, 1688:11
**authorized** [1] -
1629:25
**available** [3] -
1614:19, 1614:23,
1621:3
**Avenue** [6] - 1611:17,
1611:23, 1612:4,
1612:9, 1612:13,
1702:12
**average** [12] -
1622:11, 1622:12,
1622:16, 1622:23,
1622:24, 1622:25,
1624:5, 1624:16,
1624:19, 1626:24,
1651:8, 1652:2
**avoid** [1] - 1696:20
**aware** [2] - 1654:25,
1655:4

**B**

**backed** [8] - 1633:20,
1634:6, 1634:8,
1634:23, 1635:20,
1635:21, 1636:9
**bad** [1] - 1660:6
**badly** [1] - 1662:24
**balance** [2] - 1629:12,
1635:18
**balances** [1] - 1625:21
**Bank** [2] - 1643:18,
1649:11
**bank** [19] - 1619:1,
1619:2, 1619:4,
1630:19, 1635:5,
1647:9, 1647:12,
1647:14, 1648:18,
1648:23, 1649:14,

1652:12, 1653:16,
1654:3, 1654:4,
1654:8, 1654:11,
1654:19, 1654:20
**banking** [5] - 1628:23,
1636:20, 1648:5,
1648:20, 1649:25
**bankrupt** [1] - 1642:9
**banks** [39] - 1618:13,
1618:14, 1618:15,
1625:2, 1626:18,
1628:4, 1629:2,
1630:4, 1630:5,
1630:6, 1630:8,
1630:18, 1631:7,
1631:8, 1631:10,
1631:14, 1631:23,
1632:12, 1632:20,
1633:7, 1647:8,
1647:16, 1648:18,
1648:22, 1649:7,
1649:9, 1649:10,
1650:19, 1650:25,
1651:1, 1651:17,
1651:20, 1651:25,
1652:24, 1653:25,
1656:13, 1656:22,
1657:17
**BARNES** [1] - 1611:16
**base** [5] - 1650:3,
1650:6, 1650:8,
1650:13, 1651:4
**based** [39] - 1615:11,
1626:8, 1627:12,
1635:15, 1644:14,
1644:15, 1646:9,
1647:1, 1657:15,
1658:4, 1659:3,
1664:24, 1667:13,
1668:12, 1672:3,
1672:21, 1672:22,
1672:23, 1673:20,
1676:13, 1676:17,
1676:19, 1677:2,
1677:3, 1678:7,
1678:8, 1678:10,
1678:18, 1685:14,
1686:14, 1686:21,
1687:25, 1688:1,
1691:21, 1700:4,
1700:22
**basis** [39] - 1619:10,
1619:13, 1620:1,
1620:2, 1622:18,
1622:19, 1622:24,
1624:25, 1625:10,
1625:15, 1626:3,
1628:2, 1632:8,
1640:9, 1640:22,
1640:24, 1641:4,

1641:9, 1643:23,
1644:3, 1646:25,
1647:1, 1649:17,
1649:18, 1650:2,
1651:12, 1652:2,
1652:4, 1655:18,
1655:19, 1655:20,
1656:8, 1656:11,
1659:7, 1665:1,
1667:16, 1670:16,
1676:20
**basis-point** [1] -
1641:4
**became** [1] - 1635:2
**becomes** [2] -
1627:14, 1646:3
**BEFORE** [1] - 1611:13
**begin** [3] - 1659:25,
1697:5, 1697:12
**beginning** [1] -
1693:11
**begins** [3] - 1619:13,
1680:8, 1697:3
**behalf** [3] - 1672:13,
1672:14, 1696:19
**behind** [5] - 1677:24,
1679:20, 1688:20,
1692:13, 1692:21
**belief** [3] - 1680:18,
1689:7, 1697:17
**believes** [2] - 1684:9,
1684:13
**below** [7] - 1619:14,
1620:3, 1637:10,
1638:13, 1685:13,
1685:15, 1697:1
**Ben** [1] - 1675:2
**bench** [1] - 1660:1
**benchmark** [6] -
1619:22, 1620:5,
1620:7, 1620:9,
1641:16, 1652:19
**benefit** [3] - 1644:12,
1653:25, 1654:20
**BERGER** [1] - 1612:3
**BERGMAN** [1] -
1612:7
**Berkley** [1] - 1611:16
**Bernanke** [3] - 1675:2,
1676:21, 1676:23
**BERNSTEIN** [1] -
1612:3
**best** [4] - 1614:19,
1614:23, 1686:21,
1702:6
**better** [1] - 1656:21
**between** [13] -
1619:12, 1632:4,
1644:13, 1646:24,
1651:19, 1653:8,

1657:21, 1657:23,
1658:5, 1660:21,
1665:18, 1678:15,
1691:15
**beyond** [1] - 1687:21
**big** [4] - 1626:14,
1657:22, 1657:25,
1662:21
**bigger** [2] - 1622:22,
1684:3
**biggest** [4] - 1633:18,
1648:6, 1655:17
**billion** [53] - 1615:18,
1622:17, 1624:21,
1624:22, 1624:23,
1624:24, 1626:19,
1629:11, 1629:25,
1632:5, 1632:8,
1638:15, 1639:10,
1639:11, 1640:2,
1641:22, 1648:9,
1649:8, 1652:11,
1655:14, 1655:22,
1655:24, 1656:2,
1656:9, 1656:12,
1656:24, 1657:2,
1657:4, 1657:9,
1657:14, 1657:20,
1658:4, 1658:13,
1659:10, 1660:22,
1660:23, 1661:5,
1661:6, 1661:8,
1661:25, 1662:6,
1662:7, 1664:1,
1664:6, 1664:9,
1666:12, 1681:5
**billion-dollar** [1] -
1656:2
**billions** [7] - 1626:18,
1649:12, 1662:1,
1663:15, 1664:21,
1665:7, 1675:12
**binder** [9] - 1660:4,
1669:22, 1669:24,
1679:18, 1679:21,
1688:21, 1692:14,
1694:14, 1695:23
**binders** [1] - 1659:25
**bit** [5] - 1638:23,
1640:1, 1640:7,
1667:6, 1670:23
**blood** [1] - 1685:21
**blow** [3] - 1680:6,
1696:17, 1697:2
**blue** [1] - 1688:21
**BOIES** [1] - 1611:22
**bold** [1] - 1696:4
**bond** [6] - 1633:24,
1633:25, 1634:1,
1634:2, 1652:18,

1652:19
**bonds** [2] - 1652:20,
1654:16
**book** [4] - 1637:7,
1637:17, 1638:19,
1674:11
**books** [1] - 1674:13
**bore** [1] - 1692:2
**borrow** [5] - 1618:14,
1621:13, 1622:14,
1640:4, 1640:11
**borrower** [2] -
1624:17, 1643:3
**borrowers** [2] -
1625:14, 1628:3
**borrowing** [7] -
1618:15, 1624:17,
1635:15, 1636:7,
1645:9, 1652:14,
1652:16
**bother** [1] - 1691:6
**bottom** [5] - 1614:15,
1625:8, 1625:9,
1646:21, 1665:1
**bought** [1] - 1631:17
**branch** [1] - 1647:9
**break** [2] - 1659:16,
1659:18
**BRIAN** [1] - 1611:16
**briefly** [1] - 1636:19
**bring** [1] - 1675:12
**broad** [1] - 1665:23
**brought** [2] - 1635:3,
1677:24
**bucket** [1] - 1649:21
**buckets** [1] - 1649:21
**bulk** [1] - 1649:15
**bunch** [3] - 1651:9,
1688:14, 1694:2
**business** [3] -
1633:17, 1636:5,
1636:13
**businesses** [2] -
1634:9, 1636:14
**but-for** [2] - 1663:17,
1663:20
**buy** [6] - 1615:20,
1615:23, 1616:10,
1617:10, 1625:4,
1626:3
**BY** [2] - 1614:10,
1660:9

**C**

**CA** [1] - 1611:3
**calculated** [1] - 1646:9
**Calendar** [2] -
1680:10, 1684:7
**calendar** [5] - 1682:21,

1686:4, 1686:11, 1686:18, 1697:20
**cannot** [1] - 1671:24
**cap** [10] - 1661:14, 1662:5, 1662:17, 1662:20, 1663:17, 1663:22, 1663:25, 1664:2, 1666:20
**Capital** [5] - 1614:25, 1629:17, 1629:20, 1630:2, 1632:13
**capital** [10] - 1615:10, 1630:4, 1630:6, 1630:9, 1637:7, 1637:9, 1637:12, 1649:5, 1650:23, 1687:20
**capped** [1] - 1663:12
**case** [16] - 1617:21, 1625:17, 1630:23, 1632:16, 1639:14, 1640:22, 1653:20, 1656:8, 1667:7, 1669:13, 1679:13, 1691:7, 1694:22, 1701:5, 1701:6, 1701:7
**Case** [1] - 1611:9
**cash** [2] - 1638:6, 1698:11
**casualty** [1] - 1633:16
**categories** [2] - 1622:12, 1626:15
**categorizes** [1] - 1649:19
**CDS** [12] - 1633:19, 1633:21, 1633:23, 1633:24, 1634:3, 1634:5, 1636:3, 1636:13, 1637:22, 1638:4, 1638:7, 1638:13
**cents** [7] - 1664:23, 1665:8, 1675:15, 1678:4, 1681:14, 1681:22, 1689:15
**certainly** [1] - 1639:12
**CERTIFICATE** [1] - 1702:1
**certify** [1] - 1702:4
**cetera** [2] - 1684:16, 1689:17
**chair** [6] - 1669:15, 1672:7, 1672:10, 1672:13, 1672:18, 1674:8
**Chair** [12] - 1674:2, 1674:5, 1674:11, 1674:25, 1675:1, 1675:6, 1675:13,

1675:21, 1675:23, 1675:24, 1676:7, 1677:24
**Chairman** [3] - 1677:4, 1678:15, 1700:5
**chairman** [3] - 1673:7, 1676:21, 1676:23
**change** [4] - 1623:7, 1645:2, 1645:20, 1646:8
**changed** [1] - 1644:25
**changing** [1] - 1637:18
**charge** [3] - 1646:18, 1656:22, 1686:15
**charged** [8] - 1620:21, 1624:15, 1625:15, 1640:16, 1640:18, 1647:2, 1647:25, 1686:1
**charging** [1] - 1685:20
**chart** [1] - 1618:5
**Chase** [1] - 1611:19
**CHECK** [1] - 1611:19
**chose** [1] - 1639:7
**circular** [5] - 1683:2, 1683:7, 1683:10, 1683:13, 1683:16
**CLASS** [1] - 1611:10
**Class** [2] - 1611:18, 1612:2
**clause** [2] - 1677:6
**cleaned** [1] - 1629:1
**clear** [3] - 1619:16, 1662:11, 1663:19
**clearly** [1] - 1626:19
**clicker** [1] - 1621:12
**close** [5] - 1620:24, 1626:2, 1629:11, 1655:2, 1655:6
**closing** [2] - 1616:14, 1616:16
**collapse** [3] - 1635:4, 1638:4, 1638:17
**collateral** [5] - 1635:16, 1636:8, 1636:10, 1638:5, 1638:14
**COLUMBIA** [1] - 1611:1
**column** [4] - 1624:1, 1625:19, 1625:25, 1631:5
**columns** [1] - 1622:6
**combination** [1] - 1617:3
**combined** [1] - 1621:23
**coming** [2] - 1635:11, 1679:10

**commenting** [1] - 1684:18
**commercial** [9] - 1614:24, 1620:25, 1621:2, 1621:24, 1624:5, 1624:17, 1625:12, 1626:10, 1628:3
**Commission** [1] - 1696:7
**Commitment** [18] - 1660:12, 1660:15, 1660:16, 1660:22, 1662:18, 1662:25, 1663:12, 1663:22, 1664:10, 1664:12, 1664:19, 1665:5, 1672:6, 1675:10, 1676:15, 1681:6, 1683:4, 1697:7
**commitment** [49] - 1616:1, 1620:22, 1621:2, 1621:5, 1622:1, 1622:14, 1623:21, 1624:16, 1624:17, 1624:22, 1625:3, 1625:13, 1626:9, 1626:12, 1626:19, 1632:3, 1648:2, 1648:9, 1648:21, 1649:3, 1649:4, 1650:10, 1650:22, 1650:23, 1653:14, 1655:10, 1655:13, 1655:14, 1655:23, 1656:6, 1660:13, 1660:15, 1661:5, 1661:8, 1663:14, 1663:17, 1664:15, 1664:21, 1665:6, 1666:11, 1666:20, 1666:24, 1675:11, 1697:5, 1697:15, 1698:11, 1699:11, 1699:14
**commitments** [24] - 1614:24, 1616:5, 1619:3, 1619:4, 1621:1, 1621:4, 1621:24, 1622:4, 1622:12, 1623:22, 1624:6, 1626:11, 1626:14, 1626:17, 1626:23, 1627:3, 1627:10, 1630:20, 1645:7, 1646:14, 1648:11, 1648:13, 1663:3
**committed** [9] - 1625:1, 1632:9,

1660:18, 1660:24, 1661:17, 1662:3, 1662:25, 1690:17, 1690:21
**common** [17] - 1615:21, 1617:11, 1617:16, 1617:17, 1625:4, 1625:6, 1626:4, 1627:17, 1629:8, 1632:11, 1632:12, 1644:9, 1644:16, 1644:17, 1668:2, 1668:3, 1682:8
**commonly** [2] - 1619:5, 1652:19
**communications** [1] - 1691:19
**companies** [7] - 1620:21, 1660:25, 1661:9, 1662:24, 1664:2, 1665:19, 1666:12
**company** [5] - 1633:14, 1661:5, 1661:6, 1664:6
**comparable** [2] - 1639:12, 1652:17
**comparables** [7] - 1614:20, 1614:24, 1615:4, 1615:5, 1615:9, 1669:9, 1678:22
**comparator** [2] - 1639:4, 1643:21
**compare** [9] - 1617:25, 1620:14, 1624:5, 1626:11, 1631:4, 1631:25, 1637:3, 1657:4, 1668:10
**compared** [2] - 1623:25, 1637:11
**comparing** [1] - 1620:6
**comparison** [24] - 1615:11, 1616:2, 1616:12, 1623:6, 1623:9, 1625:13, 1627:5, 1627:13, 1631:23, 1632:22, 1633:8, 1637:14, 1639:21, 1641:12, 1651:19, 1652:6, 1653:2, 1657:7, 1657:19, 1657:21, 1658:1, 1658:5, 1664:24, 1669:10
**comparisons** [3] - 1668:12, 1672:3,

