```
 1              BEFORE THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2

 3   FAIRHOLME FUNDS, INC., et al.,   .
                                      .
 4           Plaintiffs,              .
                                      .  Case Number 13-cv-1053
 5        vs.                         .
                                      .
 6   FEDERAL HOUSING FINANCE AGENCY,  .
     et al.,                          .
 7                                    .
             Defendants.              .
 8   - - - - - - - - - - - - - - - -
     In re FANNIE MAE/FREDDIE MAC     .  Case Number 13-mc-1288
 9   SENIOR PREFERRED STOCK PURCHASE  .
     AGREEMENT CLASS ACTION           .  Washington, D.C.
10   LITIGATIONS.                     .  October 26, 2022
     - - - - - - - - - - - - - - - -     1:54 p.m.
11

12           TRANSCRIPT OF JURY TRIAL, AFTERNOON SESSION
                BEFORE THE HONORABLE ROYCE C. LAMBERTH
13                   UNITED STATES DISTRICT JUDGE

14   APPEARANCES:

15   For Berkley Plaintiffs:      BRIAN BARNES, ESQ.
                                  Cooper & Kirk, PLLC
16                                1523 New Hampshire Avenue Northwest
                                  Washington, D.C. 20036
17
     For Class Plaintiffs:        LEE RUDY, ESQ.
18                                ERIC ZAGAR, ESQ.
                                  Kessler Topaz Meltzer & Check, LLP
19                                280 King of Prussia Road
                                  Radnor, Pennsylvania 19087
20
                                  HAMISH HUME, ESQ.
21                                SAMUEL KAPLAN, ESQ.
                                  KENYA DAVIS, ESQ.
22                                Boies Schiller Flexner LLP
                                  1401 New York Avenue Northwest
23                                Washington, D.C. 20005

24

25                       -- continued --
```

```
 1    APPEARANCES (CONTINUED):

 2                                  ROBERT KRAVETZ, ESQ.
                                    Bernstein Litowitz Berger &
 3                                     Grossmann LLP
                                    1251 Avenue of the Americas
 4                                  New York, New York 10020

 5    For Defendant Federal
      Housing Finance Agency:       JONATHAN STERN, ESQ.
 6                                  ASIM VARMA, ESQ.
                                    DAVID BERGMAN, ESQ.
 7                                  IAN HOFFMAN, ESQ.
                                    ROBERT JONES, ESQ.
 8                                  Arnold & Porter Kaye Scholer LLP
                                    601 Massachusetts Avenue Northwest
 9                                  Washington, D.C. 20001

10

11    Official Court Reporter:      SARA A. WICK, RPR, CRR
                                    United States District Court
12                                     for the District of Columbia
                                    333 Constitution Avenue Northwest
13                                  Room 4704-B
                                    Washington, D.C. 20001
14                                  202-354-3284

15    Proceedings recorded by stenotype shorthand.
      Transcript produced by computer-aided transcription.
16

17

18

19

20

21

22

23

24

25
```

C O N T E N T S

TESTIMONY

ANJAN THAKOR          Cross-Examination................ 1724
                     Redirect Examination............. 1745

ROSS KARI -
DEPOSITION TESTIMONY   Direct Examination............... 1751
                     Cross-Examination................ 1768

EXHIBITS RECEIVED

PX-101, PX-215, PX-261, PX-262, PX-266, PX-492......... 1749

DX-508, DX-527, DX-736................................ 1749

PX-498, PX-499....................................... 1777

PX-180............................................... 1784

PX-512............................................... 1784

PX-37, PX-40......................................... 1785

PX-144............................................... 1798

PX-146............................................... 1800

PX-210............................................... 1802

PX-227............................................... 1805

PX-278............................................... 1810

P R O C E E D I N G S

(Call to order of the court.)

(Jury entered courtroom.)

THE COURT:  You may be seated.

All right.  Mr. Jones, you may proceed.

MR. JONES:  Thank you, Your Honor.

ANJAN THAKOR, WITNESS FOR THE PLAINTIFFS, RESUMED STAND

CROSS-EXAMINATION (Continued)

BY MR. JONES:

Q.   Good afternoon, Dr. Thakor.

A.   Good afternoon.

Q.   Before lunch, we had looked at the Treasury waiver letters
waiving the PCF, and we had just looked at an SEC filing from
Fannie Mae from 2011 talking about the PCF.

Do you recall that?

A.   Yes.

Q.   Now let's take a look at an SEC filing from Freddie Mac
from the same time frame, just to see what Freddie Mac was
saying about the PCF.

Can we pull up DX-369, please.

Professor Thakor, this is in your binder at tab 6, and
there's a blue piece of paper.  It's the one behind the blue
piece of paper, DX-369.

A.   All right.  So --

Q.   If you go to -- flip to the second page, the first page is

1    just a blank one -- you see that this is Freddie Mac's SEC

2    Form 10-K for 2011?

3    A.    This is DX-369; right?

4    Q.    Correct.

5    A.    Okay.

6    Q.    My question is just, do you see from the cover page there,

7    which is on the screen, this is Freddie Mac's SEC Form 10-K from

8    2011?

9    A.    Yes.

10   Q.    And we can go ahead to page 15 of the .pdf.

11        Professor Thakor, in your binder, it's just that page,

12   because it's a long document.  We didn't put all 477 pages of

13   the SEC filing.

14        Do you see under the heading "government support for our

15   business," the first paragraph there -- could we blow up that

16   header and paragraph?  Actually, I don't need all that.  Just

17   the "government support for our business" and the first

18   paragraph there for starters.

19   A.    Yes, I do.

20   Q.    Okay.  And I guess before we read that, again, you looked

21   at some SEC filings for Fannie and Freddie from 2008 and 2012,

22   but you did not look at all of the SEC filings.

23        And this is one of the ones, I will tell you, that's not

24   listed in your report in your materials considered.  So that

25   would be mean this is an SEC filing you did not look at before;

1    right?

2    A.    Yeah.  If it wasn't listed in my report, I didn't look at

3    it.

4    Q.    So under "government support for our business," if we could

5    blow up just that first paragraph there, it says, "We are

6    dependent" -- we, again, this is Freddie Mac talking in the SEC

7    filing now; right?  Correct?

8    A.    Yes.

9    Q.    Okay.  So "we," Freddie Mac, "are dependent upon the

10   continued support of Treasury and FHFA in order to continue

11   operating our business."

12        Do you see that?

13   A.    Yes, I do.

14   Q.    And you understand that was true at this time?  Freddie Mac

15   was, in fact, dependent upon the continued support of the

16   Treasury Department in order to continue operating its business;

17   right?

18   A.    Yes.

19   Q.    Okay.  And if we can just go -- well, the next sentence

20   says, "Our ability to access funds from Treasury under the

21   purchase agreement."

22        Purchase agreement there, that's the PSPAs; right?

23   A.    Correct.

24   Q.    "Our ability to access funds from Treasury under the PSPAs

25   is critical to keeping us solvent."

1    And solvent just means -- it means not broke; it means like

2    not in the red; right?

3    A.   Yeah.  I understand what solvent means, yes.

4    Q.   I understand that you understand it.  I'm trying to have

5    you explain it to the jurors.

6    A.   Okay.

7    Q.   Solvent means that you aren't broke; right?

8    A.   Yes.

9    Q.   So it says, "Our ability," Freddie Mac's, "ability to

10   access funds from Treasury under the PSPAs is critical to

11   keeping us solvent," meaning not broke, "and avoiding the

12   appointment of a receiver by FHFA under statutory mandatory

13   receivership provisions."

14       Do you see that?

15   A.   Yes.

16   Q.   And are you familiar with the concept that under the

17   Housing and Economic Recovery Act of 2008, the HERA statute,

18   that if Fannie or Freddie's financial condition got too dire,

19   FHFA was actually required to put them into a receivership,

20   which is different than a conservatorship; right?

21   A.   Yes.

22   Q.   And that was -- without getting into the details of a

23   receivership, that's bad; right?

24   A.   Right.  It's usually when you're in bankruptcy and so on.

25   Q.   It's like bankruptcy; right?

1   A.   Yes.

2   Q.   Okay.  So what this is saying is, without the Treasury

3   commitment to keep Freddie Mac not broke, without that Treasury

4   commitment, they would essentially go into this form of

5   bankruptcy; right?

6   A.   I mean, it's -- yeah, this is saying that the support is

7   important for their financial solvency, yes.

8   Q.   Their financial solvency and specifically to avoid being

9   put into receivership, which is this form of bankruptcy; right?

10  A.   That's what it says.

11  Q.   And it was the Treasury commitment that was doing that

12  work, that was keeping them solvent, that was keeping them not

13  broke, that was keeping them out of bankruptcy; right?

14  A.   Helping to.

15  Q.   Sure.  Okay.  Can we go down a few paragraphs, to the one

16  that begins "we expect to request," and if we can blow that up.

17       Okay.  So this is the paragraph here that's talking

18  about -- it gets into talking about the PCF, which is what

19  you're talking about.

20       So it starts by saying, "We expect to request additional

21  draws under the PSPAs in future periods.  Over time, our

22  dividend obligation to Treasury will increasingly drive future

23  draws."

24       Do you see that?

25  A.   Yes, I do.

1    Q.   Again, that's referring to this concept of circular draws,

2    right, having to draw from the commitment, the Treasury

3    commitment, to give the dividends back to Treasury, which

4    increases the liquidation preference, which then requires paying

5    higher dividends and taking bigger draws; right?  It's all

6    circular?

7    A.   In the future.

8    Q.   That's what this is referring to, those circular draws in

9    the future?

10   A.   That's what it looks like.

11   Q.   Okay.  And then it says, "Although we may experience

12   period-to-period variability" -- I think the jury has heard this

13   piece before, but I will just go over it quickly.

14        "Although we may experience period-to-period variability in

15   earnings and comprehensive income, it is unlikely that we,"

16   Freddie Mac, "will generate net income or comprehensive income

17   in excess of our annual dividends payable to Treasury over the

18   long term."

19        Do you see that?

20   A.   Yes, I do.

21   Q.   And do you understand what's that saying is over the long

22   term, Freddie Mac says it's unlikely that they will even have

23   enough money to pay the 10 percent dividends?  Right?

24   A.   Right.  This is the prediction at the time that they filed

25   this 10-K.

1    Q.   And they filed this 10-K in 2012 for calendar year 2011;

2    right?

3    A.   Yes, for 2011.

4    Q.   So this is Freddie Mac in 2012.  That's the same year as

5    the Third Amendment; right?

6    A.   Yeah, which happened later.

7    Q.   The Third Amendment happened later, in August of 2012;

8    right?

9    A.   Yes.

10   Q.   So in 2012, the same year as the Third Amendment, we have

11   Freddie Mac here saying it is unlikely they are even going to

12   have enough money to pay the 10 percent dividend to Treasury

13   over the long term, and that's what they said in their SEC

14   filing; right?

15   A.   At the time that they filed the 10-K.  But the housing

16   market did rebound, and their financial condition did improve

17   significantly in 2012.

18   Q.   Okay.  So let's look at what it says, then, specifically

19   about the PCFs.

20        So it says, then, "In addition, we are required under the

21   PSPAs to pay a quarterly commitment fee to Treasury."

22        And that "in addition," you understand that means in

23   addition to the 10 percent dividend, which is what it was

24   talking about in the prior sentence; right?

25   A.   Yes.  They're on two different amounts.

1    Q.    Two different amounts.

2    A.    The dividend is on the drawn amount, and the PCF is on the

3    undrawn amount, yes.

4    Q.    Okay.  So under the PSPAs, they're going to owe both?  They

5    have to pay the 10 percent dividends, and they also in

6    addition -- like it says here, they have to pay the PCF; right?

7    A.    When they determine what it is.

8    Q.    Okay.  So it says, "we," Freddie Mac, "are required to pay

9    the PCF to Treasury, which could contribute to future draws if

10   the fee is not waived."

11         Do you see that?

12   A.    Yes.

13   Q.    Just help me and the jury understand.  Is that saying that,

14   similar to how Freddie Mac and Fannie Mae were having to draw

15   from the Treasury commitment to pay the 10 percent dividend,

16   this is expressing that Freddie Mac may have to draw even more

17   money from the Treasury commitment also to pay the PCF?  That's

18   what this is saying; right?

19   A.    Right.  But it doesn't say anything that contradicts

20   anything that I've said.  This says when they determine what the

21   PCF is, they're going to have to pay it.  That's all it's

22   saying, we're going to need money to pay the PCF when we set the

23   PCF, which they've done no analysis to quantify at this point.

24         So they don't know what it is; Treasury doesn't know what

25   it is.  And they've done no analysis to support any number.

1    So if I'm just sitting there not having done any analysis

2    at all, I may have to pay a PCF at some point when Treasury and

3    FHFA negotiate in good faith with input from the chairman of the

4    Fed.  There will be a number, and that's something that we'll

5    have to pay.  I mean, that's all I see this saying.  It's not

6    stating a number.  They have no idea what the PCF will be when

7    it's determined, and they've done no analysis to support any

8    number.

9    Q.   Dr. Thakor, it says one more thing, right, which is that if

10   the fee is not waived and the fee is not set, the need to pay

11   the PCF could contribute to future draws, and that means that

12   Freddie Mac would have to draw from the Treasury commitment to

13   pay the PCF back to Treasury; right?

14       That's what this is saying when it says the PCF "could

15   contribute to future draws if the fee is not waived"; right?

16   A.   Could.

17   Q.   Could, right.

18   A.   If I knew what it was, which they don't.

19   Q.   If it was zero -- if the PCF was zero, it wouldn't require

20   any draw, right, because you don't have to draw any money from

21   the commitment in order to pay a fee of zero?

22   A.   And as I said before lunch, if I have not done an all-in

23   cost analysis, the type that I presented here, I would not be

24   able to say what the PCF is.

25       And then, of course, if I have an earnings shortfall to

1    meet the dividends and then the PCF is some positive number, not

2    knowing how large it is because I've done no analysis to know

3    how large it is, then I would say, yeah, it could contribute to

4    future draws if the fee is not waived.  That's just a statement

5    of fact.

6        But the fact of the matter is, at this stage, lacking any

7    analysis, Freddie doesn't know, Fannie doesn't know, FHFA

8    doesn't know, and Treasury doesn't know what that quantification

9    of the PCF is going to represent.

10   Q.  Right.  And they have never had to figure it out before,

11   because as we've seen from all the waiver letters, to this point

12   through 2011, Fannie and Freddie, they didn't have any money.

13   They didn't even have enough money to pay the 10 percent

14   dividend, let alone a PCF on top of it.

15       Right?

16   A.  Right.  But waiving the PCF doesn't preclude doing an

17   analysis to determine what the PCF will be when you impose it.

18   Q.  Then it says, "Treasury waived the fee for all quarters of

19   2011 and the first quarter of 2012, but it," meaning

20   Treasury, "has indicated that it remains committed to protecting

21   taxpayers and ensuring that our," Freddie Mac's, "future

22   positive earnings are returned to taxpayers as compensation for

23   their investment."

24       Do you see that?

25   A.  Sure.

Q.   And that's the same thing that Treasury was telling FHFA

and, in turn, was telling Fannie Mae and Freddie Mac, that the

Treasury Department, in connection with this PCF, they're going

to revisit it every quarter to see whether it should then be

set, and the Treasury Department is committed to protecting

taxpayers and ensuring that Fannie Mae and Freddie Mac's future

positive earnings are returned to taxpayers; right?

A.   Right.  And they said this for all the assistance they

provided.  They said this in the case of the CPP.  They said

this in the case of the assistance they provided to AIG.

     And I showed you the terms earlier of those assistance

packages and how they compared with what the GSEs were asked to

pay.  And, you know, Treasury and the U.S. government -- this

was reported in newspapers; it's nothing proprietary -- they

said on the investment that they made in AIG, they made a profit

for the taxpayers.  And that -- on the assistance they provided

to the CPP banks, similarly, taxpayers were protected.

     So this statement was pretty standard at the time for

Treasury to make in the context of all the assistance packages

that they put together, because there was a lot of sensitivity

on the part of taxpayers, like, why is the government bailing

out Wall Street?  And people are angry about that.

     And so the government was quite meticulous to say, look,

we're doing this to protect the financial system, we're going to

protect the taxpayers.

1    Q.   And that last sentence says, "The amount of the quarterly

2    commitment fee," the PCF, "has not yet been established and

3    could be substantial."

4         Do you see that?

5    A.   Again, I mean, could be when I don't know what the number

6    is, okay.

7    Q.   My question was just, do you see it?

8    A.   I'm sorry?

9    Q.   My question was just, do you see that?

10   A.   Yes, I do.

11   Q.   Okay.  Thanks.  We can pull that one down, please.

12        Have you ever seen or heard a suggestion -- I think you've

13   maybe talked about this in your testimony with Mr. Kaplan --

14   seen or heard a suggestion that the PCF, the periodic commitment

15   fee, should be set as Fannie and Freddie's net worth -- that the

16   PCF should be set as a net worth sweep?

17   A.   I'm sorry.  I don't understand the question.

18   Q.   Okay.  My question is, have you ever heard of a suggestion

19   that the PCF should be set at the net worth of the companies?

20   A.   I don't know.  I've looked at a lot of documents.  It may

21   have been suggested by somebody, but I haven't seen any analysis

22   that would support a conclusion like that, based on a

23   quantification of the PCF using the guidance provided by the

24   PSPA.

25        MR. JONES:  I would like to pull up another document.  This

1    is a document that's not in evidence, so if we could switch off

2    the monitor.

3              COURTROOM DEPUTY:  It's off.

4              MR. JONES:  Can we pull up DX-375, and if we can blow

5    up the e-mail at the bottom, I would request to display this to

6    the jury under Rule of Evidence 703.

7              MR. KAPLAN:  I don't think any proper foundation has

8    been laid, Your Honor.  I object.

9              THE COURT:  I'll take the objection on the phone.

10         (Bench conference.)

11             MR. JONES:  Your Honor, this is Stanton Jones for the

12   defendants.

13         This is an e-mail from Mr. Ugoletti to Mr. DeMarco at FHFA

14   talking about the PCF and specifically referencing a possibility

15   or concern that the Treasury Department through Secretary

16   Geithner would propose setting the PCF as a net income or net

17   worth sweep.

18         And this document, first of all, should be displayed to the

19   jury under Rule 703 because Professor Thakor has already said

20   and, in fact, had a slide saying that he relied on documents

21   produced in discovery between the parties, documents concerning

22   the PCF.  This is precisely that type of document.

23         And we're entitled to put it to him to show that he

24   excluded documents that tend to refute his opinion about the PCF

25   being zero.

1       And I would also note, Your Honor, that during Professor

2   Thakor's direct examination, on slide 21, Mr. Kaplan himself

3   displayed an e-mail exchange between Treasury and Treasury's

4   outside advisor, Grant Thornton, that is not an admitted

5   document.  It is inadmissible hearsay, but because it's the type

6   of documents that experts rely on and that Professor Thakor

7   relied on, it was appropriately displayed, we think, and we're

8   seeking to do the exact same thing here.

9       THE COURT:  I thought the objection was that you

10  hadn't laid a foundation.  Has he seen this document?

11      MR. JONES:  I believe he has not, Your Honor.  But my

12  entire point with the questioning is that he testified that this

13  is the type of document that he would rely on, but he simply

14  wasn't given this document.  He was given different documents

15  that say other things about the net worth sweep.

16      MR. KAPLAN:  Your Honor, this is Sam Kaplan.  None of

17  what Mr. Jones is saying makes this appropriate.

18      First of all, this rule is about the documents he relied

19  on, not the documents he didn't.  What defendants are trying --

20      THE COURT:  The objection is sustained.

21      MR. KAPLAN:  Thank you.

22      (End of bench conference.)

23      BY MR. JONES:

24  Q.  Can we put up, please, Mr. Salazar, PX-149.

25      Professor Thakor, this is tab 9 in your binder.  This

1    document, I believe, is in evidence.

2    A.   Okay.

3    Q.   This is a slide deck from FHFA.  You see Mr. DeMarco's name

4    there, and it's dated January 19, 2012, and the title

5    is "mortgage market issues:  Discussion with Treasury Secretary

6    Geithner."

7         Do you see that?

8    A.   Yes, I see it.

9    Q.   Okay.  Great.  And you understand that Mr. DeMarco, as head

10   of the FHFA, was having discussions with Secretary Geithner, the

11   head of the Treasury Department, around this time related to the

12   PSPAs, including the PCF; right?

13   A.   Yes.

14   Q.   Okay.  If you go to page 6 -- I'm sorry, page 5, the one

15   before this one.

16        Just to orient us, the first bullet here in this FHFA

17   document about a meeting with Secretary Geithner says that "the

18   current agreement resets the Treasury funding cap based on

19   losses for the three years ending on December 31, 2012."

20        And you understand that is a reference to what we talked

21   about earlier, that at the end of 2012, at the end of the Second

22   Amendment to the PSPAs, the Treasury cap was going to come

23   back -- it had been gone for three years, the cap was going to

24   come back, and it was going to be based on a formula; right?

25   A.   Yes.

1    Q.   And the next bullet says, "Some market participants have

2    begun to raise questions regarding whether this," meaning the

3    Treasury commitment, "will be sufficient to justify continued

4    investment in enterprise securities."

5         Do you see that?

6    A.   Yes.

7    Q.   And you understand that the reference to "enterprise

8    securities" there means the mortgage-backed securities; right?

9    A.   Yes.

10   Q.   So this is saying that market participants, people who

11   participate in this secondary mortgage market, have begun to

12   question whether the Treasury commitment will be enough money to

13   justify investing in Fannie Mae and Freddie Mac mortgage-backed

14   securities; right?

15   A.   Okay.

16   Q.   You do understand that that's what this means?

17   A.   Yes.

18   Q.   And then if we go down two bullets, to the fourth bullet,

19   it says, "The periodic commitment fee has been waived to date."

20        And that's consistent with your understanding as of

21   January 19, 2012, that the PCF had been waived, Treasury had

22   waived the PCF every quarter for that time; right?

23   A.   Yes.

24   Q.   Okay.  "The periodic commitment fee has been waived to

25   date, and the setting of this fee could also impact near-term

1    stability."

2        Do you see that?

3    A.    Yes, I do.

4    Q.    Okay.  And so when it says that the PCF, the setting of

5    this fee could impact the near-term stability of the companies,

6    that's not because the fee was going to be zero and that they

7    would have to pay nothing; right?  That wouldn't impact

8    near-term stability.

9    A.    Right.

10   Q.    Okay.  What it says here and what it means is that the PCF

11   would impact the company's near-term stability if the PCF was

12   set at a very large amount; right?  That's what would impact the

13   company's near-term stability, not if it was set at zero or a

14   very small amount?

15   A.    It's not saying anything about the amount, because again,

16   as Mr. DeMarco himself testified in both his deposition and in

17   court, he had undertaken no analysis.  Neither had Mr. Ugoletti,

18   neither had anybody at Treasury.  So nobody knows what the

19   quantification of the commitment fee should be.  Right?

20        So they're saying, hey, if the commitment fee is imposed

21   and it's not waived again, it will be another drain on the

22   financial resources of the GSEs.

23        Well, as an abstract concept, without knowing what it

24   should be, based on any systematic analysis as suggested by the

25   contract, I think that statement is understandable from an

```
 1    economic standpoint.

 2         But the fact of the matter is, they don't know what the fee

 3    should be because they have not tried to quantify what it is.

 4    So this is saying, well, if it's high, it will be a big drain;

 5    if it's not high, it's not a drain.

 6         But these statements are really hard to assign economic

 7    content to without knowing what the size of the PCF should be,

 8    and that is why the contract provided the guidance that it did

 9    for how the PCF should be determined.  They didn't say, well, it

10    could be anything or it should be 100 percent of profits.  They

11    could have said that in '08 if that's what they wanted it to be.

12    Q.   Okay.  Let's pull up PX-351.  This is also in evidence.

13    And this is tab 10 in your binder.

14    A.   So which tab?

15    Q.   10.  This is a declaration of Mario Ugoletti.

16         You've heard of Mr. Ugoletti before, is that right,

17    Professor Thakor?

18    A.   Yes, I see it.

19    Q.   He was an FHFA person involved in these dealings?

20    A.   Yeah.  I believe he worked for Mr. DeMarco.

21    Q.   That's right.  Okay.

22         Can we turn to page 5, please.  And if we look at -- can we

23    blow up paragraph 9.

24    A.   Okay.

25    Q.   So Mr. Ugoletti said -- I'm going to focus on the last
```

1    sentence, but just for context, this is saying that the PSPAs

2    gave Treasury the right to waive the PCF based on adverse

3    conditions in the mortgage market.  And then it says Treasury

4    did waive for 2010 and 2011 when the enterprises had

5    insufficient funds to pay even the 10 percent dividend, let

6    alone an additional PCF.

7        Do you see that?

8    A.   Yes, I do.

9    Q.   And that's consistent with what we've seen already from the

10   other documents, that through 2010 and through 2011, Treasury

11   quarter after quarter was waiving the PCF and was constantly

12   saying, we are waiving the PCF because Fannie and Freddie are in

13   such dire condition financially they don't even have enough

14   money to pay us the 10 percent dividend that they owe us, that

15   they already owe us, Treasury Department, more money than they

16   have.

17       And so that was why Treasury was waiving the PCF; right?

18   A.   Right.  And like I said, waiving the PCF does not preclude

19   doing an analysis to quantify the PCF and what it should be when

20   Treasury felt that the GSEs were strong enough to impose it.

21   They could have done that analysis.  It wasn't precluded by

22   their decision to waive it.  And then they would have had a

23   number that people would have known.

24   Q.   Okay.  And then in the last sentence, Mr. Ugoletti

25   states, "It was clear by this time that, given the risks of the

1  enterprises and the enormity of the Treasury commitment, the

2  value of the PCF was incalculably large."

3       Do you see that?

4  A.   I do see that.

5  Q.   When he refers to the enormity of the Treasury commitment,

6  that goes back to what we talked about at the beginning of our

7  discussion here, that the Treasury commitment was this

8  commitment by the Department of Treasury on behalf of U.S.

9  taxpayers to put in, starting with $200 billion and 400 billion

10 and then an unlimited amount with the cap coming back into

11 place, but even then, it was going to be 258 billion.

12      That's what Mr. Ugoletti is referring to when he talks

13 about the enormity of the Treasury commitment, right, those

14 words there?

15 A.   Yeah, this is a statement, but the statements that

16 Mr. Ugoletti has said, he had no idea how to compute the PCF,

17 that he was not in the business of computing the PCF and he

18 didn't know how to do it.

19 Q.   We can pull this one down.

20      We have looked now at a series of documents where the

21 Treasury Department, FHFA, Fannie Mae, and Freddie Mac are all

22 discussing the PCF and talking about how this was a fee that was

23 designed to provide -- intended to provide increased additional

24 compensation to American taxpayers on top of the 10 percent

25 dividend.  They were expressing that it could be a substantial

1    amount.  If it was set, it could require them to draw more money

2    from the Treasury commitment just to pay the fee.  It could

3    impact their stability as operational companies.

4        Right?  We've seen those documents?

5    A.   Yes, we've seen documents where people are speculating

6    about what the fee might be if it is imposed with no analysis to

7    back up any sort of quantification of the fee.

8    Q.   Okay.  And you can't point me to a single document or

9    statement where the Treasury Department says or suggests that

10   the PCF -- well, the PCF should just be zero?

11   A.   I can't point you to any document that says that the PCF

12   should be anything based on what Treasury did.  They have no

13   analysis to support that it should be 100 percent of earnings.

14   They have no analysis to support any number because they never

15   undertook any analysis and neither did FHFA.

16   Q.   So what I said is correct, then?  You cannot point me to a

17   single document where Treasury said or suggested that the PCF,

18   it's going to be zero, zero dollars, zero cents?

19   A.   I think I answered it.  If you don't do any analysis, you

20   have no quantification of the PCF by your own admission, then

21   how can I give you documents which say this is what the PCF

22   should be.

23   Q.   You can't point me to a single document where the Treasury

24   Department said or suggested that hey, we, the Treasury

25   Department, feel that we're fully compensated by the 10 percent

1    and the warrants, we don't need any more money, we're good?  You

2    haven't seen any documents --

3    A.   They never undertook an all-in cost analysis.  They never

4    did what the PSPA Section 3.2 that I presented in direct was

5    guiding the participants to do.

6         THE COURT:  Mr. Jones, we have a saying in Texas, if

7    you beat a horse to death.  I think you're there.

8         Any other questions?

9         MR. JONES:  No more questions.  Thank you.

10        THE COURT:  Any redirect?  I know you like my Texas

11   saying, but if you want to ask any other questions, you can.

12        MR. KAPLAN:  I am from Texas, Your Honor, and I will

13   heed your Texas saying.  Just a very few questions.

14                       REDIRECT EXAMINATION

15        BY MR. KAPLAN:

16   Q.   First of all, the CPP -- Mr. Jones referred to American

17   taxpayer money, which he repeated about five or six times.  I

18   just want to make sure, the CPP, AIG, FDIC, and then the federal

19   government's statutory commitment to FDIC, all of that involves

20   taxpayer money; correct?

21   A.   Exactly.  It's all our money.

22   Q.   And the all-in compensation that the GSEs paid that went to

23   taxpayers, the $18.9 billion dividend, the $1 billion initial

24   commitment fee, the 79.9 percent -- the warrants for

25   79.9 percent, all that went to the benefit of taxpayers; right?

1   A.   Exactly, all of the compensation, yes.

2   Q.   You were asked, Professor Thakor, if you were a mind

3   reader, effectively, if you knew what they would have done.

4   A.   Uh-huh.

5   Q.   And I believe you answered that you're not a mind reader;

6   correct?

7   A.   Uh-huh; that's right.

8   Q.   But if you -- under your assumptions that you undertook in

9   your analysis, you assumed, correct me if I'm wrong, that they

10   would act in good faith according to the terms of the contract,

11   with the aim of full compensation, not overcompensation, and

12   according to an objective market-based standard; correct?

13   A.   That's correct.

14   Q.   And under that assumption, what was your opinion?

15   A.   So if they had undertaken an actual analysis to try and

16   quantify the PCF using market-based data like I did with

17   economists who knew how to analyze that data, I think they would

18   have come to the same conclusion that I did.

19   Q.   And Professor Thakor, I believe you answered this or said

20   this, but I just want to make sure.  The declaration you were

21   shown at the very end there that was from Mr. Ugoletti, that was

22   the same Mr. Ugoletti we saw in the video yesterday?

23   A.   Yes, that's right, who said that he didn't know how to set

24   the PCF, he was not in the business of determining the PCF.

25   Q.   Did Mr. Ugoletti provide any type of analysis that would

1   justify quantification of the PCF at any level?

2   A.   That's correct.

3   Q.   Bottom line, Professor Thakor, in all of your decades of

4   experience and your analysis of this issue, all the analysis you

5   conducted in this case, could the PCF possibly be anywhere close

6   to the net worth of the GSEs?

7   A.   Absolutely not.  My analysis indicates it would be nowhere

8   close to that.

9        MR. KAPLAN:  Thanks very much, Professor.

10   No further questions, Your Honor.

11        THE COURT:  All right.  You can step down.

12   Can I speak to counsel on the phone.

13   (Bench conference.)

14        THE COURT:  I guess subject to exhibits, the

15   plaintiffs are ready to rest, and I can rule on those at the end

16   of the day?

17        MR. HUME:  Yes, Judge Lamberth.  This is Hamish Hume

18   for the plaintiffs.

19   I was going to come to the podium and say, subject to the

20   agreement we have and that we discussed with the Court and

21   counsel, we rest, and just leave it.

22   What that means is we have some exhibits to offer, about 20

23   exhibits, at the end of the day when the jury is not here, and

24   the defendants are free to make their motion at that time.

25        THE COURT:  And the defendants will go ahead and call

1    their first witness now in front of the jury.  Okay.

2              MR. JONES:  Should Mr. Hume come to the podium to say

3    that the plaintiffs rest before we call our first witness?

4              THE COURT:  Yes.

5         (End of bench conference.)

6              MR. HUME:  Your Honor, Hamish Hume for the plaintiffs.

7         Members of the jury, subject to the agreement on two minor

8    matters that we've discussed off the record, plaintiffs rest

9    their case.

10        Thank you, Your Honor.

11             THE COURT:  Thank you very much.

12        There's some legal questions I will deal with later.  In

13   the meantime, then, we're going to get the first witness for the

14   defendants going forward.

15             MR. HOFFMAN:  Good afternoon, Your Honor.  Ian Hoffman

16   on behalf of the defendants.

17        Defendants will call Mr. Donald Layton by deposition

18   designations through video.

19        Before we do so, Your Honor, I would like to move into

20   evidence several exhibits that will be used during Mr. Layton's

21   testimony, as well as with the next witness, who will be also

22   presented by deposition, but it will be a live actor.

23        And I believe there are no objections, but plaintiffs can

24   confirm to these.  So I will list the plaintiffs' exhibit first,

25   because there's some plaintiffs' exhibits, and defendants'

1   exhibits next.

2       Plaintiffs' Exhibit 101, Plaintiffs' Exhibit 215,

3   Plaintiffs' Exhibit 261, Plaintiffs' Exhibit 262, Plaintiffs'

4   Exhibit 266, Plaintiffs' Exhibit 492.

5       And I'm going to read now several defendants' exhibits.  I

6   believe that several of these are in evidence, but I will read

7   them anyway, just to make sure.

8       Defendants' Exhibit 369, which I believe is in, Defendants'

9   Exhibit 394 -- I believe both of those are in.

10          COURTROOM DEPUTY:  Yes.

11          MR. HOFFMAN:  Defendants' 408, which I believe is in,

12  Defendants' 451, which I also believe is in, and then

13  Defendants' Exhibit 508, Defendants' Exhibit 527, and

14  Defendants' Exhibit 736.

15      That's all I have for exhibits, Your Honor.

16          THE COURT:  All right.  They're all received.

17      (PX-101, PX-215, PX-261, PX-262, PX-266, and PX-492

18  received into evidence.)

19      (DX-508, DX-527, and DX-736 received into evidence.)

20          MR. HOFFMAN:  So we will play the video of Mr. Donald

21  Layton, L-a-y-t-o-n.  Thank you, Your Honor.

22      (Video deposition of Donald Layton played.)

23          THE COURT:  We will take our afternoon recess.

24      (Jury exited courtroom.)

25          THE COURT:  This can be off the record.

 1          (Discussion off the record.)

 2          (Recess taken from 3:25 p.m. to 3:56 p.m.)

 3          (Jury not present.)

 4          THE COURT:  While the jury is on the way, who is this

 5     the deposition of?

 6          MR. HOFFMAN:  Good afternoon, Your Honor.  Ian

 7     Hoffman, on behalf of the defendants.

 8          This is Mr. Ross Kari, R-o-s-s K-a-r-i.  He is Freddie

 9     Mac's former chief financial officer, CFO.  It's being presented

10     live but as a readout of a deposition designation.

11          I was not personally in court yesterday.  I don't know if

12     Your Honor gave an instruction that this is not the real --

13          THE COURT:  I will repeat it, yeah.

14          (Jury entered courtroom.)

15          THE COURT:  You may be seated, ladies and gentlemen.

16     We have another deposition that's going to be read live, and

17     it's not too long.

18          You can go ahead and call the person who is going to read

19     the deposition.

20          MR. HOFFMAN:  Defendants call Mr. Ross Kari, Freddie

21     Mac's former chief financial officer.

22          THE COURT:  It will be read by a person who is not the

23     witness.

24          MR. RUDY:  Your Honor, Lee Rudy.

25          I've also been drafted to read the questions, based on my

1    prior acting experience.

2            THE COURT:  Okay.

3        (Deposition testimony of Ross Kari read into the record as

4    follows.)

5                        DIRECT EXAMINATION

6            AS READ BY MR. RUDY:

7    Q.   You should have a document in front of you that's been

8    marked Defendants' Exhibit 736.  It's a document that's marked

9    at the top "Freddie Mac biography, Ross J. Kari."  I will

10   represent to you we got this off the Freddie Mac website.

11           Have you seen this document before?

12   A.   Yes.

13   Q.   Is the information in this biography an accurate summary of

14   your professional career, at least through your time with

15   Freddie?

16   A.   It's an accurate very high-level summary.  It's certainly

17   not comprehensive, but it's a high-level summary.

18   Q.   Okay.  You don't see anything that's inaccurate in it?

19   A.   No.

20   Q.   And this covers your time through your work with Freddie.

21   But can you briefly summarize what you've done professionally

22   since leaving Freddie.

23   A.   I retired when I left Freddie.  At the --

24   Q.   Okay.  And turning back to your biography, Exhibit 736, it

25   says in the next-to-last paragraph that you received a BS degree

1   in mathematics and an MBA in finance, both from the University

2   of Oregon.

3       Approximately when did you receive those degrees?

4   A.   The BS in mathematics was June of 1980, and the MBA,

5   concentration finance, was in June of 1983.

6   Q.   Okay.  And did your work toward either of those degrees

7   include any kind of concentration in accounting or any kind of

8   accounting training?

9   A.   Certainly.  It was -- in an MBA curriculum, you do take

10  some accounting.

11  Q.   I take it you are not a CPA?

12  A.   I am not a CPA.

13  Q.   And did you start out at Wells Fargo directly out of the

14  MBA program?

15  A.   Yes.

16  Q.   And according to your biography, from 2002 to 2006, you

17  served as an executive vice president and chief operating

18  officer for the Federal Home Loan Bank of San Francisco.

19      Can you provide a little more detail about what your duties

20  were at the Federal Home Loan Bank of San Francisco?

21  A.   As the chief operating officer, the CFO, treasurer,

22  enterprise risk manager, head of sales and marketing, head of

23  technology, comptroller all reported to me.  So responsibility

24  for all of those disciplines within the company.

25  Q.   And who did you report to?

A.   I reported to the president of the company, who was Dean
Schultz at that time.

Q.   And did you -- when you left the Federal Home Loan Bank of
San Francisco, is that when you went to Safeco Corporation?

A.   Yes.

Q.   And I note, was that in 2006?

A.   Yes.

Q.   Approximately when, do you know?

A.   June of 2006.

Q.   And what line of business was Safeco Corporation involved
in?

A.   It was a property and casualty insurance company, also
in -- that had a surety business.

Q.   I'm sorry.  A --

A.   A surety business, another form of property and casualty
type of insurance.

Q.   And can you elaborate a bit on what your duties and
responsibilities were as executive vice president and CFO of
Safeco Corporation?

A.   Again, I managed the various financial management
disciplines, which would have included financial planning
analysis, treasury, manage the investment portfolio of the
company, oversaw the management of the investment portfolio of
the company, the comptroller of the company, also had the surety
business reporting to me.

1    Q.   And when did you leave Safeco?

2    A.   I left Safeco in September of 2008.

3    Q.   And what is -- and is that when you went to Fifth Third

4    Bank Corp.?

5    A.   I started at Fifth Third Bank Corp. in November 2008.

6    Q.   And you were there until when?

7    A.   Until October -- actually, it was probably very late

8    September of 2009.

9    Q.   And can you elaborate a bit on what your duties and

10   responsibilities were as CFO of Fifth Third Bank Corp.?

11   A.   I managed the various financial disciplines of a large

12   regional commercial bank:  Financial planning analysis, the

13   comptroller, the treasurer, financial risk management

14   activities.

15   Q.   And so you left Fifth Third to go to Freddie?

16   A.   Yes.

17   Q.   And how did that come about?  Can you describe how you came

18   to be hired by Freddie Mac?

19   A.   I was contacted by a recruiter asking if I would take a

20   phone call from David Moffett, who at the time was the CEO of

21   Freddie Mac.  He was -- he became CEO of Freddie Mac after the

22   company went under conservatorship.  And I knew David from my

23   time when I was the CFO at Wells Fargo and he was the CFO at

24   another very large national bank.  We would see each other

25   occasionally at CFO roundtable meetings.

1    He had -- he needed to recruit a CFO.  He knew me, reached

2    out to me, asked if I would be interested in talking to him.  I

3    said yes, I would be.  A week later, David Moffett resigned as

4    the CEO.

5        I then got a call from a gentleman by the name of Chris

6    Lynch, who was the audit committee chairman and someone I knew

7    from my time at Wells Fargo.  He was the KPMG signing audit

8    partner on the Wells Fargo audit.  He asked if I would be

9    interested in talking to Freddie Mac.  I said I would.  I

10   interviewed with Freddie Mac.  At the time John Koskinen was

11   filling the role of CEO, chief operating officer, and CFO.  And

12   I met with John, who offered the job.  I rejected it at the time

13   because I didn't know who the CEO was going to be.

14       A couple months later, they called me back and said well,

15   we just hired a CEO, Ed Haldeman, and asked if I would be

16   interested in meeting with Ed Haldeman.  I said certainly.

17       We met for a couple hours on a street corner in Cincinnati

18   on a Sunday afternoon, and I enjoyed the conversation with Ed.

19       I recognized the importance that both Fannie Mae and

20   Freddie Mac -- the important role they played in the financial

21   system at the time of severe liquidity constraints, and I

22   thought it to be fascinating to be a part of a recovery effort

23   and the inevitable discussions about what to do as far as the

24   future of the two significant housing GSEs.

25   Q.   Turning back to your biography, which is Exhibit 736 --

1    A.    Uh-huh.

2    Q.    -- the first paragraph has a brief description of some of

3    your responsibilities as executive vice president and CFO of

4    Freddie Mac, and I would like to go over those with you --

5    A.    Uh-huh.

6    Q.    -- to make sure I understand --

7    A.    Okay.

8    Q.    -- what they entailed.

9          So it says first of all in this position you were

10   responsible for the company's financial controls.

11         What does that mean, being responsible for the company's

12   financial controls?

13   A.    Being responsible for identifying necessary controls and

14   monitoring the operation of those controls to ensure accuracy of

15   financial statements.

16         In addition, certain aspects of risk management would be

17   described as financial controls, risk management such as hedging

18   various types of financial risks, such as interest rate risk.

19   Q.    Were there other aspects of risk management that came

20   within your responsibility that you can recall?

21   A.    Well, a broad view of risk management would include

22   Sarbanes-Oxley testing and reporting to ensure accuracy of

23   financial statements.

24         Most other risk management activities were managed under

25   Paige Wisdom, who was the chief enterprise risk manager.

1   Q.   And you referred a couple of times already to ensuring the

2   accuracy of financial statements.

3   A.   Uh-huh.

4   Q.   I take it that that was your -- part of your responsibility

5   as well?  You were responsible for ensuring the accuracy of

6   Freddie Mac's financial statements?

7   A.   I was responsible for managing the process that was focused

8   on ensuring the accuracy of the financial statements.

9   Q.   And when you talk about financial statements, are you

10  talking about 10-Ks and 10-Qs and things like that?

11  A.   10-Ks and 10-Qs are the primary regulatory financial

12  statements.  It's also earnings releases, you know, various

13  forms of reporting to the board, forms of reporting to the

14  regulator.

15  Q.   Mr. Kari, you've been handed a document marked PX-101.

16  It's the minutes of a Freddie Mac board of directors meeting

17  dated June 3, 2011.  There's a Bates number, which is a number

18  at the lower right-hand corner, FHLMC 00000610 through 6122.

19  I'm just going to ask you a few questions about this.

20       The third paragraph on the first page, it indicates you

21  were in attendance at that meeting; correct?

22  A.   Yes.

23  Q.   Near the bottom of that bottom paragraph,

24  "he" -- there's a discussion, "he," which I think is referring

25  to you, and this is the very last line on that page.

1    "He then noted that for the longer-term forecast the

2    company expects to have small draws from Treasury for the third

3    and fourth quarters of 2011; however, no draws are expected for

4    2012 and 2013."

5    Do you see that discussion?

6    A.   Okay.

7    Q.   That longer-term forecast that's being referred to here, is

8    that one of the three-year forecasts that you were referring to

9    earlier?

10   A.   I don't have a specific memory about this period of time.

11   The three-year forecasts would have been updated on a quarterly

12   basis.

13   Q.   And when it says "the company expects to have small draws

14   from Treasury for the third and fourth quarters; however, no

15   draws are expected for 2012 and 2013" and focusing on those two

16   years, 2012 and 2013, does this mean that the forecast indicated

17   that for those years Freddie expected to have enough net income

18   to cover its dividend obligations on -- on the PSPAs?

19   A.   Net income wouldn't ultimately be the driver.  It would be

20   comprehensive income.

21   Q.   Okay.  And with that clarification -- well, let me

22   rephrase.

23   Does this -- does that discussion that no draws are

24   expected for 2012 and 2013, does that mean that the forecast

25   indicated that for those years, Freddie expected to have enough

1    comprehensive income to cover its dividend obligations on the

2    PSPAs?

3    A.    That would be a fair assumption.

4    Q.    Okay.  Another topic according to this that was discussed

5    during those meetings was actions that the company could take to

6    reduce the draws from Treasury.

7    A.    Uh-huh.

8    Q.    Do you recall discussions with FHFA -- FHFA or Treasury or

9    internally about actions that Freddie could take to reduce the

10   Treasury draws?

11   A.    Well, I think I would interpret that as I do recall

12   discussions about how we can make more money, which ultimately

13   would result in a reduced draw.  And basically, that's what the

14   focus was, to improve the financial performance of the company,

15   which would have the result of reducing the draw.

16   Q.    Do you recall -- and I don't want to limit it to this time

17   period, but let's say the last six months of 2011 through the

18   Third Amendment, which is August of 2012, do you recall

19   discussions either internally or with FHFA or Treasury about

20   other types of actions that could be taken to reduce Treasury

21   draws other than to make more money?

22   A.    Again, what time period are you focused on?

23   Q.    The second half of 2011, first seven and a half months of

24   2012.

25   A.    I don't recall.

Q.   And just to be clear, do you recall those types of discussions but just don't recall when they happened?

A.   Early in my time there, there were discussions about the dividend rate of 10 percent and whether that was something that could be reduced.  It was never something that was pursued, though.

Q.   Discussions with who?

A.   Well, I think general discussions with FHFA comparing the dividend that Fannie Mae and Freddie Mac were paying on the capital provided by Treasury versus the dividend rate being paid by commercial banks that received TARP funds.  That's the type of discussions that took place.

And Fannie Mae and Freddie Mac were paying a high dividend rate.  The question was, could that be reduced.  Obviously, it never was.

Q.   Do you recall an explanation being provided --

A.   No.

Q.   -- as to why it never was?

A.   No, I don't.

Q.   Was it FHFA who told you it would not be reduced?

A.   I don't recall specifically.

Q.   If you go on in the same paragraph, another topic was, quote, the lack of inclination by Treasury to reduce the interest rate on our draws from Treasury.

A.   Uh-huh.

Q.   Is that the same type of thing you were just talking about,
reducing the dividend rate?

A.   Yes.

Q.   So this is 2011 now?

A.   True.

Q.   Does this refresh your recollection about whether there was
discussion of that topic during this time frame?

A.   Well, my recollection is that those were discussions that
took place in 2010, shortly after I got there.  But I don't know
whether those were discussions that were continued -- continued
with other members of the management team such as Mr. Golding.
So --

Q.   Okay.  So in preparing projections of future performance,
did Freddie typically prepare those projections under various
scenarios?

A.   Yes.

Q.   What were those scenarios based on?

A.   Based on input from various experts throughout the company
on what's an expected case for assumptions, such as house price
path, what would be a more pessimistic case, and what would be a
more optimistic case.

     And we would go through the same type of range of scenarios
for other items, such as credit spreads, default rates, any
number of inputs, including the size of the balance sheet.  That
was a major driver that I didn't mention earlier today, you

1    know, will the retained portfolio shrink more rapidly than our

2    base case or will it shrink less rapidly.  So --

3    Q.   And then in the course of that answer, you referred to two

4    things:  Expected case and base case.  Are those the same thing?

5    A.   They're the same thing.  Excuse me.

6    Q.   No, that's fine.  I just wanted to make sure I understood.

7    A.   Yes.

8    Q.   And describe for me the nature of that analysis, the

9    analysis of whether the valuation allowance should be reversed

10   or the deferred tax asset realized.

11   A.   Well, as I indicated earlier, I was not a part of the team

12   that early in my time there performed the assessment.  It would

13   have been done by the director of tax and his staff, as well as

14   working with both the comptroller, as well as the financial

15   planning analysis department that did the projections.

16   Q.   And I'm sorry.  I don't mean to interrupt, but do all these

17   people that you just mentioned --

18   A.   Yes.

19   Q.   -- they all reported to you; right?

20   A.   Yes.

21   Q.   I'm sorry.  Go ahead.

22   A.   No problem.  And given that the size of the valuation

23   allowance was significant, I would anticipate -- though I did

24   not in the late 2011-2012 time frame have conversations with

25   PWC, the outside auditor, I would anticipate that is one of

1   those items that they reviewed on a periodic basis in order for

2   them to sign off on the financial statements.

3   Q.   And to what extent were the analyses of the valuation

4   analysis for the deferred tax asset shared with Freddie's audit

5   committee?

6   A.   I do not recall sharing that assessment with the audit

7   committee in my time there until -- until -- it may have been

8   the fourth quarter of 2012.  It may have been the first quarter

9   of 2013.

10  Q.   Was Freddie's CEO briefed on the decisions relating to the

11  deferred tax asset valuation allowance for the period 2011 to

12  2012?

13  A.   When we began -- well, as I said, fourth quarter of 2012 or

14  first quarter of 2013, we would have gone through a detailed

15  discussion with the CEO.

16  Q.   I take it the board of directors was not briefed on this

17  type of analysis, again during the period of 2011 to 2012 as

18  I've defined it?

19  A.   As I said, by the fourth quarter of 2012 or early 2013,

20  I -- in one of those periods, we began discussions with them

21  about the possibility that this could happen.

22  Q.   And prior to that time, do you know if --

23  A.   I don't recall --

24  Q.   Okay.

25  A.   -- having that conversation prior.

1   Q.   You would consider yourself a member of Freddie's senior

2   management?

3   A.   Uh-huh.

4   Q.   When did Freddie's senior management first learn about the

5   net worth sweep decision?

6   A.   I do not recall the specific sequence of events.  It was

7   after the decision had been made.  I believe it was first

8   communicated to our CEO and then communicated through him to the

9   other members of senior management.

10  Q.   And what was the reaction of senior management to the net

11  worth sweep?

12  A.   I can't recall each individual's reaction or whether there

13  was a consensus on reaction.

14  Q.   What was your reaction?

15  A.   My reaction was that it simplified some things

16  operationally.  It eliminated a sort of circular process with

17  respect to the payment of dividends and the additional need for

18  a draw.  So --

19  Q.   Is that it?

20  A.   Uh-huh.

21  Q.   No other reactions?

22  A.   No.

23  Q.   Okay.  You say senior management learned about it, the net

24  worth sweep, after the decision.  Was there any knowledge or

25  was -- strike that.

1      Did any of Freddie's senior management, to your knowledge,

2  know that something like the net worth sweep was being

3  contemplated?

4  A.   Not to my knowledge.

5  Q.   I take it you did not?

6  A.   I did not.

7  Q.   And I take it to your knowledge Freddie was not consulted

8  at all -- Freddie's senior management was not consulted at all

9  by either FHFA or Treasury in that decision?

10  A.   You're correct.  To my knowledge, we were not consulted.

11  Q.   Did anything about the Third Amendment concern you as chief

12  financial officer of Freddie?

13  A.   No, it did not concern me.

14  Q.   A few minutes ago, when we were talking about capital

15  levels, we talked about your views about an appropriate

16  conservative level of capitalization.

17      Would you have considered or did you consider $3 billion an

18  appropriate conservative level of capitalization for Freddie at

19  the time of the net worth sweep?

20  A.   As a going concern, no, it would not be.

21  Q.   In your view, could Freddie Mac operate safely with zero

22  capital?

23  A.   In my view, absent a capital commitment from some source,

24  Freddie Mac could not operate safely with no capital.

25  Q.   And my question to you is, did Freddie consider private

1  shareholders a stakeholder in the GSEs?

2  A.   We believed that the conservator represented the interests

3  of the shareholders as defined in the conservatorship agreement.

4  Q.   Did you have a view regarding whether the net worth sweep

5  was beneficial to private shareholders?

6  A.   I recall having the view that it was neither beneficial nor

7  detrimental.

8  Q.   Why was that?

9  A.   A view that the long-term financial performance of the

10  company would be -- those trends would be dominated by the

11  contraction in the balance sheet driven by the constraints on

12  the retained portfolio, and that even with a period of earnings

13  in excess of the 10 percent dividend over time, the contraction

14  of the retained portfolio would lead to a period of time where

15  earnings were not adequate to sustain any meaningful value for

16  the common shareholders.

17  Q.   When you say "over time," how long of a period of time were

18  you thinking about?

19  A.   I was -- I don't have a specific timeline.  I'm thinking

20  trends, in terms of future outlook, you know.

21      Once the retained portfolio dropped from $900 billion,

22  which is what it was when I got there, to $200 billion or even

23  smaller, the bulk of the earnings power of the company would

24  have gone away.

25  Q.   Did you have a view as to whether the net worth sweep was

1    beneficial to private shareholders, over the short term,

2    beneficial or detrimental?

3    A.   No, no perspective that was different from the long term,

4    since the interests of the long term -- of the private

5    shareholders should be a reflection of the long-term financial

6    potential of the company.

7    Q.   Did you have a view as to whether under the net worth sweep

8    Treasury would in the short term be paid more than it would have

9    otherwise?

10   A.   At the time, based upon the forecasts that were provided to

11   me just before the net worth sweep, there were periods where the

12   U.S. government would have received a greater dividend than they

13   would have under the 10 percent dividend.  However, I believe in

14   the longer term that would reverse itself.

15   Q.   During the 2011-2012 time period, as I've defined it, did

16   you have a view as to Freddie's prospects for building its

17   capital through profit improvements that were resulting from

18   better asset quality and things like that?

19   A.   As I had mentioned, I viewed the long-term prospects of

20   generating adequate earnings to both cover the dividend prior to

21   the Third Amendment as being perhaps short term.

22        But over the long term, because of the runoff of the

23   retained portfolio and the constraints that we were operating

24   under in terms of pricing new products, so on and so forth, I

25   viewed those prospects as being very limited in terms of the

1   ability to build the capital.

2   Q.   Is it still your belief that the financial statements that

3   the company submitted that were prepared during your tenure --

4   and let's concentrate on 2011 to 2012 -- were accurate and

5   complete in all material respects?

6   A.   Is it still -- I have not learned of anything that would

7   change that opinion.

8        MR. BERGMAN:   Your Honor, David Bergman for defendants

9   playing defense counsel.

10       Mr. Rudy and I will take our show on the road at some point

11   maybe.

12                          CROSS-EXAMINATION

13            AS READ BY MR. BERGMAN:

14   Q.   Okay.   For the record, Mr. Kari, I have a few questions.   I

15   will take as little of your time as I can.

16   A.   Okay.

17   Q.   First, if you wouldn't mind handing the court reporter this

18   document and asking her to mark it as an exhibit, Defendant's

19   Exhibit 508.

20       It's Form 10-Q for Federal Home Loan Mortgage Corporation

21   for the quarterly period ending June 30, 2012.   And I will

22   represent that this is an excerpt from the document.   I didn't

23   bring the big thick document like plaintiffs' counsel did.

24       So if you wouldn't mind turning to page -- are you familiar

25   with this document, first of all?   Is this a document that you

1   would have seen when you were at Freddie Mac?

2   A.   I would have seen this document while I was at Freddie Mac.

3   Q.   And I think you testified earlier that you were responsible

4   for ensuring the accuracy of financial statements; is that

5   correct?

6   A.   That's right, through the work of all the -- the work of

7   all of the staff that report to me.

8   Q.   Exactly.  Okay.

9        If you could turn to page 10, please, and just look under

10   where the paragraph -- the paragraph that's headed "long-term

11   financial sustainability."  I will read it into the record.

12        "There is significant uncertainty as to our long-term

13   financial sustainability.  The acting director of FHFA stated on

14   September 19 that" -- I'm sorry.  I will just do the second

15   paragraph.

16        "We expect to request additional draws under the purchase

17   agreement in future periods.  Over time, our dividend obligation

18   to Treasury will increasingly drive future draws.  Although we

19   may experience period-to-period variability in earnings and

20   comprehensive income, it is unlikely that we will generate net

21   income or comprehensive income in excess of our annual dividends

22   payable to Treasury over the long term."

23        Was that -- to your knowledge, was that accurate at the

24   time?

25   A.   To my knowledge, that was accurate at the time.

```
 1   Q.   Okay.  Let's turn now to page 92, which is only a couple

 2   pages behind that.

 3        Under "capital resources," the second paragraph says, "We

 4   expect to request additional draws under the purchase agreement

 5   in future periods.  Over time, our dividend obligation to

 6   Treasury on the senior preferred stock will increasingly drive

 7   future draws.  Although we may experience period-to-period

 8   variability in earnings and comprehensive income, it is unlikely

 9   that we will generate net income or comprehensive income in

10   excess of our annual dividends payable to Treasury over the long

11   term.  In addition, we are required under the purchase agreement

12   to pay a quarterly commitment fee to Treasury, which could

13   contribute to future draws if Treasury does not" waive -- "does

14   not continue to waive the fee."

15        Was that an accurate statement?

16   A.   Yes.

17   Q.   Okay.  Thank you.  I have no more questions on this

18   document.

19        Now, if you wouldn't mind turning to Defendants'

20   Exhibit 369 of the exhibits that you were already handed today,

21   if you can dig it out.  I would like to draw your attention on

22   page 9 to the third paragraph from the bottom that starts "we

23   expect."  And what I'm going to read is going to be similar to

24   what I read before.

25        "We expect to request additional draws under the purchase
```

1    agreement in future periods.  Over time, our dividend obligation

2    to Treasury will increasingly drive future draws.  Although we

3    may experience period-to-period variability in the earnings and

4    comprehensive income, it is unlikely that we will generate net

5    income or comprehensive income in excess of our annual dividends

6    payable to Treasury over the long term.  In addition, we are

7    required under the purchase agreement to pay a quarterly

8    commitment fee to Treasury, which could contribute to future

9    draws if the fee is not waived.  Treasury waived the fee for all

10   quarters of 2011 and the first quarter of 2012, but it has

11   indicated that it remains committed to protecting taxpayers and

12   ensuring that our future positive earnings are returned to

13   taxpayers as compensation for their investment.  The amount of

14   the quarterly commitment fee has not yet been established and

15   could be substantial."

16        Was that your understanding at the time?

17   A.   That's correct.

18   Q.   Now, if we could turn to Defendants' Exhibit 527.

19   A.   Okay.

20   Q.   I would just like to -- and the date on this document is

21   draft, August 14th, 2012.  I think we established that already.

22        If you wouldn't mind turning back to page 2, and if you

23   look at the fourth bullet point on the right-hand side.

24   A.   Uh-huh.

25   Q.   It states, "Over the long term, it is likely that our

1   dividend obligation will exceed comprehensive income, resulting

2   in additional Treasury draws."

3        Do you see that?

4   A.   Yes, I do.

5   Q.   Was that your understanding at the time?

6   A.   Yes, it is -- yes, it was.  Excuse me.

7   Q.   Okay.  And the last document I would like you to turn to is

8   Defendants' Exhibit 451.  And that was the 2012 corporate

9   forecast three-year outlook dated May 22, 2012.

10  A.   Uh-huh.

11  Q.   And that's a Freddie Mac document?

12  A.   Uh-huh.

13  Q.   If you wouldn't mind turning to page 2311.

14  A.   2311?  Oh, okay.  You're talking about the Bates number.

15  Q.   Yes.  I don't see another page number.  Oh, page 8.

16  A.   Uh-huh.

17  Q.   At the top, it says "cumulative Treasury draws for 2014."

18       Do you see that?

19  A.   Yes.

20  Q.   And then the first bullet point says, "Projected cumulative

21  Treasury draws through 2014 under a range of scenarios,

22  including the stress case, is between $71 billion and

23  $194 billion."

24       Is that a forecast that was issued by Freddie Mac as of

25  May 2012?

1  A.   It was, yes.

2  Q.   And then last, I would just like to ask you, we've been --

3  I'm sorry.  Plaintiffs' counsel was asking you a lot of

4  questions today about the so-called commitment under the PSPAs.

5       And what is your understanding of the amount of the

6  commitment in August of 2012, approximately?

7  A.   I don't recall the specific amount of the commitment.  The

8  commitment, in my memory, our stress scenario cumulative draws

9  did not exceed the maximum amount of the commitment in any of

10  our three-year forecasts.

11  Q.   Do you recall -- if I represent to you that the amount of

12  the maximum of the commitment under the agreement at that time

13  was around $200 billion, would you disagree with that?

14  A.   The maximum amount --

15  Q.   That you could draw.

16  A.   Yeah, yes, I think that is approximately correct.

17  Q.   Okay.  And --

18  A.   It wasn't a nice round number, because it continued to

19  change through the end of 2011 based upon the draws taken

20  through that period.

21  Q.   Okay.

22  A.   Okay.

23  Q.   To your recollection and knowledge, could you have obtained

24  a $200 billion commitment from any entity in the private market

25  at that time?

1   A.   It is my opinion that we could not retain, achieve any kind

2   of commitment like that in the private market --

3   Q.   Okay.  Thank you.

4   A.   -- given the constraints that we were operating under.

5   Q.   Did any of these projections take into account the future

6   payment of a periodic commitment fee?

7   A.   They did not.

8   Q.   Did you -- did Freddie Mac ever calculate a periodic

9   commitment fee or attempt to estimate the market value of a

10  periodic commitment fee?

11  A.   We did not.

12          MR. BERGMAN:  Thank you.

13          MR. HOFFMAN:  If we may be heard briefly on the phone.

14       (Bench conference.)

15          MR. HOFFMAN:  Your Honor, Ian Hoffman on behalf of the

16  defendants.

17       It's 4:30 now.  We think it makes the most sense, if it's

18  okay with Your Honor, to release the jury and focus on some

19  evidentiary objection matters for the day.

20       Plaintiffs have informed us that they wish to move in 25 or

21  so documents.  We have no objection to a handful of them, but

22  there are many objections to the remainder, and we expect

23  argument on them.

24       Your Honor, there's also some evidentiary objection issues

25  that plaintiffs have informed me will arise in connection with

1    the Attari testimony, who is our next live witness.

2         And so my intention was to ask the Court if you would be

3    willing to take those up before he takes the stand so we don't

4    have to spend an inordinate amount of time on the phone, Your

5    Honor, while Mister -- while Dr. Attari is on the stand.

6         So we think it makes sense to try to resolve those things

7    and any other sort of preliminary matters today before moving on

8    to our next witness.

9         MR. HUME:  Your Honor, this is Hamish Hume with the

10   plaintiffs.

11        I agree.  All of that sounds sensible to me.

12        THE COURT:  Okay.

13   (End of bench conference.)

14        THE COURT:  Ladies and gentlemen, I have some things I

15   need to resolve before we go forward.  So I'm going give you all

16   a break and to let you go for the day.  Don't talk about the

17   case.  Don't let anyone talk to you about the case.  Leave your

18   notes here in the jury room.  I will see you all at 10:00

19   tomorrow.  Have a nice afternoon off.

20   (Jury exited courtroom.)

21        THE COURT:  Okay.  Mr. Hume?

22        MR. HUME:  Thank you, Your Honor.  Hamish Hume for the

23   plaintiffs.

24        THE COURT:  All right.  We're going to go back to --

25   plaintiffs were ready to rest their case, and I have to rule on

1    any remaining exhibits and then take any motion.  And we're

2    going to ignore everything that happened in the defendants' case

3    and not consider any of those matters that happened during the

4    presentation of defendants' evidence, freezing the record as of

5    where the plaintiffs were ready to rest, except subject to

6    consideration of additional exhibits they want to offer.

7              MR. HUME:  That's my understanding as well, Your

8    Honor.  Thank you.  This again is Hamish Hume for the

9    plaintiffs.

10       We are offering in exhibits in three categories, Your

11   Honor.  Again, as counsel, Mr. Hoffman said, some, I think, are

12   not objected to; some are.  And so we will go piecemeal.

13             THE COURT:  Okay.

14             MR. HUME:  The first are ten documents that are, what

15   I would say, defendant documents, FHFA or Fannie Mae or Freddie.

16   Let's do, I think, the easy ones first.

17             THE COURT:  Okay.

18             MR. HUME:  The 2013 10-Ks for both Fannie Mae and

19   Freddie are PX-498 and 499.  We move those into evidence.

20             MR. JONES:  Can we have Court's indulgence for one

21   second.  Those weren't on the list that we were given.

22       Do you want to give us those and come back to those at the

23   end?  We will just take a look at them.

24       Actually, hold on.  I can do these really fast.

25       No objection.

1          THE COURT:  Plaintiffs' 498 and 499 are received.

2      (PX-498 and PX-499 received into evidence.)

3          MR. HUME:  Thank you.

4      Similarly, Plaintiffs' Exhibit 37 and 40 are the

5  contractual warrants that --

6          COURTROOM DEPUTY:  They're already in.

7          MR. HUME:  They're already in?

8          COURTROOM DEPUTY:  Yes.

9          MR. JONES:  No objection.

10          MR. HUME:  So far so good.

11      Plaintiffs' Exhibit 27?

12          COURTROOM DEPUTY:  It's already in.

13          MR. JONES:  27 is already in, Plaintiffs' Exhibit 27?

14          COURTROOM DEPUTY:  One second, Your Honor.

15      I'm sorry.  That one is not in.  I'm reading the wrong one.

16  I'm reading defendants'.  My apologies.  Go ahead.

17          MR. HUME:  So Plaintiffs' Exhibit 27 is a short

18  transcription of a speech by the head of the FHFA's predecessor,

19  OFHEO, James B. Lockhart, who is director and then became

20  director of FHFA.

21      The proffer is that it has a statement that -- this is in

22  March of 2008.  The statement, "Importantly, the two companies

23  have committed to raise significant capital and to maintain

24  overall capital levels well in excess of requirements in order

25  to ensure market confidence and fulfill their public mission."

1          THE COURT:  Is there an objection?

2          MR. JONES:  Yes, Your Honor, there's an objection.

3          THE COURT:  What's the objection?

4          MR. JONES:  Relevance and prejudice.  This document --

5     as Mr. Hume said, this is from March 2008.  This is from before

6     the Housing and Economic Recovery Act of 2008 was passed.  FHFA

7     did not exist at this time.  Mr. Lockhart worked for the

8     predecessor agency.

9        So we think that anything that this document says from

10    March 2008 about Fannie Mae and Freddie Mac is irrelevant and

11    would just risk confusing the jury because the time period is

12    just not relevant to anything in the case.

13         MR. HUME:  There are two other documents that fall

14    under the same category, so I may just proffer on those, give

15    Counsel a chance to --

16         THE COURT:  Okay.

17         MR. HUME:  The whole point of this, it's not a huge

18    point but we do think it's relevant.  As we've shown in the

19    case, private shareholders did invest about $20 billion in 2007

20    and 2008.  We just think it is relevant for the jury to know

21    that the regulator thought that was a good thing.

22       That's it.  It's not --

23         THE COURT:  What are the numbers of the others?

24         MR. HUME:  The two new ones are PX-513 and PX-514.

25    PX-513 is another speech by Mr. Lockhart when he was director of

1    OFHEO.  Again, there's literally just one or two sentences.  He

2    says -- on page 16 to 17, he describes the difficulties the

3    enterprises went through, and he says, "In response, and with

4    vigorous encouragement from OFHEO, each enterprise has raised

5    substantial amounts of capital starting in November of last

6    year."

7          And on pages 22 and 23 --

8                THE COURT:  Do you have copies I can look at?

9                MR. HUME:  I'm sure we do.

10               MR. JONES:  Your Honor, if I may be heard on those

11   two.

12               COURTROOM DEPUTY:  Your Honor, Plaintiffs' Exhibit 37

13   and 40 were not previously admitted.

14               MR. JONES:  We have no objection to those.  So it will

15   be fast.

16               MR. HUME:  If we can show the Court the document on

17   the screen.  I can also hand up my version of both documents,

18   Your Honor, which has tabs.

19         This is PX-513, a speech by Mr. Lockhart, director of

20   OFHEO, 44th Annual Conference on Bank Structure and Competition,

21   May 16, 2008.

22         The two relevant passages that we seek to admit it for, one

23   of them starts at the bottom of page 16 --

24               THE COURT:  You're talking about putting in all 39

25   pages?

1          MR. HUME:  We don't have to.  The paragraphs we would

2     be talking about is this paragraph and one other.  The paragraph

3     says, "Those increased risks became evident after the mortgage

4     market turmoil began last August.  Fannie Mae and Freddie Mac

5     reported large losses in the third and fourth quarters of 2007

6     and the first quarter of this year.  Specifically, Fannie Mae,"

7     and it goes on, "reported $7.1 billion in losses in those three

8     quarters, while Freddie Mac reported losses of $3.8 billion on

9     top of losses in three of the previous four quarters," reference

10    to chart 3.

11         And then the sentence I read earlier, "In response, and

12    with vigorous encouragement from OFHEO, each enterprise has

13    raised substantial amounts of capital starting in November of

14    last year. "

15         OFHEO is one of the two predecessor agencies to FHFA.

16         There is also a proffer I would make on page 22 of the

17    document, just one other paragraph.  Beginning, "Last week,

18    OFHEO lifted its two-year-old consent order with Fannie Mae.  We

19    also agreed to reduce Fannie Mae's minimum capital requirement

20    further, to 15 percent above the 2.5 percent statutory minimum,

21    upon the enterprise's completion of the sale of at least

22    $6 billion in equity, which will further enhance Fannie Mae's

23    ability to support the secondary market by expanding its

24    retained mortgage portfolio.  On Wednesday, Freddie Mac agreed

25    to raise $5.5 billion in equity, and we took similar actions.

 1    Those actions were designed to make the capital ratios of the

 2    enterprises more countercyclical, while creating incentives for

 3    them to raise more capital."

 4        Those two paragraphs, Your Honor, is the sole purpose of

 5    offering PX-513.

 6        MR. JONES:  And Your Honor, the defendants would

 7    object to 513 for many of the same reasons.  Again, this is a

 8    speech that Mr. Lockhart gave on May 16, 2008, before FHFA

 9    existed.  Even the paragraphs that Mr. Hume just read, without

10    any context or anyone to explain them -- first of all, they're

11    just irrelevant, because this time period is irrelevant.

12        But just as an example, there was a reference in here to a

13    consent order.  I don't even know what that is referring to.  So

14    I don't know how the jury would have any context to understand

15    what this is, or a reference to capital requirements that may

16    have been in place before HERA.  It's irrelevant and could only

17    serve to confuse the jury to give them this with no -- at all,

18    but certainly to give it to them with no context.

19        MR. HUME:  We would make no argument about consent

20    decree or anything.  This is simply to show they raised capital

21    during a tumultuous time from private investors, and the

22    regulator thought that was a good thing.  That's it.

23        THE COURT:  Do you want to show me what's in 27?

24        MR. HUME:  Yes.  If I could, I will show you what's in

25    PX-514 and then in 27, and then you will have the complete

```
1   picture.
2       On PX-514, it's a 2008 report to Congress from OFHEO.  The
3   cover letter to that is written by the director, Mr. Lockhart,
4   again.  And on the second page, after reporting again on what's
5   been happening with the enterprises and the mortgage market, the
6   second page of the letter, the middle paragraph there, "The
7   enterprises' 2007 financial statements reported combined fourth
8   quarter losses" --
9           THE COURT:  Lockhart is somebody you all deposed;
10  right?
11          MR. HUME:  Yes.
12          THE COURT:  And you called him.
13          MR. HUME:  Yes.
14          THE COURT:  The objections are sustained.
15          MR. HUME:  Just so we're clear, that's objection
16  sustained on PX-513, 514, and 27?
17          THE COURT:  All of those are things you could have
18  discussed with him and asked him about.  Just pulling those out
19  of the blue without the witness is not something that's going to
20  be helpful to the jury, I find.
21          MR. HUME:  Understood, Your Honor.
22      The next FHFA document -- or, rather, is a defense
23  document, PX-298.  This is a document produced by Fannie Mae.
24  It is a document Susan McFarland --
25          THE COURT:  Who is SMG?
```

1          MR. HUME:  Senior Management Group of Fannie Mae.

2          THE COURT:  Okay.

3          MR. HUME:  This document was presented to

4    Ms. McFarland at her deposition, and she did give testimony

5    about it.  However, I don't believe the designated testimony of

6    Ms. McFarland includes her discussion of this document.  It is a

7    document giving talking points for a meeting or a lunch on

8    August 22nd, 2012.

9          I don't know if this is objected to or not.

10          MR. JONES:  It is, Your Honor.  Defendants object on

11    several grounds.  First, foundation, on the face of this

12    document, it isn't clear what this is, who created it, who saw

13    it, if anyone.  Mr. Hume just represented that SMG at the top

14    stands for Senior Management Group.  I wasn't aware of that.

15          And he also said correctly that although they did call

16    Ms. McFarland as a witness in their case by deposition

17    designation, any testimony that she may have given about this

18    document -- and I don't even recall if she did, but it wasn't

19    played during the trial.  It was not presented to the jury.  So

20    this document would go to the jury with zero context for what it

21    is.

22          It is also -- it would also be unduly prejudicial for that

23    reason.

24          THE COURT:  Can I see the top of it again?

25          All right.  The objection is sustained.

```
 1              MR. HUME:  Your Honor, I'm not surprised by that, and
 2    I appreciate and understand that.  Depending on whether it's
 3    within scope, we may present a short rebuttal case.
 4              THE COURT:  I can't hear you.
 5              MR. HUME:  Depending on -- we may present a short
 6    rebuttal case after defendants' case.  May I just ask that if
 7    it's within scope, we be given a chance then?
 8              THE COURT:  I understand.
 9              MR. HUME:  I understand without context it's not
10    useful.  So I respect and understand that.
11         The next document is PX-180.  This is -- again, could we
12    bring it up on the screen.
13              MR. JONES:  We have no objection to this one.  I don't
14    know if that shortens your discussion.
15              MR. HUME:  That shortens my argument quite
16    efficiently.
17              THE COURT:  180 is received without objection.
18         (PX-180 received into evidence.)
19              MR. HUME:  The last of the defendants' documents,
20    PX-512, Your Honor made a ruling yesterday on PX-226.  This is a
21    portion of that e-mail that only contains what FHFA sent to
22    Treasury --
23              MR. JONES:  No objection with the redactions.
24              THE COURT:  It's received without objection.
25         (PX-512 received into evidence.)
```

1           MR. HUME:  So that completes the defendant documents.

2      I'm reminded by my colleague that we do need -- PX-37 and

3  PX-40 are the 2013 10-Ks for Fannie Mae and Freddie Mac.  We

4  move those in evidence.

5           MR. JONES:  No objection to PX-37 and PX-40.

6           THE COURT:  So these are plaintiffs'?

7           MR. HUME:  They are the Fannie Mae and Freddie Mac

8  10-K SEC filings.

9           THE COURT:  What are the numbers?

10          MR. HUME:  Plaintiffs' Exhibit 37 and Plaintiffs'

11 Exhibit 40.

12          THE COURT:  Okay.  They're received.

13     (PX-37 and PX-40 received into evidence.)

14          MR. HUME:  Thank you.

15     The next category of documents, Your Honor, are documents

16 prepared by the accounting firm Grant Thornton.  They are -- I

17 will get to the admissibility of them, but Grant Thornton was

18 hired by the -- as these documents themselves show, Grant

19 Thornton was hired by the Treasury Department in 2008 and

20 retained for several years to do an annual evaluation of the

21 Treasury's interests under the preferred stock purchase

22 agreement.

23     There are four documents that we seek admission on, and I

24 will explain what they are and why they are, and we can bring

25 them up.

1        The first is PX-225.  PX-225 is a list of questions Grant

2   Thornton has for the Fannie Mae forecasting group.  And the

3   questions include on the second page under the "other items,"

4   under paragraph 4B, "What are the plans for the DTA?"

5        We seek admission of that simply for the fact that that

6   question was asked, not for any other purpose.  So we don't

7   believe it is hearsay.  If it were hearsay, we think it would be

8   a business record.  But we only seek its admission to show that

9   that question was asked by Grant Thornton on July 26, 2012.

10        It may not have been the best document for me to start

11   with, because the other ones do a better job of showing what

12   Grant Thornton is and what their role is.

13        I don't know if there's an objection on this.

14            MR. JONES:  Yes.  We object to this; hearsay, lack of

15   foundation, undue prejudice.

16        First of all, this is hearsay.  It's not a public record.

17   It's not even a government document.  There's been zero

18   testimony about this document, so no foundation laid for

19   business records exception at all.

20        And on the face of it, you can't even tell who made it, who

21   saw it, who did anything with it, you know.  What is it?  Maybe

22   the jury has heard the name Grant Thornton.  I couldn't say for

23   sure.  But there's nowhere near enough testimony or context for

24   the jury to be able to use this in any straightforward way.

25        And there's -- Mr. Hume said something about they just want

1    to get in the fact that the question was asked.  We don't

2    actually know from this document whether the question was ever

3    asked or, if so, of whom or what the answer was.

4         MR. HUME:  I could limit it to saying we simply want

5    to note that Grant Thornton was planning to ask the question,

6    nothing more than that.

7         But I do think the foundation and the context may be aided

8    by the other documents.

9         THE COURT:  What are the other Grant Thornton

10   documents?  Let's look at them all.

11        MR. HUME:  If I could, Your Honor, show PX-131.

12   PX-131 --

13        MR. JONES:  Mr. Hume, do you have a copy of this one?

14   This was not on the list you sent before.  So we don't have

15   copies of 131 or 132.

16        You can go ahead while they're getting it.  Thank you.

17        MR. HUME:  Sorry about that.

18        MR. JONES:  No problem.

19        MR. HUME:  PX-131 is a November 8, 2011, letter from

20   Grant Thornton to Ms. Carole Banks, 1500 Pennsylvania.

21        The subject matter is "valuation of senior preferred stock

22   purchase agreement warrant of the Federal National Mortgage

23   Association," meaning Fannie Mae, "as of September 30, 2011."

24        It begins by saying, "Dear Ms. Banks.  As requested, we

25   have determined the fair value of the warrant."  It goes on to

1      explain the work that Grant Thornton has done to do that.

2             This document, we believe, has relevance because it shows

3      an actual valuation that Grant Thornton did for Treasury that

4      can be found on page 27 of 41 of this document.

5             On page 27 of 41, if you could blow up the lines on the --

6      you were at the right place.  What happened?  One more document

7      up.  Page 27.  You're on 28 now.  That's right.  The bottom left

8      box of three lines and the numbers, that's it.

9             This shows that Grant Thornton determined, based on all of

10     the analysis reflected in the document, an adjusted estimated

11     value of the warrant for Fannie Mae of $967 million for the

12     common stock warrant.

13            And we believe it is relevant to the case that Treasury

14     valued its common stock warrant.  If that had value, there's

15     been some testimony and argument -- testimony by, I believe,

16     Mr. DeMarco and others, an argument that private shareholders

17     had no rights to dividends and didn't own anything valuable.

18     This is showing that Grant Thornton thought that Treasury's

19     stock warrant for 80 percent of the stock was worth almost

20     $1 billion.

21            And this is still in September -- as of September 30, 2011,

22     before the many positive developments in 2012.

23            So number 1, we admit it to show that there was value in

24     these common stock warrants, that Treasury was valuing them or

25     having someone value them, and number 2, I think this helps lay

the foundation for what Grant Thornton's role was.

There's a similar document for Freddie Mac, which we don't need to look at, PX-132, that shows valuation of the common stock warrant estimated at about 500 million.

And then the final Grant Thornton document is PX-194, which is a simple agenda for a meeting between Grant Thornton and Treasury.

Sorry.  This is 194.  PX-194 is an e-mail from an Anne Eberhardt at Grant Thornton to a series of people at Treasury. Subject, "meeting with Treasury, KPMG, and GT for FY 2012 GSE valuation," and it attaches the agenda for the May 29, 2012, meeting.

It says "Treasury, KPMG, and Grant Thornton."  That makes clear who GT is.  And if you look, it has a layout of events that will happen during the year.

And under point 4, it shows the Grant Thornton work to value the common stock warrants, value the senior preferred shares, and calculate the liquidity commitment.

If we go just back up to the top under "new valuation issues," the second bullet point is "returning the deferred tax asset to the GSE balance sheets."

Now, Your Honor, I just want to remind the Court that when this case began, defendants submitted a declaration from Mario Ugoletti to explain why the defendants agreed to the net worth sweep.  And in paragraph 20 of that declaration -- and we can

1    pull it up, it's in evidence -- Mr. Ugoletti said that when they

2    agreed to the net worth sweep in August 17th, 2012, neither the

3    enterprises nor FHFA had begun to consider rerecording or

4    writing up the deferred tax asset.  He then said neither

5    Treasury nor FHFA envisioned the deferred tax asset write-up.

6         I'm happy to present the precise language, but that is my

7    best good-faith recollection of what it says in his declaration.

8         This is relevant evidence that these issues were being

9    discussed, at least at some level, before August 17th, 2012.

10           MR. JONES:  Your Honor, defendants object to all three

11   of these documents.  That's PX-225, PX-131, and PX-194.

12        To begin with, they're -- and 132.

13           THE COURT:  I thought it was 294.

14           MR. JONES:  All four of these documents, 225, 131,

15   132, and 194, are all inadmissible hearsay.  They're

16   documents -- the only hearsay objection that I heard Mr. Hume

17   raise at all was business records.  They're not business

18   records.  They don't meet the test.

19        There's also been no testimony at all to even try to

20   establish the elements for the business records exception, which

21   leads to the next objection, which is foundation.

22        The plaintiffs deposed a Grant Thornton witness in this

23   case, but they did not designate any of the testimony from that

24   deposition to play to the jury.  So the jury has not heard from

25   and will not hear from anyone from Grant Thornton at all about

these documents or any of the work that Grant Thornton was doing for the Treasury Department.

So those are sort of the generalized objections on hearsay and foundation. Just a couple of specifics as I was trying to study these documents.

I still don't have a copy of 131, but what I was able to follow, PX-131 is a 41-page letter from Grant Thornton to maybe the Executive Office of the President about some sort of valuation. We had no opportunity to cross-examine about this document because they didn't put on any witness about it, what was the context.

And as to the various spreadsheets and charts and text in here, again, the jury, without context, could not be expected to make heads or tails of this document and the numbers that it's presenting without any witness testimony.

MR. HUME: Your Honor --

THE COURT: The objections are sustained.

What's next?

MR. HUME: Next, Your Honor, are nine Treasury documents. And of course, the Court has already issued some rulings on Treasury documents, which we are mindful of.

If I could, Your Honor, I would like to set the context for these. I think some of these -- I don't know if any of them are not objected to. I'm anticipating they are all objected to.

Some of them, I think, fall more squarely within the

1    Court's prior rulings and are clearly public records.

2              THE COURT:  Okay.

3              MR. HUME:  Some of them will be closer calls and, we

4    would argue, are not hearsay but go to state of mind.

5         But the big picture, Your Honor, is that these -- the FHFA

6    has said in this case they did the net worth sweep to avoid the

7    problem of eroding the capital commitment and it was the fear of

8    making losses and circular draws that would erode that

9    commitment.

10        There is evidence already in the record and more that we

11   seek to offer here that there was a shared goal by Treasury and

12   FHFA to do the opposite, to not let the enterprises make money

13   and build capital, and that that is what drove the sweep, the

14   opposite of what they've said, the opposite of what's in

15   Mr. Ugoletti's declaration and their defense in this case.

16        The evidence that's already in the case on that, I will

17   point to two things which we could show.  One is PX-259, where

18   at the bottom, Mr. Griffin, who is an accountant at FHFA,

19   reports on a meeting that he just had with Mr. DeMarco.  "The

20   meeting with Ed went well."

21        Then we flip to the top.  He gets a question back from

22   Mr. Satriano, his boss, about did they talk about the auditors.

23   He talks about the going concern issue, which I don't think is

24   of relevance.  He does say, "There was a question about

25   rerecording certain deferred tax assets that had been written

1  off.  Jeff indicated both of the boards had discussed this at

2  the last meeting."

3      So the boards had discussed writing up the value of the

4  deferred tax assets.

5      And Mr. Griffin, who is reporting on a meeting with Ed

6  DeMarco, says -- this, you can highlight.  He says, "I do not

7  think that makes sense, given the amendments are designed to

8  demonstrate wind-down."

9      Mr. DeMarco testified that that is not his view.  He was

10  asked, Was the net worth sweep something that was designed to

11  demonstrate wind-down?  He said not from his standpoint.  He

12  said it in deposition; he said it again at trial.

13      But this document is from an accountant who met with him

14  and is reporting on his meeting with him and says that his

15  understanding is the amendments are designed to demonstrate

16  wind-down and it's for that reason he doesn't think it makes

17  sense for them to write up assets.

18      Again, the point being, there's evidence of a shared goal

19  to do the opposite of what Mr. Ugoletti and the defendants have

20  said.  It's not that they were worried about losses that would

21  erode the capital commitment.  It's that they were worried they

22  would make money and retain earnings and build capital, and that

23  would tell the market, hey, these guys might come back, they

24  might exit conservatorship.

25      And they did not want that as a policy matter.  They

1    wanted -- they did not want any momentum to be built for Fannie

2    Mae and Freddie Mac returning to their old models, and

3    therefore, building profits, making profits, building net worth

4    was something they wanted to prevent.

5         MR. JONES:  Mr. Hume, I'm just confused.  This is

6    PX-259.  This document is already in evidence.  Ms. Jenkins just

7    confirmed.  We didn't object to this document.

8         MR. HUME:  I understand that.  I'm trying to lay the

9    foundation for there being a shared goal.

10        Every time we talk about the Treasury documents, we get a

11   long speech about how completely irrelevant what Treasury said

12   is, unless I can show the physical document being held up to an

13   FHFA person's face.  And I'm just saying, there is evidence of a

14   shared goal.

15        There's also a document from Mr. Ugoletti right after the

16   earnings are released saying there's a renewed push for the net

17   worth sweep the day after Fannie and Freddie release their

18   profit numbers of the second quarter, which were above the

19   10 percent and building positive net worth.  But I will skip

20   over that and go to this notion of a shared goal.

21        PX-144 is not in evidence, and we offer it in evidence.  It

22   is an e-mail with an agenda from Mary Miller, the under

23   secretary for finance to Mr. DeMarco.  So here we do have

24   something sent to Mr. DeMarco.  And she says, "Here is a draft

25   agenda for discussion."

1       And the agenda on the next page, "agenda for discussion

2    with FHFA," the first paragraph says, if we can blow it

3    up, "FHFA and Treasury share common goals to promote a strong

4    housing market recovery, reduce government involvement in the

5    housing market over time, and to provide the public and

6    financial markets with a clear plan to wind down the GSEs."

7       So it's a shared goal.

8       And you can put that back and go to paragraph numbered 2

9    and blow that up.

10      Number 2 says, "Establish meaningful policies that

11   demonstrate a commitment to winding down the GSEs."

12      Again, this is a document shared between the under

13   secretary of domestic finance at Treasury and Mr. DeMarco.  It's

14   clearly relevant.  It shows the joint plan.  It's January 2012.

15   And it is clearly a public record and a business record, and

16   it's really simply showing that the statement was made.

17      So we think it's not -- we think it's not hearsay to begin

18   with, but even if it were, it would clearly satisfy those

19   exceptions.

20      Also, I am told, Your Honor, that this one may be the

21   easiest one, because this one was in Mr. Ugoletti's designated

22   video deposition, and I'm told by my colleagues that the Court

23   said it would be admitted.  So perhaps there's no objection on

24   this one.

25          MR. JONES:  No, we object to this one.

 1                THE COURT:  Okay.

 2                MR. JONES:  So several objections.

 3          First and just quickly, because we've gone over this,

 4     hearsay.  This is described as a draft agenda for a meeting that

 5     has not happened yet.  So we don't believe that that's a public

 6     record.  On its face, it's iterative.  It's marked as a draft.

 7     It's future-looking.  The meeting hasn't happened yet.

 8          But beyond that, there are several other problems with

 9     admitting this document and doing it now.  First of all, when

10     Mr. DeMarco -- so this is an e-mail from Mary Miller at Treasury

11     to Mr. DeMarco about an upcoming meeting.

12          When Mr. DeMarco was here and testified during the trial,

13     the plaintiffs asked him about this meeting on the stand, but

14     they did not use this document or show it to him.

15          So it's very prejudicial to us to put this document in now

16     when Mr. DeMarco is not still on the stand.  We have no

17     opportunity through our examination to elicit his explanation or

18     commentary about this document.

19          Mr. Hume said that this document was discussed by

20     Mr. Ugoletti during his deposition video which was played.  The

21     problem is that what Mr. Ugoletti said is that he had never seen

22     this document before because he's neither a sender nor a

23     recipient of this e-mail.  Mr. Ugoletti is not on here at all.

24     So deposition testimony from Mr. Ugoletti about a document that

25     he's never seen can't lay a proper foundation.

1    I would also note that there was additional deposition

2    testimony in the -- about this document from Mr. Bowler and

3    Mr. Foster who, as the Court knows, there is no -- no one will

4    be playing their deposition videos.  So the jury will not hear

5    from Mr. Bowler or Mr. Foster about what they had to say about

6    this document during their depositions.

7        So for those reasons, hearsay, foundation, and undue

8    prejudice, particularly putting it in now at the very end of the

9    case after Mr. DeMarco has left the stand.

10             MR. HUME:  Your Honor, if I may briefly respond.

11       I'm not aware of a rule that you have to show an otherwise

12   admissible document to a witness in order to have it admitted.

13   The whole reason we're here is you're allowed to offer documents

14   into evidence.  The defendants can present their case.  They can

15   present whatever evidence they want about this document.  It is

16   simply recording a meeting and what was planned for that meeting

17   between Treasury and FHFA.

18       And this Court has previously held in its decision on

19   October 13th, at the top of page 20 of the ECF 221, "It is

20   conceivable that evidence of Treasury's negotiating position or

21   pressures from the White House could provide some insight into

22   whether FHFA in fact negotiated the Third Amendment in

23   accordance with shareholders' reasonable expectations."

24       The Court also held on the previous page that some of these

25   documents that defendants tried to exclude memorialize

1    conversations between FHFA and Treasury.  At that time the Court

2    wanted to -- denied their motion to exclude all these documents,

3    denied our motion for a wholesale inclusion.

4            THE COURT:  I will receive it.  I think it is not

5    inadmissible hearsay.  It is in effect a public record, and I

6    will receive it.

7        (PX-144 received into evidence.)

8            THE COURT:  What's your next one?

9            MR. HUME:  So that's PX-144.

10   PX-146 is a very similar document, if we can bring that up.

11   It's a document -- a Treasury memorandum that says "briefing

12   memorandum for Secretary Geithner," relating to an event,

13   meeting with Edward DeMarco, acting director of FHFA, on Friday,

14   January 6th, 2012.

15       The first paragraph says, "Primary objective:  To discuss

16   the shared goal between the FHFA and Treasury to reduce

17   government involvement in the housing market and Treasury's

18   desire to provide the public and financial markets with a clear

19   plan to wind down the government-sponsored enterprises over

20   time."

21           THE COURT:  What was the very top of that?

22           MR. HUME:  "Briefing memorandum for

23   Secretary Geithner."

24           THE COURT:  Oh, for the secretary, okay.

25       Does it show who signed it?

1          MR. HUME:  On the back, it says who the participants

2     in the meeting will be.

3          THE COURT:  So we don't know who wrote it.

4          MR. HUME:  I don't think this document states who

5     authored the document.

6          One other point of relevance, Your Honor, is in the second

7     bullet under "key points to make."  The second key point to make

8     is, "Stress Treasury's desire to establish meaningful policies

9     that demonstrate a commitment to winding down the GSEs."

10          THE COURT:  I understand.

11          What's the argument for the objection?

12          MR. JONES:  We would argue hearsay on this one for the

13     same reasons.  But this document has additional problems, which

14     is, there's no indication who created this.  The Bates stamp

15     indicates that it was produced by the Treasury Department, but

16     beyond that, we have no idea who wrote these words, who said

17     them, and it's labeled a briefing memo.

18          This is an additional one where this is about a meeting

19     that Mr. DeMarco attended, and plaintiffs didn't show

20     Mr. DeMarco in his testimony.  I think Mr. Hume indicated we

21     could try to clean that up in our case, but as Your Honor knows,

22     we had an agreement with the other side.  And so it -- hearsay

23     and the total lack of context for who created this document, for

24     what purpose, who was it shared with, the jury will know none of

25     that.

1          MR. HUME:  Two quick points, if I might, Your Honor.

2      Your Honor, we have a stipulation on authenticity of all

3  these documents.

4          THE COURT:  I understand.  And it shows U.S. Treasury

5  produced.  So it will be received.

6      (PX-146 received into evidence.)

7          THE COURT:  Since it's authentic and it's produced by

8  the Treasury, I will receive it.

9          MR. HUME:  Now, the next document is PX-210, an

10  internal Treasury e-mail attaching a list of Q and As, questions

11  and answers on housing finance reform.

12      The first sentence says -- actually, if you go to the next

13  e-mail down, the context is clearer.  It says, "TFG will be

14  testifying on the 25th and 26th."  The record will show

15  Secretary Geithner testified to Congress on those days.  This is

16  a set of questions and answers to prepare the Secretary for his

17  congressional testimony.

18      The only portion of it that plaintiffs seek to use are

19  found on pages 9 and 10 -- or really 9 to 11, I should say,

20  because that is the portion in which there are Q and As relating

21  to the preferred stock purchase agreements.

22      The first Q and A, just as a point of interest, Your Honor,

23  is who at Treasury is in charge of managing the preferred stock

24  purchase agreement.  It refers to the under secretary of

25  domestic finance.  That was Mary Miller.  And then the Office of

1    Capital Markets, that was Tim Bowler.

2        But the relevance of it is the third bullet -- there are

3    two or three points here.  Again, it talks about wind-down in

4    the third bullet point under the second question.  But if we go

5    to page 10, there's three pages of questions and answers on the

6    PSPAs.  One big point is, none of the points reference any

7    concern about the circular draw making a material erosion of the

8    Treasury commitment, and we, therefore, think that's important

9    evidence about the extent to which that was a serious concern.

10       Second point is, if we go to the question on page 10 that

11   says, "Has the Administration considered" -- sorry.  Page 11 of

12   the .pdf.  That's the confusion.  Sorry.  That's it.

13       In the middle of that page, "Has the Administration

14   considered modifying the PSPA agreements before the capacity

15   becomes fixed at the end of 2012?"

16       That's the closest you get to kind of a hint that well,

17   there are going to be caps; instead of being unlimited, it's

18   going to be a capped commitment.

19       You then have six bullet points, none of which talk about

20   an amendment for the net worth sweep, none of which say that

21   this is a serious problem, that there could be an erosion of the

22   commitment once it becomes capped.

23       And to the contrary --

24            THE COURT:  All of which is written by Treasury.  So

25   it doesn't mean anything anyway.

1    All right.  What's the objection?

2         MR. JONES:  Hearsay, Your Honor.

3         THE COURT:  Overruled.  It's received.

4    (PX-210 received into evidence.)

5         THE COURT:  For what it's worth.

6         MR. HUME:  Understood, Your Honor.

7    PX-227 is an e-mail from Mr. Bowler, who is in the office

8    of housing finance -- sorry, office of capital markets at

9    Treasury, to Mr. Jim Parrot, who was the senior advisor to the

10   National Economic Council at the White House.  It copies

11   Mr. Michael Stegman, who is the author of that memo, recounting

12   the meeting between Mr. DeMarco and Mr. Geithner.

13        THE COURT:  Right.

14        MR. HUME:  The date is August 6, 2012.  It says, "Let

15   me know when you can discuss.  Now very timely."  And this

16   document contains a term sheet of the recommended changes from

17   the 10 percent dividend to the net worth sweep.

18   And underneath "timing," it says, "Timing.  Announce in

19   mid-August after each GSE releases record second quarter

20   earnings."  So that was anticipated.  It then says, "Earnings

21   will be in excess of current 10 percent dividend paid to

22   Treasury."  So that was known or anticipated.

23   And then under "rationale," the rationale includes a number

24   of points, but the third major bullet point after saying that it

25   protects the taxpayers, it says, "The GSEs will be wound down

1    faster and will not return to their past state."

2        The next bullet point, I think, is the critical one, if you

3    could just pull it back up.  I'm going to read the third bullet

4    point -- the first bullet point under that last one is "GSEs

5    will not be allowed to build capital and exit conservatorship in

6    their prior form."

7        And again, on relevance, I would point the Court to its

8    decision on October 13th, page 20, ECF document 221 in the

9    Fairholme case.  "It is conceivable that evidence of Treasury's

10   negotiating position or pressures from the White House could

11   provide some insight into whether FHFA, in fact, negotiated the

12   Third Amendment in accordance with shareholders' reasonable

13   expectations."

14       So that's relevant, because again I think there is evidence

15   in this case supporting that this was done for the opposite of

16   the reason that they were not going to make enough money and

17   were going to have a circular draw that eroded the commitment,

18   but instead was done because they didn't want to let them build

19   capital.

20           THE COURT:  I understand.  Go back to who the people

21   are.

22           MR. HUME:  If we go back up to the top of the e-mail,

23   it's Mr. Bowler from the Treasury Department in the office of

24   capital markets sending it to Mr. Jim Parrot, who was at the

25   National Economic Council in President Obama's White House, and

1    copied to Michael Stegman.

2           THE COURT:  Who was Stegman?

3           MR. HUME:  Stegman was at Treasury, who was the person

4    who wrote the memo based on what Secretary Geithner reported

5    from his meeting with Mr. DeMarco.

6           THE COURT:  So this is all internal Treasury, sending

7    it to the White House.

8           MR. HUME:  Correct.

9           THE COURT:  Let's hear the objection.

10          MR. JONES:  We would object, Your Honor; relevance,

11   prejudice, and hearsay.

12       Under Your Honor's ruling related to the potential

13   relevance of some Treasury documents, this does not qualify.

14   There's no indication that these particular positions would be

15   expressed to FHFA.  There's no evidence that these particular

16   provisions were expressed to FHFA in negotiations.  They were

17   shared from the Treasury Department to the White House.  That's

18   all we know about this.

19       On hearsay, Your Honor, this document is different from the

20   other documents that Your Honor has admitted over hearsay

21   objections.  This document is marked as recommended changes.  So

22   it's one person's suggested changes to a term sheet, which

23   itself is not a financial deal.  It's very preliminary,

24   iterative, and irrelevant.

25          MR. HUME:  Your Honor, very briefly, on page 3, on the

1    hearsay point, this document was approved by Mary Miller, under

2    secretary for domestic finance.  It was drafted by capital

3    markets, Tim Bowler.  I think he was the head of the office of

4    capital markets.  It was approved by Mary Miller and Michael

5    Stegman.

6        I think this satisfies the public record exception, Your

7    Honor.  I also think it goes to state of mind, even if --

8            THE COURT:  I'll receive it.

9        (PX-227 received into evidence.)

10            THE COURT:  It certainly shows what Treasury was

11    thinking, and DeMarco has already testified about his

12    communications with Treasury.

13        All right.  Any others, then?

14            MR. HUME:  Almost done.

15            THE COURT:  All right.

16            MR. HUME:  PX-270 is an e-mail chain between Treasury

17    employees.  The top e-mail is from Mr. Parrot, who is in the

18    White House, to Mr. Bowler -- actually, it's to Adam Chepenik,

19    another Treasury employee, copying Mr. Bowler and Mr. Stegman.

20    And he has been sent -- as the e-mail below says, he has been

21    sent some questions and answers.

22        He then responds by saying, "Perhaps I'm reading too

23    quickly, but where are the attached in the new version?"

24        This is Mr. Parrot now from the White House, from the

25    National Economic Council.  And he has attached something that

1    he didn't see in what was sent to him.

2         The attachment, then, has -- if we go to the next page, it

3    has something called "difficult critiques."  First it has

4    critiques "from the right," and then it has "from the left."

5              THE COURT:  These are White House critiques?

6              MR. HUME:  I believe the context shows these are their

7    preparations -- this is their answers to the potential critiques

8    they could face after they announce the change.

9              THE COURT:  Right.

10             MR. HUME:  I think that's what the context shows.  If

11   you look at "from the right," it begins --

12             THE COURT:  Who wrote these answers?

13             MR. HUME:  I believe they came from Mr. Parrot

14   directly.

15             THE COURT:  Okay.  The objection to those is

16   sustained.  There's no evidence that was ever transmitted to

17   DeMarco; right?

18             MR. HUME:  That's why I began the way I did, Your

19   Honor.

20             THE COURT:  I'm sorry?

21             MR. HUME:  That's why I began with one or two exhibits

22   already in evidence, to try to demonstrate that there is -- we

23   would submit there is evidence in the record that these things

24   were communicated to FHFA.

25             THE COURT:  I didn't hear you.

```
 1              MR. HUME:  There is, in our view --

 2              THE COURT:  Not argument.  I said evidence.

 3              MR. HUME:  -- circumstantial evidence.

 4              THE COURT:  That doesn't cut it.  Either DeMarco knows

 5      about that or he doesn't.  He wasn't asked about it.  So forget

 6      it as a document coming into evidence.  It's not admitted.

 7          What's your next one?

 8              MR. HUME:  PX-271, I think, is a qualitatively

 9      different type of document, Your Honor, because it is a final

10      set of Q and As to address questions about the net worth sweep

11      sent from Adam Chepenik.

12              THE COURT:  Being sent to the White House?

13              MR. HUME:  It was sent to the White House.

14              THE COURT:  So what?

15              MR. HUME:  It reveals Treasury's state of mind.  And

16      the key point I would draw Your Honor's attention to, page 5 of

17      the document, at the top, it says "key framing/talking points."

18          And third, they say --

19              THE COURT:  When was the sweep announced?

20              MR. HUME:  It was announced the next day after this

21      document, on the morning -- before 9:00 a.m. on August 17th.

22              THE COURT:  All right.  Go ahead.

23              MR. HUME:  Well, Your Honor, as with the other

24      documents, we believe this shows Treasury's state of mind and is

25      highly relevant to the negotiation and what was really
```

1    happening.  That's point number 1.

2         Point number 2, we believe there is evidence in the record

3    that this was shared by Mr. DeMarco, circumstantial evidence

4    based on the e-mail where his colleague says that his

5    understanding was net worth sweep is designed to demonstrate

6    wind-down.

7         And point number 3, Your Honor, to Counsel's argument and

8    perhaps the Court's perception that we should have shown these

9    documents to Mr. DeMarco, I did try to show a similar document,

10   PX-226, which we thought was the clearest document on this, and

11   that was -- the objection to that was sustained.  So we were not

12   able to.

13        We're now trying to simply offer them in evidence this way

14   because we think they are not hearsay, they are highly relevant,

15   and there is evidence in the record that these perspectives and

16   motivations were shared.

17            THE COURT:  Go back to the first page of this.  What

18   is happening here?

19            MR. HUME:  So Megan Moore's e-mail says, "Do we have

20   final Q and A?"  Mr. Chepenik circulates the attachment we're

21   looking at, which is labeled "final PSPA announcement."

22            THE COURT:  And what is attached is supposed to be

23   that final PSPA announcement?

24            MR. HUME:  Yes.  The attachment with that file name is

25   what's shown here next to the e-mail.  Starting on page 3 of the

1    overall document is a series of PSPA amendment Q and As.  That's

2    the way it was produced.

3        I'm stating that based on my understanding of how these

4    documents are generally produced, that there's no issue of

5    authenticity.  If it was produced like this with these Bates

6    numbers, that means that was the attachment.

7                THE COURT:  Is that what was announced?

8                MR. HUME:  The attached document is not -- there is a

9    separate document that's the formal announcement.  So I can't

10   count for the file name saying "announcement."  I think that

11   somebody just gave that file name for these questions and

12   answers, which were designed to --

13               THE COURT:  For press guidance or what?

14               MR. HUME:  That's my understanding of it contextually,

15   yes.

16               THE COURT:  Go back to the page before that.

17               MR. HUME:  Did you want the cover page, Judge?  I can

18   also give you a hard copy, if that would be easier.

19               THE COURT:  Go to the next page.

20       I really think the Court has a lot of problems trying to

21   say that the government has no right to decide on how they're

22   going to do their business with the press and keep that

23   confidential, and for the government -- for the Court to come

24   along later and try to inhibit the government's ability to

25   decide how to best put things in the light for the press and

1   then without any ability to try to explain then how this was

2   prepared and done.

3        I don't think I can allow that to be used in that fashion.

4   I don't know if I would do it with a witness, but I certainly

5   don't see the Court being in the posture of just blindly saying

6   that internal documents like this prepared for the government

7   trying to figure out how to explain things like this should be

8   used in that fashion.

9        So I will sustain the objection.  The government has to

10  have some ability to be able to run itself without the Court

11  doing things like that to it.  So I think I have to sustain that

12  objection.  I know I'm for an open government as well as anybody

13  else, but I think the government has to be able to have some

14  ability to function.

15            MR. HUME:  The file name was at the bottom of that

16  second page, "PSPA announcement Q and A."  That's consistent

17  with the Court's ruling, but I wasn't able to point that out

18  earlier.

19       The next document, I hope, will not be controversial.  It

20  is PX-278 and is in fact the formal press announcement that was

21  released by the Treasury Department.

22            MR. JONES:  No objection.

23            THE COURT:  278 is received, then.

24       (PX-278 received into evidence.)

25            MR. HUME:  We're now on our last two.  I'm quite

1    confident there will be an objection.  Your Honor, the last two

2    documents go together.  On the left is PX-274, which in an

3    e-mail chain from a reporter at *The Wall Street Journal*, to Jim

4    Parrot.  In the middle of the page, there's an e-mail from a

5    reporter named Nick Timiraos to Mr. Parrot, who works in the

6    National Economic Council.

7         And it says "what Wallison told Bloomberg," and there's a

8    quote.  You don't need to highlight it until I tell you.  But

9    the quote is, "The most significant issue here is whether Fannie

10   Mae and Freddie Mac will come back to life, because their

11   profits will enable them to recapitalize themselves and then it

12   will look as though it is feasible for them to return as private

13   companies backed by the government, Wallison said in a telephone

14   interview."

15        Please highlight this:  "What the Treasury Department seems

16   to be doing here, and I think it's a really good idea, is to

17   deprive them of all their capital so that doesn't happen."

18        So that is an outside observer -- the record will show in a

19   moment, I believe, Mr. Wallison is a -- works at a think-tank,

20   the American Enterprise Institute.  That's what he told the

21   press.  And the point is, this is what's told to Mr. Parrot.

22        And PX-279, if we can now blow up the bottom e-mail of

23   PX-279, the first e-mail, this is all we care about from PX-279.

24   If we put the two together, this is 29 minutes later.

25   Mr. Parrot e-mails Mr. Wallison to say, "Good comment on

1    Bloomberg.  You are exactly right on substance and intent."

2        If we can put that box with the Wallison and Bloomberg

3    quote, it will be more clear.

4        We think again this goes to state of mind of the

5    administration.  It is the White House, not the Treasury

6    Department.  But it is a unitary executive.  The Treasury

7    Departments answers to the White House.  Mr. Parrot was clearly

8    involved.  And he is saying that Wallison's description that the

9    Treasury is trying to deprive them of their capital so they

10   cannot come back to life because their profits would enable them

11   to recapitalize themselves is exactly right on substance and

12   intent.  That is precisely the opposite of the defense being

13   made in this case.

14       We think this is evidence of the highest relevance, and it

15   is not hearsay in our view because we're simply admitting this

16   to show the state of mind of the administration.  And again, we

17   think there are strong circumstantial evidence that this state

18   of mind was shared with Mr. DeMarco and with FHFA.

19       So we move PX-274 and 279 into evidence.

20       MR. JONES:  Your Honor, defendants object to both

21   documents.  If Mr. Hume would be so kind as to just leave the

22   screen up the way it is, this is a helpful way for me to explain

23   the objection.

24       So the top e-mail that you're looking at on the screen is

25   from Mr. Timiraos -- he's a reporter at *The Wall Street*

1    *Journal* -- to Mr. Parrot.  He's at the White House.  And what

2    this e-mail is, it's like a game of telephone where the kids

3    whisper something into each other's ears one at a time.  This is

4    a *Wall Street Journal* reporter e-mailing the White House about

5    what someone at the think tank reportedly told a Bloomberg

6    reporter, Bloomberg News reporter, about what the American

7    Enterprise Institute think tank fellow thinks that, quote, the

8    Treasury Department seems to be doing here.

9         So it's multiple layers of hearsay deep.  And at the

10   bottom, you get a think tank person from Washington, D.C.,

11   speculating about what he thinks the Treasury Department, in his

12   own words, seems to be doing here.  And that gets passed up from

13   the American Enterprise Institute fellow reportedly to Bloomberg

14   News and then to -- you have The Wall Street Journal reporter

15   now is telling it to the White House, multiple layers of

16   hearsay, speculation at the bottom of it.

17        It's also irrelevant.

18        Then in the bottom e-mail below that one -- the first one

19   we were looking at just now on the top is PX-274.  On the

20   bottom, you have the excerpt from PX-279.  This is an e-mail

21   from Mr. Parrot at the White House to Mr. Wallison, who is the

22   American -- he's the think tank fellow.  He's the guy from the

23   American Enterprise Institute.  And you have a one-line e-mail

24   from the White House person telling the think tank fellow "good

25   comment in Bloomberg."

1        Your Honor, these documents are not plausibly public

2   records or qualifying for any sort of hearsay exception.

3        They are -- I would also note, Your Honor, and this is a

4   case that we've cited to the Court in some of the other recent

5   briefings, I think Mr. Hume said these were being offered for

6   some state of mind purpose.  A few days ago, they sought to

7   admit these documents, or at least in the motion in limine, to

8   admit Treasury documents.  They sought to admit these documents

9   for their truth under the co-conspirator exception.

10        And there is a Sixth Circuit case, *United States v.*

11   *Maher* -- it's 801 Fed.2d 1477 -- that explains that it's

12   inappropriate to try to reverse course when you try to admit

13   documents for their truth under some exception, are told that

14   exception does not apply, and then turn around and say you want

15   it for some nonhearsay purpose like for state of mind.

16        Many, many layers of hearsay.  It's just speculation from

17   some think tank person.  And it ends up at the White House.

18   It's irrelevant.

19            MR. HUME:  Your Honor, may I briefly respond?

20        First, on the last point, I meant to try to put this in our

21   brief the other day.  I can understand why courts, when you're

22   going with a particular document, you make one argument and you

23   lose and you make another argument, at some point, they think,

24   come on.

25        That's not what happened here.  We've got all the Treasury

```
 1   documents that we thought were important, and we tried to get

 2   them all in in one motion.  And the reason we did it was because

 3   if we needed a witness, we have to go through the Touhy process.

 4   So we tried to do it en masse and without a whole lot of nuance,

 5   as Your Honor noted, document by document.

 6        It is not inconsistent with that to say, you know what,

 7   many of these documents actually come in as state of mind.

 8   There's nothing inconsistent about that.  This is state of mind.

 9        Two points on this very well described series of chains in

10   the link of communication.  This could be completely fabricated.

11   It could be made up by a fairy monster.  It doesn't matter.

12   What matters is that Mr. Parrot says "exactly right on substance

13   and intent."

14        Now, lest it be confusing --

15             THE COURT:  If Mr. Parrot was at Treasury, it might

16   have some more impact.

17        I will sustain the objection.  He's thinking he knows what

18   Treasury thinks.  Somebody at Treasury needs to tell me what

19   they think, not Mr. Parrot.

20             MR. HUME:  We would submit he's Treasury's boss, but

21   we respectfully --

22             THE COURT:  He's not Treasury's boss.  He's a flunky

23   at the White House.  I know he might not like me saying it that

24   way, but he works at the White House.  The secretary works --

25             MR. HUME:  Understood, Your Honor.
```

1          THE COURT:  I'm sorry I called him a flunky.  He's

2    just a staff member at the White House.  He's nobody's boss.

3          MR. HUME:  Understood.

4      Your Honor, that concludes the issues on the exhibits.

5    There's one other loose end on plaintiffs' case-in-chief, which

6    is during -- and I don't think we need to resolve it now but

7    just to identify it.

8      During Mr. DeMarco's testimony, I asked him if he had

9    plans; the plans involved legislation.  I asked him, Did you

10   really think it could pass in 2012, President Obama in the White

11   House and Republicans in the House?  And he quite definitely

12   said there was legislation that passed, and he said it passed

13   the Senate Banking Committee.

14     And the question was about 2012.  We think it was an error,

15   and we checked.  There is no legislation that passed in 2012.

16     We ask defendants to correct the record.

17         THE COURT:  I thought maybe he meant out of committee.

18         MR. HUME:  What he was talking about was something

19   that happened in 2014.  There's no dispute.  Defendants have

20   said that was what he was referring to.  But the testimony came

21   in as 2012.

22     I think the solution may be that we seek judicial notice

23   that nothing came out of committee in '12, in 2012.  My

24   colleague, Mr. Kaplan, has been dealing with this.  And I think

25   we're trying to work something out cooperatively.

```
1              THE COURT:  Okay.

2              MR. HUME:  Is that about right?

3              MR. KAPLAN:  Just to clarify one thing --

4              THE COURT:  I was thinking it more likely came out of

5   committee and he made a mistake.

6              MR. KAPLAN:  It may well be a mistake, Your Honor.

7   The point wouldn't be to say he was deliberately lying.  And it

8   was -- he reflexively said something in response to Mr. Hume.

9         But nonetheless, we do think it's important to correct the

10  record.  At the moment -- the only reason I'm up here, I wanted

11  to alert the Court to the state of discussions with my friends,

12  which is -- what we've agreed to is -- we're going to try to

13  work it out.  Because of the procedural place we're at where

14  we're resting, what we've agreed to is that if we are to submit

15  something, we will submit it in our brief rebuttal case.  They

16  will not object that it's beyond the scope.  And we will try to

17  work it out in the meantime.

18             THE COURT:  Okay.

19             MR. JONES:  Your Honor, briefly, we agree with what

20  Mr. Kaplan said about the procedures the parties have worked

21  out.  I would just say for the record we don't agree with the

22  characterizations of what happened.  I hope that we won't ever

23  have to bring it to you so you won't hear it again.

24             THE COURT:  You all have a motion?  Plaintiffs have a

25  motion as well; right?
```

1          MR. STERN:  Your Honor, I was jumping the gun.

2    Mr. Hume and I were going to discuss scheduling with the Court.

3    I know the Court usually does that off the record at the bench.

4    We have just a few comments.  We will wait until the Court is

5    ready for us.

6          THE COURT:  Was there a motion for judgment?

7          MR. JONES:  Yes.  Would you like us to go ahead and

8    make our motion for judgment now?

9          THE COURT:  The record's now closed; right?

10         MR. HUME:  Yes, Your Honor, subject to that judicial

11   notice issue, yes.

12         MR. JONES:  Thank you, Your Honor.  Stanton Jones for

13   the defendants.

14      The defendants move, pursuant to --

15         THE COURT:  I gave you a compliment yesterday, and

16   already you're in charge?  Just teasing.

17         MR. JONES:  Very good, Your Honor.  Thank you.

18      Pursuant to Federal Rule of Civil Procedure 50(a),

19   defendants move for judgment as a matter of law.

20      As Your Honor knows, the standard under Rule 50(a) is

21   basically the summary judgment standard and whether a reasonable

22   jury would not have a legally sufficient evidentiary basis to

23   find for the plaintiffs, and that is the case here for multiple

24   reasons.

25      First, plaintiffs have failed to prove harm or damages to

class members with reasonable certainty.  At summary judgment, the Court held that plaintiffs could try to prove that class members were harmed by the stock price drop on August 17th, 2012, so ten years ago.

Plaintiffs have not supplied a valid evidentiary basis for a jury to find harm to class members based on that one-day stock price drop ten years ago.  And here's why:  The class members -- under the class definitions, the class members are all current shareholders, only current shareholders, people holding the shares today.

And plaintiffs have introduced no evidence at all and no basis for a jury to conclude that the value of Fannie Mae and Freddie Mac stock would be higher than it actually is today but for the Third Amendment.  And that's fatal to their claim as a matter of law.

Now, plaintiffs rely on the event study to show that the stock prices dropped on the day of the Third Amendment back ten years ago.  But even if a jury were to accept that the event study establishes that stock price drop from ten years ago, the event study tells them nothing, and there is no other evidence to tell them what the stock price would be today in the absence of the Third Amendment.

That's true for all class members, whether they purchased their shares before the Third Amendment or after the Third Amendment.  And I would like to take those two in turn.

1          So start with class members who bought their shares before

2     the Third Amendment and have held them through all the way until

3     today, because those people would be in the class.  It's all

4     current shareholders.

5          Even if the stock price fell that one day ten years ago, if

6     you accept that the event study shows that stock price drop for

7     one day, plaintiffs have introduced no evidence that the price

8     of their shares today would be any different, any higher than it

9     is in the real world today if it weren't for the Third

10    Amendment.

11         These shareholders still hold the shares today.  They never

12    sold them.  So to establish harm from a stock price drop one day

13    ten years ago, they would need to prove by a preponderance of

14    the evidence that the value, the price of their shares today,

15    would be higher were it not for the Third Amendment.

16         And it's not intuitive that that's true.  It's not

17    intuitive that a one-day drop in the price of a stock -- we're

18    now over ten years ago -- is changing, depressing the price

19    value of the stock ten years later today.

20         And not only is it not intuitive, economically or

21    otherwise, there's absolutely no evidence that it's true.  There

22    is no evidence in the record from which the jury could conclude

23    based on an evidentiary basis that the stock price today for

24    class members who hold their shares today would be higher were

25    it not for the Third Amendment.  The jury would be left simply

1   to guess.

2       Again, even if the jury accepted the event study showing

3   the stock price drop ten years ago on that day in August 2012,

4   the jury would be left to guess whether these class members were

5   harmed and, if so, by how much on the basis of the value of

6   their shares today.

7       So that's class members who bought their shares before the

8   Third Amendment and still hold them today.

9       Now consider the other class members, which are those that

10  bought their shares after the Third Amendment and still hold

11  them today.  That's the rest of the class.  They have for

12  starters the same problem as class members who bought their

13  shares before the Third Amendment, which is that there's no

14  evidence and no basis for a jury to find that their shares today

15  would be worth more but for the Third Amendment.

16      So that's the same problem whether you're looking at

17  shareholders who bought before the Third Amendment or after.

18  But these shareholders who bought their shares after the Third

19  Amendment, they have an even bigger problem, which is if

20  anything, the evidence that has come in during the trial proves

21  that these shareholders who bought after the Third Amendment, it

22  proves that they were not harmed by the stock price drop.  And

23  if anything, they benefited from the stock price drop, because

24  as everybody knows, the objective in stock market investing is

25  to buy low and sell high.

1    And so we have all of these people in the class who bought

2    their shares after the Third Amendment, when on plaintiffs'

3    theory of the case the stock price was depressed, it was lower,

4    and they got to buy low.  Being able to buy low is not harm to

5    an investor in the stock market.  It's an advantage.  It's a

6    financial benefit to those people.

7    So because plaintiffs' theory of the case, of harm is that

8    the stock prices were depressed, were declined, dropped after

9    the Third Amendment, these shareholders who bought low, they got

10   the benefit of any price reduction that's attributable to the

11   Third Amendment.

12   If anything, Your Honor, it's the people who bought before

13   the Third Amendment and sold their shares after the Third

14   Amendment who may have been harmed by the stock price drop on

15   August 17th, 2012, ten years ago, because they did the thing you

16   don't want to do in the stock market.  They bought high or they

17   sold lower.

18   But none of those people are in the class, because by

19   definition, if you have sold your share, you are not in the

20   class, because the class is only the current shareholders.

21   So as to all class members, Your Honor, in sum on this

22   argument, a stock price drop during a 24-hour window ten years

23   ago is simply not informative, it isn't probative of whether the

24   market value of a current shareholder's stock in 2022 is lower

25   than it would be today but for the Third Amendment.

1    And plaintiffs have put in no evidence at all that would

2    allow a jury to make any determination one way or the other on

3    that issue, and they cannot just intuit it, because it isn't

4    intuitive.

5    And so for this reason, a jury could not find that the

6    plaintiffs have proven harm or damages with reasonable certainty

7    to any members of the class.  That's the first argument.

8    The second argument is related but distinct, and that is,

9    the evidence affirmatively establishes, similar to what I was

10   just describing, that the class now includes many people, many

11   class members who bought their shares after the Third Amendment.

12   They suffered no harm.  The evidence, I think, actually proves

13   that they did not suffer harm.

14   So the first argument you could think of as a failure of

15   proof.  This is a problem that the evidence affirmatively proves

16   no harm to many class members, all of them who purchased their

17   shares after the Third Amendment.

18   This argument, Your Honor, is a basis for judgment as a

19   matter of law under Rule 50(a).

20   We also think it's a basis for decertifying the classes,

21   because you have classes that now consist of a lot of people,

22   the entire universe of people who own shares today that they

23   purchased after the Third Amendment, who suffered no harm.

24   Your Honor may recall the Court certified these classes at

25   a time in the case before the stock price drop theory had even

1    been introduced into the case.  Dr. Mason's reply report with

2    the event study hadn't even been served yet.  The only theory in

3    the case at that time was lost dividends, and Your Honor's class

4    certification decision says explicitly -- finds the Rule 23

5    requirements of commonality and predominance were satisfied

6    exclusively and explicitly on the basis that lost dividends

7    harm -- so the theory that's out of the case -- was a viable

8    basis for proving an injury to all class members with common

9    proof.

10        So this is a Rule 50(a) judgment as a matter of law

11   problem.  It's also a class certification problem, having all of

12   these class members for whom the evidence proves they were

13   unharmed and, in fact, were financially benefited by having the

14   opportunity to buy when the stock price was lower as a result of

15   the Third Amendment on plaintiffs' own telling of the evidence

16   in the case.

17        So I will anticipate here that the plaintiffs will argue

18   that even if the seller was harmed, the person who sold the

19   shares who had bought high/sold low, because of the Third

20   Amendment, that person was harmed, they will say that -- well,

21   that person's not in the class, but I anticipate the plaintiffs

22   will say that this claim travels with the share, which is a

23   concept that has come up in several contexts in the case.

24        The problem, Your Honor, is that, unlike the prior lost

25   dividends theory where the theory was that the share was

entitled to receive dividends in perpetuity, forever, and that those should have been received but were not, that claim traveled with the share, but the claim now based on a drop in the stock price, that is the type of claim that is personal to the shareholders and does not travel with the share.

This concept of traveling with the share comes from UCC, the Uniform Commercial Code, Section 8-302, and there is an Ohio Supreme Court decision from 2018 that is the leading national decision on this issue, and it is directly on point.

The Court held there -- it's called *Cheatham v. Huntington National Bank*.  It's 157 Ohio State 3d 358.  And as a Michigan guy, it hurts me to say Ohio State out loud.  But it's just a citation, not a name of a school.

That is directly on point.  It holds that a court cannot certify a class of all current -- it was bondholders, not stockholders, just a different type of security.  The Court cannot certify a class of all current bondholders on a theory that they were harmed by a prior stock price drop because the people who had bought after weren't harmed and that type of claim does not travel with the share.  It doesn't travel with the share.

The Delaware case law, which, Your Honor, you may recall from prior contexts in this case, is consistent with that Ohio decision.  The Delaware case law establishes that this type of claim, that claims that are personal to the shareholder as

opposed to being something affixed to the share, do not travel

with the share.  And a claim that the shareholder -- that the

share dropped in value is a claim that's personal to the

shareholder, again because it harms the person when they sell

the share, not the person when they buy the share.

And if you just think about it for a minute, it really

doesn't make sense to think of this claim traveling with the

share.  The seller, the person who owned the share before, is

selling at a depressed price.  They are harmed by that

potentially.  The person who is buying the share is getting the

opportunity to buy the share at a lower price.  They are being

advantaged.  The idea that the buyer is somehow automatically

acquiring from the seller the right to assert the seller's harm

from having sold to the buyer low does not make any sense.

And the case law supports this, but I just wanted to make

sure that we convey that there is an incoherence to the notion

of applying this "claims travels with the share" concept when

you're talking about a harm based on a stock price drop.

Virginia hasn't addressed this issue at all under its

version of the Uniform Commercial Code, but I will say that

Delaware, Virginia, and Ohio have all adopted the model UCC

provision that says that their state's UCC statutes should be

construed, quote, to make uniform the law among the various

jurisdictions.

So all of these states have an objective to have their UCC

statutes construed uniformly.  And as I said, the 2018 Ohio

Supreme Court decision on this precise issue is the leading

national decision.

THE COURT:  And it's doing it under the UCC?

MR. JONES:  It is doing it specifically under this

exact same provision of the UCC, yes.

So for that reason, Your Honor -- that's our second

argument.

And the third argument, I'm saying this exclusively for

preservation purposes.  We understand from the summary judgment

stage that the arguments that we made related to *Collins* and

reasonableness, as well as the other argument, the public

interest provision, best interest provision of HERA is

incorporated into the contract and supplies the standard.  We

would renew those arguments now at the Rule 50(a) stage for

preservation purposes.

Oh, one more.  There is a sufficient evidentiary basis for

a jury to find that FHFA acted arbitrarily or unreasonably in

violation of the reasonable expectations of shareholders, just

an insufficient evidentiary basis.

Thank you, Your Honor.

MR. HUME:  This is Hamish Hume for the plaintiffs.

Your Honor, I think I can briefly respond.

THE COURT:  Sure.

MR. HUME:  The stock drop measures the harm that was

inflicted by the net worth sweep.  And it's a minimal measure.

The evidence in the record that supports harm to the shareholders is that under the net worth sweep 100 percent of everything goes to Treasury, and there is zero possibility of anything ever going to the private shareholders.

And the evidence shows that that resulted in the Treasury getting $150 billion more than it would have gotten.  That money would have been with the GSEs --  130 billion of that would have been with the GSEs, about 123.

The evidence also shows that Fannie and Freddie were extremely profitable from 2012 onwards.  2012, Fannie Mae made 7.6 billion, and that was a record.  You know what they made in 2013?  86 billion.  And they kept making profits year after year after year.

August 16, 2012, things were still a little shaky.  They were getting better, but the outside parties didn't know how good things looked inside.

What was the market price?  The market price was the estimate, the estimated value the market put on the potential that private shareholders would one day participate in the earnings of these companies and get dividends.  That's what that 2.6 billion was or 2.9 billion.

The net worth sweep took away the possibility of getting those dividends, and the stock dropped 1.6 billion, the three classes, and that is a stipulated fact.

 1          And there can be no -- it is inconceivable that a jury

 2     could not rationally find that that was caused by the

 3     announcement of the net worth sweep.  It would be irrational for

 4     a jury to find otherwise.

 5          But that's not -- I don't even think that's their argument.

 6     The point is, that is a measure of the harm inflicted on the

 7     shares, and this Court has ruled that the rights in those shares

 8     travel when they're sold.  Page 8 of this Court's 2018 ruling.

 9          And it is not a stock -- it is not the loss on the sale of

10     the shares that we are suing over.  It is the infliction of harm

11     on the shares themselves that no longer have that right to

12     potential dividends.  And the fact that they didn't go to zero

13     is only because somebody out there is betting that this thing is

14     going to go away.  It's the only way rationally they could be

15     anything other than zero.

16          And there is plenty of evidence in this record to support

17     the judgment that it would be higher than that, that right now,

18     given how well they've done, that $2.9 billion valuation before

19     the net worth sweep would be way higher, and the delta caused by

20     the net worth sweep would therefore be way higher.

21          So the evidence supports 1.6 billion as a minimal measure

22     of a harm that was inflicted on the shares and that runs with

23     the shares, as this Court has already ruled several times.

24          My colleagues have passed me lots of notes, but to me,

25     that's all we need to say.  If the Court is even remotely

1    considering it, I think my colleagues would want to brief.

2              THE COURT:  I agree.  The motion is denied.

3         Now, in terms of tomorrow morning, there's still some

4    argument about Attari which we may convene early to dispose of

5    since I'm tired.

6              MR. HOFFMAN:  That's fine with defendants, Your Honor.

7              THE COURT:  We will start at 9:30, since I told the

8    jury 10:00.  Can we do it in 30 minutes?

9              MR. HOFFMAN:  Yes, Your Honor.

10             MR. STERN:  Your Honor, the plaintiffs and defendants

11   have a joint proposal and request about scheduling.  I don't

12   know if the Court wants to do it like this or up at the bench.

13             THE COURT:  Yeah.

14             MR. STERN:  Your Honor, I think Mr. Hume and I are --

15   we join each other in this.  We were a bit over-ambitious in

16   thinking that we would be able to close and instruct and send

17   the jury out on Friday.  If the Court will indulge me.

18        The timing seems to evolve like this:  We expect that

19   Dr. Attari's direct examination will be in the range of two and

20   a half to three hours.  Obviously, Plaintiffs don't know yet how

21   long their cross will take; they haven't heard the direct.  But

22   if we presume one-half the time of direct examination, which is

23   probably a minimum, that would be four and a half hours of

24   testimony from Dr. Attari.

25        We then have Mr. Satriano.  We anticipate his direct will

be approximately one and a half hours.  Again, a conservative estimate for cross at half that would bring his testimony to two and a quarter hours.

That would mean that we have six and three-quarter hours of defense testimony.  If there's going to be some rebuttal case, even a minimal one, we're well into Friday morning, Your Honor, and that would sort of defeat what Mr. Hume and I had hoped would be a day that we could begin at 10:00 with closings.

So we understand that the Court has been shooting for Friday.  We respectfully submit that even if we got the closings in on Friday, unless the jury is going to come back in half an hour, which is probably unlikely in a case like this, they would be back Monday anyway.

So we would propose to move as efficiently as we can through the remaining evidence, then use Friday, whatever time is left on Friday, for a charge conference, because I think Mr. Hume and I also agree that it would be helpful for the parties to have a -- the Court may well know right now what it's going to do with jury instructions.  But it would be helpful for the parties to know that going into final preparation for their closing arguments.

I don't know how I drew the short straw having to make this request, Your Honor, but I think I can bill it as a joint one, and we would ask to rearrange the schedule so that we would plan to close on Monday morning.

1    We raise this today because I know that the Court told the
2    parties that the Court occasionally chats with the jurors about
3    nonsubstantive matters, and I thought if the Court were going to
4    grant this request --

5    THE COURT:  There will be some jurors who are going to
6    seek to be excused.  So I can talk to them.  I know that there
7    are a couple of jurors that have expressed to me that if it runs
8    over they're going to have problems.

9    MR. STERN:  The Court can certainly deal with those
10   problems, but for what it's worth, unless they were going to
11   render a verdict in 20 minutes, they would have to come back
12   Monday anyway.

13   So, Your Honor, can we plan to close on Monday morning, or
14   should we wait to hear back from the Court?

15   THE COURT:  I think you better plan on seeing how many
16   jurors want to be excused if I give them the bad news in the
17   morning and we see what the excuses are.

18   MR. STERN:  Understood, Your Honor.

19   THE COURT:  We can't get too low, or we run the risk
20   of a mistrial.

21   MR. STERN:  Understood, Your Honor.  And we would be
22   hopeful that as the Court said it would during voir dire, that
23   to the extent the Court may have some influence in relieving
24   jurors of some of their employment distress at least.

25   THE COURT:  Right.

```
1              MR. STERN:  Thank you, Your Honor.

2              THE COURT:  I don't know what their problems were.

3    They were just nervous.

4              MR. STERN:  Understood, Your Honor.

5              THE COURT:  One has a wedding, I know, and I don't

6    know if it meant the whole weekend or if it was away or what.  I

7    don't know exactly.  So I'll get more details.

8              MR. STERN:  Thank you, Your Honor.

9              THE COURT:  It may be at the lunch hour I will talk to

10   them in more detail.  If we could get through Attari, we'll do

11   that, and maybe at the lunch hour, I will talk to them about

12   what their problems are if we were to run over.

13             MR. STERN:  Thank you, Your Honor.

14             THE COURT:  See you all tomorrow at 9:30.

15        (Proceedings adjourned at 6:10 p.m.)

16

17

18

19

20

21

22

23

24

25
```

CERTIFICATE OF OFFICIAL COURT REPORTER


        I, Sara A. Wick, certify that the foregoing is a

correct transcript from the record of proceedings in the

above-entitled matter.



/s/ Sara A. Wick_____              October 26, 2022___

SIGNATURE OF COURT REPORTER              DATE

## $

**$150** [1] - 1828:7
**$194** [1] - 1772:23
**$20** [1] - 1778:19
**$200** [4] - 1743:9, 1766:22, 1773:13, 1773:24
**$71** [1] - 1772:22
**$900** [1] - 1766:21
**$967** [1] - 1788:11

## '

**'08** [1] - 1741:11
**'12** [1] - 1816:23

## /

**/s** [1] - 1834:8

## 0

**00000610** [1] - 1757:18

## 1

**1** [4] - 1745:23, 1788:20, 1788:23, 1808:1
**1.6** [2] - 1828:24, 1829:21
**10** [22] - 1729:23, 1730:12, 1730:23, 1731:5, 1731:15, 1741:15, 1742:5, 1742:14, 1743:24, 1744:25, 1760:4, 1766:13, 1767:13, 1769:9, 1794:19, 1800:19, 1801:5, 1801:10, 1802:17, 1802:21
**10-K** [6] - 1725:2, 1725:7, 1729:25, 1730:1, 1730:15, 1785:8
**10-Ks** [4] - 1757:10, 1757:11, 1776:18, 1785:3
**10-Q** [1] - 1768:20
**10-Qs** [2] - 1757:10, 1757:11
**100** [3] - 1741:10, 1744:13, 1828:3
**10020** [1] - 1722:4
**101** [1] - 1749:2
**10:00** [3] - 1775:18,

1830:8, 1831:8
**11** [2] - 1800:19, 1801:11
**123** [1] - 1828:9
**1251** [1] - 1722:3
**13-cv-1053** [1] - 1721:4
**13-mc-1288** [1] - 1721:8
**130** [1] - 1828:8
**131** [3] - 1787:15, 1790:14, 1791:6
**132** [3] - 1787:15, 1790:12, 1790:15
**13th** [2] - 1797:19, 1803:8
**1401** [1] - 1721:22
**1477** [1] - 1814:11
**14th** [1] - 1771:21
**15** [2] - 1725:10, 1780:20
**1500** [1] - 1787:20
**1523** [1] - 1721:16
**157** [1] - 1825:11
**16** [5] - 1779:2, 1779:21, 1779:23, 1781:8, 1828:15
**17** [1] - 1779:2
**1724** [1] - 1723:4
**1745** [1] - 1723:4
**1749** [2] - 1723:10, 1723:11
**1751** [1] - 1723:6
**1768** [1] - 1723:6
**1777** [1] - 1723:12
**1784** [2] - 1723:13, 1723:14
**1785** [1] - 1723:15
**1798** [1] - 1723:16
**17th** [5] - 1790:2, 1790:9, 1807:21, 1819:3, 1822:15
**18.9** [1] - 1745:23
**180** [1] - 1784:17
**1800** [1] - 1723:17
**1802** [1] - 1723:18
**1805** [1] - 1723:19
**1810** [1] - 1723:20
**19** [3] - 1738:4, 1739:21, 1769:14
**19087** [1] - 1721:19
**194** [2] - 1789:8, 1790:15
**1980** [1] - 1752:4
**1983** [1] - 1752:5
**1:54** [1] - 1721:10

## 2

**2** [5] - 1771:22,

1788:25, 1795:8, 1795:10, 1808:2
**2.5** [1] - 1780:20
**2.6** [1] - 1828:22
**2.9** [2] - 1828:22, 1829:18
**20** [5] - 1747:22, 1789:25, 1797:19, 1803:8, 1832:11
**20001** [2] - 1722:9, 1722:13
**20005** [1] - 1721:23
**2002** [1] - 1752:16
**20036** [1] - 1721:16
**2006** [3] - 1752:16, 1753:6, 1753:9
**2007** [3] - 1778:19, 1780:5, 1782:7
**2008** [13] - 1725:21, 1727:17, 1754:2, 1754:5, 1777:22, 1778:5, 1778:6, 1778:10, 1778:20, 1779:21, 1781:8, 1782:2, 1785:19
**2009** [1] - 1754:8
**2010** [3] - 1742:4, 1742:10, 1761:9
**2011** [22] - 1724:14, 1725:2, 1725:8, 1730:1, 1730:3, 1733:12, 1733:19, 1742:4, 1742:10, 1757:17, 1758:3, 1759:17, 1759:23, 1761:4, 1763:11, 1763:17, 1768:4, 1771:10, 1773:19, 1787:19, 1787:23, 1788:21
**2011-2012** [2] - 1762:24, 1767:15
**2012** [52] - 1725:21, 1730:1, 1730:4, 1730:7, 1730:10, 1730:17, 1733:19, 1738:4, 1738:19, 1738:21, 1739:21, 1758:4, 1758:15, 1758:16, 1758:18, 1759:24, 1759:18, 1759:24, 1763:8, 1763:12, 1763:13, 1763:17, 1763:19, 1768:4, 1768:21, 1771:10, 1771:21, 1772:8, 1772:9, 1772:25, 1773:6, 1783:8, 1786:9, 1788:22, 1789:10, 1789:11,

1790:2, 1790:9, 1795:14, 1798:14, 1801:15, 1802:14, 1816:10, 1816:14, 1816:15, 1816:21, 1816:23, 1819:4, 1821:3, 1822:15, 1828:11, 1828:15
**2013** [10] - 1758:4, 1758:15, 1758:16, 1758:24, 1763:9, 1763:14, 1763:19, 1776:18, 1785:3, 1828:13
**2014** [3] - 1772:17, 1772:21, 1816:19
**2018** [3] - 1825:8, 1827:1, 1829:8
**202-354-3284** [1] - 1722:14
**2022** [3] - 1721:10, 1822:24, 1834:8
**21** [1] - 1737:2
**215** [1] - 1749:2
**22** [3] - 1772:9, 1779:7, 1780:16
**221** [2] - 1797:19, 1803:8
**225** [1] - 1790:14
**22nd** [1] - 1783:8
**23** [2] - 1779:7, 1824:4
**2311** [2] - 1772:13, 1772:14
**24-hour** [1] - 1822:22
**25** [1] - 1774:20
**258** [1] - 1743:11
**25th** [1] - 1800:14
**26** [3] - 1721:10, 1786:9, 1834:8
**261** [1] - 1749:3
**262** [1] - 1749:3
**266** [1] - 1749:4
**26th** [1] - 1800:14
**27** [10] - 1777:11, 1777:13, 1777:17, 1781:23, 1781:25, 1782:16, 1788:4, 1788:5, 1788:7
**278** [1] - 1810:23
**279** [1] - 1812:19
**28** [1] - 1788:7
**280** [1] - 1721:19
**29** [2] - 1789:11, 1811:24
**294** [1] - 1790:13

## 3

**3** [6] - 1757:17, 1765:17, 1780:10,

1804:25, 1808:7, 1808:25
**3.2** [1] - 1745:4
**3.8** [1] - 1780:8
**30** [4] - 1768:21, 1787:23, 1788:21, 1830:8
**31** [1] - 1738:19
**333** [1] - 1722:12
**358** [1] - 1825:11
**369** [2] - 1749:8, 1770:20
**37** [3] - 1777:4, 1779:12, 1785:10
**39** [1] - 1779:24
**394** [1] - 1749:9
**3:25** [1] - 1750:2
**3:56** [1] - 1750:2
**3d** [1] - 1825:11

## 4

**4** [1] - 1789:16
**40** [3] - 1777:4, 1779:13, 1785:11
**400** [1] - 1743:9
**408** [1] - 1749:11
**41** [2] - 1788:4, 1788:5
**41-page** [1] - 1791:7
**44th** [1] - 1779:20
**451** [2] - 1749:12, 1772:8
**4704-B** [1] - 1722:13
**477** [1] - 1725:12
**492** [1] - 1749:4
**498** [1] - 1777:1
**499** [2] - 1776:19, 1777:1
**4:30** [1] - 1774:17
**4B** [1] - 1786:4

## 5

**5** [3] - 1738:14, 1741:22, 1807:16
**5.5** [1] - 1780:25
**50(a** [4] - 1818:18, 1818:20, 1824:10, 1827:15
**50(a)** [1] - 1823:19
**500** [1] - 1789:4
**508** [2] - 1749:13, 1768:19
**513** [1] - 1781:7
**514** [1] - 1782:16
**527** [2] - 1749:13, 1771:18

**6**

**6** [4] - 1724:21,
1738:14, 1780:22,
1802:14
**601** [1] - 1722:8
**6122** [1] - 1757:18
**6:10** [1] - 1833:15
**6th** [1] - 1798:14

**7**

**7.1** [1] - 1780:7
**7.6** [1] - 1828:12
**703** [2] - 1736:6,
1736:19
**736** [4] - 1749:14,
1751:8, 1751:24,
1755:25
**79.9** [2] - 1745:24,
1745:25

**8**

**8** [3] - 1772:15,
1787:19, 1829:8
**8-302** [1] - 1825:7
**80** [1] - 1788:19
**801** [1] - 1814:11
**86** [1] - 1828:13

**9**

**9** [5] - 1737:25,
1741:23, 1770:22,
1800:19
**92** [1] - 1770:1
**9:00** [1] - 1807:21
**9:30** [2] - 1830:7,
1833:14

**A**

**a.m** [1] - 1807:21
**ability** [10] - 1726:20,
1726:24, 1727:9,
1768:1, 1780:23,
1809:24, 1810:1,
1810:10, 1810:14
**able** [9] - 1732:24,
1786:24, 1791:6,
1808:12, 1810:10,
1810:13, 1810:17,
1822:4, 1830:16
**above-entitled** [1] -
1834:5
**absence** [1] - 1819:21
**absent** [1] - 1765:23
**absolutely** [2] -
1747:7, 1820:21

**abstract** [1] - 1740:23
**accept** [2] - 1819:18,
1820:6
**accepted** [1] - 1821:2
**access** [3] - 1726:20,
1726:24, 1727:10
**accordance** [2] -
1797:23, 1803:12
**according** [4] -
1746:10, 1746:12,
1752:16, 1759:4
**account** [1] - 1774:5
**accountant** [2] -
1792:18, 1793:13
**accounting** [4] -
1752:7, 1752:8,
1752:10, 1785:16
**accuracy** [6] -
1756:14, 1756:22,
1757:2, 1757:5,
1757:8, 1769:4
**accurate** [6] -
1751:13, 1751:16,
1768:4, 1769:23,
1769:25, 1770:15
**achieve** [1] - 1774:1
**acquiring** [1] -
1826:13
**act** [1] - 1746:10
**Act** [2] - 1727:17,
1778:6
**acted** [1] - 1827:18
**acting** [3] - 1751:1,
1769:13, 1798:13
**ACTION** [1] - 1721:9
**actions** [5] - 1759:5,
1759:9, 1759:20,
1780:25, 1781:1
**activities** [2] -
1754:14, 1756:24
**actor** [1] - 1748:22
**actual** [2] - 1746:15,
1788:3
**Adam** [2] - 1805:18,
1807:11
**addition** [7] - 1730:20,
1730:22, 1730:23,
1731:6, 1756:16,
1770:11, 1771:6
**additional** [12] -
1728:20, 1742:6,
1743:23, 1764:17,
1769:16, 1770:4,
1770:25, 1772:2,
1776:6, 1797:1,
1799:13, 1799:18
**address** [1] - 1807:10
**addressed** [1] -
1826:19
**adequate** [2] -

1766:15, 1767:20
**adjourned** [1] -
1833:15
**adjusted** [1] - 1788:10
**administration** [2] -
1812:5, 1812:16
**Administration** [2] -
1801:11, 1801:13
**admissibility** [1] -
1785:17
**admissible** [1] -
1797:12
**admission** [4] -
1744:20, 1785:23,
1786:5, 1786:8
**admit** [6] - 1779:22,
1788:23, 1814:7,
1814:8, 1814:12
**admitted** [6] - 1737:4,
1779:13, 1795:23,
1797:12, 1804:20,
1807:6
**admitting** [2] - 1796:9,
1812:15
**adopted** [1] - 1826:21
**advantage** [1] -
1822:5
**advantaged** [1] -
1826:12
**adverse** [1] - 1742:2
**advisor** [2] - 1737:4,
1802:9
**affirmatively** [2] -
1823:9, 1823:15
**affixed** [1] - 1826:1
**AFTERNOON** [1] -
1721:12
**afternoon** [7] -
1724:10, 1724:11,
1748:15, 1749:23,
1750:6, 1755:18,
1775:19
**agencies** [1] - 1780:15
**agency** [1] - 1778:8
**AGENCY** [1] - 1721:6
**Agency** [1] - 1722:5
**agenda** [7] - 1789:6,
1789:11, 1794:22,
1794:25, 1795:1,
1796:4
**ago** [12] - 1765:14,
1814:6, 1819:4,
1819:7, 1819:18,
1819:19, 1820:5,
1820:13, 1820:18,
1821:3, 1822:15,
1822:23
**agree** [5] - 1775:11,
1817:19, 1817:21,
1830:2, 1831:17

**agreed** [6] - 1780:19,
1780:24, 1789:24,
1790:2, 1817:12,
1817:14
**AGREEMENT** [1] -
1721:9
**agreement** [16] -
1726:21, 1726:22,
1738:18, 1747:20,
1748:7, 1766:3,
1769:17, 1770:4,
1770:11, 1771:1,
1771:7, 1773:12,
1785:22, 1787:22,
1799:22, 1800:24
**agreements** [2] -
1800:21, 1801:14
**ahead** [8] - 1725:10,
1747:25, 1750:18,
1762:21, 1777:16,
1787:16, 1807:22,
1818:7
**aided** [2] - 1722:15,
1787:7
**AIG** [3] - 1734:10,
1734:15, 1745:18
**aim** [1] - 1746:11
**al** [2] - 1721:3, 1721:6
**alert** [1] - 1817:11
**all-in** [3] - 1732:22,
1745:3, 1745:22
**allow** [2] - 1810:3,
1823:2
**allowance** [3] -
1762:9, 1762:23,
1763:11
**allowed** [2] - 1797:13,
1803:5
**almost** [2] - 1788:19,
1805:14
**alone** [2] - 1733:14,
1742:6
**ambitious** [1] -
1830:15
**amendment** [2] -
1801:20, 1809:1
**Amendment** [36] -
1730:5, 1730:7,
1730:10, 1738:22,
1759:18, 1765:11,
1767:21, 1797:22,
1803:12, 1819:14,
1819:17, 1819:22,
1819:24, 1819:25,
1820:2, 1820:10,
1820:15, 1820:25,
1821:8, 1821:10,
1821:13, 1821:15,
1821:17, 1821:19,
1821:21, 1822:2,

1822:9, 1822:11,
1822:13, 1822:14,
1822:25, 1823:11,
1823:17, 1823:23,
1824:15, 1824:20
**amendments** [2] -
1793:7, 1793:15
**American** [7] -
1743:24, 1745:16,
1811:20, 1813:6,
1813:13, 1813:22,
1813:23
**Americas** [1] - 1722:3
**amount** [15] - 1731:2,
1731:3, 1735:1,
1740:12, 1740:14,
1740:15, 1743:10,
1744:1, 1771:13,
1773:5, 1773:7,
1773:9, 1773:11,
1773:14, 1775:4
**amounts** [4] -
1730:25, 1731:1,
1779:5, 1780:13
**analyses** [1] - 1763:3
**analysis** [33] -
1731:23, 1731:25,
1732:1, 1732:7,
1732:23, 1733:2,
1733:7, 1733:17,
1735:21, 1740:17,
1740:24, 1742:19,
1742:21, 1744:6,
1744:13, 1744:14,
1744:15, 1744:19,
1745:3, 1746:9,
1746:15, 1746:25,
1747:4, 1747:7,
1753:22, 1754:12,
1762:8, 1762:9,
1762:15, 1763:4,
1763:17, 1788:10
**analyze** [1] - 1746:17
**angry** [1] - 1734:22
**ANJAN** [2] - 1723:4,
1724:7
**Anne** [1] - 1789:8
**announce** [2] -
1802:18, 1806:8
**announced** [3] -
1807:19, 1807:20,
1809:7
**announcement** [7] -
1808:21, 1808:23,
1809:9, 1809:10,
1810:16, 1810:20,
1829:3
**Annual** [1] - 1779:20
**annual** [5] - 1729:17,
1769:21, 1770:10,

1771:5, 1785:20
**answer** [2] - 1762:3,
1787:3
**answered** [3] -
1744:19, 1746:5,
1746:19
**answers** [8] - 1800:11,
1800:16, 1801:5,
1805:21, 1806:7,
1806:12, 1809:12,
1812:7
**anticipate** [5] -
1762:23, 1762:25,
1824:17, 1824:21,
1830:25
**anticipated** [2] -
1802:20, 1802:22
**anticipating** [1] -
1791:24
**anyway** [4] - 1749:7,
1801:25, 1831:13,
1832:12
**apologies** [1] -
1777:16
**APPEARANCES** [2] -
1721:14, 1722:1
**apply** [1] - 1814:14
**applying** [1] - 1826:17
**appointment** [1] -
1727:12
**appreciate** [1] -
1784:2
**appropriate** [3] -
1737:17, 1765:15,
1765:18
**appropriately** [1] -
1737:7
**approved** [2] - 1805:1,
1805:4
**arbitrarily** [1] -
1827:18
**argue** [3] - 1792:4,
1799:12, 1824:17
**argument** [20] -
1774:23, 1781:19,
1784:15, 1788:15,
1788:16, 1799:11,
1807:2, 1808:7,
1814:22, 1814:23,
1822:22, 1823:7,
1823:8, 1823:14,
1823:18, 1827:8,
1827:9, 1827:12,
1829:5, 1830:4
**arguments** [3] -
1827:11, 1827:15,
1831:21
**arise** [1] - 1774:25
**Arnold** [1] - 1722:8
**AS** [2] - 1751:6,

1768:13
**ASIM** [1] - 1722:6
**aspects** [2] - 1756:16,
1756:19
**assert** [1] - 1826:13
**assessment** [2] -
1762:12, 1763:6
**asset** [7] - 1762:10,
1763:4, 1763:11,
1767:18, 1789:21,
1790:4, 1790:5
**assets** [3] - 1792:25,
1793:4, 1793:17
**assign** [1] - 1741:6
**assistance** [5] -
1734:8, 1734:10,
1734:11, 1734:16,
1734:19
**Association** [1] -
1787:23
**assumed** [1] - 1746:9
**assumption** [2] -
1746:14, 1759:3
**assumptions** [2] -
1746:8, 1761:19
**attached** [4] -
1805:23, 1805:25,
1808:22, 1809:8
**attaches** [1] - 1789:11
**attaching** [1] -
1800:10
**attachment** [4] -
1806:2, 1808:20,
1808:24, 1809:6
**Attari** [5] - 1775:1,
1775:5, 1830:4,
1830:24, 1833:10
**Attari's** [1] - 1830:19
**attempt** [1] - 1774:9
**attendance** [1] -
1757:21
**attended** [1] - 1799:19
**attention** [2] -
1770:21, 1807:16
**attributable** [1] -
1822:10
**audit** [5] - 1755:6,
1755:7, 1755:8,
1763:4, 1763:6
**auditor** [1] - 1762:25
**auditors** [1] - 1792:22
**August** [15] - 1730:7,
1759:18, 1771:21,
1773:6, 1780:4,
1783:8, 1790:2,
1790:9, 1802:14,
1802:19, 1807:21,
1819:3, 1821:3,
1822:15, 1828:15
**authentic** [1] - 1800:7

**authenticity** [2] -
1800:2, 1809:5
**author** [1] - 1802:11
**authored** [1] - 1799:5
**automatically** [1] -
1826:12
**Avenue** [5] - 1721:16,
1721:22, 1722:3,
1722:8, 1722:12
**avoid** [2] - 1728:8,
1792:6
**avoiding** [1] - 1727:11
**aware** [2] - 1783:14,
1797:11

## B

**backed** [3] - 1739:8,
1739:13, 1811:13
**bad** [2] - 1727:23,
1832:16
**bailing** [1] - 1734:21
**balance** [3] - 1761:24,
1766:11, 1789:21
**Bank** [8] - 1752:18,
1752:20, 1753:3,
1754:4, 1754:5,
1754:10, 1779:20,
1825:11
**bank** [2] - 1754:12,
1754:24
**Banking** [1] - 1816:13
**bankruptcy** [5] -
1727:24, 1727:25,
1728:5, 1728:9,
1728:13
**banks** [2] - 1734:17,
1760:11
**Banks** [2] - 1787:20,
1787:24
**BARNES** [1] - 1721:15
**base** [2] - 1762:2,
1762:4
**based** [21] - 1735:22,
1738:18, 1738:24,
1740:24, 1742:2,
1744:12, 1746:12,
1746:16, 1750:25,
1761:17, 1761:18,
1767:10, 1773:19,
1788:9, 1804:4,
1808:4, 1809:3,
1819:6, 1820:23,
1825:3, 1826:18
**basis** [14] - 1758:12,
1763:1, 1818:22,
1819:5, 1819:12,
1820:23, 1821:5,
1821:14, 1823:18,
1823:20, 1824:6,

1824:8, 1827:17,
1827:20
**Bates** [4] - 1757:17,
1772:14, 1799:14,
1809:5
**beat** [1] - 1745:7
**became** [3] - 1754:21,
1777:19, 1780:3
**becomes** [2] -
1801:15, 1801:22
**BEFORE** [2] - 1721:1,
1721:12
**began** [6] - 1763:13,
1763:20, 1780:4,
1789:23, 1806:18,
1806:21
**begin** [3] - 1790:12,
1795:17, 1831:8
**beginning** [2] -
1743:6, 1780:17
**begins** [3] - 1728:16,
1787:24, 1806:11
**begun** [3] - 1739:2,
1739:11, 1790:3
**behalf** [4] - 1743:8,
1748:16, 1750:7,
1774:15
**behind** [2] - 1724:22,
1770:2
**belief** [1] - 1768:2
**below** [2] - 1805:20,
1813:18
**bench** [5] - 1737:22,
1748:5, 1775:13,
1818:3, 1830:12
**Bench** [3] - 1736:10,
1747:13, 1774:14
**beneficial** [4] -
1766:5, 1766:6,
1767:1, 1767:2
**benefit** [3] - 1745:25,
1822:6, 1822:10
**benefited** [2] -
1821:23, 1824:13
**Berger** [1] - 1722:2
**Bergman** [1] - 1768:8
**BERGMAN** [4] -
1722:6, 1768:8,
1768:13, 1774:12
**Berkley** [1] - 1721:15
**Bernstein** [1] - 1722:2
**best** [4] - 1786:10,
1790:7, 1809:25,
1827:13
**better** [4] - 1767:18,
1786:11, 1828:16,
1832:15
**betting** [1] - 1829:13
**between** [10] -
1736:21, 1737:3,

1772:22, 1789:6,
1795:12, 1797:17,
1798:1, 1798:16,
1802:12, 1805:16
**beyond** [3] - 1796:8,
1799:16, 1817:16
**big** [4] - 1741:4,
1768:23, 1792:5,
1801:6
**bigger** [2] - 1729:5,
1821:19
**bill** [1] - 1831:23
**billion** [27] - 1743:9,
1743:11, 1745:23,
1765:17, 1766:21,
1766:22, 1772:22,
1772:23, 1773:13,
1773:24, 1778:19,
1780:7, 1780:8,
1780:22, 1780:25,
1788:20, 1828:7,
1828:8, 1828:12,
1828:13, 1828:22,
1828:24, 1829:18,
1829:21
**binder** [4] - 1724:21,
1725:11, 1737:25,
1741:13
**biography** [5] -
1751:9, 1751:13,
1751:24, 1752:16,
1755:25
**bit** [3] - 1753:17,
1754:9, 1830:15
**blank** [1] - 1725:1
**blindly** [1] - 1810:5
**Bloomberg** [7] -
1811:7, 1812:1,
1812:2, 1813:5,
1813:6, 1813:13,
1813:25
**blow** [9] - 1725:15,
1726:5, 1728:16,
1736:4, 1741:23,
1788:5, 1795:2,
1795:9, 1811:22
**blue** [3] - 1724:22,
1782:19
**board** [3] - 1757:13,
1757:16, 1763:16
**boards** [2] - 1793:1,
1793:3
**Boies** [1] - 1721:22
**bondholders** [2] -
1825:15, 1825:17
**boss** [4] - 1792:22,
1815:20, 1815:22,
1816:2
**bottom** [14] - 1736:5,
1747:3, 1757:23,

1770:22, 1779:23, 1788:7, 1792:18, 1810:15, 1811:22, 1813:10, 1813:16, 1813:18, 1813:20
**bought** [14] - 1820:1, 1821:7, 1821:10, 1821:12, 1821:17, 1821:18, 1821:21, 1822:1, 1822:9, 1822:12, 1822:16, 1823:11, 1824:19, 1825:19
**Bowler** [7] - 1797:2, 1797:5, 1801:1, 1802:7, 1803:23, 1805:3, 1805:18
**bowler** [1] - 1805:19
**box** [2] - 1788:8, 1812:2
**break** [1] - 1775:16
**BRIAN** [1] - 1721:15
**brief** [4] - 1756:2, 1814:21, 1817:15, 1830:1
**briefed** [2] - 1763:10, 1763:16
**briefing** [3] - 1798:11, 1798:22, 1799:17
**briefings** [1] - 1814:5
**briefly** [7] - 1751:21, 1774:13, 1797:10, 1804:25, 1814:19, 1817:19, 1827:23
**bring** [6] - 1768:23, 1784:12, 1785:24, 1798:10, 1817:23, 1831:2
**broad** [1] - 1756:21
**broke** [5] - 1727:1, 1727:7, 1727:11, 1728:3, 1728:13
**BS** [2] - 1751:25, 1752:4
**build** [5] - 1768:1, 1792:13, 1793:22, 1803:5, 1803:18
**building** [4] - 1767:16, 1794:3, 1794:19
**built** [1] - 1794:1
**bulk** [1] - 1766:23
**bullet** [14] - 1738:16, 1739:1, 1739:18, 1771:23, 1772:20, 1789:20, 1799:7, 1801:2, 1801:4, 1801:19, 1802:24, 1803:2, 1803:3, 1803:4
**bullets** [1] - 1739:18

**business** [18] - 1725:15, 1725:17, 1726:4, 1726:11, 1726:16, 1743:17, 1746:24, 1753:10, 1753:13, 1753:15, 1753:25, 1786:8, 1786:19, 1790:17, 1790:20, 1795:15, 1809:22
**buy** [6] - 1821:25, 1822:4, 1824:14, 1826:5, 1826:11
**buyer** [2] - 1826:12, 1826:14
**buying** [1] - 1826:10
**BY** [5] - 1724:9, 1737:23, 1745:15, 1751:6, 1768:13

## C

**calculate** [2] - 1774:8, 1789:18
**calendar** [1] - 1730:1
**cannot** [5] - 1744:16, 1812:10, 1823:3, 1825:14, 1825:17
**cap** [4] - 1738:18, 1738:22, 1738:23, 1743:10
**capacity** [1] - 1801:14
**capital** [29] - 1760:10, 1765:14, 1765:22, 1765:23, 1765:24, 1767:17, 1768:1, 1770:3, 1777:23, 1777:24, 1779:5, 1780:13, 1780:19, 1781:1, 1781:3, 1781:15, 1781:20, 1792:7, 1792:13, 1793:21, 1793:22, 1802:8, 1803:5, 1803:19, 1803:24, 1805:2, 1805:4, 1811:17, 1812:9
**Capital** [1] - 1801:1
**capitalization** [2] - 1765:16, 1765:18
**capped** [2] - 1801:18, 1801:22
**caps** [1] - 1801:17
**care** [1] - 1811:23
**career** [1] - 1751:14
**Carole** [1] - 1787:20
**case** [52] - 1734:9, 1734:10, 1747:5, 1748:9, 1761:19, 1761:20, 1761:21,

1762:2, 1762:4, 1772:22, 1775:17, 1775:25, 1776:2, 1778:12, 1778:19, 1783:16, 1784:3, 1784:6, 1788:13, 1789:23, 1790:23, 1792:6, 1792:15, 1792:16, 1797:9, 1797:14, 1799:21, 1803:9, 1803:15, 1812:13, 1814:4, 1814:10, 1816:5, 1817:15, 1818:23, 1822:3, 1822:7, 1823:25, 1824:1, 1824:3, 1824:7, 1824:16, 1824:23, 1825:22, 1825:23, 1825:24, 1826:15, 1831:5, 1831:12
**Case** [2] - 1721:4, 1721:8
**case-in-chief** [1] - 1816:5
**casualty** [2] - 1753:12, 1753:15
**categories** [1] - 1776:10
**category** [2] - 1778:14, 1785:15
**caused** [2] - 1829:2, 1829:19
**cents** [1] - 1744:18
**CEO** [9] - 1754:20, 1754:21, 1755:4, 1755:11, 1755:13, 1755:15, 1763:10, 1763:15, 1764:8
**certain** [2] - 1756:16, 1792:25
**certainly** [7] - 1751:16, 1752:9, 1755:16, 1781:18, 1805:10, 1810:4, 1832:9
**certainty** [2] - 1819:1, 1823:6
**CERTIFICATE** [1] - 1834:1
**certification** [2] - 1824:4, 1824:11
**certified** [1] - 1823:24
**certify** [3] - 1825:15, 1825:17, 1834:3
**CFO** [10] - 1750:9, 1752:21, 1753:18, 1754:10, 1754:23, 1754:25, 1755:1, 1755:11, 1756:3

**chain** [2] - 1805:16, 1811:3
**chains** [1] - 1815:9
**chairman** [2] - 1732:3, 1755:6
**chance** [2] - 1778:15, 1784:7
**change** [3] - 1768:7, 1773:19, 1806:8
**changes** [3] - 1802:16, 1804:21, 1804:22
**changing** [1] - 1820:18
**characterizations** [1] - 1817:22
**charge** [3] - 1800:23, 1818:16, 1831:16
**chart** [1] - 1780:10
**charts** [1] - 1791:12
**chats** [1] - 1832:2
**Cheatham** [1] - 1825:10
**Check** [1] - 1721:18
**checked** [1] - 1816:15
**Chepenik** [3] - 1805:18, 1807:11, 1808:20
**chief** [8] - 1750:9, 1750:21, 1752:17, 1752:21, 1755:11, 1756:25, 1765:11, 1816:5
**Chris** [1] - 1755:5
**Cincinnati** [1] - 1755:17
**Circuit** [1] - 1814:10
**circular** [7] - 1729:1, 1729:6, 1729:8, 1764:16, 1792:8, 1801:7, 1803:17
**circulates** [1] - 1808:20
**circumstantial** [3] - 1807:3, 1808:3, 1812:17
**citation** [1] - 1825:13
**cited** [1] - 1814:4
**Civil** [1] - 1818:18
**claim** [10] - 1819:14, 1824:22, 1825:2, 1825:3, 1825:4, 1825:20, 1825:25, 1826:2, 1826:3, 1826:7
**claims** [2] - 1825:25, 1826:17
**clarification** [1] - 1758:21
**clarify** [1] - 1817:3

**Class** [1] - 1721:17
**CLASS** [1] - 1721:9
**class** [31] - 1819:1, 1819:2, 1819:6, 1819:7, 1819:8, 1819:23, 1820:1, 1820:3, 1820:24, 1821:4, 1821:7, 1821:9, 1821:11, 1821:12, 1822:1, 1822:18, 1822:20, 1822:21, 1823:7, 1823:10, 1823:11, 1823:16, 1824:3, 1824:8, 1824:11, 1824:12, 1824:21, 1825:15, 1825:17
**classes** [2] - 1823:20, 1823:21, 1823:24, 1828:25
**clean** [1] - 1799:21
**clear** [8] - 1742:25, 1760:1, 1782:15, 1783:12, 1789:14, 1795:6, 1798:18, 1812:3
**clearer** [1] - 1800:13
**clearest** [1] - 1808:10
**clearly** [5] - 1792:1, 1795:14, 1795:15, 1795:18, 1812:7
**close** [5] - 1747:5, 1747:8, 1830:16, 1831:25, 1832:13
**closed** [1] - 1818:9
**closer** [1] - 1792:3
**closest** [1] - 1801:16
**closing** [1] - 1831:21
**closings** [2] - 1831:8, 1831:10
**co** [1] - 1814:9
**co-conspirator** [1] - 1814:9
**Code** [2] - 1825:7, 1826:20
**colleague** [3] - 1785:2, 1808:4, 1816:24
**colleagues** [3] - 1795:22, 1829:24, 1830:1
**Collins** [1] - 1827:11
**Columbia** [1] - 1722:12
**COLUMBIA** [1] - 1721:1
**combined** [1] - 1782:7
**coming** [2] - 1743:10, 1807:6
**comment** [2] -

1811:25, 1813:25
**commentary** [1] - 1796:18
**comments** [1] - 1818:4
**commercial** [2] - 1754:12, 1760:11
**Commercial** [2] - 1825:7, 1826:20
**commitment** [51] - 1728:3, 1728:4, 1728:11, 1729:2, 1729:3, 1730:21, 1731:15, 1731:17, 1732:12, 1732:21, 1735:2, 1735:14, 1739:3, 1739:12, 1739:19, 1739:24, 1740:19, 1740:20, 1743:1, 1743:5, 1743:7, 1743:8, 1743:13, 1744:2, 1745:19, 1745:24, 1765:23, 1770:12, 1771:8, 1771:14, 1773:4, 1773:6, 1773:7, 1773:8, 1773:9, 1773:12, 1773:24, 1774:2, 1774:6, 1774:9, 1774:10, 1789:18, 1792:7, 1792:9, 1793:21, 1795:11, 1799:9, 1801:8, 1801:18, 1801:22, 1803:17
**committed** [4] - 1733:20, 1734:5, 1771:11, 1777:23
**committee** [6] - 1755:6, 1763:5, 1763:7, 1816:17, 1816:23, 1817:5
**Committee** [1] - 1816:13
**common** [8] - 1766:16, 1788:12, 1788:14, 1788:24, 1789:3, 1789:17, 1795:3, 1824:8
**commonality** [1] - 1824:5
**communicated** [3] - 1764:8, 1806:24
**communication** [1] - 1815:10
**communications** [1] - 1805:12
**companies** [6] - 1735:19, 1740:5,

1744:3, 1777:22, 1811:13, 1828:21
**company** [16] - 1752:24, 1753:1, 1753:12, 1753:23, 1753:24, 1754:22, 1758:2, 1758:13, 1759:5, 1759:14, 1761:18, 1766:10, 1766:23, 1767:6, 1768:3
**company's** [4] - 1740:11, 1740:13, 1756:10, 1756:11
**compared** [1] - 1734:12
**comparing** [1] - 1760:8
**compensated** [1] - 1744:25
**compensation** [6] - 1733:22, 1743:24, 1745:22, 1746:1, 1746:11, 1771:13
**Competition** [1] - 1779:20
**complete** [2] - 1768:5, 1781:25
**completely** [2] - 1794:11, 1815:10
**completes** [1] - 1785:1
**completion** [1] - 1780:21
**compliment** [1] - 1818:15
**comprehensive** [12] - 1729:15, 1729:16, 1751:17, 1758:20, 1759:1, 1769:20, 1769:21, 1770:8, 1770:9, 1771:4, 1771:5, 1772:1
**comptroller** [4] - 1752:23, 1753:24, 1754:13, 1762:14
**compute** [1] - 1743:16
**computer** [1] - 1722:15
**computer-aided** [1] - 1722:15
**computing** [1] - 1743:17
**conceivable** [2] - 1797:20, 1803:9
**concentrate** [1] - 1768:4
**concentration** [2] - 1752:5, 1752:7
**concept** [6] - 1727:16,

1729:1, 1740:23, 1824:23, 1825:6, 1826:17
**concern** [7] - 1736:15, 1765:11, 1765:13, 1765:20, 1792:23, 1801:7, 1801:9
**concerning** [1] - 1736:21
**conclude** [2] - 1819:12, 1820:22
**concludes** [1] - 1816:4
**conclusion** [2] - 1735:22, 1746:18
**condition** [3] - 1727:18, 1730:16, 1742:13
**conditions** [1] - 1742:3
**conducted** [1] - 1747:5
**Conference** [1] - 1779:20
**conference** [7] - 1736:10, 1737:22, 1747:13, 1748:5, 1774:14, 1775:13, 1831:16
**confidence** [1] - 1777:25
**confident** [1] - 1811:1
**confidential** [1] - 1809:23
**confirm** [1] - 1748:24
**confirmed** [1] - 1794:7
**confuse** [1] - 1781:17
**confused** [1] - 1794:5
**confusing** [2] - 1778:11, 1815:14
**confusion** [1] - 1801:12
**Congress** [2] - 1782:2, 1800:15
**congressional** [1] - 1800:17
**connection** [2] - 1734:3, 1774:25
**consensus** [1] - 1764:13
**consent** [3] - 1780:18, 1781:13, 1781:19
**conservative** [3] - 1765:16, 1765:18, 1831:1
**conservator** [1] - 1766:2
**conservatorship** [5] - 1727:20, 1754:22, 1766:3, 1793:24,

1803:5
**consider** [6] - 1764:1, 1765:17, 1765:25, 1776:3, 1790:3, 1821:9
**consideration** [1] - 1776:6
**considered** [4] - 1725:24, 1765:17, 1801:11, 1801:14
**considering** [1] - 1830:1
**consist** [1] - 1823:21
**consistent** [4] - 1739:20, 1742:9, 1810:16, 1825:23
**conspirator** [1] - 1814:9
**constantly** [1] - 1742:11
**Constitution** [1] - 1722:12
**constraints** [4] - 1755:21, 1766:11, 1767:23, 1774:4
**construed** [2] - 1826:23, 1827:1
**consulted** [3] - 1765:7, 1765:8, 1765:10
**contacted** [1] - 1754:19
**contains** [2] - 1784:21, 1802:16
**contemplated** [1] - 1765:3
**content** [1] - 1741:7
**context** [16] - 1734:19, 1742:1, 1781:10, 1781:14, 1781:18, 1783:20, 1784:9, 1786:23, 1787:7, 1791:11, 1791:13, 1791:22, 1799:23, 1800:13, 1806:6, 1806:10
**contexts** [2] - 1824:23, 1825:23
**contextually** [1] - 1809:14
**continue** [3] - 1726:10, 1726:16, 1770:14
**Continued** [1] - 1724:8
**continued** [7] - 1721:25, 1726:10, 1726:15, 1739:3, 1761:10, 1773:18
**CONTINUED** [1] -

1722:1
**contract** [4] - 1740:25, 1741:8, 1746:10, 1827:14
**contraction** [2] - 1766:11, 1766:13
**contractual** [1] - 1777:5
**contradicts** [1] - 1731:19
**contrary** [1] - 1801:23
**contribute** [6] - 1731:9, 1732:11, 1732:15, 1733:3, 1770:13, 1771:8
**controls** [5] - 1756:10, 1756:12, 1756:13, 1756:14, 1756:17
**controversial** [1] - 1810:19
**convene** [1] - 1830:4
**conversation** [2] - 1755:18, 1763:25
**conversations** [2] - 1762:24, 1798:1
**convey** [1] - 1826:16
**Cooper** [1] - 1721:15
**cooperatively** [1] - 1816:25
**copied** [1] - 1804:1
**copies** [3] - 1779:8, 1787:15, 1802:10
**copy** [3] - 1787:13, 1791:6, 1809:18
**copying** [1] - 1805:19
**corner** [2] - 1755:17, 1757:18
**Corp** [3] - 1754:4, 1754:5, 1754:10
**corporate** [1] - 1772:8
**Corporation** [4] - 1753:4, 1753:10, 1753:19, 1768:20
**correct** [19] - 1725:4, 1726:7, 1726:23, 1744:16, 1745:20, 1746:6, 1746:9, 1746:12, 1746:13, 1747:2, 1757:21, 1765:10, 1769:5, 1771:17, 1773:16, 1804:8, 1816:16, 1817:9, 1834:4
**correctly** [1] - 1783:15
**cost** [2] - 1732:23, 1745:3
**Council** [4] - 1802:10, 1803:25, 1805:25, 1811:6
**counsel** [6] - 1747:12,

1747:21, 1768:9,
1768:23, 1773:3,
1776:11
**Counsel** [1] - 1778:15
**Counsel's** [1] - 1808:7
**count** [1] - 1809:10
**countercyclical** [1] -
1781:2
**couple** [6] - 1755:14,
1755:17, 1757:1,
1770:1, 1791:4,
1832:7
**course** [4] - 1732:25,
1762:3, 1791:20,
1814:12
**Court** [42] - 1722:11,
1722:11, 1747:20,
1775:2, 1779:16,
1789:22, 1791:20,
1795:22, 1797:3,
1797:18, 1797:24,
1798:1, 1803:7,
1809:20, 1809:23,
1810:5, 1810:10,
1814:4, 1817:11,
1818:2, 1818:3,
1818:4, 1819:2,
1823:24, 1825:8,
1825:10, 1825:16,
1827:2, 1829:7,
1829:23, 1829:25,
1830:12, 1830:17,
1831:9, 1831:18,
1832:1, 1832:2,
1832:3, 1832:9,
1832:14, 1832:22,
1832:23
**court** [5] - 1724:2,
1740:17, 1750:11,
1768:17, 1825:14
**COURT** [117] - 1721:1,
1724:4, 1736:9,
1737:9, 1737:20,
1745:6, 1745:10,
1747:11, 1747:14,
1747:25, 1748:4,
1748:11, 1749:16,
1749:23, 1749:25,
1750:4, 1750:13,
1750:15, 1750:22,
1751:2, 1775:12,
1775:14, 1775:21,
1775:24, 1776:13,
1776:17, 1777:1,
1778:1, 1778:3,
1778:16, 1778:23,
1779:8, 1779:24,
1781:23, 1782:9,
1782:12, 1782:14,
1782:17, 1782:25,

1783:2, 1783:24,
1784:4, 1784:8,
1784:17, 1784:24,
1785:6, 1785:9,
1785:12, 1787:9,
1790:13, 1791:17,
1792:2, 1796:1,
1798:4, 1798:8,
1798:21, 1798:24,
1799:3, 1799:10,
1800:4, 1800:7,
1801:24, 1802:3,
1802:5, 1802:13,
1803:20, 1804:2,
1804:6, 1804:9,
1805:8, 1805:10,
1805:15, 1806:5,
1806:9, 1806:12,
1806:15, 1806:20,
1806:25, 1807:2,
1807:4, 1807:12,
1807:14, 1807:19,
1807:22, 1808:17,
1808:22, 1809:7,
1809:13, 1809:16,
1809:19, 1810:23,
1815:15, 1815:22,
1816:1, 1816:17,
1817:1, 1817:4,
1817:18, 1817:24,
1818:6, 1818:9,
1818:15, 1827:4,
1827:24, 1830:2,
1830:7, 1830:13,
1832:5, 1832:15,
1832:19, 1832:25,
1833:2, 1833:5,
1833:9, 1833:14,
1834:1, 1834:9
**Court's** [5] - 1776:20,
1792:1, 1808:8,
1810:17, 1829:8
**COURTROOM** [7] -
1736:3, 1749:10,
1777:6, 1777:8,
1777:12, 1777:14,
1779:12
**courtroom** [4] -
1724:3, 1749:24,
1750:14, 1775:20
**courts** [1] - 1814:21
**cover** [6] - 1725:6,
1758:18, 1759:1,
1767:20, 1782:3,
1809:17
**covers** [1] - 1751:20
**CPA** [2] - 1752:11,
1752:12
**CPP** [4] - 1734:9,
1734:17, 1745:16,

1745:18
**created** [3] - 1783:12,
1799:14, 1799:23
**creating** [1] - 1781:2
**credit** [1] - 1761:23
**critical** [3] - 1726:25,
1727:10, 1803:2
**critiques** [4] - 1806:3,
1806:4, 1806:5,
1806:7
**CROSS** [2] - 1724:8,
1768:12
**cross** [3] - 1791:9,
1830:21, 1831:2
**Cross** [2] - 1723:4,
1723:6
**CROSS-**
**EXAMINATION** [2] -
1724:8, 1768:12
**Cross-Examination..**
**..............** [2] - 1723:4,
1723:6
**cross-examine** [1] -
1791:9
**CRR** [1] - 1722:11
**cumulative** [3] -
1772:17, 1772:20,
1773:8
**current** [9] - 1738:18,
1802:21, 1819:8,
1819:9, 1820:4,
1822:20, 1822:24,
1825:15, 1825:17
**curriculum** [1] -
1752:9
**cut** [1] - 1807:4

# D

**D.C** [6] - 1721:9,
1721:16, 1721:23,
1722:9, 1722:13,
1813:10
**damages** [2] -
1818:25, 1823:6
**data** [2] - 1746:16,
1746:17
**DATE** [1] - 1834:9
**date** [4] - 1739:19,
1739:25, 1771:20,
1802:14
**dated** [3] - 1738:4,
1757:17, 1772:9
**DAVID** [1] - 1722:6
**David** [4] - 1754:20,
1754:22, 1755:3,
1768:8
**DAVIS** [1] - 1721:21
**days** [2] - 1800:15,
1814:6

**deal** [3] - 1748:12,
1804:23, 1832:9
**dealing** [1] - 1816:24
**dealings** [1] - 1741:19
**Dean** [1] - 1753:1
**Dear** [1] - 1787:24
**death** [1] - 1745:7
**decades** [1] - 1747:3
**December** [1] -
1738:19
**decertifying** [1] -
1823:20
**decide** [2] - 1809:21,
1809:25
**decision** [13] -
1742:22, 1764:5,
1764:7, 1764:24,
1765:9, 1797:18,
1803:8, 1824:4,
1825:8, 1825:9,
1825:24, 1827:2,
1827:3
**decisions** [1] -
1763:10
**deck** [1] - 1738:3
**declaration** [6] -
1741:15, 1746:20,
1789:23, 1789:25,
1790:7, 1792:15
**declined** [1] - 1822:8
**decree** [1] - 1781:20
**deep** [1] - 1813:9
**default** [1] - 1761:23
**defeat** [1] - 1831:7
**defendant** [2] -
1776:15, 1785:1
**Defendant** [1] -
1722:5
**Defendant's** [1] -
1768:18
**Defendants** [1] -
1721:7
**defendants** [27] -
1736:12, 1737:19,
1747:24, 1747:25,
1748:14, 1748:16,
1748:17, 1750:7,
1750:20, 1768:8,
1774:16, 1781:6,
1783:10, 1789:23,
1789:24, 1790:10,
1793:19, 1797:14,
1797:25, 1812:20,
1816:16, 1816:19,
1818:13, 1818:14,
1818:19, 1830:6,
1830:10
**defendants'** [9] -
1748:25, 1749:5,
1749:8, 1749:11,

1776:2, 1776:4,
1777:16, 1784:6,
1784:19
**Defendants'** [9] -
1749:8, 1749:12,
1749:13, 1749:14,
1751:8, 1770:19,
1771:18, 1772:8
**defense** [5] - 1768:9,
1782:22, 1792:15,
1812:12, 1831:5
**deferred** [8] - 1762:10,
1763:4, 1763:11,
1789:20, 1790:4,
1790:5, 1792:25,
1793:4
**defined** [3] - 1763:18,
1766:3, 1767:15
**definitely** [1] -
1816:11
**definition** [1] -
1822:19
**definitions** [1] -
1819:8
**degree** [1] - 1751:25
**degrees** [2] - 1752:3,
1752:6
**Delaware** [3] -
1825:22, 1825:24,
1826:21
**deliberately** [1] -
1817:7
**delta** [1] - 1829:19
**DeMarco** [27] -
1736:13, 1738:9,
1740:16, 1741:20,
1788:16, 1792:19,
1793:6, 1793:9,
1794:23, 1794:24,
1795:13, 1796:10,
1796:11, 1796:12,
1796:16, 1797:9,
1798:13, 1799:19,
1799:20, 1802:12,
1804:5, 1805:11,
1806:17, 1807:4,
1808:3, 1808:9,
1812:18
**DeMarco's** [2] -
1738:3, 1816:8
**demonstrate** [7] -
1793:8, 1793:11,
1793:15, 1795:11,
1799:9, 1806:22,
1808:5
**denied** [3] - 1798:2,
1798:3, 1830:2
**Department** [21] -
1726:16, 1734:3,
1734:5, 1736:15,

1738:11, 1742:15, 1743:8, 1743:21, 1744:9, 1744:24, 1744:25, 1785:19, 1791:2, 1799:15, 1803:23, 1804:17, 1810:21, 1811:15, 1812:6, 1813:8, 1813:11
**department** [1] - 1762:15
**Departments** [1] - 1812:7
**dependent** [3] - 1726:6, 1726:9, 1726:15
**deposed** [2] - 1782:9, 1790:22
**deposition** [18] - 1740:16, 1748:17, 1748:22, 1749:22, 1750:5, 1750:10, 1750:16, 1750:19, 1751:3, 1783:4, 1783:16, 1790:24, 1793:12, 1795:22, 1796:20, 1796:24, 1797:1, 1797:4
**DEPOSITION** [1] - 1723:6
**depositions** [1] - 1797:6
**depressed** [3] - 1822:3, 1822:8, 1826:9
**depressing** [1] - 1820:18
**deprive** [2] - 1811:17, 1812:9
**DEPUTY** [7] - 1736:3, 1749:10, 1777:6, 1777:8, 1777:12, 1777:14, 1779:12
**describe** [2] - 1754:17, 1762:8
**described** [3] - 1756:17, 1796:4, 1815:9
**describes** [1] - 1779:2
**describing** [1] - 1823:10
**description** [2] - 1756:2, 1812:8
**designate** [1] - 1790:23
**designated** [2] - 1783:5, 1795:21
**designation** [2] - 1750:10, 1783:17
**designations** [1] -

1748:18
**designed** [7] - 1743:23, 1781:1, 1793:7, 1793:10, 1793:15, 1808:5, 1809:12
**desire** [2] - 1798:18, 1799:8
**detail** [2] - 1752:19, 1833:10
**detailed** [1] - 1763:14
**details** [2] - 1727:22, 1833:7
**determination** [1] - 1823:2
**determine** [3] - 1731:7, 1731:20, 1733:17
**determined** [4] - 1732:7, 1741:9, 1787:25, 1788:9
**determining** [1] - 1746:24
**detrimental** [2] - 1766:7, 1767:2
**developments** [1] - 1788:22
**different** [9] - 1727:20, 1730:25, 1731:1, 1737:14, 1767:3, 1804:19, 1807:9, 1820:8, 1825:16
**difficult** [1] - 1806:3
**difficulties** [1] - 1779:2
**dig** [1] - 1770:21
**dire** [3] - 1727:18, 1742:13, 1832:22
**Direct** [1] - 1723:6
**direct** [6] - 1737:2, 1745:4, 1830:19, 1830:21, 1830:22, 1830:25
**DIRECT** [1] - 1751:5
**directly** [4] - 1752:13, 1806:14, 1825:9, 1825:14
**director** [8] - 1762:13, 1769:13, 1777:19, 1777:20, 1778:25, 1779:19, 1782:3, 1798:13
**directors** [2] - 1757:16, 1763:16
**disagree** [1] - 1773:13
**disciplines** [3] - 1752:24, 1753:21, 1754:11
**discovery** [1] - 1736:21

**discuss** [3] - 1798:15, 1802:15, 1818:2
**discussed** [8] - 1747:20, 1748:8, 1759:4, 1782:18, 1790:9, 1793:1, 1793:3, 1796:19
**discussing** [1] - 1743:22
**Discussion** [1] - 1750:1
**discussion** [11] - 1738:5, 1743:7, 1757:24, 1758:5, 1758:23, 1761:7, 1763:15, 1783:6, 1784:14, 1794:25, 1795:1
**discussions** [14] - 1738:10, 1755:23, 1759:8, 1759:12, 1759:19, 1760:2, 1760:3, 1760:7, 1760:8, 1760:12, 1761:8, 1761:10, 1763:20, 1817:11
**display** [1] - 1736:5
**displayed** [3] - 1736:18, 1737:3, 1737:7
**dispose** [1] - 1830:4
**dispute** [1] - 1816:19
**distinct** [1] - 1823:8
**distress** [1] - 1832:24
**District** [2] - 1722:11, 1722:12
**DISTRICT** [3] - 1721:1, 1721:1, 1721:13
**dividend** [27] - 1728:22, 1730:12, 1730:23, 1731:2, 1731:15, 1733:14, 1742:5, 1742:14, 1743:25, 1745:23, 1758:18, 1759:1, 1760:4, 1760:9, 1760:10, 1760:13, 1761:2, 1766:13, 1767:12, 1767:13, 1767:20, 1769:17, 1770:5, 1771:1, 1772:1, 1802:17, 1815:5
**dividends** [18] - 1729:3, 1729:5, 1729:17, 1729:23, 1731:5, 1733:1, 1764:17, 1769:21, 1770:10, 1771:5, 1788:17, 1824:3,

1824:6, 1824:25, 1825:1, 1828:21, 1828:24, 1829:12
**document** [98] - 1725:12, 1735:25, 1736:1, 1736:18, 1736:22, 1737:5, 1737:10, 1737:13, 1737:14, 1738:1, 1738:17, 1744:8, 1744:11, 1744:17, 1744:23, 1751:7, 1751:8, 1751:11, 1757:15, 1768:18, 1768:22, 1768:23, 1768:25, 1769:2, 1770:18, 1771:20, 1772:7, 1772:11, 1778:4, 1778:9, 1779:16, 1780:17, 1782:22, 1782:23, 1782:24, 1783:3, 1783:6, 1783:7, 1783:12, 1783:18, 1783:20, 1784:11, 1786:10, 1786:17, 1786:18, 1787:2, 1788:2, 1788:4, 1788:6, 1788:10, 1789:2, 1789:5, 1791:10, 1791:14, 1793:13, 1794:6, 1794:7, 1794:12, 1794:15, 1795:12, 1796:9, 1796:14, 1796:15, 1796:18, 1796:19, 1796:22, 1796:24, 1797:2, 1797:6, 1797:12, 1797:15, 1798:10, 1798:11, 1799:4, 1799:5, 1799:13, 1799:23, 1800:9, 1802:16, 1803:8, 1804:19, 1804:21, 1805:1, 1807:6, 1807:9, 1807:17, 1807:21, 1808:9, 1808:10, 1809:1, 1809:8, 1809:9, 1810:19, 1814:22, 1815:5
**documents** [54] - 1735:20, 1736:20, 1736:21, 1736:24, 1737:6, 1737:14, 1737:18, 1737:19, 1742:10, 1743:20, 1744:4, 1744:5, 1744:21, 1745:2, 1774:21, 1776:14,

1776:15, 1778:13, 1779:17, 1784:19, 1785:1, 1785:15, 1785:18, 1785:23, 1787:8, 1787:10, 1790:11, 1790:14, 1790:16, 1791:1, 1791:5, 1791:20, 1791:21, 1794:10, 1797:13, 1797:25, 1798:2, 1800:3, 1804:13, 1804:20, 1807:24, 1808:9, 1809:4, 1810:6, 1811:2, 1812:21, 1814:1, 1814:7, 1814:8, 1814:13, 1815:1, 1815:7
**dollars** [1] - 1744:18
**domestic** [3] - 1795:13, 1800:25, 1805:2
**dominated** [1] - 1766:10
**Donald** [3] - 1748:17, 1749:20, 1749:22
**done** [16] - 1731:23, 1731:25, 1732:1, 1732:7, 1732:22, 1733:2, 1742:21, 1746:3, 1751:21, 1762:13, 1788:1, 1803:15, 1803:18, 1805:14, 1810:2, 1829:18
**down** [16] - 1728:15, 1735:11, 1739:18, 1743:19, 1747:11, 1793:8, 1793:11, 1793:16, 1795:6, 1795:11, 1798:19, 1799:9, 1800:13, 1801:3, 1802:25, 1808:6
**Dr** [6] - 1724:10, 1732:9, 1775:5, 1824:1, 1830:19, 1830:24
**draft** [4] - 1771:21, 1794:24, 1796:4, 1796:6
**drafted** [2] - 1750:25, 1805:2
**drain** [3] - 1740:21, 1741:4, 1741:5
**draw** [15] - 1729:2, 1731:14, 1731:16, 1732:12, 1732:20, 1744:1, 1759:13, 1759:15, 1764:18,

1770:21, 1773:15,
1801:7, 1803:17,
1807:16
**drawn** [1] - 1731:2
**draws** [32] - 1728:21,
1728:23, 1729:1,
1729:5, 1729:8,
1731:9, 1732:11,
1732:15, 1733:4,
1758:2, 1758:3,
1758:13, 1758:15,
1758:23, 1759:6,
1759:10, 1759:21,
1760:24, 1769:16,
1769:18, 1770:4,
1770:7, 1770:13,
1770:25, 1771:2,
1771:9, 1772:2,
1772:17, 1772:21,
1773:8, 1773:19,
1792:8
**drew** [1] - 1831:22
**drive** [4] - 1728:22,
1769:18, 1770:6,
1771:2
**driven** [1] - 1766:11
**driver** [2] - 1758:19,
1761:25
**drop** [16] - 1819:3,
1819:7, 1819:19,
1820:6, 1820:12,
1820:17, 1821:3,
1821:22, 1821:23,
1822:14, 1822:22,
1823:25, 1825:3,
1825:18, 1826:18,
1827:25
**dropped** [5] - 1766:21,
1819:17, 1822:8,
1826:3, 1828:24
**drove** [1] - 1792:13
**DTA** [1] - 1786:4
**during** [19] - 1737:1,
1748:20, 1759:5,
1761:7, 1763:17,
1767:15, 1768:3,
1783:19, 1789:15,
1796:12, 1796:20,
1797:6, 1816:6,
1816:8, 1821:20,
1822:22, 1832:22
**duties** [3] - 1752:19,
1753:17, 1754:9
**DX-369** [3] - 1724:20,
1724:23, 1725:3
**DX-375** [1] - 1736:4
**DX-508** [2] - 1723:11,
1749:19
**DX-527** [2] - 1723:11,

1749:19
**DX-736** [1] - 1749:19
**DX-736**.......................
.......... [1] - 1723:11

# E

**e-mail** [27] - 1736:5,
1736:13, 1737:3,
1784:21, 1789:8,
1794:22, 1796:10,
1796:23, 1800:10,
1800:13, 1802:7,
1803:22, 1805:16,
1805:17, 1805:20,
1808:4, 1808:19,
1808:25, 1811:3,
1811:4, 1811:22,
1811:23, 1812:24,
1813:2, 1813:18,
1813:20, 1813:23
**e-mailing** [1] - 1813:4
**e-mails** [1] - 1811:25
**early** [4] - 1760:3,
1762:12, 1763:19,
1830:4
**earnings** [19] -
1729:15, 1732:25,
1733:22, 1734:7,
1744:13, 1757:12,
1766:12, 1766:15,
1766:23, 1767:20,
1769:19, 1770:8,
1771:3, 1771:12,
1793:22, 1794:16,
1802:20, 1828:21
**ears** [1] - 1813:3
**easier** [1] - 1809:18
**easiest** [1] - 1795:21
**easy** [1] - 1776:16
**Eberhardt** [1] - 1789:9
**ECF** [2] - 1797:19,
1803:8
**economic** [2] -
1741:1, 1741:6
**Economic** [6] -
1727:17, 1778:6,
1802:10, 1803:25,
1805:25, 1811:6
**economically** [1] -
1820:20
**economists** [1] -
1746:17
**Ed** [5] - 1755:15,
1755:16, 1755:18,
1792:20, 1793:5
**Edward** [1] - 1798:13
**effect** [1] - 1798:5
**effectively** [1] - 1746:3
**efficiently** [2] -

1784:16, 1831:14
**effort** [1] - 1755:22
**either** [4] - 1752:6,
1759:19, 1765:9,
1807:4
**elaborate** [2] -
1753:17, 1754:9
**elements** [1] - 1790:20
**elicit** [1] - 1796:17
**eliminated** [1] -
1764:16
**employee** [1] -
1805:19
**employees** [1] -
1805:17
**employment** [1] -
1832:24
**en** [1] - 1815:4
**enable** [2] - 1811:11,
1812:10
**encouragement** [2] -
1779:4, 1780:12
**End** [3] - 1737:22,
1748:5, 1775:13
**end** [10] - 1738:21,
1746:21, 1747:15,
1747:23, 1773:19,
1776:23, 1797:8,
1801:15, 1816:5
**ending** [2] - 1738:19,
1768:21
**ends** [1] - 1814:17
**enhance** [1] - 1780:22
**enjoyed** [1] - 1755:18
**enormity** [3] - 1743:1,
1743:5, 1743:13
**ensure** [3] - 1756:14,
1756:22, 1777:25
**ensuring** [4] -
1733:21, 1734:6,
1757:1, 1757:5,
1757:8, 1769:4,
1771:12
**entailed** [1] - 1756:8
**entered** [2] - 1724:3,
1750:14
**Enterprise** [4] -
1811:20, 1813:7,
1813:13, 1813:23
**enterprise** [6] -
1739:4, 1739:7,
1752:22, 1756:25,
1779:4, 1780:12
**enterprise's** [1] -
1780:21
**enterprises** [8] -
1742:4, 1743:1,
1779:3, 1781:2,
1782:5, 1790:3,
1792:12, 1798:19

**enterprises'** [1] -
1782:7
**entire** [2] - 1737:12,
1823:22
**entitled** [3] - 1736:23,
1825:1, 1834:5
**entity** [1] - 1773:24
**envisioned** [1] -
1790:5
**equity** [2] - 1780:22,
1780:25
**ERIC** [1] - 1721:18
**erode** [2] - 1792:8,
1793:21
**eroded** [1] - 1803:17
**eroding** [1] - 1792:7
**erosion** [2] - 1801:7,
1801:21
**error** [1] - 1816:14
**ESQ** [12] - 1721:15,
1721:17, 1721:18,
1721:20, 1721:21,
1721:21, 1722:2,
1722:5, 1722:6,
1722:6, 1722:7,
1722:7
**essentially** [1] -
1728:4
**establish** [4] -
1790:20, 1795:10,
1799:8, 1820:12
**established** [3] -
1735:2, 1771:14,
1771:21
**establishes** [3] -
1819:19, 1823:9,
1825:24
**estimate** [3] - 1774:9,
1828:19, 1831:2
**estimated** [3] -
1788:10, 1789:4,
1828:19
**et** [2] - 1721:3, 1721:6
**evaluation** [1] -
1785:20
**event** [7] - 1798:12,
1819:16, 1819:18,
1819:20, 1820:6,
1821:2, 1824:2
**events** [2] - 1764:6,
1789:14
**evidence** [68] -
1736:1, 1738:1,
1741:12, 1748:20,
1749:6, 1749:18,
1749:19, 1776:4,
1776:19, 1777:2,
1784:18, 1784:25,
1785:4, 1785:13,
1790:1, 1790:8,

1792:10, 1792:16,
1793:18, 1794:6,
1794:13, 1794:21,
1797:14, 1797:15,
1797:20, 1798:7,
1800:6, 1801:9,
1802:4, 1803:9,
1803:14, 1804:15,
1805:9, 1806:16,
1806:22, 1806:23,
1807:2, 1807:3,
1807:6, 1808:2,
1808:3, 1808:13,
1808:15, 1810:24,
1812:14, 1812:17,
1812:19, 1819:11,
1819:20, 1820:7,
1820:14, 1820:21,
1820:22, 1821:14,
1821:20, 1823:1,
1823:9, 1823:12,
1823:15, 1824:12,
1824:15, 1828:2,
1828:6, 1828:10,
1829:16, 1829:21,
1831:15
**Evidence** [1] - 1736:6
**evident** [1] - 1780:3
**evidentiary** [7] -
1774:19, 1774:24,
1818:22, 1819:5,
1820:23, 1827:17,
1827:20
**evolve** [1] - 1830:18
**exact** [2] - 1737:8,
1827:6
**exactly** [7] - 1745:21,
1746:1, 1769:8,
1812:1, 1812:11,
1815:12, 1833:7
**examination** [4] -
1737:2, 1796:17,
1830:19, 1830:22
**EXAMINATION** [4] -
1724:8, 1745:14,
1751:5, 1768:12
**Examination**............
. [1] - 1723:4
**Examination**............
. . [1] - 1723:6
**Examination**............
.. [2] - 1723:4, 1723:6
**examine** [1] - 1791:9
**example** [1] - 1781:12
**exceed** [2] - 1772:1,
1773:9
**except** [1] - 1776:5
**exception** [7] -
1786:19, 1790:20,
1805:6, 1814:2,

1814:9, 1814:13, 1814:14

**exceptions** [1] - 1795:19

**excerpt** [2] - 1768:22, 1813:20

**excess** [7] - 1729:17, 1766:13, 1769:21, 1770:10, 1771:5, 1777:24, 1802:21

**exchange** [1] - 1737:3

**exclude** [2] - 1797:25, 1798:2

**excluded** [1] - 1736:24

**exclusively** [2] - 1824:6, 1827:9

**excuse** [2] - 1762:5, 1772:6

**excused** [2] - 1832:6, 1832:16

**excuses** [1] - 1832:17

**executive** [4] - 1752:17, 1753:18, 1756:3, 1812:6

**Executive** [1] - 1791:8

**exhibit** [3] - 1748:24, 1751:24, 1768:18

**Exhibit** [24] - 1749:2, 1749:3, 1749:4, 1749:8, 1749:9, 1749:13, 1749:14, 1751:8, 1755:25, 1768:19, 1770:20, 1771:18, 1772:8, 1777:4, 1777:11, 1777:13, 1777:17, 1779:12, 1785:10, 1785:11

**exhibits** [14] - 1747:14, 1747:22, 1747:23, 1748:20, 1748:25, 1749:1, 1749:5, 1749:15, 1770:20, 1776:1, 1776:6, 1776:10, 1806:21, 1816:4

**EXHIBITS** [1] - 1723:9

**exist** [1] - 1778:7

**existed** [1] - 1781:9

**exit** [2] - 1793:24, 1803:5

**exited** [2] - 1749:24, 1775:20

**expanding** [1] - 1780:23

**expect** [8] - 1728:16, 1728:20, 1769:16, 1770:4, 1770:23, 1770:25, 1774:22,

---

1830:18

**expectations** [3] - 1797:23, 1803:13, 1827:19

**expected** [8] - 1758:3, 1758:15, 1758:17, 1758:24, 1758:25, 1761:19, 1762:4, 1791:13

**expects** [2] - 1758:2, 1758:13

**experience** [7] - 1729:11, 1729:14, 1747:4, 1751:1, 1769:19, 1770:7, 1771:3

**experts** [2] - 1737:6, 1761:18

**explain** [8] - 1727:5, 1781:10, 1785:24, 1788:1, 1789:24, 1810:1, 1810:7, 1812:22

**explains** [1] - 1814:11

**explanation** [2] - 1760:16, 1796:17

**explicitly** [2] - 1824:4, 1824:6

**expressed** [3] - 1804:15, 1804:16, 1832:7

**expressing** [2] - 1731:16, 1743:25

**extent** [3] - 1763:3, 1801:9, 1832:23

**extremely** [1] - 1828:11

---

# F

**fabricated** [1] - 1815:10

**face** [5] - 1783:11, 1786:20, 1794:13, 1796:6, 1806:8

**fact** [13] - 1726:15, 1733:5, 1733:6, 1736:20, 1741:2, 1786:5, 1787:1, 1797:22, 1803:11, 1810:20, 1824:13, 1828:25, 1829:12

**failed** [1] - 1818:25

**failure** [1] - 1823:14

**fair** [2] - 1759:3, 1787:25

**FAIRHOLME** [1] - 1721:3

**Fairholme** [1] - 1803:9

**fairy** [1] - 1815:11

---

**faith** [3] - 1732:3, 1746:10, 1790:7

**fall** [2] - 1778:13, 1791:25

**familiar** [2] - 1727:16, 1768:24

**Fannie** [36] - 1724:14, 1725:21, 1727:18, 1731:14, 1733:7, 1733:12, 1734:2, 1734:6, 1735:15, 1739:13, 1742:12, 1743:21, 1755:19, 1760:9, 1760:13, 1776:15, 1776:18, 1778:10, 1780:4, 1780:6, 1780:18, 1780:19, 1780:22, 1782:23, 1783:1, 1785:3, 1785:7, 1786:2, 1787:23, 1788:11, 1794:1, 1794:17, 1811:9, 1819:12, 1828:10, 1828:11

**FANNIE** [1] - 1721:8

**far** [2] - 1755:23, 1777:10

**Fargo** [4] - 1752:13, 1754:23, 1755:7, 1755:8

**fascinating** [1] - 1755:22

**fashion** [2] - 1810:3, 1810:8

**fast** [2] - 1776:24, 1779:15

**faster** [1] - 1803:1

**fatal** [1] - 1819:14

**FDIC** [2] - 1745:18, 1745:19

**fear** [1] - 1792:7

**feasible** [1] - 1811:12

**Fed** [1] - 1732:4

**Fed.2d** [1] - 1814:11

**Federal** [7] - 1722:5, 1752:18, 1752:20, 1753:3, 1768:20, 1787:22, 1818:18

**FEDERAL** [1] - 1721:6

**federal** [1] - 1745:18

**fee** [32] - 1730:21, 1731:10, 1732:10, 1732:15, 1732:21, 1733:4, 1733:18, 1735:2, 1735:15, 1739:19, 1739:24, 1739:25, 1740:5, 1740:6, 1740:19, 1740:20, 1741:2,

---

1743:22, 1744:2, 1744:6, 1744:7, 1745:24, 1770:12, 1770:14, 1771:8, 1771:9, 1771:14, 1774:6, 1774:9, 1774:10

**fell** [1] - 1820:5

**fellow** [4] - 1813:7, 1813:13, 1813:22, 1813:24

**felt** [1] - 1742:20

**few** [7] - 1726:15, 1745:13, 1757:19, 1765:14, 1768:14, 1814:6, 1818:4

**FHFA** [46] - 1726:10, 1727:12, 1727:19, 1732:3, 1733:7, 1734:1, 1736:13, 1738:3, 1738:10, 1738:16, 1741:19, 1743:21, 1744:15, 1759:8, 1759:19, 1760:8, 1760:20, 1765:9, 1769:13, 1776:15, 1777:20, 1778:6, 1780:15, 1781:8, 1782:22, 1784:21, 1790:3, 1790:5, 1792:5, 1792:12, 1792:18, 1794:13, 1795:2, 1795:3, 1797:17, 1797:22, 1798:1, 1798:13, 1798:16, 1803:11, 1804:15, 1804:16, 1806:24, 1812:18, 1827:18

**FHFA's** [1] - 1777:18

**FHLMC** [1] - 1757:18

**Fifth** [4] - 1754:3, 1754:5, 1754:10, 1754:15

**figure** [2] - 1733:10, 1810:7

**file** [4] - 1808:24, 1809:10, 1809:11, 1810:15

**filed** [3] - 1729:24, 1730:1, 1730:15

**filing** [6] - 1724:13, 1724:17, 1725:13, 1725:25, 1726:7, 1730:14

**filings** [3] - 1725:21, 1725:22, 1785:8

**filling** [1] - 1755:11

**final** [6] - 1789:5, 1807:9, 1808:20,

---

1808:21, 1808:23, 1831:20

**finance** [8] - 1752:1, 1752:5, 1794:23, 1795:13, 1800:11, 1800:25, 1802:8, 1805:2

**FINANCE** [1] - 1721:6

**Finance** [1] - 1722:5

**financial** [40] - 1727:18, 1728:7, 1728:8, 1730:16, 1734:24, 1740:22, 1750:9, 1750:21, 1753:20, 1753:21, 1754:11, 1754:12, 1754:13, 1755:20, 1756:10, 1756:12, 1756:15, 1756:17, 1756:18, 1756:23, 1757:2, 1757:6, 1757:8, 1757:9, 1757:11, 1759:14, 1762:14, 1763:2, 1765:12, 1766:9, 1767:5, 1768:2, 1769:4, 1769:11, 1769:13, 1782:7, 1795:6, 1798:18, 1804:23, 1822:6

**financially** [2] - 1742:13, 1824:13

**fine** [2] - 1762:6, 1830:6

**firm** [1] - 1785:16

**first** [47] - 1724:25, 1725:15, 1725:17, 1726:5, 1733:19, 1736:18, 1737:18, 1738:16, 1745:16, 1748:1, 1748:3, 1748:13, 1748:24, 1756:2, 1756:9, 1757:20, 1759:23, 1763:8, 1763:14, 1764:4, 1764:7, 1768:17, 1768:25, 1771:10, 1772:20, 1776:14, 1776:16, 1780:6, 1781:10, 1783:11, 1786:1, 1786:16, 1795:2, 1796:3, 1796:9, 1798:15, 1800:12, 1800:22, 1803:4, 1806:3, 1808:17, 1811:23, 1813:18, 1814:20, 1818:25, 1823:7, 1823:14

**five** [1] - 1745:17

**fixed** [1] - 1801:15
**Flexner** [1] - 1721:22
**flip** [2] - 1724:25, 1792:21
**flunky** [2] - 1815:22, 1816:1
**focus** [3] - 1741:25, 1759:14, 1774:18
**focused** [2] - 1757:7, 1759:22
**focusing** [1] - 1758:15
**follow** [1] - 1791:7
**follows** [1] - 1751:4
**FOR** [2] - 1721:1, 1724:7
**forecast** [6] - 1758:1, 1758:7, 1758:16, 1758:24, 1772:9, 1772:24
**forecasting** [1] - 1786:2
**forecasts** [4] - 1758:8, 1758:11, 1767:10, 1773:10
**foregoing** [1] - 1834:3
**forever** [1] - 1825:1
**forget** [1] - 1807:5
**form** [4] - 1728:4, 1728:9, 1753:15, 1803:6
**Form** [3] - 1725:2, 1725:7, 1768:20
**formal** [2] - 1809:9, 1810:20
**former** [2] - 1750:9, 1750:21
**forms** [2] - 1757:13
**formula** [1] - 1738:24
**forth** [1] - 1767:24
**forward** [2] - 1748:14, 1775:15
**Foster** [2] - 1797:3, 1797:5
**foundation** [12] - 1736:7, 1737:10, 1783:11, 1786:15, 1786:18, 1787:7, 1789:1, 1790:21, 1791:4, 1794:9, 1796:25, 1797:7
**four** [4] - 1780:9, 1785:23, 1790:14, 1830:23
**fourth** [9] - 1739:18, 1758:3, 1758:14, 1763:8, 1763:13, 1763:19, 1771:23, 1780:5, 1782:7
**frame** [3] - 1724:18, 1761:7, 1762:24

**framing/talking** [1] - 1807:17
**Francisco** [3] - 1752:18, 1752:20, 1753:4
**Freddie** [75] - 1724:17, 1724:18, 1725:1, 1725:7, 1725:21, 1726:6, 1726:9, 1726:14, 1727:9, 1728:3, 1729:16, 1729:22, 1730:4, 1730:11, 1731:8, 1731:14, 1731:16, 1732:12, 1733:7, 1733:12, 1733:21, 1734:2, 1734:6, 1739:13, 1742:12, 1743:21, 1750:8, 1750:20, 1751:9, 1751:10, 1751:15, 1751:20, 1751:22, 1751:23, 1754:15, 1754:18, 1754:21, 1755:9, 1755:10, 1755:20, 1756:4, 1757:6, 1757:16, 1758:17, 1758:25, 1759:9, 1760:9, 1760:13, 1761:14, 1765:7, 1765:12, 1765:18, 1765:21, 1765:24, 1765:25, 1769:1, 1769:2, 1772:11, 1772:24, 1774:8, 1776:15, 1776:19, 1778:10, 1780:4, 1780:8, 1780:24, 1785:3, 1785:7, 1789:2, 1794:2, 1794:17, 1811:10, 1819:13, 1828:10
**Freddie's** [9] - 1727:18, 1735:15, 1763:4, 1763:10, 1764:1, 1764:4, 1765:1, 1765:8, 1767:16
**free** [1] - 1747:24
**freezing** [1] - 1776:4
**Friday** [7] - 1798:13, 1830:17, 1831:6, 1831:10, 1831:11, 1831:15, 1831:16
**friends** [1] - 1817:11
**front** [2] - 1748:1, 1751:7
**fulfill** [1] - 1777:25
**full** [1] - 1746:11

**fully** [1] - 1744:25
**function** [1] - 1810:14
**funding** [1] - 1738:18
**funds** [5] - 1726:20, 1726:24, 1727:10, 1742:5, 1760:11
**FUNDS** [1] - 1721:3
**future** [24] - 1728:21, 1728:22, 1729:7, 1729:9, 1731:9, 1732:11, 1732:15, 1733:4, 1733:21, 1734:6, 1755:24, 1761:13, 1766:20, 1769:17, 1769:18, 1770:5, 1770:7, 1770:13, 1771:1, 1771:2, 1771:8, 1771:12, 1774:5, 1796:7
**future-looking** [1] - 1796:7
**FY** [1] - 1789:10

**G**

**game** [1] - 1813:2
**Geithner** [9] - 1736:16, 1738:6, 1738:10, 1738:17, 1798:12, 1798:23, 1800:15, 1802:12, 1804:4
**general** [1] - 1760:8
**generalized** [1] - 1791:3
**generally** [1] - 1809:4
**generate** [4] - 1729:16, 1769:20, 1770:9, 1771:4
**generating** [1] - 1767:20
**gentleman** [1] - 1755:5
**gentlemen** [2] - 1750:15, 1775:14
**given** [10] - 1737:14, 1742:25, 1762:22, 1774:4, 1776:21, 1783:17, 1784:7, 1793:7, 1829:18
**goal** [7] - 1792:11, 1793:18, 1794:9, 1794:14, 1794:20, 1795:7, 1798:16
**goals** [1] - 1795:3
**golding** [1] - 1761:11
**good-faith** [1] - 1790:7
**government** [18] -

1725:14, 1725:17, 1726:4, 1734:13, 1734:21, 1734:23, 1767:12, 1786:17, 1795:4, 1798:17, 1798:19, 1809:21, 1809:23, 1810:6, 1810:9, 1810:12, 1810:13, 1811:13
**government's** [2] - 1745:19, 1809:24
**government-sponsored** [1] - 1798:19
**grant** [1] - 1832:4
**Grant** [25] - 1737:4, 1785:16, 1785:17, 1785:18, 1786:1, 1786:9, 1786:12, 1786:22, 1787:5, 1787:9, 1787:20, 1788:1, 1788:3, 1788:9, 1788:18, 1789:1, 1789:5, 1789:6, 1789:9, 1789:13, 1789:16, 1790:22, 1790:25, 1791:1, 1791:7
**great** [1] - 1738:9
**greater** [1] - 1767:12
**Griffin** [2] - 1792:18, 1793:5
**Grossmann** [1] - 1722:3
**grounds** [1] - 1783:11
**group** [1] - 1786:2
**Group** [2] - 1783:1, 1783:14
**GSE** [3] - 1789:10, 1789:21, 1802:19
**GSEs** [14] - 1734:12, 1740:22, 1742:20, 1745:22, 1747:6, 1755:24, 1766:1, 1795:6, 1795:11, 1799:9, 1802:25, 1803:4, 1828:8, 1828:9
**GT** [2] - 1789:10, 1789:14
**guess** [4] - 1725:20, 1747:14, 1821:1, 1821:4
**guidance** [3] - 1735:23, 1741:8, 1809:13
**guiding** [1] - 1745:5
**gun** [1] - 1818:1
**guy** [2] - 1813:22, 1825:12

**guys** [1] - 1793:23

**H**

**Haldeman** [2] - 1755:15, 1755:16
**half** [8] - 1759:23, 1830:20, 1830:22, 1830:23, 1831:1, 1831:2, 1831:11
**HAMISH** [1] - 1721:20
**Hamish** [6] - 1747:17, 1748:6, 1775:9, 1775:22, 1776:8, 1827:22
**Hampshire** [1] - 1721:16
**hand** [3] - 1757:18, 1771:23, 1779:17
**handed** [2] - 1757:15, 1770:20
**handful** [1] - 1774:21
**handing** [1] - 1768:17
**happy** [1] - 1790:6
**hard** [2] - 1741:6, 1809:18
**harm** [18] - 1818:25, 1819:6, 1820:12, 1822:4, 1822:7, 1823:6, 1823:12, 1823:13, 1823:16, 1823:23, 1824:7, 1826:13, 1826:18, 1827:25, 1828:2, 1829:6, 1829:10, 1829:22
**harmed** [9] - 1819:3, 1821:5, 1821:22, 1822:14, 1824:18, 1824:20, 1825:18, 1825:19, 1826:9
**harms** [1] - 1826:4
**head** [6] - 1738:9, 1738:11, 1752:22, 1777:18, 1805:3
**headed** [1] - 1769:10
**header** [1] - 1725:16
**heading** [1] - 1725:14
**heads** [1] - 1791:14
**hear** [7] - 1784:4, 1790:25, 1797:4, 1804:9, 1806:25, 1817:23, 1832:14
**heard** [11] - 1729:12, 1735:12, 1735:14, 1735:18, 1741:16, 1774:13, 1779:10, 1786:22, 1790:16, 1790:24, 1830:21
**hearsay** [26] - 1737:5,

1786:7, 1786:14, 1786:16, 1790:15, 1790:16, 1791:3, 1792:4, 1795:17, 1796:4, 1797:7, 1798:5, 1799:12, 1799:22, 1802:2, 1804:11, 1804:19, 1804:20, 1805:1, 1808:14, 1812:15, 1813:9, 1813:16, 1814:2, 1814:16
**hedging** [1] - 1756:17
**heed** [1] - 1745:13
**held** [6] - 1794:12, 1797:18, 1797:24, 1819:2, 1820:2, 1825:10
**help** [1] - 1731:13
**helpful** [4] - 1782:20, 1812:22, 1831:17, 1831:19
**helping** [1] - 1728:14
**helps** [1] - 1788:25
**HERA** [3] - 1727:17, 1781:16, 1827:13
**high** [7] - 1741:4, 1741:5, 1751:16, 1751:17, 1760:13, 1821:25, 1822:16
**high-level** [2] - 1751:16, 1751:17
**high/sold** [1] - 1824:19
**higher** [8] - 1729:5, 1819:13, 1820:8, 1820:15, 1820:24, 1829:17, 1829:19, 1829:20
**highest** [1] - 1812:14
**highlight** [3] - 1793:6, 1811:8, 1811:15
**highly** [2] - 1807:25, 1808:14
**himself** [2] - 1737:2, 1740:16
**hint** [1] - 1801:16
**hired** [4] - 1754:18, 1755:15, 1785:18, 1785:19
**Hoffman** [4] - 1748:15, 1750:7, 1774:15, 1776:11
**HOFFMAN** [10] - 1722:7, 1748:15, 1749:11, 1749:20, 1750:6, 1750:20, 1774:13, 1774:15, 1830:6, 1830:9
**hold** [5] - 1776:24,

1820:11, 1820:24, 1821:8, 1821:10
**holding** [1] - 1819:9
**holds** [1] - 1825:14
**Home** [4] - 1752:18, 1752:20, 1753:3, 1768:20
**Honor** [100] - 1724:6, 1736:8, 1736:11, 1737:1, 1737:11, 1737:16, 1745:12, 1747:10, 1748:6, 1748:10, 1748:15, 1748:19, 1749:15, 1749:21, 1750:6, 1750:12, 1750:24, 1768:8, 1774:15, 1774:18, 1774:24, 1775:5, 1775:9, 1775:22, 1776:8, 1776:11, 1777:14, 1778:2, 1779:10, 1779:12, 1779:18, 1781:4, 1781:6, 1782:21, 1783:10, 1784:1, 1784:20, 1785:15, 1787:11, 1789:22, 1790:10, 1791:16, 1791:19, 1791:22, 1792:5, 1795:20, 1797:10, 1799:6, 1799:21, 1800:1, 1800:2, 1800:22, 1802:2, 1802:6, 1804:10, 1804:19, 1804:20, 1804:25, 1805:7, 1806:19, 1807:9, 1807:23, 1808:7, 1811:1, 1812:20, 1814:1, 1814:3, 1814:19, 1815:5, 1815:25, 1816:4, 1817:6, 1817:19, 1818:1, 1818:10, 1818:12, 1818:17, 1818:20, 1822:12, 1822:21, 1823:18, 1823:24, 1824:24, 1825:22, 1827:7, 1827:21, 1827:23, 1830:6, 1830:9, 1830:10, 1830:14, 1831:6, 1831:23, 1832:13, 1832:18, 1832:21, 1833:1, 1833:4, 1833:8, 1833:13
**Honor's** [3] - 1804:12, 1807:16, 1824:3

**HONORABLE** [1] - 1721:12
**hope** [2] - 1810:19, 1817:22
**hoped** [1] - 1831:7
**hopeful** [1] - 1832:22
**horse** [1] - 1745:7
**hour** [3] - 1831:12, 1833:9, 1833:11
**hours** [6] - 1755:17, 1830:20, 1830:23, 1831:1, 1831:3, 1831:4
**House** [24] - 1797:21, 1802:10, 1803:10, 1803:25, 1804:7, 1804:17, 1805:18, 1805:24, 1806:5, 1807:12, 1807:13, 1812:5, 1812:7, 1813:1, 1813:4, 1813:15, 1813:21, 1813:24, 1814:17, 1815:23, 1815:24, 1816:2, 1816:11
**house** [1] - 1761:19
**Housing** [3] - 1722:5, 1727:17, 1778:6
**housing** [7] - 1730:15, 1755:24, 1795:4, 1795:5, 1798:17, 1800:11, 1802:8
**HOUSING** [1] - 1721:6
**huge** [1] - 1778:17
**HUME** [86] - 1721:20, 1747:17, 1748:6, 1775:9, 1775:22, 1776:7, 1776:14, 1776:18, 1777:3, 1777:7, 1777:10, 1777:17, 1778:13, 1778:17, 1778:24, 1779:9, 1779:16, 1780:1, 1781:19, 1781:24, 1782:11, 1782:13, 1782:15, 1782:21, 1783:1, 1783:3, 1784:1, 1784:5, 1784:9, 1784:15, 1784:19, 1785:1, 1785:7, 1785:10, 1785:14, 1787:4, 1787:11, 1787:17, 1787:19, 1791:16, 1791:19, 1792:3, 1794:8, 1797:10, 1798:9, 1798:22, 1799:1, 1799:4, 1800:1, 1800:9, 1802:6,

1802:14, 1803:22, 1804:3, 1804:8, 1804:25, 1805:14, 1805:16, 1806:6, 1806:10, 1806:13, 1806:18, 1806:21, 1807:1, 1807:3, 1807:8, 1807:13, 1807:15, 1807:20, 1807:23, 1808:19, 1808:24, 1809:8, 1809:14, 1809:17, 1810:15, 1810:25, 1814:19, 1815:20, 1815:25, 1816:3, 1816:18, 1817:2, 1818:10, 1827:22, 1827:25
**Hume** [24] - 1747:17, 1748:2, 1748:6, 1775:9, 1775:21, 1775:22, 1776:8, 1778:5, 1781:9, 1783:13, 1786:25, 1787:13, 1790:16, 1794:5, 1796:19, 1799:20, 1812:21, 1814:5, 1817:8, 1818:2, 1827:22, 1830:14, 1831:7, 1831:17
**Huntington** [1] - 1825:10
**hurts** [1] - 1825:12

## I

**Ian** [3] - 1748:15, 1750:6, 1774:15
**IAN** [1] - 1722:7
**idea** [5] - 1732:6, 1743:16, 1799:16, 1811:16, 1826:12
**identify** [1] - 1816:7
**identifying** [1] - 1756:13
**ignore** [1] - 1776:2
**impact** [7] - 1739:25, 1740:5, 1740:7, 1740:11, 1740:12, 1744:3, 1815:16
**importance** [1] - 1755:19
**important** [5] - 1728:7, 1755:20, 1801:8, 1815:1, 1817:9
**importantly** [1] - 1777:22
**impose** [2] - 1733:17,

1742:20
**imposed** [2] - 1740:20, 1744:6
**improve** [2] - 1730:16, 1759:14
**improvements** [1] - 1767:17
**inaccurate** [1] - 1751:18
**inadmissible** [3] - 1737:5, 1790:15, 1798:5
**inappropriate** [1] - 1814:12
**INC** [1] - 1721:3
**incalculably** [1] - 1743:2
**incentives** [1] - 1781:2
**inclination** [1] - 1760:23
**include** [3] - 1752:7, 1756:21, 1786:3
**included** [1] - 1753:21
**includes** [3] - 1783:6, 1802:23, 1823:10
**including** [3] - 1738:12, 1761:24, 1772:22
**inclusion** [1] - 1798:3
**incoherence** [1] - 1826:16
**income** [18] - 1729:15, 1729:16, 1736:16, 1758:17, 1758:19, 1758:20, 1759:1, 1769:20, 1769:21, 1770:8, 1770:9, 1771:4, 1771:5, 1772:1
**inconceivable** [1] - 1829:1
**inconsistent** [2] - 1815:6, 1815:8
**incorporated** [1] - 1827:14
**increased** [2] - 1743:23, 1780:3
**increases** [1] - 1729:4
**increasingly** [4] - 1728:22, 1769:18, 1770:6, 1771:2
**indicated** [7] - 1733:20, 1758:16, 1758:25, 1762:11, 1771:11, 1793:1, 1799:20
**indicates** [3] - 1747:7, 1757:20, 1799:15
**indication** [2] - 1799:14, 1804:14

**individual's** [1] - 1764:12
**indulge** [1] - 1830:17
**indulgence** [1] - 1776:20
**inevitable** [1] - 1755:23
**inflicted** [3] - 1828:1, 1829:6, 1829:22
**infliction** [1] - 1829:10
**influence** [1] - 1832:23
**information** [1] - 1751:13
**informative** [1] - 1822:23
**informed** [2] - 1774:20, 1774:25
**inhibit** [1] - 1809:24
**initial** [1] - 1745:23
**injury** [1] - 1824:8
**inordinate** [1] - 1775:4
**input** [2] - 1732:3, 1761:18
**inputs** [1] - 1761:24
**inside** [1] - 1828:17
**insight** [2] - 1797:21, 1803:11
**instead** [2] - 1801:17, 1803:18
**Institute** [4] - 1811:20, 1813:7, 1813:13, 1813:23
**instruct** [1] - 1830:16
**instruction** [1] - 1750:12
**instructions** [1] - 1831:19
**insufficient** [2] - 1742:5, 1827:20
**insurance** [2] - 1753:12, 1753:16
**intended** [1] - 1743:23
**intent** [3] - 1812:1, 1812:12, 1815:13
**intention** [1] - 1775:2
**interest** [5] - 1756:18, 1760:24, 1800:22, 1827:13
**interested** [3] - 1755:2, 1755:9, 1755:16
**interests** [3] - 1766:2, 1767:4, 1785:21
**internal** [3] - 1800:10, 1804:6, 1810:6
**internally** [2] - 1759:9, 1759:19
**interpret** [1] - 1759:11
**interrupt** [1] - 1762:16

**interview** [1] - 1811:14
**interviewed** [1] - 1755:10
**introduced** [3] - 1819:11, 1820:7, 1824:1
**intuit** [1] - 1823:3
**intuitive** [4] - 1820:16, 1820:17, 1820:20, 1823:4
**invest** [1] - 1778:19
**investing** [2] - 1739:13, 1821:24
**investment** [6] - 1733:23, 1734:15, 1739:4, 1753:22, 1753:23, 1771:13
**investor** [1] - 1822:5
**investors** [1] - 1781:21
**involved** [4] - 1741:19, 1753:10, 1812:8, 1816:9
**involvement** [2] - 1795:4, 1798:17
**involves** [1] - 1745:19
**irrational** [1] - 1829:3
**irrelevant** [8] - 1778:10, 1781:11, 1781:16, 1794:11, 1804:24, 1813:17, 1814:18
**issue** [9] - 1747:4, 1792:23, 1809:4, 1811:9, 1818:11, 1823:3, 1825:9, 1826:19, 1827:2
**issued** [2] - 1772:24, 1791:20
**issues** [5] - 1738:5, 1774:24, 1789:20, 1790:8, 1816:4
**items** [2] - 1761:23, 1763:1, 1786:3
**iterative** [2] - 1796:6, 1804:24
**itself** [3] - 1767:14, 1804:23, 1810:10

## J

**James** [1] - 1777:19
**January** [4] - 1738:4, 1739:21, 1795:14, 1798:14
**Jeff** [1] - 1793:1
**Jenkins** [1] - 1794:6
**Jim** [1] - 1802:9, 1803:24, 1811:3
**job** [2] - 1755:12,

1786:11
**John** [2] - 1755:10, 1755:12
**join** [1] - 1830:15
**joint** [3] - 1795:14, 1830:11, 1831:23
**JONATHAN** [1] - 1722:5
**Jones** [6] - 1724:5, 1736:11, 1737:17, 1745:6, 1745:16, 1818:12
**JONES** [40] - 1722:7, 1724:6, 1724:9, 1735:25, 1736:4, 1736:11, 1737:11, 1737:23, 1745:9, 1748:2, 1776:20, 1777:9, 1777:13, 1778:2, 1778:4, 1779:10, 1779:14, 1781:6, 1783:10, 1784:13, 1784:23, 1785:5, 1786:14, 1787:13, 1787:18, 1790:10, 1790:14, 1794:5, 1795:25, 1796:2, 1799:12, 1802:2, 1804:10, 1810:22, 1812:20, 1817:19, 1818:7, 1818:12, 1818:17, 1827:5
**Journal** [4] - 1811:3, 1813:1, 1813:4, 1813:14
**JUDGE** [1] - 1721:13
**Judge** [2] - 1747:17, 1809:17
**judgment** [9] - 1816:6, 1818:8, 1818:19, 1818:21, 1819:1, 1823:18, 1824:10, 1827:10, 1829:17
**judicial** [2] - 1816:22, 1818:10
**July** [1] - 1786:9
**jumping** [1] - 1818:1
**June** [5] - 1752:4, 1752:5, 1753:9, 1757:17, 1768:21
**jurisdictions** [1] - 1826:24
**jurors** [6] - 1727:5, 1832:2, 1832:5, 1832:7, 1832:16, 1832:24
**jury** [42] - 1729:12, 1731:13, 1736:6, 1736:19, 1747:23,

1748:1, 1748:7, 1750:4, 1774:18, 1775:18, 1778:11, 1778:20, 1781:14, 1781:17, 1782:20, 1783:19, 1783:20, 1786:22, 1786:24, 1790:24, 1791:13, 1797:4, 1799:24, 1818:22, 1819:6, 1819:12, 1819:18, 1820:22, 1820:25, 1821:2, 1821:4, 1821:14, 1823:2, 1823:5, 1827:18, 1829:1, 1829:4, 1830:8, 1830:17, 1831:11, 1831:19
**Jury** [5] - 1724:3, 1749:24, 1750:3, 1750:14, 1775:20
**JURY** [1] - 1721:12
**justify** [3] - 1739:3, 1739:13, 1747:1

## K

**K-a-r-i** [1] - 1750:8
**Kaplan** [5] - 1735:13, 1737:2, 1737:16, 1816:24, 1817:20
**KAPLAN** [9] - 1721:21, 1736:7, 1737:16, 1737:21, 1745:12, 1745:15, 1747:9, 1817:3, 1817:6
**Kari** [6] - 1750:8, 1750:20, 1751:3, 1751:9, 1757:15, 1768:14
**KARI** [1] - 1723:5
**Kaye** [1] - 1722:8
**keep** [2] - 1728:3, 1809:22
**keeping** [5] - 1726:25, 1727:11, 1728:12, 1728:13
**KENYA** [1] - 1721:21
**kept** [1] - 1828:13
**Kessler** [1] - 1721:18
**key** [4] - 1799:7, 1807:16, 1807:17
**kids** [1] - 1813:2
**kind** [5] - 1752:7, 1774:1, 1801:16, 1812:21
**King** [1] - 1721:19
**Kirk** [1] - 1721:15
**knowing** [3] - 1733:2,

1740:23, 1741:7
**knowledge** [8] - 1764:24, 1765:1, 1765:4, 1765:7, 1765:10, 1769:23, 1769:25, 1773:23
**known** [2] - 1742:23, 1802:22
**knows** [7] - 1740:18, 1797:3, 1799:21, 1807:4, 1815:17, 1818:20, 1821:24
**Koskinen** [1] - 1755:10
**KPMG** [3] - 1755:7, 1789:10, 1789:13
**KRAVETZ** [1] - 1722:2

## L

**L-a-y-t-o-n** [1] - 1749:21
**labeled** [2] - 1799:17, 1808:21
**lack** [3] - 1760:23, 1786:14, 1799:23
**lacking** [1] - 1733:6
**ladies** [2] - 1750:15, 1775:14
**laid** [3] - 1736:8, 1737:10, 1786:18
**Lamberth** [1] - 1747:17
**LAMBERTH** [1] - 1721:12
**language** [1] - 1790:6
**large** [7] - 1733:2, 1733:3, 1740:12, 1743:2, 1754:11, 1754:24, 1780:5
**last** [18] - 1735:1, 1741:25, 1742:24, 1751:25, 1757:25, 1759:17, 1772:7, 1773:2, 1779:5, 1780:4, 1780:14, 1780:17, 1784:19, 1793:2, 1803:4, 1810:25, 1811:1, 1814:20
**late** [2] - 1754:7, 1762:24
**law** [8] - 1818:19, 1819:15, 1823:19, 1824:10, 1825:22, 1825:24, 1826:15, 1826:23
**lay** [3] - 1788:25, 1794:8, 1796:25
**layers** [3] - 1813:9,

**1813:15, 1814:16**
**layout** [1] - 1789:14
**Layton** [3] - 1748:17,
1749:21, 1749:22
**Layton's** [1] - 1748:20
**lead** [1] - 1766:14
**leading** [2] - 1825:8,
1827:2
**leads** [1] - 1790:21
**learn** [1] - 1764:4
**learned** [2] - 1764:23,
1768:6
**least** [5] - 1751:14,
1780:21, 1790:9,
1814:7, 1832:24
**leave** [4] - 1747:21,
1754:1, 1775:17,
1812:21
**leaving** [1] - 1751:22
**LEE** [1] - 1721:17
**Lee** [1] - 1750:24
**left** [11] - 1751:23,
1753:3, 1754:2,
1754:15, 1788:7,
1797:9, 1806:4,
1811:2, 1820:25,
1821:4, 1831:16
**legal** [1] - 1748:12
**legally** [1] - 1818:22
**legislation** [3] -
1816:9, 1816:12,
1816:15
**less** [1] - 1762:2
**lest** [1] - 1815:14
**letter** [4] - 1782:3,
1782:6, 1787:19,
1791:7
**letters** [2] - 1724:12,
1733:11
**level** [6] - 1747:1,
1751:16, 1751:17,
1765:16, 1765:18,
1790:9
**levels** [2] - 1765:15,
1777:24
**life** [2] - 1811:10,
1812:10
**lifted** [1] - 1780:18
**light** [1] - 1809:25
**likely** [2] - 1771:25,
1817:4
**limine** [1] - 1814:7
**limit** [2] - 1759:16,
1787:4
**limited** [1] - 1767:25
**line** [4] - 1747:3,
1753:10, 1757:25,
1813:23
**lines** [2] - 1788:5,
1788:8

**link** [1] - 1815:10
**liquidation** [1] -
1729:4
**liquidity** [2] - 1755:21,
1789:18
**list** [5] - 1748:24,
1776:21, 1786:1,
1787:14, 1800:10
**listed** [2] - 1725:24,
1726:2
**literally** [1] - 1779:1
**LITIGATIONS** [1] -
1721:10
**Litowitz** [1] - 1722:2
**live** [4] - 1748:22,
1750:10, 1750:16,
1775:1
**LLP** [4] - 1721:18,
1721:22, 1722:3,
1722:8
**Loan** [4] - 1752:18,
1752:20, 1753:3,
1768:20
**Lockhart** [7] -
1777:19, 1778:7,
1778:25, 1779:19,
1781:8, 1782:3,
1782:9
**long-term** [5] -
1766:9, 1767:5,
1767:19, 1769:10,
1769:12
**longer-term** [2] -
1758:1, 1758:7
**look** [16] - 1724:17,
1725:22, 1725:25,
1726:2, 1730:18,
1734:23, 1741:22,
1769:9, 1771:23,
1776:23, 1779:8,
1787:10, 1789:3,
1789:14, 1806:11,
1811:12
**looked** [6] - 1724:12,
1724:13, 1725:20,
1735:20, 1743:20,
1828:17
**looking** [5] - 1796:7,
1808:21, 1812:24,
1813:19, 1821:16
**looks** [1] - 1729:10
**loose** [1] - 1816:5
**lose** [1] - 1814:23
**loss** [1] - 1829:9
**losses** [8] - 1738:19,
1780:5, 1780:7,
1780:8, 1780:9,
1782:8, 1792:8,
1793:20
**lost** [3] - 1824:3,

**1824:6, 1824:24
loud** [1] - 1825:12
**low** [7] - 1821:25,
1822:4, 1822:9,
1824:19, 1826:14,
1832:19
**lower** [6] - 1757:18,
1822:3, 1822:17,
1822:24, 1824:14,
1826:11
**lunch** [1] - 1724:12,
1732:22, 1783:7,
1833:9, 1833:11
**lying** [1] - 1817:7
**Lynch** [1] - 1755:6

---

**M**

---

**Mac** [46] - 1724:17,
1724:18, 1726:6,
1726:9, 1726:14,
1728:3, 1729:16,
1729:22, 1730:4,
1730:11, 1731:8,
1731:14, 1731:16,
1732:12, 1734:2,
1739:13, 1743:21,
1751:9, 1751:10,
1754:18, 1754:21,
1755:9, 1755:10,
1755:20, 1756:4,
1757:16, 1760:9,
1760:13, 1765:21,
1765:24, 1769:1,
1769:2, 1772:11,
1772:24, 1774:8,
1778:10, 1780:4,
1780:8, 1780:24,
1785:3, 1785:7,
1789:2, 1794:2,
1811:10, 1819:13
**MAC** [1] - 1721:8
**Mac's** [8] - 1725:1,
1725:7, 1727:9,
1733:21, 1734:6,
1750:9, 1750:21,
1757:6
**Mae** [26] - 1724:14,
1731:14, 1734:2,
1734:6, 1739:13,
1743:21, 1755:19,
1760:9, 1760:13,
1776:15, 1776:18,
1778:10, 1780:4,
1780:6, 1780:18,
1782:23, 1783:1,
1785:3, 1785:7,
1786:2, 1787:23,
1788:11, 1794:2,
1811:10, 1819:12,

**1828:11
Mae's** [2] - 1780:19,
1780:22
**MAE/FREDDIE** [1] -
1721:8
**Maher** [1] - 1814:11
**mail** [27] - 1736:5,
1736:13, 1737:3,
1784:21, 1789:8,
1794:22, 1796:10,
1796:23, 1800:10,
1800:13, 1802:7,
1803:22, 1805:16,
1805:17, 1805:20,
1808:4, 1808:19,
1808:25, 1811:3,
1811:4, 1811:22,
1811:23, 1812:24,
1813:2, 1813:18,
1813:20, 1813:23
**mailing** [1] - 1813:4
**mails** [1] - 1811:25
**maintain** [1] - 1777:23
**major** [2] - 1761:25,
1802:24
**manage** [1] - 1753:22
**managed** [3] -
1753:20, 1754:11,
1756:24
**Management** [2] -
1783:1, 1783:14
**management** [16] -
1753:20, 1753:23,
1754:13, 1756:16,
1756:17, 1756:19,
1756:21, 1756:24,
1761:11, 1764:2,
1764:4, 1764:9,
1764:10, 1764:23,
1765:1, 1765:8
**manager** [2] -
1752:22, 1756:25
**managing** [2] -
1757:7, 1800:23
**mandatory** [1] -
1727:12
**March** [3] - 1777:22,
1778:5, 1778:10
**Mario** [2] - 1741:15,
1789:23
**mark** [1] - 1768:18
**marked** [5] - 1751:8,
1757:15, 1796:6,
1804:21
**market** [26] - 1730:16,
1738:5, 1739:1,
1739:10, 1739:11,
1742:3, 1746:12,
1746:16, 1773:24,
1774:2, 1774:9,

**1777:25, 1780:4,
1780:23, 1782:5,
1793:23, 1795:4,
1795:5, 1798:17,
1821:24, 1822:5,
1822:16, 1822:24,
1828:18, 1828:19
market-based** [2] -
1746:12, 1746:16
**marketing** [1] -
1752:22
**Markets** [1] - 1801:1
**markets** [6] - 1795:6,
1798:18, 1802:8,
1803:24, 1805:3,
1805:4
**Mary** [5] - 1794:22,
1796:10, 1800:25,
1805:1, 1805:4
**Mason's** [1] - 1824:1
**Massachusetts** [1] -
1722:8
**masse** [1] - 1815:4
**material** [2] - 1768:5,
1801:7
**materials** [1] -
1725:24
**mathematics** [2] -
1752:1, 1752:4
**matter** [10] - 1733:6,
1741:2, 1787:21,
1793:25, 1815:11,
1818:19, 1819:15,
1823:19, 1824:10,
1834:5
**matters** [6] - 1748:8,
1774:19, 1775:7,
1776:3, 1815:12,
1832:3
**maximum** [3] -
1773:9, 1773:12,
1773:14
**MBA** [4] - 1752:1,
1752:4, 1752:9,
1752:14
**McFarland** [4] -
1782:24, 1783:4,
1783:6, 1783:16
**mean** [10] - 1725:25,
1728:6, 1732:5,
1735:5, 1756:11,
1758:16, 1758:24,
1762:16, 1801:25,
1831:4
**meaning** [4] -
1727:11, 1733:19,
1739:2, 1787:23
**meaningful** [3] -
1766:15, 1795:10,
1799:8

**means** [12] - 1727:1, 1727:3, 1727:7, 1730:22, 1732:11, 1739:8, 1739:16, 1740:10, 1747:22, 1809:6
**meant** [3] - 1814:20, 1816:17, 1833:6
**meantime** [2] - 1748:13, 1817:17
**measure** [3] - 1828:1, 1829:6, 1829:21
**measures** [1] - 1827:25
**meet** [2] - 1733:1, 1790:18
**meeting** [24] - 1738:17, 1755:16, 1757:16, 1757:21, 1783:7, 1789:6, 1789:10, 1789:12, 1792:19, 1792:20, 1793:2, 1793:5, 1793:14, 1796:4, 1796:7, 1796:11, 1796:13, 1797:16, 1798:13, 1799:2, 1799:18, 1802:12, 1804:5
**meetings** [2] - 1754:25, 1759:5
**Megan** [1] - 1808:19
**Meltzer** [1] - 1721:18
**member** [2] - 1764:1, 1816:2
**members** [21] - 1748:7, 1761:11, 1764:9, 1819:1, 1819:3, 1819:6, 1819:7, 1819:8, 1819:23, 1820:1, 1820:24, 1821:4, 1821:7, 1821:9, 1821:12, 1822:21, 1823:7, 1823:11, 1823:16, 1824:8, 1824:12
**memo** [3] - 1799:17, 1802:11, 1804:4
**memorandum** [3] - 1798:11, 1798:12, 1798:22
**memorialize** [1] - 1797:25
**memory** [2] - 1758:10, 1773:8
**mention** [1] - 1761:25
**mentioned** [2] - 1762:17, 1767:19
**met** [3] - 1755:12,

1755:17, 1793:13
**meticulous** [1] - 1734:23
**Michael** [3] - 1802:11, 1804:1, 1805:4
**Michigan** [1] - 1825:11
**mid** [1] - 1802:19
**mid-August** [1] - 1802:19
**middle** [3] - 1782:6, 1801:13, 1811:4
**might** [6] - 1744:6, 1793:23, 1793:24, 1800:1, 1815:15, 1815:23
**Miller** [5] - 1794:22, 1796:10, 1800:25, 1805:1, 1805:4
**million** [2] - 1788:11, 1789:4
**mind** [18] - 1746:2, 1746:5, 1768:17, 1768:24, 1770:19, 1771:22, 1772:13, 1792:4, 1805:7, 1807:15, 1807:24, 1812:4, 1812:16, 1812:18, 1814:6, 1814:15, 1815:7, 1815:8
**mindful** [1] - 1791:21
**minimal** [3] - 1828:1, 1829:21, 1831:6
**minimum** [3] - 1780:19, 1780:20, 1830:23
**minor** [1] - 1748:7
**minute** [1] - 1826:6
**minutes** [5] - 1757:16, 1765:14, 1811:24, 1830:8, 1832:11
**mission** [1] - 1777:25
**mistake** [2] - 1817:5, 1817:6
**Mister** [1] - 1775:5
**mistrial** [1] - 1832:20
**model** [1] - 1826:21
**models** [1] - 1794:2
**modifying** [1] - 1801:14
**Moffett** [2] - 1754:20, 1755:3
**moment** [2] - 1811:19, 1817:10
**momentum** [1] - 1794:1
**Monday** [4] - 1831:13, 1831:25, 1832:12, 1832:13

**money** [21] - 1729:23, 1730:12, 1731:17, 1731:22, 1732:20, 1733:12, 1733:13, 1739:12, 1742:14, 1742:15, 1744:1, 1745:1, 1745:17, 1745:20, 1745:21, 1759:12, 1759:21, 1792:12, 1793:22, 1803:16, 1828:7
**monitor** [1] - 1736:2
**monitoring** [1] - 1756:14
**monster** [1] - 1815:11
**months** [3] - 1755:14, 1759:17, 1759:23
**Moore's** [1] - 1808:19
**morning** [6] - 1807:21, 1830:3, 1831:6, 1831:25, 1832:13, 1832:17
**mortgage** [8] - 1738:5, 1739:8, 1739:11, 1739:13, 1742:3, 1780:3, 1780:24, 1782:5
**Mortgage** [2] - 1768:20, 1787:22
**mortgage-backed** [2] - 1739:8, 1739:13
**most** [3] - 1756:24, 1774:17, 1811:9
**motion** [11] - 1747:24, 1776:1, 1798:2, 1798:3, 1814:7, 1815:2, 1817:24, 1817:25, 1818:6, 1818:8, 1830:2
**motivations** [1] - 1808:16
**move** [8] - 1748:19, 1774:20, 1776:19, 1785:4, 1812:19, 1818:14, 1818:19, 1831:14
**moving** [1] - 1775:7
**MR** [156] - 1724:6, 1724:9, 1735:25, 1736:4, 1736:7, 1736:11, 1737:11, 1737:16, 1737:21, 1737:23, 1745:9, 1745:12, 1745:15, 1747:9, 1747:17, 1748:2, 1748:6, 1748:15, 1749:11, 1749:20, 1750:6, 1750:20, 1750:24, 1751:6, 1768:8,

1768:13, 1774:12, 1774:13, 1774:15, 1775:9, 1775:22, 1776:7, 1776:14, 1776:18, 1776:20, 1777:3, 1777:7, 1777:9, 1777:10, 1777:13, 1777:17, 1778:2, 1778:4, 1778:13, 1778:17, 1778:24, 1779:9, 1779:10, 1779:14, 1779:16, 1780:1, 1781:6, 1781:19, 1781:24, 1782:11, 1782:13, 1782:15, 1782:21, 1783:1, 1783:3, 1783:10, 1784:1, 1784:5, 1784:9, 1784:13, 1784:15, 1784:19, 1784:23, 1785:1, 1785:5, 1785:7, 1785:10, 1785:14, 1786:14, 1787:4, 1787:11, 1787:13, 1787:17, 1787:18, 1787:19, 1790:10, 1790:14, 1791:16, 1791:19, 1792:3, 1794:5, 1794:8, 1795:25, 1796:2, 1797:10, 1798:9, 1798:22, 1799:1, 1799:4, 1799:12, 1800:1, 1800:9, 1802:2, 1802:6, 1802:14, 1803:22, 1804:3, 1804:8, 1804:10, 1804:25, 1805:14, 1805:16, 1806:6, 1806:10, 1806:13, 1806:18, 1806:21, 1807:1, 1807:3, 1807:8, 1807:13, 1807:15, 1807:20, 1807:23, 1808:19, 1808:24, 1809:8, 1809:14, 1809:17, 1810:15, 1810:22, 1810:25, 1812:20, 1814:19, 1815:20, 1815:25, 1816:3, 1816:18, 1817:2, 1817:3, 1817:6, 1817:19, 1818:1, 1818:7, 1818:10, 1818:12, 1818:17, 1827:5, 1827:22, 1827:25, 1830:6, 1830:9,

1830:10, 1830:14, 1832:9, 1832:18, 1832:21, 1833:1, 1833:4, 1833:8, 1833:13
**multiple** [3] - 1813:9, 1813:15, 1818:23

## N

**name** [8] - 1738:3, 1755:5, 1786:22, 1808:24, 1809:10, 1809:11, 1810:15, 1825:13
**named** [1] - 1811:5
**National** [6] - 1787:22, 1802:10, 1803:25, 1805:25, 1811:6, 1825:11
**national** [3] - 1754:24, 1825:8, 1827:3
**nature** [1] - 1762:8
**near** [7] - 1739:25, 1740:5, 1740:8, 1740:11, 1740:13, 1757:23, 1786:23
**near-term** [5] - 1739:25, 1740:5, 1740:8, 1740:11, 1740:13
**necessary** [1] - 1756:13
**need** [12] - 1725:16, 1731:22, 1732:10, 1745:1, 1764:17, 1775:15, 1785:2, 1789:3, 1811:8, 1816:6, 1820:13, 1829:25
**needed** [2] - 1755:1, 1815:3
**needs** [1] - 1815:18
**negotiate** [1] - 1732:3
**negotiated** [2] - 1797:22, 1803:11
**negotiating** [2] - 1797:20, 1803:10
**negotiation** [1] - 1807:25
**negotiations** [1] - 1804:16
**nervous** [1] - 1833:3
**net** [39] - 1729:16, 1735:15, 1735:16, 1735:19, 1736:16, 1737:15, 1747:6, 1758:17, 1758:19, 1764:5, 1764:10, 1764:23, 1765:2,

1765:19, 1766:4,
1766:25, 1767:7,
1767:11, 1769:20,
1770:9, 1771:4,
1789:24, 1790:2,
1792:6, 1793:10,
1794:3, 1794:16,
1794:19, 1801:20,
1802:17, 1807:10,
1808:5, 1828:1,
1828:3, 1828:23,
1829:3, 1829:19,
1829:20

**never** [10] - 1733:10,
1744:14, 1745:3,
1760:5, 1760:15,
1760:18, 1796:21,
1796:25, 1820:11

**New** [4] - 1721:16,
1721:22, 1722:4

**new** [4] - 1767:24,
1778:24, 1789:19,
1805:23

**News** [2] - 1813:6,
1813:14

**news** [1] - 1832:16

**newspapers** [1] -
1734:14

**next** [24] - 1726:19,
1739:1, 1748:21,
1749:1, 1751:25,
1775:1, 1775:8,
1782:22, 1784:11,
1785:15, 1790:21,
1791:18, 1791:19,
1795:1, 1798:8,
1800:9, 1800:12,
1803:2, 1806:2,
1807:7, 1807:20,
1808:25, 1809:19,
1810:19

**next-to-last** [1] -
1751:25

**nice** [2] - 1773:18,
1775:19

**Nick** [1] - 1811:5

**nine** [1] - 1791:19

**nobody** [1] - 1740:18

**nobody's** [1] - 1816:2

**none** [6] - 1737:16,
1799:24, 1801:6,
1801:19, 1801:20,
1822:18

**nonetheless** [1] -
1817:9

**nonhearsay** [1] -
1814:15

**nonsubstantive** [1] -
1832:3

**Northwest** [4] -

1721:16, 1721:22,
1722:8, 1722:12

**note** [5] - 1737:1,
1753:6, 1787:5,
1797:1, 1814:3

**noted** [2] - 1758:1,
1815:5

**notes** [2] - 1775:18,
1829:24

**nothing** [6] - 1734:14,
1740:7, 1787:6,
1815:8, 1816:23,
1819:20

**notice** [2] - 1816:22,
1818:11

**notion** [2] - 1794:20,
1826:16

**November** [4] -
1754:5, 1779:5,
1780:13, 1787:19

**nowhere** [2] - 1747:7,
1786:23

**nuance** [1] - 1815:4

**number** [21] -
1731:25, 1732:4,
1732:6, 1732:8,
1733:1, 1735:5,
1742:23, 1744:14,
1757:17, 1761:24,
1772:14, 1772:15,
1773:18, 1788:23,
1788:25, 1795:10,
1802:23, 1808:1,
1808:2, 1808:7

**Number** [2] - 1721:4,
1721:8

**numbered** [1] - 1795:8

**numbers** [6] -
1778:23, 1785:9,
1788:8, 1791:14,
1794:18, 1809:6

## O

**Obama** [1] - 1816:10

**Obama's** [1] - 1803:25

**object** [10] - 1736:8,
1781:7, 1783:10,
1786:14, 1790:10,
1794:7, 1795:25,
1804:10, 1812:20,
1817:16

**objected** [4] -
1776:12, 1783:9,
1791:24

**objection** [34] -
1736:9, 1737:9,
1737:20, 1774:19,
1774:21, 1774:24,
1776:25, 1777:9,

1778:1, 1778:2,
1778:3, 1779:14,
1782:15, 1783:25,
1784:13, 1784:17,
1784:23, 1784:24,
1785:5, 1786:13,
1790:16, 1790:21,
1795:23, 1799:11,
1802:1, 1804:9,
1806:15, 1808:11,
1810:9, 1810:12,
1810:22, 1811:1,
1812:23, 1815:17

**objections** [7] -
1748:23, 1774:22,
1782:14, 1791:3,
1791:17, 1796:2,
1804:21

**objective** [4] -
1746:12, 1798:15,
1821:24, 1826:25

**obligation** [5] -
1728:22, 1769:17,
1770:5, 1771:1,
1772:1

**obligations** [2] -
1758:18, 1759:1

**observer** [1] - 1811:18

**obtained** [1] - 1773:23

**obviously** [2] -
1760:14, 1830:20

**occasionally** [2] -
1754:25, 1832:2

**October** [5] - 1721:10,
1754:7, 1797:19,
1803:8, 1834:8

**OF** [4] - 1721:1,
1721:12, 1834:1,
1834:9

**offer** [6] - 1747:22,
1776:6, 1792:11,
1794:21, 1797:13,
1808:13

**offered** [2] - 1755:12,
1814:5

**offering** [2] - 1776:10,
1781:5

**Office** [2] - 1791:8,
1800:25

**office** [4] - 1802:7,
1802:8, 1803:23,
1805:3

**officer** [6] - 1750:9,
1750:21, 1752:18,
1752:21, 1755:11,
1765:12

**OFFICIAL** [1] - 1834:1

**Official** [1] - 1722:11

**OFHEO** [8] - 1777:19,
1779:1, 1779:4,

1779:20, 1780:12,
1780:15, 1780:18,
1782:2

**Ohio** [6] - 1825:7,
1825:11, 1825:12,
1825:23, 1826:21,
1827:1

**old** [2] - 1780:18,
1794:2

**once** [2] - 1766:21,
1801:22

**one** [62] - 1724:22,
1725:1, 1725:23,
1728:15, 1732:9,
1735:11, 1738:14,
1738:15, 1743:19,
1758:8, 1762:25,
1763:20, 1776:20,
1777:14, 1777:15,
1779:1, 1779:22,
1780:2, 1780:15,
1780:17, 1784:13,
1787:13, 1788:6,
1792:17, 1795:20,
1795:21, 1795:24,
1795:25, 1797:3,
1798:8, 1799:6,
1799:12, 1799:18,
1801:6, 1803:2,
1803:4, 1804:22,
1806:21, 1807:7,
1813:3, 1813:18,
1813:23, 1814:22,
1815:2, 1816:5,
1817:3, 1819:6,
1820:5, 1820:7,
1820:12, 1820:17,
1823:2, 1827:17,
1828:20, 1830:22,
1831:1, 1831:6,
1831:23, 1833:5

**one-day** [1] - 1819:6,
1820:17

**one-half** [1] - 1830:22

**one-line** [1] - 1813:23

**ones** [4] - 1725:23,
1776:16, 1778:24,
1786:11

**onwards** [1] - 1828:11

**open** [1] - 1810:12

**operate** [2] - 1765:21,
1765:24

**operating** [7] -
1726:11, 1726:16,
1752:17, 1752:21,
1755:11, 1767:23,
1774:4

**operation** [1] -
1756:14

**operational** [1] -

1744:3

**operationally** [1] -
1764:16

**opinion** [4] - 1736:24,
1746:14, 1768:7,
1774:1

**opportunity** [4] -
1791:9, 1796:17,
1824:14, 1826:11

**opposed** [1] - 1826:1

**opposite** [6] -
1792:12, 1792:14,
1793:19, 1803:15,
1812:12

**optimistic** [1] -
1761:21

**order** [9] - 1724:2,
1726:10, 1726:16,
1732:21, 1763:1,
1777:24, 1780:18,
1781:13, 1797:12

**Oregon** [1] - 1752:2

**orient** [1] - 1738:16

**otherwise** [4] -
1767:9, 1797:11,
1820:21, 1829:4

**outlook** [2] - 1766:20,
1772:9

**outside** [4] - 1737:4,
1762:25, 1811:18,
1828:16

**over-ambitious** [1] -
1830:15

**overall** [2] - 1777:24,
1809:1

**overcompensation**
[1] - 1746:11

**overruled** [1] - 1802:3

**oversaw** [1] - 1753:23

**owe** [3] - 1731:4,
1742:14, 1742:15

**own** [5] - 1744:20,
1788:17, 1813:12,
1823:22, 1824:15

**owned** [1] - 1826:8

**Oxley** [1] - 1756:22

## P

**p.m** [4] - 1721:10,
1750:2, 1833:15

**packages** [2] -
1734:12, 1734:19

**page** [46] - 1724:25,
1725:6, 1725:10,
1725:11, 1738:14,
1741:22, 1757:20,
1757:25, 1768:24,
1769:9, 1770:1,
1770:22, 1771:22,

1772:13, 1772:15, 1779:2, 1779:23, 1780:16, 1782:4, 1782:6, 1786:3, 1788:4, 1788:5, 1788:7, 1795:1, 1797:19, 1797:24, 1801:5, 1801:10, 1801:11, 1801:13, 1803:8, 1804:25, 1806:2, 1807:16, 1808:17, 1808:25, 1809:16, 1809:17, 1809:19, 1810:16, 1811:4, 1829:8

**pages** [6] - 1725:12, 1770:2, 1779:7, 1779:25, 1800:19, 1801:5

**paid** [4] - 1745:22, 1760:10, 1767:8, 1802:21

**Paige** [1] - 1756:25

**paper** [2] - 1724:22, 1724:23

**paragraph** [25] - 1725:15, 1725:16, 1725:18, 1726:5, 1728:17, 1741:23, 1751:25, 1756:2, 1757:20, 1757:23, 1760:22, 1769:10, 1769:15, 1770:3, 1770:22, 1780:2, 1780:17, 1782:6, 1786:4, 1789:25, 1795:2, 1795:8, 1798:15

**paragraphs** [4] - 1728:15, 1780:1, 1781:4, 1781:9

**Parrot** [15] - 1802:9, 1803:24, 1805:17, 1805:24, 1806:13, 1811:4, 1811:5, 1811:21, 1811:25, 1812:7, 1813:1, 1813:21, 1815:12, 1815:15, 1815:19

**part** [4] - 1734:21, 1755:22, 1757:4, 1762:11

**participants** [4] - 1739:1, 1739:10, 1745:5, 1799:1

**participate** [2] - 1739:11, 1828:20

**particular** [3] - 1804:14, 1804:15, 1814:22

**particularly** [1] - 1797:8

**parties** [6] - 1736:21, 1817:20, 1828:16, 1831:18, 1831:20, 1832:2

**partner** [1] - 1755:8

**pass** [1] - 1816:10

**passages** [1] - 1779:22

**passed** [6] - 1778:6, 1813:12, 1816:12, 1816:15, 1829:24

**past** [1] - 1803:1

**path** [1] - 1761:20

**pay** [23] - 1729:23, 1730:12, 1730:21, 1731:5, 1731:6, 1731:8, 1731:15, 1731:17, 1731:21, 1731:22, 1732:2, 1732:5, 1732:10, 1732:13, 1732:21, 1733:13, 1734:13, 1740:7, 1742:5, 1742:14, 1744:2, 1770:12, 1771:7

**payable** [4] - 1729:17, 1769:22, 1770:10, 1771:6

**paying** [3] - 1729:4, 1760:9, 1760:13

**payment** [2] - 1764:17, 1774:6

**PCF** [63] - 1724:13, 1724:14, 1724:19, 1728:18, 1731:2, 1731:6, 1731:9, 1731:17, 1731:21, 1731:22, 1731:23, 1732:2, 1732:6, 1732:11, 1732:13, 1732:14, 1732:19, 1732:24, 1733:1, 1733:9, 1733:14, 1733:16, 1733:17, 1734:3, 1735:2, 1735:14, 1735:16, 1735:19, 1735:23, 1736:14, 1736:16, 1736:22, 1736:24, 1738:12, 1739:21, 1739:22, 1740:4, 1740:10, 1740:11, 1741:7, 1741:9, 1742:2, 1742:6, 1742:11, 1742:12, 1742:17, 1742:18, 1742:19, 1743:2, 1743:16, 1743:17,

1743:22, 1744:10, 1744:11, 1744:17, 1744:20, 1744:21, 1746:16, 1746:24, 1747:1, 1747:5

**PCFs** [1] - 1730:19

**pdf** [2] - 1725:10, 1801:12

**Pennsylvania** [2] - 1721:19, 1787:20

**people** [17] - 1734:22, 1739:10, 1742:23, 1744:5, 1762:17, 1789:9, 1803:20, 1819:9, 1820:3, 1822:1, 1822:6, 1822:12, 1822:18, 1823:10, 1823:21, 1823:22, 1825:19

**percent** [24] - 1729:23, 1730:12, 1730:23, 1731:5, 1731:15, 1733:13, 1741:10, 1742:5, 1742:14, 1743:24, 1744:13, 1744:25, 1745:24, 1745:25, 1760:4, 1766:13, 1767:13, 1780:20, 1788:19, 1794:19, 1802:17, 1802:21, 1828:3

**perception** [1] - 1808:8

**performance** [3] - 1759:14, 1761:13, 1766:9

**performed** [1] - 1762:12

**perhaps** [4] - 1767:21, 1795:23, 1805:22, 1808:8

**period** [23] - 1729:12, 1729:14, 1758:10, 1759:17, 1759:22, 1763:11, 1763:17, 1766:12, 1766:14, 1766:17, 1767:15, 1768:21, 1769:19, 1770:7, 1771:3, 1773:20, 1778:11, 1781:11

**period-to-period** [5] - 1729:12, 1729:14, 1769:19, 1770:7, 1771:3

**periodic** [7] - 1735:14, 1739:19, 1739:24, 1763:1, 1774:6, 1774:8, 1774:10

**periods** [6] - 1728:21,

1763:20, 1767:11, 1769:17, 1770:5, 1771:1

**perpetuity** [1] - 1825:1

**person** [13] - 1741:19, 1750:18, 1750:22, 1804:3, 1813:10, 1813:24, 1814:17, 1824:18, 1824:20, 1826:4, 1826:5, 1826:8, 1826:10

**person's** [3] - 1794:13, 1804:22, 1824:21

**personal** [3] - 1825:4, 1825:25, 1826:3

**personally** [1] - 1750:11

**perspective** [1] - 1767:3

**perspectives** [1] - 1808:15

**pessimistic** [1] - 1761:20

**phone** [5] - 1736:9, 1747:12, 1754:20, 1774:13, 1775:4

**physical** [1] - 1794:12

**picture** [2] - 1782:1, 1792:5

**piece** [3] - 1724:22, 1724:23, 1729:13

**piecemeal** [1] - 1776:12

**place** [6] - 1743:11, 1760:12, 1761:9, 1781:16, 1788:6, 1817:13

**Plaintiffs** [4] - 1721:4, 1721:15, 1721:17, 1830:20

**plaintiffs** [31] - 1747:15, 1747:18, 1748:3, 1748:6, 1748:8, 1748:23, 1774:20, 1774:25, 1775:10, 1775:23, 1775:25, 1776:5, 1776:9, 1790:22, 1796:13, 1799:19, 1800:18, 1817:24, 1818:23, 1818:25, 1819:2, 1819:5, 1819:11, 1819:16, 1820:7, 1823:1, 1823:6, 1824:17, 1824:21, 1827:22, 1830:10

**PLAINTIFFS** [1] - 1724:7

**plaintiffs'** [13] - 1748:24, 1748:25, 1749:2, 1768:23, 1773:3, 1777:1, 1777:11, 1785:6, 1785:10, 1816:5, 1822:2, 1822:7, 1824:15

**Plaintiffs** [10] - 1749:2, 1749:3, 1749:4, 1777:4, 1777:13, 1777:17, 1779:12, 1785:10

**plan** [6] - 1795:6, 1795:14, 1798:19, 1831:24, 1832:13, 1832:15

**planned** [1] - 1797:16

**planning** [4] - 1753:21, 1754:12, 1762:15, 1787:5

**plans** [3] - 1786:4, 1816:9

**plausibly** [1] - 1814:1

**play** [2] - 1749:20, 1790:24

**played** [4] - 1749:22, 1755:20, 1783:19, 1796:20

**playing** [2] - 1768:9, 1797:4

**plenty** [1] - 1829:16

**PLLC** [1] - 1721:15

**podium** [2] - 1747:19, 1748:2

**point** [41] - 1731:23, 1732:2, 1733:11, 1737:12, 1744:8, 1744:11, 1744:16, 1744:23, 1768:10, 1771:23, 1772:20, 1778:17, 1778:18, 1789:16, 1789:20, 1792:17, 1793:18, 1799:6, 1799:7, 1800:22, 1801:4, 1801:6, 1801:10, 1802:24, 1803:2, 1803:4, 1803:7, 1805:1, 1807:16, 1808:1, 1808:2, 1808:7, 1810:17, 1811:21, 1814:20, 1814:23, 1817:7, 1825:9, 1825:14, 1829:6

**points** [9] - 1783:7, 1799:7, 1800:1, 1801:3, 1801:6, 1801:19, 1802:24,

1807:17, 1815:9
**policies** [2] - 1795:10, 1799:8
**policy** [1] - 1793:25
**Porter** [1] - 1722:8
**portfolio** [8] - 1753:22, 1753:23, 1762:1, 1766:12, 1766:14, 1766:21, 1767:23, 1780:24
**portion** [3] - 1784:21, 1800:18, 1800:20
**position** [3] - 1756:9, 1797:20, 1803:10
**positions** [1] - 1804:14
**positive** [6] - 1733:1, 1733:22, 1734:7, 1771:12, 1788:22, 1794:19
**possibility** [4] - 1736:14, 1763:21, 1828:4, 1828:23
**possibly** [1] - 1747:5
**posture** [1] - 1810:5
**potential** [5] - 1767:6, 1804:12, 1806:7, 1828:19, 1829:12
**potentially** [1] - 1826:10
**power** [1] - 1766:23
**precise** [2] - 1790:6, 1827:2
**precisely** [2] - 1736:22, 1812:12
**preclude** [2] - 1733:16, 1742:18
**precluded** [1] - 1742:21
**predecessor** [3] - 1777:18, 1778:8, 1780:15
**prediction** [1] - 1729:24
**predominance** [1] - 1824:5
**preference** [1] - 1729:4
**preferred** [6] - 1770:6, 1785:21, 1787:21, 1789:17, 1800:21, 1800:23
**PREFERRED** [1] - 1721:9
**prejudice** [4] - 1778:4, 1786:15, 1797:8, 1804:11
**prejudicial** [2] - 1783:22, 1796:15
**preliminary** [2] -

1775:7, 1804:23
**preparation** [1] - 1831:20
**preparations** [1] - 1806:7
**prepare** [2] - 1761:14, 1800:16
**prepared** [4] - 1768:3, 1785:16, 1810:2, 1810:6
**preparing** [1] - 1761:13
**preponderance** [1] - 1820:13
**present** [6] - 1750:3, 1784:3, 1784:5, 1790:6, 1797:14, 1797:15
**presentation** [1] - 1776:4
**presented** [6] - 1732:23, 1745:4, 1748:22, 1750:9, 1783:3, 1783:19
**presenting** [1] - 1791:15
**preservation** [2] - 1827:10, 1827:16
**president** [4] - 1752:17, 1753:1, 1753:18, 1756:3
**President** [3] - 1791:8, 1803:25, 1816:10
**press** [5] - 1809:13, 1809:22, 1809:25, 1810:20, 1811:21
**pressures** [2] - 1797:21, 1803:10
**presume** [1] - 1830:22
**pretty** [1] - 1734:18
**prevent** [1] - 1794:4
**previous** [2] - 1780:9, 1797:24
**previously** [2] - 1779:13, 1797:18
**price** [29] - 1761:19, 1819:3, 1819:7, 1819:19, 1819:21, 1820:5, 1820:6, 1820:7, 1820:12, 1820:14, 1820:17, 1820:18, 1820:23, 1821:3, 1821:22, 1821:23, 1822:3, 1822:10, 1822:14, 1822:22, 1823:25, 1824:14, 1825:4, 1825:18, 1826:9, 1826:11, 1826:18, 1828:18

prices [2] - 1819:17, 1822:8
**pricing** [1] - 1767:24
**Primary** [1] - 1798:15
**primary** [1] - 1757:11
**private** [12] - 1765:25, 1766:5, 1767:1, 1767:4, 1773:24, 1774:2, 1778:19, 1781:21, 1788:16, 1811:12, 1828:5, 1828:20
**probative** [1] - 1822:23
**problem** [12] - 1762:22, 1787:18, 1792:7, 1796:21, 1801:21, 1821:12, 1821:16, 1821:19, 1823:15, 1824:11, 1824:24
**problems** [7] - 1796:8, 1799:13, 1809:20, 1832:8, 1832:10, 1833:2, 1833:12
**procedural** [1] - 1817:13
**Procedure** [1] - 1818:18
**procedures** [1] - 1817:20
**proceed** [1] - 1724:5
**Proceedings** [2] - 1722:15, 1833:15
**proceedings** [1] - 1834:4
**process** [3] - 1757:7, 1764:16, 1815:3
**produced** [9] - 1722:15, 1736:21, 1782:23, 1799:15, 1800:5, 1800:7, 1809:2, 1809:4, 1809:5
**products** [1] - 1767:24
**professional** [1] - 1751:14
**professionally** [1] - 1751:21
**Professor** [11] - 1724:21, 1725:11, 1736:19, 1737:1, 1737:6, 1737:25, 1741:17, 1746:2, 1746:19, 1747:3, 1747:9
**proffer** [3] - 1777:21, 1778:14, 1780:16
**profit** [3] - 1734:15, 1767:17, 1794:18

**profitable** [1] - 1828:11
**profits** [6] - 1741:10, 1794:3, 1811:11, 1812:10, 1828:13
**program** [1] - 1752:14
**Projected** [1] - 1772:20
**projections** [4] - 1761:13, 1761:14, 1762:15, 1774:5
**promote** [1] - 1795:3
**proof** [2] - 1823:15, 1824:9
**proper** [2] - 1736:7, 1796:25
**property** [2] - 1753:12, 1753:15
**proposal** [1] - 1830:11
**propose** [2] - 1736:16, 1831:14
**proprietary** [1] - 1734:14
**prospects** [3] - 1767:16, 1767:19, 1767:25
**protect** [2] - 1734:24, 1734:25
**protected** [1] - 1734:17
**protecting** [3] - 1733:20, 1734:5, 1771:11
**protects** [1] - 1802:25
**prove** [3] - 1818:25, 1819:2, 1820:13
**proven** [1] - 1823:6
**proves** [5] - 1821:20, 1821:22, 1823:12, 1823:15, 1824:12
**provide** [8] - 1743:23, 1746:25, 1752:19, 1795:5, 1797:21, 1798:18, 1803:11
**provided** [8] - 1734:9, 1734:10, 1734:16, 1735:23, 1741:8, 1760:10, 1760:16, 1767:10
**proving** [1] - 1824:8
**provision** [4] - 1826:22, 1827:6, 1827:13
**provisions** [2] - 1727:13, 1804:16
**Prussia** [1] - 1721:19
**PSPA** [7] - 1735:24, 1745:4, 1801:14, 1808:21, 1808:23, 1809:1, 1810:16

**PSPAs** [13] - 1726:22, 1726:24, 1727:10, 1728:21, 1730:21, 1731:4, 1738:12, 1738:22, 1742:1, 1758:18, 1759:2, 1773:4, 1801:6
**public** [11] - 1777:25, 1786:16, 1792:1, 1795:5, 1795:15, 1796:5, 1798:5, 1798:18, 1805:6, 1814:1, 1827:12
**pull** [8] - 1724:20, 1735:11, 1735:25, 1736:4, 1741:12, 1743:19, 1790:1, 1803:3
**pulling** [1] - 1782:18
**PURCHASE** [1] - 1721:9
**purchase** [11] - 1726:21, 1726:22, 1769:16, 1770:4, 1770:11, 1770:25, 1771:7, 1785:21, 1787:22, 1800:21, 1800:24
**purchased** [3] - 1819:23, 1823:16, 1823:23
**purpose** [5] - 1781:4, 1786:6, 1799:24, 1814:6, 1814:15
**purposes** [2] - 1827:10, 1827:16
**pursuant** [2] - 1818:14, 1818:18
**pursued** [1] - 1760:5
**push** [1] - 1794:16
**put** [16] - 1725:12, 1727:19, 1728:9, 1734:20, 1736:23, 1737:24, 1743:9, 1791:10, 1795:8, 1796:15, 1809:25, 1811:24, 1812:2, 1814:20, 1823:1, 1828:19
**putting** [2] - 1779:24, 1797:8
**PWC** [1] - 1762:25
**PX-101** [3] - 1723:10, 1749:17, 1757:15
**PX-131** [5] - 1787:11, 1787:12, 1787:19, 1790:11, 1791:7
**PX-132** [1] - 1789:3
**PX-144** [3] - 1794:21, 1798:7, 1798:9

**PX-144**......................
........................ [1] -
1723:16
**PX-146** [2] - 1798:10,
1800:6
**PX-146**......................
........................ [1] -
1723:17
**PX-149** [1] - 1737:24
**PX-180** [2] - 1784:11,
1784:18
**PX-180**......................
........................ [1] -
1723:13
**PX-194** [3] - 1789:5,
1789:8, 1790:11
**PX-210** [2] - 1800:9,
1802:4
**PX-210**......................
........................ [1] -
1723:18
**PX-215** [2] - 1723:10,
1749:17
**PX-225** [3] - 1786:1,
1790:11
**PX-226** [2] - 1784:20,
1808:10
**PX-227** [2] - 1802:7,
1805:9
**PX-227**......................
........................ [1] -
1723:19
**PX-259** [2] - 1792:17,
1794:6
**PX-261** [2] - 1723:10,
1749:17
**PX-262** [2] - 1723:10,
1749:17
**PX-266** [2] - 1723:10,
1749:17
**PX-270** [1] - 1805:16
**PX-271** [1] - 1807:8
**PX-274** [3] - 1811:2,
1812:19, 1813:19
**PX-278** [2] - 1810:20,
1810:24
**PX-278**......................
........................ [1] -
1723:20
**PX-279** [4] - 1811:22,
1811:23, 1813:20
**PX-298** [1] - 1782:23
**PX-351** [1] - 1741:12
**PX-37** [4] - 1723:15,
1785:2, 1785:5,
1785:13
**PX-40** [3] - 1785:3,
1785:5, 1785:13
**PX-40**..........................
.................. [1] -

1723:15
**PX-492** [1] - 1749:17
**PX-492**.......... [1] -
1723:10
**PX-498** [3] - 1723:12,
1776:19, 1777:2
**PX-499** [1] - 1777:2
**PX-499**......................
........................ [1] -
1723:12
**PX-512** [2] - 1784:20,
1784:25
**PX-512**......................
........................ [1] -
1723:14
**PX-513** [5] - 1778:24,
1778:25, 1779:19,
1781:5, 1782:16
**PX-514** [3] - 1778:24,
1781:25, 1782:2

# Q

**qualify** [1] - 1804:13
**qualifying** [1] - 1814:2
**qualitatively** [1] -
1807:8
**quality** [1] - 1767:18
**quantification** [6] -
1733:8, 1735:23,
1740:19, 1744:7,
1744:20, 1747:1
**quantify** [4] - 1731:23,
1741:3, 1742:19,
1746:16
**quarter** [17] - 1733:19,
1734:4, 1739:22,
1742:11, 1763:8,
1763:13, 1763:14,
1763:19, 1771:10,
1780:6, 1782:8,
1794:18, 1802:19,
1831:3, 1831:4
**quarterly** [7] -
1730:21, 1735:1,
1758:11, 1768:21,
1770:12, 1771:7,
1771:14
**quarters** [7] - 1733:18,
1758:3, 1758:14,
1771:10, 1780:5,
1780:8, 1780:9
**questioning** [1] -
1737:12
**questions** [20] -
1739:2, 1745:8,
1745:9, 1745:11,
1745:13, 1747:10,
1748:12, 1750:25,
1757:19, 1768:14,

1770:17, 1773:4,
1786:1, 1786:3,
1800:10, 1800:16,
1801:5, 1805:21,
1807:10, 1809:11
**quick** [1] - 1800:1
**quickly** [3] - 1729:13,
1796:3, 1805:23
**quite** [4] - 1734:23,
1784:15, 1810:25,
1816:11
**quote** [6] - 1760:23,
1811:8, 1811:9,
1812:3, 1813:7,
1826:23

# R

**Radnor** [1] - 1721:19
**raise** [6] - 1739:2,
1777:23, 1780:25,
1781:3, 1790:17,
1832:1
**raised** [3] - 1779:4,
1780:13, 1781:20
**range** [3] - 1761:22,
1772:21, 1830:19
**rapidly** [2] - 1762:1,
1762:2
**rate** [6] - 1756:18,
1760:4, 1760:10,
1760:14, 1760:24,
1761:2
**rates** [1] - 1761:23
**rather** [1] - 1782:22
**rationale** [2] - 1802:23
**rationally** [2] - 1829:2,
1829:14
**ratios** [1] - 1781:1
**re** [1] - 1721:8
**reached** [1] - 1755:1
**reaction** [5] - 1764:10,
1764:12, 1764:13,
1764:14, 1764:15
**reactions** [1] -
1764:21
**READ** [2] - 1751:6,
1768:13
**read** [14] - 1725:20,
1749:5, 1749:6,
1750:16, 1750:18,
1750:22, 1750:25,
1751:3, 1769:11,
1770:23, 1770:24,
1780:11, 1781:9,
1803:3
**reader** [2] - 1746:3,
1746:5
**reading** [3] - 1777:15,
1777:16, 1805:22

**readout** [1] - 1750:10
**ready** [4] - 1747:15,
1775:25, 1776:5,
1818:5
**real** [2] - 1750:12,
1820:9
**realized** [1] - 1762:10
**really** [9] - 1741:6,
1776:24, 1795:16,
1800:19, 1807:25,
1809:20, 1811:16,
1816:10, 1826:6
**rearrange** [1] -
1831:24
**reason** [8] - 1783:23,
1793:16, 1797:13,
1803:16, 1815:2,
1817:10, 1823:5,
1827:7
**reasonable** [6] -
1797:23, 1803:12,
1818:21, 1819:1,
1823:6, 1827:19
**reasonableness** [1] -
1827:12
**reasons** [4] - 1781:7,
1797:7, 1799:13,
1818:24
**rebound** [1] - 1730:16
**rebuttal** [4] - 1784:3,
1784:6, 1817:15,
1831:5
**recapitalize** [2] -
1811:11, 1812:11
**receive** [6] - 1752:3,
1798:4, 1798:6,
1800:8, 1805:8,
1825:1
**received** [23] -
1749:16, 1749:18,
1749:19, 1751:25,
1760:11, 1767:12,
1777:1, 1777:2,
1784:17, 1784:18,
1784:24, 1784:25,
1785:12, 1785:13,
1798:7, 1800:5,
1800:6, 1802:3,
1802:4, 1805:9,
1810:23, 1810:24,
1825:2
**RECEIVED** [1] -
1723:9
**receiver** [1] - 1727:12
**receivership** [4] -
1727:13, 1727:19,
1727:23, 1728:9
**recent** [1] - 1814:4
**recess** [1] - 1749:23
**Recess** [1] - 1750:2

**recipient** [1] - 1796:23
**recognized** [1] -
1755:19
**recollection** [4] -
1761:6, 1761:8,
1773:23, 1790:7
**recommended** [2] -
1802:16, 1804:21
**record** [30] - 1748:8,
1749:25, 1750:1,
1751:3, 1768:14,
1769:11, 1776:4,
1786:8, 1786:16,
1792:10, 1795:15,
1796:6, 1798:5,
1800:14, 1802:19,
1805:6, 1806:23,
1808:2, 1808:15,
1811:18, 1816:16,
1817:10, 1817:21,
1818:3, 1820:22,
1828:2, 1828:12,
1829:16, 1834:4
**record's** [1] - 1818:9
**recorded** [1] - 1722:15
**recording** [1] -
1797:16
**records** [6] - 1786:19,
1790:17, 1790:18,
1790:20, 1792:1,
1814:2
**recounting** [1] -
1802:11
**Recovery** [2] -
1727:17, 1778:6
**recovery** [2] -
1755:22, 1795:4
**recruit** [1] - 1755:1
**recruiter** [1] - 1754:19
**red** [1] - 1727:2
**redactions** [1] -
1784:23
**redirect** [1] - 1745:10
**Redirect** [1] - 1723:4
**REDIRECT** [1] -
1745:14
**reduce** [7] - 1759:6,
1759:9, 1759:20,
1760:23, 1780:19,
1795:4, 1798:16
**reduced** [4] - 1759:13,
1760:5, 1760:14,
1760:20
**reducing** [2] -
1759:15, 1761:2
**reduction** [1] -
1822:10
**reference** [6] -
1738:20, 1739:7,
1780:9, 1781:12,

1781:15, 1801:6
**referencing** [1] -
1736:14
**referred** [4] - 1745:16,
1757:1, 1758:7,
1762:3
**referring** [7] - 1729:1,
1729:8, 1743:12,
1757:24, 1758:8,
1781:13, 1816:20
**refers** [2] - 1743:5,
1800:24
**reflected** [1] - 1788:10
**reflection** [1] - 1767:5
**reflexively** [1] - 1817:8
**reform** [1] - 1800:11
**refresh** [1] - 1761:6
**refute** [1] - 1736:24
**regarding** [2] -
1739:2, 1766:4
**regional** [1] - 1754:12
**regulator** [3] -
1757:14, 1778:21,
1781:22
**regulatory** [1] -
1757:11
**rejected** [1] - 1755:12
**related** [4] - 1738:11,
1804:12, 1823:8,
1827:11
**relating** [3] - 1763:10,
1798:12, 1800:20
**release** [2] - 1774:18,
1794:17
**released** [2] - 1794:16,
1810:21
**releases** [2] - 1757:12,
1802:19
**relevance** [9] - 1778:4,
1788:2, 1792:24,
1799:6, 1801:2,
1803:7, 1804:10,
1804:13, 1812:14
**relevant** [10] -
1778:12, 1778:18,
1778:20, 1779:22,
1788:13, 1790:8,
1795:14, 1803:14,
1807:25, 1808:14
**relied** [3] - 1736:20,
1737:7, 1737:18
**relieving** [1] - 1832:23
**rely** [3] - 1737:6,
1737:13, 1819:16
**remainder** [1] -
1774:22
**remaining** [2] -
1776:1, 1831:15
**remains** [2] - 1733:20,
1771:11

**remind** [1] - 1789:22
**reminded** [1] - 1785:2
**remotely** [1] - 1829:25
**render** [1] - 1832:11
**renew** [1] - 1827:15
**renewed** [1] - 1794:16
**repeat** [1] - 1750:13
**repeated** [1] - 1745:17
**rephrase** [1] - 1758:22
**reply** [1] - 1824:1
**report** [6] - 1725:24,
1726:2, 1752:25,
1769:7, 1782:2,
1824:1
**reported** [9] - 1734:14,
1752:23, 1753:1,
1762:19, 1780:5,
1780:7, 1780:8,
1782:7, 1804:4
**reportedly** [2] -
1813:5, 1813:13
**Reporter** [1] - 1722:11
**reporter** [8] - 1768:17,
1811:3, 1811:5,
1812:25, 1813:4,
1813:6, 1813:14
**REPORTER** [2] -
1834:1, 1834:9
**reporting** [7] -
1753:25, 1756:22,
1757:13, 1782:4,
1793:5, 1793:14
**reports** [1] - 1792:19
**represent** [4] - 1733:9,
1751:10, 1768:22,
1773:11
**represented** [2] -
1766:2, 1813:13
**Republicans** [1] -
1816:11
**request** [9] - 1728:16,
1728:20, 1736:5,
1769:16, 1770:4,
1770:25, 1830:11,
1831:23, 1832:4
**requested** [1] -
1787:24
**require** [2] - 1732:19,
1744:1
**required** [5] - 1727:19,
1730:20, 1731:8,
1770:11, 1771:7
**requirement** [1] -
1780:19
**requirements** [3] -
1777:24, 1781:15,
1824:5
**requires** [1] - 1729:4
**rerecording** [2] -
1790:3, 1792:25

**resets** [1] - 1738:18
**resigned** [1] - 1755:3
**resolve** [3] - 1775:6,
1775:15, 1816:6
**resources** [2] -
1740:22, 1770:3
**respect** [2] - 1764:17,
1784:10
**respectfully** [2] -
1815:21, 1831:10
**respects** [1] - 1768:5
**respond** [3] - 1797:10,
1814:19, 1827:23
**responds** [1] -
1805:22
**response** [3] - 1779:3,
1780:11, 1817:8
**responsibilities** [3] -
1753:18, 1754:10,
1756:3
**responsibility** [3] -
1752:23, 1756:20,
1757:4
**responsible** [6] -
1756:10, 1756:11,
1756:13, 1757:5,
1757:7, 1769:3
**rest** [7] - 1747:15,
1747:21, 1748:3,
1748:8, 1775:25,
1776:5, 1821:11
**resting** [1] - 1817:14
**result** [3] - 1759:13,
1759:15, 1824:14
**resulted** [1] - 1828:6
**resulting** [2] -
1767:17, 1772:1
**RESUMED** [1] -
1724:7
**retain** [2] - 1774:1,
1793:22
**retained** [7] - 1762:1,
1766:12, 1766:14,
1766:21, 1767:23,
1780:24, 1785:20
**retired** [1] - 1751:23
**return** [2] - 1803:1,
1811:12
**returned** [3] - 1733:22,
1734:7, 1771:12
**returning** [2] -
1789:20, 1794:2
**reveals** [1] - 1807:15
**reverse** [2] - 1767:14,
1814:12
**reversed** [1] - 1762:9
**reviewed** [1] - 1763:1
**revisit** [1] - 1734:4
**right-hand** [2] -
1757:18, 1771:23

**rights** [2] - 1788:17,
1829:7
**risk** [11] - 1752:22,
1754:13, 1756:16,
1756:17, 1756:18,
1756:19, 1756:21,
1756:24, 1756:25,
1778:11, 1832:19
**risks** [3] - 1742:25,
1756:18, 1780:3
**Road** [1] - 1721:19
**road** [1] - 1768:10
**ROBERT** [2] - 1722:2,
1722:7
**role** [4] - 1755:11,
1755:20, 1786:12,
1789:1
**Room** [1] - 1722:13
**room** [1] - 1775:18
**Ross** [4] - 1750:8,
1750:20, 1751:3,
1751:9
**ROSS** [2] - 1723:5,
1750:8
**round** [1] - 1773:18
**roundtable** [1] -
1754:25
**ROYCE** [1] - 1721:12
**RPR** [1] - 1722:11
**RUDY** [3] - 1721:17,
1750:24, 1751:6
**Rudy** [2] - 1750:24,
1768:10
**Rule** [8] - 1736:6,
1736:19, 1818:18,
1818:20, 1823:19,
1824:4, 1824:10,
1827:15
**rule** [4] - 1737:18,
1747:15, 1775:25,
1797:11
**ruled** [2] - 1829:7,
1829:23
**ruling** [4] - 1784:20,
1804:12, 1810:17,
1829:8
**rulings** [2] - 1791:21,
1792:1
**run** [3] - 1810:10,
1832:19, 1833:12
**runoff** [1] - 1767:22
**runs** [2] - 1829:22,
1832:7

**S**

**Safeco** [5] - 1753:4,
1753:10, 1753:19,
1754:1, 1754:2
**safely** [2] - 1765:21,

1765:24
**Salazar** [1] - 1737:24
**sale** [2] - 1780:21,
1829:9
**sales** [1] - 1752:22
**Sam** [1] - 1737:16
**SAMUEL** [1] - 1721:21
**San** [3] - 1752:18,
1752:20, 1753:4
**SARA** [1] - 1722:11
**Sara** [2] - 1834:3,
1834:8
**Sarbanes** [1] -
1756:22
**Sarbanes-Oxley** [1] -
1756:22
**satisfied** [1] - 1824:5
**satisfies** [1] - 1805:6
**satisfy** [1] - 1795:18
**Satriano** [2] - 1792:22,
1830:25
**saw** [3] - 1746:22,
1783:12, 1786:21
**scenario** [1] - 1773:8
**scenarios** [4] -
1761:15, 1761:17,
1761:22, 1772:21
**schedule** [1] -
1831:24
**scheduling** [2] -
1818:2, 1830:11
**Schiller** [1] - 1721:22
**Scholer** [1] - 1722:8
**school** [1] - 1825:13
**Schultz** [1] - 1753:2
**scope** [3] - 1784:3,
1784:7, 1817:16
**screen** [5] - 1725:7,
1779:17, 1784:12,
1812:22, 1812:24
**seated** [2] - 1724:4,
1750:15
**SEC** [11] - 1724:13,
1724:17, 1725:1,
1725:7, 1725:13,
1725:21, 1725:22,
1725:25, 1726:6,
1730:13, 1785:8
**Second** [1] - 1738:21
**second** [19] - 1724:25,
1759:23, 1769:14,
1770:3, 1776:21,
1777:14, 1782:4,
1782:6, 1786:3,
1789:20, 1794:18,
1799:6, 1799:7,
1801:4, 1801:10,
1802:19, 1810:16,
1823:8, 1827:7
**secondary** [2] -

1739:11, 1780:23
**Secretary** [9] -
1736:15, 1738:5,
1738:10, 1738:17,
1798:12, 1798:23,
1800:15, 1800:16,
1804:4
**secretary** [6] -
1794:23, 1795:13,
1798:24, 1800:24,
1805:2, 1815:24
**Section** [2] - 1745:4,
1825:7
**securities** [4] -
1739:4, 1739:8,
1739:14
**security** [1] - 1825:16
**see** [36] - 1724:18,
1725:1, 1725:6,
1725:14, 1726:12,
1727:14, 1728:24,
1729:19, 1731:11,
1732:5, 1733:24,
1734:4, 1735:4,
1735:7, 1735:9,
1738:3, 1738:7,
1738:8, 1739:5,
1740:2, 1741:18,
1742:7, 1743:3,
1743:4, 1751:18,
1754:24, 1758:5,
1772:3, 1772:15,
1772:18, 1775:18,
1783:24, 1806:1,
1810:5, 1832:17,
1833:14
**seeing** [1] - 1832:15
**seek** [8] - 1779:22,
1785:23, 1786:5,
1786:8, 1792:11,
1800:18, 1816:22,
1832:6
**seeking** [1] - 1737:8
**sell** [2] - 1821:25,
1826:4
**seller** [3] - 1824:18,
1826:8, 1826:13
**seller's** [1] - 1826:13
**selling** [1] - 1826:9
**Senate** [1] - 1816:13
**send** [1] - 1830:16
**sender** [1] - 1796:22
**sending** [2] - 1803:24,
1804:6
**SENIOR** [1] - 1721:9
**Senior** [1] - 1783:14
**senior** [12] - 1764:1,
1764:4, 1764:9,
1764:10, 1764:23,
1765:1, 1765:8,

1770:6, 1783:1,
1787:21, 1789:17,
1802:9
**sense** [6] - 1774:17,
1775:6, 1793:7,
1793:17, 1826:7,
1826:14
**sensible** [1] - 1775:11
**sensitivity** [1] -
1734:20
**sent** [9] - 1784:21,
1787:14, 1794:24,
1805:20, 1805:21,
1806:1, 1807:11,
1807:12, 1807:13
**sentence** [7] -
1726:19, 1730:24,
1735:1, 1742:1,
1742:24, 1780:11,
1800:12
**sentences** [1] - 1779:1
**separate** [1] - 1809:9
**September** [6] -
1754:2, 1754:8,
1769:14, 1787:23,
1788:21
**sequence** [1] - 1764:6
**series** [4] - 1743:20,
1789:9, 1809:1,
1815:9
**serious** [2] - 1801:9,
1801:21
**serve** [1] - 1781:17
**served** [2] - 1752:17,
1824:2
**SESSION** [1] -
1721:12
**set** [13] - 1731:22,
1732:10, 1734:5,
1735:15, 1735:16,
1735:19, 1740:12,
1740:13, 1744:1,
1746:23, 1791:22,
1800:16, 1807:10
**setting** [3] - 1736:16,
1739:25, 1740:4
**seven** [1] - 1759:23
**several** [9] - 1748:20,
1749:5, 1749:6,
1783:11, 1785:20,
1796:2, 1796:8,
1824:23, 1829:23
**severe** [1] - 1755:21
**shaky** [1] - 1828:15
**share** [19] - 1795:3,
1822:19, 1824:22,
1824:25, 1825:3,
1825:5, 1825:6,
1825:20, 1825:21,
1826:1, 1826:2,

1826:3, 1826:5,
1826:8, 1826:10,
1826:11, 1826:17
**shared** [14] - 1763:4,
1792:11, 1793:18,
1794:9, 1794:14,
1794:20, 1795:7,
1795:12, 1798:16,
1799:24, 1804:17,
1808:3, 1808:16,
1812:18
**shareholder** [3] -
1825:25, 1826:2,
1826:4
**shareholder's** [1] -
1822:24
**shareholders** [22] -
1766:1, 1766:3,
1766:5, 1766:16,
1767:1, 1767:5,
1778:19, 1788:16,
1819:9, 1820:4,
1820:11, 1821:17,
1821:18, 1821:21,
1822:9, 1822:20,
1825:5, 1827:19,
1828:3, 1828:5,
1828:20
**shareholders'** [2] -
1797:23, 1803:12
**shares** [26] - 1789:18,
1819:10, 1819:24,
1820:1, 1820:8,
1820:11, 1820:14,
1820:24, 1821:6,
1821:7, 1821:10,
1821:13, 1821:14,
1821:18, 1822:2,
1822:13, 1823:11,
1823:17, 1823:22,
1824:19, 1829:7,
1829:10, 1829:11,
1829:22, 1829:23
**sharing** [1] - 1763:6
**sheet** [4] - 1761:24,
1766:11, 1802:16,
1804:22
**sheets** [1] - 1789:21
**shooting** [1] - 1831:9
**short** [7] - 1767:1,
1767:8, 1767:21,
1777:17, 1784:3,
1784:5, 1831:22
**shortens** [2] -
1784:14, 1784:15
**shortfall** [1] - 1732:25
**shorthand** [1] -
1722:15
**shortly** [1] - 1761:9
**show** [21] - 1736:23,

1768:10, 1779:16,
1781:20, 1781:23,
1781:24, 1785:18,
1786:8, 1787:11,
1788:23, 1792:17,
1794:12, 1796:14,
1797:11, 1798:25,
1799:19, 1800:14,
1808:9, 1811:18,
1812:16, 1819:16
**showed** [1] - 1734:11
**showing** [4] -
1786:11, 1788:18,
1795:16, 1821:2
**shown** [4] - 1746:21,
1778:18, 1808:8,
1808:25
**shows** [13] - 1788:2,
1788:9, 1789:3,
1789:16, 1795:14,
1800:4, 1805:10,
1806:6, 1806:10,
1807:24, 1820:6,
1828:6, 1828:10
**shrink** [2] - 1762:1,
1762:2
**side** [2] - 1771:23,
1799:22
**sign** [1] - 1763:2
**SIGNATURE** [1] -
1834:9
**signed** [1] - 1798:25
**significant** [5] -
1755:24, 1762:23,
1769:12, 1777:23,
1811:9
**significantly** [1] -
1730:17
**signing** [1] - 1755:7
**similar** [7] - 1731:14,
1770:23, 1780:25,
1789:2, 1798:10,
1808:9, 1823:9
**similarly** [2] - 1734:17,
1777:4
**simple** [1] - 1789:6
**simplified** [1] -
1764:15
**simply** [10] - 1737:13,
1781:20, 1786:5,
1787:4, 1795:16,
1797:16, 1808:13,
1812:15, 1820:25,
1822:23
**single** [3] - 1744:8,
1744:17, 1744:23
**sitting** [1] - 1732:1
**six** [4] - 1745:17,
1759:17, 1801:19,
1831:4

**Sixth** [1] - 1814:10
**size** [3] - 1741:7,
1761:24, 1762:22
**skip** [1] - 1794:19
**slide** [3] - 1736:20,
1737:2, 1738:3
**small** [3] - 1740:14,
1758:2, 1758:13
**smaller** [1] - 1766:23
**SMG** [2] - 1782:25,
1783:13
**so-called** [1] - 1773:4
**sold** [7] - 1820:12,
1822:13, 1822:17,
1822:19, 1824:18,
1826:14, 1829:8
**sole** [1] - 1781:4
**solution** [1] - 1816:22
**solvency** [2] - 1728:7,
1728:8
**solvent** [6] - 1726:25,
1727:1, 1727:3,
1727:7, 1727:11,
1728:12
**someone** [3] - 1755:6,
1788:25, 1813:5
**sorry** [16] - 1735:8,
1735:17, 1738:14,
1753:14, 1762:16,
1762:21, 1769:14,
1773:3, 1777:15,
1787:17, 1789:8,
1801:11, 1801:12,
1802:8, 1806:20,
1816:1
**sort** [7] - 1744:7,
1764:16, 1775:7,
1791:3, 1791:8,
1814:2, 1831:7
**sought** [2] - 1814:6,
1814:8
**sounds** [1] - 1775:11
**source** [1] - 1765:23
**specific** [4] - 1758:10,
1764:6, 1766:19,
1773:7
**specifically** [6] -
1728:8, 1730:18,
1736:14, 1760:21,
1780:6, 1827:5
**specifics** [1] - 1791:4
**speculating** [2] -
1744:5, 1813:11
**speculation** [2] -
1813:16, 1814:16
**speech** [5] - 1777:18,
1778:25, 1779:19,
1781:8, 1794:11
**spend** [1] - 1775:4
**sponsored** [1] -

1798:19
**spreads** [1] - 1761:23
**spreadsheets** [1] - 1791:12
**squarely** [1] - 1791:25
**stability** [6] - 1740:1, 1740:5, 1740:8, 1740:11, 1740:13, 1744:3
**staff** [3] - 1762:13, 1769:7, 1816:2
**stage** [3] - 1733:6, 1827:11, 1827:15
**stakeholder** [1] - 1766:1
**stamp** [1] - 1799:14
**stand** [5] - 1775:3, 1775:5, 1796:13, 1796:16, 1797:9
**STAND** [1] - 1724:7
**standard** [5] - 1734:18, 1746:12, 1818:20, 1818:21, 1827:14
**standpoint** [2] - 1741:1, 1793:11
**stands** [1] - 1783:14
**Stanton** [2] - 1736:11, 1818:12
**start** [4] - 1752:13, 1786:10, 1820:1, 1830:7
**started** [1] - 1754:5
**starters** [2] - 1725:18, 1821:12
**starting** [4] - 1743:9, 1779:5, 1780:13, 1808:25
**starts** [3] - 1728:20, 1770:22, 1779:23
**state** [13] - 1792:4, 1803:1, 1805:7, 1807:15, 1807:24, 1812:4, 1812:16, 1812:17, 1814:6, 1814:15, 1815:7, 1815:8, 1817:11
**State** [2] - 1825:11, 1825:12
**state's** [1] - 1826:22
**statement** [9] - 1733:4, 1734:18, 1740:25, 1743:15, 1744:9, 1770:15, 1777:21, 1777:22, 1795:16
**statements** [13] - 1741:6, 1743:15, 1756:15, 1756:23, 1757:2, 1757:6,

1757:8, 1757:9, 1757:12, 1763:2, 1768:2, 1769:4, 1782:7
**STATES** [2] - 1721:1, 1721:13
**states** [4] - 1742:25, 1771:25, 1799:4, 1826:25
**States** [2] - 1722:11, 1814:10
**stating** [2] - 1732:6, 1809:3
**statute** [1] - 1727:17
**statutes** [2] - 1826:22, 1827:1
**statutory** [3] - 1727:12, 1745:19, 1780:20
**Stegman** [6] - 1802:11, 1804:1, 1804:2, 1804:3, 1805:5, 1805:19
**stenotype** [1] - 1722:15
**step** [1] - 1747:11
**STERN** [11] - 1722:5, 1818:1, 1830:10, 1830:14, 1832:9, 1832:18, 1832:21, 1833:1, 1833:4, 1833:8, 1833:13
**still** [10] - 1768:2, 1768:6, 1788:21, 1791:6, 1796:16, 1820:11, 1821:8, 1821:10, 1828:15, 1830:3
**stipulated** [1] - 1828:25
**stipulation** [1] - 1800:2
**STOCK** [1] - 1721:9
**stock** [43] - 1770:6, 1785:21, 1787:21, 1788:12, 1788:14, 1788:19, 1788:24, 1789:4, 1789:17, 1800:21, 1800:23, 1819:3, 1819:6, 1819:13, 1819:17, 1819:19, 1819:21, 1820:5, 1820:6, 1820:12, 1820:17, 1820:19, 1820:23, 1821:3, 1821:22, 1821:23, 1821:24, 1822:3, 1822:5, 1822:8, 1822:14, 1822:16, 1822:22,

1822:24, 1823:25, 1824:14, 1825:4, 1825:18, 1826:18, 1827:25, 1828:24, 1829:9
**stockholders** [1] - 1825:16
**straightforward** [1] - 1786:24
**straw** [1] - 1831:22
**street** [1] - 1755:17
**Street** [5] - 1734:22, 1811:3, 1812:25, 1813:4, 1813:14
**Stress** [1] - 1799:8
**stress** [2] - 1772:22, 1773:8
**strike** [1] - 1764:25
**strong** [3] - 1742:20, 1795:3, 1812:17
**Structure** [1] - 1779:20
**study** [7] - 1791:5, 1819:16, 1819:19, 1819:20, 1820:6, 1821:2, 1824:2
**subject** [7] - 1747:14, 1747:19, 1748:7, 1776:5, 1787:21, 1789:10, 1818:10
**submit** [5] - 1806:23, 1815:20, 1817:14, 1817:15, 1831:10
**submitted** [2] - 1768:3, 1789:23
**substance** [1] - 1812:1, 1812:11, 1815:12
**substantial** [5] - 1735:3, 1743:25, 1771:15, 1779:5, 1780:13
**suffer** [1] - 1823:13
**suffered** [2] - 1823:12, 1823:23
**sufficient** [3] - 1739:3, 1818:22, 1827:17
**suggested** [5] - 1735:21, 1740:24, 1744:17, 1744:24, 1804:22
**suggestion** [3] - 1735:12, 1735:14, 1735:18
**suggests** [1] - 1744:9
**suing** [1] - 1829:10
**sum** [1] - 1822:21
**summarize** [1] - 1751:21
**summary** [6] -

1751:13, 1751:16, 1751:17, 1818:21, 1819:1, 1827:10
**Sunday** [1] - 1755:18
**supplied** [1] - 1819:5
**supplies** [1] - 1827:14
**support** [13] - 1725:14, 1725:17, 1726:4, 1726:10, 1726:15, 1728:6, 1731:25, 1732:7, 1735:22, 1744:13, 1744:14, 1780:23, 1829:16
**supporting** [1] - 1803:15
**supports** [3] - 1826:15, 1828:2, 1829:21
**supposed** [1] - 1808:22
**Supreme** [3] - 1825:8, 1827:2
**surety** [3] - 1753:13, 1753:15, 1753:24
**surprised** [1] - 1784:1
**Susan** [1] - 1782:24
**sustain** [4] - 1766:15, 1810:9, 1810:11, 1815:17
**sustainability** [2] - 1769:11, 1769:13
**sustained** [7] - 1737:20, 1782:14, 1782:16, 1783:25, 1791:17, 1806:16, 1808:11
**sweep** [29] - 1735:16, 1736:17, 1737:15, 1764:5, 1764:11, 1764:24, 1765:2, 1765:19, 1766:4, 1766:25, 1767:7, 1767:11, 1789:25, 1790:2, 1792:6, 1792:13, 1793:10, 1794:17, 1801:20, 1802:17, 1807:10, 1807:19, 1808:5, 1828:1, 1828:3, 1828:23, 1829:3, 1829:19, 1829:20
**switch** [1] - 1736:1
**system** [2] - 1734:24, 1755:21
**systematic** [1] - 1740:24

**T**

**tab** [4] - 1724:21, 1737:25, 1741:13, 1741:14
**tabs** [1] - 1779:18
**tails** [1] - 1791:14
**talks** [3] - 1743:12, 1792:23, 1801:3
**tank** [7] - 1811:19, 1813:5, 1813:7, 1813:10, 1813:22, 1813:24, 1814:17
**TARP** [1] - 1760:11
**tax** [9] - 1762:10, 1762:13, 1763:4, 1763:11, 1789:20, 1790:4, 1790:5, 1792:25, 1793:4
**taxpayer** [2] - 1745:17, 1745:20
**taxpayers** [15] - 1733:21, 1733:22, 1734:6, 1734:7, 1734:16, 1734:17, 1734:21, 1734:25, 1743:9, 1743:24, 1745:23, 1745:25, 1771:11, 1771:13, 1802:25
**team** [2] - 1761:11, 1762:11
**teasing** [1] - 1818:16
**technology** [1] - 1752:23
**telephone** [2] - 1811:13, 1813:2
**ten** [12] - 1776:14, 1819:4, 1819:7, 1819:17, 1819:19, 1820:5, 1820:13, 1820:18, 1820:19, 1821:3, 1822:15, 1822:22
**tend** [1] - 1736:24
**tenure** [1] - 1768:3
**term** [28] - 1729:18, 1729:22, 1730:13, 1739:25, 1740:5, 1740:8, 1740:11, 1740:13, 1758:1, 1758:7, 1766:9, 1767:1, 1767:3, 1767:4, 1767:5, 1767:8, 1767:14, 1767:19, 1767:21, 1767:22, 1769:10, 1769:12, 1769:22, 1770:11, 1771:6, 1771:25, 1802:16,

1804:22
**terms** [6] - 1734:11, 1746:10, 1766:20, 1767:24, 1767:25, 1830:3
**test** [1] - 1790:18
**testified** [7] - 1737:12, 1740:16, 1769:3, 1793:9, 1796:12, 1800:15, 1805:11
**testifying** [1] - 1800:14
**testimony** [23] - 1735:13, 1748:21, 1751:3, 1775:1, 1783:4, 1783:5, 1783:17, 1786:18, 1786:23, 1788:15, 1790:19, 1790:23, 1797:2, 1799:20, 1800:17, 1816:8, 1816:20, 1830:24, 1831:2, 1831:5
**TESTIMONY** [2] - 1723:3, 1723:6
**testing** [1] - 1756:22
**Texas** [4] - 1745:6, 1745:10, 1745:12, 1745:13
**text** [1] - 1791:12
**TFG** [1] - 1800:13
**THAKOR** [2] - 1723:4, 1724:7
**Thakor** [11] - 1724:10, 1724:21, 1725:11, 1732:9, 1736:19, 1737:6, 1737:25, 1741:17, 1746:2, 1746:19, 1747:3
**Thakor's** [1] - 1737:2
**THE** [118] - 1721:9, 1721:1, 1721:12, 1724:4, 1724:7, 1736:9, 1737:9, 1737:20, 1745:6, 1745:10, 1747:11, 1747:14, 1747:25, 1748:4, 1748:11, 1749:16, 1749:23, 1749:25, 1750:4, 1750:13, 1750:15, 1750:22, 1751:2, 1775:12, 1775:14, 1775:21, 1775:24, 1776:13, 1776:17, 1777:1, 1778:1, 1778:3, 1778:16, 1778:23, 1779:8, 1779:24, 1781:23,

1782:9, 1782:12, 1782:14, 1782:17, 1782:25, 1783:2, 1783:24, 1784:4, 1784:8, 1784:17, 1784:24, 1785:6, 1785:9, 1785:12, 1787:9, 1790:13, 1791:17, 1792:2, 1796:1, 1798:4, 1798:8, 1798:21, 1798:24, 1799:3, 1799:10, 1800:4, 1800:7, 1801:24, 1802:3, 1802:5, 1802:13, 1803:20, 1804:2, 1804:6, 1804:9, 1805:8, 1805:10, 1805:15, 1806:5, 1806:9, 1806:12, 1806:15, 1806:20, 1806:25, 1807:2, 1807:4, 1807:12, 1807:14, 1807:19, 1807:22, 1808:17, 1808:22, 1809:7, 1809:13, 1809:16, 1809:19, 1810:23, 1815:15, 1815:22, 1816:1, 1816:17, 1817:1, 1817:4, 1817:18, 1817:24, 1818:6, 1818:9, 1818:15, 1827:4, 1827:24, 1830:2, 1830:7, 1830:13, 1832:5, 1832:15, 1832:19, 1832:25, 1833:2, 1833:5, 1833:9, 1833:14
**themselves** [4] - 1785:18, 1811:11, 1812:11, 1829:11
**theory** [8] - 1822:3, 1822:7, 1823:25, 1824:2, 1824:7, 1824:25, 1825:17
**therefore** [3] - 1794:3, 1801:8, 1829:20
**they've** [5] - 1731:23, 1731:25, 1732:7, 1792:14, 1829:18
**thick** [1] - 1768:23
**think-tank** [1] - 1811:19
**thinking** [6] - 1766:18, 1766:19, 1805:11, 1815:17, 1817:4, 1830:16

**thinks** [3] - 1813:7, 1813:11, 1815:18
**third** [11] - 1757:20, 1758:2, 1758:14, 1770:22, 1780:5, 1801:2, 1801:4, 1802:24, 1803:3, 1807:18, 1827:9
**Third** [39] - 1730:5, 1730:7, 1730:10, 1754:3, 1754:5, 1754:10, 1754:15, 1759:18, 1765:11, 1767:21, 1797:22, 1803:12, 1819:14, 1819:17, 1819:22, 1819:24, 1820:2, 1820:9, 1820:15, 1820:25, 1821:8, 1821:10, 1821:13, 1821:15, 1821:17, 1821:18, 1821:21, 1822:2, 1822:9, 1822:11, 1822:13, 1822:25, 1823:11, 1823:17, 1823:23, 1824:15, 1824:19
**Thornton** [24] - 1737:4, 1785:16, 1785:17, 1785:19, 1786:2, 1786:9, 1786:12, 1786:22, 1787:5, 1787:9, 1787:20, 1788:1, 1788:3, 1788:9, 1788:18, 1789:5, 1789:6, 1789:9, 1789:13, 1789:16, 1790:22, 1790:25, 1791:1, 1791:7
**Thornton's** [1] - 1789:1
**three** [16] - 1738:19, 1738:23, 1758:8, 1758:11, 1772:9, 1773:10, 1776:10, 1780:7, 1780:9, 1788:8, 1790:10, 1801:3, 1801:5, 1828:24, 1830:20, 1831:4
**three-quarter** [1] - 1831:4
**three-year** [4] - 1758:8, 1758:11, 1772:9, 1773:10
**throughout** [1] - 1761:18
**Tim** [2] - 1801:1, 1805:3

**timeline** [1] - 1766:19
**timely** [1] - 1802:15
**timing** [2] - 1802:18, 1830:18
**Timing** [1] - 1802:18
**Timiraos** [2] - 1811:5, 1812:25
**tired** [1] - 1830:5
**title** [1] - 1738:4
**today** [22] - 1761:25, 1770:20, 1773:4, 1775:7, 1819:10, 1819:13, 1819:21, 1820:3, 1820:8, 1820:9, 1820:11, 1820:14, 1820:19, 1820:23, 1820:24, 1821:6, 1821:8, 1821:11, 1821:14, 1822:25, 1823:22, 1832:1
**together** [3] - 1734:20, 1811:2, 1811:24
**tomorrow** [3] - 1775:19, 1830:3, 1833:14
**took** [4] - 1760:12, 1761:9, 1780:25, 1828:23
**top** [16] - 1733:14, 1743:24, 1751:9, 1772:17, 1780:9, 1783:13, 1783:24, 1789:19, 1792:21, 1797:19, 1798:21, 1803:22, 1805:17, 1807:17, 1812:24, 1813:19
**Topaz** [1] - 1721:18
**topic** [3] - 1759:4, 1760:22, 1761:7
**total** [1] - 1799:23
**Touhy** [1] - 1815:3
**toward** [1] - 1752:6
**training** [1] - 1752:8
**Transcript** [1] - 1722:15
**TRANSCRIPT** [1] - 1721:12
**transcript** [1] - 1834:4
**transcription** [2] - 1722:15, 1777:18
**transmitted** [1] - 1806:16
**travel** [5] - 1825:5, 1825:20, 1826:1, 1829:8
**traveled** [1] - 1825:3
**traveling** [2] - 1825:6, 1826:7

**travels** [2] - 1824:22, 1826:17
**treasurer** [2] - 1752:21, 1754:13
**Treasury** [138] - 1724:12, 1726:10, 1726:16, 1726:20, 1726:24, 1727:10, 1728:2, 1728:3, 1728:11, 1728:22, 1729:2, 1729:3, 1729:17, 1730:12, 1730:21, 1731:9, 1731:15, 1731:17, 1731:24, 1732:2, 1732:12, 1732:13, 1733:8, 1733:18, 1733:20, 1734:1, 1734:3, 1734:5, 1734:13, 1734:19, 1736:15, 1737:3, 1738:5, 1738:11, 1738:18, 1738:22, 1739:3, 1739:12, 1739:21, 1740:18, 1742:2, 1742:3, 1742:10, 1742:15, 1742:17, 1742:20, 1743:1, 1743:5, 1743:7, 1743:8, 1743:13, 1743:21, 1744:2, 1744:9, 1744:12, 1744:17, 1744:23, 1744:24, 1758:2, 1758:14, 1759:6, 1759:8, 1759:10, 1759:19, 1759:20, 1760:10, 1760:23, 1760:24, 1765:9, 1767:8, 1769:18, 1769:22, 1770:6, 1770:10, 1770:12, 1770:13, 1771:2, 1771:6, 1771:8, 1771:9, 1772:2, 1772:17, 1772:21, 1784:22, 1785:19, 1788:3, 1788:13, 1788:24, 1789:7, 1789:9, 1789:10, 1789:13, 1790:5, 1791:2, 1791:19, 1791:21, 1792:11, 1794:10, 1794:11, 1795:3, 1795:13, 1796:10, 1797:17, 1798:1, 1798:11, 1798:16, 1799:15, 1800:4, 1800:8, 1800:10, 1800:23, 1801:8,

1801:24, 1802:9,
1802:22, 1803:23,
1804:3, 1804:6,
1804:13, 1804:17,
1805:10, 1805:12,
1805:16, 1805:19,
1810:21, 1811:15,
1812:5, 1812:6,
1812:9, 1813:8,
1813:11, 1814:8,
1814:25, 1815:15,
1815:18, 1828:4,
1828:6
**treasury** [1] - 1753:22
**Treasury's** [11] -
1737:3, 1785:21,
1788:18, 1797:20,
1798:17, 1799:8,
1803:9, 1807:15,
1807:24, 1815:20,
1815:22
**trends** [2] - 1766:10,
1766:20
**trial** [4] - 1783:19,
1793:12, 1796:12,
1821:20
**TRIAL** [1] - 1721:12
**tried** [4] - 1741:3,
1797:25, 1815:1,
1815:4
**true** [5] - 1726:14,
1761:5, 1819:23,
1820:16, 1820:21
**truth** [2] - 1814:9,
1814:13
**try** [14] - 1746:15,
1775:6, 1790:19,
1799:21, 1806:22,
1808:9, 1809:24,
1810:1, 1814:12,
1814:20, 1817:12,
1817:16, 1819:2
**trying** [9] - 1727:4,
1737:19, 1791:4,
1794:8, 1808:13,
1809:20, 1810:7,
1812:9, 1816:25
**tumultuous** [1] -
1781:21
**turmoil** [1] - 1780:4
**turn** [8] - 1734:2,
1741:22, 1769:9,
1770:1, 1771:18,
1772:7, 1814:14,
1819:25
**turning** [6] - 1751:24,
1755:25, 1768:24,
1770:19, 1771:22,
1772:13
**two** [27] - 1730:25,

1731:1, 1739:18,
1748:7, 1755:24,
1758:15, 1762:3,
1777:22, 1778:13,
1778:24, 1779:1,
1779:11, 1779:22,
1780:15, 1780:18,
1781:4, 1792:17,
1800:1, 1801:3,
1806:21, 1810:25,
1811:1, 1811:24,
1815:9, 1819:25,
1830:19, 1831:2
**two-year-old** [1] -
1780:18
**type** [15] - 1732:23,
1736:22, 1737:5,
1737:13, 1746:25,
1753:16, 1760:11,
1761:1, 1761:22,
1763:17, 1807:9,
1825:4, 1825:16,
1825:19, 1825:24
**types** [3] - 1756:18,
1759:20, 1760:1
**typically** [1] - 1761:14

## U

**U.S** [4] - 1734:13,
1743:8, 1767:12,
1800:4
**UCC** [6] - 1825:6,
1826:21, 1826:22,
1826:25, 1827:4,
1827:6
**Ugoletti** [19] -
1736:13, 1740:17,
1741:15, 1741:16,
1741:25, 1742:24,
1743:12, 1743:16,
1746:21, 1746:22,
1746:25, 1789:24,
1790:1, 1793:19,
1794:15, 1796:20,
1796:21, 1796:23,
1796:24
**Ugoletti's** [2] -
1792:15, 1795:21
**ultimately** [2] -
1758:19, 1759:12
**uncertainty** [1] -
1769:12
**under** [55] - 1725:14,
1726:4, 1726:20,
1726:24, 1727:10,
1727:12, 1727:16,
1728:21, 1730:20,
1731:4, 1736:6,
1736:19, 1746:8,

1746:14, 1754:22,
1756:24, 1761:14,
1767:7, 1767:13,
1767:24, 1769:9,
1769:16, 1770:3,
1770:4, 1770:11,
1770:25, 1771:7,
1772:21, 1773:4,
1773:12, 1774:4,
1778:14, 1785:21,
1786:3, 1786:4,
1789:16, 1789:19,
1794:22, 1795:12,
1799:7, 1800:24,
1801:4, 1802:23,
1803:4, 1804:12,
1805:1, 1814:9,
1814:13, 1818:20,
1819:8, 1823:19,
1826:19, 1827:4,
1827:5, 1828:3
**underneath** [1] -
1802:18
**understandable** [1] -
1740:25
**Understood** [2] -
1832:21, 1833:4
**understood** [6] -
1762:6, 1782:21,
1802:6, 1815:25,
1816:3, 1832:18
**undertaken** [2] -
1740:17, 1746:15
**undertook** [3] -
1744:15, 1745:3,
1746:8
**undrawn** [1] - 1731:3
**undue** [2] - 1786:15,
1797:7
**unduly** [1] - 1783:22
**unharmed** [1] -
1824:13
**uniform** [1] - 1826:23
**Uniform** [2] - 1825:7,
1826:20
**uniformly** [1] - 1827:1
**unitary** [1] - 1812:6
**United** [2] - 1722:11,
1814:10
**UNITED** [2] - 1721:1,
1721:13
**universe** [1] - 1823:22
**University** [1] - 1752:1
**unless** [3] - 1794:12,
1831:11, 1832:10
**unlike** [1] - 1824:24
**unlikely** [7] - 1729:15,
1729:22, 1730:11,
1769:20, 1770:8,
1771:4, 1831:12

**unlimited** [2] -
1743:10, 1801:17
**unreasonably** [1] -
1827:18
**up** [38] - 1724:20,
1725:15, 1726:5,
1728:16, 1735:25,
1736:4, 1736:5,
1737:24, 1741:12,
1741:23, 1744:7,
1775:3, 1779:17,
1784:12, 1785:25,
1788:5, 1788:7,
1789:19, 1790:1,
1790:4, 1790:5,
1793:3, 1793:17,
1794:12, 1795:3,
1795:9, 1798:10,
1799:21, 1803:3,
1803:22, 1811:22,
1812:22, 1813:12,
1814:17, 1815:11,
1817:10, 1824:23,
1830:12
**upcoming** [1] -
1796:11
**updated** [1] - 1758:11
**useful** [1] - 1784:10

## V

**valid** [1] - 1819:5
**valuable** [1] - 1788:17
**valuation** [11] -
1762:9, 1762:22,
1763:3, 1763:11,
1787:21, 1788:3,
1789:3, 1789:11,
1789:19, 1791:9,
1829:18
**value** [18] - 1743:2,
1766:15, 1774:9,
1787:25, 1788:11,
1788:14, 1788:23,
1788:25, 1789:17,
1793:3, 1819:12,
1820:14, 1820:19,
1821:5, 1822:24,
1826:3, 1828:19
**valued** [1] - 1788:14
**valuing** [1] - 1788:24
**variability** [5] -
1729:12, 1729:14,
1769:19, 1770:8,
1771:3
**various** [8] - 1753:20,
1754:11, 1756:18,
1757:12, 1761:14,
1761:18, 1791:12,
1826:23

**VARMA** [1] - 1722:6
**verdict** [1] - 1832:11
**version** [3] - 1779:17,
1805:23, 1826:20
**versus** [1] - 1760:10
**viable** [1] - 1824:7
**vice** [3] - 1752:17,
1753:18, 1756:3
**video** [6] - 1746:22,
1748:18, 1749:20,
1749:22, 1795:22,
1796:20
**videos** [1] - 1797:4
**view** [12] - 1756:21,
1765:21, 1765:23,
1766:4, 1766:6,
1766:9, 1766:25,
1767:7, 1767:16,
1793:9, 1807:1,
1812:15
**viewed** [2] - 1767:19,
1767:25
**views** [1] - 1765:15
**vigorous** [2] - 1779:4,
1780:12
**violation** [1] - 1827:19
**Virginia** [2] - 1826:19,
1826:21
**voir** [1] - 1832:22
**vs** [1] - 1721:5

## W

**wait** [2] - 1818:4,
1832:14
**waive** [5] - 1742:2,
1742:4, 1742:22,
1770:13, 1770:14
**waived** [12] - 1731:10,
1732:10, 1732:15,
1733:4, 1733:18,
1739:19, 1739:21,
1739:22, 1739:24,
1740:21, 1771:9
**waiver** [2] - 1724:12,
1733:11
**waiving** [6] - 1724:13,
1733:16, 1742:11,
1742:12, 1742:17,
1742:18
**Wall** [5] - 1734:22,
1811:3, 1812:25,
1813:4, 1813:14
**Wallison** [6] - 1811:7,
1811:13, 1811:19,
1811:25, 1812:2,
1813:21
**Wallison's** [1] -
1812:8
**wants** [1] - 1830:12

**warrant** [7] - 1787:22, 1787:25, 1788:11, 1788:12, 1788:14, 1788:19, 1789:4
**warrants** [5] - 1745:1, 1745:24, 1777:5, 1788:24, 1789:17
**Washington** [6] - 1721:9, 1721:16, 1721:23, 1722:9, 1722:13, 1813:10
**website** [1] - 1751:10
**wedding** [1] - 1833:5
**Wednesday** [1] - 1780:24
**week** [2] - 1755:3, 1780:17
**weekend** [1] - 1833:6
**Wells** [4] - 1752:13, 1754:23, 1755:7, 1755:8
**whisper** [1] - 1813:3
**White** [23] - 1797:21, 1802:10, 1803:10, 1803:25, 1804:7, 1804:17, 1805:18, 1805:24, 1806:5, 1807:12, 1807:13, 1812:5, 1812:7, 1813:1, 1813:4, 1813:15, 1813:21, 1813:24, 1814:17, 1815:23, 1815:24, 1816:2, 1816:10
**whole** [4] - 1778:17, 1797:13, 1815:4, 1833:6
**wholesale** [1] - 1798:3
**Wick** [2] - 1834:3, 1834:8
**WICK** [1] - 1722:11
**willing** [1] - 1775:3
**wind** [7] - 1793:8, 1793:11, 1793:16, 1795:6, 1798:19, 1801:3, 1808:6
**wind-down** [5] - 1793:8, 1793:11, 1793:16, 1801:3, 1808:6
**winding** [2] - 1795:11, 1799:9
**window** [1] - 1822:22
**Wisdom** [1] - 1756:25
**wish** [1] - 1774:20
**WITNESS** [1] - 1724:7
**witness** [15] - 1748:1, 1748:3, 1748:13, 1748:21, 1750:23, 1775:1, 1775:8,

1782:19, 1783:16, 1790:22, 1791:10, 1791:15, 1797:12, 1810:4, 1815:3
**words** [3] - 1743:14, 1799:16, 1813:12
**works** [4] - 1811:5, 1811:19, 1815:24
**world** [1] - 1820:9
**worried** [2] - 1793:20, 1793:21
**worth** [36] - 1735:15, 1735:16, 1735:19, 1736:17, 1737:15, 1747:6, 1764:5, 1764:11, 1764:24, 1765:2, 1765:19, 1766:4, 1766:25, 1767:7, 1767:11, 1788:19, 1789:24, 1790:2, 1792:6, 1793:10, 1794:3, 1794:17, 1794:19, 1801:20, 1802:5, 1802:17, 1807:10, 1808:5, 1821:15, 1828:1, 1828:3, 1828:23, 1829:3, 1829:19, 1829:20, 1832:10
**wound** [1] - 1802:25
**write** [2] - 1790:5, 1793:17
**write-up** [1] - 1790:5
**writing** [2] - 1790:4, 1793:3
**written** [3] - 1782:3, 1792:25, 1801:24
**wrote** [4] - 1799:3, 1799:16, 1804:4, 1806:12

## Y

**year** [15] - 1730:1, 1730:4, 1730:10, 1758:8, 1758:11, 1772:9, 1773:10, 1779:6, 1780:6, 1780:14, 1780:18, 1789:15, 1828:13, 1828:14
**years** [17] - 1738:19, 1738:23, 1758:16, 1758:17, 1758:25, 1785:20, 1819:4, 1819:7, 1819:18, 1819:19, 1820:5, 1820:13, 1820:18, 1820:19, 1821:3,

1822:15, 1822:22
**yesterday** [4] - 1746:22, 1750:11, 1784:20, 1818:15
**York** [3] - 1721:22, 1722:4
**yourself** [1] - 1764:1

## Z

**ZAGAR** [1] - 1721:18
**zero** [16] - 1732:19, 1732:21, 1736:25, 1740:6, 1740:13, 1744:10, 1744:18, 1765:21, 1783:20, 1786:17, 1828:4, 1829:12, 1829:15