### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

```
FAIRHOLME FUNDS, INC., ET AL., et al,      Civil Action
                                           No. 1:13-1053
                    Plaintiffs,

         vs.
                                           October 27, 2022
FEDERAL HOUSING FINANCE                    9:39 a.m.
     AGENCY, et al,                        Washington, DC


                    Defendants.
_____

In re: FANNIE MAE/FREDDIE MAC              Civil Action
SENIOR PREFERRED STOCK PURCHASE            13-1288
AGREEMENT CLASS ACTION
LITIGATIONS.

_____
```

TRANSCRIPT OF JURY TRIAL – **MORNING SESSION**
**BEFORE THE HONORABLE ROYCE C. LAMBERTH**
UNITED STATES DISTRICT JUDGE


PLAINTIFFS' APPEARANCES:

| | |
|---|---|
| **For Plaintiffs:** | **CHARLES COOPER**<br>**DAVID THOMPSON**<br>**VINCENT COLATRIANO**<br>**PETER PATERSON**<br>**BRIAN BARNES**<br>Cooper & Kirk, PLLC<br>1523 New Hampshire Avenue NW<br>Washington, D.C. 20036 |
| **For Class Plaintiffs:** | **ERIC ZAGAR**<br>Kessler Topaz Meltzer & Check, LLP<br>280 King of Prussia Road<br>Radnor, Pennsylvania 19087 |
| | **HAMISH HUME**<br>**SAMUEL KAPLAN**<br>Boies Schiller Flexner LLP<br>1401 New York Avenue NW<br>Washington, D.C. 20005 |

APPEARANCES (CONTINUED):

                                            **MICHAEL J. BARRY**
  Grant & Eisenhofer, P.A.
  123 Justison Street
  Wilmington, Delaware 19801

  **ADAM WIERZBOWSKI**
  Bernstein Litowitz Berger &
  Grossmann LLP
  1251 Avenue of the Americas
  New York, New York 10020

**For Defendant Federal**
**Housing Finance Agency:**  **ASIM VARMA**
  **HOWARD CAYNE**
  **DAVID BERGMAN**
  **IAN HOFFMAN**
  Arnold & Porter Kaye Scholer LLP
  601 Massachusetts Avenue NW
  Washington, D.C. 20001

**For Federal Home Loan**
**Mortgage Company:**  **MICHAEL CIATTI**
  King & Spalding LLP
  1700 Pennsylvania Avenue NW
  Washington, D.C. 20006

**For Federal National**
**Mortgage Association:**  **MEAGHAN VERGOW**
  O'Melveny & Myers LLP
  1625 I Street NW
  Washington, D.C. 20006

**Reported By:**  **LORRAINE T. HERMAN, RPR, CRC**
  Official Court Reporter
  U.S. District & Bankruptcy Cts.
  333 Constitution Avenue, NW
  Room 6720
  Washington, D.C. 20001
  202-354-3196

*** Proceedings recorded by stenotype shorthand.
*** Transcript produced by computer-aided transcription.

1

# I N D E X

2

**WITNESS**                                              **PAGE**

3

MUKARRAM ATTARI

4

    Direct Examination by Mr. Hoffman          1886

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **P R O C E E D I N G S**

2            **DEPUTY CLERK:**  Court's in session, please be

3    seated.

4            **MR. HOFFMAN:**  Good morning, Your Honor, Ian

5    Hoffman on behalf of defendants.  We appreciate the Court's

6    time this morning starting a little early so we can resolve

7    some of these issues before the testimony begins.

8            I think it makes the most sense for me to start

9    here and move a few -- attempt to move a few exhibits into

10   evidence, which are related to some of the disputes between

11   the parties about Dr. Attari's testimony.

12           After I move those two exhibits into evidence, we

13   discuss that, I'd like to discuss an issue of displaying

14   certain documents that are not yet in evidence to the jury

15   under Rule 703.

16           I understand plaintiffs have a couple other

17   objections related to Dr. Attari's testimony, and I'll let

18   them take those up next and I can respond in kind, if that's

19   okay with Your Honor.

20           **THE COURT:**  Okay.

21           **MR. HOFFMAN:**  Okay.  So first, Your Honor,

22   defendants would respectfully move into evidence Defendants'

23   Exhibit 412 and Defendants' Exhibit 529.  I have paper

24   copies for Your Honor, if I may approach.

25           **THE COURT:**  Okay.

1    **MR. HOFFMAN:**  Ms. Jenkins, how do I clear this

2    screen?  Ms. Jenkins, is there a way I can clear the screen?

3    Is there a button?  Thank you.

4          Okay, so the first one is Defendants' Exhibit 412.

5    Mr. Salazar, why don't you go ahead and pull that up.

6          Your Honor, just for context.  Both of these

7    exhibits are market analyst reports.  As the Court may

8    recall, this was addressed in Motions in Limine before

9    trial, Your Honor.  And the Court ruled that they can be

10   offered if there's evidence to show that they were

11   considered by FHFA decision makers.

12         These two documents are market analyst reports

13   that were considered by FHFA decision makers.  The cover

14   email here at 412 is from Mario Ugoletti to Mr. Ed DeMarco,

15   and the Court has heard from both of these individuals.  The

16   subject line here is GSE PSPA backstop questions.

17         The backstop, Your Honor, is the outstanding

18   Treasury commitment.  And Mr. Ugoletti tells Mr. DeMarco

19   it's a reasonable summary.  And the analyst report itself,

20   Your Honor -- and I won't go through it in any detail here,

21   but it identifies the issue of market concern.

22         And by market concern, it's the concern of MBS

23   holders and bond holders and investors in the enterprises'

24   securities, and raising the alarm that the circular draws,

25   combined with the cap on the commitment, increase the risk

1    of these bonds and decrease the confidence that these

2    investors have.

3                This document, Your Honor, obviously on its face

4    was shared with the -- among the key decision makers at

5    FHFA.  Additionally, Your Honor, you've heard a lot about

6    the Ugoletti declaration, the declaration of Mario Ugoletti.

7                I believe Mr. Hume characterized it yesterday as

8    explaining why FHFA entered into the Third Amendment and the

9    net worth sweep.  That declaration specifically references

10   this very Deutsche Bank analyst report as one of the

11   examples of this market concern.

12               So we think there is ample evidence, Your Honor,

13   that this was considered by the decision makers at the time.

14   Mr. DeMarco, himself, testified that market participant

15   concern was an issue.

16               The second one, Your Honor, is 529.  Mr. Salazar,

17   if you could pull up Defendants' Exhibit' Exhibit 529.

18               This document, Your Honor, is their meeting notes

19   from an August 15th meeting with Treasury.  This meeting has

20   already been testified about.  These are -- this is a FHFA

21   document.  There's a little FHFA logo.  And there was

22   deposition testimony earlier in this case that these were --

23   this comes from FHFA's files, and this is particularly

24   Mr. DeMarco's files in particular.

25               And in this packet of notes, Your Honor, if you,

1    Mr. Salazar, go to the next page, there is a Moody's report

2    that was issued after the second quarter SEC filings were

3    issued but before the Third Amendment was executed.

4              And this also raises the concern that, even with

5    Fannie Mae and Freddie Mac's second quarter results, the

6    circularity problem -- Moody's was predicting the

7    circularity problem would continue and it would jeopardize

8    the confidence in the MBS and bonds.

9              And so that this was -- if you go, Mr. Salazar, to

10   the next page and the next page after that, I believe there

11   is also -- keep going.

12             Yes, so this is a summary of the review of the

13   changes to the PSPAs, and the page after that is, I believe,

14   a draft of the Third Amendment itself.  So this was all --

15   this is in one packet, Your Honor, that was brought to this

16   meeting.  So obviously, these analyst concerns were part of

17   this decision-making process.

18             Mr. Salazar, you can take those down.

19             So we would move those into evidence as clearly

20   meeting the standards that this Court laid out in its Motion

21   in Limine ruling before trial.

22             Now, there are a bunch of other analyst reports

23   that echo these, but that there isn't the quite the same

24   direct evidence that it was put in front of Mr. Ugoletti or

25   Mr. DeMarco and considered it in the months before the Third

1   Amendment.  I think it was sort of in the air at the time

2   but, as a documentary matter, they're on different footing.

3            However, Dr. Attari, who the Court is going to

4   hear from soon, one of his tasks was to evaluate the

5   reasonableness of the Third Amendment in light of the

6   conservator's goals.  And one way he went about doing that

7   was identifying whether, as an objective matter, the market

8   participant concern was a real issue, and also evaluating,

9   in his expert opinion, whether the Third Amendment met those

10  concerns.

11           And he did that by surveying all of these types of

12  analyst reports, totally aside from what Mr. DeMarco and

13  Mr. Ugoletti looked at.  And you'll hear from the court that

14  his findings were obviously very consistent and there's a

15  variety of analyst reports.

16           The ones that, in addition to those two, that I'm

17  moving into substantive evidence, Your Honor, there are a

18  variety of market analyst reports that came out right when

19  the Third Amendment was announced.  Obviously, Judge, market

20  analyst reports that came out after the Third Amendment was

21  announced, technically don't -- couldn't influence FHFA's

22  pre-Third Amendment decision-making.

23           However, they validate the concern, and they show

24  that the Third Amendment was a reasonable way to address

25  this very issue.  And so Dr. Attari -- and we would like to

1   present to the jury portions of those analyst reports

2   showing what they said about how the Third Amendment

3   alleviated the risks to Fannie Mae and Freddie Mac MBS

4   holders and bond holders.  And this is extremely probative

5   to the issues in the case, Your Honor.

6           This is more than just -- let me back up.  I think

7   a lot of plaintiffs' presentation is that this concern was

8   overblown or non-existent, where everyone should have known

9   that the profitability was coming.

10          There's all of these outside observers.  And you

11   will hear from Dr. Attari that they are very sophisticated

12   outside observers who have access to a lot of data, and

13   they're crunching a lot of numbers.  And they're all

14   pointing in the same direction.  So it's very important that

15   the jury know that these concerns that Director DeMarco had

16   were objectively reasonable and Dr. Attari is going to speak

17   to that.

18          Under Rule 703, as Your Honor knows -- let me back

19   up.  The experts can rely upon this type of evidence if a

20   foundation is laid that experts in the field do so.  And

21   Dr. Attari will lay that foundation, and I don't even think

22   there's going to be a dispute about that.

23          And under Rule 703, Your Honor, the probative

24   value here, for all of the reasons I described, greatly

25   outweighs any prejudicial effect.  It will be very clear to

1   the jury that these are market analyst reports.  They're not

2   FHFA's words or Fannie and Freddie's words, things like

3   that.  Obviously, it will be subject to ample

4   cross-examination.

5           I can show some examples, if Your Honor wants, of

6   the types of clips that we would show from these analyst

7   reports if you'd find it helpful, but I think you get the

8   idea.

9           Court's indulgence.  I just want to make sure I

10  covered the points on this.

11          And, Your Honor, on the post-Third Amendment

12  analyst reports, it's a fundamental part of Dr. Attari's

13  opinion.  And it is the -- one of the bases of his opinion

14  are these findings.  So it's important for the jury, instead

15  of him just sort of stating a conclusion at a high level to

16  sort of prove it up.  And it goes to the reasonableness of

17  his opinion and the persuasiveness of it.

18          And, again, Your Honor, the pre-Third Amendment

19  reports that he will highlight, that I've also moved into

20  substantive evidence, show that there was a concern.  And

21  it's not so much that the market was necessarily even

22  justified in being concerned, but that this was a concern

23  that was in the air that Director DeMarco was considering

24  and that the Third Amendment helps alleviate it.

25          I'm happy to argue it further, Your Honor, but it

1   might make sense for me to let plaintiffs respond.  And then

2   if they have other issues with Dr. Attari's testimony they

3   would like to raise and I can respond to those.

4           **THE COURT:**  Okay.

5           **MR. HOFFMAN:**  Thank you, Your Honor.

6           **MR. KRAVETZ:**  Good morning, Your Honor.

7   Robert Kravetz on behalf of plaintiffs.

8           Your Honor, may I pass up a version of the

9   presentation that defendants are going to give through

10  Dr. Attari?

11          **THE COURT:**  Yes.

12          **MR. KRAVETZ:**  Thank you.

13          If I could ask Mr. DeRita to pull up Page 5 of the

14  defense presentation, please.

15          Good morning, Your Honor.

16          Dr. Attari, one of his opinions that he's offering

17  this morning or throughout the day is that "It was

18  reasonable for FHFA to agree to the Third Amendment."

19          And a good bulk of that opinion comes from his

20  review of analyst reports.  Those span, the largest portion

21  of the overall presentation, from Pages 18 to 32.  And I'll

22  deal, first, with the two exhibits that defendants are

23  seeking to introduce substantively, and then move on to our

24  argument relating to the others that defendants just want to

25  display.

1          Your Honor, the two analyst reports, which are

2    DX-412 and DX-529, that defendants seek to admit

3    substantively are inadmissible hearsay.  These are pre-net

4    worth sweep analyst reports that are being offered to show

5    that it was reasonable for FHFA to agree to the Third

6    Amendment based on the information that they had at the

7    time.

8          At the time that the Court ruled on the Motion in

9    Limine, the Court said that such evidence is only admissible

10   if defendants can show that any specific report factored

11   into the FHFA's decision-making process or a hearsay

12   exception applies.  To date, Your Honor, there's been no

13   trial testimony introduced that Mr. DeMarco who -- he

14   testified he was the sole decision-maker in connection

15   with -- I'll just grab some water.

16         Mr. DeMarco testified that he was the sole

17   decision-maker in connection with the Third Amendment.  He

18   testified over two days, including in the defendants' case

19   in chief.  At no time did Mr. DeMarco indicate that he

20   relied on a single analyst report.  No such report has been

21   introduced into evidence.

22         Now what the defendants are seeking to do is offer

23   Dr. Attari as a mouthpiece for information that otherwise is

24   hearsay and that there has been no connection that this

25   specific report or these two specific reports factored into

1    Mr. DeMarco's decision-making process.

2            It's our position that there is substantial

3    prejudice to introduce these reports here through an expert

4    rather than through the witnesses themselves, who we'd have

5    the opportunity to cross-examine.

6            With respect to Mr. Ugoletti, defendants could

7    have had the opportunity to call Mr. Ugoletti or to

8    designate portions of Mr. Ugoletti's testimony.  They did

9    not do so.  So now, we're faced with a substantial prejudice

10   where we have information that is coming in through an

11   expert.  It's unduly prejudicial at this time, given that we

12   haven't had the opportunity to cross-examine on any of these

13   documents.

14           Now, looking at these two documents specifically,

15   Your Honor, I would like to start with Exhibit 529, if

16   Mr. DeRita could please just pull that up for a moment.

17           Your Honor, this document here is dated August 15,

18   2012.  This is at a time in which the Third -- FHFA had

19   already decided to enter into the Third Amendment.  So on

20   this particular occasion, that decision was being

21   communicated.  And you see the attendees, if Mr. DeRita

22   can -- thank you, sir.

23           If you see here, Mr. DeMarco is there,

24   Mr. Ugoletti is there, and Mr. Pollard is there, but then

25   Don Layton, Jerry Weiss, Tim Mayopoulos and Judith Dunn are

1  the recipients from the GSEs who are learning about the

2  entry, the decision to enter into the Third Amendment.

3          Mr. Hoffman indicated that there were, "Obviously

4  the analyst concerns factored into that decision-making

5  process."  But we don't know that, Your Honor, because there

6  hasn't been any testimony despite ample opportunity to do so

7  and to lay that foundation.

8          So in particular, with respect to Defendants'

9  Exhibit 529, defendants can't show any proper foundation

10  that this specific report factored into the decision-making

11  process because the report itself and what they're

12  demonstrating here is conveying that information to the GSEs

13  at a time in which it was already decided.

14          In terms of DX-412, we still have the same

15  argument, Your Honor, that there has been inadequate

16  foundation that Mr. Ugoletti or Mr. DeMarco specifically

17  relied upon this in the decision-making process -- let me

18  back up, Mr. Ugoletti's decision-making here is irrelevant,

19  because Mr. DeMarco testified on the stand that he was the

20  sole decision-maker for purposes of entering into the net

21  worth sweep.

22          So the fact that he received an email from

23  Mr. Ugoletti that sets forth Mr. Ugoletti's discussion of

24  that particular piece in DX-412, it's irrelevant as to

25  whether this specifically factored into Mr. DeMarco's

1    decision-making process.

2           Under 403, even putting to the side that, you

3    know, from a hearsay perspective, the argument prior to

4    trial was that these analyst reports are hearsay and the

5    Court found that they're hearsay.  And the reason why the

6    Court did not allow them to come into evidence with respect

7    to shareholder expectations is because these are the types

8    of documents where it would invite juror confusion because

9    they would look to the documents for their truth.

10          So they are only documents that are relevant if

11   there can be a foundation that the specific person who

12   received that information relied upon it, notwithstanding

13   the hearsay information.

14          Again, with respect to these two arguments, it's

15   our position that defendants have failed to meet that burden

16   despite having the opportunity to ask Mr. DeMarco about it

17   and -- and Dr. Attari, as an expert, should not be the

18   mouthpiece for hearsay that's otherwise inadmissible.

19          There would be significant prejudice from an

20   expert who was not the decision-maker to get on the stand

21   and to tell the jury that it would be reasonable for the

22   defendants to have relied upon this information when they

23   aren't telling the jury that themselves.

24          So that's with respect to the substantive

25   documents.  The 703 argument, Your Honor, most of the

1    additional analyst reports that defendants seek to display

2    to the jury relate to information or analyst reports that

3    postdate the net worth sweep.

4           Again, the opinion that Dr. Attari is purporting

5    to give is that it was reasonable for FHFA to enter into the

6    net worth sweep based on the information that they had at

7    the time of the net worth sweep.

8           And so now, we're focusing with essentially --

9    which looks like a book report in PowerPoint form of a

10   litany of analyst reports that postdate the Third Amendment

11   selectively chosen by Dr. Attari in order to achieve the

12   intended purpose.  There is minimal to no probative value of

13   this evidence.

14          Mr. Hoffman referenced the standard under Rule

15   703.  Rule 703 flips the Rule 403 standard.  So as, where

16   normally the opponent is seeking to exclude evidence based

17   on an argument that the probative value is substantially

18   outweighed by the prejudicial effect, Rule 703 states, if

19   facts or data would otherwise be inadmissible, the proponent

20   of the opinion, here the defendants, may disclose them to

21   the jury, only if their probative value in helping the jury

22   evaluate the opinion substantially outweighs their

23   prejudicial effect.

24          The defendants cannot meet that very high burden.

25   And it's a high burden for a reason because what you don't

1   want to happen is the jury to be impermissibly relying upon

2   an expert seeking to introduce evidence that is otherwise

3   inadmissible to support the expert's opinion.

4           First, there is minimal to no probative value

5   because these analyst reports that all post date the Third

6   Amendment, and there's no reason to believe that any FHFA

7   officials actually relied on these analyst reports prior to

8   the Third Amendment given that the date of each of them

9   occurred after.  So the post-Third Amendment analysis of

10  individual analysts is irrelevant to the issue given the

11  lack of foundation.

12          It's also highly prejudicial, Your Honor, because

13  analysts don't have the same access to information as would

14  the individual decision makers from FHFA.  They wouldn't

15  have access to the types of internal information,

16  alternatives to the net worth sweep, all of these things

17  that we've heard about over the last two weeks of trial.

18          So there's no value with respect to the specific

19  opinion that Dr. Attari purports to offer into evidence,

20  which is that it was reasonable for the FHFA to engage in

21  the decision that it did.

22          And with respect to 703, Your Honor, courts have

23  considered these types of arguments in similar context.  A

24  quote from a decision from the Southern District of New York

25  where Court excluded plans from an expert in a case

1   involving the financial crisis to read into evidence the

2   events of accounts of events that occurred post-dating

3   September 2008.

4         And the Court held, To the extent the expert plans

5   to read these articles to the jury, he would be no more than

6   a mouthpiece for hearsay.  That's In Re: Reserve Fund

7   Securities and Derivative Litigation.  It's at 2012 Westlaw

8   12356742 at star 3.

9         And the reason being, as the Court notes,

10  "Although Rule 703 of the Federal Rules of Evidence permits

11  an expert to rely on hearsay in reaching his own opinion, a

12  party cannot call an expert simply as a conduit for

13  introducing hearsay under the guise that the testifying

14  expert used the hearsay as the basis for his testimony."

15        So for all of these reasons, Your Honor,

16  plaintiffs oppose the admission of the specific exhibit

17  substantively DX-412 and DX-529.  And based on the

18  significant risk of juror confusion and the fact that

19  defendants cannot satisfy their burden under 703, defendants

20  oppose showing the jury in demonstrative form documents that

21  have not been introduced into evidence and which otherwise

22  post-date the Third Amendment.

23        And just one last point on that.  Your Honor has

24  already held in this case that, to show a demonstrative to

25  the jury, it must be based on evidence that has been

1      admitted at trial.  As defendants concede, they're not even

2      seeking to introduce these analyst reports into the record.

3              Thank you, Your Honor.

4              **THE COURT:**  All right.

5              **MR. HOFFMAN:**  Good morning, Your Honor, I have a

6      few brief points in response.

7              Plaintiffs' counsel argued that these documents

8      should not be admitted because there isn't specific

9      testimony from Mr. DeMarco about them.  I jotted down

10     yesterday, when Mr. Hume was arguing at the end of the day,

11     and I believe his quote was "You don't have to present every

12     document into evidence through a witness."

13             And the Court agreed and admitted several

14     documents for other reasons, despite some arguments by my

15     colleague that sound similar to the arguments that

16     plaintiffs are making this morning.  So that's the first

17     point.

18             Your Honor, with respect to 412, the Deutsche Bank

19     article that Mr. Ugoletti sent to Mr. DeMarco, I believe

20     there was an argument that something like it's not clear,

21     still, that it was considered by them.  I would point Your

22     Honor to, again, the Mr. Ugoletti declaration, which

23     Mr. Hume characterized again yesterday as explaining FHFA's

24     decision-making process entering into the Third Amendment.

25             It specifically references and quotes this

1    article.  Plaintiffs moved that into evidence and plaintiffs

2    have made a big deal about Ugoletti declaration.  Even under

3    a rule of completeness analysis, Your Honor, under Rule 611,

4    they can't move a piece of a document into evidence that

5    quotes a part of another document and then vigorously argue

6    that that whole document should not come into evidence;

7    that's 412.

8          For 529, Your Honor, the Moody's article that's

9    attached to the meeting notes, there's no dispute from

10   plaintiffs that this is part of and connected to the

11   discussions around the Third Amendment.  I believe

12   plaintiffs' argument this morning was that, because of the

13   timing, the decision, their argument is, was already made.

14         But, Your Honor, first of all, no decision is

15   final until it's signed.  I believe that's what

16   Mr. DeMarco's testimony was.  Obviously, Mr. DeMarco made

17   clear that he's the sole decision-maker, that, you know, he

18   signs the document and not people like Mr. Ugoletti, but he

19   obviously has a staff that supports him.

20         For this document, Your Honor, this was -- the

21   evidence indicates, the face of the document indicates that

22   it was brought to the meeting with the enterprises

23   themselves to show them and discuss the reasons for the

24   Third Amendment.

25         So it's splitting a lot of hairs to say that,

1    well, you know, this didn't go into the decision-making.  It

2    only went into justifying the decision.  This document is

3    part of the mix that went into the decision-making for the

4    Third Amendment.  So those two should come in as substantive

5    evidence.

6         With respect to the other additional analyst

7    reports and whether they should be shown to the jury, Your

8    Honor, the key issue is that these reports show that the

9    market was concerned.  And then, in response to the Third

10   Amendment, the market was reassured.

11        It's not trying to show that the analyst reports

12   were correct.  And it's a fundamental part of Dr. Attari's

13   opinion, which again, plaintiffs' are not seeking to exclude

14   the opinion.  He did an analysis that, was there a concern

15   and was it met?

16        So it's going to explain that, and these analyst

17   reports just give that support for his opinion.  For that

18   reason, he's not a mere conduit because he's not just

19   reading news articles.  He's giving his opinion, and these

20   go into the bases of his opinion.

21        I don't want to beat a dead horse, Your Honor.

22        **THE COURT:**  All right.

23        The objections will be overruled and they're a

24   proper basis for the opinion and the documents are

25   admissible as part of the expert's opinion and in support of

1    his opinion.

2            All right.  As soon as the jury is ready, then we

3    will proceed.

4            **MR. KRAVETZ:**  Your Honor, we have two other

5    matters with respect to the PowerPoint, Your Honor.

6            **THE COURT:**  All right.

7            **MR. KRAVETZ:**  Mr. DeRita, if you could put up that

8    same Page 5, please.

9            Your Honor, the second opinion that Dr. Attari

10   purports to give is that it was reasonable for FHFA to

11   conclude that a substantial periodic commitment fee would be

12   set.

13           **THE COURT:**  Right.

14           **MR. KRAVETZ:**  The Court, in your prior decision,

15   Your Honor, excluded Dr. Attari from giving the opinion that

16   the PCF should have been set at the entirety of the net

17   worth sweep, 100 percent of profits, because it was

18   essentially an ipse dixit based on inadequate foundation.

19           As you said, Your Honor, while there may not be a

20   need to cite evidence for basic financial concepts, like the

21   principle that providers of equity capital usually receive

22   the firm's profits, the Court is troubled by the lack of

23   citation or explanation for the proposition that "a market

24   participant would typically set the PCF based on the role of

25   the commitment" and a leap from that proposition to the

1    assumption that the market value of the commitment would be

2    100 percent of what is due to providers of equity capital.

3              Further, Your Honor said that Dr. Attari did not

4    claim to be relying on his expertise or experience when he

5    stated as if it were obvious how a market participant would

6    typically set the PCF or anything like it and therefore it

7    was excluded.

8              So now, while the Court has excluded the

9    quantitative opinion from Dr. Attari that he cannot testify

10   that the profits would be -- that the PCF should have been

11   set at 100 percent of the net worth sweep, defendants seek

12   to couch the opinion as giving a qualitative opinion that

13   the PCF should be, "substantial" or that a substantial

14   periodic commitment fee would be set.

15             And so it's a qualitative attempt to say, if not

16   the same thing but close to the same thing is an opinion

17   that has been excluded, and we think that's out based on the

18   rationale the Court gave to exclude the other opinion in

19   terms of the quantitative approach to setting the periodic

20   commitment fee under Rule 702.

21             It's also our argument that such a conclusion

22   should be -- and out of the slide presentation under Rule

23   403.  What is substantial is an extremely vague term.  It's

24   not tethered to any actual number leaving the jury guessing

25   as to what it actually means.

1       There is nothing in the report of Dr. Attari

2   explaining what substantial means other than saying

3   substantial means the entirety of the net worth sweep would

4   be the appropriate PCF.

5       So it would be an example, once again, of trying

6   to provide through an expert unfairly prejudicial

7   information based on an opinion that's been excluded that

8   would lead to substantial juror confusion.  And for that

9   reason, we request that Dr. Attari not be allowed to refer

10  to this opinion that it was reasonable for FHFA to conclude

11  that a substantial periodic commitment fee would be set.

12      **MR. HOFFMAN:**  All right.  Any other points before

13  we go to the --

14      **MR. KRAVETZ:**  There is one more, Your Honor.  If I

15  can ask Mr. DeRita to pull up Page 47, please.

16      Your Honor, on this particular slide, Dr. Attari

17  purports to give the opinion that the reduced supply of

18  bonds resulting from the faster reduction of the retained

19  portfolio required by the Third Amendment is not the cause

20  of the change in bond yields.

21      Dr. Attari did not provide this specific opinion

22  anywhere in his report.  His opinion in his report was

23  that -- the bond -- the change in bond yields attributed to

24  the Third -- that the -- the change in bond yields could be

25  attributed to the Third Amendment.  But that was because, to

1  bond holders, it reduced the risk of default.  There was no

2  analysis or no opinion ruling out that, in actuality, the

3  yield spreads changed in response to declining bond supply

4  or increased bond demand rather than any perceived risk of

5  default.

6       **MR. HOFFMAN:**  Your Honor, I'm sorry to interrupt

7  this.  I might have a way to shortcut this if I may confer

8  with counsel briefly.

9       (Discussion off the record)

10      **MR. KRAVETZ:**  Based on -- I'll let Mr. Hoffman

11 make the representation.  It's my understanding that

12 defendants are not going to show the slide to the jury.

13 Thank you, Your Honor.

14      **THE COURT:**  All right.  Okay.

15      **MR. HOFFMAN:**  Your Honor, I'm mindful of the time

16 and mindful of the jury, so I'm trying to streamline things

17 here.

18      The PCF issue, Your Honor, is not an issue.  We

19 fully respect and understand the Court's ruling.  Dr. Attari

20 will not opine that the Third Amendment is all of the

21 earnings of the company, which is the precise opinion that

22 the Court excluded.

23      He's not going to opine that Mr. DeMarco's

24 testimony, that it could have been all earnings, was valid.

25 Nothing like that.

1          Plaintiffs' counsel showed the one conclusion

2     slide, but there's 15 or 20 slides at the end, all of which

3     are point-by-point responses to Professor Thakor's opinions

4     about the PCF.  Dr. Attari's opinion is simply that the PCF

5     would have been large, and it was larger than Professor

6     Thakor opines and that it was, therefore, reasonable to sort

7     of go into the mix of the Third Amendment discussion.

8          Just on this word "substantial" and that it's

9     ambiguous and the like, again, Your Honor, the SEC filings

10    themselves that the company put out said there can be a

11    periodic commitment fee, and we expect it could be

12    substantial.  He's not trying to put any numbers on it and

13    he's not going to opine in any way that runs afoul to the

14    Court's ruling.

15         Thank you.

16         **MR. KRAVETZ:**  Just briefly, Your Honor.

17         It's one thing to say that an SEC filing indicates

18    that the PCF would be substantial.  It's another for an

19    expert to say "It was reasonable for FHFA to conclude that a

20    substantial periodic commitment fee would be set" when

21    there's no nexus to that particular opinion.  And the Court

22    has already excluded the quantitative approach because it's

23    inadmissible ipse dixit.

24         **THE COURT:**  I agree with you.

25         All right.  We'll take a recess and see if the

1    jury is ready.  Actually, we don't need to take a recess.

2           **MR. HOFFMAN:**  Your Honor, I just want to make sure

3    I understand the Court's ruling so that I can let Dr. Attari

4    know and change the slide.  So I believe you said -- I heard

5    "I agree."

6           **THE COURT:**  That he can say what the report said

7    but not add his opinion.  In other words, you said whatever

8    the report said, but he doesn't need to add that he agrees

9    or he has his own opinion.

10          **MR. HOFFMAN:**  Okay.  So are the slides that Mr. --

11   are the slides that were shown okay if he doesn't opine that

12   it was substantial?

13          **THE COURT:**  Is the slide just quoting the report?

14          **MR. HOFFMAN:**  The slide, I believe, says that it

15   was reasonable for FHFA to conclude --

16          **THE COURT:**  I don't think he can say that.

17          **MR. HOFFMAN:**  Okay.  Okay.

18          **MR. KRAVETZ:**  Your Honor, Robert Kravetz for

19   plaintiffs.  May we have a moment to confer on the slide

20   changes?  Thank you, Your Honor.

21          (Break)

22          (Jury entered the courtroom)

23          **THE COURT:**  Good morning, ladies and gentlemen.

24   You may be seated.

25          All right.  Defendants may call your next witness.

1          **MR. HOFFMAN:**  Good morning, Your Honor, Ian

2    Hoffman on behalf of the defendants.  Defendants call

3    Dr. Mukarram Attari.

4          **DEPUTY CLERK:**  Sir, if you would remain standing

5    and please raise your right hand?

6          (Witness sworn)

7          **DEPUTY CLERK:**  Thank you.  You may be seated.  And

8    please speak clearly into the microphone.

9          **THE COURT:**  Please take your mask off while you're

10   on the witness stand.

11              **DIRECT EXAMINATION OF MUKARRAM ATTARI**

12   BY MR. HOFFMAN:

13      **Q.**   Good morning, Dr. Attari.

14      **A.**   Good morning.

15      **Q.**   Will you please introduce yourself to the members

16   of the jury?

17      **A.**   My name is Mukarram Attari.

18      **Q.**   What do you do for a living?

19      **A.**   I work as an economic consultant firm called

20   Charles River Associates.  I'm a Vice President and

21   co-leader of the finance practice at the firm.

22      **Q.**   And that firm is Charles River Associates?

23      **A.**   Yes, Charles River Associates.

24      **Q.**   That's sometimes called CRA?

25      **A.**   Yes.

1    Q.   And how long have you worked at CRA?

2    A.   It will be 20 years in January.

3    Q.   And do you do economic consulting work at CRA?

4    A.   Yes.

5    Q.   And what kind of work does that entail?

6    A.   That entails working on litigation, on regulatory

7    matters and sometimes just trying to help clients understand

8    the economics of a problem.

9    Q.   And what industries does your work focus on?

10   A.   More than half my work is in financial services,

11   so working in banking, insurance, mortgage finance, you

12   know, trading of securities and trading of various kinds of

13   products.

14   Q.   And can you describe some of your types of clients

15   that you work with?

16   A.   So the clients tend to be a variety of

17   institutions and people.  It can be employees of companies,

18   you know, where we are retained to assist the employees.  It

19   can be the companies themselves.  It can be investors in

20   companies.  And so it varies.  It can be government

21   agencies.

22   Q.   And you have worked for government agencies before

23   in your consulting capacity?

24   A.   Yes.

25   Q.   And you mentioned the financial services industry

1    as one of the industries that you work in.  Do you consider

2    Fannie Mae and Freddie Mac as part of the financial services

3    industry?

4         **A.**   Yes.

5         **Q.**   Why is that?

6         **A.**   Because they are firms that operate in, you know,

7    they have a lot to do with mortgage finance, and mortgage

8    finance is a big part of financial services.

9         **Q.**   What kind of academic degrees do you have,

10   Dr. Attari?

11        **A.**   I have a PhD in finance.  Before that, I have an

12   MBA with a specialization in finance, and I have an

13   undergraduate degree in engineering.

14        **Q.**   And where did you get your PhD in finance?

15        **A.**   At the University of Iowa in Iowa City.

16        **Q.**   And have you testified as an expert before?

17        **A.**   Yes.

18        **Q.**   On how many occasions?

19        **A.**   I've been an expert on seven occasions.  That

20   includes writing expert reports, being deposed and I've been

21   at trial once before this.

22        **Q.**   And in what areas do you consider yourself to be

23   an expert?

24        **A.**   I consider myself to be an expert in corporate

25   finance and the modeling of companies and of contracts.  And

1   securities trading and event studies, which is going to be a

2   third area that's important to this case.

3       **Q.**   Before you joined CRA, did you teach?

4       **A.**   Yes, I taught at the University of Wisconsin, and

5   I also taught while I was a PhD student at the University of

6   Iowa.

7       **Q.**   And have you published any research?

8       **A.**   Yeah.  I've published in what you see are the top

9   journals in my field and I've published in each of them.

10          **MR. HOFFMAN:**   Your Honor, at this time, defendants

11   would tender Dr. Attari as an expert in the fields of

12   corporate finance and securities markets.

13              **THE COURT:**   Any objection?

14          **MR. KRAVETZ:**   No, Your Honor, not at this time.

15              **THE COURT:**   Okay.  You may proceed.

16          **MR. HOFFMAN:**   Thank you, Your Honor.  Court's

17   indulgence.  I just need to check a slide issue here.

18   **BY MR. HOFFMAN:**

19       **Q.**   Dr. Attari, were you hired by the defendants in

20   this case to serve as an expert?

21       **A.**   Yes, I was.

22       **Q.**   Please describe at a high level the questions that

23   we, the defendants, asked you to answer.

24          **MR. HOFFMAN:**   And you can go to the next slide,

25   Mr. Salazar.

1    **THE WITNESS:**  There were three main parts to the

2    assignment.  The first was to analyze the Third Amendment

3    and to opine on the reasonableness of the FHFA's agreement

4    to the Third Amendment in light of the information that was

5    available to it and the goals that FHFA had.

6         The second piece of the assignment was to look at

7    the periodic commitment fee and to consider what a

8    reasonable level for the periodic commitment fee would be.

9    **MR. KRAVETZ:**  Objection, Your Honor.

10   **THE COURT:**  Overruled.

11   BY MR. HOFFMAN:

12   **Q.**   On the periodic commitment fee, did you review the

13   opinions of Professor Thakor, plaintiffs' expert in this

14   case, pertaining to the amount of the periodic commitment

15   fee?

16   **A.**   I did.

17   **Q.**   And was that part of your -- scope of your opinion

18   is giving your response to that?

19   **A.**   Yes, it was.

20   **Q.**   And at a high level, did you agree or disagree

21   with Professor Thakor's opinions about the periodic

22   commitment fee?

23   **A.**   I disagreed.

24   **Q.**   We can get into that in more detail.

25        And backing up, you also evaluated the opinions of

1    plaintiffs' expect, Professor Dharan; is that right?

2         **A.**   Yes.

3         **Q.**   And do you agree or disagree with his opinions

4    about the reasonableness of FHFA's decision to enter into

5    the Third Amendment?

6         **A.**   I disagree.

7         **Q.**   So this sort of takes us to the third question,

8    and can you tell the jury about that?

9         **A.**   So I was also asked to review the expert reports

10   filed by Professor Dharan or Dr. Dharan, Professor Thakor

11   and Dr. Mason and to opine on those.

12        **Q.**   We will address those responses sort of in the

13   course as we go.  Is that your intention?

14        **A.**   Yes.

15        **Q.**   So let's talk a little bit at a high level about

16   your conclusions with respect to these three questions.

17            **MR. HOFFMAN:**  So we can go to the next slide,

18   Mr. Salazar.

19   **BY MR. HOFFMAN:**

20        **Q.**   What was your high-level, top-line conclusion

21   about the reasonableness of FHFA's decision to enter into

22   the Third Amendment?

23        **A.**   My high-level conclusion was that it was

24   reasonable.  And the reasons it was reasonable are laid out

25   on the slide.

1    The commitment was critical to the survival of the

2    enterprises and the ability to operate in a regular fashion.

3    And to do that, they needed to ensure that debt holders, the

4    people who lent money to the enterprises, were confident

5    about lending that money to the enterprises.

6    And mortgage-backed securities holders are people

7    who were willing to buy mortgage-backed securities.  You can

8    think of mortgage-backed securities as being what these

9    companies produce.  And you had to be comfortable in getting

10   people to buy those securities.

11   People in the marketplace had been expressing

12   concerns about what would happen once the Third Amendment

13   became capped at the end of 2012.  And the reason was that

14   they were buying these securities, mortgage-backed

15   securities, at 30 years, you know, a life of 30 years.

16   And they needed to be comfortable that the

17   companies would be around to honor the guarantees that were

18   a part of these securities that they were buying over the

19   life of the securities.  So it wasn't like, Would the

20   company be around next year or would it be around in two

21   years?  It was would it be around, you know, essentially for

22   good?  And you know so that was the environment prior to the

23   Third Amendment.

24   I also looked at whether the prices of securities

25   reacted in a way that was consistent with kind of the

1   concerns that were being expressed before the Third

2   Amendment and the kind of relief, in a sense, that was

3   expressed after the Third Amendment.  And that was all

4   consistent.

5          The prices of bonds, the long-term bonds, went up.

6   And all of this, you know, external evidence was consistent

7   with the internal evidence.  So if you looked at the

8   company's projections, internal projections, then you can

9   see that, even ignoring taxes, they were essentially barely

10  able to meet the dividends that would be due.  At some

11  point, taxes would kick in and that would be another source

12  of a problem.

13      **Q.**   Now let's talk briefly about your second

14  conclusion about the periodic commitment fee.

15          **MR. HOFFMAN:**  Mr. Salazar, you can take the slides

16  down for a moment.

17  **BY MR. HOFFMAN:**

18      **Q.**   When you analyzed Professor Thakor's opinions

19  about the PCF, can you explain at a high level why you

20  disagreed with Professor Thakor's conclusions about the PCF?

21      **A.**   So my understanding is that Professor Thakor has

22  two opinions about the PCF.  One is that it is zero.  And

23  that kind of just doesn't make economic sense to me and

24  doesn't seem reasonable.

25          All of the players at the time were express --

1    making statements saying that they believed the PCF would be

2    levied at some point or would be set at some point and that

3    it would be substantial.

4         **MR. KRAVETZ:**  Objection, Your Honor.  Move to

5    strike.

6         **THE COURT:**  Overruled.

7         **THE WITNESS:**  So that, on the face of it, that

8    doesn't make -- a zero PCF doesn't make a whole lot of

9    sense.  The second piece is that the companies were

10   receiving 258 billion in equity capital.  To assume that

11   this had no value and would be available for free, that too

12   doesn't make a lot of sense.  So that was one piece of it.

13        The second piece is that Dr. Thakor calculates

14   that if a PCF was to be charged it could be $1 billion

15   roughly, give or take.  $1 billion is not even 1 percent of

16   $250 billion.  Remember this was not a loan.  This was an

17   equity investment.

18        So it's like saying that people would be willing

19   to invest equity in companies that had no other capital for

20   less than 1 percent a year.  It just doesn't make sense.

21        **MR. HOFFMAN:**  Thank you, Dr. Attari.

22        Mr. Salazar, we can put the slides back up?

23   **BY MR. HOFFMAN:**

24        **Q.**   Before we get into sort of the meat of your

25   opinion, Dr. Attari, I think it would be helpful for the

1    jury to understand a little bit about the economic context

2    that you analyzed.  The jury has heard a lot about how

3    Fannie Mae and Freddie Mac work.  So I don't think you have

4    any intentions of rehashing that here.

5            But for the purpose of providing context for your

6    opinions, can you briefly describe the different types of

7    investors in Fannie Mae and Freddie Mac?

8            **MR. HOFFMAN:**  You can go to the next slide,

9    Mr. Salazar.

10           **THE WITNESS:**  So there are four different groups

11   of investors, broadly, in Fannie Mae and Freddie Mac.  One

12   group, and this is -- I referred earlier to the

13   mortgage-backed securities as being the product that Fannie

14   Mae and Freddie Mac makes.  Right?

15           So there's investors in the mortgage-backed

16   securities and that's one set of investors.  And this is a

17   large amount.  I mean, across the two companies in 2012

18   there were 5 trillion roughly of mortgage-backed securities

19   outstanding.  So these are investors that invest and hold a

20   large amount of securities across these companies.  Right?

21           What you have here is that the companies buy up

22   mortgages.  They put them in pools and then they put on a

23   guarantee.  And the guarantee says that, if the underlying

24   borrower on the mortgage cannot pay, Fannie Mae and Freddie

25   Mac will step in, in their place and pay off the loan.  And

1   as you can imagine, just like buying insurance.  Right?

2        So one of the things that's critical in buying

3   insurance is to make -- to have a high level of confidence

4   that the insurance company will actually be around to make

5   payments if the need arises.  And this is not like, you

6   know, like we buy car insurance or home insurance that might

7   cover six months or a year at a time and you could switch.

8   This is, basically, insurance that you're buying for 30

9   years.  So --

10  **BY MR. HOFFMAN:**

11       **Q.**   Go ahead.  I'm sorry.

12       **A.**   So confidence is kind of critical to these

13  investors.

14       **Q.**   So you mention that Fannie Mae and Freddie Mac

15  would step in at certain times with the MBS holders.  Is

16  that in reference to the guarantee?

17       **A.**   Yes.

18       **Q.**   And can you describe for the jury just a little

19  bit more as to how that guarantee works for the MBS holders?

20       **A.**   So the way it works is that, if a mortgage

21  holder -- if a mortgage borrower stops making payments on

22  the mortgage or does not make full payments on the mortgage,

23  Fannie Mae and Freddie Mac will step in and make those

24  payments.

25       **Q.**   And that's the insurance kind of analogy you were

1    drawing?

2         **A.**    Yes.

3         **Q.**    So what --

4         **A.**    The mortgage-backed security holders don't have to

5    worry about the ultimate mortgage borrower.  They kind of

6    basically just have to worry about whether Fannie Mae or

7    Freddie Mac will be around.

8         **Q.**    Will be around is that what you said?

9         **A.**    Will be around to make good on those guarantees.

10        **Q.**    Just so I can hear you, Dr. Attari, if you could

11   just maybe scooch a little closer to the microphone, I'd

12   greatly appreciate it.

13        **A.**    Sorry.

14        **Q.**    That's okay.  What are the next type of investors

15   in Fannie Mae and Freddie Mac?

16        **A.**    So the next type of bond holders -- and these are

17   where Fannie Mae and Freddie Mac borrow money to help them

18   operate or to fund the assets that they have on their

19   balance sheets.

20             Some of these are kind of mortgages that people

21   have stopped paying on and Fannie Mae and Freddie Mac have

22   kind of bought the mortgage out and are trying to resolve

23   the situation with the borrower.  And some are -- where they

24   bought the mortgages but haven't issued kind of the

25   securities and some of just other securities that Fannie Mae

1    and Freddie Mac hold.

2            Now, these bond holders are lending to Fannie Mae

3    and Freddie Mac.  They aren't lending against a specific set

4    of assets.  So you're kind of -- for these people, you have

5    to have general confidence in Fannie Mae and Freddie Mac's

6    ability to, you know, make the payments on the debt, on the

7    lendings that they're making to Fannie Mae and Freddie Mac.

8       Q.   So just taking a couple steps back.  Can you just

9    explain to the members of the jury, what is a bond for those

10   who may not be immediately familiar?

11      A.   Sure.  Bond is just like a loan except that it's

12   chopped up in pieces.  It's chopped up in thousand-dollar

13   pieces and it's packaged in a way that makes it easy to

14   trade.  So it's not terribly complicated.

15      Q.   So Fannie Mae and Freddie Mac issue both

16   mortgage-backed securities and bonds; is that right?

17      A.   Yes.

18      Q.   Okay.  And at a high level, sir, what's the

19   difference between mortgage-backed securities and bonds?

20      A.   Both are debt, so people are lending money to the

21   companies.  The difference is that the mortgage-backed

22   securities have collateral, so there's all these mortgages

23   sitting out there that, you know, kind of provide comfort to

24   them.  You know, they're not going to be -- or they're not

25   at risk of being completely wiped out if Fannie Mae and

1    Freddie Mac fail, but they will take significant losses or

2    could take significant losses.

3            The bond holders, there's no specific asset

4    sitting there.  It's kind of against the general, you know,

5    pool of assets of Fannie Mae and Freddie Mac.

6       Q.   So does that mean bonds are a little bit riskier

7    than mortgage-backed securities?

8       A.   Yes, bonds are a little bit riskier than

9    mortgage-backed securities.

10      Q.   Now what is the next type of investor in Fannie

11   Mae and Freddie Mac?

12      A.   The next type is preferred shareholders and then

13   we're going to get to common shareholders.  And these are

14   investors in the company.  So they actually own a piece of

15   the company and they share in the profits of the company.

16           When the companies make profits, the preferred

17   shareholders get a share of the profits first.  And once

18   they have been paid the amount that they've been promised,

19   then the common shareholders can start getting a share of

20   the profits.

21           So that's kind of the -- you know, one -- one of

22   the distinctions between preferred and common.  The

23   preferred shareholders get fist dibs at the profits, and the

24   common only get a share of the profits after the preferred

25   have gotten their share.

1    **Q.**   So the order here, as listed on your slide, that's

2    the order of priority; is that right?

3    **A.**   Yes, it's the order of priority.

4    **Q.**   Now, there have been some references to debt and

5    equity and those terms.  Can you describe what those terms

6    mean relative to the slide here?

7    **A.**   So the top two categories of holders are debt

8    holders.  They are lenders to the company.  You know, they

9    are, essentially, making loans to the company.

10         The bottom two are investors and owners of the

11   company.  So they are what we refer to as equity in the

12   company.

13   **Q.**   And can you describe the sort of relative risk

14   profiles of these holders?

15   **A.**   Right.  So there's the bar at the left of your

16   screen.  The mortgage-backed securities holders have the

17   lowest risk and they have the lowest reward of return.  The

18   common shareholders bear the highest risk and have the

19   highest return.

20         So if the companies do very well, then they stand

21   to make a lot of money.  If the companies do very poorly,

22   they're kind of wiped out.  You know, the preferred have a

23   little bit less risk.  You know, they only get wiped out if

24   the common get wiped out, for example.  But they trade off

25   some of the returns.  So they earn a lower return than the

1  common.

2      **Q.**   And if, in general, if a company goes bankrupt,

3  who gets paid first out of the proceeds of what's left over

4  in the company?

5      **A.**   So the debt holders get paid first.  In a company

6  like Fannie Mae and Freddie Mac, it is more complicated

7  because the mortgage-backed securities actually sit in these

8  little tiny -- you know, little companies on the side.

9          And that would create complications in terms of

10  how they get paid.  But regardless of that, the

11  mortgage-backed securities and bond holders would get paid

12  before the preferred and common shareholders.

13      **Q.**   And if there's not enough money left over,

14  generally speaking, after a bankruptcy, if there's not

15  enough money left over after the debt holders here are paid,

16  what happens to the equity?

17      **A.**   The equity holders don't get anything.

18          It's pretty common that the debt holders don't

19  get, you know, all of the money that's due to them.  I mean,

20  that normally is what happens in bankruptcy.

21      **Q.**   Now, the jury has heard references in this case to

22  the term market confidence and market confidence in Fannie

23  Mae and Freddie Mac.

24          In your expert opinion, what do you understand

25  market confidence in this context with Fannie and Freddie to

1  be referring to?

2       **A.**   It's the confidence of the MBS holders and the

3  bond holders and confidence in kind of the enterprises'

4  ability to service those debts.

5       **Q.**   When you say "service those debts" -- well, first

6  of all, MBS and bond holders, is that the first two

7  categories on your slide?

8       **A.**   Yes, the top two categories.

9       **Q.**   When you say confidence that Fannie and Freddie

10  will be able to service those debts, what do you mean by

11  that?

12       **A.**   So they'll be able to make interest payments when

13  they are due.  They'll be able to make principle payments

14  when the principle comes due.  Basically that.

15       **Q.**   So for MBS, confidence that, if the underlying

16  mortgages default, confidence that Fannie Mae and Freddie

17  Mac's guarantee will kick in; is that right?

18       **A.**   Yes.  That if the underlying mortgage borrowers

19  default, then Fannie Mae and Freddie Mac will step in and

20  make the investors whole.  That's what investors kind of

21  need to be confident about.

22       **Q.**   And when you say -- when you say here, "Fully pay

23  and not default on their debts with respect to the bonds,"

24  is it fair to say that's just whether those small loans will

25  get repaid?

1    **A.**    Yes.

2    **Q.**    For bonds, Fannie Mae and Freddie Mac are the

3    borrower; is that right?

4    **A.**    Yes.  For bonds, Fannie Mae and Freddie Mac are

5    the borrower.  For the mortgage-backed securities, it is

6    whether they'll perform on the guarantees, that, you know,

7    if there are losses, they'll step in and make the -- cover

8    those losses.

9    **Q.**    Now, in your opinion, Dr. Attari, why is it

10   important for the mortgage-backed securities holders and

11   those bond holders to have confidence in Fannie Mae and

12   Freddie Mac?  Why is that important?

13   **A.**    Because if they don't have confidence, they'll

14   stop buying new mortgage-backed securities and bonds that

15   Fannie Mae and Freddie Mac are trying to issue.

16   And the prices of existing bonds will start to

17   fall and mortgage-backed securities will start to fall

18   because investors will start to get concerned about whether

19   they'll get paid.  And so, you know, they'll basically, you

20   know, start to demand higher and higher returns.

21   **Q.**    So if the demand for mortgage-backed securities

22   starts to go down or the investors demand more money in

23   light of this lack of confidence, what effect does that have

24   on Fannie and Freddie?

25   **A.**    Well, so it has an effect on Fannie and Freddie in

1   various ways.  One is that it makes it more expensive for

2   Fannie and Freddie to issue these securities which means

3   there's less -- you know, less of the profit -- there's less

4   opportunity for profit for Fannie and Freddie.  Their

5   profits will go down.

6          Two is kind of it will spill over into the -- it

7   could spill over into the mortgage market itself because

8   now, if Fannie and Freddie are having to pay higher rates to

9   mortgage-backed securities holders, the people who are

10  getting mortgages will have to pay higher rates so that the

11  process can still work.

12      Q.   So a loss of confidence, a loss of market

13  confidence, as you've defined it here, that's bad for Fannie

14  and Freddie.  Right?

15      A.   It's bad for Fannie and Freddie.

16      Q.   Now, let's go back to the financial crisis of 2007

17  and 2008.  You understand, based on your research and

18  knowledge generally, that Fannie Mae and Freddie Mac were

19  placed into conservatorship in September of 2008?

20      A.   Yes, I do.

21      Q.   And what impact did the financial crisis have on

22  the market confidence in Fannie and Freddie's

23  mortgage-backed securities and bonds?

24      A.   Prior to them being placed into conservatorship,

25  there were market concerns about Fannie and Freddie's

1   ability to survive and to service their bonds and to, you

2   know, make good on the MBS guarantees.  So investors kind of

3   were becoming more hesitant about buying these securities.

4   And they were wanting higher rates of return.  Both of those

5   things had happened in 2008.

6       Q.   And how did that -- how did that impact Fannie Mae

7   and Freddie Mac?

8       A.   Well, they were -- their ability to operate was

9   becoming more and more limited.  And that, you know, my

10  understanding, based on the research in this case and other

11  work I've done, was the reason for the conservatorship and

12  the senior preferred stock agreements.

13      Q.   Absent the conservatorship and the preferred stock

14  purchase agreements that you just referred to, what would

15  happen to Fannie Mae and Freddie Mac?

16      A.   They would likely have gone bankrupt, just like a

17  number of firms, financial firms, went bankrupt during that

18  period.

19      Q.   How would that have been related to this mortgage

20  confidence issue?

21      A.   Well, that would tell you that the market -- the

22  market was losing confidence and it had been right to lose

23  confidence.

24      Q.   So Fannie Mae and Freddie Mac were losing money in

25  the lead up to the conservatorship; is that right?

1    A.    Yes.

2    Q.    And what were some of the ways in which they

3    were -- why were they losing money?

4    A.    So they were losing money for a variety of

5    different ways.  The mortgages that they guarantee, people

6    were defaulting on those mortgages, and Fannie Mae and

7    Freddie Mac had to step in and make those guaranteed

8    payments.

9    Q.    So I'll just pause right there.  So you made an

10   insurance company analogy earlier; is that right?

11   A.    Yes.

12   Q.    So as Fannie Mae, as the insurer of these bonds,

13   was having to essentially pay out more and more claims; is

14   that right?

15   A.    Yes.

16   Q.    Okay.  You can proceed with your answer.  I'm

17   sorry.

18   A.    So that was one.  Two was Fannie Mae and Freddie

19   Mac used to buy and hold mortgages on their own, you know --

20   for their own benefit.  And they were increasing losses on

21   those mortgages.  And there, you know, it was not like they

22   had to pay someone out.  It was just they were having to

23   absorb those losses.

24         And three was they were buying and holding

25   mortgage-backed securities issued by other, you know,

1    issuers, and they were losing money on those mortgage-backed

2    securities as their prices went down.

3         Q.   Now, before the conservatorship, didn't Fannie Mae

4    and Freddie Mac, didn't they have a lot of capital built up,

5    equity capital, that would have helped weather those losses?

6         A.   Over time, they did have a lot of equity capital

7    built up that would help them weather the losses, but it was

8    insufficient.  It turned out to be insufficient.

9         Q.   And so what do you mean by that?  What happened to

10   that capital over time?

11        A.   That capital was depleted, and they got to a point

12   where they didn't have any capital, so they had zero

13   capital.  It was all lost because of these payments that had

14   to be made on the guarantees or because of losses they had

15   to absorb on the mortgages they owned or losses that they --

16   that resulted from, you know, other securities that they

17   owned.

18        Q.   Now, that capital that was depleted that you just

19   referenced, where did that capital come from, originally?

20        A.   That capital came from the common stockholders and

21   the junior preferred stockholders and was profits that had

22   been retained over the years.

23        Q.   So that's those the bottom two investor class on

24   your slide earlier; is that right?

25        A.   Yes.

1908

1   **Q.**   And those are the ones who had contributed at

2   least some of the capital to Fannie and Freddie.  Right?

3   **A.**   Yes.  They had contributed some of the capital and

4   then some of the profits had been returned.

5   **Q.**   And what happened to all of that capital?

6   **A.**   It was lost.  I mean, like I said, some of it had

7   went away because they had to pay out on their guarantees.

8   Some of it went away because there were losses on loans that

9   they owned.  Some of it was, you know, there were losses on

10  securities that they owned.

11  **Q.**   So by the end of 2008, did Fannie Mae and Freddie

12  Mac have any capital left over that the preferred and common

13  stockholders had put in?

14  **A.**   No.

15  **Q.**   I want to change gears a little bit, Dr. Attari,

16  and talk about your --

17  **A.**   Can I just make one clarification?

18  **Q.**   Sure.

19  **A.**   So the way financial companies work, right, it's

20  you know, since we're using this insurance analogy, right,

21  if I'm insuring houses, say I'm ensuring houses in

22  California where I live, as -- depending on kind of the fire

23  season that is predicted an insurance company will not

24  necessarily wait until the houses burn down to kind of put

25  aside money to pay that claim.

1    They continuously, you know, each quarter making

2    predictions of what the losses will be and setting aside

3    money to cover losses.  Because if they waited till houses

4    burned down, that would be too late.

5    So Fannie Mae and Freddie Mac, part of what they

6    do is also it's not just that, oh, I have a claim.  I need

7    to pay it.  It's they're making predictions about what the

8    claims will be on the guarantees and having to set aside

9    money for that.

10   **Q.**   So your first task in this case, the question that

11   we, the defendants, asked you to answer was the Third

12   Amendment -- was it reasonable for FHFA to enter into the

13   Third Amendment?

14   And I believe you framed it earlier as, in light

15   of the conservator's goals and in light of the information

16   at the time.  Why did you frame it in that way?  What's the

17   relevance of the conservator's goals?

18   **A.**   Let me just step back.  So in terms of any

19   decision, if you're evaluating -- if you need to evaluate

20   the reasonableness, you need to know what the objectives are

21   and you need to know what information is available.  And so

22   that's why the conservator's goals are relevant.

23   To evaluate the Third Amendment, we need to

24   recognize what the goals of the conservator were.  And the

25   goals of the conservator were to ensure stability of the

1       secondary mortgage market.

2               And the stability of the secondary mortgage market

3       was important because the goals of Fannie Mae and Freddie

4       Mac were to ensure access to mortgages for low- and

5       moderate-income Americans.

6               **MR. HOFFMAN:**  Mr. Salazar, let's jump ahead maybe

7       two slides.

8               Actually, I'm sorry, let's go back one.

9       **BY MR. HOFFMAN:**

10      **Q.**   So, Dr. Attari, in doing all of your research for

11      this case, did you come to an understanding of what the

12      goals of the conservatorship were?

13      **A.**   Yes.

14      **Q.**   And what was that understanding based on?

15      **A.**   It was based on the documents like the one that

16      you have up here.

17              **MR. HOFFMAN:**  And, Mr. Salazar, I think you can

18      advance to the next -- there we go.

19      **BY MR. HOFFMAN:**

20      **Q.**   So what are we looking at here and how did this

21      inform your opinion as to what the goals of the

22      conservatorship were?

23      **A.**   So the top call-out basically is a Q and A that

24      was put out by FHFA at the time of the conservatorship.  And

25      it kind of is meant to tell the public what is being done

1   and so on, in that the -- one of the questions is, What are

2   the goals of the conservatorship.

3       Q.   And the goals here reference "To help restore

4   confidence in the company."  What do you understand that to

5   mean in your experience?

6       A.   Well, to help restore confidence in the company,

7   in this context is basically to help the company operate, to

8   be able to, you know, create and sell those mortgage-backed

9   securities, to be able to, you know, buy up mortgages in the

10  secondary mortgage market so there's, you know, more money

11  available for new mortgages and so on.

12      Q.   And is this goal of the conservatorship related to

13  that market confidence issue we talked about earlier?

14      A.   That is my understanding.  Because it talks about

15  "enhance its capacity to fulfill its mission and mitigate

16  systemic risk that has contributed directly to the

17  instability in the current market."  So it's about all of

18  the issues we've been discussing.

19      Q.   Talking about shoring up confidence in the MBS and

20  bond holders.  Right?

21      A.   Yes.

22      Q.   Now, in your opinion and your experience, was one

23  of the goals of the conservatorship to maximize shareholder

24  profits?

25      A.   No, it wasn't.

1       **Q.**   What led you to the conclusion that it was not one

2   of the goals?

3       **A.**   So the bottom call-out is from the Freddie Mac

4   annual report for 2008.  It's called a 10-K.  And if you

5   look at that, in there, there's an explicit statement that

6   says that they are no longer managed with a strategy to

7   maximize common stockholder returns.  There are similar

8   statements in other filings also.

9       **Q.**   And the market confidence issue that we've heard

10   so much about, that's in reference to confidence of the MBS

11   and bond holders?

12       **A.**   Yes.

13       **Q.**   Not confidence in the junior preferred and common

14   shareholders?

15       **A.**   Correct.

16       **Q.**   So let's go to the next slide here.

17       So now we've talked about the goals of the

18   conservatorship.  What about the role and the goals of the

19   Treasury commitment?  First of all, just to make sure we're

20   all on the same page.

21       What do you understand the Treasury commitment to

22   mean?  Are you familiar with that?

23       **A.**   Yes.  So in 2008, the Treasury made a commitment

24   to invest up to $100 billion, so 100 billion in each of

25   Fannie Mae and Freddie Mac.  And the investments would be

1   made when the -- you know, when the liabilities of the

2   companies exceeded their assets or they were on the border.

3   So the investments would be made to bring the assets and

4   liabilities back to the same level so they are at zero

5   capital.

6          And then subsequently, the commitment was raised

7   to 200 billion and kind of an unlimited amount.  And the

8   objective was -- the stated objective was to help these

9   companies maintain confidence and continue to operate.

10     **Q.**   So, Dr. Attari, can you explain, in your expert

11  opinion, what the importance of the Treasury commitment was?

12          **MR. HOFFMAN:**  If we can go to the next slide?

13          **THE WITNESS:**  Well, without the Treasury

14  commitment, these companies would not have been able to

15  continue to operate.  So, you know, that's the way I think

16  about the importance of the Treasury commitment.

17          That Treasury was making a commitment to ensure

18  that these companies could operate and the way it was doing

19  so was to, you know, provide confidence to the

20  mortgage-backed security holders and bond holders that they

21  would be paid.

22  **BY MR. HOFFMAN:**

23     **Q.**   So in your slide here, you've inserted "Treasury

24  commitment" into this investor lineup.  Can you explain why

25  they're placed where they are?

1    **A.**   Well, that is where they sat in -- you know, they

2    sat in the stack that we have.

3    **Q.**   So I think the jury has heard a lot about how the

4    Treasury commitment and the PSPAs work.  But in relationship

5    to the debt holders here, the MBS holders and the bond

6    holders, how did the Treasury commitment ensure that they

7    had confidence in their investments?

8    **A.**   Well, I'd just like to apologize for a typo.  It

9    says "bold holders".

10   **Q.**   Bold bond holders, that's okay?

11   **A.**   So the Treasury commitment came in below the MBS

12   and the bond, and so it sat below that and provided

13   confidence, the two levels up or above it, that they would

14   get paid.  There would be money there to pay them, you know,

15   whatever was due as it came due.

16   **Q.**   Now, if mortgage-backed securities holders, after

17   the Third Amendment -- I'm sorry.  Strike that.  After the

18   PSPAs were put in place, if mortgage-backed securities

19   holders, if there were defaults on the mortgage and Fannie

20   Mae and Freddie Mac had to step in and pay their guarantee,

21   what role did the Treasury commitment have?  Did it help

22   Fannie Mae and Freddie Mac do that?

23   **A.**   Yes.  Because they could draw on the Treasury

24   commitment and use that money to pay on the guarantees.

25   **Q.**   Now, you understand between 2009 and 2012 the

1    Treasury commitment was unlimited; is that right?

2         **A.**    Yes.

3         **Q.**    So in that time period, were the MBS holders and

4    bond holders -- not bold holders -- were the MBS holders and

5    bond holders, were their assets essentially guaranteed?

6         **A.**    Yes, from 2010 to 2012.

7         **Q.**    So does that mean that, from 2010 to 2012, no

8    matter what happened, those two investor classes were going

9    to get 100 cents on the dollar; is that right?

10        **A.**    Yes.

11        **Q.**    Now, let's talk about the Third Amendment to the

12   preferred stock purchase agreements.  Based on your research

13   in this case and your review of documents and testimony,

14   what do you understand about the primary purpose of the

15   Third Amendment to be?

16        **A.**    So at the end of 2012, the Treasury commitment was

17   to be capped.  It was to be fixed based on a formula.  And

18   the -- you know, it was estimated that it would be about 125

19   billion left for Fannie Mae and about 150 billion left for

20   Freddie Mac.  Those are large numbers.

21             But, again, these are companies that have -- you

22   know, about 3 trillion in borrowings for Fannie Mae and 2

23   trillion in borrowings for Freddie Mac.  While they are

24   large numbers, we are talking about, you know, numbers that

25   are even larger.

1    So those debt holders, people who had lent money

2    to Fannie Mae and Freddie Mac, and the holders of the

3    mortgage-backed securities, they were beginning to express

4    concern about whether these remaining amounts in the

5    commitment would be sufficient.

6    One of the causes of concern was that the Fannie

7    Mae and Freddie Mac had to make dividend payments on the

8    amounts that had been drawn under the Treasury commitment.

9    And these dividend payments would eat up about 12 billion a

10   year for Fannie Mae and about 7 a year for Freddie Mac.  So

11   they weren't insignificant amounts.

12   And the investors generally, kind of -- you know,

13   when they're faced with this type of thing, they're

14   thinking, analyzing the situation.  And a number of them,

15   based on their analysis, did not think that Fannie Mae and

16   Freddie Mac would be able to earn 7 and 12 billion a year

17   going forward.

18   So what they were concerned about was a steady

19   situation where, year after year, quarter after quarter,

20   Fannie Mae and Freddie Mac would have to draw on the

21   commitment to pay the dividend on the senior preferred

22   stock.  And that would, you know, slowly spiral to a

23   situation where the commitment was used up.

24   **Q.**   So, Dr. Attari, before -- I'll say, during 2012

25   and before the Third Amendment, the Treasury commitment was

1       unlimited as we just discussed.  Right?

2            **A.**   Yes.

3            **Q.**   And in that timeframe, the MBS and bond holders

4       here would get 100 cents on the dollar, no matter what; is

5       that right?

6            **A.**   Correct.

7            **Q.**   Now, after 2012, the amount of the Treasury

8       commitment was going to become capped.  Right?

9            **A.**   Yes.

10           **Q.**   And if the Treasury commitment that was capped was

11      being eroded down, there's a -- there was a possibility that

12      the MBS and bond holders were not going to get 100 cents on

13      their dollar?

14           **A.**   Yes, particularly if it got eroded down and then

15      you had a downturn where there were large losses on

16      mortgages.

17           **Q.**   And you identified investor and market concerns.

18      As part of your analysis and your expert opinion in this

19      case, did you consider any market analyst reports that

20      reflected those kinds of concerns?

21           **A.**   Yes.  So one of the standard types of analysis

22      that experts in my field do is to review analyst reports,

23      you know, at the time of the events that we are trying to

24      study.

25                   And the reason we do that is that these are

1    professionals that follow the markets and, you know, are

2    informed about them and, because they're continuously

3    following the markets, they are often highly sophisticated

4    about the market that they're following.

5         And they're actually writing things down.  So it's

6    not like we need to, you know, ask someone, what were you

7    thinking 10 years ago on August 1st?  It's -- you can

8    actually see what the person was thinking because they wrote

9    it down and they published it.  So that is why these kind of

10   reports are commonly and widely used in the type of work I

11   do.

12        **Q.**   Back to this case, can you just explain, why did

13   you consider market analyst reports and how did you go about

14   finding relevant analyst reports?

15        **A.**   So there are subscription services that collect

16   and make available analyst reports.  We, as a firm, have

17   access to or have a subscription to one of these services.

18        And I had the team working with me pull down all

19   of the reports that they could find for Fannie Mae and

20   Freddie Mac over a period of time.  I think we looked

21   broadly initially.

22        **Q.**   Why look at market analyst reports at all in

23   connection with opining about the reasonableness of FHFA's

24   decision to enter into the Third Amendment?

25        **A.**   Well, because if -- I mean, like I mentioned, this

1    is about market confidence.  If the market was confident and

2    this was not an issue, we would have expected not to find

3    this particular thing mentioned or it would have been

4    mentioned in passing.  And, you know, Ah, there is this

5    happening but, you know, it really has no implications or

6    nothing to worry about.

7            What I saw instead were people kind of noting the

8    December 31st, you know, the commitment was to be capped on

9    December 31st and it went back in time.  I mean, the --

10   people started noting this fairly early on.  And as, you

11   know, we progressed through time, more and more people noted

12   this.

13           And they seemed to have the same kind of thinking,

14   which is that it was going to be capped.  The 10 percent

15   dividend was going to exceed the profits of the firms and

16   result in circular draws.  The circular draws would erode

17   the commitment, and that poses a risk to mortgage-backed

18   security holders and bond investors.

19   **Q.**   So does your slide deck, Dr. Attari, show some

20   examples of these market analyst reports that you looked at?

21   **A.**   Yes.

22   **Q.**   And I'd like to have you show the jury some of

23   these examples but just, off the top, does this presentation

24   include all of the market analyst reports that you looked

25   at?

1      **A.**   No, it does not.  My report includes a much

2  more -- a much broader set.

3           **MR. HOFFMAN:**  So let's go to the next slide.

4  **BY MR. HOFFMAN:**

5      **Q.**   And this is a snapshot here of Defendants'

6  Exhibit' Exhibit 412 which is in evidence.  And what is this

7  Deutsche Bank report that we're looking at?  Can you just

8  describe what it is?

9      **A.**   Sure.  So Deutsche Bank is a large German bank

10  that helps Fannie Mae and Freddie Mac sell bonds and

11  mortgage-backed securities to investors.  As part of that

12  process, they kind of put out analyst reports.

13           So they are people who research these markets.

14  They're talking to investors kind of, you know.  From

15  investors, they get questions.  And then some of these

16  questions, they actually might find, might be interesting to

17  a broader group of investors or they might think they are

18  more interesting.  Anyway, so they write-up, kind of, the

19  findings of their research on those.

20           And so this is a Deutsche Bank report from March

21  14, 2012, and in particular, it's on mortgage-backed

22  securities and securitized products.

23      **Q.**   Dr. Attari, I don't want to cut you off, but let's

24  go ahead and go to the document itself.  I think it will

25  just be easier for the jury to understand what you are

1    talking about.

2            **MR. HOFFMAN:**  Let's go to 412 and Page 5 of 8.

3    Mr. Salazar, if you could just zoom in on the very first

4    sentence of this Deutsche Bank analyst report, refers to

5    December 31st.

6    **BY MR. HOFFMAN:**

7        **Q.**    Dr. Attari, it says "December 31st of this year

8    marks the scheduled end to the unlimited U.S. Treasury

9    support for Fannie Mae and Freddie Mac."  Do you see that?

10       **A.**    Yes.

11       **Q.**    What do you understand that to be referring to?

12       **A.**    This is the cap that was to go into effect on

13   December 31st, 2012.

14       **Q.**    If we look down to the bottom of this first

15   paragraph where it starts with "both Fannie Mae and Freddie

16   Mac have subsequently said that the need to pay dividends to

17   Treasury creates significant uncertainty about our long-term

18   financial sustainability."  Do you see that?

19       **A.**    Yes.

20       **Q.**    And then the very last sentence, which is the

21   words of the Deutsche Bank article, "That uncertainty puts

22   both their MBS and debt at risk."  What do you understand

23   that last sentence to mean?

24       **A.**    Well, this is the concern that investors had --

25   investors and market participants had, that the commitment

1   would be capped, the companies would not generate enough

2   profit to, you know, to pay the dividend.

3         That would cause the commitment to be eroded and,

4   you know, that's a risk for people that are investing in

5   mortgage-backed securities and bonds.  The word "debt" kind

6   of is a reference to the other bonds.

7         **MR. HOFFMAN:**  Let's go to Page 6 of 8,

8   Mr. Salazar.  Let's focus in on the second figure that's in

9   the middle of the page.

10   **BY MR. HOFFMAN:**

11       **Q.**   And you've reviewed this before.  Right,

12   Dr. Attari?

13       **A.**   Yes.

14       **Q.**   Can you explain to the jury what Deutsche Bank is

15   projecting here?

16       **A.**   So Deutsche Bank is projecting that, based on

17   different assumptions that the Freddie Mac commitment runs

18   out, in their estimation, by 2037.

19       **Q.**   That the Treasury commitment would totally run

20   out?

21       **A.**   Totally run out.  And for Fannie Mae, if you look

22   at the figure, it's earlier.

23         **MR. HOFFMAN:**  Okay.  So let's back out real quick

24   just so the jury understands.

25

1    **BY MR. HOFFMAN:**

2        **Q.**    So this is the smaller chart up top?

3        **A.**    Yes.

4        **Q.**    So Deutsche Bank is predicting that Fannie Mae

5    would run out of the Treasury commitment sooner?

6        **A.**    Yeah, it's in the mid 2020s.

7            **MR. HOFFMAN:**  Now let's go to Page 7 of 8,

8    Mr. Salazar.  And under market implications, just highlight

9    that market implications in the first sentence.

10   **BY MR. HOFFMAN:**

11       **Q.**    So here, Dr. Attari, it says "for MBS

12   investors" -- that's that first investor class that was at

13   the top of the stack; is that right?

14       **A.**    Yes.

15       **Q.**    -- "diminishing Treasury support raises a risk

16   that the agencies one day might face challenges covering MBS

17   losses."

18            What do you understand agencies to be referring to

19   there?

20       **A.**    This is Fannie Mae and Freddie Mac.  They're

21   referred to as government-sponsored entities or agencies in

22   the marketplace.

23       **Q.**    Where it says here "They might face challenges in

24   covering MBS losses," am I right that that's the guarantee?

25   They might have trouble actually making their guarantee and

1    paying the MBS holders?

2        **A.**   Yes.

3            **MR. HOFFMAN:**   And if we go to the past page, Page

4    8 of 8, Mr. Salazar, right above the view in rates, that

5    paragraph, it starts with "nevertheless," if you could

6    highlight that.

7    **BY MR. HOFFMAN:**

8        **Q.**   And towards the bottom here, it says "look for

9    Treasury".   So let's highlight that sentence.   "Look for

10   Treasury and the agencies" -- and, again, that's Fannie Mae

11   and Freddie Mac?

12       **A.**   Yes.

13       **Q.**   So "look for Treasury and Fannie Mae and Freddie

14   Mac to restructure the PSPA dividend after the November

15   elections, and for spreads and liquidity to improve

16   sharply."   Do you see that?

17       **A.**   Yes.

18       **Q.**   What do you understand this sentence to be saying?

19       **A.**   They are predicting that the PSPAs, the amendment

20   would happen after the elections and that, once that

21   happened, the bonds would become easier to trade because

22   then, you know, maybe some -- they think certain investors

23   are sitting out during this period and that the prices of

24   the bonds will go up.

25            So spreads is a reference to price.   And we'll

1    talk about this in a few minutes.

2         Q.   Right.  So bond prices for Fannie Mae and Freddie

3    Mac will improve.  That's what they are predicting?

4         A.   They will go up, yes.

5         Q.   And Deutsche Bank is predicting that they will

6    improve in response to an amendment to the PSPAs?

7         A.   Yes.

8         Q.   Now this was in March of 2012.  Right?

9         A.   Yes.

10        Q.   And Deutsche Bank is predicting that the PSPAs

11   will be amended to fix this circular dividend erosion issue?

12        A.   Correct.

13        Q.   Was Deutsche Bank right that the amendment

14   happened after the November elections?

15        A.   No.

16        Q.   It happened before.  Right?

17        A.   Yes.

18             MR. HOFFMAN:  You can take that down, Mr. Salazar.

19   Let's take a look at one more of these analyst reports

20   before the Third Amendment was executed.

21   BY MR. HOFFMAN:

22        Q.   So let's actually just go right to the document

23   itself.  I think that's even easier to understand.  So this

24   is Defendants' Exhibit 529 which is in evidence.

25        A.   Okay.

1    Q.   Let's go to the second page.  Zoom in a little bit

2    so we can capture the top portion of this.  My apologies

3    that the copy here is a copy of a copy so it's getting a

4    little bit grainy.

5         What is Moody's Investors Service or what is

6    Moody's, Dr. Attari?

7    A.   So Moody's is a credit-creating agency.  They're

8    one of three credit-creating agencies that provide ratings

9    to bonds.  So just like we get credit scores, bonds issued

10   by companies get credit ratings.

11   Q.   And -- oh, go ahead.  I'm sorry.

12   A.   While the three -- typically, you need two ratings

13   on any given bond issue, so it's not like you pick one --

14   one of the three that's best for you.

15   Q.   And how would you describe in your experience

16   Moody's significance as a player in the financial markets?

17   A.   Well, if any of the credit rating agencies,

18   Moody's, Standard and Poor's or Fitch, if they reduce your

19   rating, that's not good for you as a company.

20   Q.   And what was the date of this report by Moody's?

21   A.   This was August 13th, 2012.  So this was after

22   Fannie Mae and Freddie Mac had released their second quarter

23   earnings and before the Third Amendment.  So there was like

24   a week period.  This is bang in the middle of that week.

25   Q.   So let's look at the -- the headline here is

1  "Fannie Mae's and Freddie Mac's return to profitability is

2  fleeting."  Do you see that?

3      **A.**   Uh-huh.

4      **Q.**   And do you understand, the "return to

5  profitability" here is talking about the recent second

6  quarter reports that had just been issued by the companies?

7      **A.**   Yes.

8      **MR. HOFFMAN:**  So let's take a look at the second

9  paragraph there.  It says "Improving housing values."  Let's

10  zoom in on that.

11  **BY MR. HOFFMAN:**

12      **Q.**   It says, "Improving housing values will reduce

13  credit losses" in Fannie Mae and Freddie Mac's mortgage

14  portfolios.  And then will say, "However, once the benefit

15  of reserve release runs its course, we believe the

16  government-sponsored enterprises' ultimate path remains

17  unchanged:  They will deplete their capital bases because

18  the dividends they'll be paying on their preferred

19  securities will be greater than their earnings."  Do you see

20  that?

21      **A.**   Yes.

22      **Q.**   What do you understand Moody's to be saying here?

23      **A.**   This was, again, what we were talking about, which

24  is that they will not consistently be able to earn more than

25  the dividend.  They'll have to make draws on the commitment.

1    And over time, the commitment will be depleted.

2           Now, one thing that is -- or a couple of things I

3    think that are interesting about this one, one is it's after

4    the second quarter earnings, while the other one was before

5    the second quarter earnings.

6           The other is that companies talk to credit rating

7    agencies much more than they talk to outside analysts.  So

8    they provide information to both sets of bodies but, with

9    credit rating agencies, they actually provide much more

10   information because credit ratings are so important.

11       **Q.**   Now --

12       **MR. HOFFMAN:**  You can go back to Dr. Attari's

13   presentation.

14   **BY MR. HOFFMAN:**

15       **Q.**   Now, we've looked at two examples so far, market

16   analyst reports, talking about these issues before the Third

17   Amendment was executed.  Were there more that you considered

18   than just those two?

19       **A.**   Yes.

20       **Q.**   And were those other reports you looked at

21   consistent or inconsistent with these two?

22       **A.**   They were consistent.

23       **Q.**   Now, did you also look at market analyst reports

24   that were published following the Third Amendment's

25   announcement?

1    **A.**    Yes, I did.

2    **Q.**    And why did you look at those?

3    **A.**    Well, I wanted to see what the reaction was to the

4    Third Amendment, whether analysts viewed it as solving the

5    problem on the concern that they had raised.  Yeah.  So that

6    was the primary purpose.

7         **MR. HOFFMAN:**  Let's go to the next slide.

8    **BY MR. HOFFMAN:**

9    **Q.**    And what did you find?  What were your findings

10   based on that review of analyst reports that were issued

11   after the Third Amendment was announced?

12   **A.**    So it was that the problem of, you know, the risk

13   that the companies' earnings would be lower than the

14   dividends and that would, you know, over time, cause the

15   commitment to be eroded and depleted had been eliminated.

16   That was, bottom line, the view of the analysts.

17        So they noted that, you know, they noted what the

18   Third Amendment was because part of this is just informing

19   people about, you know, announcements by companies and

20   information.  So they noted that, under the Third Amendment,

21   the dividend would equal the profits.

22        Because of that, the problem of circular draws was

23   eliminated and the risk of the commitment being depleted due

24   to circular draws was eliminated, and that this was a --

25   this was good for the confidence of MBS and bond investors

1    and Fannie Mae and Freddie Mac.

2        **Q.**   So these post-Third Amendment reports, in general,

3    reported that it was good for those MBS investors and the

4    bond investors.  They were at the top two in the stack?

5        **A.**   Yes.

6            **MR. HOFFMAN:**  So let's go to the next slide --

7            **THE COURT:**  Let's take our morning recess.  We

8    will take ten minutes.

9            **MR. HOFFMAN:**  Okay.  Thank you, Your Honor.

10       (Break)

11       (Jury exited the courtroom)

12           **MR. HOFFMAN:**  Your Honor, may I remind the witness

13   to scooch forward a little bit as best he can and lean into

14   the microphone?  I tried to go and scooch his chair forward,

15   but the chair is fixed.  And then I tried to scooch the

16   microphone forward and the microphone is fixed.  So just

17   lean forward as best as you can, Dr. Attari.

18               Thank you, Your Honor.

19           **THE COURT:**  You all may be seated.

20       (Jury entered the courtroom)

21           **THE COURT:**  Mr. Hoffman, you may proceed.

22           **MR. HOFFMAN:**  Thank you, Your Honor.  If we could

23   get Dr. Attari's slides back up on the screen.

24   **BY MR. HOFFMAN:**

25       **Q.**   Just to reorient us, Dr. Attari, we're talking

1    about your findings based on your review of the post-Third

2    Amendment, that is, the analyst reports issued after the

3    announcement of the Third Amendment.  Right?

4         **A.**   Yes.

5         **Q.**   Let's take a look at some of those examples.  If

6    we can go to the next slide, is this one of the analyst

7    reports you looked at?

8         **A.**   Yes.

9         **Q.**   This is from Barclay's, and that's a financial

10   institution that also does market analysis; is that right?

11        **A.**   Yes, it helps -- it's another big financial

12   institution.  This one, I think is based in London.  They

13   took over the remains of Lehman Brothers when it collapsed

14   in September of 2008.  And they too helped Fannie Mae and

15   Freddie Mac sell securities to investors.

16        **Q.**   And this card, it's a little bit small, but this

17   is a report that was issued after the Third Amendment.

18   Right?

19        **A.**   Yes.

20             **MR. HOFFMAN:**  Let's go to the next iteration here.

21   **BY MR. HOFFMAN:**

22        **Q.**   This is just a snippet of this document.  It says,

23   "With the change in support."  I'm just pausing there.

24   Based on your review of this document, do you understand the

25   "change in support" to be referencing the Third Amendment

1  Third Amendment?

2      **A.**   Yes.

3      **Q.**   It says, "With the change in support, we see

4  virtually no chance of the post-YE12" -- and that means

5  year-end '12, 2012?

6      **A.**   Yes.

7      **Q.**   "We see virtually no chance of the post-year-end

8  2012 capital supports being exhausted over a multi-decade

9  period."  What do you understand that to mean?

10     **A.**   Basically, the risk of erosion that we were

11  talking about because of circular draws is kind of

12  eliminated.  So, you know, they see that this as really

13  solving the problem for decades.

14     **Q.**   In the next highlighted line, it says, "In our

15  view, this puts to rest any worries about GSE credit risk

16  even in intermediate/longer maturities."  Do you see that?

17     **A.**   Yes.

18     **Q.**   And are the worries about GSE credit risk, is that

19  the market concern issue that we talked about earlier?

20     **A.**   Yes.  About whether or not the GSEs would be able

21  to pay the bond holders and the MBS on the MBS guarantees.

22     **Q.**   Let's go to the next slide in your presentation.

23  Is this another one of the analyst reports that you looked

24  at that followed the Third Amendment?

25     **A.**   Yes.

1    **Q.**   And RBC Capital Markets, that's another analyst

2    outfit?

3    **A.**   Yes.  RBC used to be Royal Bank of Canada.

4    **Q.**   This report is talking about the changes in the

5    PSPAs, which was the Third Amendment.  Right?

6    **A.**   Yes.

7    **Q.**   So here, it says "The change to payments on the

8    preferred stock stops the downward spiral toward the $200

9    billion per GSE limit on capital injections from the

10   Treasury."  Do you see that?

11   **A.**   Yes.

12   **Q.**   Do you understand RBC's reference here to the

13   downward spiral to be a reference to the circular draw

14   problem?

15   **A.**   Yes, the circular draw and the associated erosion.

16   **Q.**   And then, if we just jump to the next paragraph,

17   it says, "Under the new rules, the movement towards the $200

18   billion limit won't entirely stop, but it will be very, very

19   slow."  Do you see that?

20   **A.**   Yes.

21   **Q.**   What do you understand that to be referencing?

22   **A.**   Basically, the fact that, you know, the GSEs would

23   still have to draw on the commitment if they made losses.

24   But other than that, they won't have to draw on the

25   commitment.  If they made very small profits, that would be

1    the dividend that they would have to pay Treasury.  And if

2    they made no profits, if it was zero, then, you know, again,

3    they would not have to pay anything nor would they have to

4    draw in that situation.

5        Q.   And so do you understand RBC Capital Markets here

6    to be saying that, in the future, there might still be draws

7    on the Treasury commitment, but they would be if Fannie Mae

8    or Freddie Mac was just losing money in their ordinary

9    course of business?

10       A.   Yes.

11       Q.   As opposed to drawing down the commitment just to

12   pay the dividend?

13       A.   Correct.

14       Q.   And then the last sentence here, RBC Capital

15   Markets is saying, "Accordingly, the timeframe for either

16   GSE to hit the $200 billion limit should shift from several

17   years to something measured in decades."  What do you

18   understand that to mean?

19       A.   It tells you that, prior to the amendment, they

20   thought that the entire amount could be used up in several

21   years.  Now they don't specify what that is, but it's

22   still -- they're talking about years.  Now they're saying

23   that that risk has gone away.  We don't need to worry about

24   this for decades.

25           **MR. HOFFMAN:**  Let's go to the next slide in your

1    deck.

2    **BY MR. HOFFMAN:**

3        Q.    Is this another analyst report from Guggenheim

4    Partners that you evaluated as part of your study here?

5        A.    Yes.  I think the specific document calls it a

6    market commentary, not a research report or something like

7    that.  But it's, again, a financial, you know, an investment

8    firm and a firm that helps companies raise capital putting

9    out its take on the -- on the Third Amendment.

10        **MR. HOFFMAN:**  Let's go to actually the next slide.

11    One more.

12    **BY MR. HOFFMAN:**

13        Q.    Here, in this piece of the Guggenheim Partners'

14    commentary, this is talking about the Third Amendment.

15    Right?

16        A.    Yes.

17        Q.    And Guggenheim Partners says, "It means Fannie and

18    Freddie will be on a stronger financial footing as they will

19    not have to seek Treasury preferred just to repay Treasury."

20    Do you see that?

21        A.    Yes.

22        Q.    Here, Guggenheim is commenting that the Third

23    Amendment places Fannie and Freddie on stronger financial

24    footing?

25        A.    Correct.  And they're talking about the circular

1  draws in the second part of that sentence, that they won't

2  have to make draws to pay the preferred dividend.

3     **Q.**   And in the second highlighted portion here on your

4  slide, it says, "This should calm debt investors as the fear

5  was that Fannie and Freddie, without the earnings from the

6  ever-shrinking retained portfolios, would find making the

7  Treasury dividend payments increasingly challenging."  Do

8  you see is that?

9     **A.**   Yes.

10     **Q.**   So calm debt investors' fears, debt investors,

11  that's those top two investor classes in your earlier slide?

12     **A.**   Yes, the bond and mortgage-backed security

13  holders.

14     **Q.**   What's the reference to "ever-shrinking retained

15  portfolios" to?

16     **A.**   As part of the PSPAs back in 2008, there was a

17  requirement that the retained assets that Fannie Mae and

18  Freddie Mac held had to be shrunk over time.  And those

19  retained assets, which initially were, you know,

20  three-quarters of a trillion, roughly, for each of them,

21  were viewed as being the most profitable part of Fannie Mae

22  and Freddie Mac's business.

23         Since those bits were to be shrinking, the concern

24  for a lot of analysts had been that, you know, the profits

25  would shrink over time.  And the shrinking in the profits

1    would make earning enough to pay the preferred dividend

2    difficult or impossible.

3        **Q.**   So separate and apart from the Third Amendment,

4    the original PSPAs required Fannie Mae and Freddie Mac to

5    shrink their retained portfolio.  Right?

6        **A.**   Yes.

7        **Q.**   And that means Fannie Mae and Freddie Mac would be

8    making less money over time?

9        **A.**   Yes.

10       **Q.**   And the Third Amendment had one piece that was the

11   net worth sweep portion.  Right?

12       **A.**   Yes.

13       **Q.**   And the Third Amendment also had another piece

14   about this retained portfolio.  Right?

15       **A.**   Yes.

16       **Q.**   And it -- the Third Amendment piece on the

17   retained portfolio, it just meant that the speed with which

18   the enterprises were reducing those assets would be -- it

19   would be sped up over time?

20       **A.**   Yes.  It was going to be sped up.  So until the

21   Third Amendment, the rate of reduction was going to be 10

22   percent a year until they reached 250 billion.  After the

23   Third Amendment, it was 15 percent a year until they reached

24   250 billion.

25              So they would reach that $250 billion number about

1    three years earlier than they were previously projected to

2    reach it.

3        Q.    So Fannie and Freddie would be making less money

4    faster?

5        A.    They would be making less money, yes, faster.

6        Q.    And Guggenheim Partners is pointing out that that,

7    by itself, was also driving this concern about Fannie Mae

8    and Freddie Mac's ability to pay this 10 percent dividend.

9    Right?

10       A.    Yes.  That had been one of the primary factors

11   that had been driving this concern.

12       Q.    Even before the Third Amendment?

13       A.    Even before the Third Amendment.

14       Q.    Okay.  So let's go to the next slide.  We only got

15   one more.  This is an article from Fitch.  And Fitch, is

16   this another one of the reports that you looked at in

17   connection with your opinion in this case?

18       A.    Yes.  Fitch is, again, a rating agency like

19   Moody's and Standard and Poor's.

20       Q.    And here, after the Third Amendment, Fitch is

21   saying, "In Fitch's view, replacement of the fixed dividend

22   alleviates potential concerns about a breach of the support

23   cap, which kicks in next year under the funding agreement

24   with Treasury."

25              So this, here, is also referencing the cap that

1    was happening at the end of 2012.  Right?

2         A.    Yes.

3         Q.    And how this Third Amendment alleviates the

4    problem that the market analysts had observed before.

5    Right?

6         A.    Yes.

7         Q.    Were there more post-Third Amendment analyst

8    reports that you looked at beyond just the few that we

9    highlighted here?

10        A.    Yes.

11        Q.    Were they consistent or inconsistent with the

12   observations in the analyst reports that we've just

13   highlighted?

14        A.    They were consistent.

15        Q.    And so what's your bottom line conclusion,

16   Dr. Attari, based on your analysis of all of the analyst

17   reports before the Third Amendment and after the Third

18   Amendment?  What's the takeaway?

19        A.    The takeaway was that there was market concern

20   about the circular draws and causing an erosion of the

21   capital and, you know, ultimately leading to a depletion on

22   the capital.

23             And the Third Amendment eliminated the circular

24   draws and significantly eliminated that problem of the risk

25   of the Treasury commitment being depleted because of

1    circular draws.

2        **Q.**   So the market analysts observed a problem.  Right?

3    And the same types of market analysts observed that the

4    Third Amendment fixed the problem; is that right?

5        **A.**   Yes.

6        **Q.**   Let's change gears a little bit, Dr. Attari, and

7    talk about enterprise internal projections.

8            Now, all of the analyst reports that we looked at,

9    they were not prepared by Fannie Mae and Freddie Mac.

10   Right?

11       **A.**   No, they were not.

12       **Q.**   What were those analyst reports then based on?  I

13   mean, some of them had, you know, very, looked like,

14   specific projections.  How did analyst reports in general

15   come up with those types of projections if they're not

16   working at the company?

17       **A.**   So analysts collect and analyze a lot of

18   information that is put out by various, you know, government

19   agencies and by the companies themselves and so on.

20           So -- and remember, we are talking about Fannie

21   Mae and Freddie Mac and the housing market.  And these are,

22   you know, significant portions of the market.  I mean, if

23   you look at the newspapers, there's -- you know, in your

24   local newspaper, you'll see things about what's happening to

25   house prices.  How many houses are being sold?

1       You know, so all of that information is available.
2   All of that information is gathered up and analyzed by these
3   people.  How many new mortgages were issued in a particular
4   month?  How many people kind of closed on homes in a
5   particular month?

6       And all of those -- all of that information allows
7   analysts to come up with pretty accurate or pretty informed
8   projections about, you know, the business of Fannie Mae and
9   Freddie Mac.  And it's not just Fannie Mae and Freddie Mac.

10      I've done this in other cases I worked on.
11  Analysts have kind of a broader view of the marketplace and
12  of the industry than companies typically do.  Because
13  companies, you know, the people at companies might know
14  their business very well, but they might miss trends in
15  the -- that are affecting the marketplace more generally.

16  **Q.**   So you're talking about the reliability of these
17  analyst reports and their projections.  But, again, to be
18  fair and totally clear, those projections that we looked at
19  in the analyst reports, they weren't prepared by Fannie or
20  Freddie.  Right?

21  **A.**   Yes.  They weren't prepared by Fannie or Freddie.

22  **Q.**   So let's talk now a little bit about the internal
23  projections that were prepared by Fannie Mae and Freddie Mac
24  and what they showed.

25  **A.**   Uh-huh.

1    **Q.**   Now, you're familiar with Dr. Dharan, one of

2    plaintiffs' experts in this case.  Right?

3    **A.**   Yes.

4    **Q.**   And you're aware that he's testified that Fannie

5    Mae and Freddie Mac's internal documents and projections

6    paints a different picture than the analyst reports.  Right?

7    **A.**   I am aware of that.

8    **Q.**   And at a high level, do you agree or disagree with

9    Mr. Dharan's assessment?

10   **A.**   I disagree.

11   **Q.**   And why is that?

12   **A.**   We can go through the projections, but I believe

13   the projections that Dr. Dharan is looking at has certain

14   problems.  And even if we set those problems aside, the

15   projections don't show what he's opine -- the projections

16   still show that the circular draws would be a problem.

17   **Q.**   So let's go to the next slide here in your deck.

18   Do you recognize this document, Dr. Attari?

19   **A.**   Yes, I do.

20   **Q.**   And this is a Fannie Mae document prepared by

21   David Benson in the summer of 2012.  Right?

22   **A.**   Yes.

23   **Q.**   Do you understand this to be one of the primary

24   documents that Dr. Dharan relied upon to generate his

25   opinions?

1    **A.**   That's my understanding.

2    **Q.**   Now, did you rely on this document specifically to

3    formulate your opinions?

4    **A.**   No, I did not.  This is a draft as of July 6th.

5    What I relied on were the actual slides or the document that

6    was presented at the board meeting.

7    **Q.**   So Dr. Dharan relied on the draft and you relied

8    on the final?

9    **A.**   I did.

10   **Q.**   This draft was, what, at least a few weeks before

11   the final was created, is that right, when you compare the

12   as-of date versus --

13   **A.**   Yes, it's about two weeks before the final.

14   **Q.**   Let's take a look at the final.  And let's just

15   look at the document itself.

16   **MR. HOFFMAN:**  Mr. Salazar, it's PX-218 and let's

17   not display that to the jury yet just so I can confirm that,

18   I believe, PX-218 is in evidence.

19   Okay.  So you can pull up Plaintiffs' Exhibit 218

20   and display it, please.  Thank you, Ms. Jenkins.

21   And let's go to Page 20 of 53 of Plaintiffs'

22   Exhibit 218.

23   **Q.**   Now, Dr. Attari, do you recognize this as the

24   final version of the David Benson projections from the

25   summer of 2012?

1    **A.**   Yes.  This is the version that was presented at

2    the board meeting.  There were subsequent updates, but this

3    is the final as to the board meeting.

4    **Q.**   Okay.  And just backing up a couple steps, you

5    looked at both of these versions, just in the course of your

6    analysis.  Right?

7    **A.**   Yes.

8    **Q.**   And which one do you give more weight to?

9    **A.**   I give more weight to this one, because it was

10   presented at the board meeting for one thing.  And there

11   were certain numbers on the other one that had changed

12   significantly.  So, for example, the residual equity of

13   Freddie Mac on the other one was about 25 billion, if I

14   recall.

15   **Q.**   So let me help you out, here, Dr. Attari -- I mean

16   help the court reporter out really.  Are you referring to

17   the residual equity line on Freddie Mac?  So that's the

18   third row here, Freddie Mac residual equity?

19   **A.**   Yes, I am.

20   **Q.**   And you're comparing the residual equity line in

21   that draft slide to the final slide?  And what were the

22   differences you recall?

23   **A.**   So you're at the 6.3 billion?

24   **Q.**   At the end here of 2022.

25   **A.**   At the end in 2022.  And there, it was in excess

1    of 20 billion in 2022.

2        **Q.**    Did you understand that just to be a mistake?

3        **A.**    Yeah.

4        **Q.**    And, again, the jury has heard about this before

5    and so I don't want to belabor it, but this was a document

6    prepared by Fannie Mae, a Fannie Mae executive, Mr. Benson.

7    Right?

8        **A.**    Yes.  So Mr. Benson worked at Fannie Mae.  They

9    were projecting Freddie Mac based on trends, as I think how

10   it's described.

11       **Q.**    So the mistake you were just describing was in the

12   Freddie Mac section of the projections that someone from

13   Fannie Mae had created.  Right?

14       **A.**    Yes.

15           **MR. HOFFMAN:**  Let's back out of this, Mr. Salazar,

16   and let's zoom in on the Fannie Mae portion of the Fannie

17   Mae slide, just that whole top bar.  Okay.

18   **BY MR. HOFFMAN:**

19       **Q.**    Now, what do you understand these top two lines of

20   Fannie Mae's projections to be comparing?

21       **A.**    So the top line -- again, I mean, the one thing to

22   keep in mind, and I think we decided to set the problems

23   aside so we'll come back to those later.

24           But the top line is the comprehensive income.  So

25   this is kind of the money the company earns or is projected

1    to earn in this case each year from 2012 through 2022.

2              And the second line is the amount that they are

3    projecting will be due in preferred dividend payments each

4    year from 2012 to 2022.

5         Q.   And you said something that I want to make sure

6    the jury understands.  It's something that I had intended to

7    ask you about but skipped over.

8              Do you think that this -- even this final version

9    of Mr. Benson's presentation, do you think it is a

10   highly-reliable forecast?

11        A.   No, I do not.

12        Q.   And you have several bases on which to disagree

13   that it's a reliable forecast.  Right?

14        A.   Yes.

15        Q.   So I want to have you explain your disagreements

16   with this forecast to the jury.  But first, I want to ask

17   you a few questions about it.

18              Just assuming that it's all 100 percent accurate

19   and we're taking it at face value.  Does that make sense?

20        A.   Yep.

21        Q.   So taking it at face value here, it's comparing

22   how much money Fannie Mae is going to make -- how much money

23   Fannie Mae thinks it's going to make over the next 10 years

24   compared to how much money Fannie Mae is going to have to

25   pay to the Treasury under the 10 percent dividend.  Right?

1       **A.**   Yes.

2       **Q.**   So just before you look at the numbers, residual

3   equity, is that the same thing as net worth?

4       **A.**   Yes, that is net worth.

5       **Q.**   And net worth is just how much a company's assets

6   exceeds its liabilities.  Right?

7       **A.**   Yes.

8       **Q.**   For 2012, here -- now, this document was prepared

9   in July of 2012; is that right?

10      **A.**   Yes.

11      **Q.**   And so, for 2012, do you understand it to be

12  forecasting what the year will end up like looking forward?

13      **A.**   Yes.  So they have part of the year is actual and

14  the rest of the year is kind of a projection.

15      **Q.**   And so what is Fannie Mae predicting that it will

16  make in 2012 relative to the amount it will owe on the

17  Treasury dividend?

18      **A.**   It's saying that it will make the same amount that

19  it will owe on the Treasury dividend.  So it will make 11.6

20  billion and it will owe 11.6 billion.

21      **Q.**   So Fannie Mae is predicting that, in 2012, they

22  won't be able to afford the 10 percent dividend. Right?

23      **A.**   They'll barely be able to afford it.

24      **Q.**   Fair enough.  They will barely be able to afford

25  it.  They won't be able to make any money at all on top of,

1       after the 10 percent dividend?

2           A.   Yes.  There will be nothing left over.

3           Q.   Now what does Fannie Mae's forecast for the year

4       of 2013.  Did they forecast making more money or less than

5       money than they would owe on the 10 percent dividend?

6           A.   Less money.  So they're forecasting that they'll

7       make 7 and a half billion and they'll owe 11.8 billion and

8       so there will be a gap of about 4 billion.

9           Q.   And does that mean, under the -- before the Third

10      Amendment, they have to take a circular draw?

11          A.   Yes.  And you can see that in the cumulative

12      infusion line.  It goes up by about 4 billion.

13          Q.   Now, what about 2014?  Do they make enough money

14      in 2014 to be able to afford to pay the 10 percent dividend?

15          A.   No, they will not.  They'll make 11 billion and

16      they'll owe 12.1 billion.

17          Q.   And so they would have to take a circular draw.

18      Is that what they're forecasting here?

19          A.   Yes.  They're forecasting that they'll have to

20      take a circular draw.  The other thing to note is that the

21      dividend payment has gone up for 2014 because they had to

22      take a circular draw in 2013.

23          Q.   And with each of these circular draws, the

24      Treasury commitment, the total amount that's still available

25      is going down each time.  Right?

1    A.    Yes.

2    Q.    And the zero residual equity means there is no net

3    worth -- Fannie Mae is predicting no net worth at the end of

4    2014?

5    A.    Correct.

6    Q.    Now, let's look at 2015.  Fannie Mae, in 2015,

7    they're forecasting that they will make more than they --

8    excuse me.  They're forecasting they'll make more than the

9    Treasury 10 percent dividend.  Right?

10   A.    Yes.  So in 2015, 2016 and 2017, they are

11   forecasting they'll make more than the 10 percent Treasury

12   dividend.

13   Q.    And so in 2015, '16 and '17, the residual equity,

14   also known as net worth, is rising.  Right?

15   A.    Yes.  So it increases from zero at the end of 2014

16   to 2.8 billion at the end of 2017.

17   Q.    Now, let's look at 2018.  The numbers here seem to

18   show that Fannie is forecasting that in 2018 it looks almost

19   like a break-even.  They're going to make 12.2 billion, but

20   they're going to owe 12.2 billion.  But is it really a

21   breakeven or no?

22   A.    No.  It must be because of rounding because they

23   make 12.2 billion, they owe 12.2 billion, but if you look at

24   the net worth or the residual equity line that we've been

25   looking at, that gets reduced from 2.8 to 2.7 billion.  So

1    there must be a small piece of the payment that they have to

2    draw from the residue equity line.

3         Q.   Now, in 2019, 2020, 2021 and 2022, in each of

4    those years, Fannie Mae is forecasting that they will not

5    make enough money to afford to pay the 10 percent dividend;

6    is that right?

7         A.   Yes.  In each of those years, the income is less

8    than the amount of dividend and the difference is growing

9    over time.

10        Q.   And so circular -- well, strike that.  Let's back

11   up.

12        So by the end of 2022, even by the end of 2021,

13   how much residual equity is left in Fannie Mae under these

14   forecasts?

15        A.   There is no residual equity left in either 2021 or

16   2022.  Actually, in 2021, they'll have to start making

17   circular draws again.  And you can tell that if you look at

18   the cumulative infusion line which has gone up.

19        Q.   So circular draws, under these forecasts, resume

20   in 2011 and 2022?

21        A.   Yes.

22        Q.   And this whole forecast, it just factors in the 10

23   percent dividend.  Right?

24        A.   Yes.

25        Q.   It doesn't factor in any variable dividend based

1    on the net worth because that hadn't happened --

2        A.   No, it doesn't.

3        Q.   I'm sorry.  That hadn't happened yet.  Right?

4        A.   It hadn't happened?

5        Q.   However, the 10 percent dividend itself causes

6    zero net worth at Fannie Mae at the end of these forecasts.

7    Right?

8        A.   Yes.  Zero net worth and they've drawn down an

9    amount about 8 billion on the Treasury commitment.

10       Q.   So the net effect of this is, for net worth

11   purposes, is the same as the net worth sweep; is that right?

12       A.   Yes.

13       Q.   But is it -- is it a better situation or a worse

14   situation than under the net worth sweep?

15       A.   It's a worse situation under the net worth sweep

16   because, under the net worth sweep, they would not have had

17   to draw on the commitment.

18       Q.   Okay.  So just so I'm clear because I think I

19   might have messed it up in the question, the forecasts here

20   under the Second Amendment not the Third Amendment, it is

21   your testimony that that is what is worse that the sweep

22   because, under this forecast, they would have to keep making

23   circular draws?

24       A.   Correct.

25            **MR. HOFFMAN:**  So let's back out, Mr. Salazar, of

1    this slide, and we can go back to Dr. Attari's slide deck.

2    **BY MR. HOFFMAN:**

3        **Q.**   So that's taking the Fannie Mae forecast at face

4    value.  Right?

5        **A.**   Yes.

6        **Q.**   And I didn't walk -- do a similar walk-through of

7    Freddie Mac, but we're going to talk about Freddie Mac in a

8    minute.

9            Now, you testified earlier that you did not think

10   that these forecasts were highly reliable.  Can you explain

11   to the jury why you believe that?

12       **A.**   Well, so the forecasts, you know, as we've noted

13   already for Freddie Mac, they contained errors.  They do not

14   account for the PCF.

15       **Q.**   So the PCF is something that had not been set or

16   charged by Treasury up until -- even through 2012.  Right?

17       **A.**   Yes.  It had been waived every quarter of 2011 and

18   the first two quarters of 2012 but, at some point, the

19   expectation was that it would be set and these forecasts

20   kind of don't even have a line for the PCF.

21       **Q.**   And if the PCF had been set, it would be on top of

22   the 10 percent dividend.  Right?

23       **A.**   Yes.

24       **Q.**   How would that impact those numbers?  All of those

25   little numbers we looked at, how would it impact those if

1    the PCF had been set?

2        A.    So the profits line would remain the same, but

3    then everything below that would be impacted.  The amount of

4    the 10 percent dividend in the initial years would be the

5    same.  But then what you'd have is just like we saw the

6    circular draws on the 10 percent dividend creating kind of

7    higher dividends over time, that line could potentially

8    change.

9        Next, you'd actually have to take out the amount

10   of the PCF to figure out what the residual equity on net

11   worth was and what the draws were.  So if you added on, for

12   example, a $1 billion worth of PCF on that -- and I'm just

13   using 1 as a round number -- then each year all of the

14   numbers would change by 1 billion.

15       In years where there was circular draws, they

16   would increase.  In future years, there might be circular

17   draws because the dividend had gone up because of, you know,

18   circular draws in earlier years and so on.

19       Q.    Your slide here refers to longer time horizons

20   than typical and simplifying assumptions.  What do you mean

21   by that?

22       A.    My understanding from Mr. Benson's testimony is

23   that Fannie Mae typically did projections for three or four

24   years.  So the normal time horizon at the time these

25   projections were done would have been out through 2016.

1    And then they -- you know, for a specific purpose

2    they kind of extended those out.  But they didn't do it in

3    the same kind of rigorous way they might create a

4    shorter-term forecasts.  They made simplifying assumptions

5    to give them these longer-term forecasts.

6        **Q.**   You mentioned Mr. Benson's testimony.  He's the

7    Fannie Mae executive that created this slide deck?

8        **A.**   Yes, that is my understanding.

9        **Q.**   What do you recall his testimony was, which was

10   played to the jury, about these slides -- I'm sorry, about

11   these forecasts?

12       **A.**   Basically what I just said.  That it was unusual

13   and it wasn't done in the same kind of -- with the same kind

14   of rigor that the other forecasts might have been done.

15       **Q.**   You've included in your slides here a quote from

16   Mr. Benson's testimony?

17       **A.**   Uh-huh.

18       **Q.**   Here, Mr. Benson says, "You've asked if it was the

19   best estimate.  It wasn't.  The purpose of this wasn't

20   necessarily to go through the kind of rigor that one would

21   typically go through in terms of the way we would do our

22   official forecast."  Is that the rigor that you referred to

23   a moment ago?

24       **A.**   Yes.

25       **Q.**   And he calls it an "unofficial, long-term

1   forecast, which by the way is not usual for us to do a

2   10-year forecast."

3            Based on Mr. Benson's testimony did you think --

4   did Mr. Benson's testimony increase your confidence in the

5   reliability of his forecasts or did it decrease your

6   confidence?

7       A.   It decreased my confidence.

8       Q.   If we go back to the slide of your critiques of

9   Mr. Benson's projections, you say here, "only a base-case

10  scenario.  No stress."  What do you mean by that?

11      A.   So this is only one scenario and they describe it

12  as a base-case scenario.  They're not looking at what

13  happens, kind of, you know, if things turn out worse than

14  expected or better than expected.

15           And from the perspective of the commitment and

16  from FHFA's perspective in terms of its goals and

17  objectives, it's going to be those downside scenarios that

18  are important.  You know, is there enough?  Is the

19  commitment enough to survive the downside?  How do you

20  maximize the commitment so that you have enough to survive

21  the downside?  Those kinds of questions.

22      Q.   So is it typical for a company to only forecast in

23  one base-case scenario?

24      A.   No.  It's actually quite rare that they would only

25  do one base case.  The typical forecasts have multiple

1    scenarios.

2        Q.   So just zooming out, Dr. Attari, do these Fannie

3    Mae internal projections that we looked at, do they change

4    your view as to whether it was reasonable for FHFA to agree

5    to the Third Amendment?

6        A.   No, they don't change my view.

7        Q.   Why not?

8        A.   Because, as you can see from what we just talked

9    about, even in the base-case scenario, Fannie Mae was not

10   going to be able to meet the 10 percent dividend and was

11   going to have to make circular draws.  And the Third

12   Amendment eliminated the need for those circular draws.

13       Q.   Now, let's talk about Freddie Mac for a moment.

14   And I'm not going to belabor the year-by-year in the slides

15   that Mr. Benson had projected.  But in the course of your

16   research and analysis in this case, did you look at Freddie

17   Mac documents and Freddie Mac analysis about its own

18   forecasts of what was to come?

19       A.   Yes.

20       Q.   What did you find?

21       A.   I found basically the same kind of situation.  In

22   fact, they had explicit statements that, you know, said that

23   they were -- and one is projected up there -- is that, over

24   the long-term, it's likely that our dividend obligations --

25   that is the amount we owe on the senior preferred stock,

1957

1    will exceed the comprehensive income, resulting in

2    additional draws.  So they're talking about circular draws

3    here.

4        Q.   And I'm not going to belabor it and zoom in, but

5    those three little bars that are in the small piece of the

6    call-out of this document, do you recall what those were

7    reflecting?

8        A.   One set is the net income and the other set is the

9    comprehensive income.

10       Q.   And why the three different colors there?

11       A.   There are three different scenarios.  So one is

12   worse, one is base and one is better.

13       Q.   So when Freddie Mac, in the summer of 2012, was

14   forecasting its earnings, Freddie Mac looked at several

15   different scenarios, not just a base case.  Right?

16       A.   Yes.  And these forecasts are over a much shorter

17   period too.

18       Q.   And what do you mean by that?

19       A.   So excuse me.  These don't run through 2022, like

20   the Fannie Mae projections that we were looking for.  These

21   run through 2015.

22       Q.   So instead of being 10-year projections, these are

23   just 3-year projections?

24       A.   Yes.  Three and a half.

25       Q.   Three and a half.  And that's more common in your

1    experience for companies to do?

2         **A.**    Yes.

3         **Q.**    And more reliable?

4         **A.**    And more reliable.  And that's my understanding of

5    Fannie Mae's typical process also.

6         **Q.**    Now, let's --

7              **MR. HOFFMAN:**  You can take the slides down,

8    Mr. Salazar.

9    **BY MR. HOFFMAN:**

10        **Q.**    I want to ask a couple questions about the

11   deferred tax assets.  Are you familiar with what deferred

12   tax assets are?

13        **A.**    Yes.

14        **Q.**    Dr. Dharan testified that the deferred tax assets,

15   she calls them a total solution to this problem of circular

16   draws.  Do you agree with Dr. Dharan that the deferred tax

17   assets were a total solution to the problem?

18        **A.**    No.

19        **Q.**    Why not?

20        **A.**    So for a number of reasons.  One is the Fannie Mae

21   projections that we were looking at.  You know, companies,

22   when they earn profits, have to pay taxes.  Those particular

23   projections did not reflect taxes.  So they actually

24   reflected the fact that, year after year, Fannie Mae was

25   going to benefit from the deferred tax assets.  Right?

1    Now, even so, they were unable to cover the full

2    10 percent dividend in most of those years.  And in

3    particular, if you go to the end of the projection, 2022,

4    you recall that I said that kind of the gap was widening.

5    Now, at some point soon after '22, the benefit

6    from the deferred tax assets would run out -- excuse me --

7    and Fannie Mae --

8    **Q.**    Take your time.  I'll do the same.

9    (Quick drink break)

10   **A.**    Fannie Mae and Freddie Mac would actually have to

11   start accounting for taxes, and that would mean that gap

12   would become even larger.

13   **Q.**    Now, Dr. Dharan's testimony was that there was an

14   imminent or forthcoming write-up of the deferred tax assets

15   and that that would also solve the problem.  Do you agree or

16   disagree with that?

17   **A.**    I disagree.

18   **Q.**    And why is that?

19   **A.**    So what the write-up would do, and this is a

20   little bit kind of multi-step, if you will, is that it would

21   increase the net worth when it was down.  But then each year

22   after that, the profits would reflect the taxes that kind

23   of -- that had to be accrued.

24   So it's like you're creating one part with this

25   asset and then each year you're taking money from income in

1    the form of taxes and filling that part up.  Okay?

2         So each year then, starting 2013, if the deferred

3    tax asset write-up was done in 2013, you would have taxes

4    kind of reducing the comprehensive income.

5         And what that would do is that you would get a big

6    step up in 2012 or '13, whenever you did the deferred tax

7    write-up in the net worth, and every year after that, the

8    net worth would step down.

9    Q.   And so, even if there was a one-time increase in

10   the net worth of the company resulting from the write-up of

11   deferred tax assets, if Fannie Mae and Freddie Mac aren't

12   earning enough money to pay the 10 percent dividend, that

13   net worth is still going to be steadily decreasing over

14   time?

15   A.   Yes.

16   Q.   And eventually, it would run out unless Fannie Mae

17   and Freddie Mac make enough money every single year to

18   afford the 10 percent dividend; is that right?

19   A.   Yes.  To afford the 10 percent, make enough money

20   to afford the 10 percent dividend after paying taxes.

21   Q.   And if they were making enough money to pay the 10

22   percent dividend, and if a periodic commitment fee were

23   added on top of that, that would mean the net worth that had

24   gone up as a result of the write-up, that would -- it would

25   diminish and decrease even faster?

1    **A.**    Yes.

2    **Q.**    So over the long term, the DTA would just not

3    solve the problem of the circular draw?

4    **A.**    Right.  And I mean, you know, this would be

5    apparent to investors, and they would kind of have the same

6    sort of concerns that they were expressing in 2012.

7           **MR. HOFFMAN:**  Court's indulgence, Your Honor.

8    **BY MR. HOFFMAN:**

9    **Q.**    Dr. Dharan also testified that Fannie Mae and

10   Freddie Mac, instead of doing the net worth sweep, could

11   have done a payment-in-kind or 12 percent option.  Would

12   that have solved the circular dividend problem?

13   **A.**    No.

14   **Q.**    Why not?

15   **A.**    So if you recall, when we were going through those

16   tables, in 2013 there is a shortfall.  Right?  So let's say

17   that they switched to payment-in-kind in 2013.  What that

18   would do is that now they'd have to pay 12 percent or they'd

19   owe 12 percent dividend instead of 10 percent dividend going

20   forward.

21           I don't know if you recall, but every year roughly

22   the dividend was 12 billion, you know, from 2013 to 2022.

23   That would jump up by 20 percent.  So now it would be more

24   in the, like 14 and a half billion.  In none of those years

25   did Fannie Mae earn more than 14 and a half billion.  So

1   that problem would just pile up.

2       Q.   So let's quickly, just to I think illuminate the

3   problem you were looking at, let's take a look at

4   plaintiffs' 218 again, and at page 20 of 53 and let's zoom

5   in on the Fannie Mae numbers.

6           So let's focus on 2013, which is the first year

7   here where they're forecasting that they're not going to

8   make enough money to afford the 10 percent dividend.

9       A.   Yes.

10      Q.   So in 2013, if Fannie Mae had done the 12 percent

11  option instead of the 10 percent, what would have happened?

12  So they would have added the difference between 11.8 and

13  7.5?  They would have just tacked that on to the liquidation

14  preference?

15      A.   Yes.  So I mean, you would have to re-jiggle this

16  table and kind of keep track of the liquidation preference

17  separately from cumulative infusion because, you know, they

18  would be like --

19      Q.   Right but the bottom line with these would be

20  what?

21      A.   Yeah.  The bottom line would be that number would

22  go up and, you know, there would be 12 percent owed on that

23  number which, like I mentioned, would be roughly 14 billion

24  in the next year.  And then, you know, the shortfall in 2014

25  would be larger than what we see.

1    And that would kind of add more to that pile and

2    then the shortfall in 2015 would be larger.  And you'd have

3    a shortfall every year.  So you'd never get to a point like

4    you do here where Fannie Mae is accumulating residual

5    equity.

6    **Q.**   Right.  And that Treasury liquidation preference

7    would be getting bigger and bigger and bigger.  Right?

8    **A.**   Yes.

9    **Q.**   And that means that the dividends each year would

10   be getting bigger and bigger and bigger?

11   **A.**   Yes.

12   **Q.**   So just to highlight this, so for example --

13   **MR. HOFFMAN:**  Mr. Salazar, you can highlight the

14   12.1 preferred -- so under 2014, the dividend payment is

15   12.1, if you highlight that.

16   **BY MR. HOFFMAN:**

17   **Q.**   So if they did this 12 percent payment-in-kind,

18   that number would jump up to 14 billion; is that right?

19   **A.**   14 and a half, yes.

20   **Q.**   And then if they did the payment-in-kind 12

21   percent instead of 10 percent in 2014, then the next year's

22   dividend, it wouldn't be 14.  It would be something even

23   larger than that?

24   **A.**   Yes.

25   **Q.**   So to ever get out of that hole Fannie -- in this

1    case, Fannie Mae would have to earn more and more and more

2    money?

3        **A.**   Yes.

4        **Q.**   But Fannie Mae wasn't projecting that they were

5    going to be making more and more and more money?

6        **A.**   No.

7        **Q.**   So would the 12 percent payment-in-kind make the

8    situation better or worse for Fannie Mae?

9        **A.**   It would make it worse.

10       **MR. HOFFMAN:**  Okay.  Let's go back to Dr. Attari's

11   slides and let's talk about bonds, not bolds but bonds.

12       **THE WITNESS:**  All right.

13   BY MR. HOFFMAN:

14       **Q.**   Did you conduct -- as an analysis in this case,

15   did you look at how market participants viewed the

16   commitment?

17       **A.**   Yes.

18       **Q.**   And you did that in two ways.  Right?  One way we

19   already looked at.  We looked at all of those analyst

20   reports?

21       **A.**   Yes.

22       **Q.**   Did you do any other sort of quantitative analysis

23   about market participants?

24       **A.**   Yes, I performed a bond event study.

25       **Q.**   And so at a high level -- and some of this gets

1    pretty technical too -- what's a bond event study and what's

2    the purpose of it?

3         A.    So a bond event study is we have an event, which

4    is the Third Amendment.  And we are interested in knowing

5    the impact that the event had on the prices of the bonds.

6    And the prices -- and the bonds that I'm going to look at

7    are the long-term bonds of Fannie Mae and Freddie Mac.

8              Just remember, we are talking about an event that

9    solves a problem that kind of becomes more and more of an

10   issue over time.  So I'm going to look at the long-term

11   bonds because those prices are going to be more sensitive to

12   this.

13        Q.    And what were your high-level conclusions after

14   doing the bond event study.

15        A.    The prices of Fannie Mae's long-term bonds went

16   up, which is consistent with the Third Amendment having made

17   the funds safer.

18             MR. HOFFMAN:  So -- actually, let's back up a

19   little bit in the slides.  I'm sorry.  The steps in a bond

20   event study, which I believe is Slide 38.

21   BY MR. HOFFMAN:

22        Q.    Just so the members of the jury understand, just

23   walk us through, at a high level, the steps.  Again, this

24   can get technical, but I just want them to understand the

25   sort of rigor that went into this.

1    **A.**   Yes.   So this is an approach that is widely used

2    in finance and economics.   There are thousands of event

3    studies that have been done over the years.   The first thing

4    you do in an event study is to identify the event that you

5    want to study.   In this case, that's easy.   It's the Third

6    Amendment.

7         What you want to do is figure out the time at

8    which it happened.   It's in the morning on August 17th of

9    2012.   The next is to measure the change in price of the

10   securities that you're studying at the time of the event.

11        The third is to adjust those securities price

12   changes for, you know, market wide changes.   So, you know,

13   changes in interest rates.   What happened to U.S. Treasury

14   securities at that time?   And that's what we are going to do

15   here.

16        And finally -- and that's done using a statistical

17   analysis.   It's called a regression analysis.   And the final

18   step is to do a statistical test that gives us confidence in

19   the results that we are getting.

20   **Q.**   And the bonds are the same types of bonds that are

21   in that second investor class on your slide that we looked

22   at earlier?

23   **A.**   Yes.

24   **Q.**   And I believe your testimony earlier was that

25   bonds are -- it's like a loan that the company takes but

1       it's broken up into small pieces; is that right?

2            **A.**   Yes.

3            **Q.**   And after a bond is issued and the money is lent,

4       can they be traded around by investors?

5            **A.**   Yes.  That is the purpose of structuring it as a

6       bond instead of a loan.

7            **Q.**   Okay.  And bond pricing can get kind of

8       complicated.  Right?

9            **A.**   Yes.

10           **Q.**   And so I think it would help the jury to just --

11      maybe we can just jump to your conclusions, which is at

12      Slide 45.  Thank you.

13               And so talk us through these conclusions and, at a

14      high level, how you got there.

15           **A.**   Okay.  So I looked at the long-term bonds of

16      Fannie Mae and Freddie Mac.  And this is fairly typical

17      looking at specific sets of bonds when you're doing a bond

18      event study.  And the bonds I chose were the long-term

19      bonds.

20               And the bonds I chose were also bonds that were

21      very standardized in the features.  So the Fannie Mae and

22      Freddie Mac issue, lots of bonds that have complicated

23      features and, you know, the people who've looked at event

24      studies and develop the event studies for bonds have

25      recognized the fact that looking at bonds with complicated

1   features introduces noise into the study and kind of dilutes

2   the ability to find results.

3        So I looked at standardized long-term bonds.  And

4   what I found was that the prices of those bonds went up.

5   And what that means, you know, when prices of bonds go up or

6   when people are willing to lend you more money for the same

7   interest rate or charge you a lower interest rate to lend

8   you the same money, it means that they view you as being a

9   safer borrower.  And that's kind of the conclusion that I

10  reached.

11  **Q.**   And so the way you've described it here, those

12  bond prices changed in a favorable way in direct response to

13  the announcement of the Third Amendment?

14  **A.**   Yes.

15  **Q.**   So the bonds that were getting traded around in a

16  secondary market, the prices improved in a way that

17  indicated they were safer?

18  **A.**   Yes.

19  **Q.**   And you mentioned here "increased investor

20  confidence in Fannie and Freddie."  What does that refer to?

21  **A.**   Well, that refers to the fact that the bond

22  prices, the increase in bond prices, is kind of telling us

23  that investors are now more confident.  Because if they

24  become less confident, prices would have gone down.  If

25  there had been no change in confidence, prices would have

1    been unchanged.

2        **Q.**   Now, this is the -- this was the second way you

3    looked at the market confidence issue.  Right?  With the

4    first way being looking at all of the analyst reports?

5        **A.**   Yes.

6        **Q.**   And with the analyst reports, we looked at analyst

7    reports before the Third Amendment that identified the

8    problem.  Right?

9        **A.**   Yes.

10       **Q.**   And you identified the market analyst reports

11   after the Third Amendment and how they described that the

12   Third Amendment solved that problem?

13       **A.**   Yes.

14       **Q.**   Are the results of your bond event study

15   consistent or inconsistent with all of those market analyst

16   report conclusions?

17       **A.**   They're consistent with the market analyst report

18   conclusions.

19       **Q.**   How so?

20       **A.**   So if you recall, there was concern and that

21   concern you can think of it as a risk.  There was higher

22   risk before the Third Amendment that the underlying

23   uncertainty and risk was resolved as a result of the Third

24   Amendment.

25                So the circular draws problem went away.  And, you

1  know, investors became more confident.  In kind of over the

2  same timeline, bond prices went up.  The two things kind of

3  line up and are consistent.

4      **Q.**   So let's go to the next slide and just I want to

5  get your sort of bottom-line conclusion with respect to the

6  reasonableness of FHFA's decision to enter into the Third

7  Amendment.  Can you explain your bottom-line conclusion as

8  you've laid it out here?

9      **A.**   Sure.  So I start with the goals of the PSPAs.

10 And these are the stated goals that we looked at very early

11 on in the day.  And that was to increase mortgage-backed

12 security and bond-investor confidence.

13     Now, by the time you get to 2012, there's concern.

14 Investors are expressing concern.  That's kind of causing a

15 little bit of reduced confidence.  And that concern is that

16 these circular dividends are going forward.

17     And those circular dividends, which is because

18 profits are not large enough to cover dividends, will erode

19 the commitment.  And there might not be money left in the

20 pot to, you know, if you have a downturn, for example.

21     And the solution is that the Third Amendment makes

22 those dividends equal to profits.  Now you've eliminated the

23 possibility that you have a situation where dividends are

24 more than profits.  And the investors, the market

25 participants who write reports basically make that point.

1    You know, people put their money where their mouth
2    is, as it were, and bond prices go up.  And so the decision
3    and the action achieved the goal.  So that's why I think
4    it's reasonable.
5    **MR. HOFFMAN:**  Your Honor, I have one more short
6    section to continue, and I'm happy to proceed unless you
7    think it's a good time for a break.
8    **THE COURT:**  Let's do it at 1:30.
9    **MR. HOFFMAN:**  Okay.  Thank you, Your Honor.
10    **THE COURT:**  Don't talk about the case.  Don't let
11    anyone talk to you about the case.  I'll see you all back at
12    1:30.
13    (Jury exited the courtroom)
14    **THE COURT:**  I need counsel to wait in the
15    courtroom for a moment.
16    One of the jurors gave me a note that I needed to
17    discuss with you.  I need to talk with the juror first.
18    **MR. HOFFMAN:**  Absolutely, Your Honor.
19    (The Judge exited the bench to speak with the juror)
20    **THE COURT:**  Be seated.
21    Actually, we can do this on the phone.  It doesn't
22    need to be public record at this stage until we decide what
23    we're going to do.  I just got another note too.
24    This is going to be a sealed conference with counsel
25    only.

1       (Sealed discussion)











1

2

3

4          (Sealed discussion concluded)

5          (Proceedings concluded at 12:52 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  **C E R T I F I C A T E**

2

3       I, **Lorraine T. Herman, Official Court Reporter,**

4  certify that the foregoing is a true and correct transcript

5  of the record of proceedings in the above-entitled matter.

6

7

8

9

   ___October 27, 2022___          _/s/_____

10            Date                        Lorraine T. Herman

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**BY MR. HOFFMAN: [31]** 1886/12 1889/18 1890/11 1891/19 1893/17 1894/23 1896/10 1910/9 1910/19 1913/22 1920/4 1921/6 1922/10 1922/25 1923/10 1924/7 1925/21 1927/11 1928/14 1929/8 1930/24 1931/21 1935/2 1935/12 1945/18 1952/2 1958/9 1961/8 1963/16 1964/13 1965/21

**DEPUTY CLERK: [4]** 1862/2 1886/4 1886/7 1972/3

**MR. HOFFMAN: [51]** 1862/4 1862/21 1863/1 1869/5 1877/5 1882/12 1883/6 1883/15 1885/2 1885/10 1885/14 1885/17 1886/1 1889/10 1889/16 1889/24 1891/17 1893/15 1894/21 1895/8 1910/6 1910/17 1913/12 1920/3 1921/2 1922/7 1922/23 1923/7 1924/3 1925/18 1927/8 1928/12 1929/7 1930/6 1930/9 1930/12 1930/22 1931/20 1934/25 1935/10 1943/16 1945/15 1951/25 1958/7 1961/7 1963/13 1964/10 1965/18 1971/5 1971/9 1971/18

**MR. HUME: [1]** 1977/2

**MR. KRAVETZ: [12]** 1869/6 1869/12 1880/4 1880/7 1880/14 1882/14 1883/10 1884/16 1885/18 1889/14 1890/9 1894/4

**MR. STERN: [10]** 1973/24 1974/8 1974/10 1974/16 1974/21 1974/24 1975/15 1976/15

**THE COURT: [38]** 1862/20 1862/25 1869/4 1869/11 1877/4 1879/22 1880/6 1880/13 1883/14 1884/24 1885/6 1885/13 1885/16 1885/23 1886/9 1889/13 1889/15 1890/10 1894/6 1930/7 1930/19 1930/21 1971/8 1971/10 1971/14 1971/20 1972/2 1972/4 1974/1 1974/3 1974/9 1974/13 1974/19 1974/22 1975/14 1976/11 1976/17 1976/23

**THE WITNESS: [5]** 1890/1 1894/7 1895/10 1913/13 1964/12

**$**

**$1 [3]** 1894/14 1894/15 1953/12

**$100 [1]** 1912/24

**$200 [3]** 1933/8 1933/17 1934/16

**$250 [2]** 1894/16 1937/25

**'**

**'12 [1]** 1932/5

**'13 [1]** 1960/6

**'16 [1]** 1949/13

**'17 [1]** 1949/13

**'22 [1]** 1959/5

**/**

**/s [1]** 1978/9

**1**

**10 [29]** 1918/7 1919/14 1937/21 1938/8 1946/23 1946/25 1947/22 1948/1 1948/5 1948/14 1949/9 1949/11 1950/5 1950/22 1951/5 1952/22 1953/4 1953/6 1956/10 1959/2 1960/12 1960/18 1960/19 1960/20 1960/21 1961/19

1963/21

**10-K [1]** 1912/4

**10-year [2]** 1955/2 1957/22

**100 [8]** 1880/17 1881/2 1881/11 1912/24 1915/9 1917/4 1917/12 1946/18

**10020 [1]** 1860/6

**1053 [1]** 1859/3

**11 [1]** 1948/15

**11.6 [2]** 1947/19 1947/20

**11.8 [2]** 1948/7 1962/12

**12 [11]** 1916/9 1916/16 1961/11 1961/18 1961/19 1961/22 1962/10 1962/22 1963/17 1963/20 1964/7

**12.1 [3]** 1948/16 1963/14 1963/15

**12.2 [4]** 1949/19 1949/20 1949/23 1949/23

**123 [1]** 1860/3

**12356742 [1]** 1876/8

**125 [1]** 1915/18

**1251 [1]** 1860/6

**1288 [1]** 1859/9

**12:52 p.m [1]** 1977/5

**13-1288 [1]** 1859/9

**13th [1]** 1926/21

**14 [7]** 1920/21 1961/24 1961/25 1962/23 1963/18 1963/19 1963/22

**1401 [1]** 1859/24

**15 [3]** 1871/17 1884/2 1937/23

**150 [1]** 1915/19

**1523 [1]** 1859/19

**15th [1]** 1864/19

**1625 [1]** 1860/16

**1700 [1]** 1860/13

**17th [1]** 1966/8

**18 [1]** 1869/21

**19087 [1]** 1859/22

**19801 [1]** 1860/3

**1:13-1053 [1]** 1859/3

**1:30 [2]** 1971/8 1971/12

**1st [1]** 1918/7

**2**

**2.7 [1]** 1949/25

**2.8 [2]** 1949/16 1949/25

**20 [6]** 1884/2 1887/2 1943/21 1945/1 1961/23 1962/4

**200 [1]** 1913/7

**20001 [2]** 1860/11 1860/22

**20005 [1]** 1859/25

**20006 [2]** 1860/14 1860/17

**20036 [1]** 1859/19

**2007 [1]** 1904/16

**2008 [9]** 1876/3 1904/17 1904/19 1905/5 1908/11 1912/4 1912/23 1931/14 1936/16

**2009 [1]** 1914/25

**2010 [2]** 1915/6 1915/7

**2011 [2]** 1950/20 1952/17

**2012 [33]** 1871/18 1876/7 1892/13 1895/17 1914/25 1915/6 1915/7 1915/16 1916/24 1917/7 1920/21 1921/13 1925/8 1926/21 1932/5 1932/8 1939/1 1942/21 1943/25 1946/1 1946/4 1947/8 1947/9 1947/11 1947/16 1947/21 1952/16 1952/18 1957/13 1960/6 1961/6 1966/9 1970/13

**2013 [9]** 1948/4 1948/22 1960/2 1960/3 1961/16 1961/17 1961/22 1962/6 1962/10

**2014 [8]** 1948/13 1948/14 1948/21 1949/4 1949/15 1962/24 1963/14 1963/21

**2015 [6]** 1949/6 1949/6 1949/10 1949/13 1957/21 1963/2

**2016 [2]** 1949/10

**2**

**2016... [1]** 1953/25
**2017 [2]** 1949/10
1949/16
**2018 [2]** 1949/17
1949/18
**2019 [1]** 1950/3
**202-354-3196 [1]**
1860/23
**2020 [1]** 1950/3
**2020s [1]** 1923/6
**2021 [4]** 1950/3
1950/12 1950/15
1950/16
**2022 [14]** 1859/5
1944/24 1944/25
1945/1 1946/1 1946/4
1950/3 1950/12
1950/16 1950/20
1957/19 1959/3
1961/22 1978/9
**2037 [1]** 1922/18
**218 [5]** 1943/16
1943/18 1943/19
1943/22 1962/4
**25 [1]** 1944/13
**250 [2]** 1937/22
1937/24
**258 [1]** 1894/10
**27 [2]** 1859/5 1978/9
**280 [1]** 1859/21

**3**

**3-year [1]** 1957/23
**30 [3]** 1892/15 1892/15
1896/8
**3196 [1]** 1860/23
**31st [5]** 1919/8 1919/9
1921/5 1921/7 1921/13
**32 [1]** 1869/21
**333 [1]** 1860/21
**38 [1]** 1965/20

**4**

**403 [3]** 1873/2 1874/15
1881/23
**412 [11]** 1862/23
1863/4 1863/14 1870/2
1872/14 1872/24
1876/17 1877/18
1878/7 1920/6 1921/2
**45 [1]** 1967/12
**47 [1]** 1882/15

**5**

**529 [9]** 1862/23
1864/16 1864/17
1870/2 1871/15 1872/9
1876/17 1878/8
1925/24
**53 [2]** 1943/21 1962/4

**6**

**6.3 [1]** 1944/23
**601 [1]** 1860/10
**611 [1]** 1878/3
**6720 [1]** 1860/22
**6th [1]** 1943/4

**7**

**7.5 [1]** 1962/13
**702 [1]** 1881/20
**703 [10]** 1862/15
1867/18 1867/23
1873/25 1874/15
1874/15 1874/18
1875/22 1876/10
1876/19

**9**

**9:39 [1]** 1859/5

**A**

**a.m [1]** 1859/5
**ability [7]** 1892/2
1898/6 1902/4 1905/1
1905/8 1938/8 1968/2
**able [16]** 1893/10
1902/10 1902/12
1902/13 1911/8 1911/9
1913/14 1916/16
1927/24 1932/20
1947/22 1947/23
1947/24 1947/25
1948/14 1956/10
**about [111]** 1862/11
1864/5 1864/20 1866/6
1867/2 1867/22 1872/1
1873/16 1875/17
1877/9 1878/2 1884/4
1890/21 1891/4 1891/8
1891/15 1891/21
1892/5 1892/12
1893/13 1893/14
1893/19 1893/20
1893/22 1895/1 1895/2
1897/5 1897/6 1902/21
1903/18 1904/25

1905/3 1908/16 1909/7
1911/13 1911/14
1911/17 1911/19
1912/10 1912/17
1912/18 1913/16
1914/3 1915/11
1915/14 1915/18
1915/19 1915/22
1915/24 1916/4 1916/9
1916/10 1916/18
1918/2 1918/4 1918/13
1918/23 1919/1 1919/6
1921/1 1921/17 1925/1
1927/5 1927/23 1928/3
1928/16 1929/19
1931/1 1932/11
1932/15 1932/18
1932/19 1932/20
1933/4 1934/22
1934/23 1935/14
1935/2 1937/14
1937/25 1938/7
1938/22 1939/20
1940/7 1940/20
1940/24 1941/8
1941/16 1941/22
1943/13 1944/13
1945/4 1946/7 1946/17
1948/8 1948/12
1948/13 1951/9 1952/7
1954/10 1954/10
1956/9 1956/13
1956/17 1957/2
1958/10 1964/10
1964/23 1965/8
1971/10 1971/11
**above [3]** 1914/13
1924/4 1978/5
**above-entitled [1]**
1978/5
**Absent [1]** 1905/13
**Absolutely [1]**
1971/18
**absorb [2]** 1906/23
1907/15
**academic [1]** 1888/9
**access [5]** 1867/12
1875/13 1875/15
1910/4 1918/17
**Accordingly [1]**
1934/15
**account [1]** 1952/14
**accounting [1]**
1959/11

**accounts [1]** 1876/2
**accrued [1]** 1959/23
**accumulating [1]**
1963/4
**accurate [2]** 1941/7
1946/18
**achieve [1]** 1874/11
**achieved [1]** 1971/3
**across [2]** 1895/17
1895/20
**action [4]** 1859/2
1859/9 1859/10 1971/3
**actual [3]** 1881/24
1943/5 1947/13
**actuality [1]** 1883/2
**actually [21]** 1875/7
1881/25 1885/1 1896/4
1899/14 1901/7 1910/8
1918/5 1918/8 1920/16
1923/25 1925/22
1928/9 1935/10
1950/16 1953/9
1955/24 1958/23
1959/10 1965/18
1971/21
**ADAM [1]** 1860/4
**add [3]** 1885/7 1885/8
1963/1
**added [3]** 1953/11
1960/23 1962/12
**addition [1]** 1866/16
**additional [3]** 1874/1
1879/6 1957/2
**Additionally [1]**
1864/5
**address [2]** 1866/24
1891/12
**addressed [1]** 1863/8
**adjust [1]** 1966/11
**admissible [2]** 1870/9
1879/25
**admission [1]** 1876/16
**admit [1]** 1870/2
**admitted [3]** 1877/1
1877/8 1877/13
**advance [1]** 1910/18
**affecting [1]** 1941/15
**afford [9]** 1947/22
1947/23 1947/24
1948/14 1950/5
1960/18 1960/19
1960/20 1962/8
**afoul [1]** 1884/13
**after [35]** 1862/12

**A**

**after... [34]** 1865/2 1865/10 1865/13 1866/20 1875/9 1893/3 1899/24 1901/14 1901/15 1914/16 1914/17 1916/19 1916/19 1917/7 1924/14 1924/20 1925/14 1926/21 1928/3 1929/11 1931/2 1931/17 1937/22 1938/20 1939/17 1948/1 1958/24 1959/5 1959/22 1960/7 1960/20 1965/13 1967/3 1969/11

**again [20]** 1868/18 1873/14 1874/4 1877/22 1877/23 1879/13 1882/5 1884/9 1915/21 1924/10 1927/23 1934/2 1935/7 1938/18 1941/17 1945/4 1945/21 1950/17 1962/4 1965/23

**against [2]** 1898/3 1899/4

**agencies [11]** 1887/21 1887/22 1923/16 1923/18 1923/21 1924/10 1926/8 1926/17 1928/7 1928/9 1940/19

**agency [4]** 1859/6 1860/8 1926/7 1938/18

**ago [2]** 1918/7 1954/23

**agree [10]** 1869/18 1870/5 1884/24 1885/5 1890/20 1891/3 1942/8 1956/4 1958/16 1959/15

**agreed [1]** 1877/13

**agreement [3]** 1859/10 1890/3 1938/23

**agreements [3]** 1905/12 1905/14 1915/12

**agrees [1]** 1885/8

**Ah [1]** 1919/4

**ahead [5]** 1863/5 1896/11 1910/6

**aided [1]** 1860/25

**air [2]** 1866/1 1868/23

**al [3]** 1859/2 1859/2 1859/6

**alarm [1]** 1863/24

**all [51]** 1865/14 1866/11 1867/10 1867/17 1867/24 1875/5 1875/16 1876/15 1877/4 1878/14 1879/22 1880/2 1880/6 1882/12 1883/14 1883/20 1883/24 1884/2 1884/25 1885/25 1893/3 1893/6 1893/25 1898/22 1901/19 1902/6 1907/13 1908/5 1910/10 1911/17 1912/19 1912/20 1918/18 1918/22 1919/24 1930/19 1939/16 1940/8 1941/1 1941/2 1941/6 1941/6 1946/18 1947/25 1952/24 1953/13 1964/12 1964/19 1969/4 1969/15 1971/11

**alleviate [1]** 1868/24

**alleviated [1]** 1867/3

**alleviates [2]** 1938/22 1939/3

**allow [1]** 1873/6

**allowed [1]** 1882/9

**allows [1]** 1941/6

**almost [1]** 1949/18

**already [8]** 1864/20 1871/19 1872/13 1876/24 1878/13 1884/22 1952/13 1964/19

**also [22]** 1865/4 1865/11 1866/8 1868/19 1875/12 1881/21 1889/5 1890/25 1891/9 1892/24 1909/6 1912/8 1928/23 1931/10 1937/13 1938/7 1938/25 1949/14 1958/5 1959/15 1961/9 1967/20

**alternatives [1]** 1875/16

**Although [1]** 1876/10

**am [3]** 1923/24 1942/7 1944/19

**ambiguous [1]** 1884/9

**amended [1]** 1925/11

**amendment [102]** 1864/8 1865/3 1865/14 1866/1 1866/5 1866/9 1866/19 1866/20 1866/22 1866/24 1867/2 1868/11 1868/18 1868/24 1869/18 1870/6 1870/17 1871/19 1872/2 1874/10 1875/6 1875/8 1875/9 1876/22 1877/24 1878/11 1878/24 1879/4 1879/10 1882/19 1882/25 1883/20 1884/7 1890/2 1890/4 1891/5 1891/22 1892/12 1892/23 1893/2 1893/3 1909/12 1909/13 1909/23 1914/17 1915/11 1915/15 1916/25 1918/24 1924/19 1925/6 1925/13 1925/20 1926/23 1928/17 1929/4 1929/11 1929/18 1929/20 1930/2 1931/2 1931/3 1931/17 1931/25 1932/1 1932/24 1933/5 1934/19 1935/9 1935/14 1935/23 1937/3 1937/10 1937/13 1937/16 1937/21 1937/23 1938/12 1938/13 1938/20 1939/3 1939/7 1939/17 1939/18 1939/23 1940/4 1948/10 1951/20 1951/20 1956/5 1956/12 1965/4 1965/16 1966/6 1968/13 1969/7 1969/11 1969/12 1969/22 1969/24

**alternatives [1]** 1970/7 1970/21

**Amendment's [1]** 1928/24

**Americans [1]** 1910/5

**Americas [1]** 1860/6

**among [1]** 1864/9

**amount [16]** 1890/14 1895/17 1895/20 1899/18 1913/7 1917/7 1934/20 1946/2 1947/16 1947/18 1948/24 1950/8 1951/9 1953/3 1953/9 1956/25

**amounts [3]** 1916/4 1916/8 1916/11

**ample [3]** 1864/12 1868/3 1872/6

**analogy [3]** 1896/25 1906/10 1908/20

**analysis [16]** 1875/9 1878/3 1879/14 1883/2 1916/15 1917/18 1917/21 1931/10 1939/16 1944/6 1956/16 1956/17 1964/14 1964/22 1966/17 1966/17

**analyst [64]** 1863/7 1863/12 1863/19 1864/10 1865/16 1865/22 1866/12 1866/15 1866/18 1866/20 1867/1 1868/1 1868/6 1868/12 1869/20 1870/1 1870/4 1870/20 1872/4 1873/4 1874/1 1874/2 1874/10 1875/5 1875/7 1877/2 1879/6 1879/11 1879/16 1917/19 1917/22 1918/13 1918/14 1918/16 1918/22 1919/20 1919/24 1920/12 1921/4 1925/19 1928/16 1928/23 1929/10 1931/2 1931/6 1932/23 1933/1 1935/3 1939/7 1939/12 1939/16 1940/8 1940/12 1940/14 1941/17 1941/19 1942/6 1964/19 1969/4 1969/6 1969/6 1969/10

**analyst... [2]** 1969/15 1969/17
**analysts [12]** 1875/10 1875/13 1928/7 1929/4 1929/16 1936/24 1939/4 1940/2 1940/3 1940/17 1941/7 1941/11
**analyze [2]** 1890/2 1940/17
**analyzed [3]** 1893/18 1895/2 1941/2
**analyzing [1]** 1916/14
**announced [3]** 1866/19 1866/21 1929/11
**announcement [3]** 1928/25 1931/3 1968/13
**announcements [1]** 1929/19
**annual [1]** 1912/4
**another [10]** 1878/5 1884/18 1893/11 1931/11 1932/23 1933/1 1935/3 1937/13 1938/16 1971/23
**answer [3]** 1889/23 1906/16 1909/11
**any [25]** 1863/20 1867/25 1870/10 1871/12 1872/6 1872/9 1875/6 1881/24 1882/12 1883/4 1884/12 1884/13 1889/7 1889/13 1895/4 1907/12 1908/12 1909/18 1917/19 1926/13 1926/17 1932/15 1947/25 1950/25 1964/22
**anyone [1]** 1971/11
**anything [3]** 1881/6 1901/17 1934/3
**Anyway [1]** 1920/18
**anywhere [1]** 1882/22
**apart [1]** 1937/3
**apologies [1]** 1926/2
**apologize [1]** 1914/8
**apparent [1]** 1961/5
**APPEARANCES [2]** 1859/15 1859/25
**applies [1]** 1870/12

**appreciate [2]** 1862/9 1897/12
**approach [4]** 1862/24 1881/19 1884/22 1966/1
**appropriate [1]** 1882/4
**area [1]** 1889/2
**areas [1]** 1888/22
**aren't [3]** 1873/23 1898/3 1960/11
**argue [2]** 1868/25 1878/5
**argued [1]** 1877/7
**arguing [1]** 1877/10
**argument [9]** 1869/24 1872/15 1873/3 1873/25 1874/17 1877/20 1878/12 1878/13 1881/21
**arguments [4]** 1873/14 1875/23 1877/14 1877/15
**arises [1]** 1896/5
**Arnold [1]** 1860/10
**around [11]** 1878/11 1892/17 1892/20 1892/20 1892/21 1896/4 1897/7 1897/8 1897/9 1967/4 1968/15
**article [5]** 1877/19 1878/1 1878/8 1921/21 1938/15
**articles [2]** 1876/5 1879/19
**as [86]** 1863/7 1864/7 1864/10 1865/19 1866/2 1866/7 1867/18 1870/23 1872/24 1873/17 1874/15 1875/13 1876/9 1876/12 1876/14 1877/1 1877/23 1879/4 1879/25 1880/2 1880/2 1880/19 1881/5 1881/12 1881/25 1886/19 1888/1 1888/2 1888/16 1889/11 1889/20 1891/13 1892/8 1895/13 1896/1 1896/19 1900/1 1900/11 1904/13 1906/12 1906/12 1907/2 1908/22

1914/15 1917/1 1917/18 1918/16 1919/10 1920/11 1923/21 1926/16 1926/19 1929/4 1930/13 1930/17 1930/17 1932/12 1934/11 1935/4 1935/18 1936/4 1936/16 1936/21 1943/4 1943/12 1943/23 1944/3 1945/9 1947/3 1949/14 1951/11 1952/12 1953/13 1955/12 1956/4 1956/8 1960/24 1964/14 1967/5 1968/8 1969/21 1969/23 1970/7 1971/2
**as-of [1]** 1943/12
**aside [6]** 1866/12 1908/25 1909/2 1909/8 1942/14 1945/23
**ASIM [1]** 1860/8
**ask [7]** 1869/13 1873/16 1882/15 1918/6 1946/7 1946/16 1958/10
**asked [4]** 1889/23 1891/9 1909/11 1954/18
**assessment [1]** 1942/9
**asset [3]** 1899/3 1959/25 1960/3
**assets [18]** 1897/18 1898/4 1899/5 1913/2 1913/3 1915/5 1936/17 1936/19 1937/18 1947/5 1958/11 1958/12 1958/14 1958/17 1958/25 1959/6 1959/14 1960/11
**assignment [2]** 1890/2 1890/6
**assist [1]** 1887/18
**associated [1]** 1933/15
**Associates [3]** 1886/20 1886/22 1886/23
**Association [1]**

**assume [1]** 1894/10
**assuming [1]** 1946/18
**assumption [1]** 1881/1
**assumptions [3]** 1922/17 1953/20 1954/4
**attached [1]** 1878/9
**Attari [51]** 1866/3 1866/25 1867/11 1867/16 1867/21 1869/10 1869/16 1870/23 1873/17 1874/4 1874/11 1875/19 1880/9 1880/15 1881/3 1881/9 1882/1 1882/9 1882/16 1882/21 1883/19 1885/3 1886/3 1886/11 1886/13 1886/17 1888/10 1889/11 1889/19 1894/21 1894/25 1897/10 1903/9 1908/15 1910/10 1913/10 1916/24 1919/19 1920/23 1921/7 1922/12 1923/11 1926/6 1930/17 1930/25 1939/16 1940/6 1942/18 1943/23 1944/15 1956/2
**Attari's [10]** 1862/11 1862/17 1868/12 1869/2 1879/12 1884/4 1928/12 1930/23 1952/1 1964/10
**attempt [2]** 1862/9 1881/15
**attendees [1]** 1871/21
**attributed [2]** 1882/23 1882/25
**August [5]** 1864/19 1871/17 1918/7 1926/21 1966/8
**available [1]** 1890/5 1894/11 1909/21 1911/11 1918/16 1941/1 1948/24
**Avenue [6]** 1859/19 1859/24 1860/6 1860/10 1860/13 1860/21

## A

**aware [2]** 1942/4
1942/7
**away [4]** 1908/7
1908/8 1934/23
1969/25

## B

**back [24]** 1867/6
1867/18 1872/18
1894/22 1898/8
1904/16 1909/18
1910/8 1913/4 1918/12
1919/9 1922/23
1928/12 1930/23
1936/16 1945/15
1945/23 1950/10
1951/25 1952/1 1955/8
1964/10 1965/18
1971/11
**backed [36]** 1892/6
1892/7 1892/8 1892/14
1895/13 1895/15
1895/18 1897/4
1898/16 1898/19
1898/21 1899/7 1899/9
1900/16 1901/7
1901/11 1903/5
1903/10 1903/14
1903/17 1903/21
1904/9 1904/23
1906/25 1907/1 1911/8
1913/20 1914/16
1914/18 1916/3
1919/17 1920/11
1920/21 1922/5
1936/12 1970/11
**backing [2]** 1890/25
1944/4
**backstop [2]** 1863/16
1863/17
**bad [2]** 1904/13
1904/15
**balance [1]** 1897/19
**bang [1]** 1926/24
**bank [15]** 1864/10
1877/18 1920/7 1920/9
1920/9 1920/20 1921/4
1921/21 1922/14
1922/16 1923/4 1925/5
1925/10 1925/13
1933/3
**banking [1]** 1887/11
**bankrupt [3]** 1901/2

**bankruptcy [3]**
1860/21 1901/14
1901/20
**bar [2]** 1900/15
1945/17
**Barclay's [1]** 1931/9
**barely [3]** 1893/9
1947/23 1947/24
**BARNES [1]** 1859/18
**BARRY [1]** 1860/2
**bars [1]** 1957/5
**base [7]** 1955/9
1955/12 1955/23
1955/25 1956/9
1957/12 1957/15
**base-case [4]** 1955/9
1955/12 1955/23
1956/9
**based [27]** 1870/6
1874/6 1874/16
1876/17 1876/25
1880/18 1880/24
1881/17 1882/7
1883/10 1904/17
1905/10 1910/14
1910/15 1915/12
1915/17 1916/15
1922/16 1929/10
1931/1 1931/12
1931/24 1939/16
1940/12 1945/9
1950/25 1955/3
**bases [4]** 1868/13
1879/20 1927/17
1946/12
**basic [1]** 1880/20
**basically [11]** 1896/8
1897/6 1902/14
1903/19 1910/23
1911/7 1932/10
1933/22 1954/12
1956/21 1970/25
**basis [2]** 1876/14
1879/24
**be [173]**
**bear [1]** 1900/18
**beat [1]** 1879/21
**became [2]** 1892/13
1970/1
**because [53]** 1872/5
1872/11 1872/19
1873/7 1873/8 1874/25
1875/5 1875/12 1877/8

1880/17 1882/25
1884/22 1888/6 1901/7
1903/13 1903/18
1904/7 1907/13
1907/14 1908/7 1908/8
1909/3 1910/3 1911/14
1914/23 1918/2 1918/8
1918/25 1924/21
1927/17 1928/10
1929/18 1929/22
1932/11 1939/25
1941/12 1944/9
1948/21 1949/22
1949/22 1951/1
1951/16 1951/18
1951/22 1953/17
1953/17 1956/8
1962/17 1965/11
1968/23 1970/17
**become [4]** 1917/8
1924/21 1959/12
1968/24
**becomes [1]** 1965/9
**becoming [2]** 1905/3
1905/9
**been [43]** 1864/20
1870/12 1870/20
1870/24 1872/6
1872/15 1876/21
1876/25 1880/16
1881/10 1881/17
1882/7 1883/24 1884/5
1888/19 1888/20
1892/11 1899/18
1899/18 1900/4
1905/19 1905/22
1907/22 1908/4
1911/18 1913/14
1916/8 1919/3 1927/6
1929/15 1936/24
1938/10 1938/11
1949/24 1952/15
1952/17 1952/21
1953/1 1953/25
1954/14 1966/3
1968/25 1969/1
**before [35]** 1859/13
1862/7 1863/8 1865/3
1865/21 1865/25
1882/12 1887/22
1888/11 1888/16
1888/21 1889/3 1893/1
1894/24 1901/12

1916/25 1922/11
1925/16 1925/20
1926/23 1928/4
1928/16 1938/12
1938/13 1939/4
1939/17 1943/10
1943/13 1945/4 1947/2
1948/9 1969/7 1969/22
**beginning [1]** 1916/3
**begins [1]** 1862/7
**behalf [3]** 1862/5
1869/7 1886/2
**being [20]** 1868/22
1870/4 1871/20 1876/9
1888/20 1892/8 1893/1
1895/13 1898/25
1904/24 1910/25
1917/11 1929/23
1932/8 1936/21
1939/25 1940/25
1957/22 1968/8 1969/4
**belabor [3]** 1945/5
1956/14 1957/4
**believe [17]** 1864/7
1865/10 1865/13
1875/6 1877/11
1877/19 1878/11
1878/15 1885/4
1885/14 1909/14
1927/15 1942/12
1943/18 1952/11
1965/20 1966/24
**believed [1]** 1894/1
**below [3]** 1914/11
1914/12 1953/3
**bench [1]** 1971/19
**benefit [4]** 1906/20
1927/14 1958/25
1959/5
**Benson [6]** 1942/21
1943/24 1945/6 1945/8
1954/18 1956/15
**Benson's [7]** 1946/9
1953/22 1954/6
1954/16 1955/3 1955/4
1955/9
**Berger [1]** 1860/5
**BERGMAN [1]** 1860/9
**Bernstein [1]** 1860/5
**best [4]** 1926/14
1930/13 1930/17
1954/19
**better [4]** 1951/13

**B**

**better... [3]** 1955/14 1957/12 1964/8
**between [5]** 1862/10 1898/19 1899/22 1914/25 1962/12
**beyond [1]** 1939/8
**big [4]** 1878/2 1888/8 1931/11 1960/5
**bigger [6]** 1963/7 1963/7 1963/7 1963/10 1963/10 1963/10
**billion [42]** 1894/10 1894/14 1894/15 1894/16 1912/24 1912/24 1913/7 1915/19 1915/19 1916/9 1916/16 1933/9 1933/18 1934/16 1937/22 1937/24 1937/25 1944/13 1944/23 1945/1 1947/20 1947/20 1948/7 1948/7 1948/8 1948/12 1948/15 1948/16 1949/16 1949/19 1949/20 1949/23 1949/23 1949/25 1951/9 1953/12 1953/14 1961/22 1961/24 1961/25 1962/23 1963/18
**bit [16]** 1891/15 1895/1 1896/19 1899/6 1899/8 1900/23 1908/15 1926/1 1926/4 1930/13 1931/16 1940/6 1941/22 1959/20 1965/19 1970/15
**bits [1]** 1936/23
**board [4]** 1943/6 1944/2 1944/3 1944/10
**bodies [1]** 1928/8
**Boies [1]** 1859/24
**bold [3]** 1914/9 1914/10 1915/4
**bolds [1]** 1964/11
**bond [51]** 1863/23 1867/4 1882/20 1882/23 1882/23 1882/24 1883/1 1883/3 1883/4 1897/16 1898/2

1898/9 1898/11 1899/3 1901/11 1902/3 1902/6 1903/11 1911/20 1912/11 1913/20 1914/5 1914/10 1914/12 1915/4 1915/5 1917/3 1917/12 1919/18 1925/2 1926/13 1929/25 1930/4 1932/21 1936/12 1964/24 1965/1 1965/3 1965/14 1965/19 1967/3 1967/6 1967/7 1967/17 1968/12 1968/21 1968/22 1969/14 1970/2 1970/12 1971/2
**bond-investor [1]** 1970/12
**bonds [47]** 1864/1 1865/8 1882/18 1893/5 1893/5 1898/16 1898/19 1899/6 1899/8 1902/23 1903/2 1903/4 1903/14 1903/16 1904/23 1905/1 1906/12 1920/10 1922/5 1922/6 1924/21 1924/24 1926/9 1926/9 1964/11 1964/11 1965/5 1965/6 1965/7 1965/11 1965/15 1966/20 1966/20 1966/25 1967/15 1967/17 1967/18 1967/19 1967/20 1967/20 1967/22 1967/24 1967/25 1968/3 1968/4 1968/5 1968/15
**book [1]** 1874/9
**border [1]** 1913/2
**borrow [1]** 1897/17
**borrower [7]** 1895/24 1896/21 1897/5 1897/23 1903/3 1903/5 1968/9
**borrowers [1]** 1902/18
**borrowings [2]** 1915/22 1915/23
**both [9]** 1863/6 1863/15 1898/15 1898/20 1905/4 1921/15 1921/22

**bottom [11]** 1900/10 1907/23 1912/3 1921/14 1924/8 1929/16 1939/15 1962/19 1962/21 1970/5 1970/7
**bottom-line [2]** 1970/5 1970/7
**bought [2]** 1897/22 1897/24
**breach [1]** 1938/22
**break [5]** 1885/21 1930/10 1949/19 1959/9 1971/7
**break-even [1]** 1949/19
**breakeven [1]** 1949/21
**BRIAN [1]** 1859/18
**brief [1]** 1877/6
**briefly [4]** 1883/8 1884/16 1893/13 1895/6
**bring [1]** 1913/3
**broader [3]** 1920/2 1920/17 1941/11
**broadly [2]** 1895/11 1918/21
**broken [1]** 1967/1
**Brothers [1]** 1931/13
**brought [2]** 1865/15 1878/22
**built [2]** 1907/4 1907/7
**bulk [1]** 1869/19
**bunch [1]** 1865/22
**burden [4]** 1873/15 1874/24 1874/25 1876/19
**burn [1]** 1908/24
**burned [1]** 1909/4
**business [4]** 1934/9 1936/22 1941/8 1941/14
**button [1]** 1863/3
**buy [6]** 1892/7 1892/10 1895/21 1896/6 1906/19 1911/9
**buying [8]** 1892/14 1892/18 1896/1 1896/2 1896/8 1903/14 1905/3 1906/24

**C**

**calculates [1]** 1894/13

**California [1]** 1908/22
**call [7]** 1871/7 1876/12 1885/25 1886/2 1910/23 1912/3 1957/6
**call-out [3]** 1910/23 1912/3 1957/6
**called [4]** 1886/19 1886/24 1912/4 1966/17
**calls [3]** 1935/5 1954/25 1958/15
**calm [2]** 1936/4 1936/10
**came [5]** 1866/18 1866/20 1907/20 1914/11 1914/15
**can [73]** 1862/6 1862/18 1863/2 1863/9 1865/18 1867/19 1868/5 1869/3 1870/10 1871/22 1873/11 1882/15 1884/10 1885/3 1885/6 1885/16 1887/14 1887/17 1887/19 1887/19 1887/20 1889/24 1890/24 1891/8 1891/17 1892/7 1893/8 1893/15 1893/19 1894/22 1895/6 1895/8 1896/1 1896/18 1897/10 1898/8 1899/19 1900/8 1900/13 1904/11 1906/16 1908/17 1910/17 1913/10 1913/12 1913/24 1918/7 1918/12 1920/7 1922/14 1925/18 1926/2 1928/12 1930/13 1930/17 1931/6 1942/12 1943/17 1943/19 1948/11 1950/17 1952/1 1952/10 1956/8 1958/7 1963/13 1965/24 1967/4 1967/7 1967/11 1969/21 1970/7 1971/21
**can't [2]** 1872/9 1878/4
**Canada [1]** 1933/3
**cannot [5]** 1874/24 1876/12 1876/19 1881/9 1895/24

**cap [4]** 1863/25
1921/12 1938/23
1938/25
**capacity [2]** 1887/23
1911/15
**capital [28]** 1880/21
1881/2 1894/10
1894/19 1907/4 1907/5
1907/6 1907/10
1907/11 1907/12
1907/13 1907/18
1907/19 1907/20
1908/2 1908/3 1908/5
1908/12 1913/5
1927/17 1932/8 1933/1
1933/9 1934/5 1934/14
1935/8 1939/21
1939/22
**capped [7]** 1892/13
1915/17 1917/8
1917/10 1919/8
1919/14 1922/1
**capture [1]** 1926/2
**car [1]** 1896/6
**card [1]** 1931/16
**case [30]** 1864/22
1867/5 1870/18
1875/25 1876/24
1889/2 1889/20
1890/14 1901/21
1905/10 1909/10
1910/11 1915/13
1917/19 1918/12
1938/17 1942/2 1946/1
1955/9 1955/12
1955/23 1955/25
1956/9 1956/16
1957/15 1964/1
1964/14 1966/5
1971/10 1971/11
**cases [1]** 1941/10
**categories [3]** 1900/7
1902/7 1902/8
**cause [3]** 1882/19
1922/3 1929/14
**causes [2]** 1916/6
1951/5
**causing [2]** 1939/20
1970/14
**CAYNE [1]** 1860/8
**cents [3]** 1915/9
1917/4 1917/12
**certain [5]** 1862/14

1896/15 1924/22
1942/13 1944/11
**certify [1]** 1978/4
**chair [2]** 1930/14
1930/15
**challenges [2]**
1923/16 1923/23
**challenging [1]** 1936/7
**chance [2]** 1932/4
1932/7
**change [16]** 1882/20
1882/23 1882/24
1885/4 1908/15
1931/23 1931/25
1932/3 1933/7 1940/6
1953/8 1953/14 1956/3
1956/6 1966/9 1968/25
**changed [3]** 1883/3
1944/11 1968/12
**changes [6]** 1865/13
1885/20 1933/4
1966/12 1966/12
1966/13
**characterized [2]**
1864/7 1877/23
**charge [1]** 1968/7
**charged [2]** 1894/14
1952/16
**CHARLES [4]** 1859/16
1886/20 1886/22
1886/23
**chart [1]** 1923/2
**check [2]** 1859/21
1889/17
**chief [1]** 1870/19
**chopped [2]** 1898/12
1898/12
**chose [2]** 1967/18
1967/20
**chosen [1]** 1874/11
**CIATTI [1]** 1860/12
**circular [36]** 1863/24
1919/16 1919/16
1925/11 1929/22
1929/24 1932/11
1933/13 1933/15
1935/25 1939/20
1939/23 1940/1
1942/16 1948/10
1948/17 1948/20
1948/22 1948/23
1950/10 1950/17
1950/19 1951/23
1953/6 1953/15

1956/11 1956/12
1957/2 1958/15 1961/3
1961/12 1969/25
1970/16 1970/17
**circularity [2]** 1865/6
1865/7
**citation [1]** 1880/23
**cite [1]** 1880/20
**City [1]** 1888/15
**Civil [2]** 1859/2 1859/9
**claim [2]** 1881/4
1908/25 1909/6
**claims [2]** 1906/13
1909/8
**clarification [1]**
1908/17
**class [5]** 1859/10
1859/20 1907/23
1923/12 1966/21
**classes [2]** 1915/8
1936/11
**clear [7]** 1863/1
1863/2 1867/25
1877/20 1878/17
1941/18 1951/18
**clearly [2]** 1865/19
1886/8
**clients [3]** 1887/7
1887/14 1887/16
**clips [1]** 1868/6
**close [1]** 1881/16
**closed [1]** 1941/4
**closer [1]** 1897/11
**co [1]** 1886/21
**co-leader [1]** 1886/21
**COLATRIANO [1]**
1859/17
**collapsed [1]** 1931/13
**collateral [1]** 1898/22
**colleague [1]** 1877/15
**collect [2]** 1918/15
1940/17
**colors [1]** 1957/10
**COLUMBIA [1]** 1859/1
**combined [1]** 1863/25
**come [9]** 1873/6
1878/6 1879/4 1907/19
1910/11 1940/15
1941/7 1945/23
1956/18
**comes [3]** 1864/23
1869/19 1902/14
**comfort [1]** 1898/23

**comfortable [2]**
1892/9 1892/16
**coming [2]** 1867/9
1871/10
**commentary [2]**
1935/6 1935/14
**commenting [1]**
1935/22
**commitment [65]**
1863/18 1863/25
1880/11 1880/25
1881/1 1881/14
1881/20 1882/11
1884/11 1884/20
1890/7 1890/8 1890/12
1890/14 1890/22
1892/1 1893/14
1912/19 1912/21
1912/23 1913/6
1913/11 1913/14
1913/16 1913/17
1913/24 1914/4 1914/6
1914/11 1914/21
1914/24 1915/1
1915/16 1916/5 1916/8
1916/21 1916/23
1916/25 1917/8
1917/10 1919/8
1919/17 1921/25
1922/3 1922/17
1922/19 1923/5
1927/25 1928/1
1929/15 1929/23
1933/23 1933/25
1934/7 1934/11
1939/25 1948/24
1951/9 1951/17
1955/15 1955/19
1955/20 1960/22
1964/16 1970/19
**common [14]** 1899/13
1899/19 1899/22
1899/24 1900/18
1900/24 1901/1
1901/12 1901/18
1907/20 1908/12
1912/7 1912/13
1957/25
**commonly [1]** 1918/10
**communicated [1]**
1871/17
**companies [34]**
1887/17 1887/19
1887/20 1888/25

**C**

**companies... [30]**
1892/9 1892/17 1894/9
1894/19 1895/17
1895/20 1895/21
1898/21 1899/16
1900/20 1900/21
1901/8 1908/19 1913/2
1913/9 1913/14
1913/18 1915/21
1922/1 1926/10 1927/6
1928/6 1929/19 1935/8
1940/19 1941/12
1941/13 1941/13
1958/1 1958/21
**companies' [1]**
1929/13
**company [26]** 1860/12
1883/21 1884/10
1892/20 1896/4
1899/14 1899/15
1899/15 1900/8 1900/9
1900/11 1900/12
1901/2 1901/4 1901/5
1906/10 1908/23
1911/4 1911/6 1911/7
1926/19 1940/16
1945/25 1955/22
1960/10 1966/25
**company's [2]** 1893/8
1947/5
**compare [1]** 1943/11
**compared [1]** 1946/24
**comparing [3]**
1944/20 1945/20
1946/21
**completely [1]**
1898/25
**completeness [1]**
1878/3
**complicated [5]**
1898/14 1901/6 1967/8
1967/22 1967/25
**complications [1]**
1901/9
**comprehensive [4]**
1945/24 1957/1 1957/9
1960/4
**computer [1]** 1860/25
**computer-aided [1]**
1860/25
**concede [1]** 1877/1
**concepts [1]** 1880/20
**concern [26]** 1863/21

1869/22 1863/22
1864/11 1864/15
1865/4 1866/8 1866/23
1867/7 1868/20
1868/22 1879/14
1916/4 1916/6 1921/24
1929/5 1932/19
1936/23 1938/7
1938/11 1939/19
1969/20 1969/21
1970/13 1970/14
1970/15
**concerned [4]** 1868/22
1879/9 1903/18
1916/18
**concerns [11]** 1865/16
1866/10 1867/15
1872/4 1892/12 1893/1
1904/25 1917/17
1917/20 1938/22
1961/6
**conclude [4]** 1880/11
1882/10 1884/19
1885/15
**concluded [2]** 1977/4
1977/5
**conclusion [11]**
1868/15 1881/21
1884/1 1891/20
1891/23 1893/14
1912/1 1939/15 1968/9
1970/5 1970/7
**conclusions [7]**
1891/16 1893/20
1965/13 1967/11
1967/13 1969/16
1969/18
**conduct [1]** 1964/14
**conduit [2]** 1876/12
1879/18
**confer [2]** 1883/7
1885/19
**conference [1]**
1971/24
**confidence [44]**
1864/1 1865/8 1896/3
1896/12 1898/5
1901/22 1901/22
1901/25 1902/2 1902/3
1902/9 1902/15
1902/16 1903/11
1903/13 1903/23
1904/12 1904/13
1904/22 1905/20

1905/22 1905/23
1911/4 1911/6 1911/13
1911/19 1912/9
1912/10 1912/13
1913/9 1913/19 1914/7
1914/13 1919/1
1929/25 1955/4 1955/6
1955/7 1966/18
1968/20 1968/25
1969/3 1970/12
1970/15
**confident [6]** 1892/4
1902/21 1919/1
1968/23 1968/24
1970/1
**confirm [1]** 1943/17
**confusion [3]** 1873/8
1876/18 1882/8
**connected [1]** 1878/10
**connection [5]**
1870/14 1870/17
1870/24 1918/23
1938/17
**conservator [2]**
1909/24 1909/25
**conservator's [4]**
1866/6 1909/15
1909/17 1909/22
**conservatorship [13]**
1904/19 1904/24
1905/11 1905/13
1905/25 1907/3
1910/12 1910/22
1910/24 1911/2
1911/12 1911/23
1912/18
**consider [6]** 1888/1
1888/22 1888/24
1890/7 1917/19
1918/13
**considered [7]**
1863/11 1863/13
1864/13 1865/25
1875/23 1877/21
1928/17
**considering [1]**
1868/23
**consistent [12]**
1866/14 1892/25
1893/4 1893/6 1928/21
1928/22 1939/11
1939/14 1965/16
1969/15 1969/17
1970/3

**consistently [1]**
1927/24
**Constitution [1]**
1860/21
**consultant [1]** 1886/19
**consulting [2]** 1887/3
1887/23
**contained [1]** 1952/13
**context [6]** 1863/6
1875/23 1895/1 1895/5
1901/25 1911/7
**continue [1]** 1865/7
1913/9 1913/15 1971/6
**CONTINUED [1]**
1860/1
**continuously [2]**
1909/1 1918/2
**contracts [1]** 1888/25
**contributed [3]** 1908/1
1908/3 1911/16
**conveying [1]** 1872/12
**COOPER [2]** 1859/16
1859/18
**copies [1]** 1862/24
**copy [3]** 1926/3
1926/3 1926/3
**corporate [2]** 1888/24
1889/12
**correct [9]** 1879/12
1912/15 1917/6
1925/12 1934/13
1935/25 1949/5
1951/24 1978/4
**couch [1]** 1881/12
**could [22]** 1864/17
1869/13 1871/6
1871/16 1880/7
1882/24 1883/24
1884/11 1894/14
1896/7 1897/10 1899/2
1904/7 1913/18
1914/23 1918/19
1921/3 1924/5 1930/22
1934/20 1953/7
1961/10
**couldn't [1]** 1866/21
**counsel [5]** 1877/7
1883/8 1884/1 1971/14
1971/24
**couple [5]** 1862/16
1898/8 1928/2 1944/4
1958/10
**course [5]** 1891/13
1927/15 1934/9 1944/5

**C**

course... [1]  1956/15
court [24]  1859/1
1860/20 1863/7 1863/9
1863/15 1865/20
1866/3 1866/13 1870/8
1870/9 1873/5 1873/6
1875/25 1876/4 1876/9
1877/13 1880/14
1880/22 1881/8
1881/18 1883/22
1884/21 1944/16
1978/3
Court's [8]  1862/2
1862/5 1868/9 1883/19
1884/14 1885/3
1889/16 1961/7
courtroom [5]  1885/22
1930/11 1930/20
1971/13 1971/15
courts [1]  1875/22
cover [6]  1863/13
1896/7 1903/7 1909/3
1959/1 1970/18
covered [1]  1868/10
covering [2]  1923/16
1923/24
CRA [4]  1886/24
1887/1 1887/3 1889/3
CRC [1]  1860/20
create [3]  1901/9
1911/8 1954/3
created [3]  1943/11
1945/13 1954/7
creates [1]  1921/17
creating [4]  1926/7
1926/8 1953/6 1959/24
credit [11]  1926/7
1926/8 1926/9 1926/10
1926/17 1927/13
1928/6 1928/9 1928/10
1932/15 1932/18
credit-creating [2]
1926/7 1926/8
crisis [3]  1876/1
1904/16 1904/21
critical [3]  1892/1
1896/2 1896/12
critiques [1]  1955/8
cross [3]  1868/4
1871/5 1871/12
cross-examination [1]
1868/4
cross-examine [2]

crunching [1]  1867/13
Cts [1]  1860/21
cumulative [3]
1948/11 1950/18
1962/17
current [1]  1911/17
cut [1]  1920/23

**D**

D.C [6]  1859/19
1859/25 1860/11
1860/14 1860/17
1860/22
data [2]  1867/12
1874/19
date [7]  1870/12
1875/5 1875/8 1876/22
1926/20 1943/12
1978/10
dated [1]  1871/17
dating [1]  1876/2
DAVID [4]  1859/16
1860/9 1942/21
1943/24
day [4]  1869/17
1877/10 1923/16
1970/11
days [1]  1870/18
DC [1]  1859/6
dead [1]  1879/21
deal [2]  1869/22
1878/2
debt [15]  1892/3
1898/6 1898/20 1900/4
1900/7 1901/5 1901/15
1901/18 1914/5 1916/1
1921/22 1922/5 1936/4
1936/10 1936/10
debts [4]  1902/4
1902/5 1902/10
1902/23
decade [1]  1932/8
decades [3]  1932/13
1934/17 1934/24
December [5]  1919/8
1919/9 1921/5 1921/7
1921/13
decide [1]  1971/22
decided [3]  1871/19
1872/13 1945/22
decision [36]  1863/11
1863/13 1864/4
1864/13 1865/17

1871/5 1871/12
1870/14 1870/17
1871/1 1871/20 1872/2
1872/4 1872/10
1872/17 1872/18
1872/20 1873/1
1873/20 1875/14
1875/21 1875/24
1877/24 1878/13
1878/14 1878/17
1879/1 1879/2 1879/3
1880/14 1891/4
1891/21 1909/19
1918/24 1970/6 1971/2
decision-maker [5]
1870/14 1870/17
1872/20 1873/20
1878/17
decision-making [12]
1865/17 1866/22
1870/11 1871/1 1872/4
1872/10 1872/17
1872/18 1873/1
1877/24 1879/1 1879/3
deck [5]  1919/19
1935/1 1942/17 1952/1
1954/7
declaration [5]  1864/6
1864/6 1864/9 1877/22
1878/2
declining [1]  1883/3
decrease [3]  1864/1
1955/5 1960/25
decreased [1]  1955/7
decreasing [1]
1960/13
default [5]  1883/1
1883/5 1902/16
1902/19 1902/23
defaulting [1]  1906/6
defaults [1]  1914/19
Defendant [1]  1860/7
defendants [28]
1859/7 1862/5 1862/22
1869/9 1869/22
1869/24 1870/2
1870/10 1870/22
1871/6 1872/9 1873/15
1873/22 1874/1
1874/20 1874/24
1876/19 1876/19
1877/1 1881/11
1883/12 1885/25
1886/2 1886/2 1889/10

1889/15 1889/23
1909/11
defendants' [8]
1862/22 1862/23
1863/4 1864/17
1870/18 1872/8 1920/5
1925/24
defense [1]  1869/14
deferred [10]  1958/11
1958/11 1958/14
1958/16 1958/25
1959/6 1959/14 1960/2
1960/6 1960/11
defined [1]  1904/13
degree [1]  1888/13
degrees [1]  1888/9
Delaware [1]  1860/3
demand [4]  1883/4
1903/20 1903/21
1903/22
DeMarco [17]  1863/14
1863/18 1864/14
1865/25 1866/12
1867/15 1868/23
1870/13 1870/16
1870/19 1871/23
1871/6 1872/19
1873/16 1877/9
1877/19 1878/16
DeMarco's [5]  1864/24
1871/1 1872/25
1878/16 1883/23
demonstrating [1]
1872/12
demonstrative [2]
1876/20 1876/24
depending [1]
1908/22
deplete [1]  1927/17
depleted [6]  1907/11
1907/18 1928/1
1929/15 1929/23
1939/25
depletion [1]  1939/21
deposed [1]  1888/20
deposition [1]
1864/22
DeRita [5]  1869/13
1871/16 1871/21
1880/7 1882/15
Derivative [1]  1876/7
describe [9]  1887/14
1889/22 1895/6
1896/18 1900/5

**D**

**describe... [4]** 1900/13
1920/8 1926/15
1955/11
**described [4]** 1867/24
1945/10 1968/11
1969/11
**describing [1]** 1945/11
**designate [1]** 1871/8
**despite [3]** 1872/6
1873/16 1877/14
**detail [2]** 1863/20
1890/24
**Deutsche [13]** 1864/10
1877/18 1920/7 1920/9
1920/20 1921/4
1921/21 1922/14
1922/16 1923/4 1925/5
1925/10 1925/13
**develop [1]** 1967/24
**Dharan [10]** 1891/1
1891/10 1891/10
1942/1 1942/13
1942/24 1943/7
1958/14 1958/16
1961/9
**Dharan's [2]** 1942/9
1959/13
**dibs [1]** 1899/23
**did [55]** 1866/11
1870/19 1871/8 1873/6
1875/21 1879/14
1881/3 1882/21
1888/14 1889/3
1890/12 1890/16
1890/20 1904/21
1905/6 1905/10 1907/6
1907/19 1908/11
1909/16 1910/11
1910/20 1914/6
1914/21 1914/21
1916/15 1917/19
1918/12 1918/13
1928/23 1929/1 1929/2
1929/9 1940/14 1943/2
1943/4 1943/9 1945/2
1948/4 1952/9 1953/23
1955/3 1955/4 1955/5
1956/16 1956/20
1958/23 1960/6
1961/25 1963/17
1963/20 1964/14
1964/15 1964/18
1964/22

**didn't [6]** 1879/4
1907/3 1907/4 1907/12
1952/6 1954/2
**difference [4]** 1898/19
1898/21 1950/8
1962/12
**differences [1]**
1944/22
**different [9]** 1866/2
1895/6 1895/10 1906/5
1922/17 1942/6
1957/10 1957/11
1957/15
**difficult [1]** 1937/2
**dilutes [1]** 1968/1
**diminish [1]** 1960/25
**diminishing [1]**
1923/15
**direct [4]** 1861/4
1865/24 1886/11
1968/12
**direction [1]** 1867/14
**directly [1]** 1911/16
**Director [2]** 1867/15
1868/23
**disagree [8]** 1890/20
1891/3 1891/6 1942/8
1942/10 1946/12
1959/16 1959/17
**disagreed [2]** 1890/23
1893/20
**disagreements [1]**
1946/15
**disclose [1]** 1874/20
**discuss [4]** 1862/13
1862/13 1878/23
1971/17
**discussed [1]** 1917/1
**discussing [1]**
1911/18
**discussion [5]**
1872/23 1883/9 1884/7
1972/1 1977/4
**discussions [1]**
1878/11
**display [4]** 1869/25
1874/1 1943/17
1943/20
**displaying [1]** 1862/13
**dispute [2]** 1867/22
1878/9
**disputes [1]** 1862/10
**distinctions [1]**
1899/22

**DISTRICT [5]** 1859/1
1859/1 1859/13
1860/21 1875/24
**dividend [50]** 1916/7
1916/9 1916/21
1919/15 1922/2
1924/14 1925/11
1927/25 1929/21
1934/1 1934/12 1936/2
1936/7 1937/1 1938/8
1938/21 1946/3
1946/25 1947/17
1947/19 1947/22
1948/1 1948/5 1948/14
1948/21 1949/9
1949/12 1950/5 1950/8
1950/23 1950/25
1951/5 1952/22 1953/4
1953/6 1953/17
1956/10 1956/24
1959/2 1960/12
1960/18 1960/20
1960/22 1961/12
1961/19 1961/19
1961/22 1962/8
1963/14 1963/22
**dividends [11]**
1893/10 1921/16
1927/18 1929/14
1953/7 1963/9 1970/16
1970/17 1970/18
1970/22 1970/23
**dixit [2]** 1880/18
1884/23
**do [94]** 1863/1
1867/20 1870/22
1871/9 1872/6 1886/18
1886/18 1887/3 1887/3
1888/1 1888/7 1888/9
1888/22 1891/3 1892/3
1900/20 1900/21
1901/24 1902/10
1904/20 1907/9 1909/6
1911/4 1912/21
1914/22 1915/14
1917/22 1917/25
1918/11 1921/9
1921/11 1921/18
1921/22 1923/18
1924/16 1924/18
1927/2 1927/4 1927/19
1927/22 1931/24
1932/9 1932/16
1933/10 1933/12

1933/21
1934/5 1934/17
1935/20 1936/7
1941/12 1942/8
1942/18 1942/19
1942/23 1943/23
1944/8 1945/19 1946/8
1946/9 1946/11
1947/11 1948/13
1952/6 1952/13
1953/20 1954/2 1954/9
1954/21 1955/1
1955/10 1955/19
1955/25 1956/2 1956/3
1957/6 1957/18 1958/1
1958/16 1959/8
1959/15 1959/19
1960/5 1961/18 1963/4
1964/22 1966/4 1966/7
1966/14 1966/18
1971/8 1971/21
1971/23
**document [25]** 1864/3
1864/18 1864/21
1871/17 1877/12
1878/4 1878/5 1878/6
1878/18 1878/20
1878/21 1879/2
1920/24 1925/22
1931/22 1931/24
1935/5 1942/18
1942/20 1943/2 1943/5
1943/15 1945/5 1947/8
1957/6
**documentary [1]**
1866/2
**documents [17]**
1862/14 1863/12
1871/13 1871/14
1873/8 1873/9 1873/10
1873/25 1876/20
1877/7 1877/14
1879/24 1910/15
1915/13 1942/5
1942/24 1956/17
**does [14]** 1887/5
1887/9 1896/22 1899/6
1903/23 1915/7
1919/19 1919/23
1920/1 1931/10
1946/19 1948/3 1948/9
1968/20
**doesn't [11]** 1885/8
1885/11 1893/23

**doesn't... [8]** 1893/24
1894/8 1894/8 1894/12
1894/20 1950/25
1951/2 1971/21
**doing [6]** 1866/6
1910/10 1913/18
1961/10 1965/14
1967/17
**dollar [4]** 1898/12
1915/9 1917/4 1917/13
**Don [1]** 1871/25
**don't [26]** 1863/5
1866/21 1867/21
1872/5 1874/25
1875/13 1877/11
1879/21 1885/1
1885/16 1895/3 1897/4
1901/17 1901/18
1903/13 1920/23
1934/21 1934/23
1942/15 1945/5
1952/20 1956/6
1957/19 1961/21
1971/10 1971/10
**done [11]** 1905/11
1910/25 1941/10
1953/25 1954/13
1954/14 1960/3
1961/11 1962/10
1966/3 1966/16
**down [22]** 1865/18
1877/9 1893/16
1903/22 1904/5 1907/2
1908/24 1909/4
1917/11 1917/14
1918/5 1918/9 1918/18
1921/14 1925/18
1934/11 1948/25
1951/8 1958/7 1959/21
1960/8 1968/24
**downside [3]** 1955/17
1955/19 1955/21
**downturn [2]** 1917/15
1970/20
**downward [2]** 1933/8
1933/13
**Dr [11]** 1885/3 1886/3
1886/13 1894/13
1894/25 1919/19
1922/12 1926/6
1943/23 1958/14
1961/9
**Dr. [59]** 1862/11

1862/17 1866/3
1866/25 1867/11
1867/16 1867/21
1868/12 1869/2
1869/10 1869/16
1870/23 1873/17
1874/4 1874/11
1875/19 1879/12
1880/9 1880/15 1881/3
1881/9 1882/1 1882/9
1882/16 1882/21
1883/19 1884/4
1888/10 1889/11
1889/19 1891/10
1891/11 1894/21
1897/10 1903/9
1908/15 1910/10
1913/10 1916/24
1920/23 1921/7
1923/11 1928/12
1930/17 1930/23
1930/25 1939/16
1940/6 1942/1 1942/13
1942/18 1942/24
1943/7 1944/15 1952/1
1956/2 1958/16
1959/13 1964/10
**Dr. Attari [41]** 1866/3
1866/25 1867/11
1867/16 1867/21
1869/10 1869/16
1870/23 1873/17
1874/4 1874/11
1875/19 1880/9
1880/15 1881/3 1881/9
1882/1 1882/9 1882/16
1882/21 1883/19
1888/10 1889/11
1889/19 1894/21
1897/10 1903/9
1908/15 1910/10
1913/10 1916/24
1920/23 1921/7
1923/11 1930/17
1930/25 1939/16
1940/6 1942/18
1944/15 1956/2
**Dr. Attari's [10]**
1862/11 1862/17
1868/12 1869/2
1879/12 1884/4
1928/12 1930/23
1952/1 1964/10
**Dr. Dharan [6]**

1942/13 1942/24
1943/7 1958/16
**Dr. Dharan's [1]**
1959/13
**Dr. Mason [1]** 1891/11
**draft [5]** 1865/14
1943/4 1943/7 1943/10
1944/21
**draw [14]** 1914/23
1916/20 1933/13
1933/15 1933/23
1933/24 1934/4
1948/10 1948/17
1948/20 1948/22
1950/2 1951/17 1961/3
**drawing [2]** 1897/1
1934/11
**drawn [2]** 1916/8
1951/8
**draws [29]** 1863/24
1919/16 1919/16
1927/25 1929/22
1929/24 1932/11
1934/6 1936/1 1936/2
1939/20 1939/24
1940/1 1942/16
1948/23 1950/17
1950/19 1951/23
1953/6 1953/11
1953/15 1953/17
1953/18 1956/11
1956/12 1957/2 1957/2
1958/16 1969/25
**drink [1]** 1959/9
**driving [2]** 1938/7
1938/11
**DTA [1]** 1961/2
**due [9]** 1881/2
1893/10 1901/19
1902/13 1902/14
1914/15 1914/15
1929/23 1946/3
**Dunn [1]** 1871/25
**during [3]** 1905/17
1916/24 1924/23
**DX [6]** 1870/2 1870/2
1872/14 1872/24
1876/17 1876/17
**DX-412 [4]** 1870/2
1872/14 1872/24
1876/17
**DX-529 [2]** 1870/2
1876/17

**each [16]** 1875/8
1889/9 1909/1 1912/24
1936/20 1946/1 1946/3
1948/23 1948/25
1950/3 1950/7 1953/13
1959/21 1959/25
1960/2 1963/9
**earlier [14]** 1864/22
1895/12 1906/10
1907/24 1909/14
1911/13 1922/22
1932/19 1936/11
1938/1 1952/9 1953/18
1966/22 1966/24
**early [3]** 1862/6
1919/10 1970/10
**earn [7]** 1900/25
1916/16 1927/24
1946/1 1958/22
1961/25 1964/1
**earning [2]** 1937/1
1960/12
**earnings [9]** 1883/21
1883/24 1926/23
1927/19 1928/4 1928/5
1929/13 1936/5
1957/14
**earns [1]** 1945/25
**easier [3]** 1920/25
1924/21 1925/23
**easy [2]** 1898/13
1966/5
**eat [1]** 1916/9
**echo [1]** 1865/23
**economic [4]** 1886/19
1887/3 1893/23 1895/1
**economics [2]** 1887/8
1966/2
**Ed [1]** 1863/14
**effect [7]** 1867/25
1874/18 1874/23
1903/23 1903/25
1921/12 1951/10
**Eisenhofer [1]** 1860/2
**either [2]** 1934/15
1950/15
**elections [3]** 1924/15
1924/20 1925/14
**eliminated [8]** 1929/15
1929/23 1929/24
1932/12 1939/23
1939/24 1956/12
1970/22

**E**

email **[2]**  1863/14 1872/22
employees **[2]** 1887/17 1887/18
end **[19]**  1877/10 1884/2 1892/13 1908/11 1915/16 1921/8 1932/5 1932/7 1939/1 1944/24 1944/25 1947/12 1949/3 1949/15 1949/16 1950/12 1950/12 1951/6 1959/3
engage **[1]**  1875/20
engineering **[1]** 1888/13
enhance **[1]**  1911/15
enough **[16]**  1901/13 1901/15 1922/1 1937/1 1947/24 1948/13 1950/5 1955/18 1955/19 1955/20 1960/12 1960/17 1960/19 1960/21 1962/8 1970/18
ensure **[5]**  1892/3 1909/25 1910/4 1913/17 1914/6
ensuring **[1]**  1908/21
entail **[1]**  1887/5
entails **[1]**  1887/6
enter **[8]**  1871/19 1872/2 1874/5 1891/4 1891/21 1909/12 1918/24 1970/6
entered **[3]**  1864/8 1885/22 1930/20
entering **[2]**  1872/20 1877/24
enterprise **[1]**  1940/7
enterprises **[5]** 1878/22 1892/2 1892/4 1892/5 1937/18
enterprises' **[3]** 1863/23 1902/3 1927/16
entire **[1]**  1934/20
entirely **[1]**  1933/18
entirety **[2]**  1880/16 1882/3
entities **[1]**  1923/21
entitled **[1]**  1978/5
entry **[1]**  1872/2

environment **[1]** 1892/22
equal **[2]**  1929/21 1970/22
equity **[24]**  1880/21 1881/2 1894/10 1894/17 1894/19 1900/5 1900/11 1901/16 1901/17 1907/5 1907/6 1944/12 1944/17 1944/18 1944/20 1947/3 1949/2 1949/13 1949/24 1950/2 1950/13 1950/15 1953/10 1963/5
ERIC **[1]**  1859/20
erode **[2]**  1919/16 1970/18
eroded **[4]**  1917/11 1917/14 1922/3 1929/15
erosion **[4]**  1925/11 1932/10 1933/15 1939/20
errors **[1]**  1952/13
essentially **[7]**  1874/8 1880/18 1892/21 1893/9 1900/9 1906/13 1915/5
estimate **[1]**  1954/19
estimated **[1]**  1915/18
estimation **[1]**  1922/18
et **[3]**  1859/2 1859/2 1859/6
evaluate **[4]**  1866/4 1874/22 1909/19 1909/23
evaluated **[2]**  1890/25 1935/4
evaluating **[2]**  1866/8 1909/19
even **[25]**  1865/4 1867/21 1868/21 1873/2 1877/1 1878/2 1893/9 1894/15 1915/25 1925/23 1932/16 1938/12 1938/13 1942/14 1946/8 1949/19 1950/12 1952/16 1952/20 1956/9 1959/1 1959/12 1960/9 1960/25 1963/22

event **[17]**  1869/1 1964/24 1965/1 1965/3 1965/3 1965/5 1965/8 1965/14 1965/20 1966/2 1966/4 1966/4 1966/10 1967/18 1967/23 1967/24 1969/14
events **[3]**  1876/2 1876/2 1917/23
eventually **[1]**  1960/16
ever **[3]**  1936/6 1936/14 1963/25
ever-shrinking **[2]** 1936/6 1936/14
every **[6]**  1877/11 1952/17 1960/7 1960/17 1961/21 1963/3
everyone **[1]**  1867/8
everything **[1]**  1953/3
evidence **[34]**  1862/10 1862/12 1862/14 1862/22 1863/10 1864/12 1865/19 1865/24 1866/17 1867/19 1868/20 1870/9 1870/21 1873/6 1874/13 1874/16 1875/2 1875/19 1876/1 1876/10 1876/21 1876/25 1877/12 1878/1 1878/4 1878/6 1878/21 1879/5 1880/20 1893/6 1893/7 1920/6 1925/24 1943/18
examination **[3]** 1861/4 1868/4 1886/11
examine **[2]**  1871/5 1871/12
example **[6]**  1882/5 1900/24 1944/12 1953/12 1963/12 1970/20
examples **[6]**  1864/11 1868/5 1919/20 1919/23 1928/15 1931/5
exceed **[2]**  1919/15 1957/1
exceeded **[1]**  1913/2
exceeds **[1]**  1947/6
except **[1]**  1898/11

exception **[1]**  1870/12
excess **[1]**  1944/25
exclude **[3]**  1874/16 1879/13 1881/18
excluded **[8]**  1875/25 1880/15 1881/7 1881/8 1881/17 1882/7 1883/22 1884/22
excuse **[1]**  1949/8 1957/19 1959/6
executed **[3]**  1865/3 1925/20 1928/17
executive **[2]**  1945/6 1954/7
exhausted **[1]**  1932/8
exhibit **[1]**  1862/23 1862/23 1863/4 1864/17 1871/15 1872/9 1876/16 1920/6 1925/24 1943/19 1943/22
Exhibit' **[2]**  1864/17 1920/6
exhibits **[4]**  1862/9 1862/12 1863/7 1869/22
existent **[1]**  1867/9
existing **[1]**  1903/16
exited **[3]**  1930/11 1971/13 1971/19
expect **[2]**  1884/11 1891/1
expectation **[1]** 1952/19
expectations **[1]** 1873/7
expected **[3]**  1919/2 1955/14 1955/14
expensive **[1]**  1904/1
experience **[5]**  1881/4 1911/5 1911/22 1926/15 1958/1
expert **[25]**  1866/9 1871/3 1871/11 1873/17 1873/20 1875/2 1875/25 1876/4 1876/11 1876/12 1876/14 1882/6 1884/19 1888/16 1888/19 1888/20 1888/23 1888/24 1889/11 1889/20 1890/13 1891/9 1901/24 1913/10

**E**

expert... [1] 1917/18
expert's [2] 1875/3
1879/25
expertise [1] 1881/4
experts [4] 1867/19
1867/20 1917/22
1942/2
explain [10] 1879/16
1893/19 1898/9
1913/10 1913/24
1918/12 1922/14
1946/15 1952/10
1970/7
explaining [3] 1864/8
1877/23 1882/2
explanation [1]
1880/23
explicit [2] 1912/5
1956/22
express [2] 1893/25
1916/3
expressed [2] 1893/1
1893/3
expressing [3]
1892/11 1961/6
1970/14
extended [1] 1954/2
extent [1] 1876/4
external [1] 1893/6
extremely [2] 1867/4
1881/23

**F**

face [8] 1864/3
1878/21 1894/7
1923/16 1923/23
1946/19 1946/21
1952/3
faced [2] 1871/9
1916/13
fact [7] 1872/22
1876/18 1933/22
1956/22 1958/24
1967/25 1968/21
factor [1] 1950/25
factored [5] 1870/10
1870/25 1872/4
1872/10 1872/25
factors [2] 1938/10
1950/22
facts [1] 1874/19
fail [1] 1899/1
failed [1] 1873/15

fair [3] 1902/24
1941/18 1947/24
FAIRHOLME [1]
1859/2
fairly [2] 1919/10
1967/16
fall [2] 1903/17
1903/17
familiar [4] 1898/10
1912/22 1942/1
1958/11
FANNIE [145]
far [1] 1928/15
fashion [1] 1892/2
faster [4] 1882/18
1938/4 1938/5 1960/25
favorable [1] 1968/12
fear [1] 1936/4
fears [1] 1936/10
features [3] 1967/21
1967/23 1968/1
FEDERAL [5] 1859/5
1860/7 1860/12
1860/15 1876/10
fee [13] 1880/11
1881/14 1881/20
1882/11 1884/11
1884/20 1890/7 1890/8
1890/12 1890/15
1890/22 1893/14
1960/22
few [7] 1862/9 1862/9
1877/6 1925/1 1939/8
1943/10 1946/17
FHFA [21] 1863/11
1863/13 1864/5 1864/8
1864/20 1864/21
1869/18 1870/5
1871/18 1874/5 1875/6
1875/14 1875/20
1880/10 1882/10
1884/19 1885/15
1890/5 1909/12
1910/24 1956/4
FHFA's [11] 1864/23
1866/21 1868/2
1870/11 1877/23
1890/3 1891/4 1891/21
1918/23 1955/16
1970/6
field [3] 1867/20
1889/9 1917/22
fields [1] 1889/11
figure [4] 1922/8

fall [3] 1902/24
1966/7
filed [1] 1891/10
files [2] 1864/23
1864/24
filing [1] 1884/17
filings [3] 1865/2
1884/9 1912/8
filling [1] 1960/1
final [10] 1878/15
1943/8 1943/11
1943/13 1943/14
1943/24 1944/3
1944/21 1946/8
1966/17
finally [1] 1966/16
finance [12] 1859/5
1860/8 1886/21
1887/11 1888/7 1888/8
1888/11 1888/12
1888/14 1888/25
1889/12 1966/2
financial [17] 1876/1
1880/20 1887/10
1887/25 1888/2 1888/8
1904/16 1904/21
1905/17 1908/19
1921/18 1926/16
1931/9 1931/11 1935/7
1935/18 1935/23
find [8] 1868/7
1918/19 1919/2
1920/19 1929/9 1936/6
1956/20 1968/2
finding [1] 1918/14
findings [5] 1866/14
1868/14 1920/19
1929/9 1931/1
fire [1] 1908/22
firm [6] 1886/19
1886/21 1886/22
1918/16 1935/8 1935/8
firm's [1] 1880/22
firms [4] 1888/6
1905/17 1905/17
1919/15
first [24] 1862/21
1863/14 1869/22 1875/4
1877/16 1878/14
1890/2 1899/17 1901/3
1901/5 1902/5 1902/6
1909/10 1912/19
1921/3 1921/14 1923/9
1923/12 1946/16

1952/18 1962/6 1966/3
1969/4 1971/17
fist [1] 1899/23
Fitch [5] 1926/18
1938/15 1938/15
1938/18 1938/20
Fitch's [1] 1938/21
fix [1] 1925/11
fixed [5] 1915/17
1930/15 1930/16
1938/21 1940/4
fleeting [1] 1927/2
Flexner [1] 1859/24
flips [1] 1874/15
focus [3] 1887/9
1922/8 1962/6
focusing [1] 1874/8
follow [1] 1918/1
followed [1] 1932/24
following [3] 1918/3
1918/4 1928/24
footing [3] 1866/2
1935/18 1935/24
forecast [12] 1946/10
1946/13 1946/16
1948/3 1948/4 1950/22
1951/22 1952/3
1954/22 1955/1 1955/2
1955/22
forecasting [11]
1947/12 1948/6
1948/18 1948/19
1949/7 1949/8 1949/11
1949/18 1950/4
1957/14 1962/7
forecasts [15] 1950/14
1950/19 1951/6
1951/19 1952/10
1952/12 1952/19
1954/4 1954/5 1954/11
1954/14 1955/5
1955/25 1956/18
1957/16
foregoing [1] 1978/4
form [3] 1874/9
1876/20 1960/1
formula [1] 1915/17
formulate [1] 1943/3
forth [1] 1872/23
forthcoming [1]
1959/14
forward [8] 1916/17
1930/13 1930/14
1930/16 1930/17

1992

# F

**forward... [3]** 1947/12
1961/20 1970/16
**found [3]** 1873/5
1956/21 1968/4
**foundation [8]**
1867/20 1867/21
1872/7 1872/9 1872/16
1873/11 1875/11
1880/18
**four [2]** 1895/10
1953/23
**frame [1]** 1909/16
**framed [1]** 1909/14
**FREDDIE [115]** 1859/9
1865/5 1867/3 1888/2
1895/3 1895/7 1895/11
1895/14 1895/24
1896/14 1896/23
1897/7 1897/15
1897/17 1897/21
1898/1 1898/3 1898/5
1898/7 1898/15 1899/1
1899/5 1899/11 1901/6
1901/23 1901/25
1902/9 1902/16
1902/19 1903/2 1903/4
1903/12 1903/15
1903/24 1903/25
1904/2 1904/4 1904/8
1904/14 1904/15
1904/18 1905/7
1905/15 1905/24
1906/7 1906/18 1907/4
1908/2 1908/11 1909/5
1910/3 1912/3 1912/25
1914/20 1914/22
1915/20 1915/23
1916/2 1916/7 1916/10
1916/16 1916/20
1918/20 1920/10
1921/9 1921/15
1922/17 1923/20
1924/11 1924/13
1925/2 1926/22 1927/1
1927/13 1930/1
1931/15 1934/8
1935/18 1935/23
1936/5 1936/18
1936/22 1937/4 1937/7
1938/3 1938/8 1940/9
1940/21 1941/9 1941/9
1941/20 1941/21
1941/23 1942/5

1944/13 1944/17
1944/18 1945/9
1945/12 1952/7 1952/7
1952/13 1956/13
1956/16 1956/17
1957/13 1957/14
1959/10 1960/11
1960/17 1961/10
1965/7 1967/16
1967/22 1968/20
**Freddie's [3]** 1868/2
1904/22 1904/25
**free [1]** 1894/11
**front [1]** 1865/24
**fulfill [1]** 1911/15
**full [2]** 1896/22 1959/1
1902/22
**fully [2]** 1883/19
1902/22
**fund [2]** 1876/6
1897/18
**fundamental [2]**
1868/12 1879/12
**funding [1]** 1938/23
**funds [2]** 1859/2
1965/17
**further [2]** 1868/25
1881/3
**future [2]** 1934/6
1953/16

# G

**gap [3]** 1948/8 1959/4
1959/11
**gathered [1]** 1941/2
**gave [2]** 1881/18
1971/16
**gears [2]** 1908/15
1940/6
**general [5]** 1898/5
1899/4 1901/2 1930/2
1940/14
**generally [4]** 1901/14
1904/18 1916/12
1941/15
**generate [2]** 1922/1
1942/24
**gentlemen [1]** 1885/23
**German [1]** 1920/9
**get [34]** 1868/7
1873/20 1888/14
1890/24 1894/24
1899/13 1899/17
1899/23 1899/24
1900/23 1900/24

1901/11 1901/17
1901/19 1902/25
1903/18 1903/19
1914/14 1915/9 1917/4
1917/12 1920/15
1926/9 1926/10
1930/23 1960/5 1963/3
1963/25 1965/24
1967/7 1970/5 1970/13
**gets [3]** 1901/3
1949/25 1964/25
**getting [8]** 1892/9
1899/19 1904/10
1926/3 1963/7 1963/10
1966/19 1968/15
**give [9]** 1869/9 1874/5
1879/17 1880/17
1882/17 1894/15
1944/8 1944/9 1954/5
**given [4]** 1871/11
1875/8 1875/10
1926/13
**gives [1]** 1966/18
**giving [4]** 1879/19
1880/15 1881/12
1890/18
**go [57]** 1863/5
1863/20 1865/1 1865/9
1879/1 1879/20
1882/13 1884/7
1889/24 1891/13
1891/17 1895/8
1896/11 1903/22
1904/5 1904/16 1910/8
1910/18 1912/16
1913/12 1918/13
1920/3 1920/24
1920/24 1921/2
1921/12 1922/7 1923/7
1924/3 1924/24 1925/4
1925/22 1926/1
1926/11 1928/12
1929/7 1930/6 1930/14
1931/6 1931/20
1932/22 1934/25
1935/10 1938/14
1942/12 1942/17
1943/21 1952/1
1954/20 1954/21
1955/8 1959/13 1962/22
1964/10 1968/5 1970/4
1971/2
**goal [2]** 1911/12

**goals [19]** 1866/6
1890/5 1909/15
1909/17 1909/22
1909/24 1909/25
1910/3 1910/12
1910/21 1911/2 1911/3
1911/23 1912/2
1912/17 1912/18
1955/16 1970/9
1970/10
**goes [3]** 1868/16
1901/2 1948/12
**going [45]** 1865/11
1866/3 1867/16
1867/22 1869/9
1879/16 1883/12
1883/23 1884/13
1889/1 1898/24
1899/13 1915/8
1916/17 1917/8
1917/12 1919/14
1919/15 1937/20
1937/21 1946/22
1946/23 1946/24
1948/25 1949/19
1949/20 1952/7
1955/17 1956/10
1956/11 1956/14
1957/4 1958/25
1960/13 1961/15
1961/19 1962/7 1964/5
1965/6 1965/10
1965/11 1966/14
1970/16 1971/23
1971/24
**gone [7]** 1905/16
1934/23 1948/21
1950/18 1953/17
1960/24 1968/24
**good [16]** 1862/4
1869/6 1869/15
1869/19 1877/5
1885/23 1886/1
1886/13 1886/14
1892/22 1897/9 1905/2
1926/19 1929/25
1930/3 1971/7
**got [5]** 1907/11
1917/14 1938/14
1967/14 1971/23
**gotten [1]** 1899/25
**government [5]**
1887/20 1887/22

**G**

**government... [3]**
1923/21 1927/16
1940/18
**government-sponsored [2]** 1923/21 1927/16
**grab [1]** 1870/15
**grainy [1]** 1926/4
**Grant [1]** 1860/2
**greater [1]** 1927/19
**greatly [2]** 1867/24
1897/12
**Grossmann [1]** 1860/5
**group [2]** 1895/12
1920/17
**groups [1]** 1895/10
**growing [1]** 1950/8
**GSE [5]** 1863/16
1932/15 1932/18
1933/9 1934/16
**GSEs [4]** 1872/1
1872/12 1932/20
1933/22
**guarantee [9]** 1895/23
1895/23 1896/16
1896/19 1902/17
1906/5 1914/20
1923/24 1923/25
**guaranteed [2]** 1906/7
1915/5
**guarantees [9]**
1892/17 1897/9 1903/6
1905/2 1907/14 1908/7
1909/8 1914/24
1932/21
**guessing [1]** 1881/24
**Guggenheim [5]**
1935/3 1935/13
1935/17 1935/22
1938/6
**guise [1]** 1876/13

**H**

**had [63]** 1867/15
1870/6 1871/7 1871/12
1871/18 1874/6 1890/5
1892/9 1892/11
1894/11 1894/19
1905/5 1905/22 1906/7
1906/22 1907/12
1907/13 1907/14
1907/21 1908/1 1908/3
1908/4 1908/6 1908/7
1908/13 1914/7

1914/20 1916/7 1916/8
1916/8 1917/15
1918/18 1921/24
1921/25 1926/22
1927/6 1929/5 1929/15
1936/18 1936/24
1937/10 1937/13
1938/10 1938/11
1939/4 1940/13
1944/11 1945/13
1946/6 1948/21
1951/16 1952/15
1952/17 1952/21
1953/1 1953/17
1956/15 1956/22
1959/23 1960/23
1962/10 1965/5
1968/25
**hadn't [3]** 1951/1
1951/3 1951/4
**hairs [1]** 1878/25
**half [7]** 1887/10
1948/7 1957/24
1957/25 1961/24
1961/25 1963/19
**HAMISH [1]** 1859/23
**Hampshire [1]**
1859/19
**hand [1]** 1886/5
**happen [4]** 1875/1
1892/12 1905/15
1924/20
**happened [13]** 1905/5
1907/9 1908/5 1915/8
1924/21 1925/14
1925/16 1951/1 1951/3
1951/4 1962/11 1966/8
1966/13
**happening [3]** 1919/5
1939/1 1940/24
**happens [3]** 1901/16
1901/20 1955/13
**happy [2]** 1868/25
1971/6
**has [24]** 1863/15
1864/19 1870/20
1870/24 1872/15
1876/23 1876/25
1878/19 1881/8
1881/17 1884/22
1885/9 1893/21 1895/2
1901/21 1903/25
1911/16 1914/3 1919/5
1934/23 1942/13

1945/4 1948/21
1950/18
**hasn't [1]** 1872/6
**have [131]**
**haven't [2]** 1871/12
1897/24
**having [6]** 1873/16
1904/8 1906/13
1906/22 1909/8
1965/16
**he [24]** 1866/6 1866/11
1868/19 1870/13
1870/14 1870/16
1870/17 1870/19
1872/19 1872/22
1876/5 1878/17
1878/18 1879/14
1881/4 1881/9 1885/6
1885/8 1885/8 1885/9
1885/11 1885/16
1930/13 1954/25
**he's [11]** 1869/16
1878/17 1879/18
1879/18 1879/19
1883/23 1884/12
1884/13 1942/4
1942/15 1954/6
**headline [1]** 1926/25
**hear [4]** 1866/4
1866/13 1867/11
1897/10
**heard [9]** 1863/15
1864/5 1875/17 1885/4
1895/2 1901/21 1912/9
1914/3 1945/4
**hearsay [12]** 1870/3
1870/11 1870/24
1873/3 1873/4 1873/5
1873/13 1873/18
1876/6 1876/11
1876/13 1876/14
**held [3]** 1876/4
1876/24 1936/18
**help [11]** 1887/7
1897/17 1907/7 1911/3
1911/6 1911/7 1913/8
1914/21 1944/15
1944/16 1967/10
**helped [2]** 1907/5
1931/14
**helpful [2]** 1868/7
1894/25
**helping [1]** 1874/21
**helps [4]** 1868/24

1920/16 1931/11
1935/8
**here [68]** 1862/9
1863/14 1863/16
1863/20 1867/24
1871/3 1871/17
1871/23 1872/12
1872/18 1874/20
1883/17 1889/17
1895/4 1895/21 1900/1
1900/6 1901/15
1902/22 1904/13
1910/16 1910/20
1911/3 1912/16
1913/23 1914/5 1917/4
1920/5 1922/15
1923/11 1923/23
1924/8 1926/3 1926/25
1927/5 1927/22
1931/20 1933/7
1933/12 1934/5
1934/14 1935/4
1935/13 1935/22
1936/3 1938/20
1938/25 1939/9
1942/17 1944/15
1944/18 1944/24
1946/21 1947/8
1948/18 1949/17
1951/19 1953/19
1954/15 1954/18
1955/9 1957/3 1962/7
1963/4 1966/15
1968/11 1968/19
1970/8
**HERMAN [3]** 1860/20
1978/3 1978/10
**hesitant [1]** 1905/3
**high [16]** 1868/15
1874/24 1874/25
1889/22 1890/20
1891/15 1891/20
1891/23 1893/19
1896/3 1898/18 1942/8
1964/25 1965/13
1965/23 1967/14
**high-level [3]** 1891/20
1891/23 1965/13
**higher [7]** 1903/20
1903/20 1904/8
1904/10 1905/4 1953/7
1969/21
**highest [2]** 1900/18
1900/19

**highlight [7]** 1868/19
1923/8 1924/6 1924/9
1963/12 1963/13
1963/15
**highlighted [4]**
1932/14 1936/3 1939/9
1939/13
**highly [4]** 1875/12
1918/3 1946/10
1952/10
**highly-reliable [1]**
1946/10
**him [2]** 1868/15
1878/19
**himself [1]** 1864/14
**hired [1]** 1889/19
**his [25]** 1866/4 1866/9
1866/14 1868/13
1868/17 1869/16
1869/19 1876/11
1876/14 1877/11
1879/17 1879/19
1879/20 1880/1 1881/4
1882/22 1882/22
1882/22 1885/7 1885/9
1891/3 1930/14
1942/24 1954/9 1955/5
**hit [1]** 1934/16
**HOFFMAN [8]** 1860/9
1861/4 1862/5 1872/3
1874/14 1883/10
1886/2 1930/21
**hold [3]** 1895/19
1898/1 1906/19
**holder [1]** 1896/21
**holders [52]** 1863/23
1863/23 1867/4 1867/4
1883/1 1892/3 1892/6
1896/15 1896/19
1897/4 1897/16 1898/2
1899/3 1900/7 1900/8
1900/14 1900/16
1901/5 1901/11
1901/15 1901/17
1901/18 1902/2 1902/3
1902/6 1903/10
1903/11 1904/9
1911/20 1912/11
1913/20 1913/20
1914/5 1914/5 1914/6
1914/9 1914/10
1914/16 1914/19
1915/3 1915/4 1915/4

1915/4 1915/5 1916/1
1916/2 1917/3 1917/12
1919/18 1924/1
1932/21 1936/13
**holding [1]** 1906/24
**hole [1]** 1963/25
**home [2]** 1860/12
1896/6
**homes [1]** 1941/4
**honor [80]** 1862/4
1862/19 1862/21
1862/24 1863/6 1863/9
1863/17 1863/20
1864/3 1864/5 1864/12
1864/16 1864/18
1864/25 1865/15
1866/17 1867/5
1867/18 1867/23
1868/5 1868/11
1868/18 1868/25
1869/5 1869/6 1869/8
1869/15 1870/1
1870/12 1871/15
1871/17 1872/5
1872/15 1873/25
1875/12 1875/22
1876/15 1876/23
1877/3 1877/5 1877/18
1877/22 1878/3 1878/8
1878/14 1878/20
1879/8 1879/21 1880/4
1880/5 1880/9 1880/15
1880/19 1881/3
1882/14 1882/16
1883/6 1883/13
1883/15 1883/18
1884/9 1884/16 1885/2
1885/18 1885/20
1886/1 1889/10
1889/14 1889/16
1890/9 1892/17 1894/4
1930/9 1930/12
1930/18 1930/22
1961/7 1971/5 1971/9
1971/18
**HONORABLE [1]**
1859/13
**horizon [1]** 1953/24
**horizons [1]** 1953/19
**horse [1]** 1879/21
**house [1]** 1940/25
**houses [5]** 1908/21
1908/21 1908/24
1909/3 1940/25

**housing [15]** 1859/5
1860/8 1927/9 1927/12
1940/21
**how [34]** 1863/1
1867/2 1881/5 1887/1
1888/18 1895/2
1896/19 1901/10
1905/6 1905/6 1905/19
1910/20 1914/3 1914/6
1918/13 1926/15
1939/3 1940/14
1940/25 1941/3 1941/4
1945/9 1946/22
1946/22 1946/24
1947/5 1950/13
1952/24 1952/25
1955/19 1964/15
1967/14 1969/11
1969/19
**HOWARD [1]** 1860/8
**However [4]** 1866/3
1866/23 1927/14
1951/5
**huh [1]** 1927/3
1941/25 1954/17
**HUME [4]** 1859/23
1864/7 1877/10
1877/23

# I

**I'd [4]** 1862/13 1897/11
1914/8 1919/22
**I'll [8]** 1862/17 1869/21
1870/15 1883/10
1906/9 1916/24 1959/8
1971/11
**I'm [24]** 1866/16
1868/25 1883/6
1883/15 1883/16
1886/20 1896/11
1906/16 1908/21
1908/21 1910/8
1914/17 1926/11
1931/23 1951/3
1951/18 1953/12
1954/10 1956/14
1957/4 1965/6 1965/10
1965/19 1971/6
**I've [7]** 1868/19
1888/19 1888/20
1889/8 1889/9 1905/11
1941/10
**IAN [3]** 1860/9 1862/4
1886/1

**idea [1]** 1868/8
**identified [3]** 1917/17
1969/7 1969/10
**identifies [1]** 1863/21
**identify [1]** 1966/4
**identifying [1]** 1866/7
**ignoring [1]** 1893/9
**illuminate [1]** 1962/2
**imagine [1]** 1896/1
**immediately [1]**
1898/10
**imminent [1]** 1959/14
**impact [5]** 1904/21
1905/6 1952/24
1952/25 1965/5
**impacted [1]** 1953/3
**impermissibly [1]**
1875/1
**implications [3]**
1919/5 1923/8 1923/9
**importance [2]**
1913/11 1913/16
**important [8]** 1867/14
1868/14 1889/2
1903/10 1903/12
1910/3 1928/10
1955/18
**impossible [1]** 1937/2
**improve [3]** 1924/15
1925/3 1925/6
**improved [1]** 1968/16
**Improving [2]** 1927/9
1927/12
**inadequate [2]**
1872/15 1880/18
**inadmissible [5]**
1870/3 1873/18
1874/19 1875/3
1884/23
**INC [1]** 1859/2
**include [1]** 1919/24
**included [1]** 1954/15
**includes [2]** 1888/20
1920/1
**including [1]** 1870/18
**income [8]** 1910/5
1945/2 1950/7 1957/1
1957/8 1957/9 1959/25
1960/4
**inconsistent [3]**
1928/21 1939/11
1969/15
**increase [7]** 1863/25
1953/16 1955/4

## I

**increase... [4]** 1959/21 1960/9 1968/22 1970/11
**increased [2]** 1883/4 1968/19
**increases [1]** 1949/15
**increasing [1]** 1906/20
**increasingly [1]** 1936/7
**indicate [1]** 1870/19
**indicated [2]** 1872/3 1968/17
**indicates [3]** 1878/21 1878/21 1884/17
**individual [2]** 1875/10 1875/14
**individuals [1]** 1863/15
**indulgence [3]** 1868/9 1889/17 1961/7
**industries [2]** 1887/9 1888/1
**industry [3]** 1887/25 1888/3 1941/12
**influence [1]** 1866/21
**inform [1]** 1910/21
**information [22]** 1870/6 1870/23 1871/10 1872/12 1873/12 1873/13 1873/22 1874/2 1874/6 1875/13 1875/15 1882/7 1890/4 1909/15 1909/21 1928/8 1928/10 1929/20 1940/18 1941/1 1941/2 1941/6
**informed [2]** 1918/2 1941/7
**informing [1]** 1929/18
**infusion [3]** 1948/12 1950/18 1962/17
**initial [1]** 1953/4
**initially [2]** 1918/21 1936/19
**injections [1]** 1933/9
**inserted [1]** 1913/23
**insignificant [1]** 1916/11
**instability [1]** 1911/17
**instead [8]** 1868/14 1919/7 1957/22 1961/10 1961/19

1962/11 1963/21 1967/6
**institution [2]** 1931/10 1931/12
**institutions [1]** 1887/17
**insufficient [2]** 1907/8 1907/8
**insurance [11]** 1887/11 1896/1 1896/3 1896/4 1896/6 1896/6 1896/8 1896/25 1906/10 1908/20 1908/23
**insurer [1]** 1906/12
**insuring [1]** 1908/21
**intended [2]** 1874/12 1946/6
**intention [1]** 1891/13
**intentions [1]** 1895/4
**interest [4]** 1902/12 1966/13 1968/7 1968/7
**interested [1]** 1965/4
**interesting [3]** 1920/16 1920/18 1928/3
**intermediate [1]** 1932/16
**intermediate/longer [1]** 1932/16
**internal [7]** 1875/15 1893/7 1893/8 1940/7 1941/22 1942/5 1956/3
**interrupt [1]** 1883/6
**introduce [5]** 1869/23 1871/3 1875/2 1877/2 1886/15
**introduced [3]** 1870/13 1870/21 1876/21
**introduces [1]** 1968/1
**introducing [1]** 1876/13
**invest [3]** 1894/19 1895/19 1912/24
**investing [1]** 1922/4
**investment [2]** 1894/17 1935/7
**investments [3]** 1912/25 1913/3 1914/7
**investor [10]** 1899/10 1907/23 1913/24 1915/8 1917/17 1923/12 1936/11

1970/12
**investors [40]** 1863/23 1864/2 1887/19 1895/7 1895/11 1895/15 1895/16 1895/19 1896/13 1897/14 1899/14 1900/10 1902/20 1902/20 1903/18 1903/22 1905/2 1916/12 1919/18 1920/11 1920/14 1920/15 1920/17 1921/24 1921/25 1923/12 1924/22 1926/5 1929/25 1930/3 1930/4 1931/15 1936/4 1936/10 1961/5 1967/4 1968/23 1970/1 1970/14 1970/24
**investors' [1]** 1936/10
**invite [1]** 1873/8
**involving [1]** 1876/1
**Iowa [3]** 1888/15 1888/15 1889/6
**ipse [2]** 1880/18 1884/23
**irrelevant [3]** 1872/18 1872/24 1875/10
**is [300]**
**isn't [2]** 1865/23 1877/8
**issue [23]** 1862/13 1863/21 1864/15 1866/8 1866/25 1875/10 1879/8 1883/18 1883/18 1889/17 1898/15 1903/15 1904/2 1905/20 1911/13 1912/9 1919/2 1925/11 1926/13 1932/19 1965/10 1967/22 1969/3
**issued [11]** 1865/2 1865/3 1897/24 1906/25 1926/9 1927/6 1929/10 1931/2 1931/17 1941/3 1967/3
**issuers [1]** 1907/1
**issues [5]** 1862/7 1867/5 1869/2 1911/18 1928/16

**it [220]**
**it's [76]** 1863/19 1863/22 1867/14 1868/12 1868/14 1868/21 1871/2 1871/11 1872/24 1873/14 1874/25 1875/12 1876/7 1877/20 1878/15 1878/25 1879/11 1879/12 1879/16 1881/15 1881/21 1881/23 1883/11 1884/8 1884/17 1884/18 1884/22 1894/18 1898/11 1898/12 1898/13 1898/14 1899/4 1900/3 1901/18 1902/2 1904/15 1908/19 1909/6 1909/7 1911/17 1912/4 1918/5 1918/7 1920/21 1922/22 1923/6 1926/3 1926/13 1928/3 1931/11 1931/16 1934/21 1935/7 1941/9 1943/13 1943/16 1945/10 1946/6 1946/13 1946/18 1946/21 1946/23 1947/11 1951/15 1955/17 1955/24 1956/24 1959/24 1966/5 1966/8 1966/17 1966/25 1967/1 1971/3 1971/7
**iteration [1]** 1931/20
**its [10]** 1864/3 1865/20 1911/15 1911/15 1927/15 1935/9 1947/6 1955/16 1956/17 1957/14
**itself [9]** 1863/19 1865/14 1872/11 1904/7 1920/24 1925/23 1938/7 1943/15 1951/5

## J

**January [1]** 1887/2
**Jenkins [3]** 1863/1 1863/2 1943/20
**jeopardize [1]** 1865/7
**Jerry [1]** 1871/25

**J**

jiggle [1] 1962/15
joined [1] 1889/3
jotted [1] 1877/9
journals [1] 1889/9
JUDGE [3] 1859/13
1866/19 1971/19
Judith [1] 1871/25
July [2] 1943/4 1947/9
jump [5] 1910/6
1933/16 1961/23
1963/18 1967/11
junior [2] 1907/21
1912/13
juror [5] 1873/8
1876/18 1882/8
1971/17 1971/19
jurors [1] 1971/16
jury [45] 1859/12
1862/14 1867/1
1867/15 1868/1
1868/14 1873/21
1873/23 1874/2
1874/21 1874/21
1875/1 1876/5 1876/20
1876/25 1879/7 1880/2
1881/24 1883/12
1883/16 1885/1
1885/22 1886/16
1891/8 1895/1 1895/2
1896/18 1898/9
1901/21 1914/3
1919/22 1920/25
1922/14 1922/24
1930/11 1930/20
1943/17 1945/4 1946/6
1946/16 1952/11
1954/10 1965/22
1967/10 1971/13
just [95] 1863/6
1867/6 1868/9 1868/15
1869/24 1870/15
1871/16 1876/23
1879/17 1879/18
1884/8 1884/16 1885/2
1885/13 1887/7
1889/17 1893/23
1894/20 1896/1
1896/18 1897/6
1897/10 1897/11
1897/25 1898/8 1898/8
1898/11 1902/24
1905/14 1905/16
1906/9 1906/22

1907/18 1908/17
1909/6 1909/18
1912/19 1914/8 1917/1
1918/12 1919/23
1920/7 1920/25 1921/3
1922/24 1923/8
1925/22 1926/9 1927/6
1928/18 1929/18
1930/16 1930/25
1931/22 1931/23
1933/16 1934/8
1934/11 1935/19
1937/17 1939/8
1939/12 1941/9
1943/14 1943/17
1944/4 1944/5 1945/2
1945/11 1945/17
1946/18 1947/2 1947/5
1950/22 1951/18
1953/5 1953/12
1954/12 1956/2 1956/8
1957/15 1957/23
1961/2 1962/1 1962/2
1962/13 1963/12
1965/8 1965/22
1965/22 1965/24
1967/10 1967/11
1970/4 1971/23
justified [1] 1868/22
justifying [1] 1879/2
Justison [1] 1860/3

**K**

KAPLAN [1] 1859/23
Kaye [1] 1860/10
keep [4] 1865/11
1945/22 1951/22
1962/16
Kessler [1] 1859/21
key [2] 1864/4 1879/8
kick [2] 1893/11
1902/17
kicks [1] 1938/23
kind [67] 1862/18
1887/5 1888/9 1892/25
1893/2 1893/23
1896/12 1896/25
1897/5 1897/20
1897/22 1897/24
1898/4 1898/23 1899/4
1899/21 1900/22
1902/3 1902/20 1904/6
1905/2 1908/22
1908/24 1910/25

1919/7 1919/13
1920/12 1920/14
1920/18 1922/5
1932/11 1941/4
1941/11 1945/25
1947/14 1952/20
1953/6 1954/2 1954/3
1954/13 1954/13
1954/20 1955/13
1956/21 1959/4
1959/20 1959/22
1960/4 1961/5 1961/11
1961/17 1962/16
1963/1 1963/17
1963/20 1964/7 1965/9
1967/7 1968/1 1968/9
1968/22 1970/1 1970/2
1970/14
kinds [3] 1887/12
1917/20 1955/21
King [2] 1859/21
1860/13
Kirk [1] 1859/18
know [102] 1867/15
1872/5 1873/3 1878/17
1879/1 1885/4 1887/12
1887/18 1888/6
1892/15 1892/21
1892/22 1893/6 1896/6
1898/6 1898/23
1898/24 1899/4
1899/21 1900/8
1900/22 1900/23
1901/8 1901/19 1903/6
1903/19 1903/20
1904/3 1905/2 1905/9
1906/19 1906/21
1906/25 1907/16
1908/9 1908/20 1909/1
1909/20 1909/21
1911/8 1911/9 1911/10
1913/1 1913/15
1913/19 1914/1
1914/14 1915/18
1915/22 1915/24
1916/12 1916/22
1917/23 1918/1 1918/6
1919/4 1919/5 1919/8
1919/11 1920/14
1922/2 1922/4 1924/22
1929/12 1929/14
1929/17 1929/19
1932/12 1933/22

1934/2 1935/7 1936/19
1936/24 1939/21
1940/13 1940/18
1940/22 1940/23
1941/1 1941/8 1941/13
1941/23 1952/12
1953/17 1954/1
1955/13 1955/18
1956/22 1958/21
1961/4 1961/21
1961/22 1962/17
1962/22 1962/24
1966/12 1966/12
1967/23 1968/5 1970/1
1970/20 1971/1
knowing [1] 1965/4
knowledge [1]
1904/18
known [2] 1867/8
1949/14
knows [1] 1867/18
Kravetz [2] 1869/7
1885/18

**L**

lack [3] 1875/11
1880/22 1903/23
ladies [1] 1885/23
laid [4] 1865/20
1867/20 1891/24
1970/8
LAMBERTH [1]
1859/13
large [8] 1884/5
1895/17 1895/20
1915/20 1915/24
1917/15 1920/9
1970/18
larger [6] 1884/5
1915/25 1959/12
1962/25 1963/2
1963/23
largest [1] 1869/20
last [5] 1875/17
1876/23 1921/20
1921/23 1934/14
late [1] 1909/4
later [1] 1945/23
lay [2] 1867/21 1872/7
Layton [1] 1871/25
lead [2] 1882/8
1905/25
leader [1] 1886/21
leading [1] 1939/21

# L

**lean [2]** 1930/13
1930/17
**leap [1]** 1880/25
**learning [1]** 1872/1
**least [2]** 1908/2
1943/10
**leaving [1]** 1881/24
**led [1]** 1912/1
**left [11]** 1900/15
1901/3 1901/13
1901/15 1908/12
1915/19 1915/19
1948/2 1950/13
1950/15 1970/19
**Lehman [1]** 1931/13
**lend [2]** 1968/6 1968/7
**lenders [1]** 1900/8
**lending [4]** 1892/5
1898/2 1898/3 1898/20
**lendings [1]** 1898/7
**lent [3]** 1892/4 1916/1
1967/3
**less [12]** 1894/20
1900/23 1904/3 1904/3
1904/3 1937/8 1938/3
1938/5 1948/4 1948/6
1950/7 1968/24
**let [10]** 1862/17 1867/6
1867/18 1869/1
1872/17 1883/10
1885/3 1909/18
1944/15 1971/10
**let's [55]** 1891/15
1893/13 1904/16
1910/6 1910/8 1912/16
1915/11 1920/3
1920/23 1921/2 1922/7
1922/8 1922/23 1923/7
1924/9 1925/19
1925/22 1926/1
1926/25 1927/8 1927/9
1929/7 1930/6 1930/7
1931/5 1931/20
1932/22 1934/25
1935/10 1938/14
1940/6 1941/22
1942/17 1943/14
1943/14 1943/16
1943/21 1945/15
1945/16 1949/6
1949/17 1950/10
1951/25 1956/13
1958/6 1961/16 1962/2

1962/3 1962/4 1962/6
1964/10 1964/11
1965/18 1970/4 1971/8
**level [16]** 1868/15
1889/22 1890/8
1890/10 1891/15
1891/20 1891/23
1893/19 1896/3
1898/18 1913/4 1942/8
1964/25 1965/13
1965/23 1967/14
**levels [1]** 1914/13
**levied [1]** 1894/2
**liabilities [3]** 1913/1
1913/4 1947/6
**life [2]** 1892/15
1892/19
**light [5]** 1866/5 1890/4
1903/23 1909/14
1909/15
**like [43]** 1862/13
1866/25 1868/2 1869/3
1871/15 1874/9
1877/20 1878/18
1880/20 1881/6
1883/25 1884/9
1892/19 1894/18
1896/1 1896/5 1896/6
1898/11 1901/6
1905/16 1906/21
1908/6 1910/15 1914/8
1918/6 1918/25
1919/22 1926/9
1926/13 1926/23
1935/6 1938/18
1940/13 1947/12
1949/19 1953/5
1957/19 1959/24
1961/24 1962/18
1962/23 1963/3
1966/25
**likely [2]** 1905/16
1956/24
**Limine [3]** 1863/8
1865/21 1870/9
**limit [3]** 1933/9
1933/18 1934/16
**limited [1]** 1905/9
**line [22]** 1863/16
1891/20 1929/16
1932/14 1939/15
1944/17 1944/20
1945/21 1945/24
1946/2 1948/12

1949/24 1950/2
1950/18 1952/20
1953/2 1953/7 1962/19
1962/21 1970/3 1970/5
1970/7
**lines [1]** 1945/19
**lineup [1]** 1913/24
**liquidation [3]**
1962/13 1962/16
1963/6
**liquidity [1]** 1924/15
**listed [1]** 1900/1
**litany [1]** 1874/10
**litigation [2]** 1876/7
1887/6
**LITIGATIONS [1]**
1859/10
**Litowitz [1]** 1860/5
**little [23]** 1862/6
1864/21 1891/15
1895/1 1896/18
1897/11 1899/6 1899/8
1900/23 1901/8 1901/8
1908/15 1926/1 1926/4
1930/13 1931/16
1940/6 1941/22
1952/25 1957/5
1959/20 1965/19
1970/15
**live [1]** 1908/22
**living [1]** 1886/18
**LLP [6]** 1859/21
1859/24 1860/5
1860/10 1860/13
1860/16
**loan [6]** 1860/12
1894/16 1895/25
1898/11 1966/25
1967/6
**loans [3]** 1900/9
1902/24 1908/8
**local [1]** 1940/24
**logo [1]** 1864/21
**London [1]** 1931/12
**long [12]** 1887/1
1893/5 1921/17
1954/25 1956/24
1961/2 1965/7 1965/10
1965/15 1967/15
1967/18 1968/3
**long-term [10]** 1893/5
1921/17 1954/25
1956/24 1965/7
1965/10 1965/15

1967/15 1967/18
1968/3
**longer [4]** 1912/6
1932/16 1953/19
1954/5
**longer-term [1]** 1954/5
**look [28]** 1873/9
1890/6 1912/5 1918/22
1921/14 1922/21
1924/8 1924/9 1924/13
1925/19 1926/25
1927/8 1928/23 1929/2
1931/5 1940/23
1943/14 1943/15
1947/2 1949/6 1949/17
1949/23 1950/17
1956/16 1962/3
1964/15 1965/6
1965/10
**looked [28]** 1866/13
1892/24 1893/7
1918/20 1919/20
1919/24 1928/15
1928/20 1931/7
1932/23 1938/16
1939/8 1940/8 1940/13
1941/18 1944/5
1952/25 1956/3
1957/14 1964/19
1964/19 1966/21
1967/15 1967/23
1968/3 1969/3 1969/6
1970/10
**looking [13]** 1871/14
1910/20 1920/7
1942/13 1947/12
1949/25 1955/12
1957/20 1958/21
1962/3 1967/17
1967/25 1969/4
**looks [2]** 1874/9
1949/18
**LORRAINE [3]**
1860/20 1978/3
1978/10
**lose [1]** 1905/22
**losing [6]** 1905/22
1905/24 1906/3 1906/4
1907/1 1934/8
**loss [2]** 1904/12
1904/12
**losses [19]** 1899/1
1899/2 1903/7 1903/8
1906/20 1906/23

## L

**losses... [13]** 1907/5
1907/7 1907/14
1907/15 1908/8 1908/9
1909/2 1909/3 1917/15
1923/17 1923/24
1927/13 1933/23
**lost [2]** 1907/13
1908/6
**lot [15]** 1864/5 1867/7
1867/12 1867/13
1878/25 1888/7 1894/8
1894/12 1895/2
1900/21 1907/4 1907/6
1914/3 1936/24
1940/17
**lots [1]** 1967/22
**low [1]** 1910/4
**lower [3]** 1900/25
1929/13 1968/7
**lowest [2]** 1900/17
1900/17

## M

**MAC [90]** 1859/9
1867/3 1888/2 1895/3
1895/7 1895/11
1895/14 1895/25
1896/14 1896/23
1897/7 1897/15
1897/17 1897/21
1898/1 1898/3 1898/7
1898/15 1899/1 1899/5
1899/11 1901/6
1901/23 1902/19
1903/2 1903/4 1903/12
1903/15 1904/18
1905/7 1905/15
1905/24 1906/7
1906/19 1907/4
1908/12 1909/5 1910/4
1912/3 1912/25
1914/20 1914/22
1915/20 1915/23
1916/2 1916/7 1916/10
1916/16 1916/20
1918/20 1920/10
1921/9 1921/16
1922/17 1923/20
1924/11 1924/14
1925/3 1926/22 1930/1
1931/15 1934/8
1936/18 1937/4 1937/7
1940/9 1940/21 1941/9

1941/19 1941/23
1944/13 1944/17
1944/18 1945/9
1945/12 1952/7 1952/7
1952/13 1956/13
1956/17 1956/17
1957/13 1957/14
1959/10 1960/11
1960/17 1961/10
1965/7 1967/16
1967/22
**Mac's [8]** 1865/5
1898/5 1902/17 1927/1
1927/13 1936/22
1938/8 1942/5
**made [13]** 1878/2
1878/13 1878/16
1906/9 1907/14
1912/23 1913/1 1913/3
1933/23 1933/25
1934/2 1954/4 1965/16
**MAE [118]** 1859/9
1865/5 1867/3 1888/2
1895/3 1895/7 1895/11
1895/14 1895/24
1896/14 1896/23
1897/6 1897/15
1897/17 1897/21
1897/25 1898/2 1898/5
1898/7 1898/15
1898/25 1899/5
1899/11 1901/6
1901/23 1902/16
1902/19 1903/2 1903/4
1903/11 1903/15
1904/18 1905/6
1905/15 1905/24
1906/6 1906/12
1906/18 1907/3
1908/11 1909/5 1910/3
1912/25 1914/20
1914/22 1915/19
1915/22 1916/2 1916/7
1916/10 1916/15
1916/20 1918/19
1920/10 1921/9
1921/15 1922/21
1923/4 1923/20
1924/10 1924/13
1925/2 1926/22
1927/13 1930/1
1931/14 1934/7
1936/17 1936/21
1937/4 1937/7 1938/7

1940/6 1940/21 1941/8
1941/9 1941/23 1942/5
1942/20 1945/6 1945/6
1945/8 1945/13
1945/16 1945/17
1946/22 1946/23
1946/24 1947/15
1947/21 1949/3 1949/6
1950/4 1950/13 1951/6
1952/3 1953/23 1954/7
1956/3 1956/9 1957/20
1958/20 1958/24
1959/7 1959/10
1960/11 1960/16
1961/9 1961/25 1962/5
1962/10 1963/4 1964/1
1964/4 1964/8 1965/7
1967/16 1967/21
**Mae's [5]** 1927/1
1945/20 1948/3 1958/5
1965/15
**MAE/FREDDIE [1]**
1859/9
**main [1]** 1890/1
**maintain [1]** 1913/9
**make [54]** 1868/9
1869/1 1883/11 1885/2
1893/23 1894/8 1894/8
1894/12 1894/20
1896/3 1896/4 1896/22
1896/23 1897/9 1898/6
1899/16 1900/21
1902/12 1902/13
1902/20 1903/7 1905/2
1906/7 1908/17
1912/19 1916/7
1918/16 1927/25
1936/2 1937/1 1946/5
1946/19 1946/22
1946/23 1947/16
1947/18 1947/19
1947/25 1948/7
1948/13 1948/15
1949/7 1949/8 1949/11
1949/19 1949/23
1950/5 1956/11
1960/17 1960/19
1962/8 1964/7 1964/9
1970/25
**maker [5]** 1870/14
1870/17 1872/20
1873/20 1878/17
**makers [5]** 1863/11
1863/13 1864/4

1864/15 1875/14
**makes [5]** 1862/8
1895/14 1898/13
1904/1 1970/21
**making [30]** 1865/17
1866/22 1870/11
1871/1 1872/4 1872/10
1872/17 1872/18
1873/1 1877/16
1877/24 1879/1 1879/3
1894/1 1896/21 1898/7
1900/9 1909/1 1909/7
1913/17 1923/25
1936/6 1937/8 1938/3
1938/5 1948/4 1950/16
1951/22 1960/21
1964/5
**managed [1]** 1912/6
**many [4]** 1888/18
1940/25 1941/3 1941/4
**March [2]** 1920/20
1925/8
**Mario [2]** 1863/14
1864/6
**market [63]** 1863/7
1863/12 1863/21
1863/22 1864/11
1864/14 1866/7
1866/18 1866/19
1868/1 1868/21 1879/9
1879/10 1880/23
1881/1 1881/5 1901/22
1901/22 1901/25
1904/7 1904/12
1904/22 1904/25
1905/21 1905/22
1910/1 1910/2 1911/10
1911/13 1911/17
1912/9 1917/17
1917/19 1918/4
1918/13 1918/22
1919/1 1919/1 1919/20
1919/24 1921/25
1923/8 1923/9 1928/15
1928/23 1931/10
1932/19 1935/6 1939/4
1939/19 1940/2 1940/3
1940/21 1940/22
1964/15 1964/23
1966/12 1968/16
1969/3 1969/10
1969/15 1969/17
1970/24
**marketplace [4]**

**marketplace... [4]**
1892/11 1923/22
1941/11 1941/15
**markets [8]** 1889/12
1918/1 1918/3 1920/13
1926/16 1933/1 1934/5
1934/15
**marks [1]** 1921/8
**mask [1]** 1886/9
**Mason [1]** 1891/11
**Massachusetts [1]**
1860/10
**matter [5]** 1866/2
1866/7 1915/8 1917/4
1978/5
**matters [2]** 1880/5
1887/7
**maturities [1]** 1932/16
**maximize [3]** 1911/23
1912/7 1955/20
**may [15]** 1862/24
1863/7 1869/8 1874/20
1880/19 1883/7
1885/19 1885/24
1885/25 1886/7
1889/15 1898/10
1930/12 1930/19
1930/21
**maybe [4]** 1897/11
1910/6 1924/22
1967/11
**Mayopoulos [1]**
1871/25
**MBA [1]** 1888/12
**MBS [26]** 1863/22
1865/8 1867/3 1896/15
1896/19 1902/2 1902/6
1902/15 1905/2
1911/19 1912/10
1914/5 1914/11 1915/3
1915/4 1917/3 1917/12
1921/22 1923/11
1923/16 1923/24
1924/1 1929/25 1930/3
1932/21 1932/21
**me [13]** 1862/8 1867/6
1867/18 1869/1
1872/17 1893/23
1909/18 1918/18
1944/15 1949/8
1957/19 1959/6
1971/16
**MEAGHAN [1]**

**mean [27]** 1895/17
1899/6 1900/6 1901/19
1902/10 1907/9 1908/6
1911/5 1912/22 1915/7
1918/25 1919/9
1921/23 1932/9
1934/18 1940/13
1940/22 1944/15
1945/21 1948/9
1953/20 1955/10
1957/18 1959/11
1960/23 1961/4
1962/15
**means [11]** 1881/25
1882/2 1882/3 1904/2
1932/4 1935/17 1937/7
1949/2 1963/9 1968/5
1968/8
**meant [2]** 1910/25
1937/17
**measure [1]** 1966/9
**measured [1]** 1934/17
**meat [1]** 1894/24
**meet [4]** 1873/15
1874/24 1893/10
1956/10
**meeting [11]** 1864/18
1864/19 1864/19
1865/16 1865/20
1878/9 1878/22 1943/6
1944/2 1944/3 1944/10
**Meltzer [1]** 1859/21
**members [3]** 1886/15
1898/9 1965/22
**mention [1]** 1896/14
**mentioned [7]** 1887/25
1918/25 1919/3 1919/4
1954/6 1962/23
1968/19
**mere [1]** 1879/18
**messed [1]** 1951/19
**met [2]** 1866/9
1879/15
**MICHAEL [2]** 1860/2
1860/12
**microphone [5]**
1886/8 1897/11
1930/14 1930/16
1930/16
**mid [1]** 1923/6
**middle [2]** 1922/9
1926/24
**might [17]** 1869/1

1920/16 1920/17
1923/16 1923/23
1923/25 1934/6
1941/13 1941/14
1951/10 1953/16
1954/3 1954/14
1970/19
**mind [1]** 1945/22
**mindful [2]** 1883/15
1883/16
**minimal [2]** 1874/12
1875/4
**minute [1]** 1952/8
**minutes [2]** 1925/1
1930/8
**miss [1]** 1941/14
**mission [1]** 1911/15
**mistake [2]** 1945/2
1945/11
**mitigate [1]** 1911/15
**mix [2]** 1879/3 1884/7
**modeling [1]** 1888/25
**moderate [1]** 1910/5
**moderate-income [1]**
1910/5
**moment [6]** 1871/16
1885/19 1893/16
1954/23 1956/13
1971/15
**money [47]** 1892/4
1892/5 1897/17
1898/20 1900/21
1901/13 1901/15
1901/19 1903/22
1905/24 1906/3 1906/4
1907/1 1908/25 1909/3
1909/9 1911/10
1914/14 1914/24
1916/11 1934/8 1937/8
1938/3 1938/5 1945/25
1946/22 1946/22
1946/24 1947/25
1948/4 1948/5 1948/6
1948/13 1950/5
1959/25 1960/12
1960/17 1960/19
1960/21 1962/8 1964/2
1964/5 1967/3 1968/6
1968/19 1970/19 1971/1
**month [2]** 1941/4
1941/5
**months [2]** 1865/25
1896/7

1865/6 1878/8 1926/5
1926/6 1926/7 1926/16
1926/18 1926/20
1927/22 1938/19
**more [54]** 1867/6
1876/5 1882/14
1887/10 1890/24
1896/19 1901/6
1903/22 1904/1 1905/3
1905/9 1905/9 1906/13
1906/13 1911/10
1919/11 1919/11
1920/2 1920/18
1925/19 1927/24
1928/7 1928/9 1928/17
1935/11 1938/15
1939/7 1941/15 1944/8
1944/9 1948/4 1949/7
1949/8 1949/11
1957/25 1958/3 1958/4
1961/23 1961/25
1963/1 1964/1 1964/1
1964/1 1964/5 1964/5
1964/5 1965/9 1965/9
1965/11 1968/6
1968/23 1970/1
1970/24 1971/5
**morning [15]** 1859/12
1862/4 1862/6 1869/6
1869/15 1869/17
1877/5 1877/16
1878/12 1885/23
1886/1 1886/13
1886/14 1930/7 1966/8
**mortgage [56]**
1860/12 1860/15
1887/11 1888/7 1888/7
1892/6 1892/7 1892/8
1892/14 1895/13
1895/15 1895/18
1895/24 1896/20
1896/21 1896/22
1896/22 1897/4 1897/5
1897/22 1898/16
1898/19 1898/21
1899/7 1899/9 1900/16
1901/7 1901/11
1902/18 1903/5
1903/10 1903/14
1903/17 1903/21
1904/7 1904/9 1904/23
1905/19 1906/25
1907/1 1910/1 1910/2

# M

**mortgage... [14]**
1911/8 1911/10
1913/20 1914/16
1914/18 1914/19
1916/3 1919/17
1920/11 1920/21
1922/5 1927/13
1936/12 1970/11
**mortgage-backed [36]**
1892/6 1892/7 1892/8
1892/14 1895/13
1895/15 1895/18
1897/4 1898/16
1898/19 1898/21
1899/7 1899/9 1900/16
1901/7 1901/11 1903/5
1903/10 1903/14
1903/17 1903/21
1904/9 1904/23
1906/25 1907/1 1911/8
1913/20 1914/16
1914/18 1916/3
1919/17 1920/11
1920/21 1922/5
1936/12 1970/11
**mortgages [16]**
1895/22 1897/20
1897/24 1898/22
1902/16 1904/10
1906/5 1906/6 1906/19
1906/21 1907/15
1910/4 1911/9 1911/11
1917/16 1941/3
**most [4]** 1862/8
1873/25 1936/21
1959/2
**Motion [2]** 1865/20
1870/8
**Motions [1]** 1863/8
**mouth [1]** 1971/1
**mouthpiece [3]**
1870/23 1873/18
1876/6
**move [8]** 1862/9
1862/9 1862/12
1862/22 1865/19
1869/23 1878/4 1894/4
**moved [2]** 1868/19
1878/1
**movement [1]** 1933/17
**moving [1]** 1866/17
**Mr [11]** 1861/4
1863/14 1865/9

1865/24 1871/10
1885/10 1943/16
1945/15 1951/25
1955/3 1958/8
**Mr. [72]** 1863/5
1863/18 1863/18
1864/7 1864/14
1864/16 1864/24
1865/1 1865/18
1865/25 1866/12
1866/13 1869/13
1870/13 1870/16
1870/19 1871/1 1871/6
1871/7 1871/8 1871/16
1871/21 1871/23
1871/24 1871/24
1872/3 1872/16
1872/16 1872/18
1872/19 1872/23
1872/23 1872/25
1873/16 1874/14
1877/9 1877/19
1877/19 1877/22
1877/23 1878/16
1878/16 1878/18
1880/7 1882/15
1883/10 1883/23
1889/25 1891/18
1893/15 1894/22
1895/9 1910/6 1910/17
1921/3 1922/8 1923/8
1924/4 1925/18
1930/21 1942/9 1945/6
1945/8 1946/9 1953/22
1954/6 1954/16
1954/18 1955/4 1955/9
1956/15 1963/13
**Mr. Benson [4]** 1945/6
1945/8 1954/18
1956/15
**Mr. Benson's [6]**
1946/9 1953/22 1954/6
1954/16 1955/4 1955/9
**Mr. DeMarco [14]**
1863/18 1864/14
1865/25 1866/12
1870/13 1870/16
1870/19 1871/23
1872/16 1872/19
1873/16 1877/9
1877/19 1878/16
**Mr. DeMarco's [5]**
1864/24 1871/1
1872/25 1878/16

**Mr. DeRita [5]** 1869/13
1871/16 1871/21
1880/7 1882/15
**Mr. Dharan's [1]**
1942/9
**Mr. Hoffman [4]**
1872/3 1874/14
1883/10 1930/21
**Mr. Hume [2]** 1864/7
1877/23
**Mr. Pollard [1]**
1871/24
**Mr. Salazar [17]**
1863/5 1864/16 1865/1
1865/18 1889/25
1891/18 1893/15
1894/22 1895/9 1910/6
1910/17 1921/3 1922/8
1923/8 1924/4 1925/18
1963/13
**Mr. Ugoletti [10]**
1863/18 1866/13
1871/6 1871/7 1871/24
1872/16 1872/23
1877/19 1877/22
1878/18
**Mr. Ugoletti's [3]**
1871/8 1872/18
1872/23
**Ms [2]** 1863/1 1863/2
**Ms. [1]** 1943/20
**Ms. Jenkins [1]**
1943/20
**much [12]** 1868/21
1912/10 1920/1 1920/2
1928/7 1928/9 1946/22
1946/22 1946/24
1947/5 1950/13
1957/16
**Mukarram [3]** 1886/3
1886/11 1886/17
**multi [2]** 1932/8
1959/20
**multi-decade [1]**
1932/8
**multi-step [1]** 1959/20
**multiple [1]** 1955/25
**must [3]** 1876/25
1949/22 1950/1
**my [18]** 1877/14
1883/11 1886/17
1887/10 1889/9
1891/23 1893/21

1909/13 1911/14
1917/22 1920/1 1926/2
1943/1 1953/22 1954/8
1955/7 1956/6 1958/4
**Myers [1]** 1860/16
**myself [1]** 1888/24

# N

**name [1]** 1886/17
**National [1]** 1860/15
**necessarily [3]**
1868/21 1908/24
1954/20
**need [19]** 1880/20
1885/1 1885/8 1889/17
1896/5 1902/21 1909/6
1909/19 1909/20
1909/21 1909/23
1918/6 1921/16
1926/12 1934/23
1956/12 1971/14
1971/17 1971/22
**needed [3]** 1892/3
1892/16 1971/16
**net [36]** 1864/9 1870/3
1872/20 1874/3 1874/6
1874/7 1875/16
1880/16 1881/11
1882/3 1937/11 1947/3
1947/4 1947/5 1949/2
1949/3 1949/14
1949/24 1951/1 1951/6
1951/8 1951/10
1951/10 1951/11
1951/14 1951/15
1951/16 1953/10
1957/8 1959/21 1960/7
1960/8 1960/10
1960/13 1960/23
1961/10
**never [1]** 1963/3
**nevertheless [1]**
1924/5
**new [9]** 1859/19
1859/24 1860/6 1860/6
1875/24 1903/14
1911/11 1933/17
1941/3
**news [1]** 1879/19
**newspaper [1]**
1940/24
**newspapers [1]**
1940/23
**next [35]** 1862/18

# N

**next... [34]**  1865/1
1865/10 1865/10
1885/25 1889/24
1891/17 1892/20
1895/8 1897/14
1897/16 1899/10
1899/12 1910/18
1912/16 1913/12
1920/3 1929/7 1930/6
1931/6 1931/20
1932/14 1932/22
1933/16 1934/25
1935/10 1938/14
1938/23 1942/17
1946/23 1953/9
1962/24 1963/21
1966/9 1970/4
**nexus [1]**  1884/21
**no [47]**  1859/3
1870/12 1870/19
1870/20 1870/24
1874/12 1875/4 1875/6
1875/18 1876/5 1878/9
1878/14 1883/1 1883/2
1884/21 1889/14
1894/11 1894/19
1899/3 1908/14
1911/25 1912/6 1915/7
1917/4 1919/5 1920/1
1925/15 1932/4 1932/7
1934/2 1940/11 1943/4
1946/11 1948/15
1949/2 1949/3 1949/21
1949/22 1950/15
1951/2 1955/10
1955/24 1956/6
1958/18 1961/13
1964/6 1968/25
**noise [1]**  1968/1
**non [1]**  1867/8
**non-existent [1]**
1867/8
**none [1]**  1961/24
**normal [1]**  1953/24
**normally [2]**  1874/16
1901/20
**not [93]**  1862/14
1868/1 1868/21 1871/9
1873/6 1873/17
1873/20 1876/21
1877/1 1877/8 1877/20
1878/6 1878/18
1879/11 1879/13

1879/18 1879/18
1880/19 1881/3
1881/15 1881/24
1882/9 1882/19
1882/21 1883/12
1883/18 1883/20
1883/23 1884/12
1884/13 1885/7
1889/14 1894/15
1894/16 1896/5
1896/22 1898/10
1898/14 1898/24
1898/24 1901/13
1901/14 1902/23
1906/21 1908/23
1909/6 1912/1 1912/13
1913/14 1915/4
1916/15 1917/12
1918/6 1919/2 1919/2
1920/1 1922/1 1926/13
1926/19 1927/24
1932/20 1934/3 1935/6
1935/19 1940/9
1940/11 1940/15
1941/9 1943/4 1943/17
1946/11 1948/15
1950/4 1951/16
1951/20 1952/9
1952/13 1952/15
1955/1 1955/12 1956/7
1956/9 1956/14 1957/4
1957/15 1958/19
1958/23 1961/2
1961/14 1962/7
1964/11 1970/18
1970/19
**note [3]**  1948/20
1971/16 1971/23
**noted [5]**  1919/11
1929/17 1929/17
1929/20 1952/12
**notes [4]**  1864/18
1864/25 1876/9 1878/9
**nothing [4]**  1882/1
1883/25 1919/6 1948/2
**noting [2]**  1919/7
1919/10
**notwithstanding [1]**
1873/12
**November [2]**  1924/14
1925/14
**now [54]**  1865/22
1870/22 1871/9
1871/14 1874/8 1881/8

1893/10 1898/22
1899/10 1900/4
1901/21 1903/9 1904/8
1904/16 1907/3
1907/18 1911/22
1912/17 1914/16
1914/25 1915/11
1917/7 1923/7 1925/8
1928/2 1928/11
1928/15 1928/23
1934/21 1934/22
1940/8 1941/22 1942/1
1943/2 1943/23
1945/19 1947/8 1948/3
1948/13 1949/6
1949/17 1950/3 1952/9
1956/13 1958/6 1959/1
1959/5 1959/13
1961/18 1961/23
1968/23 1969/2
1970/13 1970/22
**number [9]**  1881/24
1905/17 1916/14
1937/25 1953/13
1958/20 1962/21
1962/23 1963/18
**numbers [12]**  1867/13
1884/12 1915/20
1915/24 1915/24
1944/11 1947/2
1949/17 1952/24
1952/25 1953/14
1962/5
**NW [6]**  1859/19
1859/24 1860/10
1860/13 1860/16
1860/21

# O

**O'Melveny [1]**  1860/16
**objection [3]**  1889/13
1890/9 1894/4
**objections [2]**  1862/17
1879/23
**objective [3]**  1866/7
1913/8 1913/8
**objectively [1]**
1867/16
**objectives [2]**  1909/20
1955/17
**obligations [1]**
1956/24
**observations [1]**
1939/12

**observed [3]**  1939/4
1940/2 1940/3
**observers [2]**  1867/10
1867/12
**obvious [1]**  1881/5
**obviously [8]**  1864/3
1865/16 1866/14
1866/19 1868/3 1872/3
1878/16 1878/19
**occasion [1]**  1871/20
**occasions [2]**  1888/18
1888/19
**occurred [2]**  1875/9
1876/2
**October [2]**  1859/5
1978/9
**off [6]**  1883/9 1886/9
1895/25 1900/24
1919/23 1920/23
**offer [2]**  1870/22
1875/19
**offered [2]**  1863/10
1870/4
**offering [1]**  1869/16
**official [3]**  1860/20
1954/22 1978/3
**officials [1]**  1875/7
**often [1]**  1918/3
**oh [2]**  1909/6 1926/11
**okay [29]**  1862/19
1862/20 1862/21
1862/25 1863/4 1869/4
1883/14 1885/10
1885/11 1885/17
1885/17 1889/15
1897/14 1898/18
1906/16 1914/10
1922/23 1925/25
1930/9 1938/14
1943/19 1944/4
1945/17 1951/18
1960/1 1964/10 1967/7
1967/15 1971/9
**once [6]**  1882/5
1888/21 1892/12
1899/17 1924/20
1927/14
**one [71]**  1863/4
1864/10 1864/16
1865/15 1866/4 1866/6
1868/13 1869/16
1876/23 1882/14
1884/1 1884/17 1888/1
1893/22 1894/12

# O

**one... [56]** 1895/11 1895/16 1896/2 1899/21 1899/21 1904/1 1906/18 1908/17 1910/8 1910/15 1911/1 1911/22 1912/1 1916/6 1917/21 1918/17 1923/16 1925/19 1926/8 1926/13 1926/14 1928/2 1928/3 1928/3 1928/4 1931/6 1931/12 1932/23 1935/11 1937/10 1938/10 1938/15 1938/16 1942/1 1942/23 1944/8 1944/9 1944/10 1944/11 1944/13 1945/21 1954/20 1955/11 1955/23 1955/25 1956/23 1957/8 1957/11 1957/12 1957/12 1958/20 1959/24 1960/9 1964/18 1971/5 1971/16

**one-time [1]** 1960/9

**ones [2]** 1866/16 1908/1

**only [12]** 1870/9 1873/10 1874/21 1879/2 1899/24 1900/23 1938/14 1955/9 1955/11 1955/22 1955/24 1971/25

**operate [8]** 1888/6 1892/2 1897/18 1905/8 1911/7 1913/9 1913/15 1913/18

**opine [7]** 1883/20 1883/23 1884/13 1885/11 1890/3 1891/11 1942/15

**opines [1]** 1884/6

**opining [1]** 1918/23

**opinion [46]** 1866/9 1868/13 1868/13 1868/17 1869/19 1874/4 1874/20 1874/22 1875/3 1875/19 1876/11

1879/17 1879/19 1879/20 1879/24 1879/25 1880/1 1880/9 1880/15 1881/9 1881/12 1881/12 1881/16 1881/18 1882/7 1882/10 1882/17 1882/21 1882/22 1883/2 1883/21 1884/4 1884/21 1885/7 1885/9 1890/17 1894/25 1901/24 1903/9 1910/21 1911/22 1913/11 1917/18 1938/17

**opinions [11]** 1869/16 1884/3 1890/13 1890/21 1890/25 1891/3 1893/18 1893/22 1895/6 1942/25 1943/3

**opponent [1]** 1874/16

**opportunity [6]** 1871/5 1871/7 1871/12 1872/6 1873/16 1904/4

**oppose [2]** 1876/16 1876/20

**opposed [1]** 1934/11

**option [2]** 1961/11 1962/11

**order [4]** 1874/11 1900/1 1900/2 1900/3

**ordinary [1]** 1934/8

**original [1]** 1937/4

**originally [1]** 1907/19

**other [28]** 1862/16 1865/22 1869/2 1877/14 1879/6 1880/4 1881/18 1882/2 1882/12 1885/7 1894/19 1897/25 1905/10 1906/25 1907/16 1912/8 1922/6 1928/4 1928/6 1928/20 1933/24 1941/10 1944/11 1944/13 1948/20 1954/14 1957/8 1964/22

**others [1]** 1869/24

**otherwise [5]** 1870/23 1873/18 1874/19 1875/2 1876/21

1873/15 1881/21 1921/17 1930/7 1932/14 1954/21 1956/24

**out [48]** 1865/20 1866/18 1866/20 1881/17 1881/22 1883/2 1884/10 1891/24 1897/22 1898/23 1898/25 1900/22 1900/23 1900/24 1901/3 1906/13 1906/22 1907/8 1908/7 1910/23 1910/24 1912/3 1920/12 1922/18 1922/20 1922/21 1922/23 1923/5 1924/23 1935/9 1938/6 1940/18 1944/15 1944/16 1945/15 1951/25 1953/9 1953/10 1953/25 1954/2 1955/13 1956/2 1957/6 1959/6 1960/16 1963/25 1966/7 1970/8

**outfit [1]** 1933/2

**outside [3]** 1867/10 1867/12 1928/7

**outstanding [2]** 1863/17 1895/19

**outweighed [1]** 1874/18

**outweighs [2]** 1867/25 1874/22

**over [33]** 1870/18 1875/17 1892/18 1901/3 1901/13 1901/13 1901/15 1904/6 1904/7 1907/6 1907/10 1907/22 1908/12 1918/20 1928/1 1929/14 1931/13 1932/8 1936/18 1936/25 1937/8 1937/19 1946/7 1946/23 1948/2 1950/9 1953/7 1956/23 1957/16 1960/13 1961/2 1965/10 1966/3 1970/1

**overall [1]** 1869/21

**overblown [1]** 1867/8

**overruled [3]** 1879/23 1890/10 1894/6

**owe [10]** 1947/16 1947/19 1947/20 1948/5 1948/7 1948/16 1949/20 1949/23 1956/25 1961/19

**owed [1]** 1962/22

**own [6]** 1876/11 1885/9 1899/14 1906/19 1906/20 1956/17

**owned [4]** 1907/15 1907/17 1908/9 1908/10

**owners [1]** 1900/10

# P

**P.A [1]** 1860/2

**p.m [1]** 1977/5

**packaged [1]** 1898/13

**packet [2]** 1864/25 1865/15

**page [18]** 1861/2 1865/1 1865/10 1865/10 1865/13 1869/13 1880/8 1882/15 1912/20 1921/2 1922/7 1922/9 1923/7 1924/3 1924/3 1926/1 1943/21 1962/4

**Pages [1]** 1869/21

**paid [9]** 1899/18 1901/3 1901/5 1901/10 1901/11 1901/15 1903/19 1913/21 1914/14

**paints [1]** 1942/6

**paper [1]** 1862/23

**paragraph [4]** 1921/15 1924/5 1927/9 1933/16

**part [22]** 1865/16 1868/12 1878/5 1878/10 1879/3 1879/12 1879/25 1888/2 1888/8 1890/17 1892/18 1909/5 1917/18 1920/11 1929/18 1935/4 1936/1 1936/16 1936/21 1947/13 1959/24 1960/1

**participant [4]** 1864/14 1866/8

**participant... [2]** 1880/24 1881/5
**participants [4]** 1921/25 1964/15 1964/23 1970/25
**particular [12]** 1864/24 1871/20 1872/8 1872/24 1882/16 1884/21 1919/3 1920/21 1941/3 1941/5 1958/22 1959/3
**particularly [2]** 1864/23 1917/14
**parties [1]** 1862/11
**Partners [3]** 1935/4 1935/17 1938/6
**Partners' [1]** 1935/13
**parts [1]** 1890/1
**party [1]** 1876/12
**pass [1]** 1869/8
**passing [1]** 1919/4
**past [1]** 1924/3
**PATERSON [1]** 1859/17
**path [1]** 1927/16
**pause [1]** 1906/9
**pausing [1]** 1931/23
**pay [30]** 1895/24 1895/25 1902/22 1904/8 1904/10 1906/13 1906/22 1908/7 1908/25 1909/7 1914/14 1914/20 1914/24 1916/21 1921/16 1922/2 1932/21 1934/1 1934/3 1934/12 1936/2 1937/1 1938/8 1946/25 1948/14 1950/5 1958/22 1960/12 1960/21 1961/18
**paying [4]** 1897/21 1924/1 1927/18 1960/20
**payment [8]** 1948/21 1950/1 1961/11 1961/17 1963/14 1963/17 1963/20 1964/7
**payments [14]** 1896/5 1896/21 1896/22 1896/24 1898/6 1902/12 1902/13

1906/8 1907/13 1916/7 1916/9 1933/7 1936/7 1946/3
**PCF [23]** 1880/16 1880/24 1881/6 1881/10 1881/13 1882/4 1883/18 1884/4 1884/4 1884/18 1893/19 1893/20 1893/22 1894/1 1894/8 1894/14 1952/14 1952/15 1952/20 1952/21 1953/1 1953/10 1953/12
**Pennsylvania [2]** 1859/22 1860/13
**people [25]** 1878/18 1887/17 1892/4 1892/6 1892/10 1892/11 1894/18 1897/20 1898/4 1898/20 1904/9 1906/5 1916/1 1919/7 1919/10 1919/11 1920/13 1922/4 1929/19 1941/3 1941/4 1941/13 1967/23 1968/6 1971/1
**per [1]** 1933/9
**perceived [1]** 1883/4
**percent [43]** 1880/17 1881/2 1881/11 1894/15 1894/20 1919/14 1937/22 1937/23 1938/8 1946/18 1946/25 1947/22 1948/1 1948/5 1948/14 1949/9 1949/11 1950/5 1950/23 1951/5 1952/10 1959/2 1960/12 1960/18 1960/19 1960/20 1960/22 1961/11 1961/18 1961/19 1961/19 1961/23 1962/8 1962/10 1962/11 1962/22 1963/17 1963/21 1963/21 1964/7
**perform [1]** 1903/6
**performed [1]** 1964/24
**period [7]** 1905/18 1915/3 1918/20

1932/9 1957/17
**periodic [13]** 1880/11 1881/14 1881/19 1882/11 1884/11 1884/20 1890/7 1890/8 1890/12 1890/14 1890/21 1893/14 1960/22
**permits [1]** 1876/10
**person [2]** 1873/11 1918/8
**perspective [3]** 1873/3 1955/15 1955/16
**persuasiveness [1]** 1868/17
**pertaining [1]** 1890/14
**PETER [1]** 1859/17
**PhD [3]** 1888/11 1888/14 1889/5
**phone [1]** 1971/21
**pick [1]** 1926/13
**picture [1]** 1942/6
**piece [13]** 1872/24 1878/4 1890/6 1894/9 1894/12 1894/13 1899/14 1935/13 1937/10 1937/13 1937/16 1950/1 1957/5
**pieces [3]** 1898/12 1898/13 1967/1
**pile [2]** 1962/1 1963/1
**place [2]** 1895/25 1914/18
**placed [3]** 1904/19 1904/24 1913/25
**places [1]** 1935/23
**plaintiffs [12]** 1859/3 1859/16 1859/20 1862/16 1869/1 1869/7 1876/16 1877/16 1878/1 1878/1 1878/10 1885/19
**plaintiffs' [12]** 1859/15 1867/7 1877/7 1878/12 1879/13 1884/1 1890/13 1891/1 1942/2 1943/19 1943/21 1962/4
**plans [2]** 1875/25 1876/4
**played [1]** 1954/10
**player [1]** 1926/16
**players [1]** 1893/25

**please [1]** 1862/2 1869/14 1871/16 1880/8 1882/15 1886/5 1886/8 1886/9 1886/15 1889/22 1943/20
**PLLC [1]** 1859/18
**point [13]** 1876/23 1877/17 1877/21 1884/3 1884/13 1893/11 1894/2 1894/2 1907/11 1952/18 1959/5 1963/3 1970/25
**pointing [2]** 1867/14 1938/6
**points [3]** 1868/10 1877/6 1882/12
**Pollard [1]** 1871/24
**pool [1]** 1899/5
**pools [1]** 1895/22
**Poor's [2]** 1926/18 1938/19
**poorly [1]** 1900/21
**Porter [1]** 1860/10
**portfolio [4]** 1882/19 1937/5 1937/14 1937/17
**portfolios [3]** 1927/14 1936/6 1936/15
**portion [5]** 1869/20 1926/2 1936/3 1937/11 1945/16
**portions [3]** 1867/1 1871/8 1940/22
**poses [1]** 1919/17
**position [2]** 1871/2 1873/15
**possibility [2]** 1917/11 1970/23
**post [10]** 1868/11 1875/5 1875/9 1876/2 1876/22 1930/2 1931/1 1932/4 1932/7 1939/7
**post-date [1]** 1876/22
**post-dating [1]** 1876/2
**post-Third [5]** 1868/11 1875/9 1930/2 1931/1 1939/7
**post-YE12 [1]** 1932/4
**post-year-end [1]** 1932/7
**postdate [2]** 1874/3 1874/10
**pot [1]** 1970/20
**potential [1]** 1938/22

# P

potentially [1]  1953/7
PowerPoint [2]  1874/9
1880/5
practice [1]  1886/21
pre [3]  1866/22
1868/18 1870/3
pre-net [1]  1870/3
pre-Third [2]  1866/22
1868/18
precise [1]  1883/21
predicted [1]  1908/23
predicting [9]  1865/6
1923/4 1924/19 1925/3
1925/5 1925/10
1947/15 1947/21
1949/3
predictions [2]  1909/2
1909/7
preference [3]
1962/14 1962/16
1963/6
preferred [23]  1859/9
1899/12 1899/16
1899/22 1899/23
1899/24 1900/22
1901/12 1905/12
1905/13 1907/21
1908/12 1912/13
1915/12 1916/21
1927/18 1933/8
1935/19 1936/2 1937/1
1946/3 1956/25
1963/14
prejudice [3]  1871/3
1871/9 1873/19
prejudicial [6]  1867/25
1871/11 1874/18
1874/23 1875/12
1882/6
prepared [7]  1940/9
1941/19 1941/21
1941/23 1942/20
1945/6 1947/8
present [2]  1867/1
1877/11
presentation [9]
1867/7 1869/9 1869/14
1869/21 1881/22
1919/23 1928/13
1932/22 1946/9
presented [3]  1943/6
1944/1 1944/10
President [1]  1886/20

pretty [4]  1901/18
1941/7 1941/7 1965/1
previously [1]  1938/1
price [3]  1924/25
1966/9 1966/11
prices [21]  1892/24
1893/5 1903/16 1907/2
1924/23 1925/2
1940/25 1965/5 1965/6
1965/11 1965/15
1968/4 1968/5 1968/12
1968/16 1968/22
1968/22 1968/24
1968/25 1970/2 1971/2
pricing [1]  1967/7
primary [4]  1915/14
1929/6 1938/10
1942/23
principle [3]  1880/21
1902/13 1902/14
prior [6]  1873/3 1875/7
1880/14 1892/22
1904/24 1934/19
priority [2]  1900/2
1900/3
probative [6]  1867/4
1867/23 1874/12
1874/17 1874/21
1875/4
problem [25]  1865/6
1865/7 1887/8 1893/12
1929/5 1929/12
1929/22 1932/13
1933/14 1939/4
1939/24 1940/2 1940/4
1942/16 1958/15
1958/17 1959/15
1961/3 1961/12 1962/1
1962/3 1965/9 1969/8
1969/12 1969/25
problems [3]  1942/14
1942/14 1945/22
proceed [5]  1880/3
1889/15 1906/16
1930/21 1971/6
proceedings [3]
1860/25 1977/5 1978/5
proceeds [1]  1901/3
process [11]  1865/17
1870/11 1871/1 1872/5
1872/11 1872/17
1873/1 1877/24
1904/11 1920/12
1958/5

produce [1]  1892/9
produced [1]  1860/25
product [1]  1895/13
products [2]  1887/13
1920/22
professionals [1]
1918/1
Professor [10]  1884/3
1884/5 1890/13
1890/21 1891/1
1891/10 1891/10
1893/18 1893/20
1893/21
profiles [1]  1900/14
profit [3]  1904/3
1904/4 1922/2
profitability [3]  1867/9
1927/1 1927/5
profitable [1]  1936/21
profits [25]  1880/17
1880/22 1881/10
1899/15 1899/16
1899/17 1899/20
1899/23 1899/24
1904/5 1907/21 1908/4
1911/24 1919/15
1929/21 1933/25
1934/2 1936/24
1936/25 1953/2
1958/22 1959/22
1970/18 1970/22
1970/24
progressed [1]
1919/11
projected [4]  1938/1
1945/25 1956/15
1956/23
projecting [5]  1922/15
1922/16 1945/9 1946/3
1964/4
projection [2]  1947/14
1959/3
projections [26]
1893/8 1893/8 1940/7
1940/14 1940/15
1941/8 1941/17
1941/18 1941/23
1942/5 1942/12
1942/13 1942/15
1942/15 1943/24
1945/12 1945/20
1953/23 1953/25
1955/9 1956/3 1957/20
1957/22 1957/23

1959/24 1958/22
promised [1]  1899/18
proper [2]  1872/9
1879/24
proponent [1]  1874/19
proposition [2]
1880/23 1880/25
prove [1]  1868/16
provide [7]  1882/6
1882/21 1898/23
1913/19 1926/8 1928/8
1928/9
provided [1]  1914/12
providers [2]  1880/21
1881/2
providing [1]  1895/5
Prussia [1]  1859/21
PSPA [2]  1863/16
1924/14
PSPAs [10]  1865/13
1914/4 1914/18
1924/19 1925/10
1925/10 1933/5
1936/16 1937/4 1970/9
public [2]  1910/25
1971/22
published [5]  1889/7
1889/8 1889/9 1918/9
1928/24
pull [7]  1863/5
1864/17 1869/13
1871/16 1882/15
1918/18 1943/19
purchase [3]  1859/9
1905/14 1915/12
purporting [1]  1874/4
purports [3]  1875/19
1880/10 1882/17
purpose [8]  1874/12
1895/5 1915/14 1929/6
1954/1 1954/19 1965/2
1967/5
purposes [2]  1872/20
1951/11
put [14]  1865/24
1880/7 1884/10
1884/12 1894/22
1895/22 1895/22
1908/13 1908/24
1910/24 1914/18
1920/12 1940/18
1971/1
puts [2]  1921/21
1932/15

**P**

**putting [2]** 1873/2 1935/8
**PX [2]** 1943/16 1943/18
**PX-218 [2]** 1943/16 1943/18

**Q**

**qualitative [2]** 1881/12 1881/15
**quantitative [4]** 1881/9 1881/19 1884/22 1964/22
**quarter [10]** 1865/2 1865/5 1909/1 1916/19 1916/19 1926/22 1927/6 1928/4 1928/5 1952/17
**quarters [2]** 1936/20 1952/18
**question [3]** 1891/7 1909/10 1951/19
**questions [9]** 1863/16 1889/22 1891/16 1911/1 1920/15 1920/16 1946/17 1955/21 1958/10
**quick [2]** 1922/23 1959/9
**quickly [1]** 1962/2
**quite [2]** 1865/23 1955/24
**quote [3]** 1875/24 1877/11 1954/15
**quotes [2]** 1877/25 1878/5
**quoting [1]** 1885/13

**R**

**Radnor [1]** 1859/22
**raise [3]** 1869/3 1886/5 1935/8
**raised [2]** 1913/6 1929/5
**raises [2]** 1865/4 1923/15
**raising [1]** 1863/24
**rare [1]** 1955/24
**rate [3]** 1937/21 1968/7 1968/7
**rates [5]** 1904/8 1904/10 1905/4 1924/4 1966/13

**rather [2]** 1877/4 1883/4
**rating [5]** 1926/17 1926/19 1928/6 1928/9 1938/18
**ratings [4]** 1926/8 1926/10 1926/12 1928/10
**rationale [1]** 1881/18
**RBC [4]** 1933/1 1933/3 1934/5 1934/14
**RBC's [1]** 1933/12
**re [3]** 1859/9 1876/6 1962/15
**re-jiggle [1]** 1962/15
**reach [2]** 1937/25 1938/2
**reached [3]** 1937/22 1937/23 1968/10
**reaching [1]** 1876/11
**reacted [1]** 1892/25
**reaction [1]** 1929/3
**read [2]** 1876/1 1876/5
**reading [1]** 1879/19
**ready [2]** 1880/2 1885/1
**real [2]** 1866/8 1922/23
**really [4]** 1919/5 1932/12 1944/16 1949/20
**reason [9]** 1873/5 1874/25 1875/6 1876/9 1879/18 1882/9 1892/13 1905/11 1917/25
**reasonable [20]** 1863/19 1866/24 1867/16 1869/18 1870/5 1873/21 1874/5 1875/20 1880/10 1882/10 1884/6 1884/19 1885/15 1890/8 1891/24 1891/24 1893/24 1909/12 1956/4 1971/4
**reasonableness [8]** 1866/5 1868/16 1890/3 1891/4 1891/21 1909/20 1918/23 1970/6
**reasons [6]** 1867/24 1876/15 1877/14 1878/23 1891/24

**reassured [1]** 1879/10
**recall [9]** 1863/8 1944/14 1944/22 1954/9 1957/6 1959/4 1961/15 1961/21 1969/20
**receive [1]** 1880/21
**received [2]** 1872/22 1873/12
**receiving [1]** 1894/10
**recent [1]** 1927/5
**recess [3]** 1884/25 1885/1 1930/7
**recipients [1]** 1872/1
**recognize [3]** 1909/24 1942/18 1943/23
**recognized [1]** 1967/25
**record [4]** 1877/2 1883/9 1971/22 1978/5
**recorded [1]** 1860/25
**reduce [2]** 1926/18 1927/12
**reduced [4]** 1882/17 1883/1 1949/25 1970/15
**reducing [2]** 1937/18 1960/4
**reduction [2]** 1882/18 1937/21
**refer [3]** 1882/9 1900/11 1968/20
**reference [8]** 1896/16 1911/3 1912/10 1922/6 1924/25 1933/12 1933/13 1936/14
**referenced [2]** 1874/14 1907/19
**references [4]** 1864/9 1877/25 1900/4 1901/21
**referencing [3]** 1931/25 1933/21 1938/25
**referred [4]** 1895/12 1905/14 1923/21 1954/22
**referring [4]** 1902/1 1921/11 1923/18 1944/16
**refers [3]** 1921/4 1953/19 1968/21
**reflect [2]** 1958/23

**reflected [2]** 1917/20 1958/24
**reflecting [1]** 1957/7
**regardless [1]** 1901/10
**regression [1]** 1966/17
**regular [1]** 1892/2
**regulatory [1]** 1887/6
**rehashing [1]** 1895/4
**relate [1]** 1874/2
**related [4]** 1862/10 1862/17 1905/19 1911/12
**relating [1]** 1869/24
**relationship [1]** 1914/4
**relative [3]** 1900/6 1900/13 1947/16
**release [1]** 1927/15
**released [1]** 1926/22
**relevance [1]** 1909/17
**relevant [3]** 1873/10 1909/22 1918/14
**reliability [2]** 1941/16 1955/5
**reliable [5]** 1946/10 1946/13 1952/10 1958/3 1958/4
**relied [9]** 1870/20 1872/17 1873/12 1873/22 1875/7 1942/24 1943/5 1943/7 1943/7
**relief [1]** 1893/2
**rely [3]** 1867/19 1876/11 1943/2
**relying [2]** 1875/1 1881/4
**remain [2]** 1886/4 1953/2
**remaining [1]** 1916/4
**remains [2]** 1927/16 1931/13
**remember [3]** 1894/16 1940/20 1965/8
**remind [1]** 1930/12
**reorient [1]** 1930/25
**repaid [1]** 1902/25
**repay [1]** 1935/19
**replacement [1]** 1938/21
**report [28]** 1863/19 1864/10 1865/1

Case 1:13-cv-01053-RGA Document 279 Filed 12/30/22 Page 148 of 157

**report... [25]** 1870/10 1870/20 1870/20 1870/25 1872/10 1872/11 1874/9 1882/1 1882/22 1882/22 1885/6 1885/8 1885/13 1912/4 1920/1 1920/7 1920/20 1921/4 1926/20 1931/17 1933/4 1935/3 1935/6 1969/16 1969/17

**reported [2]** 1860/20 1930/3

**reporter [3]** 1860/20 1944/16 1978/3

**reports [67]** 1863/7 1863/12 1865/22 1866/12 1866/15 1866/18 1866/20 1867/1 1868/1 1868/7 1868/12 1868/19 1869/20 1870/1 1870/4 1870/25 1871/3 1873/4 1874/1 1874/2 1874/10 1875/5 1875/7 1877/2 1879/7 1879/8 1879/11 1879/17 1888/20 1891/9 1917/19 1917/22 1918/10 1918/13 1918/14 1918/16 1918/19 1918/22 1919/20 1919/24 1920/12 1925/19 1927/6 1928/16 1928/20 1928/23 1929/10 1930/2 1931/2 1931/7 1932/23 1938/16 1939/8 1939/12 1939/17 1940/8 1940/12 1940/14 1941/17 1941/19 1942/6 1964/20 1969/4 1969/6 1969/7 1969/10 1970/25

**representation [1]** 1883/11

**request [1]** 1882/9

**required [2]** 1882/19 1937/4

**requirement [1]** 1936/17

**research [9]** 1889/7

1910/10 1915/12 1920/13 1920/19 1935/6 1956/16

**reserve [2]** 1876/6 1927/15

**residual [12]** 1944/12 1944/17 1944/18 1944/20 1947/2 1949/2 1949/13 1949/24 1950/13 1950/15 1953/10 1963/4

**residue [1]** 1950/2

**resolve [2]** 1862/6 1897/22

**resolved [1]** 1969/23

**respect [14]** 1871/6 1872/8 1873/6 1873/14 1873/24 1875/18 1875/22 1877/18 1879/6 1880/5 1883/19 1891/16 1902/23 1970/5

**respectfully [1]** 1862/22

**respond [3]** 1862/18 1869/1 1869/3

**response [6]** 1877/6 1879/9 1883/3 1890/18 1925/6 1968/12

**responses [2]** 1884/3 1891/12

**rest [2]** 1932/15 1947/14

**restore [2]** 1911/3 1911/6

**restructure [1]** 1924/14

**result [3]** 1919/16 1960/24 1969/23

**resulted [1]** 1907/16

**resulting [3]** 1882/18 1957/1 1960/10

**results [4]** 1865/5 1966/19 1968/2 1969/14

**resume [1]** 1950/19

**retained [10]** 1882/18 1887/18 1907/22 1936/6 1936/14 1936/17 1936/19 1937/5 1937/14 1937/17

**return [6]** 1900/17

1905/4 1927/1 1927/4

**returned [1]** 1908/4

**returns [3]** 1900/25 1903/20 1912/7

**review [9]** 1865/12 1869/20 1890/12 1891/9 1915/13 1917/22 1929/10 1931/1 1931/24

**reviewed [1]** 1922/11

**reward [1]** 1900/17

**right [98]** 1866/18 1877/4 1879/22 1880/2 1880/6 1880/13 1882/12 1883/14 1884/25 1885/25 1886/5 1891/1 1895/14 1895/20 1896/1 1898/16 1900/2 1900/15 1902/17 1903/3 1904/14 1905/22 1905/25 1906/9 1906/10 1906/14 1907/24 1908/2 1908/19 1908/20 1911/20 1915/1 1915/9 1917/1 1917/5 1917/8 1922/11 1923/13 1923/24 1924/4 1925/2 1925/8 1925/13 1925/16 1925/22 1931/3 1931/10 1931/18 1933/5 1935/15 1937/5 1937/11 1937/14 1938/9 1939/1 1939/5 1940/2 1940/4 1940/10 1941/20 1942/2 1942/6 1942/21 1943/11 1944/6 1945/7 1945/13 1946/13 1946/25 1947/6 1947/9 1947/22 1948/25 1949/9 1949/14 1950/6 1950/23 1951/3 1951/7 1951/11 1952/4 1952/16 1952/22 1957/15 1958/25 1960/18 1961/4 1961/16 1962/19 1963/6 1963/7 1963/18 1964/12 1964/18 1967/1 1967/8 1969/3

**rigor [4]** 1954/14 1954/20 1954/22 1965/25

**rigorous [1]** 1954/3

**rising [1]** 1949/14

**risk [24]** 1863/25 1876/16 1883/1 1883/4 1898/25 1900/13 1900/17 1900/18 1900/23 1911/16 1919/17 1921/22 1922/4 1923/15 1929/12 1929/23 1932/10 1932/15 1932/18 1934/23 1939/24 1969/21 1969/22 1969/23

**riskier [2]** 1899/6 1899/8

**risks [1]** 1867/3

**River [3]** 1886/20 1886/22 1886/23

**Road [1]** 1859/21

**Robert [2]** 1869/7 1885/18

**Robert Kravetz [2]** 1869/7 1885/18

**role [3]** 1880/24 1912/18 1914/21

**Room [1]** 1860/22

**roughly [5]** 1894/15 1895/18 1936/20 1961/21 1962/23

**round [1]** 1953/13

**rounding [1]** 1949/22

**row [1]** 1944/18

**Royal [1]** 1933/3

**ROYCE [1]** 1859/13

**RPR [1]** 1860/20

**rule [12]** 1862/15 1867/18 1867/23 1874/14 1874/15 1874/15 1874/14 1876/10 1878/3 1878/3 1881/20 1881/22

**ruled [2]** 1863/9 1870/8

**rules [2]** 1876/10 1933/17

**ruling [5]** 1865/21 1883/2 1883/19 1884/14 1885/3

**run [7]** 1922/19

R

**run... [6]** 1922/21 1923/5 1957/19 1957/21 1959/6 1960/16
**runs [3]** 1884/13 1922/17 1927/15

S

**safer [3]** 1965/17 1968/9 1968/17
**said [16]** 1867/2 1870/9 1880/19 1881/3 1884/10 1885/4 1885/6 1885/7 1885/8 1897/8 1908/6 1921/16 1946/5 1954/12 1956/22 1959/4
**Salazar [22]** 1863/5 1864/16 1865/1 1865/9 1865/18 1889/25 1891/18 1893/15 1894/22 1895/9 1910/6 1910/17 1921/3 1922/8 1923/8 1924/4 1925/18 1943/16 1945/15 1951/25 1958/8 1963/13
**same [26]** 1865/23 1867/14 1872/14 1875/13 1880/8 1881/16 1881/16 1912/20 1913/4 1919/13 1940/3 1947/3 1947/18 1951/11 1953/2 1953/5 1954/3 1954/13 1954/13 1956/21 1959/8 1961/5 1966/20 1968/6 1968/8 1970/2
**SAMUEL [1]** 1859/23
**sat [3]** 1914/1 1914/2 1914/12
**satisfy [1]** 1876/19
**saw [2]** 1919/7 1953/5
**say [16]** 1878/25 1881/15 1884/17 1884/19 1885/6 1885/16 1902/5 1902/9 1902/22 1902/22 1902/24 1908/21 1916/24 1927/14 1955/9 1961/16
**saying [10]** 1882/2

1894/1 1894/18 1924/18 1927/22 1934/6 1934/15 1934/22 1938/21 1947/18
**says [18]** 1885/14 1895/23 1912/6 1914/9 1921/7 1923/11 1923/23 1924/8 1927/9 1927/12 1931/22 1932/3 1932/14 1933/7 1933/17 1935/17 1936/4 1954/18
**scenario [5]** 1955/10 1955/11 1955/12 1955/23 1956/9
**scenarios [4]** 1955/17 1956/1 1957/11 1957/15
**scheduled [1]** 1921/8
**Schiller [1]** 1859/24
**Scholer [1]** 1860/10
**scooch [4]** 1897/11 1930/13 1930/14 1930/15
**scope [1]** 1890/17
**scores [1]** 1926/9
**screen [4]** 1863/2 1863/3 1900/16 1930/23
**sealed [3]** 1971/24 1972/1 1977/4
**season [1]** 1908/23
**seated [5]** 1862/3 1885/24 1886/7 1930/19 1971/20
**SEC [3]** 1865/2 1884/9 1884/17
**second [21]** 1864/16 1865/2 1865/5 1880/9 1890/6 1893/13 1894/9 1894/13 1922/8 1926/1 1926/22 1927/5 1927/8 1928/4 1928/5 1936/1 1936/3 1946/2 1951/20 1966/21 1969/2
**secondary [4]** 1910/1 1910/2 1911/10 1968/16
**section [2]** 1945/12 1971/6
**securities [53]** 1863/24 1876/7 1887/12 1889/1

1892/8 1892/10 1892/14 1892/15 1892/18 1892/19 1892/24 1895/13 1895/16 1895/18 1895/20 1897/25 1897/25 1898/16 1898/19 1898/22 1899/7 1899/9 1900/16 1901/7 1901/11 1903/5 1903/10 1903/14 1903/17 1903/21 1904/2 1904/9 1904/23 1905/3 1906/25 1907/2 1907/16 1908/10 1911/9 1914/16 1914/18 1916/3 1920/11 1920/22 1922/5 1927/19 1931/15 1966/10 1966/11 1966/14
**securitized [1]** 1920/22
**security [5]** 1897/4 1913/20 1919/18 1936/12 1970/12
**see [25]** 1871/21 1871/23 1884/25 1889/8 1893/9 1918/8 1921/9 1921/18 1924/16 1927/2 1927/19 1929/3 1932/3 1932/7 1932/12 1932/16 1933/10 1933/19 1935/20 1936/8 1940/24 1948/11 1956/8 1962/25 1971/11
**seek [4]** 1870/2 1874/1 1881/11 1935/19
**seeking [6]** 1869/23 1870/22 1874/16 1875/17 1877/2 1879/13
**seem [2]** 1893/24 1949/17
**seemed [1]** 1919/13
**selectively [1]** 1874/11
**sell [3]** 1911/8 1920/10 1931/15
**senior [4]** 1859/9 1905/12 1916/21 1956/25
**sense [8]** 1862/8

1869/11 1893/2 1893/23 1894/9 1894/12 1894/20 1946/19
**sensitive [1]** 1965/11
**sent [1]** 1877/19
**sentence [8]** 1921/4 1921/20 1921/23 1923/9 1924/9 1924/18 1934/14 1936/1
**separate [1]** 1937/3
**separately [1]** 1962/17
**September [3]** 1876/3 1904/19 1931/14
**serve [1]** 1889/20
**service [5]** 1902/4 1902/5 1902/10 1905/1 1926/5
**services [6]** 1887/10 1887/25 1888/2 1888/8 1918/15 1918/17
**session [2]** 1859/12 1862/2
**set [21]** 1880/12 1880/16 1880/24 1881/6 1881/11 1881/14 1882/11 1884/20 1894/2 1895/16 1898/3 1909/8 1920/2 1942/14 1945/22 1952/15 1952/19 1952/21 1953/1 1957/8 1957/8
**sets [3]** 1872/23 1928/8 1967/17
**setting [2]** 1881/19 1909/2
**seven [1]** 1888/19
**several [5]** 1877/13 1934/16 1934/20 1946/12 1957/14
**share [5]** 1899/15 1899/17 1899/19 1899/24 1899/25
**shared [1]** 1864/4
**shareholder [2]** 1873/7 1911/23
**shareholders [8]** 1899/12 1899/13 1899/17 1899/19 1899/23 1900/18 1901/12 1912/14
**sharply [1]** 1924/16
**she [1]** 1958/15
**sheets [1]** 1897/19

**S**

shift [1] 1934/16
shoring [1] 1911/19
short [1] 1971/5
shortcut [1] 1883/7
shorter [2] 1954/4
 1957/16
shorter-term [1]
 1954/4
shortfall [4] 1961/16
 1962/24 1963/2 1963/3
shorthand [1] 1860/25
should [12] 1867/8
 1873/17 1877/18 1878/6
 1879/4 1879/7 1880/16
 1881/10 1881/13
 1881/22 1934/16
 1936/4
show [18] 1863/10
 1866/23 1868/5 1868/6
 1868/20 1870/4
 1870/10 1872/9
 1876/24 1878/23
 1879/8 1879/11
 1883/12 1919/19
 1919/22 1942/15
 1942/16 1949/18
showed [2] 1884/1
 1941/24
showing [2] 1867/2
 1876/20
shown [2] 1879/7
 1885/11
shrink [2] 1936/25
 1937/5
shrinking [4] 1936/6
 1936/14 1936/23
 1936/25
shrunk [1] 1936/18
side [2] 1873/2 1901/8
signed [1] 1878/15
significance [1]
 1926/16
significant [6] 1873/19
 1876/18 1899/1 1899/2
 1921/17 1940/22
significantly [2]
 1939/24 1944/12
signs [1] 1878/18
similar [4] 1875/23
 1877/15 1912/7 1952/6
simplifying [1]
 1953/20 1954/4
simply [2] 1876/12

since [2] 1908/20
 1936/23
single [2] 1870/20
 1960/17
sir [3] 1871/22 1886/4
 1898/18
sit [1] 1901/7
sitting [3] 1898/23
 1899/4 1924/23
situation [11] 1897/23
 1916/14 1916/19
 1916/23 1934/4
 1951/13 1951/14
 1951/15 1956/21
 1964/8 1970/23
six [1] 1896/7
skipped [1] 1946/7
slide [44] 1881/22
 1882/16 1883/12
 1884/2 1885/4 1885/13
 1885/14 1885/19
 1889/17 1889/24
 1891/17 1891/25
 1895/8 1900/1 1900/6
 1902/7 1907/24
 1912/16 1913/12
 1913/23 1919/19
 1920/3 1929/7 1930/6
 1931/6 1932/22
 1934/25 1935/10
 1936/4 1936/11
 1938/14 1942/17
 1944/21 1944/21
 1945/17 1952/1 1952/1
 1953/19 1954/7 1955/8
 1965/20 1966/21
 1967/12 1970/4
slides [14] 1884/2
 1885/10 1885/11
 1893/15 1894/22
 1910/7 1930/23 1943/5
 1954/10 1954/15
 1956/14 1958/7
 1964/11 1965/19
slow [1] 1933/19
slowly [1] 1916/22
small [6] 1902/24
 1931/16 1933/25
 1950/1 1957/5 1967/1
smaller [1] 1923/2
snapshot [1] 1920/5
snippet [1] 1931/22
so [288]

sold [1] 1840/25
sole [4] 1870/14
 1870/16 1872/20
 1878/17
solution [3] 1958/15
 1958/17 1970/21
solve [2] 1959/15
 1961/3
solved [2] 1961/12
 1969/12
solves [1] 1965/9
solving [2] 1929/4
 1932/13
some [30] 1862/7
 1862/10 1868/5
 1870/15 1877/14
 1887/14 1893/10
 1894/2 1894/2 1897/20
 1897/23 1897/25
 1900/4 1900/25 1906/2
 1908/2 1908/3 1908/4
 1908/6 1908/8 1908/9
 1919/19 1919/22
 1920/15 1924/22
 1931/5 1940/13
 1952/18 1959/5
 1964/25
someone [3] 1906/2
 1918/6 1945/12
something [7] 1877/20
 1934/17 1935/6 1946/5
 1946/6 1952/15
 1963/22
sometimes [2]
 1886/24 1887/7
soon [3] 1866/4
 1880/2 1959/5
sooner [1] 1923/5
sophisticated [2]
 1867/11 1918/3
sorry [10] 1883/6
 1896/11 1897/13
 1906/17 1910/8
 1914/17 1926/11
 1951/3 1954/10
 1965/19
sort [12] 1866/1
 1868/15 1868/16
 1884/6 1891/7 1891/12
 1894/24 1900/13
 1961/6 1964/22
 1965/25 1970/5
sound [1] 1877/15
source [1] 1893/11

Southern [1] 1875/24
Spalding [1] 1860/13
span [1] 1869/20
speak [3] 1867/16
 1886/8 1971/19
speaking [1] 1901/14
specialization [1]
 1888/12
specific [15] 1870/10
 1870/25 1870/25
 1872/10 1873/11
 1875/18 1876/16
 1877/8 1882/21 1898/3
 1899/3 1935/5 1940/14
 1954/1 1967/17
specifically [6] 1864/9
 1871/14 1872/16
 1872/25 1877/25
 1943/2
specify [1] 1934/21
sped [2] 1937/19
 1937/20
speed [1] 1937/17
spill [2] 1904/6 1904/7
spiral [3] 1916/22
 1933/8 1933/13
splitting [1] 1878/25
sponsored [2]
 1923/21 1927/16
spreads [3] 1883/3
 1924/15 1924/25
stability [2] 1909/25
 1910/2
stack [3] 1914/2
 1923/13 1930/4
staff [1] 1878/19
stage [1] 1971/22
stand [4] 1872/19
 1873/20 1886/10
 1900/20
standard [5] 1874/14
 1874/15 1917/21
 1926/18 1938/19
standardized [2]
 1967/21 1968/3
standards [1] 1865/20
standing [1] 1886/4
star [1] 1876/8
start [10] 1862/8
 1871/15 1899/19
 1903/16 1903/17
 1903/18 1903/20
 1950/16 1959/11
 1970/9

S

**started [1]** 1919/10
**starting [2]** 1862/6
1960/2
**starts [3]** 1903/22
1921/15 1924/5
**stated [3]** 1881/5
1913/8 1970/10
**statement [1]** 1912/5
**statements [3]** 1894/1
1912/8 1956/22
**states [3]** 1859/1
1859/13 1874/18
**stating [1]** 1868/15
**statistical [2]** 1966/16
1966/18
**steadily [1]** 1960/13
**steady [1]** 1916/18
**stenotype [1]** 1860/25
**step [12]** 1895/25
1896/15 1896/23
1902/19 1903/7 1906/7
1909/18 1914/20
1959/20 1960/6 1960/8
1966/18
**steps [4]** 1898/8
1944/4 1965/19
1965/23
**still [9]** 1872/14
1877/21 1904/11
1933/23 1934/6
1934/22 1942/16
1948/24 1960/13
**stock [7]** 1859/9
1905/12 1905/13
1915/12 1916/22
1933/8 1956/25
**stockholder [1]**
1912/7
**stockholders [3]**
1907/20 1907/21
1908/13
**stop [2]** 1903/14
1933/18
**stopped [1]** 1897/21
**stops [2]** 1896/21
1933/8
**strategy [1]** 1912/6
**streamline [1]** 1883/16
**Street [2]** 1860/3
1860/16
**stress [1]** 1955/10
**strike [3]** 1894/5
1914/17 1950/10

**stronger [2]** 1935/18
1935/23
**structuring [1]** 1967/5
**student [1]** 1889/5
**studies [4]** 1889/1
1966/3 1967/24
1967/24
**study [12]** 1917/24
1935/4 1964/24 1965/1
1965/3 1965/14
1965/20 1966/4 1966/5
1967/18 1968/1
1969/14
**studying [1]** 1966/10
**subject [2]** 1863/16
1868/3
**subscription [2]**
1918/15 1918/17
**subsequent [1]** 1944/2
**subsequently [2]**
1913/6 1921/16
**substantial [16]**
1871/2 1871/9 1880/11
1881/13 1881/13
1881/23 1882/2 1882/3
1882/8 1882/11 1884/8
1884/12 1884/18
1884/20 1885/12
1894/3
**substantially [2]**
1874/17 1874/22
**substantive [4]**
1866/17 1868/20
1873/24 1879/4
**substantively [3]**
1869/23 1870/3
1876/17
**such [3]** 1870/9
1870/20 1881/21
**sufficient [1]** 1916/5
**summary [2]** 1863/19
1865/12
**summer [3]** 1942/21
1943/25 1957/13
**supply [2]** 1882/17
1883/3
**support [9]** 1875/3
1879/17 1879/25
1921/9 1923/15
1931/23 1931/25
1932/3 1938/22
**supports [2]** 1878/19
1932/8
**sure [8]** 1868/9 1885/2

1898/11 1908/18
1912/19 1920/9 1946/5
1970/9
**surveying [1]** 1866/11
**survival [1]** 1892/1
**survive [3]** 1905/1
1955/19 1955/20
**sustainability [1]**
1921/18
**sweep [17]** 1864/9
1870/4 1872/21 1874/3
1874/6 1874/7 1875/16
1880/17 1881/11
1882/3 1937/11
1951/11 1951/14
1951/15 1951/16
1951/21 1961/10
**switch [1]** 1896/7
**switched [1]** 1961/17
**sworn [1]** 1886/6
**systemic [1]** 1911/16

T

**table [1]** 1962/16
**tables [1]** 1961/16
**tacked [1]** 1962/13
**take [25]** 1862/18
1865/18 1884/25
1885/1 1886/9 1893/15
1894/15 1899/1 1899/2
1925/18 1925/19
1927/8 1930/7 1930/8
1931/5 1935/9 1943/14
1948/10 1948/11
1948/20 1948/22
1953/9 1958/7 1959/8
1962/3
**takeaway [2]** 1939/18
1939/19
**takes [2]** 1891/7
1966/25
**taking [5]** 1898/8
1946/19 1946/21
1952/3 1959/25
**talk [16]** 1891/15
1893/13 1908/16
1915/11 1925/1 1928/6
1928/7 1940/7 1941/22
1952/7 1956/13
1964/11 1967/13
1971/10 1971/11
1971/17
**talked [4]** 1911/13
1912/17 1932/19

1950/8
**talking [17]** 1911/19
1915/24 1920/14
1921/1 1927/5 1927/23
1928/16 1930/25
1932/11 1933/4
1934/22 1935/14
1935/25 1940/20
1941/16 1957/2 1965/8
**talks [1]** 1911/14
**task [1]** 1909/10
**tasks [1]** 1866/4
**taught [2]** 1889/4
1889/5
**tax [10]** 1958/11
1958/12 1958/14
1958/16 1958/25
1959/6 1959/14 1960/3
1960/6 1960/11
**taxes [9]** 1893/9
1893/11 1958/22
1958/23 1959/11
1959/22 1960/1 1960/3
1960/20
**teach [1]** 1889/3
**team [1]** 1918/18
**technical [2]** 1965/1
1965/24
**technically [1]**
1866/21
**tell [5]** 1873/21 1891/8
1905/21 1910/25
1950/17
**telling [2]** 1873/23
1968/22
**tells [2]** 1863/18
1934/19
**ten [1]** 1930/8
**tend [1]** 1887/16
**tender [1]** 1889/11
**term [15]** 1881/23
1893/5 1901/22
1921/17 1954/4 1954/5
1954/21 1956/24
1961/2 1965/7 1965/10
1965/15 1967/15
1967/18 1968/3
**terms [8]** 1872/14
1881/19 1900/5 1900/5
1901/9 1909/18
1954/21 1955/16
**terribly [1]** 1898/14
**test [1]** 1966/18
**testified [11]** 1864/14

2010

# T

**testified... [10]**
1864/20 1870/14
1870/16 1870/18
1872/19 1888/16
1942/4 1952/9 1958/14
1961/9
**testify [1]** 1881/9
**testifying [1]** 1876/13
**testimony [22]** 1862/7
1862/11 1862/17
1864/22 1869/2
1870/13 1871/8 1872/6
1876/14 1877/9
1878/16 1883/24
1915/13 1951/21
1953/22 1954/6 1954/9
1954/16 1955/3 1955/4
1959/13 1966/24
**tethered [1]** 1881/24
**Thakor [5]** 1884/6
1890/13 1891/10
1893/21 1894/13
**Thakor's [4]** 1884/3
1890/21 1893/18
1893/20
**than [34]** 1867/6
1871/4 1876/5 1882/2
1883/4 1884/5 1887/10
1894/20 1899/7 1899/8
1900/25 1927/19
1927/24 1928/7
1928/18 1929/13
1933/24 1938/1
1941/12 1942/6 1948/4
1948/5 1949/7 1949/8
1949/11 1950/8
1951/14 1953/20
1955/13 1955/14
1961/25 1962/25
1963/23 1970/24
**thank [17]** 1863/3
1869/5 1869/12
1871/22 1877/3
1883/13 1884/15
1885/20 1886/7
1889/16 1894/21
1930/9 1930/18
1930/22 1943/20
1967/12 1971/9
**that [695]**
**that's [51]** 1862/18
1873/18 1873/24
1876/6 1877/16 1878/7

1878/8 1878/15
1881/17 1882/7
1886/24 1889/2
1895/16 1896/2
1896/25 1897/14
1899/21 1900/1
1901/19 1902/20
1902/24 1904/13
1907/23 1909/22
1912/10 1913/15
1914/10 1922/4 1922/8
1923/12 1923/24
1924/10 1925/3
1925/23 1926/14
1926/19 1931/9 1933/1
1936/11 1943/1
1944/17 1948/24
1952/3 1957/25 1958/4
1966/5 1966/14
1966/16 1968/9
1970/14 1971/3
**their [37]** 1864/18
1873/9 1874/21
1874/22 1876/19
1878/13 1895/25
1897/18 1899/25
1902/23 1904/4 1905/1
1905/8 1906/19
1906/20 1907/2 1908/7
1913/2 1914/7 1914/20
1915/5 1916/15
1917/13 1920/19
1921/22 1922/18
1923/25 1926/22
1927/17 1927/18
1927/19 1934/8 1937/5
1941/14 1941/17
1971/1 1971/1
**them [22]** 1862/18
1873/6 1874/20 1875/8
1877/9 1877/21
1878/23 1889/9
1895/22 1897/17
1898/24 1901/19
1904/24 1907/7
1914/14 1916/14
1918/2 1936/20
1940/13 1954/5
1958/15 1965/24
**themselves [6]** 1871/4
1873/23 1878/23
1884/10 1887/19
1940/19
**then [35]** 1869/1

1869/23 1871/22
1878/5 1879/9 1880/2
1893/8 1895/22
1899/12 1899/19
1900/20 1902/19
1908/4 1913/6 1917/14
1920/15 1921/20
1924/22 1927/14
1930/15 1933/16
1934/2 1934/14
1940/12 1953/3 1953/5
1953/13 1954/1
1959/21 1959/25
1960/2 1962/24 1963/2
1963/20 1963/21
**there [85]** 1863/2
1863/3 1864/12
1864/21 1865/1
1865/10 1865/22
1865/23 1866/17
1868/20 1870/24
1871/2 1871/23
1871/24 1871/24
1872/3 1872/5 1872/15
1873/11 1873/19
1874/12 1875/4 1877/8
1877/20 1879/14
1880/19 1882/1
1882/14 1883/1
1884/10 1890/1
1895/10 1895/18
1898/23 1899/4 1900/4
1903/7 1904/25 1906/9
1906/21 1908/8 1908/9
1910/18 1912/5 1912/7
1914/14 1914/14
1914/19 1917/11
1917/15 1918/15
1919/4 1923/19
1926/23 1927/9
1928/17 1931/23
1934/6 1936/16 1939/7
1939/19 1944/2
1944/10 1944/25
1948/2 1948/8 1949/2
1950/1 1950/15
1953/15 1953/16
1955/18 1956/23
1957/10 1957/11
1959/13 1960/9
1961/16 1962/22
1966/2 1967/14
1968/25 1969/20
1969/21 1970/19

1869/23 1871/22
1863/10
1864/21 1866/14
1867/10 1867/22
1870/12 1875/6
1875/18 1878/9 1884/2
1884/21 1895/15
1898/22 1899/3
1900/15 1901/13
1901/14 1904/3 1904/3
1911/10 1912/5
1917/11 1940/23
1970/13
**therefore [2]** 1881/6
1884/6
**these [95]** 1862/7
1863/6 1863/12
1863/15 1864/1 1864/1
1864/20 1864/22
1865/16 1865/23
1866/11 1867/10
1867/15 1868/1 1868/6
1868/14 1870/3
1870/25 1871/3
1871/12 1871/14
1873/4 1873/7 1873/14
1875/5 1875/7 1875/16
1875/23 1876/5
1876/15 1877/2 1877/7
1879/8 1879/16
1879/19 1891/16
1892/8 1892/14
1892/18 1895/19
1895/20 1896/12
1897/16 1897/20
1898/2 1898/4 1898/22
1899/13 1900/14
1901/7 1904/2 1905/3
1906/12 1907/13
1913/8 1913/14
1913/18 1915/21
1916/4 1916/9 1917/25
1918/9 1918/17
1919/20 1919/23
1920/13 1920/15
1925/19 1928/16
1928/21 1930/2
1940/21 1941/2
1941/16 1944/5
1945/19 1948/23
1950/13 1950/19
1951/6 1952/10
1952/19 1953/24
1954/5 1954/10
1954/11 1956/2

**there's [24]** 1863/10

**these... [8]** 1957/16
1957/19 1957/20
1957/22 1962/19
1967/13 1970/10
1970/16
**they [201]**
**they'd [2]** 1961/18
1961/18
**they'll [18]** 1902/12
1902/13 1903/6 1903/7
1903/13 1903/19
1903/19 1927/18
1927/25 1947/23
1948/6 1948/7 1948/15
1948/16 1948/19
1949/8 1949/11
1950/16
**they're [38]** 1866/2
1867/13 1867/13
1868/1 1872/11 1873/5
1877/1 1879/23 1898/7
1898/24 1898/24
1900/22 1909/7
1913/25 1916/13
1916/13 1918/2 1918/4
1918/5 1920/14
1923/20 1926/7
1934/22 1934/22
1935/25 1940/15
1948/6 1948/18
1948/19 1949/7 1949/8
1949/19 1949/20
1955/12 1957/2 1962/7
1962/7 1969/17
**they've [2]** 1899/18
1951/8
**thing [11]** 1881/16
1881/16 1884/17
1916/13 1919/3 1928/2
1944/10 1945/21
1947/3 1948/20 1966/3
**things [10]** 1868/2
1875/16 1883/16
1896/2 1905/5 1918/5
1928/2 1940/24
1955/13 1970/2
**think [35]** 1862/8
1864/12 1866/1 1867/6
1867/21 1868/7
1881/17 1885/16
1892/8 1894/25 1895/3
1910/17 1913/15
1914/3 1916/15

1918/20 1920/11
1920/24 1924/22
1925/23 1928/3
1931/12 1935/5 1945/9
1945/22 1946/8 1946/9
1951/18 1952/9 1955/3
1962/2 1967/10
1969/21 1971/3 1971/7
**thinking [4]** 1916/14
1918/7 1918/8 1919/13
**thinks [1]** 1946/23
**third [104]** 1864/8
1865/3 1865/14
1865/25 1866/5 1866/9
1866/19 1866/20
1866/22 1866/24
1867/2 1868/11
1868/18 1868/24
1869/18 1870/5
1870/17 1871/18
1871/19 1872/2
1874/10 1875/5 1875/8
1875/9 1876/22
1877/24 1878/11
1878/24 1879/4 1879/9
1882/19 1882/24
1882/25 1883/20
1884/7 1889/2 1890/2
1890/4 1891/5 1891/7
1891/22 1892/12
1892/23 1893/1 1893/3
1909/11 1909/13
1909/23 1914/17
1915/11 1915/15
1916/25 1918/24
1925/20 1926/23
1928/16 1928/24
1929/4 1929/11
1929/18 1929/20
1930/2 1931/1 1931/3
1931/17 1931/25
1932/1 1932/24 1933/5
1935/9 1935/14
1935/22 1937/3
1937/10 1937/13
1937/16 1937/21
1937/23 1938/12
1938/13 1938/20
1939/3 1939/7 1939/17
1939/17 1939/23
1940/4 1944/18 1948/9
1951/20 1956/5
1956/11 1965/4
1965/16 1966/5

1969/7 1969/11
1969/12 1969/22
1969/23 1970/6
1970/21
**this [197]**
**THOMPSON [1]**
1859/16
**those [77]** 1862/12
1862/18 1865/18
1865/19 1866/9
1866/16 1867/1 1869/3
1869/20 1879/4
1891/11 1891/12
1892/10 1896/23
1897/9 1898/9 1900/5
1900/5 1902/4 1902/5
1902/10 1902/24
1903/8 1903/11 1905/4
1906/6 1906/7 1906/21
1906/23 1907/1 1907/5
1907/23 1908/1 1911/8
1915/8 1915/20 1916/1
1917/20 1920/19
1928/18 1928/20
1929/2 1930/3 1931/5
1936/11 1936/18
1936/23 1937/18
1940/12 1940/15
1941/6 1941/18
1942/14 1945/23
1950/4 1950/7 1952/24
1952/24 1952/25
1954/2 1955/17
1955/21 1956/12
1957/5 1957/6 1958/22
1959/2 1961/15
1961/24 1964/19
1965/11 1966/11
1968/4 1968/11
1969/15 1970/7
1970/22
**thought [1]** 1934/20
**thousand [1]** 1898/12
**thousand-dollar [1]**
1898/12
**thousands [1]** 1966/2
**three [14]** 1890/1
1891/16 1906/24
1926/8 1926/12
1926/14 1936/20
1938/1 1953/23 1957/5
1957/10 1957/11
1957/24 1957/25

**three-quarters [1]**
1936/20
**through [20]** 1863/20
1869/9 1871/3 1871/4
1871/10 1877/12
1882/6 1919/11
1942/12 1946/1 1952/6
1952/16 1953/25
1954/20 1954/21
1957/19 1957/21
1961/15 1965/23
1967/13
**throughout [1]**
1869/17
**till [1]** 1909/3
**Tim [1]** 1871/25
**time [45]** 1862/6
1864/13 1866/1 1870/7
1870/8 1870/19
1871/11 1871/18
1872/13 1874/7
1883/15 1889/10
1889/14 1893/25
1896/7 1907/6 1907/10
1909/16 1910/24
1915/3 1917/23
1918/20 1919/9
1919/11 1928/1
1929/14 1936/18
1936/25 1937/8
1937/19 1948/25
1950/9 1953/7 1953/19
1953/24 1953/24
1959/8 1960/9 1960/14
1965/10 1966/7
1966/10 1966/14
1970/13 1971/7
**timeframe [2]** 1917/3
1934/15
**timeline [1]** 1970/2
**times [1]** 1896/15
**timing [1]** 1878/13
**tiny [1]** 1901/8
**too [6]** 1894/11 1909/4
1931/14 1957/17
1965/1 1971/23
**took [1]** 1931/13
**top [18]** 1889/8
1891/20 1900/7 1902/8
1910/23 1919/23
1923/2 1923/13 1926/2
1930/4 1936/11
1945/17 1945/19
1945/21 1945/24

# T

**top... [3]** 1947/25 1952/21 1960/23
**top-line [1]** 1891/20
**Topaz [1]** 1859/21
**total [3]** 1948/24 1958/15 1958/17
**totally [4]** 1866/12 1922/19 1922/21 1941/18
**toward [1]** 1933/8
**towards [2]** 1924/8 1933/17
**track [1]** 1962/16
**trade [3]** 1898/14 1900/24 1924/21
**traded [2]** 1967/4 1968/15
**trading [3]** 1887/12 1887/12 1889/1
**transcript [3]** 1859/12 1860/25 1978/4
**transcription [1]** 1860/25
**Treasury [47]** 1863/18 1864/19 1912/19 1912/21 1912/23 1913/11 1913/13 1913/16 1913/17 1913/23 1914/4 1914/6 1914/11 1914/21 1914/23 1915/1 1915/16 1916/8 1916/25 1917/7 1917/10 1921/8 1921/17 1922/19 1923/5 1923/15 1924/9 1924/10 1924/13 1933/10 1934/1 1934/7 1935/19 1935/19 1936/7 1938/24 1939/25 1946/25 1947/17 1947/19 1948/24 1949/9 1949/11 1951/9 1952/16 1963/6 1966/13
**trends [2]** 1941/14 1945/9
**trial [8]** 1859/12 1863/9 1865/21 1870/13 1873/4 1875/17 1877/1 1888/21

**tried [2]** 1930/14 1930/15
**trillion [4]** 1895/18 1915/22 1915/23 1936/20
**trouble [1]** 1923/25
**troubled [1]** 1880/22
**true [1]** 1978/4
**truth [1]** 1873/9
**trying [8]** 1879/11 1882/5 1883/16 1884/12 1887/7 1897/22 1903/15 1917/23
**turn [1]** 1955/13
**turned [1]** 1907/8
**two [36]** 1862/12 1863/12 1866/16 1869/22 1870/1 1870/18 1870/25 1871/14 1873/14 1875/17 1879/4 1880/4 1892/20 1893/22 1895/17 1900/7 1900/10 1902/6 1902/8 1904/6 1906/18 1907/23 1910/7 1914/13 1915/8 1926/12 1928/15 1928/18 1928/21 1930/4 1936/11 1943/13 1945/19 1952/18 1964/18 1970/2
**type [7]** 1867/19 1897/14 1897/16 1899/10 1899/12 1916/13 1918/10
**types [11]** 1866/11 1868/6 1873/7 1875/15 1875/23 1887/14 1895/6 1917/21 1940/3 1940/15 1966/20
**typical [5]** 1953/20 1955/22 1955/25 1958/5 1967/16
**typically [6]** 1880/24 1881/6 1926/12 1941/12 1953/23 1954/21
**typo [1]** 1914/8

# U

**U.S [3]** 1860/21 1921/8

**Ugoletti [15]** 1863/14 1863/18 1864/6 1864/6 1865/24 1866/13 1871/6 1871/7 1871/24 1872/16 1872/23 1877/19 1877/22 1878/2 1878/18
**Ugoletti's [3]** 1871/8 1872/18 1872/23
**Uh [3]** 1927/3 1941/25 1954/17
**Uh-huh [3]** 1927/3 1941/25 1954/17
**ultimate [2]** 1897/5 1927/16
**ultimately [1]** 1939/21
**unable [1]** 1959/1
**uncertainty [3]** 1921/17 1921/21 1969/23
**unchanged [2]** 1927/17 1969/1
**under [26]** 1862/15 1867/18 1867/23 1873/2 1874/14 1876/13 1876/19 1878/2 1878/3 1881/20 1881/22 1916/8 1923/8 1929/20 1933/17 1938/23 1946/25 1948/9 1950/13 1950/19 1951/14 1951/15 1951/16 1951/20 1951/22 1963/14
**undergraduate [1]** 1888/13
**underlying [4]** 1895/23 1902/15 1902/18 1969/22
**understand [31]** 1862/16 1883/19 1885/3 1887/7 1895/1 1901/24 1904/17 1911/4 1912/21 1914/25 1915/14 1920/25 1921/11 1921/22 1923/18 1924/18 1925/23 1927/4 1927/22 1931/24 1932/9 1933/12 1933/21 1934/5 1934/18

1942/25 1945/2 1945/19 1947/11 1965/22 1965/24
**understanding [10]** 1883/11 1893/21 1905/10 1910/11 1910/14 1911/14 1943/1 1953/22 1954/21 1958/4
**understands [2]** 1922/24 1946/6
**unduly [1]** 1871/11
**unfairly [1]** 1882/6
**UNITED [2]** 1859/1 1859/13
**University [3]** 1888/15 1889/4 1889/5
**unless [2]** 1960/16 1971/6
**unlimited [4]** 1913/7 1915/1 1917/1 1921/8
**unofficial [1]** 1954/25
**until [7]** 1878/15 1908/24 1937/20 1937/22 1937/23 1952/16 1971/22
**unusual [1]** 1954/12
**up [71]** 1862/18 1863/5 1864/17 1867/6 1867/19 1868/16 1869/8 1869/13 1871/16 1872/18 1880/7 1882/15 1890/25 1893/5 1894/22 1895/21 1898/12 1898/12 1905/25 1907/4 1907/7 1910/16 1911/9 1911/19 1912/24 1914/13 1916/9 1916/23 1920/18 1923/2 1924/24 1925/4 1930/23 1934/20 1937/19 1937/20 1940/15 1941/2 1941/7 1943/19 1944/4 1947/12 1948/12 1948/21 1950/11 1950/18 1951/19 1952/16 1953/17 1956/23 1959/14 1959/19 1960/1 1960/3 1960/6 1960/7 1960/10 1960/24 1960/24

2012

2013

**U**

up... [12] 1961/23 1962/1 1962/22 1963/18 1965/16 1965/18 1967/1 1968/4 1968/5 1970/2 1970/3 1971/2
updates [1] 1944/2
upon [6] 1867/19 1872/17 1873/12 1873/22 1875/1 1942/24
us [7] 1891/7 1930/25 1955/1 1965/23 1966/18 1967/13 1968/22
use [1] 1914/24
used [7] 1876/14 1906/19 1916/23 1918/10 1933/3 1934/20 1966/1
using [3] 1908/20 1953/13 1966/16
usual [1] 1955/1
usually [1] 1880/21

**V**

vague [1] 1881/23
valid [1] 1883/24
validate [1] 1866/23
value [11] 1867/24 1874/12 1874/17 1874/21 1875/4 1875/18 1881/1 1894/11 1946/19 1946/21 1952/4
values [2] 1927/9 1927/12
variable [1] 1950/25
varies [1] 1887/20
variety [4] 1866/15 1866/18 1887/16 1906/4
various [3] 1887/12 1904/1 1940/18
VARMA [1] 1860/8
VERGOW [1] 1860/15
version [4] 1869/8 1943/24 1944/1 1946/8
versions [1] 1944/5
versus [1] 1943/12
very [18] 1864/10 1866/14 1866/25 1867/11 1867/14

1867/25 1874/24 1900/20 1900/21 1921/3 1921/20 1933/18 1933/18 1933/25 1940/13 1941/14 1967/21 1970/10
Vice [1] 1886/20
view [8] 1924/4 1929/16 1932/15 1938/21 1941/11 1956/4 1956/6 1968/8
viewed [3] 1929/4 1936/21 1964/15
vigorously [1] 1878/5
VINCENT [1] 1859/17
virtually [2] 1932/4 1932/7
vs [1] 1859/4

**W**

wait [2] 1908/24 1971/14
waited [1] 1909/3
waived [1] 1952/17
walk [3] 1952/6 1952/6 1965/23
walk-through [1] 1952/6
want [16] 1868/9 1869/24 1875/1 1879/21 1885/2 1908/15 1920/23 1945/5 1946/5 1946/15 1946/16 1958/10 1965/24 1966/5 1966/7 1970/4
wanted [1] 1929/3
wanting [1] 1905/4
wants [1] 1868/5
was [211]
Washington [7] 1859/6 1859/19 1859/25 1860/11 1860/14 1860/17 1860/22
wasn't [6] 1892/19 1911/25 1954/13 1954/19 1954/19 1964/4
water [1] 1870/15
way [21] 1863/2 1866/6 1866/24 1883/7 1884/13 1892/25

1908/19 1909/16 1913/15 1913/18 1954/3 1954/21 1955/1 1964/18 1968/11 1968/12 1968/16 1969/2 1969/4
ways [4] 1904/1 1906/2 1906/5 1964/18
we [94] 1862/5 1862/6 1862/12 1864/12 1865/19 1866/25 1868/6 1871/10 1871/11 1872/5 1872/14 1880/2 1880/4 1881/17 1882/9 1882/13 1883/18 1884/11 1885/1 1885/19 1887/18 1889/23 1890/24 1891/12 1891/13 1891/17 1894/22 1894/24 1896/6 1900/11 1909/11 1909/23 1910/18 1910/20 1911/13 1913/12 1914/2 1915/24 1917/1 1917/23 1917/25 1918/6 1918/16 1918/20 1919/2 1919/11 1921/14 1924/3 1926/2 1926/9 1927/15 1927/23 1930/7 1930/22 1931/6 1932/3 1932/7 1932/10 1932/19 1933/16 1934/23 1938/14 1939/8 1940/8 1940/20 1941/18 1942/12 1942/14 1945/22 1952/1 1952/25 1953/5 1954/21 1955/8 1956/3 1956/8 1956/25 1957/20 1958/21 1961/15 1962/25 1964/18 1964/19 1965/3 1965/4 1965/8 1966/14 1966/19 1966/21 1967/11 1969/6 1970/10 1971/21 1971/22
we'd [1] 1871/4
we'll [3] 1884/25

we're [10] 1871/9 1874/8 1899/13 1908/20 1912/19 1920/7 1930/25 1946/19 1952/7 1971/23
we've [8] 1875/17 1911/18 1912/9 1912/17 1928/15 1939/12 1949/24 1952/12
weather [2] 1907/5 1907/7
week [2] 1926/24 1926/24
weeks [3] 1875/17 1943/10 1943/13
weight [2] 1944/8 1944/9
Weiss [1] 1871/25
well [18] 1879/1 1900/20 1902/5 1903/25 1905/8 1905/21 1911/6 1913/13 1914/1 1914/8 1918/25 1921/24 1926/17 1929/3 1941/14 1950/10 1952/12 1968/21
went [14] 1866/6 1879/2 1879/3 1893/5 1905/17 1907/2 1908/7 1908/8 1919/9 1965/15 1965/25 1968/4 1969/25 1970/2
were [109] 1863/10 1863/13 1864/22 1865/2 1865/16 1866/14 1867/16 1872/3 1879/12 1881/5 1885/11 1889/19 1890/1 1892/4 1892/7 1892/14 1892/17 1892/18 1893/1 1893/9 1893/25 1894/9 1895/18 1896/25 1904/18 1904/25 1905/3 1905/4 1905/8 1905/24 1906/2 1906/3 1906/6 1906/6 1906/20 1906/22 1906/24 1907/1 1908/8 1908/9 1909/24

**were... [67]** 1909/25
1910/4 1910/12
1910/22 1913/2
1914/18 1914/19
1915/3 1915/4 1915/5
1915/8 1916/3 1916/18
1917/12 1917/15
1918/6 1919/7 1927/23
1928/17 1928/20
1928/22 1928/24
1929/9 1929/10 1930/4
1932/10 1936/19
1936/21 1936/23
1937/18 1938/1 1939/7
1939/11 1939/14
1940/9 1940/11
1940/12 1941/3
1941/23 1943/5 1944/2
1944/11 1944/21
1945/9 1945/11
1952/10 1953/11
1953/25 1956/23
1957/6 1957/20
1958/17 1958/21
1959/1 1960/21
1960/22 1961/6
1961/15 1962/3 1964/4
1965/13 1967/18
1967/20 1967/20
1968/15 1968/17
1971/2
**weren't [3]** 1916/11
1941/19 1941/21
**Westlaw [1]** 1876/7
**what [129]**
**what's [9]** 1898/18
1901/3 1909/16
1936/14 1939/15
1939/18 1940/24
1965/1 1965/1
**whatever [2]** 1885/7
1914/15
**when [25]** 1866/18
1873/22 1877/10
1881/4 1884/20
1893/18 1899/16
1902/5 1902/9 1902/12
1902/14 1902/22
1902/22 1913/1 1913/1
1916/13 1931/13
1943/11 1957/13
1958/22 1959/21
1961/15 1967/17

**whenever [1]** 1960/6
**where [24]** 1867/8
1871/10 1873/8
1874/15 1875/25
1887/18 1888/14
1897/17 1897/23
1907/12 1907/19
1908/22 1913/25
1914/1 1916/19
1916/23 1917/15
1921/15 1923/23
1953/15 1962/7 1963/4
1970/23 1971/1
**whether [13]** 1866/7
1866/9 1872/25 1879/7
1892/24 1897/6
1902/24 1903/6
1903/18 1916/4 1929/4
1932/20 1956/4
**which [36]** 1862/10
1870/1 1871/18
1872/13 1874/9
1875/20 1876/21
1877/22 1879/13
1883/21 1884/2 1889/1
1904/2 1906/2 1919/14
1920/6 1921/20
1925/24 1927/23
1933/5 1936/19
1937/17 1938/23
1944/8 1946/12
1950/18 1954/9 1955/1
1962/6 1962/23 1965/3
1965/16 1965/20
1966/8 1967/11
1970/17
**while [7]** 1880/19
1881/8 1886/9 1889/5
1915/23 1926/12
1928/4
**who [16]** 1866/3
1867/12 1870/13
1871/14 1872/1 1873/11
1873/20 1892/4 1892/7
1898/10 1901/3 1904/9
1908/1 1916/1 1920/13
1970/25
**who've [1]** 1967/23
**whole [5]** 1878/6
1894/8 1902/20
1945/17 1950/22
**why [23]** 1863/5
1864/8 1873/5 1888/5

1903/12 1906/3
1909/16 1909/22
1913/24 1918/9
1918/12 1918/22
1929/2 1942/11
1952/11 1956/7
1957/10 1958/19
1959/18 1961/14
1971/3
**wide [1]** 1966/12
**widely [2]** 1918/10
1966/1
**widening [1]** 1959/4
**WIERZBOWSKI [1]**
1860/4
**will [64]** 1867/11
1867/21 1867/25
1868/3 1868/19
1879/23 1880/3
1883/20 1886/15
1887/2 1891/12
1895/25 1896/4
1896/23 1897/7 1897/8
1897/9 1899/1 1902/10
1902/17 1902/19
1902/24 1903/16
1903/17 1903/18
1904/5 1904/6 1904/10
1908/23 1909/2 1909/8
1920/24 1924/24
1925/3 1925/4 1925/5
1925/11 1927/12
1927/14 1927/17
1927/19 1927/24
1928/1 1930/8 1933/18
1935/18 1935/18
1946/3 1947/12
1947/15 1947/16
1947/18 1947/19
1947/19 1947/20
1947/24 1948/2 1948/8
1948/15 1949/7 1950/4
1957/1 1959/20
1970/18
**willing [3]** 1892/7
1894/18 1968/6
**Wilmington [1]** 1860/3
**wiped [4]** 1898/25
1900/22 1900/23
1900/24
**Wisconsin [1]** 1889/4
**without [2]** 1913/13
1936/5

**witness [6]** 1861/2
1877/12 1885/25
1886/6 1886/10
1930/12
**witnesses [1]** 1871/4
**won't [6]** 1863/20
1933/18 1933/24
1936/1 1947/22
1947/25
**word [2]** 1884/8
1922/5
**words [4]** 1868/2
1868/2 1885/7 1921/21
**work [13]** 1886/19
1887/3 1887/5 1887/9
1887/10 1887/15
1888/1 1895/3 1904/11
1905/11 1908/19
1914/4 1918/10
**worked [4]** 1887/1
1887/22 1941/10
1945/8
**working [4]** 1887/6
1887/11 1918/18
1940/16
**works [2]** 1896/19
1896/20
**worries [2]** 1932/15
1932/18
**worry [4]** 1897/5
1897/6 1919/6 1934/23
**worse [7]** 1951/13
1951/15 1951/21
1955/13 1957/12
1964/8 1964/9
**worth [35]** 1864/9
1870/4 1872/21 1874/3
1874/6 1874/7 1875/16
1880/17 1881/11
1882/3 1937/11 1947/3
1947/4 1947/5 1949/3
1949/3 1949/14
1949/24 1951/1 1951/6
1951/8 1951/10
1951/11 1951/14
1951/15 1951/16
1953/11 1953/12
1959/21 1960/7 1960/8
1960/10 1960/13
1960/23 1961/10
**would [164]**
**wouldn't [2]** 1875/14
1963/22
**write [8]** 1920/18

## W

**write... [7]**  1959/14
1959/19 1960/3 1960/7
1960/10 1960/24
1970/25
**write-up [7]**  1920/18
1959/14 1959/19
1960/3 1960/7 1960/10
1960/24
**writing [2]**  1888/20
1918/5
**wrote [1]**  1918/8

## Y

**YE12 [1]**  1932/4
**Yeah [5]**  1889/8
1923/6 1929/5 1945/3
1962/21
**year [38]**  1892/20
1894/20 1896/7
1916/10 1916/10
1916/16 1916/19
1916/19 1921/7 1932/5
1932/7 1937/22
1937/23 1938/23
1946/1 1946/4 1947/12
1947/13 1947/14
1948/3 1953/13 1955/2
1956/14 1956/14
1957/22 1957/23
1958/24 1958/24
1959/21 1959/25
1960/2 1960/7 1960/17
1961/21 1962/6
1962/24 1963/3 1963/9
**year's [1]**  1963/21
**year-end [1]**  1932/5
**years [22]**  1887/2
1892/15 1892/15
1892/21 1896/9
1907/22 1918/7
1934/17 1934/21
1934/22 1938/1
1946/23 1950/4 1950/7
1953/4 1953/15
1953/16 1953/18
1953/24 1959/2
1961/24 1966/3
**Yep [1]**  1946/20
**yes [150]**
**yesterday [3]**  1864/7
1877/10 1877/23
**yet [3]**  1862/14
1943/17 1951/3

**yield [1]**  1880/3
**yields [3]**  1882/20
1882/23 1882/24
**York [4]**  1859/24
1860/6 1860/6 1875/24
**you [366]**
**you'd [5]**  1868/7
1953/5 1953/9 1963/2
1963/3
**you'll [2]**  1866/13
1940/24
**you're [13]**  1886/9
1896/8 1898/4 1909/19
1941/16 1942/1 1942/4
1944/20 1944/23
1959/24 1959/25
1966/10 1967/17
**you've [9]**  1864/5
1904/13 1913/23
1922/11 1954/15
1954/18 1968/11
1970/8 1970/22
**your [154]**
**yourself [2]**  1886/15
1888/22

## Z

**ZAGAR [1]**  1859/20
**zero [9]**  1893/22
1894/8 1907/12 1913/4
1934/2 1949/2 1949/15
1951/6 1951/8
**zoom [6]**  1921/3
1926/1 1927/10
1945/16 1957/4 1962/4
**zooming [1]**  1956/2