```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
 2
      - - - - - - - - - - - - - - - x
 3    FAIRHOLME FUNDS, INC., et al.,
                                      CA No: 1:13-cv-01053-RCL
 4                 Plaintiffs,
                                      Washington, D.C.
 5                                    Thursday, October 27, 2022
      vs.                             1:43 p.m.
 6
      FEDERAL HOUSING FINANCE AGENCY,
 7    et al.,
 8                 Defendants.
      - - - - - - - - - - - - - - - x
 9    IN RE: FANNIE MAE/FREDDIE MAC   Case Number 1:13-cv-1288
      SENIOR PREFERRED STOCK PURCHASE
10    AGREEMENT CLASS ACTION
      LITIGATIONS
11
12    _____
13            TRANSCRIPT OF JURY TRIAL - AFTERNOON SESSION
            HELD BEFORE THE HONORABLE ROYCE C. LAMBERTH
14                  UNITED STATES DISTRICT JUDGE
      _____
15    APPEARANCES:
16    For the Berkley Plaintiffs:   BRIAN BARNES, ESQ.
                                    COOPER & KIRK, PLLC
17                                  1523 New Hampshire Avenue, NW
                                    Washington, D.C. 20036
18
      For Class Plaintiffs:         LEE D. RUDY  ESQ.
19                                  KESSLER TOPAZ MELTZER & CHECK
                                    280 King of Prussia Road
20                                  Radnor, Pennsylvania 19087
21                                  HAMISH HUME, ESQ.
                                    KENYA DAVIS, ESQ.
22                                  SAMUEL KAPLAN, ESQ.
                                    BOIES SCHILLER FLEXNER LLP
23                                  1401 New York Avenue Northwest
                                    Washington, D.C. 20005
24
      (CONTINUED ON NEXT PAGE)
25
```

2019

```
 1    APPEARANCES (CONTINUED):

 2    For Class Plaintiffs:        RICH GLUCK, ESQ.
                                   ROBERT KRAVETZ, ESQ.
 3                                 BERNSTEIN LITOWITZ BERGER &
                                   GROSSMANN LLP
 4                                 1251 Avenue of the Americas
                                   New York, New York 10020
 5

 6    For Defendant Federal
      Housing Finance Agency:      JONATHAN STERN, ESQ.
 7                                 ASIM VARMA, ESQ.
                                   DAVID BERGMAN, ESQ.
 8                                 IAN HOFFMAN, ESQ.
                                   STANTON JONES, ESQ.
 9                                 ARNOLD & PORTER KAYE SCHOLER
                                   601 Massachusetts Avenue NW
10                                 Washington, D.C. 20001

11

12    Court Reporter:             Lisa A. Moreira, RDR, CRR
                                   Official Court Reporter
13                                 U.S. Courthouse, Room 6718
                                   333 Constitution Avenue, NW
14                                 Washington, DC  20001
                                   (202) 354-3187
15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2

WITNESS                                              PAGE
3
MUKARRAM ATTARI, Ph.D., Resumed
4
     (By Mr. Hoffman)..................................2022
5     (By Mr. Kravetz)..................................2043
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1               P R O C E E D I N G S
2          THE COURT:  I talked to the jury, and the other
3     jurors -- if I accommodate No. 7 by stopping at 2:00
4     tomorrow, other jurors who were anxious will all be
5     satisfied with that.  So I explained to all the jurors what
6     we're contemplating right now is recessing tomorrow at 2:00
7     and resuming Monday for closings and instructions at 10:00
8     on Monday.  And all of them are actually quite pleased, if I
9     give them all letters that we'll still be in session that
10    they can give to their employers, so I assured them they'll
11    have letters this afternoon.
12         MR. HOFFMAN:  Thank you, Your Honor.
13         MR. STERN:  Thank you, Your Honor.
14         THE COURT:  And then we can talk at the end of the
15    day about the schedule for tomorrow.  Depending on how the
16    testimony's going, we could take lunch from 12:00 to 1:00
17    and come back and go from 1:00 to 2:00 with testimony,
18    depending on where we are.  We'll just see where we get to.
19    Or we can make them go without lunch, if we're going to stop
20    at 2:00.  We'll just see where we are with testimony.  I
21    told that one juror who has to be out in Maryland before the
22    bank closes that we were going to accommodate that.
23         MR. HOFFMAN:  I think that makes sense to us, Your
24    Honor.  We appreciate it.
25         THE COURT:  And I explained to them that I had
```

```
 1    excused the one juror, and so -- and some of them seemed
 2    pleased actually.
 3              MR. HOFFMAN:  Well, we appreciate the report.  I
 4    think it's adequate.
 5              Shall we get the witness, Your Honor?
 6              THE COURT:  Yes.  I don't know if I should have
 7    reported that.
 8              MR. HOFFMAN:  I won't tell, Judge.
 9              THE COURT:  Off the record for a minute.
10              (Discussion off the record)
11              (Jury enters courtroom)
12              THE COURT:  I have excused Juror No. 5, so the
13    other two jurors can move down this way one seat, and in the
14    future just remain there, and everybody else can stay where
15    you are.  You all can be seated now.
16              And we're ready to proceed.
17              You can proceed, Mr. Hoffman.
18              MR. HOFFMAN:  Thank you, Your Honor.
19              Again, for the record, Ian Hoffman on behalf of
20    the defendants.
21                   MUKARRAM ATTARI, PhD, Resumed
22                   DIRECT EXAMINATION, Continued
23    BY MR. HOFFMAN:
24    Q.  Good afternoon, Dr. Attari.
25    A.  Good afternoon.
```

1    Q.  I just have one more section of questions for you.  We

2    appreciate your time.  These questions are about the

3    periodic commitment fee.

4    A.  Yes.

5    Q.  And you're aware of the testimony in this case of one of

6    plaintiff's experts, Professor Thakor, right?

7    A.  Yes.

8    Q.  And Professor Thakor offered opinions about what he

9    believed would be an appropriate periodic commitment fee; is

10   that right?

11   A.  Yes.

12   Q.  And you're aware that he has two opinions.  One is that

13   the periodic commitment fee -- I believe his primary opinion

14   is the periodic commitment fee, an appropriate fee would be

15   zero; is that right?

16   A.  Yes.

17   Q.  And his alternative opinion about the periodic

18   commitment fee is that it would be set at a rate in the

19   range of up to 45 basis points.

20   A.  Yes.

21   Q.  Okay.  And do you agree or disagree with those two

22   opinions?

23   A.  I disagree.

24   Q.  Okay.  And you're prepared to offer testimony about

25   that?

1    A.  Yes.

2    Q.  So before we get into that, just to orient us all --

3              MR. HOFFMAN:  Let's go to the next slide of

4    Dr. Attari's slide deck.

5    Q.  The periodic commitment fee, it's one of the four

6    components of compensation to Treasury.  Is that what your

7    slide is saying here?

8    A.  Yes.  So there's the dividend, there's an initial $1

9    billion commitment fee, the warrants for 79.9 percent of the

10   common stock, and then there's a periodic commitment fee

11   that's to start on January 1, 2010.

12             MR. HOFFMAN:  And let's go to the next -- the

13   callout here.

14   Q.  What do you understand the purpose of the periodic

15   commitment fee to be based on your review of the facts and

16   documents in this case?

17   A.  So the document said that it's intended to fully

18   compensate purchaser -- that's Treasury -- for the support

19   provided by the ongoing commitment, and that it shall be

20   determined with reference to the market value of the

21   commitment as then in effect.

22   Q.  Now, just focusing on that last phrase that you just

23   read, "the value of the commitment then in effect,"  what is

24   that referring to?  The outstanding Treasury Commitment?

25   A.  Yes.

1    Q.  And so this is talking about the value of the undrawn

2    portion of the commitment; is that right?

3    A.  Yes.

4    Q.  So it's not talking about the value of what has already

5    been drawn and given to the enterprises?

6    A.  Correct.

7    Q.  So it's the market value of what's sort of left and

8    available?

9    A.  Yes.

10   Q.  And the dividends here -- as you indicate in your slide,

11   the dividends are compensation for what has already been

12   drawn, right?

13   A.  Yes.

14   Q.  So Professor Thakor's first opinion would be that the

15   periodic commitment fee -- that an appropriate rate for that

16   fee, based on the market value of all the remaining Treasury

17   Commitments, should be zero dollars.

18   A.  Yes.

19   Q.  Why do you disagree with that?

20   A.  Well, that just doesn't make sense.  It's $258 billion

21   of Treasury Commitment that's available to the enterprises;

22   and saying that it's nothing doesn't make sense

23   economically; and it was inconsistent with what the parties

24   themselves were stating about the periodic commitment fee at

25   the time.

```
1    Q.  So let's go to your next slide here.  What are all these
2    letters that we're looking at?
3    A.  These are letters that Treasury sent the enterprises and
4    FHFA each quarter as it waived the commitment fee.
5    Q.  And let's -- I believe your slide has a callout of some
6    of these -- some of this language.  Do you recognize this as
7    being some of the language from these PCF waiver letters?
8    A.  Yes.  This is from the December 29, 2010, letter, which
9    was the first waiver letter that was sent.
10   Q.  And the letter -- just so the jury understands, who sent
11   this letter?  Which party?
12   A.  Treasury sent the letter.
13   Q.  And sent it to Director DeMarco, right?
14   A.  Yes.  That's his name on there at FHFA.
15   Q.  So -- and Treasury would be the recipient of this
16   periodic commitment fee, right?
17   A.  Yes.  It would receive the money.
18   Q.  And so this -- is this the first of this kind of these
19   waiver letters?
20   A.  Yes.
21   Q.  Okay.  And so here in this first line that's been
22   highlighted, "The amount of the PCF is intended to fully
23   compensate Treasury for the support provided by the ongoing
24   funding commitment under the Agreement."  Do you see that?
25   A.  Yes.
```

```
1    Q.  And is that consistent with your testimony a moment ago

2    that the purpose of the periodic commitment fee was to

3    compensate for the undrawn portion of the commitment?

4    A.  Yes.

5    Q.  And the second highlight here is -- it says -- refers to

6    a belief that "the imposition of the PCF at this time would

7    not fulfill its intended purpose of generating increased

8    compensation to the American taxpayer."

9             What about that statement leads you to conclude

10   that you don't think the PCF would be zero?

11   A.  Well, if it was going to be zero, they would just have

12   said it's zero and been done with it, not sent letters

13   quarter after quarter.

14            And the second thing is that what the statement is

15   saying -- is noting is the fact that if a PCF had been

16   levied at that time, all that would happen is that Fannie

17   Mae and Freddie Mac would draw on the commitment to pay the

18   PCF, and that wouldn't increase the compensation to

19   taxpayers.

20   Q.  And the reference here to increased compensation, that's

21   increased on top of the 10 percent, right?

22   A.  Yes.

23   Q.  Again, so the last highlight here it says, "Accordingly,

24   Treasury believes that the imposition of the PCF at this

25   time would not provide additional net proceeds for the
```

```
 1    American taxpayer."  Do you see that?

 2    A.  Yes.

 3    Q.  And so the "additional net proceeds," you understand

 4    that to be a reference to something additional on top of the

 5    10 percent dividend?

 6    A.  Correct.

 7    Q.  Now, we won't go through each of these PCF waiver

 8    letters, but based on your review of these documents, do

 9    they all say -- include similar language?

10    A.  Yes, they do.

11              MR. HOFFMAN:  Let's go to the next slide.

12    Q.  Are these additional reasons why you disagree with

13    Professor Thakor's conclusion that a zero PCF is wrong?  And

14    could you explain your reasons.

15    A.  Yes.  So these are the additional reasons.  And

16    what Dr. Thakor has done is, he says that he has, you know,

17    compared the commitment to certain benchmarks, and the

18    benchmarks that he's using are incorrect.  And so he reaches

19    the wrong conclusion, in my view.

20    Q.  So when you say a Treasury Commitment is an equity

21    commitment, what do you mean by that?

22    A.  Well, the Treasury was not lending money to Fannie Mae

23    and Freddie Mac, it was providing equity capital to Fannie

24    Mae and Freddie Mac, and it was actually providing equity

25    capital to them when they had negative equity capital.
```

```
 1              So it's not like this is a company that already
 2       has lots of equity and maybe it needs some more and you're
 3       topping it off.  This is when the company has negative
 4       equity, Treasury steps in and plugs the hole.
 5       Q.  And when you say "equity commitment," if the jurors
 6       remember your four investor classes, the top two, the MBS
 7       and bondholders, those are considered debt investors, right?
 8       A.  Yes.
 9       Q.  And the bottom two investors are considered equity
10       investors, shareholders, right?
11       A.  Yes.
12       Q.  And I don't know if the jury recalls -- we can pull it
13       back up, but I'm sure they do -- that the Treasury
14       Commitment was inserted there above the junior preferreds,
15       but they were also considered equity commitment; is that
16       right?
17       A.  Yes.  So debt is like a loan, and these were not loans.
18       This was actually money that was being invested and money
19       that was at risk of being lost.
20              MR. HOFFMAN:  Okay.  So let's go back to
21       Dr. Attari's slide.
22              Thank you.
23       Q.  So loan commitments, you say, is not the same as equity
24       commitments, and you mention two types of loan commitments
25       here.
```

1          Can you describe why you mentioned those two here.

2   A.  Well, Dr. Thakor described how he used commercial loan

3   commitments, studies of commercial loan commitments to

4   arrive at his conclusion that the PCF would be zero.  And

5   the point I'm making here is that those studies look at

6   loans that companies are getting from banks, not equity

7   capital that companies get.  And so they're just not

8   relevant here because they're in that top tier that we were

9   looking at, and what we need to look at are commitments that

10  fall in the bottom tier.

11  Q.  And the bottom tier of that investor class, is it your

12  opinion that that tier is exposed to more risk than the

13  upper tier?

14  A.  Yes.

15  Q.  And what does more risk mean in terms of what an

16  investor expects to be compensated?

17  A.  More risk means more return, that investors require a

18  greater reward to invest if they're investing equity and

19  they're -- you know, if they're lending.

20  Q.  And so is it fair to say that your opinion is that

21  comparing an equity commitment and the fees associated with

22  it to a loan commitment and the fee associated with it, it's

23  apples and oranges?

24  A.  Correct.

25  Q.  You also have a reference here to banks that received

```
1    Capital Purchase Program investments.  So, first, can you
2    maybe just remind the jury what CPP investments are and what
3    your opinion is about this.
4    A.  Sure.  So one of the other types of investments that
5    Professor Thakor considered was this thing called Capital
6    Purchase Program.  That happened in 2008.  And under that
7    banks received some amount of equity capital.
8           But these were banks that had significant amounts
9    of their own equity capital, and this was just to top things
10   off so that the market would have more confidence.  This was
11   not banks that had negative equity capital and the hole was
12   being plugged.
13          So while these fall in the same bucket that we've
14   been talking about, the equity investments, they're
15   completely different in the sense that these are companies
16   that had a lot of their own equity capital already, and this
17   was a bit of a top-off that was put in place to increase
18   market confidence.
19   Q.  And so in the time that the Third Amendment was
20   executed, how much equity capital did Fannie Mae and Freddie
21   Mac have?
22   A.  They had negative equity capital prior to each draw, so
23   they would only draw when they had negative equity capital.
24   And at the time of the Third Amendment, they had marginally
25   positive equity capital because the last quarter earned a
```

1    little bit more than what was due on the 10 percent

2    dividend.

3    Q.  But according to Fannie Mae's internal projections, that

4    residual equity of Fannie Mae and Dave Benson, they were

5    projecting that that equity capital would quickly run out?

6    A.  Yes.

7    Q.  Now, on this slide, before we move off of it, Slide 51,

8    there's a reference to the New York Fed secured loan

9    commitment to AIG.  What is that in reference to?

10   A.  Well, so AIG was a large insurance company that received

11   various kinds of government support.  And one of the things

12   that Professor Thakor talks to is the terms of that support.

13   It's a very specific piece of the support, which is AIG

14   received an $85 billion secured loan commitment.  So that's

15   like, you know, you're getting a mortgage on your house.

16   You're putting up your house as security, and then you can

17   borrow.  And AIG received that kind of a facility from the

18   New York Fed.

19           So, again, it's not comparable because it's a

20   loan, not equity, not an investment.  Plus, this is not just

21   the regular kind of loan; this is a secured loan where AIG

22   had to put up assets to be able to pull down -- to borrow

23   money.

24   Q.  If a borrower puts up assets, they can usually get a

25   better rate; is that right?

1    A.   Yes.

2    Q.   That's sort of like a home mortgage?

3    A.   Correct.

4    Q.   Did Fannie Mae and Freddie Mac put up any assets to get

5    the Treasury Commitment?

6    A.   No.

7    Q.   So you've prepared a slide here on the next one

8    comparing this AIG commitment fee to the Fannie Mae and

9    Freddie Mac commitment fee.  So you don't have to go through

10   all of this, Dr. Attari, but maybe just highlight why you've

11   included this.

12   A.   So I included this because what this slide shows is that

13   if you compared the terms of what AIG received to what

14   Fannie Mae and Freddie Mac received, the terms that AIG

15   received were more beneficial on each dimension of the

16   contract.

17           The good part is that these two contracts started,

18   you know, very close together in time.  The PSPAs are from

19   September 7, 2008.  The AIG facility is from roughly a week

20   later, September 16, 2008.

21           As I noted, the AIG facility's a lot safer because

22   it's a secured loan.  AIG had to put up assets to make

23   draws, while Fannie Mae and Freddie Mac were able to make

24   draws without putting up any assets.

25           The AIG facility was only two years.  Fannie Mae,

1    the PSPAs were indefinite.

2          The size was roughly -- the initial size was

3    roughly comparable.  AIG was $85 billion, Fannie Mae/Freddie

4    Mac got a billion each.

5          The initial commitment fee that AIG paid was

6    significantly greater.  It paid $1.7 billion instead of $1

7    billion for Fannie Mae and Freddie Mac.

8          And the value of the equity that underlaid the

9    warrant -- in both cases the warrant was for 79.9 percent of

10   the equity.  In AIG's case, the value of that equity was put

11   at $23 billion, while Fannie Mae and Freddie Mac valued the

12   equity -- Fannie Mae had valued it at $3.5 billion and

13   Freddie Mac at $2.3 billion.  So, you know, AIG alone was

14   almost ten times Freddie Mac, and about eight times what

15   Fannie Mae paid.

16         The rate on the AIG facility was higher, and it

17   had an 8.5 percent commitment fee, periodic commitment fee.

18   Q.  So 8.5 percent PCF, that's what the AIG package had?

19   A.  Yes.

20   Q.  And, again, just to orient the jury here, Professor

21   Thakor's opinion -- his first opinion is that the PCF for

22   Fannie and Freddie would be zero.

23   A.  Yes.

24   Q.  But his second opinion is that at most it would be 45

25   basis points; is that right?

```
1     A.  Yes.

2     Q.  So what is 45 basis points translated into a percent?

3     A.  It's 0.45 percent.  So it's roughly 1/20 or something.

4     I can't do the math.

5     Q.  So to compare them, if you were to substitute in

6     Professor Thakor's PCF here, it would be comparing 8.5

7     percent to 0.45 percent?

8     A.  Correct.

9     Q.  Now, to be fair, the AIG facility, it was modified over

10    time, right?

11    A.  Yes, it was modified over time, but, I mean, the --

12    Fannie Mae and Freddie Mac PSPAs were also modified.  They

13    rose from $100 billion to $200 billion to uncapped.

14    Q.  And you're comparing here -- to make it apples to

15    apples, I understand what you're comparing here what the

16    first contemporaneous packages were, right?

17    A.  Yes.

18          MR. HOFFMAN:  So let's go to Dr. Attari's next

19    slide.

20    Q.  Here you say Dr. Thakor's conclusion that the PCF would

21    be $1.16 billion annually is wrong.

22          So here now you're talking about Professor

23    Thakor's second opinion, his sort of fall-back opinion; that

24    if it's not zero, it would at least be $1.16 billion

25    annually.  Is that right?
```

1    A.   Yes.

2    Q.   So you disagree with that conclusion, right?

3    A.   Yes.

4    Q.   And explain to the members of the jury why.

5    A.   So what Dr. Thakor does is that he uses -- the FDIC

6    administers a program that provides deposit insurance to

7    banks so people who, you know, deposit money in banks don't

8    have to worry about the safety of their deposits.  And for

9    that program, banks pay into a fund a deposit insurance fee,

10   and there's a formula that's used to determine that fee.

11          Dr. Thakor takes the rate, you know, that's

12   published as a part of the formula, and the rate that he

13   picks is for large banks.  And that is from 2.5 basis points

14   to 45 basis points, and he takes the upper end of that

15   range.

16          However, what he doesn't recognize is that banks,

17   to be able to continue to operate and to have access to

18   deposit insurance, actually have to meet minimum capital

19   requirements.

20          But, again, I mean, Fannie Mae and Freddie Mac had

21   no capital requirements, so they would not meet any kind of

22   capital requirements, so they would not even have access to

23   this kind of deposit insurance, you know, program.

24   Q.   And, again, in the summer of 2012, before the Third

25   Amendment was executed, Fannie Mae was forecasting that for

1    itself it would not have capital going forward into the

2    future for the next ten years, right?

3    A.  Yes.

4    Q.  I believe, if I recall correctly, there were two or

5    three years, in that range, where they had $1 billion or $2

6    billion in capital, and then it quickly dissipated as a

7    result of the 10 percent dividend alone, right?

8    A.  Yes.  So, you know, what this tells us is that first off

9    you can't really use the FDIC approach.  And if you want to

10   use the FDIC approach, and if you decided that you -- this

11   was the best possible way of going forward, then you'd have

12   to considerably increase that 45-basis-point rate before you

13   use it.

14         The second thing that Professor Thakor does, and

15   this is actually -- I believe we have a slide -- is that he

16   applies it to the outstanding commitment.  The FDIC very

17   clearly states that it's to be applied to total assets minus

18   equity capital.  And since Fannie Mae and Freddie Mac had no

19   equity capital, it basically means you had to apply it to

20   total assets.

21   Q.  So let's break that down a little bit.

22         The way that Professor Thakor calculates the PCF

23   here is sort of with two data points, right?  It's a rate, a

24   percentage?

25   A.  Uh-huh.

1    Q.  And his upper end is 0.45 percent; is that right?

2    A.  Yes.

3    Q.  And the percentage has to be multiplied against

4    something --

5    A.  Yes.

6    Q.  -- in order to get the PCF.  Right so far?

7    A.  Yes.

8    Q.  Okay.  And what he applies the rate against is referred

9    to sometimes as the base; is that right?

10   A.  Yes.  It's called the assessment base.

11   Q.  And so what assessment base did Professor Thakor use?

12   A.  Professor Thakor used the remaining portion of the

13   commitment.

14   Q.  Now, is that consistent or inconsistent with the

15   assessment base that the FDIC uses when it calculates its

16   fees?

17   A.  It's inconsistent.

18          MR. HOFFMAN:  So let's go to the next slide in

19   Dr. Attari's presentation.

20   Q.  What is the base against which the FDIC fees are

21   assessed against?

22   A.  So as you can see on the monitor, what the FDIC says --

23   it defines it.  It says to define a bank's assessment base

24   as its average consolidated total assets -- so assets minus

25   average tangible equity.  That's equity.

1    Q.  So the last sentence there says, "Therefore, a bank pays

2    assessments" -- that's like the fees we're talking about?

3    A.  Yes.

4    Q.  "A bank pays assessments on its total liabilities, not

5    just insured deposits."

6    A.  Correct.

7             MR. HOFFMAN:  And so let's go to the next slide --

8    A.  And just --

9             MR. HOFFMAN:  -- please.

10   A.  Sorry.

11           So Professor Thakor justifies his use of the

12   commitment instead of the total assets based on this idea

13   that it's only the insured deposits that matter.  And this

14   last statement, sentence, very clearly says it's not the

15   insured deposits.

16           MR. HOFFMAN:  So let's go to the next slide.

17   Q.  So Dr. Thakor's calculation you have up top here, and I

18   believe you copied this in from his presentation; is that

19   right?

20   A.  Yes, this is copied from his slides.

21   Q.  And so this describes the somewhat basic formula that I

22   tried to characterize earlier of the fee times the base

23   equals the -- I'm sorry, the fee rate times the base equals

24   the fee, right?

25   A.  Yes.

1    Q.  And so 0.0045, that's the 45 basis points?

2    A.  Yes.

3    Q.  And he calculates that against the undrawn commitment,

4    which was $258 billion as of --

5    A.  Well, he's putting it together for Fannie Mae and

6    Freddie Mac, so it's $258.1 billion for the two companies

7    combined as of June 30, 2012.

8    Q.  Now, the second calculation here is your calculation.

9    And describe how that corrects Dr. Thakor's calculation.

10   A.  So I've left the fee portion the same, just because

11   adjusting it is complicated, and, you know, it -- I'm not

12   even very sure that it can be done.

13   Q.  But just to pause you right there.  Do you agree that 45

14   basis points, that the rate is appropriate?

15   A.  No.  It's too low.

16   Q.  It's too low because it was an apples-to-oranges

17   comparison with the other banks, right?

18   A.  Correct.  The other banks had significant amounts of

19   equity capital to support themselves, while Fannie Mae and

20   Freddie Mac had practically none.

21   Q.  So here, you're just assuming for the sake of argument

22   that the rate is appropriate, but you're multiplying it

23   against the corrected assessment base.  And describe what

24   you're doing here.

25   A.  Right.  So what I've done to determine the corrected

1    assessment base is I've taken Fannie Mae's assets and

2    Freddie Mac's assets, added them together, and then

3    subtracted out Fannie Mae and Freddie Mac's equity capital.

4    And that gives me, you know, the correct base -- definition

5    of the base as we saw in the previous slide.

6    Q.  And so even assuming that Dr. Thakor's comparison to the

7    FDIC is appropriate, even assuming that his rate is

8    appropriate, if you applied the formula in the way that the

9    FDIC itself applies it, what is the total periodic

10    commitment fee?

11    A.  It's $23.4 billion for Fannie Mae and Freddie Mac

12    combined.

13    Q.  That's a lot bigger than $1.16 billion, right?

14    A.  Yes.

15    Q.  And just so the jury understands this and appreciates

16    it, how regularly was the PCF to be imposed under the PSPAs

17    before it was waived as part of the Third Amendment?

18    A.  Sorry, I don't fully understand.

19    Q.  I'm sorry.  It was a very poor question.

20         Was the periodic commitment fee intended to be a

21    one-time fee?

22    A.  Oh, no.  It was to be paid annually.  So this is the

23    annual amount, and it would be set once every five years.

24    So if you were doing this -- setting it -- you would set it

25    at this level for five years, and then this is the amount

1    that would be paid every year for each of those five years.

2    Q.  I see.  And so even under Dr. Thakor's calculation, it

3    will be $1.16 billion applied to the enterprises every

4    single year?

5    A.  Yes.

6    Q.  And without the Third Amendment, it would be applied

7    every single year on top of the 10 percent dividend?

8    A.  Yes.

9    Q.  And under your corrected calculation, even assuming all

10   the comparables are appropriate -- which I understand you

11   disagree with.  But for the sake of argument, your corrected

12   calculation yields an annual PCF of $23.4 billion; is that

13   right?

14   A.  Yes.

15   Q.  Let's go to your last slide, Dr. Attari.

16           So what are your bottom-line conclusions about the

17   periodic commitment fee?

18   A.  Well, so it's what we've been talking about.

19           The first is the PCF would not be zero.  You know,

20   like I mentioned, Treasury had stated that a PCF would be

21   set when the enterprises were able to pay.  Fannie and

22   Freddie had repeatedly recognized it in various filings,

23   that they would have to pay a PCF, and that it would be

24   substantial.

25           Dr. Thakor arrives at his conclusion of a zero PCF

 1    using benchmarks that are not comparable.  You know, he uses

 2    loan commitments.  This is an equity commitment.  They're

 3    apples and oranges.

 4            And finally, that even if you adopted the approach

 5    and, you know, only corrected a part of the problem, you end

 6    up with a PCF that is $23.4 billion.  And if you corrected

 7    the other piece, if you corrected the rate, you'd have a

 8    higher rate, and so an even higher PCF.

 9            MR. HOFFMAN:  Thank you very much, Dr. Attari.  I

10    have no further questions at this time.

11            THE WITNESS:  Thank you.

12            THE COURT:  You may cross-examine.

13            MR. KRAVETZ:  Good afternoon, Your Honor; Robert

14    Kravetz on behalf of plaintiffs.  May I have a moment to

15    grab some binders, please?

16            Thank you.

17            (Pause)

18            MR. KRAVETZ:  Thank you, Your Honor.

19                          CROSS-EXAMINATION

20    BY MR. KRAVETZ:

21    Q.  Good afternoon, Dr. Attari.

22    A.  Good afternoon.

23    Q.  I want to start, sir, by asking you about your

24    background.  You indicate you've been at CRA for about 20

25    years; is that correct?

1     A.  Yes.

2     Q.  And what kind of services does CRA provide?

3     A.  We provide economic consulting services in various kinds

4     of litigation and regulatory matters.

5     Q.  All right.  And you, in particular, I think you

6     testified on direct -- what's your particular area of focus

7     at CRA?

8     A.  Finance.

9     Q.  When you say "finance," what do you mean?

10    A.  I work across a broad range of areas of finance.  It

11    includes valuation and corporate finance.  It includes

12    mortgage-backed securities.  It includes analysis of trading

13    in various kinds of financial markets.  It includes advance

14    studies.

15            MR. KRAVETZ:  If I can ask Mr. DeRita to please

16    pull up Slide 3 of the defense presentation.

17            Thank you.

18    Q.  Now, you indicated, sir, that prior to the time at CRA

19    you taught at a university; is that correct?

20    A.  Yes.

21    Q.  All right.  When did your teaching experience end?

22    A.  At the end of 2002.

23    Q.  Okay.  And after that you --

24    A.  Sorry.  Yes, the end of 2002.

25    Q.  Okay.  And after that you went to CRA?

1    A.  Yes.

2    Q.  All right.  Now, on the right-hand portion of the slide

3    you have published research; is that correct?

4    A.  Yes.

5    Q.  All right.  And you list certain journals.  Are those

6    journals in which you've published?

7    A.  Yes.

8    Q.  All right.  Now, you prepared an expert report in this

9    matter; is that correct?

10   A.  Uh-huh.

11   Q.  All right.  And attached to that expert report there was

12   a CV of yours; is that right?

13   A.  Yes.

14   Q.  All right.  And the CV would have listed all of your

15   experience to date as of the date that you rendered your

16   expert report?

17   A.  It lists in my work experience, yes.

18   Q.  Okay.  It would have listed your publications and your

19   working papers?

20   A.  Yes.

21   Q.  Any courses that you taught?

22   A.  Yes.

23   Q.  And any presentations that you've given?

24   A.  Yes.

25   Q.  All right.  As well as your expert assignments?

1    A.   Yes.

2    Q.   All right.  In terms of publications, sir, am I correct

3    that the last publication that you've authored was from

4    2006?

5    A.   Probably, yes.  That's when it would have been

6    published.

7    Q.   All right.  When was the financial crisis?

8    A.   2007 and '8.

9    Q.   All right.  So none of your publications deal with any

10   of the events that occurred during the financial crisis; am

11   I correct?

12   A.   None of my research publications deal with that, yes.

13   Q.   Right.  None of your research publications deal with

14   long-term bonds, correct?

15   A.   Actually, I take that back.  So if you go back and look

16   at my research publications, the papers in there deal with

17   the kinds of dislocations in securities markets that we saw

18   in 2008, but that we had seen earlier in the late '90s when

19   long-term capital management went under.

20   Q.   Right.  But my specific question is:  You haven't

21   published in the area of the 2008 financial crisis, correct?

22   A.   No, I have not.

23   Q.   Okay.  You haven't published in the area of long-term

24   bonds, correct?

25   A.   I have published on the pricing of bonds and options,

1    yes.

2    Q.  All right.  And you haven't published in the area of

3    financial projections, correct?

4    A.  No, I have not.

5    Q.  Okay.  And you haven't published in the area of

6    financial modeling, correct?

7    A.  Pretty much every paper of mine is on financial

8    modeling, so I'm not sure what you mean by that.

9    Q.  Well, and -- that's fair.  So financial modeling in

10   terms of the process of making financial projections within

11   a financial institution?

12   A.  I have not published on that.

13   Q.  Okay.  Thank you.

14           And have you published in the area of tax

15   accounting?

16   A.  I have not.

17   Q.  All right.  Now, am I correct, sir, that you have not

18   worked in government service throughout the course of your

19   career?

20   A.  I have not worked in government -- well, the University

21   of Wisconsin was a government institution, but otherwise,

22   no, I have not worked in government service.

23   Q.  You haven't worked for the United States federal

24   government, have you?

25   A.  No.

1   Q.  You have not worked for a financial regulator; is that
2   correct?
3   A.  I have not worked for them directly.  I've worked on
4   consulting assignments.
5   Q.  All right.  You have not served as a conservator, have
6   you, sir?
7   A.  No.
8   Q.  All right.  And other than one summer as an intern in
9   1992, you've never actually worked at a financial
10  institution, correct?
11  A.  Correct.
12  Q.  All right.  And I believe, sir, according to your CV,
13  you worked for one year for an accounting firm; is that
14  right?
15  A.  I worked in the consulting arm of that firm.
16  Q.  And that was in 1992?
17  A.  Yes.
18  Q.  All right.  And since that time, you have not worked as
19  an auditor or consultant with -- for a public accounting
20  firm; is that correct?
21  A.  I have never worked as an auditor.
22  Q.  All right.  Your CV also listed your presentations; is
23  that correct?
24  A.  Yes.
25  Q.  Am I correct that your last presentation that you've

1   given was in 2009?

2   A.  Yes.

3   Q.  All right.  No presentations since that time at any

4   conferences?

5   A.  Yes.  At conferences, yes.

6   Q.  Okay.  And am I also correct, sir, that your CV doesn't

7   list your participation at any conferences or meetings with

8   the Federal Reserve, the SEC, or any government regulators

9   within the past 15 years?  Am I correct?

10  A.  15 years?  I don't know.  There's one which was at the

11  Atlanta Fed.  I don't know when it was.  But I'm assuming

12  you're using 15 because it was in 2006.

13  Q.  2006.  So within the last 17 years you have not --

14  A.  I think 15.

15  Q.  -- participated in any conference with a government

16  regulator; is that correct?

17  A.  I think 17, you wouldn't get that to work if it was

18  2006.

19  Q.  16 years.  Thank you for correcting my math.  16 years.

20  Is that correct?

21  A.  Yes.

22  Q.  All right.  Now, you're familiar with the report that

23  you prepared in this case; is that correct?

24  A.  Yes.

25  Q.  And that report contains all of the opinions that you're

1    offering at trial; is that right?

2    A.  Yes.

3    Q.  All right.  And in general, your report is 89 pages

4    long.  Does that seem correct?

5    A.  Yes.

6    Q.  A lot of footnotes?

7    A.  Yes.

8    Q.  All right.  And given that length, if something was

9    important for you to note in connection with your

10   assignment, we should expect to find it in there, correct?

11   A.  Yes.

12   Q.  All right.  You also have in your report an appendix

13   that's labeled "Documents Considered."  Is that correct?

14   A.  Yes.

15   Q.  All right.  That's pretty standard in connection with

16   preparing an expert report; am I right?

17   A.  Yes.

18   Q.  And why is that?  Why do you have a section in your

19   report entitled "Documents Considered"?

20   A.  It's to kind of provide the other side with information

21   on documents that I reviewed and considered in connection

22   with the report.

23   Q.  That would be the entirety of the field in terms of what

24   you considered in rendering your opinion in this case?

25   A.  Yes.

```
 1    Q.  Okay.
 2             All right.  Sir, I want to pick up where you just
 3    left off in terms of the PCF.
 4             MR. KRAVETZ:  And some of the slide numbers
 5    changed, so, Mr. DeRita, let's put it up on here first
 6    before we publish, if that's okay, to make sure that we use
 7    the correct slides.
 8             THE COURTROOM DEPUTY:  I'm sorry?
 9             MR. KRAVETZ:  There was an amendment to the
10    slides.  I want to ensure that we use the correct slides
11    that the defendants used, if we could just display it on the
12    screen before the jury?
13             THE COURTROOM DEPUTY:  He has to do it.
14             MR. KRAVETZ:  All right.
15    Q.  Now, is it fair to say, sir, that there are some
16    fundamental disagreements between you and Dr. Thakor
17    regarding how to set the market value of the PCF?
18    A.  Yes.
19    Q.  All right.  Now, you don't dispute that Dr. Thakor is a
20    leading expert in loan commitments, right?
21    A.  He is an expert in loan commitments, yes.
22    Q.  Well, in fact, in your report you cited to Dr. Thakor's
23    own paper; isn't that right?
24    A.  I believe he cited to his own paper, and I kind of was
25    rebutting his report, and so I cited to a different part of
```

1    his paper.

2    Q.  All right.  But in Appendix B of your report you also

3    cited to a book that Dr. Thakor wrote entitled "Contemporary

4    Financial Intermediation" as one of the sources that you

5    considered in connection with your report; is that right?

6    A.  Yes.

7    Q.  All right.  Now, the portion of your expert report where

8    you cited to Dr. Thakor's paper, you would agree with me

9    that that was an empirical study conducted by Dr. Thakor in

10   which he examined approximately 2,500 bank loan commitments;

11   is that right?

12   A.  Could you show me what you're referring to?  Because I

13   note references to Dr. Thakor in various places, and I don't

14   want to misstate.

15            MR. KRAVETZ:  Yes.  Can I have one moment.

16            Give me one moment, sir.  I'll hand it up to you.

17            May I approach, Your Honor?

18            THE COURT:  Yes.

19   Q.  And actually, sir, I have the copy of your report now,

20   if I can just give you a clean version.

21   A.  Okay.

22   Q.  If you can turn, please, to Pages 52 and 53.

23   A.  Yes.

24   Q.  All right.  Sir, I direct your attention on Page 52 to

25   Paragraph 125.  And let me know when you're there.

1    A.  Uh-huh.

2    Q.  All right.  And do you note in that paragraph of your

3    report you're citing to Dr. Thakor's prior study; is that

4    correct?

5    A.  Yes.

6    Q.  And does it indicate that Dr. Thakor analyzed 2,513 loan

7    commitment contracts?  Do I have that right?

8    A.  Yes.

9    Q.  All right.  You also cite to an additional study of

10   Berg, Saunders, and Steffen that analyzed 32,343 loan

11   contracts; is that right?

12   A.  Yes.

13   Q.  All right.  And you're aware that Dr. Thakor had

14   reviewed those loan commitment contracts in formulating his

15   opinion; is that correct?

16   A.  Yes.

17   Q.  All right.  Would you acknowledge that these are the

18   leading scholarly writings on the loan commitment fee?

19   A.  Yes.

20   Q.  All right.  And prior to your work in this case, do you

21   have any recollection at all of having read those papers?

