```
1                    BEFORE THE UNITED STATES DISTRICT COURT
                         FOR THE DISTRICT OF COLUMBIA
2

3     FAIRHOLME FUNDS, INC., et al.,   .
                                       .
4              Plaintiffs,             .
                                       .  Case Number 13-cv-1053
5          vs.                         .
                                       .
6     FEDERAL HOUSING FINANCE AGENCY,  .
      et al.,                          .
7                                      .
               Defendants.             .
8     - - - - - - - - - - - - - - - - -
      In re FANNIE MAE/FREDDIE MAC     .  Case Number 13-mc-1288
9     SENIOR PREFERRED STOCK PURCHASE  .
      AGREEMENT CLASS ACTION           .  Washington, D.C.
10    LITIGATIONS.                     .  October 28, 2022
      - - - - - - - - - - - - - - - - -   10:09 a.m.
11

12               TRANSCRIPT OF JURY TRIAL, MORNING SESSION
                    BEFORE THE HONORABLE ROYCE C. LAMBERTH
13                     UNITED STATES DISTRICT JUDGE

14    APPEARANCES:

15    For Berkley Plaintiffs:       BRIAN BARNES, ESQ.
                                    Cooper & Kirk, PLLC
16                                  1523 New Hampshire Avenue Northwest
                                    Washington, D.C. 20036
17
      For Class Plaintiffs:         LEE RUDY, ESQ.
18                                  ERIC ZAGAR, ESQ.
                                    Kessler Topaz Meltzer & Check, LLP
19                                  280 King of Prussia Road
                                    Radnor, Pennsylvania 19087
20
                                    HAMISH HUME, ESQ.
21                                  SAMUEL KAPLAN, ESQ.
                                    KENYA DAVIS, ESQ.
22                                  Boies Schiller Flexner LLP
                                    1401 New York Avenue Northwest
23                                  Washington, D.C. 20005

24

25                         -- continued --
```

```
 1    APPEARANCES (CONTINUED):

 2                               ROBERT KRAVETZ, ESQ.
                                 RICHARD GLUCK, ESQ.
 3                               Bernstein Litowitz Berger &
                                    Grossmann LLP
 4                               1251 Avenue of the Americas
                                 New York, New York 10020
 5
      For Defendant Federal
 6    Housing Finance Agency:    JONATHAN STERN, ESQ.
                                 DAVID BERGMAN, ESQ.
 7                               IAN HOFFMAN, ESQ.
                                 ROBERT JONES, ESQ.
 8                               Arnold & Porter Kaye Scholer LLP
                                 601 Massachusetts Avenue Northwest
 9                               Washington, D.C. 20001

10

11    Official Court Reporter:   SARA A. WICK, RPR, CRR
                                 United States District Court
12                                  for the District of Columbia
                                 333 Constitution Avenue Northwest
13                               Room 4704-B
                                 Washington, D.C. 20001
14                               202-354-3284

15    Proceedings recorded by stenotype shorthand.
      Transcript produced by computer-aided transcription.
16

17

18

19

20

21

22

23

24

25
```

C O N T E N T S

TESTIMONY

MUKARRAM ATTARI          Cross-Examination (Continued)... 2173
                         Redirect Examination............ 2187

NICHOLAS SATRIANO        Direct Examination.............. 2204
                         Cross-Examination............... 2243

BALA DHARAN              Direct Examination.............. 2276


                         EXHIBITS RECEIVED

DX-916........................................... 2207

DX-499........................................... 2218

DX-472A.......................................... 2222

DX-560........................................... 2239

```
1                    P R O C E E D I N G S

2          (Call to order of the court.)

3          (Jury entered courtroom.)

4              THE COURT:  Be seated.

5      Good morning, Doctor.  You may resume the stand.

6              MR. KRAVETZ:  Good morning, Your Honor, members of the

7      jury, Dr. Attari.  Robert Kravetz on behalf of plaintiffs.

8                  CROSS-EXAMINATION (Continued)

9              BY MR. KRAVETZ:

10     Q.   You testified yesterday that you relied upon post-Third

11     Amendment analyst reports in rendering your opinion about a

12     change in bond yield spreads; is that correct?

13     A.   I looked at both Third Amendment analyst reports to

14     understand how -- what the analyst was saying about the Third

15     Amendment.

16     Q.   And one of those reports listed on the slide was an RBC

17     Capital Markets report from August 17th of 2012.

18          Do you recall that?

19     A.   Yes.

20              MR. KRAVETZ:  Your Honor, I'd ask to display that.  It

21     was embedded within a slide, but I want to show a different

22     portion.  It's not admitted, but display under Rule 703, please.

23              MR. HOFFMAN:  No objection.

24              MR. KRAVETZ:  This is DX-538.

25              BY MR. KRAVETZ:
```

1   Q.   And sir, I know you focused in your slide on the top

2   portion of the analyst report entitled "preferred stock."

3       Do you recall that?

4   A.   Yes.

5   Q.   I would ask Mr. DeRita to please enlarge the paragraph

6   entitled "portfolios to shrink 15 percent a year."

7       And let me know if you see that on your screen, sir.

8   A.   Yes.

9   Q.   And do you see, in connection with the same RBC report,

10  that the analyst concluded, "This expected decline in supply was

11  largely responsible for the pronounced tightening in agency and

12  other high-quality issuer spreads on the news"?  Do you see

13  that, sir?

14  A.   Yes.

15  Q.   All right.  I want to talk about just a couple of the

16  slides that you had on your presentation.  If I could ask

17  Mr. DeRita to please pull up slide 50 of the defense

18  presentation.

19      Sir, do you recall testifying yesterday about AIG and the

20  secured loan that the New York Fed provided to AIG during the

21  financial crisis?

22  A.   Yes.

23  Q.   All right.  And if I recall, your testimony was that AIG is

24  different than the GSEs because AIG received a secured loan,

25  while the GSEs received an equity investment; is that right?

1    A.   Yes, an equity investment when they had negative equity,

2    yes.

3    Q.   All right.  And on your slide, for AIG, you list the New

4    York Fed secured loan commitment to AIG.

5         Did I read that correctly?

6    A.   Yes.  That was the bit that Professor Thakor said was the

7    comparable piece.

8    Q.   But isn't it true, sir, that AIG also received a

9    $40 billion equity infusion from the Treasury Department as

10   another component of the government rescue package?

11   A.   That was later, and it was not a commitment.  It was just

12   an investment.

13   Q.   But I'm just asking, am I correct that there was a

14   $40 billion equity investment by the Department of the Treasury

15   into AIG?

16   A.   Yes.

17   Q.   Okay.  And that was used in part to pay down the secured

18   loan that was listed on your slide?

19   A.   The secured loan amount decreased at the time of the equity

20   investment.

21   Q.   And you're aware that Professor Thakor did, in fact,

22   address that equity investment made by the Treasury Department

23   into AIG in his report; correct?

24   A.   I don't believe it was in the -- in terms of coming up with

25   the commitment fee he did address it.  Otherwise, yes.

1    Q.    That's your understanding?

2    A.    Yes.

3    Q.    Just to be clear, that equity infusion provided by Treasury

4    to AIG, that was not on your slide package yesterday; is that

5    right?

6    A.    I mentioned it when I talked about it.

7    Q.    Okay.  If we can show defense slide --

8    A.    Sorry.  It was in November.  It wasn't in September.

9    Q.    We talked about the date discrepancy yesterday; correct?

10   A.    Not discrepancy.  There were two different various

11   components, and I'm looking at the original one, how it was set

12   up, because it was right at the time of the Fannie Mae and

13   Freddie Mac commitments.

14   Q.    But it did change a month and a half later; right?

15   A.    It changed a month and a half later.

16   Q.    Okay.  If we can pull up slide 47, please.

17          This was a slide related to your opinion regarding the

18   purpose of the PCF; is that correct?

19   A.    Yes.

20   Q.    And you have highlighted language there for the purpose of

21   the PCF that states, "It shall be determined with reference to

22   the market value of the commitment as then in effect."

23          Is that correct?

24   A.    Yes.

25   Q.    Do you recall at your deposition testifying that when you

1    interpreted that highlighted phrase in rendering your opinion,

2    that you found the phrase "with reference to" to be superfluous

3    to market value?

4    A.    Well, "with reference to" means that you're looking at the

5    market value.

6    Q.    That's how you interpret it?

7    A.    Yes.

8    Q.    Okay.  Now, we talked yesterday about -- you had the slide

9    with the different categories of debt and equity.

10        Do you recall that?

11   A.    Yes.

12   Q.    And you had on the top of the pyramid MBS and then bonds;

13   is that right?

14   A.    Yes.

15   Q.    And then you had preferred shares and common shares?

16   A.    Yes.

17   Q.    All right.  Now, I would like to -- if Mr. DeRita could

18   show slide 50, please.  That one is 51, Mr. DeRita.  I know the

19   slides changed a bit.  It's entitled "bottom line conclusion."

20        While we're finding it, do you recall that on your slide

21   you noted that one of the goals of the PSPAs was to increase MBS

22   and bond investor confidence?  Do you recall that slide?

23   A.    Yes.

24   Q.    Okay.  And am I correct that you did not perform an event

25   study or other quantitative analysis regarding the impact of the

1    Third Amendment on MBS?

2    A.   I did not.

3    Q.   Okay.  I would ask if could display Exhibit -- Plaintiffs'

4    282, Mr. DeRita.  This is already in evidence from yesterday.

5    If we could go to the second page.

6        And sir, if you recall, this was the e-mail that FHFA sent

7    internally on the morning or just following the Third Amendment?

8    Do you recall that?

9    A.   Yes.

10   Q.   And it's tab 17 in your binder, if you would like to see a

11   hard copy, although it might be easier to read it on the screen.

12   Mr. DeRita, can you please enlarge the paragraph there?

13       So Dr. Attari, we talked yesterday about this internal

14   e-mail in the context of supply and what the FHFA's internal

15   conclusions were about the change in supply relating to

16   long-term bonds.  But I want to ask about MBS.

17       Do you see in this FHFA e-mail the following:  "The

18   reaction in MBS trading has been almost a nonevent"?

19   A.   Yes.

20   Q.   And that's within the e-mail that FHFA personnel sent on

21   the date of the Third Amendment?

22   A.   Yes.  And the Third Amendment kind of was designed to

23   prevent a negative reaction over time in MBS.  So you wouldn't

24   expect it to immediately have an impact on the MBS.

25   Q.   But just to be clear, they characterized it as a, quote

1    unquote, nonevent; correct?

2    A.   Yes.

3    Q.   Okay.  All right.  And last question, sir; there's two

4    questions.  Your opinion yesterday relates to -- or your opinion

5    overall relates to whether it was reasonable for FHFA to take

6    the actions that they did in entering into the Third Amendment;

7    correct?

8    A.   Yes.

9    Q.   Okay.  When you're assessing whether something is

10   reasonable, economically reasonable, is it necessary to think

11   about the range of alternatives that are available to the person

12   making the decision?

13   A.   It's necessary to think about the range of alternatives,

14   but, you know, not an infinite set of alternatives.  It has to

15   be a set that is feasible and kind of implementable and will

16   achieve the objective.

17   Q.   So the answer is yes, it is necessary?

18   A.   Yes.

19   Q.   Okay.  As a part of your analysis in this case, did you

20   consider whether there were any alternatives for -- to the net

21   worth sweep for addressing the circular draw problem?

22   A.   I did not.

23            MR. KRAVETZ:  Thank you.

24        Your Honor, no further questions.  I believe Mr. Barnes may

25   have some questions on behalf of his client.

1          THE COURT:  All right.

2          MR. BARNES:  May I approach the witness?

3          THE COURT:  Yes.

4          THE WITNESS:  Thank you.

5          MR. BARNES:  I'm Brian Barnes on behalf of the Berkley

6     Plaintiffs.

7                         CROSS-EXAMINATION

8          BY MR. BARNES:

9     Q.   Good morning, Dr. Attari.

10    A.   Good morning.

11    Q.   Dr. Attari, you testified yesterday with Mr. Hoffman on

12    direct that the money that was invested by private preferred

13    shareholders had all been used up; it was all gone by the end of

14    2008.  Is that right?

15    A.   I said, yes, it had been used up in the form of actual

16    losses and reserves for expected losses.

17    Q.   One of the documents you considered in forming your

18    opinions in this case was the 2008 10-K for Fannie Mae; is that

19    correct?

20    A.   Yes.

21    Q.   And I think that's already in evidence.  It should be

22    Defense Exhibit 136.  I'd like to pull that up, if we could.

23         Dr. Attari, this is the 2008 10-K for Fannie Mae; is that

24    right?

25    A.   Yes.

Q.   Okay.  And I would like to look at page 282 of 500, if we
could.  And this is the balance sheet for Fannie Mae as of the
end of 2008; is that right?

A.   Yes.

Q.   How much cash and cash equivalence does Fannie have at the
end of 2008?

A.   17, 18 billion.

Q.   Okay.  And if we look a little further down on the balance
sheet, there's an entry here for senior preferred stock.  It
says there are, I think, a million shares, and it values those
at $1 billion.

     Do you see that?

A.   Yes.

Q.   And that's Treasury's senior preferred stock, the senior
preferred stock that Treasury got as a part of the PSPAs; is
that right?

A.   Yes.

Q.   And then just below that, there's another entry that
says "preferred stock," and the valuation attributed on the
balance sheet to the preferred stock is $21.2 billion; is that
right?

A.   That's the value -- that's the amount, yes.

Q.   Yeah.  And the preferred stock that this is talking about
here is the junior preferred stock owned by the plaintiffs in
this case; is that right?

1    A.    Yes.

2    Q.    Okay.

3    A.    And the bottom line equity number is negative 15 billion.

4    Q.    Right.

5    A.    So that's the combined -- combination of the common, the

6    preferred, the retained earnings, and the Treasury preferred

7    stock.

8    Q.    But you didn't mean to suggest when you were testifying

9    yesterday that the junior preferred stock owned by the

10   plaintiffs had been removed from the balance sheet as of the end

11   of 2008, did you?

12   A.    No, but the way one thinks about this, when you look at the

13   balance sheet as a combined value, the balance sheet value, and

14   the right number there is negative 15 billion.

15   Q.    And you're not an accountant, are you?

16   A.    I'm not.

17   Q.    Next I'd like to look at Plaintiffs' Exhibit 180.  I think

18   that's another document that's in evidence.

19        Okay.  You will see at the top of this e-mail it's an

20   e-mail that was sent to Tim Mayopolous and Susan McFarland at

21   Fannie Mae on May 8, 2012.

22        Do you see that?

23   A.    Yes.

24   Q.    And Mr. Mayopoulos was the CEO of Fannie Mae at the time;

25   is that right?

1    A.   Yes.

2    Q.   Ms. McFarland was the CFO at Fannie Mae at the time; is

3    that right?

4    A.   That's my recollection, yes.

5    Q.   You will see in the body of the e-mail, there's a line that

6    says, "Susan, I presume you did not have any other edits to this

7    document from Phil following your meeting with him last week."

8         Do you see that?

9    A.   Yes.

10   Q.   And if we look at the attachment to this e-mail, the first

11   sentence in the attachment, it says, "We believe that

12   policymakers and the public need to be better informed about

13   what government support of Fannie Mae has cost taxpayers to date

14   and what it will ultimately cost taxpayers at the end of the

15   day."

16        Do you see that?

17   A.   Yes.

18   Q.   And then the beginning of the next paragraph, it says, "We

19   fear that there is an unfortunate misunderstanding that this

20   $116.2 billion figure represents actual cash losses that have

21   been irretrievably lost by taxpayers."

22        Do you see that?

23   A.   Yes.

24   Q.   The next paragraph says, "For example, if one examines what

25   degree of cash infusion would have been required to keep Fannie

Mae operating on a cash basis, the amount is much lower than the

$116.2 billion GAAP measure."

    Do you see that?

A.   Yes.

Q.   Do you have any basis for disagreeing with that statement?

A.   No.  But I mean, you know, cash accounting would have kept

half the financial companies in the United States going through

the crisis.  So I'm not very sure what this means.

Q.   Later on in the paragraph, there's a sentence that

says, "If one examines what Fannie Mae's cash needs have been in

conservatorship, the support needed from Treasury would have

been approximately $7 billion through the end of 2011."

    Do you see that?

A.   Yes.

Q.   Again, you don't have any basis for disagreeing with that

statement; is that correct?

A.   No.

Q.   And you don't disagree with Dr. Dharan's opinion that most

of the draws that were taken under the senior preferred stock

purchase agreements were the result of noncash accounting

losses; is that correct?

A.   I have no reason to agree or disagree.

Q.   Okay.  We can take that down.

    Yesterday, I think there were some questions about whether

supply and demand dynamics could provide an alternative

1    explanation for some of the findings in your expert report.

2         Do you remember that?

3    A.   Yes.

4    Q.   And I asked you about supply and demand issues during your

5    deposition.

6         Do you remember that?

7    A.   Yes.

8    Q.   And you hadn't thought about supply and demand as an

9    alternative possible explanation before I asked you about those

10   issues during your deposition, had you?

11   A.   No, because supply and demand is typically not an issue in

12   financial markets.

13   Q.   If you had gone back after the deposition and studied those

14   issues and concluded that the opinions in your expert report

15   were wrong, do you think the defendants would have kept you on

16   as an expert witness?

17              MR. HOFFMAN:  Objection, Your Honor.

18              THE COURT:  Overruled.

19              THE WITNESS:  I'm not sure.  That's something to ask

20   them.

21              BY MR. BARNES:

22   Q.   Dr. Attari, you testified yesterday that the net worth

23   sweep was reasonable because it addressed a concern among

24   bondholders about Treasury's funding commitment being eroded

25   through circular draws; is that right?

1    A.   Yes.

2    Q.   And to determine whether bondholders were concerned about

3    circular draws, one of the things you did was you looked at the

4    yield spread on Fannie and Freddie bonds; is that right?

5    A.   Yes.

6    Q.   One way to check the yield spread -- tell me if I've got

7    this right -- would be to go on to a Bloomberg terminal and pull

8    the data; is that correct?

9    A.   Yes.

10   Q.   And just so I'm clear and the jury is clear, a higher yield

11   spread reflects more concern about the ability of the borrower

12   to pay; is that right?

13   A.   Yes.

14   Q.   Conversely, a lower yield spread expresses less concern

15   about the ability of the borrower to pay; do I have that right?

16   A.   Yes.

17   Q.   So if, over time, investors had -- are becoming more and

18   more confident in a borrower's ability to pay, you would expect

19   the yield spread to become smaller; isn't that right?

20   A.   Yes.

21   Q.   Conversely, if investors were becoming more and more

22   concerned about a borrower's ability to pay, the yield spread

23   should grow; isn't that right?

24   A.   Yes.

25   Q.   Before the Third Amendment, so before bondholders knew

1    about the net worth sweep prior to the Third Amendment, the

2    yield spreads on Fannie and Freddie bonds were in a long-term

3    trend of getting smaller; isn't that right?

4    A.    Yes.  We were getting out of the crisis, and kind of the

5    crisis was fading in the mirror, as it was.  So yield spreads

6    generally across the board were coming down.

7    Q.    Well, isn't that the opposite of what we would expect to

8    see if bondholders were worried about Fannie and Freddie not

9    being able to pay?

10   A.    Not really, because it's a matter of, are they coming down

11   as fast or are they coming down more slowly.  And as we saw, the

12   best way of looking at this is to look at what happened on the

13   day, like your colleague just asked me about the MBS market.

14   And if that had been the case, we would have seen nothing on the

15   long-term bonds.

16   Q.    But starting at the beginning of 2012 and moving towards

17   August of 2012, the yield spread is going down; isn't that

18   right?

19   A.    Yes, and it would have gone down faster if there was no

20   concern.

21              MR. BARNES:  Okay.  No further questions.

22                        REDIRECT EXAMINATION

23              BY MR. HOFFMAN:

24   Q.    Good morning, Dr. Attari.  I have just about ten minutes'

25   worth of questions for you.  I appreciate your time this

1    morning.

2        Dr. Attari, do you recall some questions that Mr. Kravetz,

3    plaintiffs' counsel, asked you about Mr. Dave Benson's

4    deposition testimony?  Do you recall that?

5    A.    Yes.

6    Q.    And Mr. Benson is the Fannie Mae executive who authored the

7    "golden years of earnings" e-mail, as well as the forecast chart

8    that we've looked at a lot; is that right?

9    A.    Yes.

10   Q.    Mr. Kravetz asked you about the phrase "marketing spin."

11       Do you recall that?

12   A.    Yes.

13   Q.    There was some question and confusion as to whether those

14   were your words or Mr. Benson's words.

15       Do you recall that?

16   A.    Yes.

17   Q.    Would it help you recall who said that by reviewing

18   Mr. Benson's deposition testimony?

19   A.    Yes.

20   Q.    And you reviewed Mr. Benson's deposition testimony as a

21   part of your -- preparation of your report; right?

22   A.    Yes.

23   Q.    Mr. Salazar, if you could play the clip of Mr. Benson's

24   deposition testimony, which has already been played in court.

25       (Video played.)

1    Q.    So Dr. Attari, Mr. Benson described his projections as

2    marketing spin, not you; is that right?

3    A.    Correct.

4    Q.    Let's pull up Defendants' Exhibit 412.

5          Dr. Attari, you will recall I asked you some questions on

6    direct examination about a Deutsche Bank report.

7          Do you recall that?

8    A.    Yes.

9    Q.    Let's go to the second page of this for now, Mr. Salazar.

10         This is the document here that's showing on everyone's

11   screen.  That's the Deutsche Bank report that we discussed; is

12   that right?

13   A.    Yes.

14   Q.    And Mr. Kravetz asked you some questions about whether

15   anyone at FHFA had ever seen or considered this report.

16         Do you recall that?

17   A.    Yes.

18   Q.    Okay.  So Mr. Salazar, let's go to the first page of

19   this --

20              MR. KRAVETZ:  Objection, Your Honor;

21   mischaracterization of testimony.

22              THE COURT:  Sustained.

23              BY MR. HOFFMAN:

24   Q.    Mr. Salazar, let's go to the first page of Defendants'

25   Exhibit 412, page 1 of 8.  And let's zoom in on the text here.

1       So this is an e-mail -- well, let me ask you, who is this

2    e-mail from?

3    A.   It's from Mario Ugoletti.

4    Q.   And based on all your review of the materials and evidence

5    in this case, do you know what Mr. Ugoletti's role was?

6    A.   He was a senior person who supported Mr. DeMarco.

7    Q.   This is an e-mail from Mr. Ugoletti to Mr. DeMarco; is that

8    right?

9    A.   Yes.

10   Q.   And who is Mr. DeMarco?

11   A.   Mr. DeMarco was the acting director of the FHFA at the

12   time.

13   Q.   And the subject line here, it says "Forward:  GSE/PSPA

14   backstop questions."

15       Do you see that?

16   A.   Yes.

17   Q.   And what do you understand that to be in reference to?

18   A.   The PSPA backstop would be the Treasury commitment.

19   Q.   And Mr. Ugoletti here tells Mr. DeMarco, he characterizes

20   this as a reasonable summary; right?

21   A.   Yes.

22   Q.   And there's a .pdf attachment.

23       Do you see that?

24   A.   Yes.

25   Q.   And the attachment, if Mr. Salazar goes to the next page,

1    is the Deutsche Bank article?

2    A.   Yes.

3    Q.   So before we get off of this document, Mr. Salazar --

4    Court's indulgence.

5         Do you recall, Dr. Attari, that Mr. Kravetz asked you some

6    questions about how the analysts at Deutsche Bank had noted that

7    perhaps FHFA and Treasury would agree to just defer, suspend the

8    dividend?  Do you recall that?

9    A.   Yes.

10   Q.   For the 10 percent dividend to be just deferred or

11   suspended altogether, Treasury would have had to have agreed to

12   that; right?

13   A.   I assume so, yes.

14   Q.   Because they were a party to the contract?

15   A.   Yes.

16   Q.   And they were the recipients of the 10 percent dividend?

17   A.   Yes.

18   Q.   In all of your research and analysis in this case, did you

19   see any evidence indicating that Treasury would have agreed to

20   just drop the 10 percent dividend?

21   A.   No.

22            MR. KRAVETZ:  Objection; foundation.

23            THE COURT:  Overruled.

24            THE WITNESS:  No, I did not.

25            BY MR. HOFFMAN:

1   Q.   And do you know one way or another whether Treasury would

2   have had the ability to just give up the 10 percent dividend in

3   light of the restrictions on compromising debts owed to the

4   United States?

5                  MR. KRAVETZ:  Objection; foundation, Your Honor.

6                  THE COURT:  Overruled.

7                  THE WITNESS:  I do not know.

8                  BY MR. HOFFMAN:

9   Q.   You can take that down, Mr. Salazar.   Thank you.

10        Do you recall Mr. Kravetz asked you some questions

11   yesterday about Fannie and Freddie's credit ratings and, in

12   particular, the credit ratings of the Fannie and Freddie bonds?

13   A.   Yes.

14   Q.   And he asked you questions about whether any of those bonds

15   had ever been downgraded or whether there was discussion about

16   downgrading those bonds.

17        Do you recall that?

18   A.   Yes.

19   Q.   Now, I want to ask you about something that you addressed

20   in your report.

21        Do you recall any discussion by Moody's, one of the credit

22   rating agencies, about possible downgrades of Fannie and Freddie

23   bonds as a result of concern about the circular dividends?

24   A.   Yes.

25   Q.   Let's take a look at Defendants' Exhibit 339.   For now,

```
 1    let's just display it to the witness and counsel, Ms. Jenkins
 2    and Mr. Salazar.
 3          Dr. Attari, do you recognize this document?
 4    A.   Yes.
 5    Q.   And the bottom corner indicates this is a Moody's Investors
 6    Service document; is that right?
 7    A.   Yes.
 8    Q.   This is from September of 2011?
 9    A.   Yes.
10    Q.   This is one of the materials you considered in formulating
11    your opinions in this case; is that right?
12    A.   Yes.
13    Q.   Just to orient everyone, this is a pre-Third Amendment
14    market analyst report; right?
15    A.   Yes.
16    Q.   We didn't go into this one in your direct examination, but
17    is this one of the ones that you said you reviewed but wasn't a
18    part of your initial presentation?
19    A.   Yes.
20    Q.   Okay.
21          MR. HOFFMAN:  Permission to display this to the jury,
22    Your Honor, as a part of his materials considered under
23    Rule 703.
24          THE COURT:  You may.
25          COURTROOM DEPUTY:  Is this in evidence?
```

```
1              MR. HOFFMAN:  It is not in evidence.

2              BY MR. HOFFMAN:

3    Q.    This is a Moody's weekly credit outlook; right?

4    A.    Yes.

5    Q.    And Moody's is one of the credit rating agencies?

6    A.    One of the three credit rating agencies, yes.

7    Q.    So let's turn to page 16 of the .pdf.  Let's focus in on,

8    Mr. Salazar, on the "furthermore" paragraph.

9          So here, Moody's is saying, "Furthermore, dividends on the

10   U.S. Treasury Department's senior preferred stock."

11         What do you understand that to be referencing?

12   A.    This is the drawn portion of the commitment, the bit on

13   which they had to pay the 10 percent.

14   Q.    It's the 10 percent dividend?

15   A.    Yes.

16   Q.    The 10 percent dividend, Moody's says, "will eliminate

17   Fannie Mae's contingent capital by 2019 and Freddie Mac's by

18   2022."

19         Do you see that?

20   A.    Yes.

21   Q.    What do you understand that to be referencing?

22   A.    The contingent capital is the undrawn portion of the

23   commitment, and they're saying that that would run out by 2019

24   for Fannie Mae and 2022 for Freddie Mac based on their model.

25   Q.    And this is -- is this similar or different than --
```

1    Deutsche Bank six months later also had those projections.  I

2    don't know if you recall the slopes going down.

3        How is this similar or different to what Deutsche Bank was

4    stating?

5    A.   They were also saying that the commitment would run out.

6    The date was a little bit different.

7    Q.   As a result of the 10 percent dividends?

8    A.   As a result of the 10 percent dividends.

9    Q.   Combined with the cap that was going to come in on the

10   Treasury commitment starting at the beginning of 2013?

11   A.   Yes.

12   Q.   And Moody's also says, "This assumes that the GSEs are able

13   to fully offset credit losses, which we believe is unlikely."

14   A.   Yes.

15   Q.   What do you understand that to mean?

16   A.   This is making quite optimistic assumptions about what will

17   happen to the -- in terms of the losses going forward.

18   Q.   So Mr. Salazar, let's go to the next paragraph that starts

19   with "our view."  Here, let's start with the sentence in the

20   first paragraph that says, "The government's actions."

21       It says, "The government's actions to preserve Fannie Mae

22   and Freddie Mac, as well as statements by senior government

23   officials, lead us to believe that the likely path of GSE reform

24   will include further support for current creditors, if

25   necessary."

1      What do you understand "further support for current

2   creditors, if necessary" to mean?

3   A.   They -- that the commitment would somehow be increased.

4   Q.   More money being made available?

5   A.   More money being made available.

6   Q.   Whether by the Treasury commitment or something else?

7   A.   Yes.

8   Q.   Because in the prior paragraph, Moody's is predicting that

9   the Treasury commitment is going to run out.

10  A.   Yes.

11  Q.   Okay.  And so the next paragraph, Moody's says, "However,

12  if GSE reform proves too contentious to arrive at a consensus or

13  if it excludes explicit support and results in less-relevant

14  GSEs with insufficient contingent capital."

15      I will just pause there.  What do you

16  understand "insufficient contingent capital" to mean there?

17  A.   There's not enough in the undrawn portion of the commitment

18  or, you know, some other facility like it.

19  Q.   So basically, if the Treasury commitment is not preserved

20  or increased in some way?

21  A.   Yes.

22  Q.   Okay.  Then Moody's says, "It would be a credit negative

23  and prompt a review of their AAA ratings."

24      What does that mean?

25  A.   That means if the commitment is not somehow increased, then

1    that would be negative and the ratings would go down.

2    Q.    And then in the last portion here, there's a reference at

3    the end of the sentence that this "would likely be multiple

4    notches below the current AAA ratings."

5         What does that mean?

6    A.    So it would fall significantly, that the credit rating

7    agencies reduce ratings in notches, but what they're talking

8    about here is multiple notches, so it would actually go down

9    entire categories.  So it might go from AAA to just A or even

10   below that.  They're not saying where it would end up.

11   Q.    Is a reduction in a company's bond ratings bad for the

12   company?

13   A.    It is bad for the company, and a multiple-notch reduction

14   is very bad.  It tends to disrupt the company's operations and

15   financing.

16   Q.    What typically happens, in your expert opinion, when a

17   company's -- any company's bond ratings are dropped?

18   A.    The costs of financing goes up, and in the case of a

19   company like Fannie Mae and Freddie Mac, the access to financing

20   could also be affected.  And because their profits were

21   essentially the difference between the rate they earned on the

22   mortgages and investments and the rate they paid, their profits

23   would shrink.

24   Q.    So Moody's is saying if this Treasury commitment problem

25   isn't fixed, Moody's might have to reduce Fannie Mae and Freddie

1    Mac's bond ratings?

2    A.   Yes.

3    Q.   You can take that down, Mr. Salazar.

4         We had looked at another Moody's report as well as a part

5    of your direct examination; right?

6    A.   Yes.

7    Q.   So that one was the week before the Third Amendment was

8    signed; right?

9    A.   Yes.  That was after the second quarter earnings had been

10   announced and just before the Third Amendment was signed.

11   Q.   And the title of that, do you recall, was "Fannie Mae and

12   Freddie Mac's return to profitability as fleeting"?

13   A.   Yes.

14   Q.   And Moody's in that report said even up until the week

15   before the Third Amendment was signed, their path remains

16   unchanged?  That was what Moody's said then?

17   A.   Yes.

18   Q.   So Mr. Barnes asked you some questions about Fannie Mae's

19   10-K.

20        Do you recall that?

21   A.   Uh-huh.

22   Q.   So let's take a look at that, Mr. Salazar.  It's

23   Defendants' Exhibit 136.

24        I just want to look at one page and really one number,

25   because the jury has seen a lot of these 10-Ks.  So

1    Defendants' Exhibit 136, and let's go to page 282 of 500.  And

2    Mr. Salazar, if you don't mind, zoom in on the bottom four, five

3    lines, the text and the numbers.  And then let's highlight this

4    number that's almost at the bottom on the left-hand column that

5    has a parentheses around it, and it says 15,314.  And let's

6    highlight the text that's in this row, Mr. Salazar, and it

7    says "total stockholders' equity (deficit)."

8         Can you just explain to the jury what this means and what

9    the negative number means?

10   A.   The negative number is telling you that the book value --

11   so this is an accounting statement.  So the book value of the

12   equity is negative 15 billion.  And the way that you can see it

13   on this page is if you look at the assets, they're $912 billion,

14   and that's near the top of your screen, and total liability --

15   so assets is things the company owns.  And liabilities, which is

16   the amounts that they owe, is 927 billion.  So their own assets

17   were 912 billion, and they owe 927 billion, and so they have a

18   negative equity position of 15 billion.

19   Q.   So the negative number here means Fannie owes over

20   $15 billion more than it has?

21   A.   Yes.

22   Q.   You can take that down, Mr. Salazar.

23        Do you recall, Dr. Attari, that both plaintiffs' counsel

24   asked you a lot of questions about bond yields and bond spreads

25   and bond price movement over different periods of time?  Do you

1   recall that?

2   A.   Yes.

3   Q.   I'm not going to go into all of those details again, but I

4   will just ask you this:  Do any of those questions or

5   suggestions from plaintiffs' counsel, do you believe they

6   undermine your conclusions with respect to your bond event study

7   in any way?

8   A.   No, they do not.

9   Q.   And why not?

10   A.   Because the way to look at this question, the effect that

11   the Third Amendment had is to look at what happened on the day

12   of the Third Amendment.  If you try to extend the period you're

13   looking at, then you run into the difficulty that there's a lot

14   of other things that are going on in the world that affect

15   whatever you're looking at.

16        So, you know, the markets themselves have been very

17   disrupted in 2008, and those disruptions had aftershocks because

18   of events in the United States and in Europe and elsewhere.  And

19   after a long period, markets were becoming calmer.

20        So the long-term downward trend in yields and yield spreads

21   had to do with markets becoming calmer generally.

22        What we're interested in is -- or what I was interested in

23   is what was the impact of the Third Amendment on bond yields,

24   and did it have any impact, and what was it.  And for that, the

25   right thing to do is to look at August 17th, what happened on

1    August 17th.

2    Q.   And you looked at long-term benchmark bonds for Fannie Mae

3    and Freddie Mac; right?

4    A.   Yes.

5    Q.   What did you observe happened as soon as the Third

6    Amendment was announced?

7    A.   As soon as the Third Amendment was announced, those yields

8    declined, and that means that investors viewed Fannie Mae and

9    Freddie Mac as being safer.  So they viewed Fannie Mae and

10   Freddie Mac as being safer on August 17th than on August 16th,

11   and significantly safer.

12   Q.   Do you recall plaintiffs' counsel asked you some questions

13   about alternatives to the Third Amendment net worth sweep?  Do

14   you recall that?

15   A.   Yes.

16   Q.   And one of the plaintiffs' purported alternatives is this

17   12 percent instead of 10 percent option.

18        Do you recall that?

19   A.   Yes.

20   Q.   And you testified about that 12 percent, not 10 percent,

21   payment on your direct examination; right?

22   A.   Yes.

23   Q.   And you explained why it would be worse than the net worth

24   sweep?

25   A.   Yes.

```
 1   Q.   And this was when we were walking through the Fannie Mae
 2   numbers, and you explained how if they did this 12 percent
 3   option, then that dividend amount would just grow and grow and
 4   grow; is that right?
 5   A.   Yes.
 6   Q.   And even if Fannie Mae and Freddie Mac weren't paying out
 7   cash, the liquidation preference would grow and grow and grow?
 8   A.   Yes.
 9   Q.   And so the money owed to Treasury would just keep going up?
10   A.   Yes.
11   Q.   Dr. Attari, you were asked a number of questions about loan
12   commitment fees.
13        Do you recall that?
14   A.   Yes.
15   Q.   This was in the context of Professor Thakor's opinion about
16   whether it's fair to compare -- I'll back up.
17        This is about the periodic commitment fee; is that right?
18   A.   Yes.
19   Q.   And how to come up with the best estimate of what a
20   periodic commitment fee would be; is that right?
21   A.   Yes.
22   Q.   Now, is the Treasury commitment a loan?
23   A.   No.
24   Q.   What is it?
25   A.   It is an equity investment.  If these companies aren't able
```

1   to pay it back, it's gone.

2   Q.   Now, in September of 2008, Dr. Attari, during the housing

3   and financial crisis, could Fannie Mae and Freddie Mac have gone

4   to a bank and gotten a loan instead of doing the PSPAs with

5   Treasury?

6   A.   I believe they would not.

7   Q.   And why not?

8   A.   If that had been an option, they would have done that.

9   Q.   What did they do instead?

10  A.   They went to Treasury and got a commitment -- a commitment

11  to invest equity, you know, a hundred billion of equity when

12  they had negative equity capital.  I mean, no bank would lend

13  you if you have negative equity capital.

14  Q.   And Fannie Mae and Freddie Mac soon after the Third

15  Amendment -- strike that.

16       Soon after the conservatorship went into place, they ran

17  out of their equity capital?

18  A.   They ran out of their equity capital.

19  Q.   And they began drawing on the Treasury commitment?

20  A.   Yes.

21           MR. HOFFMAN:  No further questions.  Thank you,

22  Dr. Attari.

23           THE COURT:  You may step down.

24       Next witness?

25           MR. HOFFMAN:  Defendants call Mr. Nicholas Satriano,

1    Your Honor.

2              NICHOLAS SATRIANO, WITNESS FOR THE DEFENDANTS, SWORN

3                          DIRECT EXAMINATION

4              BY MR. HOFFMAN:

5    Q.   Good morning, Mr. Satriano.

6    A.   Good morning.

7    Q.   I'm going to take your cue and get my own glass of water.

8    If I could remind you to stay leaned forward so I and the jury

9    can hear you, I would appreciate it.

10         Mr. Satriano, could you please introduce yourself to the

11   members of the jury.

12   A.   Hi.  Good morning.  My name is Nick Satriano.

13   Q.   Mr. Satriano, where do you work?

14   A.   I work at the Federal Housing Finance Agency, which is

15   known as the FHFA.

16   Q.   And how long have you worked at FHFA?

17   A.   I have worked at FHFA and its predecessors for 19 years.

18   Q.   And did you work -- and you mentioned predecessors.  What

19   does that mean?

20   A.   So FHFA was created from a combination of several federal

21   agencies, and I worked at one of the predecessor agencies named

22   The Office of Federal Housing Enterprise Oversight, also known

23   as OFHEO.

24   Q.   And OFHEO eventually was merged into and became FHFA in

25   2008; is that right?

```
 1   A.   Yes.

 2   Q.   What is your current role at FHFA?

 3   A.   My current role is the chief accountant of the agency.

 4   Q.   And how long have you held that role?

 5   A.   I've had this role for more than ten years.

 6   Q.   Since around 2011?

 7   A.   Yes.

 8   Q.   And now backing up a few steps, where did you go to

 9   college?

10   A.   I went to college at Earlham College.

11   Q.   And what did you study?

12   A.   I studied Japanese history.

13   Q.   And did you do more schooling after college?

14   A.   I did.

15   Q.   And what kind of schooling did you do?

16   A.   I got a master's in international finance from the

17   University of Denver, and I did further study in accounting in

18   Virginia.

19   Q.   And did you receive accounting certification?

20   A.   I did.  I'm a licensed CPA in the state of Virginia.

21   Q.   And what did you do for work after you finished your

22   education?

23   A.   I'll start after my master's degree.  I was in

24   Washington -- came to Washington, D.C., and I worked for a time

25   at the GAO, which is the General Accounting Office, now known as
```

1    the Government Accountability Office, and I worked in an area

2    covering financial markets and financial institutions.

3    Q.   And then you eventually joined OFHEO, the predecessor of

4    FHFA?

5    A.   Right, with some other moves in between.

6    Q.   And so you spent most of your career at FHFA; is that

7    right?

8    A.   That's right.

9    Q.   And can you tell the jury briefly what is -- what do you do

10   as FHFA's chief accountant?

11   A.   Okay.  So FHFA, as you may have heard already, is a

12   regulatory agency which oversees the secondary mortgage market,

13   which primarily includes Fannie Mae, Freddie Mac, and the

14   federal home loan banks.

15       My role is to run the Office of the Chief Accountant.  We

16   do that by issuing accounting- and auditing-related guidance to

17   our regulated entities, Fannie and Freddie.  The primary areas

18   where we spend the most of our time in the accounting office is

19   looking at accounting policy, how management records and decides

20   how to record transactions.

21       We also look at financial disclosures.  I will assume

22   you've heard a lot about the SEC filings the last week.  So

23   that's the things -- those are the kinds of documents we spent a

24   lot of time reviewing and commenting on to ensure completeness

25   and transparency.

1    Q.    I'm going to change gears a little bit, Mr. Satriano, and

2    talk about the Third Amendment.

3    A.    Okay.

4    Q.    First, I would like to pull up a document that I believe is

5    not yet in evidence.  So Mr. Salazar, if you could pull up

6    Defendants' Exhibit 916.  Let's just zoom in a little bit,

7    Mr. Salazar, so the witness can see what we're looking at.

8          Mr. Satriano, do you recognize this document?

9    A.    Yes, I do.

10   Q.    And what is it?

11   A.    It's an e-mail with an attachment to several members of the

12   FHFA.

13   Q.    And the subject here is the PSPA?

14   A.    Yes, it is.

15   Q.    And it was sent to you in June of 2012; is that right?

16   A.    Yes.

17          MR. HOFFMAN:  At this time defendants would move into

18   evidence Defendants' Exhibit 916.

19          MR. ZAGAR:  No objection.

20          THE COURT:  Received.

21    (DX-916 received into evidence.)

22          BY MR. HOFFMAN:

23   Q.    Who sent this e-mail to you and others?

24   A.    This e-mail is from Mario Ugoletti.

25   Q.    Mr. Ugoletti was at FHFA at this time?

```
1    A.    Yes, he was.

2    Q.    Can you remind us, what was his role?

3    A.    Mr. Ugoletti was advisor to the acting director of FHFA.

4    Q.    And who was the acting director at this time?

5    A.    The acting director was Ed DeMarco.

6    Q.    I want you to help us identify who else this e-mail was

7    sent to.  First -- let me back up a moment.

8          This e-mail was sent June 5, 2012; is that right?

9    A.    That's correct.

10   Q.    This was a few months before the Third Amendment was

11   signed?

12   A.    Yes.

13   Q.    The first recipient here is Mr. Alfred Pollard.

14         Do you see that?

15   A.    Yes.

16   Q.    What was Mr. Pollard's role at this time?

17   A.    Mr. Pollard's formal title was general counsel, which sort

18   of more colloquially means the top lawyer of the agency, of

19   FHFA.

20   Q.    And he was an in-house lawyer --

21   A.    Yes, so he's a federal employee, leads our Office of

22   General Counsel, which is our group of lawyers.

23   Q.    And Mr. Mark Laponsky, what was his role at this time?

24   A.    He's a legal executive working for Mr. Pollard.

25   Q.    And the next person is Mr. Patrick Lawler.
```

```
 1        What was Mr. Lawler's role at this time?
 2   A.   Mr. Lawler was the agency's chief economist, so sort of
 3   kind of similar position to mine, similar chief-type role.
 4   Q.   Sort of similar level to yours?
 5   A.   Yes.  He was an executive at the agency as well.
 6   Q.   And what about Jon Greenlee?  What was his role?
 7   A.   Jon Greenlee's role was the head of safety and soundness
 8   examinations, also sort of our top executive in that space.
 9   Q.   Ms. Meg Burns, what was her role at this time?
10   A.   Meg Burns is another executive in our housing policy
11   function.  So she's a housing expert.
12   Q.   And Mr. Jeffrey Spohn, what was Mr. Spohn's role?
13   A.   Jeff Spohn was our lead executive covering the
14   conservatorship in the conservatorship operations office.
15   Q.   And finally, Jamie Newell, what was Jamie Newell's role?
16   A.   Jamie Newell was one of Jeffrey Spohn's executive
17   delegates.
18   Q.   You were on here as well, and you were chief accountant at
19   FHFA at this time?
20   A.   Yeah, I was copied on this e-mail, given my role as chief
21   accountant.
22   Q.   So this e-mail has FHFA's top lawyer, top economist, top
23   accountant, top operations person, and top supervision person
24   and one of the top policy people; is that right?
25   A.   Yes.
```

Q.   And Mr. Ugoletti is sending all of those people a draft of the Third Amendment; is that right?

A.   Yes.

Q.   And if we scroll down a little bit, Mr. Ugoletti is sort of doling out particular questions to particular people; right?

A.   Yes.

Q.   Okay.  So there isn't a particular question directed to you at this time.

     You can take the document down.

     There wasn't a particular question directed to you, but did you read that draft of the Third Amendment?

A.   Yes, I did.

Q.   And did you -- did you conclude that there were any accounting issues with it when you reviewed it?

A.   No.  I concluded that there were no accounting issues.

Q.   And what were some of the issues you thought about when you looked at that?

A.   So, a couple of things.  The main thing that I thought about with respect to accounting and auditing is this -- there's a notion in the auditing world called "going concern."  An auditor is required to issue a going concern opinion if they think the company that they're auditing is not going to be in business in the next year.

     So with every one of these PSPA amendments that happened over time, one of my primary concerns was assessing the changes

1    to ensure that it would not cause a going concern.

2    Q.   And -- and you concluded that the Third Amendment that you

3    reviewed did not raise a going concern problem; right?

4    A.   Yes.

5    Q.   And in fact, did you conclude that it helped?

6    A.   Yeah, it immensely helped that issue.

7    Q.   How so?

8    A.   Well, the PSPA, under its previously modified -- previous

9    to the modification, there was a circularity of dividend issue

10   where the enterprises were required to pay out moneys to pay for

11   the dividend.  That was eroding the amount of dividend

12   available, the Treasury commitment available.  That was a big

13   concern, at least from the accounting perspective, relative to

14   going concern.

15   Q.   And so the Third Amendment that you were reviewing stopped

16   that circularity issue?

17   A.   That's right, yes.

18   Q.   So that reduced any concerns about going concern?

19   A.   Yeah.  So we checked with -- we checked internally,

20   discussed it, and concluded that that was an improvement with

21   respect to the going concern issue.

22   Q.   All right.  Mr. Satriano, I want to change gears a little

23   bit to talk about deferred tax assets.

24        Are you familiar at a high level with what deferred tax

25   assets are?

1    A.    Yes.

2    Q.    Can you remind the jury briefly as to what a deferred tax

3    asset is?  And I know this can get complicated.

4    A.    Okay.  So a deferred tax asset is a part of the accounting

5    framework, a part of GAAP, we call it, generally accepted

6    accounting principles.

7          At a high level, deferred tax assets are created because of

8    timing differences between -- we call GAAP reporting, SEC-type

9    reporting, where you're reporting your income and losses, and

10   tax accounting, where you're trying to figure out how much taxes

11   you owe in any given year.

12   Q.    And practically speaking, the deferred tax asset is kind of

13   like a tax credit; is that fair?

14   A.    Right.  So assets are good.  You want more assets.  So when

15   a deferred tax asset is created, it means it has some use in the

16   future.  In this case, its use is to help offset your tax

17   liability or the amount of taxes that you would have to pay in

18   the future.

19   Q.    So if Fannie Mae and Freddie Mac owe taxes in the future

20   and they have deferred tax assets, then they can just apply

21   those deferred tax assets to reduce their tax bill; is that

22   right?

23   A.    Yes.

24   Q.    Now, deferred tax assets, or DTAs, they can be written

25   down; right?

1   A.   So yes.

2   Q.   And that's sometimes called -- a valuation analysis is the

3   technical term?

4   A.   Correct.

5   Q.   And am I right that they're written down when a company

6   thinks we're not going to actually have any taxable income, so

7   we can't use the tax credit?

8   A.   Yes.

9   Q.   Okay.  So Fannie and Freddie had a lot of DTAs by the time

10  they entered into the conservatorship in 2008; is that right?

11  A.   Yes, they had deferred tax asset balances.

12       I was trying to think of the number.  Sorry.

13  Q.   That's okay.  And those deferred tax assets were, in fact,

14  written down soon after the conservatorship began?

15  A.   Yes, that's correct.

16  Q.   And after those DTAs were written down in late 2008, there

17  was a periodic review process to determine whether they should

18  ever be written back up; is that right?

19  A.   Yes.

20  Q.   How often did that process occur?

21  A.   So as with most accounting estimates, they're required to

22  be updated quarterly, so four times a year, at the end of each

23  quarter, along with the preparation of the financial statements.

24  Q.   So the quarterly financial statements, those are the 10-Qs;

25  right?

1    A.   That's correct.  That's the shorthand.

2    Q.   And so this quarterly DTA review process, this happened

3    sort of in conjunction with the quarterly SEC filing process?

4    A.   Right.  So as a part of the preparation of a quarterly

5    financial statement, management -- in this case, we're talking

6    about Fannie Mae or Freddie Mac's management -- has the

7    obligation to update and have a basis for all of the numbers

8    they put in their financial statements, DTA being one of those

9    numbers.

10   Q.   And so each quarter, Fannie Mae and Freddie Mac would sit

11   down and look and determine, are we going to be able to use

12   these DTAs and should the deferred tax assets be written up; is

13   that right?

14   A.   Written up or written down.

15   Q.   Or stay down?

16   A.   Or stay the same.

17   Q.   And FHFA was involved in that quarterly process in terms of

18   oversight; is that right?

19   A.   That's correct.

20   Q.   And what about you personally?  Were you kept abreast of

21   those quarterly reviews?

22   A.   Leading the quarterly reviews was one of my primary

23   responsibilities as the chief accountant for the agency.

24   Q.   And each quarter, Fannie Mae and Freddie Mac would generate

25   a formal memo stating their conclusion about whether the DTAs

1  should stay written down or be written back up again; is that

2  right?

3  A.   Yes.

4  Q.   And did you review those memos each quarter?

5  A.   Yes, I did.

6  Q.   That was a part of your job?

7  A.   A part of my job.

8  Q.   And to answer the question of whether a DTA should be

9  written up or stay written down, that process involves a lot of

10  judgment; right?

11  A.   Yes, it does.

12  Q.   And what's the sort of standard that the company has to

13  apply to determine whether to write up the DTA?

14  A.   Sure.  So in generally accepted accounting principles, in

15  GAAP, there's a -- in the DTA space, there's a series of rules,

16  and the standard in this area of GAAP is that it has to be more

17  likely than not.  So in numbers, that means it has to be at

18  least 51 percent that you will be able to use the tax asset in

19  the future.

20      So they have to weigh positive evidence and negative

21  evidence and come up with an assessment and an opinion that has

22  to be more likely than not, so greater than 51 percent.

23  Q.   So Fannie and Freddie would sort of list out the positives,

24  list out the negatives, and make a judgment as to whether it was

25  more likely than not that they would be able to use these DTAs?

1  A.   Yes.

2  Q.   Now let's talk about how this quarterly DTA review process

3  turned out for Fannie Mae and Freddie Mac.

4       So the DTAs were written down in late 2008; is that right?

5  A.   Yes.

6  Q.   And so this quarterly review process happened throughout

7  2009, 2010, 2011; right?

8  A.   Yes.

9  Q.   And so what did Fannie Mae and Freddie Mac conclude about

10 the DTAs during that time span, so 2009 to 2011?

11 A.   So each quarter, they filed the 10-Qs with the SEC.  As a

12 part of that analysis, they prepared this DTA valuation analysis

13 memo.  And in each of those quarters, both Fannie and Freddie

14 concluded that it was more likely than not that they would not

15 be able to use the tax asset.  Therefore, they kept it, the

16 asset, written down.

17 Q.   So they concluded it was not likely that they would be

18 making money that would be taxed, so they couldn't use these

19 DTAs like tax credits; is that right?

20 A.   That's correct.

21 Q.   And in the first quarter of 2012, did they both reach the

22 same conclusion?

23 A.   They did.

24 Q.   Okay.  So now I want to focus on the second quarter of

25 2012.

1    A.    Okay.

2    Q.    Can you remind the jury when the second quarter of 2012

3    ended officially?

4    A.    Yeah.  So the financial reporting period ended at the end

5    of June, so June 30th, 2012.

6    Q.    And this quarterly review process, did it happen before

7    June 30th, 2012, or did it happen after the end of the quarter?

8    A.    Right.  For each quarter, there's a specified number of

9    days that a company is allowed to prepare their reports.  It's

10   about 45 days.  So the analysis happens after the books and

11   records are closed for the quarter.  So it happens subsequent to

12   the end of the month -- end of the quarter.

13   Q.    Do you recall for the second quarter of 2012 about what

14   time this quarterly review process happened for the DTAs?

15   A.    Yeah.  So in any quarter, and that quarter as well, it

16   happens about a month after the quarter ends.

17   Q.    So that would be about the end of July or early

18   August of 2012?

19   A.    So in 2012, middle of the year, end of July, yeah.

20   Q.    Fannie and Freddie reached their DTA conclusion late July,

21   early August 2012?

22   A.    That's correct.

23   Q.    And let's take a look, Mr. Salazar, at Defendants'

24   Exhibit 499A, which I do not believe is in evidence yet.  And

25   let's look at the second page of 499A.  And let's focus in on

1    that top box.

2         Mr. Satriano, do you recognize this document?

3    A.   Yes, I do.

4    Q.   And what is it?

5    A.   This is the memo that we've been referring to.  The formal

6    name is the "second quarter 2012 valuation allowance."

7    Q.   And what's the date of this memo?

8    A.   It is dated June 30, 2012.

9    Q.   But does that mean it was written on June 30th?

10   A.   No.  The date in this instance means that it is related to

11   the numbers as of June 30, 2012.

12   Q.   And did you review this memo at the time?

13   A.   I did.

14        MR. HOFFMAN:  Defendants would move into evidence

15   Defendants' Exhibit 499A.

16        MR. ZAGAR:  No objection.

17        THE COURT:  Received.

18   (DX-499 received into evidence.)

19        By MR. HOFFMAN:

20   Q.   For the benefit of the jurors, this is the second quarter

21   2012 valuation allowance memo.

22        Valuation allowance, that's the official accounting term

23   for the write-up or write-down; is that right?

24   A.   That's correct.

25   Q.   And let's take a look, Mr. Salazar, at the first page of

1    this document, the cover e-mail that's attaching this.

2        This is an internal Fannie Mae e-mail, and it's dated

3    July 27th, 2012.

4        Do you see that?

5    A.   Yes.

6    Q.   And is that consistent with your recollection as to when

7    this memo was actually drafted?

8    A.   Yes, it is.

9    Q.   Okay.  Let's go back to the memo itself, and let's go to

10   what I have as page 5 of 10.  And let's zoom in in the middle

11   portion that says "summary."

12       Actually, let's back up a little bit, Mr. Salazar.  Let's

13   zoom in on "current forecast" and "summary," so that sort of

14   block of text.  Perfect.

15       So I want to highlight under the word "summary."  The

16   sentence there, I want to direct your attention to that,

17   Mr. Satriano.

18       It says, "Fannie Mae has significant negative evidence due

19   to the recent cumulative losses, uncertainty in the exit

20   strategy from conservatorship, uncertainty about long-term

21   financial sustainability due to the mandated reduction in our

22   mortgage portfolio, and continued forecasted charge-offs in the

23   outer years, resulting in a forecasted net taxable loss

24   position."

25       A lot of words there, but can you help the jury understand,

what is Fannie Mae concluding with these words in this sentence?

A.   Sure.  So this is primarily a list of negative evidence.
We spoke about positive evidence and negative evidence.  This
is -- some of these things are defined in the literature related
to this area.

     History of cumulative losses, that's a fact.  That's
something that's already happened.  So in the accounting
literature, you give that a lot of weight, because it's
objectively verifiable.

     Another specific component in the accounting literature is
this wording around uncertainty, future uncertainties or --
actually, they use the word "unsettled circumstances" typically.
So they're trying to describe that exiting conservatorship is an
unsettled circumstance and uncertainty that management doesn't
know, and therefore, that has a negative impact on their ability
to forecast taxable income.

Q.   So Fannie Mae is saying, with all of the circumstances,
including questions about long-term financial sustainability,
Fannie Mae just doesn't know yet whether they're going to have
taxes in the future?

          MR. ZAGAR:  Objection; leading.

          THE COURT:  Overruled.

          THE WITNESS:  Actually, in the sentence that we've
highlighted, it says, "Resulting in a forecasted net taxable
loss position."

1          So Fannie Mae is telling -- is concluding in their analysis

2     that they are forecasting a loss in their tax position.  If

3     you're forecasting a loss and you don't pay taxes, this asset

4     that helps you reduce your taxes, it has no benefit to you.

5     Q.   So the last sentence here says, "We believe there is not

6     sufficient positive evidence to outweigh the negative evidence

7     and, therefore, do not believe it is more likely than not that

8     our deferred tax asset," and then there's an exception noted

9     there, "will be realized."

10          We can talk about the exception, but is the bottom line

11    here that Fannie Mae is saying that they've done the weighing of

12    the positive and negative, and they just don't think there's

13    enough positive evidence to write up the DTA?

14    A.   Yes, that's what they're saying.

15    Q.   And I'm not trying to hide the ball here.  The exception

16    that is noted there, that's a very small sort of technical piece

17    of the DTAs; is that right?

18    A.   Yeah.  They assert they're holding this little group of

19    securities.  And if you're going to hold them, then you don't

20    need to worry about the temporary nature of the loss.  So that's

21    why they're excluded from the broader calculations.

22    Q.   You can take that down, Mr. Salazar.

23          Let's look briefly at one more document in this space.

24    This one is not yet in evidence, Defendants' Exhibit 472A.

25          Mr. Salazar, if you could pull that up and just show it to

1    the witness and the Court.  And let's go to the next page and

2    zoom in on everything above "executive summary."

3        Mr. Satriano, do you recognize this document?

4    A.   Yes, I do.

5    Q.   And what is it?

6    A.   This is Freddie Mac's management's analysis,

7    titled "2Q 2012 valuation allowance assessment."  It's the

8    corollary document to what Fannie Mae produced in a slightly

9    different document.

10   Q.   So this is Freddie Mac's --

11   A.   This is Freddie Mac's version of the analysis.

12   Q.   And did you review this memo at the time?

13   A.   Yes, I did.

14           MR. HOFFMAN:  Defendants' would move into evidence

15   Defendants' Exhibit 472A, Your Honor.

16           MR. ZAGAR:  No objection.

17           THE COURT:  Received.

18       (DX-472A received into evidence.)

19           BY MR. HOFFMAN:

20   Q.   Mr. Salazar, once it is displayed, if you could also go

21   back to the first page of this exhibit.

22       And Mr. Satriano, is this a series of e-mails passing

23   around and attaching this memo?

24   A.   Yes.

25   Q.   And the top line e-mail, Mr. Salazar, if you could zoom in

1  and focus on the date that this was circulated internally at

2  Freddie Mac.

3        This was circulated to Freddie Mac's auditor at PWC on

4  August 1st, 2012; is that right?

5  A.    Yes.

6  Q.    And is that consistent with your recollection as to the

7  time in which this DTA conclusion memo was circulated?

8  A.    Yes, typically one month after the quarter end.

9  Q.    So let's go to the next page, Mr. Salazar, and let's zoom

10  in on the top portion.

11        Again, I want to make sure the jury understands.  The

12  effective date here says June 30th, 2012; right?

13  A.    Uh-huh.

14  Q.    But it was written and finalized around August 1st?

15  A.    That's right.  So it --

16  Q.    And the cc line, Stephen Lewis at FHFA?

17  A.    Yes.

18  Q.    Who was Stephen Lewis?

19  A.    Stephen Lewis was an employee in the Office of the Chief

20  Accountant at the FHFA who worked for me.

21  Q.    So what was the bottom line conclusion on Freddie Mac's DTA

22  analysis at this time?

23  A.    With slightly different wording, it was the same as Fannie

24  Mae's conclusion.

25  Q.    That there was not sufficient evidence to write up the DTA?

1    A.    That's correct.

2    Q.    Because there was not sufficient evidence that Freddie Mac

3    would be making money and, therefore, owing taxes?

4    A.    Right.  The negative evidence outweighed the positive

5    evidence when, you know, thinking about the accounting rules.

6    Q.    So let's just quickly look at the last page of this

7    document, Mr. Salazar, and the paragraph that starts "in order

8    to support a conclusion."  Let's highlight the sentence that's

9    about three lines down.

10         It says, "Forecasts become more difficult to be used as

11   positive evidence when there are cumulative losses.  Future

12   income projections following a cumulative loss are inherently

13   subjective since a return to profitability often involves a

14   turnaround plan that has not yet been demonstrated."

15         What did you understand that to mean?

16   A.    A forecast is a future -- is a hypothetical; right?  It's

17   management's best estimate of what's going to happen in the

18   future.  Forecasts are inherently unknowable and subjective.

19   Therefore, in this specific DTA analysis, things that are not

20   objectively verifiable, so things you can't know and touch, are

21   given less weight than things that you do know, things that

22   actually happened already.

23         And I think that's what they're trying to say.

24         When there are cumulative losses, right -- so that's

25   something that has happened in the recent past, they know it,

1    it's a fact.  So they're trying to lay out in this sentence

2    really what's objective and what's subjective.

3    Q.   And Mr. Salazar, let's take a look at the next paragraph.

4    It will be the last piece of this document, the one that

5    starts "the cumulative book loss position."  Let's highlight the

6    sentence about midway through this paragraph that starts

7    with "thus."

8         "Thus, we determined that it is more likely than not that

9    the net deferred tax assets," with a parenthetical exclusion,

10   "will not be realizable in the future."

11        Do you see that?

12   A.   Yes, I do.

13   Q.   That's Freddie Mac concluding they are not going to write

14   up the DTAs this quarter?

15   A.   That's right.

16   Q.   Again, with the exception of this small sort of particular

17   type of DTA; is that right?

18   A.   Yes.  It's the same exception that Fannie noted, very

19   common.

20   Q.   So let's take that document down, Mr. Salazar.

21        So just to orient us to make sure we all understand the

22   documents we've looked at, at this time, Fannie and Freddie

23   concluded that they would not be writing up their DTAs at the

24   end of July or beginning of August of 2012; is that right?

25   A.   Yes.

1    Q.   And they reached that conclusion right before they

2    finalized and filed their 10-Qs?

3    A.   That's right.

4    Q.   Now, Mr. Satriano, was it readily apparent to you -- the

5    time the Third Amendment was executed in August of 2012, was it

6    readily apparent to you that Fannie Mae and Freddie Mac would be

7    writing up their DTAs in the near future?

8    A.   No.

9    Q.   Why not?

10   A.   Well, we just went through a very detailed analysis that

11   demonstrated that they had no ability to use the deferred tax

12   assets or no opinion that they could use those deferred tax

13   assets in the near future.

14        So this is really one week -- we're talking one week

15   earlier, we had just completed this very detailed process

16   reviewing their memos, approving it, back and forth.

17        So yeah, no, I didn't think there was any inclination, and

18   neither did management, according to their analysis.

19   Q.   And when you say "management," you're referring to internal

20   Fannie and Freddie management?

21   A.   Yes, I am.

22   Q.   And Fannie and Freddie management were the ones who had

23   prepared those memos?

24   A.   That's right.  That's their responsibility.

25   Q.   Now, Fannie Mae had -- at this time had just had two

1    quarters of profitability earlier in 2012; right?

2    A.   Yes.

3    Q.   And Freddie Mac had had one quarter of profitability

4    earlier in 2012; is that right?

5    A.   That's correct.

6    Q.   Why didn't that make it readily apparent to you that these

7    DTAs were going to be written up in the near future?

8    A.   So while they did have earnings in the first and second

9    quarter, I would describe them as very modest.  So they were

10   small numbers, small earnings, like just barely, relative to the

11   losses they had been experiencing for the previous three years.

12        And even though positive income is a positive factor, when

13   you compare it against all of the negative, it just doesn't get

14   there.

15   Q.   Mr. Salazar, let's pull up Plaintiffs' Exhibit 259, which

16   is already in evidence, and let's just auto zoom in a little

17   bit, but zoom in so we can see the whole e-mail chain.

18        I'll take that back, Mr. Salazar.  Let's start at the

19   bottom and focus on the first e-mail in time.

20        Now, Mr. Satriano, the first e-mail here is an e-mail from

21   James Griffin to you on August 14th of 2012; is that right?

22   A.   Yes.

23   Q.   And who is Mr. Griffin?

24   A.   Mr. Griffin is -- was the deputy chief accountant who

25   worked for me.

1   Q.   And he's describing a PSPA meeting; right?

2   A.   Yes.

3   Q.   And he's saying the meeting with Ed went well.

4        You understood that to be a reference to Ed DeMarco?

5   A.   Yes.

6   Q.   And they're talking about how -- Mr. Griffin is talking

7   about how the amendment is expected to be made public some time

8   on Friday.

9        And you understand that to be a reference to the Third

10  Amendment; right?

11  A.   Yes.

12  Q.   And Mr. Griffin here is talking about how the enterprises

13  will be informed the next day of the Third Amendment; right?

14  A.   Yes.

15  Q.   So let's go up, Mr. Salazar, to the next e-mail in this

16  chain.

17       And here, you respond to Mr. Griffin saying, "Any

18  discussion of reaching out to the auditors?  Given the changes,

19  should be fine."

20  A.   Yes.

21  Q.   Who are Fannie Mae and Freddie Mac's auditors?

22  A.   Fannie Mae's auditors are Deloitte & Touche, and Freddie

23  Mac's auditors are PricewaterhouseCoopers.

24  Q.   And you say "given the changes, should be fine."

25       Is that in reference to your earlier testimony about how

1    you didn't think it raised any going concern issue?

2    A.    That's correct.  And I think as I mentioned, it's the

3    auditor's responsibility to assert a going concern opinion or

4    conclusion.  And so checking with them is what I did.

5    Q.    So let's go to the top-most e-mail, Mr. Salazar, at the

6    very top of the page here, and blow that up.

7          And this is Mr. Griffin's response to you; right?

8    A.    Yes.

9    Q.    And he says, "Nick, there was not."

10          And he's referring to there was not talk about reaching out

11    to the auditors in the meeting that he was in?

12    A.    Yes.

13    Q.    And he says, "I do not thing," though did you understand

14    him to mean "I do not think"?

15    A.    Yes.  I think that was a typo.

16    Q.    Right.  So "I do not think there would be a going concern

17    issue."

18          That was what you thought at the time, too; right?

19    A.    That was the consensus, yes.

20    Q.    Then Mr. Griffin says, "There was a question about

21    re-recording certain deferred tax assets that had been written

22    off.  Jeff indicated both of the boards had discussed this at

23    the last meeting based on the view that they were going to be

24    profitable going forward."

25          Do you see that?

1   A.   I do.

2   Q.   What did you understand him to be talking about at this

3   time?

4   A.   He was relaying what he heard at the meeting.

5   Q.   Yeah.  And Jeff here, Jeff is Jeff Spohn; is that right?

6   A.   Yeah, that's what I understood to be.

7   Q.   And what was Jeff Spohn's role at the time?

8   A.   So Jeff Spohn, as I mentioned earlier, was -- ran our

9   conservatorship operations.  So that meant he was the agent's,

10  FHFA's primarily go-between between Fannie Mae and Freddie Mac

11  management, and one of his responsibilities was to be an

12  observer at their board meetings, full board meeting.

13  Q.   So Mr. Spohn is the FHFA person who would sit in and

14  observe Fannie Mae and Freddie Mac's full board meetings?

15  A.   Yes.

16  Q.   And the report here that you're getting from Mr. Griffin is

17  that Mr. Spohn had observed some discussion at the last board

18  meetings about the deferred tax assets; is that right?

19  A.   That's correct.

20  Q.   Now, when you read this e-mail, did it surprise you that

21  there apparently was some discussion of the DTAs at the board

22  meetings?

23  A.   Not at all.

24  Q.   Why not?

25  A.   Because each quarter, Fannie and Freddie management discuss

1    and prepare an analysis about the DTA.  And the board has a

2    responsibility to understand what is going on with the financial

3    picture.  And so it was very common that there would be

4    questions -- you know, this is not the audit committee, which is

5    more the financial experts of the board.  This is more the

6    general larger board.

7         So it's very common that there were questions about looking

8    to the future.  Profitability going forward, great.  Positive

9    factor.  A board member asked it, and they talked about it,

10   yeah.

11   Q.   But was your takeaway from this e-mail that the DTAs would

12   be written up in the near future?

13   A.   No.

14   Q.   Why not?

15   A.   As we just said -- so now this is 8/14.  Within the past

16   two weeks, we have just gone through a very detailed process

17   reviewing how Fannie and Freddie management, including these

18   people in this meeting, the board meeting, concluded that they

19   didn't have a basis to write up the assets at the current time.

20   Q.   And so let's look at the last sentence where -- I'm sorry,

21   the next sentence in this e-mail.

22        Mr. Griffin says, "I do not think that makes sense, given

23   the amendments are designed to demonstrate wind-down."

24        What did you understand Mr. Griffin to mean by that?

25             MR. ZAGAR:  Objection; calls for speculation.

```
 1              MR. HOFFMAN:  Your Honor, I'm asking what Mr. Satriano
 2    understood at the time, Your Honor.
 3         Your Honor -- is there a ruling on the objection, Your
 4    Honor?
 5         Ms. Jenkins?
 6              COURTROOM DEPUTY:  Your Honor?
 7              MR. HOFFMAN:  Your Honor, would you like a break, or
 8    shall we continue?
 9              THE COURT:  How much more do you have with the
10    witness?
11              MR. HOFFMAN:  10 to 15 minutes.  We can break now,
12    Your Honor, if that's a good time.
13              THE COURT:  We can break.
14         (Jury exited courtroom.)
15              THE COURT:  Off the record.
16         (Discussion off the record.)
17         (Recess taken from 11:31 p.m. to 11:59 a.m.)
18              THE COURT:  Before the jury comes in, whatever the
19    objection was, I will hear that outside of the presence of the
20    witness.
21         (Bench conference.)
22              MR. HOFFMAN:  Your Honor, Ian Hoffman on behalf of the
23    defendants.
24         Just to reorient all of us, if I could ask Mr. Salazar, if
25    I could ask him to display this document on the screen so that
```

we can understand all of what we're talking about.

Thank you, Your Honor.  Court's indulgence for just a moment.

Just to orient the Court, Your Honor, this is a document that's already in evidence, and this is a document that plaintiffs have highlighted several times.  And it's an e-mail chain back and forth three days before the Third Amendment was signed, and the sender of the original e-mail is Mr. Jim Griffin and recipient is the witness, Mr. Satriano.  Mr. Griffin, as Mr. Satriano just testified, was one of his deputies, and it's a back and forth between them.

So the top-most e-mail is the one we were talking about at the last objection.  Mr. Satriano has already testified as to his understanding of the first few sentences of this e-mail. And the point where there was an objection before we took the break, Your Honor, is about three or four lines down in the first e-mail.  I'm going to ask Mr. Salazar to highlight it just so we can see what we're talking about, Your Honor.

And so, Your Honor, the sentence that we're talking about is the one that's being highlighted now.  "I do not think that makes sense, given the amendments are designed to demonstrate wind-down."

The question I asked the witness is, What did you understand Mr. Griffin to mean by that?  And I believe the objection was that it called for speculation.

1      I'm not asking the witness to speculate as to what

2   Mr. Griffin meant.  I'm asking the witness what his

3   understanding was at the time as the recipient of this e-mail.

4      Again, this is a document that plaintiffs have shown to the

5   jury over and over again and have characterized that this means

6   Mr. Satriano was the recipient of this e-mail, and Mr. Griffin's

7   boss at the time, and the jury is obviously entitled to know

8   what Mr. Satriano understood this to mean at the time.

9           THE COURT:  I understand.  Just rephrase your question

10   that way.

11           MR. HOFFMAN:  I will, Your Honor, as to what

12   Mr. Satriano understood this to mean at the time.

13           THE COURT:  That's fine.

14           MR. HOFFMAN:  Thank you, Your Honor.

15      (End of bench conference.)

16           THE COURT:  The jury is on its way.

17      (Jury entered courtroom.)

18           THE COURT:  You may be seated.

19   Counsel, you may proceed.

20           MR. HOFFMAN:  Thank you, Your Honor.

21           BY MR. HOFFMAN:

22   Q.   If I could ask Mr. Salazar to display Plaintiff's Exhibit

23   259, which again is in evidence, and this is the document we

24   were looking at before we took a break.

25      Okay.  So just to reorient us, Mr. Satriano, you recall I

1   was asking you some questions about this e-mail exchange.  And

2   this was a back and forth between you and Mr. Griffin; right?

3   A.   Yes.

4   Q.   And Mr. Griffin worked for you at the time or worked under

5   you?

6   A.   Yes.

7   Q.   And this e-mail back and forth happened on August 14th,

8   2012, and that was three days before the Third Amendment was

9   signed?

10  A.   Yes.

11  Q.   So in this top-most e-mail, I already asked you some

12  questions about the first few sentences.  Before we took the

13  break, I asked you to focus on the sentence that we have

14  highlighted here where Mr. Griffin says, "I do not think that

15  makes sense, given the amendments are designed to demonstrate

16  wind-down."

17       What did you understand this to mean at the time?

18  A.   At the time I understood this to mean -- well, he thought

19  there were two things that weren't consistent.  And one of the

20  features of the Third Amendment that will be disclosed shortly,

21  right, so Jim knew, a lot of other people, Fannie Mae did not

22  know yet, was that one of the components of it was to accelerate

23  the wind-down of their asset portfolio, alternatively known as

24  retained portfolio or mortgage portfolio.

25       Indirectly, if you have a smaller portfolio, smaller

1   earnings, most likely lower profitability.  That is what I

2   understood him to be meaning when he said it doesn't make sense.

3   Q.   So the Third Amendment had a net worth sweep component, and

4   it also had this component that talked about an accelerated

5   reduction in the retained portfolio; is that correct?

6   A.   Yes.

7   Q.   And so what you were just testifying about a moment ago was

8   the accelerated reduction part of the Third Amendment?

9   A.   Yes.

10  Q.   And the wind-down of those assets?

11  A.   Right.

12  Q.   And you didn't understand this sentence to mean at the time

13  shutting the companies altogether; right?

14  A.   Not at all.  The purpose of the Third Amendment was to put

15  them into preserve and conserve assets and put them in a safe

16  and sound position to meet their mission.

17  Q.   And to preserve and conserve the Treasury commitment?

18  A.   Yes.

19  Q.   Now, you can take that down, Mr. Salazar.

20       Now, the Third Amendment was signed a few days later on

21  August 17th, 2012; right?

22  A.   Yes.

23  Q.   And in the weeks that followed, did you discuss anything

24  about Fannie Mae's deferred tax assets with Susan McFarland?

25  A.   Yes, I did.

1    Q.   And can you remind the jury, who was Susan McFarland, and

2    what was her role at the time?

3    A.   So at the time in 2012, August 2012, Susan McFarland was

4    Fannie Mae's chief financial officer, CFO.

5    Q.   Let's take a look at Defendants' Exhibit 560, which is not

6    yet in evidence, and let's take a look at the second page of

7    this e-mail first, Mr. Salazar.

8         Mr. Satriano, do you recognize this document?

9    A.   I do.

10              MR. HOFFMAN:   Court's indulgence, Your Honor.

11              BY MR. HOFFMAN:

12   Q.   And what is Defendants' Exhibit 560?

13   A.   It is a template of meeting notes that are typically

14   prepared at the agency when we have meetings with our regulated

15   entities.

16   Q.   And it's a template, but does it also have the actual

17   substance of meeting notes?

18   A.   Right.   So they're meeting notes from a biweekly meeting

19   that I typically held with the CFO.

20   Q.   And if we could go back to the first page of this document,

21   Mr. Salazar, Defendants' 560, and we can zoom in on the text

22   here.

23        You e-mailed these meeting notes to Mr. Andre Galeano, and

24   you copied Ms. Melissa Schwitters; is that right?

25   A.   That's correct.

1    Q.   And when did you send this e-mail?

2    A.   I sent this e-mail on August 28th, 2012.

3    Q.   And you say here -- well, first of all, who is Ms. Melissa

4    Schwitters?

5    A.   Melissa Schwitters is an accountant that works for me in

6    the Office of Chief Accountant.

7    Q.   And Mr. Galeano?

8    A.   Mr. Galeano was an executive, or is an executive who had

9    oversight responsibilities at the time for Fannie Mae.

10   Q.   And so in the body of the e-mail, you say, "Attached,

11   please find notes from the recent meeting with the CFO."

12        Is that a reference to the attached notes that we looked at

13   a moment ago?

14   A.   Yes, that is.

15   Q.   And who prepared the notes?

16   A.   Melissa Schwitters prepared them, and I reviewed them.

17   Q.   And was Ms. Schwitters at the meeting?

18   A.   Yes, with me.

19   Q.   And did she prepare the notes soon after the meeting

20   happened?

21   A.   Yes.  That's our practice.

22   Q.   And that was my next question.  Is it a regular practice of

23   your office to prepare these types of notes?

24   A.   Yes, it is.

25             MR. HOFFMAN:  Your Honor, at this time, I would like

 1   to move in Defendants' Exhibit 560.

 2              MR. ZAGAR:  Plaintiffs object, Your Honor; hearsay.

 3              THE COURT:  Overruled.  They're received.

 4         (DX-560 received in evidence.)

 5              BY MR. HOFFMAN:

 6   Q.    So if we could display Defendants' 560 to the jury.

 7         Before we move on, this was the cover e-mail that you were

 8   just describing where you identified this as being notes from

 9   the recent meeting from the CFO; is that right?

10   A.    That's right.

11   Q.    And who is the CFO that you're referencing in this e-mail?

12   A.    Susan McFarland.

13   Q.    Okay.  So Mr. Salazar, if we could go to the first page of

14   the attachment, which is the next page of the exhibit.  So let's

15   focus in on the subjects and the meeting date.  That's fine.

16         This is a biweekly meeting with the Fannie Mae CFO, so a

17   sort of ordinary-course meeting?

18   A.    That's right.

19   Q.    And when did the meeting occur?

20   A.    The meeting occurred on August 23rd.

21   Q.    This was after the Third Amendment was signed?

22   A.    Yeah.  This was about a week after.

23   Q.    And if we could go to the next page, Mr. Salazar, and if we

24   focus in on 3 and 3A together.

25         So in the first part of 3, it says, "Impact of the changes

1    to the Treasury agreement on longer-term financial forecasts."

2       Do you see that?

3    A.   I do.

4    Q.   And did you recall that as being a reference to a

5    discussion about the Third Amendment, the changes to the

6    Treasury agreement?

7    A.   Yes, it is.

8    Q.   And in the last sentence of 3, it says, "It will likely

9    reduce the likelihood of future draws."

10      Do you see that?

11   A.   I do.

12   Q.   And was that a reference to ending the circular draws?

13   A.   Yes, it was.

14   Q.   And then let's look at 3A.  It says, "We followed up with a

15   question about the deferred tax asset."

16      Who is the "we" there?

17   A.   The we in that context would be Melissa Schwitters and

18   myself.

19   Q.   And it says, "Susan noted."

20      That's Susan McFarland; right?

21   A.   Susan McFarland, yes, CFO.

22   Q.   "Susan noted that there is a $62 billion valuation

23   allowance against the deferred tax asset."

24      Do you see that?

25   A.   I do.

1  Q.   So the 62 billion valuation analysis, that's an accounting

2  term for 62 billion had been written down; right?

3  A.   Yes.

4  Q.   And then it says, "They have started some analysis."

5       And is the "they" there Fannie Mae?

6  A.   Yes, it is.

7  Q.   "They have started some analysis around when/if any,

8  including a part, of the valuation allowance could be reversed."

9       Do you see that?

10 A.   I do.

11 Q.   And do you recall having that conversation with

12 Ms. McFarland?

13 A.   Yes, I did.

14 Q.   And in that conversation, what did she say about the

15 possibility of writing up the deferred tax asset?

16 A.   We tried to catch it in this sentence, this last sentence.

17 So she was sharing with me that they had started some analysis,

18 but obviously, given where they were in the analysis, they

19 hadn't made a determination related to timing, when or if,

20 possibility, they could -- we say reverse the valuation

21 allowance.  That means write-up in this case.

22       And the other notion, including a part, so there's a notion

23 in the accounting that you can -- it's not all or nothing.

24 Maybe there's a reason for it to go up a little bit, go down a

25 little bit, and that's what that question or that's what that

1    description tries to highlight.

2    Q.   So based on this meeting with Ms. McFarland on August 23rd,

3    2012, what was your understanding as to how far along Fannie Mae

4    was in the process of evaluating whether to write up the DTAs?

5    A.   They were in the beginning of any of the analysis.

6    Q.   And it wasn't even clear at the time if they were going to

7    write up the DTAs at all?

8            MR. ZAGAR:  Objection; leading.

9            BY MR. HOFFMAN:

10   Q.   Is that what you understood Ms. McFarland to --

11   A.   Yes, that's what we tried to capture here, that there's an

12   analysis that started.  When and if -- so management would

13   ultimately have to take that analysis, put it into the --

14   through the accounting rules, which is, is this positive

15   evidence or negative evidence, how verifiable, how objective is

16   our financial forecast, how uncertain or certain is the

17   forecast.

18       So all those things come into play after the existence of

19   the forecast, which they don't even have yet.

20           MR. HOFFMAN:  No further questions at this time, Your

21   Honor.

22       Thank you, Mr. Satriano.

23           THE COURT:  You may cross-examine.

24           THE WITNESS:  We don't need this; right?

25           MR. ZAGAR:  The one that Mr. Hoffman handed you, keep

1    it handy.

2                  THE COURT:  Okay.

3                  MR. ZAGAR:  May I proceed, Your Honor?

4                  THE COURT:  Yes.

5                  MR. ZAGAR:  Thank you.  Eric Zagar for the plaintiffs.

6                        CROSS-EXAMINATION

7                  BY MR. ZAGAR:

8    Q.   Good afternoon, Mr. Satriano.

9    A.   Good afternoon.

10   Q.   Freddie and Fannie have to file quarterly and annual

11   reports with the SEC; right?

12   A.   Yes.

13   Q.   And a quarterly report is called a 10-Q, and an annual

14   report is called a 10-K; right?

15   A.   Yes.

16   Q.   But before Fannie or Freddie can file a 10-Q or a 10-K with

17   the SEC, they have to get the go-ahead from your office; right?

18   A.   Among other things.

19   Q.   They have to send a draft to your office, the Office of

20   Chief Accountant, before they file it; right?

21   A.   There's a process the agency has, had at the time, still

22   has today, to systematically review their draft filings prior to

23   filing with the SEC.

24   Q.   And your office might have some changes to the document

25   before it's filed; right?

1    A.    Anyone in the agency who reviews it, yes.

2    Q.    And if your office tells Fannie and Freddie to make some

3    changes, they would usually do that; right?

4    A.    Yeah, depending on the severity of the suggestion.

5    Q.    Because if your office is not satisfied with what the

6    report says, Fannie and Freddie can't file it with the SEC;

7    right?

8    A.    Yes.

9    Q.    And when your office is satisfied that the report looks

10   like it's ready to go, your office sends Fannie and Freddie

11   something called an acknowledgment letter that tells them they

12   can go ahead and make the filing with the SEC; right?

13   A.    Yes.  So once we reviewed the report in draft and have

14   gotten some understanding of the contents, reviewed it for

15   material omissions or material misstatements, then we sign --

16   have the acknowledgment letter signed that they use in order to

17   file the report.

18   Q.    And Fannie and Freddie can't make the filing until they get

19   that letter from your office; right?

20   A.    Yes.  It's actually from the agency.  It's not from my

21   office.

22   Q.    And the process as you just testified, that was the same

23   process back in 2012; right?

24   A.    Yes.

25   Q.    Okay.  So let's bring up one of the exhibits that we have

1   not seen today but we have seen before in the case.  This is

2   DX-476, and this has been admitted into evidence.

3       And this is Fannie Mae's Form 10-K for second quarter of

4   2012; right?

5   A.   Was that a question to me?

6   Q.   Yes.  That's what this is; right?

7   A.   Yes.

8   Q.   And this was filed with the SEC on August 8, 2012; is that

9   right?

10  A.   Yes, that's my memory.

11  Q.   So let's now go to page 5 of this exhibit, which is

12  actually page 1 of the 10-Q itself.  Let's look right at the

13  very top of the page.

14      Even before the introduction, there's this section in

15  italics; right?  Do you see that?

16  A.   Yes, it is.

17  Q.   Let's look at the third paragraph in that section, and that

18  says, "This report contains forward-looking statements that are

19  based on management's current expectations and are subject to

20  significant uncertainties and changes in circumstances.  Please

21  review forward-looking statements for more information on the

22  forward-looking statements in this report.  Our actual results

23  may differ materially from those reflected in these

24  forward-looking statements due to a variety of factors."

25      Do you see that?

1    A.    Yes.

2    Q.    Okay.  So it says please review the section called

3    forward-looking statements, and that's on page 85 of the

4    exhibit.  So let's go there.

5          And we see the heading "forward-looking statements"; right?

6    A.    Yes.

7    Q.    So let's look at the first sentence under the heading,

8    which says, "This report includes statements that constitute

9    forward-looking statements within the meaning of Section 21(e)

10   of the Securities Exchange Act of 1934"; right?  Do you see

11   that?

12   A.    Yes, that's what it says.

13   Q.    And the law that's referenced there, Section 21(e) of the

14   Securities Exchange Act of 1934, are you familiar with that law?

15   A.    I'm not familiar with the contents as I sit here.

16   Q.    Okay.  Why don't you turn in your binder to tab 5.  This is

17   a portion of that statute, the Securities Exchange Act of 1934,

18   that includes Section 21(e).

19         Do you see that?

20   A.    Yes, I do.

21   Q.    And the title of that section is "application of safe

22   harbor for forward-looking statements"; right?

23   A.    That's what it says.

24   Q.    So do you understand -- do you have an understanding that

25   there's this thing called a safe harbor for forward-looking

1    statements?

2    A.   Yes.

3    Q.   And that means that if you meet all the requirements that

4    are spelled out in this section, you can't be held liable if you

5    make a forward-looking statement that turns out to be wrong?  Is

6    that your understanding of it?

7    A.   Yes.

8    Q.   Okay.  And forward-looking statements are treated

9    differently than statements of actual results; right?

10   A.   Yes.

11   Q.   There's no safe harbor for statements of actual results;

12   right?

13   A.   No, I don't think so.

14   Q.   You have to check those meticulously before you publish

15   them, because they have to be right?

16   A.   Correct.

17   Q.   So let's go back to the exhibit now on page 85, and let's

18   look at the third sentence of the paragraph we were looking at,

19   which says, "Forward-looking statements often include words such

20   as expect, anticipate, intend, plan, believe, seek, estimate,

21   forecast, project, would, should, could, likely, may, or similar

22   words."

23        Right?  It says that?

24   A.   Yes.

25   Q.   And then let's look at the second paragraph, which

says, "Among the forward-looking statements in this report are
statements relating to," and then there's this very long list of
bullet points under that.

Do you see that?

Well, let's actually go over to the next page, Mr. DeRita.

You will see the bullet points go on, and then even on the
next page after that, there's more bullet points.

Do you see that?

A.   I see it.

Q.   I counted them up.  There are 58 all together.

Will you take my word for that?

A.   Sure.

Q.   Okay.  And everything in that list, the 58 bullet points,
is a forward-looking statement; right?

A.   That's what's in that section.

Q.   So everything in that list is insulated from liability
under the safe harbor that we talked about; right?

A.   Yes.

Q.   Okay.  So now let's go over to page 87 of the exhibit.
Already there.  And about a third of the way down, this would be
the 34th of the 58 bullet points.  It's one that says, "Our
expectation that although we may experience period-to-period
volatility in earnings and comprehensive income, we will not
generate net income or comprehensive income in excess of our
annual dividend obligation to Treasury over the long term."

1          Do you see that?

2     A.   I see that.

3     Q.   And that is one of these ones that's identified as a

4     forward-looking statement; right?

5     A.   Yes.

6     Q.   So that statement is insulated from liability under the

7     safe harbor; right?

8     A.   Yes.

9     Q.   Okay.  Now let's go to the next page, page 88.  And right

10    below the last bullet point there, there's a paragraph, and that

11    says, "Forward-looking statements reflect our management's

12    expectations, forecasts, or predictions of future conditions,

13    events, or results based on various assumptions and management's

14    estimates of trends and economic factors in the markets in which

15    we are active, as well as our business plans.  They are not

16    guarantees of future performance.  By their nature,

17    forward-looking statements are subject to risks and

18    uncertainties.  Our actual results and financial condition may

19    differ, possibly materially, from the anticipated results and

20    financial condition indicated in these forward-looking

21    statements.  There are a number of factors that could cause

22    actual conditions, events, or results to differ materially from

23    those described in the forward-looking statements contained in

24    this report, including, but not limited to," and then there's a

25    long list of factors; right?

1    A.    Yes.

2    Q.    Do you see that?  And let's go down to the next page, which

3    says, "Readers are cautioned to place forward-looking statements

4    in this report or that we make from time to time into proper

5    context by carefully considering the factors discussed in risk

6    factors in our 2011 Form 10-K and in this report.  These

7    forward-looking statements are representative only as of the

8    date they are made, and we undertake no obligation to update any

9    forward-looking statement as a result of new information, future

10   events or otherwise, except as required under the federal

11   securities laws."

12        Do you see that?

13   A.    Yes, I do.

14   Q.    So we're not going to look at the risk factors in 2011

15   Form 10-K.  That's --

16   A.    Can you repeat that?  I didn't hear you.

17   Q.    I said, we're not going to look at the risk factors in the

18   2011 Form 10-K, but to your recollection, that goes on for

19   several pages also; right?

20   A.    Right.  So these factors are considered updates to the 2011

21   10-K factors?

22   Q.    Right.  And both the forward-looking statements and the

23   risk factors are things that look into the future; right?

24   A.    I don't know if that's a true statement about risk factors.

25   Q.    Okay.  But at least the forward-looking statements, as the

1   name would suggest, look into the future?

2   A.   That's correct.

3   Q.   And the statements of actual results look to the past, to

4   what has already happened; right?

5   A.   Correct.

6   Q.   And since no one can predict the future with certainty, the

7   forward-looking statements are not as certain as statements of

8   actual results; right?

9   A.   Yes.

10  Q.   And that's why these filings have all this cautionary

11  language about forward-looking statements but not about the

12  actual results; right?

13  A.   Yes.

14  Q.   Okay.  So let's go back to the beginning, page 5 of the

15  exhibit, and let's go down to the bottom of the page, and

16  there's the heading "executive summary."

17       Do you see that?

18  A.   Yes.

19  Q.   Okay.  And the first sentence there says, "The actions we

20  have been taking since 2009 to provide liquidity and support to

21  the market, grow a strong new book of business, and minimize

22  losses on loans we acquired prior to 2009 are having a positive

23  impact on our business and our performance"; right?

24  A.   Yes.

25  Q.   Do you see that?

1    A.    Uh-huh.

2    Q.    And then the first bullet point under there is

3    titled "financial results"; right?

4    A.    Yes.

5    Q.    And the first sentence of the bullet point says, "We

6    experienced significant improvement in our financial results for

7    the second quarter and first half of 2012 as compared with the

8    second quarter and first half of 2011"; right?

9    A.    Yes.

10   Q.    And that, what we just read, that's a statement of actual

11   results, not a forward-looking statement; right?

12   A.    Yes, it is.

13   Q.    Okay.  Now let's go over to the next page, page 6.  And

14   there, it says, "We generated positive net worth for the second

15   quarter."

16   A.    Sorry.  Where are you?

17   Q.    Very top of the page.  "We generated positive net worth for

18   the second quarter, paid Treasury its quarterly dividend, and

19   were not required to draw funds from Treasury for the quarter

20   under the senior preferred stock purchase agreement"; right?

21   A.    Yes.

22   Q.    That's also a statement of actual results; right?

23   A.    Yes.

24   Q.    And then it says, "We expect our financial results for 2012

25   to be significantly better than our 2011 results."

```
 1           Do you see that?
 2    A.    I do.
 3    Q.    But that one is a forward-looking statement; right?
 4    A.    Where are we in the document?  I don't see the header above
 5    this.
 6    Q.    This is carrying over from the previous page, which is the
 7    executive summary, and the first bullet point called "financial
 8    results."
 9    A.    Right.  So it seems like they're including a
10    forward-looking statement in the executive statement.
11    Q.    Right.  Okay.  Let's go down to the next bullet point
12    titled "strong new book of business."
13           Do you see that?
14    A.    Yes, I see it.
15    Q.    Okay.  And the last sentence of that bullet point says, "We
16    expect that our new single family book of business will be
17    profitable over its lifetime"; right?
18    A.    I see that.
19    Q.    And that one's also a forward-looking statement; right?
20    A.    Yes.  It's talking about the future.
21    Q.    Okay.  And let's now go to the next bullet point
22    titled "credit performance."
23           Are you with me?
24    A.    Yes, I am with you.
25    Q.    And then the first sentence there says, "Our single-family
```

serious delinquency rate has steadily declined each quarter

since the first quarter of 2010 and was 3.53 percent as of

June 30, 2012, compared with 4.08 percent as of June 30, 2011";

right?

A.   Yes.

Q.   And that is a statement of actual results; right?

A.   Yes.

Q.   And these bullet points that we've just gone through, both

the statements of actual results and the forward-looking

statements, all of these were positive regarding Fannie Mae's

financial performance; right?

A.   Modestly positive, yes.

Q.   Okay.  Let's go down to the bottom of the page, and there's

a heading there "summary of our financial performance for the

second quarter and first half of 2012."

        Do you see that?

A.   I do see that.

Q.   The first sentence under that heading says, "We experienced

a significant improvement in our financial results for the

second quarter and first half of 2012 compared with the second

quarter and first half of 2011"; right?

A.   Yes.

Q.   That's also a statement of actual results; right?

A.   Yes.

Q.   And then the second sentence, it says, "We saw improvements

1    in the housing market in the first half of 2012."

2        Do you see that?

3    A.    I do.

4    Q.    And that's also a statement of actual results; right?

5    A.    It's hard to say from that language.

6    Q.    Okay.  And the third sentence says, "In addition, we have

7    seen improvement in the performance of our book of business,

8    including lower delinquency rates and higher reperformance rates

9    for our modified loans"; right?

10   A.    Yes.

11   Q.    And that one is also a statement of actual results; right?

12   A.    Yes.

13   Q.    Okay.  And the last sentence says, "These factors have

14   resulted in a reduction in our loan loss reserves and a

15   corresponding recognition of a benefit (rather than a provision)

16   for credit losses for the second quarter and first half of

17   2012."

18       Right?

19   A.    Yes.

20   Q.    And that sentence we just read, that means that Fannie Mae

21   released some of its allowance for loan losses; right?

22   A.    That's what it says.

23   Q.    And that resulted in an increase in net worth; right?

24   A.    I don't know if it resulted in an increase in net worth.

25   It resulted in a release of the allowance, which is -- helps

1    income in the given quarter.

2    Q.    Right.   So that makes income go up?

3    A.    Makes income go up, all else equal.

4    Q.    Right.   And that statement about releasing the allowance,

5    that's a statement of actual results; right?

6    A.    Yes, it is.

7    Q.    So a moment ago, you said that these financial results

8    reflected a modest improvement.   That was your word; right?

9    A.    Yep.

10   Q.    But the 10-Q actually says significant improvement, doesn't

11   it?

12   A.    Right.   So you're reading -- this is sort of absolute

13   statements you're reading.   So relative to 2011, which was very

14   bad, this looks really good.   That's the comparison they're

15   making.   So I just wanted to give that context.

16   Q.    Okay.   Let's now go over to the next page of the exhibit,

17   which is page 7.   And at the top of the page, there's a

18   heading "comprehensive income (loss)" and then under

19   that "quarterly results"; right?

20   A.    Yes.

21   Q.    And first sentence under the heading there says, "We

22   recognized comprehensive income of $5.4 billion in the second

23   quarter of 2012"; right?

24   A.    Yes.

25   Q.    And that's a statement of actual results; right?

1    A.    Yes, it is.

2    Q.    And the next sentence says, "In comparison, our

3    comprehensive loss and net loss for the second quarter of 2011

4    were $2.9 billion"; right?

5    A.    Yes.

6    Q.    And that's also a statement of actual results; right?

7    A.    Yes.

8    Q.    You said yes?

9    A.    I said yes.

10   Q.    Sorry.  Let's go to the first sentence of the next

11   paragraph, which says, "The significant improvement in our

12   second quarter results was primarily due to recognition of

13   benefit for credit losses of $3.0 billion"; right?

14   A.    Yes.

15   Q.    Again, that's a statement of actual results; right?

16   A.    Yes.

17   Q.    And in the next sentence, "This benefit for credit losses

18   was due to a decrease in our total loss reserves, driven

19   primarily by an improvement in the profile of our single-family

20   book of business resulting from an increase in actual home

21   prices."

22         Do you see that?

23   A.    Yes, I see it.

24   Q.    And again, it's a statement of actual results; right?

25   A.    Yes.

1    Q.   And then the last sentence here says, "In addition, our

2    single family serious delinquency rate continued to decline";

3    right?

4    A.   Yes.

5    Q.   Again, a statement of actual results; right?

6    A.   Yes.

7    Q.   Now let's go down to the bottom of the page, and there's a

8    heading "year-to-date results."

9         Do you see that?

10   A.   I see it.

11   Q.   And the first sentence under that heading says, "Our

12   comprehensive income for the first half of 2012 was

13   $8.5 billion"; right?

14   A.   Yes.

15   Q.   And that's a statement of actual results; right?

16   A.   Yes.

17   Q.   And then the second sentence says, "In comparison, we

18   recognized a comprehensive loss of $9.2 billion in the first

19   half of 2011"; right?

20   A.   Yes.

21   Q.   And again, a statement of actual results; right?

22   A.   Yes.

23   Q.   And then down at the bottom of the page, there's a heading,

24   "net worth."

25        Do you see that?

1    A.    Yes, I do.

2    Q.    And the first sentence under that heading says, "Our net

3    worth of $2.8 billion as of June 30, 2012, reflects our

4    comprehensive income of $8.5 billion, offset by a payment to

5    Treasury of $5.8 billion in senior preferred stock dividends

6    during the first half of 2012."

7          Do you see that?

8    A.    Yes.

9    Q.    And that's also a statement of actual results; right?

10   A.    Yes.

11   Q.    All right.  So let's now go over to the next page, page 8,

12   and very top of the page, first sentence says, "As a result of

13   our positive net worth as of June 30, 2012, we are not

14   requesting a draw from Treasury under the senior preferred stock

15   purchase agreement"; right?

16   A.    Yes.

17   Q.    Again, that's a statement of actual results; right?

18   A.    Yes.

19   Q.    All right.  Now let's skip a few pages and go ahead to

20   page 16.  In the very last paragraph on the page, looking at the

21   third sentence there, it says, "Although we may experience

22   period-to-period volatility in earnings and comprehensive

23   income, we do not expect to generate net income or comprehensive

24   income in excess of our annual dividend obligation to Treasury

25   over the long term."

1        Do you see that?

2   A.   Yes.

3   Q.   And that one is a forward-looking statement; right?

4   A.   But just -- this is not the forward-looking statement

5   section anymore; right?

6   Q.   Well, that's not my question.  My question is --

7   A.   Before I answer, I want to make sure I know what section

8   I'm talking about.

9   Q.   Well, this is in the executive summary.

10  A.   Okay.  So it's different.

11  Q.   Well, so my question to you is, the statement we just read

12  is a forward-looking statement; right?

13  A.   That statement -- so that statement is in two different

14  places in the document, yes.

15  Q.   Okay.  And the next sentence after that says, "However, we

16  expect that in some future quarters we will be able to generate

17  comprehensive income sufficient to cover at least a portion of

18  our quarterly dividend payments to Treasury"; right?

19  A.   Yes.

20  Q.   Okay.  So let's now go to a different document, DX-477,

21  which has also been admitted into evidence.  And this one is

22  Freddie Mac's Form 10-Q for the second quarter of 2012; right?

23  A.   Yes.

24  Q.   And this one was filed by the SEC on August 7, 2012; is

25  that right?

1    A.    Around that time.

2    Q.    Okay.  We're not going to go through this one in as much

3    detail, but let's look at some of it.

4    A.    Sure.

5    Q.    Let's start on page 5 of the exhibit.  Again, this is the

6    very first page of the 10-Q, and just like in the Fannie Mae

7    one, there's this section in italics right at the top.

8          Do you see that?

9    A.    Sorry.  Yes.

10   Q.    And then the second paragraph in that section says, "This

11   quarterly report on Form 10-Q includes forward-looking

12   statements that are based on current expectations and are

13   subject to significant risks and uncertainties.  These

14   forward-looking statements are made as of the date of this Form

15   10-Q, and we undertake no obligation to update any

16   forward-looking statement to reflect events or circumstances

17   after the date of this Form 10-Q.  Actual results might differ

18   significantly from those described in or implied by such

19   statements due to various factors and uncertainties."

20         Right?

21   A.    Yes.

22   Q.    So now let's go over to page 100 of the exhibit.  And down

23   near the bottom, there's a heading "forward-looking statements";

24   right?

25   A.    Yes.

1    Q.   And the paragraph there says, "We regularly communicate

2    information concerning our business activities to investors, the

3    news media, securities analysts, and others as part of our

4    normal operations.  Some of these communications, including this

5    Form 10-Q, contain forward-looking statements, including

6    statements pertaining to the conservatorship."

7         Do you see that?

8    A.   Yes, I see it.

9    Q.   And let's go over to the next page, page 101.  It

10   says, "These statements are not historical facts but, rather,

11   represent our expectations based on current information, plans,

12   judgments, assumptions, estimates, and projections.  Actual

13   results may differ significantly from those described in or

14   implied by such forward-looking statements due to various

15   factors and uncertainties"; right?

16   A.   Yes.

17   Q.   Okay.  So let's go back a few pages to page 97.

18            MR. HOFFMAN:  Objection, Your Honor; asked and

19   answered and cumulative.

20            THE COURT:  Sustained.  This is the same.  What's the

21   difference in this one?

22            BY MR. ZAGAR:

23   Q.   This is -- this forward-looking statement cautionary

24   language, this appears in practically every SEC filing of this

25   type; right?

1    A.   Yes, it's common language.

2    Q.   Okay.  Let's go to page 5 of the exhibit.  And again, this

3    is the very first page of the 10-Q.  Under the heading "summary

4    of financial results," in the first paragraph there, the fourth

5    sentence says, "Our comprehensive income for the second quarter

6    of 2012 was 2.9 billion," right?

7              MR. HOFFMAN:  Objection, Your Honor; asked and

8    answered, cumulative.

9              MR. ZAGAR:  This is Freddie Mac, Your Honor, just

10   establishing the facts in this 10-Q.

11        If counsel would like to stipulate these are accurate, I

12   can move on.

13             MR. HOFFMAN:  The SEC filings are in evidence, Your

14   Honor.

15             THE COURT:  The objection is sustained.  It's already

16   in evidence.  So having him repeat what's already in evidence is

17   cumulative.

18             BY MR. ZAGAR:

19   Q.   Can we bring up, Mr. DeRita, DX-916.

20        And this is one of the documents that Mr. Hoffman showed

21   you; right?

22   A.   Yes, it is.

23   Q.   All right.  Looking at the second page of the exhibit,

24   that's where the markup of the Third Amendment starts; right?

25   A.   Yes.

1    Q.   Right.  You were copied on this e-mail, including the

2    markup, but on the first page where Mr. Ugoletti, who sent this

3    e-mail, he has some specific asks, none of those three pertain

4    to you; right?

5    A.   That's correct.

6    Q.   And you were not asked by anybody whether FHFA should agree

7    to the Third Amendment; right?

8    A.   I'm sorry.  Can you repeat that?

9    Q.   Nobody asked you whether FHFA should agree to the Third

10   Amendment; right?

11   A.   Agree?

12   Q.   Agree.

13   A.   At this time that was not a question posed to me in this

14   e-mail.

15   Q.   And it was not posed to you at any time because that was

16   not your role at FHFA; right?

17   A.   No.  It was provided -- we did discuss it internally, and I

18   was asked for my thoughts on it about from an accounting

19   perspective, and I shared those thoughts, as we discussed

20   earlier.

21   Q.   From an accounting perspective?

22   A.   From an accounting perspective.

23   Q.   But the decision whether to sign this document, that was

24   Mr. DeMarco's decision; right?

25   A.   It's not my decision.

1    Q.   Right.  And the decision of whether the Third Amendment

2    should include a net worth sweep, that was not your decision

3    either; right?

4    A.   Correct.

5    Q.   Okay.  Let's now go to DX-499A, another document that

6    Mr. Hoffman showed you.  And let's turn to page 5 of 10 here.

7         And you recall Mr. Hoffman asked you some questions about

8    this page; right?

9    A.   This says page 4.

10   Q.   Sorry.  We're on 499A, DX-499A?

11   A.   Is that a question to me?

12   Q.   No, it's a question to Mr. DeRita.

13        My apologies.  So in the top third of the page is a

14   heading "current forecast."

15        Do you see that?

16   A.   Yes.

17   Q.   Mr. Hoffman did not ask you about this paragraph; right?

18   A.   I don't remember.

19   Q.   Okay.  Well, I'm going to ask you about it.

20   A.   Okay.

21   Q.   It says, "Over the four-year period of 2012 to 2015, the

22   company is forecasting GAAP income."

23        Do you see that?

24   A.   I see it.

25   Q.   And so that means at the time of this document, they were

1    forecasting profit for the period 2012 to 2015; right?

2              MR. HOFFMAN:  Objection; mischaracterizes the

3    document.

4              THE COURT:  Overruled.

5              BY MR. ZAGAR:

6    Q.   You can answer the question.

7    A.   Okay.  It says that they're forecasting income.  So if

8    expenses were greater than income, it would not end up as

9    profits.

10   Q.   Okay.  But let's go to the next sentence.

11   A.   Okay.

12   Q.   It says, "The company expects that our total loss reserves

13   peaked as of December 31, 2011, and will not increase in the

14   foreseeable future."

15        Do you see that?

16   A.   I see it.

17   Q.   Okay.  And that was their forecast as of the date of this

18   document, which if we go back, this was, I think you

19   testified -- it's dated, the first page, as of June 30th, but

20   this was done in late July or early August.

21        Do you remember that testimony?

22   A.   Yes; correct.

23   Q.   Okay.  And now let's go to 472A, and that's the Freddie one

24   that you were asked about; right?

25   A.   Okay.

Q.   And if we go to page 7 of that document, very last page,

and if we go to the second paragraph under the heading "weighing

of available evidence," the one that starts "in order to support

a conclusion."

     And let's highlight the last sentence of that paragraph,

which says, "Actual results achieved to date under an existing

turnaround plan will presumably be given much more weight than

projected results under a pending plan."

     Do you see that?

A.   I see it.

Q.   And do you agree with that statement there?

A.   Yes, I do.

Q.   Okay.  We can take that one down.

     You know who Susan McFarland was; right?

A.   Yes, I do.

Q.   And at the time in 2012, she was the chief financial

officer of Fannie Mae; right?

A.   Correct.

Q.   And you met with her occasionally; right?

A.   I did.

Q.   And other people in your office also met with her

occasionally; right?

A.   Yes.

Q.   And you're aware that the jury has heard portions of

Ms. McFarland's deposition read to them?  Are you aware of that?

1    A.    I am not aware of that.

2    Q.    Okay.  Well, that, in fact, happened, I can tell you.  I'm

3    sure everyone remembers.  It was quite a dramatic reading.  I

4    wasn't here that day, but I heard it was very good.

5    A.    Okay.

6    Q.    Are you aware that in that deposition Ms. McFarland

7    testified about a meeting in July of 2012 of the Fannie Mae

8    executive committee?

9    A.    I'm not aware of that.

10   Q.    Okay.  Are you aware that Mr. Spohn -- you know him; right?

11   A.    Yes, I know him.

12   Q.    And Mr. Brad Martin, he's another FHFA person?

13   A.    Brad Martin is a Fannie Mae employee.

14   Q.    Okay.  But Mr. Spohn is FHFA; right?

15   A.    Yes.

16   Q.    And are you aware that Ms. McFarland testified that at this

17   Fannie Mae executive committee meeting in July of 2012 Mr. Spohn

18   was there?

19   A.    Yes.

20   Q.    That wouldn't surprise you?  He attended these kinds of

21   meetings all the time; right?

22   A.    As I said earlier.

23   Q.    Right.  And are you aware that Ms. McFarland testified that

24   in that meeting in July of 2012 where Mr. Spohn was in

25   attendance, she raised the potential that the valuation

1   allowance on Fannie Mae's DTAs might be reversed in what she

2   called the not-so-distant future?  Are you aware of that?

3           MR. HOFFMAN:  Objection, Your Honor.  If I may be

4   heard on the phone briefly.

5           (Bench conference.)

6           MR. HOFFMAN:  Your Honor, Ian Hoffman on behalf of the

7   defendants.

8       Mr. Zagar just elicited from Mr. Satriano that he was not

9   aware that Ms. McFarland's deposition was read into the record.

10  He was not aware of it.

11      Now Mr. Zagar is going piece by piece through her testimony

12  asking Mr. Satriano, Aren't you aware that Ms. McFarland said

13  this?  Aren't you aware that Ms. McFarland said that?

14      So Mr. Zagar has already elicited from the witness that he

15  didn't know Ms. McFarland's testimony was presented here, and

16  he's just reciting and repeating her testimony to the jury when

17  Mr. Satriano as a fact witness just didn't know and doesn't

18  know.  So he's just using Mr. Satriano as a vehicle to repeat

19  Ms. McFarland's testimony, and it's inappropriate.

20          MR. ZAGAR:  Your Honor, Eric Zagar for the plaintiffs.

21      I'm trying to lay the foundation for the questions that I'm

22  going to ask Mr. Satriano, which is whether he disagrees with

23  Ms. McFarland or thinks that she was not telling the truth.

24      To be able to ask him those questions, I need to ask him

25  the foundation of what she said and then ask him if he agrees

1    with it or not.

2              MR. HOFFMAN:  He just negated the foundation because

3    Mr. Satriano said he doesn't know what she testified to.

4    Mr. Satriano already has testified about what was in his

5    personal knowledge, what he discussed with Ms. McFarland, and

6    that's what the jury should hear, not a narration of

7    Ms. McFarland's prior testimony.

8              THE COURT:  The objection is sustained.

9         (End of bench conference.)

10             MR. ZAGAR:  Thank you, Your Honor.

11             BY MR. ZAGAR:

12   Q.   Whatever Ms. McFarland testified to, you have no reason to

13   believe it's untrue, do you?

14             MR. HOFFMAN:  Objection, Your Honor; same objection.

15             THE COURT:  Sustained.

16             BY MR. ZAGAR:

17   Q.   You don't dispute, sir, that some people at FHFA, perhaps

18   not yourself but others, were aware that Fannie Mae was talking

19   about potentially releasing the DTAs at some point in the

20   not-so-distant future; right?

21        You don't think that -- you don't dispute that, do you?

22   A.   I do.

23   Q.   Why?

24   A.   Because I haven't seen any evidence of that.

25   Q.   But if there were evidence of that that you're unaware of,

```
 1    you have no basis to say one way or the other --

 2              MR. HOFFMAN:  Objection, Your Honor.

 3              THE COURT:  Sustained.

 4              BY MR. ZAGAR:

 5    Q.   The valuation allowance memos, some of which we've gone

 6    through, they deal with just the quarter that has just passed;

 7    right?

 8    A.   As of a certain date, yes.

 9    Q.   Right.  So they are not making predictions about what might

10    happen in the next quarter or the one after that; right?

11              MR. HOFFMAN:  Objection, Your Honor; mischaracterizes

12    the documents.

13              THE COURT:  Sustained.

14              MR. HOFFMAN:  The objection was sustained.

15              THE COURT:  They do have future in them.  They

16    qualify.

17              BY MR. ZAGAR:

18    Q.   But my question is, with regard to whether to write up or

19    write down the DTA, the memo talks about just the quarter that

20    it's dealing with; it does not say anything about whether the

21    DTA might be written up or written down in the next quarter?

22    Right?

23    A.   Can you repeat the question, maybe break it down a bit?

24    Q.   Sure.  This analysis of whether to write up or write down

25    the DTA, it's done every quarter; right?
```

1    A.    Yes.

2    Q.    And so when the memo says we've done the analysis for this

3    quarter and this is what we concluded --

4    A.    Yes.

5    Q.    -- that's all it's doing, is talking about that one quarter

6    and the conclusion for that one quarter; right?

7    A.    No.

8    Q.    Is it your testimony that a valuation allowance memo for

9    the second quarter tells you anything about whether the DTAs

10   will be written up or written down, say, two quarters into the

11   future?

12   A.    My testimony is that the valuation allowance memo as of any

13   given quarter has future predictions in them as to their

14   expected business performance along the lines of a

15   forward-looking statement.

16   Q.    Right.  But there is no advanced conclusion of whether the

17   DTA will be written up or written down in the next quarter or

18   the one after that?

19   A.    Correct.  That's why statements about someone saying we're

20   going to write it up in the future are -- I don't take that

21   seriously.

22   Q.    Okay.  But in fact, in the first quarter of 2013 --

23   A.    Yes.

24   Q.    -- when they did this analysis of Fannie Mae, they

25   concluded that the DTA valuation should be written up?

```
 1   A.   In Q1 '13, yes, that was the first time they concluded
 2   that.
 3   Q.   Okay.  And in Q3 '13, Freddie Mac wrote theirs up?
 4   A.   Yes; that's right.
 5   Q.   And if someone had predicted that would happen, they would
 6   have turned out to be right?
 7             MR. HOFFMAN:  Objection, Your Honor.
 8             THE COURT:  Sustained.
 9             BY MR. ZAGAR:
10   Q.   One very quick line of questioning.  Can we go now to
11   DX-460 -- and I'm not sure if this one has been admitted into
12   evidence, but if not, I assume defendants have no objection, and
13   I move it in.
14             MR. HOFFMAN:  Court's indulgence for just one moment,
15   Your Honor.
16        We do object, your Honor.
17        (Bench conference.)
18             MR. HOFFMAN:  Your Honor, Ian Hoffman on behalf of the
19   defendants.
20        This is an e-mail from Mr. Timothy Bowler at the Treasury
21   Department to the SEC and copying Mr. Satriano and attaching
22   some materials.
23        The e-mail itself contains hearsay, including about who the
24   materials were previously shared with in the first line,
25   including the Department of Justice, and the presentation itself
```

 1  is a detailed presentation about the planned -- the planned

 2  Third Amendment, which contains a variety of statements and

 3  summaries and conclusions from the Treasury Department, and we

 4  believe they are hearsay, Your Honor.

 5       MR. ZAGAR:  Eric Zagar for plaintiffs, Your Honor.

 6       I will note, this is a defendant exhibit; this is not a

 7  plaintiff exhibit.  Defendants told us that they might use this

 8  with Mr. Satriano.  They did not.  But presumably, if they have

 9  an objection to it, they would not have put it on their own

10  exhibit list.

11       Furthermore, I am only going to use this for one very, very

12  limited purpose.  I'm only going to ask about one page of this

13  and even just like part of one page having to do with Grant

14  Thornton.

15       I could do it without, but it's a defendant's document.  I

16  don't see the problem.

17       MR. HOFFMAN:  Your Honor has already sustained several

18  objections to Grant Thornton documents, Your Honor.  Of course,

19  both sides have documents on each other's exhibit lists, and it

20  depends on their uses, and we believe the use is inappropriate

21  here on hearsay grounds.

22       THE COURT:  The objection is sustained.

23       (End of bench conference.)

24       MR. ZAGAR:  No further questions, Your Honor.

25       THE COURT:  Any redirect?

1          MR. HOFFMAN:  Your Honor, no redirect, but I have some

2   housekeeping matters.

3          THE COURT:  You can step down.

4      Any other witnesses for the defendant?

5          MR. HOFFMAN:  Your Honor, no further witnesses, but we

6   have some documents we would like to move to be admitted.

7          THE COURT:  We will do that after the jury goes.  So

8   the defense rests?

9          MR. HOFFMAN:  Subject to the additional documents,

10  Your Honor, and a discussion about deposition transcripts, other

11  than that, defense rests.

12         THE COURT:  Rebuttal witnesses or evidence?

13         MR. HUME:  Your Honor, Hamish Hume for the defendants.

14     We are ready to call our rebuttal witness.  I'm conscious

15  of the hour, and I don't think we will be able to finish all the

16  rebuttal witnesses by 2:00, and I know some members of the jury

17  might be hungry.

18     So we will proceed however you wish.

19         THE COURT:  Okay.  Let's start.  I promised the jury

20  we will recess the trial itself at 2:00.

21         MR. HUME:  Okay.  As their first rebuttal witness,

22  plaintiffs call Professor Bala Dharan.

23         THE COURT:  Professor Dharan, I remind you you are

24  still under oath.

25         BALA DHARAN, WITNESS FOR THE PLAINTIFFS, SWORN

```
1                        DIRECT EXAMINATION

2              BY MR. HUME:

3      Q.   Good afternoon, Professor Dharan.

4      A.   Good afternoon.

5      Q.   Thank you for coming back.  We're going to try to be

6      efficient and clear.  Okay?

7      A.   Thank you.

8      Q.   Were you here over the last few days and did you hear the

9      testimony of the defendants' expert, Dr. Attari?

10     A.   Yes, for the most part.

11     Q.   Okay.  Did you hear his testimony about the deferred tax

12     assets?

13     A.   Yes.

14     Q.   And did you hear the testimony of the witness this morning,

15     Mr. Satriano, about the deferred tax assets?

16     A.   Yes.

17     Q.   Did any of the testimony that you heard from either

18     Dr. Attari or Mr. Satriano in any way change your opinion, your

19     opinion about the deferred tax assets?

20     A.   No, not at all.

21     Q.   Dr. Attari said something about the deferred tax assets

22     only being a temporary thing because when you have taxable

23     income then they shrink or they go away or something.

24           Did you understand that testimony?

25     A.   He wasn't very clear about exactly all the steps that he
```

1    was trying to describe.  But as I understood, he was getting the

2    accounting drawn on that.

3    Q.    Can you explain to the jury what you mean by that.

4    A.    Okay.  So when the deferred tax assets are brought back to

5    the balance sheet, that's a one-time item, of course, and an

6    amount comes in of about $70 billion.  But once it comes in, it

7    stays as an asset.

8         As Mr. Satriano said also this morning, an asset is a good

9    thing.  So it's on the balance as an asset.

10        In the future when the enterprises make income,

11   comprehensive income, that's going to add to the net worth, but

12   it doesn't by itself change the net -- the comprehensive income

13   adds to the net worth without necessarily having any impact on

14   the deferred tax asset.  So the deferred tax asset actually

15   becomes more like a cash.

16        For example, let's say I owe the government -- I make $10

17   in income, and I owe the government, say, $3 in tax, assuming,

18   say, 30 percent tax.  The $10 income goes to the net worth.  But

19   the $3 tax I don't have to pay because I have all this deferred

20   tax asset.  So I will just reduce the deferred tax asset by $3.

21        But that $3 reduction in deferred tax asset is because I'm

22   saving cash.  Right?  Otherwise, I would have paid cash.  So you

23   can think of it as really changing the deferred tax asset to

24   cash, and -- but it doesn't change the net worth that's being

25   increased by $10.  So the $10 increase is still there.

1          That's the main thing I wanted to emphasize.

2     Q.   So just to be clear, if there's taxable income and you can

3     use the deferred tax asset to avoid paying taxes, does the

4     deferred tax asset go down by the same amount of cash you get to

5     keep in net worth?

6     A.   Yes; exactly.

7     Q.   In exchange, a piece of the deferred tax asset for cash,

8     which is also adding to net worth?

9     A.   Effectively, to restate what I said earlier, once you add

10    the $10 comprehensive income to the net worth, that addition is

11    going to stay there.  And the fact that we don't have to pay tax

12    on it is really handled everything on the asset side.

13         Basically, we're going to tell the government we don't have

14    to pay the $3 because we have all these deferred tax asset.  So

15    the government says okay, so we'll reduce the deferred tax asset

16    by $3 and avoid paying the cash for the $10 income.

17         So that's really the best way to think about it.  The net

18    worth goes up.  It doesn't go down any further because we are

19    using up the deferred tax asset.

20    Q.   Now, I think Mr. Satriano said recently, just now in

21    testimony, that there was only profits for one entity for one

22    quarter, and they were rather small profits in the first two

23    quarters of 2012.

24         Do you recall that testimony?

25    A.   I think that's what I heard also, yes.

1    Q.   The record will show what he actually said.  I thought I

2    heard that.

3         I would like to show -- I borrowed in my opening from one

4    of your slides and then had a couple others.  I would like to

5    see from my opening slides demonstrative slide 20, and then I

6    will show one or two others.

7         Slide 20 -- thank you, Ms. Jenkins.  Hopefully, we can put

8    it up on the big screen, too.  Thank you.

9              COURTROOM DEPUTY:  It takes a second.

10             BY MR. HUME:

11   Q.   Slide 20 shows the actual results for the first quarter for

12   Fannie Mae and Freddie Mac and for the second quarter for Fannie

13   Mae and Freddie Mac.

14        Do you see that?

15   A.   Yes.

16   Q.   Are those small numbers?

17   A.   No.  These are, first of all, not small numbers, and they

18   are positive, meaning there was comprehensive income in every

19   single quarter for both Fannie Mae and Freddie Mac.

20   Q.   Now, you see how Freddie Mac for the first quarter had

21   comprehensive income of $1.8 billion, and we say equal to

22   1.8 billion dividend.

23        Do you see that?

24   A.   Correct.

25   Q.   Do you recall there's some rounding here that might have

1   been a little below?  Do you recall that?

2   A.   Yes, I do.

3   Q.   This is going to come up later, too.  There's been some

4   testimony yesterday.

5        Do you remember Dr. Attari saying something that sounded

6   like he was suggesting that if your comprehensive income is

7   lower than the 10 percent dividend, you're not making a profit?

8   A.   Yeah.  Again --

9             MR. BERGMAN:  Objection; mischaracterizes, Your Honor.

10            BY MR. HUME:

11  Q.   Let's characterize it this way.  If anyone in this

12  courtroom has formed the understanding, anyone has formed the

13  understanding that when you make comprehensive income less than

14  the dividend you're not really making a profit, would that be a

15  correct or an incorrect understanding?

16  A.   That would be an incorrect statement.  Comprehensive income

17  is computed before worrying about dividends.  So income is what

18  you first calculate.

19       And here, it is 3.1 billion and 1.8 billion.  That is the

20  comprehensive income, and they are positive.  And then same

21  thing with second quarter, 5.4 billion and 2.9 billion, they're

22  both big and positive.

23       And that means that in all four cases here, two quarters,

24  both enterprises, the income is positive.  The fact that in one

25  case, let's say, the comprehensive income is less than dividends

1    to be paid, that doesn't change the fundamental fact that the

2    comprehensive income is positive.

3    Q.   Now, on the relationship, does the 10 percent dividend

4    amount and whether the income is above or below it or right

5    around the same, does that have anything at all to do with

6    whether you're making enough profits and regular profits to

7    write up the deferred tax asset?

8    A.   The 10 percent dividend has no role to play.  This is

9    important to understand that when somebody says sustainable

10    profit or sustained profit, they're talking about the profit

11    line, which is the comprehensive income line.  It has nothing to

12    do with comprehensive income minus dividend.

13        Dividends don't really play at all.  So comprehensive

14    income is the main --

15    Q.   Let's just move it along quickly here.  Everyone's hungry.

16    Everyone's tired.  I really love your explanations, but I'm

17    going to try to keep it quick.

18        If the profit number is the relevant question for the

19    deferred tax asset, just the profit number and how regular and

20    sustainable it looks --

21    A.   Yes; absolutely.

22    Q.   Okay.  Now, again, if somebody said there was only a small

23    profit in the second quarter, would that be true?

24    A.   For which enterprise?

25    Q.   For Fannie Mae.  Do you see what the Fannie Mae number is?

1    A.   Yes.

2    Q.   Okay.  Let's go to the next slide.

3         Here, this is straight from the Fannie Mae 10-K.  Now,

4    we're going ahead to the end of the year.  They didn't know

5    this.  I'm not meaning to suggest they knew this at the time.

6    I'm addressing whether that 5 point something billion second

7    quarter profit is a small profit.  Okay?  I have a question for

8    you.

9         This is from the 10-K.  Do you see it says, "Our net income

10   of 17.2 billion in 2012 is the largest in our history"?

11   A.   Yes.

12   Q.   Do you see that?

13   A.   I do.

14   Q.   Now, what -- help me out with some arithmetic.  What does

15   that imply about the second quarter profit number of over $5

16   billion?

17   A.   Very large.

18   Q.   Now, they didn't know.  No one can know the future with

19   certainty; no one is suggesting that anyone can know the future

20   with certainty.  But can we have PX-211 to see what they were

21   saying about the future.

22        Do you see it's a May 2012 financial update?

23   A.   Yes.

24   Q.   Do you see it's got a Fannie Mae logo?

25        Actually, you know what?  Rather than this, it's easier to

1    just show from Professor Dharan's demonstratives slide, I

2    believe, 36.  I apologize for -- it's a callout from this, and

3    it will be faster, because I don't remember the page number.

4         This is a callout from that document, TX-211.

5    A.   Right.

6    Q.   What is the last sentence of the second bullet?

7         And you have a date here, do you see?

8    A.   Yes.

9    Q.   July 9th, 2012?

10   A.   Yes, July 9th, 2012.

11   Q.   And that's over a month before Ed DeMarco agreed to the net

12   worth sweep?

13   A.   Correct.

14   Q.   Do you recall that?

15   A.   Correct.

16   Q.   What's the last sentence of this middle bullet say?

17   A.   "2012 comprehensive income is expected to be sufficient to

18   cover the dividend obligations for the full year."

19   Q.   Does that have any implication -- you're an accountant;

20   correct?

21   A.   Yes.

22   Q.   And Mr. Satriano is also an accountant?

23   A.   Yes.

24   Q.   Dr. Attari is not an accountant; correct?

25   A.   That's what he said in the deposition.

1    Q.    Okay.  That he is not?

2    A.    Yes.

3    Q.    I think he said it in the trial, too.

4          What is the implication of the sentence you've just seen

5    and the financial information you saw for the first two

6    quarters?

7          Forget about the year-end result.  Pretend you don't know

8    that.  All you know is the first two quarters that we showed and

9    the work that's been done behind this bullet.

10         What implications would that have to you if you were an

11   accountant at Fannie Mae on July 9th, 2012, with respect to the

12   deferred tax asset?

13   A.    Well, it's getting more and more likely that the deferred

14   tax assets would come back on the balance sheet, especially

15   combined with the next bullet about the future, the next five

16   years.

17         So considering that information, you know, you now know

18   that you're going to be expecting profits, and that's going to

19   be a huge factor in bringing back the deferred tax asset to the

20   balance sheet.

21   Q.    Okay.  Let's talk about projections.  You heard Dr. Attari

22   talk about and criticize the projections you relied on.

23         Do you recall that?

24   A.    Yes.

25   Q.    And he criticized it because it had the word "draft" on it.

1          Do you recall that?

2     A.    Yes.

3     Q.    But have you reviewed all of the subsequent versions?   The

4     final version that went to the board and the version that was

5     used with Treasury, have you reviewed those?

6     A.    I have.

7     Q.    Do they change your opinion in any way?

8     A.    No, not at all.

9     Q.    Do they show the same thing or a different thing in sum and

10    substance with regard to how much remaining funding of the

11    Treasury commitment they were predicting ten years later?

12    A.    Same thing.   I was mainly focusing on exactly that point,

13    which is how much Treasury funding still remains.   And that is

14    the number that did not change in any of these in any

15    substantive way.

16    Q.    Can you pull up PX-213, please.

17          This is a document the jury has seen many times, and you --

18    this is one source of the projections you relied on; is that

19    right?

20    A.    Yes.

21    Q.    Okay.   And is one reason you relied on this because of who

22    it was sent to?

23    A.    It was because this is the document that was sent to the

24    various parties that we talked about during my previous stand

25    here.   Mr. DeMarco received it.   So this was something I wanted

1    to emphasize.  Mr. Mario Ugoletti received it.  And also, I

2    believe we identified several others, if I remember.

3    Q.   Do you recall whether this was the version shown to Susan

4    McFarland --

5    A.   Exactly.  This was also shown to Ms. McFarland in her

6    depositions, and I was going to be using her deposition

7    testimony quotation.  So I wanted to use this document that she

8    was commenting on.

9    Q.   So can we quickly go to page 20 of this document.

10        You looked at this page; correct?

11   A.   Yes.

12   Q.   Okay.  And what lines were you focused on when you looked

13   at this page?

14   A.   So the line I'm focusing on is the "remaining funding under

15   SPSPA," which is the last line in both Fannie Mae and Freddie

16   Mac's case.

17   Q.   Can you again briefly explain to the jury why that is an

18   important line for you and your opinion in this case.

19   A.   This is the whole point of the circular draw concern that

20   FHFA said they had in order to do the Third Amendment.  They

21   kept saying, you know, both Mr. DeMarco and Mr. Ugoletti, that

22   that was the reason.

23        But looking at the numbers here, the remaining funding,

24   which is the concern about the circular draw exhausting that,

25   did not happen.  It's not happening in the forecast here.

1       For Fannie Mae, it went only from $124.8 billion to

2    118.3 billion.  I think we did the math on the $6.5 billion.

3    And for Freddie Mac, it remained unchanged from $148.3 billion

4    to $148.3 billion, which means zero dollars was projected to be

5    used from the funding cap, which literally means no circular

6    draw concern.

7    Q.   There might be some circular draws under this; correct?

8    A.   There might be some.  We talked about the 6.5 billion.

9    Q.   But is there going to be -- does it show an erosion of the

10   Treasury commitment?

11   A.   It does not show any material erosion at all of the --

12   especially for Freddie Mac, zero, and for Fannie Mae,

13   6.5 billion out of 124 billion.

14   Q.   Now, Dr. Attari criticized this document because of a

15   different line; correct?

16   A.   I think he said something about this being a draft and so

17   on.

18   Q.   But what else?  Do you remember him talking about residual

19   equity?

20   A.   I think he was talking about the residual equity line.

21   Q.   Did you ever once in all of your work, in all of your

22   reports, in all of your deposition testimony, and in all of your

23   trial testimony, ever once rely on the residual equity line in

24   this document?

25   A.   I didn't have to, because my focus is on the question of

```
1    circular draw that affects the remaining funding.  That's the
2    main focus of the whole circular draw question.
3    Q.   Now, let's look at what Ms. McFarland said in her
4    deposition about this document, because they tried to call the
5    reliability of it into question.
6         You have in your binder at tab 2 the designated deposition
7    portions of Susan McFarland's testimony.
8    A.   Okay.
9    Q.   Could you please turn -- and Mr. DeRita, if you can pull
10   this up, it would be very helpful.
11        This is, members of the jury, what was read to you by our
12   lawyer actors the other day.  But there is a written version of
13   it.
14        On page 33, if we can look at page 33 -- we have a
15   different version of page 33.  Can you see on page 33 in your
16   binder, can you see at line 114:24 of the designated deposition,
17   it says, "We will move on to our next exhibit"?  Do you see
18   that?
19   A.   Yes.
20   Q.   What exhibit is it?
21   A.   It's Plaintiffs' Exhibit 213, [McFarland 14].
22   Q.   Do you understand that to mean that Exhibit 14 to the
23   McFarland deposition was Plaintiffs' Exhibit 213?
24   A.   Yes.
25   Q.   And that's the exhibit you were just looking at?
```

1    A.   That's one we just saw also.

2    Q.   Now, if you turn to the next page, you will see she's asked

3    a number of questions about this document.

4         Do you see that?

5    A.   Yes.

6    Q.   And you reviewed this deposition and relied on it in

7    forming your opinions in this case?

8    A.   Yes.

9    Q.   Now, towards the bottom of the next page, do you see that

10   she says -- she's asked whether it's clear -- first, she says --

11   she's asked, "Was it clear at this time Fannie returned to

12   stable profitability?"

13        Do you see that towards the top of the page?

14   A.   Which paragraph?

15   Q.   Page 34, the second question at the top of the page.

16   A.   Okay.

17   Q.   It says, "And by this time, it was clear Fannie had

18   returned to stable profitability?"

19        Do you see that?

20   A.   Yes.

21   Q.   And she says, "I wouldn't say it was clear.  I would say we

22   had positive earnings.  We were seeing a lot of positive

23   movement," et cetera.

24        Do you see that?

25   A.   Yes.

```
1    Q.   And key attributes.

2         And then the question is, "A high probability, would you

3    say?"

4         Do you see that?

5    A.   Yes.

6    Q.   And she says, "I would say it's probable."

7         Do you see that?

8    A.   Yes.

9              MR. BERGMAN:  Your Honor, objection to cumulative at

10   this point.

11             MR. HUME:  They may not like it, Your Honor, but they

12   attacked --

13             MR. STERN:  Objection.

14             MR. HUME:  Sorry.

15        (Bench conference.)

16             THE COURT:  What is it you're reading from?  The

17   deposition?

18             MR. HUME:  This is the witness's -- Dr. Attari called

19   into question the reliability of these projections.  There are

20   several witnesses, including Ms. McFarland, who read the

21   projections and said she believed they showed sustained

22   profitability.

23        That's it.  It's going to be one sentence that I show him

24   now, and then we're going to move on to other documents.

25             THE COURT:  All right.
```

1          (End of bench conference.)

2               BY MR. HUME:

3    Q.   There's another question and answer, if you could just

4    show, Mr. DeRita.

5          Do you see that -- what Ms. McFarland says in the next

6    answer?

7    A.   Yes.

8    Q.   Did you rely on that in formulating your opinion?

9    A.   Yes, I did.

10   Q.   What did she say?

11   A.   This is where she used the "more likely than not" phrase.

12   So she's saying that -- "I would say it was, you know,

13   definitely more likely than not that we would have sustained

14   profitability."  And that's a key phrase in accounting.

15   Q.   If the chief financial officer had that view at the time of

16   these projections in July of 2012, does that have implications

17   for what people at that time should have known about the

18   deferred tax asset?

19   A.   Yes, very much.  It implies that the deferred tax assets

20   are starting to -- the likelihood of them coming back to the

21   balance sheet is going up.  There's all these positives that are

22   being listed by Ms. McFarland.

23   Q.   Okay.  I would like to quickly refer you -- did you review

24   the testimony of Tim Mayopoulos, who is the Fannie Mae either

25   president or CEO during 2012?

1    A.    Yes.

2    Q.    And that's at tab 1 of your binder, and could I ask you to

3    turn to page 14 of -- this, again, is the deposition excerpts,

4    the written version of the videotape that was played to the

5    jury.

6    A.    Okay.

7    Q.    And this time, Mr. DeRita and I are in sync, I believe.

8          Do you see there in the middle of the page, line 121,

9    Mr. Mayopoulos is asked, "Am I right in assuming that when

10   senior management would present the board with a set of

11   financial projections, that those would sort of reflect senior

12   management's best work and their best assessment of what was

13   likely to happen, that the projections were as good as the

14   senior management could make them?"

15         That's the question.  Do you see that?

16   A.    Yes.

17   Q.    And Mr. Mayopoulos answered, "I think we endeavored to

18   create what we thought were credible, reliable, reasonable

19   projections."

20         Do you see that?

21   A.    Yes.

22   Q.    And he's asked, "You wouldn't have given the board

23   projections you thought were wrong?"  Answer, "No."

24         Do you see that?

25   A.    Yes.

1    Q.   Is that relevant to your opinion?

2    A.   It is.

3    Q.   And do you know whether these projections that were in

4    PX-213 with only minor variations that the parties relied on

5    were shown to the board?

6    A.   Yes.

7    Q.   Can we show PX-218, please.

8         Now, do you see what that is, Mr. Dharan?

9         It's at tab 5 of the binder.  Do you see that?

10   A.   Yes.

11   Q.   What does it say on the cover page of that document?  Does

12   it say "Fannie Mae board meeting"?  Do you see the cover page of

13   the document?

14   A.   I see the page, yes.

15   Q.   Do you see that it's referring to the Fannie Mae board

16   meeting?

17   A.   Can you repeat the question?

18   Q.   Do you see that it references the Fannie Mae board meeting,

19   July 9th, 2012?

20   A.   Yes, it does.

21   Q.   And if you would go to page 20 of this document, is this

22   essentially the same as the chart that was in PX-213 with the

23   minor change?

24   A.   With some minor change, but not on the -- not significant

25   for the remaining funding commitment line.

1    Q.   For the numbers you relied on, are they substantively --

2    A.   For the numbers I relied on, the message and the

3    conclusions are exactly the same.

4    Q.   Mr. DeRita, please highlight not on the top line, not the

5    2020 number but the 2022 number.  I don't want to suggest

6    something --

7    A.   Correct.

8    Q.   So it is a little lower for Fannie; is that right?

9    A.   It's lower by $8.7 billion.

10   Q.   How much lower is it than the number in PX-213?

11   A.   About 2.2 billion.

12   Q.   Would that change your opinion in any way?

13   A.   It doesn't at all, because we're talking about a funding

14   cap of 134.8 billion available.  So that's the main basis.

15   Q.   The fact that this document was shown to the board with no

16   draft language, no subject to verification language but shown to

17   the board and verified by Mr. Mayopoulos's testimony, is that

18   relevant to your opinion?

19   A.   Yes.  These are really similar documents, and the fact that

20   it's shown to the board is relevant.

21   Q.   If all you had was the PX-213 document and not this, would

22   your opinion be stronger or weaker?  Did this strengthen or

23   impact or weaken your opinion?

24   A.   It's the same opinion.

25   Q.   Does it strengthen your opinion?

```
 1    A.   Well, both documents are similar in my mind.  So the
 2    opinion would be the same.
 3    Q.   Now, are you aware of the fact that these same projections
 4    were shown to the United States Treasury?
 5    A.   Again --
 6    Q.   Can you look at please tab 6 of your binder --
 7    A.   Okay.
 8    Q.   -- and Plaintiffs' Exhibit 269.
 9    A.   Which page again?
10    Q.   It's tab 6, PX-269.  It's going to come up on the screen as
11    well.
12    A.   I've got the tab.
13    Q.   I believe this is in evidence.
14         COURTROOM DEPUTY:  It is.  Just give it one second.
15    There's a lag.
16         BY MR. HUME:
17    Q.   Can we see at the top, this is an e-mail from Judith Dunn?
18    A.   Yes.
19    Q.   August 15, 2012.  Do you see that?
20    A.   Yes.
21    Q.   So this is just two days before the net worth sweep?
22    A.   Yes.
23    Q.   And you see it's sent to Tim Mayopolous?
24    A.   Yes.
25    Q.   You understood he was either the president or CEO of Fannie
```

1    Mae at that time?

2    A.   Correct.

3    Q.   And the attachment says "Treasury slides final."

4         Do you see that?

5    A.   Yes, I do.

6    Q.   And it says, "Tim, here is the revised Treasury deck.  See

7    Nicola's e-mail below."

8         Do you see that?

9    A.   Yes.

10   Q.   And below it is an e-mail forwarding it from Nicola Fraser.

11        Do you see that?

12   A.   Yes.

13   Q.   Okay.  Let's go to page 20 of this document.

14        Actually, before you do that, do you see that Nicola

15   Fraser's e-mail says in the third paragraph, "This update

16   includes the corrections that were made to the Freddie numbers

17   that were incorrect in the prior version"?  Do you see that?

18   A.   Yes.

19   Q.   Okay.  Now let's look at page 20.

20        Again, what line is most important to you in this chart of

21   projections over ten years?

22   A.   The remaining funding under SPSPA.  That's the line we are

23   looking for.

24   Q.   And is that the line that's relevant to whether or not

25   there was, in fact, a genuine concern about eroding the Treasury

1    commitment, as the defendants say in this case?

2    A.    Exactly, whether or not the concern is justified.

3    Q.    Or did it exist?

4    A.    Or if it even exists, right.

5    Q.    Okay.  Can you highlight these numbers from 2012 and '22 in

6    this, Mr. DeRita.

7          And how do these numbers compare to the ones we've seen

8    elsewhere?

9    A.    These are again the exact same as just the one we saw

10   earlier.  So $8.7 billion difference.  So the total funding used

11   is only 8.7 billion out of $124.8 billion.

12   Q.    Over what period of time?

13   A.    Over a ten-year period of time.

14   Q.    And that Fannie Mae -- the Freddie Mac number at the

15   bottom, do you recall in a prior version that it was

16   148 billion?

17   A.    It was a little less, but that there was zero usage.  So

18   it's 149.3 billion instead of 148 point something, but there's

19   no usage.

20   Q.    It's higher in this document than in the first document you

21   relied on, PX-213?

22   A.    It is higher, yes.

23   Q.    So that's more helpful to your opinion?

24   A.    There is more funding available and still zero used.

25   Q.    Now, please put up PX-509.  I think we're going slightly

1   out of order here.  But again, it's another e-mail.  I believe

2   it's in evidence, but if not, we move it in.

3                COURTROOM DEPUTY:  This is.

4                MR. BERGMAN:  One moment, please, Your Honor.

5                COURTROOM DEPUTY:  It's in.

6                BY MR. HUME:

7   Q.   I should have shown this earlier, because it's a little

8   earlier, August 7, 2012.  Nicola Fraser is sending this to Tim

9   Mayopoulos.

10  A.   Yes.

11  Q.   David Benson.  Do you see that?

12  A.   Yes.

13  Q.   Susan McFarland.  Do you see that?

14  A.   Yes; exactly.

15  Q.   And again, it's Treasury slides are the attachments.

16       Do you see that?

17  A.   Yes.

18  Q.   Okay.  And again, if we go to page 20 of this document --

19  page 9 of this document.

20  A.   Yes.

21  Q.   And what does this document show?

22  A.   Again, the same kind of forecast.  Again, I'm focusing on

23  the same line, which is the remaining funding under SPSPA, which

24  is really the whole point of the tertiary funding available.

25  Q.   So this one is actually a week, eight days before the one

1    we just looked at.  I did it out of order.  Sorry about that.

2         But you see here for Freddie, it's down to 148.

3         Do you see that?

4    A.   Yes.

5    Q.   But there's no erosion shown in the Freddie projection, is

6    there?

7    A.   There's still no erosion in the Freddie projection.

8    Q.   And in the document eight years later, it was a slightly

9    higher number, 149?

10   A.   Right, but no erosion.

11   Q.   And the erosion in Fannie is the same as in the other

12   document?

13   A.   Same 8.7 billion erosion out of $124.8 billion.

14   Q.   Over what period of time?

15   A.   Over a ten-year period of time.

16   Q.   Now, you had a slide in your direct testimony where you

17   showed, based on one document graphically --

18         MR. BERGMAN:  Objection, Your Honor; exceeding the

19   scope.  This one in particular in direct testimony reviewed.

20         MR. HUME:  No, no.  This is new.  This is responding

21   to a direct attack on Professor Dharan's work and expert opinion

22   by saying that he relied on the wrong document, he relied on an

23   unreliable document, and he didn't look at all the proper

24   documents.  This is going to show in two or three slides how his

25   opinion is unchanged when you look at all these documents.

1          THE COURT:  The objection is overruled.

2          BY MR. HUME:

3    Q.   Could I have the Dharan rebuttal slides, please.

4          Did you prepare these slides, Dr. Dharan?

5    A.   Yes, I did.

6    Q.   In response to what you heard from --

7    A.   Exactly, in response, just to make sure that I can compare

8    all the drafts on the screen so the jury can see how those

9    numbers would look side by side.

10   Q.   So just for context, this is the original slide 47 in your

11   demonstratives.

12         Can you just briefly explain what this shows?

13   A.   Yes.  What I did in this slide and what I showed earlier is

14   the combined Fannie Mae and Freddie Mac funding available in --

15   as of 2012, looking forward.

16   Q.   And then using PX -- using the Benson projections, did you

17   show what it predicted would happen ten years later under those

18   projections?

19   A.   Yes.  So what I showed in this graph was under these

20   projections, I showed how much of this $266 billion was going to

21   be used in ten years, combined between Fannie and Freddie.

22   That's $6.5 billion.

23   Q.   Okay.  So that's the erosion that they say they're worried

24   about, and you're showing, at least under those projections, how

25   much erosion there is?

1    A.    Exactly.  So this is the one I showed the jury before.

2    Q.    Now, what have you done --

3    A.    So what I have done is I just wanted to put those three

4    additional versions that I was asked about, and I wanted to show

5    them side by side.  So the first one is what I -- this is the

6    PX-216.  And then it's PX-218.  Here you see that the total

7    available is a little bigger, 273.1.

8    Q.    Do we see what happens after --

9    A.    After, yeah.  So after we use the 8.7 billion, it's going

10   to be 264.4, essentially unchanged when you look at the

11   available amount compared to the previous one.

12   Q.    What about if you look at PX-509?

13   A.    Again, the initial amount is bigger, but then we subtract

14   the 8.7 billion, and now we get to 264.4 billion.

15         So the amount available in 2022 under the three different

16   drafts is exactly the same, and it is the fourth one that

17   essentially repeats this one more time.

18   Q.    And again, so do they show any material difference at all

19   in terms of the risk of eroding the Treasury commitment?

20   A.    Not at all.  All four of them, if you look at the amount

21   available after usage, it's really effectively the same number,

22   266 billion, 264 billion, 264 billion, 265 billion.

23   Q.    And you recall PX-218 was the version sent to the board?

24   Do you recall that?

25   A.    I believe so, yeah.

1    Q.    And PX-269 is the version that was used with Treasury?

2    A.    Yes.

3    Q.    Now, did you prepare another slide on this that involves

4    the DTAs?

5    A.    I just wanted to add the DTA to this to show one more

6    slide.

7          So what this slide does is in the projections that we were

8    seeing, they did not include the DTA coming back to the balance

9    sheet, what is called DTA being released to the balance sheet.

10   I just wanted to show what that would do here.

11         So once we add the DTA to the balance sheet, the net worth

12   goes up by $74.4 billion because of the write-up of the DTAs,

13   which make the total funding available now to $348.5 billion.

14         And then if you click again, so what happens this time is

15   that the $8.7 billion, using one of the final versions, is no

16   longer coming from Treasury draw.  It's not coming from using of

17   the net worth.  So the net worth is used, but no more Treasury

18   draw is taking place.

19   Q.    Just so it's not confusing, all of these bar charts, to

20   simplify and speed things along, you did combined?

21   A.    Yes.

22   Q.    Fannie Mae and Freddie combined?

23   A.    Exactly, just to make sure -- because Freddie didn't use

24   any funding.  So this is activity showing the combined without

25   diluting the information.

1    Q.   Now, there was also -- do you recall Susan McFarland

2    talking about going to Treasury and talking about these

3    projections in her testimony?

4    A.   Yes.

5    Q.   Now, do you recall questioning or testimony from Dr. Attari

6    about Mr. Benson's testimony that there was some marketing

7    aspect of this?  Do you recall that?

8    A.   Marketing spin.

9    Q.   Yeah.  Let's look at that, shall we?  Shall we look at what

10   he actually said?  It's tab 5 of your binder.  It's the Benson

11   designated -- sorry.  Tab 3 of your binder is the Benson

12   designated deposition testimony which was played by video.

13   There's a written transcript of it.  I think if we look at

14   page 9 of the designations, of the clips, which is page 175,

15   that's it.

16   A.   Okay.

17   Q.   At the top there, 175:16 -- but before we look at that,

18   let's see if we can put some context in it.  Let's look at the

19   previous page, page 8.

20              COURTROOM DEPUTY:  I'm sorry, Counsel.  What is this?

21              MR. HUME:  This is the designations list report --

22              COURTROOM DEPUTY:  Is it in evidence?

23              MR. HUME:  It is not in evidence.

24              COURTROOM DEPUTY:  Okay.

25              MR. HUME:  Well, all of it is in evidence, but it came

1    in orally by videotape.

2              COURTROOM DEPUTY:  If this is a document, you will

3    have to move the document in.

4              MR. HUME:  We need to give it an exhibit number.  I

5    would call it PX-550 and move it into evidence.

6              MR. BERGMAN:  One moment, please.

7              MR. HUME:  While we're at it, just to save counsel

8    time, I would also like to move in the designated deposition

9    clip report from Mr. Mayopoulos, which we will call PX --

10             MR. BERGMAN:  Your Honor, object.  Can we go on the

11   phone for one moment.

12         (Bench conference.)

13             MR. BERGMAN:  Your Honor, David Bergman for

14   defendants.

15        I thought we had a discussion that trial testimony was not

16   going to go back as evidence to the Court -- to the jury, and I

17   thought effectively this would take some trial testimony, mark

18   it as an exhibit, and send it back to the jury, as I understand.

19        In the past, we've -- this is deposition testimony that was

20   played, and we've shown deposition transcripts to the witnesses

21   and published them to the jury here but not marked them as

22   exhibits and sent them back.  And I think that should be the

23   procedure here.  I object to marking certain portions of

24   testimony and having them admitted as trial evidence.

25             THE COURT:  Sustained.

1       (End of bench conference.)

2             BY MR. HUME:

3    Q.   The witness can see it.

4         The testimony I wanted to show first, if we go back to

5    page 8, do you see where it references Mr. Benson being given a

6    document at lines 173:07?  Do you see that?

7    A.   Yes.

8    Q.   Now let's go to the next page, page 9 of the designations.

9         Do you see three quarters of the way down the page, at line

10   176:15, it says PX 216.15?  Do you see that?

11   A.   Yes.

12   Q.   And the question there is, "And if you look at the next

13   page, slide 14."

14        Do you see that?

15   A.   Yes.

16   Q.   Do you understand the questioner at this point is having

17   Mr. Benson look at the next page in the deck from what he had

18   been looking at, which is slide 14, which is number 15 of

19   PX-216?

20   A.   Yes.

21   Q.   Okay.  So now let's look at what he said about the previous

22   page.  If we could, I would like to pull up PX-216.  We don't

23   need to show the clip report on the screen.  We can show the

24   exhibit.  It is in evidence.  We can being show the witness --

25   the jury the exhibit, and the witness has the deposition

1    testimony in front of him.

2        So PX-216, we want to go to page -- the page before was

3    page 14 of the exhibit.

4    A.   Okay.

5    Q.   That's where we want to go.  That's page 15 of the exhibit

6    and 14.

7        That's the slide he turns to next.  Do you recall that?

8    A.   Yes.

9    Q.   So the slide before is which one?  Okay.

10       So about this page is where Mr. Benson gives his testimony

11   at the top of -- on your clip report, top of page 9, this is

12   where he says the thing about a marketing issue.

13       Do you see that?

14   A.   Yes.

15   Q.   And you've read that before; correct?

16   A.   Yes, I've read this before.

17   Q.   Okay.  And what is your understanding?  How does it impact

18   your opinion?

19   A.   It doesn't change my opinion at all.  He is talking about

20   the market -- when he says marketing spin, he's talking about

21   telling the public through Treasury that Fannie Mae and Freddie

22   Mac are earning enough -- paying enough dividends for the

23   government to recover its initial investment.  And he even puts

24   the term "repayment" within quotations.

25       He's calling it a marketing spin in the sense of telling

1    the public that Fannie Mae and Freddie Mac are returning money

2    to the government, but he's not talking about the profit

3    projection.  He's talking about the fact that dividends are

4    going to the government at a level that cowers the initial

5    investment and more.

6    Q.   Do you recall what the president of Fannie Mae at the time

7    said about projections he gave to the board, what he thought

8    about them?

9    A.   About being accurate?

10    Q.   Yes.

11    A.   Yes.

12    Q.   Now, can I go to the next slide on this PX-216.

13    There was some testimony yesterday with Dr. Attari about

14    two different things that I would like to give you a chance to

15    respond to.

16    One is, again, you've testified to this before, when the

17    comprehensive income is less than the dividend, does that mean

18    they're not making profits?

19    A.   No, not at all.  Your profit is all about the first line

20    here, which is the comprehensive income.  So if the

21    comprehensive income is positive, you're making profits.

22    Q.   And you recall these projections show up -- one of the

23    versions of the document has the reference to David Benson

24    saying something about golden years of GSE earnings?

25    A.   Yes.

1   Q.   And would it be correct or incorrect -- have you looked at

2   the actual results Fannie Mae and Freddie Mac have had since

3   August 2012 up to the present?

4   A.   Yes, I have.

5   Q.   Has it been better or worse than what's shown in the

6   projection?

7   A.   Much better.  Even the 2012 numbers were, if I remember,

8   greater.

9   Q.   So if anybody in this courtroom had formed the

10  understanding that those golden years never really happened,

11  would that be a correct or incorrect understanding?

12  A.   Certainly, the future profits were much bigger than what

13  was even projected here.

14  Q.   Better than what he called -- you're saying the actual

15  results were better than what Mr. Benson called the golden

16  years?

17  A.   Were much better.

18  Q.   A couple other quick questions.

19       Do you recall Dr. Attari saying something about, and I

20  think maybe Mr. Satriano did, too, about if you shrink the

21  retained portfolio, that means you're going to make less money?

22  Do you recall that testimony?

23  A.   Yes.

24  Q.   Can you very briefly for the jury explain the difference

25  between retained portfolio and the securitization?

1    A.    Okay.

2    Q.    Very briefly.

3    A.    Very briefly, because it's been covered by others, as well

4    as myself.  Fannie Mae really is doing two things.  One, the

5    most important thing they do is they buy all the mortgages from,

6    I think I called it, main street bank, and then they put them

7    all together and sell it to the public, and that's called

8    securitization.  That gives them money, which then they give it

9    back to the banks.  So that's the securitization business, which

10   means guaranteeing those mortgages, and they charge a so-called

11   G fee.  Right?

12         They also occasionally -- initially, they were doing a lot

13   more of this.  They also retain or just hold on to the mortgages

14   themselves.  Not all of them, some of them.

15         In addition, when those mortgages that they securitized, if

16   they did not perform well, if they defaulted, for example,

17   Fannie Mae would buy them and hold on to them as well.

18         And that is the investment portfolio.  The investment

19   portfolio is acting as a buffer to help Fannie Mae do this job

20   of securitization.  And so if something goes wrong during

21   securitization, they bring those and hold on to them in the

22   investment.

23   Q.    So with respect to the testimony from Dr. Attari and

24   Mr. Satriano that if you -- let's set the stage first.

25         You understand the Third Amendment slightly increased the

1    percentage of which Fannie Mae and Freddie Mac were going to

2    shrink that retained portfolio?

3    A.   Yes, indeed.

4    Q.   And do you recall testimony from Dr. Attari and

5    Mr. Satriano that if you shrink the retained portfolio, you're

6    going to make less money, less profit?  Do you recall that?

7    A.   Yes.

8    Q.   Do you have an opinion on that testimony?

9    A.   Yes, I do.

10   Q.   What is it?

11   A.   Basically, they're ignoring -- there's a connection between

12   the two.  The guarantee fee which Fannie Mae and Freddie Mac

13   make is connected to the investment activity that they do as

14   well.  And this was also mentioned by Mr. Layton in his

15   deposition, which I think we heard on video here.

16        And the main point is that it's because they're able to do

17   the investment portfolio that they're able to do the guarantee

18   business better and better.

19        So if the investment portfolio is reduced, over time,

20   that's going to lead to a higher guarantee fee being charged to

21   the banks that sell the mortgages, which is what actually

22   happened as well.  So this is not something hypothetical.

23        So the fact that investment portfolio goes down doesn't

24   automatically by any means guarantee or mean that the total

25   income for Fannie Mae and Freddie Mac will go down.  It will be

1    compensated by guarantee fee instead.

2    Q.    In your opinion, having studied this now, is it correct or

3    incorrect for someone to assert that if the retained portfolio

4    shrinks Fannie Mae and Freddie Mac are going to make less

5    profit?

6    A.    It's an incomplete statement.  So it ignores the fact that

7    the retained portfolio and the guarantee business are

8    interconnected.

9    Q.    So it may not be correct?

10   A.    It may not be correct.

11   Q.    And in actuality, how did it turn out?

12   A.    In actuality, as I said a minute ago, as the retained

13   portfolio shrank, Fannie Mae and Freddie Mac increased the G fee

14   that they charged to the mortgage sellers, and the overall

15   income increased.

16   Q.    Now, Dr. Attari criticized your projections, but I have

17   another question.  You listened to him and you read his report

18   and you read his deposition; is that right?

19   A.    Yes.

20   Q.    Did you see Dr. Attari present any financial projections

21   that were in place in August 2012 before the net worth sweep was

22   agreed upon that were more reliable than the projections you

23   looked at?

24   A.    No, I did not.

25   Q.    Did you hear Dr. Attari's testimony about the payment in

1    kind option, sometimes called the PIK option or payment in kind?

2    A.    Yes.

3    Q.    And can you briefly explain -- before I ask you about his

4    testimony, just very briefly, how does that work again?

5    A.    So if the enterprises -- you know, normally they pay

6    10 percent dividend in cash under the 2012 conditions before the

7    Third Amendment.  Right?  So suppose they choose not to pay the

8    10 percent in cash dividend.  Then they would have to pay -- add

9    that amount to the liquidation preference.  So if there's a

10   $1,000 amount that needs to be paid as 10 percent dividend and

11   you don't pay it, it adds to the liquidation preference.

12       And it is true that in the future, then, you have to pay

13   12 percent on that, as well as all the other liquidation

14   preference you have, and that's the paid in kind that people

15   talk about.

16   Q.    And if in the future you make a little more money, are you

17   allowed to pay down the part of the liquidation preference that

18   was increased --

19   A.    Absolutely.  That's the whole point of the paid in kind

20   dividend.  You don't have to permanently pay 12 percent

21   dividend.  You have the option in a future year, maybe next

22   quarter, the next year.  Maybe your net worth is going to be

23   bigger, which actually has happened up and down in the time

24   period.  So when you have more net worth, you can pay back that

25   paid in kind amount.

```
 1           So it's not a permanent thing.  And that's the great
 2    flexibility.  That's like unbelievable flexibility, which is the
 3    reason why the paid in kind is a powerful alternative.
 4    Q.   Now, what did you understand -- did you hear what
 5    Dr. Attari said about the payment in kind?  Did he say it
 6    increased the liquidation preference?
 7    A.   Yes.
 8    Q.   Did he say whether or not using the payment in kind option
 9    would reduce the Treasury commitment or erode the Treasury
10    commitment?  What did he say about that?
11    A.   He agreed that it should not, it did not change the
12    Treasury draw amount available.
13    Q.   Or it would not?
14    A.   Yeah.
15    Q.   So if you do the payment in kind option, what did
16    Dr. Attari say about what would happen to the Treasury
17    commitment?
18    A.   So he said and I also had said that it will not change the
19    total amount of Treasury draw that is available.
20    Q.   But the liquidation preference goes up?
21    A.   That is correct.
22    Q.   What did he say about whether bondholders, creditors who
23    the defendants say they were worried about when they did the net
24    worth sweep, trying to make sure they weren't concerned?  Would
25    they care?  And what did Dr. Attari say about whether they would
```

1    care about the liquidation preference going up?

2    A.   He agreed that the liquidation preference going up doesn't

3    change the bondholders in terms of what they can get, because in

4    terms of the priority you get the bondholders first and then the

5    senior preferred and then the remaining shareholders.

6        So increasing the liquidation preference for the

7    government, the senior preferred doesn't change the cash flow

8    that goes -- potentially that can go to the bondholders.  And I

9    think Dr. Attari agreed with that.

10   Q.   Did you hear anything in Dr. Attari's testimony that could

11   explain why he thinks the payment in kind would not have

12   adequately addressed any possible concern that might have

13   existed about eroding the commitment and causing concern amongst

14   bondholders?

15   A.   I did not.  He was agreeing with all the basic facts and

16   premises, but I did not hear him say how it does not solve the

17   problem.

18   Q.   Did you see Dr. Attari showing any evidence of actual

19   discussions within the FHFA, memos writing back and forth, about

20   their concerns that the bond market was getting the jitters and

21   was worried about the erosion of the Treasury commitment?  Did

22   you see anything like that?

23   A.   I don't recall.  I don't think so.

24   Q.   Did you listen to Dr. Attari's testimony about what's

25   called the yield spread?

1    A.   Yes.

2    Q.   And can you -- is the yield spread the difference between

3    the yield on a bond issued by Fannie Mae and Freddie Mac versus

4    the yield on the United States Treasury bond?

5    A.   Some index or some comparison, typically United States

6    Treasury.  It could be similar-rated bonds of other

7    corporations.

8    Q.   And is the idea -- is the point that the higher the yield

9    curve, the bigger the difference, the more there might be an

10   indication of concern amongst bondholders because people don't

11   want to buy it, they're selling it more than they're buying it,

12   so the yield goes up and the price goes down?

13   A.   Absolutely.  The higher the yield spread, the more there is

14   a concern potentially about the riskiness of Fannie Mae and

15   Freddie Mac.

16   Q.   And conversely, what happens if the yield spread is lower,

17   going lower?

18   A.   Exactly, conversely.  If the yield spread is lower, then

19   there's less concern or there's no concern about the riskiness

20   of Fannie Mae and Freddie Mac.

21   Q.   So did you have a reaction to his testimony and have an

22   opinion on his testimony about the yield spread?

23   A.   I think he made some statements.  I didn't see him support

24   them with analysis in his report that I read and deposition.  So

25   he said if there had not been the Third Amendment, then the

1   yield spread sort of increased.  But that statement, he never

2   analyzed, he didn't provide any data for this hypothetical, if

3   this had not been done then this thing would have increased type

4   of statement.

5   Q.   Did you decide, did you make a decision this morning about

6   this issue and how you wanted to react to it?

7   A.   I just wanted to summarize some of the comments I wanted to

8   make in a single slide.  I will quickly run through that.

9   Q.   Did you make this slide?

10  A.   Yes.

11  Q.   Did you make it this morning?

12  A.   Just this morning.

13  Q.   Can you explain to the jury what it says.

14  A.   Okay.  So Dr. Attari's opinion on the yield that we just

15  talked about, first of all, he did an empirical analysis showing

16  there was a small decline in yield.  I just wanted to comment on

17  that, as well as the other comment I just made.

18      First of all, there was already an implied guarantee.  The

19  government had always stated a guarantee on an implied way that

20  was made explicit by the conservatorship.  And that's what FHFA

21  has said in their semiannual report.  They said the previous

22  implied commitment is now explicit.  The market already had this

23  government guarantee from the U.S. Treasury that the GSEs would

24  honor their obligations.  So that means that there was no

25  concern in the first place.

1        Secondly, the bonds that Dr. Attari was looking at, the GSE

2   bonds, they were actually yielding less than the Moody's

3   corporate bond index for similar rating.  That means the

4   marketplace was looking at the GSEs as more safer, safer than

5   the corporate bond alternatives.

6   Q.   You mean safer even than a AAA rated?

7   A.   Even AAA rated, described as AAA rated.

8        And even the bond yields and the bond yield spreads that he

9   was looking at according to his own data were declining even

10  prior to the announcement of the third -- of the net worth

11  sweep.

12       And so those are really important facts to say there was no

13  concern in the marketplace.

14  Q.   What does it mean if the yield spread were declining even

15  before the net worth sweep?

16  A.   That means the market was getting more comfortable, not

17  more concerned but more comfortable about the riskiness of the

18  two GSEs.

19  Q.   Now, when Dr. Attari was confronted with that point this

20  morning, do you recall that he said well, the yield spread would

21  have dropped faster if they had known about the net worth sweep?

22  Do you recall that?

23  A.   That's what I was mentioning earlier.  I was --

24  Q.   Did he show any analysis for that?

25  A.   He did not.

1    Q.   Have you ever seen any analysis showing that?

2    A.   I have not seen any analysis.

3    Q.   What are the remaining points on here?

4    A.   So the other two I just wanted to mention, there are other

5    potential issues that he had in coming up with his conclusion.

6        So number 1, he was only looking at a very small handful of

7    bonds issued by the GSEs.  They were not even the typical

8    long-term bonds.  But in spite of all of these limitations, he

9    still could only show 11 basis point sort of abnormal decline

10   based on some index comparison.

11       But even ignoring -- a total decline of only 13 basis

12   points.  If this is the measure of market's concern about the

13   GSEs, I just don't see how you could justify the net worth sweep

14   based just on this concern.

15   Q.   In sum and substance, did his analysis of yield spreads

16   show any concern amongst the bond market that would justify any

17   action, let alone the net worth sweep?

18   A.   No concern.

19   Q.   I have two more questions, folks.  I'm sorry I've kept you

20   this long.

21       Do you recall Dr. Attari said something in his testimony

22   about how he thought the net worth sweep is good for the GSEs

23   because it preserved the commitment, something like that?

24   A.   Something like that, yes.

25   Q.   Now, have you studied -- I have two questions.  You studied

1    the results -- this doesn't count towards my two.

2         You studied the actual results of Fannie Mae and Freddie

3    Mac?

4    A.   Yes.

5    Q.   Up to the present.  So do you have an opinion on whether,

6    without the net worth sweep, would they have needed to draw down

7    anything from the Treasury commitment from August 2012 to the

8    present?

9    A.   None.

10   Q.   Can I show slide 21, because he said, Dr. Attari said they

11   were better off with the net worth sweep than without because

12   they had the commitment, and I want to ask you a question about

13   that.

14        Do you recall this slide, the difference between the

15   dividend in 2013, what it would have been under the original

16   deal and what it was under the net worth sweep, and that the

17   difference was 111 billion?

18   A.   Yes.  I've shown this earlier, absolutely.

19   Q.   And do you recall I asked Mr. DeMarco, would the GSEs have

20   been better with the Treasury commitment and the 111 billion or

21   just the Treasury commitment?  Do you remember that?

22   A.   Yes.

23        MR. BERGMAN:  Objection, Your Honor.  This is

24   cumulative, and it's already been addressed by Dr. Dharan.

25        BY MR. HUME:

1    Q.   One question.   Did Dr. Attari give an opinion on this that

2    was explained somehow why they were better off with just the

3    commitment and without the 111 billion?   Did you hear that from

4    him?

5    A.   I didn't hear him say it.

6              MR. HUME:   No more questions.

7              THE COURT:   All right, ladies and gentlemen.   I

8    promised you you could go at 2:00 today.   So you can.   We will

9    come back at 10:00 on Monday.   Don't talk about the case.   Have

10   a nice weekend.   Take care of your chores, those of you who have

11   chores, and I will see you at 10:00 on Monday.

12        (Jury exited courtroom.)

13              THE COURT:   I'll take ten minutes before meeting with

14   counsel.   Okay.   20 minutes, because we are going to switch

15   court reporters.

16        (Recess taken at 1:59 p.m.)

17        (Afternoon session reported by Lisa Moreira and bound under

18   separate cover.)

CERTIFICATE OF OFFICIAL COURT REPORTER


        I, Sara A. Wick, certify that the foregoing is a

correct transcript from the record of proceedings in the

above-entitled matter.



/s/ Sara A. Wick_____        October 29, 2022___

SIGNATURE OF COURT REPORTER        DATE

## $

**$1,000** [1] - 2312:10
**$10** [6] - 2277:16, 2277:18, 2277:25, 2278:10, 2278:16
**$15** [1] - 2199:20
**$266** [1] - 2300:20
**$3** [1] - 2277:20
**$40** [2] - 2175:9, 2175:14
**$62** [1] - 2240:22
**$70** [1] - 2277:6
**$912** [1] - 2199:13

## '

**'13** [2] - 2273:1, 2273:3
**'22** [1] - 2297:5

## /

**/s** [1] - 2321:8

## 1

**1** [5] - 2181:11, 2189:25, 2245:12, 2292:2, 2318:6
**1.8** [3] - 2279:21, 2279:22, 2280:19
**10** [20] - 2191:10, 2191:16, 2191:20, 2192:2, 2194:13, 2194:14, 2194:16, 2195:7, 2195:8, 2201:17, 2201:20, 2219:10, 2232:11, 2265:6, 2280:7, 2281:3, 2281:8, 2312:6, 2312:8, 2312:10
**10-K** [12] - 2180:18, 2180:23, 2198:19, 2243:14, 2243:16, 2245:3, 2250:6, 2250:15, 2250:18, 2250:21, 2282:3, 2282:9
**10-Ks** [1] - 2198:25
**10-Q** [12] - 2243:13, 2243:16, 2245:12, 2256:10, 2260:22, 2261:6, 2261:11, 2261:15, 2261:17, 2262:5, 2263:3, 2263:10
**10-Qs** [3] - 2213:24, 2216:11, 2226:2

**100** [1] - 2261:22
**10020** [1] - 2171:4
**101** [1] - 2262:9
**10:00** [2] - 2320:9, 2320:11
**10:09** [1] - 2170:10
**11** [1] - 2318:9
**111** [3] - 2319:17, 2319:20, 2320:3
**114:24** [1] - 2288:16
**116.2** [2] - 2183:20, 2184:2
**118.3** [1] - 2287:2
**11:31** [1] - 2232:17
**11:59** [1] - 2232:17
**12** [5] - 2201:17, 2201:20, 2202:2, 2312:13, 2312:20
**121** [1] - 2292:8
**124** [1] - 2287:13
**124.8** [3] - 2287:1, 2297:11, 2299:13
**1251** [1] - 2171:4
**13** [1] - 2318:11
**13-cv-1053** [1] - 2170:4
**13-mc-1288** [1] - 2170:8
**134.8** [1] - 2294:14
**136** [3] - 2180:22, 2198:23, 2199:1
**14** [6] - 2288:22, 2292:3, 2305:13, 2305:18, 2306:3, 2306:6
**1401** [1] - 2170:22
**148** [3] - 2297:16, 2297:18, 2299:2
**148.3** [2] - 2287:3, 2287:4
**149** [1] - 2299:9
**149.3** [1] - 2297:18
**14** [1] - 2288:21
**14th** [2] - 2227:21, 2235:7
**15** [9] - 2174:6, 2182:3, 2182:14, 2199:12, 2199:18, 2232:11, 2295:19, 2305:18, 2306:5
**15,314** [1] - 2199:5
**1523** [1] - 2170:16
**16** [2] - 2194:7, 2259:20
**16th** [1] - 2201:10
**17** [2] - 2178:10, 2181:7
**17.2** [1] - 2282:10
**173:07** [1] - 2305:6
**175** [1] - 2303:14

**175:16** [1] - 2303:17
**176:15** [1] - 2305:10
**17th** [5] - 2173:17, 2200:25, 2201:1, 2201:10, 2236:21
**18** [1] - 2181:7
**180** [1] - 2182:17
**19** [1] - 2204:17
**19087** [1] - 2170:19
**1934** [3] - 2246:10, 2246:14, 2246:17
**1:59** [1] - 2320:16
**1st** [2] - 2223:4, 2223:14

## 2

**2** [1] - 2288:6
**2.2** [1] - 2294:11
**2.8** [1] - 2259:3
**2.9** [3] - 2257:4, 2263:6, 2280:21
**20** [9] - 2279:5, 2279:7, 2279:11, 2286:9, 2293:21, 2296:13, 2296:19, 2298:18, 2320:14
**20001** [2] - 2171:9, 2171:13
**20005** [1] - 2170:23
**20036** [1] - 2170:16
**2008** [12] - 2180:14, 2180:18, 2180:23, 2181:3, 2181:6, 2182:11, 2200:17, 2203:2, 2204:25, 2213:10, 2213:16, 2216:4
**2009** [4] - 2216:7, 2216:10, 2251:20, 2251:22
**2010** [2] - 2216:7, 2254:2
**2011** [17] - 2184:12, 2193:8, 2205:6, 2216:7, 2216:10, 2250:6, 2250:14, 2250:18, 2250:20, 2252:8, 2252:25, 2254:3, 2254:21, 2256:13, 2257:3, 2258:19, 2266:13
**2012** [77] - 2173:17, 2182:21, 2187:16, 2187:17, 2207:15, 2208:8, 2216:21, 2216:25, 2217:2, 2217:5, 2217:7, 2217:13, 2217:18, 2217:19, 2217:21,

**2218:6, 2218:8,**
2218:11, 2218:21, 2219:3, 2222:7, 2223:4, 2223:12, 2225:24, 2226:5, 2227:1, 2227:4, 2227:21, 2235:8, 2236:21, 2237:3, 2238:2, 2242:3, 2244:23, 2245:4, 2245:8, 2252:7, 2252:24, 2254:3, 2254:15, 2254:20, 2255:1, 2255:17, 2256:23, 2258:12, 2259:3, 2259:6, 2259:13, 2260:22, 2260:24, 2263:6, 2265:21, 2266:1, 2267:16, 2268:7, 2268:17, 2268:24, 2278:23, 2282:10, 2282:22, 2283:9, 2283:10, 2283:17, 2284:11, 2291:16, 2291:25, 2293:19, 2295:19, 2297:5, 2298:8, 2300:15, 2308:3, 2308:7, 2311:21, 2312:6, 2319:7
**2013** [3] - 2195:10, 2272:22, 2319:15
**2015** [2] - 2265:21, 2266:1
**2019** [2] - 2194:17, 2194:23
**202-354-3284** [1] - 2171:14
**2020** [1] - 2294:5
**2022** [6] - 2170:10, 2194:18, 2194:24, 2294:5, 2301:15, 2321:8
**21** [1] - 2319:10
**21(e** [2] - 2246:9, 2246:13
**21(e)** [1] - 2246:18
**21.2** [1] - 2181:20
**213** [2] - 2288:21, 2288:23
**216.15** [1] - 2305:10
**2173** [1] - 2172:4
**2187** [1] - 2172:4
**2204** [1] - 2172:5
**2207** [1] - 2172:10
**2218** [1] - 2172:11
**2222** [1] - 2172:12
**2239** [1] - 2172:13
**2243** [1] - 2172:6

**2276** [1] - 2172:7
**23rd** [2] - 2239:20, 2242:2
**259** [2] - 2227:15, 2234:23
**264** [2] - 2301:22
**264.4** [2] - 2301:10, 2301:14
**265** [1] - 2301:22
**266** [1] - 2301:22
**269** [1] - 2295:8
**273.1** [1] - 2301:7
**27th** [1] - 2219:3
**28** [1] - 2170:10
**280** [1] - 2170:19
**282** [3] - 2178:4, 2181:1, 2199:1
**28th** [1] - 2238:2
**29** [1] - 2321:8
**2:00** [3] - 2275:16, 2275:20, 2320:8
**2Q** [1] - 2222:7

## 3

**3** [9] - 2239:24, 2239:25, 2240:8, 2277:17, 2277:19, 2277:21, 2278:14, 2278:16, 2303:11
**3.0** [1] - 2257:13
**3.1** [1] - 2280:19
**3.53** [1] - 2254:2
**30** [7] - 2218:8, 2218:11, 2254:3, 2259:3, 2259:13, 2277:18
**30th** [5] - 2217:5, 2217:7, 2218:9, 2223:12, 2266:19
**31** [1] - 2266:13
**33** [4] - 2288:14, 2288:15
**333** [1] - 2171:12
**339** [1] - 2192:25
**34** [1] - 2289:15
**348.5** [1] - 2302:13
**34th** [1] - 2248:21
**36** [1] - 2283:2
**3A** [2] - 2239:24, 2240:14

## 4

**4** [1] - 2265:9
**4.08** [1] - 2254:3
**412** [2] - 2189:4, 2189:25
**45** [1] - 2217:10
**47** [2] - 2176:16,

2300:10
**4704-B** [1] - 2171:13
**472A** [3] - 2221:24,
2222:15, 2266:23
**499A** [4] - 2217:24,
2217:25, 2218:15,
2265:10

## 5

**5** [12] - 2208:8,
2219:10, 2245:11,
2246:16, 2251:14,
2261:5, 2263:2,
2265:6, 2282:6,
2282:15, 2293:9,
2303:10
**5.4** [2] - 2256:22,
2280:21
**5.8** [1] - 2259:5
**50** [2] - 2174:17,
2177:18
**500** [2] - 2181:1,
2199:1
**51** [3] - 2177:18,
2215:18, 2215:22
**560** [5] - 2237:5,
2237:12, 2237:21,
2239:1, 2239:6
**58** [3] - 2248:10,
2248:13, 2248:21

## 6

**6** [3] - 2252:13,
2295:6, 2295:10
**6.5** [4] - 2287:2,
2287:8, 2287:13,
2300:22
**601** [1] - 2171:8
**62** [2] - 2241:1, 2241:2

## 7

**7** [5] - 2184:12,
2256:17, 2260:24,
2267:1, 2298:8
**703** [2] - 2173:22,
2193:23
**74.4** [1] - 2302:12

## 8

**8** [6] - 2182:21,
2189:25, 2245:8,
2259:11, 2303:19,
2305:5
**8.5** [2] - 2258:13,
2259:4
**8.7** [7] - 2294:9,

2297:10, 2297:11,
2299:13, 2301:9,
2301:14, 2302:15
**8/14** [1] - 2231:15
**85** [2] - 2246:3,
2247:17
**87** [1] - 2248:19
**88** [1] - 2249:9

## 9

**9** [4] - 2298:19,
2303:14, 2305:8,
2306:11
**9.2** [1] - 2258:18
**912** [1] - 2199:17
**916** [2] - 2207:6,
2207:18
**927** [2] - 2199:16,
2199:17
**97** [1] - 2262:17
**9th** [4] - 2283:9,
2283:10, 2284:11,
2293:19

## A

**a.m** [2] - 2170:10,
2232:17
**AAA** [6] - 2196:23,
2197:4, 2197:9,
2317:6, 2317:7
**ability** [7] - 2186:11,
2186:15, 2186:18,
2186:22, 2192:2,
2220:15, 2226:11
**able** [12] - 2187:9,
2195:12, 2202:25,
2214:11, 2215:18,
2215:25, 2216:15,
2260:16, 2269:24,
2275:15, 2310:16,
2310:17
**abnormal** [1] - 2318:9
**above-entitled** [1] -
2321:5
**abreast** [1] - 2214:20
**absolute** [1] - 2256:12
**absolutely** [4] -
2281:21, 2312:19,
2315:13, 2319:18
**accelerate** [1] -
2235:22
**accelerated** [2] -
2236:4, 2236:8
**accepted** [2] - 2212:5,
2215:14
**access** [1] - 2197:19
**according** [2] -
2226:18, 2317:9

**Accountability** [1] -
2206:1
**Accountant** [4] -
2206:15, 2223:20,
2238:6, 2243:20
**accountant** [13] -
2182:15, 2205:3,
2206:10, 2209:18,
2209:21, 2209:23,
2214:23, 2227:24,
2238:5, 2283:19,
2283:22, 2283:24,
2284:11
**Accounting** [1] -
2205:25
**accounting** [29] -
2184:6, 2184:20,
2199:11, 2205:17,
2205:19, 2206:16,
2206:18, 2206:19,
2210:14, 2210:15,
2210:19, 2211:13,
2212:4, 2212:6,
2212:10, 2213:21,
2215:14, 2218:22,
2220:7, 2220:10,
2224:5, 2241:1,
2241:23, 2242:14,
2264:18, 2264:21,
2264:22, 2277:2,
2291:14
**accurate** [2] -
2263:11, 2307:9
**achieve** [1] - 2179:16
**achieved** [1] - 2267:6
**acknowledgment** [2] -
2244:11, 2244:16
**acquired** [1] - 2251:22
**Act** [3] - 2246:10,
2246:14, 2246:17
**acting** [5] - 2190:11,
2208:3, 2208:4,
2208:5, 2309:19
**action** [2] - 2318:17
**ACTION** [1] - 2170:9
**actions** [4] - 2179:6,
2195:20, 2195:21,
2251:19
**active** [1] - 2249:15
**activities** [1] - 2262:2
**activity** [2] - 2302:24,
2310:13
**actors** [1] - 2288:12
**actual** [37] - 2180:15,
2183:20, 2237:16,
2245:22, 2247:9,
2247:11, 2249:18,
2249:22, 2251:3,
2251:8, 2251:12,
2252:10, 2252:22,

2254:6, 2254:9,
2254:23, 2255:4,
2255:11, 2256:5,
2256:25, 2257:6,
2257:15, 2257:20,
2257:24, 2258:5,
2258:15, 2258:21,
2259:9, 2259:17,
2261:17, 2262:12,
2267:6, 2279:11,
2308:2, 2308:14,
2314:18, 2319:2
**actuality** [2] - 2311:11,
2311:12
**add** [5] - 2277:11,
2278:9, 2302:5,
2302:11, 2312:8
**adding** [1] - 2278:8
**addition** [4] - 2255:6,
2258:1, 2278:10,
2309:15
**additional** [2] -
2275:9, 2301:4
**address** [2] - 2175:22,
2175:25
**addressed** [4] -
2185:23, 2192:19,
2314:12, 2319:24
**addressing** [2] -
2179:21, 2282:6
**adds** [2] - 2277:13,
2312:11
**adequately** [1] -
2314:12
**admitted** [6] -
2173:22, 2245:2,
2260:21, 2273:11,
2275:6, 2304:24
**advanced** [1] -
2272:16
**advisor** [1] - 2208:3
**affect** [1] - 2200:14
**affected** [1] - 2197:20
**affects** [1] - 2288:1
**Afternoon** [1] -
2320:17
**afternoon** [4] -
2243:8, 2243:9,
2276:3, 2276:4
**aftershocks** [1] -
2200:17
**agencies** [6] -
2192:22, 2194:5,
2194:6, 2197:7,
2204:21
**Agency** [2] - 2171:6,
2204:14
**agency** [10] - 2174:11,
2205:3, 2206:12,
2208:18, 2209:5,

2214:23, 2237:14,
2243:21, 2244:1,
2244:20
**AGENCY** [1] - 2170:6
**agency's** [1] - 2209:2
**agent's** [1] - 2230:9
**ago** [4] - 2236:7,
2238:13, 2256:7,
2311:12
**agree** [7] - 2184:22,
2191:7, 2264:6,
2264:9, 2264:11,
2264:12, 2267:11
**agreed** [7] - 2191:11,
2191:19, 2283:11,
2311:22, 2313:11,
2314:2, 2314:9
**agreeing** [1] - 2314:15
**AGREEMENT** [1] -
2170:9
**agreement** [4] -
2240:1, 2240:6,
2252:20, 2259:15
**agreements** [1] -
2184:20
**agrees** [1] - 2269:25
**ahead** [4] - 2243:17,
2244:12, 2259:19,
2282:4
**aided** [1] - 2171:15
**AIG** [10] - 2174:19,
2174:20, 2174:23,
2174:24, 2175:3,
2175:4, 2175:8,
2175:15, 2175:23,
2176:4
**al** [2] - 2170:3, 2170:6
**Alfred** [1] - 2208:13
**allowance** [14] -
2218:6, 2218:21,
2218:22, 2222:7,
2240:23, 2241:8,
2241:21, 2255:21,
2255:25, 2256:4,
2269:1, 2271:5,
2272:8, 2272:12
**allowed** [2] - 2217:9,
2312:17
**almost** [2] - 2178:18,
2199:4
**alone** [1] - 2318:17
**alternative** [3] -
2184:25, 2185:9,
2313:3
**alternatively** [1] -
2235:23
**alternatives** [7] -
2179:11, 2179:13,
2179:14, 2179:20,
2201:13, 2201:16,

2317:5
**altogether** [2] -
2191:11, 2236:13
**Amendment** [48] -
2173:11, 2173:13,
2173:15, 2178:1,
2178:7, 2178:21,
2178:22, 2179:6,
2186:25, 2187:1,
2193:13, 2198:7,
2198:10, 2198:15,
2200:11, 2200:12,
2200:23, 2201:6,
2201:7, 2201:13,
2203:15, 2207:2,
2208:10, 2210:2,
2210:11, 2211:2,
2211:15, 2226:5,
2228:10, 2228:13,
2233:7, 2235:8,
2235:20, 2236:3,
2236:8, 2236:14,
2236:20, 2239:21,
2240:5, 2263:24,
2264:7, 2264:10,
2265:1, 2274:2,
2286:20, 2309:25,
2312:7, 2315:25
**amendment** [1] -
2228:7
**amendments** [4] -
2210:24, 2231:23,
2233:21, 2235:15
**Americas** [1] - 2171:4
**amount** [18] - 2175:19,
2181:22, 2184:1,
2202:3, 2211:11,
2212:17, 2277:6,
2278:4, 2281:4,
2301:11, 2301:13,
2301:15, 2301:20,
2312:9, 2312:10,
2312:25, 2313:12,
2313:19
**amounts** [1] - 2199:16
**analysis** [32] -
2177:25, 2179:19,
2191:18, 2213:2,
2216:12, 2217:10,
2221:1, 2222:6,
2222:11, 2223:22,
2224:19, 2226:10,
2226:18, 2231:1,
2241:1, 2241:4,
2241:7, 2241:17,
2241:18, 2242:5,
2242:12, 2242:13,
2271:24, 2272:2,
2272:24, 2315:24,
2316:15, 2317:24,

2318:1, 2318:2,
2318:15
**analyst** [6] - 2173:11,
2173:13, 2173:14,
2174:2, 2174:10,
2193:14
**analysts** [2] - 2191:6,
2262:3
**analyzed** [1] - 2316:2
**Andre** [1] - 2237:23
**announced** [3] -
2198:10, 2201:6,
2201:7
**announcement** [1] -
2317:10
**annual** [4] - 2243:10,
2243:13, 2248:25,
2259:24
**answer** [6] - 2179:17,
2215:8, 2260:7,
2266:6, 2291:3,
2291:6
**Answer** [1] - 2292:23
**answered** [3] -
2262:19, 2263:8,
2292:17
**anticipate** [1] -
2247:20
**anticipated** [1] -
2249:19
**apologies** [1] -
2265:13
**apologize** [1] - 2283:2
**apparent** [3] - 2226:4,
2226:6, 2227:6
**APPEARANCES** [2] -
2170:14, 2171:1
**application** [1] -
2246:21
**apply** [2] - 2212:20,
2215:13
**appreciate** [2] -
2187:25, 2204:9
**approach** [1] - 2180:2
**approving** [1] -
2226:16
**area** [3] - 2206:1,
2215:16, 2220:5
**areas** [1] - 2206:17
**arithmetic** [1] -
2282:14
**Arnold** [1] - 2171:8
**arrive** [1] - 2196:12
**article** [1] - 2191:1
**aspect** [1] - 2303:7
**assert** [3] - 2221:18,
2229:3, 2311:3
**assessing** [2] -
2179:9, 2210:25
**assessment** [3] -

2215:21, 2222:7,
2292:12
**asset** [35] - 2212:3,
2212:4, 2212:12,
2212:15, 2213:11,
2215:18, 2216:15,
2216:16, 2221:3,
2221:8, 2235:23,
2240:15, 2240:23,
2241:15, 2277:7,
2277:8, 2277:9,
2277:14, 2277:20,
2277:21, 2277:23,
2278:3, 2278:4,
2278:7, 2278:12,
2278:14, 2278:15,
2278:19, 2281:7,
2281:19, 2284:12,
2284:19, 2291:18
**assets** [29] - 2199:13,
2199:15, 2199:16,
2211:23, 2211:25,
2212:7, 2212:14,
2212:20, 2212:21,
2212:24, 2213:13,
2214:12, 2225:9,
2226:12, 2226:13,
2229:21, 2230:18,
2231:19, 2236:10,
2236:15, 2236:24,
2276:12, 2276:15,
2276:19, 2276:21,
2277:4, 2284:14,
2291:19
**assume** [3] - 2191:13,
2206:21, 2273:12
**assumes** [1] - 2195:12
**assuming** [2] -
2277:17, 2292:9
**assumptions** [3] -
2195:16, 2249:13,
2262:12
**Attached** [1] - 2238:10
**attached** [1] - 2238:12
**attaching** [3] - 2219:1,
2222:23, 2273:21
**attachment** [7] -
2183:10, 2183:11,
2190:22, 2190:25,
2207:11, 2239:14,
2296:3
**attachments** [1] -
2298:15
**attack** [1] - 2299:21
**attacked** [1] - 2290:12
**Attari** [41] - 2173:7,
2178:13, 2180:9,
2180:11, 2180:23,
2185:22, 2187:24,
2188:2, 2189:1,

2189:5, 2191:5,
2193:3, 2199:23,
2202:11, 2203:2,
2203:22, 2276:9,
2276:18, 2276:21,
2280:5, 2283:24,
2284:21, 2287:14,
2290:18, 2303:5,
2307:13, 2308:19,
2309:23, 2310:4,
2311:16, 2311:20,
2313:5, 2313:16,
2313:25, 2314:9,
2314:18, 2317:1,
2317:19, 2318:21,
2319:10, 2320:1
**ATTARI** [1] - 2172:4
**Attari's** [4] - 2311:25,
2314:10, 2314:24,
2316:14
**attendance** [1] -
2268:25
**attended** [1] - 2268:20
**attention** [1] - 2219:16
**attributed** [1] -
2181:19
**attributes** [1] - 2290:1
**audit** [1] - 2231:4
**auditing** [4] - 2206:16,
2210:19, 2210:20,
2210:22
**auditing-related** [1] -
2206:16
**auditor** [2] - 2210:21,
2223:3
**auditor's** [1] - 2229:3
**auditors** [5] - 2228:18,
2228:21, 2228:22,
2228:23, 2229:11
**August** [27] - 2173:17,
2187:17, 2200:25,
2201:1, 2201:10,
2217:18, 2217:21,
2223:4, 2223:14,
2225:24, 2226:5,
2227:21, 2235:7,
2236:21, 2237:3,
2238:2, 2239:20,
2242:2, 2245:8,
2260:24, 2266:20,
2295:19, 2298:8,
2308:3, 2311:21,
2319:7
**authored** [1] - 2188:6
**auto** [1] - 2227:16
**automatically** [1] -
2310:24
**available** [17] -
2179:11, 2196:4,
2196:5, 2211:12,

2267:3, 2294:14,
2297:24, 2298:24,
2300:14, 2301:7,
2301:11, 2301:15,
2301:21, 2302:13,
2313:12, 2313:19
**Avenue** [5] - 2170:16,
2170:22, 2171:4,
2171:8, 2171:12
**avoid** [2] - 2278:3,
2278:16
**aware** [16] - 2175:21,
2267:24, 2267:25,
2268:1, 2268:6,
2268:9, 2268:10,
2268:16, 2268:23,
2269:2, 2269:9,
2269:10, 2269:12,
2269:13, 2270:18,
2295:3

**B**

**backing** [1] - 2205:8
**backstop** [2] -
2190:14, 2190:18
**bad** [4] - 2197:11,
2197:13, 2197:14,
2256:14
**BALA** [2] - 2172:7,
2275:25
**Bala** [1] - 2275:22
**balance** [14] - 2181:2,
2181:8, 2181:20,
2182:10, 2182:13,
2277:5, 2277:9,
2284:14, 2284:20,
2291:21, 2302:8,
2302:9, 2302:11
**balances** [1] - 2213:11
**ball** [1] - 2221:15
**bank** [3] - 2203:4,
2203:12, 2309:6
**Bank** [6] - 2189:6,
2189:11, 2191:1,
2191:6, 2195:1,
2195:3
**banks** [3] - 2206:14,
2309:9, 2310:21
**bar** [1] - 2302:19
**barely** [1] - 2227:10
**Barnes** [3] - 2179:24,
2180:5, 2198:18
**BARNES** [6] -
2170:15, 2180:2,
2180:5, 2180:8,
2185:21, 2187:21
**based** [11] - 2190:4,
2194:24, 2229:23,
2242:2, 2245:19,

2249:13, 2261:12,
2262:11, 2299:17,
2318:10, 2318:14
**basic** [1] - 2314:17
**basis** [9] - 2184:1,
2184:5, 2184:15,
2214:7, 2231:19,
2271:1, 2294:14,
2318:9, 2318:11
**became** [1] - 2204:24
**become** [2] - 2186:19,
2224:10
**becomes** [1] - 2277:15
**becoming** [4] -
2186:17, 2186:21,
2200:19, 2200:21
**BEFORE** [2] - 2170:1,
2170:12
**began** [2] - 2203:19,
2213:14
**beginning** [6] -
2183:18, 2187:16,
2195:10, 2225:24,
2242:5, 2251:14
**behalf** [6] - 2173:7,
2179:25, 2180:5,
2232:22, 2269:6,
2273:18
**behind** [1] - 2284:9
**below** [8] - 2181:18,
2197:4, 2197:10,
2249:10, 2280:1,
2281:4, 2296:7,
2296:10
**bench** [7] - 2232:21,
2234:15, 2270:9,
2274:23, 2291:1,
2304:12, 2305:1
**Bench** [3] - 2269:5,
2273:17, 2290:15
**benchmark** [1] -
2201:2
**benefit** [5] - 2218:20,
2221:4, 2255:15,
2257:13, 2257:17
**Benson** [11] - 2188:6,
2189:1, 2298:11,
2300:16, 2303:10,
2303:11, 2305:5,
2305:17, 2306:10,
2307:23, 2308:15
**Benson's** [6] - 2188:3,
2188:14, 2188:18,
2188:20, 2188:23,
2303:6
**Berger** [1] - 2171:3
**Bergman** [1] - 2304:13
**BERGMAN** [9] -
2171:6, 2280:7,
2290:9, 2298:4,

2299:18, 2304:6,
2304:10, 2304:13,
2319:23
**Berkley** [2] - 2170:15,
2180:5
**Bernstein** [1] - 2171:3
**best** [6] - 2187:12,
2202:19, 2224:17,
2278:17, 2292:12
**better** [12] - 2183:12,
2252:25, 2308:5,
2308:7, 2308:14,
2308:15, 2308:17,
2310:18, 2319:11,
2319:20, 2320:2
**between** [12] -
2197:21, 2206:5,
2212:8, 2230:10,
2233:11, 2235:2,
2300:21, 2308:25,
2310:11, 2315:2,
2319:14
**big** [3] - 2211:12,
2279:8, 2280:22
**bigger** [5] - 2301:7,
2301:13, 2308:12,
2312:23, 2315:9
**bill** [1] - 2212:21
**billion** [73] - 2175:9,
2175:14, 2181:7,
2181:11, 2181:20,
2182:3, 2182:14,
2183:20, 2184:2,
2184:12, 2199:12,
2199:13, 2199:16,
2199:17, 2199:18,
2199:20, 2203:11,
2240:22, 2241:1,
2241:2, 2256:22,
2257:4, 2257:13,
2258:13, 2258:18,
2259:3, 2259:4,
2259:5, 2263:6,
2277:6, 2279:21,
2279:22, 2280:19,
2280:21, 2282:6,
2282:10, 2282:16,
2287:1, 2287:2,
2287:3, 2287:4,
2287:8, 2287:13,
2294:9, 2294:11,
2294:14, 2297:10,
2297:11, 2297:16,
2297:18, 2299:13,
2300:20, 2300:22,
2301:9, 2301:14,
2301:22, 2302:12,
2302:13, 2302:15,
2319:17, 2319:20,
2320:3

**binder** [9] - 2178:10,
2246:16, 2288:6,
2288:16, 2292:2,
2293:9, 2295:6,
2303:10, 2303:11
**bit** [13] - 2175:6,
2177:19, 2194:12,
2195:6, 2207:1,
2207:6, 2210:4,
2211:23, 2219:12,
2227:17, 2241:24,
2241:25, 2271:23
**biweekly** [2] -
2237:18, 2239:16
**block** [1] - 2219:14
**Bloomberg** [1] -
2186:7
**blow** [1] - 2229:6
**board** [23] - 2187:6,
2230:12, 2230:14,
2230:17, 2230:21,
2231:1, 2231:5,
2231:6, 2231:9,
2231:18, 2285:4,
2292:10, 2292:22,
2293:5, 2293:12,
2293:15, 2293:18,
2294:15, 2294:17,
2294:20, 2301:23,
2307:7
**boards** [1] - 2229:22
**body** [2] - 2183:5,
2238:10
**Boies** [1] - 2170:22
**bond** [18] - 2173:12,
2177:22, 2197:11,
2197:17, 2198:1,
2199:24, 2199:25,
2200:6, 2200:23,
2314:20, 2315:3,
2315:4, 2317:3,
2317:5, 2317:8,
2318:16
**bondholders** [10] -
2185:24, 2186:2,
2186:25, 2187:8,
2313:22, 2314:3,
2314:4, 2314:8,
2314:14, 2315:10
**bonds** [15] - 2177:12,
2178:16, 2186:4,
2187:2, 2187:15,
2192:12, 2192:14,
2192:16, 2192:23,
2201:2, 2315:6,
2317:1, 2317:2,
2318:7, 2318:8
**book** [8] - 2199:10,
2199:11, 2225:5,
2251:21, 2253:12,

2253:16, 2255:7,
2257:20
**books** [1] - 2217:10
**borrowed** [1] - 2279:3
**borrower** [2] -
2186:11, 2186:15
**borrower's** [2] -
2186:18, 2186:22
**boss** [1] - 2234:7
**bottom** [15] - 2177:19,
2182:3, 2193:5,
2199:2, 2199:4,
2221:10, 2223:21,
2227:19, 2251:15,
2254:13, 2258:7,
2258:23, 2261:23,
2289:9, 2297:15
**bound** [1] - 2320:17
**Bowler** [1] - 2273:20
**box** [1] - 2218:1
**Brad** [2] - 2268:12,
2268:13
**break** [7] - 2227:7,
2232:11, 2232:13,
2233:16, 2234:24,
2235:13, 2271:23
**Brian** [1] - 2180:5
**BRIAN** [11] - 2170:15
**briefly** [11] - 2206:9,
2212:2, 2221:23,
2269:4, 2286:17,
2300:12, 2308:24,
2309:2, 2309:3,
2312:3, 2312:4
**bring** [3] - 2244:25,
2263:19, 2309:21
**bringing** [1] - 2284:19
**broader** [1] - 2221:21
**brought** [1] - 2277:4
**buffer** [1] - 2309:19
**bullet** [17] - 2248:3,
2248:6, 2248:7,
2248:13, 2248:21,
2249:10, 2252:2,
2252:5, 2253:7,
2253:11, 2253:15,
2253:21, 2254:8,
2283:6, 2283:16,
2284:9, 2284:15
**Burns** [2] - 2209:9,
2209:10
**business** [13] -
2210:23, 2249:15,
2251:21, 2251:23,
2253:12, 2253:16,
2255:7, 2257:20,
2262:2, 2272:14,
2309:9, 2310:18,
2311:7
**buy** [3] - 2309:5,

2309:17, 2315:11
**buying** [1] - 2315:11
**BY** [34] - 2173:9,
2173:25, 2180:8,
2185:21, 2187:23,
2189:23, 2191:25,
2192:8, 2194:2,
2204:4, 2207:22,
2222:19, 2234:21,
2237:11, 2239:5,
2242:9, 2243:7,
2262:22, 2263:18,
2266:5, 2270:11,
2270:16, 2271:4,
2271:17, 2273:9,
2276:2, 2279:10,
2280:10, 2291:2,
2295:16, 2298:6,
2300:2, 2305:2,
2319:25

## C

**calculate** [1] - 2280:18
**calculations** [1] -
2221:21
**callout** [2] - 2283:2,
2283:4
**calmer** [2] - 2200:19,
2200:21
**cap** [3] - 2195:9,
2287:5, 2294:14
**Capital** [1] - 2173:17
**capital** [8] - 2194:17,
2194:22, 2196:14,
2196:16, 2203:12,
2203:13, 2203:17,
2203:18
**capture** [1] - 2242:11
**care** [3] - 2313:25,
2314:1, 2320:10
**career** [1] - 2206:6
**carefully** [1] - 2250:5
**carrying** [1] - 2253:6
**Case** [2] - 2170:4,
2170:8
**case** [18] - 2179:19,
2180:18, 2181:25,
2187:14, 2190:5,
2191:18, 2193:11,
2197:18, 2212:16,
2214:5, 2241:21,
2245:1, 2280:25,
2286:16, 2286:18,
2289:7, 2297:1,
2320:9
**cases** [1] - 2280:23
**cash** [18] - 2181:5,
2183:20, 2183:25,
2184:1, 2184:6,

2184:10, 2202:7,
2277:15, 2277:22,
2277:24, 2278:4,
2278:7, 2278:16,
2312:6, 2312:8,
2314:7
**catch** [1] - 2241:16
**categories** [2] -
2177:9, 2197:9
**causing** [1] - 2314:13
**cautionary** [2] -
2251:10, 2262:23
**cautioned** [1] - 2250:3
**cc** [1] - 2223:16
**CEO** [3] - 2182:24,
2291:25, 2295:25
**certain** [5] - 2229:21,
2242:16, 2251:7,
2271:8, 2304:23
**certainly** [1] - 2308:12
**certainty** [3] - 2251:6,
2282:19, 2282:20
**CERTIFICATE** [1] -
2321:1
**certification** [1] -
2205:19
**certify** [1] - 2321:3
**cetera** [1] - 2289:23
**CFO** [8] - 2183:2,
2237:4, 2237:19,
2238:11, 2239:9,
2239:11, 2239:16,
2240:21
**chain** [3] - 2227:17,
2228:16, 2233:7
**chance** [1] - 2307:14
**change** [19] - 2173:12,
2176:14, 2178:15,
2207:1, 2211:22,
2276:18, 2277:12,
2277:24, 2281:1,
2285:7, 2285:14,
2293:23, 2293:24,
2294:12, 2306:19,
2313:11, 2313:18,
2314:3, 2314:7
**changed** [2] -
2176:15, 2177:19
**changes** [8] -
2210:25, 2228:18,
2228:24, 2239:25,
2240:5, 2243:24,
2244:3, 2245:20
**changing** [1] -
2277:23
**characterize** [1] -
2280:11
**characterized** [2] -
2178:25, 2234:5
**characterizes** [1] -

2190:19
**charge** [2] - 2219:22,
2309:10
**charge-offs** [1] -
2219:22
**charged** [2] - 2310:20,
2311:14
**chart** [3] - 2188:7,
2293:22, 2296:20
**charts** [1] - 2302:19
**check** [2] - 2186:6,
2247:14
**Check** [1] - 2170:18
**checked** [2] - 2211:19
**checking** [1] - 2229:4
**Chief** [4] - 2206:15,
2223:19, 2238:6,
2243:20
**chief** [11] - 2205:3,
2206:10, 2209:2,
2209:3, 2209:18,
2209:20, 2214:23,
2227:24, 2237:4,
2267:16, 2291:15
**chief-type** [1] - 2209:3
**choose** [1] - 2312:7
**chores** [2] - 2320:10,
2320:11
**circular** [11] - 2179:21,
2185:25, 2186:3,
2192:23, 2240:12,
2286:19, 2286:24,
2287:5, 2287:7,
2288:1, 2288:2
**circularity** [2] -
2211:9, 2211:16
**circulated** [3] -
2223:1, 2223:3,
2223:7
**circumstance** [1] -
2220:14
**circumstances** [4] -
2220:12, 2220:17,
2245:20, 2261:16
**Class** [1] - 2170:17
**CLASS** [1] - 2170:9
**clear** [12] - 2176:3,
2178:25, 2186:10,
2242:6, 2276:6,
2276:25, 2278:2,
2289:10, 2289:11,
2289:17, 2289:21
**click** [1] - 2302:14
**client** [1] - 2179:25
**clip** [4] - 2188:23,
2304:9, 2305:23,
2306:11
**clips** [1] - 2303:14
**closed** [1] - 2217:11
**colleague** [1] -

2187:13
**college** [3] - 2205:9,
2205:10, 2205:13
**College** [1] - 2205:10
**colloquially** [1] -
2208:18
**COLUMBIA** [1] -
2170:1
**Columbia** [1] -
2171:12
**column** [1] - 2199:4
**combination** [2] -
2182:5, 2204:20
**combined** [9] -
2182:5, 2182:13,
2195:9, 2284:15,
2300:14, 2300:21,
2302:20, 2302:22,
2302:24
**comfortable** [2] -
2317:16, 2317:17
**coming** [10] - 2175:24,
2187:6, 2187:10,
2187:11, 2276:5,
2291:20, 2302:8,
2302:16, 2318:5
**comment** [2] -
2316:16, 2316:17
**commenting** [2] -
2206:24, 2286:8
**comments** [1] -
2316:7
**commitment** [43] -
2175:4, 2175:11,
2175:25, 2176:22,
2185:24, 2190:18,
2194:12, 2194:23,
2195:5, 2195:10,
2196:3, 2196:6,
2196:9, 2196:17,
2196:19, 2196:25,
2197:24, 2202:12,
2202:17, 2202:20,
2202:22, 2203:10,
2203:19, 2211:12,
2236:17, 2285:11,
2287:10, 2293:25,
2297:1, 2301:19,
2313:9, 2313:10,
2313:17, 2314:13,
2314:21, 2316:22,
2318:23, 2319:7,
2319:12, 2319:20,
2319:21, 2320:3
**commitments** [1] -
2176:13
**committee** [3] -
2231:4, 2268:8,
2268:17
**common** [6] -

2177:15, 2182:5,
2225:19, 2231:3,
2231:7, 2263:1
**communicate** [1] -
2262:1
**communications** [1] -
2262:4
**companies** [3] -
2184:7, 2202:25,
2236:13
**company** [10] -
2197:12, 2197:13,
2197:19, 2199:15,
2210:22, 2213:5,
2215:12, 2217:9,
2265:22, 2266:12
**company's** [4] -
2197:11, 2197:14,
2197:17
**comparable** [1] -
2175:7
**compare** [4] -
2202:16, 2227:13,
2297:7, 2300:7
**compared** [4] -
2252:7, 2254:3,
2254:20, 2301:11
**comparison** [5] -
2256:14, 2257:2,
2258:17, 2315:5,
2318:10
**compensated** [1] -
2311:1
**completed** [1] -
2226:15
**completeness** [1] -
2206:24
**complicated** [1] -
2212:3
**component** [4] -
2175:10, 2220:10,
2236:3, 2236:4
**components** [2] -
2176:11, 2235:22
**comprehensive** [30] -
2248:23, 2248:24,
2256:18, 2256:22,
2257:3, 2258:12,
2258:18, 2259:4,
2259:22, 2259:23,
2260:17, 2263:5,
2277:11, 2277:12,
2278:10, 2279:18,
2279:21, 2280:6,
2280:13, 2280:16,
2280:20, 2280:25,
2281:2, 2281:11,
2281:12, 2281:13,
2283:17, 2307:17,
2307:20, 2307:21

**compromising** [1] -
2192:3
**computed** [1] -
2280:17
**computer** [1] -
2171:15
**computer-aided** [1] -
2171:15
**concern** [33] -
2185:23, 2186:11,
2186:14, 2187:20,
2192:23, 2210:20,
2210:21, 2211:1,
2211:3, 2211:13,
2211:14, 2211:18,
2211:21, 2229:1,
2229:3, 2229:16,
2286:19, 2286:24,
2287:6, 2296:25,
2297:2, 2314:12,
2314:13, 2315:10,
2315:14, 2315:19,
2316:25, 2317:13,
2318:12, 2318:14,
2318:16, 2318:18
**concerned** [4] -
2186:2, 2186:22,
2313:24, 2317:17
**concerning** [1] -
2262:2
**concerns** [3] -
2210:25, 2211:18,
2314:20
**conclude** [3] -
2210:13, 2211:5,
2216:9
**concluded** [12] -
2174:10, 2185:14,
2210:15, 2211:2,
2211:20, 2216:14,
2216:17, 2225:23,
2231:18, 2272:3,
2272:25, 2273:1
**concluding** [3] -
2220:1, 2221:1,
2225:13
**conclusion** [14] -
2177:19, 2214:25,
2216:22, 2217:20,
2223:7, 2223:21,
2223:24, 2224:8,
2226:1, 2229:4,
2267:4, 2272:6,
2272:16, 2318:5
**conclusions** [4] -
2178:15, 2200:6,
2274:3, 2294:3
**condition** [2] -
2249:18, 2249:20
**conditions** [3] -

2249:12, 2249:22, 2312:6

**conference** [10] - 2232:21, 2234:15, 2269:5, 2270:9, 2273:17, 2274:23, 2290:15, 2291:1, 2304:12, 2305:1

**confidence** [1] - 2177:22

**confident** [1] - 2186:18

**confronted** [1] - 2317:19

**confusing** [1] - 2302:19

**confusion** [1] - 2188:13

**conjunction** [1] - 2214:3

**connected** [1] - 2310:13

**connection** [2] - 2174:9, 2310:11

**conscious** [1] - 2275:14

**consensus** [2] - 2196:12, 2229:19

**conservatorship** [11] - 2184:11, 2203:16, 2209:14, 2213:10, 2213:14, 2219:20, 2220:13, 2230:9, 2262:6, 2316:20

**conserve** [2] - 2236:15, 2236:17

**consider** [1] - 2179:20

**considered** [5] - 2180:17, 2189:15, 2193:10, 2193:22, 2250:20

**considering** [2] - 2250:5, 2284:17

**consistent** [3] - 2219:6, 2223:6, 2235:19

**constitute** [1] - 2246:8

**Constitution** [1] - 2171:12

**contain** [1] - 2262:5

**contained** [1] - 2249:23

**contains** [3] - 2245:18, 2273:23, 2274:2

**contentious** [1] - 2196:12

**contents** [2] - 2244:14, 2246:15

**context** [7] - 2178:14,

2202:15, 2240:17, 2250:5, 2256:15, 2300:10, 2303:18

**contingent** [4] - 2194:17, 2194:22, 2196:14, 2196:16

**continue** [1] - 2232:8

**Continued** [1] - 2173:8

**continued** [3] - 2170:25, 2219:22, 2258:2

**CONTINUED** [1] - 2171:1

**Continued)..** [1] - 2172:4

**contract** [1] - 2191:14

**conversation** [2] - 2241:11, 2241:14

**conversely** [4] - 2186:14, 2186:21, 2315:16, 2315:18

**Cooper** [1] - 2170:15

**copied** [3] - 2209:20, 2237:24, 2264:1

**copy** [1] - 2178:11

**copying** [1] - 2273:21

**corner** [1] - 2193:5

**corollary** [1] - 2222:8

**corporate** [2] - 2317:3, 2317:5

**corporations** [1] - 2315:7

**correct** [55] - 2173:12, 2175:13, 2175:23, 2176:9, 2176:18, 2176:23, 2177:24, 2179:1, 2179:7, 2180:19, 2184:16, 2184:21, 2186:8, 2189:3, 2208:9, 2213:4, 2213:15, 2214:1, 2214:19, 2216:20, 2217:22, 2218:24, 2224:1, 2227:5, 2229:2, 2230:19, 2236:5, 2237:25, 2247:16, 2251:2, 2251:5, 2264:5, 2265:4, 2266:22, 2267:18, 2272:19, 2279:24, 2280:15, 2283:13, 2283:15, 2283:20, 2283:24, 2286:10, 2287:7, 2287:15, 2294:7, 2296:2, 2306:15, 2308:1, 2308:11, 2311:2, 2311:9, 2311:10,

2313:21, 2321:4

**corrections** [1] - 2296:16

**correctly** [1] - 2175:5

**corresponding** [1] - 2255:15

**cost** [2] - 2183:13, 2183:14

**costs** [1] - 2197:18

**counsel** [10] - 2188:3, 2193:1, 2199:23, 2200:5, 2201:12, 2208:17, 2234:19, 2263:11, 2304:7, 2320:14

**Counsel** [2] - 2208:22, 2303:20

**count** [1] - 2319:1

**counted** [1] - 2248:10

**couple** [4] - 2174:15, 2210:18, 2279:4, 2308:18

**course** [3] - 2239:17, 2274:18, 2277:5

**Court** [5] - 2171:11, 2171:11, 2222:1, 2233:4, 2304:16

**COURT** [50] - 2170:1, 2173:4, 2180:1, 2180:3, 2185:18, 2189:22, 2191:23, 2192:6, 2193:24, 2203:23, 2207:20, 2218:17, 2220:22, 2222:17, 2232:9, 2232:13, 2232:15, 2232:18, 2234:9, 2234:13, 2234:16, 2234:18, 2239:3, 2242:23, 2243:2, 2243:4, 2262:20, 2263:15, 2266:4, 2270:8, 2270:15, 2271:3, 2271:13, 2271:15, 2273:8, 2274:22, 2274:25, 2275:3, 2275:7, 2275:12, 2275:19, 2275:23, 2290:16, 2290:25, 2300:1, 2304:25, 2320:7, 2320:13, 2321:1, 2321:9

**court** [3] - 2173:2, 2188:24, 2320:15

**Court's** [4] - 2191:4, 2233:2, 2237:10, 2273:14

**courtroom** [6] - 2173:3, 2232:14,

2234:17, 2280:12, 2308:9, 2320:12

**COURTROOM** [10] - 2193:25, 2232:6, 2279:9, 2295:14, 2298:3, 2298:5, 2303:20, 2303:22, 2303:24, 2304:2

**cover** [7] - 2219:1, 2239:7, 2260:17, 2283:18, 2293:11, 2293:12, 2320:18

**covered** [1] - 2309:3

**covering** [2] - 2206:2, 2209:13

**cowers** [1] - 2307:4

**CPA** [1] - 2205:20

**create** [1] - 2292:18

**created** [3] - 2204:20, 2212:7, 2212:15

**credible** [1] - 2292:18

**credit** [15] - 2192:11, 2192:12, 2192:21, 2194:3, 2194:5, 2194:6, 2195:13, 2196:22, 2197:6, 2212:13, 2213:7, 2253:22, 2255:16, 2257:13, 2257:17

**creditors** [3] - 2195:24, 2196:2, 2313:22

**credits** [1] - 2216:19

**crisis** [5] - 2174:21, 2184:8, 2187:4, 2187:5, 2203:3

**criticize** [1] - 2284:22

**criticized** [3] - 2284:25, 2287:14, 2311:16

**CROSS** [3] - 2173:8, 2180:7, 2243:6

**Cross** [2] - 2172:4, 2172:6

**cross** [1] - 2242:23

**CROSS-EXAMINATION** [3] - 2173:8, 2180:7, 2243:6

**Cross-Examination** [1] - 2172:4

**Cross-Examination..** ............ [1] - 2172:6

**cross-examine** [1] - 2242:23

**CRR** [1] - 2171:11

**cue** [1] - 2204:7

**cumulative** [11] - 2219:19, 2220:6, 2224:11, 2224:12,

2234:17, 2280:12, 2308:9, 2320:12

2224:24, 2225:5, 2262:19, 2263:8, 2263:17, 2290:9, 2319:24

**current** [11] - 2195:24, 2196:1, 2197:4, 2205:2, 2205:3, 2219:13, 2231:19, 2245:19, 2261:12, 2262:11, 2265:14

**curve** [1] - 2315:9

---

## D

**D.C** [6] - 2170:9, 2170:16, 2170:23, 2171:9, 2171:13, 2205:24

**data** [3] - 2186:8, 2316:2, 2317:9

**date** [17] - 2176:9, 2178:21, 2183:13, 2195:6, 2218:7, 2218:10, 2223:1, 2223:12, 2239:15, 2250:8, 2258:8, 2261:14, 2261:17, 2266:17, 2267:6, 2271:8, 2283:7

**DATE** [1] - 2321:9

**dated** [3] - 2218:8, 2219:2, 2266:19

**Dave** [1] - 2188:3

**David** [3] - 2298:11, 2304:13, 2307:23

**DAVID** [1] - 2171:6

**DAVIS** [1] - 2170:21

**days** [8] - 2217:9, 2217:10, 2233:7, 2235:8, 2236:20, 2276:8, 2295:21, 2298:25

**deal** [2] - 2271:6, 2319:16

**dealing** [1] - 2271:20

**debt** [1] - 2177:9

**debts** [1] - 2192:3

**December** [1] - 2266:13

**decide** [1] - 2316:5

**decides** [1] - 2206:19

**decision** [7] - 2179:12, 2264:23, 2264:24, 2264:25, 2265:1, 2265:2, 2316:5

**deck** [2] - 2296:6, 2305:17

**decline** [5] - 2174:10, 2258:2, 2316:16,

2318:9, 2318:11
**declined** [2] - 2201:8, 2254:1
**declining** [2] - 2317:9, 2317:14
**decrease** [1] - 2257:18
**decreased** [1] - 2175:19
**defaulted** [1] - 2309:16
**defendant** [2] - 2274:6, 2275:4
**Defendant** [1] - 2171:5
**defendant's** [1] - 2274:15
**defendants** [13] - 2185:15, 2203:25, 2207:17, 2218:14, 2232:23, 2269:7, 2273:12, 2273:19, 2274:7, 2275:13, 2297:1, 2304:14, 2313:23
**DEFENDANTS** [1] - 2204:2
**Defendants** [1] - 2170:7
**Defendants'** [16] - 2189:4, 2189:24, 2192:25, 2198:23, 2199:1, 2207:6, 2207:18, 2217:23, 2218:15, 2221:24, 2222:15, 2237:5, 2237:12, 2237:21, 2239:1, 2239:6
**defendants'** [2] - 2222:14, 2276:9
**defense** [4] - 2174:17, 2176:7, 2275:8, 2275:11
**Defense** [1] - 2180:22
**defer** [1] - 2191:7
**deferred** [48] - 2191:10, 2211:23, 2211:24, 2212:2, 2212:4, 2212:7, 2212:12, 2212:15, 2212:20, 2212:21, 2212:24, 2213:11, 2213:13, 2214:12, 2221:8, 2225:9, 2226:11, 2226:12, 2229:21, 2230:18, 2236:24, 2240:15, 2240:23, 2241:15, 2276:11, 2276:15, 2276:19, 2276:21, 2277:4, 2277:14,

2277:19, 2277:20, 2277:21, 2277:23, 2278:3, 2278:4, 2278:7, 2278:14, 2278:15, 2278:19, 2281:7, 2281:19, 2284:12, 2284:13, 2284:19, 2291:18, 2291:19
**deficit)** [1] - 2199:7
**defined** [1] - 2220:4
**definitely** [1] - 2291:13
**degree** [2] - 2183:25, 2205:23
**delegates** [1] - 2209:17
**delinquency** [3] - 2254:1, 2255:8, 2258:2
**Deloitte** [1] - 2228:22
**demand** [4] - 2184:25, 2185:4, 2185:8, 2185:11
**DeMarco** [11] - 2190:6, 2190:7, 2190:10, 2190:11, 2190:19, 2208:5, 2228:4, 2283:11, 2285:25, 2286:21, 2319:19
**DeMarco's** [1] - 2264:24
**demonstrate** [3] - 2231:23, 2233:21, 2235:15
**demonstrated** [2] - 2224:14, 2226:11
**demonstrative** [1] - 2279:5
**demonstratives** [2] - 2283:1, 2300:11
**Denver** [1] - 2205:17
**Department** [4] - 2175:9, 2175:14, 2175:22, 2273:21, 2273:25, 2274:3
**Department's** [1] - 2194:10
**deposition** [30] - 2176:25, 2185:5, 2185:10, 2185:13, 2188:4, 2188:18, 2188:20, 2188:24, 2267:25, 2268:6, 2269:9, 2275:10, 2283:25, 2286:6, 2287:22, 2288:4, 2288:6, 2288:16, 2288:23, 2289:6,

2290:17, 2292:3, 2303:12, 2304:8, 2304:19, 2304:20, 2305:25, 2310:15, 2311:18, 2315:24
**depositions** [1] - 2286:6
**deputies** [1] - 2233:10
**DEPUTY** [10] - 2193:25, 2232:6, 2279:9, 2295:14, 2298:3, 2298:5, 2303:20, 2303:22, 2303:24, 2304:2
**deputy** [1] - 2227:24
**DeRita** [14] - 2174:5, 2174:17, 2177:17, 2177:18, 2178:4, 2178:12, 2248:5, 2263:19, 2265:12, 2288:9, 2291:4, 2292:7, 2294:4, 2297:6
**describe** [3] - 2220:13, 2227:9, 2277:1
**described** [5] - 2189:1, 2249:23, 2261:18, 2262:13, 2317:7
**describing** [2] - 2228:1, 2239:8
**description** [1] - 2242:1
**designated** [5] - 2288:6, 2288:16, 2303:11, 2303:12, 2304:8
**designations** [3] - 2303:14, 2303:21, 2305:8
**designed** [4] - 2178:22, 2231:23, 2233:21, 2235:15
**detail** [1] - 2261:3
**detailed** [4] - 2226:10, 2226:15, 2231:16, 2274:1
**details** [1] - 2200:3
**determination** [1] - 2241:19
**determine** [4] - 2186:2, 2213:17, 2214:11, 2215:13
**determined** [2] - 2176:21, 2225:8
**Deutsche** [6] - 2189:6, 2189:11, 2191:1, 2191:6, 2195:1, 2195:3

**Dharan** [7] - 2275:22, 2275:23, 2276:3, 2293:8, 2300:3, 2300:4, 2319:24
**DHARAN** [2] - 2172:7, 2275:25
**Dharan's** [3] - 2184:18, 2283:1, 2299:21
**differ** [5] - 2245:23, 2249:19, 2249:22, 2261:17, 2262:13
**difference** [9] - 2197:21, 2262:21, 2297:10, 2301:18, 2308:24, 2315:2, 2315:9, 2319:14, 2319:17
**differences** [1] - 2212:8
**different** [18] - 2173:21, 2174:24, 2176:10, 2177:9, 2194:25, 2195:3, 2195:6, 2199:25, 2222:9, 2223:23, 2260:10, 2260:13, 2260:20, 2285:9, 2287:15, 2288:15, 2301:15, 2307:14
**differently** [1] - 2247:9
**difficult** [1] - 2224:10
**difficulty** [1] - 2200:13
**diluting** [1] - 2302:25
**DIRECT** [2] - 2204:3, 2276:1
**direct** [9] - 2180:12, 2189:6, 2193:16, 2198:5, 2201:21, 2219:16, 2299:16, 2299:19, 2299:21
**Direct** [2] - 2172:5, 2172:7
**directed** [2] - 2210:7, 2210:10
**director** [4] - 2190:11, 2208:3, 2208:4, 2208:5
**disagree** [2] - 2184:18, 2184:22
**disagreeing** [2] - 2184:5, 2184:15
**disagrees** [1] - 2269:22
**disclosed** [1] - 2235:20
**disclosures** [1] - 2206:21
**discrepancy** [2] - 2176:9, 2176:10

**discuss** [3] - 2230:25, 2236:23, 2264:17
**discussed** [6] - 2189:11, 2211:20, 2229:22, 2250:5, 2264:19, 2270:5
**discussion** [8] - 2192:15, 2192:21, 2228:18, 2230:17, 2230:21, 2240:5, 2275:10, 2304:15
**Discussion** [1] - 2232:16
**discussions** [1] - 2314:19
**display** [8] - 2173:20, 2173:22, 2178:3, 2193:1, 2193:21, 2232:25, 2234:22, 2239:6
**displayed** [1] - 2222:20
**dispute** [2] - 2270:17, 2270:21
**disrupt** [1] - 2197:14
**disrupted** [1] - 2200:17
**disruptions** [1] - 2200:17
**distant** [2] - 2269:2, 2270:20
**DISTRICT** [3] - 2170:1, 2170:1, 2170:13
**District** [2] - 2171:11, 2171:12
**dividend** [29] - 2191:8, 2191:10, 2191:16, 2191:20, 2192:2, 2194:14, 2194:16, 2202:3, 2211:9, 2211:11, 2248:25, 2252:18, 2259:24, 2260:18, 2279:22, 2280:7, 2280:14, 2281:3, 2281:8, 2281:12, 2283:18, 2307:17, 2312:6, 2312:8, 2312:10, 2312:20, 2312:21, 2319:15
**dividends** [10] - 2192:23, 2194:9, 2195:7, 2195:8, 2259:5, 2280:17, 2280:25, 2281:13, 2306:22, 2307:3
**Doctor** [1] - 2173:5
**document** [65] - 2182:18, 2183:7, 2189:10, 2191:3,

2193:3, 2193:6,
2207:4, 2207:8,
2210:9, 2218:2,
2219:1, 2221:23,
2222:3, 2222:8,
2222:9, 2224:7,
2225:4, 2225:20,
2232:25, 2233:4,
2233:5, 2234:4,
2234:23, 2237:8,
2237:20, 2243:24,
2253:4, 2260:14,
2260:20, 2264:23,
2265:5, 2265:25,
2266:3, 2266:18,
2267:1, 2274:15,
2283:4, 2285:17,
2285:23, 2286:7,
2286:9, 2287:14,
2287:24, 2288:4,
2289:3, 2293:11,
2293:13, 2293:21,
2294:15, 2294:21,
2296:13, 2297:20,
2298:18, 2298:19,
2298:21, 2299:8,
2299:12, 2299:17,
2299:22, 2299:23,
2304:2, 2304:3,
2305:6, 2307:23
**documents** [14] -
2180:17, 2206:23,
2225:22, 2263:20,
2271:12, 2274:18,
2274:19, 2275:6,
2275:9, 2290:24,
2294:19, 2295:1,
2299:24, 2299:25
**doling** [1] - 2210:5
**dollars** [1] - 2287:4
**done** [9] - 2203:8,
2221:11, 2266:20,
2271:25, 2272:2,
2284:9, 2301:2,
2301:3, 2316:3
**down** [67] - 2175:17,
2181:8, 2184:23,
2187:6, 2187:10,
2187:11, 2187:17,
2187:19, 2192:9,
2195:2, 2197:1,
2197:8, 2198:3,
2199:22, 2203:23,
2210:4, 2210:9,
2212:25, 2213:5,
2213:14, 2213:16,
2214:11, 2214:14,
2214:15, 2215:1,
2215:9, 2216:4,
2216:16, 2218:23,

2221:22, 2224:9,
2225:20, 2231:23,
2233:16, 2233:22,
2235:16, 2235:23,
2236:10, 2236:19,
2241:2, 2241:24,
2248:20, 2250:2,
2251:15, 2253:11,
2254:13, 2258:7,
2258:23, 2261:22,
2267:13, 2271:19,
2271:21, 2271:23,
2271:24, 2272:10,
2272:17, 2275:3,
2278:4, 2278:18,
2299:2, 2305:9,
2310:23, 2310:25,
2312:17, 2312:23,
2315:12, 2319:6
**downgraded** [1] -
2192:15
**downgrades** [1] -
2192:22
**downgrading** [1] -
2192:16
**downward** [1] -
2200:20
**Dr** [48] - 2173:7,
2178:13, 2180:9,
2180:11, 2180:23,
2184:18, 2185:22,
2187:24, 2188:2,
2189:1, 2189:5,
2191:5, 2193:3,
2199:23, 2202:11,
2203:2, 2203:22,
2276:9, 2276:18,
2276:21, 2280:5,
2283:24, 2284:21,
2287:14, 2290:18,
2300:4, 2303:5,
2307:13, 2308:19,
2309:23, 2310:4,
2311:16, 2311:20,
2311:25, 2313:5,
2313:16, 2313:25,
2314:9, 2314:10,
2314:18, 2314:24,
2316:14, 2317:1,
2317:19, 2318:21,
2319:10, 2319:24,
2320:1
**draft** [8] - 2210:1,
2210:11, 2243:19,
2243:22, 2244:13,
2284:25, 2287:16,
2294:16
**drafted** [1] - 2219:7
**drafts** [2] - 2300:8,
2301:16

**dramatic** - 2268:3
**draw** [13] - 2179:21,
2252:19, 2259:14,
2286:19, 2286:24,
2287:6, 2288:1,
2288:2, 2302:16,
2302:18, 2313:12,
2313:19, 2319:6
**drawing** [1] - 2203:19
**drawn** [2] - 2194:12,
2277:2
**draws** [6] - 2184:19,
2185:25, 2186:3,
2240:9, 2240:12,
2287:7
**driven** [1] - 2257:18
**drop** [1] - 2191:20
**dropped** [2] - 2197:17,
2317:21
**DTA** [24] - 2214:2,
2214:8, 2215:8,
2215:13, 2215:15,
2216:2, 2216:12,
2217:20, 2221:13,
2223:7, 2223:21,
2223:25, 2224:19,
2225:17, 2231:1,
2271:19, 2271:21,
2271:25, 2272:17,
2272:25, 2302:5,
2302:8, 2302:9,
2302:11
**DTAs** [24] - 2212:24,
2213:9, 2213:16,
2214:12, 2214:25,
2215:25, 2216:4,
2216:10, 2216:19,
2217:14, 2221:17,
2225:14, 2225:23,
2226:7, 2227:7,
2230:21, 2231:11,
2242:4, 2242:7,
2269:1, 2270:19,
2272:9, 2302:4,
2302:12
**due** [7] - 2219:18,
2219:21, 2245:24,
2257:12, 2257:18,
2261:19, 2262:14
**Dunn** [1] - 2295:17
**during** [9] - 2174:20,
2185:4, 2185:10,
2203:2, 2216:10,
2259:6, 2285:24,
2291:25, 2309:20
**DX-460** [1] - 2273:11
**DX-472A** [1] - 2222:18
**DX-472A** .................
........................... [1]
- 2172:12

**DX-476** [1] - 2245:2
**DX-477** [1] - 2260:20
**DX-499** [1] - 2218:18
**DX-499** ....................
........................... [1] -
2172:11
**DX-499A** [2] - 2265:5,
2265:10
**DX-538** [1] - 2173:24
**DX-560** [1] - 2239:4
**DX-560** ....................
........................... [1] -
2172:13
**DX-916** [2] - 2207:21,
2263:19
**DX-916** ....................
........................... [1] -
2172:10
**dynamics** [1] -
2184:25

---

# E

**e-mail** [57] - 2178:6,
2178:14, 2178:17,
2178:20, 2182:19,
2182:20, 2183:5,
2183:10, 2188:7,
2190:1, 2190:2,
2190:7, 2207:11,
2207:23, 2207:24,
2208:6, 2208:8,
2209:20, 2209:22,
2219:1, 2219:2,
2222:25, 2227:17,
2227:19, 2227:20,
2228:15, 2229:5,
2230:20, 2231:11,
2231:21, 2233:6,
2233:8, 2233:12,
2233:14, 2233:17,
2234:3, 2234:6,
2235:1, 2235:7,
2235:11, 2237:7,
2238:1, 2238:2,
2238:10, 2239:7,
2239:11, 2264:1,
2264:3, 2264:14,
2273:20, 2273:23,
2295:17, 2296:7,
2296:10, 2296:15,
2298:1
**e-mailed** [1] - 2237:23
**e-mails** [1] - 2222:22
**Earlham** [1] - 2205:10
**early** [3] - 2217:17,
2217:21, 2266:20
**earned** [1] - 2197:21
**earning** [1] - 2306:22
**earnings** [10] - 2182:6,

2188:7, 2198:9,
2227:8, 2227:10,
2236:1, 2248:23,
2259:22, 2289:22,
2307:24
**easier** [2] - 2178:11,
2282:25
**economic** [1] -
2249:14
**economically** [1] -
2179:10
**economist** [2] -
2209:2, 2209:22
**Ed** [4] - 2208:5,
2228:3, 2228:4,
2283:11
**edits** [1] - 2183:6
**education** [1] -
2205:22
**effect** [2] - 2176:22,
2200:10
**effective** [1] - 2223:12
**effectively** [3] -
2278:9, 2301:21,
2304:17
**efficient** [1] - 2276:6
**eight** [2] - 2298:25,
2299:8
**either** [4] - 2265:3,
2276:17, 2291:24,
2295:25
**elicited** [2] - 2269:8,
2269:14
**eliminate** [1] -
2194:16
**elsewhere** [2] -
2200:18, 2297:8
**embedded** [1] -
2173:21
**emphasize** [2] -
2278:1, 2286:1
**empirical** [1] -
2316:15
**employee** [3] -
2208:21, 2223:19,
2268:13
**end** [20] - 2180:13,
2181:3, 2181:6,
2182:10, 2183:14,
2184:12, 2197:3,
2197:10, 2213:22,
2217:4, 2217:7,
2217:12, 2217:17,
2217:19, 2223:8,
2225:24, 2266:8,
2282:4, 2284:7
**End** [5] - 2234:15,
2270:9, 2274:23,
2291:1, 2305:1
**endeavored** [1] -

2292:17
**ended** [2] - 2217:3, 2217:4
**ending** [1] - 2240:12
**ends** [1] - 2217:16
**enlarge** [2] - 2174:5, 2178:12
**ensure** [2] - 2206:24, 2211:1
**entered** [3] - 2173:3, 2213:10, 2234:17
**entering** [1] - 2179:6
**enterprise** [1] - 2281:24
**Enterprise** [1] - 2204:22
**enterprises** [5] - 2211:10, 2228:12, 2277:10, 2280:24, 2312:5
**entire** [1] - 2197:9
**entities** [2] - 2206:17, 2237:15
**entitled** [5] - 2174:2, 2174:6, 2177:19, 2234:7, 2321:5
**entity** [1] - 2278:21
**entry** [2] - 2181:9, 2181:18
**equal** [2] - 2256:3, 2279:21
**equity** [23] - 2174:25, 2175:1, 2175:9, 2175:14, 2175:19, 2175:22, 2176:3, 2177:9, 2182:3, 2199:7, 2199:12, 2199:18, 2202:25, 2203:11, 2203:12, 2203:13, 2203:17, 2203:18, 2287:19, 2287:20, 2287:23
**equivalence** [1] - 2181:5
**Eric** [3] - 2243:5, 2269:20, 2274:5
**ERIC** [1] - 2170:18
**erode** [1] - 2313:9
**eroded** [1] - 2185:24
**eroding** [4] - 2211:11, 2296:25, 2301:19, 2314:13
**erosion** [10] - 2287:9, 2287:11, 2299:5, 2299:7, 2299:10, 2299:11, 2299:13, 2300:23, 2300:25, 2314:21
**especially** [2] - 2284:14, 2287:12

**ESQ** [12] - 2170:15, 2170:17, 2170:18, 2170:20, 2170:21, 2170:21, 2171:2, 2171:2, 2171:6, 2171:6, 2171:7, 2171:7
**essentially** [4] - 2197:21, 2293:22, 2301:10, 2301:17
**establishing** [1] - 2263:10
**estimate** [3] - 2202:19, 2224:17, 2247:20
**estimates** [3] - 2213:21, 2249:14, 2262:12
**et** [3] - 2170:3, 2170:6, 2289:23
**Europe** [1] - 2200:18
**evaluating** [1] - 2242:4
**event** [2] - 2177:24, 2200:6
**events** [5] - 2200:18, 2249:13, 2249:22, 2250:10, 2261:16
**eventually** [1] - 2204:24, 2206:3
**evidence** [57] - 2178:4, 2180:21, 2182:18, 2190:4, 2191:19, 2193:25, 2194:1, 2207:5, 2207:18, 2207:21, 2215:20, 2215:21, 2217:24, 2218:14, 2218:18, 2219:18, 2220:2, 2220:3, 2221:6, 2221:13, 2221:24, 2222:14, 2222:18, 2223:25, 2224:2, 2224:4, 2224:5, 2224:11, 2227:16, 2233:5, 2234:23, 2237:6, 2239:4, 2242:15, 2245:2, 2260:21, 2263:13, 2263:16, 2267:3, 2270:24, 2270:25, 2273:12, 2275:12, 2295:13, 2298:2, 2303:22, 2303:23, 2303:25, 2304:5, 2304:16, 2304:24, 2305:24, 2314:18
**exact** [1] - 2297:9
**exactly** [12] - 2276:25, 2278:6, 2285:12,

2286:5, 2294:3, 2297:2, 2298:14, 2300:7, 2301:1, 2301:16, 2302:23, 2315:18
**Examination** [1] - 2172:4
**EXAMINATION** [6] - 2173:8, 2180:7, 2187:22, 2204:3, 2243:6, 2276:1
**examination** [4] - 2189:6, 2193:16, 2198:5, 2201:21
**Examination........... ** [1] - 2172:4
**Examination............. ** [2] - 2172:5, 2172:7
**Examination............ . ** [1] - 2172:6
**examinations** [1] - 2209:8
**examine** [1] - 2242:23
**examines** [2] - 2183:24, 2184:10
**example** [3] - 2183:24, 2277:16, 2309:16
**exceeding** [1] - 2299:18
**except** [1] - 2250:10
**exception** [5] - 2221:8, 2221:10, 2221:15, 2225:16, 2225:18
**excerpts** [1] - 2292:3
**excess** [2] - 2248:24, 2259:24
**exchange** [2] - 2235:1, 2278:7
**Exchange** [3] - 2246:10, 2246:14, 2246:17
**excluded** [1] - 2221:21
**excludes** [1] - 2196:13
**exclusion** [1] - 2225:9
**executed** [1] - 2226:5
**executive** [16] - 2188:6, 2208:24, 2209:5, 2209:8, 2209:10, 2209:13, 2209:16, 2222:2, 2238:8, 2251:16, 2253:7, 2253:10, 2260:9, 2268:8, 2268:17
**exhausting** [1] - 2286:24
**exhibit** [25] - 2222:21, 2239:14, 2245:11,

2246:4, 2247:17, 2248:19, 2251:15, 2256:16, 2261:5, 2261:22, 2263:2, 2263:23, 2274:6, 2274:7, 2274:10, 2274:19, 2288:17, 2288:20, 2288:25, 2304:4, 2304:18, 2305:24, 2305:25, 2306:3, 2306:5
**Exhibit** [23] - 2178:3, 2180:22, 2182:17, 2189:4, 2189:25, 2192:25, 2198:23, 2199:1, 2207:6, 2207:18, 2217:24, 2218:15, 2221:24, 2222:15, 2227:15, 2234:22, 2237:5, 2237:12, 2239:1, 2288:21, 2288:22, 2288:23, 2295:8
**EXHIBITS** [1] - 2172:9
**exhibits** [2] - 2244:25, 2304:22
**exist** [1] - 2297:3
**existed** [1] - 2314:13
**existence** [1] - 2242:18
**existing** [1] - 2267:6
**exists** [1] - 2297:4
**exit** [1] - 2219:19
**exited** [2] - 2232:14, 2320:12
**exiting** [1] - 2220:13
**expect** [8] - 2178:24, 2186:18, 2187:7, 2247:20, 2252:24, 2253:16, 2259:23, 2260:16
**expectation** [1] - 2248:22
**expectations** [4] - 2245:19, 2249:12, 2261:12, 2262:11
**expected** [5] - 2174:10, 2180:16, 2228:7, 2272:14, 2283:17
**expecting** [1] - 2284:18
**expects** [1] - 2266:12
**expenses** [1] - 2266:8
**experience** [2] - 2248:22, 2259:21
**experienced** [2] - 2252:6, 2254:18
**experiencing** [1] - 2227:11

**expert** [7] - 2185:1, 2185:14, 2185:16, 2197:16, 2209:11, 2276:9, 2299:21
**experts** [1] - 2231:5
**explain** [8] - 2199:8, 2277:3, 2286:17, 2300:12, 2308:24, 2312:3, 2314:11, 2316:13
**explained** [3] - 2201:23, 2202:2, 2320:2
**explanation** [2] - 2185:1, 2185:9
**explanations** [1] - 2281:16
**explicit** [3] - 2196:13, 2316:20, 2316:22
**expresses** [1] - 2186:14
**extend** [1] - 2200:12

**F**

**facility** [1] - 2196:18
**fact** [18] - 2175:21, 2211:5, 2213:13, 2220:6, 2225:1, 2268:2, 2269:17, 2272:22, 2278:11, 2280:24, 2281:1, 2294:15, 2294:19, 2295:3, 2296:25, 2307:3, 2310:23, 2311:6
**factor** [3] - 2227:12, 2231:9, 2284:19
**factors** [15] - 2245:24, 2249:14, 2249:21, 2249:25, 2250:5, 2250:6, 2250:14, 2250:17, 2250:20, 2250:21, 2250:23, 2250:24, 2255:13, 2261:19, 2262:15
**facts** [4] - 2262:10, 2263:10, 2314:15, 2317:12
**fading** [1] - 2187:5
**fair** [2] - 2202:16, 2212:13
**FAIRHOLME** [1] - 2170:3
**fall** [1] - 2197:6
**familiar** [3] - 2211:24, 2246:14, 2246:15
**family** [4] - 2253:16, 2253:25, 2257:19, 2258:2

**Fannie** [130] -
2176:12, 2180:18,
2180:23, 2181:2,
2181:5, 2182:21,
2182:24, 2183:2,
2183:13, 2183:25,
2184:10, 2186:4,
2187:2, 2187:8,
2188:6, 2192:11,
2192:12, 2192:22,
2194:17, 2194:24,
2195:21, 2197:19,
2197:25, 2198:11,
2198:18, 2199:19,
2201:2, 2201:8,
2201:9, 2202:1,
2202:6, 2203:3,
2203:14, 2206:13,
2206:17, 2212:19,
2213:9, 2214:6,
2214:10, 2214:24,
2215:23, 2216:3,
2216:9, 2216:13,
2217:20, 2219:2,
2219:18, 2220:1,
2220:17, 2220:19,
2221:1, 2221:11,
2222:8, 2223:23,
2225:18, 2225:22,
2226:6, 2226:20,
2226:22, 2226:25,
2228:21, 2228:22,
2230:10, 2230:14,
2230:25, 2231:17,
2235:21, 2236:24,
2237:4, 2238:9,
2239:16, 2241:5,
2242:3, 2243:10,
2243:16, 2244:2,
2244:6, 2244:10,
2244:18, 2245:3,
2254:10, 2255:20,
2261:6, 2267:17,
2268:7, 2268:13,
2268:17, 2269:1,
2270:18, 2272:24,
2279:12, 2279:19,
2281:25, 2282:3,
2282:24, 2284:11,
2286:15, 2287:1,
2287:12, 2289:11,
2289:17, 2291:24,
2293:12, 2293:15,
2293:18, 2294:8,
2295:25, 2297:14,
2299:11, 2300:14,
2300:21, 2302:22,
2306:21, 2307:1,
2307:6, 2308:2,
2309:4, 2309:17,
2309:19, 2310:1,

2310:12, 2310:25,
2311:4, 2311:13,
2315:3, 2315:14,
2315:20, 2319:2
**FANNIE** [1] - 2170:8
**far** [1] - 2242:3
**fast** [1] - 2187:11
**faster** [3] - 2187:19,
2283:3, 2317:21
**fear** [1] - 2183:19
**feasible** [1] - 2179:15
**features** [1] - 2235:20
**Fed** [2] - 2174:20,
2175:4
**Federal** [3] - 2171:5,
2204:14, 2204:22
**FEDERAL** [1] - 2170:6
**federal** [4] - 2204:20,
2206:14, 2208:21,
2250:10
**fee** [8] - 2175:25,
2202:17, 2202:20,
2309:11, 2310:12,
2310:20, 2311:1,
2311:13
**fees** [1] - 2202:12
**few** [8] - 2205:8,
2208:10, 2233:14,
2235:12, 2236:20,
2259:19, 2262:17,
2276:8
**FHFA** [34] - 2178:6,
2178:17, 2178:20,
2179:5, 2189:15,
2190:11, 2191:7,
2204:15, 2204:16,
2204:17, 2204:20,
2204:24, 2205:2,
2206:4, 2206:6,
2206:11, 2207:12,
2207:25, 2208:3,
2208:19, 2209:19,
2214:17, 2223:16,
2223:20, 2230:13,
2264:6, 2264:9,
2264:16, 2268:12,
2268:14, 2270:17,
2286:20, 2314:19,
2316:20
**FHFA's** [4] - 2178:14,
2206:10, 2209:22,
2230:10
**figure** [2] - 2183:20,
2212:10
**file** [5] - 2243:10,
2243:16, 2243:20,
2244:6, 2244:17
**filed** [5] - 2216:11,
2226:2, 2243:25,
2245:8, 2260:24

**filing** [5] - 2214:3,
2243:23, 2244:12,
2244:18, 2262:24
**filings** [4] - 2206:22,
2243:22, 2251:10,
2263:13
**final** [3] - 2285:4,
2296:3, 2302:15
**finalized** [2] - 2223:14,
2226:2
**finally** [1] - 2209:15
**Finance** [2] - 2171:6,
2204:14
**FINANCE** [1] - 2170:6
**finance** [1] - 2205:16
**financial** [36] -
2174:21, 2184:7,
2185:12, 2203:3,
2206:2, 2206:21,
2213:23, 2213:24,
2214:5, 2214:8,
2217:4, 2219:21,
2220:18, 2231:2,
2231:5, 2237:4,
2240:1, 2242:16,
2249:18, 2249:20,
2252:3, 2252:6,
2252:24, 2253:7,
2254:11, 2254:14,
2254:19, 2256:7,
2263:4, 2267:16,
2282:22, 2284:5,
2291:15, 2292:11,
2311:20
**financing** [3] -
2197:15, 2197:18,
2197:19
**findings** [1] - 2185:1
**fine** [4] - 2228:19,
2228:24, 2234:13,
2239:15
**finish** [1] - 2275:15
**finished** [1] - 2205:21
**first** [70] - 2183:10,
2189:18, 2189:24,
2195:20, 2207:4,
2208:7, 2208:13,
2216:21, 2218:25,
2222:21, 2227:8,
2227:19, 2227:20,
2233:14, 2233:17,
2235:12, 2237:7,
2237:20, 2238:3,
2239:13, 2239:25,
2246:7, 2251:19,
2252:2, 2252:5,
2252:7, 2252:8,
2253:7, 2253:25,
2254:2, 2254:15,
2254:18, 2254:20,

2254:21, 2255:1,
2255:16, 2256:21,
2257:10, 2258:11,
2258:12, 2258:18,
2259:2, 2259:6,
2259:12, 2261:6,
2263:3, 2263:4,
2264:2, 2266:19,
2272:22, 2273:1,
2273:24, 2275:21,
2278:22, 2279:11,
2279:17, 2279:20,
2280:18, 2284:5,
2284:8, 2289:10,
2297:20, 2301:5,
2305:4, 2307:19,
2309:24, 2314:4,
2316:15, 2316:18,
2316:25
**five** [2] - 2199:2,
2284:15
**fixed** [1] - 2197:25
**fleeting** [1] - 2198:12
**flexibility** [2] - 2313:2
**Flexner** [1] - 2170:22
**flow** [1] - 2314:7
**focus** [10] - 2194:7,
2216:24, 2217:25,
2223:1, 2227:19,
2235:13, 2239:15,
2239:24, 2287:25,
2288:2
**focused** [2] - 2174:1,
2286:12
**focusing** [3] -
2285:12, 2286:14,
2298:22
**folks** [1] - 2318:19
**followed** [2] -
2236:23, 2240:14
**following** [4] - 2178:7,
2178:17, 2183:7,
2224:12
**FOR** [3] - 2170:1,
2204:2, 2275:25
**forecast** [12] - 2188:7,
2219:13, 2220:16,
2224:16, 2242:16,
2242:17, 2242:19,
2247:21, 2265:14,
2266:17, 2286:25,
2298:22
**forecasted** [3] -
2219:22, 2219:23,
2220:24
**forecasting** [5] -
2221:2, 2221:3,
2265:22, 2266:1,
2266:7
**forecasts** [4] -

2224:10, 2224:18,
2240:1, 2249:12
**foregoing** [1] - 2321:3
**foreseeable** [1] -
2266:14
**forget** [1] - 2284:7
**Form** [9] - 2245:3,
2250:6, 2250:15,
2250:18, 2260:22,
2261:11, 2261:14,
2261:17, 2262:5
**form** [1] - 2180:15
**formal** [3] - 2208:17,
2214:25, 2218:5
**formed** [3] - 2280:12,
2308:9
**forming** [2] - 2180:17,
2289:7
**formulating** [2] -
2193:10, 2291:8
**forth** [6] - 2226:16,
2233:7, 2233:11,
2235:2, 2235:7,
2314:19
**Forward** [1] - 2190:13
**forward** [47] -
2195:17, 2204:8,
2229:24, 2231:8,
2245:18, 2245:21,
2245:22, 2245:24,
2246:3, 2246:5,
2246:9, 2246:22,
2246:25, 2247:5,
2247:8, 2247:19,
2248:1, 2248:14,
2249:4, 2249:11,
2249:17, 2249:20,
2249:23, 2250:3,
2250:7, 2250:9,
2250:22, 2250:25,
2251:7, 2251:11,
2252:11, 2253:3,
2253:10, 2253:19,
2254:9, 2260:3,
2260:4, 2260:12,
2261:11, 2261:14,
2261:16, 2261:23,
2262:5, 2262:14,
2262:23, 2272:15,
2300:15
**forward-looking** [42] -
2245:18, 2245:21,
2245:22, 2245:24,
2246:3, 2246:5,
2246:9, 2246:22,
2246:25, 2247:5,
2247:8, 2247:19,
2248:1, 2248:14,
2249:4, 2249:11,
2249:17, 2249:20,

2249:23, 2250:3,
2250:7, 2250:9,
2250:22, 2250:25,
2251:7, 2251:11,
2252:11, 2253:3,
2253:10, 2253:19,
2254:9, 2260:3,
2260:4, 2260:12,
2261:11, 2261:14,
2261:16, 2261:23,
2262:5, 2262:14,
2262:23, 2272:15
**forwarding** [1] -
2296:10
**foundation** [5] -
2191:22, 2192:5,
2269:21, 2269:25,
2270:2
**four** [6] - 2199:2,
2213:22, 2233:16,
2265:21, 2280:23,
2301:20
**four-year** [1] - 2265:21
**fourth** [2] - 2263:4,
2301:16
**framework** [1] -
2212:5
**Fraser** [2] - 2296:10,
2298:8
**Fraser's** [1] - 2296:15
**Freddie** [87] - 2176:13,
2186:4, 2187:2,
2187:8, 2192:12,
2192:22, 2194:17,
2194:24, 2195:22,
2197:19, 2197:25,
2198:12, 2201:3,
2201:9, 2201:10,
2202:6, 2203:3,
2203:14, 2206:13,
2206:17, 2212:19,
2213:9, 2214:6,
2214:10, 2214:24,
2215:23, 2216:3,
2216:9, 2216:13,
2217:20, 2222:6,
2222:10, 2222:11,
2223:2, 2223:3,
2223:21, 2224:2,
2225:13, 2225:22,
2226:6, 2226:20,
2226:22, 2227:3,
2228:21, 2228:22,
2230:10, 2230:14,
2230:25, 2231:17,
2243:10, 2243:16,
2244:2, 2244:6,
2244:10, 2244:18,
2260:22, 2263:9,
2266:23, 2273:3,

2279:12, 2279:13,
2279:19, 2279:20,
2286:15, 2287:3,
2287:12, 2296:16,
2297:14, 2299:2,
2299:5, 2299:7,
2300:14, 2300:21,
2302:22, 2302:23,
2306:21, 2307:1,
2308:2, 2310:1,
2310:12, 2310:25,
2311:4, 2311:13,
2315:3, 2315:15,
2315:20, 2319:2
**Freddie's** [1] -
2192:11
**Friday** [1] - 2228:8
**front** [1] - 2306:1
**full** [3] - 2230:12,
2230:14, 2283:18
**fully** [1] - 2195:13
**function** [1] - 2209:11
**fundamental** [1] -
2281:1
**funding** [17] -
2185:24, 2285:10,
2285:13, 2286:14,
2286:23, 2287:5,
2288:1, 2293:25,
2294:13, 2296:22,
2297:10, 2297:24,
2298:23, 2298:24,
2300:14, 2302:13,
2302:24
**funds** [1] - 2252:19
**FUNDS** [1] - 2170:3
**furthermore** [3] -
2194:8, 2194:9,
2274:11
**future** [40] - 2212:16,
2212:18, 2212:19,
2215:19, 2220:11,
2220:20, 2224:11,
2224:16, 2224:18,
2225:10, 2226:7,
2226:13, 2227:7,
2231:8, 2231:12,
2240:9, 2249:12,
2249:16, 2250:9,
2250:23, 2251:1,
2251:6, 2253:20,
2260:16, 2266:14,
2269:2, 2270:20,
2271:15, 2272:11,
2272:13, 2272:20,
2277:10, 2282:18,
2282:19, 2282:21,
2284:15, 2308:12,
2312:12, 2312:16,
2312:21

**G**

**GAAP** [6] - 2184:2,
2212:5, 2212:8,
2215:15, 2215:16,
2265:22
**Galeano** [3] - 2237:23,
2238:7, 2238:8
**GAO** [1] - 2205:25
**gears** [2] - 2207:1,
2211:22
**General** [2] - 2205:25,
2208:22
**general** [2] - 2208:17,
2231:6
**generally** [4] - 2187:6,
2200:21, 2212:5,
2215:14
**generate** [4] -
2214:24, 2248:24,
2259:23, 2260:16
**generated** [2] -
2252:14, 2252:17
**gentlemen** [1] -
2320:7
**genuine** [1] - 2296:25
**given** [14] - 2209:20,
2212:11, 2224:21,
2228:18, 2228:24,
2231:22, 2233:21,
2235:15, 2241:18,
2256:1, 2267:7,
2272:13, 2292:22,
2305:5
**glass** [1] - 2204:7
**GLUCK** [1] - 2171:2
**go-ahead** [1] -
2243:17
**go-between** [1] -
2230:10
**goals** [1] - 2177:21
**golden** [4] - 2188:7,
2307:24, 2308:10,
2308:15
**Government** [1] -
2206:1
**government** [13] -
2175:10, 2183:13,
2195:22, 2277:16,
2277:17, 2278:13,
2278:15, 2306:23,
2307:2, 2307:4,
2314:7, 2316:19,
2316:23
**government's** [2] -
2195:20, 2195:21
**Grant** [2] - 2274:13,
2274:18
**graph** [1] - 2300:19
**graphically** [1] -

2299:17
**great** [2] - 2231:8,
2313:1
**greater** [3] - 2215:22,
2266:8, 2308:8
**Greenlee** [1] - 2209:6
**Greenlee's** [1] -
2209:7
**Griffin** [17] - 2227:21,
2227:23, 2227:24,
2228:6, 2228:12,
2228:17, 2229:20,
2230:16, 2231:22,
2231:24, 2233:8,
2233:9, 2233:24,
2234:2, 2235:2,
2235:4, 2235:14
**Griffin's** [2] - 2229:7,
2234:6
**Grossmann** [1] -
2171:3
**grounds** [1] - 2274:21
**group** [2] - 2208:22,
2221:18
**grow** [8] - 2186:23,
2202:3, 2202:4,
2202:7, 2251:21
**GSE** [4] - 2195:23,
2196:12, 2307:24,
2317:1
**GSE/PSPA** [1] -
2190:13
**GSEs** [11] - 2174:24,
2174:25, 2195:12,
2196:14, 2316:23,
2317:4, 2317:18,
2318:7, 2318:13,
2318:22, 2319:19
**guarantee** [9] -
2310:12, 2310:17,
2310:20, 2310:24,
2311:1, 2311:7,
2316:18, 2316:19,
2316:23
**guaranteeing** [1] -
2309:10
**guarantees** [1] -
2249:16
**guidance** [1] -
2206:16

**H**

**half** [13] - 2176:14,
2176:15, 2184:7,
2252:7, 2252:8,
2254:15, 2254:20,
2254:21, 2255:1,
2255:16, 2258:12,
2258:19, 2259:6

**Hamish** [1] - 2275:13
**HAMISH** [1] - 2170:20
**Hampshire** [1] -
2170:16
**hand** [1] - 2199:4
**handed** [1] - 2242:25
**handful** [1] - 2318:6
**handled** [1] - 2278:12
**handy** [1] - 2243:1
**harbor** [5] - 2246:22,
2246:25, 2247:11,
2248:17, 2249:7
**hard** [2] - 2178:11,
2255:5
**head** [1] - 2209:7
**header** [1] - 2253:4
**heading** [15] - 2246:5,
2246:7, 2251:16,
2254:14, 2254:18,
2256:18, 2256:21,
2258:8, 2258:11,
2258:23, 2259:2,
2261:23, 2263:3,
2265:14, 2267:2
**hear** [13] - 2204:9,
2232:19, 2250:16,
2270:6, 2276:8,
2276:11, 2276:14,
2311:25, 2313:4,
2314:10, 2314:16,
2320:3, 2320:5
**heard** [12] - 2206:11,
2206:22, 2230:4,
2267:24, 2268:4,
2269:4, 2276:17,
2278:25, 2279:2,
2284:21, 2300:6,
2310:15
**hearsay** [4] - 2239:2,
2273:23, 2274:4,
2274:21
**held** [3] - 2205:4,
2237:19, 2247:4
**help** [6] - 2188:17,
2208:6, 2212:16,
2219:25, 2282:14,
2309:19
**helped** [2] - 2211:5,
2211:6
**helpful** [2] - 2288:10,
2297:23
**helps** [2] - 2221:4,
2255:25
**hi** [1] - 2204:12
**hide** [1] - 2221:15
**high** [4] - 2174:12,
2211:24, 2212:7,
2290:2
**high-quality** [1] -
2174:12

**higher** [8] - 2186:10, 2255:8, 2297:20, 2297:22, 2299:9, 2310:20, 2315:8, 2315:13
**highlight** [10] - 2199:3, 2199:6, 2219:15, 2224:8, 2225:5, 2233:17, 2242:1, 2267:5, 2294:4, 2297:5
**highlighted** [6] - 2176:20, 2177:1, 2220:24, 2233:6, 2233:20, 2235:14
**historical** [1] - 2262:10
**history** [3] - 2205:12, 2220:6, 2282:10
**HOFFMAN** [51] - 2171:7, 2173:23, 2185:17, 2187:23, 2189:23, 2191:25, 2192:8, 2193:21, 2194:1, 2194:2, 2203:21, 2203:25, 2204:4, 2207:17, 2207:22, 2218:14, 2218:19, 2222:14, 2222:19, 2232:1, 2232:7, 2232:11, 2232:22, 2234:11, 2234:14, 2234:20, 2234:21, 2237:10, 2237:11, 2238:25, 2239:5, 2242:9, 2242:20, 2262:18, 2263:7, 2263:13, 2266:2, 2269:3, 2269:6, 2270:2, 2270:14, 2271:2, 2271:11, 2271:14, 2273:7, 2273:14, 2273:18, 2274:17, 2275:1, 2275:5, 2275:9
**Hoffman** [9] - 2180:11, 2232:22, 2242:25, 2263:20, 2265:6, 2265:7, 2265:17, 2269:6, 2273:18
**hold** [4] - 2221:19, 2309:13, 2309:17, 2309:21
**holding** [1] - 2221:18
**home** [2] - 2206:14, 2257:20
**honor** [1] - 2316:24
**Honor** [62] - 2173:6,

2173:20, 2179:24, 2185:17, 2189:20, 2192:5, 2193:22, 2204:1, 2222:15, 2232:1, 2232:2, 2232:3, 2232:4, 2232:6, 2232:7, 2232:12, 2232:22, 2233:2, 2233:4, 2233:16, 2233:18, 2233:19, 2234:11, 2234:14, 2234:20, 2237:10, 2238:25, 2239:2, 2242:21, 2243:3, 2262:18, 2263:7, 2263:9, 2263:14, 2269:3, 2269:6, 2269:20, 2270:10, 2270:14, 2271:2, 2271:11, 2273:7, 2273:15, 2273:16, 2273:18, 2274:4, 2274:5, 2274:17, 2274:18, 2274:24, 2275:1, 2275:5, 2275:10, 2275:13, 2280:9, 2290:9, 2290:11, 2298:4, 2299:18, 2304:10, 2304:13, 2319:23
**HONORABLE** [1] - 2170:12
**Hopefully** [1] - 2279:7
**hour** [1] - 2275:15
**house** [1] - 2208:20
**housekeeping** [1] - 2275:2
**HOUSING** [1] - 2170:6
**housing** [4] - 2203:2, 2209:10, 2209:11, 2255:1
**Housing** [3] - 2171:6, 2204:14, 2204:22
**huge** [1] - 2284:19
**Hume** [1] - 2275:13
**HUME** [22] - 2170:20, 2275:13, 2275:21, 2276:2, 2279:10, 2280:10, 2290:11, 2290:14, 2290:18, 2291:2, 2295:16, 2298:6, 2299:20, 2300:2, 2303:21, 2303:23, 2303:25, 2304:4, 2304:7, 2305:2, 2319:25, 2320:6
**hundred** [1] - 2203:11
**hungry** [1] - 2275:17,

2281:15
**hypothetical** [3] - 2224:16, 2310:22, 2316:2

## I

**Ian** [3] - 2232:22, 2269:6, 2273:18
**IAN** [1] - 2171:7
**idea** [1] - 2315:8
**identified** [3] - 2239:8, 2249:3, 2286:2
**identify** [1] - 2208:6
**ignores** [1] - 2311:6
**ignoring** [2] - 2310:11, 2318:11
**immediately** [1] - 2178:24
**immensely** [1] - 2211:6
**impact** [10] - 2177:25, 2178:24, 2200:23, 2200:24, 2220:15, 2239:25, 2251:23, 2277:13, 2294:23, 2306:17
**implementable** [1] - 2179:15
**implication** [2] - 2283:19, 2284:4
**implications** [2] - 2284:10, 2291:16
**implied** [5] - 2261:18, 2262:14, 2316:18, 2316:19, 2316:22
**implies** [1] - 2291:19
**imply** [1] - 2282:15
**important** [5] - 2281:9, 2286:18, 2296:20, 2309:5, 2317:12
**improvement** [8] - 2211:20, 2252:6, 2254:19, 2255:7, 2256:8, 2256:10, 2257:11, 2257:19
**improvements** [1] - 2254:25
**in-house** [1] - 2208:20
**inappropriate** [2] - 2269:19, 2274:20
**INC** [1] - 2170:3
**inclination** [1] - 2226:17
**include** [4] - 2195:24, 2247:19, 2265:2, 2302:8
**includes** [5] - 2206:13, 2246:8,

2246:18, 2261:11, 2296:16
**including** [13] - 2220:18, 2231:17, 2241:8, 2241:22, 2249:24, 2253:9, 2255:8, 2262:4, 2262:5, 2264:1, 2273:23, 2273:25, 2290:20
**income** [53] - 2212:9, 2213:6, 2220:16, 2224:12, 2227:12, 2248:23, 2248:24, 2256:1, 2256:2, 2256:3, 2256:18, 2256:22, 2258:12, 2259:4, 2259:23, 2259:24, 2260:17, 2263:5, 2265:22, 2266:7, 2266:8, 2276:23, 2277:10, 2277:11, 2277:12, 2277:17, 2277:18, 2278:2, 2278:10, 2278:16, 2279:18, 2279:21, 2280:6, 2280:13, 2280:16, 2280:17, 2280:20, 2280:24, 2280:25, 2281:2, 2281:4, 2281:11, 2281:12, 2281:14, 2282:9, 2283:17, 2307:17, 2307:20, 2307:21, 2310:25, 2311:15
**incomplete** [1] - 2311:6
**incorrect** [6] - 2280:15, 2280:16, 2296:17, 2308:1, 2308:11, 2311:3
**increase** [6] - 2177:21, 2255:23, 2255:24, 2257:20, 2266:13, 2277:25
**increased** [11] - 2196:3, 2196:20, 2196:25, 2277:25, 2309:25, 2311:13, 2311:15, 2312:18, 2313:6, 2316:1, 2316:3
**increasing** [1] - 2314:6
**indeed** [1] - 2310:3
**index** [3] - 2315:5, 2317:3, 2318:10
**indicated** [2] - 2229:22, 2249:20

**indicates** [1] - 2193:5
**indicating** [1] - 2191:19
**indication** [1] - 2315:10
**indirectly** [1] - 2235:25
**indulgence** [4] - 2191:4, 2233:2, 2237:10, 2273:14
**infinite** [1] - 2179:14
**information** [7] - 2245:21, 2250:9, 2262:2, 2262:11, 2284:5, 2284:17, 2302:25
**informed** [2] - 2183:12, 2228:13
**infusion** [3] - 2175:9, 2176:3, 2183:25
**inherently** [2] - 2224:12, 2224:18
**initial** [4] - 2193:18, 2301:13, 2306:23, 2307:4
**instance** [1] - 2218:10
**instead** [5] - 2201:17, 2203:4, 2203:9, 2297:18, 2311:1
**institutions** [1] - 2206:2
**insufficient** [2] - 2196:14, 2196:16
**insulated** [2] - 2248:16, 2249:6
**intend** [1] - 2247:20
**interconnected** [1] - 2311:8
**interested** [1] - 2200:22
**internal** [4] - 2178:13, 2178:14, 2219:2, 2226:19
**internally** [4] - 2178:7, 2211:19, 2223:1, 2264:17
**international** [1] - 2205:16
**interpret** [1] - 2177:6
**interpreted** [1] - 2177:1
**introduce** [1] - 2204:10
**introduction** [1] - 2245:14
**invest** [1] - 2203:11
**invested** [1] - 2180:12
**investment** [16] - 2174:25, 2175:1, 2175:12, 2175:14,

2175:20, 2175:22,
2202:25, 2306:23,
2307:5, 2309:18,
2309:22, 2310:13,
2310:17, 2310:19,
2310:23
**investments** [1] -
2197:22
**investor** [1] - 2177:22
**Investors** [1] - 2193:5
**investors** [4] -
2186:17, 2186:21,
2201:8, 2262:2
**involved** [1] - 2214:17
**involves** [3] - 2215:9,
2224:13, 2302:3
**irretrievably** [1] -
2183:21
**issue** [10] - 2185:11,
2210:21, 2211:6,
2211:9, 2211:16,
2211:21, 2229:1,
2229:17, 2306:12,
2316:6
**issued** [2] - 2315:3,
2318:7
**issuer** [1] - 2174:12
**issues** [7] - 2185:4,
2185:10, 2185:14,
2210:14, 2210:15,
2210:16, 2318:5
**issuing** [1] - 2206:16
**italics** [2] - 2245:15,
2261:7
**item** [1] - 2277:5
**itself** [6] - 2219:9,
2245:12, 2273:23,
2273:25, 2275:20,
2277:12

---

## J

**James** [1] - 2227:21
**Jamie** [3] - 2209:15,
2209:16
**Japanese** [1] -
2205:12
**Jeff** [7] - 2209:13,
2229:22, 2230:5,
2230:7, 2230:8
**Jeffrey** [2] - 2209:12,
2209:16
**Jenkins** [3] - 2193:1,
2232:5, 2279:7
**Jim** [2] - 2233:8,
2235:21
**jitters** [1] - 2314:20
**job** [3] - 2215:6,
2215:7, 2309:19
**joined** [1] - 2206:3

**Jon** [2] - 2209:6,
2209:7
**JONATHAN** [1] -
2171:6
**JONES** [1] - 2171:7
**JUDGE** [1] - 2170:13
**judgment** [2] -
2215:10, 2215:24
**judgments** [1] -
2262:12
**Judith** [1] - 2295:17
**July** [14] - 2217:17,
2217:19, 2217:20,
2219:3, 2225:24,
2266:20, 2268:7,
2268:17, 2268:24,
2283:9, 2283:10,
2284:11, 2291:16,
2293:19
**June** [14] - 2207:15,
2208:8, 2217:5,
2217:7, 2218:8,
2218:9, 2218:11,
2223:12, 2254:3,
2259:3, 2259:13,
2266:19
**junior** [2] - 2181:24,
2182:9
**jurors** [1] - 2218:20
**jury** [38] - 2173:3,
2173:7, 2186:10,
2193:21, 2198:25,
2199:8, 2204:8,
2204:11, 2206:9,
2212:2, 2217:2,
2219:25, 2223:11,
2232:18, 2234:5,
2234:7, 2234:16,
2237:1, 2239:6,
2267:24, 2269:16,
2270:6, 2275:7,
2275:16, 2275:19,
2277:3, 2285:17,
2286:17, 2288:11,
2292:5, 2300:8,
2301:1, 2304:16,
2304:18, 2304:21,
2305:25, 2308:24,
2316:13
**Jury** [3] - 2232:14,
2234:17, 2320:12
**JURY** [1] - 2170:12
**Justice** [1] - 2273:25
**justified** [1] - 2297:2
**justify** [2] - 2318:13,
2318:16

---

## K

**KAPLAN** [1] - 2170:21

**Kaye** [1] - 2171:8
**keep** [5] - 2183:25,
2202:9, 2242:25,
2278:5, 2281:17
**KENYA** [1] - 2170:21
**kept** [6] - 2184:6,
2185:15, 2214:20,
2216:15, 2286:21,
2318:19
**Kessler** [1] - 2170:18
**key** [2] - 2290:1,
2291:14
**kind** [17] - 2178:22,
2179:15, 2187:4,
2205:15, 2209:3,
2212:12, 2298:22,
2312:1, 2312:14,
2312:19, 2312:25,
2313:3, 2313:5,
2313:8, 2313:15,
2314:11
**kinds** [2] - 2206:23,
2268:20
**King** [1] - 2170:19
**Kirk** [1] - 2170:15
**knowledge** [1] -
2270:5
**known** [6] - 2204:15,
2204:22, 2205:25,
2235:23, 2291:17,
2317:21
**Kravetz** [6] - 2173:7,
2188:2, 2188:10,
2189:14, 2191:5,
2192:10
**KRAVETZ** [10] -
2171:2, 2173:6,
2173:9, 2173:20,
2173:24, 2173:25,
2179:23, 2189:20,
2191:22, 2192:5

---

## L

**ladies** [1] - 2320:7
**lag** [1] - 2295:15
**LAMBERTH** [1] -
2170:12
**language** [7] -
2176:20, 2251:11,
2255:5, 2262:24,
2263:1, 2294:16
**Laponsky** [1] -
2208:23
**large** [1] - 2282:17
**largely** [1] - 2174:11
**larger** [1] - 2231:6
**largest** [1] - 2282:10
**last** [24] - 2179:3,
2183:7, 2197:2,

2206:22, 2221:5,
2224:6, 2225:4,
2229:23, 2230:17,
2231:20, 2233:13,
2240:8, 2241:16,
2249:10, 2253:15,
2255:13, 2258:1,
2259:20, 2267:1,
2267:5, 2276:8,
2283:6, 2283:16,
2286:15
**late** [4] - 2213:16,
2216:4, 2217:20,
2266:20
**law** [2] - 2246:13,
2246:14
**Lawler** [2] - 2208:25,
2209:2
**Lawler's** [1] - 2209:1
**laws** [1] - 2250:11
**lawyer** [4] - 2208:18,
2208:20, 2209:22,
2288:12
**lawyers** [1] - 2208:22
**lay** [2] - 2225:1,
2269:21
**Layton** [1] - 2310:14
**lead** [3] - 2195:23,
2209:13, 2310:20
**leading** [3] - 2214:22,
2220:21, 2242:8
**leads** [1] - 2208:21
**leaned** [1] - 2204:8
**least** [5] - 2211:13,
2215:18, 2250:25,
2260:17, 2300:24
**leave** [6] - 2199:3,
2224:9, 2233:16,
2272:14, 2286:12,
2305:6
**legal** [1] - 2208:24
**lend** [1] - 2203:12
**less** [13] - 2186:14,
2196:13, 2224:21,
2280:13, 2280:25,
2297:17, 2307:17,
2308:21, 2310:6,
2311:4, 2315:19,
2317:2
**less-relevant** [1] -
2196:13
**letter** [3] - 2244:11,
2244:16, 2244:19
**level** [4] - 2209:4,
2211:24, 2212:7,
2307:4
**Lewis** [3] - 2223:16,
2223:18, 2223:19
**liabilities** [1] - 2199:15
**liability** [4] - 2199:14,
2212:17, 2248:16,

2249:6
**liable** [1] - 2247:4
**licensed** [1] - 2205:20
**lifetime** [1] - 2253:17
**light** [1] - 2192:3
**likelihood** [2] -
2240:9, 2291:20
**likely** [16] - 2195:23,
2197:3, 2215:17,
2215:22, 2215:25,
2216:14, 2216:17,
2221:7, 2225:8,
2236:1, 2240:8,
2247:21, 2284:13,
2291:11, 2291:13,
2292:13
**limitations** [1] -
2318:8
**limited** [2] - 2249:24,
2274:12
**line** [28] - 2177:19,
2182:3, 2183:5,
2190:13, 2221:10,
2222:25, 2223:16,
2223:21, 2273:10,
2273:24, 2281:11,
2286:14, 2286:15,
2286:18, 2287:15,
2287:20, 2287:23,
2288:16, 2292:8,
2293:25, 2294:4,
2296:20, 2296:22,
2296:24, 2298:23,
2305:9, 2307:19
**lines** [6] - 2199:3,
2224:9, 2233:16,
2272:14, 2286:12,
2305:6
**liquidation** [10] -
2202:7, 2312:9,
2312:11, 2312:13,
2312:17, 2313:6,
2313:20, 2314:1,
2314:2, 2314:6
**liquidity** [1] - 2251:20
**Lisa** [1] - 2320:17
**list** [10] - 2175:3,
2215:23, 2215:24,
2220:2, 2248:2,
2248:13, 2248:16,
2249:25, 2274:10,
2303:21
**listed** [3] - 2173:16,
2175:18, 2291:22
**listen** [1] - 2314:24
**listened** [1] - 2311:17
**lists** [1] - 2274:19
**literally** [1] - 2287:5
**literature** [3] - 2220:4,
2220:8, 2220:10

**LITIGATIONS** [1] - 2170:10
**Litowitz** [1] - 2171:3
**LLP** [4] - 2170:18, 2170:22, 2171:3, 2171:8
**loan** [11] - 2174:20, 2174:24, 2175:4, 2175:18, 2175:19, 2202:11, 2202:22, 2203:4, 2206:14, 2255:14, 2255:21
**loans** [2] - 2251:22, 2255:9
**logo** [1] - 2282:24
**long-term** [8] - 2178:16, 2187:2, 2187:15, 2200:20, 2201:2, 2219:20, 2220:18, 2318:8
**longer-term** [1] - 2240:1
**look** [54] - 2181:1, 2181:8, 2182:12, 2182:17, 2183:10, 2187:12, 2192:25, 2198:22, 2198:24, 2199:13, 2200:10, 2200:11, 2200:25, 2206:21, 2214:11, 2217:23, 2217:25, 2218:25, 2221:23, 2224:6, 2225:3, 2231:20, 2237:5, 2237:6, 2240:14, 2245:12, 2245:17, 2246:7, 2247:18, 2247:25, 2250:14, 2250:17, 2250:23, 2251:1, 2251:3, 2261:3, 2288:3, 2288:14, 2295:6, 2296:19, 2299:23, 2299:25, 2300:9, 2301:10, 2301:12, 2301:20, 2303:9, 2303:13, 2303:17, 2303:18, 2305:12, 2305:17, 2305:21
**looked** [13] - 2173:13, 2186:3, 2188:8, 2198:4, 2201:2, 2210:17, 2225:22, 2238:12, 2286:10, 2286:12, 2299:1, 2308:1, 2311:23
**looking** [63] - 2176:11, 2177:4, 2187:12, 2200:13, 2200:15, 2206:19, 2207:7,

2231:7, 2234:24, 2245:18, 2245:21, 2245:22, 2245:24, 2246:3, 2246:5, 2246:9, 2246:22, 2246:25, 2247:5, 2247:8, 2247:18, 2247:19, 2248:1, 2248:14, 2249:4, 2249:11, 2249:17, 2249:20, 2249:23, 2250:3, 2250:7, 2250:9, 2250:22, 2250:25, 2251:7, 2251:11, 2252:11, 2253:3, 2253:10, 2253:19, 2254:9, 2259:20, 2260:3, 2260:4, 2260:12, 2261:11, 2261:14, 2261:16, 2261:23, 2262:5, 2262:14, 2262:23, 2263:23, 2272:15, 2286:23, 2288:25, 2296:23, 2300:15, 2305:18, 2317:1, 2317:4, 2317:9, 2318:6
**looks** [3] - 2244:9, 2256:14, 2281:20
**loss** [14] - 2219:23, 2220:25, 2221:2, 2221:3, 2221:20, 2224:12, 2225:5, 2255:14, 2256:18, 2257:3, 2257:18, 2258:18, 2266:12
**losses** [17] - 2180:16, 2183:20, 2184:21, 2195:13, 2195:17, 2212:9, 2219:19, 2220:6, 2224:11, 2224:24, 2227:11, 2251:22, 2255:16, 2255:21, 2257:13, 2257:17
**lost** [1] - 2183:21
**love** [1] - 2281:16
**lower** [11] - 2184:1, 2186:14, 2236:1, 2255:8, 2280:7, 2294:8, 2294:9, 2294:10, 2315:16, 2315:17, 2315:18

## M

**MAC** [1] - 2170:8
**Mac** [44] - 2176:13, 2194:24, 2195:22, 2197:19, 2201:3,

2201:9, 2201:10, 2202:6, 2203:3, 2203:14, 2206:13, 2212:19, 2214:10, 2214:24, 2216:3, 2216:9, 2223:2, 2224:2, 2225:13, 2226:6, 2227:3, 2230:10, 2263:9, 2273:3, 2279:12, 2279:13, 2279:19, 2279:20, 2287:3, 2287:12, 2297:14, 2300:14, 2306:22, 2307:1, 2308:2, 2310:1, 2310:12, 2310:25, 2311:4, 2311:13, 2315:3, 2315:15, 2315:20, 2319:3
**Mac's** [14] - 2194:17, 2198:1, 2198:12, 2214:6, 2222:6, 2222:10, 2222:11, 2223:3, 2223:21, 2228:21, 2228:23, 2230:14, 2260:22, 2286:16
**Mae** [90] - 2176:12, 2180:18, 2180:23, 2181:2, 2182:21, 2182:24, 2183:2, 2183:13, 2184:1, 2188:6, 2194:24, 2195:21, 2197:19, 2197:25, 2198:11, 2201:2, 2201:8, 2201:9, 2202:1, 2202:6, 2203:3, 2203:14, 2206:13, 2212:19, 2214:6, 2214:10, 2214:24, 2216:3, 2216:9, 2219:2, 2219:18, 2220:1, 2220:17, 2220:19, 2221:1, 2221:11, 2222:8, 2226:6, 2226:25, 2228:21, 2230:10, 2230:14, 2235:21, 2238:9, 2239:16, 2241:5, 2242:3, 2255:20, 2261:6, 2267:17, 2268:7, 2268:13, 2268:17, 2270:18, 2272:24, 2279:12, 2279:13, 2279:19, 2281:25, 2282:3, 2282:24, 2284:11, 2286:15, 2287:1, 2287:12,

2291:24, 2293:12, 2293:15, 2293:18, 2296:1, 2297:14, 2300:14, 2302:22, 2306:21, 2307:1, 2307:6, 2308:2, 2309:4, 2309:17, 2309:19, 2310:1, 2310:12, 2310:25, 2311:4, 2311:13, 2315:3, 2315:14, 2315:20, 2319:2
**Mae's** [10] - 2184:10, 2194:17, 2198:18, 2223:24, 2228:22, 2236:24, 2237:4, 2245:3, 2254:10, 2269:1
**MAE/FREDDIE** [1] - 2170:8
**mail** [57] - 2178:6, 2178:14, 2178:17, 2178:20, 2182:19, 2182:20, 2183:5, 2183:10, 2188:7, 2190:1, 2190:2, 2190:7, 2207:11, 2207:23, 2207:24, 2208:6, 2208:8, 2209:20, 2209:22, 2219:1, 2219:2, 2222:25, 2227:17, 2227:19, 2227:20, 2228:15, 2229:5, 2230:20, 2231:11, 2231:21, 2233:6, 2233:8, 2233:12, 2233:14, 2233:17, 2234:3, 2234:6, 2235:1, 2235:7, 2235:11, 2237:7, 2238:1, 2238:2, 2238:10, 2239:7, 2239:11, 2264:1, 2264:3, 2264:14, 2273:20, 2273:23, 2295:17, 2296:7, 2296:10, 2296:15, 2298:1
**mailed** [1] - 2237:23
**mails** [1] - 2222:22
**main** [7] - 2210:18, 2278:1, 2281:14, 2288:2, 2294:14, 2309:6, 2310:16
**management** [14] - 2206:19, 2214:5, 2214:6, 2220:14, 2226:18, 2226:19, 2226:20, 2226:22,

2230:11, 2230:25, 2231:17, 2242:12, 2292:10, 2292:14
**management's** [6] - 2222:6, 2224:17, 2245:19, 2249:11, 2249:13, 2292:12
**mandated** [1] - 2219:21
**Mario** [3] - 2190:3, 2207:24, 2286:1
**mark** [1] - 2304:17
**Mark** [1] - 2208:23
**marked** [1] - 2304:21
**market** [13] - 2176:22, 2177:3, 2177:5, 2187:13, 2193:14, 2206:12, 2251:21, 2255:1, 2306:20, 2314:20, 2316:22, 2317:16, 2318:16
**market's** [1] - 2318:12
**marketing** [7] - 2188:10, 2189:2, 2303:6, 2303:8, 2306:12, 2306:20, 2306:25
**marketplace** [2] - 2317:4, 2317:13
**Markets** [1] - 2173:17
**markets** [6] - 2185:12, 2200:16, 2200:19, 2200:21, 2206:2, 2249:14
**marking** [1] - 2304:23
**markup** [2] - 2263:24, 2264:2
**Martin** [2] - 2268:12, 2268:13
**Massachusetts** [1] - 2171:8
**master's** [2] - 2205:16, 2205:23
**material** [4] - 2244:15, 2287:11, 2301:18
**materially** [3] - 2245:23, 2249:19, 2249:22
**materials** [5] - 2190:4, 2193:10, 2193:22, 2273:22, 2273:24
**math** [1] - 2287:2
**matter** [2] - 2187:10, 2321:5
**matters** [1] - 2275:2
**Mayopolous** [2] - 2182:20, 2295:23
**Mayopoulos** [6] - 2182:24, 2291:24, 2292:9, 2292:17,

2298:9, 2304:9
**Mayopoulos's** [1] -
2294:17
**MBS** [8] - 2177:12,
2177:21, 2178:1,
2178:16, 2178:18,
2178:23, 2178:24,
2187:13
**McFarland** [30] -
2182:20, 2183:2,
2236:24, 2237:1,
2237:3, 2239:12,
2240:20, 2240:21,
2241:12, 2242:2,
2242:10, 2267:14,
2268:6, 2268:16,
2268:23, 2269:12,
2269:13, 2269:23,
2270:5, 2270:12,
2286:4, 2286:5,
2288:3, 2288:21,
2288:23, 2290:20,
2291:5, 2291:22,
2298:13, 2303:1
**McFarland's** [6] -
2267:25, 2269:9,
2269:15, 2269:19,
2270:7, 2288:7
**mean** [25] - 2182:8,
2184:6, 2195:15,
2196:2, 2196:16,
2196:24, 2197:5,
2203:12, 2204:19,
2218:9, 2224:15,
2229:14, 2231:24,
2233:24, 2234:8,
2234:12, 2235:17,
2235:18, 2236:12,
2277:3, 2288:22,
2307:17, 2310:24,
2317:6, 2317:14
**meaning** [4] - 2236:2,
2246:9, 2279:18,
2282:5
**means** [25] - 2177:4,
2184:8, 2196:25,
2199:8, 2199:9,
2199:19, 2201:8,
2208:18, 2212:15,
2215:17, 2218:10,
2234:5, 2241:21,
2247:3, 2255:20,
2265:25, 2280:23,
2287:4, 2287:5,
2308:21, 2309:10,
2310:24, 2316:24,
2317:3, 2317:16
**meant** [2] - 2230:9,
2234:2
**measure** [2] - 2184:2,

2318:12
**media** [1] - 2262:3
**meet** [2] - 2236:16,
2247:3
**meeting** [31] - 2183:7,
2228:1, 2228:3,
2229:11, 2229:23,
2230:4, 2230:12,
2231:18, 2237:13,
2237:17, 2237:18,
2237:23, 2238:11,
2238:17, 2238:19,
2239:9, 2239:15,
2239:16, 2239:17,
2239:19, 2239:20,
2242:2, 2268:7,
2268:17, 2268:24,
2293:12, 2293:16,
2293:18, 2320:13
**meetings** [6] -
2230:12, 2230:14,
2230:18, 2230:22,
2237:14, 2268:21
**Meg** [2] - 2209:9,
2209:10
**Melissa** [5] - 2237:24,
2238:3, 2238:5,
2238:16, 2240:17
**Meltzer** [1] - 2170:18
**member** [1] - 2231:9
**members** [5] - 2173:6,
2204:11, 2207:11,
2275:16, 2288:11
**memo** [15] - 2214:25,
2216:13, 2218:5,
2218:7, 2218:12,
2218:21, 2219:7,
2219:9, 2222:12,
2222:23, 2223:7,
2271:19, 2272:2,
2272:8, 2272:12
**memory** [1] - 2245:10
**memos** [5] - 2215:4,
2226:16, 2226:23,
2271:5, 2314:19
**mention** [1] - 2318:4
**mentioned** [5] -
2176:6, 2204:18,
2229:2, 2230:8,
2310:14
**mentioning** [1] -
2317:23
**merged** [1] - 2204:24
**message** [1] - 2294:2
**met** [2] - 2267:19,
2267:21
**meticulously** [1] -
2247:14
**middle** [4] - 2217:19,
2219:10, 2283:16,

2292:8
**midway** [1] - 2225:6
**might** [15] - 2178:11,
2197:9, 2197:25,
2243:24, 2261:17,
2269:1, 2271:9,
2271:21, 2274:7,
2275:17, 2279:25,
2287:7, 2287:8,
2314:12, 2315:9
**million** [1] - 2181:10
**mind** [2] - 2199:2,
2295:1
**mine** [1] - 2209:3
**minimize** [1] - 2251:21
**minor** [3] - 2293:4,
2293:23, 2293:24
**minus** [1] - 2281:12
**minute** [1] - 2311:12
**minutes** [3] - 2232:11,
2320:13, 2320:14
**minutes'** [1] - 2187:24
**mirror** [1] - 2187:5
**mischaracterization**
[1] - 2189:21
**mischaracterizes** [3] -
2266:2, 2271:11,
2280:9
**mission** [1] - 2236:16
**misstatements** [1] -
2244:15
**misunderstanding** [1]
- 2183:19
**model** [1] - 2194:24
**modest** [2] - 2227:9,
2256:8
**modestly** [1] -
2254:12
**modification** [1] -
2211:9
**modified** [2] - 2211:8,
2255:9
**moment** [9] - 2208:7,
2233:3, 2236:7,
2238:13, 2256:7,
2273:14, 2298:4,
2304:6, 2304:11
**Monday** [2] - 2320:9,
2320:11
**money** [11] - 2180:12,
2196:4, 2196:5,
2202:9, 2216:18,
2224:3, 2307:1,
2308:21, 2309:8,
2310:6, 2312:16
**moneys** [1] - 2211:10
**month** [6] - 2176:14,
2176:15, 2217:12,
2217:16, 2223:8,
2283:11

**months** [2] - 2195:1,
2208:10
**Moody's** [16] -
2192:21, 2193:5,
2194:3, 2194:5,
2194:9, 2194:16,
2195:12, 2196:8,
2196:11, 2196:22,
2197:24, 2197:25,
2198:4, 2198:14,
2198:16, 2317:2
**Moreira** [1] - 2320:17
**MORNING** [1] -
2170:12
**morning** [16] - 2173:5,
2173:6, 2178:7,
2180:9, 2180:10,
2187:24, 2188:1,
2204:5, 2204:6,
2204:12, 2276:14,
2277:8, 2316:5,
2316:11, 2316:12,
2317:20
**mortgage** [4] -
2206:12, 2219:22,
2235:24, 2311:14
**mortgages** [6] -
2197:22, 2309:5,
2309:10, 2309:13,
2309:15, 2310:21
**most** [11] - 2184:18,
2206:6, 2206:18,
2213:21, 2229:5,
2233:12, 2235:11,
2236:1, 2276:10,
2296:20, 2309:5
**move** [15] - 2207:17,
2218:14, 2222:14,
2239:1, 2239:7,
2263:12, 2273:13,
2275:6, 2281:15,
2288:17, 2290:24,
2298:2, 2304:3,
2304:5, 2304:8
**movement** [2] -
2199:25, 2289:23
**moves** [1] - 2206:5
**moving** [1] - 2187:16
**MR** [118] - 2173:6,
2173:9, 2173:20,
2173:23, 2173:24,
2173:25, 2179:23,
2180:2, 2180:5,
2180:8, 2185:17,
2185:21, 2187:21,
2187:23, 2189:20,
2189:23, 2191:22,
2191:25, 2192:5,
2192:8, 2193:21,
2194:1, 2194:2,

2203:21, 2203:25,
2204:4, 2207:17,
2207:19, 2207:22,
2218:14, 2218:16,
2218:19, 2220:21,
2222:14, 2222:16,
2222:19, 2231:25,
2232:1, 2232:7,
2232:11, 2232:22,
2234:11, 2234:14,
2234:20, 2234:21,
2237:10, 2237:11,
2238:25, 2239:2,
2239:5, 2242:8,
2242:9, 2242:20,
2242:25, 2243:3,
2243:5, 2243:7,
2262:18, 2262:22,
2263:7, 2263:9,
2263:13, 2263:18,
2266:2, 2266:5,
2269:3, 2269:6,
2269:20, 2270:2,
2270:10, 2270:11,
2270:14, 2270:16,
2271:2, 2271:4,
2271:11, 2271:14,
2271:17, 2273:7,
2273:9, 2273:14,
2273:18, 2274:5,
2274:17, 2274:24,
2275:1, 2275:5,
2275:9, 2275:13,
2275:21, 2276:2,
2279:10, 2280:9,
2280:10, 2290:9,
2290:11, 2290:13,
2290:14, 2290:18,
2291:2, 2295:16,
2298:4, 2298:6,
2299:18, 2299:20,
2300:2, 2303:21,
2303:23, 2303:25,
2304:4, 2304:6,
2304:7, 2304:10,
2304:13, 2305:2,
2319:23, 2319:25,
2320:6
**MUKARRAM** [1] -
2172:4
**multiple** [3] - 2197:3,
2197:8, 2197:13
**multiple-notch** [1] -
2197:13

## N

**name** [3] - 2204:12,
2218:6, 2251:1
**named** [1] - 2204:21
**narration** [1] - 2270:6

**nature** [2] - 2221:20, 2249:16
**near** [6] - 2199:14, 2226:7, 2226:13, 2227:7, 2231:12, 2261:23
**necessarily** [1] - 2277:13
**necessary** [5] - 2179:10, 2179:13, 2179:17, 2195:25, 2196:2
**need** [6] - 2183:12, 2221:20, 2242:24, 2269:24, 2304:4, 2305:23
**needed** [2] - 2184:11, 2319:6
**needs** [2] - 2184:10, 2312:10
**negated** [1] - 2270:2
**negative** [23] - 2175:1, 2178:23, 2182:3, 2182:14, 2196:22, 2197:1, 2199:9, 2199:10, 2199:12, 2199:18, 2199:19, 2203:12, 2203:13, 2215:20, 2219:18, 2220:2, 2220:3, 2220:15, 2221:6, 2221:12, 2224:4, 2227:13, 2242:15
**negatives** [1] - 2215:24
**net** [48] - 2179:20, 2185:22, 2187:1, 2201:13, 2201:23, 2219:23, 2220:24, 2225:9, 2236:3, 2248:24, 2252:14, 2252:17, 2255:23, 2255:24, 2257:3, 2258:24, 2259:2, 2259:13, 2259:23, 2265:2, 2277:11, 2277:12, 2277:13, 2277:18, 2277:24, 2278:5, 2278:8, 2278:10, 2278:17, 2282:9, 2283:11, 2295:21, 2302:11, 2302:17, 2311:21, 2312:22, 2312:24, 2313:23, 2317:10, 2317:15, 2317:21, 2318:13, 2318:17, 2318:22, 2319:6, 2319:11, 2319:16
**never** [2] - 2308:10,

2316:1
**new** [5] - 2250:9, 2251:21, 2253:12, 2253:16, 2299:20
**New** [6] - 2170:16, 2170:22, 2171:4, 2174:20, 2175:3
**Newell** [2] - 2209:15, 2209:16
**Newell's** [1] - 2209:15
**news** [2] - 2174:12, 2262:3
**next** [50] - 2182:17, 2183:18, 2183:24, 2190:25, 2195:18, 2196:11, 2203:24, 2208:25, 2210:23, 2222:1, 2223:9, 2225:3, 2228:13, 2228:15, 2231:21, 2238:22, 2239:14, 2239:23, 2248:5, 2248:7, 2249:9, 2250:2, 2252:13, 2253:11, 2253:21, 2256:16, 2257:2, 2257:10, 2257:17, 2259:11, 2260:15, 2262:9, 2266:10, 2271:10, 2271:21, 2272:17, 2282:2, 2284:15, 2288:17, 2289:2, 2289:9, 2291:5, 2305:8, 2305:12, 2305:17, 2306:7, 2307:12, 2312:21, 2312:22
**nice** [1] - 2320:10
**Nicholas** [1] - 2203:25
**NICHOLAS** [2] - 2172:5, 2204:2
**Nick** [2] - 2204:12, 2229:9
**Nicola** [3] - 2296:10, 2296:14, 2298:8
**Nicola's** [1] - 2296:7
**nobody** [1] - 2264:9
**noncash** [1] - 2184:20
**none** [2] - 2264:3, 2319:9
**nonevent** [2] - 2178:18, 2179:1
**normal** [1] - 2262:4
**normally** [1] - 2312:5
**Northwest** [4] - 2170:16, 2170:22, 2171:8, 2171:12
**not-so-distant** [2] - 2269:2, 2270:20
**notch** [1] - 2197:13

**notches** [3] - 2197:4, 2197:7, 2197:8
**note** [1] - 2274:6
**noted** [7] - 2177:21, 2191:6, 2221:8, 2221:16, 2225:18, 2240:19, 2240:22
**notes** [10] - 2237:13, 2237:17, 2237:18, 2237:23, 2238:11, 2238:12, 2238:15, 2238:19, 2238:23, 2239:8
**nothing** [3] - 2187:14, 2241:23, 2281:11
**notion** [3] - 2210:20, 2241:22
**November** [1] - 2176:8
**Number** [2] - 2170:4, 2170:8
**number** [27] - 2182:3, 2182:14, 2198:24, 2199:4, 2199:9, 2199:10, 2199:19, 2202:11, 2213:12, 2217:8, 2249:21, 2281:18, 2281:19, 2281:25, 2282:15, 2283:3, 2285:14, 2289:3, 2294:5, 2294:10, 2297:14, 2299:9, 2301:21, 2304:4, 2305:18, 2318:6
**numbers** [17] - 2199:3, 2202:2, 2214:7, 2214:9, 2215:17, 2218:11, 2227:10, 2279:16, 2279:17, 2286:23, 2294:1, 2294:2, 2296:16, 2297:5, 2297:7, 2300:9, 2308:7

### O

**oath** [1] - 2275:24
**object** [4] - 2239:2, 2273:16, 2304:10, 2304:23
**objection** [37] - 2173:23, 2185:17, 2189:20, 2191:22, 2192:5, 2207:19, 2218:16, 2220:21, 2222:16, 2231:25, 2232:3, 2232:19, 2233:13, 2233:15, 2233:25, 2242:8,

2262:18, 2263:7, 2263:15, 2266:2, 2269:3, 2270:8, 2270:14, 2271:2, 2271:11, 2271:14, 2273:7, 2273:12, 2274:9, 2274:22, 2280:9, 2290:9, 2290:13, 2299:18, 2300:1, 2319:23
**objections** [1] - 2274:18
**objective** [3] - 2179:16, 2225:2, 2242:15
**objectively** [2] - 2220:9, 2224:20
**obligation** [5] - 2214:7, 2248:25, 2250:8, 2259:24, 2261:15
**obligations** [2] - 2283:18, 2316:24
**observe** [2] - 2201:5, 2230:14
**observed** [1] - 2230:17
**observer** [1] - 2230:12
**obviously** [2] - 2234:7, 2241:18
**occasionally** [3] - 2267:19, 2267:22, 2309:12
**occur** [2] - 2213:20, 2239:19
**occurred** [1] - 2239:20
**October** [2] - 2170:10, 2321:8
**OF** [4] - 2170:1, 2170:12, 2321:1, 2321:9
**office** [13] - 2206:18, 2209:14, 2238:23, 2243:17, 2243:19, 2243:24, 2244:2, 2244:5, 2244:9, 2244:10, 2244:19, 2244:21, 2267:21
**Office** [8] - 2204:22, 2205:25, 2206:1, 2206:15, 2208:21, 2223:19, 2238:6, 2243:19
**officer** [3] - 2237:4, 2267:17, 2291:15
**official** [1] - 2218:22
**Official** [1] - 2171:11
**OFFICIAL** [1] - 2321:1
**officially** [1] - 2217:3
**officials** [1] - 2195:23

**offs** [1] - 2219:22
**offset** [3] - 2195:13, 2212:16, 2259:4
**OFHEO** [3] - 2204:23, 2204:24, 2206:3
**often** [3] - 2213:20, 2224:13, 2247:19
**omissions** [1] - 2244:15
**once** [7] - 2222:20, 2244:13, 2277:6, 2278:9, 2287:21, 2287:23, 2302:11
**one** [102] - 2173:16, 2176:11, 2177:18, 2177:21, 2180:17, 2182:12, 2183:24, 2184:10, 2186:3, 2186:6, 2192:1, 2192:21, 2193:10, 2193:16, 2193:17, 2194:5, 2194:6, 2198:7, 2198:24, 2201:16, 2204:21, 2209:16, 2209:24, 2210:24, 2210:25, 2214:8, 2214:22, 2221:23, 2221:24, 2223:8, 2225:4, 2226:14, 2227:3, 2230:11, 2233:10, 2233:12, 2233:20, 2235:19, 2235:22, 2242:25, 2244:25, 2248:21, 2249:3, 2251:6, 2253:3, 2255:11, 2260:3, 2260:21, 2260:24, 2261:2, 2261:7, 2262:21, 2263:20, 2266:23, 2267:3, 2267:13, 2271:1, 2271:10, 2272:5, 2272:6, 2272:18, 2273:10, 2273:11, 2273:14, 2274:11, 2274:12, 2274:13, 2277:5, 2278:21, 2279:3, 2279:6, 2280:24, 2282:18, 2282:19, 2285:18, 2285:21, 2289:1, 2290:23, 2295:14, 2297:9, 2298:4, 2298:25, 2299:17, 2299:19, 2301:1, 2301:5, 2301:11, 2301:16, 2301:17, 2302:5, 2302:15, 2304:6, 2304:11,

2306:9, 2307:16, 2307:22, 2309:4, 2320:1
**one's** [1] - 2253:19
**one-time** [1] - 2277:5
**ones** [4] - 2193:17, 2226:22, 2249:3, 2297:7
**opening** [2] - 2279:3, 2279:5
**operating** [1] - 2184:1
**operations** [5] - 2197:14, 2209:14, 2209:23, 2230:9, 2262:4
**opinion** [36] - 2173:11, 2176:17, 2177:1, 2179:4, 2184:18, 2197:16, 2202:15, 2210:21, 2215:21, 2226:12, 2229:3, 2276:18, 2276:19, 2285:7, 2286:18, 2291:8, 2293:1, 2294:12, 2294:18, 2294:22, 2294:23, 2294:24, 2294:25, 2295:2, 2297:23, 2299:21, 2299:25, 2306:18, 2306:19, 2310:8, 2311:2, 2315:22, 2316:14, 2319:5, 2320:1
**opinions** [4] - 2180:18, 2185:14, 2193:11, 2289:7
**opposite** [1] - 2187:7
**optimistic** [1] - 2195:16
**option** [8] - 2201:17, 2202:3, 2203:8, 2312:1, 2312:21, 2313:8, 2313:15
**orally** [1] - 2304:1
**order** [7] - 2173:2, 2224:7, 2244:16, 2267:3, 2286:20, 2298:1, 2299:1
**ordinary** [1] - 2239:17
**ordinary-course** [1] - 2239:17
**orient** [3] - 2193:13, 2225:21, 2233:4
**original** [4] - 2176:11, 2233:8, 2300:10, 2319:15
**otherwise** [3] - 2175:25, 2250:10, 2277:22

**outer** [1] - 2219:23
**outlook** [1] - 2194:3
**outside** [1] - 2232:19
**outweigh** [1] - 2221:6
**outweighed** [1] - 2224:4
**overall** [2] - 2179:5, 2311:14
**overruled** [7] - 2185:18, 2191:23, 2192:6, 2220:22, 2239:3, 2266:4, 2300:1
**oversees** [1] - 2206:12
**Oversight** [1] - 2204:22
**oversight** [2] - 2214:18, 2238:9
**owe** [6] - 2199:16, 2199:17, 2212:11, 2212:19, 2277:16, 2277:17
**owed** [2] - 2192:3, 2202:9
**owes** [1] - 2199:19
**owing** [1] - 2224:3
**own** [4] - 2199:16, 2204:7, 2274:9, 2317:9
**owned** [2] - 2181:24, 2182:9
**owns** [1] - 2199:15

## P

**p.m** [2] - 2232:17, 2320:16
**package** [2] - 2175:10, 2176:4
**page** [112] - 2178:5, 2181:1, 2189:9, 2189:18, 2189:24, 2189:25, 2190:25, 2194:7, 2198:24, 2199:1, 2199:13, 2217:25, 2218:25, 2219:10, 2222:1, 2222:21, 2223:9, 2224:6, 2229:6, 2237:6, 2237:20, 2239:13, 2239:14, 2239:23, 2245:11, 2245:12, 2245:13, 2246:3, 2247:17, 2248:5, 2248:7, 2248:19, 2249:9, 2250:2, 2251:14, 2251:15, 2252:13, 2252:17, 2253:6, 2254:13, 2256:16,

2256:17, 2258:7, 2258:23, 2259:11, 2259:12, 2259:20, 2261:5, 2261:6, 2261:22, 2262:9, 2262:17, 2263:2, 2263:3, 2263:23, 2264:2, 2265:6, 2265:8, 2265:9, 2265:13, 2266:19, 2267:1, 2274:12, 2274:13, 2283:3, 2286:9, 2286:10, 2286:13, 2288:14, 2288:15, 2289:2, 2289:9, 2289:13, 2289:15, 2292:3, 2292:8, 2293:11, 2293:12, 2293:14, 2293:21, 2295:9, 2296:13, 2296:19, 2298:18, 2298:19, 2303:14, 2303:19, 2305:5, 2305:8, 2305:9, 2305:13, 2305:17, 2305:22, 2306:2, 2306:3, 2306:5, 2306:10, 2306:11
**pages** [3] - 2250:19, 2259:19, 2262:17
**paid** [9] - 2197:22, 2252:18, 2277:22, 2281:1, 2312:10, 2312:14, 2312:19, 2312:25, 2313:3
**paragraph** [27] - 2174:5, 2178:12, 2183:18, 2183:24, 2184:9, 2194:8, 2195:18, 2195:20, 2196:8, 2196:11, 2224:7, 2225:3, 2225:6, 2245:17, 2247:18, 2247:25, 2249:10, 2257:11, 2259:20, 2261:10, 2262:1, 2263:4, 2265:17, 2267:2, 2267:5, 2289:14, 2296:15
**parentheses** [1] - 2199:5
**parenthetical** [1] - 2225:9
**part** [21] - 2175:17, 2179:19, 2181:15, 2188:21, 2193:18, 2193:22, 2198:4, 2212:4, 2212:5,

2214:4, 2215:6, 2215:7, 2216:12, 2236:8, 2239:25, 2241:8, 2241:22, 2262:3, 2274:13, 2276:10, 2312:17
**particular** [7] - 2192:12, 2210:5, 2210:7, 2210:10, 2225:16, 2299:19
**parties** [2] - 2285:24, 2293:4
**party** [1] - 2191:14
**passed** [1] - 2271:6
**passing** [1] - 2222:22
**past** [4] - 2224:25, 2231:15, 2251:3, 2304:19
**path** [2] - 2195:23, 2198:15
**Patrick** [1] - 2208:25
**pause** [1] - 2196:15
**pay** [23] - 2175:17, 2186:12, 2186:15, 2186:18, 2186:22, 2187:9, 2194:13, 2203:1, 2211:10, 2212:17, 2221:3, 2277:19, 2278:11, 2278:14, 2312:5, 2312:7, 2312:8, 2312:11, 2312:12, 2312:17, 2312:20, 2312:24
**paying** [4] - 2202:6, 2278:3, 2278:16, 2306:22
**payment** [8] - 2201:21, 2259:4, 2311:25, 2312:1, 2313:5, 2313:8, 2313:15, 2314:11
**payments** [1] - 2260:18
**PCF** [2] - 2176:18, 2176:21
**pdf** [2] - 2190:22, 2194:7
**peaked** [1] - 2266:13
**pending** [1] - 2267:8
**Pennsylvania** [1] - 2170:19
**people** [10] - 2209:24, 2210:1, 2210:5, 2231:18, 2235:21, 2267:21, 2270:17, 2291:17, 2312:14, 2315:10
**percent** [28] - 2174:6, 2191:10, 2191:16,

2191:20, 2192:2, 2194:13, 2194:14, 2194:16, 2195:7, 2195:8, 2201:17, 2201:20, 2202:2, 2215:18, 2215:22, 2254:2, 2254:3, 2277:18, 2280:7, 2281:3, 2281:8, 2312:6, 2312:8, 2312:10, 2312:13, 2312:20
**percentage** [1] - 2310:1
**perfect** [1] - 2219:14
**perform** [2] - 2177:24, 2309:16
**performance** [7] - 2249:16, 2251:23, 2253:22, 2254:11, 2254:14, 2255:7, 2272:14
**perhaps** [2] - 2191:7, 2270:17
**period** [14] - 2200:12, 2200:19, 2217:4, 2248:22, 2259:22, 2265:21, 2266:1, 2297:12, 2297:13, 2299:14, 2299:15, 2312:24
**period-to-period** [2] - 2248:22, 2259:22
**periodic** [3] - 2202:17, 2202:20, 2213:17
**periods** [1] - 2199:25
**permanent** [1] - 2313:1
**permanently** [1] - 2312:20
**permission** [1] - 2193:21
**person** [7] - 2179:11, 2190:6, 2208:25, 2209:23, 2230:13, 2268:12
**personal** [1] - 2270:5
**personally** [1] - 2214:20
**personnel** [1] - 2178:20
**perspective** [4] - 2211:13, 2264:19, 2264:21, 2264:22
**pertain** [1] - 2264:3
**pertaining** [1] - 2262:6
**Phil** [1] - 2183:7
**phone** [2] - 2269:4, 2304:11
**phrase** [5] - 2177:1,

2177:2, 2188:10, 2291:11, 2291:14
**picture** [1] - 2231:3
**piece** [6] - 2175:7, 2221:16, 2225:4, 2269:11, 2278:7
**PIK** [1] - 2312:1
**place** [5] - 2203:16, 2250:3, 2302:18, 2311:21, 2316:25
**places** [1] - 2260:14
**plaintiff** [1] - 2274:7
**Plaintiff's** [1] - 2234:22
**Plaintiffs** [4] - 2170:4, 2170:15, 2170:17, 2180:6
**PLAINTIFFS** [1] - 2275:25
**plaintiffs** [10] - 2173:7, 2181:24, 2182:10, 2233:6, 2234:4, 2239:2, 2243:5, 2269:20, 2274:5, 2275:22
**Plaintiffs'** [6] - 2178:3, 2182:17, 2227:15, 2288:21, 2288:23, 2295:8
**plaintiffs'** [5] - 2188:3, 2199:23, 2200:5, 2201:12, 2201:16
**plan** [4] - 2224:14, 2247:20, 2267:7, 2267:8
**planned** [2] - 2274:1
**plans** [2] - 2249:15, 2262:11
**play** [4] - 2188:23, 2242:18, 2281:8, 2281:13
**played** [5] - 2188:24, 2188:25, 2292:4, 2303:12, 2304:20
**PLLC** [1] - 2170:15
**point** [21] - 2233:15, 2249:10, 2252:2, 2252:5, 2253:7, 2253:11, 2253:15, 2253:21, 2270:19, 2282:6, 2285:12, 2286:19, 2290:10, 2297:18, 2298:24, 2305:16, 2310:16, 2312:19, 2315:8, 2317:19, 2318:9
**points** [8] - 2248:3, 2248:6, 2248:7, 2248:13, 2248:21, 2254:8, 2318:3,

2318:12
**policy** [3] - 2206:19, 2209:10, 2209:24
**policymakers** [1] - 2183:12
**Pollard** [2] - 2208:13, 2208:24
**Pollard's** [2] - 2208:16, 2208:17
**Porter** [1] - 2171:8
**portfolio** [18] - 2219:22, 2235:23, 2235:24, 2235:25, 2236:5, 2308:21, 2308:25, 2309:18, 2309:19, 2310:2, 2310:5, 2310:17, 2310:19, 2310:23, 2311:3, 2311:7, 2311:13
**portfolios** [1] - 2174:6
**portion** [10] - 2173:22, 2174:2, 2194:12, 2194:22, 2196:17, 2197:2, 2219:11, 2223:10, 2246:17, 2260:17
**portions** [3] - 2267:24, 2288:7, 2304:23
**posed** [2] - 2264:13, 2264:15
**position** [7] - 2199:18, 2209:3, 2219:24, 2220:25, 2221:2, 2225:5, 2236:16
**positive** [25] - 2215:20, 2220:3, 2221:6, 2221:12, 2221:13, 2224:4, 2224:11, 2227:12, 2231:8, 2242:14, 2251:22, 2252:14, 2252:17, 2254:10, 2254:12, 2259:13, 2279:18, 2280:20, 2280:22, 2280:24, 2281:2, 2289:22, 2307:21
**positives** [2] - 2215:23, 2291:21
**possibility** [2] - 2241:15, 2241:20
**possible** [3] - 2185:9, 2192:22, 2314:12
**possibly** [1] - 2249:19
**post** [1] - 2173:10
**post-Third** [1] - 2173:10
**potential** [2] - 2268:25, 2318:5

**potentially** [3] - 2270:19, 2314:8, 2315:14
**powerful** [1] - 2313:3
**practically** [2] - 2212:12, 2262:24
**practice** [2] - 2238:21, 2238:22
**pre** [1] - 2193:13
**pre-Third** [1] - 2193:13
**predecessor** [2] - 2204:21, 2206:3
**predecessors** [2] - 2204:17, 2204:18
**predict** [1] - 2251:6
**predicted** [2] - 2273:5, 2300:17
**predicting** [2] - 2196:8, 2285:11
**predictions** [3] - 2249:12, 2271:9, 2272:13
**preference** [10] - 2202:7, 2312:9, 2312:11, 2312:14, 2312:17, 2313:6, 2313:20, 2314:1, 2314:2, 2314:6
**preferred** [20] - 2174:2, 2177:15, 2180:12, 2181:9, 2181:14, 2181:15, 2181:19, 2181:20, 2181:23, 2181:24, 2182:6, 2182:9, 2184:19, 2194:10, 2252:20, 2259:5, 2259:14, 2314:5, 2314:7
**PREFERRED** [1] - 2170:9
**premises** [1] - 2314:16
**preparation** [3] - 2188:21, 2213:23, 2214:4
**prepare** [6] - 2217:9, 2231:1, 2238:19, 2238:23, 2300:4, 2302:3
**prepared** [5] - 2216:12, 2226:23, 2237:14, 2238:15, 2238:16
**presence** [1] - 2232:19
**present** [5] - 2292:10, 2308:3, 2311:20, 2319:5, 2319:8

**presentation** [5] - 2174:16, 2174:18, 2193:18, 2273:25, 2274:1
**presented** [1] - 2269:15
**preserve** [3] - 2195:21, 2236:15, 2236:17
**preserved** [2] - 2196:19, 2318:23
**president** [3] - 2291:25, 2295:25, 2307:6
**presumably** [2] - 2267:7, 2274:8
**presume** [1] - 2183:6
**pretend** [1] - 2284:7
**prevent** [1] - 2178:23
**previous** [8] - 2211:8, 2227:11, 2253:6, 2285:24, 2301:11, 2303:19, 2305:21, 2316:21
**previously** [2] - 2211:8, 2273:24
**price** [2] - 2199:25, 2315:12
**prices** [1] - 2257:21
**PricewaterhouseCo opers** [1] - 2228:23
**primarily** [5] - 2206:13, 2220:2, 2230:10, 2257:12, 2257:19
**primary** [3] - 2206:17, 2210:25, 2214:22
**principles** [2] - 2212:6, 2215:14
**priority** [1] - 2314:4
**private** [1] - 2180:12
**probability** [1] - 2290:2
**probable** [1] - 2290:6
**problem** [5] - 2179:21, 2197:24, 2211:3, 2274:16, 2314:17
**procedure** [1] - 2304:23
**proceed** [3] - 2234:19, 2243:3, 2275:18
**Proceedings** [1] - 2171:15
**proceedings** [1] - 2321:4
**process** [16] - 2213:17, 2213:20, 2214:2, 2214:3, 2214:17, 2215:9, 2216:2, 2216:6,

2217:6, 2217:14, 2226:15, 2231:16, 2242:4, 2243:21, 2244:22, 2244:23
**produced** [2] - 2171:15, 2222:8
**Professor** [7] - 2175:6, 2175:21, 2202:15, 2275:22, 2276:3, 2283:1, 2299:21
**professor** [1] - 2275:23
**profile** [1] - 2257:19
**profit** [16] - 2266:1, 2280:7, 2280:14, 2281:10, 2281:18, 2281:19, 2281:23, 2282:7, 2282:15, 2307:2, 2307:19, 2310:6, 2311:5
**profitability** [10] - 2198:12, 2224:13, 2227:1, 2227:3, 2231:8, 2236:1, 2289:12, 2289:18, 2290:22, 2291:14
**profitable** [2] - 2229:24, 2253:17
**profits** [11] - 2197:20, 2197:22, 2266:9, 2278:21, 2278:22, 2281:6, 2284:18, 2307:18, 2307:21, 2308:12
**project** [1] - 2247:21
**projected** [3] - 2267:8, 2287:4, 2308:13
**projection** [4] - 2299:5, 2299:7, 2307:3, 2308:6
**projections** [28] - 2189:1, 2195:1, 2224:12, 2262:12, 2284:21, 2284:22, 2285:18, 2290:19, 2290:21, 2291:16, 2292:11, 2292:13, 2292:19, 2292:23, 2293:3, 2295:3, 2296:21, 2300:16, 2300:18, 2300:20, 2300:24, 2302:7, 2303:3, 2307:7, 2307:22, 2311:16, 2311:20, 2311:22
**promised** [2] - 2275:19, 2320:8
**prompt** [1] - 2196:23
**pronounced** [1] -

2174:11
**proper** [2] - 2250:4, 2299:23
**proves** [1] - 2196:12
**provide** [3] - 2184:25, 2251:20, 2316:2
**provided** [3] - 2174:20, 2176:3, 2264:17
**provision** [1] - 2255:15
**Prussia** [1] - 2170:19
**PSPA** [5] - 2190:18, 2207:13, 2210:24, 2211:8, 2228:1
**PSPAs** [3] - 2177:21, 2181:15, 2203:4
**public** [3] - 2183:12, 2228:7, 2306:21, 2307:1, 2309:7
**publish** [1] - 2247:14
**published** [1] - 2304:21
**pull** [12] - 2174:17, 2176:16, 2180:22, 2186:7, 2189:4, 2207:4, 2207:5, 2221:25, 2227:15, 2285:16, 2288:9, 2305:22
**PURCHASE** [1] - 2170:9
**purchase** [3] - 2184:20, 2252:20, 2259:15
**purported** [1] - 2201:16
**purpose** [4] - 2176:18, 2176:20, 2236:14, 2274:12
**put** [10] - 2214:8, 2236:14, 2236:15, 2242:13, 2274:9, 2279:7, 2297:25, 2301:3, 2303:18, 2309:6
**puts** [1] - 2306:23
**PWC** [1] - 2223:3
**PX** [3] - 2300:16, 2304:9, 2305:10
**PX-211** [1] - 2282:20
**PX-213** [6] - 2285:16, 2293:4, 2293:22, 2294:10, 2294:21, 2297:21
**PX-216** [5] - 2301:6, 2305:19, 2305:22, 2306:2, 2307:12
**PX-218** [3] - 2293:7, 2301:6, 2301:23

**PX-269** [2] - 2295:10, 2302:1
**PX-509** [2] - 2297:25, 2301:12
**PX-550** [1] - 2304:5
**pyramid** [1] - 2177:12

### Q

**Q1** [1] - 2273:1
**Q3** [1] - 2273:3
**qualify** [1] - 2271:16
**quality** [1] - 2174:12
**quantitative** [1] - 2177:25
**quarter** [64] - 2198:9, 2213:23, 2214:10, 2214:24, 2215:4, 2216:11, 2216:21, 2216:24, 2217:2, 2217:7, 2217:8, 2217:11, 2217:12, 2217:13, 2217:15, 2217:16, 2218:6, 2218:20, 2223:8, 2225:14, 2227:3, 2227:9, 2230:25, 2245:3, 2252:7, 2252:8, 2252:15, 2252:18, 2252:19, 2254:1, 2254:2, 2254:15, 2254:20, 2254:21, 2255:16, 2256:1, 2256:23, 2257:3, 2257:12, 2260:22, 2263:5, 2271:6, 2271:10, 2271:19, 2271:21, 2271:25, 2272:3, 2272:5, 2272:6, 2272:9, 2272:13, 2272:17, 2272:22, 2278:22, 2279:11, 2279:12, 2279:19, 2279:20, 2280:21, 2281:23, 2282:7, 2282:15, 2312:22
**quarterly** [18] - 2213:22, 2213:24, 2214:2, 2214:3, 2214:4, 2214:17, 2214:21, 2214:22, 2216:2, 2216:6, 2217:6, 2217:14, 2243:10, 2243:13, 2252:18, 2256:19, 2260:18, 2261:11
**quarters** [9] - 2216:13, 2227:1, 2260:16, 2272:10, 2278:23,

2280:23, 2284:6, 2284:8, 2305:9
**questioner** [1] - 2305:16
**questioning** [2] - 2273:10, 2303:5
**questions** [35] - 2179:4, 2179:24, 2179:25, 2184:24, 2187:21, 2187:25, 2188:2, 2189:5, 2189:14, 2190:14, 2191:6, 2192:10, 2192:14, 2198:18, 2199:24, 2200:4, 2201:12, 2202:11, 2203:21, 2210:5, 2220:18, 2231:4, 2231:7, 2235:1, 2235:12, 2242:20, 2265:7, 2269:21, 2269:24, 2274:24, 2289:3, 2308:18, 2318:19, 2318:25, 2320:6
**quick** [3] - 2273:10, 2281:17, 2308:18
**quickly** [5] - 2224:6, 2281:15, 2286:9, 2291:23, 2316:8
**quite** [2] - 2195:16, 2268:3
**quotation** [1] - 2286:7
**quotations** [1] - 2306:24
**quote** [1] - 2178:25

### R

**Radnor** [1] - 2170:19
**raise** [1] - 2211:3
**raised** [2] - 2229:1, 2268:25
**ran** [3] - 2203:16, 2203:18, 2230:8
**range** [2] - 2179:11, 2179:13
**rate** [4] - 2197:21, 2197:22, 2254:1, 2258:2
**rated** [4] - 2315:6, 2317:6, 2317:7
**rates** [2] - 2255:8
**rather** [4] - 2255:15, 2262:10, 2278:22, 2282:25
**rating** [5] - 2192:22, 2194:5, 2194:6, 2197:6, 2317:3
**ratings** [9] - 2192:11,

2192:12, 2196:23, 2197:1, 2197:4, 2197:7, 2197:11, 2197:17, 2198:1
**RBC** [2] - 2173:16, 2174:9
**re** [2] - 2170:8, 2229:21
**re-recording** [1] - 2229:21
**reach** [1] - 2216:21
**reached** [2] - 2217:20, 2226:1
**reaching** [2] - 2228:18, 2229:10
**react** [1] - 2316:6
**reaction** [3] - 2178:18, 2178:23, 2315:21
**read** [16] - 2175:5, 2178:11, 2210:11, 2230:20, 2252:10, 2255:20, 2260:11, 2267:25, 2269:9, 2288:11, 2290:20, 2306:15, 2306:16, 2311:17, 2311:18, 2315:24
**readers** [1] - 2250:3
**readily** [3] - 2226:4, 2226:6, 2227:6
**reading** [4] - 2256:12, 2256:13, 2268:3, 2290:16
**ready** [2] - 2244:10, 2275:14
**realizable** [1] - 2225:10
**realized** [1] - 2221:9
**really** [17] - 2187:10, 2198:24, 2225:2, 2226:14, 2256:14, 2277:23, 2278:12, 2278:17, 2280:14, 2281:13, 2281:16, 2294:19, 2298:24, 2301:21, 2308:10, 2309:4, 2317:12
**reason** [6] - 2184:22, 2241:24, 2270:12, 2285:21, 2286:22, 2313:3
**reasonable** [6] - 2179:5, 2179:10, 2185:23, 2190:20, 2292:18
**rebuttal** [5] - 2275:12, 2275:14, 2275:16, 2275:21, 2300:3
**receive** [1] - 2205:19
**RECEIVED** [1] -

2172:9
**received** [13] - 2174:24, 2174:25, 2175:8, 2207:20, 2207:21, 2218:17, 2218:18, 2222:17, 2222:18, 2239:3, 2239:4, 2285:25, 2286:1
**recent** [4] - 2219:19, 2224:25, 2238:11, 2239:9
**recently** [1] - 2278:20
**Recess** [2] - 2232:17, 2320:16
**recess** [1] - 2275:20
**recipient** [4] - 2208:13, 2233:9, 2234:3, 2234:6
**recipients** [1] - 2191:16
**reciting** [1] - 2269:16
**recognition** [2] - 2255:15, 2257:12
**recognize** [5] - 2193:3, 2207:8, 2218:2, 2222:3, 2237:8
**recognized** [2] - 2256:22, 2258:18
**recollection** [4] - 2183:4, 2219:6, 2223:6, 2250:18
**record** [6] - 2206:20, 2232:15, 2232:16, 2269:9, 2279:1, 2321:4
**recorded** [1] - 2171:15
**recording** [1] - 2229:21
**records** [2] - 2206:19, 2217:11
**recover** [1] - 2306:23
**redirect** [2] - 2274:25, 2275:1
**REDIRECT** [1] - 2187:22
**Redirect** [1] - 2172:4
**reduce** [8] - 2197:7, 2197:25, 2212:21, 2221:4, 2240:9, 2277:20, 2278:15, 2313:9
**reduced** [2] - 2211:18, 2310:19
**reduction** [7] - 2197:11, 2197:13, 2219:21, 2236:5, 2236:8, 2255:14, 2277:21

**refer** [1] - 2291:23
**reference** [12] -
2176:21, 2177:2,
2177:4, 2190:17,
2197:2, 2228:4,
2228:9, 2228:25,
2238:12, 2240:4,
2240:12, 2307:23
**referenced** [1] -
2246:13
**references** [2] -
2293:18, 2305:5
**referencing** [3] -
2194:11, 2194:21,
2239:11
**referring** [4] - 2218:5,
2226:19, 2229:10,
2293:15
**reflect** [3] - 2249:11,
2261:16, 2292:11
**reflected** [2] -
2245:23, 2256:8
**reflects** [2] - 2186:11,
2259:3
**reform** [2] - 2195:23,
2196:12
**regard** [2] - 2271:18,
2285:10
**regarding** [3] -
2176:17, 2177:25,
2254:10
**regular** [3] - 2238:22,
2281:6, 2281:19
**regularly** [1] - 2262:1
**regulated** [2] -
2206:17, 2237:14
**regulatory** [1] -
2206:12
**related** [5] - 2176:17,
2206:16, 2218:10,
2220:4, 2241:19
**relates** [2] - 2179:4,
2179:5
**relating** [2] - 2178:15,
2248:2
**relationship** [1] -
2281:3
**relative** [3] - 2211:13,
2227:10, 2256:13
**relaying** [1] - 2230:4
**release** [1] - 2255:25
**released** [2] - 2255:21,
2302:9
**releasing** [2] - 2256:4,
2270:19
**relevant** [6] - 2196:13,
2281:18, 2293:1,
2294:18, 2294:20,
2296:24
**reliability** [2] - 2288:5,

2290:19
**reliable** [2] - 2292:18,
2311:22
**relied** [11] - 2173:10,
2284:22, 2285:18,
2285:21, 2289:6,
2293:4, 2294:1,
2294:2, 2297:21,
2299:22
**rely** [2] - 2287:23,
2291:8
**remained** [1] - 2287:3
**remaining** [9] -
2285:10, 2286:14,
2286:23, 2288:1,
2293:25, 2296:22,
2298:23, 2314:5,
2318:3
**remains** [2] - 2198:15,
2285:13
**remember** [10] -
2185:2, 2185:6,
2265:18, 2266:21,
2280:5, 2283:3,
2286:2, 2287:18,
2308:7, 2319:21
**remembers** [1] -
2268:3
**remind** [6] - 2204:8,
2208:2, 2212:2,
2217:2, 2237:1,
2275:23
**removed** [1] - 2182:10
**rendering** [2] -
2173:11, 2177:1
**reorient** [2] - 2232:24,
2234:25
**repayment** [1] -
2306:24
**repeat** [6] - 2250:16,
2263:16, 2264:8,
2269:18, 2271:23,
2293:17
**repeating** [1] -
2269:16
**repeats** [1] - 2301:17
**reperformance** [1] -
2255:8
**rephrase** [1] - 2234:9
**report** [36] - 2173:17,
2174:2, 2174:9,
2175:23, 2185:1,
2185:14, 2188:21,
2189:6, 2189:11,
2189:15, 2192:20,
2193:14, 2198:4,
2198:14, 2230:16,
2243:13, 2243:14,
2244:6, 2244:9,
2244:13, 2244:17,

2245:18, 2245:22,
2246:8, 2248:1,
2249:24, 2250:4,
2250:6, 2261:11,
2303:21, 2304:9,
2305:23, 2306:11,
2311:17, 2315:24,
2316:21
**reported** [1] - 2320:17
**Reporter** [1] - 2171:11
**REPORTER** [2] -
2321:1, 2321:9
**reporters** [1] -
2320:15
**reporting** [4] - 2212:8,
2212:9, 2217:4
**reports** [6] - 2173:11,
2173:13, 2173:16,
2217:9, 2243:11,
2287:22
**represent** [1] -
2262:11
**representative** [1] -
2250:7
**represents** [1] -
2183:20
**requesting** [1] -
2259:14
**required** [6] - 2183:25,
2210:21, 2211:10,
2213:21, 2250:10,
2252:19
**requirements** [1] -
2247:3
**rescue** [1] - 2175:10
**research** [1] - 2191:18
**reserves** [4] -
2180:16, 2255:14,
2257:18, 2266:12
**residual** [3] - 2287:18,
2287:20, 2287:23
**respect** [5] - 2200:6,
2210:19, 2211:21,
2284:11, 2309:23
**respond** [2] - 2228:17,
2307:15
**responding** [1] -
2299:20
**response** [3] - 2229:7,
2300:6, 2300:7
**responsibilities** [3] -
2214:23, 2230:11,
2238:9
**responsibility** [3] -
2226:24, 2229:3,
2231:2
**responsible** [1] -
2174:11
**restate** [1] - 2278:9
**restrictions** [1] -

2192:3
**rests** [2] - 2275:8,
2275:11
**result** [7] - 2184:20,
2192:23, 2195:7,
2195:8, 2250:9,
2259:12, 2284:7
**resulted** [4] - 2255:14,
2255:23, 2255:24,
2255:25
**resulting** [3] -
2219:23, 2220:24,
2257:20
**results** [48] - 2196:13,
2245:22, 2247:9,
2247:11, 2249:13,
2249:18, 2249:19,
2249:22, 2251:3,
2251:8, 2251:12,
2252:3, 2252:6,
2252:11, 2252:22,
2252:24, 2252:25,
2253:8, 2254:6,
2254:9, 2254:19,
2254:23, 2255:4,
2255:11, 2256:5,
2256:7, 2256:19,
2256:25, 2257:6,
2257:12, 2257:15,
2257:24, 2258:5,
2258:8, 2258:15,
2258:21, 2259:9,
2259:17, 2261:17,
2262:13, 2263:4,
2267:6, 2267:8,
2279:11, 2308:2,
2308:15, 2319:1,
2319:2
**resume** [1] - 2173:5
**retain** [1] - 2309:13
**retained** [10] - 2182:6,
2235:24, 2236:5,
2308:21, 2308:25,
2310:2, 2310:5,
2311:3, 2311:7,
2311:12
**return** [2] - 2198:12,
2224:13
**returned** [2] - 2289:11,
2289:18
**returning** [1] - 2307:1
**reverse** [1] - 2241:20
**reversed** [2] - 2241:8,
2269:1
**review** [15] - 2190:4,
2196:23, 2213:17,
2214:2, 2215:4,
2216:2, 2216:6,
2217:6, 2217:14,
2218:12, 2222:12,

2243:22, 2245:21,
2246:2, 2291:23
**reviewed** [11] -
2188:20, 2193:17,
2210:14, 2211:3,
2238:16, 2244:13,
2244:14, 2285:3,
2285:5, 2289:6,
2299:19
**reviewing** [5] -
2188:17, 2206:24,
2211:15, 2226:16,
2231:17
**reviews** [3] - 2214:21,
2214:22, 2244:1
**revised** [1] - 2296:6
**RICHARD** [1] - 2171:2
**risk** [6] - 2250:5,
2250:14, 2250:17,
2250:23, 2250:24,
2301:19
**riskiness** [3] -
2315:14, 2315:19,
2317:17
**risks** [2] - 2249:17,
2261:13
**Road** [1] - 2170:19
**Robert** [1] - 2173:7
**ROBERT** [2] - 2171:2,
2171:7
**role** [21] - 2190:5,
2205:2, 2205:3,
2205:4, 2205:5,
2206:15, 2208:2,
2208:16, 2208:23,
2209:1, 2209:3,
2209:6, 2209:7,
2209:9, 2209:12,
2209:15, 2209:20,
2230:7, 2237:2,
2264:16, 2281:8
**Room** [1] - 2171:13
**rounding** [1] -
2279:25
**row** [1] - 2199:6
**ROYCE** [1] - 2170:12
**RPR** [1] - 2171:11
**RUDY** [1] - 2170:17
**Rule** [2] - 2173:22,
2193:23
**rules** [3] - 2215:15,
2224:5, 2242:14
**ruling** [1] - 2232:3
**run** [6] - 2194:23,
2195:5, 2196:9,
2200:13, 2206:15,
2316:8

# S

**safe** [6] - 2236:15, 2246:21, 2246:25, 2247:11, 2248:17, 2249:7
**safer** [6] - 2201:9, 2201:10, 2201:11, 2317:4, 2317:6
**safety** [1] - 2209:7
**Salazar** [40] - 2188:23, 2189:9, 2189:18, 2189:24, 2190:25, 2191:3, 2192:9, 2193:2, 2194:8, 2195:18, 2198:3, 2198:22, 2199:2, 2199:6, 2199:22, 2207:5, 2207:7, 2217:23, 2218:25, 2219:12, 2221:22, 2221:25, 2222:20, 2222:25, 2223:9, 2224:7, 2225:3, 2225:20, 2227:15, 2227:18, 2228:15, 2229:5, 2232:24, 2233:17, 2234:22, 2236:19, 2237:7, 2237:21, 2239:13, 2239:23
**SAMUEL** [1] - 2170:21
**Sara** [2] - 2321:3, 2321:8
**SARA** [1] - 2171:11
**satisfied** [2] - 2244:5, 2244:9
**SATRIANO** [2] - 2172:5, 2204:2
**Satriano** [42] - 2203:25, 2204:5, 2204:10, 2204:12, 2204:13, 2207:1, 2207:8, 2211:22, 2218:2, 2219:17, 2222:3, 2222:22, 2226:4, 2227:20, 2232:1, 2233:9, 2233:10, 2233:13, 2234:6, 2234:8, 2234:12, 2234:25, 2237:8, 2242:22, 2243:8, 2269:8, 2269:12, 2269:17, 2269:18, 2269:22, 2270:3, 2270:4, 2273:21, 2274:8, 2276:15, 2276:18, 2277:8, 2278:20, 2283:22, 2308:20,

2309:24, 2310:5
**save** [1] - 2304:7
**saving** [1] - 2277:22
**saw** [5] - 2187:11, 2254:25, 2284:5, 2289:1, 2297:9
**Schiller** [1] - 2170:22
**Scholer** [1] - 2171:8
**schooling** [2] - 2205:13, 2205:15
**Schwitters** [6] - 2237:24, 2238:4, 2238:5, 2238:16, 2238:17, 2240:17
**scope** [1] - 2299:19
**screen** [9] - 2174:7, 2178:11, 2189:11, 2199:14, 2232:25, 2279:8, 2295:10, 2300:8, 2305:23
**scroll** [1] - 2210:4
**seated** [2] - 2173:4, 2234:18
**SEC** [14] - 2206:22, 2212:8, 2214:3, 2216:11, 2243:11, 2243:17, 2243:23, 2244:6, 2244:12, 2245:8, 2260:24, 2262:24, 2263:13, 2273:21
**SEC-type** [1] - 2212:8
**second** [41] - 2178:5, 2189:9, 2198:9, 2216:24, 2217:2, 2217:13, 2217:25, 2218:6, 2218:20, 2227:8, 2237:6, 2245:3, 2247:25, 2252:7, 2252:8, 2252:14, 2252:18, 2254:15, 2254:20, 2254:25, 2255:16, 2256:22, 2257:3, 2257:12, 2258:17, 2260:22, 2261:10, 2263:5, 2263:23, 2267:2, 2272:9, 2279:9, 2279:12, 2280:21, 2281:23, 2282:6, 2282:15, 2283:6, 2289:15, 2295:14
**secondary** [1] - 2206:12
**secondly** [1] - 2317:1
**section** [10] - 2245:14, 2245:17, 2246:2, 2246:21, 2247:4, 2248:15, 2260:5,

2260:7, 2261:7, 2261:10
**Section** [3] - 2246:9, 2246:13, 2246:18
**secured** [5] - 2174:20, 2174:24, 2175:4, 2175:17, 2175:19
**securities** [3] - 2221:19, 2250:11, 2262:3
**Securities** [3] - 2246:10, 2246:14, 2246:17
**securitization** [5] - 2308:25, 2309:8, 2309:9, 2309:20, 2309:21
**securitized** [1] - 2309:15
**see** [136] - 2174:7, 2174:9, 2174:12, 2178:10, 2178:17, 2181:12, 2182:19, 2182:22, 2183:5, 2183:8, 2183:16, 2183:22, 2184:3, 2184:13, 2187:8, 2190:15, 2190:23, 2191:19, 2194:19, 2199:12, 2207:7, 2208:14, 2219:4, 2225:11, 2227:17, 2229:25, 2233:18, 2240:2, 2240:10, 2240:24, 2241:9, 2245:15, 2245:25, 2246:5, 2246:10, 2246:19, 2248:4, 2248:6, 2248:8, 2248:9, 2249:1, 2249:2, 2250:2, 2250:12, 2251:17, 2251:25, 2253:1, 2253:4, 2253:13, 2253:14, 2253:18, 2254:16, 2254:17, 2255:2, 2257:22, 2257:23, 2258:9, 2258:10, 2258:25, 2259:7, 2260:1, 2261:8, 2262:7, 2262:8, 2265:15, 2265:23, 2265:24, 2266:15, 2266:16, 2267:9, 2267:10, 2274:16, 2279:5, 2279:14, 2279:20, 2279:23, 2281:25, 2282:9, 2282:12, 2282:20, 2282:22,

2282:24, 2283:7, 2288:15, 2288:16, 2288:17, 2289:2, 2289:4, 2289:9, 2289:13, 2289:19, 2289:24, 2290:4, 2290:7, 2291:5, 2292:8, 2292:15, 2292:20, 2292:24, 2293:8, 2293:9, 2293:12, 2293:14, 2293:15, 2293:18, 2295:17, 2295:19, 2295:23, 2296:4, 2296:6, 2296:8, 2296:11, 2296:14, 2296:17, 2298:11, 2298:13, 2298:16, 2299:2, 2299:3, 2300:8, 2301:6, 2301:8, 2303:18, 2305:3, 2305:5, 2305:6, 2305:9, 2305:10, 2305:14, 2306:13, 2311:20, 2314:18, 2314:22, 2315:23, 2318:13, 2320:11
**seeing** [2] - 2289:22, 2302:8
**seek** [1] - 2247:20
**sell** [2] - 2309:7, 2310:21
**sellers** [1] - 2311:14
**selling** [1] - 2315:11
**semiannual** [1] - 2316:21
**send** [3] - 2238:1, 2243:19, 2304:18
**sender** [1] - 2233:8
**sending** [2] - 2210:1, 2298:8
**sends** [1] - 2244:10
**senior** [15] - 2181:9, 2181:14, 2184:19, 2190:6, 2194:10, 2195:22, 2252:20, 2259:5, 2259:14, 2292:10, 2292:11, 2292:14, 2314:5, 2314:7
**SENIOR** [1] - 2170:9
**sense** [5] - 2231:22, 2233:21, 2235:15, 2236:2, 2306:25
**sent** [14] - 2178:6, 2178:20, 2182:20, 2207:15, 2207:23, 2208:7, 2208:8, 2238:2, 2264:2,

2285:22, 2285:23, 2295:23, 2301:23, 2304:22
**sentence** [48] - 2183:11, 2184:9, 2195:19, 2197:3, 2219:16, 2220:1, 2220:23, 2221:5, 2224:8, 2225:1, 2225:6, 2231:20, 2231:21, 2233:19, 2235:13, 2236:12, 2240:8, 2241:16, 2246:7, 2247:18, 2251:19, 2252:5, 2253:15, 2253:25, 2254:18, 2254:25, 2255:6, 2255:13, 2255:20, 2256:21, 2257:2, 2257:10, 2257:17, 2258:1, 2258:11, 2258:17, 2259:2, 2259:12, 2259:21, 2260:15, 2263:5, 2266:10, 2267:5, 2283:6, 2283:16, 2284:4, 2290:23
**sentences** [2] - 2233:14, 2235:12
**separate** [1] - 2320:18
**September** [3] - 2176:8, 2193:8, 2203:2
**series** [2] - 2215:15, 2222:22
**serious** [2] - 2254:1, 2258:2
**seriously** [1] - 2272:21
**Service** [1] - 2193:6
**SESSION** [1] - 2170:12
**session** [1] - 2320:17
**set** [5] - 2176:11, 2179:14, 2179:15, 2292:10, 2309:24
**several** [7] - 2204:20, 2207:11, 2233:6, 2250:19, 2274:17, 2286:2, 2290:20
**severity** [1] - 2244:4
**shall** [4] - 2176:21, 2232:8, 2303:9
**shared** [2] - 2264:19, 2273:24
**shareholders** [2] - 2180:13, 2314:5
**shares** [3] - 2177:15, 2181:10

**sharing** [1] - 2241:17
**sheet** [13] - 2181:2, 2181:9, 2181:20, 2182:10, 2182:13, 2277:5, 2284:14, 2284:20, 2291:21, 2302:9, 2302:11
**shorthand** [2] - 2171:15, 2214:1
**shortly** [1] - 2235:20
**show** [30] - 2173:21, 2176:7, 2177:18, 2221:25, 2279:1, 2279:3, 2279:6, 2283:1, 2285:9, 2287:9, 2287:11, 2290:23, 2291:4, 2293:7, 2298:21, 2299:24, 2300:17, 2301:4, 2301:18, 2302:5, 2302:10, 2305:4, 2305:23, 2305:24, 2307:22, 2317:24, 2318:9, 2318:16, 2319:10
**showed** [9] - 2263:20, 2265:6, 2284:8, 2290:21, 2299:17, 2300:13, 2300:19, 2300:20, 2301:1
**showing** [6] - 2189:10, 2300:24, 2302:24, 2314:18, 2316:15, 2318:1
**shown** [13] - 2234:4, 2286:3, 2286:5, 2293:5, 2294:15, 2294:16, 2294:20, 2295:4, 2298:7, 2299:5, 2304:20, 2308:5, 2319:18
**shows** [2] - 2279:11, 2300:12
**shrank** [1] - 2311:13
**shrink** [6] - 2174:6, 2197:23, 2276:23, 2308:20, 2310:2, 2310:5
**shrinks** [1] - 2311:4
**shutting** [1] - 2236:13
**side** [5] - 2278:12, 2300:9, 2301:5
**sides** [1] - 2274:19
**sign** [2] - 2244:15, 2264:23
**SIGNATURE** [1] - 2321:9
**signed** [9] - 2198:8, 2198:10, 2198:15, 2208:11, 2233:8,

2235:9, 2236:20, 2239:21, 2244:16
**significant** [8] - 2219:18, 2245:20, 2252:6, 2254:19, 2256:10, 2257:11, 2261:13, 2293:24
**significantly** [5] - 2197:6, 2201:11, 2252:25, 2261:18, 2262:13
**similar** [10] - 2194:25, 2195:3, 2209:3, 2209:4, 2247:21, 2294:19, 2295:1, 2315:6, 2317:3
**similar-rated** [1] - 2315:6
**simplify** [1] - 2302:20
**single** [6] - 2253:16, 2253:25, 2257:19, 2258:2, 2279:19, 2316:8
**single-family** [2] - 2253:25, 2257:19
**sit** [3] - 2214:10, 2230:13, 2246:15
**six** [1] - 2195:1
**skip** [1] - 2259:19
**slide** [34] - 2173:16, 2173:21, 2174:1, 2174:17, 2175:3, 2175:18, 2176:4, 2176:7, 2176:16, 2176:17, 2177:8, 2177:18, 2177:20, 2177:22, 2279:5, 2279:7, 2279:11, 2282:2, 2283:1, 2299:16, 2300:10, 2300:13, 2302:3, 2302:6, 2302:7, 2305:13, 2305:18, 2306:7, 2306:9, 2307:12, 2316:8, 2316:9, 2319:10, 2319:14
**slides** [9] - 2174:16, 2177:19, 2279:4, 2279:5, 2296:3, 2298:15, 2299:24, 2300:3, 2300:4
**slightly** [5] - 2222:8, 2223:23, 2297:25, 2299:8, 2309:25
**slopes** [1] - 2195:2
**slowly** [1] - 2187:11
**small** [11] - 2217:16, 2225:16, 2227:10, 2278:22, 2279:16,

2279:17, 2281:22, 2282:7, 2316:16, 2318:6
**smaller** [4] - 2186:19, 2187:3, 2235:25
**so-called** [1] - 2309:10
**solve** [1] - 2314:16
**someone** [3] - 2272:19, 2273:5, 2311:3
**sometimes** [2] - 2213:2, 2312:1
**soon** [6] - 2201:5, 2201:7, 2203:14, 2203:16, 2213:14, 2238:19
**sorry** [13] - 2176:8, 2213:12, 2231:20, 2252:16, 2257:10, 2261:9, 2264:8, 2265:10, 2290:14, 2299:1, 2303:11, 2303:20, 2318:19
**sort** [16] - 2208:17, 2209:2, 2209:4, 2209:8, 2210:4, 2214:3, 2215:12, 2215:23, 2219:13, 2221:16, 2225:16, 2239:17, 2256:12, 2292:11, 2316:1, 2318:9
**sound** [2] - 2236:16
**sounded** [1] - 2280:5
**soundness** [1] - 2209:7
**source** [1] - 2285:18
**space** [3] - 2209:8, 2215:15, 2221:23
**span** [1] - 2216:10
**speaking** [1] - 2212:12
**specific** [3] - 2220:10, 2224:19, 2264:3
**specified** [1] - 2217:8
**speculate** [1] - 2234:1
**speculation** [2] - 2231:25, 2233:25
**speed** [1] - 2302:20
**spelled** [1] - 2247:4
**spend** [1] - 2206:18
**spent** [2] - 2206:6, 2206:23
**spin** [5] - 2188:10, 2189:2, 2303:8, 2306:20, 2306:25
**spite** [1] - 2318:8
**Spohn** [10] - 2209:12, 2209:13, 2230:5,

2230:8, 2230:13, 2230:17, 2268:10, 2268:14, 2268:17, 2268:24
**Spohn's** [3] - 2209:12, 2209:16, 2230:7
**spread** [16] - 2186:4, 2186:6, 2186:11, 2186:14, 2186:19, 2186:22, 2187:17, 2314:25, 2315:2, 2315:13, 2315:16, 2315:18, 2315:22, 2316:1, 2317:14, 2317:20
**spreads** [8] - 2173:12, 2174:12, 2187:2, 2187:5, 2199:24, 2200:20, 2317:8, 2318:15
**SPSPA** [3] - 2286:15, 2296:22, 2298:23
**stable** [2] - 2289:12, 2289:18
**stage** [1] - 2309:24
**stand** [2] - 2173:5, 2285:24
**standard** [2] - 2215:12, 2215:16
**start** [5] - 2195:19, 2205:23, 2227:18, 2261:5, 2275:19
**started** [4] - 2241:4, 2241:7, 2241:17, 2242:12
**starting** [3] - 2187:16, 2195:10, 2291:20
**starts** [6] - 2195:18, 2224:7, 2225:5, 2225:6, 2263:24, 2267:3
**state** [1] - 2205:20
**statement** [46] - 2184:5, 2184:16, 2199:11, 2214:15, 2247:5, 2248:14, 2249:4, 2249:6, 2250:9, 2250:24, 2252:10, 2252:11, 2252:22, 2253:3, 2253:10, 2253:19, 2254:6, 2254:23, 2255:4, 2255:11, 2256:4, 2256:5, 2256:25, 2257:6, 2257:15, 2257:24, 2258:5, 2258:15, 2258:21, 2259:9, 2259:17, 2260:3, 2260:4, 2260:11,

2260:12, 2260:13, 2261:16, 2262:23, 2267:11, 2272:15, 2280:16, 2311:6, 2316:1, 2316:4
**statements** [46] - 2195:22, 2213:23, 2213:24, 2214:8, 2245:18, 2245:21, 2245:22, 2245:24, 2246:3, 2246:5, 2246:8, 2246:9, 2246:22, 2247:1, 2247:8, 2247:9, 2247:11, 2247:19, 2248:1, 2248:2, 2249:11, 2249:17, 2249:21, 2249:23, 2250:3, 2250:7, 2250:22, 2250:25, 2251:3, 2251:7, 2251:11, 2254:9, 2254:10, 2256:13, 2261:12, 2261:14, 2261:19, 2261:23, 2262:5, 2262:6, 2262:10, 2262:14, 2272:19, 2274:2, 2315:23
**States** [7] - 2171:11, 2184:7, 2192:4, 2200:18, 2295:4, 2315:4, 2315:5
**STATES** [2] - 2170:1, 2170:13
**states** [1] - 2176:21
**stating** [2] - 2195:4, 2214:25
**statute** [1] - 2246:17
**stay** [6] - 2204:8, 2214:15, 2214:16, 2215:1, 2215:9, 2278:11
**stays** [1] - 2277:7
**steadily** [1] - 2254:1
**stenotype** [1] - 2171:15
**step** [2] - 2203:23, 2275:3
**Stephen** [3] - 2223:16, 2223:18, 2223:19
**steps** [2] - 2205:8, 2276:25
**STERN** [2] - 2171:6, 2290:13
**still** [7] - 2243:21, 2275:24, 2277:25, 2285:13, 2297:24, 2299:7, 2318:9
**stipulate** [1] - 2263:11

**stock** [15] - 2174:2,
2181:9, 2181:14,
2181:15, 2181:19,
2181:20, 2181:23,
2181:24, 2182:7,
2182:9, 2184:19,
2194:10, 2252:20,
2259:5, 2259:14
**STOCK** [1] - 2170:9
**stockholders'** [1] -
2199:7
**stopped** [1] - 2211:15
**straight** [1] - 2282:3
**strategy** [1] - 2219:20
**street** [1] - 2309:6
**strengthen** [2] -
2294:22, 2294:25
**strike** [1] - 2203:15
**strong** [2] - 2251:21,
2253:12
**stronger** [1] - 2294:22
**studied** [6] - 2185:13,
2205:12, 2311:2,
2318:25, 2319:2
**study** [4] - 2177:25,
2200:6, 2205:11,
2205:17
**subject** [7] - 2190:13,
2207:13, 2245:19,
2249:17, 2261:13,
2275:9, 2294:16
**subjective** [3] -
2224:13, 2224:18,
2225:2
**subjects** [1] - 2239:15
**subsequent** [2] -
2217:11, 2285:3
**substance** [3] -
2237:17, 2285:10,
2318:15
**substantive** [1] -
2285:15
**substantively** [1] -
2294:1
**subtract** [1] - 2301:13
**sufficient** [5] - 2221:6,
2223:25, 2224:2,
2260:17, 2283:17
**suggest** [4] - 2182:8,
2251:1, 2282:5,
2294:5
**suggesting** [2] -
2280:6, 2282:19
**suggestion** [1] -
2244:4
**suggestions** [1] -
2200:5
**sum** [2] - 2285:9,
2318:15
**summaries** [1] -

2274:3
**summarize** [1] -
2316:7
**summary** [10] -
2190:20, 2219:11,
2219:13, 2219:15,
2222:2, 2251:16,
2253:7, 2254:14,
2260:9, 2263:3
**superfluous** [1] -
2177:2
**supervision** [1] -
2209:23
**supply** [7] - 2174:10,
2178:14, 2178:15,
2184:25, 2185:4,
2185:8, 2185:11
**support** [9] - 2183:13,
2184:11, 2195:24,
2196:1, 2196:13,
2224:8, 2251:20,
2267:3, 2315:23
**supported** [1] -
2190:6
**suppose** [1] - 2312:7
**surprise** [2] - 2230:20,
2268:20
**Susan** [15] - 2182:20,
2183:6, 2236:24,
2237:1, 2237:3,
2239:12, 2240:19,
2240:20, 2240:21,
2240:22, 2267:14,
2286:3, 2288:7,
2298:13, 2303:1
**suspend** [1] - 2191:7
**suspended** [1] -
2191:11
**sustainability** [2] -
2219:21, 2220:18
**sustainable** [2] -
2281:9, 2281:20
**sustained** [15] -
2189:22, 2262:20,
2263:15, 2270:8,
2270:15, 2271:3,
2271:13, 2271:14,
2273:8, 2274:17,
2274:22, 2281:10,
2290:21, 2291:13,
2304:25
**sweep** [20] - 2179:21,
2185:23, 2187:1,
2201:13, 2201:24,
2236:3, 2265:2,
2283:12, 2295:21,
2311:21, 2313:24,
2317:11, 2317:15,
2317:21, 2318:13,
2318:17, 2318:22,

2319:6, 2319:11,
2319:16
**switch** [1] - 2320:14
**SWORN** [2] - 2204:2,
2275:25
**sync** [1] - 2292:7
**systematically** [1] -
2243:22

---

**T**

---

**tab** [10] - 2178:10,
2246:16, 2288:6,
2292:2, 2293:9,
2295:6, 2295:10,
2295:12, 2303:10,
2303:11
**takeaway** [1] -
2231:11
**talks** [1] - 2271:19
**tax** [60] - 2211:23,
2211:24, 2212:2,
2212:4, 2212:7,
2212:10, 2212:12,
2212:13, 2212:15,
2212:16, 2212:20,
2212:21, 2212:24,
2213:7, 2213:11,
2213:13, 2214:12,
2215:18, 2216:15,
2216:19, 2221:2,
2221:8, 2225:9,
2226:11, 2226:12,
2229:21, 2230:18,
2236:24, 2240:15,
2240:23, 2241:15,
2276:11, 2276:15,
2276:19, 2276:21,
2277:4, 2277:14,
2277:17, 2277:18,
2277:19, 2277:20,
2277:21, 2277:23,
2278:3, 2278:4,
2278:7, 2278:11,
2278:14, 2278:15,
2278:19, 2281:7,
2281:19, 2284:12,
2284:14, 2284:19,
2291:18, 2291:19
**taxable** [6] - 2213:6,
2219:23, 2220:16,
2220:24, 2276:22,
2278:2
**taxed** [1] - 2216:18
**taxes** [8] - 2212:10,
2212:17, 2212:19,
2220:20, 2221:3,
2221:4, 2224:3,
2278:3
**taxpayers** [3] -

2183:13, 2183:14,
2183:21
**technical** [2] - 2213:3,
2221:16
**template** [2] -
2237:13, 2237:16
**temporary** [2] -
2221:20, 2276:22
**ten** [9] - 2187:24,
2205:5, 2285:11,
2296:21, 2297:13,
2299:15, 2300:17,
2300:21, 2320:13
**ten-year** [2] - 2297:13,
2299:15
**tends** [1] - 2197:14
**term** [15] - 2178:16,
2187:2, 2187:15,
2200:20, 2201:2,
2213:3, 2218:22,
2219:20, 2220:18,
2240:1, 2241:2,
2248:25, 2259:25,
2306:24, 2318:8
**terminal** [1] - 2186:7
**terms** [6] - 2175:24,
2195:17, 2214:17,
2301:19, 2314:3,
2314:4
**tertiary** [1] - 2298:24
**testified** [15] -
2173:10, 2180:11,
2185:22, 2201:20,
2233:10, 2233:13,
2244:22, 2266:19,
2268:7, 2268:16,
2268:23, 2270:3,
2270:4, 2270:12,
2307:16
**testifying** [4] -
2174:19, 2176:25,
2182:8, 2236:7
**TESTIMONY** [1] -
2172:3
**testimony** [54] -
2174:23, 2188:4,
2188:18, 2188:20,
2188:24, 2189:21,
2228:25, 2266:21,
2269:11, 2269:15,
2269:16, 2269:19,
2270:7, 2272:8,
2272:12, 2276:9,
2276:11, 2276:14,
2276:17, 2276:24,
2278:21, 2278:24,
2280:4, 2286:7,
2287:22, 2287:23,
2288:7, 2291:24,
2294:17, 2299:16,

2299:19, 2303:3,
2303:5, 2303:6,
2303:12, 2304:15,
2304:17, 2304:19,
2304:24, 2305:4,
2306:1, 2306:10,
2307:13, 2308:22,
2309:23, 2310:4,
2310:8, 2311:25,
2312:4, 2314:10,
2314:24, 2315:21,
2315:22, 2318:21
**text** [5] - 2189:25,
2199:3, 2199:6,
2219:14, 2237:21
**Thakor** [2] - 2175:6,
2175:21
**Thakor's** [1] - 2202:15
**THE** [58] - 2170:1,
2170:1, 2170:12,
2173:4, 2180:1,
2180:3, 2180:4,
2185:18, 2185:19,
2189:22, 2191:23,
2191:24, 2192:6,
2192:7, 2193:24,
2203:23, 2204:2,
2207:20, 2218:17,
2220:22, 2220:23,
2222:17, 2232:9,
2232:13, 2232:15,
2232:18, 2234:9,
2234:13, 2234:16,
2234:18, 2239:3,
2242:23, 2242:24,
2243:2, 2243:4,
2262:20, 2263:15,
2266:4, 2270:8,
2270:15, 2271:3,
2271:13, 2271:15,
2273:8, 2274:22,
2274:25, 2275:3,
2275:7, 2275:12,
2275:19, 2275:23,
2275:25, 2290:16,
2290:25, 2300:1,
2304:25, 2320:7,
2320:13
**theirs** [1] - 2273:3
**themselves** [2] -
2200:16, 2309:14
**therefore** [5] -
2216:15, 2220:15,
2221:7, 2224:3,
2224:19
**they've** [1] - 2221:11
**thinking** [1] - 2224:5
**thinks** [4] - 2182:12,
2213:6, 2269:23,
2314:11

**third** [8] - 2245:17, 2247:18, 2248:20, 2255:6, 2259:21, 2265:13, 2296:15, 2317:10
**Third** [48] - 2173:10, 2173:13, 2173:14, 2178:1, 2178:7, 2178:21, 2178:22, 2179:6, 2186:25, 2187:1, 2193:13, 2198:7, 2198:10, 2198:15, 2200:11, 2200:12, 2200:23, 2201:5, 2201:7, 2201:13, 2203:14, 2207:2, 2208:10, 2210:2, 2210:11, 2211:2, 2211:15, 2226:5, 2228:9, 2228:13, 2233:7, 2235:8, 2235:20, 2236:3, 2236:8, 2236:14, 2236:20, 2239:21, 2240:5, 2263:24, 2264:7, 2264:9, 2265:1, 2274:2, 2286:20, 2309:25, 2312:7, 2315:25
**Thornton** [2] - 2274:14, 2274:18
**thoughts** [2] - 2264:18, 2264:19
**three** [11] - 2194:6, 2224:9, 2227:11, 2233:7, 2233:16, 2235:8, 2264:3, 2299:24, 2301:3, 2301:15, 2305:9
**throughout** [1] - 2216:6
**tightening** [1] - 2174:11
**Tim** [5] - 2182:20, 2291:24, 2295:23, 2296:6, 2298:8
**timing** [2] - 2212:8, 2241:19
**Timothy** [1] - 2273:20
**tired** [1] - 2281:16
**title** [3] - 2198:11, 2208:17, 2246:21
**titled** [4] - 2222:7, 2252:3, 2253:12, 2253:22
**today** [3] - 2243:22, 2245:1, 2320:8
**together** [3] - 2239:24, 2248:10, 2309:7

**took** [3] - 2233:15, 2234:24, 2235:12
**top** [32] - 2174:1, 2177:12, 2182:19, 2199:14, 2208:18, 2209:8, 2209:22, 2209:23, 2209:24, 2218:1, 2222:25, 2223:10, 2229:5, 2229:6, 2233:12, 2235:11, 2245:13, 2252:17, 2256:17, 2259:12, 2261:7, 2265:13, 2289:13, 2289:15, 2294:4, 2295:17, 2303:17, 2306:11
**top-most** [3] - 2229:5, 2233:12, 2235:11
**Topaz** [1] - 2170:18
**total** [10] - 2199:7, 2199:14, 2257:18, 2266:12, 2297:10, 2301:6, 2302:13, 2310:24, 2313:19, 2318:11
**touch** [1] - 2224:20
**Touche** [1] - 2228:22
**towards** [4] - 2187:16, 2289:9, 2289:13, 2319:1
**trading** [1] - 2178:18
**transactions** [1] - 2206:20
**Transcript** [1] - 2171:15
**transcript** [2] - 2303:13, 2321:4
**TRANSCRIPT** [1] - 2170:12
**transcription** [1] - 2171:15
**transcripts** [2] - 2275:10, 2304:20
**transparency** [1] - 2206:25
**Treasury** [63] - 2175:9, 2175:14, 2175:22, 2176:3, 2181:15, 2182:6, 2184:11, 2190:18, 2191:7, 2191:11, 2191:19, 2192:1, 2194:10, 2195:10, 2196:6, 2196:9, 2196:19, 2197:24, 2202:9, 2202:22, 2203:5, 2203:10, 2203:19, 2211:12, 2236:17, 2240:1, 2240:6,

2248:25, 2252:18, 2252:19, 2259:5, 2259:14, 2259:24, 2260:18, 2273:20, 2274:3, 2285:5, 2285:11, 2285:13, 2287:10, 2295:4, 2296:3, 2296:6, 2296:25, 2298:15, 2301:19, 2302:1, 2302:16, 2302:17, 2303:2, 2306:21, 2313:9, 2313:12, 2313:16, 2313:19, 2314:21, 2315:4, 2315:6, 2316:23, 2319:7, 2319:20, 2319:21
**Treasury's** [2] - 2181:14, 2185:24
**treated** [1] - 2247:8
**trend** [2] - 2187:3, 2200:20
**trends** [1] - 2249:14
**trial** [6] - 2275:20, 2284:3, 2287:23, 2304:15, 2304:17, 2304:24
**TRIAL** [1] - 2170:12
**tried** [3] - 2241:16, 2242:11, 2288:4
**tries** [1] - 2242:1
**true** [4] - 2175:8, 2250:24, 2281:23, 2312:12
**truth** [1] - 2269:23
**try** [3] - 2200:12, 2276:5, 2281:17
**trying** [9] - 2212:10, 2213:12, 2220:13, 2221:15, 2224:23, 2225:1, 2269:21, 2277:1, 2313:24
**turn** [7] - 2194:7, 2246:16, 2265:6, 2288:9, 2289:2, 2292:3, 2311:11
**turnaround** [2] - 2224:14, 2267:7
**turned** [2] - 2216:3, 2273:6
**turns** [2] - 2247:5, 2306:7
**two** [22] - 2176:10, 2179:3, 2226:25, 2231:16, 2235:19, 2260:13, 2272:10, 2278:22, 2279:6, 2280:23, 2284:5, 2284:8, 2295:21,

2299:24, 2307:14, 2309:4, 2310:12, 2317:18, 2318:4, 2318:19, 2318:25, 2319:1
**TX-211** [1] - 2283:4
**type** [5] - 2209:3, 2212:8, 2225:17, 2262:25, 2316:3
**types** [1] - 2238:23
**typical** [1] - 2318:7
**typically** [7] - 2185:11, 2197:16, 2220:12, 2223:8, 2237:13, 2237:19, 2315:5
**typo** [1] - 2229:15

**U**

**U.S** [2] - 2194:10, 2316:23
**Ugoletti** [11] - 2190:3, 2190:7, 2190:19, 2207:24, 2207:25, 2208:3, 2210:1, 2210:4, 2264:2, 2286:1, 2286:21
**Ugoletti's** [1] - 2190:5
**ultimately** [2] - 2183:14, 2242:13
**unaware** [1] - 2270:25
**unbelievable** [1] - 2313:2
**uncertain** [1] - 2242:16
**uncertainties** [6] - 2220:11, 2245:20, 2249:18, 2261:13, 2261:19, 2262:15
**uncertainty** [4] - 2219:19, 2219:20, 2220:11, 2220:14
**unchanged** [4] - 2198:16, 2287:3, 2299:25, 2301:10
**under** [36] - 2173:22, 2184:19, 2193:22, 2211:8, 2219:15, 2235:4, 2246:7, 2248:3, 2248:17, 2249:6, 2250:10, 2252:2, 2252:20, 2254:18, 2256:18, 2256:21, 2258:11, 2259:2, 2259:14, 2263:3, 2267:2, 2267:6, 2267:8, 2275:24, 2286:14, 2287:7, 2296:22, 2298:23, 2300:17,

2300:19, 2300:24, 2301:15, 2312:6, 2319:15, 2319:16, 2320:17
**undermine** [1] - 2200:6
**understood** [10] - 2228:4, 2230:6, 2232:2, 2234:8, 2234:12, 2235:18, 2236:2, 2242:10, 2277:1, 2295:25
**undertake** [2] - 2250:8, 2261:15
**undrawn** [2] - 2194:22, 2196:17
**unfortunate** [1] - 2183:19
**UNITED** [2] - 2170:1, 2170:13
**United** [7] - 2171:11, 2184:7, 2192:4, 2200:18, 2295:4, 2315:4, 2315:5
**University** [1] - 2205:17
**unknowable** [1] - 2224:18
**unlikely** [1] - 2195:13
**unquote** [1] - 2179:1
**unreliable** [1] - 2299:23
**unsettled** [2] - 2220:12, 2220:14
**untrue** [1] - 2270:13
**up** [82] - 2174:17, 2175:24, 2176:12, 2176:16, 2180:13, 2180:15, 2180:22, 2189:4, 2192:2, 2197:10, 2197:18, 2198:14, 2202:9, 2202:16, 2202:19, 2205:8, 2207:4, 2207:5, 2208:7, 2213:18, 2214:12, 2214:14, 2215:1, 2215:9, 2215:13, 2215:21, 2218:23, 2219:12, 2221:13, 2221:25, 2223:25, 2225:14, 2225:23, 2226:7, 2227:7, 2227:15, 2228:15, 2229:6, 2231:12, 2231:19, 2240:14, 2241:15, 2241:21, 2241:24, 2242:4, 2242:7, 2244:25, 2248:10, 2256:2,

2256:3, 2263:19, 2266:8, 2271:18, 2271:21, 2271:24, 2272:10, 2272:17, 2272:20, 2272:25, 2273:3, 2278:18, 2278:19, 2279:8, 2280:3, 2281:7, 2285:16, 2288:10, 2291:21, 2295:10, 2297:25, 2302:12, 2305:22, 2307:22, 2308:3, 2312:23, 2313:20, 2314:1, 2314:2, 2315:12, 2318:5, 2319:5
**update** [5] - 2214:7, 2250:8, 2261:15, 2282:22, 2296:15
**updated** [1] - 2213:22
**updates** [1] - 2250:20
**usage** [3] - 2297:17, 2297:19, 2301:21
**uses** [1] - 2274:20

---

**V**

**valuation** [16] - 2181:19, 2213:2, 2216:12, 2218:6, 2218:21, 2218:22, 2222:7, 2240:22, 2241:1, 2241:8, 2241:20, 2268:25, 2271:5, 2272:8, 2272:12, 2272:25
**value** [8] - 2176:22, 2177:3, 2177:5, 2181:22, 2182:13, 2199:10, 2199:11
**values** [1] - 2181:10
**variations** [1] - 2293:4
**variety** [2] - 2245:24, 2274:2
**various** [5] - 2176:10, 2249:13, 2261:19, 2262:14, 2285:24
**vehicle** [1] - 2269:18
**verifiable** [3] - 2220:9, 2224:20, 2242:15
**verification** [1] - 2294:16
**verified** [1] - 2294:17
**version** [11] - 2222:11, 2285:4, 2286:3, 2288:12, 2288:15, 2292:4, 2296:17, 2297:15, 2301:23, 2302:1
**versions** [4] - 2285:3,

2301:4, 2302:15, 2307:23
**versus** [1] - 2315:3
**Video** [1] - 2188:25
**video** [2] - 2303:12, 2310:15
**videotape** [2] - 2292:4, 2304:1
**view** [3] - 2195:19, 2229:23, 2291:15
**viewed** [2] - 2201:8, 2201:9
**Virginia** [2] - 2205:18, 2205:20
**volatility** [2] - 2248:23, 2259:22
**vs** [1] - 2170:5

---

**W**

**walking** [1] - 2202:1
**Washington** [7] - 2170:9, 2170:16, 2170:23, 2171:9, 2171:13, 2205:24
**water** [1] - 2204:7
**weaken** [1] - 2294:23
**weaker** [1] - 2294:22
**week** [8] - 2183:7, 2198:7, 2198:14, 2206:22, 2226:14, 2239:22, 2298:25
**weekend** [1] - 2320:10
**weekly** [1] - 2194:3
**weeks** [2] - 2231:16, 2236:23
**weigh** [1] - 2215:20
**weighing** [2] - 2221:11, 2267:2
**weight** [3] - 2220:8, 2224:21, 2267:7
**when/if** [1] - 2241:7
**whole** [5] - 2227:17, 2286:19, 2288:2, 2298:24, 2312:19
**WICK** [1] - 2171:11
**Wick** [2] - 2321:3, 2321:8
**wind** [5] - 2231:23, 2233:22, 2235:16, 2235:23, 2236:10
**wind-down** [5] - 2231:23, 2233:22, 2235:16, 2235:23, 2236:10
**wish** [1] - 2275:18
**witness** [20] - 2180:2, 2185:16, 2193:1, 2203:24, 2207:7, 2222:1, 2232:10,

2232:20, 2233:9, 2233:23, 2234:1, 2234:2, 2269:14, 2269:17, 2275:14, 2275:21, 2276:14, 2305:3, 2305:24, 2305:25
**WITNESS** [8] - 2180:4, 2185:19, 2191:24, 2192:7, 2204:2, 2220:23, 2242:24, 2275:25
**witness's** [1] - 2290:18
**witnesses** [6] - 2275:4, 2275:5, 2275:12, 2275:16, 2290:20, 2304:20
**word** [5] - 2219:15, 2220:12, 2248:11, 2256:8, 2284:25
**wording** [2] - 2220:11, 2223:23
**words** [6] - 2188:14, 2219:25, 2220:1, 2247:19, 2247:22
**works** [1] - 2238:5
**world** [2] - 2200:14, 2210:20
**worried** [4] - 2187:8, 2300:23, 2313:23, 2314:21
**worry** [1] - 2221:20
**worrying** [1] - 2280:17
**worse** [2] - 2201:23, 2308:5
**worth** [41] - 2179:21, 2185:22, 2187:1, 2187:25, 2201:13, 2201:23, 2236:3, 2252:14, 2252:17, 2255:23, 2255:24, 2258:24, 2259:3, 2259:13, 2265:2, 2277:11, 2277:13, 2277:18, 2277:24, 2278:5, 2278:8, 2278:10, 2278:18, 2283:12, 2295:21, 2302:11, 2302:17, 2311:21, 2312:22, 2312:24, 2313:24, 2317:10, 2317:15, 2317:21, 2318:13, 2318:17, 2318:22, 2319:6, 2319:11, 2319:16
**write** [17] - 2215:13, 2218:23, 2221:13, 2223:25, 2225:13,

2231:19, 2241:21, 2242:4, 2242:7, 2271:18, 2271:19, 2271:24, 2272:20, 2281:7, 2302:12
**write-down** [1] - 2218:23
**write-up** [3] - 2218:23, 2241:21, 2302:12
**writing** [4] - 2225:23, 2226:7, 2241:15, 2314:19
**written** [30] - 2212:24, 2213:5, 2213:14, 2213:16, 2213:18, 2214:12, 2214:14, 2215:1, 2215:9, 2216:4, 2216:16, 2218:9, 2223:14, 2227:7, 2229:21, 2231:12, 2241:2, 2271:21, 2272:10, 2272:17, 2272:25, 2288:12, 2292:4, 2303:13
**wrote** [1] - 2273:3

---

**Y**

**year** [14] - 2174:6, 2210:23, 2212:11, 2213:22, 2217:19, 2258:8, 2265:21, 2282:4, 2283:18, 2284:7, 2297:13, 2299:15, 2312:21, 2312:22
**year-end** [1] - 2284:7
**year-to-date** [1] - 2258:8
**years** [14] - 2188:7, 2204:17, 2205:5, 2219:23, 2227:11, 2284:16, 2285:11, 2296:21, 2299:8, 2300:17, 2300:21, 2307:24, 2308:10, 2308:16
**yesterday** [15] - 2173:10, 2174:19, 2176:4, 2176:9, 2177:8, 2178:4, 2178:13, 2179:4, 2180:11, 2182:9, 2184:24, 2185:22, 2192:11, 2280:4, 2307:13
**yield** [28] - 2173:12, 2186:4, 2186:6, 2186:10, 2186:14,

2186:19, 2186:22, 2187:2, 2187:5, 2187:17, 2200:20, 2314:25, 2315:2, 2315:3, 2315:4, 2315:8, 2315:12, 2315:13, 2315:16, 2315:18, 2315:22, 2316:1, 2316:14, 2316:16, 2317:8, 2317:14, 2317:20, 2318:15
**yielding** [1] - 2317:2
**yields** [5] - 2199:24, 2200:20, 2200:23, 2201:7, 2317:8
**York** [5] - 2170:22, 2171:4, 2174:20, 2175:4
**yourself** [2] - 2204:10, 2270:18

---

**Z**

**ZAGAR** [25] - 2170:18, 2207:19, 2218:16, 2220:21, 2222:16, 2231:25, 2239:2, 2242:8, 2242:25, 2243:3, 2243:5, 2243:7, 2262:22, 2263:9, 2263:18, 2266:5, 2269:20, 2270:10, 2270:11, 2270:16, 2271:4, 2271:17, 2273:9, 2274:5, 2274:24
**Zagar** [6] - 2243:5, 2269:8, 2269:11, 2269:14, 2269:20, 2274:5
**zero** [4] - 2287:4, 2287:12, 2297:17, 2297:24
**zoom** [11] - 2189:25, 2199:2, 2207:6, 2219:10, 2219:13, 2222:2, 2222:25, 2223:9, 2227:16, 2227:17, 2237:21