```
 1                  BEFORE THE UNITED STATES DISTRICT COURT
                         FOR THE DISTRICT OF COLUMBIA
 2

 3   FAIRHOLME FUNDS, INC., et al.,   .
                                      .
 4             Plaintiffs,            .
                                      .   Case Number 13-cv-1053
 5        vs.                         .
                                      .
 6   FEDERAL HOUSING FINANCE AGENCY,  .
     et al.,                          .
 7                                    .
               Defendants.            .
 8   - - - - - - - - - - - - - - - -
     In re FANNIE MAE/FREDDIE MAC     .  Case Number 13-mc-1288
 9   SENIOR PREFERRED STOCK PURCHASE  .
     AGREEMENT CLASS ACTION           .  Washington, D.C.
10   LITIGATIONS.                     .  October 31, 2022
     - - - - - - - - - - - - - - - -     1:49 p.m.
11

12             TRANSCRIPT OF JURY TRIAL, AFTERNOON SESSION
                  BEFORE THE HONORABLE ROYCE C. LAMBERTH
13                    UNITED STATES DISTRICT JUDGE

14   APPEARANCES:

15   For Berkley Plaintiffs:      BRIAN BARNES, ESQ.
                                  Cooper & Kirk, PLLC
16                                1523 New Hampshire Avenue Northwest
                                  Washington, D.C. 20036
17
     For Class Plaintiffs:        LEE RUDY, ESQ.
18                                ERIC ZAGAR, ESQ.
                                  Kessler Topaz Meltzer & Check, LLP
19                                280 King of Prussia Road
                                  Radnor, Pennsylvania 19087
20
                                  HAMISH HUME, ESQ.
21                                SAMUEL KAPLAN, ESQ.
                                  KENYA DAVIS, ESQ.
22                                Boies Schiller Flexner LLP
                                  1401 New York Avenue Northwest
23                                Washington, D.C. 20005

24

25                       -- continued --
```

1    APPEARANCES (CONTINUED):

2                                  MICHAEL J. BARRY, ESQ.
                                   Grant & Eisenhofer, P.A.
3                                  123 Justison Street
                                   Seventh Floor
4                                  Wilmington, Delaware 19801

5                                  ROBERT KRAVETZ, ESQ.
                                   RICHARD GLUCK, ESQ.
6                                  Bernstein Litowitz Berger &
                                      Grossmann LLP
7                                  1251 Avenue of the Americas
                                   New York, New York 10020

8
     For Defendant Federal
9    Housing Finance Agency:       JONATHAN STERN, ESQ.
                                   ASIM VARMA, ESQ.
10                                 DAVID BERGMAN, ESQ.
                                   IAN HOFFMAN, ESQ.
11                                 ROBERT JONES, ESQ.
                                   Arnold & Porter Kaye Scholer LLP
12                                 601 Massachusetts Avenue Northwest
                                   Washington, D.C. 20001
13

14   Official Court Reporter:     SARA A. WICK, RPR, CRR
                                   United States District Court
15                                    for the District of Columbia
                                   333 Constitution Avenue Northwest
16                                 Room 4704-B
                                   Washington, D.C. 20001
17                                 202-354-3284

18   Proceedings recorded by stenotype shorthand.
     Transcript produced by computer-aided transcription.
19

20

21

22

23

24

25

2514

1
# C O N T E N T S

2

3                                    CLOSINGS

4    Closing Statement by Plaintiffs........................ 2517

5    Closing Statement by Defendants........................ 2576

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2          (Call to order of the court.)

 3          (Jury not present.)

 4          THE COURT:  All right.  I think you have the final

 5   version as I've put it together on the jury instructions as I

 6   would read them to the jury.  That last sentence I put in as the

 7   plaintiffs wanted it in that -- what would be 23 or 24.  I think

 8   with renumbering, it becomes 23, and then 22 was the old 23.

 9          The version that I send back when I sign them in writing

10   does not have titles.  So it's just the text, just so you know

11   what actually goes back to the jury.  But as I read it to the

12   jury, it will be -- the wording will be as you now have it, so

13   you know before you begin your closings.

14          What did you all decide about how we're going to do the

15   closings?

16          MR. STERN:  Your Honor, I would ask to split, and I

17   would plan to go until 4:45 or so.

18          Is that all right with the Court?

19          THE COURT:  All right.  And how much are you going to

20   reserve for tomorrow?

21          MR. HUME:  Hamish Hume.  We will reserve for tomorrow.

22   Just in terms of timing, Your Honor, I think I'm fairly

23   representing that we haven't made a deal on strict time limits.

