# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| |
|---|
| **In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations** |
| **THIS DOCUMENT RELATES TO: ALL CASES** |

**Misc. Action No. 13-mc-1288 (RCL)**

<u>CLASS ACTION</u>

Supplemental Expert Report of

**BALA G. DHARAN, PH.D., CPA**

February 10, 2023

**Confidential and Subject to Protective Order**

## <u>TABLE OF CONTENTS</u>

I.      Introduction and Summary of Supplemental Support for Opinions ................................. 1

II.     Supplemental Support for the Viability of the PIK Option ................................................ 2

III.    Supplemental Support Regarding Dr. Attari's Event Study and His Opinions Regarding
        Investor Concerns .............................................................................................................. 7

IV.     Supplemental Support from Documents Showing the NWS was Not Reasonably Needed
        to Address Concerns Over Circular Dividends Eroding the Commitment ....................... 13

V.      Supplemental Support for Testimony on Role of Non-Cash Accounting Adjustments .... 18

## I.       Introduction and Summary of Supplemental Support for Opinions

1.      I submitted my initial report in this matter on August 12, 2021 ("Initial Report"), and a rebuttal report on March 1, 2022 ("Rebuttal Report"). I am producing this supplemental report to identify supplemental support for opinions and testimony I have previously given.

2.      The opinions on which I am identifying supplemental support are as follows:[1]

(a)      I previously testified that the payment-in-kind ("PIK") option set forth in the Certificates of Designation for Treasury's Senior Preferred Stock ("Certificates") was a viable alternative to the Net Worth Sweep ("NWS"). Dr. Attari testified that the PIK option would have made the GSEs' situation "worse,"[2] would not have "solved the circular dividend problem,"[3] and would have eroded the Treasury Commitment that FHFA used to justify the NWS.[4] Dr. Attari's testimony is incorrect. The use of the PIK option by the GSEs in lieu of drawing down on the Treasury Commitment would have prevented it from being used to pay dividends and thus would have fully addressed any possible concerns about such erosion on the part of bond or MBS investors. At the same time, using the PIK option would have been vastly better for both the GSEs and the private shareholders, as it would have allowed the GSEs to build their net worth if (as proved to be the case) they were profitable. An analysis of what the PIK option would have done if used between 2008-2012 helps illustrate this. *See* Section II, below.

(b)      I previously opined that Dr. Attari's event study of bond yield spreads in August 2012 does not shed any light on any relevant issue and that yield spreads, if anything, support my opinion concerning the NWS.[5] According to Dr. Attari, his bond event study showed a narrowing of yield spreads, and he attributes this narrowing to increased confidence in the GSEs' creditworthiness based on the NWS dividend. There is no sound basis for this opinion, and it is contradicted by various contemporaneous documents that attribute the narrowing of yield spreads to investors viewing the Third Amendment as reducing the future supply of GSE bonds (thus

---

[1] Exhibit E, attached hereto, lists the documents considered for my supplemental support. All defined terms in the Initial Report and Rebuttal Report are incorporated herein.

[2] Trial Tr. 1964:7-9.

[3] Trial Tr. 1961:9-13.

[4] Trial Tr. 1939:19-1940:5.

[5] Dharan Rebuttal Report, pp. 19-21.

leading to a price increase and a narrowing of yield spreads). Moreover, the yield spreads in 2012 were low and declining throughout the year, and nothing in the yield spread data suggests that investors' confidence in the GSE bonds was waning as the re-imposition of the Treasury caps approached. Also, the GSEs were able to *increase* their issuances of MBS in 2012 considerably compared to 2011, which undermines the contention that the impending Treasury caps were causing concerns among MBS investors, much less concerns that could have justified the NWS.[6] *See* Section III, below.

(c)     I previously opined in my Initial Report and testified that the NWS was not reasonably necessary to address any alleged concern about future circular dividends causing a material erosion of the Treasury Commitment.[7] Various Treasury documents from government officials knowledgeable about the NWS negotiations provide supplemental support for that opinion. *See* Section IV, below.

(d)     I previously testified that the GSEs' profits and losses from 2008 through 2012 were most heavily affected by non-cash accounting adjustments, such as asset write downs and write ups.[8] A contemporaneous 2012 document prepared by Fannie Mae provides additional support for that opinion.[9] A review of the cash position of the GSEs provides further support for that opinion. This evidence, along with a review of the GSE balance sheets, rebuts testimony by Dr. Attari wrongly suggesting that investments by preferred shareholders did not assist the GSEs in conservatorship. *See* Section V, below.


## II.     Supplemental Support for the Viability of the PIK Option

3.     Dr. Attari's rebuttal report did not address the viability of the PIK option provided in the Certificates for potential use by GSEs. Nevertheless, he testified at trial that using the PIK option

---

[6] FHFA 2012 Report to Congress, available at
https://www.fhfa.gov/AboutUs/Reports/ReportDocuments/2012_AnnualReportToCongress_508.pdf, Table 2 and Table 11.

[7] Dharan Initial Report, pp. 25, 29-31, 81-82.

[8] See Dharan Trial Demonstratives, slide 17, titled "Provisions, Write-Downs and Write-Ups". A version of it is reproduced herein as Exhibit D.

[9] See PX-0180 (FM_Fairholme_CFC-00002895 to 2897).

would not have "solved the circular dividend problem,"[10] and would instead have made the GSEs' situation "worse."[11]

4.      Dr. Attari's testimony on this issue is incorrect. The use of the PIK option would have fully addressed any alleged concern about circular dividends without having to give away 100% of the GSEs' profits in perpetuity (as in the case of the NWS). The PIK option does not use any of the Treasury Commitment to pay dividends. Under all circumstances, it is at least as effective as the NWS in ensuring no erosion of the Treasury Commitment caused by circular dividends.

5.      Moreover, under some circumstances, the PIK option is clearly more effective than the NWS in protecting against erosion of the Treasury Commitment. In a scenario where the GSEs are first profitable for some periods of time (as they were in 2012 and thereafter), and thereafter suffer significant losses (such as if a severe "stress" scenario were to occur), the NWS results in the GSEs having to draw down on the Commitment. That is because the GSEs will have transferred all their net worth increases to the Treasury during the profitable time period, and will not have any capital (other than the small and shrinking reserve provided for in the Third Amendment). Thus, if there is subsequently a severe business downturn with losses (such as in a stress scenario), the GSEs would have no capital to absorb the losses, and instead must draw from Treasury's Commitment to cover losses and avoid a negative net worth. Under such a scenario, the PIK alternative would be far better at protecting against erosion of the Treasury Commitment because the PIK option would allow the GSEs to build capital when profitable. Then, if a subsequent stress scenario emerges, there will be more capital to absorb losses, and thus less need to draw down on the Commitment as compared to under the NWS.

---

[10] Trial Tr. 1961:9-13.

[11] Trial Tr. 1964:7-9.

