**EXHIBIT 2**

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| **In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations**<br><br>**THIS DOCUMENT RELATES TO:**<br>**ALL CASES** | Misc. Action No. 13-mc-1288 (RCL) |

**SUPPLEMENTAL EXPERT REPORT OF
JOSEPH R. MASON**

**February 10, 2023**

**CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER**



CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

**TABLE OF CONTENTS**

Page

I. Introduction and Summary of Opinions ........................................................................... 1

II. The Attari Report's Characterization of a "Recovery" in GSE Share Prices in this Case is Misleading ........................................................................................................................ 3

    A. Changes in GSE share prices identified as a "recovery" by Defendants are unrelated to the NWS and thus irrelevant to the harm ............................................ 3

    B. The NWS Altered the Value Path of GSE Shares ............................................... 4

    C. The GSEs' Performance Since 2012 Makes the $1.6 Billion Measure of Damages Conservative ......................................................................................................... 5

III. Prejudgment Interest ......................................................................................................... 6



CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER



| | | | |
|---|---|---|---|
| | 7250 Dallas Parkway<br>Suite 200<br>Plano, Texas 75024<br>+1.972.377.0300 | 1000 Louisiana Street<br>Suite 1150<br>Houston, Texas 77002<br>+1.713.457.3125 | 405 Lexington Avenue<br>Floor 9<br>New York, New York 10174<br>+1.212.364.1926 |

## I.   Introduction and Summary of Opinions

1.   While Defendants' counsel suggested in trial and at closing[1] that share price fluctuations unrelated to the Net Worth Sweep ("NWS") mitigated damages later in 2012, there is no sound economic basis to support the notion that subsequent changes in the stock prices represented a "recovery" that would offset damages arising from the NWS.[2]

2.   I testified at trial that the NWS caused GSE shareholders damages of $1.6 billion.[3]  A stock price movement reflects the market's assessment of the value of new information (here, the NWS), so that the change in price that was caused by the new information reflects the market's best estimate of the value of that information.  I testified that work performed by Defendants' expert, Dr. Attari, shows damages to GSE private shareholders of at least $1.6 billion.  That $1.6 billion is the one-day decline in the market value of the GSE stocks that occurred promptly upon the announcement of the NWS, which cannot logically be attributed to anything other than the NWS.[4]

3.   Only share price increases arising from changes to the NWS – rather than share price increases arising from other influences – could mitigate the harm caused by the NWS.  I know of no facts or claims by Defendants or their experts that any change to the NWS from August 17, 2012 to today has occurred that has mitigated or reduced the damages the NWS caused to shareholders in this case.  As a result, there has been no causal influence to date that mitigates the $1.6 billion harm. The $1.6 billion decline in share value associated with the announcement of the NWS on August 17, 2012, therefore, constitutes a reasonable and reliable measure of damages at that time, as well as today.[5]

---

[1]   *See* Transcript of Jury Trial ("Trial Tr.") 1524:1-17; 2688:3-8.

[2]   I also note that Defendants' expert, Dr. Attari, expressed no formal analysis or opinion regarding loss mitigation in this matter.

[3]   *See* Trial Tr. 1499:4-17.

[4]   *See* Trial Tr. 1539:11-14.  Note that neither Defendants' expert nor I have identified any confounding information that could account for any portion of the $1.6 billion decline in value of the relevant GSE shares.  Dr. Attari's presentation, however, also shows statistically significant negative excess returns on August 20, 2012, the subsequent trading day following the announcement of the NWS on Friday August 17, 2012.  Dr. Attari's presentation associates this date with the NWS (*see* FHFA-DDC-0119100).  If one accepts Dr. Attari's attribution of the further decline on August 20, 2012 to the NWS, damages increase beyond the $1.6 billion derived from the single-day effect on Friday, August 17, 2012 to $1.73 billion (*see* FHFA-DDC-0119085).

[5]   As the Court recognized prior to trial, "Dr. Mason previously opined that a measure of expectation damages based on lost share value would total approximately $1.6 billion based on a 50 to 60 percent decline in value estimated by one of defendants' experts, **although he cautioned that that measure 'understates damages ...** because it does not fully encompass the shares' fundamental value.'"  *See Fairholme Funds, Inc. v. Federal Housing Finance Agency*, 2022 WL 11110548, at *2 (D.D.C. Oct. 19, 2022) (emphasis added).

4. The opinions explained in this supplement are provided because on cross-examination, defense counsel read a bullet point from Dr. Attari's PowerPoint presentation of his equity event study results that included the phrase "[the] [p]rice of the common stock recovered in September 2012 and that of the junior preferred stocks recovered during October 2012."[6] I was then asked by defense counsel only, "Did [defense counsel] read that correctly?"[7] I was prevented from explaining that the stock price "recovery" alluded to in the passage in no way lessened the harm the NWS caused shareholders and does not mitigate damages in this matter, as Defendants' counsel implied.[8]

5. Having reviewed portions of the trial transcript, I understand that Defendants asserted that such an explanation would "offer completely new opinions that were never disclosed" and are "completely outside the scope of [my] expert disclosures."[9] But that is not so. In my reply expert report, I opined that:

> "I understand that Dr. Attari supervised an event study whereby he evaluated the statistical significance of the equity share price declines in response to the NWS and evaluated the market value decline.[10] … [B]ased on my review of the documents produced on this topic by Defendants, adoption of Defendants' method and analysis of the decline in share price would appear to yield damages of approximately $1.6B based on the decline in the GSE share price.[11]"

6. In rendering my opinion, I had considered the entirety of Dr. Attari's analysis summarized in the presentation of his equity event study results,[12] including the statements pertaining to changes in GSE share prices (among them, the statement regarding the recovery) and the corresponding backup materials to weigh Dr. Attari's analysis in its entirety. My opinion, therefore, already included the conclusion that the so-called price "recovery" noted by Dr. Attari in no way mitigated the harm the NWS caused GSE shareholders or the damages resulting from that harm through the remainder of 2012, the period analyzed by Dr. Attari.

