# EXHIBIT A

Page 1

```
        IN THE UNITED STATES COURT OF FEDERAL CLAIMS
                      NO. 13-465 C
                 (FILED FEBRUARY 26, 2014)


-------------------------------x
FAIRHOLME FUNDS, INC., ET AL

VS.                              RCFC 12(b); RCFC 12(b)(6);
                                 RCFC 56(d)
THE UNITED STATES
-------------------------------x
         PROTECTED INFORMATION ONLY TO BE DISCLOSED

           IN ACCORDANCE WITH PROTECTIVE ORDER

         ORAL DEPOSITION OF MS. SUSAN MCFARLAND

                    HOUSTON, TEXAS

                   JULY 15TH, 2015

                     10:01 A.M.
```

Reported By:
SAMANTHA DOWNING, CSR
JOB NO. 39652

1  December 2010.  You weren't there.

2     A.   Correct.

3     Q.   But when you did arrive in the middle of 2011,

4  did you see any manifestations of the administration's

5  commitment to ensure existing common equity holders

6  would not have access to any positive earnings from

7  Fannie?

8             MR. LAUFGRABEN:  Object to the form of

9  the question; lack of foundation.

10    A.   The only example that I -- that comes to mind

11 of note is the Third Amendment.

12    Q.   (BY MR. THOMPSON)  Yeah.

13            And what was your reaction when you

14 learned -- you learned of a Third Amendment a couple of

15 days beforehand; is that right?

16    A.   Correct.

17    Q.   All right.  And what was your reaction to it?

18            MR. LAUFGRABEN:  Objection; vague.

19    Q.   (BY MR. THOMPSON)  Did you think it was the

20 effective nationalization of the companies?

21            MR. LAUFGRABEN:  Objection; form.

22            MR. BARTOLOMUCCI:  Objection; form.

23    A.   No, I didn't view it as nationalizing.  It

24 borders on that; I can see.

25            But I had, shortly before that, had

Page 45

1  a meeting with Treasury whereby we reviewed our
2  forecasts.  I had expressed a view that I believed we
3  were now in a sustainable profitability, that we would
4  be able to deliver sustainable profits over time.  I
5  even mentioned the possibility that it could get to a
6  point in the not-so-distant future where the factors
7  might exist whereby the allowance on the
8  deferred tax asset would be released.  We were not there
9  yet, but, you know, you could see positive things
10 occurring.
11             So when the amendment went into place,
12 part of my reaction was they did that in response to my
13 communication of our forecasts and the implication of
14 those forecasts, that it was probably a desire not to
15 allow capital to build up within the enterprises and not
16 to allow the enterprises to recapitalize themselves.
17     Q.   (BY MR. THOMPSON)  And with whom at Treasury do
18 you have this meeting?
19     A.   So the -- which meeting?
20     Q.   The one you just referenced where --
21     A.   Where I had the discussion about the forecasts?
22     Q.   Yes.
23     A.   So it was a common practice for us to meet with
24 Treasury on a quarterly basis to review our results from
25 the past quarter and to update them on our forecasts;

1          MR. LAUFGRABEN:  Object to the form of
2  the question.
3      Q.   (BY MR. THOMPSON)  The sweep was the 17th, I
4  will represent to you.
5      A.   Yeah.
6               This is August 6th?
7      Q.   Yeah.
8      A.   So as of this meeting, no, I did not know that
9  the Third Amendment was going to be put in place.
10     Q.   And do you recall what Tim Mayopoulos' reaction
11  was to the Third Amendment?
12          MR. LAUFGRABEN:  Object to the form of
13  the question; lack of foundation.
14     A.   I can tell you the logistics of the
15  communication of the Third Amendment.  That might be
16  helpful.
17     Q.   (BY MR. THOMPSON)  Sure.
18     A.   I was on vacation in Mexico and was contacted,
19  I believe it was Tuesday of that week -- I may be off a
20  day -- that Secretary Geithner would like to meet with
21  the CEOs and CFOs of the two GSEs the next morning.  I
22  inquired into flight arrangements that could get me back
23  in time for the meeting, only to discover there were no
24  commercial arrangements to make that happen.
25               So I let Tim know that I couldn't find a

