## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| BERKLEY INSURANCE CO., et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> THE FEDERAL HOUSING FINANCE AGENCY, et al., <br><br> *Defendants.* | Case No. 1:13-cv-1053-RCL |
| IN RE FANNIE MAE/FREDDIE MAC SENIOR PREFERRED STOCK PURCHASE AGREEMENT CLASS ACTION LITIGATIONS <br> _____ <br><br> This document relates to: <br> ALL CASES | Case No. 1:13-mc-1288-RCL |

## PLAINTIFFS' MOTION IN LIMINE FOR ADMISSION OF PX 550, PX 226, PX 562, PX 274, AND PX 279

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

FACTUAL BACKGROUND .......................................................................................... 7

      A.    The Evidence Shows FHFA and Treasury Had A Shared Goal To Wind
           Down The GSEs. ....................................................................................... 7

      B.    Tim Bowler and Jim Parrott Were The Primary Treasury and White House
           Officials Responsible For The Third Amendment And Its Net Worth
           Sweep. ....................................................................................................... 9

      C.    Documents Confirm Treasury Pushed the Third Amendment After
           Learning of, and Because of, the GSEs' Positive Earnings. .................... 12

      D.    Documents Confirm that Treasury and the White House Viewed the Net
           Worth Sweep as Furthering their Intent to Wind Down the GSEs and That
           Wind Down Meant Depriving Them Of All Of Their Capital. ................ 14

ARGUMENT ................................................................................................................. 15

      I.    EACH OF PX-0550, PX-0226, PX-0562, PX-0274, AND PX-0279 IS HIGHLY
          RELEVANT. ............................................................................................ 18

           A.    Treasury and White House Motives Are Relevant Given Evidence
                 That FHFA Did Not See Any Urgency To Amending the PSPAs,
                 And That Treasury Drove The Net Worth Sweep For Reasons That
                 Are Contrary To Those Offered By Defendants. .......................... 18

           B.    Treasury and White House Motives Are Relevant Given Evidence
                 That FHFA Understood and Shared Treasury's Understanding
                 That The Net Worth Sweep's Purpose Was To Demonstrate That
                 The GSEs Would Be Wound Down By Depriving Them Of Their
                 Capital. ......................................................................................... 21

           C.    The Statements In The Proffered Exhibits Were Made By Treasury
                 And White House Officials With Responsibility For The Net
                 Worth Sweep. ............................................................................... 22

           D.    The Documents Are Relevant To Rebutting Testimony As To
                 Which Aspects Of The Third Amendment Were Intended To
                 Demonstrate Wind Down ............................................................. 24

      II.    THE RULE AGAINST HEARSAY DOES NOT BAR ADMISSION OF PX-
          0226, PX-0274, PX-0279, PX-0550, AND PX-0562. ......................................... 26

CONCLUSION ............................................................................................................. 29

APPENDIX A ................................................................................................................................ 31

# **TABLE OF AUTHORITIES**

## **Cases**

*Alexander v. F.B.I.,*
    198 F.R.D. 306 (D.D.C. 2000) ............................................................................ 29

*Howard Univ. v. Roberts-Williams,*
    37 A.3d 896 (D.C. 2012) ................................................................................... 17

*Perry v. City of Chicago,*
    733 F.3d 248 (7th Cir. 2013) ............................................................................ 18

*United States v. Akers,*
    702 F.2d 1145 (D.C. Cir. 1983) ................................................................... 17, 18

*United States v. Best,*
    219 F.3d 192 (2d Cir. 2000) .............................................................................. 27

*United States v. Bishop,*
    291 F.3d 1100 (9th Cir. 2002) .......................................................................... 27

*United States v. Cantu,*
    876 F.2d 1134 (5th Cir. 1989) .......................................................................... 26

*United States v. Churn,*
    800 F.3d 768 (6th Cir. 2015) ....................................................................... 27, 29

*United States v. Hillie,*
    39 F.4th 674 (D.C. Cir. Ct. App. 2022) ...................................................... 26, 29

*United States v. Safavian,*
    435 F. Supp. 2d 36 (D.D.C. 2006) .................................................................... 28

*United States v. Sanders,*
    485 F.3d 654 (D.C. Cir. 2007) .......................................................................... 17

*United States v. Smith,*
    521 F.2d 957 (D.C. Cir. 1975) .......................................................................... 29

## **Rules**

Fed. R. Evid. 801 ....................................................................................................... 26

Fed. R. Evid. 803(3) .............................................................................................. 27, 28

Fed. R. Evid. 803(6) ................................................................................................... 28

Fed. R. Evid. 803(8)...................................................................................................... 28

Fed. R. Evid. 807 ......................................................................................................... 28

**<u>Treatises</u>**

18B Fed. Prac. & Proc. Juris. § 4478 (3d ed. Wright & Miller).................................... 17

Plaintiffs respectfully submit this memorandum in support of their Motion *In Limine* for Admission of five exhibits:  PX 550 (attached as Ex. D), PX 226 (attached as Ex. A), PX 562 (attached as Ex. F), PX 274 (attached as Ex. B), and PX 279 (attached as Ex. C).  PX 550 and PX 562 were not presented at the first trial and thus were never ruled upon.  During that trial, the Court sustained objections to PX 226, PX 274, and PX 279.

## **<u>INTRODUCTION</u>**

Prior to the first trial in this action, the Court correctly rejected Defendants' motion to exclude documents showing Treasury's intent in entering into the Net Worth Sweep.  Class ECF No. 222 at 19-20; *Fairholme* ECF No. 221 at 19-20.  The Court correctly held that "it is conceivable that evidence of Treasury's negotiating position or pressures from the White House could provide some insight into whether FHFA in fact negotiated the Third Amendment in accordance with shareholders' reasonable expectations. For example, after offering a document suggesting that Treasury intended to wind down the GSEs, plaintiffs might ask an FHFA witness if he was aware of and shared that intent." *Id.* at 20.

Plaintiffs strongly agree with that ruling for two reasons.  First, there is substantial evidence that Treasury worked very closely with FHFA on all aspects of the Net Worth Sweep and shared its intent with FHFA that the Net Worth Sweep was being pursued as part of an overall strategy to ensure that the GSEs would not be allowed to build capital, but instead would be subject to a "wind down." FHFA's Acting Director DeMarco has denied that was part of his intent in agreeing to the Net Worth Sweep.  Plaintiffs should be permitted to confront Mr. DeMarco with the evidence of Treasury's intent to determine whether he shared that intent, and to test the credibility of his previous assertions that he did not share that intent.  If the jury concludes that Mr. DeMarco shared that intent to implement the Net Worth Sweep as part of a wind down strategy, that is highly relevant to whether FHFA's stated

reasons for agreeing to the Sweep were pretextual, and whether they were consistent with reasonable shareholder expectations.

Second, there is also substantial evidence that Treasury drove the timing of the Net Worth Sweep, and that Mr. DeMarco and FHFA saw "no urgency" in agreeing to the Net Worth Sweep in the summer of 2012. If the jury concludes that Mr. DeMarco was somehow unaware of Treasury's frequently stated intent to use the Net Worth Sweep to implement a wind down, or was aware of it but simply ignored it, that would be highly relevant to whether FHFA acted arbitrarily or unreasonably, and therefore in a manner that was not in accordance with reasonable shareholder expectations.

