# EXHIBIT 3

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 10-K

ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2011

Commission File Number: 001-34139

# Federal Home Loan Mortgage Corporation

*(Exact name of registrant as specified in its charter)*

**Freddie Mac**

| **Federally chartered corporation** | 8200 Jones Branch Drive | 52-0904874 | (703) 903-2000 |
|---|---|---|---|
| *(State or other jurisdiction of incorporation or organization)* | McLean, Virginia 22102-3110 *(Address of principal executive offices, including zip code)* | *(I.R.S. Employer Identification No.)* | *(Registrant's telephone number, including area code)* |

**Securities registered pursuant to Section 12(b) of the Act: None**

**Securities registered pursuant to Section 12(g) of the Act:**

Voting Common Stock, no par value per share (OTC: FMCC)
Variable Rate, Non-Cumulative Preferred Stock, par value $1.00 per share (OTC: FMCCI)
5% Non-Cumulative Preferred Stock, par value $1.00 per share (OTC: FMCKK)
Variable Rate, Non-Cumulative Preferred Stock, par value $1.00 per share (OTC: FMCCG)
5.1% Non-Cumulative Preferred Stock, par value $1.00 per share (OTC: FMCCH)
5.79% Non-Cumulative Preferred Stock, par value $1.00 per share (OTC: FMCCK)
Variable Rate, Non-Cumulative Preferred Stock, par value $1.00 per share (OTC: FMCCL)
Variable Rate, Non-Cumulative Preferred Stock, par value $1.00 per share (OTC: FMCCM)
Variable Rate, Non-Cumulative Preferred Stock, par value $1.00 per share (OTC: FMCCN)
5.81% Non-Cumulative Preferred Stock, par value $1.00 per share (OTC: FMCCO)
6% Non-Cumulative Preferred Stock, par value $1.00 per share (OTC: FMCCP)
Variable Rate, Non-Cumulative Preferred Stock, par value $1.00 per share (OTC: FMCCJ)
5.7% Non-Cumulative Preferred Stock, par value $1.00 per share (OTC: FMCKP)
Variable Rate, Non-Cumulative Perpetual Preferred Stock, par value $1.00 per share (OTC: FMCCS)
6.42% Non-Cumulative Perpetual Preferred Stock, par value $1.00 per share (OTC: FMCCT)
5.9% Non-Cumulative Perpetual Preferred Stock, par value $1.00 per share (OTC: FMCKO)
5.57% Non-Cumulative Perpetual Preferred Stock, par value $1.00 per share (OTC: FMCKM)
5.66% Non-Cumulative Perpetual Preferred Stock, par value $1.00 per share (OTC: FMCKN)
6.02% Non-Cumulative Perpetual Preferred Stock, par value $1.00 per share (OTC: FMCKL)
6.55% Non-Cumulative Perpetual Preferred Stock, par value $1.00 per share (OTC: FMCKI)
Fixed-to-Floating Rate Non-Cumulative Perpetual Preferred Stock, par value $1.00 per share (OTC: FMCKJ)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐   No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   ☒ Yes   ☐ No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐                                                                                 Accelerated filer ☒
Non-accelerated filer (Do not check if a smaller reporting company) ☐                    Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

The aggregate market value of the common stock held by non-affiliates computed by reference to the price at which the common equity was last sold on June 30, 2011 (the last business day of the registrant's most recently completed second fiscal quarter) was $227.4 million.

As of February 27, 2012, there were 649,733,472 shares of the registrant's common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE:** None



FHFA 2703

# PART I

*This Annual Report on Form 10-K includes forward-looking statements that are based on current expectations and are subject to significant risks and uncertainties. These forward-looking statements are made as of the date of this Form 10-K and we undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date of this Form 10-K. Actual results might differ significantly from those described in or implied by such statements due to various factors and uncertainties, including those described in "BUSINESS — Forward-Looking Statements," and "RISK FACTORS" in this Form 10-K.*

*Throughout this Form 10-K, we use certain acronyms and terms that are defined in the "GLOSSARY."*

## ITEM 1. BUSINESS

### Conservatorship

We continue to operate under the direction of FHFA, as our Conservator. We are also subject to certain constraints on our business activities imposed by Treasury due to the terms of, and Treasury's rights under, the Purchase Agreement. We are dependent upon the continued support of Treasury and FHFA in order to continue operating our business. Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent and avoiding the appointment of a receiver by FHFA under statutory mandatory receivership provisions. The conservatorship and related matters have had a wide-ranging impact on us, including our regulatory supervision, management, business, financial condition, and results of operations.

As our Conservator, FHFA succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any stockholder, officer or director thereof, with respect to the company and its assets. FHFA, as Conservator, has directed and will continue to direct certain of our business activities and strategies. FHFA has delegated certain authority to our Board of Directors to oversee, and to management to conduct, day-to-day operations. The directors serve on behalf of, and exercise authority as directed by, the Conservator.

