**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BERKLEY INSURANCE CO., *et al*., | |
| Plaintiffs, | |
| v. | Case No. 13-cv-1053-RCL |
| FEDERAL HOUSING FINANCE AGENCY, *et al.*, | |
| Defendants. | |
| In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations | |
| _____ | Case No. 13-mc-1288-RCL |
| This document relates to: ALL CASES | |

<u>**REPLY IN SUPPORT OF DEFENDANTS' OMNIBUS MOTION IN LIMINE**</u>

# <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ......................................................................................................... ii

I.      Reply in Support of Defendants' Omnibus Motion in Limine No. 1:  Ms.
        McFarland's Speculation About Treasury's Motives Is Inadmissible............................... 1

II.     Reply in Support of Defendants' Omnibus Motion in Limine No. 2: Plaintiffs
        Should Be Precluded from Arguing That the PSPAs or the Enterprises' Draws on
        the Treasury Commitment Were Loans or Similar to Loans or Borrowing ...................... 3

III.    Reply in Support of Defendants' Omnibus Motion In Limine No. 3: Evidence and
        Argument Comparing the $33.2 Billion Original Issuance Price to the $5.1 Billion
        in Pre-Conservatorship Dividends Paid to Junior Preferred Shareholders Should Be
        Excluded ........................................................................................................................... 7

        A.      The Court Has Not Decided the Issues Raised in Defendants' Motion.................. 9

        B.      Plaintiffs Do Not Dispute and Thus Concede That Several Arguments They
                Made at the First Trial Are Unsupported, Irrelevant, and Unduly Prejudicial ..... 11

        C.      Plaintiffs Fail To Justify Their Arguments That Private Shareholders' "Net
                Investment" and "Fairness" Are Relevant to Shareholders' "Reasonable
                Expectations" or the "Context" of the Enterprises' Public Mission.................... 12

        D.      The Challenged Evidence and Argument Is More Prejudicial Than
                Probative ............................................................................................................ 15

IV.     Reply in Support of Defendants' Omnibus Motion in Limine No. 4: The Court
        Should Exclude Evidence and Argument Concerning Dividends Paid and Value
        Transferred to Treasury After the Third Amendment........................................................ 17

        A.      Neither the Court's Prior Motion to Dismiss Ruling nor the Stipulated Facts
                from the First Trial Provide a Basis for Misusing Post-Third Amendment
                Evidence in the Second Trial .............................................................................. 17

        B.      Plaintiffs' "Relevance" Argument About the Billions in Dividends and
                Value Transferred to Treasury in the Decade After the Third Amendment Is
                Boundless and Incorrect...................................................................................... 19

        C.      Plaintiffs' Evidence and Argument About Dividends Paid Years After the
                Third Amendment Will Unfairly Prejudice Defendants and Mislead or
                Confuse the Jury ................................................................................................ 23

CONCLUSION.................................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bradshaw v. Perdue*,
   No. 04-cv-1422 (PLF), 2018 U.S. Dist. LEXIS 123950 (D.D.C. July 30, 2018)....................21

*Charles v. Home Depot U.S.A., Inc.*,
   No. 1:16-CV-02054 (GMH), 2021 WL 4439057 (D.D.C. Sept. 28, 2021)............................12

*Collins v. Yellen*,
   141 S. Ct. 1761 (2021).............................................................................................................3

*Dunlap v. State Farm Fire & Cas. Co.*,
   878 A.2d 434 (Del. 2005)........................................................................................................15

* *Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency*,
   Nos. 13-cv-1053, 13-cv-1439, 13-mc-1288, 2018 WL 4680197
   (D.D.C. Sept. 28, 2018)...............................................................................................3, 18, 19

*Fairholme Funds, Inc. v. FHFA*,
   Nos. 13-cv-1053, 13-mc-1288, 2022 WL 13937460 (D.D.C. Oct. 21, 2022)........................18

* *Geftman v. Comm'r of Internal Revenue*,
   154 F.3d 61 (3d Cir. 1998).......................................................................................................4

*Gerber v. Enter. Prods. Holdings, LLC*,
   67 A.3d 400 (Del. 2013)..........................................................................................................18

*LNC Invs., Inc. v. First Fid. Bank*,
   No. 92 CIV. 7584, 2000 WL 1118898 (S.D.N.Y. Aug. 8, 2000)............................................19

*Millenkamp v. Davisco Foods Int'l*,
   No. CV03-439, 2009 WL 10678657 (D. Idaho Nov. 10, 2009)..............................................19

*Miller v. HCP & Co.*,
   No. CV 2017-0291, 2018 WL 656378 (Del. Ch. Feb. 1, 2018) .............................................15

*Miller v. HCP Trumpet Invs., LLC*,
   194 A.3d 908 (Del. 2018).........................................................................................................15

*Nuskey v. Hochberg*,
   723 F. Supp. 2d 229 (D.D.C. 2010).........................................................................................21

*Perry Cap. LLC v. Mnuchin*,
   864 F.3d 591 (D.C. Cir. 2017)......................................................................................3, 13, 14

\* *Phrasavang v. Deutsche Bank*,
656 F. Supp. 2d 196 (D.D.C. 2009) ...................................................................1

*Quadrangle Dev. Corp. v. Antonelli*,
935 F.2d 1337 (D.C. Cir. 1991) ......................................................................24

*United States v. Brown*,
503 F. Supp. 2d 239 (D.D.C. 2007) ................................................................21

*United States v. Coughlin*,
527 F. App'x 3 (D.C. Cir. 2013) ......................................................................24

*United States v. Coughlin*,
821 F. Supp. 2d 35 (D.D.C. 2011) ..................................................................24

*United States v. Ganias*,
824 F.3d 199 (2d Cir. 2016) .............................................................................21

*United States v. Manner*,
887 F.2d 317 (D.C. Cir. 1989) ........................................................................24

*Vectura Ltd. v. GlaxoSmithKline LLC*,
981 F.3d 1030 (Fed. Cir. 2020) .......................................................................25

\* *Wannall v. Honeywell, Inc.*,
775 F.3d 425 (D.C. Cir. 2014) .........................................................................12

**Statutes**

12 U.S.C. § 1716 .................................................................................................14

**Other Authorities**

*Black's Law Dictionary* (11th ed. 2019) ...........................................................4

3B Federal Jury Practice and Instructions—Civil § 163:270 (6th ed. 2023) ...................4

Lawrence's Anderson on the Uniform Commercial Code § 1-304:6 (3d ed.) ...........................15

Jeffrey J. Rachlinski, *A Positive Psychological Theory of Judging in Hindsight*,
65 U. Chi. L. Rev. 571 (1998) ..........................................................................24

## I.     Reply in Support of Defendants' Omnibus Motion in Limine No. 1:
##        Ms. McFarland's Speculation About Treasury's Motives Is Inadmissible

Ms. McFarland's speculation about Treasury's motives for executing the Third

Amendment is inadmissible for the reasons given in the Court's rulings at the first trial.

