# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BERKLEY INSURANCE CO., *et al*.,<br><br>        Plaintiffs,<br><br>    v.<br><br>FEDERAL HOUSING FINANCE<br>AGENCY, *et al.*,<br><br>        Defendants. | Case No. 13-cv-1053-RCL |
| In re Fannie Mae/Freddie Mac Senior<br>Preferred Stock Purchase Agreement Class<br>Action Litigations<br><br>_____<br><br>This document relates to:<br>ALL CASES | Case No. 13-mc-1288-RCL |

## JOINT SUBMISSION OF OBJECTIONS TO DEPOSITION DESIGNATIONS

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................................. 1

DESIGNATIONS AND OBJECTIONS.................................................................................... 1

I.   Susan McFarland ......................................................................................................... 1

II.  Timothy J. Mayopoulos ............................................................................................. 9

III. David C. Benson ......................................................................................................... 15

## PRELIMINARY STATEMENT

In advance of the retrial set to begin July 24, 2023, the parties met and conferred in an effort to consensually resolve their objections to the other side's deposition designations and counter-designations.  The parties have substantially narrowed the scope of disputes and now jointly submit the limited set of designations on which the parties have reached an impasse.

## DESIGNATIONS AND OBJECTIONS

### I.      Susan McFarland

Both sides designated testimony from Plaintiffs' deposition of Susan McFarland, who is the former Chief Financial Officer of Fannie Mae.  Excerpts of the Parties' designations from Ms. McFarland's deposition transcript is attached as Exhibit **A**.  The following are deposition excerpts designated by Plaintiffs to which Defendants have objected.

- **Susan McFarland -- 60:7–16**

```
60:  7 Q.   And FHFA was on notice that you had sent this
      8 message to Treasury?
      9 A.   Yes.
     10 MR. LAUFGRABEN:  Object to the form of
     11 the question.
     12 A.   Yes.
     13 Q.   (BY MR. THOMPSON)  And they were on notice of
     14 that fact before the Third Amendment; is that right?
     15 MR. LAUFGRABEN:  Same objection.
     16 A.   Yes.
```

*Defendants' Objections: Foundation, Personal Knowledge, Speculation*

In this excerpt, Ms. McFarland testifies that FHFA, at the time of the Third Amendment, was "on notice" that Ms. McFarland had told Treasury at a meeting that there was a future possibility of the allowance on the Deferred Tax Asset ("DTAs") being released.  This testimony should be excluded because it lacks foundation, the witness lacks personal knowledge, and it is speculation.  The deposition lays no foundation for how Ms. McFarland would know that FHFA

1

was "on notice" of what she told Treasury about DTAs at a meeting that she does not recall

FHFA attending.  If anything, Ms. McFarland's testimony demonstrates that she did *not* know

whether FHFA was aware of what she told Treasury.

As background, Ms. McFarland testified that, before the Third Amendment, she told

Treasury that there was a future possibility of the allowance on the DTAs being released.  45:4–8

("I even mentioned the possibility that it could get to a point in the not-so-distant future where

the factors might exist whereby the allowance on the deferred tax asset would be released.").

Ms. McFarland was questioned extensively about who attended the meeting, and in general she

expressed uncertainty about the attendees.  When asked "with whom at Treasury d[id] you have

this meeting?" she replied, "I don't remember every specific person in the meeting."  45:17–

46:3.

Importantly, however, Ms. McFarland testified unequivocally that she did *not* recall

whether anyone from FHFA attended the meeting:

```
54:  2 Q.    Okay. Was anyone from FHFA at this meeting?
     3 A.    I don't recollect. I don't remember.
```

(Emphasis added.)  By Ms. McFarland's own admission, she does not remember whether

"anyone from FHFA" was at the meeting with Treasury where the DTAs were discussed.

Despite this clear answer, Plaintiffs' counsel probed for a link between what Treasury

knew and what FHFA knew, eventually eliciting the response at issue here—namely, Ms.

McFarland's agreement that "FHFA was on notice that [she] had sent this message to

Treasury[.]"  60:7–9.  But Plaintiffs' counsel never elicited any explanation from Ms. McFarland

as to how or why she believed that FHFA had notice of what she told Treasury at the meeting.

The failure to establish this link is critical because, in the preceding testimony, Ms. McFarland

clearly testified that she does not recall whether anyone from FHFA was at the meeting with Treasury.

Plaintiffs point to other portions of Ms. McFarland's deposition concerning her interactions with people at FHFA about the DTAs.  But none of that other testimony supports the conclusion that FHFA was on notice that Ms. McFarland communicated *this particular message* to Treasury.  Rather, the passages reflect Ms. McFarland's interactions with FHFA generally. *E.g.*, 55:4–5 ("We had more regular interactions with individuals at FHFA.").  Plaintiffs do not identify a nexus between what Ms. McFarland told Treasury about the DTAs and FHFA's supposed awareness of what Ms. McFarland told Treasury at the meeting discussed in her testimony.  No such nexus was ever established because Ms. McFarland did not recall if anyone from FHFA was there.

Here, the witness's clear answer on whether "anyone from FHFA" was at the meeting ("I don't recollect.  I don't remember"), combined with Plaintiffs' counsel's failure to establish how or why Ms. McFarland believed that FHFA nevertheless knew what she said at the meeting, precludes the admission of her later testimony speculating, without foundation, that FHFA was aware, and on notice, of what she told Treasury at the meeting about her expectation regarding the DTAs.

**Plaintiffs' Response:**

There is no basis to exclude Ms. McFarland's testimony about Treasury and FHFA's awareness of the DTA release, which is based on her personal knowledge of what she directly informed FHFA personnel.

 "[E]vidence  to   prove personal knowledge may   consist   of   the   witness's   own testimony." Fed. R. Evid. 602; *see also* 27 Charles Alan Wright & Victor James Gold, Federal

Practice and Procedure: Evidence § 6028 (2d ed.2007) ("[P]ersonal knowledge may be established by the testimony of an in court witness without any elaborate foundation separate from the witness' description of the events in question.").  Further, "personal knowledge of a fact 'is not an absolute' to Rule 602's foundational requirement, which 'may consist of what the witness thinks [s]he knows from personal perception.'"  *United States v. Cuti*, 720 F.3d 453, 458-59 (2d Cir. 2013) (citing Fed. R. Evid. 602 adv. comm. note).

