# EXHIBIT B

# Fannie Mae/Freddie Mac

Joseph Cacciapalle, et al. / (2013-036)

## Mayopoulos Agreed To Designations

Deponent: Timothy Mayopoulos

March 10, 2020

Created: 6/30/2023 1:40 pm by Bridget Wing



everchron

The operating system for lawyers®

# TRANSCRIPT INDEX

| Transcript | Page |
| --- | --- |
| Deposition of Timothy Mayopoulos | 2 |

CONFIDENTIAL   Kessler Topaz Meltzer & Check, LLP

Designation Report                                    Fannie Mae/Freddie Mac (2013-036)

**Deposition of Timothy Mayopoulos**   (March 10, 2020)          (19 Clips / Runtime: 00:33:16)

Page 14:4 to 15:20                                    ▶ 00:02:07

| Plaintiffs | Affirmative |
|---|---|

```
 4      Q.   Okay.  And I guess maybe to start, I'll
 5   ask you to just sort of, at a high level, sketch out
 6   sort of your professional background up to the time
 7   when you came to Fannie Mae.
 8      A.   I was educated at Cornell University.
 9   Graduated in 1980.  Went to law school at New York
10   University School of Law, graduated in 1984.  Upon
11   graduation I clerked in the Southern District of New
12   York.  After that I joined the law firm Davis Polk &
13   Wardwell in New York.  I was there until 1994.  When
14   I left, joined the Whitewater Investigation in
15   Little Rock, Arkansas, was there for 18 months.
16           Came back to New York.  I worked in three
17   investment banks, Donaldson, Lufkin & Jenrette,
18   Credit Suisse First Boston, and Deutsche Bank, and
19   then -- as an in-house lawyer and then moved to
20   Charlotte, North Carolina, where I was the general
21   counsel of Bank of America for five years, and then
22   in early 2009, I joined Fannie Mae.
 1      Q.   And what was your first job at Fannie
 2   Mae?  What was your role at the start?
 3      A.   I was the general counsel.
 4      Q.   And I think you were eventually promoted
 5   from that position.  Do I have that right?
 6      A.   I served as the general counsel
 7   exclusively for the first 18 months or so, and then
 8   I was made the chief administrative officer, and
 9   served in that capacity for another 18 months and
10   then was named the CEO in June 2012.
11      Q.   And can you describe for me generally
12   what your responsibilities were as chief
13   administrative officer?
14      A.   It included the general counsel function,
15   but also included oversight over things such as
```

CONFIDENTIAL
                                          Kessler Topaz Meltzer & Check, LLP

Fannie Mae/Freddie Mac (2013-036)

```
16   human resources and communications and marketing, a
17   variety of kind of nonbusiness, but functional
18   roles.
19       Q.    And when were you promoted to CEO?
20       A.    June 2012.
```

CONFIDENTIAL

Kessler Topaz Meltzer & Check, LLP

**Page 78:19 to 81:15**   ▶ 00:03:51

**Defendants**                                    Affirmative

```
19        Q.    Yeah.   Shareholder -- or stockholders'
20   equity, was that one of the things that you were
21   generally supposed to take into account when you're
22   making decisions for Fannie Mae, or was that not --
 1   not one of the relevant considerations?
 2        A.    I wouldn't say that we ran the company
 3   with an eye towards promoting stockholder equity
 4   over everything else, if that's the question.
 5        Q.    That's not the question.   The question
 6   is:   Is -- maintaining a positive stockholders'
 7   equity, was that one of the things that you were
 8   told to take into account when you were managing
 9   Fannie Mae?
10        A.    Well, at the time I joined the company,
11   we did not have a positive shareholder equity.   It
12   was only through capital infusions from Treasury
13   that we got to zero at the end of every quarter, and
14   we didn't get to positive shareholder equity for
15   quite some time.   So it was certainly, I think, an
16   objective to have the company have positive
17   shareholder equity and to get to long-term
18   profitability, but for the first few years that I
19   was at the company, I don't think anybody thought
20   that that was something that was likely to happen.
21        Q.    And I guess to back up there, you made
22   reference to -- I think you made reference to draws
 1   on the Treasury funding commitment.
 2             Did I hear that right?
 3        A.    Yes.
 4        Q.    And what's the connection between making
 5   draws on Treasury's funding commitment and
 6   stockholders' equity?
 7        A.    Fannie Mae was required to maintain
 8   stockholder equity -- positive stockholder equity
 9   of, you know, at least a dollar as of the end of
10   every quarter, and so in those quarters in which we
```

