UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BERKLEY INSURANCE CO., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>FEDERAL HOUSING FINANCE AGENCY, *et al.*,<br><br>Defendants. | Case No. 1:13-cv-1053-RCL |
| In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations<br><br>_____<br><br>This document relates to:<br>ALL CASES | Case No. 1:13-mc-1288-RCL |

**DEFENDANTS' PRETRIAL STATEMENT**

Pursuant to Rule 16.5 of the Local Civil Rules, and the Scheduling Order entered on March 10, 2023 (Class ECF No. 282, Berkley ECF 292), Defendants Federal Housing Finance Agency ("FHFA" or "Conservator"), as Conservator for the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac," and together with Fannie Mae, the "Enterprises"), and the Enterprises hereby submit their Pretrial Statement for the upcoming retrial commencing on July 24, 2023.

I.      **Statement of the Case**

<u>Brief Description of the Nature of the Case</u>.

This case was tried before a jury in October 2022 and concluded with the Court declaring a mistrial on the basis of a hung jury. The retrial is scheduled to begin on July 24, 2023.

The case arises out of the continuing consequences of one of the greatest financial crises in our country's history—the 2008 financial crisis. In response to that crisis, the government took unprecedented (and successful) efforts to assure the stability of the secondary mortgage market, a critical component of the country's economy, by stabilizing the two most significant players in that market—Fannie Mae and Freddie Mac (the "Enterprises"). On September 6, 2008, FHFA's then-Director placed the Enterprises into conservatorships to stem the ongoing rapid deterioration of the secondary mortgage market and doubts about the Enterprises' ability to absorb further losses. Failure to address this crisis would have had catastrophic consequences for both the national and international economies.

The next day, FHFA, as Conservator on behalf of each Enterprise, entered into Senior Preferred Stock Purchase Agreements (the "PSPAs") with the Department of the Treasury ("Treasury"). Under the PSPAs, Treasury committed to make up to $100 billion available to each Enterprise (the "Treasury Commitment" or "Commitment") to ensure that they maintained a positive net worth. In exchange for this unprecedented commitment to each Enterprise, Treasury received consideration from each Enterprise in the form of fixed dividends, warrants, a liquidation preference, and an entitlement to periodic commitment fees. In 2009, the PSPAs were amended twice to increase the size of the Treasury Commitment, first to $200 billion for each Enterprise and then to an unlimited amount through December 31, 2012, when it would again become capped. Between 2008 and 2012, the Enterprises drew over $187 billion from the Commitments. Plaintiffs do not challenge the decision to place each of the Enterprises into

2

conservatorship, the decision to enter into the PSPAs on behalf of each Enterprise, or the decision to amend the PSPAs twice in 2009.

On August 17, 2012, FHFA, acting as Conservator of the Enterprises, and Treasury amended the PSPAs for a third time. This is referred to as the Third Amendment and is the focus of this case. Among other things, the Third Amendment (a) replaced the fixed quarterly dividend owed to Treasury, which was based on 10% of each Enterprise's liquidation preference, with a variable dividend based on each Enterprise's net worth; and (b) suspended Treasury's imposition of any periodic commitment fees so long as the new dividend based on net worth was in effect.

Plaintiffs are shareholders of Fannie Mae and Freddie Mac, who invested in the stock of these highly regulated entities with the knowledge that dividends are not guaranteed. They allege that the Conservator's decision to enter into the Third Amendment on behalf of Fannie Mae and Freddie Mac was arbitrary and unreasonable and that the Third Amendment harmed Plaintiffs by causing a one-day, $1.6 billion decline in the market value of their stock on August 17, 2012. Defendants maintain that the Third Amendment did not violate the reasonable expectations of the private shareholders as of the time of contracting (December 24, 2009) because the decision to enter into the Third Amendment was reasonable in light of FHFA's power to act in the best interest of the public and secondary mortgage market, the facts and circumstances known to FHFA at the time, and because the Third Amendment did not deprive shareholders of dividends or any other benefit that they were entitled, or reasonably expected, to receive.

Identities of the Parties.

