# EXHIBIT C

# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

| | |
|---|---|
| BERKLEY INSURANCE CO., et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>THE FEDERAL HOUSING FINANCE AGENCY, et al.,<br><br>*Defendants*. | Case No. 1:13-cv-1053-RCL |
| IN RE FANNIE MAE/FREDDIE MAC SENIOR PREFERRED STOCK PURCHASE AGREEMENT CLASS ACTION LITIGATIONS<br>_____<br><br>This document relates to:<br>ALL CASES | Case No. 1:13-mc-1288-RCL |

## JOINT STATEMENT OF UNDISPUTED FACTS

The parties to the above-captioned actions hereby agree and stipulate to the following statement of undisputed facts, which may be accepted as true by the Court and the fact-finder, and as to which no further proof is necessary:

1. Congress created Fannie Mae in 1938 and Freddie Mac (together, the "Enterprises") in 1970 to support the Nation's home mortgage system by increasing the funds available to lend to borrowers and thus increasing home ownership.

2. The Enterprises purchase mortgages, some of which the Enterprises pool into mortgage-backed securities. The Enterprises guarantee the payment of principal and interest to investors who buy those mortgage-backed securities. By creating this secondary mortgage market,

1

the Enterprises increase liquidity for private banks, which enables them to make additional loans to individuals for home purchases.

3.  By 2007, Fannie Mae's and Freddie Mac's mortgage portfolios had a combined value of approximately $5 trillion and they owned almost half of the Nation's existing mortgages.

4.  The Enterprises have issued common stock and numerous series of non-cumulative preferred stock (the "Preferred Stock"), all of which are publicly traded.

5.  Of the Fannie Mae Preferred Stock currently outstanding, the earliest series was issued in September 1998 (Fannie Mae, Series D (FDDXD)), and the latest series was issued in May 2008 (Fannie Mae, Series T (FNMAT)). The funds raised by Fannie Mae by issuing Preferred Shares from September 1998 to May 2008 are as follows:

| Issuance Series | Date of Issuance | Proceeds (in millions of USD) |
|---|---|---|
| FDDXD | September 30, 1998 | $150 |
| FNMFM | April 15, 1999 | $150 |
| FNMAP | March 20, 2000 | $690 |
| FNMAO | August 8, 2000 | $288 |
| FNMAM | April 6, 2001 | $400 |
| FNMAG | October 28, 2002 | $300 |
| FNMAN | April 29, 2003 | $345 |
| FNMAL | June 10, 2003 | $460 |
| FNMAK | September 25, 2003 | $225 |
| FNMFN | December 30, 2004 | $2,500 |
| FNMFO | December 30, 2004 | $2,492 |
| FNMAH | September 28, 2007 | $1,000 |
| FNMAI | October 4, 2007 | $375 |
| FNMAJ | November 21, 2007 | $530 |

| | | |
|---|---|---|
| FNMAS | December 11, 2007 | $7,000 |
| FNMAT | May 19, 2008 | $2,225 |
| **TOTAL** | | $19,130 |

6. Of the Freddie Mac Preferred Stock currently outstanding, the earliest series was issued in April 1996 (Freddie Mac, Series I (FMCCI)), and the latest series was issued in December 2007 (Freddie Mac, Series KJ (FMCKJ)). The funds raised by Freddie Mac by issuing Junior Preferred Shares from April 1996 to December 2007 are as follows:

| **Issuance Series** | **Date of Issuance** | **Proceeds (in millions of USD)** |
|---|---|---|
| FMCCI | April 23, 1996 | $250 |
| FREGP | October 27, 1997 | $150 |
| FMCKK | March 23, 1998 | $400 |
| FMCCG | September 23, 1998 | $220 |
| FMCCH | September 23, 1998 | $400 |
| FREJP | October 28, 1998 | $200 |
| FREJO | March 19, 1999 | $150 |
| FMCCK | July 21, 1999 | $250 |
| FMCCL | November 5, 1999 | $287 |
| FMCCM | January 26, 2001 | $325 |
| FMCCN | March 23, 2001 | $230 |
| FMCCO | March 23, 2001 | $173 |
| FMCCP | May 30, 2001 | $173 |
| FMCCJ | May 30, 2001 | $201 |
| FMCKP | October 30, 2001 | $300 |
| FREJN | January 29, 2002 | $300 |
| FMCCS | July 17, 2006 | $750 |

