# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Lynchburg Division

| | | |
|---|---|---|
| | ) | |
| W.C. ENGLISH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 6:17-cv-00018 (NKM/RSB) |
| | ) | |
| RUMMEL, KLEPPER & KAHL, LLP, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**RK&K'S MEMORANDUM IN SUPPORT OF RENEWED MOTION FOR JUDGMENT
AS A MATTER OF LAW OR, IN THE ALTERNATIVE, NEW TRIAL**

William D. Bayliss, Esq. (VSB # 13741)
bbayliss@williamsmullen.com
Brendan D. O'Toole, Esq. (VSB #71329)
botoole@williamsmullen.com
Joseph E. Blackburn, III, Esq. (VSB #81871)
jblackburn@williamsmullen.com
Williams Mullen
200 South 10th Street, 16th Floor
Richmond, VA 23219
Telephone No.: (804) 420-6588; Fax No.: (804) 420-6507
*Counsel for Defendant Rummel, Klepper & Kahl, LLP*

## **TABLE OF CONTENTS**

I.      INTRODUCTION    …………………………………………………………………1

II.     FACTS ADDUCED AT TRIAL ....................................................................................2

     A.  W.C. English is Responsible for Building Bridge B603 Per the Plans and Specifications. ......................................................................................................2

     B.  RK&K Subcontracts to Provide Quality Assurance Services For the Project. .............3

     C.  CDM Smith Subcontracts to Provide Quality Control Services for the Project...........6

     D.  English is Responsible for Obtaining Approval from AECOM Before Any Changes Are Made to Those Plans and Specifications. ................................................7

     E.  English's Design-Build Construction Team...............................................................7

     F.  English Decides to Use the Incorrect, 1.75" Slab Runners. .........................................8

     G.  English Admits it Knew or Should've Known of a Design Change. ...........................9

     H.  English Knows QA and QC Cannot Direct Design Changes to the Plans. .................10

     I.  The April 24, 2012 Dry Runs Show Deficiencies, And English is Aware of Those Deficiencies But Proceeds With the Concrete Pour. .................................11

     J.  Construction Defects Alleged by VDOT in July 2012................................................13

     K.  The Jury Verdict .......................................................................................................14

III.    STANDARD OF REVIEW.........................................................................................14

     A.  Judgment as a Matter of Law ...................................................................................14

     B.  Motion for a New Trial.............................................................................................15

III.    ARGUMENT .............................................................................................................15

     A.  THE EVIDENCE DOES NOT SUPPORT THE JURY'S CONCLUSION THAT ENGLISH WAS ENTITLED TO $1,986,089.70 IN DAMAGES OR INDEMNIFICATION FROM RK&K. ......................................................................15

        1.  It is Undisputed That But For English's Failure to Process an RFI, "We Wouldn't Be Here Today."........................................................................15

        2.  English Poured B603 Knowing It Would Not Meet the Plans and Specs.............17

        3.  The Jury Verdict Is Inconsistent with Others' Faults, Particularly That of CDM Smith and VDOT, for Which RK&K is Not Responsible.....................................19

        4.  The Verdict Doesn't Fit English's Comparative Negligence Theory. ..................23

     B.  THE JURY'S DAMAGES AWARD IS EXCESSIVE AND ERRONEOUS FOR MULTIPLE REASONS. .........................................................................................25

        1.  The Court Should Vacate the Award of Prejudgment Interest as a Matter of Law. 25

        2.  The Jury Verdict Was Excessive and Requires a New Trial or Remittitur. ..........29

    i.   English's $228,089.73 "Extended Home Office Overhead" Is Based on Unsupported Assumptions and Speculation. .....................................................31

    ii.  RK&K Is Entitled to a Credit for the Amount English Received as Part of the CDM Settlement. ............................................................................................32

C.  THE COURT DID NOT PROPERLY INSTRUCT THE JURY. ...............................33

Defendant, Rummel, Klepper & Kahl, LLP ("RK&K"), by counsel, and pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure, states as follows for its Memorandum in Support of Renewed Motion for Judgment as a Matter of Law or, in the Alternative, New Trial:

## I.     <u>INTRODUCTION</u>

Following a four-day trial, a jury returned a verdict in favor of Plaintiff W.C. English, Inc. ("English") and against RK&K for $1,986,089.70 for English's claimed damages arising out the construction of bridge B603. Although English admitted that it along with others, such as CDM Smith, Inc. ("CDM Smith") and VDOT, were at fault in the construction of B603, the jury's verdict did not allocate any damages amongst English and the non-parties at fault. Rather, the jury assigned an excessive lump sum damages amount solely against RK&K. The verdict must be set aside.

As a matter of law, English had a contractual obligation to build the bridge per approved plans and specifications, and the subcontract between English and RK&K explicitly provided that RK&K is not responsible for English's failure to do so. It is rare in this profession when a party admits to being the "but for" cause of an event, but that's exactly what English did. It admitted that it failed to build per plans and specs and admitted that but for its failures, it would not have suffered any damages. Just as importantly, English sought damages of $2.8 million, admitted that entities other than RK&K were responsible for the damages sought, but failed to put forth any evidence of an allocation or apportionment of who was responsible for what. Instead, the jury was simply asked to speculate. And in its speculation, the jury awarded excessive damages against RK&K that was unsupported by the evidence, was contrary to the parties' contractual agreement, and was incompatible with English's admitted fault.

Because a reasonable jury could not have concluded that RK&K was responsible for nearly $2 million in damages, RK&K requests the Court vacate English's damages award. Alternatively, RK&K asks the Court to grant a new trial because the jury's verdict was against the clear weight of the evidence and will result in a miscarriage of justice. RK&K also asks the Court to grant a new trial because the jury's prejudgment interest award on $1.986 million, running from June 24, 2014, is against the clear weight of the evidence, inequitable, and an abuse of discretion. Alternatively, RK&K asks the Court to either vacate or amend the prejudgment interest award.

## II.    FACTS ADDUCED AT TRIAL

### A.    W.C. English is Responsible for Building Bridge B603 Per the Plans and Specifications.

In 2009, VDOT and W.C. English, Inc. executed a $75 million contract requiring English to perform all design and construction services necessary to build a replacement bridge, known as B603, on a portion of I-81 (the "Project"). (Pl.'s Ex. 1; 1d Tr. 67-68.)[1] English was required to achieve substantial completion of the Project (the day the traveling public can use the roadway) by September 4, 2012, with final completion no later than October 30, 2012. (Ex. 1 at 3-4; 1d Tr. 79-80.)

AECOM USA, Inc. was the designer of record for the Project. (1d Tr. 70-71.) AECOM's role during bridge construction was to, among other things, address design-related issues for the Project. Only English and AECOM could implement changes to the bridge design. (2d Tr. 24.)

English was required to build bridge B603 per AECOM's approved plans and specifications. (Pl.'s Ex. 2, RK&K Subcontract, *Standard Terms and Conditions* (the "Standard

---

[1] The trial comprised four days and the transcript is separately paginated for each day, though not consecutively. Citations to the transcript are to the day the testimony occurred and the page in the record where the testimony is found. For example, "1d Tr. Tr. 67-68" is a reference to testimony that occurred on the first day of trial at pages 67-68 of the first day's transcript.

Terms"), at ¶ 7; Pl.'s Ex. 1, Prime Contract at 118, § 2.7.1; 3d Tr. 23; 3d Tr. 156.) According to the design plans, the bridge deck concrete depth was to have a minimum deck thickness of 8.5". (Pl.'s Ex. 7; 1d Tr. 72, 105, 176; 2d Tr. 158.) The design also required two mats of reinforcing steel bar supports – they could be 2.5" slab runners or high chairs – to be positioned before pouring the concrete bridge deck. (1d Tr. 187.) The clearance between the bridge deck riding surface and the top mat of reinforcing steel was to be 2.75". (Pl.'s Ex. 7; 1d Tr. 105-06, 176.)  The applicable specifications allowed for a typical tolerance of up to + 0.5". (1d Tr. 105, 108; 2d Tr. 158-59.)

English possessed authority to stop work anytime it wanted; it never did. (2d Tr. 48; 3d Tr. 19.) It was undisputed that English did not build B603 per the plans and specifications. (3d Tr. 23.)

**B.    RK&K Subcontracts to Provide Quality Assurance Services For the Project.**

*RK&K Amends English's Form QA Subcontract*. English propounded a form subcontract to RK&K for the performance of all quality assurance services related to the Project. (3d Tr. 178.) English's original draft would've made RK&K responsible for *any* claim VDOT made against English relating to the manner or sufficiency of the work performed, even if RK&K was not at fault and even if English or its subcontractors caused the alleged loss. (3d Tr. 149-51.)

This was obviously a no-go from RK&K's perspective. So, before signing, RK&K made numerous changes to English's form agreement including, as relevant here, the insertion of RK&K's printed "Standard Terms" and handwritten modifications to the form's "Indemnity" and "Damage" provisions. (Pl.'s Ex. 2, *Standard Terms* & §§ 11 and 24; 3d Tr. 179-82.) RK&K's purpose in negotiating the QA Subcontract with English was "to have contract language that protect[ed RK&K]." (3d Tr. 185-86.) English accepted all of RK&K's contractual changes. (Id. 151, 182-83.)

