# EXHIBIT B



## Speech

# Prepared Remarks of Melvin L. Watt Director of FHFA at the Bipartisan Policy Center

2/18/2016

**Remarks as Prepared for Delivery**

**Melvin L. Watt, Director**

**Federal Housing Finance Agency**

Bipartisan Policy Center

Washington, D.C.

February 18, 2016

Thank you, Secretary Cisneros, for your opening remarks and introduction. I also want to thank the Bipartisan Policy Center for extending the invitation for me to speak today on our work at the Federal Housing Finance Agency (FHFA). I think all of you will agree that the things I am going to talk about deserve bipartisan attention and collaboration like we have seldom seen in recent years.

This speech has two parts, an easy part and a difficult part. Both parts reflect a philosophy that I hope all of you agree we have tried to encourage since I became the Director of FHFA – a philosophy of open, honest, and transparent discussion and decision making that helps demystify what FHFA, Fannie Mae, and Freddie Mac do and how those things relate to housing finance stakeholders.

The first part of my speech is easy because it looks retrospectively at some of the things we have accomplished and how we have managed Fannie Mae and Freddie Mac (the Enterprises) in conservatorship to accomplish them. By saying that this part of the speech is easy, however, I want to be careful not to suggest that all the decisions I will highlight were easy or noncontroversial when they were being considered. It has been my experience that when decisions produce positive results down the road, we tend to forget how controversial or complicated these decisions might have been at the time they were made.

The second part of the speech is difficult, both because it looks forward – something I have shown much less inclination to do up to this point in my time as Director of FHFA – and because looking forward is inherently more difficult and almost always tends to generate more controversy. After two full years as Director of FHFA, however, I think it's timely for me to talk not only about our accomplishments, but also about some of the challenges and risks we face, some of which wil surely become more difficult for us to control the longer the conservatorships continue. While my primary responsibility as

conservator may be to manage the Enterprises in the present as I have said on a number of occasions, I believe that I have an obligation, both in my role as conservator and in my role as regulator, to be frank and transparent about our challenges and risks.  By doing so, I hope these remarks will ignite some dialogue that could well be difficult, but I believe is also critically needed.

**The Unprecedented Conservatorships of Fannie Mae and Freddie Mac**

Some background is necessary to frame both parts of the speech.  Congress established FHFA in 2008 during the height of the financial crisis, and one of the Agency's first acts was to place the Enterprises into conservatorship.  Under the Senior Preferred Stock Purchase Agreements (PSPAs), the U.S. Department of the Treasury (Treasury Department) has provided essential financial commitments of taxpayer funding to support the Enterprises' compromised financial status.  During the first four years of conservatorship, the Enterprises drew a total of $187.5 billion from Treasury, but neither Enterprise has made a further draw since 2012.  Fannie Mae has approximately $118 billion of its PSPA commitment remaining, and Freddie Mac has approximately $141 billion remaining.  Since the beginning of conservatorship through the end of 2015, the Enterprises paid approximately $241 billion in dividends to the Treasury Department.  Under the provisions of the PSPAs the Enterprises' dividend payments do not offset the amounts drawn from the Treasury Department.

Virtually everyone would agree that today we have a much safer and more stable housing finance system than when FHFA placed the Enterprises in conservatorship.  I also think that most people would attribute a significant part of these improvements to decisions made in conservatorship.  Guarantee fees have increased by two and a half times since 2009, and our review last year concluded that overall guarantee fee levels are now appropriate.  Stronger credit standards have removed unsound risk layering and, in a manner consistent with safety and soundness, we have increasingly focused on how to support sustainable access to credit for homeowners, one of the Enterprises' statutory obligations.

Delinquencies and foreclosures have gone down on the Enterprises' legacy books of business, and the number of REO properties held by the Enterprises has decreased significantly.  The number of HARP refinances has surpassed 3.3 million and the Enterprises have taken more than 3.6 million other actions to prevent foreclosures.  The Enterprises' retained portfolios have decreased by over half since March 2009, and their portfolios are now more focused on supporting their core business operations.  The Enterprises' multifamily programs had strong performance through the crisis, and they continue to share risk with private investors.  Their multifamily purchases provide needed liquidity for the general multifamily market, with an increasing focus on affordable rental housing.

