# EXHIBIT G

Written Testimony
Dr. Mark A. Calabria, Director
Federal Housing Finance Agency

## House Committee on Financial Services
### "Prioritizing Fannie's and Freddie's Capital Over America's Homeowners and Renters? A Review of the Federal Housing Finance Agency's Response to the COVID-19 Pandemic"

Chairwoman Waters, Ranking Member McHenry, and distinguished members of the Committee, thank you for the invitation to appear at today's hearing.

The Federal Housing Finance Agency (FHFA) has acted swiftly and prudently to respond to COVID-19. Thanks in part to our efforts, the housing market has largely been a bright spot in the pandemic economic data. We continue to update our policies as the challenges facing renters, borrowers, and market participants evolve.

**FHFA's Actions to Protect Agency Workforce and Maintain Mission Focus**

FHFA's hard-working employees are the Agency's greatest asset, and their well-being is my top priority. Our teleworking flexibilities have enabled our staff to remain safe and manage at-home obligations, while continuing to fulfill the Agency's vital mission.

The FHFA team has gone above and beyond in carrying out FHFA's statutory responsibilities while also rising to meet the challenges presented by COVID-19. In March, our telework test transitioned the very next day into a full-time mandatory telework period for the Agency that is still ongoing. With critical support from the Office of the Chief Operating Officer, FHFA employees quickly adapted to the new environment, allowing the Agency to maintain continuity of operations during this crisis.

The Office of Technology and Information Management has kept the FHFA workforce productive and connected by rapidly deploying remote tools and staff training, meeting employees' IT equipment needs, and safeguarding the Agency's network capacity, connectivity, and security. The Office of Facilities Operations Management has established and continually updated protocols and procedures for keeping our employees and headquarters safe and healthy, working tirelessly to provide employees with the equipment and office supplies needed to set up and sustain their remote workstations. The Office of Human Resources Management has been instrumental in ensuring employees have the support they need to remain engaged and productive, including by developing new work schedule and leave flexibilities, expanding the Agency's Employee Assistance Program, and meeting special accommodation requests resulting from our remote-work posture.

Across the board, the FHFA team has seamlessly transitioned to a virtual environment. This includes the hiring, on-boarding, and training processes that are essential for FHFA to continue developing and retaining a highly talented and effective workforce. The Office of

Written Testimony of Dr. Mark A. Calabria, FHFA Director – House Financial Services – September 14, 2020

Budget and Financial Management and the Enterprise Program Management Office, working with FHFA's COVID-19 Task Force, have helped the Agency stay coordinated on the updated guidance provided by various government entities, health officials, and local authorities. I am proud of the flexibility, cooperation, and hard work of every member of the FHFA team during this pandemic.

The Office of Congressional Affairs and Communication has remained engaged with and accessible to members of Congress and their staff. Since March, FHFA's legislative affairs team has held dozens of remote congressional meetings and briefings to discuss Agency policies and provide technical assistance with legislation. This is a testament to FHFA's dedicated staff and our ongoing commitment to responding to congressional inquiries in a timely manner, maintaining transparency, and connecting the Agency's many subject matter experts to legislative staff.

FHFA has also worked closely with our peer financial regulators and other federal agencies to respond to the COVID-19 national emergency. Through regular communication channels, FHFA and these agencies continue to share, in real-time, challenges, ideas, and solutions to help each other develop best practices based on the latest guidance available. Timely information sharing has enabled FHFA to respond to evolving COVID-19 related challenges in a rapid, nimble, and effective manner.

We have continued to prioritize our work to foster an environment where everyone feels safe, respected, and valued for our differences. The senseless violence and loss of innocent life that have roiled our nation in recent months – and that have torn apart too many communities across the country for too long – highlight the importance of this work both in the workplace and beyond. They also have strengthened our resolve to uphold the Agency's core values of fairness, diversity, and inclusion. At the beginning of this year, we established the Office of Equal Opportunity and Fairness in order to elevate equal employment opportunity practices and conflict resolution resources to the division level. As the Agency announced earlier this week, FHFA has hired Debra Chew as the first permanent Director for the office.

