# EXHIBIT H



Speech

# Prepared Remarks of Dr. Mark A. Calabria, Director of FHFA, at Mortgage Bankers Association - 2020 Convention and Expo

10/19/2020

**Public Remarks as Prepared for Delivery**

**Dr. Mark A. Calabria**

**Director, Federal Housing Finance Agency**

MORTGAGE BANKERS ASSOCIATION

2020 ANNUAL CONVENTION AND EXPO

MONDAY, OCTOBER 19, 2020

VIRTUAL

Thank you, Susan [Stewart], for that introduction and for inviting me to speak today. I want to thank you and Kristy Fercho for your leadership and our conversations over the recent months.

While I wish we could be meeting in person, I always appreciate any opportunity to speak with the Mortgage Bankers Association. I have lost track of the number of MBA events I have attended over the years. But I know that this is the fourth time I have addressed the MBA as FHFA Director. And I look forward to many more over my next 3 and a half years.

I want to thank Bob Broeksmit for his continued partnership in working with FHFA and industry throughout the pandemic.

He and I both understand the importance of Fannie and Freddie during a challenging time for homeowners, as we have seen in this pandemic. I appreciate Bob's constructive feedback and look forward to working with him and all of MBA's members over the rest of the year and beyond.

As Bob knows, working closely with FHFA's stakeholders has been a top priority of mine. The past seven months illustrate how important it is for FHFA to hear from market participants and consumers across the country. We welcome and need that feedback.

And I thank the Mortgage Bankers Association for providing your insights and perspectives.

Building on our commitment to collaboration, today, I am announcing to the MBA Annual that FHFA is releasing a new rule that will ensure stakeholders and the public always have a formal opportunity to provide feedback when the Enterprises consider new products or lines of business. I will provide more detail on this proposed rule in a few minutes. But first, let me bring you up to date on our response to COVID.

Since early March, we have all been doing our part to respond to the COVID-19 national emergency. In that time, I have personally held almost 100 meetings and calls to keep an open line of communication.

MBA members have been on the front lines of the response to COVID's effects on borrowers. You have helped millions get into forbearance plans. Now, you are helping many who are ready to get back to paying their mortgage. You have helped homeowners benefit from historically low rates through refinancing.

And throughout it all, you have continued underwriting the good loans that make homeownership both affordable and sustainable. I appreciate all your efforts that have helped keep the market functioning through this time of stress.

I have been humbled to be able to play my part in this effort. You have seen the team at FHFA move swiftly to respond to the developing challenges. Working with our regulated entities, we have helped borrowers and renters stay safe in their homes.

And we have taken steps to help the mortgage market continue functioning both during and after this crisis.

When local government offices were shutting down across the country, FHFA authorized loan-closing, employment-verification, and appraisal flexibilities. These flexibilities have kept the origination process open and ensured the physical safety of market participants. And I am pleased to announce today that we are extending these flexibilities until at least November 30.

I want to thank Bob and MBA's leadership team for their support of these flexibilities. You have been an essential resource in helping FHFA understand how they are used by your members.

We suspended all single-family foreclosures and foreclosure-driven evictions. This policy has protected more than 28 million homeowners and enabled roughly 200,000 families facing foreclosure pre-COVID to stay in their homes. FHFA recently extended the foreclosure and eviction moratorium through the end of this year.

We allowed homeowners to receive forbearance from their mortgage payments for up to 12 months. We had the Enterprises work with servicers to develop loan modification options and repayment plans. This ensures borrowers will not face payment shock.

We allowed borrowers in forbearance who return to making payments to repay what they missed when they sell their home or refinance their loan. This made one consistent set of options available to all borrowers in forbearance.

The payment deferral option is good for borrowers, servicers, and MBS investors. I want to thank MBA for their support of this new repayment option.

From the outset, we have emphasized that those who can make their mortgage payments should continue doing so. Of the borrowers with an Enterprise-backed mortgage in forbearance, about one-fifth continue to make payments. As I announced to the MBA conference this May, FHFA directed the Enterprises to treat these borrowers as current if they buy a new home or refinance.

We made sure that distressed borrowers do not have to deal with endless rounds of paperwork to negotiate with their servicer. This stands in stark contrast to the experience following the 2008 crisis. We specifically avoided the constantly changing rules under HARP and HAMP that added so much confusion in the last crisis.

