# EXHIBIT B

**Statement of Melvin L. Watt**
**Director, Federal Housing Finance Agency**


Before the U.S. House of Representatives Committee on Financial Services


January 27, 2015


Chairman Hensarling, Ranking Member Waters and members of the Committee, thank you for inviting me to testify today about our work at the Federal Housing Finance Agency (FHFA) and for providing my first opportunity to return to this Committee since I left Congress.

FHFA was established by the Housing and Economic Recovery Act of 2008 (HERA) and is responsible for the effective supervision, regulation, and housing mission oversight of the Federal National Mortgage Association (Fannie Mae), the Federal Home Loan Mortgage Corporation (Freddie Mac), and the Federal Home Loan Bank System, which includes 12 Federal Home Loan Banks (FHLBanks) and the Office of Finance.  FHFA's mission is to ensure that these regulated entities operate in a safe and sound manner and that they serve as a reliable source of liquidity and funding for housing finance and community investment.  Since 2008, FHFA has also served as conservator of Fannie Mae and Freddie Mac (together, the Enterprises).

I am pleased to provide an overview of FHFA's statutory responsibilities and an update on the Enterprises' financial condition, FHFA's activities as regulator and conservator of the Enterprises, the FHLBanks' financial condition, and FHFA's regulatory activities as regulator of the FHLBanks.


## FHFA's Statutory Responsibilities

    **I.**     **FHFA's Regulatory Oversight of the Federal Home Loan Banks, Fannie Mae and Freddie Mac**

The Federal Housing Enterprises Financial Safety and Soundness Act (the Safety and Soundness Act), as amended by HERA, requires FHFA to fulfill the following responsibilities in our oversight of the Federal Home Loan Bank System (FHLBank System) and the Enterprises:

       (A) to oversee the prudential operations of each regulated entity; and

       (B) to ensure that--

1

(i) each regulated entity operates in a safe and sound manner, including maintenance of adequate capital and internal controls;

(ii) the operations and activities of each regulated entity foster liquid, efficient, competitive, and resilient national housing finance markets (including activities relating to mortgages on housing for low- and moderate-income families involving a reasonable economic return that may be less than the return earned on other activities);

(iii) each regulated entity complies with this chapter and the rules, regulations, guidelines, and orders issued under this chapter and the authorizing statutes;

(iv) each regulated entity carries out its statutory mission only through activities that are authorized under and consistent with this chapter and the authorizing statutes; and

(v) the activities of each regulated entity and the manner in which such regulated entity is operated are consistent with the public interest.

12 U.S.C. § 4513(a)(1).

## II.    FHFA's Role as Conservator of Fannie Mae and Freddie Mac

Congress granted the Director of FHFA the discretionary authority in HERA to appoint FHFA as conservator or receiver of Fannie Mae, Freddie Mac, or any of the Federal Home Loan Banks, upon determining that specified criteria had been met.  On September 6, 2008, FHFA exercised this authority to place Fannie Mae and Freddie Mac into conservatorships.  Subsequently, Fannie Mae and Freddie Mac together received $187.5 billion in taxpayer support under the Senior Preferred Stock Purchase Agreements (PSPAs) executed with the U.S. Department of the Treasury.  FHFA continues to oversee these conservatorships.

As conservator of the Enterprises, FHFA is mandated to:

(D) …take such action as may be--

(i) necessary to put the regulated entity in a sound and solvent condition; and

(ii) appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity.

12 U.S.C. § 4617(b)(2)(D).

As conservator, FHFA must also fulfill the responsibilities enumerated above in 12 U.S.C. § 4513(a)(1).  Additionally, FHFA has a statutory responsibility under the Emergency Economic Stabilization Act of 2008 (EESA) to "implement a plan that seeks to maximize assistance for

2

homeowners and use its authority to encourage the servicers of the underlying mortgages, and considering net present value to the taxpayer, to take advantage of…available programs to minimize foreclosures."  12 U.S.C. § 5220(b)(1).

My goal, as Director of FHFA since January 6, 2014, has been to lead FHFA in meeting the mandates assigned to it by statute until such time as Congress revises those mandates.


## FHFA's Actions as Regulator and Conservator of Fannie Mae and Freddie Mac

As regulator and conservator of Fannie Mae and Freddie Mac, FHFA has taken consistent actions in the past year to ensure their safety and soundness, to ensure that they provide liquidity to the housing finance market, to preserve and conserve their assets, and to ensure that they meet their obligations to homeowners under EESA.

### I.      Financial Performance and Condition of Fannie Mae and Freddie Mac

Since the Enterprises were placed in conservatorship in 2008, their operations have stabilized and their financial performance has improved significantly.  Fannie Mae has not made a draw under the PSPA since the fourth quarter of 2011, and Freddie Mac has not made a draw since the first quarter of 2012.  Some of the improvement in the Enterprises' performance relates to one-time or transitory items, such as the reversal of each Enterprise's deferred tax asset valuation allowance, legal settlements, and the release of loan loss reserves as a result of rising house prices.  Part of the improvement is also attributable to other factors, including responsible business practices, strengthened underwriting practices, rising house prices, and increased guarantee fees.

While steps taken in the conservatorships have helped stabilize the Enterprises' financial condition and the mortgage market, significant challenges remain.  Serious delinquencies have declined but remain historically high compared to pre-crisis levels, and counterparty exposure remains a concern.  While risks from the Enterprises' mortgage-related investment portfolios are declining as the size of their portfolios shrinks, revenues from these portfolios are also shrinking. Both Enterprises continue to work to maintain and improve the effectiveness and efficiency of their operational and information technology infrastructures.  Additionally, under the terms of the PSPAs, the Enterprises do not have the ability to build capital internally while they remain in conservatorship.  Attracting and retaining the best qualified workforce in this period in which the future of the Enterprises is uncertain also continues to be a challenge.

Other significant financial and performance highlights about the Enterprises include the following:

3

Fannie Mae
- For the first nine months of 2014, Fannie Mae reported earnings of $12.9 billion compared to net income of $77.5 billion for the first nine months of 2013, which reflected a number of one-time or transitory items.  Calculations have not yet been completed for 2014 and, therefore, comparisons are being made here on the basis of three quarters.

- The cumulative amount of draws that Fannie Mae has received from the Treasury to date under its PSPA is $116.1 billion.  Through September 30, 2014, Fannie Mae has paid $130.5 billion in cash dividends to Treasury on the company's senior preferred stock.  Under the PSPA, dividends do not offset prior Treasury draws.

- The credit quality of new single-family acquisitions was strong through the third quarter of 2014, with a weighted average FICO score of 743 and a weighted average loan-to-value (LTV) ratio of 77 percent.

- The serious delinquency rate was 1.96 percent for Fannie Mae's total single-family book of business as of September 30, 2014.  The serious delinquency rate for loans acquired between 2005 and 2008 was 8.27 percent compared to 0.34 percent for loans acquired since 2009 as of September 30, 2014.  The serious delinquency rate for loans acquired prior to 2005 was 3.27 percent.

- Fannie Mae continues to reduce its retained portfolio in accordance with the PSPA.  As of September 30, 2014, Fannie Mae's retained portfolio balance was $438.1 billion, which represents a decline of $52.6 billion since the beginning of the year, when the balance was $490.7 billion.


Freddie Mac
- For the first nine months of 2014, Freddie Mac reported earnings of $7.5 billion, compared to net income of $40.1 billion for the first nine months of 2013, which reflected a number of one-time or transitory items.

- The cumulative amount of draws that Freddie Mac has received from the Treasury to date under its PSPA is $71.3 billion.  Through September 30, 2014, Freddie Mac has paid $88.2 billion in cash dividends to Treasury on the company's senior preferred stock.  Under the PSPA, dividends do not offset prior Treasury draws.

- The credit quality of new single-family acquisitions remained high through the third quarter of 2014, with a weighted average FICO score of 744 and a weighted average LTV ratio of 77 percent.

- The serious delinquency rate was 1.96 percent for Freddie Mac's single-family book of business as of September 30, 2014.  The serious delinquency rate for loans originated between 2005 and 2008 was 7.66 percent compared to 0.23 percent for loans originated

4

since 2009 as of September 30, 2014. The serious delinquency rate for loans originated prior to 2005 was 3.12 percent.

- Freddie Mac continues to reduce its retained portfolio in accordance with the PSPA. As of September 30, 2014, Freddie Mac's retained portfolio balance was $413.6 billion, which represents a decline of $47.4 billion since the beginning of the year, when the balance was $461.0 billion.

## II.     FHFA's Supervisory Activities Related to the Enterprises

FHFA's supervision function evaluates the safety and soundness of the Enterprises' operations. Safety and soundness is a top priority in meeting FHFA's statutory obligations, in execution of Enterprise strategic initiatives and in all business and control functions. FHFA takes a risk-based approach to supervision, which prioritizes examination activities based on the risk a given practice poses to a regulated entity's safe and sound operation or its compliance with applicable laws and regulations. FHFA conducts on-site examinations at the regulated entities, ongoing risk analysis, and off-site review and surveillance. FHFA communicates supervisory standards to the regulated entities, establishes expectations for strong risk management, identifies risks, and requires remediation of identified deficiencies.

In 2014, FHFA issued supervisory guidance to the Enterprises on topics related to operational risk management, counterparty risk management, mortgage servicing transfers, cyber risk management, and liquidity risk management. This guidance articulates FHFA's supervisory expectations related to those matters and informs examination activities. Examples of important guidance issued during 2014 include the following:

Advisory Bulletin 2014-05, *Cyber Risk Management Guidance*, describes the characteristics of a cyber risk management program that FHFA believes will enable the regulated entities to successfully perform their responsibilities and protect their environments. FHFA's key expectations include Enterprise assessment of system vulnerabilities, effective monitoring of cyber risks, and oversight of third parties with access to Enterprise data.

Advisory Bulletin 2014-06, *Mortgage Servicing Transfers,* articulated FHFA's supervisory expectations for the Enterprises with regard to servicing transfers of mortgage loans that they hold or guarantee. Pursuant to contracts with their counterparties, the Enterprises must approve the transfer of servicing operations or servicing rights. FHFA has focused on Enterprise approval processes for these transactions due in large part to the significant recent transfers of mortgage servicing operations from federally-regulated banks to non-bank entities that are generally subject to less regulation and are more concentrated in their operations.

PX-0585 - p. 5 of 19

Advisory Bulletin 2014-07, *Oversight of Single Family Seller/Servicer Relationships*, articulated FHFA's requirement that the Enterprises assess financial, operational, and compliance risks associated with their counterparties and develop a risk management framework that can be applied throughout the Enterprise's contractual relationship with seller/servicers.

Standards set by FHFA are also reflected in guidance to our examiners, which is provided in FHFA's Examination Manual.  The manual includes twenty-six modules that cover various Enterprise operations and provide background on a range of operational, credit, and market risks. The manual is a valuable tool for implementing FHFA's risk-based approach to supervision of the Enterprises and is available on FHFA's website.

FHFA maintains a team of examiners on-site at each Enterprise, and the examiners receive support from off-site analysts and subject matter experts.  Examination teams perform targeted examinations of specific Enterprise operations and conduct ongoing monitoring of risk control functions and business lines.  The examination work is performed in accordance with plans prepared annually for each Enterprise, taking into account factors such as analysis of existing risks, changes in business operations and strategic initiatives, and mortgage market developments.  Where FHFA's Enterprise supervision team identifies deficiencies, examiners communicate expectations for remedial action.  Examiner risk assessments are updated during the year to ensure that emerging risks and Enterprise business changes receive appropriate examination coverage.

Findings from targeted examinations and ongoing monitoring conducted through the course of the year are relied upon by examiners in assigning ratings to each Enterprise under the ratings system adopted by FHFA in 2013.  The system, known as CAMELSO, includes separate ratings for Capital, Asset quality, Management, Earnings, Liquidity, Sensitivity to market risk, and Operations.  The examination findings are also incorporated into annual Reports of Examination, which capture FHFA's view of the safety and soundness of each Enterprise's operations. Information from the Reports of Examination is included in FHFA's annual Report to Congress.

### III.    FHFA's Strategic Goals and Scorecard Objectives for the Conservatorships of Fannie Mae and Freddie Mac

During 2014, FHFA defined and worked to further the objectives included in the *2014 Strategic Plan for the Conservatorships of Fannie Mae and Freddie Mac* (2014 Conservatorship Strategic Plan) and the 2014 Conservatorship Scorecard.

FHFA has already published the *2015 Scorecard for Fannie Mae, Freddie Mac and Common Securitization Solutions* (2015 Conservatorship Scorecard), which details FHFA's

6

conservatorship expectations for the Enterprises during 2015 and builds on last year's Scorecard. Both the 2014 and 2015 Conservatorship Scorecards are centered around three strategic goals.

**A. MAINTAIN, in a safe and sound manner, credit availability and foreclosure prevention activities for new and refinanced mortgages to foster liquid, efficient, competitive, and resilient national housing finance markets**

FHFA's first strategic goal, MAINTAIN, requires the Enterprises to support access to credit for single-family and multifamily mortgages, as well as foreclosure prevention activities. FHFA and the Enterprises have focused on a number of objectives under this strategic goal in the last year, including clarifying the Representation and Warranty Framework, providing targeted access to credit opportunities for creditworthy borrowers, working with small and rural lenders, implementing loan modification and REO strategies in hardest hit communities, and prioritizing affordable housing through multifamily loan purchases. In the 2015 Conservatorship Scorecard, FHFA also expressed an expectation that the Enterprises address other priorities, such as assessing the reliability of and the operational feasibility of using alternate or updated credit score models.

*Representation and Warranty Framework*
FHFA and the Enterprises made substantial progress on updating and clarifying the Representation and Warranty Framework (Framework) during 2014, and these efforts build on the agency's work over the last several years to refine the Framework. The Framework provides Fannie Mae and Freddie Mac with remedies – such as requiring a lender to repurchase a loan – when they discover that a loan purchase does not meet their underwriting guidelines. In updating and clarifying the Framework, FHFA's objectives are to continue to support safe and sound Enterprise operations, encourage lenders to reduce their credit overlays, and complement the agency's efforts to strengthen the Enterprises' quality control process.

FHFA prioritized providing greater clarity around the life-of-loan exclusions used in the Framework during 2014, and the Enterprises announced further improvements in this area on November 20, 2014. Specifically, those changes 1) limit repurchase requests under the life-of-loan exclusions to significant matters that impact the overall credit risk of the loan; 2) modify the life-of-loan exclusions for misrepresentations and data inaccuracies to incorporate a significance test; 3) clarify the requirements for requesting repurchase related to compliance with applicable laws and regulations; and 4) provide lenders a list of unacceptable mortgage products. The changes provide all parties with greater clarity about when the life-of-loan exemptions apply and when they do not. These revisions also maintain and support safe and sound Enterprise operations and are consistent with FHFA's broader efforts to ensure that the Enterprises' place more emphasis on upfront quality control reviews and other upfront risk management practices.

7

Earlier in 2014, FHFA and the Enterprises also announced other Framework refinements that included revising payment history requirements, providing written notification of repurchase relief to lenders, and eliminating automatic repurchases for mortgage insurance rescissions.

We also started efforts in 2014 to develop an independent dispute resolution program that could be used as a last step, in certain circumstances, to resolve disputes between lenders and the Enterprises. This would enable lenders to challenge a repurchase request by allowing them to request a neutral third party to determine whether there was a breach of the selling representations and warranties that justifies the repurchase request. Currently, FHFA and the Enterprises are engaged in outreach activities with a variety of lenders and dispute resolution providers to solicit their input on the initial design of the dispute resolution process. Under the 2015 Conservatorship Scorecard, FHFA expects the Enterprises to finalize these improvements to the Representation and Warranty Framework in 2015.

_Providing Targeted Access to Credit Opportunities for Creditworthy Borrowers_
On December 8, 2014, Fannie Mae and Freddie Mac announced purchase guidelines that enable creditworthy borrowers who meet stringent criteria and can afford a mortgage, but lack the resources to pay a substantial down payment plus closing costs, to get a mortgage with a three percent down payment. These purchase guidelines will provide an important – but targeted – access to credit opportunity for creditworthy individuals and families.

To appropriately manage the Enterprises' risk, the Enterprises' purchase guidelines emphasize strong underwriting standards and do not allow the kind of risk layering that occurred in the years leading up to the housing crisis. First, the purchase guidelines for these loans include compensating factors and risk mitigants – such as housing counseling, stronger credit histories, or lower debt-to-income ratios – to evaluate a borrower's creditworthiness. Second, like other loans purchased by the Enterprises, these loans must have full documentation and cannot include 40-year or interest-only terms. Third, 97 percent LTV loans must be fixed-rate and cannot have an adjustable rate. Fourth, the products will leverage the Enterprises' existing automated underwriting systems. Finally, like other loans with down payments below 20 percent, these loans require private capital credit enhancement, such as private mortgage insurance.

The Enterprises' purchase guidelines for the 97 percent LTV loan product provide a responsible approach to improving access to credit while also furthering safe and sound lending practices. The product focuses on first-time homebuyers and requires borrowers to be owner-occupants. Both Enterprises expect to purchase only a small amount of these loans each year compared to their overall loan purchase volume, and FHFA will be monitoring the ongoing performance of these loans.

*Working with Small Lenders, Rural Lenders and Housing Finance Agencies*

The Enterprises have also continued efforts to work with small lenders, rural lenders, and Housing Finance Agencies (HFAs) and to strengthen their understanding of how the Enterprises might be able to better serve these entities.  This work is important because we know that community-based lenders and HFAs play a vital role in serving rural and underserved markets across the country.

In the first quarter of 2014, the Enterprises issued lender guidance clarifying a number of property and appraisal requirements for dwellings in small towns and rural areas.  Further, as part of its ongoing effort to serve the affordable housing market and provide liquidity to small towns and rural areas, Fannie Mae revised its Selling Guide in September 2014 to allow for the delivery of Department of Housing and Urban Development (HUD)-guaranteed Section 184 mortgages and Department of Agriculture Rural Development (RD)-guaranteed Section 502 loans as standard instead of negotiated-only products.  Fannie Mae also piloted expanded partnerships with county-level HFAs which go beyond its traditional state-level approach.

FHFA expects the Enterprises to continue outreach and initiatives with small lenders, rural lenders, and HFAs in 2015, including exploring the feasibility of purchasing a greater number of manufactured housing loans that are secured by real estate.

*Loss Mitigation and Foreclosure Prevention Activities*

Since entering conservatorship, the Enterprises have continued to focus on loss mitigation and borrower assistance activities.  As of October 31, 2014, the Enterprises had conducted nearly 3.4 million foreclosure prevention actions since the start of the conservatorships in September 2008.

The 2015 Conservatorship Scorecard provides updated expectations for the Enterprises concerning their loss mitigation and foreclosure prevention activities.  This includes expectations for the Enterprises to develop and execute strategies that reduce both the number of severely aged delinquent loans and the number of vacant real estate owned (REO) properties held by the Enterprises.  These efforts will leverage and build on activities over the last year, including the Neighborhood Stabilization Initiative.  Through this effort, FHFA has selected the City of Detroit and Cook County, IL for pilot programs.  In these areas, the Enterprises have worked to improve outcomes in hardest hit markets through developing pre-foreclosure strategies, such as deeper loan modifications, and post-foreclosure strategies that address individual properties.

The 2015 Conservatorship Scorecard expectation that the Enterprises reduce the number of seriously delinquent loans they hold will also draw upon recent experience with non-performing loan (NPLs) sales.  FHFA's expectation is that the sale of seriously delinquent loans through NPL sales will result in more favorable outcomes for borrowers, while also reducing losses to the Enterprises and, therefore, to taxpayers.  In 2014, Freddie Mac conducted a pilot sale of loans

PX-0585 - p. 9 of 19

serviced by Bank of America that were, on average, more than three years delinquent at the time of sale.  In addition, FHFA is working with both Enterprises to develop additional guidelines for ongoing NPL sales by the Enterprises, with a focus on guidelines that provide more favorable outcomes for borrowers, avoid foreclosure wherever possible and require post-sale reporting to track borrower outcomes.  FHFA and the Enterprises plan to release further information about these NPL sale guidelines in early 2015.

