# EXHIBIT C

CONFIDENTIAL
Protected Information To Be Disclosed Only In Accordance With Protective Order

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| FAIRHOLME FUNDS, INC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>THE FEDERAL HOUSING FINANCE AGENCY, *et al.*,<br><br>Defendants. | Civil No. 13-1053 (RCL) |
| In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations<br><br>_____<br><br>This document relates to:<br>ALL CASES | Miscellaneous No. 13-1288 (RCL) |

**EXPERT REPORT OF MUKARRAM ATTARI, PH.D**
**REPLYING TO DR. DHARAN'S SUPPLEMENTAL REPORT**

MAY 5, 2023

# Table of Contents

1.   **Introduction and Summary of Opinions** ......................................................................... 1

2.   **Dr. Dharan's analysis of PIK is irrelevant, speculative and incorrect** .................................... 2

   2.1.   Dr. Dharan is incorrect: PIK would not have helped the GSEs
          and would have made the GSEs' situation worse. ............................................................ 3

   2.2.   Dr. Dharan's analysis of PIK from 2008 to 2012 is irrelevant and speculative. ................ 9

3.   **Dr. Dharan's analysis of the bond event study is incorrect** ................................................. 12

4.   **Dr. Dharan's analysis of non-cash accounting adjustments is irrelevant
     and misleading** ................................................................................................................ 17

5.   **Signature and reservation of rights** ................................................................................. 19

# 1.    Introduction and Summary of Opinions

1.    I submitted a rebuttal report (the "Attari Rebuttal Report") in this matter on February 1, 2022.[1] My opinions in this report are in response to the supplemental report of Dr. Bala G. Dharan dated February 10, 2023, (the "Dharan Supplemental Report") and the errata to the Dharan Supplemental Report provided on May 2, 2023 (the "Dharan Errata").

2.    It is my opinion that Dr. Dharan's analysis of the payment-in-kind ("PIK") provisions of the Preferred Stock Purchase Agreements ("PSPAs") involving the payment of dividends on the GSEs' SPS liquidation preference balance is irrelevant, speculative and incorrect.

   a)   If the FHFA had directed the GSEs to use PIK in lieu of agreeing to the net worth sweep under the Third Amendment, it would not have been preferable for the GSEs. It is my opinion that i) PIK would have made the GSEs' situation worse and ii) given FHFA's objectives and the uncertainty in the housing market, the net worth sweep had advantages over PIK. Dr. Dharan's analysis uses hindsight, and his claim that the financial performance of the GSEs in future years was "foreseeable" is without basis.

   b)   Dr. Dharan's analysis of what the GSEs' financial results would have been had they paid PIK dividends of 12% rather than cash dividends of 10% from 2008 to 2012 is irrelevant. The analysis is irrelevant because the decision to enter into the Third Amendment was made in 2012, not 2008. Even if his analysis is viewed as "illustrative," as Dr. Dharan claims, it speculatively assumes that using PIK would not have had any impact on any other events or decisions made from 2008 to 2012. Finally, his corrected analysis shows that PIK would have put the GSEs in a worse situation in 2012, not a better one.

3.    It is my opinion that Dr. Dharan's assertion that the bond event study in the Attari Rebuttal Report is flawed because I purportedly failed to account for changes related to expectations about the supply of GSE bonds is incorrect. Any market expectation of a decrease in the supply of GSE bonds due to the accelerated reduction of the cap on the retained asset portfolio would not have impacted the long-term GSE bonds that I analyze in my bond event study. Dr.

---

[1]   Appendix A lists the documents considered for this reply report. All defined terms in the Attari Rebuttal Report are incorporated herein.

Dharan's claims that the Third Amendment affected bond prices because it signaled a new intent to wind down the GSEs is without basis and defies logic.  Dr. Dharan is likewise incorrect in claiming that the credit ratings agencies did not express concern about the impact of the cap on the Treasury Commitment prior to the Third Amendment.

4.        It is my opinion that Dr. Dharan's assertions about "cash basis" analysis, including the cash that junior preferred shareholders paid for their shares and how that is accounted for by the GSEs under GAAP, is irrelevant and misleading.  Dr. Dharan's explanation for his cash basis analysis is not supported by facts. Further, his statements about the balances of preferred stock on the GSEs' balance sheets are irrelevant and are based on incomplete analysis.

## 2.        Dr. Dharan's analysis of PIK is irrelevant, speculative and incorrect

5.        Dr. Dharan claims that PIK "was far preferable to the NWS from the perspective of both the GSEs and the private shareholders."[2]  He stated that this was because, by using PIK, "the GSEs would have had the opportunity to build capital in periods of high profits and pay down any additions to the Liquidation Preference caused from use of the PIK."[3]  In his deposition, Dr. Dharan noted that the net worth sweep eliminated circular draws and therefore the erosion of the Treasury Commitment in order to pay Treasury dividends.[4]  He agreed that one of the FHFA's stated objectives for the Third Amendment was to eliminate circular draws.[5]  Nevertheless, he contends that executing the Third Amendment was not reasonable because PIK, which was already available under the Second Amendment, would have been "better" for the GSEs than the net worth sweep.[6]

6.        As I explain below, Dr. Dharan ignores that PIK might only have been better for the GSEs under certain scenarios.  Most importantly, there is no evidence that PIK was better than the net worth sweep based on the GSEs' projections of their own financial performance at the time of the

---

[2]        Dharan Supplemental Report, ¶ 8.

[3]        Dharan Supplemental Report, ¶ 8.

[4]        Deposition of Bala Dharan, Ph.D., April 20, 2023 ("Dharan Supplemental Deposition"), 92:9-93:13.

[5]        Dharan Supplemental Deposition, 197:7-13.

[6]        Dharan Supplemental Report, ¶ 2(a).

execution of the Third Amendment.[7]   The evidence shows that under the GSEs' projected financial performance, using PIK would have left the GSEs in a worse situation: it would have exacerbated the projected shortfall of the GSEs' comprehensive income to cover the annual dividend obligations and increased the liquidation preference.   Those projections also show that the GSEs would not have built net worth had they used PIK.   Dr. Dharan also proposes an analysis of the 2008 to 2012 period that purports to show the benefits of PIK.[8]   However, Dr. Dharan's analysis confirms that PIK was inferior.

7.       In the paragraphs below, I also explain why there is no basis for Dr. Dharan's claims that my prior testimony regarding PIK was incorrect.[9]   My opinion, consistent with my previous testimony, is that PIK would have made the GSEs' situation "worse" and that given FHFA's objectives and the uncertainty in the housing market at the time, the net worth sweep had advantages over PIK.

## 2.1.   Dr. Dharan is incorrect: PIK would not have helped the GSEs and would have made the GSEs' situation worse.

8.       In his supplemental report, Dr. Dharan states that "[t]he use of the PIK option by the GSEs in lieu of drawing down on the Treasury Commitment would have prevented it from being used to pay dividends and thus would have fully addressed any possible concerns about such erosion on the part of bond or MBS investors."[10]   In his deposition, Dr. Dharan said that paying dividends to Treasury via PIK was superior to the net worth sweep from the perspective of the GSEs and FHFA because "the PIK option allows [the GSEs] to make use of good quarters and good periods to build net worth and then use that to pay dividends in the quarters where they have to without borrowing from the Treasury" and because the GSEs "are also able to pay down the liquidation preference that was added on as a result of exercising the PIK option whenever they finally are able to make enough money to build up the net worth again."[11]   Further, Dr. Dharan asserts in the Dharan Supplemental Report that "the GSEs would never

---

[7]       Fannie Mae projected the performance of both GSEs in the Fannie Mae Strategic Planning Projections ("Fannie Mae 2012 Projections"). PX-0218.  I focus solely on the projections for Fannie Mae, not those for Freddie Mac, for two reasons.  First, the Fannie Mae 2012 Projections were prepared only by Fannie Mae and not Freddie Mac.  Attari Rebuttal Report, ¶162.  Second, I understand that there were errors in Fannie Mae's projections of Freddie Mac.  As I have previously testified, Freddie Mac's own projections, which were through 2014, were less optimistic than the ones Fannie Mae prepared for Freddie Mac.  See Layton Deposition, Exhibit 10 at FHLMC_00002307.

[8]       Dharan Supplemental Report, ¶ 11 and Dharan Errata, ¶ 2.

[9]       Dharan Supplemental Report, ¶ 10.

[10]       Dharan Supplemental Report, ¶ 2(a).

[11]       Dharan Supplemental Deposition, 99:9-101:2.

---

have needed to use the PIK option in 2013 because their comprehensive income in 2013 vastly exceeded the 10% dividend amount."[12]  Dr. Dharan is using hindsight to validate his assertion that PIK would have been better for the GSEs than the net worth sweep, because, as I explain below, as of August 2012, the GSEs were not projecting earnings that would have allowed them to build net worth.  Even if FHFA had directed the GSEs to pay dividends to Treasury via PIK rather than execute the Third Amendment, the Fannie Mae 2012 Projections Dr. Dharan relies on[13] would not have projected that Fannie Mae would build net worth.  The financial results for 2013 and the years after that, which Dr. Dharan relies on to support his contention that PIK was superior, were not available to FHFA at the time it executed the Third Amendment in August 2012.

