# EXHIBIT E

Page 1

1           UNITED STATES DISTRICT COURT
2              DISTRICT OF COLUMBIA
3
     In Re:  Fannie Mae/Freddie Mac    ) Misc. Action No.
4    Senior Preferred Stock Purchase   ) 13-mc-1288(RCL)
     Agreement                         )
5    ----------------------------------)
6
7                      - - -
8            TUESDAY, DECEMBER 1, 2020
9                      - - -
10
11      30(B)(6) Remote Videotaped Deposition of FHFA, by
12   and through its designee, NICHOLAS SATRIANO,
13   beginning at 9:14 a.m., before Nancy J. Martin, a
14   Registered Merit Reporter, Certified Shorthand
15   Reporter.  All parties appeared remotely.
16
17
18
19
20
21
22

Page 90

1  describe that I became actively involved in the
2  assessment about releasing the reserves.
3  BY MR. THOMAS:
4      Q. You only became actively involved after the
5  companies determined that they were going to release
6  the reserves; right?
7      MR. HOFFMAN: Object to the form.
8      THE WITNESS: No. I was involved every
9  quarter -- and my main involvement, as I recall, was
10 reviewing the quarterly required memos, analyses that
11 they prepared where they either confirmed the
12 valuation allowance or did something else. And I
13 think in the financial reporting packages, they often
14 would have this sort of FAS 109 memo, I think they
15 referenced to it as.
16     And obviously, when management came to
17 FHFA -- I'm talking Fannie Mae management -- I became
18 far more actively involved in the assessment.
19 BY MR. THOMAS:
20     Q. You became far more actively involved in the
21 assessment after the companies decided they were going
22 to take relief valuation allowances for the DTAs;

Page 91

1  correct?
2      MR. HOFFMAN: Object to the form.
3      You can answer.
4      THE WITNESS: I became involved after the
5  company issued the first draft of its 2012 10-K to
6  FHFA for review.
7  BY MR. THOMAS:
8      Q. Why did you become more involved because of
9  that?
10     A. Because it was after that time that
11 management came to FHFA and said despite what was in
12 the first draft of the 2012 10-K, they informed us
13 that they thought a case could be made, or that they
14 should be making the case to consider reversing, in
15 part or in full, the valuation allowance that had been
16 previously established.
17     Q. So in their draft 10-K they decided not to
18 take a valuation allowance, but then they came to FHFA
19 and said they thought they should take a valuation
20 allowance?
21     A. That's generally what I recall.
22     Q. Can you explain how that makes any sense?

Page 92

1      A. So in the preparation -- well, I have to
2  infer into management, in the preparation of the first
3  draft or an early draft -- I don't know if it was the
4  first draft of the 10-K -- management had reaffirmed
5  its decision not to reverse the DTA as of Q4 2012.
6      In subsequent drafts that came to the agency
7  for our review, and in discussions with management
8  after that time, they were increasingly considering
9  the need to reverse the DTA as of Q4 2012.
10     Q. Well, didn't the FHFA suggest they re-look at
11 that issue?
12     MR. HOFFMAN: Object to the form.
13     THE WITNESS: At that time, FHFA had a
14 quarterly process for reviewing financial statements,
15 draft financial statements and related assertions that
16 support the financial statements. And so we often --
17 we looked at those memos every quarter. I don't
18 recall a specific directive or issuance that would be
19 out of normal that we would have been looking at it.
20 BY MR. THOMAS:
21     Q. Let me understand that. You don't recall
22 anyone from the FHFA indicating to the companies that

Page 93

1  they should take a second look at their decision to
2  release valuation allowances?
3      A. What I recall is I believe I was maybe one of
4  the first people that they formally came to, to say,
5  "We think we should reverse the valuation allowance."
6  I recall thinking at the time that that was unlikely.
7  Given the evidence and information analysis that was
8  presented to me up until that point, that it was
9  premature, and there was likely more work that they
10 needed to do prior to confirming that they -- the
11 positive evidence outweighed the negative evidence
12 with respect to releasing the valuation allowance.
13     Q. You indicated -- so you had an uptick in
14 involvement and focus on the DTA valuation allowance
15 issue starting in late 2012; is that correct?
16     A. Right. I recall a meeting at the end of
17 August with the then CFO, and then I believe I started
18 to engage more actively with the -- one of the
19 executives who led some of the tax analysis at Fannie
20 Mae at the end of the third quarter, somewhere around
21 that time.
22     Q. What was the reason for that increased

