# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

FAIRHOLME FUNDS, INC., ET AL., et al,     Civil Action
                                          No. 1:13-1053
               Plaintiffs,

      vs.
                                          August 2, 2023
FEDERAL HOUSING FINANCE                   Washington, DC
    AGENCY, et al,
                  Defendants.             1:57 p.m.
_____

In re: FANNIE MAE/FREDDIE MAC             Civil Action
SENIOR PREFERRED STOCK PURCHASE           No. 1:13-1288
AGREEMENT CLASS ACTION
LITIGATIONS.
_____


TRANSCRIPT OF **JURY TRIAL - DAY 8**
BEFORE THE HONORABLE **ROYCE C. LAMBERTH**
UNITED STATES DISTRICT JUDGE


PLAINTIFFS' APPEARANCES:

**For Berkley Plaintiffs: CHARLES COOPER**
**xxx                     DAVID THOMPSON**
**                        VINCENT COLATRIANO**
**                        PETER PATTERSON**
**                        BRIAN BARNES**
                          Cooper & Kirk, PLLC
                          1523 New Hampshire Avenue NW
                          Washington, D.C. 20036


**For Class Plaintiffs:  ERIC ZAGAR**
**                        LAUREN LUMMUS**
                          Kessler Topaz Meltzer & Check, LLP
                          280 King of Prussia Road
                          Radnor, Pennsylvania 19087

**                        HAMISH HUME**
**                        SAMUEL KAPLAN**
                          Boies Schiller Flexner LLP
                          1401 New York Avenue NW
                          Washington, D.C. 20005

APPEARANCES (CONTINUED):

                           **MICHAEL J. BARRY**
                             Grant & Eisenhofer, P.A.
                             123 Justison Street
                             Wilmington, Delaware 19801

                           **ADAM WIERZBOWSKI**
                             Bernstein Litowitz Berger &
                             Grossmann LLP
                             1251 Avenue of the Americas
                             New York, New York 10020

**For Defendant Federal**
**Housing Finance Agency:** **ASIM VARMA**
                         **HOWARD CAYNE**
                         **DAVID BERGMAN**
                         **IAN HOFFMAN**
                           Arnold & Porter Kaye Scholer LLP
                         601 Massachusetts Avenue NW
                         Washington, D.C. 20001

**For Federal Home Loan**
**Mortgage Company:** **MICHAEL CIATTI**
                         King & Spalding LLP
                         1700 Pennsylvania Avenue NW
                         Washington, D.C. 20006

**For Federal National**
**Mortgage Association:** **MEAGHAN VERGOW**
                         O'Melveny & Myers LLP
                         1625 I Street NW
                         Washington, D.C. 20006

**Reported By:** **LORRAINE T. HERMAN, RPR, CRC**
                         Official Court Reporter
                         U.S. District & Bankruptcy Cts.
                         333 Constitution Avenue, NW
                         Room 6720
                         Washington, DC 20001
                         202-354-3196

\*\*\* Proceedings recorded by stenotype shorthand.
\*\*\* Transcript produced by computer-aided transcription.

1                          **I N D E X**

2   **WITNESS**                                              **PAGE**

3   NICHOLAS SATRIANO

4        Direct Examination by Mr. Hoffman              4
         Cross-Examination by Mr. Rudy                 13
5        Redirect Examination by Mr. Hoffman          102
         Recross-Examination by Mr. Rudy              112

6

7

8                        **E X H I B I T S**

9   **EXHIBIT**                                             **PAGE**

10  Defendants' No. 560    Received into Evidence      8
    Plaintiffs' No. 595    Received into Evidence     23
11  Plaintiffs' No. 596    Received into Evidence     25
    Plaintiffs' No. 158    Received into Evidence     92
12  Plaintiffs' No. 594    Received into Evidence     94
    Defendants' No. 368    Received into Evidence    121
13  Defendants' No. 419    Received into Evidence    121
    Defendants' No. 474    Received into Evidence    121
14  Defendants' No. 490    Received into Evidence    121
    Defendants' No. 508    Received into Evidence    121
15  Defendants' No. 408    Received into Evidence    121
    Plaintiffs' No. 261    Received into Evidence    121
16  Defendants' No. 81-A   Received into Evidence    122
    Defendants' No. 83     Received into Evidence    122
17  Defendants' No. 219    Received into Evidence    122
    Defendants' No. 272    Received into Evidence    122
18  Defendants' No. 299    Received into Evidence    122
    Defendants' No. 329    Received into Evidence    122
19  Defendants' No. 344    Received into Evidence    122
    Defendants' No. 365    Received into Evidence    122
20  Defendants' No. 393    Received into Evidence    122
    Defendants' No. 418    Received into Evidence    122
21  Defendants' No. 469    Received into Evidence    122
    Defendants' No. 919-A  Received into Evidence    122
22  Defendants' No. 412    Received into Evidence    122
    Defendants' No. 529    Received into Evidence    122

23

24

25

1                    **P R O C E E D I N G S**

2              (REPORTER'S NOTE: The morning portion of the trial

3       was reported by Nancy Meyer, who prepared said transcript.)

4              **THE COURT:**  All right.  We are ready, Counsel.

5              **MR. HOFFMAN:**  Your Honor, may the witness --

6         (Jury entered the courtroom.)

7              **THE COURT:**  You may be seated.

8              Good afternoon, ladies and gentlemen.  I apologize

9       for the delay.  We had some equipment problems.

10             You may proceed with your examination.

11             **MR. HOFFMAN:**  Good afternoon, Your Honor, members

12      of the jury, Ian Hoffman on behalf of defendants.

13         **DIRECT EXAMINATION OF NICHOLAS SATRIANO (CONT'D.)**

14      BY MR. HOFFMAN:

15         **Q.**   Now, Mr. Satriano, I'm now going to ask you some

16      questions about after the third amendment was signed.  And

17      just to orient us in time, the third amendment was signed on

18      August 17th of 2012; is that right?

19         **A.**   Yes.

20         **Q.**   In the weeks that followed the signing of the

21      third amendment, did you have any discussions with anyone at

22      Fannie Mae about the DTA?

23         **A.**   Yes, I did.

24         **Q.**   And who did you have discussion with?

25         **A.**   I had -- as we mentioned earlier -- I mentioned

                          DIRECT - SATRIANO

1     earlier, I periodically meet with the chief financial

2     officers as part of my regular practice.

3              It happened to be that I had one of those meetings

4     in the second half of August.  And at that meeting, I did

5     make inquiries as to her thought process with respect to the

6     third amendment and the deferred tax assets.

7        **Q.**   And who did you meet with?

8        **A.**   Sorry.  I met with Susan McFarland, who was the

9     Chief Financial Officer at the time.

10       **Q.**   The Chief Financial Officer of which company?

11       **A.**   At Fannie Mae.

12       **Q.**   And what effect, if any, did that discussion with

13    Ms. McFarland have on your understanding of whether and when

14    Fannie Mae's deferred tax asset would be written up?

15       **A.**   So I had a question, a series of questions for

16    her.  We had a discussion, and I left the meeting with the

17    impression that --

18              **MR. RUDY:**  Objection.  Hearsay.

19              **THE COURT:**  Overruled.

20              **THE WITNESS:**  I left the meeting with the

21    impression that Fannie Mae was about to start some analysis

22    to consider when and if, if/when, to reverse either a part

23    of the deferred tax asset valuation allowance or the whole

24    deferred tax asset valuation allowance.

25

                         DIRECT - SATRIANO

1       BY MR. HOFFMAN:

2           Q.    Were there any notes taken of this meeting?

3           A.    Yes, there were.

4           Q.    Who took the notes?

5           A.    I attended the meeting with one of my colleagues

6       from the Office of the Chief Accountant, Melissa Schwitters,

7       and she prepared the notes.

8           Q.    And were the notes turned into a memo summarizing

9       the meeting?

10          A.    Yes, they were.  And I reviewed them prior to

11      finalizing the minutes.

12              MR. HOFFMAN:  So let's take a look at Defendants'

13      Exhibit 560, and let's only show it to the witness for now.

14      Defendants' Exhibit 560.

15              And let's go to the second page of 560.

16              MR. MONTGOMERY:  [Complied]

17              MR. HOFFMAN:  And let's go in the sort of top half

18      of the document, Mr. Montgomery.

19              MR. MONTGOMERY:  [Complied]

20      BY MR. HOFFMAN:

21          Q.    Mr. Satriano, do you recognize this document?

22          A.    Yes, I do.

23          Q.    What is it?

24          A.    It is a template that we use at the agency for

25      taking meeting notes of certain meetings.

                        DIRECT - SATRIANO

1    **Q.**   And is this document just the template or is it an
2    actual memo as well?
3    **A.**   I'm sorry.  It is also filled out with the notes
4    from the meeting that we attended.
5    **Q.**   And is this the memo that you testified about a
6    moment ago summarizing the meeting with Ms. McFarland?
7    **A.**   Yes, it is.
8    **Q.**   And what is the subject of the memo that's listed
9    here?
10   **A.**   Biweekly meeting with Fannie Mae CFO.
11   **Q.**   And what's the meeting date identified?
12   **A.**   The meeting date was August 23rd, 2012.
13   **Q.**   And August 23rd, 2012, was that before or after
14   the third amendment was signed?
15   **A.**   It was after the third amendment was signed.
16   **Q.**   And I believe you said Ms. Schwitters took the
17   notes; is that correct?
18   **A.**   Yes, she did.
19   **Q.**   And was she at the meeting as well?
20   **A.**   Yes, she was.
21   **Q.**   Did she prepare the notes soon after the meeting
22   happened?
23   **A.**   Yes, she did.
24   **Q.**   Is it a regular practice of your office to prepare
25   these types of meeting memos?

DIRECT - SATRIANO

1          A.    Yes, it is.

2          Q.    Was this particular meeting memo created and

3    maintained in the ordinary course of FHFA's business?

4          A.    Yes, it was.

5          Q.    And let's go to the very first page of DX-560?

6               MR. MONTGOMERY:   [Complied]

7               MR. HOFFMAN:   Thank you.

8    BY MR. HOFFMAN:

9          Q.    What is this, Mr. Satriano?

10         A.    This is an email.

11         Q.    From who and to who?

12         A.    This is an email from me to Andre Galeano, who was

13   another executive at the Federal Housing Finance Agency,

14   FHFA.

15         Q.    When did you send this email?

16         A.    After I reviewed these minutes and we completed

17   them, I sent them to Andre Galeano for his awareness as to

18   what Ms. McFarland had shared with us during the meeting.

19               MR. HOFFMAN:   Your Honor, at this time defendants

20   would move into evidence Defendants' Exhibit 560.

21               MR. RUDY:   No objection.

22               THE COURT:   Received.

23        (Defendants' Exhibit 560 was received.)

24               MR. HOFFMAN:   Okay.  Let's publish that to the

25   jury.

                         DIRECT - SATRIANO

1          **MR. MONTGOMERY:**  [Complied]

2   **BY MR. HOFFMAN:**

3       **Q.**   Okay.

4          And so if you could read out what you told Mr.

5   Galeano here in the email, the first sentence.

6       **A.**   "Hi Andre.  Attached please find notes from the

7   recent meeting with the CFO."

8       **Q.**   Is that recent meeting with the CFO the one you

9   were just describing?

10      **A.**   Yes, it is.

11         **MR. HOFFMAN:**  Okay.

12         So, Mr. Montgomery, let's go to Page 2 of

13  Defendants' Exhibit 560, and let's zoom in on the top half

14  including the purpose bullet.

15         **MR. MONTGOMERY:**  [Complied]

16  **BY MR. HOFFMAN:**

17      **Q.**   Just for the jury's awareness, is this the first

18  page of the memo you were describing a moment ago?

19      **A.**   Yes, it is.

20      **Q.**   And can you read the purpose line?

21      **A.**   "The purpose of the meeting is to get an update

22  from the CFO's perspective of significant issues facing

23  Fannie Mae and to discuss issues of mutual concern."

24      **Q.**   And is that consistent or inconsistent with your

25  recollection of the purpose of this meeting?

                        DIRECT - SATRIANO

1      **A.**    It's consistent.

2      **Q.**    Okay.

3              **MR. HOFFMAN:**   Let's go, Mr. Montgomery, to Page 3

4      of 3.

5              **MR. MONTGOMERY:**   [Complied]

6              **MR. HOFFMAN:**   Let's zoom in on items 3 and 3-A.

7              **MR. MONTGOMERY:**   [Complied]

8              **MR. HOFFMAN:**   First, let's highlight the first

9      line, "impact of the changes."

10     **BY MR. HOFFMAN:**

11     **Q.**    Do you see that, Mr. Satriano?

12     **A.**    Yes.

13     **Q.**    Can you read that out, please?

14     **A.**    "Impact of the changes to the Treasury agreement

15     on longer term financial forecasts."

16     **Q.**    And what changes to the Treasury agreement are

17     being referred to here?

18     **A.**    The ones that I think of were the change in how

19     the dividend formula was calculated and also how -- and the

20     component related to the retained mortgage portfolio

21     accelerated shrinkage wind-down.

22     **Q.**    Were both of those part of the third amendment?

23     **A.**    Those were both components of the third amendment.

24     **Q.**    Let's highlight the last sentence in this bullet

25     point 3.  "It will likely reduce the likelihood of future

                         DIRECT - SATRIANO

1  draws."  What does that mean?

2      **A.**   So just for context, the first highlighted

3  sentence is the topic or issue that I brought up.  And the

4  next four sentences are Ms. McFarland's response.

5      So this is her responding to my question saying,

6  "It will likely reduce the likelihood of future draws."

7      **Q.**   And what did you understand that to be in

8  reference to?

9      **A.**   I understood that to mean that the changes that

10  occurred in the third amendment with respect to the

11  calculation of the dividend formula would have the effect of

12  potentially reducing the likelihood of future draws.

13      **Q.**   Now let's highlight all of bullet point 3-A, and

14  I'd like you to read that out to the jury, please.

15      **A.**   Okay.

16      "We followed up with a question about the deferred

17  tax asset.  Susan noted that there is a $62 billion

18  valuation allowance against the deferred tax asset.  They

19  have started some analysis around when/if any (including a

20  part) of the valuation allowance could be reversed."

21      **Q.**   Mr. Satriano, is this description consistent with

22  your recollection of the meeting?

23      **A.**   Yes, it is.

24      **Q.**   And what did you understand Ms. McFarland to be

25  saying?  How did you understand this part of the memo?

1    A.   I understood it to mean that Fannie Mae was

2  beginning some analysis around when and if they could

3  potentially reverse part of the valuation allowance and, as

4  we've been talking about today, that would write up the

5  deferred tax asset.

6    Q.   And based on your meeting with Ms. McFarland on

7  August 23rd, 2012, what was your understanding as to how far

8  along Fannie Mae was in its process of evaluating whether to

9  write up the DTA?

10    A.   I understood it to be at the beginning stages.

11    Q.   And what significance, if any, did you place on

12  the statement that they have started some analysis around

13  when/if any, including a part of the valuation allowance,

14  could be reversed?  That when/if, what significance, if any,

15  did you place on that?

16    A.   I mean, it highlights some measure of uncertainty

17  about the decision and I -- for me, as an accountant, I

18  think this is essentially what is happening each quarter

19  when they performed the analysis that we were discussing

20  earlier, positive items compared against negative items,

21  making an assessment each quarter.

22    Q.   And so at this time, in late August of 2012, what

23  was your understanding about whether and when Fannie Mae's

24  DTA would be written up?

25    A.   I didn't have a timeframe based on this discussion

DIRECT - SATRIANO

1   with her except that I thought that it was consistent with,

2   you know, the previously certified results from earlier in

3   the month.

4           **MR. HOFFMAN:**  Court's indulgence, Your Honor.

5           Take that down, Mr. Montgomery.

6           **MR. MONTGOMERY:**  [Complied]

7           **MR. HOFFMAN:**  Mr. Satriano, thank you.  No further

8   questions at this time, Your Honor.

9           **THE COURT:**  You may cross-examine.

10          **MR. RUDY:**  Thank you, Your Honor.  Lee Rudy for

11  plaintiffs.

12          <u>**CROSS-EXAMINATION OF NICHOLAS SATRIANO**</u>

13  BY MR. RUDY:

14      **Q.**   Mr. Satriano, you would agree with me that the

15  third amendment was Mr. DeMarco's decision alone.  Right?

16      **A.**   No, I wouldn't.

17      **Q.**   Okay.  You gave testimony in a prior proceeding.

18  Do you recall that?

19      **A.**   Yes, I recall giving testimony.

20      **Q.**   Okay.  Under oath?

21      **A.**   Yes.

22      **Q.**   And you were asked the question, "Nobody asked you

23  whether FHFA should agree to the third amendment.  Right?

24  Agree?"

25          Answer.  Agree.

                    CROSS - SATRIANO

1          Do you recall giving that testimony?

2     **A.**   Yes, I do.

3     **Q.**   Okay.  So let me ask you again.  You agree that

4  Mr. DeMarco never asked you for your opinion about whether

5  he should agree to the net worth sweep, did he?

6     **A.**   Agree.

7     **Q.**   You agree now?

8     **A.**   The questions -- I misunderstood.

9     **Q.**   I'm just asking if you agree with that.

10    **A.**   Your first question and your second question

11  appeared different to me.

12    **Q.**   Well, let me just ask the question again.

13    **A.**   Please.

14    **Q.**   If you don't understand, please, just let me know.

15    **A.**   I will.

16    **Q.**   Mr. Satriano, you agree that Mr. DeMarco never

17  asked you for your opinion about whether he should agree to

18  the net worth sweep, did he?

19    **A.**   Yes.  Mr. DeMarco never asked me for my opinion.

20  Ms. Wanda DeLeo asked me for my opinion, who was my boss at

21  the time.  And she was sharing those views up to her boss,

22  Ed DeMarco.  That's what I understand the process to be.

23    **Q.**   Okay.  Just if you feel like you can't answer my

24  question, let me know.

25    **A.**   I will.

                    CROSS - SATRIANO

1    Q.   That really wasn't what I asked you.  And we'll

2    get to Ms. DeLeo.

3    A.   Ask again.

4    Q.   In fact, nobody -- well, withdrawn.

5         **MR. RUDY:**  Let's put up DX-916.

6         **MS. McGUIRE:**  [Complied]

7    **BY MR. RUDY:**

8    Q.   Your counsel asked you some questions about this

9    document, this email.  Right?

10   A.   Yes.

11   Q.   Do you recall?

12   A.   Yes, I do.

13   Q.   Okay.

14        And you were CC-ed on this email string.  Right?

15   A.   Yeah.  Actually, it was to me.

16   Q.   I apologize.  That's correct.

17        Did you write back to this email?

18   A.   No, I did not.

19   Q.   You testified that you reviewed the net worth

20   sweep, the third amendment, I should say, for accounting and

21   auditing-related issues.  Right?

22   A.   Yes.

23   Q.   You said that Ms. DeLeo asked you for -- that you

24   gave an analysis to Ms. DeLeo.  Right?  You did an analysis

25   of the third amendment and its effect on whether it would

CROSS - SATRIANO

1    cause any going concern issues.  Right?

2        A.    She asked for my views on the draft components of

3    what was to become the third amendment and I shared those

4    with her.

5        Q.    Okay.  So your testimony on direct was you did an

6    analysis.  That was your word.  Right?

7        A.    Yeah, I didn't do a written analysis, and that's

8    what I'm trying to be careful -- be accurate about.

9        Q.    Yeah, that's where I am going.

10       A.    Okay.

11       Q.    So you said you were asked for your analysis and

12   you gave your analysis and you gave it to Ms. DeLeo.  Right?

13       A.    That's correct.

14       Q.    And your testimony was you conveyed that analysis

15   orally to Ms. DeLeo.  Right?

16       A.    Yes.

17       Q.    And you agree with me that you never wrote any

18   sort of analysis of the effect of the third amendment on

19   Fannie or Freddie.  Right?

20       A.    Yes.

21       Q.    From accounting issues or otherwise.  Right?

22       A.    Yes.

23       Q.    Okay.

24             So you -- it's your testimony that you gave

25   accounting advice to your boss related to the effect of this

CROSS - SATRIANO

1    potentially hundreds-of-billions-of-dollar transaction to

2    your boss, and you just did that in a conversation?

3              **MR. HOFFMAN:**  Objection.  Assumes facts.

4              **THE COURT:**  Overruled.

5              **THE WITNESS:**  I was asked to provide her my

6    thoughts and review and that's what I did.

7    **BY MR. HOFFMAN:**

8         **Q.**   How long a conversation was that?

9         **A.**   We sat down with the draft, and we went through

10   component by component, half an hour or an hour meeting.

11   That's what I recall.

12        **Q.**   Okay.  No one wrote anything down about this?

13        **A.**   I believe Ms. DeLeo conveyed my concerns or my

14   analysis to Ed DeMarco.

15        **Q.**   Orally?

16        **A.**   I cannot speak for her actions.  I'm sorry.

17        **Q.**   You've never seen a written memo describing the

18   accounting effects of the third amendment, the net worth

19   sweep or anything.  Right?

20        **A.**   Not prepared by me, no.

21        **Q.**   Well, any memo describing whether -- the

22   accounting effects of the third amendment, the net worth

23   sweep on Fannie and Freddie, have you seen any such memo in

24   this case?

25        **A.**   Can you be more specific about your question?

                          CROSS - SATRIANO

1      Q.   I'm trying to be general.  Have you seen any memo

2   summarizing the accounting effects of the third amendment on

3   Fannie and Freddie?

4      A.   No, not related to the issues that I was most

5   concerned with.

6      Q.   So -- okay.  Let's talk a little bit about SEC

7   filings?

8      A.   Okay.

9      Q.   You were shown DX-476.

10         MR. RUDY:  Can we put that up?

11         MS. McGUIRE:  [Complied]

12   BY MR. RUDY:

13      Q.   This is Fannie Mae's second quarter 2012 Form

14   10-Q.  Correct?

15      A.   Yes.

16      Q.   And you gave testimony about this document?

17      A.   I did.

18      Q.   You described the executive summary in a Form 10-Q

19   as "the highlights."  Right?

20      A.   Yes.

21         MR. RUDY:  So let's turn to the executive summary

22   on Page 5.

23         MS. McGUIRE:  [Complied]

24   BY MR. RUDY:

25      Q.   That's the beginning of the executive summary.

                        CROSS - SATRIANO

1   Right.

2        **A.**   Yes.

3        **Q.**   Okay.  And the first highlight it appears to be

4   that Fannie Mae is doing really well.  Right?

5        **A.**   Significant improvement relative to the previous

6   period, yes.

7        **Q.**   Right.  That's the first highlight that Fannie Mae

8   put in their second quarter Form 10-Q.  Right?

9        **A.**   Yes.

10        **MR. RUDY:**  Let's look at DX-477.

11        **MS. McGUIRE:**  [Complied]

12   **BY MR. RUDY:**

13        **Q.**   This is Freddie Mac's second quarter 2012 Form

14   10-Q.  Right?

15        **A.**   Yes.

16        **MR. RUDY:**  And let's go to the executive summary

17   on Page 5.

18        **MS. McGUIRE:**  [Complied]

19        **MR. RUDY:**  Let's highlight executive summary and

20   then the first two sections there, "Overview" and "Summary

21   of Financial Results."

22   **BY MR. RUDY:**

23        **Q.**   So just above that, there's an executive summary

24   which talks about the history of Freddie Mac, chartered by

25   Congress, et cetera.  Right?

                    CROSS - SATRIANO

1          Then we get to summary of financial results.

2          **MR. RUDY:**  If we could just highlight that.  The

3     box you had up before.  Yep.

4          **MS. McGUIRE:**  [Complied]

5     BY MR. RUDY:

6     **Q.**   "We continue to be affected by ongoing weakness in

7     the economy.  However, certain actions taken since early

8     2009, including our participation in HAMP and HARP are

9     helping to stabilize the housing market.  During the six

10    months ended June 30, 2012, we observed certain signs of

11    stabilization in the housing market, which contributed to

12    our improved financial results in the second quarter of

13    2012."  Right?

14    **A.**   Yes, that's what it says.

15    **Q.**   Okay.

16         And the next sentence talks about how

17    comprehensive income was 2.9 billion, by comparison,

18    comprehensive income for the second quarter, the same

19    quarter in '11, was a loss of 1.1 billion.  Right?

20    **A.**   Yes.

21    **Q.**   Freddie Mac is doing pretty well too.  Right?

22    **A.**   Relative to 2011, they have improved, yes.

23    **Q.**   And that's the first highlight of the executive

24    summary which is the highlights.  Right?

25    **A.**   Yes, it is.

                     CROSS - SATRIANO

1          **MR. RUDY:**  You can take that down.  Thank you.

2          **MS. McGUIRE:**  [Complied]

3   BY MR. RUDY:

4      **Q.**   Mr. Satriano, you are aware that, when public

5   companies, including Fannie and Freddie, put out their

6   quarterly results, they often accompany those results with a

7   press release.  Correct?

8      **A.**   Yes, they do.

9      **Q.**   Okay.

10          Those press releases are also filed with the SEC.

11   Correct?

12     **A.**   Correct.

13     **Q.**   On a Form 8-K.  Right?

14     **A.**   Yes.

15     **Q.**   And so they have to be honest in those documents

16   too.  They're filed with the SEC.  Right?

17     **A.**   Yes.

18          **MR. RUDY:**  I'd like, to put up PX-595.  It's not

19   yet in evidence so just ask the witness to see it.

20          **MS. McGUIRE:**  [Complied]

21   BY MR. RUDY:

22     **Q.**    Is this Fannie Mae's press release that

23   accompanied the release of its second quarter earnings on

24   August 8th, 2012?

25     **A.**   Assuming you're going to get to the attachment.

                        CROSS - SATRIANO

1    This is the Form 8-K.  Thank you.  Yes, this is -- if this

2    are the two associated?  It looks like they're a press

3    release from that period.

4        **Q.**   Yeah, well let's just go page-by-page until you're

5    comfortable looking at -- that it is the right document.

6            So the first page is this.  Do you see that?

7    Let's go to the second page.  Do you see that?

8        **A.**   Yes.

9        **Q.**   Are you comfortable saying that this is the press

10   release that accompanied the 10-Q second quarter earnings?

11       **A.**   Can you scroll down one or two more pages?

12       **Q.**   Sure.

13       **A.**   Until we get to the attachments page?

14       **Q.**   Yep.

15       **A.**   There it is.  Thank you.

16           **MS. McGUIRE:**  [Complied]

17   **BY MR. RUDY:**

18       **Q.**   Does this appear to be what I suggested for this?

19       **A.**   Yes, thank you for that.  I appreciate it.

20       **Q.**   Do you agree this is the press release?

21       **A.**   Yes.  The first item is the news release.

22           **MR. RUDY:**  I'm going to offer this into evidence

23   as PX-595.

24           **MR. HOFFMAN:**  No objection.

25           **THE COURT:**  Received.

                     CROSS - SATRIANO

1          (Plaintiffs' Exhibit 595 was received.)

2               MR. RUDY:  I'd like to show you Page 6 of this

3     document, which is the first page of the press release.  And

4     I'd ask that we highlight the headline of the press release.

5               MS. McGUIRE:  [Complied]

6     BY MR. RUDY:

7          Q.   This is what Fannie Mae told investors when they

8     released their second quarter results in 2012.  Correct?

9          A.   Yes.

10         Q.   Fannie Mae reports net income of 5.1 billion for

11    second quarter 2012.  Right?

12         A.   Yes.

13         Q.   Sub headline, "Net income of 7.8 billion for first

14    half of 2012 demonstrates company's long-term earnings

15    potential."  Right?

16         A.   Yes.

17              MR. RUDY:  If we could scroll down a little bit.

18    There's a quote from Mr. Mayopoulos.

19              MS. McGUIRE:  [Complied]

20    BY MR. RUDY:

21         Q.   Do you see this quote from Mr. Mayopoulos?

22         A.   I'm looking at it, yes.

23         Q.   Okay.

24              He says, "'Better market conditions and our

25    actions to strengthen Fannie Mae's new business and limit

                         CROSS - SATRIANO

1   losses from the company's legacy business contributed to

2   positive second-quarter results,' said Timothy J.

3   Mr. Mayopoulos, President and CEO.  'While it was too early

4   to declare a national housing recovery and our results for

5   the second half of 2012 may not be as strong as the first

6   half, we expect our financial results in 2012 to be

7   substantially better than the past few years.'"  Right?

8        A.   Yes.

9             MR. RUDY:  Okay.  You can pull that down.

10            MS. McGUIRE:  [Complied]

11            MR. RUDY:  Actually, can you put it back up and

12   show Page 7?

13            MS. McGUIRE:  [Complied]

14   BY MR. RUDY:

15        Q.   Do you see this bar chart?

16        A.   Yes, I do.

17        Q.   Okay.

18             "This chart shows that, since Quarter 4 of 2008,

19   Fannie has almost always drawn more from the Treasury than

20   it has paid Treasury, but in the last two quarters, Fannie

21   has actually paid Treasury more than its drawn."  Is that

22   right?

23        A.   Yes, it is.

24        Q.   Okay.

25             That's what -- the orange bar is the draw and the

CROSS - SATRIANO

1    blue bar is the payment.  Right?

2         **A.**   Yes, it is.

3              **MR. RUDY:**  Okay.  You can pull this down.

4              **MS. McGUIRE:**  [Complied]

5              **MR. RUDY:**  We'll put up PX-596, not in evidence

6    just for the witness at this time.

7              **MS. McGUIRE:**  [Complied]

8    **BY MR. RUDY:**

9         **Q.**   Mr. Satriano, I'll just scroll through the first

10   few pages because I'm going to ask you the same question.

11   Does this appear to be Freddie Mac's press release?

12        **A.**   Yes, it does.

13             **MR. RUDY:**  I'm going to move 596 into evidence.

14             **MR. HOFFMAN:**  No objection.

15             **THE COURT:**  Received.

16        (Plaintiffs' Exhibit 596 was received.)

17             **MR. RUDY:**  Okay.  Let's go to Page 6 and I'd like

18   you to highlight the headline again.

19   **BY MR. RUDY:**

20        **Q.**   Do you see the headline of Freddie Mac's second

21   quarter press release is "Freddie Mac reports net income of

22   3 billion, comprehensive income of 2.9 billion for second

23   quarter 2012."  Right?

24        **A.**   Yes.

25        **Q.**   No Treasury draw required.  See that?

                         CROSS - SATRIANO

1       **A.**   I see it.

2       **Q.**   Okay.  And let's go to the quote from the CEO,

3  Don Layton.  Do you see that?

4       **A.**   Yes, I do.

5       **Q.**   "Freddie Mac's commitment to helping homeowners

6  enabled 5.9 million borrowers to refinance or avoid

7  foreclosure since the financial crisis began, said Freddie

8  Mac CEO, Don Layton.  Our work continued during this

9  quarter.  We helped over 350,000 families," et cetera.

10      "At the same time, our financial results enabled

11  us to avoid an additional draw from the U.S. Treasury

12  despite paying a $1.8 billion cash dividend to the nation's

13  taxpayers."  Right?

14       **A.**   Yes.

15       **Q.**   That's how the CEO is announcing the results to

16  the world.  Right?

17       **A.**   Yes.

18       **Q.**   And let's go to the bar chart on Page 7.  Similar

19  bar chart, except an annual rather than quarterly draws

20  versus payments.  Right?

21       **A.**   Yes.

22       **Q.**   So you see, again, whereas, over the last few

23  years, Freddie Mac has drawn more than it's paid and now

24  that trend is reversing in 2012.  Right?

25       **A.**   Yes, it is.

CROSS - SATRIANO

1          **MR. RUDY:**  Okay.  We can pull this down.

2          **MS. McGUIRE:**  [Complied]

3     BY MR. RUDY:

4          **Q.**   Mr. Satriano, I want to ask you some questions

5     about deferred tax asset, DTAs.  Okay?

6          **A.**   Yes.

7          **Q.**   The jury has heard some of this.  They're getting

8     an education in tax law, right, or taxation and accounting.

9     Right?

10         **A.**   Sure.

11         **Q.**   Okay.  So you agree that a deferred tax asset is

12    like a deduction that can only be used if the company has

13    taxable income?

14         **A.**   That's correct.

15         **Q.**   So if Fannie Mae and Freddie Mac owe taxes in the

16    future and they have deferred tax assets, they can just

17    apply those assets against the future income to reduce their

18    tax bill.  Right?

19         **A.**   That's the -- that's the operation, yes.

20         **Q.**   And a DTA is written down when the company thinks

21    it's not going to actually have taxable income, so it can't

22    use the tax credit.  Right?

23         **A.**   Yes.

24         **Q.**   And you testified about a valuation allowance,

25    which is what the company creates as an offset against that

                        CROSS - SATRIANO

1    tax asset if they think they're not going to be able to use

2    it?

3           **A.**   Yes.

4           **Q.**   Or the colloquial way of saying that as it's

5    written down?

6           **A.**   Right.  Yes.

7           **Q.**   So when the company thinks it can use the deferred

8    tax asset, it reverses the allowance or it writes back up

9    the DTA.  Right?

10          **A.**   Yes.

11          **Q.**   And sustained profitability, would that be a

12   significant positive factor in determining whether to write

13   up a DTA?

14          **A.**   Yes, it would.

15          **Q.**   Okay.  So starting in 2008, Fannie and Freddie

16   started writing down their DTAs.  Is that right?

17          **A.**   Yes.

18          **Q.**   And it was a massive write-down.  Right?

19          **A.**   It was very large.

20          **Q.**   About a hundred billion between the two companies?

21          **A.**   I'll take your word for it.

22          **Q.**   Give or take?

23          **A.**   Give or take, yeah.

24          **Q.**   And that was a huge paper loss for both Fannie and

25   Freddie.  Right?

                       CROSS - SATRIANO

1      **A.**   So, yes, it was a huge loss following U.S.

2  generally accepted accounting principles.

3      **Q.**   But what I mean by paper loss is they didn't lose

4  a hundred billion dollars of like -- they didn't spend more

5  than they were taking in, like a -- you know, if you own a

6  store and you had a hundred-billion-dollar loss because

7  you're not selling your products, it's not like that.

8  Right?  It's a paper loss.  It's a GAAP write-down.

9  Correct?

10         **MR. HOFFMAN:**  Objection.  Vague.  Confusing.

11         **THE COURT:**  Overruled.

12  **BY MR. RUDY:**

13      **Q.**   Do you understand the question?

14      **A.**   No, I don't.

15      **Q.**   Let me try again.

16      **A.**   By paper, do you mean a cash loss?

17      **Q.**   Not a cash loss, a paper loss meaning it's an

18  accounting write-down but it's not an actual loss of

19  revenues or profits like in a normal business.  Right?

20      **A.**   So at that time, Fannie Mae and Freddie Mac were

21  required to follow U.S. GAAP, which requires that type of

22  accounting.  It's called accrual accounting, and so they

23  were following the accounting rules that those were the

24  results.

25      **Q.**   I'm not quibbling with the decision to write it

CROSS - SATRIANO

1    down, just to be clear.  I understand -- you agree they had

2    to do it.  They had to write them down.  Right?

3         **A.**    Right.

4         **Q.**    But they weren't -- they didn't lose a hundred

5    billion dollars.  Right?  The write-down caused their net

6    worth to go down.  Right?

7         **A.**    So the asset had to be written down, so they lost

8    the value of that asset.  And so they did have some loss

9    relative to their financial statements.

10        **Q.**    Their actual cash losses were a very small

11   proportion of the amount of their actual losses for

12   accounting purposes.  Right?

13              **MR. HOFFMAN:**  Objection.

14              **THE COURT:**  Overruled.

15              **THE WITNESS:**  Can you be more specific?  Are you

16   talking in total?  Are you talking about the deferred tax

17   asset component?

18   **BY MR. RUDY:**

19        **Q.**    I'm going to move on.

20        **A.**    Okay.

21        **Q.**    In 2013, these DTAs were reversed or written back

22   up.  Right?

23        **A.**    They were.

24        **Q.**    And that sent about $75 billion to the Treasury

25   Department just from the DTA write-up.  Right?

                         CROSS - SATRIANO

1      A.     I assume you're talking about Fannie and Freddie

2   collectively?

3      Q.     Yes.

4      A.     Yeah, that's about the number.

5      Q.     So in August of 2012, before the net worth sweep,

6   you knew and FHFA knew that Fannie and Freddie were sitting

7   on these enormous written-down DTAs.  Right?

8      A.     Yes.   That's what they were disclosed.

9      Q.     And the combined amount of DTAs they were sitting

10  on at that time was about 100 billion.  Right?

11     A.     Somewhere around there, yes.

12     Q.     And FHFA knew that, whenever it happened, if those

13  DTAs were reversed and written back up, that would cause a

14  huge amount of money -- of accounting of net worth to come

15  back on to the balance sheet.  Right?

16     A.     It would cause a significant increase in income

17  that would yield, you know, a higher net income for the

18  period in which the reversal occurred.

19     Q.     Right.

20            So you never did any -- among the things you

21  didn't do any written analysis of, you never did any sort of

22  a written analysis of the potential effects of a DTA

23  write-back-up for Fannie and Freddie.  Right?

24     A.     No, but I had the -- I was reviewing their own --

25  sorry.  I was reviewing their analyses on a

                        CROSS - SATRIANO

1    quarter-over-quarter basis, and so I had an understanding of

2    what the accounting standards required and that they were

3    complying with the accounting standards and producing

4    transparent and complete numbers.

5         **Q.**   Okay.

6              So just to be clear what you mean by that answer,

7    I'm asking you about what they're looking forward at.  The

8    DTA memos, we're going to get to those, the couple of memos.

9         **A.**   Okay.

10        **Q.**   They are decided as of the actual quarter.  Right?

11        **A.**   Yes, they are.

12        **Q.**   I'm asking you whether there was any analysis done

13   of future write-ups of the DTA?

14        **A.**   So in those memos there are forecasts.

15        **Q.**   There are forecasts of profitability, but there's

16   not forecasts of whether the DTA will be written up.  Right?

17        **A.**   So in order to make a decision about whether to

18   write up or write down the DTA, management is required --

19   Fannie Mae and Freddie Mac management is required to assess

20   the positive elements and negative elements and make an

21   assessment whether it is more likely than not that the

22   positive outweighs the negative or does the negative

23   outweigh the positive.

24        **Q.**   So it's a build-up methodology?

25        **A.**   There's not an analysis of -- I think you're

                      CROSS - SATRIANO

1    describing it is not the way the accounting rules work.

2         **Q.**    The way I'm describing it, I'm asking you is, Was

3    there any analysis done by your office of the potential for

4    Fannie or Freddie to write up the DTAs and what that would

5    do?

6         **A.**    No, there was no written analysis -- on that

7    topic.

8         **Q.**    Thank you.

9              So Fannie Mae wrote up its DTA in the first

10   quarter of 2013.  Right?

11        **A.**    Yes.

12        **Q.**    And that write-up put approximately $50.6 billion

13   back onto Fannie's books.  Right?

14        **A.**    That number was represented as net income.   I

15   don't know if it's written on their books but...

16        **Q.**    Okay.  Would you like to look at a document?

17        **A.**    If that would help.

18        **Q.**    Sure.

19             **MR. RUDY:**  Let's pull up PX-344.

20             **MS. McGUIRE:**   [Complied]

21             **MR. RUDY:**  This is Fannie Mae's first quarter 2013

22   Form 10-Q.  I don't recall if this is in evidence, but I

23   don't need to show it to the jury.

24   **BY MR. RUDY:**

25        **Q.**    Let me just ask you to look at Page 6.  And I'll

                         CROSS - SATRIANO

1    just ask you whether you could look at this.

2            And then answer my question, if you recall that

3    the write-up at Fannie Mae of the DTA put $50.6 billion back

4    onto Fannie Mae's books in the first quarter?

5        A.    Yes.

6            **MR. RUDY:**   Thank you.  You can pull it down.

7            **MS. McGUIRE:**   [Complied]

8    BY MR. RUDY:

9        Q.    And that $50.6 billion was recorded as part of

10   Fannie's comprehensive income.  Right?

11       A.    Yes, it was.

12       Q.    And the same thing happened at Freddie Mac, but it

13   happened in the third quarter.  Right?

14       A.    Yes.

15       Q.    So in the third quarter, Freddie Mac wrote back up

16   its DTA, and that bought $24 billion back onto Freddie Mac's

17   books.  Right?

18       A.    Yes.

19       Q.    So, collectively, the DTA write-ups of Fannie and

20   Freddie collectively brought about $75 billion in income in

21   the books back onto these company's books in 2013.  Right?

22       A.    Yes.

23       Q.    In the first year that the net worth sweep took

24   effect.  Right?

25       A.    Yes.

                        CROSS - SATRIANO

1      Q.    When I was asking you a moment ago whether there

2    was any analysis done by FHFA about the DTA write-ups,

3    nobody at FHFA wrote any sort of analysis of what might

4    happen if these DTAs that they're sitting on, this $100

5    billion of assets were written back up, nobody at FHFA wrote

6    any sort of a memo analyzing the effect of what would happen

7    in the event of a net worth sweep.  Is that your testimony?

8      A.    What we did at FHFA --

9      Q.    I asked you if there was a memo.  Is that a

10   yes-or-no question?

11     A.    There's a presentation that I prepared and

12   presented to many people within the agency.

13     Q.    [Inaudible]

14     A.    So it wasn't in a memo form, but it was in a

15   presentation form.

16     Q.    Okay.

17           So you're saying that you showed up at a meeting

18   with no notes and you just talked about what might happen.

19   Is that what you're saying?

20     A.    No, that's not what I said.

21     Q.    Okay.

22           Well, you showed up at a meeting with nothing in

23   writing and you started talking; is that right?

24     A.    The question I heard was, Did FHFA or the Office

25   of the Chief Accountant prepare any analysis about the

                        CROSS - SATRIANO

1    deferred tax assets in the timeframe -- I'm assuming you are

2    talking about 2012/2013; is that correct?

3         **Q.**   Yes.  Uh-huh.

4         **A.**   So I didn't write a memo, but we prepared several

5    different PowerPoint presentations discussing the issue and

6    the potential implications and the actions that the agency

7    was taking during that time.

8         **Q.**   Okay.

9              So you say you created a PowerPoint presentation

10   analyzing the potential for DTA write-up?

11        **A.**   And discussing and summarizing the issue, yes.

12        **Q.**   Okay.

13             So never produced in this case.  Where is it?

14             **MR. HOFFMAN:**  Objection, Your Honor.

15   Characterize --

16             **MR. RUDY:**  I asked him where is it.

17             **MR. HOFFMAN:**  Objection, Your Honor.  May we go to

18   the phone, Your Honor?

19             **THE COURT:**  Overruled.

20         (Sidebar discussion.)

21             **MR. HOFFMAN:**  Can you hear me, Your Honor?

22             Your Honor, Ian Hoffman on behalf of the

23   defendants.

24             I think it is objectionable to call out to the

25   jury and ask questions about what was produced in discovery

                      CROSS - SATRIANO

1    or not.  We're well beyond the discovery phase here, and any

2    issues related to discovery are not pertinent and, to the

3    jury, not relevant to be highly prejudicial.

4           **THE COURT:**  Rephrase the question of, Does he have

5    a copy?  Has he seen a copy lately?  You don't have to say

6    what about discovery.

7           (Sidebar discussion concluded.)

8           **THE COURT:**  He's going to rephrase the question.

9    **BY MR. RUDY:**

10     **Q.**   Okay.

11          When is the last time you saw this PowerPoint?

12     **A.**   In the last year.

13     **Q.**   Where?

14     **A.**   On my computer.

15     **Q.**   And did you give a copy of it to your lawyers to

16    turn over in this case?

17     **A.**   You would have to ask my lawyers.

18     **Q.**   I am asking you.

19     **A.**   I believe this was turned over, yes, as part of

20    the discovery in the multiple cases.

21     **Q.**   Okay.

22          So let's talk about it.  So you're saying that

23    there's a PowerPoint analyzing what would happen in the

24    event of a DTA write-up in the event of a net worth sweep?

25     **A.**   Yes, I believe that's what we tried to highlight

CROSS - SATRIANO

1      for stakeholders at the FHFA.

2           Q.    Okay.  So FHFA knew that, if the DTAs were written

3      back up, that that would send potentially $75 billion back

4      onto the books of these companies, and it would be swept to

5      the Treasury?  That's something FHFA knew before the net

6      worth sweep?  Is that your testimony?

7           A.    I don't know the exact date of it, but I believe

8      that, generally, when I explained the accounting issues at

9      the agency, that's how we described it, that if the

10     valuation allowance was removed because the situation

11     depended -- dictated that it should be, that the result

12     would be -- that that write-up would get reflected in net

13     income causing a large increase in the net worth for that

14     period, yes.

15          Q.    And did your PowerPoint that's on your computer

16     somewhere actually analyze the likelihood of whether or when

17     that would happen?

18          A.    I don't recall that specific component.

19          Q.    How many slides are on the PowerPoint?

20          A.    Um, 15 or 20.

21          Q.    Fifteen or 20?

22          A.    Yes.  Yeah, maybe.

23          Q.    What else is it saying?  Isn't that the main

24     question is what's going to happen?

25          A.    I think we were trying to explain how it happens,

                         CROSS - SATRIANO

1    the process by which a company is required to go through and

2    analyze their financial information and their prospects for

3    taxable income in order to come to the conclusion.

4        Q.   So you're just talking about the mechanics of what

5    would happen hypothetically.  Is that what you're saying?

6        A.   I think people could -- I think it was clear from

7    looking at the balance sheet, what the number of the

8    write-off was and, if that was reversed in total, it would

9    come into net income.  I think that was -- people understood

10   that.

11       Q.   People means FHFA?

12       A.   Yes, I'm sorry.  People at FHFA.

13           MR. RUDY:  I'm receiving a flurry of notes.  Hold

14   on a second.

15       (Brief pause.)

16   BY MR. RUDY:

17       Q.   Just to clarify, this PowerPoint was created

18   before the net worth sweep?

19       A.   Sitting here today, I don't have the date exactly

20   in my head.

21       Q.   Well, it wouldn't really make a lot of sense to

22   analyze the potential for the DTAs being reversed and, you

23   know, put back on the books of Fannie and Freddie after it

24   had already happened.  Right?  That wouldn't make much sense

25   as a PowerPoint, would it?

                        CROSS - SATRIANO

1       **A.**   I agree it wouldn't make sense, but I don't know

2   the exact date I guess is my testimony.

3       **Q.**   Right.  And I was just asking, that PowerPoint was

4   created before the net worth sweep.  Right?

5       **A.**   Perhaps.  Since I don't know the date, sitting

6   here today, I can't say yes or no.  I'm sorry.

7       **Q.**   So when these DTAs were written back up in 2013 --

8       **A.**   Yes.

9       **Q.**   -- and put all this extra money back on their

10  books --

11      **A.**   Yes.

12      **Q.**   -- they didn't actually have extra cash.  Right?

13  The enterprises didn't get $75 billion of cash into the

14  companies when that happened.  Right?

15      **A.**   Right.  That's not how the accounting works.

16      **Q.**   Right.  But with the net worth sweep, Fannie and

17  Freddie actually owed cash to the Treasury Department.

18  Right?

19      **A.**   Yes, they did.

20      **Q.**   Okay.

21          So tell me if I am right.  As a result of the

22  reversal of the DTAs and all of this additional money coming

23  onto the books of Fannie and Freddie, Fannie and Freddie now

24  had to pay an enormous amount of money to the Treasury that

25  they didn't have.  Right?

                        CROSS - SATRIANO

1    **A.**   They had to pay based on what they had previously

2    drawn from the commitment, yes.

3    **Q.**   Well, they had to pay their entire net worth in

4    2013 --

5    **A.**   Right.

6    **Q.**   -- to the Treasury Department.  Right?

7    **A.**   Yes.

8    **Q.**   And these write-ups wrote their net worth way up.

9    Right?

10   **A.**   Yes.

11   **Q.**   But along with the net worth going up, they didn't

12   actually get the cash to pay the money to the Treasury

13   Department.  Right?

14   **A.**   Right.

15        So these are accrual accounting adjustments and

16   those are the rules.

17   **Q.**   Right.

18        I mean, so like if my house goes up in value, I

19   don't have more money in my bank account.  Right?

20   **A.**   That's right.

21   **Q.**   Okay.

22        So --

23   **A.**   Well, I don't know.  You tell me.  Your bank

24   account.

25   **Q.**   I think you understand the point.

                    CROSS - SATRIANO

1          So what Fannie and Freddie actually had to do in

2     that situation is they had to go out and borrow money to pay

3     the Treasury Department all of that dividend that was now

4     owed to the Treasury Department; is that right?

5          A.   In which period are you talking about?

6          Q.   2013, as a result of the net worth sweep and the

7     write-ups of the DTAs?

8          A.   I'm not familiar with the financing operations in

9     order -- what Fannie Mae did.

10         Q.   I'm going to show you DX-663.  This is Fannie

11     Mae's 2013 second quarter 10-Q.  Do you recognize that

12     document?

13         A.   I do.

14             MR. RUDY:  Can we turn to Page 45?

15             MS. McGUIRE:   [Complied]

16     BY MR. RUDY:

17         Q.   I've highlighted a passage for you.  I'll just ask

18     you the question again.  Did Fannie and Freddie have to

19     actually go out and borrow the money to pay the dividend to

20     Treasury?

21         A.   Yes, they did.

22         Q.   How much did they have to borrow?

23         A.   It doesn't say in this call-out.

24         Q.   It says they paid $63.6 billion to Treasury during

25     the first half of 2013.  Right?

                         CROSS - SATRIANO

1      **A.**    Yes.

2      **Q.**    And it says the increase -- it says, "overall debt

3      funding activity increased in the first half of 2013

4      compared to the first half of 2012.  This increase was

5      primarily due to an increase in debt issuances in the first

6      quarter of 2013 due to the possible need to pay a

7      significant dividend payment to Treasury in the second

8      quarter of 2013."

9           So you don't know how much they actually had to go

10     out and borrow but they owed this $63.6 billion and they

11     didn't have it.  Right?

12     **A.**    No, I don't know how much they actually went into

13     the market to borrow to help support that.

14     **Q.**    But you know they didn't have it?

15     **A.**    Yeah.  I know they didn't have it if they borrowed

16     money.

17          **MR. RUDY:**  You can take this down.  Thanks.

18          **MS. McGUIRE:**  [Complied]

19     BY MR. RUDY:

20     **Q.**    You were asked about -- we talked a little bit a

21     moment ago about these memos that were written each quarter

22     at Fannie and Freddie where the companies make the

23     determination whether or not to write up the DTAs.  Right?

24     **A.**    Yes.

25     **Q.**    Your counsel asked you some questions about those?

CROSS - SATRIANO

1    **A.**   Yes, he did.

2    **Q.**   Okay.

3         So, first, let me just can ask you.  Who -- let's

4    take Fannie Mae first.

5    **A.**   Okay.

6    **Q.**   Who at Fannie Mae makes that decision whether or

7    not to reverse the DTA valuation allowance at the end of a

8    quarter?

9    **A.**   So I think it starts with a memo prepared

10   primarily by the tax team.  At Fannie Mae, I think it was

11   the Vice President of Tax, Vicki Lyons.

12        It is reviewed and approved by several layers of

13   management above her.  I think the memo stated Chryssa

14   Halley and a controller, Greg Fink.  And then it would be

15   ultimately approved further up the food chain by the CFO.

16   **Q.**   The food chain at Fannie Mae?

17   **A.**   At Fannie Mae, yes.

18   **Q.**   So this is entirely a management decision at

19   Fannie Mae.  Right?

20   **A.**   So as part of that process, FHFA is getting early

21   drafts of the filings and these types of memos as well.

22   **Q.**   Right.  So you're in the loop but you're not

23   making the decision.  Right?

24   **A.**   Right.  So management prepares the financial

25   statements.  Management at Fannie Mae and Freddie Mac

                        CROSS - SATRIANO

1    prepare the financial statements.

2         Q.    Right.  But you're not in the meetings.  Right?

3         A.    Some of the meetings I'm in and some of them I'm

4    not.

5         Q.    Right.  But the decision whether or not to write

6    back up a DTA allowance is a management decision.  Right?

7         A.    Yes, it is.

8         Q.    It's not a board decision.  Right?

9         A.    The board would have oversight, especially the

10   audit committee related to significant accounting estimates

11   of which this is one of them.

12            So typically, they would have to bring a summary

13   memo of their conclusion or more like a PowerPoint

14   presentation of their conclusion to the audit committee for

15   review and discussion.  So there's oversight but, yes, the

16   management makes the decision and then there's different

17   versions of oversight to make sure of the completeness and

18   transparency of it.

19        Q.    But we can agree that the Board of Directors

20   oversees the entire company.  Right?

21        A.    Yes.

22        Q.    But the decision is made by management, and that

23   decision whether to write a DTA up is not a decision made at

24   the board level.  Right?

25        A.    Right.

                    CROSS - SATRIANO

1      **Q.**    Okay.

2           It's made at the management level, and it's

3      overseen by the audit committee.  Right?

4      **A.**    Yes.

5      **Q.**    And the audit committee is just a part of the

6      board of directors.  Right?

7      **A.**    Yes.

8      **Q.**    A committee of the full board?

9      **A.**    Yes.

10          **MR. RUDY:**  Let's put up DX-472-A.

11          **MS. McGUIRE:**  [Complied]

12     **BY MR. RUDY:**

13     **Q.**    So this is what you referred to as the memo that

14     Freddie Mac prepared to decide to write up the -- whether or

15     not to write up the DTA valuation allowance at the end of

16     the second quarter of 2012.  Right?

17     **A.**    That's their memo, yes.

18     **Q.**    And you were asked about the date that's

19     highlighted up here, August 1st.  Right?

20     **A.**    Yes.

21     **Q.**    And you -- you recognize, though, that the date is

22     August 1st, but this is a decision made as of June 30th.

23     Right?

24     **A.**    This is a decision for the reporting period ending

25     June 30th.

CROSS - SATRIANO

1     Q.    Right.

2           So the fact that the decision is -- that the memo

3     may be completed four or five weeks later, doesn't affect

4     the fact that the only numbers that are being looked at are

5     numbers as of June 30th.  Right?

6     A.    Primarily, yes.

7     Q.    What do you mean "primarily"?

8     A.    I think management is responsible for subsequent

9     events and, depending on the type of subsequent event, they

10    may be required to include that information in the financial

11    statements via disclosure or even perhaps via -- if they

12    determine that that subsequent event actually related to

13    activity that happened before the period closed, they would

14    have to make an adjustment to the financial statement.

15          So they have some obligation to keep the estimate

16    current until the filing actually occurs.

17    Q.    This isn't filed.

18    A.    So this is the basis for the numbers in the

19    filing.

20    Q.    In what filing?

21    A.    In the SEC filing for the second quarter of 2012.

22    Q.    Yes, you're talking about the Form 10-Q?

23    A.    Yes, I am.

24    Q.    I'm asking about this memo.  This is an internal

25    memo.  Right?  It's not filed?

CROSS - SATRIANO

1      **A.**    So this internal memo provides the support for the

2   numbers and disclosures that are in the 10-Q.

3      **Q.**    I understand that.

4      **A.**    Okay.

5      **Q.**    But I'm asking you whether this is a memo as of

6   June 30th.

7           There's nothing in this memo -- I mean,

8   hypothetically, maybe you would need to use subsequent

9   events.  I guess is that what you're saying?  There's

10  nothing in this memo that says they relied on anything after

11  June 30th.  Right?

12     **A.**    Right.

13     **Q.**    Okay.

14          So when you testified that this analysis was --

15     **A.**    I don't know every page of this memo without

16  looking at it, but, conceptually, I agree with you.

17     **Q.**    Right.

18          Well, if it doesn't say anything in this memo

19  about, We looked at things after June 30th, the assumption

20  is they are looking at numbers as of June 30th.  Right?

21     **A.**    Yes.

22     **Q.**    So when you testified about how this decision was

23  made right before the net worth sweep on August 17th, not

24  exactly right.  Is it?

25     **A.**    No, it is right.

CROSS - SATRIANO

1       Q.   Well, the decision was made, but it's based on

2   numbers that happened a month earlier.  Right?

3       A.   That's right.

4       Q.   Okay.

5            And that's the same thing for the Fannie Mae

6   document right, 499-A?  I'll ask him to put it up --

7       A.   No.  No.  No.  Fannie Mae's memo?

8       Q.   Yes.

9       A.   Yes.

10      Q.   For Fannie Mae's memo, it has a date of July 27th

11   but, again, this is a June 30th --

12      A.   June 30th period --

13      Q.   Right.

14      A.   -- prepared after --

15      Q.   Right.  Based on numbers as of June 30th?

16      A.   Yes, that's correct.

17      Q.   Thank you.

18           And you agree with me that each of these memos

19   essentially are weighing positive evidence against negative

20   evidence.  Right?

21      A.   Yes.

22      Q.   And you agree with me that, when management does

23   that weighting, they weigh past results much more heavily

24   than future projections.  Right?

25      A.   Yes.

                        CROSS - SATRIANO

1    Q.   And I think your testimony on direct was that

2   forecasts are difficult to use as positive evidence,

3   especially after a period of sustained losses.  Right?

4    A.   Yes, that was the wording Freddie Mac used in

5   their -- as their justification and I agree with it.

6    Q.   And you agree with it.

7        So the decision whether to reverse a DTA

8   write-down, you mentioned that, to reverse it, basically

9   management needs to find that it's more likely than not that

10   the GSE would be able to use the DTA in the future.  Right?

11    A.   So that there is enough positive evidence -- more

12   likely than not that there is enough positive evidence to

13   overcome the negative evidence that exists.  Right.

14    Q.   And another way to say that is it's like a

15   51 percent standard.  Right?

16    A.   Yeah.  Fifty-one, more likely than not.

17    Q.   And do you agree that small changes in the

18   weightings or different perspectives could easily change the

19   conclusion of that analysis?

20    A.   Yes, I do.

21        MR. RUDY:  Let's pull up DX-472-A, Page 7.

22        MS. McGUIRE:  [Complied]

23   BY MR. RUDY:

24    Q.   And this is the -- I'll highlight the quote that

25   you -- I'll find it.

CROSS - SATRIANO

1          (Brief pause.)

2              **MR. RUDY:**  In the paragraph that starts with "In

3     order," the second sentence, "Forecasts become more

4     difficult," can you highlight that sentence?

5              **MS. McGUIRE:**  [Complied]

6     BY MR. RUDY:

7         **Q.**   This is what we were just talking about.

8         **A.**   Can you just ground me?  Is this Freddie Mac's

9     document?

10        **Q.**   It is.  I can't testify but I'm showing you

11    different pages.

12        **A.**   Sorry.  I didn't see the first page.

13        **Q.**   Sure.

14        **A.**   Thank you.

15        **Q.**   So it says, "Forecasts become more difficult to be

16    used as positive evidence when there are cumulative losses."

17    Then it says, "Future income projections following a

18    cumulative loss are inherently subjective since a return to

19    profitability often involves a turnaround plan that has not

20    yet been demonstrated."  Do you agree with that?

21        **A.**   Yes, that's what it says.

22        **Q.**   And do you agree with that as just a general

23    matter of accounting principles that future projections

24    don't have the same weight under the accounting rules as

25    past results?

                          CROSS - SATRIANO

1        A.    Yes, I agree with that.

2        Q.    The things that have already happened have a lot

3    more significant when you're doing this 51-percent weighing.

4    Right?

5        A.    Yes.

6        Q.    Let's look at Page 4 of this document.

7            MR. RUDY:   There's a chart in the middle of the

8    page there.

9            MS. McGUIRE:   [Complied]

10   BY MR. RUDY:

11       Q.    This is actually visually depicting Freddie Mac's

12   last several years of losses or profits.  Right?

13       A.    Yes.

14       Q.    Okay.  So for 2010, there was a loss of $15.462

15   billion.  Right?

16       A.    Yes.

17       Q.    2011, a loss of $6.19 billion.  Right?

18       A.    Yes.

19       Q.    And the forecast for 2012 is profits of $6.558

20   billion.  Right?

21       A.    Yes.

22       Q.    But what you're saying is, even though you're

23   looking at that huge change, I mean, that's like a $12

24   billion swing year to year.  Right?

25       A.    Yes, that is, from 2011 to the forecast of '12.

                        CROSS - SATRIANO

1      **Q.**    Right.

2             And massive change over the last four years.

3    Right?

4      **A.**    Yes, it's a significant change.

5      **Q.**    But under the accounting rules, you have to weight

6    the prior results way heavier than those projected results.

7    Right?

8      **A.**    Yes.  The three-year cumulative loss is a

9    significant component in the analysis.

10            **MR. RUDY:**  Okay.  Let's look at DX-499-A.

11            **MS. McGUIRE:**  [Complied]

12         (Published exhibit.)

13   **BY MR. RUDY:**

14     **Q.**    This is the Fannie Mae memo.  Correct?

15     **A.**    Yeah, the cover letter, yeah.

16     **Q.**    Let's look at Page 8, top paragraph.  This is what

17   Fannie Mae's DTA committee was projecting about the future.

18   Right?

19         (Brief pause.)

20     **Q.**    Have you had a chance to read the paragraph?

21     **A.**    Yes, I have.  Thank you.

22     **Q.**    Do you see that the forecasted cumulative

23   five-year net interest income increased from 90.8 billion in

24   the March forecast to 94.7 billion in the May forecast?

25     **A.**    Yes, I see that.

                          CROSS - SATRIANO

1    **Q.**    Okay.

2        **MR. RUDY:**    Let's turn to Page 5 of this document.

3        **MS. McGUIRE:**    [Complied]

4        **MR. RUDY:**    And let's highlight -- under "current

5    forecast," let's highlight those next three paragraphs.

6    Yep.

7        **MS. McGUIRE:**    [Complied]

8    **BY MR. RUDY:**

9    **Q.**    So you were asked about this on direct

10   examination.   Right?

11   **A.**    The first paragraph, yes.

12   **Q.**    And you gave -- well, let's first, I don't know if

13   you were asked to read the first two sentences.   So let's do

14   that.

15   **A.**    Okay.

16   **Q.**    "Over the four-year period of 2012 to 2015, the

17   company is forecasting GAAP income.   The company expects our

18   total loss reserves peaked as of December 31, 2011 and will

19   not increase in the foreseeable future."   Right?

20   **A.**    Yes.

21   **Q.**    And then you were asked some questions about

22   dividends, right, and you gave some testimony about circular

23   draws.   Right?

24   **A.**    Yes, I did.

25   **Q.**    It doesn't say anything about dividends or

CROSS - SATRIANO

1    circular draws in here, does it?

2        **A.**    No, I wasn't asked the question of whether that

3    was on this piece of paper.

4        **Q.**    Do you recall the question you were asked?

5        **A.**    I think I was asked, What was my understanding of

6    what the disclosure was trying to convey.

7        **Q.**    This disclosure is trying to convey something that

8    it doesn't say?

9        **A.**    We were comparing this to the other disclosure.

10       **Q.**    What other disclosure?  The 10-Q?

11       **A.**    That counsel showed me.

12       **Q.**    I'm asking what you're comparing it to.

13       **A.**    The $11.7 billion dividend obligation.

14       **Q.**    So you took a number that's not on the page and

15   you compared it to what the DTA committee was looking at

16   when they write, this is what our future forecast looked

17   like.  And you're giving the jury your analysis of the

18   relevance of this information coupled with this other

19   document that's not in front of them.  Is that what you're

20   saying?

21       **A.**    I was answering the question asked.

22       **Q.**    You were answering the question that was asked?

23       **A.**    Yes.

24       **Q.**    Okay.

25            Do you agree with me that dividends don't factor

CROSS - SATRIANO

1    into whether Fannie has achieved sustainable profitability.

2    Right?

3         A.   The dividend payment?

4         Q.   Whether they owe dividends is not relevant as an

5    accounting matter to whether they have achieved sustainable

6    profitability.   Right?

7         A.   Yes, I agree with you.

8         Q.   So you agree with that.

9              So you agree that, whether or not Freddie or

10   Fannie owes these dividends, is not relevant to whether the

11   DTA will be written up or not.   Right?

12        A.   I'm sorry.   Can you repeat the question, please?

13        Q.   You agree with me that, whether or not Fannie or

14   Freddie owed dividends to the Treasury, is not relevant to

15   whether the DTA will be written up or not.   Correct?

16        A.   Correct.

17        Q.   That's under the accounting rules.   Right?

18        A.   What part is under the accounting rules?

19        Q.   What you just said.   What was your --

20        A.   I said, correct.

21        Q.   Okay.

22             So when you're testifying about a DTA write-up --

23        A.   Yes.

24        Q.   -- and the dividends aren't on the screen, and

25   you're talking about dividends in relation to sustainable

                         CROSS - SATRIANO

1    profitability, they have nothing to do with each other?

2    Those are apples and oranges.   Right?

3         A.    They are not apples and oranges, because the

4    dividend obligation gets paid from income.   Income is stated

5    on this page.   And what we were examining was, if we know

6    the dividend obligation for the same period of years and we

7    know Fannie's forecast of income over those four years, we

8    were making a comparison, is there enough in earnings to pay

9    the dividend?

10        Q.    That's not the question that this memo is being

11   asked.   Right?   This memo is trying to -- is analyzing the

12   question of whether the DTA is going to be written up, which

13   is a question of whether the company has achieved

14   sustainable profitability.   Right?

15        A.    Yes.   Counsel was asking me that question, and

16   that's why I answered it like that.

17        Q.    Okay.

18              Well, I'm asking you my questions now.

19        A.    Yeah.

20        Q.    And what I'm asking you is this memo has nothing

21   to do with dividends being paid to Treasury.   This memo is

22   analyzing whether the DTA will be written up.   Correct?

23        A.    This memo attempts to get to the right value of

24   the DTA, written up, written down, stay the same, yes.

25        Q.    Right.   Okay.   I'll move on.

                         CROSS - SATRIANO

1           Now, these memos from the second quarter of 2012,

2    there is nothing in these memos that says, not writing it up

3    in 2012, here is what we think we'll do next quarter or the

4    quarter after that.   Right?   Nothing in these memos like

5    that.   Right?

6        A.   Nothing that explicit that I recall.

7        Q.   It's a decision that's made each quarter as to

8    that quarter's numbers.   Correct?

9        A.   And the associated analyses that are incorporated

10   in that quarterly analysis.   Yes.

11       Q.   Right.

12           But you know --

13           MR. RUDY:   You can pull this down.

14           MS. McGUIRE:   [Complied]

15           MR. RUDY:   Thank you.

16   BY MR. RUDY:

17       Q.   You know that just two quarters later Fannie wrote

18   their DTA up.   Right?

19       A.   Yes, that's what happened.   And one quarter later

20   they did not.   Right?

21       Q.   Well, I think that's implicit in my question.   Two

22   quarters later implies the quarter in between the dividend.

23   Yes, two quarters later, they did.   Right?

24       A.   Yes.   So each quarter they do the analysis and,

25   when the facts and circumstances dictate that they change

                        CROSS - SATRIANO

1    their position, they did.

2        Q.    So there is no advance conclusion in these memos

3    of whether the DTA will be written up or written down in the

4    next quarter or the one after that.  Right?

5        A.    Yes.  There's not an advanced conclusion.

6        Q.    Okay.

7             Now, you know that Fannie and Freddie were talking

8    about the possibility of writing up their DTAs prior to the

9    net worth sweep.  Correct?

10       A.    Yes.  They were discussing their future

11   profitability in different forums.

12       Q.    And their future profitability was related to

13   whether they would end up needing to write up the DTA.

14   Right?

15       A.    Future profitability would assist in that

16   endeavor.

17       Q.    Right.

18             So you know that those conversations about future

19   profitability and the future profitability's effect on the

20   DTA was being talked about at Fannie and Freddie prior to

21   the net worth sweep.  Right?

22       A.    Can you be more specific about what you're saying?

23   "I know they're being talked about."  In what form are you

24   mentioning?

25       Q.    Are there conversations at the board level and at

CROSS - SATRIANO

1    the management level about whether or not Fannie and Freddie

2    will be in a position to be writing up their DTAs in the

3    not-so-distant future?

4        A.    So the one conversation that I am definitely aware

5    of, it was described by Jeff Spohn that the boards were

6    discussing the possibility of rerecording certain DTAs given

7    their view of expected profitability.  So I'm definitely

8    aware of that.

9             You may be aware of other discussions, but the

10   discussions that I participate in, you know, I'm the

11   accountant, are around these DTA memos and the conclusions

12   that are reached in those memos, which these same people

13   have approved and signed off on.

14       Q.    Right.  So you know that Susan McFarland was

15   Fannie's CFO in 2012.  Right?

16       A.    Yes.

17       Q.    You know that she was hand-selected by Mr. DeMarco

18   to have that job?

19       A.    Yes, she was picked by him, approved by him.

20       Q.    She had previously served as the CFO of Capital

21   One.  Do you know that?

22       A.    Yes, I believe that was her previous employer.

23       Q.    Did you think she was good at her job?

24       A.    I thought she did parts of her job very well.

25       Q.    In July or August of 2012, she told FHFA and

                          CROSS - SATRIANO

1    Treasury they should expect Fannie Mae might be writing up

2    their DTAs in the not-so-distant future and predicted the

3    number would be around $50 billion; isn't that right?

4         A.   I have no idea.

5         Q.   You have no idea?

6         A.   That she said that, no, I don't.

7         Q.   So you recall testifying at a prior proceeding in

8    this case about nine months ago.  Right?

9         A.   Yes, I recall the discussion.

10        Q.   Do you recall being asked that exact question at

11   that proceeding about nine months ago?

12        A.   No, I don't.

13        Q.   You don't recall being asked about whether you

14   knew that Susan McFarland had said in the not-so-distant

15   future that the DTAs would be written up and $50 billion is

16   going to come back onto the books?

17        A.   No, as I sit here today, I don't recall the

18   specifics of the question nor my answer.

19        Q.   Do you recall being asked anything at that prior

20   proceeding about what you knew about what Ms. McFarland had

21   said in this case?

22        A.   Prior to the DTA, I don't recall.  What I do

23   recall is that, when we did the analysis and she certified

24   the financial results as of 2-2-2012 at the end of -- early

25   August, end of July, that's what I knew that she -- that was

                         CROSS - SATRIANO

 1     her intent with respect to DTA.

 2          And then since I wanted to confirm that

 3     understanding, two weeks later I followed up with her in a

 4     two-on-one, in-person meeting to ask her about her thoughts

 5     about DTA write-up, all of those things that were in the

 6     meeting notes.

 7        Q.   Okay.  Respectfully, that didn't answer any

 8     question.

 9        A.   Okay.

10        Q.   My question was, Are you aware that she gave that

11     testimony in this case?

12        A.   No.  I'm not part of -- I don't know what her

13     testimony -- I don't know who has testified in this case.  I

14     don't know anything.  Sorry.

15        Q.   Okay.

16          But you don't recall nine months ago being asked

17     about what you knew about that?  I guess, in those nine

18     months, you didn't bother to check what she said in this

19     case to see if maybe it was different from what you think?

20          MR. HOFFMAN:  Objection, Your Honor.

21          THE COURT:  Sustained.

22     BY MR. RUDY:

23        Q.   If she testified in this case that she told FHFA

24     and Treasury in July or August of 2012 before the net worth

25     sweep that she predicted that Fannie would be writing back

                    CROSS - SATRIANO

1    up its DTA by about $50 billion in the not-so-distant

2    future, you would have no reason to believe that she isn't

3    telling the truth about that?

4          **MR. HOFFMAN:**  Objection, Your Honor.

5          **THE COURT:**  Sustained.

6    BY MR. RUDY:

7        **Q.**   You're aware that, in the first quarter of 2013,

8    $50 billion of DTA write-up hit Fannie Mae's books.  Right?

9        **A.**   Yes, I am aware.

10         **MR. RUDY:**  I'm going to ask that we pull up

11   PX-259.

12         **MS. McGUIRE:**  [Complied]

13   BY MR. RUDY:

14       **Q.**   You were asked some questions about this on direct

15   examination.  You recall.  Right?

16       **A.**   Yes, I do.

17       **Q.**   This is an email chain between you and James

18   Griffin.  Right?

19       **A.**   Yes.

20       **Q.**   He worked for you at FHFA?

21       **A.**   Yes.

22       **Q.**   He was your deputy chief accountant when you were

23   the chief accountant?

24       **A.**   Yes, he was.

25       **Q.**   Fair to call him your right-hand man?

                         CROSS - SATRIANO

1      A.   I had two deputies, so right and left.

2      Q.   Okay.

3           And this email string was on August 14th.  Right?

4  Three days before the third amendment?

5      A.   Yes.

6           **MR. RUDY:**  Jan, if you could highlight the second

7  and third sentences?

8           **MS. McGUIRE:**  [Complied]

9  **BY MR. RUDY:**

10     Q.   "There was a question about rerecording certain

11 deferred tax assets that had been written-off.  Jeff

12 indicated both of the boards had discussed this at the last

13 meeting based on the view that they were going to be

14 profitable going forward."  Do you see that?

15     A.   I do.

16     Q.   Jeff is Jeff Spohn?

17     A.   I believe so.

18     Q.   And Jeff Spohn ran FHFA's conservatorship

19 operations?

20     A.   Yes.

21     Q.   And Jeff regularly attended Fannie and Freddie

22 board meetings.  Right?

23     A.   Yes.

24     Q.   And rerecording certain deferred tax assets means

25 writing up the DTAs.  Right?

                         CROSS - SATRIANO

1      **A.**   Yes, that's how I understand that sentence.

2      **Q.**   Do you agree with me that this email is saying

3  that, according to Jeff Spohn, both of Fannie and Freddie's

4  boards had already discussed the possibility of writing up

5  the DTA allowances prior to August 14th at their last board

6  meetings?

7      **A.**   I agree that they were discussing the issue, yeah.

8          **THE COURT:**   Is this a good breaking point?

9          **MR. RUDY:**   This is fine.  Sure.

10          **THE COURT:**   We will take 10 minutes.

11          **MR. RUDY:**   Thank you.

12      (Recess.)

13      (Discussion off the record at the bench.)

14      (Jury entered the courtroom.)

15          **THE COURT:**   You may be seated.

16      (Witness resumed the stand.)

17          **THE COURT:**   All right.  You may resume your

18  examination.

19          **MR. RUDY:**   Thank you, Your Honor.

20  **BY MR. RUDY:**

21      **Q.**   Good afternoon.

22          So right before the break, Mr. Satriano, we were

23  looking at this exhibit, PX-259.  And we had just read these

24  two highlighted sentences that say there's a question about

25  rerecording certain deferred tax assets -- could we display

CROSS - SATRIANO

1    this?

2              **DEPUTY CLERK:**  Yes.

3              **MR. RUDY:**  Thanks so much.

4    BY MR. RUDY:

5        **Q.**   -- that had been written off.  Jeff indicated both

6    of the boards had discussed this at the last meeting based

7    on the view that they were going to be profitable going

8    forward.  You see that.  Right?

9        **A.**   Yes, I see that.

10       **Q.**   So I just want to confirm that you understand that

11   the way you read this is that Jeff Spohn is saying that both

12   Fannie and Freddie's boards had discussed rerecording the

13   DTAs prior to August 14th; is that right?

14       **A.**   Well, there was a question, yeah.  And I assume

15   there was a follow-up discussion about it.  That's what I

16   understand from this email.

17       **Q.**   So you understand that, prior to August 14th, both

18   boards had talked about the possibility of rerecording the

19   DTAs before August 14th?

20       **A.**   Yes, I do.

21       **Q.**   And when you were asked questions about it on

22   direct examination, you went like this (Indicated.) with

23   your hands and you said, Hey, how about that DTA thing?  Do

24   you recall doing that?

25       **A.**   No, I don't.

                          CROSS - SATRIANO

1      **Q.**   Okay.

2            Well, that was your summary of what you believe

3      happened at the board meetings that they said, "Hey what

4      about that DTA thing?"  Do you recall that testimony?

5      **A.**   No, I don't.  Maybe you want to read it back to

6      me.

7      **Q.**   I don't have that ability.  I'm sorry.

8            But I'll just ask you, do you remember saying

9      those words putting aside the hand motions?

10     **A.**   No, but if you just ask me a question, I'll answer

11     it.

12     **Q.**   Okay.

13           So my question is, you don't think that this was

14     some sort of a casual little conversation that happened at

15     the board meetings the decision about whether to write up a

16     hundred billion dollars of written-down DTAs, do you?

17     **A.**   No, I don't think conversations at the board level

18     are typically casual.  That's not how I'd define them.

19     **Q.**   Okay.

20           Well, this is also not something that's typically

21     talked about at the board level either.  Right?  Whether to

22     write up the DTA allowance is something that happens at that

23     specific management committee, as we talked about earlier.

24     Right?

25     **A.**   No.

                              CROSS - SATRIANO

1    **Q.**   No, it's not right?

2    **A.**   No, I don't think your question -- no is my

3    answer.

4    **Q.**   Okay.

5         So you think that -- was it, in your

6    understanding, was it typical that every board meeting from

7    2008 to 2012, that the board would inquire about whether

8    they could rerecord the DTAs?

9    **A.**   No, I don't think that would be typical either.

10   **Q.**   Okay.

11        If this was unusual, they're starting to talk

12   about this because they're talking about potential

13   sustainable profitability.  Right?

14   **A.**   So if they believe -- maybe we infer from this

15   message they believe that they are going to be profitable

16   going forward, one of the implications is, at some point in

17   the future, they would have to consider whether they would

18   write up a whole or portion of the deferred tax asset.

19   **Q.**   Right.  But this wasn't, like, water-cooler

20   conversation about maybe we'll write up the DTAs.  This is a

21   board -- as I understand it, both boards are talking about

22   this prior to August 14th.  Right?

23   **A.**   That's what Jeff indicates.

24   **Q.**   And you have no reason to doubt that?

25   **A.**   No, because I think -- as I mentioned earlier on

CROSS - SATRIANO

1    direct, the CFO, especially at Fannie Mae, they would

2    provide a financial -- key financial highlights to the full

3    board.

4              So the full board would be hearing information

5    about key significant accounting judgments of which the DTA

6    is one of them and that there would be discussions is not

7    surprising to me at all.

8        Q.   So you agree that there were discussions at both

9    boards prior to August 14th about the DTAs?

10       A.   Based on this note, yes, I agree with you.

11       Q.   Okay.  And you also agree with me that Jeff Spohn,

12   the representative from the FHFA, was typically at all of

13   the board meetings of Fannie and Freddie.  Right?

14       A.   Yes.

15       Q.   And this email would seem to indicate that he

16   would know that they were talking about it at those board

17   meetings.  Right?

18       A.   Yes, that's what this indicates.

19       Q.   So you would agree with me that FHFA is present at

20   both board meetings when they are talking about the

21   possibility of rerecording the DTAs.  Right?

22       A.   That's what Jeff says, yes.

23       Q.   And you have no reason to doubt that?

24       A.   No, not based on this note.

25       Q.   Thank you.

                    CROSS - SATRIANO

1          We'll come back to this email in a moment, but I

2   want to move on to something else, which is DX-560.

3          **MS. McGUIRE:**  [Complied]

4          **MR. RUDY:**  Thank you.

5   **BY MR. RUDY:**

6     **Q.**   Do you recall giving testimony about this document

7   on direct examination?

8     **A.**   Yes, I do.

9     **Q.**   So this is an email that you send to Mr. Galeano

10  on August 28th.  Who is Mr. Galeano?

11    **A.**   Yes, it is.  Mr. Galeano is an executive at the

12  Federal Housing Finance Agency.

13    **Q.**   Okay.  And this email attaches some notes.  Right?

14    **A.**   Yes.

15    **Q.**   Let's look at the notes, the next page.  And so

16  you see this formatting stuff here at the top?

17    **A.**   Yes, I do.

18    **Q.**   Does this appear to be the form of a memo that's

19  an incomplete memo?

20    **A.**   I think the -- the items in the form drop down

21  were not selected, and so when you print it out, that's the

22  way it looks.  So it looks strange.

23    **Q.**   It looks strange but it doesn't say, prepared by,

24  it doesn't say the date, it doesn't say the focus area.

25  Nothing was selected in these "drop downs".  Right?

                        CROSS - SATRIANO

1    A.   That's right.  Much of that information is below.

2    Q.   Well, would you agree with me that this appears to

3    be an incompetent form of this memo?

4    A.   I would agree with you that the top part of this

5    document is not filled out.

6    Q.   Okay.

7         Let's go ahead to the next page.

8    MS. McGUIRE:   [Complied]

9    MR. RUDY:   And let's highlight number 3, 3-A.

10   BY MR. RUDY:

11   Q.   This is what you were asked about.  Right?

12        So this is a conversation is that you and

13   Ms. Schwitters.  Right?

14   A.   This is primarily a conversation between myself

15   and Ms. McFarland, the CFO of Fannie Mae.

16   Q.   Who took the notes?

17   A.   Melissa Schwitters and myself.

18   Q.   Right.  So you described this a minute ago as a

19   two-on-one.  Right?

20   A.   Yeah, I don't think there is anyone other from

21   Fannie there.

22   Q.   So it's you, Ms. Schwitters and Ms. McFarland?

23   A.   Yes.

24   Q.   And when was the meeting?

25   A.   If you go back to the first page, I think the date

                        CROSS - SATRIANO

1    is on there.

2         Q.   Okay.  Let's go back to the first page.

3              **MS. McGUIRE:**  [Complied]

4              **THE WITNESS:**  I guess it would be the second page.

5    The first page of the notes.

6    BY MR. RUDY:

7         Q.   It says meeting date August 23rd.  Right?

8         A.   Yes.

9         Q.   The email said August 28th.  Right?

10        A.   The email was sent on August 28th.  It didn't say

11   the meeting was August 28th.

12        Q.   I didn't ask you that.

13        A.   That's what you implied.  That's what I understood

14   from your question so I'm clarifying.

15        Q.   I will try to be clearer.

16             So let's go back to 3-A again.

17             **MS. McGUIRE:**  [Published]

18   BY MR. RUDY:

19        Q.   So it says, Susan noted there is a $62 billion

20   valuation allowance against the deferred tax asset.  They

21   have started some analysis around when or if (including a

22   part of the valuation allowance should be reversed).

23        A.   Could be reversed.

24        Q.   It's not your testimony, is it, that this memo

25   means they had not yet started looking at this issue before

                         CROSS - SATRIANO

1    August -- before the net worth sweep, is it?

2        A.   It is my testimony that, as of this date, they

3    must have started something prior to it because I wrote,

4    "They have started some analysis."  So prior to the 23rd of

5    August -- I don't know which date and she didn't say, I

6    wrote down what she said -- that they started some analysis.

7        Q.   Right.  But on direct examination, you said, I

8    took it from this that they had just started?

9        A.   Yeah.  They had started analysis.

10       Q.   It doesn't say "just started."  It said "started."

11       A.   Well, it didn't say "should" but, you know, that's

12   what you read.  It said could.

13       Q.   I'm sorry.  I'm not following you, sir.  But I

14   guess my question is about your testimony not about what I'm

15   saying.

16           So your testimony on direct examination was you

17   read this memo and you say, they had just started.  Is that

18   your memory that they -- that in this meeting, August 23rd,

19   after the net worth sweep, that they had just started

20   looking at this question?

21       A.   Yes, because -- step back a little bit.

22           Fannie Mae management, including Ms. McFarland,

23   had recently certified the Q2 financial statements with a

24   conclusion, with respect to the DTA, that it was not more

25   likely than not that they would be able to realize them.

                          CROSS - SATRIANO

1        And that's two, three weeks before this meeting.

2                So sometime after that certification and prior to

3        this meeting, would be a reasonable timeframe to think about

4        that they started in that timeframe.  That was why I said

5        what I said.

6            Q.    Okay.

7                So do you have -- you don't have any reason to

8        doubt Ms. McFarland saying that she was looking at this

9        before the net worth sweep, do you?

10                MR. HOFFMAN:   Objection, Your Honor.

11                THE WITNESS:   I have no information to support

12        that.

13                MR. RUDY:   You have no information to support

14        that?

15                MR. HOFFMAN:   Objection, Your Honor, as to some

16        other statement that's being referred to.  It's unclear.

17                THE COURT:   I thought he just said the basis was

18        that they had just filed that on the 1st.  Right?

19                THE WITNESS:   I was trying to give a scope to your

20        question.  So I -- what I know is that, on August 7th or

21        8th, they filed their second quarter SEC filings.  In that

22        filing, they have a valuation allowance or a write-down of

23        the DTA.

24                And we have looked at certifications that

25        Ms. McFarland has made with respect to the sort of

                         CROSS - SATRIANO

1    completeness, no material omissions, no material

2    misstatements based on her knowledge.

3            So I take that, as of August 8th -- 7th or 8th --

4    between that date and the 23rd, there's a possibility that

5    Ms. McFarland had requested that her staff start some

6    analysis.  So when I characterized --

7            **THE COURT:**  But that certification was on June

8    30th, wasn't it?

9            **THE WITNESS:**  But she's certifying it as of a

10   specific date.  Right?  So that the 8th is, to the best of

11   her knowledge, as of that date.

12           **THE COURT:**  As of that date is when it's

13   certified?

14           **THE WITNESS:**  That's when the certification is

15   dated.

16   **BY MR. RUDY:**

17       **Q.**   The certification is dated that day that says

18   that, based on numbers ending June 30th, they've decided,

19   for that quarter alone, the second quarter, not to write the

20   DTA up?

21       **A.**   That's right.

22       **Q.**   Right.  And this email says, They have started

23   some analysis around when/if any part of the valuation could

24   be reversed.  Right?

25       **A.**   Yes.

                         CROSS - SATRIANO

1     Q.    That's future looking.  That's forward looking.

2     Right?

3           A.    Yes, and they have started.

4           Q.    So the memos that are done each quarter --

5                 **THE COURT:**  But in any event, you don't know when

6     they started?

7                 **THE WITNESS:**  No.  I don't know and I was trying

8     to --

9                 **THE COURT:**  You're not trying to say when.

10                **THE WITNESS:**  -- give a range of when it could

11    have started based on my understanding of living through

12    that time period.  So for me, it's either after the 8th of

13    August and likely before the 23rd.  So in that time

14    timeframe, in that two-week window, that's when I think it

15    probably started.

16    **BY MR. RUDY:**

17          Q.    Okay.

18                But you don't mean to imply to the jury or

19    otherwise that this analysis started after the net worth

20    sweep.  Right?  You have no basis to say that.  Right?

21          A.    I don't know the answer to that question.

22          Q.    Thank you.

23                Mr. Satriano, you understand that the plaintiffs

24    in this case are arguing that the FHFA did not agree to the

25    net worth sweep to protect Fannie and Freddie but rather to

                        CROSS - SATRIANO

1    facilitate their wind-down.  Right?  You understand that

2    that's the argument the plaintiffs are making in this case?

3        **A.**    No, I don't.

4        **Q.**    You don't understand?

5        **A.**    I do not.

6        **Q.**    Okay.

7              Are you aware that Mr. DeMarco has denied that he

8    agreed to the net worth sweep to facilitate Fannie and

9    Freddie's wind-down?

10       **A.**    I am not aware of what Mr. DeMarco said.

11       **Q.**    Sir, you appear to be looking past me when I'm

12   asking you questions.  What's happening?

13       **A.**    Well, I'm wondering, you know, I don't -- I

14   don't -- see these are counsel questions.  I don't know.

15             I can tell you what I did at the time.  I don't

16   know what Mr. DeMarco or Ms. McFarland have either said in

17   this courtroom or have said in other statements made to you.

18   That's what I don't know because I wasn't with you then.

19       **Q.**    That's fine.  What I'm asking you right now is why

20   you keep looking over at counsel.

21       **A.**    Because I'm wondering if I'm allowed to answer or

22   there is something.  So he is my counsel so I am looking

23   over there to see -- I have no idea.  Am I supposed to

24   answer yes or no?  I don't know what -- you know, I don't

25   know the scope of your lawsuit.

                        CROSS - SATRIANO

1    **Q.**    Okay.  Sir --

2    **A.**    I just know what I did during that time and that's

3    why I'm here.

4    **Q.**    Right.

5          And while you're here, I'm going to ask you some

6    questions.  If you don't know the answer to the question,

7    you can say I don't know.  If you know the answer to the

8    question, I'm just going to ask you to answer it.

9    **A.**    That's what I am trying.

10   **Q.**    Right.

11         And these guys have nothing to do with it.  Okay?

12   **A.**    [No response]

13   **Q.**    So you're not aware that Mr. DeMarco, in this

14   lawsuit, has said that the reason that he agreed to the net

15   worth sweep was to protect Fannie and Freddie against the

16   risk that the Treasury commitment was being eroded by

17   circular draws?

18         **MR. HOFFMAN:**  Objection, Your Honor.  He just

19   answered that he doesn't know what --

20         **THE COURT:**  Sustained.

21         **MR. RUDY:**  Let's put back up PX-259.

22         **MS. McGUIRE:**  [Complied]

23         **MR. RUDY:**  So now, we have this document where

24   James Griffin, your right or your left-hand man, says that

25   "the amendments are designed to demonstrate wind-down."  Do

1    you see that?

2        **A.**   Yes, I do.

3        **Q.**   And your testimony is that you understood this

4    sentence to mean -- when it says "the amendments are

5    designed to demonstrate wind-down," what you say and you

6    said on direct examination is that that refers to the

7    accelerated reduction of the retained mortgage portfolio.

8    Right?

9        **A.**   Yes.

10       **Q.**   Your testimony is you did not take Mr. Griffin to

11   be referring to winding down Fannie and Freddie?

12       **A.**   No, I didn't because he's referring to --

13       **Q.**   I just asked you if that's what you understood.

14       **A.**   No.  I'm sorry.  I apologize.  No.

15       **Q.**   And you see from this email, if we go down to the

16   bottom email, that Mr. Griffin wrote his email right after

17   he met with Mr. DeMarco.  Right?

18       **A.**   Yes.

19       **Q.**   Would you agree with me that it's important to

20   FHFA, your employer, for you to say that Mr. Griffin didn't

21   mean wind-down of the GSEs?

22            **MR. HOFFMAN:**  Objection, Your Honor.

23            **THE COURT:**  Sustained.

24   **BY MR. RUDY:**

25       **Q.**   So just to clarify, you testified on direct

                         CROSS - SATRIANO

1    examination that you recall receiving his email?

2        **A.**   Yes, I do.

3        **Q.**   You do.  You remember back to 2012, getting this

4    email?

5        **A.**   Yes.

6        **Q.**   Okay.

7        **A.**   I have had the opportunity to review it several

8    times since then.

9        **Q.**   I'm not asking you if you understand it.  I'm

10   asking you whether your testimony that you remember

11   receiving it in 2012 is true.

12       **A.**   Yes.

13       **Q.**   So James Griffin, your former deputy chief

14   accountant, was he good at his job?

15       **A.**   Yes, he was.

16       **Q.**   Was he a smart guy in your opinion?

17       **A.**   Yes.

18       **Q.**   Was he a good communicator?

19       **A.**   Yes.

20       **Q.**   How long did you work together?

21       **A.**   I don't know the exact date Jim came to work for

22   the FHFA, but he had been there for -- I would guess a

23   couple of years at this point.

24       **Q.**   And how long did you -- in total, how long did you

25   work together?

                            CROSS - SATRIANO

1       A.   Many years.

2       Q.   Okay.

3            He's not with FHFA anymore.  Right?

4       A.   Yes, he is.

5       Q.   Well, is he not at one of the banks that FHFA

6  oversees or is he actually back at the agency?

7       A.   No, he never left the agency once he came.

8       Q.   Oh, okay.

9            So he's still an employee of FHFA?

10      A.   Yes, he is.

11      Q.   Okay.

12           Are you aware of any reason why Mr. Griffin

13  couldn't come in here to say what he meant in this email

14  rather than you?

15           MR. HOFFMAN:  Objection, Your Honor.

16           THE COURT:  Sustained.

17  BY MR. RUDY:

18      Q.   I want to ask you about the phrase in this email

19  "I do not think that makes sense."

20           You understand what the plaintiff -- do you want

21  to take a moment?

22      A.   I got it.  Found it.  Sorry.

23      Q.   Sure.

24           So you understand that what the plaintiffs are

25  saying that this means is it doesn't make sense for Fannie

                         CROSS - SATRIANO

1    and Freddie to write up the DTAs right now because it's

2    going to show Fannie and Freddie to be profitable, and the

3    third amendment is designed to demonstrate that they're

4    being wound down?

5            **MR. HOFFMAN:**  Objection, Your Honor, as to

6    plaintiffs' allegations.

7            **MR. RUDY:**  I think it's fair, Your Honor, to find

8    out if he understands what the lawsuit is about.

9            **THE COURT:**  I said overruled.

10           **MR. RUDY:**  Thank you.

11   **BY MR. RUDY:**

12       **Q.**   Do you understand that that's what the plaintiffs

13   are arguing in this case?

14       **A.**   I believe that what you're telling me is the true

15   statement.

16       **Q.**   Okay.

17           But your testimony here is that that's not what

18   you think that Mr. Griffin meant when he wrote this.  Right?

19       **A.**   Yes, it is.

20       **Q.**   It is true?

21       **A.**   Yes, it is my testimony.

22       **Q.**   Okay.

23           And so your testimony is, when he wrote, "I don't

24   think that makes sense," you think it meant, it doesn't make

25   sense to rerecord the deferred tax assets because the

                    CROSS - SATRIANO

1   accelerated reduction of the mortgage portfolio is going to

2   make Fannie and Freddie less profitable moving forward.  Is

3   that basically right?

4        **A.**   Yes.

5        **Q.**   Okay.

6             When you were talking about this document on

7   direct examination, you said the board didn't know that.

8   Right?  And so I think what you were referring to as the

9   board didn't know that, the board didn't know that three

10  days later after this email that there would be a third

11  amendment announced.  Right?

12       **A.**   That's my understanding.  Yes, I said that.

13       **Q.**   So that's what you're saying that, you know, you

14  think that Mr. Griffin is saying, it doesn't make sense

15  because they don't know there's about to be this third

16  amendment announced, which is going to include an

17  accelerated wind-down of the deferred -- of the mortgage

18  portfolio.  Right?

19       **A.**   Yes.

20       **Q.**   Okay.

21             But the board did already know that that retained

22  mortgage portfolio was already being reduced.  Right?

23       **A.**   Yes.  What I have discussed earlier in the day,

24  when we talked about the third amendment, was how one of the

25  changes in the third amendment was an acceleration of the

CROSS - SATRIANO

1   already ongoing wind-down of that portfolio.

2       **Q.**   Right.

3       **A.**   So there's a new covenant that made it wind-down

4   faster.

5       **Q.**   Correct.

6       **A.**   Relative to the previous version of the PSPA.

7       **Q.**   Okay.  Thank you.

8       **A.**   Uh-huh.

9       **Q.**   So the previous PSPA, in effect since 2008, FHFA

10  told Fannie and Freddie that you have all of these retained

11  mortgages in a portfolio?

12      **A.**   Yes.

13      **Q.**   That you testified made them -- made those

14  companies carry too much risk.  Right?

15      **A.**   I think that was the perspective, yes.

16      **Q.**   So FHFA told Fannie and Freddie, We want you to

17  hold less of those mortgages, and we want you to reduce the

18  size of that portfolio.  Right?

19      **A.**   Yes.

20      **Q.**   And they told them in 2008 that they wanted them

21  to reduce the size of that portfolio over time.  Correct?

22      **A.**   Correct.

23      **Q.**   And each year, they would need to reduce the size

24  of the portfolio by 10 percent each year.  Correct?

25      **A.**   That was the original standard, yes.

CROSS - SATRIANO

1    Q.    So from 2008 to '09 to '10 to '11 to '12, 10

2  percent per year they were already reducing the size of that

3  portfolio.  Correct?

4    A.    Correct.

5    Q.    And the board knew that.  Right?

6    A.    Yes, they did.

7    Q.    The thing that the board didn't know about that,

8  sitting here on August 14th, was that it was going to go

9  from a reduction rate of 10 percent a year to a reduction

10 rate of 15 percent a year.  Right?

11   A.    Yes.

12   Q.    But the board knew about the reduction.  Right?

13   A.    Yes, they did, the original reduction, the 10

14 percent.

15   Q.    And the original reduction had, as its target,

16 that the portfolios would be reduced down to $250 billion

17 per GSE.  Right?

18   A.    Yes, I think that was the threshold.

19   Q.    So at the end of the reduction, that had been

20 going on since 2008, Fannie would have no more than 250

21 billion in their portfolio.  Right?  Right?

22   A.    Yes, I'm sorry.

23   Q.    And Freddie would have no more than 250 billion in

24 their portfolio.  Right?

25   A.    Yes.

CROSS – SATRIANO

1   Q. And the only thing that was going to change three

2 days later that the board didn't know was that instead of it

3 taking another 10 years to get there, it would take another

4 six years to get there; is that right?

5   A. Yeah.  That's what acceleration means.

6   Q. Right.  But the reduction was happening.  It was

7 getting to the same place, but it would get there a little

8 faster.  Right?

9   A. Yes.

10   Q. So it's your testimony that you think that what

11 this is referring to is the board didn't know that we're

12 going to get to the same place a little faster, and that's

13 going to make the companies so much less profitable that

14 writing up the DTAs doesn't make sense anymore.  That's your

15 testimony?

16   A. My testimony, with respect to this email, is that

17 Jim Griffin in his sentence, "I do not think that makes

18 sense, given the amendments are designed to demonstrate

19 wind-down," refers to the prospects of them being profitable

20 going forward given that their profitability is about to be

21 slowed down.

22    And, therefore, when you think about -- so Jim and

23 I are accountants.  We're thinking about this from this

24 deferred tax asset sort of metric, matrix, it would likely

25 push that time out when they would have enough positive

CROSS - SATRIANO

1    evidence compared to their negative evidence.

2           I think that's -- that's how I understand it.  And

3    I understand this sentence that you've highlighted to be

4    keyed off of this earnings speed as I said earlier.

5        Q.   Well, the profitability is already baked into the

6    company's forecast where they know they're going to end up

7    at 250 billion either way.  Right?

8        A.   [No response]

9        Q.   You talked on direct examination --

10       A.   No, that's not correct.

11       Q.   Well, on direct examination you talked about

12   revenues.  Now you're talking about profits.  Right?

13       A.   I just -- I think your statement "profitability

14   being baked into the 250" is not a clear statement.  So if

15   you could repeat that for me.

16       Q.   All right.

17       A.   Thank you.

18       Q.   I guess my question is, the third amendment didn't

19   demonstrate wind-down any more than the original PSPA

20   demonstrated wind-down; isn't that right?

21       A.   To me, the acceleration was indicative that they

22   wanted -- the government wanted this to happen quicker.  And

23   that's why they made that amendment.

24       Q.   Well, let me ask you, when Ms. McFarland found

25   out, she didn't know -- on August 14th, she didn't know

                          CROSS - SATRIANO

1    about the net worth sweep or the third amendment.  Right?

2        **A.**    Yes, that's my understanding.

3        **Q.**    Okay.

4              But when she found out about it, she didn't think

5    that it was going to significantly affect the profits of

6    Fannie Mae, did she?

7              **MR. HOFFMAN:**  Objection.

8              **THE COURT:**  Sustained.

9              **MR. RUDY:**  Well, let me just put back up DX-560,

10   the memo you were just talking about.

11             **THE WITNESS:**  Okay.

12             **MS. McGUIRE:**  [Complied]

13             **MR. RUDY:**  Let's go to Paragraph 3, right above

14   it.

15             **MS. McGUIRE:**  [Complied]

16   **BY MR. RUDY:**

17       **Q.**    So this is the memo that you wrote after the third

18   amendment when you met with Ms. McFarland.  Right?

19       **A.**    Correct.

20       **Q.**    She says, "It may not change the long-term

21   forecast significantly."  Right?  That's what she told you

22   on August 23rd.  Right?

23       **A.**    "It may not change the long-term forecast

24   significantly."  Yes, that's what she said.

25       **Q.**    Right.  This certainly isn't her going, oh, my

                         CROSS - SATRIANO

1    gosh, now that I know about the accelerated reduction of the

2    portfolio, all of my calculations are completely thrown into

3    chaos.  Right?  That's not what she's saying?

4        **A.**   No.  What she's saying is that it may not change

5    the long-term forecast significantly.

6        **Q.**   Okay.  Thank you.

7            **MR. RUDY:**  You can take this down.  Let's go back

8    to 259 again.

9            **MS. McGUIRE:**   [Complied]

10   **BY MR. RUDY:**

11       **Q.**   I'm going to bring us back to high school and

12   we're going to talk about grammar for a moment if that's

13   okay.  I know you were a history major, so I'm sure you

14   wrote a lot of papers in college.  Right?

15           So I'm going to ask you a couple of questions

16   about the phrase, "are designed to demonstrate."  You told

17   me Mr. Griffin was a clear communicator and good at his job

18   a minute ago.  Right?

19       **A.**   Yes.

20       **Q.**   We can agree that the third amendment included two

21   provisions, among others, two that we've talked about, a

22   provision for the net worth sweep.  Right?

23       **A.**   Yes.

24       **Q.**   And another provision for the accelerated

25   reduction of the retained mortgage portfolio.  Right?

                        CROSS - SATRIANO

1    A.    Yes.

2    Q.    Okay.

3          So if you were correct about what Mr. Griffin

4    meant, would you agree that a simpler way to say this would

5    be, "I don't think that makes sense because the amendments

6    include wind-down."

7          MR. RUDY:  Could we show the slide to illustrate

8    that, Ms. McGuire?

9          MS. McGUIRE:  [Complied]

10   BY MR. RUDY:

11   Q.    Wouldn't that be a much simpler way to say this?

12   A.    I have no view on your edits.

13   Q.    Under your supposed interpretation of this email,

14   "the amendments are designed to demonstrate wind-down"

15   doesn't make grammatical sense though, does it?

16   A.    My understanding is my understanding.

17   Q.    Okay.

18         MR. RUDY:  Let's put up the next slide, if we

19   could.

20         MS. McGUIRE:  [Complied]

21   BY MR. RUDY:

22   Q.    You said already, the amendments, plural, refers

23   to these two things.  Right?  [Indicated]  Among others.

24   Right?

25   A.    Yes.

                    CROSS - SATRIANO

1    Q.   So then the amendments, this is our reading.  You

2  understand the plaintiffs are saying it means the amendments

3  are designed to demonstrate -- next?

4         MS. McGUIRE:   [Complied]

5  BY MR. RUDY:

6    Q.   -- wind-down of Fannie Mae and Freddie Mac.  You

7  know that that's what we're arguing.  Right?

8    A.   If you tell me that, yes, I believe you.

9    Q.   Now let's go to what your interpretation is.  The

10  amendments are designed to demonstrate, accelerated

11  reduction of the retained portfolio.

12         So the amendments are demonstrating the

13  amendments.  Does that make any sense to you?

14    A.   Yes, it does.

15    Q.   Okay.

16    A.   Would you like me to explain?

17    Q.   No.

18    A.   Okay.  Thanks.

19    Q.   Mr. Satriano, you're aware that the Treasury

20  Department wanted to wind-down Fannie and Freddie at this

21  time.  Right?  You're aware of that?

22    A.   No, I am not.  I don't work for the Treasury.

23    Q.   So you don't know that, in 2012, the Treasury

24  Department wanted to wind-down Fannie and Freddie?

25    A.   I think, in the broader context of making the

CROSS - SATRIANO

1  mortgage finance market sustainable, I think they were

2  looking for avenues of how to do that during that time.

3        Q.    Well, the avenue they were proposing was to

4  wind-down Fannie and Freddie.  You know that.  Right?

5        A.    Yes, in the context of replacing it with something

6  else.  Right?

7        Q.    I'm asking you.  A moment ago, you said you didn't

8  know that.  And now, do you know that or do you not know

9  that?

10       A.    Broadly, yes, I know that.

11       Q.    Okay.  Thank you.

12             I'm going to show you PX-158.  This is Fannie

13  Mae's 2011 Form 10-K.  Are you familiar with this document?

14             THE WITNESS:  Yes, I am.

15             MR. RUDY:  Is this in evidence?

16             DEPUTY CLERK:  [Shakes head]

17             MR. RUDY:  I'd like to move this into evidence.

18             MR. HOFFMAN:  No objection.

19             THE COURT:  Received.

20        (Plaintiffs' Exhibit 158 was received.)

21             MR. RUDY:  Let's go to Page 249 of 374.  Let's

22  highlight "in February 2011."  Okay.

23             MS. McGUIRE:  [Complied]

24  BY MR. RUDY:

25        Q.    So, Mr. Satriano, this is a Fannie Mae Form 10-K

                          CROSS - SATRIANO

1    that you are familiar with.  And it says here, I'm assuming

2    you know this that "In February of 2011, Treasury and HUD

3    released a report to Congress on reforming America's housing

4    finance market.  The report provides that the administration

5    will work with FHFA to determine the best way to responsibly

6    reduce Fannie Mae's and Freddie Mac's role in the market and

7    ultimately wind-down both institutions."  Period.

8        A.    Yes.

9        Q.    So Fannie Mae was reporting to its investors that

10   the Treasury Department was saying, We want to wind-down,

11   Fannie Mae.  Right?

12       A.    Yes.

13       Q.    So you knew that.  Right?

14       A.    And that's why I answered in the context of

15   replacing it with something else.  So thinking about this

16   type of statement, I tried to provide a contextual answer.

17       Q.    Okay.

18             So the way they're using the word "wind-down" is

19   not referring to accelerated reduction of retained mortgage

20   portfolio.  They're talking about winding down Fannie and

21   Freddie.  Right?

22       A.    That's what I understand from reading this.

23       Q.    This is in a Fannie Mae Form 10-K annual report.

24   Right?

25       A.    Right, commenting on what happened in this last

                         CROSS - SATRIANO

1  year.

2      **Q.**   Okay.

3          **MR. RUDY:**  I'm going to put up PX-594, please.

4          **MS. McGUIRE:**  [Complied]

5      (Published exhibit.)

6          **MR. RUDY:**  This is a February 2, 2012 Treasury

7  press release.  I'm going to offer this into evidence.

8          **MR. HOFFMAN:**  No objection.

9          **THE COURT:**  Received.

10     (Plaintiffs' Exhibit 594 was received.)

11 **BY MR. RUDY:**

12     **Q.**   And you see that this is an email from the

13 Treasury to you.  Right?

14     **A.**   Yes, it is.

15     **Q.**   And it appears that you subscribed to a service

16 that sends you press releases from the Treasury Department;

17 is that right?

18     **A.**   Yes.

19     **Q.**   Okay.

20          And the first sentence of this talks about

21 progress made on financial reform to date.  Do you see that?

22     **A.**   Yes, I see it.

23          **MR. RUDY:**  Now let's go down to, I have it as Page

24 6035.  That's probably not the document number.  That's it.

25 Okay.  Yeah.  So Page 4 of 6 here.

                       CROSS - SATRIANO

1           **MS. McGUIRE:**   [Complied]

2   BY MR. RUDY:

3       **Q.**   And the first two sentences reference -- this is

4   from Treasury, treasury press release referencing the 2011

5   report to Congress.  Right?

6       **A.**   Yes.

7       **Q.**   And, again, the first sentence references,

8   including a path for winding down the GSEs.  Right?

9       **A.**   Yes.

10      **Q.**   So you know that, when Treasury talks about, at

11   least from Treasury's perspective, wind-down, wind-down

12   means winding down the GSEs.  Right?

13      **A.**   From Treasury's perspective, yes.

14      **Q.**   Thank you.

15          **MR. RUDY:**  You can pull this down.

16          **MS. McGUIRE:**   [Complied]

17   BY MR. RUDY:

18      **Q.**   Okay.

19          I want to turn to these SEC filings.  I'm going to

20   put back up DX-476.  This is the 2Q Form 10-Q.  On Page 16

21   there's a disclosure -- you see the sentence, "Although we

22   may experience period-to-period variability in earnings and

23   comprehensive income, we do not expect to generate net

24   income in excess of our annual dividend obligation to

25   Treasury over the long term."  Right?

                    CROSS - SATRIANO

1      A.   Yes, I see that.

2      Q.   This is a sentence that was highlighted on direct

3    examination.  Right?

4      A.   Uh-huh.

5           MR. RUDY:  Let's look at DX-477.

6           MS. McGUIRE:  [Published]

7    BY MR. RUDY:

8      Q.   And we'll go to Page 14.  This is the Freddie Mac

9    10-Q.  Go to Page 14, a very similar sentence.  Okay.  Do

10   you see the same sentence there, "Although we may experience

11   period-to-period variability," et cetera.  Right?

12     A.   Yes, I see that sentence.

13          MR. RUDY:  I'm sorry.  Let's go back to 476, the

14   Fannie document, on Page 85.

15          MS. McGUIRE:  [Complied]

16   BY MR. RUDY:

17     Q.   Page 85, if we zoom in on forward-looking

18   statements, this is a list of risk and future-looking

19   forward statements.  Right?  These bullet points?

20     A.   Yes.

21     Q.   Okay.

22          MR. RUDY:  And go to the next page.

23          MS. McGUIRE:  [Complied]

24          MR. RUDY:  And the next page.

25          MS. McGUIRE:  [Complied]

                         CROSS - SATRIANO

BY MR. RUDY:

Q.   All in all, you're aware that there's -- you can

trust my math.   There's 85 bullet points here.   Right?

A.   I trust your math.

Q.   Okay.

A.   Yes.

Q.   And the 34th of those bullet points --

MR. RUDY:   If we could highlight it, I think it's

on the prior page.

MS. McGUIRE:   [Complied]

MR. RUDY:   Actually -- I'll walk away from that.

BY MR. RUDY:

Q.   On this list of bullet points, there's no

reference about -- no reference at all to the Treasury

commitment being capped at the end of 2012, is there?

A.   I don't know.   Are you talking about out of the

85?

Q.   Yes.

A.   I don't know from memory.   I'm sorry.

Q.   Okay.

And if you're aware, there's nothing in there

about how Fannie Mae was at risk of eroding the Treasury

commitment as a result of circular draws.   That's not a risk

that's disclosed in this Form 10-Q, is it?

A.   I think didn't we talk about paragraphs where they

CROSS - SATRIANO

1    would increasingly have to draw to pay the dividend

2    obligation?

3         Q.    Well, that's not what I'm asking you.

4         A.    What are you asking me?  I'm sorry.  I don't

5    understand.

6         Q.    Okay, sir.

7              MR. RUDY:  Let's put up the side-by-side

8    disclosure of those two provisions that we just read to each

9    other, the one from the Fannie and the one from the Freddie.

10             MS. McGUIRE:  [Complied]

11   BY MR. RUDY:

12        Q.    So these are the sentences that we just looked at

13   from DX-476 and 477.  Right?

14        A.    Okay.

15        Q.    And you see that they're almost to the word

16   identical sentences.  Right?

17        A.    They are similar, yes.

18        Q.    Let's just talk about how these disclosures get

19   prepared?

20        A.    Okay.

21        Q.    Fannie and Freddie have separate management teams.

22   Right?

23        A.    Uh-huh.

24        Q.    Separate lawyers?

25        A.    Yeah.

                         CROSS - SATRIANO

1       **Q.**    Separate boards of directors?

2       **A.**    Yeah.

3       **Q.**    Separate auditors.  Right?

4       **A.**    [No response]

5       **Q.**    And this sentence ends up in both of their

6    disclosures almost word for word.  Correct?

7       **A.**    Yes.

8           **MR. RUDY:**  You can pull that down.

9           **MS. McGUIRE:**  [Complied]

10   BY MR. RUDY:

11      **Q.**    So tell me if I'm right about this.  Fannie and

12   Freddie can't make an SEC filing unless the FHFA gives them

13   the green light.  Right?

14      **A.**    Yes, that's part of the process.

15      **Q.**    Sir, I asked you earlier when I stood up before

16   the SEC filings came in just asked you a couple questions.

17   The last question I asked you was whether you had any reason

18   to believe that the SEC filings aren't accurate and

19   reliable.  Right?  Do you remember that?

20      **A.**    I do.

21      **Q.**    And you said you have no reason to dispute that.

22   Right?

23      **A.**    Yes.

24      **Q.**    And you said that they were reliable because of

25   the "governance and controls that are applied each quarter

                         CROSS – SATRIANO

1    inside of the GSEs."  Right?

2         **A.**    Yes.

3         **Q.**    Okay.

4              I'm going to show you DX-476 again.  This is the

5    Form 10-Q, second quarter.

6              **MR. RUDY:**  And let's go to Page 161 to 162.

7              **MS. McGUIRE:**  [Complied]

8    BY MR. RUDY:

9         **Q.**    I want to highlight this section that's called

10   "description of material weakness."

11             I'm going to direct you to Page 161, the top

12   paragraph, with the phrase starting "There is a reasonable

13   possibility."

14             So it says, "There is a reasonable possibility

15   that a material misstatement of the company's annual or

16   interim financial statements will not be prevented or

17   detected on a timely basis."  Right?

18        **A.**    Yes.

19        **Q.**    And on Page 162, the last two sentences, "As a

20   result, we did not maintain effective controls and

21   procedures designed to ensure complete and accurate

22   disclosure as required by GAAP as of June 30th, 2012 or as

23   of the date of filing this report.  Based on discussions

24   with FHFA and the structural nature of this weakness, it is

25   likely that we will not remediate this material weakness

                        CROSS - SATRIANO

1    while we are under conservatorship."

2           Do you see that?

3       A.    Yes, I do.

4       Q.    These paragraphs are specifically cautioning

5    investors that they may not be able to rely on the accuracy

6    and reliability of these financial statements.  Isn't that

7    what this is saying?

8       A.    Yes, it is.

9           **MR. RUDY:**  You can pull that down.

10          **MS. McGUIRE:**  [Complied]

11   **BY MR. RUDY:**

12      Q.    I'm going to show you PX-158, Fannie Mae's Form

13   10-K.  I direct you to Page 75, the bottom paragraph.  Tell

14   me if I'm reading this correctly.  This is from the annual

15   report, 2011.

16          "Material weaknesses in our internal control over

17   financial reporting could result in errors in our reported

18   results or disclosures that are not complete or accurate."

19          Did I read that right?

20      A.    No, you read it correctly.

21          **MR. RUDY:**  You can pull that down.

22          **MS. McGUIRE:**  [Complied]

23   **BY MR. RUDY:**

24      Q.    Freddie Mac has similar disclosures.  Right?

25      A.    Yes, they do.

                    CROSS - SATRIANO

1      Q.   And Fannie and Freddie, in fact, have had similar

2  disclosures to that going all the way back to 2009; isn't

3  that right?

4      A.   Yes.

5          MR. RUDY:  One moment, Your Honor.

6      (Brief pause.)

7      (Discussion off the record between counsel.)

8          MR. RUDY:  Your Honor, subject to just something

9  to talk about outside of the presence of the jury, I have no

10  more questions at this time.

11          THE COURT:  Any redirect?

12          **REDIRECT EXAMINATION OF NICHOLAS SATRIANO**

13  BY MR. HOFFMAN:

14      Q.   Good afternoon again, Mr. Satriano.  Ian Hoffman

15  on behalf of the defendants.

16          Mr. Satriano, you were asked some questions about

17  a presentation you prepared about the potential write-up of

18  the DTAs.  Do you recall that?

19      A.   Yes, I do.

20      Q.   And I believe you testified that you didn't know

21  the exact date of the presentation, so you couldn't say for

22  sure if it was before or after the third amendment on

23  August 17th, 2012; is that right?

24      A.   That's right.

25      Q.   In 2013, in the lead-up to the actual write-ups of

REDIRECT - SATRIANO

1    the DTA by Fannie, do you recall discussions within FHFA

2    about the DTA?

3         A.   Yes.  I recall discussions.

4         Q.   And were you involved in those discussions?

5         A.   Yes, I was.

6         Q.   I'm going to ask to pull up plaintiffs' exhibit,

7    just to display to Mr. Satriano, Plaintiffs' Exhibit 336.

8    Only for Mr. Satriano.

9              **MR. MONTGOMERY:**  [Complied]

10   **BY MR. HOFFMAN:**

11        Q.   Mr. Satriano, do you recognize this document?  And

12   I can scroll through it if that would help.

13        A.   Yes.  I believe this was the document that I had

14   in mind.

15        Q.   So let's go back to the first page.  And what is

16   this document?

17        A.   This is a presentation --

18        Q.   And what's --

19        A.   -- on deferred tax.

20        Q.   I'm sorry.  Go ahead.  It's a presentation on?

21        A.   Deferred taxes.

22        Q.   And what's the date of this presentation at

23   Plaintiffs' Exhibit 336?

24        A.   March 14th, 2013.

25        Q.   So that's over six months after the third

                         REDIRECT - SATRIANO

1    amendment was signed.  Right?

2         A.    Yes.

3         Q.    Now, were you involved in this presentation?

4         A.    Yes, I was.

5         Q.    Now, were there other presentations and documents

6    around this time in 2013 about a possible DTA write-up by

7    Fannie Mae?

8         A.    I believe there were.

9              MR. HOFFMAN:  Okay.  So you can take down

10   Plaintiffs' Exhibit 336 and let's pull up Plaintiffs'

11   Exhibit 328.

12             MR. MONTGOMERY:  [Complied]

13             MR. HOFFMAN:  Again, this is just for

14   Mr. Satriano.

15   BY MR. HOFFMAN:

16        Q.    Do you recognize Plaintiffs' Exhibit 328?

17        A.    Yes, I do.

18        Q.    And what is it?

19        A.    It is a presentation -- I believe this is

20   ultimately a presentation that was prepared by Fannie Mae

21   related to deferred tax assets assessment of valuation

22   allowance.

23        Q.    And this one -- what is the date of this

24   presentation?

25        A.    February 12th, 2013.

                    REDIRECT - SATRIANO

1     Q.   And this one was a presentation by Fannie Mae for

2     this one?

3     A.   Yes, it was.

4     Q.   Okay.

5          And the first one we looked at, was that a

6     presentation by FHFA or Fannie Mae?

7     A.   The first one was an FHFA presentation.

8     Q.   And this one, the date of the Fannie Mae

9     presentation, what's the date of this?

10    A.   February 12th, 2013.

11    Q.   And were both of these presentations that were in

12    2013 discussing the issue of the possible DTA write-up by

13    Fannie Mae?

14    A.   Yes, they were.

15         **MR. HOFFMAN:**  I'd like to pull up another exhibit,

16    again, just for Mr. Satriano.  I believe it doesn't have an

17    exhibit marking yet, but we're not offering it for admission

18    at this time, but it's Exhibit 23 from Mr. Satriano's

19    deposition.

20         So if we could zoom in a little bit,

21    Mr. Montgomery.  Thank you.

22         **MR. MONTGOMERY:**  [Complied]

23    **BY MR. HOFFMAN:**

24    Q.   Mr. Satriano, do you recognize this document?

25    A.   Yes, I do.

                     REDIRECT - SATRIANO

1      **Q.**  And what is it?

2      **A.**  I believe --

3      **MR. HOFFMAN:**  We can scroll to the next page,

4  perhaps, Mr. Montgomery.

5      **THE WITNESS:**  I believe this is an analysis that

6  the Office of the Chief Accountant, my team, prepared to

7  brief the agency's acting director on this potential

8  accounting issue.

9  **BY MR. HOFFMAN:**

10      **Q.**  And let's go back to the first page of this

11  exhibit and what is the date of this presentation?

12      **A.**  So it says, "Briefing for acting director,

13  February 21, 2013 (with corrections to Page 3 made on

14  February 22nd, 2013)."

15      **Q.**  Now, is this first document and the first document

16  we looked at -- let me take a step back.  The document we're

17  looking at now, is this an FHFA presentation?

18      **A.**  Yes, it is.

19      **Q.**  And you said it was prepared by whom?

20      **A.**  By me and my team and the Office of the Chief

21  Accountant.

22      **Q.**  Now, this one and the first one we looked at,

23  Plaintiffs' Exhibit 336, are they examples of the types of

24  presentation that you testified about in response to

25  Mr. Rudy's question?

REDIRECT - SATRIANO

1     A.   Yes, these were what I had in mind.

2     Q.   The first one, Plaintiffs' Exhibit 336, what was

3     the date of that again?

4     A.   March 14th, 2013.

5     Q.   So even as of March 14th, 2013, there were still

6     discussions happening about whether Fannie Mae's DTA would

7     be written up?

8     A.   Yes.

9          MR. RUDY:  You can take that down, Mr. Montgomery.

10         MR. MONTGOMERY:  [Complied]

11   BY MR. HOFFMAN:

12    Q.   Let's take a look at Plaintiffs' Exhibit 595.  Do

13    you recall Mr. Rudy asking you questions about this

14    document?

15    A.   Yes, I do.

16    Q.   And let's flip to Page 6 of Plaintiffs' Exhibit

17    595.  And can you just remind the jury what this document is

18    that we're looking at?

19    A.   This is a copy of Fannie Mae's press release

20    announcing their financial results for the second quarter of

21    2012.

22    Q.   And plaintiffs' counsel asked you some questions

23    and call-outs of various parts of this press release; is

24    that right?

25    A.   Yes, he did.

                    REDIRECT - SATRIANO

1          MR. HOFFMAN:  So let's take a look at another part

2    of this press release at Page 13 of 41.  And let's zoom in

3    on the second-to-last paragraph, towards the bottom that

4    starts with "Fannie Mae's second quarter."  And then let's

5    highlight the last sentence of that --

6          MS. McGUIRE:  [Complied]

7          MR. HOFFMAN:  -- that says, "Although we may

8    experience."

9    BY MR. HOFFMAN:

10        Q.   Can you go ahead and read that for the members of

11   the jury, please?

12        A.   "Although we may experience period-to-period

13   volatility in earnings and comprehensive income, we do not

14   expect to generate net income or comprehensive income in

15   excess of our annual dividend obligation to Treasury over

16   the long term."

17        Q.   And is that consistent or inconsistent with what

18   was in Fannie Mae's contemporaneous SEC filing?

19        A.   I believe it was consistent.

20        MR. HOFFMAN:  Okay.  You may take that down.

21        MR. MONTGOMERY:  [Complied]

22        MR. HOFFMAN:  Let's pull up Plaintiffs' Exhibit

23   259.  And let's zoom in on the top email here.

24        MR. MONTGOMERY:  [Complied]

25

                    REDIRECT - SATRIANO

1    BY MR. HOFFMAN:

2         Q.   Do you recall a moment during plaintiffs'

3    counsel's questions, Mr. Satriano, where, I believe he asked

4    you the question, this doesn't make sense, and you said

5    something along the lines of I think it does.  And you asked

6    him would you like to know why.  I believe he answered, no.

7    Do you recall that?

8         A.   Yes, I do.

9         Q.   So would you like to tell the members of the jury

10   now what you would have said?

11        A.   Yes.  Thank you.

12             What I was going to say was, we're accountants.

13   Our scope is relatively narrow and focused on the accounting

14   matters that we face.  And Jim and I are both accountants

15   focusing on these issues.

16             So how I read this and how I think he wrote it was

17   he was talking about this notion of profitability going

18   forward, and if that's reducing, that pushes out the whole

19   DTA analysis further into the future.  And that's what I

20   understood and that's all I was going to share.  Thank you.

21        **MR. HOFFMAN:**  Court's indulgence.  One moment,

22   Your Honor.

23        (Brief pause.)

24        (Discussion off the record between Mr. Hoffman and

25   Mr. Stern.)

                    REDIRECT - SATRIANO

1          **MR. HOFFMAN:**  Thank you very much, Mr. Satriano

2    and members of the jury.  I have no further questions at

3    this time.

4          **THE COURT:**  All right.  Thank you.

5          **MR. RUDY:**  Your Honor, may I be heard on the phone

6    very briefly?  It's going to be very quick.

7          (Sidebar discussion.)

8          **MR. RUDY:**  Your Honor, it's Lee Rudy for

9    plaintiffs.  I hate to ask to do any recross, but there was

10   an allegation that came up through my cross about potential

11   spoliation.  And I just wanted it to be very clear.  I'm

12   happy to accept the answer, but the witness on cross

13   basically said that he did an analysis of before the net

14   worth sweep.

15         It's sort of left implicit that what he was just

16   shown was what he was talking about, and he didn't do an

17   analysis before the net worth sweep.  But I think it would

18   be appropriate for me to just ask him, could you just

19   clarify, when you said you did an analysis before the net

20   worth sweep, that that was wrong you were thinking about

21   these documents.  And that would be all.  I think we need to

22   tie that up.

23         Otherwise, I don't think it's entirely clear to

24   the jury whether he did or didn't do an analysis before the

25   net worth sweep because he was shown some stuff from

                         REDIRECT - SATRIANO

1    afterwards, and I think counsel was implying that that was

2    what he was talking about.  It's frankly a little unclear.

3          So my request is if I could just ask one or two

4    questions on recross.

5          **MR. HOFFMAN:**  Your Honor, Ian Hoffman on behalf of

6    defendants.

7          Mr. Satriano did not testify on direct that he did

8    an analysis before the third amendment.

9          Mr. Rudy asked him question after question about

10   documents and whether documents existed.  And eventually

11   Mr. Satriano said, I made a presentation.  And the time

12   period in which Mr. Satriano -- I'm sorry, in which Mr. Rudy

13   was asking these questions was very unclear.

14         He cleared it up himself in a way when he asked,

15   When did you give this presentation or make this

16   presentation?  And Mr. Satriano said, I don't recall.  And

17   then, when I showed him presentations on redirect, without

18   me even asking him or leading him, he said, This is the one

19   I was talking about in front of Mr. Rudy.

20         So the suggestion that, A, he testified on direct

21   that he had done some kind of analysis before the third

22   amendment is incorrect and, you know, leading him in that

23   way would be inappropriate, Your Honor.

24         **THE COURT:**  I don't recall the testimony well

25   enough to say.  So if you want to open that door, we got 30

1    minutes, but you're going to open the door to him

2    redirecting too.

3                **MR. RUDY:**  Thank you for the advice, Your Honor.

4    Let me just confer for one second.  Thank you.

5           (Sidebar discussion concluded.)

6                **RECROSS-EXAMINATION OF NICHOLAS SATRIANO**

7    BY MR. RUDY:

8         **Q.**   Mr. Satriano, I just have one more question.

9         **A.**   Sure, go ahead.

10        **Q.**   Earlier when I was asking you questions about --

11   you mentioned a PowerPoint that you had produced.  Right?

12        **A.**   Yes.

13        **Q.**   And then you were just asked some questions by

14   Mr. Hoffman.  Those were the PowerPoints you were referring

15   to?

16        **A.**   Yes, they were.

17        **Q.**   And those were from 2013 after the net worth

18   sweep?

19        **A.**   Yes.  If you recall, I was not able and was

20   uncomfortable trying to recite a date to you, and I had some

21   sense that I didn't exactly know the date.  So what -- the

22   context I can give you is that, as the issue became more of

23   a real and pressing issue for the FHFA with respect to the

24   deferred tax asset actually being revalued or the DTA being

25   written up, myself and my team started to do more and more

                        RECROSS - SATRIANO

1     analysis as is evidenced by those briefings and updates to

2     senior management and to staff at the FHFA.

3          **Q.**   In 2013?

4          **A.**   Yes.   That was the date of those memos.   So you

5     know, maybe there were some 2012, you know, just started,

6     started -- you know, could have started in 2012.   But by

7     2013, we were definitely ramped up and to be prepared for

8     the decision when it ultimately happened.

9          **Q.**   Okay.

10         And the questions that I was asking you before,

11    though, were did you do any sort of written analysis before

12    the net worth sweep.   Right?

13         **A.**   That's right.

14         **Q.**   These PowerPoints were after the net worth sweep?

15         **A.**   That's correct.

16         **Q.**   Thank you.

17         **A.**   Yeah, you're welcome.

18         **MR. HOFFMAN:**   Your Honor, if I may be heard on the

19    phone briefly?

20         (Sidebar discussion.)

21         **MR. HOFFMAN:**   Your Honor, Ian Hoffman on behalf of

22    the defendants.   Defendants would request a curative

23    instruction now in front of the jury.

24         During Mr. Rudy's direct examination -- I'm sorry,

25    during Mr. Rudy's cross-examination in response to

                          RECROSS - SATRIANO

1   Mr. Satriano's answer about these presentations, which we

2   now know were in 2013, Mr. Rudy made the declarative

3   statement to Mr. Satriano in front of the jury, "Okay.  So

4   this was never produced in this case.  Where is it?"

5          And believe Your Honor, to be clear, sustained the

6   objection, but this is highly prejudicial and the documents

7   were produced.  The documents I just showed -- half the

8   documents I just showed Mr. Satriano were on plaintiffs'

9   exhibit list.  And plaintiffs' counsel is making accusations

10  of withholding evidence in front of the jury, which we think

11  merits a curative instruction, Your Honor.  We could propose

12  language that's very simple and straightforward that says

13  that the suggestion that a document was not produced in the

14  pretrial discovery process is untrue.

15          **MR. RUDY:**  Your Honor, Lee Rudy for plaintiffs.

16          The confusion came from the witness's mouth.  The

17  witness was not sure when he had created these PowerPoints.

18          I was asking him, did you do any written analysis

19  before the net worth sweep?  That was my question.  And then

20  he volunteered that he did and he said he turned it over a

21  year ago.  These documents that Mr. Hoffman just showed were

22  not produced a year ago.  They were produced, like, way

23  before that.

24          So it was reasonable receiving that answer for me

25  to follow up as I did, Your Honor.  No curative instruction

RECROSS - SATRIANO

1    is warranted.  Frankly, I just cleaned it up for him with my

2    recross.

3              I'm happy with the state of the record as it is

4    right now, which is the witness admitted he didn't do any

5    analysis before the net worth sweep.  If there was any

6    confusion about that before my recross, I favorably to the

7    defendants resolved it.  And I think that this issue has

8    been put to bed with a bow around it.

9              Your Honor, there's certainly nothing improper

10   about me following up on a witness who, in front of the

11   jury, says I produced something to counsel a year ago when I

12   know I haven't gotten anything a year ago.

13             **MR. HOFFMAN:**  Your Honor, Ian Hoffman on behalf of

14   defendants.  We looked at the Realtime.  Mr. Satriano

15   said --

16             **THE COURT:**  Wait.  I heard it all.  The comments

17   made in front of the jury were improper, but I'm not giving

18   an instruction now.

19        (Sidebar discussion concluded.)

20             **THE COURT:**  Back.

21        (Sidebar discussion.)

22             **THE COURT:**  I'm talking about the comments made

23   regarding why was he not producing discovery.  I don't think

24   it was ever improper to be done in front of the jury.  You

25   make it to me first.  In any event, I am not going to try to

1    straighten it all out now.

2         (Sidebar discussion concluded.)

3              **THE COURT:**  You can step down.

4         (Witness stepped down.)

5              **THE COURT:**  Ladies and gentlemen, we're going to

6    stop for the day at this time.  After consulting with

7    counsel and after talking to you about the -- you can go

8    ahead and sit down.  After consulting with counsel and after

9    talking to the jurors as -- all have the record so far.

10             As you know, the Court is going to have

11   difficulties in sitting tomorrow because of security

12   problems connected with the criminal case going forward

13   against former President Trump.  I have decided that we will

14   not sit tomorrow.

15             I've consulted with counsel, and we will be able

16   to go forward and complete the testimony in the case by

17   sitting on Friday and Monday and probably have closing

18   arguments on Tuesday.  So it would delay us a little in

19   getting the trial completed but, hopefully, all of you will

20   be able to accommodate that schedule.

21             There will be so much security problems and other

22   things in connection with the President's appearance here

23   that I think it's going to be everybody's advantage to not

24   try to come down here tomorrow, and we'll convene at 10:00

25   on Friday here.

                         RECROSS - SATRIANO

1          Don't talk about the case.  Don't let anyone talk

2     to you about the case.  This is an important case, but I

3     think that everybody doesn't need a lot of hassle tomorrow.

4     So I'm going to save all of you the trouble, and we'll

5     convene at 10:00 on Friday.

6          Hopefully, the fencing around the courthouse will

7     be down by Friday morning.  If it's not, you'll still be

8     able to come in the Third Street entrance.  Have your jury

9     badges with you if we still have demonstrations and other

10    problems.  Just bring your juror badges with you, and you'll

11    be let in first.  You won't have to wait in the long lines

12    to come in.  Hopefully, everything will be back to normal

13    Friday.  I'll see you all at 10:00 Friday.

14          Don't read or listen to anything about this case,

15    but I don't think you'll see anything about this case.

16     [Laughter]

17     (Jury exited the courtroom.)

18          THE COURT:  All right.  Anything you all are dying

19    to do tonight?

20          MR. STERN:  Did you say we are dying to do,

21    Your Honor?

22          THE COURT:  I'll see you all Friday at 10.  You

23    are dying to do something.  Okay.  What is it?

24          MR. HOFFMAN:  Your Honor, I don't want to incur

25    the Court's wrath, but we have some documents that we wanted

RECROSS - SATRIANO

1    to move in --

2            **THE COURT:**  Okay.

3            **MR. HOFFMAN:**  That we expected there to be

4    objections to.  I'm responsible for these, Your Honor.  I

5    just need to sort of gather my notes.  So if you could --

6    either take a brief recess or --

7            **THE COURT:**  I'll wait for her to come back in.

8    Yeah.

9            **MR. HOFFMAN:**  Okay.

10           **THE COURT:**  You need some time first?

11           **MR. HOFFMAN:**  Just five to ten minutes just to

12   gather my papers, Your Honor, and my notes.  Thank you,

13   Your Honor.

14       (Recess.)

15           **MR. HUME:**  Judge Lamberth, Hamish Hume for the

16   plaintiffs.  Before we argue the objections, I wanted to

17   inform the Court, I've already informed defendants of this,

18   that our expert, Dr. Mason, Professor Mason, told us earlier

19   today around the middle of the day that he tested positive

20   for COVID.

21           He testified here Thursday and Friday.  It's now

22   Wednesday, almost a week later, and he tested positive

23   today.  However, he has been in court, including

24   yesterday -- not today, obviously, not after testing

25   positive, and he was with some of our lawyers yesterday

                     RECROSS - SATRIANO

1    evening.

2          So we're going to all test.  No one has any issues

3    so far.  The defendants know and may or may not test if they

4    have been in contact.  But I just wanted to make sure the

5    Court knew because we, obviously, want to be very careful --

6          **THE COURT:**  I appreciate, but he was pretty far

7    away from me.

8          **MR. HUME:**  Yeah.

9          **THE COURT:**  I think so.

10         **MR. HUME:**  Okay.

11         **THE COURT:**  My wife has just been tested and came

12   out negative, because she wasn't exposed but she thought she

13   had some symptoms but she came out negative twice so I think

14   she's safe.  I've, so far, come out negative every time.

15         **MR. HUME:**  I'm glad to hear it, Your Honor.  We're

16   all happy to hear that.  And I hope never to have to come

17   back to the issue.  I just wanted to let you know.  Thank

18   you.

19         **THE COURT:**  Thanks very much for bringing it to my

20   attention, though.

21         **MR. HOFFMAN:**  Your Honor, Ian Hoffman on behalf of

22   defendants.  I very much appreciate the Court's indulgence

23   to allow us to clear up --

24         **THE COURT:**  Sure.

25         **MR. HOFFMAN:**  -- some of these objections and

                       RECROSS - SATRIANO

1    document issues today.

2            So I have a list of exhibits that defendants will

3    move into evidence.  I understand that they fit into sort of

4    three buckets.  The largest bucket, thankfully, there's no

5    objection.

6            **THE COURT:**  Okay.

7            **MR. HOFFMAN:**  The second bucket, there are two

8    documents to which plaintiffs will object for the record.

9            **THE COURT:**  Okay.

10           **MR. HOFFMAN:**  And then two documents in which

11   there is a lot of objection that we will argue.

12           **THE COURT:**  Okay.

13           **MR. HOFFMAN:**  And so I'll happily read the numbers

14   through the first two buckets, and I'll do them in that

15   order so that plaintiffs' counsel can be prepared to note an

16   objection for the record.

17       (Brief pause.)

18           Okay, Your Honor, I'm getting my list straight

19   here.  Okay.  Um, these are several defense exhibits and,

20   just so plaintiffs can follow along, these are portions of

21   SEC filings that were played, that were displayed during the

22   Mayopoulos and Ross Kari depositions.

23           Now that the full and complete SEC filings have

24   been moved into evidence, we are going to move these in as

25   well because they were associated with those depositions.

                        RECROSS - SATRIANO

1          So this is Defendants' Exhibit 490; Defendants'

2    Exhibit 474; Defendants' Exhibit 368; Defendants' Exhibit

3    419 and Defendants' Exhibit 508.

4          **MR. KRAVETZ:**  No objection, Your Honor.

5          **THE COURT:**  Received.

6       (Defendants' Exhibits 368, 419, 474, 490 and 508 were

7    received.)

8          **MR. HOFFMAN:**  Next, Your Honor, again, so folks

9    can follow along, there are two exhibits that we will move

10   in that will be part of the Donald Layton deposition

11   testimony.  I believe there's no objection to these either,

12   but we'll just move them in now while we're on exhibit

13   issues.

14          Those are Defendants' Exhibit 408 and Plaintiffs'

15   Exhibit 261.

16          **MR. KRAVETZ:**  No objection.

17          **THE COURT:**  Received.

18       (Defendants' Exhibit 408 was received.)

19       (Plaintiffs' Exhibit 261 was received.)

20          **MR. HOFFMAN:**  And these are a few additional ones

21   that I believe are associated with Dr. Attari's testimony.

22   Again, I believe there is no objection to these either.

23   Defendants' exhibit -- and I'll say DX, DX-81-A, as in

24   Alpha; DX-83; DX-219; DX-272; DX-299; DX-329; DX-344;

25   DX-365; DX-418; DX-469; DX-393; and DX-919-A, as in Alpha.

                         RECROSS - SATRIANO

1          **MR. KRAVETZ:**  No objection.

2          **THE COURT:**  Received.

3       (Defendants' Exhibits 81-A, 83, 219, 272, 299, 329,

4    344, 365, 393, 418, 469 and 919-A were received.)

5          **MR. HOFFMAN:**  I think that takes us to the two

6    documents in which I understand there will be an objection

7    for the record.  These were addressed in Your Honor's

8    pretrial opinion.  And these two exhibits were admitted --

9    or the Court ruled that they would be admitted over

10   plaintiffs' objection.  These are DX-412 and DX-529.

11         **MR. KRAVETZ:**  I object for the record, Your Honor.

12         **THE COURT:**  They are received.

13      (Defendants' Exhibits 412 and 529 were received.)

14         **MR. HOFFMAN:**  Let me just confer with my team to

15   make sure I've got all of my numbers straight.

16         All right.  Very good.  Thank you, Your Honor.

17   That takes us to the two exhibits that defendants would move

18   into evidence, and I'm happy to present why they are

19   admissible.  The first is Defendants' Exhibit 380-A, as in

20   Alpha.

21         And I'll note the second one and then I'll circle

22   back to it.  The second is Defendants' Exhibit 339.  So

23   we're talking 380-A and DX-339.

24         So let's start with Defendants' Exhibit 380-A.

25         And, Mr. Montgomery, if you could pull it up on

RECROSS - SATRIANO

1    the screen.

2              **MR. MONTGOMERY:**  [Complied]

3              **MR. HOFFMAN:**  Just to orient Your Honor, this is

4    an email from an analyst attaching an analyst report.

5    Your Honor has heard a lot about analyst reports and the

6    relevance here in the case, and I'm not going to rehash it.

7              Actually, it's probably better to start,

8    Mr. Montgomery, with the Court's opinion.  And you can pull

9    it up at Page 5 for the Court to follow along.  But the

10   Court ruled before this trial and reaffirmed that analyst

11   reports could be offered for their effect on FHFA

12   decision-makers' state of mind.

13             So this is towards the bottom of the page maybe

14   four lines up from the bottom and thus could be offered.

15   Four lines up from the bottom, "thus could be offered for

16   their effect on the FHFA decision-makers' state of mind."

17             And the Court -- for the two documents that were

18   at issue in this opinion, at the bottom of Page 6 and top of

19   Page 7, Your Honor let them in.  And on the bottom of Page 6

20   in the middle of the line where it says, "But there is a

21   clear chain of inferences," Your Honor ruled that "There is

22   a clear chain of inferences the jury could draw:  That the

23   reports' presence in email chains and meeting notes related

24   to the third amendment implies that Mr. Demarco and/or

25   Ugoletti saw and read them and that, after doing so, they

1    considered the reports in the decision-making process."

2              **THE COURT:**  Right.

3              **MR. HOFFMAN:**  And they were relevant for that

4    purpose.  Your Honor, both of the documents -- you can take

5    that down, Mr. Montgomery.

6              **MR. MONTGOMERY:**  [Complied]

7              **MR. HOFFMAN:**  Both of the analyst reports we're

8    moving in, there's ample evidence that Mr. Ugoletti saw

9    them, considered them at the time and they were part of the

10   decision-making process.  There is sufficient evidence for

11   that.

12             So if we go back to 380-A.  Mr. Montgomery, 380-A.

13             **MR. MONTGOMERY:**  [Complied]

14             **MR. HOFFMAN:**  And in the middle of the page,

15   Your Honor, I'm not going to dwell on this, but this is

16   Barclays Capital is sending Jamie Newell who's at FHFA --

17   Mr. Satriano gave testimony about Jamie Newell -- and

18   Mr. Rajiv Setia from Barclays Capital is attaching an

19   analyst report and also giving some of his sort of color

20   commentary on it.

21             I believe Mr. Setia, he's obviously from Barclays.

22   I can't recall at the moment if he authored the report but

23   he's passing it along.

24             Let's go to the first page of the report itself.

25   And if we look at Page 7 of 19, and under the section, the

                        RECROSS - SATRIANO

1   last paragraph starts with "already."  It says, "Already,

2   both GSEs have noted that it is unlikely that we will

3   regularly generate net income in excess of our annual

4   dividends payable to Treasury."

5           And the analyst goes on to say, "Continued losses

6   at the GSEs after 2012, driven by the preferred dividends,"

7   this is circularity issue, Your Honor, "at a time when they

8   do not have the benefit of an unlimited capital backstop

9   would pose a threat to global financial stability in our

10  view."  So this is talking about the caps coming and market

11  analyst's concern.

12          So if we go back to the very first page of this

13  document, Mr. Montgomery.

14          **MR. MONTGOMERY:**  [Complied]

15          **MR. HOFFMAN:**  The document was sent by Barclays --

16  from Barclays to Jamie Newell at FHFA.  And Jamie Newell, up

17  top, forwards it to Mr. Ugoletti, "Mario, just passing along

18  some color from a Barclay's analyst."  The date here is

19  significant, Your Honor.  It was sent on January 11, 2012.

20  And then you can see the attachment here indicates that

21  Mr. Ugoletti received this attachment.

22          This alone, Your Honor, I think, is sufficient to

23  demonstrate that it was, you know, considered or there is at

24  least sufficient evidence for the jury to conclude that it

25  was considered by Mr. Ugoletti at the time.

                    RECROSS - SATRIANO

1          But there's even more, Your Honor, and I'll ask

2    Mr. Montgomery to pull up Defendants' Exhibit 381, which is

3    not yet in evidence but we expect to move it in.

4          **MR. MONTGOMERY:**  [Complied]

5          **MR. HOFFMAN:**  381 is, this is an internal FHFA

6    email, Your Honor, and the date here is January 19th, 2012,

7    which is seven days -- eight days after Mr. Ugoletti got the

8    Barclays' analyst report.  What's being attached here to

9    this email from Ms. Burns within FHFA to Mr. DeMarco and

10   Mr. Ugoletti.

11         So let's go to the first page of the attachment,

12   Mr. Montgomery.

13         **MR. MONTGOMERY:**  [Complied]

14         **MR. HOFFMAN:**  So this document is a PowerPoint

15   presentation for a meeting with the Treasury Department in

16   early January of 2012 that sort of initiated the discussions

17   about what became the third amendment.

18         So if we look at Page 6 of 17 and then just call

19   out the sending bullet.

20         **MR. MONTGOMERY:**  [Complied]

21         **MR. HOFFMAN:**  So just about a week after

22   Mr. Ugoletti got the Barclays' analyst report, here is this

23   presentation that FHFA is going to give in its meeting with

24   Treasury that says, "Some market participants have begun to

25   raise questions regarding whether this will be sufficient to

                         RECROSS - SATRIANO

1    continue investment in the enterprises."

2         And the first bullet, you can see, is talking

3    about that cap.  So there is ample evidence that this was

4    considered and, indeed, right before this meeting though

5    that's not even essential to the evidentiary foundation.  So

6    this, we think, is squarely within the Court's prior ruling

7    that it is not being offered for a hearsay purpose but for

8    the effect on the FHFA decision-makers' state of mind.

9         So you can take that down, Mr. Montgomery.

10        **MR. MONTGOMERY:**  [Complied]

11        **MR. HOFFMAN:**  The next document is very similar,

12   Your Honor.  Defendants' Exhibit 339, let's pull that up.

13        **MR. MONTGOMERY:**  [Complied]

14        **MR. HOFFMAN:**  So this is a Moody's analyst report.

15   Moody's, of course, is a credit rating agency.  And this one

16   is dated a little bit earlier but not that much earlier,

17   September 26th, 2011 there in the top right corner.

18        Mr. Montgomery, if we go to Page 16 of 57.

19        **MR. MONTGOMERY:**  [Complied]

20        **MR. HOFFMAN:**  And then let's call out the

21   paragraph of text right below the first chart,

22   "Furthermore."

23        **MR. MONTGOMERY:**  [Complied]

24        **MR. HOFFMAN:**  So Moody's is saying here

25   "Furthermore, dividends on the U.S. Treasury's senior

RECROSS - SATRIANO

1   preferred stock will eliminate Fannie Mae's contingent

2   capital by 2019 and Freddie Mac's by 2022."  That's the

3   Treasury commitment, the contingent capital, that's being

4   referred to.  This assumes that the GSEs are able to fully

5   offset credit losses.

6           So now, let's go down to the bottom paragraph of

7   this report, "However."

8           **MR. MONTGOMERY:**  [Complied]

9           **MR. HOFFMAN:**  So it's talking about if GSE reform

10  is too contentious to address the issues with the GSEs in

11  the last sentence that starts, "In this case."

12          "In this case, the GSEs' debt ratings would

13  depend" on the company's financial -- I'm sorry -- "on the

14  company's capital position and financial profile, and would

15  likely be multiple notches below the current AAA ratings."

16          And before, the first paragraph, you can just

17  actually highlight the whole sentence, Mr. Montgomery, the

18  "however" sentence.

19          **MR. MONTGOMERY:**  [Complied]

20          **MR. HOFFMAN:**  The punch line here, Your Honor, is

21  that Moody's is saying, if the cap issue isn't fixed, it

22  could prompt a review of Fannie and Freddie's credit ratings

23  for their bonds, and that would be a very consequential

24  thing.  And so if -- there is evidence, Your Honor, that

25  this was also considered by the FHFA decision-makers.

                          RECROSS - SATRIANO

1            So let's pull up Plaintiffs' Exhibit 351.

2            **MR. MONTGOMERY:**  [Complied]

3            **MR. HOFFMAN:**  And this is the declaration of

4   Mr. Ugoletti, Your Honor.  And this has been admitted into

5   evidence.  The plaintiffs put it into evidence.

6            This, of course, is a declaration that was

7   submitted in this case, early in this case.  And it

8   describes, you know, a sort of point-by-point FHFA's

9   rationale for the third amendment.

10           So if you go to Paragraph 15, Mr. Montgomery.

11           **MR. MONTGOMERY:**  [Complied]

12           **MR. HOFFMAN:**  And let's call out the first

13   portion, maybe the first five lines or so of Paragraph 15.

14           **MR. MONTGOMERY:**  [Complied]

15           **MR. HOFFMAN:**  "Market forecasts -- which FHFA

16   monitored -- predicted that the enterprises' ongoing payment

17   of the 10 percent dividend would completely exhaust

18   Treasury's funding commitment within ten years, leading to

19   potential downgrades in enterprises' credit ratings."

20           That's Mr. Ugoletti speaking.

21           And the very next sentence says, "Moody's rating

22   service opined that the 10 percent dividend payments would

23   eliminate Fannie's contingent capital" and the rest of the

24   sentence I just read.  And they cite, Mr. Ugoletti cites

25   here the Moody's report.

                          RECROSS - SATRIANO

1        And so, this too, Your Honor, is sufficient

2    evidence for the jury to conclude that this also factored

3    into Mr. Ugoletti's and the FHFA decision-makers, into their

4    decision-making process in connection with the third

5    amendment.

6        Finally, at the very bottom portion of this call

7    out, there it says, "Likewise Deutsche Bank observed" --

8    that Deutsche Bank analyst report was another one that

9    Your Honor has already admitted, so it's consistent here

10   that these are listing out.  There's sufficient evidence

11   that these are listing out, you know, certain of the analyst

12   reports that Mr. Ugoletti relied upon.

13       So we would respectfully move in DX-399 and 380

14   for their non-hearsay purpose.

15       **THE COURT:**  All right.

16       **MR. KRAVETZ:**  Good afternoon, Your Honor.  Robert

17   Kravetz on behalf of plaintiffs.  Just going to call out

18   Defense Exhibit 380-A.

19       Your Honor, as we're booting up, I can start my

20   argument.

21       Defendants' Exhibit 380-A is an email from January

22   2012 which contains quadruple hearsay.  It is an email from

23   an analyst from Barclays who is discussing a conversation

24   that that person had from someone from Moody's who then

25   reports it to Jamie Newell who passes it on to

1    Mario Ugoletti.

2            Part of the text of the cover email has nothing to

3    do with the analyst report itself, which is attached

4    thereto.  And, you know, when you get into the timing, we

5    have not only hearsay objections, and it's clearly hearsay,

6    but also 403 objections.

7            There's no -- there's no indication that this

8    particular report had any impact eight months later at the

9    time of the net worth sweep.  And to the extent that it did,

10    we could hear from Mr. DeMarco on Friday.  Mr. Ugoletti is

11    not going to be called by defendants.  He's only appeared

12    via deposition.

13            And not only is this hearsay but also, from a 403

14    perspective, you know, the fact that you have the underlying

15    analyst report is dated December 2011.  So, Your Honor, this

16    is prior to even the 2011 annual report being filed, which

17    would have been filed in, I believe, March of 2012.

18            So we're now talking about three reporting cycles

19    back, and Your Honor now knows how much has happened in the

20    state of the world and the state of the GSEs between the

21    time of December 2011 and the date of the net worth sweep.

22            So for those reasons, we think, not only is this

23    hearsay, quadruple hearsay and, at minimum, should the cover

24    email be redacted, but the report itself is unduly

25    prejudicial given the timing of the report, given that it's

                          RECROSS - SATRIANO

1    multiple cycles back in the process and given that the GSEs

2    had moved on at this point by August 17th of 2012.

3            And Your Honor's opinion, the rest of it on Page

4    7, Your Honor stated that there had to be some type of

5    implication that DeMarco -- "DeMarco and/or Ugoletti saw

6    them and read them and that, after doing so, they considered

7    the reports in the decision-making process."

8            And the timing here is way too attenuated.  It's

9    not like this is a report from August or just a couple

10   months before the net worth sweep.  This is an email in

11   January attaching a report from December.  And we think it

12   could cause confusion among the jury as to how much they

13   should -- how much weight they should give to this

14   particular document, particularly because it's unclear

15   whether anyone will testify about it.

16           If Mr. DeMarco testifies about it on Friday or

17   Monday, then maybe we have a different conversation about

18   this particular analyst report.

19           The other one, I think, Your Honor, DX-339, is a

20   much easier call.  This is a 57-page weekly credit outlook

21   that contains a whole host of information, including

22   information completely unrelated to Fannie and Freddie.

23   This would have been 11 months earlier from the time of the

24   net worth sweep.

25           Your Honor heard evidence, I think, already over

                        RECROSS - SATRIANO

1    the course of this trial from Dr. Dharan and will hear from

2    Dr. Attari, because he testified similarly at the last

3    trial, that neither GSE, in fact, was ever put on a ratings

4    watch list.  Neither GSE, in fact, was ever downgraded

5    beyond what U.S. Treasury bonds were.

6             If I could just ask if we could pull up

7    Plaintiffs' Exhibit 257, please, Ms. McGuire.

8             **MS. McGUIRE:**  [Complied]

9             **MR. KRAVETZ:**  If you recall, Your Honor, this is a

10   document that came into evidence a couple days ago.  This is

11   four days prior to the third amendment, Monday, August 13th,

12   2012.  And if we can call out the last paragraph, Ms.

13   McGuire.

14            **MS. McGUIRE:**  [Complied]

15            **MR. KRAVETZ:**  This is Fitch -- on the next page?

16            **MS. McGUIRE:**  [Complied]

17            **MR. KRAVETZ:**  And Fitch is confirming exactly what

18   I was saying that there hadn't been a downgrade.  It's

19   unlikely there is going to be any type of near-term pressure

20   of GSE ratings.  So between the date of this report, Your

21   Honor, September 2011 to August of 2012, neither GSE had

22   been placed on a ratings watch list let alone downgraded.

23            So introducing this document would cause nothing

24   but confusion among the jury in terms of how they should

25   consider it.  And there's a reference to the fact that this

                              RECROSS - SATRIANO

1    is -- that Mr. Ugoletti referred to the document in PX-351.

2    That's a post hoc declaration filed in December 2013.  So

3    there's no indication that anything from this particular

4    document would have had an impact on the decision-making

5    process 11 months later.

6              So for those reasons, we move to exclude the

7    documents.

8              **MR. HOFFMAN:**  Your Honor, as the movant, may I be

9    heard briefly?

10             **THE COURT:**  Sure.

11             **MR. HOFFMAN:**  So on Defendants' Exhibit 380-A, the

12   Barclays one, Your Honor.  I hear no argument from

13   plaintiffs' counsel that, if there's evidence that

14   Mr. Ugoletti saw and considered this, then it would be

15   admissible.  And the document clearly shows that he saw it

16   and he considered it.  And it goes -- all of it goes to the

17   effect on the listener.  It's a non-hearsay purpose.

18             Mr. Kravetz, plaintiffs' counsel, argues that it's

19   too old because it was back in January of 2012.  But,

20   Your Honor, the negotiation and discussion process was

21   beginning just around that time.  And the document I showed

22   a moment ago, Your Honor, is -- one week later there's a

23   meeting between Mr. DeMarco and Mr. Ugoletti, on the one

24   hand, and the Treasury Department, on the other hand, to

25   begin the discussions of what eventually becomes the third

RECROSS - SATRIANO

1    amendment.

2          And so it's -- it is -- it is extremely clear from

3    the record that that would have had an impact and impacted

4    their decision-making.

5          I heard a lot, Your Honor, about, well, there is

6    no witness that has testified about these things yet.

7    That's the exact same argument, Your Honor, that plaintiffs

8    made both in the first trial and they made it again in their

9    pretrial Motion in Limine to exclude the Deutsche Bank and

10   the other analyst report.  And the Court has consistently

11   ruled that, if there's a sufficient foundation in the

12   documents, you don't need testimony.

13          All of the argument about, it's too old, the

14   timing is too attenuated, it all goes to the weight.  They

15   can argue that very ably to the jury that they should be

16   discounted.  Again, there's a little bit of picking and

17   choosing, I feel like, that's going on, Your Honor,

18   because -- you know --

19          **THE COURT:**  If you leave those documents with me,

20   I'll look at them tomorrow.  And we'll be in recess and I'll

21   see you all at 10:00.

22          **MR. HOFFMAN:**  Thank you very much, Your Honor.  I

23   appreciate it.

24          **THE COURT:**  On Friday.

25       (Proceedings concluded at 5:23 p.m.)

                    RECROSS - SATRIANO

1          **C E R T I F I C A T E**

2

3          I, **Lorraine T. Herman, Official Court Reporter,**

4    certify that the foregoing is a true and correct transcript

5    of the record of proceedings in the above-entitled matter.

6

7

8     ___August 2, 2023___        ___/s/  Lorraine T. Herman___
            **DATE**                    **Lorraine T. Herman**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    RECROSS – SATRIANO

**BY MR. HOFFMAN:**
**[16]**  4/14 5/25 6/20 8/8
9/2 9/16 10/10 17/7
102/13 103/10 104/15
105/23 106/9 107/11
108/9 108/25

**BY MR. RUDY: [65]**
13/13 15/7 18/12 18/24
19/12 19/22 20/5 21/3
21/21 22/17 23/6 23/20
24/14 25/8 25/19 27/3
29/12 30/18 33/24 34/8
37/9 39/16 42/16 43/19
46/12 50/23 51/6 52/10
53/13 54/8 58/16 62/22
63/6 63/13 64/9 65/20
66/4 70/5 71/10 72/6
72/18 75/16 76/16
79/24 81/17 82/11
88/16 89/10 90/10
90/21 91/5 92/24 94/11
95/2 95/17 96/7 96/16
97/1 97/12 98/11 99/10
100/8 101/11 101/23
112/7

**DEPUTY CLERK: [2]**
66/2 92/16

**MR. HOFFMAN: [79]**
4/5 4/11 6/12 6/17 8/7
8/19 8/24 9/11 10/3
10/6 10/8 13/4 13/7
17/3 22/24 25/14 29/10
30/13 36/14 36/17
36/21 62/20 63/4 74/10
74/15 78/18 79/22
81/15 82/5 88/7 92/18
94/8 104/9 104/13
105/15 106/3 108/1
108/7 108/20 108/22
109/21 110/1 111/5
113/18 113/21 115/13
117/24 118/3 118/9
118/11 119/21 119/25
120/7 120/10 120/13
121/8 121/20 122/5
122/14 123/3 124/3
124/7 124/14 125/15
126/5 126/14 126/21
127/11 127/14 127/20
127/24 128/9 128/20
129/3 129/12 129/15
134/8 134/11 135/22

**MR. HUME: [4]**  118/15

**MR. KRAVETZ: [8]**
121/4 121/16 122/1
122/11 130/16 133/9
133/15 133/17

**MR. MONTGOMERY:**
**[30]**  6/16 6/19 8/6 9/1
9/15 10/5 10/7 13/6
103/9 104/12 105/22
107/10 108/21 108/24
123/2 124/6 124/13
125/14 126/4 126/13
126/20 127/10 127/13
127/19 127/23 128/8
128/19 129/2 129/11
129/14

**MR. RUDY: [81]**  5/18
8/21 13/10 15/5 18/10
18/21 19/10 19/16
19/19 20/2 21/1 21/18
22/22 23/2 23/17 24/9
24/11 25/3 25/5 25/13
25/17 27/1 33/19 33/21
34/6 36/16 39/13 42/14
43/17 46/10 50/21 51/2
52/7 53/10 54/2 54/4
58/13 58/15 63/10 64/6
65/9 65/11 65/19 66/3
70/4 71/9 74/13 78/21
78/23 82/7 82/10 88/9
88/13 89/7 90/7 90/18
92/15 92/17 92/21 94/3
94/6 94/23 95/15 96/5
96/13 96/22 96/24 97/8
97/11 98/7 99/8 100/6
101/9 101/21 102/5
102/8 107/9 110/5
110/8 112/3 114/15

**MR. STERN: [1]**
117/20

**MS. McGUIRE: [59]**
15/6 18/11 18/23 19/11
19/18 20/4 21/2 21/20
22/16 23/5 23/19 24/10
24/13 25/4 25/7 27/2
33/20 34/7 42/15 43/18
46/11 50/22 51/5 52/9
53/11 54/3 54/7 58/14
63/12 64/8 70/3 71/8
72/3 72/17 78/22 88/12
88/15 89/9 90/9 90/20
91/4 92/23 94/4 95/1
95/16 96/6 96/15 96/23
96/25 97/10 98/10 99/9

108/6 133/8 133/14
133/16

**THE COURT: [61]**  4/4
4/7 5/19 8/22 13/9 17/4
22/25 25/15 29/11
30/14 36/19 37/4 37/8
62/21 63/5 65/8 65/10
65/15 65/17 74/17 75/7
75/12 76/5 76/9 78/20
79/23 81/16 82/9 88/8
92/19 94/9 102/11
110/4 111/24 115/16
115/20 115/22 116/3
116/5 117/18 117/22
118/2 118/7 118/10
119/6 119/9 119/11
119/19 119/24 120/6
120/9 120/12 121/5
121/17 122/2 122/12
124/2 130/15 134/10
135/19 135/24

**THE WITNESS: [13]**
5/20 17/5 30/15 72/4
74/11 74/19 75/9 75/14
76/7 76/10 88/11 92/14
106/5

**$**
**$1.8 [1]**  26/12
**$100 [1]**  35/4
**$11.7 [1]**  55/13
**$12 [1]**  52/23
**$15.462 [1]**  52/14
**$24 [1]**  34/16
**$250 [1]**  85/16
**$50 [4]**  61/3 61/15 63/1
63/8
**$50.6 [3]**  33/12 34/3
34/9
**$6.19 [1]**  52/17
**$6.558 [1]**  52/19
**$62 [2]**  11/17 72/19
**$63.6 [2]**  42/24 43/10
**$75 [4]**  30/24 34/20
38/3 40/13

**'**
**'09 [1]**  85/1
**'10 [1]**  85/1
**'11 [2]**  20/19 85/1
**'12 [2]**  52/25 85/1
**'Better [1]**  23/24
**'While [1]**  24/3

**/s [1]**  136/8

**1**
**1.1 [1]**  20/19
**10 [9]**  65/10 84/24 85/1
85/9 85/13 86/3 117/22
129/17 129/22
**10-K [4]**  92/13 92/25
93/23 101/13
**10-Q [14]**  18/14 18/18
19/8 19/14 22/10 33/22
42/11 47/22 48/2 55/10
95/20 96/9 97/24 100/5
**100 [1]**  31/10
**10020 [1]**  2/6
**1053 [1]**  1/3
**10:00 [4]**  116/24 117/5
117/13 135/21
**11 [3]**  125/19 132/23
134/5
**123 [1]**  2/3
**1251 [1]**  2/6
**1288 [1]**  1/8
**12th [2]**  104/25 105/10
**13 [1]**  108/2
**13th [1]**  133/11
**14 [2]**  96/8 96/9
**1401 [1]**  1/24
**14th [12]**  64/3 65/5
66/13 66/17 66/19
68/22 69/9 85/8 87/25
103/24 107/4 107/5
**15 [4]**  38/20 85/10
129/10 129/13
**1523 [1]**  1/18
**158 [3]**  92/12 92/20
101/12
**16 [2]**  95/20 127/18
**161 [2]**  100/6 100/11
**162 [2]**  100/6 100/19
**1625 [1]**  2/16
**17 [1]**  126/18
**1700 [1]**  2/13
**17th [4]**  4/18 48/23
102/23 132/2
**19 [1]**  124/25
**19087 [1]**  1/21
**19801 [1]**  2/3
**19th [1]**  126/6
**1:13-1053 [1]**  1/3
**1:13-1288 [1]**  1/8
**1:57 [1]**  1/6
**1st [3]**  46/19 46/22

**1**

**1st... [1]** 74/18

**2**

**2-2-2012 [1]** 61/24
**2.9 [2]** 20/17 25/22
**20 [2]** 38/20 38/21
**20001 [2]** 2/11 2/22
**20005 [1]** 1/24
**20006 [2]** 2/14 2/17
**20036 [1]** 1/18
**2008 [7]** 24/18 28/15
68/7 84/9 84/20 85/1
85/20
**2009 [2]** 20/8 102/2
**2010 [1]** 52/14
**2011 [14]** 20/22 52/17
52/25 54/18 92/13
92/22 93/2 95/4 101/15
127/17 131/15 131/16
131/21 133/21
**2012 [50]** 4/18 7/12
7/13 12/7 12/22 18/13
19/13 20/10 20/13
21/24 23/8 23/11 23/14
24/5 24/6 25/23 26/24
31/5 43/4 46/16 47/21
52/19 54/16 58/1 58/3
60/15 60/25 61/24
62/24 68/7 80/3 80/11
91/23 94/6 97/15
100/22 102/23 107/21
113/5 113/6 125/6
125/19 126/6 126/16
130/22 131/17 132/2
133/12 133/21 134/19
**2012/2013 [1]** 36/2
**2013 [29]** 30/21 33/10
33/21 34/21 36/2 40/7
41/4 42/6 42/11 42/25
43/3 43/6 43/8 63/7
102/25 103/24 104/6
104/25 105/10 105/12
106/13 106/14 107/4
107/5 112/17 113/3
113/7 114/2 134/2
**2015 [1]** 54/16
**2019 [1]** 128/2
**202-354-3196 [1]** 2/23
**2022 [1]** 128/2
**2023 [2]** 1/5 136/8
**21 [1]** 106/13
**219 [2]** 121/24 122/3
**22nd [1]** 106/14

**23rd [9]** 7/12 7/13 12/7
72/7 73/4 73/18 75/4
76/13 88/22
**249 [1]** 92/21
**250 [4]** 85/20 85/23
87/7 87/14
**257 [1]** 133/7
**259 [5]** 63/11 65/23
78/21 89/8 108/23
**261 [2]** 121/15 121/19
**26th [1]** 127/17
**272 [2]** 121/24 122/3
**27th [1]** 49/10
**280 [1]** 1/21
**28th [4]** 70/10 72/9
72/10 72/11
**299 [2]** 121/24 122/3
**2Q [1]** 95/20

**3**

**3-A [4]** 10/6 11/13 71/9
72/16
**30 [2]** 20/10 111/25
**30th [13]** 46/22 46/25
47/5 48/6 48/11 48/19
48/20 49/11 49/12
49/15 75/8 75/18
100/22
**31 [1]** 54/18
**3196 [1]** 2/23
**328 [2]** 104/11 104/16
**329 [2]** 121/24 122/3
**333 [1]** 2/21
**336 [5]** 103/7 103/23
104/10 106/23 107/2
**339 [4]** 122/22 122/23
127/12 132/19
**344 [3]** 33/19 121/24
122/4
**34th [1]** 97/7
**350,000 [1]** 26/9
**351 [2]** 129/1 134/1
**365 [2]** 121/25 122/4
**368 [2]** 121/2 121/6
**374 [1]** 92/21
**380 [1]** 130/13
**380-A [8]** 122/19
122/23 122/24 124/12
124/12 130/18 130/21
134/11
**381 [2]** 126/2 126/5
**393 [2]** 121/25 122/4
**399 [1]** 130/13

**4**

**403 [2]** 131/6 131/13
**408 [2]** 121/14 121/18
**41 [1]** 108/2
**412 [2]** 122/10 122/13
**418 [2]** 121/25 122/4
**419 [2]** 121/3 121/6
**45 [1]** 42/14
**469 [2]** 121/25 122/4
**474 [2]** 121/2 121/6
**476 [5]** 18/9 95/20
96/13 98/13 100/4
**477 [3]** 19/10 96/5
98/13
**490 [2]** 121/1 121/6
**499-A [1]** 49/6

**5**

**5.1 [1]** 23/10
**5.9 [1]** 26/6
**508 [2]** 121/3 121/6
**51 percent [1]** 50/15
**51-percent [1]** 52/3
**529 [2]** 122/10 122/13
**560 [9]** 6/13 6/14 6/15
8/5 8/20 8/23 9/13 70/2
88/9
**57 [1]** 127/18
**57-page [1]** 132/20
**594 [2]** 94/3 94/10
**595 [5]** 21/18 22/23
23/1 107/12 107/17
**596 [3]** 25/5 25/13
25/16
**5:23 p.m [1]** 135/25

**6**

**601 [1]** 2/10
**6035 [1]** 94/24
**663 [1]** 42/10
**6720 [1]** 2/22

**7**

**7.8 [1]** 23/13
**75 [1]** 101/13
**7th [2]** 74/20 75/3

**8**

**8-K [2]** 21/13 22/1
**81-A [1]** 122/3
**83 [2]** 121/24 122/3
**85 [4]** 96/14 96/17 97/3
97/17
**8th [6]** 21/24 74/21

**163 [1]** 75/3 75/10 76/12

**9**

**90.8 [1]** 53/23
**916 [1]** 15/5
**919-A [1]** 122/4
**94.7 [1]** 53/24

**A**

**AAA [1]** 128/15
**ability [1]** 67/7
**able [9]** 28/1 50/10
73/25 101/5 112/19
116/15 116/20 117/8
128/4
**ably [1]** 135/15
**about [165]**
**above [4]** 19/23 44/13
88/13 136/5
**above-entitled [1]**
136/5
**accelerated [8]** 10/21
79/7 83/1 83/17 89/1
89/24 91/10 93/19
**acceleration [3]** 83/25
86/5 87/21
**accept [1]** 110/12
**accepted [1]** 29/2
**accommodate [1]**
116/20
**accompanied [2]**
21/23 22/10
**accompany [1]** 21/6
**according [1]** 65/3
**account [2]** 41/19
41/24
**accountant [9]** 6/6
12/17 35/25 60/11
63/22 63/23 80/14
106/6 106/21
**accountants [3]** 86/23
109/12 109/14
**accounting [30]** 15/20
16/21 16/25 17/18
17/22 18/2 27/8 29/2
29/18 29/22 29/22
29/23 30/12 31/14 32/2
32/3 33/1 38/8 40/15
41/15 45/10 51/23
51/24 53/5 56/5 56/17
56/18 69/5 106/8
109/13
**accrual [2]** 29/22
41/15

**A**

accuracy [1] 101/5
accurate [4] 16/8
99/18 100/21 101/18
accusations [1] 114/9
achieved [3] 56/1 56/5
57/13
acting [2] 106/7
106/12
Action [3] 1/2 1/8 1/9
actions [4] 17/16 20/7
23/25 36/6
activity [2] 43/3 47/13
actual [6] 7/2 29/18
30/10 30/11 32/10
102/25
actually [20] 15/15
24/11 24/21 27/21
38/16 40/12 40/17
41/12 42/1 42/19 43/9
43/12 47/12 47/16
52/11 81/6 97/11
112/24 123/7 128/17
ADAM [1] 2/4
additional [3] 26/11
40/22 121/20
address [1] 128/10
addressed [1] 122/7
adjustment [1] 47/14
adjustments [1] 41/15
administration [1]
93/4
admissible [2] 122/19
134/15
admission [1] 105/17
admitted [5] 115/4
122/8 122/9 129/4
130/9
advance [1] 59/2
advanced [1] 59/5
advantage [1] 116/23
advice [2] 16/25 112/3
affect [2] 47/3 88/5
affected [1] 20/6
after [34] 4/16 7/13
7/15 7/21 8/16 39/23
48/10 48/19 49/14 50/3
58/4 59/4 73/19 74/2
76/12 76/19 79/16
83/10 88/17 102/22
103/25 111/9 112/17
113/14 116/6 116/7
116/8 116/8 118/24
123/25 125/6 126/7

afternoon [5] 4/8 4/11
65/21 102/14 130/16
afterwards [1] 111/1
again [20] 14/3 14/12
15/3 25/18 26/22 29/15
42/18 49/11 72/16 89/8
95/7 100/4 102/14
104/13 105/16 107/3
121/8 121/22 135/8
135/16
against [8] 11/18
12/20 27/17 27/25
49/19 72/20 78/15
116/13
agency [11] 1/6 2/8
6/24 8/13 35/12 36/6
38/9 70/12 81/6 81/7
127/15
agency's [1] 106/7
ago [16] 7/6 9/18 35/1
43/21 61/8 61/11 62/16
71/18 89/18 92/7
114/21 114/22 115/11
115/12 133/10 134/22
agree [43] 13/14 13/23
13/24 13/25 14/3 14/5
14/6 14/7 14/9 14/16
14/17 16/17 22/20
27/11 30/1 40/1 45/19
48/16 49/18 49/22 50/5
50/6 50/17 51/20 51/22
52/1 55/25 56/7 56/8
56/9 56/13 65/2 65/7
69/8 69/10 69/11 69/19
71/2 71/4 76/24 79/19
89/20 90/4
agreed [2] 77/8 78/14
agreement [3] 1/9
10/14 10/16
ahead [5] 71/7 103/20
108/10 112/9 116/8
aided [1] 2/25
al [3] 1/2 1/2 1/6
all [37] 4/4 11/13 40/9
40/22 42/3 62/5 65/17
69/7 69/12 84/10 87/16
89/2 97/2 97/2 97/14
102/2 109/20 110/4
110/21 115/16 116/1
116/9 116/19 117/4
117/13 117/18 117/18
117/22 119/2 119/16
122/15 122/16 130/15

134/16 135/13 135/14
135/21
allegation [1] 110/10
allegations [1] 82/6
allow [1] 119/23
allowance [17] 5/23
5/24 11/18 11/20 12/3
12/13 27/24 28/8 38/10
44/7 45/6 46/15 67/22
72/20 72/22 74/22
104/22
allowances [1] 65/5
allowed [1] 77/21
almost [4] 24/19 98/15
99/6 118/22
alone [4] 13/15 75/19
125/22 133/22
along [8] 12/8 41/11
109/5 120/20 121/9
123/9 124/23 125/17
Alpha [3] 121/24
121/25 122/20
already [14] 39/24
52/2 65/4 83/21 83/22
84/1 85/2 87/5 90/22
118/17 125/1 125/1
130/9 132/25
also [10] 7/3 10/19
21/10 67/20 69/11
124/19 128/25 130/2
131/6 131/13
Although [4] 95/21
96/10 108/7 108/12
always [1] 24/19
am [13] 16/9 37/18
40/21 47/23 60/4 63/9
77/10 77/22 77/23 78/9
91/22 92/14 115/25
amendment [39] 4/16
4/17 4/21 5/6 7/14 7/15
10/22 10/23 11/10
13/15 13/23 15/20
15/25 16/3 16/18 17/18
17/22 18/2 64/4 82/3
83/11 83/16 83/24
83/25 87/18 87/23 88/1
88/18 89/20 102/22
104/1 111/8 111/22
123/24 126/17 129/9
130/5 133/11 135/1
amendments [11]
78/25 79/4 86/18 90/5
90/14 90/22 91/1 91/2
91/10 91/12 91/13

134/16 135/13 135/14
135/21
America's [1] 93/3
Americas [1] 2/6
among [5] 31/20 89/21
90/23 132/12 133/24
amount [4] 30/11 31/9
31/14 40/24
ample [2] 124/8 127/3
analyses [2] 31/25
58/9
analysis [49] 5/21
11/19 12/2 12/12 12/19
15/24 15/24 16/4 16/7
16/11 16/12 16/14
16/18 17/14 31/21
31/22 32/12 32/25 33/3
33/6 35/2 35/3 35/25
48/14 50/19 53/9 55/17
58/10 58/24 61/23
72/21 73/4 73/6 73/9
75/6 75/23 76/19 106/5
109/19 110/13 110/17
110/19 110/24 111/8
111/21 113/1 113/11
114/18 115/5
analyst [18] 123/4
123/4 123/5 123/10
124/7 124/19 125/5
125/18 126/8 126/22
127/14 130/8 130/11
130/23 131/3 131/15
132/18 135/10
analyst's [1] 125/11
analyze [3] 38/16 39/2
39/22
analyzing [5] 35/6
36/10 37/23 57/11
57/22
Andre [3] 8/12 8/17
9/6
Andre Galeano [1]
8/12
announced [2] 83/11
83/16
announcing [2] 26/15
107/20
annual [8] 26/19 93/23
95/24 100/15 101/14
108/15 125/3 131/16
another [8] 8/13 50/14
86/3 86/3 89/24 105/15
108/1 130/8
answer [18] 13/25
14/23 32/6 34/2 61/18
62/7 67/10 68/3 76/21

**A**

answer... [9] 77/21 77/24 78/6 78/7 78/8 93/16 110/12 114/1 114/24

answered [4] 57/16 78/19 93/14 109/6

answering [2] 55/21 55/22

any [40] 4/21 5/12 6/2 11/19 12/11 12/13 12/14 16/1 16/17 17/21 17/23 18/1 31/20 31/21 31/21 32/12 33/3 35/2 35/3 35/6 35/25 37/1 62/7 74/7 75/23 76/5 81/12 87/19 91/13 99/17 102/11 110/9 113/11 114/18 115/4 115/5 115/25 119/2 131/8 133/19

anymore [2] 81/3 86/14

anyone [4] 4/21 71/20 117/1 132/15

anything [12] 17/12 17/19 48/10 48/18 54/25 61/19 62/14 115/12 117/14 117/15 117/18 134/3

apologize [3] 4/8 15/16 79/14

appear [4] 22/18 25/11 70/18 77/11

appearance [1] 116/22

APPEARANCES [2] 1/14 1/25

appeared [2] 14/11 131/11

appears [3] 19/3 71/2 94/15

apples [2] 57/2 57/3

applied [1] 99/25

apply [1] 27/17

appreciate [4] 22/19 119/6 119/22 135/23

appropriate [1] 110/18

approved [4] 44/12 44/15 60/13 60/19

approximately [1] 33/12

are [88] 4/4 10/16 11/4 20/8 21/4 21/10 22/2 22/9 30/15 30/16 32/10

32/14 32/19 32/15 36/1 37/2 38/19 41/15 41/16 42/5 47/4 47/4 48/2 48/20 49/19 50/2 51/16 51/18 57/2 57/3 58/9 59/23 59/25 60/11 60/12 62/10 67/18 68/15 68/21 69/20 76/4 76/24 77/2 77/7 77/14 78/25 79/4 81/12 81/24 82/13 86/18 86/23 89/2 89/16 90/14 91/2 91/3 91/10 91/12 92/13 93/1 97/16 98/4 98/12 98/17 99/25 101/1 101/4 101/18 106/23 109/14 117/18 117/20 117/23 120/7 120/19 120/20 120/24 121/9 121/14 121/20 121/21 122/10 122/12 122/18 128/4 130/10 130/11

area [1] 70/24

aren't [2] 56/24 99/18

argue [3] 118/16 120/11 135/15

argues [1] 134/18

arguing [3] 76/24 82/13 91/7

argument [5] 77/2 130/20 134/12 135/7 135/13

arguments [1] 116/18

Arnold [1] 2/10

around [13] 11/19 12/2 12/12 31/11 60/11 61/3 72/21 75/23 104/6 115/8 117/6 118/19 134/21

as [75] 4/25 5/2 5/5 7/2 7/19 8/17 12/3 12/7 12/17 18/19 22/23 24/5 24/5 27/25 28/4 32/10 33/14 34/9 37/19 39/25 40/21 42/6 44/20 44/21 46/13 46/22 47/5 48/5 48/20 49/15 50/2 50/5 51/16 51/22 51/24 54/18 56/4 58/7 60/20 61/17 61/21 67/23 68/21 68/25 71/18 73/2 74/15 75/3 75/9 75/11 75/12 82/5 83/8 85/15 87/4 94/23 97/23

100/19 100/22 100/22 100/22 100/22 107/5 112/22 113/1 114/25 115/3 116/9 116/10 120/24 121/23 121/25 122/19 130/19 132/12 134/8

aside [1] 67/9

ASIM [1] 2/8

ask [31] 4/15 14/3 14/12 15/3 21/19 23/4 25/10 27/4 33/25 34/1 36/25 37/17 42/17 44/3 49/6 62/4 63/10 67/8 67/10 72/12 78/5 78/8 81/18 87/24 89/15 103/6 110/9 110/18 111/3 126/1 133/6

asked [44] 13/22 13/22 14/4 14/17 14/19 14/20 15/1 15/8 15/23 16/2 16/11 17/5 35/9 36/16 43/20 43/25 46/18 54/9 54/13 54/21 55/2 55/4 55/5 55/21 55/22 57/11 61/10 61/13 61/19 62/16 63/14 66/21 71/11 79/13 99/15 99/16 99/17 102/16 107/22 109/3 109/5 111/9 111/14 112/13

asking [26] 14/9 32/7 32/12 33/2 35/1 37/18 40/3 47/24 48/5 55/12 57/15 57/18 57/20 77/12 77/19 80/9 80/10 92/7 98/3 98/4 107/13 111/13 111/18 112/10 113/10 114/18

assess [1] 32/19

assessment [3] 12/21 32/21 104/21

asset [17] 5/14 5/23 5/24 11/17 11/18 12/5 27/5 27/11 28/1 28/8 30/7 30/8 30/17 68/18 72/20 86/24 112/24

assets [10] 5/6 27/16 27/17 35/5 36/1 64/11 64/24 65/25 82/25 104/21

assist [1] 59/15

associated [4] 22/2 58/9 120/25 121/21

Association [1] 2/15

assume [2] 31/1 66/14

assumes [2] 17/3 128/4

assuming [3] 21/25 36/1 93/1

assumption [1] 48/19

attached [3] 9/6 126/8 131/3

attaches [1] 70/13

attaching [3] 123/4 124/18 132/11

attachment [4] 21/25 125/20 125/21 126/11

attachments [1] 22/13

Attari [1] 133/2

Attari's [1] 121/21

attempts [1] 57/23

attended [3] 6/5 7/4 64/21

attention [1] 119/20

attenuated [2] 132/8 135/14

audit [4] 45/10 45/14 46/3 46/5

auditing [1] 15/21

auditing-related [1] 15/21

auditors [1] 99/3

August [42] 1/5 4/18 5/4 7/12 7/13 12/7 12/22 21/24 31/5 46/19 46/22 48/23 60/25 61/25 62/24 64/3 65/5 66/13 66/17 66/19 68/22 69/9 70/10 72/7 72/9 72/10 72/11 73/1 73/5 73/18 74/20 75/3 76/13 85/8 87/25 88/22 102/23 132/2 132/9 133/11 133/21 136/8

August 17th [2] 102/23 132/2

August 23rd [1] 88/22

authored [1] 124/22

avenue [7] 1/18 1/24 2/6 2/10 2/13 2/21 92/3

avenues [1] 92/2

avoid [2] 26/6 26/11

aware [15] 21/4 60/4 60/8 60/9 62/10 63/7 63/9 77/7 77/10 78/13 81/12 91/19 91/21 97/2 97/21

awareness [2] 8/17

**A**

awareness... **[1]** 9/17
away **[2]** 97/11 119/7

**B**

back **[49]** 15/17 24/11
28/8 30/21 31/13 31/15
31/23 33/13 34/3 34/15
34/16 34/21 35/5 38/3
38/3 39/23 40/7 40/9
45/6 61/16 62/25 67/5
70/1 71/25 72/2 72/16
73/21 78/21 80/3 81/6
88/9 89/7 89/11 95/20
96/13 102/2 103/15
106/10 106/16 115/20
117/12 118/7 119/17
122/22 124/12 125/12
131/19 132/1 134/19
backstop **[1]** 125/8
badges **[2]** 117/9
117/10
baked **[2]** 87/5 87/14
balance **[2]** 31/15 39/7
bank **[5]** 41/19 41/23
130/7 130/8 135/9
Bankruptcy **[1]** 2/21
banks **[1]** 81/5
bar **[5]** 24/15 24/25
25/1 26/18 26/19
Barclay's **[1]** 125/18
Barclays **[7]** 124/16
124/18 124/21 125/15
125/16 130/23 134/12
Barclays' **[2]** 126/8
126/22
BARNES **[1]** 1/17
BARRY **[1]** 2/2
based **[13]** 12/6 12/25
41/1 49/1 49/15 64/13
66/6 69/10 69/24 75/2
75/18 76/11 100/23
basically **[3]** 50/8 83/3
110/13
basis **[5]** 32/1 47/18
74/17 76/20 100/17
be **[118]** 4/7 5/3 5/14
11/7 11/20 11/24 12/10
12/14 12/24 14/22 16/8
16/8 17/25 18/1 19/3
20/6 21/15 22/18 24/5
24/6 25/11 27/12 28/1
28/11 30/1 30/7 30/15
32/6 32/16 37/3 38/4

38/14 38/19 44/14 47/6
47/10 50/10 51/15
56/11 56/15 57/12
57/22 59/3 59/22 60/2
60/2 60/9 61/1 61/3
61/15 62/25 64/13
65/15 66/7 68/9 68/15
69/4 69/6 70/18 71/3
72/4 72/15 72/22 72/23
73/25 74/3 75/24 77/11
79/11 82/2 83/10 83/15
85/16 86/20 87/3 90/5
90/11 100/16 101/5
107/7 110/5 110/6
110/11 110/18 110/21
111/23 113/7 113/18
114/5 115/24 116/15
116/20 116/21 116/23
117/7 117/7 117/11
117/12 118/3 119/5
120/15 121/10 122/6
122/9 123/11 123/14
123/15 126/25 128/15
128/23 131/11 131/24
132/4 133/19 134/8
134/14 135/15 135/20
became **[2]** 112/22
126/17
because **[25]** 25/10
29/6 38/10 57/3 68/12
68/25 73/3 73/21 77/18
77/21 79/12 82/1 82/25
83/15 90/5 99/24
110/25 116/11 119/5
119/12 120/25 132/14
133/2 134/19 135/18
become **[3]** 16/3 51/3
51/15
becomes **[1]** 134/25
bed **[1]** 115/8
been **[16]** 12/4 51/20
64/11 66/5 80/22 85/19
115/8 118/23 119/4
119/11 120/24 129/4
131/17 132/23 133/18
133/22
before **[37]** 1/12 7/13
20/3 31/5 38/5 39/18
40/4 47/13 48/23 62/24
64/4 65/22 66/19 72/25
73/1 74/1 74/9 76/13
99/15 102/22 110/13
110/17 110/19 110/24
111/8 111/21 113/10

113/11 114/9 114/13
115/5 115/6 118/16
123/10 127/4 128/16
132/10
began **[1]** 26/7
begin **[1]** 134/25
beginning **[4]** 12/2
12/10 18/25 134/21
begun **[1]** 126/24
behalf **[8]** 4/12 36/22
102/15 111/5 113/21
115/13 119/21 130/17
being **[24]** 10/17 39/22
47/4 57/10 57/21 59/20
59/23 61/10 61/13
61/19 62/16 74/16
78/16 82/4 83/22 86/19
87/14 97/15 112/24
112/24 126/8 127/7
128/3 131/16
believe **[30]** 7/16 17/13
37/19 37/25 38/7 60/22
63/2 64/17 67/2 68/14
68/15 82/14 91/8 99/18
102/20 103/13 104/8
104/19 105/16 106/2
106/5 108/19 109/3
109/6 114/5 121/11
121/21 121/22 124/21
131/17
below **[3]** 71/1 127/21
128/15
bench **[1]** 65/13
benefit **[1]** 125/8
Berger **[1]** 2/5
BERGMAN **[1]** 2/9
Berkley **[1]** 1/15
Bernstein **[1]** 2/5
best **[2]** 75/10 93/5
better **[2]** 24/7 123/7
between **[10]** 28/20
58/22 63/17 71/14 75/4
102/7 109/24 131/20
133/20 134/23
beyond **[2]** 37/1 133/5
bill **[1]** 27/18
billion **[41]** 11/17
20/17 20/19 23/10
23/13 25/22 25/22
26/12 28/20 29/4 29/6
30/5 30/24 31/10 33/12
34/3 34/9 34/16 34/20
35/5 38/3 40/13 42/24
43/10 52/15 52/17

53/24 55/13 61/3 61/15
63/1 63/8 67/16 72/19
85/16 85/21 85/23 87/7
billions **[1]** 17/1
bit **[7]** 18/6 23/17
43/20 73/21 105/20
127/16 135/16
Biweekly **[1]** 7/10
blue **[1]** 25/1
board **[30]** 45/8 45/9
45/19 45/24 46/6 46/8
59/25 64/22 65/5 67/3
67/15 67/17 67/21 68/6
68/7 68/21 69/3 69/4
69/13 69/16 69/20 83/7
83/9 83/9 83/21 85/5
85/7 85/12 86/2 86/11
boards **[9]** 60/5 64/12
65/4 66/6 66/12 66/18
68/21 69/9 99/1
Boies **[1]** 1/23
bonds **[2]** 128/23
133/5
books **[12]** 33/13
33/15 34/4 34/17 34/21
34/21 38/4 39/23 40/10
40/23 61/16 63/8
booting **[1]** 130/19
borrow **[5]** 42/2 42/19
42/22 43/10 43/13
borrowed **[1]** 43/15
borrowers **[1]** 26/6
boss **[4]** 14/20 14/21
16/25 17/2
both **[19]** 10/22 10/23
28/24 64/12 65/3 66/5
66/11 66/17 68/21 69/8
69/20 93/7 99/5 105/11
109/14 124/4 124/7
125/2 135/8
bother **[1]** 62/18
bottom **[10]** 79/16
101/13 108/3 123/13
123/14 123/15 123/18
123/19 128/6 130/6
bought **[1]** 34/16
bow **[1]** 115/8
box **[1]** 20/3
break **[1]** 65/22
breaking **[1]** 65/8
BRIAN **[1]** 1/17
brief **[8]** 39/15 51/1
53/19 102/6 106/7

**B**

**brief... [3]** 109/23 118/6 120/17
**Briefing [1]** 106/12
**briefings [1]** 113/1
**briefly [3]** 110/6 113/19 134/9
**bring [3]** 45/12 89/11 117/10
**bringing [1]** 119/19
**broader [1]** 91/25
**Broadly [1]** 92/10
**brought [2]** 11/3 34/20
**bucket [2]** 120/4 120/7
**buckets [2]** 120/4 120/14
**build [1]** 32/24
**build-up [1]** 32/24
**bullet [9]** 9/14 10/24 11/13 96/19 97/3 97/7 97/13 126/19 127/2
**Burns [1]** 126/9
**business [4]** 8/3 23/25 24/1 29/19

**C**

**calculated [1]** 10/19
**calculation [1]** 11/11
**calculations [1]** 89/2
**call [11]** 36/24 42/23 63/25 107/23 126/18 127/20 129/12 130/6 130/17 132/20 133/12
**call-out [1]** 42/23
**call-outs [1]** 107/23
**called [3]** 29/22 100/9 131/11
**came [8]** 80/21 81/7 99/16 110/10 114/16 119/11 119/13 133/10
**can [55]** 9/20 10/13 17/25 18/10 21/1 22/11 24/9 24/11 25/3 27/1 27/12 27/16 28/7 30/15 34/6 36/21 42/14 43/17 44/3 45/19 51/4 51/8 56/12 58/13 59/22 77/15 78/7 89/7 89/20 95/15 97/2 99/8 101/9 101/21 103/12 104/9 106/3 107/9 107/17 108/10 112/22 116/3 116/7 120/15 120/20 121/9 123/8 124/4

125/20 127/2 127/3 128/16 130/19 133/12 135/15
**can't [6]** 14/23 27/21 40/6 51/10 99/12 124/22
**cannot [1]** 17/16
**cap [2]** 127/3 128/21
**capital [8]** 60/20 124/16 124/18 125/8 128/2 128/3 128/14 129/23
**capped [1]** 97/15
**caps [1]** 125/10
**careful [2]** 16/8 119/5
**carry [1]** 84/14
**case [25]** 17/24 36/13 37/16 61/8 61/21 62/11 62/13 62/19 62/23 76/24 77/2 82/13 114/4 116/12 116/16 117/1 117/2 117/2 117/14 117/15 123/6 128/11 128/12 129/7 129/7
**cases [1]** 37/20
**cash [8]** 26/12 29/16 29/17 30/10 40/12 40/13 40/17 41/12
**casual [2]** 67/14 67/18
**cause [5]** 16/1 31/13 31/16 132/12 133/23
**caused [1]** 30/5
**causing [1]** 38/13
**cautioning [1]** 101/4
**CAYNE [1]** 2/8
**CC [1]** 15/14
**CC-ed [1]** 15/14
**CEO [4]** 24/3 26/2 26/8 26/15
**certain [8]** 6/25 20/7 20/10 60/6 64/10 64/24 65/25 130/11
**certainly [2]** 88/25 115/9
**certification [4]** 74/2 75/7 75/14 75/17
**certifications [1]** 74/14
**certified [4]** 13/2 61/23 73/23 75/13
**certify [1]** 136/4
**certifying [1]** 75/9
**cetera [3]** 19/25 26/9 96/11

**CFO [8]** 44/15 60/15 60/20 69/1 71/15
**CFO's [1]** 9/22
**chain [5]** 44/15 44/16 63/17 123/21 123/22
**chains [1]** 123/23
**chance [1]** 53/20
**change [10]** 10/18 50/18 52/23 53/2 53/4 58/25 86/1 88/20 88/23 89/4
**changes [6]** 10/9 10/14 10/16 11/9 50/17 83/25
**chaos [1]** 89/3
**Characterize [1]** 36/15
**characterized [1]** 75/6
**CHARLES [1]** 1/15
**chart [6]** 24/15 24/18 26/18 26/19 52/7 127/21
**chartered [1]** 19/24
**check [2]** 1/20 62/18
**chief [10]** 5/1 5/9 5/10 6/6 35/25 63/22 63/23 80/13 106/6 106/20
**choosing [1]** 135/17
**Chryssa [1]** 44/13
**CIATTI [1]** 2/12
**circle [1]** 122/21
**circular [4]** 54/22 55/1 78/17 97/23
**circularity [1]** 125/7
**circumstances [1]** 58/25
**cite [1]** 129/24
**cites [1]** 129/24
**Civil [2]** 1/2 1/8
**clarify [3]** 39/17 79/25 110/19
**clarifying [1]** 72/14
**CLASS [2]** 1/9 1/19
**cleaned [1]** 115/1
**clear [12]** 30/1 32/6 39/6 87/14 89/17 110/11 110/23 114/5 119/23 123/21 123/22 135/2
**cleared [1]** 111/14
**clearer [1]** 72/15
**clearly [2]** 131/5 134/15
**closed [1]** 47/13

**closing [1]** 116/17
**COLATRIANO [1]** 1/16
**colleagues [1]** 6/5
**collectively [3]** 31/2 34/19 34/20
**college [1]** 89/14
**colloquial [1]** 28/4
**color [2]** 124/19 125/18
**COLUMBIA [1]** 1/1
**combined [1]** 31/9
**come [12]** 31/14 39/3 39/9 61/16 70/1 81/13 116/24 117/8 117/12 118/7 119/14 119/16
**comfortable [2]** 22/5 22/9
**coming [2]** 40/22 125/10
**commentary [1]** 124/20
**commenting [1]** 93/25
**comments [2]** 115/16 115/22
**commitment [7]** 26/5 41/2 78/16 97/15 97/23 128/3 129/18
**committee [8]** 45/10 45/14 46/3 46/5 46/8 53/17 55/15 67/23
**communicator [2]** 80/18 89/17
**companies [7]** 21/5 28/20 38/4 40/14 43/22 84/14 86/13
**company [11]** 2/12 5/10 27/12 27/20 27/25 28/7 39/1 45/20 54/17 54/17 57/13
**company's [7]** 23/14 24/1 34/21 87/6 100/15 128/13 128/14
**compared [4]** 12/20 43/4 55/15 87/1
**comparing [2]** 55/9 55/12
**comparison [2]** 20/17 57/8
**complete [5]** 32/4 100/21 101/18 116/16 120/23
**completed [3]** 8/16 47/3 116/19
**completely [3]** 89/2

**C**

completely... [2] 129/17 132/22
completeness [2] 45/17 75/1
Complied [87] 6/16 6/19 8/6 9/1 9/15 10/5 10/7 13/6 15/6 18/11 18/23 19/11 19/18 20/4 21/2 21/20 22/16 23/5 23/19 24/10 24/13 25/4 25/7 27/2 33/20 34/7 42/15 43/18 46/11 50/22 51/5 52/9 53/11 54/3 54/7 58/14 63/12 64/8 70/3 71/8 72/3 78/22 88/12 88/15 89/9 90/9 90/20 91/4 92/23 94/4 95/1 95/16 96/15 96/23 96/25 97/10 98/10 99/9 100/7 101/10 101/22 103/9 104/12 105/22 107/10 108/6 108/21 108/24 123/2 124/6 124/13 125/14 126/4 126/13 126/20 127/10 127/13 127/19 127/23 128/8 128/19 129/2 129/11 129/14 133/8 133/14 133/16
complying [1] 32/3
component [6] 10/20 17/10 17/10 30/17 38/18 53/9
components [2] 10/23 16/2
comprehensive [7] 20/17 20/18 25/22 34/10 95/23 108/13 108/14
computer [3] 2/25 37/14 38/15
computer-aided [1] 2/25
conceptually [1] 48/16
concern [3] 9/23 16/1 125/11
concerned [1] 18/5
concerns [1] 17/13
conclude [2] 125/24 130/2
concluded [5] 37/7 112/5 115/19 116/2

135/25
conclusion [7] 39/3 45/13 45/14 50/19 59/2 59/5 73/24
conclusions [1] 60/11
conditions [1] 23/24
confer [2] 112/4 122/14
confirm [2] 62/2 66/10
confirming [1] 133/17
Confusing [1] 29/10
confusion [4] 114/16 115/6 132/12 133/24
Congress [3] 19/25 93/3 95/5
connected [1] 116/12
connection [2] 116/22 130/4
consequential [1] 128/23
conservatorship [2] 64/18 101/1
consider [3] 5/22 68/17 133/25
considered [9] 124/1 124/9 125/23 125/25 127/4 128/25 132/6 134/14 134/16
consistent [7] 9/24 10/1 11/21 13/1 108/17 108/19 130/9
consistently [1] 135/10
Constitution [1] 2/21
consulted [1] 116/15
consulting [2] 116/6 116/8
CONT'D [1] 4/13
contact [1] 119/4
contains [2] 130/22 132/21
contemporaneous [1] 108/18
contentious [1] 128/10
context [5] 11/2 91/25 92/5 93/14 112/22
contextual [1] 93/16
contingent [3] 128/1 128/3 129/23
continue [2] 20/6 127/1
continued [3] 2/1 26/8 125/5

contributed [2] 20/23 24/1
control [1] 101/16
controller [1] 44/14
controls [2] 99/25 100/20
convene [2] 116/24 117/5
conversation [9] 17/2 17/8 60/4 67/14 68/20 71/12 71/14 130/23 132/17
conversations [3] 59/18 59/25 67/14
convey [2] 55/6 55/7
conveyed [2] 16/14 17/13
cooler [1] 68/19
COOPER [2] 1/15 1/17
copy [2] 37/5 37/5 37/15 107/19
corner [1] 127/17
correct [31] 7/17 15/16 16/13 18/14 21/7 21/11 21/12 23/8 27/14 29/9 36/2 49/16 53/14 56/15 56/16 56/20 57/22 58/8 59/9 84/5 84/21 84/22 84/24 85/3 85/4 87/10 88/19 90/3 99/6 113/15 136/4
corrections [1] 106/13
correctly [2] 101/14 101/20
could [37] 9/4 11/20 12/2 12/14 20/2 23/17 34/1 39/6 50/18 64/6 65/25 68/8 72/23 73/12 75/23 76/10 87/15 90/7 90/19 97/8 101/17 105/20 110/18 111/3 113/6 114/11 118/5 122/25 123/11 123/14 123/15 123/22 128/22 131/10 132/12 133/6 133/6
couldn't [2] 81/13 102/21
counsel [19] 4/4 15/8 43/25 55/11 57/15 77/14 77/20 77/22 102/7 107/22 111/1 114/9 115/11 116/7 116/8 116/15 120/15

counsel's [1] 109/3
couple [6] 32/8 80/23 89/15 99/16 132/9 133/10
coupled [1] 55/18
course [4] 8/3 127/15 129/6 133/1
court [12] 1/1 2/20 116/10 118/17 118/23 119/5 122/9 123/9 123/10 123/17 135/10 136/3
Court's [6] 13/4 109/21 117/25 119/22 123/8 127/6
courthouse [1] 117/6
courtroom [1] 4/6 65/14 77/17 117/17
covenant [1] 84/3
cover [3] 53/15 131/2 131/23
COVID [1] 118/20
CRC [1] 2/20
created [5] 8/2 36/9 39/17 40/4 114/17
creates [1] 27/25
credit [6] 27/22 127/15 128/5 128/22 129/19 132/20
criminal [1] 116/12
crisis [1] 26/7
cross [6] 3/4 13/9 13/12 110/10 110/12 113/25
cross-examination [3] 3/4 13/12 113/25
cross-examine [1] 13/9
Cts [1] 2/21
cumulative [4] 51/16 51/18 53/8 53/22
curative [2] 113/22 114/11 114/25
current [3] 47/16 54/4 128/15
cycles [2] 131/18 132/1

**D**

D.C [5] 1/18 1/24 2/11 2/14 2/17
date [36] 7/11 7/12 38/7 39/19 40/2 40/5

144

**D**

date... **[30]** 46/18 46/21 49/10 70/24 71/25 72/7 73/2 73/5 75/4 75/10 75/11 75/12 80/21 94/21 100/23 102/21 103/22 104/23 105/8 105/9 106/11 107/3 112/20 112/21 113/4 125/18 126/6 131/21 133/20 136/8
dated **[4]** 75/15 75/17 127/16 131/15
DAVID **[2]** 1/15 2/9
day **[5]** 1/11 75/17 83/23 116/6 118/19
days **[7]** 64/4 83/10 86/2 126/7 126/7 133/10 133/11
DC **[2]** 1/5 2/22
debt **[3]** 43/2 43/5 128/12
December **[5]** 54/18 131/15 131/21 132/11 134/2
decide **[1]** 46/14
decided **[3]** 32/10 75/18 116/13
decision **[34]** 12/17 13/15 29/25 32/17 44/6 44/18 44/23 45/5 45/6 45/8 45/16 45/22 45/23 45/23 46/22 46/24 47/2 48/22 49/1 50/7 58/7 67/15 113/8 123/12 123/16 124/1 124/10 127/8 128/25 130/3 130/4 132/7 134/4 135/4
decision-makers **[2]** 128/25 130/3
decision-makers' **[3]** 123/12 123/16 127/8
decision-making **[6]** 124/1 124/10 130/4 132/7 134/4 135/4
declaration **[3]** 129/3 129/6 134/2
declarative **[1]** 114/2
declare **[1]** 24/4
deduction **[1]** 27/12
Defendant **[1]** 2/7
defendants **[16]** 1/6 4/12 8/19 36/23 102/15

115/7 115/14 118/17 119/3 119/22 120/2 122/17 131/11
Defendants' **[23]** 6/12 6/14 8/20 8/23 9/13 121/1 121/1 121/2 121/2 121/3 121/6 121/14 121/18 121/23 122/3 122/13 122/19 122/22 122/24 126/2 127/12 130/21 134/11
defense **[2]** 120/19 130/18
deferred **[25]** 5/6 5/14 5/23 5/24 11/16 11/18 12/5 27/5 27/11 27/16 28/7 30/16 36/1 64/11 64/24 65/25 68/18 72/20 82/25 83/17 86/24 103/19 103/21 104/21 112/24
define **[1]** 67/17
definitely **[3]** 60/4 60/7 113/7
Delaware **[1]** 2/3
delay **[2]** 4/9 116/18
DeLeo **[7]** 14/20 15/2 15/23 15/24 16/12 16/15 17/13
DeMarco **[18]** 14/4 14/16 14/19 14/22 17/14 60/17 77/7 77/10 77/16 78/13 79/17 123/24 126/9 131/10 132/5 132/5 132/16 134/23
DeMarco's **[1]** 13/15
demonstrate **[10]** 78/25 79/5 82/3 86/18 87/19 89/16 90/14 91/3 91/10 125/23
demonstrated **[2]** 51/20 87/20
demonstrates **[1]** 23/14
demonstrating **[1]** 91/12
demonstrations **[1]** 117/9
denied **[1]** 77/7
Department **[12]** 30/25 40/17 41/6 41/13 42/3 42/4 91/20 91/24 93/10

depend **[1]** 128/13
depended **[1]** 38/11
depending **[1]** 47/9
depicting **[1]** 52/11
deposition **[3]** 105/19 121/10 131/12
depositions **[2]** 120/22 120/25
deputies **[1]** 64/1
deputy **[2]** 63/22 80/13
described **[4]** 18/18 38/9 60/5 71/18
describes **[1]** 129/8
describing **[6]** 9/9 9/18 17/17 17/21 33/1 33/2
description **[2]** 11/21 100/10
designed **[9]** 78/25 79/5 82/3 86/18 89/16 90/14 91/3 91/10 100/21
despite **[1]** 26/12
detected **[1]** 100/17
determination **[1]** 43/23
determine **[2]** 47/12 93/5
determining **[1]** 28/12
Deutsche **[3]** 130/7 130/8 135/9
Dharan **[1]** 133/1
dictate **[1]** 58/25
dictated **[1]** 38/11
did **[70]** 4/21 4/23 4/24 5/4 5/7 5/12 7/18 7/21 7/23 8/15 11/7 11/24 11/25 12/11 12/15 14/5 14/18 15/17 15/18 15/24 16/5 17/2 17/6 18/17 30/8 31/20 31/21 35/8 35/24 37/15 38/15 40/19 42/9 42/18 42/21 42/22 44/1 54/24 58/20 58/23 59/1 60/23 60/24 61/23 76/24 77/15 78/2 79/10 80/20 80/24 80/24 83/21 85/6 85/13 88/6 100/20 101/19 107/25 110/13 110/19 110/24 111/7 111/7 111/15 113/11 114/18 114/20 114/25 117/20

didn't **[40]** 12/25 16/7 29/3 29/4 30/4 31/21 36/4 40/12 40/13 40/25 41/11 43/11 43/14 43/15 51/12 62/7 62/18 72/10 72/12 73/5 73/11 79/12 79/20 83/7 83/9 83/9 85/7 86/2 86/11 87/18 87/25 87/25 88/4 92/7 97/25 102/20 110/16 110/24 112/21 115/4
different **[8]** 14/11 36/5 45/16 50/18 51/11 59/11 62/19 132/17
difficult **[3]** 50/2 51/4 51/15
difficulties **[1]** 116/11
direct **[22]** 3/4 4/13 16/5 50/1 54/9 63/14 66/22 69/1 70/7 73/7 73/16 79/6 79/25 83/7 87/9 87/11 96/2 100/11 101/13 111/7 111/20 113/24
director **[2]** 106/7 106/12
directors **[3]** 45/19 46/6 99/1
disclosed **[2]** 31/8 97/24
disclosure **[8]** 47/11 55/6 55/7 55/9 55/10 95/21 98/8 100/22
disclosures **[6]** 48/2 98/18 99/6 101/18 101/24 102/2
discounted **[1]** 135/16
discovery **[7]** 36/25 37/1 37/2 37/6 37/20 114/14 115/23
discuss **[1]** 9/23
discussed **[5]** 64/12 65/4 66/6 66/12 83/23
discussing **[8]** 12/19 36/5 36/11 59/10 60/6 65/7 105/12 130/23
discussion **[19]** 4/24 5/12 5/16 12/25 36/20 37/7 45/15 61/9 65/13 66/15 102/7 109/24 110/7 112/5 113/20 115/19 115/21 116/2

**D**

**discussion... [1]** 134/20

**discussions [12]** 4/21 60/9 60/10 69/6 69/8 100/23 103/1 103/3 103/4 107/6 126/16 134/25

**display [2]** 65/25 103/7

**displayed [1]** 120/21

**dispute [1]** 99/21

**distant [4]** 60/3 61/2 61/14 63/1

**DISTRICT [4]** 1/1 1/1 1/12 2/1

**dividend [17]** 10/19 11/11 26/12 42/3 42/19 43/7 55/13 56/3 57/4 57/6 57/9 58/22 95/24 98/1 108/15 129/17 129/22

**dividends [12]** 54/22 54/25 55/25 56/4 56/10 56/14 56/24 56/25 57/21 125/4 125/6 127/25

**do [106]** 6/21 6/22 10/11 13/18 14/1 14/2 15/11 15/12 16/7 21/8 22/6 22/7 22/20 23/21 24/15 24/16 25/20 26/3 26/4 29/13 29/16 30/2 31/21 33/5 42/1 42/11 42/13 47/7 50/17 50/20 51/20 51/22 53/22 54/13 55/4 55/25 57/1 57/21 58/3 58/24 60/21 61/10 61/19 61/22 63/16 64/14 64/15 65/2 66/20 66/23 67/4 67/8 67/16 70/6 70/8 70/17 74/7 74/9 77/5 78/11 78/25 79/2 80/2 80/3 81/19 81/20 82/12 86/17 92/2 92/8 92/8 94/21 95/23 96/9 99/19 99/20 101/2 101/3 101/25 102/18 102/19 103/1 103/11 104/16 104/17 105/24 105/25 107/12 107/15 108/13 109/2 109/7 109/8 110/9 110/16 110/24

115/4 117/19 117/20 117/23 120/14 125/8 131/3

**document [43]** 6/18 6/21 7/1 15/9 18/16 22/5 23/3 33/16 42/12 49/6 51/9 52/6 54/2 55/19 70/6 71/5 78/23 83/6 92/13 94/24 96/14 103/11 103/13 103/16 105/24 106/15 106/15 106/16 107/14 107/17 114/13 120/1 125/13 125/15 126/14 127/11 132/14 133/10 133/23 134/1 134/4 134/15 134/21

**documents [18]** 21/15 104/5 110/21 111/10 111/10 114/6 114/7 114/8 114/21 117/25 120/8 120/10 122/6 123/17 124/4 134/7 135/12 135/19

**does [13]** 11/1 22/18 25/11 25/12 32/22 37/4 49/22 55/1 70/18 90/15 91/13 91/14 109/5

**doesn't [18]** 42/23 47/3 48/18 54/25 55/8 70/23 70/24 70/24 73/10 78/19 81/25 82/24 83/14 86/14 90/15 105/16 109/4 117/3

**doing [6]** 19/4 20/21 52/3 66/24 123/25 132/6

**dollar [2]** 17/1 29/6

**dollars [3]** 29/4 30/5 67/16

**Don [2]** 26/3 26/8

**Don Layton [1]** 26/3

**don't [72]** 14/14 29/14 33/15 33/22 33/23 37/5 38/7 38/18 39/19 40/1 40/5 41/19 41/23 43/9 43/12 48/15 51/24 54/12 55/25 61/6 61/12 61/13 61/17 61/22 62/12 62/13 62/14 62/16 66/25 67/5 67/7 67/13 67/17 68/2 68/9

76/7 76/18 76/21 77/3 77/4 77/13 77/14 77/14 77/15 77/18 77/24 77/24 78/6 78/7 80/21 82/23 83/15 90/5 91/22 91/23 97/16 97/19 98/4 110/23 111/16 111/24 115/23 117/1 117/1 117/14 117/15 117/24 135/12

**Donald [1]** 121/10

**done [6]** 32/12 33/3 35/2 76/4 111/21 115/24

**door [2]** 111/25 112/1

**doubt [3]** 68/24 69/23 74/8

**down [80]** 10/21 13/5 17/9 17/12 21/1 22/11 23/17 24/9 25/3 27/1 27/20 28/5 28/16 28/18 29/8 29/18 30/1 30/2 30/5 30/6 30/7 31/7 32/18 34/6 43/17 50/8 57/24 58/13 59/3 67/16 70/20 73/6 74/22 77/1 77/9 78/25 79/5 79/11 79/15 79/21 82/4 83/17 84/1 84/3 85/16 86/19 86/21 87/19 87/20 89/7 90/6 90/14 91/6 91/20 91/24 92/4 93/7 93/10 93/18 93/20 94/23 95/8 95/11 95/15 95/12 95/15 99/8 101/9 101/21 104/9 107/9 108/20 116/3 116/4 116/8 116/24 117/7 124/5 127/9 128/6

**downgrade [1]** 133/18

**downgraded [2]** 133/4 133/22

**downgrades [1]** 129/19

**downs [1]** 70/25

**Dr [1]** 118/18

**Dr. [3]** 121/21 133/1 133/2

**Dr. Attari [1]** 133/2

**Dr. Attari's [1]** 121/21

**Dr. Dharan [1]** 133/1

**draft [2]** 16/2 17/9

**drafts [1]** 44/21

25/25 25/25 26/11 98/1 123/22

**drawn [4]** 24/19 24/21 26/23 41/2

**draws [8]** 11/1 11/6 11/12 26/19 54/23 55/1 78/17 97/23

**driven [1]** 125/6

**drop [2]** 70/20 70/25

**DTA [58]** 4/22 12/9 12/24 27/20 28/9 28/13 30/25 31/22 32/8 32/13 32/16 32/18 33/9 34/3 34/16 34/19 35/2 36/10 37/24 44/7 45/6 45/23 46/15 50/7 50/10 53/17 55/15 56/11 56/15 56/22 57/12 57/22 57/24 58/18 59/3 59/13 59/20 60/11 61/22 62/1 62/5 63/1 63/8 65/5 66/23 67/4 67/22 69/5 73/24 74/23 75/20 103/1 103/2 104/6 105/12 107/6 109/19 112/24

**DTAs [30]** 27/5 28/16 30/21 31/7 31/9 31/13 33/4 35/4 38/2 39/22 40/7 40/22 42/7 43/23 59/8 60/2 60/6 61/2 61/15 64/25 66/13 66/19 67/16 68/8 68/20 69/9 69/21 82/1 86/14 102/18

**due [2]** 43/5 43/6

**during [11]** 8/18 20/9 26/8 36/7 42/24 78/2 92/2 109/2 113/24 113/25 120/21

**dwell [1]** 124/15

**DX [32]** 8/5 15/5 18/9 19/10 42/10 46/10 50/21 53/10 70/2 88/9 95/20 96/5 98/13 100/4 121/23 121/23 121/24 121/24 121/24 121/24 121/24 121/24 121/25 121/25 121/25 121/25 122/10 122/10 122/23 130/13 132/19

**DX-219 [1]** 121/24

**DX-272 [1]** 121/24

**DX-299 [1]** 121/24

**D**

**DX-329 [1]** 121/24
**DX-339 [2]** 122/23
132/19
**DX-344 [1]** 121/24
**DX-365 [1]** 121/25
**DX-393 [1]** 121/25
**DX-399 [1]** 130/13
**DX-412 [1]** 122/10
**DX-418 [1]** 121/25
**DX-469 [1]** 121/25
**DX-472-A [2]** 46/10
50/21
**DX-476 [4]** 18/9 95/20
98/13 100/4
**DX-477 [2]** 19/10 96/5
**DX-499-A [1]** 53/10
**DX-529 [1]** 122/10
**DX-560 [3]** 8/5 70/2
88/9
**DX-663 [1]** 42/10
**DX-81-A [1]** 121/23
**DX-83 [1]** 121/24
**DX-916 [1]** 15/5
**DX-919-A [1]** 121/25
**dying [3]** 117/18
117/20 117/23

**E**

**each [12]** 12/18 12/21
43/21 49/18 57/1 58/7
58/24 76/4 84/23 84/24
98/8 99/25
**earlier [15]** 4/25 5/1
12/20 13/2 49/2 67/23
68/25 83/23 87/4 99/15
112/10 118/18 127/16
127/16 132/23
**early [6]** 20/7 24/3
44/20 61/24 126/16
129/7
**earnings [7]** 21/23
22/10 23/14 57/8 87/4
95/22 108/13
**easier [1]** 132/20
**easily [1]** 50/18
**economy [1]** 20/7
**ed [3]** 14/22 15/14
17/14
**edits [1]** 90/12
**education [1]** 27/8
**effect [13]** 5/12 11/11
15/25 16/18 16/25
34/24 35/6 59/19 84/9

129/11 123/16 127/5
134/17
**effective [1]** 100/20
**effects [4]** 17/18 17/22
18/2 31/22
**eight [2]** 126/7 131/8
**Eisenhofer [1]** 2/2
**either [9]** 5/22 67/21
68/9 76/12 77/16 87/7
118/6 121/11 121/22
**elements [2]** 32/20
32/20
**eliminate [2]** 128/1
129/23
**else [4]** 38/23 70/2
92/6 93/15
**email [39]** 8/10 8/12
8/15 9/5 15/9 15/14
15/17 63/17 64/3 65/2
66/16 69/15 70/1 70/9
70/13 72/9 72/10 75/22
79/15 79/16 79/16 80/1
80/4 81/13 81/18 83/10
86/16 90/13 94/12
108/23 123/4 123/23
126/6 126/9 130/21
130/22 131/2 131/24
132/10
**employee [1]** 81/9
**employer [2]** 60/22
79/20
**enabled [2]** 26/6 26/10
**end [8]** 44/7 46/15
59/13 61/24 61/25
85/19 87/6 97/15
**endeavor [1]** 59/16
**ended [1]** 20/10
**ending [2]** 46/24 75/18
**ends [1]** 99/5
**enormous [2]** 31/7
40/24
**enough [5]** 50/11
50/12 57/8 86/25
111/25
**ensure [1]** 100/21
**entered [2]** 4/6 65/14
**enterprises [2]** 40/13
127/1
**enterprises' [2]** 129/16
129/19
**entire [2]** 41/3 45/20
**entirely [2]** 44/18
110/23
**entitled [1]** 136/5

**entrance [1]** 113/7
**equipment [1]** 4/9
**ERIC [1]** 1/19
**eroded [1]** 78/16
**eroding [1]** 97/22
**errors [1]** 101/17
**especially [3]** 45/9
50/3 69/11
**essential [1]** 127/5
**essentially [2]** 12/18
49/19
**estimate [1]** 47/15
**estimates [1]** 45/10
**et [6]** 1/2 1/2 1/6 19/25
26/9 96/11
**et cetera [1]** 19/25
**evaluating [1]** 12/8
**even [7]** 47/11 52/22
107/5 111/18 126/1
127/5 131/16
**evening [1]** 119/1
**event [7]** 35/7 37/24
37/24 47/9 47/12 76/5
115/25
**events [2]** 47/9 48/9
**eventually [2]** 111/10
134/25
**ever [3]** 115/24 133/3
133/4
**every [3]** 48/15 68/6
119/14
**everybody [1]** 117/3
**everybody's [1]**
116/23
**everything [1]** 117/12
**evidence [61]** 3/10
3/10 3/11 3/11 3/12
3/12 3/13 3/13 3/14
3/14 3/15 3/15 3/16
3/16 3/17 3/17 3/18
3/18 3/19 3/19 3/20
3/20 3/21 3/21 3/22
3/22 8/20 21/19 22/22
25/5 25/13 33/22 49/19
49/20 50/2 50/11 50/12
50/13 51/16 87/1 87/1
92/15 92/17 94/7
114/10 120/3 120/24
122/18 124/8 124/10
125/24 126/3 127/3
128/24 129/5 129/5
130/2 130/10 132/25
133/10 134/13
**evidenced [1]** 113/1

**evidentiary [1]** 127/5

**exact [6]** 38/7 40/2
61/10 80/21 102/21
135/7
**exactly [4]** 39/19 48/24
112/21 133/17
**examination [24]** 3/4
3/4 3/5 3/5 4/10 4/13
13/12 54/10 63/15
65/18 66/22 70/7 73/7
73/16 79/6 80/1 83/7
87/9 87/11 96/3 102/12
112/6 113/24 113/25
**examine [1]** 13/9
**examining [1]** 57/5
**examples [1]** 106/23
**except [2]** 13/1 26/19
**excess [3]** 95/24
108/15 125/3
**exclude [2]** 134/6
135/9
**executive [9]** 8/13
18/18 18/21 18/25
19/16 19/19 19/23
20/23 70/11
**exhaust [1]** 129/17
**exhibit [50]** 3/9 6/13
6/14 8/20 8/23 9/13
23/1 25/16 53/12 65/23
92/20 94/5 94/10 103/6
103/7 103/23 104/10
104/11 104/16 105/15
105/17 105/18 106/11
106/23 107/2 107/12
107/16 108/22 114/9
121/1 121/2 121/2
121/2 121/3 121/12
121/14 121/15 121/18
121/19 121/23 122/19
122/22 122/24 126/2
127/12 129/1 130/18
130/21 133/7 134/11
**exhibits [8]** 120/2
120/19 121/6 121/9
122/3 122/8 122/13
122/17
**existed [1]** 111/10
**exists [1]** 50/13
**exited [1]** 117/17
**expect [5]** 24/6 61/1
95/23 108/14 126/3
**expected [2]** 60/7
118/3
**expects [1]** 54/17

# E

**experience [4]** 95/22
96/10 108/8 108/12
**expert [1]** 118/18
**explain [2]** 38/25
91/16
**explained [1]** 38/8
**explicit [1]** 58/6
**exposed [1]** 119/12
**extent [1]** 131/9
**extra [2]** 40/9 40/12
**extremely [1]** 135/2

# F

**face [1]** 109/14
**facilitate [2]** 77/1 77/8
**facing [1]** 9/22
**fact [8]** 15/4 47/2 47/4
102/1 131/14 133/3
133/4 133/25
**factor [2]** 28/12 55/25
**factored [1]** 130/2
**facts [2]** 17/3 58/25
**fair [2]** 63/25 82/7
**FAIRHOLME [1]** 1/2
**familiar [3]** 42/8 92/13
93/1
**families [1]** 26/9
**FANNIE [119]** 1/8 4/22
5/11 5/14 5/21 7/10
9/23 12/1 12/8 12/23
16/19 17/23 18/3 18/13
19/4 19/7 21/5 21/22
23/7 23/10 23/25 24/19
24/20 27/15 28/15
28/24 29/20 31/1 31/6
31/23 32/19 33/4 33/9
33/21 34/3 34/4 34/19
39/23 40/16 40/23
40/23 42/1 42/9 42/10
42/18 43/22 44/4 44/6
44/10 44/16 44/17
44/19 44/25 49/5 49/7
49/10 53/14 53/17 56/1
56/10 56/13 58/17 59/7
59/20 60/1 61/1 62/25
63/8 64/21 65/3 66/12
69/1 69/13 71/15 71/21
73/22 76/25 77/8 78/15
79/11 81/25 82/2 83/2
84/10 84/16 85/20 88/6
91/6 91/20 91/24 92/4
92/12 92/25 93/6 93/9
93/11 93/20 93/23

**99/11 101/12 102/1
103/1 104/7 104/20
105/1 105/6 105/8
105/13 107/6 107/19
108/4 108/18 128/1
128/22 132/22
**Fannie's [5]** 33/13
34/10 57/7 60/15
129/23
**far [5]** 12/7 116/9
119/3 119/6 119/14
**faster [3]** 84/4 86/8
86/12
**favorably [1]** 115/6
**February [7]** 92/22
93/2 94/6 104/25
105/10 106/13 106/14
**FEDERAL [6]** 1/5 2/7
2/12 2/15 8/13 70/12
**feel [2]** 14/23 135/17
**fencing [1]** 117/6
**few [4]** 24/7 25/10
26/22 121/20
**FHFA [48]** 8/14 13/23
31/6 31/12 35/2 35/3
35/5 35/8 35/24 38/1
38/2 38/5 39/11 39/12
44/20 60/25 62/23
63/20 69/12 69/19
76/24 79/20 80/22 81/3
81/5 81/9 84/9 84/16
93/5 99/12 100/24
103/1 105/6 105/7
106/17 112/23 113/2
123/11 123/16 124/16
125/16 126/5 126/9
126/23 127/8 128/25
129/15 130/3
**FHFA's [3]** 8/3 64/18
129/8
**Fifteen [1]** 38/21
**Fifty [1]** 50/16
**Fifty-one [1]** 50/16
**filed [9]** 21/10 21/16
47/17 47/25 74/18
74/21 131/16 131/17
134/2
**filing [8]** 47/16 47/19
47/20 47/21 74/22
99/12 100/23 108/18
**filings [8]** 18/7 44/21
74/21 95/19 99/16
99/18 120/21 120/23

**finalizing [1]** 6/11
**Finally [1]** 130/6
**finance [6]** 1/5 2/8
8/13 70/12 92/1 93/4
**financial [28]** 5/1 5/9
5/10 10/15 19/21 20/1
20/12 24/6 26/7 26/10
30/9 39/2 44/24 45/1
47/10 47/14 61/24 69/2
69/2 73/23 94/21
100/16 101/6 101/17
107/20 125/9 128/13
128/14
**financing [1]** 42/8
**find [4]** 9/6 50/9 50/25
82/7
**fine [2]** 65/9 77/19
**Fink [1]** 44/14
**first [60]** 8/5 9/5 9/17
10/8 10/8 11/2 14/10
19/3 19/7 19/20 20/23
22/6 22/21 23/3 23/13
24/5 25/9 33/9 33/21
34/4 34/23 42/25 43/3
43/4 43/5 44/3 44/4
51/12 54/11 54/12
54/13 63/7 71/25 72/2
72/5 94/20 95/3 95/7
103/15 105/5 105/7
106/10 106/15 106/15
106/22 107/2 115/25
117/11 118/10 120/14
122/19 124/24 125/12
126/11 127/2 127/21
128/16 129/12 129/13
135/8
**fit [1]** 120/3
**Fitch [2]** 133/15
133/17
**five [4]** 47/3 53/23
118/11 129/13
**five-year [1]** 53/23
**fixed [1]** 128/21
**Flexner [1]** 1/23
**flip [1]** 107/16
**flurry [1]** 39/13
**focus [1]** 70/24
**focused [1]** 109/13
**focusing [1]** 109/15
**folks [1]** 121/8
**follow [6]** 29/1 66/15
114/25 120/20 121/9
123/9

**followed [3]** 4/20
11/16 62/3
**following [5]** 29/1
29/23 51/17 73/13
115/10
**food [2]** 44/15 44/16
**forecast [11]** 52/19
52/25 53/24 53/24 54/5
55/16 57/7 87/6 88/21
88/23 89/5
**forecasted [1]** 53/22
**forecasting [1]** 54/17
**forecasts [8]** 10/15
32/14 32/15 32/16 50/2
51/3 51/15 129/15
**foreclosure [1]** 26/7
**foregoing [1]** 136/4
**foreseeable [1]** 54/19
**form [21]** 18/13 18/18
19/8 19/13 21/13 22/1
33/22 35/14 35/15
47/22 59/23 70/18
70/20 71/3 92/13 92/25
93/23 95/20 97/24
100/5 101/12
**formatting [1]** 70/16
**former [2]** 80/13
116/13
**formula [2]** 10/19
11/11
**forums [1]** 59/11
**forward [12]** 32/7
64/14 66/8 68/16 76/1
83/2 86/20 96/17 96/19
109/18 116/12 116/16
**forward-looking [1]**
96/17
**forwards [1]** 125/17
**found [3]** 81/22 87/24
88/4
**foundation [2]** 127/5
135/11
**four [8]** 11/4 47/3 53/2
54/16 57/7 123/14
123/15 133/11
**four-year [1]** 54/16
**frankly [2]** 111/2 115/1
**FREDDIE [69]** 1/8
16/19 17/23 18/3 19/13
19/24 20/21 21/5 25/11
25/20 25/21 26/5 26/7
26/23 27/15 28/15
28/25 29/20 31/1 31/6

**follow-up [1]** 66/15

## F

**FREDDIE... [49]** 31/23
32/19 33/4 34/12 34/15
34/16 34/20 39/23
40/17 40/23 40/23 42/1
42/18 43/22 44/25
46/14 50/4 51/8 52/11
56/9 56/14 59/7 59/20
60/1 64/21 69/13 76/25
78/15 79/11 82/1 82/2
83/2 84/10 84/16 85/23
91/6 91/20 91/24 92/4
93/6 93/21 96/8 98/9
98/21 99/12 101/24
102/1 128/2 132/22
**Freddie's [4]** 65/3
66/12 77/9 128/22
**Friday [11]** 116/17
116/25 117/5 117/7
117/13 117/13 117/22
118/21 131/10 132/16
135/24
**front [8]** 55/19 111/19
113/23 114/3 114/10
115/10 115/17 115/24
**full [4]** 46/8 69/2 69/4
120/23
**fully [1]** 128/4
**funding [2]** 43/3
129/18
**FUNDS [1]** 1/2
**further [4]** 13/7 44/15
109/19 110/2
**Furthermore [2]**
127/22 127/25
**future [26]** 10/25 11/6
11/12 27/16 27/17
32/13 49/24 50/10
51/17 51/23 53/17
54/19 55/16 59/10
59/12 59/15 59/18
59/19 60/3 61/2 61/15
63/2 68/17 76/1 96/18
109/19
**future-looking [1]**
96/18

## G

**GAAP [4]** 29/8 29/21
54/17 100/22
**Galeano [6]** 8/12 8/17
9/5 70/9 70/10 70/11
**gather [2]** 118/5
118/12

**gave [10]** 13/17 15/24
16/12 16/12 16/24
18/16 54/12 54/22
62/10 124/17
**general [2]** 18/1 51/22
**generally [2]** 29/2 38/8
**generate [3]** 95/23
108/14 125/3
**gentlemen [2]** 4/8
116/5
**get [16]** 9/21 15/2 20/1
21/25 22/13 32/8 38/12
40/13 41/12 57/23 86/3
86/4 86/7 86/12 98/18
131/4
**gets [1]** 57/4
**getting [6]** 27/7 44/20
80/3 86/7 116/19
120/18
**give [9]** 28/22 28/23
37/15 74/19 76/10
111/15 112/22 126/23
132/13
**given [6]** 60/6 86/18
86/20 131/25 131/25
132/1
**gives [1]** 99/12
**giving [6]** 13/19 14/1
55/17 70/6 115/17
124/19
**glad [1]** 119/15
**global [1]** 125/9
**go [47]** 6/15 6/17 8/5
9/12 10/3 19/16 22/4
22/7 25/17 26/2 26/18
30/6 36/17 39/1 42/2
42/19 43/9 71/7 71/25
72/2 72/16 79/15 85/8
88/13 89/7 91/9 92/21
94/23 96/8 96/9 96/13
96/22 100/6 103/15
103/20 106/10 108/10
112/9 116/7 116/16
121/6 124/24 125/12
126/11 127/18 128/6
129/10
**goes [5]** 41/18 125/5
134/16 134/16 135/14
**going [70]** 4/15 16/1
16/9 21/25 22/22 25/10
25/13 27/21 28/1 30/19
32/8 37/8 38/24 41/11
42/10 57/12 61/16
63/10 64/13 64/14 66/7

78/8 82/2 83/1 83/16
85/8 85/20 86/1 86/12
86/13 86/20 87/6 88/5
88/25 89/11 89/12
89/15 92/12 94/3 94/7
95/19 100/4 100/11
101/12 102/2 103/6
109/12 109/17 109/20
110/6 112/1 115/25
116/5 116/10 116/12
116/23 117/4 119/2
120/24 123/6 124/15
126/23 130/17 131/11
133/19 135/17
**good [11]** 4/8 4/11
60/23 65/8 65/21 80/14
80/18 89/17 102/14
122/16 130/16
**gosh [1]** 89/1
**got [5]** 81/22 111/25
122/15 126/7 126/22
**gotten [1]** 115/12
**governance [1]** 99/25
**government [1]** 87/22
**grammar [1]** 89/12
**grammatical [1]** 90/15
**Grant [1]** 2/2
**green [1]** 99/13
**Greg [1]** 44/14
**Griffin [12]** 63/18
78/24 79/10 79/16
79/20 80/13 81/12
82/18 83/14 86/17
89/17 90/3
**Grossmann [1]** 2/5
**ground [1]** 51/8
**GSE [7]** 50/10 85/17
128/9 133/3 133/4
133/20 133/21
**GSEs [10]** 79/21 95/8
95/12 100/1 125/2
125/6 128/4 128/10
131/20 132/1
**GSEs' [1]** 128/12
**guess [7]** 40/2 48/9
62/17 72/4 73/14 80/22
87/18
**guy [1]** 80/16
**guys [1]** 78/11

## H

**had [62]** 4/9 4/25 5/3
5/15 5/16 8/18 20/3

31/24 32/1 39/24 40/24
41/1 41/1 41/3 42/1
42/2 43/9 53/20 60/20
61/14 61/20 64/1 64/11
64/12 65/4 65/23 66/5
66/6 66/12 66/18 72/25
73/8 73/9 73/17 73/19
73/23 74/18 75/5 80/7
80/22 85/15 85/19
99/17 102/1 103/13
107/1 111/21 112/11
112/20 114/17 119/13
130/24 131/8 132/2
132/4 133/21 134/4
135/3
**hadn't [1]** 133/18
**half [11]** 5/4 6/17 9/13
17/10 23/14 24/5 24/6
42/25 43/3 43/4 114/7
**Halley [1]** 44/14
**HAMISH [2]** 1/22
118/15
**HAMP [1]** 20/8
**Hampshire [1]** 1/18
**hand [6]** 60/17 63/25
67/9 78/24 134/24
134/24
**hand-selected [1]**
60/17
**hands [1]** 66/23
**happen [8]** 35/4 35/6
35/18 37/23 38/17
38/24 39/5 87/22
**happened [16]** 5/3
7/22 31/12 34/12 34/13
39/24 40/14 47/13 49/2
52/2 58/19 67/3 67/14
93/25 113/8 131/19
**happening [4]** 12/18
77/12 86/6 107/6
**happens [2]** 38/25
67/22
**happily [1]** 120/13
**happy [4]** 110/12
115/3 119/16 122/18
**HARP [1]** 20/8
**has [28]** 24/19 24/20
24/21 26/23 27/7 27/12
37/5 49/10 51/19 56/1
57/13 57/20 62/13
74/25 77/7 78/14
101/24 115/7 118/23
119/2 119/11 123/5

# H

**has... [6]** 129/4 130/9 131/2 131/19 135/6 135/10
**hassle [1]** 117/3
**hate [1]** 110/9
**have [105]** 4/21 4/24 5/13 11/11 11/19 12/12 12/25 17/23 18/1 20/22 21/15 27/16 27/21 30/8 37/4 37/5 37/17 39/19 40/12 40/25 41/19 42/18 42/22 43/11 43/14 43/15 45/9 45/12 47/14 47/15 51/24 52/2 52/2 53/5 53/20 53/21 56/5 57/1 60/13 60/18 61/4 61/5 63/2 67/7 68/17 68/24 69/23 72/21 73/3 73/4 74/7 74/7 74/11 74/13 74/22 74/24 75/22 76/3 76/11 76/20 77/16 77/17 77/23 78/11 78/23 80/7 83/23 84/10 85/20 85/23 86/25 90/12 94/23 98/1 98/21 99/21 102/1 102/9 105/16 109/10 110/2 112/8 113/6 116/9 116/10 116/13 116/17 117/8 117/9 117/11 117/25 119/4 119/16 120/2 120/23 125/2 125/8 126/24 131/5 131/14 131/17 132/17 132/23 134/4 135/3
**haven't [1]** 115/12
**he [69]** 14/5 14/5 14/17 14/18 23/24 37/4 37/5 44/1 63/20 63/22 63/24 69/15 74/17 77/7 77/22 78/14 78/18 78/19 79/17 80/14 80/15 80/16 80/18 80/22 81/4 81/5 81/6 81/7 81/7 81/10 81/13 82/8 82/18 82/23 107/25 109/3 109/6 109/16 109/17 110/13 110/15 110/16 110/16 110/24 110/25 111/2 111/7 111/14 111/14 111/18 111/20 111/21 114/17 114/20

114/20 114/20 114/20 115/4 115/23 118/19 118/21 118/22 118/23 118/25 119/6 124/22 133/2 134/15 134/16
**he's [7]** 37/8 79/12 81/3 81/9 124/21 124/23 131/11
**head [2]** 39/20 92/16
**headline [4]** 23/4 23/13 25/18 25/20
**hear [6]** 36/21 119/15 119/16 131/10 133/1 134/12
**heard [9]** 27/7 35/24 110/5 113/18 115/16 123/5 132/25 134/9 135/5
**hearing [1]** 69/4
**hearsay [10]** 5/18 127/7 130/14 130/22 131/5 131/5 131/13 131/23 131/23 134/17
**heavier [1]** 53/6
**heavily [1]** 49/23
**help [3]** 33/17 43/13 103/12
**helped [1]** 26/9
**helping [2]** 20/9 26/5
**her [22]** 5/5 5/16 11/5 13/1 14/21 16/4 17/5 17/16 44/13 60/22 60/23 60/24 62/1 62/3 62/4 62/4 62/12 75/2 75/5 75/11 88/25 118/7
**here [36]** 7/9 9/5 10/17 37/1 39/19 40/6 46/19 55/1 58/3 61/17 70/16 78/3 78/5 81/13 82/17 85/8 93/1 94/25 97/3 108/23 116/22 116/24 116/25 118/21 120/19 123/6 125/18 125/20 126/6 126/8 126/22 127/24 128/20 129/25 130/9 132/8
**HERMAN [4]** 2/20 136/3 136/8 136/8
**Hey [2]** 66/23 67/3
**Hi [1]** 9/6
**high [1]** 89/11
**higher [1]** 31/17
**highlight [22]** 10/8 10/24 11/13 19/3 19/7

19/19 20/2 20/23 23/9 25/18 37/25 50/24 51/4 54/4 54/5 64/6 71/9 92/22 97/8 100/9 108/5 128/17
**highlighted [6]** 11/2 42/17 46/19 65/24 87/3 96/2
**highlights [4]** 12/16 18/19 20/24 69/2
**highly [2]** 37/3 114/6
**him [15]** 36/16 49/6 60/19 60/19 63/25 109/6 110/18 111/9 111/17 111/18 111/18 111/22 112/1 114/18 115/1
**himself [1]** 111/14
**his [7]** 8/17 79/16 80/1 80/14 86/17 89/17 124/19
**history [2]** 19/24 89/13
**hit [1]** 63/8
**hoc [1]** 134/2
**HOFFMAN [13]** 2/9 3/4 3/5 4/12 36/22 102/14 109/24 111/5 112/14 113/21 114/21 115/13 119/21
**hold [2]** 39/13 84/17
**Home [1]** 2/12
**homeowners [1]** 26/5
**honest [1]** 21/15
**Honor [83]** 4/5 4/11 8/19 13/4 13/8 13/10 36/14 36/17 36/18 36/21 36/22 62/20 63/4 65/19 74/10 74/15 78/18 79/22 81/15 82/5 82/7 102/5 102/8 109/22 110/5 110/8 111/5 111/23 112/3 113/18 113/21 114/5 114/11 114/15 114/25 115/9 115/13 117/21 117/24 118/4 118/12 118/13 119/15 119/21 120/18 121/4 121/8 122/11 122/16 123/3 123/5 123/19 123/21 124/4 124/15 125/7 125/19 125/22 126/1 126/6 127/12 128/20 128/24 129/4 130/1

25/18 37/25 50/24 51/4 54/4 54/5 64/6 71/9 92/22 97/8 100/9 108/5 128/17
**Honor's [2]** 122/7 132/3
**HONORABLE [1]** 1/12
**hope [1]** 119/16
**hopefully [3]** 116/19 117/6 117/12
**host [1]** 132/21
**hour [2]** 17/10 17/10
**house [1]** 41/18
**housing [8]** 1/5 2/8 8/13 20/9 20/11 24/4 70/12 93/3
**how [32]** 10/18 10/19 11/25 12/7 17/8 20/16 26/15 38/9 38/19 38/25 40/15 42/22 43/9 43/12 48/22 65/1 66/23 67/18 80/20 80/24 80/24 83/24 87/2 92/2 97/22 98/18 109/16 109/16 131/19 132/12 132/13 133/24
**HOWARD [1]** 2/8
**however [4]** 20/7 118/23 128/7 128/18
**HUD [1]** 93/2
**huge [4]** 28/24 29/1 31/14 52/23
**huh [4]** 36/3 84/8 96/4 98/23
**HUME [2]** 1/22 118/15
**hundred [5]** 28/20 29/4 29/6 30/4 67/16
**hundred-billion-dollar [1]** 29/6
**hundreds [1]** 17/1
**hypothetically [2]** 39/5 48/8

# I

**I'd [8]** 11/14 21/18 23/2 23/4 25/17 67/18 92/17 105/15
**I'll [22]** 25/9 28/21 33/25 42/17 49/6 50/24 50/25 57/25 67/8 67/10 97/11 117/13 117/22 118/7 120/13 120/14

**I**

**I'll... [6]** 121/23 122/21
122/21 126/1 135/20
135/20

**I'm [86]** 4/15 7/3 14/9
16/8 17/16 18/1 22/22
23/22 25/10 25/13
29/25 30/19 32/7 32/12
33/2 33/2 36/1 39/12
39/13 40/6 42/8 42/10
45/3 45/3 47/24 48/5
51/10 55/12 56/12
57/18 57/20 60/7 60/10
62/12 63/10 67/7 72/14
73/13 73/13 73/14
77/11 77/13 77/19
77/21 77/21 78/3 78/5
78/8 79/14 80/9 80/9
85/22 89/11 89/13
89/15 92/7 92/12 93/1
94/3 94/7 95/19 96/13
97/19 98/3 98/4 99/11
100/4 100/11 101/12
101/14 103/6 103/20
110/11 111/12 113/24
115/3 115/17 115/22
117/4 118/4 119/15
120/18 122/18 123/6
124/15 128/13

**I've [5]** 42/17 116/15
118/17 119/14 122/15

**IAN [8]** 2/9 4/12 36/22
102/14 111/5 113/21
115/13 119/21

**Ian Hoffman [1]**
102/14

**idea [3]** 61/4 61/5
77/23

**identical [1]** 98/16

**identified [1]** 7/11

**illustrate [1]** 90/7

**impact [5]** 10/9 10/14
131/8 134/4 135/3

**impacted [1]** 135/3

**implication [1]** 132/5

**implications [2]** 36/6
68/16

**implicit [2]** 58/21
110/15

**implied [1]** 72/13

**implies [2]** 58/22
123/24

**imply [1]** 76/18

**implying [1]** 111/1

**important [2]** 79/19
117/2

**impression [2]** 5/17
5/21

**improper [3]** 115/9
115/17 115/24

**improved [2]** 20/12
20/22

**improvement [1]** 19/5

**inappropriate [1]**
111/23

**Inaudible [1]** 35/13

**INC [1]** 1/2

**include [3]** 47/10
83/16 90/6

**included [1]** 89/20

**including [10]** 9/14
11/19 12/13 20/8 21/5
72/21 73/22 95/8
118/23 132/21

**income [29]** 20/17
20/18 23/10 23/23
25/21 25/22 27/13
27/17 27/21 31/16
31/17 33/14 34/10
34/20 38/13 39/3 39/9
51/17 53/23 54/17 57/4
57/4 57/7 95/23 95/24
108/13 108/14 108/14
125/3

**incompetent [1]** 71/3

**incomplete [1]** 70/19

**inconsistent [2]** 9/24
108/17

**incorporated [1]** 58/9

**incorrect [1]** 111/22

**increase [6]** 31/16
38/13 43/2 43/4 43/5
54/19

**increased [2]** 43/3
53/23

**increasingly [1]** 98/1

**incur [1]** 117/24

**indeed [1]** 127/4

**indicate [1]** 69/15

**indicated [4]** 64/12
66/5 66/22 90/23

**indicates [3]** 68/23
69/18 125/20

**indication [2]** 131/7
134/3

**indicative [1]** 87/21

**indulgence [3]** 13/4
109/21 119/22

**infer [1]** 68/14

**inferences [2]** 123/21
123/22

**inform [1]** 118/17

**information [9]** 39/2
47/10 55/18 69/4 71/1
74/11 74/13 132/21
132/22

**informed [1]** 118/17

**inherently [1]** 51/18

**initiated [1]** 126/16

**inquire [1]** 68/7

**inquiries [1]** 5/5

**inside [1]** 100/1

**instead [1]** 86/2

**institutions [1]** 93/7

**instruction [4]** 113/23
114/11 114/25 115/18

**intent [1]** 62/1

**interest [1]** 53/23

**interim [1]** 100/16

**internal [4]** 47/24 48/1
101/16 126/5

**interpretation [2]**
90/13 91/9

**introducing [1]** 133/23

**investment [1]** 127/1

**investors [3]** 23/7 93/9
101/5

**involved [2]** 103/4
104/3

**involves [1]** 51/19

**is [348]**

**isn't [9]** 38/23 47/1
61/3 63/2 87/20 88/25
101/6 102/2 128/21

**issuances [1]** 43/5

**issue [14]** 11/3 36/5
36/11 65/7 72/25
105/12 106/8 112/22
112/23 115/7 119/17
123/18 125/7 128/21

**issues [13]** 9/22 9/23
15/21 16/1 16/21 18/4
37/2 38/8 109/15 119/2
120/1 121/13 128/10

**it [268]**

**it's [56]** 10/1 16/24
21/18 26/23 27/21 28/4
29/7 29/8 29/8 29/17
29/18 29/22 32/24
33/15 45/8 46/2 46/2
47/25 49/1 50/9 50/14
53/4 58/7 68/1 71/22

74/16 75/12
76/12 79/19 82/1 82/7
86/10 97/8 103/20
105/18 110/6 110/8
110/15 110/23 111/2
116/23 117/7 118/21
123/7 128/9 130/9
131/5 131/25 132/8
132/14 133/18 134/17
134/18 135/2 135/13

**item [1]** 22/21

**items [4]** 10/6 12/20
12/20 70/20

**its [10]** 12/8 15/25
21/23 24/21 33/9 34/16
63/1 85/15 93/9 126/23

**itself [3]** 124/24 131/3
131/24

**J**

**James [3]** 63/17 78/24
80/13

**Jamie [5]** 124/16
124/17 125/16 125/16
130/25

**Jan [1]** 64/6

**January [6]** 125/19
126/6 126/16 130/21
132/11 134/19

**Jeff [12]** 60/5 64/11
64/16 64/16 64/18
64/21 65/3 66/5 66/11
68/23 69/11 69/22

**Jim [4]** 80/21 86/17
86/22 109/14

**job [5]** 60/18 60/23
60/24 80/14 89/17

**JUDGE [2]** 1/12
118/15

**judgments [1]** 69/5

**July [4]** 49/10 60/25
61/25 62/24

**June [14]** 20/10 46/22
46/25 47/5 48/6 48/11
48/19 48/20 49/11
49/12 49/15 75/7 75/18
100/22

**juror [1]** 117/10

**jurors [1]** 116/9

**jury [32]** 1/11 4/6 4/12
8/25 11/14 27/7 33/23
36/25 37/3 55/17 65/14
76/18 102/9 107/17
108/11 109/9 110/2

**J**

jury... **[15]** 110/24
113/23 114/3 114/10
115/11 115/17 115/24
117/8 117/17 123/22
125/24 130/2 132/12
133/24 135/15
**jury's [1]** 9/17
**just [94]** 4/17 7/1 9/9
9/17 11/2 14/9 14/12
14/14 14/23 17/2 19/23
20/2 21/19 22/4 25/6
25/9 27/16 30/1 30/25
32/6 33/25 34/1 35/18
39/4 39/17 40/3 42/17
44/3 46/5 51/7 51/8
51/22 56/19 58/17
65/23 66/10 67/8 67/10
73/8 73/10 73/17 73/19
74/17 74/18 78/2 78/8
78/18 79/13 79/25
87/13 88/9 88/10 98/8
98/12 98/18 99/16
102/8 103/7 104/13
105/16 107/17 110/11
110/15 110/18 110/18
111/3 112/4 112/8
112/13 113/5 114/7
114/8 114/21 115/1
117/10 118/5 118/11
118/11 119/4 119/11
119/17 120/20 121/12
122/14 123/3 125/17
126/18 126/21 128/16
129/24 130/17 132/9
133/6 134/21
**justification [1]** 50/5
**Justison [1]** 2/3

**K**

**KAPLAN [1]** 1/23
**Kari [1]** 120/22
**Kaye [1]** 2/10
**keep [2]** 47/15 77/20
**Kessler [1]** 1/20
**key [2]** 69/2 69/5
**keyed [1]** 87/4
**kind [1]** 111/21
**King [2]** 1/21 2/13
**Kirk [1]** 1/17
**knew [13]** 31/6 31/6
31/12 38/2 38/5 61/14
61/20 61/25 62/17 85/5
85/12 93/13 119/5

**know [94]** 13/22 14/4
14/24 29/5 31/17 33/15
38/7 39/23 40/1 40/5
41/23 43/9 43/12 43/14
43/15 48/15 54/12 57/5
57/7 58/12 58/17 59/7
59/18 59/23 60/10
60/14 60/17 60/21
62/12 62/13 62/14
69/16 73/5 73/11 74/20
76/5 76/7 76/21 77/13
77/14 77/16 77/18
77/24 77/24 77/25 78/2
78/6 78/7 78/7 78/19
80/21 83/7 83/9 83/9
83/13 83/15 83/21 85/7
86/2 86/11 87/6 87/25
87/25 89/1 89/13 91/7
91/23 92/4 92/8 92/8
92/8 92/10 93/2 95/10
97/16 97/19 102/20
109/6 111/22 112/21
113/5 113/5 113/6
114/2 115/12 116/10
119/3 119/17 125/23
129/8 130/11 131/4
131/14 135/18
**knowledge [2]** 75/2
75/11
**knows [1]** 131/19
**Kravetz [2]** 130/17
134/18

**L**

**ladies [2]** 4/8 116/5
**LAMBERTH [2]** 1/12
118/15
**language [1]** 114/12
**large [2]** 28/19 38/13
**largest [1]** 120/4
**last [19]** 10/24 24/20
26/22 37/11 37/12
52/12 53/2 64/12 65/5
66/6 93/25 99/17
100/19 108/3 108/5
125/1 128/11 133/2
133/12
**late [1]** 12/22
**lately [1]** 37/5
**later [12]** 47/3 58/17
58/19 58/22 58/23 62/3
83/10 86/2 118/22
131/8 134/5 134/22
**Laughter [1]** 117/16

**LAUREN [1]** 1/20
**law [1]** 27/8
**lawsuit [3]** 77/25
78/14 82/8
**lawyers [4]** 37/15
37/17 98/24 118/25
**layers [1]** 44/12
**Layton [3]** 26/3 26/8
121/10
**lead [1]** 102/25
**lead-up [1]** 102/25
**leading [3]** 111/18
111/22 129/18
**least [2]** 95/11 125/24
**leave [1]** 135/19
**Lee [3]** 13/10 110/8
114/15
**left [6]** 5/16 5/20 64/1
78/24 81/7 110/15
**left-hand [1]** 78/24
**legacy [1]** 24/1
**less [3]** 83/2 84/17
86/13
**let [17]** 14/3 14/12
14/14 14/24 29/15
33/25 44/3 87/24 88/9
106/16 112/4 117/1
117/11 119/17 122/14
123/19 133/22
**let's [73]** 6/12 6/13
6/15 6/17 8/5 8/24 9/12
9/13 10/3 10/6 10/8
10/24 11/13 15/5 18/6
18/21 19/10 19/16
19/19 22/4 22/7 25/17
26/2 26/18 33/19 37/22
44/3 46/10 50/21 52/6
53/10 53/16 54/2 54/4
54/5 54/12 54/13 70/15
71/7 71/9 72/2 72/16
78/21 88/13 89/7 90/18
91/9 92/21 92/21 94/23
96/5 96/13 98/7 98/18
100/6 103/15 104/10
106/10 107/12 107/16
108/1 108/2 108/4
108/22 108/23 122/24
124/24 126/11 127/12
127/20 128/6 129/1
129/12
**letter [1]** 53/15
**level [6]** 45/24 46/2
59/25 60/1 67/17 67/21
**light [1]** 99/13

**like [29]** 6/14 14/23
21/18 22/2 23/2 25/17
27/12 29/4 29/5 29/7
29/19 33/16 41/18
45/13 50/14 52/23
55/17 57/16 58/4 66/22
68/19 91/16 92/17
105/15 109/6 109/9
114/22 132/9 135/17
**likelihood [4]** 10/25
11/6 11/12 38/16
**likely [11]** 10/25 11/6
32/21 50/9 50/12 50/16
73/25 76/13 86/24
100/25 128/15
**Likewise [1]** 130/7
**Limine [1]** 135/9
**limit [1]** 23/25
**line [4]** 9/20 10/9
123/20 128/20
**lines [5]** 109/5 117/11
123/14 123/15 129/13
**list [7]** 96/18 97/13
114/9 120/2 120/18
133/4 133/22
**listed [1]** 7/8
**listen [1]** 117/14
**listener [1]** 134/17
**listing [2]** 130/10
130/11
**LITIGATIONS [1]** 1/9
**Litowitz [1]** 2/5
**little [12]** 18/6 23/17
43/20 67/14 73/21 86/7
86/12 105/20 111/2
116/18 127/16 135/16
**living [1]** 76/11
**LLP [6]** 1/20 1/23 2/5
2/10 2/12 2/16
**Loan [1]** 2/12
**long [11]** 17/8 23/14
80/20 80/24 80/24
88/20 88/23 89/5 95/25
108/16 117/11
**long-term [4]** 23/14
88/20 88/23 89/5
**longer [1]** 10/15
**look [15]** 6/12 19/10
33/16 33/25 34/1 52/6
53/10 53/16 70/15 96/5
107/12 108/1 124/25
126/18 135/20
**looked [9]** 47/4 48/19
55/16 74/24 98/12

## L

**looked... [4]** 105/5
106/16 106/22 115/14
**looking [22]** 22/5
23/22 32/7 39/7 48/16
48/20 52/23 55/15
65/23 72/25 73/20 74/8
76/1 76/1 77/11 77/20
77/22 92/2 96/17 96/18
106/17 107/18
**looks [4]** 22/2 70/22
70/22 70/23
**loop [1]** 44/22
**LORRAINE [4]** 2/20
136/3 136/8 136/8
**lose [2]** 29/3 30/4
**loss [16]** 20/19 28/24
29/1 29/3 29/6 29/8
29/16 29/17 29/17
29/18 30/8 51/18 52/14
52/17 53/8 54/18
**losses [8]** 24/1 30/10
30/11 50/3 51/16 52/12
125/5 128/5
**lost [1]** 30/7
**lot [7]** 39/21 52/2
89/14 117/3 120/11
123/5 135/5
**LUMMUS [1]** 1/20
**Lyons [1]** 44/11

## M

**MAC [17]** 1/8 19/24
20/21 25/21 26/8 26/23
27/15 29/20 32/19
34/12 34/15 44/25
46/14 50/4 91/6 96/8
101/24
**Mac's [9]** 19/13 25/11
25/20 26/5 34/16 51/8
52/11 93/6 128/2
**made [21]** 45/22 45/23
46/2 46/22 48/23 49/1
58/7 74/25 77/17 84/3
84/13 84/13 87/23
94/21 106/13 111/11
114/2 115/17 115/22
135/8 135/8
**MAE [44]** 1/8 4/22 5/11
5/21 7/10 9/23 12/1
12/8 19/4 19/7 23/7
23/10 27/15 29/20
32/19 33/9 34/3 42/9
44/4 44/6 44/10 44/16

44/17 44/19 44/25 49/5
53/14 61/1 69/1 71/15
73/22 88/6 91/6 92/25
93/9 93/11 93/23 97/22
104/7 104/20 105/1
105/6 105/8 105/13
**Mae's [20]** 5/14 12/23
18/13 21/22 23/25
33/21 34/4 42/11 49/7
49/10 53/17 63/8 92/13
93/6 101/12 107/6
107/19 108/4 108/18
128/1
**MAE/FREDDIE [1]** 1/8
**main [1]** 38/23
**maintain [1]** 100/20
**maintained [1]** 8/3
**major [1]** 89/13
**make [23]** 5/5 32/17
32/20 39/21 39/24 40/1
43/22 45/17 47/14
81/25 82/24 83/2 83/14
86/13 86/14 90/15
91/13 99/12 109/4
111/15 115/25 119/4
122/15
**makers [2]** 128/25
130/3
**makers' [3]** 123/12
123/16 127/8
**makes [6]** 44/6 45/16
81/19 82/24 86/17 90/5
**making [12]** 12/21
44/23 57/8 77/2 91/25
114/9 124/1 124/10
130/4 132/7 134/4
135/4
**man [2]** 63/25 78/24
**management [18]**
32/18 32/19 44/13
44/18 44/24 44/25 45/6
45/16 45/22 46/2 47/8
49/22 50/9 60/1 67/23
73/22 98/21 113/2
**many [3]** 35/12 38/19
81/1
**March [5]** 53/24
103/24 107/4 107/5
131/17
**Mario [2]** 125/17 131/1
**Mario Ugoletti [1]**
131/1
**market [10]** 20/9 20/11
23/24 43/13 92/1 93/4

93/6 129/1 129/10 129/24
129/15
**marking [1]** 105/17
**Mason [2]** 118/18
118/18
**Massachusetts [1]**
2/10
**massive [2]** 28/18 53/2
**material [6]** 75/1 75/1
100/10 100/15 100/25
101/16
**math [2]** 97/3 97/4
**matrix [1]** 86/24
**matter [3]** 51/23 56/5
136/5
**matters [1]** 109/14
**may [26]** 4/5 4/7 4/10
13/9 24/5 36/17 47/3
47/10 53/24 60/9 65/15
65/17 88/20 88/23 89/4
95/22 96/10 101/5
108/7 108/12 108/20
110/5 113/18 119/3
119/3 134/8
**maybe [10]** 38/22 48/8
62/19 67/5 68/14 68/20
113/5 123/13 129/13
132/17
**Mayopoulos [4]** 23/18
23/21 24/3 120/22
**McFarland [18]** 5/8
5/13 7/6 8/18 11/24
12/6 60/14 61/14 61/20
71/15 71/22 73/22 74/8
74/25 75/5 77/16 87/24
88/18
**McFarland's [1]** 11/4
**McGuire [3]** 90/8
133/7 133/13
**me [58]** 8/12 12/17
13/14 14/3 14/11 14/12
14/14 14/19 14/20
14/24 15/15 16/17
17/20 29/15 33/25
36/21 40/21 41/23 44/3
49/18 49/22 51/8 55/11
55/25 56/13 57/15 65/2
67/6 67/10 69/7 69/11
69/19 71/2 76/12 77/11
79/19 82/14 87/15
87/21 87/24 88/9 89/17
91/8 91/16 98/4 99/11
101/14 106/16 106/20
110/18 111/18 112/4

126/18 129/10 115/25
119/7 122/14 135/19
**MEAGHAN [1]** 2/15
**mean [14]** 11/1 11/9
12/1 12/16 29/3 29/16
32/6 41/18 47/7 48/7
52/23 76/18 79/4 79/21
**meaning [1]** 29/17
**means [7]** 39/11 64/24
72/25 81/25 86/5 91/2
95/12
**meant [4]** 81/13 82/18
82/24 90/4
**measure [1]** 12/16
**mechanics [1]** 39/4
**meet [2]** 5/1 5/7
**meeting [42]** 5/4 5/16
5/20 6/2 6/5 6/9 6/25
7/4 7/6 7/10 7/11 7/12
7/19 7/21 7/25 8/2 8/18
9/7 9/8 9/21 9/25 11/22
12/6 17/10 35/17 35/22
62/4 62/6 64/13 66/6
68/6 71/24 72/7 72/11
73/18 74/1 74/3 123/23
126/15 126/23 127/4
134/23
**meetings [11]** 5/3 6/25
45/2 45/3 64/22 65/6
67/3 67/15 69/13 69/17
69/20
**Melissa [2]** 6/6 71/17
**Melissa Schwitters [1]**
6/6
**Meltzer [1]** 1/20
**members [4]** 4/11
108/10 109/9 110/2
**memo [44]** 6/8 7/2 7/5
7/8 8/2 9/18 11/25
17/17 17/21 17/23 18/1
35/6 35/9 35/14 36/4
44/9 44/13 45/13 46/13
46/17 47/2 47/24 47/25
48/1 48/5 48/7 48/10
48/15 48/18 49/7 49/10
53/14 57/10 57/11
57/20 57/21 57/23
70/18 70/19 71/3 72/24
73/17 88/10 88/17
**memory [2]** 73/18
97/19
**memos [15]** 7/25 32/8
32/8 32/14 43/21 44/21
49/18 58/1 58/2 58/4

**M**

memos... [5]  59/2
60/11 60/12 76/4 113/4
mentioned [5]  4/25
4/25 50/8 68/25 112/11
mentioning [1]  59/24
merits [1]  114/11
message [1]  68/15
met [3]  5/8 79/17
88/18
methodology [1]
32/24
metric [1]  86/24
Meyer [1]  4/3
MICHAEL [2]  2/2 2/12
middle [4]  52/7 118/19
123/20 124/14
might [3]  35/3 35/18
61/1
million [1]  26/6
mind [5]  103/14 107/1
123/12 123/16 127/8
minimum [1]  131/23
minute [2]  71/18 89/18
minutes [5]  6/11 8/16
65/10 112/1 118/11
misstatement [1]
100/15
misstatements [1]
75/2
misunderstood [1]
14/8
moment [13]  7/6 9/18
35/1 43/21 70/1 81/21
89/12 92/7 102/5 109/2
109/21 124/22 134/22
Monday [3]  116/17
132/17 133/11
money [9]  31/14 40/9
40/22 40/24 41/12
41/19 42/2 42/19 43/16
monitored [1]  129/16
Montgomery [18]  6/18
9/12 10/3 13/5 105/21
106/4 107/9 122/25
123/8 124/5 124/12
125/13 126/2 126/12
127/9 127/18 128/17
129/10
month [2]  13/3 49/2
months [10]  20/10
61/8 61/11 62/16 62/18
103/25 131/8 132/10
132/23 134/5

Moody's [1]  127/14
127/15 127/24 128/21
129/21 129/25 130/24
more [28]  17/25 22/11
24/19 24/21 26/23 29/4
30/15 32/21 41/19
45/13 49/23 50/9 50/11
50/16 51/3 51/15 52/3
59/22 73/24 85/20
85/23 87/19 102/10
112/8 112/22 112/25
112/25 126/1
morning [2]  4/2 117/7
mortgage [10]  2/12
2/15 10/20 79/7 83/1
83/17 83/22 89/25 92/1
93/19
mortgages [2]  84/11
84/17
most [1]  18/4
Motion [1]  135/9
motions [1]  67/9
mouth [1]  114/16
movant [1]  134/8
move [15]  8/20 25/13
30/19 57/25 70/2 92/17
118/1 120/3 120/24
121/9 121/12 122/17
126/3 130/13 134/6
moved [2]  120/24
132/2
moving [2]  83/2 124/8
Mr [12]  3/4 3/4 3/5 3/5
4/15 9/4 13/7 106/25
123/24 124/8 129/24
134/18
Mr. [107]  6/18 6/21 8/9
9/12 10/3 10/11 11/21
13/5 13/14 13/15 14/4
14/16 14/16 14/19 21/4
23/18 23/21 24/3 25/9
27/4 60/17 65/22 70/9
70/10 70/11 76/23 77/7
77/10 77/16 78/13
79/10 79/16 79/17
79/20 81/12 82/18
83/14 89/17 90/3 91/19
92/25 102/14 102/16
103/7 103/8 103/11
104/14 105/16 105/18
105/21 105/24 106/4
107/9 107/13 109/3
109/24 109/25 110/1
111/7 111/9 111/11

111/19 112/8 112/14
113/24 113/25 114/1
114/2 114/3 114/8
114/21 115/14 122/25
123/8 124/5 124/12
124/17 124/18 124/21
125/13 125/17 125/21
125/25 126/2 126/7
126/9 126/10 126/12
126/22 127/9 127/18
128/17 129/4 129/10
129/20 130/3 130/12
131/10 131/10 132/16
134/1 134/14 134/23
Mr. DeMarco [13]  14/4
14/16 14/19 60/17 77/7
77/10 77/16 78/13
79/17 126/9 131/10
132/16 134/23
Mr. DeMarco's [1]
13/15
Mr. Galeano [3]  70/9
70/10 70/11
Mr. Griffin [8]  79/10
79/16 79/20 81/12
82/18 83/14 89/17 90/3
Mr. Hoffman [3]
109/24 112/14 114/21
Mr. Mayopoulos [3]
23/18 23/21 24/3
Mr. Montgomery [18]
6/18 9/12 10/3 13/5
105/21 106/4 107/9
122/25 123/8 124/5
124/12 125/13 126/2
126/12 127/9 127/18
128/17 129/10
Mr. Rajiv [1]  124/18
Mr. Rudy [5]  107/13
111/9 111/12 111/19
114/2
Mr. Rudy's [2]  113/24
113/25
Mr. Satriano [32]  6/21
8/9 10/11 11/21 13/14
14/16 21/4 25/9 27/4
65/22 76/23 91/19
92/25 102/14 102/16
103/7 103/8 103/11
104/14 105/16 105/24
109/3 110/1 111/7
111/11 111/12 111/16

114/8
Mr. Satriano's [2]
105/18 114/1
Mr. Setia [1]  124/21
Mr. Stern [1]  109/25
Mr. Ugoletti [13]
125/17 125/21 125/25
126/7 126/10 126/22
129/4 129/20 130/12
131/10 134/1 134/14
134/23
Mr. Ugoletti's [1]
130/3
Ms [2]  133/7 133/12
Ms. [28]  5/13 7/6 7/16
8/18 11/4 11/24 12/6
14/20 15/2 15/23 15/24
16/12 16/15 17/13
61/20 71/13 71/15
71/22 71/22 73/22 74/8
74/25 75/5 77/16 87/24
88/18 90/8 126/9
Ms. Burns [1]  126/9
Ms. DeLeo [6]  15/2
15/23 15/24 16/12
16/15 17/13
Ms. McFarland [15]
5/13 7/6 8/18 11/24
12/6 61/20 71/15 71/22
73/22 74/8 74/25 75/5
77/16 87/24 88/18
Ms. McFarland's [1]
11/4
Ms. McGuire [1]  90/8
Ms. Schwitters [3]
7/16 71/13 71/22
Ms. Wanda [1]  14/20
much [20]  39/24 42/22
43/9 43/12 49/23 66/3
71/1 84/14 86/13 90/11
110/1 116/21 119/19
119/22 127/16 131/19
132/12 132/13 132/20
135/22
multiple [3]  37/20
128/15 132/1
must [1]  73/3
mutual [1]  9/23
my [56]  5/2 6/5 11/5
14/19 14/20 14/20
14/23 16/2 17/5 17/13
17/13 34/2 37/14 37/17
39/20 40/2 41/18 41/19

**M**

my... [38] 55/5 57/18 58/21 61/18 62/10 67/13 68/2 73/2 73/14 76/11 77/22 82/21 83/12 86/16 87/18 88/2 88/25 89/2 90/16 90/16 97/3 106/6 106/20 110/10 111/3 112/25 114/19 115/1 115/6 118/5 118/12 118/12 119/11 119/19 120/18 122/14 122/15 130/19
Myers [1] 2/16
myself [3] 71/14 71/17 112/25

**N**

Nancy [1] 4/3
narrow [1] 109/13
nation's [1] 26/12
national [2] 2/15 24/4
nature [1] 100/24
near [1] 133/19
near-term [1] 133/19
need [9] 33/23 43/6 48/8 84/23 110/21 117/3 118/5 118/10 135/12
needing [1] 59/13
needs [1] 50/9
negative [10] 12/20 32/20 32/22 32/22 49/19 50/13 87/1 119/12 119/13 119/14
negotiation [1] 134/20
neither [3] 133/3 133/4 133/21
net [57] 14/5 14/18 15/19 17/18 17/22 23/10 23/13 25/21 30/5 31/5 31/14 31/17 33/14 34/23 35/7 37/24 38/5 38/12 38/13 39/9 39/18 40/4 40/16 41/3 41/8 41/11 42/6 48/23 53/23 59/9 59/21 62/24 73/1 73/19 74/9 76/19 76/25 77/8 78/14 88/1 89/22 95/23 108/14 110/13 110/17 110/19 110/25 112/17 113/12 113/14 114/19 115/5 125/3 131/9 131/21 132/10

never [11] 14/4 14/16 14/19 16/17 17/17 31/20 31/21 36/13 81/7 114/4 119/16
new [6] 1/18 1/24 2/6 2/6 23/25 84/3
Newell [5] 124/16 124/17 125/16 125/16 130/25
news [1] 22/21
next [16] 11/4 20/16 54/5 58/3 59/4 70/15 71/7 90/18 91/3 96/22 96/24 106/3 121/8 127/11 129/21 133/15
NICHOLAS [5] 3/3 4/13 13/12 102/12 112/6
nine [4] 61/8 61/11 62/16 62/17
no [92] 1/3 1/8 8/21 13/7 13/16 15/18 17/12 17/20 18/4 22/24 25/14 25/25 29/14 31/24 33/6 33/6 35/10 35/18 35/20 40/6 43/12 48/25 49/7 49/7 49/7 55/2 59/2 61/4 61/5 61/6 61/12 61/17 62/12 63/2 66/25 67/5 67/10 67/17 67/25 68/1 68/2 68/2 68/9 68/24 68/25 69/23 69/24 74/11 74/13 75/1 75/1 76/7 76/20 77/3 77/23 77/24 78/12 79/12 79/14 79/14 81/7 85/20 85/23 87/8 87/10 89/4 90/12 91/17 91/22 92/18 94/8 97/13 97/14 99/4 99/21 101/20 102/9 109/6 110/2 114/25 119/2 120/4 121/4 121/11 121/16 121/22 122/1 122/6 122/10
objectionable [1] 36/24
objections [5] 118/4 118/16 119/25 131/5 131/6
obligation [7] 47/15 55/13 57/4 57/6 95/24 98/2 108/15
observed [2] 20/10 130/7
obviously [3] 118/24 119/5 124/21
occurred [2] 11/10 31/18
occurs [1] 47/16
off [8] 39/8 60/13

not [131] 1/9/18 17/20 18/4 21/18 24/5 25/5 27/21 28/1 29/7 29/7 29/17 29/18 29/25 32/16 32/21 32/25 33/1 35/20 37/1 37/2 37/3 40/15 42/8 43/23 44/7 44/22 45/2 45/4 45/5 45/8 45/23 46/15 47/25 48/23 50/9 50/12 50/16 51/19 54/19 55/14 55/19 56/4 56/9 56/10 56/11 56/13 56/14 56/15 57/3 57/10 58/2 58/20 59/5 60/1 60/3 61/6 61/14 62/12 63/1 67/18 67/20 68/1 69/6 69/24 70/21 71/5 72/24 72/25 73/13 73/14 73/24 73/25 75/19 76/9 76/24 77/5 77/10 78/13 79/10 80/9 81/3 81/5 81/19 82/17 86/17 87/10 87/14 88/20 88/23 89/3 89/4 91/22 92/8 93/19 94/24 95/23 97/23 98/3 100/16 100/20 100/25 101/5 101/18 105/17 108/13 111/7 112/19 114/13 114/17 114/22 115/17 115/23 115/25 116/14 116/23 117/7 118/24 118/24 119/3 123/6 124/15 125/8 126/3 127/5 127/7 127/16 131/5 131/11 131/13 131/22 132/9
not-so-distant [4] 60/3 62/1 61/14 63/1
notches [1] 128/15
note [5] 4/2 69/10 69/24 120/15 122/21
noted [3] 11/17 72/19 125/2
notes [19] 6/2 6/4 6/7 6/8 6/25 7/3 7/17 7/21 9/6 35/18 39/13 62/6 70/13 70/15 71/16 72/5 118/5 118/12 123/23
nothing [14] 35/22 48/7 48/10 57/1 57/20 58/2 58/4 58/6 70/25 78/11 97/21 115/9

notion [1] 109/17
now [36] 4/15 4/15 6/13 11/13 14/7 26/23 40/23 42/3 57/18 58/1 59/7 77/19 78/23 82/1 87/12 89/1 91/9 92/8 94/23 104/3 104/5 106/15 106/17 106/22 109/10 113/23 114/2 115/4 115/18 116/1 118/21 120/23 121/12 128/6 131/18 131/19
number [7] 31/4 33/14 39/7 55/14 61/3 71/9 94/24
numbers [12] 32/4 47/4 47/5 47/18 48/2 48/20 49/2 49/15 58/8 75/18 120/13 122/15
NW [6] 1/18 1/24 2/10 2/13 2/16 2/21

**O**

O'Melveny [1] 2/16
oath [1] 13/20
object [2] 120/8 122/11
objection [31] 5/18 8/21 17/3 22/24 25/14 29/10 30/13 36/14 36/17 62/20 63/4 74/10 74/15 78/18 79/22 81/15 82/5 88/7 92/14 94/8 114/6 120/5 120/11 120/16 121/4 121/11 121/16 121/22 122/1 122/6 122/10

non [2] 130/14 134/17
non-hearsay [2] 130/14 134/17
normal [2] 29/19 117/12
nobody [4] 13/22 15/4 35/3 35/5

**off... [6]** 64/11 65/13 66/5 87/4 102/7 109/24
**offer [2]** 22/22 94/7
**offered [4]** 123/11 123/14 123/15 127/7
**offering [1]** 105/17
**office [6]** 6/6 7/24 33/3 35/24 106/6 106/20
**Officer [2]** 5/9 5/10
**officers [1]** 5/2
**Official [2]** 2/20 136/3
**offset [2]** 27/25 128/5
**often [2]** 21/6 51/19
**oh [2]** 81/8 88/25
**okay [122]** 8/24 9/3 9/11 10/2 11/15 13/17 13/20 14/3 14/23 15/13 16/5 16/10 16/23 17/12 18/6 18/8 19/3 20/15 21/9 23/23 24/9 24/17 24/24 25/3 25/17 26/2 27/1 27/5 27/11 28/15 30/20 32/5 32/9 33/16 35/16 35/21 36/8 36/12 37/10 37/21 38/2 40/20 41/21 44/2 44/5 46/1 48/4 48/13 49/4 52/14 53/10 54/1 54/15 55/24 56/21 57/17 57/25 59/6 62/7 62/9 62/15 64/2 67/1 67/12 67/19 68/4 68/10 69/11 70/13 71/6 72/2 74/6 76/17 77/6 78/1 78/11 80/6 81/2 81/8 81/11 82/16 82/22 83/5 83/20 84/7 88/3 88/11 89/6 89/13 90/2 90/17 91/15 91/18 92/11 92/22 93/17 94/2 94/19 94/25 95/18 96/9 96/21 97/5 97/20 98/6 98/14 98/20 100/3 104/9 105/4 108/20 113/9 114/3 117/23 118/2 118/9 119/10 120/6 120/9 120/12 120/18 120/19 134/12
**old [2]** 134/19 135/13
**omissions [1]** 75/1
**once [1]** 81/7
**one [42]** 5/3 6/5 9/8 17/12 22/11 45/11 50/16 58/19 59/4 60/4 60/24 62/4 68/18 69/6 71/19 81/5 83/24 98/9 98/9 102/5 104/23 105/1 105/2 105/5 105/7 105/8 106/22 106/22 107/2 109/21 111/3 111/18 112/4 112/8 119/2 122/21 127/15 130/8 132/19 134/12 134/22 134/23
**ones [2]** 10/18 121/20
**ongoing [3]** 20/6 84/1 129/16
**only [9]** 6/13 27/12 47/4 86/1 103/8 131/5 131/11 131/13 131/22
**open [2]** 111/25 112/1
**operation [1]** 27/19
**operations [2]** 42/8 64/19
**opined [1]** 129/22
**opinion [9]** 14/4 14/17 14/19 14/20 80/16 122/8 123/8 123/18 132/3
**opportunity [1]** 80/7
**orally [2]** 16/15 17/15
**orange [1]** 24/25
**oranges [2]** 57/2 57/3
**order [5]** 32/17 39/3 42/9 51/3 120/15
**ordinary [1]** 8/3
**orient [2]** 4/17 123/3
**original [4]** 84/25 85/13 85/15 87/19
**other [15]** 55/9 55/10 55/18 57/1 60/9 71/20 74/16 77/17 98/9 104/5 116/21 117/9 132/19 134/24 135/10
**others [2]** 89/21 90/23
**otherwise [3]** 16/21 76/19 110/23
**our [19]** 20/8 20/12 23/24 24/4 24/6 26/8 26/10 54/17 55/16 91/1 95/24 101/16 101/17 108/15 109/13 118/18 118/25 125/3 125/9
**out [30]** 7/3 9/4 10/13 11/14 21/5 36/24 42/2 42/19 42/23 43/10 70/21 71/5 82/8 86/25 87/25 88/4 97/16

**outlook [1]** 132/20
**outs [1]** 107/23
**outside [1]** 102/9
**outweigh [1]** 32/23
**outweighs [1]** 32/22
**over [18]** 26/9 26/22 32/1 37/16 37/19 53/2 54/16 57/7 77/20 77/23 84/21 95/25 101/16 103/25 108/15 114/20 122/9 132/25
**overall [1]** 43/2
**overcome [1]** 50/13
**overruled [6]** 5/19 17/4 29/11 30/14 36/19 82/9
**overseen [1]** 46/3
**oversees [2]** 45/20 81/6
**oversight [3]** 45/9 45/15 45/17
**Overview [1]** 19/20
**owe [2]** 27/15 56/4
**owed [4]** 40/17 42/4 43/10 56/14
**owes [1]** 56/10
**own [2]** 29/5 31/24

**P**

**P.A [1]** 2/2
**p.m [2]** 1/6 135/25
**page [72]** 3/2 3/9 6/15 8/5 9/12 9/18 10/3 18/22 19/17 22/4 22/4 22/6 22/7 22/13 23/2 23/3 24/12 25/17 26/18 33/25 42/14 48/15 50/21 51/12 52/6 52/8 53/16 54/2 55/14 57/5 70/15 71/7 71/25 72/2 72/4 72/5 92/21 94/23 94/25 95/20 96/8 96/9 96/14 96/17 96/22 96/24 97/9 100/6 100/11 100/19 101/13 103/15 106/3 106/10 106/13 107/16 108/2 123/9 123/13 123/18 123/19 123/19 124/14

**page [2]** 124/14 125/12
**pages [3]** 22/11 25/10 51/11
**paid [6]** 24/20 24/21 26/23 42/24 57/4 57/21
**paper [6]** 28/24 29/3 29/8 29/16 29/17 55/3
**papers [2]** 89/14 118/12
**paragraph [15]** 51/2 53/16 53/20 54/11 88/13 100/12 101/13 108/3 125/1 127/21 128/6 128/16 129/10 129/13 133/12
**paragraphs [3]** 54/5 97/25 101/4
**part [21]** 5/2 5/22 10/22 11/20 11/25 12/3 12/13 34/9 37/19 44/20 46/5 56/18 62/12 71/4 72/22 75/23 99/14 108/1 121/10 124/9 131/2
**participants [1]** 126/24
**participate [1]** 60/10
**participation [1]** 20/8
**particular [5]** 8/2 131/8 132/14 132/18 134/3
**particularly [1]** 132/14
**parts [2]** 60/24 107/23
**passage [1]** 42/17
**passes [1]** 130/25
**passing [2]** 124/23 125/17
**past [4]** 24/7 49/23 51/25 77/11
**path [1]** 95/8
**PATTERSON [1]** 1/16
**pause [6]** 39/15 51/1 53/19 102/6 109/23 120/17
**pay [9]** 40/24 41/1 41/3 41/12 42/2 42/19 43/6 57/8 98/1
**payable [1]** 125/4
**paying [1]** 26/12
**payment [4]** 25/1 43/7 56/3 129/16
**payments [2]** 26/20

P

**payments...** [1] 129/22
**peaked** [1] 54/18
**Pennsylvania** [2] 1/21
2/13
**people** [6] 35/12 39/6
39/9 39/11 39/12 60/12
**per** [2] 85/2 85/17
**percent** [9] 50/15 52/3
84/24 85/2 85/9 85/10
85/14 129/17 129/22
**performed** [1] 12/19
**perhaps** [3] 40/5 47/11
106/4
**period** [20] 19/6 22/3
31/18 38/14 42/5 46/24
47/13 49/12 50/3 54/16
57/6 76/12 93/7 95/22
95/22 96/11 96/11
108/12 108/12 111/12
**periodically** [1] 5/1
**person** [2] 62/4 130/24
**perspective** [5] 9/22
84/15 95/11 95/13
131/14
**perspectives** [1] 50/18
**pertinent** [1] 37/2
**PETER** [1] 1/16
**phase** [1] 37/1
**phone** [3] 36/18 110/5
113/19
**phrase** [3] 81/18 89/16
100/12
**picked** [1] 60/19
**picking** [1] 135/16
**piece** [1] 55/3
**place** [4] 12/11 12/15
86/7 86/12
**placed** [1] 133/22
**plaintiff** [1] 81/20
**plaintiffs** [17] 1/3 1/15
1/19 13/11 76/23 77/2
81/24 82/12 91/2 110/9
114/15 118/16 120/8
120/20 129/5 130/17
135/7
**plaintiffs'** [29] 1/14
23/1 25/16 82/6 92/20
94/10 103/6 103/7
103/23 104/10 104/10
104/16 106/23 107/2
107/12 107/16 107/22
108/22 109/2 114/8
114/9 120/15 121/14

**plan** [1] 51/19
**played** [1] 120/21
**please** [9] 9/6 10/13
11/14 14/13 14/14
56/12 94/3 108/11
133/7
**PLLC** [1] 1/17
**plural** [1] 90/22
**point** [9] 10/25 11/13
41/25 65/8 68/16 80/23
129/8 129/8 132/2
**points** [4] 96/19 97/3
97/7 97/13
**Porter** [1] 2/10
**portfolio** [17] 10/20
79/7 83/1 83/18 83/22
84/1 84/11 84/18 84/21
84/24 85/3 85/21 85/24
89/2 89/25 91/11 93/20
**portfolios** [1] 85/16
**portion** [4] 4/2 68/18
129/13 130/6
**portions** [1] 120/20
**pose** [1] 125/9
**position** [3] 59/1 60/2
128/14
**positive** [15] 12/20
24/2 28/12 32/20 32/22
32/23 49/19 50/2 50/11
50/12 51/16 86/25
118/19 118/22 118/25
**possibility** [8] 59/8
60/6 65/4 66/18 69/21
75/4 100/13 100/14
**possible** [3] 43/6
104/6 105/12
**post** [1] 134/2
**potential** [11] 23/15
31/22 33/3 36/6 36/10
39/22 68/12 102/17
106/7 110/10 129/19
**potentially** [4] 11/12
12/3 17/1 38/3
**PowerPoint** [12] 36/5
36/9 37/11 37/23 38/15
38/19 39/17 39/25 40/3
45/13 112/11 126/14
**PowerPoints** [3]
112/14 113/14 114/17
**practice** [2] 5/2 7/24
**predicted** [3] 61/2
62/25 129/16

**preferred** [3] 7/8 125/6
128/1
**prejudicial** [3] 37/3
114/6 131/25
**prepare** [4] 7/21 7/24
35/25 45/1
**prepared** [16] 4/3 6/7
17/20 35/11 36/4 44/9
46/14 49/14 70/23
98/19 102/17 104/20
106/6 106/19 113/7
120/15
**prepares** [1] 44/24
**presence** [2] 102/9
123/23
**present** [2] 69/19
122/18
**presentation** [25]
35/11 35/15 36/9 45/14
102/17 102/21 103/17
103/20 103/22 104/3
104/19 104/20 104/24
105/1 105/6 105/7
105/9 106/11 106/17
106/24 111/11 111/15
111/16 126/15 126/23
**presentations** [5] 36/5
104/5 105/11 111/17
114/1
**presented** [1] 35/12
**President** [3] 24/3
44/11 116/13
**President's** [1] 116/22
**press** [16] 21/7 21/10
21/22 22/2 22/9 22/20
23/3 23/4 25/11 25/21
94/7 94/16 95/4 107/19
107/23 108/2
**pressing** [1] 112/23
**pressure** [1] 133/19
**pretrial** [3] 114/14
122/8 135/9
**pretty** [2] 20/21 119/6
**prevented** [1] 100/16
**previous** [4] 19/5
60/22 84/6 84/9
**previously** [3] 13/2
41/1 60/20
**primarily** [5] 43/5
44/10 47/6 47/7 71/14
**principles** [2] 29/2
51/23
**print** [1] 70/21
**prior** [20] 6/10 13/17

**p.m** [2] 5/6 99/8 59/20 61/7
61/19 61/22 65/5 66/13
66/17 68/22 69/9 73/3
73/4 74/2 97/9 127/6
131/16 133/11
**probably** [4] 76/15
94/24 116/17 123/7
**problems** [4] 4/9
116/12 116/21 117/10
**procedures** [1] 100/21
**proceed** [1] 4/10
**proceeding** [4] 13/17
61/7 61/11 61/20
**proceedings** [3] 2/25
135/25 136/5
**process** [14] 5/5 12/8
14/22 39/1 44/20 99/14
114/14 124/1 124/10
130/4 132/1 132/7
134/5 134/20
**produced** [10] 2/25
36/13 36/25 112/11
114/4 114/7 114/13
114/22 114/22 115/11
**producing** [2] 32/3
115/23
**products** [1] 29/7
**Professor** [1] 118/18
**profile** [1] 128/14
**profitability** [17] 28/11
32/15 51/19 56/1 56/6
57/1 57/14 59/11 59/12
59/15 59/19 60/7 68/13
86/20 87/5 87/13
109/17
**profitability's** [1]
59/19
**profitable** [7] 64/14
66/7 68/15 82/2 83/2
86/13 86/19
**profits** [5] 29/19 52/12
52/19 87/12 88/5
**progress** [1] 94/21
**projected** [1] 53/6
**projecting** [1] 53/17
**projections** [3] 49/24
51/17 51/23
**prompt** [1] 128/22
**proportion** [1] 30/11
**propose** [1] 114/11
**proposing** [1] 92/3
**prospects** [2] 39/2
86/19
**protect** [2] 76/25 78/15

**P**

**provide [3]** 17/5 69/2 93/16
**provides [2]** 48/1 93/4
**provision [2]** 89/22 89/24
**provisions [2]** 89/21 98/8
**Prussia [1]** 1/21
**PSPA [3]** 84/6 84/9 87/19
**public [1]** 21/4
**publish [1]** 8/24
**Published [4]** 53/12 72/17 94/5 96/6
**pull [22]** 24/9 25/3 27/1 33/19 34/6 50/21 58/13 63/10 95/15 99/8 101/9 101/21 103/6 104/10 105/15 108/22 122/25 123/8 126/2 127/12 129/1 133/6
**punch [1]** 128/20
**PURCHASE [1]** 1/8
**purpose [8]** 9/14 9/20 9/21 9/25 124/4 127/7 130/14 134/17
**purposes [1]** 30/12
**push [1]** 86/25
**pushes [1]** 109/18
**put [22]** 15/5 18/10 19/8 21/5 21/18 24/11 25/5 33/12 34/3 39/23 40/9 46/10 49/6 78/21 88/9 90/18 94/3 95/20 98/7 115/8 129/5 133/3
**putting [1]** 67/9
**PX [11]** 21/18 22/23 25/5 33/19 63/11 65/23 78/21 92/12 94/3 101/12 134/1
**PX-158 [2]** 92/12 101/12
**PX-259 [3]** 63/11 65/23 78/21
**PX-344 [1]** 33/19
**PX-351 [1]** 134/1
**PX-594 [1]** 94/3
**PX-595 [2]** 21/18 22/23
**PX-596 [1]** 25/5

**Q**

**Q2 [1]** 73/23
**quadruple [2]** 130/22

**quarter [49]** 12/18 12/21 18/13 19/8 19/13 20/12 20/18 20/19 21/23 22/10 23/8 23/11 24/2 24/18 25/21 25/23 26/9 32/1 32/1 32/10 33/10 33/21 34/4 34/13 34/15 42/11 43/6 43/8 43/21 44/8 46/16 47/21 58/1 58/3 58/4 58/7 58/19 58/22 58/24 59/4 63/7 74/21 75/19 75/19 76/4 99/25 100/5 107/20 108/4
**quarter's [1]** 58/8
**quarter-over-quarter [1]** 32/1
**quarterly [3]** 21/6 26/19 58/10
**quarters [4]** 24/20 58/17 58/22 58/23
**question [53]** 5/15 11/5 11/16 13/22 14/10 14/10 14/12 14/24 17/25 25/10 29/13 34/2 35/10 35/24 37/4 37/8 38/24 42/18 55/2 55/4 55/21 55/22 56/12 57/10 57/12 57/13 57/15 58/21 61/10 61/18 62/8 62/10 64/10 65/24 66/14 67/10 67/13 68/2 72/14 73/14 73/20 74/20 76/21 78/6 78/8 87/18 99/17 106/25 109/4 111/9 111/9 112/8 114/19
**questions [29]** 4/16 5/15 13/8 14/8 15/8 27/4 36/25 43/25 54/21 57/18 63/14 66/21 77/12 77/14 78/6 89/15 99/16 102/10 102/16 107/13 107/22 109/3 110/2 111/4 111/13 112/10 112/13 113/10 126/25
**quibbling [1]** 29/25
**quick [1]** 110/6
**quicker [1]** 87/22
**quote [4]** 23/18 23/21 26/2 50/24

**R**

**Radnor [1]** 1/21
**raise [1]** 126/25
**Rajiv [1]** 124/18
**ramped [1]** 113/7
**ran [1]** 64/18
**range [1]** 76/10
**rate [2]** 85/9 85/10
**rather [3]** 26/19 76/25 81/14
**rating [2]** 127/15 129/21
**ratings [7]** 128/12 128/15 128/22 129/19 133/3 133/20 133/22
**rationale [1]** 129/9
**re [1]** 1/8
**reached [1]** 60/12
**read [21]** 9/4 9/20 10/13 11/14 53/20 54/13 65/23 66/11 67/5 73/12 73/17 98/8 101/19 101/20 108/10 109/16 117/14 120/13 123/25 129/24 132/6
**reading [3]** 91/1 93/22 101/14
**ready [1]** 4/4
**reaffirmed [1]** 123/10
**real [1]** 112/23
**realize [1]** 73/25
**really [3]** 15/1 19/4 39/21
**Realtime [1]** 115/14
**reason [8]** 63/2 68/24 69/23 74/7 78/14 81/12 99/17 99/21
**reasonable [4]** 74/3 100/12 100/14 114/24
**reasons [2]** 131/22 134/6
**recall [35]** 13/18 13/19 14/1 15/11 17/11 33/22 34/2 38/18 55/4 58/6 61/7 61/9 61/10 61/13 61/17 61/19 61/22 61/23 62/16 63/15 66/24 67/4 70/6 80/1 102/18 103/1 103/3 107/13 109/2 109/7 111/16 111/24 112/19 124/22 133/9
**received [46]** 3/10 3/10 3/11 3/11 3/12

3/12 3/13 3/14 3/14 3/15 3/15 3/16 3/16 3/17 3/17 3/18 3/18 3/19 3/19 3/20 3/20 3/21 3/21 3/22 3/22 8/22 8/23 22/25 23/1 25/15 25/16 92/19 92/20 94/9 94/10 121/5 121/7 121/17 121/18 121/19 122/2 122/6 122/12 122/13 125/21
**receiving [4]** 39/13 80/1 80/11 114/24
**recent [2]** 9/7 9/8
**recently [1]** 73/23
**recess [4]** 65/12 118/6 118/14 135/20
**recite [1]** 112/20
**recognize [6]** 6/21 42/11 46/21 103/11 104/16 105/24
**recollection [2]** 9/25 11/22
**record [11]** 65/13 102/7 109/24 115/3 116/9 120/8 120/16 122/7 122/11 135/3 136/5
**recorded [2]** 2/25 34/9
**recovery [1]** 24/4
**recross [6]** 3/5 110/9 111/4 112/6 115/2 115/6
**Recross-Examination [2]** 3/5 112/6
**redacted [1]** 131/24
**redirect [4]** 3/5 102/11 102/12 111/17
**redirecting [1]** 112/2
**reduce [7]** 10/25 11/6 27/17 84/17 84/21 84/23 93/6
**reduced [2]** 83/22 85/16
**reducing [3]** 11/12 85/2 109/18
**reduction [13]** 79/7 83/1 85/9 85/9 85/12 85/13 85/15 85/19 86/6 89/1 89/25 91/11 93/19
**reference [5]** 11/8 95/3 97/14 97/14 133/25
**references [1]** 95/7
**referencing [1]** 95/4

# R

**referred [5]** 10/17 46/13 74/16 128/4 134/1
**referring [6]** 79/11 79/12 83/8 86/11 93/19 112/14
**refers [3]** 79/6 86/19 90/22
**refinance [1]** 26/6
**reflected [1]** 38/12
**reform [2]** 94/21 128/9
**reforming [1]** 93/3
**regarding [2]** 115/23 126/25
**regular [2]** 5/2 7/24
**regularly [2]** 64/21 125/3
**rehash [1]** 123/6
**related [10]** 10/20 15/21 16/25 18/4 37/2 45/10 47/12 59/12 104/21 123/23
**relation [1]** 56/25
**relative [4]** 19/5 20/22 30/9 84/6
**relatively [1]** 109/13
**release [16]** 21/7 21/22 21/23 22/3 22/10 22/20 22/21 23/3 23/4 25/11 25/21 94/7 95/4 107/19 107/23 108/2
**released [2]** 23/8 93/3
**releases [2]** 21/10 94/16
**relevance [2]** 55/18 123/6
**relevant [5]** 37/3 56/4 56/10 56/14 124/3
**reliability [1]** 101/6
**reliable [2]** 99/19 99/24
**relied [2]** 48/10 130/12
**rely [1]** 101/5
**remediate [1]** 100/25
**remember [4]** 67/8 80/3 80/10 99/19
**remind [1]** 107/17
**removed [1]** 38/10
**repeat [2]** 56/12 87/15
**rephrase [2]** 37/4 37/8
**replacing [2]** 92/5 93/15
**report [27]** 93/3 93/4

93/23 96/8 100/23 101/15 123/4 124/19 124/22 124/24 126/8 126/22 127/14 128/7 129/25 130/8 131/3 131/8 131/15 131/16 131/24 131/25 132/9 132/11 132/18 133/20 135/10
**reported [3]** 2/20 4/3 101/17
**Reporter [2]** 2/20 136/3
**REPORTER'S [1]** 4/2
**reporting [4]** 46/24 93/9 101/17 131/18
**reports [9]** 23/10 25/21 123/5 123/11 124/1 124/7 130/12 130/25 132/7
**reports' [1]** 123/23
**representative [1]** 69/12
**represented [1]** 33/14
**request [2]** 111/3 113/22
**requested [1]** 75/5
**required [8]** 25/25 29/21 32/2 32/18 32/19 39/1 47/10 100/22
**requires [1]** 29/21
**rerecord [2]** 68/8 82/25
**rerecording [7]** 60/6 64/10 64/24 65/25 66/12 66/18 69/21
**reserves [1]** 54/18
**resolved [1]** 115/7
**respect [7]** 5/5 11/10 62/1 73/24 74/25 86/16 112/23
**respectfully [2]** 62/7 130/13
**responding [1]** 11/5
**response [6]** 11/4 78/12 87/8 99/4 106/24 113/25
**responsible [2]** 47/8 118/4
**responsibly [1]** 93/5
**rest [2]** 129/23 132/3
**result [6]** 38/11 40/21 42/6 97/23 100/20 101/17

**results [19]** 19/25 20/1 20/12 21/6 21/6 23/8 24/4 24/6 26/10 26/15 29/24 49/23 51/25 53/6 53/6 61/24 101/18 107/20
**results,' [1]** 24/2
**resume [1]** 65/17
**resumed [1]** 65/16
**retained [7]** 10/20 79/7 83/21 84/10 89/25 91/11 93/19
**return [1]** 51/18
**revalued [1]** 112/24
**revenues [2]** 29/19 87/12
**reversal [2]** 31/18 40/22
**reverse [5]** 5/22 12/3 44/7 50/7 50/8
**reversed [9]** 11/20 12/14 30/21 31/13 39/8 39/22 72/22 72/23 75/24
**reverses [1]** 28/8
**reversing [1]** 26/24
**review [4]** 17/6 45/15 80/7 128/22
**reviewed [4]** 6/10 8/16 15/19 44/12
**reviewing [2]** 31/24 31/25
**right [302]**
**right-hand [1]** 63/25
**risk [5]** 78/16 84/14 96/18 97/22 97/23
**Road [1]** 1/21
**Robert [1]** 130/16
**role [1]** 93/6
**Room [1]** 2/22
**Ross [1]** 120/22
**ROYCE [1]** 1/12
**RPR [1]** 2/20
**Rudy [10]** 3/4 3/5 13/10 107/13 110/8 111/9 111/12 111/19 114/2 114/15
**Rudy's [3]** 106/25 113/24 113/25
**ruled [4]** 122/9 123/10 123/21 135/11
**rules [7]** 29/23 33/1 41/16 51/24 53/5 56/17 56/18

**ruling [1]** 127/6

# S

**safe [1]** 119/14
**said [47]** 4/3 7/16 15/23 16/11 24/2 26/7 35/20 56/19 56/20 61/6 61/14 61/21 62/18 66/23 67/3 72/9 73/6 73/7 73/10 73/12 74/4 74/5 74/17 77/10 77/16 77/17 78/14 79/6 82/9 83/7 83/12 87/4 88/24 90/22 92/7 99/21 99/24 106/19 109/4 109/10 110/13 110/19 111/11 111/16 111/18 114/20 115/15
**same [13]** 20/18 25/10 26/10 34/12 49/5 51/24 57/6 57/24 60/12 86/7 86/12 96/10 135/7
**SAMUEL [1]** 1/23
**sat [1]** 17/9
**SATRIANO [39]** 3/3 4/13 4/15 6/21 8/9 10/11 11/21 13/7 13/12 13/14 14/16 21/4 25/9 27/4 65/22 76/23 91/19 92/25 102/12 102/14 102/16 103/7 103/8 103/11 104/14 105/16 105/24 109/3 110/1 111/7 111/11 111/12 111/16 112/6 112/8 114/3 114/8 115/14 124/17
**Satriano's [2]** 105/18 114/1
**save [1]** 117/4
**saw [6]** 37/11 123/25 124/8 132/5 134/14 134/15
**say [32]** 15/20 36/9 37/5 40/6 42/23 48/18 50/14 54/25 55/8 65/24 70/23 70/24 70/24 72/10 73/5 73/10 73/11 73/17 76/9 76/20 78/7 79/5 79/20 81/13 90/4 90/11 102/21 109/12 111/25 117/20 121/23 125/5
**saying [29]** 11/5 11/25

**S**

saying... [27]  22/9
28/4 35/17 35/19 37/22
38/23 39/5 48/9 52/22
55/20 59/22 65/2 66/11
67/8 73/15 74/8 81/25
83/13 83/14 89/3 89/4
91/2 93/10 101/7
127/24 128/21 133/18
says [29]  20/14 23/24
42/24 43/2 43/2 48/10
51/15 51/17 51/21 58/2
69/22 72/7 72/19 75/17
75/22 78/24 79/4 88/20
93/1 100/14 106/12
108/7 114/12 115/11
123/20 125/1 126/24
129/21 130/7
schedule [1]  116/20
Schiller [1]  1/23
Scholer [1]  2/10
school [1]  89/11
Schwitters [5]  6/6
7/16 71/13 71/17 71/22
scope [3]  74/19 77/25
109/13
screen [2]  56/24 123/1
scroll [5]  22/11 23/17
25/9 103/12 106/3
seated [2]  4/7 65/15
SEC [12]  18/6 21/10
21/16 47/21 74/21
95/19 99/12 99/16
99/18 108/18 120/21
120/23
second [36]  5/4 6/15
14/10 18/13 19/8 19/13
20/12 20/18 21/23 22/7
22/10 23/8 23/11 24/2
24/5 25/20 25/22 39/14
42/11 43/7 46/16 47/21
51/3 58/1 64/6 72/4
74/21 75/19 100/5
107/20 108/3 108/4
112/4 120/7 122/21
122/22
second-quarter [1]
24/2
section [2]  100/9
124/25
sections [1]  19/20
security [2]  116/11
116/21
see [38]  10/11 21/19
22/6 22/7 23/2 24/5
25/20 25/25 26/1 26/3
26/22 51/12 53/22
53/25 62/19 64/14 66/8
66/9 70/16 77/14 77/23
79/1 79/15 94/12 94/21
94/22 95/21 96/1 96/10
96/12 98/15 101/2
117/13 117/15 117/22
125/20 127/2 135/21
seem [1]  69/15
seen [4]  17/17 17/23
18/1 37/5
selected [3]  60/17
70/21 70/25
selling [1]  29/7
send [2]  8/15 38/3
70/9
sending [2]  124/16
126/19
sends [1]  94/16
senior [3]  1/8 113/2
127/25
sense [15]  39/21 39/24
40/1 81/19 81/25 82/24
82/25 83/14 86/14
86/18 90/5 90/15 91/13
109/4 112/21
sent [5]  8/17 30/24
72/10 125/15 125/19
sentence [24]  9/5
10/24 11/3 20/16 51/3
51/4 65/1 79/4 86/17
87/3 94/20 95/7 95/21
96/2 96/9 96/10 96/12
99/5 108/5 128/11
128/17 128/18 129/21
129/24
sentences [8]  11/4
54/13 64/7 65/24 95/3
98/12 98/16 100/19
separate [4]  98/21
98/24 99/1 99/3
September [2]  127/17
133/21
series [1]  5/15
served [1]  60/20
service [2]  94/15
129/22
Setia [2]  124/18
124/21
seven [1]  126/7
several [5]  36/4 44/12
52/12 80/7 120/19
shakes [1]  92/16
share [1]  109/20
shared [2]  8/18 16/3
sharing [1]  14/21
she [38]  6/7 7/18 7/19
7/20 7/21 7/23 14/21
16/2 60/17 60/19 60/20
60/23 60/24 60/25 61/6
61/23 61/25 62/10
62/18 62/23 62/23
62/25 63/2 73/5 73/6
74/8 87/25 87/25 88/4
88/4 88/6 88/20 88/21
88/24 119/12 119/12
119/12 119/13
she's [4]  75/9 89/3
89/4 119/14
sheet [2]  31/15 39/7
shorthand [1]  2/25
should [13]  13/23 14/5
14/17 15/20 38/11 61/1
72/22 73/11 131/23
132/13 132/13 133/24
135/15
show [10]  6/13 23/2
24/12 33/23 42/10 82/2
90/7 92/12 100/4
101/12
showed [8]  35/17
35/22 55/11 111/17
114/7 114/8 114/21
134/21
showing [1]  51/10
shown [3]  18/9 110/16
110/25
shows [2]  24/18
134/15
shrinkage [1]  10/21
side [2]  98/7 98/7
Sidebar [8]  36/20 37/7
110/7 112/5 113/20
115/19 115/21 116/2
signed [6]  4/16 4/17
7/14 7/15 60/13 104/1
significance [2]  12/11
12/14
significant [11]  9/22
19/5 28/12 31/16 43/7
45/10 52/3 53/4 53/9
69/5 125/19
significantly [4]  88/5
88/21 88/24 89/5
signing [1]  4/20
signs [1]  20/10
Shakes [1]  92/16
similar [6]  26/18 96/9
98/17 101/24 102/1
127/11
similarly [1]  133/2
simple [1]  114/12
simpler [2]  90/4 90/11
since [9]  20/7 24/18
26/7 40/5 51/18 62/2
80/8 84/9 85/20
sir [5]  73/13 77/11
78/1 98/6 99/15
sit [3]  61/17 116/8
116/14
sitting [8]  31/6 31/9
35/4 39/19 40/5 85/8
116/11 116/17
situation [2]  38/10
42/2
six [3]  20/9 86/4
103/25
size [4]  84/18 84/21
84/23 85/2
slide [2]  90/7 90/18
slides [1]  38/19
slowed [1]  86/21
small [2]  30/10 50/17
smart [1]  80/16
so [229]
some [44]  4/9 4/15
5/21 11/19 12/2 12/12
12/16 15/8 27/4 27/7
30/8 43/25 45/3 45/3
47/15 54/21 54/22
63/14 67/14 68/16
70/13 72/21 73/4 73/6
74/15 75/5 75/23 78/5
102/16 107/22 110/25
111/21 112/13 112/20
113/5 117/25 118/10
118/25 119/13 119/25
124/19 125/18 126/24
132/4
someone [1]  130/24
something [13]  38/5
55/7 67/20 67/22 70/2
73/3 77/22 92/5 93/15
102/8 109/5 115/11
117/23
sometime [1]  74/2
somewhere [2]  31/11
38/16
soon [1]  7/21
sorry [21]  5/8 7/3
17/16 31/25 39/12 40/6

**S**

sorry... [15] 51/12
56/12 62/14 67/7 73/13
79/14 81/22 85/22
96/13 97/19 98/4
103/20 111/12 113/24
128/13
sort [15] 6/17 16/18
31/21 35/3 35/6 67/14
74/25 86/24 110/15
113/11 118/5 120/3
124/19 126/16 129/8
Spalding [1] 2/13
speak [1] 17/16
speaking [1] 129/20
specific [6] 17/25
30/15 38/18 59/22
67/23 75/10
specifically [1] 101/4
specifics [1] 61/18
speed [1] 87/4
spend [1] 29/4
Spohn [6] 60/5 64/16
64/18 65/3 66/11 69/11
spoliation [1] 110/11
squarely [1] 127/6
stability [1] 125/9
stabilization [1] 20/11
stabilize [1] 20/9
staff [2] 75/5 113/2
stages [1] 12/10
stakeholders [1] 38/1
stand [1] 65/16
standard [2] 50/15
84/25
standards [2] 32/2
32/3
start [5] 5/21 75/5
122/24 123/7 130/19
started [26] 11/19
12/12 28/16 35/23
72/21 72/25 73/3 73/4
73/6 73/8 73/9 73/10
73/10 73/17 73/19 74/4
75/22 76/3 76/6 76/11
76/15 76/19 112/25
113/5 113/6 113/6
starting [3] 28/15
68/11 100/12
starts [5] 44/9 51/2
108/4 125/1 128/11
state [6] 115/3 123/12
123/16 127/8 131/20
131/20

stated [3] 44/13 57/4
132/4
statement [8] 12/12
47/14 74/16 82/15
87/13 87/14 93/16
114/3
statements [10] 30/9
44/25 45/1 47/11 73/23
77/17 96/18 96/19
100/16 101/6
STATES [2] 1/1 1/12
stay [1] 57/24
stenotype [1] 2/25
step [3] 73/21 106/16
116/3
stepped [1] 116/4
Stern [1] 109/25
still [4] 81/9 107/5
117/7 117/9
stock [2] 1/8 128/1
stood [1] 99/15
stop [1] 116/6
store [1] 29/6
straight [2] 120/18
122/15
straighten [1] 116/1
straightforward [1]
114/12
strange [2] 70/22
70/23
Street [3] 2/3 2/16
117/8
strengthen [1] 23/25
string [2] 15/14 64/3
strong [1] 24/5
structural [1] 100/24
stuff [2] 70/16 110/25
Sub [1] 23/13
subject [2] 7/8 102/8
subjective [1] 51/18
submitted [1] 129/7
subscribed [1] 94/15
subsequent [4] 47/8
47/9 47/12 48/8
substantially [1] 24/7
such [1] 17/23
sufficient [7] 124/10
125/22 125/24 126/25
130/1 130/10 135/11
suggested [1] 22/18
suggestion [2] 111/20
114/13
summarizing [4] 6/8
7/6 18/2 36/11

summary [11] 18/18
18/21 18/25 19/16
19/19 19/20 19/23 20/1
20/24 45/12 67/2
support [4] 43/13 48/1
74/11 74/13
supposed [2] 77/23
90/13
sure [15] 22/12 27/10
33/18 45/17 51/13 65/9
81/23 89/13 102/22
112/9 114/17 119/4
119/24 122/15 134/10
surprising [1] 69/7
Susan [5] 5/8 11/17
60/14 61/14 72/19
sustainable [6] 56/1
56/5 56/25 57/14 68/13
92/1
sustained [9] 28/11
50/3 62/21 63/5 78/20
79/23 81/16 88/8 114/5
sweep [40] 14/5 14/18
15/20 17/19 17/23 31/5
34/23 35/7 37/24 38/6
39/18 40/4 40/16 42/6
48/23 59/9 59/21 62/25
73/1 73/19 74/9 76/20
76/25 77/8 78/15 88/1
89/22 110/14 110/17
110/20 110/25 112/18
113/12 113/14 114/19
115/5 131/9 131/21
132/10 132/24
swept [1] 38/4
swing [1] 52/24
symptoms [1] 119/13

**T**

take [23] 6/12 13/5
21/1 28/21 28/22 28/23
43/17 44/4 65/10 75/3
79/10 81/21 86/3 89/7
104/9 106/16 107/9
107/12 108/1 108/20
118/6 124/4 127/9
taken [2] 6/2 20/7
takes [2] 122/5 122/17
taking [4] 6/25 29/5
36/7 86/3
talk [9] 18/6 37/22
68/11 89/12 97/25
98/18 102/9 117/1
117/1

tarked [1] 35/18
43/20 59/20 59/23
66/18 67/21 67/23
83/24 87/9 87/11 89/21
talking [33] 12/4 30/16
30/16 31/1 35/23 36/2
39/4 42/5 47/22 51/7
56/25 59/7 68/12 68/21
69/16 69/20 83/6 87/12
88/10 93/20 97/16
109/17 110/16 111/2
111/19 115/22 116/7
116/9 122/23 125/10
127/2 128/9 131/18
talks [4] 19/24 20/16
94/20 95/10
target [1] 85/15
tax [29] 5/6 5/14 5/23
5/24 11/17 11/18 12/5
27/5 27/8 27/11 27/16
27/18 27/22 28/1 28/8
30/16 36/1 44/10 44/11
64/11 64/24 65/25
68/18 72/20 82/25
86/24 103/19 104/21
112/24
taxable [3] 27/13
27/21 39/3
taxation [1] 27/8
taxes [2] 27/15 103/21
taxpayers [1] 26/13
team [5] 44/10 106/6
106/20 112/25 122/14
teams [1] 98/21
tell [7] 40/21 41/23
77/15 91/8 99/11
101/13 109/9
telling [2] 63/3 82/14
template [2] 6/24 7/1
ten [2] 118/11 129/18
term [8] 10/15 23/14
88/20 88/23 89/5 95/25
108/16 133/19
terms [1] 133/24
test [2] 119/2 119/3
tested [3] 118/19
118/22 119/11
testified [15] 7/5 15/19
27/24 48/14 48/22
62/13 62/23 79/25
84/13 102/20 106/24
111/20 118/21 133/2
135/6
testifies [1] 132/16

**T**

testify [3] 51/10 111/7 132/15
testifying [2] 56/22 61/7
testimony [35] 13/17 13/19 14/1 16/5 16/14 16/24 18/16 35/7 38/6 40/2 50/1 54/22 62/11 62/13 67/4 70/6 72/24 73/2 73/14 73/16 79/3 79/10 80/10 82/17 82/21 82/23 86/10 86/15 86/16 111/24 116/16 121/11 121/21 124/17 135/12
testing [1] 118/24
text [2] 127/21 131/2
than [17] 24/7 24/19 24/21 26/19 26/23 29/5 32/21 49/24 50/9 50/12 50/16 53/6 73/25 81/14 85/20 85/23 87/19
thank [36] 8/7 13/7 13/10 21/1 22/1 22/15 22/19 33/8 34/6 49/17 51/14 53/21 58/15 65/11 65/19 69/25 70/4 76/22 82/10 84/7 87/17 89/6 92/11 95/14 105/21 109/11 109/20 110/1 110/4 112/3 112/4 113/16 118/12 119/17 122/16 135/22
thankfully [1] 120/4
Thanks [4] 43/17 66/3 91/18 119/19
that [619]
that's [109] 7/8 14/22 15/16 16/7 16/9 16/13 17/6 17/11 18/25 19/7 20/14 20/23 24/25 26/15 27/14 27/19 27/19 31/4 31/8 35/20 37/25 38/5 38/9 38/15 40/15 41/20 46/17 46/18 49/3 49/5 49/16 51/21 52/23 55/14 55/19 56/17 57/10 57/16 58/7 58/19 58/21 61/25 65/1 66/15 67/18 67/20 68/23 69/18 69/22 70/18 70/21 71/1 72/13 72/13 73/11 74/1

74/6 75/14 76/21 76/1 76/14 77/2 77/18 77/19 78/2 78/9 79/13 82/12 82/17 83/12 83/13 86/5 86/12 86/14 87/2 87/2 87/10 87/23 88/2 88/21 88/24 89/3 89/12 91/7 93/14 93/22 94/24 94/24 97/23 97/24 98/3 99/14 100/9 102/24 103/25 109/18 109/19 109/20 113/13 113/15 114/12 127/5 128/2 128/3 129/20 134/2 135/7 135/17
their [46] 19/8 21/5 23/8 27/17 28/16 30/5 30/9 30/10 30/11 31/24 31/25 33/15 39/2 39/2 40/9 41/3 41/8 45/13 45/14 46/17 50/5 50/5 58/18 59/1 59/8 59/10 59/12 60/2 60/7 61/2 65/5 74/21 77/1 85/21 85/24 86/20 87/1 99/5 107/20 123/11 123/16 128/23 130/3 130/14 135/4 135/8
them [24] 6/10 8/17 8/17 30/2 45/3 45/11 55/19 67/18 69/6 73/25 84/13 84/20 84/20 86/19 99/12 120/14 121/12 123/19 123/25 124/9 124/9 132/6 132/6 135/20
then [23] 19/20 20/1 34/2 44/14 45/16 51/17 54/21 62/2 77/18 80/8 91/1 108/4 111/17 112/13 114/19 120/10 122/21 125/20 126/18 127/20 130/24 132/17 134/14
there [68] 6/2 6/3 11/17 19/20 22/15 31/11 32/12 32/14 32/15 33/3 33/6 35/1 35/9 50/11 50/12 51/16 52/8 52/14 57/8 58/2 59/2 59/25 64/10 66/14 66/15 69/6 69/8 71/20 71/21 72/1 72/19 77/22 77/23 80/22 83/10 86/3

97/21 100/12 100/14 104/5 104/8 107/5 110/9 113/5 115/5 116/21 118/3 120/7 120/11 121/9 121/22 122/6 123/20 123/21 124/10 125/23 127/3 127/17 128/24 130/7 132/4 133/18 133/19 135/5
there's [35] 19/23 23/18 32/15 32/25 35/11 37/23 45/15 45/16 48/7 48/9 52/7 59/5 65/24 75/4 83/15 84/3 95/21 97/2 97/3 97/13 97/21 115/9 120/4 121/11 124/8 126/1 130/10 131/7 131/7 133/25 134/3 134/13 134/22 135/11 135/16
therefore [1] 86/22
thereto [1] 131/4
these [55] 7/25 8/16 30/21 31/7 34/21 35/4 38/4 40/7 41/8 41/15 43/21 44/21 49/18 56/10 58/1 58/2 58/4 59/2 60/11 60/12 65/23 70/25 77/14 78/11 84/10 90/23 95/19 96/19 98/12 98/18 101/4 101/6 105/11 107/1 109/15 110/21 111/13 113/14 114/1 114/17 114/21 118/4 119/25 120/19 120/20 120/24 121/11 121/20 121/22 122/7 122/8 122/10 130/10 130/11 135/6
they [139]
they're [14] 21/16 22/2 27/7 28/1 32/7 35/4 59/23 68/11 68/12 82/3 87/6 93/18 93/20 98/15
they've [1] 75/18
thing [7] 34/12 49/5 66/23 67/4 85/7 86/1 128/24
things [7] 31/20 48/19 52/2 62/5 90/23 116/22

think [72] 10/18 12/18 28/1 32/25 36/24 38/25 39/6 39/6 39/9 41/25 44/9 44/10 44/13 47/8 50/1 55/5 58/3 58/21 60/23 62/19 67/13 67/17 68/2 68/5 68/9 68/25 70/20 71/20 71/25 74/3 76/14 81/19 82/7 82/18 82/24 82/24 83/8 83/14 84/15 85/18 86/10 86/17 86/22 87/2 87/13 88/4 90/5 91/25 92/1 97/8 97/25 109/5 109/16 110/17 110/21 110/23 111/1 114/10 115/7 115/23 116/23 117/3 117/15 119/9 119/13 122/5 125/22 127/6 131/22 132/11 132/19 132/25
thinking [3] 86/23 93/15 110/20
thinks [2] 27/20 28/7
third [42] 4/16 4/17 4/21 5/6 7/14 7/15 10/22 10/23 11/10 13/15 13/23 15/20 15/25 16/3 16/18 17/18 17/22 18/2 34/13 34/15 64/4 64/7 82/3 83/10 83/15 83/24 83/25 87/18 88/1 88/17 89/20 102/22 103/25 111/8 111/21 117/8 123/24 126/17 129/9 130/4 133/11 134/25
this [329]
THOMPSON [1] 1/15
those [39] 5/3 10/22 10/23 14/21 16/3 21/6 21/10 21/15 27/17 29/23 31/12 32/8 32/14 41/16 43/25 53/6 54/5 57/2 57/7 59/18 60/12 62/5 62/17 67/9 69/16 84/13 84/17 97/7 98/8 103/4 112/14 112/17 113/1 113/4 120/25 121/14 131/22 134/6 135/19
though [6] 46/21 52/22 90/15 113/11

**T**

**though... [2]** 119/20 127/4

**thought [5]** 5/5 13/1 60/24 74/17 119/12

**thoughts [2]** 17/6 62/4

**threat [1]** 125/9

**three [8]** 53/8 54/5 64/4 74/1 83/9 86/1 120/4 131/18

**three-year [1]** 53/8

**threshold [1]** 85/18

**through [7]** 17/9 25/9 39/1 76/11 103/12 110/10 120/14

**thrown [1]** 89/2

**Thursday [1]** 118/21

**thus [2]** 123/14 123/15

**tie [1]** 110/22

**time [35]** 4/17 5/9 8/19 12/22 13/8 14/21 25/6 26/10 29/20 31/10 36/7 37/11 76/12 76/13 77/15 78/2 84/21 86/25 91/21 92/2 102/10 104/6 105/18 110/3 111/11 116/6 118/10 119/14 124/9 125/7 125/25 131/9 131/21 132/23 134/21

**timeframe [5]** 12/25 36/1 74/3 74/4 76/14

**timely [1]** 100/17

**times [1]** 80/8

**timing [4]** 131/4 131/25 132/8 135/14

**Timothy [1]** 24/2

**today [8]** 12/4 39/19 40/6 61/17 118/19 118/23 118/24 120/1

**together [2]** 80/20 80/25

**told [10]** 9/4 23/7 60/25 62/23 84/10 84/16 84/20 88/21 89/16 118/18

**tomorrow [5]** 116/11 116/14 116/24 117/3 135/20

**tonight [1]** 117/19

**too [11]** 20/21 21/16 24/3 84/14 112/2 128/10 130/1 132/8 134/19 135/13 135/14

**took [6]** 34/11 54/23 55/14 71/16 73/8

**top [10]** 6/17 9/13 53/16 70/16 71/4 100/11 108/23 123/18 125/17 127/17

**Topaz [1]** 1/20

**topic [2]** 11/3 33/7

**total [4]** 30/16 39/8 54/18 80/24

**towards [2]** 108/3 123/13

**transaction [1]** 17/1

**transcript [4]** 1/11 2/25 4/3 136/4

**transcription [1]** 2/25

**transparency [1]** 45/18

**transparent [1]** 32/4

**treasury [44]** 10/14 10/16 24/19 24/20 24/21 25/25 26/11 30/24 38/5 40/17 40/24 41/6 41/12 42/3 42/4 42/20 42/24 43/7 56/14 57/21 61/1 62/24 78/16 91/19 91/22 91/23 93/2 93/10 94/6 94/13 94/16 95/4 95/4 95/10 95/25 97/14 97/22 108/15 125/4 126/15 126/24 128/3 133/5 134/24

**Treasury's [4]** 95/11 95/13 127/25 129/18

**trend [1]** 26/24

**trial [7]** 1/11 4/2 116/19 123/10 133/1 133/3 135/8

**tried [2]** 37/25 93/16

**trouble [1]** 117/4

**true [4]** 80/11 82/14 82/20 136/4

**Trump [1]** 116/13

**trust [2]** 97/3 97/4

**truth [1]** 63/3

**try [4]** 29/15 72/15 115/25 116/24

**trying [11]** 16/8 18/1 38/25 55/6 55/7 57/11 74/19 76/7 76/9 78/9 112/20

**Tuesday [1]** 116/18

**turn [5]** 18/21 37/16 42/14 54/2 95/19

**turned [3]** 6/8 37/19 114/20

**twice [1]** 119/13

**two [31]** 19/20 22/2 22/11 24/20 28/20 54/13 58/17 58/21 58/23 62/3 62/4 64/1 65/24 71/19 74/1 76/14 89/20 89/21 90/23 95/3 98/8 100/19 111/3 120/7 120/10 120/14 121/9 122/5 122/8 122/17 123/17

**two-week [1]** 76/14

**type [5]** 29/21 47/9 93/16 132/4 133/19

**types [3]** 7/25 44/21 106/23

**typical [2]** 68/6 68/9

**typically [4]** 45/12 67/18 67/20 69/12

**U**

**U.S [6]** 2/21 26/11 29/1 29/21 127/25 133/5

**Ugoletti [18]** 123/25 124/8 125/17 125/21 125/25 126/7 126/10 126/22 129/4 129/20 129/24 130/12 131/1 131/10 132/5 134/1 134/14 134/23

**Ugoletti's [1]** 130/3

**Uh [4]** 36/3 84/8 96/4 98/23

**Uh-huh [4]** 36/3 84/8 96/4 98/23

**ultimately [4]** 44/15 93/7 104/20 113/8

**Um [2]** 38/20 120/19

**uncertainty [1]** 12/16

**unclear [4]** 74/16 111/2 111/13 132/14

**uncomfortable [1]** 112/20

**under [9]** 13/20 51/24 53/5 54/4 56/17 56/18 90/13 101/1 124/25

**underlying [1]** 131/14

**understand [28]** 11/7 11/24 11/25 14/14 14/22 29/13 30/1 41/25 48/3 65/1 66/10 66/16

**[many entries]** 76/23 77/1 77/4 80/9 81/20 81/24 82/12 87/2 87/3 91/2 93/22 98/5 120/3 122/6

**understanding [12]** 5/13 12/7 12/23 32/1 55/5 62/3 68/6 76/11 83/12 88/2 90/16 90/16

**understands [1]** 82/8

**understood [8]** 11/9 12/1 12/10 39/9 72/13 79/3 79/13 109/20

**unduly [1]** 131/24

**UNITED [2]** 1/1 1/12

**unless [1]** 99/12

**unlikely [2]** 125/2 133/19

**unlimited [1]** 125/8

**unrelated [1]** 132/22

**until [3]** 22/4 22/13 47/16

**untrue [1]** 114/14

**unusual [1]** 68/11

**up [116]** 5/14 11/3 11/16 12/4 12/9 12/24 14/21 15/5 18/10 20/3 21/18 24/11 25/5 28/8 28/13 30/22 30/25 31/13 31/23 32/16 32/18 32/24 33/4 33/9 33/12 33/19 34/3 34/15 35/5 35/17 35/22 36/10 37/24 38/3 38/12 40/7 41/8 41/11 41/18 43/23 44/15 45/6 45/20 46/10 46/14 46/15 46/19 49/6 50/21 56/11 56/15 56/22 57/12 57/22 57/24 58/2 58/18 59/3 59/8 59/13 59/13 60/2 61/1 61/15 62/3 62/5 63/1 63/8 63/10 64/25 65/4 66/15 67/15 67/22 68/18 68/20 75/20 78/21 82/1 86/14 87/6 88/9 90/18 94/3 95/20 98/7 99/5 99/15 102/17 102/25 103/6 104/6 104/10 105/12 105/15 107/7 108/22 110/10 110/22 111/14 112/25 113/7 114/25 115/1 115/10 119/23 122/25 123/9 123/14 123/15

**U**

up... [6]  125/16 126/2 127/12 129/1 130/19 133/6
update [1]  9/21
updates [1]  113/1
upon [1]  130/12
ups [6]  32/13 34/19 35/2 41/8 42/7 102/25
us [9]  4/17 8/18 26/11 89/11 116/18 118/18 119/23 122/5 122/17
use [7]  6/24 27/22 28/1 28/7 48/8 50/2 50/10
used [3]  27/12 50/4 51/16
using [1]  93/18

**V**

Vague [1]  29/10
valuation [15]  5/23 5/24 11/18 11/20 12/3 12/13 27/24 38/10 44/7 46/15 72/20 72/22 74/22 75/23 104/21
value [3]  30/8 41/18 57/23
variability [2]  95/22 96/11
various [1]  107/23
VARMA [1]  2/8
VERGOW [1]  2/15
version [1]  84/6
versions [1]  45/17
versus [1]  26/20
very [22]  8/5 28/19 30/10 60/24 96/9 110/1 110/6 110/6 110/11 111/13 114/12 119/5 119/19 119/22 122/16 125/12 127/11 128/23 129/21 130/6 135/15 135/22
via [3]  47/11 47/11 131/12
Vice [1]  44/11
Vicki [1]  44/11
view [5]  60/7 64/13 66/7 90/12 125/10
views [2]  14/21 16/2
VINCENT [1]  1/16
visually [1]  52/11
volatility [1]  108/13
volunteered [1]

R4/20
vs [1]  1/4

**W**

wait [3]  115/16 117/11 118/7
walk [1]  97/11
Wanda [1]  14/20
want [14]  27/4 66/10 67/5 70/2 81/18 81/20 84/16 84/17 93/10 95/19 100/9 111/25 117/24 119/5
wanted [11]  62/2 84/20 87/22 87/22 91/20 91/24 110/11 117/25 118/16 119/4 119/17
warranted [1]  115/1
was [213]
Washington [7]  1/5 1/18 1/24 2/11 2/14 2/17 2/22
wasn't [7]  15/1 35/14 55/2 68/19 75/8 77/18 119/12
watch [2]  133/4 133/22
water [1]  68/19
water-cooler [1]  68/19
way [18]  28/4 33/1 33/2 41/8 50/14 53/6 66/11 70/2 87/7 90/4 90/11 93/5 93/18 102/2 111/14 111/23 114/22 132/8
we [113]  4/4 4/9 4/25 5/16 6/24 7/4 8/16 11/16 12/19 17/9 17/9 18/10 20/1 20/2 20/6 20/10 22/13 23/4 23/17 24/6 26/9 27/1 35/8 36/4 36/17 37/25 38/9 38/25 42/14 43/20 45/19 48/19 51/7 55/9 57/5 57/5 57/6 57/7 58/3 61/23 63/10 65/10 65/22 65/23 65/25 67/23 68/14 74/24 78/23 79/15 83/24 84/16 84/17 89/20 90/7 90/18 93/10 95/21 95/23 96/10 96/17 97/8 97/25 98/8 98/12 100/20 100/25 101/1

105/5 105/20 106/3 106/16 106/22 108/7 108/12 108/13 109/14 110/21 111/25 113/7 114/1 114/10 114/11 115/14 116/13 116/15 117/9 117/20 117/25 117/25 118/3 118/16 119/5 120/11 120/24 121/9 124/12 124/25 125/2 125/12 126/3 126/18 127/6 127/18 130/13 131/4 131/10 131/22 132/11 132/17 133/6 133/12 134/6
we'll [10]  15/1 25/5 58/3 68/20 70/1 96/8 116/24 117/4 121/12 135/20
we're [18]  32/8 37/1 86/11 86/23 89/12 91/7 105/17 106/16 107/18 109/12 116/5 119/2 119/15 121/12 122/23 124/7 130/19 131/18
we've [2]  12/4 89/21
weakness [4]  20/6 100/10 100/24 100/25
weaknesses [1] 101/16
Wednesday [1]  118/22
week [4]  76/14 118/22 126/21 134/22
weekly [1]  132/20
weeks [4]  4/20 47/3 62/3 74/1
weigh [1]  49/23
weighing [2]  49/19 52/3
weight [4]  51/24 53/5 132/13 135/14
weighting [1]  49/23
weightings [1]  50/18
welcome [1]  113/17
well [36]  7/2 7/19 14/12 15/4 17/21 19/4 20/21 22/4 35/22 37/1 39/21 41/3 41/23 44/21 48/18 49/1 54/12 57/18 58/21 60/24 66/14 67/2 67/20 71/2 73/11 77/13 81/5 87/5 87/11 87/24 88/9 92/3 98/3 111/24 120/25 135/5

went [3]  17/7/9 43/12 66/22
were [104]  6/2 6/3 6/8 6/10 9/9 9/18 10/18 10/22 10/23 12/19 13/22 15/14 16/11 18/9 29/5 29/20 29/23 29/23 30/10 30/21 30/23 31/6 31/8 31/9 31/13 32/2 35/5 38/2 38/25 40/7 43/20 43/21 46/18 51/7 54/9 54/13 54/21 55/4 55/9 55/22 57/5 57/8 59/7 59/10 60/5 62/5 63/14 63/22 64/13 65/7 65/22 66/7 66/21 69/8 69/16 70/21 71/11 83/6 83/8 85/2 88/10 89/13 90/3 92/1 92/3 99/24 102/16 103/4 104/3 104/5 104/8 105/11 105/11 105/14 107/1 107/5 110/20 112/13 112/14 112/14 112/16 112/17 113/5 113/7 113/11 113/14 114/2 114/7 114/8 114/21 114/22 115/17 120/21 120/21 120/25 121/6 122/4 122/7 122/8 122/13 123/17 124/3 124/9 133/5
weren't [1]  30/4
what [151]
what's [7]  7/11 38/24 77/12 103/18 103/22 105/9 126/3
when [66]  5/13 5/22 5/22 8/15 11/19 12/2 12/13 12/14 12/19 12/23 21/4 23/7 27/20 28/7 35/1 37/11 38/8 38/16 40/7 40/14 48/14 48/22 49/22 51/16 52/3 55/16 56/22 58/25 61/23 63/22 66/21 69/20 70/21 71/24 72/21 75/6 75/12 75/14 75/23 76/5 76/9 76/10 76/14 77/11 79/4 82/18 82/23 83/6 83/24 86/22 86/25 87/24 88/4 88/18 95/10 99/15 110/19 111/14 111/15 111/17

164

**W**

**when... [6]** 112/10 113/8 114/17 115/11 125/7 131/4

**when/if [4]** 11/19 12/13 12/14 75/23

**whenever [1]** 31/12

**where [11]** 16/9 36/13 36/16 37/13 43/22 78/23 87/6 97/25 109/3 114/4 123/20

**whereas [1]** 26/22

**whether [49]** 5/13 12/8 12/23 13/23 14/4 14/17 15/25 17/21 28/12 32/12 32/16 32/17 32/21 34/1 35/1 38/16 43/23 44/6 45/5 45/23 46/14 48/5 50/7 55/2 56/1 56/4 56/5 56/9 56/10 56/13 56/15 57/12 57/13 57/22 59/3 59/13 60/1 61/13 67/15 67/21 68/7 68/17 80/10 99/17 107/6 110/24 111/10 126/25 132/15

**which [31]** 5/10 19/24 20/11 20/24 23/3 27/25 29/21 31/18 39/1 42/5 45/11 57/12 60/12 69/5 70/2 73/5 83/16 111/12 111/12 114/1 114/10 115/4 120/8 120/10 122/6 126/2 126/7 129/15 130/22 131/3 131/16

**while [3]** 78/5 101/1 121/12

**who [18]** 4/3 4/24 5/7 5/8 6/4 8/11 8/11 8/12 14/20 44/3 44/6 62/13 70/10 71/16 115/10 130/23 130/24 130/25

**who's [1]** 124/16

**whole [5]** 5/23 68/18 109/18 128/17 132/21

**whom [1]** 106/19

**why [10]** 57/16 74/4 77/19 78/3 81/12 87/23 93/14 109/6 115/23 122/18

**WIERZBOWSKI [1]** 2/4

**wife [1]** 119/11

**will [33]** 10/25 11/6 14/15 14/25 32/16 54/18 56/11 56/15 57/22 59/3 60/2 65/10 72/15 93/5 100/16 100/25 116/13 116/15 116/19 116/21 117/6 117/12 120/2 120/8 120/11 121/9 121/10 122/6 125/2 126/25 128/1 132/15 133/1

**Wilmington [1]** 2/3

**wind [23]** 10/21 77/1 77/9 78/25 79/5 79/21 83/17 84/1 84/3 86/19 87/19 87/20 90/6 90/4 91/6 91/20 91/24 92/4 93/7 93/10 93/18 95/11 95/11

**wind-down [23]** 10/21 77/1 77/9 78/25 79/5 79/21 83/17 84/1 84/3 86/19 87/19 87/20 90/6 90/14 91/6 91/20 91/24 92/4 93/7 93/10 93/18 95/11 95/11

**winding [4]** 79/11 93/20 95/8 95/12

**window [1]** 76/14

**withdrawn [1]** 15/4

**withholding [1]** 114/10

**within [5]** 35/12 103/1 126/9 127/6 129/18

**without [2]** 48/15 111/17

**witness [12]** 3/2 4/5 6/13 21/19 25/6 65/16 110/12 114/17 115/4 115/10 116/4 135/6

**witness's [1]** 114/16

**won't [1]** 117/11

**wondering [2]** 77/13 77/21

**word [6]** 16/6 28/21 93/18 98/15 99/6 99/6

**wording [1]** 50/4

**words [1]** 67/9

**work [7]** 26/8 33/1 80/20 80/21 80/25 91/22 93/5

**worked [1]** 63/20

**works [1]** 40/15

**world [2]** 26/16 131/20

**worth [46]** 14/7 14/13 15/19 17/18 17/22 30/6 31/5 31/14 34/23 35/7 37/24 38/6 38/13 39/18 40/4 40/16 41/3 41/8 41/11 42/6 48/23 59/9 59/21 62/24 73/1 73/19 74/9 76/19 76/25 77/8 78/15 88/1 89/22 110/14 110/17 110/20 110/25 112/17 113/12 113/14 114/19 115/5 131/9 131/21 132/10 132/24

**would [93]** 5/14 8/20 11/11 12/4 12/24 13/14 15/25 28/11 28/14 31/13 31/16 31/17 33/4 33/16 33/17 35/6 37/17 37/23 38/3 38/4 38/12 38/12 38/17 39/5 39/8 39/25 44/14 45/9 45/12 47/13 48/8 50/10 59/13 59/15 61/3 61/15 62/25 63/2 68/7 68/9 68/17 68/17 69/1 69/4 69/6 69/15 69/16 69/19 71/2 71/4 72/4 73/25 74/3 79/19 80/22 83/10 84/23 85/16 85/20 85/23 86/3 86/7 86/24 86/25 90/4 90/4 91/16 98/1 103/12 107/6 109/6 109/9 109/10 110/17 110/21 111/23 113/22 116/18 122/9 122/17 125/9 128/12 128/14 128/23 129/17 129/22 130/13 131/17 132/23 133/23 134/4 134/14 135/3

**wouldn't [5]** 13/16 39/21 39/24 40/1 90/11

**wound [1]** 82/4

**wrath [1]** 117/25

**write [49]** 12/4 12/9 15/17 28/12 28/18 29/8 29/18 29/25 30/2 30/5 30/25 31/23 32/13 32/18 32/18 33/4 33/12 34/3 34/19 35/2 36/4 36/10 37/24 38/12 39/8 41/8 42/7 43/23 45/5 45/23 46/14 46/15 50/8

50/13 56/22 59/13 62/5 63/8 67/15 67/22 68/18 68/20 74/22 75/19 82/1 102/17 102/25 104/6 105/12

**write-back-up [1]** 31/23

**write-down [6]** 28/18 29/8 29/18 30/5 50/8 74/22

**write-off [1]** 39/8

**write-up [12]** 30/25 33/12 34/3 36/10 37/24 38/12 56/22 62/5 63/8 102/17 104/6 105/12

**write-ups [6]** 32/13 34/19 35/2 41/8 42/7 102/25

**writes [1]** 28/8

**writing [10]** 28/16 35/23 58/2 59/8 60/2 61/1 62/25 64/25 65/4 86/14

**written [35]** 5/14 12/24 16/7 17/17 27/20 28/5 30/7 30/21 31/7 31/13 31/21 31/22 32/16 33/6 33/15 35/5 38/2 40/7 43/21 56/11 56/15 57/12 57/22 57/24 57/24 59/3 59/3 61/15 64/11 66/5 67/16 107/7 112/25 113/11 114/18

**written-down [2]** 31/7 67/16

**written-off [1]** 64/11

**wrong [1]** 110/20

**wrote [16]** 16/17 17/12 33/9 34/15 35/3 35/5 41/8 58/17 73/3 73/6 79/16 82/18 82/23 88/17 89/14 109/16

**X**

**xxx [1]** 1/15

**Y**

**yeah [23]** 15/15 16/7 16/9 22/4 28/23 31/4 38/22 43/15 50/16 53/15 53/15 57/19 65/7 66/14 71/20 73/9 86/5 94/25 98/25 99/2 113/17 118/8 119/8

# Y

**year [17]** 34/23 37/12
52/24 52/24 53/8 53/23
54/16 84/23 84/24 85/2
85/9 85/10 94/1 114/21
114/22 115/11 115/12
**years [10]** 26/23 52/12
53/2 57/6 57/7 80/23
81/1 86/3 86/4 129/18
**years.' [1]** 24/7
**Yep [3]** 20/3 22/14
54/6
**yes [255]**
**yesterday [2]** 118/24
118/25
**yet [6]** 21/19 51/20
72/25 105/17 126/3
135/6
**yield [1]** 31/17
**York [3]** 1/24 2/6 2/6
**you [522]**
**you'll [3]** 117/7 117/10
117/15
**you're [37]** 21/25 22/4
29/7 31/1 32/25 35/17
35/19 37/22 39/4 39/5
44/22 44/22 45/2 47/22
48/9 52/3 52/22 52/22
55/12 55/17 55/19
56/22 56/25 59/22 63/7
76/9 78/5 78/13 82/14
83/13 87/12 91/19
91/21 97/2 97/21 112/1
113/17
**you've [2]** 17/17 87/3
**your [153]**
**Your Honor [71]** 4/5
4/11 8/19 13/4 13/10
36/14 36/17 36/18
36/21 62/20 63/4 65/19
74/10 74/15 78/18
79/22 81/15 82/5 102/5
109/22 110/5 110/8
111/5 111/23 112/3
113/18 114/5 114/11
114/15 114/25 115/9
115/13 117/21 117/24
118/4 118/13 119/21
120/18 121/4 121/8
122/11 122/16 123/3
123/5 123/19 123/21
124/15 125/7 125/22
126/1 126/6 127/12
128/24 129/4 130/9
130/16 130/19 131/15
131/19 132/4 132/19
132/25 133/9 134/8
134/12 134/20 134/22
135/5 135/7 135/17
135/22
**Your Honor's [2]**
122/7 132/3

# Z

**ZAGAR [1]** 1/19
**zoom [6]** 9/13 10/6
96/17 105/20 108/2
108/23