1687:25
**compensate** [4] - 1643:8, 1675:10, 1691:20, 1691:22
**compensated** [12] - 1626:6, 1641:16, 1641:17, 1643:25, 1659:8, 1667:17, 1667:19, 1667:21, 1668:13, 1681:6, 1684:15, 1686:9
**compensation** [32] - 1614:16, 1614:25, 1615:13, 1615:17, 1626:8, 1626:9, 1627:12, 1628:3, 1631:25, 1632:23, 1639:5, 1655:5, 1656:1, 1657:18, 1665:10, 1665:12, 1665:15, 1667:18, 1680:21, 1681:10, 1681:14, 1681:21, 1681:24, 1682:9, 1682:17, 1689:9, 1690:1, 1690:3, 1690:23, 1691:23, 1692:4, 1697:18
**complete** [2] - 1635:4, 1702:6
**completely** [6] - 1629:4, 1636:21, 1637:13, 1658:25, 1670:22, 1676:9
**completeness** [1] - 1667:13
**complex** [2] - 1649:22, 1649:24
**complicated** [1] - 1651:10
**component** [2] - 1615:8, 1615:24
**components** [1] - 1615:16
**compute** [3] - 1657:13, 1665:22, 1667:16
**computed** [1] - 1651:18
**computing** [1] - 1665:11
**concede** [1] - 1677:17
**concept** [1] - 1641:7
**concerned** [1] - 1653:14
**concise** [1] - 1670:23
**conclude** [6] - 1614:19, 1625:12, 1641:4, 1643:20, 1646:8, 1673:23

concluded [7] - 1646:24, 1668:19, 1670:11, 1671:1, 1671:8, 1671:22, 1672:11
conclusion [8] - 1627:13, 1640:25, 1644:24, 1645:20, 1646:2, 1647:3, 1676:19, 1678:12
condition [9] - 1628:11, 1628:16, 1631:16, 1643:6, 1645:12, 1647:12, 1656:17, 1685:6, 1700:10
conditions [2] - 1620:17, 1637:18
conduct [1] - 1627:16
confidence [1] - 1653:23
confirm [1] - 1693:9
Congress [2] - 1629:22, 1629:25
consequence [1] - 1682:5
conservative [3] - 1627:6, 1627:8, 1655:16
conservator [2] - 1671:8, 1677:23
consider [2] - 1626:13, 1658:15
considered [1] - 1628:9
consistent [3] - 1670:22, 1685:4, 1693:15
constant [1] - 1643:10
constitutes [1] - 1702:4
Constitution [2] - 1612:13, 1702:12
consultation [4] - 1672:7, 1672:18, 1673:12, 1677:5
consulted [2] - 1673:7, 1675:9
content [5] - 1673:21, 1673:22, 1678:8, 1691:20, 1700:22
contents [3] - 1690:4, 1695:25, 1696:1
context [6] - 1615:13, 1636:20, 1648:10, 1679:24, 1683:25, 1696:5
continue [3] - 1619:7, 1699:12, 1700:8
continued [4] -

1648:12, 1680:18, 1689:6, 1697:16
CONTINUED [2] - 1611:24, 1612:1
Continued [1] - 1614:9
contract [36] - 1614:16, 1615:16, 1619:22, 1633:6, 1633:21, 1633:23, 1633:24, 1634:4, 1638:1, 1638:7, 1640:3, 1640:10, 1643:25, 1646:18, 1659:8, 1665:11, 1668:15, 1672:1, 1673:18, 1673:21, 1673:23, 1675:16, 1675:17, 1675:20, 1675:22, 1675:25, 1676:4, 1676:17, 1677:4, 1677:7, 1678:9, 1690:5, 1691:19, 1700:3, 1700:20, 1700:23
contracts [16] - 1618:20, 1621:5, 1622:1, 1622:10, 1623:21, 1631:6, 1633:19, 1633:20, 1634:6, 1636:3, 1636:14, 1637:22, 1638:2, 1638:5, 1638:14, 1638:17
COOPER [1] - 1611:16
copy [1] - 1669:21
Corporation [1] - 1647:7
correct [50] - 1614:12, 1614:21, 1615:2, 1615:3, 1621:25, 1623:2, 1623:4, 1623:5, 1623:7, 1629:17, 1633:9, 1633:10, 1634:12, 1634:13, 1634:15, 1639:6, 1641:2, 1641:19, 1642:19, 1643:3, 1644:18, 1644:22, 1644:23, 1647:18, 1650:7, 1656:1, 1656:14, 1656:15, 1658:17, 1660:19, 1661:1, 1661:10, 1662:18, 1664:4, 1664:11, 1667:5, 1668:19, 1669:18, 1671:9, 1672:8, 1677:13, 1683:21, 1683:24, 1689:4, 1693:7,

1693:22, 1694:22, 1695:1, 1696:2, 1698:6
correctly [2] - 1670:18, 1680:22
correlated [2] - 1635:2, 1682:11
corresponds [1] - 1649:21
cost [33] - 1615:9, 1615:11, 1615:12, 1616:21, 1616:22, 1617:8, 1617:9, 1617:12, 1617:14, 1617:20, 1617:21, 1617:24, 1626:6, 1641:6, 1641:8, 1643:23, 1645:22, 1646:19, 1659:6, 1664:24, 1665:11, 1665:15, 1667:11, 1667:16, 1668:10, 1668:11, 1669:10, 1676:19, 1681:23, 1682:10, 1686:15, 1688:5, 1689:20
costly [1] - 1633:1
costs [3] - 1616:4, 1616:14, 1616:15
counsel [1] - 1614:5
country [2] - 1675:1, 1675:13
couple [8] - 1640:2, 1641:21, 1659:25, 1660:5, 1674:1, 1679:22, 1688:16, 1690:6
course [4] - 1615:18, 1619:19, 1625:2, 1683:8
court [1] - 1658:17
COURT [14] - 1611:1, 1614:2, 1621:14, 1659:17, 1659:19, 1659:21, 1660:2, 1687:11, 1692:17, 1698:21, 1698:25, 1701:4, 1701:9, 1702:1
Court [4] - 1612:12, 1612:12, 1701:9, 1702:11
Courthouse [2] - 1612:13, 1702:11
courtroom [1] - 1701:8
covenants [1] - 1638:13
cover [2] - 1638:16, 1696:9

covers [2] - 1623:13, 1630:20
CPP [6] - 1630:3, 1630:13, 1631:6, 1631:24, 1632:20, 1633:7
credit [7] - 1633:21, 1634:13, 1636:2, 1638:12, 1639:9, 1640:2, 1652:9
crisis [21] - 1615:2, 1618:2, 1620:15, 1620:17, 1623:10, 1623:13, 1629:1, 1629:21, 1630:16, 1630:21, 1630:22, 1633:12, 1633:14, 1634:25, 1637:6, 1637:16, 1638:24, 1651:6, 1655:1, 1655:5
cross [1] - 1659:21
CROSS [1] - 1660:8
CROSS-EXAMINATION [1] - 1660:8
CRR [3] - 1612:12, 1702:3, 1702:10
cumulative [10] - 1630:11, 1630:13, 1641:23, 1642:1, 1642:5, 1642:12, 1642:21, 1643:12, 1643:14

# D

D.C [4] - 1611:4, 1611:17, 1611:23, 1612:10
data [8] - 1615:11, 1619:3, 1620:20, 1620:22, 1621:5, 1622:5, 1626:22, 1651:25
date [7] - 1642:8, 1645:1, 1645:18, 1655:10, 1661:22, 1696:8
Dated [1] - 1702:8
DAVID [1] - 1612:7
DAVIS [1] - 1611:21
DC [2] - 1612:14, 1702:13
deal [3] - 1660:20, 1661:4, 1665:18, 1672:5
debt [3] - 1633:20, 1637:22, 1638:2
decades [1] - 1658:24

December [8] - 1661:12, 1661:21, 1661:23, 1666:19, 1679:24, 1687:14, 1696:11
decide [1] - 1616:11
decided [1] - 1695:7
decline [1] - 1636:4
declined [1] - 1638:12
declines [1] - 1635:24
deems [1] - 1628:13
default [6] - 1633:21, 1633:25, 1634:13, 1636:2, 1637:25, 1638:9
defaults [1] - 1634:2
Defendant [1] - 1612:6
Defendant's [4] - 1679:16, 1688:18, 1692:10, 1694:12
Defendants [1] - 1611:8
defendants [1] - 1660:11
deferred [1] - 1629:10
define [1] - 1651:8
demand [1] - 1654:13
DeMarco [3] - 1658:16, 1659:1, 1679:25
DeMarco's [1] - 1657:11
Department [14] - 1660:17, 1661:17, 1662:2, 1662:25, 1667:21, 1675:11, 1685:11, 1685:23, 1687:2, 1687:3, 1687:16, 1687:17, 1688:15, 1688:25
department [1] - 1679:25
department's [1] - 1692:25
depended [2] - 1634:7, 1634:10
depleted [1] - 1652:12
deposed [1] - 1669:13
deposit [15] - 1647:2, 1647:8, 1647:21, 1648:14, 1648:17, 1649:20, 1650:1, 1652:13, 1654:5, 1654:10, 1654:14, 1654:20, 1654:24, 1663:4, 1663:8
Deposit [1] - 1647:6
deposition [3] - 1660:5, 1669:20, 1669:25

**depositors** [4] - 1647:17, 1648:24, 1650:21, 1653:13
**deposits** [12] - 1647:10, 1647:12, 1648:5, 1649:8, 1649:13, 1649:15, 1649:16, 1650:14, 1651:6, 1651:17, 1651:19, 1652:1
**describe** [5] - 1629:20, 1633:11, 1636:19, 1666:5, 1674:8
**described** [1] - 1674:12
**despite** [1] - 1637:20
**determination** [1] - 1686:20
**determine** [14] - 1615:5, 1617:3, 1619:6, 1668:24, 1682:3, 1686:4, 1686:19, 1689:20, 1690:19, 1691:22, 1694:7, 1697:20, 1698:4, 1700:2
**determined** [3] - 1614:17, 1646:11, 1686:9
**determining** [1] - 1677:3
**Dharan's** [1] - 1629:11
**difference** [1] - 1653:8
**differences** [1] - 1653:10
**different** [12] - 1618:22, 1622:22, 1625:20, 1634:21, 1638:21, 1640:1, 1640:7, 1642:3, 1649:20, 1656:5, 1671:18, 1698:15
**differentiating** [1] - 1644:3
**dimension** [1] - 1642:4
**DIRECT** [1] - 1614:9
**direct** [4] - 1631:22, 1665:2, 1666:8, 1671:16
**direction** [2] - 1628:24, 1628:25
**director** [2] - 1658:16, 1675:14, 1677:23, 1680:1
**disagree** [1] - 1658:25
**discussed** [1] - 1666:8
**distinguish** [1] - 1644:13
**DISTRICT** [3] - 1611:1,

1611:1, 1611:13
**diversified** [1] - 1634:16
**divided** [1] - 1651:16
**dividend** [45] - 1615:19, 1617:14, 1617:25, 1619:18, 1624:8, 1631:9, 1632:4, 1641:18, 1641:24, 1642:6, 1642:9, 1642:10, 1642:13, 1642:15, 1643:1, 1643:5, 1643:6, 1643:7, 1643:12, 1644:15, 1645:24, 1656:4, 1656:16, 1657:10, 1658:9, 1658:13, 1667:22, 1681:4, 1682:20, 1683:2, 1683:5, 1683:8, 1683:13, 1684:16, 1684:22, 1685:2, 1685:13, 1687:24, 1689:17, 1693:12, 1698:8, 1698:10, 1699:3, 1699:10
**dividends** [17] - 1617:17, 1617:18, 1630:15, 1631:20, 1668:1, 1668:3, 1668:5, 1683:7, 1683:17, 1684:24, 1685:16, 1685:17, 1685:23, 1687:5, 1687:17, 1696:21, 1698:16
**document** [3] - 1694:17, 1695:16, 1700:13
**documentary** [1] - 1679:1
**documents** [7] - 1668:21, 1668:22, 1669:5, 1686:22, 1691:9, 1695:7, 1695:14
**Dodd** [1] - 1651:7
**Dodd-Frank** [1] - 1651:7
**dollar** [3] - 1649:9, 1656:2, 1682:17
**dollars** [19] - 1615:18, 1622:17, 1624:21, 1626:18, 1632:8, 1649:12, 1663:1, 1663:15, 1664:22, 1664:23, 1665:7, 1665:8, 1675:12, 1675:15, 1678:4,

1681:13, 1681:22, 1689:15
**domestic** [1] - 1651:5
**done** [18] - 1621:11, 1638:22, 1646:15, 1668:23, 1670:15, 1671:5, 1683:8, 1686:21, 1689:21, 1691:13, 1691:24, 1694:6, 1694:10, 1699:20, 1699:21, 1700:1, 1700:6, 1700:15
**dotted** [1] - 1616:15
**double** [1] - 1661:4
**doubled** [1] - 1666:11
**down** [12] - 1615:20, 1622:14, 1632:4, 1635:4, 1640:23, 1649:4, 1650:23, 1655:15, 1656:7, 1656:11, 1685:14, 1697:1
**Dr** [1] - 1629:11
**draw** [3] - 1650:22, 1683:4, 1683:10
**drawing** [1] - 1685:21
**drawn** [7] - 1615:20, 1632:4, 1655:15, 1656:4, 1656:7, 1656:11, 1685:14
**draws** [4] - 1683:2, 1683:13, 1683:16, 1684:5
**DTAs** [1] - 1645:15
**due** [3] - 1680:17, 1689:6, 1697:16
**during** [17] - 1615:1, 1620:15, 1620:17, 1629:21, 1630:16, 1630:21, 1630:22, 1633:12, 1638:19, 1650:3, 1651:14, 1654:25, 1655:5, 1662:10, 1686:4, 1697:20
**DX** [2] - 1688:18, 1692:10
**DX299** [1] - 1688:22
**DX329** [1] - 1691:5
**DX344** [1] - 1691:5
**DX365** [1] - 1691:5
**DX418** [1] - 1691:5
**DX469** [1] - 1691:5
**DX574** [2] - 1692:15, 1692:21

## E

**early** [1] - 1642:24

**earmarked** [1] - 1644:10
**earned** [1] - 1685:1
**earnings** [12] - 1682:22, 1683:15, 1683:17, 1684:22, 1684:23, 1685:13, 1685:15, 1685:17, 1687:23, 1688:7, 1690:22
**easiest** [1] - 1656:23
**easily** [1] - 1655:18
**economic** [5] - 1673:20, 1673:22, 1678:8, 1691:20, 1700:22
**economist** [1] - 1672:2
**economy** [2] - 1649:10, 1649:25
**effect** [1] - 1693:13
**effectively** [2] - 1635:12, 1640:18
**eight** [2] - 1640:23, 1661:2
**either** [2] - 1621:17, 1645:1
**element** [5] - 1617:8, 1617:9, 1617:11, 1617:14, 1617:24
**elements** [3] - 1616:21, 1617:20, 1617:21
**eliminated** [2] - 1662:17, 1666:19
**eliminating** [1] - 1662:20
**empirical** [1] - 1621:4
**end** [11] - 1614:13, 1627:11, 1627:23, 1651:11, 1652:3, 1655:19, 1661:14, 1661:23, 1682:11, 1682:21, 1684:7
**ended** [1] - 1696:11
**engaging** [1] - 1636:6
**enormous** [2] - 1648:3, 1676:24
**enormously** [1] - 1648:11
**ensure** [2] - 1653:23, 1696:19
**ensuring** [1] - 1690:21
**Enterprise** [1] - 1680:10
**enterprises** [2] - 1660:21, 1683:3
**Enterprises** [4] - 1682:22, 1684:7, 1690:22, 1693:10