22   A.  I probably had read them as a graduate student.

23   Q.  Any specific recollection?

24   A.  No.

25   Q.  You said "probably."

```
 1                  I'm sorry?
 2     A.  No.
 3     Q.  Okay.  And you agree with the analysis and conclusions
 4     of those papers, correct?
 5     A.  Yes.
 6     Q.  Okay.  Prior to your report in this case, had you ever
 7     written about loan commitment fees?
 8     A.  No.
 9     Q.  Had you ever given a lecture about loan commitment fees?
10     A.  No.
11     Q.  Had you ever performed a study regarding loan commitment
12     fees?
13     A.  No.
14     Q.  Had you ever given an expert opinion in another case
15     regarding loan commitment fees?
16     A.  No.
17     Q.  In fact, is it fair to say, sir, that you never even
18     examined one single loan commitment contract prior to being
19     retained as an expert in this case?
20     A.  Yes.
21     Q.  That is correct?
22     A.  Yes.
23     Q.  All right.  Now, in connection with this assignment
24     you've actually been able to look at a loan commitment
25     contract for the first time; is that right?
```

1    A.  Yes.

2    Q.  All right.

3    A.  Actually, I'll take that back.  I had looked at a loan

4    commitment contract, but it was not for the purpose of

5    expert work.  It was separate.

6    Q.  All right.  Do you recall that you previously testified

7    in this matter?

8    A.  Yes.

9    Q.  You were deposed twice?

10   A.  Yes.

11   Q.  All right.  And on the occasion of your deposition, do

12   you recall whether, in your prior work, you had ever had

13   occasion to review contracts that included loan commitment

14   fees?

15   A.  I probably said no.

16   Q.  You did say "no."  Is that your answer?

17   A.  I think I said no.

18   Q.  Okay.  And I don't recall if there was an answer to the

19   question that I think I posed, which is:  In connection with

20   this case, how many loan commitment contracts have you

21   reviewed?

22   A.  I think less than ten.

23   Q.  Less than ten?

24          So the entirety of your expert opinion with

25   respect to the PCF and loan commitment fees is based on your

1    review of five loan commitments and less than ten loan

2    commitments that you had only looked at for the very first

3    time in connection with your retention in this matter.  Is

4    that right?

5    A.  Yes, because the PCF is an equity commitment and not a

6    loan commitment.

7    Q.  I'm sorry?

8    A.  The PCF is an equity commitment and not a loan

9    commitment.  So, I mean, looking at loan commitments isn't

10   going to tell us very much.

11   Q.  But just so we're clear, prior to this retention you had

12   never looked at a loan commitment before?

13   A.  Yes.

14   Q.  Okay.  Now, you're aware that Dr. Thakor made certain

15   assumptions regarding the contractual language of the PCF;

16   is that right?

17   A.  Yes.

18   Q.  All right.  So one was that he assumed that the PCF

19   provision would be enforceable and that it would be

20   implemented in good faith, right?

21           MR. HOFFMAN:  Objection, Your Honor.  This is

22   outside the scope and irrelevant, and also it's a legal

23   issue as to what --

24           THE COURT:  Overruled.

25   Q.  All right.  Sir, I'll ask that again.  You're aware that

1    Dr. Thakor made several assumptions regarding the

2    contractual language of the PCF; is that correct?

3    A.  I know that he made assumptions, yes.

4    Q.  All right.  So you assume that the PCF would be -- he

5    assumed that the PCF would be enforceable and that it would

6    be implemented in good faith; is that correct?

7    A.  Yes.

8    Q.  All right.  And you agreed at your deposition with

9    Dr. Thakor's assumption as to what would constitute good

10   faith; is that correct?

11   A.  I believe so.

12   Q.  All right.  And, in fact, you noted that good faith

13   meant that FHFA and Treasury would not simply use the

14   commitment fee as a vehicle for funneling funds to Treasury,

15   and that instead the fee would be determined with reference

16   to an objective market standard.  Is that correct?

17   A.  Those don't sound like my words, but I may have agreed

18   to that question.  That doesn't sound like the way I speak.

19   Q.  It's your testimony that you agreed to that at your

20   deposition?

21   A.  You're telling me that I agreed to it, so I'll agree to

22   you.

23              MR. KRAVETZ:  All right.  I'd ask at this point if

24   Mr. DeRita could please play Clip 11.

25              (Video playing)

1          MR. KRAVETZ:  Thank you, Mr. DeRita.

2     Q.  All right.  So essentially you undertook the same

3     assumptions as Dr. Thakor did with respect to the PCF?

4     A.  Yes.

5     Q.  Or the PCF provision of the PSPA, correct?

6     A.  That it would not be used to funnel funds to Treasury,

7     yes.

8     Q.  Okay.  Sir, are you aware that -- as I understand it,

9     part of your overall opinion in this case is that FHFA acted

10    reasonably in connection with the decision to enter into the

11    net worth sweep; is that right?

12    A.  Yes.

13    Q.  All right.  And do you recall who was the acting

14    director at FHFA during the time period of the

15    conservatorship?

16    A.  Mr. DeMarco.

17    Q.  Okay.  Now, are you aware, sir, that prior to the Third

18    Amendment, that Mr. DeMarco did not make any attempt to

19    quantify what the PCF would be in the absence of reaching

20    the Third Amendment?  Is that right?

21    A.  That's my understanding.

22    Q.  Okay.  And that he did not otherwise direct anyone at

23    FHFA to do so?

24    A.  That's my understanding.

25    Q.  Okay.  Now, are you aware or have you reviewed any

 1    documents in this case demonstrating that either the GSEs or

 2    FHFA itself undertook certain attempts to determine what a

 3    PCF might be?

 4    A.  Could you say that again, please.

 5    Q.  Yes.  It actually might be more helpful to show you a

 6    document.

 7              MR. KRAVETZ:  I'll ask Mr. DeRita to pull up

 8    PX111, which is in evidence.

 9    Q.  Sir, this is a document in evidence.  It's "2011 FHFA

10    Scenario Forecast, 3Q Update, Four-Year Outlook."

11              I'd ask, if you can, for a moment -- before we

12    look at the document, turn to Appendix B, and let us know if

13    this is one of the materials that you considered in

14    rendering your opinion.

15    A.  Yes, I believe it is.

16              THE COURTROOM DEPUTY:  I'm sorry, Counsel, what's

17    the exhibit number?

18              MR. KRAVETZ:  This is Exhibit 111.

19    Q.  Do you see there's a Bates number at the bottom right-

20    hand corner of this document?

21    A.  Yes.  It looks familiar, so if you'd like, we can carry

22    on.  If you want to point me to the specific page of the

23    thing, I can confirm.

24    Q.  Well, I will in a moment.  But actually, if you could

25    turn to Appendix B, I think on Page --

1    A.   No, I am on Appendix B -- sorry.   I am on Appendix B.

2    Q.   All right.   And you list the production documents that

3    you considered in connection with your opinion; is that

4    right?

5    A.   Uh-huh.

6    Q.   And they run alphabetically starting with F through the

7    next page?

8    A.   Yes.

9    Q.   All right.   Do you see any documents with that Bates

10   number on your report?

11   A.   GT -- I'm sorry, I must have seen a different version of

12   this.

13   Q.   A different version?   Okay.

14          But you think generally you're familiar with this

15   particular document?

16   A.   I believe so.

17          MR. KRAVETZ:   All right.   I'd ask if Mr. DeRita

18   could please go to Page 10.

19   Q.   Sir, do you see a slide here that's entitled "Earnings

20   Sensitivity"?

21   A.   Yes.

22   Q.   All right.   And the fourth bullet down, can you read

23   that aloud, please?

24   A.   "Sensitivity to a Commitment Fee based on remaining

25   commitment available beginning in 2013 of $149 billion shows

1     that a 25 basis point fee results in a $0.4 billion annual

2     impact on Stockholders' Equity."

3     Q.  So in this particular document --

4               MR. KRAVETZ:  If we can go -- Mr. DeRita, can you

5     do a split screen between this and the first page, please?

6     Page 1 and Page 10.

7     Q.  So this is actually labeled "FHFA Scenario Forecast,"

8     correct?

9     A.  Yes, but I believe it's a Freddie Mac document because

10    the page we were looking at has Freddie Mac's logo on it.

11    Q.  Right.  And it's your understanding that Freddie Mac

12    would run modeling projections based on -- they would run

13    projections based on modeling assumptions or inputs provided

14    by FHFA, correct?

15    A.  Yes.

16    Q.  Okay.

17    A.  About home prices and such.  I don't know how detailed

18    or the full list of assumptions that FHFA provided.

19    Q.  Right.  And so the assumptions that were in the document

20    from Freddie would come from FHFA, correct?

21    A.  The underlying assumptions, yes.

22    Q.  That's your understanding?

23    A.  Yes.

24    Q.  And in this particular document, it indicates --

25               MR. KRAVETZ:  If Mr. DeRita can please enlarge

1    that last bullet point.

2    Q.  -- that the commitment fee here is being shown with a

3    fee of 25 basis points; is that correct?

4    A.  I believe there's 100 basis points, which is 1 percent

5    scenario, also there.  And these tables are fairly typical

6    in these types of slides where what they're interested in is

7    how much do things change per unit.

8    Q.  Right.  When you're saying "fairly typical," have you

9    talked to anyone at these corporations who prepared these

10   slides?

11   A.  I've looked at a number of these types of presentations.

12   Q.  Well, apart from looking at them, have you actually

13   talked to the person who prepared this slide?

14   A.  No.

15   Q.  All right.

16   A.  I've read some of their testimony.

17   Q.  So that's your assumption, then, when you're describing

18   whether 25 basis points was one of the projections relating

19   to this assessment?

20   A.  Well, no, I'm telling you it's on the page.

21   Q.  Right.  But one of the assumptions was 25 basis points,

22   correct?

23   A.  They're taking it in steps of 25 basis points.  So zero,

24   25, 50, 75, and 100.

25   Q.  Let's look at another document.

1          MR. KRAVETZ:  This one is not yet in evidence, so

2     I'd ask if Mr. DeRita can pull up PX47, please.

3          And just for the witness, sir, if you could --

4     Mr. DeRita, if you could enlarge the lower right-hand corner

5     of the document.

6     Q.  And, Dr. Attari, is this a document that you've seen

7     before in connection with your expert work in this case?

8          MR. KRAVETZ:  We can just back it out, Mr. DeRita.

9     A.  Not -- sorry, what is that?

10          MR. KRAVETZ:  I'll ask if Mr. DeRita can enlarge

11     the top of it, please.

12          THE WITNESS:  Oh, the bottom, actually.

13     Q.  And, sir, it's in your binder, if that's easier for you

14     to review it.

15     A.  Yes.

16     Q.  It's at Tab 32.  I'll just take a moment for you to get

17     your bearings with it.

18          (Pause)

19     A.  Actually, it might be easier on the screen.

20     Q.  It's small print.  I hear ya.

21          Sir, can you look at the first paragraph of the

22     document entitled "Discussion - Valuation of Treasury

23     Preferred Stock and Warrants."

24          MR. KRAVETZ:  Actually, if you can back out,

25     Mr. DeRita, it's right there.

```
1              THE WITNESS:  Yes.
2    Q.  And there's a discussion of potential valuation
3    methodology.  Do you see that?
4    A.  Uh-huh.
5    Q.  And there's a reference to preferred stock representing
6    a private investment in Freddie?
7    A.  Uh-huh.
8    Q.  And then the last line, he noted that "The form of
9    investment is similar to that of a credit facility, so a par
10   value may be most appropriate for valuation purposes."  Do
11   you see that?
12   A.  Yes.
13   Q.  And then the last sentence:  "The 10% coupon" -- which
14   would be the dividend, correct?
15   A.  Yes, I assume so.  It could be applied in various ways.
16   Q.  But the sentence itself says, "The 10% coupon
17   essentially represents a commitment fee for the credit
18   line."  Do you see that?
19   A.  That wouldn't make any sense.
20   Q.  Well, did you write the memo?
21   A.  No, I didn't, and that's precisely the point I'm making.
22   Q.  Okay.  And someone from Freddie Mac wrote the memo,
23   though, yes?
24   A.  And maybe you should ask them.
25   Q.  But in their own document -- in Freddie Mac's own
```

1    document it says, "The 10% coupon essentially represents a

2    commitment fee for the credit line"; is that right?

3    A.  Yes.  But think about it right at the beginning.  Right?

4    There's nothing drawn, so there's no payments to Treasury.

5    And so Treasury's getting nothing, but it's agreed to put up

6    $100 billion.  And if there never were any draws, it never

7    gets anything; and in a sense it has agreed to underwrite

8    $100 billion worth of equity investments for nothing.

9           As an economist, that doesn't make a lot of sense.

10   Q.  You might think it doesn't make sense, but it's in the

11   document, right?

12   A.  Yes.

13          MR. KRAVETZ:  Okay.  All right.  We can take that

14   one down, Mr. DeRita.

15   Q.  I want to ask you a little bit about some of the loan

16   commitment review that you had, sir.  But first I want to

17   ask, sir, do you have an understanding of the term "rescue

18   financing"?

19   A.  Rescue financing?

20   Q.  Yes.

21   A.  Yes.

22   Q.  What's your understanding of that term?

23   A.  It's -- there are investors that put money into

24   companies that are either bankrupt or close to bankrupt to

25   try to get them -- help them revive themselves.

1   Q.  And that can include both injections of equity and a

2   loan?

3   A.  It can be structured as injections of equity and a loan.

4   The loan typically, though, comes in ahead of all existing

5   debtors.

6   Q.  And am I correct that you stated -- and you've stated in

7   your deposition -- that you do not consider yourself to be

8   an expert in rescue financing?

9   A.  No, I do not.

10  Q.  Okay.  Let's start with some of your opinions

11  regarding -- or your response to Dr. Thakor's opinions

12  regarding using a bank loan commitment as a proxy for

13  setting the value of the PCF.  Okay?

14  A.  Okay.

15  Q.  All right.  Now, you may not agree with Dr. Thakor's

16  conclusions, but am I correct that you have no reason to

17  doubt the results of Dr. Thakor's research regarding bank

18  loan commitments?

19  A.  The paper that was published that he refers to?

20  Q.  Yes.

21  A.  No, I don't.

22  Q.  Okay.  So if you don't doubt the research, am I correct

23  that you agree that the research on bank loan commitment

24  fees establishes that commitment fees are set as a component

25  of all-in compensation provided by the lender for providing

1    the commitment and the anticipated funding under the

2    commitment?  Is that correct?

3    A.  By the lender on a loan, yes.

4    Q.  Okay.  It's the all-in compensation, correct?

5    A.  Yes.  But, again, by a lender on a loan.  That, I think,

6    is critical here.

7    Q.  I understand.  But I'm just asking -- let's talk about

8    bank loan commitments first.

9    A.  Okay.

10   Q.  So the studies that you don't dispute which examine

11   commitment fees that were imposed over approximately 35,000

12   bank loan commitments found that in the banking context

13   banks typically charge borrowers, one, an upfront fee; is

14   that correct?

15   A.  Yes.

16   Q.  All right.  Two, an ongoing fee on the undrawn portion

17   of the commitment, correct?

18   A.  Yes.

19   Q.  All right.  And, third, an interest rate separate and

20   apart that is tied to a market rate such as LIBOR?

21   A.  Or it can be a fixed rate.

22   Q.  Or it can be fixed.

23        So upfront fee, ongoing fee on the undrawn portion

24   of the commitment, and some type of interest rate, whether

25   it's fixed or it's tied to a market rate like LIBOR?

1    A.  Yes.

2    Q.  Okay.

3    A.  Along with contractual terms protecting the lender.

4    Q.  And you're aware that in the studies that Dr. Thakor and

5    his colleagues have conducted, on average, for that upfront

6    fee, banks charged a rate of approximately 61 basis points;

7    is that correct?

8    A.  To lenders that they were willing to make commitments

9    to, yes.

10   Q.  That's 0.61 percent?

11   A.  0.61 percent.

12   Q.  Okay.  And the fee on the remaining -- on the ongoing

13   commitment under the study of 35,000 loan commitments was

14   approximately 38 basis points; is that correct?

15   A.  I'm going from memory, but you have the papers in front

16   of you, and I'm going to accept it.  I'm just making that

17   point.

18          And I think it's 25,000.  One of the studies was

19   23,000 and the other 2,000, but it doesn't matter.

20   Q.  But actually, if you'd like, it's in Paragraph 125 of

21   your report, if you'd like to refresh your memory.

22   A.  Sure.

23          Yes, 35,000.  You're right.

24   Q.  35,000?  Okay.

25          And you agree that approximately 38 basis points

1    for the ongoing commitment?

2    A.  I agree.

3    Q.  Okay.  And so that would be in addition to -- that 38-

4    basis-point commitment fee, that would be in addition to the

5    interest rate on the loan, correct?

6    A.  Yes.

7    Q.  All right.  Do you recall that in August 2012 the LIBOR

8    rate was just over 1 percent?

9    A.  Okay, yes.

10   Q.  I mean, there was a period of very low interest rates in

11   2012, right?

12   A.  Yes.

13   Q.  Okay.  So under the results of the studies, a borrower

14   seeking a bank commitment fee from a bank in or around

15   August 2012 would pay approximately 2 to 3 percent interest

16   rate in addition to the loan commitment fee?

17   A.  On a loan, and if the borrower was of the same quality

18   as the ones considered in the paper, and if, you know,

19   banks' ability to fund were the same, yes.

20   Q.  And you're aware that Dr. Thakor computed the all-in

21   cost for bank loan commitment fees as around 2.5 to 4

22   percent; is that right?

23   A.  Yes; with a material adverse change clause in place,

24   yes, an escape clause.

25   Q.  I'm sorry.

1              And so here -- I know you disagree with

2    Dr. Thakor, but the upfront fee -- just so we get the facts

3    straight -- for the PSPAs, $1 billion for each GSE, correct?

4    A.  Yes.

5    Q.  All right.  Treasury -- and I'm not sure if you

6    mentioned this on direct, but another feature -- it may have

7    been in your slide.

8              Were there warrants that Treasury also had the

9    ability to exercise?

10   A.  Yes.  They were worth about $2 billion for Freddie and

11   $3 billion for Fannie.

12   Q.  And from where did you derive those numbers?

13   A.  From the 10-Qs that Fannie and Freddie put out after

14   they entered into these.

15   Q.  All right.  So you have the upfront fee, the option to

16   exercise the warrants, also a 10 percent dividend?

17   A.  Yes.

18   Q.  All right.  And that's all before we get to the PCF,

19   correct?

20   A.  Yes.

21   Q.  All right.  Now, one criticism that you've expressed in

22   your direct is that the size of the Treasury Commitment was

23   too large in comparison to a bank loan commitment fee; is

24   that right?

25              MR. HOFFMAN:  Objection, Your Honor;

1    mischaracterizes.

2              THE COURT:  Rephrase that.

3    Q.  Well, am I correct that you disagree with the comparison

4    between bank loan commitments and the size of the Treasury

5    Commitment in this particular case?

6              MR. HOFFMAN:  Objection, Your Honor;

7    mischaracterizes.

8              THE COURT:  Well, you can answer that.

9    A.  So the size of the typical bank loan commitment was I

10   think $500 million or something, or actually it says from

11   $75 million to $550 million in Professor Thakor's paper,

12   while the Treasury Commitment to each of Fannie and Freddie

13   was $100 billion, yes.

14   Q.  Now, are you aware, though, from the research that

15   Dr. Thakor and his colleagues performed, that bank loan

16   commitment fees are generally smaller as the commitment gets

17   larger?

18   A.  In certain types of situations, yes.

19   Q.  That's the research, correct?

20   A.  Yes.  But, again, we are talking about loan commitments,

21   and larger loan commitments would only be available to

22   strong borrowers.  And here we're talking about companies

23   that are receiving equity commitments that are -- and the

24   companies themselves have no capital.

25              So, I mean, we're just talking about fundamentally

1   different situations.

2   Q.  Well, you don't dispute that the research shows that the

3   size of a bank commitment is set consistent with the

4   lender's capital position and capacity; is that correct?

5   A.  I don't know the research well enough to be able to sit

6   here and say that, but that would not surprise me.

7   Q.  Okay.  So the research would be what it is?

8   A.  Yes.

9   Q.  Okay.  You also discussed FDIC premiums.  That's

10  something that Dr. Thakor had offered in connection with his

11  expert opinion; is that right?

12  A.  Yes.

13  Q.  All right.  That was another method that Dr. Thakor used

14  to calculate market share, correct?

15  A.  Market share?  Sorry.  Market share?  That doesn't sound

16  right.

17  Q.  Well, as an appropriate equivalent to setting the PCF,

18  Dr. Thakor looked to what the FDIC insurance premium would

19  be, correct?

20  A.  Correct.  The market value of the commitment, yes.

21  Q.  Okay.  Now, you don't object in general to the fact that

22  an FDIC premium charged to banks could be a method of

23  assessing the PCF, correct?

24  A.  I don't believe it is appropriate, but, you know, as

25  Dr. Thakor points out, the options here are limited, so I'm

1   willing to consider it as a possibility --

2   Q.  All right.

3   A.  -- appropriately applied.

4   Q.  It can be a method, correct?

5   A.  It could be a method.

6   Q.  Okay.  Now, you referred, in your testimony -- and you

7   put up a slide -- to 2.5 to 45 basis points as being the

8   range for the FDIC insurance premium that would be assessed

9   to banks; is that right?

10  A.  I believe that's what Dr. Thakor says.

11  Q.  Okay.  But do you have any reason to dispute it?

12  A.  No.

13  Q.  Okay.  Now, you understand Dr. Thakor's position is that

14  it is important to focus on the all-in costs in setting a

15  commitment fee, correct?

16  A.  Yes.

17  Q.  Okay.  And that's based on his decades of empirical

18  research in this area?

19  A.  Yes.

20  Q.  Okay.  Now --

21  A.  I mean, I don't know what it's based on, but you're

22  telling me, and I'm saying yes.

23  Q.  Well, you would accept that he has decades of empirical

24  research in this area?

25  A.  Yes, but I don't know if that's what led him to the

1    answer.

2    Q.  All right.  Now, you understand, though, that Dr. Thakor

3    didn't apply the fee, just the 2.5 to 45 basis points, but

4    that he actually went a step further and compared what large

5    financial institutions would pay with respect to insured

6    deposits.  Do you recall that?

7    A.  Yes.  But these were large, well-capitalized,

8    independently standing banks.

9    Q.  Well, on direct, though -- did you refer to that extra

10   step that Dr. Thakor took on your direct testimony?

11   A.  I thought I did, but if I didn't, I must have missed it.

12          I think I mentioned that he looked at insured

13   deposits.

14   Q.  That he looked at insured deposits.  But were you aware

15   that he took the extra step at examining what some of the

16   largest banks in the United States would pay in terms of

17   number of basis points with respect to insured deposits?

18   A.  What the banks paid, yes.  And I believe that table in

19   his report has an error.

20   Q.  I'm sorry?

21   A.  I believe that analysis has an error in it.

22   Q.  Well, I understand that your criticism is that the fee

23   should have been applied to the assessment base; is that

24   right?

25   A.  Well, that's what the FDIC says.

1   Q.  Right.  I'm asking you if you're even aware that

2   Dr. Thakor went a step further and pulled out and was able

3   to disaggregate what the fee would be with respect to

4   insured deposits, not with respect to the assessment base?

5   Were you aware of that?

6   A.  Yes.  And I'm saying -- I'm aware that he's done the

7   analysis, and I'm noting that there's an error in the table

8   in his report where he does that analysis.

9   Q.  Right.  And in terms of the report you have, though, the

10  slide -- I believe it's Slide 60 that you showed, one of

11  your very last slides.  You understand that that's not

12  Dr. Thakor's analysis that you're depicting on the slide,

13  correct?

14  A.  Well, that slide contains his analysis and my analysis

15  correcting one piece of his analysis.

16  Q.  Well, you didn't do that extra step of the analysis that

17  Dr. Thakor did, did you?

18  A.  I'm not sure what extra step you're talking about

19  because the FDIC on its -- in its document says that you

20  shouldn't be dividing by insured deposits.

21       If he had done the analysis a different way and

22  said, "Well, these large banks pay X as the fee, and they

23  have Y as assets minus equity, and, look, the percentage is

24  lower," then the question is, is the percentage lower

25  because they have lots of capital, as they do, or is the

1   percentage lower because the FDIC is just putting out this

2   45-basis-point number for no reason at all?

3   Q.  Right.  But just the last question on this topic, just

4   to be clear.  You're aware that Dr. Thakor took the extra

5   step to determine what some of the largest banks would have

6   paid in terms of basis points just with respect to insured

7   deposits?

8   A.  I'm not sure I understand the question.  I'm sorry.

9          MR. KRAVETZ:  Okay.  I want to move on to AIG and

10  ask if Mr. DeRita can please display Slide 52.

11  Q.  Now, AIG was a large insurance organization; is that

12  right?

13  A.  Yes.

14  Q.  With subsidiaries across the world?

15  A.  Yes.

16  Q.  And AIG, during the financial crisis, was exposed to

17  multiple sides of the implosion of the housing market; is

18  that right?

19  A.  Yes.

20  Q.  On the liability side they provided a form of insurance

21  primarily to large financial institutions; is that right?

22  A.  Yes.

23  Q.  And on the asset side, they also owned or own mortgage-

24  backed securities, correct?

25  A.  Yes.

1    Q.  All right.  And the change in housing prices affected

2    both sides of the equation?

3    A.  Yes.

4    Q.  All right.  And not unlike the GSEs, where the change in

5    housing prices and the real estate market also had a direct

6    impact on what happened to the GSEs in September 2008?

7    A.  Yes.

8    Q.  Okay.  And because AIG was deemed to be too big to fail,

9    given its position within the overall financial system, AIG

10   was given forms of government assistance; is that right?

11   A.  My understanding is that Lehman Brothers was allowed to

12   fail, and the disruption in markets was so significant after

13   that that the government decided that it wasn't -- the risk

14   of allowing AIG to fail was not something that -- or we

15   shouldn't go ahead and see what would happen if AIG failed.

16   Q.  Right.  So the government stepped in to provide a

17   backstop?

18   A.  Yes.

19   Q.  All right.  Now, the slide that we have up on the

20   screen, you're comparing AIG to -- the assistance provided

21   by the government to AIG to the assistance provided by the

22   government to Fannie Mae and Freddie Mac; is that right?

23   A.  Yes.

24   Q.  All right.  Now, I want to start with that date of

25   origination.  You note there it's September 16, 2008.  But

1    you're aware, sir, that that was changed very quickly after

2    the original terms were imposed; is that right?

3    A.  The terms of that facility?

4    Q.  Yes.

5    A.  Yes, they were changed in November.

6    Q.  In fact, they were changed on November 10th of 2008.

7    A.  Yes.

8           MR. KRAVETZ:  All right.  I'd ask if Mr. DeRita

9    can put that up, please.

10   Q.  All right.  And let's go down to the -- the next part

11   would be the interest rate that was drawn on AIG, the AIG

12   note.  You list it here as being 12 percent; is that

13   correct?

14   A.  Yes.

15   Q.  But you understand that just a month and a half later

16   that was negotiated down rather quickly to LIBOR plus 3

17   percent, correct?

18   A.  Yes.  And it was in conjunction with a large equity

19   infusion into AIG, a different part of the government, but

20   yes.

21   Q.  Correct, okay.  Let's look at the last line here.  The

22   commitment fee on undrawn amounts, you list that commitment

23   fee as being 8.5 percent, correct?

24   A.  Yes.

25   Q.  That's 850 basis points?

1    A.  Yes.

2    Q.  All right.  Do you recall what happened in November,

3    shortly after the agreement is amended?  Do you recall what

4    that went down to?

5    A.  It went down to 75 basis points.

6    Q.  75 basis points, correct?

7    A.  But again, it was in conjunction with a large infusion

8    of equity.  And this was a secured loan, so now -- you'll

9    recall I had that slide, and so if you stuck in equity below

10   the lenders, the lenders became -- were lending to a much

11   safer company, so you would expect the interest rate and the

12   commitment fee to go down.

13   Q.  But just to be clear for purposes of this slide, shortly

14   after AIG received financing from the government there was a

15   significant change in the interest rate, and there was a

16   significant change in the commitment fee.  Do I have that

17   right?

18   A.  Yes, and the size of the commitment went down from $85

19   billion to $65 billion also.

20        MR. KRAVETZ:  You can take that down, Mr. DeRita.

21   Q.  Now, Dr. Attari, am I correct that one of your opinions

22   is that the Third Amendment was consistent with the goals of

23   the conservatorship?

24   A.  Yes.

25        MR. KRAVETZ:  Okay.  And if Mr. DeRita can pull up

1    Slide 4 of the defense presentation, please.

2            And just if you can enlarge No. 1.

3    Q.  All right.  So -- and, in fact, on this slide you posed

4    that as one of your three assignments in this case?

5    A.  Yes.

6    Q.  All right.  Now, as part of your assignment that -- or

7    your assessment that FHFA acted reasonably, did you opine

8    that the Third Amendment was consistent with FHFA's internal

9    views of the risks that were faced by the enterprises?

10   A.  I'm not sure what -- could you kind of --

11   Q.  Sure.  That's fair.  Let me ask it -- try to ask it a

12   little bit better.

13           So in connection with your report, you're

14   assessing the reasonableness of FHFA, correct?

15   A.  Yes.

16   Q.  And when you say "FHFA," that's an independent

17   government agency, right?

18   A.  Yes.

19   Q.  But when you're citing to particular facts within your

20   report relating to the reasonableness of FHFA, you're citing

21   to the deposition testimony of employees of FHFA or Fannie

22   Mae or Freddie Mac, correct?

23   A.  Yes.

24   Q.  Okay.  Because whether FHFA is reasonable or not is

25   going to depend on whether the individuals who were running

```
1    FHFA were reasonable, correct?

2    A.  Yes.

3              MR. KRAVETZ:  All right.  So we can take that down

4    for a moment.

5    Q.  In general, do you think it's important, as the author

6    of an expert report, to assess the credibility of the

7    sources that you cite in your report?

8    A.  Yes.

9    Q.  Okay.  Now, are you aware that during this trial

10   Mr. DeMarco testified that he was the sole decision-maker

11   for FHFA's decision to enter into the Third Amendment?

12   A.  I believe it was in conjunction with Mr. Ugoletti.

13   Q.  Well, were you present during Mr. DeMarco's trial

14   testimony?

15   A.  No, but I recall reading about Mr. Ugoletti in some of

16   the transcripts.

17   Q.  The trial transcripts?

18   A.  I believe so.

19   Q.  Are you aware of whether Mr. Ugoletti actually testified

20   at trial or not live?

21   A.  Maybe video?

22   Q.  Okay.  So if I can just have you go to Section 3.4 of

23   your report just for a moment.

24   A.  Sure.  What paragraph?

25   Q.  If you can just start at the outset of 3.4.
```

1           And then once you're there, let me know, and I can

2      direct you to a paragraph.

3      A.  Yes.

4      Q.  All right.  So would you agree that in this particular

5      section of your report, almost every citation, every

6      footnote, starting from Paragraphs 94 to 100 relate to one

7      of the two depositions of Mr. DeMarco; is that correct?

8      A.  94 to 100.  Does that go -- oh, but that's in 93.

9      Q.  It will be Footnotes 188 to 198.

10     A.  Yes.

11     Q.  And essentially in your report, when you include

12     something in a footnote, that means you're citing to a

13     particular fact that you believe establishes something in

14     dispute?

15     A.  Or provides a source for a fact that I'm using.

16     Q.  Okay.  You haven't spoken with Mr. DeMarco separately,

17     have you?

18     A.  No.

19     Q.  All right.  And you didn't attend any of his depositions

20     in person, did you?

21     A.  No.

22     Q.  All right.  And you've noted that you're at least aware

23     that Mr. DeMarco testified over two days of trial last week?

24     A.  Yes.

25     Q.  All right.  And you weren't here in person, correct?

```
 1    A.  No.

 2    Q.  All right.  No chance to evaluate his trial testimony in

 3    person?

 4    A.  No.

 5    Q.  All right.  Nor the trial testimony of any other FHFA

 6    employees?

 7    A.  No.

 8    Q.  All right.  So when you're offering opinions today about

 9    the alleged reasonableness of FHFA's conduct, none of those

10    opinions are based on the trial testimony of any witnesses,

11    correct?

12    A.  Correct.

13    Q.  Okay.  Because you didn't see that?

14    A.  I've reviewed it, but I haven't seen it.

15    Q.  Okay.  Now, you said on direct, in terms of evaluating

16    the reasonableness of whether the conduct was consistent

17    with the goals of the conservatorship, it's important to do

18    that in light of the objectives of the conservatorship and

19    the information that's available.  Do I have that right?

20    A.  Yes.

21    Q.  Okay.  And you evaluated the goals of the

22    conservatorship based on certain documents; is that correct?

23    A.  Yes.

24    Q.  All right.  And I believe --

25            MR. KRAVETZ:  If Mr. DeRita can pull up Slide 12.
```

1    Hopefully this is the same one.

2              And while Mr. DeRita's doing that -- I believe

3    it's changed, Mr. DeRita, so maybe 10.

4              Perfect.  Thank you.

5    Q.  All right.  So up on the screen you have a couple of

6    documents, and this slide is entitled "Goals of the

7    Conservatorship," correct?

8    A.  Yes.

9    Q.  Okay.  And these are -- did you prepare the slides in

10   connection with your testimony?

11   A.  I worked with counsel.  I don't have the skills to do

12   the graphics.

13   Q.  Did you provide the information that went into the

14   slides?

15   A.  Basically what kind of information, yes.

16   Q.  Well, does that mean that you chose the actual documents

17   that went into the slides?

18   A.  Not specifically, because there were multiple copies and

19   there were issues about what was admitted and not admitted,

20   and so they handled that part of it.

21   Q.  Did you have any input in your slides to choosing which

22   documents you were going to talk about today?

23   A.  Yes, I did, and I said that it was not the specific

24   versions because there were limitations on whether it was

25   part of the trial exhibits or not.  But what the content was

1    and what types of documents were my choice.

2    Q.  Yes.  And I'm just getting to whether these were

3    documents that were important to you --

4    A.  Yes.

5    Q.  -- personally in establishing what were the goals of the

6    conservatorship?

7    A.  Yes.

8    Q.  Certainly not to talk about PowerPoint skills, because I

9    would be right with you.

10            All right.  I'd like to display a document that's

11   been admitted into evidence.  It's Exhibit 2E, Plaintiff's

12   2E.

13            And just with reference, sir, if we can -- before

14   we look at the document, look at the bottom right-hand

15   corner of this document.  There's a Bates number.  Do you

16   see that?

17   A.  Uh-huh.

18   Q.  And if you could just go back to Appendix B of your

19   report and let us know if this was one of the documents that

20   you relied upon in forming your opinion in this matter?

21   A.  (Witness reviews document)  No.

22            MR. KRAVETZ:  Okay.  If I could ask Mr. DeRita to

23   enlarge the top portion of the slide.

24   Q.  And, sir, do you see that this is an email from Ed

25   DeMarco dated October 30, 2008?

1    A.  Yes.

2    Q.  Sent to other individuals who work for FHFA?

3    A.  Yes.

4    Q.  And it's -- the subject is "Treasury Support for the

5    GSEs - Request For Slides."

6    A.  Yes.

7    Q.  And Mr. DeMarco indicates, "Here you go -- my slides and

8    notes from my talk to ABS East."

9         Do you know what ABS East is?

10   A.  It's asset-backed securities.  There used to be

11   conferences for people who were involved in the asset-backed

12   securities market.

13   Q.  Major conference every year?

14   A.  Yes.

15   Q.  All right.  And then there's a reference to Slides 17

16   and 18 and particular notes, and then there appears to be a

17   PowerPoint and a Word document attached to the email; is

18   that correct?

19   A.  Yes.

20   Q.  All right.  This isn't listed in the materials that you

21   considered, but have you seen this document before?

22   A.  I don't believe so.

23   Q.  You've never seen it before?

24   A.  I don't think so.

25   Q.  All right.

```
 1    A.  I saw a reference to this in Mr. DeMarco's trial

 2    testimony.

 3    Q.  But prior to that time, prior to Mr. DeMarco's trial

 4    testimony, you've never seen this document?

 5    A.  I don't think so, no.

 6    Q.  And because you hadn't seen it before at the time you

 7    prepared your report, you didn't consider this document in

 8    connection with your opinions in this matter.  Is that

 9    correct?

10    A.  Correct.

11            MR. KRAVETZ:  All right.  I'd ask if Mr. DeRita

12    can turn to Page 16 of the document.

13    Q.  And just while we're doing that, if I can draw your

14    attention to Paragraph 45 of your report, please.  And, sir,

15    that's on Page 19 under the section "Goals of the

16    Conservatorship."

17    A.  Uh-huh.

18    Q.  All right.  And does that part of your report indicate

19    that you gained your understanding of the goals of the

20    conservatorship from counsel?

21    A.  Where does it --

22            MR. HOFFMAN:  Objection, Your Honor;

23    mischaracterizes.

24    A.  -- say that?

25            THE COURT:  Overruled.
```

1    A.  Yes, it says my understanding from counsel.

2    Q.  From defense counsel?

3    A.  Yes.

4    Q.  Okay.

5    A.  Sorry, it says -- hang on.  I think it says my

6    understanding from counsel is that pursuant to HERA the

7    conservators are authorized to do certain things.

8            I don't think it says anything about the goals of

9    the conservatorship in that paragraph.

10   Q.  Well, that particular Section, Section 2.6, is entitled

11   "Goals of the Conservatorship," correct?

12   A.  Yes.

13   Q.  And that's the very first paragraph after that?

14   A.  That's about HERA.  It's not about the goals, because

15   the goals -- the conservator put out a statement saying what

16   its goals were.

17   Q.  Okay.  But this particular --

18           MR. KRAVETZ:  Mr. DeRita, thank you.  If we can go

19   to Page 16 of the PowerPoint.

20   Q.  And so we're clear, this is a document that you've never

21   seen before.

22   A.  Correct.

23   Q.  All right.  And it's defining to ABS East, this large,

24   important conference every year, what the conservatorship

25   is; is that correct?

1    A.  Yes.  And I believe this is language similar to what's

2    in the Q&A that you had up or I had up earlier.

3    Q.  Well, maybe.

4        MR. KRAVETZ:  Let's ask Mr. DeRita to highlight

5    the last sentence.

6    Q.  Here, sir.  Can you read that aloud to the jury?

7    A.  "Conservatorship statutes provide broad authority for a

8    conservator to operate the institution until it is

9    stabilized and then returned to the shareholders."

10   Q.  So it says in there "stabilized" and "returned to

11   shareholders," correct?

12   A.  Yes.

13   Q.  All right.  And you noted on direct that there was not a

14   goal relating to the shareholders consistent with the

15   conservatorship.  Do you recall that?

16   A.  I believe it was slightly different, but I -- I mean, I

17   don't recall the precise words I used.

18   Q.  Well, on direct examination am I correct that you did

19   not -- you did not find that there was a goal in the

20   conservatorship associated with stabilizing the companies

21   and then returning them to their shareholders?

22   A.  I spoke of the goal that had to do with ensuring the

23   safety and the stability of the secondary mortgage market.