24   We are going to try to target.  I bet I may go a little over an

25   hour and a half today, hour and 45.  I will have notes passed.
```

1         Certainly, whatever I do, Mr. Stern would have commensurate

2    time.

3              MR. STERN:  I was thinking of it the other way around,

4    Your Honor.  If I go two hours today, Mr. Hume would have what's

5    left of the two hours for tomorrow, give or take, Your Honor.

6              MR. HUME:  Two hours total?

7              MR. STERN:  Right, two hours total.  Yes, Your Honor.

8              THE COURT:  I will bring in the jury as soon as I can

9    get them together.

10        At the end of today, I do want you all to try to make sure

11   we've got the exhibits straight that will be going back with my

12   courtroom deputy.  So that will be a task for tomorrow.  Better

13   that you have straight exactly what's going back.

14        (Jury entered courtroom.)

15             THE COURT:  Good afternoon, ladies and gentlemen.  We

16   have reached the point in the trial where I have consulted with

17   the attorneys, and I have decided on my final instructions on

18   the law.  They're entitled to know what they will be before they

19   give you their closing arguments.

20        We're going to begin the closing arguments now.  They will

21   not be completed this afternoon, so we will back tomorrow for

22   the final closing arguments.  We will stop before 5:00 so

23   everyone can go trick-or-treating today, some of you with

24   children, some of you without.

25        In any event, we are going to stop by 5:00 this afternoon.

1    We will start back at 10:00 tomorrow for the final closing

2    arguments.

3         Plaintiffs argue first, and then the defendants will start

4    their argument this afternoon and finish tomorrow morning.  The

5    plaintiffs get the opportunity to argue to you last in rebuttal

6    because the plaintiffs have the burden of proof, so they get the

7    chance to speak to you last.  But the defendants will be arguing

8    part of their argument today and then the rest of it tomorrow

9    morning.

10        So be patient.  We're almost there.

11        Plaintiffs can go first.  Mr. Hume, you may proceed.

12        Don't make up your mind until you've heard all the

13   evidence.  I will be sending with you as you retire to be in

14   your deliberations all of the items of evidence that have been

15   received in evidence so you will have them with you in the jury

16   room.  But they will make reference to items of evidence that

17   have been received.

18        Those depositions that have been played, you will have

19   available to you equipment that you can play the depositions if

20   you want to see any of that evidence while you're in the jury

21   room.  And you will also have available to you all the evidence

22   that I've received into evidence with you in the jury room as

23   you retire.

24        Go ahead, Mr. Hume.

25             MR. HUME:  Thank you, Judge Lamberth, members of the

1    jury.  Hamish Hume for the plaintiffs.

2         The first and in some ways the biggest thing I want to say

3    to you is thank you.  And on this one, maybe only on this one,

4    Mr. Stern and his team, I know, will agree with me and my team

5    in expressing our gratitude for what you've done.

6         It's hard to capture in words.  You've had your lives

7    disrupted for over two weeks.  Everything about your normal life

8    you had to put aside.  You had to come to this courtroom every

9    day and watch lawyers try to establish facts in all kinds of

10   ways, with witnesses, asking questions, cross-examining,

11   documents, videotaped depositions, and even lawyers acting as

12   other lawyers and acting as witnesses to read the depositions.

13        And I know at times it's probably seemed messy.  It may

14   have seemed boring.  It may have seemed confusing.  We get it

15   that sometimes it's not pretty all the time.  We try to make it

16   as clear as possible, both sides, but it's an imperfect process.

17        And I know how hard you worked to pay attention and follow.

18   We saw you taking notes.  We are so grateful.  It is a

19   tremendous public service, and I hope that despite the burden

20   that is imposed on you, you will find it -- you will take

21   gratitude and inspiration from the public service you are a part

22   of.

23        Because as I said in the opening, this is how our system

24   works.  We have a disagreement.  It's been going on quite a long

25   time, and we can't resolve it.  And in our system, it's you, the

people, who resolve it.  So it's an honor to be a part of that

process.

     Now, as I said, it can be messy, and that's why today is

really important, today and tomorrow, because now we get a

chance, Mr. Stern and I, to summarize that evidence and argue

about what we think it shows.  And hopefully, that will help

clarify things and make things as clear as possible, although

you're going to hear from two very different perspectives.

     So I would like to begin with what the question is that

you're being asked to resolve so that that is crystal clear,

because until you understand what to make of all this evidence

that's been thrown at you, you have to understand the question.

     And you're going to get a verdict form with a number of

questions, but the first is the biggest.  The first is the

question of whether or not there's been a breach of the

contract, of the implied covenant.

     But here is what the question boils down to.  Okay?  By

agreeing to the net worth sweep on August 17th, 2012, did the

defendants exercise their power in a way that was arbitrary or

unreasonable and thereby destroyed the private shareholders'

rights to receive potential dividends in the future under their

contract?  That is the question.

     Let me say it again.  By agreeing to the net worth sweep on

August 17th, 2012, did the defendants exercise their power in a

way that arbitrarily or unreasonably destroyed the rights of the

1    private shareholders to receive potential dividends in the

2    future?  That's the question.

3         Mr. DeRita, if we put it on the screen, we can see it.

4         I want to explain why that's the question, briefly.  Let's

5    see if I got it right.  I think I got it right, more or less.

6    That's the question.  And the reason that is the question is

7    because the private shareholders have a contract with the

8    defendants.  And as the judge will instruct you in more detail

9    after we're done with our arguments, that contract has something

10   called an implied covenant of good faith and fair dealing that

11   is an unwritten part of every contract, an implied covenant of

12   good faith and fair dealing.

13        And here's what it means.  And you're going to get full

14   instructions on this.  But in this case, the most important

15   thing is, what it means is that when the contract gives

16   discretion to one side of the contract to do certain things,

17   gives power or discretion, the other party can exercise that

18   power.  But they cannot exercise it in a way that arbitrarily or

19   unreasonably destroys the benefit of the bargain that the other

20   side reasonably expected.  And the reasonable expectation part

21   of that is based on an objective standard of what could be

22   reasonably expected.  I will talk more about that in a second.

23        But you're going to hear these words over again,

24   arbitrarily or unreasonably.  The legal test is or, one or the

25   other.  We're going to obviously tell you it was both, so you're

1    to hear me say it was arbitrary and unreasonable, but the legal

2    test is was it one or the other, either one.  And the

3    instructions are going to explain to you how to understand those

4    words.

5         That is why when we first met two weeks ago I began my

6    opening statement by saying that this case is about what happens

7    when powerful people exercise their power in a way that is

8    arbitrary, that is unreasonable, and that shows utter disregard

9    and indifference to the harm that it causes to other people.

10        Now -- and then I said and the question ultimately is

11   whether there can be a remedy for that, at least sometimes.  And

12   you may think, well, that happens a lot in our system.

13   Hopefully, it doesn't happen too often.  But in this case, the

14   reason we can have a remedy is because they had a contract, and

15   that contract had this implied covenant.

16        Let me say a little bit about what the case is not about

17   and what the question is not.  It is not about what happened in

18   2008.  It is not about whether it was a good or bad idea for the

19   federal government to put Fannie Mae and Freddie Mac into

20   conservatorship.  It is not about whether the original terms of

21   the preferred stock purchase agreement were fair or not fair.

22   It's not about that.  It's not about what you hear defendants

23   saying all the time.  It's not about whether FHFA had the power

24   to act in the public interest.  It's not about whether FHFA was

25   required to maximize -- to operate the enterprise to maximize

1    shareholder returns.

2         We agree that FHFA had the power to act in the public

3    interest.  We agree that FHFA was not acquired to operate the

4    enterprises to maximize private shareholder returns.

5         Our point is that FHFA couldn't just do whatever it wanted

6    without regard to the consequences.  It couldn't act arbitrarily

7    and unreasonably in ways that destroyed our contractual rights

8    and our reasonable expectations about those contractual rights.

9         This case is not about the public interest versus private

10   interests.  It's about what happens when powerful people

11   exercise their power in a way that is arbitrary, that is

12   unreasonable, shows utter disregard and indifference to the harm

13   it causes, and there's no good reason for it.  That's what it's

14   about.

15        Now, let's jump to slide 5, because at some level --

16   members of the jury, at some level, I ought to be able to finish

17   in about five minutes and sit down.  These guys would be a

18   little mad at me if I did that.  At some level, I should,

19   because let's go over what happened here.  All right?

20        You've seen this slide.  You might remember it from my

21   opening.  This is just to help you see the basic structure.

22   Okay?

23        Fannie Mae and Freddie Mac are in conservatorship.  That's

24   what's going on on the right-hand side.  The shareholders have

25   contracts.  Those are the shareholders we represent.  The little

blue line, "right to potential dividends."  Not a guarantee.
But the whole point of buying stock is to receive dividends, and
that's the way it normally works.  I will say more about that in
a second.

2008, in conservatorship, they make a contract with
Treasury.  That contract says Treasury will get senior preferred
stock above the private shareholders and an annual dividend of
10 percent of the amount invested, the amount drawn down.

I sometimes said "borrowed."  That makes them very unhappy.
I don't think it matters.  "Drawn down," I will try to always
say it that way.  That's the way they like to say it.  Fine.

10 percent of the amount drawn down plus a billion extra --
1 billion extra for each, and they got warrants to buy
80 percent of the common stock.

Okay.  So at that point Treasury owns almost everything.
If these enterprises come back, become profitable, rebuild net
worth, and exit conservatorship, Treasury is going to own and
get most of the benefit of that, but not everything.  And those
private shareholders had -- essentially what they had was hope,
a contractually based hope, an expectation that if things worked
out, they could be on the road again to what happened before,
which is dividends.

And then this happened in August 2012, and we're going to
talk more about it.  But at that point things were very
different.  They had turned the corner.  They're starting to

1    record record profits.

2         You saw that from me, I'm sure, more times than you wanted

3    to, and you're going to see more today.  But they're making

4    profits in 2012, profits above the amount of that 10 percent

5    dividend.  Things are going well.  The housing market's

6    recovered.  The financial market's recovered.  Lots of internal

7    documents saying things are going -- looking pretty good.

8         And this happens:  Third Amendment changes the deal.  That

9    10 percent gets replaced with a dividend of 100 percent of the

10   net worth forever.  They go from having almost everything to

11   absolutely everything.

12        And what does that do to our rights to contractual hope?

13        I did that too quickly.

14        What did that do?  Can we go back to 5, please.  That

15   destroyed our contractual hope, erased the possibility of

16   potential dividends, and made those contracts essentially

17   worthless, because the whole point of a shareholder contract is

18   to get dividends.  And as long as that stayed in place, no one

19   could get a dividend.

20        And so -- listen, you heard evidence, testimony.  There's a

21   few simple facts about this.  There's never been anything like

22   this before.  It's totally unprecedented.  You will have seen no

23   example, and you will not, of a net worth sweep.  In human

24   history, in this case, it hasn't happened.  It's not a thing.

25        You also saw what it resulted in.  It resulted in Fannie

1    Mae and Freddie Mac sending $330 billion of value to the

2    Treasury, which was at least 150 billion more than Treasury

3    would have gotten under the 10 percent dividend, 150 billion

4    more.

5         And it's still going on.  They changed how they do it.

6    Now, instead of sweeping the cash, they're letting them finally

7    build capital, but every time they build capital, Treasury's

8    interest goes up.  Their stock gets more value.  So they own

9    everything.  They're still getting 100 percent.

10        So like I said, at some level, on the face of it, it's an

11   easy case.  At some level, all you need to know is what I just

12   told you.

13        You also saw that there was no consideration, no studies,

14   no memos, no analysis.  It just happened.  You didn't see a

15   single memo analyzing the pros and cons, considering do we need

16   to do this, is the reason we're doing this, does it make sense.

17   Nothing.

18        And so just so that -- if we jump to slide 4, this is what

19   you're going to see on the verdict form.  This is Question 1.

20   This is the question.  This is how the courts formulate it.  I

21   think it is the same question -- you're going to get lots of

22   instructions on how to understand it.  But that's the same

23   question I asked, and the answer is that.  That's what we're

24   asking for, and we think it's clear that's what should happen.

25        Now, I'm going to do a little bit more.  I'm not going to

1    sit down.  I'm going to show you -- I'm going to jump to the

2    next easiest way, if you need to see a little bit more, the

3    documents, three or four or five documents that just hands-down

4    on their own mean we have to win this case.

5        And to do that, first, I want to remind you what the reason

6    is that the defendants have given.  Mario Ugoletti, you saw him

7    on videotape.  He gave a declaration to this court, a sworn

8    declaration in December 2013 when this case began -- like I

9    said, it's been going on a while -- and he said the reason was

10   concerns that the amount of capital Treasury was making

11   available to these enterprises was going to shrink because they

12   couldn't pay the 10 percent dividend and they had to borrow to

13   pay it and borrow to pay it -- sorry, draw down to pay it, draw

14   down to pay it, the circular dividend.

15       But the reason it was a problem according to them was that

16   it would shrink the commitment, because at the end of 2012 that

17   Treasury commitment was going from unlimited to having a cap.

18   Okay?

19       And then when the cap -- they were estimating that between

20   the two entities they would have about 275 billion under the cap

21   of capital, of money that they could draw on if they needed it.

22       And so what they're saying is, that 275 billion was not

23   enough, and there was going to be grave danger that this

24   circular draw thing was going to eat into it, shrink it, and

25   that what would happen is that the people who buy the bonds and

the mortgage-backed securities, those people were in a panic.
And if they panic, it's very disruptive to the whole financial
system.  And we agree; that's true, if they really do panic.

But the thing is, there's no evidence of that.  All the
evidence is the opposite.  Those bond investors, those MBS
investors, their comfort level with the securities was just
fine, and you will not see a single memo at FHFA analyzing this
question of how much is this 275 billion going to shrink, how
much will it shrink, how quickly will it shrink, and at what
point will it cause panic in the financial marketplace.
Nothing, zero analysis of that.

What you will see, though, are documents that directly
contradict that explanation.  That explanation is in Mario
Ugoletti's declaration, and you're going to hear it again.
That's the argument that they try to make.  But you saw a
document, the most important document in this case, PX-205,
Plaintiff Exhibit 205.

Let's go to slide 73.  You saw this document a couple of
times.  This is a memorandum written by a Treasury official
named Michael Stegman.  He's writing it to Mary Miller, who was
a very senior person in Treasury, the Undersecretary for
Domestic Finance.  The date is June 25, 2012, so a little less
than two months before the net worth sweep was signed.

The memo begins, "The Secretary provided an overview of his
and your previous day's meeting with Ed DeMarco."

1           The Secretary is Treasury Secretary Timothy Geithner.

2   Okay?  Ed DeMarco, as you know, was the acting director of FHFA

3   and the person who made the decision to do the net worth sweep,

4   the central figure in this case, and he's the person who says he

5   was the sole decisionmaker, and he's the person who with his

6   friend Mario Ugoletti say we did it because we thought the

7   commitment would shrink and people would get worried.

8           What does this memo say?  It says, "Since the Secretary

9   raised the possibility of a PR covenant" -- that's a reference

10  to principal reduction; we will talk more about that in a

11  second -- "DeMarco no longer sees the urgency of amending the

12  PSPAs this year."  No urgency.

13          Seven weeks later, it's signed, Boom.  At the end of my

14  argument, I'm going to run through basically every piece of

15  evidence between June 25th, 2012, and August 17th, 2012, and it

16  is going to amaze you, because you feel like you've seen a lot.

17  There's nothing.  It's just -- it happens in an August rush.

18  Sleepy Washington, August, rush, rush, rush, no analysis.

19          And look what he says here?  There's no urgency.  Two

20  reasons.  The first reason is, "The GSEs will be generating

21  large revenues over the coming years."  That's what we've been

22  saying in this case.  That's what we've been showing the facts

23  are in this case through the documents that existed at the time.

24  That's what you heard the expert Bala Dharan say.

25          And he goes further.  The document says he goes further.

1   It reports him as saying that they're going to make large

2   revenues, "enabling them to pay the 10 percent annual dividend

3   well into the future even with the caps."

4        That is a direct refutation of the reason they have given

5   this court for why they gave away the entire net worth of Fannie

6   Mae and Freddie Mac in perpetuity.  That document alone wins the

7   case for plaintiffs, hands down.  If you read no other document,

8   please read that document.  And I'm going to show you a little

9   later what Ed DeMarco said about that document in trial right

10  here on the stand.

11       Now, there is, obviously, a lot more.  Let me preview

12  something.  Let's look at what their actual projections were

13  showing about this supposed erosion, the risk that the Treasury

14  commitment was going to be eaten into in the future.

15       Let's go to slide 96.  You saw Professor Dharan give

16  testimony on this.  You saw the other side try to attack his

17  credibility by saying, Oh, you relied on a draft, you relied on

18  a draft, PX-23.  Well, he relied on that because it was sent to

19  Ed DeMarco, and it was shown to Susan McFarland, the chief

20  financial officer.

21       But it doesn't matter, because it appears these projections

22  by Dave Benson that they keep trying to discredit appear over

23  and over and over, and they all show the same thing:  No risk of

24  erosion of that Treasury commitment.  Yes, a few circular draws,

25  but nothing that is going to materially change the enormous

1    amount of capital that Treasury is making available even when

2    the caps come back, something on the order of 275 billion.

3        It was sent to the board.  And you heard earlier this

4    morning Fannie Mae's CEO Tim Mayopolous say, When we sent the

5    board something, we tried to get them something that was

6    reliable, that was credible, that was reasonable.

7        It was prepared -- later, after they sent it to the board

8    at Fannie Mae, they kept using it.  They didn't dump it.  They

9    kept using it and using it to prepare for a meeting with the

10   United States Treasury.  You don't take things over to the

11   United States Treasury if you don't think they're reliable.

12       Two documents show they're prepared and one that was

13   actually shown to Treasury on August 9th, 2012.  Tuck that away.

14   Wait until I walk through what happened from June 25, 2012, to

15   August 17th, 2012.  What happened?  Because part of what

16   happened is Treasury has shown these great projections showing

17   no problem of erosion under the cap.

18       Here's what these documents show.  You can remember these

19   slides.  All of them show that in 10 years that 273 billion at

20   the most may go down to 264.  No serious erosion problem.  You

21   saw these slides.  I hope they make sense to you.

22       What Professor Dharan is trying to show is that, if you

23   combine Fannie Mae and Freddie Mac, that blue bar represents how

24   much capital, how much money the United States Treasury is

25   making available to them once the caps come back.  This is

1    what -- it was a little bit of a complicated formula for what

2    the cap would be.  In the summer of 2012, this is what they were

3    all predicting the cap would be.  It changes a tiny bit.

4          So this is what Professor Dharan says.  The Benson

5    projections say that's what's going to happen to the cap; that's

6    what's going to happen to the commitment.

7          Let me do that again.  That's what the projections --

8    that's what they say the cap is going to be in 2012,

9    273 billion.  Okay?  Then they say, let's project out our

10   profits.  All right?  And we've got to pay this 10 percent

11   dividend.  It is expensive.  Sometimes we're going to make money

12   above the dividend; sometimes not.  Actually, for Freddie Mac,

13   using their public information, they predicted they would always

14   make more than the 10 percent dividend.  For Fannie Mae,

15   sometimes above, sometimes below.  But they're always making

16   profits.  They're never having to draw down the entire amount

17   for the 10 percent.  It might be a little shortfall; they draw a

18   little bit.

19         Over ten years, what are they projecting is going to

20   happen?  All right?  That.  The 273 may get eaten into a little

21   bit.  6 billion.  Look at all the blue space.  That's what makes

22   the bond investors and the mortgage-backed securities investors

23   happy, lots of blue.  Then they're happy, no problems.

24         So, that's the document they tried to discredit.  That's

25   what it shows.  What about the other documents?  Well, let's

1    see.

2         This one went to the board.  Very similar.  Basically no

3    difference.  These are the ones that were prepared for Treasury.

4    Very similar.  No real difference.  This is the one that was

5    actually shown to Treasury.  It's actually showing a little bit

6    bigger cap, 274 -- 265 after the end of ten years.

7         These do not show a problem.  These do not show a problem

8    to be solved at all, let alone a problem that you would solve

9    with a net worth sweep, some unprecedented thing where you give

10   away the entire net worth forever.

11        Now, let me jump to slide 34.  It's also important what you

12   have not seen.  And I mentioned this earlier.  Again, you have

13   not seen and you will not see any FHFA memos or even extensive

14   e-mails saying, We have to worry about this cap; it's coming

15   down.  How much are we going to eat into it?  Let's calculate,

16   let's estimate how much it's going to come down, and at what

17   point will the bond investors or MBS investors get spooked.  We

18   need to think that.  We need to study that.  We need to get

19   Ms. Tagoe to study that.  We need to get other smart people to

20   study that.

21        Nothing.  We don't see that.  The evidence just doesn't

22   show that this was a big thing.  And that's a clue as to what's

23   really going on here, because what I'm going to show you is that

24   the real reason, it seems, is the opposite of what they've told

25   you.

1      Now, one other document you have not seen, it just recently

2  came into evidence, that is further devastating proof that there

3  was no problem, there was no issue, that this erosion of the

4  Treasury commitment was not a thing, it was not a serious

5  concern, and certainly, it wouldn't justify something as drastic

6  as the net worth sweep.

7      Let's go to slide 125.  This is a document that is internal

8  at the Treasury Department.  This is going to show you what

9  Treasury was saying.  You've seen those blue charts, what the

10  GSEs were saying and what they were showing FHFA.

11      July 3rd, 2012, an e-mail to a bunch of people saying, "TFG

12  will be testifying on the 25th and 26th."  That is Timothy

13  Geithner, the Secretary of the Treasury, getting ready to

14  testify, I believe -- well, I know based on the public record,

15  before Congress.

16      So they're getting him ready, and they're saying, "We

17  anticipate housing will be a topic of discussion.  We need you

18  to review and revise the Q and A on Sharepoint."  And they're

19  sending it to people who work on housing policy at Treasury.

20  You can see Michael Stegman's name up there, Timothy Bowler,

21  other names, Jeff Foster, the people at Treasury who were

22  involved with Fannie and Freddie.  Those were the Treasury

23  people involved with Fannie and Freddie.

24      So six days later, July 9th, they write back, "Please find

25  attached updated redline and clean housing Q and A."  They are

1   preparing points for Timothy Geithner to say when he testifies.

2   In that document, there is a section on the preferred stock

3   purchase agreements with lots of questions that he might receive

4   from Congress.  He might get questions, and the people who know

5   most at Treasury are telling him what the answers are.

6        One of the questions is, "Has the Administration considered

7   modifying the PSPA agreements before the capacity becomes fixed

8   at the end of 2012?"  Before the caps.  These are the caps that

9   are the centerpiece of the defendants' case.  The caps were

10   coming back, the caps, the caps, the caps at the end of 2012.

11   Okay?  So it's going to be limited.  Is that a problem?  Do you

12   need to do something, is the question they're preparing him to

13   answer.

14        Here's what they tell him he should say.  First, "Under the

15   conservative baseline stress test forecasts conducted by FHFA,

16   both Fannie Mae and Freddie Mac are expected to have positive

17   net income in 2013.  This will mean that Treasury is not

18   expected to need to fund any operating losses at Fannie Mae and

19   Freddie Mac after the expiration of the funding commitment."

20        Next sentence -- next bullet.  "To the extent that required

21   dividend payments exceed net income, FHFA, as conservator, could

22   consider not declaring dividends."

23        You heard testimony in this case about something called the

24   payment in kind option, where if you can't pay the cash

25   dividend, the contract itself with Treasury says you don't have

1    to draw down.  It doesn't say anything about needing to draw

2    down and eat into the commitment.  You can just increase the

3    liquidation preference.  That's what this is saying.

4        Next bullet point, there's that number again.  "We expect

5    that $275 billion" -- that's basically the same number in the

6    Benson projections.  "We expect that 275 billion will provide a

7    substantial cushion for any unexpected losses," and here's the

8    really important part, "and should give market participants

9    confidence about the government's commitment to these

10   institutions."

11       Those market participants are the bond investors and the

12   mortgage-backed security investors, the people defendants say

13   they were worried about.  And Treasury is telling Tim Geithner,

14   not a problem.

15       Now, based on all those reasons, if we go back to slide 4,

16   check the box.  This is a yes.  This was arbitrary and

17   unreasonable.  The reason they've given you is not the real

18   reason.  It's not a reason to do it.

19       Now, I want to say a little bit about reasonable

20   expectations, because it's a part of what forms the judgment

21   about arbitrary and unreasonable.

22       So let's go to slide 7.

23       As the Court will tell you, reasonable expectations for

24   shareholders are not just based -- are not based on subjective

25   feelings of 10,000 or 100,000 shareholders.  And that's why when

1    we brought our plaintiffs here, they were limited in what they

2    were allowed to say.  They weren't allowed to come in and say, I

3    thought this was going to happen --

4              MR. STERN:  Objection, Your Honor.

5              THE COURT:  Overruled.

6              MR. HUME:  I'm certainly not complaining.  I'm

7    explaining.

8         They testified -- we will talk about what they said.  But

9    the point is, the objective facts are what inform reasonable

10   expectations, and the Court will tell you that.

11        Here's one objective fact.  The preferred shareholders in

12   Fannie Mae and Freddie Mac invested money into Fannie Mae and

13   Freddie Mac of $33.2 billion.  You heard the summary witness,

14   the very first witness in the case, walk through lots of

15   numbers.  This is one of her charts.  It is in evidence.  You

16   can ask to see it.  It's PX-4F.

17        We are not -- in the opening, Mr. Stern accused me of

18   trying to say this was like a loan.  I didn't say it was a loan.

19   I in fact said this isn't really how it works because you're

20   supposed to keep getting dividends.  It's supposed to be better

21   than a loan.  You keep getting dividends as long as they can pay

22   them.

23        But the point is, look how low the dividends is compared to

24   the total amount invested.  And here's the thing:  That's from

25   about 1996 to 2008.  That's the time those preferred

 1   shareholders invested that money.  But a subset of that money, a

 2   huge subset, basically two-thirds, was invested in 2007 and

 3   2008.

 4        And those two years -- and there is a stipulation in this

 5   case that the financial crisis started in the summer of 2007.

 6   It was a bad year already.  The housing market, everything was

 7   starting to get bad, and Fannie Mae and Freddie Mac needed

 8   money, and their regulator, the predecessor agency to the FHFA,

 9   wanted them to go and get money.

10        That's a relevant fact for you to be aware of, because in

11   those two troubled years, private investors invested

12   $19.7 billion, and the dividends they received were 1.1.

13        Now, I want to be clear.  These two slides I've just shown

14   you are not what we're asking for in damages.  They're not a

15   part of our damages argument.  They're a part of our basic

16   fairness argument and the argument about what reasonable

17   expectations -- what would inform them.

18        And I just think they're relevant overall context for you

19   to understand, because these government-sponsored enterprises --

20   for four decades, Congress didn't want the federal government to

21   fund them.  Congress created them to fulfill a public mission,

22   which is to help the housing market, because the politicians all

23   believed in the American dream and wanting to support people's

24   ability to get a mortgage.  So they had a public mission.

25        But where did they get the money to fulfill that public

mission?  For four decades, it was from private investors, and these private investors put in a lot of money, and they didn't get a lot out.

Now, more facts relevant to -- this testimony, in the interest of time, I won't read it, but you should know that Mr. DeMarco -- this is his trial testimony -- admitted that in 2007 and 2008, the regulators thought it was in their interest, in the interest of Fannie Mae and Freddie Mac -- look at this last question.

"And am I correct that in 2007 and 2008, there was a belief amongst the regulators where you worked at the agency that both Fannie Mae and Freddie Mac would benefit from raising more capital, more money from private investors?"  Meaning private shareholders.

And he says yes.  He says it's based on something that happened before he was there, but he says basically yes.  And he was there at that regulator at that time.  That's what the top half shows.