6.      Similarly, the PIK option would be more advantageous than the NWS in a scenario where expected profitability first caused the GSEs to release the DTA valuation allowances fully (increasing the net worth, as happened in 2013), followed by a stress scenario that was severe enough to require the GSEs to make a new provision for the DTA valuation allowance. Under the NWS, the GSEs first increase net worth when the DTA allowances are reversed, thus transferring a huge amount cash to the Treasury (as happened in 2013); then, when new DTA allowances are taken, that causes a loss, leading to additional drawdowns from the Treasury (there being no capital buffer accumulated from the profitable years). The PIK option would avoid that: opting to rely on the PIK for any problem paying cash dividends, the GSEs would be able to accumulate net worth during good years that would allow the GSEs to absorb any new DTA valuation allowance without having to use the Treasury Commitment.

7.      Further, the possibility that the PIK option might result in a higher Liquidation Preference for the Treasury than use of the NWS does not change the risks for GSE bond and MBS investors since these investors would have priority of payment over preferred and common stockholders in case of a liquidation, including over the Treasury's Liquidation Preference. Thus, the increase in the Treasury's Liquidation Preference does not cause any concern or risk increase for such investors. Additionally, the Certificates provide that the GSEs have the right to pay down the increases in Liquidation Preference attributable to the PIK option and thereby return of the dividend rate to 10%. This feature of the PIK option is not something Dr. Attari addressed in his prior testimony.

8.      The PIK option was far preferable to the NWS from the perspective of both the GSEs and the private shareholders. Under the NWS, 100% of all future profits were transferred to the Treasury, no matter how large those profits might be. That means the NWS guaranteed that the

GSEs could never build capital, return to a sound and solvent condition, return to normal business operations, and exit conservatorship. Under the PIK option, by contrast, the GSEs would have had the opportunity to build capital in periods of high profits and pay down any additions to the Liquidation Preference caused from use of the PIK. That would have been better for the GSEs and their shareholders. The PIK option would therefore have allowed for the possibility of the GSEs building capital, returning to sound and solvent condition, and returning to normal business operations, and potentially having the ability to exit conservatorship, consistent with FHFA's stated goals of the conservatorship.[12] Dr. Attari is incorrect in saying the PIK option and the 12% dividend rate would have made the GSEs' situation "worse."[13]

9.      An obvious illustration is what happened in 2013 where the GSEs generated far more in comprehensive income than the 10% dividend amount. Under the NWS, the GSEs had to pay dividends of over $130 billion to the Treasury, roughly $111 billion more than they would have paid under the 10% dividend. Had the GSEs resolved to use the PIK to avoid any Commitment drawdowns, they would not have had to do anything more than pay the 10% dividend.

10.     In his trial testimony, Dr. Attari asserted that the use of the PIK option in 2013 would have required Fannie Mae (as an example) to pay a $14 billion dividend rather than a $12 billion dividend followed by steadily increasing Liquidation Preference amounts that would lead to increasing dividend amounts.[14] In making these assertions, Dr. Attari ignores that (1) the relevant comparison should be the PIK option in 2013 versus the NWS in 2013, and (2) the GSEs would never have needed to use the PIK option in 2013 because their comprehensive income in 2013 vastly exceeded the 10% dividend amount, allowing them to pay the cash dividend without any

---

[12] Dharan Initial Report, p. 10.

[13] Trial Tr. 1964:7-9.

[14] Trial Tr. 1962-1964.

circular draw. Further, this was foreseeable as of August 2012 because, by that time, the GSEs had earned substantial profits for two quarters and were returning to sustained profitability that made it reasonably likely they would be able to reverse the valuation allowances on the DTAs, which would significantly increase their net worth and eliminate any future need to draw down on the Treasury Commitment.[15] As events actually unfolded, both GSEs indeed released the DTA valuation allowances in their entirety in 2013 and thus it would not ever have been necessary to use the PIK option beyond August 2012.[16]

11.     It is illustrative of Dr. Attari's failure to understand or analyze the PIK option that he has ignored the extent to which the PIK option would have been superior to the GSEs' practice of drawing on the Treasury Commitment to pay dividends during 2008 to 2012. This can be seen by examining what would have occurred if the GSEs had used the PIK option in lieu of drawing on the Treasury Commitment to pay cash dividends to the Treasury from 2008 to 2012. I have provided such an analysis, presented in Exhibit A to this report. The analysis shows that, had the GSEs used the PIK option during those years, they would have paid *less* in cash dividends to the Treasury, and at the same time the Liquidation Preference owed to the Treasury would have been *lower* at the end of 2012 compared to what actually happened by not using the PIK option.

12.     Given these considerations, there is no basis in economics, finance, or accounting for FHFA not to have used the PIK option to address any asserted concerns on the part of bond and MBS investors that it claims justified the NWS. The trial testimony of Messrs. DeMarco[17] and Ugoletti[18] indicated that they did not consider this option and were either unaware of it or did not

---

[15] Dharan Initial Report, pp. 33, 45.

[16] Dharan Initial Report, p. 47.

[17] Trial Tr. 751:10-19.

[18] Deposition of Mario Ugoletti dated May 15, 2015, pp. 55-56.

understand that it would fully protect the Treasury Commitment from any erosion caused by an inability to pay the 10% cash dividend. Mr. Ugoletti, in fact, said "it doesn't make economic sense to pay in kind when you can pay in cash."[19] The failure to consider the PIK option given its obvious benefits supports my prior opinion that the process leading up to the NWS was inconsistent with what reasonable shareholders would expect for such a major transaction.

13.     Additional documents support my opinion that the PIK alternative was a viable and superior option for addressing concerns in situations where the GSEs did not have the ability to pay a cash dividend without drawing on the Treasury Commitment. For example, in a memo prepared for Treasury Secretary Geithner to use in preparing to testify before Congress, the following question "Has the Administration considered modifying the PSPA agreements before the capacity becomes fixed at the end of 2012?" is posed, and the following response is provided: "To the extent that required dividend payments exceed net income, FHFA, as conservator, could consider not declaring dividends pursuant to the certificates of designation for the preferred shares, so that draws on the PSPAs are not used to pay dividends, preserving as much funding as possible to cover any unanticipated losses at Fannie Mae and Freddie Mac."[20]

### III.     Supplemental Support Regarding Dr. Attari's Event Study and His Opinions Regarding Investor Concerns

#### a.     Supplemental data relating to debt investors.

14.     In his report and at trial, Dr. Attari claimed that an event study he conducted of bond price yield spreads showed that investors believed the Third Amendment reduced the risk of default on GSE debt, reduced concerns about GSE creditworthiness, and signaled that GSE debt was more "safe." Dr. Attari also linked his event study with his use of analyst reports by

---

[19] Deposition of Mario Ugoletti dated May 15, 2015, p. 56.

[20] PX-0210, p. 10 (UST00061557 to 1607 at 1567).

explaining that those were the "two ways" he used to look "at how market participants viewed the commitment."[21] His discussion of the analyst reports claimed that the narrowed yield spreads reflected reduced concern about the erosion of the Treasury Commitment and that the NWS was the source of that reduced concern.[22] I have previously critiqued this opinion of Dr. Attari,[23] which I believe to be unfounded and inaccurate, and there are additional data and documents that supplement and support my critique.