7. The opinion in my Reply Report regarding the $1.6 billion in damages estimated at the announcement of the NWS applies today, as well as in 2012. The harm caused by the NWS today is likely much higher today because the GSEs were profitable over the period and value derived from that profitability accrued to the Treasury. Over the ensuing ten years after the NWS, the NWS has caused approximately $150 billion in excess value (exceeding pre-existing contractual requirements) to accrue to the Treasury, which necessarily had a negative impact on the value of the GSE shares owned by private shareholders. As noted by the Court, for instance, these additional amounts would have (at a minimum) "increase[d] the value of Plaintiffs' underlying securities either by way of reinvestment into the company or

---

[6] *See* FHFA-DDC-0119087.
[7] *See* Trial Tr. 1524:6.
[8] *See* Trial Tr. 1535:8-1537:25; Trial Tr. 2687:21-2688:12.
[9] *See* Trial Tr. 1535:14-16; *see also* Trial Tr. 1536:3-4.
[10] *See* FHFA-DDC-0119086; *see also*, Attari Deposition, 16:19-17:3.
[11] *See* FHFA-DDC-0119091. The $1.6B excludes the decline associated with FNMA common equity.
[12] *See* Trial Exhibit PX-375; FHFA-DDC-0119086.

reduction of debt."[13]  The $150 billion in value that accrued to Treasury amounts to *roughly 100 times* the estimated damages of $1.6 billion.[14]

8.  I have been asked by counsel to provide further information behind my opinion with regard to whether the "recovery" in GSE share prices referred to by Dr. Attari in the summary of his equity event study results at FHFA-DDC-0119087, or any other purported recovery, mitigates damages in this case. In particular, I have been asked to refine and clarify the relevant portions of my prior Expert and Reply Report opinions in response to Defendants' cross-examination and argument, and to detail my reasoning with regard to why the aforementioned stock price recovery discussed by Defendants' counsel, or any purported recovery, does not mitigate damages in this case.

9.  In summary, I am of the opinion that there has not been a change in the NWS policy (by which all profits generated by the GSEs accrue to the benefit of Treasury) that would mitigate damages in this case.[15]  Thus, the harm from the NWS persists to this day.  Since the share price movement that Defendants characterize as a "recovery" is unrelated to any change in the NWS, Defendants' purported "recovery" in GSE share prices cannot logically reduce the $1.6 billion in damages caused by the NWS.

10.  I have been asked to include the details of those opinions here for the convenience of the factfinder in this matter even though the opinions in this report were already advanced, either explicitly or implicitly, in one or both of the two prior reports that I submitted in this case.  In addition, I have also been asked to calculate prejudgment interest on damages through the date of this report as well as through the expected date of trial.

## II. The Attari Report's Characterization of a "Recovery" in GSE Share Prices in this Case is Misleading

### A. Changes in GSE share prices identified as a "recovery" by Defendants are unrelated to the NWS and thus irrelevant to the harm

11.  Dr. Attari's stock price analysis, as summarized in FHFA-DDC-0119086, analyzes the time period of January 1, 2012 to December 31, 2012.  The NWS was enacted August 17, 2012, on which date the value of the GSEs' common and preferred stock, in the aggregate, dropped by more than half.  At FHFA-DDC-0119087, Defendants' expert wrote the "[p]rice of the common stock recovered in September 2012 and that of the junior preferred stocks recovered during October 2012."[16]  But there were no changes to the NWS in the six to ten weeks following its announcement, let alone any such change that could have

---

[13]  *See Fairholme Funds, Inc. v. Federal Housing Finance Agency*, 2018 WL 4680197, at *14 (D.D.C. Sept. 28, 2018).

[14]  The $1.6 billion amounts to an average of approximately $1.40 per share for FNMA JPS, approximately $1.69 per share for FMCC JPS, and approximately $.07 per share for FMCC common stock.

[15]  *See* Mason Report dated August 27, 2021 at ¶ 27.  *See also* Joint Statement of Undisputed Facts dated October 18, 2022 at ¶¶ 44-45.

[16]  FHFA-DDC-0119087.

3

resulted in any relevant *recovery from* the NWS, which, in fact, imposed harm to shareholders that persists to this day.[17] It is my opinion that the "recovery" characterized in this statement is irrelevant to damages in this case because there is no sound economic basis to support the notion that subsequent changes in the stock prices represented a recovery that would offset damages arising from the NWS.