1  way to get back in time. And apparently there were some
2  other individuals -- I don't know if it was the CEO or
3  CFO of Freddie. I was not the only one logistically
4  challenged to make the meeting at 8:00 the next morning.
5              The decision was then made that
6  Secretary Geithner would not then meet. Instead, they
7  set up a meeting with Mary Miller that I know Tim
8  attended in person, and she communicated the -- that
9  they were going to put the Third Amendment in place.
10             Tim subsequently had a briefing call with
11 myself and a few other executives at Fannie Mae after
12 that to inform us. So I was still in Mexico on vacation
13 on the phone receiving -- being informed of the
14 Third Amendment.
15             So I say that only in the context of, you
16 know, I have to assess it based on what I heard. I
17 wasn't in the room. I couldn't, you know, get a sense
18 from body language or any of the other things.
19             I think -- you know, the sense I got was
20 maybe not that dissimilar from my reaction. When you're
21 in the unique situation that the GS Es were in, you're
22 never shocked at anything. But I -- there was a little
23 bit of surprise and yet not surprise, in the sense that
24 the chance that they -- we didn't believe that Treasury
25 would be too fond of a significant amount of capital

1  buildup inside the enterprises.
2      Q.   Why not.
3           They had mortgaged 79.9 percent of the
4  economy.
5           MR. LAUFGRABEN:  Objection to the form of
6  the question; calls for speculation.
7      A.   There was a desire to reach a more wholistic
8  solution for housing finance reform.
9           So as time passed and the companies
10 continued to operate and things happened through the
11 operation of those companies, you had -- all of the
12 parties involved, whether that's Treasury or FHFA or
13 Fannie, had to deal with the outcomes of those in the
14 absence of a more wholistic solution.
15          Some of those outcomes could start taking
16 things down a certain path that might affect or make the
17 ultimate solution, if there ever is one, more difficult
18 to deal with.
19          And I don't know.  I am just saying that
20 if you start allowing capital to accumulate up in the
21 enterprises, then that creates an additional variable or
22 factor that has to be taken into account if and when
23 perhaps a more wholistic solution is put in place.
24          You know, again, I am giving you sort of
25 my perspective on why, you know, there might be a reason

1  to prefer that not to happen -- you know, capital
2  accumulation to happen at that point in time.
3      Q.   And what did Mr. Mayopoulos say during this
4  conference call when you were in Mexico?
5      A.   Well, he was very factual providing the
6  information that was provided to him by Treasury.
7      Q.   Yeah.
8      A.   Kind of discussing, okay, what does this mean?
9  What do we need to do?
10              You know, there were communication
11 issues, there's logistical issues, different things that
12 had to be -- you know, we had to be prepared to deal
13 with it.  And so what do we as a company need to do and
14 by when and who is on point for different things.  So
15 there was a little bit of a call to action.
16              And, you know, we needed to communicate
17 to the Board.  We also ultimately needed to communicate
18 to the employees.  But you -- you know, the timing of
19 when and how you did that was very important because we
20 couldn't get out in front of, you know, the
21 communications that Treasury needed to make.  So we
22 needed to make sure that we were clear on that -- you
23 know, that type of thing --
24     Q.   Okay.
25     A.   -- and working through that.

1      Q.   (BY MR. THOMPSON)  So was there a -- did you
2  have the sense that the Government simply was not going
3  to allow the private shareholders to participate in
4  future profits when you were at Fannie?
5              Do you think that was one of the
6  possibilities that might ultimately come out?
7              MR. LAUFGRABEN:  Renew our objections and
8  our instruction to the witness not to answer.
9              Counsel still has not tied this to the
10 Discovery Order.
11             MR. BARTOLOMUCCI:  David, do you really
12 want her to answer what was her sense of what the
13 Government thought was possible?
14             MR. THOMPSON:  Yeah.
15             I mean, it goes to the reasonable
16 investment -- yeah.
17     Q.   (BY MR. THOMPSON)  I mean, from your
18 perspective, you were dealing with the Government, and
19 you said you weren't surprised totally by the net worth
20 sweep.
21             I just really want you to explain why.
22             MR. LAUFGRABEN:  Same objections, and
23 same instructions.
24     A.   I will tell you -- yeah.  This is from my
25 vantage point.  I am not presuming what the Government

1 was thinking or wanted. I am not trying to represent
2 anything from them. I may represent my perspective on
3 what they may have been thinking.
4     I just sat down with them -- to the
5 Treasury and said, "We think we're sustaining
6 profitable."
7     The numbers were decent-sized. I also
8 put on the radar that there was a possibility of a
9 deferred tax allowance release that could be sitting in
10 the not-so-distant future.
11     So the fact that this happened shortly
12 thereafter -- so the time -- the time connection there
13 was part of why -- that was part of why I wasn't
14 surprised. Okay. I just told them that.
15     So then the question is why would they be
16 concerned of us making money and creating capital inside
17 the enterprise. I think in my own opinion, a lot of --
18 a lot of people got wiped out, and the Government had to
19 step in on a lot of fronts during the financial crisis.
20 I think politically it seemed a little -- it would seem
21 to me that there would be individuals bothered that some
22 individuals might profit from the Government's support
23 of the enterprises, okay?
24     So, you know, it wouldn't -- would it
25 be -- how would it play out if somebody made big bucks