Notwithstanding the Court's correct pre-trial ruling rejecting Defendants' motion to exclude all documents showing Treasury or White House intent, during the trial itself the Court sustained objections to three documents showing the intent of Treasury and the White House in pushing for the Net Worth Sweep – PX 226, PX 274, and PX 279 (with PX 274 and PX 279 needing to be read together to show their full significance). Plaintiffs believe those rulings were predicated on incomplete information about the importance of the specific individuals who wrote the emails at issue, and about the extent of the evidence showing that Treasury and FHFA shared the same intent. Moreover, additional exhibits, not presented in the prior trial, strengthen the relevance of these excluded exhibits—including PX 550 and PX 562, the admission into evidence of which is also sought in this motion. Further, testimony from an FHFA official during Defendants' case, Mr. Nicholas Satriano, provides an additional basis for admitting these exhibits into evidence.

At trial, the evidence established that on August 9, 2012, FHFA official Mario Ugoletti reported to FHFA Acting Director DeMarco that there was a "renewed push" for the Net Worth Sweep (PX 247, attached as Ex. F, admitted into evidence in Trial One). Mr. DeMarco testified that "renewed push" came from Treasury. Ex. G (Trial Transcript) ("Trial Tr.") at 1045:12–21.

The Net Worth Sweep was then executed and announced publicly on August 17, 2012.  A chronological review of the five exhibits that are the subject of this motion helps flesh out the facts of why there was a "renewed push" for the Net Worth Sweep right after the GSEs reported large profits in excess of the 10% dividend, allowing them to start rebuilding capital and net worth.

PX 550 was not presented at the prior trial, and thus has not been ruled on by the Court.  It is an email from Mr. Bowler to another official at Treasury named Jeff Foster, dated July 30, 2012—attaching a one-page document entitled "PSPA Covenant and Timing Proposal July 30, 2012." Ex. D.  It contains a list of bullet points describing the Third Amendment.  Those bullets include a bullet stating: "**The GSEs are being wound down faster and will not return to their prior state**," and another stating "**GSEs will not build capital and exit conservatorship in their prior form**."  *Id.*  It also says "Tax payer will now benefit from all future earnings at the GSEs." *Id.*  This is highly relevant evidence that the purpose of the Net Worth Sweep was to prevent the GSEs from building capital.  That is inconsistent with FHFA's position that the Net Worth Sweep was driven only by a desire to address the circular dividend problem – a problem that does not exist if the GSEs are making enough profit to build capital.  Treasury's state of mind reflected in this document is highly relevant, and thus PX 550 should be admitted.  There is ample evidence that Treasury's state of mind reflected in this document was shared with FHFA, as shown below.

PX 226, which was excluded by bench ruling during the trial, shows this same state of mind, and shows what motivated the "renewed push" by Treasury for the Net Worth Sweep in early August 2012, as Mr. Ugoletti reported to Mr. DeMarco in PX 267.  PX 226 is a July 31, 2012 email chain which begins with FHFA sending Treasury officials the GSE financial results for the second quarter of 2012, showing both GSEs making large profits that substantially exceeded the amount of the 10% dividend to Treasury, thereby allowing them to start building up positive net

worth.  Ex. A (PX 226).  That information was forwarded internally at Treasury to Timothy Bowler, the Deputy Assistant Secretary of the Treasury in charge of the Office of Capital Markets. Mr. DeMarco described Mr. Bowler as the "point person" at Treasury for negotiations over the Net Worth Sweep, as did Mr. Ugoletti.[1]  The email to Mr. Bowler reported the strong financial results of the GSEs, stating:  "Post dividends, Fannie Mae will still have $2.8 bn of net worth and Freddie will have $1.1 bn of net worth."  Ex. A.  In response, Mr. Bowler wrote: "**Really makes sense to push the net worth sweep this quarter**."  *Id.*  This is strong evidence that Treasury's point person in negotiating the Net Worth Sweep was motivated by a desire to prevent the GSEs from using profits above the dividend amount to build positive capital and net worth, not by the *opposite* concern that the GSEs would make insufficient profits to pay the 10% dividend (i.e., not by the stated concern relied on by FHFA since the inception of this case).

PX 562 shows that Treasury's state of mind—its intention to use the Net Worth Sweep to wind down the GSEs and prevent them from building capital—was shared with FHFA.  PX 562 was not presented at the prior trial, and thus the Court has never addressed its admissibility.  It shows that on August 16, 2017, the day before the Net Worth Sweep was announced, Mr. DeMarco provided edits to the Treasury Department on its written press release announcing the Net Worth Sweep.  It shows a Treasury official emailing that "final PSPA press release" to other Treasury officials, and writing that "It reflects final edits from Acting FHF A Director DeMarco received this evening."  Ex. E.  While it does not show what those edits were, the important fact is that Mr. DeMarco obviously reviewed and commented on the press release before it was published.  And

---

[1] Ex. K (Excerpts of Edward DeMarco (2020) Deposition Transcript) ("DeMarco Dep.") at 303:16 – 305:5; Ex. M (Excerpts of Mario Ugoletti Deposition Transcript) ("Ugoletti Dep.") at 151:5– 152:1.

here is what that press release stated at the very top in bold and italicized words, both in the version

he reviewed and the one that was publicly released:

**TREASURY DEPARTMENT ANNOUNCES FURTHER STEPS TO
EXPEDITE WIND DOWN OF FANNIE MAE AND FREDDIE MAC**

*Modifications to Preferred Stock Purchase Agreements Will Make Sure That Every
Dollar of Earnings Fannie Mae and Freddie Mac Generate Will Benefit Taxpayers*

PX 562 (emphasis in original).

      This document makes it impossible for FHFA to deny that Mr. DeMarco knew, before the

Net Worth Sweep was executed on August 17, 2012, that Treasury's intent was for the Sweep to

be part of an effort "**TO EXPEDITE WIND DOWN**" of the GSEs, and to "*Make Sure That Every

Dollar of Earnings"* goes to "taxpayers" (i.e., Treasury), not to the GSEs.  That makes PX 562

highly relevant and admissible.  It also shows that the same Treasury state of mind reflected was

not kept secret from Mr. DeMarco but instead was openly shared with him, reinforcing why all the

exhibits that are the subject of this motion must be admitted into evidence.

      PX 274 and 279 likewise show that Treasury and the White House were motivated by the

desire to ensure that the GSEs would not be permitted to build capital—a concern that is the

opposite of the stated concern proffered by FHFA in this case.  They relate to a statement made by

Mr. James Parrott, Special Counsel to the National Economic Council with responsibility in the

White House for housing policy and housing finance policy.  It was Parrott, the White House's

point person on the Administration's housing policy, who informed Treasury, on behalf of the

White House, that he was "comfortable with moving to a variable dividend relative to the fixed 10

percent dividend."[2]  In PX 274, Mr. Parrott was sent the following statement made by a GSE

---

[2] Ex. L (Excerpts of Timothy Bowler Deposition Transcript) ("Bowler Dep.") at 153:4–13,
247:19–248:2.

observer at the American Enterprise Institute, Mr. Peter Wallison, to Bloomberg, on the date the

Net Worth Sweep was announced (August 17, 2012):

> "The most significant issue here is whether Fannie and Freddie will come back to life
> because their profits will enable them to re-capitalize themselves and then it will look as
> though it is feasible for them to return as private companies backed by the government,"
> Wallison said in a telephone interview.  "What the Treasury Department seems to be doing
> here, and I think it's a really good idea, is to deprive them of all their capital so that doesn't
> happen."[3]

PX 279 shows that 30 minutes after seeing this quote, Mr. Parrott emailed Mr. Wallison to

say this:  "Good comment in Bloomberg.  You are exactly right on substance and intent."  Ex. C

(PX 279).  This is incredibly important evidence.  As shown below, Mr. Parrott is the White

Official to whom the Treasury Department reported on issues relating to the GSEs.  He was not an

irrelevant flunky.  He was directly involved in managing GSE policy, and had responsibility for

what Treasury was doing with respect to the PSPAs and the Net Worth Sweep.  And these two

exhibits show that his state of mind was the same as Treasury's:  that the Net Worth Sweep was

driven by a concern that the GSEs' "profits will enable them to re-capitalize themselves" and exit

conservatorship, and by a desire "to deprive them of all their capital so that doesn't happen."  That

is the opposite of the concern advanced by Mr. DeMarco and FHFA in this litigation – likely

because they know that it would be inconsistent with reasonable shareholder expectations to

prevent the GSEs from using their profits to recapitalize themselves.