There is significant uncertainty as to whether or when we will emerge from conservatorship, as it has no specified termination date, and as to what changes may occur to our business structure during or following conservatorship, including whether we will continue to exist. We are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near-term. Our future structure and role will be determined by the Administration and Congress, and there are likely to be significant changes beyond the near-term. We have no ability to predict the outcome of these deliberations.

A number of bills have been introduced in Congress that would bring about changes in the business model of Freddie Mac and Fannie Mae. In addition, on February 11, 2011, the Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market, including options for structuring the government's long-term role in a housing finance system in which the private sector is the dominant provider of mortgage credit. The report recommends winding down Freddie Mac and Fannie Mae, and states that the Administration will work with FHFA to determine the best way to responsibly reduce the role of Freddie Mac and Fannie Mae in the market and ultimately wind down both institutions. The report states that these efforts must be undertaken at a deliberate pace, which takes into account the impact that these changes will have on borrowers and the housing market.

The report states that the government is committed to ensuring that Freddie Mac and Fannie Mae have sufficient capital to perform under any guarantees issued now or in the future and the ability to meet any of their debt obligations, and further states that the Administration will not pursue policies or reforms in a way that would impair the ability of Freddie Mac and Fannie Mae to honor their obligations. The report states the Administration's belief that under the companies' senior preferred stock purchase agreements with Treasury, there is sufficient funding to ensure the orderly and deliberate wind down of Freddie Mac and Fannie Mae, as described in the Administration's plan.

On February 2, 2012, the Administration announced that it expects to provide more detail concerning approaches to reform the U.S. housing finance market in the spring, and that it plans to begin exploring options for legislation more intensively with Congress. On February 21, 2012, FHFA sent to Congress a strategic plan for the next phase of the conservatorships of Freddie Mac and Fannie Mae. For more information on current legislative and regulatory initiatives, see "Regulation and Supervision — *Legislative and Regulatory Developments*."

Our business objectives and strategies have in some cases been altered since we were placed into conservatorship, and may continue to change. Based on our charter, other legislation, public statements from Treasury and FHFA officials, and guidance and directives from our Conservator, we have a variety of different, and potentially competing, objectives. Certain changes to our business objectives and strategies are designed to provide support for the mortgage market in a

on seriously delinquent loans in our portfolio, we expect our credit losses will continue to remain high even if the volume of new serious delinquencies declines.

- Continued negative impact of certain loan groups within the single-family credit guarantee portfolio, such as those underwritten with certain lower documentation standards and interest-only loans, as well as other 2005 through 2008 vintage loans. These groups continue to be large contributors to our credit losses.
- Cumulative declines in national home prices during the last five years, based on our own index. As a result of these price declines, approximately 20% of loans in our single-family credit guarantee portfolio, based on UPB, had estimated current LTV ratios in excess of 100% (underwater loans) as of December 31, 2011.
- Deterioration in the financial condition of many of our mortgage insurers, which reduced our estimates of expected recoveries from these counterparties.

Some of our loss mitigation activities create fluctuations in our delinquency statistics. For example, loans that we report as seriously delinquent before they enter a modification trial period continue to be reported as seriously delinquent until the modifications become effective and the loans are removed from delinquent status by our servicers. See "MD&A — RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-family Mortgage Credit Risk — Credit Performance — Delinquencies*" for further information about factors affecting our reported delinquency rates.

### Government Support for our Business

We are dependent upon the continued support of Treasury and FHFA in order to continue operating our business. Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent and avoiding the appointment of a receiver by FHFA under statutory mandatory receivership provisions.

Under the Purchase Agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth. The $200 billion cap on Treasury's funding commitment will increase as necessary to eliminate any net worth deficits we may have during 2010, 2011, and 2012. We believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, although the costs of our debt funding could vary.

To address our net worth deficit of $146 million at December 31, 2011, FHFA, as Conservator, will submit a draw request on our behalf to Treasury under the Purchase Agreement in the amount of $146 million. FHFA will request that we receive these funds by March 31, 2012. Upon funding of the draw request: (a) our aggregate liquidation preference on the senior preferred stock owned by Treasury will increase to $72.3 billion; and (b) the corresponding annual cash dividend owed to Treasury will increase to $7.23 billion.

We pay cash dividends to Treasury at an annual rate of 10%. During 2011, we paid dividends to Treasury of $6.5 billion. We received cash proceeds of $8.0 billion from draws under Treasury's funding commitment during 2011. Through December 31, 2011, we paid aggregate cash dividends to Treasury of $16.5 billion, an amount equal to 23% of our aggregate draws received under the Purchase Agreement. As of December 31, 2011, our annual cash dividend obligation to Treasury on the senior preferred stock exceeded our annual historical earnings in all but one period.