Plaintiffs do not dispute the correctness of this Court's prior ruling excluding nearly identical

McFarland testimony that "amount[ed] to McFarland's speculation as to what Treasury's

reasoning might have been." Trial Tr. 227:10-11.[1]  Plaintiffs make no attempt to distinguish the

challenged testimony from that nearly identical testimony.  Indeed, because Plaintiffs do not

argue that Ms. McFarland has personal knowledge of the subject matter of the testimony—

namely, why Treasury executed the Third Amendment—Plaintiffs concede that Ms. McFarland

does not know if Treasury executed the Third Amendment "in response to [her] communication

of [Fannie Mae's] forecasts," or if "it was probably a [Treasury] desire not to allow capital to

build up within the Enterprises." Mot. Ex. A at 45:11-16 (Class ECF No. 289-1; Berkley ECF

No. 303-1).[2]  Inasmuch as Plaintiffs failed to respond to any of Defendants' arguments in their

opposition, the court should treat them as conceded.  *See Phrasavang v. Deutsche Bank*, 656 F.

Supp. 2d 196, 201 (D.D.C. 2009).

Curiously, Plaintiffs spend most of their opposition arguing that Ms. McFarland's

testimony is *inadmissible*, albeit for a different reason—because it supposedly constitutes

inadmissible "reaction" testimony.  *See* Opp. at 1-2.  Plaintiffs then repeat the arguments from

their own motion to exclude so-called "reaction" testimony by other Enterprise executives and an

---

[1]     The transcripts from the first trial are docketed at ECF Nos. 263-289 on the *Berkley* docket, No. 1:13-cv-1053-RCL; the transcripts are not docketed on the Class docket. This brief cites to the page–line numbers in the transcripts themselves.

[2]     "Class ECF No." refers to docket 1:13-mc-01288-RCL; "Berkley ECF No." refers to docket 1:13-cv-1053-RCL.

FHFA official.  *See id.* at 1 (citing Pls.' Omnibus Mot. at 6-9 (Class ECF No. 292; Berkley ECF No. 307)).  Plaintiffs state that they "*do not oppose*" exclusion of Ms. McFarland's testimony, "provided that the Court also excludes the testimony identified in Plaintiffs' Motions" regarding "reaction" testimony.  *Id.* at 3 (emphasis added).

The Court should reject Plaintiffs' transparent attempt to horse-trade on two distinct motions that involve two distinct issues.  None of the "reaction" testimony at issue in the other motion includes *speculation about a third party's motives in executing the Third Amendment*. Rather, that other testimony comprises those witnesses' *own* reactions to and assessments of the Third Amendment.  That testimony is admissible because, as discussed in Defendants' opposition to Plaintiffs' motion to exclude, it is within the personal knowledge of each witness. *See* Defs.' Opp. to Pls' Omnibus Mot. at 10-17 (Class ECF No. 309, Berkley ECF No. 320). Here, by contrast, Ms. McFarland has no personal knowledge of *Treasury's* motivation for executing the Third Amendment, so her testimony is inadmissible.  The Court should accordingly *grant* Defendants' motion to exclude Ms. McFarland's speculation about Treasury's motives and *deny* Plaintiffs' motion to exclude other witnesses' "reaction" testimony for the reasons explained in Defendants' opposition brief.  *Id.*

Further, in arguing that there are no differences between the two sets of testimony, Plaintiffs mischaracterize Ms. McFarland's testimony as being about "*Defendants'* decision to enter into the Third Amendment" when Ms. McFarland's testimony speculates about *Treasury's* motivation.  Opp. at 1 (emphasis added).  Treasury is not a party to the case, and its decision is not in issue.  This Court considered that distinction when ruling that Ms. McFarland's nearly identical testimony was substantially more prejudicial than probative.  *See* Trial Tr. 226:24-227:5 (the Court stating that the McFarland testimony "could potentially confuse the jury into thinking

that McFarland had personal knowledge of Treasury's position, which might lend credence to the idea that FHFA adopted that position").  The same potential confusion is present here.

Finally, Plaintiffs argue that a separate, *unopposed* portion of Ms. McFarland's testimony should "remain[] admissible."  Opp. at 2.  Defendants agree, which is why they did not move to exclude that testimony.  There, Ms. McFarland addresses a topic she *does* have personal knowledge of—namely, what she purportedly told Treasury before the Third Amendment.  *See* Trial Tr. 226:12-15 (admitting other testimony "based on McFarland's personal knowledge of things she told Treasury").  In the challenged testimony, by contrast, Ms. McFarland speculates about Treasury's motivation behind the Third Amendment—something she knows nothing about, as the Court previously recognized.  *See id.* at 226:24-227:5, 227:10-11.  The Court should grant the present motion to exclude the speculative McFarland testimony and deny Plaintiffs' motion to exclude the other witnesses' "reaction" testimony.

## II.     Reply in Support of Defendants' Omnibus Motion in Limine No. 2: Plaintiffs Should Be Precluded from Arguing That the PSPAs or the Enterprises' Draws on the Treasury Commitment Were Loans or Similar to Loans or Borrowing

It is undisputed that the PSPAs, and the Enterprises' draws on the Treasury Commitment pursuant to the PSPAs, were not "loans" to the Enterprises or a form of Enterprise "borrowing" from Treasury.  Treasury is a senior preferred *stockholder* in the Enterprises, and Treasury's infusion of funds or payment of draws to prevent Enterprise insolvency is an *equity* investment, not a form of debt.  *See Collins v. Yellen*, 141 S. Ct. 1761, 1770 (2021) (describing how Treasury purchased "senior preferred shares and quarterly fixed-rate dividends"); *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 598 (D.C. Cir. 2017) (describing how "Treasury made billions of dollars in emergency capital available to Fannie Mae and Freddie Mac . . . in exchange for preferred shares of their stock"); *Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency* ("*MTD Ruling*"), Nos. 13-cv-1053, 13-cv-1439, 13-mc-1288, 2018 WL 4680197, at *3 (D.D.C. Sept. 28, 2018)

(describing how "Treasury agreed to invest billions of dollars in the GSEs in exchange for one million senior preferred shares"). Any testimony or argument suggesting otherwise is factually erroneous and thus confusing and prejudicial. Mot. at 3-6.