As Courts have indicated, "This standard is not difficult to meet. A court should exclude testimony for lack of personal knowledge 'only if in the proper exercise of the trial court's discretion it finds that the witness could not have actually perceived or observed that which he testifies to.'"  *U.S. v. Guiterrez de Lopez*, 761 F.3d 1123, 1132 (10th Cir. 2014) (collecting cases and authorities); *see also* 1 Kenneth S. Broun, McCormick on Evidence § 10 n.6 (7th ed.2013) ("[T]he foundational fact of personal knowledge under Rule 602 falls under Rule 104(b); and the trial judge plays only a limited, screening role, merely deciding whether the foundational testimony would permit a rational juror to find that the witness possesses the firsthand knowledge."); 27 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure: Evidence § 6022 (2d ed. 2007)  ("[T]he testimony is excluded only if, as a matter of law, no juror could reasonably conclude that the witness perceived the facts to which she testifies.").  "Accordingly, if a rational juror could conclude based on a witness's testimony that he or she has personal knowledge of a fact, the witness may testify about that fact." *Guiterrez de Lopez*, 761 F.3d at 1132.

The above excerpt falls at the tail end of a longer affirmative designation by Plaintiffs to which Defendants do not object, which spans from pages 54:20 through 60:6.  The passage relates to Fannie Mae's anticipated treatment of its DTA, which Ms. McFarland estimated would be released "sometime mid-2013."  As the emphasized passages in the fuller excerpt below make

clear, Ms. McFarland's testimony was that throughout 2012 she was in regular communication with the rest of Fannie Mae's management team, its board of directors, FHFA management, and Treasury representatives about Fannie Mae's improving financial situation.  As part of those conversations, Ms. McFarland testified that she told each of those constituencies that Fannie Mae's improving financial condition would likely lead to a release of the approximately "$50 billion" DTA sometime in "mid-2013."  The foundation for Ms. McFarland's testimony in the final two questions and answers of this passage (to which Defendants object) are found in the preceding six pages of testimony.  The longer excerpt is found below:

> Q. Did you ever have any similar type of conversation with anyone at the FHFA about the deferred tax asset prior to the Third Amendment?
>
> A. Yes.
>
> Q. Okay. And tell me about that meeting.
>
> A. Well -- I don't -- so just as we -- you know, we had a formal quarterly sit-down with Treasury. We had more regular interactions with individuals at FHFA. So one either Jeff Spohn and/or Brad Martin would attend our Executive Committee meetings. And so generally anything I was going to say at Treasury, I was already telling the Executive Committee, and Brad or Jeff would have been present at those meetings. And as such, my reviews of actuals and forecasts and even the -- the the raising of the potential that that allowance might be reversed in the not-so-distant future I would have mentioned at an Executive Committee meeting, and Jeff and/or Brad would have been present to hear that.
>
> Q. And just to be clear on that, that would have been within a month of the Third Amendment?
>
> A. It would have been prior to that --
>
> Q. Yes.
>
> A. -- because it's all part of the discussions we have through the quarter-end-close process and forecast preparation and Board prep and all that kind of stuff that takes place in that cycle.
>
> Q. Just so the record is clear, when you say, "prior to that," what

5

period would that have been?

A. Well, it would have been probably -- I would suspect it was -- something that occurred in July would be my -- because of the timing. You know, you're closing the books for the second quarter. We're prepping for the upcoming Board meetings, getting the forecasts done, letting the team know when the results are coming out for the quarter, all of those kinds of conversations that would happen internal at Fannie Mae before we would ever have that conversation with Treasury.

Q. Okay. And I am sorry I interrupted you.  You described these –

A. And then with the -- we also provide -- so we cannot file our Q unless DeMarco gave us permission to file the Q. So drafts of our filings were also provided to FHFA first. They had the opportunity to provide feedback, and then we could incorporate that feedback and then got approval for the final filings. We also had a press release that would go along with -- when we filed a Q, we would go out with a press release. There is where you might see a little more color. There would normally be a quote for the CEO like Tim and a quote from me, and we would also kind of preclear that press release with FHFA before issuing the press release. As far as -- <u>I believe during 2012, I began to signal -- there began to be some public communication as to our view that things were starting to look good and starting to head in a positive direction.</u> I would have to refresh my memory through documents as to the timing of what I said and when. <u>But I know through the course of early 2012 and then throughout that summer, the messaging was getting a bit more and more positive that we were sending out. And certainly FHFA was aware of our communications, our external communications in that regard. As far as the deferred tax asset, I -- I don't recollect that we had some big formal meeting to break the news to them, okay? I believe that it was just something that we talked about in the normal course of keeping them informed about kind of what we're seeing. And also, Jeff Spohn and/or Brad Martin would attend our Board meetings, so they would also hear that the same comments I was making to Treasury, I was making to the Board.</u>

Q. Okay. In the same timetable?

A. I don't remember exactly when the Board meetings were within that window, but it would have been Board meetings shortly before that that I would have reviewed this very same information.

<u>Q. Okay. And when you say that you would have had dialogue</u>

6

with people at FHFA about the deferred tax assets, with who would you have had the dialogue? Would that have been Mario Ugoletti?

A. Yeah. So early on, it's probably through the Chief Accountant's office of the FHFA, because it is a technical accounting matter.

Q. And do you happen to recall –

A. I can pick him out of a lineup.

Q. Okay. We'll show you some names later on.

A. I tell you, I -- ask me a number, I can probably give it to you. People's names... It would have started there. Eventually there were conversations with Director DeMarco and key direct reports of his, but that -- the -- those -- the DeMarco conversations occurred when we were actually in the serious mode of potentially -- we were looking -- we did a full analysis at the end of the second quarter; no release. We did a full analysis at the end of the third quarter; no release. When we were doing the analysis for the fourth quarter of 2012, we started to get to a point where we were tipping towards release, and that's when I began to have conversations with more senior folks at FHFA on it. But they were already aware of the statement that I made to Treasury. I mean, in general, I put it on people's radar screens that it's something that could happen in the not-so-distant future. I will say that I believe Mary Miller asked me in this meeting about how large would it be and did I have any idea of when.