11    lost substantial amounts of money, and we had

12    already consumed all of the capital of the company,

13    the only way we could get to -- back to a net

14    balance that was positive was to make a draw on the

15    Treasury commitment under the PSPA.

16        Q.    Well, and so maybe I can ask the question

17    in a slightly different way.  Was minimizing the

18    draws on Treasury's funding commitment among the

19    goals that FHFA gave you when you're managing Fannie

20    Mae as the CEO?

21        A.    I think that FHFA expected us to manage

22    the business prudently so as not to incur

1    unnecessary losses, but we were balancing, and I

2    think FHFA was balancing many different factors in

3    terms of what to pursue at any given time.  But

4    overall, we were trying to do things that were good

5    for the company and good for the market and good for

6    borrowers and good for taxpayers.  So we were

7    balancing all of those things.

8        Q.    Mm-hmm.  And when you say good for the

9    company, what -- what do you mean by that?

10        A.    You know, that it would enable the

11    company to continue to operate, continue to be

12    viable.  The company played an important role in the

13    housing finance system, and one of our directives

14    was to make sure that it was operationally

15    effective.

CONFIDENTIAL

**Page 83:4 to 85:2**                                    ▶ 00:03:30          Plaintiffs                              Affirmative

```
 4      Q.    And this will be Exhibit 7.  It's also
 5  FNM-Fairholme-0022594, and at least the way it pops
 6  up on my document review platform, I've also
 7  included a document that I think was separately
 8  produced, which is just the sequential Bates number,
 9  which is FNM-Fairholme-0022595.
10            And, if you would, just read the cover
11  e-mail for me, and I'm actually -- this is a draft.
12  I'm mostly going to ask you questions about the
13  final version of the document rather than the draft,
14  but just wanted to -- to kind of show you the draft
15  as an initial matter.
16            And I ask you, sir, if you've seen these
17  documents before.
18      A.    I have.
19      Q.    When was the last time you saw them?
20      A.    I think I saw them yesterday.
21      Q.    And do you recall the circumstances of --
22  of sort of what prompted the drafting of this
 1  letter?
 2      A.    I don't have a detailed recollection, but
 3  I do recall that the board of directors had
 4  expressed desire to communicate with Director
 5  DeMarco in writing about steps that might be taken
 6  to publicize the progress that Fannie Mae had made
 7  and to help market and policymakers understand the
 8  current state of the company.
 9      Q.    And would this have been a common way for
10  the board to communicate with Director DeMarco, or
11  was this a little unusual?
12            MS. VERGOW:  Objection to form.
13            THE WITNESS:  If your question is did the
14  board write many letters to Director DeMarco, it
15  wrote some, but it didn't write many.
16  BY MR. BARNES:
17      Q.    Okay.  And what were the circumstances
```



```
18    under which the board would opt to write a letter to
19    the director of FHFA?
20         A.   I believe it was in those circumstances
21    where it had things it wanted to convey that were
22    longer than, you know, a short conversation, and
 1    typically involved things that the board -- the
 2    board felt strongly about.
```

**Page 86:1 to 86:1**    ▶ 00:00:02    **Plaintiffs**    Affirmative

```
 1         Q.   And this is I guess, Exhibit 8.  It's
```

**Page 86:4 to 87:15**                    ▶ 00:02:10          **Defendants**                    Affirmative

```
 4    was prepared maybe on March 15th, 2012.  This is the
 5    version that I believe went to FHFA, but it was not
 6    sent until September 14th, 2012, and I'm curious.
 7              Do you recall sort of what explains the
 8    length of the process that was involved in preparing
 9    the letter?
10       A.   I don't remember all of the circumstances
11    that might have contributed to that passage of time.
12    I think some of it was getting feedback from the
13    board, which consists of a dozen or so people,
14    consists of incorporating those comments.  It
15    consists -- I think there were also events that may
16    have occurred in that period that may have
17    influenced what the board wanted to put in the
18    letter, but I don't remember.  I can't account for
19    the six months that it took to -- to finalize the
20    draft.
21       Q.   Do you recall what any of the events
22    might have been that would have contributed to the
 1    delay?
 2       A.   My recollection is that one of the things
 3    that happened was that -- my recollection is that at
 4    some point FHFA put out some further guidance as to
 5    the strategic plan for -- for the enterprises, and I
 6    think that might have influenced this.  But that's
 7    just my vague recollection.
 8       Q.   Okay.  So you think there was a strategic
 9    plan from FHFA that may have influenced the contents
10    of the letter; is that right?
11       A.   Maybe.  I -- I just -- I can't
12    remember -- I just remember there was something that
13    was going on with respect to FHFA that influenced
14    this, and it might have been the strategic plan, but
15    I don't remember.
```

**Page 87:16 to 88:5**                    ▶ 00:00:57          **Plaintiffs**                          Affirmative

16       Q.    Okay.  And what would the board have been

17    trying to accomplish in sending a letter like this

18    to FHFA?