In the Class Action (No. 13-mc-1288), this Court has certified three classes, consisting of all current shareholders of (1) Fannie Mae junior preferred stock, (2) Freddie Mac junior preferred stock, and (3) Freddie Mac common stock, or their successors in interest to the extent shares are sold before any final judgment or settlement. *See* Order Certifying Classes (ECF No. 139 in 1:13-mc-1288) (Dec 7, 2021).

The *Berkley* action (No. 13-cv-1053, formerly referred to as the "*Fairholme*" action) includes several Enterprise shareholders, known as the Berkley Plaintiffs, who opted out of the classes and are pursuing their claims individually. The Berkley Plaintiffs are several affiliated insurance companies that own preferred stock in both Enterprises.[1] The two Fairholme entities that were also plaintiffs in the *Berkley* action—Fairholme Funds, Inc., and The Fairholme Fund (the "Fairholme Plaintiffs")—did not opt out of the classes, and this Court granted their motion to sever and stay their claims pending resolution of the class action. *See* Order (ECF No. 164 in No. 1:13-cv-1053) (May 31, 2022).

In both the Class Action and *Berkley* action, Defendants are FHFA as Conservator of the Enterprises, Fannie Mae, and Freddie Mac.

All of the Plaintiffs' claims will be tried before a jury. *See id.*

Basis of the Court's Jurisdiction. This Court has jurisdiction over the Class Action under 28 U.S.C. § 1332(d)(2)(A) (providing original jurisdiction over class actions exceeding $5 million in which "any member of a class of plaintiffs is a citizen of a State different from any

---

[1] The Berkley Plaintiffs consist of Berkley Insurance Company, Acadia Insurance Company, Admiral Indemnity Company, Admiral Insurance Company, Berkley Regional Insurance Company, Carolina Casualty Insurance Company, Midwest Employers Casualty Insurance Company, Nautilus Insurance Company, and Preferred Employers Insurance Company. *See* Am. Compl. ¶¶ 6-15 in *Berkley* (ECF No. 75 in 1:13-cv-1053).

defendant"). The Court has jurisdiction over the Berkley Plaintiffs' claims under 28 U.S.C. § 1332(a) (diversity jurisdiction).

## II.     Statement of Claims

Plaintiffs' sole remaining claim against Defendants is for breach of the implied covenant of good faith and fair dealing arising under Delaware law for Fannie Mae and Virginia law for Freddie Mac, which this Court has held is contained in the Enterprises' contracts with each group of shareholders. As stated in this Court's prior ruling, "[t]he question" for liability on this claim is whether, in entering into the Third Amendment on behalf of the Enterprises, FHFA as Conservator "exercised [its] discretion arbitrarily or unreasonably in a way that frustrated Plaintiffs' expectations under the contract." *Fairholme Funds, Inc. v. FHFA*, No. 13-cv-1053, 2018 WL 4680197, at *13 (D.D.C. Sept. 28, 2018).

## III.    Statement of Defenses

The evidence will demonstrate that Defendants did not breach the implied covenant of good faith and fair dealing under the Enterprises' contracts with the shareholders.

The Conservator's execution of the Third Amendment on behalf of each of the Enterprises was neither arbitrary nor unreasonable. Rather, the Third Amendment was a reasonable solution to a problem that caused significant market concern about the stability of the secondary mortgage market: it eliminated the risk that the finite Treasury Commitment providing crucial capital to the Enterprises would be eroded by the fixed 10% quarterly dividend payments owed by each of the Enterprises to Treasury.

At the time of the Third Amendment, FHFA as Conservator reasonably anticipated that there were future scenarios in which the Treasury Commitment would be eroded for two reasons. First, when the Enterprises did not generate enough profit to pay the fixed 10% quarterly dividend, they drew on their respective Commitments to pay the dividend, thereby reducing the

amount of their respective Commitments and increasing the next dividend payment.  Second, the Treasury Commitment would become fixed (and could not be increased) after December 31, 2012 under the terms of the Second Amendment.  Erosion of the Commitment would deplete the funds that were available to each Enterprise to cover any future significant operating losses.  The risk that the Commitment would be eroded threatened the Enterprises' ability to issue new debt, diminished MBS investors' confidence in the Enterprises' ability to honor their guarantees, and stood to decrease the value of the Enterprises' mortgage-backed securities and thereby reduce liquidity in the secondary mortgage market.  Thus, the Conservator faced the risk of developments that would have jeopardized the entire housing finance market, and thus the national economy.