3

| | | |
|---|---|---|
| FMCCT | July 17, 2006 | $250 |
| FMCKO | October 16, 2006 | $500 |
| FMCKM | January 16, 2007 | $1,100 |
| FMCKN | April 16, 2007 | $500 |
| FMCKL | July 24, 2007 | $500 |
| FMCKI | September 28, 2007 | $500 |
| FMCKJ | December 4, 2007 | $6,000 |
| **TOTAL** | | $14,109 |

7. Each of the series of shares, which Plaintiffs hold and are at issue in this case – all of the Junior Preferred Shares issued by both of the Enterprises and the common shares issued by Freddie Mac – are governed by documents called "Certificates of Designation." Each of these Certificates of Designation entitle the stockholders to the payment of dividends if declared by the Boards of the respective Enterprises. The Certificates of Designation do not require the Board of either Enterprise to declare dividends. The Preferred Stock dividends, if declared by the Enterprises' board of directors, are calculated based on a percentage of the stock's face value. If the Board of either Enterprise declares a dividend, the Certificates of Designation establish an order in which the dividends on the various series must be paid. All dividends must be paid to all preferred stockholders before any dividends are paid on any common shares. The Certificates of Designation also provide an order in which the holders of the various series of shares may share in any distribution of assets upon liquidation of the Enterprise.

8. A financial crisis began in the summer of 2007. The crisis led Congress and financial regulators to enact multiple, systemic reforms. One of those reforms was the enactment of a federal law called the Housing and Recovery Act of 2008 ("HERA") in July 2008, which

4

addressed the concern that Fannie Mae's and Freddie Mac's financial condition would imperil the national economy.

9. HERA established the Federal Housing Finance Agency ("FHFA") and made it responsible for, among other things, "the effective supervision, regulation, and housing mission oversight" of the Enterprises. HERA empowered the Director of FHFA to place the Enterprises into conservatorship or receivership under certain circumstances.

10. HERA also amended the charters of the Enterprises by granting Treasury temporary authority to fund the Enterprises by purchasing Enterprise stock.

11. On September 6, 2008, FHFA's Director appointed FHFA as conservator of both Fannie Mae and Freddie Mac. The Boards of Directors of Fannie Mae and Freddie Mac each consented, by resolution, to the appointment of FHFA as conservator pursuant to HERA.

12. On September 7, 2008, FHFA, acting as conservator of Fannie Mae and Freddie Mac, entered each Enterprise into a Senior Preferred Stock Purchase Agreement with the U.S. Department of the Treasury ("Treasury") (collectively, the "PSPAs").

13. In announcing the conservatorship on September 7, 2008, FHFA Director Lockhart stated that "in order to restore the balance between safety and soundness and mission, FHFA has placed Fannie Mae and Freddie Mac into conservatorship. That is a statutory process designed to stabilize a troubled institution with the objective of returning the entities to normal business operations. FHFA will act as the conservator to operate the Enterprises until they are stabilized."

14. When the conservatorships were announced, FHFA's director also told the public that "in order to conserve over $2 billion in capital every year, the common stock and preferred stock dividends will be eliminated, but the common and all preferred stocks will continue to remain outstanding."

15. Other than the senior preferred stock issued to Treasury pursuant to the PSPAs, no Preferred Stock has been issued by the Enterprises since the conservatorships began in September 2008.

16. Except for dividends paid to Treasury on its Senior Preferred Stock, the Enterprises have not declared and paid dividends on common stock or Preferred Stock during the conservatorships.

17. Under the PSPAs, Treasury committed to invest up to $100 billion in each Enterprise as needed to ensure that every quarter each Enterprise maintained a positive net worth (the "Treasury Commitment" or "Commitment"). An Enterprise has a positive net worth if its assets exceed its liabilities as determined by Generally Accepted Accounting Principles ("GAAP").

18. For quarters in which an Enterprise's liabilities exceed its assets under GAAP, the PSPAs allow the Enterprise to draw upon Treasury's Commitment in an amount equal to the difference between liabilities and assets.