Under the QA Subcontract, RK&K was to provide QA services "on the subject project in strict accordance with VDOT plans, specifications and special provisions for the lump sum price of $3,305,000.00." (Pl.'s Ex. 2 at 2, *Schedule A ("Work")*.) The QA services were to be performed "in accordance with the prevailing standard of professional care for similar services in relation to projects of similar scope, size and complexity." (Id., *Standard Terms* ¶ 2.) English paid RK&K "to make sure that the Project [was] built according to the plans and specifications." (1d Tr. 91.)

*RK&K is Not a Guarantor and English Remains Responsible to Build B603 Per the Plans.* English agreed RK&K did not guarantee English's construction work, (1d Tr. 90), and English remained "ultimately responsible for the quality of the construction." (Id. at 630; 3d Tr. 191.) Indeed:

> Performance of QA phase services shall not be construed to relieve [English] from responsibility to perform the construction work in accordance with the Construction Documents and accepted industry standards. *RK&K is not responsible for the Contractor's failure to perform the construction work in accordance with the Construction Documents.*

(Pl.'s Ex. 2, *Standard Terms*, ¶ 7; 3d Tr. 181.) Simply put, RK&K was unwilling "to assume the risk of being sued for millions of dollars if English failed to build per plans and specifications." (3d Tr. 191.) English's expert agreed that this provision means RK&K is not responsible no matter what its liability may be. (3d Tr. 35.) But English interpreted this provision to mean RK&K would not be held responsible if there was "an area that we really wouldn't think that they would be able to inspect." (3d Tr. 93.) English never intended for RK&K to have no responsibility if it didn't do its job. (3d Tr. 94.)

*RK&K's Indemnity Obligations*. Concerning RK&K's indemnification obligations, Section 11 of the Subcontract provides:

Should Owner or any other person assert a claim or institute a suit, action, or proceeding against Contractor involving the manner or sufficiency of the performance of the Work, Subcontractor shall ~~upon request of Contractor promptly assume the defense of such claim, suit, action or proceeding, at Subcontractor's expense, and Subcontractor shall~~ indemnify and save harmless Contractor and its ~~agents~~, servants and employees, from and against any liability, loss, damage, or expense arising out of or relate to such claim, suit, action, or proceeding, *to the extent directly caused by the negligence of subcontractor but not to the extent caused by the acts or omissions of Contractor or its Subcontractors or consultants of any tier.*

The handwritten changes were to make sure RK&K "would not be picking up the whole ticket, if you will." (3d Tr. 182.) RK&K had no intent of being "responsible for [English's] omissions or errors[.]" (Id.) Thus, RK&K understood that if there was "a dispute about how much English was responsible and how much RK&K was responsible, they would each have to pay their own share on whatever the claim was by [VDOT]." (Id. 187-88.) The responsibility would be allocated. (Id. 188.) Similarly, English interpreted the indemnification provision to mean "that if RK&K has created a problem, then they are responsible for the cost of that problem. If English Construction has caused the problem, then they are responsible for their cost." (1d Tr. 88.; 3d Tr. 89.) According to English, "What's fair is fair." (1d Tr. 88.)

***The QA/QC Plan and QAM Richard Clarke***. The parties developed an Overall Quality Assurance and Quality Control Plan ("QA/QC Plan") to govern the relationship between the construction team, the design team, the quality assurance team, and the quality control team. (See Pl.'s Exs. 3, 5 & 67.) Under the QA Plan, RK&K's "primary role" was "to ensure the work conforms to the 'approved for construction' plans and VDOT specifications by reviewing the QC data and performing independent sampling and testing to verify the QC test results." (Pl.'s Ex. 5 at § 3.2.) RK&K was to be "distinct and separate from the design and production staff," *i.e.*, independent from the construction activity. (Id. at § 3.1; 1d Tr. 83; 4d Tr. 10.) But, according to VDOT, RK&K was to perform "a limited, limited inspection." (3d Tr. 212.) QA performs "about

10 percent of the level of effort of QC," but "it's not intended to be a hundred percent coverage. It's not intended to be a guarantee of the quality of all the work of a project." (4d Tr. 87.)

RK&K's Quality Assurance Manager ("QAM") for the Project was Richard Clarke, a licensed professional engineer. (1d Tr. 75.) His role was to make sure B603 was built per plans and specifications, and he possessed authority to stop work on the Project or refuse payment to English if work was out of conformity. (1d Tr. 84, 173-74; 3d Tr. 85.) It was Clarke's job, to the best of his ability, to say when something meets the plans and specs. (4d Tr. 41.) Where a problem existed on B603, Clarke was required to issue a non-conformance report ("NCR"). (1d Tr. 84-85; 4d Tr. 39-40.) Clarke reported to English's Project Manager, Bernie Davis. (1d Tr. 77; 4d Tr. 39.) English "didn't want [Clark] going and directing work without forces or anything or making corrections." (3d Tr. 87.)

### C. CDM Smith Subcontracts to Provide Quality Control Services for the Project.

CDM Smith subcontracted with English to provide Quality Control services for the Project. It made no changes to its QC Subcontract and accepted English's form document "as is." CDM's principal responsibility as QC was to provide inspection, measurements, and testing to assess construction processes relative to the applicable bridge standards and specifications, and to report all sampling, visual inspections, certifications, and daily diaries directly to RK&K. (Def.'s Ex. 2 at § 4.1; 1d Tr. 75.) As QC inspector Victor Niagro testified, "[m]y duties . . . were to monitor and inspect the work of the contractor and the subcontractors and to assure that the work was being done per the approved plans and specifications." (2d Tr. 68.) Khairy Wahba served as CDM Smith's senior QC inspector. (2d Tr. 101.) CDM Smith reported directly to English. (1d Tr. 157.)

**D. English is Responsible for Obtaining Approval from AECOM Before Any Changes Are Made to Those Plans and Specifications.**

English knew that any change to the bridge design was required to be approved by AECOM through the process of submitting written requests for information (RFIs) to AECOM. (1d Tr. 174-75; 2d Tr. 24; 3d Tr. 158-59.) No design changes to the Project could occur before this approval was secured. It was English's responsibility to identify a potential design change and it was English's responsibility to send RFI's to AECOM. (1d Tr. 151.) As Dylan Frazier testified, "if there's going to be any change to the plans, then we submit an RFI to see if it's acceptable." (1d Tr. 183.)

**E. English's Design-Build Construction Team.**

Two of English's bridge foreman, Anderson "Blue" Jeffries and Jehugh Crouch, testified. These individuals looked after the daily operations of English's crew, including putting in rebar and pouring concrete. (1d Tr. 73; 2d Tr. 58.)

English's Bridge Superintendent for the Project was Matthew Hackney. He oversaw construction of the bridge, including coordination of all the work performed on the bridge. (1d Tr. 152-53.) He reported to Gary Galloway, English's Construction Manager for the Project. (Id.)

Dylan Frazier was English's Project Coordinator. (Id. 170.) His responsibilities included preparing and writing RFIs and ordering materials. (Id. 171; 2d Tr. 21.) Frazier reviewed and was familiar with B603's requirements, specifications, and plans, and he maintained the RFI log for the Project. (1d Tr.175; 2d Tr. 22.) More than 160 RFIs were processed for the Project. (Def.'s Ex. 18; 2d Tr. 21.) Frazier reported to Galloway. (1d Tr. 72, 171.)

Mr. Galloway, who oversaw the entire Project, reported to Bernie Davis, English's Project Manager. (1d Tr. 72, 171-72.) Davis was English's "top guy on the Project," but he wasn't there

very much. (1d Tr. 66; 4d Tr. 11.) Davis reported to English's Senior Vice-President, Wilson

Dickerson. (1d Tr. 76; 3d Tr. 80.) Dickerson is a professional engineer. (3d Tr. 79.)

**F.    English Decides to Use the Incorrect, 1.75" Slab Runners.**

*April 6, 2012 Frazier Log Note*. Frazier wanted to use slab runners instead of high-chairs

in the deck (2d Tr. 27.) Frazier's April 6, 2012 log note makes that clear. (Def.'s Ex. 11.)

Thereafter, English began installing 2.5" slab runners. (1d Tr. 187; 2d Tr. 60.) According to

Frazier's note, Clarke said he "wanted to talk to Harold (AECOM) and will let [Frazier] know

what he says and if an RFI is needed. Richard said he spoke with Harold and *they* wanted to use

1¾" slab runners in order to get more coverage on the steel." (Def.'s Ex. 11.) If Frazier's log note

is accurate, Clarke did precisely what he was supposed to do by seeking approval from AECOM

to use the shorter slab runners. (2d Tr. 28-29.) Clarke, according to Frazier's log note, indicated

AECOM wanted to use the shorter runners.