We have completed efforts to revamp and improve the Representation and Warranty Framework, and we have strengthened counterparty standards for mortgage insurers and non-bank Seller/Servicers.  We have started and significantly ramped up credit risk transfer programs at both Freddie Mac and Fannie Mae, with both Enterprises now regularly transferring substantial credit risk to private investors on over 90 percent of their typical 30-year, fixed-rate acquisitions.  We have a target for Freddie Mac to start using the Common Securitization Platform (CSP) in 2016, and a target for the Single Security to go into effect with both Enterprises using the CSP to support their major securitization activities in 2018.

In all of these things, we have also placed greater attention on diversity and inclusion in the Enterprises' business operations, consistent with legal standards and with projections that the future composition of homeowners, renters, and the country as a whole will be more diverse.

**FHFA's Role as Regulator and Conservator.**  As this list highlights, FHFA's role as conservator of Fannie Mae and Freddie Mac has been unprecedented in its scope, complexity, and duration – especially when you consider Fannie Mae and Freddie Mac's role in supporting over $5 trillion in mortgage loans and guarantees.  This is an extraordinary role for a regulatory agency also because we are obligated to fulfill both the role of supervisor and the role of conservator at the same time, and

because we are now approaching eight full years of having these obligations.  So let me also describe briefly how FHFA has managed these dual responsibilities.

Like other federal financial regulators, FHFA conducts safety and soundness supervision with a deliberate distance between FHFA and the Enterprises.  Members of our supervision staff, many of whom are located onsite at Fannie Mae and Freddie Mac, conduct examinations that focus on areas of highest risk to the Enterprises.  They produce reports of examination and make findings as to whether the Enterprises need to make corrective actions in particular areas.

In contrast, our role as conservator involves a different kind of relationship with the Enterprises.  Under the Housing and Economic Recovery Act of 2008, FHFA has the full authority of the Enterprises' boards of directors, management, and shareholders while the Enterprises are in conservatorship.  This means that FHFA has ultimate authority and control to make business, policy, and risk decisions for the Enterprises, and the Enterprises' boards know that their job is to meet our expectations.

However, managing these Enterprises in conservatorship requires much more of a joint effort than would occur under a normal regulatory relationship.  For example, while an examiner would review board or management minutes after the meetings have taken place, members of FHFA's Division of Conservatorship team attend management and board meetings as part of our conservatorship functions, and I personally attend and preside at executive sessions of Enterprise board meetings.

**FHFA's Management of Fannie Mae and Freddie Mac in Conservatorship.**  There are four key approaches that we use to manage the unique nature of these conservatorships.  Using these approaches, we have been able to fulfill our statutory obligations to ensure safety and soundness, to preserve and conserve Enterprise assets, to ensure liquidity in the housing finance market, and to satisfy the Enterprises' public purpose missions.

First, we set the overall strategic direction for the Enterprises in FHFA's Conservatorship Strategic Plan and in annual scorecards that outline our policy expectations.  We set quarterly and year-end milestones for our scorecard objectives, and we conduct regular evaluations of whether the Enterprises are on track or behind in meeting our targets.  Our final scorecard assessments at the end of each year factor into the compensation calculations for Fannie Mae and Freddie Mac executives.

Second, we delegate the day-to-day operations of the companies to their boards and senior management.  With over 12,000 employees at the two Enterprises and considering the nationwide scope and technical nature of their businesses, we can't pull every lever and make every day-to-day operating decision.  If we tried, I'm quick to acknowledge that their operations would grind to a halt.  Under conservatorship, the Enterprises continue to operate as business corporations with boards of directors subject to corporate governance standards.  The Enterprise boards are responsible – like boards of directors at other companies – for overseeing their business activities.  They review budgets and set risk limits.  They examine business plans and oversee senior management.

When FHFA first placed the Enterprises into conservatorship, FHFA selected new chief executive officers, reestablished their boards of directors, and approved new board members.  FHFA has continued to approve all new CEOs and board members throughout conservatorship, and they are responsible for meeting our expectations and effectively running the companies.  I meet several times a month with the CEOs of Freddie Mac and Fannie Mae.  In addition to my attendance at board meetings, I have regular conversations and engagement with each Enterprise's board chair to help elevate issues that need to be resolved.

Third, we have carved out actions that are not delegated to the Enterprises that require advance approval by FHFA.  Deciding which items we should delegate to the Enterprises and which should require FHFA approval is a judgment call

and finding the right balance is an ongoing process. There are decisions that are obvious choices for FHFA to make, such as setting the core components of the guarantee fees charged by Fannie Mae and Freddie Mac. Others are closer calls. While we retain the authority to step in and make the call on any issue, even ones that we previously delegated, we have found that providing as much clarity as possible about roles and responsibilities serves everyone better.