I commend FHFA's Office of Minority and Women Inclusion (OMWI) for its steadfast support of the Agency's workforce during this time. This includes OMWI's work, with my support, to launch FHFA's Diversity Advisory Council, which aims to ensure diversity in all aspects of the Agency's employment and contracting practices and to create regular programs that engage employees on professional and personal diversity and inclusion issues. OMWI is playing an essential role in helping FHFA employees affected by the recent events and tensions across the country, offering training, listening sessions, and other resources. And tomorrow OMWI is partnering with our Office of Human Resources Management to continue recruiting the next generation of FHFA personnel from Historically Black Colleges and Universities at the Atlanta University Center Consortium virtual career fair. This kind of recruitment is only one of the examples of how the Agency continues to build a diverse pipeline of talent for its future workforce. FHFA already has one of the most diverse workforces amongst federal regulatory agencies. Our diversity is – and will remain – a key source of FHFA's success.

Written Testimony of Dr. Mark A. Calabria, FHFA Director – House Financial Services – September 14, 2020

Across all divisions and offices, FHFA's employees have remained united in our efforts to enable American families to stay safe in their homes during this public health emergency. We have worked closely with our regulated entities, Fannie Mae and Freddie Mac (the Enterprises) and the Federal Home Loan Banks (FHLBanks), to support borrowers and renters, while ensuring the proper functioning of the mortgage market both during and after this crisis. Our actions have been – and continue to be – data driven.

**FHFA's Strong Research Capabilities Are Key to Agency's Data Driven Policymaking**

Through oversight of the regulated entities, FHFA collects and analyzes a significant amount of data on trends in the housing and mortgage markets. This enables the Agency to respond appropriately to market developments, promote market efficiency and stability, and disseminate information to improve the public's understanding of housing finance markets. Economic research and data analytics are core competencies of effective safety and soundness supervision, which is essential to preparing the Agency and the Enterprises to responsibly exit and operate safely outside of conservatorship. That is why, from the beginning of my term, one of my top priorities has been to strengthen FHFA's research and data analysis capabilities.

For instance, the Agency has enhanced the accessibility of existing data products, such as quarterly and monthly house price indexes (HPIs). FHFA produces the nation's only public, freely available HPIs that measure changes in single-family house prices based on data that cover all 50 states and over 400 American cities and extend back to the mid-1970s. The HPIs are built from tens of millions of home sales and offer insights about house price fluctuations at the national, census division, state, metro area, county, ZIP code, and census tract levels. In May, with the publication of 2020's first HPI Quarterly Report, FHFA launched a new interactive dashboard, available on the Agency's website, that illustrates house-price trends across the top 100 Metropolitan Statistical Areas. In August, with the publication of 2020's second HPI Quarterly Report, FHFA enhanced the HPI Calculator, a popular website tool that now enables users to compare house price changes over time at the metro area and state levels.

In addition to increasing the exposure of existing data products, FHFA has taken several steps to elevate and expand the Agency's research capabilities and contributions. In January 2020, as part of an organizational realignment, FHFA created the Division of Research and Statistics (DRS) to strengthen the Agency's data collection and analysis capabilities. DRS is FHFA's center for economic and market research, data development, and statistical analysis to support the Agency's divisions and offices engaged in oversight, supervision, rulemaking, and policy development. The division examines trends and risks in housing and housing finance markets, advances modeling capabilities, develops and maintains data, evaluates policy impacts, and engages with research communities outside of the Agency.

The research and data analysis capabilities that FHFA created and continues to strengthen within DRS have been critical to supporting the Agency's data-driven response to COVID-19. For instance, DRS has enhanced FHFA's capacity to monitor housing and mortgage markets by leveraging existing data sources and seeking out new ones. This has provided a comprehensive

view of the state of the mortgage market prior to the pandemic and it has enabled FHFA to understand, in real time, how circumstances have changed over the course of the crisis.

**The State of the Market Before and During COVID-19 Crisis**

At the start of 2020, the American housing market was in a strong position. A low interest rate environment and stable labor markets drove robust demand and price appreciation. Home price growth in the first quarter of 2020 outpaced annual growth from the same period a year before as falling interest rates and shrinking inventories for sale led prices higher just prior to the COVID-19 crisis. Nationwide, house prices increased 1.7 percent in the first quarter of 2020, a 5.7 percent increase from the first quarter of 2019. FHFA's seasonally adjusted monthly index for March was up 0.1 percent from February.