I made clear that we would operate on an honor system. And thus far the data shows very little indication of abuse by Fannie or Freddie borrowers during this national emergency.

FHFA has also taken action to protect renters impacted by COVID. For the first time in history we developed nationwide multifamily forbearance programs that prohibit landlords in forbearance from evicting tenants for the nonpayment of rent.

We allowed multifamily property owners to extend their forbearance for an additional three months on the condition that they adopt stronger renter protections.

At our direction, the Enterprises created online lookup tools that allow renters and borrowers to determine if they are eligible for eviction protection or forbearance. Renters in roughly 170,000 multifamily units are protected by these programs.

I want to thank the MBA team for your assistance on multifamily market issues. You were instrumental in helping FHFA connect with a variety of market participants, including life insurers, lenders, and CMBS investors and issuers.

This gave us a holistic look at what was going on in the multifamily space, especially given all the uncertainty introduced by COVID. MBA has also been tremendously helpful by providing forecasting information and feedback related to the multifamily forbearance programs. This dialogue and partnership have been critical to the success of our COVID response.

Single-family forbearance was largely adapted from existing natural disaster programs. But we designed the nationwide multifamily forbearance programs from the ground up at the outset of the crisis. This has been somewhat like building the plane while we are flying it. Your feedback has allowed us to continue developing these programs to ensure that relief was available and fair to all parties involved.

We have been closely monitoring the data to see how consumers are responding and how all our policies are working. At this point, I am optimistic about what the data is telling us.

It is encouraging to see Enterprise forbearance rates continue declining. Enterprise single-family forbearance peaked at just over 6 percent in May. According to the latest MBA data, which is similar to our own, it is now down to 4.03 percent.

I recognize that servicers have entered another busy period as the expiration of many initial forbearance plans now requires them to contact and review options with each borrower. Thank you again for doing the hard work of helping borrowers through this time of financial stress.

FHFA has also taken action to support the functioning of the mortgage market, both during and after this crisis.

In April, we recognized that nonbank servicers needed clarity to serve the market in that stressed environment. In response, FHFA instituted a four-month limit on servicers' obligations to advance principal and interest on loans in forbearance. This advance obligation limit has provided much-needed stability and clarity to the mortgage market.

To support lenders' liquidity, FHFA enabled the Enterprises to purchase certain single-family mortgages that go into forbearance between closing and delivery.

It is important to recognize that the Enterprises had never before purchased loans in forbearance. The status quo was that they could not buy these loans. FHFA put a new option on the table for the first time.

I am proud of FHFA's response to this pandemic. Our actions have helped homeowners, renters, and the housing market deal with this crisis. But they have also come at a cost.

The Enterprises estimate that these policies will cost at least $6 billion. That is $4 billion in loan losses from projected forbearance defaults, $1 billion in losses from the foreclosure moratorium, and another $1 billion in forbearance expenses.

These figures could be even higher depending on the path of the economic recovery.

To cover these projected losses, starting December 1, the Enterprises will be adding an adverse market fee of 0.5 percent to some refinance acquisitions.

FHFA tailored the fee to ensure low-income borrowers can continue accessing record-low rates to reduce their monthly mortgage payments. Exempt from the fee are borrowers with loan balances of $125,000 or less, nearly half of whom are at or below 80 percent of area median income. Also exempt are affordable refinance products, Home Ready and Home Possible.

It is critical to remember that this fee covers losses that are the result of policies that have helped millions of Americans stay safe in their homes during a global pandemic.

And it is important to recognize that Congress has not provided the Enterprises any funding to offset the costs of these policies. However, the Enterprises' congressional charters explicitly say that expenses must be recovered via income.

The fee was originally scheduled to go into effect September 1. But after listening to the feedback from stakeholders, including MBA, FHFA delayed implementation until December 1. This recognizes that Congress may take the opportunity to review alternatives.

Most financial institutions are required to maintain reserves of loss-absorbing capital exactly for situations like this. By contrast, Fannie and Freddie were required for years to send almost every penny of their loss-absorbing capital to the U.S. Treasury.