FHFA also expects the Enterprises to continue targeted outreach activities to increase consumer awareness of the Home Affordable Refinance Program (HARP).  Many borrowers could benefit from the HARP program, but may not fully understand the benefits or that they qualify.  In addition, FHFA expects the Enterprises to continue refining and improving other loss mitigation and foreclosure prevention strategies.  In 2014, Enterprise activities in this area included expanding the Streamlined Modification program, which addresses documentation challenges associated with traditional modifications, to include deeply delinquent loans.  Moving forward, FHFA will continue to review loss mitigation options to help families stay in their homes, stabilize communities, and meet our conservatorship and EESA obligations.

_Multifamily_
For individuals and families who rent rather than buy, continuing to support affordable rental housing is also an ongoing priority for FHFA and the Enterprises.  Fannie Mae and Freddie Mac have historically played a key role in providing financing to the multifamily housing finance market throughout all market cycles and their multifamily portfolios demonstrated strong performance even through the financial crisis.

FHFA's 2015 Conservatorship Scorecard requires each Enterprise to continue multifamily purchases, but not to exceed a volume cap of $30 billion each for these purchases.  This continues the approach taken in the 2014 Conservatorship Scorecard.  FHFA has also continued to emphasize the Enterprises' critical role in the affordable rental housing market by allowing the Enterprises to provide financing for affordable multifamily properties beyond the volume cap.  Through this approach, the focus is to support the financing of affordable housing and the housing needs of people in rural and other underserved areas, including areas that rely heavily on manufactured housing.

On multifamily purchases, we are also requiring the companies to continue to share risk with the private sector, which Freddie Mac does through a capital markets structure and Fannie Mae does through a risk sharing model.  Both approaches transfer significant risk in the multifamily business to the private market.

10

**B. REDUCE taxpayer risk through increasing the role of private capital in the mortgage market**

FHFA's second strategic goal, REDUCE, is focused on ways to bring additional private capital into the system in order to reduce taxpayer risk. This strategic goal, and the related expectations in the 2015 Conservatorship Scorecard, requires the Enterprises to reduce Fannie Mae and Freddie Mac's overall risk exposure. FHFA's objectives include ongoing requirements for the Enterprises to conduct single-family credit risk transfers, reduce each Enterprises' retained portfolio, and update private mortgage insurance eligibility requirements.

*Credit Risk Transfers*
FHFA and the Enterprises remain focused on increasing the amount of credit risk transferred from the Enterprises. FHFA increased the targeted levels of single-family credit risk transfers in 2014 and 2015. FHFA increased the 2014 Conservatorship Scorecard target to achieve a meaningful credit risk transfer of $90 billion in unpaid principal balance (UPB), up from $30 billion in 2013. In the 2015 Conservatorship Scorecard, FHFA increased these targets to $150 billion of UPB for Fannie Mae and $120 billion of UPB for Freddie Mac, subject to market conditions. In meeting these thresholds, FHFA will continue to expect each Enterprise to execute a minimum of two different types of credit risk transfer transactions, which includes securities-based transactions and insurance transactions. Additionally, FHFA expects all activities undertaken in fulfillment of these objectives to be conducted in a manner consistent with safety and soundness.

During 2014, the Enterprises executed credit risk transfers on single-family mortgages with a combined unpaid principal balance of over $300 billion. In each transaction, the Enterprises retained a small first-loss position in the underlying loans, sold a significant portion of the risk beyond the initial loss and then retained the catastrophic risk in the event losses exceeded the private capital support. As a result, private capital is absorbing significant credit risk on much of Fannie Mae and Freddie Mac's new purchases, thereby substantially reducing risk to taxpayers from these purchases. Both Enterprises will also continue to utilize and test different risk transfer structures.

*Retained Portfolio Reductions*
Both Enterprises continue to reduce the size of their retained mortgage portfolios consistent with the terms of the PSPAs, which require them to reduce their portfolios to no more than $250 billion each by 2018. Both Fannie Mae and Freddie Mac have developed plans to meet this target even under adverse market conditions. As their portfolios continue to decline, they are transferring interest rate risk, credit risk on securities and liquidity risk from these portfolios to the private sector. As of September 30, 2014, Freddie Mac's portfolio stood at $414 billion, and Fannie Mae's at $438 billion.

11

Under the 2015 Conservatorship Scorecard, FHFA is requiring the Enterprises to implement their approved retained portfolio reduction plans in order to meet the PSPA requirements. FHFA's guidelines require the Enterprises to implement these plans even under adverse market conditions while taking into consideration the impacts to the market, borrowers, and neighborhood stability.

*Private Mortgage Insurer Eligibility Requirements*

FHFA has continued to advance efforts to strengthen Fannie Mae and Freddie Mac's counterparty requirements for private mortgage insurers. When a borrower makes a down payment of less than 20 percent, these mortgages are required by statute to have a credit enhancement – private capital standing behind the loan – in order to qualify for purchase by the Enterprises. Private mortgage insurance has always played an important role in meeting this requirement and it is critical to make sure that private mortgage insurers are able to cover claims both in good times and in bad times. To this end, in 2014 FHFA released a Request for Input on draft Private Mortgage Insurer Eligibility Requirements. Our objective is to have the Enterprises strengthen their risk management by enhancing the financial, business, and operational requirements in place for their private mortgage insurer counterparties, thereby enhancing mortgage insurers' ability to pay claims over the long-term.

FHFA is in the process of reviewing and considering the public input we received as part of our comprehensive evaluation of this issue. Consistent with our statutory mandates, our assessments and policy decisions will take into account both safety and soundness considerations and potential impacts on access to credit and housing finance market liquidity.

**C. BUILD a new single-family securitization infrastructure for use by the Enterprises and adaptable for use by other participants in the secondary market in the future**

FHFA's final strategic goal is to BUILD a new infrastructure for the Enterprises' securitization functions. This includes ongoing work to develop the Common Securitization Platform (CSP) infrastructure and to improve the liquidity of Enterprise securities. FHFA has established that FHFA's first objective for the CSP is to make sure that it works for the benefit of Fannie Mae and Freddie Mac. We are also requiring that the CSP leverage the systems, software and standards used in the private sector wherever possible, which will ensure that the CSP will be adaptable for use by other secondary market actors – including private-label securities issuers – in the future. In addition, FHFA has worked with the Enterprises to leverage the CSP in order to develop a Single Security, which we believe will improve liquidity in the housing finance markets. FHFA and the Enterprises have made significant progress on both the CSP and the Single Security in the past year, and we expect the Enterprises to continue moving aggressively on these multiyear initiatives in 2015.

12

### Common Securitization Platform

The Enterprises made important progress during 2014 in establishing the organizational infrastructure for the CSP. This includes the announcement of a Chief Executive Officer for Common Securitization Solutions (CSS) – the entity that we expect to house and operate the CSP.

In addition, FHFA and the Enterprises made considerable progress on the design-and-build phase of the CSP. Each Enterprise has designated staff to work on the project at the CSS location, and this team has been developing the technology and infrastructure of the CSP platform during the last year. This includes work to incorporate the Single Security into the development of the CSP. Furthermore, Fannie Mae and Freddie Mac have reorganized their staffs with business operations and information technology experts to develop the systems and processes needed to integrate with the CSP. As this work continues, Fannie Mae and Freddie Mac staff will engage in continuous testing and will develop operating policies and procedures to ensure a smooth transition to the CSP. FHFA, Fannie Mae, and Freddie Mac are committed to achieving a seamless CSP launch, and the actions taken so far are moving us in the right direction toward this multiyear goal.

### Single Security

FHFA's top priority in pursuing the Single Security is to deepen and strengthen liquidity in the housing finance markets. In today's market, the mortgage-backed securities issued by Fannie Mae and Freddie Mac trade in separate "to-be-announced" (TBA) markets. The forward-trading that takes place in TBA securities allows borrowers to lock in a mortgage rate. The TBA market also adds efficiencies to the process, which reduce transaction costs and result in lower mortgage rates for borrowers. In today's TBA market, there is a price disparity between Fannie Mae and Freddie Mac securities largely due to greater trading volumes of Fannie Mae securities. This price disparity imposes an additional cost on Freddie Mac – and therefore on taxpayers. We believe that a Single Security can further strengthen market liquidity by reducing the trading disparities between Fannie Mae and Freddie Mac securities.

FHFA issued a Request for Input on FHFA's proposed Single Security structure last year as the first step in a multiyear process. FHFA is working with the Enterprises to process the feedback we received and will move forward in a deliberate and transparent manner. FHFA will release a Progress Report on this initiative in the coming months. As part of the 2015 Conservatorship Scorecard, FHFA established the expectation that the Enterprises would finalize the Single Security structure during 2015 and would begin the process of developing a plan to implement the Single Security in the market. This remains a multiyear process, but we made significant progress during 2014.

13

### IV.    Additional Matters and Initiatives Impacting Fannie Mae and Freddie Mac

In addition to the activities outlined above, FHFA continues to work on a number of other matters and initiatives that impact Fannie Mae and Freddie Mac, several of which are highlighted below.

#### *Guarantee Fees*

One of the first decisions I made as Director of FHFA was to suspend increases in guarantee fees that had been announced by FHFA in December of 2013.  Given the impact of these fees on the Enterprises, the housing finance markets, and on borrowers, I believed that it was critical to do further evaluation and to get feedback from stakeholders.  After additional assessment at FHFA, we issued a Request for Input that provided further details on how the Enterprises set these fees and posed a number of questions to prompt substantive feedback about how guarantee fee levels affect various aspects of the mortgage market.

FHFA is now reviewing and considering the input we received as part of our comprehensive evaluation of this issue.  Consistent with our statutory mandates, our assessments and policy decisions will take into account both safety and soundness and possible impacts on access to credit and housing finance market liquidity.

#### *Fannie Mae and Freddie Mac Housing Goals*

On August 29, 2014, FHFA issued a proposed rule to set the Enterprises' housing goals for 2015 through 2017 for both single-family and multifamily loan purchases.  FHFA's proposed rule raised questions for public comment about how best to set Fannie Mae and Freddie Mac's housing goals to encourage responsible lending that is done in a safe and sound manner and that also serves the single-family and rental housing needs of lower-income families as required in HERA.  FHFA is in the process of evaluating comments submitted to the agency and finalizing the rule.

#### *Housing Trust Fund and Capital Magnet Fund*

Last month, FHFA directed Fannie Mae and Freddie Mac to begin setting aside funds to be allocated to the Housing Trust Fund and the Capital Magnet Fund pursuant to HERA.  The statute authorized FHFA to temporarily suspend these allocations, and FHFA informed Fannie Mae and Freddie Mac of a temporary suspension on November 13, 2008.  In letters sent to the Enterprises on December 11, 2014, FHFA notified Fannie Mae and Freddie Mac of the agency's decision to reverse the temporary suspension.  These letters, copies of which were provided to Members of Congress who had communicated views to FHFA about whether or not the temporary suspension should continue, established prudent safeguards in the event of adverse changes in the Enterprises' financial condition or draws under the PSPAs.

14

*Certain Super Priority Lien Programs and Risk to the Enterprises*

During 2014, FHFA has continued to monitor and assess two areas of state-level actions that threaten the legal priority of single-family loans owned or guaranteed by Fannie Mae and Freddie Mac: 1) through certain energy retrofit financing programs structured as tax assessments and 2) through granting priority rights in foreclosure proceedings for homeowner associations.

While FHFA is not opposed to energy retrofit financing programs that allow homeowners to improve energy efficiency, these programs must be structured to ensure protection of the core financing for the home and, therefore, cannot undermine the first-lien status of Fannie Mae and Freddie Mac mortgages.  Concerning certain energy retrofit financing programs, such as first-lien Property Assessed Clean Energy (PACE) programs, FHFA has reiterated that Fannie Mae and Freddie Mac's policies prohibit the purchase of a mortgage on property that has a first-lien PACE loan attached to it.  This restriction has two potential implications for borrowers.  First, a homeowner with a first-lien PACE loan cannot refinance their existing mortgage with a Fannie Mae or Freddie Mac mortgage.  Second, anyone wanting to buy a home that already has a first-lien PACE loan cannot use a Fannie Mae or Freddie Mac loan for the purchase.  In addition to aggressive enforcement of these existing policies, FHFA is continuing to evaluate or explore other possible remedies and legal actions to protect the Enterprises' lien position.

Additionally, FHFA has taken legal action in some instances in which unpaid homeowners association dues may be deemed under the laws of a state to be senior to preexisting mortgage liens owned or guaranteed by Fannie Mae or Freddie Mac on a homeowner's property.  As conservator, FHFA has an obligation to protect Fannie Mae's and Freddie Mac's rights, and will aggressively do so.


## FHFA's Actions as Regulator of the Federal Home Loan Banks

The FHLBanks continue to play an important role in housing finance by providing a reliable funding source and other services to member institutions, including smaller institutions that would otherwise have limited access to these services.  In addition, the FHLBanks have specific statutory requirements related to affordable housing and, as a result, the FHLBanks annually contribute substantially toward the development of affordable housing.

### I.      Financial Performance and Condition of the Federal Home Loan Banks

The financial performance and condition of the FHLBank System remain strong.  Led by growth in advances, the aggregate balance sheet of the FHLBanks has increased over the past two years, but remains considerably smaller than in peak years.  Advances totaled $545 billion as the end of the third quarter of 2014, up from $499 billion at year-end 2013, but down approximately 50

15

percent from a peak of $1.01 trillion in the third quarter of 2008.  The overall decline in advance volume from the peak is a result of increased market liquidity from deposits and sluggish economic growth.

Following are highlights of the financial performance of the FHLBanks:

- The FHLBanks, in aggregate, reported net income of $1.7 billion for the first three quarters of 2014 after earning $1.8 billion in the first three quarters of 2013.  All twelve FHLBanks were profitable during these quarters.

- The FHLBanks saw substantial asset growth during the first nine months of 2014, driven by advances to members.  As of the end of the third quarter of 2014, aggregate FHLBank assets totaled $883 billion and $545 billion in advances – up from $835 billion and $499 billion at the end of 2013.  Advances constituted 62 percent of assets at the FHLBanks in aggregate at the end of the third quarter of 2014, up from 60 percent at the end of 2013.

- Retained earnings have grown significantly in recent years and totaled $13.0 billion, or 1.5 percent of assets, as of the third quarter of 2014.

- Also at the end of the third quarter of 2014, the FHLBanks had an aggregate regulatory capital ratio of 5.6 percent – comfortably above the statutory minimum of 4.0 percent.

- All FHLBanks had net asset values (equity values) in excess of the par value of their members' stock holdings.  The market value of the FHLBanks was 142 percent of the par value of capital stock as of the third quarter of 2014, the highest ratio since FHFA started tracking this metric in 2002.

## II.    FHFA's Supervisory and Regulatory Activities Related to the FHLBanks

FHFA conducts annual safety and soundness and affordable housing program examinations of all 12 FHLBanks and the Office of Finance based on well-defined supervisory strategies.  Similar to the approach utilized in supervision of the Enterprises, FHFA uses a risk-based approach to conducting supervisory examinations of the FHLBanks, which prioritizes examination activities based on the risks given practices pose to a regulated entity's safe and sound operations or to its compliance with applicable laws and regulations.  FHFA's FHLBank supervision also utilizes the CAMELSO ratings system and incorporates these ratings into each FHLBanks' Report of Examination.  Information from the Reports of Examination is included in FHFA's annual Report to Congress.

Over the last few years, FHFA's supervisory work has included assessments of FHLBank mortgage purchase programs, the substantial increase in advances to a few very large member institutions, the FHLBanks' changing capital composition in light of their increasing retained

16

earnings and reduced activity stock requirements, and their management of unsecured credit. We are also currently conducting reviews of FHLBank enterprise risk management structures and approaches to vendor management.

FHFA also provides the FHLBanks supervisory guidance in the form of Advisory Bulletins that outline the agency's regulatory expectations.  In 2014, FHFA issued Advisory Bulletins 2014-02, *Operational Risk Management*, and 2014-05, *Cyber Risk Management*.  Other Advisory Bulletins applicable to the FHLBanks covered areas such as model risk management, collateral valuation and management, and the classification of risky assets.

FHFA's supervision of the FHLBanks' expanding mortgage programs involves oversight of the operational issues raised by two new products – Mortgage Partner Finance (MPF) Direct and MPF Government MBS.  The FHLBank of Chicago expects to begin offering these new products in early 2015, although this could change.  Under MPF Direct, participating members may sell non-conforming and conforming, single-family, fixed-rate mortgage loans to the Chicago FHLBank, which would concurrently sell the loans to a third-party private investor that would accumulate the loans for securitization.  The Chicago FHLBank expects, at least initially, that loans sold would be "jumbo conforming" loans capped at $729,750 for a single unit in the contiguous United States.

Under the MPF Government MBS program, the Chicago FHLBank would purchase government guaranteed or insured loans, accumulate the loans on its balance sheet as held for sale, and pool the loans in securities guaranteed by the Government National Mortgage Association (Ginnie Mae).  The Chicago FHLBank would then sell the securities to other FHLBanks, members approved to participate in the mortgage programs, and external investors.

The mission focus of the FHLBank System is an important component of FHFA's regulatory activities.  FHFA has undertaken three recent efforts related to the housing finance mission of the FHLBanks.  First, in September 2014, FHFA released a proposed rulemaking involving membership requirements for the FHLBanks.  Congress established the FHLBank System in 1932 as a government sponsored enterprise with a focus on housing finance.  Over time, Congress has expanded the membership base, expanded the types of assets that are eligible collateral for advances, and made other incremental changes to the System.  However, over eighty years later, the FHLBanks are still grounded in supporting housing finance.

Under the current membership rule, institutions may gain access to the benefits of FHLBank membership by meeting a one-time test showing the minimum required housing finance assets at the time of application.  FHFA has proposed eliminating this one-time test and, instead, requiring that FHLBank members maintain a minimum amount of housing finance assets on an ongoing basis.  In addition, FHFA has proposed defining an insurance company in such a way that

17

captive insurers would no longer be eligible for FHLBank membership.  A captive insurance company provides benefits only for its parent company, which itself is often not eligible for FHLBank membership.  While captive insurers may in some cases be involved in housing finance, allowing them to have access to the FHLBank System raises a number of policy issues that are discussed in the proposed rule.

The comment period for this proposed rule ended on January 12, 2015, and we received approximately 1,300 comments.  FHFA is in the process of reviewing and considering these comments.  As I have consistently emphasized since becoming Director of FHFA, getting input and feedback from stakeholders is a crucial part of FHFA's policymaking process, and we will carefully consider comments made by members of this Committee as well as the public in determining our final rule.

Second, FHFA has been in continued dialogue with the FHLBanks about "core mission assets." This also relates to the fundamental issue of how the FHLBanks use the benefits of their government-sponsored status to support their housing finance and community investment mission.  In partnership with the FHLBanks, I believe we are making progress in developing a framework to describe the fundamental characteristics of what a FHLBank's balance sheet should look like in order to demonstrate a satisfactory mission commitment.

FHFA's third ongoing effort related to the mission of FHLBanks is a review of FHFA's Affordable Housing Program (AHP) regulation.  The AHP program provides funding for both single-family and rental affordable housing – including housing affordable to very low-income individuals and families.  In 2013, the FHLBanks allocated $297 million to their AHPs for the purchase, construction, or rehabilitation of over 37,800 housing units.  FHFA is committed to working with the FHLBanks to make this program more efficient by reviewing, and possibly updating, our AHP regulation.

A new area of FHFA's recent regulatory work has involved the merger of the FHLBanks of Des Moines and Seattle, which would be the first merger ever of two FHLBanks.  There has been considerable change in our nation's financial system, in the membership base of the FHLBanks, and in market conditions across the various FHLBank districts since the FHLBank System was established in 1932.  As a result, the FHLBanks have seen changes in advance demand and membership composition which, in turn, has affected the fundamental franchise values of some of the FHLBanks.