9.      Dr. Dharan claims that comprehensive income exceeding the dividend was "foreseeable as of August 2012."[14]  Dr. Dharan's claim lacks any empirical basis.  Even if the Fannie Mae 2012 Projections were deemed to be what was "foreseeable" as of August 2012, Fannie Mae projected that 2013 profits would not exceed even the 10% dividends, and would certainly not reach a level sufficient to repay the accrued 12% PIK dividends.

10.     As of the date of the Third Amendment, the GSEs did not expect to earn enough comprehensive income (or "profit") to pay down accrued PIK dividends that would have been projected to be accrued over the 10-year period from 2013 through 2022.[15]  The Fannie Mae 2012 Projections assumed that the GSEs would pay 10% cash dividends, and the comprehensive income that was projected did not consistently exceed the annual 10% cash dividends.[16]  Indeed, Fannie Mae projected that both GSEs would have a shortfall in several years.[17]  Had the Fannie Mae 2012 Projections assumed that PIK would be used, the dividends would have been projected to accrue at the higher rate of 12%, increasing the amount due as dividends in each subsequent quarter without a change in the GSEs' comprehensive income.  Additionally, the 12% dividends would have accrued on a higher liquidation preference because

---

[12]     Dharan Supplemental Report, ¶ 10.

[13]     Attari Rebuttal Report, Section 4.2.  See also Expert Report of Bala G. Dharan, Ph.D., CPA, August 12, 2021, ("Dharan Report"), ¶ 66.

[14]     Dharan Supplemental Report, ¶ 10.

[15]     For purposes of this report, I use "comprehensive income" and "profits" (or "losses") interchangeably.

[16]     PX-218 at FM_Fairholme_CFC-00000221.

[17]     Fannie Mae's projected comprehensive income did not exceed the 10% dividends in 7 out of 10 years and Freddie Mac's projected comprehensive income did not exceed the dividends in 4 out of 10 years from 2013 to 2022. PX-218 at FM_Fairholme_CFC-00000221.

---

the accrual of 12% PIK dividends would have resulted in a higher liquidation preference than if the 10% cash dividends had been paid with circular cash draws.

11.    Accruing 12% dividends rather than paying 10% dividends in cash would have caused the SPS liquidation preference to be greater than is reflected in the Fannie Mae 2012 Projections.   In Figure 1, I show the SPS liquidation preference assuming 12% PIK dividends and no PCF (in blue bars) and compare that to the SPS liquidation preference assuming 10% cash dividends and no PCF as contained in the Fannie Mae 2012 Projections (in orange bars) and the SPS liquidation preference under the Third Amendment (in purple bars) for Fannie Mae.   In this analysis, for the 12% PIK dividends scenario, I assume that i) any year which starts with a PIK liquidation preference balance greater than zero would have a 12% dividend due on the full outstanding liquidation preference; ii) in any year in which Fannie Mae would generate negative net worth by paying that year's dividend in full, Fannie Mae would use PIK for the amount of negative net worth that would be generated;[18] and iii) the liquidation preference would increase by the amount of PIK dividends.   For the Third Amendment scenario, I assume that the dividend due is any positive net worth prior to paying dividends.   Figure 1 shows that the projected liquidation preference assuming the 12% PIK dividend and no PCF would have steadily increased from 2013 to 2022 (i.e., Fannie Mae would never have generated sufficient cash to pay that year's dividend fully in cash or pay down any of the accrued PIK dividends from net worth) and would have been significantly higher in 2022 than the liquidation preference assuming 10% cash dividends and no PCF or under the Third Amendment.   Thus, Fannie Mae was not projected to accumulate capital if it used PIK (i.e., the net worth was projected to be zero every year from 2012 to 2022).

---

[18]    Had there been any year where there would have been a positive net worth after paying the dividend due in that year, that amount would have been used to reduce any PIK liquidation preference balance.   As noted below, there was no such year during the projection period.

**Figure 1: Fannie Mae SPS Liquidation Preference assuming 12% PIK dividends and no PCF, 10% cash dividends and no PCF, and the Third Amendment using the Fannie Mae 2012 Projections[19]**



12.     A higher liquidation preference would also cause dividends to be higher, making it harder for the GSEs to be able to meet those larger dividend payments.  In fact, assuming 12% PIK and no PCF would have resulted in a shortfall (i.e. the projected yearly dividends were greater than projected profits in that year) in all 10 years of the Fannie Mae 2012 Projections, instead of a shortfall in only 7 of 10 years assuming 10% cash dividends and no PCF and no shortfall in any of the 10 years with the Third Amendment.  Figure 2 shows Fannie Mae's shortfall in dividend payments assuming 12% PIK and no PCF (blue bars), its shortfall assuming 10% cash dividends and no PCF (orange bars) and its shortfall in dividend payments under the Third Amendment which is, by design, 0 each year.

---

19      Exhibit 1.

**Figure 2: Fannie Mae shortfall in payments assuming 12% PIK dividends and no PCF, 10% cash dividends and no PCF, and the Third Amendment using the Fannie Mae 2012 Projections[20]**



13.   The results shown above are consistent with my testimony at a prior proceeding, where I noted that for Fannie Mae "[t]he bottom line would be that [liquidation preference] number would go up and, you know, there would be 12 percent [dividend] owed on that [liquidation preference] number which, like I mentioned, would be roughly $14 billion in the next year. And then, you know, the shortfall in 2014 would be larger than what we see. And that would kind of add more to that pile and then the shortfall in 2015 would be larger. And you'd have a shortfall every year."[21]

14.   Overall, as shown in Table 1, the total dividends projected to be accrued or paid by Fannie Mae from 2013 to 2022 under the Third Amendment scenario are lower than total dividends projected assuming 12% PIK dividends and no PCF, and the projected SPS liquidation preference is lower under the Third Amendment scenario than the projected liquidation

---

[20]   Exhibit 1.

[21]   Trial Transcript 1962:21-1963:5.

preference assuming 12% PIK dividends and no PCF.[22]  Neither scenario results in Fannie Mae accumulating net worth or depleting the Commitment.  In other words, the Third Amendment scenario is superior for Fannie Mae to the 12% PIK dividends scenario, based on Fannie Mae 2012 Projections.

**Table 1: Fannie Mae Third Amendment Scenario vs. 12% PIK Dividends Scenario (assuming no PCF) using Fannie Mae 2012 Projections ($ billions)[23]**

|  | Dividends Paid or Accrued, 2013-2022 | Liquidation Preference, 2022 | Net Worth, 2022 | Unused Commitment, 2022 |
|---|---|---|---|---|
| **12% PIK Dividends Scenario (no PCF)** | 154.0 | 156.1 | 0.0 | 117.6 |
| **Third Amendment Scenario** | 113.6 | 117.1 | 0.0 | 117.6 |

15.     Moreover, the above results are conservative because the Fannie Mae 2012 Projections do not reflect FHFA's stated objective to shrink and de-risk the GSEs, which would have reduced their profits.[24]  Lower profits mean that the GSEs' profits would have been insufficient to cover the SPS dividend, whether paid as a 10% cash dividend or a 12% PIK dividend, in more years than in the analysis above.

16.     Dr. Dharan has testified that PIK was preferable because it would allow the GSEs to avoid drawing on the Commitment to cover temporary small shortfalls and would allow the GSEs to pay down the liquidation preference associated with the accrued PIK dividend in subsequent periods when they earned more than the dividend amount.[25]  Dr. Dharan's reasoning is flawed because the higher dividend rate of 12%, once PIK was used, means that paying down the accrued PIK dividend, even if it was the result of a temporary shortfall in profits, would be difficult, as I have shown above.  The higher 12% dividend rate would cause the liquidation

---

22      Freddie Mac's own projections, which assumed 10% cash dividends and no PCF, showed comprehensive income of $6.3 billion and $6.0 billion in 2013 and 2014, respectively.  This was lower than the projected 10% cash dividends of $7.4 billion and $7.5 billion in 2013 and 2014, respectively.  Layton Deposition, Exhibit 10 at FHLMC_00002307.  As a result, the Freddie Mac projections would also have shown an even greater shortfall and higher liquidation preference if they had assumed 12% PIK dividends and no PCF.

23      Exhibit 1; Attari Rebuttal Report, footnote 251.

24      Attari Rebuttal Report, Section 4.2.2.; Trial Transcript 1953:19-1958:5.

25      Dharan Supplemental Deposition, 95:14-97:3.

preference to continue to grow.  This effect would be even more pronounced when the GSEs' profits declined as they shrank and de-risked in line with the FHFA's stated objective; in that case, the shortfall in profits relative to dividends would be projected to be even greater.