Page 234

1  statements is that there are fair value gains and
2  losses that can be significant related to their -- the
3  accounting for their derivatives, and those elements
4  can change significantly in any given quarter. And so
5  those could also have a significant impact.
6  BY MR. THOMAS:
7      Q. Okay. Let me -- I'm having some loading
8  issues again here.
9      My last question, I'm not sure, do you know
10 "yes" or "no," whether the companies would have had to
11 call into the treasury under the SPS if it hadn't been
12 for the DTA valuation allowances and the increased
13 loan loss reserves?
14     MR. HOFFMAN: Object to the form.
15     THE WITNESS: I don't know because that
16 sounds like it would not be a calculation pursuant to
17 GAAP, which is what they were required to do under the
18 PSPAs.
19     (Deposition Exhibit 34 was marked for
20     identification.)
21 BY MR. THOMAS:
22     Q. Let me ask you to look at a document I've

Page 235

1  marked as Exhibit 34.
2      A. Okay.
3      Q. And this is an E-mail chain on or about
4  March 28, March 30, some of which you've been copied
5  in. On the second page, it says -- it's an E-mail
6  from John Kerr. It says, "As you may already know,
7  decisions regarding conservatorship, loan loss
8  reserves," and "other temporary accountings and other
9  issues below" are "made at the highest levels in our
10 agency." Do you see that?
11     A. And you referring to the E-mail from John
12 Kerr to Angelia Bowman?
13     Q. Yes.
14     A. Okay. I do see that.
15     Q. Who's John Kerr?
16     A. Let's see.
17     (Pause in proceedings.)
18 BY MR. THOMAS:
19     Q. I see an FHFA e-mail address if that helps.
20     A. Yeah. I just wanted to be clear. So John
21 Kerr was one of the examiners in charge, and I believe
22 at this time he was the examiner in charge of Fannie

Page 236

1  Mae.
2      Q. Okay. Is it accurate to say that the
3  decisions regarding conservatorship, loan loss
4  reserves, and other temporary accountings were being
5  addressed at the highest levels at FHFA during --
6      THE WITNESS: Let me read this E-mail so I
7  can give you a complete answer.
8      (The witness reviewed Exhibit 34.)
9      THE WITNESS: Okay. I'm sorry. I've read
10 the E-mail. Can you ask your question again, please?
11 BY MR. THOMAS:
12     Q. The question was just whether it's true that
13 decisions regarding conservatorship, loan loss
14 reserves, or other temporary accountings were made at
15 the highest level of FHFA.
16     MR. HOFFMAN: Objection to the form.
17     You may answer.
18     THE WITNESS: A good example of how the
19 interaction of the highest levels of FHFA, and I'll
20 just say Acting Director DeMarco or Director Lockhart
21 was -- at least with respect to accounting is that we
22 would provide recommendations or updates and analysis,

Page 237

1  and that is how they were briefed. I don't know about
2  the accuracy of the rest of this statement. I don't
3  know what records the directors or the front office
4  would maintain.
5  BY MR. THOMAS:
6      Q. It's not about maintaining record. Was the
7  highest levels of the agency involved in making
8  decisions on things like loan loss reserves?
9      A. Yes. I think as the chief accountant,
10 whether it was Wanda DeLeo prior to me or me, because
11 this is a little bit earlier. So I'm not sure who was
12 involved at this time.
13     Typically, we brief our executive management
14 on the significant items under our responsibility, and
15 we get their guidance and input. And so I would hope
16 that they feel that they always had been briefed about
17 significant accounting items and had a chance to offer
18 their leadership input.
19     Q. It sounds like -- I'm just trying to ask you
20 a simple question. Do you agree with this, that they
21 were making the decisions on these issues?
22     MR. HOFFMAN: Object to the form.

60 (Pages 234 - 237)