**Enterprises'** [1] - 1682:20
**entire** [3] - 1629:23, 1659:11
**entities** [1] - 1658:10
**entitled** [1] - 1688:11
**entity** [5] - 1615:10, 1630:23, 1645:9, 1654:25, 1655:4
**equity** [9] - 1635:24, 1636:4, 1636:21, 1636:22, 1637:1, 1637:9, 1637:20, 1638:19, 1651:9
**especially** [2] - 1645:14, 1659:1
**ESQ** [12] - 1611:16, 1611:18, 1611:21, 1611:21, 1611:22, 1612:2, 1612:2, 1612:6, 1612:7, 1612:7, 1612:8, 1612:8
**essentially** [18] - 1615:23, 1625:5, 1630:1, 1630:3, 1630:24, 1631:1, 1631:14, 1631:17, 1633:25, 1634:3, 1635:3, 1636:7, 1636:20, 1639:14, 1639:19, 1653:12, 1653:19, 1657:8
**estimate** [2] - 1662:8, 1662:12
**et** [4] - 1611:3, 1611:7, 1684:16, 1689:17
**evaluate** [6] - 1686:3, 1686:8, 1686:10, 1690:18, 1697:19, 1698:1
**eventually** [1] - 1639:15
**evidence** [6] - 1679:16, 1679:16, 1691:5, 1692:9, 1692:16, 1694:15
**exactly** [5] - 1617:7, 1620:8, 1628:14, 1665:4, 1691:24
**examination** [1] - 1621:22
**EXAMINATION** [2] - 1614:9, 1660:8
**examine** [1] - 1659:22
**examined** [1] - 1622:4
**example** [5] - 1616:3, 1616:8, 1618:24, 1619:25, 1623:18
**exceed** [1] - 1683:17

exceeds [1] - 1619:14
excerpt [1] - 1695:24
excess [1] - 1658:12
exchange [2] - 1631:7,
1647:14
Exchange [1] - 1696:7
exchanged [1] -
1642:25
exercise [1] - 1627:24
exercises [1] -
1617:15
exhibit [1] - 1659:25
Exhibit [4] - 1679:16,
1688:19, 1692:11,
1694:12
exist [1] - 1665:15
existed [1] - 1620:17
exit [4] - 1631:19,
1632:16, 1632:19,
1632:25
exited [2] - 1631:11,
1631:14
exiting [1] - 1633:3
exits [1] - 1701:8
expect [2] - 1696:4,
1696:18
expectation [1] -
1687:22
expected [1] - 1696:22
expeditiously [1] -
1637:18
expensive [3] -
1633:6, 1638:1,
1683:25
experience [7] -
1621:10, 1621:21,
1638:9, 1669:7,
1673:19, 1678:10,
1678:11
expert [2] - 1695:15,
1695:17
expertise [3] -
1646:14, 1658:24,
1669:8
expire [1] - 1627:23
explain [3] - 1618:11,
1627:7, 1644:3
explained [2] -
1617:21, 1632:7
explanation [2] -
1619:8, 1639:3
exposed [3] - 1635:8,
1636:15, 1639:18
exposure [1] -
1634:25
express [2] - 1654:1,
1677:1
expressed [2] -
1655:21, 1684:20
extend [3] - 1650:19,

1651:1, 1656:9
extended [1] - 1639:13
extending [1] - 1630:4
extensively [1] -
1669:9
extrapolate [1] -
1627:9
extrapolated [1] -
1627:2
extremely [1] - 1635:8

# F

face [1] - 1617:8
faced [1] - 1617:7
facility [1] - 1639:9
fact [11] - 1614:16,
1614:18, 1673:3,
1677:4, 1684:21,
1685:2, 1685:9,
1691:18, 1697:24,
1700:18
factor [2] - 1637:23,
1645:21
factors [1] - 1629:13
fail [3] - 1653:22,
1698:10, 1698:12
failures [1] - 1652:12
fair [4] - 1620:6,
1635:10, 1638:22,
1653:2
FAIRHOLME [1] -
1611:3
faith [2] - 1648:19,
1700:4
fall [6] - 1635:21,
1635:22, 1635:23,
1636:2, 1656:19,
1685:15
falling [3] - 1619:11,
1630:7, 1645:25
falls [1] - 1656:21
familiar [3] - 1616:9,
1636:16, 1674:3
fancy [3] - 1633:22,
1636:7, 1680:13
FANNIE [1] - 1611:9
Fannie [27] - 1616:7,
1660:18, 1660:22,
1661:17, 1661:24,
1664:13, 1664:20,
1666:21, 1678:24,
1685:10, 1685:22,
1686:23, 1687:1,
1687:14, 1693:23,
1694:4, 1694:20,
1695:8, 1696:5,
1696:14, 1696:18,
1697:4, 1698:16,
1698:17, 1699:4,

1699:5, 1701:2
far [4] - 1633:6,
1645:23, 1673:6,
1700:25
fast [1] - 1637:25
FDIC [30] - 1647:2,
1647:5, 1647:6,
1647:10, 1647:14,
1647:15, 1647:16,
1647:19, 1648:3,
1648:14, 1648:17,
1648:22, 1648:24,
1649:19, 1650:18,
1652:7, 1652:9,
1652:23, 1652:24,
1653:2, 1653:17,
1653:18, 1654:2,
1654:8, 1654:10,
1654:12, 1655:9,
1656:13, 1658:5
FDIC's [4] - 1650:1,
1650:15, 1656:17,
1656:21
feature [1] - 1642:12
fed [3] - 1672:19,
1673:12, 1674:8
Fed [20] - 1620:1,
1639:15, 1639:25,
1640:20, 1640:21,
1641:8, 1641:21,
1644:9, 1674:2,
1674:5, 1674:11,
1674:25, 1675:1,
1675:6, 1675:12,
1676:7, 1677:5,
1677:24, 1678:15,
1700:5
fed's [1] - 1639:23
FEDERAL [1] - 1611:6
federal [11] - 1619:1,
1635:5, 1647:7,
1648:2, 1648:7,
1654:1, 1654:23,
1672:7, 1672:10,
1672:13, 1673:7
Federal [5] - 1612:6,
1643:18, 1647:6,
1675:21, 1675:24
feds [1] - 1639:9
Fee [10] - 1660:12,
1660:16, 1664:13,
1664:19, 1665:5,
1672:6, 1675:10,
1676:15, 1681:6,
1697:7
fee [49] - 1615:6,
1615:18, 1617:9,
1622:16, 1622:18,
1622:24, 1623:1,
1624:19, 1624:21,

1624:25, 1625:15,
1626:3, 1626:25,
1631:12, 1632:6,
1632:8, 1641:5,
1641:14, 1644:21,
1646:11, 1655:8,
1655:11, 1656:3,
1656:16, 1657:18,
1658:4, 1658:15,
1658:20, 1664:13,
1664:19, 1664:22,
1665:6, 1666:23,
1668:4, 1675:9,
1675:15, 1676:6,
1676:7, 1677:13,
1678:2, 1678:3,
1697:5, 1697:15,
1697:18, 1697:21,
1697:25, 1698:4,
1698:12
fees [4] - 1626:24,
1627:11, 1699:11,
1699:14
fell [1] - 1636:10
few [6] - 1639:2,
1661:11, 1666:18,
1679:20, 1694:25
FHFA [16] - 1668:22,
1671:8, 1671:10,
1671:21, 1671:24,
1672:18, 1673:11,
1675:14, 1676:22,
1678:23, 1679:9,
1680:1, 1688:25,
1696:5, 1696:18,
1697:24
FHFA's [1] - 1677:23
fifth [1] - 1677:18
figure [2] - 1627:20,
1678:20
figuring [1] - 1663:14
filed [1] - 1696:6
filing [2] - 1695:9,
1696:8
filings [2] - 1694:21,
1694:24
final [2] - 1615:24,
1652:6
finally [1] - 1629:9
Finance [2] - 1612:6,
1622:4
FINANCE [1] - 1611:6
finance [2] - 1627:21,
1682:16
financed [1] - 1636:25
financial [38] - 1615:1,
1618:2, 1618:20,
1620:15, 1623:10,
1623:13, 1628:11,
1628:16, 1629:21,

1629:23, 1630:1,
1631:16, 1633:12,
1633:14, 1634:20,
1635:18, 1636:23,
1637:19, 1638:24,
1639:20, 1643:6,
1645:8, 1645:12,
1647:11, 1648:15,
1648:17, 1651:6,
1653:15, 1654:5,
1655:1, 1655:5,
1685:6, 1688:3,
1690:9, 1699:12,
1700:8, 1700:10
financially [6] -
1628:13, 1663:8,
1682:2, 1682:4,
1682:5, 1690:8
fine [2] - 1643:6,
1694:19
finished [1] - 1698:22
First [3] - 1624:22,
1666:10, 1666:13
first [28] - 1621:1,
1622:6, 1627:7,
1631:5, 1631:9,
1639:2, 1639:23,
1639:25, 1646:6,
1647:4, 1648:2,
1654:7, 1654:8,
1657:6, 1657:9,
1661:3, 1663:11,
1674:16, 1678:22,
1678:25, 1680:2,
1680:9, 1693:25,
1694:3, 1694:6,
1696:3, 1696:17,
1697:16
first-most [1] -
1674:16
fiscal [1] - 1696:11
five [2] - 1631:9,
1691:3
fixed [1] - 1616:24
flexibility [3] -
1632:20, 1632:24,
1633:5
FLEXNER [1] -
1611:22
flip [1] - 1688:21
focus [2] - 1646:20,
1664:25
focused [2] - 1634:22,
1657:16
focusing [2] -
1617:23, 1659:9
fold [1] - 1628:7
FOR [1] - 1611:1
forecast [3] - 1682:21,
1682:22, 1683:14,

1684:7, 1685:3,
1687:21
forecasts [1] -
1628:23
foregoing [1] - 1702:4
form [6] - 1631:1,
1638:5, 1639:17,
1687:7, 1687:9
Form [3] - 1695:8,
1696:6, 1696:12
forms [3] - 1665:12,
1665:14, 1667:18
formula [4] - 1614:15,
1663:13, 1664:9,
1665:22
forward [1] - 1687:21
forward-looking [1] -
1687:21
foundation [1] -
1698:24
four [4] - 1637:23,
1641:12, 1642:19,
1644:6
fragile [1] - 1628:10
fragility [3] - 1680:18,
1689:7, 1697:16
Frank [1] - 1651:7
Freddie [24] - 1616:7,
1660:18, 1660:23,
1661:18, 1661:24,
1664:13, 1664:20,
1666:21, 1677:23,
1678:24, 1685:10,
1685:22, 1686:24,
1687:1, 1687:14,
1693:23, 1694:4,
1694:20, 1698:16,
1698:18, 1699:4,
1699:5, 1701:3
friend [1] - 1659:14
front [2] - 1616:17,
1677:19
fulfill [2] - 1680:20,
1689:8
full [8] - 1614:16,
1626:8, 1655:2,
1655:6, 1691:23,
1696:3, 1696:17,
1702:5
fully [14] - 1626:6,
1641:15, 1641:17,
1643:24, 1659:7,
1667:17, 1667:19,
1667:21, 1668:13,
1681:5, 1684:15,
1686:9, 1691:19,
1691:22
fund [5] - 1647:21,
1652:12, 1652:14,
1653:16, 1696:23

funding [6] - 1649:15,
1650:19, 1652:11,
1652:25, 1653:21,
1656:10
funds [1] - 1696:19
FUNDS [1] - 1611:3
future [7] - 1642:8,
1642:10, 1642:15,
1643:7, 1645:14,
1645:17, 1690:21

**G**

General [1] - 1677:19
general [5] - 1616:3,
1620:12, 1620:14,
1626:22, 1628:23
generally [1] - 1627:24
generate [5] -
1681:14, 1681:21,
1690:1, 1692:4,
1697:18
generating [3] -
1680:20, 1681:10,
1689:9
gentlemen [1] -
1614:4
given [12] - 1624:14,
1625:5, 1632:3,
1633:7, 1646:5,
1646:6, 1646:14,
1650:18, 1650:25,
1665:10, 1667:11,
1699:19
GLUCK [1] - 1612:2
goal [4] - 1614:16,
1646:6, 1648:15,
1653:12
government [9] -
1629:16, 1629:22,
1638:18, 1648:2,
1648:7, 1648:11,
1653:3, 1653:15,
1654:1
GROSSMANN [1] -
1612:3
group [3] - 1618:13,
1618:14, 1649:23
GSE [8] - 1615:14,
1615:21, 1631:25,
1643:11, 1643:16,
1656:12, 1659:11,
1682:8
GSE's [2] - 1637:3,
1643:12
GSEs [63] - 1615:12,
1615:17, 1617:6,
1617:7, 1618:18,
1619:17, 1620:4,
1622:17, 1624:2,

1624:3, 1624:15,
1624:20, 1626:12,
1626:20, 1627:12,
1628:9, 1628:13,
1629:7, 1629:12,
1630:10, 1630:21,
1632:1, 1632:3,
1632:16, 1632:20,
1633:6, 1634:16,
1634:22, 1635:9,
1637:8, 1639:4,
1639:13, 1640:16,
1641:5, 1641:13,
1644:13, 1644:20,
1645:11, 1648:16,
1649:3, 1650:22,
1651:19, 1653:3,
1653:20, 1653:22,
1655:10, 1655:23,
1656:1, 1656:6,
1657:5, 1658:6,
1658:7, 1658:12,
1658:21, 1663:7,
1668:5, 1682:1,
1682:4, 1682:5,
1685:6, 1687:20,
1688:2, 1690:8
guarantee [1] - 1654:1
guess [1] - 1620:11
guidance [10] -
1621:7, 1659:3,
1668:25, 1672:2,
1672:23, 1676:14,
1676:16, 1677:2,
1678:9, 1679:2
guided [1] - 1700:20
guidelines [2] -
1665:23, 1666:8
guides [2] - 1667:14,
1668:12
guy [2] - 1675:2,
1682:16

**H**

half [4] - 1624:24,
1640:23, 1646:25,
1665:1
HAMISH [1] - 1611:21
Hampshire [1] -
1611:17
head [1] - 1677:20
heading [1] - 1628:25
health [1] - 1637:19
heard [3] - 1658:19,
1674:10, 1683:1
heavily [4] - 1634:10,
1635:11, 1635:13,
1636:15
HELD [1] - 1611:13
held [2] - 1634:8,

1643:10
help [1] - 1676:6
hereby [1] - 1702:3
high [1] - 1656:20
higher [12] - 1618:3,
1619:24, 1628:18,
1628:19, 1637:12,
1637:25, 1645:8,
1645:9, 1654:17,
1658:10, 1682:7
highly [1] - 1635:2
HOFFMAN [1] -
1612:8
holders [1] - 1642:6
holding [1] - 1635:20
holistically [3] -
1617:23, 1682:13,
1690:4
home [1] - 1617:21
Honor [7] - 1614:6,
1621:12, 1659:16,
1660:1, 1687:8,
1692:18, 1692:24
HONORABLE [1] -
1611:13
hoping [1] - 1660:6
house [2] - 1616:10,
1630:7
housing [9] - 1612:6,
1616:8, 1628:22,
1629:2, 1634:7,
1634:10, 1635:1,
1635:3, 1635:7,
1635:12, 1635:21,
1636:2, 1636:10,
1636:12, 1636:15,
1639:18, 1645:16,
1653:24, 1687:22
HOUSING [1] - 1611:6
huge [4] - 1634:5,
1635:1, 1648:6,
1654:11
HUME [1] - 1611:21
hundred [1] - 1657:25
hundreds [7] -
1649:12, 1662:1,
1663:15, 1664:21,
1665:7, 1675:11