24   I did not talk about this goal.

25   Q.  This is a separate goal?

```
 1    A.  This is a separate goal.

 2    Q.  Okay.  Now --

 3    A.  In 2008.

 4    Q.  In 2008, right after the inception of the

 5    conservatorship, right?

 6    A.  Yes, when they had made practically no draws on the

 7    commitment.

 8    Q.  Well, the other document you showed, to be fair, sir, on

 9    your slide was from September 2008 --

10    A.  Yes.

11    Q.  -- on the inception of the conservatorship, correct?

12    A.  Yes.

13    Q.  All right.  This is October.

14    A.  Yes.

15    Q.  Close in time.

16    A.  Close in time.

17    Q.  All right.  And this is a separate goal expressed by

18    Mr. DeMarco?

19    A.  Yes.

20    Q.  All right.  Now, Dr. Attari, am I correct, then, that

21    this was not one of the specific goals -- this goal

22    expressed by Mr. DeMarco -- that you considered in rendering

23    your opinion that FHFA acted reasonably in undertaking the

24    Third Amendment?  Yes or no.

25    A.  I did not, yes.
```

1    Q.  Okay.  Thank you.

2              MR. KRAVETZ:  Now, if we can take that down for a

3    moment, Mr. DeRita.

4              Now, if we can put up Plaintiff's Exhibit 2C,

5    please, Mr. DeRita.

6    Q.  Now, this is a document that was in one of your slides,

7    right?

8    A.  I believe so.

9    Q.  Okay.

10   A.  Or a version of it, yes.

11   Q.  A version of it.  And the first --

12             MR. KRAVETZ:  If we can enlarge the first

13   paragraph "What is a conservatorship?"

14             Actually, if we can enlarge it, sir.  Thank you.

15   I may have misspoke.

16   Q.  All right.  And you had just mentioned in your testimony

17   that one of the goals that you did actually consider was

18   whether the conservatorship would put the companies, quote,

19   in a sound and solvent condition, end quote.  Is that right?

20   A.  I said the secondary market in a sound -- or are you

21   talking about the previous document we were just looking at?

22             Sorry, I'm --

23   Q.  That's okay.  I'm just asking with what's on the screen

24   here.

25   A.  Ah.

1    Q.  This indicates in this particular sentence, "A

2    conservatorship is the legal process in which a person or

3    entity is appointed to establish control and oversight of a

4    Company to put it in a sound and solvent condition."  Is

5    that correct?

6    A.  Yes.

7    Q.  Okay.  And so this is stating the goal in reference to

8    the companies, right?

9    A.  Yes.

10             MR. KRAVETZ:  All right.  And, Mr. DeRita, if you

11   can go to Page 2 of this document to the Q&A of when the

12   conservatorship period will end, or "When will the

13   conservatorship period end?"

14   Q.  And similarly here, when there's a discussion of safe

15   and solvent condition, it's with respect to the company,

16   correct?

17   A.  Yes.

18   Q.  All right.  Now, these terms "sound" and "solvent,"

19   "safety" and "soundness," are these terms that have a

20   particular meaning in the context of financial institutions?

21   A.  Yes, normally that they have sufficient capital to

22   operate.

23   Q.  Right.  And the goal in that context, when these terms

24   are used, is that these particular entities, you want them

25   to build up capital, correct?

```
1    A.  It can be that they have access to capital to operate.

2    Q.  Well, there is a whole rating system that applies to

3    whether banks are in a safe and sound condition; do I have

4    that right?

5    A.  Yes.

6    Q.  It's called CAMELS, C-A-M-E-L-S, correct?

7    A.  Yes.

8    Q.  The "C" refers to capital adequacy, right?

9    A.  Yes.

10   Q.  All right.  So one of the goals in determining that

11   an organization, that a financial institution, is in a safe

12   and sound condition is if that entity is able to retain

13   capital.

14   A.  Have capital.

15   Q.  Have capital, okay.

16   A.  Yes.

17   Q.  And because of that, financial regulators impose minimum

18   capital requirements that financial institutions must meet

19   to demonstrate safety and soundness?

20   A.  Yes.

21   Q.  All right.  But here the impact of the net worth sweep

22   is that the GSEs were prohibited from attaining any capital,

23   correct?

24   A.  Well, they had capital.  It was the Treasury Commitment.

25   And the net worth sweep protected that capital.
```

1    Q.  So it's your testimony that the company -- following the

2    net worth sweep, the net worth of the GSEs didn't all go to

3    Treasury?

4    A.  It did, but there was the Treasury Commitment.  So for

5    Fannie Mae, there was $125 billion sitting there, and you

6    could -- you know, you could agree to continue under the

7    Second Amendment and run the risk that that 125 went down to

8    zero over time, or you could take steps to protect it.  And

9    a lot of what happened in taking steps to protect it is that

10   it eliminated the variability of, you know, whether you

11   would have enough this period to pay the dividend or not,

12   would you have enough to pay the PCF or not.  So there's a

13   tradeoff.

14   Q.  But you don't dispute that after the net worth sweep, as

15   a consequence of the net worth sweep, in 2013 the GSEs

16   transferred to Treasury above and beyond what they would

17   have paid under the 10 percent dividend an additional $111

18   billion?

19   A.  In 2013, yes.

20   Q.  In 2013?

21   A.  Things that were not known in 2012.

22   Q.  I'm just asking as a result of the net worth sweep?

23   A.  Yes.

24   Q.  Okay.  And so just to be clear, as a result of the net

25   worth sweep the entities were not even allowed to retain

```
1    capital, correct?

2    A.  And they didn't run the risk of eroding the capital that

3    they had, yes.

4    Q.  And so essentially, as a result of the net worth sweep,

5    the maximum capital requirement of the GSEs was zero?

6    A.  No.  It was they had massive amounts of capital that

7    would not get eroded, so they were very safe.

8    Q.  Well, they had massive amounts of capital that all went

9    to Treasury in 2013, right?

10   A.  No.  They had massive amounts of undrawn commitments.

11   So Fannie Mae had $125 billion that it could operate with,

12   and Freddie Mac had $150 billion that -- of capital that it

13   could operate with.

14   Q.  And is it your opinion that taking all of the profits of

15   the GSEs and sweeping them to Treasury furthers safety and

16   soundness goals?

17   A.  Yes, because it eliminates the possibility of eroding

18   that $125 billion commitment.

19   Q.  It also prevents them from retaining any capital.

20   A.  Yes.

21            THE COURT:  This is a good breaking point.

22            MR. KRAVETZ:  Thank you, Your Honor.

23            THE COURT:  We'll take ten minutes.

24            (Recess taken)

25            THE COURT:  All right.  You may proceed.
```

1    BY MR. KRAVETZ:

2    Q.  Good afternoon again, Dr. Attari.

3    A.  Good afternoon.

4    Q.  Sir, during your testimony you discussed the credit

5    ratings of the GSEs.  Do you recall that?

6    A.  Yes.

7    Q.  Okay.  And --

8    A.  Well, I discussed the credit rating agency reports.

9    Q.  Reports of credit agencies, correct?

10   A.  Yes.

11   Q.  Okay.  And there are three major credit ratings agencies

12   in the United States; is that correct?

13   A.  Yes.

14   Q.  All right.  And there are Moody's, and I think we saw a

15   slide about Moody's?

16   A.  Yes.

17   Q.  What are the two other?

18   A.  Yes, Fitch is one, and I think we saw maybe a slide

19   about that one, too.

20   Q.  Okay.

21   A.  And then the Standard & Poor's.

22   Q.  So Moody's, Standard & Poor's, and Fitch.  Those are the

23   three major credit ratings agencies in the United States?

24   A.  Yes.

25   Q.  Okay.  Now, am I correct, sir, that generally, in and

1    around the time from the inception of the conservatorship

2    through the time of the net worth sweep, that the credit

3    ratings of Fannie and Freddie were generally the same as

4    U.S. sovereign debt, that is Treasury debt, right?

5    A.   Yes.

6    Q.   Okay.  And so they're the same credit rating as the

7    United States government?

8    A.   Yes, because of the commitment.

9    Q.   And those -- the ratings in the -- during the period of

10   time prior to the net worth sweep, the ratings that were

11   imposed by each of the three ratings agencies were some of

12   the highest that you could have.  Is that right?

13   A.   Yes.

14   Q.   Triple-A?

15   A.   Yes.  Whatever it was.  I think for a while one of them

16   had it a little lower, but that was because the government

17   was at a little lower than Triple-A.

18   Q.   That was at a time period where Congress was having

19   difficulty and there was a government shutdown and a threat

20   of the debt ceiling in or around the time.  Do you recall

21   that?

22   A.   I don't recall the specific reasons.  I know that one of

23   them mentions that, you know, we're keeping it at the level,

24   but if...

25   Q.   But I guess the point is that the GSEs' credit ratings

1    moved directionally with the credit ratings of the U.S.

2    government?

3    A.  Yes.  And because of -- that was because of the

4    commitment.

5    Q.  And those ratings had not gone down between December

6    2009 and August 2012?

7    A.  No, they had not as far -- I mean, yes, sitting here,

8    they had not.

9    Q.  All right.  So even as the GSEs were getting closer to

10   the time period of the Third Amendment, when the cap was

11   going to be imposed, as you testified, in year end 2012, the

12   ratings did not change?

13   A.  The ratings had not changed.

14   Q.  They had not changed at any time prior to the net worth

15   sweep?

16   A.  Yes, because there was an unlimited amount of government

17   support in effect at that time.

18   Q.  Right.  So there was no downgrade in just the credit

19   ratings of the GSEs to reflect that those bonds were

20   materially more risky, correct?

21   A.  Yes.  But they were discussing the fact of the risk.

22   Q.  Right.  But I'm just asking, true or false, whether

23   they'd actually been downgraded?

24   A.  They had not.

25   Q.  Okay.  And are you familiar with the concept of ratings

1    outlooks?

2    A.  Yes.

3    Q.  All right.  What does that mean?

4    A.  A ratings outlook is often when a rating agency is

5    reviewing an issue for either an upgrade or a downgrade,

6    they'll kind of put it on either a watch or an outlook.

7    Q.  And that basically puts the company or, in this case,

8    the government-sponsored entity on notice of a potential

9    ratings change, correct?

10   A.  And investors, yes.

11   Q.  All right.  But here, the credit ratings agencies had

12   not issued any type of negative ratings outlook based on

13   their concern over the erosion of the commitment prior to

14   the net worth sweep, correct?

15   A.  Yes.  But that -- you know, waiting for an outlook or a

16   watch would have been -- by that time, things would have

17   been too late.

18   Q.  Well, I mean -- but I think you've testified that that

19   type of watch is put in place if there's an expectation that

20   there's going to be some fundamental change in that

21   particular corporation or government entity, correct?

22   A.  Yes.

23   Q.  All right.  And just yes or no.  As of the time of the

24   Third Amendment, had any of the three major credit rating

25   agencies placed the GSEs on a watch list?

1    A.   No.

2    Q.   Okay.  So all of the supposed concern in the bond

3    markets, in terms of the imposition of the caps that was

4    going to come in December of 2012, never called any of the

5    three credit rating agencies to downgrade the rating of GSE

6    debt or to even issue a negative ratings outlook on GSE

7    debt, correct?

8    A.   Yes.

9    Q.   Okay.  Now, let's talk a little bit about analyst

10   reports.  And you showed some analyst reports throughout

11   your presentation today; is that right?

12   A.   Yes.

13   Q.   It's true that analyst reports are often the opinion of

14   a particular analyst employed by a firm, right?

15   A.   Or a group of analysts.  Some of those reports had

16   multiple authors.

17   Q.   Yes.  One or a handful of people, correct?

18   A.   Yes.

19   Q.   They're the ones who were actually signing the report?

20   A.   Yes.  Just like when we talked about the FHFA, the

21   FHFA's opinions are the opinions of the people at FHFA.

22   Q.   Okay.  And, you know, in terms of analyst reports --

23   just a few general questions about analyst reports.

24   A.   Sure.

25   Q.   And we can take a look at the two that you showed in

1    particular.

2              You wouldn't expect that analysts would have

3    access to internal GSE emails, would you?

4    A.  No.

5    Q.  Okay.  Including if there was an email that described

6    the GSEs as being at an inflection point in an economic

7    recovery?

8    A.  They would not.

9    Q.  Okay.  Or that the GSEs were likely to face a,

10   quote-unquote, roaring recovery?

11   A.  They would not have access to emails.

12   Q.  Okay.  So if there's an email saying that the GSEs were

13   about to enter a golden age of earnings, that's not

14   something that would be shared with an analyst, correct?

15   A.  The email would not, but the underlying sentiment would

16   probably be shared because the GSEs, like other issuers,

17   talk to other analysts and credit rating agencies.

18   Q.  So it's your testimony that as of the summer 2012,

19   before the net worth sweep, it was likely that someone from

20   the GSEs told an analyst that the GSEs were entering a

21   golden age of recovery?

22   A.  I would not expect them to have used the exact same

23   words.

24   Q.  All right.  Now, you wouldn't expect that analysts would

25   have access to internal GSE forecasts, correct?

1    A.  Would not have access, correct, yes.

2    Q.  Okay.  An analyst would not have access to nonpublic

3    data showing the GSE's actual performance before they

4    publicly disclose those results?

5    A.  They would not have access to nonpublic data.

6    Q.  Because some of -- I think you've seen -- the documents

7    that you've seen, am I correct that there would be

8    information that would be disclosed on a monthly basis in

9    terms of the results of the GSE's performance?

10   A.  Yes.  But a lot of the information underlying that --

11   for example, loan performance -- is reported by the GSEs

12   publicly on a monthly basis.  Actual loan-level information

13   is available on a monthly basis.

14          So a lot of the underlying data is available, but

15   not the specifics on those slides and reports, no.

16   Q.  Right.  Okay.  And to the extent that FHFA or the GSE

17   had any internal analyses of the housing market, that

18   wouldn't be something that would be shared with analysts,

19   correct?

20   A.  Their analysis would not be -- well, I mean, it depends.

21   Again, all of these companies are putting out information

22   periodically on their assessments of the housing market,

23   their opinions about home prices.  I think Fannie and

24   Freddie used to put out home price forecasts for the longest

25   time.

1    Q.  Right.  But I'm asking if there's internal assessments

2    of the housing market of FHFA and the GSEs, that typically

3    wouldn't be shared with an analyst?

4    A.  Well, if it's internal, it's internal.

5    Q.  Right.  And analysts, to your understanding, would not

6    have access to private meetings between FHFA officials and

7    Treasury Department officials, correct?

8    A.  No, they would not.

9    Q.  All right.  And the analyst reports that we reviewed --

10   or that you reviewed in connection with your slides, none of

11   those analyst reports were discussing the possible or

12   potential release of billions of dollars in deferred tax

13   assets, did they?

14   A.  There was one analyst report earlier in time that's

15   referenced in my report that does talk about the DTA and how

16   and when it might be released and so on.

17   Q.  All right.  And I think you testified that you -- either

18   you and your team pulled all of the relevant analyst reports

19   relating to --

20   A.  Yes.

21   Q.  -- Fannie Mae and Freddie Mac --

22   A.  Yes.

23   Q.  -- is that correct?

24          And during your presentation, you displayed two

25   analyst reports that you testified were consistent with the

 1    reasonableness of the actions of FHFA entering into the

 2    Third Amendment; is that right?

 3    A.  Before the Third Amendment or --

 4    Q.  Before the Third Amendment.

 5    A.  Yes, maybe two or three, I don't remember -- recall,

 6    yes.

 7    Q.  Okay.  And did you personally choose those for

 8    inclusion?

 9    A.  Yes.

10    Q.  All right.  Now, am I correct, sir, that you have no

11    knowledge, sitting here today, whether Ed DeMarco relied on

12    either of those analyst reports in entering -- making the

13    decision to enter into the Third Amendment, correct?

14    A.  Relied on them?  Yes.  No -- you're right.

15    Q.  All right.  And you have no information sitting here

16    today whether Mario Ugoletti specifically relied on the

17    analyst reports in entering into the Third Amendment,

18    correct?

19    A.  Correct.

20    Q.  Okay.  You haven't spoken to them about that?

21    A.  I have not.

22         MR. KRAVETZ:  Okay.  I'd ask if Mr. DeRita can

23    please display I believe it's Defense Exhibit 412, please.

24         If we can go to the third page.

25         And I believe the next page.  I have 5 of 8.

1    Thank you.

2    Q.  All right.  This is one of the reports that you

3    displayed during your testimony, correct?

4    A.  Yes.

5    Q.  And this report -- this is an analyst report of an

6    analyst from Deutsche Bank; is that right?

7    A.  Yes.

8            MR. KRAVETZ:  If we can go to the last page,

9    please, Mr. DeRita.  And just enlarge the bottom right-hand

10   corner, the reference to the name and the phone number.

11   A.  Steven Abrahams?

12   Q.  Yes.

13   A.  Yes.

14   Q.  And does that indicate that Mr. Abrahams would have been

15   the author of this analyst report?

16   A.  Or the person to contact if you had questions about this

17   analyst report.

18   Q.  Okay.  But this particular analyst report, it doesn't

19   indicate another author other than Mr. Abrahams, correct?

20   A.  Maybe on the front page.  I thought it had a list of

21   people's names, but maybe I'm mistaken.

22   Q.  I believe that the earlier page is an agenda of a

23   separate meeting --

24   A.  No, no, no, the front page of the report.

25   Q.  -- from 2012.

1          MR. KRAVETZ:  We can go to the front page,

2     Mr. DeRita.  That would be on Page --

3     A.  Isn't that -- it says contributors?  Maybe I'm just...

4     Coordinators.

5     Q.  Okay.  Now, I'd like to --

6          MR. KRAVETZ:  If Mr. DeRita can go to Page 5 of 8,

7     please, and enlarge the lower left-hand corner with the

8     paragraph beginning with "An inability."

9     Q.  Now, your testimony was that at this time -- and correct

10    me if I'm wrong -- that there was evidence within the market

11    that there was a concern of the erosion -- potential erosion

12    of the Treasury Commitment cap?

13    A.  Yes.  Treasury -- the undrawn portion of the capped

14    Treasury Commitment, yes.

15    Q.  Correct.  And in this particular paragraph it appears

16    that Mr. Abrahams is providing one potential solution to the

17    problem and, do you see in the second paragraph, indicates

18    that the most likely relief would come from suspending the

19    annual 10 percent dividend that the agencies will owe to

20    Treasury on its holdings of preferred stock?

21    A.  I think he's proposing two and maybe knocking them both

22    down because the first sentence talks about an inability to

23    extend unlimited backing.  So he's suggesting one option

24    might be just extend the unlimited backing, but if you

25    can't, then maybe suspend the 10 percent dividend --

1    Q.  Right, he --

2    A.  -- which, again, economically doesn't make a whole lot

3    of sense.

4    Q.  That's your position, that Mr. Abrahams's alternative

5    here of suspending the 10 percent dividend doesn't make a

6    lot of sense?

7    A.  Yes.  I believe maybe at some point either he or other

8    people discuss why that wouldn't make sense, because

9    Treasury would be giving up $18 billion a year in dividend

10   payments.

11   Q.  Well, he notes that it might also come with political

12   costs; is that correct?

13   A.  It might.  I mean, I don't know.  I assume giving up $18

14   billion comes with political costs for the U.S. government.

15   Q.  Right.  And so this particular analyst is describing

16   that it could be a political decision in terms of deciding

17   what to do with the agencies -- the GSEs in the future,

18   correct?

19   A.  Giving away $18 billion a year?  Yes.

20           MR. KRAVETZ:  And if we can turn, then, to the

21   next page, Page 6, please.

22           All right.  And, Mr. DeRita, if you can enlarge

23   the lower right-hand portion, please.  Just the bottom

24   paragraph.

25   Q.  Now, this note was issued March 14th of 2012, correct?

1   A.  Yes.

2   Q.  And this would have been a time prior to the GSEs

3   releasing their first quarter of 2012 results?

4   A.  Yes.

5   Q.  All right.  And prior to releasing their second quarter

6   2012 results?

7   A.  Yes.

8   Q.  And you're aware in general the results of the GSEs

9   continued to improve throughout the first half of 2012,

10  correct?

11  A.  Yes.

12          MR. KRAVETZ:  All right.  And if Mr. DeRita can

13  highlight four lines down, the fifth.

14  Q.  "The quality of newly guaranteed loans also has

15  increased dramatically."  Do you see that?

16  A.  Uh-huh.

17  Q.  And that's prior to the results coming in even in the

18  first half of 2012, right?

19  A.  I think they're just making a statement about the

20  quality of newly guaranteed loans.  They wouldn't need to --

21  you know, the quality of the loans is one piece, and then

22  the results on that investment is a different piece.

23  Q.  Right.  And if you're making better quality loans,

24  that's going to be a factor in the long-term performance of

25  the financial institution of the GSE, right?

```
1    A.  Yes.

2    Q.  You don't want to make bad loans.  You want to make good

3    loans that will pay off over time?

4    A.  Yes.

5    Q.  Okay.

6    A.  Make good loans that are profitable.

7           MR. KRAVETZ:  If we can go to the next page,

8    please, at the top.  And the fact at the very -- where it

9    says "Recent books of guarantees," Mr. DeRita.

10          If you can just highlight that first sentence.

11   Q.  Do you see where it says, "Recent books of guarantees

12   arguably are among the best ever written by the agencies"?

13   A.  Yes.

14          MR. KRAVETZ:  And finally, Mr. DeRita, if we can

15   go down to "Market Implications."

16   Q.  In the second sentence does it state, "The high quality

17   of current loans and the prospect of rising guarantee fees

18   should allow the agencies to cover losses in most

19   scenarios."  Do you see that?

20   A.  Yes.

21   Q.  All right.  And I'm not sure if you mentioned on direct,

22   but what are guarantee fees?

23   A.  Guarantee fees.  So I mentioned that the enterprises

24   guaranteed the mortgages and the loans, and these are the

25   fees that they earn for that purpose.
```

1   Q.  All right.  And throughout 2012 were the agencies

2   charging more in guarantee fees?

3   A.  I believe so.

4   Q.  And that would bring in greater income to the GSEs; is

5   that correct?

6   A.  I believe that it may have been part of some law that

7   required them to transmit some of those increases to the

8   Treasury, but, again, sitting here I'm working from memory.

9   Q.  But it's coming to the government in some fashion?

10  A.  Yes, but it was part of some tax package.

11  Q.  Now, during the period of the conservatorship, from

12  September 2008 through the net worth sweep, the GSEs were

13  still regularly issuing debt, correct?

14  A.  Yes.

15  Q.  And they were regularly issuing hundreds of billions of

16  dollars in debt.  Am I right?

17  A.  Yes.

18  Q.  And was there more short-term debt or long-term debt

19  that the GSEs were issuing at that time?

20  A.  It was shorter than before the crisis.

21  Q.  Shorter than before the crisis?

22  A.  Yes.

23  Q.  About the same amount of short-term debt versus long-

24  term debt?

25  A.  No, they weren't -- before the crisis they used to

1  regularly issue maturities longer than five years.  I

2  believe after the crisis they stopped issuing more than five

3  years.

4  Q.  All right.  And so do you recall what the level of

5  short-term versus long-term debt was in 2011 and '12?

6  A.  Sitting here, no.

7          MR. KRAVETZ:  Okay.  Can we enlarge PX158, please,

8  Mr. DeRita, at Table 32, which would be -- let's see.  Let's

9  actually start with -- let's start at PX163 at Page 85,

10  please.

11          THE COURTROOM DEPUTY:  I'm sorry, 163?

12          MR. KRAVETZ:  PX163 at 85.

13          THE COURTROOM DEPUTY:  It's not in.

14  Q.  And, sir, did you review the 10-K filings of the GSEs in

15  connection with rendering your expert report?

16  A.  Yes.

17  Q.  All right.  And would you have reviewed sections of the

18  10-K relating to the issuance of debt securities?

19  A.  Yes.

20          MR. KRAVETZ:  Mr. DeRita, if we can go to Page --

21  it should be Page 185, sir.  Perfect.  Yes.  If you can

22  enlarge Table 67.

23  Q.  Sir, this particular table, just to refresh your

24  recollection, does it list for Freddie Mac the amount of

25  debt securities that were issued in the year ending 2011?

1     A.  Yes.

2     Q.  All right.  And what were -- what was the total debt

3     that was issued by that GSE?

4     A.  $710 billion.

5     Q.  $710 billion?

6           And just to confirm, this is a document that you

7     would have relied upon in your analysis?

8     A.  Yes.  I mean, right now I don't know what specific

9     document it is, but if it's a 10-K, then I have looked at

10    it, yes, and relied on it.

11          MR. KRAVETZ:  At this time, Your Honor, we would

12    request to move PX163 into evidence.

13          MR. HOFFMAN:  No objection.

14          THE COURT:  Received.

15          MR. KRAVETZ:  Can that be displayed to the jury,

16    please?  Thank you.

17    Q.  All right.  And so, sir, this is indicating that

18    approximately how much in debt issued in 2011?

19    A.  $710 billion.

20    Q.  All right.  So during that period of the

21    conservatorship, then, the GSEs were still able to issue a

22    significant amount of short-term and long-term debt; is that

23    correct?

24    A.  Yes.  They had an unlimited government guarantee.

25    Q.  All right.  Now, when Mr. Hoffman was asking you

1    questions, he asked you about yield spreads, correct?

2    A.  Yes.

3    Q.  All right.  And a yield spread is the difference between

4    the yield on a GSE bond and the yield on a Treasury bond; is

5    that right?

6    A.  Actually, I don't believe we went over that part of

7    my --

8    Q.  Well, do you want to describe to the jury what a yield

9    spread is?

10   A.  Sure.

11   Q.  Okay.  Go ahead.

12   A.  It's the yield on a bond that you're interested in, so

13   in this case the bonds issued by Fannie Mae and Freddie Mac,

14   and then you subtract down the yield on a comparable-

15   maturity U.S. Treasury security.  So the difference is

16   called the yield spread, and the difference reflects the

17   risk of the companies.

18   Q.  And is it the case basically that the higher the yield

19   spread, the more cause for concern there is in terms of the

20   instability of the GSE bond market?  Do I have that right?

21   A.  Well, a higher yield spread reflects that there is more

22   concern about, you know, the ability of the borrower to pay.

23   Q.  And so correspondingly, the lower the yield spread, the

24   lower the difference between Treasury bonds and GSE bonds,

25   the less cause for concern.  Is that right?

1    A.  Yes.

2    Q.  All right.  In your work in this case, did you look at

3    the yield spreads on GSE bonds going back to the years

4    before the financial crisis?

5    A.  Probably.

6    Q.  And did you review those -- look at the yield spreads

7    going back to that time period and determine how it changed

8    from that period through the net worth sweep?

9    A.  Yes.  It increased during the crisis period, and then

10   for -- at the shorter maturities, it came back down.  And at

11   the longer maturities, it didn't come all the way back down.

12   Q.  Okay.  So the yield spread, then, was higher before the

13   crisis began in the summer of 2007; is that right?

14   A.  Well, the yield spread was low in 2005 and '6.

15   Q.  Correct, yes.

16   A.  At some point it started increasing.

17   Q.  And that was during the period of the financial crisis?

18   A.  That was prior to the government stepping in and, you

19   know, providing support to Fannie Mae and Freddie Mac.  And

20   then the yield spread kind of came down but was elevated.

21   And then at the shorter maturities, it came back down to

22   roughly the pre-crisis level, but at the longer maturities,

23   it was still elevated in 2012.

24   Q.  All right.  And -- but it's true, though, there was less

25   cause for concern over the potential instability of the GSE

1    bond market in 2012 before the net worth sweep than there

2    was in the years or the time period just preceding the

3    financial crisis; is that right?

4    A.   In 2008, there was -- the spreads were possibly wider,

5    yes.  Yes.

6    Q.   Okay.  So as they got -- and it's also true the yield

7    spread throughout the course of 2012 got lower, right?

8    A.   Yes.

9    Q.   Okay.  And so as they got closer to the time in which

10   the caps would be reimposed, which is 12/31/2012, the yield

11   spreads got lower, meaning that as that deadline approached,

12   December 31st, there was less cause for concern over

13   instability in the market?

14   A.   Yes, because they declined pretty dramatically on the

15   17th of August, and then kind of -- they drifted over

16   because now default had been taken off as a concern.

17   Q.   Correct, okay.  Thank you.

18              It was your opinion -- well, let me actually --

19              MR. KRAVETZ:  Mr. DeRita, I believe -- if you

20   could display Slide 46, please.  This may have changed in

21   the different version, but we can see this one first.  This

22   is of the defense's slides.

23              And I think we have to go a little bit earlier

24   than this.  We're looking for a slide that's entitled "The

25   Change in Bond Yields Attributable to the Third Amendment."

1          And if I could, Your Honor, since the numbers

2    changed, if I could check with my colleagues, if they know?

3          (Pause)

4          MR. KRAVETZ:  Just for the record, this is now new

5    Slide 44 in the defense presentation.

6    Q.  All right.  So, sir, you indicated that you performed an

7    event study in this case of the bond market; is that

8    correct?

9    A.  Yes.

10   Q.  And can you repeat again what was your conclusion in

11   terms of why the yield spread changed in relationship to the

12   Third Amendment.

13   A.  Well, what I'm showing here is that the yield spreads

14   changed on the date of the Third Amendment, and a decline in

15   the -- this is actually the yield.  So the third column is

16   the change in the yields directly, which is -- if you look

17   at the first bond, it's 13.1 basis points, so that's 0.131

18   percent.

19          And then, you know, I run a regression analysis

20   that strips out the change that's related to Treasury bonds,

21   you know, to adjust for market-wide moments.  And what's

22   left over and attributable to the Third Amendment is 11.3

23   basis points.  So that's, you know, about a 0.1 percent

24   decline in the yield on Fannie Mae on that first bond.

25          And then, if you go down in that column, you can

1    see the decline for the other bonds.

2              So the first bond matures on November 15, 2030;

3    the next one on May 15, 2030; the following one on January

4    1, 2030, and so on.

5              So all of these bonds experienced a pretty

6    dramatic -- for the bond market, a pretty dramatic decline

7    in the yield on the bond on the day of the Third Amendment,

8    which suggests that the Third Amendment -- that investors

9    believed the bonds had become safer.  And the event that we

10   had was the Third Amendment, so the Third Amendment made the

11   bonds safer.

12   Q.  But your specific conclusion is that the bond yields

13   changed why?  In relation to the cap that was -- or in

14   relation to the net worth sweep?

15   A.  Yes.

16             MR. KRAVETZ:  Okay.  We can take that slide down

17   for a moment.

18   Q.  And you indicated that to reach this conclusion you

19   performed something called an event study; is that right?

20   A.  Yes.

21   Q.  All right.  And that's something you've performed before

22   in your connection as an expert in other matters?

23   A.  Yes.

24   Q.  All right.  And essentially an event study is going to

25   measure the change of what occurred on a particular day; is

1    that right?

2    A.  Yes, in response to an event.

3    Q.  Generally it's a one-day window in connection with a

4    response to an event?

5    A.  Yes.

6    Q.  All right.  And you referenced with -- this is the

7    output on the PowerPoint slide, but would there be more that

8    would go into this bond event study?  Would there be

9    additional materials that you would have created in

10   connection with this event study?

11   A.  Yes.  There would be calculations.  There would be data.

12   There would be analysis, yes.

13   Q.  And that's normally in the form of an Excel file; is

14   that right?

15   A.  It could be an Excel file.  It might be a computer kind

16   of data file.

17   Q.  Some type of data file?

18   A.  Yes.

19   Q.  All right.  And the slides that we just saw, that

20   summarizes the results of your event study, correct?

21   A.  Yes.

22   Q.  All right.  Now, during your deposition in this matter,

23   do you recall if you were asked about the factors that drive

24   the yield spread on a bond to decrease?

25   A.  Factors?  Could you clarify that?

1    Q.   Yes.  Do you recall being asked about what factors might

2    apply to the change in yields and bonds?

3    A.   Yes.   Interest rates on Treasury securities is the

4    relevant factor for Fannie Mae and Freddie Mac bonds.

5    Q.   And do you recall that you testified during your

6    deposition that a change in supply of GSE bonds compared to

7    the amount of outstanding debt that the agencies have could

8    be a factor that impacts bond spreads?

9    A.   I believe I was asked about that, and I said that was

10   unlikely to be a factor because there were substitutes for

11   GSE bonds.

12   Q.   Do you believe that you testified it was unlikely to be

13   a factor?

14   A.   It was unlikely to be a factor, yes.

15            MR. KRAVETZ:  I'd ask if Mr. DeRita can play Clip

16   18, please.

17            (Video playing)

18   Q.   All right.  So do you recall now that you acknowledged

19   that the change in supply could be a factor in declining

20   yield spreads?

21   A.   Yes.

22   Q.   Is the answer yes?

23   A.   Yes.

24   Q.   Okay.  Now, do you know, sir, whether -- or have you

25   reviewed any internal FHFA documents relating to the

1    movement in the bond market on the day of the net worth

2    sweep?

3    A.   I have.

4    Q.   You have?

5         MR. KRAVETZ:  I'd ask if we can first display to

6    Dr. Attari PX282, please.

7    Q.   Is this one of the documents that you've reviewed, sir?

8    A.   Probably, yes.

9    Q.   Okay.  This is an email dated August 17, 2012.  So

10   that's the date of the net worth sweep, correct?

11   A.   Uh-huh.

12   Q.   It's from an FHFA employee named Robert Hynes; is that

13   right?

14   A.   It's from someone named Robert Hynes, yes, FHFA.

15   Q.   And to a number of recipients, including Mr. DeMarco; is

16   that correct?

17   A.   Yes.

18        MR. KRAVETZ:  Mr. DeRita, if you can just back out

19   for a moment.

20        MR. HOFFMAN:  Mr. Kravetz, what tab?  Is this in

21   the binder?

22        MR. KRAVETZ:  This would be Tab 17.

23        MR. HOFFMAN:  Thank you.

24        MR. KRAVETZ:  Yes.

25   Q.   And the subject matter or the subject of the email is

1     "Capital Markets Update" and then refers to -- a lot of

2     ellipses and other things, but that's the beginning of the

3     subject matter; is that correct?

4     A.  Yes.

5             MR. KRAVETZ:  All right.  Your Honor, plaintiffs

6     now move for the admission of 282.

7             MR. HOFFMAN:  No objection.

8             MR. KRAVETZ:  And I'd ask if we can please display

9     it.

10            THE COURT:  Received.

11            MR. KRAVETZ:  Now, if I can ask Mr. DeRita, then,

12    to go to the next page, please.  All right.  And to enlarge

13    the next -- the paragraph under the second graph.

14    Q.  And in this particular FHFA email on the date of the net

15    worth sweep, does it state, sir, "The rationale is that as

16    the Enterprises wind down there will be less longer term

17    debt issued, leaving investors to fight over existing

18    supply"?  Did I read that correctly?

19    A.  Yes.

20    Q.  All right.  And that it indicates, "Also, it is more

21    likely that buyers will squirrel away existing holdings,

22    reducing the float of available supply in the secondary

23    market."  Is that correct?

24    A.  Yes.

25            MR. KRAVETZ:  All right.  I'll ask if Mr. DeRita

1   can take that down.

2   Q.  So this particular FHFA document is attributing the

3   change in the yield spreads to the change in supply,

4   correct?

5   A.  Yes.

6   Q.  With it being that because -- part of the change in the

7   net worth sweep is a reduction in the retained portfolio; is

8   that right?

9   A.  I believe it's --

10          MR. HOFFMAN:  Objection, Your Honor; outside the

11  scope.  If I might be heard on the phone on this?

12          THE COURT:  The objection's sustained.  He's not

13  the author, I take it.

14          MR. KRAVETZ:  I'm sorry, Your Honor?

15          THE COURT:  He's not the author, I take it?

16          MR. KRAVETZ:  He's not the author, Your Honor.

17          I'd ask if next we can display, first on the

18  screen to Dr. Attari, PX288.

19          And for counsel, this is Tab 18.

20  Q.  And, Dr. Attari, if it's easier for you to review it,

21  it's Tab 18.

22          Sir, do you recognize that this is an email to

23  Mario Ugoletti on August 17, 2012?

24  A.  Yes.

25  Q.  Entitled with the subject, "Treasury and the GSEs

```
 1    Execute 'Post-Nup' Agreement"?

 2    A.  Yes.

 3          MR. KRAVETZ:  All right.  If Mr. DeRita can back

 4    out for a moment and enlarge "Summary of Market Impacts."

 5    Q.  And do you see on the email there's a reference to

 6    "tighter debt spreads for Fannie and Freddie given their new

 7    'post-nup' agreement with Treasury"?

 8          MR. KRAVETZ:  And I apologize for reading too

 9    fast.

10    Q.  Do you see that, sir?

11    A.  Yes.

12    Q.  In the next line it references "Accelerated wind down of

13    mortgage portfolios lead to accelerated diminishment of debt

14    supply."  Is that correct?

15    A.  Yes.

16          MR. KRAVETZ:  All right.  You can take that down,

17    Mr. DeRita.

18    Q.  So these two particular documents -- and just going back

19    to your deposition testimony, I think we just saw a clip

20    where you indicated that if there is a reduction in supply,

21    that can be one of the reasons why you have an increase in

22    the price of a particular bond, correct?

23    A.  Yes.

24    Q.  All right.  And so here in these particular emails

25    there's a reference to the very fact that there's a change
```

1    in the yield spread is due to decreased supply and increased

2    prices, correct?

3    A.  Yes.

4    Q.  Okay.  And, sir, did you consider, as part of your event

5    study, whether the retained mortgage portfolio provision of

6    the Third Amendment would have had the effect of increasing

7    overall demand for the long-term bonds in your study?

8    A.  Increasing the demand?  No, I did not.

9    Q.  Okay.  If you can, just with reference to your report,

10   Appendix C, please.

11   A.  Uh-huh.

12   Q.  And does Appendix C generally set forth the methodology

13   of your bond event study?

14   A.  Yes.

15   Q.  And am I correct that it notes that the GSE bond market

16   is among the most active of the bond markets?  Is that

17   right?

18   A.  Yes.

19   Q.  And the daily trading volume, at least at the time you

20   wrote your report, was approximately $6.4 billion?

21   A.  Yes.

22   Q.  All right.  And in your study you focused on seven long-

23   term bonds, correct?

24   A.  Yes.

25   Q.  You're aware that there are more -- there were more than

1    1,000 bonds that were issued relating to the GSEs in the

2    first half of 2012, correct?

3    A.  I was not aware of it, but I'll take that number.

4    Q.  It wouldn't surprise you that there were over a thousand

5    bonds that were issued, would it?

6    A.  A thousand seems on the high side, but...

7    Q.  All right.  And you focused only on -- out of the

8    thousand or more than a thousand bonds that were available,

9    you focused on seven, correct?

10   A.  Yes.

11   Q.  All right.  And you indicate in your report that you did

12   so because short-term bonds would be less focused on the

13   risk of the commitment because the risk that it would be

14   exhausted prior to maturity of the bonds would be small,

15   correct?