So the regulators wanted that investment.  That's relevant to reasonable expectations, in my view.

And here's the past history.  Why did people invest?  We don't pretend to be saints, that we were doing it just to help the public mission.  We invest -- people invest money because they want a safe investment that pays dividends.  You met all sorts of shareholders.  The history was, that's what these

companies were.  They were stable.  They paid dividends every

quarter.  All of those yeses -- this is from Susan Hartman

again -- means that dividends were paid every quarter until

September 2008.

Now, you've seen this document before many times, too,

PX-2C.  Reasonable expectations are informed also by what the

FHFA said when the conservatorship began.  What did they say?

And we have a couple of documents, this and one other I want to

show you.  And we've highlighted all different parts of it.  At

one point, counsel for the other side even accused me of trying

to hide something.  I'd love you to read every word of this

document ten times.  Please read it, all of it.

First question, "What is a conservatorship?"

"A conservatorship is the legal process in which a person

or entity is appointed to establish control and oversight of a

company to put it in a sound and solvent condition."

You heard Professor Dharan explain solvent is an accounting

term that is essentially the same as net worth, having assets

more than liability.  The more your assets are greater than your

liability, the more your net worth.  The more your net worth,

the more solvent you are.

The net worth sweep is completely the opposite of putting

the companies in a sound and solvent condition.

Next question, "What is a conservator?"

"A conservator is the person or entity appointed to oversee

the affairs of a company for the purpose of bringing the company
back to financial health."

The Company, capital C here, there is one for Fannie Mae
and one for Freddie Mac.  They're saying the same thing.

There's a lot of technical jargon about how FHFA is the
conservator.  And it ends again with the goal "to keep the
company in a safe and solvent financial condition."

Next question, "What are the goals?"

This is one where counsel seemed to argue that by showing
the first sentence I was hiding the ball.  I think the first
sentence to an answer is pretty important.  They say the purpose
of appointing the conservator is "to preserve and conserve the
company's assets and property and put the company in a sound and
solvent condition."

Preserve and conserve assets and property is the opposite
of a net worth sweep, which sweeps all the net worth away.
Sound and solvent, again, that means trying to build net worth.
Net worth sweep is the opposite.

And yes, there are other statements about systemic risk and
public mission.  None of that is inconsistent with what we're
saying.  In fact, it's consistent.  It's better for the
companies and the system if the companies have both the Treasury
commitment and the 150 billion or 130 billion that was taken
away from them.  They would have more cushion.

"When will it end?"  When will the conservatorship period

1    end?  This is September 2008.

2         "Upon the director's determination that the plan to restore

3    the company to a safe and solvent condition has been completed,

4    the director will issue an order terminating the

5    conservatorship."

6         That's the opposite of the net worth sweep, because that

7    will never happen under the net worth sweep.  You can't get to a

8    safe and solvent condition if you have a net worth sweep.  So

9    you can't do what this is saying the goal is to do.

10        And what are the powers?  Again, you can tell I like this

11   document, can't you?  It's to put the company in a sound and

12   solvent condition, preserve and conserve the assets.

13        Now, this is even better, because a month later, on

14   October 30, Ed DeMarco, the central figure in this case who made

15   the decision to agree to the net worth sweep, he went off to a

16   big important conference.  He worked at the FHFA at that time.

17   He was one of the senior deputy directors.  That's how he became

18   acting director.

19        He circulates his slides from his speech.  Okay?  In his

20   speech, he presents this.  He explains to everyone the same

21   thing, except even better.  He says, conservatorship is a

22   statutory process to stabilize a troubled institution.  It's

23   intended to have a limited duration and has as its objective to

24   return the entity to normal business operations once stabilized.

25        Again, the opposite of the net worth sweep.

1          And look at this one.  "Conservatorship statutes provide

2     broad authority for a conservator to operate the institution

3     until it is stabilized and" -- and then what happens? --

4     "returned to the shareholders."

5          So we're not totally out of the picture, actually.  We had

6     hope.  We had contractual hope until the net worth sweep.

7          These are reasonable expectations that this would happen,

8     or at least there was a chance.  This was the goal.  This was

9     the plan.  The net worth sweep decimates it.  Totally the

10    opposite.  Destroys the reasonable expectations.

11         Now, we're trying to keep tight on time.  So I'm going to

12    do this pretty quickly.  But you did meet some shareholders.  As

13    I said, the subjective views are not what the reasonable

14    expectations are.  But there are real people here involved, and

15    we're entitled to make sure you realize that, thousands of them.

16    Okay?

17         You met Michelle Miller.  What's interesting is how

18    different they are.  She lives in St. Louis, licensed

19    administrator at a senior living facility.  She's a beginner

20    investor.  She's not a super sophisticated one.  She wanted to

21    choose stocks that pay a dividend, and she bought 500 shares.

22    These shares, each one doesn't cost that much.  And she said she

23    wanted to represent the other people, just like myself, that had

24    been harmed.

25         You met Tim Castle, who lives in Columbus, former

carpenter, former state rep.  Bought a thousand Freddie common
shares and still has them.

You meant Joseph Cacciapalle, who is the named plaintiff.
We had to do it by videotaped deposition.  He's a little
elderly, he's a little infirmed.  He wanted something that paid
a dividend.

And then a very different kind of investor, the Berkley
plaintiffs who are technically not in the class but we're saying
exactly the same thing, which is why you haven't heard
Mr. Barnes say much, because we're working together.  But
they're here.  He's an extremely sophisticated investor.  He's
been doing this all his life.  This is what he does.

He says he's conservative.  His company owns 10.7 million
shares.  There are some big institutional investors, small
little individual investors.  And he said to you here, sworn
testimony, the FHFA didn't do what they said they were going to
do; they said they were going to conserve and preserve Fannie
Mae and Freddie Mac back to solvent.  Did not do that.

They made it clear they're not suing about 2008.

Now, this is going to structure the rest of my
presentation, which I might have to go through some of it a
little quickly.  But the bottom line is, the question, the
question you have is, by agreeing to the net worth sweep on
August 17th, 2012, did the defendants arbitrarily or
unreasonably destroy the ability of private shareholders to

 1    receive potential dividends in the future?

 2         And there are at least three different ways you could get

 3    to yes on that.  I've already shown you some at a high level.

 4    We think it's the easiest yes for all sorts of reasons,

 5    including what I've already shown you.

 6         But you're going to get detailed instruction on what

 7    "arbitrarily" and "unreasonable" means.  We think it's both

 8    arbitrary and unreasonable, and they're very similar concepts.

 9    But you will get instructions on what's entailed.  And if you

10    find that we have proved any one of the following three facts,

11    then you have to check yes.  In my view, you should, in our

12    view, check yes on question 1.

13         First, it was a grossly inadequate process.  No studies, no

14    memos, no analysis, and an August rush.  I'm going to tell you

15    more about that in a second.

16         That leads to an arbitrary and unreasonable decision.  We

17    say "and," even though we have to prove "or," arbitrary or

18    unreasonable.  But we think it's both.  That's the first reason.

19         If you find that true, that alone, that alone means we

20    should win.  You look at the instructions; that's our view of

21    it.

22         Second, the reason they gave, the commitment was going to

23    get eroded, the caps were coming back, and the circular draw was

24    going to erode the commitment.  That's their reason.  It makes

25    no sense when you look at the facts.  It's contradicted by the

facts.  It's contradicted by PX-205, which reports what Ed
DeMarco said.  And there's no document.  Mary Miller, who was on
that call, no one wrote back and said, oh, no, he didn't say
that.

You're going to have to ask yourself how believable it is
that someone would write a memo like that to one of the top
officials in the Treasury Department and it be not true, based
upon what the Secretary of the Treasury told him.  The reason
makes no sense.  The reason is contradicted by the facts.  That
makes it arbitrary and unreasonable.

And third, the true motive was different and, in fact, the
opposite.  Now, this is a little bit of detective work, we will
show you later.  But I submit to you, there's evidence in the
record that supports the conclusion that what really went down
here is the opposite.

Instead of being concerned that they were never going to
make enough money to pay the dividend and have to draw, draw,
draw from the Treasury and lose that commitment, instead of
that, what was really behind this and what caused the August
rush, why did it go down so quickly?  Because they were making
profits above 10 percent.  They were building net worth.  They
were going to start building capital.

And there were certain people who have an ideological view,
a policy view that this --  these guys, Fannie Mae and Freddie
Mac, shouldn't be allowed to come back to life.  We didn't like

them.  We thought their charters were fundamentally flawed.  Ed
DeMarco said that here.  Some of his friends at Treasury may
have agreed.

It's not a coincidence that after the second quarter
earnings come out showing big profits, way above the 10 percent
dividend, all of a sudden, it will make your head spin how
quickly the net worth sweep is signed.

So that makes it an arbitrary and unreasonable decision.
You don't have to find all three.  You can find any one of
those, and we win.  And they are interwoven, of course.  They
relate to one another.  But you find any one of those to be
true -- we believe you should as the instructions -- we think
you will follow the instructions.  If you find any one of those
to be true, you check yes on question 1.

I've got a lot of slides on this first point, because here
are the things Ed DeMarco admitted and had to admit because it
was true and it was shown in his deposition.

"Question:  Is there a single document, a single memorandum
analyzing the pros and cons of entering into the net worth sweep
on behalf of Fannie Mae and Freddie Mac?"

"Answer:  No."

Just think about that.  This decision sent $330 billion
from Fannie Mae and Freddie Mac to Treasury, over 150 billion
more than would have been spent under the 10 percent dividend.
Not a single memo analyzing the pros and cons.

1        Let me just step back for a second.  There's all kinds of

2   decisions that we make in life.  Sometimes we want to decide if

3   we're going to have coffee or tea or are we going to have Coke

4   or Pepsi?  Are we going to go out the left or right door?  You

5   remember counsel trying to use that analogy with our experts.

6   You don't need to spend a lot of time with those decisions most

7   of the time.

8        But if you're in a position of power and you're making

9   decisions about multitrillion dollar companies about whether to

10  promise to transfer their net worth away in perpetuity, that's a

11  decision that needs a whole lot of study.  The amount of work

12  you need to do goes way up the bigger the decision.

13       So that alone right there, that admission shows there was

14  no process, and it goes on.

15       "Question:  Well, did you ever ask anyone at FHFA do an

16  analysis before you agree to the net worth sweep based on

17  whatever you thought the best projections were, taking into

18  account your plans?"

19       Remember, he kept saying he had plans.  He didn't look at

20  these other projections because he had his own plans.  Well, did

21  you ask someone to study that?

22       "Question:  Did you ever ask anyone, run an analysis on

23  whether we're more likely to end up paying more or less to

24  Treasury under the net worth sweep?  Did that happen?

25       "Answer:  No."

1        Part of being reasonable and not arbitrary is taking into
2   account new information.  And the record will show that
3   Mr. DeMarco first learned about this idea -- he doesn't remember
4   where it came from, by the way.  What does that tell you?  It's
5   a solution to this enormous problem, and he doesn't remember
6   where it came from?  But he had fleets of financial analysts and
7   economists running a division doing financial modeling, led by
8   Ms. Tagoe.  He could have asked her to update the projections;
9   he didn't do it.
10       "Question:  You didn't ask Ms. Tagoe to do a new set of
11  projections before you agreed to the net worth sweep?
12       "Answer:  I don't believe I did.  No, I did not."
13       The old projections were October 2011.  A lot of new things
14  had happened since then.  You're going to make a huge decision?
15  You need to take into account new information, assimilate new
16  information.  Where are we now, where are we now that we're
17  signing this momentous document that's going to make this huge
18  net worth sweep happen?
19       Here, he just admitted it over and over here.  No memos?
20  Yes.  No e-mails with a long analysis?  Correct.  No e-mails
21  back and forth between FHFA and Treasury negotiating whether or
22  not to do it?  Correct.  Correct, he admits.  If those existed,
23  your counsel would have shown you; right?  He didn't show you
24  that?  Correct.
25       There's no negotiation, no analysis, no studies, no

1    negotiation.

2        He didn't consider alternatives.  That's another part of

3    being reasonable.  Consider the alternatives that you could do

4    for this supposed problem.  For example, what about trying to

5    negotiate a provision just in case?  Like all these projections

6    are suggesting and all these documents saying roaring recovery,

7    golden years, what if you end up making a lot of money, Fannie

8    Mae and Freddie Mac, how about you negotiate a provision which

9    says, Hey, net worth sweep but not too much, we don't have to

10   pay you more than this much more than the 10 percent, something

11   like that.

12       It's not that complicated.

13       You didn't negotiate that?  "We didn't negotiate that as a

14   scenario, no."

15       How about just negotiate a different rate, something

16   between 10 percent and 100 percent of net worth, so some other

17   way to do it?  Didn't try that.

18       How about a provision where you say, you know what?  We're

19   worried about this commitment, that's what we're worried about,

20   how about you just kick in the net worth sweep only if you get

21   to a certain level of erosion?  Nope, didn't try to do that

22   either.

23       And how about -- since the concern apparently is you can't

24   pay the 10 percent dividend, well, then pay the lesser of the

25   net worth and 10 percent, and if it is less, then the shortfall

1    you owe with interest?  Didn't consider that.

2        And he didn't negotiate just for a little more time.  You

3    will see the August rush a little later.  A little more time

4    would have made a difference.  Things were getting better and

5    better every quarter, and they had those huge deferred tax

6    assets that were going to increase net worth.

7        Again, you will see no studies of this supposed problem

8    about the Treasury commitment.

9        Can't remember whose idea it was.

10       Now, one of the biggest alternatives -- oh, before we get

11   to that, you remember some questions about principal reduction.

12   That's in that other document, PR covenant, principal reduction.

13       What does principal reduction mean?  It means for

14   struggling homeowners whose houses are now worth less than their

15   mortgage, writing off some of the debt, like the student loan

16   debt forgiveness, it's writing off some of that debt to help

17   people out.

18       And the Treasury Department at this time really wanted to

19   do it.  It was a priority of the administration to do principal

20   reduction.  And Ed DeMarco didn't want to do it.  It was against

21   his philosophy.

22       But the real point is this:  We only got a fraction of what

23   appears to be out there in terms of the work he did on principal

24   reduction.  But he did so much more work on fighting principal

25   reduction than he did on the net worth sweep.  Zero analysis,

memos, studies, consideration of alternatives before the net

worth sweep versus massive effort, work, studies, data

analytics, memos, and tough negotiating to resist principal

reduction.

He says he was very focused on principal reduction.  His

extensive work, does he recall people at FHFA produced memos or

data on principal reduction?  Yes.  How about on the net worth

sweep?  No, no; as he already told us, no, we didn't do that.

Look at this document.  I didn't do the setup right for

that, but you get the picture.  PX-500 was a letter.  You may

remember this sort of awkward moment in court.  I had to cross

out the name.  This was a letter Ed DeMarco sent to Congress

about all the reasons why he was against principal reduction.

23 pages -- three-page letter and 23 pages after that of

analysis, graphs, data, arguments on why not to do principal

reduction.  That's just one.  He said there were others.

There's nothing like that on the net worth sweep.

He testified at length he was proud of how much work he did

on this.  He obviously felt very strongly about it.  So there

was a great deal of analysis that was done, bottom bullet.

There were quite a number of people that were involved.

Look at the middle bullet.  "They did a great deal of

analysis in terms of the potential impact of principal

forgiveness on the financial results and the financial impact of

this.  We modeled out what this would cost the companies."

1          Why didn't they model out the net worth sweep?  Stark,

2    stark contrast.

3          And look how tough he was.  Treasury Secretary Geithner

4    really wanted him to put a PR covenant, a promise to do

5    principal reduction in that Third Amendment.  He really wanted

6    it.  DeMarco refused to do it.

7          "Question:  And you won that battle?  It didn't go in it,

8    did it?

9          "Answer:  It did not."

10          He could be tough when he cared about something; he could

11    negotiate.

12          Who did he put in charge?  Who did he ignore?  Here's who

13    was not consulted, Ms. Tagoe, the head of modeling.  Not

14    consulted.  She's the one who could have done the stress test

15    for him and updated it.  The CEO of Fannie Mae, not consulted.

16    The CEO of Freddie Mac, not consulted.  This is David Benson,

17    who was doing all these projections that kept appearing over and

18    over again showing no problem, not consulted.  Susan McFarland,

19    the chief financial officer of Fannie Mae, not consulted.  Ross

20    Kari, chief financial officer of Freddie Mac, not consulted.

21          They had a lot of smart people very knowledgeable about

22    these businesses.  He didn't ask any of them for any input.

23          There's testimony from Mr. Layton and Mr. Kari about how

24    they were just told this is happening, done deal.  They were

25    told two days before the net worth sweep, and they were not

1    asked anything.

2         Mr. Ugoletti is the only person Mr. DeMarco got involved.

3    And he was friends of his from back at Treasury.  They worked

4    with each other.  And then he hired him when Mr. DeMarco became

5    acting director.  He hired him as a special advisor.  And he

6    made Mr. Ugoletti the point person.  You saw Ugoletti's

7    deposition.  We're going to show you some clips in a bit.

8         So that's part of what's arbitrary.  Why did he put him in

9    charge as opposed to these other people?

10        Can we play the audio clip from his deposition?

11        Before you do, his testimony showed that he worked at

12   Treasury and he negotiated or was involved in negotiating the

13   original preferred stock purchase agreement for Treasury, with

14   FHFA and Fannie Mae and Freddie Mac on the other side.  It was

15   supposed to be an arm's length negotiation.  Then he comes over

16   in 2009 and works at FHFA, but he testified he was detailed back

17   at Treasury and spent half his time at each place for either six

18   months or a year or maybe a year and a half.  It wasn't clear;

19   he wasn't sure.

20        And then he is chosen -- he is chosen by DeMarco to

21   negotiate this.  And he's asked -- the FHFA is supposed to be

22   representing Fannie Mae and Freddie Mac.  Yes, it can act in the

23   public interest, but it is also the conservator.  It wears two

24   hats.  And when it's the conservator -- it is supposed to be

25   doing all those things, preserve and conserve assets for Fannie

1    and Freddie.

2        Let's see what Mr. Ugoletti's understanding of that role or

3    that difference was.  Let's play the clip.

4        (Audio recording played.)

5            MR. HUME:  That answer makes no sense.  He does not

6    know.  What that last answer means is he doesn't know if he's

7    acting as a government regulator or is he acting as the

8    conservator.  And so he bails himself out by saying well, I

9    didn't sign it.  That's true.  Ed DeMarco signed it.  But this

10   is the point person, and no one else was involved.

11       Now, I'm going to be running short on time.  So I'm going

12   to speed up.  They told the GSEs on Wednesday, the 15th.  And if

13   they told them on the 15th, they already made a decision on the

14   14th.  In fact, this e-mail shows at 7:30 in the morning they

15   had already had the decision on Tuesday, the 14th.

16       Now, there's one other huge alternative that I mentioned

17   earlier and that you saw me go through with Mr. DeMarco.  It's

18   called the payment in kind.  You look -- the certificates of

19   designation are a part of the contract that Fannie and Freddie

20   had with Treasury.  It's like a shareholder contract, like the

21   certificates our clients have.  It says how the dividends get

22   paid, what rate they get paid.  It says very clearly that if you

23   can't pay a dividend and you don't pay it, then what happens is

24   the amount of that dividend is just added to Treasury's

25   liquidation preference.

1          The liquidation preference is like the principal value of

2     the senior preferred stock.  It's the value of the stock.  It

3     would be the value if there actually is a liquidation or

4     dissolution.  It's also the value that's used to determine what

5     the dividend will be the next time.

6          And if you fail to pay for whatever reason, if you don't

7     pay the cash dividend, it gets automatically added to the

8     liquidation preference, and then from that time forward, the

9     next provision says for all quarters after that the dividend

10    rate goes up to 12 percent.

11         Sure, 12 percent is worse than 10 percent, but it's a hell

12    of a lot better than your net worth for all time.  Plus, the

13    contract says that if you make enough money the next time --

14    most of the time you're not allowed to pay down the liquidation

15    preference.  You can't repay Treasury the money you've drawn.

16    They don't let you.  They don't let you repay them, which is

17    pretty weird, but that's the deal.  But they do let you repay

18    them for the payment in kind part.  So if you don't have the

19    cash to pay and the payment in kind is used instead, you can

20    repay that.

21         And here's what this looks like.  Here's their slide on a

22    circular dividend problem.  This is what -- and I tried to make

23    it better, because I animated it to show the problem that they

24    say caused the net worth sweep.

25         If you don't have the cash, they say, you borrow it from

Treasury to pay the 10 percent dividend.  And then what happens
is your liquidation preference goes up, and the Treasury
commitment goes down.  That's what they're trying to avoid.  If
that goes way down, materially down, they say, at some point the
bond investors and mortgage-backed security investors might get
upset.

       But what if you just do what the contract says?  If you do
what the contract says, we think the 10 percent dividend you can
pay is paid in kind, which adds to the liquidation preference.
And what happens to the commitment that you care about?  That's
the thing you care about.  What happens?  Nothing.  No change.
And then if you're able, you can repay that payment in kind.
"PIK" means payment in kind.  Liquidation preference goes down.
Again, no change to the commitment.  And the rate goes back to
10 percent.

       Now -- and again, there's no change.

       Let's say you can't pay it, and let's say it is 12 percent
from the beginning.  It's still the same thing.  The liquidation
preference goes up.  What happens to the commitment?  Nothing.
Let's say you can't pay it.  Now you have to do it again.
You're at 12 percent.  Liquidation preference keeps going up.
What happens to the commitment that is the key reason?  They say
the blue bar, that's the key for them.  What happens?  No
change.  This was in the contract.  Total solution to what they
claim the problem was.

1        And this is why:  Because they're worried about these

2    people.  This is what they say the whole case is about, making

3    sure these people don't panic.  These people care about the

4    Treasury commitment, they don't want it to go down a lot,

5    because if it goes drastically down, they get worried there

6    won't be money there to pay.

7        But they don't care at all how big the liquidation

8    preference is, how big the preferred -- the senior preferred

9    shareholder -- this is Treasury down here.  They don't care how

10    big that gets, because the senior preferred stock sits

11    underneath these investors.  If there's a liquidation, if

12    there's a disaster and there's a bankruptcy and everything gets

13    sold off, these guys get paid first.  This liquidation

14    preference sits behind them.  It doesn't matter how big that bar

15    goes on the right side.  All they care about is the bar on the

16    left side.

17        And the contract gives a total solution to that.  Payment

18    in kind.

19        PX-33, PX-34, they're the same.  One Fannie Mae, one

20    Freddie Mac.  That's where you can read those paragraphs and

21    just read how it works.

22        He didn't consider it.  Okay?  It didn't come up.  No one

23    had discussed this.

24        "No one brought that to your attention?"  "No one had

25    discussed this at any point."

He didn't bother to ask anybody, I don't think.  He didn't
say anything about thinking about it, and we will show you
later, he tried at trial with his defense counsel to pretend
that he rejected it because of the 12 percent being higher than
10.

That's not true.  This is true.  You see the last question?

"Question:  It never came up?

"Answer:  No."

All right.  We've been through reason number 1, and the
answer just on reason number 1 is clear.

Now, reason number 2, the reason given makes no sense.
This has been the focus in some ways in the trial.

And again, Mario Ugoletti, sworn declaration.  This is
Plaintiffs' Exhibit 351.  This is their best effort at the
beginning of this lawsuit to explain to the Court why this
lawsuit should be thrown out, because they did all these
wonderful things and that's why they did it.  They say they
couldn't pay the 10 percent dividend and they would have to
draw, draw, draw.

And I want to be clear about this.  It's not -- the problem
they're solving is not that occasionally you might have to draw
down from the Treasury commitment.  Because that's just
occasional, and you have 275 billion, and you might use up a
little bit.  No one's going to panic.  There's no sign of anyone
panicking.  It's got to be a huge amount of continual drawing

that eats into that commitment at a rapid pace for it to be a problem.

And that's what they said they thought was happening. That's what they claimed in this declaration. We shared the concern about this 10 percent, concerns about the adequacy of Treasury's financial commitment.

Remember in July, I showed you that document when they prepared Secretary Geithner to testify? They said 275 billion, the cap, should give everyone plenty of cushion, plenty of comfort.

They said in this declaration this is why they did it. Again, we're back to the center of the case.

PX-205, the memo that says what Mr. DeMarco said to Secretary Geithner. This is a memo written by Michael Stegman, June 25, 2012, recording what was said based on what the Secretary of the Treasury told him. What are the chances the Secretary of the Treasury is going to tell him something false? What are the chances that he's going to make something up that wasn't told to him? And there's no document saying no, no, no, it wasn't quite like that.

Not only that, what he says, no urgency because they're going to be generating large revenues, enabling them to pay the dividend even with the caps.

The other reason you should believe this is really what he said? Because it's true. That's what the projections were

showing.  That's what Professor Dharan showed you.  That's what the Benson projections show.  And he said it.

Now let's see what happened.  Okay?  He came here and he testified, and we asked him, did he say this.  In lawsuits like this, you take a deposition first where you're sworn under oath to tell the truth, and he had two, one in 2015 and one in 2020. And he was asked about this.

And as we showed when I cross-examined him, in the depositions, he said "I don't recall."  Then he came to court, and he tried to say something different.

I asked him, "Did you tell Secretary Geithner in June 2012 that the GSEs would be generating large revenues over the coming year, thereby enabling them to pay the 10 percent annual dividend well into the future even with the caps?"

In deposition, he said, "I don't recall what I said."

Here's what he said here.  That ain't quite the same thing; that ain't quite the same thing.

So I showed him.  We went on and on.

"The answer that you gave when that question was asked was 'I don't recall exactly what I told them.'"

The word "no" was not a part of his answer in the deposition.

I said, "Was that truthful and accurate in your deposition?"  "Yes."

I said, "In the deposition, you said you don't recall;

1 correct?"

2     "Answer:  That's what I said, and I believe that's what I

3 said here.  I actually thought my answer was quite the same as

4 what I gave in the prior deposition."

5     Really?  Let's see.

6     "Question:  The question is, did you say that to

7 Mr. Geithner?

8     "Answer:  I don't believe I did, no. "

9     That is a different answer than "I don't recall."

10     "Question:  So in the deposition, twice, you said 'I don't

11 recall.'"

12     "Answer:  Right.

13     "Question:  Was that truthful and accurate testimony?

14     "Answer:  Yes.

15     "Question:  But today you say 'no, I don't believe I did.'

16     "Answer:  I'm sorry, sir.  To say 'I don't believe I did'

17 and 'I don't recall,' I'm not finding as big a distinction as

18 you are."

19     So I said to him:

20     "Question:  So is it your testimony that you don't see a

21 big difference between 'no, I don't believe I did,' and 'I don't

22 recall what I said'?  You don't see a big distinction between

23 that?

24     "Answer:  No."

25     The jury instructions are going to tell you how you make

assessments and judgments about credibility.  And they're
basically going to say you can use all of your resources as
human beings who have lived on Planet Earth your whole life and
have interacted with people.

You saw Ed DeMarco.  You saw him testify extensively.  We
submit to you that his testimony on this point was not credible.
He was playing a little bit of word games, in my view, in our
view.

Now, again, there's no projections about this big problem.
You heard from Professor Dharan.  You saw the mountain of
evidence of all the good things that were happening.  They made
profits in the first quarter.  They made even bigger profits in
the second quarter.  This is the opposite of the trend they say
they're worrying about.

And it wasn't just a fluke, Professor Dharan said to you;
it was structural improvements in the business.  Things were
getting better.  The principal source of revenue when they
securitize these mortgages and sell them out is they get paid a
guarantee fee from the banks.  The G fees were going up.  The
prices were going up.  The prices they charged were going up.

And the credit losses, the biggest problem they had, they
weren't -- it wasn't a cash problem they had.  It was an
accounting problem, because the accountants look at these
assets, these mortgage assets, and they say -- they have to try
to predict the future.  They have to say, what are the chances

that some of these homeowners are going to default and Fannie Mae and Freddie Mac are going to have to pay all of these guarantees?