15.     First, as I stated previously, Dr. Attari, without any basis, attributes the price increase in GSE bonds to a perceived improvement in GSE creditworthiness attributable to the NWS. In doing so, he ignores confounding factors that would affect bond prices, including most obviously the market's expectation that the Third Amendment would result in a decrease in the supply of GSE bonds.[24] An expected decrease in the supply (without a change in demand) would be expected to result in an increase in the price of bonds.

16.     The Third Amendment would reasonably have been perceived as likely to result in a substantial decrease in the supply of GSE bonds. It accelerated the annual rate at which the GSEs were required to shrink their investment portfolios to 15%, compared to a 10% rate before the Third Amendment.[25] The GSEs generally issued bonds to raise funds and finance the investment portfolio, and so a shrinkage of the investment portfolio would mean a decreased supply of GSE bonds. In its press release announcing the Third Amendment and its NWS, the Treasury stated

---

[21] Trial Tr. 1964:14-21.

[22] Trial Tr. 1917:17-1930:15.

[23] Dharan Rebuttal Report, p. 19-22; Trial Tr. 2314:24-2318:18.

[24] Dharan Rebuttal Report, p. 21. I also observe that Dr. Joseph Mason reached the same conclusion. Additionally, at trial, Dr. Attari acknowledged his deposition testimony, particularly that a change in supply could be a factor in declining bond yield spreads. Trial Tr. 2119:1-23.

[25] PX-0003-A4, p. 6 (FHFA-DDC-0054967 to 4974 at 4972); PX-0003-B4, p. 6 (FHFA-DDC-0054959 to 4966 at 4964).

that this would "help expedite the wind down of Fannie Mae and Freddie Mac."[26] The expectation of an expedited wind down of the GSEs would mean a greater market expectation of a major decrease in the supply of GSE bonds. The expectation of supply reduction would thus be a key confounding factor that would affect bond prices and thus could explain the increase in the bond price (and therefore the declines in GSE bond yields). Dr. Attari did not consider this confounding factor in his interpretation of the event study results.[27]

17.     Contemporaneous FHFA documents I have reviewed support my opinion by specifically attributing the narrowing of yield spreads to the market's expectation that there would be a lower supply of GSE debt both before and following the Third Amendment.

18.     For example, a June 5, 2012 FHFA Weekly Report issued two months before the Third Amendment stated, "Spreads may have been helped by the fact there will be no new supply to absorb this week following Fannie Mae's decision to pass on its calendar date to price a Benchmark Note."[28] Furthermore, FHFA's Office of Systemic Risk and Market Surveillance commented in its Capital Markets Weekly Report dated August 19, 2012, on the debt market's reaction to the Third Amendment and stated that "the tightening was caused by the Treasury Department's announcement that it would accelerate the wind-down of the Enterprises. For agency debt investors that points to fewer remaining new issues since the lifespan of Fannie/Freddie just got shorter."[29] This FHFA report further stated, "Agency spreads *have been tightening all year* due to investors designating them as safe asset cohorts to Treasuries but the

---

[26] Dharan Initial Report, p. 17.

[27] Trial Tr. 2130:3-16. Dr. Attari stated at trial that supply "is not a reason that is typically looked at", but did not otherwise explain how he ruled out an anticipated shrinking of supply, a factor he acknowledged during his testimony could cause declining yield spreads. Trial Tr. 2119:18-23.

[28] FHFA-DDC-0319690 to 9694 at 9693.

[29] FHFA-DDC-0320331 to 0334 at 0334.

prospect of fewer years of new issues remaining served as a 'last call' of sorts, particularly for longer maturities that may not be tapped again."[30] FHFA itself thus specifically (and contemporaneously) attributed narrowed yield spreads for longer-term bonds that were the subject of Dr. Attari's event study to anticipated reductions in supply of the bonds—*not* to a change in alleged market concern about the risk of GSE default.

19.     Numerous other documents further support this explanation by recognizing that the Third Amendment was perceived as very likely to reduce supply of GSE debt, thus increasing prices and reducing yield spreads.[31] They confirm Dr. Attari lacks a reliable basis for contending the narrowing of yield spreads shows the NWS was a reasonable response to alleged concerns about GSE creditworthiness in light of the impending reinstatement of Treasury Commitment caps.

20.     Instead, as I explained in my Rebuttal Report, a review of GSE bond yield spreads in 2012 demonstrates that the market was not concerned that the risk of circular dividends could materially erode the very generous caps on the Treasury Commitment that would come into effect on December 31, 2012, and did not perceive any serious risk of GSE debt default.[32] GSE spreads were "tightening *all year* due to investors designating them as safe asset cohorts to Treasuries."[33] This can be seen in the charts in Exhibit B attached to this report, which were prepared by Dr. Mason, but which I have reviewed and agree with.[34]

---

[30] FHFA-DDC-0320331 to 0334 at 0334. [Emphasis added.]

[31] FM_Fairholme_CFC_00000939 to 0940 at 0939; Fairholme-DDC-0009617 to 9618 at 9617; FHFA-DDC-0425927 to 5931 at 5927; TREASDDC00057122 to 7126 at 7122; FHFA00102594 to 2596 at 2594; FHFA-DDC-0119071 to 9076 at 9071; PX-0282, p. 2 (FHFA-DDC-0410592 to 0595 at 0593).

[32] Dharan Rebuttal Report, pp. 19-21.

[33] FHFA-DDC-0320331 to 0334 at 0334. [Emphasis added.] *See also* FHFA-DDC-0319690 to 9694 (June 5, 2012 FHFA Weekly Report) at 9693 ("Agencies remain a safe harbor destination for investors, evidenced by the outperformance of the Freddie Mac 10YR Reference Note vs. its Treasury benchmark in recent days.")

[34] Exhibit B1 shows the 2012 bond yield data through the end of 2012 for the GSE bonds' yield spreads – based on the weighted average yield spreads on the four benchmark bonds for Fannie Mae and the three reference notes for

21.     Both Exhibit B charts show that GSE debt traded throughout 2012 at much lower yields (i.e., much higher prices) than AAA corporate bonds, the safest rated debt issued by private corporations. Additionally, they show that the GSE debts' yield spreads were generally steady or declining throughout 2012. The yield spreads on bonds that Dr. Attari analyzed on GSE debt thus showed declines even prior to the announcement of the NWS.[35] That the yield spread of GSE debt was either steady or going *down* generally throughout 2012 is *the opposite* of what one would expect if bond investors viewed GSE debt as becoming increasingly risky due to the anticipated re-imposition of caps on the Treasury Commitment.

22.     Further, as stated above, the approximately one-tenth of one percent decline of the yields for the long-term bonds used by Dr. Attari on the date of the NWS was plausibly attributed by contemporaneous commentators (including FHFA) to the anticipated decline in supply, not increased confidence in the GSEs' creditworthiness.[36] Accordingly, there is no reliable basis for using this decline to conclude there was concern among bond investors that needed to be addressed, much less that the NWS was required to address it.