12. From an economic standpoint, for any "recovery" to be considered to have offset or mitigated damages in this matter, that "recovery" must have been caused by a reversal or material change to the NWS, which (as Defendants' expert's event study shows) caused the loss of value of $1.6 billion for the relevant GSE shares on the day it was announced. But Defendants' expert's analysis does *not* attempt to show, nor even suggest, that any or all of the purported "recovery" was caused in any way by a subsequent change to the NWS. Neither the FHFA nor the U.S. Treasury announced a change to their intention and policy that the benefits of GSE performance should accrue to Treasury, rather than shareholders.[18] Defendants' expert's presentation includes a table of news events related to positive price movements of the GSE shares from August 2012 through October 2012; yet Defendants' expert does not even attempt to link any of these events to changes in the NWS. I reviewed the news releases cited by Defendants' expert during the period following the NWS and see no reference to changes to the NWS between August 17, 2012 and the end of October 2012 (the purported recovery period). It must, therefore, be that the changes to the stock price during the purported "recovery" period are unrelated to any new developments about the NWS that would offset or mitigate damages in this case. The statement in Dr. Attari's presentation discussing price "recoveries" in September 2012 and October 2012 is, therefore, inapt and had no impact on my opinion regarding "damages of approximately $1.6B" arising from the NWS. There also has been no change to the NWS from December 31, 2012 through the date of this report that has remedied or mitigated the harm caused to shareholders by the NWS.[19]

### B. The NWS Altered the Value Path of GSE Shares

13. Since no change was made to the NWS in the timeframe analyzed by Defendants, it is reasonable to believe that had the NWS *not* been enacted, the value path of Fannie Mae and Freddie Mac

---

[17] Note that share prices had also not, in fact, "recovered" to pre-NWS levels as of the dates mentioned in FHFA-DDC-0119087. I note that at the end of September 2012, the common stock of FMCC reached a per-share value of $0.26 compared to a value of $0.30 on August 16, 2012, immediately prior to the NWS. Similarly, the common stock of FNMA reached a per-share value of $0.28 at the end of September 2012 compared to a value of $0.30 on August 16, 2012, immediately prior to the NWS. The market values of the FMCC and FNMA preferred stocks reached a value of $849 million and $1.11 billion, respectively, at the end of October 2012, compared to a value of $1.26 billion and $1.46 billion, respectively, on August 16, 2012 (*see* FHFA-DDC-0119085). In fact, during the remainder of 2012, prices never exceeded those on the day prior to the NWS (FHFA-DDC-0119086-101). None of those share price movements, however, could be associated with any change to the NWS because there was no change to the NWS.

[18] The NWS "ma[de] sure that every dollar of earnings that Fannie Mae and Freddie Mac generate will be used to benefit taxpayers for their investment in those firms." U.S. Department of Treasury. *See* "Treasury Department Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac," August 17, 2012.

[19] As noted in the Mason Report, "under the terms of the Fourth Amendment all increases in net worth accrue to Treasury in the form of an increase to the liquidation preference" such that all benefits of GSE earnings continue to accrue to Treasury through today just as they did under the Third Amendment. *See* Mason Report dated August 27, 2021 at ¶ 27. *See also* Joint Statement of Undisputed Facts dated October 18, 2022 at ¶¶ 44-45.

shares at FHFA-DDC-0119088-89 would have proceeded *without* the drop caused by the NWS announcement on August 17, 2012. Said differently, without the NWS, the stock prices would have fluctuated on subsequent news after August 17, 2012 – beginning at their levels from August 16, 2012 (before the NWS) and *not* from the suppressed levels from after the NWS.[20] Since the stock price increases after August 17, 2012 have nothing to do with the NWS, they cannot in any way mitigate or offset damages in this matter. In addition, those stock price increases likely would have been larger had the NWS not attenuated the link (in particular the upside link) between the GSEs' cash flows and investor returns.

### C. The GSEs' Performance Since 2012 Makes the $1.6 Billion Measure of Damages Conservative

14. At the time of the NWS, the economic recovery was well underway. By almost any measure, the housing market, the financial services industry, and the economy at-large had already recovered significantly from the height of the crisis, aided by an immediate infusion of roughly $5 trillion in assistance from the U.S. Government and the Federal Reserve System.[21] By August 2012, the internal conditions at the GSEs were ripe for strong future performance and growth.[22] From the date of the NWS through Q2 2022, the GSEs earned over $330 billion in comprehensive income.[23]

15. At trial, I testified about how the NWS had an ongoing impact on the GSEs and shareholders, including how it swept "every dollar of profit the GSEs earned going forward," "prevented the companies from building capital," and "insured that shareholders would receive little to no benefit from any future positive financial performance by the GSEs."[24] The NWS thus prevented shareholders from sharing in the benefit of this performance in any way.[25] Instead, the benefits of the performance have accrued solely to Treasury as senior preferred shareholder with approximately $330 billion of value accruing to Treasury from 2013 through Q2 2022.[26] This amounts to an excess of approximately $150 billion in value when compared

---

[20] I note that Dr. Attari visually positioned the date indicator for the NWS at the end of the day August 17, 2012 in his charts within FHFA-DDC-0119088-89, rather than at the beginning of that day, creating the illusion that the large drop occurred before the Net Worth Sweep. Tables elsewhere in FHFA-DDC-0119086-101 show that the stock price fell from the previous high on the day of the NWS. Prices never exceed those on the day prior to the Net Worth Sweep at any time analyzed by Defendants in FHFA-DDC-0119086-101.