1  because -- off the backs of the taxpayers?  I am kind
2  of -- how some people could connect dots that the
3  Government stepped in, put a bunch of money into the
4  GSEs using taxpayers' funds, and now Daddy Big Bucks
5  over here is making a big profit off of Fannie Mae
6  stock.
7              You could see how positioned that way,
8  how that would be pretty politically unpalatable.  I
9  could see why there could be a concern that anybody
10 plays things out that way.  So, thus, why -- I wasn't
11 trying to presume that they completely wanted to wipe
12 out the shareholders, but I certainly would appreciate
13 why there would be sensitivity of things playing out in
14 a way that somebody would glob on to that story line.
15             Does that make sense?
16    Q.   (BY MR. THOMPSON)  Yes.  Thank you.  And let's
17 go on.
18             MR. LAUFGRABEN:  Is this a good time to
19 take a five-minute break?
20             MR. THOMPSON:  Sure.
21             THE REPORTER:  Okay.  It's 2:58.
22             (Recess from 2:58 p.m. to 3:05 p.m.)
23             THE REPORTER:  It's 3:05.
24    Q.   (BY MR. THOMPSON)  Okay.  We're on to
25 McFarland 20, and it has a Bates number of Fannie Mae

Case 1:13-cv-01053-RCL   Document 303-1   Filed 05/26/23   Page 12 of 14

1  But as it relates to mortgages, they may be considering
2  taking positions in different types of entities or
3  companies, or they may already have position in
4  different types of entities or companies that are
5  related to the mortgage industry.
6              Because Fannie and Freddie happen to be
7  part of that industry, it's possible that they might
8  have positions.
9      Q.   Do you know if any of the firms with which you
10 interviewed has positions in Fannie or Freddie?
11     A.   I didn't -- you know, I -- I don't know for
12 certain.  I didn't, like, ask for and see a list of all
13 their holdings, no.
14              So -- and they're -- no.
15              MR. THOMPSON:  I just want the record to
16 reflect that all these questions are outside the
17 Government's understanding of the temporal dimension of
18 these depositions.  I think it's just fine, but
19 continue.
20     Q.   (BY MR. LAUFGRABEN)  Do you recall any of the
21 questions that the people you met with asked concerning,
22 you know, either this litigation or anything else
23 concerning the Third Amendment?
24     A.   I think I remember getting a question in the
25 vein of, "What do you think Treasury was thinking when

1  they put the Third Amendment in place?"
2              And I think my response was that, you
3  know, while, you know, Treasury, you know, informed us
4  that the amendment was going in place before it was put
5  in place and provided their perspective or rationale for
6  why they were doing it, I am not Treasury.  I couldn't
7  get in the minds of Treasury and what they were
8  thinking.
9              I think someone may have asked, "Do you
10 think they put this in place so they could solve the
11 debt ceiling problem?"
12             I said, "There's lots of people that
13 found it interesting that it happened at a time when
14 there was some challenges around the debt ceiling."
15             I said, "I never had conversations with
16 Treasury about solving debt ceiling problems with the
17 Third Amendment."
18             I am trying to think.  I am trying to
19 think of other questions.
20             I might have gotten kind of a wind-down
21 question.  I want to be careful here because I am trying
22 to remember the -- you know, there were a lot of
23 different topics and conversations we were discussing
24 far beyond this particular topic, but it did -- there
25 were -- on occasion, a question or two would come up

1 with somebody I was meeting with about it, whether that
2 was idle curiosity on their part, or whether they had a
3 specific desire or need to understand something.
4     Q.   When did this trip to New York take place?
5     A.   In April, late April of 2015.
6     Q.   Okay.  If you could find out who you did meet
7 with --
8     A.   I want to be careful, because, I mean, these
9 are -- you know, I don't feel -- I want to be careful
10 that I am treating their business confidentially.
11           In other words, just as I wouldn't want
12 to discuss certain things at Capital One with you guys
13 that aren't relevant to -- you know what I mean?  I want
14 to be respectful of confidentiality, as need be.
15     Q.   We're under a Protective Order.
16     A.   So --
17           MR. BARTOLOMUCCI:  I think they're only
18 interested in conversations about these lawsuits.
19     A.   Yeah.  Nobody asked me the question, like,
20 "Okay.  The lawsuit -- the such and such lawsuit and" --
21 they never positioned questions in the construct of,
22 "Okay.  For this particular lawsuit," and then go into a
23 series of questions.
24           There were questions that were asked that
25 were not dissimilar to some of the questions that were