This case is not about the best way for housing policy to be managed in this country.

Instead, it is about whether the Net Worth Sweep was inconsistent with the reasonable expectations

of the shareholders who had contracts with the GSEs that had never been terminated or cancelled.

The evidence addressed in this motion is of absolutely central relevance to that issue:  these

---

[3] Ex. B (PX 274).

exhibits show that the Net Worth Sweep was driven by a desire to deprive the GSEs of capital, to prevent them from using their resurgence in large profits, which were already higher than the 10% dividend and were growing even larger, to build positive net worth, and to ensure that they would not appear to be on a path to exiting conservatorship. And the evidence shows that intention was shared with, and by, the FHFA. That contradicts the explanation the FHFA gave to this Court in the Mario Ugoletti declaration filed in 2013,[4] as well as the testimony of Mr. DeMarco and the defenses advanced by the FHFA in this case.

To decide this case fairly, the jury needs to see this evidence.

## FACTUAL BACKGROUND

### A. The Evidence Shows FHFA and Treasury Had A Shared Goal To Wind Down The GSEs.

On August 17, 2012, FHFA and Treasury jointly agreed to the Third Amendment to the Senior Preferred Stock Purchase Agreements ("PSPAs") between Fannie Mae, Freddie Mac, and Treasury. One major component of the Third Amendment was the so-called "Net Worth Sweep," which adjusted the fixed 10% annual dividend under the PSPAs to a dividend equal to 100% of the net worth for each company. FHFA has claimed since the inception of this action, and at trial through testimony of former Acting Director Edward DeMarco ("DeMarco"), that its motivation for agreeing to the Net Worth Sweep was to address a "circular draw" problem that threatened to materially erode Treasury's funding commitment for the GSEs.[5] However, as outlined below, there was substantial evidence admitted in the first trial that leading up to, and in connection with,

---

[4] Ex. J (PX 351) (Case 1:13-cv-01053-RLW Document 24-2).

[5] *See* Ex. J (PX 351) (Mario Ugoletti's sworn declaration submitted at the beginning of this case in 2013, stating that the Net Worth Sweep was driven by concerns over the circular dividends, and not mentioning any consideration of wind down); Trial Tr. at 637:17-638:14 (trial testimony of Mr. DeMarco denying that "wind down" was part of the motivation for the Net Worth Sweep.)

the Third Amendment, Treasury and FHFA discussed their shared goal to wind down Fannie Mae and Freddie Mac.  Further, the evidence, including the exhibits that are the subject of this motion, shows this shared goal of winding down the GSEs was a principal reason for the Net Worth Sweep.

On January 4, 2012, Mary Miller ("Miller"), the Undersecretary for Domestic Finance at Treasury, sent DeMarco an email with a draft agenda "for discussion" related to an upcoming January 6, 2012 meeting between FHFA and Treasury.  The "Agenda for Discussion w. FHFA" stated that "FHFA and Treasury share common goals to … reduce government involvement in the housing market over time and to provide the public and financial markets with a clear plan to wind down the GSEs."[6]  The draft agenda that DeMarco and Miller discussed also included "Establish[ing] meaningful policies that demonstrate a commitment to winding down the GSEs."[7]

The meeting for which the draft agenda was prepared took place on January 6, 2012 between DeMarco and Treasury Secretary Timothy Geithner.[8]  Treasury's internal briefing memorandum regarding the meeting for Secretary Geithner included points from the draft agenda Miller sent DeMarco two days earlier.  According to the briefing memorandum, the "Primary Objective" was "To discuss the shared goal between the Federal Housing Finance Agency (FHFA) and Treasury to reduce government involvement in the housing market and Treasury's desire to provide the public and financial markets with a clear plan to wind down the [GSEs] over time."[9]  Under the heading "Key Points to Make," the briefing memorandum explained that Secretary Geithner should:

- "Stress Treasury's desire to establish meaningful policies that demonstrate a commitment to winding down the GSEs";

---

[6] Ex. U (PX-0144).

[7] *Id*.

[8] Ex. V (PX-0146).

[9] *Id.*

- "express a willingness to consider restructuring the calculation of Treasury's dividend payments from a fixed 10 percent annual rate to a variable payment based on available positive net worth"; and

- "express willingness to work with FHFA to draft policy paper(s) on our housing market and GSE reform goals[.]"[10]

Not long after that meeting, FHFA delivered on the policy papers discussed with Treasury. On February 21, 2012, FHFA released its "Strategic Plan" for the Enterprises.[11] This policy paper included the goal to "Gradually contract the Enterprises' dominant presence in the marketplace while simplifying and shrinking their operations."[12] The Strategic Plan explicitly stated that "this plan does not anticipate Fannie Mae and Freddie Mac continuing as they existed before conservatorship."[13] It further stated that "the Enterprises may well cease to exist at some point in the future."[14] Each of these statements echoed the "wind down" goals outlined in the Treasury agenda and briefing memorandum for the Treasury-FHFA meeting discussed above. The statements in the FHFA Strategic Plan are also consistent with Treasury's stated goals as set forth in its February 2011 white paper, which called for winding down the GSEs.[15]

### B. Tim Bowler and Jim Parrott Were The Primary Treasury and White House Officials Responsible For The Third Amendment And Its Net Worth Sweep.

With their goals articulated, FHFA and Treasury moved forward to negotiate the Third Amendment. For FHFA, DeMarco delegated the discussions with Treasury to his special advisor

---

[10] *Id.*

[11] Ex. H (PX-0154).

[12] *Id.* at 2.

[13] *Id.* at 21.

[14] *Id.*

[15] *See* Ex. I (PX-0096) at 3, 13-14.

Mario Ugoletti ("Ugoletti"), who handled most of the interactions with Treasury.[16]  On the other side of the discussion for Treasury was Timothy Bowler ("Bowler"), the then-Deputy Assistant Secretary who ran Treasury's Office of Capital Markets.[17]  Bowler was intimately involved in discussions regarding the Third Amendment and Net Worth Sweep and reported directly to Miller, the Undersecretary for Domestic Finance.[18]  DeMarco testified that in discussions concerning the Net Worth Sweep, "The Treasury Secretary, Mary Miller, [and] Tim Bowler would be the -- would be the principal officials at Treasury that I would be interacting with."[19]  DeMarco testified that he believed that Bowler was Ugoletti's direct counterpart at Treasury, stating that he "believe[d] the point person at Treasury probably would have been Tim Bowler."[20]  Ugoletti himself testified that Bowler was his "primary point of contact" at Treasury concerning the Third Amendment and agreed that he and Bowler were the "primary negotiators" of the Third Amendment.[21]  When asked "whose idea was it to have a Net Worth Sweep as part of the Third Amendment," Ugoletti testified that it "probably would have been Tim Bowler."[22]

Bowler confirmed at his deposition that he was involved in negotiations with Ugoletti and others at FHFA concerning the Net Worth Sweep.[23]  Bowler personally reviewed the Treasury draft of the Third Amendment from Treasury's general counsel's office before it went to FHFA.[24]

[16] *See* Ex. K (DeMarco Dep.) at 15:14-16:9 ("Mario Ugoletti, who was a senior advisor to me at the time and was the person I designated to work directly with the Treasury Department in developing the Third Amendment").
[17] *See* Ex. L (Bowler Dep.) at 27:1-9.
[18] Ex. M (Ugoletti Dep.) at 236:20–21.
[19] DeMarco Dep. at 178:17–179:1.
[20] DeMarco Dep. at 303:16 – 305:5.
[21] Ugoletti Dep. at at 151:5–152:1.
[22] Ugoletti Dep. at 150:6 – 151:8.
[23] Bowler Dep. at 68:11-16.
[24] Bowler Dep. at 236:1–8, 236:14–15, 237:2–9.