We expect to request additional draws under the Purchase Agreement in future periods. Over time, our dividend obligation to Treasury will increasingly drive future draws. Although we may experience period-to-period variability in earnings and comprehensive income, it is unlikely that we will generate net income or comprehensive income in excess of our annual dividends payable to Treasury over the long term. In addition, we are required under the Purchase Agreement to pay a quarterly commitment fee to Treasury, which could contribute to future draws if the fee is not waived. Treasury waived the fee for all quarters of 2011 and the first quarter of 2012, but it has indicated that it remains committed to protecting taxpayers and ensuring that our future positive earnings are returned to taxpayers as compensation for their investment. The amount of the quarterly commitment fee has not yet been established and could be substantial.

There continues to be significant uncertainty in the current mortgage market environment, and continued high levels of unemployment, weakness in home prices, and adverse changes in interest rates, mortgage security prices, and spreads could lead to additional draws. For discussion of other factors that could result in additional draws, see "RISK FACTORS — Conservatorship and Related Matters — *We expect to make additional draws under the Purchase Agreement in future periods, which will adversely affect our future results of operations and financial condition.*"

On August 5, 2011, S&P lowered the long-term credit rating of the U.S. government to "AA+" from "AAA" and assigned a negative outlook to the rating. On August 8, 2011, S&P lowered our senior long-term debt credit rating to "AA+" from "AAA" and assigned a negative outlook to the rating. While this could adversely affect our liquidity and the supply and cost of debt financing available to us in the future, we have not yet experienced such adverse effects. For more

**Forward-Looking Statements**

We regularly communicate information concerning our business activities to investors, the news media, securities analysts, and others as part of our normal operations. Some of these communications, including this Form 10-K, contain "forward-looking statements," including statements pertaining to the conservatorship, our current expectations and objectives for our efforts under the MHA Program, the servicing alignment initiative and other programs to assist the U.S. residential mortgage market, future business plans, liquidity, capital management, economic and market conditions and trends, market share, the effect of legislative and regulatory developments, implementation of new accounting guidance, credit losses, internal control remediation efforts, and results of operations and financial condition on a GAAP, Segment Earnings, and fair value basis. Forward-looking statements involve known and unknown risks and uncertainties, some of which are beyond our control. Forward-looking statements are often accompanied by, and identified with, terms such as "objective," "expect," "trend," "forecast," "anticipate," "believe," "intend," "could," "future," "may," "will," and similar phrases. These statements are not historical facts, but rather represent our expectations based on current information, plans, judgments, assumptions, estimates, and projections. Actual results may differ significantly from those described in or implied by such forward-looking statements due to various factors and uncertainties, including those described in the "RISK FACTORS" section of this Form 10-K and:

- the actions FHFA, Treasury, the Federal Reserve, the SEC, HUD, the Administration, Congress, and our management may take;
- the impact of the restrictions and other terms of the conservatorship, the Purchase Agreement, the senior preferred stock, and the warrant on our business, including our ability to pay: (a) the dividend on the senior preferred stock; and (b) any quarterly commitment fee that we are required to pay to Treasury under the Purchase Agreement;
- our ability to maintain adequate liquidity to fund our operations, including following any changes in the support provided to us by Treasury or FHFA, a change in the credit ratings of our debt securities or a change in the credit rating of the U.S. government;
- changes in our charter or applicable legislative or regulatory requirements, including any restructuring or reorganization in the form of our company, whether we will remain a stockholder-owned company or continue to exist and whether we will be wound down or placed under receivership, regulations under the GSE Act, the Reform Act, or the Dodd-Frank Act, regulatory or legislative actions taken to implement the Administration's plan to reform the housing finance system, regulatory or legislative actions that require us to support non-mortgage market initiatives, changes to affordable housing goals regulation, reinstatement of regulatory capital requirements, or the exercise or assertion of additional regulatory or administrative authority;
- changes in the regulation of the mortgage and financial services industries, including changes caused by the Dodd-Frank Act, or any other legislative, regulatory, or judicial action at the federal or state level;
- enforcement actions against mortgage servicers and other mortgage industry participants by federal or state authorities;
- the scope of various initiatives designed to help in the housing recovery (including the extent to which borrowers participate in the recently expanded HARP program, the MHA Program and new non-HAMP standard loan modification initiative), and the impact of such programs on our credit losses, expenses, and the size and composition of our mortgage-related investments portfolio;
- the impact of any deficiencies in foreclosure documentation practices and related delays in the foreclosure process;
- the ability of our financial, accounting, data processing, and other operating systems or infrastructure, and those of our vendors to process the complexity and volume of our transactions;
- changes in accounting or tax guidance or in our accounting policies or estimates, and our ability to effectively implement any such changes in guidance, policies, or estimates;
- changes in general regional, national, or international economic, business, or market conditions and competitive pressures, including changes in employment rates and interest rates, and changes in the federal government's fiscal and monetary policy;
- changes in the U.S. residential mortgage market, including changes in the rate of growth in total outstanding U.S. residential mortgage debt, the size of the U.S. residential mortgage market, and home prices;
- our ability to effectively implement our business strategies, including our efforts to improve the supply and liquidity of, and demand for, our products, and restrictions on our ability to offer new products or engage in new activities;