Unable to contest that the PSPAs and draws on the Treasury Commitment are not a loan or borrowing, Plaintiffs instead contend that in the first trial they merely "analogized" that a draw is "similar to" or "like" a loan or borrowing. Opp. at 6; *see, e.g.*, Trial Tr. 261:8-14 (dividend owed to Treasury was "[v]ery similar to a 10 percent loan"); *id.* at 311:6 ("like a 10 percent loan"). But statements by Plaintiffs suggesting that a draw on the Commitment is similar to a loan are likely to confuse the jury and unfairly prejudice Defendants. Plaintiffs' mere "analogizing" ignored the dispositive way in which a draw on the Commitment is entirely unlike a loan or borrowing: the Enterprises had no contractual obligation to *repay* the money under the PSPAs. "A 'loan' is an advance of money pursuant to an agreement, either express or implied, that the money *will be repaid* at some future date. The *agreement to repay must be absolute*, that is, payable in any event." 3B Federal Jury Practice and Instructions—Civil § 163:270 (6th ed. 2023) (emphasis added); *see also Geftman v. Comm'r of Internal Revenue*, 154 F.3d 61, 68 (3d Cir. 1998) (for a disbursement to constitute a loan, "there must have been . . . an unconditional obligation on the part of the transferee to repay the money, and an unconditional intention on the part of the transferor to secure repayment" (citations omitted)).[3]

Plaintiffs have not confined themselves to analogies in any case: Plaintiffs plainly called the draws a loan without any qualifying language in the first trial, and Plaintiffs should be

---

[3] *See also Black's Law Dictionary* (11th ed. 2019) ("dividend": "A portion of a company's earnings or profits distributed pro rata to its shareholders, usu. in the form of cash or additional shares."; "borrow": "To receive money with the understanding or agreement that it must be repaid, usu. with interest."; "lend": "To provide (money) temporarily on condition of repayment, usu. with interest.").

precluded from making similar misstatements that are likely to confuse the jury in the second trial. *See, e.g.*, Trial Tr. 281:14-15 (asserting in opening statement that Treasury "wouldn't let Fannie and Freddie *repay the loan*") (emphasis added); PX-004-V (attached as **Exhibit A**) (demonstrative slide purportedly calculating total amount the Enterprises "borrowed" from Treasury).  Therefore, to avoid jury confusion, Defendants seek to preclude Plaintiffs from referring to the PSPAs or draws on the Treasury Commitment as a "loan" or "borrowing" and from contending that they are "similar to" or "like" a loan.

Given that Plaintiffs have not disputed that Treasury's investment is *equity* (not debt), it would be unfairly prejudicial to permit Plaintiffs to say that the Enterprises' draws on the Treasury Commitment are "like" a loan, when the defining feature of a loan—that it must be repaid—is not a term of Treasury's stock.  The analogy may confuse the jury, and unfairly prejudice Defendants, because it may portray the Third Amendment as unfairly depriving the "borrowers" (*i.e.*, the Enterprises) of the ability to repay.  Under Plaintiffs' theory, the Third Amendment was arbitrary and unreasonable in part because the Enterprises paid more than the 10% "interest" rate agreed to in 2008.  Trial Tr. 312:5-9.  But unlike a loan, the draws could not be repaid, and the dividend was not an interest payment.  When jurors consider whether FHFA's execution of the Third Amendment in August 2012 was reasonable, they should not be confused into believing that the draws are "like" or "similar to" a loan.  Rule 403 bars the introduction of such an unfairly prejudicial argument.

Plaintiffs also refer to a "disclaimer" they purportedly made in closing argument.  Opp. at 6; Trial Tr. 2536:17-22 ("I didn't say it was a loan.").  But that disclaimer has nothing to do with the Treasury draws not being loans.  In context, it is clear that Plaintiffs were referring to the $33.2 billion aggregate issuance price of Plaintiffs' preferred shares, not draws on the Treasury

Commitment.[4]  In any event, rather than cure the confusion, a disclaimer is likely to only further confuse the jury, by suggesting that a loan and draws on the Treasury Commitment are materially similar despite being technically different.

Plaintiffs incorrectly assert that Defendants' counsel referred to draws on the Treasury Commitment as loans.  Opp. at 4.  Defendants said nothing of the kind.  Defendants described the *circular draws* as follows in their opening statement:  "It's like borrowing money to pay your credit card debt.  The hole just keeps getting deeper and deeper.  And when Fannie and Freddie had to draw from the commitment to pay the 10 percent that was based on what they had already drawn from the commitment, that was a huge problem."  Trial Tr. 361:5-9.  As the context makes clear, Defendants' reference to "borrowing money to pay your credit card debt" was a comparison to the problem of the Enterprises taking a draw from Treasury to pay the dividend to Treasury and the resultant increase in the liquidation preference used in computing the 10% dividend the following quarter.  In other words, "[t]he hole just keeps getting deeper and deeper."  Trial Tr. 361:6.  Plaintiffs' goose/gander argument does not apply here; Defendants did not refer to Treasury's investment as a loan in the first trial, and they do not intend on doing so in the second trial.

Defendants acknowledge that some government officials made references to Treasury being paid back for its funding.  *See* Opp. Ex. 2-H at 71; Opp. Ex. 2-J at 57.[5]  Those statements

---

[4]     Plaintiffs should never have implied that the issuance price of the preferred shares was a loan to be repaid in the first place, and Defendants have moved to exclude any such argument or suggestion at the second trial.  *See* Mot. at 6-18.

[5]     Plaintiffs also identify references to the "secured credit facility" that permits the Enterprises to borrow from Treasury.  The credit facility was a program different from the PSPAs.  *See* Opp. Ex. 2-D at 1 (DBRS comments); Opp. Ex. 2-G at 5-6 (DX-130) (mortgage note).  Plaintiffs also cite minutes of a September 24, 2008, meeting at Freddie Mac that analogized the Treasury Commitment, before any draws were taken, to a "credit facility," and Mr. DeMarco agreed with that characterization.  Opp. Ex. 2-E at 1; Opp. Ex. 2-F at 101:3-12.

do not transform what is clear from the written PSPAs: that the draws are not loans.  These statements reflect concern about the government being compensated for "bailing out" the Enterprises and are best understood as references to Treasury receiving compensation for its investment.  Unlike other shareholders, Treasury cannot sell its senior preferred shares.  The references cannot be understood to imply that that Treasury funding is "like a loan" because it is undisputed that there is simply no requirement or ability for the Enterprises to "repay" the draws.

III.    **Reply in Support of Defendants' Omnibus Motion In Limine No. 3: Evidence and Argument Comparing the $33.2 Billion Original Issuance Price to the $5.1 Billion in Pre-Conservatorship Dividends Paid to Junior Preferred Shareholders Should Be Excluded**

At the first trial, Plaintiffs made multiple arguments comparing junior preferred shareholders' original $33.2 billion investment in the Enterprises with the $5.1 billion in dividends they received—both before conservatorship.  Plaintiffs argued that overall "fairness" dictates "repayment" of the original $33.2 billion investment, that it was "reasonable" for private shareholders to expect future dividends based on the $28.2 billion delta between that original investment and the $5.1 billion in pre-conservatorship dividends, and that private shareholders' investment means they are "supposed to keep getting dividends."  Defendants' motion demonstrated why the Court should exclude these types of arguments—and any evidence or argument at all—comparing the $33.2 billion original issuance price and $5.1 billion in pre-conservatorship dividends.  *See* Mot. at 6.  Plaintiffs do not dispute (and thus concede) significant portions of Defendants' motion, and Plaintiffs' remaining arguments are meritless.

As a threshold matter, Plaintiffs are incorrect that the Court has already denied

---

These references, along with incorrect descriptions from third parties like the *Wall Street Journal* (Opp. Ex. 2-B) and the National Association of Realtors (Opp. Ex. 2-C), cannot possibly be interpreted to mean that the draws themselves were loans.