Q. Yeah.

A. And I believe my response was around 50 billion, but that could be larger or smaller depending upon when. The further out in time it is, the smaller it probably would be. It is part of the evidence that it might be good. So the further out in time that it would be released, the smaller the release size would be. But I said probably in the 50-billion-dollar range and probably sometime mid 2013 at that time when I met with them late July, early August 2012. But I said we had not done a real in-depth analysis, so I was just kind of giving her kind of my off-the-cuff perspective in the moment.

Q. And FHFA was on notice that you had sent this message to Treasury?

A. Yes.

Q. And they were on notice of that fact before the Third

7

==Amendment; is that right?==

==A. Yes.==

As the above passage makes clear, both FHFA and the Treasury Department were "on notice" of Ms. McFarland's prediction that Fannie Mae would release its DTA in 2013 because she, FHFA, and Treasury were having regular meetings about Fannie Mae's improving financial condition, which directly impacted the likelihood of the DTA reversal.  Ms. McFarland also specifically references a "meeting" with "Mary Miller" (from the Treasury Department), in which Ms. Miller "asked [her] about how large would [the DTA release] would be and did I have any idea of when."  Ms. McFarland testified that her "response was around 50 billion," and that it would be "probably sometime mid 2013."  Ms. McFarland specified that the "meeting" was "at that time when I met with them late July, early August 2012."  This testimony establishes the foundation that Ms. McFarland told Treasury about Fannie Mae's expected DTA reversal "before the Third Amendment."

As to whether FHFA knew what Treasury knew, the preceding passage makes clear that while she "had a formal quarterly sit-down with Treasury," she had "more regular interactions with individuals at FHFA."  As she put it, "generally anything I was going to say at Treasury, I was already telling the Executive Committee."  Ms. McFarland also testified that Jeff Spohn and Brad Martin (each representatives of FHFA) "would attend our Executive Committee meetings," and "would also hear that the same comments I was making to Treasury, I was making to the Board."

Here, that Ms. McFarland directly informed FHFA and Treasury about the possibility of the DTA release establishes that she had personal knowledge of the agency's awareness of the facts that she told them.  Her testimony is therefore not impermissibly speculative.   Defendants' objection should be overruled.

8

## II.     Timothy J. Mayopoulos

Both sides designated testimony from Plaintiffs' deposition of Timothy Mayopoulos,

who is the former President and CEO of Fannie Mae.  Excerpts of the Parties' designations from

Mr. Mayopoulos' deposition transcript is attached as **Exhibit B**.  The following are deposition

excerpts designated by Plaintiffs to which Defendants have objected.

- **Mayopoulos -- 260:4–262:1**

```
260: 4 Q.    Let me ask you about the question
      5 Mr. Barnes asked you about as a hypothetical of what
      6 might have happened if there had not been a net
      7 worth sweep.
      8 There's a document in here somewhere --
      9 I'm not sure where -- that talks about how other
     10 companies, even in the financial crisis, were able
     11 to get bailout money or other financial rescue
     12 packages at about a 5 percent cap charge as opposed
     13 to 10 percent.  Regardless of that, would you agree
     14 that during this time frame, the last decade, 10
     15 percent has been -- is a fairly expensive cost of
     16 capital?
     17 MS. VERGOW:  Objection.  Incomplete
     18 hypothetical.
     19 THE WITNESS:  What I would say is that in
     20 commercial context, yes, 10 percent was an expensive
     21 amount of cost of capital.  This wasn't a commercial
     22 transaction.
261: 1 BY MR. HUME:
      2 Q.    No.  I understand.  And the point of my
      3 question is not to criticize --
      4 A.    And I -- I wasn't involved in negotiating
      5 it -- [the original PSPA]
      6 Q.    Right.
      7 A.    -- so I have no vested stake in it one
      8 way or the other.
      9 Q.    Right.
     10 A.    I'm not trying to defend it.  I'm just
     11 saying it's not an arm's length commercial
     12 transaction.  It's as much of a -- you know, a
     13 political transaction, where the people extending
```

9

```
14 the taxpayers' credit need to satisfy political
15 constituencies that they are getting adequate
16 compensation for that.
17 Q.    Right.  I understand.  And would you say
18 the same is true for the transaction that took place
19 in August 2012 with the third amendment, that it's
20 not an arm's length commercial transaction; it's a
21 political transaction?  Would you say the same is
22 basically true?
262: 1 A.    Yes.
```

***Defendants' Objections: Foundation, Personal Knowledge, Speculation, Relevance***

At the first trial, this Court sustained Defendants' objection to this deposition testimony from Mr. Mayopoulos concerning whether Fannie Mae's original Senior Preferred Stock Purchase Agreement (the "PSPA") or the Third Amendment were "commercial" or "arms-length" transactions on the ground that "Mayopoulos did not claim to have any personal knowledge of what factors the negotiators considered, political or otherwise; and his own opinion about approaching the negotiations as political is irrelevant since there's no allegation that he was, in fact, involved."  Trial Tr. 227:24–228:5; *see* Joint Submission on Deposition Designations at 15-17, Class ECF No. 227, Berkley ECF No. 224.  Plaintiffs have re-designated this same testimony and ask the Court to revisit its prior holding.  The Court should reaffirm its prior decision excluding the testimony because it is speculative, irrelevant, and the witness lacks personal knowledge.