19       A.    I think it's captured here on the first

20    page of the letter, where the board says that the

21    board feels a strong obligation to work with FHFA to

22    inform policymakers, industry participants, and the

1    public at large about developments of Fannie Mae in

2    the housing finance market.

3            I think this was an attempt to encourage

4    Director DeMarco to share this information with

5    those constituencies.

**Page 88:20 to 89:6**                    ▶ 00:00:23          **Defendants**                          Affirmative

20       Q.    And do you have any recollection of how

21    FHFA responded to this letter?  Did it implement any

22    of the suggestions?

1    A.    My recollection is that there were

2    discussions about this.  Director DeMarco

3    attended -- regularly attended meetings of the board

4    of directors in executive session, and my

5    recollection is that there were discussions about

6    the content of this letter.

| Page 90:16 to 91:16 | ▶ 00:01:11 | Plaintiffs | Affirmative |

```
16        Q.    And I think you mentioned one of the
17   themes in this letter is -- I don't recall how you
18   put it, but sort of Fannie's return to
19   profitability.
20             Is that a fair characterization?
21        A.    I think what I characterized it was
22   progress had been made at Fannie Mae on a number of
 1   fronts, yeah.
 2        Q.    Okay.  And would Director DeMarco have
 3   been aware of that progress even before receiving
 4   this letter in September of 2012?
 5        A.    I'm sure he was.
 6        Q.    Okay.  And why are you sure?
 7        A.    The senior representatives of FHFA were
 8   on site at Fannie Mae every day.  They sat in on all
 9   of our senior management meetings.  They sat in all
10   of our board meetings.  They -- they had complete,
11   open access to everything that was happening at
12   Fannie Mae, and I'm aware that they gave regular
13   reports to Director DeMarco and others at FHFA.
14             So I don't think there was anything going
15   on at Fannie Mae, progress or otherwise, that they
16   weren't aware of.
```

| Page 93:18 to 93:22 | ▶ 00:00:49 | Plaintiffs | Affirmative |

```
18        Q.    And now if you would jump ahead to page
19   5, and I'll ask you to read the section under
20   heading No. 4, "Fannie Mae Has Built a Demonstrably
21   Strong New Book of Business."
22             Do you see that?
```

**Page 94:1 to 95:16**                          ▶ 00:02:17          **Plaintiffs**                    Affirmative

```
 1      A.   Yes.
 2           Yes, I've read it.
 3      Q.   And what is the board saying in this
 4 section?  What is the point they are trying to
 5 convey to FHFA?
 6           MS. VERGOW:  Objection to form.
 7           THE WITNESS:  I think the gist of this is
 8 that while the company had a very challenged book of
 9 business of loans that had been acquired in the
10 years leading up to the crisis, many of those loans
11 were either being paid off or otherwise resolved,
12 and of course every day the company was acquiring
13 new loans, making new guarantees on loans more
14 recently originated that had higher credit quality,
15 and that the mix of the old, more troubled
16 population of loans and the newer, higher performing
17 loans, was steadily changing over time.
18 BY MR. BARNES:
19      Q.   And that's an accurate description of
20 Fannie's situation as of September 2012; is that
21 right?
22      A.   Yes.
 1      Q.   And sometimes I've heard people talk
 2 about this concept use the word "vintages."  Is that
 3 a familiar term to you?
 4      A.   Yes.
 5      Q.   And can you just sort of explain that as
 6 a concept?
 7      A.    So we would categorize different eras of
 8 loans by vintage, typically by a year, and so 2005
 9 would be a vintage and 2006 would be a vintage, and
10 we often tracked many of our risk management
11 measures by vintage to show what the delinquency
12 rate or the loss rate was for 2005 loans versus 2006
13 loans or 2008 loans versus 2012 loans.
14      Q.   Okay.  And what did that sort of vintage
```

Designation Report                                                                                          Fannie Mae/Freddie Mac (2013-036)

15    analysis imply about Fannie's profitability going

16    forward as of September 2012?