By executing the Third Amendment, FHFA eliminated the risk that paying dividends to Treasury would erode Treasury's Commitment (that is, the funds available to the Enterprises) and furthered the public interest in a stable secondary mortgage market.  The Third Amendment guaranteed that each of the Enterprises would never again draw money from Treasury just to make their quarterly dividend payments.  This ensured that the Treasury Commitment, which was due to be capped as of January 1, 2013 under the terms of the Second Amendment, would be available to backstop the Enterprises' operations during quarters in which either of the Enterprises incurred losses.  Maximizing the amount of the Treasury Commitment available to cover potential future losses maximized the ability of the Enterprises to survive in future worst case scenarios.  It was reasonable for the Conservator to consider and plan for such scenarios and guard against downside risk from future financial downturns that could threaten the stability of the secondary mortgage market.  Thus, FHFA's execution of the Third Amendment on behalf of

each of the Enterprises was a reasonable action to promote the public interest in a stable secondary mortgage market.

The Third Amendment did not violate Plaintiffs' reasonable expectations under the shareholder contract at the time of contracting (*i.e.*, December 24, 2009, *see Fairholme Funds, Inc. v. FHFA* ("*MIL Ruling*"), Nos. 13-cv-1053, 13-mc-1288, 2022 WL 13937460, at *5-6 (D.D.C. Oct. 21, 2022)).  Enterprise shareholders' expectations are informed by the risks inherent in investing in stocks, the heightened risks of investing in stocks of highly regulated government-sponsored enterprises, and the knowledge that dividends are never guaranteed, even in profitable companies.  Moreover, Plaintiffs' primary claim is that the Third Amendment reduced the value of their shares by eliminating their ability to ever share in the future profits of the Enterprises via receipt of dividends.  But, by December 2009, no reasonable shareholder of Fannie Mae or Freddie Mac stock expected to be paid dividends in light of, *inter alia*, the Conservator's elimination of dividends to private shareholders while the Enterprises are in conservatorship, Treasury's veto power over dividends to shareholders, FHFA's statutory authority as Conservator to put the public's interests in the stable operation of the secondary mortgage market over the interests of Fannie Mae and Freddie Mac shareholders, Treasury's massive and then-growing liquidation preferences, and the Enterprises' public statements that they could not afford to pay the 10% Treasury dividend over the long term.

**IV.    Schedule of Witnesses**

The names of witnesses whose testimony Defendants expect to present at trial, or whose testimony Defendants may present if the need arises, are set forth below.  Defendants reserve the right to call any witnesses identified by Plaintiffs and to call any witnesses not previously identified or disclosed for impeachment purposes.  Defendants further reserve the right to revise or supplement these disclosures if warranted, including in response to Plaintiffs' pretrial

disclosures and other pretrial filings, any rulings or orders issued by the Court (including those resolving any pending or forthcoming motions in limine), and any information discovered between now and trial.  Defendants also intend to present the testimony of multiple witnesses by deposition designation, as set forth in Section VIII below.

<u>Witnesses Defendants Expect to Call at Trial</u>

- **Edward DeMarco**

    o   Address:  contact through Defendants' counsel

    o   Brief description of testimony: Mr. DeMarco was a senior official at FHFA since its inception in 2008, and was Acting Director of FHFA in August 2012, at which time he executed the Third Amendment as Conservator on behalf of each of the Enterprises. He will testify about the role of the Enterprises in the mortgage market; impact of the financial crisis on the Enterprises' business and financial condition; FHFA's conservatorship operations and strategic plans; the payment of dividends by the Enterprises; the periodic commitment fee under the PSPAs; FHFA's decision to execute the Third Amendment, including the factors considered by FHFA; the capital requirements applicable to the Enterprises; and the financial condition, performance, and forecasts of the Enterprises during his tenure at FHFA. He may also provide additional testimony consistent with his deposition testimony on May 7, 2015, and December 21, 2020, as well as his testimony during the first trial in this matter.