19. In return for the Treasury Commitment, Treasury received one million shares in a newly created class of non-voting stock in each Enterprise, known as Senior Preferred Stock.

20. The specific terms of the Senior Preferred Stock were contained in a document called the Certificate of Designation of Terms of Variable Liquidation Preference Senior Preferred Stock, Series 2008-2, referred to herein as the "Treasury Stock Certificate."

21. The PSPAs, and their associated Treasury Stock Certificates, entitled Treasury to the following with respect to each Enterprise: (i) a $1 billion senior liquidation preference—a priority right above all other stockholders, whether preferred or otherwise, to receive distributions from assets if the Enterprise was liquidated; (ii) a dollar-for-dollar increase in that liquidation

preference each time an Enterprise drew on the Treasury Commitment; (iii) an annual cash dividend (paid quarterly) of 10% of Treasury's liquidation preference, or if not paid in cash, an increase of the liquidation preference at a rate of 12% of Treasury's liquidation preference; and (iv) warrants allowing Treasury to purchase up to 79.9% of each Enterprise's common stock at a price of $0.00001 per share through September 7, 2028.

22. The total cost of exercising Treasury's common stock warrants in both Fannie Mae and Freddie Mac is less than $72,000.

23. The PSPAs also provided for a quarterly Periodic Commitment Fee paid by each Enterprise to Treasury, and stated as follows:

> The Periodic Commitment Fee is intended to fully compensate Purchaser [Treasury] for the support provided by the ongoing Commitment following December 31, 2009. The amount of the Periodic Commitment Fee shall be set not later than December 31, 2009 with respect to the ensuing five-year period, shall be reset every five years thereafter and shall be determined with reference to the market value of the Commitment as then in effect. The amount of the Periodic Commitment Fee shall be mutually agreed by Purchaser and Seller [Treasury and each respective Enterprise, acting by and through FHFA], subject to their reasonable discretion and in consultation with the Chairman of the Federal Reserve; provided, that Purchaser [Treasury] may waive the Periodic Commitment Fee for up to one year at a time, in its sole discretion, based on adverse conditions in the United States mortgage market.

24. Treasury waived the Periodic Commitment Fee for 2010, 2011, and 2012. The Enterprises have never paid any Periodic Commitment Fee to Treasury.

25. The PSPAs barred the Enterprises from making any other distributions to Enterprise stockholders—including issuing dividends to shareholders—without Treasury's consent.

26. On May 6, 2009, Treasury and FHFA, acting as conservator of the Enterprises, amended the PSPAs (the "First Amendment"). The First Amendment doubled the Treasury

7

Commitment to each Enterprise, from $100 billion each ($200 billion total) to $200 billion each ($400 billion total).

27. On December 24, 2009, Treasury and FHFA, acting as conservator of the Enterprises, again amended the PSPAs (the "Second Amendment"). The Second Amendment replaced the $200,000,000,000 Treasury Commitment to each Enterprise with a new commitment to provide as much funding as each Enterprise needed to prevent insolvency through December 31, 2012, after which time a cap on the Commitment would be reinstated and fixed pursuant to a formula. The Second Amendment also extended the date for Treasury to set the Periodic Commitment Fee from December 31, 2009 to December 31, 2010.

28. In the first quarter of 2012, Fannie Mae recorded comprehensive income (i.e., earnings) of $3.1 billion, compared to a comprehensive loss of $6.3 billion in the first quarter of 2011; and Freddie Mac recorded comprehensive income of $1.8 billion, compared to a comprehensive income of $2.7 billion in the first quarter of 2011.

29. In the second quarter of 2012, Fannie Mae recorded comprehensive income of $5.4 billion, compared to a comprehensive loss and net loss of $2.9 billion for the second quarter of 2011; and Freddie Mac recorded comprehensive income of $2.9 billion, compared to a comprehensive loss of $1.1 billion for the second quarter of 2011.

30. From the outset of the conservatorships in 2008 through the first quarter of 2012, there were some quarters in which the Enterprises lacked the cash necessary to pay the 10% dividend to Treasury. On such occasions, the Enterprises drew from the Treasury Commitment in order to pay Treasury its quarterly dividend.