*The April 9, 2012 Pre-Pour Meeting*. Three days later, on April 9, 2012, a pre-pour

meeting was held at English's office. Representatives of English (Davis, Galloway, Hackney,

Frazier, and bridge foreman Jeffries); RK&K (Lee Yowell, Clarke, and RK&K's records manager

Roy Floyd); CDM (QC Manager Terry Oliver and QC inspectors Wahba and Niagro); and various

(though unnamed) VDOT individuals attended. (Pl.'s Ex. 9, April 9, 2012 log entry.)  Hackney

and Frazier remained silent about the change in the height of the slab runners. CDM Smith agrees

the change to smaller runners should have been discussed at this meeting and that an RFI should

have been generated because of the forthcoming design change. (2d Tr. 86-87, 89.) For this reason,

English admits that Hackney's and Frazier's failures to notify Mr. Davis of the change in the height

of the slab runners used on the Project constituted a failure of their responsibilities. (1d Tr. 151-

53.)

***Clarke and Wahba's April 17, 2012 "Directive" to Use Shorter Slab Runners.*** To this point, English had been installing 2.5" slab runners. (1d Tr. 187; 2d Tr. 60.) Around April 17, 2012, QAM Clarke and CDM inspector Khairy Wahba said English was using the wrong size slab runners, instructed English to stop using the 2.5" slab runners, and required English to use 1.75" slab runners instead. (1d Tr. 118; 185, 187; 2d Tr. 60-61; Jeffries Dep. 18:17-22:9.)[2] According to Frazier, Clarke said he would not pay unless English used the shorter slab runners. (1d Tr. 187; 2d Tr. 11.) Clarke picked out a 1.75" slab runner, pointed to it and said it "met the plans and specs." (1d Tr. 188.) Clarke did not suggest the change in slab runner height constituted a design change. (Id.) English told CDM that there was approval to use the smaller slab runners. (4d Tr. 122.)

English ordered the shorter 1.75" slab runners for the bridge deck, and the shorter runners were shipped to English on April 18, 2012. (Pl.'s Ex. 19; 1d Tr. 191; 2d Tr. 35.) English installed them the next day. (1d Tr. 192, Jeffries Dep. 37:21-38:4, 38:19-40:19, 65:23-66:19, 80:9-23.)

### G. English Admits it Knew or Should've Known of a Design Change.

English agreed incorporating the shorter slab runners into B603 "is exactly what caused the problems." (2d Tr. 41-42, 47-48.) Although Frazier admitted the use of shorter slab runners would change the amount of cover on B603, he did not believe the use of the shorter slab runners constituted a design change. (1d Tr. 184-85, 186; 2d Tr. 24-25.) For this reason, Frazier never submitted to AECOM an RFI for a design change. (2d Tr. 42.) Numerous witnesses testified, however, that the use of the shorter slab runners *was* a design change that required an RFI and that only English (not RK&K or CDM Smith) processes RFIs. (1d Tr. 163; 2d Tr. 29-30; 3d Tr. 158-59; 4d Tr. 12, 20, 83; Jeffries Dep. 20:3-5.) CDM Smith agreed. (2d Tr. 87-88.) Frazier conceded

---

[2] Jeffries, who died prior to trial, testified by deposition. His deposition transcript is attached as **Exhibit A**.

he was wrong to have thought reducing the height of the slab runners was not a design change. (2d Tr. 42-43.) And as Mr. Dickerson (English's Senior VP) agreed, consistent with RK&K's expert: Frazier and Hackney "should have been able to look at [the plans] and see" that if shorter slab runners were used it would've resulted in a design change requiring an RFI. (3d Tr. 165; 4d Tr. 83.)

Bernie Davis also testified that his team should report design changes to him. (1d Tr. 151.) Again, this was consistent with RK&K's expert testimony. (4d Tr. 80-81.) Importantly, Frazier testified that Davis was "aware" of use of 1.75" slab runners in B603. (2d Tr. 42.) Frazier agreed that he should've issued an RFI but did not because Clarke said the shorter slab runners met B603's requirements and that an RFI as not needed. (1d Tr. 189.)

### H. English Knows QA and QC Cannot Direct Design Changes to the Plans.

English also knew that the inspectors could not order changes to the Project work to be completed in the field or direct changes to the plans, drawings, or specifications for B603. (2d Tr. 28, 44, 48, 98, 133-34; 3d Tr. 159; 4d Tr. 12, Jeffries Dep. 37:21-24.) Stated differently, Richard Clarke had no authority to issue design change directives to English; as Frazier agreed, English does not "take directives from inspectors." (1d Tr. 86-87, 162; 2d Tr. 28, 48; 3d Tr. 159; 4d Tr. 12.) And as English testified (and RK&K's expert agreed), "even if an inspector tells an English superintendent or the project coordinator to make a design change . . . RK&K, as a QA inspector, . . . can't make that kind of a design change." (3d Tr. 159; 4d Tr. 83.) Only the designer could change B603's design. (1d Tr. 174.) For this reason, English was supposed to insist on written confirmation, like an RFI, for a deviation that involved changing the height of the slab runners. (4d Tr. 83-84.)

Importantly, English's bridge foreman, "Blue" Jeffries, testified (via deposition) that he would not install smaller slab runners – even if directed to do so by an inspector – unless that design change was approved by English's Superintendent, Hackney, or its Project Coordinator, Frazier. (Jeffries Dep. 37:21-38:4; see id. 40:20-24, 65:23-66:19.) Jeffries, whose responsibilities included making sure the rebar was installed correctly and that the placement and spacing of the rebar mats was proper, agreed that "*even if the inspector tells you to do something, you're not doing it until you get permission from somebody above you at English.*" (Id. 5-6, 8, 10, 35-36, 40:20-24; 3d Tr. 167.)

On April 21, QC inspector Niagro notified English superintendent Hackney and foreman Jeffries that "an inspection of the reinforcement steel placement found several deficiencies that required correction." (Pl.'s Ex. 12, 4/21/2012 DWR.) Niagro also told Hackney the rebar placement and deck mat spacing should be rechecked. (Id.; 2d Tr. 76.)

## I.   The April 24, 2012 Dry Runs Show Deficiencies, And English is Aware of Those Deficiencies But Proceeds With the Concrete Pour.

On April 24, Frazier watched the two "dry runs" being performed. (1d Tr. 193; Pl.'s Ex. 9.) Hackney was also present, as were foreman Jeffries and Crouch. (2d Tr. 63, 98; Jeffries Dep. 57:24-58:5.) So was VDOT. (2d Tr. 98; 4d Tr. 26.) QC inspectors Wahba and Niagro were also present, as was QAM Clarke. (2d Tr. 81, 92; 4d Tr. 21, 28.) "It's hectic" when a deck is poured – pump trucks are cranked up, the concrete is pumped onto the deck, trucks are rolling in left and right, the boom comes down, etc. (4d Tr. 27-28.)

Ultimately, the dry run reports, prepared by CDM Smith, reflect various measurements out of specification (items over 9" for Deck Depth and 3.25" for Clearance were excessive). (Pl.'s Ex. 11; 1d Tr. 196-99; 2d Tr. 105-06.) Frazier and Hackney were aware of the various out-of-spec measurements. (2d Tr. 49.) As were Clarke and CDM Smith. (2d Tr. 107.) According to Frazier,

Clarke never noted a problem with these measurements, did not stop English's work, or issue an NCR. (1d Tr. 85, 199.) And even though the QC plan required CDM Smith to report any deficiencies to Gary Galloway and Bernie Davis, it did not do so. (2d Tr. 124-25.) No one told Davis B603 was not built in accordance with the plans and specifications. (1d Tr. 112.)

But the reality is that the April 24 measurements were "brought to everybody's attention, . . . particularly [English]." (2d Tr. 95.) "Everybody heard it." (2d Tr. 129-30.) Davis, English's head guy, wasn't at B603 on April 24, but Hackney and Frazier were present and aware of the nonconformities. In fact, RK&K/CDM presented the measurements to Hackney and told him about the nonconformities. (3d Tr. 16-17; 4d Tr. 24, 56.) Mr. Wahba testified that, while performing the April 24 inspections, he notified English and RK&K that the preliminary measurements for the concrete clearance were above the tolerance in the approved AECOM drawings and the applicable VDOT specifications. (2d Tr. 104-07.) And English's response when made aware of these measurements is critical *and undisputed*.

As Mr. Wahba and Mr. Clarke testified, after the dry runs, Hackney, English's superintendent, told RK&K and CDM Smith that the tolerance for the clearance on the deck could go up to *one inch* (instead of the required ½") and that "it was in the specs. It is allowed." (2d Tr. 127, 130; 3d Tr. 19; 4d Tr. 14.) So, according to English's (incorrect) insistence, the deck thickness could go to 9.5" and the clearance to 3.75". (2d Tr.130; 3d Tr. 19.) Also undisputed is the fact that Clarke, RK&K's QAM, correctly told Hackney English could *not* exceed ½" tolerance, and that English would not get paid if it exceeded this standard. (2d Tr. 130l; 3d Tr. 19; 4d Tr. 14, 24-25.) Hackney stated the problems "would be fixed, and he felt like he had an inch tolerance to play with on it, and he was good to go, and he was going to pour the deck." (4d Tr. 24.)