The fourth prong of our conservatorship model is oversight and monitoring of Enterprise activities, and this is something that happens on an on-going basis – it's probably not an overstatement to say this takes place constantly. In addition to attending meetings of the management committees, FHFA staff members engage in regular dialogue with the management and operational teams at the Enterprises, regularly review information submitted by the Enterprises, and take action where appropriate.

Managing the Enterprises in conservatorship through this four-step approach – with regular adjustments to account for changing circumstances – has worked well. FHFA's conservatorship decisions have helped navigate the Enterprises through a financial crisis and, despite the substantial negative impact of the crisis, helped prevent it from being far worse.

**The Challenges and Risks of a Protracted Conservatorship**
However, an eight-year conservatorship is unprecedented, and managing the ongoing, protracted conservatorships of Fannie Mae and Freddie Mac poses a number of unique challenges and risks. This leads me to the more difficult part of these remarks.

I have consistently stated that our responsibility and role at FHFA as conservator is to manage in the present. However, as we work to appropriately manage challenges and risks in the present, we also have a responsibility to assess when these challenges and risks may escalate to the point that they negatively impact the Enterprises and the broader housing finance market in the future. By giving this speech today, I am signaling my belief that some of the challenges and risks we are managing are escalating and will continue to do so the longer the Enterprises remain in conservatorship. Consequently, I believe that I have a responsibility, both as regulator and as conservator, to identify and discuss this concern more openly.

***Enterprises' declining capital buffers.*** The most serious risk and the one that has the most potential for escalating in the future is the Enterprises' lack of capital. FHFA suspended statutory capital classifications when the Enterprises were placed in conservatorship, and Fannie Mae and Freddie Mac are currently unable to build capital under the provisions of the PSPAs. The agreements require each Enterprise to pay out comprehensive income generated from business operations as dividends to the Treasury Department, and the amount of funds each Enterprise is allowed to retain is often referred to as the Enterprises' "capital buffer." This capital buffer is available to absorb potential losses, which reduces the need for the Enterprises to draw additional funding from the Treasury Department. However, based on the terms of the PSPAs, this capital buffer is reducing each year. And, we are now over halfway down a five-year path toward eliminating the buffer completely.

Starting January 1, 2018, the Enterprises will have no capital buffer and no ability to weather quarterly losses – such as the non-credit related loss incurred by Freddie Mac in the third quarter of last year – without making a draw against the remaining Treasury commitments under the PSPAs. There are a number of non-credit related factors that could lead to a loss and result in a draw on those commitments: interest rate volatility; accounting treatment of derivatives, which are used to hedge risk but can also produce significant earnings volatility; reduced income from the Enterprises' declining retained portfolios; and, the increasing volume of credit risk transfer transactions, which transfer both the risk of future credit losses as well as current revenues away from the Enterprises to the private sector. A disruption in the housing market or a period of economic distress could also lead to credit-related losses and trigger a draw.

It is, of course, impossible to predict the exact ramifications of future draws of funds from the PSPA commitments. But let me offer a few observations.

First, and most importantly, future draws that chip away at the backing available by the Treasury Department under the PSPAs could undermine confidence in the housing finance market. The remaining funds available under the PSPAs provide the market with assurance that the Enterprises can meet their guarantee obligations to investors in mortgage-backed securities even while they are in conservatorship and don't have the ability to build capital. In effect, the Treasury Department's financial commitment to each Enterprise under the PSPAs is a source of capital that supports mortgage market liquidity. However, under the terms of the PSPAs, these funds can only go down and cannot be replenished. Future draws would reduce the overall backing available to the Enterprises, and a significant reduction could cause investors to view this backing as insufficient. It's unclear where investors would draw that line, but certainly before these funds were drawn down in full.

Investor confidence is critical if we are to have, as we do today, a well-functioning and highly liquid housing finance market that makes it possible for families to lock in interest rates, obtain 30-year, fixed-rate mortgages, and prepay a mortgage if they want to refinance or need to move. If investor confidence in Enterprise securities went down and liquidity declined as a result, this could have real ramifications on the availability and cost of credit for borrowers.

Second, future draws could lead to a legislative response adopted in haste or without the kind of forethought it should be given. I have been clear that conservatorship is not a desirable end state and that Congress needs to tackle the important work of housing finance reform. However, because of the intricacies of our housing finance system and the extremely high stakes for the housing finance market and for the economy as a whole if reform is not done right, I continue to hope that Congress can engage in the work of thoughtful housing finance reform before we reach a crisis of investor confidence or a crisis of any other kind. While it's not my place to meddle in political discussions, I'm also not hearing much discussion of housing finance reform in any of the presidential campaigns.