Since early 2019, existing home sales had been on a steady upward trajectory, after declining throughout 2018 due to rising rates. The National Association of Realtors' months' supply of existing homes for sale in February reached its lowest level since the series started in 1999, driving home prices upward at a faster rate in the first quarter. Single-family housing starts in February 2020 reached the highest three-month rate since November 2006, on a seasonally adjusted basis, after more than 10 years of slow but steady increases.

In response to COVID-19, financial markets endured a severe dislocation in March. Uncertainty over the public health and the economic impacts of the pandemic constrained financial liquidity, significantly disrupting the financing, lending, and hedging activities of mortgage lenders and many other market participants. Spreads between the 30-year fixed mortgage rate and the 10-year Treasury yield widened. Treasuries experienced rising yields as a market-wide demand for cash led investors to sell off their most liquid assets in response to redemption demands.

**FHFA's Policy Response: Supporting Borrowers and Renters**

From the beginning of this crisis, FHFA's policy, conservatorship, and research teams have worked together to produce forecasts and estimates of the future impact of COVID-19 on the mortgage market based on key indicators such as unemployment insurance claims and house prices. They have also developed models to support decision making regarding loan modifications, servicing, and other issues. This internal research, monitoring, and analysis have helped to inform and guide FHFA's policy actions.

One of our top priorities has been to support renters and homeowners struggling to pay for housing because of COVID-19. To do this, FHFA has directed the Enterprises to put in place certain protections. The Enterprises own or guarantee approximately $6.0 trillion in mortgages. That includes about 43 percent of multifamily units, about 8.6 million households, and more than half of single-family mortgages.  FHFA's policies apply to all single-family homeowners and multifamily property owners with an Enterprise-backed mortgage. FHFA's policies also help to set workable standards for the entire market.

Written Testimony of Dr. Mark A. Calabria, FHFA Director – House Financial Services – September 14, 2020

FHFA's policies have built on the lessons learned from the failures of the 2008 financial crisis, focusing particularly on improving the process for borrowers and renters in need of assistance. As a result, borrowers today do not have to navigate excessive and often confusing rounds of paperwork with their servicers, such as those that resulted from the multiple Home Affordable Refinance Program (HARP) and Home Affordable Modification Program (HAMP) programs during the post-housing crash foreclosure crisis.

For homeowners facing foreclosure before COVID-19, we suspended all single-family foreclosures and foreclosure-driven evictions through the end of 2020. This policy has protected more than 28 million homeowners and enabled roughly 200,000 families facing foreclosure pre-COVID to stay in their homes.

For borrowers financially impacted by COVID-19, we allowed homeowners to take a timeout from mortgage payments through forbearance for up to 12 months. The Enterprises worked with servicers to develop loan modification options and repayment plans. This ensured borrowers would not face payment shock and could remain safely in their homes.

We then allowed borrowers in forbearance who return to making monthly payments to repay what they missed when they sell their home or refinance their loan. This new payment deferral option simplifies options for borrowers and provides an additional tool for mortgage servicers.

From the beginning of the pandemic, we have emphasized that those who can make their mortgage payments should continue doing so. Of the borrowers with an Enterprise-backed mortgage in forbearance, about one-quarter continue to make payments. FHFA directed the Enterprises to treat such borrowers as current if they want to buy a new home or refinance.

FHFA also took action specifically to protect renters struggling to pay rent because of COVID-19. It is important to recognize that the Enterprises do not have a contractual relationship with tenants. Their relationship is with the property owners or landlords. Therefore, if a multifamily loan is performing and the property owner does not seek forbearance, the Enterprises cannot impose requirements on the landlords.

On March 23, FHFA announced the Enterprises' policies providing a forbearance option for multifamily property owners with an Enterprise-backed mortgage. Importantly, these policies prohibit tenants from being evicted for the nonpayment of rent during a property owner's forbearance period. In late June, we allowed multifamily property owners in forbearance to extend for an additional three months on the condition that they adopt stronger renter protections. And in August, FHFA announced that multifamily landlords with new or modified forbearance must notify tenants of their rights under the forbearance agreement.