 As a result, when I walked in the door at FHFA, Fannie and Freddie were leveraged about 1,000 to 1. If the Enterprises had still been leveraged 1,000 to 1, they would have already failed in response to COVID. On the other hand, if Fannie and Freddie had more capital when COVID hit, they would have been able to provide even more support.

Moving forward, we will continue to keep a close eye on the data and update Enterprise policies to remain responsive to the needs of borrowers, renters, and market participants.

FHFA's analytical capabilities have expanded considerably this year, thanks in large part to MBA's own former VP for Research and Economics, Dr. Lynn Fisher. She now leads FHFA's new Division of Research and Statistics, whose work has served as the foundation of our data-driven COVID response.

And it will remain essential as FHFA continues to fulfill our statutory responsibilities that guided our work well before the outbreak of COVID. That includes ensuring our regulated entities foster competitive, liquid, efficient, and resilient housing finance markets.

Fostering competitive markets requires leveling the playing field and ensuring that the same rules apply equally to all market participants. One of the troubling trends leading up to the 2008 housing crash was that the biggest players in the market received special treatment, like guarantee fee discounts, because of their size and volume.

I have nothing against the big players. But their size means they do not need to worry about access to capital markets.

That is why, last year, FHFA put an end to lingering volume-based discounts, variances, and exceptions at Fannie and Freddie. Small lenders must have access to the secondary market at terms equitable with larger players.

This is a critical step toward leveling the playing field in the housing finance marketplace. Mortgage bankers understand the benefits of competition. A competitive and fair secondary mortgage market will better serve borrowers and lenders.

And I look forward to the days of Fannie and Freddie trying to grab market share by giving preferential treatment to the biggest firms being behind us. We need to see a culture at Fannie and Freddie that treats all lenders equally.

We are looking at every rule and regulation to ensure that we are creating that level playing field across the industry. This should bring added confidence to all market participants. And it will make our entire housing finance system more resilient as well.

But there is much more that needs to be done to ensure the stability of our housing finance markets. In particular, the Enterprises must build capital.

We have made progress on that front. Fannie and Freddie's combined leverage ratio is now down to roughly 250 to 1. This is certainly better than 1,000 to 1. But it is not close to safety and soundness. In their current condition, Fannie and Freddie will fail in a serious housing downturn.

Capital absorbs losses and enables the Enterprises to continue supporting borrowers and the mortgage market during times of stress. The more capital an Enterprise has, the more support it can provide.

The day after I spoke to the MBA conference this past May, FHFA released a re-proposed regulatory capital framework for the Enterprises. The comment period for the capital rule closed at the end of August. We were pleased with both the quantity and the quality of the comment letters.

And I want to thank MBA for the comments that were submitted on behalf of your members. Based on those comments, FHFA is now hard at work to finalize the rule.

Fannie and Freddie were chartered specifically to provide countercyclical support to housing finance markets. To do this, they must have enough capital to be able to write new business when financial markets tighten. That is the core objective of this capital rule.

Meeting all the capital rule's requirements will be essential for Fannie and Freddie to become financially safe and sound. You may have seen recently that the Financial Stability Oversight Council, composed of the leading federal financial regulators, confirmed this after conducting an activities-based analysis of Fannie and Freddie.

Their findings included that, under certain scenarios, the re-proposed capital rule may not provide enough capital to withstand a serious downturn in the housing market.

Overall, the capital rule is built on the lessons of the 2008 crisis. The goal is to ensure the Enterprises operate in a safe and sound manner in order to support sustainable, affordable homeownership across the economic cycle.

For most families, homeownership is a key step toward achieving financial security and building a brighter future. But under the wrong conditions, it can be financially devastating, resulting in foreclosure, destroyed credit, and displacement.

The factor that makes the biggest difference between these two outcomes is the borrower's ability to repay the loan, as reflected in the Dodd-Frank Act.

This has been recently demonstrated by the fact that borrower debt-to-income has been one of the strongest predictors of forbearance. And too many Americans experienced this first-hand in the last financial crisis.

We also know that a major driver of today's racial homeownership gap is that minority households went into the 2008 crisis with extremely high levels of leverage.

While leverage maximizes the upside in good times, it also maximizes the downside in bad times.

From 2001 to 2005, African American and Hispanic mortgage borrowing increased 78 and 116 percent, respectively. But from 2005 to 2015, the number of minority borrowers plummeted by 63 percent.