These changes, in part, have led the Boards of Directors of the FHLBank of Des Moines and the FHLBank of Seattle to determine that a combined entity would better serve the needs of their members.  The Boards of both FHLBanks voted to approve their merger on September 25, 2014. FHFA reviewed and evaluated the merger application submitted by the FHLBanks of Des

18

Moines and Seattle to ensure that the merger would be accomplished in a safe and sound manner and would result in a financially strong FHLBank that supports the interests of all its members. FHFA issued an approval of the merger application on December 22, 2014, contingent upon the members of both FHLBanks ratifying the merger and meeting other specified conditions.  If ratified, the merger could be finalized as early as the second quarter of 2015.


## Conclusion

While I have not focused in my statement on administrative matters at FHFA, I would be remiss if I did not point out that none of the activities or initiatives described in this statement would be possible without the dedication of the staff at the Federal Housing Finance Agency.  Since I became Director at FHFA last year, it has been a pleasure getting to know the very qualified staff at FHFA and working with them to reevaluate and pursue FHFA's priorities.  I thank them for their service.  I also want to recognize the hard work of the boards, management and staffs of Fannie Mae, Freddie Mac and the FHLBanks, who continue to restore and provide critical contributions to our nation's housing finance system.

In the coming year, FHFA will continue to work to meet the agency's statutory mandates to ensure the safe and sound operations of our regulated entities and to ensure that they provide liquidity in the national housing finance market.  In addition, FHFA will continue to advance its Office of Minority and Women Inclusion responsibilities, which include furthering diversity in management, employment and business activities at FHFA, as well as at our regulated entities.

Thank you again for having me here this morning, and I look forward to answering your questions.

19



**Speech**

# Prepared Remarks of Melvin L. Watt Director of FHFA at the Bipartisan Policy Center

2/18/2016

**Remarks as Prepared for Delivery**

**Melvin L. Watt, Director**

**Federal Housing Finance Agency**

Bipartisan Policy Center

Washington, D.C.

February 18, 2016

Thank you, Secretary Cisneros, for your opening remarks and introduction.  I also want to thank the Bipartisan Policy Center for extending the invitation for me to speak today on our work at the Federal Housing Finance Agency (FHFA).  I think all of you will agree that the things I am going to talk about deserve bipartisan attention and collaboration like we have seldom seen in recent years.

This speech has two parts, an easy part and a difficult part.  Both parts reflect a philosophy that I hope all of you agree we have tried to encourage since I became the Director of FHFA – a philosophy of open, honest, and transparent discussion and decision making that helps demystify what FHFA, Fannie Mae, and Freddie Mac do and how those things relate to housing finance stakeholders.

The first part of my speech is easy because it looks retrospectively at some of the things we have accomplished and how we have managed Fannie Mae and Freddie Mac (the Enterprises) in conservatorship to accomplish them.  By saying that this part of the speech is easy, however, I want to be careful not to suggest that all the decisions I will highlight were easy or noncontroversial when they were being considered.  It has been my experience that when decisions produce positive results down the road, we tend to forget how controversial or complicated these decisions might have been at the time they were made.

The second part of the speech is difficult, both because it looks forward – something I have shown much less inclination to do up to this point in my time as Director of FHFA –  and because looking forward is inherently more difficult and almost always tends to generate more controversy.  After two full years as Director of FHFA, however, I think it's timely for me to talk not only about our accomplishments, but also about some of the challenges and risks we face, some of which wil surely become more difficult for us to control the longer the conservatorships continue.  While my primary responsibility as

conservator may be to manage the Enterprises in the present as I have said on a number of occasions, I believe that I have an obligation, both in my role as conservator and in my role as regulator, to be frank and transparent about our challenges and risks. By doing so, I hope these remarks will ignite some dialogue that could well be difficult, but I believe is also critically needed.

**The Unprecedented Conservatorships of Fannie Mae and Freddie Mac**

Some background is necessary to frame both parts of the speech. Congress established FHFA in 2008 during the height of the financial crisis, and one of the Agency's first acts was to place the Enterprises into conservatorship. Under the Senior Preferred Stock Purchase Agreements (PSPAs), the U.S. Department of the Treasury (Treasury Department) has provided essential financial commitments of taxpayer funding to support the Enterprises' compromised financial status. During the first four years of conservatorship, the Enterprises drew a total of $187.5 billion from Treasury, but neither Enterprise has made a further draw since 2012. Fannie Mae has approximately $118 billion of its PSPA commitment remaining, and Freddie Mac has approximately $141 billion remaining. Since the beginning of conservatorship through the end of 2015, the Enterprises paid approximately $241 billion in dividends to the Treasury Department. Under the provisions of the PSPAs the Enterprises' dividend payments do not offset the amounts drawn from the Treasury Department.

Virtually everyone would agree that today we have a much safer and more stable housing finance system than when FHFA placed the Enterprises in conservatorship. I also think that most people would attribute a significant part of these improvements to decisions made in conservatorship. Guarantee fees have increased by two and a half times since 2009, and our review last year concluded that overall guarantee fee levels are now appropriate. Stronger credit standards have removed unsound risk layering and, in a manner consistent with safety and soundness, we have increasingly focused on how to support sustainable access to credit for homeowners, one of the Enterprises' statutory obligations.

Delinquencies and foreclosures have gone down on the Enterprises' legacy books of business, and the number of REO properties held by the Enterprises has decreased significantly. The number of HARP refinances has surpassed 3.3 million and the Enterprises have taken more than 3.6 million other actions to prevent foreclosures. The Enterprises' retained portfolios have decreased by over half since March 2009, and their portfolios are now more focused on supporting their core business operations. The Enterprises' multifamily programs had strong performance through the crisis, and they continue to share risk with private investors. Their multifamily purchases provide needed liquidity for the general multifamily market, with an increasing focus on affordable rental housing.

We have completed efforts to revamp and improve the Representation and Warranty Framework, and we have strengthened counterparty standards for mortgage insurers and non-bank Seller/Servicers. We have started and significantly ramped up credit risk transfer programs at both Freddie Mac and Fannie Mae, with both Enterprises now regularly transferring substantial credit risk to private investors on over 90 percent of their typical 30-year, fixed-rate acquisitions. We have a target for Freddie Mac to start using the Common Securitization Platform (CSP) in 2016, and a target for the Single Security to go into effect with both Enterprises using the CSP to support their major securitization activities in 2018.

In all of these things, we have also placed greater attention on diversity and inclusion in the Enterprises' business operations, consistent with legal standards and with projections that the future composition of homeowners, renters, and the country as a whole will be more diverse.

***FHFA's Role as Regulator and Conservator.*** As this list highlights, FHFA's role as conservator of Fannie Mae and Freddie Mac has been unprecedented in its scope, complexity, and duration – especially when you consider Fannie Mae and Freddie Mac's role in supporting over $5 trillion in mortgage loans and guarantees. This is an extraordinary role for a regulatory agency also because we are obligated to fulfill both the role of supervisor and the role of conservator at the same time, and

because we are now approaching eight full years of having these obligations.  So let me also describe briefly how FHFA has managed these dual responsibilities.

Like other federal financial regulators, FHFA conducts safety and soundness supervision with a deliberate distance between FHFA and the Enterprises.  Members of our supervision staff, many of whom are located onsite at Fannie Mae and Freddie Mac, conduct examinations that focus on areas of highest risk to the Enterprises.  They produce reports of examination and make findings as to whether the Enterprises need to make corrective actions in particular areas.

In contrast, our role as conservator involves a different kind of relationship with the Enterprises.  Under the Housing and Economic Recovery Act of 2008, FHFA has the full authority of the Enterprises' boards of directors, management, and shareholders while the Enterprises are in conservatorship.  This means that FHFA has ultimate authority and control to make business, policy, and risk decisions for the Enterprises, and the Enterprises' boards know that their job is to meet our expectations.

However, managing these Enterprises in conservatorship requires much more of a joint effort than would occur under a normal regulatory relationship.  For example, while an examiner would review board or management minutes after the meetings have taken place, members of FHFA's Division of Conservatorship team attend management and board meetings as part of our conservatorship functions, and I personally attend and preside at executive sessions of Enterprise board meetings.

***FHFA's Management of Fannie Mae and Freddie Mac in Conservatorship.***  There are four key approaches that we use to manage the unique nature of these conservatorships.  Using these approaches, we have been able to fulfill our statutory obligations to ensure safety and soundness, to preserve and conserve Enterprise assets, to ensure liquidity in the housing finance market, and to satisfy the Enterprises' public purpose missions.

First, we set the overall strategic direction for the Enterprises in FHFA's Conservatorship Strategic Plan and in annual scorecards that outline our policy expectations.  We set quarterly and year-end milestones for our scorecard objectives, and we conduct regular evaluations of whether the Enterprises are on track or behind in meeting our targets.  Our final scorecard assessments at the end of each year factor into the compensation calculations for Fannie Mae and Freddie Mac executives.

Second, we delegate the day-to-day operations of the companies to their boards and senior management.  With over 12,000 employees at the two Enterprises and considering the nationwide scope and technical nature of their businesses, we can't pull every lever and make every day-to-day operating decision.  If we tried, I'm quick to acknowledge that their operations would grind to a halt.  Under conservatorship, the Enterprises continue to operate as business corporations with boards of directors subject to corporate governance standards.  The Enterprise boards are responsible – like boards of directors at other companies – for overseeing their business activities.  They review budgets and set risk limits.  They examine business plans and oversee senior management.

When FHFA first placed the Enterprises into conservatorship, FHFA selected new chief executive officers, reestablished their boards of directors, and approved new board members.  FHFA has continued to approve all new CEOs and board members throughout conservatorship, and they are responsible for meeting our expectations and effectively running the companies.  I meet several times a month with the CEOs of Freddie Mac and Fannie Mae.  In addition to my attendance at board meetings, I have regular conversations and engagement with each Enterprise's board chair to help elevate issues that need to be resolved.

Third, we have carved out actions that are not delegated to the Enterprises that require advance approval by FHFA.  Deciding which items we should delegate to the Enterprises and which should require FHFA approval is a judgment cal

and finding the right balance is an ongoing process.  There are decisions that are obvious choices for FHFA to make, such as setting the core components of the guarantee fees charged by Fannie Mae and Freddie Mac.  Others are closer calls.  While we retain the authority to step in and make the call on any issue, even ones that we previously delegated, we have found that providing as much clarity as possible about roles and responsibilities serves everyone better.

The fourth prong of our conservatorship model is oversight and monitoring of Enterprise activities, and this is something that happens on an on-going basis – it's probably not an overstatement to say this takes place constantly.  In addition to attending meetings of the management committees, FHFA staff members engage in regular dialogue with the management and operational teams at the Enterprises, regularly review information submitted by the Enterprises, and take action where appropriate.

Managing the Enterprises in conservatorship through this four-step approach – with regular adjustments to account for changing circumstances – has worked well.  FHFA's conservatorship decisions have helped navigate the Enterprises through a financial crisis and, despite the substantial negative impact of the crisis, helped prevent it from being far worse.

**The Challenges and Risks of a Protracted Conservatorship**

However, an eight-year conservatorship is unprecedented, and managing the ongoing, protracted conservatorships of Fannie Mae and Freddie Mac poses a number of unique challenges and risks.  This leads me to the more difficult part of these remarks.

I have consistently stated that our responsibility and role at FHFA as conservator is to manage in the present.  However, as we work to appropriately manage challenges and risks in the present, we also have a responsibility to assess when these challenges and risks may escalate to the point that they negatively impact the Enterprises and the broader housing finance market in the future.  By giving this speech today, I am signaling my belief that some of the challenges and risks we are managing are escalating and will continue to do so the longer the Enterprises remain in conservatorship.  Consequently, I believe that I have a responsibility, both as regulator and as conservator, to identify and discuss this concern more openly.

***Enterprises' declining capital buffers.***  The most serious risk and the one that has the most potential for escalating in the future is the Enterprises' lack of capital.  FHFA suspended statutory capital classifications when the Enterprises were placed in conservatorship, and Fannie Mae and Freddie Mac are currently unable to build capital under the provisions of the PSPAs.  The agreements require each Enterprise to pay out comprehensive income generated from business operations as dividends to the Treasury Department, and the amount of funds each Enterprise is allowed to retain is often referred to as the Enterprises' "capital buffer."  This capital buffer is available to absorb potential losses, which reduces the need for the Enterprises to draw additional funding from the Treasury Department.  However, based on the terms of the PSPAs, this capital buffer is reducing each year.  And, we are now over halfway down a five-year path toward eliminating the buffer completely.

Starting January 1, 2018, the Enterprises will have no capital buffer and no ability to weather quarterly losses – such as the non-credit related loss incurred by Freddie Mac in the third quarter of last year – without making a draw against the remaining Treasury commitments under the PSPAs.  There are a number of non-credit related factors that could lead to a loss and result in a draw on those commitments: interest rate volatility; accounting treatment of derivatives, which are used to hedge risk but can also produce significant earnings volatility; reduced income from the Enterprises' declining retained portfolios; and, the increasing volume of credit risk transfer transactions, which transfer both the risk of future credit losses as well as current revenues away from the Enterprises to the private sector.  A disruption in the housing market or a period of economic distress could also lead to credit-related losses and trigger a draw.

It is, of course, impossible to predict the exact ramifications of future draws of funds from the PSPA commitments.  But let me offer a few observations.

First, and most importantly, future draws that chip away at the backing available by the Treasury Department under the PSPAs could undermine confidence in the housing finance market.  The remaining funds available under the PSPAs provide the market with assurance that the Enterprises can meet their guarantee obligations to investors in mortgage-backed securities even while they are in conservatorship and don't have the ability to build capital.  In effect, the Treasury Department's financial commitment to each Enterprise under the PSPAs is a source of capital that supports mortgage market liquidity.  However, under the terms of the PSPAs, these funds can only go down and cannot be replenished.  Future draws would reduce the overall backing available to the Enterprises, and a significant reduction could cause investors to view this backing as insufficient.  It's unclear where investors would draw that line, but certainly before these funds were drawn down in full.

Investor confidence is critical if we are to have, as we do today, a well-functioning and highly liquid housing finance market that makes it possible for families to lock in interest rates, obtain 30-year, fixed-rate mortgages, and prepay a mortgage if they want to refinance or need to move.  If investor confidence in Enterprise securities went down and liquidity declined as a result, this could have real ramifications on the availability and cost of credit for borrowers.

Second, future draws could lead to a legislative response adopted in haste or without the kind of forethought it should be given.  I have been clear that conservatorship is not a desirable end state and that Congress needs to tackle the important work of housing finance reform.  However, because of the intricacies of our housing finance system and the extremely high stakes for the housing finance market and for the economy as a whole if reform is not done right, I continue to hope that Congress can engage in the work of thoughtful housing finance reform before we reach a crisis of investor confidence or a crisis of any other kind.  While it's not my place to meddle in political discussions, I'm also not hearing much discussion of housing finance reform in any of the presidential campaigns.

***The role of market discipline in conservatorship.***  A less discussed, but related, challenge posed by a continuing conservatorship is Fannie Mae and Freddie Mac's insulation from normal market forces that would otherwise inform their operations and business practices.  There are differing views about the Enterprises' business models leading up to the financial crisis, but in conservatorship the responsibility to create a regime of market discipline and appropriate competition falls squarely on FHFA's shoulders.  The longer the Enterprises remain in conservatorship, the greater and more complicated this responsibility becomes.

This challenge presents itself in multiple decisions, including pricing.  Although the Enterprises are not building capital while they are in conservatorship, FHFA expects Freddie Mac and Fannie Mae to determine their pricing as though they were holding capital and seeking an appropriate economic return on this capital.  This is something that was very important to FHFA as we started to review and make adjustments to guarantee fees.  We worked with the Enterprises to review the cost of capital as part of our assessment of the correct level of overall guarantee fees charged by the Enterprises.  Without such an approach, it would be challenging to decide what guarantee fee levels to approve.  Through our 2016 Scorecard priority to finalize a risk management framework, we are working to further our ability to evaluate these kinds of Enterprise business decisions.

Another challenge related to market discipline is the question of how the Enterprises should or should not compete against one another.  As I discussed earlier, we have consciously structured the conservatorships of Freddie Mac and Fannie Mae so they continue to run as going concerns.  We want them to continue to innovate and to compete on the kind of customer service they provide to lenders and on the quality of their business practices.  We believe that competition in these areas is healthy for the Enterprises, good for the housing finance market, and good for borrowers.

However, we have also made a number of decisions that require the Enterprises to adopt aligned standards in certain areas, such as aligned counterparty requirements, to avoid excessive risk being placed on taxpayers.  In conservatorship,

we carefully determine when to allow competition and when to require alignment, requiring, of course, that all operations be executed in a safe and sound manner.

***Planning amidst an uncertain future.*** A final challenge that being in protracted conservatorships forces us to face is how to manage and plan for the future when there is tremendous uncertainty about what the future holds. Experience demonstrates that it is difficult to manage the Enterprises in the present without establishing some kind of plans for the future. Here, I'm not talking about plans for housing finance reform, but plans for everyday operations, including strategic planning that every well-run business does and project planning that's necessary to continue key initiatives. Without looking somewhat down the road, FHFA and the Enterprises would both lose their momentum and jeopardize day-to-day success. The key dilemma when you have an uncertain future, however, is how far down the road to look and how to retain the necessary talent to implement either short- or longer-term plans.

This challenge drove my decision to authorize the increases in compensation for both Enterprise CEOs that proved to be so controversial. First, I recognized that our delegated model relies heavily on strong management teams to uphold their side of conservatorship. Second, I decided that to be responsible we needed to have the Enterprises engage in operations-focused strategic planning over a three-to-five year horizon. To do both of those things, we needed to ensure continuity by retaining senior-level staff and having reliable succession plans that minimized disruptions.

Of course, we have implemented the legislation that Congress passed to reinstate the prior CEO compensation limits, and it is not my intention here to debate the wisdom of the decision that Congress made. Having served in Congress, I understand that it was an easy political decision. However, the issue of reliable succession planning is another example of the many challenges presented by a long-term conservatorship. The fact is that the Enterprises run businesses that rely on a highly specialized and technically skilled workforce. Retaining that workforce is essential to the Enterprises' success and to FHFA's success as conservator. With continuing uncertainty about conservatorships of indefinite duration and what role the Enterprises will play in the future of housing finance, retaining skilled employees will be an increasing challenge.

### Conclusion

We have made these ongoing conservatorships work thus far through the dedication of staff at FHFA and the staffs of both Enterprises and we, of course, remain committed to continuing this task. We know that the stakes are high for the housing finance market and for the broader economy. However, as I have indicated in my remarks today, there are substantial challenges and risks associated with the unprecedented size, complexity, and duration of the conservatorships of Fannie Mae and Freddie Mac. After more than two years at FHFA, I can assure you that these challenges are certainly not going away, and some of them are almost certain to escalate the longer the Enterprises remain in conservatorship.