17.     Furthermore, the results discussed above are also conservative because the projections did not include the PCF that Treasury had indicated it would impose once the GSEs were profitable and able to pay the PCF without circular draws and which the GSEs had indicated could be substantial.[26]  Any PCF that Treasury imposed would have increased the combined amount due (i.e. dividend plus PCF) each year and over the 10-year period in both the 10% cash dividends scenario and the 12% PIK dividends scenario, but it would not have changed the amount due under the Third Amendment, which suspended the PCF.  Thus, the imposition of a PCF would have caused the liquidation preference and future dividend shortfalls to be higher than those in Figures 1 and 2 above in the 12% PIK dividends and 10% cash dividends scenarios, but not under the Third Amendment.[27]

18.     Under the Third Amendment scenario and the 12% PIK scenario, the GSEs would only need to draw on the Commitment to cover losses and the erosion of the remaining Commitment would be slower than under the 10% cash dividends scenario.  For example, Fannie Mae was not projected to accumulate capital under the 2012 Fannie Mae Projections if they used PIK dividends.  However, among the advantages of the Third Amendment over PIK are that the dividend due would be equal to the GSEs' earnings, the PCF was suspended, and the liquidation preference would not increase if the GSEs earnings were insufficient to cover the dividend and the PCF.  Further, under the Third Amendment, any increases in the liquidation preference would not cause an increase in the amount due as dividends in subsequent periods.

## 2.2.    Dr. Dharan's analysis of PIK from 2008 to 2012 is irrelevant and speculative.

19.     Dr. Dharan purports to analyze an alternative world where the GSEs had paid PIK dividends instead of cash dividends from 2008 to 2012.[28]  On the basis of his analysis, Dr. Dharan suggests that PIK would have been "superior" to paying cash dividends and to the net worth

---

26     Attari Rebuttal Report, Section 3.5.

27     The risk of circular draws to pay a PCF would be reduced if the GSEs used the PIK option to pay dividends, which could have resulted in Treasury imposing a PCF sooner than it would have if the GSEs continued to pay 10% cash dividends and used draws to cover shortfalls.

28     Dharan Supplemental Report, ¶ 11; Dharan Errata, Exhibit A.

sweep.[29]   Dr. Dharan's conclusion that PIK would have been "superior" if exercised starting in 2008 is irrelevant, speculative, and not supported by his corrected computations.

20.   First, Dr. Dharan's analysis of FHFA electing PIK from 2008 to 2012 is irrelevant to the issues in this matter.   My understanding is that in this matter the relevant inquiry is whether FHFA's decision to enter into the Third Amendment was reasonable.   That decision was made in 2012 not in 2008.   As such, any analysis that assumes PIK was used from 2008 to 2012 is irrelevant. Even if an analysis of the period starting 2008 is viewed as being "illustrative," as Dr. Dharan claims,[30] the end date for such analysis should be 2Q 2012 and not the end of calendar year 2012 that Dr. Dharan uses.   The results for the final two quarters of 2012 were not known in August 2012 when the Third Amendment was executed and using information from the final two quarters causes the analysis to suffer from hindsight bias.

21.   Second, Dr. Dharan made a speculative assumption that the only difference between the actual world from 2008 to 2012 and an alternative world where the GSEs used PIK starting in 2008 would be whether dividends would have been paid in kind.   He did not consider the impact that the GSEs' payment of dividends in kind could have on decisions made by the other party to the contract, Treasury.   Had the dividends been paid in kind starting in 2008, Treasury might not have agreed to the specific terms of the First Amendment or the Second Amendment, or might have imposed other conditions at the time of those amendments or imposed a PCF when the GSEs first reported profits.   Dr. Dharan has not considered these possibilities and does not provide evidence that these or other changes would not have occurred.   Thus, because Dr. Dharan ignores potential alternative actions by Treasury, which is the counterparty to the PSPAs, his analysis of the 2008 to 2012 period cannot serve as an illustration of the viability of PIK in August 2012.

22.   Third, Dr. Dharan's corrected computation of the effect of using PIK dividends starting in 2008 shows that the GSEs would not have been better off having used PIK from 2008 to 2012 than by having paid 10% cash dividends.   Under Dr. Dharan's alternative scenario, Fannie Mae and Freddie Mac would have zero net worth at the end of 2012; contrast this with Fannie Mae's and Freddie Mac's reported net worth at the end of 2012 of $7.2 billion and $8.8 billion, respectively, as shown in Table 2 below.[31]   If PIK was used, the dividend rate would be 12% at the end of

---

[29]      Dharan Supplemental Report, ¶ 11; Dharan Supplemental Deposition, 116:14-117:11.

[30]      Dharan Supplemental Deposition, 115:16-116:13.

[31]      Note that in August 2012, results as of the end of 2012 would not have been known.

2012 because the portion of liquidation preference from the accrued dividends would not have been paid off.  The expected dividend payments required in 2013 assuming fixed 10% cash dividends as compared to 12% PIK dividends would have been greater in the PIK alternative world.  The higher 2013 dividends and zero capital at the end of 2012 would cause the liquidation preference and future dividends to be higher, which in turn would make it harder for the GSEs to be able to pay down the portion of the liquidation preference attributed to the PIK dividends.  In summary, as shown in Table 2, the corrected analysis shows that had PIK been used from 2008 to 2012, the GSEs would have been in a worse position at the end of 2012.

**Table 2: Results of the Dharan Alternative analysis**[32]

|  | Actual | Dharan Alternative |
|---|---|---|
| **Fannie Mae:** | | |
| Net Worth 2012 | $7.2 billion | $0 |
| Dividend Rate for 2013 | 10% | 12% |
| SPS Liquidation Preference at the end of 2012 | $117.1 billion | $117.9 billion |
| 2013 Dividend Obligation based on year end 2012 SPS Liquidation Preference | $11.7 billion | $14.1 billion |
| **Freddie Mac:** | | |
| Net Worth 2012 | $8.8 billion | $0 |
| Dividend Rate for 2013 | 10% | 12% |
| SPS Liquidation Preference at the end of 2012 | $72.3 billion | $68.0 billion |
| 2013 Dividend Obligation based on year end 2012 SPS Liquidation Preference | $7.2 billion | $8.2 billion |

23. Dr. Dharan claims that this study of PIK dividends from 2008 to 2012 was "the kind of analysis that the enterprises … should have done to understand how this option works."[33]  As shown in Table 2, this analysis would not have afforded any basis to conclude in August 2012 that PIK was a superior alternative to the Third Amendment from the GSEs' perspective.  The analysis, purportedly determining the viability of PIK in August 2012, would have instead shown that PIK would have resulted in a higher liquidation preference for Fannie Mae, higher dividends paid to Treasury in 2013 for both GSEs, and no accumulated net worth for either GSE.

---

[32]   Exhibit 2.

[33]   Dharan Supplemental Deposition, 116:18-20.

### 3.      Dr. Dharan's analysis of the bond event study is incorrect

24.     Dr. Dharan asserts that my bond event study did not account for "confounding factors that would affect bond prices, including most obviously the market's expectation that the Third Amendment would result in a decrease in the supply of GSE bonds."[34]   Dr. Dharan has provided multiple theories regarding the Third Amendment's impact on the supply of GSE bonds across his reports and deposition testimony.   Dr. Dharan has not presented empirical analysis to support his theories.   I address each of Dr. Dharan's theories below and explain why my opinion that the decline in credit spreads shown by my bond event study were a result of the reduction in risk is unchanged.   I also explain why the decline in yields on the date of the announcement of the Third Amendment is not caused by investor expectations about a reduction in the supply of bonds.

25.     First, Dr. Dharan theorizes that the Third Amendment's increase in the rate of reduction on the cap on retained assets of the GSE to from 10% to 15% would cause bond investors to expect a reduction in the supply of the GSE bonds.[35]   Dr. Dharan claims that the increase in bond prices (reduction in bond yields) on the day that the Third Amendment was announced, August 17, 2012, that I discussed in the Attari Rebuttal Report is a result of the expected reduction in the supply of the bonds and not a result of market participants' increased confidence in the ability of the GSEs to pay their debts.[36]  Dr. Dharan is incorrect.  Any expectation of a decrease in the supply of GSE bonds due to an increase in the rate of reduction on the cap on retained assets of the GSE from 10% to 15% would not have impacted the price of the long-term GSE bonds that I analyze in my bond event study.

26.     Following the Third Amendment, the rate of the wind down of the retained portfolio to a level of $250 billion was accelerated from 10% per year to 15% per year.  Dr. Dharan asserts that the acceleration of the winddown rate would result in a "substantial decrease in the supply of GSE bonds."[37]  However, the supply of the long-term GSE bonds that I analyze in my bond event study would be unaffected by the accelerated winddown of the retained portfolio.  Under the Second Amendment, the retained portfolio was to be reduced at a rate of 10% per year to $250 billion by 2021 or earlier.  Following the Third Amendment, the retained portfolio would be

---

[34]     Dharan Supplemental Report, ¶ 15.

[35]     Dharan Supplemental Report, ¶ 16.

[36]     Dharan Supplemental Deposition, 31:21-34:7.