**I**

IAN [1] - 1612:8
IBM [2] - 1634:1,
1634:2
idea [1] - 1653:15
illustration [1] -
1625:21
imagine [1] - 1654:4
impact [2] - 1669:2,
1700:9

implicit [1] - 1653:25
implied [2] - 1640:15,
1655:24
implies [1] - 1682:2
implode [1] - 1629:23
important [2] -
1653:11, 1674:5,
1675:1, 1675:4,
1677:16, 1677:17,
1682:8, 1682:11,
1688:8
impose [3] - 1644:1,
1690:8, 1690:9
imposed [1] - 1693:20
imposing [2] - 1682:6,
1684:24
imposition [5] -
1680:19, 1684:9,
1684:14, 1689:8,
1697:17
impossible [1] -
1690:12
improve [1] - 1687:23
improved [1] -
1631:17
improvement [2] -
1629:4, 1629:5
IN [2] - 1611:1, 1611:9
inappropriate [1] -
1684:15
INC [1] - 1611:3
incapable [1] -
1650:20
including [1] -
1662:14
income [2] - 1684:6,
1696:24
increase [3] - 1690:7,
1696:23, 1698:9
increased [14] -
1620:18, 1624:23,
1624:24, 1637:23,
1638:20, 1681:10,
1681:14, 1681:21,
1683:9, 1689:9,
1690:1, 1690:3,
1692:4, 1697:18
increases [3] -
1656:18, 1682:17,
1682:18
index [1] - 1619:5
indexed [2] - 1618:20,
1622:10
indicated [19] -
1615:7, 1622:9,
1623:22, 1643:18,
1656:19, 1665:1,
1665:21, 1668:11,
1668:14, 1668:16,
1670:16, 1671:2,

1671:10, 1671:25,
1690:6, 1691:12,
1694:10, 1697:19,
1699:23
**indicates** [1] - 1676:17
**indication** [1] -
1623:22
**indicators** [1] -
1667:15
**individuals** [1] -
1648:19
**industry** [6] - 1645:7,
1646:15, 1669:8,
1673:19, 1678:11,
1700:23
**infer** [2] - 1640:13,
1673:25
**inference** [3] -
1624:10, 1624:13,
1700:24
**informed** [1] - 1652:8
**infusing** [1] - 1630:4
**initial** [6] - 1624:21,
1639:13, 1639:25,
1640:3, 1641:14,
1681:5
**insist** [1] - 1659:9
**insofar** [1] - 1686:20
**instance** [1] - 1644:2
**instead** [3] - 1646:19,
1663:17, 1683:22
**instinct** [5] - 1678:22,
1678:25, 1693:25,
1694:3, 1694:6
**institution** [2] -
1636:23, 1637:20
**institutions** [9] -
1630:14, 1630:15,
1630:25, 1649:19,
1649:22, 1649:25,
1650:1, 1651:12,
1651:14
**instruments** [2] -
1630:12, 1652:17
**insurance** [33] -
1616:20, 1633:13,
1633:15, 1633:16,
1633:17, 1633:22,
1634:20, 1636:5,
1638:1, 1638:2,
1647:2, 1647:8,
1647:10, 1647:13,
1647:21, 1648:14,
1648:18, 1649:2,
1649:20, 1650:2,
1650:16, 1651:15,
1652:12, 1652:13,
1652:24, 1653:16,
1654:5, 1654:12,
1654:24, 1656:13,

1657:18, 1663:4,
1663:9
**Insurance** [1] - 1647:6
**insure** [2] - 1634:12,
1647:17
**insured** [13] - 1636:1,
1647:10, 1648:5,
1649:8, 1649:16,
1651:6, 1651:17,
1651:18, 1651:19,
1652:1, 1654:9,
1654:10, 1654:20
**insuring** [4] - 1633:25,
1635:12, 1647:22,
1650:15
**intended** [5] -
1680:20, 1681:10,
1689:9, 1689:25,
1692:3
**Interbank** [1] -
1618:12
**interbank** [1] -
1618:16
**interest** [18] - 1616:13,
1616:17, 1616:23,
1618:1, 1618:4,
1618:6, 1619:4,
1622:13, 1622:23,
1623:6, 1623:15,
1639:20, 1645:22,
1645:23, 1645:24,
1654:13, 1654:21,
1654:23
**interested** [1] -
1629:22
**interesting** [1] -
1626:21
**internal** [3] - 1614:18,
1668:21, 1669:4
**interpretation** [3] -
1646:17, 1668:15,
1692:6
**interpretations** [1] -
1653:7
**interrupt** [1] - 1618:10
**interrupting** [1] -
1619:7
**intuition** [1] - 1658:19
**invest** [1] - 1661:17
**invested** [2] - 1635:11,
1635:13
**investment** [1] -
1690:23
**investments** [1] -
1696:22
**investors** [2] - 1643:9,
1653:13
**involved** [3] - 1621:23,
1675:22, 1675:24
**involving** [1] - 1700:5

**isolation** [2] - 1665:14,
1682:15
**issue** [2] - 1648:8,
1673:8
**issued** [2] - 1623:23,
1634:1
**itself** [1] - 1666:11

**J**

**January** [10] - 1618:6,
1618:7, 1619:9,
1619:12, 1663:11,
1663:22, 1664:3,
1664:8, 1693:11,
1701:5
**JONATHAN** [1] -
1612:6
**JONES** [16] - 1612:8,
1659:23, 1660:3,
1660:9, 1669:19,
1670:6, 1679:15,
1680:6, 1688:18,
1692:10, 1692:16,
1694:12, 1694:15,
1694:18, 1696:16,
1697:2
**Jones** [2] - 1659:14,
1659:21, 1660:10
**Jones)**.....................
..............**1660** [1] -
1613:5
**journal** [1] - 1622:3
**JPMorgan** [1] -
1649:11
**JUDGE** [1] - 1611:13
**June** [1] - 1650:3
**jury** [8] - 1614:4,
1659:23, 1665:3,
1673:11, 1673:14,
1676:18, 1683:1,
1701:8
**JURY** [1] - 1611:12

**K**

**KAPLAN** [13] -
1611:22, 1614:6,
1614:10, 1621:12,
1621:15, 1621:18,
1659:13, 1684:2,
1687:7, 1692:18,
1692:24, 1698:20,
1698:22
**Kaplan)**.....................
..............**1614** [1] -
1613:4
**KAYE** [1] - 1612:9
**keep** [3] - 1632:18,
1638:5, 1638:9,
1654:19, 1666:22,

1678:5
**keeps** [1] - 1619:11
**KENYA** [1] - 1611:21
**kept** [1] - 1645:25
**KESSLER** [1] -
1611:19
**Kevin** [1] - 1614:7
**kick** [2] - 1663:23,
1664:8
**kind** [4] - 1616:3,
1631:22, 1683:19,
1688:1
**kinds** [2] - 1663:3,
1690:13
**King** [1] - 1611:19
**KIRK** [1] - 1611:16
**knowledge** [7] -
1646:15, 1669:8,
1673:19, 1678:10,
1686:21, 1700:23
**KRAVETZ** [1] - 1612:2

**L**

**lack** [2] - 1614:15,
1633:5
**lacked** [1] - 1632:21
**ladies** [1] - 1614:4
**LAMBERTH** [1] -
1611:13
**land** [1] - 1678:3
**language** [4] -
1688:17, 1690:17,
1690:24, 1690:25
**large** [7] - 1618:13,
1618:15, 1634:9,
1639:8, 1639:14,
1648:11, 1649:22
**larger** [6] - 1626:23,
1627:2, 1627:10,
1682:22, 1683:14,
1683:15
**largest** [6] - 1622:11,
1626:15, 1630:13,
1633:13, 1649:23,
1649:24
**last** [7] - 1614:11,
1639:2, 1690:15,
1692:15, 1692:21,
1693:8, 1693:9
**late** [2] - 1623:12,
1637:8
**law** [1] - 1672:15
**lawyer** [1] - 1646:16
**lead** [1] - 1669:10
**leads** [1] - 1673:23
**leapt** [1] - 1629:1
**least** [1] - 1629:7
**leave** [1] - 1694:18
**led** [4] - 1614:18,

1676:19, 1678:12
**LEE** [1] - 1611:18
**left** [1] - 1614:11
**legal** [2] - 1646:17,
1668:14
**legally** [1] - 1646:12
**lender** [2] - 1616:11,
1617:3
**lending** [3] - 1618:16,
1635:15, 1636:6
**less** [6] - 1619:10,
1619:11, 1626:24,
1633:1, 1636:10,
1656:22
**letter** [7] - 1679:9,
1679:24, 1680:7,
1680:8, 1688:24,
1690:25, 1692:25
**letters** [9] - 1679:12,
1679:20, 1688:14,
1691:3, 1691:10,
1691:25, 1692:2,
1694:2, 1697:25
**level** [2] - 1620:13,
1645:22
**leverage** [6] - 1636:16,
1636:19, 1636:20,
1637:2, 1637:9,
1637:12
**liabilities** [3] - 1636:3,
1648:7, 1648:12
**liability** [1] - 1636:1
**LIBOR** [23] - 1618:7,
1618:11, 1618:12,
1618:21, 1618:22,
1619:2, 1619:4,
1619:10, 1619:17,
1620:1, 1620:2,
1620:10, 1622:10,
1622:15, 1622:23,
1623:16, 1623:19,
1624:8, 1624:10,
1640:5, 1640:6,
1640:14
**life** [3] - 1633:15,
1634:20, 1636:5
**light** [3] - 1643:21,
1658:23, 1668:7
**lights** [1] - 1666:22
**likely** [2] - 1626:25,
1696:23
**limit** [5] - 1661:16,
1661:18, 1662:17,
1662:21, 1666:20
**line** [5] - 1614:15,
1616:15, 1640:2,
1652:9, 1677:18
**linking** [1] - 1685:3
**liquidation** [5] -
1668:5, 1681:5,

1683:9, 1684:4, 1698:7
**liquidity** [1] - 1700:10
**Lisa** [1] - 1612:12
**LISA** [1] - 1702:3
**listed** [2] - 1691:9, 1695:17
**listing** [1] - 1678:5
**literally** [1] - 1653:6
**LITIGATIONS** [1] - 1611:10
**LITOWITZ** [1] - 1612:3
**LLP** [2] - 1611:22, 1612:3
**loan** [20] - 1614:24, 1619:2, 1619:4, 1620:22, 1620:25, 1621:2, 1621:3, 1621:5, 1621:24, 1622:1, 1622:4, 1622:14, 1623:21, 1624:6, 1624:16, 1624:17, 1625:3, 1625:13, 1626:11, 1630:19
**loans** [2] - 1622:13, 1629:10
**location** [1] - 1649:14
**London** [1] - 1618:12
**look** [71] - 1614:19, 1615:8, 1615:9, 1616:12, 1616:13, 1616:19, 1616:21, 1617:2, 1620:20, 1620:25, 1621:7, 1622:5, 1623:17, 1623:25, 1626:5, 1626:21, 1626:22, 1630:19, 1631:4, 1634:18, 1634:19, 1637:5, 1637:8, 1639:22, 1643:11, 1643:22, 1645:6, 1646:3, 1649:10, 1652:20, 1653:16, 1653:21, 1654:8, 1655:8, 1655:13, 1658:3, 1659:6, 1660:6, 1667:13, 1667:14, 1668:10, 1668:12, 1671:24, 1672:1, 1672:24, 1673:18, 1676:16, 1676:18, 1679:1, 1679:3, 1679:22, 1682:13, 1688:5, 1688:15, 1690:15, 1691:7, 1692:8, 1693:8, 1693:23, 1693:25, 1694:3,

1694:9, 1695:2, 1695:3, 1695:5, 1695:6, 1695:20, 1696:3, 1701:2
**looked** [21] - 1621:5, 1629:17, 1630:19, 1637:21, 1651:13, 1651:24, 1658:6, 1662:13, 1668:21, 1678:21, 1686:22, 1690:16, 1690:25, 1691:9, 1694:1, 1694:25, 1695:11, 1695:13, 1695:16, 1695:17
**looking** [8] - 1646:19, 1658:14, 1663:20, 1669:4, 1687:21, 1688:6, 1691:6, 1692:2
**looks** [1] - 1637:11
**loss** [1] - 1634:3
**loved** [1] - 1689:24
**lower** [10] - 1616:17, 1627:5, 1627:10, 1635:25, 1645:8, 1645:18, 1645:19, 1652:4, 1654:21, 1654:22
**lunch** [2] - 1701:5, 1701:11

# M

**Mac** [8] - 1661:18, 1677:23, 1685:10, 1685:22, 1686:24, 1687:1, 1687:14, 1701:3
**MAC** [1] - 1611:9
**Mac's** [1] - 1694:20
**Mae** [12] - 1661:18, 1677:23, 1685:10, 1685:22, 1686:23, 1687:1, 1687:14, 1694:20, 1696:6, 1696:14, 1696:18, 1697:4
**Mae's** [1] - 1695:8
**MAE/FREDDIE** [1] - 1611:9
**magnitude** [1] - 1668:16
**maintain** [1] - 1696:20
**malfunctioning** [1] - 1621:13
**mandatory** [1] - 1696:20
**March** [4] - 1642:22, 1669:25, 1688:25,

1697:13
**mark** [17] - 1620:7, 1620:9, 1620:11, 1620:14, 1620:16, 1620:18, 1620:21, 1620:23, 1623:17, 1624:8, 1624:13, 1624:16, 1627:1, 1640:13, 1640:15, 1640:16, 1640:17
**mark-up** [11] - 1620:7, 1620:9, 1620:14, 1620:16, 1624:8, 1624:13, 1624:16, 1640:13, 1640:15, 1640:16, 1640:17
**mark-ups** [5] - 1620:18, 1620:21, 1620:23, 1623:17, 1627:1
**market** [56] - 1614:20, 1614:24, 1615:5, 1615:9, 1615:11, 1616:8, 1618:16, 1618:20, 1619:5, 1619:21, 1619:23, 1621:6, 1621:7, 1624:17, 1626:8, 1628:22, 1628:24, 1629:2, 1634:5, 1634:11, 1635:1, 1635:3, 1635:7, 1635:8, 1636:15, 1637:18, 1637:24, 1638:20, 1639:19, 1641:16, 1645:16, 1645:23, 1653:21, 1653:24, 1654:16, 1657:14, 1658:11, 1667:14, 1667:15, 1668:11, 1669:9, 1672:3, 1672:22, 1672:24, 1673:20, 1676:17, 1677:3, 1680:18, 1687:22, 1687:25, 1688:2, 1689:7, 1691:23, 1697:17, 1700:4, 1700:24
**market-value** [2] - 1668:11, 1669:9
**market-value-based** [6] - 1672:3, 1672:22, 1673:20, 1676:17, 1677:3, 1687:25
**markets** [4] - 1628:22, 1634:21, 1648:17, 1663:7
**Massachusetts** [1] - 1612:9