16   A.  Yes.

17   Q.  Focusing on the risk; is that right?

18   A.  Yes.

19   Q.  Not the supply?

20   A.  Yes.

21   Q.  And we've just seen some documents attributing the

22   change in bond yields not to the risk but to an increase --

23   a decrease in the supply of bonds in the market; is that

24   right?

25   A.  Yes.

1    Q.   Okay.   Am I correct that in your expert report you don't

2    cite to an academic study or a research paper for the

3    proposition that it's impossible to conduct a bond event

4    study of short-term and medium-term bonds?

5    A.   I didn't say it was impossible.   I said it was the

6    better way of doing it, and it's accepted that it's the

7    better way.   It's the standard way of doing it.

8    Q.   Well, do you recall on direct I think you said it was

9    complicated?

10   A.   I believe I said it was complicated to use callable

11   and puttable bonds, which is bonds because they have options

12   embedded in them that make them complicated.   And so the

13   standard approach is to exclude them from the event study

14   and to exclude short-term bonds from the event study.

15            I went out and looked at bonds with more than ten

16   years maturity because the question I had and was interested

17   in was about the long-term effects of the Third Amendment.

18   Q.   But you described this as a standard approach?

19   A.   Yes.   Excluding securities of various types is a

20   standard approach.

21   Q.   But just to be clear, in terms of your report, you

22   didn't cite to a research study or an academic paper for

23   that proposition, correct?

24   A.   I believe it's kind of a common issue.

25   Q.   So just so we're clear, you undertook no analysis as

```
 1    part of the work -- your work in this case as to whether the
 2    benchmark bonds that you studied as part of your event study
 3    and other bonds issued by Fannie Mae and Freddie Mac were
 4    similar from a credit risk standpoint; is that correct?
 5    A.  It would be, right.  It's the same issuer, so the credit
 6    risk would be the same.  It's what features do they have.
 7    What complicating features do they have that are different.
 8    Q.  Well, but my specific question is whether you actually
 9    conducted that work, whether you attempted to conduct that
10    work?
11    A.  Attempted to conduct what work?
12    Q.  The work of comparing the long-term bonds to the short-
13    term and medium-term bonds.
14    A.  I would need to -- it's the same issuer, so why would
15    the credit risk be different?
16          Now, it's how much credit risk do you bear.  Do
17    you get your money back tomorrow?  In which case, you know,
18    you're pretty much safe.  Or do you get it back next month?
19    Next year?  Again, you're quite safe.
20          Five years down the line?  15 years down the line?
21    Q.  But just to be clear, that's not a specific analysis
22    that you undertook in connection with your expert work in
23    this case; am I correct?
24    A.  Yes.
25    Q.  Okay.  Thank you.
```

1    A.  That's not a specific analysis.

2    Q.  So out of what you describe as one of the most active

3    bond markets with over one thousand potential bonds to

4    study, you chose only seven long-term bonds for your event

5    study.  Am I right?

6    A.  Well, I chose the ones that are the most liquid.

7         So Fannie Mae and Freddie Mac issue a lot of these

8    callable and puttable bonds.  They're issued in small

9    amounts, and they're issued on what is called a reverse

10   inquiry basis; that is, investors come in and say, "I'd like

11   to structure a bond with these features.  Would you be

12   willing to do that?"  And then Fannie Mae and Freddie Mac do

13   that in response to the investor requests.

14        And that accounts for the vast majority of the

15   thousand bonds that you're talking about.

16   Q.  We saw some --

17   A.  And then --

18   Q.  I'm sorry.  I thought you were finished.  Go ahead, sir.

19   A.  And then there are the bonds that are known as benchmark

20   bonds and reference notes.  Fannie Mae's are known as

21   benchmark bonds, and Freddie Mac's are known as reference

22   notes.

23        And these are standardized bonds.  They're just

24   like Treasury bonds where you get interest every six months,

25   and then you get your principal back.  And that's the

1    portion of the market that is liquid, and that's the portion

2    that I studied, the long end of that.

3    Q.  But to be clear, you were looking at studying the bonds

4    from a perspective of risk, not supply, correct?

5    A.  Yes.  I was looking at it from the perspective of credit

6    risk, and so I needed bonds that traded relatively

7    frequently, and so I looked at the ones that were most

8    liquid.

9    Q.  And because you didn't review whether supply could have

10   been the reason for the change in yield spreads, you had no

11   occasion to compare that to the bond study that you

12   conducted relating to the risk; is that right?

13   A.  Well, after I was asked at my deposition those questions

14   about supply, I went back and researched it and thought

15   about it.

16          And what I found is that these bonds are so far

17   out in time, the maturity, that their supply would not

18   change.  The retained portfolio would have reached the level

19   it was to reach, which is $250 billion, long before these

20   bonds matured, so there was no reason to believe that the

21   supply of these bonds was going to change.

22   Q.  Would your opinion in this case be different if, in

23   fact, bond investors and investors in mortgage-backed

24   securities were not concerned about circular draws on

25   Treasury's funding commitment but, instead, the reason was a

1    change in supply?

2    A.  So if there had been no prospect of circular draws?

3    Q.  No.  Let's assume that there wasn't actually concern

4    about circular draws, and the reason that the bond yield

5    spreads changed was due to a change in supply.  Would your

6    opinion be different?

7    A.  Well, I'd want to know why there was such a large change

8    in bond yields.  Bond yields don't change by 10 basis points

9    just for supply reasons.

10   Q.  But you didn't, in fact, study it at the time that you

11   issued your expert report, correct?

12   A.  I studied -- I did the event study.  Supply did not seem

13   like -- is not a reason that is typically looked at.  And

14   when it was raised in the deposition, I went back and

15   studied the reason, and I concluded that that wouldn't make

16   sense for these bonds in particular and even generally.

17   Q.  Let's discuss now your opinions regarding the circular

18   draw issue.  And I want to put up a document that's in

19   evidence.  It's PX205.

20   A.  Okay.

21   Q.  And there's a Bates number below, UST00533645.  Do you

22   see that?

23   A.  Uh-huh.

24   Q.  All right.  Are you familiar with this document?

25   A.  I've seen it recently.

1    Q.  You've seen it before?

2    A.  Yes.

3          MR. KRAVETZ:  Okay.  And if I can ask Mr. DeRita

4    to enlarge the last paragraph, please.

5          Now, if we can highlight the section "DeMarco no

6    longer sees the urgency of amending the PSPAs this year."

7    Q.  Do you see that, sir?

8    A.  Yes.

9    Q.  And then it goes on, "He has raised two competing

10   reasons for this position:  (1) the GSEs will be generating

11   large revenues over the coming years, thereby enabling them

12   to pay the 10% annual dividend well into the future even

13   with the caps."  Is that correct?

14   A.  Yes, that's what it says.

15   Q.  And am I correct that according to this document, at

16   least, Mr. DeMarco indicated that the caps, the caps that

17   were coming into place as of December 31, 2012, wouldn't be

18   an issue, quote, well into the future?  Is that right?

19   A.  I believe Mr. DeMarco testified on this document, so

20   it's like I'm not sure what you're asking me.

21   Q.  Well, I'm asking you whether you considered, in the

22   context of whether the circular draw concern was a

23   reasonable basis for entering into the net worth sweep, that

24   Mr. DeMarco himself told Treasury that the GSEs would be

25   generating large revenues over the coming years, thereby

```
1    enabling them to pay the 10 percent annual dividend well

2    into the future even with the caps.  Did you consider that?

3                THE COURT:  You can't word the question that way.

4    You're posing as a fact that DeMarco said that.  That

5    document doesn't even say that.

6    Q.  Well, did you --

7                THE COURT:  Reword the question.

8                MR. KRAVETZ:  Certainly, Your Honor.

9    Q.  Dr. Attari, did you consider this statement of

10   Mr. DeMarco in connection with issuing your expert opinion?

11               THE COURT:  Or did you consider his testimony?

12   A.  No, because that's not in my "Documents Considered."

13   Q.  It's not in your "Documents Considered"?

14   A.  Yes.

15   Q.  Okay.

16   A.  I don't believe so, I mean.

17   Q.  Okay.  So at the time -- that's fair.

18               At the time that you wrote the expert report, this

19   wasn't one of the documents that you considered, correct?

20   A.  I don't believe so.

21   Q.  Now, sir, would you agree -- we talked a little bit

22   about projections.  Would you agree in general that the

23   economic outlook for the GSEs improved rather substantially

24   in 2012?

25               MR. HOFFMAN:  Objection; vague.
```

```
 1                  THE COURT:  Sustained.
 2    Q.  Well, would you agree that the economic outlook for the
 3    GSEs improved in 2012?
 4                  MR. HOFFMAN:  Objection; vague.
 5                  THE COURT:  Sustained.
 6                  MR. KRAVETZ:  Well, let's ask in the context of a
 7    particular document.
 8                  If we can pull up, please, Exhibit --
 9    Plaintiff's Exhibit 213.  And just if we can enlarge the
10    top, Mr. DeRita.
11    Q.  Sir, is this a document that you've considered in
12    connection with rendering your expert report in this matter?
13    A.  I would have to look at the Bates number and compare it,
14    but I assume you know the answer so I'll accept your answer.
15                  MR. KRAVETZ:  If we can back it out, sir.
16                  And maybe seeing a particular passage might be
17    helpful.  If we can enlarge the section entitled "GSE
18    Strategy Update."
19    Q.  And there's a reference there to a Dave Benson, correct?
20    A.  Yes.
21    Q.  You had a slide about Mr. Benson in your presentation;
22    is that right?
23    A.  Yes.
24    Q.  And do you know what -- at this particular time in 2012
25    what Mr. Benson's role was at Fannie Mae?
```

1    A.  I think he was in financial planning, maybe the head of

2    financial planning or something.

3    Q.  All right.  And so here there's a sentence that

4    indicates that Mr. Benson referred to the next eight years

5    "as likely to be the golden years of GSE earnings."  Do you

6    see that, sir?

7    A.  Yes.

8    Q.  Okay.  Now, in your slide today with Mr. Benson, you

9    indicated that -- you put up particular testimony that was

10   shown via deposition clip in this case, correct?

11   A.  Yes.

12          MR. KRAVETZ:  All right.  And I'm not sure,

13   Mr. DeRita, what the number -- it was number 36.  Thank you.

14   Q.  And the top line here indicates, "Benson's Description

15   of His Projections Relied On By Dr. Dharan"; is that

16   correct?

17   A.  Yes.

18   Q.  All right.  Is this the only version of this slide that

19   you created?

20   A.  There might have been one with some more text on it; I

21   don't know.

22   Q.  There was different text on the prior version, correct?

23   A.  I think more text, but I don't recall.

24   Q.  All right.  Do you recall referring in the other slide

25   that was provided to Mr. Benson's testimony as, quote,

1    marketing spin, end quote?

2    A.  Might have been, yes.

3    Q.  Was that your characterization, your personal

4    characterization, that Mr. Benson's testimony or Mr. Benson

5    was testifying that his projections were, quote-unquote,

6    marketing spin?

7    A.  I thought it was kind of an answer that he had given

8    that included the word "marketing spin," but I don't recall

9    sitting here.

10   Q.  And as we saw in PX213, in 2012 Mr. Benson referred to

11   the next several years as "the golden age of earnings,"

12   correct?

13   A.  Yes.

14   Q.  And then it indicates February 28, 2020, Mr. Benson had

15   a different -- different spin, different take on what he had

16   said in 2012, correct?

17   A.  Well, are you referring to this text, or are you asking

18   about other text?

19   Q.  Well, you had referred to it as "marketing spin."

20   A.  I had not referred to it as "marketing" --

21        MR. HOFFMAN:  Objection, Your Honor.

22   A.  I think it was --

23        THE COURT:  Go ahead.

24        MR. HOFFMAN:  Objection, Your Honor.  He's talking

25   about a document that he hasn't put before the witness, and

1    there's no context of what he's asking about.  He's putting

2    words in the witness's mouth.

3              THE COURT:  You can finish.  You were trying to

4    answer that.  Go ahead.

5    A.  So what I'm saying is I don't know -- I don't believe

6    "marketing spin" were my words.  So I'm not really sure -- I

7    thought Mr. Benson was saying something, but I don't recall

8    sitting here.

9    Q.  All right.

10   A.  The other --

11   Q.  I'm sorry.  Go ahead, sir.

12   A.  The other point is even if the eight years were "the

13   golden years," as we saw, they weren't going to be able to

14   meet the dividend payments in most of those years, so I'm

15   not very sure what he meant when he said "golden years."

16             THE COURT:  It wasn't the golden age if they

17   immediately didn't make the payment, right?

18             THE WITNESS:  Yes.

19             THE COURT:  That's your point?

20             THE WITNESS:  Yes.

21             THE COURT:  So if he thought it was the golden

22   age, it turned out it wasn't.

23             THE WITNESS:  Well, if he thought that was the

24   golden age, then the normal periods would be much worse,

25   and, you know, the companies would just keep going down.

```
 1    BY MR. KRAVETZ:

 2    Q.  Now, we've seen a lot of projections and financial

 3    results the past couple of weeks, so I don't really want to

 4    belabor the topic, but I do want to display to you PX510,

 5    please.

 6              And, sir, do you recall whether PX510, which is

 7    "Updated Projections of Potential Draws for Fannie Mae and

 8    Freddie Mac," whether that was a document that was

 9    referenced in your expert report?

10    A.  It was.

11    Q.  It was.

12              And you're familiar with this document?

13    A.  Yes.

14              MR. KRAVETZ:  Your Honor, plaintiffs move for the

15    admission of Exhibit 510 at this time.

16              MR. HOFFMAN:  The Court's indulgence one moment.

17              Mr. Kravetz, what's the tab number?

18              MR. KRAVETZ:  30.

19              MR. HOFFMAN:  Your Honor, we object.  If I may be

20    heard on this briefly?

21              (The following is a bench conference

22               held outside the hearing of the jury)

23              MR. HOFFMAN:  Ian Hoffman on behalf of the

24    defendants.

25              Your Honor, we recognize this is an FHFA document
```

1    talking about projections, but the date here is October 26,

2    2012, and so I'm not sure of the relevance here of

3    projections that FHFA completed after execution of the Third

4    Amendment.

5              MR. KRAVETZ:  Your Honor, Robert Kravetz on behalf

6    of plaintiffs.  This document shows that it's actually based

7    off of results as of June 30, 2012.  So these are results

8    that were available to FHFA at the time of the Third

9    Amendment, even though it was published later.  And it gets

10   to what plaintiffs have argued previously, that there was

11   the ability to perform these types of narrowing projections

12   prior to the Second Amendment given that they did, in fact,

13   have results at the time.

14             MR. HOFFMAN:  Your Honor, if I may?  Ian Hoffman

15   again.

16             It's also far outside the scope of direct.

17   Dr. Attari didn't testify about any FHFA projections, and we

18   maintain my previously stated objections as well.

19             MR. KRAVETZ:  Your Honor, just briefly.

20   Dr. Attari did testify about a number of projections.  And,

21   again, it's clear this document is based on financial

22   results as of June 30, 2012, which would be clearly

23   relevant.  It's something that he would want to look at and

24   review in connection with his opinions, and he, in fact --

25             THE COURT:  I thought he said he did look and

```
 1    review.
 2              MR. KRAVETZ:  He did, Your Honor.  It's part of
 3    his appendix of materials that he did review.  And so I'd
 4    like to ask him about his review of this document in
 5    rendering his expert opinion in this matter.
 6              THE COURT:  The objection's overruled.
 7              Just so you know, I have a hard stop at 5:00.  I
 8    have the chief judge and the U.S. Attorney and others on a
 9    Zoom call that I have to do at 5:00, so I'm leaving at 5:00.
10              MR. KRAVETZ:  Yes, Your Honor.
11                   (This is the end of the bench conference)
12              MR. KRAVETZ:  The Court's indulgence.
13              THE COURT:  You can proceed.
14              MR. KRAVETZ:  Thank you, Your Honor.
15    BY MR. KRAVETZ:
16    Q.  This is a document that's referenced in your expert
17    materials, correct?
18    A.  I believe so.
19    Q.  So this is something that you would have reviewed?
20    A.  Yes.
21    Q.  All right.  Are you aware, sir, that -- and these are
22    projections of FHFA in October 2012 --
23    A.  Yes.
24    Q.  -- is that right?
25                   But it's based on data that was available as of
```

```
1    June 30, 2012, correct?
2    A.  I don't know what you mean by that.
3    Q.  Well, I'd ask if you could turn to Page 4, please.
4              MR. KRAVETZ:  And the next page, Mr. DeRita.
5              All right.  And if we can enlarge the bottom
6    portion, "October 2012, Projections."
7    Q.  And do you see the reference, sir, to actual financial
8    results for the first year of the projection period and the
9    October 2011 projections were substantially better than
10   projected?
11   A.  Uh-huh.
12             MR. KRAVETZ:  Okay.  We can back out for a moment.
13   Q.  Now, sir, in these particular projections that are based
14   off of information as of June 30, 2012, do you see that it
15   indicates that under the different modeling scenarios, that
16   there has been an improvement between these results as of
17   the first half of 2011 and the first half of 2012?  Is that
18   correct?
19   A.  I believe there would have been, but is there specific
20   text that you want me to look at?
21             I'll agree with you either way.
22   Q.  Well, it's referring to whether dividend payments were
23   subtracted from the draws that the draws -- the next
24   combined amounts of both enterprises would range from $67
25   billion to $138 billion.  Do you see that?
```

```
 1    A.  Just give me a second.

 2              (Pause)

 3              Yes, but I'm not sure how that is -- oh, in the

 4    previous one.  Okay, I see.

 5              But then there is also a change in the fact that

 6    they're not -- will not have to be any draws to pay

 7    dividends.

 8    Q.  Correct; as a result of the net worth sweep, correct?

 9    A.  Yes.

10    Q.  Okay.  And there's an indication that Freddie Mac would

11    not require any additional Treasury draws after calendar

12    year 2012, correct?

13    A.  Under the net worth sweep, yes.

14    Q.  And that under two of the three scenarios, that Fannie

15    Mae would not require any additional draws after 2012; is

16    that right?

17    A.  Yes.  So this is just saying that there would be no

18    losses after 2012 for Freddie Mac, and in two of the three

19    scenarios they weren't projecting losses for Fannie Mae.

20    Q.  Correct.

21              MR. KRAVETZ:  If we can enlarge the October 2012

22    projections.

23    Q.  Sir, do you see that in this document based on the

24    results of the first half of 2012, it's indicating that

25    updated projections of financial results for the remaining
```

1    two and a half years of the projection period are

2    substantially better than in previous projections?  Is that

3    correct?

4    A.  Yes.

5    Q.  And that's the terminology that FHFA used based on

6    information that could have been available as of the time of

7    the net worth sweep?

8    A.  Yes, but this doesn't say anything about the circular

9    draws.  It's just saying that now that we have switched to

10   this new policy, we don't anticipate draws in any of the

11   scenarios for Freddie Mac and only in one of the three -- or

12   two of the three for Fannie Mae.

13   Q.  Well, in that particular bullet point there's no

14   reference to circular draws.  It's simply saying that the

15   updated projections are, quote, substantially better, end

16   quote?

17   A.  Oh, yes.  2012 June was substantially better than 2011

18   June.

19   Q.  But not just that.  Moving forward the projection is

20   going to be -- it will be substantially better?

21   A.  Yes, but we already saw the projection for Fannie Mae

22   that showed that they still wouldn't be able to meet the

23   dividends.

24        MR. KRAVETZ:  If we can display Plaintiff's

25   Exhibit 304, please.

1           MR. HOFFMAN:  Tab number, please?

2           MR. KRAVETZ:  Tab No. 19.

3           MR. HOFFMAN:  Thank you.

4           MR. KRAVETZ:  All right.  I'll ask if Mr. DeRita

5    can please turn to Page 19.

6    Q.  And just for the record, this is a document entitled

7    "FHFA's Scenarios as of September 10, 2012."  Is that

8    correct?

9    A.  Yes, I believe so, and produced by Fannie Mae.

10          MR. KRAVETZ:  And if we can enlarge the bottom

11   portion.

12   Q.  "FHFA Base Scenario and September 2012 Board Forecast

13   Reflect Actual Results Through July 2012."  Do you see that,

14   sir?

15   A.  Yes.

16          MR. KRAVETZ:  Your Honor, we move for the

17   admission of Exhibit 304.

18          THE COURTROOM DEPUTY:  It's already in.

19          MR. KRAVETZ:  Oh, it's in?  I'm sorry.  I didn't

20   see it on the screen.

21   Q.  All right.  Now, sir, at this time the actual results

22   through July of 2012, do you see that it references $65

23   billion?  Is that correct?

24   A.  Yes.

25          MR. KRAVETZ:  All right.  If I can ask Mr. DeRita

1    to put side by side Plaintiff's Exhibit 223, at Page 7, and

2    compare that, sir, at 304, Page 20.

3             One page up, Mr. DeRita, on the page on the right,

4    Page 19 on the right.  All right.

5    Q.  And so we just saw as of July the results.  The

6    comprehensive income attributable to Fannie Mac [sic] actual

7    results as of July were $65 billion, correct?

8    A.  Well, I don't think these are actual.  These are a

9    projection for five years; 2012, '13, '14, '15, and '16.

10   Q.  And it's based off of actual results, correct?

11   A.  Actual through July, yes.

12            MR. KRAVETZ:  Okay.  And if we could compare that,

13   Mr. DeRita, to Bullet Point 6 on the executive summary on

14   the other page, if you can enlarge that.

15   Q.  And so these were the results as of May 2012, a forecast

16   of $56 billion; is that right?

17   A.  Yes, that's what it says.

18   Q.  And that's based on the actual results as of May?

19   A.  Yes.

20   Q.  All right.  But in July, based on the actual results in

21   July, the forecast had gone up from $56 billion to $65

22   billion; is that correct?

23   A.  Well, in September based on the actual results through

24   July.

25   Q.  Based on the results from July?

```
 1    A.   Through July.

 2    Q.   Right.

 3    A.   Through July 31st.

 4    Q.   And July would have been before the date of the net

 5    worth sweep, correct?

 6    A.   Yes.

 7    Q.   Okay.

 8    A.   But on July 31st you wouldn't have known this.

 9    Q.   On July 31st, correct?

10    A.   Yes, you wouldn't have known this.

11    Q.   Well, the actual results would have been available

12    internally, correct?

13    A.   I assume so.

14    Q.   Okay.  Just probably the last few quick questions today.

15         You testified about the possibility of a payment-

16    in-kind option under the PSPAs.  Do you recall that?

17    A.   Yes.  I testified what would happen if they switched to

18    that.

19    Q.   All right.  So under your understanding of the PSPAs, if

20    the dividend is not paid in cash, it would accrue at a 12

21    percent rate and then be added to the liquidation preference

22    of the PSPA; is that right?

23    A.   The dividend that was not paid would be added to the

24    liquidation preference of the PSPAs, and then dividend would

25    start accruing at a 12 percent rate on the entire amount.
```

1    Q.  And those noncash dividends would then be added to the

2    liquidation preference at that 12 percent rate?

3    A.  Those noncash -- yes, but you'd be paying 12 on the

4    entire liquidation preference.

5    Q.  Now, under that option, that would not have required a

6    draw-down of the commitment, correct?

7    A.  Yes, it would not.

8    Q.  And under the liquidation preference that was in place,

9    debt investors -- and we saw the chart where you had MBS and

10   debt investors at the top -- they actually had priority over

11   equity investors, right?

12   A.  Yes.

13   Q.  And Treasury was, in fact, an equity investor?

14   A.  Yes.

15   Q.  All right.  So Treasury -- the debt investors would have

16   had priority over Treasury under the liquidation preference?

17   A.  Yes.

18   Q.  Okay.  So -- and that would be no matter how large the

19   liquidation preference grew, correct?

20   A.  I think if they had done that, which is stop paying

21   dividends to Treasury, it would have freaked everyone out

22   and been the end of the story.

23   Q.  Right.  But that's not my question.

24          I'm just asking, just in general, they would have

25   priority regardless of how large it would grow?

```
 1    A.   Priority in bankruptcy, yes.
 2    Q.   Okay.  Now -- but the net worth sweep transferred over
 3    $111 billion over and above the 10 percent dividend in 2013,
 4    correct?
 5    A.   I don't know where you're getting that number from or
 6    what you -- you want to show me something?
 7    Q.   Sure.  If we can display --
 8              THE COURT:  10:00 tomorrow morning.
 9              MR. KRAVETZ:  Okay, Your Honor.
10              THE COURT:  The Court will be in recess.
11              Don't talk about the case.  See you all tomorrow
12    morning at 10:00.
13              (Whereupon the hearing was
14               adjourned at 4:57 p.m.)
15
16
17
18
19
20
21
22
23
24
25
```

1                    <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

2

3              I, LISA A. MOREIRA, RDR, CRR, do hereby

4     certify that the above and foregoing constitutes a true and

5     accurate transcript of my stenographic notes and is a full,

6     true and complete transcript of the proceedings to the best

7     of my ability.

8          Dated this 27th day of October, 2022.

9

10                              <u>/s/Lisa A. Moreira, RDR, CRR</u>
                                Official Court Reporter
11                              United States Courthouse
                                Room 6718
12                              333 Constitution Avenue, NW
13                              Washington, DC 20001

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$1.16** [4] - 2035:21, 2035:24, 2041:13, 2042:3
**$100** [4] - 2035:13, 2065:6, 2065:8, 2071:13
**$111** [2] - 2094:17, 2147:3
**$125** [3] - 2094:5, 2095:11, 2095:18
**$138** [1] - 2140:25
**$149** [1] - 2060:25
**$150** [1] - 2095:12
**$18** [3] - 2107:9, 2107:13, 2107:19
**$200** [1] - 2035:13
**$23** [1] - 2034:11
**$250** [1] - 2129:19
**$258** [2] - 2025:20, 2040:4
**$500** [1] - 2071:10
**$550** [1] - 2071:11
**$56** [2] - 2144:16, 2144:21
**$65** [4] - 2079:19, 2143:22, 2144:7, 2144:21
**$67** [1] - 2140:24
**$710** [3] - 2112:4, 2112:5, 2112:19
**$75** [1] - 2071:11
**$85** [3] - 2032:14, 2034:3, 2079:18

## '

**'12** [1] - 2111:5
**'13** [1] - 2144:9
**'14** [1] - 2144:9
**'15** [1] - 2144:9
**'16** [1] - 2144:9
**'6** [1] - 2114:14
**'8** [1] - 2046:8
**'90s** [1] - 2046:18
**'post** [2] - 2123:1, 2123:7
**'post-nup'** [2] - 2123:1, 2123:7

## /

**/s/Lisa** [1] - 2148:10

## 0

**0.0045** [1] - 2040:1
**0.1** [1] - 2116:23
**0.131** [1] - 2116:17
**0.4** [1] - 2061:1

**0.45** [3] - 2035:3, 2035:7, 2038:1
**0.61** [2] - 2068:10, 2068:11

## 1

**1** [11] - 2024:8, 2024:11, 2034:6, 2037:5, 2061:6, 2062:4, 2069:8, 2070:3, 2080:2, 2117:4, 2131:10
**1,000** [1] - 2125:1
**1.7** [1] - 2034:6
**1/20** [1] - 2035:3
**10** [17] - 2027:21, 2028:5, 2032:1, 2037:7, 2042:7, 2060:18, 2061:6, 2070:16, 2084:3, 2094:17, 2106:19, 2106:25, 2107:5, 2130:8, 2132:1, 2143:7, 2147:3
**10%** [4] - 2064:13, 2064:16, 2065:1, 2131:12
**10-K** [3] - 2111:14, 2111:18, 2112:9
**10-Qs** [1] - 2070:13
**100** [4] - 2062:4, 2062:24, 2082:6, 2082:8
**10020** [1] - 2019:4
**10:00** [3] - 2021:7, 2147:8, 2147:12
**10th** [1] - 2078:6
**11** [1] - 2057:24
**11.3** [1] - 2116:22
**111** [1] - 2059:18
**12** [6] - 2078:12, 2083:25, 2145:20, 2145:25, 2146:2, 2146:3
**12/31/2012** [1] - 2115:10
**125** [3] - 2052:25, 2068:20, 2094:7
**1251** [1] - 2019:4
**12:00** [1] - 2021:16
**13.1** [1] - 2116:17
**1401** [1] - 2018:23
**14th** [1] - 2107:25
**15** [7] - 2049:9, 2049:10, 2049:12, 2049:14, 2117:2, 2117:3, 2127:20
**1523** [1] - 2018:17
**16** [6] - 2033:20,

2049:19, 2077:25, 2087:12, 2088:19
**163** [1] - 2111:11
**17** [6] - 2049:13, 2049:17, 2086:15, 2120:9, 2120:22, 2122:23
**17th** [1] - 2115:15
**18** [4] - 2086:16, 2119:16, 2122:19, 2122:21
**185** [1] - 2111:21
**188** [1] - 2082:9
**19** [4] - 2087:15, 2143:2, 2143:5, 2144:4
**19087** [1] - 2018:20
**198** [1] - 2082:9
**1992** [2] - 2048:9, 2048:16
**1:00** [2] - 2021:16, 2021:17
**1:13-cv-01053-RCL** [1] - 2018:3
**1:13-cv-1288** [1] - 2018:9
**1:43** [1] - 2018:5

## 2

**2** [4] - 2037:5, 2069:15, 2070:10, 2092:11
**2,000** [1] - 2068:19
**2,500** [1] - 2052:10
**2,513** [1] - 2053:6
**2.3** [1] - 2034:13
**2.5** [4] - 2036:13, 2069:21, 2073:7, 2074:3
**2.6** [1] - 2088:10
**20** [2] - 2043:24, 2144:2
**20001** [3] - 2019:10, 2019:14, 2148:13
**20005** [1] - 2018:23
**2002** [2] - 2044:22, 2044:24
**20036** [1] - 2018:17
**2005** [1] - 2114:14
**2006** [4] - 2046:4, 2049:12, 2049:13, 2049:18
**2007** [2] - 2046:8, 2114:13
**2008** [14] - 2031:6, 2033:19, 2033:20, 2046:18, 2046:21, 2077:6, 2077:25, 2078:6, 2085:25,

2090:3, 2090:4, 2090:9, 2110:12, 2115:4
**2009** [2] - 2049:1, 2098:6
**2010** [2] - 2024:11, 2026:8
**2011** [7] - 2059:9, 2111:5, 2111:25, 2112:18, 2140:9, 2140:17, 2142:17
**2012** [49] - 2036:24, 2040:7, 2069:7, 2069:11, 2069:15, 2094:21, 2098:6, 2098:11, 2100:4, 2101:18, 2105:25, 2107:25, 2108:3, 2108:6, 2108:9, 2108:18, 2110:1, 2114:23, 2115:1, 2115:7, 2120:9, 2122:23, 2125:2, 2131:17, 2132:24, 2133:3, 2133:24, 2135:10, 2135:16, 2138:2, 2138:7, 2138:22, 2139:22, 2140:1, 2140:6, 2140:14, 2140:17, 2141:12, 2141:15, 2141:18, 2141:21, 2141:24, 2142:17, 2143:7, 2143:12, 2143:13, 2143:22, 2144:9, 2144:15
**2013** [6] - 2060:25, 2094:15, 2094:19, 2094:20, 2095:9, 2147:3
**202** [1] - 2019:14
**2020** [1] - 2135:14
**2022** [2] - 2018:5, 2148:8
**2030** [2] - 2117:2, 2117:3, 2117:4
**213** [1] - 2133:9
**223** [1] - 2144:1
**23,000** [1] - 2068:19
**23.4** [3] - 2041:11, 2042:12, 2043:6
**25** [6] - 2061:1, 2062:3, 2062:18, 2062:21, 2062:23, 2062:24
**25,000** [1] - 2068:18
**258.1** [1] - 2040:6
**26** [1] - 2138:1
**27** [1] - 2018:5
**27th** [1] - 2148:8

**28** [1] - 2135:14
**280** [1] - 2018:19
**282** [1] - 2121:6
**29** [1] - 2026:8
**2:00** [4] - 2021:3, 2021:6, 2021:17, 2021:20
**2C** [1] - 2091:4
**2E** [2] - 2085:11, 2085:12

## 3

**3** [4] - 2044:16, 2069:15, 2070:11, 2078:16
**3.4** [2] - 2081:22, 2081:25
**3.5** [1] - 2034:12
**30** [7] - 2040:7, 2085:25, 2137:18, 2138:7, 2138:22, 2140:1, 2140:14
**304** [3] - 2142:25, 2143:17, 2144:2
**31** [1] - 2131:17
**31st** [4] - 2115:12, 2145:3, 2145:8, 2145:9
**32** [2] - 2063:16, 2111:8
**32,343** [1] - 2053:10
**333** [2] - 2019:3, 2148:12
**35,000** [4] - 2067:11, 2068:13, 2068:23, 2068:24
**354-3187** [1] - 2019:14
**36** [1] - 2134:13
**38** [3] - 2068:14, 2068:25, 2069:3
**3Q** [1] - 2059:10

## 4

**4** [3] - 2069:21, 2080:1, 2140:3
**412** [1] - 2104:23
**44** [1] - 2116:5
**45** [9] - 2023:19, 2034:24, 2035:2, 2036:14, 2040:1, 2040:13, 2073:7, 2074:3, 2087:14
**45-basis-point** [2] - 2037:12, 2076:2
**46** [1] - 2115:20
**4:57** [1] - 2147:14

## 5

**5** [3] - 2022:12, 2104:25, 2106:6
**50** [1] - 2062:24
**51** [1] - 2032:7
**510** [1] - 2137:15
**52** [3] - 2052:22, 2052:24, 2076:10
**53** [1] - 2052:22
**5:00** [3] - 2139:7, 2139:9

## 6

**6** [2] - 2107:21, 2144:13
**6.4** [1] - 2124:20
**60** [1] - 2075:10
**601** [1] - 2019:9
**61** [1] - 2068:6
**67** [1] - 2111:22
**6718** [2] - 2019:13, 2148:12

## 7

**7** [3] - 2021:3, 2033:19, 2044:1
**75** [3] - 2062:24, 2079:5, 2079:6
**79.9** [2] - 2024:9, 2034:9

## 8

**8** [2] - 2104:25, 2106:6
**8.5** [4] - 2034:17, 2034:18, 2035:6, 2078:23
**85** [2] - 2111:9, 2111:12
**850** [1] - 2078:25
**89** [1] - 2050:3

## 9

**93** [1] - 2082:8
**94** [2] - 2082:6, 2082:8

## A

**ability** [5] - 2069:19, 2070:9, 2113:22, 2138:11, 2148:7
**able** [11] - 2032:22, 2033:23, 2036:17, 2042:21, 2054:24, 2072:5, 2075:2, 2093:12, 2112:21, 2136:13, 2142:22
**Abrahams** [4] -

2105:11, 2105:14, 2105:19, 2106:16
**Abrahams's** [1] - 2107:4
**ABS** [3] - 2086:8, 2086:9, 2088:23
**absence** [1] - 2058:19
**academic** [2] - 2126:2, 2126:22
**accelerated** [2] - 2123:12, 2123:13
**accept** [3] - 2068:16, 2073:23, 2133:14
**accepted** [1] - 2126:6
**access** [10] - 2036:17, 2036:22, 2093:1, 2101:3, 2101:11, 2101:25, 2102:1, 2102:2, 2102:5, 2103:6
**accommodate** [2] - 2021:3, 2021:22
**according** [3] - 2032:3, 2048:12, 2131:15
**Accordingly** [1] - 2027:23
**accounting** [3] - 2047:15, 2048:13, 2048:19
**accounts** [1] - 2128:14
**accrue** [1] - 2145:20
**accruing** [1] - 2145:25
**accurate** [1] - 2148:5
**acknowledge** [1] - 2053:17
**acknowledged** [1] - 2119:18
**acted** [3] - 2058:9, 2080:7, 2090:23
**acting** [1] - 2058:13
**ACTION** [1] - 2018:10
**actions** [1] - 2104:1
**active** [2] - 2124:16, 2128:2
**actual** [14] - 2084:16, 2102:3, 2102:12, 2140:7, 2143:13, 2143:21, 2144:6, 2144:8, 2144:10, 2144:11, 2144:18, 2144:20, 2144:23, 2145:11
**added** [4] - 2041:2, 2145:21, 2145:23, 2146:1
**addition** [3] - 2069:3, 2069:4, 2069:16
**additional** [10] - 2027:25, 2028:3,

2028:4, 2028:12, 2028:15, 2053:9, 2094:17, 2118:9, 2141:11, 2141:15
**adequacy** [1] - 2093:8
**adequate** [1] - 2022:4
**adjourned** [1] - 2147:14
**adjust** [1] - 2116:21
**adjusting** [1] - 2040:11
**administers** [1] - 2036:6
**admission** [3] - 2121:6, 2137:15, 2143:17
**admitted** [3] - 2084:19, 2085:11
**adopted** [1] - 2043:4
**advance** [1] - 2044:13
**adverse** [1] - 2069:23
**affected** [1] - 2077:1
**AFTERNOON** [1] - 2018:12
**afternoon** [8] - 2021:11, 2022:24, 2022:25, 2043:13, 2043:21, 2043:22, 2096:2, 2096:3
**age** [6] - 2101:13, 2101:21, 2135:11, 2136:16, 2136:22, 2136:24
**agencies** [14] - 2096:9, 2096:11, 2096:23, 2097:11, 2099:11, 2099:25, 2100:5, 2101:17, 2106:19, 2107:17, 2109:12, 2109:18, 2110:1, 2119:7
**agency** [3] - 2080:17, 2096:8, 2099:4
**Agency** [1] - 2019:6
**AGENCY** [1] - 2018:6
**agenda** [1] - 2105:22
**ago** [1] - 2027:1
**agree** [15] - 2023:21, 2040:13, 2052:8, 2054:3, 2057:21, 2066:15, 2066:23, 2068:25, 2069:2, 2082:4, 2094:6, 2132:21, 2132:22, 2133:2, 2140:21
**agreed** [6] - 2057:8, 2057:17, 2057:19, 2057:21, 2065:5, 2065:7
**agreement** [2] -

2079:3, 2123:7
**Agreement** [2] - 2026:24, 2123:1
**AGREEMENT** [1] - 2018:10
**ahead** [7] - 2066:4, 2077:15, 2113:11, 2128:18, 2135:23, 2136:4, 2136:11
**AIG** [31] - 2032:9, 2032:10, 2032:13, 2032:17, 2032:21, 2033:8, 2033:13, 2033:14, 2033:19, 2033:21, 2033:22, 2033:25, 2034:3, 2034:5, 2034:13, 2034:16, 2034:18, 2035:9, 2076:9, 2076:11, 2076:16, 2077:8, 2077:9, 2077:14, 2077:15, 2077:20, 2077:21, 2078:11, 2078:19, 2079:14
**AIG's** [1] - 2034:10
**al** [2] - 2018:3, 2018:7
**all-in** [4] - 2066:25, 2067:4, 2069:20, 2073:14
**alleged** [1] - 2083:9
**allow** [1] - 2109:18
**allowed** [2] - 2077:11, 2094:25
**allowing** [1] - 2077:14
**almost** [2] - 2034:14, 2082:5
**alone** [2] - 2034:13, 2037:7
**aloud** [2] - 2060:23, 2089:6
**alphabetically** [1] - 2060:6
**alternative** [2] - 2023:17, 2107:4
**amended** [1] - 2079:3
**amending** [1] - 2131:6
**amendment** [2] - 2051:9, 2104:13
**Amendment** [31] - 2031:19, 2031:24, 2036:25, 2041:17, 2042:6, 2058:18, 2058:20, 2079:22, 2080:8, 2081:11, 2090:24, 2094:7, 2098:10, 2099:24, 2104:2, 2104:3, 2104:4, 2104:17, 2115:25, 2116:12,