And they took huge write-downs in 2009 and '10 and '11, worried about the instability because the housing market had tanked.

Things are better now.  The housing market is better.  The accountants say credit losses are coming down.  Those two things mean higher profits.  And you saw the evidence.

And we're not doing 20/20 hindsight.  They keep saying that.  You're going to hear them say again.  What Professor Dharan did was look at the evidence, the facts, the documents, the projections, the financials.  He looked at what existed at that time as of August 16th or 17th or before, 2012.

July 2012, that's what they predicted was happening with the guarantee fees, going up.  What was happening with home prices?  Okay, I will admit, after the line here, that stuff they didn't know.  But they did know this -- they did know this.  It was going up, home prices.  The Case-Shiller Index, it was going up.  It was going down; it's going up.

Don't just take our word for it.  Look at their document, PX-160.  That's what they were forecasting.  They were forecasting that it was going up.

So what does Susan McFarland say to Ed DeMarco?  There he is again getting another e-mail that he doesn't seem to pay

much attention to.  The chief financial officer is reported as
saying in this executive meeting -- Susan McFarland.  You saw an
actor reading her sworn testimony.  I don't want to make light
of it, because it's some of the most important testimony in the
case.

    Her document says -- this document says she said, "The plan
reflects the view that the company is at an inflection point."
That means a turning point.  And this is January 2012.

    Because credit cycle is changing.  Credit related expenses
and loss allowances are projected to fall.  When they fall,
profits go up.

    Internal document forecasts it.  That line going down,
that's credit losses going down.  That means profit's going up.

    You've seen it.  We showed it to you during Professor
Dharan's testimony.  This is why he said it wasn't reasonably
necessary to do the net worth sweep.

    And when he said that, counsel tried to cross-examine him
and said, you're not giving an opinion on whether it was
reasonable; you're just saying it wasn't necessary.  And he
said, it might not be necessary for me to go out the left door
or the right door, so -- and it may not be necessary, but that
doesn't mean whether it's reasonable or not.

    It doesn't make any sense.  This is not going out the left
door or the right door.  This is whether you promised to give
away your entire net worth sweep forever.  The whole point of

his testimony was -- you will decide if it was reasonable.  What
he was telling you is it wasn't necessary.

And the obvious point that I am arguing to you, we are
arguing, is you would never do something like the net worth
sweep if it wasn't necessary, ever.

Draft document from the board of Fannie Mae to Ed DeMarco.
"Fannie Mae expects to be profitable and to be able to
substantially repay the government's investment."  Strangely,
did not send it until September.

The FHFA themselves, their accountants said we shouldn't be
surprised if Fannie Mae goes on a roaring recovery.  May 29th,
2012.

It goes on and on and on.  PX-211 is maybe one of the next
best, because it talks about all of the things they were
expecting to happen.  Look at the first highlighted sentence.

"2012 comprehensive income is expected to be sufficient to
cover the dividend obligations for the full year."

What that means -- what I want to emphasize about that
sentence is it means they had time.  They had time.  What they
were worried about was having to borrow -- not borrow, draw down
on the commitment to pay a dividend.  They expected not to have
to do that.  They had time.

This document, PX-211, it's got so much good stuff in it.
I'm going to move right along.  Freddie Mac has the same kind of
documents, not as many, but they have them.  They talk about the

improvement in home prices, the reduction in loan losses, and comprehensive income exceeded the dividend payment.  No need for a draw request, August 2012.

And you've seen this a lot, the golden years.  We don't want to beat the dead horse; we don't want to beat the dead horse.  But that's that, PX-213, Benson projections.

Now, we're going to skip ahead a little bit.  You've seen this already.  So we'll skip -- can we skip ahead to -- I want to show reason 3, because I think reason 2 is pretty clear.

Reason 3 -- although I do want to just briefly address two things before I leave reason 2, slide 107 -- sorry, slide 101.

You learned some accounting in this case, whether you wanted to or not, and you learned about the deferred tax asset.  That means you lost money in the past, which means you're going to pay less in federal taxes in the future.  Normally, if you expect to make those profits, that's a big asset.

And you may say, well, that's just an accounting thing.  Yeah.  The whole case is just accounting things.  This isn't about businesses that were losing cash.  It's about businesses whose assets were all intangible assets.

I hold a mortgage.  It's like a piece of paper.  Someone promises to pay me.  And now somebody's telling me there's a risk that person won't pay you, so you have to value it less on your balance sheet.  It's all accounting.

This was a huge asset that they were getting ready to write

up.  When they started losing money, they had to write it down,
so their net worth went down, and they were forced to draw down
from the Treasury to fill the hole, forced to borrow when it
went down.

And the perverse thing is, when it went up in 2013, they
were forced to pay the Treasury the full amount.  Multibillion
dollar asset, $50 billion for Fannie, 23 billion for Freddie.
And yes, they weren't done in 2012 second quarter, but
Susan McFarland testified it was on the horizon and she was
telling people.

Mr. Ugoletti claims no one knew about it.  The evidence
shows they knew about it; they talked about it.  PX-245.

And PX-259 is a document I'm going to tell you a little bit
about, but it reflects a meeting with Ed DeMarco in which it
indicates that the person who attended the meeting with Ed
DeMarco said there was a question about recording certain
deferred tax assets, and Jeff, who was at FHFA, said both of the
boards of Fannie Mae and Freddie Mac had discussed this at the
last meeting based on the view that they were going to be
profitable going forward.  They were talking about it.  They
knew it might happen soon.

Susan McFarland said the same thing.  She said she told
Treasury, sustainable profitability -- we would be able to
deliver sustainable profits.  "I even mentioned the possibility
in the not-so-distant future where we could write up those

deferred tax assets."

And she said it to FHFA as well, and she said it would be about 50 billion, and she predicted it would probably be in the middle of 2013.  As it turned out, it was the first quarter they did it.  But she predicted it.  This is what she told them in late July/early August 2012.

Now, we've already seen that one.

So that's reason 2.

Reason 3 is the motive.  I'm only going to spend three slides on this.  We're going to skip the periodic commitment fee because it's, in our view, a ridiculous fall-back argument.

They said that the reason they did this was because they were worried about the shrinking of the commitment.  And every time we said but that makes no sense, they say well, we would have had to pay it anyway in the periodic commitment fee.  We say, did you analyze the periodic commitment fee?  Did anyone ever try to calculate the periodic commitment fee?  No.

Mr. Ugoletti said that.  They all admitted it.  You heard Dr. Thakor this morning and before.  You can weigh his testimony as a leading expert in the world on periodic commitment fees versus Dr. Attari, and it's not even close.

Let's jump quickly to reason number 3, slide number 118.  As I said, if you look at what actually happened between June 25th and August 17th, you see that the true motive was the opposite.  Mr. DeMarco claimed that it was -- he didn't do this

1    to demonstrate a wind-down.

2         A wind-down is, we're not going to let these guys make

3    money; we're not going to let them build capital.  It's the

4    opposite of the reason they've given.  It's the opposite of

5    Mr. Ugoletti's declaration.  So he has to deny it.  He has to

6    deny that that was the whole point, to demonstrate wind-down.

7         But look what the e-mail said.  Remember, we just saw this

8    e-mail?  James Griffin had a meeting with Ed DeMarco about the

9    net worth sweep, Tuesday, August 14th.

10        His boss, Satriano, who you met, says okay, what about the

11   auditors?  He responds, Griffin, he says the thing about the

12   deferred tax assets we looked at.  He said the boards talked

13   about it because they're going to be profitable.

14        And the next sentence is one of the most important

15   sentences in this case.  He had a meeting with Ed DeMarco.  He

16   says, "I don't think it makes sense" for them to write up all

17   this net worth "given the amendments are designed to demonstrate

18   wind-down."

19        That's the opposite, the opposite of what they've told you

20   the reason was.  And he's saying that based on a meeting that he

21   had with Ed DeMarco, who denies that's what it was.

22        Now, you've seen a lot of slides about the impact.  I'm

23   going to show you slide 145.  We're going to tell you a little

24   bit about the impact that the net worth sweep had, not because

25   it is the basis for our damages, but because I can't have you

not understand how devastating this decision was.

In the very first year -- and it's relevant to understanding what the intent was.

The very first year of the net worth sweep, if they had not done the net worth sweep, the dividend would have been 18.9 billion.  Okay?  If they had done nothing.  Instead, under the net worth sweep, it was 130 billion.  Difference, 111 billion.

And here's why that's relevant.  It's not because I'm playing 20/20 hindsight.  It's because sometimes you learn what a person is thinking, what they're really all about, what's going on by how they react to events.  That's a big event right there, and there's not a single document, not a single e-mail, not a single memo saying, whoa, what did we do?  Is that what we meant?  Jeez, it's a little unfortunate.  Maybe we can renegotiate, or, you know, damn, I wish we hadn't done that. Nothing.

What does that tell you?  It tells you that was the idea all along.

Now, all the way brought to date, they paid 245 billion in cash.  They changed the deal around to let Fannie and Freddie keep the money.  So they're now keeping money, but Treasury owns it all, because every time they make money Treasury's liquidation preference goes up.

So they got 330 billion.  If they had just paid that

1    10 percent dividend, which was bad enough -- let's face it, it

2    ain't cheap, and they weren't allowed to pay it down -- they

3    would have paid 180.

4        So the excess value under the sweep so far is 150 billion.

5    The summary witness showed you that.  It's just pure arithmetic.

6    It's not disputed.

7        Let's skip forward now to damages.

8        Well, let me just -- this shows you how it all works.  The

9    total Treasury has gotten is 385.  In case you're curious,

10   that's how Treasury is done.  The amount drawn down -- I won't

11   use the word "borrowed" -- by Fannie and Freddie is 191.  The

12   amount transferred either in cash or increased liquidation

13   preference to match net worth increases is 385.  That's the big

14   picture.  And the little red arrow means it's still going on;

15   it's still going on.

16       Now, we were harmed.  Our clients were harmed.  That should

17   be the easiest thing to see, which is why I don't need to spend

18   a lot of time on it.

19       It eliminated the right to potential dividends.  Okay?  And

20   people estimate -- when you have stock, particularly stock in

21   companies that are in a conservatorship, people are trading and

22   buying and selling based on do they think these things are going

23   to pay dividends, and they come up with a value.  That's how

24   they're estimating that hope, that contractual hope, that

25   contractual right to potential dividends.

1          And when the net worth sweep was announced -- and this is

2    just a document saying this happened -- all the stock remained

3    outstanding and would have whatever worth was determined by the

4    market.  That's in a Freddie Mac document.  That was the deal.

5          And then the net worth sweep happened.  That's the value

6    our three classes had of their stock based on the trading price

7    of people buying and selling.  It was announced before 9:00 a.m.

8    on August 17th, and here's what happened.  That's what the

9    market said the net worth sweep did in one day.

10          That is measuring -- I want to be very clear about this.

11    The injury was done to the contracts and anyone who holds that

12    contract.  This is the measurement of that injury based on what

13    the market thought the net worth sweep did.  Because after the

14    net worth sweep, there's no way for you to get a dividend as

15    long as the net worth sweep remains in effect.  So the only

16    value the stock has after the net worth sweep is the possibility

17    the net worth sweep will somehow go away, maybe a lawsuit, maybe

18    Congress, maybe something changes --

19              MR. STERN:  Objection, Your Honor.

20              THE COURT:  Overruled.

21              MR. HUME:  -- multiplied by whatever the news is about

22    how they're doing.  There's no evidence on that.  I'm just

23    telling you, that one day is the measure of the harm.

24          So let's skip ahead to the questions at the end for harm --

25    oh, we do have, I will show you, the precise number -- let me

make clear.  There was an analysis done by the defendants'

expert, Dr. Attari, that showed this stock drop.  And you heard

from our expert, Professor Mason, who has done a lot of studies

of these things, who looked at that event study and formed the

opinion that the conclusions were sound.

     And the conclusions -- it sounds way more complicated than

it is.  All he's talking about there is was that stock drop --

the amount of that stock drop is stipulated, that 1.6 billion.

The amount is stipulated.  It's a fact.

     The only question, then, is was it caused by the net worth

sweep, the announcement of the net worth sweep?  And that's

common sense.  That was over a 50 percent drop.  That doesn't

just happen.  It was because they just announced that Treasury

is getting 100 percent of everything forever.

     And you have an economist telling you that's a sound

analysis showing the causation, and the net worth sweep caused

that drop.

     In the events, he shows the exact numbers for the three

classes.  Remember, the Fannie common shares, they're not in the

case because they didn't get a contract.  But Fannie preferred

lost 779 million.  Freddie preferred, junior preferred -- it's

called junior because the Treasury is senior.  Freddie Mac

junior preferred lost 786 million, and the Freddie common lost

46 million.  That adds up to the 1.6.

     It's in their expert's study.  The amounts are stipulated.

1    So we can go through -- JX-1 has a stipulation of facts.  If you

2    want to see the few things we agree on other than that we thank

3    you for your service, they're in JX-1, Joint Exhibit 12.

4    There's only one joint exhibit.

5       So we stipulate to all these numbers.  The numbers are

6    there.  They're not in dispute.  The only dispute, I think, is

7    was it caused by the net worth sweep, and I submit that is

8    common sense, and you have an expert saying it.

9       There it is.  That's his opinion.  "Directly observable

10   measure of damages."

11      So question 2, have we proved that we suffered harm?  Have

12   the shareholders we represent suffered harm?  Yes, obviously.

13      Question 3, what's the amount?  I just showed you the

14   amounts.  779 million for Fannie junior preferred, 786 for

15   Freddie junior preferred, 46 for the Freddie common.  The

16   numbers are there.  They're in the stipulation, which you can

17   get.

18      There's one other question, or maybe two.  Let's see.

19   Let's skip this to the last two questions.

20      For Freddie Mac, their certificates are governed by

21   Virginia law.  Under Delaware law, prejudgment interest is dealt

22   with by the Court, by the judge.  Under Virginia law, the jury

23   has to make a decision, not on the amount of -- prejudgment

24   interest, okay, is when there's a breach of contract ten years

25   ago.  In a simple case, you're supposed to get X dollars.  You

1    lost it.  You get interest often on the fact that you haven't

2    had that money all that time.

3          Here, it's a loss of value in the shares.  In the verdict

4    form, for the Freddie shareholders, you will be asked should

5    they get interest, yes or no.  And the simple argument we make

6    on that is, this happened ten years ago.  That 1.6 loss happened

7    ten years ago, and it's been a long time coming since anyone's

8    been remedied.  There's been no remedy.  And so we ask for a yes

9    on that.  And I believe all you need to do is yes.

10         And there's another question as to what date, as of what

11   date, and the date -- well, the date wasn't there, but guess

12   what the date is?  August 17th, 2012.

13         Members of the jury, I'm going to end where I began.  I've

14   got to thank you.  You listened to me so carefully.  You're so

15   patient.  I know we lawyers go on and on.  We invest all this

16   time.  Believe it or not, I skipped a lot of slides.  But I

17   think you get what our point is.

18         We ask for a verdict of yes, they breached the implied

19   covenant of good faith and fair dealing; yes, we were harmed by

20   it; yes, we are entitled to damages in the amount of the stock

21   drop on August 17th; yes, we get prejudgment interest from

22   August 17th.

23         I'm going to let Mr. Stern speak to you, but it may be that

24   the Court will give you a short recess first.

25         Thank you.  Thank you.

1          THE COURT:  We'll take a ten-minute recess.  I want to

2    come back as promptly as we can so we can get in some of the

3    defendants' argument before we recess for the day at 5:00.

4          Don't talk about the case yet.  Don't let anyone talk to

5    you about the case.  See you in ten minutes.

6          (Jury exited courtroom.)

7          (Recess taken from 3:32 p.m. to 3:48 p.m.)

8          (Jury entered courtroom.)

9          THE COURT:  You may be seated.

10   Mr. Stern, you may proceed.

11         MR. STERN:  Thank you, Your Honor.

12         Good afternoon, members of the jury.  Mr. Hume is right.  I

13   am going to agree with him on that one point.  We thank you

14   very, very much for all of the time and attention you paid.  I

15   told you in my opening statement that we know that jurors watch

16   lawyers, and I told you that lawyers watch jurors.  Well, we've

17   been watching you, and you have been an extraordinarily

18   attentive group.  Some of this subject matter has not been the

19   most thrilling.  But you have paid unbelievably close attention

20   from day 1, and I know that I speak for both tables when I say

21   that we are very, very grateful for your time and attention and

22   your service in listening to the evidence in this case.

23         And that's what I'm going to talk to you about now.  I'm

24   going to take us back ten years, August of 2012.

25         Mr. DeMarco is looking back at literally years of negative

net worth for Fannie and Freddie.  For Fannie, he's looking back on 14 consecutive quarters, from the fourth quarter of 2008 to the first quarter of 2012, over three consecutive years of liabilities exceeding assets.

And you learned what that meant.  You learned that when liabilities exceed assets, when you owe more than you have, that's negative net worth, and it's not where any company wants to be.

He's looking back at 14 consecutive quarters of Fannie and Freddie drawing on that Treasury commitment, drawing it down and down and down just to make their dividend payments to Treasury.

He knows that Fannie and Freddie have just made filings with the Securities and Exchange Commission, signed and certified by their chief executive officers and by their chief financial officers.  And those filings say point blank that Fannie and Freddie don't expect to make enough money to cover their dividend payments over the long term.  That's what he's looking back on.

What's he looking ahead to?  He's looking ahead at a stress scenario that has Fannie and Freddie drawing over $120 billion from that Treasury commitment over the next three years.  He is hearing from the marketplace that the market was very concerned about whether the amount of the Treasury commitment was going to be enough going forward.

He's a Ph.D. economist who knows his economic history.  He

knows about the financial crisis of 2007 and 2008, not very far
back in the rearview mirror.  And he knows that the financial
crisis nearly brought down Fannie and Freddie and the secondary
mortgage market and the entire United States economy.

He's a dedicated public servant, life-long, with an awesome
responsibility, an awesome responsibility placed on his
shoulders by Congress, an awesome responsibility to protect the
public interest.

And he knows every time Fannie and Freddie have to draw
money from that Treasury commitment just to pay the 10 percent
dividend that they owe to Treasury, they're drawing down on the
commitment.  And he knows that the Treasury commitment backing
up Fannie and Freddie is the only thing that's keeping Fannie
and Freddie in business.

Perhaps most important of all, members of the jury, he
hears the clock ticking, counting down to December 31st, 2012,
when that cap on the Treasury commitment is going into place.
And once that cap hits, every single dollar that Fannie and
Freddie draw from the Treasury commitment erodes that
commitment.  It shrinks it.  It brings it down.

And he knows what that means.  He knows that that means
that the Treasury commitment and the market confidence in the
Treasury commitment is absolutely vital to the financial health
of Fannie and Freddie.  And he knows that the financial health
of Fannie and Freddie is absolutely vital to the United States

housing market.  And he knows that the financial health of the

housing market is absolutely vital to the financial health of

the United States economy.  That was the lesson that was

learned, at huge economic and human cost, during the financial

crisis of 2007 and 2008.

     And what else does he know?  He knows that the buck stops

with him at FHFA.  He knows that under the law that Congress

passed in 2008, he has to take action to protect the public

interest.  He has to take action to protect the interests of the

American taxpayer who, through the Treasury Department, have

pumped hundreds of billions of dollars into Fannie and Freddie

to keep them from going bankrupt, action to protect the public

interest, not to maximize profits for the shareholders of Fannie

and Freddie.

     So that's what he did.  On August 17th, 2012, Mr. DeMarco

took action to make absolutely sure that the Treasury commitment

would be completely protected from erosion caused by circular

draws.  He took action to make absolutely sure that the markets

would know that the Treasury Department stood behind those

mortgage-backed securities.  He took action to protect the

housing market and the economy and, most of all, to protect the

American public.

     And when he took that action, he did exactly what he was

allowed to do under the shareholder contracts and the law.  He

acted reasonably to protect the public interest.  And that

1    action was not only reasonable, it was crucial.

2         And the evidence showed that any shareholder would

3    reasonably expect Mr. DeMarco and FHFA to do exactly what they

4    did.  A reasonable shareholder would know and knew that their

5    equity, their investment in these companies, had been virtually

6    wiped out years before.  They knew that the only reason the

7    companies hadn't gone out of business was that the Treasury

8    Department had stepped in with billions of dollars of taxpayer

9    money.

10        Those shareholders knew that under their shareholder

11   contracts, they did not have any guaranteed right to dividends.

12   They knew that their dividends had been eliminated as of 2012

13   years ago, in September of 2008.

14        And they knew that under HERA, that Housing Economic

15   Recovery Act, they knew that FHFA was authorized to take action

16   in the public interest, even if that action was not in the

17   interest of the shareholders.  And they knew that under

18   conservatorship, the companies were being managed to protect

19   that public interest, not to maximize returns for shareholders.

20        And because shareholders knew all of those things, it's

21   crystal clear that a reasonable shareholder would have

22   reasonably expected FHFA to act in the public interest by

23   ensuring the stability and safety of Fannie and Freddie, to

24   ensure the stability and safety of the United States housing

25   market and the entire United States economy.

1          That's what we submit, members of the jury, the evidence

2     showed you, that FHFA acted reasonably when it agreed to the

3     Third Amendment and the net worth sweep to protect the public

4     interest, and that action was within the reasonable expectations

5     of shareholders.

6          What was the evidence?  I'm going to review it with you in

7     my time together with you this afternoon.

8          You learned that the events that are important to your

9     decision in this case actually started years before the Third

10    Amendment and the net worth sweep happened.  Those events began

11    in 2007 and 2008, because you heard about the 2007 and 2008

12    financial crisis and how the collapse of the United States

13    housing market fueled that crisis and how businesses failed and

14    how people were put out of their homes and how people lost their

15    jobs.  None of that evidence is in dispute.

16         There's also no dispute about the critical role that Fannie

17    and Freddie played in the housing market in 2007 and 2008 and

18    played in the housing market in 2012 and continue to play in the

19    housing market to today.

20         You heard the numbers.  You'll remember Mr. James Lockhart.

21    We saw him on video.  He was the first director of FHFA and the

22    first conservator of the enterprises.  He told you in his

23    videotaped testimony that back in that 2008 time frame, Fannie

24    Mae was the biggest, the largest financial institution in the

25    country and that Freddie Mac was probably the third-largest.

1   You learned that Fannie and Freddie were responsible for

2   $5 trillion worth of mortgages.

3        And you're going to see in that joint -- Mr. Hume referred

4   to it as a stipulation, that joint exhibit.  I believe its

5   formal title is "Joint Statement of Undisputed Fact."  And you

6   will see in there the statement that the parties agree on, that

7   by 2007 Fannie Mae's and Freddie Mac's mortgage portfolios had a

8   combined value of approximately $5 trillion, and they owned

9   almost half of the nation's existing mortgages.

10       And you also learned from the evidence why Fannie and

11  Freddie were so critical to the housing market and the economy,

12  because the evidence showed you how the secondary mortgage

13  market worked.  And you will remember that testimony, and you

14  will remember the slides.

15       And the way it works in a nutshell is that the banks sell

16  their mortgages to Fannie and Freddie, who package them into

17  those mortgage-backed securities and then sell those

18  mortgage-backed securities to investors.

19       And you will remember that the investors we're talking

20  about are not the shareholders of Fannie and Freddie who own

21  shares in Fannie and Freddie.  The investors we're talking about

22  are the people who invest their money in those mortgage-backed

23  securities.

24       The investors then get the monthly payments, you will

25  recall, minus a fee that the homeowners are making on their

mortgages.  And the evidence showed you that the banks then had more money available to give to mortgages to help people buy homes, to create affordable and available mortgages so that homeowners could get a loan and buy a home.

And you learned that the key to making all of this work was that Fannie and Freddie guarantee to investors that they will get a return.  And again, this is in the Joint Statement of Undisputed Fact.  That's Exhibit JX-1.

And in that statement of undisputed fact, you will see the statement that the parties agree on, that the enterprises purchased mortgages, some of which the enterprises pool into mortgage-backed securities.  The enterprises guarantee the payment of principal and interest to investors who buy the mortgage-backed securities.

Then it goes on by saying by creating the secondary mortgage market, the enterprises increase liquidity.  You will remember that word being used in the testimony.  That's what enables the banks to make additional loans.

And the guarantee was that even if the homeowner couldn't make a monthly payment, Fannie and Freddie would step in and pay the investors anyway.  That is critically important evidence, members of the jury, because it told you how crucial it was for Fannie and Freddie to be able to make good on that guarantee and how crucial it was for the investors, for the market to have confidence that Fannie and Freddie would make good on that

1    guarantee.

2        Because if the investors didn't have that confidence, they

3    wouldn't invest in the mortgage-backed securities.  That

4    money -- if they didn't invest in mortgage-backed securities,

5    that money wouldn't flow back to the banks.  And if that money

6    didn't flow back to the banks, it wouldn't be there for the

7    banks to make mortgages available and affordable.

8        You also learned something else very important about the

9    guarantee and the role that it played in the financial crisis of

10   2007 and 2008.  You heard from Mr. DeMarco and from other

11   witnesses about the defaults and people not being able to pay

12   their mortgages, and you heard that Fannie and Freddie ran

13   through $70 billion of shareholder equity.

14       So that money that Mr. Hume put up on the slide that the

15   investors put in, it was gone.  That's not what was being used

16   to operate the companies.  The situation became so serious and

17   so bad that Congress had to enact a law.

18       And you've heard about that law.  We call it HERA.  That's

19   the acronym for the law.  It's in evidence, so you can look at

20   it for yourselves.  But you also heard testimony about the law

21   from Mr. Lockhart and Mr. DeMarco and other witnesses.

22       And what did you learn from that testimony?  You learned

23   that HERA doubled down on the public mission of Fannie and

24   Freddie, because you have learned that unlike other

25   corporations, Fannie and Freddie were chartered by Congress.

1    And you know from the evidence that those charters gave Fannie

2    and Freddie what the witnesses described as a public mission.

3         Can we get number 1, please.

4         These were the charters, Fannie and Freddie.  And the first

5    thing in each of those charters is the primary purpose of Fannie

6    and Freddie as government-sponsored enterprises, and the first

7    thing is to "provide stability in the secondary market for

8    residential mortgages."

9         The first thing is not maximize profits for shareholders.

10   The first thing is not make lots of money for shareholders.  The

11   first thing is provide stability in the secondary mortgage -- in

12   the secondary market for residential mortgages.  And you learned

13   from the evidence why that was so important.

14        You also learned that that had been Fannie Mae's mission

15   since it was created in 1938, and it was Freddie's mission since

16   they were created in 1970 to support the nation's housing

17   market.

18        Well, what did HERA say?  How did HERA double down on that

19   public mission?  Well, you learned that HERA was -- that HERA

20   created -- the law created the Federal Housing Finance Agency,

21   FHFA.  What else did HERA do?  HERA created FHFA and also gave

22   FHFA the authority to appoint a conservator.

23        And there's a very important provision in HERA, members of

24   the jury, that you will see in the statute that you will have

25   back in the jury room.  And I'm going to quote from part of it.

1          "The agency may as conservator take any action authorized

2     by this section which the agency determines is in the best

3     interests of the regulated entity or the agency."

4          And the judge's instructions will make clear to you -- and

5     this is not in dispute -- that what that means is the FHFA, when

6     it is acting as the conservator, has the authority to act in the

7     best interests of the public.

8          And we understand and agree that the question for you is

9     whether that authority was exercised reasonably.  But we start

10     from the proposition that that is a part of FHFA's job and a

11     part of the responsibility that Congress gave it, the

12     responsibility to protect the public interest.

13          And Mr. DeMarco knew that FHFA had that authority and had

14     that responsibility.  He knew that FHFA had the authority to put

15     the best interests of the public ahead of the financial

16     interests of the shareholders.  And you heard him testify that

17     he understood that on top of the public mission that Fannie and

18     Freddie had always had, HERA gave the conservator that

19     additional authority and that additional responsibility.

20          And that, members of the jury, is what lies at the very