23.     Additional data showing the lack of concern relating to GSE debt during 2012 can be found in the absence of any change by credit rating agencies to the GSE bonds' credit ratings, ratings outlook, or ratings watch status. During 2012, as the date for the reimposition of the caps on the Treasury Commitment approached, none of the three main credit rating agencies, S&P,

---

Freddie Mac evaluated by Dr. Attari – with a vertical line marking the date of Third Amendment announcement. Exhibit B2 shows the same data for 2012 but up to August 15, 2012, before the Third Amendment announcement.

[35] *See also*, Dharan Rebuttal Report, p. 20.

[36] Dharan Rebuttal Report, p. 21. For Fannie Mae, the weighted average yield spread on the bonds evaluated by Dr. Attari was as high as 138 basis points during the first week of January 2012, and had declined to about 121 basis points on August 14, 2012. It ended 2012 at about 112 basis points. Thus, more than half of the decline in Fannie Mae bonds' yield spread took place prior to the Third Amendment. The yield spread for Freddie Mac's reference notes evaluated by Dr. Attari was as high as 143 basis points at the start of 2012 and had declined to 126 basis points by August 14, 2012. It was about 116 basis points at the end of 2012. Once again, more than half of the decline took place prior to the Third Amendment.

Moody's, and Fitch, made any changes to the credit rating on GSE bonds. The ratings on GSE debt remained at extremely high levels reserved for the safest debt on the market. In 2012, the GSEs' debt was rated as AAA by Fitch[37] and AA+ by S&P.[38] The Aaa rating for the GSE debt issued by Moody's in 2011 remained unchanged in 2012.[39] Each of those ratings represents the same level of expectation of default risk as for the United States government debt.

24.     Further, during this 2012 time period, as the date for the reimposition of the caps on the Treasury Commitment approached, none of the three credit rating agencies made any change to the ratings outlooks or ratings watches for GSE debt to signal they might be considering a credit downgrade. When a credit rating agency has concerns about changes in the risks associated with a debt instrument, the agency will notify the public of that fact by either changing the ratings outlook for the debt or issuing a "ratings watch."[40] In 2012, no new rating outlooks or rating watches were issued by any of the rating agencies for the GSEs.[41]

### b. Supplemental data re MBS investors.

25.     As explained in my Rebuttal Report, there is no quantitative support for Dr. Attari's conclusion that the MBS market needed reassurance as to the GSEs' creditworthiness in August

---

[37] https://www.fitchratings.com/entity/fannie-mae-80089159; https://www.fitchratings.com/entity/freddie-mac-80089158.

[38] Ratings data obtained from Capital IQ.

[39] https://www.moodys.com/credit-ratings/Federal-National-Mortgage-Association-credit-rating-276550/ratings/view-by-class; https://www.moodys.com/credit-ratings/Federal-Home-Loan-Mortgage-Corp-credit-rating-276455/ratings/view-by-class.

[40] Fitch issues an outlook which indicates "the direction a rating is likely to move over a one- to two-year period," and if there is a heightened probability of a rating change, it would issue a report outlining the rating watch. *See*, PX-0516, pp. 7-8. Moody's issues a rating outlook when the possibility of a rating change exists. *See*, PX-0515, p. 29.

[41] https://www.fitchratings.com/entity/fannie-mae-80089159; https://www.fitchratings.com/entity/freddie-mac-80089158.

2012.[42] Further, data from FHFA show that the GSEs were able to significantly increase their issuance of MBS in 2012, including in the quarters before the NWS. FHFA data on MBS issuances by the GSEs are summarized in Exhibit C below. As reflected in this Exhibit, while the MBS issuances by the GSEs had declined from 2009 to 2010 and from 2010 to 2011, the issuances increased significantly in 2012. Total MBS issuances by each of the GSEs in each quarter of 2012 was much higher than the amounts issued in the corresponding quarter in 2011.

26.     The above data are inconsistent with, and do not support, Dr. Attari's contention that investors in the GSEs' MBS were increasingly concerned over the implementation of caps on the Treasury Commitment on December 31, 2012.

**IV.   Supplemental Support from Documents Showing the NWS was Not Reasonably Needed to Address Concerns Over Circular Dividends Eroding the Commitment**

27.     I have considered additional internal government documents that provide further support for opinions I have previously offered. I discuss these documents below.

28.     A set of draft Questions and Answers dated July 9, 2012 (just over one month prior to the NWS) to prepare the Secretary of the Treasury for Congressional Testimony contains the question "Has the Administration considered modifying the PSPA agreements before the capacity becomes fixed at the end of 2012?"[43] The response stated for the posed question is that "Under the conservative baseline stress test forecasts conducted by FHFA, both Fannie Mae and Freddie Mac are expected to have positive net income in 2013. This means that the Treasury is not expected to need to fund any operating losses at Fannie Mae and Freddie Mac after the expiration of the PSPA funding commitment." This document further states the expectation that

---

[42] Dharan Rebuttal Report, p. 21; *see,* PX-0282, p. 2 (FHFA-DDC-0410592 to 0595 at 0593) ("The reaction in MBS trading has been almost a non-event.")

[43] PX-0210, p. 10 (UST00061557 to 1607 at 1567).

"$275 billion, nearly twice the amount of net funding provided by Treasury to date, will provide a substantial cushion for any unexpected losses and should give market participants confidence about the government's commitment to these institutions."[44]

29.     This document reinforces my opinions. It shows there was no imminent risk that the Treasury Commitment would need to be used to fund operating losses. Further, as discussed above, it reflects that even if dividends were at some point to exceed comprehensive income, the GSEs could simply not declare a dividend "pursuant to the certificates of designation" (which means using the PIK option), avoiding any need to draw down on the Commitment.

30.     A July 31, 2012 email exchange between Treasury officials closely involved in the PSPA negotiations stated that the second quarter financial results were "much stronger" than they expected.[45] Treasury's Acting Assistant Secretary for Financial Stability, Timothy Bowler, responded to these positive earnings in excess of the 10% dividend, and the fact that the GSEs would now finally be starting to generate positive net worth, by writing: "Really makes sense to push the net worth sweep this quarter."[46] On August 6, 2012, Mr. Bowler sent an email to White House official Jim Parrott describing the term sheet with the NWS as "Now very timely."[47] Mr. Ugoletti testified that Mr. Bowler was the Treasury's point person in the NWS discussions.[48]

31.     An internal FHFA email from Mr. Ugoletti to Mr. DeMarco and others reports a "renewed push" for the NWS shortly after the above Treasury emails, and Mr. DeMarco testified

---

[44] PX-0210, p. 10 (UST00061557 to 1607 at 1567).

[45] PX-0226 (TREASDDC00044338 to 4339 at 4338).

[46] PX-0226 (TREASDDC00044338 to 4339 at 4338). [Emphasis added.]

[47] PX-0227 (UST00504498 to 4500 at 4499).