[21] *See* Expert Report of Dr. Bala Dharan ("Dharan Report") dated August 12, 2021 at ¶ 132. *See also*, United States Government Accountability Office, "Financial Regulatory Reform: Financial Crisis Losses and Potential Impacts of the Dodd-Frank Act," Report No. GAO-13-180, January 2013, at 29-31. Note further, the GAO states, "academic studies … have found that costs associated with rescuing financial institutions are generally small relative to overall crisis costs. *See, e.g.*, Reinhart and Rogoff (2009)" (at page 29, footnote 49).

[22] *See* Dharan Report at ¶¶ 43, 143-176.

[23] Plaintiffs' Trial Exhibit 5-O, Comprehensive Income of Fannie Mae and Freddie Mac.

[24] Trial Tr. 1538:15-1539:10.

[25] As I noted in the Mason Report dated August 27, 2021 at ¶49, "[i]ndeed, had the GSEs been permitted to retain earnings and deploy them elsewhere, but-for performance may logically have been stronger than actual performance. Additionally, all influences by GSE management and the FHFA were, instead, dedicated to shrinking the enterprises and, as such, hampering growth."

[26] *See* Plaintiffs' Exhibit 5-H and Joint Statement of Undisputed Facts dated October 18, 2022 at ¶47. I include increases in the liquidation preference of $84.3 billion that have occurred in lieu of dividends from Q3 2019 through Q2 2022 in this figure.

to 10% dividend payments but for the NWS.[27]  Said differently, the NWS has caused approximately $150 billion in excess value to go to one shareholder, Treasury, which necessarily harms the other, private shareholders.[28]

16.  But for the NWS, this value would have contributed to an increase in the value of privately held GSE shares.  As the Court held in its September 28, 2018 order denying Defendants' motion to dismiss the implied covenant claim, an investor would expect additional available cash on hand "to increase the value of Plaintiffs' underlying securities either by way of reinvestment into the company or reduction of debt.  The Net Worth Sweep does exactly the opposite.  It decreases the value of all securities other than the PSPAs by eliminating the possibility of profits accruing in any way to their benefit."[29]

17.  Numerous financial ratios for the GSEs would have also been improved but for the NWS, implying greater value prospects for the GSEs to shareholders.[30]  Such ratios are informative in this case, because "practitioners routinely use ratios to derive and communicate the value of companies and securities."[31]  In addition, "extensive academic research has examined the importance of ratios in predicting stock returns."[32]

18.  As a result, it is reasonable to believe that the $150 billion in excess value that accrued to Treasury under the NWS would have translated into at least $1.6 billion in increased share value – the latter being only about 1% of the former.  It is my opinion, therefore, that the $1.6 billion in damages measured at the announcement of the NWS is reasonable, and conservative, in this matter.

### III.  Prejudgment Interest

19.  I have also been asked to compute prejudgment interest through the date of this report and through the expected date of trial.  Total prejudgment interest for Fannie Mae Junior Preferred Shares is approximately $646 million through today and estimated as $684 million through trial.[33]  Total prejudgment interest for Freddie Mac Junior Preferred Shares is approximately $494 million through today and estimated as $516 million through trial, while prejudgment interest on Freddie Mac common stock is approximately $29 million through today and estimated as $30 million through trial.[34]  I will update all figures as of the date

---

[27] The GSEs would have owed approximately $180 billion in dividends over the period of 2013 through Q2 2022 but-for the NWS.  *See* Dharan Initial Report ¶ 121, fn 155, and Table 1, extending computation through Q2 2022.

[28] The $150 billion consists of approximately $65.8 billion of excess dividends and $84.3 billion of increase in liquidation preference.

[29] *Fairholme Funds, Inc. v. Federal Housing Finance Agency*, 2018 WL 4680197, at *14.

[30] For instance, solvency ratios such as debt to capital would have indicated lower financial risk but for the NWS, while improved liquidity ratios would have communicated to investors a stronger "capacity to take on debt."  The GSEs' capital ratios would have also been improved, providing a stronger overall financial position for investors. *See* CFA Institute Refresher Readings, "Financial Analysis Techniques," at pp. 32, 37.

[31] CFA Institute Refresher Readings, "Financial Analysis Techniques," p. 9.

[32] CFA Institute Refresher Readings, "Financial Analysis Techniques," p. 9.

[33] For Fannie Mae, prejudgment interest is calculated using quarterly compound interest at 5.0 percent plus the time-weighted average federal funds rate.  I understand the details on prejudgment interest for Fannie Mae are specified in Delaware Code Title VI § 2301 and have been provided direction from counsel on application of these details.

[34] For Freddie Mac, prejudgment interest is calculated using annual simple interest at the Virginia prejudgment interest rate of 6.0 percent.

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

of trial.  With prejudgment interest applied, total damages amount to approximately $2.8 billion.  I present the details of these results in full in Exhibit 1.