And Bowler walked through the terms of the Third Amendment with management of the GSEs when they were informed of it.[25]

In addition to Treasury and FHFA, the White House also worked alongside Bowler and Treasury in formulating the Third Amendment.  For the White House, the primary person was Mr. Jim Parrott, who served as Special Counsel to the National Economic Council with responsibility for housing policy and housing finance policy.[26]  Bowler testified that prior to finalizing the Third Amendment, "as Treasury Staff negotiated with FHFA staff, the Treasury staff . . . would propose the National Economic Council as to developments and the two people that we proposed would be Brian Deese and Jim Parrott."[27]  Bowler explained that with respect to the White House, "[his] primary point of contact was Jim Parrott, National Economic Council," and that Parrott informed him that he was "comfortable with moving to a variable dividend relative to the fixed 10 percent dividend."[28]  Documents and testimony show that Bowler and Parrott jointly met with the Office of Management and Budget ("OMB") to get approval for the Third Amendment in August 2012,[29] and Bowler and other Treasury officials worked with Parrott "to frame discussions on the substance, timing, and process for amending the PSPA covenants."[30]  For example, on August 6, 2012, just before the GSEs announced positive second quarter 2012 earnings and before the Third Amendment was agreed to, Bowler sent Parrott a document titled "PSPA Next Steps" with the message "now very timely."[31]  The document contained a term sheet with recommended changes

---

[25] Bowler Dep. at 259:7–11, 234:9–235:1.

[26] Bowler Dep. at 152:12–22; Ex. N (Excerpts of Jim Parrott Deposition Transcript ("Parrott Dep") at 45:12-18.

[27] Bowler Dep. at 152:14-22.

[28] Bowler Dep. at 153:4–13, 247:19–248:2.

[29] Bowler Dep. at 240:8 – 241:16; Ex. O (PX-0484); Ex. P (TREASDDC00052446).

[30] Ex. Q (PX-0477).

[31] Ex. R (PX-0227).

to the PSPAs, including changing the 10% dividend to the Net Worth Sweep.  Under "Timing",
the document stated "Announce the change in mid August after each GSE releases 'record' second
quarter earnings . . . *Earnings will be in excess of current 10% dividend paid to Treasury*."[32]  Under
"Rationale", the document stated that "Taxpayer will now benefit from all future earnings at the
GSEs[,] The GSEs will be wound down faster and will not return to their past state[,] [and] GSEs
will not be allowed to build capital and exit conservatorship in their prior form."[33]  The contents
of the document were also approved by Miller and Michael Stegman ("Stegman"), Counselor to
the Secretary for Housing Finance Policy.[34]

### C.  Documents Confirm Treasury Pushed the Third Amendment After Learning of, and Because of, the GSEs' Positive Earnings.

As explained in the Introduction, PX 550 (whose admission is sought in this motion) is a
July 30, 2012 email from Bowler to other Treasury officials attaching a document entitled "PSPA
Covenant and Timing Proposal." Ex. D.  It states that "The Treasury housing teams recommends
finalizing the PSPA agreement changes next Friday."  *Id.*  The proposal noted that the "Rationale"
for announcing the changes in August was that the "GSEs will report very strong earnings on
August 7, that will be in excess of the 10% dividend to be paid to Treasury," and that the messaging
should include that "The GSEs are being wound down faster and will not return to their past state,"
and the "GSEs will not build capital and exit conservatorship in their prior form."  *Id.*

As reflected in PX-0226 (whose admission is also sought in this motion), on July 31, 2012
(the day after PX 550 was sent), FHFA officials emailed Treasury officials with Fannie Mae's and
Freddie Mac's estimated second quarter 2012 financial results.  FHFA informed Treasury that

---

[32] *Id.* (emphasis in original).

[33] *Id.*

[34] *Id.* at 3.

Fannie Mae had net income for the quarter of $5.1 billion compared to the quarterly dividend payment of $2.9 billion, and that Fannie Mae's net worth post-dividend would be $2.8 billion. With respect to Freddie Mac, FHFA informed Treasury that Freddie Mac had net income for the quarter of $3.0 billion compared to the quarterly dividend payment of $1.8 billion, and that Freddie Mac's net worth post-dividend would be $1.1 billion.[35]  Treasury official Jeffrey Foster ("Foster") forwarded the results to others at Treasury, including Bowler, and immediately upon receiving the information showing the GSEs had income above the 10% dividend and were going to start building positive net worth, Bowler responded "Really makes sense to push the net worth sweep this quarter[.]"[36]

Eight days after Bowler's comments on the earnings preview, August 8, 2012, Ugoletti emailed DeMarco with the subject line "PSPA Update."[37]  Ugoletti told DeMarco: "Talked with Bowler this morning.  They are thinking they would like to do this next week.  He will get me working documents as soon as possible."[38]  The proposal included a "Net Income Sweep," and Ugoletti also noted that Treasury wanted to finish by the following week because Secretary Geithner "would be out of town after that."[39]  The next day, August 9, Ugoletti informed others at FHFA that "there appears to be a renewed push to move forward on PSPA amendments . . . my understanding is that largely the same as previous versions we had reviewed in terms of net income

---

[35] Ex. A (PX-0226).

[36] *Id.*

[37] Ex. T (PX-0240).

[38] *Id*.

[39] *Id.*

sweep . . ."[40]  DeMarco testified at trial that the "renewed push" to move forward on the PSPA

amendments, as referenced in Ugoletti's August 9, 2012 email, came from Treasury.[41]

### D. Documents Confirm that Treasury and the White House Viewed the Net Worth Sweep as Furthering their Intent to Wind Down the GSEs and That Wind Down Meant Depriving Them Of All Of Their Capital.

PX-0274 contains an email sent from *Wall Street Journal* reporter Nick Timiraos

("Timiraos") to Parrott on August 17, 2012 at 5:32 PM, in which Timiraos quoted a statement

Peter J. Wallison ("Wallison"), a Fellow in Financial Policy Studies at the American Enterprise

Institute, made to *Bloomberg* regarding the Net Worth Sweep:[42]

From: Timiraos, Nick [mailto:Nick.Timiraos@wsj.com]
Sent: Friday, August 17, 2012 05:32 PM
To: Parrott, Jim
Subject: RE: Garrett Statement on Treasury Decision to Amend Terms of Fannie and Freddie Bailout

what wallison told bloomberg
"The most significant issue here is whether Fannie and Freddie will come back to life because their profits will enable them to re-capitalize themselves and then it will look as though it is feasible for them to return as private companies backed by the government," Wallison said in a telephone interview. "What the Treasury Department seems to be doing here, and I think it's a really good idea, is to deprive them of all their capital so that doesn't happen."