Defendants' arguments.  Prior to closing argument at the first trial, Defendants moved in limine

to preclude Plaintiffs from arguing that $1.6 billion in damages was a fraction of their claimed

damages.  The Court denied that motion once Plaintiffs assured the Court they would not argue

that they suffered greater harm.  Trial Tr. 2440:14-18.  In contrast, the current motion concerns

arguments about shareholders' *reasonable expectations*, not harm, and it seeks to preclude

argument or evidence that those expectations are informed by the pre-conservatorship $33.2

billion issuance price, the $5.1 billion pre-conservatorship dividends, and the delta between those

numbers.  The two motions involve completely different issues.

On the merits, Plaintiffs do not dispute—and thus have conceded—that the following

arguments they made at the first trial were improper and should be excluded at the second trial:

- That Enterprise shares are "supposed to be better than a loan" because
  private shareholders are "supposed to keep getting dividends," and "[y]ou
  keep getting dividends as long as they can pay them."  *See* Mot. at 8, 15-
  17 (citing Trial Tr. 2536:19-22).

- That the value of the $28.2 billion delta and $5.2 billion in pre-
  conservatorship dividends made it "reasonable" for shareholders to expect
  additional dividends in the future.  *See* Mot. at 6, 10-11, 13-18 (citing
  Trial Tr. 2537:16-17; 2722:18-21).

- That the $28.2 billion delta represents a "stranded" investment, "money
  that the preferred shareholders invested and never got back," which the
  jury should treat as "repayment" still owed as a matter of right.  *See* Mot.
  at 9-18 (citing Trial Tr. 271:18-24, 280:20-22, 313:18-20, 314:25-315:1,
  2536:23-24, 2538:2-4).

Plaintiffs do not mention these arguments in their brief, much less refute Defendants'

assertions that they are improper because they are unsupported by the shareholder contract,

irrelevant, and unduly prejudicial.  *See* Mot. at 6-18.  Moreover, Plaintiffs explicitly concede that

they "will not" argue that "shareholders are 'owed' dividends based on the difference between

their overall investment and dividends paid by FHFA to date," Opp. at 10, or argue that

"shareholders' investment is subject to 'repayment' based on a general notion of 'fairness,'" *id.*

at 14.  Consequently, the Court should preclude Plaintiffs from making these arguments or offering any evidence that seeks to convey the same points.

Plaintiffs instead defend just three of the arguments they made in the first trial:

- That the total $33.2 billion issuance price, standing alone, is relevant to shareholders' objectively reasonable expectations under the shareholder contracts.  *See* Opp. at 10.
- That the total issuance price, standing alone, is relevant to show that shareholders "provided essential capital that assisted the [Enterprises] through the Conservatorship" and thus informs the jury's understanding of the Enterprises' mission.  *See id.* at 10, 12-13.
- That private shareholders were entitled to additional dividends as a matter of "basic" or "overall fairness."  *See id.* at 11-12.

As described below, Plaintiffs' defenses of these three arguments are meritless.  The Court should grant Defendants' motion in full.[6]

### A.    The Court Has Not Decided the Issues Raised in Defendants' Motion

Plaintiffs contend that the Court already considered and denied Defendants' arguments during the first trial.  Opp. at 7-9.  Plaintiffs are wrong:  Defendants' motion in the first trial sought to exclude arguments and evidence relating to damages, while the present motion aims to exclude argument and evidence concerning shareholders' reasonable expectations.

Prior to closing arguments at the first trial, Defendants filed a motion in limine to preclude Plaintiffs from arguing that they have suffered more than $1.6 billion in damages.

---

[6]    Plaintiffs mischaracterize Defendants' motion as a challenge limited to *argument* and contend that the Court should therefore deny Defendants' motion as to any related *evidence*.  Not so.  Defendants' motion seeks to preclude both argument and evidence.  *See, e.g.*, Mot. at 6 (heading describing motion as seeking to exclude "Evidence and Argument"); *id.* at 18 (request for relief stating "the Court should preclude Plaintiffs from presenting evidence or argument").  Defendants informed Plaintiffs at their recent July 22, 2023, meet and confer that if the Court grants this motion in limine, the paragraphs (or portions of paragraphs) of the Joint Statement of Undisputed Facts providing values of the junior preferred share issuance price from 1996 to 2008 would be removed, just as any other evidence or argument covered by the Court's exclusion order would not be admitted into evidence.

Defs.' Mot. in Limine re: Damages (Oct. 28, 2022) (Class ECF No. 239, Berkley ECF No. 233). The $1.6 billion damages calculation is the maximum conceivable damages award under their sole remaining theory of harm, *see id.* at 1-2, and Defendants' motion simply sought to exclude arguments in closing suggesting otherwise.  For example, Defendants sought to exclude the types of statements that Plaintiffs made in their opening statement, such as "we aren't asking for those numbers as damages.  We're asking for a small fraction of that," Trial Tr. 272:21-273:2, and that their damages "would be a fraction of the amount of money that the preferred shareholders invested and never got back," *id.* at 313:18-20.  As Defendants' motion explained, these arguments improperly suggested that Plaintiffs are seeking less than they are entitled to as a matter of law, which is simply incorrect.  *See* Defs.' Mot. in Limine re: Damages at 3.

In response, Plaintiffs assured the Court that they were "not going to argue for more than 1.6 billion.  We are not going to suggest that 1.6 billion is a bargain because we suffered so much more harm."  Trial Tr. 2439:3-5.[7]

The Court denied Defendants' motion "as long as [Plaintiffs] stick in the bounds of what [they were] representing," *i.e.*, as long as Plaintiffs would not argue that the harm suffered was more than $1.6 billion.  *Id.* at 2440:14-18.  Plaintiffs' counsel again assured the Court that Plaintiffs would not make the type of damages argument Defendants sought to exclude and would "explicitly tell [the jury] this is not what we're asking for in damages."  *Id.* at 2440:19-20. In other words, neither Defendants' motion nor the Court's ruling concerned shareholders' reasonable expectations.

---

[7]      While Plaintiffs also argued that shareholders' "stranded" investment is relevant to shareholder expectations, *see* Trial Tr. 2439:6-23, Defendants' motion at the first trial did not challenge the relevancy of shareholders' "stranded" investment to shareholders' reasonable expectations, nor did the Court's ruling consider that issue, *id.* at 2440:14-18.

Unlike Defendants' motion at the first trial, which sought to exclude a "pennies on the dollar"-type damages argument, the present motion seeks to exclude evidence and argument suggesting that the total pre-conservatorship issuance price ($33.2 billion), the amount of pre-conservatorship dividends ($5.1 billion), and the delta between those numbers ($28.2 billion) are relevant to shareholders' reasonable expectations of future dividends at the time of contracting, December 2009. *See* Mot. at 6-18. Defendants' motion in limine at the first trial focused on damages' arguments that made the $1.6 billion seem like "a bargain," while the current motion addresses argument and evidence related to shareholders' expectations. Thus, the Court has not addressed Defendants' arguments on these points, and Defendants' present motion is not subject to a clear error or manifest injustice standard, as Plaintiffs suggest.