Plaintiffs argue that this testimony has somehow become admissible because Defendants are elsewhere defending the admissibility of testimony regarding witnesses' personal reactions to the Third Amendment.  But the Mayopoulos testimony at issue does not concern his own reaction to the Third Amendment.  That reaction testimony is discussed in a different portion of his deposition (which Defendants have designated and Plaintiffs have separately moved to

10

exclude).[1]  *See* 146:9–13 (Q: "Do you remember what your first reaction was when you heard about the third amendment? . . . [Mr. Mayopoulos:] No, I don't remember what my reaction was.").  Rather, the testimony in dispute here concerns Mr. Mayopoulos's unfounded and speculative commentary on whether the original PSPA and the Third Amendment were a "political transaction"—that is, what motivated *others* to agree to them.  That testimony consists of rank speculation because Mr. Mayopoulos lacks personal knowledge about others' motives for entering the original PSPA and the Third Amendment, as Mr. Mayopoulos was not involved in the negotiation of either agreement and has no basis to testify on what was considered by the actual negotiators.  Indeed, this testimony is similar in kind to the testimony of Ms. McFarland that Defendants have also moved to exclude.  *See* Defs.' Omnibus MIL No. 1 at 1-6, Class ECF No. 289, Berkley ECF No. 303.

Plaintiffs invoke their own Motion in Limine #2, which seeks to exclude certain of *Defendants'* deposition designations not at issue here, to support the introduction of *Plaintiffs'* designation about Mr. Mayopoulos's speculative opinion.  To accept Plaintiffs' argument would inappropriately allow their motion in limine to simultaneously operate as a shield excluding Defendants' proper testimony and a sword introducing Plaintiffs' otherwise objectionable testimony.

For the same reasons the Court precluded this testimony at the first trial, including that Mr. Mayopoulos lacked personal knowledge and his opinion on this topic is irrelevant, it should do so again here.

---

[1]     *See* Plfs' Motion in Limine No. 2: To Preclude Defendants From Presenting Testimony From Former Employees Concerning Their Reactions To The Net Worth Sweep at 6-9, Class ECF No. 292, Berkley ECF No. 307.

*Plaintiffs' Response:*

Timothy Mayopoulos is the CEO of Fannie Mae.  He had extensive experience in the financial services sector, having spent sixteen years working for investment banks and financial institutions, including Fannie Mae.  Ex. B (Tr. 14:4-15:20).  As Fannie Mae's CEO, Mr. Mayopoulos understood the Company's financial results and overall market conditions.  *Id* (Tr. 144:3-7).

In particular, Mr. Mayopoulos was familiar with the conservatorship and its impact on managing Fannie Mae's business.  He will testify that Fannie Mae had returned to "sustained profitability," and that he was managing the company to give policymakers a "range of options," including "ending the conservatorships, having - - having the companies exit, raise new capital, become privately capitalized companies again . . ."  *Id.* (Tr. 115:17-116:13); *see id.* (90:16-91:16) (testimony regarding Fannie Mae's return to profitability, which was communicated directly to FHFA); *id.* (Tr. 93:18-22, 94:01-95:16) (testimony that Fannie Mae had built a demonstrably strong new book of business).  Mr. Mayopoulos and Fannie Mae communicated directly with FHFA and Ed DeMarco about the political implications of Fannie Mae's success.  *See* Tr. 87:16-88:05 (Fannie Mae's Board sought to "work with FHFA to inform policymakers, industry participants, and the public at large about developments of Fannie Mae in the housing finance market"); *id.* (96:21-97:12) (noting that there was a "widespread misperception among many policymakers and taxpayers that Fannie Mae will continue to experience losses indefinitely into the future").

Given this background, consisting of testimony to which Defendants do not object, the challenged portion of the Mayopoulos designation is admissible.

First, Defendants provide no basis to exclude the testimony at pages 260:4-261:21.  Apart from Defendants' failure to even address this segment of the deposition designation in their filing, Mr. Mayopoulos had extensive experience in the financial services industry, understood overall market conditions, and clearly had the personal knowledge to testify as to whether a 10% dividend payment was a fairly expensive cost of capital.  Given the lack of an objection to otherwise relevant and admissible testimony, Defendants' objection to 260:4-261:21 should be overruled.

Second, Mr. Mayopoulos's testimony about the existing PSPAs prior to the Third Amendment, *id.* (Tr. 260:21-261:16), says nothing of the motivations of FHFA or Treasury. Rather, he testified as to his own perception of the original PSPA as not being "an arms' length commercial transaction."  It is not "rank speculation" for the CEO of a Company acting under a Conservatorship, who has extensive experience in the financial services sector, to characterize that relationship as unusual and inconsistent with a normal commercial transaction (a fact Defendants emphasized repeatedly at trial to try to explain the disparate treatment between the conservatorship and other forms of government rescue financing).  Moreover, that Mr. Mayopoulos and Treasury were managing the Company to give policymakers a range of options to *exit* the Conservatorship—which FHFA did not dissuade Fannie Mae from doing— aligns with his conclusions.  As indicated above, Mr. Mayopoulos and Fannie Mae shared information with FHFA and other policymakers on public messaging about the Conservatorship, an inherently political exercise.  *See also* Ex D (PX-216) at 10-11, 17 (July 2012 presentation regarding Fannie Mae's planning to "promot[e] stakeholder and public support," "gain public support for the goals of the conservatorship,"  seek "an opportunity to fortify the transition to a new hosing system" through "thoughtful amendments or changes to the SPSPA" that "can serve

13

to make the conservatorship more successful," and "provide a path to replace government support with private capital").

Finally, testimony that the Third Amendment was also a "political transaction" is similarly admissible. Ex. B (Tr. 261:17-262:1). Again, such testimony is based on Mr. Mayopoulos's personal knowledge and his own reaction to the Third Amendment. The challenged deposition designation says nothing about any other party's motive.