CONFIDENTIAL                                                          Kessler Topaz Meltzer & Check, LLP

**Page 95:18 to 99:15**  ▶ 00:06:04

Plaintiffs                          Affirmative

```
18          THE WITNESS:  You know, looking at it
19   over the long term we expected that as the mix of
20   older vintages running off and newer vintages
21   replacing them, that the company would eventually
22   return to profitability, and I think actually by
 1   this point we were profitable for at least a quarter
 2   or so, that we expected over the long term for that
 3   to be the case.
 4          It didn't mean that we would be
 5   profitable in every financial reporting period, but
 6   over time the company would -- would -- would return
 7   to profitability.
 8   BY MR. BARNES:
 9      Q.   And this letter, the final version of the
10   letter, is dated September 2012, but was that
11   Fannie's expectation in July and August of 2012 as
12   well?
13      A.   Yes.  We -- we -- we expected that to
14   happen so that we expected that over time we would
15   get sustained profitability.  Again, assuming no
16   major changes in the macroeconomic environment or
17   sudden changes in our own business practices.
18      Q.   And Fannie Mae was right about that,
19   wasn't it?
20      A.   That turned out to be accurate, yes.
21      Q.   All right.  So flipping ahead, I'd now
22   like to ask you to read the balance of page 6.
 1   There's not a new heading when you get to page 7,
 2   but you can stop at the end of page 6, and, you
 3   know, if you need to read more to answer my
 4   questions, that's okay.  But --
 5      A.   Okay.  I've read that.
 6      Q.   Okay.  And there's a reference in the
 7   first paragraph to, quote, A widespread
 8   misperception among many policymakers and taxpayers
 9   that Fannie Mae will continue to experience losses
```

```
10   indefinitely into the future.
11          Do you see that?
12   A.    Yes.
13   Q.    Was FHFA burdened by that misperception
14   when this letter was sent in September of 2012?
15          MS. VERGOW:  Objection to form.  Calls
16   for speculation.
17          THE WITNESS:  I don't know what FHFA
18   thought, and FHFA was made up of hundreds of people,
19   if not thousands of people, and so I --
20   BY MR. BARNES:
21   Q.    Okay.  How about Mr. DeMarco?
22   A.    I don't know what Mr. DeMarco thought as
1    of this moment in time.  I don't know.  He certainly
2    had access to this information and lots of other
3    information that showed that conditions were
4    improving in the company.
5    Q.    Okay.  And then -- and I guess the third
6    paragraph in this section, the paragraph that starts
7    with the word "Second," the last -- the last
8    sentence reads, "Taking steps to reduce Fannie Mae's
9    role in the near term would only hurt troubled
10   homeowners, destabilize neighborhoods, and increase
11   taxpayer losses, as there are still nearly 500,000
12   seriously delinquent loans in our legacy books that
13   require aggressive actions."
14          I wanted to ask you to, I guess, kind of
15   take this sentence clause by clause.  What is the
16   board saying when it says that taking steps to
17   reduce Fannie Mae's role in the near term would hurt
18   troubled homeowners?
19   A.    Well, Fannie Mae was devoting
20   considerable energy to providing assistance to
21   homeowners who were unable to make their mortgage
22   payments, either in the form of loan modifications
1    or refinancings or, in the case where turning over
2    the home there's really no alternative to it,
3    facilitating ways of doing that that had less
```

```
 4   detrimental impact on -- on the borrower.

 5          So I think what the board is saying here

 6   is that if Fannie Mae were to be quickly wound down,

 7   those kinds of activities would likely be negatively

 8   impacted.

 9      Q.   And why would they be negatively

10   impacted?

11      A.   Well, if this were done to both Fannie

12   and Freddie, there were -- there really weren't any

13   other obvious players to go and conduct those

14   activities in the absence of Fannie and Freddie, at

15   least in the immediate term.
```

CONFIDENTIAL

Kessler Topaz Meltzer & Check, LLP

Fannie Mae/Freddie Mac (2013-036)