    o   Estimate of time for direct testimony:  6 hours

- **Nicholas Satriano**

    o   Address:  contact through Defendants' counsel

    o   Brief description of testimony: Mr. Satriano was FHFA's Chief Accountant when the Third Amendment was executed and continues to be its Chief Accountant today. He will testify about issues relating to the accounting policies and financial reporting for the Enterprises, including but not limited to how Enterprise financial statements reflect the capital levels, financial condition, and performance of the Enterprises. He will also testify about the Enterprises' deferred tax assets, valuation allowances set on those assets, and loan loss reserves. He may also provide additional testimony consistent with his deposition testimony on December 1, 2020, as well as his testimony during the first trial in this matter.

    o   Estimate of time for direct testimony:  3 hours

8

- **Dr. Mukarram Attari (expert)**

    o Address: contact through Defendants' counsel

    o Brief description of testimony: Dr. Attari is a financial economist and will testify that, based on his expertise, knowledge, and review of the record, it was reasonable for FHFA to agree to the Third Amendment because it furthered FHFA's goals and the Enterprises' public mission to promote the stability and liquidity of the secondary mortgage market, including in stress situations. Dr. Attari will also provide additional testimony consistent with his expert report of February 1, 2022, and his deposition testimony of February 14-15, 2022, as well as his testimony during the first trial in this matter. He will also provide testimony in response to Plaintiffs' experts' trial testimony and reports of August 12, 2021, and March 1, 2022, and the depositions of Plaintiffs' experts on September 8, 2021 (Thakor), March 25, 2022 (Thakor), September 16, 2021 (Mason), March 16, 2022 (Mason), September 11, 2021 (Dharan), and April 6, 2022 (Dharan).

    o Estimate of time for direct testimony: 6 hours

V. **Objection to Plaintiffs' Inclusion of Jim Parrott on Plaintiffs' Witness List**

On April 14, 2023, Plaintiffs served on Defendants their schedule of witnesses, which identified Jim Parrott, a former White House Official, as a witness Plaintiffs may present at trial "live or via trial deposition pending *Touhy* request." As Plaintiffs recognize, Mr. Parrott cannot provide any testimony without proper authorization from the White House. To the best of Defendants' knowledge, Plaintiffs have not resolved with the White House their *Touhy* request seeking testimony from Mr. Parrott in this case. Accordingly, it is not known whether the Plaintiffs will succeed in obtaining trial testimony from Mr. Parrott. Further, to the best of Defendants' knowledge, Plaintiffs have not served a trial subpoena on Mr. Parrott or secured his voluntary appearance for trial.

To the extent the White House authorizes Mr. Parrott to testify in this case, and to the extent he is properly subpoenaed to testify, Defendants object to either a "trial deposition" or live testimony from Mr. Parrott for various reasons, including but not limited to: (1) Plaintiffs are barred from taking and presenting at trial a so-called "trial deposition" because discovery closed

in 2020, and (2) Plaintiffs failed to timely disclose Mr. Parrott on March 10, 2023, the Court-ordered "[d]eadline for parties to disclose whether they intend to include any witnesses on their witness list who were not previously deposed," Class ECF No. 282, Berkley ECF No. 292. Defendants reserve the right to file further briefing at an appropriate time that expands upon these objections to testimony from Mr. Parrott and asserts others.

## VI. Statement Regarding Plaintiffs' Proposed "Document Reader"

Plaintiffs' April 14, 2023 schedule of witnesses also identified "Document Reader" as a witness Plaintiffs expect to present live at trial. The Parties have met and conferred about this issue and have agreed on certain aspects of the format and mechanics for Plaintiffs' proposed Document Reader, though some open issues remain.