31. When the Enterprises drew against the Treasury's Commitment to pay Treasury dividends, such draws increased the size of the liquidation preference, thereby increasing the size of the Enterprises' dividend obligation.

32. By August 2012, Fannie Mae's and Freddie Mac's annual dividend obligations on Treasury's senior preferred stock were $11.7 billion and $7.2 billion, respectively.

33. As of August 17, 2012, Fannie Mae and Freddie Mac had drawn $116.1 billion and $71.3 billion, respectively, from the Treasury Commitment, increasing Treasury's total liquidation preferences to $189.4 billion ($117.1 billion for Fannie Mae and $72.3 billion for Freddie Mac).

34. Since September 2008, Fannie Mae has drawn on the Treasury Commitment in the following quarterly amounts and cumulative amounts. Fannie Mae has not drawn on the Treasury Commitment since 2018.

| Year (Quarter) | Quarterly Draw (in millions of USD) | Cumulative Draws (in millions of USD) |
|---|---|---|
| 2008 (Q4) | - | - |
| 2009 (Q1) | $15,200 | $15,200 |
| 2009 (Q2) | $19,000 | $34,200 |
| 2009 (Q3) | $10,700 | $44,900 |
| 2009 (Q4) | $15,000 | $59,900 |
| 2010 (Q1) | $15,300 | $75,200 |
| 2010 (Q2) | $8,400 | $83,600 |
| 2010 (Q3) | $1,500 | $85,100 |
| 2010 (Q4) | $2,500 | $87,600 |
| 2011 (Q1) | $2,600 | $90,200 |
| 2011 (Q2) | $8,500 | $98,700 |
| 2011 (Q3) | $5,100 | $103,800 |
| 2011 (Q4) | $7,800 | $111,600 |

| | | |
|---|---|---|
| 2012 (Q1) | $4,600 | $116,100 |
| 2012 (Q2) | - | $116,100 |
| 2012 (Q3) | - | $116,100 |
| 2012 (Q4) | - | $116,100 |
| 2013 (Q1) | - | $116,100 |
| 2013 (Q2) | - | $116,100 |
| 2013 (Q3) | - | $116,100 |
| 2013 (Q4) | - | $116,100 |
| 2014 (Q1) | - | $116,100 |
| 2014 (Q2) | - | $116,100 |
| 2014 (Q3) | - | $116,100 |
| 2014 (Q4) | - | $116,100 |
| 2015 (Q1) | - | $116,100 |
| 2015 (Q2) | - | $116,100 |
| 2015 (Q3) | - | $116,100 |
| 2015 (Q4) | - | $116,100 |
| 2016 (Q1) | - | $116,100 |
| 2016 (Q2) | - | $116,100 |
| 2016 (Q3) | - | $116,100 |
| 2016 (Q4) | - | $116,100 |
| 2017 (Q1) | - | $116,100 |
| 2017 (Q2) | - | $116,100 |
| 2017 (Q3) | - | $116,100 |
| 2017 (Q4) | - | $116,100 |
| 2018 (Q1) | $3,700 | $119,800 |
| 2018 (Q2) | - | $119,800 |
| 2018 (Q3) | - | $119,800 |

| Year (Quarter) | Quarterly Draw (in millions of USD) | Cumulative Draws (in millions of USD) |
|---|---|---|
| 2018 (Q4) | - | $119,800 |

35. Since September 2008, Freddie Mac has drawn on the Treasury Commitment in the following quarterly amounts and cumulative amounts. Freddie Mac has not drawn on the Treasury Commitment since 2018.

| Year (Quarter) | Quarterly Draw (in millions of USD) | Cumulative Draws (in millions of USD) |
|---|---|---|
| 2008 (Q4) | $13,800 | $13,800 |
| 2009 (Q1) | $30,800 | $44,600 |
| 2009 (Q2) | $6,100 | $50,700 |
| 2009 (Q3) | - | $50,700 |
| 2009 (Q4) | - | $50,700 |
| 2010 (Q1) | - | $50,700 |
| 2010 (Q2) | $10,600 | $61,300 |
| 2010 (Q3) | $1800 | $63,100 |
| 2010 (Q4) | $100 | $63,200 |
| 2011 (Q1) | $500 | $63,700 |
| 2011 (Q2) | - | $63,700 |
| 2011 (Q3) | $1500 | $65,200 |
| 2011 (Q4) | $6000 | $71,200 |
| 2012 (Q1) | $100 | $71,300 |
| 2012 (Q2) | - | $71,300 |
| 2012 (Q3) | - | $71,300 |
| 2012 (Q4) | - | $71,300 |
| 2013 (Q1) | - | $71,300 |
| 2013 (Q2) | - | $71,300 |
| 2013 (Q3) | - | $71,300 |