12

In situations like this where the QAM informed English it was doing things wrong, VDOT (English's boss) "expect[ed] [English] not to do it." (3d Tr. 213.) But English made the conscious decision to proceed with the pour anyway. (4d Tr. 14, 24.) And in doing so it *knew the pour would deviate from B603's required plans*, but proceeded forward at its own risk. (3d Tr. 23-24; 4d Tr. 12.) "[A]t that point the contractor would be proceeding at their own risk if the inspector has told them that something is not within plans and specifications and they decide to move forward anyway." (4d Tr. 86.) Later that night, Clarke called QCM Terry Oliver to inform him of the disputed issue to which Oliver indicated "everything had been checked, good to go, and we're ready to pour." (4d Tr. 25-26, 59.)

Clarke thought it was a good pour. (4d Tr. 53.) So did CDM Smith, which agreed the "inspection, testing, and report documents show" the pour of the deck and the placement of rebar complied with the contract documents as of April 24, 2012. (4d Tr. 121.) For this reason, Clarke didn't issue an NCR to Davis or attempt to stop the pour. (4d Tr. 41-42.) RK&K also executed various checklists certifying that B603's measurements met the contract's plans and specifications. (Pl.'s Exs. 13-14, 16, 18, 22.)

**J.    Construction Defects Alleged by VDOT in July 2012**

In July 2012, VDOT issued its Final Inspection Report for B603, noting that there were certain areas of the bridge, as constructed, where coverage over the top mat of reinforcing steel was in excess of the allowable tolerance. (Pl.'s Ex. 23.) Even so, VDOT permitted traffic to travel on the bridge because both VDOT and English believed it was safe to do so. (1d Tr. 125-26, 140, 164.)

By September 21, 2012, VDOT issued a report indicating that "QA/QC personnel do not appear able to inspect the work correctly given that noncompliant work was accepted." (Pl.'s Ex.

28 at 1.) VDOT also concluded the "bridge deck was installed incorrectly and errors in reinforcing steel placement were not brought to the attention of the Design-Builder or VDOT by the QC or the QA staff prior to the placement of concrete." (Id. at 6.) That same day, RK&K issued an NCR. (Pl.'s Ex. 29.) English tried to convince VDOT B603 was acceptable as built, but VDOT instructed English to remove and replace the bridge deck on April 5, 2013. (Pl.'s Ex. 34 at 2.) English continued to fight VDOT's instruction, and only after VDOT threatened English with default in August 2013 did English finally begin to remove and replace the deck. (1d Tr. 145-47.) English finished reconstruction of B603 and achieved substantial completion on December 21, 2013. (1d Tr. 147-48.) English did not achieve final completion until 2014. (Id. 148.)

### K.    The Jury Verdict

English sought $2,837,271 in total damages against RK&K. (Pl.'s Ex. 53.) The jury awarded English $1,986,089.70 (or 70% of English's demand), plus prejudgment interest from June 24, 2014, and attorneys' fees. (Dkt. 219.)

## III.    STANDARD OF REVIEW

### A.    Judgment as a Matter of Law

"On a renewed motion for judgment as a matter of law, a court must affirm a verdict [i]f, viewing the facts in the light most favorable to the non-moving party, there is sufficient evidence for a reasonable jury to have found in the non-moving party's favor." First Union Commercial Corp. v. GATX Capital Corp., 411 F.3d 551, 556 (4th Cir. 2005). The Court should grant the motion, however, if it "determines, without weighing the evidence or considering the credibility of the witnesses, that substantial evidence does not support the jury's findings." S. Atl. Ltd. P'ship of Tenn., L.P. v. Riese, 284 F.3d 518, 532 (4th Cir. 2002).  The Court is "not a rubber stamp convened merely to endorse the conclusions of the jury, but rather [has] a duty to reverse the jury

14

verdicts if the evidence cannot support it." Price v. City of Charlotte, 93 F.3d 1241, 1250 (4th Cir. 1996).

### B. Motion for a New Trial

The standard governing motions for a new trial pursuant to Rule 59 is significantly different from that governing motions for judgment as a matter of law. Under Rule 59(a), a new trial will only be granted in three circumstances: (1) if the verdict is against the clear weight of the evidence; (2) is based upon false evidence; or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict. Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 301 (4th Cir. 1998). In considering a motion for a new trial, this Court may weigh the evidence and consider the credibility of the witnesses. See, e.g., Knussman v. Maryland, 272 F.3d 625, 647 (4th Cir. 2001).

## III.   ARGUMENT

### A. THE EVIDENCE DOES NOT SUPPORT THE JURY'S CONCLUSION THAT ENGLISH WAS ENTITLED TO $1,986,089.70 IN DAMAGES OR INDEMNIFICATION FROM RK&K.

#### 1. It is Undisputed That But For English's Failure to Process an RFI, "We Wouldn't Be Here Today."

In deciding whether to grant a new trial, this Court must "exercise[] his own independent judgment," weigh all of the evidence and the credibility of the witnesses, and determine "whether the verdict was against the clear weight of the evidence and is unfair" or "would result in a miscarriage of justice." See Gill v. Rollins Protective Servs. Co., 773 F.2d 592, 595 (4th Cir. 1985); Williams v. Nichols, 266 F.2d 389, 392 (4th Cir. 1959). Under this standard, the verdict must be vacated.

It is undisputed that English was required to build B603 per the contract plans and specifications. It is equally undisputed that English failed to do so. English has always maintained

15

that the directive to use smaller bar supports is what forced it to remove and replace B603. English's witnesses also agreed that (i) English processes RFIs, (ii) the use of 1.75" slab runners constituted a design change to B603's plans (Jeffries Dep. 19:1-20:5 ("you are going to have too much coverage on top of the rebar")), (iii) English should have sent an RFI to AECOM seeking permission to use the 1.75" slab runners, and (iv) but for this failure to act, B603 never would have been built out of specification. As Bernie Davis (English's Project Manager), Dylan Frazier (its Project Coordinator), Frank Gee (its expert), Wilson Dickerson (its Senior Vice-President), and RK&K's expert all agreed, English "wished" it had sent an RFI to AECOM and that "we wouldn't be here today" had one been processed. (1d Tr. 160-61; 2d Tr. 44, 168; 3d Tr. 12, 157, 159; 4d Tr. 78.) CDM Smith testified that English's work product deviated from the project requirements. (4d Tr. 121.) English never proffered an expert to say its conduct met its standard of care. In fact, English repeatedly conceded it bore responsibility for the demolition and replacement of B603. (3d Tr. 158.) That's why English's expert believed English acted poorly and "did things that they should not have done and things they should have done they probably wish they had done," particularly in not securing an RFI from AECOM. (2d Tr. 168; 3d Tr. 12.) These failures constituted "acts or omissions" for purposes of the QA Subcontract absolving RK&K from liability. (4d Tr. 78-79, 80-81, 86.)

The significance of this omission cannot be understated. English admits it should've known a change to shorter slab runners was a design change. It knew QAM Richard Clarke could not make changes to B603's design. And it knew it should've processed an RFI. English's failure to process the RFI was the "but for" cause of its claimed damages. Had English sent an RFI to AECOM asking for approval to use the shorter slab runners, one of two things would've happened: either (1) AECOM would've approved the design change, in which case English's losses would

fall squarely on AECOM's shoulders (and no one else's), or (2) AECOM would've rejected the RFI and the shorter slab runners never would have been incorporated. (2d Tr. 43-44; 4d Tr. 21.) Either way, as so many English witnesses testified, "we wouldn't be here today." (2d Tr. 43-44.)

When a party agrees an event would not have occurred "but for" a specific act, it means the event "would not have occurred in the absence of the alleged wrongful action or actions of the" defendant. See, e.g., Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013); Burrage v. United States, 571 U.S. 204, 211 (2014). Virginia follows this "but for" rule of proximate causation. E.g., Marchant v. Boddie-Noell Enterprises, Inc., 344 F. Supp. 2d 495, 497 (W.D. Va. 2004). So when multiple witnesses testify that B603 wouldn't have been demolished but for English's failure to issue an RFI, it's a concession that English would not have suffered harm had it done what it was supposed to do. It makes little sense, then, that the jury heard this undisputed evidence and randomly concluded English bore responsibility for only a fraction of its claimed damages. That is the very definition of a miscarriage of justice.

### 2. English Poured B603 Knowing It Would Not Meet the Plans and Specs.

The failure to issue an RFI was not English's only mess up. It is undisputed the dry run measurements were out of tolerance. And the undisputed evidence is that English *knew* of the incorrect measurements and chose to proceed with the deck pour anyway. Indeed, the dry/wet reports constitute documentation that RK&K and CDM Smith recorded errors and reported them to English. English made much of the fact at trial that QAM Clarke didn't tell English's PM, Davis, about the incorrect measurements, issue an NCR, or flag the problem in an issue log. But Frazier testified that Davis "*was aware of the [shorter slab runner] issue*." (2d Tr. 42.) Sure, Clarke could've shut the work down. But English *also* knew about the measurements, *also* had authority to shut the work down, and chose to proceed with the pour anyway. Frazier, Hackney, Crouch, and

Jeffries were all aware of the measurements. (1d Tr. 193; 2d Tr. 98.) In fact, the CDM witnesses English called at trial, Niagro and Wahba, testified the measurements were "brought to everybody's attention, . . . particularly [English]," and that "everybody heard it." (2d Tr. 95, 129-30.). So even if Davis did not know of the measurements (even though Frazier testified that he did), *English, as a company, did know*. See Instruction, 4d Tr. 138-39; Rudolph v. Farmers' Supply Co., 131 Va. 305, 310-311 (1921); Magco of Md., Inc. v. Barr, 33 Va. App. 78, 84 (2000) (recognizing the "longstanding principle in the Commonwealth that a foreman's knowledge of facts or events on a worksite is imputed to his employer").[3] No reasonable juror could conclude English remained in the dark about the out-of-spec measurements.