**The role of market discipline in conservatorship.** A less discussed, but related, challenge posed by a continuing conservatorship is Fannie Mae and Freddie Mac's insulation from normal market forces that would otherwise inform their operations and business practices. There are differing views about the Enterprises' business models leading up to the financial crisis, but in conservatorship the responsibility to create a regime of market discipline and appropriate competition falls squarely on FHFA's shoulders. The longer the Enterprises remain in conservatorship, the greater and more complicated this responsibility becomes.

This challenge presents itself in multiple decisions, including pricing. Although the Enterprises are not building capital while they are in conservatorship, FHFA expects Freddie Mac and Fannie Mae to determine their pricing as though they were holding capital and seeking an appropriate economic return on this capital. This is something that was very important to FHFA as we started to review and make adjustments to guarantee fees. We worked with the Enterprises to review the cost of capital as part of our assessment of the correct level of overall guarantee fees charged by the Enterprises. Without such an approach, it would be challenging to decide what guarantee fee levels to approve. Through our 2016 Scorecard priority to finalize a risk management framework, we are working to further our ability to evaluate these kinds of Enterprise business decisions.

Another challenge related to market discipline is the question of how the Enterprises should or should not compete against one another. As I discussed earlier, we have consciously structured the conservatorships of Freddie Mac and Fannie Mae so they continue to run as going concerns. We want them to continue to innovate and to compete on the kind of customer service they provide to lenders and on the quality of their business practices. We believe that competition in these areas is healthy for the Enterprises, good for the housing finance market, and good for borrowers.

However, we have also made a number of decisions that require the Enterprises to adopt aligned standards in certain areas, such as aligned counterparty requirements, to avoid excessive risk being placed on taxpayers. In conservatorship,

we carefully determine when to allow competition and when to require alignment, requiring, of course, that all operations be executed in a safe and sound manner.

***Planning amidst an uncertain future.***  A final challenge that being in protracted conservatorships forces us to face is how to manage and plan for the future when there is tremendous uncertainty about what the future holds.  Experience demonstrates that it is difficult to manage the Enterprises in the present without establishing some kind of plans for the future.  Here, I'm not talking about plans for housing finance reform, but plans for everyday operations, including strategic planning that every well-run business does and project planning that's necessary to continue key initiatives.  Without looking somewhat down the road, FHFA and the Enterprises would both lose their momentum and jeopardize day-to-day success.  The key dilemma when you have an uncertain future, however, is how far down the road to look and how to retain the necessary talent to implement either short- or longer-term plans.

This challenge drove my decision to authorize the increases in compensation for both Enterprise CEOs that proved to be so controversial.  First, I recognized that our delegated model relies heavily on strong management teams to uphold their side of conservatorship.  Second, I decided that to be responsible we needed to have the Enterprises engage in operations-focused strategic planning over a three-to-five year horizon.  To do both of those things, we needed to ensure continuity by retaining senior-level staff and having reliable succession plans that minimized disruptions.

Of course, we have implemented the legislation that Congress passed to reinstate the prior CEO compensation limits, and it is not my intention here to debate the wisdom of the decision that Congress made.  Having served in Congress, I understand that it was an easy political decision.  However, the issue of reliable succession planning is another example of the many challenges presented by a long-term conservatorship.  The fact is that the Enterprises run businesses that rely on a highly specialized and technically skilled workforce.  Retaining that workforce is essential to the Enterprises' success and to FHFA's success as conservator.  With continuing uncertainty about conservatorships of indefinite duration and what role the Enterprises will play in the future of housing finance, retaining skilled employees will be an increasing challenge.

**Conclusion**

We have made these ongoing conservatorships work thus far through the dedication of staff at FHFA and the staffs of both Enterprises and we, of course, remain committed to continuing this task.  We know that the stakes are high for the housing finance market and for the broader economy.  However, as I have indicated in my remarks today, there are substantial challenges and risks associated with the unprecedented size, complexity, and duration of the conservatorships of Fannie Mae and Freddie Mac.  After more than two years at FHFA, I can assure you that these challenges are certainly not going away, and some of them are almost certain to escalate the longer the Enterprises remain in conservatorship.

**Contacts:**
Media:  Stefanie Johnson (202) 649-3030 / Corinne Russell (202) 649-3032

Consumers: **Consumer Communications** or (202) 649-3811

© 2023 Federal Housing Finance Agency