While the single-family forbearance program was modeled on prior disaster response efforts, the nationwide multifamily forbearance programs with tenant protections were developed from the ground up. After putting these programs in place, FHFA directed the Enterprises to create online lookup tools that allow renters and borrowers to determine whether either of the

Written Testimony of Dr. Mark A. Calabria, FHFA Director – House Financial Services – September 14, 2020

Enterprises own or guarantee the mortgage on the property where they live and therefore whether they are eligible for eviction protection or forbearance.

Since implementing the single-family and multifamily forbearance programs, FHFA has closely monitored the data to understand the responses by borrowers and the market. As a staffer on the Senate Banking Committee during the 2008 financial crisis, I saw firsthand the importance of resisting the pressure to "act first, analyze later" that arises in a period of financial stress. In a crisis, panic can lead to ill-conceived policy responses and send confounding signals to the market. It is imperative to remain calm and make decisions based on careful, thoughtful analysis of the most up-to-date data available. The hardworking professionals of FHFA have ensured that the Agency has fulfilled this fundamental objective during the COVID-19 national emergency.

Early in the crisis, there were a wide variety of predictions about the future effects of COVID-19 on housing markets. Some observers contended that forbearance rates would reach as high as 25 to 50 percent. Given the unprecedented nature of the pandemic and the high degree of uncertainty about the economic impact, FHFA carefully monitored the data we generated internally and the data we received from the Enterprises and market participants. This has ensured that we develop and update our policies in response to the facts on the ground. At this point, I remain encouraged by what the data is telling us about the trajectory of forbearance rates.

Data developed internally at the Enterprises and by industry groups indicate that Enterprise forbearance rates remain manageable. After rising precipitously in April, the rate of forbearance uptake slowed during the last few weeks of May and then began to consistently decline week over week. According to data released by the Mortgage Bankers Association, as of May 24, 6.4 percent of total Enterprise-backed mortgages were in forbearance, compared to 11.8 percent of mortgages backed by Ginnie Mae. By the end of August, the Enterprise single-family mortgage forbearance rate had fallen to 4.8 percent, compared to 9.6 percent of Ginnie Mae loans (see Figure 1). FHFA's internal analysis shows that renters in approximately 170,000 units of multifamily housing are eligible for eviction protection because they live in properties receiving forbearance from Fannie Mae or Freddie Mac. This represents about 1.9 percent of outstanding multifamily mortgage balances at the Enterprises.

**Figure 1**



*Source: Mortgage Bankers Association, data through August 30*

      The mortgage market still faces some challenges. Responding to substantial federal support in the form of MBS purchases by the Federal Reserve, spreads between the current coupon MBS and 10-year U.S. Treasury have fallen below levels observed at the beginning of 2020, at least for the to-be-announced (TBA) market. On the other hand, spreads between the 30-year fixed mortgage rate and the 10-year Treasury yield remain high. These primary market spreads have declined, but they have not yet returned to pre-crisis levels (see Figure 2).

Written Testimony of Dr. Mark A. Calabria, FHFA Director – House Financial Services – September 14, 2020

**Figure 2**



*\*Source: Freddie Mac Primary Mortgage Market Survey, Bloomberg, U.S. Treasury*

However, current mortgage rates reported by Freddie Mac and the Mortgage Bankers Association are at the lowest point on record in the series dating back to 1971 and 1990, respectively. FHFA continues to work with the Enterprises to ensure that borrowers can access new purchase and refinancing opportunities at historically low rates. This includes the policy of treating as current borrowers in forbearance who continue to make payments. In addition, borrowers' credit history will not be negatively impacted by entering a COVID-19 related forbearance plan.

We have also helped clarify consumers' options. We updated the scripts that servicers use when talking to borrowers about forbearance. We translated those scripts and the associated forbearance application into the top five languages of borrowers with Limited English Proficiency: Spanish, Chinese, Vietnamese, Korean, and Tagalog. We have emphasized to servicers and the public that no lump sum repayment is required at the end of forbearance. We partnered with the Consumer Financial Protection Bureau (CFPB) to launch the Borrower Protection Program, which allows FHFA to leverage CFPB's consumer complaint database to

identify problematic servicing practices. And FHFA helped develop a website that consolidates federal information about mortgage relief options, renter protections, and how to avoid scams.

To help ensure that borrowers qualify for mortgages they can afford, FHFA will share with the CFPB aggregated data on loans that enter forbearance before delivery to the Enterprises. This will allow FHFA to fulfill its obligation under the Qualified Mortgage (QM) Patch to ensure that loans sold to the Enterprises are complying with the intent of Dodd-Frank's ability to repay provisions.