Minority households lost significant amounts of wealth because of the housing market collapse. Between 2007 and 2010, household wealth declined 31 percent for African American families and over 40 percent for Hispanic families.

This experience demonstrates that the benefits of owning a home require homeownership to be both affordable and sustainable. FHFA's job is to ensure the Enterprises support both.

Fannie and Freddie will continue to support access to credit and be subject to their Duty to Serve and Affordable Housing Goals. But as we learned from 2008, in order to provide stability to the housing finance system across the cycle, the Enterprises must be stable themselves. And to do that, the Enterprises must build capital.

The goal of the capital rule is safety and soundness at the Enterprises because that means safety and soundness for millions of homeowners and renters across America.

While working on the Senate Banking Committee in 2008, I spent a considerable amount of time answering calls from Americans facing foreclosure. We cannot forget that when mortgage finance goes bad, it is families that pay the price.

Of course, having a capital rule is not the same as having capital. But it is a critical step toward ensuring that the Enterprises can support sustainable homeownership throughout the economic cycle.

It is also a critical step toward responsibly ending the conservatorships. It was insufficient capital that triggered the conservatorships. And building private capital is a necessary precondition to ending them.

Ending the conservatorships will be process-driven, not calendar-driven. Other critical mile-markers include putting in place prudent and sustainable lending standards, sound risk management, and world-class regulation that applies the same set of rules to all market participants.

FHFA is implementing regulatory reforms that prepare the Agency and the Enterprises to operate effectively outside of the conservatorship framework. Our goals are to cement FHFA as a world-class regulator and ensure Fannie and Freddie are first-in-class in corporate governance and risk management.

Toward that end, as I mentioned earlier, today FHFA is releasing a new proposed rule related to Enterprise new activities.

FHFA is obligated to ensure Fannie and Freddie stay focused on their core mission and do not stray into business the market already serves well. Feedback from those on the ground helps us hold this line.

This rule will help clarify the post-conservatorship housing finance market. And it will establish a process that allows stakeholders and the public to remain engaged in shaping the future of the housing finance market as it develops.

The Housing and Economic Recovery Act of 2008 requires Fannie and Freddie to provide FHFA notice before undertaking a new activity or offering a new product. FHFA issued an interim final rule implementing these requirements in 2009.

But that process has been little used during the conservatorships. FHFA's new proposed rule retains the key concepts from the 2009 rule, while clarifying the definitions of new activities and products. We also streamlined the notice and review process.

Under the proposed rule, after an Enterprise submits a completed notice of a new activity, FHFA has 15 calendar days to determine if the new activity is a new product that needs public notice and comment. If FHFA does not determine that it merits public notice and comment within 15 calendar days, the new activity can proceed.

If FHFA determines that the new activity is in fact a new product, we will publish a notice soliciting comments for a 30-day period. We then make a decision on approval or non-approval within 30 days of the comment period ending. All these timelines are set in law.

This process only needs to occur once for each approved new product. For example, Fannie can offer a new product that is identical to or substantially similar to one for which Freddie already received approval – or vice versa.

In such cases, Fannie would simply need to give FHFA a 15-day advance notice with a description of the product and an explanation if it is substantially similar.

Importantly, the process established by this proposed rule will ensure that stakeholders like MBA and your members will have reliable, transparent opportunities to comment on new developments at the Enterprises. This is especially important when Fannie and Freddie are pursuing new lines of business.

One of the critical objectives of the 2008 reforms contained in HERA was ensuring that the activities of Fannie and Freddie remain confined to the secondary market.

I think these examples and the past several months prove that FHFA is not just willing to receive input and feedback from stakeholders. We are eager to do so. This is a testament to the hardworking employees of FHFA. And it reflects the fact that we depend on hearing from all voices in order to do our job well.

I am grateful that the Mortgage Bankers Association has been a strong partner in this effort. You will always have an open door to bring us on-the-ground knowledge from your members.

I look forward to continuing to engage with you on our COVID response, the capital rule, and much more.

Thank you again for inviting me to address your conference and participate in this important discussion. I look forward to many conversations to come.

**Contacts:**
Media: Raffi Williams **Raffi.Williams@FHFA.gov** / Adam Russell **Adam.Russell@FHFA.gov**

© 2023 Federal Housing Finance Agency