## Contacts:

Media:  Stefanie Johnson (202) 649-3030 / Corinne Russell (202) 649-3032

Consumers: **Consumer Communications** or (202) 649-3811

© 2023 Federal Housing Finance Agency

# SUSTAINABLE HOUSING FINANCE: AN UPDATE FROM THE DIRECTOR OF THE FEDERAL HOUSING FINANCE AGENCY

# HEARING

BEFORE THE

## COMMITTEE ON FINANCIAL SERVICES

## U.S. HOUSE OF REPRESENTATIVES

ONE HUNDRED FIFTEENTH CONGRESS

FIRST SESSION

OCTOBER 3, 2017

Printed for the use of the Committee on Financial Services

## Serial No. 115–44



U S GOVERNMENT PUBLISHING OFFICE

30–240 PDF                    WASHINGTON : 2018

## HOUSE COMMITTEE ON FINANCIAL SERVICES

JEB HENSARLING  Texas  *Chairman*

PATRICK T McHENRY  Nor h Caro na
  *Vice Chairman*
PETER T KING  New York
EDWARD R ROYCE  Ca forn a
FRANK D LUCAS  Ok ahoma
STEVAN PEARCE  New Mex co
BILL POSEY  F or da
BLAINE LUETKEMEYER  M ssouri
BILL HUIZENGA  M ch gan
SEAN P DUFFY  W scons n
STEVE STIVERS  Oh o
RANDY HULTGREN  I  no s
DENNIS A ROSS  F or da
ROBERT PITTENGER  Nor h Caro na
ANN WAGNER  M ssour
ANDY BARR  Ken ucky
KEITH J ROTHFUS  Pennsy van a
LUKE MESSER  Ind ana
SCOTT TIPTON  Co orado
ROGER WILLIAMS  Texas
BRUCE POLIQUIN  Ma ne
MIA LOVE  U ah
FRENCH HILL  Arkansas
TOM EMMER  M nneso a
LEE M ZELDIN  New York
DAVID A TROTT  M ch gan
BARRY LOUDERMILK  Georg a
ALEXANDER X MOONEY  Wes  V rg n a
THOMAS MacARTHUR  New Jersey
WARREN DAVIDSON  Oh o
TED BUDD  Nor h Caro na
DAVID KUSTOFF  Tennessee
CLAUDIA TENNEY  New York
TREY HOLLINGSWORTH  Ind ana

MAXINE WATERS  Ca forn a  *Ranking Member*
CAROLYN B MALONEY  New York
NYDIA M VELAZQUEZ  New York
BRAD SHERMAN  Ca forn a
GREGORY W MEEKS  New York
MICHAEL E CAPUANO  Massachuse s
WM LACY CLAY  M ssour
STEPHEN F LYNCH  Massachuse s
DAVID SCOTT  Georg a
AL GREEN  Texas
EMANUEL CLEAVER  M ssour
GWEN MOORE  W scons n
KEITH ELLISON  M nneso a
ED PERLMUTTER  Co orado
JAMES A HIMES  Connec cu
BILL FOSTER  I  no s
DANIEL T KILDEE  M ch gan
JOHN K DELANEY  Mary and
KYRSTEN SINEMA  Ar zona
JOYCE BEATTY  Oh o
DENNY HECK  Wash ng on
JUAN VARGAS  Ca forn a
JOSH GOTTHEIMER  New Jersey
VICENTE GONZALEZ  Texas
CHARLIE CRIST  F or da
RUBEN KIHUEN  Nevada

KIRSTEN SUTTON MORK  *Staff Director*

(II)

17

risen dramatically, from $115 million when the agency approved the project in January 2015, to $171 million in March 2016, and that the plans for it included high-end features, such as multi-million dollar glass walkways between the towers Fannie Mae would occupy," end quote.

It has also been reported that the budget for the headquarters includes bars, quartz and glass countertops in the wellness room, town center cafe, freestanding decorative wood, quote, "lunch huts," whatever in the world that is, custom wood menus.

Mr. Watt, we are talking about spending hundreds of millions of dollars, tens of millions of dollars certainly of hardworking tax-payers' dollars on walkways, decorative walkways, and decorative wood lunch huts. I do want to see a picture of one of those.

Is that consistent with how we need to treat those taxpayer dollars? And are you concerned by this? And what are you doing to address these, what I would view as, outrageous overruns?

Mr. WATT. Well, first of all, I don't agree with you that they are outrageous overruns.

Mr. HUIZENGA. OK. Please then—here's my formal request—provide me with a photo of a wooden lunch hut. I want to see what this is. I am in developing. I am a builder.

Mr. WATT. You know, I—

Mr. HUIZENGA. I know what overruns are.

Mr. WATT. But you also know what projections are. And the original IG report was based on projections, and this IG report is also based on projections.

Mr. HUIZENGA. So it could be higher?

Mr. WATT. No. They are coming down every time we get a report, which is exactly what I told the IG.

Mr. HUIZENGA. What decisions have you—

Mr. WATT. Look, I did this when I was in the private practice of law. You set up a tenant improvement allowance and you work toward trying to bring this in under the tenant improvement allowance if you are in the real estate business. And that is what we have been doing.

Mr. HUIZENGA. Mr. Chairman, I will followup with some written questions, and hopefully I will get—

Chairman HENSARLING. The time of the gentleman—

Mr. HUIZENGA. Thank you.

Chairman HENSARLING. The time of the gentleman has expired. The chair now recognizes the gentleman from Massachusetts, Mr. Capuano.

Mr. CAPUANO. Thank you, Mr. Chairman.

Before I get to Mr. Watt, I also want to talk about the debt clock. I will be very clear: Democrats have some blame for the debt clock. I voted for the stimulus. I am glad I did. I thought it was a good thing. I voted for the bailouts. I thought they were a good thing. And by the way, all those bailouts, almost all of them have been repaid. But I will take my share of the blame. But also, the Republicans on the other side voted for tax cuts under George Bush that were unnecessary and for two wars that are still going on that have been unfunded. So we all have something to share in the number that is there. But be warned, the minute you vote to in-

18

crease it $2 trillion to $5 trillion additional dollars, it belongs entirely to you.

So with that being said—and by the way, I want to be real clear. If you want to cut spending by $2 trillion to $5 trillion, I will disagree, but at least I will think it is internally consistent. The only thing I will say to that is I have no doubt whatsoever that the chairman would do so; and that being the case, that is one of the reasons I respect him, though deeply disagree.

So with that being said, Mr. Watt, I would like to talk about—the one thing normally we talk about is bulk sales, but we have had that conversation repeatedly. I think you have taken some steps in the direction I think is right. Obviously, you know I would like you to do more and quicker, but a discussion for another day.

I would like to talk a little bit about capital reserve. As I understand it, in the last 5 to 6 years, Fannie Mae and Freddie Mac have pretty much both made a profit, for the lack of a better word. Their revenues exceed their expenses. Is that right?

Mr. WATT. If you define profit that way, yes.

Mr. CAPUANO. Well, I am using the term loosely, mostly so average people, including my colleagues here, can understand. I will speak slower for some of them.

And so if they have what normal people would call a profit, that means their cash-flow has been positive over the years. That means your capital reserve must be incredibly good. You must have a lot of money there. So God forbid there is another bump in the economy, you will be able to cover it without a taxpayer bailout. Is that a fair assessment?

Mr. WATT. Well, not without drawing on taxpayer funding. We have taxpayer backing, but we have no capital buffer.

Mr. CAPUANO. No capital reserve? What has happened with all the money you made?

Mr. WATT. We have $600,000 until—$600 million until the end of the year, but then it goes to zero.

Mr. CAPUANO. And so what happened has with all the money you made?

Mr. WATT. It has gone to the Treasury under the—

Mr. CAPUANO. To the Treasury? To the general fund?

Mr. WATT —under the preferred stock purchase agreement (PSPA).

Mr. CAPUANO. Who pays all the revenue that you get? Am I wrong to think that the vast majority of your money comes out of fees that are charged to middle-income homeowners on top of their mortgage? Is that where most of the money comes from—almost all of it?

Mr. WATT. Yes. Disproportionately more and more of it is coming from that as opposed to portfolio income.

Mr. CAPUANO. So middle-income homeowners are paying extra on their mortgage so the United States Government's books look better than they should. By the way, those people are still paying income taxes and corporate taxes and all the other taxes that everybody else pays.

So they are paying extra for the ability to own a home? Do they know this? Have they been told this?

19

Mr. WATT. Well, I don't get into that part of it. What I have been very transparent and open about is that it is really irresponsible to try to run any business without some kind of capital cushion.

Mr. CAPUANO. So would you, if you have your druthers, would you like to increase that reserve?

Mr. WATT. Yes. And we are working with the Secretary of the Treasury to try to resolve that issue.

Mr. CAPUANO. It is my understanding that he doesn't think you should.

Mr. WATT. Well, I wouldn't say that. We are working with him now to try to resolve the issue.

Mr. CAPUANO. As I understand it, you need the permission and the agreement of the administration in order to do that. But you don't need—

Mr. WATT. No, I don't absolutely need it. I could do it by myself.

Mr. CAPUANO. Oh, good.

Mr. WATT. But I don't think that would be the best way to do it.

Mr. CAPUANO. I would agree with your interpretation, but some people might disagree with that. And I know there will be a family fight about who has the authority to do what. But it is unequivocal that you have the authority to lower fees on your own. No one has to approve those.

Mr. WATT. Well, I wouldn't lower fees to solve this problem.

Mr. CAPUANO. No, no, it won't solve the problem. But if the money is—if I am paying a mortgage and I know you are taking money and not building up a reserve and not using it to help me, and I am just adding, it is like an extra tax on me.

Why would you want to do that? If you can't buildup a reserve and therefore help provide housing to America, why don't you just cut the fees and that will solve all the problems. They are not going to let you keep it or give it back to your investors or reduce mortgages. Just cut the fees, that way you would effectively be reducing mortgages.

Mr. WATT. I don't think I could statutorily, consistent with the statutes, cut the fees to take that into account because I have an independent statutory responsibility in setting guarantee fees that are reasonable.

Mr. CAPUANO. I think you could, but we will talk about that later.

Thank you, Mr. Chairman.

Chairman HENSARLING. The time of the gentleman has expired.

The chair now recognizes the gentleman from Kentucky, Mr. Barr, Chairman of our Monetary Policy and Trade Subcommittee.

Mr. BARR. Director Watt, welcome back to the committee. Good to see you.

I know you share the general concern that the government has a near monopoly in the mortgage market. I think the most recent statistic, from 2017, is that 97 percent of all mortgaged-backed securities issued this year are explicitly backed by the Federal Government.

Given some of the changes that you started to make at FHFA, do you agree that additional steps should be taken to encourage greater private sector participation in the housing finance market?



Speech

# Prepared Remarks of Dr. Mark A. Calabria, Director of FHFA, at Mortgage Bankers Association National Secondary Market Conference & Expo 2019

*5/20/2019*

Remarks as Prepared for Delivery
Dr. Mark A. Calabria, Director
Federal Housing Finance Agency
Marriott Marquis – New York City, NY

**"The Housing Finance System's Status Quo is Over"**

Thank you, Bob, for that kind introduction and for your leadership.

It is great to be back at the Mortgage Bankers Association – and it is an honor to address such a distinguished group of leaders at your 2019 National Secondary Market Conference & Expo. Thank you all for being here today.

It's great to see so many friends and familiar faces. But there are many of you who I haven't yet met. So, I'd like to begin by briefly introducing myself and telling you a couple of things you might not know.

As Bob mentioned, I've done several tours of duty across two of the three branches of the federal government, including Congress, HUD, and the White House.

Throughout my career, I've had the honor of working with and learning from some extraordinary leaders – from Senators Shelby and Gramm to Vice President Pence. But the person who did more than any other to instill in me a deep respect for public service was my mother, Janie, who worked in county government for more than 20 years.

She also managed to raise four kids, teaching all of us along the way invaluable lessons about the importance of hard work, discipline, and honoring our obligations.

Those formative years inspired in me an interest in economics. And when I finished college, in the aftermath of the savings and loan crisis, one of the reasons I decided to go back to get my PhD is that it was the best way to avoid the dismal job market!

But for me, economics isn't just about theories and equations – it's also about the real-world impact and making a difference for American families.

And I'm fortunate to be able to continue this work in my current role as Director of the Federal Housing Finance Agency.

I've spent the better part of my career studying and working on housing policy. So, I've learned a few things about the history of our mortgage finance system, and I appreciate the challenges – and the urgent necessity – of reform.

I had the privilege to work on the Senate Banking Committee in 2003, when the accounting scandals at first Freddie and then Fannie came to light. And I was there in 2008, in the midst of the housing crash and financial crisis, when I helped craft the legislation that gave birth to the agency I now lead.

And I can tell you: everything looks a little different from the inside than it does from the outside.

That's why, for the past 5 weeks, I've been taking the time to "look under the hood," so to speak, at the agency, at Fannie Mae and Freddie Mac, and at the Federal Home Loan Banks. My objective is to get a clear understanding of both where we are today and where we can go over the next 5 years during my tenure as Director.

There's still more listening and learning to be done. But it's also time to start taking action – to move the agency forward and fulfill our statutory mandate to ensure a well-functioning national housing finance system.

And today, I'm here in New York City – the heart of the global financial system – to lay out my vision for reforming America's federal housing finance system.

But first, let me take a moment to make the case for reform – because it's important that this debate proceed from a shared understanding of why we need reform in the first place, and why we need it now.

The "why" is pretty straightforward. We need to reform our housing finance system because we never really fixed it after the housing collapse more than a decade ago.

To be sure, reforms have been implemented since the crash. Some have been helpful, many others have not. And thanks to the booming economy of the past 2 years housing prices have largely recovered to pre-crisis levels.

But since 2008, the basic structure of our mortgage finance system, centered around the federal government, has remained largely unchanged.

In fact, Washington's command of the nation's housing industry has grown even larger in the nearly 11 years since the crash, while the private-label securitization market has been and remains sluggish.

I think it's fair to say that housing policy broadly – and parts of the housing finance system in particular – are not working for many Americans today. For instance, the black-white home ownership gap is close to a 100-year high.

Meanwhile, the federal government's dominant share of the mortgage industry puts hardworking American taxpayers unfairly at risk. Fannie and Freddie remain "too big to fail." And while their books of business are in much better shape today, they have grown in size since the crisis.

With a leverage ratio of nearly one thousand to one, the GSEs' balance sheet capital cushion is razor thin relative to their huge amount of assets.

As a result, they remain vulnerable to fluctuations in housing prices, interest rates, and macroeconomic conditions. This leaves American taxpayers increasingly exposed to bearing the risks of these mortgage giants through another bailout.

Since 2008, mortgage finance reform has been "the great unfinished business" of the financial crisis. I hope you agree that these facts compel us to finally finish it.

But why is right now the right time for reform?

I'm old enough to remember when people used to say that the wrong time for reform is in the middle of a crisis.

We saw this in the early 1980s, as housing finance reform was postponed because the economy and the housing sector needed time to recover from the stagflation and double-digit interest rates of the late '70s.

And we saw it again in the years that followed the 2008 crisis.

But today, there are some who would have us believe the opposite. They argue that now is a bad time to reform our mortgage-finance system precisely because we are not in the middle of a crisis.

This is exactly the kind of shortsighted thinking that fueled the last housing market collapse.

In the years leading up to it, there were ample warning signs and ample opportunities to improve a system that a small number warned was flawed. But instead of trying to save the system from itself – and save hardworking Americans from the financial crisis – policymakers and regulators chose to wait.

More to the point, as we learned from the 2008 crisis – and as I saw firsthand from my front-row seat in the Senate Banking Committee – in the middle of a crisis it is simply impossible to develop comprehensive and long-term solutions to complex and deeply entrenched problems.

To paraphrase President John F. Kennedy, the time to repair the roof is not in the middle of a downpour, but when the sun is shining.

Reform shouldn't have to wait for the next crisis. Reform is about avoiding the next crisis.

Now is the right time to enact bold reforms to our mortgage finance system, because the sun is shining on our economy and our housing market.

If we fail to act now to make our mortgage finance system stronger, more resilient, and more equitable for American taxpayers and working families – the question will not be if the next crisis will hit, but when.

Death and taxes are not the only certainties in this world. It's also a guarantee that economic booms will eventually be followed by busts, just as housing prices will go up and they will go down.

And it is during these boom moments that we must prepare for the inevitable downturn.

It's important to keep in mind just what's at stake here – and the true costs of inaction.

We all remember the facts and figures of the financial crisis…

Thirty-five percent decline in home prices across the nation. Foreclosure filings skyrocketing by more than 80 percent. Trillions of dollars in household wealth evaporated.

All these years later, the numbers are still breathtaking.

But behind all the numbers are real stories of real Americans struggling to pick up the pieces after the crash turned their lives upside down.

While working on the Senate Banking Committee, I spent a considerable amount of my time taking calls from Americans in financial distress.

Their stories exemplified the consequences of our collective failure to make our mortgage finance system more resilient when we had the chance. We can't forget that when mortgage finance goes bad, it's families who pay the price.

Now, as a regulator, my job is to hope for the best but prepare for the worst. And that means ensuring that the entire housing finance system is strong and stable enough to weather the next downturn.

Mortgages are a huge asset class. They play a central role in the everyday lives of millions of Americans and in our broader economy. But housing can also be a volatile sector. And as 2008 proved once again, crashes in the housing market are often

the proximate cause of broader financial crises.

We have not solved the business cycle or the housing cycle – and I don't expect that we will any time soon.

But what we can do is address the vulnerabilities and inequities that remain at the heart of our mortgage finance system, to ensure that the next housing downturn doesn't spark another global financial catastrophe.

And that's exactly what I'll be focused on for the next 5 years as Director of FHFA.

FHFA's vision is "A reliable, stable, and liquid housing finance system."

This is the end state toward which all the agency's work – and all my work as Director – is guided: a housing finance system that is reliable, stable, and liquid. And, I should add, reliable, stable, and liquid over the long-term.

If you squint hard enough, anything can look reliable, stable, and liquid over a short period of time. But "long-term" means it must be reliable, stable, and liquid across the business cycle and the housing cycle.

This is the vision that will guide FHFA's work – including the work that we will do in consultation with Congress, the Administration, and other regulators.

The Administration's plan is underway, and I am fortunate to be working with Secretary Steven Mnuchin. He and I have worked often and well together in the past, and we are currently on track and meeting milestones. Given my background in housing and his in mortgages, we are moving very quickly and deliberately.

Our objective is to give taxpayers confidence that America's mortgage giants will never need another bailout. And to give investors confidence that America's secondary mortgage market is strong and resilient.

The centerpiece of our strategy is to end the Fannie and Freddie conservatorships. In their place, we will move toward a new, reformed structure of our mortgage finance system that meets the housing needs of American families, protects the American taxpayer, and supports financial stability at home and abroad.

New legislation passed by Congress and signed by the President would enable the kind of comprehensive, bold reforms we need to change the structure of our broken model. In fact, just a small number of key reforms, if enacted, would enable the development of a much better housing finance system. I plan to put forward such reforms for consideration.

For example, I'm a big believer in competition. History proves that competition works by serving consumers. It lowers prices, improves quality, and drives innovation. And when it comes to housing, competition would make the system more stable. If there were ten GSEs instead of two, it's unlikely any of them would be "too big to fail."

Right now, the market power exercised by the duopoly of Fannie and Freddie undercuts competition. But that would likely change if Congress were to authorize FHFA to issue more GSE charters, which would allow more competitors to enter the industry. Other federal regulators have the same authority – and FHFA should too.

And we have evidence that this kind of reform would succeed if enacted. Today's reemergent private mortgage insurance industry shows that there is a strong appetite and capacity for private capital to bear mortgage credit risk. And we've already seen some proposals – including a framework put out by Senator Crapo – that could support issuing new charters.

I will continue to consult with Congress on legislative reforms. And I'm hopeful that we'll be able to find broad bi-partisan agreement on some key issues, as we have in the past.

But while I'm committed to working with Congress, I'm not going to wait on Congress.

In fact, if you look at the statute, it contemplates an end to the conservatorships. The model is very similar model to how the FDIC operates. The law requires me to do what I can within my powers to fix the GSEs and then release them from conservatorship – and that's exactly what I intend to do.

The FHFA conservatorship has lasted far longer than anyone expected. Back in 2008, as it was being debated and developed, I remember thinking that any conservatorship was unlikely to last more than 6 months.

It has now been more than a decade. And while leaving Fannie and Freddie in this state of limbo may be comfortable for some, it is unsustainable as a matter of economic policy and it is unfair to American taxpayers and families.

So, for me, as Director of FHFA, five more years of limbo is not an option. It would be tantamount to economic malpractice.

I don't make a habit of predicting the future, but if there's one thing I know for sure it's that Fannie and Freddie will look much different at the end of my five-year term than they do today.

Since I'm in New York City – whose citizens are known for being direct – let me speak plainly to you: The status quo is no longer an option. The status quo is over. And my arrival at FHFA should be seen as the opening bell for change.

I can't tell you what exactly the new model will look like. But, as a regulator, what I do know is that the future role and structure of Fannie and Freddie will be determined by the amount of private capital they're able to build up.

This is a central tenet of finance – whether it's Citibank and Wells Fargo or Fannie Mae and Freddie Mac, for any financial institution, capital is the foundation of stability.

Just as the mortgage rate should reflect the underlying risk of the loan, the role and structure of Fannie and Freddie should reflect their capital levels. Institutions that have a lot of capital can afford to take more risk. Those that don't must de-risk.