[37]     Dharan Supplemental Report, ¶ 16.

reduced at a rate of 15% per year to $250 billion by 2018 or earlier.[38]  In both scenarios, the level of retained portfolio would be the same – $250 billion – by 2021, as shown in Figure 3.[39]  As such, the supply of bonds maturing in 2022 or later would not have been affected.  The bonds analyzed in the bond event study in my rebuttal report all mature in 2029 or later, when the size of the retained portfolio and the supply of bonds were not expected to be affected by the Third Amendment's accelerated winddown of the retained portfolio.

**Figure 3: Projected cap on retained assets under the Second Amendment and the Third Amendment[40]**



27.    Second, Dr. Dharan theorizes that Treasury's statements about the intended wind-down of the GSEs, and not just the accelerated reduction in the retained assets, were the reason why investors expected a reduction in supply of the GSE bonds.[41]  Dr. Dharan's theory is incorrect. FHFA had publicly stated its goal to shrink and de-risk the GSEs on multiple occasions prior to the Third Amendment and market participants were aware of this.[42]   Treasury had also

---

38      Exhibit 3.

39      Dharan Supplemental Deposition, 222:14-223:11.

40      Exhibit 3.

41      Dharan Supplemental Deposition, 34:8-36:7.

42      For example, see Attari Rebuttal Report, Section 2.6.

previously announced its plan to wind down the GSEs.[43]   Dr. Dharan has not identified what new information about FHFA or Treasury winding down the GSEs would have caused investors to revise their expectations about the future supply of GSE bonds on August 17, 2012.  As Dr. Dharan notes in his testimony, and I agree, investors do not react to old information being repeated.[44]  Thus, it cannot be that the prices of the GSE bonds increased on August 17, 2012 due to investors reacting to a statement by Treasury about an intention to wind down the GSEs because investors were already aware of Treasury's plans.

28.   Moreover, even if there had been a purported expected reduction in the supply of Fannie Mae and Freddie Mac bonds after the announcement of the Third Amendment, then investors would buy more substitutes for the bonds, offsetting any price impact on the Fannie Mae and Freddie Mac bonds from the expected decrease in supply.[45]  One set of substitutes is bonds issued by US government sponsored enterprises – those with implied backing of the US government – other than Fannie Mae and Freddie Mac, which includes the Federal Home Loan Banks, Farm Credit Bank System, Federal Agricultural Mortgage Corporation (Farmer Mac), Financing Corporation (FICO) and Resolution Funding Corporation.[46]  For clarity, I refer to these bond issuers as "Other Enterprises."[47]  Another set of substitutes is bonds issued by sovereigns, supranationals, and agencies ("SSA") (e.g., bonds denominated in US Dollars issued by the governments of Germany, France or the Netherlands, or by non-US agencies such as the World Bank).[48]  Bonds issued by Other Enterprises and by SSA issuers are viewed as substitutes to the Fannie Mae and Freddie Mac bonds because they all have national or transnational government affiliations.[49]

29.   Even if investors believed the net worth sweep was a new signal of a wind down of the GSEs, as Dr. Dharan theorizes, it would provide investors greater confidence that their bonds would be repaid and the risk of default would be reduced.  The GSEs would be less likely to exhaust

---

[43]   DX-0282 at page 3 of 32.

[44]   Dharan Supplemental Deposition, 69:20-70:12.

[45]   As described in Appendix B, my event study results are robust to changes in yields of substitute bonds.

[46]   Fabozzi, Frank J., *The Handbook of Fixed Income Securities, Ninth Edition*, McGraw Hill, 2021, pp. 193-194.

[47]   In this report, I use the term "GSEs" only to refer to Fannie Mae and Freddie Mac.

[48]   I also stated in my deposition on February 14, 2022, that the SSA bond market is a substitute for the GSE bond market. Deposition of Mukarram Attari, Ph.D., February 14, 2022, 20:13 -22:7.

[49]   PIMCO, "The SSA Market: A Legitimate 'Safe Spread Alternative'?", November 2012, p. 1; Rabobank, "SSA Market Primer," September 12, 2014, p. 9; AXA Investment Managers, "Investment Essentials: The SSA Market: An Investor Primer," June 28, 2012, p. 2.

the Commitment in a wind down or run-off mode than they would if they continued to grow, making the long-term bonds safer and increasing the price market participants would pay for them.

30.    Third, Dr. Dharan has noted that the net worth sweep caused the GSEs to pay approximately $111 billion more dividends to Treasury in 2013 than they would have under the Second Amendment's 10% cash dividend rate as a result of the reversal of the DTA reserves.[50]  He pointed out that this additional amount had to be funded by issuing additional bonds.[51]  He has also claimed that the reversal of the DTA reserve was foreseeable at the time of the Third Amendment because the GSEs were expected to make profits going forward.[52]  If the GSEs were expected to be highly profitable and accumulate capital over time, as Dr. Dharan claims, then the supply of GSE bonds would be expected to increase by approximately $111 billion in 2013 when the DTA reserve was reversed and the GSEs borrowed money to pay the SPS dividend to Treasury under the net worth sweep.  In addition, to the extent that prior to the announcement of the Third Amendment, investors had expected the GSEs to build net worth, after the announcement of the Third Amendment, those investors would expect the net worth sweep to increase the supply of bonds because the GSEs would need to borrow funds to replace the equity capital they had expected.  If Dr. Dharan's claims are accurate, the announcement of the Third Amendment would have signaled to market participants that the future supply of GSE bonds would <u>increase</u> and it should have caused the prices of the GSE bonds to <u>decline</u> (and cause yields to rise).

31.    Finally, Dr. Dharan asserts that there was a "lack of concern" for GSE debt during 2012 because there was no change in the credit ratings, ratings outlook, or ratings watch status.[53]  Dr. Dharan places great emphasis on the fact that, prior to the Third Amendment, the credit rating agencies had not placed the GSEs on a credit watch because of the upcoming cap on the Commitment.[54]  His reliance on credit watch seems to be consistent with his view that for FHFA to act to preserve the Commitment, the risk of erosion to the Commitment would need to be imminent.[55]  But Dr. Dharan never explains why FHFA would or should wait for a credit

---

50    Dharan Supplemental Report, ¶ 9.

51    Dharan Report, ¶ 179.

52    Dharan Supplemental Deposition, 112:11-113:16.

53    Dharan Supplemental Report, ¶ 23.

54    Dharan Supplemental Report, ¶ 23; Dharan Supplemental Deposition, 21:5-22:6.

55    Dharan Report, ¶ 76.

watch to be placed; by the time the risk of erosion was imminent, the GSEs already would have incurred harm.  The purpose of the Commitment was to give confidence to market participants, not to test the limits of that confidence during a stress scenario.

32.     As I described in my prior report, analysts at credit rating agencies, along with analysts at broker dealers and reports in the financial press, had expressed concern about the amount of the Commitment prior to the Third Amendment.[56] Dr. Dharan's assertion that there was a "lack of concern" by credit ratings agencies is contrary to facts.   Moreover, after the Third Amendment, the credit rating agency analysts noted that the Third Amendment alleviated concerns about the erosion of the Commitment.[57]

33.     Dr. Dharan states that the spreads on the GSE bonds were lower than those on AAA-rated corporate bonds because of the implicit government guarantee from which the GSEs benefitted.[58,59]  I agree.  However, he claims that the existence of the implicit guarantee resulted in a spread between Treasury bonds and GSE bonds that is "so small" that "the bonds market is treating [GSE] bonds as effectively Treasury bonds, not 100 percent identical but effectively.  And there is no change in that before or after the net worth sweep."[60]  This is wrong.  The implicit guarantee is not memorialized in the bond contracts.  If the guarantee had been explicit and unconditional, GSE bonds might have been substitutes for Treasury securities: GSE bonds would have traded at the same levels as Treasury securities and the spread on GSE bonds would not have narrowed as it did on the date of the announcement of the Third Amendment.  Absent an explicit guarantee, the Commitment was important to bondholders as a loss-absorbing equity cushion that would protect them from default losses.

---

[56]     Attari Rebuttal Report, Section 3.2.  See also DX-0383 at FHFA-DDC-0425903; DX-0382 at FHFA-DDC-0425914; DX-0364 at FHFA00104876; DX-0377 at FHFA00098138; DX-0380 at FHFA00104874; DX-0412 at FHFA00050899; DX-0553 at FHFA-DDC-0067169; and FHFA-DDC-0067191-196 at 0067191.

[57]     Attari Rebuttal Report, Section 3.3.1.

[58]     Dharan Supplemental Report, ¶ 21; Dharan Supplemental Deposition, 249:20-251:2.

[59]     Dr. Dharan asserts that GSE debt traded at lower yields than the "AAA corporate bonds" referring to "[b]oth Exhibit B charts."  Dharan's Exhibit B charts plot the ICE BofA 10-15 year US Corporate Index.  Dharan Supplemental Report, ¶ 21 and Exhibits B1 and B2.  Contrary to Dr. Dharan's assertion that this index represents AAA bonds, only 3 of the 139 bonds in the index are AAA bonds.  More than 98% of the value of the bonds in the index are from bonds that are below AAA rated.  ICE BofA 10-15 Year US Corporate Index (C7A0) Distribution Characteristics as of June 30, 2012, obtained from https://indices.theice.com/ using the index C7A0.