**mathematical** [5] - 1663:13, 1684:21, 1685:2, 1685:9
**mathematically** [1] - 1681:15
**matter** [7] - 1620:15, 1625:18, 1647:11, 1662:21, 1673:3, 1691:18, 1699:25
**maturities** [1] - 1618:23
**maturity** [2] - 1652:17, 1652:20
**mean** [28] - 1615:13, 1616:4, 1618:10, 1620:16, 1624:2, 1625:14, 1627:8, 1627:23, 1634:18, 1635:17, 1638:20, 1639:7, 1640:21, 1646:11, 1648:3, 1653:5, 1654:3, 1654:7, 1654:13, 1670:14, 1676:23, 1677:1, 1683:16, 1685:18, 1686:12, 1695:7, 1695:13
**meaning** [5] - 1627:9, 1648:23, 1673:20, 1673:22, 1700:21
**meaningless** [1] - 1637:14
**means** [11] - 1617:13, 1617:17, 1628:11, 1628:17, 1631:16, 1637:24, 1642:5, 1662:20, 1662:21, 1693:19, 1695:20
**meant** [1] - 1619:19
**measures** [3] - 1672:22, 1673:20, 1676:17
**meet** [2] - 1648:24, 1650:23
**meeting** [4] - 1650:20, 1676:22, 1678:14, 1678:16
**MELTZER** [1] - 1611:19
**members** [1] - 1659:23
**memory** [1] - 1642:12
**mention** [4] - 1644:2, 1672:15, 1683:16, 1684:18
**mentioned** [1] - 1668:8
**message** [1] - 1653:19
**method** [1] - 1615:5
**might** [2] - 1630:19,

1677:10
**military** [1] - 1677:20
**million** [2] - 1626:16
**mind** [2] - 1668:20, 1673:24
**minds** [3] - 1671:3, 1671:24, 1673:16
**minimums** [1] - 1637:10
**minus** [2] - 1638:12, 1651:8
**minute** [1] - 1697:23
**minutes** [3] - 1639:2, 1690:6
**miss** [4] - 1642:6, 1642:8, 1642:9, 1642:13
**missed** [4] - 1642:11, 1642:16, 1643:5, 1643:9
**misspoke** [1] - 1657:25
**misstating** [2] - 1676:9, 1678:6
**mix** [1] - 1634:9
**modeled** [1] - 1690:11
**moment** [2] - 1620:12, 1692:18
**money** [26] - 1615:23, 1616:20, 1618:14, 1626:17, 1638:9, 1638:16, 1647:21, 1650:18, 1650:25, 1651:1, 1654:4, 1654:10, 1654:15, 1654:19, 1654:22, 1660:17, 1660:24, 1661:8, 1661:16, 1666:21, 1683:5, 1684:25, 1685:12, 1685:23, 1686:10
**month** [8] - 1618:7, 1619:10, 1619:17, 1640:5, 1640:6, 1640:14, 1693:22
**months** [8] - 1618:23, 1640:3, 1641:21, 1642:19, 1644:6, 1661:2, 1661:11, 1666:18
**Moreira** [2] - 1612:12, 1702:10
**MOREIRA** [1] - 1702:3
**morning** [5] - 1614:4, 1614:6, 1659:23, 1659:24, 1660:10
**MORNING** [1] - 1611:12
**mortgage** [16] - 1616:11, 1616:13,

1616:18, 1616:20, 1616:23, 1628:22, 1633:20, 1634:6, 1634:8, 1634:23, 1635:20, 1635:21, 1636:8, 1680:18, 1689:7, 1697:17
**mortgage-backed** [6] - 1633:20, 1634:6, 1634:8, 1634:23, 1635:20, 1635:21
**mortgages** [4] - 1616:9, 1617:22, 1634:23, 1635:12
**most** [23] - 1616:8, 1630:12, 1631:10, 1636:8, 1641:4, 1646:7, 1647:23, 1649:24, 1651:20, 1652:19, 1667:9, 1667:23, 1668:9, 1674:9, 1674:12, 1674:16, 1675:1, 1675:3, 1675:4, 1675:7, 1675:13, 1676:5, 1677:25
**mostly** [1] - 1638:5
**move** [4] - 1643:7, 1678:19, 1688:13, 1692:16
**MR** [27] - 1614:6, 1614:10, 1621:12, 1621:15, 1621:18, 1659:13, 1659:23, 1660:3, 1660:9, 1669:19, 1670:6, 1679:15, 1680:6, 1684:2, 1687:7, 1688:18, 1692:10, 1692:16, 1692:18, 1692:24, 1694:12, 1694:15, 1694:18, 1696:16, 1697:2, 1698:20, 1698:22
**multi** [1] - 1649:9
**multi-trillion-dollar** [1] - 1649:9
**multiply** [2] - 1655:22, 1657:2
**must** [1] - 1696:21

**N**

**name** [2] - 1633:22, 1636:7
**named** [1] - 1675:2
**narrowly** [1] - 1659:9
**necessary** [3] - 1667:8, 1667:23, 1668:8
**necessitate** [1] -

1684:4
**necessitating** [1] - 1683:10
**need** [11] - 1626:7, 1641:18, 1642:14, 1643:8, 1649:4, 1651:1, 1652:11, 1667:19, 1686:7, 1686:15, 1689:17
**needed** [3] - 1614:19, 1638:15, 1666:21
**needs** [3] - 1648:24, 1650:20, 1650:23
**negative** [1] - 1636:12, 1639:18, 1661:24, 1662:2, 1662:7, 1662:21
**negotiate** [2] - 1676:6, 1678:2
**negotiated** [2] - 1640:23, 1677:7
**negotiating** [2] - 1677:13, 1700:21
**negotiation** [3] - 1675:9, 1677:5, 1677:10
**negotiations** [1] - 1700:4
**net** [27] - 1629:12, 1635:25, 1644:22, 1655:10, 1657:5, 1657:6, 1657:8, 1659:11, 1661:24, 1662:2, 1662:7, 1662:21, 1663:18, 1667:4, 1684:6, 1684:10, 1687:2, 1687:3, 1687:5, 1687:16, 1693:6, 1693:12, 1693:17, 1693:21, 1696:20, 1696:24, 1700:10
**never** [9] - 1619:13, 1627:22, 1628:9, 1644:20, 1668:22, 1669:3, 1685:8, 1690:11
**New** [18] - 1611:17, 1611:23, 1612:4, 1619:1, 1620:1, 1635:5, 1639:8, 1639:15, 1639:23, 1639:25, 1640:19, 1640:20, 1640:21, 1641:8, 1641:21, 1643:18, 1644:9
**new** [1] - 1633:17
**next** [15] - 1651:21, 1654:13, 1661:15, 1680:16, 1682:19,

1686:3, 1686:4, 1686:11, 1686:18, 1688:22, 1688:24, 1690:19, 1697:20, 1698:1, 1699:8
**NEXT** [1] - 1611:24
**nine** [4] - 1649:24, 1651:14, 1651:25
**nominal** [2] - 1615:22, 1625:5
**noncumulative** [9] - 1642:2, 1642:13, 1642:19, 1642:23, 1642:25, 1643:2, 1643:13, 1644:6, 1644:8
**none** [3] - 1691:10, 1691:25, 1700:24
**north** [1] - 1637:7
**Northwest** [1] - 1611:23
**notes** [1] - 1702:5
**nothing** [4] - 1654:14, 1664:23, 1665:8, 1678:3
**notice** [1] - 1693:10
**notwithstanding** [1] - 1691:19
**November** [1] - 1642:22
**nowhere** [1] - 1626:2
**nuanced** [1] - 1653:7
**Number** [1] - 1611:9
**number** [17] - 1628:1, 1639:7, 1645:4, 1646:22, 1648:1, 1653:8, 1655:17, 1656:20, 1662:1, 1672:25, 1673:4, 1673:6, 1691:14, 1699:20, 1699:22, 1699:24
**numbering** [1] - 1620:13
**numbers** [8] - 1625:19, 1625:25, 1627:4, 1627:11, 1633:4, 1655:18, 1656:18, 1662:4
**NW** [4] - 1611:17, 1612:9, 1612:13, 1702:12

**O**

**oath** [2] - 1669:16, 1670:21
**Obama** [4] - 1674:22, 1674:25, 1675:8, 1677:25

**object** [1] - 1698:20
**objection** [6] - 1684:2, 1687:7, 1687:9, 1692:17, 1692:24, 1698:24
**objective** [1] - 1630:5
**obligations** [2] - 1698:8, 1699:10
**obviously** [2] - 1620:16, 1682:8
**occur** [1] - 1663:18
**October** [2] - 1611:5, 1702:8
**OF** [3] - 1611:1, 1611:12, 1702:1
**offer** [2] - 1654:5, 1678:17
**Offer** [1] - 1618:12
**offering** [13] - 1662:11, 1668:18, 1670:25, 1671:7, 1671:21, 1671:23, 1672:9, 1672:12, 1672:17, 1672:20, 1672:21, 1673:10, 1673:13
**offers** [1] - 1654:12
**Official** [1] - 1612:12
**OFFICIAL** [1] - 1702:1
**official** [1] - 1702:11
**ON** [1] - 1611:24
**once** [4] - 1615:4, 1617:15, 1631:16, 1676:7
**one** [45] - 1615:17, 1617:8, 1617:9, 1617:23, 1618:23, 1627:3, 1627:21, 1628:8, 1628:20, 1630:18, 1633:18, 1638:11, 1638:16, 1639:7, 1642:5, 1645:5, 1646:10, 1648:6, 1648:8, 1648:13, 1656:24, 1661:13, 1666:11, 1666:13, 1666:19, 1671:22, 1672:12, 1674:13, 1677:12, 1683:18, 1688:22, 1690:16, 1692:8, 1692:9, 1692:15, 1692:16, 1692:18, 1692:21, 1693:24, 1695:11, 1695:19, 1695:24, 1696:4, 1699:9
**one's** [1] - 1688:25
**ones** [7] - 1642:11, 1642:16, 1695:2,

1695:3, 1695:6, 1695:11, 1695:17
**ongoing** [3] - 1622:18, 1622:25, 1625:15
**ons** [1] - 1623:21
**operations** [1] - 1700:10
**opined** [1] - 1676:21
**opinion** [33] - 1625:9, 1643:22, 1646:10, 1646:15, 1664:19, 1664:22, 1665:4, 1665:5, 1665:8, 1667:8, 1667:13, 1667:20, 1667:25, 1668:18, 1670:11, 1670:25, 1671:7, 1671:21, 1672:9, 1672:17, 1672:20, 1672:21, 1673:11, 1673:13, 1675:6, 1675:16, 1676:3, 1676:4, 1676:11, 1676:13, 1678:13, 1678:18, 1700:13
**opinions** [4] - 1646:6, 1667:7, 1671:23, 1672:12
**opposed** [2] - 1616:22, 1617:23
**option** [2] - 1615:21, 1683:18
**original** [4] - 1660:20, 1665:17, 1665:18
**otherwise** [1] - 1646:12
**outlook** [1] - 1645:14
**outside** [2] - 1630:20, 1647:9
**overall** [1] - 1632:25
**overnight** [1] - 1618:23
**overruled** [3] - 1687:11, 1698:21, 1698:25
**owe** [9] - 1685:11, 1685:16, 1685:22, 1685:24, 1687:2, 1687:3, 1687:4, 1698:16, 1698:18
**owed** [4] - 1683:3, 1683:14, 1687:15, 1687:16
**own** [10] - 1617:16, 1621:22, 1633:24, 1646:21, 1656:21, 1665:1, 1671:6, 1672:14, 1686:16, 1689:21

# P

**p.m** [1] - 1701:11
**package** [3] - 1633:1, 1639:8, 1640:1
**page** [1] - 1695:24
**PAGE** [2] - 1611:24, 1613:2
**Page** [3] - 1670:5, 1695:22, 1696:16
**Pages** [1] - 1670:7
**paid** [27] - 1614:25, 1615:1, 1617:8, 1617:10, 1622:17, 1623:23, 1624:21, 1630:15, 1631:22, 1632:1, 1632:7, 1641:14, 1643:15, 1643:16, 1644:20, 1651:13, 1656:3, 1657:5, 1657:9, 1658:6, 1658:8, 1658:12, 1664:14, 1665:6, 1668:5, 1685:1
**paper** [7] - 1622:2, 1622:3, 1622:10, 1622:12, 1623:13, 1626:15, 1626:22
**papers** [1] - 1621:9
**paragraph** [7] - 1680:7, 1689:1, 1690:15, 1693:8, 1696:4, 1696:17, 1697:2
**paragraphs** [1] - 1697:1
**part** [14] - 1627:16, 1630:2, 1630:12, 1630:13, 1632:13, 1633:5, 1638:23, 1670:14, 1677:5, 1679:12, 1685:6, 1688:7, 1691:7, 1694:21
**particular** [1] - 1621:9
**parties** [3] - 1666:6, 1677:12, 1700:21
**parts** [2] - 1659:8, 1691:21
**past** [4] - 1642:17, 1643:5, 1643:9, 1688:21
**path** [2] - 1629:3, 1629:5
**pay** [38] - 1616:15, 1616:16, 1616:17, 1616:19, 1618:14, 1619:6, 1619:25, 1627:12, 1628:10,

1631:8, 1631:19, 1631:21, 1634:2, 1638:8, 1640:19, 1644:15, 1647:16, 1651:15, 1655:1, 1655:6, 1656:13, 1656:15, 1656:17, 1657:17, 1664:14, 1664:20, 1680:14, 1682:1, 1683:4, 1684:22, 1684:24, 1684:25, 1687:23, 1696:21, 1698:11, 1698:12, 1699:4, 1699:6
**payable** [2] - 1680:10, 1680:13
**paying** [18] - 1618:18, 1619:17, 1620:4, 1624:18, 1641:3, 1641:8, 1641:9, 1641:13, 1652:1, 1654:21, 1656:4, 1656:11, 1657:3, 1657:8, 1658:11, 1685:17, 1697:5, 1697:12
**payment** [5] - 1642:6, 1642:9, 1642:14, 1643:6, 1683:18
**payment-in** [1] - 1683:18
**payments** [9] - 1642:10, 1642:15, 1643:5, 1643:8, 1643:9, 1682:20, 1683:8, 1683:14, 1685:14
**payouts** [1] - 1652:13
**pays** [1] - 1647:14
**PCF** [187] - 1615:8, 1615:24, 1622:25, 1625:9, 1625:12, 1625:15, 1625:17, 1626:7, 1627:14, 1628:9, 1628:10, 1628:12, 1629:8, 1631:21, 1631:22, 1637:4, 1640:19, 1640:21, 1640:23, 1641:1, 1641:4, 1641:18, 1643:15, 1643:17, 1643:21, 1643:23, 1644:1, 1644:25, 1645:5, 1645:10, 1645:17, 1645:21, 1646:2, 1646:7, 1646:9, 1646:16, 1646:18, 1646:20, 1647:24,

1649:5, 1652:8, 1655:24, 1656:8, 1657:3, 1657:12, 1657:13, 1657:15, 1657:16, 1658:4, 1659:3, 1659:7, 1659:10, 1663:17, 1664:25, 1665:14, 1665:19, 1665:23, 1666:1, 1666:4, 1666:7, 1666:13, 1666:23, 1667:3, 1667:8, 1667:10, 1667:19, 1667:23, 1667:24, 1668:8, 1668:13, 1668:19, 1668:23, 1668:24, 1669:2, 1669:3, 1670:12, 1671:1, 1671:9, 1671:12, 1671:15, 1671:22, 1672:6, 1672:11, 1672:19, 1672:22, 1672:23, 1673:4, 1673:8, 1673:12, 1673:23, 1676:11, 1676:12, 1677:3, 1678:10, 1678:21, 1679:4, 1679:5, 1679:9, 1680:1, 1680:10, 1680:17, 1680:19, 1680:25, 1681:2, 1681:4, 1681:8, 1681:13, 1681:20, 1681:25, 1682:1, 1682:3, 1682:6, 1682:14, 1682:15, 1682:17, 1684:9, 1684:14, 1684:24, 1684:25, 1685:4, 1685:5, 1685:7, 1685:8, 1685:11, 1685:19, 1685:20, 1686:2, 1686:5, 1686:14, 1686:15, 1686:19, 1686:20, 1687:6, 1687:18, 1687:24, 1688:4, 1689:2, 1689:8, 1689:14, 1689:16, 1689:20, 1689:22, 1689:23, 1690:1, 1690:5, 1690:8, 1690:9, 1690:11, 1690:19, 1691:11, 1691:14, 1691:17, 1692:1, 1692:4, 1693:5, 1693:11, 1693:16, 1693:20, 1693:24, 1694:1, 1694:4,