2116:14, 2116:22, 2117:7, 2117:8, 2117:10, 2124:6, 2126:17, 2138:4, 2138:9, 2138:12
**American** [2] - 2027:8, 2028:1
**Americas** [1] - 2019:4
**amount** [10] - 2026:22, 2031:7, 2041:23, 2041:25, 2098:16, 2110:23, 2111:24, 2112:22, 2119:7, 2145:25
**amounts** [8] - 2031:8, 2040:18, 2078:22, 2095:6, 2095:8, 2095:10, 2128:9, 2140:24
**analyses** [1] - 2102:17
**analysis** [18] - 2044:12, 2054:3, 2074:21, 2075:7, 2075:8, 2075:12, 2075:14, 2075:15, 2075:16, 2075:21, 2102:20, 2112:7, 2116:19, 2118:12, 2126:25, 2127:21, 2128:1
**analyst** [23] - 2100:9, 2100:10, 2100:13, 2100:14, 2100:22, 2100:23, 2101:14, 2101:20, 2102:2, 2103:3, 2103:9, 2103:11, 2103:14, 2103:18, 2103:25, 2104:12, 2104:17, 2105:5, 2105:6, 2105:15, 2105:17, 2105:18, 2107:15
**analysts** [6] - 2100:15, 2101:2, 2101:17, 2101:24, 2102:18, 2103:5
**analyzed** [2] - 2053:6, 2053:10
**annual** [6] - 2041:23, 2042:12, 2061:1, 2106:19, 2131:12, 2132:1
**annually** [3] - 2035:21, 2035:25, 2041:22
**answer** [9] - 2055:16, 2055:18, 2071:8, 2074:1, 2119:22, 2133:14, 2135:7, 2136:4
**anticipate** [1] -

2142:10
**anticipated** [1] -
2067:1
**anxious** [1] - 2021:4
**apart** [2] - 2062:12,
2067:20
**apologize** [1] - 2123:8
**APPEARANCES** [2] -
2018:15, 2019:1
**appendix** [2] -
2050:12, 2139:3
**Appendix** [8] - 2052:2,
2059:12, 2059:25,
2060:1, 2085:18,
2124:10, 2124:12
**apples** [5] - 2030:23,
2035:14, 2035:15,
2040:16, 2043:3
**apples-to-oranges** [1]
- 2040:16
**applied** [7] - 2037:17,
2041:8, 2042:3,
2042:6, 2064:15,
2073:3, 2074:23
**applies** [4] - 2037:16,
2038:8, 2041:9,
2093:2
**apply** [3] - 2037:19,
2074:3, 2119:2
**appointed** [1] - 2092:3
**appreciate** [3] -
2021:24, 2022:3,
2023:2
**appreciates** [1] -
2041:15
**approach** [7] - 2037:9,
2037:10, 2043:4,
2052:17, 2126:13,
2126:18, 2126:20
**approached** [1] -
2115:11
**appropriate** [11] -
2023:9, 2023:14,
2025:15, 2040:14,
2040:22, 2041:7,
2041:8, 2042:10,
2064:10, 2072:17,
2072:24
**appropriately** [1] -
2073:3
**area** [8] - 2044:6,
2046:21, 2046:23,
2047:2, 2047:5,
2047:14, 2073:18,
2073:24
**areas** [1] - 2044:10
**arguably** [1] - 2109:12
**argued** [1] - 2138:10
**argument** [2] -
2040:21, 2042:11

**arm** [1] - 2048:15
**ARNOLD** [1] - 2019:9
**arrive** [1] - 2030:4
**arrives** [1] - 2042:25
**ASIM** [1] - 2019:7
**assess** [1] - 2081:6
**assessed** [2] -
2038:21, 2073:8
**assessing** [2] -
2072:23, 2080:14
**assessment** [10] -
2038:10, 2038:11,
2038:15, 2038:23,
2040:23, 2041:1,
2062:19, 2074:23,
2075:4, 2080:7
**assessments** [4] -
2039:2, 2039:4,
2102:22, 2103:1
**asset** [3] - 2076:23,
2086:10, 2086:11
**asset-backed** [2] -
2086:10, 2086:11
**assets** [14] - 2032:22,
2032:24, 2033:4,
2033:22, 2033:24,
2037:17, 2037:20,
2038:24, 2039:12,
2041:1, 2041:2,
2075:23, 2103:13
**assignment** [3] -
2050:10, 2054:23,
2080:6
**assignments** [3] -
2045:25, 2048:4,
2080:4
**assistance** [3] -
2077:10, 2077:20,
2077:21
**associated** [3] -
2030:21, 2030:22,
2089:20
**assume** [6] - 2057:4,
2064:15, 2107:13,
2130:3, 2133:14,
2145:13
**assumed** [2] -
2056:18, 2057:5
**assuming** [5] -
2040:21, 2041:6,
2041:7, 2042:9,
2049:11
**assumption** [2] -
2057:9, 2062:17
**assumptions** [9] -
2056:15, 2057:1,
2057:3, 2058:3,
2061:13, 2061:18,
2061:19, 2061:21,
2062:21

**assured** [1] - 2021:10
**Atlanta** [1] - 2049:11
**attached** [2] - 2045:11,
2086:17
**attaining** [1] - 2093:22
**Attari** [15] - 2022:24,
2033:10, 2042:15,
2043:9, 2043:21,
2063:6, 2079:21,
2090:20, 2096:2,
2120:6, 2122:18,
2122:20, 2132:9,
2138:17, 2138:20
**ATTARI** [2] - 2020:3,
2022:21
**Attari's** [4] - 2024:4,
2029:21, 2035:18,
2038:19
**attempt** [1] - 2058:18
**attempted** [2] -
2127:9, 2127:11
**attempts** [1] - 2059:2
**attend** [1] - 2082:19
**attention** [2] -
2052:24, 2087:14
**Attorney** [1] - 2139:8
**Attributable** [1] -
2115:25
**attributable** [1] -
2116:22, 2144:6
**attributing** [2] -
2122:2, 2125:21
**auditor** [2] - 2048:19,
2048:21
**August** [6] - 2069:7,
2069:15, 2098:6,
2115:15, 2120:9,
2122:23
**author** [6] - 2081:5,
2105:15, 2105:19,
2122:13, 2122:15,
2122:16
**authored** [1] - 2046:3
**authority** [1] - 2089:7
**authorized** [1] -
2088:7
**authors** [1] - 2100:16
**available** [13] - 2025:8,
2025:21, 2060:25,
2071:21, 2083:19,
2102:13, 2102:14,
2121:22, 2125:8,
2138:8, 2139:25,
2142:6, 2145:11
**Avenue** [6] - 2018:17,
2018:23, 2019:4,
2019:9, 2019:13,
2148:12
**average** [3] - 2038:24,
2038:25, 2068:5

**aware** [24] - 2023:5,
2023:12, 2053:13,
2056:14, 2056:25,
2058:8, 2058:17,
2058:25, 2068:4,
2069:20, 2071:14,
2074:14, 2075:1,
2075:5, 2075:6,
2076:4, 2078:1,
2081:9, 2081:19,
2082:22, 2108:8,
2124:25, 2125:3,
2139:21

# B

**backed** [5] - 2044:12,
2076:24, 2086:10,
2086:11, 2129:23
**background** [1] -
2043:24
**backing** [2] - 2106:23,
2106:24
**backstop** [1] - 2077:17
**bad** [1] - 2109:2
**bank** [17] - 2021:22,
2039:1, 2039:4,
2052:10, 2066:12,
2066:17, 2066:23,
2067:8, 2067:12,
2069:14, 2069:21,
2070:23, 2071:4,
2071:9, 2071:15,
2072:3
**Bank** [2] - 2105:6
**bank's** [1] - 2038:23
**banking** [1] - 2067:12
**bankrupt** [1] - 2065:24
**bankruptcy** [1] -
2147:1
**banks** [22] - 2030:6,
2030:25, 2031:7,
2031:8, 2031:11,
2036:7, 2036:9,
2036:13, 2036:16,
2040:17, 2040:18,
2067:13, 2068:6,
2072:22, 2073:9,
2074:8, 2074:16,
2074:18, 2075:22,
2076:5, 2093:3
**banks'** [1] - 2069:19
**BARNES** [1] - 2018:16
**base** [15] - 2038:9,
2038:10, 2038:11,
2038:15, 2038:20,
2038:23, 2039:22,
2039:23, 2040:23,
2041:1, 2041:4,
2041:5, 2074:23,
2075:4, 2143:12

**based** [24] - 2024:15,
2025:16, 2028:8,
2039:12, 2055:25,
2060:24, 2061:12,
2061:13, 2073:17,
2073:21, 2083:10,
2083:22, 2099:12,
2138:6, 2138:21,
2139:25, 2140:13,
2141:23, 2142:5,
2144:10, 2144:18,
2144:20, 2144:23,
2144:25
**basic** [1] - 2039:21
**basis** [32] - 2023:19,
2034:25, 2035:2,
2036:13, 2036:14,
2040:1, 2040:14,
2061:1, 2062:3,
2062:4, 2062:18,
2062:21, 2062:23,
2068:6, 2068:14,
2068:25, 2069:4,
2073:7, 2074:3,
2074:17, 2076:6,
2078:25, 2079:5,
2079:6, 2102:8,
2102:12, 2102:13,
2116:17, 2116:23,
2128:10, 2130:8,
2131:23
**basis-point** [1] -
2069:4
**Bates** [5] - 2059:19,
2060:9, 2085:15,
2130:21, 2133:13
**bear** [1] - 2127:16
**bearings** [1] - 2063:17
**became** [1] - 2079:10
**become** [1] - 2117:9
**BEFORE** [1] - 2018:13
**began** [1] - 2114:13
**beginning** [4] -
2060:25, 2065:3,
2106:8, 2121:2
**behalf** [3] - 2022:19,
2043:14, 2137:23,
2138:5
**belabor** [1] - 2137:4
**belief** [1] - 2027:6
**believes** [1] - 2027:24
**below** [2] - 2079:9,
2130:21
**bench** [2] - 2137:21,
2139:11
**benchmark** [3] -
2127:2, 2128:19,
2128:21
**benchmarks** [3] -
2028:17, 2028:18,

2043:1
**beneficial** [1] - 2033:15
**Benson** [9] - 2032:4, 2133:19, 2133:21, 2134:4, 2134:8, 2135:4, 2135:10, 2135:14, 2136:7
**Benson's** [4] - 2133:25, 2134:14, 2134:25, 2135:4
**berg** [1] - 2053:10
**BERGER** [1] - 2019:3
**BERGMAN** [1] - 2019:7
**Berkley** [1] - 2018:16
**BERNSTEIN** [1] - 2019:3
**best** [3] - 2037:11, 2109:12, 2148:6
**better** [10] - 2032:25, 2080:12, 2108:23, 2126:6, 2126:7, 2140:9, 2142:2, 2142:15, 2142:17, 2142:20
**between** [8] - 2051:16, 2061:5, 2071:4, 2098:5, 2103:6, 2113:3, 2113:24, 2140:16
**beyond** [1] - 2094:16
**big** [1] - 2077:8
**bigger** [1] - 2041:13
**billion** [54] - 2024:9, 2025:20, 2032:14, 2034:3, 2034:4, 2034:6, 2034:7, 2034:11, 2034:12, 2034:13, 2035:13, 2035:21, 2035:24, 2037:5, 2037:6, 2040:4, 2040:6, 2041:11, 2041:13, 2042:3, 2042:12, 2043:6, 2060:25, 2061:1, 2065:6, 2065:8, 2070:3, 2070:10, 2070:11, 2071:13, 2079:19, 2094:5, 2094:18, 2095:11, 2095:12, 2095:18, 2107:9, 2107:14, 2107:19, 2112:4, 2112:5, 2112:19, 2124:20, 2129:19, 2140:25, 2143:23, 2144:7, 2144:16, 2144:21, 2144:22, 2147:3
**billions** [2] - 2103:12, 2110:15
**binder** [2] - 2063:13, 2120:21
**binders** [1] - 2043:15
**bit** [8] - 2031:17, 2032:1, 2037:21, 2065:15, 2080:12, 2100:9, 2115:23, 2132:21
**board** [1] - 2143:12
**BOIES** [1] - 2018:22
**bond** [30] - 2100:2, 2113:4, 2113:12, 2113:20, 2115:1, 2116:7, 2116:17, 2116:24, 2117:2, 2117:6, 2117:7, 2117:12, 2118:8, 2118:24, 2119:8, 2120:1, 2123:22, 2124:13, 2124:15, 2124:16, 2125:22, 2126:3, 2128:3, 2128:11, 2129:11, 2129:23, 2130:4, 2130:8
**Bond** [1] - 2115:25
**bondholders** [1] - 2029:7
**bonds** [49] - 2046:14, 2046:24, 2046:25, 2098:19, 2113:13, 2113:24, 2114:3, 2116:20, 2117:1, 2117:5, 2117:9, 2117:11, 2119:2, 2119:4, 2119:6, 2119:11, 2124:7, 2124:23, 2125:1, 2125:5, 2125:8, 2125:12, 2125:14, 2125:23, 2126:4, 2126:11, 2126:14, 2126:15, 2127:2, 2127:3, 2127:12, 2127:13, 2128:3, 2128:4, 2128:8, 2128:15, 2128:19, 2128:20, 2128:21, 2128:23, 2128:24, 2129:3, 2129:6, 2129:16, 2129:20, 2129:21, 2130:16
**book** [1] - 2052:3
**books** [2] - 2109:9, 2109:11
**borrow** [2] - 2032:17, 2032:22
**borrower** [4] - 2032:24, 2069:13, 2069:17, 2113:22
**borrowers** [2] - 2067:13, 2071:22
**bottom** [11] - 2029:9, 2030:10, 2030:11, 2042:16, 2059:19, 2063:12, 2085:14, 2105:9, 2107:23, 2140:5, 2143:10
**bottom-line** [1] - 2042:16
**break** [1] - 2037:21
**breaking** [1] - 2095:21
**BRIAN** [1] - 2018:16
**briefly** [2] - 2137:20, 2138:19
**bring** [1] - 2110:4
**broad** [2] - 2044:10, 2089:7
**Brothers** [1] - 2077:11
**bucket** [1] - 2031:13
**build** [1] - 2092:25
**Bullet** [1] - 2144:13
**bullet** [3] - 2060:22, 2062:1, 2142:13
**but..** [1] - 2125:6
**buyers** [1] - 2121:21
**BY** [5] - 2022:23, 2043:20, 2096:1, 2137:1, 2139:15

## C

**CA** [1] - 2018:3
**calculate** [1] - 2072:14
**calculates** [3] - 2037:22, 2038:15, 2040:3
**calculation** [7] - 2039:17, 2040:8, 2040:9, 2042:2, 2042:9, 2042:12
**calculations** [1] - 2118:11
**calendar** [1] - 2141:11
**callable** [2] - 2126:10, 2128:8
**callout** [2] - 2024:13, 2026:5
**CAMELS** [2] - 2093:6
**cap** [3] - 2098:10, 2106:12, 2117:13
**capacity** [1] - 2072:4
**Capital** [2] - 2031:1, 2031:5
**capital** [45] - 2028:23, 2028:25, 2030:7, 2031:7, 2031:9, 2031:11, 2031:16, 2031:20, 2031:22, 2031:23, 2031:25, 2032:5, 2036:18, 2036:21, 2036:22, 2037:1, 2037:6, 2037:18, 2037:19, 2040:19, 2041:3, 2046:19, 2071:24, 2072:4, 2075:25, 2092:21, 2092:25, 2093:1, 2093:8, 2093:13, 2093:14, 2093:15, 2093:18, 2093:22, 2093:24, 2093:25, 2095:1, 2095:2, 2095:5, 2095:6, 2095:8, 2095:12, 2095:19, 2121:1
**capitalized** [1] - 2074:7
**capped** [1] - 2106:13
**caps** [6] - 2100:3, 2115:10, 2131:13, 2131:16, 2132:2
**career** [1] - 2047:19
**carry** [1] - 2059:21
**case** [26] - 2023:5, 2024:16, 2034:10, 2049:23, 2050:24, 2053:20, 2054:6, 2054:14, 2054:19, 2055:20, 2058:9, 2059:1, 2063:7, 2071:5, 2080:4, 2099:7, 2113:13, 2113:18, 2114:2, 2116:7, 2127:1, 2127:17, 2127:23, 2129:22, 2134:10, 2147:11
**Case** [1] - 2018:9
**cases** [1] - 2034:9
**cash** [1] - 2145:20
**ceiling** [1] - 2097:20
**certain** [7] - 2028:17, 2045:5, 2056:14, 2059:2, 2071:18, 2083:22, 2088:7
**certainly** [2] - 2085:8, 2132:8
**CERTIFICATE** [1] - 2148:1
**certify** [1] - 2148:4
**chance** [1] - 2083:2
**change** [28] - 2062:7, 2069:23, 2077:1, 2077:4, 2079:15, 2079:16, 2098:12, 2099:9, 2099:20, 2116:16, 2116:20, 2117:25, 2119:2, 2119:6, 2119:19, 2122:3, 2122:6, 2123:25, 2125:22, 2129:10, 2129:18, 2129:21, 2130:1, 2130:5, 2130:7, 2130:8, 2141:5
**Change** [1] - 2115:25
**changed** [14] - 2051:5, 2078:1, 2078:5, 2078:6, 2084:3, 2098:13, 2098:14, 2114:7, 2115:20, 2116:2, 2116:11, 2116:14, 2117:13, 2130:5
**characterization** [2] - 2135:3, 2135:4
**characterize** [1] - 2039:22
**charge** [1] - 2067:13
**charged** [2] - 2068:6, 2072:22
**charging** [1] - 2110:2
**chart** [1] - 2146:9
**check** [1] - 2116:2
**CHECK** [1] - 2018:19
**chief** [1] - 2139:8
**choice** [1] - 2085:1
**choose** [1] - 2104:7
**choosing** [1] - 2084:21
**chose** [3] - 2084:16, 2128:4, 2128:6
**circular** [7] - 2129:24, 2130:2, 2130:4, 2130:17, 2131:22, 2142:8, 2142:14
**citation** [1] - 2082:5
**cite** [4] - 2053:9, 2081:7, 2126:2, 2126:22
**cited** [5] - 2051:22, 2051:24, 2051:25, 2052:3, 2052:8
**citing** [4] - 2053:3, 2080:19, 2080:20, 2082:12
**clarify** [1] - 2118:25
**Class** [2] - 2018:18, 2019:2
**class** [1] - 2030:11
**CLASS** [1] - 2018:10
**classes** [1] - 2029:6
**clause** [2] - 2069:23, 2069:24
**clean** [1] - 2052:20
**clear** [10] - 2056:11,

2153

2076:4, 2079:13,
2088:20, 2094:24,
2126:21, 2126:25,
2127:21, 2129:3,
2138:21

**clearly** [3] - 2037:17,
2039:14, 2138:22

**clip** [2] - 2123:19,
2134:10

**Clip** [2] - 2057:24,
2119:15

**close** [4] - 2033:18,
2065:24, 2090:15,
2090:16

**closer** [2] - 2098:9,
2115:9

**closes** [1] - 2021:22

**closings** [1] - 2021:7

**colleagues** [3] -
2068:5, 2071:15,
2116:2

**COLUMBIA** [1] -
2018:1

**column** [2] - 2116:15,
2116:25

**combined** [3] -
2040:7, 2041:12,
2140:24

**coming** [5] - 2108:17,
2110:9, 2131:11,
2131:17, 2131:25

**commercial** [2] -
2030:2, 2030:3

**Commitment** [13] -
2024:24, 2025:21,
2028:20, 2029:14,
2033:5, 2060:24,
2070:22, 2071:5,
2071:12, 2093:24,
2094:4, 2106:12,
2106:14

**commitment** [100] -
2023:3, 2023:9,
2023:13, 2023:14,
2023:18, 2024:5,
2024:9, 2024:10,
2024:15, 2024:19,
2024:21, 2024:23,
2025:2, 2025:15,
2025:24, 2026:4,
2026:16, 2026:24,
2027:2, 2027:3,
2027:17, 2028:17,
2028:21, 2029:5,
2029:15, 2030:21,
2030:22, 2032:9,
2032:14, 2033:8,
2033:9, 2034:5,
2034:17, 2037:16,
2038:13, 2039:12,

2040:3, 2041:10,
2041:20, 2042:17,
2043:2, 2053:7,
2053:14, 2053:18,
2054:7, 2054:9,
2054:11, 2054:15,
2054:18, 2054:24,
2055:4, 2055:13,
2055:20, 2055:25,
2056:5, 2056:6,
2056:8, 2056:9,
2056:12, 2057:14,
2060:25, 2062:2,
2064:17, 2065:2,
2065:16, 2066:12,
2066:23, 2066:24,
2067:1, 2067:2,
2067:11, 2067:17,
2067:24, 2068:13,
2069:1, 2069:4,
2069:14, 2069:16,
2069:21, 2070:23,
2071:9, 2071:16,
2072:3, 2072:20,
2073:15, 2078:22,
2079:12, 2079:16,
2079:18, 2090:7,
2095:18, 2097:8,
2098:4, 2099:13,
2125:13, 2129:25,
2146:6

**Commitments** [1] -
2025:17

**commitments** [23] -
2029:23, 2029:24,
2030:3, 2030:9,
2043:2, 2051:20,
2051:21, 2052:10,
2056:1, 2056:2,
2056:9, 2066:18,
2067:8, 2067:12,
2068:8, 2068:13,
2071:4, 2071:20,
2071:21, 2071:23,
2095:10

**common** [2] -
2024:10, 2126:24

**companies** [13] -
2030:6, 2030:7,
2031:15, 2040:6,
2065:24, 2071:22,
2071:24, 2089:20,
2091:18, 2092:8,
2102:21, 2113:17,
2136:25

**company** [8] - 2029:1,
2029:3, 2032:10,
2079:11, 2092:4,
2092:15, 2094:1,
2099:7

**comparable** [4] -
2032:19, 2034:3,
2043:1, 2113:14

**comparables** [1] -
2042:10

**compare** [5] - 2035:5,
2129:11, 2133:13,
2144:2, 2144:12

**compared** [4] -
2028:17, 2033:13,
2074:4, 2119:6

**comparing** [7] -
2030:21, 2033:8,
2035:6, 2035:14,
2035:15, 2077:20,
2127:12

**comparison** [4] -
2040:17, 2041:6,
2070:23, 2071:3

**compensate** [3] -
2024:18, 2026:23,
2027:3

**compensated** [1] -
2030:16

**compensation** [7] -
2024:6, 2025:11,
2027:8, 2027:18,
2027:20, 2066:25,
2067:4

**competing** [1] -
2131:9

**complete** [1] - 2148:6

**completed** [1] -
2138:3

**completely** [1] -
2031:15

**complicated** [4] -
2040:11, 2126:9,
2126:10, 2126:12

**complicating** [1] -
2127:7

**component** [1] -
2066:24

**components** [1] -
2024:6

**comprehensive** [1] -
2144:6

**computed** [1] -
2069:20

**computer** [1] -
2118:15

**concept** [1] - 2098:25

**concern** [11] -
2099:13, 2100:2,
2106:11, 2113:19,
2113:22, 2113:25,
2114:25, 2115:12,
2115:16, 2130:3,
2131:22

**concerned** [1] -

2129:24

**conclude** [1] - 2027:9

**concluded** [1] -
2130:15

**conclusion** [9] -
2028:13, 2028:19,
2030:4, 2035:20,
2036:2, 2042:25,
2116:10, 2117:12,
2117:18

**conclusions** [3] -
2042:16, 2054:3,
2066:16

**condition** [5] -
2091:19, 2092:4,
2092:15, 2093:3,
2093:12

**conduct** [5] - 2083:9,
2083:16, 2126:3,
2127:9, 2127:11

**conducted** [4] -
2052:9, 2068:5,
2127:9, 2129:12

**conference** [5] -
2049:15, 2086:13,
2088:24, 2137:21,
2139:11

**conferences** [4] -
2049:4, 2049:5,
2049:7, 2086:11

**confidence** [2] -
2031:10, 2031:18

**confirm** [2] - 2059:23,
2112:6

**Congress** [1] -
2097:18

**conjunction** [3] -
2078:18, 2079:7,
2081:12

**connection** [23] -
2050:9, 2050:15,
2050:21, 2052:5,
2054:23, 2055:19,
2056:3, 2058:10,
2060:3, 2063:7,
2072:10, 2080:13,
2084:10, 2087:8,
2103:10, 2111:15,
2117:22, 2118:3,
2118:10, 2127:22,
2132:10, 2133:12,
2138:24

**consequence** [1] -
2094:15

**conservator** [3] -
2048:5, 2088:15,
2089:8

**conservators** [1] -
2088:7

**Conservatorship** [3] -

2084:7, 2087:16,
2088:11

**conservatorship** [22] -
2058:15, 2079:23,
2083:17, 2083:18,
2083:22, 2085:6,
2087:20, 2088:9,
2088:24, 2089:7,
2089:15, 2089:20,
2090:5, 2090:11,
2091:13, 2091:18,
2092:2, 2092:12,
2092:13, 2097:1,
2110:11, 2112:21

**consider** [8] - 2066:7,
2073:1, 2087:7,
2091:17, 2124:4,
2132:2, 2132:9,
2132:11

**considerably** [1] -
2037:12

**Considered** [1] -
2050:19

**considered** [18] -
2029:7, 2029:9,
2029:15, 2031:5,
2050:13, 2050:21,
2050:24, 2052:5,
2059:13, 2060:3,
2069:18, 2086:21,
2090:22, 2131:21,
2132:12, 2132:13,
2132:19, 2133:11

**consistent** [8] -
2027:1, 2038:14,
2072:3, 2079:22,
2080:8, 2083:16,
2089:14, 2103:25

**consolidated** [1] -
2038:24

**constitute** [1] - 2057:9

**constitutes** [1] -
2148:4

**Constitution** [2] -
2019:13, 2148:12

**consultant** [1] -
2048:19

**consulting** [3] -
2044:3, 2048:4,
2048:15

**contact** [1] - 2105:16

**contains** [2] - 2049:25,
2075:14

**contemplating** [1] -
2021:6

**contemporaneous** [1]
- 2035:16

**Contemporary** [1] -
2052:3

**content** [1] - 2084:25

**context** [6] - 2067:12, 2092:20, 2092:23, 2131:22, 2133:6, 2136:1
**continue** [2] - 2036:17, 2094:6
**continued** [1] - 2108:9
**Continued** [1] - 2022:22
**CONTINUED** [2] - 2018:24, 2019:1
**contract** [4] - 2033:16, 2054:18, 2054:25, 2055:4
**contracts** [6] - 2033:17, 2053:7, 2053:11, 2053:14, 2055:13, 2055:20
**contractual** [3] - 2056:15, 2057:2, 2068:3
**contributors** [1] - 2106:3
**control** [1] - 2092:3
**COOPER** [1] - 2018:16
**Coordinators** [1] - 2106:4
**copied** [2] - 2039:18, 2039:20
**copies** [1] - 2084:18
**copy** [1] - 2052:19
**corner** [5] - 2059:20, 2063:4, 2085:15, 2105:10, 2106:7
**corporate** [1] - 2044:11
**corporation** [1] - 2099:21
**corporations** [1] - 2062:9
**correct** [188] - 2025:6, 2028:6, 2030:24, 2033:3, 2035:8, 2039:6, 2040:18, 2044:19, 2045:3, 2045:9, 2046:2, 2046:11, 2046:14, 2046:21, 2046:24, 2047:3, 2047:6, 2047:17, 2048:2, 2048:10, 2048:11, 2048:20, 2048:23, 2048:25, 2049:6, 2049:9, 2049:16, 2049:20, 2049:23, 2050:4, 2050:10, 2050:13, 2051:7, 2051:10, 2053:4, 2053:15, 2054:4,

2054:21, 2057:2, 2057:6, 2057:10, 2057:16, 2058:5, 2061:8, 2061:14, 2061:20, 2062:3, 2062:22, 2064:14, 2066:6, 2066:16, 2066:22, 2067:2, 2067:4, 2067:14, 2067:17, 2068:7, 2068:14, 2069:5, 2070:3, 2070:19, 2071:3, 2071:19, 2072:4, 2072:14, 2072:19, 2072:20, 2072:23, 2073:4, 2073:15, 2075:13, 2076:24, 2078:13, 2078:17, 2078:21, 2078:23, 2079:6, 2079:21, 2080:14, 2080:22, 2081:1, 2082:7, 2082:25, 2083:11, 2083:12, 2083:22, 2084:7, 2086:18, 2087:9, 2087:10, 2088:11, 2088:22, 2088:25, 2089:11, 2089:18, 2090:11, 2090:20, 2092:5, 2092:16, 2092:25, 2093:6, 2093:23, 2095:1, 2096:9, 2096:12, 2096:25, 2098:20, 2099:9, 2099:14, 2099:21, 2100:7, 2100:17, 2101:14, 2101:25, 2102:1, 2102:7, 2102:19, 2103:7, 2103:23, 2104:10, 2104:13, 2104:18, 2104:19, 2105:3, 2105:19, 2106:9, 2106:15, 2107:12, 2107:18, 2107:25, 2108:10, 2110:5, 2110:13, 2112:23, 2113:1, 2114:15, 2115:17, 2116:8, 2118:20, 2120:10, 2120:16, 2121:3, 2121:23, 2122:4, 2123:14, 2123:22, 2124:2, 2124:15, 2124:23, 2125:2, 2125:9, 2125:15, 2126:1, 2126:23, 2127:4, 2127:23, 2129:4, 2130:11, 2131:13,

2131:15, 2132:19, 2133:19, 2134:10, 2134:16, 2134:22, 2135:12, 2135:16, 2139:17, 2140:1, 2140:18, 2141:8, 2141:12, 2141:20, 2142:3, 2143:8, 2143:23, 2144:7, 2144:10, 2144:22, 2145:5, 2145:9, 2145:12, 2146:6, 2146:19, 2147:4
**corrected** [7] - 2040:23, 2040:25, 2042:9, 2042:11, 2043:5, 2043:6, 2043:7
**correcting** [2] - 2049:19, 2075:15
**correctly** [2] - 2037:4, 2121:18
**corrects** [1] - 2040:9
**correspondingly** [1] - 2113:23
**cost** [1] - 2069:21
**costs** [3] - 2073:14, 2107:12, 2107:14
**Counsel** [1] - 2059:16
**counsel** [6] - 2084:11, 2087:20, 2088:1, 2088:2, 2088:6, 2122:19
**couple** [2] - 2084:5, 2137:3
**coupon** [3] - 2064:13, 2064:16, 2065:1
**course** [2] - 2047:18, 2115:7
**courses** [1] - 2045:21
**COURT** [36] - 2018:1, 2021:2, 2021:14, 2021:25, 2022:6, 2022:9, 2022:12, 2043:12, 2052:18, 2056:24, 2071:2, 2071:8, 2087:25, 2095:21, 2095:23, 2095:25, 2112:14, 2121:10, 2122:12, 2122:15, 2132:3, 2132:7, 2132:11, 2133:1, 2133:5, 2135:23, 2136:3, 2136:16, 2136:19, 2136:21, 2138:25, 2139:6, 2139:13, 2147:8, 2147:10, 2148:1
**Court** [4] - 2019:12,

2019:12, 2147:10, 2148:11
**Court's** [2] - 2137:16, 2139:12
**Courthouse** [2] - 2019:13, 2148:11
**COURTROOM** [6] - 2051:8, 2051:13, 2059:16, 2111:11, 2111:13, 2143:18
**courtroom** [1] - 2022:11
**cover** [1] - 2109:18
**CPP** [1] - 2031:2
**CRA** [5] - 2043:24, 2044:2, 2044:7, 2044:18, 2044:25
**created** [2] - 2118:9, 2134:19
**credibility** [1] - 2081:6
**credit** [22] - 2064:9, 2064:17, 2065:2, 2096:4, 2096:8, 2096:9, 2096:11, 2096:23, 2097:2, 2097:6, 2097:25, 2098:1, 2098:18, 2099:11, 2099:24, 2100:5, 2101:17, 2127:4, 2127:5, 2127:15, 2127:16, 2129:5
**crisis** [14] - 2046:7, 2046:10, 2046:21, 2076:16, 2110:20, 2110:21, 2110:25, 2111:2, 2114:4, 2114:9, 2114:13, 2114:17, 2114:22, 2115:3
**critical** [1] - 2067:6
**criticism** [2] - 2070:21, 2074:22
**cross** [1] - 2043:12
**CROSS** [1] - 2043:19
**CROSS-EXAMINATION** [1] - 2043:19
**cross-examine** [1] - 2043:12
**CRR** [3] - 2019:12, 2148:3, 2148:10
**current** [1] - 2109:17
**CV** [5] - 2045:12, 2045:14, 2048:12, 2048:22, 2049:6

**D**

**D.C** [4] - 2018:4,

2018:17, 2018:23, 2019:10
**daily** [1] - 2124:19
**data** [8] - 2037:23, 2102:3, 2102:5, 2102:14, 2118:11, 2118:16, 2118:17, 2139:25
**date** [8] - 2045:15, 2077:24, 2116:14, 2120:10, 2121:14, 2138:1, 2145:4
**dated** [2] - 2085:25, 2120:9
**Dated** [1] - 2148:8
**Dave** [2] - 2032:4, 2133:19
**DAVID** [1] - 2019:7
**DAVIS** [1] - 2018:21
**days** [1] - 2082:23
**DC** [2] - 2019:14, 2148:13
**deadline** [1] - 2115:11
**deal** [4] - 2046:9, 2046:12, 2046:13, 2046:16
**debt** [26] - 2029:7, 2029:17, 2097:4, 2097:20, 2100:6, 2100:7, 2110:13, 2110:16, 2110:18, 2110:23, 2110:24, 2111:5, 2111:18, 2111:25, 2112:2, 2112:18, 2112:22, 2119:7, 2121:17, 2123:6, 2123:13, 2146:9, 2146:10, 2146:15
**debtors** [2] - 2066:5
**decades** [2] - 2073:17, 2073:23
**December** [5] - 2026:8, 2098:5, 2100:4, 2115:12, 2131:17
**decided** [2] - 2037:10, 2077:13
**deciding** [1] - 2107:16
**decision** [5] - 2058:10, 2081:10, 2081:11, 2104:13, 2107:16
**decision-maker** [1] - 2081:10
**deck** [1] - 2024:4
**decline** [4] - 2116:14, 2116:24, 2117:1, 2117:6
**declined** [1] - 2115:14
**declining** [1] - 2119:19

**decrease** [2] - 2118:24, 2125:23
**decreased** [1] - 2124:1
**deemed** [1] - 2077:8
**default** [1] - 2115:16
**Defendant** [1] - 2019:6
**defendants** [3] - 2022:20, 2051:11, 2137:24
**Defendants** [1] - 2018:8
**defense** [4] - 2044:16, 2080:1, 2088:2, 2116:5
**Defense** [1] - 2104:23
**defense's** [1] - 2115:22
**deferred** [1] - 2103:12
**define** [1] - 2038:23
**defines** [1] - 2038:23
**defining** [1] - 2088:23
**definition** [1] - 2041:4
**demand** [2] - 2124:7, 2124:8
**DeMarco** [19] - 2026:13, 2058:16, 2058:18, 2081:10, 2082:7, 2082:16, 2082:23, 2085:25, 2086:7, 2090:18, 2090:22, 2104:11, 2120:15, 2131:5, 2131:16, 2131:19, 2131:24, 2132:4, 2132:10
**DeMarco's** [3] - 2081:13, 2087:1, 2087:3
**demonstrate** [1] - 2093:19
**demonstrating** [1] - 2059:1
**Department** [1] - 2103:7
**depicting** [1] - 2075:12
**deposed** [1] - 2055:9
**deposit** [5] - 2036:6, 2036:7, 2036:9, 2036:18, 2036:23
**deposition** [11] - 2055:11, 2057:8, 2057:20, 2066:7, 2080:21, 2118:22, 2119:6, 2123:19, 2129:13, 2130:14, 2134:10
**depositions** [2] - 2082:7, 2082:19
**deposits** [11] - 2036:8,

2039:5, 2039:13, 2039:15, 2074:6, 2074:13, 2074:14, 2074:17, 2075:4, 2075:20, 2076:7
**DEPUTY** [6] - 2051:8, 2051:13, 2059:16, 2111:11, 2111:13, 2143:18
**DeRita** [52] - 2044:15, 2051:5, 2057:24, 2058:1, 2059:7, 2060:17, 2061:4, 2061:25, 2063:2, 2063:4, 2063:8, 2063:10, 2063:25, 2065:14, 2076:10, 2078:8, 2079:20, 2079:25, 2083:25, 2084:3, 2085:22, 2087:11, 2088:18, 2089:4, 2091:3, 2091:5, 2092:10, 2104:22, 2105:9, 2106:2, 2106:6, 2107:22, 2108:12, 2109:9, 2109:14, 2111:8, 2111:20, 2115:19, 2119:15, 2120:18, 2121:11, 2121:25, 2123:3, 2123:17, 2131:3, 2133:10, 2134:13, 2140:4, 2143:4, 2143:25, 2144:3, 2144:13
**DeRita's** [1] - 2084:2
**derive** [1] - 2070:12
**describe** [5] - 2030:1, 2040:9, 2040:23, 2113:8, 2128:2
**described** [3] - 2030:2, 2101:5, 2126:18
**describes** [1] - 2039:21
**describing** [2] - 2062:17, 2107:15
**Description** [1] - 2134:14
**detailed** [1] - 2061:17
**determine** [5] - 2036:10, 2040:25, 2059:2, 2076:5, 2114:7
**determined** [2] - 2024:20, 2057:15
**determining** [1] - 2093:10
**Deutsche** [1] - 2105:6