21     heart of this case:  Mr. DeMarco's authority and his

22     responsibility to act in the public interest and to put that

23     public interest ahead of the interests of private shareholders.

24          Well, what else did HERA say?  In addition to giving

25     HERA -- FHFA the authority to act in the public interest, it

gave the Treasury Department the funding authority to support the secondary mortgage market, because as Mr. DeMarco explained to you, Congress put those two things in two separate places. FHFA got the authority and responsibility to act in the public interest, and Treasury got the funding authority to help make that happen.

And you learned from Mr. DeMarco that because of how Congress set that up, FHFA and Treasury came together to support the housing market back in 2008.  And you know that the arrangements between Treasury and FHFA to accomplish that became the agreements that were called the preferred stock purchase agreements, or the PSPAs.  And those are the agreements that went through the amendments that ended for our purposes in August of 2012 with the Third Amendment.  But it started with the first PSPA.

And what else happened under HERA?  The evidence showed you that Mr. Lockhart was made the first director of HERA, and he didn't waste any time.  As Mr. DeMarco told you and as I just said, in the period running up to September of 2008, the shareholders' equity, their investment in the shares that they bought was wiped out.  That $70 billion of equity going into 2008, it was gone.

That's exactly what Mr. DeMarco told you.  He testified that when he became the director of FHFA, Fannie and Freddie had no capital.  They had no money to operate their businesses.  The

money that had been invested in them was gone.

So he decided to exercise the authority that Congress had given him.  He made the decision to put Fannie and Freddie into conservatorship with FHFA as the conservator, just as HERA authorized.

He issued that decision on September 6th, 2008.  His written decision to put the GSEs, Fannie and Freddie, into conservatorship is in evidence.  So if you would like, you can review it yourself.  It's two decisions, one for Fannie and one for Freddie.  But I'm going to put them up on the screen so we can look at some of the highlights.

Can we get slide 2, please.

So Mr. Lockhart explained in his testimony that a key part of the conservator's job was to ensure that the GSEs kept supporting their mission.  And the way that he did that was to appoint the conservator because of what he found.

He found that in September of 2008, the enterprise -- and there's one for each -- is in an unsafe or unsound condition to transact business.  He found that the enterprises are likely to be unable to pay their obligations or meet the demands of their creditors in the normal course of business.  That is saying they're broke, they have no operating capital, it's gone.

And what other evidence did you see about that happened when the conservatorship was imposed in September of 2008?  You saw the official statement that Mr. Lockhart issued on the

morning of September 7th, 2008.

Can we get number 3, please.

Here's his statement, and he says what the goal of the conservatorship is.  He says that "the goal of these actions is to help restore confidence in Fannie and Freddie, enhance their capacity to fulfill their mission, and mitigate the systemic risk that has contributed directly to the instability in the current market."

So he is announcing to the world, including all the shareholders, that the goal of the conservatorship is to restore confidence in Fannie and Freddie.

What else did he say in that statement?  He said that "in order to conserve over $2 billion in capital every year, the common stock and preferred stock dividends will be eliminated."

And that is, of course, a very important fact in this case. Because you will remember, I talked in my opening statement that I expected the evidence to show that shareholder dividends were eliminated in September of 2008, four years before the Third Amendment.  And that is exactly what the evidence showed.  That elimination of dividends happened four years earlier and had nothing to do with the Third Amendment, and it had nothing to do with the net worth sweep.  When we get to August 17th, 2012, we will know that those dividends had been gone for years.

What else does the statement say in that paragraph?  It says that "while dividends are eliminated, the common and

1    preferred stock will continue to remain outstanding."

2         What did that mean?  That means if you owned your share of

3    Fannie or Freddie stock, you won't get a dividend, but no one's

4    going to take away your stock.  You can keep your stock and do

5    whatever you want with it.  You can hold it.  You can sell it.

6    And if you buy low and sell high, you get to keep every penny of

7    profit that you make, less what the government wants to take

8    from you in taxes.  Or you can decide that you don't want to own

9    a stock that doesn't pay a dividend, and you can sell it.  There

10   was nothing about the conservatorship that prevented

11   shareholders from just selling their stock.

12        Before we leave this slide, though, I want to point out one

13   other aspect of that first sentence about the goal of the

14   actions, because I'm going to suggest to you later on when I

15   talk to you more about why what Mr. DeMarco did was reasonable,

16   I'm going to suggest to you that one way to think about what's

17   reasonable is to think about whether the action matched the

18   goal.

19        So if the action matches the goal, we submit to you, that

20   means that it was reasonable, because that's the whole idea of

21   taking an action if you are a public servant.  It is to have the

22   action match the public interest goal, and that's why it's so

23   important to focus on what that goal is.

24        Coming back to dividends, as long as I'm talking about

25   dividends, I want to make another point that we submit to you is

1    important.  Fannie and Freddie shareholders never had a

2    guaranteed right to dividends.  I said that in my opening.  I

3    said it a few moments ago.

4        You saw the certificate of designation, which is another

5    term for the stock certificate.  And that stock certificate is a

6    part of the contract between the shareholders and Fannie and

7    Freddie that the plaintiffs are claiming was breached, was

8    broken by the Third Amendment and the net worth sweep.  And you

9    saw the provision in that contract that makes completely clear

10   that there is no guaranteed right to a dividend.  It's right

11   there in black and white.

12       And if we can get slide 4, please.

13       This is the contract, and it's the same for Fannie and

14   Freddie, at least on this point.  This is the contract that

15   every shareholder would have.  So every shareholder knows and,

16   therefore, would reasonably expect that they don't have any

17   right to dividends and that they can only get them in the sole

18   discretion of the board of directors.  That means that the board

19   of directors gets to decide whether to issue a dividend or not.

20       And that decision can be based on any number of things.

21   The board can decide to issue a dividend.  The board can decide

22   to take the money, as I said in my opening, and buy a new truck

23   or plant or building.  That is something that everybody -- every

24   shareholder knows is completely up to the board of directors,

25   and every shareholder knows that they have no guaranteed right

1    to a dividend.

2         What other evidence was there about the imposition of the

3    conservatorship during that first week of September in 2008?

4    Well, there's a document that's -- there have been a number of

5    documents that have gotten a lot of air time, and this is one of

6    them.

7         Can we get number 5, please.

8         So this is a document that some -- it says "questions and

9    answers" at the top, but some witnesses refer to it as the fact

10   sheet.  And this is -- DX-81 is the exhibit number for this

11   document.

12        Mr. Hume called out some exhibit numbers also.  I think I

13   know why he did it.  I will tell you why I just did it.  If

14   there are exhibits that you want to see back in the jury room, I

15   believe His Honor is going to instruct you that you can request

16   them.  And if you request them, you would want to request them

17   using this exhibit number so that Ms. Jenkins can figure out

18   exactly what it is you want.

19        So what are the key points in this document?  Well, there's

20   this question at the top of the page:  "What are the goals of

21   the conservatorship?"  And that question has a two-part answer.

22   The part that actually answers the question is in the second

23   sentence, and that sentence says, "The goals of the

24   conservatorship are to help restore confidence in the company,

25   enhance its capacity to fulfill its mission, and mitigate the

systemic risk that has contributed directly to the instability in the current market."

If that sounds very familiar, that's because it is.  It's because that's exactly what Mr. Lockhart said in his separate statement.  And again, it's completely consistent with everything that Mr. Lockhart said.

And again, I will submit to you later on that in thinking about reasonableness, this is what you should focus on, this goal.

Well, there's another part to this answer that's not about the goals, and that's the first sentence.  And that says, "The purpose of appointing the conservator is to preserve and conserve the company's assets and property and to put the company in a sound and solvent condition."

I'm going to come back to this later on, but you've heard a lot from the plaintiffs about how the Third Amendment and the net worth sweep was inconsistent with preserving and conserving assets.  You heard testimony from Dr. Dharan about this.  And I'm going to come back to it later on, but for now, I will just say this:  The plaintiffs' witnesses and Dr. Dharan in particular tried to tell you that the Third Amendment and the net worth sweep were somehow inconsistent with that sentence.

But you know from the evidence that Dr. Dharan was way off base.  You know from the evidence that the only thing that was keeping the GSEs safe and solvent was the Treasury commitment.

1    And you know that in August of 2012, the Treasury commitment was

2    literally the only thing that was keeping these companies

3    afloat.  So if the Treasury commitment eroded, game over.

4        And as you know, the entire purpose of the Third Amendment

5    and the net worth sweep was to keep that Treasury commitment

6    intact.  So not only was the net worth sweep consistent with

7    preserving and conserving the assets of the company, not only

8    was it consistent with keeping the company safe and solvent,

9    preserving that commitment was the only thing that was going to

10   keep the companies safe and solvent.  And you know that from the

11   evidence.

12       One other point for this right now, and that's this:  With

13   all due respect to Dr. Dharan, you should ask yourself if he

14   wasn't trying to have it both ways.  On the one hand, he said

15   the Third Amendment and the net worth sweep were inconsistent

16   with keeping the companies solvent, but on the other hand, he

17   made a very big deal about how successful the companies were

18   after the Third Amendment.

19       I will come back to talk about that a little more later on.

20   But for now, there's one other very important fact about Fannie

21   and Freddie going into conservatorship, and that's this:  You

22   will remember that one of the things -- one other comment about

23   what's highlighted on this slide.

24       There's been a lot of discussion about if and when and how

25   the companies will come out of conservatorship.  But

1    Mr. Lockhart said from the very beginning, he said to every

2    shareholder, he said to everybody in the world, "There is no

3    exact time frame that can be given as to when this

4    conservatorship may end."

5         So a reasonable shareholder's reasonable expectation would

6    be I don't know, I don't know when this conservatorship will

7    end, because Mr. Lockhart made very clear that there's no exact

8    time frame.

9         I also want to talk to you again about the authority of the

10   conservator to act in the public interest, because that was

11   confirmed by the -- by securities filings that Fannie and

12   Freddie made in the third quarter of 2008.  And I'm going to be

13   talking a lot more about securities filings, and what I mean by

14   that are the reports that the companies made to the Securities

15   and Exchange Commission.  They made them -- they made them

16   quarterly, and those were those reports that you saw that were

17   called 10-Qs, and they made them annually, the reports that you

18   saw that were called 10-Ks.

19        Again, I'm going to talk a little more about these later

20   on, but the bottom line is this:  You learned that those

21   Securities and Exchange Commission filings were very, very

22   serious documents.  You learned that they were signed by CEOs

23   and CFOs, and you learned that there were civil penalties and

24   criminal penalties if those filings were not in good order.

25        So those filings -- can we get number 6.

1          So this filing is -- for most of these, there's a Fannie

2     and a Freddie, and usually, they're the same.  I will point out

3     where they're different.  But this is the first Fannie Mae

4     securities filing that was filed after the imposition of the

5     conservatorship.  So you can see the top -- the date is

6     November 10th, 2008.  The third quarter ended September 30th of

7     2008, but the filings don't come out right away, in part because

8     of how careful the companies have to be in putting them

9     together.

10          So what did this securities filing say?  Well, it's a

11     completely public document, and every reasonable shareholder

12     would know what's in this filing.  And what does it tell us?  It

13     says -- if we go down to the bottom box, do you see where it

14     says "managing for the benefit of the shareholders"?  That's the

15     topic.  And at the top, it says "before conservatorship."

16     What's the very first thing before "conservatorship"?  "Maximize

17     shareholder value over the long term."  Because the topic

18     is "managing for the benefits of shareholders."  So the first

19     thing under "before conservatorship" is "maximize shareholder

20     value over the long term."

21          But look what it says about during conservatorship, meaning

22     after the conservatorship was imposed on September 6th.  What it

23     says about after the conservatorship is "no longer managed with

24     a strategy to maximize common shareholder returns."  Right?

25          This was not a secret.  This was known to everybody, that

1   in conservatorship we're not worrying about maximizing

2   shareholders' returns.  What we are concerned about is

3   protecting the public interest.

4        This was one filed on November 10th, and if we can get

5   number 7, just so the members of the jury can see.

6        There's the Freddie version.  It says the same thing.  "No

7   longer managed with a strategy to maximize common shareholder

8   returns."

9        These are the first quarterly filings after Fannie and

10  Freddie went into conservatorship, and they told the public that

11  before conservatorship, maximize shareholder value, but after

12  conservatorship, no longer manage with a strategy to maximize

13  returns.  Because once Fannie and Freddie went into

14  conservatorship, FHFA was authorized and had that responsibility

15  to act in the public interest.

16       And jumping ahead for just a minute, that's how you know

17  that when Mr. DeMarco agreed to the Third Amendment and the net

18  worth sweep to protect the public interest he was acting

19  reasonably, because what he did matched the goals of the

20  conservatorship, and that's how you know that a shareholder

21  would reasonably have expected Mr. DeMarco to act in the public

22  interest and not maximize shareholder return over the long term.

23       Before I move on from the imposition of the

24  conservatorships in September of 2008, I want to pause to make

25  one thing perfectly clear, and it's actually just emphasizing

and repeating something that Mr. Hume said, or something that at least I thought I heard him say.

And that is that the plaintiffs' legal claim in this case does not challenge Mr. Lockhart's decision to put Fannie and Freddie into conservatorship.

The plaintiffs' legal claim in this case does not challenge the change from "maximize shareholder value over the long term" to "no longer managed with a strategy to maximize" those returns.

The plaintiffs' legal claim in this case does not challenge the elimination of dividends in September of 2008, four years before the Third Amendment.

And perhaps most importantly, members of the jury, the plaintiffs' legal claim does not challenge FHFA's decision to manage the companies, to fulfill their public mission, and to act in the public interest.

The plaintiffs' legal claim in this case does not challenge any of those things.

So what happened next?  You will remember HERA divided up responsibility between FHFA and Treasury.  FHFA got the authority to impose the conservatorship but didn't get funding authority, and that funding authority went to Treasury.

So the very next day after the conservatorship was imposed, FHFA and Treasury entered into the senior preferred stock agreement.  So sometimes those are referred to as the SPSPAs;

sometimes they're referred to as the PSPAs, a lot of letters. There was one with Fannie and one with Freddie.

Of course, these are critical, critical agreements between FHFA and Treasury, because what they did was to make available hundreds of billions of dollars to Fannie and Freddie so that they could guarantee those mortgage-backed securities.  Each company got $100 billion each to get them out of negative net worth, up to the black, get them out of the situation where their liabilities exceeded their assets, and draw them up into the black so that they weren't in the red.

They also established the liquidation preference that you've heard about.  I'm going to come back to that later.  They also gave Treasury the right to the fixed 10 percent dividend based on the amount of the commitment that was used.

I want to draw a distinction here between that 10 percent dividend and what you've heard referred to as the periodic commitment fee.  I'm not going to spend a lot -- I promise I'm not going to spend a lot of time on the periodic commitment fee either now or ever in my remarks to you.  I'm going to come back to it a little later on to talk to you just a few minutes about it.

But right now, as a matter of concept, the difference between the dividend and the commitment fee is that the dividend was Treasury's return on the amount of money that it was making available to the enterprises.  So the way it worked was, as the

enterprises actually took money out of the commitment, right, they start with 100 billion, they take some amount, the amount that they take out is what the 10 percent dividend is based on.

The periodic commitment fee is something different. It doesn't have to do with how much of the commitment is actually used. It's a fee that was to be paid by -- was to be paid to Treasury just for making the money available, having nothing to do with how much the commitment was actually drawn on. That was the basis of the dividend payment, and I'm going to talk about that a little bit later on.

But I want to come back right in this moment to the 10 percent dividend, because it was the nature of that dividend, the fact that it was a fixed dividend, which gives rise to the problem that I will be talking about that you heard a lot about in the evidence of the circular draw, of Fannie and Freddie having to draw money from the commitment just to pay the dividend which was based on the amount of money that was drawn from the commitment.

So every time that happened, the dividend would go up, and the next time, another draw would have to be taken to pay the dividend on the amount that was used, which goes up when that dividend is paid. That became the heart of the problem. That became the threat to the housing market and the economy.

The evidence was clear, ladies and gentlemen -- members of the jury -- old habits die hard -- that as of September 7th,

2008, as I told you before, the shareholders' equity in Fannie
and Freddie was exhausted.  And that means that the enterprises
were entirely dependent on the $200 billion Treasury commitment
and investment.  They were entirely dependent on the
$200 billion of American taxpayer money that had been made
available to them.

So this is September of 2008.  And you heard Mr. DeMarco, I
asked him how did somebody come up with that number, and he said
that they wanted a big number.  Well, 100 billion is certainly a
big number.

But it wasn't big enough, as it turns out, because between
September of 2008 and May of 2009, the enterprises continued to
be in real trouble.  Between them, they had to draw down on that
Treasury commitment every single quarter of 2009.  And
certainly, that included all the quarters leading up to
May of 2009.

And it was that fixed 10 percent dividend that was causing
a huge problem, because Fannie and Freddie were suffering huge
losses in their business.  They also had to pay this dividend.
So they had to take draws from the commitment to pay that
10 percent, but as I just said, every time they did that, they
increased the amount on which they'd have to pay the dividend
next time.

That was the circular draw, and it was just digging Fannie
and Freddie into a deeper and deeper hole.

        Mr. Lockhart told you that -- he told you about those
losses, and he said that he was very concerned about market
confidence.  So if there's a suggestion in this case that
Mr. DeMarco made that up, that there's no evidence that anyone
else cared or was concerned about market confidence or that
there's no one else in the case who thought that was a problem,
you'll know that that is not what the evidence told you.  The
evidence told you the opposite.

        And you know from Mr. Lockhart that by May of 2009, he
decided that something had to be done to bolster the confidence
of the market in the guarantee that Treasury was backing these
mortgage-backed securities with and that Treasury was backing
Fannie and Freddie with.

        So what happened in May of 2009?  In May of 2009, on
May 6th, we saw the First Amendment.  And under the First
Amendment, the commitment was doubled from 100 billion to
200 billion per enterprise, so a combined total of $400 billion.

        But you learned, members of the jury, that even that wasn't
enough.  Even $400 billion was not enough, because you learned
and we'll -- let's pull up number 8.

        You learned that -- this is Fannie.  Freddie, there was
some quarters when Freddie didn't take a draw, but let's just
look at Fannie.  You learned that in every single quarter of
2009, Fannie had negative net worth.  Its liabilities were more
than its assets, and it had to take a draw in every one of those

quarters.  See at the top where it says "in millions of U.S. dollars"?  That means what looks like $15,000 is actually $15 billion.  And you can see that Fannie had to take a draw in every single quarter of 2009 and that they had negative net worth in every single quarter.

And the circular draw problem was getting worse, because they had to draw to pay the dividends.  And those losses continued, and it became clear that that 400 billion wasn't enough to keep Fannie and Freddie above water.  And more importantly, it wasn't enough to maintain market confidence that the United States continued to stand behind these mortgage-backed security investments.

So on December 24th, 2009, a Christmas present, the Second Amendment to the PSPAs went into effect, less than eight months later, because less than eight months later the market was so worried that even the 400 billion wasn't going to be enough that Treasury and FHFA entered into the Second Amendment.

And under the Second Amendment, the money available out of the United States Treasury and from the American taxpayer was now unlimited.  Whatever Fannie needed to get from the red to the black in a given quarter, whatever Freddie needed to get from the red to the black in a given quarter, that was going to be made available by the United States Treasury to Fannie and Freddie.

But there was another key fact about the Second Amendment,

1    and that is the cap that you heard about.  The cap was coming on

2    December 31st of 2012.  And what did that mean?  That meant that

3    whatever was available as of December 31st, 2009 -- 2012, and

4    that was going to be determined, as you heard from the evidence,

5    by a formula -- whatever was available on that day was it.  That

6    was it.  It wasn't going to be increased any more.  It wasn't

7    going to be doubled.  It wasn't going to be made unlimited.

8    Hard stop at the number that was calculated by that formula.

9        And what that meant was that every dollar that came out of

10   the commitment after December 31st, 2012, couldn't be replaced.

11   And it was that cap that you now know set the stage for the

12   Third Amendment and the net worth sweep.

13       2010, more losses, more negative net worth.  Fannie and

14   Freddie together continued to take draws every quarter to get

15   them out of the red, into the black, to get them out of negative

16   net worth.  2011, same thing, negative net worth for Fannie in

17   every single quarter, having to take draws in every single

18   quarter, having to take billions of dollars of American taxpayer

19   money just to stay in business.

20       And that brings us to late 2011, because by the end of the

21   year that year, Fannie will have had 14 consecutive quarters of

22   negative net worth.  It will have drawn over $100 billion from

23   the commitment.  Things weren't getting better.  They were

24   getting worse.  Fannie had to draw more in 2011 than they did in

25   2010, and you can see that from this chart.  We can see that

from the fourth quarter of 2008 or the first quarter, actually, of 2009 to the end of 2011 -- you can check my math here -- the combined enterprises drew $187.3 billion.

And you can go to this JX-1 and look at paragraphs 34 and 35, and you will see not only this chart, you will see the chart running out for years after 2012.  I cut it off in 2012 because as we will see there was positive net worth in the next two quarters.  I'm not trying to hide that ball.  This was just to show the consecutive quarters in which Fannie had negative net worth.

So what else did Mr. DeMarco know as we come into the end of 2011?  Well, FHFA had done financial projections, and those were dated August -- October 27, 2011, and those projections had a stress case scenario.

And let's pause here for a minute to talk about the stress case, and let's see what Mr. DeMarco said a stress case was and what it meant to him as conservator.

Can we get number 9.

So this is Mr. DeMarco answering my questions.  So I said, "Mr. Hume showed you a variety of projections from Fannie and Freddie that were based on the base case."

And I said to him -- we had talked about three scenarios. And I said, "Is the base case scenario the scenario that was principally driving your thinking and decisionmaking about agreeing to the net worth sweep?"

1          And he said, "No."

2          So I asked him, "What was the scenario that was driving

3     your thinking and decisionmaking?"

4          And his answer was, "The negative scenario, the worst case

5     or, you know, bad outcome, the stress scenario."

6          And I asked him, "Just briefly, why the stress scenario and

7     not the base scenario?"

8          And his answer was, "Because I had a responsibility to

9     ensure that the country's housing finance system could withstand

10    bad outcomes that I couldn't foresee or predict but that could

11    happen.  That's why."

12         And you also heard Mr. Layton's testimony about the stress

13    case scenario.

14         Can we get slide 10.

15         So he was being asked questions about the downside and the

16    upside, the base case and the worst case or the best case and

17    the worst case.

18         And he was asked, "You're more concerned with the downside

19    than the median or upside?"  Median meaning middle.

20         And he said, "Yes.  You're concerned about all of it, but

21    the one that causes the most problems is clearly the downside."

22         "And why is that?"

23         "Because that can threaten the viability of a big company."

24         And what he meant was that can threaten the life of a big

25    company.

1    So Mr. DeMarco got this projection in October of 2011, and

2    in the stress case scenario, the draws were about $40 billion a

3    year.  And if you ran it all out, and probably not this

4    afternoon because I'm going to shut myself down in a few minutes

5    and say Happy Halloween, but tomorrow, I will bring you a chart

6    that will show you that under that October of 2011 projection,

7    it was projecting that the Treasury commitment, if there were a

8    cap, would be gone by 2019.  Completely gone.

9    So Mr. DeMarco began having conversations with the Treasury

10   Department in late 2011, because he has now become the

11   conservator.  He's the acting director of FHFA, and it is now

12   his responsibility to take some action to deal with this problem

13   that he sees coming down the road.

14   So he has a meeting, conversations with Treasury in late

15   2011, and that led to the meeting that Mr. DeMarco had with the

16   Treasury Department in the first week of January.

17   Your Honor, I can keep going a few more minutes, or this is

18   a good breaking point for me at least.

19          THE COURT:  Is this a good point?

20          MR. STERN:  Yes, it is.

21          THE COURT:  We will take an early break.

22   Happy Halloween.  Don't talk about the case.  Don't let

23   anyone talk to you about the case.  I will see you tomorrow at

24   10:00.  Don't read or listen to anything about the case, and I

25   will see you tomorrow.  Happy Halloween.

1          (Jury exited courtroom.)

2               THE COURT:  Nice job to both counsel.

3          Is anybody dying to raise anything with me, or can I see

4     you all at 10:00 tomorrow?

5               MR. STERN:  We're not dying to, Your Honor.

6               THE COURT:  Have a nice Halloween if you can.  I know

7     your kids can or your grandkids.

8          (Proceedings adjourned at 4:44 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Sara A. Wick, certify that the foregoing is a

4   correct transcript from the record of proceedings in the

5   above-entitled matter.

6

7

8   /s/ Sara A. Wick_____        October 31, 2022_____

9   SIGNATURE OF COURT REPORTER        DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$100** [2] - 2599:7, 2604:22
**$120** [1] - 2577:20
**$15** [1] - 2603:3
**$15,000** [1] - 2603:2
**$200** [2] - 2601:3, 2601:5
**$275** [1] - 2535:5
**$330** [2] - 2525:1, 2546:22
**$40** [1] - 2607:2
**$400** [2] - 2602:17, 2602:19
**$50** [1] - 2567:7
**$70** [2] - 2584:13, 2587:21

## '

**'10** [1] - 2563:4
**'11** [1] - 2563:4
**'no** [2] - 2561:15, 2561:21

## /

**/s** [1] - 2609:8

## 1

**1** [9] - 2512:10, 2523:13, 2525:19, 2544:12, 2546:14, 2558:9, 2558:10, 2576:20, 2585:3
**1.1** [1] - 2537:12
**1.6** [3] - 2573:8, 2573:24, 2575:6
**10** [35] - 2523:8, 2523:12, 2524:4, 2524:9, 2525:3, 2526:12, 2529:2, 2530:19, 2531:10, 2531:14, 2531:17, 2545:21, 2546:5, 2546:24, 2549:10, 2549:16, 2549:24, 2549:25, 2555:11, 2556:1, 2556:8, 2556:15, 2558:5, 2558:18, 2559:5, 2560:13, 2571:1, 2578:10, 2599:13, 2599:15, 2600:3, 2600:12, 2601:17, 2601:21, 2606:14
**10,000** [1] - 2535:25
**10-Ks** [1] - 2595:18
**10-Qs** [1] - 2595:17
**10.7** [1] - 2543:13
**100** [7] - 2524:9, 2525:9, 2549:16, 2573:14, 2600:2, 2601:9, 2602:16
**100,000** [1] - 2535:25
**10020** [1] - 2513:7
**101** [1] - 2566:11
**107** [1] - 2566:11
**10:00** [3] - 2517:1, 2607:24, 2608:4
**10th** [2] - 2596:6, 2597:4
**111** [1] - 2570:8
**118** [1] - 2568:22
**12** [6] - 2555:10, 2555:11, 2556:17, 2556:21, 2558:4, 2574:3
**123** [1] - 2513:3
**125** [1] - 2533:7
**1251** [1] - 2513:7
**13-cv-1053** [1] - 2512:4
**13-mc-1288** [1] - 2512:8
**130** [2] - 2540:23, 2570:7
**14** [3] - 2577:2, 2577:9, 2604:21
**1401** [1] - 2512:22
**145** [1] - 2569:23
**14th** [3] - 2554:14, 2554:15, 2569:9
**150** [5] - 2525:2, 2525:3, 2540:23, 2546:23, 2571:4
**1523** [1] - 2512:16
**15th** [2] - 2554:12, 2554:13
**16th** [1] - 2563:14
**17th** [13] - 2519:18, 2519:24, 2528:15, 2530:15, 2543:24, 2563:14, 2568:24, 2572:8, 2575:12, 2575:21, 2575:22, 2579:15, 2589:22
**18.9** [1] - 2570:6
**180** [1] - 2571:3
**187.3** [1] - 2605:3
**19.7** [1] - 2537:12
**19087** [1] - 2512:19
**191** [1] - 2571:11
**1938** [1] - 2585:15
**1970** [1] - 2585:16
**19801** [1] - 2513:4
**1996** [1] - 2536:25
**1:49** [1] - 2512:10

## 2

**2** [7] - 2558:11, 2566:9, 2566:11, 2568:8, 2574:11, 2588:12, 2589:13
**20/20** [2] - 2563:10, 2570:10
**200** [1] - 2602:17
**20001** [2] - 2513:12, 2513:16
**20005** [1] - 2512:23
**20036** [1] - 2512:16
**2007** [11] - 2537:2, 2537:5, 2538:7, 2538:10, 2578:1, 2579:5, 2581:11, 2581:17, 2582:7, 2584:10
**2008** [37] - 2521:18, 2523:5, 2536:25, 2537:3, 2538:7, 2538:10, 2539:4, 2541:1, 2543:19, 2577:2, 2578:1, 2579:5, 2579:8, 2580:13, 2581:11, 2581:17, 2581:23, 2584:10, 2587:9, 2587:19, 2587:22, 2588:6, 2588:17, 2588:24, 2589:1, 2589:18, 2592:3, 2595:12, 2596:6, 2596:7, 2597:24, 2598:11, 2601:1, 2601:7, 2601:12, 2605:1
**2009** [13] - 2553:16, 2563:4, 2601:12, 2601:14, 2601:16, 2602:9, 2602:14, 2602:24, 2603:4, 2603:13, 2604:3, 2605:2
**2010** [2] - 2604:13, 2604:25
**2011** [11] - 2548:13, 2604:16, 2604:20, 2604:24, 2605:2, 2605:12, 2605:13, 2607:1, 2607:6, 2607:10, 2607:15
**2012** [42] - 2519:18, 2519:24, 2523:23, 2524:4, 2526:16, 2527:22, 2528:15, 2530:13, 2530:14, 2530:15, 2531:2, 2531:8, 2533:11,
2534:8, 2534:10, 2543:24, 2559:15, 2560:11, 2563:14, 2563:15, 2564:8, 2565:12, 2565:16, 2566:3, 2567:8, 2568:6, 2575:12, 2576:24, 2577:3, 2578:16, 2579:15, 2580:12, 2581:18, 2587:14, 2589:22, 2594:1, 2604:2, 2604:3, 2604:10, 2605:6