[48] Deposition of Mario Ugoletti dated May 15, 2015, p. 151.

he understood this "renewed push" to come from the Treasury.[49]

32.      These documents further support my opinion that the purported threat of circular dividends materially eroding the Treasury Commitment does not provide a reasonable basis for the NWS. Improved earnings in excess of the 10% dividend and the creation of a large, positive net worth (with the prospect for much more net worth additions in future) could not economically justify an increased urgency to "push" for the NWS to address an alleged concern over circular dividends eroding the Treasury Commitment.[50]

33.      An FHFA accountant, James Griffin, stated in an email dated August 14, 2012, written just after a meeting with Mr. DeMarco and three days before the NWS was announced, that he did not believe it made sense to reverse the DTA allowance because the "amendments are designed to demonstrate wind down."[51] At trial, Mr. Nicholas Satriano (an accountant and the recipient of Mr. Griffin's email) testified that he understood the email as referring solely to the part of the Third Amendment that accelerated the decline in the GSEs' investment portfolio.[52] Mr. Satriano's explanation makes no sense as a matter of accounting. The investment portfolio, which is only one of many assets of the GSEs, was already being reduced at the rate of 10% per year even before the Third Amendment. From an accounting perspective, it does not make sense to consider an increase of this ongoing reduction to a modestly higher 15% rate as what was "designed to demonstrate wind down" in a Third Amendment that included the NWS. To the contrary, given the relative accounting impact of the various aspects of the Third Amendment,

---

[49] PX-0226 (TREASDDC00044338 to 4339); PX-0247 (FHFA00103596); Trial Tr. 1045:12-21; PX-0226 (TREASDDC00044338 to 4339 at 4338).

[50] PX-0226 (TREASDDC00044338 to 4339 at 4338).

[51] PX-0259.

[52] Trial Tr. 2235-36.

Mr. Griffin's email's reference to the Third Amendment as "designed to demonstrate wind down" only makes sense as a reference primarily, if not exclusively, to the NWS.

34.     Additional government documents associate the NWS with a wind down of the GSEs, and thus support my opinions about the Griffin email and about the lack of any reasonable need for the NWS. A draft July 20, 2012, term sheet includes as a rationale for the NWS that the "GSEs are being wound down faster and will not return to their past state."[53] Another government document notes that the "GSEs will not be allowed to build capital and exit conservatorship in their prior form."[54] Another document circulated among Treasury personnel on August 15, 2012 states that with the announcement of the NWS, "we are accelerating the Administration's commitment to wind down the GSEs and end forever their flawed model of privatized benefits and socialized losses."[55] It further states, "By taking all of their profits going forward, we are making clear that the GSEs will _not_ ever be allowed to return to profitable entities at the center of our housing finance system."[56] Similar statements are in the Treasury's public announcement on August 17, 2012, titled "Treasury Department Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac."[57]

35.     Further, on August 17, 2012, immediately following the NWS, a Bloomberg article quoted Peter Wallison, a former White House official working as a financial policy fellow studying the GSEs at a Washington DC think tank, stating that the "most significant issue" is "whether Fannie and Freddie will come back to life because their profits will enable them to re-

---

[53] UST00533618 to 3619 at 3618.

[54] UST00504498 to 4500 at 4499.

[55] PX-0270 (TREASDDC00044191 to 4193 at 4192).

[56] PX-0270 (TREASDDC00044191 to 4193 at 4192). [Emphasis in the original.]

[57] PX-0278.

capitalize themselves and then it will look as though it is feasible for them to return as private companies backed by the government."[58] The article further quoted Mr. Wallison stating, "What the Treasury Department seems to be doing here, and I think it's a really good idea, is to deprive them of all their capital so that doesn't happen."[59] Treasury officials sent Mr. Wallison's Bloomberg quote to Mr. Parrott. Mr. Parrott was a White House official with responsibility for the GSEs and thus for the NWS negotiations.[60] Mr. Parrott responded by writing "Outstanding"[61] and also wrote directly to Mr. Wallison stating, "Good comment in Bloomberg – you are exactly right on substance and intent."[62] Thus, the above documents show that the White House official in charge of the amendments to the GSE agreements with the Treasury agreed that the goal of the NWS was to "deprive [the GSEs] of all their capital" so they cannot "come back to life" by using "their profits….to re-capitalize themselves," and so that it will not "look as though it is feasible for them to return as private companies backed by the government."[63]

36.    These documents further support my opinion that the NWS was not reasonably necessary to address any concerns of circular dividends eroding the Commitment. The desire to demonstrate a wind down of the GSEs and show they will not be allowed to be profitable is far more consistent with pushing for the NWS at a time of large actual and expected profits than is the proffered circular dividend rationale.

---

[58] PX-0274 (TREASDDC00056921 to 6924 at 6921).

[59] PX-0274 (TREASDDC00056921 to 6924 at 6921).

[60] Deposition of Jim Parrott dated January 20, 2016, pp. 45-46, 71-72, 84-85.

[61] PX-0274 (TREASDDC00056921 to 6924 at 6921).

[62] PX-0279 (UST000503986 to 3987 at 3987).

[63] PX-0274; PX-0279.

37.     Other documents demonstrate officials' expectation that "taxpayers" (i.e., the Treasury) would receive more from the NWS than from the 10% dividend. [64] The understanding that taxpayers would earn more from the NWS than under the 10% dividend is inconsistent with the understanding that the GSEs would consistently earn less than the 10% dividend and have to draw from the Treasury to pay circular dividends—further supporting my opinion.

**V.      Supplemental Support for Testimony on Role of Non-Cash Accounting Adjustments**

38.     During the trial, I presented a slide with a table titled "Provisions, Write-Ups and Write-Downs," a version of which is reproduced as Exhibit D here.[65] The information in that chart is further supported by a May 8, 2012 memorandum prepared by Fannie Mae executive Anna Tilton and sent to Mr. Mayopoulos and Fannie Mae Chief Financial Officer Susan McFarland.[66] It explains that "if one examines what degree of cash infusion would have been required to keep Fannie Mae operating on a cash basis, the amount is much lower than the $116.2 billion GAAP measure."[67] The memo further describes that "Many of the losses under the GAAP measure are non-cash accounting losses [which] do not represent cash 'out the door.' If one examines what Fannie Mae's cash needs have been in conservatorship, the support needed from the Treasury would have been approximately $7 billion through the end of 2011 (not counting the Treasury dividend), or less than 10% of the GAAP measure."[68]

39.     Further, I was asked by counsel to respond to Dr. Attari's suggestion at trial that the cash invested by private preferred shareholders did not help the GSEs during the years from 2008

---

[64] PX-0270 (TREASDDC00044191 to 4193 at 4192); PX-0227 (UST00504498 to 4500 at 4499).

[65] Dharan Trial Demonstratives, Slide 17.

[66] PX-0180 ((FM_Fairholme_CFC-00002895 to 2897) (Email from Anna Tilton dated May 8, 2012, subject "Revised Treasury Draw Analysis") (Anna Tilton was at the time Chief of Staff to CEO Tim Mayopoulos).

[67] PX-0180 (FM_Fairholme_CFC-00002895 to 2897 at 2896).