_____
Joseph R. Mason, PhD

**In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations**
**Exhibit 1.A**
**Prejudgment Interest through Expected Date of Trial ($ millions)**

|  | Damages | PJI | Damages including PJI |
|---|---:|---:|---:|
| **Fannie Mae Common** | N/A | N/A | N/A |
| **Fannie Mae Junior Preferred** | $ 779.00 | $ 684.46 | $ 1,463.46 |
| **Fannie Mae Total** | $ 779.00 | $ 684.46 | $ 1,463.46 |
|  |  |  |  |
| **Freddie Mac Common** | $ 46.00 | $ 30.23 | $ 76.23 |
| **Freddie Mac Junior Preferred** | $ 786.00 | $ 516.47 | $ 1,302.47 |
| **Freddie Mac Total** | $ 832.00 | $ 546.69 | $ 1,378.69 |
|  |  |  |  |
| **Total Damages** | $ 1,611.00 | $ 1,231.15 | $ 2,842.15 |

**Notes**

(1) Prejudgement interest for Fannie Mae is calculated as quarterly compounded interest, using 5.0 percent plus the time-weighted average federal funds rate.

(2) Prejudgement interest for Freddie Mac is calculated as annual simple interest using the Virginia prejudgement interest rate of 6.0 percent.

(3) Expected date of trial applied as July 31, 2023.  I will update this calculation using prevailing federal funds rate data at the time of trial.

**In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations**
**Exhibit 1.B**
**Prejudgment Interest through February 10, 2023 ($ millions)**

|  | Damages | PJI | Damages including PJI |
|---|---:|---:|---:|
| **Fannie Mae Common** | N/A | N/A | N/A |
| **Fannie Mae Junior Preferred** | $ 779.00 | $ 645.54 | $ 1,424.54 |
| **Fannie Mae Total** | $ 779.00 | $ 645.54 | $ 1,424.54 |
| **Freddie Mac Common** | $ 46.00 | $ 28.93 | $ 74.93 |
| **Freddie Mac Junior Preferred** | $ 786.00 | $ 494.39 | $ 1,280.39 |
| **Freddie Mac Total** | $ 832.00 | $ 523.32 | $ 1,355.32 |
| **Total Damages** | $ 1,611.00 | $ 1,168.86 | $ 2,779.86 |

**Notes**

(1) Prejudgement interest for Fannie Mae is calculated as quarterly compounded interest, using 5.0 percent plus the time-weighted average federal funds rate.

(2) Prejudgement interest for Freddie Mac is calculated as annual simple interest using the Virginia prejudgement interest rate of 6.0 percent.



**JOSEPH R. MASON** PhD
*Senior Advisor*

Dr. Joseph Mason is a Professor at Louisiana State University and Fellow at the University of Pennsylvania's Wharton School of Business.

He has more than 25 years of experience advising corporations, government agencies, and research institutions on financial risk management issues, reviewing corporate risk management systems and internal models and working on contemporary finance and valuation issues.

Dr. Mason is frequently retained as an expert in disputes and investigations involving financial markets, valuation, and macroeconomic dynamics, particularly with respect to securities analysis involving equities, debt instruments, derivative instruments (including options, futures, swaps, and associated underlying price dynamics), and a variety of structured financial products.  Dr. Mason has been deposed more than fifty times and has testified at trials and hearings in the United States District Court in the Southern District of New York, the District of Connecticut, and others.

Dr. Mason has testified on economic causation, valuation, market efficiency, and damages in the areas of antitrust, PSLRA and Rule 10(b)-5, Section 11, class action, and breach of contract (*i.e.*, suitability, standard of care, financial guarantees and representations and warranties).  He has testified in several high-profile federal court cases, such as Assured Guaranty v. Flagstar Bank, In re Blue Cross Blue Shield Antitrust Litigation, and Law Debenture Trust Company v. WMC Mortgage.

In regulatory matters, Dr. Mason has been engaged by both the SEC and respondents in a variety of SEC investigations and lawsuits, including those relating to marking to market, algorithmic trading, and insider trading.  Dr. Mason has opined in connection with banks' risk management systems, their use and classification of structured finance arrangements, and economic capital assessments.  He has also been engaged as a principal in a variety of risk management and modeling reviews by institutions such as Fannie Mae, Credit Agricole CIB/Calyon, and ExxonMobil, among other firms.

With regard to public policy, Dr. Mason has testified on financial risk management and financial markets before numerous House and Senate Committees (approximately twenty times), the European Parliament, and the Federal Reserve Board. He has also advised Congress' Joint Economic Committee, the Government Accountability Office, the Congressional Research Service, the Federal Reserve Bank of Richmond, the Public Company Accounting Oversight Board, and the Financial Crisis Inquiry Commission.  At the request of the European Parliament Committee on Economic and Monetary Affairs, he co-authored the study, "Financial Supervision and Regulation in the US: Dodd-Frank Reform" (December 2018).  Prior to that study, Dr. Mason authored the "Overview and Structure of Financial Supervision and Regulation in the U.S." (September 2015) for that same committee.

Dr. Mason applies formal economic reasoning to issues involving litigation, risk management, and restructuring.  His formal economic training and experience is reflected in published academic articles and in his consultations on issues such as the economic dynamics of liquidations and recoveries, the economics of loss causation, and in valuation and risk management in the presence of imperfect information.  Not only is Dr. Mason an expert in finance, but also in regard to financial crises and the macroeconomic dynamics of losses and recoveries.

Dr. Mason was previously a Senior Financial Economist at the Office of the Comptroller of the Currency, where, among other things, he analyzed bank risks to support examination assignments and regulatory policy.  He has performed similar work for the Federal Reserve Bank of Philadelphia, the Federal Deposit Insurance Corporation, and the World Bank.