PX-0279 shows that less than twenty-nine minutes later, at 6:01 PM, Parrott emailed Wallison

directly and stated "Good comment in Bloomberg – you are exactly right on substance and

intent."[43]

This understanding was shared by FHFA.  Consistent with the above, after the Third

Amendment had been agreed to but before it was made public, FHFA officials held a meeting with

---

[40] Ex. F (PX-0247).

[41] Trial Tr. at 1045:12–21.

[42] PX-0274 is attached hereto as Exhibit B.

[43] PX-0279 is attached hereto as Exhibit C.

DeMarco to discuss its terms.  After the meeting, James Griffin ("Griffin"), an FHFA accountant, informed FHFA Chief Accountant Nicholas Satriano ("Satriano") that during that meeting "There was a question about re-recording certain deferred tax assets that had been written off.  [FHFA official] Jeff [Spohn] indicated both of the Boards had discussed this at the last meeting based on the view that they were going to be profitable going forward.  I do not think that makes sense given the amendments are designed to demonstrate wind down."[44]

Finally, when the Third Amendment was announced, Treasury issued a press release titled "Treasury Department Announced Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac."[45]  The press release, which Mr. DeMarco reviewed and edited on behalf of FHFA, PX-0562, stated that the Net Worth Sweep achieved several important objectives, including "[m]aking sure that every dollar of earnings that Fannie Mae and Freddie Mac generate will be used to benefit taxpayers for their investment in those firms" and "[a]cting upon the commitment made in the Administration's 2011 White Paper that the GSEs will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form."[46]

## ARGUMENT

Plaintiffs seek to admit documents to demonstrate that Treasury made a push to execute the Net Worth Sweep in August 2012 after Treasury learned of the GSEs' large earnings for the second quarter of 2012.  The purpose and intent of Treasury's push was to prevent the GSEs from building capital so that Treasury, with the assistance of FHFA, could continue to pursue plans to wind down the GSEs.  The Court has already ruled that Treasury's purposes and intent for entering into the Net Worth Sweep are relevant to whether FHFA's actions in agreeing to the Net Worth

---

[44] Ex. W (PX-0259).

[45] Ex. X (PX-0278).

[46] *Id.*

Sweep were arbitrary or unreasonable in light of shareholders' reasonable contractual expectations.[47] That relevance is particularly clear in light of DeMarco's trial testimony in which he denied that his intent in agreeing to the Net Worth Sweep was to demonstrate or facilitate a wind down of Fannie and Freddie, but acknowledged that Treasury and the White House had been discussing that intent publicly.[48] The relevance is further shown by Satriano's testimony during Defendants' case that he understood the email he received saying the amendments were "designed to demonstrate wind down" as merely referring to the shrinkage of the investment portfolio, not the Net Worth Sweep. The documents whose admission is sought in this motion are relevant to testing the reliability of that claimed interpretation. That testimony came after the Court's rulings on PX-0226, PX-0274, and PX-0279, and thus this point – like the evidence in PX-0550 and PX-0562—were not before the Court when it made those rulings.

Since PX-0550 and PX-0562 have never been presented to the Court, the Court should consider them in light of the arguments made herein and its prior rejection of Defendants MIL found in Class ECF No. 222 at 19-20 and *Fairholme* ECF No. 221 at 19-20.

As to the Court's prior, mid-trial bench rulings sustaining objections to PX-0226, PX-0274, and PX-0279, those rulings from Trial One do not control in Trial Two. We of course are mindful and respectful of the Court's prior rulings, and in general the parties have agreed not to ask the Court to revisit all its evidentiary rulings, subject to narrow exceptions—such as these three

---

[47] *See* Class ECF No. 222 at 19-20; *Fairholme* ECF No. 221 at 19-20 ("it is conceivable that evidence of Treasury's negotiating position or pressures from the White House could provide some insight into whether FHFA in fact negotiated the Third Amendment in accordance with shareholders' reasonable expectations").

[48] Trial Tr. at 637:25-638:14.

exhibits.  We therefore wish to make clear what the relevant legal standard is.  The D.C. Circuit

Court has held as follows:

> When, as here, 'the previous trial [is] a nullity,' the court in the new trial tries 'the
> case as if it were being tried for the first time . . . as if there had been no prior trial.'
> Thus, the fact that the photographs were admitted in first trial does not compel their
> admission in the new trial. Any reliance the defendant's attorney placed upon the
> earlier ruling in planning for the new trial was therefore unjustified. The mere fact
> that the same judge happened to be sitting did not entitle counsel to assume that the
> judge would rule the same way—especially since the judge's exercise of his broad
> discretion on an evidentiary ruling (which ultimately pertains to relevancy) must
> turn upon the evidence as developed in the particular trial.

*United States v. Akers*, 702 F.2d 1145, 1147-48 (D.C. Cir. 1983) (holding that the law of the case

doctrine did not operate "under *these circumstances*" where the "evidentiary ruling at issue was

rendered in a *new trial* which was ordered pursuant to a mistrial") (citations omitted) (alterations

in original).  Accordingly, "For mid-trial evidentiary rulings, a new trial will result in different

factual and evidentiary circumstances occasioning a new exercise of the district court's

discretion."  *United States v. Sanders*, 485 F.3d 654, 657 (D.C. Cir. 2007) (distinguishing mid-

trial, evidentiary rulings from "an alleged violation of the Speedy Trial Act" which "will not

change between trials"); *see also* 18B Fed. Prac. & Proc. Juris. § 4478 (3d ed. Wright & Miller)

(listing "new evidence adduced at a retrial directed for other reasons" as a reason to depart from

the law of the case doctrine; "In any event, the introduction of new evidence, however managed,

may be seen as creating new issues that have not been decided and thus lie outside the law of the

case.").

　　　　Further, even within the same trial, trial courts may revisit evidentiary rulings according to

the factual and evidentiary circumstances at hand.  *See Howard Univ. v. Roberts-Williams*, 37 A.3d

896, 910 (D.C. 2012) ("rulings on motions *in limine* normally are considered provisional, in the

sense that the trial court may revisit its pre[-]trial evidentiary rulings in the context of the

presentation of the evidence in the case."); *Perry v. City of Chicago*, 733 F.3d 248, 252 (7th Cir. 2013) ("Trial courts issue rulings on motions in limine to guide the parties on what evidence it will admit later in trial. As a trial progresses, the presiding judge remains free to alter earlier rulings."). In addition, the fact that these exhibits are relevant to rebutting Satriano's testimony, which was given after the Court made its rulings during Plaintiffs' case, also provides grounds for looking anew at these exhibits. The same is also true because additional documents and far more fulsome context for the high relevance of these documents is being presented more thoroughly here than it was previously, including through the citation of foundational documents not presented previously. Thus, under any standard, the Court is free to consider this motion as to PX-0226, PX-0274, and PX-0279 in light of all the evidence and argument set forth herein. *Akers*, 702 F.2d at 1147-48.

## I.   EACH OF PX-0550, PX-0226, PX-0562, PX-0274, AND PX-0279 IS HIGHLY RELEVANT.

Each of PX-0550, PX-0226, PX-0562, PX-0274, and PX-0279 should be admitted because they are relevant to and probative of the central issue in this trial: whether FHFA's actions in agreeing to the Net Worth Sweep were arbitrary or unreasonable, and thus inconsistent with the reasonable contractual expectations of shareholders. Several aspects of the current record establish the relevance of Treasury and White House motives.

### A.   Treasury and White House Motives Are Relevant Given Evidence That FHFA Did Not See Any Urgency To Amending the PSPAs, And That Treasury Drove The Net Worth Sweep For Reasons That Are Contrary To Those Offered By Defendants.