### B.   Plaintiffs Do Not Dispute and Thus Concede That Several Arguments They Made at the First Trial Are Unsupported, Irrelevant, and Unduly Prejudicial

Plaintiffs do not respond to Defendants' arguments that statements Plaintiffs' counsel made at the first trial are unsupported by evidence, irrelevant, and unduly prejudicial, nor do they offer *any* justification for making those statements. First, they make no effort to defend their argument to the jury that Enterprise shares are "supposed to be better than a loan" because junior preferred shareholders are "supposed to keep getting dividends," and "[y]ou keep getting dividends as long as they can pay them." *See* Mot. at 8, 10-18 (citing Trial Tr. 2536:19-22).

Second, they do not defend their argument that the $28.2 billion delta and $5.1 billion in pre-conservatorship dividends made it "reasonable" for shareholders to expect additional dividends in the future. *See* Mot. at 6, 9-10, 13-18 (citing Trial Tr. 2537:16-17; 2722:18-21).

Third, they do not defend their unfounded argument that the $28.2 billion delta represents a "stranded" investment, "money that the preferred shareholders invested and never got back," which the jury should treat as "repayment," still owed as a matter of right. *See* Mot. at 9-10, 16-

11

17 (citing Trial Tr. 271:18-24, 280:20-22, 313:18-20, 314:25-315:1, 2536:23-24, 2538:2-4).  On

the contrary, Plaintiffs explicitly state that they "will not . . . argue that shareholders are 'owed'

dividends based on the difference between their overall investment and dividends paid by FHFA

to date," Opp. at 10, or argue that "shareholders' investment is subject to 'repayment' based on a

general notion of 'fairness,'" *id.* at 14.

By ignoring Defendants' arguments and failing to offer any defense of the above

statements, Plaintiffs have conceded that these statements are inadmissible.  *See Wannall v.*

*Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014) ("[I]f a party files an opposition to a motion

and therein addresses only some of the movant's arguments, the court may treat the unaddressed

arguments as conceded.") (citations omitted); *see also Charles v. Home Depot U.S.A., Inc.*, No.

1:16-CV-02054 (GMH), 2021 WL 4439057, at *4 (D.D.C. Sept. 28, 2021) (treating portion of

motion in limine as conceded where the plaintiff did not respond to the defendant's argument).

Accordingly, the Court should preclude Plaintiffs from repeating the above statements

and introducing any evidence or arguments that would similarly seek to tie the $5.1 billion in

pre-conservatorship dividends or the $28.2 billion delta to shareholders' reasonable expectations

under the shareholder contracts.

  C. **Plaintiffs Fail To Justify Their Arguments That Private Shareholders' "Net Investment" and "Fairness" Are Relevant to Shareholders' "Reasonable Expectations" or the "Context" of the Enterprises' Public Mission**

Plaintiffs contend that at the second trial they should be permitted to argue and present

evidence relating to private shareholders' "net investment" (*i.e.*, the $33.2 billion total issuance

price), standing alone, and an unspecified notion of "fairness."  Specifically, Plaintiffs contend

that: (1) the "net investment" is relevant to shareholders' reasonable expectations of receiving

dividends in the future; (2) the "net investment" provides relevant "context" for understanding

the Enterprises' mission; and (3) an unspecified notion of "fairness" guides shareholders'

reasonable expectations of receiving dividends.  Plaintiffs' arguments are wrong.

First, Plaintiffs argue, in a single conclusory sentence, that the total issuance price is relevant to shareholders' reasonable expectations of receiving future dividends.  They state:

> As set forth below, Plaintiffs' net investments prior to the Conservatorship inform their expectations that, once the GSEs were stabilized and returned to shareholders—as Defendants said they would be—Plaintiffs could expect to share in the increased value of the GSEs.

Opp. at 10.

Despite Plaintiffs' commitment to "set forth" their explanation "below," the explanation never comes.  At no point do Plaintiffs explain how the "net investments" inform shareholders' reasonable expectations of receiving dividends in December 2009.  As Defendants' motion explained, for a reasonable shareholder to believe that the total issuance price makes it more or less likely that they will receive future dividends, there would have to be some basis for that belief in the shareholder contracts.  But there is none.  *See* Mot. at 10-11.  Rather, the shareholder contracts make clear that shareholders have no legal entitlement to dividends, which the Enterprises have discretion to declare or not declare, no matter what the issuance price of the stock was, and no matter whether dividends had previously been paid or not.  *See* Joint Stipulation of Undisputed Facts ¶ 7 (Class ECF No. 230) (Certificates of Designation); *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 631 (D.C. Cir. 2017) ("[T]he stock certificates upon which the class plaintiffs rely provide for dividends 'if declared by the Board of Directors, in its sole discretion.'" (citation omitted)).  Plaintiffs do not identify any other evidence from which the jury can conclude that the total issuance price of the shares from 1996 to 2008 is at all relevant for purposes of determining reasonable expectations of shareholders in December 2009.  There is accordingly no legal or factual basis for Plaintiffs to argue or introduce evidence tying private shareholders' "net investments" to their "reasonable expectations" of future dividends, and the

13

Court should exclude such argument and evidence.

Second, Plaintiffs contend that the total "net investments" are relevant to show that shareholders "provided essential capital that assisted the [Enterprises] through the Conservatorship," thus informing the Enterprises' mission. *See* Opp. at 10, 12-13.

The Enterprises' public missions are entirely unrelated to—and certainly not informed by—the total issuance price of junior preferred shares, and Plaintiffs offer no explanation for their proposed connection. Congress created both Fannie Mae and Freddie Mac by federal charter and established that their public mission is to "provide stability in the secondary market for residential mortgages, to increase the liquidity of mortgage investments, and to promote access to mortgage credit throughout the Nation." *Perry Cap. LLC*, 864 F.3d at 599 (quoting 12 U.S.C. § 1716) (cleaned up). Plaintiffs do not point to any language in the congressional charters or shareholder contracts, or any other evidence, that suggests the Enterprises' mission—or actions that the Enterprises should have taken—was informed by the issuance price of preferred shares.

Even under the broadest reading of their argument—which Plaintiffs nowhere justify— there is no basis to conclude that the issuance price does anything more than provide capital to the Enterprises which they themselves use to fulfill their missions. The fact that shareholder capital supported the Enterprises' missions in no way suggests that the sum of that capital somehow informed shareholder expectations in December 2009, after that capital had been exhausted, as evidenced by the fact that both Enterprises had drawn on the Treasury Commitment to prevent insolvency. The provision of this capital from 1996 to 2008 does not make any relevant fact concerning shareholder expectations in December 2009 more or less likely.

Third, Plaintiffs contend that they should be permitted to ground shareholders' reasonable expectations of receiving future dividends in some unspecified notion of "fairness," rather than the shareholder contracts. *See* Opp. at 11-12. That is so, Plaintiffs say, because FHFA officials made public statements telling investors to expect that the conservatorship would be temporary and that the goal of the conservatorship was to return the Enterprises to a safe and sound financial condition. *See id.* at 11-12. According to Plaintiffs, their argument that "fairness" may guide the reasonable expectations of shareholders is "thus not 'divorced from the terms of the shareholder cont[r]act,' or relevant considerations of investor expectations." *Id.* at 12 (citing Mot. at 14).