Further, to the extent that such testimony constitutes a post hoc "reaction," it is no different than the other post-Third Amendment reaction testimony briefed extensively by the parties. While Defendants correctly observe that during the last trial, the Court sustained Defendants' objection to this passage, the Court now has before it Plaintiffs' Motion in Limine #2. This motion asks the Court to rule that "reaction" testimony be treated consistently across the various witnesses whose opinions were solicited during their depositions. It would not be fair, for example, to allow Ms. Tagoe to give testimony that she "could understand" how the net worth sweep" would address the circular dividend issue facing the GSEs, *see* Plaintiffs' Opposition to Defendants' Omnibus Motion in Limine (Class ECF 304) at 1-3, but prevent Plaintiffs from eliciting testimony from Mr. Mayopoulos that his observation was the net worth sweep was "not an arm's length commercial transaction; it's a political transaction." Likewise, it would be unfair to permit Defendants to introduce testimony from Freddie Mac CFO Ross Kari that the Net Worth Sweep was "not harmful" to private shareholders. Plaintiffs' Motion in Limine # 8. Rather, Plaintiffs submit that if Mr. Mayopoulos' testimony is excluded, similar testimony from other witnesses should be as well. *See also* Plaintiffs' Omnibus Motion in Limine at 6-9; Plaintiffs' Response to Defendants' Omnibus Motion in Limine at 1-3. The Court

14

should treat all such testimony consistently, other than the one-sided approach advocated by

Defendants.

III.     **David C. Benson**

Both sides designated testimony from Plaintiffs' deposition of David Benson, the

President of Fannie Mae.  Excerpts of the Parties' designations from Mr. Benson's deposition

transcript is attached as **Exhibit C**.  The following are deposition excerpts designated by

Defendants to which Plaintiffs have objected.

- **Benson -- 79:11–80:15, 81:1–13, 191:20–192:8**

```
79:11 Q.    Okay.  And are you familiar with the
    12 preferred stock purchase agreements that FHFA and
    13 Treasury signed at the beginning of Fannie Mae's
    14 conservatorship?
    15 A.    Yes.
    16 Q.    Are you familiar with a provision of the
    17 original preferred stock purchase agreement that
    18 calls for Fannie to, I think, gradually over time,
    19 reduce the size of its retained mortgage portfolio?
    20 A.    Yes.
    21 Q.    Do you happen to recall the rate at which
    22 Fannie was required to reduce the size of its
 80: 1 retained mortgage portfolio?
     2 A.    Yes.
     3 Q.    And what was the rate?
     4 A.    Initially, 10 percent per year.
     5 Q.    Okay, and you say initially.  Did that
     6 rate change?
     7 A.    Yes.
     8 Q.    When did it change?
     9 A.    2012.
    10 Q.    And it changed as part of the third
    11 amendment to the preferred stock purchase
agreements,
    12 does that sound right?
    13 A.    The amendment of the summer of 2012, if
    14 that's what you call the third amendment, that's the
    15 amount that -- it increased to 15 percent per year.
```

15

```
        ***

81: 1 Q.    Sure.  As Fannie is reducing the size of
     2 its retained mortgage portfolio, what effect, if
any,
     3 would you expect that to have on the net revenues
     4 that Fannie is bringing in?
     5 A.    Net revenues, it would go down.
     6 Q.    Okay.  And what effect -- what would be
     7 the marginal effect on net revenues or the change in
     8 net revenue in moving from a 10 percent rate of
     9 reduction to a 15 percent rate of reduction?
    10 A.    More.
    11 Q.    You would expect it to go down faster, is
    12 that correct?
    13 A.    Faster, correct.

        ***

191:20 Q.    Do you recall any discussion within Fannie
    21 Mae before August 16th, 2012, around whether Fannie
    22 would have taxable income in the future?
192: 1 A.    I don't.
     2 Q.    Do you recall any discussions within
     3 Fannie Mae about whether it would be necessary to
     4 reverse the valuation allowance on the deferred tax
     5 assets?
     6 A.    By when?  At what time?
     7 Q.    Before August 16th, 2012.
     8 A.    I don't.
```

**Plaintiffs Objections:**

Defendants' proposed counter-designations do not satisfy Federal Rule of Civil Procedure

32(a)(6) ("Rule 32(a)(6)"), so Plaintiffs should not be forced to play these extraneous excerpts in

their case.  Mr. Benson is available as a witness; Defendants can call him live if they wish to elicit

additional testimony from him beyond the scope of Plaintiffs' affirmative deposition designations.

The Court should strike Defendants' overbroad deposition counter-designations on the ground that they are not needed to present a fair context or ensure the completeness of Plaintiffs' initial designations.  Rule 32(a)(6) provides that:

> If a party offers in evidence only part of a deposition, an adverse party may require the offeror to introduce other parts that in fairness should be considered with the part introduced, and any party may introduce any other parts.

Federal Rule of Evidence 106 repeats this principle for "a writing or a recorded statement." *See* Fed. R Evid. 106 ("If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part – or any other writing or recorded statement – that in fairness ought to be considered at the same time.").  *See also* 8A Charles Alan Wright, Arthur Miller & Richard L. Marcus, Federal Practice and Procedure § 2148 (3d ed. Apr. 2022 update) (stating that Rule 106 is a "parallel provision" to Rule 32(a)(6)).

These rules are an expression of the rule of completeness.  FRE 106 Advisory Committee notes; *Stehn v. Cody*, 74 F. Supp. 3d 140, 148 (D.D.C. 2014); *Miller v. Holzmann*, 563 F. Supp. 2d 54, 130 (D.D.C. 2008) (Rule 106 "partially codifies the common-law rule of completeness"). Courts applying this principle allow additional portions of a document or testimony as evidence only to the extent they provide clarification or context to the admitted portions.  *See E. Jean Carroll v. Trump*, 2023 WL 3071966, at *1 (S.D. N.Y. Apr. 25, 2023) (Rule 32(a)(6) "permits an adverse party to 'supplement [portions of a deposition designated by the offering party] in the interest of completeness'") (bracket material in original).

The rule of completeness is not a license to admit everything an adverse party may seek to admit. Fed. R. Civ. P. 32(a)(6) and Fed. R. Evid. 106 "do[] not require introduction of portions of a statement that are neither explanatory of nor relevant to the passages that have been admitted." *United States v. Hoffecker*, 530 F.3d 137, 192 (3d Cir. 2008) (quoting *United States v. Soures*, 736

F.2d 87, 91 (3d Cir. 1984)). As one court explained: "Rule 106 is aimed at permitting excerpts of testimony or other evidence to be understood in context; its purpose is not to permit an adversary to create a full record as to a particular issue." *In re Reserve Fund Sec. & Deriv. Litig.*, 2012 WL 12354234, at *4 (S.D.N.Y. Oct. 3, 2012). *See also In re Pagnotti*, 269 N/T/ 326, 331 (Bankr. M.D. Pa. 2001) ("It is often perfectly proper to admit segments of prior testimony without including everything, and adverse parties are not entitled to offer additional segments just because they are there and the proponent has not offered them").