**Page 115:17 to 117:10**                    ▶ 00:01:59          **Plaintiffs**                    Affirmative

| | |
|---|---|
| 17 | Q.   And you mentioned in there that |
| 18 | profitability gives policymakers a broader menu of |
| 19 | options. |
| 20 | Did I catch that right? |
| 21 | A.   Yes.  I think that's right.  I think it |
| 22 | enabled -- once Fannie and Freddie got back to |
| 1 | sustained profitability, I think that the range of |
| 2 | options that policymakers were willing to consider |
| 3 | because they could see that the taxpayers were no |
| 4 | longer deeply in the hole, it opened up a range of |
| 5 | possibilities for -- for policymakers to consider |
| 6 | that was broader than they would have considered in |
| 7 | 2008 or '09 or '10. |
| 8 | Q.   And what were the new potential policies |
| 9 | that people could consider? |
| 10 | A.   Well, one of them would be ending the |
| 11 | conservatorships, having -- having the companies |
| 12 | exit, raise new capital, become privately |
| 13 | capitalized companies again, very few people -- |
| 14 | privately capitalized companies again.  Virtually |
| 15 | nobody was talking about that in 2009 or 2010. |
| 16 | Q.   That became a viable option for |
| 17 | policymakers when Fannie returned to profitability; |
| 18 | is that right? |
| 19 | A.   When Fannie and Freddie both returned to |
| 20 | profitability, yes. |
| 21 | Q.   And remind me again when Fannie returned |
| 22 | to profitability. |
| 1 | A.   I think -- |
| 2 | MS. VERGOW:  Objection.  Vague. |
| 3 | THE WITNESS:  I think we posted a profit |
| 4 | in -- I forget whether it was the first or second |
| 5 | quarter of 2012.  So that was the first time we were |
| 6 | profitable since 2008, so that was the first quarter |
| 7 | profitability.  Whether that was the first or second |
| 8 | quarter, I don't exactly remember, and then we |

Kessler Topaz Meltzer & Check, LLP

| | |
|---|---|
| 9 | became sustainably profitable in the quarters after |
| 10 | that. |

CONFIDENTIAL

**Page 128:12 to 130:12**                    ▶ 00:02:40          **Defendants**                    Affirmative

```
12      Q.   Mm-hmm.  Okay.  And if we could, let's

13  flip to I guess slide 14.  And I apologize.  The

14  print is rather small here that we're dealing with.

15  But if you see, this is a set of financial

16  projections broken out separately for Fannie Mae and

17  Freddie Mac, and there's a line in the Fannie

18  projections that says, "Remaining funding under

19  PSPA."

20           Do you see that?

21      A.   Yes.

22      Q.   And can you tell me, how much does this

1   suggest there would still be in 2022 of Treasury

2   funding under the funding commitment?

3       A.   Under this estimate, it appears that as

4   of 2022 there would be $118.3 billion left in

5   funding under the PSPA.

6       Q.   And is that generally consistent with

7   your expectations in July of 2012 about roughly how

8   much funding would remain available, you know, ten

9   years into the future under the existing arrangement

10  with Treasury?

11      A.   I don't know that I had any independent

12  view of how much funding I thought would be

13  available ten years out.

14      Q.   Okay.  Would this -- would that be

15  consistent with kind of the considered judgment of

16  the Fannie management team?

17           MS. VERGOW:  Objection.  Calls for

18  speculation.

19           THE WITNESS:  I don't know whether that

20  management team as a whole -- by management team,

21  I'm saying what we used to call as the executive

22  committee, whether that group as a group came to a

1   consensus view.  I think the management team

2   reviewed these projections and thought that they

3   were reasonable, but I think we all understood that
```

```
 4   this was highly dependent on a number of

 5   assumptions.

 6           It was dependent on certain expectations

 7   about the macro environment, and that the right way

 8   to think about this and every other estimate or

 9   projection we made was that it was part of a range

10   of outcomes that could occur, but for ease of

11   presentation, we typically presented it as a, you

12   know, particular point estimate.
```

**Page 131:11 to 132:14**    ▶ 00:01:19

**Defendants**    Affirmative

```
11        Q.   Okay.  So when I see a financial
12   projection from this period from Fannie Mae and it
13   provides a point estimate, is it fair for me to
14   assume that this is sort of suggesting that there
15   might be a range of possibilities, some better, some
16   worse?
17             MS. VERGOW:  Objection.  Lacks
18   foundation.  Form.
19             THE WITNESS:  I think -- I think what
20   this represents is that this is an estimate.  We
21   were fond of saying that virtually every estimate we
22   made we knew was not going to be accurate.  Like, as
1    I said earlier, the chances that any particular
2    estimate, especially one going out ten years, would
3    be exactly correct, you know, it would line up with
4    what ultimately happened, the chance of that
5    happening was virtually zero.
6             So in many ways, this was not -- you
7    know, while we carried out here numbers to a decimal
8    point, in my view, the right way to read this was
9    that this was directionally the way one should think
10   about things, not that any one of these numbers
11   particularly was accurate or should represent what
12   was highly likely to happen.  It's actually highly
13   likely the numbers would be different than
14   whatever's on the piece of paper.
```