The Parties have agreed that, in advance of a document reading, Plaintiffs will identify for Defendants the specific exhibits and excerpts within those exhibits that the Document Reader will read to the jury. If Defendants want additional excerpts of the same exhibits read to the jury, Defendants will likewise identify for Plaintiffs those specific excerpts in advance of the reading.

Subject to the Court's approval, the Parties have further agreed upon the following procedures for the presentation of Plaintiffs' proposed Document Reader. First, before a document reading begins, the Court would state to the jury: "Next Plaintiffs' counsel will be presenting to you excerpts they have chosen from exhibits the Court has admitted into evidence. You will have each of the full exhibits available to you when you go to deliberate. The excerpts chosen by Plaintiffs' counsel will be read out loud by [witness name], who is a [paralegal] at one of the law firms representing the Plaintiffs in this case." Second, the Document Reader would then read Plaintiffs' chosen excerpts. Third, if Defendants want additional portions of the same exhibits read to the jury, the Court would state to the jury: "Now Defendants' counsel will present to you other portions of the same exhibits. The same [paralegal] will read these other

10

portions chosen by Defendants' counsel." Finally, the Document Reader would then read Defendants' chosen excerpts.

The Parties have also agreed to continue discussing a potential final jury instruction regarding the document reading exercise, with each party reserving its right to propose such a final instruction to this Court at a later date.

The only outstanding issues pertain to whether Plaintiffs' proposed Document Reader will be presented to the jury as a "witness." In Defendants' view, the Document Reader is not a witness (fact, expert, or summary), nor are they providing fact, expert, summary, or any other form of recognized witness testimony. To avoid giving the jury a misimpression that the Document Reader is a witness with personal knowledge of relevant facts or expertise relevant to this case, Defendants propose, subject to the Court's approval, that the Document Reader stand at the lawyers' podium, without being sworn, to read the chosen document excerpts from either a hard copy or the video screen that is visible to lawyers standing at the podium. In contrast to Plaintiffs' position, Defendants do not believe that the Document Reader should take the witness stand and be sworn in simply to perform the document reading exercise. The Document Reader is not a witness, so they should not take the witness stand. And the purpose of the oath is "to impress th[e] duty [to testify truthfully] on the witness's conscience," Fed. R. Evid. 603, which does not apply to a person who is merely reading verbatim excerpts of admitted exhibits.

## VII. Defendants' Exhibit List

Defendants' Exhibit List is attached hereto as **Exhibit A**. Pursuant to the operative Scheduling Order, the Parties exchanged exhibit lists on April 14, 2023, and exchanged objections to those exhibit lists on April 28, 2023. The Parties have also supplemented their

11

exhibit lists and objections.² Accordingly, Defendants' Exhibit List attached hereto reflects Defendants' current exhibit list, as well as all objections Plaintiffs have made to Defendants' exhibits.

Further, the Parties have agreed to proceed as they did in the first trial with regard to exhibit objections—namely, any objections that have not been raised through pending motions in limine are reserved for trial. Additionally, the Court has ordered that "the Court's rulings on all objections to exhibits at Trial 1 will carry forward and apply equally to Trial 2, with each side preserving for appeal all objections made to the admission of exhibits in Trial 1." Class ECF No. 282; Berkley ECF No. 292.

Defendants reserve the right to revise or supplement their exhibit list if warranted, including in response to Plaintiffs' pretrial disclosures and other pretrial filings, any rulings or orders issued by the Court (including those resolving any pending motions), and any information discovered between now and trial. Defendants also reserve the right to remove any exhibit from their exhibit list. Further, Defendants reserve the right to utilize any exhibits listed by Plaintiffs and to use, introduce, or rely upon any other discovery materials, including but not limited to deposition transcripts, for impeachment or cross-examination.

## VIII. Deposition Designations

The Parties' Deposition Designations are attached as **Exhibit B.** Those designations are portions of deposition testimony that the Parties intend to present at the upcoming trial, either via video or live witness reenactment (for those depositions that do not have a video recording).