| | | |
|---|---|---|
| 2013 (Q4) | - | $71,300 |
| 2014 (Q1) | - | $71,300 |
| 2014 (Q2) | - | $71,300 |
| 2014 (Q3) | - | $71,300 |
| 2014 (Q4) | - | $71,300 |
| 2015 (Q1) | - | $71,300 |
| 2015 (Q2) | - | $71,300 |
| 2015 (Q3) | - | $71,300 |
| 2015 (Q4) | - | $71,300 |
| 2016 (Q1) | - | $71,300 |
| 2016 (Q2) | - | $71,300 |
| 2016 (Q3) | - | $71,300 |
| 2016 (Q4) | - | $71,300 |
| 2017 (Q1) | - | $71,300 |
| 2017 (Q2) | - | $71,300 |
| 2017 (Q3) | - | $71,300 |
| 2017 (Q4) | - | $71,300 |
| 2018 (Q1) | $300 | $71,600 |
| 2018 (Q2) | - | $71,600 |
| 2018 (Q3) | - | $71,600 |
| 2018 (Q4) | - | $71,600 |

36. On August 17, 2012, Treasury and FHFA, acting as conservator of the Enterprises, amended the PSPAs a third time (the "Third Amendment").

37. The Third Amendment replaced the fixed 10% dividend with a quarterly variable dividend equal to the positive net worth, if any, of Fannie Mae and Freddie Mac, exceeding a pre-

12

determined capital reserve. The capital reserve was originally set at $3 billion but would decline by $600 million each year until reaching zero in 2018. The variable dividend is known as the "Net Worth Sweep."

38. The Net Worth Sweep became effective on January 1, 2013. The dividend paid by the Enterprises for the fourth quarter of 2012 was based on the 10% dividend that applied before the Net Worth Sweep, and the dividend paid for the first quarter of 2013 was based upon the Net Worth Sweep formula.

39. In addition, the Third Amendment suspended the Enterprises' obligations to pay periodic commitment fees for so long as the Net Worth Sweep remained in effect.

40. On August 16, 2012, the value of Fannie Mae's publicly traded Preferred Shares was $1.459 billion. On August 17, 2012, the value of Fannie Mae's publicly traded Preferred Shares was $680 million, representing a decline in value of $779 million.

41. On August 16, 2012, the value of Freddie Mac's common shares was $195 million, and the value of Freddie Mac's publicly traded Preferred Shares was $1.274 billion, for a combined total value of $1.469 billion. On August 17, 2012, the value of Freddie Mac's common shares was $150 million, and the value of Freddie Mac's publicly traded Preferred Shares was $488 million, representing a decline in value of $46 million and $786 million, respectively, and a combined decline in value of $831 million.

42. Pursuant to the terms of the PSPAs, as of January 1, 2013, the maximum amount of remaining funding to Fannie Mae and Freddie Mae under the Treasury Commitment was $117.6 billion and $140.5 billion, respectively.

43. On December 21, 2017, Treasury and FHFA, acting as Conservator to the Enterprises, entered into letter agreements that changed the terms of the Senior Preferred Stock

Certificates in each Enterprise, issued under the PSPAs (the "2017 Letter Agreements"), to permit each Enterprise to retain a $3 billion capital reserve. The 2017 Letter Agreements also increased Treasury's liquidation preference with respect to each Enterprise by $3 billion ($6 billion total). Under the 2017 Letter Agreements, each Enterprise paid a dividend to Treasury equal to the amount its net worth at the end of each quarter exceeded $3 billion. Those terms applied to the December 31, 2017 dividend payment and the dividend payments for each quarter thereafter, until the execution of the September 30, 2019 letter agreements.