The uncontradicted evidence also proved that RK&K presented the measurements to Hackney and told him they were nonconforming. (3d Tr. 16-17; 4d Tr. 24, 56.) Hackney, of course, never testified, so his statements are undisputed admissions by English. Hackney told RK&K and CDM that an extra ½" of tolerance "was in the specs" and "allowed." (2d Tr. 127, 130; 3d Tr. 19; 4d Tr. 14.) He was wrong and RK&K told Hackney he was wrong. When made aware of the incorrect measurements, English's expert conceded Hackney could have stopped the pour, but did not. (3d Tr. 19-20.) Instead, Hackney ignored Clarke and said, "he was good to go, and he was going to pour the deck." (2d Tr. 130l; 3d Tr. 19; 4d Tr. 14, 24-25.) The undisputed testimony, then, is that English's bridge superintendent made the conscious decision to move forward with the concrete pour for B603, despite admonitions that the clearance measurements indicated that

---

[3] "[I]t is the duty of an agent to communicate facts material to the interests of his principal of which he has notice or knowledge arising from or connected with the subject-matter of his agency, and upon grounds of public policy it is presumed he has communicated such facts to his principal; but, if he has not, still, the principal having intrusted the agent with the particular business, the other party has the right to deem the agent's knowledge obligatory upon his principal, otherwise the neglect of the agent might operate most injuriously to the rights and interests of such party." Traders' & Truckers' Bank v. Black, 60 S.E. 743, 745 (Va. 1908).

correction was required before the bridge deck could be poured. VDOT expected English not to pour the deck when confronted with the nonconforming measurements, but English ignored the QAM and proceeded with the pour *at its own risk*. (3d Tr. 213; 4d Tr. 14, 24.) Again, all of this is undisputed.

So, yes, the jury concluded RK&K made some mistakes, but here's where the QA Subcontract's language is important. RK&K is responsible to the extent its negligence has "*directly* caused" English's damages. But, and this is critical, RK&K is *not* responsible to the extent English's own acts/omissions cause – whether directly *or* indirectly – its own damages. (Pl.'s Ex. 2 ¶ 11.) The differences in the language matters. RK&K's conduct must've been more than *a* cause of or *related to* the loss. And no reasonable jury could've concluded, based on all of this unrefuted evidence, that RK&K *directly* caused $1.9 million in damage attributed to B603's demolition and replacement. This is particularly true given the QA Subcontract's command that "RK&K is not responsible for [English's] failure to perform the construction work in accordance with the Construction Documents." (Pl.'s Ex. 2, *Standard Terms* ¶ 7.) Again, the jury's allocation constitutes a miscarriage of justice and warrants a new trial.

### 3. The Jury Verdict Is Inconsistent with Others' Faults, Particularly That of CDM Smith and VDOT, for Which RK&K is Not Responsible.

Virginia juries cannot "speculate on either the cause or the amount of damages." Parkridge Phase Two Associates v. Lockheed Martin Corp., 172 F.3d 44 (4th Cir. 1999). "If the proof is too uncertain to allow a jury to apportion the part for which the defendant is responsible, the issue should not be submitted to the jury." Carr v. Citizens Bank & Trust Co., 228 Va. 644, 652 (1985). The QA Subcontract makes clear that RK&K is not responsible for the "acts of omissions of [English] *or its subcontractors*." (Pl.'s Ex. 2 at § 11.) CDM Smith, in the role of QC, was one such subcontractor. And English conceded CDM caused B603 to be built incorrectly. *First*, English

accused CDM Smith of "directing" it to use shorter slab runners. (Pl.'s Ex. 35 ("Since CDM

Smith's QC representative Khairy Wahba was involved and supported Richard's decision, I am

placing some of the responsibility on them also[.]"); Jeffries Dep. 18:17-22:9.) English sought

summary judgment against CDM. (Dkts. 57, 72.)

*Second*, the evidence showed CDM was aware of the incorrect measurements on the dry

runs but didn't report those deficiencies to English's Galloway or Davis. (2d Tr. 107, 124-25.)

English's expert testified on direct that CDM Smith was at fault for "not documenting things

properly in their record keeping." (2d Tr. 168.) English agreed, testifying unequivocally that

"CDM Smith didn't meet its quality control obligations that were owed to English" and that "those

failures by CDM Smith contributed, ultimately, to the bridge deck being taken down as well." (3d

Tr. 160.) As English's Senior Vice-President testified, "I felt like they had responsibility." (3d Tr.

165.) Further, English's expert, Gee, was retained to say RK&K *and* CDM Smith breached the

standard of care, and he concluded RK&K *and* CDM were jointly liable for whatever losses

English incurred (3d Tr. 7.) Here again, however, RK&K is not responsible for CDM's

contributions to English's claimed losses, and there was no accounting, allocation, or explanation

for how CDM's undeniable fault factored into the jury's damages award (or did not).

English also pursued a claim against VDOT for its role in the bridge takedown because

English believed "that with [VDOT] up there at the bridge that maybe they should bear some

responsibility." (3d Tr. 163-64.) When English accused VDOT of wrongdoing, it didn't blame

RK&K for any of the liquidated damages or disincentives VDOT had imposed. (3d Tr. 164.)

Indeed, English's delay expert (Ott) testified that his original opinions on which his trial testimony

was based said *VDOT* was to blame for the delays. (3d Tr. 60-63.) And this is a problem because

English's $2.8 million damages claim did not segregate out RK&K's purported responsibility from

that of English, CDM Smith, or VDOT. (3d Tr. 162.) Mr. Ott admitted he could not offer an opinion as to who was at fault (or apportion fault) for the delays leading to the imposition of liquidated damages and disincentives. (3d Tr. 60-63.) RK&K's expert (Bocock) did just that. (4d Tr. 96-97.)

To this end, <u>Hale v. Fawcett</u>, 214 Va. 583 (1974), is instructive. There, Fawcett sued for damage to his corn crop allegedly caused by adjoining landowner Hale's trespassing hogs and cattle. On Hale's property line, Hale had built a concrete cattle guard in line with an existing division fence. <u>Id.</u> at 584. The gate which extended over the cattle guard became damaged at some point and would not close, leaving an opening between the guard and the gate post. <u>Id.</u> at 585. Hale's pigs and cattle had been crossing through this opening, but there was also evidence that his livestock had entered Fawcett's farm through other breaks in the division fence "which were located 25 to 100 feet from the area of the cattle guard and the gate." <u>Id.</u> The jury returned a verdict for Fawcett but the Supreme Court of Virginia reversed, holding that while cattle caused 75% of the damage to Fawcett's crops, "there is no evidence that the defendant's cattle entering the field through the narrow space between the cattle guard and the gate post caused all of that damage." <u>Id.</u> at 586. Because Hale's cattle also entered Fawcett's farm "through and over the division fence, and the defendant was not responsible for the damage caused by the cattle so entering," Fawcett "did not prove with reasonable certainty that part of damages for which the defendant could be held responsible." <u>Id.</u> In short, judgment should have been entered for Hale because the "proof was too uncertain to allow a jury to apportion part of all of the proved damages to the acts for which defendant was responsible." <u>Id.</u>

The same result applies here. English was required to prove its damages with reasonable certainty and the cause from which they resulted. <u>Id.</u> at 585. It could not recover from RK&K for

the actions of CDM Smith. And it cannot recover at all "where speculation or conjecture must be resorted to in order to determine what caused the damage complained of." Id.

> When there is evidence of damage from several causes, as to a portion of which a defendant cannot be held liable, the burden is on a plaintiff to present evidence which will show "within a reasonable degree of certainty" the share of damages for which a defendant is responsible.

Id. at 586 (citations omitted). Here, there was plainly evidence of damage from several causes, including English, CDM Smith, VDOT, and RK&K. But RK&K was only responsible for its own negligent acts that "directly caused" English's losses, not the acts or omissions of others. As in Hale, "[n]o evidence was produced to enable the jury to form a reasonable estimate of what portion of the damage was" directly caused by RK&K's negligence "and what portion was caused by" the acts and omissions of others. Id. "Since the plaintiff did not prove with reasonable certainty that part of damages for which the defendant could be held responsible, the proof was too uncertain to allow a jury to apportion part or all the proved damages to the acts for which the defendant was responsible. Hence the issue should not have been submitted to the jury." Id.; Parkridge Phase Two Assocs. v. Lockheed Martin Corp., 172 F.3d 44, at *2-4 (4th Cir. 1999).