**FHFA's Policy Response: Ensuring the Proper Functioning of the Mortgage Market**

Working with our regulated entities, FHFA has also taken several steps to ensure the mortgage market continues to function properly both during and after this crisis.

To ensure the safety of market participants, FHFA authorized several loan-closing, employment-verification, and appraisal flexibilities. The changes include allowing desktop and exterior-only appraisals, providing alternative methods to demonstrate construction completion and satisfy borrower documentation requirements, allowing renovation disbursements, and expanding the use of power of attorney, appraisal waivers, and remote online notarization. FHFA put these flexibilities in place for 60 days and then extended them through at least September 30.

In April, FHFA recognized that nonbank servicers needed clarity to serve the market through the crisis. In response, we instituted a four-month limit on servicers' obligations to advance principal and interest payments on loans in forbearance. With respect to mortgage loans in MBS, prior to COVID-19, Fannie Mae servicers with a scheduled payment remittance had been responsible for advancing the principal and interest payment regardless of borrower payments. Freddie Mac servicers, who are generally responsible for advancing scheduled interest, are only obligated to advance four months of missed borrower interest payments. FHFA's policy established a four-month advance obligation limit for Fannie Mae scheduled servicing, which is consistent with the current policy at Freddie Mac.

To keep the mortgage market working for current and future borrowers, and to help originators continue lending, FHFA enabled the Enterprises for a limited period of time to purchase certain single-family mortgages in forbearance that meet their criteria. Charging a fee for these transactions is consistent with FHFA's statutory mandate to "preserve and conserve assets" and the Enterprises' charter requirement to purchase only those loans that meet the standards imposed by private institutional mortgage investors. Prior to this, the Enterprises had never purchased loans in forbearance. Our policy provides a new option to lenders and the Enterprises.

Additionally, FHFA took several steps to ensure the Federal Home Loan Bank System could continue to support member liquidity and housing finance markets. We relaxed liquidity requirements in a countercyclical fashion. We reminded the FHLBanks of their obligation to offer advances up to 10 years in maturity to meet their members' needs and their ability under

FHFA regulations to provide below-cost advances during disasters like the COVID-19 pandemic.

We allowed the FHLBanks to accept Paycheck Protection Program loans as collateral when making loans to their members and allowed them to accept as collateral loans that have been modified or that are in COVID-19 related forbearance. To avoid exacerbating potential liquidity problems, FHFA deferred certain deadlines related to the FHLBanks' transition from LIBOR-based exposures, while continuing our efforts to prepare for the eventual end of LIBOR. To protect the safety and soundness of the FHLBanks, FHFA issued guidance related to collateral and pricing policies aimed at ensuring that all members are treated fairly and that every FHLBank can continue to provide liquidity to institutions and communities in its district.

It is important to recognize the vital support that the FHLBanks provided to the market in response to the financial stress caused by the pandemic. A core function of the FHLBanks is to provide liquidity in times of stress. This support is critical for small and community banks that often do not have access to other sources of low-cost funding. When the COVID-19 crisis began, the FHLBanks stepped up to keep liquidity in the market, meeting unprecedented advance demand from their member financial institutions.

In March, while other liquidity sources dried up, FHLBank System advances grew by $189.4 billion – or 30.7 percent – at their peak. For the quarter ending March 31, FHLBank System advances increased 25.8 percent to $806.9 billion. While access to long term debt markets was severely limited, the System was able to fund this increased advance demand largely through discount notes and floating rate bonds indexed to the Secured Overnight Financing Rate (SOFR). For the first quarter of 2020, outstanding debt increased to $1.18 trillion, growing at the fastest pace in recent history.

As advances and assets grew, earnings decreased significantly because of reduced net interest spread and mark-to-market accounting effects. Compared to the fourth quarter of 2019, net interest income fell a substantial $350 million (28.6 percent) to $872 million, and net income decreased $262 million (29.5 percent) to $627 million. Nevertheless, for the first quarter of 2020, FHLBank System retained earnings grew $141 million to $20.7 billion, or 1.6 percent of total assets.