As a regulator, my primary concern is that the GSEs maintain capital levels commensurate with their risk profiles. And over time I think Fannie and Freddie ought to operate under essentially the same capital rules as other large financial institutions.

So, the path out of the conservatorships that we will establish for Fannie and Freddie is not going to be calendar dependent. It will be driven, first and foremost, by their ability to raise capital.

An important step on the path to building the necessary capital will be to address the Net Worth Sweep. But it would likely take a very long time to build sufficient capital through retained earnings alone.

So, we will be exploring other avenues to raise capital, such as a public offering of some kind. There is much work and analysis to do in this arena to fully explore all the options.

We are still very much in the early stages of this process. Later this year, following the President's direction, we expect the Administration to release a Housing Finance Reform Plan.

Once that plan has been finalized, hopefully sometime this fall, I will sit down with my counterparts at Treasury to develop a responsible plan to end the conservatorships, with a clear road map and mile markers, and to adjust the Treasury share agreements accordingly. And by January 1 of next year, my hope and expectation is that we will be on the path to a new regime where the GSEs can start to build capital. At that point, the path out of the conservatorships will depend not on the calendar but on Fannie and Freddie meeting the mile markers we set out for them.

It was insufficient capital that triggered the conservatorship, and it's going to be sufficient capital that triggers an exit.

But building private capital to stand between mortgage credit risk and American taxpayers is just one of our strategic objectives.

In addition to strong private capital, a reliable, stable, and liquid housing finance system also requires prudent and sustainable lending standards, sound risk management, and world-class regulation that applies the same set of rules to all market participants.

Toward that end, FHFA will also be pursuing regulatory reforms that prepare the Agency to transition into the post-conservatorship world and that ensure Fannie and Freddie are first-in-class in corporate governance and risk management.

Any rule, regulation, program, or activity begun under FHFA's previous leadership that serves these objectives, we will continue and expand.

For instance, we are working diligently toward the upcoming launch of the Uniform Mortgage Backed Security, or UMBS, which will provide a "common security" on a "Common Securitization Platform" to support market liquidity.

And we will continue working on rule makings that establish sound, prudent standards regarding both the amount and the quality of capital – including the proposed risk-based capital standard and the Proposed Rule on Validation and Approval of Credit Score Models.

Likewise, we will reexamine all Agency policies that dilute or undercut our strategic objectives and vision.

For instance, we are actively reviewing all recent expansions into new markets and activities to put an end to the era of charter creep. Anything that falls outside the GSEs' core business model and mission will be curtailed or ended altogether.

And we are looking at every rule and regulation to ensure that we're creating a level playing field across the industry. One of my responsibilities as Director of FHFA is to help create a competitive mortgage market. And that means that everyone must operate under the same set of rules.

Fannie and Freddie should be successful because they have the best management, the best execution, the best business practices – not because they have the rules and regulations stacked in their favor.

To be fair to everyone else in the emerging marketplace, no one is going to get any special favors.

So, I will be taking action administratively – and working with other regulators where necessary – to ensure that everyone is playing by the same rules across the mortgage industry.

This kind of comprehensive reform agenda will strengthen Fannie Mae and Freddie Mac for the future. When implemented, it will allow them to build a sound capital base, backstopped by world-class supervision and regulation that ensures, in a post-conservatorship world, that lending remains prudent, risks are well-managed, and corporate governance is as good as any leading financial institution in our system.

This is a vision that should bring added confidence to all market participants.

Now, I recognize that we have our work cut out for us. By anyone's standards, the agenda I've just laid out is ambitious, even in the best of political climates. But I remain optimistic and determined – and I hope all of you do too.

Yes, the legislative process is slow and messy. And yes, partisan divisions are intense.

But Washington can come together to enact bold, comprehensive reform like what I've proposed here today, as long as two basic conditions are met.

First, the problem must be urgent and the stakes of inaction high. If you remember just one thing from my remarks today, it should be that the problems plaguing our mortgage finance system are urgent – and we owe it to the country to fix them soon.

But by itself, this isn't enough. If it were, we could have avoided the 2008 financial crisis.

The second, more difficult condition must also be met, which is that the advocates for reform must be educated, organized, and highly motivated.

Notice that I didn't say that the advocates for reform must be in lockstep agreement with one another.

Over the past 5 weeks, I've met with many individuals and organizations who support reform to our mortgage finance system. And I know they're not all going to agree on everything. But they don't need to. The legislative process is not just slow and messy – it's also imperfect. Always.

Highly motivated people don't let perfect become the enemy of the good. They build coalitions. They don't shrink from a debate – they run to it. They don't grow tired or impatient. They never give up fighting for what they know is right and necessary.

And that's exactly how I would describe the men and women of the Mortgage Bankers Association. Together, you speak with one voice as "the leading advocate for the real estate finance industry" – and you advance one vision of "a diverse and a competitive market for all industry participants."

That takes a high degree of motivation, and I've seen the positive impact of your work throughout my career in public service.

So, today, let me just encourage you to stay motivated and stay engaged in this effort.

The road ahead may be difficult. But with your support and dedication, I'm confident that we can reform our mortgage finance system, and finally complete "the great unfinished business" of the financial crisis. And together we will build a stronger, more secure housing market for all Americans.

Thank you for the opportunity to address you today.

## Contacts:

Media: Stefanie Johnson (202) 649-3030 / Corinne Russell (202) 649-3032

Consumers: **Consumer Communications** or (202) 649-3811

© 2023 Federal Housing Finance Agency



**Speech**

# Prepared Remarks of Dr. Mark A. Calabria, Director of FHFA, at 2019 Ginnie Mae Summit

*6/13/2019*

**Remarks as Prepared for Delivery**

**Dr. Mark A. Calabria, Director**

**Federal Housing Finance Agency**

**2019 Ginnie Mae Summit**

**Thursday, June 13, 2019**

**3:30 - 4:00 PM**

**Marriott Wardman Park - Washington, D.C.**

**"Working Together to Build a More Stable, Resilient, and Equitable Housing Finance System"**

Thank you, Maren, for that kind introduction and for your leadership. Thank all of you for being here today.

I always appreciate the opportunity to speak from the same stage as Secretary Ben Carson, who I know you heard from earlier today.
But I am especially grateful to be here at this 2019 Ginnie Mae Summit because I imagine many of you are also interested in hearing an update on America's *other* two mortgage giants.

Many of you who do business with Ginnie Mae also work with Fannie Mae and Freddie Mac, and maybe the Federal Home Loan Banks. These institutions are regulated by the Federal Housing Finance Agency. And I am here today to talk about my vision for the future of Fannie and Freddie, and my vision for housing finance reform more broadly.

But first, it is worth spending a moment to take stock of where the mortgage finance industry is today.

One of the most significant developments since the financial crisis is the growth of non-bank, non-depository business models.

In 2013, non-banks made up 30 percent of all the mortgages sold to one of the government guarantee programs. By February of this year, that footprint had doubled to 60 percent.

Last year, non-banks made up roughly 50 percent of all mortgage originations sold to Fannie Mae and Freddie Mac. And non-banks are now Ginnie Mae's main counterparties. They service around 60 percent of the mortgages in Ginnie Mae pools.

Many of you work in the non-banking sector. You know what an important role your institutions have played in the mortgage market.

Non-banks have brought capacity to both originate and service mortgages, providing the liquidity that the market needs. And we fully expect that they will continue to play an important role moving forward.

But from a risk perspective there are some key differences between banks and non-banks that we need to address in a responsible way.

Prudent, sustainable risk management is one of my top priorities.

We have been working with Fannie and Freddie to improve counterparty risk standards. Our goal is to ensure that originators have the financial strength to continue lending through any market weakness or stressed environment.

I want to commend the innovative work that Ginnie Mae is doing on this front. The Progress Update that they released this month contains an overview of their efforts to modernize counterparty risk management practices.

I also want to thank Ginnie Mae for calling for increased collaboration with FHFA.

Ginnie Mae's footprint now stands at more than $2 trillion. An additional $5 trillion in mortgage-backed securities are guaranteed by both Fannie and Freddie. This gives us a shared interest in making sure our housing finance system is strong and stable through the cycle.

And the rapid advances in technology and data analytics give us a great opportunity to collaborate and share best practices to accomplish that goal.

We will continue to work together to adapt to the changes in the mortgage industry we have seen over the past decade.

But the more important and urgent task that we face today is to bring change to our mortgage finance system where there has been too little. This is what I would like to talk about today.

Since the financial crisis, the fundamental structure of our housing finance system has not changed. In fact, the federal government's command of our nation's housing industry has only grown larger over the past decade.

Fannie and Freddie's books of business are in better shape today than they were in 2007 and 2008. But they have grown in size since the crisis, and they remain "too big to fail."

With a leverage ratio of nearly a thousand to one, their balance-sheet capital cushion is razor thin.

This makes Fannie and Freddie vulnerable to fluctuations in housing prices, interest rates, and other macroeconomic conditions. And it leaves American taxpayers increasingly exposed to bearing the risks of these mortgage giants through another bailout.

The basic structure of the system is also inefficient and unstable. The duopoly of Fannie and Freddie undercuts competition and makes the entire system more fragile and vulnerable.

You do not need to be an economist to see the problems here.

The housing finance system we have today is largely the same system we had in 2008… A system that produced a 26 percent drop in home prices, a more than 80 percent spike in foreclosures, and the evaporation of trillions of dollars in household wealth.

Behind all the numbers are the stories of Americans struggling to pick up the pieces after the crash.

I heard some of these stories while working on the Senate Banking Committee, where I took many calls from families in financial distress.

These stories show the consequences of our collective failure to make our mortgage finance system more resilient when we had the chance.

I know the status quo can be very comfortable for many people.

But for the rest of the country – and for the broader economy – the status quo is fundamentally unstable, unfair, and unacceptable.

Under the status quo, homeowners remain vulnerable to another shock to the system. And taxpayers remain on the hook. Therefore, as I have said before, the status quo is over.

Mortgage finance reform has been called "the great unfinished business" of the financial crisis. The time has come to finally finish it. And that is exactly what I am focused on.

There are two major avenues for reform – administrative action and congressional action.

To truly fix what is broken in our housing finance system, we need both.

It is not the case that *either* Congress acts *or else* I will.

There are some things that only Congress can do. One of them is to create an explicit guarantee.

If Congress does create an explicit guarantee, it should be limited, clearly defined, and paid for.

At the same time, I will pursue administrative actions wherever appropriate and necessary. This will involve regulatory actions at FHFA. And it will involve working with Treasury, HUD, and my fellow regulators.

My responsibilities are to protect American taxpayers, protect borrowers, and protect homeownership as the cornerstone of the American Dream.

I will take whatever actions I can to fulfill these responsibilities. And I will continue working closely with Congress to make the system more resilient and stable through the cycle.

In fact, just yesterday FHFA sent its 2018 **annual report to Congress**, and I attached a letter asking for several much-needed legislative reforms.

These reforms are intended to better align my current authorities with those of other regulators within the existing framework.

For instance, I asked Congress to authorize FHFA to issue more GSE charters. This would allow more competitors to enter the industry. Other federal regulators have the same authority – and FHFA should too.

History proves that competition is the best way to serve consumers.

Competition lowers prices, improves quality, and drives innovation. Competition would also increase the stability of our housing system and ensure no institution is "too big to fail."

We have already seen some proposals that could support issuing new charters – including a framework put forward by Chairman Crapo.

I will continue to consult with Congress on legislative reforms. And I am hopeful we will be able to find broad bi-partisan agreement on some key issues, as we have in the past.

I believe there is consensus in Congress that the system is broken. And there is broad interest in fixing it.

I know that Congress can come together to pass meaningful housing finance reforms. The last major reform was the Housing and Economic Recovery Act of 2008. It passed the Senate with more than 80 votes. And I was proud to be a part of that effort.

We have done this before, and we can do it again.

While I will continue to work with Congress, I will also take action where I can.

Reform should not have to wait for the next crisis. Reform is about preparing ourselves to withstand the next crisis.

To paraphrase President John F. Kennedy, the time to repair the roof is not in the middle of a downpour but when the sun is shining.

Right now, the sun is shining on our economy and housing market. But we know booms are eventually followed by busts.

For too long, our housing finance system has fueled these cycles. It has pushed the peaks higher and dragged the valleys lower than they might otherwise be.

When the market is hot, this can feel great. But we know this feeling is fleeting.

When the market turns south, this kind of pro-cyclical housing finance system can turn a decline in prices into a global financial crisis.

What we need instead is a counter-cyclical housing finance system. That means it must be reliable, stable, and liquid over the long-term – across the business cycle and the housing cycle.

This is not the housing finance system that we have today.

But it is the housing finance system that the American people deserve. And we can build it, if we work together.

In March, the President directed the Treasury and HUD Secretaries to develop a housing reform plan. And I have been consulting with Secretary Steven Mnuchin on this plan.

Our objective is to give taxpayers confidence that America's mortgage giants will never need another bailout. We will also give investors confidence that America's secondary mortgage market is strong and resilient.

Part of our strategy is to end the Fannie and Freddie conservatorships.

We will move toward a new, reformed structure of our mortgage finance system that protects the American taxpayer, meets the housing needs of American families, and supports financial stability at home and abroad.

The conservatorships have lasted far longer than anyone expected. In 2008, as they were being debated and developed, I remember thinking that any conservatorship was unlikely to last more than 6 months.

It has now been more than a decade. This is at odds with what is contemplated in the statute. The law requires me to do what I can within my powers to fix Fannie and Freddie.

The foundation of Fannie and Freddie's path out of conservatorship is capital. This is a central tenet of finance – capital is the foundation of safety and soundness.

My primary concern is that Fannie and Freddie maintain capital levels commensurate with their risk profiles.

Over time I think they should operate under essentially the same capital rules as other large financial institutions.

An important step will be to address the Net Worth Sweep. But it would likely take a very long time to build sufficient capital through retained earnings alone.

Therefore, we will be exploring other avenues to raise capital, such as a public offering of some kind.

We are still very much in the early stages of this process. There is much work and analysis to do in this arena to fully explore all the options.

We will continue to engage with Treasury to develop a responsible plan to end the conservatorships – with a clear road map and mile markers – and to adjust the Treasury share agreements accordingly.

And by sometime next year, my hope and expectation is that we will be on the path where Fannie and Freddie can start to build capital.

But building private capital to stand between mortgage credit risk and American taxpayers is just one of our strategic objectives.

In addition, we need prudent and sustainable lending standards, sound risk management, and world-class regulation that applies the same set of rules to all market participants.

Toward that end, FHFA will also be pursuing regulatory reforms that prepare the Agency to transition into the post-conservatorship world.

As I see it, a prerequisite for ending the conservatorship is to ensure that Fannie and Freddie are first-in-class in corporate governance and risk management.

Any rule, regulation, program, or activity begun under FHFA's previous leadership that serves these objectives, we will continue and expand.

And we will continue working on rule makings that establish sound, prudent standards for both the *amount* and the *quality* of capital.

We will also reexamine all Agency policies that dilute or undercut our strategic objectives and vision.

We are actively reviewing all recent expansions into new markets and activities to put an end to the era of charter creep. Anything that falls outside the GSEs' core business model and mission will be curtailed or ended altogether.

We are also looking at every rule and regulation to ensure that we are creating a level playing field across the industry.

One of my statutory responsibilities is to create a competitive mortgage market. To do that, everyone must operate under the same rules.

That means Fannie and Freddie should be successful because they have the best management, execution, and business practices – not because they have the rules stacked in their favor.

To be fair to everyone in the emerging marketplace, no one will get any special favors.

This kind of comprehensive reform agenda will strengthen Fannie and Freddie for the future.

When implemented, it will allow them to build a sound capital base, backstopped by world-class supervision and regulation. And it should bring added confidence to all market participants.

I recognize that we have our work cut out for us. The agenda I have just laid out is ambitious.

But I am optimistic – and I hope you are too. With your support, I know we can finally complete "the great unfinished business" of the financial crisis.

Before I close, let me thank Maren Kasper one more time for hosting this great event.

This Summit is just one reason why I am confident we will succeed in building a stronger, more secure housing market for all Americans.

Thank you.

## Contacts:

Media: Corinne Russell (202) 649-3032 / Stefanie Johnson (202) 649-3030

Consumers: **Consumer Communications** or (202) 649-3811

© 2023 Federal Housing Finance Agency

**Testimony Before the U.S. House of Representatives Committee on Financial Services**
**"The Future of Affordable Housing in America Depends on Mortgage Finance Reform"**
**Dr. Mark A. Calabria – Director, Federal Housing Finance Agency**
**Tuesday, October 22, 2019**

Chairwoman Waters, Ranking Member McHenry, and distinguished members of the Committee, thank you for the invitation to appear at today's hearing.

Too many Americans lack what each of us deserves: an affordable place to call home, whether it is rented or owned.

This is a national problem that exists in communities across the country. But it has local roots. A fundamental cause of the housing affordability problem are local policies that make it harder and more expensive to build new housing.

Examples include zoning and land-use restrictions, environmental regulations, onerous building codes, and permitting requirements. These policies disproportionately hurt low-income Americans.

Our affordability problems will not be solved until local governments remove these impediments that limit the supply of affordable housing in their communities.

Our housing finance system also has a role to play. Fannie Mae and Freddie Mac ("the Enterprises") exist to ensure mortgage credit availability through the economic cycle.

This mission is critical to supporting sustainable homeownership and affordable housing, especially when the economy is weak and mortgage credit tightens.

But in their current condition, Fannie Mae and Freddie Mac will fail in a downturn. And as we learned in 2008, when Fannie and Freddie fail, America's housing affordability problems get even worse.

Together, Fannie and Freddie own or guarantee $5.6 trillion in single and multifamily mortgages, nearly half the market. Yet until very recently, they were limited to just $6 billion in allowable capital reserves. This put their combined leverage ratio at nearly a thousand to one.[1]

Last month, Secretary Mnuchin and I agreed to allow the Enterprises to retain capital of up to $45 billion combined. This is a significant step forward. Retaining just one quarter's net worth has improved their leverage ratio by roughly half. But it still stands at nearly five hundred to one. By contrast, the nation's largest banks have an average leverage ratio of around ten to one.[2]

---

[1] See Exhibit 1.
[2] See Exhibit 2.

Combined with these low capital levels, credit risk has been rising in the loans purchased by the Enterprises in recent years, with some risk factors exceeding the levels observed in 2004, the pre-crisis year that is a useful comparison case to today.[3] While average borrower credit scores are better today – 746 in the first half of 2019 compared to 706 in 2004 – the Enterprises' shares of low down payment and high debt-to-income mortgages are now higher than in 2004. Among 2019 Enterprise loan acquisitions, 20 percent had down payments of 5 percent or less, nearly double the rate in 2004, and nearly 30 percent had high debt-to-income ratios (exceeding 43 percent) compared to 27 percent in 2004.[4]

This pro-cyclical pattern of increasing mortgage risk harms first-time and lower-income borrowers. It makes it easier for them to buy homes beyond their means when the economy is strong, and harder to keep those homes when the economy is weak. More than a quarter of Enterprise acquisitions in the first half of 2019 were first-time buyer loans compared to just 10 percent in 2004.[5]

Borrower debt-to-income (DTI) is a widely used measure of ability to pay that is adversely impacted in a weak economy, when incomes tend to stagnate or decline, and household debt levels tend to stay the same or increase. Although debt-to-income ratios were initially low following the recession, between 2016 and 2018, the Enterprises nearly doubled their purchasing of loans with greater than 43 percent DTI.[6]

Market-wide serious delinquency rates in 2019 are low, between 0.6 and 0.7 percent. But the same was true in 2004. Delinquency rates today are a function of strong labor markets and rising house prices. The underlying risks in the system rarely appear until it is too late.

Regardless of loan quality, there will be defaults when the tide turns and, at their current levels of capital, Fannie Mac and Freddie Mae will fail in a downturn.

Our housing finance system is supposed to serve homeowners and renters while protecting taxpayers. Currently, it fails on both counts.

The reform plans that the Departments of Treasury and Housing and Urban Development (HUD) released last month will help address these problems. They aim to build a more resilient housing finance system that protects taxpayers and ensures the stable mortgage access upon which affordable housing depends.