[60]     Dharan Supplemental Deposition, 251:16-252:11.

---

Confidential – Subject to Protective Order

## 4.    Dr. Dharan's analysis of non-cash accounting adjustments is irrelevant and misleading

34.    Dr. Dharan makes several irrelevant and misleading statements about cash and non-cash items in the GSEs' financial statements.  First, Dr. Dharan states that a Fannie Mae document suggests that the amounts needed for Fannie Mae to keep running its operations on a "cash basis" are much lower than the amounts needed under a "GAAP measure."[61]  This is irrelevant. The Treasury Agreement requires Fannie Mae and Freddie Mac to apply GAAP accounting standards to determine the amount required to be drawn under the PSPAs.[62]  The non-cash accounting losses Fannie Mae and Freddie Mac suffered in 2008 to 2011 are still losses under GAAP and contributed to the GSEs' net worth deficits from 2008 to 2011.

35.    Second, Dr. Dharan asserts that "cash is fungible"[63] and the cash balances on Fannie Mae's and Freddie Mac's balance sheets at the end of 2008 indicate that "it is not accurate to say, as Dr. Attari had asserted at trial, that the cash from the private preferred shareholders was 'gone' by 2008."[64]  Dr. Dharan is playing word games.  In the prior proceeding, I was asked about the equity capital of the firm, which I said had been lost by the end of 2008.[65]  Equity capital is not cash.  It is a claim on the assets of the firm, after liabilities and other claims of higher priority are accounted for.  This point was made even clearer when I was asked on cross examination about "the money that was invested by private preferred shareholders," which I said "had been used up in the form of actual losses and reserves for expected losses."[66]  Yet at the start of paragraph 39 of the Dharan Supplemental Report, Dr. Dharan wrongly states that I testified that it was the "cash invested" that was "lost," and in the next sentence he mischaracterizes my testimony further as saying the "cash … was 'gone'."[67]  The accounting for the shareholders' investments in Fannie Mae's and Freddie Mac's equity was shown in Fannie Mae's and Freddie Mac's 2008 Forms 10-K, which contain balance sheets prepared under GAAP that show that their losses had exceeded the total amount invested by private preferred and common

---

[61]    Dharan Supplemental Report, ¶ 38.

[62]    Fannie Mae September 11, 2008, 8-K, Exhibit 4.1, p. 2; Freddie Mac September 11, 2008, 8-K, Exhibit 10.1, p. 2.

[63]    Dharan Supplemental Report, ¶ 39.

[64]    Dharan Supplemental Report, ¶ 39.

[65]    Trial Transcript, 1908:1-14.

[66]    Trial Transcript, 2180:11-16.

[67]    Dharan Supplemental Report, ¶ 39. See also Trial Transcript, 1908:1-14, and 2180:11-16.

shareholders and their net worth was negative, and thus the GSEs drew on the Commitment.[68] This is consistent with my testimony that the investments made in the equity capital of the GSEs by private shareholders was lost and gone by the end of 2008. The amounts invested by private preferred shareholders before September 2008 were simply not enough to allow the GSEs to maintain positive net worth. After the end of 2008, the GSEs were only able to continue to operate because of the Commitment provided by Treasury.

36.     Third, Dr. Dharan writes that the amounts invested by private preferred shareholders were still stated on the GSEs' balance sheets.[69] Dr. Dharan refers to the fact that the balance sheet shows an entry for "preferred stock balance" of $19.1 billion for Fannie Mae and $14.1 billion for Freddie Mac as of June 30, 2012.[70] These entries merely reflect the total amount invested historically by the preferred stockholders. These entries are also accompanied by a negative "accumulated deficit" entry that indicates the amount by which the GSEs' losses have exceeded their profits historically.[71] As of June 30, 2012, Fannie Mae had an accumulated deficit of $126.3 billion and Freddie Mac had an accumulated deficit of $74.6 billion.[72] Dr. Dharan also ignores the fact that Fannie Mae's and Freddie Mac's SEC Form 10-K contains a statement of equity each year. This statement tracks the various components of equity investment in the GSEs, and it includes the profits (or losses in the case of Fannie Mae and Freddie Mac) retained by each firm. These statements show that Fannie Mae and Freddie Mac had a total equity deficit at the end of 2008.[73] This means that the losses retained by Fannie Mae and Freddie Mac far exceeded the amount private preferred and common shareholders had invested in the firms.

37.     Dr. Dharan then claims that if the preferred stock balance were written off, the GSEs would have an additional "$33 billion shortage in net worth which it would have needed to replenish

---

[68]     Fannie Mae, Form 10-K for the annual period ended December 31, 2008, internal page F-3; Freddie Mac, Form 10-K for the annual period ended December 31, 2008, internal page 183.

[69]     Dr. Dharan states that "the amounts invested by private preferred shareholders remained in the GSEs' capital structure at the end of 2008 as well as after 2008 – and continue to be reported in their net worth amounts in the balance sheets as of the end of 2022." Dharan Supplemental Report, ¶ 41.

[70]     Dharan Supplemental Report, ¶ 41.

[71]     Retained earnings is the net income of a company net of dividends paid to shareholders. Berk and DeMarzo, *Corporate Finance*, 3rd Edition, Pearson, p. 32.

[72]     Fannie Mae Q2 2012 10-Q, internal page 85; Freddie Mac Q2 2012 10-Q, internal page 107.

[73]     Fannie Mae, Form 10-K for the annual period ended December 31, 2008, internal page F-3; Freddie Mac, Form 10-K for the annual period ended December 31, 2008, internal page 183.

by drawing from the Treasury Commitment."[74]   He does not explain how the $33 billion in preferred shares would be "written off" in compliance with GAAP.[75]   If the GSEs were to write off the preferred stock balance, under double-entry accounting rules, there would have to be another entry to balance that write off.   For example, if Fannie Mae were to write off some of its assets, it would also have to reduce retained earnings by the same amount.   Dr. Dharan refuses to state what the balancing entry to a write off of preferred stock would be.[76]   As such, his claims about the impact of writing off preferred stock, and any statements about the implication of the entry on the balance sheet for preferred stock is misleading.   The entry cannot be looked at in isolation.   The capital the shareholders have invested in the GSEs had been exhausted.

38.     Finally, Dr. Dharan notes that absent the amounts invested by private preferred shareholders Fannie Mae and Freddie Mac would have had additional negative net worth of approximately $28 billion at the end of 2008, which means that they would have had to draw an additional $28 billion from Treasury's Commitment.[77]   This is speculative.   Fannie Mae's and Freddie Mac's capital position would have been different, as Dr. Dharan also notes, absent the capital provided by private preferred shareholders.[78]   The difference in capital position, which Dr. Dharan notes would date back to 1996, could have affected the firms in a variety of ways, and it is impossible to state with certainty that the only effect would have been $28 billion in greater draws under the Treasury Commitment at the end of 2008.   In any event, the fact that the junior preferred stockholders' investments funded the GSEs in the past does not change the fact that at the end of 2008, the investments were nothing more than an accounting book entry – not a backstop that would provide confidence to creditors that the GSEs had capital to absorb losses.

## 5.   Signature and reservation of rights

39.     This report and the opinions expressed in it are based on my experience and my analysis of the information and materials available to me as of May 5, 2023. I reserve the right to revise what is stated above, where necessary, and especially in view of information not presently

---

[74]     Dharan Supplemental Report, ¶ 41.

[75]     Dharan Supplemental Deposition, 329:18-330:14.

[76]     Dharan Supplemental Deposition, 330:21-333:2.

[77]     Dharan Supplemental Report, ¶ 40.

[78]     Dharan Supplemental Report, ¶ 40.

known to me, and to respond to any additional information that may be brought to my attention during this proceeding.