1694:7, 1694:11, 1697:13, 1698:17, 1699:5, 1699:9, 1699:15, 1699:17, 1699:19, 1700:2, 1700:7, 1700:16, 1700:24, 1701:3
**PCF's** [1] - 1681:9
**PCFs** [2] - 1625:9, 1645:8
**PDF** [1] - 1695:22
**Pennsylvania** [1] - 1611:20
**people** [3] - 1653:4, 1674:8, 1677:17
**per** [4] - 1656:12, 1664:6
**percent** [101] - 1615:19, 1615:21, 1617:11, 1617:13, 1617:16, 1617:17, 1617:18, 1617:25, 1619:11, 1619:14, 1619:24, 1620:3, 1620:4, 1620:24, 1622:15, 1622:18, 1622:19, 1622:24, 1622:25, 1623:1, 1624:9, 1624:11, 1624:12, 1624:14, 1624:16, 1624:18, 1624:24, 1625:4, 1625:23, 1625:24, 1626:1, 1626:2, 1626:4, 1627:17, 1628:2, 1631:9, 1632:1, 1632:2, 1632:10, 1637:7, 1637:20, 1640:5, 1640:9, 1640:10, 1640:14, 1640:15, 1640:23, 1641:9, 1641:12, 1641:13, 1641:17, 1641:24, 1642:18, 1642:21, 1642:23, 1642:25, 1643:1, 1644:5, 1644:7, 1644:11, 1645:24, 1646:25, 1647:1, 1649:13, 1649:14, 1652:22, 1653:1, 1653:9, 1655:21, 1656:3, 1656:6, 1657:10, 1658:9, 1658:12, 1663:2, 1666:17, 1667:1, 1667:22, 1668:1, 1668:2, 1668:3, 1673:2, 1681:4, 1682:7,

1683:2, 1683:20, 1683:22, 1683:23, 1683:25, 1684:1, 1684:16, 1689:17, 1691:15, 1699:3, 1699:25
**percentage** [6] - 1625:1, 1632:9, 1636:25, 1637:13, 1651:18, 1652:1
**perhaps** [1] - 1682:5
**period** [11] - 1622:22, 1623:18, 1630:20, 1650:4, 1651:14, 1656:25, 1658:2, 1658:3, 1662:10, 1685:15, 1694:25
**Periodic** [10] - 1660:12, 1660:15, 1664:12, 1664:19, 1665:5, 1672:6, 1675:10, 1676:15, 1681:6, 1697:7
**periodically** [1] - 1664:20, 1665:6
**person** [13] - 1674:5, 1674:9, 1674:12, 1674:16, 1675:1, 1675:3, 1675:4, 1675:7, 1675:13, 1676:5, 1676:24, 1677:16, 1677:25
**perspective** [6] - 1626:6, 1641:8, 1645:22, 1646:20, 1681:24, 1682:10
**Ph.D** [1] - 1613:3
**pick** [4] - 1643:7, 1662:1, 1672:25, 1673:1
**picked** [6] - 1649:24, 1655:18, 1656:20, 1683:8, 1695:2, 1695:6
**picture** [2] - 1637:19, 1674:14
**PIKs** [1] - 1683:19
**place** [3] - 1644:1, 1667:4, 1678:16
**Plaintiffs** [4] - 1611:4, 1611:16, 1611:18, 1612:2
**player** [2] - 1633:19, 1634:5
**players** [1] - 1633:18
**pleased** [1] - 1625:6
**PLLC** [1] - 1611:16
**plug** [1] - 1623:20
**plus** [15] - 1620:1, 1622:15, 1622:23,

1715

1623:16, 1625:2,
1625:23, 1626:2,
1626:3, 1640:5,
1641:9, 1641:14,
1668:3, 1685:12,
1687:4
**point** [11] - 1619:23,
1626:5, 1641:4,
1642:15, 1684:20,
1684:24, 1685:9,
1687:19, 1688:2,
1688:5, 1688:13
**pointing** [1] - 1628:23
**pointless** [1] - 1685:21
**points** [35] - 1616:16,
1616:17, 1619:11,
1619:13, 1620:1,
1620:3, 1622:18,
1622:20, 1622:24,
1624:25, 1625:10,
1625:11, 1625:16,
1626:3, 1628:2,
1632:8, 1640:9,
1640:22, 1640:24,
1641:9, 1646:4,
1646:25, 1647:1,
1649:17, 1649:18,
1650:2, 1651:12,
1652:2, 1652:4,
1655:19, 1655:20,
1656:8, 1656:12,
1665:2
**PORTER** [1] - 1612:9
**portion** [6] - 1616:1,
1622:19, 1626:25,
1655:12, 1655:14,
1656:4
**portions** [1] - 1656:5
**position** [1] - 1688:3
**positions** [1] - 1630:6
**positive** [14] - 1626:7,
1627:25, 1628:1,
1637:9, 1644:1,
1646:18, 1647:24,
1668:13, 1668:16,
1686:15, 1687:20,
1690:22, 1696:20,
1699:24
**possibly** [1] - 1686:12
**potentially** [3] -
1699:10, 1699:13,
1700:7
**powerful** [10] - 1674:9,
1674:12, 1674:16,
1675:3, 1675:7,
1675:13, 1676:5,
1677:16, 1677:17,
1677:25
**practice** [1] - 1645:7
**practices** [4] -

1646:15, 1669:8,
1678:11, 1700:23
**precise** [3] - 1627:16,
1636:21, 1650:5
**preference** [5] -
1668:5, 1681:5,
1683:9, 1684:4,
1698:8
**PREFERRED** [1] -
1611:9
**preferred** [27] -
1617:15, 1617:19,
1630:11, 1630:14,
1631:2, 1631:7,
1631:15, 1631:20,
1632:17, 1632:25,
1639:11, 1639:17,
1641:23, 1642:1,
1642:2, 1642:3,
1642:5, 1642:7,
1642:23, 1642:25,
1644:7, 1685:16,
1693:13, 1698:9,
1698:10, 1698:12
**premium** [12] -
1647:14, 1647:16,
1647:19, 1650:2,
1650:16, 1651:2,
1651:13, 1651:15,
1651:18, 1652:1,
1656:14, 1656:15
**premiums** [1] - 1647:2
**present** [2] - 1619:3,
1671:6
**preserving** [1] -
1653:15
**president** [3] -
1674:17, 1674:19,
1677:19
**President** [4] -
1674:22, 1674:25,
1675:8, 1677:25
**presumption** [1] -
1663:16
**pretty** [5] - 1626:14,
1628:6, 1634:9,
1651:10, 1653:17,
1656:20, 1660:4,
1665:25
**prevailing** [1] - 1618:1
**previous** [2] - 1652:5,
1670:16
**price** [8] - 1615:22,
1615:25, 1625:5,
1625:7, 1635:20,
1649:2, 1649:5,
1664:17
**priced** [1] - 1621:6
**prices** [10] - 1627:5,
1630:7, 1634:7,

1635:21, 1636:2,
1636:10, 1636:12,
1637:16, 1637:21,
1638:2
**principles** [2] -
1627:21, 1645:6
**private** [1] - 1616:20
**privilege** [1] - 1647:16
**problems** [1] -
1628:25
**proceed** [1] - 1614:5
**proceedings** [1] -
1702:6
**proceeds** [1] -
1684:10
**produce** [1] - 1682:23
**products** [2] -
1634:20, 1635:19
**professor** [9] -
1617:25, 1618:10,
1621:21, 1641:20,
1641:25, 1654:25,
1656:24, 1659:13,
1660:10
**Professor** [27] -
1614:11, 1615:4,
1616:2, 1619:16,
1621:13, 1623:2,
1625:8, 1626:10,
1633:8, 1635:10,
1636:17, 1638:22,
1640:25, 1643:20,
1644:19, 1646:5,
1647:23, 1652:6,
1658:16, 1659:24,
1669:19, 1669:21,
1671:20, 1679:18,
1688:10, 1688:20,
1695:23
**profit** [1] - 1659:11
**profits** [9] - 1655:2,
1655:6, 1658:20,
1666:3, 1666:17,
1667:1, 1673:2,
1691:15, 1699:25
**Program** [5] - 1614:25,
1629:18, 1629:20,
1630:3, 1632:13
**program** [12] -
1629:25, 1630:5,
1630:8, 1630:9,
1631:11, 1631:15,
1631:19, 1632:17,
1632:19, 1632:25,
1633:3
**progressed** [1] -
1661:3
**projection** [1] -
1662:12
**projections** [1] -

1662:6
**promise** [14] -
1615:25, 1648:22,
1649:1, 1649:2,
1649:4, 1649:6,
1650:19, 1650:21,
1650:22, 1651:1,
1656:9, 1656:10,
1664:17
**property** [1] - 1633:16
**prospect** [1] - 1693:20
**protected** [1] -
1647:12
**protecting** [2] -
1690:18, 1690:21
**provide** [3] - 1626:7,
1667:15, 1684:10
**provided** [11] - 1621:7,
1635:6, 1647:13,
1648:15, 1648:16,
1650:17, 1654:23,
1659:3, 1665:23,
1676:14, 1677:2
**provides** [8] - 1647:8,
1648:17, 1649:20,
1654:1, 1666:8,
1672:2, 1672:23,
1678:9
**providing** [4] - 1628:4,
1630:24, 1653:12,
1656:1
**provision** [1] -
1693:12
**Prussia** [1] - 1611:19
**PSPA** [15] - 1615:12,
1615:15, 1621:7,
1624:7, 1659:4,
1667:14, 1668:12,
1672:1, 1673:3,
1673:6, 1673:18,
1675:18, 1676:14,
1677:2, 1678:8
**PSPAs** [13] - 1624:6,
1640:12, 1660:20,
1661:3, 1661:13,
1661:23, 1662:13,
1663:11, 1664:14,
1665:17, 1666:6,
1672:5
**publicly** [1] - 1696:7
**published** [1] - 1622:2
**pull** [8] - 1654:15,
1669:19, 1670:6,
1679:15, 1688:16,
1688:18, 1692:10,
1694:12
**pummeled** [1] -
1636:11
**purchase** [3] -
1627:17, 1630:13,

1644:16
**Purchase** [5] -
1614:25, 1629:18,
1629:20, 1630:3,
1632:13
**PURCHASE** [1] -
1611:9
**purchased** [3] -
1630:11, 1631:8,
1631:18
**purchases** [1] -
1631:2
**purpose** [7] - 1630:25,
1639:20, 1680:20,
1681:10, 1689:9,
1690:1, 1692:3
**purposes** [2] -
1625:21, 1639:4
**put** [9] - 1646:1,
1654:4, 1654:15,
1654:16, 1663:1,
1673:1, 1675:22,
1677:6, 1677:7
**puts** [1] - 1649:20
**putting** [1] - 1654:9

## Q

**quadruple** [1] -
1635:17
**quantification** [9] -
1669:5, 1671:12,
1671:15, 1672:1,
1685:19, 1686:20,
1691:16, 1700:1,
1700:16
**quantified** [3] -
1685:8, 1690:11,
1699:22
**quantify** [12] - 1659:2,
1668:24, 1669:3,
1681:2, 1681:8,
1682:3, 1686:2,
1686:14, 1688:4,
1689:23, 1691:14,
1694:11
**quarrel** [1] - 1700:17
**quarter** [14] - 1641:12,
1679:6, 1679:10,
1680:2, 1680:9,
1686:4, 1686:11,
1689:2, 1690:19,
1691:4, 1697:15,
1697:16, 1697:20,
1698:1
**quarterly** [4] -
1693:10, 1697:5,
1699:11, 1699:14
**quarters** [1] - 1679:8
**questions** [5] -

1659:14, 1659:15, 1669:16, 1674:1, 1688:12
**quite** [2] - 1627:6, 1634:12
**quote** [1] - 1681:9

## R

**Radnor** [1] - 1611:20
**range** [6] - 1626:15, 1649:17, 1650:1, 1652:3, 1655:9, 1668:16
**ranged** [1] - 1652:2
**Rate** [1] - 1618:12
**rate** [24] - 1616:13, 1616:17, 1616:23, 1616:25, 1617:25, 1618:13, 1618:15, 1618:17, 1618:19, 1619:5, 1619:22, 1620:4, 1620:7, 1622:13, 1622:23, 1623:16, 1652:15, 1652:16, 1654:13, 1654:21, 1654:23, 1655:19
**rates** [12] - 1618:1, 1618:4, 1618:6, 1619:4, 1619:22, 1619:23, 1620:8, 1623:6, 1624:5, 1645:22, 1645:23, 1645:24
**rather** [1] - 1653:25
**rating** [1] - 1638:12
**ratio** [11] - 1636:16, 1636:19, 1636:20, 1636:21, 1637:2, 1637:7, 1637:12, 1637:21, 1647:20, 1655:21, 1656:18
**ratios** [4] - 1637:9, 1637:11, 1637:17, 1638:19
**RDR** [3] - 1612:12, 1702:3, 1702:10
**re** [6] - 1686:3, 1686:8, 1686:10, 1690:18, 1697:19, 1698:1
**RE** [1] - 1611:9
**re-evaluate** [6] - 1686:3, 1686:8, 1686:10, 1690:18, 1697:19, 1698:1
**reach** [1] - 1644:24
**reached** [2] - 1646:10, 1647:3
**reaction** [1] - 1658:23

**read** [8] - 1668:20, 1670:18, 1671:3, 1671:24, 1673:16, 1673:24, 1680:22, 1683:12
**really** [1] - 1615:25, 1620:6, 1635:10, 1637:17, 1643:8, 1647:11, 1648:15, 1660:5, 1674:5
**reason** [8] - 1625:17, 1628:6, 1628:20, 1629:6, 1648:20, 1657:19, 1681:25, 1686:2
**reasonable** [5] - 1657:14, 1658:4, 1658:15, 1662:8, 1675:19
**reasons** [3] - 1639:7, 1645:4, 1648:1
**reassuring** [1] - 1663:7
**rebounding** [2] - 1628:24, 1645:16
**recapitalize** [3] - 1630:5, 1630:6, 1630:25
**recapitalized** [2] - 1629:2, 1630:16
**receive** [1] - 1693:10
**received** [13] - 1615:17, 1630:9, 1630:18, 1630:21, 1631:7, 1637:2, 1641:19, 1644:8, 1645:13, 1655:4, 1667:18, 1668:4, 1692:17
**receivership** [1] - 1696:21
**receiving** [2] - 1615:10, 1665:11
**recess** [3] - 1659:19, 1701:9, 1701:11
**Recess** [1] - 1659:20
**recipient** [1] - 1633:1
**recognize** [1] - 1654:17
**recollection** [1] - 1658:21
**record** [1] - 1673:25
**recovering** [1] - 1629:3
**red** [2] - 1662:24, 1666:22
**redeem** [1] - 1632:24
**redeeming** [2] - 1631:15, 1632:17
**redemption** [1] -