**Dharan** [1] - 2134:15
**difference** [4] - 2113:3, 2113:15, 2113:16, 2113:24
**different** [19] - 2031:15, 2051:25, 2060:11, 2060:13, 2072:1, 2075:21, 2078:19, 2089:16, 2108:22, 2115:21, 2127:7, 2127:15, 2129:22, 2130:6, 2134:22, 2135:15, 2140:15
**difficulty** [1] - 2097:19
**dimension** [1] - 2033:15
**diminishment** [1] - 2123:13
**direct** [15] - 2044:6, 2052:24, 2058:22, 2070:6, 2070:22, 2074:9, 2074:10, 2077:5, 2082:2, 2083:15, 2089:13, 2089:18, 2109:21, 2126:8, 2138:16
**DIRECT** [1] - 2022:22
**directionally** [1] - 2098:1
**directly** [2] - 2048:3, 2116:16
**director** [2] - 2026:13, 2058:14
**disaggregate** [1] - 2075:3
**disagree** [8] - 2023:21, 2023:23, 2025:19, 2028:12, 2036:2, 2042:11, 2070:1, 2071:3
**disagreements** [1] - 2051:16
**disclose** [1] - 2102:4
**disclosed** [1] - 2102:8
**discuss** [2] - 2107:8, 2130:17
**discussed** [3] - 2072:9, 2096:4, 2096:8
**discussing** [2] - 2098:21, 2103:11
**Discussion** [2] - 2022:10, 2063:22
**discussion** [2] - 2064:2, 2092:14
**dislocations** [1] - 2046:17
**display** [11] - 2051:11, 2076:10, 2085:10,

2104:23, 2115:20, 2120:5, 2121:8, 2122:17, 2137:4, 2142:24, 2147:7
**displayed** [3] - 2103:24, 2105:3, 2112:15
**dispute** [6] - 2051:19, 2067:10, 2072:2, 2073:11, 2082:14, 2094:14
**disruption** [1] - 2077:12
**dissipated** [1] - 2037:6
**DISTRICT** [3] - 2018:1, 2018:1, 2018:13
**dividend** [21] - 2024:8, 2028:5, 2032:2, 2037:7, 2042:7, 2064:14, 2070:16, 2094:11, 2094:17, 2106:19, 2106:25, 2107:5, 2107:9, 2131:12, 2132:1, 2136:14, 2140:22, 2145:20, 2145:23, 2145:24, 2147:3
**dividends** [6] - 2025:10, 2025:11, 2141:7, 2142:23, 2146:1, 2146:21
**dividing** [1] - 2075:20
**document** [52] - 2024:17, 2059:6, 2059:9, 2059:12, 2059:20, 2060:15, 2061:3, 2061:9, 2061:19, 2061:24, 2062:25, 2063:5, 2063:6, 2063:22, 2064:25, 2065:1, 2065:11, 2075:19, 2085:10, 2085:14, 2085:15, 2085:21, 2086:17, 2086:21, 2087:4, 2087:7, 2087:12, 2088:20, 2090:8, 2091:6, 2091:21, 2092:11, 2112:6, 2112:9, 2122:2, 2130:18, 2130:24, 2131:15, 2131:19, 2132:5, 2133:7, 2133:11, 2135:25, 2137:8, 2137:12, 2137:25, 2138:6, 2138:21, 2139:4, 2139:16, 2141:23, 2143:6
**Documents** [1] -

2050:19
**documents** [22] - 2024:16, 2028:8, 2050:13, 2050:21, 2059:1, 2060:2, 2060:9, 2083:22, 2084:6, 2084:16, 2084:22, 2085:1, 2085:3, 2085:19, 2102:6, 2119:25, 2120:7, 2123:18, 2125:21, 2132:12, 2132:13, 2132:19
**dollars** [3] - 2025:17, 2103:12, 2110:16
**done** [7] - 2027:12, 2028:16, 2040:12, 2040:25, 2075:6, 2075:21, 2146:20
**doubt** [2] - 2066:17, 2066:22
**down** [34] - 2022:13, 2032:22, 2037:21, 2060:22, 2065:14, 2078:10, 2078:16, 2079:4, 2079:5, 2079:12, 2079:18, 2079:20, 2081:3, 2091:2, 2094:7, 2098:5, 2106:22, 2108:13, 2109:15, 2113:14, 2114:10, 2114:11, 2114:20, 2114:21, 2116:25, 2117:16, 2121:16, 2122:1, 2123:12, 2123:16, 2127:20, 2136:25, 2146:6
**downgrade** [3] - 2098:18, 2099:5, 2100:5
**downgraded** [1] - 2098:23
**Dr** [63] - 2022:24, 2024:4, 2028:16, 2029:21, 2030:2, 2033:10, 2035:18, 2035:20, 2036:5, 2036:11, 2038:19, 2039:17, 2040:9, 2041:6, 2042:2, 2042:15, 2042:25, 2043:9, 2043:21, 2051:16, 2051:19, 2051:22, 2052:3, 2052:8, 2052:9, 2052:13, 2053:3, 2053:6, 2053:13, 2056:14, 2057:1, 2057:9, 2058:3,

2063:6, 2066:11,
2066:15, 2066:17,
2068:4, 2069:20,
2070:2, 2071:15,
2072:10, 2072:13,
2072:18, 2072:25,
2073:10, 2073:13,
2074:2, 2074:10,
2075:2, 2075:12,
2075:17, 2076:4,
2079:21, 2090:20,
2096:2, 2120:6,
2122:18, 2122:20,
2132:9, 2134:15,
2138:17, 2138:20
**dramatic** [2] - 2117:6
**dramatically** [2] -
2108:15, 2115:14
**draw** [7] - 2027:17,
2031:22, 2031:23,
2087:13, 2130:18,
2131:22, 2146:6
**draw-down** [1] -
2146:6
**drawn** [4] - 2025:5,
2025:12, 2065:4,
2078:11
**draws** [16] - 2033:23,
2033:24, 2065:6,
2090:6, 2129:24,
2130:2, 2130:4,
2137:7, 2140:23,
2141:6, 2141:11,
2141:15, 2142:9,
2142:10, 2142:14
**drifted** [1] - 2115:15
**drive** [1] - 2118:23
**DTA** [1] - 2103:15
**due** [3] - 2032:1,
2124:1, 2130:5
**during** [15] - 2046:10,
2058:14, 2076:16,
2081:9, 2081:13,
2096:4, 2097:9,
2103:24, 2105:3,
2110:11, 2112:20,
2114:9, 2114:17,
2118:22, 2119:5

## E

**earn** [1] - 2109:25
**earned** [1] - 2031:25
**earnings** [3] -
2101:13, 2134:5,
2135:11
**Earnings** [1] - 2060:19
**easier** [3] - 2063:13,
2063:19, 2122:20
**East** [2] - 2086:8,
2088:23

**east** [1] - 2086:9
**economic** [4] - 2044:3,
2101:6, 2132:23,
2133:2
**economically** [2] -
2025:23, 2107:2
**economist** [1] -
2065:9
**Ed** [2] - 2085:24,
2104:11
**effect** [4] - 2024:21,
2024:23, 2098:17,
2124:6
**effects** [1] - 2126:17
**eight** [3] - 2034:14,
2134:4, 2136:12
**either** [8] - 2059:1,
2065:24, 2099:5,
2099:6, 2103:17,
2104:12, 2107:7,
2140:21
**elevated** [2] - 2114:20,
2114:23
**eliminated** [1] -
2094:10
**eliminates** [1] -
2095:17
**ellipses** [1] - 2121:2
**email** [10] - 2085:24,
2086:17, 2101:5,
2101:12, 2101:15,
2120:9, 2120:25,
2121:14, 2122:22,
2123:5
**emails** [3] - 2101:3,
2101:11, 2123:24
**embedded** [1] -
2126:12
**empirical** [3] - 2052:9,
2073:17, 2073:23
**employed** [1] -
2100:14
**employee** [1] -
2120:12
**employees** [2] -
2080:21, 2083:6
**employers** [1] -
2021:10
**enabling** [2] - 2131:11,
2132:1
**end** [16] - 2021:14,
2036:14, 2038:1,
2043:5, 2044:21,
2044:22, 2044:24,
2091:19, 2092:12,
2092:13, 2098:11,
2129:2, 2135:1,
2139:11, 2142:15,
2146:22
**ending** [1] - 2111:25

**enforceable** [2] -
2056:19, 2057:5
**enlarge** [21] - 2061:25,
2063:4, 2063:10,
2080:2, 2085:23,
2091:12, 2091:14,
2105:9, 2106:7,
2107:22, 2111:7,
2111:22, 2121:12,
2123:4, 2131:4,
2133:9, 2133:17,
2140:5, 2141:21,
2143:10, 2144:14
**ensure** [1] - 2051:10
**ensuring** [1] - 2089:22
**enter** [4] - 2058:10,
2081:11, 2101:13,
2104:13
**entered** [1] - 2070:14
**entering** [5] - 2101:20,
2104:1, 2104:12,
2104:17, 2131:23
**Enterprises** [1] -
2121:16
**enterprises** [8] -
2025:5, 2025:21,
2026:3, 2042:3,
2042:21, 2080:9,
2109:23, 2140:24
**enters** [1] - 2022:11
**entire** [2] - 2145:25,
2146:4
**entirety** [2] - 2050:23,
2055:24
**entities** [2] - 2092:24,
2094:25
**entitled** [10] - 2050:19,
2052:3, 2060:19,
2063:22, 2084:6,
2088:10, 2115:24,
2122:25, 2133:17,
2143:6
**entity** [4] - 2092:3,
2093:12, 2099:8,
2099:21
**equals** [2] - 2039:23
**equation** [1] - 2077:2
**equity** [48] - 2028:20,
2028:23, 2028:24,
2028:25, 2029:2,
2029:4, 2029:5,
2029:9, 2029:15,
2029:23, 2030:6,
2030:18, 2030:21,
2031:7, 2031:9,
2031:11, 2031:14,
2031:16, 2031:20,
2031:22, 2031:23,
2031:25, 2032:4,
2032:5, 2032:20,

2034:8, 2034:10,
2034:12, 2037:18,
2037:19, 2038:25,
2040:19, 2041:3,
2043:2, 2056:5,
2056:8, 2065:8,
2066:1, 2066:3,
2071:23, 2075:23,
2078:18, 2079:8,
2079:9, 2146:11,
2146:13
**Equity** [1] - 2061:2
**equivalent** [1] -
2072:17
**eroded** [1] - 2095:7
**eroding** [2] - 2095:2,
2095:17
**erosion** [3] - 2099:13,
2106:11
**error** [3] - 2074:19,
2074:21, 2075:7
**escape** [1] - 2069:24
**ESQ** [12] - 2018:16,
2018:18, 2018:21,
2018:21, 2018:22,
2019:2, 2019:2,
2019:6, 2019:7,
2019:7, 2019:8,
2019:8
**essentially** [6] -
2058:2, 2064:17,
2065:1, 2082:11,
2095:4, 2117:24
**establish** [1] - 2092:3
**establishes** [2] -
2066:24, 2082:13
**establishing** [1] -
2085:5
**estate** [1] - 2077:5
**et** [2] - 2018:3, 2018:7
**evaluate** [1] - 2083:2
**evaluated** [1] -
2083:21
**evaluating** [1] -
2083:15
**event** [17] - 2116:7,
2117:9, 2117:19,
2117:24, 2118:2,
2118:4, 2118:8,
2118:10, 2118:20,
2124:4, 2124:13,
2126:3, 2126:13,
2126:14, 2127:2,
2128:4, 2130:12
**events** [1] - 2046:10
**evidence** [7] - 2059:8,
2059:9, 2063:1,
2085:11, 2106:10,
2112:12, 2130:19
**exact** [1] - 2101:22

**examination** [1] -
2089:18
**EXAMINATION** [2] -
2022:22, 2043:19
**examine** [2] - 2043:12,
2067:10
**examined** [2] -
2052:10, 2054:18
**examining** [1] -
2074:15
**example** [1] - 2102:11
**Excel** [2] - 2118:13,
2118:15
**exclude** [2] - 2126:13,
2126:14
**excluding** [1] -
2126:19
**excused** [2] - 2022:1,
2022:12
**Execute** [1] - 2123:1
**executed** [2] -
2031:20, 2036:25
**execution** [1] - 2138:3
**executive** [1] -
2144:13
**exercise** [2] - 2070:9,
2070:16
**exhausted** [1] -
2125:14
**exhibit** [1] - 2059:17
**Exhibit** [10] - 2059:18,
2085:11, 2091:4,
2104:23, 2133:8,
2133:9, 2137:15,
2142:25, 2143:17,
2144:1
**exhibits** [1] - 2084:25
**existing** [3] - 2066:4,
2121:17, 2121:21
**expect** [5] - 2050:10,
2079:11, 2101:2,
2101:22, 2101:24
**expectation** [1] -
2099:19
**expects** [1] - 2030:16
**experience** [3] -
2044:21, 2045:15,
2045:17
**experienced** [1] -
2117:5
**expert** [27] - 2045:8,
2045:11, 2045:16,
2045:25, 2050:16,
2051:20, 2051:21,
2052:7, 2054:14,
2054:19, 2055:5,
2055:24, 2063:7,
2066:8, 2072:11,
2081:6, 2111:15,
2117:22, 2126:1,

2127:22, 2130:11,
2132:10, 2132:18,
2133:12, 2137:9,
2139:5, 2139:16
**experts** [1] - 2023:6
**explain** [2] - 2028:14,
2036:4
**explained** [2] - 2021:5,
2021:25
**exposed** [2] - 2030:12,
2076:16
**expressed** [3] -
2070:21, 2090:17,
2090:22
**extend** [2] - 2106:23,
2106:24
**extent** [2] - 2102:16
**extra** [5] - 2074:9,
2074:15, 2075:16,
2075:18, 2076:4

## F

**face** [1] - 2101:9
**faced** [1] - 2080:9
**facility** [7] - 2032:17,
2033:19, 2033:25,
2034:16, 2035:9,
2064:9, 2078:3
**facility's** [1] - 2033:21
**fact** [19] - 2027:15,
2051:22, 2054:17,
2057:12, 2072:21,
2078:6, 2080:3,
2082:13, 2082:15,
2098:21, 2109:8,
2123:25, 2129:23,
2130:10, 2132:4,
2138:12, 2138:24,
2141:5, 2146:13
**factor** [7] - 2108:24,
2119:4, 2119:8,
2119:10, 2119:13,
2119:14, 2119:19
**factors** [3] - 2118:23,
2118:25, 2119:1
**facts** [3] - 2024:15,
2070:2, 2080:19
**fail** [3] - 2077:8,
2077:12, 2077:14
**failed** [1] - 2077:15
**fair** [8] - 2030:20,
2035:9, 2047:9,
2051:15, 2054:17,
2080:11, 2090:8,
2132:17
**FAIRHOLME** [1] -
2018:3
**fairly** [2] - 2062:5,
2062:8

**faith** [4] - 2056:20,
2057:6, 2057:10,
2057:12
**fall** [3] - 2030:10,
2031:13, 2035:23
**fall-back** [1] - 2035:23
**false** [1] - 2098:22
**familiar** [6] - 2049:22,
2059:21, 2060:14,
2098:25, 2130:24,
2137:12
**FANNIE** [1] - 2018:9
**Fannie** [54] - 2027:16,
2028:22, 2028:23,
2031:20, 2032:3,
2032:4, 2033:4,
2033:8, 2033:14,
2033:23, 2033:25,
2034:3, 2034:7,
2034:11, 2034:12,
2034:15, 2034:22,
2035:12, 2036:20,
2036:25, 2037:18,
2040:5, 2040:19,
2041:1, 2041:3,
2041:11, 2042:21,
2070:11, 2070:13,
2071:12, 2077:22,
2080:21, 2094:5,
2095:11, 2097:3,
2102:23, 2103:21,
2113:13, 2114:19,
2116:24, 2119:4,
2123:6, 2127:3,
2128:7, 2128:12,
2128:20, 2133:25,
2137:7, 2141:14,
2141:19, 2142:12,
2142:21, 2143:9,
2144:6
**far** [4] - 2038:6,
2098:7, 2129:16,
2138:16
**fashion** [1] - 2110:9
**fast** [1] - 2123:9
**FDIC** [16] - 2036:5,
2037:9, 2037:10,
2037:16, 2038:15,
2038:20, 2038:22,
2041:7, 2041:9,
2072:9, 2072:18,
2072:22, 2073:8,
2074:25, 2075:19,
2076:1
**feature** [1] - 2070:6
**features** [3] - 2127:6,
2127:7, 2128:11
**February** [1] - 2135:14
**fed** [1] - 2049:11
**Fed** [2] - 2032:8,

2032:18
**Federal** [1] - 2019:6
**FEDERAL** [1] - 2018:6
**federal** [2] - 2047:23,
2049:8
**Fee** [1] - 2060:24
**fee** [61] - 2023:3,
2023:9, 2023:13,
2023:14, 2023:18,
2024:5, 2024:9,
2024:10, 2024:15,
2025:15, 2025:16,
2025:24, 2026:4,
2026:16, 2027:2,
2030:22, 2033:8,
2033:9, 2034:5,
2034:17, 2036:9,
2036:10, 2039:22,
2039:23, 2039:24,
2040:10, 2041:10,
2041:20, 2041:21,
2042:17, 2053:18,
2057:14, 2057:15,
2061:1, 2062:2,
2062:3, 2064:17,
2065:2, 2067:13,
2067:16, 2067:23,
2068:6, 2068:12,
2069:4, 2069:14,
2069:16, 2070:2,
2070:15, 2070:23,
2073:15, 2074:3,
2074:22, 2075:3,
2075:22, 2078:22,
2078:23, 2079:12,
2079:16
**fees** [20] - 2030:21,
2038:16, 2038:20,
2039:2, 2054:7,
2054:9, 2054:12,
2054:15, 2055:14,
2055:25, 2066:24,
2067:11, 2069:21,
2071:16, 2109:17,
2109:22, 2109:23,
2109:25, 2110:2
**few** [2] - 2100:23,
2145:14
**FHFA** [40] - 2026:4,
2026:14, 2057:13,
2058:9, 2058:14,
2058:23, 2059:2,
2059:9, 2061:7,
2061:14, 2061:18,
2061:20, 2080:7,
2080:14, 2080:16,
2080:20, 2080:21,
2080:24, 2081:1,
2083:5, 2086:2,
2090:23, 2100:20,

2100:21, 2102:16,
2103:2, 2103:6,
2104:1, 2119:25,
2120:12, 2120:14,
2121:14, 2122:2,
2137:25, 2138:3,
2138:8, 2138:17,
2139:22, 2142:5,
2143:12
**FHFA's** [5] - 2080:8,
2081:11, 2083:9,
2100:21, 2143:7
**field** [1] - 2050:23
**fifth** [1] - 2108:13
**fight** [1] - 2121:17
**file** [4] - 2118:13,
2118:15, 2118:16,
2118:17
**filings** [2] - 2042:22,
2111:14
**finally** [2] - 2043:4,
2109:14
**Finance** [1] - 2019:6
**finance** [4] - 2044:8,
2044:9, 2044:10,
2044:11
**FINANCE** [1] - 2018:6
**Financial** [1] - 2052:4
**financial** [30] -
2044:13, 2046:7,
2046:10, 2046:21,
2047:3, 2047:6,
2047:7, 2047:9,
2047:10, 2047:11,
2048:1, 2048:9,
2074:5, 2076:16,
2076:21, 2077:9,
2092:20, 2093:11,
2093:17, 2093:18,
2108:25, 2114:4,
2114:17, 2115:3,
2134:1, 2134:2,
2137:2, 2138:21,
2140:7, 2141:25
**financing** [4] -
2065:18, 2065:19,
2066:8, 2079:14
**finish** [1] - 2136:3
**finished** [1] - 2128:18
**firm** [4] - 2048:13,
2048:15, 2048:20,
2100:14
**first** [35] - 2025:14,
2026:9, 2026:18,
2026:21, 2031:1,
2034:21, 2035:16,
2037:8, 2042:19,
2051:5, 2054:25,
2056:2, 2061:5,
2063:21, 2065:16,

2067:8, 2088:13,
2091:11, 2091:12,
2106:22, 2108:3,
2108:9, 2108:18,
2109:10, 2115:21,
2116:17, 2116:24,
2117:2, 2120:5,
2122:17, 2125:2,
2140:8, 2140:17,
2141:24
**Fitch** [2] - 2096:18,
2096:22
**five** [9] - 2041:23,
2041:25, 2042:1,
2056:1, 2111:1,
2111:2, 2127:20,
2144:9
**fixed** [3] - 2067:21,
2067:22, 2067:25
**FLEXNER** [1] -
2018:22
**float** [1] - 2121:22
**focus** [2] - 2044:6,
2073:14
**focused** [4] - 2124:22,
2125:7, 2125:9,
2125:12
**focusing** [2] -
2024:2, 2125:17
**following** [3] - 2094:1,
2117:3, 2137:21
**footnote** [2] - 2082:6,
2082:12
**footnotes** [1] - 2050:6
**Footnotes** [1] - 2082:9
**FOR** [1] - 2018:1
**forecast** [4] - 2059:10,
2143:12, 2144:15,
2144:21
**Forecast** [1] - 2061:7
**forecasting** [1] -
2036:25
**forecasts** [2] -
2101:25, 2102:24
**foregoing** [1] - 2148:4
**form** [3] - 2064:8,
2076:20, 2118:13
**forming** [1] - 2085:20
**forms** [1] - 2077:10
**formula** [4] - 2036:10,
2036:12, 2039:21,
2041:8
**formulating** [1] -
2053:14
**forth** [1] - 2124:12
**forward** [3] - 2037:1,
2037:11, 2142:19
**four** [4] - 2024:5,
2029:6, 2059:10,
2108:13

**four-year** [1] - 2059:10
**fourth** [1] - 2060:22
**freaked** [1] - 2146:21
**Freddie** [51] - 2027:17, 2028:23, 2028:24, 2031:20, 2033:4, 2033:9, 2033:14, 2033:23, 2034:7, 2034:11, 2034:13, 2034:14, 2034:22, 2035:12, 2036:20, 2037:18, 2040:6, 2040:20, 2041:2, 2041:3, 2041:11, 2042:22, 2061:9, 2061:10, 2061:11, 2061:20, 2064:6, 2064:22, 2064:25, 2070:10, 2070:13, 2071:12, 2077:22, 2080:22, 2095:12, 2097:3, 2102:24, 2103:21, 2111:24, 2113:13, 2114:19, 2119:4, 2123:6, 2127:3, 2128:7, 2128:12, 2128:21, 2137:8, 2141:10, 2141:18, 2142:11
**frequently** [1] - 2129:7
**front** [4] - 2068:15, 2105:20, 2105:24, 2106:1
**fulfill** [1] - 2027:7
**full** [2] - 2061:18, 2148:5
**fully** [3] - 2024:17, 2026:22, 2041:18
**fund** [2] - 2036:9, 2069:19
**fundamental** [2] - 2051:16, 2099:20
**fundamentally** [1] - 2071:25
**funding** [3] - 2026:24, 2067:1, 2129:25
**funds** [2] - 2057:14, 2058:6
**FUNDS** [1] - 2018:3
**funnel** [1] - 2058:6
**funneling** [1] - 2057:14
**furthers** [1] - 2095:15
**future** [6] - 2022:14, 2037:2, 2107:17, 2131:12, 2131:18, 2132:2

## G

**gained** [1] - 2087:19
**general** [7] - 2050:3, 2072:21, 2081:5, 2100:23, 2108:8, 2132:22, 2146:24
**generally** [7] - 2060:14, 2071:16, 2096:25, 2097:3, 2118:3, 2124:12, 2130:16
**generating** [3] - 2027:7, 2131:10, 2131:25
**given** [11] - 2025:5, 2045:23, 2049:1, 2050:8, 2054:9, 2054:14, 2077:9, 2077:10, 2123:6, 2135:7, 2138:12
**GLUCK** [1] - 2019:2
**goal** [10] - 2089:14, 2089:19, 2089:22, 2089:24, 2089:25, 2090:1, 2090:17, 2090:21, 2092:7, 2092:23
**goals** [13] - 2079:22, 2083:17, 2083:21, 2085:5, 2087:19, 2088:8, 2088:14, 2088:15, 2088:16, 2090:21, 2091:17, 2093:10, 2095:16
**Goals** [3] - 2084:6, 2087:15, 2088:11
**golden** [9] - 2101:13, 2101:21, 2134:5, 2135:11, 2136:13, 2136:15, 2136:16, 2136:21, 2136:24
**GSEs'** [1] - 2097:25
**GT** [1] - 2060:11
**guarantee** [5] - 2109:17, 2109:22, 2109:23, 2110:2, 2112:24
**guaranteed** [3] - 2108:14, 2108:20, 2109:24
**guarantees** [2] - 2109:9, 2109:11
**guess** [1] - 2097:25

## H

**half** [8] - 2078:15, 2108:9, 2108:18, 2125:2, 2140:17, 2141:24, 2142:1

**grab** [1] - 2043:15
**graduate** [1] - 2053:22
**graph** [1] - 2121:13
**graphics** [1] - 2084:12
**greater** [3] - 2030:18, 2034:6, 2110:4
**grew** [1] - 2146:19
**GROSSMANN** [1] - 2019:3
**group** [1] - 2100:15
**grow** [1] - 2146:25
**GSE** [18] - 2070:3, 2100:5, 2100:6, 2101:3, 2101:25, 2102:16, 2108:25, 2112:3, 2113:4, 2113:20, 2113:24, 2114:3, 2114:25, 2119:6, 2119:11, 2124:15, 2133:17, 2134:5
**GSE's** [2] - 2102:3, 2102:9
**GSEs** [35] - 2059:1, 2077:4, 2077:6, 2086:5, 2093:22, 2094:2, 2094:15, 2095:5, 2095:15, 2096:5, 2098:9, 2098:19, 2099:25, 2101:6, 2101:9, 2101:12, 2101:16, 2101:20, 2102:11, 2103:2, 2107:17, 2108:2, 2108:8, 2110:4, 2110:12, 2110:19, 2111:14, 2112:21, 2122:25, 2125:1, 2131:10, 2131:24, 2132:23, 2133:3

**HAMISH** [1] - 2018:21
**Hampshire** [1] - 2018:17
**hand** [8] - 2045:2, 2052:16, 2059:20, 2063:4, 2085:14, 2105:9, 2106:7, 2107:23
**handful** [1] - 2100:17
**handled** [1] - 2084:20
**hang** [1] - 2088:5
**hard** [1] - 2139:7
**head** [1] - 2134:1
**hear** [1] - 2063:20
**heard** [2] - 2122:11, 2137:20
**hearing** [2] - 2137:22, 2147:13
**HELD** [1] - 2018:13
**held** [1] - 2137:22
**help** [1] - 2065:25
**helpful** [2] - 2059:5, 2133:17
**HERA** [2] - 2088:6, 2088:14
**hereby** [1] - 2148:3
**high** [2] - 2109:16, 2125:6
**higher** [6] - 2034:16, 2043:8, 2113:18, 2113:21, 2114:12
**highest** [1] - 2097:12
**highlight** [7] - 2027:5, 2027:23, 2033:10, 2089:4, 2108:13, 2109:10, 2131:5
**highlighted** [1] - 2026:22
**himself** [1] - 2131:24
**Hoffman** [5] - 2022:17, 2022:19, 2112:25, 2137:23, 2138:14
**HOFFMAN** [36] - 2019:8, 2021:12, 2021:23, 2022:3, 2022:8, 2022:18, 2022:23, 2024:3, 2024:12, 2028:11, 2029:20, 2035:18, 2038:18, 2039:7, 2039:9, 2039:16, 2043:9, 2056:21, 2070:25, 2071:6, 2087:22, 2112:13, 2120:20, 2120:23, 2121:7, 2122:10, 2132:25, 2133:4, 2135:21, 2135:24, 2137:16, 2137:19, 2137:23, 2138:14,

2143:1, 2143:3
Hoffman)....................
...............**2022** [1] -
2020:4
**holdings** [2] -
2106:20, 2121:21
**hole** [2] - 2029:4,
2031:11
**home** [4] - 2033:2,
2061:17, 2102:23,
2102:24
**Honor** [33] - 2021:12,
2021:13, 2021:24,
2022:5, 2022:18,
2043:13, 2043:18,
2052:17, 2056:21,
2070:25, 2071:6,
2087:22, 2095:22,
2112:11, 2116:1,
2121:5, 2122:10,
2122:14, 2122:16,
2132:8, 2135:21,
2135:24, 2137:14,
2137:19, 2137:25,
2138:5, 2138:14,
2138:19, 2139:2,
2139:10, 2139:14,
2143:16, 2147:9
**HONORABLE** [1] -
2018:13
**hopefully** [1] - 2084:1
**house** [2] - 2032:15,
2032:16
**HOUSING** [1] - 2018:6
**housing** [7] - 2019:6,
2076:17, 2077:1,
2077:5, 2102:17,
2102:22, 2103:2
**HUME** [1] - 2018:21
**hundreds** [1] -
2110:15
**Hynes** [2] - 2120:12,
2120:14

## I

**Ian** [3] - 2022:19,
2137:23, 2138:14
**IAN** [1] - 2019:8
**idea** [1] - 2039:12
**if..** [1] - 2097:24
**immediately** [1] -
2136:17
**impact** [3] - 2061:2,
2077:6, 2093:21
**impacts** [2] - 2119:8,
2123:4
**implemented** [2] -
2056:20, 2057:6
**implications** [1] -

2109:15
**implosion** [1] - 2076:17
**important** [6] - 2050:9, 2073:14, 2081:5, 2083:17, 2085:3, 2088:24
**impose** [1] - 2093:17
**imposed** [5] - 2041:16, 2067:11, 2078:2, 2097:11, 2098:11
**imposition** [3] - 2027:6, 2027:24, 2100:3
**impossible** [2] - 2126:3, 2126:5
**improve** [1] - 2108:9
**improved** [2] - 2132:23, 2133:3
**improvement** [1] - 2140:16
**IN** [2] - 2018:1, 2018:9
**in-kind** [1] - 2145:16
**inability** [2] - 2106:8, 2106:22
**INC** [1] - 2018:3
**inception** [3] - 2090:4, 2090:11, 2097:1
**include** [3] - 2028:9, 2066:1, 2082:11
**included** [4] - 2033:11, 2033:12, 2055:13, 2135:8
**includes** [4] - 2044:11, 2044:12, 2044:13
**including** [2] - 2101:5, 2120:15
**inclusion** [1] - 2104:8
**income** [2] - 2110:4, 2144:6
**inconsistent** [3] - 2025:23, 2038:14, 2038:17
**incorrect** [1] - 2028:18
**increase** [5] - 2027:18, 2031:17, 2037:12, 2123:21, 2125:22
**increased** [6] - 2027:7, 2027:20, 2027:21, 2108:15, 2114:9, 2124:1
**increases** [1] - 2110:7
**increasing** [3] - 2114:16, 2124:6, 2124:8
**indefinite** [1] - 2034:1
**independent** [1] - 2080:16
**independently** [1] - 2074:8

**indicate** [7] - 2025:10, 2043:24, 2053:6, 2087:18, 2105:14, 2105:19, 2125:11
**indicated** [6] - 2044:18, 2116:6, 2117:18, 2123:20, 2131:16, 2134:9
**indicates** [9] - 2061:24, 2086:7, 2092:1, 2106:17, 2121:20, 2134:4, 2134:14, 2135:14, 2140:15
**indicating** [2] - 2112:17, 2141:24
**indication** [1] - 2141:10
**individuals** [2] - 2080:25, 2086:2
**indulgence** [2] - 2137:16, 2139:12
**inflection** [1] - 2101:6
**information** [9] - 2050:20, 2083:19, 2084:13, 2084:15, 2102:8, 2102:10, 2102:12, 2102:21, 2104:15, 2140:14, 2142:6
**infusion** [2] - 2078:19, 2079:7
**initial** [3] - 2024:8, 2034:2, 2034:5
**injections** [2] - 2066:1, 2066:3
**input** [1] - 2084:21
**inputs** [1] - 2061:13
**inquiry** [1] - 2128:10
**inserted** [1] - 2029:14
**instability** [3] - 2113:20, 2114:25, 2115:13
**instead** [4] - 2034:6, 2039:12, 2057:15, 2129:25
**institution** [6] - 2047:11, 2047:21, 2048:10, 2089:8, 2093:11, 2108:25
**institutions** [4] - 2074:5, 2076:21, 2092:20, 2093:18
**instructions** [1] - 2021:7
**insurance** [9] - 2032:10, 2036:6, 2036:9, 2036:18, 2036:23, 2072:18, 2073:8, 2076:11,

2076:20
**insured** [10] - 2039:5, 2039:13, 2039:15, 2074:5, 2074:12, 2074:14, 2074:17, 2075:4, 2075:20, 2076:6
**intended** [4] - 2024:17, 2026:22, 2027:7, 2041:20
**interest** [10] - 2067:19, 2067:24, 2069:5, 2069:10, 2069:15, 2078:11, 2079:11, 2079:15, 2119:3, 2128:24
**interested** [3] - 2062:6, 2113:12, 2126:16
**intermediation** [1] - 2052:4
**intern** [1] - 2048:8
**internal** [9] - 2032:3, 2080:8, 2101:3, 2101:25, 2102:17, 2103:1, 2103:4, 2119:25
**internally** [1] - 2145:12
**invest** [1] - 2030:18
**invested** [1] - 2029:18
**investing** [1] - 2030:18
**investment** [4] - 2032:20, 2064:6, 2064:9, 2108:22
**investments** [5] - 2031:1, 2031:2, 2031:4, 2031:14, 2065:8
**investor** [5] - 2029:6, 2030:11, 2030:16, 2128:13, 2146:13
**investors** [15] - 2029:7, 2029:9, 2029:10, 2030:17, 2065:23, 2099:10, 2117:8, 2121:17, 2128:10, 2129:23, 2146:9, 2146:10, 2146:11, 2146:15
**involved** [1] - 2086:11
**irrelevant** [1] - 2056:22
**issuance** [1] - 2111:18
**issue** [9] - 2056:23, 2099:5, 2100:6, 2111:1, 2112:21, 2126:24, 2128:7, 2130:18, 2131:18
**issued** [13] - 2099:12,

2107:25, 2111:25, 2112:3, 2112:18, 2113:13, 2121:17, 2125:1, 2125:5, 2127:3, 2128:8, 2128:9, 2130:11
**issuer** [2] - 2127:5, 2127:14
**issuers** [1] - 2101:16
**issues** [1] - 2084:19
**issuing** [5] - 2110:13, 2110:15, 2110:19, 2111:2, 2132:10
**itself** [4] - 2037:1, 2041:9, 2059:2, 2064:16

**J**

**January** [2] - 2024:11, 2117:3
**JONATHAN** [1] - 2019:6
**JONES** [1] - 2019:8
**journals** [2] - 2045:5, 2045:6
**Judge** [1] - 2022:8
**judge** [1] - 2139:8
**JUDGE** [1] - 2018:13
**July** [14] - 2143:13, 2143:22, 2144:5, 2144:7, 2144:11, 2144:20, 2144:21, 2144:24, 2144:25, 2145:1, 2145:3, 2145:4, 2145:8, 2145:9
**June** [7] - 2040:7, 2138:7, 2138:22, 2140:1, 2140:14, 2142:17, 2142:18
**junior** [1] - 2029:14
**juror** [2] - 2021:21, 2022:1
**Juror** [1] - 2022:12
**jurors** [5] - 2021:3, 2021:4, 2021:5, 2022:13, 2029:5
**JURY** [1] - 2018:12
**jury** [13] - 2021:2, 2022:11, 2026:10, 2029:12, 2031:2, 2034:20, 2036:4, 2041:15, 2051:12, 2089:6, 2112:15, 2113:8, 2137:22
**just..** [1] - 2106:3
**justifies** [1] - 2039:11

**K**

**KAPLAN** [1] - 2018:22
**KAYE** [1] - 2019:9
**keep** [1] - 2136:25
**keeping** [1] - 2097:23
**KENYA** [1] - 2018:21
**KESSLER** [1] - 2018:19
**kind** [17] - 2026:18, 2032:17, 2032:21, 2036:21, 2036:23, 2044:2, 2050:20, 2051:24, 2080:10, 2084:15, 2099:6, 2114:20, 2115:15, 2118:15, 2126:24, 2135:7, 2145:16
**kinds** [4] - 2032:11, 2044:3, 2044:13, 2046:17
**King** [1] - 2018:19
**KIRK** [1] - 2018:16
**knocking** [1] - 2106:21
**knowledge** [1] - 2104:11
**known** [6] - 2094:21, 2128:19, 2128:20, 2128:21, 2145:8, 2145:10
**KRAVETZ** [93] - 2019:2, 2043:13, 2043:18, 2043:20, 2044:15, 2051:4, 2051:9, 2051:14, 2052:15, 2057:23, 2058:1, 2059:7, 2059:18, 2060:17, 2061:4, 2061:25, 2063:1, 2063:8, 2063:10, 2063:24, 2065:13, 2076:9, 2078:8, 2079:20, 2079:25, 2081:3, 2083:25, 2085:22, 2087:11, 2088:18, 2089:4, 2091:2, 2091:12, 2092:10, 2095:22, 2096:1, 2104:22, 2105:8, 2106:1, 2106:6, 2107:20, 2108:12, 2109:7, 2109:14, 2111:7, 2111:12, 2111:20, 2112:11, 2112:15, 2115:19, 2116:4, 2117:16, 2119:15, 2120:5, 2120:18, 2120:22, 2120:24, 2121:5,

2160

2121:8, 2121:11,
2121:25, 2122:14,
2122:16, 2123:3,
2123:8, 2123:16,
2131:3, 2132:8,
2133:6, 2133:15,
2134:12, 2137:1,
2137:14, 2137:18,
2138:5, 2138:19,
2139:2, 2139:10,
2139:12, 2139:14,
2139:15, 2140:4,
2140:12, 2141:21,
2142:24, 2143:2,
2143:4, 2143:10,
2143:16, 2143:19,
2143:25, 2144:12,
2147:9
**Kravetz** [4] - 2043:14,
2120:20, 2137:17,
2138:5
**Kravetz)**.....................
.............**2043** [1] -
2020:5

# L

**labeled** [2] - 2050:13,
2061:7
**LAMBERTH** [1] -
2018:13
**language** [6] - 2026:6,
2026:7, 2028:9,
2056:15, 2057:2,
2089:1
**large** [16] - 2032:10,
2036:13, 2070:23,
2074:4, 2074:7,
2075:22, 2076:11,
2076:21, 2078:18,
2079:7, 2088:23,
2130:7, 2131:11,
2131:25, 2146:18,
2146:25
**larger** [2] - 2071:17,
2071:21
**largest** [2] - 2074:16,
2076:5
**last** [20] - 2024:22,
2027:23, 2031:25,
2039:1, 2039:14,
2042:15, 2046:3,
2048:25, 2049:13,
2062:1, 2064:8,
2064:13, 2075:11,
2076:3, 2078:21,
2082:23, 2089:5,
2105:8, 2131:4,
2145:14
**late** [2] - 2046:18,
2099:17