**2013** [4] - 2526:8, 2534:17, 2567:5, 2568:4
**2015** [1] - 2560:6
**2019** [1] - 2607:8
**202-354-3284** [1] - 2513:17
**2020** [1] - 2560:6
**2022** [2] - 2512:10, 2609:8
**205** [1] - 2527:17
**21** [2] - 2515:8
**23** [6] - 2515:7, 2515:8, 2551:14, 2567:7
**24** [1] - 2515:7
**245** [1] - 2570:20
**24th** [1] - 2603:13
**25** [3] - 2527:22, 2530:14, 2559:15
**2517** [1] - 2514:4
**2576** [1] - 2514:5
**25th** [3] - 2528:15, 2533:12, 2568:24
**264** [1] - 2530:20
**265** [1] - 2532:6
**26th** [1] - 2533:12
**27** [1] - 2605:13
**273** [3] - 2530:19, 2531:9, 2531:20
**274** [1] - 2532:6
**275** [7] - 2526:20, 2526:22, 2527:8, 2530:2, 2535:6, 2558:23, 2559:8
**280** [1] - 2512:19
**29th** [1] - 2565:11

## 3

**3** [6] - 2566:9, 2566:10, 2568:9, 2568:22, 2574:13, 2589:2
**30** [1] - 2541:14
**30th** [1] - 2596:6

**31** [1] - 2609:8
**31st** [4] - 2578:16, 2604:2, 2604:3, 2604:10
**33.2** [1] - 2536:13
**330** [1] - 2570:25
**333** [1] - 2513:15
**34** [2] - 2532:11, 2605:4
**35** [1] - 2605:5
**351** [1] - 2558:14
**385** [2] - 2571:9, 2571:13
**3:32** [1] - 2576:7
**3:48** [1] - 2576:7
**3rd** [1] - 2533:11

## 4

**4** [3] - 2525:18, 2535:15, 2591:12
**400** [2] - 2603:8, 2603:16
**45** [1] - 2515:25
**46** [2] - 2573:24, 2574:15
**4704-B** [1] - 2513:16
**4:44** [1] - 2608:8
**4:45** [1] - 2515:17

## 5

**5** [5] - 2522:15, 2524:14, 2582:2, 2582:8, 2592:7
**50** [2] - 2568:3, 2573:12
**500** [1] - 2542:21
**5:00** [3] - 2516:22, 2516:25, 2576:3

## 6

**6** [2] - 2531:21, 2595:25
**601** [1] - 2513:12
**6th** [3] - 2588:6, 2596:22, 2602:15

## 7

**7** [2] - 2535:22, 2597:5
**73** [1] - 2527:18
**779** [2] - 2573:21, 2574:14
**786** [2] - 2573:23, 2574:14
**7:30** [1] - 2554:14
**7th** [2] - 2589:1, 2600:25

**8**

**8** [1] - 2602:20
**80** [1] - 2523:14

**9**

**9** [1] - 2605:18
**96** [1] - 2529:15
**9:00** [1] - 2572:7
**9th** [2] - 2530:13, 2533:24

**A**

**a.m** [1] - 2572:7
**ability** [2] - 2537:24, 2543:25
**able** [6] - 2522:16, 2556:12, 2565:7, 2567:23, 2583:23, 2584:11
**above-entitled** [1] - 2609:5
**absolutely** [6] - 2524:11, 2578:23, 2578:25, 2579:2, 2579:16, 2579:18
**accomplish** [1] - 2587:10
**according** [1] - 2526:15
**account** [3] - 2547:18, 2548:2, 2548:15
**accountants** [3] - 2562:23, 2563:8, 2565:10
**accounting** [6] - 2539:17, 2562:23, 2566:12, 2566:17, 2566:18, 2566:24
**accurate** [2] - 2560:23, 2561:13
**accused** [2] - 2536:17, 2539:10
**acquired** [1] - 2522:3
**acronym** [1] - 2584:19
**Act** [1] - 2580:15
**act** [13] - 2521:24, 2522:2, 2522:6, 2553:22, 2580:22, 2586:6, 2586:22, 2586:25, 2587:4, 2595:10, 2597:15, 2597:21, 2598:16
**acted** [2] - 2579:25, 2581:2
**acting** [10] - 2518:11, 2518:12, 2528:2, 2541:18, 2553:5,

2554:7, 2586:6, 2597:18, 2607:11
**ACTION** [1] - 2512:9
**action** [17] - 2579:8, 2579:9, 2579:12, 2579:16, 2579:18, 2579:20, 2579:23, 2580:1, 2580:15, 2580:16, 2581:4, 2586:1, 2590:17, 2590:19, 2590:21, 2590:22, 2607:12
**actions** [2] - 2589:4, 2590:14
**actor** [1] - 2564:3
**actual** [1] - 2529:12
**added** [2] - 2554:24, 2555:7
**addition** [1] - 2586:24
**additional** [3] - 2583:18, 2586:19
**address** [1] - 2566:10
**adds** [2] - 2556:9, 2573:24
**adequacy** [1] - 2559:5
**adjourned** [1] - 2608:8
**administration** [1] - 2550:19
**Administration** [1] - 2534:6
**administrator** [1] - 2542:19
**admission** [1] - 2547:13
**admit** [2] - 2546:16, 2563:17
**admits** [1] - 2548:22
**admitted** [4] - 2538:6, 2546:16, 2548:19, 2568:18
**advisor** [1] - 2553:5
**affairs** [1] - 2540:1
**affordable** [2] - 2583:3, 2584:7
**afloat** [1] - 2594:3
**afternoon** [7] - 2516:15, 2516:21, 2516:25, 2517:4, 2576:12, 2581:7, 2607:4
**AFTERNOON** [1] - 2512:12
**Agency** [2] - 2513:9, 2585:20
**agency** [5] - 2537:8, 2538:11, 2586:1, 2586:2, 2586:3
**AGENCY** [1] - 2512:6
**ago** [6] - 2521:5, 2574:25, 2575:6,

2575:7, 2580:13, 2591:3
**agree** [14] - 2518:4, 2522:2, 2522:3, 2527:3, 2541:15, 2547:16, 2574:2, 2576:13, 2582:6, 2583:10, 2586:6, 2590:17, 2590:19, 2590:22, 2607:12
**agreed** [4] - 2546:3, 2548:11, 2581:2, 2597:17
**agreeing** [4] - 2519:18, 2519:23, 2543:23, 2605:25
**agreement** [3] - 2521:21, 2553:13, 2598:25
**AGREEMENT** [1] - 2512:9
**agreements** [6] - 2534:3, 2534:7, 2587:11, 2587:12, 2599:3
**ahead** [9] - 2517:24, 2566:7, 2566:8, 2572:24, 2577:19, 2586:15, 2586:23, 2597:16
**aided** [1] - 2513:18
**ain't** [3] - 2560:16, 2560:17, 2571:2
**air** [1] - 2592:5
**al** [2] - 2512:3, 2512:6
**allowances** [1] - 2564:10
**allowed** [6] - 2536:2, 2545:25, 2555:14, 2571:2, 2579:24
**almost** [4] - 2517:10, 2523:15, 2524:10, 2582:9
**alone** [5] - 2529:6, 2532:8, 2544:19, 2547:13
**alternative** [1] - 2554:16
**alternatives** [4] - 2549:2, 2549:3, 2550:10, 2551:1
**amaze** [1] - 2528:16
**amending** [1] - 2528:11
**Amendment** [22] - 2524:8, 2552:5, 2581:3, 2581:10, 2587:14, 2589:19, 2589:21, 2591:8, 2593:16, 2593:21, 2594:4, 2594:15, 2594:18, 2597:17,

2598:12, 2602:15, 2602:16, 2603:14, 2603:17, 2603:18, 2603:25, 2604:12
**amendments** [2] - 2569:17, 2587:13
**American** [6] - 2537:23, 2579:10, 2579:22, 2601:5, 2603:19, 2604:18
**Americas** [1] - 2513:7
**amount** [27] - 2523:8, 2523:12, 2524:4, 2526:10, 2530:1, 2531:16, 2536:24, 2547:11, 2554:24, 2558:25, 2567:6, 2571:10, 2571:12, 2573:8, 2573:9, 2574:13, 2574:23, 2575:20, 2577:23, 2599:14, 2599:24, 2600:2, 2600:17, 2600:21, 2601:22
**amounts** [2] - 2573:25, 2574:14
**analogy** [1] - 2547:5
**analysis** [14] - 2525:14, 2527:11, 2528:18, 2544:14, 2547:16, 2547:22, 2548:20, 2548:25, 2550:25, 2551:15, 2551:20, 2551:23, 2573:1, 2573:16
**analysts** [1] - 2548:6
**analytics** [1] - 2551:3
**analyze** [1] - 2568:16
**analyzing** [4] - 2525:15, 2527:7, 2546:19, 2546:25
**animated** [1] - 2555:23
**announced** [3] - 2572:1, 2572:7, 2573:13
**announcement** [1] - 2573:11
**announcing** [1] - 2589:9
**annual** [3] - 2523:7, 2529:2, 2560:13
**annually** [1] - 2595:17
**Answer** [11] - 2546:21, 2547:25, 2548:12, 2552:9, 2558:8, 2561:2, 2561:8, 2561:12, 2561:14, 2561:16, 2561:24
**answer** [14] - 2525:23,

2534:13, 2540:11, 2554:5, 2554:6, 2558:10, 2560:19, 2560:21, 2561:3, 2561:9, 2592:21, 2593:10, 2606:4, 2606:8
**answering** [1] - 2605:19
**answers** [3] - 2534:5, 2592:9, 2592:22
**anticipate** [1] - 2533:17
**anyway** [2] - 2568:15, 2583:21
**appear** [1] - 2529:22
**APPEARANCES** [2] - 2512:14, 2513:1
**appearing** [1] - 2552:17
**appoint** [2] - 2585:22, 2588:16
**appointed** [2] - 2539:15, 2539:25
**appointing** [2] - 2540:12, 2593:12
**arbitrarily** [6] - 2519:25, 2520:18, 2520:24, 2522:6, 2543:24, 2544:7
**arbitrary** [13] - 2519:19, 2521:1, 2521:8, 2522:11, 2535:16, 2535:21, 2544:8, 2544:16, 2544:17, 2545:10, 2546:8, 2548:1, 2553:8
**argue** [4] - 2517:3, 2517:5, 2519:5, 2540:9
**arguing** [3] - 2517:7, 2565:3, 2565:4
**argument** [10] - 2517:4, 2517:8, 2527:15, 2528:14, 2537:15, 2537:16, 2568:11, 2575:5, 2576:3
**arguments** [6] - 2516:19, 2516:20, 2516:22, 2517:2, 2520:9, 2551:15
**arithmetic** [1] - 2571:5
**arm's** [1] - 2553:15
**Arnold** [1] - 2513:11
**arrangements** [1] - 2587:10
**arrow** [1] - 2571:14
**aside** [1] - 2518:8

**ASIM** [1] - 2513:9
**aspect** [1] - 2590:13
**assessments** [1] - 2562:1
**asset** [4] - 2566:13, 2566:16, 2566:25, 2567:7
**assets** [21] - 2539:18, 2539:19, 2540:13, 2540:15, 2541:12, 2550:6, 2553:25, 2562:24, 2566:20, 2567:17, 2568:1, 2569:12, 2577:4, 2577:6, 2593:13, 2593:18, 2594:7, 2599:9, 2602:25
**assimilate** [1] - 2548:15
**attached** [1] - 2533:25
**attack** [1] - 2529:16
**Attari** [2] - 2568:21, 2573:2
**attended** [1] - 2567:15
**attention** [6] - 2518:17, 2557:24, 2564:1, 2576:14, 2576:19, 2576:21
**attentive** [1] - 2576:18
**attorneys** [1] - 2516:17
**audio** [1] - 2553:10
**Audio** [1] - 2554:4
**auditors** [1] - 2569:11
**August** [27] - 2519:18, 2519:24, 2523:23, 2528:15, 2528:17, 2528:18, 2530:13, 2530:15, 2543:24, 2544:14, 2545:19, 2550:3, 2563:14, 2566:3, 2568:6, 2568:24, 2569:9, 2572:8, 2575:12, 2575:21, 2575:22, 2576:24, 2579:15, 2587:14, 2589:22, 2594:1, 2605:13
**authority** [17] - 2542:2, 2585:22, 2586:6, 2586:9, 2586:13, 2586:14, 2586:19, 2586:21, 2586:25, 2587:1, 2587:4, 2587:5, 2588:2, 2595:9, 2598:21, 2598:22
**authorized** [4] - 2580:15, 2586:1, 2588:5, 2597:14

**automatically** [1] - 2555:7
**available** [16] - 2517:19, 2517:21, 2526:11, 2530:1, 2530:25, 2583:2, 2583:3, 2584:7, 2599:4, 2599:25, 2600:7, 2601:6, 2603:18, 2603:23, 2604:3, 2604:5
**Avenue** [5] - 2512:16, 2512:22, 2513:7, 2513:12, 2513:15
**avoid** [1] - 2556:3
**aware** [1] - 2537:10
**awesome** [3] - 2578:5, 2578:6, 2578:7
**awkward** [1] - 2551:11

## B

**backed** [15] - 2527:1, 2531:22, 2535:12, 2556:5, 2579:20, 2582:17, 2582:18, 2582:22, 2583:12, 2583:14, 2584:3, 2584:4, 2599:6, 2602:12, 2603:12
**backing** [3] - 2578:12, 2602:11, 2602:12
**bad** [2] - 2521:18, 2537:6, 2537:7, 2571:1, 2584:17, 2606:5, 2606:10
**bails** [1] - 2554:8
**Bala** [1] - 2528:24
**balance** [1] - 2566:24
**ball** [2] - 2540:10, 2605:8
**bankrupt** [1] - 2579:12
**bankruptcy** [1] - 2557:12
**banks** [7] - 2562:19, 2582:15, 2583:1, 2583:18, 2584:5, 2584:6, 2584:7
**bar** [4] - 2530:23, 2556:23, 2557:14, 2557:15
**bargain** [1] - 2520:19
**Barnes** [1] - 2543:10
**BARNES** [1] - 2512:15
**BARRY** [1] - 2513:2
**base** [5] - 2593:24, 2605:21, 2605:23, 2606:7, 2606:16
**based** [20] - 2520:21, 2523:20, 2533:14,

2535:15, 2535:24, 2538:15, 2545:7, 2547:16, 2559:15, 2567:19, 2569:20, 2571:22, 2572:6, 2572:12, 2591:20, 2599:14, 2600:3, 2600:17, 2605:21
**baseline** [1] - 2534:15
**basic** [2] - 2522:21, 2537:15
**basis** [2] - 2569:25, 2600:9
**battle** [1] - 2552:7
**beat** [2] - 2566:5
**became** [8] - 2541:17, 2553:4, 2584:16, 2587:10, 2587:24, 2600:22, 2600:23, 2603:8
**become** [2] - 2523:16, 2607:10
**becomes** [2] - 2515:8, 2534:7
**BEFORE** [2] - 2512:1, 2512:12
**began** [6] - 2521:5, 2526:8, 2539:7, 2575:13, 2581:10, 2607:9
**begin** [3] - 2515:13, 2516:20, 2519:9
**beginner** [1] - 2542:19
**beginning** [3] - 2556:18, 2558:15, 2595:1
**begins** [1] - 2527:24
**behalf** [1] - 2546:20
**behind** [4] - 2545:19, 2557:14, 2579:19, 2603:11
**beings** [1] - 2562:3
**belief** [1] - 2538:10
**believable** [1] - 2545:5
**below** [1] - 2531:15
**benefit** [4] - 2520:19, 2523:18, 2538:12, 2596:14
**benefits** [1] - 2596:18
**Benson** [6] - 2529:22, 2531:4, 2535:6, 2552:16, 2560:2, 2566:6
**Berger** [1] - 2513:6
**BERGMAN** [1] - 2513:10
**Berkley** [2] - 2512:15, 2543:7
**Bernstein** [1] - 2513:6
**best** [7] - 2547:17,

2558:14, 2565:14, 2586:2, 2586:7, 2586:15, 2606:16
**bet** [1] - 2515:24
**better** [13] - 2516:12, 2536:20, 2540:21, 2541:13, 2541:21, 2550:4, 2550:5, 2555:12, 2555:23, 2562:17, 2563:7, 2604:23
**between** [15] - 2526:19, 2528:15, 2548:21, 2549:16, 2561:21, 2561:22, 2568:23, 2587:10, 2591:6, 2598:20, 2599:3, 2599:15, 2599:23, 2601:11, 2601:13
**big** [21] - 2532:22, 2541:16, 2543:14, 2546:5, 2557:7, 2557:8, 2557:10, 2557:14, 2561:17, 2561:21, 2561:22, 2562:9, 2566:16, 2570:12, 2571:13, 2594:17, 2601:9, 2601:10, 2601:11, 2606:23, 2606:24
**bigger** [3] - 2532:6, 2547:12, 2562:12
**biggest** [5] - 2518:2, 2519:14, 2550:10, 2562:21, 2581:24
**billion** [51] - 2523:12, 2523:13, 2525:1, 2525:2, 2525:3, 2526:20, 2526:22, 2527:8, 2530:2, 2530:19, 2531:9, 2531:21, 2535:5, 2535:6, 2536:13, 2537:12, 2540:23, 2546:22, 2546:23, 2558:23, 2559:8, 2567:7, 2568:3, 2570:6, 2570:7, 2570:8, 2570:20, 2570:25, 2571:4, 2573:8, 2577:20, 2584:13, 2587:21, 2589:13, 2599:7, 2600:2, 2601:3, 2601:5, 2601:9, 2602:16, 2602:17, 2602:19, 2603:3, 2603:8, 2603:16, 2604:22, 2605:3,

2607:2
**billions** [4] - 2579:11, 2580:8, 2599:5, 2604:18
**bit** [17] - 2521:16, 2525:25, 2526:2, 2531:1, 2531:3, 2531:18, 2531:21, 2532:5, 2535:19, 2545:12, 2553:7, 2558:24, 2562:7, 2566:7, 2567:13, 2569:24, 2600:10
**black** [6] - 2591:11, 2599:8, 2599:10, 2603:21, 2603:22, 2604:15
**blank** [1] - 2577:15
**blue** [6] - 2523:1, 2530:23, 2531:21, 2531:23, 2533:9, 2556:23
**board** [10] - 2530:3, 2530:5, 2530:7, 2532:2, 2565:6, 2591:18, 2591:21, 2591:24
**boards** [2] - 2567:18, 2569:12
**Boies** [1] - 2512:22
**boils** [1] - 2519:17
**bolster** [1] - 2602:10
**bond** [7] - 2527:5, 2531:22, 2532:17, 2535:11, 2556:5
**bonds** [1] - 2526:25
**Boom** [1] - 2528:13
**boring** [1] - 2518:14
**borrow** [6] - 2526:12, 2526:13, 2555:25, 2565:20, 2567:3
**borrowed** [2] - 2523:9, 2571:11
**boss** [1] - 2569:10
**bother** [1] - 2558:1
**bottom** [4] - 2543:22, 2551:20, 2595:20, 2596:13
**bought** [3] - 2542:21, 2543:1, 2587:21
**Bowler** [1] - 2533:20
**box** [2] - 2535:16, 2596:13
**breach** [2] - 2519:15, 2574:24
**breached** [2] - 2575:18, 2591:7
**break** [1] - 2607:21
**breaking** [1] - 2607:18
**BRIAN** [1] - 2512:15

**briefly** [3] - 2520:4, 2566:10, 2606:6
**bring** [2] - 2516:8, 2607:5
**bringing** [1] - 2540:1
**brings** [2] - 2578:20, 2604:20
**broad** [1] - 2542:2
**broke** [1] - 2588:22
**broken** [1] - 2591:8
**brought** [4] - 2536:1, 2557:24, 2570:20, 2578:3
**buck** [1] - 2579:6
**build** [4] - 2525:7, 2540:17, 2569:3
**building** [3] - 2545:21, 2545:22, 2591:23
**bullet** [4] - 2534:20, 2535:4, 2551:20, 2551:22
**bunch** [1] - 2533:11
**burden** [2] - 2517:6, 2518:19
**business** [8] - 2541:24, 2562:16, 2578:14, 2580:7, 2588:19, 2588:21, 2601:19, 2604:19
**businesses** [5] - 2552:22, 2566:19, 2581:13, 2587:25
**buy** [7] - 2523:13, 2526:25, 2583:2, 2583:4, 2583:13, 2590:6, 2591:22
**buying** [3] - 2523:2, 2571:22, 2572:7

2526:10, 2526:21, 2530:1, 2530:24, 2538:13, 2540:3, 2545:22, 2569:3, 2587:25, 2588:22, 2589:13
**caps** [12] - 2529:3, 2530:2, 2530:25, 2534:8, 2534:9, 2534:10, 2544:23, 2559:23, 2560:14
**capture** [1] - 2518:6
**care** [6] - 2556:10, 2556:11, 2557:3, 2557:7, 2557:9, 2557:15
**cared** [2] - 2552:10, 2602:5
**careful** [1] - 2596:8
**carefully** [1] - 2575:14
**carpenter** [1] - 2543:1
**case** [56] - 2520:14, 2521:6, 2521:13, 2521:16, 2522:9, 2524:24, 2525:11, 2526:4, 2526:8, 2527:16, 2528:4, 2528:22, 2528:23, 2529:7, 2534:9, 2534:23, 2536:14, 2537:5, 2541:14, 2549:5, 2557:2, 2559:12, 2564:5, 2566:12, 2566:18, 2569:15, 2571:9, 2573:20, 2574:25, 2576:4, 2576:5, 2576:22, 2581:9, 2586:21, 2589:15, 2598:3, 2598:6, 2598:10, 2598:17, 2602:3, 2602:6, 2605:14, 2605:16, 2605:21, 2605:23, 2606:4, 2606:13, 2606:16, 2606:17, 2607:2, 2607:22, 2607:23, 2607:24
**Case** [3] - 2512:4, 2512:8, 2563:19
**Case-Shiller** [1] - 2563:19
**cash** [9] - 2525:6, 2534:24, 2555:7, 2555:19, 2555:25, 2562:22, 2566:19, 2570:21, 2571:12
**Castle** [1] - 2542:25
**causation** [1] - 2573:16

**caused** [6] - 2545:19, 2555:24, 2573:10, 2573:16, 2574:7, 2579:17
**causes** [3] - 2521:9, 2522:13, 2606:21
**causing** [1] - 2601:17
**center** [1] - 2559:12
**centerpiece** [1] - 2534:9
**central** [2] - 2528:4, 2541:14
**CEO** [3] - 2530:4, 2552:15, 2552:16
**CEOs** [1] - 2595:22
**certain** [4] - 2520:16, 2545:23, 2549:21, 2567:16
**certainly** [5] - 2516:1, 2533:5, 2536:6, 2601:9, 2601:15
**CERTIFICATE** [1] - 2609:1
**certificate** [3] - 2591:4, 2591:5
**certificates** [3] - 2554:18, 2554:21, 2574:20
**certified** [1] - 2577:14
**certify** [1] - 2609:3
**CFOs** [1] - 2595:23
**challenge** [5] - 2598:4, 2598:6, 2598:10, 2598:14, 2598:17
**chance** [2] - 2517:7, 2519:5, 2542:8
**chances** [3] - 2559:16, 2559:18, 2562:25
**change** [6] - 2529:25, 2556:11, 2556:14, 2556:16, 2556:24, 2598:7
**changed** [2] - 2525:5, 2570:21
**changes** [3] - 2524:8, 2531:3, 2572:18
**changing** [1] - 2564:9
**charge** [2] - 2552:12, 2553:9
**charged** [1] - 2562:20
**chart** [4] - 2604:25, 2605:5, 2607:5
**chartered** [1] - 2584:25
**charters** [4] - 2546:1, 2585:1, 2585:4, 2585:5
**charts** [2] - 2533:9, 2536:15

**cheap** [1] - 2571:2
**Check** [1] - 2512:18
**check** [5] - 2535:16, 2544:11, 2544:12, 2546:14, 2605:2
**chief** [6] - 2529:19, 2552:19, 2552:20, 2564:1, 2577:14
**children** [1] - 2516:24
**choose** [1] - 2542:21
**chosen** [2] - 2553:20
**Christmas** [1] - 2603:13
**circular** [9] - 2526:14, 2526:24, 2529:24, 2544:23, 2555:22, 2579:17, 2600:15, 2601:24, 2603:6
**circulates** [1] - 2541:19
**civil** [1] - 2595:23
**claim** [6] - 2556:25, 2598:3, 2598:6, 2598:10, 2598:14, 2598:17
**claimed** [2] - 2559:4, 2568:25
**claiming** [1] - 2591:7
**claims** [1] - 2567:11
**clarify** [1] - 2519:7
**class** [1] - 2543:8
**CLASS** [1] - 2512:9
**Class** [1] - 2512:17
**classes** [2] - 2572:6, 2573:19
**clean** [1] - 2533:25
**clear** [19] - 2518:16, 2519:7, 2519:10, 2525:24, 2537:13, 2543:19, 2553:18, 2558:10, 2558:20, 2566:9, 2572:10, 2573:1, 2580:21, 2586:4, 2591:9, 2595:7, 2597:25, 2600:24, 2603:8
**clearly** [2] - 2554:22, 2606:21
**clients** [2] - 2554:21, 2571:16
**clip** [2] - 2553:10, 2554:3
**clips** [1] - 2553:7
**clock** [1] - 2578:16
**close** [2] - 2568:21, 2576:19
**closing** [4] - 2516:19, 2516:20, 2516:22, 2517:1
**Closing** [2] - 2514:4,

2514:5
**closings** [2] - 2515:13, 2515:15
**CLOSINGS** [1] - 2514:3
**clue** [1] - 2532:22
**coffee** [1] - 2547:3
**coincidence** [1] - 2546:4
**Coke** [1] - 2547:3
**collapse** [1] - 2581:12
**COLUMBIA** [1] - 2512:1
**Columbia** [1] - 2513:15
**Columbus** [1] - 2542:25
**combine** [1] - 2530:23
**combined** [3] - 2582:8, 2602:17, 2605:3
**comfort** [2] - 2527:6, 2559:10
**coming** [10] - 2528:21, 2532:14, 2534:10, 2544:23, 2560:12, 2563:8, 2575:7, 2590:24, 2604:1, 2607:13
**commensurate** [1] - 2516:1
**comment** [1] - 2594:22
**Commission** [3] - 2577:13, 2595:15, 2595:21
**commitment** [66] - 2526:16, 2526:17, 2528:7, 2529:14, 2529:24, 2531:6, 2533:4, 2534:19, 2535:2, 2535:9, 2540:23, 2544:22, 2544:24, 2545:18, 2549:19, 2550:8, 2556:3, 2556:10, 2556:14, 2556:19, 2556:22, 2557:4, 2558:22, 2559:1, 2559:6, 2565:21, 2568:10, 2568:13, 2568:15, 2568:16, 2568:17, 2568:20, 2577:10, 2577:21, 2577:23, 2578:10, 2578:12, 2578:17, 2578:19, 2578:20, 2578:22, 2578:23, 2579:16, 2593:25, 2594:1, 2594:3,

## C

**Cacciapalle** [1] - 2543:3
**calculate** [2] - 2532:15, 2568:17
**calculated** [1] - 2604:8
**cannot** [1] - 2520:18
**cap** [17] - 2526:17, 2526:19, 2526:20, 2530:17, 2531:2, 2531:3, 2531:5, 2531:8, 2532:6, 2532:14, 2559:9, 2578:17, 2578:18, 2604:1, 2604:11, 2607:8
**capacity** [3] - 2534:7, 2589:6, 2592:25
**capital** [13] - 2525:7,

2594:5, 2594:9,
2599:14, 2599:17,
2599:18, 2599:23,
2600:1, 2600:4,
2600:5, 2600:8,
2600:16, 2600:18,
2601:3, 2601:14,
2601:20, 2602:16,
2604:10, 2604:23,
2607:7
**common** [11] -
2523:14, 2543:1,
2573:12, 2573:19,
2573:23, 2574:8,
2574:15, 2589:14,
2589:25, 2596:24,
2597:7
**companies** [19] -
2539:1, 2539:23,
2540:22, 2547:9,
2551:25, 2571:21,
2580:5, 2580:7,
2580:18, 2584:16,
2594:2, 2594:10,
2594:16, 2594:17,
2594:25, 2595:14,
2596:8, 2598:15
**company** [17] -
2539:16, 2540:1,
2540:7, 2540:13,
2541:3, 2541:11,
2543:13, 2564:7,
2577:7, 2592:24,
2593:14, 2594:7,
2594:8, 2599:7,
2606:23, 2606:25
**Company** [1] - 2540:3
**company's** [2] -
2540:13, 2593:13
**compared** [1] -
2536:23
**complaining** [1] -
2536:6
**completed** [2] -
2516:21, 2541:3
**completely** [7] -
2539:22, 2579:17,
2591:9, 2591:24,
2593:5, 2596:11,
2607:8
**complicated** [3] -
2531:1, 2549:12,
2573:6
**comprehensive** [2] -
2565:16, 2566:2
**computer** [1] -
2513:18
**computer-aided** [1] -
2513:18
**concept** [1] - 2599:22

**concepts** [1] - 2544:8
**concern** [3] - 2533:5,
2549:23, 2559:5
**concerned** [7] -
2545:16, 2577:22,
2597:2, 2602:2,
2602:5, 2606:18,
2606:20
**concerns** [2] -
2526:10, 2559:5
**conclusion** [1] -
2545:14
**conclusions** [2] -
2573:5, 2573:6
**condition** [9] -
2539:16, 2539:23,
2540:7, 2540:14,
2541:3, 2541:8,
2541:12, 2588:18,
2593:14
**conducted** [1] -
2534:15
**conference** [1] -
2541:16
**confidence** [11] -
2535:9, 2578:22,
2583:25, 2584:2,
2589:5, 2589:11,
2592:24, 2602:3,
2602:5, 2602:10,
2603:10
**confirmed** [1] -
2595:11
**confusing** [1] -
2518:14
**Congress** [14] -
2533:15, 2534:4,
2537:20, 2537:21,
2551:12, 2572:18,
2578:7, 2579:7,
2584:17, 2584:25,
2586:11, 2587:3,
2587:8, 2588:2
**cons** [3] - 2525:15,
2546:19, 2546:25
**consecutive** [5] -
2577:2, 2577:3,
2577:9, 2604:21,
2605:9
**consequences** [1] -
2522:6
**conservative** [2] -
2534:15, 2543:13
**conservator** [20] -
2534:21, 2539:24,
2539:25, 2540:6,
2540:12, 2542:2,
2553:23, 2553:24,
2554:8, 2581:22,
2585:22, 2586:1,

2586:6, 2586:18,
2588:4, 2588:16,
2593:12, 2595:10,
2605:17, 2607:11
**conservator's** [1] -
2588:14
**conservatorship** [42] -
2521:20, 2522:23,
2523:5, 2523:17,
2539:7, 2539:13,
2539:14, 2540:25,
2541:5, 2541:21,
2542:1, 2571:21,
2580:18, 2588:4,
2588:8, 2588:24,
2589:4, 2589:10,
2590:10, 2592:3,
2592:21, 2592:24,
2594:21, 2594:25,
2595:4, 2595:6,
2596:5, 2596:15,
2596:16, 2596:19,
2596:21, 2596:22,
2596:23, 2597:1,
2597:10, 2597:11,
2597:12, 2597:14,
2597:20, 2598:5,
2598:21, 2598:23
**conservatorships** [1]
- 2597:24
**conserve** [7] -
2540:12, 2540:15,
2541:12, 2543:17,
2553:25, 2589:13,
2593:13
**conserving** [2] -
2593:17, 2594:7
**consider** [5] -
2534:22, 2549:2,
2549:3, 2550:1,
2557:22
**consideration** [2] -
2525:13, 2551:1
**considered** [1] -
2534:6
**considering** [1] -
2525:15
**consistent** [4] -
2540:21, 2593:5,
2594:6, 2594:8
**Constitution** [1] -
2513:15
**consulted** [8] -
2516:16, 2552:13,
2552:14, 2552:15,
2552:16, 2552:18,
2552:19, 2552:20
**context** [1] - 2537:18
**continual** [1] -
2558:25

**continue** [2] -
2581:18, 2590:1
**continued** [5] -
2512:25, 2601:12,
2603:8, 2603:11,
2604:14
**CONTINUED** [1] -
2513:1
**contract** [27] -
2519:16, 2519:22,
2520:7, 2520:9,
2520:11, 2520:15,
2520:16, 2521:14,
2521:15, 2523:5,
2523:6, 2524:17,
2534:25, 2554:19,
2554:20, 2555:13,
2556:7, 2556:8,
2556:24, 2557:17,
2572:12, 2573:20,
2574:24, 2591:6,
2591:9, 2591:13,
2591:14
**contracts** [5] -
2522:25, 2524:16,
2572:11, 2579:24,
2580:11
**contractual** [7] -
2522:7, 2522:8,
2524:12, 2524:15,
2542:6, 2571:24,
2571:25
**contractually** [1] -
2523:20
**contradict** [1] -
2527:13
**contradicted** [3] -
2544:25, 2545:1,
2545:9
**contrast** [1] - 2552:2
**contributed** [2] -
2589:7, 2593:1
**control** [1] - 2539:15
**conversations** [2] -
2607:9, 2607:14
**Cooper** [1] - 2512:15
**corner** [1] - 2523:25
**corporations** [1] -
2584:25
**correct** [7] - 2538:10,
2548:20, 2548:22,
2548:24, 2561:1,
2609:4
**cost** [3] - 2542:22,
2551:25, 2579:4
**counsel** [7] - 2539:10,
2540:9, 2547:5,
2548:23, 2558:3,
2564:17, 2608:2
**counting** [1] - 2578:16

**country** [1] - 2581:25
**country's** [1] - 2606:9
**couple** [2] - 2527:18,
2539:8
**course** [4] - 2546:10,
2588:21, 2589:15,
2599:3
**COURT** [15] - 2512:1,
2515:4, 2515:19,
2516:8, 2516:15,
2536:5, 2572:20,
2576:1, 2576:9,
2607:19, 2607:21,
2608:2, 2608:6,
2609:1, 2609:9
**Court** [8] - 2513:14,
2513:14, 2515:18,
2535:23, 2536:10,
2558:15, 2574:22,
2575:24
**court** [5] - 2515:2,
2526:7, 2529:5,
2551:11, 2560:9
**courtroom** [6] -
2516:12, 2516:14,
2518:8, 2576:6,
2576:8, 2608:1
**courts** [1] - 2525:20
**covenant** [8] -
2519:16, 2520:10,
2520:11, 2521:15,
2528:9, 2550:12,
2552:4, 2575:19
**cover** [2] - 2565:17,
2577:16
**create** [1] - 2583:3
**created** [6] - 2537:21,
2585:15, 2585:16,
2585:20, 2585:21
**creating** [1] - 2583:15
**credibility** [2] -
2529:17, 2562:1
**credible** [2] - 2530:6,
2562:6
**credit** [5] - 2562:21,
2563:8, 2564:9,
2564:13
**creditors** [1] - 2588:21
**criminal** [1] - 2595:24
**crisis** [7] - 2537:5,
2578:1, 2578:3,
2579:5, 2581:12,
2581:13, 2584:9
**critical** [4] - 2581:16,
2582:11, 2599:3
**critically** [1] - 2583:21
**cross** [4] - 2518:10,
2551:11, 2560:8,
2564:17
**cross-examine** [1] -

2564:17
**cross-examined** [1] - 2560:8
**cross-examining** [1] - 2518:10
**CRR** [1] - 2513:14
**crucial** [3] - 2580:1, 2583:22, 2583:24
**crystal** [2] - 2519:10, 2580:21
**curious** [1] - 2571:9
**current** [2] - 2589:8, 2593:2
**cushion** [3] - 2535:7, 2540:24, 2559:9
**cut** [1] - 2605:6
**cycle** [1] - 2564:9

**D**

**D.C** [5] - 2512:9, 2512:16, 2512:23, 2513:12, 2513:16
**damages** [6] - 2537:14, 2537:15, 2569:25, 2571:7, 2574:10, 2575:20
**damn** [1] - 2570:16
**danger** [1] - 2526:23
**data** [3] - 2551:2, 2551:7, 2551:15
**date** [8] - 2527:22, 2570:20, 2575:10, 2575:11, 2575:12, 2596:5
**DATE** [1] - 2609:9
**dated** [1] - 2605:13
**Dave** [1] - 2529:22
**David** [1] - 2552:16
**DAVID** [1] - 2513:10
**DAVIS** [1] - 2512:21
**day's** [1] - 2527:25
**days** [2] - 2533:24, 2552:25
**dead** [2] - 2566:5
**deal** [10] - 2515:23, 2524:8, 2551:20, 2551:22, 2552:24, 2555:17, 2570:21, 2572:4, 2594:17, 2607:12
**dealing** [3] - 2520:10, 2520:12, 2575:19
**dealt** [1] - 2574:21
**debt** [3] - 2550:15, 2550:16
**decades** [2] - 2537:20, 2538:1
**December** [6] - 2526:8, 2578:16,

2603:13, 2604:2, 2604:3, 2604:10
**decide** [7] - 2515:14, 2547:2, 2565:1, 2590:8, 2591:19, 2591:21
**decided** [3] - 2516:17, 2588:2, 2602:10
**decimates** [1] - 2542:9
**decision** [19] - 2528:3, 2541:15, 2544:16, 2546:8, 2546:22, 2547:11, 2547:12, 2548:14, 2554:13, 2554:15, 2570:1, 2574:23, 2581:9, 2588:3, 2588:6, 2588:7, 2591:20, 2598:4, 2598:14
**decisionmaker** [1] - 2528:5
**decisionmaking** [2] - 2605:24, 2606:3
**decisions** [4] - 2547:2, 2547:6, 2547:9, 2588:9
**declaration** [7] - 2526:7, 2526:8, 2527:14, 2558:13, 2559:4, 2559:11, 2569:5
**declaring** [1] - 2534:22
**dedicated** [1] - 2578:5
**deeper** [2] - 2601:25
**default** [1] - 2563:1
**defaults** [1] - 2584:11
**Defendant** [1] - 2513:8
**defendants** [9] - 2517:3, 2517:7, 2519:19, 2519:24, 2520:8, 2521:22, 2526:6, 2535:12, 2543:24
**Defendants** [1] - 2512:7
**defendants'** [3] - 2534:9, 2573:1, 2576:3
**Defendants..............
........** [1] - 2514:5
**defense** [1] - 2558:3
**deferred** [5] - 2550:5, 2566:13, 2567:17, 2568:1, 2569:12
**Delaware** [2] - 2513:4, 2574:21
**deliberations** [1] - 2517:14

**deliver** [1] - 2567:24
**demands** [1] - 2588:20
**DeMarco** [50] - 2527:25, 2528:2, 2528:11, 2529:9, 2529:19, 2538:6, 2541:14, 2545:2, 2546:2, 2546:16, 2548:3, 2550:20, 2551:12, 2552:6, 2553:2, 2553:4, 2553:20, 2554:9, 2554:17, 2559:13, 2562:5, 2563:24, 2565:6, 2567:14, 2567:16, 2568:25, 2569:8, 2569:15, 2569:21, 2576:25, 2579:15, 2580:3, 2584:10, 2584:21, 2586:13, 2587:2, 2587:7, 2587:18, 2587:23, 2590:15, 2597:17, 2597:21, 2601:7, 2602:4, 2605:11, 2605:16, 2605:19, 2607:1, 2607:9, 2607:15
**DeMarco's** [1] - 2586:21
**demonstrate** [3] - 2569:1, 2569:6, 2569:17
**denies** [1] - 2569:21
**deny** [2] - 2569:5, 2569:6
**Department** [9] - 2533:8, 2545:7, 2550:18, 2579:10, 2579:19, 2580:8, 2587:1, 2607:10, 2607:16
**dependent** [2] - 2601:3, 2601:4
**deposition** [11] - 2543:4, 2546:17, 2553:7, 2553:10, 2560:5, 2560:15, 2560:22, 2560:24, 2560:25, 2561:4, 2561:10
**depositions** [5] - 2517:18, 2517:19, 2518:11, 2518:12, 2560:9
**deputy** [2] - 2516:12, 2541:17
**DeRita** [1] - 2520:3
**described** [1] - 2585:2

**designation** [2] - 2554:19, 2591:4
**designed** [1] - 2569:17
**despite** [1] - 2518:19
**destroy** [1] - 2543:25
**destroyed** [4] - 2519:20, 2519:25, 2522:7, 2524:15
**destroys** [2] - 2520:19, 2542:10
**detail** [1] - 2520:8
**detailed** [2] - 2544:6, 2553:16
**detective** [1] - 2545:12
**determination** [1] - 2541:2
**determine** [1] - 2555:4
**determined** [2] - 2572:3, 2604:4
**determines** [1] - 2586:2
**devastating** [2] - 2533:2, 2570:1
**Dharan** [13] - 2528:24, 2529:15, 2530:22, 2531:4, 2539:17, 2560:1, 2562:10, 2562:15, 2563:12, 2593:18, 2593:20, 2593:23, 2594:13
**Dharan's** [1] - 2564:15
**did'** [1] - 2561:16
**die** [1] - 2600:25
**difference** [7] - 2532:3, 2532:4, 2550:4, 2554:3, 2561:21, 2570:7, 2599:22
**different** [12] - 2519:8, 2523:25, 2539:9, 2542:18, 2543:7, 2544:2, 2545:11, 2549:15, 2560:10, 2561:9, 2596:3, 2600:4
**digging** [1] - 2601:24
**direct** [1] - 2529:4
**directly** [4] - 2527:12, 2574:9, 2589:7, 2593:1
**director** [8] - 2528:2, 2541:4, 2541:18, 2553:5, 2581:21, 2587:17, 2587:24, 2607:11
**director's** [1] - 2541:2
**directors** [4] - 2541:17, 2591:18, 2591:19, 2591:24

**disagreement** [1] - 2518:24
**disaster** [1] - 2557:12
**discredit** [2] - 2529:22, 2531:24
**discretion** [3] - 2520:16, 2520:17, 2591:18
**discussed** [3] - 2557:23, 2557:25, 2567:18
**discussion** [2] - 2533:17, 2594:24
**dispute** [5] - 2574:6, 2581:15, 2581:16, 2586:5
**disputed** [1] - 2571:6
**disregard** [2] - 2521:8, 2522:12
**disrupted** [1] - 2518:7
**disruptive** [1] - 2527:2
**dissolution** [1] - 2555:4
**distant** [1] - 2567:25
**distinction** [3] - 2561:17, 2561:22, 2599:15
**District** [2] - 2513:14, 2513:15
**DISTRICT** [3] - 2512:1, 2512:1, 2512:13
**divided** [1] - 2598:19
**dividend** [61] - 2523:7, 2524:5, 2524:9, 2524:19, 2525:3, 2526:12, 2526:14, 2529:2, 2531:11, 2531:12, 2531:14, 2534:21, 2534:25, 2542:21, 2543:6, 2545:17, 2546:6, 2546:24, 2549:24, 2554:23, 2554:24, 2555:5, 2555:7, 2555:9, 2555:22, 2556:1, 2556:8, 2558:18, 2559:23, 2560:14, 2565:17, 2565:21, 2566:2, 2570:5, 2571:1, 2572:14, 2577:11, 2577:17, 2578:11, 2590:3, 2590:9, 2591:10, 2591:19, 2591:21, 2592:1, 2599:13, 2599:16, 2599:23, 2600:3, 2600:9, 2600:12, 2600:13, 2600:17, 2600:19, 2600:21,

2600:22, 2601:17, 2601:19, 2601:22
**dividends** [33] - 2519:21, 2520:1, 2523:1, 2523:2, 2523:22, 2524:16, 2524:18, 2534:22, 2536:20, 2536:21, 2536:23, 2537:12, 2538:24, 2539:1, 2539:3, 2544:1, 2554:21, 2571:19, 2571:23, 2571:25, 2580:11, 2580:12, 2589:14, 2589:17, 2589:20, 2589:23, 2589:25, 2590:24, 2590:25, 2591:2, 2591:17, 2598:11, 2603:7
**division** [1] - 2548:7
**document** [37] - 2527:16, 2527:18, 2528:25, 2529:6, 2529:7, 2529:8, 2529:9, 2531:24, 2533:1, 2533:7, 2534:2, 2539:5, 2539:12, 2541:11, 2545:2, 2546:18, 2548:17, 2550:12, 2551:9, 2559:7, 2559:19, 2563:21, 2564:6, 2564:12, 2565:6, 2565:23, 2567:13, 2570:13, 2572:2, 2572:4, 2592:4, 2592:8, 2592:11, 2592:19, 2596:11
**documents** [15] - 2518:11, 2524:7, 2526:3, 2527:12, 2528:23, 2530:12, 2530:18, 2531:25, 2539:8, 2549:6, 2563:12, 2565:25, 2592:5, 2595:22
**dollar** [4] - 2547:9, 2567:7, 2578:18, 2604:9
**dollars** [6] - 2574:25, 2579:11, 2580:8, 2599:5, 2603:2, 2604:18
**Domestic** [1] - 2527:22
**done** [15] - 2518:5, 2520:9, 2551:20, 2552:14, 2552:24,

2567:8, 2570:5, 2570:6, 2570:16, 2571:10, 2572:11, 2573:1, 2573:3, 2602:10, 2605:12
**door** [5] - 2547:4, 2564:20, 2564:21, 2564:24
**double** [1] - 2585:18
**doubled** [3] - 2584:23, 2602:16, 2604:7
**down** [55] - 2519:17, 2522:17, 2523:8, 2523:10, 2523:12, 2526:1, 2526:3, 2526:13, 2526:14, 2529:7, 2530:20, 2531:16, 2532:15, 2532:16, 2535:1, 2535:2, 2545:14, 2545:20, 2555:14, 2556:3, 2556:4, 2556:13, 2557:4, 2557:5, 2557:9, 2558:22, 2563:8, 2563:20, 2564:12, 2564:13, 2565:20, 2567:1, 2567:2, 2567:4, 2569:1, 2569:2, 2569:6, 2569:18, 2571:2, 2571:10, 2577:10, 2577:11, 2578:3, 2578:11, 2578:16, 2578:20, 2584:23, 2585:18, 2596:13, 2601:13, 2607:4, 2607:13
**downs** [1] - 2563:4
**downside** [3] - 2606:15, 2606:18, 2606:21
**Dr** [7] - 2568:19, 2568:21, 2573:2, 2593:18, 2593:20, 2593:23, 2594:13
**draft** [3] - 2529:17, 2529:18, 2565:6
**drastic** [1] - 2533:5
**drastically** [1] - 2557:5
**draw** [34] - 2526:13, 2526:21, 2526:24, 2531:16, 2531:17, 2535:1, 2544:23, 2545:17, 2545:18, 2558:19, 2558:21, 2565:20, 2566:3, 2567:2, 2578:9, 2578:19, 2599:9,

2599:15, 2600:15, 2600:16, 2600:20, 2601:13, 2601:24, 2602:22, 2602:25, 2603:3, 2603:6, 2603:7, 2604:24
**drawing** [5] - 2558:25, 2577:10, 2577:20, 2578:11
**drawn** [8] - 2523:8, 2523:10, 2523:12, 2555:15, 2571:10, 2600:8, 2600:17, 2604:22
**draws** [6] - 2529:24, 2579:18, 2601:20, 2604:14, 2604:17, 2607:2
**dream** [1] - 2537:23
**drew** [1] - 2605:3
**driving** [2] - 2605:24, 2606:2
**drop** [6] - 2573:2, 2573:7, 2573:8, 2573:12, 2573:17, 2575:21
**due** [1] - 2594:13
**dump** [1] - 2530:8
**duration** [1] - 2541:23
**during** [4] - 2564:14, 2579:4, 2592:3, 2596:21
**DX-81** [1] - 2592:10
**dying** [2] - 2608:3, 2608:5

# E

**e-mail** [6] - 2533:11, 2554:14, 2563:25, 2569:7, 2569:8, 2570:13
**e-mails** [3] - 2532:14, 2548:20
**early** [1] - 2607:21
**earnings** [1] - 2546:5
**Earth** [1] - 2562:3
**easiest** [3] - 2526:2, 2544:4, 2571:17
**easy** [1] - 2525:11
**eat** [3] - 2526:24, 2532:15, 2535:2
**eaten** [2] - 2529:14, 2531:20
**eats** [1] - 2559:1
**economic** [2] - 2577:25, 2579:4
**Economic** [1] - 2580:14
**economist** [2] -

2573:15, 2577:25
**economists** [1] - 2548:7
**economy** [6] - 2578:4, 2579:3, 2579:21, 2580:25, 2582:11, 2600:23
**Ed** [19] - 2527:25, 2528:2, 2529:9, 2529:19, 2541:14, 2545:1, 2546:1, 2546:16, 2550:20, 2551:12, 2554:9, 2562:5, 2563:24, 2565:6, 2567:14, 2567:15, 2569:8, 2569:15, 2569:21
**effect** [2] - 2572:15, 2603:14
**effort** [2] - 2551:2, 2558:14
**eight** [2] - 2603:14, 2603:15
**Eisenhofer** [1] - 2513:2
**either** [5] - 2521:2, 2549:22, 2553:17, 2571:12, 2599:19
**elderly** [1] - 2543:5
**eliminated** [5] - 2571:19, 2580:12, 2589:14, 2589:18, 2589:25
**elimination** [2] - 2589:20, 2598:11
**emphasize** [1] - 2565:18
**emphasizing** [1] - 2597:25
**enables** [1] - 2583:18
**enabling** [3] - 2529:2, 2559:22, 2560:13
**enact** [1] - 2584:17
**end** [17] - 2516:10, 2526:16, 2528:13, 2532:6, 2534:8, 2534:10, 2540:25, 2541:1, 2547:23, 2549:7, 2572:24, 2575:13, 2595:4, 2595:7, 2604:20, 2605:2, 2605:11
**ended** [2] - 2587:13, 2596:6
**ends** [1] - 2540:6
**enhance** [2] - 2589:5, 2592:25
**enormous** [2] - 2529:25, 2548:5
**ensure** [3] - 2580:24,

2588:14, 2606:9
**ensuring** [1] - 2580:23
**entailed** [1] - 2544:9
**entered** [4] - 2516:14, 2576:8, 2598:24, 2603:17
**entering** [1] - 2546:19
**enterprise** [3] - 2521:25, 2588:17, 2602:17
**enterprises** [16] - 2522:4, 2523:16, 2526:11, 2537:19, 2581:22, 2583:10, 2583:11, 2583:12, 2583:16, 2585:6, 2588:19, 2599:25, 2600:1, 2601:2, 2601:12, 2603:5
**entire** [7] - 2529:5, 2531:16, 2532:10, 2564:25, 2578:4, 2580:25, 2594:4
**entirely** [2] - 2601:3, 2601:4
**entities** [1] - 2526:20
**entitled** [4] - 2516:18, 2542:15, 2575:20, 2609:5
**entity** [4] - 2539:15, 2539:25, 2541:24, 2586:3
**equipment** [1] - 2517:19
**equity** [5] - 2580:5, 2584:13, 2587:20, 2587:21, 2601:1
**erased** [1] - 2524:15
**ERIC** [1] - 2512:18
**erode** [1] - 2544:24
**eroded** [2] - 2544:23, 2594:3
**erodes** [1] - 2578:19
**erosion** [7] - 2529:13, 2529:24, 2530:17, 2530:20, 2533:3, 2549:21, 2579:17
**ESQ** [14] - 2512:15, 2512:17, 2512:18, 2512:20, 2512:21, 2512:21, 2513:2, 2513:5, 2513:5, 2513:9, 2513:9, 2513:10, 2513:10, 2513:11
**essentially** [3] - 2523:19, 2524:16, 2539:18
**establish** [2] - 2518:9, 2539:15

2617

**established** [1] -
2599:11
**estimate** [2] - 2532:16,
2571:20
**estimating** [2] -
2526:19, 2571:24
**et** [2] - 2512:3, 2512:6
**event** [3] - 2516:25,
2570:12, 2573:4
**events** [4] - 2570:12,
2573:18, 2581:8,
2581:10
**evidence** [49] -
2517:13, 2517:14,
2517:15, 2517:16,
2517:20, 2517:21,
2517:22, 2519:5,
2519:11, 2524:20,
2527:4, 2527:5,
2528:15, 2532:21,
2533:2, 2536:15,
2545:13, 2562:11,
2563:9, 2563:12,
2567:11, 2572:22,
2576:22, 2580:2,
2581:1, 2581:6,
2581:15, 2582:10,
2582:12, 2583:1,
2583:21, 2584:19,
2585:1, 2585:13,
2587:16, 2588:8,