[68] PX-0180 (FM_Fairholme_CFC-00002895 to 2897 at 2896).

through 2012 and was "lost"[69] or "gone"[70] by the end of 2008. First, cash is fungible, and it is not accurate to say, as Dr. Attari had asserted at trial, that the cash from the private preferred stockholders was "gone" by 2008. In fact, Fannie Mae's balance sheet showed a cash balance[71] at the end of June 2008 of $13.5 billion, and Freddie Mac had a corresponding balance in cash of $43.6 billion.[72] The combined cash balance of the two GSEs at the end of June 2008 was approximately $57 billion. The corresponding total at the end of 2008 was $63.3 billion.[73] Given the fungibility of cash, it is incorrect to say that these large cash balances in 2008 did not include any cash raised from private preferred stockholders from 1996 to 2008.

40.     Second, preferred stock is a component of a company's net worth and the private preferred stock issued by the GSEs is reported as part of the GSEs' balance sheet net worth at the end of 2008. Had the GSEs not raised the approximately $33 billion from private preferred stockholders from 1996 to 2008, their net worth at the end of 2008 would have been approximately $28 billion less,[74] and therefore they would have had to draw an equivalent amount of cash from the Treasury at the end of 2008 in order to keep their net worth positive and to meet their cash needs. This, in turn, would have cost approximately an additional $3 billion in each of the following years in the form of additional dividends to be paid to the Treasury. Likewise, if one examines only the investment made by private preferred shareholders in 2007

---

[69] Trial Tr. 1908:1-14.

[70] Trial Tr. 2180:11-16.

[71] The amounts reported include cash equivalents.

[72] Balance sheet cash data are taken from the GSEs' 2008 Q2 10-Q filings.

[73] Cash and cash equivalents in the balance sheet at the end of December 2008 was $17.9 billion for Fannie Mae and $45.3 billion for Freddie Mac, for a total of $63.3 billion. Balance sheet cash data are taken from the GSEs' 2008 10-K filings.

[74] Approximately $33 billion amount invested from 1996 through 2008 minus approximately $5 billion paid out to those private shareholders in dividends. See JX-0001, pp. 5-7, for total preferred stock issued by the GSEs and PX-0005-A-O.xls, tabs "FNMA Dividends" and "FMCC Dividends" for dividends paid to preferred stockholders.

and 2008, those investments saved the GSEs from having to draw down an additional $18.6 billion.[75] Thus, the investment by private shareholders significantly aided and contributed to the net worth position of the GSEs during the conservatorship.

41.     Based on my review of the GSEs' balance sheets, the amounts invested by private preferred shareholders remained in the GSEs' capital structure at the end of 2008 as well as after 2008 – and continue to be reported in their net worth amounts in the balance sheets as of the end of 2022. For example, Fannie Mae's balance sheet as of the second quarter of 2012 reflects a preferred stock balance of $19.13 billion,[76] which remained the same as of the third quarter of 2022.[77] Similarly, Freddie Mac's balance sheet as of the second quarter of 2012 reflects a preferred stock balance of $14.109 billion,[78] which remained the same as of the third quarter of 2022.[79] If the private preferred shares had to be written off, the GSEs would have approximately a $33 billion shortage in net worth which it would have needed to replenish by drawing from the Treasury Commitment.

Respectfully submitted,

*Bala G. Dharan*

Bala G. Dharan, Ph.D., CPA

---

[75] $19.7 billion invested by private shareholders in 2007 and 2008 (JX-0001) minus $1.1 billion paid out in dividends on the shares issued for such investments during 2007 and 2008 (PX-0005-A-O.xls).

[76] Fannie Mae Form 10-Q for the Quarter ended June 30, 2012, p. 85.

[77] Fannie Mae Form 10-Q for the Quarter ended September 30, 2022, p. 73.

[78] Freddie Mac Form 10-Q for the Quarter ended June 30, 2012, p. 107.

[79] Freddie Mac Form 10-Q for the Quarter ended September 30, 2022, p. 51.

## Exhibit A
### Comparison of Using Payment-in-Kind Option from 2008 to 2012 vs. Actuals – Effect on Cash Dividends and Liquidation Preference
### Panel A – Fannie Mae

| Year and Quarter | Actual ($ millions) | | | | Alternative: Pay Payment-In-Kind Dividends If Cash Dividend Would Erode Treasury Commitment ($ millions) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Net Worth (Actual) | Quarterly Draws (Actual) | Cash Dividends Paid (Actual) | Total Liquidation Preference (Actual) | Net Worth Before Dividend | Net Worth | Quarterly Draws to Cure Negative Net Worth | Interest Rate for Dividend (10% or 12%) | Cash Dividends Paid | Addition of Liquidation Preference Issued as Payment-In-Kind | Pay Down of Liquidation Preference Issued as Payment-In-Kind | Net Liquidation Preference Issued as Payment-In-Kind | Total Liquidation Preference |
| 3Q 2008 | $ 9,276 | $ - | $ - | $ 1,000 | $ 9,276 | $ 9,276 | $ - | | $ - | $ - | $ - | $ - | $ 1,000 |
| 4Q 2008 | $ (15,157) | $ - | $ 31 | $ 1,000 | $ (15,126) | $ (15,126) | $ - | 10% | $ - | $ 31 | $ - | $ 31 | $ 1,031 |
| 1Q 2009 | $ (18,929) | $ 15,200 | $ 25 | $ 16,200 | $ (18,873) | $ (18,873) | $ 15,200 | 12% | $ - | $ 31 | $ - | $ 62 | $ 16,262 |
| 2Q 2009 | $ (10,602) | $ 19,000 | $ 409 | $ 35,200 | $ (10,137) | $ (10,137) | $ 18,900 | 12% | $ - | $ 488 | $ - | $ 550 | $ 35,650 |
| 3Q 2009 | $ (14,960) | $ 10,700 | $ 886 | $ 45,900 | $ (13,609) | $ (13,609) | $ 10,200 | 12% | $ - | $ 1,069 | $ - | $ 1,619 | $ 46,919 |
| 4Q 2009 | $ (15,281) | $ 15,000 | $ 1,150 | $ 60,900 | $ (12,780) | $ (12,780) | $ 13,700 | 12% | $ - | $ 1,408 | $ - | $ 3,027 | $ 62,027 |
| 1Q 2010 | $ (8,371) | $ 15,300 | $ 1,527 | $ 76,200 | $ (4,343) | $ (4,343) | $ 12,800 | 12% | $ - | $ 1,861 | $ - | $ 4,888 | $ 76,688 |
| 2Q 2010 | $ (1,411) | $ 8,400 | $ 1,909 | $ 84,600 | $ 4,526 | $ - | $ 4,400 | 12% | $ 2,301 | $ - | $ 2,225 | $ 2,662 | $ 78,862 |
| 3Q 2010 | $ (2,447) | $ 1,500 | $ 2,118 | $ 86,100 | $ 1,082 | $ - | $ - | 12% | $ 1,082 | $ 1,284 | $ - | $ 3,946 | $ 80,146 |
| 4Q 2010 | $ (2,517) | $ 2,500 | $ 2,152 | $ 88,600 | $ 2,082 | $ - | $ - | 12% | $ 2,082 | $ 322 | $ - | $ 4,269 | $ 80,469 |
| 1Q 2011 | $ (8,418) | $ 2,600 | $ 2,216 | $ 91,200 | $ (3,685) | $ (3,685) | $ - | 12% | $ - | $ 2,414 | $ - | $ 6,683 | $ 82,883 |
| 2Q 2011 | $ (5,087) | $ 8,500 | $ 2,281 | $ 99,700 | $ 1,927 | $ - | $ 3,700 | 12% | $ 1,927 | $ 559 | $ - | $ 7,242 | $ 87,142 |
| 3Q 2011 | $ (7,791) | $ 5,100 | $ 2,495 | $ 104,800 | $ (209) | $ (209) | $ - | 12% | $ - | $ 2,614 | $ - | $ 9,856 | $ 89,756 |
| 4Q 2011 | $ (4,571) | $ 7,800 | $ 2,621 | $ 112,600 | $ 5,632 | $ - | $ 300 | 12% | $ 2,693 | $ - | $ 2,939 | $ 6,917 | $ 87,117 |
| 1Q 2012 | $ 268 | $ 4,600 | $ 2,819 | $ 117,100 | $ 7,658 | $ - | $ - | 12% | $ 2,614 | $ - | $ 5,044 | $ 1,873 | $ 82,073 |
| 2Q 2012 | $ 2,770 | $ - | $ 2,931 | $ 117,100 | $ 5,433 | $ 1,098 | $ - | 12% | $ 2,462 | $ - | $ 1,873 | $ - | $ 80,200 |
| 3Q 2012 | $ 2,412 | $ - | $ 2,929 | $ 117,100 | $ 3,669 | $ 1,664 | $ - | 10% | $ 2,005 | $ - | $ - | $ - | $ 80,200 |
| 4Q 2012 | $ 7,224 | $ - | $ 2,929 | $ 117,100 | $ 9,405 | $ 7,400 | $ - | 10% | $ 2,005 | $ - | $ - | $ - | $ 80,200 |
| | | $ 116,200 | $ 31,428 | | | | | | $ 79,200 | $ 19,170 | $ 12,082 | $ 12,082 | $ - |