Dr. Mason holds a Doctor of Philosophy in financial economics and monetary theory, as well as Master of Science in economics from the University of Illinois at Urbana-Champaign and a Bachelor of Science in economics from Arizona State University.

**Direct** *+1.212.364.1926*
**Mobile** *+1.610.805.9083*
**Email** *jmason@bvagroup.com*



**JOSEPH R. MASON,** PhD
*Senior Advisor*

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

## TESTIMONY AND PUBLICATIONS

**DEPOSITION TESTIMONY:**

*Deutsche Bank National Trust Company, solely In its capacity as Trustee for the Morgan Stanley ABS Capital I Inc. Trust, Series 2007-NC1 v. Morgan Stanley ABS Capital I Inc.*
No. 650291/2013
Supreme Court of the State of New York, County of New York

*Deutsche Bank National Trust Company, solely In its capacity as Trustee for the Morgan Stanley ABS Capital I Inc. Trust, Series 2007-NC3 v. Morgan Stanley ABS Capital I Inc.*
No. 651959/2013
Supreme Court of the State of New York, County of New York

*Sjunde AP-Fonden, individually and on Behalf of All Others Similarly Situated v. The Goldman Sachs Group, Inc., et al.*
No. 1:18-cv-12084-VSB
United States District Court, Southern District of New York

*Commerzbank AG v. U.S. Bank National Association*
No. 16-cv-04569-DLC-SDA
United States District Court, Southern District of New York

*In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations*
No. 13-mc-1288-RCL
United States District Court, District of Columbia

*Phoenix Light SF Limited, et al. v. HSBC Bank USA, National Association*
No. 14-cv-10101-LGS-SN
United States District Court, Southern District of New York

*In re Acuity Brands, Inc. Securities Litigation*
No. 18-cv-02140-MHC
United States District Court, Northern District of Georgia, Atlanta Division

*SEB Investment Management AB, Individually and on Behalf of All Others Similarly Situated v. ENDO International PLC, et al.*
No. 17-cv-03711-TJS
United States District Court, Eastern District of Pennsylvania

*Atlantica Holdings, Inc., et al. v. BTA Bank JSC*
No. 13-cv-05790-JMF
United States District Court, Southern District of New York

*Atlantica Holdings, Inc., et al. v. Sovereign Wealth Fund "Samruk- Kazyna," JSC*
No. 12-cv-08852-JMF
United States District Court, Southern District of New York

*Homeward Residential, Inc., solely in its capacity as Master Servicer for the Option One Mortgage Loan Trust 2006-2, for the benefit of the Trustee and the holders of Option One Mortgage Loan Trust 2006-2 Certificates v. Sand Canyon Corporation, f/k/a Option One Mortgage Corporation*
No. 12-cv-05067-JFK-JLC
United States District Court, Southern District of New York



**JOSEPH R. MASON,** PhD
*Senior Advisor*

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

*Homeward Residential, Inc., solely in its capacity as Servicer for the Option One Mortgage Loan Trust 2006-3, for the benefit of the Trustee and the holders of Option One Mortgage Loan Trust 2006-3 Certificates v. Sand Canyon Corporation, f/k/a Option One Mortgage Corporation*
No. 12-cv-07319-JFK-JLC
United States District Court, Southern District of New York

*Phoenix Light SF Limited, et al. v. The Bank of New York Mellon*
No. 14-cv-10104-VEC
United States District Court, Southern District of New York

*Securities and Exchange Commission v. Amir Waldman*
No. 17-cv-02088-RMB
United States District Court, Southern District of New York

*Securities and Exchange Commission v. Lawrence F. Cluff, Jr. and Roger E. Shaoul*
No. 17-cv-02460-RMB
United States District Court, Southern District of New York

*Nora Fernandez, et al. v. UBS Financial Services of Puerto Rico, et al.*
No. 15-cv-02859-SHS
United States District Court, Southern District of New York

*Vesta Halay Johnston and Lake Charles Rubber and Gasket Co. L.L.C. v. Susan Halay Vincent, Martin Bryan Vincent, Moby Goodwin, and Gulf Coast Rubber & Gasket, L.L.C*
No. 2015-4153-G
14th Judicial District Court, Calcasieu Parish, Louisiana

*Trust Instruction Proceeding regarding Deutsche Bank National Trust Co., solely as Trustee of Securitized Asset Backed Receivables LLC Trust 2007- BR2 (SABR 2007-BR2) and Securitized Asset Backed Receivables LLC Trust 2007-BR3 (SABR 2007- BR3 v. WMC Mortgage, LLC)*
No. 651789/2013
Supreme Court of the State of New York, County of New York

*Deutsche Bank National Trust Co., solely in its capacity as Trustee for the Morgan Stanley Structured Trust I 2007-1 v. Morgan Stanley Mortgage Capital Holdings LLC, as Successor-by-Merger to Morgan Stanley Mortgage Capital Inc.*
No. 14-cv-03020-LTS
United States District Court, Southern District of New York

*The Bank of New York Mellon solely as Securities Administrator for the J.P. Morgan Mortgage Acquisition Trust, Series 2006-WMC4 v. WMC Mortgage. LLC, et al.*
No. 654464/2012
Supreme Court of the State of New York, County of New York