The evidence shows that Treasury was driving the Net Worth Sweep at the time it occurred and that it was "pushing" it for reasons that run directly counter to FHFA's claim that the Net Worth Sweep occurred because of concerns over circular dividends. PX-0226 demonstrates that the push to approve the Net Worth Sweep was driven by Treasury and was prompted by news of

*positive* earnings from the GSEs, not by FHFA's concerns about the "circular draw" potentially eroding the Treasury commitment once it became capped starting in 2013.  DeMarco confirmed that Treasury rushed to get the Net Worth Sweep done and testified that "when Treasury was ready to move there was very little time at that point to move to get it done."[49]  DeMarco similarly admitted that the August 9, 2012 "renewed push" on the PSPA amendments was from Treasury.[50] Ugoletti's August 8 "PSPA Update" email to DeMarco also evidences that Treasury drove the timing.  It stated that Ugoletti "Talked with Bowler this morning.  They are thinking they would like to do this next week.  He will get me what the working documents as soon as possible."[51]  That Treasury drove the timing of the Net Worth Sweep for its own purposes is relevant, as the Court has held, because "Treasury's negotiating position or pressures from the White House could provide some insight into whether FHFA in fact negotiated the Third Amendment in accordance with shareholders' reasonable expectations."  Class ECF No. 222 at 19-20; *Fairholme* ECF No. 221 at 19-20.

Here, PX-0226, PX-0274, PX-0279, PX-0562, and PX-0550 show that, contrary to FHFA's position in this case, both Treasury (in PX-0226 and PX-0550) and the White House (in PX-0274 and PX-0279) were motivated to finalize the Net Worth Sweep before the GSEs started posting further profits and retaining capital.  PX-0562 shows this intent was shared with DeMarco before the Net Worth Sweep was executed or announced.  From the White House's perspective, the "substance and intent" of the Net Worth Sweep was "to deprive [the GSEs] of their capital" so that they could not recapitalize themselves and return as private companies.[52]  Treasury shared the

---

[49] Trial Tr. at 924:2-:4.

[50] *Id.* at 1045:12-:21.

[51] Ex. T (PX-0240).

[52] Ex. B (PX-0274); Ex. C (PX-0279).

same intent, as demonstrated by (1) Bowler's statement that it "Really makes sense the push the net worth sweep this quarter" after learning of the GSEs' positive quarterly earnings above the 10% dividend amount, allowing them to build net worth, (2) Bowler's July 30 proposal stating that Treasury's message was that the "GSEs will not build capital and exit conservatorship in their prior form," and (3) the other evidence admitted in the first trial and summarized above.[53]

The evidence of Treasury's motives for pushing for the Net Worth Sweep when it did is still more relevant in light of contemporaneous evidence that Acting Director DeMarco did not view it as urgent to amend the PSPAs at the time. This is shown in PX-0205, which was admitted in evidence at the prior trial. It is an internal Treasury memorandum authored by Treasury official Michael Stegman, Counselor to the Secretary for Housing Finance Policy. It summarizes a June 24, 2012 meeting between DeMarco and Secretary Geithner and Undersecretary Miller, and says that DeMarco "no longer sees the urgency of amending the PSPAs this year." Ex. Z (PX 205). It gives as a reason for that lack of urgency that "the GSEs will be generating large revenues over the coming years, thereby enabling them to pay the 10% annual dividend well into the future without the caps." *Id*. Another document, not presented at the trial (but likely to be presented at this year's trial), confirms that DeMarco was telling Treasury there was no urgency to amending the PSPAs. It is a Treasury email chain from June 21, 2012—shortly before the June 24 meeting summarized in PX 205—and describes a pre-meeting that Mr. Stegman described by writing: "I also came away with a feeling that if we were to insist on a PR covenant"—meaning the Principal Reduction concept that Acting Director DeMarco opposed and Treasury supported—"then FHFA would either slow walk or refuse to sign. This comes from my putting together *something that Ed said at the beginning about his lack of sense of urgency about needing to adjust the PSPAs*,

---

[53] *E.g.*, Ex. U (PX-0144), Ex. V (PX-0146), Ex. R (PX-0227), and Ex. X (PX-0278).

with Mario's comment more than 30 minutes later into the discussion that 'it takes to [sic] signatures' to change the PSPAs."  Ex. AA (PX-0584) (emphasis added).

In short, FHFA saw no urgency to amending the PSPAs; Treasury did.  Treasury drove the timing with a "renewed push" right after the GSEs announced record profits above the 10% dividend allowing them to build capital.  Treasury's renewed push for the Sweep was motived by a desire to wind down the GSEs, which FHFA knew when it agreed to the Sweep.  The documents showing that motivation are thus highly relevant and must be admitted.

**B.    Treasury and White House Motives Are Relevant Given Evidence That FHFA Understood and Shared Treasury's Understanding That The Net Worth Sweep's Purpose Was To Demonstrate That The GSEs Would Be Wound Down By Depriving Them Of Their Capital.**

The relevance of the exhibits addressed in this motion is also established by the evidence that FHFA knew of and shared the understanding that the Net Worth Sweep's purpose was to demonstrate a wind down of the GSEs.  The admitted documents demonstrate Treasury and FHFA met in January 2012 to discuss "Treasury's desire to establish meaningful policies that demonstrate a commitment to winding down the GSEs."  Further, an FHFA document expressly states that the understanding that the "Amendments were designed to demonstrate wind down."

Plaintiffs should be permitted to put the above-referenced documents into evidence and to cross-examine DeMarco on his understanding of why Treasury pushed the Third Amendment in August 2012.  Then the jury can decide whether it was these motivations that truly were driving the Net Worth Sweep.  Plaintiffs should be allowed to question DeMarco about the following:

- Whether he was aware of Treasury's and the White House's motive for pushing the Net Worth Sweep when they did;

- If so, how that motive factored into FHFA's decision to agree to the Net Worth Sweep at the time it decided to do so;

- If DeMarco claims he was not aware of Treasury and the White House's motive, whether he and FHFA acted unreasonably by failing to understand that;

- Whether the same motive drove FHFA's decision considering the FHFA meetings with Treasury and evidence of FHFA's own statements regarding wind down (such as in PX-0259); and

- Whether Ugoletti's and DeMarco's stated reason for agreeing to the Net Worth Sweep—concern about "circular draw" and potential material erosion of the Treasury Commitment—was unreasonable or pretextual, or at a minimum substantially incomplete.

**C.     The Statements In The Proffered Exhibits Were Made By Treasury And White House Officials With Responsibility For The Net Worth Sweep.**

The statements in PX-0226, PX-0274, PX-0279, and PX-0550 are also relevant because the persons who made the statements render them reliable.  In the first trial, the Court declined to admit PX-0226, reasoning that:

> While I said in my Motion in Limine opinion that it was conceivable that evidence of Treasury's negotiating position could provide [ ] some insight into whether FHFA, in fact, negotiated the Third Amendment in accordance with shareholders' reasonable expectations, there is no reason to believe that this Deputy Assistant Secretary's brief remark in an email would actually reflect on the Treasury's negotiating position or that his individual position would ever have even been communicated to the FHFA in the course of the negotiations.  It's not like a statement from the Secretary or someone who we know was actively involved in the negotiations.  Even if the email were of some limited relevance to FHFA's motive, I find that relevance is substantially outweighed by risk of jury confusion because the jury might not understand the relationship between a mid-level Treasury official's beliefs and FHFA's motives.[54]

The Court also declined to admit PX-0274 and PX-0279, stating:

---

[54] Trial Tr. at 1574-1575.

THE COURT: If Mr. Parrott was at Treasury, it might have some more impact. I will sustain the objection. He's thinking he knows what Treasury thinks. Somebody at Treasury needs to tell me what they think, not Mr. Parrott.