Plaintiffs' logic is confusing. As an initial matter, the public statements they cite, even if relevant, have nothing to do with the total issuance price of the preferred shares. In any event, Plaintiffs ignore Defendants' argument: a breach of implied covenant claim "does not entitle a court to rewrite a contract on the basis of some 'unspecified notion of fairness.'" Lawrence's Anderson on the Uniform Commercial Code § 1-304:6 (3d ed.) (citation omitted); *see also* Mot. at 14-15 (citing *Miller v. HCP & Co.*, No. CV 2017-0291, 2018 WL 656378, at *9 (Del. Ch. Feb. 1, 2018), *aff'd sub nom. Miller v. HCP Trumpet Invs., LLC*, 194 A.3d 908 (Del. 2018); *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005)). The implied covenant does not create a "free-floating duty" based on Plaintiffs' own notion of fairness, untethered from the shareholder contracts.

### D.     The Challenged Evidence and Argument Is More Prejudicial Than Probative

Plaintiffs' efforts to downplay the misleading nature of their arguments are unpersuasive. Plaintiffs contend that because they did not *explicitly* argue that there was a contractual requirement to pay dividends or that "repayment" of private shareholders' original investment was required as a matter of "fairness," there is therefore no risk of prejudice to Defendants. *See*

15

Opp. at 13-14.  Plaintiffs' statements at the first trial show otherwise.  They argued that shareholders are "supposed to keep getting dividends."  Trial Tr. 2536:19-22.  They urged the jury to treat the $5.2 billion in pre-conservatorship dividends as partial "repayment" of private shareholders' original investment.  *Id.* at 271:18-24.  They referred to the $28.2 billion delta between the total issuance price and the pre-conservatorship dividends as money that "shareholders invested and never got back."  *Id.* at 313:18-20.  And they tied those arguments to undefined notions of "overall" and "basic fairness."  *Id.* at 273:3, 2537:15-16.

Plaintiffs also ignore Defendants' arguments regarding the prejudicial effect of tying the total issuance price to shareholders' reasonable expectations of dividends.  *Compare* Mot. at 17*, with* Opp. at 13-14.  The Court has explained that the jury may not consider information that is neither "objective[]" nor grounded in the "shareholder contracts."  *See* Final Jury Instructions at 9 (Class ECF No. 250, Berkley ECF No. 240) ("Final Jury Instructions").  Yet Plaintiffs seek to muddy the Court's instruction by arguing that "it's not unreasonable to have that expectation [of receiving dividends] when you've invested that much money into the enterprises."  Trial Tr. 2722:18-21.  As Defendants have explained, the shareholder contracts do not provide *any* basis for believing that the total issuance price makes it more or less likely that the shareholders will receive future dividends.  Mot. at 11-12, 16-17.  Accordingly, any such argument or evidence risks confusing the jury about what evidence they can consider when assessing shareholders' "objectively reasonable expectations."

Plaintiffs' presentation of these arguments to the jury at the first trial risked misleading the jury and unfairly prejudicing Defendants.  The Court should exclude all such statements from the upcoming second trial.

**IV.     Reply in Support of Defendants' Omnibus Motion in Limine No. 4: The Court Should Exclude Evidence and Argument Concerning Dividends Paid and Value Transferred to Treasury After the Third Amendment**

Plaintiffs do not dispute that they intend to inundate the jury in the second trial, as they did in the first trial, with evidence and arguments highlighting the billions in dividends and value that Treasury received pursuant to the Net Worth Sweep in the decade *after* the Third Amendment.  *See* Opp. at 21-27.  But the future that actually unfolded between 2013 and 2022 is not relevant to the jury's evaluation of the question in this case: whether FHFA acted arbitrarily or unreasonably *in August 2012*, when it entered into the Third Amendment, based on "the existing facts and circumstances" known to FHFA *at that time*, thereby frustrating the fruits of the bargain that shareholders reasonably expected as of December 2009.  Final Jury Instructions at 8.  Plaintiffs' repeated references to the $150 billion Treasury received after the Third Amendment improperly invite the jury to judge FHFA's decision through the lens of hindsight and to conclude that the $1.6 billion they claim in damages is a bargain relative to the $150 billion Treasury received, which Plaintiffs baselessly suggest would have otherwise gone to private shareholders.  Plaintiffs concede that the dividends and value transferred to Treasury after the Third Amendment have no bearing on damages in this case.  Opp. at 29.  Nor do they have any bearing on liability.  The figures will serve only to unfairly prejudice Defendants and mislead or confuse the jury.

**A.     Neither the Court's Prior Motion to Dismiss Ruling nor the Stipulated Facts from the First Trial Provide a Basis for Misusing Post-Third Amendment Evidence in the Second Trial**

Plaintiffs argue that this Court found in 2018 that the billions in post-Third Amendment dividends and value transferred to Treasury are "highly probative" and that a Joint Statement of Undisputed Facts from the first trial mandates the admission of such evidence and argument in the second trial.  Opp. at 16-17.  Plaintiffs are wrong on both counts.

<u>First</u>, this Court's 2018 decision on Defendants' motion to dismiss does not address the evidentiary questions presented here. *See generally MTD Ruling*. If anything, that decision supports *exclusion* of evidence and argument of post-Third Amendment dividends and value transferred to Treasury. In particular, this Court found that "Plaintiffs are . . . correct that '[a]n implied covenant claim . . . *looks to the past*,' at 'what the parties would have agreed to themselves had they considered the issue in their original bargaining positions at the time of contracting.'" *Id.* at *8 (emphasis added) (quoting *Gerber v. Enter. Prods. Holdings, LLC*, 67 A.3d 400, 418 (Del. 2013)). The Court concluded that "the *time of contracting* for the purposes of the implied covenant inquiry must be the time of the most recent change in contract—whether by amendment or change of law," *id.* at *9—which has since been determined to be December 2009, *Fairholme Funds, Inc. v. FHFA*, Nos. 13-cv-1053, 13-mc-1288, 2022 WL 13937460, at *5 (D.D.C. Oct. 21, 2022). Under this standard, the Court found that, accepting the complaint allegations as true at the motion to dismiss stage, Plaintiffs had plausibly alleged conduct "at the time the Third Amendment was enacted" that showed FHFA "understood" and "knew" that the Third Amendment would be unnecessary yet "permitted the Treasury to reap enormous benefits in exchange for no new investment." *MTD Ruling* at *11. That analysis focused on allegations about what the parties knew *at the time* of the Third Amendment and what the Third Amendment "permitted" *at that time*. The Court never addressed the dividends actually paid to Treasury *after* the Third Amendment, much less suggested that such evidence would be relevant to assessing the decision that had come before. *Id.*[8]

---

[8]     Plaintiffs also argue that they have evidence that "Defendants understood, prior to the Third Amendment, that the GSEs had reached 'sustained profitability.'" Opp. at 21. Their slanted account is belied by overwhelming evidence to the contrary, but that is beside the point for present purposes. At trial Plaintiffs can seek to introduce evidence about the facts and circumstances at the time of the Third Amendment, but any such evidence does not make what