These principles apply to limit the scope of deposition counter-designations. *See In re Yasmin & Yaz (Drospirenone) Mkg., Sales Practices & PMF Prods. Liab. Litig.*, 2011 WL 6740391, at *19 (S.D. Ill. Dec. 22, 2011) (Rule 32(a)(6) requires "*only* so much counter designation will be read as is necessary to allow for a *fair* reading of the testimony"); *Anchor Sav. Bank, FSB v. U.S.*, 2005 WL 6112617, at *7 (Fed. Ct. May 17, 2005) ("defendant's opportunity under Rule 106 does not permit defendant to designate portions of the deposition testimony that are irrelevant or prejudicial, or portions that are wholly unrelated to discrete issues raised by plaintiff's own designations"). *See also Carroll v. Trump*, 2023 WL 3079966, at *1 n. 1 ("Where Defendants' counter-designations seek to introduce new material and do not serve to give the whole picture of a portion of the deposition that Plaintiff designated, they are inadmissible") (internal quotations and citations omitted).

The deposition excerpts above are not fair counter-designations to anything Plaintiff has designated. Plaintiffs have made a significant effort to streamline the presentation of each of their witnesses appearing via deposition designations. Exhibit C is a transcript of the portions of Mr. Benson's testimony that the Parties have jointly agreed to present to the jury. As Exhibit C makes clear, Plaintiffs have only designated 22 minutes of testimony from Mr. Benson. Plaintiffs have

already agreed to several of Defendants' counter-designations. *See id.* Defendants' additional proposed counter-designations do not relate to any of the limited material that Plaintiffs have affirmatively designated.

The deposition excerpts above relate to Fannie Mae's reduction in its retained mortgage portfolio (79:11-80:15 and 81:1-13), and its expected treatment of a deferred tax asset (191:20-192:8). Defendants argue that the above excerpts are responsive to three of Plaintiffs' affirmative designations, found at pages 182:15-183:8, 189:19-190:10, and 198:16-199:8. *See* Exhibit C. In two of these supposedly related excerpts, Mr. Benson merely gives high-level, directional testimony that in 2012, "things [at Fannie Mae] were getting better." 198:3; *see also* 182:5-8 ("golden years" are coming). In the third, Mr. Benson explains that nobody at either FHFA or the Treasury Department ever "suggest[ed] that Fannie Mae's projections were too optimistic." Plaintiffs offering such testimony does not open the door to extraneous unrelated detail about the potential effects on Fannie Mae's business from the gradual reduction of its retained mortgage portfolio. Nor does this testimony allow Defendants to offer Mr. Benson's lack of recall as to whether Fannie Mae was considering reversing its DTA.

First, pages 182:15-183:8 relate to a key exhibit for Plaintiffs in which Mr. Benson characterized "the next 8 years" as likely to be "the golden years of GSE earnings":

> Q. So this is Benson 19, FHFA-00047889. Mr. Benson, have you seen this document before?
>
> A. I have not.
>
> Q. It purports to be a set of notes from a Fannie Mae executive management meeting on July 9th, 2012.
>
> A. Uh-huh.
>
> Q. And if you would, read for me the paragraph of text that is under GSE strategy update.

A. Okay. Okay.

Q. Mr. Benson, did you say at a meeting of the executive management team on July 9th, 2012 that the next eight years were likely to be the golden years of GSE earnings?

A. That sounds like something I might have said. I don't recall.

Plaintiffs' affirmative designation of testimony that Mr. Benson told his management team that he expected Fannie Mae to be entering the "golden years of GSE earnings" does not fairly entitle Defendants to force Plaintiffs to include testimony about Fannie Mae's plans relating to its retained mortgage portfolio or the deferred tax asset. Contrary to Defendants' suggestion, neither "net revenues" (81:1-13) nor "taxable income" (191:20-22) is equivalent to "profitability" or "earnings". On the contrary, "net revenues", "taxable income", and "earnings" are all distinct accounting line entries that do not necessarily move in unison directionally, *e.g.*, "earnings" can increase even as "net revenues" decrease. "Fairness" and "completeness" do not require testimony that uses technical accounting terms without defining them or explaining how they relate to each other, which is only likely to confuse the jury.

Second, at pages 189:19-190:10, Plaintiffs affirmatively designated Mr. Benson's testimony to make the point that nobody from either FHFA or the Treasury Department ever told him that Fannie Mae's financial projections were "too optimistic":

Q. And the financial projections we've been looking at, would these be projections that FHFA also would have had access to?

A. Yes.

Q. Do you recall during this period anyone from FHFA suggesting that Fannie's projections were too optimistic?

A. I don't recall.

Q. Do you recall anyone from the Treasury Department suggesting that Fannie Mae's projections were too optimistic?

A. I don't recall that either.

20

This testimony does not fairly entitle Defendants to force Plaintiffs to include testimony from Mr. Benson relating to the status or plans for Fannie Mae's retained mortgage portfolio or the deferred tax asset.

Third, Plaintiffs offer the testimony from Mr. Benson at pages 198:16-199:8 to make the point that between 2011 and 2012, Fannie Mae's "financial condition" was "getting better":

> Q. Can you give me a sense for how Fannie's financial condition had changed between September 2011 and August 2012?
>
> A. I just don't have the data in front of me to represent -- give you much of a representation on that, other than improving.
>
> Q. Things were getting better?
>
> A. Things were getting better.
>
> Q. And as things got better, would that have an effect on projections of comprehensive income?
>
> A. As a general matter, yes.