Fannie Mae/Freddie Mac (2013-036)

**Page 136:4 to 136:12**                    ▶ 00:00:32          **Plaintiffs**                    Affirmative

    4        Q.    Sure.  Looking at these financial

    5    projections we've been talking about for Fannie Mae,

    6    do they imply a near-term threat that Fannie is

    7    going to make draws so large on Treasury's funding

    8    commitment that it will exhaust the available funds?

    9        A.    No.  As we discussed earlier, under this

   10    set of assumptions, the model indicates that the

   11    company would still have $118.3 billion in available

   12    funding as of 2020.

**Page 143:13 to 144:18**                          ▶ 00:01:46          **Plaintiffs**                    Affirmative

```
13        Q.    Yeah.  And how frequent of an occurrence
14   was it for you to meet with people from the Treasury
15   Department?
16        A.    We had a standing quarterly meeting with
17   Treasury.  Typically several members of senior
18   management would go to Treasury and meet with one or
19   two senior people at Treasury and then a number of
20   staffers.  Meetings typically lasted an hour to an
21   hour and a half.
22        Q.    Mm-hmm.  And do you recall the general
 1   topics that would be discussed, or was there
 2   anything routinely that was on the agenda?
 3        A.    We typically reviewed most-recent
 4   financial results, any view we had about upcoming
 5   financial results, overall market conditions, and
 6   then any particular topics that Treasury wanted to
 7   discuss or we thought were particularly timely.
 8        Q.    And as part of these meetings, would you
 9   typically present a set of financial projections to
10   people from Treasury?
11        A.    There was usually some form -- you know,
12   condensed form of financial projections.
13        Q.    Mm-hmm.  And am I right in assuming that
14   when you brought a set of financial projections to
15   the Treasury Department, they reflected Fannie Mae's
16   best thinking about what it expected to happen in
17   the future?
18        A.    Yes.
```

| Page 187:14 to 188:10   ▶ 00:00:55 | Plaintiffs                          Affirmative |
|---|---|

14    Q.   Mm-hmm.  And I think you expressed that
15  concern in terms of sort of political consequences
16  of draws.  Did you worry about the financial
17  consequences of draws?
18    A.   Not in any immediate way, because there
19  was still plenty of capacity left in the PSPA
20  commitment.  We assumed that at some point if -- if
21  Fannie and/or Freddie needed to continue to draw on
22  the PSPA commitment, that at some point market
1   participants might start to wonder whether there was
2   sufficient capital there, thinking about what was on
3   balance sheet and what was virtually available to be
4   able to continue to do business with us.
5         But we didn't think we were anywhere
6   close to that risk, but we also assumed that market
7   participants, if they were going to get nervous
8   about it, would get nervous about it long before
9   that number dropped to zero, but we didn't know
10  exactly what would be the tipping point.

| Page 247:9 to 247:18   ▶ 00:00:30 | Plaintiffs                          Affirmative |
|---|---|

9   was being drafted and throughout the ensuing months
10  into the summer of 2012, did you feel relatively
11  optimistic about the ability of Fannie Mae to return
12  to long-term sustainable profitability?
13        MS. VARMA:  Objection.
14        MS. VERGOW:  Objection.  Vague.
15        THE WITNESS:  In the summer of 2012 was I
16  optimistic that Fannie Mae could achieve sustainable
17  profitability?  I thought that was -- that was a
18  clear possibility, yes.

CONFIDENTIAL                                                    Kessler Topaz Meltzer & Check, LLP

Fannie Mae/Freddie Mac (2013-036)

**Page 264:22 to 265:5**　　　　▶ 00:00:14

Plaintiffs　　　　Affirmative

```
22      Q.   All right.  Do you think it's important
 1   for the public to understand that the enterprises
 2   have paid tens of billion dollars more to the
 3   Treasury than the Treasury advanced to the
 4   enterprises?
 5      A.   Yes.
```

Kessler Topaz Meltzer & Check, LLP