---

² Plaintiffs served Defendants with an additional set of exhibits on June 29, 2023. Plaintiffs' exhibit list attached to their pretrial statement reflects that Defendants have neither served objections nor indicated they have no objection to these additional exhibits. The Parties agree that Defendants have not waived their objections to these additional exhibits and that Defendants will serve any objections to these exhibits by July 10, 2023.

Pursuant to the Scheduling Order, the Parties exchanged deposition designations on April 14, 2023, and objections on April 28, 2023. The Parties also have supplemented their designations and objections and met and conferred about them several times. The Parties resolved many, but not all, of their objections through this process. The remaining disputes are reflected in (a) the pending motion in limine briefing, and (b) the Parties' Joint Submission of Objections to Deposition Designations, which is being filed contemporaneously with this pretrial statement. Exhibit B, attached hereto, reflects the Parties' designations. Certain designations remain in dispute and are the subject of pending motions in limine or the Parties' Joint Submission of Objections to Deposition Designations.

Defendants reserve the right to revise or supplement their designations if warranted, including in response to Plaintiffs' pretrial disclosures and other pretrial filings, any rulings or orders issued by the Court (including those resolving any objections or pending or forthcoming motions in limine), and any information discovered between now and trial. Defendants also reserve the right to remove any deposition designations from their list, and to add additional designations to the extent any currently available witnesses become unavailable.

## IX. Itemization of Damages

Defendants do not seek any damages against Plaintiffs.

Plaintiffs seek $1.6 billion in damages, which reflects the total one-day decline in the market value of all of the Class Plaintiffs' Fannie Mae and Freddie Mac shares following the announcement of the Third Amendment, plus prejudgment interest. *See* Pls.' Opp. to Defs.' Omnibus Mot. in Limine at 29 (Class ECF No. 304; Berkley ECF No. 316) ("[T]he Court has repeatedly ruled that Plaintiffs are limited to seeking $1.6 billion in damages, and Plaintiffs have committed not to argue for more than that.").

Plaintiffs no longer seek any non-monetary relief.

13

X.   **Agreed Statement Regarding Joint Statement of Undisputed Facts**

The Parties submitted a Joint Statement of Undisputed Facts at the first trial (Class ECF No. 230), which is attached as **Exhibit C**. The Parties have met and conferred and are continuing to meet and confer in good faith regarding various potential changes to the prior Joint Statement of Undisputed Facts in hopes of reaching an agreement. Some potential changes to the prior Joint Statement of Undisputed Facts depend on the resolution of pending motions in limine. Accordingly, the Parties have agreed to defer the filing of any new Joint Statement of Undisputed Facts until a later date, likely after resolution of the motions in limine. The Parties will promptly notify the Court if they reach agreement on a new Joint Statement of Undisputed Facts.

XI.   **Agreements Concerning the Scope of Certain Experts' Testimony**

To avoid pretrial motions practice, the Parties have met and conferred concerning the scope of certain experts' testimony at the upcoming retrial and have agreed to the following:

With respect to Plaintiffs' expert, Dr. Anjan Thakor, the Parties have agreed that Prof. Thakor will not testify that the "most appropriate" periodic commitment fee ("PCF") was or would have been zero, or otherwise testify to the effect that the PCF "should be" or "is" zero. The Parties further agree that this would not preclude Prof. Thakor from explaining, in the context of his opinion about a PCF of 2.5-45 bps, that some comparators he considered would yield a zero PCF.

With respect to Plaintiffs' expert, Dr. Joseph Mason, the Parties have agreed that Dr. Mason will not testify that $1.61 billion represents a "conservative" estimate of damages. Nor will Dr. Mason opine that the Enterprises' performance since 2012 makes the $1.61 billion measure of damages reasonable, or that the $150 billion in purported "excess dividends" transferred to Treasury in the decade after the Third Amendment has any bearing on Plaintiffs'

14

alleged damages. The Parties have further agreed that Defendants will not ask Dr. Mason any questions about a price recovery in Enterprise shares following the Net Worth Sweep (*see, e.g.,* Tr. 1523:25-1524:17 (questions about a recovery in share prices in September 2012 and October 2012), and Defendants will not otherwise argue to the jury that the share price increases after the Third Amendment mitigated damages.