44. On September 30, 2019, Treasury and FHFA, acting as Conservator to the Enterprises, entered into letter agreements that changed the terms of the Senior Preferred Stock Certificates in each Enterprise, issued under the PSPAs (the "2019 Letter Agreements"), to permit each Enterprise to retain earnings beyond the $3 billion capital reserves previously allowed through the 2017 Letter Agreements. The 2019 Letter Agreements also provided that the liquidation preferences for Treasury's Senior Preferred Stock would increase by the amount of capital the Enterprises retained each quarter. Fannie Mae and Freddie Mac were permitted to maintain capital reserves of $25 billion and $20 billion, respectively.

45. On January 14, 2021, Treasury and FHFA, acting as Conservator to the Enterprises, entered into letter agreements that changed the terms of the Senior Preferred Stock Certificates in each Enterprise, issued under the PSPAs (the "2021 Letter Agreements"). Among other things, the 2021 Letter Agreements suspended the cash dividend owed in order to permit each Enterprise to retain earnings until it satisfied the requirements of the 2020 Enterprise capital rule, and provided that the liquidation preference for each Enterprise would increase each quarter by the amount in earnings each Enterprise was permitted to retain in lieu of the cash dividend.

46. Since their entry into conservatorship, Fannie Mae and Freddie Mac paid quarterly dividends to Treasury in the following amounts:

| Year (Quarter) | Fannie Mae Dividends (in millions of USD) | Freddie Mac Dividends (in millions of USD) |
|---|---|---|
| 2008 (Q4) | $31 | $172 |
| 2009 (Q1) | $25 | $370 |
| 2009 (Q2) | $409 | $1,149 |
| 2009 (Q3) | $886 | $1,294 |
| 2009 (Q4) | $1,150 | $1,292 |
| 2010 (Q1) | $1,527 | $1,292 |
| 2010 (Q2) | $1,909 | $1,293 |
| 2010 (Q3) | $2,118 | $1,561 |
| 2010 (Q4) | $2,152 | $1,603 |
| 2011 (Q1) | $2,216 | $1,605 |
| 2011 (Q2) | $2,281 | $1,617 |
| 2011 (Q3) | $2,495 | $1,618 |
| 2011 (Q4) | $2,621 | $1,655 |
| 2012 (Q1) | $2,819 | $1,807 |
| 2012 (Q2) | $2,931 | $1,809 |
| 2012 (Q3) | $2,929 | $1,809 |
| 2012 (Q4) | $2,929 | $1,808 |
| 2013 (Q1) | $4,224 | $5,827 |
| 2013 (Q2) | $59,368 | $6,971 |
| 2013 (Q3) | $10,243 | $4,357 |
| 2013 (Q4) | $8,617 | $30,436 |
| 2014 (Q1) | $7,191 | $10,435 |
| 2014 (Q2) | $5,691 | $4,499 |

| | | |
|---|---|---|
| 2014 (Q3) | $3,712 | $1,890 |
| 2014 (Q4) | $4,000 | $2,786 |
| 2015 (Q1) | $1,920 | $851 |
| 2015 (Q2) | $1,796 | $746 |
| 2015 (Q3) | $4,359 | $3,913 |
| 2015 (Q4) | $2,203 | - |
| 2016 (Q1) | $2,859 | $1,740 |
| 2016 (Q2) | $919 | - |
| 2016 (Q3) | $2,869 | $933 |
| 2016 (Q4) | $2,977 | $2,310 |
| 2017 (Q1) | $5,471 | $4,475 |
| 2017 (Q2) | $2,779 | $2,234 |
| 2017 (Q3) | $3,117 | $1,986 |
| 2017 (Q4) | $648 | $2,250 |
| 2018 (Q1) | - | - |
| 2018 (Q2) | $938 | - |
| 2018 (Q3) | $4,459 | $1,585 |
| 2018 (Q4) | $3,975 | $2,560 |
| 2019 (Q1) | $3,240 | $1,477 |
| 2019 (Q2) | $2,361 | $1,665 |
| 2019 (Q3) | - | - |
| 2019 (Q4) | - | - |
| 2020 (Q1) | - | - |
| 2020 (Q2) | - | - |
| 2020 (Q3) | - | - |
| 2020 (Q4) | - | - |
| 2021 (Q1) | - | - |

| | | |
|---|---|---|
| 2021 (Q2) | - | - |
| 2021 (Q3) | - | - |
| 2021 (Q4) | - | - |
| 2022 (Q1) | - | - |
| 2022 (Q2) | - | - |
| **Total Before January 1, 2013** | $31,428 | $23,754 |
| **Total After January 1, 2013** | $149,936 | $95,926 |
| **TOTAL** | $181,364 | $119,680 |