In short, there was no evidence as to how English's claimed damages should've been apportioned; the jury was simply left to speculate and arbitrarily allocated $1.986 million in responsibility to RK&K despite all of the evidence of English's fault – and, just as importantly, that of others (like CDM Smith and VDOT). Given all of the above, English failed to prove "*with reasonable certainty the amount of damages and the cause from which they resulted*; speculation and conjecture cannot form the basis of the recovery." Collelo v. Geographic Servs., Inc., 283 Va. 56, 72 (2012). The jury here did exactly what RK&K warned the Court the jury would do – throw a number up in the air. (3d Tr. 175.) This error warrants a new trial.

22

**4. The Verdict Doesn't Fit English's Comparative Negligence Theory.**

Throughout, English has argued the QA Subcontract provided for a comparative negligence-style theory of responsibility under which RK&K was responsible to the extent it directly caused English's losses, but not to the extent English, its subcontractors, or others caused English's damages. But the verdict and instructions were inconsistent with English's theory. To start, English claimed RK&K was jointly and severally liable with CDM Smith for English's damages. (3d Tr. 7.) But, the joint and several liability doctrine is inconsistent with the principles of comparative fault because with the latter, it requires a wrongdoer to pay for more damages than he caused or for which he was responsible and therefore makes him responsible for others' actions in addition to his own. The underlying theory of comparative fault, by contrast, "is founded on attaching liability in direct proportion to the respective fault of each person whose negligence caused the damage." Laubach v. Morgan, 588 P.2d 1071, 1075 (Okla. 1971). Comparative fault renders joint and several liability "obsolete." McIntyre v. Balentine, 833 S.W.2d 52, 58 (Tenn. 1992).

The potential injustice of combining joint and several liability with comparative negligence clearly occurred here. English presented, and was permitted to present, 100% of its damages even though it was undisputed that RK&K was not liable for 100% of those damages. Permitting 100% of damages to be presented to the jury perhaps makes sense under a contributory negligence theory where defendants are jointly and several liable for 100% of a plaintiff's damages, but not under a comparative negligence theory where defendants are only responsible for their proportionate share. It is not difficult to see the injustice created in this case when you consider that English settled two disputes arising out of this issue– with VDOT and CDM – and still presented 100% of its damages to the jury. Indeed, English assuredly has double and even tripled dipped by presenting 100% of

its damages when it admits that portions of those damages were also due to CDM Smith, AECOM, VDOT, and even English itself.

For comparative fault to work, the jury must apportion responsibility among all parties *and non-parties* that "caused or contributed to the injury or damage for which recovery is sought." Id. And a jury's failure to apportion fault necessitates a new trial. See e.g., Oden v. Steel Erecting, Inc., 31 P.3d 806 (Ariz. 2001) (remanding case for new trial where jury failed to apportion any fault to non-party despite stipulation that non-party proximately caused the injuries); Meyer v. Estate of Swain, 763 P.2d 337 (Nev. 1988) (where drunken motorcyclist struck and killed drunken pedestrian on a dark road, holding that the motorcyclist was completely negligent and the pedestrian zero percent negligent was clearly wrong, irrational, and manifestly unjust, requiring retrial); Korleski v. Lane, 102 N.W.2d 234 (Wis. 1960) (apportionment of fifty percent of negligence to the plaintiff for excessive speed was not supported by the evidence and required a new trial). For a jury to apportion responsibility among all parties and non-parties as required under a comparative negligence theory, English needed to present sufficient evidence to allow the jury to apportion fault without speculating. By presenting 100% of its damages and presenting no evidence regarding apportionment of fault among the admittedly responsible parties and non-parties, English failed to meet its burden.

Here, the jury did not find the percentage of fault attributable to the parties and non-parties. This highlights the error of English failing to present evidence regarding the proportionate fault. It makes it impossible to know if and how the jury apportioned fault or to determine the impact that English improperly presenting excessive damages had on the jury verdict. English also never met its burden to see the jury was properly instructed as nothing in the verdict apportions responsibility among any of the entities that allegedly contributed to English's claimed damages –

CDM Smith, VDOT, RK&K, and English itself. As a result, the amount of damages assigned to RK&K is simply against the weight of the evidence and contrary to the admissions and unrebutted evidence of English's, CDM Smith's, and VDOT's comparative fault.

## B. THE JURY'S DAMAGES AWARD IS EXCESSIVE AND ERRONEOUS FOR MULTIPLE REASONS.

### 1. The Court Should Vacate the Award of Prejudgment Interest as a Matter of Law.

Virginia permits a jury discretion to "provide interest on any principal sum awarded, or any part thereof, and fix the period at which the interest shall commence." Va. Code § 8.01-382. To this end the jury was told it possessed discretion to award prejudgment interest if it found in English's favor and awarded damages. (4d Tr. 139.) VDOT fixed final completion as June 24, 2014, (Pl.'s Ex. 51), and this is the date the jury apparently decided prejudgment interest should commence on the $1,986,089.70 damage award. This results in more than $839,000 in prejudgment interest to English. Respectfully, the jury abused its discretion and the award must be set aside to prevent manifest injustice.

"Virginia law governs the award of prejudgment interest in a diversity case." BioVeris Corp. v. Wohlstadter, 69 F. Supp. 3d 574, 581 (W.D. Va. 2014). In exercising its discretion, the factfinder should hesitate to award prejudgment interest in a case where, as here, "the problems arose over the interpretation of a contract, prejudgment interest is high, and both parties acted in good faith." Cont'l Ins. Co. v. City of Virginia Beach, 908 F. Supp. 341, 349 (E.D. Va. 1995) (citing Hewitt v. Hutter, 432 F. Supp. 795, 800 (W.D. Va. 1977); McDevitt & Street Co. v. Marriott Corp., 754 F. Supp. 513, 515 (E.D. Va. 1991)). Indeed, when "the dispute between the parties involved a genuine legal question that the parties were entitled to litigate, and that neither party appears to have acted in bad faith," prejudgment interest should not be awarded. Int'l Fid. Ins. Co. v. W. Virginia Water Auth., 2012 WL 4503191, at *7 (W.D. Va. Sept. 28, 2012) (citation omitted).

As this Court has held, equity counsels against "penaliz[ing] the defendants for exercising their right to litigate any bona fide legal questions . . . by imposing on them an obligation to pay a large sum of prejudgment interest."  Hewitt, 432 F. Supp. at 800; see also Moore Bros. Co. v. Brown & Root, Inc., 207 F.3d 717, 727 (4th Cir. 2000) (factfinder should "weigh the equities in a particular case to determine whether an award of prejudgment interest is appropriate.").

Here, the jury abused its discretion and was not properly instructed on the factors in determining whether to award prejudgment interest.[4] This is the very type of case courts routinely conclude are not suitable for prejudgment interest. *First*, English accused RK&K of wrongdoing concerning B603 more than eight years ago, in April 2013. (Pl.'s Ex. 35.) English achieved substantial completion in December 2013. (3d Tr. 54-55.) But for reasons known only to English, it did not file suit against RK&K and CDM until more than three years later, on January 12, 2017. Thereafter, the parties engaged in significant discovery, and trial was scheduled for the spring of 2018. (Dkt. 32.) In January 2018, the parties filed cross-motions for summary judgment after which the Court granted RK&K and CDM Smith's motions, denied English's motion, dismissed the case, and entered a Final Order on April 3, 2018. (Dkt. 107.) English appealed to the Fourth Circuit, which reversed on August 14, 2019. (Dkt. 117.) On remand, trial was rescheduled for April 27, 2020. (Dkt. 121.)

---

[4] RK&K objected to the jury being instructed on and determining prejudgment interest because, as a matter of law, it would be an abuse of discretion to award such interest. (3d Tr. 220-21.)  RK&K further requested that if the jury was instructed on prejudgment interest, it should've been told of the factors it could consider in deciding whether to award that interest. (Id.) RK&K included the following in its proposed instruction: "Generally, prejudgment interest should not be awarded when the dispute involves the interpretation of the contract, the prejudgment interest amount is high, and both parties acted in good faith." (4d Tr. 119-120.) The court refused RK&K's proposed instruction.

Then COVID-19 hit. National and state emergencies were declared to prevent the virus's

spread. On March 16, 2020, Chief Judge Urbanski issued Standing Order No. 2020-5 that, in part,

continued all civil jury trials. That same day, English sought a stay of all proceedings. (Dkt. 153 ¶

6.) As the pandemic raged on, the parties' settlement conference with Magistrate Judge Ballou was

repeatedly pushed back, finally occurring on April 15, 2021. The mediation proved unsuccessful,

though CDM would later settle with English. The jury trial commenced on June 7, 2021 and

concluded on June 10, 2021—nearly *two years after* the Fourth Circuit remanded the case, *nearly*

*4½ after* English instituted its lawsuit, and *7 years after* the jury determined prejudgment interest

should commence. It is simply unjust, inequitable, unfair, and wrong for RK&K to be held

responsible for seven years of prejudgment interest totaling more than $839,000 when the delays

occurring during that time were due to circumstances beyond RK&K's control. See Farmville Inv.