Following the injections of liquidity provided by the Federal Reserve and The Coronavirus Aid, Relief, and Economic Security Act, the FHLBanks' balance sheets – both advances and debt outstanding – fell to or below pre-crisis levels (see Figure 3). This is exactly what the FHLBanks are supposed to do as counter-cyclical providers of liquidity. And it is why FHFA is focused on protecting the System's safety and soundness. It is critical that the Banks remain capable of being a source of liquidity when their members and the economy need it most.

Written Testimony of Dr. Mark A. Calabria, FHFA Director – House Financial Services – September 14, 2020

**Figure 3**



*\* Source: FHLBanks*

      I am proud of FHFA's response to this pandemic. Our actions have helped homeowners, renters, and the housing market deal with this crisis. But they have also come at significant cost.

      Conservative estimates price COVID-19 related costs for the Enterprises at roughly $6 billion. As reported on the Enterprises' 10-Q disclosure forms, $4 billion is from expected loan losses due to projected forbearance defaults. The expected losses associated with the foreclosure moratorium amount to at least $1 billion. Other forbearance-related expenses and fees, such as the $500 fee the Enterprises pay to servicers for loss mitigation, account for another $1 billion. Again, these are conservative estimates of the costs of responding to COVID-19. The Congressional Budget Office (CBO) projects the Enterprises' annual earnings in 2020 will be reduced by $10 billion as a result of the coronavirus pandemic[1]

---

[1] Congressional Budget Office, "Effects of Recapitalizing Fannie Mae and Freddie Mac Through Administrative Actions," https://www.cbo.gov/publication/56511, August 2020.

To cover these projected losses, starting December 1, the Enterprises will be adding an adverse market fee of 0.5 percent when they purchase select refinance mortgages.

The fee applies to refinance mortgages and will not impact new purchase mortgages, including first-time homebuyers – a key element FHFA required of the Enterprises. Additionally, the fee is expected to have minimal impact on low-income borrowers, as nearly 95 percent of recent refinance acquisitions have credit scores at or above 700 and nearly 80 percent have loan-to-value ratios at or below 80 percent.

FHFA tailored the fee to ensure low-income borrowers can continue accessing record-low rates to reduce their monthly mortgage payments. Exempt from the fee are borrowers with loan balances of $125,000 or less, nearly half of whom are at or below 80 percent of area median income. Also exempt are affordable refinance products, Home Ready and Home Possible.

The losses this fee covers are the result of policies that have helped millions of Americans stay safe in their homes during a global pandemic. Although Congress has not provided any funding to offset the costs of these policies, the Enterprises' congressional charters require that expenses must be recovered via income.

The fee increase was originally scheduled to go into effect September 1. After listening to feedback, including from the Committee, FHFA delayed implementation until December 1. This recognizes that Congress may take the opportunity to review alternatives.

Delaying this fee will help provide certainty to the market and borrowers; however, the total amount raised through the fee will be unlikely to cover the cost of Enterprise assistance to borrowers and renters during the pandemic. Low mortgage rates have already significantly elevated the rate of Enterprise refinance acquisitions (see Figure 4), and delaying the fee reduces the number of transactions the cost can be spread over. If Congress takes action to support these programs before the new implementation date, such a change will factor into the costs borne.

Written Testimony of Dr. Mark A. Calabria, FHFA Director – House Financial Services – September 14, 2020

**Figure 4**



*Source: FHFA*

**Assessing FHFA's Policy Response: The State of the Market Today**

    FHFA's response to COVID-19 has significantly helped borrowers, renters, and the housing market deal with this crisis. But we also recognize that more work remains. The crisis caused by COVID-19 is not over. The full economic and financial impact of the pandemic is not yet known. The future state of the labor market remains uncertain. For these reasons, FHFA is still hard at work to ensure our policies continue to respond to the challenges as they evolve. We remain committed to working with other federal agencies, Congress, our regulated entities, and stakeholders to get through this difficult time. With that said, the housing market has been a bright spot in the economic data so far.

    Following some contraction in mortgage market activity in March and April, the purchase market rebounded in a strong V-shaped recovery. In the second half of May, purchase mortgage applications surpassed its year-over-year level. Between June and August, applications are on track to be more than 20 percent higher, on average, compared to the same period in 2019. Existing home sales (EHS) in August reached their highest level since December of 2006 at 5.9 million, according to the National Association of Realtors (see Figure 5). While they have not completely returned to pre-COVID levels, housing starts are also showing strong signs of recovery.