Chairwoman Waters, I strongly share the principles for housing finance reform that you laid out at the beginning of this Congress. The Treasury and HUD plans are broadly consistent with your principles:

---

[3] According to inflation-adjusted house prices, the current point in the housing cycle is similar to 2004 – a point in time where real prices had been rising for about 7.5 years, and roughly 2.5 years before the downturn in house prices. While similar in terms of house price growth, 2004 and 2019 differ in terms of mortgage activity. Purchase mortgages represented more than two-thirds of Enterprise acquisitions in the first half of 2019, while refinances were more prevalent in 2004, comprising nearly 60 percent of acquisitions.
[4] Statistics on credit risk are from proprietary Enterprise data reported to FHFA.
[5] Ibid.
[6] Ibid.

- "maintaining access to the 30-year fixed rate mortgage;

- ensuring sufficient private capital is in place to protect taxpayers;

- providing stability and liquidity so that we can withstand any future financial crisis;

- ensuring a smooth transition to a new finance system;

- requiring transparency and standardization in a way that ensures a level playing field for all financial institutions, especially credit unions and community banks;

- maintaining access for all qualified borrowers that can sustain homeownership and serving homeowners of the future; and

- ensuring access to affordable rental housing."[7]

These principles, which I believe are widely shared by members of this Committee, are reflected in my top priorities at FHFA. First, cement FHFA as a world-class regulator so as to ensure Fannie Mae and Freddie Mac operate in a safe and sound condition. Second, end the 11-year conservatorships. Third, foster competitive, liquid, efficient, and resilient national housing finance markets.

Since this is my first appearance before the Committee in my capacity as FHFA Director, I would like to reiterate a commitment I made in my nomination hearing before the U.S. Senate Committee on Banking, Housing, and Urban Affairs. For every decision I have faced or will face, including those regarding projects or initiatives that predate my confirmation as Director, my first question will always be: "what does the statute say?"

My role as Director of FHFA is to carry out the clear intent of Congress. Article I, Section 8 of the United States Constitution states, "All legislative powers herein granted are vested" – and vested exclusively – "in a Congress of the United States." By contrast, the powers and responsibilities of FHFA are limited to faithfully executing the laws, which apply equally to everyone at FHFA without exception.

For instance, the Housing and Economic Recovery Act of 2008 directs the FHFA Director to release the Enterprises from conservatorship through one of three mechanisms: "reorganizing, rehabilitating, or winding up [their] affairs."[8] Therefore, ending the Enterprise conservatorships is one of my top priorities first and foremost because it is what the statute requires.

---

[7] U.S. House Committee on Financial Services, "Waters Outlines Agenda in First Policy Speech as Committee Chairwoman," January 16, 2019. Accessed on October 17, 2019: https://financialservices.house.gov/news/documentsingle.aspx?DocumentID=401718
[8] 12 U.S.C. § 4617(a)(2).

A precondition for responsibly ending the conservatorships is that the Enterprises must be well-regulated and well-capitalized, such that once Fannie Mae and Freddie Mac exit, they never have to return. To achieve this objective, since my tenure as Director began just over 6 months ago, FHFA has taken several important steps, summarized below, to strengthen the Agency and improve the resilience of our nation's mortgage finance system.

Cementing FHFA as a world-class regulator

A key source of FHFA's success is our commitment to diversity. FHFA has one of the most diverse workforces amongst federal financial regulatory agencies. To cement FHFA as a world-class regulator, we are strengthening our commitment to minority and women inclusion in our examination processes, hiring practices, and procurement and supplier policies. For instance, FHFA recently created and approved funding for a new executive Associate Director position within OMWI for diversity and inclusion examinations of all FHFA's regulated entities.

Prior to ending the conservatorships, FHFA's supervision of the Enterprises must be strong and well-executed. All supervisory and oversight procedures and systems must ensure that FHFA's examination work is consistently rigorous, timely, and effective, and that additional resources are efficiently allocated to meet the needs of critical areas such as risk modeling and information technology. Over the past 6 months, FHFA's Enterprise examination program, which includes on-site examiners at both Fannie Mae and Freddie Mac, implemented a range of examination plans aimed at ensuring safety and soundness.

First, FHFA accounting experts continued their oversight of the Enterprises' adoption of the new Current Expected Credit Loss (CECL) accounting standard. Second, FHFA published guidance to clarify certain supervisory expectations, providing supplemental detail to the Agency's Prudential Management and Operating Standards. Third, FHFA issued new advisory bulletins addressing business resiliency management, fraud reporting by Fannie Mae and Freddie Mac, and Enterprise-wide compliance risk management.

In addition to the supervision and regulation of the Enterprises, a vital role of FHFA is to oversee the Federal Home Loan Bank System. Since my tenure as Director began, FHFA's Division of Bank Regulation has issued reports of examination for 7 of the eleven Federal Home Loan Banks. These examinations concluded that the condition and operations at all 7 Banks were satisfactory. They also identified deficiencies in certain areas and put forward recommendations on how to address them in the normal course of business. In addition, 5 Community Investment Program examinations were completed, including advances and grants for housing and economic development.

Key Policy Actions

At the same time that FHFA has been strengthening our regulatory and supervisory capabilities the past 6 months, the Agency has also implemented new policies that focus the Enterprises and the Federal Home Loan Banks on fulfilling their statutory missions in a safe and sound manner that protects taxpayers.

**Revised Multi-Family Caps to Prioritize Affordable Housing**

On September 13, 2019, FHFA revised the Enterprise multi-family loan purchase caps to ensure a strong focus on their statutory mission while not crowding out private capital. The new caps provide ample support to the multi-family market with a combined $200 billion in purchase capacity through 2020, while closing loopholes that allowed the Enterprises to displace private capital where such other sources of financing were available. Importantly, the new cap framework increased the levels of the Enterprises' multi-family business that is mission-driven, affordable housing to at least 37.5 percent.

**Finalized Credit Score Rule to Support Sustainable Homeownership**

On August 16, 2019, FHFA issued a Final Rule on the Validation and Approval of Credit Score Models, fulfilling the congressional mandates of Section 310 of the Economic Growth, Regulatory Relief, and Consumer Protection Act of 2018. The Final Rule requires a four-phase process for validation and approval of credit score model(s):

1. Solicitation of applications from credit score model developers;
2. Submission and initial review of submitted applications;
3. Credit score assessment; and
4. Enterprise business assessment.

Issuing this Final Rule is an important step toward ensuring that the Enterprises utilize tools that accurately measure risk, so that borrowers have a safe and sound path to homeownership and taxpayers are protected.

**Protected Equitable Market Access for Small Lenders**

On September 16, 2019, FHFA issued formal policy guidance to the Enterprises prohibiting volume-based guaranty fee discounts in order to provide a level playing field for small lenders. A central reason for the existence of Fannie Mae and Freddie Mac is to provide small lenders, community banks, and credit unions with access to the secondary market. Large market entities have access to varied sources of liquidity and the scale to access Wall Street liquidity through securitization. Smaller lenders rely on the liquidity provided by the Enterprises. But access alone is not sufficient. Small lenders must have access at terms that are equitable with larger entities.

In the lead up to the 2008 financial crisis, large financial institutions that controlled substantial market share received significant guaranty fee discounts from the Enterprises because of their volume. These volume-based discounts disadvantaged smaller institutions and drove consolidation that was not healthy for the market. FHFA's formal policy guidance implements the principle of "same rate of the return for the same risks, regardless of size." This principle supports equitable access for small lenders while appropriately allowing for guaranty fees to reflect differences that may exist in the risk profiles between lenders of different size.

**Ended Enterprise Pilot That Fell Outside Core Guaranty Business**

FHFA has been actively reviewing Enterprise pilots and new programs to ensure that they align with activities core to the Enterprises' guaranty business and statutory mission, mitigate risk, and are essential to end the conservatorships. On September 18, 2019, FHFA announced the end of the Enterprises' Mortgage Servicing Rights (MSR) Financing Pilot Program. The MSR pilot, begun in 2018, provided financing to non-bank servicers. FHFA determined that a wide assortment of alternative sources of private capital and financing were readily available. The pilot, in which only Freddie Mac chose to participate, is being wound down in an orderly manner.

**Began Transition Away from LIBOR to Alternative Reference Rates**

The anticipated end of the availability of the London Interbank Offered Rate (LIBOR), and the need to transition to alternative reference rates, is a major issue for the markets and FHFA's regulated entities. Therefore, ensuring the Federal Home Loan Banks (Banks) and the Enterprises are able to reduce risk exposure and prudently expedite the transition away from LIBOR is a policy priority for FHFA.

On September 27, 2019, FHFA sent a supervisory letter to the Banks instructing them that, as of December 31, 2019, they should stop purchasing investments in assets tied to LIBOR with a contractual maturity beyond December 31, 2021. The letter further instructed that, as of March 31, 2020, the Banks should no longer enter into all other LIBOR-based transactions involving advances, debt, derivatives, or other products with maturities beyond December 31, 2021, with only very limited exceptions granted by FHFA.

**Conclusion**

There is broad, bipartisan agreement today that our nation's housing finance system is in urgent need of reform. There is no denying that the status quo poses significant risk to taxpayers, homeowners, renters, and the entire financial system. There is also a consensus building around the principles toward which we can work, including preserving access to the 30-year fixed-rate mortgage, building private capital to stand between mortgage credit risk and taxpayers, and supporting sustainable homeownership and affordable housing.

As Director of FHFA, I will continue to take action, consistent with my statutory responsibilities and the statutory mission of the entities I regulate, to build a stronger, more resilient mortgage finance system. And I stand willing to work with all who share these goals.

Thank you again for the opportunity to testify today. I look forward to answering your questions.

**Exhibit 1**[9]



[9] Large U.S. banks and the Enterprises are subject to separate leverage ratio requirements that use differing components, both in terms of what each firm can use to meet its respective requirements and which balance sheet measures the requirements are based on. To provide a simplified version of the actual requirements for the purposes of comparison, this graph uses Stockholders' Equity for the banks and Total Consolidated Assets (Total Capital) for the Enterprises.

**Exhibit 2**



# Leverage Comparison - 2019 Q2 Update:
# 4 Largest U.S. Banks vs. The Enterprises

Total Assets relative to Stockholders' Equity (banks) and Total Capital (Enterprises)
Updated to reflect retained earnings from 2019 Q2

Written Testimony
Dr. Mark A. Calabria, Director
Federal Housing Finance Agency

**House Committee on Financial Services**
**"Prioritizing Fannie's and Freddie's Capital Over America's Homeowners and Renters? A Review of the Federal Housing Finance Agency's Response to the COVID-19 Pandemic"**

Chairwoman Waters, Ranking Member McHenry, and distinguished members of the Committee, thank you for the invitation to appear at today's hearing.

The Federal Housing Finance Agency (FHFA) has acted swiftly and prudently to respond to COVID-19. Thanks in part to our efforts, the housing market has largely been a bright spot in the pandemic economic data. We continue to update our policies as the challenges facing renters, borrowers, and market participants evolve.

**FHFA's Actions to Protect Agency Workforce and Maintain Mission Focus**

FHFA's hard-working employees are the Agency's greatest asset, and their well-being is my top priority. Our teleworking flexibilities have enabled our staff to remain safe and manage at-home obligations, while continuing to fulfill the Agency's vital mission.

The FHFA team has gone above and beyond in carrying out FHFA's statutory responsibilities while also rising to meet the challenges presented by COVID-19. In March, our telework test transitioned the very next day into a full-time mandatory telework period for the Agency that is still ongoing. With critical support from the Office of the Chief Operating Officer, FHFA employees quickly adapted to the new environment, allowing the Agency to maintain continuity of operations during this crisis.

The Office of Technology and Information Management has kept the FHFA workforce productive and connected by rapidly deploying remote tools and staff training, meeting employees' IT equipment needs, and safeguarding the Agency's network capacity, connectivity, and security. The Office of Facilities Operations Management has established and continually updated protocols and procedures for keeping our employees and headquarters safe and healthy, working tirelessly to provide employees with the equipment and office supplies needed to set up and sustain their remote workstations. The Office of Human Resources Management has been instrumental in ensuring employees have the support they need to remain engaged and productive, including by developing new work schedule and leave flexibilities, expanding the Agency's Employee Assistance Program, and meeting special accommodation requests resulting from our remote-work posture.

Across the board, the FHFA team has seamlessly transitioned to a virtual environment. This includes the hiring, on-boarding, and training processes that are essential for FHFA to continue developing and retaining a highly talented and effective workforce. The Office of

Written Testimony of Dr. Mark A. Calabria, FHFA Director – House Financial Services – September 14, 2020

Budget and Financial Management and the Enterprise Program Management Office, working with FHFA's COVID-19 Task Force, have helped the Agency stay coordinated on the updated guidance provided by various government entities, health officials, and local authorities. I am proud of the flexibility, cooperation, and hard work of every member of the FHFA team during this pandemic.

The Office of Congressional Affairs and Communication has remained engaged with and accessible to members of Congress and their staff. Since March, FHFA's legislative affairs team has held dozens of remote congressional meetings and briefings to discuss Agency policies and provide technical assistance with legislation. This is a testament to FHFA's dedicated staff and our ongoing commitment to responding to congressional inquiries in a timely manner, maintaining transparency, and connecting the Agency's many subject matter experts to legislative staff.

FHFA has also worked closely with our peer financial regulators and other federal agencies to respond to the COVID-19 national emergency. Through regular communication channels, FHFA and these agencies continue to share, in real-time, challenges, ideas, and solutions to help each other develop best practices based on the latest guidance available. Timely information sharing has enabled FHFA to respond to evolving COVID-19 related challenges in a rapid, nimble, and effective manner.

We have continued to prioritize our work to foster an environment where everyone feels safe, respected, and valued for our differences. The senseless violence and loss of innocent life that have roiled our nation in recent months – and that have torn apart too many communities across the country for too long – highlight the importance of this work both in the workplace and beyond. They also have strengthened our resolve to uphold the Agency's core values of fairness, diversity, and inclusion. At the beginning of this year, we established the Office of Equal Opportunity and Fairness in order to elevate equal employment opportunity practices and conflict resolution resources to the division level. As the Agency announced earlier this week, FHFA has hired Debra Chew as the first permanent Director for the office.

I commend FHFA's Office of Minority and Women Inclusion (OMWI) for its steadfast support of the Agency's workforce during this time. This includes OMWI's work, with my support, to launch FHFA's Diversity Advisory Council, which aims to ensure diversity in all aspects of the Agency's employment and contracting practices and to create regular programs that engage employees on professional and personal diversity and inclusion issues. OMWI is playing an essential role in helping FHFA employees affected by the recent events and tensions across the country, offering training, listening sessions, and other resources. And tomorrow OMWI is partnering with our Office of Human Resources Management to continue recruiting the next generation of FHFA personnel from Historically Black Colleges and Universities at the Atlanta University Center Consortium virtual career fair. This kind of recruitment is only one of the examples of how the Agency continues to build a diverse pipeline of talent for its future workforce. FHFA already has one of the most diverse workforces amongst federal regulatory agencies. Our diversity is – and will remain – a key source of FHFA's success.

Written Testimony of Dr. Mark A. Calabria, FHFA Director – House Financial Services – September 14, 2020

Across all divisions and offices, FHFA's employees have remained united in our efforts to enable American families to stay safe in their homes during this public health emergency. We have worked closely with our regulated entities, Fannie Mae and Freddie Mac (the Enterprises) and the Federal Home Loan Banks (FHLBanks), to support borrowers and renters, while ensuring the proper functioning of the mortgage market both during and after this crisis. Our actions have been – and continue to be – data driven.

**FHFA's Strong Research Capabilities Are Key to Agency's Data Driven Policymaking**

Through oversight of the regulated entities, FHFA collects and analyzes a significant amount of data on trends in the housing and mortgage markets. This enables the Agency to respond appropriately to market developments, promote market efficiency and stability, and disseminate information to improve the public's understanding of housing finance markets. Economic research and data analytics are core competencies of effective safety and soundness supervision, which is essential to preparing the Agency and the Enterprises to responsibly exit and operate safely outside of conservatorship. That is why, from the beginning of my term, one of my top priorities has been to strengthen FHFA's research and data analysis capabilities.

For instance, the Agency has enhanced the accessibility of existing data products, such as quarterly and monthly house price indexes (HPIs). FHFA produces the nation's only public, freely available HPIs that measure changes in single-family house prices based on data that cover all 50 states and over 400 American cities and extend back to the mid-1970s. The HPIs are built from tens of millions of home sales and offer insights about house price fluctuations at the national, census division, state, metro area, county, ZIP code, and census tract levels. In May, with the publication of 2020's first HPI Quarterly Report, FHFA launched a new interactive dashboard, available on the Agency's website, that illustrates house-price trends across the top 100 Metropolitan Statistical Areas. In August, with the publication of 2020's second HPI Quarterly Report, FHFA enhanced the HPI Calculator, a popular website tool that now enables users to compare house price changes over time at the metro area and state levels.

In addition to increasing the exposure of existing data products, FHFA has taken several steps to elevate and expand the Agency's research capabilities and contributions. In January 2020, as part of an organizational realignment, FHFA created the Division of Research and Statistics (DRS) to strengthen the Agency's data collection and analysis capabilities. DRS is FHFA's center for economic and market research, data development, and statistical analysis to support the Agency's divisions and offices engaged in oversight, supervision, rulemaking, and policy development. The division examines trends and risks in housing and housing finance markets, advances modeling capabilities, develops and maintains data, evaluates policy impacts, and engages with research communities outside of the Agency.

The research and data analysis capabilities that FHFA created and continues to strengthen within DRS have been critical to supporting the Agency's data-driven response to COVID-19. For instance, DRS has enhanced FHFA's capacity to monitor housing and mortgage markets by leveraging existing data sources and seeking out new ones. This has provided a comprehensive

Written Testimony of Dr. Mark A. Calabria, FHFA Director – House Financial Services – September 14, 2020

view of the state of the mortgage market prior to the pandemic and it has enabled FHFA to understand, in real time, how circumstances have changed over the course of the crisis.

**The State of the Market Before and During COVID-19 Crisis**

At the start of 2020, the American housing market was in a strong position. A low interest rate environment and stable labor markets drove robust demand and price appreciation. Home price growth in the first quarter of 2020 outpaced annual growth from the same period a year before as falling interest rates and shrinking inventories for sale led prices higher just prior to the COVID-19 crisis. Nationwide, house prices increased 1.7 percent in the first quarter of 2020, a 5.7 percent increase from the first quarter of 2019. FHFA's seasonally adjusted monthly index for March was up 0.1 percent from February.

Since early 2019, existing home sales had been on a steady upward trajectory, after declining throughout 2018 due to rising rates. The National Association of Realtors' months' supply of existing homes for sale in February reached its lowest level since the series started in 1999, driving home prices upward at a faster rate in the first quarter. Single-family housing starts in February 2020 reached the highest three-month rate since November 2006, on a seasonally adjusted basis, after more than 10 years of slow but steady increases.

In response to COVID-19, financial markets endured a severe dislocation in March. Uncertainty over the public health and the economic impacts of the pandemic constrained financial liquidity, significantly disrupting the financing, lending, and hedging activities of mortgage lenders and many other market participants. Spreads between the 30-year fixed mortgage rate and the 10-year Treasury yield widened. Treasuries experienced rising yields as a market-wide demand for cash led investors to sell off their most liquid assets in response to redemption demands.

**FHFA's Policy Response: Supporting Borrowers and Renters**

From the beginning of this crisis, FHFA's policy, conservatorship, and research teams have worked together to produce forecasts and estimates of the future impact of COVID-19 on the mortgage market based on key indicators such as unemployment insurance claims and house prices. They have also developed models to support decision making regarding loan modifications, servicing, and other issues. This internal research, monitoring, and analysis have helped to inform and guide FHFA's policy actions.

One of our top priorities has been to support renters and homeowners struggling to pay for housing because of COVID-19. To do this, FHFA has directed the Enterprises to put in place certain protections. The Enterprises own or guarantee approximately $6.0 trillion in mortgages. That includes about 43 percent of multifamily units, about 8.6 million households, and more than half of single-family mortgages.  FHFA's policies apply to all single-family homeowners and multifamily property owners with an Enterprise-backed mortgage. FHFA's policies also help to set workable standards for the entire market.