Mukarram Attari, Ph. D

May 5, 2023

**Exhibit 1**
**Fannie Mae: Liquidation Preference and Shortfall in Dividend Payments Under Different Dividend Scenarios Based on Fannie Mae 2012 Projections**
*Amounts in $ billions*

| | | 2012 [a] | 2013 [b] | 2014 [c] | 2015 [d] | 2016 [e] | 2017 [f] | 2018 [g] | 2019 [h] | 2020 [i] | 2021 [j] | 2022 [k] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **10% Cash Dividends and No PCF** | | | | | | | | | | | |
| [1] | Comprehensive Income | 11.6 | 7.5 | 11.0 | 12.5 | 13.9 | 13.2 | 12.2 | 11.4 | 10.9 | 10.5 | 10.5 |
| [2] | Dividends Due | 11.6 | 11.8 | 12.1 | 12.2 | 12.2 | 12.2 | 12.2 | 12.2 | 12.2 | 12.3 | 12.5 |
| [3] | Shortfall in dividend payments | 0.0 | 4.3 | 1.1 | -0.3 | -1.7 | -1.0 | 0.0 | 0.8 | 1.3 | 1.8 | 2.0 |
| [4] | Cumulative Infusion | 116.1 | 119.0 | 121.2 | 121.5 | 121.5 | 121.5 | 121.5 | 121.5 | 121.5 | 122.9 | 124.8 |
| [5] | SPS Liquidation Preference | 117.1 | 120.0 | 122.2 | 122.5 | 122.5 | 122.5 | 122.5 | 122.5 | 122.5 | 123.9 | 125.8 |
| | | | | | | | | | | | | |
| | **12% PIK Dividends and No PCF** | | | | | | | | | | | |
| [6] | Comprehensive Income | | 7.5 | 11.0 | 12.5 | 13.9 | 13.2 | 12.2 | 11.4 | 10.9 | 10.5 | 10.5 |
| [7] | Dividends Due | | 11.8 | 14.4 | 14.8 | 15.1 | 15.2 | 15.5 | 15.9 | 16.4 | 17.1 | 17.8 |
| [8] | Shortfall in dividend payments | | 4.3 | 3.4 | 2.3 | 1.2 | 2.0 | 3.3 | 4.5 | 5.5 | 6.6 | 7.3 |
| [9] | Cash Dividends Paid (Lesser of [6] and [7]) | | 7.5 | 11.0 | 12.5 | 13.9 | 13.2 | 12.2 | 11.4 | 10.9 | 10.5 | 10.5 |
| [10] | PIK dividends accrued | | 4.3 | 3.4 | 2.3 | 1.2 | 2.0 | 3.3 | 4.5 | 5.5 | 6.6 | 7.3 |
| [11] | Draws from the Commitment | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| [12] | Net Worth | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| [13] | Cumulative Commitment Draws | 116.1 | 116.1 | 116.1 | 116.1 | 116.1 | 116.1 | 116.1 | 116.1 | 116.1 | 116.1 | 116.1 |
| [14] | SPS Liquidation Preference | 117.1 | 120.0 | 123.4 | 125.7 | 126.9 | 128.9 | 132.2 | 136.7 | 142.2 | 148.7 | 156.1 |
| | | | | | | | | | | | | |
| | <u>**Third Amendment**</u> | | | | | | | | | | | |
| [15] | Comprehensive Income | | 7.5 | 11.0 | 12.5 | 13.9 | 13.2 | 12.2 | 11.4 | 10.9 | 10.5 | 10.5 |
| [16] | Dividends Due and Paid | | 7.5 | 11.0 | 12.5 | 13.9 | 13.2 | 12.2 | 11.4 | 10.9 | 10.5 | 10.5 |
| [17] | Shortfall in dividend payments | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| [18] | Draws from the Commitment | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| [19] | Net Worth | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| [20] | Cumulative Commitment Draws | 116.1 | 116.1 | 116.1 | 116.1 | 116.1 | 116.1 | 116.1 | 116.1 | 116.1 | 116.1 | 116.1 |
| [21] | SPS Liquidation Preference | 117.1 | 117.1 | 117.1 | 117.1 | 117.1 | 117.1 | 117.1 | 117.1 | 117.1 | 117.1 | 117.1 |

**Exhibit 1**

**Fannie Mae: Liquidation Preference and Shortfall in Dividend Payments Under Different Dividend Scenarios Based on Fannie Mae 2012 Projections**

**Notes and Sources:**

| | |
|---|---|
| [1]-[2] | PX-0218 at FM_Fairholme_CFC-00000221. |
| [3] | = [2] - [1]. |
| [4] | PX-0218 at FM_Fairholme_CFC-00000221. |
| [5] | = [4] + 1. |
| [6] | PX-0218 at FM_Fairholme_CFC-00000221. |
| [7][b] | PX-0218 at FM_Fairholme_CFC-00000221.  2013 dividends are charged at 10% because 2012 dividends were fully paid in cash. |
| [7][c]-[7][k] | = [14] corresponding to the previous year * 12%. While Fannie Mae has outstanding accrued PIK liquidation preference, dividends due are computed at a 12% rate. See Fannie Mae, Form 8-K, September 11, 2008, Exhibit 4.2, Section 2(c). |
| | |
| [8] | = [7] - [6]. |
| [9] | = MIN([6], [7]). |
| [10] | = [7] - [9]. |
| [11] | = - MIN([12] corresponding to the previous year, 0). |
| [12][a] | PX-0218 at FM_Fairholme_CFC-00000221. |
| [12][b]-[12][k] | = [12] corresponding to the previous year + [6] corresponding to the current year - [9] corresponding to the current year + [11] corresponding to the current year. |
| [13][a] | PX-0218 at FM_Fairholme_CFC-00000221. |
| [13][b]-[13][k] | = [13] corresponding to the previous year + [11] corresponding to the current year. |
| [14][a] | = [5][a]. |
| [14][b] | = [5][b]. |
| [14][c]-[14][k] | = [14] corresponding to the previous year + [10] corresponding to the current year + [11] corresponding to the current year. |
| [15] | PX-0218 at FM_Fairholme_CFC-00000221. |
| [16] | = [15]. |
| [17] | = [16] - [15]. |
| [18] | = - MIN([19] corresponding to the previous year, 0). |
| [19][a] | PX-0218 at FM_Fairholme_CFC-00000221. |
| [19][b]-[19][k] | = [19] corresponding to the previous year + [15] corresponding to the current year - [16] corresponding to the current year + [18] corresponding to the current year. |
| [20][a] | PX-0218 at FM_Fairholme_CFC-00000221. |
| [20][b]-[20][k] | = [20] corresponding to the previous year + [18] corresponding to the current year. |
| [21][a] | = [14][a]. |
| [21][b]-[21][k] | = [21] corresponding to the previous year + [18] corresponding to the current year. |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Exhibit 2**
**Results of Dharan Alternative analysis**
*Amounts in $ billions*

| | | Actual | Dharan Alternative |
|---|---|---|---|
| | | [a] | [b] |
| | **Fannie Mae** | | |
| [1] | Net Worth 2012 | 7.2 | 0.0 |
| [2] | Dividend Rate for 2013 and onwards | 10% | 12% |
| [3] | SPS Liquidation Preference at the end of 2012 | 117.1 | 117.9 |
| [4] | 2013 Dividend Obligation based on year end 2012 SPS Liquidation Preference | 11.7 | 14.1 |
| | **Freddie Mac** | | |
| [5] | Net Worth 2012 | 8.8 | 0.0 |
| [6] | Dividend Rate for 2013 | 10% | 12% |
| [7] | SPS Liquidation Preference at the end of 2012 | 72.3 | 68.0 |
| [8] | 2013 Dividend Obligation based on year end 2012 SPS Liquidation Preference | 7.2 | 8.2 |

**Notes and Sources:**

[1]    Dharan Errata, Exhibit A, Panel A.

[2][a]  10%, because PIK was not used.

[2][b]  12%, because Fannie Mae has a liquidation preference balance issued as PIK as of Q4 2012.

[3]    Dharan Errata, Exhibit A, Panel A.

[4]    = [2] * [3].

[5]    Dharan Errata, Exhibit A, Panel B.

[6][a]  10%, because PIK was not used.

[6][b]  12%, because Freddie Mac has a liquidation preference issued as PIK balance as of Q4 2012.

[7]    Dharan Errata, Exhibit A, Panel B.

[8]    = [6] * [7].

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Exhibit 3**
**Cap on Retained Assets of Fannie Mae and Freddie Mac Under Second and Third Amendments**
*Amounts in $ billions*

|  | Year | Cap on Retained Assets under Second Amendment | Cap on Retained Assets under Third Amendment | Long-Term Bonds Maturity |
|---|---|---|---|---|
|  | [a] | [b] | [c] | [d] |
| [1] | 2009 | 900 | NA | No |
| [2] | 2010 | 810 | NA | No |
| [3] | 2011 | 729 | NA | No |
| [4] | 2012 | 656 | 650 | No |
| [5] | 2013 | 590 | 553 | No |
| [6] | 2014 | 531 | 470 | No |
| [7] | 2015 | 478 | 399 | No |
| [8] | 2016 | 430 | 339 | No |
| [9] | 2017 | 387 | 288 | No |
| [10] | 2018 | 349 | 250 | No |
| [11] | 2019 | 314 | 250 | No |
| [12] | 2020 | 282 | 250 | No |
| [13] | 2021 | 254 | 250 | No |
| [14] | 2022 | 250 | 250 | No |
| [15] | 2023 | 250 | 250 | No |
| [16] | 2024 | 250 | 250 | No |
| [17] | 2025 | 250 | 250 | No |
| [18] | 2026 | 250 | 250 | No |
| [19] | 2027 | 250 | 250 | No |
| [20] | 2028 | 250 | 250 | No |
| [21] | 2029 | 250 | 250 | Yes |
| [22] | 2030 | 250 | 250 | Yes |
| [23] | 2031 | 250 | 250 | Yes |
| [24] | 2032 | 250 | 250 | Yes |

**Notes and Sources:**

[1][b]      "Seller shall not own, as of any applicable date, Mortgage Assets in excess of (i) on December 31, 2009, $900 billion, or (ii) on December 31 of each year thereafter, 90.0% of the aggregate amount of Mortgage Assets that Seller was permitted to own as of December 31 of the immediately preceding calendar year; provided, that in no event shall Seller be required under this Section 5.7 to own less than $250 billion in Mortgage Assets." See Fannie Mae, Form 8-K, December 30, 2009, Exhibit 4.1, Section 9, and Freddie Mac, Form 8-K, December 29, 2009, Exhibit 10.1, Section 9.