1632:15
**redemptions** [1] - 1631:13
**refer** [1] - 1683:7
**reference** [7] - 1614:17, 1683:1, 1683:6, 1683:13, 1689:25, 1691:23, 1699:13
**referred** [2] - 1662:5, 1671:16
**referring** [6] - 1698:15, 1698:16, 1698:17, 1699:2, 1699:3, 1699:14
**refers** [4] - 1622:1, 1660:16, 1681:9, 1700:20
**reflect** [2] - 1620:18, 1633:5
**reflected** [1] - 1700:25
**reflects** [1] - 1627:4
**refurbish** [1] - 1652:14
**regulatory** [1] - 1637:10
**relatable** [1] - 1616:5
**related** [2] - 1620:16, 1652:7
**relating** [1] - 1698:8
**relative** [1] - 1647:22
**relatively** [1] - 1633:17
**relevant** [4] - 1618:17, 1618:19, 1632:22, 1687:19
**relied** [1] - 1621:10
**relief** [1] - 1629:24
**relies** [1] - 1676:14
**rely** [1] - 1653:18
**remaining** [1] - 1664:10
**remains** [3] - 1690:17, 1690:20, 1693:13
**remember** [5] - 1618:4, 1622:13, 1628:8, 1658:7, 1695:13, 1695:16
**remind** [3] - 1618:5, 1646:10, 1647:4
**reminder** [1] - 1674:15
**remove** [1] - 1662:5
**repeat** [1] - 1687:12
**report** [4] - 1671:17, 1691:9, 1695:17, 1696:6
**REPORTER** [1] - 1702:1
**Reporter** [3] - 1612:12, 1612:12, 1702:11
**reports** [1] - 1665:2

**represent** [2] - 1657:12, 1660:11
**request** [4] - 1659:16, 1659:18, 1696:5, 1696:18
**requested** [1] - 1695:7
**require** [1] - 1673:24
**required** [9] - 1637:10, 1646:12, 1672:15, 1675:23, 1682:20, 1683:17, 1698:10, 1698:11
**requires** [1] - 1675:25
**rescue** [2] - 1630:1, 1630:25
**rescued** [1] - 1639:19
**research** [13] - 1620:22, 1621:3, 1621:4, 1621:9, 1621:11, 1621:21, 1625:10, 1627:10, 1638:23, 1645:6, 1646:14, 1673:19, 1678:11
**Reserve** [4] - 1635:5, 1643:18, 1675:22, 1675:24
**reserve** [8] - 1619:1, 1638:10, 1647:20, 1656:18, 1672:7, 1672:10, 1672:14, 1673:7
**reserves** [1] - 1656:21
**resources** [2] - 1699:12, 1700:9
**respect** [1] - 1676:24
**respectfully** [1] - 1688:10
**response** [1] - 1671:2
**responses** [1] - 1670:16
**restoring** [1] - 1629:10
**restrict** [1] - 1633:2
**result** [1] - 1648:12
**resulted** [1] - 1630:3
**results** [1] - 1700:9
**resume** [2] - 1614:3, 1642:15
**Resumed** [2] - 1613:3, 1614:8
**return** [1] - 1654:17
**returned** [2] - 1684:8, 1690:22
**reversal** [1] - 1645:15
**review** [1] - 1694:24
**reviewed** [2] - 1679:12, 1694:20
**RICH** [1] - 1612:2
**rid** [3] - 1661:13, 1693:5, 1693:16

**rise** [1] - 1619:13
**risk** [3] - 1620:19, 1637:25, 1654:18
**risks** [1] - 1635:1
**Road** [1] - 1611:19
**ROBERT** [1] - 1612:2
**role** [1] - 1674:2
**roof** [1] - 1638:3
**Room** [2] - 1612:13, 1702:12
**room** [1] - 1678:1
**rough** [1] - 1641:10
**roughly** [1] - 1626:16
**routinely** [1] - 1648:11
**row** [1] - 1625:9
**ROYCE** [1] - 1611:13
**RUDY** [1] - 1611:18
**runs** [1] - 1648:18

## S

**safety** [2] - 1654:12, 1654:23
**sample** [4] - 1622:22, 1623:12, 1627:3, 1630:20
**SAMUEL** [1] - 1611:22
**sat** [2] - 1658:17, 1669:15
**Saunders** [1] - 1623:11
**Saunders/Steffen** [1] - 1623:3
**saw** [4] - 1651:25, 1655:18, 1689:5, 1697:23
**scheduled** [2] - 1697:5, 1697:12
**SCHILLER** [1] - 1611:22
**scholarly** [1] - 1674:3
**SCHOLER** [1] - 1612:9
**school** [1] - 1672:14
**scope** [1] - 1670:14
**screen** [2] - 1670:6, 1670:7
**seated** [1] - 1614:2
**SEC** [3] - 1694:20, 1694:24, 1695:8
**Second** [13] - 1661:13, 1661:22, 1662:4, 1662:14, 1662:16, 1663:5, 1663:10, 1663:21, 1666:18, 1666:22, 1686:25, 1687:4
**second** [13] - 1625:25, 1647:4, 1669:20, 1674:9, 1674:12, 1675:3, 1675:7,

1675:13, 1676:5,
1677:25, 1680:7,
1689:1, 1689:2
**second-most** [7] -
1674:9, 1674:12,
1675:3, 1675:7,
1675:13, 1676:5,
1677:25
**secondly** [1] - 1628:21
**secretary** [6] -
1675:14, 1677:11,
1677:15, 1677:18,
1677:22, 1678:15
**Section** [1] - 1691:21
**securities** [12] -
1633:20, 1634:7,
1634:8, 1634:23,
1635:16, 1635:20,
1635:22, 1636:6,
1636:7, 1636:8,
1636:9
**Securities** [1] - 1696:7
**securitization** [1] -
1634:24
**see** [46] - 1616:2,
1618:9, 1618:25,
1619:3, 1619:9,
1619:23, 1620:20,
1620:22, 1625:9,
1625:14, 1625:23,
1640:4, 1641:3,
1646:2, 1647:9,
1651:12, 1658:2,
1660:4, 1671:5,
1671:13, 1678:23,
1679:2, 1680:4,
1680:11, 1681:11,
1682:23, 1684:11,
1685:9, 1686:5,
1688:17, 1688:22,
1688:23, 1689:1,
1689:5, 1689:10,
1689:24, 1690:2,
1690:24, 1692:23,
1693:14, 1694:6,
1696:24, 1697:21,
1698:13, 1699:7,
1701:7
**seeing** [1] - 1622:7
**seem** [1] - 1660:7
**select** [1] - 1618:13
**sell** [3] - 1633:23,
1633:24, 1638:7
**sellers** [1] - 1638:4
**selling** [2] - 1636:13,
1637:22
**send** [1] - 1653:20
**senior** [3] - 1693:13,
1698:10, 1698:12
**SENIOR** [1] - 1611:9

**sense** [6] - 1627:13,
1633:4, 1635:8,
1649:5, 1655:16,
1659:12
**sensitivity** [1] - 1669:1
**sent** [1] - 1679:8
**sentence** [6] -
1680:16, 1682:19,
1683:12, 1686:3,
1689:5, 1699:8
**separated** [1] -
1679:21
**September** [5] -
1637:6, 1638:11,
1660:21, 1665:17,
1693:1
**SESSION** [1] -
1611:12
**set** [27] - 1628:9,
1628:12, 1629:8,
1637:4, 1644:21,
1644:25, 1645:17,
1655:17, 1666:5,
1668:23, 1669:3,
1672:6, 1672:19,
1672:24, 1673:12,
1676:15, 1681:1,
1681:13, 1681:20,
1682:3, 1686:5,
1689:21, 1690:20,
1691:11, 1692:1,
1697:21, 1698:4
**sets** [1] - 1647:19
**setting** [4] - 1666:6,
1673:8, 1678:9,
1685:20
**shape** [1] - 1653:17
**shared** [2] - 1620:22,
1676:18
**shares** [1] - 1653:4
**sheet** [2] - 1635:18,
1688:21
**sheets** [2] - 1629:12,
1679:21
**shocks** [2] - 1636:12,
1639:18
**shopping** [1] -
1616:12
**short** [4] - 1618:15,
1637:23, 1659:19,
1700:11
**short-term** [1] -
1618:15
**shorter** [1] - 1623:13
**shortfall** [3] - 1648:23,
1648:25, 1662:3
**show** [1] - 1651:23
**showed** [4] - 1639:22,
1645:24, 1652:4,
1690:13

**showing** [1] - 1657:13
**shown** [4] - 1618:8,
1628:8, 1659:6,
1688:1
**shows** [4] - 1622:10,
1626:23, 1651:24,
1677:1
**side** [2] - 1635:19,
1636:1
**sides** [1] - 1636:12
**sign** [2] - 1616:15,
1647:9
**significantly** [1] -
1618:3
**similar** [2] - 1630:10,
1663:3
**similarly** [2] - 1671:7,
1671:11
**simple** [3] - 1625:18,
1665:25, 1684:21
**simplify** [1] - 1650:11
**simply** [2] - 1665:23,
1668:20
**sinking** [2] - 1637:24,
1637:25
**situation** [8] - 1686:4,
1686:8, 1686:11,
1686:23, 1687:13,
1690:19, 1697:20,
1698:2
**size** [4] - 1626:10,
1626:11, 1648:8,
1648:13
**Slide** [1] - 1614:7
**slide** [7] - 1614:12,
1619:8, 1627:4,
1640:4, 1651:21,
1652:5, 1663:25
**slides** [2] - 1664:1,
1674:14
**slip** [1] - 1679:21
**small** [2] - 1615:23,
1625:7
**smaller** [7] - 1626:19,
1626:24, 1627:1,
1627:4, 1627:11,
1627:22, 1645:10
**so..** [1] - 1695:14
**sold** [2] - 1636:1,
1652:24
**sole** [1] - 1644:12
**solely** [1] - 1664:25
**sometime** [1] -
1642:24
**sometimes** [1] -
1674:12
**sorry** [9] - 1622:8,
1624:3, 1643:16,
1655:3, 1657:25,
1659:17, 1678:5,

1690:18, 1698:22
**sort** [8] - 1629:1,
1632:1, 1637:17,
1646:19, 1646:20,
1659:2, 1662:7,
1663:3
**sorts** [1] - 1645:7
**source** [6] - 1629:17,
1636:3, 1639:14,
1647:23, 1647:24,
1682:9
**sources** [1] - 1621:1
**space** [1] - 1664:10
**speaking** [4] -
1625:19, 1672:13,
1672:14, 1672:16
**specific** [1] - 1691:14
**specifically** [1] -
1699:9
**specified** [1] - 1620:9
**specify** [1] - 1624:7
**speculate** [1] -
1678:17
**split** [1] - 1670:7
**split-screen** [1] -
1670:7
**spoken** [1] - 1669:9
**stability** [4] - 1639:20,
1648:15, 1653:15,
1653:23
**stabilize** [1] - 1648:16
**stable** [3] - 1629:3,
1648:19, 1663:8
**stand** [1] - 1614:3
**stands** [3] - 1618:12,
1633:21, 1647:6
**STANTON** [1] - 1612:8
**Stanton** [1] - 1660:10
**start** [2] - 1660:13,
1679:3
**starting** [4] - 1619:23,
1663:11, 1664:2,
1664:5
**state** [2] - 1623:15,
1623:16
**statement** [4] -
1691:17, 1700:18,
1700:19, 1701:1
**statements** [2] -
1682:14, 1690:13
**States** [10] - 1674:6,
1674:9, 1674:13,
1674:17, 1674:19,
1675:4, 1675:7,
1676:6, 1678:1,
1702:11
**STATES** [2] - 1611:1,
1611:13
**statutorily** [1] -
1656:21

**stay** [1] - 1666:21
**stayed** [1] - 1619:14
**stenographic** [1] -
1702:5
**step** [9] - 1648:25,
1650:12, 1680:17,
1680:24, 1681:3,
1689:6, 1689:14,
1689:16
**stepped** [6] - 1631:10,
1631:11, 1635:6,
1639:9, 1639:10,
1639:25
**STERN** [1] - 1612:6
**still** [4] - 1663:14,
1688:20, 1692:13,
1692:14
**stipulated** [1] -
1652:16
**STOCK** [1] - 1611:9
**stock** [51] - 1615:21,
1615:23, 1617:11,
1617:15, 1617:16,
1617:18, 1617:19,
1625:4, 1625:6,
1626:4, 1627:17,
1628:16, 1628:19,
1629:6, 1629:8,
1630:11, 1630:14,
1631:2, 1631:7,
1631:15, 1631:17,
1631:20, 1632:11,
1632:13, 1632:17,
1632:25, 1639:11,
1639:17, 1641:23,
1642:1, 1642:2,
1642:5, 1642:7,
1642:23, 1642:25,
1643:2, 1644:7,
1644:9, 1644:11,
1644:16, 1644:17,
1654:16, 1668:2,
1668:3, 1682:8,
1685:16, 1693:13,
1698:9, 1698:10,
1698:12
**stocks** [1] - 1642:4
**stone** [1] - 1685:20
**stop** [1] - 1641:25
**story** [2] - 1638:21,
1688:8
**strain** [2] - 1699:12,
1700:8
**strength** [2] - 1645:9,
1690:9
**stress** [1] - 1620:18
**strictly** [1] - 1625:19
**strike** [1] - 1615:22
**striking** [1] - 1653:8
**strong** [3] - 1628:13,

1685:7, 1688:3
**stronger** [9] - 1627:14, 1645:10, 1645:12, 1645:15, 1646:3, 1656:18, 1682:4, 1682:5, 1690:8
**structured** [1] - 1682:19
**studied** [4] - 1621:23, 1622:22, 1628:22, 1630:17
**studies** [3] - 1621:22, 1623:11, 1626:11
**study** [7] - 1622:21, 1623:2, 1623:3, 1623:12, 1623:21, 1625:11
**studying** [1] - 1638:23
**stuff** [1] - 1668:7
**subsequent** [3] - 1622:3, 1622:21, 1625:11
**subsequently** [1] - 1642:24
**subsidiaries** [1] - 1634:19
**substantial** [8] - 1628:6, 1628:15, 1629:15, 1696:22, 1699:10, 1699:11, 1699:14, 1700:8
**substantially** [1] - 1658:10
**sudden** [1] - 1638:14
**suffered** [1] - 1634:3
**sufficient** [2] - 1688:7, 1690:10
**sufficiently** [2] - 1685:7, 1688:3
**suggest** [1] - 1619:20
**suggested** [1] - 1627:11
**summarizes** [1] - 1614:12
**summary** [1] - 1635:10
**superficially** [1] - 1634:18
**supposed** [6] - 1657:12, 1664:13, 1664:20, 1675:10, 1675:18, 1700:3
**suspended** [1] - 1693:5
**suspends** [1] - 1667:3
**swap** [1] - 1633:22
**swaps** [2] - 1634:13, 1636:2
**sweep** [1] - 1644:22, 1655:11, 1657:5, 1657:6, 1663:18,

1667:4, 1693:6, 1693:12, 1693:17, 1693:21
**switched** [4] - 1642:18, 1642:22, 1644:5, 1644:7
**system** [5] - 1629:23, 1630:1, 1648:5, 1648:20, 1649:25