**law** [1] - 2110:6
**lead** [1] - 2123:13
**leading** [2] - 2051:20,
2053:18
**leads** [1] - 2027:9
**least** [4] - 2035:24,
2082:22, 2124:19,
2131:16
**leaving** [2] - 2121:17,
2139:9
**lecture** [1] - 2054:9
**led** [1] - 2073:25
**LEE** [1] - 2018:18
**left** [5] - 2025:7,
2040:10, 2051:3,
2106:7, 2116:22
**left-hand** [1] - 2106:7
**legal** [2] - 2056:22,
2092:2
**Lehman** [1] - 2077:11
**lender** [4] - 2066:25,
2067:3, 2067:5,
2068:3
**lender's** [1] - 2072:4
**lenders** [3] - 2068:8,
2079:10
**lending** [3] - 2028:22,
2030:19, 2079:10
**length** [1] - 2050:8
**less** [8] - 2055:22,
2055:23, 2056:1,
2113:25, 2114:24,
2115:12, 2121:16,
2125:12
**letter** [5] - 2026:8,
2026:9, 2026:10,
2026:11, 2026:12
**letters** [8] - 2021:9,
2021:11, 2026:2,
2026:3, 2026:7,
2026:19, 2027:12,
2028:8
**level** [6] - 2041:25,
2097:23, 2102:12,
2111:4, 2114:22,
2129:18
**levied** [1] - 2027:16
**liabilities** [1] - 2039:4
**liability** [1] - 2076:20
**LIBOR** [4] - 2067:20,
2067:25, 2069:7,
2078:16
**light** [1] - 2083:18
**likely** [5] - 2101:9,
2101:19, 2106:18,
2121:21, 2134:5
**limitations** [1] -
2084:24
**limited** [1] - 2072:25
**line** [10] - 2026:21,

2042:16, 2064:8,
2064:18, 2065:2,
2078:21, 2123:12,
2127:20, 2134:14
**lines** [1] - 2108:13
**liquid** [3] - 2128:6,
2129:1, 2129:8
**liquidation** [7] -
2145:21, 2145:24,
2146:2, 2146:4,
2146:8, 2146:16,
2146:19
**Lisa** [1] - 2019:12
**LISA** [1] - 2148:3
**list** [9] - 2045:5,
2049:7, 2060:2,
2061:18, 2078:12,
2078:22, 2099:25,
2105:20, 2111:24
**listed** [4] - 2045:14,
2045:18, 2048:22,
2086:20
**lists** [1] - 2045:17
**litigation** [1] - 2044:4
**LITIGATIONS** [1] -
2018:10
**LITOWITZ** [1] - 2019:3
**live** [1] - 2081:20
**LLP** [2] - 2018:22,
2019:3
**loan** [61] - 2029:17,
2029:23, 2029:24,
2030:2, 2030:3,
2030:22, 2032:8,
2032:14, 2032:20,
2032:21, 2033:22,
2043:2, 2051:20,
2051:21, 2052:10,
2053:6, 2053:10,
2053:14, 2053:18,
2054:7, 2054:9,
2054:11, 2054:15,
2054:18, 2054:24,
2055:3, 2055:13,
2055:20, 2055:25,
2056:1, 2056:6,
2056:8, 2056:9,
2056:12, 2065:15,
2066:2, 2066:3,
2066:4, 2066:12,
2066:18, 2066:23,
2067:3, 2067:5,
2067:8, 2067:12,
2068:13, 2069:5,
2069:16, 2069:17,
2069:21, 2070:23,
2071:4, 2071:9,
2071:15, 2071:20,
2071:21, 2079:8,
2102:11, 2102:12

**loan-level** [1] -
2102:12
**loans** [11] - 2029:17,
2030:6, 2108:14,
2108:20, 2108:21,
2108:23, 2109:2,
2109:3, 2109:6,
2109:17, 2109:24
**logo** [1] - 2061:10
**long-term** [11] -
2046:14, 2046:19,
2046:23, 2108:24,
2110:18, 2111:5,
2112:22, 2124:7,
2126:17, 2127:12,
2128:4
**longest** [1] - 2102:24
**look** [19] - 2030:5,
2030:9, 2046:15,
2054:24, 2059:12,
2062:25, 2063:21,
2075:23, 2078:21,
2085:14, 2100:25,
2114:2, 2114:6,
2116:16, 2133:13,
2138:23, 2138:25,
2140:20
**looked** [11] - 2055:3,
2056:2, 2056:12,
2062:11, 2072:18,
2074:12, 2074:14,
2112:9, 2126:15,
2129:7, 2130:13
**looking** [9] - 2026:2,
2030:9, 2056:9,
2061:10, 2062:12,
2091:21, 2115:24,
2129:3, 2129:5
**looks** [1] - 2059:21
**losses** [3] - 2109:18,
2141:18, 2141:19
**lost** [1] - 2029:19
**low** [4] - 2040:15,
2040:16, 2069:10,
2114:14
**lower** [12] - 2063:4,
2075:24, 2076:1,
2097:16, 2097:17,
2106:7, 2107:23,
2113:23, 2113:24,
2115:7, 2115:11
**lunch** [2] - 2021:16,
2021:19

# M

**Mac** [38] - 2027:17,
2028:23, 2028:24,
2031:21, 2033:4,
2033:9, 2033:14,
2033:23, 2034:4,

2034:7, 2034:11,
2034:13, 2034:14,
2035:12, 2036:20,
2037:18, 2040:6,
2040:20, 2041:11,
2061:9, 2061:11,
2064:22, 2077:22,
2080:22, 2095:12,
2103:21, 2111:24,
2113:13, 2114:19,
2119:4, 2127:3,
2128:7, 2128:12,
2137:8, 2141:10,
2141:18, 2142:11,
2144:6
**MAC** [1] - 2018:9
**Mac's** [5] - 2041:2,
2041:3, 2061:10,
2064:25, 2128:21
**Mae** [41] - 2027:17,
2028:22, 2028:24,
2031:20, 2032:4,
2033:4, 2033:8,
2033:14, 2033:23,
2033:25, 2034:7,
2034:11, 2034:12,
2034:15, 2035:12,
2036:20, 2036:25,
2037:18, 2040:5,
2040:19, 2041:3,
2041:11, 2077:22,
2080:22, 2094:5,
2095:11, 2103:21,
2113:13, 2114:19,
2116:24, 2119:4,
2127:3, 2128:7,
2128:12, 2133:25,
2137:7, 2141:15,
2141:19, 2142:12,
2142:21, 2143:9
**Mae's** [3] - 2032:3,
2041:1, 2128:20
**MAE/FREDDIE** [1] -
2018:9
**Mae/Freddie** [1] -
2034:3
**maintain** [1] - 2138:18
**major** [4] - 2086:13,
2096:11, 2096:23,
2099:24
**majority** [1] - 2128:14
**maker** [1] - 2081:10
**management** [1] -
2046:19
**March** [1] - 2107:25
**marginally** [1] -
2031:24
**Mario** [2] - 2104:16,
2122:23
**market** [35] - 2024:20,

2025:7, 2025:16, 2031:10, 2031:18, 2051:17, 2057:16, 2067:20, 2067:25, 2072:14, 2072:15, 2072:20, 2076:17, 2077:5, 2086:12, 2089:23, 2091:20, 2102:17, 2102:22, 2103:2, 2106:10, 2109:15, 2113:20, 2115:1, 2115:13, 2116:7, 2116:21, 2117:6, 2120:1, 2121:23, 2123:4, 2124:15, 2125:23, 2129:1
**market-wide** [1] - 2116:21
**marketing** [6] - 2135:1, 2135:6, 2135:8, 2135:19, 2135:20, 2136:6
**markets** [7] - 2044:13, 2046:17, 2077:12, 2100:3, 2121:1, 2124:16, 2128:3
**Maryland** [1] - 2021:21
**Massachusetts** [1] - 2019:9
**massive** [3] - 2095:6, 2095:8, 2095:10
**material** [1] - 2069:23
**materially** [1] - 2098:20
**materials** [5] - 2059:13, 2086:20, 2118:9, 2139:3, 2139:17
**math** [2] - 2035:4, 2049:19
**matter** [13] - 2039:13, 2045:9, 2055:7, 2056:3, 2068:19, 2085:20, 2087:8, 2118:22, 2120:25, 2121:3, 2133:12, 2139:5, 2146:18
**matters** [2] - 2044:4, 2117:22
**matured** [1] - 2129:20
**matures** [1] - 2117:2
**maturities** [5] - 2111:1, 2114:10, 2114:11, 2114:21, 2114:22
**maturity** [4] - 2113:15, 2125:14, 2126:16, 2129:17
**maximum** [1] - 2095:5

**MBS** [2] - 2029:6, 2146:9
**mean** [20] - 2028:21, 2030:15, 2035:11, 2036:20, 2044:9, 2047:8, 2056:9, 2069:10, 2071:25, 2073:21, 2084:16, 2089:16, 2098:7, 2099:3, 2099:18, 2102:20, 2107:13, 2112:8, 2132:16, 2140:2
**meaning** [2] - 2092:20, 2115:11
**means** [3] - 2030:17, 2037:19, 2082:12
**meant** [2] - 2057:13, 2136:15
**measure** [1] - 2117:25
**medium** [2] - 2126:4, 2127:13
**medium-term** [2] - 2126:4, 2127:13
**meet** [5] - 2036:18, 2036:21, 2093:18, 2136:14, 2142:22
**meeting** [1] - 2105:23
**meetings** [2] - 2049:7, 2103:6
**MELTZER** [1] - 2018:19
**members** [1] - 2036:4
**memo** [2] - 2064:20, 2064:22
**memory** [3] - 2068:15, 2068:21, 2110:8
**mention** [1] - 2029:24
**mentioned** [7] - 2030:1, 2042:20, 2070:6, 2074:12, 2091:16, 2109:21, 2109:23
**mentions** [1] - 2097:23
**method** [4] - 2072:13, 2072:22, 2073:4, 2073:5
**methodology** [2] - 2064:3, 2124:12
**might** [14] - 2059:3, 2059:5, 2063:19, 2065:10, 2103:16, 2106:24, 2107:11, 2107:13, 2118:15, 2119:1, 2122:11, 2133:16, 2134:20, 2135:2
**million** [3] - 2071:10, 2071:11

**mine** [1] - 2047:7
**minimum** [2] - 2036:18, 2093:17
**minus** [3] - 2037:17, 2038:24, 2075:23
**minute** [1] - 2022:9
**minutes** [1] - 2095:23
**mischaracterizes** [3] - 2071:1, 2071:7, 2087:23
**missed** [1] - 2074:11
**misspoke** [1] - 2091:15
**misstate** [1] - 2052:14
**mistaken** [1] - 2105:21
**modeling** [6] - 2047:6, 2047:8, 2047:9, 2061:12, 2061:13, 2140:15
**modified** [3] - 2035:9, 2035:11, 2035:12
**moment** [15] - 2027:1, 2043:14, 2052:15, 2052:16, 2059:11, 2059:24, 2063:16, 2081:4, 2081:23, 2091:3, 2117:17, 2120:19, 2123:4, 2137:16, 2140:12
**moments** [1] - 2116:21
**Monday** [2] - 2021:7, 2021:8
**money** [8] - 2026:17, 2028:22, 2029:18, 2032:23, 2036:7, 2065:23, 2127:17
**monitor** [1] - 2038:22
**month** [2] - 2078:15, 2127:18
**monthly** [3] - 2102:8, 2102:12, 2102:13
**months** [1] - 2128:24
**Moody's** [3] - 2096:14, 2096:15, 2096:22
**MOREIRA** [1] - 2148:3
**Moreira** [2] - 2019:12, 2148:10
**morning** [2] - 2147:8, 2147:12
**mortgage** [8] - 2032:15, 2033:2, 2044:12, 2076:23, 2089:23, 2123:13, 2124:5, 2129:23
**mortgage-backed** [2] - 2044:12, 2129:23
**mortgages** [1] - 2109:24
**most** [9] - 2034:24,

2064:10, 2106:18, 2109:18, 2124:16, 2128:2, 2128:6, 2129:7, 2136:14
**mouth** [1] - 2136:2
**move** [7] - 2022:13, 2032:7, 2076:9, 2112:12, 2121:6, 2137:14, 2143:16
**moved** [1] - 2098:1
**movement** [1] - 2120:1
**moving** [1] - 2142:19
**MR** [128] - 2021:12, 2021:13, 2021:23, 2022:3, 2022:8, 2022:18, 2022:23, 2024:3, 2024:12, 2028:11, 2029:20, 2035:18, 2038:18, 2039:7, 2039:9, 2039:16, 2043:9, 2043:13, 2043:18, 2043:20, 2044:15, 2051:4, 2051:9, 2051:14, 2052:15, 2056:21, 2057:23, 2058:1, 2059:7, 2059:18, 2060:17, 2061:4, 2061:25, 2063:1, 2063:8, 2063:10, 2063:24, 2065:13, 2070:25, 2071:6, 2076:9, 2078:8, 2079:20, 2079:25, 2081:3, 2083:25, 2085:22, 2087:11, 2087:22, 2088:18, 2089:4, 2091:2, 2091:12, 2092:10, 2095:22, 2096:1, 2104:22, 2105:8, 2106:1, 2106:6, 2107:20, 2108:12, 2109:7, 2109:14, 2111:7, 2111:12, 2111:20, 2112:11, 2112:13, 2112:15, 2115:19, 2116:4, 2117:16, 2119:15, 2120:5, 2120:18, 2120:20, 2120:22, 2120:23, 2120:24, 2121:5, 2121:7, 2121:8, 2121:11, 2121:25, 2122:10, 2122:14, 2122:16, 2123:3, 2123:8, 2123:16, 2131:3, 2132:8,

2132:25, 2133:4, 2133:6, 2133:15, 2134:12, 2135:21, 2135:24, 2137:1, 2137:14, 2137:16, 2137:18, 2137:19, 2137:23, 2138:5, 2138:14, 2138:19, 2139:2, 2139:10, 2139:12, 2139:14, 2139:15, 2140:4, 2140:12, 2141:21, 2142:24, 2143:1, 2143:2, 2143:3, 2143:4, 2143:10, 2143:16, 2143:19, 2143:25, 2144:12, 2147:9
**MUKARRAM** [2] - 2020:3, 2022:21
**multiple** [3] - 2076:17, 2084:18, 2100:16
**multiplied** [1] - 2038:3
**multiplying** [1] - 2040:22
**must** [3] - 2060:11, 2074:11, 2093:18

**N**

**name** [2] - 2026:14, 2105:10
**named** [3] - 2120:12, 2120:14
**names** [1] - 2105:21
**narrowing** [1] - 2138:11
**need** [3] - 2030:9, 2108:20, 2127:14
**needed** [1] - 2129:6
**needs** [1] - 2029:2
**negative** [7] - 2028:25, 2029:3, 2031:11, 2031:22, 2031:23, 2099:12, 2100:6
**negotiated** [1] - 2078:16
**net** [31] - 2027:25, 2028:3, 2058:11, 2093:21, 2093:25, 2094:2, 2094:14, 2094:15, 2094:22, 2094:24, 2095:4, 2097:2, 2097:10, 2098:14, 2099:14, 2101:19, 2110:12, 2114:8, 2115:1, 2117:14, 2120:1, 2120:10, 2121:14, 2122:7, 2131:23, 2141:8, 2141:13,

2162

2142:7, 2145:4,
2147:2
**never** [10] - 2048:9,
2048:21, 2054:17,
2056:12, 2065:6,
2086:23, 2087:4,
2088:20, 2100:4
**New** [6] - 2018:17,
2018:23, 2019:4,
2032:8, 2032:18
**new** [3] - 2116:4,
2123:6, 2142:10
**newly** [2] - 2108:14,
2108:20
**NEXT** [1] - 2018:24
**next** [26] - 2024:3,
2024:12, 2026:1,
2028:11, 2033:7,
2035:18, 2037:2,
2038:18, 2039:7,
2039:16, 2060:7,
2078:10, 2104:25,
2107:21, 2109:7,
2117:3, 2121:12,
2121:13, 2122:17,
2123:12, 2127:18,
2127:19, 2134:4,
2135:11, 2140:4,
2140:23
**noncash** [2] - 2146:1,
2146:3
**none** [6] - 2040:20,
2046:9, 2046:12,
2046:13, 2083:9,
2103:10
**nonpublic** [2] -
2102:2, 2102:5
**normal** [1] - 2136:24
**normally** [2] -
2092:21, 2118:13
**Northwest** [1] -
2018:23
**note** [6] - 2050:9,
2052:13, 2053:2,
2077:25, 2078:12,
2107:25
**noted** [5] - 2033:21,
2057:12, 2064:8,
2082:22, 2089:13
**notes** [7] - 2086:8,
2086:16, 2107:11,
2124:15, 2128:20,
2128:22, 2148:5
**nothing** [4] - 2025:22,
2065:4, 2065:5,
2065:8
**notice** [1] - 2099:8
**noting** [2] - 2027:15,
2075:7
**November** [4] -

2078:5, 2078:6,
2079:2, 2117:2
**number** [18] - 2059:17,
2059:19, 2060:10,
2062:11, 2074:17,
2076:2, 2085:15,
2105:10, 2120:15,
2125:3, 2130:21,
2133:13, 2134:13,
2137:17, 2138:20,
2143:1, 2147:5
**Number** [1] - 2018:9
**numbers** [3] - 2051:4,
2070:12, 2116:1
**Nup'** [1] - 2123:1
**nup'** [1] - 2123:7
**NW** [4] - 2018:17,
2019:9, 2019:13,
2148:12

---

# O

**object** [2] - 2072:21,
2137:19
**objection** [11] -
2056:21, 2070:25,
2071:6, 2087:22,
2112:13, 2121:7,
2122:10, 2132:25,
2133:4, 2135:21,
2135:24
**objection's** [2] -
2122:12, 2139:6
**objections** [1] -
2138:18
**objective** [1] - 2057:16
**objectives** [1] -
2083:18
**occasion** [3] -
2055:11, 2055:13,
2129:11
**occurred** [2] -
2046:10, 2117:25
**October** [9] - 2018:5,
2085:25, 2090:13,
2138:1, 2139:22,
2140:6, 2140:9,
2141:21, 2148:8
**OF** [3] - 2018:1,
2018:12, 2148:1
**offer** [1] - 2023:24
**offered** [2] - 2023:8,
2072:10
**offering** [2] - 2050:1,
2083:8
**Official** [1] - 2019:12
**OFFICIAL** [1] - 2148:1
**official** [1] - 2148:11
**officials** [2] - 2103:6,
2103:7

**often** [2] - 2099:4,
2100:13
**ON** [1] - 2018:24
**once** [2] - 2041:23,
2082:1
**one** [62] - 2021:21,
2022:1, 2022:13,
2023:1, 2023:5,
2023:12, 2024:5,
2031:4, 2032:11,
2033:7, 2041:21,
2048:8, 2048:13,
2049:10, 2052:4,
2052:15, 2052:16,
2054:18, 2056:18,
2059:13, 2062:18,
2062:21, 2063:1,
2065:14, 2067:13,
2068:18, 2070:21,
2075:10, 2075:15,
2079:21, 2080:4,
2082:6, 2084:1,
2085:19, 2090:21,
2091:6, 2091:17,
2093:10, 2096:18,
2096:19, 2097:15,
2097:22, 2100:17,
2103:14, 2105:2,
2106:16, 2106:23,
2108:21, 2115:21,
2117:3, 2118:3,
2120:7, 2123:21,
2128:2, 2128:3,
2132:19, 2134:20,
2137:16, 2141:4,
2142:11, 2144:3
**one-day** [1] - 2118:3
**one-time** [1] - 2041:21
**ones** [4] - 2069:18,
2100:19, 2128:6,
2129:7
**ongoing** [6] - 2024:19,
2026:23, 2067:16,
2067:23, 2068:12,
2069:1
**operate** [6] - 2036:17,
2089:8, 2092:22,
2093:1, 2095:11,
2095:13
**opine** [1] - 2080:7
**opinion** [28] - 2023:13,
2023:17, 2025:14,
2030:12, 2030:20,
2031:3, 2034:21,
2034:24, 2035:23,
2050:24, 2053:15,
2054:14, 2055:24,
2058:9, 2059:14,
2060:3, 2072:11,
2085:20, 2090:23,

2095:14, 2100:13,
2115:18, 2129:22,
2130:6, 2132:10,
2139:5
**opinions** [15] - 2023:8,
2023:12, 2023:22,
2049:25, 2066:10,
2066:11, 2079:21,
2083:8, 2083:10,
2087:8, 2100:21,
2102:23, 2130:17,
2138:24
**option** [4] - 2070:15,
2106:23, 2145:16,
2146:5
**options** [3] - 2046:25,
2072:25, 2126:11
**oranges** [3] - 2030:23,
2040:16, 2043:3
**order** [1] - 2038:6
**organization** [2] -
2076:11, 2093:11
**orient** [2] - 2024:2,
2034:20
**original** [1] - 2078:2
**origination** [1] -
2077:25
**otherwise** [2] -
2047:21, 2058:22
**outlook** [8] - 2059:10,
2099:4, 2099:6,
2099:12, 2099:15,
2100:6, 2132:23,
2133:2
**outlooks** [1] - 2099:1
**output** [1] - 2118:7
**outset** [1] - 2081:25
**outside** [4] - 2056:22,
2122:10, 2137:22,
2138:16
**outstanding** [3] -
2024:24, 2037:16,
2119:7
**overall** [3] - 2058:9,
2077:9, 2124:7
**overruled** [3] -
2056:24, 2087:25,
2139:6
**oversight** [1] - 2092:3
**owe** [1] - 2106:19
**own** [7] - 2031:9,
2031:16, 2051:23,
2051:24, 2064:25,
2076:23
**owned** [1] - 2076:23

---

# P

**p.m** [2] - 2018:5,
2147:14

**package** [2] - 2034:18,
2110:10
**packages** [1] -
2035:16
**PAGE** [2] - 2018:24,
2020:2
**Page** [20] - 2052:24,
2059:25, 2060:18,
2061:6, 2087:12,
2087:15, 2088:19,
2092:11, 2106:2,
2106:6, 2107:21,
2111:9, 2111:20,
2111:21, 2140:3,
2143:5, 2144:1,
2144:2, 2144:4
**page** [19] - 2059:22,
2060:7, 2061:5,
2061:10, 2062:20,
2104:24, 2104:25,
2105:8, 2105:20,
2105:22, 2105:24,
2106:1, 2107:21,
2109:7, 2121:12,
2140:4, 2144:3,
2144:14
**pages** [1] - 2050:3
**Pages** [1] - 2052:22
**paid** [10] - 2034:5,
2034:6, 2034:15,
2041:22, 2042:1,
2074:18, 2076:6,
2094:17, 2145:20,
2145:23
**paper** [10] - 2047:7,
2051:23, 2051:24,
2052:1, 2052:8,
2066:19, 2069:18,
2071:11, 2126:2,
2126:22
**papers** [5] - 2045:19,
2046:16, 2053:21,
2054:4, 2068:15
**par** [1] - 2064:9
**Paragraph** [3] -
2052:25, 2068:20,
2087:14
**paragraph** [13] -
2053:2, 2063:21,
2081:24, 2082:2,
2088:9, 2088:13,
2091:13, 2106:8,
2106:15, 2106:17,
2107:24, 2121:13,
2131:4
**Paragraphs** [1] -
2082:6
**part** [20] - 2033:17,
2036:12, 2041:17,
2043:5, 2051:25,

2058:9, 2078:10,
2078:19, 2080:6,
2084:20, 2084:25,
2087:18, 2110:6,
2110:10, 2113:6,
2122:6, 2124:4,
2127:1, 2127:2,
2139:2
**participated** [1] -
2049:15
**participation** [1] -
2049:7
**particular** [35] -
2044:5, 2044:6,
2060:15, 2061:3,
2061:24, 2071:5,
2080:19, 2082:4,
2082:13, 2086:16,
2088:10, 2088:17,
2092:1, 2092:20,
2092:24, 2099:21,
2100:14, 2101:1,
2105:18, 2106:15,
2107:15, 2111:23,
2117:25, 2121:14,
2122:2, 2123:18,
2123:22, 2123:24,
2130:16, 2133:7,
2133:16, 2133:24,
2134:9, 2140:13,
2142:13
**parties** [1] - 2025:23
**party** [1] - 2026:11
**passage** [1] - 2133:16
**past** [2] - 2049:9,
2137:3
**pause** [1] - 2040:13
**Pause** [4] - 2043:17,
2063:18, 2116:3,
2141:2
**pay** [15] - 2027:17,
2036:9, 2042:21,
2042:23, 2069:15,
2074:5, 2074:16,
2075:22, 2094:11,
2094:12, 2109:3,
2113:22, 2131:12,
2132:1, 2141:6
**paying** [2] - 2146:3,
2146:20
**payment** [2] - 2136:17,
2145:15
**payments** [4] - 2065:4,
2107:10, 2136:14,
2140:22
**pays** [2] - 2039:1,
2039:4
**PCF** [43] - 2026:7,
2026:22, 2027:6,
2027:10, 2027:15,

2027:18, 2027:24,
2028:7, 2028:13,
2030:4, 2034:18,
2034:21, 2035:6,
2035:20, 2037:22,
2038:6, 2041:16,
2042:12, 2042:19,
2042:20, 2042:23,
2042:25, 2043:6,
2043:8, 2051:3,
2051:17, 2055:25,
2056:5, 2056:8,
2056:15, 2056:18,
2057:2, 2057:4,
2057:5, 2058:3,
2058:5, 2058:19,
2059:3, 2066:13,
2070:18, 2072:17,
2072:23, 2094:12
**Pennsylvania** [1] -
2018:20
**people** [5] - 2036:7,
2086:11, 2100:17,
2100:21, 2107:8
**people's** [1] - 2105:21
**per** [1] - 2062:7
**percent** [35] - 2024:9,
2027:21, 2028:5,
2032:1, 2034:9,
2034:17, 2034:18,
2035:2, 2035:3,
2035:7, 2037:7,
2038:1, 2042:7,
2062:4, 2068:10,
2068:11, 2069:8,
2069:15, 2069:22,
2070:16, 2078:12,
2078:17, 2078:23,
2094:17, 2106:19,
2106:25, 2107:5,
2116:18, 2116:23,
2132:1, 2145:21,
2145:25, 2146:2,
2147:3
**percentage** [5] -
2037:24, 2038:3,
2075:23, 2075:24,
2076:1
**perfect** [2] - 2084:4,
2111:21
**perform** [1] - 2138:11
**performance** [4] -
2102:3, 2102:9,
2102:11, 2108:24
**performed** [5] -
2054:11, 2071:15,
2116:6, 2117:19,
2117:21
**period** [17] - 2058:14,
2069:10, 2092:12,

2092:13, 2094:11,
2097:9, 2097:18,
2098:10, 2110:11,
2112:20, 2114:7,
2114:8, 2114:9,
2114:17, 2115:2,
2140:8, 2142:1
**periodic** [16] - 2023:3,
2023:9, 2023:13,
2023:14, 2023:17,
2024:5, 2024:10,
2024:14, 2025:15,
2025:24, 2026:16,
2027:2, 2034:17,
2041:9, 2041:20,
2042:17
**periodically** [1] -
2102:22
**periods** [1] - 2136:24
**person** [6] - 2062:13,
2082:20, 2082:25,
2083:3, 2092:2,
2105:16
**personal** [1] - 2135:3
**personally** [2] -
2085:5, 2104:7
**perspective** [2] -
2129:4, 2129:5
**Ph.D** [1] - 2020:3
**PhD** [1] - 2022:21
**phone** [2] - 2105:10,
2122:11
**phrase** [1] - 2024:22
**pick** [1] - 2051:2
**picks** [1] - 2036:13
**piece** [5] - 2032:13,
2043:7, 2075:15,
2108:21, 2108:22
**place** [5] - 2031:17,
2069:23, 2099:19,
2131:17, 2146:8
**placed** [1] - 2099:25
**places** [1] - 2052:13
**Plaintiff's** [5] -
2085:11, 2091:4,
2133:9, 2142:24,
2144:1
**plaintiff's** [1] - 2023:6
**plaintiffs** [5] -
2043:14, 2121:5,
2137:14, 2138:6,
2138:10
**Plaintiffs** [4] - 2018:4,
2018:16, 2018:18,
2019:2
**planning** [2] - 2134:1,
2134:2
**play** [2] - 2057:24,
2119:15
**playing** [2] - 2057:25,

2119:17
**pleased** [2] - 2021:8,
2022:2
**PLLC** [1] - 2018:16
**plugged** [1] - 2031:12
**plugs** [1] - 2029:4
**plus** [2] - 2032:20,
2078:16
**point** [16] - 2030:5,
2057:23, 2059:22,
2061:1, 2062:1,
2064:21, 2068:17,
2069:4, 2095:21,
2097:25, 2101:6,
2107:7, 2114:16,
2136:12, 2136:19,
2142:13
**Point** [1] - 2144:13
**points** [27] - 2023:19,
2034:25, 2035:2,
2036:13, 2036:14,
2037:23, 2040:1,
2040:14, 2062:3,
2062:4, 2062:18,
2062:21, 2062:23,
2068:6, 2068:14,
2068:25, 2072:25,
2073:7, 2074:3,
2074:17, 2076:6,
2078:25, 2079:5,
2079:6, 2116:17,
2116:23, 2130:8
**policy** [1] - 2142:10
**political** [3] - 2107:11,
2107:14, 2107:16
**poor** [1] - 2041:19
**Poor's** [2] - 2096:21,
2096:22
**PORTER** [1] - 2019:9
**portfolio** [3] - 2122:7,
2124:5, 2129:18
**portfolios** [1] -
2123:13
**portion** [15] - 2025:2,
2027:3, 2038:12,
2040:10, 2045:2,
2052:7, 2067:16,
2067:23, 2085:23,
2106:13, 2107:23,
2129:1, 2140:6,
2143:11
**posed** [2] - 2055:19,
2080:3
**posing** [1] - 2132:4
**position** [5] - 2072:4,
2073:13, 2077:9,
2107:4, 2131:10
**positive** [1] - 2031:25
**possibility** [3] -
2073:1, 2095:17,

2145:15
**possible** [2] - 2037:11,
2103:11
**possibly** [1] - 2115:4
**potential** [8] - 2064:2,
2099:8, 2103:12,
2106:11, 2106:16,
2114:25, 2128:3,
2137:7
**PowerPoint** [4] -
2085:8, 2086:17,
2088:19, 2118:7
**practically** [2] -
2040:20, 2090:6
**pre** [1] - 2114:22
**pre-crisis** [1] -
2114:22
**preceding** [1] - 2115:2
**precise** [1] - 2089:17
**precisely** [1] - 2064:21
**preference** [7] -
2145:21, 2145:24,
2146:2, 2146:4,
2146:8, 2146:16,
2146:19
**preferred** [3] -
2063:23, 2064:5,
2106:20
**PREFERRED** [1] -
2018:9
**preferreds** [1] -
2029:14
**premium** [3] -
2072:18, 2072:22,
2073:8
**premiums** [1] - 2072:9
**prepare** [1] - 2084:9
**prepared** [7] -
2023:24, 2033:7,
2045:8, 2049:23,
2062:9, 2062:13,
2087:7
**preparing** [1] -
2050:16
**present** [1] - 2081:13
**presentation** [9] -
2038:19, 2039:18,
2044:16, 2048:25,
2080:1, 2100:11,
2103:24, 2116:5,
2133:21
**presentations** [4] -
2045:23, 2048:22,
2049:3, 2062:11
**pretty** [6] - 2047:7,
2050:15, 2115:14,
2117:5, 2117:6,
2127:18
**prevents** [1] - 2095:19
**previous** [4] - 2041:5,

2091:21, 2141:4,
2142:2
**previously** [3] -
2055:6, 2138:10,
2138:18
**price** [2] - 2102:24,
2123:22
**prices** [5] - 2061:17,
2077:1, 2077:5,
2102:23, 2124:2
**pricing** [1] - 2046:25
**primarily** [1] - 2076:21
**primary** [1] - 2023:13
**principal** [1] - 2128:25
**print** [1] - 2063:20
**priority** [4] - 2146:10,
2146:16, 2146:25,
2147:1
**private** [2] - 2064:6,
2103:6
**problem** [2] - 2043:5,
2106:17
**proceed** [4] - 2022:16,
2022:17, 2095:25,
2139:13
**proceedings** [1] -
2148:6
**proceeds** [2] -
2027:25, 2028:3
**process** [2] - 2047:10,
2092:2
**produced** [1] - 2143:9
**production** [1] -
2060:2
**Professor** [15] -
2023:6, 2023:8,
2025:14, 2028:13,
2031:5, 2032:12,
2034:20, 2035:6,
2035:22, 2037:14,
2037:22, 2038:11,
2038:12, 2039:11,
2071:11
**profitable** [1] - 2109:6
**profits** [1] - 2095:14
**Program** [2] - 2031:1,
2031:6
**program** [3] - 2036:6,
2036:9, 2036:23
**prohibited** [1] -
2093:22
**projected** [1] -
2140:10
**projecting** [2] -
2032:5, 2141:19
**projection** [5] -
2140:8, 2142:1,
2142:19, 2142:21,
2144:9
**projections** [23] -

2032:3, 2047:3,
2047:10, 2061:12,
2061:13, 2062:18,
2132:22, 2135:5,
2137:2, 2137:7,
2138:1, 2138:3,
2138:11, 2138:17,
2138:20, 2139:22,
2140:6, 2140:9,
2140:13, 2141:22,
2141:25, 2142:2,
2142:15
**Projections** [1] -
2134:15
**proposing** [1] -
2106:21
**proposition** [2] -
2126:3, 2126:23
**prospect** [2] -
2109:17, 2130:2
**protect** [2] - 2094:8,
2094:9
**protected** [1] -
2093:25
**protecting** [1] - 2068:3
**provide** [7] - 2027:25,
2044:2, 2044:3,
2050:20, 2077:16,
2084:13, 2089:7
**provided** [9] -
2024:19, 2026:23,
2061:13, 2061:18,
2066:25, 2076:20,
2077:20, 2077:21,
2134:25
**provides** [2] - 2036:6,
2082:15
**providing** [5] -
2028:23, 2028:24,
2066:25, 2106:16,
2114:19
**provision** [3] -
2056:19, 2058:5,
2124:5
**proxy** [1] - 2066:12
**Prussia** [1] - 2018:19
**PSPA** [2] - 2058:5,
2145:22
**PSPAs** [9] - 2033:18,
2034:1, 2035:12,
2041:16, 2070:3,
2131:6, 2145:16,
2145:19, 2145:24
**public** [1] - 2048:19
**publication** [1] -
2046:3
**publications** [6] -
2045:18, 2046:2,
2046:9, 2046:12,
2046:13, 2046:16

**publicly** [2] - 2102:4,
2102:12
**publish** [1] - 2051:6
**published** [13] -
2036:12, 2045:3,
2045:6, 2046:6,
2046:21, 2046:23,
2046:25, 2047:2,
2047:5, 2047:12,
2047:14, 2066:19,
2138:9
**pull** [8] - 2029:12,
2032:22, 2044:16,
2059:7, 2063:2,
2079:25, 2083:25,
2133:8
**pulled** [2] - 2075:2,
2103:18
**PURCHASE** [1] -
2018:9
**Purchase** [2] - 2031:1,
2031:6
**purchaser** [1] -
2024:18
**purpose** [5] - 2024:14,
2027:2, 2027:7,
2055:4, 2109:25
**purposes** [2] -
2064:10, 2079:13
**pursuant** [1] - 2088:6
**put** [22] - 2031:17,
2032:22, 2033:4,
2033:22, 2034:10,
2051:5, 2065:5,
2065:23, 2070:13,
2073:7, 2078:9,
2088:15, 2091:4,
2091:18, 2092:4,
2099:6, 2099:19,
2102:24, 2130:18,
2134:9, 2135:25,
2144:1
**puts** [2] - 2032:24,
2099:7
**puttable** [2] - 2126:11,
2128:8
**putting** [6] - 2032:16,
2033:24, 2040:5,
2076:1, 2102:21,
2136:1
**PX111** [1] - 2059:8
**PX158** [1] - 2111:7
**PX163** [3] - 2111:9,
2111:12, 2112:12
**PX205** [1] - 2130:19
**PX213** [1] - 2135:10
**PX282** [1] - 2120:6
**PX288** [1] - 2122:18
**PX47** [1] - 2063:2
**PX510** [2] - 2137:4,

2137:6

## Q

**Q&A** [2] - 2089:2,
2092:11
**quality** [6] - 2069:17,
2108:14, 2108:20,
2108:21, 2108:23,
2109:16
**quantify** [1] - 2058:19
**quarter** [6] - 2026:4,
2027:13, 2031:25,
2108:3, 2108:5
**questions** [8] -
2023:1, 2023:2,
2043:10, 2100:23,
2105:16, 2113:1,
2129:13, 2145:14
**quick** [1] - 2145:14
**quickly** [4] - 2032:5,
2037:6, 2078:1,
2078:16
**quite** [2] - 2021:8,
2127:19
**quote** [9] - 2091:18,
2091:19, 2101:10,
2131:18, 2134:25,
2135:1, 2135:5,
2142:15, 2142:16
**quote-unquote** [2] -
2101:10, 2135:5

## R

**Radnor** [1] - 2018:20
**raised** [2] - 2130:14,
2131:9
**range** [6] - 2023:19,
2036:15, 2037:5,
2044:10, 2073:8,
2140:24
**rate** [30] - 2023:18,
2025:15, 2032:25,
2034:16, 2036:11,
2036:12, 2037:12,
2037:23, 2038:8,
2039:23, 2040:14,
2040:22, 2041:7,
2043:7, 2043:8,
2067:19, 2067:20,
2067:21, 2067:24,
2067:25, 2068:6,
2069:5, 2069:8,
2069:16, 2078:11,
2079:11, 2079:15,
2145:21, 2145:25,
2146:2
**rates** [2] - 2069:10,
2119:3
**rather** [2] - 2078:16,

2132:23
**rating** [8] - 2093:2,
2096:8, 2097:6,
2099:4, 2099:24,
2100:5, 2101:17
**ratings** [19] - 2096:5,
2096:11, 2096:23,
2097:3, 2097:9,
2097:10, 2097:11,
2097:25, 2098:1,
2098:5, 2098:12,
2098:13, 2098:19,
2098:25, 2099:4,
2099:9, 2099:11,
2099:12, 2100:6
**rationale** [1] - 2121:15
**RDR** [3] - 2019:12,
2148:3, 2148:10
**RE** [1] - 2018:9
**reach** [2] - 2117:18,
2129:19
**reached** [1] - 2129:18
**reaches** [1] - 2028:18
**reaching** [1] - 2058:19
**read** [7] - 2024:23,
2053:21, 2053:22,
2060:22, 2062:16,
2089:6, 2121:18
**reading** [2] - 2081:15,
2123:8
**ready** [1] - 2022:16
**real** [1] - 2077:5
**really** [5] - 2037:9,
2136:6, 2137:3
**reason** [9] - 2066:16,
2073:11, 2076:2,
2129:10, 2129:20,
2129:25, 2130:4,
2130:13, 2130:15
**reasonable** [3] -
2080:24, 2081:1,
2131:23
**reasonableness** [5] -
2080:14, 2080:20,
2083:9, 2083:16,
2104:1
**reasonably** [3] -
2058:10, 2080:7,
2090:23
**reasons** [7] - 2028:12,
2028:14, 2028:15,
2097:22, 2123:21,
2130:9, 2131:10
**rebutting** [1] - 2051:25
**receive** [1] - 2026:17
**received** [11] -
2030:25, 2031:7,
2032:10, 2032:14,
2032:17, 2033:13,
2033:14, 2033:15,