2588:23, 2589:17,
2589:19, 2592:2,
2593:23, 2593:24,
2594:11, 2600:15,
2600:24, 2602:4,
2602:7, 2602:8,
2604:4
**exact** [3] - 2573:18,
2595:3, 2595:7
**exactly** [9] - 2516:13,
2543:9, 2560:20,
2579:23, 2580:3,
2587:23, 2589:19,
2592:18, 2593:4
**examine** [1] - 2564:17
**examined** [1] - 2560:8
**examining** [1] -
2518:10
**example** [2] - 2524:23,
2549:4
**exceed** [2] - 2534:21,
2577:6
**exceeded** [2] - 2566:2,
2599:9
**exceeding** [1] -
2577:4
**except** [1] - 2541:21
**excess** [1] - 2571:4
**Exchange** [3] -

2577:13, 2595:15,
2595:21
**executive** [2] - 2564:2,
2577:14
**exercise** [7] - 2519:19,
2519:24, 2520:17,
2520:18, 2521:7,
2522:11, 2588:2
**exercised** [1] - 2586:9
**exhausted** [1] -
2601:2
**Exhibit** [4] - 2527:17,
2558:14, 2574:3,
2583:8
**exhibit** [5] - 2574:4,
2582:4, 2592:10,
2592:12, 2592:17
**exhibits** [2] - 2516:11,
2592:14
**existed** [3] - 2528:23,
2548:22, 2563:13
**existing** [1] - 2582:9
**exit** [1] - 2523:17
**exited** [2] - 2576:6,
2608:1
**expect** [6] - 2535:4,
2535:6, 2566:16,
2577:16, 2580:3,
2591:16
**expectation** [3] -
2520:20, 2523:20,
2595:5
**expectations** [11] -
2522:8, 2535:20,
2535:23, 2536:10,
2537:17, 2538:20,
2539:6, 2542:7,
2542:10, 2542:14,
2581:4
**expected** [9] -
2520:20, 2520:22,
2534:16, 2534:18,
2565:16, 2565:21,
2580:22, 2589:17,
2597:21
**expecting** [1] -
2565:15
**expects** [1] - 2565:7
**expenses** [1] - 2564:9
**expensive** [1] -
2531:11
**expert** [5] - 2528:24,
2568:20, 2573:2,
2573:3, 2574:8
**expert's** [1] - 2573:25
**experts** [1] - 2547:5
**expiration** [1] -
2534:19
**explain** [4] - 2520:4,
2521:3, 2539:17,

2558:15
**explained** [2] -
2587:2, 2588:13
**explaining** [1] -
2536:7
**explains** [1] - 2541:20
**explanation** [2] -
2527:13
**expressing** [1] -
2518:5
**extensive** [2] -
2532:13, 2551:6
**extensively** [1] -
2562:5
**extent** [1] - 2534:20
**extra** [2] - 2523:12,
2523:13
**extraordinarily** [1] -
2576:17
**extremely** [1] -
2543:11

---

**F**

**face** [2] - 2525:10,
2571:1
**facility** [1] - 2542:19
**Fact** [2] - 2582:5,
2583:8
**fact** [14] - 2536:11,
2536:19, 2537:10,
2540:21, 2545:11,
2554:14, 2573:9,
2575:1, 2583:9,
2589:15, 2592:9,
2594:20, 2600:13,
2603:25
**facts** [11] - 2518:9,
2524:21, 2528:22,
2536:9, 2538:4,
2544:10, 2544:25,
2545:1, 2545:9,
2563:12, 2574:1
**fail** [1] - 2555:6
**failed** [1] - 2581:13
**fair** [5] - 2520:10,
2520:12, 2521:21,
2575:19
**FAIRHOLME** [1] -
2512:3
**fairly** [1] - 2515:22
**fairness** [1] - 2537:16
**faith** [3] - 2520:10,
2520:12, 2575:19
**fall** [3] - 2564:10,
2568:11
**fall-back** [1] - 2568:11
**false** [1] - 2559:17
**familiar** [1] - 2593:3
**FANNIE** [1] - 2512:8

**Fannie** [114] -
2521:19, 2522:23,
2524:25, 2529:5,
2530:4, 2530:8,
2530:23, 2531:14,
2533:22, 2533:23,
2534:16, 2534:18,
2536:12, 2537:7,
2538:8, 2538:12,
2540:3, 2543:17,
2545:24, 2546:20,
2546:23, 2549:7,
2552:15, 2552:19,
2553:14, 2553:22,
2553:25, 2554:19,
2557:19, 2563:1,
2565:6, 2565:7,
2565:11, 2567:7,
2567:18, 2570:21,
2571:11, 2573:19,
2573:20, 2574:14,
2577:1, 2577:9,
2577:12, 2577:16,
2577:20, 2578:3,
2578:9, 2578:13,
2578:18, 2578:24,
2578:25, 2579:11,
2579:13, 2580:23,
2581:16, 2581:23,
2582:1, 2582:7,
2582:10, 2582:16,
2582:20, 2582:21,
2583:6, 2583:20,
2583:23, 2583:25,
2584:12, 2584:23,
2584:25, 2585:1,
2585:4, 2585:5,
2585:14, 2586:17,
2587:24, 2588:3,
2588:7, 2588:9,
2589:5, 2589:11,
2590:3, 2591:1,
2591:6, 2591:13,
2594:20, 2595:11,
2596:1, 2596:3,
2597:9, 2597:13,
2598:4, 2599:2,
2599:5, 2600:15,
2601:1, 2601:18,
2601:24, 2602:13,
2602:21, 2602:23,
2602:24, 2603:3,
2603:9, 2603:20,
2603:23, 2604:13,
2604:16, 2604:21,
2604:24, 2605:9,
2605:20
**far** [2] - 2571:4, 2578:1
**Federal** [2] - 2513:8,
2585:20
**federal** [3] - 2521:19,

2537:20, 2566:15
**FEDERAL** [1] - 2512:6
**fee** [11] - 2562:19,
2568:10, 2568:15,
2568:16, 2568:17,
2582:25, 2599:17,
2599:18, 2599:23,
2600:4, 2600:6
**feelings** [1] - 2535:25
**fees** [3] - 2562:19,
2563:16, 2568:20
**felt** [1] - 2551:19
**few** [7] - 2524:21,
2529:24, 2574:2,
2591:3, 2599:20,
2607:4, 2607:17
**FHFA** [51] - 2521:23,
2521:24, 2522:2,
2522:3, 2522:5,
2527:7, 2528:2,
2532:13, 2533:10,
2534:15, 2534:21,
2537:8, 2539:7,
2540:5, 2541:16,
2543:16, 2547:15,
2548:21, 2551:6,
2553:14, 2553:16,
2553:21, 2565:10,
2567:17, 2568:2,
2579:7, 2580:3,
2580:15, 2580:22,
2581:2, 2581:21,
2585:21, 2585:22,
2586:5, 2586:13,
2586:14, 2586:25,
2587:4, 2587:8,
2587:10, 2587:24,
2588:4, 2597:14,
2598:20, 2598:24,
2599:4, 2603:17,
2605:12, 2607:11
**FHFA's** [2] - 2586:10,
2598:14
**fighting** [1] - 2550:24
**figure** [3] - 2528:4,
2541:14, 2592:17
**filed** [2] - 2596:4,
2597:4
**filing** [4] - 2596:1,
2596:4, 2596:10,
2596:12
**filings** [9] - 2577:12,
2577:15, 2595:11,
2595:13, 2595:21,
2595:24, 2595:25,
2596:7, 2597:9
**fill** [1] - 2567:3
**final** [4] - 2515:4,
2516:17, 2516:22,
2517:1

**finally** [1] - 2525:6
**Finance** [3] - 2513:9,
2527:22, 2585:20
**finance** [1] - 2606:9
**FINANCE** [1] - 2512:6
**financial** [28] - 2524:6,
2527:2, 2527:10,
2529:20, 2537:5,
2540:2, 2540:7,
2548:6, 2548:7,
2551:24, 2552:19,
2552:20, 2559:6,
2564:1, 2577:15,
2578:1, 2578:2,
2578:23, 2578:24,
2579:1, 2579:2,
2579:4, 2581:12,
2581:24, 2584:9,
2586:15, 2605:12
**financials** [1] -
2563:13
**fine** [2] - 2523:11,
2527:7
**finish** [2] - 2517:4,
2522:16
**First** [2] - 2602:15
**first** [44] - 2517:3,
2517:11, 2518:2,
2519:14, 2521:5,
2526:5, 2528:20,
2534:14, 2536:14,
2539:13, 2540:10,
2544:13, 2544:18,
2546:15, 2548:3,
2557:13, 2560:5,
2562:12, 2565:15,
2568:4, 2570:2,
2570:4, 2575:24,
2577:3, 2581:21,
2581:22, 2585:4,
2585:6, 2585:9,
2585:10, 2585:11,
2587:15, 2587:17,
2590:13, 2592:3,
2593:11, 2596:3,
2596:16, 2596:18,
2597:9, 2605:1,
2607:16
**five** [2] - 2522:17,
2526:3
**fixed** [4] - 2534:7,
2599:13, 2600:13,
2601:17
**flawed** [1] - 2546:1
**fleets** [1] - 2548:6
**Flexner** [1] - 2512:22
**Floor** [1] - 2513:3
**flow** [2] - 2584:5,
2584:6
**fluke** [1] - 2562:15

**focus** [3] - 2558:12,
2590:23, 2593:8
**focused** [1] - 2551:5
**follow** [2] - 2518:17,
2546:13
**following** [1] -
2544:10
**FOR** [1] - 2512:1
**forced** [3] - 2567:2,
2567:3, 2567:6
**forecasting** [2] -
2563:22, 2563:23
**forecasts** [2] -
2534:15, 2564:12
**foregoing** [1] - 2609:3
**foresee** [1] - 2606:10
**forever** [4] - 2524:10,
2532:10, 2564:25,
2573:14
**forgiveness** [2] -
2550:16, 2551:24
**form** [3] - 2519:13,
2525:19, 2575:4
**formal** [1] - 2582:5
**formed** [1] - 2573:4
**former** [2] - 2542:25,
2543:1
**forms** [1] - 2535:20
**formula** [2] - 2531:1,
2604:5, 2604:8
**formulate** [1] -
2525:20
**forth** [1] - 2548:21
**forward** [4] - 2555:8,
2567:20, 2571:7,
2577:24
**Foster** [1] - 2533:21
**four** [6] - 2526:3,
2537:20, 2538:1,
2589:18, 2589:20,
2598:11
**fourth** [2] - 2577:2,
2605:1
**fraction** [1] - 2550:22
**frame** [3] - 2581:23,
2595:3, 2595:8
**Freddie** [108] -
2521:19, 2522:23,
2525:1, 2529:6,
2530:23, 2531:12,
2533:22, 2533:23,
2534:16, 2534:19,
2536:12, 2536:13,
2537:7, 2538:8,
2538:12, 2540:4,
2543:1, 2543:18,
2545:24, 2546:20,
2546:23, 2549:8,
2552:16, 2552:20,
2553:14, 2553:22,

2554:1, 2554:19,
2557:20, 2563:2,
2565:24, 2567:7,
2567:18, 2570:21,
2571:11, 2572:4,
2573:21, 2573:22,
2573:23, 2574:15,
2574:20, 2575:4,
2577:1, 2577:10,
2577:12, 2577:16,
2577:20, 2578:3,
2578:9, 2578:13,
2578:14, 2578:19,
2578:24, 2578:25,
2579:11, 2579:14,
2580:23, 2581:17,
2581:25, 2582:1,
2582:7, 2582:11,
2582:16, 2582:20,
2582:21, 2583:6,
2583:20, 2583:23,
2583:25, 2584:12,
2584:24, 2584:25,
2585:2, 2585:4,
2585:6, 2586:18,
2587:24, 2588:3,
2588:7, 2588:10,
2589:5, 2589:11,
2590:3, 2591:1,
2591:7, 2591:14,
2594:21, 2595:12,
2596:2, 2597:6,
2597:10, 2597:13,
2598:5, 2599:2,
2599:5, 2600:15,
2601:2, 2601:18,
2601:25, 2602:13,
2602:21, 2602:22,
2603:9, 2603:21,
2603:24, 2604:14,
2605:21
**Freddie's** [1] -
2585:15
**friend** [1] - 2528:6
**friends** [2] - 2546:2,
2553:3
**fueled** [1] - 2581:13
**fulfill** [5] - 2537:21,
2537:25, 2589:6,
2592:25, 2598:15
**full** [3] - 2520:13,
2565:17, 2567:6
**fund** [2] - 2534:18,
2537:21
**fundamentally** [1] -
2546:1
**funding** [5] - 2534:19,
2587:1, 2587:5,
2598:21, 2598:22
**FUNDS** [1] - 2512:3

**future** [9] - 2519:21,
2520:2, 2529:3,
2529:14, 2544:1,
2560:14, 2562:25,
2566:15, 2567:25

---

# G

**game** [1] - 2594:3
**games** [1] - 2562:7
**Geithner** [9] - 2528:1,
2533:13, 2534:1,
2535:13, 2552:3,
2559:8, 2559:14,
2560:11, 2561:7
**generating** [3] -
2528:20, 2559:22,
2560:12
**gentlemen** [2] -
2516:15, 2600:24
**given** [10] - 2526:6,
2529:4, 2535:17,
2558:11, 2569:4,
2569:17, 2588:3,
2595:3, 2603:21,
2603:22
**GLUCK** [1] - 2513:5
**goal** [12] - 2540:6,
2541:9, 2542:8,
2589:3, 2589:4,
2589:10, 2590:13,
2590:18, 2590:19,
2590:22, 2590:23,
2593:9
**goals** [5] - 2540:8,
2592:20, 2592:23,
2593:11, 2597:19
**golden** [2] - 2549:7,
2566:4
**governed** [1] -
2574:20
**government** [6] -
2521:19, 2537:19,
2537:20, 2554:7,
2585:6, 2590:7
**government's** [2] -
2535:9, 2565:8
**government-
sponsored** [2] -
2537:19, 2585:6
**grandkids** [1] - 2608:7
**Grant** [1] - 2513:2
**graphs** [1] - 2551:15
**grateful** [2] - 2518:18,
2576:21
**gratitude** [2] - 2518:5,
2518:21
**grave** [1] - 2526:23
**great** [3] - 2530:16,
2551:20, 2551:22

**greater** [1] - 2539:19
**Griffin** [2] - 2569:8,
2569:11
**grossly** [1] - 2544:13
**Grossmann** [1] -
2513:6
**group** [1] - 2576:18
**GSEs** [7] - 2528:20,
2533:10, 2554:12,
2560:12, 2588:7,
2588:14, 2593:25
**guarantee** [11] -
2523:1, 2562:19,
2563:16, 2583:6,
2583:12, 2583:19,
2583:23, 2584:1,
2584:9, 2599:6,
2602:11
**guaranteed** [4] -
2580:11, 2591:2,
2591:10, 2591:25
**guarantees** [1] -
2563:3
**guess** [1] - 2575:11
**guys** [4] - 2522:17,
2545:24, 2557:13,
2569:2

---

# H

**habits** [1] - 2600:25
**half** [5] - 2515:25,
2538:18, 2553:17,
2553:18, 2582:9
**Halloween** [4] -
2607:5, 2607:22,
2607:25, 2608:6
**HAMISH** [1] - 2512:20
**Hamish** [2] - 2515:21,
2518:1
**Hampshire** [1] -
2512:16
**hand** [3] - 2522:24,
2594:14, 2594:16
**hands** [2] - 2526:3,
2529:7
**hands-down** [1] -
2526:3
**happy** [4] - 2531:23,
2607:22, 2607:25
**Happy** [1] - 2607:5
**hard** [4] - 2518:6,
2518:17, 2600:25,
2604:8
**harm** [6] - 2521:9,
2522:12, 2572:23,
2572:24, 2574:11,
2574:12
**harmed** [4] - 2542:24,
2571:16, 2575:19

**Hartman** [1] - 2539:2
**hats** [1] - 2553:24
**head** [2] - 2546:6, 2552:13
**health** [5] - 2540:2, 2578:23, 2578:24, 2579:1, 2579:2
**hear** [6] - 2519:8, 2520:23, 2521:1, 2521:22, 2527:14, 2563:11
**heard** [28] - 2517:12, 2524:20, 2528:24, 2530:3, 2534:23, 2536:13, 2539:17, 2543:9, 2562:10, 2568:18, 2573:2, 2581:11, 2581:20, 2584:10, 2584:12, 2584:18, 2584:20, 2586:16, 2593:15, 2593:18, 2598:2, 2599:12, 2599:16, 2600:14, 2601:7, 2604:1, 2604:4, 2606:12
**hearing** [1] - 2577:22
**hears** [1] - 2578:16
**heart** [2] - 2586:21, 2600:22
**hell** [1] - 2555:11
**help** [9] - 2519:6, 2522:21, 2537:22, 2538:22, 2550:16, 2583:2, 2587:5, 2589:5, 2592:24
**HERA** [17] - 2580:14, 2584:18, 2584:23, 2585:18, 2585:19, 2585:21, 2585:23, 2586:18, 2586:24, 2586:25, 2587:16, 2587:17, 2588:4, 2598:19
**hide** [2] - 2539:11, 2605:8
**hiding** [1] - 2540:10
**high** [2] - 2544:3, 2590:6
**higher** [2] - 2558:4, 2563:9
**highlighted** [3] - 2539:9, 2565:15, 2594:23
**highlights** [1] - 2588:11
**himself** [1] - 2554:8
**hindsight** [2] - 2563:10, 2570:10
**hired** [2] - 2553:4,

2553:5
**history** [4] - 2524:24, 2538:21, 2538:25, 2577:25
**hits** [1] - 2578:18
**HOFFMAN** [1] - 2513:10
**hold** [2] - 2566:21, 2590:5
**holds** [1] - 2572:11
**hole** [2] - 2567:3, 2601:25
**home** [4] - 2563:16, 2563:19, 2566:1, 2583:4
**homeowner** [1] - 2583:19
**homeowners** [4] - 2550:14, 2563:1, 2582:25, 2583:4
**homes** [2] - 2581:14, 2583:3
**honor** [1] - 2519:1
**Honor** [11] - 2515:16, 2515:22, 2516:4, 2516:5, 2516:7, 2536:4, 2572:19, 2576:11, 2592:15, 2607:17, 2608:5
**HONORABLE** [1] - 2512:12
**hope** [10] - 2518:19, 2523:19, 2523:20, 2524:12, 2524:15, 2530:21, 2542:6, 2571:24
**hopefully** [2] - 2519:6, 2521:13
**horizon** [1] - 2567:9
**horse** [2] - 2566:5, 2566:6
**hour** [2] - 2515:25
**hours** [4] - 2516:4, 2516:5, 2516:6, 2516:7
**houses** [1] - 2550:14
**Housing** [3] - 2513:9, 2580:14, 2585:20
**HOUSING** [1] - 2512:6
**housing** [21] - 2524:5, 2533:17, 2533:19, 2533:25, 2537:6, 2537:22, 2563:5, 2563:7, 2579:1, 2579:2, 2580:24, 2581:13, 2581:17, 2581:18, 2581:19, 2582:11, 2585:16, 2587:9, 2600:23, 2606:9

**huge** [11] - 2537:2, 2548:14, 2548:17, 2550:5, 2554:16, 2558:25, 2563:4, 2566:25, 2579:4, 2601:18
**human** [3] - 2524:23, 2562:3, 2579:4
**Hume** [11] - 2515:21, 2516:4, 2517:11, 2517:24, 2518:1, 2576:12, 2582:3, 2584:14, 2592:12, 2598:1, 2605:20
**HUME** [7] - 2512:20, 2515:21, 2516:6, 2517:25, 2536:6, 2554:5, 2572:21
**hundreds** [2] - 2579:11, 2599:5

## I

**IAN** [1] - 2513:10
**idea** [5] - 2521:18, 2548:3, 2550:9, 2570:18, 2590:20
**ideological** [1] - 2545:23
**ignore** [1] - 2552:12
**impact** [4] - 2551:23, 2551:24, 2569:22, 2569:24
**imperfect** [1] - 2518:16
**implied** [5] - 2519:16, 2520:10, 2520:11, 2521:15, 2575:18
**important** [19] - 2519:4, 2520:14, 2527:16, 2532:11, 2535:8, 2540:11, 2541:16, 2564:4, 2569:14, 2578:15, 2581:8, 2583:21, 2584:8, 2585:13, 2585:23, 2589:15, 2590:23, 2591:1, 2594:20
**importantly** [2] - 2598:13, 2603:10
**impose** [1] - 2598:21
**imposed** [4] - 2518:20, 2588:24, 2596:22, 2598:23
**imposition** [3] - 2592:2, 2596:4, 2597:23
**improvement** [1] - 2566:1

**improvements** [1] - 2562:16
**inadequate** [1] - 2544:13
**INC** [1] - 2512:3
**included** [1] - 2601:15
**including** [2] - 2544:5, 2589:9
**income** [4] - 2534:17, 2534:21, 2565:16, 2566:2
**inconsistent** [4] - 2540:20, 2593:17, 2593:22, 2594:15
**increase** [3] - 2535:2, 2550:6, 2583:16
**increased** [3] - 2571:12, 2601:22, 2604:6
**increases** [1] - 2571:13
**Index** [1] - 2563:19
**indicates** [1] - 2567:15
**indifference** [2] - 2521:9, 2522:12
**individual** [1] - 2543:15
**infirmed** [1] - 2543:5
**inflection** [1] - 2564:7
**inform** [2] - 2536:9, 2537:17
**information** [4] - 2531:13, 2548:2, 2548:15, 2548:16
**informed** [1] - 2539:6
**injury** [2] - 2572:11, 2572:12
**input** [1] - 2552:22
**inspiration** [1] - 2518:21
**instability** [3] - 2563:5, 2589:7, 2593:1
**instead** [5] - 2525:6, 2545:16, 2545:18, 2555:19, 2570:6
**institution** [3] - 2541:22, 2542:2, 2581:24
**institutional** [1] - 2543:14
**institutions** [1] - 2535:10
**instruct** [2] - 2520:8, 2592:15
**instruction** [1] - 2544:6
**instructions** [11] - 2515:5, 2516:17,

2520:14, 2521:3, 2525:22, 2544:9, 2544:20, 2546:12, 2546:13, 2561:25, 2586:4
**intact** [1] - 2594:6
**intangible** [1] - 2566:20
**intended** [1] - 2541:23
**intent** [1] - 2570:3
**interacted** [1] - 2562:4
**interest** [36] - 2521:24, 2522:3, 2522:9, 2525:8, 2538:5, 2538:7, 2538:8, 2550:1, 2553:23, 2574:21, 2574:24, 2575:1, 2575:5, 2575:21, 2578:8, 2579:9, 2579:13, 2579:25, 2580:16, 2580:17, 2580:19, 2580:22, 2581:4, 2583:13, 2586:12, 2586:22, 2586:23, 2586:25, 2587:5, 2590:22, 2595:10, 2597:3, 2597:15, 2597:18, 2597:22, 2598:16
**interesting** [1] - 2542:17
**interests** [7] - 2522:10, 2579:9, 2586:3, 2586:7, 2586:15, 2586:16, 2586:23
**internal** [3] - 2524:6, 2533:7, 2564:12
**interwoven** [1] - 2546:10
**invest** [7] - 2538:21, 2538:23, 2575:15, 2582:22, 2584:3, 2584:4
**invested** [7] - 2523:8, 2536:12, 2536:24, 2537:1, 2537:2, 2537:11, 2588:1
**investment** [6] - 2538:19, 2538:24, 2565:8, 2580:5, 2587:20, 2601:4
**investments** [1] - 2603:12
**investor** [3] - 2542:20, 2543:7, 2543:11
**investors** [27] - 2527:5, 2527:6, 2531:22, 2532:17,

2535:11, 2535:12,
2537:11, 2538:1,
2538:2, 2538:13,
2543:14, 2543:15,
2556:5, 2557:11,
2582:18, 2582:19,
2582:21, 2582:24,
2583:6, 2583:13,
2583:21, 2583:24,
2584:2, 2584:15
**involved** [7] - 2533:22,
2533:23, 2542:14,
2551:21, 2553:2,
2553:12, 2554:10
**issue** [4] - 2533:3,
2541:4, 2591:19,
2591:21
**issued** [2] - 2588:6,
2588:25
**items** [2] - 2517:14,
2517:16
**itself** [1] - 2534:25

## J

**James** [2] - 2569:8,
2581:20
**January** [2] - 2564:8,
2607:16
**jargon** [1] - 2540:5
**jeez** [1] - 2570:15
**Jeff** [2] - 2533:21,
2567:17
**Jenkins** [1] - 2592:17
**job** [3] - 2586:10,
2588:14, 2608:2
**jobs** [1] - 2581:15
**Joint** [3] - 2574:3,
2582:5, 2583:7
**joint** [3] - 2574:4,
2582:3, 2582:4
**JONATHAN** [1] -
2513:9
**JONES** [1] - 2513:11
**Joseph** [1] - 2543:3
**judge** [2] - 2520:8,
2574:22
**JUDGE** [1] - 2512:13
**Judge** [1] - 2517:25
**judge's** [1] - 2586:4
**judgment** [1] -
2535:20
**judgments** [1] -
2562:1
**July** [4] - 2533:11,
2533:24, 2559:7,
2563:15
**July/early** [1] - 2568:6
**jump** [5] - 2522:15,
2525:18, 2526:1,

2532:11, 2568:22
**jumping** [1] - 2597:16
**June** [6] - 2527:22,
2528:15, 2530:14,
2559:15, 2560:11,
2568:24
**junior** [5] - 2573:21,
2573:22, 2573:23,
2574:14, 2574:15
**jurors** [2] - 2576:15,
2576:16
**Jury** [5] - 2515:3,
2516:14, 2576:6,
2576:8, 2608:1
**JURY** [1] - 2512:12
**jury** [25] - 2515:5,
2515:6, 2515:11,
2515:12, 2516:8,
2517:15, 2517:20,
2517:22, 2518:1,
2522:16, 2561:25,
2574:22, 2575:13,
2576:12, 2578:15,
2581:1, 2583:22,
2585:24, 2585:25,
2586:20, 2592:14,
2597:5, 2598:13,
2600:25, 2602:18
**justify** [1] - 2533:5
**Justison** [1] - 2513:3
**JX-1** [4] - 2574:1,
2574:3, 2583:8,
2605:4

## K

**KAPLAN** [1] - 2512:21
**Kari** [2] - 2552:20,
2552:23
**Kaye** [1] - 2513:11
**keep** [14] - 2529:22,
2536:20, 2536:21,
2540:6, 2542:11,
2563:10, 2570:22,
2579:12, 2590:4,
2590:6, 2594:5,
2594:10, 2603:9,
2607:17
**keeping** [6] - 2570:22,
2578:13, 2593:25,
2594:2, 2594:8,
2594:16
**keeps** [1] - 2556:21
**KENYA** [1] - 2512:21
**kept** [5] - 2530:8,
2530:9, 2547:19,
2552:17, 2588:14
**Kessler** [1] -
2512:18
**key** [6] - 2556:22,
2556:23, 2583:5,

2588:13, 2592:19,
2603:25
**kick** [1] - 2549:20
**kids** [1] - 2608:7
**kind** [10] - 2534:24,
2543:7, 2554:18,
2555:18, 2555:19,
2556:9, 2556:12,
2556:13, 2557:18,
2565:24
**kinds** [2] - 2518:9,
2547:1
**King** [1] - 2512:19
**Kirk** [1] - 2512:15
**knowledgeable** [1] -
2552:21
**known** [2] - 2596:25
**knows** [15] - 2577:12,
2577:25, 2578:1,
2578:2, 2578:9,
2578:12, 2578:21,
2578:24, 2579:1,
2579:6, 2579:7,
2591:15, 2591:24,
2591:25
**KRAVETZ** [1] - 2513:5

## L

**ladies** [2] - 2516:15,
2600:24
**LAMBERTH** [1] -
2512:12
**Lamberth** [1] -
2517:25
**large** [4] - 2528:21,
2529:1, 2559:22,
2560:12
**largest** [2] - 2581:24,
2581:25
**last** [8] - 2515:6,
2517:5, 2517:7,
2538:9, 2554:6,
2558:6, 2567:19,
2574:19
**late** [4] - 2568:6,
2604:20, 2607:10,
2607:14
**law** [11] - 2516:18,
2574:21, 2574:22,
2579:7, 2579:24,
2584:17, 2584:18,
2584:19, 2584:20,
2585:20
**lawsuit** [3] - 2558:15,
2558:16, 2572:17
**lawsuits** [1] - 2560:4
**lawyers** [6] - 2518:9,
2518:11, 2518:12,
2575:15, 2576:16

**Layton** [1] - 2552:23
**Layton's** [1] - 2606:12
**leading** [2] - 2568:20,
2601:15
**leads** [1] - 2544:16
**learn** [2] - 2570:10,
2584:22
**learned** [24] - 2548:3,
2566:12, 2566:13,
2577:5, 2579:4,
2581:8, 2582:1,
2582:10, 2583:5,
2584:8, 2584:22,
2584:24, 2585:12,
2585:14, 2585:19,
2587:7, 2595:20,
2595:22, 2595:23,
2602:18, 2602:19,
2602:21, 2602:23
**least** [7] - 2521:11,
2525:2, 2542:8,
2544:2, 2591:14,
2598:2, 2607:18
**leave** [2] - 2566:11,
2590:12
**led** [2] - 2548:7,
2607:15
**LEE** [1] - 2512:17
**left** [5] - 2516:5,
2547:4, 2557:16,
2564:20, 2564:23
**legal** [8] - 2520:24,
2521:1, 2539:14,
2598:3, 2598:6,
2598:10, 2598:14,
2598:17
**length** [2] - 2551:18,
2553:15
**less** [10] - 2520:5,
2527:22, 2547:23,
2549:25, 2550:14,
2566:15, 2566:23,
2590:7, 2603:14,
2603:15
**lesser** [1] - 2549:24
**lesson** [1] - 2579:3
**letter** [3] - 2551:10,
2551:12, 2551:14
**letters** [1] - 2599:1
**letting** [1] - 2525:6
**level** [8] - 2522:15,
2522:16, 2522:18,
2525:10, 2525:11,
2527:6, 2544:3,
2549:21
**liabilities** [4] - 2577:4,
2577:6, 2599:9,
2602:24
**liability** [2] - 2539:19,
2539:20

**licensed** [1] - 2542:18
**lies** [1] - 2586:20
**life** [7] - 2518:7,
2543:12, 2545:25,
2547:2, 2562:3,
2578:5, 2606:24
**life-long** [1] - 2578:5
**light** [1] - 2564:3
**likely** [2] - 2547:23,
2588:19
**limited** [3] - 2534:11,
2536:1, 2541:23
**limits** [1] - 2515:23
**line** [5] - 2523:1,
2543:22, 2563:17,
2564:12, 2595:20
**liquidation** [17] -
2535:3, 2554:25,
2555:1, 2555:3,
2555:8, 2555:14,
2556:2, 2556:9,
2556:13, 2556:18,
2556:21, 2557:7,
2557:11, 2557:13,
2570:24, 2571:12,
2599:11
**liquidity** [1] - 2583:16
**listen** [2] - 2524:20,
2607:24
**listened** [1] - 2575:14
**listening** [1] - 2576:22
**literally** [2] - 2576:25,
2594:2
**LITIGATIONS** [1] -
2512:10
**Litowitz** [1] - 2513:6
**lived** [1] - 2562:3
**lives** [3] - 2518:6,
2542:18, 2542:25
**living** [1] - 2542:19
**LLP** [4] - 2512:18,
2512:22, 2513:6,
2513:11
**loan** [6] - 2536:18,
2536:21, 2550:15,
2566:1, 2583:4
**loans** [1] - 2583:18
**Lockhart** [10] -
2581:20, 2584:21,
2587:17, 2588:13,
2593:4, 2593:6,
2595:1, 2595:7,
2602:1, 2602:9
**lockhart** [1] - 2588:25
**Lockhart's** [1] -
2598:4
**look** [24] - 2528:19,
2529:12, 2531:21,
2536:23, 2538:8,
2542:1, 2544:20,

2544:25, 2547:19,
2551:9, 2551:22,
2552:3, 2554:18,
2562:23, 2563:12,
2563:21, 2565:15,
2568:23, 2569:7,
2584:19, 2588:11,
2596:21, 2602:23,
2605:4
**looked** [3] - 2563:13,
2569:12, 2573:4
**looking** [7] - 2524:7,
2576:25, 2577:1,
2577:9, 2577:18,
2577:19
**looks** [2] - 2555:21,
2603:2
**lose** [1] - 2545:18
**losing** [2] - 2566:19,
2567:1
**loss** [3] - 2564:10,
2575:3, 2575:6
**losses** [10] - 2534:18,
2535:7, 2562:21,
2563:8, 2564:13,
2566:1, 2601:19,
2602:2, 2603:7,
2604:13
**lost** [6] - 2566:14,
2573:21, 2573:23,
2575:1, 2581:14
**Louis** [1] - 2542:18
**love** [1] - 2539:11
**low** [2] - 2536:23,
2590:6

---

# M

**MAC** [1] - 2512:8
**Mac** [31] - 2521:19,
2522:23, 2525:1,
2529:6, 2530:23,
2531:12, 2534:16,
2534:19, 2536:12,
2536:13, 2537:7,
2538:8, 2538:12,
2540:4, 2543:18,
2545:25, 2546:20,
2546:23, 2549:8,
2552:16, 2552:20,
2553:14, 2553:22,
2557:20, 2563:2,
2565:24, 2567:18,
2572:4, 2573:22,
2574:20, 2581:25
**Mac's** [1] - 2582:7
**mad** [1] - 2522:18
**Mae** [32] - 2521:19,
2522:23, 2525:1,
2529:6, 2530:8,

---

2530:23, 2531:14,
2534:16, 2534:18,
2536:12, 2537:7,
2538:8, 2538:12,
2540:3, 2543:18,
2545:24, 2546:20,
2546:23, 2549:8,
2552:15, 2552:19,
2553:14, 2553:22,
2557:19, 2563:2,
2565:6, 2565:7,
2565:11, 2567:18,
2581:24, 2596:3
**Mae's** [3] - 2530:4,
2582:7, 2585:14
**MAE/FREDDIE** [1] -
2512:8
**mail** [6] - 2533:11,
2554:14, 2563:25,
2569:7, 2569:8,
2570:13
**mails** [2] - 2532:14,
2548:20
**maintain** [1] - 2603:10
**manage** [2] - 2597:12,
2598:15
**managed** [4] -
2580:18, 2596:23,
2597:7, 2598:8
**managing** [2] -
2596:14, 2596:18
**Mario** [4] - 2526:6,
2527:13, 2528:6,
2558:13
**market** [37] - 2535:8,
2535:11, 2537:6,
2563:7, 2572:4,
2572:9, 2572:13,
2577:22, 2578:4,
2578:22, 2579:1,
2579:2, 2579:21,
2580:25, 2581:13,
2581:17, 2581:18,
2581:19, 2582:11,
2582:13, 2583:16,
2583:24, 2585:7,
2585:12, 2585:17,
2587:2, 2587:9,
2589:8, 2593:2,
2600:23, 2602:2,
2602:5, 2602:11,
2603:10, 2603:15
**market's** [2] - 2524:5,
2524:6
**marketplace** [2] -
2527:10, 2577:22
**markets** [1] - 2579:18
**Mary** [2] - 2527:20,
2545:2

---

**Mason** [1] - 2573:3
**Massachusetts** [1] -
2513:12
**massive** [1] - 2551:2
**match** [2] - 2571:13,
2590:22
**matched** [2] -
2590:17, 2597:19
**matches** [1] - 2590:19
**materially** [2] -
2529:25, 2556:4
**math** [1] - 2605:2
**matter** [5] - 2529:21,
2557:14, 2576:18,
2599:22, 2609:5
**matters** [1] - 2523:10
**maximize** [15] -
2521:25, 2522:4,
2579:13, 2580:19,
2585:9, 2596:16,
2596:19, 2596:24,
2597:7, 2597:11,
2597:12, 2597:22,
2598:7, 2598:8
**maximizing** [1] -
2597:1
**Mayopolous** [1] -
2530:4
**MBS** [2] - 2527:5,
2532:17
**McFarland** [6] -
2529:19, 2552:18,
2563:24, 2564:2,
2567:9, 2567:22
**mean** [8] - 2526:4,
2534:17, 2550:13,
2563:9, 2564:22,
2590:2, 2595:13,
2604:2
**meaning** [3] -
2538:13, 2596:21,
2606:19
**means** [24] - 2520:13,
2520:15, 2539:3,
2540:17, 2544:7,
2544:19, 2550:13,
2554:6, 2556:13,
2564:8, 2564:13,
2565:18, 2565:19,
2566:14, 2571:14,
2578:21, 2586:5,
2590:2, 2590:20,
2591:18, 2601:2,
2603:2
**meant** [7] - 2543:3,
2570:15, 2577:5,
2604:2, 2604:9,
2605:17, 2606:24
**measure** [2] -
2572:23, 2574:10

---

**measurement** [1] -
2572:12
**measuring** [1] -
2572:10
**median** [2] - 2606:19
**meet** [2] - 2542:12,
2588:20
**meeting** [11] -
2527:25, 2530:9,
2564:2, 2567:14,
2567:15, 2567:19,
2569:8, 2569:15,
2569:20, 2607:14,
2607:15
**Meltzer** [1] - 2512:18
**members** [13] -
2517:25, 2522:16,
2575:13, 2576:12,
2578:15, 2581:1,
2583:22, 2585:23,
2586:20, 2597:5,
2598:13, 2600:24,
2602:18
**memo** [9] - 2525:15,
2527:7, 2527:24,
2528:8, 2545:6,
2546:25, 2559:13,
2559:14, 2570:14
**memorandum** [2] -
2527:19, 2546:18
**memos** [7] - 2525:14,
2532:13, 2544:14,
2548:19, 2551:1,
2551:3, 2551:6
**mentioned** [3] -
2532:12, 2554:16,
2567:24
**messy** [2] - 2518:13,
2519:3
**met** [5] - 2521:5,
2538:24, 2542:17,
2542:25, 2569:10
**Michael** [3] - 2527:20,
2533:20, 2559:14
**MICHAEL** [1] - 2513:2
**Michelle** [1] - 2542:17
**middle** [3] - 2551:22,
2568:4, 2606:19
**might** [10] - 2522:20,
2531:17, 2534:3,
2534:4, 2543:21,
2556:5, 2558:21,
2558:23, 2564:20,
2567:21
**Miller** [3] - 2527:20,
2542:17, 2545:2
**million** [5] - 2543:13,
2573:21, 2573:23,
2573:24, 2574:14
**millions** [1] - 2603:1

---

**mind** [1] - 2517:12
**minus** [1] - 2582:25
**minute** [3] - 2576:1,
2597:16, 2605:15
**minutes** [5] - 2522:17,
2576:5, 2599:20,
2607:4, 2607:17
**mirror** [1] - 2578:2
**mission** [15] -
2537:21, 2537:24,
2538:1, 2538:23,
2540:20, 2584:23,
2585:2, 2585:14,
2585:15, 2585:19,
2586:17, 2588:15,
2589:6, 2592:25,
2598:15
**mitigate** [2] - 2589:6,
2592:25
**model** [1] - 2552:1
**modeled** [1] - 2551:25
**modeling** [2] - 2548:7,
2552:13
**modifying** [1] - 2534:7
**moment** [2] - 2551:11,
2600:11
**momentous** [1] -
2548:17
**moments** [1] - 2591:3
**money** [45] - 2526:21,
2530:24, 2531:11,
2536:12, 2537:1,
2537:8, 2537:9,
2537:25, 2538:2,
2538:13, 2538:23,
2545:17, 2549:7,
2555:13, 2555:15,
2557:6, 2566:14,
2567:1, 2569:3,
2570:22, 2570:23,
2575:2, 2577:16,
2578:10, 2580:9,
2582:22, 2583:2,
2584:4, 2584:5,
2585:10, 2587:25,
2587:25, 2588:1,
2591:22, 2599:24,
2600:1, 2600:7,
2600:16, 2600:17,
2601:5, 2603:18,
2604:19
**month** [1] - 2541:13
**monthly** [2] - 2582:24,
2583:20
**months** [4] - 2527:23,
2553:18, 2603:14,
2603:15
**morning** [6] - 2517:4,
2517:9, 2530:4,
2554:14, 2568:19,

2589:1
**mortgage** [25] -
2527:1, 2531:22,
2535:12, 2537:24,
2550:15, 2556:5,
2562:24, 2566:21,
2578:4, 2579:20,
2582:7, 2582:12,
2582:17, 2582:18,
2582:22, 2583:12,
2583:14, 2583:16,
2584:3, 2584:4,
2585:11, 2587:2,
2599:6, 2602:12,
2603:12
**mortgage-backed** [15]
- 2527:1, 2531:22,
2535:12, 2556:5,
2579:20, 2582:17,
2582:18, 2582:22,
2583:12, 2583:14,
2584:3, 2584:4,
2599:6, 2602:12,
2603:12
**mortgages** [12] -
2562:18, 2582:2,
2582:9, 2582:16,
2583:1, 2583:2,
2583:3, 2583:11,
2584:7, 2584:12,
2585:8, 2585:12
**most** [15] - 2520:14,
2523:18, 2527:16,
2530:20, 2534:5,
2547:6, 2555:14,
2564:4, 2569:14,
2576:19, 2578:15,
2579:21, 2596:1,
2598:13, 2606:21
**motive** [3] - 2545:11,
2568:9, 2568:24
**mountain** [1] -
2562:10
**move** [2] - 2565:24,
2597:23
**MR** [14] - 2515:16,
2515:21, 2516:3,
2516:6, 2516:7,
2517:25, 2536:4,
2536:6, 2554:5,
2572:19, 2572:21,
2576:11, 2607:20,
2608:5
**multibillion** [1] -
2567:6
**multiplied** [1] -
2572:21
**multitrillion** [1] -
2547:9

## N

**name** [2] - 2533:20,
2551:12
**named** [2] - 2527:20,
2543:3
**names** [1] - 2533:21
**nation's** [2] - 2582:9,
2585:16
**nature** [1] - 2600:12
**nearly** [1] - 2578:3
**necessary** [6] -
2564:16, 2564:19,
2564:20, 2564:21,
2565:2, 2565:5
**need** [16] - 2525:11,
2525:15, 2526:2,
2532:18, 2532:19,
2533:17, 2534:12,
2534:18, 2547:6,
2547:12, 2548:15,
2566:2, 2571:17,
2575:9
**needed** [4] - 2526:21,
2537:7, 2603:20,
2603:21
**needing** [1] - 2535:1
**needs** [1] - 2547:11
**negative** [11] -
2576:25, 2577:7,
2599:7, 2602:24,
2603:4, 2604:13,
2604:15, 2604:16,
2604:22, 2605:9,
2606:4
**negotiate** [8] - 2549:5,
2549:8, 2549:13,
2549:15, 2550:2,
2552:11, 2553:21
**negotiated** [1] -
2553:12
**negotiating** [3] -
2548:21, 2551:3,
2553:12
**negotiation** [3] -
2548:25, 2549:1,
2553:15
**net** [96] - 2519:18,
2519:23, 2523:16,
2524:10, 2524:23,
2527:23, 2528:3,
2529:5, 2532:9,
2532:10, 2533:6,
2534:17, 2534:21,
2539:18, 2539:20,
2539:22, 2540:16,
2540:17, 2540:18,
2541:6, 2541:7,
2541:8, 2541:15,
2541:25, 2542:6,

2542:9, 2543:23,
2545:21, 2546:7,
2546:19, 2547:10,
2547:16, 2547:24,
2548:11, 2548:18,
2549:9, 2549:16,
2549:20, 2549:25,
2550:6, 2550:25,
2551:1, 2551:7,
2551:17, 2552:1,
2552:25, 2555:12,
2555:24, 2564:16,
2564:25, 2565:4,
2567:2, 2569:9,
2569:17, 2569:24,
2570:4, 2570:5,
2570:7, 2571:13,
2572:1, 2572:5,
2572:9, 2572:13,
2572:14, 2572:15,
2572:16, 2572:17,
2573:10, 2573:11,
2573:16, 2574:7,
2577:1, 2577:7,
2581:3, 2581:10,
2589:22, 2591:8,
2593:17, 2593:22,
2594:5, 2594:6,
2594:15, 2597:17,
2599:7, 2602:24,
2603:4, 2604:12,
2604:13, 2604:16,
2604:22, 2605:7,
2605:9, 2605:25
**never** [7] - 2524:21,
2531:16, 2541:7,
2545:16, 2558:7,
2565:4, 2591:1
**New** [4] - 2512:16,
2512:22, 2513:7
**new** [6] - 2548:2,
2548:10, 2548:13,
2548:15, 2591:22
**news** [1] - 2572:21
**next** [17] - 2526:2,
2534:20, 2535:4,
2539:24, 2540:8,
2555:5, 2555:9,
2555:13, 2565:13,
2569:14, 2577:21,
2598:19, 2598:23,
2600:20, 2601:23,
2605:7
**nice** [2] - 2608:2,
2608:6
**none** [2] - 2540:20,
2581:15
**normal** [3] - 2518:7,
2541:24, 2588:21
**normally** [2] - 2523:3,

2566:15
**Northwest** [4] -
2512:16, 2512:22,
2513:12, 2513:15
**not-so-distant** [1] -
2567:25
**notes** [2] - 2515:25,
2518:18
**nothing** [14] -
2525:17, 2527:11,
2528:17, 2529:25,
2532:21, 2551:17,
2556:11, 2556:19,
2570:6, 2570:17,
2589:21, 2590:10,
2600:7
**November** [3] -
2512:10, 2596:6,
2597:4
**number** [25] -
2519:13, 2535:4,
2535:5, 2551:21,
2558:9, 2558:10,
2558:11, 2568:22,
2572:25, 2585:3,
2589:2, 2591:20,
2592:4, 2592:7,
2592:10, 2592:17,
2595:25, 2597:5,
2601:8, 2601:9,
2601:10, 2602:20,
2604:8, 2605:18
**Number** [2] - 2512:4,
2512:8
**numbers** [7] -
2536:15, 2573:18,
2574:5, 2574:16,
2581:20, 2592:12
**nutshell** [1] - 2582:15

## O

**oath** [1] - 2560:5
**objection** [2] - 2536:4,
2572:19
**objective** [4] -
2520:21, 2536:9,
2536:11, 2541:23
**obligations** [2] -
2565:17, 2588:20
**observable** [1] -
2574:9
**obvious** [1] - 2565:3
**obviously** [4] -
2520:25, 2529:11,
2551:19, 2574:12
**occasional** [1] -
2558:23
**occasionally** [1] -
2558:21

**October** [6] - 2541:14,
2548:13, 2605:13,
2607:1, 2607:6,
2609:8
**OF** [4] - 2512:1,
2512:12, 2609:1,
2609:9
**officer** [2] - 2529:20,
2552:19, 2552:20,
2564:1
**officers** [2] - 2577:14,
2577:15
**OFFICIAL** [1] - 2609:1
**Official** [1] - 2513:14
**official** [2] - 2527:19,
2588:25
**officials** [1] - 2545:7
**often** [2] - 2521:13,
2575:1
**old** [3] - 2515:8,
2548:13, 2600:25
**once** [4] - 2530:25,
2541:24, 2578:18,
2597:13
**one** [69] - 2518:3,
2520:16, 2520:24,
2521:2, 2524:18,
2530:12, 2532:2,
2532:4, 2533:1,
2534:6, 2536:11,
2536:15, 2539:8,
2539:10, 2540:3,
2540:4, 2540:9,
2541:17, 2542:1,
2542:20, 2542:22,
2544:10, 2545:3,
2545:6, 2546:9,
2546:11, 2546:13,
2550:10, 2551:16,
2552:14, 2554:10,
2554:16, 2557:19,
2557:22, 2557:24,
2560:6, 2565:13,
2567:11, 2568:7,
2569:14, 2572:9,
2572:23, 2574:4,
2574:18, 2576:13,
2588:9, 2588:18,
2590:12, 2590:16,
2592:5, 2594:12,
2594:14, 2594:20,
2594:22, 2597:4,
2597:25, 2599:2,
2602:6, 2602:25,
2606:21
**one's** [2] - 2558:24,
2590:3
**ones** [1] - 2532:3
**opening** [8] - 2518:23,
2521:6, 2522:21,

2536:17, 2576:15,
2589:16, 2591:2,
2591:22
**operate** [5] - 2521:25,
2522:3, 2542:2,
2584:16, 2587:25
**operating** [2] -
2534:18, 2588:22
**operations** [1] -
2541:24
**opinion** [3] - 2564:18,
2573:5, 2574:9
**opportunity** [1] -
2517:5
**opposed** [1] - 2553:9
**opposite** [17] - 2527:5,
2532:24, 2539:22,
2540:15, 2540:18,
2541:6, 2541:25,
2542:10, 2545:12,
2545:15, 2562:13,
2568:25, 2569:4,
2569:19, 2602:8
**option** [1] - 2534:24
**order** [5] - 2515:2,
2530:2, 2541:4,
2589:13, 2595:24
**original** [2] - 2521:20,
2553:13
**ought** [1] - 2522:16
**outcome** [1] - 2606:5
**outcomes** [1] -
2606:10
**outstanding** [2] -
2572:3, 2590:1
**overall** [1] - 2537:18
**overruled** [2] - 2536:5,
2572:20
**oversee** [1] - 2539:25
**oversight** [1] -
2539:15
**overview** [1] - 2527:24
**owe** [3] - 2550:1,
2577:6, 2578:11
**own** [6] - 2523:17,
2525:8, 2526:4,
2547:20, 2582:20,
2590:8
**owned** [2] - 2582:8,
2590:2
**owns** [3] - 2523:15,
2543:13, 2570:22

---

**P**

---

**P.A** [1] - 2513:2
**p.m** [4] - 2512:10,
2576:7, 2608:8
**pace** [1] - 2559:1
**package** [1] - 2582:16

**page** [2] - 2551:14,
2592:20
**pages** [2] - 2551:14
**paid** [16] - 2539:1,
2539:3, 2543:5,
2554:22, 2556:9,
2557:13, 2562:18,
2570:20, 2570:25,
2571:3, 2576:14,
2576:19, 2600:6,
2600:22
**panic** [6] - 2527:1,
2527:2, 2527:3,
2527:10, 2557:3,
2558:24
**panicking** [1] -
2558:25
**paper** [1] - 2566:21
**paragraph** [1] -
2589:24
**paragraphs** [2] -
2557:20, 2605:4
**part** [25] - 2517:8,
2518:21, 2519:1,
2520:11, 2520:20,
2530:15, 2535:8,
2535:20, 2537:15,
2548:1, 2549:2,
2553:8, 2554:19,
2555:18, 2560:21,
2585:25, 2586:10,
2586:11, 2588:13,
2591:6, 2592:21,
2592:22, 2593:10,
2596:7
**participants** [2] -
2535:8, 2535:11
**particular** [1] -
2593:21
**particularly** [1] -
2571:20
**parties** [2] - 2582:6,
2583:10
**parts** [1] - 2539:9
**party** [1] - 2520:17
**passed** [2] - 2515:25,
2579:8
**past** [2] - 2538:21,
2566:14
**patient** [2] - 2517:10,
2575:15
**pause** [2] - 2597:24,
2605:15
**pay** [50] - 2518:17,
2526:12, 2526:13,
2526:14, 2529:2,
2531:10, 2534:24,
2536:21, 2542:21,
2545:17, 2549:10,
2549:24, 2554:23,

2555:6, 2555:7,
2555:14, 2555:19,
2556:1, 2556:9,
2556:17, 2556:20,
2557:6, 2558:18,
2559:22, 2560:13,
2563:2, 2563:25,
2565:21, 2566:15,
2566:22, 2566:23,
2567:6, 2568:15,
2571:2, 2571:23,
2578:10, 2583:20,
2584:11, 2588:20,
2590:9, 2600:16,
2600:20, 2601:19,
2601:20, 2601:22,
2603:7
**paying** [1] - 2547:23
**payment** [11] -
2534:24, 2554:18,
2555:18, 2555:19,
2556:12, 2556:13,
2557:17, 2566:2,
2583:13, 2583:20,
2600:9
**payments** [4] -
2534:21, 2577:11,
2577:17, 2582:24
**pays** [1] - 2538:24
**penalties** [2] -
2595:23, 2595:24
**Pennsylvania** [1] -
2512:19
**penny** [1] - 2590:6
**people** [37] - 2519:1,
2521:7, 2521:9,
2522:10, 2526:25,
2527:1, 2528:7,
2532:19, 2533:11,
2533:19, 2533:21,
2533:23, 2534:4,
2535:12, 2538:21,
2538:23, 2542:14,
2542:23, 2545:23,
2550:17, 2551:6,
2551:21, 2552:21,
2553:9, 2557:2,
2557:3, 2562:4,
2567:10, 2571:20,
2571:21, 2572:7,
2581:14, 2582:22,
2583:2, 2584:11
**people's** [1] - 2537:23
**Pepsi** [1] - 2547:4
**per** [1] - 2602:17
**percent** [43] - 2523:8,
2523:12, 2523:14,
2524:4, 2524:9,
2525:3, 2525:9,
2526:12, 2529:2,

2531:10, 2531:14,
2531:17, 2545:21,
2546:5, 2546:24,
2549:10, 2549:16,
2549:24, 2549:25,
2555:10, 2555:11,
2556:1, 2556:8,
2556:15, 2556:17,
2556:21, 2558:4,
2558:18, 2559:5,
2560:13, 2571:1,
2573:12, 2573:14,
2578:10, 2599:13,
2599:15, 2600:3,
2600:12, 2601:17,
2601:21
**perfectly** [1] - 2597:25
**perhaps** [2] - 2578:15,
2598:13