| | | |
|---|---|---|
| Treasury Commitment erosion prevented by using the payment-in-kind option: | | $ 36,900 |
| Cash saved/(additional cash paid) by using the paid-in-kind option: | | $ 176 |

**Exhibit A (Continued)**
**Comparison of Using Payment-in-Kind Option from 2008 to 2012 vs. Actuals – Effect on Cash Dividends and Liquidation Preference**
**Panel B – Freddie Mac**

| Year and Quarter | Actual ($ millions) | | | | Alternative: Pay Payment-In-Kind Dividends If Cash Dividend Would Erode Treasury Commitment ($ millions) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Net Worth (Actual) | Quarterly Draws (Actual) | Cash Dividends Paid (Actual) | Total Liquidation Preference (Actual) | Net Worth Before Dividend | Net Worth | Quarterly Draws to Cure Negative Net Worth | Interest Rate for Dividend (10% or 12%) | Cash Dividends Paid | Addition of Liquidation Preference Issued as Payment-In-Kind | Pay Down of Liquidation Preference Issued as Payment-In-Kind | Net Liquidation Preference Issued as Payment-In-Kind | Total Liquidation Preference |
| 3Q 2008 | $ (13,795) | $ - | $ - | $ 1,000 | $ (13,795) | $ (13,795) | $ 13,800 | | $ - | $ - | $ - | $ - | $ 1,000 |
| 4Q 2008 | $ (30,731) | $ 13,800 | $ 172 | $ 14,800 | $ (30,559) | $ (30,559) | $ 13,800 | 10% | $ - | $ 172 | $ - | $ 172 | $ 14,972 |
| 1Q 2009 | $ (6,008) | $ 30,800 | $ 370 | $ 45,600 | $ (5,466) | $ (5,466) | $ 30,600 | 12% | $ - | $ 449 | $ - | $ 621 | $ 46,021 |
| 2Q 2009 | $ 8,232 | $ 6,100 | $ 1,149 | $ 51,700 | $ 9,923 | $ 7,921 | $ 5,500 | 12% | $ 1,381 | $ - | $ 621 | $ - | $ 50,900 |
| 3Q 2009 | $ 10,406 | $ - | $ 1,294 | $ 51,700 | $ 11,389 | $ 10,117 | $ - | 10% | $ 1,273 | $ - | $ - | $ - | $ 50,900 |
| 4Q 2009 | $ 4,372 | $ - | $ 1,292 | $ 51,700 | $ 5,375 | $ 4,102 | $ - | 10% | $ 1,273 | $ - | $ - | $ - | $ 50,900 |
| 1Q 2010 | $ (10,525) | $ - | $ 1,292 | $ 51,700 | $ (9,503) | $ (9,503) | $ - | 10% | $ - | $ 1,273 | $ - | $ 1,273 | $ 52,173 |
| 2Q 2010 | $ (1,738) | $ 10,600 | $ 1,293 | $ 62,300 | $ 577 | $ - | $ 9,600 | 12% | $ 577 | $ 988 | $ - | $ 2,260 | $ 62,760 |
| 3Q 2010 | $ (58) | $ 1,800 | $ 1,561 | $ 64,100 | $ 3,241 | $ - | $ - | 12% | $ 1,883 | $ - | $ 1,358 | $ 902 | $ 61,402 |
| 4Q 2010 | $ (401) | $ 100 | $ 1,603 | $ 64,200 | $ 1,260 | $ - | $ - | 12% | $ 1,260 | $ 582 | $ - | $ 1,484 | $ 61,984 |
| 1Q 2011 | $ 1,237 | $ 500 | $ 1,605 | $ 64,700 | $ 3,243 | $ - | $ - | 12% | $ 1,860 | $ - | $ 1,383 | $ 101 | $ 60,601 |
| 2Q 2011 | $ (1,478) | $ - | $ 1,617 | $ 64,700 | $ (1,098) | $ (1,098) | $ - | 12% | $ - | $ 1,818 | $ - | $ 1,919 | $ 62,419 |
| 3Q 2011 | $ (5,991) | $ 1,500 | $ 1,618 | $ 66,200 | $ (3,993) | $ (3,993) | $ 1,100 | 12% | $ - | $ 1,873 | $ - | $ 3,791 | $ 65,391 |
| 4Q 2011 | $ (146) | $ 6,000 | $ 1,655 | $ 72,200 | $ 3,507 | $ - | $ 4,000 | 12% | $ 1,962 | $ - | $ 1,545 | $ 2,246 | $ 67,846 |
| 1Q 2012 | $ (18) | $ 100 | $ 1,807 | $ 72,300 | $ 1,935 | $ - | $ - | 12% | $ 1,935 | $ 100 | $ - | $ 2,347 | $ 67,947 |
| 2Q 2012 | $ 1,086 | $ - | $ 1,809 | $ 72,300 | $ 2,913 | $ - | $ - | 12% | $ 2,038 | $ - | $ 875 | $ 1,472 | $ 67,072 |
| 3Q 2012 | $ 4,907 | $ - | $ 1,809 | $ 72,300 | $ 5,630 | $ 2,146 | $ - | 12% | $ 2,012 | $ - | $ 1,472 | $ - | $ 65,600 |
| 4Q 2012 | $ 8,827 | $ - | $ 1,808 | $ 72,300 | $ 7,874 | $ 6,234 | $ - | 10% | $ 1,640 | $ - | $ - | $ - | $ 65,600 |
| | | $ 71,300 | $ 23,754 | | | | $ 64,600 | | $ 19,092 | $ 7,255 | $ 7,255 | $ - | |

| | | |
|---|---|---|
| Treasury Commitment erosion prevented by using the payment-in-kind option: | $ | 6,700 |
| Cash saved/(additional cash paid) by using the paid-in-kind option: | $ | (2,593) |

**Exhibit B1**
**Corporate Bond Spreads and GSE Bond Credit Spreads, 2012 (Full Year)**



Source: PX-0444. The GSEs' yield spreads equal the weighted average yield spreads of the benchmark bonds of Fannie Mae and reference notes of Freddie Mac evaluated by Dr. Attari.