*TMI Trust Company of New York, solely in its capacity as Separate Trustee of the Securitized Asset Backed Receivables LLC Trust 2006-WM2 v. WMC Mortgage LLC, f/k/a WMC Mortgage Corp.*
No. 12-cv-01538-CSH
United States District Court, District of Connecticut

**CONFIDENTIAL DO NOT DISTRIBUTE WITHOUT CONSENT**



**JOSEPH R. MASON,** PhD
*Senior Advisor*

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

**TRIAL AND HEARING TESTIMONY:**

*In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations*
No. 13-mc-1288-RCL
United States District Court, District of Columbia

*In re Blue Cross Blue Shield Antitrust Litigation (MDL No. 2406)*
No. 13-cv-20000-RDP
United States District Court, Northern District of Alabama, Southern Division

*Vesta Halay Johnston and Lake Charles Rubber and Gasket Co. L.L.C. v. Susan Halay Vincent, Martin Bryan Vincent, Moby Goodwin, and Gulf Coast Rubber & Gasket, L.L.C*
No. 2015-4153-G
14th Judicial District Court, Calcasieu Parish, Louisiana

*United States of America v. Tinghui Xie, also known as Kelly Xie, also known as Kelly Liu, et al.*
No. 17-92-JWD-EWD
United States District Court, Middle District of Louisiana

*Securities and Exchange Commission v. Amir Waldman*
No. 17-cv-02088-RMB
United States District Court, Southern District of New York

*Securities and Exchange Commission v. Lawrence F. Cluff, Jr. and Roger E. Shaoul*
No. 17-cv-02460-RMB
United States District Court, Southern District of New York

*TMI Trust Company of New York, solely in its capacity as Separate Trustee of the Securitized Asset Backed Receivables LLC Trust 2006-WM2 v. WMC Mortgage LLC, f/k/a WMC Mortgage Corp.*
No. 12-cv-01538-CSH
United States District Court, District of Connecticut


**LEGISLATIVE AND REGULATORY TESTIMONY, BRIEFS, AND PRESENTATIONS:**

*Presentation to U.S. Securities & Exchange Commission Staff*
Confidential matter relating to whether and how a global asset management company applied algorithmic trading tools, models, and methods to emerging market debt portfolio management.
Washington, D.C.

Brief of Dr. Joseph R. Mason, et al., as Amici Curiae Financial Economists in support of Respondents, on *Writ of Certiorari to the United States Court of Appeals for the Second Circuit, in the Supreme Court of the United States*, Goldman Sachs Group, Inc., et al., Petitioners, v. Arkansas Teacher Retirement System, et al., Respondents, March 3, 2021.

Brief of Dr. Joseph R. Mason, et al., as Amici Curiae Economics and Finance Professors, in support of *Defendants' Opposition to Plaintiffs' Motion for Summary Judgment and Defendant's Cross Motion-Motion for Summary Judgment*, People of the State of California, et al., Plaintiffs, v. The Office of the Comptroller of the Currency, et al., Defendants, United States District Court, Northern District of California (Oakland), January 21, 2021.

*Testimony before the U.S. House of Representatives Committee on Natural Resources, Subcommittee on Energy and Mineral Resources,* "Climate Change: Preparing for the Energy Transition," February 12, 2019.



**JOSEPH R. MASON,** PhD
*Senior Advisor*

---

Co-Author (with Jeffrey D. Balcombe and W. Scott Dalrymple), "Financial Supervision and Regulation in the US: Dodd-Frank Reform," *European Parliament*, December 2018.

*Testimony before the U.S. Senate Committee on Energy and Natural Resources,* "Hearing on the Bureau of Ocean Energy Management's 2017-2022 OCS Oil and Gas Leasing Program," May 19, 2016.

*Testimony before the U.S. House of Representatives Committee on Natural Resources,* "The Impacts of Federal Policies on Energy Production and Economic Growth in the Gulf," September 15, 2015.

"Overview and Structure of Financial Supervision and Regulation in the U.S.," Prepared for the European Parliament's Committee on Economic and Monetary Affairs, Directorate General for Internal Policies, Policy Department A: Economic and Scientific Policy, IP/A/ECON/2012-16, PE 492.470, September 2015.

*Testimony before the U.S. Senate Committee on Environment and Public Works, Clean Air and Nuclear Safety Subcommittee, Minority Field Hearing,* "The EPA's Threat to Louisiana's Ozone Attainment," August 5, 2014.

*Testimony before the U.S. Senate Committee on Environment and Public Works, Clean Air and Nuclear Safety Subcommittee,* "Climate Change: The Need to Act Now," June 18, 2014.

*Testimony before the U.S. House of Representatives Committee on Natural Resources*, "One Year after President Obama's Gulf of Mexico 6-Month Moratorium Officially Lifted: Examining the Lingering Impacts on Jobs, Energy Production and Local Economies," October 12, 2011.

**ACADEMIC PUBLICATIONS:**

"ETF ownership and firm-specific information in corporate bond returns," (with Meredith E. Rhodes), *Journal of Financial Markets*, forthcoming.

"Asset Sales, Recourse, and Investor Reactions to Initial Securitizations: Evidence Why Off-Balance Sheet Accounting Treatment Does Not Remove On-Balance Sheet Financial Risk," (with Eric J. Higgins and Adi Mordel), *Journal of Risk Finance*, Vol. 20, Issue 3, August 12, 2019.