MR. HUME: We would submit he's Treasury's boss, but we respectfully –

THE COURT: He's not Treasury's boss. He's a flunky at the White House. I know he might not like me saying it that way, but he works at the White House. The secretary works –

MR. HUME: Understood, Your Honor.

THE COURT: I'm sorry I called him a flunky. He's just a staff member at the White House. He's nobody's boss.

MR. HUME: Understood.[55]

As explained above, Bowler was intimately involved in negotiating and finalizing the terms of the Third Amendment. Bowler was the primary negotiator of the Third Amendment for Treasury, and DeMarco and Ugoletti regularly interacted with Bowler as their primary point of contact and "point person" at Treasury.[56] After the Third Amendment was finalized, Bowler thanked Ugoletti directly "for all [his] help in getting the PSPAs over the finish line."[57]

Parrott was also heavily involved alongside Treasury on behalf of the White House National Economic Council. Parrott was Bowler's "primary point of contact" at the White House and was the primary official at the National Economic Council to whom Treasury proposed the specifics of the Third Amendment.[58] Bowler explained that Parrott directly informed him, on behalf of the White House, that he was "comfortable with moving to a variable dividend relative to the fixed 10 percent dividend."[59] Bowler and Parrrot also jointly met with the OMB to get

---

[55] Plaintiffs did not seek to move PX-0550 into evidence in the first trial.

[56] DeMarco Dep. at 178:17–179:1, 303:16 – 305:5; Ugoletti Dep. at 151:5–152:1.

[57] Ex. Y (PX-0294).

[58] Bowler Dep. at 152:14-22, 153:4–13, 247:19–248:2.

[59] Bowler Dep. at 153:4–13, 247:19–248:2.

approval for the Third Amendment in August 2012,[60] and worked together "to frame discussions on the substance, timing, and process for amending the PSPA covenants."[61]

Bowler and Parrott were each senior level officials intimately involved in the negotiations and decision-making over the Third Amendment, and their statements are reliable indications of Treasury's and the White House's intentions in approving the Net Worth Sweep and pushing for its adoption in August 2012.  In determining whether FHFA acted arbitrarily or unreasonably in agreeing to it, the jury should be permitted to consider the statements made in PX-0226, PX-0274, PX-0279, PX-0550, and PX-0562 and their affect, or lack thereof, on FHFA's decision to agree to the Net Worth Sweep.

### D.    The Documents Are Relevant To Rebutting Testimony As To Which Aspects Of The Third Amendment Were Intended To Demonstrate Wind Down

PX 0259 makes clear that a reasonable jury could conclude from FHFA's own documents that the purpose of the Third Amendment was "to demonstrate wind down."  That email was sent by an FHFA account (Griffin) minutes after meeting with Acting Director DeMarco on August 14, 2012—when the Net Worth Sweep was being agreed upon.  Griffin wrote that the purpose of the Third Amendment was "to demonstrate wind down."  Ex. W (PX-0259).  This document prevents FHFA from maintaining the twin fictions that (i) if this purpose existed, it only belonged to other agencies, and (ii) FHFA somehow remained entirely unaware of it.  This evidence alone gives the jury ample basis to conclude ***FHFA's*** motive was to demonstrate wind down.

Unable to keep proof of this motivation confined to other agencies, Defendants attempted to confuse the jury as to its significance by arguing at the first trial that this concept had a different meaning in connection with the Third Amendment than the plain meaning of the words would

---

[60] Bowler Dep. at 240:8 – 241:16; Ex. O (PX-0484); Ex. P (TREASDDC00052446).
[61] Ex. Q (PX-0477).

otherwise have suggested.  Specifically, Defendants called Nicholas Satriano, who was not the author of the remark and did not claim to have discussed it with Griffin, to testify about his understanding of Griffin's meaning.  Satriano testified (over objection) that he understood Griffin's statement regarding "demonstrat[ing] wind down" to refer only to the provision of the Third Amendment that called for the GSEs to reduce their retained portfolios on a somewhat faster timetable—not to the Net Worth Sweep which deprived the GSEs of all of their profits in perpetuity.  Trial Tr. at 2233:19-2236:18.

This testimony was, in a word, absurd and cynical inasmuch as it used the authority of FHFA's chief accountant to conceal the obvious fact that the Net Worth Sweep would be a far more drastic and permanent reflection of wind down than a mere acceleration in the decline of a portfolio that already was happening and now would occur more quickly.  There is zero basis for suggesting that it was the acceleration that would "demonstrate wind down."

But for present purposes what matters is that if FHFA's chief accountant is permitted to seek to confuse the jury in this way as to the meaning of this critical document, Plaintiffs should be able to put forward evidence establishing the implausibility of his interpretation by showing the contemporaneous understanding of the concept of wind down by FHFA's contractual counterparty—those with the first-hand knowledge of the Net Worth Sweep's intent.  In particular, Bowler's bullet point memo (PX-0550) saying "GSEs are being wound down faster and will not return to their current state", and that "GSEs will not build capital and exit conservatorship in their prior form" present reliable evidence that should be admitted to rebut Satriano's testimony.  PX-0274 and PX-0279 likewise show that both market observers and the White House official with primary responsibility for the Net Worth Sweep readily understood that it was the Net Worth Sweep that was intended to demonstrate wind down by depriving the GSEs of their capital.  As

Mr. Parrott confirmed, the "substance and intent" of the Third Amendment was to "deprive" the GSEs "*of all their capital* so" they would not "come back to life" lest it "look as though it is feasible for them to return as private companies backed by the government."  If those with responsibility for the transaction understood that the Net Worth Sweep would demonstrate wind down in this way, it at a minimum makes Mr. Satriano's claimed understanding less plausible.  The jury should be permitted to determine whose understanding of the concept should be applied to the document—a current employee of the principal Defendant offering a post hoc "understanding" 10 years later or a White House official giving his honest contemporaneous view of how the Net Worth Sweep would demonstrate that the GSEs would never be allowed to build capital and come back to life.

## II.       THE RULE AGAINST HEARSAY DOES NOT BAR ADMISSION OF PX-0226, PX-0274, PX-0279, PX-0550, AND PX-0562.

The statements in PX-0226, PX-0274, PX-0279, PX-0550, and PX-0562 are not barred by the rule against hearsay because Plaintiffs are not seeking to admit them for the truth of any matter asserted.  They are also admissible to show state of mind, motive, and intent pursuant to Federal Rule of Evidence 803(3).

Statements not offered for their truth are not hearsay.[62]  Plaintiffs seek to admit PX-0226, PX-0274, PX-0279, PX-0550, and PX-0562 only to demonstrate that the statements were made by

---

[62] *See, e.g.*, *United States v. Hillie*, 39 F.4th 674, 693 (D.C. Cir. 2022) (holding that statements were not hearsay because they were not admitted for their truth); *United States v. Cantu*, 876 F.2d 1134, 1137 (5th Cir. 1989) ("If the significance of a statement 'lies solely in the fact that it was made,' rather than in the veracity of the out-of-court declarant's assertion, the statement is not hearsay because it is not offered to prove the truth of the matter asserted."); Fed. R. Evid. 801, Advisory Committee Note to Subdivision (c) ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay.").