Second, Plaintiffs incorrectly suggest that the Joint Statement of Undisputed Facts from the first trial, which included a chart of the amounts of post-Third Amendment dividends, permits them to misuse the figures anew in the second trial.  Opp. at 16-17; 29-30.  For one, stipulations from a prior trial are not binding on a later trial in the same case.  *Cf. LNC Invs., Inc. v. First Fid. Bank*, No. 92 CIV. 7584, 2000 WL 1118898, at *1 (S.D.N.Y. Aug. 8, 2000); *Millenkamp v. Davisco Foods Int'l*, No. CV03-439, 2009 WL 10678657, at *3 (D. Idaho Nov. 10, 2009).  Indeed, given how Plaintiffs improperly used the information at the first trial, Defendants have not agreed to present similar stipulations to the jury at the second trial.  By entering the stipulated facts in the first trial, Defendants did not and do not agree to permit misleading and unfairly prejudicial arguments about those facts.  The prior joint submission did not even mention the purported $150 billion in "excess" dividends and value transferred to Treasury at all, because that figure assumes, without basis, that in the absence of the Third Amendment the 10% dividend with no Periodic Commitment Fee would have remained in place for ten years.  The prior joint submission is simply not a valid basis to allow improper evidence and argument at the upcoming trial.  In any event, Defendants have informed Plaintiffs that if the Court grants this motion in limine, the paragraphs (or portions of paragraphs) of the Joint Statement of Undisputed Facts at issue in this motion would not be submitted into evidence, just like any other evidence covered by the Court's exclusion order.

### B.   Plaintiffs' "Relevance" Argument About the Billions in Dividends and Value Transferred to Treasury in the Decade After the Third Amendment Is Boundless and Incorrect

Plaintiffs assert that the amounts of cumulative dividends and value transferred to

---

happened years after the Third Amendment relevant.  As the Court held, the issue to be determined is whether Defendants acted arbitrarily or unreasonably "at the time the Third Amendment was enacted."  *MTD Ruling* at *11.

Treasury—including the total amount transferred over *ten years* after the Third Amendment—is relevant for two principal reasons.  Neither holds water.

<u>First</u>, Plaintiffs say that such evidence and argument is relevant because "[i]f FHFA truly agreed to the Net Worth Sweep out of a concern that the GSEs would have insufficient profits to pay the 10% dividend, there would be evidence showing some surprise, consternation, or at least recognition on the part of FHFA that in 2013 the Net Worth Sweep" resulted in substantial dividends to Treasury.  Opp. at 18; *id.* at 16, 22-24 (similar).  But this argument completely misstates FHFA's reasoning.  Mr. DeMarco understood that his job as Conservator was to protect against potential worst-case scenarios.  He was clear that he was planning for a worst-case scenario, which had only to be possible, not probable.  Trial Tr. 886:21-887:12, 1062:22-1063:5.  That profits in 2013 exceeded a hypothetical 10% dividend does not illuminate whether it was reasonable for the Conservator to plan for a worst-case scenario that might occur in 2013 or beyond.

In any event, Plaintiffs' focus at the first trial was not just on the dividends paid in 2013.  Rather, Plaintiffs highlighted the dividends paid for *nearly ten years* afterward, touting a sum they likely believed the jury would find enormous.  But Plaintiffs do not and could not argue that the amounts actually paid over ten years were known to FHFA in August 2012.  Indeed, the so-called "golden years" projections that Plaintiffs' expert relied upon do not on their face support that a transfer of $150 billion in value to Treasury was expected.  *See* Opp. Ex. 4-F at 19-20 (PX-213).  Those future events accordingly say nothing about whether FHFA acted arbitrarily or unreasonably in August 2012 based on "the existing facts and circumstances" at that time.  Final Jury Instructions at 8.

Plaintiffs cite no case law supporting their boundless theory, and the cases they do cite

are inapposite.  Plaintiffs' principal case dealt with character evidence, and it expressly stated that such evidence is admissible only "so long as the danger of unfair prejudice does not substantially outweigh the probative value of the evidence."  *Bradshaw v. Perdue*, No. 04-cv-1422 (PLF), 2018 U.S. Dist. LEXIS 123950, at *3-4 (D.D.C. July 30, 2018).  Even with respect to character evidence, "[t]he time frame in which specific incidents occurred may affect the Court's calculation of their probative value."  *United States v. Brown*, 503 F. Supp. 2d 239, 246 (D.D.C. 2007).  In *United States v. Ganias*, 824 F.3d 199, 214 (2d Cir. 2016), the court discussed how forensic computer examiners might find the non-existence of evidence at a later date (finding no virus on a defendant's computer) to be probative of its absence before (undermining the defendant's claim that a virus, not he, committed the crime).  *Ganias* says nothing about the relevance of later-occurring facts to assessing the reasonableness of an earlier decision.  And in *Nuskey v. Hochberg*, 723 F. Supp. 2d 229, 234 (D.D.C. 2010) (cited at Opp. at 23), the court did not "admit[]" evidence of "[s]ubsequent actions by [the] employer" at all; it *excluded* such evidence.

Second, Plaintiffs' argument that evidence of a decade of dividends and value transferred from 2013 through 2022 is relevant to "whether FHFA acted reasonably" in August 2012 is the very definition of hindsight.  Whether the dividends paid over the subsequent ten years were reasonably foreseeable depends on what was known in August 2012, and the reasonableness of FHFA's decision in any case depends on the weight FHFA placed on various potential future outcomes when it executed the Third Amendment.  As explained above, Mr. DeMarco had to plan for a worst-case scenario that was *possible*, even if it was not probable.  Plaintiffs' arguments about actual outcomes risk confusing the jury about whether it was reasonable to plan for a different future.

Moreover, in the first trial, Plaintiffs did not just argue that it was reasonably foreseeable that net worth would increase in 2013; they argued that the Third Amendment was "unreasonable" because its overall "consequences . . . were catastrophic."  Trial Tr. 307:16-22.  This is inappropriate, and even their own expert did not endorse this use of post-Third Amendment evidence: he emphasized at trial that "the only purpose of looking at" post-Third Amendment data was "to try to show what the *impact* of the net worth sweep was."  *Id.* at 1098:17-21 (emphasis added).  In his own analysis of whether the Net Worth Sweep was "something reasonable shareholders could expect," the expert was "restricted" to "information that [FHFA and the Enterprises] had *at the time of the Third Amendment*," to "putting [him]self essentially in the same place that [the decisionmakers] were in *at the time*."  *Id.* at 1097:17-1098:8 (emphasis added).  Plaintiffs' focus on $150 billion in supposed excess dividends and value transferred to Treasury from 2013-2022 disregards the intent and knowledge of the decisionmaker in 2012 that are the basis of their implied covenant claim.  Rather, Plaintiffs improperly and baselessly suggested that private shareholders would have received these billions in the absence of the Third Amendment.