Again, this testimony does not entitle Defendants to force Plaintiffs to include unrelated testimony from Mr. Benson about Fannie Mae's retained mortgage portfolio or the deferred tax asset in their affirmative case.

Nor may Defendants play the Benson clips in their case-in-chief.  Mr. Benson, Fannie Mae's current CEO, is an available witness under Rule 32(a)(4).  Mr. Benson is available to testify, so if Defendants want him to give testimony about topics beyond the scope of Plaintiffs' deposition designations, they are free to call him as a witness in their case.

Defendants' argument that the plain text of Rule 32(a)(6) permits them to play whatever portion of their own witness's deposition they like misreads the rule.  As the court in *Carroll v. Trump*, held, the purpose of Rule 32(a)(6) is to represent "an attempt to preclude the selective use of deposition testimony that might convey a misleading impression," and permits an adverse party

to 'supplement [portions of a deposition designated by the offering party] in the interest of completeness.'"   No. 22-cv-10016, 2023 WL 3071966, at *1 (S.D.N.Y. Apr. 25, 2023).   But reading the final clause to authorize the adverse party to use any other parts of the deposition for any purpose "is unsupported by the great weight of authority . . . [and] [s]uch an interpretation of the rule also would render its first part, which reflects the purported policy objective of the rule, superfluous."   *See id*.

Further, Defendants' reliance on the decision in *Saget v. Trump,* 351 F. Supp. 3d 251, 256 (E.D.N.Y. 2019) is sorely misplaced.   The court in *Saget* permitted admission of full deposition transcripts of defendant's employees beyond the scope of what plaintiffs in that case designated ***because those witnesses were admittedly unavailable*** under Rule 32 as outside the court's subpoena power.   *See Saget v. Trump,* 351 F. Supp.at 254-56.   Due to that unavailability, the court permitted admission of the full deposition transcripts as in the spirit of the purpose of Rule 32 and Rule 45.   *See id*.   Here, Benson is within Defendants' control as an employee of Fannie Mae and is within the Court's subpoena power.   Thus Benson is fully available for trial.   When a witness under a party's control is available for trial, the party cannot admit its own deposition testimony in its case in chief.   *See Carroll* 2023 WL 3071966, at *1.

### *Defendants' Response:*

Plaintiffs object to playing these excerpts from Mr. Benson's deposition either in Plaintiffs' case or Defendants' case because they dispute that the testimony satisfies Federal Rule of Civil Procedure 32(a)(6).   Plaintiffs are incorrect.   Plaintiffs must play the challenged deposition designations in their case because those designations satisfy the fairness/completeness

requirement under the first clause of Rule 32(a)(6).[2]  But to the extent the Court disagrees,

Defendants can play the challenged designations in Defendants' own case under the plain and

unambiguous text of the second clause of Rule 32(a)(6).

First, this testimony satisfies the fairness/completeness standard under the first clause of

Rule 32(a)(6).  An adverse party may introduce other excerpts from a witness's deposition

testimony "that in fairness should be considered with the part[s]" introduced by the designating

party.  *See Armenian Assembly of Am., Inc. v. Cafesjian*, No. 07-cv-1259 (CKK), 2010 WL

11595466, at *2 (D.D.C. Oct. 26, 2010) (quoting Fed. R. Civ. P. 32(a)(6)) (allowing defendants

to counter-designate deposition excerpts over plaintiffs' objection).  In these passages, Mr.

Benson testified about Fannie Mae's reduction of its retained mortgage portfolio (79:11–80:15

and 81:1–13) and whether he had discussions in 2012 about reversing the valuation on Fannie

Mae's DTAs (191:20–192:8).  This testimony, which pertains to expectations of Fannie Mae's

future profitability, is directly related to Plaintiffs' extensive designation of other testimony by

Mr. Benson concerning the same subject – Fannie Mae's expectations of future profitability.

At the first trial, Plaintiffs relied heavily on Mr. Benson's "golden years" projections,

stating in closing argument that "we don't want to beat the dead horse" in repeatedly showing

those projections to the jury.  Trial Tr. 2566:4–6 ("And you've seen this a lot, the golden years.

We don't want to beat the dead horse; we don't want to beat the dead horse.  But that's that, PX-

213, Benson projections.").  For the upcoming retrial, Plaintiffs have again designated extensive

testimony from Mr. Benson's deposition regarding Fannie Mae's expectations of future

profitability, including the "golden years" projections.  *See* 183:3-6 ("Q: Mr. Benson, did you

---

[2]      Rule 32(a)(6) provides: "If a party offers in evidence only part of a deposition, an adverse party may require the offeror to introduce other parts that in fairness should be considered with the part introduced, and any party may itself introduce any other parts."

say at a meeting of the executive management team on July 9th, 2012 that the next eight years were likely to be the *golden years of GSE earnings*?"); 190:3-6 ("Q. Do you recall during this period anyone from FHFA suggesting that *Fannie's projections were too optimistic*?"); 199:4-5 ("Q. And as things got better, would that have an effect on *projections of comprehensive income*?") (emphases added).

 Defendants' counter-designations are about the same issue: Fannie Mae's expectations of future profitability.  For one, Mr. Benson testifies to the reduction of Fannie's retained mortgage portfolio and the effect that he expected it to have on "net revenue" in the future.  *See, e.g.,* 81:6-10 (Q: "[W]hat would be the marginal *effect on net revenues* or the *change in net revenue* in moving from a 10 percent rate of reduction to a 15 percent rate of reduction?" A. "More.") (emphases added).  Without a doubt, this portion of testimony relating to Mr. Benson's expectations of Fannie Mae's *net revenue* (which Defendants have designated) directly relates to Mr. Benson's expectations of Fannie Mae's *profitability* (which Plaintiffs have designated). Additionally, Mr. Benson testifies about whether there was any discussion about Fannie Mae's "taxable income *in the future*."  *See* 191:20-192:8 (emphasis added).  Once again, this testimony directly relates to Mr. Benson's expectations of Fannie Mae's profitability, as reversing the DTAs affected profitability.