## XII. Proposed Voir Dire

The Parties have agreed to the proposed voir dire attached as **Exhibit D**. The Parties previously submitted these questions to the Court as part of their Joint Motion to Issue a Jury Questionnaire In Advance of Voir Dire. *See* Class ECF No. 285; Berkley ECF No. 295. The Court denied that motion (Class ECF No. 299; Berkley ECF No. 311), so the Parties have agreed—as they did before the first trial—that the proposed supplemental jury questionnaire constitutes their joint proposed voir dire. If the Court orders that the voir dire be revised, the Parties would propose to meet and confer to discuss any revisions required by the Court's direction.

## XIII. Proposed Jury Instructions and Verdict Forms

The Parties' proposed preliminary jury instructions are attached hereto as **Exhibit E-1**. These are the same preliminary instructions used in the first trial, and the Parties agree they should be used again.

Defendants' proposed final jury instructions are attached hereto as **Exhibit E-2**. While the Parties have reached agreement on much of these instructions, several areas of dispute remain outstanding and are addressed in Defendants' pending Omnibus Mot. to Revise Jury

15

Instructions (Class ECF No. 303, Berkley ECF No. 312).[3]

The Parties' proposed verdict form is attached hereto as **Exhibit F**. This is the same verdict form used in the first trial, and the Parties agree it should be used again.

---

[3] Defendants have filed a motion seeking a revision to the final jury instruction regarding prejudgment interest under the Virginia law that applies to Plaintiffs' claim against Freddie Mac. *See* Class ECF No. 303, Berkley ECF No. 312. Under the Delaware law that applies to the claim against Fannie Mae, the Court, not the jury, would decide whether to award prejudgment interest. *See Citadel Holding Corp. v. Roven*, 603 A.2d 818, 826 (Del. 1992). Like the Virginia law addressed in Defendants' jury instructions motion, Delaware law restricts the circumstances in which prejudgment interest should be awarded; Defendants are prepared to provide the Court with briefing at the appropriate time about the principles that would govern a decision whether to award prejudgment interest on an award of damages against Fannie Mae. *See, e.g.*, *Lum v. Nationwide Mut. Ins. Co.*, No. 78C-MY-55, 1982 WL 1585, at *5 (Del. Super. Ct. Apr. 27, 1982), *aff'd*, 461 A.2d 693 (Del. 1983) ("Pre-judgment interest should only be awarded in those cases in which the amount of damages owed by the defendant is so readily ascertainable … that the defendant could have opted to simply pay the plaintiff immediately, rather than force him or her to obtain judicial relief through litigation").

Dated: June 30, 2023

Respectfully submitted,

*/s/ Asim Varma*
Asim Varma (D.C. Bar # 426364)
Jonathan L. Stern (D.C. Bar # 375713)
David B. Bergman (D.C. Bar # 435392)
Ian S. Hoffman (D.C. Bar # 983419)
R. Stanton Jones (D.C. Bar # 987088)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave. NW
Washington, DC 20001
(202) 942-5000
Asim.Varma@arnoldporter.com
Jonathan.Stern@arnoldporter.com
David.Bergman@arnoldporter.com
Ian.Hoffman@arnoldporter.com
Stanton.Jones@arnoldporter.com

*Attorneys for Defendant Federal Housing Finance Agency*

*/s/ Michael J. Ciatti*
Michael J. Ciatti (D.C. Bar # 467177)
KING & SPALDING LLP
1700 Pennsylvania Ave. NW
Washington, DC 20006
Tel.: (202) 661-7828
Fax: (202) 626-3737
mciatti@kslaw.com

*Attorney for the Federal Home Loan Mortgage Corp.*

*/s/ Meaghan VerGow*
Meaghan VerGow (D.C. Bar # 977165)
O'MELVENY & MYERS LLP
1625 Eye St. NW
Washington, DC 20006
Tel.: (202) 383-5300
Fax: (202) 383-5414
mvergow@omm.com

*Attorney for the Federal National Mortgage Association*