47. As of the end of the second quarter of 2022, the total amount by which Treasury's liquidation preference has been increased as a result of the 2017, 2019 and 2021 letter agreements is $84.3 billion.

Respectfully submitted,

| | |
|---|---|
| */s/ Asim Varma* . <br> Howard N. Cayne (D.C. Bar #331306) <br> Asim Varma (D.C. Bar #426364) <br> David B. Bergman (D.C. Bar #435392) <br> ARNOLD &PORTER KAYE SCHOLER LLP <br> 601 Massachusetts Ave NW <br> Washington, DC 20001 <br> Tel: (202) 942-5000 <br> Howard.Cayne@arnoldporter.com <br> Asim.Varma@arnoldporter.com <br> David.Bergman@arnoldporter.com <br><br> *Attorneys for Defendant Federal Housing Finance Agency and Director Mark A. Calabria* <br><br> */s/ Michael J. Ciatti* . <br> Michael J. Ciatti (D.C. Bar #467177) <br> KING &SPALDING LLP <br> 1700 Pennsylvania Ave. N.W. <br> Washington, DC 20006 | */s/ Hamish P.M. Hume* . <br> BOIES SCHILLER FLEXNER LLP <br> Hamish P.M. Hume (D.C. Bar #449914) <br> Samuel Kaplan (D.C. Bar #463350) <br> 1401 New York Ave. NW <br> Washington, DC 20005 <br> Tel: (202) 237-2727 <br> Fax: (202) 237-6131 <br> hhume@bsfllp.com <br> skaplan@bsfllp.com <br><br> KESSLER TOPAZ MELTZER & CHECK, LLP <br> Eric L. Zagar (*Pro Hac Vice*) <br> 280 King of Prussia Rd. <br> Radnor, PA 19087 <br> Tel: (610) 667-7706 <br> Fax: (610) 667-7056 <br> ezagar@ktmc.com <br><br> GRANT & EISENHOFER, P.A. <br> Michael J. Barry (*Pro Hac Vice*) |

17

| | |
|---|---|
| Tel: (202) 626-5508<br>Fax: (202) 626-3737<br>mciatti@kslaw.com<br><br>*Attorney for the Federal Home Loan Mortgage Corp.*<br><br>*/s/ Meaghan VerGow* .<br>Meaghan VerGow (D.C. Bar # 977165)<br>O'MELVENY &MYERS LLP<br>1625 Eye Street, N.W.<br>Washington, DC 20006<br>Tel: (202) 383-5300<br>Fax: (202) 383-5414<br>mvergow@omm.com<br><br>*Attorney for the Federal National Mortgage Association* | 123 Justison Street<br>Wilmington, DE 19801<br>Tel: (302) 622-7000<br>Fax: (302) 622-7100<br>mbarry@gelaw.com<br><br>BERNSTEIN LITOWITZ BERGER<br>  & GROSSMANN LLP<br>Adam Wierzbowski (*Pro Hac Vice*)<br>1251 Avenue of the Americas<br>New York, NY 10020<br>Tel: (212) 554-1400<br>Fax: (212) 554-1444<br>adam@blbglaw.com<br><br>*Co-Lead Counsel for Plaintiffs*<br><br>*/s/ David Thompson* .<br>Charles J. Cooper (Bar No. 24870)<br>David Thompson (Bar No. 450503)<br>COOPER & KIRK, PLLC<br>1523 New Hampshire Avenue, N.W.<br>Washington, D.C. 20036<br>Telephone: 202.220.9600<br>Facsimile: 202.220.9601<br>ccooper@cooperkirk.com<br><br>*Counsel for Plaintiffs in No. 13-1053* |