Grp., LLC v. Prospect Homes of Richmond, Inc., 79 Va. Cir. 69 (2009) (denying prevailing party's

request for prejudgment interest "because this dispute has taken more than two years to progress

from the date of filing until the trial" and "where the prevailing plaintiff participated in the delay").

*Second*, the parties' dispute involved a genuine, good faith disagreement over the

interpretation of contract language. See Reid v. Ayscue, 246 Va. 454, 459 (1993) (affirming denial

of prejudgment interest because "a legitimate controversy existed" and the "delay in resolving that

issue was not attributable to the parties, but involved, among other things," issues beyond their

control (the presiding judge's death); Atl. Builders Group, Inc. v. JAK Construction, Inc., 34 Va.

Cir. 282, 285 (1994) ("In view of the conflicting nature of the evidence as to C&I's performance

of its obligations, Plaintiff's request for prejudgment interest will be denied").

In fact, RK&K originally prevailed on its motion for summary judgment based on its

argued interpretation of the QA Subcontract's language. Of course, the Fourth Circuit ultimately

saw the matter differently, concluding that the interpretation should be the decided by the jury. But no one can seriously contend RK&K acted in bad faith in pursuing its contractual arguments; rather, it insisted upon litigating the meaning of contractual language with which even the federal courts disagreed. That the jury found against RK&K does not diminish RK&K's *bona fides* in contesting English's claims, making prejudgment interest inappropriate. And as this genuine dispute was litigated and appealed, years passed, and the dispute was only further compounded by the delays caused by COVID-19. Given these undisputed facts, it makes no sense to hold RK&K responsible for more than $839,000 in interest on top of the jury's $1.9 million damages award and English's likely request for $1 million in attorneys' fees.

As this Court has previously held, it's unfair to penalize a party for exercising its right to litigate *bona fide* legal questions arising under a contract. <u>Hewitt</u>, 432 F. Supp. at 800. Awards of prejudgment interest must not result in over-compensation of the plaintiff, <u>Wickham Contracting Co. v. Loc. Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO</u>, 955 F.2d 831, 834 (2d Cir. 1992), which is what will happen here should the award be upheld. We also cannot forget that English admitted its wrongdoing at trial, which is another factor weighing against an award of prejudgment interest. <u>McDevitt & St. Co. v. Marriott Corp.</u>, 713 F. Supp. 906, 937 (E.D. Va. 1989) (interest not warranted because party claiming interest was at fault), <u>rev'd on other grounds,</u> 911 F.2d 723 (4th Cir. 1990).

This Court long ago held that fairness and equity are the principal considerations underlying an award of prejudgment interest. <u>City of Danville v. Chesapeake & O. Ry. Co.</u>, 34 F. Supp. 620, 638 (W.D. Va. 1940). Accordingly, prejudgment interest "is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness." <u>Id.</u> (citing <u>Bd. of Cty. Commissioners v. United States</u>, 308 U.S. 343, 352 (1939)). In

order to correct a clear error of law and prevent manifest injustice – indeed, to uphold basic fairness and to avoid unnecessarily penalizing RK&K– the prejudgment interest award must be vacated.

### 2. The Jury Verdict Was Excessive and Requires a New Trial or Remittitur.

In evaluating the alleged excessiveness of a jury's compensatory damages award, this Court "sitting in diversity must apply state law standards." Konkel v. Bob Evans Farms Inc., 165 F.3d 275, 280 (4th Cir. 1999) (citing Gasperini v. Ctr. For Humanities, Inc., 518 U.S. 415, 430–31 (1996)). In Virginia, "[w]hen a verdict is challenged on the basis of alleged excessiveness, a trial court is compelled to set it aside 'if the amount awarded is so great as to shock the conscience of the court and to create the impression that the jury has been motivated by passion, corruption, or prejudice, or has misconceived or misconstrued the facts or the law, or if the award is so out of proportion to the injuries suffered as to suggest that it is not the product of a fair and impartial decision.'" Hughston v. New Home Media, 552 F. Supp. 2d 559, 564 (E.D. Va. 2008) (citing Shepard v. Capitol Foundry of Virginia, Inc., 262 Va. 715 (2001)). Further, while there is no specific provision for remittitur under the Federal Rules, "it is well established that a remittitur should be ordered when a jury award will result in a miscarriage of justice." Hughston, 552 F. Supp. 2d at 564 (citation omitted). Under the practice of remittitur, "the trial court orders a new trial unless the plaintiff accepts a reduction in an excessive jury award." Id.

The Court should order remittitur or grant a new trial. Indeed, the undisputed facts establish that "but for" English's own failure to request an RFI weeks before the bridge deck was poured, this case would never have been filed. English conceded it bore responsibility for the errors in the bridge deck. The undisputed evidence also proved CDM Smith bore responsibility for the defects in the bridge deck. Moreover, the QA Subcontract provided that RK&K was not responsible for English's failure to build per plans and specs and that RK&K was only required to indemnify "to

the extent *directly caused* by the negligence of [RK&K] but not to the extent caused by the acts or omissions of [English] or its subcontractors or consultants of any tier." (Pl.'s Ex. 2 at § 11.)

In the face of English's admissions over and over that "we would not be here today" but for English's failure to submit an RFI,[5] it is impossible to conclude that the damages were "directly caused" by RK&K and were not caused "by the acts or omissions of English or its subcontractors." English admitted that its acts and omissions caused the problem. Not only this, the undisputed evidence established that English's bridge superintendent, Matthew Hackney, was informed of the excessive coverage on the deck after the initial dry runs, but insisted that the pour go forward. (2d Tr. 127:3-20, 128:20-131:10.)

English knew of the non-conformities in B603, RK&K informed Hackney that he did not have a one-inch tolerance, and Hackney insisted he was correct and proceeded with what was later determined to be an incorrect pour. The jury simply ignored this undisputed testimony, ignored the contract language and the admissions of English, and somehow awarded English $1.96 million in damages. The size of this award and its assignment to RK&K in the face of evidence that English was responsible for the majority of the fault, and that its subcontractor CDM Smith was also at fault, is an amount that shocks the conscience and leaves only one conclusion: the jury "has misconceived or misconstrued the facts or the law." Hughston, 552 F. Supp. 2d at 564.[6] Because

---

[5] Bernie Davis, the design-build project manager for English, testified, "I wish they [English] would have sent an RFI because it would have never happened." (1d Tr. 153.) Dylan Frazier agreed that "we wouldn't be here today" if an RFI had been filed. (2d Tr. 44.) Wilson Dickerson, English's senior vice-president on the project, also agreed. (3d Tr. 159.)

[6] This is also true with respect to English's "delay" damages, particularly where English's scheduling expert (Ott) could not apportion the delay damages amongst those involved. See Driggs Corp. v. Commonwealth, 1996 WL 1065551, at *4 (Va. Cir. Ct. 1996) (denying 389 days of claimed compensable delay that could not be apportioned to VDOT). In fact, Ott apportioned the delays to *VDOT*, not RK&K or CDM. (3d Tr. 60-63.) Where construction delays arise out of multiple causes, expert apportionment is vital to avoid speculation and to ensure an objective nexus between delays and the party to whom the plaintiff assigns those delays. See Techdyn Sys. Corp.

the jury award will result in a miscarriage of justice, this Court should order a new trial unless English accepts a reduction in that award.[7]

> ### i. English's $228,089.73 "Extended Home Office Overhead" Is Based on Unsupported Assumptions and Speculation.

English's treasurer testified as to English's "extended home office overhead." (3d Tr. 72.) He said English used the "Eichleay Formula" to calculate $228,089.73 in overhead damages. (Pl.'s Ex. 61.) But there are three problems with this calculation. First, English presented no evidence that it "could not have recouped its home office overhead from other revenue-producing work," a necessary element of an overhead damages claim. Commonwealth v. AMEC Civ., LLC, 280 Va. 396, 423 (2010). In other words, for English's "extended overhead" projections to make sense, one must assume English could not have recouped that overhead from other revenue-producing work. English never addressed whether such recovery was even possible. Moreover, English never established (other than through a mathematical calculation) that its "extended overhead" expenses were attributable to the delays or incurred because of the delays. There was no evidence that the delays actually increased English's total overhead costs, and there was no evidence that English's actual overhead costs were unavailable. Therefore, English was not entitled to its claimed "extended home office overhead."[8]

---

v. Whittaker Corp., 245 Va. 291, 295, 297-98 (1993) (affirming delay damages where delay claim arose out of multiple causes and scheduling expert analyzed and apportioned delays among the general contractor, subcontractor, and the Air Force). That wasn't done here. Without a scheduling analysis tailored toward RK&K's conduct, English did not meet its burden of proving compensable delay.

[7] The $5,000 in daily "Disincentives," (3d Tr. 121; Pl.'s Ex. 52 at ¶ 4), assessed on top of two sets of liquidated damages, is an unenforceable penalty. English never raised that argument to VDOT and it is unfair for RK&K to be "stuck" with this daily rate when it was not allowed to participate in the settlement negotiation with VDOT that resulted in the disincentives passed down to RK&K.