Written Testimony of Dr. Mark A. Calabria, FHFA Director – House Financial Services –
September 14, 2020

**Figure 5**



*Source: National Association of Realtors*

House prices were supported by this rebound in market activity. After falling slightly in May relative to April, house prices rose by 0.9 percent in June as local economies re-opened and transactions picked up. Nationwide, house prices increased 0.8 percent in the second quarter of 2020, a 5.4 percent increase from the second quarter of 2019.

Based on the Enterprises' second quarter acquisitions of purchase mortgages in 2019 and 2020, loan risk factors such as average credit scores, debt-to-income (DTI), and loan-to-value (LTV) ratios have changed only slightly this year compared to last. Refinance acquisitions in the second quarter had higher credit scores, lower DTIs and lower LTVs. The Enterprises, at the direction of FHFA, will continue to take measured and responsible steps to maintain a prudent risk profile and address layered risks. Moving forward, FHFA will continue to closely monitor all sources of market data and let the data drive our decisions.

At this point, I am encouraged by what the data tells us about the state of the mortgage market and the capacity of servicers following FHFA's robust policy response.

Total monthly Enterprise principal and interest payments at the beginning of the crisis were approximately $32 billion. Of that, about 40 percent, approximately $13 billion, of the advance obligation rests with the Enterprises. About $11 billion, approximately a third, rests with depositories. Therefore, roughly $8 billion, approximately a quarter, of the potential monthly advance obligation rests with nonbanks. At a 4.8 percent forbearance rate this translates into approximately $384 million per month of nonbank incremental advance needs. As a result of FHFA's four-month limit on servicers' obligations to advance principal and interest payments on loans in forbearance, nonbanks' total four-month obligation is approximately $1.5 billion. However, as noted above, a quarter of borrowers in forbearance have not stopped making mortgage payments.

Written Testimony of Dr. Mark A. Calabria, FHFA Director – House Financial Services – September 14, 2020

In addition, both Fannie Mae and Freddie Mac programs allow servicers to use a portion of mortgage payoffs from refinancings to help cover these advance obligations. This has a significant impact especially under the Fannie Mae program.

At FHFA's encouragement, servicers have been increasing their available liquidity. Total nonbank liquidity among Enterprise counterparties increased by 9 percent to $36 billion in the first quarter of 2020. Of that, unencumbered cash and equivalents made up $13 billion, an increase of 19 percent from December 31, 2019. By the end of June, servicers drawing down their lines of credit reduced their official overall liquidity, but unencumbered cash and equivalents significantly increased by 38 percent to $18 billion.

**Looking Ahead: The Urgent Need to Build Capital at the Enterprises and Advance Housing Finance Reform**

FHFA's strong response to COVID does not mean that all is well. Most notably, the Enterprises lack the capital to withstand a serious housing downturn. This jeopardizes their important mission to support borrowers in housing finance markets during periods of stress.

Fannie Mae and Freddie Mac are private companies created by Congress to perform a public mission. A core element of that mission, stated in their congressional charters, is to "promote access to mortgage credit throughout the Nation." They do this by buying mortgages from lenders, which allows more mortgages to be made, and by guaranteeing the principal and interest payments on behalf of borrowers to investors in mortgage-backed securities.

For most families, homeownership is a key step toward achieving financial security and building a brighter future for their children. But under the wrong conditions, it can be financially devastating, resulting in foreclosure, eviction, destroyed credit, displacement, and worse. The factor that makes the biggest difference between these two outcomes is not the mortgage rate today but the borrower's ability to repay the loan in the future.

There is no rate low enough to make a mortgage beneficial for a borrower who experiences a severe financial shock like unemployment before they have a chance to build any meaningful equity in their home. This is demonstrated by the fact that borrower debt-to-income has been one of the strongest predictors of forbearance and by the lived experiences of too many Americans in the last financial crisis. We must remember the lessons of the housing crash that shattered the financial future of countless families.

It started with a push to expand mortgage lending at all costs, even if it meant saddling low-income and minority borrowers with extreme levels of debt. While leverage maximizes the upside in good times, it also maximizes the downside in bad times. From 2001 to 2005, African American and Hispanic mortgage borrowing increased 78 and 116 percent, respectively. Then from 2005 to 2015, the collapse of the housing bubble drove the number of minority borrowers down by about 63 percent.