Written Testimony of Dr. Mark A. Calabria, FHFA Director – House Financial Services – September 14, 2020

FHFA's policies have built on the lessons learned from the failures of the 2008 financial crisis, focusing particularly on improving the process for borrowers and renters in need of assistance. As a result, borrowers today do not have to navigate excessive and often confusing rounds of paperwork with their servicers, such as those that resulted from the multiple Home Affordable Refinance Program (HARP) and Home Affordable Modification Program (HAMP) programs during the post-housing crash foreclosure crisis.

For homeowners facing foreclosure before COVID-19, we suspended all single-family foreclosures and foreclosure-driven evictions through the end of 2020. This policy has protected more than 28 million homeowners and enabled roughly 200,000 families facing foreclosure pre-COVID to stay in their homes.

For borrowers financially impacted by COVID-19, we allowed homeowners to take a timeout from mortgage payments through forbearance for up to 12 months. The Enterprises worked with servicers to develop loan modification options and repayment plans. This ensured borrowers would not face payment shock and could remain safely in their homes.

We then allowed borrowers in forbearance who return to making monthly payments to repay what they missed when they sell their home or refinance their loan. This new payment deferral option simplifies options for borrowers and provides an additional tool for mortgage servicers.

From the beginning of the pandemic, we have emphasized that those who can make their mortgage payments should continue doing so. Of the borrowers with an Enterprise-backed mortgage in forbearance, about one-quarter continue to make payments. FHFA directed the Enterprises to treat such borrowers as current if they want to buy a new home or refinance.

FHFA also took action specifically to protect renters struggling to pay rent because of COVID-19. It is important to recognize that the Enterprises do not have a contractual relationship with tenants. Their relationship is with the property owners or landlords. Therefore, if a multifamily loan is performing and the property owner does not seek forbearance, the Enterprises cannot impose requirements on the landlords.

On March 23, FHFA announced the Enterprises' policies providing a forbearance option for multifamily property owners with an Enterprise-backed mortgage. Importantly, these policies prohibit tenants from being evicted for the nonpayment of rent during a property owner's forbearance period. In late June, we allowed multifamily property owners in forbearance to extend for an additional three months on the condition that they adopt stronger renter protections. And in August, FHFA announced that multifamily landlords with new or modified forbearance must notify tenants of their rights under the forbearance agreement.

While the single-family forbearance program was modeled on prior disaster response efforts, the nationwide multifamily forbearance programs with tenant protections were developed from the ground up. After putting these programs in place, FHFA directed the Enterprises to create online lookup tools that allow renters and borrowers to determine whether either of the

Written Testimony of Dr. Mark A. Calabria, FHFA Director – House Financial Services –
September 14, 2020

Enterprises own or guarantee the mortgage on the property where they live and therefore whether they are eligible for eviction protection or forbearance.

Since implementing the single-family and multifamily forbearance programs, FHFA has closely monitored the data to understand the responses by borrowers and the market. As a staffer on the Senate Banking Committee during the 2008 financial crisis, I saw firsthand the importance of resisting the pressure to "act first, analyze later" that arises in a period of financial stress. In a crisis, panic can lead to ill-conceived policy responses and send confounding signals to the market. It is imperative to remain calm and make decisions based on careful, thoughtful analysis of the most up-to-date data available. The hardworking professionals of FHFA have ensured that the Agency has fulfilled this fundamental objective during the COVID-19 national emergency.

Early in the crisis, there were a wide variety of predictions about the future effects of COVID-19 on housing markets. Some observers contended that forbearance rates would reach as high as 25 to 50 percent. Given the unprecedented nature of the pandemic and the high degree of uncertainty about the economic impact, FHFA carefully monitored the data we generated internally and the data we received from the Enterprises and market participants. This has ensured that we develop and update our policies in response to the facts on the ground. At this point, I remain encouraged by what the data is telling us about the trajectory of forbearance rates.

Data developed internally at the Enterprises and by industry groups indicate that Enterprise forbearance rates remain manageable. After rising precipitously in April, the rate of forbearance uptake slowed during the last few weeks of May and then began to consistently decline week over week. According to data released by the Mortgage Bankers Association, as of May 24, 6.4 percent of total Enterprise-backed mortgages were in forbearance, compared to 11.8 percent of mortgages backed by Ginnie Mae. By the end of August, the Enterprise single-family mortgage forbearance rate had fallen to 4.8 percent, compared to 9.6 percent of Ginnie Mae loans (see Figure 1). FHFA's internal analysis shows that renters in approximately 170,000 units of multifamily housing are eligible for eviction protection because they live in properties receiving forbearance from Fannie Mae or Freddie Mac. This represents about 1.9 percent of outstanding multifamily mortgage balances at the Enterprises.

Written Testimony of Dr. Mark A. Calabria, FHFA Director – House Financial Services – September 14, 2020

**Figure 1**



*Source: Mortgage Bankers Association, data through August 30*

      The mortgage market still faces some challenges. Responding to substantial federal support in the form of MBS purchases by the Federal Reserve, spreads between the current coupon MBS and 10-year U.S. Treasury have fallen below levels observed at the beginning of 2020, at least for the to-be-announced (TBA) market. On the other hand, spreads between the 30-year fixed mortgage rate and the 10-year Treasury yield remain high. These primary market spreads have declined, but they have not yet returned to pre-crisis levels (see Figure 2).

Written Testimony of Dr. Mark A. Calabria, FHFA Director – House Financial Services – September 14, 2020

**Figure 2**



*Source: Freddie Mac Primary Mortgage Market Survey, Bloomberg, U.S. Treasury*

However, current mortgage rates reported by Freddie Mac and the Mortgage Bankers Association are at the lowest point on record in the series dating back to 1971 and 1990, respectively. FHFA continues to work with the Enterprises to ensure that borrowers can access new purchase and refinancing opportunities at historically low rates. This includes the policy of treating as current borrowers in forbearance who continue to make payments. In addition, borrowers' credit history will not be negatively impacted by entering a COVID-19 related forbearance plan.

We have also helped clarify consumers' options. We updated the scripts that servicers use when talking to borrowers about forbearance. We translated those scripts and the associated forbearance application into the top five languages of borrowers with Limited English Proficiency: Spanish, Chinese, Vietnamese, Korean, and Tagalog. We have emphasized to servicers and the public that no lump sum repayment is required at the end of forbearance. We partnered with the Consumer Financial Protection Bureau (CFPB) to launch the Borrower Protection Program, which allows FHFA to leverage CFPB's consumer complaint database to

Written Testimony of Dr. Mark A. Calabria, FHFA Director – House Financial Services – September 14, 2020

identify problematic servicing practices. And FHFA helped develop a website that consolidates federal information about mortgage relief options, renter protections, and how to avoid scams.

To help ensure that borrowers qualify for mortgages they can afford, FHFA will share with the CFPB aggregated data on loans that enter forbearance before delivery to the Enterprises. This will allow FHFA to fulfill its obligation under the Qualified Mortgage (QM) Patch to ensure that loans sold to the Enterprises are complying with the intent of Dodd-Frank's ability to repay provisions.

**FHFA's Policy Response: Ensuring the Proper Functioning of the Mortgage Market**

Working with our regulated entities, FHFA has also taken several steps to ensure the mortgage market continues to function properly both during and after this crisis.

To ensure the safety of market participants, FHFA authorized several loan-closing, employment-verification, and appraisal flexibilities. The changes include allowing desktop and exterior-only appraisals, providing alternative methods to demonstrate construction completion and satisfy borrower documentation requirements, allowing renovation disbursements, and expanding the use of power of attorney, appraisal waivers, and remote online notarization. FHFA put these flexibilities in place for 60 days and then extended them through at least September 30.

In April, FHFA recognized that nonbank servicers needed clarity to serve the market through the crisis. In response, we instituted a four-month limit on servicers' obligations to advance principal and interest payments on loans in forbearance. With respect to mortgage loans in MBS, prior to COVID-19, Fannie Mae servicers with a scheduled payment remittance had been responsible for advancing the principal and interest payment regardless of borrower payments. Freddie Mac servicers, who are generally responsible for advancing scheduled interest, are only obligated to advance four months of missed borrower interest payments. FHFA's policy established a four-month advance obligation limit for Fannie Mae scheduled servicing, which is consistent with the current policy at Freddie Mac.

To keep the mortgage market working for current and future borrowers, and to help originators continue lending, FHFA enabled the Enterprises for a limited period of time to purchase certain single-family mortgages in forbearance that meet their criteria. Charging a fee for these transactions is consistent with FHFA's statutory mandate to "preserve and conserve assets" and the Enterprises' charter requirement to purchase only those loans that meet the standards imposed by private institutional mortgage investors. Prior to this, the Enterprises had never purchased loans in forbearance. Our policy provides a new option to lenders and the Enterprises.

Additionally, FHFA took several steps to ensure the Federal Home Loan Bank System could continue to support member liquidity and housing finance markets. We relaxed liquidity requirements in a countercyclical fashion. We reminded the FHLBanks of their obligation to offer advances up to 10 years in maturity to meet their members' needs and their ability under

Written Testimony of Dr. Mark A. Calabria, FHFA Director – House Financial Services – September 14, 2020

**PX-0591 - p. 9 of 17**

FHFA regulations to provide below-cost advances during disasters like the COVID-19 pandemic.

We allowed the FHLBanks to accept Paycheck Protection Program loans as collateral when making loans to their members and allowed them to accept as collateral loans that have been modified or that are in COVID-19 related forbearance. To avoid exacerbating potential liquidity problems, FHFA deferred certain deadlines related to the FHLBanks' transition from LIBOR-based exposures, while continuing our efforts to prepare for the eventual end of LIBOR. To protect the safety and soundness of the FHLBanks, FHFA issued guidance related to collateral and pricing policies aimed at ensuring that all members are treated fairly and that every FHLBank can continue to provide liquidity to institutions and communities in its district.

It is important to recognize the vital support that the FHLBanks provided to the market in response to the financial stress caused by the pandemic. A core function of the FHLBanks is to provide liquidity in times of stress. This support is critical for small and community banks that often do not have access to other sources of low-cost funding. When the COVID-19 crisis began, the FHLBanks stepped up to keep liquidity in the market, meeting unprecedented advance demand from their member financial institutions.

In March, while other liquidity sources dried up, FHLBank System advances grew by $189.4 billion – or 30.7 percent – at their peak. For the quarter ending March 31, FHLBank System advances increased 25.8 percent to $806.9 billion. While access to long term debt markets was severely limited, the System was able to fund this increased advance demand largely through discount notes and floating rate bonds indexed to the Secured Overnight Financing Rate (SOFR). For the first quarter of 2020, outstanding debt increased to $1.18 trillion, growing at the fastest pace in recent history.

As advances and assets grew, earnings decreased significantly because of reduced net interest spread and mark-to-market accounting effects. Compared to the fourth quarter of 2019, net interest income fell a substantial $350 million (28.6 percent) to $872 million, and net income decreased $262 million (29.5 percent) to $627 million. Nevertheless, for the first quarter of 2020, FHLBank System retained earnings grew $141 million to $20.7 billion, or 1.6 percent of total assets.

Following the injections of liquidity provided by the Federal Reserve and The Coronavirus Aid, Relief, and Economic Security Act, the FHLBanks' balance sheets – both advances and debt outstanding – fell to or below pre-crisis levels (see Figure 3). This is exactly what the FHLBanks are supposed to do as counter-cyclical providers of liquidity. And it is why FHFA is focused on protecting the System's safety and soundness. It is critical that the Banks remain capable of being a source of liquidity when their members and the economy need it most.

Written Testimony of Dr. Mark A. Calabria, FHFA Director – House Financial Services – September 14, 2020

**Figure 3**



* *Source: FHLBanks*

     I am proud of FHFA's response to this pandemic. Our actions have helped homeowners, renters, and the housing market deal with this crisis. But they have also come at significant cost.

     Conservative estimates price COVID-19 related costs for the Enterprises at roughly $6 billion. As reported on the Enterprises' 10-Q disclosure forms, $4 billion is from expected loan losses due to projected forbearance defaults. The expected losses associated with the foreclosure moratorium amount to at least $1 billion. Other forbearance-related expenses and fees, such as the $500 fee the Enterprises pay to servicers for loss mitigation, account for another $1 billion. Again, these are conservative estimates of the costs of responding to COVID-19. The Congressional Budget Office (CBO) projects the Enterprises' annual earnings in 2020 will be reduced by $10 billion as a result of the coronavirus pandemic[1]

---

[1] Congressional Budget Office, "Effects of Recapitalizing Fannie Mae and Freddie Mac Through Administrative Actions," https://www.cbo.gov/publication/56511, August 2020.

Written Testimony of Dr. Mark A. Calabria, FHFA Director – House Financial Services – September 14, 2020

To cover these projected losses, starting December 1, the Enterprises will be adding an adverse market fee of 0.5 percent when they purchase select refinance mortgages.

The fee applies to refinance mortgages and will not impact new purchase mortgages, including first-time homebuyers – a key element FHFA required of the Enterprises. Additionally, the fee is expected to have minimal impact on low-income borrowers, as nearly 95 percent of recent refinance acquisitions have credit scores at or above 700 and nearly 80 percent have loan-to-value ratios at or below 80 percent.

FHFA tailored the fee to ensure low-income borrowers can continue accessing record-low rates to reduce their monthly mortgage payments. Exempt from the fee are borrowers with loan balances of $125,000 or less, nearly half of whom are at or below 80 percent of area median income. Also exempt are affordable refinance products, Home Ready and Home Possible.

The losses this fee covers are the result of policies that have helped millions of Americans stay safe in their homes during a global pandemic. Although Congress has not provided any funding to offset the costs of these policies, the Enterprises' congressional charters require that expenses must be recovered via income.

The fee increase was originally scheduled to go into effect September 1. After listening to feedback, including from the Committee, FHFA delayed implementation until December 1. This recognizes that Congress may take the opportunity to review alternatives.

Delaying this fee will help provide certainty to the market and borrowers; however, the total amount raised through the fee will be unlikely to cover the cost of Enterprise assistance to borrowers and renters during the pandemic. Low mortgage rates have already significantly elevated the rate of Enterprise refinance acquisitions (see Figure 4), and delaying the fee reduces the number of transactions the cost can be spread over. If Congress takes action to support these programs before the new implementation date, such a change will factor into the costs borne.

Written Testimony of Dr. Mark A. Calabria, FHFA Director – House Financial Services – September 14, 2020

**Figure 4**



*Source: FHFA*

**Assessing FHFA's Policy Response: The State of the Market Today**

      FHFA's response to COVID-19 has significantly helped borrowers, renters, and the housing market deal with this crisis. But we also recognize that more work remains. The crisis caused by COVID-19 is not over. The full economic and financial impact of the pandemic is not yet known. The future state of the labor market remains uncertain. For these reasons, FHFA is still hard at work to ensure our policies continue to respond to the challenges as they evolve. We remain committed to working with other federal agencies, Congress, our regulated entities, and stakeholders to get through this difficult time. With that said, the housing market has been a bright spot in the economic data so far.

      Following some contraction in mortgage market activity in March and April, the purchase market rebounded in a strong V-shaped recovery. In the second half of May, purchase mortgage applications surpassed its year-over-year level. Between June and August, applications are on track to be more than 20 percent higher, on average, compared to the same period in 2019. Existing home sales (EHS) in August reached their highest level since December of 2006 at 5.9 million, according to the National Association of Realtors (see Figure 5). While they have not completely returned to pre-COVID levels, housing starts are also showing strong signs of recovery.

Written Testimony of Dr. Mark A. Calabria, FHFA Director – House Financial Services – September 14, 2020

**Figure 5**



*Source: National Association of Realtors*

House prices were supported by this rebound in market activity. After falling slightly in May relative to April, house prices rose by 0.9 percent in June as local economies re-opened and transactions picked up. Nationwide, house prices increased 0.8 percent in the second quarter of 2020, a 5.4 percent increase from the second quarter of 2019.

Based on the Enterprises' second quarter acquisitions of purchase mortgages in 2019 and 2020, loan risk factors such as average credit scores, debt-to-income (DTI), and loan-to-value (LTV) ratios have changed only slightly this year compared to last. Refinance acquisitions in the second quarter had higher credit scores, lower DTIs and lower LTVs. The Enterprises, at the direction of FHFA, will continue to take measured and responsible steps to maintain a prudent risk profile and address layered risks. Moving forward, FHFA will continue to closely monitor all sources of market data and let the data drive our decisions.

At this point, I am encouraged by what the data tells us about the state of the mortgage market and the capacity of servicers following FHFA's robust policy response.

Total monthly Enterprise principal and interest payments at the beginning of the crisis were approximately $32 billion. Of that, about 40 percent, approximately $13 billion, of the advance obligation rests with the Enterprises. About $11 billion, approximately a third, rests with depositories. Therefore, roughly $8 billion, approximately a quarter, of the potential monthly advance obligation rests with nonbanks. At a 4.8 percent forbearance rate this translates into approximately $384 million per month of nonbank incremental advance needs. As a result of FHFA's four-month limit on servicers' obligations to advance principal and interest payments on loans in forbearance, nonbanks' total four-month obligation is approximately $1.5 billion. However, as noted above, a quarter of borrowers in forbearance have not stopped making mortgage payments.

Written Testimony of Dr. Mark A. Calabria, FHFA Director – House Financial Services – September 14, 2020

In addition, both Fannie Mae and Freddie Mac programs allow servicers to use a portion of mortgage payoffs from refinancings to help cover these advance obligations. This has a significant impact especially under the Fannie Mae program.

At FHFA's encouragement, servicers have been increasing their available liquidity. Total nonbank liquidity among Enterprise counterparties increased by 9 percent to $36 billion in the first quarter of 2020. Of that, unencumbered cash and equivalents made up $13 billion, an increase of 19 percent from December 31, 2019. By the end of June, servicers drawing down their lines of credit reduced their official overall liquidity, but unencumbered cash and equivalents significantly increased by 38 percent to $18 billion.

**Looking Ahead: The Urgent Need to Build Capital at the Enterprises and Advance Housing Finance Reform**

FHFA's strong response to COVID does not mean that all is well. Most notably, the Enterprises lack the capital to withstand a serious housing downturn. This jeopardizes their important mission to support borrowers in housing finance markets during periods of stress.

Fannie Mae and Freddie Mac are private companies created by Congress to perform a public mission. A core element of that mission, stated in their congressional charters, is to "promote access to mortgage credit throughout the Nation." They do this by buying mortgages from lenders, which allows more mortgages to be made, and by guaranteeing the principal and interest payments on behalf of borrowers to investors in mortgage-backed securities.

For most families, homeownership is a key step toward achieving financial security and building a brighter future for their children. But under the wrong conditions, it can be financially devastating, resulting in foreclosure, eviction, destroyed credit, displacement, and worse. The factor that makes the biggest difference between these two outcomes is not the mortgage rate today but the borrower's ability to repay the loan in the future.

There is no rate low enough to make a mortgage beneficial for a borrower who experiences a severe financial shock like unemployment before they have a chance to build any meaningful equity in their home. This is demonstrated by the fact that borrower debt-to-income has been one of the strongest predictors of forbearance and by the lived experiences of too many Americans in the last financial crisis. We must remember the lessons of the housing crash that shattered the financial future of countless families.

It started with a push to expand mortgage lending at all costs, even if it meant saddling low-income and minority borrowers with extreme levels of debt. While leverage maximizes the upside in good times, it also maximizes the downside in bad times. From 2001 to 2005, African American and Hispanic mortgage borrowing increased 78 and 116 percent, respectively. Then from 2005 to 2015, the collapse of the housing bubble drove the number of minority borrowers down by about 63 percent.

Written Testimony of Dr. Mark A. Calabria, FHFA Director – House Financial Services – September 14, 2020

These communities lost significant amounts of wealth. Between 2007 and 2010, household wealth declined 31 percent for African American families and over 40 percent for Hispanic families.[2]

Looking back on the housing bubble, it is clear that the most important financial achievement for many Americans was not getting into homeownership but staying in. When the bottom fell out, families were left to pick up the pieces.