[2][b]-[24][b]      = [b] corresponding to the previous year * 90%, provided that the cap on retained assets does not fall below $250 billion. See Fannie Mae, Form 8-K, December 30, 2009, Exhibit 4.1, Section 9, and Freddie Mac, Form 8-K, December 29, 2009, Exhibit 10.1, Section 9.

[4][c]      "Seller shall not own, as of any applicable date, Mortgage Assets in excess of (i) on December 31, 2012, $650 billion, or (ii) on December 31 of each year thereafter, 85.0% of the aggregate amount of Mortgage Assets that Seller was permitted to own as of December 31 of the immediately preceding calendar year; provided, that in no event shall Seller be required under this Section 5.7 to own less than $250 billion in Mortgage Assets." See Fannie Mae, Form 8-K, August 17, 2012, Exhibit 4.1, Section 6, and Freddie Mac, Form 8-K, August 17, 2012, Exhibit 10.1, Section 6.

[5][c]-[24][c]      = [c] corresponding to the previous year * 85%, provided that the cap on retained assets does not fall below $250 billion. See Fannie Mae, Form 8-K, August 17, 2012, Exhibit 4.1, Section 6, and Freddie Mac, Form 8-K, August 17, 2012, Exhibit 10.1, Section 6.

[d]      "Yes" for the years that correspond to the maturity years of the long-term bonds of Fannie Mae and Freddie Mac, "No" otherwise. See Attari Rebuttal Report, Exhibit 1, [1][d] to [7][d].

**Exhibit 4**

**Regression Coefficients from the Market Model Estimation of the Impact of the Announcement of the Third Amendment**

**Fannie Mae Long-Term Benchmark Bonds and Freddie Mac Long-Term Reference Notes Outstanding as of June 30, 2012**

Regression Model: Change in Yield$_t$ = $\beta_0$ + $\beta_1$*Change in US Treasury Yield$_t$ + $\beta_2$*Change in Other Enterprise Bonds Index Yield$_t$ + $\beta_3$*Third Amendment$_t$ + $\varepsilon_t$

| | Issuer | CUSIP Number | Issue Date | Maturity Date | Change in Yield$_t$ on 8/17/2012 (%) | R-squared | $\beta_0$ Value (%) | $\beta_0$ T-statistic | $\beta_1$ Value (%) | $\beta_1$ T-statistic | $\beta_2$ Value (%) | $\beta_2$ T-statistic | $\beta_3$ Value (%) | $\beta_3$ T-statistic | Modified Duration (Years) | Percentage Change in Price on 8/17/2012 (%) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | [a] | [b] | [c] | [d] | [e] | [f] | [g] | [h] | [i] | [j] | [k] | [l] | [m] | [n] | [o] | [p] |
| | **Long-Term Benchmark Bonds** | | | | | | | | | | | | | | | |
| [1] | Fannie Mae | 31359MGK3 | 2000-11-03 | 2030-11-15 | -0.131 | 0.793 | 0 0003 | 0.190 | 0.517 | 10.459 | 0 389 | 8 382 | -0.107 | -5.076 | 11.9 | 1.3 |
| [2] | Fannie Mae | 31359MFP3 | 2000-05-05 | 2030-05-15 | -0.121 | 0.793 | 0 0002 | 0.142 | 0.555 | 11.159 | 0 361 | 7.715 | -0.097 | -4.572 | 11.5 | 1.1 |
| [3] | Fannie Mae | 31359MFJ7 | 2000-02-15 | 2030-01-15 | -0.111 | 0.831 | 0 0002 | 0.193 | 0.540 | 12 294 | 0 379 | 9.181 | -0.087 | -4.634 | 11.5 | 1.0 |
| [4] | Fannie Mae | 31359MEU3 | 1999-05-25 | 2029-05-15 | -0.111 | 0.822 | 0 0002 | 0.129 | 0.556 | 12 254 | 0 365 | 8 549 | -0.087 | -4.487 | 11.4 | 1.0 |
| | **Long-Term Reference Notes** | | | | | | | | | | | | | | | |
| [5] | Freddie Mac | 3134A4KX1 | 2002-02-20 | 2032-07-15 | -0.121 | 0.823 | 0 0004 | 0.318 | 0.566 | 12 366 | 0 363 | 8.429 | -0.097 | -4.968 | 12.9 | 1.3 |
| [6] | Freddie Mac | 3134A4AA2 | 2000-10-25 | 2031-03-15 | -0.091 | 0.815 | 0 0001 | 0.043 | 0.558 | 12 209 | 0 352 | 8.198 | -0.067 | -3.448 | 11.9 | 0.8 |
| [7] | Freddie Mac | 3134A3U46 | 1999-11-22 | 2029-09-15 | -0.101 | 0.842 | 0 0001 | 0.049 | 0.584 | 13.562 | 0 357 | 8 810 | -0 077 | -4.163 | 11.3 | 0.9 |

**Notes and Sources**

The market model is estimated using 250 days of yield data, from the period between February 17, 2012 and February 17, 2013. The selected time frame corresponds to a one-year window (6-months each side) around the announcement of the Third Amendment.

Change in Yield$_t$ is equal to the yield of Fannie Mae Benchmark Bonds and Freddie Mac Reference Notes on day t *minus* the yield of Fannie Mae Benchmark Bonds and Freddie Mac Reference Notes on day t - 1.

Change in US Treasury Yield$_t$ is equal to the yield of the 10-year US Treasury security on day t *minus* the yield of the 10-year US Treasury security on day t - 1.

Change in Other Enterprise Bonds Index Yield$_t$ is equal to the yield of the Other Enterprise Bonds Index on day t *minus* the yield of the Other Enterprise Bonds Index on day t - 1.

Third Amendment$_t$ is an indicator variable that is equal to 1 on the date of the Third Amendment, August 17, 2012 and 0 otherwise.

$\beta_0$, $\beta_1$, $\beta_2$ and $\beta_3$ are regression coefficients.

$\varepsilon_t$ is the regression residual on day t.

| | |
|---|---|
| [a]-[d] | Exhibit 1 in Attari Rebuttal Report. |
| [e] | Yield of Fannie Mae Benchmark Bond or Freddie Mac Reference Note on August 17, 2012 *minus* the yield of Fannie Mae Benchmark Bond or Freddie Mac Reference Note on August 16, 2012; Backup Exhibits. |
| [f]-[n] | Results of market model estimation of the effect of the Third Amendment on Fannie Mae's Benchmark Bonds or Freddie Mac's Reference Notes controlling for change in the Other Enterprise Bonds Index; Backup Exhibits. |
| [o] | See [1][j] - [7][j] in Exhibit 1 in Attari Rebuttal Report. |
| [p] | = - [m] * [o]. Percentage change in price = - Modified Duration * Change in yield. Bodie, Kane, and Marcus, *Investments*, 10th Edition, McGraw Hill Education, p. 521. |

**Exhibit 5**

**Regression Coefficients from the Market Model Estimation of the Impact of the Announcement of the Third Amendment**

**Fannie Mae Long-Term Benchmark Bonds and Freddie Mac Long-Term Reference Notes Outstanding as of June 30, 2012**

Regression Model: Change in Yield$_t$ = $\beta_0$ + $\beta_1$*Change in US Treasury Yield$_t$ + $\beta_2$*Change in SSA Index Yield$_t$ + $\beta_3$*Third Amendment$_t$ + $\epsilon_t$