## T

**Tab** [10] - 1669:24, 1670:3, 1679:19, 1679:20, 1688:20, 1692:13, 1692:15, 1692:20, 1692:21, 1694:14
**tab** [3] - 1670:2, 1692:12, 1692:22
**table** [2] - 1695:25, 1696:1
**talks** [1] - 1699:9
**tangible** [1] - 1651:9
**TARP** [1] - 1629:24
**tax** [1] - 1629:10
**taxpayer** [15] - 1660:17, 1660:24, 1661:8, 1661:16, 1663:1, 1680:21, 1681:11, 1681:15, 1681:22, 1682:17, 1684:11, 1689:10, 1690:2, 1690:3, 1692:5
**taxpayers** [5] - 1682:9, 1684:8, 1690:21, 1690:23, 1697:19
**technicalities** [1] - 1650:12
**teetering** [1] - 1635:4
**ten** [6] - 1652:18, 1656:25, 1657:3, 1657:22, 1658:1, 1658:3
**ten-year** [4] - 1652:18, 1656:25, 1658:1, 1658:3
**tend** [3] - 1620:18, 1626:23, 1627:1
**tens** [1] - 1621:23
**term** [4] - 1618:15, 1636:16, 1700:11
**terms** [20] - 1615:16, 1629:16, 1630:17, 1631:4, 1631:6, 1631:23, 1633:6, 1639:22, 1640:3, 1640:10, 1643:11, 1643:25, 1646:6,

1651:13, 1653:8, 1657:3, 1667:22, 1676:14, 1677:2, 1694:6
**testified** [2] - 1614:22, 1678:20
**testimony** [17] - 1628:8, 1629:11, 1644:20, 1657:11, 1658:17, 1658:19, 1665:2, 1665:21, 1668:22, 1670:20, 1670:21, 1671:10, 1671:16, 1671:25, 1676:9, 1678:6, 1678:7
**THAKOR** [2] - 1613:3, 1614:8
**Thakor** [11] - 1614:11, 1615:4, 1636:17, 1659:24, 1660:10, 1669:21, 1671:20, 1679:18, 1688:10, 1688:20, 1695:23
**Thakor's** [2] - 1621:13, 1669:20
**THE** [18] - 1611:1, 1611:1, 1611:13, 1614:2, 1621:14, 1621:16, 1659:16, 1659:17, 1659:18, 1659:19, 1659:21, 1660:2, 1687:11, 1692:17, 1698:21, 1698:25, 1701:4, 1701:9
**themselves** [1] - 1700:15
**Therefore** [1] - 1684:6
**therefore** [1] - 1667:23
**they've** [4] - 1686:13, 1686:16, 1689:19, 1689:21
**thick** [1] - 1660:4
**Third** [13] - 1623:24, 1632:2, 1640:8, 1667:2, 1686:25, 1687:15, 1691:4, 1693:1, 1693:2, 1693:4, 1693:11, 1693:16, 1693:19
**third** [3] - 1617:14, 1624:1, 1648:21
**thousands** [1] - 1621:23
**three** [19] - 1618:7, 1619:10, 1619:17, 1622:11, 1626:15, 1628:7, 1640:5, 1640:6, 1640:13,

1640:14, 1640:17, 1661:15, 1661:19, 1661:21, 1661:23, 1662:3, 1663:2, 1663:6, 1664:7
**three-fold** [1] - 1628:7
**three-month** [6] - 1618:7, 1619:10, 1619:17, 1640:5, 1640:6, 1640:14
**tied** [3] - 1619:2, 1619:4, 1619:22
**together** [2] - 1646:1, 1664:2
**took** [5] - 1624:13, 1641:16, 1651:16, 1655:8, 1655:20
**top** [10] - 1641:18, 1652:3, 1655:9, 1655:19, 1655:25, 1656:2, 1656:3, 1685:24, 1687:17, 1696:1
**TOPAZ** [1] - 1611:19
**total** [8] - 1636:22, 1637:13, 1637:21, 1649:15, 1651:8, 1658:7, 1660:23, 1661:8
**totally** [1] - 1664:7
**towards** [1] - 1685:17
**track** [1] - 1618:6
**traditionally** [1] - 1651:5
**TRANSCRIPT** [1] - 1611:12
**transcript** [2] - 1702:5, 1702:6
**transcripts** [1] - 1660:5
**transferred** [2] - 1639:16, 1644:11
**transparent** [1] - 1651:20
**Treasury** [150] - 1615:17, 1615:22, 1615:25, 1617:10, 1617:15, 1625:2, 1626:6, 1626:8, 1626:20, 1627:12, 1628:9, 1628:12, 1629:7, 1630:1, 1630:4, 1630:9, 1630:10, 1630:15, 1630:18, 1630:24, 1631:2, 1631:8, 1631:12, 1631:15, 1631:18, 1631:20, 1631:23, 1632:10, 1632:17, 1639:10,

1639:15, 1639:16, 1641:15, 1641:19, 1641:22, 1642:20, 1643:15, 1643:16, 1643:24, 1644:6, 1644:8, 1644:12, 1645:13, 1648:22, 1649:3, 1652:10, 1652:11, 1652:15, 1652:16, 1652:19, 1652:25, 1653:12, 1653:19, 1653:20, 1657:8, 1659:2, 1659:7, 1660:16, 1660:17, 1660:21, 1660:22, 1660:24, 1661:17, 1662:2, 1662:17, 1662:24, 1662:25, 1663:12, 1663:22, 1664:10, 1664:21, 1665:10, 1665:18, 1666:20, 1667:17, 1667:21, 1668:13, 1668:18, 1668:21, 1669:4, 1670:11, 1670:15, 1671:1, 1671:11, 1672:18, 1673:11, 1675:11, 1675:14, 1676:22, 1677:12, 1677:15, 1677:18, 1677:22, 1678:15, 1678:23, 1679:4, 1679:5, 1679:8, 1679:25, 1680:9, 1680:16, 1680:24, 1681:3, 1681:6, 1682:20, 1683:3, 1683:4, 1683:5, 1683:14, 1684:8, 1684:13, 1685:5, 1685:11, 1685:23, 1686:3, 1686:8, 1686:10, 1686:15, 1686:21, 1687:2, 1687:3, 1687:15, 1687:17, 1688:3, 1688:15, 1688:25, 1689:1, 1689:6, 1689:13, 1690:17, 1690:18, 1690:20, 1691:12, 1691:20, 1691:22, 1692:25, 1694:1, 1694:2, 1696:19, 1697:6, 1697:14, 1697:19, 1697:24, 1697:25, 1698:1, 1698:17, 1698:18, 1699:4, 1699:6
**Treasury's** [9] -

1719

1632:15, 1639:16, 1641:15, 1650:22, 1661:5, 1668:20, 1684:15, 1696:22, 1697:17
**TRIAL** [1] - 1611:12
**tried** [2] - 1668:23, 1689:23
**triggered** [1] - 1638:13
**trillion** [2] - 1648:6, 1649:9
**trouble** [1] - 1633:12
**troubled** [1] - 1629:24
**true** [4] - 1636:22, 1648:10, 1702:4, 1702:6
**trust** [1] - 1644:11
**truthful** [1] - 1670:21
**try** [2] - 1673:25, 1686:19
**trying** [4] - 1653:20, 1676:2, 1677:9
**tub** [2] - 1646:21, 1664:25
**turn** [1] - 1695:22
**turned** [3] - 1621:8, 1669:7, 1669:8
**turning** [1] - 1629:16
**twice** [1] - 1669:14
**two** [11] - 1621:9, 1622:6, 1632:4, 1642:4, 1646:6, 1646:25, 1660:24, 1665:1, 1697:1, 1698:15, 1699:2
**types** [3] - 1635:16, 1642:3, 1642:4

## U

**U.S** [6] - 1612:13, 1629:22, 1648:5, 1652:16, 1653:14, 1677:20
**Ugoletti** [1] - 1659:1
**ultimately** [1] - 1621:23
**unable** [1] - 1648:23
**under** [19] - 1615:12, 1626:1, 1629:24, 1630:8, 1631:6, 1631:24, 1633:7, 1636:3, 1650:23, 1657:5, 1660:20, 1663:10, 1665:11, 1669:16, 1670:21, 1675:7, 1686:24, 1687:4, 1693:19
**underlying** [1] - 1625:20

**undertaken** [2] - 1686:13, 1689:19
**undertook** [1] - 1646:22
**underwriters** [1] - 1638:4
**undrawn** [8] - 1616:1, 1622:19, 1626:25, 1650:9, 1655:9, 1655:12, 1655:14, 1655:23
**UNITED** [2] - 1611:1, 1611:13
**United** [10] - 1674:5, 1674:9, 1674:13, 1674:16, 1674:19, 1675:3, 1675:7, 1676:6, 1678:1, 1702:11
**university** [1] - 1672:15
**unlike** [1] - 1642:8
**unlimited** [2] - 1663:2, 1664:7
**unnecessary** [1] - 1684:14
**unprecedented** [1] - 1648:10
**up** [50] - 1616:16, 1620:7, 1620:9, 1620:12, 1620:14, 1620:16, 1620:18, 1624:8, 1624:13, 1624:16, 1625:18, 1625:25, 1627:11, 1629:2, 1631:10, 1631:11, 1632:9, 1632:12, 1634:2, 1636:3, 1640:13, 1640:15, 1640:16, 1640:17, 1642:7, 1642:11, 1642:14, 1642:16, 1643:4, 1643:7, 1644:16, 1647:12, 1648:25, 1652:10, 1656:9, 1662:3, 1669:19, 1670:6, 1673:5, 1679:15, 1680:6, 1682:11, 1688:16, 1688:18, 1692:10, 1694:12, 1694:18, 1696:17, 1697:2
**updates** [1] - 1623:9
**upfront** [15] - 1615:18, 1617:9, 1622:16, 1622:24, 1624:19, 1624:21, 1624:25, 1626:3, 1626:24, 1631:12, 1632:6,

1632:8, 1656:2, 1656:16, 1668:4
**upper** [4] - 1661:15, 1661:18, 1662:17, 1666:20
**ups** [5] - 1620:18, 1620:21, 1620:23, 1623:17, 1627:1
**usage** [4] - 1622:18, 1623:1, 1625:15, 1626:25
**useful** [2] - 1619:23, 1620:5
**usual** [1] - 1633:15

## V

**vague** [2] - 1687:7, 1687:10
**valuation** [1] - 1627:16
**valuations** [1] - 1682:12
**value** [27] - 1614:17, 1621:7, 1626:8, 1627:22, 1627:25, 1628:6, 1628:15, 1628:18, 1628:19, 1635:23, 1667:14, 1667:15, 1668:11, 1669:9, 1672:3, 1672:22, 1672:24, 1673:20, 1676:17, 1677:3, 1682:7, 1682:18, 1687:25, 1690:7, 1691:23, 1700:4, 1700:24
**values** [3] - 1634:7, 1635:21, 1688:2
**variable** [1] - 1618:19
**VARMA** [1] - 1612:7
**verge** [4] - 1629:10, 1635:4, 1638:3, 1638:17
**versus** [1] - 1642:1
**veto** [3] - 1631:13, 1632:15, 1632:18
**view** [10] - 1614:23, 1627:5, 1646:8, 1647:23, 1650:9, 1667:20, 1667:24, 1668:8, 1668:9, 1678:2
**viewed** [3] - 1639:3, 1682:15, 1685:6
**volatile** [1] - 1637:17
**vs** [1] - 1611:5

## W

**waived** [3] - 1679:5, 1697:15

**waiver** [9] - 1679:20, 1688:14, 1688:24, 1690:25, 1691:3, 1691:10, 1692:25, 1693:10, 1697:25
**waives** [2] - 1680:9, 1693:11
**waiving** [12] - 1679:9, 1680:1, 1680:17, 1680:25, 1681:3, 1681:25, 1685:4, 1685:5, 1689:2, 1689:14, 1689:16, 1697:25
**walk** [1] - 1617:5
**warrant** [3] - 1625:4, 1627:24, 1644:14
**warrants** [24] - 1615:20, 1617:10, 1617:15, 1626:3, 1627:15, 1627:17, 1627:22, 1628:5, 1628:14, 1628:17, 1628:19, 1629:14, 1632:10, 1632:12, 1644:2, 1644:9, 1644:10, 1644:16, 1668:1, 1681:4, 1682:7, 1682:18, 1684:16, 1690:7
**Washington** [6] - 1611:4, 1611:17, 1611:23, 1612:10, 1612:14, 1702:13
**weak** [2] - 1643:5, 1682:1
**weaken** [2] - 1628:11, 1682:2
**weakened** [1] - 1630:7
**weaker** [1] - 1628:17
**Wednesday** [1] - 1611:5
**whammy** [1] - 1635:17
**whole** [2] - 1651:9, 1690:5
**willing** [1] - 1654:22
**window** [1] - 1623:14
**withdrawal** [2] - 1648:24, 1650:20
**WITNESS** [4] - 1613:2, 1621:16, 1659:16, 1659:18
**witness** [2] - 1614:3, 1660:1
**woods** [1] - 1629:5
**word** [4] - 1660:15, 1660:16, 1680:13, 1695:21
**words** [1] - 1624:25
**works** [1] - 1625:22

**world** [2] - 1663:18, 1663:20
**world's** [1] - 1633:13
**worry** [2] - 1653:16, 1653:21
**worth** [30] - 1627:18, 1628:16, 1628:18, 1629:8, 1629:12, 1629:14, 1635:25, 1636:10, 1644:22, 1655:10, 1657:5, 1657:6, 1657:8, 1659:11, 1661:24, 1662:2, 1662:7, 1662:22, 1663:18, 1667:4, 1687:2, 1687:3, 1687:5, 1687:16, 1693:6, 1693:12, 1693:17, 1693:21, 1696:20, 1700:10
**worthless** [1] - 1627:23
**writing** [1] - 1634:6, 1638:23
**written** [3] - 1674:11, 1675:20, 1700:15
**wrote** [2] - 1633:19, 1676:4

## Y

**year** [11] - 1652:18, 1656:12, 1656:24, 1656:25, 1657:6, 1657:9, 1658:1, 1658:3, 1670:1, 1686:18, 1696:11
**Year** [3] - 1680:10, 1682:21, 1684:7
**years** [12] - 1621:11, 1630:20, 1631:9, 1657:3, 1661:15, 1661:19, 1661:21, 1661:24, 1662:3, 1663:2, 1663:6, 1664:7
**yesterday** [6] - 1614:13, 1614:23, 1615:7, 1638:24, 1644:20, 1678:20
**York** [17] - 1611:23, 1612:4, 1619:1, 1620:1, 1635:5, 1639:8, 1639:15, 1639:23, 1639:25, 1640:19, 1640:20, 1640:21, 1641:8, 1641:21, 1643:18, 1644:9

## Z

**zero** [64] - 1625:9,
1625:12, 1625:17,
1627:14, 1627:22,
1641:1, 1641:5,
1643:24, 1645:20,
1646:2, 1646:8,
1646:16, 1659:7,
1664:22, 1664:23,
1664:24, 1665:7,
1665:8, 1665:19,
1666:1, 1666:14,
1666:24, 1667:10,
1667:17, 1667:24,
1668:8, 1668:19,
1670:12, 1671:9,
1671:22, 1672:11,
1672:19, 1673:1,
1673:13, 1673:24,
1675:15, 1676:8,
1676:12, 1678:3,
1678:4, 1680:25,
1681:1, 1681:13,
1681:14, 1681:20,
1681:22, 1682:14,
1682:17, 1689:15,
1691:11, 1691:15,
1692:1, 1699:18,
1699:24
**zeroing** [1] - 1616:22
**zoom** [1] - 1679:23