2165

2079:14, 2112:14,
2121:10
**receiving** [1] - 2071:23
**Recent** [2] - 2109:9,
2109:11
**recently** [1] - 2130:25
**recess** [1] - 2147:10
**Recess** [1] - 2095:24
**recessing** [1] - 2021:6
**recipient** [1] - 2026:15
**recipients** [1] -
2120:15
**recognize** [4] - 2026:6,
2036:16, 2122:22,
2137:25
**recognized** [1] -
2042:22
**recollection** [3] -
2053:21, 2053:23,
2111:24
**record** [5] - 2022:9,
2022:10, 2022:19,
2116:4, 2143:6
**recovery** [3] - 2101:7,
2101:10, 2101:21
**reducing** [1] - 2121:22
**reduction** [2] - 2122:7,
2123:20
**refer** [1] - 2074:9
**reference** [21] -
2024:20, 2027:20,
2028:4, 2030:25,
2032:8, 2032:9,
2057:15, 2064:5,
2085:13, 2086:15,
2087:1, 2092:7,
2105:10, 2123:5,
2123:25, 2124:9,
2128:20, 2128:21,
2133:19, 2140:7,
2142:14
**referenced** [4] -
2103:15, 2118:6,
2137:9, 2139:16
**references** [3] -
2052:13, 2123:12,
2143:22
**referred** [6] - 2038:8,
2073:6, 2134:4,
2135:10, 2135:19,
2135:20
**referring** [5] - 2024:24,
2052:12, 2134:24,
2135:17, 2140:22
**refers** [4] - 2027:5,
2066:19, 2093:8,
2121:1
**reflect** [2] - 2098:19,
2143:13
**reflects** [2] - 2113:16,

2113:21
**refresh** [2] - 2068:21,
2111:23
**regarding** [9] -
2051:17, 2054:11,
2054:15, 2056:15,
2057:1, 2066:11,
2066:12, 2066:17,
2130:17
**regardless** [1] -
2146:25
**regression** [1] -
2116:19
**regular** [1] - 2032:21
**regularly** [4] -
2041:16, 2110:13,
2110:15, 2111:1
**regulator** [2] - 2048:1,
2049:16
**regulators** [2] -
2049:8, 2093:17
**regulatory** [1] - 2044:4
**reimposed** [1] -
2115:10
**relate** [1] - 2082:6
**related** [1] - 2116:20
**relating** [8] - 2062:18,
2080:20, 2089:14,
2103:19, 2111:18,
2119:25, 2125:1,
2129:12
**relation** [2] - 2117:13,
2117:14
**relationship** [1] -
2116:11
**relatively** [1] - 2129:6
**release** [1] - 2103:12
**released** [1] - 2103:16
**releasing** [2] - 2108:3,
2108:5
**relevance** [1] - 2138:2
**relevant** [4] - 2030:8,
2103:18, 2119:4,
2138:23
**relied** [6] - 2085:20,
2104:11, 2104:14,
2104:16, 2112:7,
2112:10
**Relied** [1] - 2134:15
**relief** [1] - 2106:18
**remain** [1] - 2022:14
**remaining** [5] -
2025:16, 2038:12,
2060:24, 2068:12,
2141:25
**remember** [2] -
2029:6, 2104:5
**remind** [1] - 2031:2
**rendered** [1] - 2045:15
**rendering** [6] -

2050:24, 2059:14,
2090:22, 2111:15,
2133:12, 2139:5
**repeat** [1] - 2116:10
**repeatedly** [1] -
2042:22
**rephrase** [1] - 2071:2
**report** [54] - 2022:3,
2045:8, 2045:11,
2045:16, 2049:22,
2049:25, 2050:3,
2050:12, 2050:16,
2050:19, 2050:22,
2051:22, 2051:25,
2052:2, 2052:5,
2052:7, 2052:19,
2053:3, 2054:6,
2060:10, 2068:21,
2074:19, 2075:8,
2075:9, 2080:13,
2080:20, 2081:6,
2081:7, 2081:23,
2082:5, 2082:11,
2085:19, 2087:7,
2087:14, 2087:18,
2100:19, 2103:14,
2103:15, 2105:5,
2105:15, 2105:17,
2105:18, 2105:24,
2111:15, 2124:9,
2124:20, 2125:11,
2126:1, 2126:21,
2130:11, 2132:18,
2133:12, 2137:9
**reported** [2] - 2022:7,
2102:11
**Reporter** [3] -
2019:12, 2019:12,
2148:11
**REPORTER** [1] -
2148:1
**reports** [16] - 2096:8,
2096:9, 2100:10,
2100:13, 2100:15,
2100:22, 2100:23,
2102:15, 2103:9,
2103:11, 2103:18,
2103:25, 2104:12,
2104:17, 2105:2
**representing** [1] -
2064:5
**represents** [2] -
2064:17, 2065:1
**request** [1] - 2112:12
**Request** [1] - 2086:5
**requests** [1] - 2128:13
**require** [3] - 2030:17,
2141:11, 2141:15
**required** [2] - 2110:7,
2146:5

**requirement** [1] -
2095:5
**requirements** [4] -
2036:19, 2036:21,
2036:22, 2093:18
**rescue** [3] - 2065:17,
2065:19, 2066:8
**research** [16] - 2045:3,
2046:12, 2046:13,
2046:16, 2066:17,
2066:22, 2066:23,
2071:14, 2071:19,
2072:2, 2072:5,
2072:7, 2073:18,
2073:24, 2126:2,
2126:22
**researched** [1] -
2129:14
**reserve** [1] - 2049:8
**residual** [1] - 2032:4
**respect** [8] - 2055:25,
2058:3, 2074:5,
2074:17, 2075:3,
2075:4, 2076:6,
2092:15
**response** [4] -
2066:11, 2118:2,
2118:4, 2128:13
**result** [5] - 2037:7,
2094:22, 2094:24,
2095:4, 2141:8
**results** [31] - 2061:1,
2066:17, 2069:13,
2102:4, 2102:9,
2108:3, 2108:6,
2108:8, 2108:17,
2108:22, 2118:20,
2137:3, 2138:7,
2138:13, 2138:22,
2140:8, 2140:16,
2141:24, 2141:25,
2143:13, 2143:21,
2144:5, 2144:7,
2144:10, 2144:15,
2144:18, 2144:20,
2144:23, 2144:25,
2145:11
**Resumed** [2] - 2020:3,
2022:21
**resuming** [1] - 2021:7
**retain** [2] - 2093:12,
2094:25
**retained** [4] - 2054:19,
2122:7, 2124:5,
2129:18
**retaining** [1] - 2095:19
**retention** [2] - 2056:3,
2056:11
**return** [1] - 2030:17
**returned** [2] - 2089:9,

2089:10
**returning** [1] - 2089:21
**revenues** [2] -
2131:11, 2131:25
**reverse** [1] - 2128:9
**review** [14] - 2024:15,
2028:8, 2055:13,
2056:1, 2063:14,
2065:16, 2111:14,
2114:6, 2122:20,
2129:9, 2138:24,
2139:1, 2139:3,
2139:4
**reviewed** [11] -
2050:21, 2053:14,
2055:21, 2058:25,
2083:14, 2103:9,
2103:10, 2111:17,
2119:25, 2120:7,
2139:19
**reviewing** [1] - 2099:5
**reviews** [1] - 2085:21
**revive** [1] - 2065:25
**reward** [1] - 2030:18
**reword** [1] - 2132:7
**RICH** [1] - 2019:2
**right-hand** [5] -
2045:2, 2063:4,
2085:14, 2105:9,
2107:23
**rising** [1] - 2109:17
**risk** [20] - 2029:19,
2030:12, 2030:15,
2030:17, 2077:13,
2094:7, 2095:2,
2098:21, 2113:17,
2125:13, 2125:17,
2125:22, 2127:4,
2127:6, 2127:15,
2127:16, 2129:4,
2129:6, 2129:12
**risks** [1] - 2080:9
**risky** [1] - 2098:20
**Road** [1] - 2018:19
**roaring** [1] - 2101:10
**ROBERT** [1] - 2019:2
**Robert** [4] - 2043:13,
2120:12, 2120:14,
2138:5
**role** [1] - 2133:25
**Room** [2] - 2019:13,
2148:12
**rose** [1] - 2035:13
**roughly** [5] - 2033:19,
2034:2, 2034:3,
2035:3, 2114:22
**ROYCE** [1] - 2018:13
**RUDY** [1] - 2018:18
**run** [7] - 2032:5,
2060:6, 2061:12,

2166

2094:7, 2095:2,
2116:19
**running** [1] - 2080:25

## S

**safe** [6] - 2092:14,
2093:3, 2093:11,
2095:7, 2127:18,
2127:19
**safer** [4] - 2033:21,
2079:11, 2117:9,
2117:11
**safety** [5] - 2036:8,
2089:23, 2092:19,
2093:19, 2095:15
**sake** [2] - 2040:21,
2042:11
**SAMUEL** [1] - 2018:22
**satisfied** [1] - 2021:5
**Saunders** [1] -
2053:10
**saw** [13] - 2041:5,
2046:17, 2087:1,
2096:14, 2096:18,
2118:19, 2123:19,
2128:16, 2135:10,
2136:13, 2142:21,
2144:5, 2146:9
**scenario** [3] - 2059:10,
2062:5, 2143:12
**Scenario** [1] - 2061:7
**scenarios** [5] -
2109:19, 2140:15,
2141:14, 2141:19,
2142:11
**Scenarios** [1] - 2143:7
**schedule** [1] - 2021:15
**SCHILLER** [1] -
2018:22
**scholarly** [1] - 2053:18
**SCHOLER** [1] - 2019:9
**scope** [3] - 2056:22,
2122:11, 2138:16
**screen** [8] - 2051:12,
2061:5, 2063:19,
2077:20, 2084:5,
2091:23, 2122:18,
2143:20
**seat** [1] - 2022:13
**seated** [1] - 2022:15
**SEC** [1] - 2049:8
**second** [11] - 2027:5,
2027:14, 2034:24,
2035:23, 2037:14,
2040:8, 2106:17,
2108:5, 2109:16,
2121:13, 2141:1
**Second** [2] - 2094:7,
2138:12

**secondary** [3] -
2089:23, 2091:20,
2121:22
**section** [6] - 2023:1,
2050:18, 2082:5,
2087:15, 2131:5,
2133:17
**Section** [3] - 2081:22,
2088:10
**sections** [1] - 2111:17
**secured** [5] - 2032:8,
2032:14, 2032:21,
2033:22, 2079:8
**securities** [10] -
2044:12, 2046:17,
2076:24, 2086:10,
2086:12, 2111:18,
2111:25, 2119:3,
2126:19, 2129:24
**security** [2] - 2032:16,
2113:15
**see** [37] - 2021:18,
2021:20, 2026:24,
2028:1, 2038:22,
2042:2, 2059:19,
2060:9, 2060:19,
2064:3, 2064:11,
2064:18, 2077:15,
2083:13, 2085:16,
2085:24, 2106:17,
2108:15, 2109:11,
2109:19, 2111:8,
2115:21, 2117:1,
2123:5, 2123:10,
2130:22, 2131:7,
2134:6, 2140:7,
2140:14, 2140:25,
2141:4, 2141:23,
2143:13, 2143:20,
2143:22, 2147:11
**seeing** [1] - 2133:16
**seeking** [1] - 2069:14
**seem** [2] - 2050:4,
2130:12
**sees** [1] - 2131:6
**SENIOR** [1] - 2018:9
**sense** [12] - 2021:23,
2025:20, 2025:22,
2031:15, 2064:19,
2065:7, 2065:9,
2065:10, 2107:3,
2107:6, 2107:8,
2130:16
**Sensitivity** [1] -
2060:20
**sensitivity** [1] -
2060:24
**sent** [7] - 2026:3,
2026:9, 2026:10,
2026:12, 2026:13,

2027:12, 2086:2
**sentence** [10] -
2039:1, 2039:14,
2064:13, 2064:16,
2089:5, 2092:1,
2106:22, 2109:10,
2109:16, 2134:3
**sentiment** [1] -
2101:15
**separate** [6] - 2055:5,
2067:19, 2089:25,
2090:1, 2090:17,
2105:23
**separately** [1] -
2082:16
**September** [9] -
2033:19, 2033:20,
2077:6, 2077:25,
2090:9, 2110:12,
2143:7, 2143:12,
2144:23
**served** [1] - 2048:5
**service** [2] - 2047:18,
2047:22
**services** [2] - 2044:2,
2044:3
**session** [1] - 2021:9
**SESSION** [1] -
2018:12
**set** [8] - 2023:18,
2041:23, 2041:24,
2042:21, 2051:17,
2066:24, 2072:3,
2124:12
**setting** [4] - 2041:24,
2066:13, 2072:17,
2073:14
**seven** [3] - 2124:22,
2125:9, 2128:4
**several** [2] - 2057:1,
2135:11
**shall** [2] - 2022:5,
2024:19
**share** [3] - 2072:14,
2072:15
**shared** [4] - 2101:14,
2101:16, 2102:18,
2103:3
**shareholders** [5] -
2029:10, 2089:9,
2089:11, 2089:14,
2089:21
**short** [8] - 2110:18,
2110:23, 2111:5,
2112:22, 2125:12,
2126:4, 2126:14,
2127:12
**short-term** [7] -
2110:18, 2110:23,
2111:5, 2112:22,

2125:12, 2126:4,
2126:14
**shorter** [4] - 2110:20,
2110:21, 2114:10,
2114:21
**shortly** [2] - 2079:3,
2079:13
**show** [3] - 2052:12,
2059:5, 2147:6
**showed** [5] - 2075:10,
2090:8, 2100:10,
2100:25, 2142:22
**showing** [2] - 2102:3,
2116:13
**shown** [2] - 2062:2,
2134:10
**shows** [4] - 2033:12,
2060:25, 2072:2,
2138:6
**shutdown** [1] -
2097:19
**sic** [2] - 2144:6
**side** [6] - 2050:20,
2076:20, 2076:23,
2125:6, 2144:1
**sides** [2] - 2076:17,
2077:2
**significant** [6] -
2031:8, 2040:18,
2077:12, 2079:15,
2079:16, 2112:22
**significantly** [1] -
2034:6
**signing** [1] - 2100:19
**similar** [4] - 2028:9,
2064:9, 2089:1,
2127:4
**similarly** [1] - 2092:14
**simply** [2] - 2057:13,
2142:14
**single** [3] - 2042:4,
2042:7, 2054:18
**sit** [1] - 2072:5
**sitting** [3] - 2094:5,
2098:7, 2104:11,
2104:15, 2110:8,
2111:6, 2135:9,
2136:8
**situations** [2] -
2071:18, 2072:1
**six** [1] - 2128:24
**size** [7] - 2034:2,
2070:22, 2071:4,
2071:9, 2072:3,
2079:18
**skills** [2] - 2084:11,
2085:8
**slide** [43] - 2024:3,
2024:4, 2024:7,
2025:10, 2026:1,

2026:5, 2028:11,
2029:21, 2032:7,
2033:7, 2033:12,
2035:19, 2037:15,
2038:18, 2039:7,
2039:16, 2041:5,
2042:15, 2045:2,
2051:4, 2060:19,
2062:13, 2070:7,
2073:7, 2075:10,
2075:12, 2075:14,
2077:19, 2079:9,
2079:13, 2080:3,
2084:6, 2085:23,
2090:9, 2096:15,
2096:18, 2115:24,
2117:16, 2118:7,
2133:21, 2134:8,
2134:18, 2134:24
**Slide** [8] - 2032:7,
2044:16, 2075:10,
2076:10, 2080:1,
2083:25, 2115:20,
2116:5
**slides** [17] - 2039:20,
2051:7, 2051:10,
2062:6, 2062:10,
2075:11, 2084:9,
2084:14, 2084:17,
2084:21, 2086:7,
2091:6, 2102:15,
2103:10, 2115:22,
2118:19
**Slides** [2] - 2086:5,
2086:15
**slightly** [1] - 2089:16
**small** [3] - 2063:20,
2125:14, 2128:8
**smaller** [1] - 2071:16
**sole** [1] - 2081:10
**solution** [1] - 2106:16
**solvent** [4] - 2091:19,
2092:4, 2092:15,
2092:18
**someone** [3] -
2064:23, 2101:19,
2120:14
**sometimes** [1] -
2038:9
**somewhat** [1] -
2039:21
**sorry** [23] - 2039:10,
2039:23, 2041:18,
2041:19, 2044:24,
2051:8, 2054:1,
2056:7, 2059:16,
2060:1, 2060:11,
2063:9, 2069:25,
2072:15, 2074:20,
2076:8, 2088:5,

2091:22, 2111:11, 2122:14, 2128:18, 2136:11, 2143:19
**sort** [4] - 2025:7, 2033:2, 2035:23, 2037:23
**sound** [9] - 2057:17, 2057:18, 2072:15, 2091:19, 2091:20, 2092:4, 2092:18, 2093:3, 2093:12
**soundness** [3] - 2092:19, 2093:19, 2095:16
**source** [1] - 2082:15
**sources** [2] - 2052:4, 2081:7
**sovereign** [1] - 2097:4
**specific** [13] - 2032:13, 2046:20, 2053:23, 2059:22, 2084:23, 2090:21, 2097:22, 2112:8, 2117:12, 2127:8, 2127:21, 2128:1, 2140:19
**specifically** [2] - 2084:18, 2104:16
**specifics** [1] - 2102:15
**spin** [6] - 2135:1, 2135:6, 2135:8, 2135:15, 2135:19, 2136:6
**split** [1] - 2061:5
**spoken** [2] - 2082:16, 2104:20
**sponsored** [1] - 2099:8
**spread** [9] - 2113:3, 2113:9, 2113:16, 2113:19, 2113:21, 2113:23, 2114:12, 2114:14, 2114:20, 2115:7, 2116:11, 2118:24, 2124:1
**spreads** [12] - 2113:1, 2114:3, 2114:6, 2115:4, 2115:11, 2116:13, 2119:8, 2119:20, 2122:3, 2123:6, 2129:10, 2130:5
**squirrel** [1] - 2121:21
**stability** [1] - 2089:23
**stabilized** [2] - 2089:9, 2089:10
**stabilizing** [1] - 2089:20
**Standard** [2] - 2096:21, 2096:22
**standard** [6] -

2050:15, 2057:16, 2126:7, 2126:13, 2126:18, 2126:20
**standardized** [1] - 2128:23
**standing** [1] - 2074:8
**standpoint** [1] - 2127:4
**STANTON** [1] - 2019:8
**start** [8] - 2024:11, 2043:23, 2066:10, 2077:24, 2081:25, 2111:9, 2145:25
**started** [2] - 2033:17, 2114:16
**starting** [2] - 2060:6, 2082:6
**state** [2] - 2109:16, 2121:15
**statement** [6] - 2027:9, 2027:14, 2039:14, 2088:15, 2108:19, 2132:9
**STATES** [2] - 2018:1, 2018:13
**States** [6] - 2047:23, 2074:16, 2096:12, 2096:23, 2097:7, 2148:11
**states** [1] - 2037:17
**stating** [2] - 2025:24, 2092:7
**statutes** [1] - 2089:7
**stay** [1] - 2022:14
**Steffen** [1] - 2053:10
**stenographic** [1] - 2148:5
**step** [7] - 2074:4, 2074:10, 2074:15, 2075:2, 2075:16, 2075:18, 2076:5
**stepped** [1] - 2077:16
**stepping** [1] - 2114:18
**steps** [4] - 2029:4, 2062:23, 2094:8, 2094:9
**STERN** [2] - 2019:6, 2021:13
**Steven** [1] - 2105:11
**still** [5] - 2021:9, 2110:13, 2112:21, 2114:23, 2142:22
**stock** [4] - 2024:10, 2063:23, 2064:5, 2106:20
**STOCK** [1] - 2018:9
**Stockholders'** [1] - 2061:2
**stop** [3] - 2021:19, 2139:7, 2146:20

**stopped** [1] - 2111:2
**stopping** [1] - 2021:3
**story** [1] - 2146:22
**straight** [1] - 2070:3
**Strategy** [1] - 2133:18
**strips** [1] - 2116:20
**strong** [1] - 2071:22
**structure** [1] - 2128:11
**structured** [1] - 2066:3
**stuck** [1] - 2079:9
**student** [1] - 2053:22
**studied** [4] - 2127:2, 2129:2, 2130:12, 2130:15
**studies** [7] - 2030:3, 2030:5, 2044:14, 2067:10, 2068:4, 2068:18, 2069:13
**study** [26] - 2052:9, 2053:3, 2053:9, 2054:11, 2068:13, 2116:7, 2117:19, 2117:24, 2118:8, 2118:10, 2118:20, 2124:5, 2124:7, 2124:13, 2124:22, 2126:2, 2126:4, 2126:13, 2126:14, 2126:22, 2127:2, 2128:4, 2128:5, 2129:11, 2130:10, 2130:12
**studying** [1] - 2129:3
**subject** [5] - 2086:4, 2120:25, 2121:3, 2122:25
**subsidiaries** [1] - 2076:14
**substantial** [1] - 2042:24
**substantially** [6] - 2132:23, 2140:9, 2142:2, 2142:15, 2142:17, 2142:20
**substitute** [1] - 2035:5
**substitutes** [1] - 2119:10
**subtract** [1] - 2113:14
**subtracted** [2] - 2041:3, 2140:23
**sufficient** [1] - 2092:21
**suggesting** [1] - 2106:23
**suggests** [2] - 2117:8
**summarizes** [1] - 2118:20
**summary** [2] - 2123:4, 2144:13
**summer** [4] - 2036:24,

2048:8, 2101:18, 2114:13
**supply** [19] - 2119:6, 2119:19, 2121:18, 2121:22, 2122:3, 2123:14, 2123:20, 2124:1, 2125:19, 2125:23, 2129:4, 2129:9, 2129:14, 2129:17, 2129:21, 2130:1, 2130:5, 2130:9, 2130:12
**support** [8] - 2024:18, 2026:23, 2032:11, 2032:12, 2032:13, 2040:19, 2098:17, 2114:19
**Support** [1] - 2086:4
**supposed** [1] - 2100:2
**surprise** [2] - 2072:6, 2125:4
**suspend** [2] - 2106:25
**suspending** [2] - 2106:18, 2107:5
**sustained** [3] - 2122:12, 2133:1, 2133:5
**sweep** [28] - 2058:11, 2093:21, 2093:25, 2094:2, 2094:14, 2094:15, 2094:22, 2094:25, 2095:4, 2097:2, 2097:10, 2098:15, 2099:14, 2101:19, 2110:12, 2114:8, 2115:1, 2117:14, 2120:2, 2120:10, 2121:15, 2122:7, 2131:23, 2141:8, 2141:13, 2142:7, 2145:5, 2147:2
**sweeping** [1] - 2095:15
**switched** [2] - 2142:9, 2145:17
**system** [2] - 2077:9, 2093:2

# T

**Tab** [4] - 2063:16, 2120:22, 2122:19, 2122:21
**tab** [4] - 2120:20, 2137:17, 2143:1, 2143:2
**table** [3] - 2074:18, 2075:7, 2111:23
**Table** [2] - 2111:8, 2111:22

**tables** [1] - 2062:5
**talks** [2] - 2032:12, 2106:22
**tangible** [1] - 2038:25
**taught** [2] - 2044:19, 2045:21
**tax** [3] - 2047:14, 2103:12, 2110:10
**taxpayer** [2] - 2027:8, 2028:1
**taxpayers** [1] - 2027:19
**teaching** [1] - 2044:21
**team** [1] - 2103:18
**ten** [7] - 2034:14, 2037:2, 2055:22, 2055:23, 2056:1, 2095:23, 2126:15
**term** [25] - 2046:14, 2046:19, 2046:23, 2065:17, 2065:22, 2108:24, 2110:18, 2110:23, 2110:24, 2111:5, 2112:22, 2121:16, 2124:7, 2124:23, 2125:12, 2126:4, 2126:14, 2126:17, 2127:12, 2127:13, 2128:4
**terminology** [1] - 2142:5
**terms** [25] - 2030:15, 2032:12, 2033:13, 2033:14, 2046:2, 2047:10, 2050:23, 2051:3, 2068:3, 2074:16, 2075:9, 2076:6, 2078:2, 2078:3, 2083:15, 2092:18, 2092:19, 2092:23, 2100:3, 2100:22, 2102:9, 2107:16, 2113:19, 2116:11, 2126:21
**testified** [14] - 2044:6, 2055:6, 2081:10, 2081:19, 2082:23, 2098:11, 2099:18, 2103:17, 2103:25, 2119:5, 2119:12, 2131:19, 2145:15, 2145:17
**testify** [2] - 2138:17, 2138:20
**testifying** [1] - 2135:5
**testimony** [28] - 2021:17, 2021:20, 2023:5, 2023:24, 2027:1, 2057:19, 2062:16, 2073:6,

2074:10, 2080:21, 2081:14, 2083:2, 2083:5, 2083:10, 2084:10, 2087:2, 2087:4, 2091:16, 2094:1, 2096:4, 2101:18, 2105:3, 2106:9, 2123:19, 2132:11, 2134:9, 2134:25, 2135:4
**testimony's** [1] - 2021:16
**text** [6] - 2134:20, 2134:22, 2134:23, 2135:17, 2135:18, 2140:20
**Thakor** [38] - 2023:6, 2023:8, 2028:16, 2030:2, 2031:5, 2032:12, 2036:5, 2036:11, 2037:14, 2037:22, 2038:11, 2038:12, 2039:11, 2042:25, 2051:16, 2051:19, 2052:3, 2052:9, 2052:13, 2053:6, 2053:13, 2056:14, 2057:1, 2058:3, 2068:4, 2069:20, 2070:2, 2071:15, 2072:10, 2072:13, 2072:18, 2072:25, 2073:10, 2074:2, 2074:10, 2075:2, 2075:17, 2076:4
**Thakor's** [20] - 2025:14, 2028:13, 2034:21, 2035:6, 2035:20, 2035:23, 2039:17, 2040:9, 2041:6, 2042:2, 2051:22, 2052:8, 2053:3, 2057:9, 2066:11, 2066:15, 2066:17, 2071:11, 2073:13, 2075:12
**THE** [49] - 2018:1, 2018:1, 2018:13, 2021:2, 2021:14, 2021:25, 2022:6, 2022:9, 2022:12, 2043:11, 2043:12, 2051:8, 2051:13, 2052:18, 2056:24, 2059:16, 2063:12, 2064:1, 2071:2, 2071:8, 2087:25, 2095:21, 2095:23, 2095:25, 2111:11,

2111:13, 2112:14, 2121:10, 2122:12, 2122:15, 2132:3, 2132:7, 2132:11, 2133:1, 2133:5, 2135:23, 2136:3, 2136:16, 2136:18, 2136:19, 2136:20, 2136:21, 2136:23, 2138:25, 2139:6, 2139:13, 2143:18, 2147:8, 2147:10
**themselves** [4] - 2025:24, 2040:19, 2065:25, 2071:24
**thereby** [2] - 2131:11, 2131:25
**Therefore** [1] - 2039:1
**Third** [29] - 2031:19, 2031:24, 2036:24, 2041:17, 2042:6, 2058:17, 2058:20, 2079:22, 2080:8, 2081:11, 2090:24, 2098:10, 2099:24, 2104:2, 2104:3, 2104:4, 2104:17, 2115:25, 2116:12, 2116:14, 2116:22, 2117:7, 2117:8, 2117:10, 2124:6, 2126:17, 2138:3, 2138:8
**third** [4] - 2067:19, 2104:13, 2104:24, 2116:15
**thousand** [6] - 2125:4, 2125:6, 2125:8, 2128:3, 2128:15
**threat** [1] - 2097:19
**three** [12] - 2037:5, 2080:4, 2096:11, 2096:23, 2097:11, 2099:24, 2100:5, 2104:5, 2141:14, 2141:18, 2142:11, 2142:12
**throughout** [5] - 2047:18, 2100:10, 2108:9, 2110:1, 2115:7
**Thursday** [1] - 2018:5
**tied** [2] - 2067:20, 2067:25
**tier** [5] - 2030:8, 2030:10, 2030:11, 2030:12, 2030:13
**tighter** [1] - 2123:6
**today** [7] - 2083:8, 2084:22, 2100:11,

2104:11, 2104:16, 2134:8, 2145:14
**together** [3] - 2033:18, 2040:5, 2041:2
**tomorrow** [6] - 2021:4, 2021:6, 2021:15, 2127:17, 2147:8, 2147:11
**took** [3] - 2074:10, 2074:15, 2076:4
**top** [14] - 2027:21, 2028:4, 2029:6, 2030:8, 2031:9, 2031:17, 2039:17, 2042:7, 2063:11, 2085:23, 2109:8, 2133:10, 2134:14, 2146:10
**top-off** [1] - 2031:17
**TOPAZ** [1] - 2018:19
**topic** [2] - 2076:3, 2137:4
**topping** [1] - 2029:3
**total** [7] - 2037:17, 2037:20, 2038:24, 2039:4, 2039:12, 2041:9, 2112:2
**traded** [1] - 2129:6
**tradeoff** [1] - 2094:13
**trading** [2] - 2044:12, 2124:19
**transcript** [2] - 2148:5, 2148:6
**TRANSCRIPT** [1] - 2018:12
**transcripts** [2] - 2081:16, 2081:17
**transferred** [1] - 2094:16, 2147:2
**translated** [1] - 2035:2
**transmit** [1] - 2110:7
**Treasury** [55] - 2024:6, 2024:18, 2024:24, 2025:16, 2025:21, 2026:3, 2026:12, 2026:15, 2026:23, 2027:24, 2028:20, 2028:22, 2029:4, 2029:13, 2033:5, 2042:20, 2057:13, 2057:14, 2058:6, 2063:22, 2065:4, 2070:5, 2070:8, 2070:22, 2071:4, 2071:12, 2086:4, 2093:24, 2094:3, 2094:4, 2094:16, 2095:9, 2095:15, 2097:4, 2103:7, 2106:12, 2106:13,

2106:14, 2106:20, 2107:9, 2110:8, 2113:4, 2113:15, 2113:24, 2116:20, 2119:3, 2122:25, 2123:7, 2128:24, 2131:24, 2141:11, 2146:13, 2146:15, 2146:16, 2146:21
**Treasury's** [2] - 2065:5, 2129:25
**TRIAL** [1] - 2018:12
**trial** [12] - 2050:1, 2081:9, 2081:13, 2081:17, 2081:20, 2082:23, 2083:2, 2083:5, 2083:10, 2084:25, 2087:1, 2087:3
**tried** [1] - 2039:22
**Triple** [2] - 2097:14, 2097:17
**Triple-A** [2] - 2097:14, 2097:17
**true** [6] - 2098:22, 2100:13, 2114:24, 2115:6, 2148:4, 2148:6
**try** [2] - 2065:25, 2080:11
**trying** [1] - 2136:3
**turn** [7] - 2052:22, 2059:12, 2059:25, 2087:12, 2107:20, 2140:3, 2143:5
**turned** [1] - 2136:22
**twice** [1] - 2055:9
**two** [26] - 2022:13, 2023:12, 2023:21, 2029:6, 2029:9, 2029:24, 2030:1, 2033:17, 2033:25, 2037:4, 2037:23, 2040:6, 2067:16, 2082:7, 2082:23, 2096:17, 2100:25, 2103:24, 2104:5, 2106:21, 2123:18, 2131:9, 2141:14, 2141:18, 2142:1, 2142:12
**type** [4] - 2067:24, 2099:12, 2099:19, 2118:17
**types** [8] - 2029:24, 2031:4, 2062:6, 2062:11, 2071:18, 2085:1, 2126:19, 2138:11
**typical** [3] - 2062:5,

2062:8, 2071:9
**typically** [4] - 2066:4, 2067:13, 2103:2, 2130:13

# U

**U.S** [6] - 2019:13, 2097:4, 2098:1, 2107:14, 2113:15, 2139:8
**Ugoletti** [5] - 2081:12, 2081:15, 2081:19, 2104:16, 2122:23
**uncapped** [1] - 2035:13
**under** [21] - 2026:24, 2031:6, 2041:16, 2042:2, 2042:9, 2046:19, 2067:1, 2068:13, 2069:13, 2087:15, 2094:6, 2094:17, 2121:13, 2140:15, 2141:13, 2141:14, 2145:16, 2145:19, 2146:5, 2146:8, 2146:16
**underlaid** [1] - 2034:8
**underlying** [4] - 2061:21, 2101:15, 2102:10, 2102:14
**undertaking** [1] - 2090:23
**undertook** [4] - 2058:2, 2059:2, 2126:25, 2127:22
**underwrite** [1] - 2065:7
**undrawn** [8] - 2025:1, 2027:3, 2040:3, 2067:16, 2067:23, 2078:22, 2095:10, 2106:13
**unit** [1] - 2062:7
**United** [6] - 2047:23, 2074:16, 2096:12, 2096:23, 2097:7, 2148:11
**UNITED** [2] - 2018:1, 2018:13
**university** [1] - 2044:19
**University** [1] - 2047:20
**unlike** [1] - 2077:4
**unlikely** [3] - 2119:10, 2119:12, 2119:14
**unlimited** [4] - 2098:16, 2106:23, 2106:24, 2112:24

2169

**unquote** [2] - 2101:10, 2135:5
**up** [34] - 2023:19, 2029:13, 2032:16, 2032:22, 2032:24, 2033:4, 2033:22, 2033:24, 2039:17, 2043:6, 2044:16, 2051:2, 2051:5, 2052:16, 2059:7, 2063:2, 2065:5, 2073:7, 2077:19, 2078:9, 2079:25, 2083:25, 2084:5, 2089:2, 2091:4, 2092:25, 2107:9, 2107:13, 2130:18, 2133:8, 2134:9, 2144:3, 2144:21
**Update** [1] - 2133:18
**update** [2] - 2059:10, 2121:1
**updated** [3] - 2137:7, 2141:25, 2142:15
**upfront** [5] - 2067:13, 2067:23, 2068:5, 2070:2, 2070:15
**upgrade** [1] - 2099:5
**upper** [3] - 2030:13, 2036:14, 2038:1
**urgency** [1] - 2131:6
**uses** [3] - 2036:5, 2038:15, 2043:1
**UST00533645** [1] - 2130:21

# V

**vague** [2] - 2132:25, 2133:4
**Valuation** [1] - 2063:22
**valuation** [3] - 2044:11, 2064:2, 2064:10
**value** [12] - 2024:20, 2024:23, 2025:1, 2025:4, 2025:7, 2025:16, 2034:8, 2034:10, 2051:17, 2064:10, 2066:13, 2072:20
**valued** [2] - 2034:11, 2034:12
**variability** [1] - 2094:10
**various** [7] - 2032:11, 2042:22, 2044:3, 2044:13, 2052:13, 2064:15, 2126:19

**VARMA** [1] - 2019:7
**vast** [1] - 2128:14
**vehicle** [1] - 2057:14
**version** [8] - 2052:20, 2060:11, 2060:13, 2091:10, 2091:11, 2115:21, 2134:18, 2134:22
**versions** [1] - 2084:24
**versus** [2] - 2110:23, 2111:5
**via** [1] - 2134:10
**Video** [2] - 2057:25, 2119:17
**video** [1] - 2081:21
**view** [1] - 2028:19
**views** [1] - 2080:9
**volume** [1] - 2124:19
**vs** [1] - 2018:5

# W

**waiting** [1] - 2099:15
**waived** [2] - 2026:4, 2041:17
**waiver** [4] - 2026:7, 2026:9, 2026:19, 2028:7
**warrant** [2] - 2034:9
**warrants** [4] - 2024:9, 2063:23, 2070:8, 2070:16
**Washington** [6] - 2018:4, 2018:17, 2018:23, 2019:10, 2019:14, 2148:13
**watch** [4] - 2099:6, 2099:16, 2099:19, 2099:25
**ways** [1] - 2064:15
**week** [2] - 2033:19, 2082:23
**weeks** [1] - 2137:3
**well-capitalized** [1] - 2074:7
**whole** [2] - 2093:2, 2107:2
**wide** [1] - 2116:21
**wider** [1] - 2115:4
**willing** [3] - 2068:8, 2073:1, 2128:12
**wind** [2] - 2121:16, 2123:12
**window** [1] - 2118:3
**Wisconsin** [1] - 2047:21
**WITNESS** [7] - 2020:2, 2043:11, 2063:12, 2064:1, 2136:18, 2136:20, 2136:23

**witness** [3] - 2022:5, 2063:3, 2135:25
**Witness** [1] - 2085:21
**witness's** [1] - 2136:2
**witnesses** [1] - 2083:10
**Word** [1] - 2086:17
**word** [2] - 2132:3, 2135:8
**words** [5] - 2057:17, 2089:17, 2101:23, 2136:2, 2136:6
**world** [1] - 2076:14
**worry** [1] - 2036:8
**worse** [1] - 2136:24
**worth** [31] - 2058:11, 2065:8, 2070:10, 2093:21, 2093:25, 2094:2, 2094:14, 2094:15, 2094:22, 2094:25, 2095:4, 2097:2, 2097:10, 2098:14, 2099:14, 2101:19, 2110:12, 2114:8, 2115:1, 2117:14, 2120:1, 2120:10, 2121:15, 2122:7, 2131:23, 2141:8, 2141:13, 2142:7, 2145:5, 2147:2
**write** [1] - 2064:20
**writings** [1] - 2053:18
**written** [2] - 2054:7, 2109:12
**wrote** [4] - 2052:3, 2064:22, 2124:20, 2132:18

# Y

**year** [15] - 2042:1, 2042:4, 2042:7, 2048:13, 2059:10, 2086:13, 2088:24, 2098:11, 2107:9, 2107:19, 2111:25, 2127:19, 2131:6, 2140:8, 2141:12
**years** [30] - 2033:25, 2037:2, 2037:5, 2041:23, 2041:25, 2042:1, 2043:25, 2049:9, 2049:10, 2049:13, 2049:19, 2111:1, 2111:3, 2114:3, 2115:2, 2126:16, 2127:20, 2131:11, 2131:25, 2134:4, 2134:5, 2135:11, 2136:12,

2136:13, 2136:14, 2136:15, 2142:1, 2144:9
**yield** [29] - 2113:1, 2113:3, 2113:4, 2113:8, 2113:12, 2113:14, 2113:16, 2113:18, 2113:21, 2113:23, 2114:3, 2114:6, 2114:12, 2114:14, 2114:20, 2115:6, 2115:10, 2116:11, 2116:13, 2116:15, 2116:24, 2117:7, 2118:24, 2119:20, 2122:3, 2124:1, 2129:10, 2130:4
**Yields** [1] - 2115:25
**yields** [7] - 2042:12, 2116:16, 2117:12, 2119:2, 2125:22, 2130:8
**York** [5] - 2018:23, 2019:4, 2032:8, 2032:18
**yourself** [1] - 2066:7

# Z

**zero** [14] - 2023:15, 2025:17, 2027:10, 2027:11, 2027:12, 2028:13, 2030:4, 2034:22, 2035:24, 2042:19, 2042:25, 2062:23, 2094:8, 2095:5
**Zoom** [1] - 2139:9