**period** [2] - 2540:25,
2587:19
**periodic** [8] - 2568:10,
2568:15, 2568:16,
2568:17, 2568:20,
2599:16, 2599:18,
2600:4
**perpetuity** [2] -
2529:6, 2547:10
**person** [12] - 2527:21,
2528:3, 2528:4,
2528:5, 2539:14,
2539:25, 2553:2,
2553:6, 2554:10,
2566:23, 2567:15,
2570:11
**perspectives** [1] -
2519:8
**perverse** [1] - 2567:5
**Ph.D** [1] - 2577:25
**philosophy** [1] -
2550:21
**picture** [3] - 2542:5,
2551:10, 2571:14
**piece** [2] - 2528:14,
2566:21
**PIK** [1] - 2556:13
**place** [3] - 2524:18,
2553:17, 2578:17
**placed** [1] - 2578:6
**places** [1] - 2587:3
**Plaintiff** [1] - 2527:17
**plaintiff** [1] - 2543:3
**plaintiffs** [11] - 2515:7,
2517:3, 2517:5,
2517:6, 2517:11,
2518:1, 2529:7,
2536:1, 2543:8,
2591:7, 2593:16
**Plaintiffs** [3] - 2512:4,
2512:15, 2512:17

**plaintiffs'** [6] -
2593:20, 2598:3,
2598:6, 2598:10,
2598:14, 2598:17
**Plaintiffs'** [1] -
2558:14
**Plaintiffs...................
....** [1] - 2514:4
**plan** [4] - 2515:17,
2541:2, 2542:9,
2564:6
**Planet** [1] - 2562:3
**plans** [3] - 2547:18,
2547:19, 2547:20
**plant** [1] - 2591:23
**play** [4] - 2517:19,
2553:10, 2554:3,
2581:18
**played** [5] - 2517:18,
2554:4, 2581:17,
2581:18, 2584:9
**playing** [2] - 2562:7,
2570:10
**plenty** [1] - 2559:9
**PLLC** [1] - 2512:15
**plus** [2] - 2523:12,
2555:12
**point** [34] - 2516:16,
2522:5, 2523:2,
2523:15, 2523:24,
2524:17, 2527:10,
2532:17, 2535:4,
2536:9, 2536:23,
2539:10, 2546:15,
2550:22, 2553:6,
2554:10, 2556:4,
2557:25, 2562:6,
2564:7, 2564:8,
2564:25, 2565:3,
2569:6, 2575:17,
2576:13, 2577:15,
2590:12, 2590:25,
2591:14, 2594:12,
2596:2, 2607:18,
2607:19
**points** [2] - 2534:1,
2592:19
**policy** [2] - 2533:19,
2545:24
**politicians** [1] -
2537:22
**pool** [1] - 2583:11
**Porter** [1] - 2513:11
**portfolios** [1] - 2582:7
**position** [1] - 2547:8
**positive** [2] - 2534:16,
2605:7
**possibility** [4] -
2524:15, 2528:9,
2567:24, 2572:16

possible [2] - 2518:16, 2519:7
potential [8] - 2519:21, 2520:1, 2523:1, 2524:16, 2544:1, 2551:23, 2571:19, 2571:25
power [9] - 2519:19, 2519:24, 2520:17, 2520:18, 2521:7, 2521:23, 2522:2, 2522:11, 2547:8
powerful [2] - 2521:7, 2522:10
powers [1] - 2541:10
PR [3] - 2528:9, 2550:12, 2552:4
precise [1] - 2572:25
predecessor [1] - 2537:8
predict [2] - 2562:25, 2606:10
predicted [4] - 2531:13, 2563:15, 2568:3, 2568:5
predicting [1] - 2531:3
preference [15] - 2535:3, 2554:25, 2555:1, 2555:8, 2555:15, 2556:2, 2556:9, 2556:13, 2556:19, 2556:21, 2557:8, 2557:14, 2570:24, 2571:13, 2599:11
preferred [20] - 2521:21, 2523:6, 2534:2, 2536:11, 2536:25, 2553:13, 2555:2, 2557:8, 2557:10, 2573:20, 2573:21, 2573:23, 2574:14, 2574:15, 2587:11, 2589:14, 2590:1, 2598:24
PREFERRED [1] - 2512:9
prejudgment [3] - 2574:21, 2574:23, 2575:21
prepare [1] - 2530:9
prepared [4] - 2530:7, 2530:12, 2532:3, 2559:8
preparing [2] - 2534:1, 2534:12
present [2] - 2515:3, 2603:13
presentation [1] - 2543:21

presents [1] - 2541:20
preserve [6] - 2540:12, 2540:15, 2541:12, 2543:17, 2553:25, 2593:12
preserving [3] - 2593:17, 2594:7, 2594:9
pretend [2] - 2538:22, 2558:3
pretty [6] - 2518:15, 2524:7, 2540:11, 2542:12, 2555:17, 2566:9
prevented [1] - 2590:10
preview [1] - 2529:11
previous [1] - 2527:25
price [2] - 2572:6
prices [5] - 2562:20, 2563:17, 2563:19, 2566:1
primary [1] - 2585:5
principal [17] - 2528:10, 2550:11, 2550:12, 2550:13, 2550:19, 2550:23, 2550:24, 2551:3, 2551:5, 2551:7, 2551:13, 2551:15, 2551:23, 2552:5, 2555:1, 2562:17, 2583:13
principally [1] - 2605:24
priority [1] - 2550:19
private [14] - 2519:20, 2520:1, 2520:7, 2522:4, 2522:9, 2523:7, 2523:19, 2537:11, 2538:1, 2538:2, 2538:13, 2543:25, 2586:23
problem [28] - 2526:15, 2530:17, 2530:20, 2532:7, 2532:8, 2533:3, 2534:11, 2535:14, 2548:5, 2549:4, 2550:7, 2552:18, 2555:22, 2555:23, 2556:25, 2558:20, 2559:2, 2562:9, 2562:21, 2562:22, 2562:23, 2600:14, 2600:22, 2601:18, 2602:6, 2603:6, 2607:12
problems [2] - 2531:23, 2606:21

proceed [2] - 2517:11, 2576:10
Proceedings [2] - 2513:18, 2608:8
proceedings [1] - 2609:4
process [6] - 2518:16, 2519:2, 2539:14, 2541:22, 2544:13, 2547:14
produced [2] - 2513:18, 2551:6
Professor [12] - 2529:15, 2530:22, 2531:4, 2539:17, 2560:1, 2562:10, 2562:15, 2563:11, 2564:14, 2573:3
profit [1] - 2590:7
profit's [1] - 2564:13
profitability [1] - 2567:23
profitable [4] - 2523:16, 2565:7, 2567:20, 2569:13
profits [7] - 2524:1, 2524:4, 2531:10, 2531:16, 2545:21, 2546:5, 2562:12, 2563:9, 2564:11, 2566:16, 2567:24, 2579:13, 2585:9
project [1] - 2531:9
projected [1] - 2564:10
projecting [2] - 2531:19, 2607:7
projection [2] - 2607:1, 2607:6
projections [21] - 2529:12, 2529:21, 2530:16, 2531:5, 2531:7, 2535:6, 2547:17, 2547:20, 2548:8, 2548:11, 2548:13, 2549:5, 2552:17, 2559:25, 2560:2, 2562:9, 2563:13, 2566:6, 2605:12, 2605:13, 2605:20
promise [3] - 2547:10, 2552:4, 2599:17
promised [1] - 2564:24
promises [1] - 2566:22
promptly [1] - 2576:2
proof [2] - 2517:6, 2533:2

property [3] - 2540:13, 2540:15, 2593:13
proposition [1] - 2586:10
pros [3] - 2525:15, 2546:19, 2546:25
protect [11] - 2578:7, 2579:8, 2579:9, 2579:12, 2579:20, 2579:21, 2579:25, 2580:18, 2581:3, 2586:12, 2597:18
protected [1] - 2579:17
protecting [1] - 2597:3
proud [1] - 2551:18
prove [1] - 2544:17
proved [2] - 2544:10, 2574:11
provide [4] - 2535:6, 2542:1, 2585:7, 2585:11
provided [1] - 2527:24
provision [6] - 2549:5, 2549:8, 2549:18, 2555:9, 2585:23, 2591:9
Prussia [1] - 2512:19
PSPA [2] - 2534:7, 2587:15
PSPAs [4] - 2528:12, 2587:12, 2599:1, 2603:14
public [45] - 2518:19, 2518:21, 2521:24, 2522:2, 2522:9, 2531:13, 2533:14, 2537:21, 2537:24, 2537:25, 2538:23, 2540:20, 2553:23, 2578:5, 2578:8, 2579:8, 2579:12, 2579:22, 2579:25, 2580:16, 2580:19, 2580:22, 2581:3, 2584:23, 2585:2, 2585:19, 2586:7, 2586:12, 2586:15, 2586:17, 2586:22, 2586:23, 2586:25, 2587:4, 2590:21, 2590:22, 2595:10, 2596:11, 2597:3, 2597:10, 2597:15, 2597:18, 2597:21, 2598:15, 2598:16
pull [1] - 2602:20
pumped [1] - 2579:11
purchase [4] -

2521:21, 2534:3, 2553:13, 2587:11
PURCHASE [1] - 2512:9
purchased [1] - 2583:11
pure [1] - 2571:5
purpose [5] - 2540:1, 2540:11, 2585:5, 2593:12, 2594:4
purposes [1] - 2587:13
put [23] - 2515:5, 2515:6, 2518:8, 2520:3, 2521:19, 2538:2, 2539:16, 2540:13, 2541:11, 2552:4, 2552:12, 2553:8, 2581:14, 2584:14, 2584:15, 2586:14, 2586:22, 2587:3, 2588:3, 2588:7, 2588:10, 2593:13, 2598:4
putting [2] - 2539:22, 2596:8
PX-160 [1] - 2563:22
PX-205 [3] - 2527:16, 2545:1, 2559:13
PX-211 [2] - 2565:13, 2565:23
PX-213 [1] - 2566:6
PX-23 [1] - 2529:18
PX-245 [1] - 2567:12
PX-259 [1] - 2567:13
PX-2C [1] - 2539:6
PX-33 [1] - 2557:19
PX-34 [1] - 2557:19
PX-4F [1] - 2536:16
PX-500 [1] - 2551:10

## Q

quarter [23] - 2539:2, 2539:3, 2546:4, 2550:5, 2562:12, 2562:13, 2567:8, 2568:4, 2577:2, 2577:3, 2595:12, 2596:6, 2601:14, 2602:23, 2603:4, 2603:5, 2603:21, 2603:22, 2604:14, 2604:17, 2604:18, 2605:1
quarterly [2] - 2595:16, 2597:9
quarters [9] - 2555:9, 2577:2, 2577:9, 2601:15, 2602:22,

2603:1, 2604:21,
2605:8, 2605:9
**questions** [11] -
2518:10, 2519:14,
2534:3, 2534:4,
2534:6, 2550:11,
2572:24, 2574:19,
2592:8, 2605:19,
2606:15
**quickly** [7] - 2524:13,
2527:9, 2542:12,
2543:22, 2545:20,
2546:7, 2568:22
**quite** [6] - 2518:24,
2551:21, 2559:20,
2560:16, 2560:17,
2561:3
**quote** [1] - 2585:25

## R

**Radnor** [1] - 2512:19
**raise** [1] - 2608:3
**raised** [1] - 2528:9
**raising** [1] - 2538:12
**ran** [2] - 2584:12,
2607:3
**rapid** [1] - 2559:1
**rate** [4] - 2549:15,
2554:22, 2555:10,
2556:14
**re** [1] - 2512:8
**reached** [1] - 2516:16
**react** [1] - 2570:12
**read** [11] - 2515:6,
2515:11, 2518:12,
2529:7, 2529:8,
2538:5, 2539:11,
2539:12, 2557:20,
2557:21, 2607:24
**reading** [1] - 2564:3
**ready** [3] - 2533:13,
2533:16, 2566:25
**real** [6] - 2532:4,
2532:24, 2535:17,
2542:14, 2550:22,
2601:13
**realize** [1] - 2542:15
**really** [13] - 2519:4,
2527:3, 2532:23,
2535:8, 2536:19,
2545:14, 2545:19,
2550:18, 2552:4,
2552:5, 2559:24,
2561:5, 2570:11
**rearview** [1] - 2578:2
**reason** [36] - 2520:6,
2521:14, 2522:13,
2525:16, 2526:5,
2526:9, 2526:15,

2528:20, 2529:4,
2532:24, 2535:17,
2535:18, 2544:18,
2544:22, 2544:24,
2545:8, 2545:9,
2555:6, 2556:22,
2558:9, 2558:10,
2558:11, 2559:24,
2566:9, 2566:10,
2566:11, 2568:8,
2568:9, 2568:12,
2568:22, 2569:4,
2569:20, 2580:6
**reasonable** [27] -
2520:20, 2522:8,
2530:6, 2535:19,
2535:23, 2536:9,
2537:16, 2538:20,
2539:6, 2542:7,
2542:10, 2542:13,
2548:1, 2549:3,
2564:19, 2564:22,
2565:1, 2580:1,
2580:4, 2580:21,
2581:4, 2590:15,
2590:17, 2590:20,
2595:5, 2596:11
**reasonableness** [1] -
2593:8
**reasonably** [11] -
2520:20, 2520:22,
2564:15, 2579:25,
2580:3, 2580:22,
2581:2, 2586:9,
2591:16, 2597:19,
2597:21
**reasons** [4] - 2528:20,
2535:15, 2544:4,
2551:13
**rebuild** [1] - 2523:16
**rebuttal** [1] - 2517:5
**receive** [5] - 2519:21,
2520:1, 2523:2,
2534:3, 2544:1
**received** [4] - 2517:15,
2517:17, 2517:22,
2537:12
**recently** [1] - 2533:1
**recess** [3] - 2575:24,
2576:1, 2576:3
**Recess** [1] - 2576:7
**record** [6] - 2524:1,
2533:14, 2545:14,
2548:2, 2609:4
**recorded** [1] - 2513:18
**recording** [3] -
2554:4, 2559:15,
2567:16
**recovered** [2] - 2524:6
**recovery** [2] - 2549:6,

2565:11
**Recovery** [1] -
2580:15
**red** [5] - 2571:14,
2599:10, 2603:20,
2603:22, 2604:15
**redline** [1] - 2533:25
**reduction** [14] -
2528:10, 2550:11,
2550:12, 2550:13,
2550:20, 2550:24,
2550:25, 2551:4,
2551:5, 2551:7,
2551:13, 2551:16,
2552:5, 2566:1
**refer** [1] - 2592:9
**reference** [2] -
2517:16, 2528:9
**referred** [4] - 2582:3,
2598:25, 2599:1,
2599:16
**reflects** [2] - 2564:7,
2567:14
**refused** [1] - 2552:6
**refutation** [1] - 2529:4
**regard** [1] - 2522:6
**regulated** [1] - 2586:3
**regulator** [3] - 2537:8,
2538:17, 2554:7
**regulators** [3] -
2538:7, 2538:11,
2538:19
**rejected** [1] - 2558:4
**relate** [1] - 2546:11
**related** [1] - 2564:9
**relevant** [6] - 2537:10,
2537:18, 2538:4,
2538:19, 2570:2,
2570:9
**reliable** [2] - 2530:6,
2530:11
**relied** [3] - 2529:17,
2529:18
**remain** [1] - 2590:1
**remained** [1] - 2572:2
**remains** [1] - 2572:15
**remarks** [1] - 2599:19
**remedied** [1] - 2575:8
**remedy** [3] - 2521:11,
2521:14, 2575:8
**remember** [20] -
2522:20, 2530:18,
2547:5, 2547:19,
2548:3, 2548:5,
2550:9, 2550:11,
2551:11, 2559:7,
2569:7, 2573:19,
2581:20, 2582:13,
2582:14, 2582:19,
2583:17, 2589:16,

2594:22, 2598:19
**remind** [1] - 2526:5
**renegotiate** [1] -
2570:16
**renumbering** [1] -
2515:8
**rep** [1] - 2543:1
**repay** [6] - 2555:15,
2555:16, 2555:17,
2555:20, 2556:12,
2565:8
**repeating** [1] - 2598:1
**replaced** [2] - 2524:9,
2604:10
**repeating** [1] - 2598:1
**reported** [1] - 2564:1
**REPORTER** [2] -
2609:1, 2609:9
**Reporter** [1] - 2513:14
**reports** [5] - 2529:1,
2545:1, 2595:14,
2595:16, 2595:17
**represent** [3] -
2522:25, 2542:23,
2574:12
**representing** [2] -
2515:23, 2553:22
**represents** [1] -
2530:23
**request** [4] - 2566:3,
2592:15, 2592:16
**required** [2] - 2521:25,
2534:20
**reserve** [2] - 2515:20,
2515:21
**residential** [2] -
2585:8, 2585:12
**resist** [1] - 2551:3
**resolve** [3] - 2518:25,
2519:1, 2519:10
**resources** [1] - 2562:2
**respect** [1] - 2594:13
**responds** [1] -
2569:11
**responsibility** [13] -
2578:6, 2578:7,
2586:11, 2586:12,
2586:14, 2586:19,
2586:22, 2587:4,
2597:14, 2598:20,
2606:8, 2607:12
**responsible** [1] -
2582:1
**rest** [2] - 2517:8,
2543:20
**restore** [4] - 2541:2,
2589:5, 2589:10,
2592:24
**resulted** [2] - 2524:25
**results** [1] - 2551:24
**retire** [2] - 2517:13,

2517:23
**return** [4] - 2541:24,
2583:7, 2597:22,
2599:24
**returned** [1] - 2542:4
**returns** [8] - 2522:1,
2522:4, 2580:19,
2596:24, 2597:2,
2597:8, 2597:13,
2598:9
**revenue** [1] - 2562:17
**revenues** [4] -
2528:21, 2529:2,
2559:22, 2560:12
**review** [3] - 2533:18,
2581:6, 2588:9
**revise** [1] - 2533:18
**RICHARD** [1] - 2513:5
**ridiculous** [1] -
2568:11
**right-hand** [1] -
2522:24
**rights** [5] - 2519:21,
2519:25, 2522:7,
2522:8, 2524:12
**rise** [1] - 2600:13
**risk** [6] - 2529:13,
2529:23, 2540:19,
2566:23, 2589:7,
2593:1
**Road** [1] - 2512:19
**road** [2] - 2523:21,
2607:13
**roaring** [2] - 2549:6,
2565:11
**ROBERT** [2] - 2513:5,
2513:11
**role** [3] - 2544:2,
2581:16, 2584:9
**Room** [1] - 2513:16
**room** [5] - 2517:16,
2517:21, 2517:22,
2585:25, 2592:14
**Ross** [1] - 2552:19
**ROYCE** [1] - 2512:12
**RPR** [1] - 2513:14
**RUDY** [1] - 2512:17
**run** [2] - 2528:14,
2547:22
**running** [4] - 2548:7,
2554:11, 2587:19,
2605:6
**rush** [1] - 2528:17,
2528:18, 2544:14,
2545:20, 2550:3

## S

**safe** [7] - 2538:24,
2540:7, 2541:3,

2541:8, 2593:25,
2594:8, 2594:10
**safety** [2] - 2580:23,
2580:24
**said'** [1] - 2561:22
**saints** [1] - 2538:22
**SAMUEL** [1] - 2512:21
**SARA** [1] - 2513:14
**Sara** [2] - 2609:3,
2609:8
**Satriano** [1] - 2569:10
**saw** [25] - 2518:18,
2524:2, 2524:25,
2525:13, 2526:6,
2527:15, 2527:18,
2529:15, 2529:16,
2530:21, 2553:6,
2554:17, 2562:5,
2562:10, 2563:9,
2564:2, 2569:7,
2581:21, 2588:25,
2591:4, 2591:9,
2595:16, 2595:18,
2602:15
**scenario** [12] -
2549:14, 2577:20,
2605:14, 2605:23,
2606:2, 2606:4,
2606:5, 2606:6,
2606:7, 2606:13,
2607:2
**scenarios** [1] -
2605:22
**Schiller** [1] - 2512:22
**Scholer** [1] - 2513:11
**screen** [2] - 2520:3,
2588:10
**seated** [1] - 2576:9
**Second** [4] - 2603:13,
2603:17, 2603:18,
2603:25
**second** [10] - 2520:22,
2523:4, 2528:11,
2544:15, 2544:22,
2546:4, 2547:1,
2562:13, 2567:8,
2592:22
**secondary** [7] -
2578:3, 2582:12,
2583:15, 2585:7,
2585:11, 2585:12,
2587:2
**secret** [1] - 2596:25
**Secretary** [12] -
2527:24, 2528:1,
2528:8, 2533:13,
2545:8, 2552:3,
2559:8, 2559:14,
2559:16, 2559:17,
2560:11

**section** [2] - 2534:2,
2586:2
**Securities** [3] -
2577:13, 2595:14,
2595:21
**securities** [17] -
2527:1, 2527:6,
2531:22, 2579:20,
2582:17, 2582:18,
2582:23, 2583:12,
2583:14, 2584:3,
2584:4, 2595:11,
2595:13, 2596:4,
2596:10, 2599:6,
2602:12
**securitize** [1] -
2562:18
**security** [2] - 2535:12,
2556:5, 2603:12
**see** [48] - 2517:20,
2520:3, 2520:5,
2522:21, 2524:3,
2525:14, 2525:19,
2526:2, 2527:7,
2527:12, 2532:1,
2532:13, 2532:21,
2533:20, 2536:16,
2550:3, 2550:7,
2554:2, 2558:6,
2560:3, 2561:5,
2561:20, 2561:22,
2568:24, 2571:17,
2574:2, 2574:18,
2576:5, 2582:3,
2582:6, 2583:9,
2585:24, 2588:23,
2592:14, 2596:5,
2596:13, 2597:5,
2603:1, 2603:3,
2604:25, 2605:5,
2605:7, 2605:16,
2607:23, 2607:25,
2608:3
**seem** [1] - 2563:25
**sees** [2] - 2528:11,
2607:13
**sell** [6] - 2562:18,
2582:15, 2582:17,
2590:5, 2590:6,
2590:9
**selling** [3] - 2571:22,
2572:7, 2590:11
**send** [2] - 2515:9,
2565:9
**sending** [3] - 2517:13,
2525:1, 2533:19
**SENIOR** [1] - 2512:9
**senior** [9] - 2523:6,
2527:21, 2541:17,
2542:19, 2555:2,

2557:8, 2557:10,
2573:22, 2598:24
**sense** [11] - 2525:16,
2530:21, 2544:25,
2545:9, 2554:5,
2558:11, 2564:23,
2568:14, 2569:16,
2573:12, 2574:8
**sent** [6] - 2529:18,
2530:3, 2530:4,
2530:7, 2546:22,
2551:12
**sentence** [12] -
2515:6, 2534:20,
2540:10, 2540:11,
2565:15, 2565:19,
2569:14, 2590:13,
2592:23, 2593:11,
2593:22
**sentences** [1] -
2569:15
**separate** [2] - 2587:3,
2593:4
**September** [18] -
2539:4, 2541:1,
2565:9, 2580:13,
2587:19, 2588:6,
2588:17, 2588:24,
2589:1, 2589:18,
2592:3, 2596:6,
2596:22, 2597:24,
2598:11, 2600:25,
2601:7, 2601:12
**serious** [4] - 2530:20,
2533:4, 2584:16,
2595:22
**servant** [2] - 2578:5,
2590:21
**service** [4] - 2518:19,
2518:21, 2574:3,
2576:22
**SESSION** [1] -
2512:12
**set** [3] - 2548:10,
2587:8, 2604:11
**setup** [1] - 2551:9
**seven** [1] - 2528:13
**Seventh** [1] - 2513:3
**share** [1] - 2590:2
**shared** [1] - 2559:4
**shareholder** [26] -
2522:1, 2522:4,
2524:17, 2554:20,
2557:9, 2579:24,
2580:2, 2580:4,
2580:10, 2580:21,
2584:13, 2589:17,
2591:15, 2591:24,
2591:25, 2595:2,
2596:11, 2596:17,

2596:19, 2596:24,
2597:7, 2597:11,
2597:20, 2597:22,
2598:7
**shareholder's** [1] -
2595:5
**shareholders** [34] -
2520:1, 2520:7,
2522:24, 2522:25,
2523:7, 2523:19,
2535:24, 2535:25,
2536:11, 2537:1,
2538:14, 2538:25,
2542:4, 2542:12,
2543:25, 2574:12,
2575:4, 2579:13,
2580:10, 2580:17,
2580:19, 2580:20,
2581:5, 2582:20,
2585:9, 2585:10,
2586:16, 2586:23,
2589:10, 2590:11,
2591:1, 2591:6,
2596:14, 2596:18
**shareholders'** [4] -
2519:20, 2587:20,
2597:2, 2601:1
**Sharepoint** [1] -
2533:18
**shares** [8] - 2542:21,
2542:22, 2543:2,
2543:14, 2573:19,
2575:3, 2582:21,
2587:20
**sheet** [2] - 2566:24,
2592:10
**Shiller** [1] - 2563:19
**short** [2] - 2554:11,
2575:24
**shortfall** [2] - 2531:17,
2549:25
**shorthand** [1] -
2513:18
**shoulders** [1] - 2578:7
**show** [26] - 2526:1,
2529:8, 2529:23,
2530:12, 2530:18,
2530:19, 2530:22,
2532:7, 2532:22,
2532:23, 2533:8,
2539:9, 2545:13,
2548:2, 2548:23,
2553:7, 2555:23,
2558:2, 2560:2,
2566:9, 2569:23,
2572:25, 2589:17,
2605:9, 2607:6
**showed** [16] -
2553:11, 2559:7,
2560:1, 2560:8,

2560:18, 2564:14,
2571:5, 2573:2,
2574:13, 2580:2,
2581:2, 2582:12,
2583:1, 2587:16,
2589:19, 2605:20
**showing** [10] -
2528:22, 2529:13,
2530:16, 2532:5,
2533:10, 2540:9,
2546:5, 2552:18,
2560:1, 2573:16
**shown** [9] - 2529:19,
2530:13, 2530:16,
2532:5, 2537:13,
2544:3, 2544:5,
2546:17, 2548:23
**shows** [10] - 2519:6,
2521:8, 2522:12,
2531:25, 2538:18,
2547:13, 2554:14,
2567:12, 2571:8,
2573:18
**shrink** [7] - 2526:11,
2526:16, 2526:24,
2527:8, 2527:9,
2528:7
**shrinking** [1] -
2568:13
**shrinks** [1] - 2578:20
**shut** [1] - 2607:4
**side** [8] - 2520:16,
2520:20, 2522:24,
2529:16, 2539:10,
2553:14, 2557:15,
2557:16
**sides** [1] - 2518:16
**sign** [3] - 2515:9,
2554:9, 2558:24
**SIGNATURE** [1] -
2609:9
**signed** [6] - 2527:23,
2528:13, 2546:7,
2554:9, 2577:13,
2595:22
**signing** [1] - 2548:17
**similar** [3] - 2532:2,
2532:4, 2544:8
**simple** [3] - 2524:21,
2574:25, 2575:5
**single** [15] - 2525:15,
2527:7, 2546:18,
2546:25, 2570:13,
2570:14, 2578:18,
2601:14, 2602:23,
2603:4, 2603:5,
2604:17
**sit** [2] - 2522:17,
2526:1
**sits** [2] - 2557:10,

2557:14
**situation** [2] - 2584:16, 2599:8
**six** [2] - 2533:24, 2553:17
**skip** [7] - 2566:7, 2566:8, 2568:10, 2571:7, 2572:24, 2574:19
**skipped** [1] - 2575:16
**sleepy** [1] - 2528:18
**slide** [20] - 2522:15, 2522:20, 2525:18, 2527:18, 2529:15, 2532:11, 2533:7, 2535:15, 2535:22, 2555:21, 2566:11, 2568:22, 2569:23, 2584:14, 2588:12, 2590:12, 2591:12, 2594:23, 2606:14
**slides** [9] - 2530:19, 2530:21, 2537:13, 2541:19, 2546:15, 2568:10, 2569:22, 2575:16, 2582:14
**small** [1] - 2543:14
**smart** [2] - 2532:19, 2552:21
**sold** [1] - 2557:13
**sole** [2] - 2528:5, 2591:17
**solution** [3] - 2548:5, 2556:24, 2557:17
**solve** [1] - 2532:8
**solved** [1] - 2532:8
**solvent** [16] - 2539:16, 2539:17, 2539:21, 2539:23, 2540:7, 2540:14, 2540:17, 2541:3, 2541:8, 2541:12, 2543:18, 2593:14, 2593:25, 2594:8, 2594:10, 2594:16
**solving** [1] - 2558:21
**someone** [3] - 2545:6, 2547:21, 2566:21
**sometimes** [11] - 2518:15, 2521:14, 2523:9, 2531:11, 2531:12, 2531:15, 2547:2, 2570:10, 2598:25, 2599:1
**soon** [2] - 2516:8, 2567:21
**sophisticated** [2] - 2542:20, 2543:11
**sorry** [3] - 2526:13, 2561:16, 2566:11

**sort** [1] - 2551:11
**sorts** [2] - 2538:25, 2544:4
**sound** [8] - 2539:16, 2539:23, 2540:13, 2540:17, 2541:11, 2573:5, 2573:15, 2593:14
**sounds** [2] - 2573:6, 2593:3
**source** [1] - 2562:17
**space** [1] - 2531:21
**special** [1] - 2553:5
**speech** [2] - 2541:19, 2541:20
**speed** [1] - 2554:12
**spend** [5] - 2547:6, 2568:9, 2571:17, 2599:17, 2599:18
**spent** [2] - 2546:24, 2553:17
**spin** [1] - 2546:6
**split** [1] - 2515:16
**sponsored** [2] - 2537:19, 2585:6
**spooked** [1] - 2532:17
**SPSPAs** [1] - 2598:25
**St** [1] - 2542:18
**stability** [4] - 2580:23, 2580:24, 2585:7, 2585:11
**stabilize** [1] - 2541:22
**stabilized** [2] - 2541:24, 2542:3
**stable** [1] - 2539:1
**stage** [1] - 2604:11
**stand** [2] - 2529:10, 2603:11
**standard** [1] - 2520:21
**stark** [2] - 2552:1, 2552:2
**start** [5] - 2517:1, 2517:3, 2545:22, 2586:9, 2600:2
**started** [4] - 2537:5, 2567:1, 2581:9, 2587:14
**starting** [2] - 2523:25, 2537:7
**state** [1] - 2543:1
**Statement** [4] - 2514:4, 2514:5, 2582:5, 2583:7
**statement** [11] - 2521:6, 2576:15, 2582:6, 2583:9, 2583:10, 2588:25, 2589:3, 2589:12, 2589:16, 2589:24, 2593:5

**statements** [1] - 2540:19
**STATES** [2] - 2512:1, 2512:13
**States** [13] - 2513:14, 2530:10, 2530:11, 2530:24, 2578:4, 2578:25, 2579:3, 2580:24, 2580:25, 2581:12, 2603:11, 2603:19, 2603:23
**statute** [1] - 2585:24
**statutes** [1] - 2542:1
**statutory** [1] - 2541:22
**stay** [1] - 2604:19
**stayed** [1] - 2524:18
**Stegman** [2] - 2527:20, 2559:14
**Stegman's** [1] - 2533:20
**stenotype** [1] - 2513:18
**step** [2] - 2547:1, 2583:20
**stepped** [1] - 2580:8
**STERN** [3] - 2513:9, 2515:16, 2516:3, 2516:7, 2536:4, 2572:19, 2576:11, 2607:20, 2608:5
**Stern** [6] - 2516:1, 2518:4, 2519:5, 2536:17, 2575:23, 2576:10
**still** [6] - 2525:5, 2525:9, 2543:2, 2556:18, 2571:14, 2571:15
**stipulate** [1] - 2574:5
**stipulated** [3] - 2573:8, 2573:9, 2573:25
**stipulation** [4] - 2537:4, 2574:1, 2574:16, 2582:4
**stock** [31] - 2521:21, 2523:2, 2523:7, 2523:14, 2525:8, 2534:2, 2553:13, 2555:2, 2557:10, 2571:20, 2572:2, 2572:6, 2572:16, 2573:2, 2573:7, 2573:8, 2575:20, 2587:11, 2589:14, 2590:1, 2590:3, 2590:4, 2590:9, 2590:11, 2591:5, 2598:24
**STOCK** [1] - 2512:9

**stocks** [1] - 2542:21
**stood** [1] - 2579:19
**stop** [3] - 2516:22, 2516:25, 2604:8
**stops** [1] - 2579:6
**straight** [2] - 2516:11, 2516:13
**strangely** [1] - 2565:8
**strategy** [4] - 2596:24, 2597:7, 2597:12, 2598:8
**Street** [1] - 2513:3
**stress** [10] - 2534:15, 2552:14, 2577:19, 2605:14, 2605:15, 2605:16, 2606:5, 2606:6, 2606:12, 2607:2
**strict** [1] - 2515:23
**strongly** [1] - 2551:19
**structural** [1] - 2562:16
**structure** [2] - 2522:21, 2543:20
**struggling** [1] - 2550:14
**student** [1] - 2550:15
**studies** [7] - 2525:13, 2544:13, 2548:25, 2550:7, 2551:1, 2551:2, 2573:3
**study** [7] - 2532:18, 2532:19, 2532:20, 2547:11, 2547:21, 2573:4, 2573:25
**stuff** [2] - 2563:17, 2565:23
**subject** [1] - 2576:18
**subjective** [2] - 2535:24, 2542:13
**submit** [7] - 2545:13, 2562:6, 2574:7, 2581:1, 2590:19, 2590:25, 2593:7
**subset** [2] - 2537:1, 2537:2
**substantial** [1] - 2535:7
**substantially** [1] - 2565:8
**successful** [1] - 2594:17
**sudden** [1] - 2546:6
**suffered** [2] - 2574:11, 2574:12
**suffering** [1] - 2601:18
**sufficient** [1] - 2565:16
**suggest** [2] - 2590:14, 2590:16

**suggesting** [1] - 2549:6
**suggestion** [1] - 2602:3
**suing** [1] - 2543:19
**summarize** [1] - 2519:5
**summary** [2] - 2536:13, 2571:5
**summer** [2] - 2531:2, 2537:5
**super** [1] - 2542:20
**support** [4] - 2537:23, 2585:16, 2587:1, 2587:8
**supporting** [1] - 2588:15
**supports** [1] - 2545:14
**supposed** [9] - 2529:13, 2536:20, 2549:4, 2550:7, 2553:15, 2553:21, 2553:24, 2574:25
**surprised** [1] - 2565:11
**Susan** [7] - 2529:19, 2539:2, 2552:18, 2563:24, 2564:2, 2567:9, 2567:22
**sustainable** [2] - 2567:23, 2567:24
**sweep** [66] - 2519:18, 2519:23, 2524:23, 2527:23, 2528:3, 2532:9, 2533:6, 2539:22, 2540:16, 2540:18, 2541:6, 2541:7, 2541:8, 2541:15, 2541:25, 2542:6, 2542:9, 2543:23, 2546:7, 2546:19, 2547:16, 2547:24, 2548:11, 2548:18, 2549:9, 2549:20, 2550:25, 2551:2, 2551:8, 2551:17, 2552:1, 2552:25, 2555:24, 2564:16, 2564:25, 2565:5, 2569:9, 2569:24, 2570:4, 2570:5, 2570:7, 2571:4, 2572:1, 2572:5, 2572:9, 2572:13, 2572:14, 2572:15, 2572:16, 2572:17, 2573:11, 2573:16, 2574:7, 2581:3, 2581:10, 2589:22, 2591:8,

2593:17, 2593:22,
2594:5, 2594:6,
2594:15, 2597:18,
2604:12, 2605:25
**sweeping** [1] - 2525:6
**sweeps** [1] - 2540:16
**sworn** [5] - 2526:7,
2543:15, 2558:13,
2560:5, 2564:3
**system** [6] - 2518:23,
2518:25, 2521:12,
2527:3, 2540:22,
2606:9
**systemic** [3] -
2540:19, 2589:6,
2593:1

## T

**tables** [1] - 2576:20
**Tagoe** [4] - 2532:19,
2548:8, 2548:10,
2552:13
**talks** [1] - 2565:14
**tanked** [1] - 2563:6
**target** [1] - 2515:24
**task** [1] - 2516:12
**tax** [5] - 2550:5,
2566:13, 2567:17,
2568:1, 2569:12
**taxes** [2] - 2566:15,
2590:8
**taxpayer** [5] -
2579:10, 2580:8,
2601:5, 2603:19,
2604:18
**tea** [1] - 2547:3
**team** [2] - 2518:4
**technical** [1] - 2540:5
**technically** [1] -
2543:8
**ten** [9] - 2531:19,
2532:6, 2539:12,
2574:24, 2575:6,
2575:7, 2576:1,
2576:5, 2576:24
**ten-minute** [1] -
2576:1
**term** [7] - 2539:18,
2577:17, 2591:5,
2596:17, 2596:20,
2597:22, 2598:7
**terminating** [1] -
2541:4
**terms** [4] - 2515:22,
2521:20, 2550:23,
2551:23
**test** [4] - 2520:24,
2521:2, 2534:15,
2552:14

**testified** [6] - 2536:8,
2551:18, 2553:16,
2560:4, 2567:9,
2587:23
**testifies** [1] - 2534:1
**testify** [4] - 2533:14,
2559:8, 2562:5,
2586:16
**testifying** [1] -
2533:12
**testimony** [24] -
2524:20, 2529:16,
2534:23, 2538:4,
2538:6, 2543:16,
2552:23, 2553:11,
2561:13, 2561:20,
2562:6, 2564:3,
2564:4, 2564:15,
2565:1, 2568:19,
2581:23, 2582:13,
2583:17, 2584:20,
2584:22, 2588:13,
2593:18, 2606:12
**text** [1] - 2515:10
**TFG** [1] - 2533:11
**Thakor** [1] - 2568:19
**THE** [15] - 2512:1,
2512:1, 2512:12,
2515:4, 2515:19,
2516:8, 2516:15,
2536:5, 2572:20,
2576:1, 2576:9,
2607:19, 2607:21,
2608:2, 2608:6
**themselves** [1] -
2565:10
**thereby** [2] - 2519:20,
2560:13
**therefore** [1] - 2591:16
**they've** [4] - 2532:24,
2535:17, 2569:4,
2569:19
**thinking** [6] - 2516:3,
2558:2, 2570:11,
2593:7, 2605:24,
2606:3
**third** [4] - 2545:11,
2581:25, 2595:12,
2596:6
**Third** [16] - 2524:8,
2552:5, 2581:3,
2581:9, 2587:14,
2589:18, 2589:21,
2591:8, 2593:16,
2593:21, 2594:4,
2594:15, 2594:18,
2597:17, 2598:12,
2604:12
**third-largest** [1] -
2581:25

**thirds** [1] - 2537:2
**thousand** [1] - 2543:1
**thousands** [1] -
2542:15
**threat** [1] - 2600:23
**threaten** [2] - 2606:23,
2606:24
**three** [11] - 2526:3,
2544:2, 2544:10,
2546:9, 2551:14,
2568:9, 2572:6,
2573:18, 2577:3,
2577:21, 2605:22
**three-page** [1] -
2551:14
**thrilling** [1] - 2576:19
**thrown** [2] - 2519:12,
2558:16
**ticking** [1] - 2578:16
**tight** [1] - 2542:11
**Tim** [3] - 2530:4,
2535:13, 2542:25
**timing** [1] - 2515:22
**Timothy** [4] - 2528:1,
2533:12, 2533:20,
2534:1
**tiny** [1] - 2531:3
**title** [1] - 2582:5
**titles** [1] - 2515:10
**today** [10] - 2515:25,
2516:4, 2516:10,
2516:23, 2517:8,
2519:3, 2519:4,
2524:3, 2561:15,
2581:19
**together** [7] - 2515:5,
2516:9, 2543:10,
2581:7, 2587:8,
2596:9, 2604:14
**tomorrow** [13] -
2515:20, 2515:21,
2516:5, 2516:12,
2516:21, 2517:1,
2517:4, 2517:8,
2519:4, 2607:5,
2607:23, 2607:25,
2608:4
**took** [6] - 2563:4,
2579:16, 2579:18,
2579:20, 2579:23,
2600:1
**top** [8] - 2538:17,
2545:6, 2586:17,
2592:9, 2592:20,
2596:5, 2596:15,
2603:1
**Topaz** [1] - 2512:18
**topic** [3] - 2533:17,
2596:15, 2596:17
**total** [7] - 2516:6,

2516:7, 2536:24,
2556:24, 2557:17,
2571:9, 2602:17
**totally** [3] - 2524:22,
2542:5, 2542:9
**tough** [3] - 2551:3,
2552:3, 2552:10
**trading** [2] - 2571:21,
2572:6
**transact** [1] - 2588:19
**transcript** [1] - 2609:4
**TRANSCRIPT** [1] -
2512:12
**Transcript** [1] -
2513:18
**transcription** [1] -
2513:18
**transfer** [1] - 2547:10
**transferred** [1] -
2571:12
**Treasury** [104] -
2523:6, 2523:15,
2523:17, 2525:2,
2526:10, 2526:17,
2527:19, 2527:21,
2528:1, 2529:13,
2529:24, 2530:1,
2530:10, 2530:11,
2530:13, 2530:16,
2530:24, 2532:3,
2532:5, 2533:4,
2533:8, 2533:9,
2533:13, 2533:19,
2533:21, 2533:22,
2534:5, 2534:17,
2534:25, 2535:13,
2540:22, 2545:7,
2545:8, 2545:18,
2546:2, 2546:23,
2547:24, 2548:21,
2550:8, 2550:18,
2552:3, 2553:3,
2553:12, 2553:13,
2553:17, 2554:20,
2555:15, 2556:1,
2556:2, 2557:4,
2557:9, 2558:22,
2559:16, 2559:17,
2567:3, 2567:6,
2567:23, 2570:22,
2571:9, 2571:10,
2573:13, 2573:22,
2577:10, 2577:11,
2577:21, 2577:23,
2578:10, 2578:11,
2578:12, 2578:17,
2578:19, 2578:22,
2578:23, 2579:10,
2579:16, 2579:19,
2580:7, 2587:1,

2587:5, 2587:8,
2587:10, 2593:25,
2594:1, 2594:3,
2594:5, 2598:20,
2598:22, 2598:24,
2599:4, 2599:13,
2600:7, 2601:3,
2601:14, 2602:11,
2602:12, 2603:17,
2603:19, 2603:23,
2607:7, 2607:9,
2607:14, 2607:16
**Treasury's** [5] -
2525:7, 2554:24,
2559:6, 2570:23,
2599:24
**treating** [1] - 2516:23
**tremendous** [1] -
2518:19
**trend** [1] - 2562:13
**trial** [5] - 2516:16,
2529:9, 2538:6,
2558:3, 2558:12
**TRIAL** [1] - 2512:12
**trick** [1] - 2516:23
**trick-or-treating** [1] -
2516:23
**tried** [7] - 2530:5,
2531:24, 2555:22,
2558:3, 2560:10,
2564:17, 2593:21
**trillion** [2] - 2582:2,
2582:8
**trouble** [1] - 2601:13
**troubled** [2] - 2537:11,
2541:22
**truck** [1] - 2591:22
**true** [12] - 2527:3,
2544:19, 2545:7,
2545:11, 2546:12,
2546:14, 2546:17,
2554:9, 2558:6,
2559:25, 2568:24
**truth** [1] - 2560:6
**truthful** [2] - 2560:23,
2561:13
**try** [11] - 2515:24,
2516:10, 2518:9,
2518:15, 2523:10,
2527:15, 2529:16,
2549:17, 2549:21,
2562:24, 2568:17
**trying** [11] - 2529:22,
2530:22, 2536:18,
2539:10, 2540:17,
2542:11, 2547:5,
2549:4, 2556:3,
2594:14, 2605:8
**tuck** [1] - 2530:13
**Tuesday** [2] - 2554:15,

2569:9
**turned** [2] - 2523:25, 2568:4
**turning** [1] - 2564:8
**turns** [1] - 2601:11
**twice** [1] - 2561:10
**two** [27] - 2516:4, 2516:5, 2516:6, 2516:7, 2518:7, 2519:8, 2521:5, 2526:20, 2527:23, 2528:19, 2530:12, 2537:2, 2537:4, 2537:11, 2537:13, 2552:25, 2553:23, 2560:6, 2563:8, 2566:10, 2574:18, 2574:19, 2587:3, 2588:9, 2592:21, 2605:7
**two-part** [1] - 2592:21
**two-thirds** [1] - 2537:2

## U

**U.S** [1] - 2603:1
**Ugoletti** [7] - 2526:6, 2528:6, 2553:2, 2553:6, 2558:13, 2567:11, 2568:18
**Ugoletti's** [4] - 2527:14, 2553:6, 2554:2, 2569:5
**ultimately** [1] - 2521:10
**unable** [1] - 2588:20
**unbelievably** [1] - 2576:19
**under** [23] - 2519:21, 2525:3, 2526:20, 2530:17, 2534:14, 2541:7, 2546:24, 2547:24, 2560:5, 2570:6, 2571:4, 2574:21, 2574:22, 2579:7, 2579:24, 2580:10, 2580:14, 2580:17, 2587:16, 2596:19, 2602:15, 2603:18, 2607:6
**underneath** [1] - 2557:11
**Undersecretary** [1] - 2527:21
**understood** [1] - 2586:17
**Undisputed** [2] - 2582:5, 2583:8
**undisputed** [1] - 2583:9

**unexpected** [1] - 2535:7
**unfortunate** [1] - 2570:15
**unhappy** [1] - 2523:9
**UNITED** [2] - 2512:1, 2512:13
**United** [13] - 2513:14, 2530:10, 2530:11, 2530:24, 2578:4, 2578:25, 2579:3, 2580:24, 2580:25, 2581:12, 2603:11, 2603:19, 2603:23
**unlike** [1] - 2584:24
**unlimited** [2] - 2526:17, 2603:20, 2604:7
**unprecedented** [2] - 2524:22, 2532:9
**unreasonable** [12] - 2519:20, 2521:1, 2521:8, 2522:12, 2535:17, 2535:21, 2544:7, 2544:8, 2544:16, 2544:18, 2545:10, 2546:8
**unreasonably** [5] - 2519:25, 2520:19, 2520:24, 2522:7, 2543:25
**unsafe** [1] - 2588:18
**unsound** [1] - 2588:18
**unwritten** [1] - 2520:11
**up** [47] - 2517:12, 2525:8, 2533:20, 2547:12, 2547:23, 2549:7, 2554:12, 2555:10, 2556:2, 2556:19, 2556:21, 2557:22, 2558:7, 2558:23, 2559:18, 2562:19, 2562:20, 2563:16, 2563:19, 2563:20, 2563:23, 2564:11, 2564:13, 2567:1, 2567:5, 2567:25, 2569:16, 2570:24, 2571:23, 2573:24, 2578:13, 2584:14, 2587:8, 2587:19, 2588:10, 2591:24, 2598:19, 2599:8, 2599:9, 2600:19, 2600:21, 2601:8, 2601:15, 2602:4, 2602:20
**update** [1] - 2548:8
**updated** [2] - 2533:25,

2552:15
**upset** [1] - 2556:6
**upside** [2] - 2606:16, 2606:19
**urgency** [4] - 2528:11, 2528:12, 2528:19, 2559:21
**utter** [2] - 2521:8, 2522:12

## V

**value** [17] - 2525:1, 2525:8, 2555:1, 2555:2, 2555:3, 2555:4, 2566:23, 2571:4, 2571:23, 2572:5, 2572:16, 2575:3, 2582:8, 2596:17, 2596:20, 2597:11, 2598:7
**variety** [1] - 2605:20
**VARMA** [1] - 2513:9
**verdict** [4] - 2519:13, 2525:19, 2575:3, 2575:18
**version** [3] - 2515:5, 2515:9, 2597:6
**versus** [3] - 2522:9, 2551:2, 2568:21
**viability** [1] - 2606:23
**video** [1] - 2581:21
**videotape** [1] - 2526:7
**videotaped** [3] - 2518:11, 2543:4, 2581:23
**view** [11] - 2538:20, 2544:11, 2544:12, 2544:20, 2545:23, 2545:24, 2562:7, 2562:8, 2564:7, 2567:19, 2568:11
**views** [1] - 2542:13
**Virginia** [2] - 2574:21, 2574:22
**virtually** [1] - 2580:5
**vital** [3] - 2578:23, 2578:25, 2579:2
**vs** [1] - 2512:5

## W

**wait** [1] - 2530:14
**walk** [2] - 2530:14, 2536:14
**wants** [2] - 2577:7, 2590:7
**warrants** [1] - 2523:13
**Washington** [6] - 2512:9, 2512:16,

2512:23, 2513:12, 2513:16, 2528:18
**waste** [1] - 2587:18
**watch** [3] - 2518:9, 2576:15, 2576:16
**watching** [1] - 2576:17
**water** [1] - 2603:9
**ways** [6] - 2518:2, 2518:10, 2522:7, 2544:2, 2558:12, 2594:14
**wears** [1] - 2553:23
**Wednesday** [1] - 2554:12
**week** [2] - 2592:3, 2607:16
**weeks** [3] - 2518:7, 2521:5, 2528:13
**weigh** [1] - 2568:19
**weird** [1] - 2555:17
**white** [1] - 2591:11
**whoa** [1] - 2570:14
**whole** [10] - 2523:2, 2524:17, 2527:2, 2547:11, 2557:2, 2562:3, 2564:25, 2566:18, 2569:6, 2590:20
**WICK** [1] - 2513:14
**Wick** [2] - 2609:3, 2609:8
**Wilmington** [1] - 2513:4
**win** [3] - 2526:4, 2544:20, 2546:10
**wind** [4] - 2569:1, 2569:2, 2569:6, 2569:18
**wind-down** [4] - 2569:1, 2569:2, 2569:6, 2569:18
**wins** [1] - 2529:6
**wiped** [2] - 2580:6, 2587:21
**wish** [1] - 2570:16
**withstand** [1] - 2606:9
**witness** [3] - 2536:13, 2536:14, 2571:5
**witnesses** [7] - 2518:10, 2518:12, 2584:11, 2584:21, 2585:2, 2592:9, 2593:20
**won** [1] - 2552:7
**wonderful** [1] - 2558:17
**word** [6] - 2539:11, 2560:21, 2562:7, 2563:21, 2571:11,

2583:17
**wording** [1] - 2515:12
**words** [3] - 2518:6, 2520:23, 2521:4
**works** [7] - 2518:24, 2523:3, 2536:19, 2553:16, 2557:21, 2571:8, 2582:15
**world** [3] - 2568:20, 2589:9, 2595:2
**worried** [10] - 2528:7, 2535:13, 2549:19, 2557:1, 2557:5, 2563:5, 2565:20, 2568:13, 2603:16
**worry** [1] - 2532:14
**worrying** [2] - 2562:14, 2597:1
**worse** [3] - 2555:11, 2603:6, 2604:24
**worst** [3] - 2606:4, 2606:16, 2606:17
**worth** [97] - 2519:18, 2519:23, 2523:17, 2524:10, 2524:23, 2527:23, 2528:3, 2529:5, 2532:9, 2532:10, 2533:6, 2539:18, 2539:20, 2539:22, 2540:16, 2540:17, 2540:18, 2541:6, 2541:7, 2541:8, 2541:15, 2541:25, 2542:6, 2542:9, 2543:23, 2545:21, 2546:7, 2546:19, 2547:10, 2547:16, 2547:24, 2548:11, 2548:18, 2549:9, 2549:16, 2549:20, 2549:25, 2550:6, 2550:14, 2550:25, 2551:2, 2551:7, 2551:17, 2552:1, 2552:25, 2555:12, 2555:24, 2564:16, 2564:25, 2565:4, 2567:2, 2569:9, 2569:17, 2569:24, 2570:4, 2570:5, 2570:7, 2571:13, 2572:1, 2572:3, 2572:5, 2572:9, 2572:13, 2572:14, 2572:15, 2572:16, 2572:17, 2573:10, 2573:11, 2573:16, 2574:7, 2577:1, 2577:7, 2581:3, 2581:10,

2582:2, 2589:22, 2591:8, 2593:17, 2593:22, 2594:5, 2594:6, 2594:15, 2597:18, 2599:8, 2602:24, 2603:5, 2604:12, 2604:13, 2604:16, 2604:22, 2605:7, 2605:10, 2605:25

**worthless** [1] - 2524:17

**write** [7] - 2533:24, 2545:6, 2563:4, 2566:25, 2567:1, 2567:25, 2569:16

**write-downs** [1] - 2563:4

**writing** [4] - 2515:9, 2527:20, 2550:15, 2550:16

**written** [3] - 2527:19, 2559:14, 2588:7

**wrote** [1] - 2545:3

## Y

**year** [12] - 2528:12, 2537:6, 2553:18, 2560:13, 2565:17, 2570:2, 2570:4, 2589:13, 2604:21, 2607:3

**years** [23] - 2528:21, 2530:19, 2531:19, 2532:6, 2537:4, 2537:11, 2549:7, 2566:4, 2574:24, 2575:6, 2575:7, 2576:24, 2576:25, 2577:3, 2577:21, 2580:6, 2580:13, 2581:9, 2589:18, 2589:20, 2589:23, 2598:11, 2605:6

**yeses** [1] - 2539:2

**York** [3] - 2512:22, 2513:7

**yourself** [3] - 2545:5, 2588:9, 2594:13

**yourselves** [1] - 2584:20

## Z

**ZAGAR** [1] - 2512:18

**zero** [2] - 2527:11, 2550:25