**Exhibit B2**
**Corporate Bond Spreads and GSE Bond Credit Spreads, 2012 (Until August 15, 2012)**



Source: PX-0445. The GSEs' yield spreads equal the weighted average yield spreads of the benchmark bonds of Fannie Mae and reference notes of Freddie Mac evaluated by Dr. Attari.

**Exhibit C**
**MBS Issuances by Fannie Mae and Freddie Mac**
Total of Single-Family and Multi-Family Mortgage-Backed Securities[80]

| Year/Quarter | Fannie Mae ($ Million) | Freddie Mac ($ Million) |
|---|---|---|
| 2008 to 2012 – Annual: | | |
| 2008 | $542,813 | $357,851 |
| 2009 | $807,853 | $475,412 |
| 2010 | $629,746 | $393,037 |
| 2011 | $598,672 | $317,261 |
| 2012 | $865,487 | $466,479 |
| | | |
| 2011 and 2012 – Quarterly: | | |
| 2011 Q1 | $175,254 | $98,716 |
| 2011 Q2 | $110,783 | $66,223 |
| 2011 Q3 | $119,564 | $70,430 |
| 2011 Q4 | $193,071 | $81,892 |
| | | |
| 2012 Q1 | $205,606 | $113,801 |
| 2012 Q2 | $182,585 | $106,611 |
| 2012 Q3 | $239,247 | $110,758 |
| 2012 Q4 | $238,049 | $135,309 |

---

[80] 2012 quarterly data in the table are from FHFA 2012 Report to Congress, available at
https://www.fhfa.gov/AboutUs/Reports/ReportDocuments/2012_AnnualReportToCongress_508.pdf. The report also contains annual data. 2011 quarterly data
are from FHFA 2011 Report to Congress, available at https://www.fhfa.gov/AboutUs/Reports/ReportDocuments/2011_AnnualReportToCongress_508.pdf. In
both FHFA annual reports, Table 2 has the MBS issuance data for Fannie Mae and Table 11 has the corresponding data for Freddie Mac.

**Exhibit D**
**Accounting Provisions, Write-Downs, and Write-Ups for Fannie Mae and Freddie Mac, 2008 to 2021**

**Panel A: Fannie Mae**

| | FY 2008 | FY 2009 | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Credit Losses Benefit / (Provision) | $ (28.0) | $ (72.6) | $ (24.9) | $ (26.7) | $ 0.9 | $ 8.9 | $ 4.0 | $ 0.8 | $ 2.2 | $ 2.0 | $ 3.3 | $ 4.0 | $ (0.7) | $ 5.1 |
| | | ($152.2) | | | | | | | $30.5 | | | | | |
| DTA Valuation Allowance Reversal / (Provision) | $ (30.8) | $ (21.9) | $ (3.6) | $ (7.8) | $ 5.2 | $ 58.4 | $ 0.3 | $ 0.2 | $0 | $0 | $0 | $0 | $0 | $0 |
| | | ($64.1) | | | | | | | $64.1 | | | | | |
| Comprehensive Income / (Loss) | $ (58.7) | $ (60.5) | $ (10.6) | $ (16.4) | $ 18.8 | $ 84.8 | $ 14.7 | $ 10.6 | $ 11.7 | $ 2.3 | $ 15.6 | $ 14.0 | $ 11.8 | $ 22.1 |
| | | ($146.2) | | | | | | | $206.4 | | | | | |

**Panel B: Freddie Mac**

| | FY 2008 | FY 2009 | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Credit Losses Benefit / (Provision) | $ (16.4) | $ (29.5) | $ (17.2) | $ (10.7) | $ (1.9) | $ 2.5 | $ (0.1) | $ 2.7 | $ 0.8 | $ 0.1 | $ 0.7 | $ 0.7 | $ (1.5) | $ 1.0 |
| | | ($73.9) | | | | | | | $5.1 | | | | | |
| DTA Valuation Allowance Reversal / (Provision) | $ (22.4) | $ (2.7) | $ (8.3) | $ (2.3) | $ 4.0 | $ 31.7 | $0 | $0 | $0 | $0 | 0 | $0 | $0 | $0 |
| | | ($35.7) | | | | | | | $35.7 | | | | | |
| Comprehensive Income / (Loss) | $ (70.5) | $ (2.9) | $ 0.3 | $ (1.2) | $ 16.0 | $ 51.6 | $ 9.4 | $ 5.8 | $ 7.1 | $ 5.6 | $ 8.6 | $ 7.8 | $ 7.5 | $ 11.6 |
| | | ($74.3) | | | | | | | $131.0 | | | | | |

**Exhibit E**
**Supplemental Documents Considered / Relied Upon**

**Case Documents:**
Fairholme-DDC-0009617 to 9618
FHFA00102594 to 2596
FHFA-DDC-0119071 to 9076
FHFA-DDC-0319690 to 9694
FHFA-DDC-0320331 to 0334
FHFA-DDC-0425927 to 5931
FM_Fairholme_CFC_00000939
JX-0001
PX-0003-A4
PX-0003-B4
PX-0005-A-O.xls
PX-0033
PX-0034
PX-0180
PX-0205
PX-0210
PX-0226
PX-0227
PX-0247
PX-0259
PX-0270
PX-0274
PX-0278
PX-0279
PX-0282
PX-0444
PX-0445
PX-0515
PX-0516
DX-0412 (FHFA00050893 to 0900)
TREASDDC00057122 to 7126
UST00504498 to 4500
UST00517634 to 7635
UST00533618 to 3619
UST00538681 to 8683
Bala Dharan Trial Demonstratives
Trial Transcripts, Days 4, 5, 6, 7, 9 and 10

**Other Documents/Sources:**
Capital IQ
Fannie Mae Forms 10-Q and 10-K for various quarters and years
Freddie Mac Forms 10-K and 10-Q for various quarters and years

FHFA Annual Report to Congress, 2011

FHFA Annual Report to Congress, 2012

https://www.fitchratings.com/entity/fannie-mae-80089159

https://www.fitchratings.com/entity/freddie-mac-80089158

https://www.moodys.com/credit-ratings/Federal-National-Mortgage-Association-credit-rating-276550/ratings/view-by-class

https://www.moodys.com/credit-ratings/Federal-Home-Loan-Mortgage-Corp-credit-rating-276455/ratings/view-by-class