"Self-reporting under SEC Reg AB and transparency in securitization: evidence from loan-level disclosure of risk factors in RMBS deals," (with Michael Imerman and Hong Lee), *Journal of Risk Finance*, Vol. 15, Issue 4, August 18, 2014.

"The Effects of Reconstruction Finance Corporation Assistance on Michigan Banks' Survival in the 1930s," (with Charles Calomiris and Marc Weidenmier), *Explorations in Economic History*, Vol. 50, Issue 4, October 2013.

"'Blood and Treasure': Exiting the Great Depression and Lessons for Today," (with Kris Mitchener), *Oxford Journal of Economic Policy*, October 2010.

"Options-based Structural Model Estimation of Bond Recovery Rates," (with Robert R. Cangemi, Jr. and Michael S. Pagano), *Journal of Financial Intermediation*, Vol. 21, Issue 3, July 2012.

**BOOK CHAPTERS:**

"Financial Regulation and Fraud in CO2 Markets," *Research Handbook of Investing in the Triple Bottom Line*, Sabri Boubaker, Douglas Cummings and Doc Nguyen, eds., Cheltenham: Edward Elgar, 2018, pp. 9-28.



**JOSEPH R. MASON,** PhD  
*Senior Advisor*

CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER

---

"Contagion and Bank Failures during the Great Depression: The Chicago Banking Panic of June 1932," (with Charles Calomiris). American Economic Review, December 1997 (87:5), pp. 863-884. Reprinted in The International Library of Critical Writings in Economics –*Regulation and Governance of Financial Institutions*, edited by James R. Barth and Ross Levine, Cheltenham: Edward Elgar Publishers, 2016.

"Fundamentals, Panics and Bank Distress during the Depression," (with Charles Calomiris), *American Economic Review,* December 2003 (93:5), pp. 1615-1647. Reprinted in the International Library of Critical Writings in Economics – *Regulation* and *Governance of Financial Institutions*, James R. Barth and Ross Levine, eds., Cheltenham: Edward Elgar Publishers, 2016. Also reprinted in The International Library of Critical Writings in Economics – Financial Crises. Franklin Allen, ed., Cheltenham: Edward Elgar Publishers, 2008.

"'Blood and Treasure': Exiting the Great Depression and Lessons for Today," (with Kris Mitchener). *The Great Depression of the 1930s*, Peter Fearon and Nicholas Crafts, eds. Oxford University Press 2013, pp. 395-428.

**COMMENTS, OPINIONS, EDITORIALS:**

"COVID-19 Recovery and Commercial Real Estate Dynamics," (with Jody Bland), *BVA Group*, April 17, 2020.

"Evaluating Economic Losses in the Age of Coronavirus," (with Jody Bland), *BVA Group*, April 16, 2020.

"PPP Loan Policy and Lenders' Litigation Risk," (with Jody Bland), *BVA Group*, April 6, 2020.

"COVID-19 as a Natural Disaster and the Role of CARES," (with Jody Bland), *BVA Group*, April 2, 2020.

"Consumer Debt Defaults and the COVID-19 Pandemic," (with Jody Bland), *BVA Group*, March 27, 2020.

"Investing in a Consumer Debt Holiday," (with Jody Bland), *BVA Group*, March 25, 2020.

"COVID-19 Economic Policy to Fight the New War, " (with Jody Bland), *BVA Group*, March 24, 2020.

"Mortgage Payment Holidays, Servicing Advances, and Fed Policy," (with Jody Bland) *BVA Group*, March 23, 2020.



**In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations**
**Appendix B - Supplemental Information Considered**

**Case Documents:**
(1) Transcript of Jury Trial, *Fairholme Funds, Inc. v. Federal Housing Finance Agency*, 2022
(2) Joint Statement of Undisputed Facts, *Fairholme Funds, Inc. v. Federal Housing Finance Agency*, October 18, 2022
(3) Plaintiff's Trial Exhibit 5, *Fairholme Funds, Inc. v. Federal Housing Finance Agency*, 2022

**Court Cases:**
(1) *Fairholme Funds, Inc. v. Federal Housing Finance Agency*, 2018 WL 4680197
(2) *Fairholme Funds, Inc. v. Federal Housing Finance Agency*, 2022 WL 11110548

**Articles and Press Releases:**
(1) "Treasury Department Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac," *U.S. Department of Treasury*, August 17, 2012, https://home.treasury.gov/news/press-releases/tg1684
(2) "Financial Regulatory Reform: Financial Crisis Losses and Potential Impacts of the Dodd-Frank Act," *U.S. Government Accountability Office*, January 16, 2013, https://www.gao.gov/products/gao-13-180
(3) "Housing and Mortgage Markets in 2012," *Federal Housing Finance Agency*, December 2013, https://www.fhfa.gov/PolicyProgramsResearch/Research/PaperDocuments/20131213_RP_HousingMortgageMarkets_2012_508.pdf
(4) "Financial Statement Analysis - Financial Analysis Techniques," *CFA Institute Refresher Reading*, 2023

**Other:**
(1) Backup Materials to FHFA-DDC-0119086-101
(2) GSE stock price data for the three classes at issue, August 2012 to present (updated Bloomberg LP data)

*\*All information and materials previously considered in Corrected Mason Report dated August 27, 2021 and Mason Reply Report dated March 1, 2022 incorporated by reference.*