Treasury and White House officials in discussions regarding the Net Worth Sweep.  Because the relevance of PX-0226, PX-0274, PX-0279, PX-0550, and PX-0562 does not depend on whether the statements made therein were true, but only that they were made, those statements are not hearsay.  *See United States v. Churn*, 800 F.3d 768, 776 (6th Cir. 2015) (statements not hearsay when the question of whether the "statements were true or not was irrelevant to what the government was trying to show by introducing the email.").  Statements used for the limited purpose "to explain the basis of this witness's state of mind, to explain what this witness was doing . . . fall outside the definition of hearsay." *Id.*[63]  Plaintiffs seek to introduce the statements in PX-0226, PX-0274, PX-0279, PX-0550, and PX-0562 for that non-hearsay purpose, to explain – in their own words – what Treasury and the White House were doing and saying.

The statements in PX-0226, PX-0274, PX-0279, and PX-0550 are admissible under Fed. R. Evid. 803(3) to show the Executive Branch declarants' "then-existing state of mind (such as motive, intent, or plan)" regarding the Net Worth Sweep.  FRE 803(3).  Statements reflecting Treasury's and the White House's then-present plans, motive, and intentions to do an act, *i.e.*, to implement the Net Worth Sweep, are exempted from the rule against hearsay.  *See United States v. Best*, 219 F.3d 192, 198 (2d Cir. 2000) ("A declarant's out-of-court statement as to his intent to perform a certain act in the future is not excludable on hearsay grounds."); *United States v. Bishop*, 291 F.3d 1100, 1110 (9th Cir. 2002) ("Statements of intent to perform a future act are admissible 'state of mind' testimony under Rule 803(3).").

Bowler's statement in PX-0226 that it "[r]eally makes sense to push the net worth sweep this quarter" immediately after learning of the GSEs' strong second quarter financial results shows

---

[63] The Sixth Circuit further noted that the district court "prudently instructed the jury that the document was 'being introduced for a limited purpose.'" *Id.*

that Treasury's state of mind in pushing the Net Worth Sweep was to prevent a build-up of capital at the GSEs.[64]  Likewise, PX-0550 states that the "rationale" for Treasury's push to approve the Third Amendment in August was based in part on the GSEs' "very strong earnings on August 7, that will be in excess of the 10% dividend," and that the Net Worth Sweep would "highlight Treasury's focus on winding down the GSEs."  These statements evidence the sort of motive, plan, and intention that FRE 803(3) exempts from the rule against hearsay.

Similarly, PX-0274 and PX-0279 evidence Parrott's state of mind.  Parrott explicitly stated that the "intent" of the Net Worth Sweep was to prevent the GSEs from being able to use earnings to build capital and thereby return as profitable private companies.  The fact of that motive and state of mind is relevant for the reasons identified above—it demonstrates how the concept was understood at the time by the proponents of the Net Worth Sweep, rebutting FHFA's stated position in this case, as well as Satriano's testimony in which he denied that the Net Worth Sweep was "designed to demonstrate wind down."

In addition, PX-0226, PX-0274, PX-0279, PX-0550, and PX-0562 are admissible under FRE 803(8) as a public record setting forth Treasury's activities with another independent agency of the Executive Branch in coordinating communications strategy regarding a matter of immense public importance under FRE 803(8).  *See* Class ECF No. 222 at 8-9; *Fairholme* ECF No. 221 at 8-9.

Finally, with regard to the sentence in PX-0562 about Treasury receiving edits on its press release from DeMarco "this evening," that sentence and email is admissible as evidence of Treasury's shared intent with FHFA under FRE 803(3); as a public record setting forth Treasury's

---

[64] *See, e.g.*, *United States v. Safavian*, 435 F. Supp. 2d 36, 44 (D.D.C. 2006) (admitting certain emails pursuant to Fed. R. Evid. 803(3) as they "show [declarant]'s state of mind at the time he received them or at some later time.").

activities with another independent agency of the Executive Branch in coordinating communications strategy regarding a matter of immense public importance under FRE 803(8), *see* Class ECF No. 222 at 8-9 and *Fairholme* ECF No. 221 at 8-9; and under the residual exception, FRE 807.  *See, e.g., Alexander v. F.B.I.*, 198 F.R.D. 306, 320 (D.D.C. 2000) (Lamberth, J.) (applying residual exception to conversation between an attorney and the White House Counsel's office).  That the language of the press release stated that it was Treasury's intent to "wind down" the GSEs is also admissible to impeach Mr. DeMarco's contrary trial testimony that the Third Amendment was not intended to demonstrate wind down, Trial Tr. at 637:17-638:14, especially after he provided comments on a specific Treasury press release stating the opposite**.**  *See, e.g., United States v. Smith*, 521 F.2d 957, 965 (D.C. Cir. 1975) (hearsay is admissible to impeach a testifying witness as a prior inconsistent statement.). Further, the fact that Mr. DeMarco received and edited the Treasury press release is also relevant regardless of the truth of the press release, as it shows the close coordination between the agencies and is relevant to show the manner in which FHFA negotiated and rolled out the Third Amendment with Treasury.  *Hillie*, 39 F.4th at 692-93; *Churn*, 800 F.3d at 776.

## **CONCLUSION**

For the foregoing reasons, the documents marked as PX-0226, PX-0274, PX-0279, PX-0550, and PX-0562 should be ruled admissible at trial.[65]

---

[65] Should the Court have any concern that the documents sought to be admitted through this motion could somehow confuse the jury regarding the distinction between FHFA and Treasury or the White House (which we do not believe is likely), Plaintiffs would not oppose a limiting instruction to make the distinctions clear.

Dated: May 26, 2023

*/s/ Charles J. Cooper*
Charles J. Cooper (Bar No. 24870)
David H. Thompson (Bar No. 450503)
Vincent J. Colatriano (Bar No. 429562)
Peter A. Patterson (Bar No. 998668)
Brian W. Barnes (*Pro Hac Vice*)
**COOPER & KIRK, PLLC**
1523 New Hampshire Avenue, N.W.
Washington, DC 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com

*Counsel for Berkley Plaintiffs, et al.*

Respectfully submitted,

*/s/Hamish P.M. Hume*
Hamish P.M. Hume (Bar No. 449914)
Samuel C. Kaplan (Bar No. 463350)
**BOIES SCHILLER FLEXNER LLP**
1401 New York Ave. NW
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
hhume@bsfllp.com
skaplan@bsfllp.com

Eric L. Zagar (*Pro Hac Vice*)
**KESSLER TOPAZ
  MELTZER & CHECK, LLP**
280 King of Prussia Rd.
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
ezagar@ktmc.com

Michael J. Barry (*Pro Hac Vice*)
**GRANT & EISENHOFER, P.A.**
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100
mbarry@gelaw.com

Adam Wierzbowski (*Pro Hac Vice*)
**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
adam@blbglaw.com

*Co-Lead Counsel for the Class*

**APPENDIX A**

| Motion Exhibit | Trial Exhibit | Admitted in Prior Trial? |
|---|---|---|
| A | PX-226 | No |
| B | PX-274 | No |
| C | PX-279 | No |
| D | PX-550 | N/A |
| E | PX-562 | N/A |
| F | PX-247 | Yes |
| G | Trial Transcript | N/A |
| H | PX-154 | Yes |
| I | PX-96 | No |
| J | PX-351 | Yes |
| K | DeMarco Deposition | N/A |
| L | Bowler Deposition | N/A |
| M | Ugoletti Deposition | N/A |
| N | Parrott Deposition | N/A |
| O | PX-484 | No |
| P | TREASDDC00052446 | N/A |
| Q | PX-477 | No |
| R | PX-227 | Yes |
| T | PX-240 | No |
| U | PX-144 | Yes |
| V | PX-146 | Yes |

| | | |
|---|---|---|
| W | PX-259 | Yes |
| X | PX-278 | Yes |
| Y | PX-294 | No |
| Z | PX-205 | Yes |
| AA | PX-584 | N/A |