<u>Third</u>, Plaintiffs embrace FHFA's articulation of what the jury might consider in assessing whether FHFA acted reasonably:

> i) the reasonableness of FHFA's stated objective of precluding the erosion of the Treasury Commitment in light of possible losses in a stress scenario; ii) the reasonableness of the concern by FHFA and the market that the Enterprises may not be able to consistently pay a 10% dividend given the uncertainty of the housing market and future financial performance of the Enterprises; or iii) the fit between the action taken, *i.e.*, the Third Amendment, and the objective, *i.e.*, maximizing the duration of the Commitment.

Opp. at 24 (quoting Mot. at 24).  Plaintiffs then proceed to argue that in making its assessment, the jury is entitled to consider evidence that "contradicts" Defendants' contentions.  *Id*. at 24-25.  But Plaintiffs do not establish how the post-Third Amendment dividends relate to any of the

issues the jury might consider.

Specifically, Plaintiffs suggest that the purported excess of $150 billion transferred to Treasury proves that the Net Worth Sweep (a) "could not and did not" relate to concerns about Commitment fees, (b) was never intended to help return the Enterprises to normal business operations, and (c) was never intended to benefit the public interest. *Id*. at 25-26. Plaintiffs are presenting the same argument under three superficially different covers: that FHFA's asserted reasons for their actions in 2012 can be disproved by future events. Once again, this is the very definition of hindsight bias. Experiencing an outcome that depends on developments that cannot be known ex ante does not retroactively make a decision unreasonable.

Plaintiffs also state that absent evidence of the Net Worth Sweep's impact, "the jury will lack a crucial frame of reference against which to measure whether and how the Net Worth Sweep violated shareholder expectations." *Id*. at 26. Yet Plaintiffs have offered no evidence to support their contention that post-Third Amendment dividends violated shareholders' expectations as of December 2009. Plaintiffs' argument is nothing more than another attempt to plant the seed that if Treasury received an excess $150 billion, then in the absence of the Third Amendment that same amount would have benefitted shareholders. Similarly, post-Third Amendment profits made by the Enterprises cannot demonstrate that the decision made in August 2012 to protect against a worst-case scenario was not in the public interest simply because such a scenario never materialized over the subsequent ten years.

### C.    Plaintiffs' Evidence and Argument About Dividends Paid Years After the Third Amendment Will Unfairly Prejudice Defendants and Mislead or Confuse the Jury

Plaintiffs do not dispute that juries can be susceptible to hindsight bias. Mot. at 25-26. And they concede that evidence and argument regarding post-Third Amendment dividends and value transferred to Treasury are irrelevant to their $1.6 billion damages claim. Opp. at 29.

Nevertheless, Plaintiffs argue that just because the evidence may be prejudicial, it is not *unfairly* prejudicial. *See id*. at 28. But Defendants have identified how the evidence and argument at issue would invite *unfair* prejudice. *See, e.g.*, Mot. at 28 (noting the evidence would invite the jury to base its decision upon mistaken inferences and misleading references). Plaintiffs also gloss over that the Rule 403 standard requires a "balancing" of the probative value versus the prejudicial effect. *See United States v. Coughlin*, 821 F. Supp. 2d 35, 43 (D.D.C. 2011) (Lamberth, J.), *aff'd*, 527 F. App'x 3 (D.C. Cir. 2013); *United States v. Manner*, 887 F.2d 317, 322 (D.C. Cir. 1989). As discussed above, the probative value of post-Third Amendment dividends—particularly the cumulative dividends and value transferred to Treasury many years after the Third Amendment—is de minimis at best. Events that occurred post-Third Amendment could hardly be said to have any plausible bearing on the reasonableness of FHFA's decision to enter into the Third Amendment in August 2012.

By contrast, the risk of unfair prejudice to Defendants or of misleading or confusing the jury is substantial. For one, permitting Plaintiffs to present evidence and argument concerning dividends and value transferred to Treasury after the Third Amendment would improperly encourage the jury to evaluate the reasonableness of FHFA's decision based on information and events that followed it, which necessarily could not have been part of FHFA's decisionmaking in 2012. A jury's ability to assess the reasonableness of a decision can be compromised when they are presented with evidence of events that occurred after the decision was made. *See, e.g.*, *Quadrangle Dev. Corp. v. Antonelli*, 935 F.2d 1337, 1340 (D.C. Cir. 1991) ("In our view, however, the district court mistakenly considered commercial reasonableness in hindsight (*ex post*) instead of commercial reasonableness 'surrounding the making of the contract' (*ex ante*)." (citation omitted)); *see also* Jeffrey J. Rachlinski, *A Positive Psychological Theory of Judging in*

*Hindsight*, 65 U. Chi. L. Rev. 571, 576-602 (1998).

Further, Plaintiffs' repeated references to the so-called excess $150 billion would unfairly risk confusing or misleading the jury into believing that the actual harm was drastically higher than the $1.6 billion in damages Plaintiffs are seeking.  This risks the jury perceiving Plaintiffs' claimed damages as mere "pennies on the dollar," unfairly prejudicing Defendants.  *See Vectura Ltd. v. GlaxoSmithKline LLC*, 981 F.3d 1030, 1043-44 (Fed. Cir. 2020) (agreeing with district court's finding that party's "conduct . . . was improper" where it "had repeatedly emphasized the amount of revenues made by Defendants and the relative smallness of the damages award they were requesting" (citation omitted)).  Evidence and arguments about post-Third Amendment dividends and value transferred to Treasury also are likely to divert the jury from their task of evaluating "the *existing* facts and circumstances" at the time of the Third Amendment.  Final Jury Instructions at 8 (emphasis added).  In short, jurors should not, as Plaintiffs told them in the first trial, "keep your eye on that $150 billion."  Trial Tr. 314:24.  They should keep their eye on what happened at the time the Third Amendment was enacted.

## CONCLUSION

For reasons set forth in Defendants' Omnibus Motion in Limine, and as explained above, the Court should grant Defendants' Omnibus Motion in Limine in full.

Dated: June 23, 2023

Respectfully submitted,

 /s/ Asim Varma
Asim Varma (D.C. Bar # 426364)
Jonathan L. Stern (D.C. Bar # 375713)
David B. Bergman (D.C. Bar # 435392)
Ian S. Hoffman (D.C. Bar # 983419)
R. Stanton Jones (D.C. Bar # 987088)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave NW
Washington, D.C. 20001
(202) 942-5000
Asim.Varma@arnoldporter.com
Jonathan.Stern@arnoldporter.com
David.Bergman@arnoldporter.com
Ian.Hoffman@arnoldporter.com
Stanton.Jones@arnoldporter.com

*Attorneys for Defendant Federal Housing Finance Agency*

 /s/ Michael J. Ciatti
Michael J. Ciatti (D.C. Bar # 467177)
KING & SPALDING LLP
1700 Pennsylvania Ave. N.W.
Washington, DC 20006
Tel: (202) 661-7828
Fax: (202) 626-3737
mciatti@kslaw.com

*Attorney for the Federal Home Loan Mortgage Corp.*

 /s/ Meaghan VerGow
Meaghan VerGow (D.C. Bar # 977165)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
Tel: (202) 383-5300
Fax: (202) 383-5414
mvergow@omm.com

*Attorney for the Federal National Mortgage Association*