 These three counter-designations fit comfortably within the body of caselaw cited by Plaintiffs on the standard for completeness/fairness under Rules 32 and 106.  *See, e.g.*, *Anchor Sav. Bank, FSB v. United States*, No. 95-39 C, 2005 WL 6112617, at *7 (Fed. Cl. May 17, 2005) ("Defendant shall have the opportunity . . . to designate other portions of plaintiff's proffered depositions that should in fairness be considered contemporaneously with plaintiff's submissions.").  Plaintiffs argue that because they did not designate testimony regarding the

accelerated reduction of the retained portfolio or the DTAs specifically, Defendants' counters fall short as fairness designations. That is an unreasonably narrow understanding of the testimony at issue. Mr. Benson was questioned extensively at his deposition about Fannie Mae's future profitability. Among other inquiries, Plaintiffs probed into Mr. Benson's "golden years" projections and any basis for such projections. Fannie Mae's *accelerated reduction of its retained portfolio* ("[n]et revenues, it would go down") and *DTAs* ("would [Fannie Mae] have taxable income in the future?") are directly related to Fannie Mae's projections and future profitability. 81:5, 191:22. That is why those questions were asked in the deposition, and that is why it is fair to present these three counter-designations alongside similar testimony designated by Plaintiffs about Mr. Benson's expectations for Fannie Mae's future profitability.

Second, even if the Benson testimony at issue did not qualify as fairness/completeness counter-designations under the first clause of Rule 32(a)(6)—and it does—Defendants would be permitted to present these designations in their own case-in-chief. Under the second clause of Rule 32(a)(6), "[i]f a party offers in evidence only part of a deposition . . . any party may itself introduce any other parts." On its face, the plain text of Rule 32(a)(6) allows a party (here, Defendants) to use "any other parts" of a deposition of which parts are offered by its adversary. The Court should apply Rule 32(a)(6) as written, as other courts have.

For example, in *Saget v. Trump*, the plaintiffs deposed several witnesses outside the court's subpoena power and sought to admit only the plaintiffs' designations. 351 F. Supp. 3d 251, 256 (E.D.N.Y. 2019). The defendants requested that the deposition transcripts be admitted in their entirety because the text of Rule 32(a)(6) allows the defendants to "introduce any other parts [of the depositions]." *Id*. In agreeing with the defendants' interpretation of Rule 32(a)(6), the court admitted the full deposition transcripts, explaining that: "Rule 32(a)(6) allows

Defendants to both: (1) require Plaintiffs to introduces [*sic*] other parts of the deposition transcripts that ought to be considered in fairness with the parts already introduced and; (2) to introduce *any other parts* of the depositions." *Id.* (emphasis added) (admitting into evidence "Defendants' deposition transcripts in full").  Defendants acknowledge that there is contrary authority, even within the same circuit as the *Saget* case.  *See, e.g., Carroll v. Trump*, No. 22-cv-10016, 2023 WL 3071966, at *1 (S.D.N.Y. Apr. 25, 2023).  But the better reading of the rule in circumstances when the testimony does not qualify as a completeness or fairness designation (such that it has to be presented to the jury in tandem with the other party's designations)—and the only reading that gives effect to all of the rule's text—permits a party to introduce "any other parts" of a deposition in its *own* case when the party's adversary introduces parts of the deposition in its case.

 In sum, Plaintiffs must play the challenged Benson testimony above in their case-in-chief because this testimony satisfies Rule 32(a)(6)'s fairness/completeness requirements.  But alternatively, Defendants can play the challenged testimony in their own case-in-chief under the plain text of the second clause of Rule 32(a)(6).

Dated: June 30, 2023

Respectfully submitted,

*/s/ Asim Varma*
Asim Varma (D.C. Bar # 426364)
Jonathan L. Stern (D.C. Bar # 375713)
David B. Bergman (D.C. Bar # 435392)
Ian S. Hoffman (D.C. Bar # 983419)
R. Stanton Jones (D.C. Bar # 987088)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave NW
Washington, D.C. 20001
(202) 942-5000
Asim.Varma@arnoldporter.com
Jonathan.Stern@arnoldporter.com
David.Bergman@arnoldporter.com
Ian.Hoffman@arnoldporter.com
Stanton.Jones@arnoldporter.com

*Attorneys for Defendant Federal Housing
Finance Agency*

*/s/ Michael J. Ciatti*
Michael J. Ciatti (D.C. Bar # 467177)
KING & SPALDING LLP
1700 Pennsylvania Ave. N.W.
Washington, DC 20006
Tel: (202) 661-7828
Fax: (202) 626-3737
mciatti@kslaw.com

*Attorney for the Federal Home Loan
Mortgage Corp.*

*/s/ Meaghan VerGow*
Meaghan VerGow (D.C. Bar # 977165)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
Tel: (202) 383-5300
Fax: (202) 383-5414
mvergow@omm.com

*Attorney for the Federal National Mortgage
Association*

/s/ Charles J. Cooper

Charles J. Cooper (Bar No. 24870)
David H. Thompson (Bar No. 450503)
Vincent J. Colatriano (Bar No.
429562) Peter A. Patterson (Bar No.
998668)  Brian W. Barnes (*Pro Hac
Vice*)  **COOPER & KIRK, PLLC**
1523 New Hampshire Avenue, N.W.
Washington, DC 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com
*Counsel for Berkley Plaintiffs, et al.*

/s/ Hamish P.M. Hume

Hamish P.M. Hume (Bar No. 449914)
Samuel C. Kaplan (Bar No. 463350)
**BOIES SCHILLER FLEXNER LLP**
1401 New York Ave. NW
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
hhume@bsfllp.com
skaplan@bsfllp.com

Eric L. Zagar (*Pro Hac Vice*)
**KESSLER TOPAZ MELTZER & CHECK,
LLP**
280 King of Prussia Rd.
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
ezagar@ktmc.com

Michael J. Barry (*Pro Hac Vice*)
**GRANT & EISENHOFER, P.A.**
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100
mbarry@gelaw.com

Adam Wierzbowski (*Pro Hac Vice*)
**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
adam@blbglaw.com
*Co-Lead Counsel for the Class*

28