[8] The Eichleay Formula "has been criticized as an inadequate substitute for direct evidence of the actual amount of damages and no less speculative than other unsupported opinion evidence simply

Second, and as English agrees, the home office overhead calculation assumes English is not responsible for *any* of the B603 delays. (3d Tr. 75-76.) English's evidence failed to allocate the damages between extra work allegedly caused by RK&K and extra work resulting from delays alleged not to be RK&K's responsibility (i.e., attributable to CDM Smith, English, AECOM, or others). E.g., Hale v. Fawcett, 214 Va. 583 (1974) (reversing judgment for plaintiff in negligence action when there was evidence of damages from separate causes, as to a portion of which defendant was not responsible; the Supreme Court of Virginia held plaintiff failed to prove with reasonable certainty the share of the damage for which defendant could be held liable).

### ii. RK&K Is Entitled to a Credit for the Amount English Received as Part of the CDM Settlement.

As the Court knows, English settled its virtually identical claims against CDM Smith prior to trial. Va. Code § 8.01-35.1(A)(1) provides that, in a multi-defendant situation, "any amount recovered against the other person or any one of them" in a settlement "shall be reduced by any amount stipulated by the covenant or release, or in the amount of the consideration paid for it, whichever is greater." Thus, RK&K is entitled to a setoff in the amount English received from CDM Smith in its settlement with English. Selective Way Ins. Co. v. Schulle, 2014 WL 462807, at *2 (W.D. Va. Feb. 5, 2014).

CDM paid English $100,000 to settle English's lawsuit. (Def.'s Ex. 49.) But, "[t]he amount of consideration paid for a settlement is a matter for the trial court to consider in applying Code § 8.01–35.1." William H. Gordon Assocs., Inc. v. Heritage Fellowship, United Church of Christ, 291 Va. 122, 149 (2016). That is because "Code § 8.01–35.1 expressly indicates that there can be a difference between what is 'stipulated' on the face of a settlement agreement and the amount of

---

because it was cast in a mathematical milieu." Fairfax Cty. Redevelopment & Hous. Auth. v. Worcester Bros. Co., 257 Va. 382, 390 (1999).

consideration actually attributable to a particular category of exposure." Id. Thus, in looking at CDM Smith's Counterclaim, it had an unpaid bill of $329,660 and had calculated interest on that bill at the contract rate into 2017 when the Counterclaim was filed. The interest on that sum was $146,517. CDM also had a bill for one month services post-completion in the amount of $135,481 for Nov-Dec of 2013 services. Applying a 6% interest rate on that number for approximately 7 years results in an additional $114,000. Calculating the interest on the $329,660 for 4 years from 2017-2021 leads to an additional $158,000. At the end of the day, the charges would be $465,141 and the interest would be approximately $418,517, so RK&K's credit will be approximately $883,658 plus the $100,000 cash component, which results in a total credit of $983,658.[9]

## C. THE COURT DID NOT PROPERLY INSTRUCT THE JURY.

RK&K proposed two jury instructions that the Court erroneously denied. First, RK&K proposed an instruction that would have properly informed the jury that English, and not RK&K, was responsible for the negligence of CDM Smith:

> RK&K is not responsible for CDM Smith's failure to perform in accordance with its contractual obligations to English. CDM Smith was a subcontractor of English, and pursuant to English's QA Contract with RK&K, RK&K is not liable for the acts and omission of English or English's subcontractors.

(Dkt. 197, Proposed Instruction 30.) RK&K also requested the jury be informed of the black letter law in Virginia that a party who commits the first material breach is not entitled to enforce the contract:

---

[9] In light of its settlement with CDM which occurred shortly before trial, the Court should have precluded English from requesting from the jury the full amount of damages English claimed it was owed at trial ($2.83 million), see Pl.'s Ex. 53, because English had already been compensated for some of those damages. Here again, English's *joint and several liability* theory throughout the case (under which RK&K would be responsible for 100% of the damages with CDM Smith) does not square with the *comparative fault* theory English advanced at trial (under which RK&K would only be responsible for its portion of the damages, but not that of others).

> When the first breaching party commits a material breach, that party cannot enforce the contract. A material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract. If the initial breach is material, the other party to the contract is excused from performing his contractual obligations.

(Dkt. 197, Proposed Instruction 35.) Both instructions should've been tendered to the jury.

A district court errs if it declined to give an instruction that "(1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired" a party's ability to put on his case. Noel v. Artson, 641 F.3d 580, 586 (4th Cir. 2011). The Court "holistically" examines a claim that an instruction was improperly rejected, viewing it in context of the jury charge as given. See id. Here, both instructions were (1) correct, (2) not covered by the other jury instructions, and (3) dealt with important points that the failure to tender them impaired RK&K's ability to defend against English's claims.

***First Material Breach.*** The failure to instruct the jury on the first material breach law in Virginia deprived RK&K of a critical defense. Virginia law is clear that when "the first breaching party commits a material breach, that party cannot enforce the contract." Countryside Orthopaedics, P.C. v. Peyton, 261 Va. 142, 154 (2001) (citing Horton v. Horton, 254 Va. 111, 115 (1997)). English conceded it breached the contract by failing to request and RFI before installing the shorter slab runners and that "we wouldn't be here today" had one been processed. (1d Tr. 160-61; 2d Tr. 44; 3d Tr. 157, 159; 4d Tr. 78.) The fact English admits that "we wouldn't be here today" had an RFI been processed establishes the materiality of English's breach. And it was for the jury to decide, had they been properly instructed, whether English "commit[ted] the first breach of a contract [and thus was] not entitled to enforce the contract." Countryside Orthopaedics, 261 Va. at 154.

*Failure to Instruct the Jury That RK&K is Not Responsible for CDM's Failures.* The jury was also not properly instructed on the effect of CDM's Smith's errors or omissions. RK&K was not responsible for "the acts or omissions of [English] *or its subcontractors or consultants of any tier.*" (Pl.'s Ex. 2 at § 11.) RK&K's proposed jury instruction No. 30 would have informed the jury that RK&K was not responsible for CDM Smith's acts or omissions, but the instruction was refused.

The evidence, however, unequivocally established that CDM Smith was at fault. (2d Tr. 107, 124-25, 168; 3d Tr. 160.) As English's Senior Vice-President testified, "I felt like they had responsibility." (3d Tr. 165.) The failure to tell the jury RK&K was not responsible for CDM's fault was not harmless. The instructions, as given, did not "adequately inform the jury of the controlling legal principles," but instead misled or confused the jury "to the prejudice of the objecting party," RK&K. Rowland v. Am. Gen. Fin., Inc., 340 F.3d 187, 191 (4th Cir. 2003). And that "error seriously prejudiced [RK&K's] case," id., because it led the jury to apportion fault and damages only between RK&K and English when there was evidence that other parties, like CDM, contributed to English's claimed losses. See id. at 193-94 (holding in Title VII sex discrimination case that "[h]ad the district court given the requested instruction . . . it is at least possible that the jury would have found that gender was 'a motivating factor" in American General's failure to promote Rowland. The refusal to give the instruction thus did 'seriously prejudice[ ]' Rowland's case."). The jury should have been instructed that RK&K was not responsible for CDM Smith's failures, and as result, the jury improperly award a disproportionate fault to RK&K.

**RUMMEL, KLEPPER & KAHL, LLP**

By:  */s/ Williams D. Bayliss*
       William D. Bayliss, Esq.
       Virginia State Bar No. 13741
       Counsel for Defendant

WILLIAMS MULLEN
200 South 10th Street, Suite 1600
Richmond, Virginia 23219
Telephone: (804) 420-6000
Facsimile: (804) 420-6507
bbayliss@williamsmullen.com

Brendan D. O'Toole, Esq. (VSB # 71329)
Joseph E. Blackburn, III (VSB # 81871)
Williams Mullen
200 South 10th Street, 16th Floor
Richmond, VA 23219
Telephone No.: (804) 420-6588
Facsimile No.: (804) 420-6507
botoole@williamsmullen.com
jblackburn@williamsmullen.com

*Counsel for Defendant Rummel, Klepper & Kahl, LLP*

# **CERTIFICATE**

I HEREBY CERTIFY that on the 16th day of July, 2021, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

James R. Harvey, III, Esq. (VSB # 40726)
Dustin M. Paul, Esq. (VSB # 75287)
Vandeventer Black, LLP
101 West Main Street, Suite 500
Norfolk, VA 23510
T: (757) 446-8600
F: (757) 446-8670
JHarvey@VanBlackLaw.com
GOstroff@VanBlackLaw.com
*Counsel for Plaintiff W.C. English, Inc.*

By: */s/ William D. Bayliss*_____
William D. Bayliss
Virginia State Bar No.13741
Counsel for Defendant
WILLIAMS MULLEN
200 South 10th Street, Suite 1600
Richmond, Virginia 23219
Telephone: (804) 420-6000
Facsimile: (804) 420-6507
bbayliss@williamsmullen.com
*Counsel for Defendant Rummel, Klepper & Kahl, LLP*