Written Testimony of Dr. Mark A. Calabria, FHFA Director – House Financial Services – September 14, 2020

These communities lost significant amounts of wealth. Between 2007 and 2010, household wealth declined 31 percent for African American families and over 40 percent for Hispanic families.[2]

Looking back on the housing bubble, it is clear that the most important financial achievement for many Americans was not getting into homeownership but staying in. When the bottom fell out, families were left to pick up the pieces.

Another of the Enterprises' core purposes stated in their congressional charters is to "provide stability" to the housing finance system. But to provide stability, they must be stable themselves. And in 2008, Fannie Mae and Freddie Mac were anything but stable.

My job and my statutory mission is to make sure that the Enterprises never again fail the millions of families whose financial futures depend on a stable mortgage market. To do this, they must build capital.

Capital is the portion of the Enterprise's funds that is not owed to anyone and protects against unexpected losses. That is the core purpose and function of capital. Capital absorbs losses and enables the Enterprises to continue supporting borrowers when other sources of credit disappear. The more capital an Enterprise has, the more losses it will be able to absorb, and the more support it can provide.

FHFA has made progress in building capital at the Enterprises. Their combined leverage ratio improved from roughly 1,000 to 1 when I started last year to roughly 250 to 1 today. But much more work remains.

This May, FHFA took a critical step toward solving this problem when we released a re-proposed capital framework for Fannie Mae and Freddie Mac. The framework targets an eventual 25 to 1 leverage ratio, or capital equal to roughly 4 percent of Adjusted Total Assets. This is the amount of loss-absorbing capital that FHFA estimates each Enterprise will need to remain a viable going concern, both on its balance sheet and in the eyes of creditors and counterparties, amid a house price shock on par with the 2008 crash.

Meeting the requirements in this capital framework, when combined with effective prudential supervision, will make Fannie Mae and Freddie Mac financially safe and sound. That must be our goal. Safety and soundness at the Enterprises means safety and soundness for millions of homeowners and renters across America.

Capital is what will allow the Enterprises to support borrowers and renters who fall on hard times through no fault of their own, like those struggling because of COVID. Capital is what will allow them to continue providing liquidity to the mortgage market.

---

[2] Signe-Mary McKernan, Caroline Ratcliffe, Eugene Steuerle, and Sisi Zhang, "Less than Equal: Racial Disparities in Wealth Accumulation," Urban Institute, https://www.urban.org/sites/default/files/publication/23536/412802-less-than-equal-racial-disparities-in-wealth-accumulation.pdf, April 2013.

Written Testimony of Dr. Mark A. Calabria, FHFA Director – House Financial Services – September 14, 2020

And capital is what will allow Fannie Mae and Freddie Mac to weather a crisis and continue doing their part to help ensure all Americans have an affordable place to call home, whether it is rented or owned. This is the foundation of reliable mortgage credit access during periods of financial stress.

The primary beneficiaries of a financial system's safety and soundness are the families it serves. Avoiding another housing crisis and recession benefits all families, but it is especially important for low-income and minority families who are first to lose their jobs and savings when downturns hit.

As the COVID crisis has clearly shown, there are still critical vulnerabilities in our mortgage system that put taxpayers and our housing market at risk. The longer our housing finance system continues without needed reforms, the greater the risk that the American housing market collapses again when it comes under strain.

FHFA has the statutory responsibility and authority to stabilize the Enterprises and to restore them to safety and soundness with appropriate capital requirements and effective prudential regulation. The Agency has made great progress in matching the Enterprises' risk to their capital, and FHFA's new rule will require enough loss-absorbing capacity for them to be able to fulfill their counter-cyclical mission.

But only Congress can enact the full range of reforms necessary to fix the structural flaws in our housing finance system. To that end, in June of this year, I included in FHFA's recent Annual Report to Congress several legislative recommendations to strengthen FHFA with additional regulatory and supervisory authorities on par with those of other independent federal financial regulators.

I stand ready to work with all who share the goal of building a stronger, more resilient housing finance system in America.

Written Testimony of Dr. Mark A. Calabria, FHFA Director – House Financial Services – September 14, 2020