Another of the Enterprises' core purposes stated in their congressional charters is to "provide stability" to the housing finance system. But to provide stability, they must be stable themselves. And in 2008, Fannie Mae and Freddie Mac were anything but stable.

My job and my statutory mission is to make sure that the Enterprises never again fail the millions of families whose financial futures depend on a stable mortgage market. To do this, they must build capital.

Capital is the portion of the Enterprise's funds that is not owed to anyone and protects against unexpected losses. That is the core purpose and function of capital. Capital absorbs losses and enables the Enterprises to continue supporting borrowers when other sources of credit disappear. The more capital an Enterprise has, the more losses it will be able to absorb, and the more support it can provide.

FHFA has made progress in building capital at the Enterprises. Their combined leverage ratio improved from roughly 1,000 to 1 when I started last year to roughly 250 to 1 today. But much more work remains.

This May, FHFA took a critical step toward solving this problem when we released a re-proposed capital framework for Fannie Mae and Freddie Mac. The framework targets an eventual 25 to 1 leverage ratio, or capital equal to roughly 4 percent of Adjusted Total Assets. This is the amount of loss-absorbing capital that FHFA estimates each Enterprise will need to remain a viable going concern, both on its balance sheet and in the eyes of creditors and counterparties, amid a house price shock on par with the 2008 crash.

Meeting the requirements in this capital framework, when combined with effective prudential supervision, will make Fannie Mae and Freddie Mac financially safe and sound. That must be our goal. Safety and soundness at the Enterprises means safety and soundness for millions of homeowners and renters across America.

Capital is what will allow the Enterprises to support borrowers and renters who fall on hard times through no fault of their own, like those struggling because of COVID. Capital is what will allow them to continue providing liquidity to the mortgage market.

---

[2] Signe-Mary McKernan, Caroline Ratcliffe, Eugene Steuerle, and Sisi Zhang, "Less than Equal: Racial Disparities in Wealth Accumulation," Urban Institute, https://www.urban.org/sites/default/files/publication/23536/412802-less-than-equal-racial-disparities-in-wealth-accumulation.pdf, April 2013.

Written Testimony of Dr. Mark A. Calabria, FHFA Director – House Financial Services – September 14, 2020

And capital is what will allow Fannie Mae and Freddie Mac to weather a crisis and continue doing their part to help ensure all Americans have an affordable place to call home, whether it is rented or owned. This is the foundation of reliable mortgage credit access during periods of financial stress.

The primary beneficiaries of a financial system's safety and soundness are the families it serves. Avoiding another housing crisis and recession benefits all families, but it is especially important for low-income and minority families who are first to lose their jobs and savings when downturns hit.

As the COVID crisis has clearly shown, there are still critical vulnerabilities in our mortgage system that put taxpayers and our housing market at risk. The longer our housing finance system continues without needed reforms, the greater the risk that the American housing market collapses again when it comes under strain.

FHFA has the statutory responsibility and authority to stabilize the Enterprises and to restore them to safety and soundness with appropriate capital requirements and effective prudential regulation. The Agency has made great progress in matching the Enterprises' risk to their capital, and FHFA's new rule will require enough loss-absorbing capacity for them to be able to fulfill their counter-cyclical mission.

But only Congress can enact the full range of reforms necessary to fix the structural flaws in our housing finance system. To that end, in June of this year, I included in FHFA's recent Annual Report to Congress several legislative recommendations to strengthen FHFA with additional regulatory and supervisory authorities on par with those of other independent federal financial regulators.

I stand ready to work with all who share the goal of building a stronger, more resilient housing finance system in America.

Written Testimony of Dr. Mark A. Calabria, FHFA Director – House Financial Services – September 14, 2020



**Speech**

# Prepared Remarks of Dr. Mark A. Calabria, Director of FHFA, at Mortgage Bankers Association - 2020 Convention and Expo

10/19/2020

**Public Remarks as Prepared for Delivery**

**Dr. Mark A. Calabria**

**Director, Federal Housing Finance Agency**

MORTGAGE BANKERS ASSOCIATION

2020 ANNUAL CONVENTION AND EXPO

MONDAY, OCTOBER 19, 2020

VIRTUAL

Thank you, Susan [Stewart], for that introduction and for inviting me to speak today. I want to thank you and Kristy Fercho for your leadership and our conversations over the recent months.

While I wish we could be meeting in person, I always appreciate any opportunity to speak with the Mortgage Bankers Association. I have lost track of the number of MBA events I have attended over the years. But I know that this is the fourth time I have addressed the MBA as FHFA Director. And I look forward to many more over my next 3 and a half years.

I want to thank Bob Broeksmit for his continued partnership in working with FHFA and industry throughout the pandemic.

He and I both understand the importance of Fannie and Freddie during a challenging time for homeowners, as we have seen in this pandemic. I appreciate Bob's constructive feedback and look forward to working with him and all of MBA's members over the rest of the year and beyond.

As Bob knows, working closely with FHFA's stakeholders has been a top priority of mine. The past seven months illustrate how important it is for FHFA to hear from market participants and consumers across the country. We welcome and need that feedback.

And I thank the Mortgage Bankers Association for providing your insights and perspectives.

Building on our commitment to collaboration, today, I am announcing to the MBA Annual that FHFA is releasing a new rule that will ensure stakeholders and the public always have a formal opportunity to provide feedback when the Enterprises consider new products or lines of business. I will provide more detail on this proposed rule in a few minutes. But first, let me bring you up to date on our response to COVID.

Since early March, we have all been doing our part to respond to the COVID-19 national emergency. In that time, I have personally held almost 100 meetings and calls to keep an open line of communication.

MBA members have been on the front lines of the response to COVID's effects on borrowers. You have helped millions get into forbearance plans. Now, you are helping many who are ready to get back to paying their mortgage. You have helped homeowners benefit from historically low rates through refinancing.

And throughout it all, you have continued underwriting the good loans that make homeownership both affordable and sustainable. I appreciate all your efforts that have helped keep the market functioning through this time of stress.

I have been humbled to be able to play my part in this effort. You have seen the team at FHFA move swiftly to respond to the developing challenges. Working with our regulated entities, we have helped borrowers and renters stay safe in their homes.

And we have taken steps to help the mortgage market continue functioning both during and after this crisis.

When local government offices were shutting down across the country, FHFA authorized loan-closing, employment-verification, and appraisal flexibilities. These flexibilities have kept the origination process open and ensured the physical safety of market participants. And I am pleased to announce today that we are extending these flexibilities until at least November 30.

I want to thank Bob and MBA's leadership team for their support of these flexibilities. You have been an essential resource in helping FHFA understand how they are used by your members.

We suspended all single-family foreclosures and foreclosure-driven evictions. This policy has protected more than 28 million homeowners and enabled roughly 200,000 families facing foreclosure pre-COVID to stay in their homes. FHFA recently extended the foreclosure and eviction moratorium through the end of this year.

We allowed homeowners to receive forbearance from their mortgage payments for up to 12 months. We had the Enterprises work with servicers to develop loan modification options and repayment plans. This ensures borrowers will not face payment shock.

We allowed borrowers in forbearance who return to making payments to repay what they missed when they sell their home or refinance their loan. This made one consistent set of options available to all borrowers in forbearance.

The payment deferral option is good for borrowers, servicers, and MBS investors. I want to thank MBA for their support of this new repayment option.

From the outset, we have emphasized that those who can make their mortgage payments should continue doing so. Of the borrowers with an Enterprise-backed mortgage in forbearance, about one-fifth continue to make payments. As I announced to the MBA conference this May, FHFA directed the Enterprises to treat these borrowers as current if they buy a new home or refinance.

We made sure that distressed borrowers do not have to deal with endless rounds of paperwork to negotiate with their servicer. This stands in stark contrast to the experience following the 2008 crisis. We specifically avoided the constantly changing rules under HARP and HAMP that added so much confusion in the last crisis.

I made clear that we would operate on an honor system. And thus far the data shows very little indication of abuse by Fannie or Freddie borrowers during this national emergency.

FHFA has also taken action to protect renters impacted by COVID. For the first time in history we developed nationwide multifamily forbearance programs that prohibit landlords in forbearance from evicting tenants for the nonpayment of rent.

We allowed multifamily property owners to extend their forbearance for an additional three months on the condition that they adopt stronger renter protections.

At our direction, the Enterprises created online lookup tools that allow renters and borrowers to determine if they are eligible for eviction protection or forbearance. Renters in roughly 170,000 multifamily units are protected by these programs.

I want to thank the MBA team for your assistance on multifamily market issues. You were instrumental in helping FHFA connect with a variety of market participants, including life insurers, lenders, and CMBS investors and issuers.

This gave us a holistic look at what was going on in the multifamily space, especially given all the uncertainty introduced by COVID. MBA has also been tremendously helpful by providing forecasting information and feedback related to the multifamily forbearance programs. This dialogue and partnership have been critical to the success of our COVID response.

Single-family forbearance was largely adapted from existing natural disaster programs. But we designed the nationwide multifamily forbearance programs from the ground up at the outset of the crisis. This has been somewhat like building the plane while we are flying it. Your feedback has allowed us to continue developing these programs to ensure that relief was available and fair to all parties involved.

We have been closely monitoring the data to see how consumers are responding and how all our policies are working. At this point, I am optimistic about what the data is telling us.

It is encouraging to see Enterprise forbearance rates continue declining. Enterprise single-family forbearance peaked at just over 6 percent in May. According to the latest MBA data, which is similar to our own, it is now down to 4.03 percent.

I recognize that servicers have entered another busy period as the expiration of many initial forbearance plans now requires them to contact and review options with each borrower. Thank you again for doing the hard work of helping borrowers through this time of financial stress.

FHFA has also taken action to support the functioning of the mortgage market, both during and after this crisis.

In April, we recognized that nonbank servicers needed clarity to serve the market in that stressed environment. In response, FHFA instituted a four-month limit on servicers' obligations to advance principal and interest on loans in forbearance. This advance obligation limit has provided much-needed stability and clarity to the mortgage market.

To support lenders' liquidity, FHFA enabled the Enterprises to purchase certain single-family mortgages that go into forbearance between closing and delivery.

It is important to recognize that the Enterprises had never before purchased loans in forbearance. The status quo was that they could not buy these loans. FHFA put a new option on the table for the first time.

I am proud of FHFA's response to this pandemic. Our actions have helped homeowners, renters, and the housing market deal with this crisis. But they have also come at a cost.

The Enterprises estimate that these policies will cost at least $6 billion. That is $4 billion in loan losses from projected forbearance defaults, $1 billion in losses from the foreclosure moratorium, and another $1 billion in forbearance expenses.

These figures could be even higher depending on the path of the economic recovery.

To cover these projected losses, starting December 1, the Enterprises will be adding an adverse market fee of 0.5 percent to some refinance acquisitions.

FHFA tailored the fee to ensure low-income borrowers can continue accessing record-low rates to reduce their monthly mortgage payments. Exempt from the fee are borrowers with loan balances of $125,000 or less, nearly half of whom are at or below 80 percent of area median income. Also exempt are affordable refinance products, Home Ready and Home Possible.

It is critical to remember that this fee covers losses that are the result of policies that have helped millions of Americans stay safe in their homes during a global pandemic.

And it is important to recognize that Congress has not provided the Enterprises any funding to offset the costs of these policies. However, the Enterprises' congressional charters explicitly say that expenses must be recovered via income.

The fee was originally scheduled to go into effect September 1. But after listening to the feedback from stakeholders, including MBA, FHFA delayed implementation until December 1. This recognizes that Congress may take the opportunity to review alternatives.

Most financial institutions are required to maintain reserves of loss-absorbing capital exactly for situations like this. By contrast, Fannie and Freddie were required for years to send almost every penny of their loss-absorbing capital to the U.S. Treasury.

As a result, when I walked in the door at FHFA, Fannie and Freddie were leveraged about 1,000 to 1. If the Enterprises had still been leveraged 1,000 to 1, they would have already failed in response to COVID. On the other hand, if Fannie and Freddie had more capital when COVID hit, they would have been able to provide even more support.

Moving forward, we will continue to keep a close eye on the data and update Enterprise policies to remain responsive to the needs of borrowers, renters, and market participants.

FHFA's analytical capabilities have expanded considerably this year, thanks in large part to MBA's own former VP for Research and Economics, Dr. Lynn Fisher. She now leads FHFA's new Division of Research and Statistics, whose work has served as the foundation of our data-driven COVID response.

And it will remain essential as FHFA continues to fulfill our statutory responsibilities that guided our work well before the outbreak of COVID. That includes ensuring our regulated entities foster competitive, liquid, efficient, and resilient housing finance markets.

Fostering competitive markets requires leveling the playing field and ensuring that the same rules apply equally to all market participants. One of the troubling trends leading up to the 2008 housing crash was that the biggest players in the market received special treatment, like guarantee fee discounts, because of their size and volume.

I have nothing against the big players. But their size means they do not need to worry about access to capital markets.

That is why, last year, FHFA put an end to lingering volume-based discounts, variances, and exceptions at Fannie and Freddie. Small lenders must have access to the secondary market at terms equitable with larger players.

This is a critical step toward leveling the playing field in the housing finance marketplace. Mortgage bankers understand the benefits of competition. A competitive and fair secondary mortgage market will better serve borrowers and lenders

And I look forward to the days of Fannie and Freddie trying to grab market share by giving preferential treatment to the biggest firms being behind us. We need to see a culture at Fannie and Freddie that treats all lenders equally.

We are looking at every rule and regulation to ensure that we are creating that level playing field across the industry. This should bring added confidence to all market participants. And it will make our entire housing finance system more resilient as well.

But there is much more that needs to be done to ensure the stability of our housing finance markets. In particular, the Enterprises must build capital.

We have made progress on that front. Fannie and Freddie's combined leverage ratio is now down to roughly 250 to 1. This is certainly better than 1,000 to 1. But it is not close to safety and soundness. In their current condition, Fannie and Freddie will fail in a serious housing downturn.

Capital absorbs losses and enables the Enterprises to continue supporting borrowers and the mortgage market during times of stress. The more capital an Enterprise has, the more support it can provide.

The day after I spoke to the MBA conference this past May, FHFA released a re-proposed regulatory capital framework for the Enterprises. The comment period for the capital rule closed at the end of August. We were pleased with both the quantity and the quality of the comment letters.

And I want to thank MBA for the comments that were submitted on behalf of your members. Based on those comments, FHFA is now hard at work to finalize the rule.

Fannie and Freddie were chartered specifically to provide countercyclical support to housing finance markets. To do this, they must have enough capital to be able to write new business when financial markets tighten. That is the core objective of this capital rule.

Meeting all the capital rule's requirements will be essential for Fannie and Freddie to become financially safe and sound. You may have seen recently that the Financial Stability Oversight Council, composed of the leading federal financial regulators, confirmed this after conducting an activities-based analysis of Fannie and Freddie.

Their findings included that, under certain scenarios, the re-proposed capital rule may not provide enough capital to withstand a serious downturn in the housing market.

Overall, the capital rule is built on the lessons of the 2008 crisis. The goal is to ensure the Enterprises operate in a safe and sound manner in order to support sustainable, affordable homeownership across the economic cycle.

For most families, homeownership is a key step toward achieving financial security and building a brighter future. But under the wrong conditions, it can be financially devastating, resulting in foreclosure, destroyed credit, and displacement.

The factor that makes the biggest difference between these two outcomes is the borrower's ability to repay the loan, as reflected in the Dodd-Frank Act.

This has been recently demonstrated by the fact that borrower debt-to-income has been one of the strongest predictors of forbearance. And too many Americans experienced this first-hand in the last financial crisis.

We also know that a major driver of today's racial homeownership gap is that minority households went into the 2008 crisis with extremely high levels of leverage.

While leverage maximizes the upside in good times, it also maximizes the downside in bad times.

From 2001 to 2005, African American and Hispanic mortgage borrowing increased 78 and 116 percent, respectively. But from 2005 to 2015, the number of minority borrowers plummeted by 63 percent.

Minority households lost significant amounts of wealth because of the housing market collapse. Between 2007 and 2010, household wealth declined 31 percent for African American families and over 40 percent for Hispanic families.

This experience demonstrates that the benefits of owning a home require homeownership to be both affordable and sustainable. FHFA's job is to ensure the Enterprises support both.

Fannie and Freddie will continue to support access to credit and be subject to their Duty to Serve and Affordable Housing Goals. But as we learned from 2008, in order to provide stability to the housing finance system across the cycle, the Enterprises must be stable themselves. And to do that, the Enterprises must build capital.

The goal of the capital rule is safety and soundness at the Enterprises because that means safety and soundness for millions of homeowners and renters across America.

While working on the Senate Banking Committee in 2008, I spent a considerable amount of time answering calls from Americans facing foreclosure. We cannot forget that when mortgage finance goes bad, it is families that pay the price.

Of course, having a capital rule is not the same as having capital. But it is a critical step toward ensuring that the Enterprises can support sustainable homeownership throughout the economic cycle.

It is also a critical step toward responsibly ending the conservatorships. It was insufficient capital that triggered the conservatorships. And building private capital is a necessary precondition to ending them.

Ending the conservatorsh ps will be process-driven, not calendar-driven. Other critical mile-markers include putting in place prudent and sustainable lending standards, sound risk management, and world-class regulation that applies the same set of rules to all market participants.

FHFA is implementing regulatory reforms that prepare the Agency and the Enterprises to operate effectively outside of the conservatorship framework. Our goals are to cement FHFA as a world-class regulator and ensure Fannie and Freddie are first-in-class in corporate governance and risk management.

Toward that end, as I mentioned earlier, today FHFA is releasing a new proposed rule related to Enterprise new activities.

FHFA is obligated to ensure Fannie and Freddie stay focused on their core mission and do not stray into business the market already serves well. Feedback from those on the ground helps us hold this line.

This rule will help clarify the post-conservatorship housing finance market. And it will establish a process that allows stakeholders and the public to remain engaged in shaping the future of the housing finance market as it develops.

The Housing and Economic Recovery Act of 2008 requires Fannie and Freddie to provide FHFA notice before undertaking a new activity or offering a new product. FHFA issued an interim final rule implementing these requirements in 2009.

But that process has been little used during the conservatorships. FHFA's new proposed rule retains the key concepts from the 2009 rule, while clarifying the definitions of new activities and products. We also streamlined the notice and review process.

Under the proposed rule, after an Enterprise submits a completed notice of a new activity, FHFA has 15 calendar days to determine if the new activity is a new product that needs public notice and comment. If FHFA does not determine that it merits public notice and comment within 15 calendar days, the new activity can proceed.

If FHFA determines that the new activity is in fact a new product, we will publish a notice soliciting comments for a 30-day period. We then make a decision on approval or non-approval within 30 days of the comment period ending. All these timelines are set in law.

This process only needs to occur once for each approved new product. For example, Fannie can offer a new product that is identical to or substantially similar to one for which Freddie already received approval – or vice versa.

In such cases, Fannie would simply need to give FHFA a 15-day advance notice with a description of the product and an explanation if it is substantially similar.

Importantly, the process established by this proposed rule will ensure that stakeholders like MBA and your members will have reliable, transparent opportunities to comment on new developments at the Enterprises. This is especially important when Fannie and Freddie are pursuing new lines of business.

One of the critical objectives of the 2008 reforms contained in HERA was ensuring that the activities of Fannie and Freddie remain confined to the secondary market.

I think these examples and the past several months prove that FHFA is not just willing to receive input and feedback from stakeholders. We are eager to do so. This is a testament to the hardworking employees of FHFA. And it reflects the fact that we depend on hearing from all voices in order to do our job well.

I am grateful that the Mortgage Bankers Association has been a strong partner in this effort. You will always have an open door to bring us on-the-ground knowledge from your members.

I look forward to continuing to engage with you on our COVID response, the capital rule, and much more.

Thank you again for inviting me to address your conference and participate in this important discussion. I look forward to many conversations to come.

**Contacts:**
Media: Raffi Williams **Raffi.Williams@FHFA.gov** / Adam Russell **Adam.Russell@FHFA.gov**

© 2023 Federal Housing Finance Agency