| | | | | | | $\beta_0$ | | $\beta_1$ | | $\beta_2$ | | $\beta_3$ | | Abnormal Change in Price | |
| | Issuer [a] | CUSIP Number [b] | Issue Date [c] | Maturity Date [d] | Change in Yield$_t$ on 8/17/2012 (%) [e] | R-squared [f] | Value (%) [g] | T-statistic [h] | Value (%) [i] | T-statistic [j] | Value (%) [k] | T-statistic [l] | Value (%) [m] | T-statistic [n] | Modified Duration (Years) [o] | Percentage Change in Price on 8/17/2012 (%) [p] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Long-Term Benchmark Bonds** | | | | | | | | | | | | | | | |
| [1] | Fannie Mae | 31359MGK3 | 2000-11-03 | 2030-11-15 | -0.131 | 0.732 | -0.0005 | -0.322 | 0.841 | 23.767 | 0.085 | 1.294 | -0.112 | -4.715 | 11.9 | 1.3 |
| [2] | Fannie Mae | 31359MFP3 | 2000-05-05 | 2030-05-15 | -0.121 | 0.741 | -0.0004 | -0.258 | 0.848 | 24.257 | 0.120 | 1.861 | -0.102 | -4.340 | 11.5 | 1.2 |
| [3] | Fannie Mae | 31359MFJ7 | 2000-02-15 | 2030-01-15 | -0.111 | 0.772 | -0.0005 | -0.372 | 0.857 | 26.681 | 0.078 | 1.318 | -0.092 | -4.254 | 11.5 | 1.1 |
| [4] | Fannie Mae | 31359MEU3 | 1999-05-25 | 2029-05-15 | -0.111 | 0.768 | -0.0006 | -0.403 | 0.862 | 26.404 | 0.074 | 1.229 | -0.092 | -4.179 | 11.4 | 1.0 |
| | **Long-Term Reference Notes** | | | | | | | | | | | | | | | |
| [5] | Freddie Mac | 3134A4KX1 | 2002-02-20 | 2032-07-15 | -0.121 | 0.769 | -0.0003 | -0.189 | 0.866 | 26.372 | 0.084 | 1.384 | -0.102 | -4.616 | 12.9 | 1.3 |
| [6] | Freddie Mac | 3134A4AA2 | 2000-10-25 | 2031-03-15 | -0.091 | 0.764 | -0.0006 | -0.435 | 0.850 | 26.139 | 0.090 | 1.500 | -0.072 | -3.289 | 11.9 | 0.9 |
| [7] | Freddie Mac | 3134A3U46 | 1999-11-22 | 2029-09-15 | -0.101 | 0.792 | -0.0006 | -0.479 | 0.883 | 28.338 | 0.084 | 1.465 | -0.081 | -3.880 | 11.3 | 0.9 |

**Notes and Sources**

The market model is estimated using 249 days of yield data, from the period between February 17, 2012 and February 17, 2013. The selected time frame corresponds to a one-year window (6-months each side) around the announcement of the Third Amendment. 4/6/2012 is excluded because there is no yield data for the SSA Index. Hence, the yield change for 4/9/2012 is calculated as the difference between 4/9/2012 and the most recent data point prior to it, 4/5/2012.

Change in Yield$_t$ is equal to the yield of Fannie Mae Benchmark Bonds and Freddie Mac Reference Notes on day t *minus* the yield of Fannie Mae Benchmark Bonds and Freddie Mac Reference Notes on day t - 1.

Change in US Treasury Yield$_t$ is equal to the yield of the 10-year US Treasury security on day t *minus* the yield of the 10-year US Treasury security on day t - 1.

Change in SSA Index Yield$_t$ is equal to the yield of the ICE BofA 10+ Year US Foreign Government and Supranational Index, on day t *minus* the yield of the ICE BofA 10+ Year US Foreign Government and Supranational Index on day t - 1.

Third Amendment$_t$ is an indicator variable that is equal to 1 on the date of the Third Amendment, August 17, 2012 and 0 otherwise.

$\beta_0$, $\beta_1$, $\beta_2$ and $\beta_3$ are regression coefficients.

$\epsilon_t$ is the regression residual on day t.

[a]-[d]   Exhibit 1 in Attari Rebuttal Report.
[e]   Yield of Fannie Mae Benchmark Bond or Freddie Mac Reference Note on August 17, 2012 *minus* the yield of Fannie Mae Benchmark Bond or Freddie Mac Reference Note on August 16, 2012; Backup Exhibits.
[f]-[n]   Results of market model estimation of the effect of the Third Amendment on Fannie Mae's Benchmark Bonds or Freddie Mac's Reference Notes controlling for change in the SSA Index; Backup Exhibits.
[o]   See [1][j] - [7][j] in Exhibit 1 in Attari Rebuttal Report.
[p]   = - [m] * [o]. Percentage change in price = - Modified Duration * Change in yield. Bodie, Kane, and Marcus, *Investments*, 10th Edition, McGraw Hill Education, p. 521.

## Appendix A: Documents Considered

### Expert Reports:

[1]   Expert Report of Bala G. Dharan, Ph.D., CPA, dated August 12, 2021, with Exhibits A-B
[2]   Rebuttal Expert Report of Mukarram Attari, Ph.D., dated February 1, 2022, with Exhibits 1-13 and Appendices A-C
[3]   Supplemental Expert Report of Bala G. Dharan, Ph.D., CPA, dated February 10, 2023, with Exhibits A-E
[4]   Errata to February 10, 2023 Supplemental Expert Report of Bala G. Dharan, Ph.D., CPA, dated May 2, 2023, with Exhibit A

### Deposition Transcripts and Exhibits:

[5]   February 14, 2022, Deposition Transcript of Mukarram Attari, Ph.D., with Exhibits 1-23
[6]   April 20, 2023, Deposition Transcript of Bala Dharan, Ph.D., with Exhibits 1-12

### SEC Filings:

[7]   Fannie Mae Form 10-K: 2008
[8]   Fannie Mae Form 10-Q: Q2 2012
[9]   Fannie Mae Form 8-K: September 11, 2008; December 30, 2009; August 17, 2012
[10]  Freddie Mac Form 10-K: 2008
[11]  Freddie Mac Form 10-Q: Q2 2012
[12]  Freddie Mac Form 8-K: September 11, 2008; December 29, 2009; August 17, 2012

### Case Documents:

[13]  DX-0282
[14]  DX-0364
[15]  DX-0377
[16]  DX-0380
[17]  DX-0382
[18]  DX-0383
[19]  DX-0412
[20]  DX-0553
[21]  PX-0218
[22]  Transcript of Jury Trial – Morning Session, *Fairholme Funds, Inc., et al. vs. Federal Housing Finance Agency, et al.*, October 27, 2022
[23]  Transcript of Jury Trial – Morning Session, *Fairholme Funds, Inc., et al. vs. Federal Housing Finance Agency, et al.*, October 28, 2022

### Production Documents:

[24]  Layton Deposition, Exhibit 10 [FHLMC_00002303 - 328]
[25]  FHFA-DDC-0067191 - 196

## Textbooks:

[26]  Berk and DeMarzo, *Corporate Finance*, 3rd Edition, Pearson
[27]  Bodie, Kane, and Marcus, *Investments*, 10th Edition, New York: McGraw-Hill/Irwin
[28]  Fabozzi, Frank J., *The Handbook of Fixed Income Securities*, Ninth Edition, McGraw Hill, 2021

## Financial Data Sources:

[29]  Bloomberg, ICE BofA 10+ Year US Foreign Government and Supranational Index, GS09, Effective Yield
[30]  Refinitiv Eikon
[31]  Refinitiv Eikon DataStream
[32]  ICE BofA 10-15 Year US Corporate Index (C7A0) Distribution Characteristics as of June 30, 2012, obtained from https://indices.theice.com/ using the index C7A0

## Other Articles:

[33]  AXA Investment Managers, "Investment Essentials: The SSA market: an investor primer," June 28, 2012
[34]  PIMCO, "The SSA Market: a Legitimate 'Safe Spread Alternative?'," November 2012
[35]  Rabobank, "SSA Market Primer," September 12, 2014

**<u>Note:</u>**

All information and materials previously considered in Rebuttal Expert Report of Mukarram Attari, Ph.D., dated February 1, 2022, incorporated by reference.

# Appendix B:  Substitute Bonds

1.      To test the validity of Dr. Dharan's claim that the decline in bond yields on August 17, 2012 that I reported in the bond event study in the Attari Rebuttal Report was the result of an expected reduction in bond supply, I rerun the event study analysis to control for changes in the yields of Other Enterprise bonds and SSA bonds.[1]  An increase in price (reduction in yields) of long-term Fannie Mae and Freddie Mac bonds due to an expected reduction in their supply would result in higher prices (lower yields) of Other Enterprise bonds and SSA bonds.  The results of the market model controlling for the change in yield of Other Enterprise bonds are shown in Exhibit 4.  The results of the market model controlling for the change in yield of the SSA bonds are shown in Exhibit 5.  Exhibits 4 and 5 show that even after controlling for any change in yields of Other Enterprise bonds or SSA bonds due to the purported expected reduction in supply of the long-term Fannie Mae and Freddie Mac bonds, the yields of the long-term Fannie Mae and Freddie Mac bonds declined between 6.7 and 11.2 basis points on the date of the announcement of the Third Amendment.

---

[1]      The yields of SSA bonds are obtained using ICE BofA 10+ Year US Foreign Government and Supranational Index (Bloomberg ticker GS09 Index).  The index of Other Enterprise bonds is calculated using the yields of individual bonds issued by these Other Enterprises.  To construct the index, I collect the yield data on all bonds issued by Other Enterprises that have more than $1 billion in amount outstanding and more than 10 years to maturity as of June 30, 2012.  I calculate an index of the average yield of each of those bonds and then calculate the change in yield using that index.