```
 1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2

 3    * * * * * * * * * * * * * * *    )
      FAIRHOLME FUNDS, INC., et al.,   )    Civil Action
 4                                     )    No. 13-1053
                   Plaintiffs,         )
 5                                     )
         vs.                           )
 6                                     )
      FEDERAL HOUSING FINANCE AGENCY,  )    Washington, D.C.
 7    et al.,                          )    July 26, 2023
                                       )    10:08 a.m.
 8                 Defendants.         )
                                       )
 9    * * * * * * * * * * * * * * *    )

10    IN RE:  FANNIE MAE/FREDDIE MAC   )
      SENIOR PREFERRED STOCK PURCHASE  )    MC Case No. 13-1288
11    AGREEMENT CLASS ACTION LITIGATION )

12

13                 TRANSCRIPT OF JURY TRIAL
                   DAY 3 - MORNING SESSION
14         BEFORE THE HONORABLE ROYCE C. LAMBERTH,
             UNITED STATES SENIOR DISTRICT JUDGE
15

16

      APPEARANCES:
17

      FOR THE BERKLEY          VINCENT COLATRIANO, ESQ.
18    PLAINTIFFS:              COOPER & KIRK, PLLC
                               1523 New Hampshire Avenue, Northwest
19                             Washington, D.C. 20036

20    FOR THE CLASS            HAMISH P.M. HUME, ESQ.
      PLAINTIFFS:              KENYA KHALELAH DAVIS, ESQ.
21                             BOIES, SCHILLER & FLEXNER, LLP
                               1401 New York Avenue, Northwest
22                             Washington, D.C. 20005

23                             LEE D. RUDY, ESQ.
                               KESSLER, TOPAZ, MELTZER & CHECK, LLP
24                             280 King of Prussia Road
                               Radnor, Pennsylvania 19087

25
```

```
 1        APPEARANCES, CONT'D:

 2        FOR THE CLASS            ROBERT F. KRAVETZ, ESQ.
          PLAINTIFFS:              BERNSTEIN, LITOWITZ, BERGER &
 3                                    GROSSMAN, LLP
                                   1251 Avenue of the Americas
 4                                 New York, New York 10020

 5        FOR THE DEFENDANTS       ASIM VARMA, ESQ.
          FHFA, FANNIE MAE &       IAN HOFFMAN, ESQ.
 6        FREDDIE MAC:             DAVID BERGMAN, ESQ.
                                   JONATHAN LOUIS STERN, ESQ.
 7                                 STANTON JONES, ESQ.
                                   ARNOLD & PORTER KAYE SCHOLER
 8                                 601 Massachusetts Avenue, Northwest
                                   Washington, D.C. 20001
 9
          REPORTED BY:            LISA EDWARDS, RDR, CRR
10                                Official Court Reporter
                                  United States District Court for the
11                                   District of Columbia
                                  333 Constitution Avenue, Northwest
12                                Room 6706
                                  Washington, D.C. 20001
13                                (202) 354-3269

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              I N D E X

2

3       Opening Statement of Ms. Davis                    Page 409

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURTROOM DEPUTY:  This is Civil Action
 2    13-1053 with related Miscellaneous Case 13-1288, In Re:
 3    Fannie Mae/Freddie Mac Senior Preferred Stock Purchase
 4    Agreement Class Action Litigations.
 5              THE COURT:  You can bring the jury in.
 6              MR. HUME:  Your Honor?
 7              THE COURT:  Yes.
 8              MR. HUME:  Hamish Hume for the Plaintiffs.
 9              Before you bring in the jury, could we raise two
10    quick things that both Plaintiffs and Defendants wish to
11    address?
12              THE COURT:  All right.
13              MR. HUME:  Very quickly.
14              THE COURT:  All right.
15              MR. HUME:  One, we weren't sure whether the Court
16    planned to read the short instruction -- the neutral
17    statement of the case.  That's Instruction No. 3.  I think
18    counsel for Defendants would like it read.  We don't object.
19    We think it would be useful.  It's not long; it's one page.
20              THE COURT:  The one I read at the beginning of
21    voir dire?  I can reread it.
22              MR. HUME:  Thank you, your Honor.
23              THE COURT:  We'll have to get it.
24              MR. HUME:  The second thing is, the lectern, we
25    were told you wanted it set at an angle so the lawyer would
```

 1    be partly facing the Court.  We respect and understand that.

 2              We're a little concerned that as it's set it will

 3    make the jurors on this side feel a little -- like we're not

 4    talking to them as much as the others.  So I think Mr. Stern

 5    and I would prefer if we could straighten it and then make

 6    sure we are positioning ourselves both to you and the jury

 7    physically.

 8              Is that --

 9              THE COURT:  All right.

10              MR. HUME:  -- permissible?

11              THE COURT:  All right.

12              MR. STERN:  Thank you, your Honor.

13              MR. HUME:  Thank you.

14              THE COURT:  Bring in the jury.

15              THE COURTROOM DEPUTY:  Jury panel.

16              (Whereupon, the jury entered the courtroom at

17    10:11 a.m. and the following proceedings were had:)

18              THE COURT:  You may be seated.

19              Good morning, ladies and gentlemen.

20              THE JURY:  Good morning.

21              THE COURT:  At this point we're going to have the

22    opening statements of the attorneys.

23              As you may recall from my preliminary instructions

24    yesterday, the opening statements are a description of what

25    the attorneys think they're going to prove in the case.

1   They're of course not evidence themselves, but their

2   statement of what they hope to prove in the case.

3   Statements of the attorneys are not evidence.  You'll have

4   to listen to the evidence as it comes in.

5           I'm going to read to you again a statement of what

6   the case is all about before they begin that just so you can

7   have my statement of what the case is all about.

8           This is a class action brought by Plaintiffs

9   Joseph Cacciapalle, Michelle Miller, Timothy Cassell and

10  Barry Borodkin on behalf of common and preferred

11  shareholders of the Federal Home Loan Mortgage Corporation,

12  normally called Freddie Mac, and the preferred shareholders

13  of the Federal National Mortgage Association, normally

14  called Fannie Mae.

15          I'll explain in more detail later what a class

16  action is.

17          In addition to the class action Plaintiffs, the

18  Plaintiffs also include several insurance companies,

19  including Plaintiff Berkley Insurance Company.

20          When I refer to the "class action Plaintiffs," I

21  mean those four Plaintiffs that I just named and the classes

22  of shareholders that they represent.  When I refer to the

23  "WR Berkley Plaintiffs," I mean Berkley Insurance Company

24  and the other insurance companies who are Plaintiffs in the

25  case.  When I refer to "the Plaintiffs," I mean the class

1     action Plaintiffs and the WR Berkley Plaintiffs together.

2           The Defendants in this case are the Federal

3     Housing Finance Agency, which I will refer to as FHFA,

4     Fannie Mae and Freddie Mac.  Fannie Mae and Freddie Mac are

5     sometimes referred to as government-sponsored enterprises,

6     or GSEs, or sometimes as "the companies."  FHFA is the

7     conservator of Fannie Mae and Freddie Mac and is sometimes

8     referred to as "the conservator."  When I refer to "the

9     Defendants," I mean FHFA, Fannie Mae and Freddie Mac

10    together.

11          Fannie Mae and Freddie Mac are

12    government-sponsored enterprises created by Congress to

13    promote access to home mortgages by increasing liquidity and

14    stability in the secondary market for home mortgages.

15          While Fannie Mae and Freddie Mac are

16    government-sponsored, they are also publicly traded

17    companies that issued both common and preferred stock over

18    the years.

19          As I explained earlier, Plaintiffs in the case are

20    holders of common and/or junior preferred stock in Fannie

21    Mae and/or Freddie Mac.  Shareholders are treated by the law

22    as having contracts with the companies whose stock they

23    hold.  A shareholder's contract with the corporation

24    includes not only documents such as stock certificates,

25    certificates of designations, the corporate charter and

1      bylaws, but also the corporate law under which the

2      corporation is formed and regulated.

3              For Fannie Mae and Freddie Mac, changes to federal

4      law, that is, those affecting the governance of the GSEs and

5      their relationships with their shareholders, amend or inform

6      the investor contract.

7              In this case, Plaintiffs claim that the Defendants

8      breached something that we call the implied covenant of good

9      faith and fair dealing in Plaintiffs' shareholder contracts

10     with Fannie Mae and Freddie Mac.

11             Defendants deny Plaintiffs' claim.

12             After the close of the evidence, I will instruct

13     you further about the legal standard for proving a breach of

14     the implied covenant.  But for now, you should understand

15     that that implied covenant is something that is an unwritten

16     part of every contract, including the shareholder contracts

17     held by the Plaintiffs.

18             The question of whether the implied covenant is

19     breached depends on whether the Defendants took actions that

20     unreasonably or arbitrarily frustrated or interfered with

21     the reasonable contractual expectations of shareholders.  I

22     will provide more detailed instructions at the end of the

23     case and before you begin your deliberations.

24             At the end of the case, I will give you

25     instructions in writing.  I have to read them to you also,

1    but when you're in the jury room I will send in written

2    instructions to you so you'll have those with you during the

3    time of your deliberations.

4         With that, the Plaintiffs will begin their opening

5    statement.

6         MR. HUME:  Thank you, Judge Lamberth.  My partner,

7    Ms. Davis, will deliver the opening for Plaintiffs.

8         THE COURT:  Ms. Davis.

9         MS. DAVIS:  Thank you, your Honor.

10        Ladies and gentlemen, we are here today for one

11   reason and one reason only.  We are here today because a

12   government official exercised his power in a way that was

13   extreme and unprecedented and in a way that caused

14   $1.6 billion worth of financial harm to thousands of

15   Americans.

16        During the financial crisis in 2008, this official

17   inherited the job of being the conservator for Fannie Mae

18   and Freddie Mac, two enormous companies that sit at the

19   center of our housing finance system and our global economy.

20        Both he and the government agency that he took

21   charge of said that they would work hard to make sure that

22   they could restore the net worth of Fannie and Freddie, that

23   they would conserve and preserve the assets of Fannie and

24   Freddie and that they would return Fannie and Freddie to its

25   shareholders.  That was his job.

1        But what you're going to learn is that on August

2   17th, 2012, just when those companies were starting to

3   become profitable again and building their net worth, this

4   government official did exactly the opposite.  He forced

5   those companies to give away 100 percent of their net worth

6   and profits to Treasury forever.  All of it.  For no good

7   reason.

8        What you're going to learn and what the evidence

9   will show you is that its process for making this decision

10  was grossly inadequate for the magnitude of the effect of

11  the decision that he made.

12       His action, unprecedented in American history,

13  violated the contractual rights of shareholders.  And like

14  any official that rushes to make a decision in an

15  unreasonable way, it caused a great deal of harm.  And those

16  two companies right now today are still in a perpetual state

17  of limbo.  And no one, no one, wanted that.

18       The people he harmed are our clients, the private

19  shareholders:  everyone from elderly people who have their

20  pensions to young people who are starting out fresh and new.

21  Banks that are in our communities and insurance companies.

22  People and institutions that lost -- that invested over

23  $33 billion into Fannie and Freddie.

24       The government official I'm referring to, his name

25  is Edward DeMarco.  He was the acting director of the FHFA.

```
 1        I'm going to tell you what that acronym means.  There are

 2        lots of acronyms in this case.  That is the Federal Housing

 3        Finance Agency.  And "acting" means that he took over

 4        temporarily until the president could appoint someone and

 5        that person could be confirmed by the Senate.

 6               As you heard Judge Lamberth say, the main

 7        Defendant, the FHFA, is a government agency that acts as

 8        what's called a conservator.  That's going to be a big word

 9        during the course of our discussion, "conservator."  You're

10        going to learn what that means.

11               One thing it means is that since it was founded in

12        2008, the FHFA has had control of Fannie and Freddie, public

13        companies with stocks that trade on the stock exchange just

14        like other public companies.

15               And another thing it means is that because of that

16        control, the FHFA is treated as a party to the shareholder

17        contracts that Fannie and Freddie had with our clients, the

18        shareholders.

19               Ladies and gentlemen of the jury, we brought this

20        case because the FHFA breached those shareholder contracts

21        when it gave 100 percent of Fannie Mae and Freddie Mac's

22        current and future profits and net worth forever, for no

23        good reason.  That's what the evidence will show.

24               You heard Judge Lamberth speak about a concept

25        called the implied covenant of good faith and fair dealing.
```

1     It's something that he told you exists in every contract.

2     And what the evidence will show is that the decision by FHFA

3     to give away 100 percent of the present and future profits

4     and net worth of Fannie Mae and Freddie Mac was a violation,

5     a breach, of that implied covenant of good faith and fair

6     dealing between Fannie Mae, Freddie Mac, FHFA and our

7     clients, the shareholders.  Good faith and fair dealing.

8             Each of you, chosen to decide this case, have been

9     involved in a contract before.  It's either been an

10    employment contract, either when you rent a car or you buy a

11    car, when you rent your apartment or you buy a home.  All

12    those things, all those contracts, are governed with the

13    same principle:  good faith, fair dealing.

14            And what it means is that one party to a contract

15    cannot do things that make it impossible for the other party

16    to the contract to get the benefit that they bargained for

17    from the contract.  In other words, the party on the other

18    side of the contract can't just pull the rug out from under

19    you when you've involved yourself in a contract with them.

20            So while you see a lot of evidence in this case --

21    and there's going to be lots of details, I'll warn you ahead

22    of time -- I want you to lock into your brain what you came

23    in here with:  good faith, fair dealing.

24            Now, you have to be careful because you have to

25    apply it to the agreement that you see in this case and all

Opening Statement by Ms. Davis

1    of the expectations that shareholders were given in this

2    case.  But the principle is the same:  the idea that no one

3    entering a contract expects the other party will do

4    something that will frustrate the very purpose of that

5    contract by completely undermining the ability of the other

6    side to get the benefit of the contract they bargained for,

7    doing something so egregious that you couldn't have ever

8    anticipated that that's what they would do.

9         Now, it's true.  That concept is true when you're

10   dealing with a corporation, when you're dealing with

11   government or even something as simple as a lemonade stand.

12   It's an implied covenant, so it's unwritten.  But it's

13   definitely understood.

14        Now, why should you care about what happened in

15   this case?  I'm going to tell you why you should care about

16   what happened in this case.  You should care because this is

17   fundamental stuff.  This is about trust in being able to be

18   a party in a contract and trust that the other side won't

19   undo the purpose of the contract.

20        When the person on the other side is the

21   government, that's even more important that those fairness

22   concepts are kept.  When the government is a party to a

23   contract, it must play by the same rules as everyone else:

24   the same rules you play by, the same rules I have to play

25   by.  If the government can undo a contract with my clients,

1      they can undo it with anyone.

2              I'm Kenya Davis.  And I'm here with my colleagues,

3      Hamish Hume, Robert Kravetz, Rudy Lee -- Lee Rudy and Vince

4      Colatriano.  Our team and our clients, we thank you.  We

5      thank you sincerely for allowing us to place our conflict in

6      your hands.

7              First, I want to speak to you about Fannie Mae and

8      Freddie Mac.  Fannie Mae and Freddie Mac and the investors

9      that helped to fund them for decades are our clients here in

10     this case, the shareholders.

11             You've heard of Fannie Mae and Freddie Mac before.

12     But even if you haven't heard of them, they still impact

13     your life in a very meaningful way.

14             Congress created Fannie Mae and Freddie Mac to

15     fulfill a public mission, to support the secondary mortgage

16     market, which allows ordinary Americans to get mortgages at

17     affordable prices so they can realize the dream of owning a

18     home.

19             Now, what is the secondary mortgage market and how

20     does it work?  Homebuyers borrow money from local banks and

21     private lenders and they have mortgages with those

22     institutions.  There's the mortgage going there that you're

23     going to owe.  Right?

24             Now, Fannie and Freddie buy those mortgages and

25     give the banks money so that the banks have more money to

1    loan to other homebuyers.  That's what Congress created

2    Fannie and Freddie to do.  And it was that process,

3    supported by Fannie and Freddie at the center of it, that

4    allows average people to be able to buy homes.

5           Now, without that support, banks would have less

6    capital to lend and mortgage prices would be much, much

7    higher.  And it would be much harder for ordinary Americans

8    to buy their homes.

9           Now, you'll notice on the slide that there are two

10   other groups there, bond investors and MBS investors.  Now,

11   the first group, the bond investors, those are people who

12   lend to Fannie and Freddie in exchange to get a promise of

13   repayment.

14          The other group, the MBS investors, those are the

15   people who buy what Fannie and Freddie sell, which are those

16   groups of mortgages that are packaged together and they

17   become mortgage-backed securities.  I know some of you have

18   heard of that before:  mortgage-backed securities.  So

19   that's what the MBS investors buy.

20          Neither of those groups, bond investors or MBS

21   investors, are parties to this case.  But they will be

22   talked about during the course of this case.  I wanted you

23   to know how they fit into the secondary mortgage market.

24          Congress created Fannie Mae during the Great

25   Depression in the 1930s.  And for the first three decades,

1      Fannie Mae by itself operated as an agency of the federal

2      government.  If Fannie Mae was profitable, the profits went

3      to the federal government; and if it lost money, those

4      losses were borne by the federal government and ultimately

5      the taxpayers.

6              But in 1968, Congress decided that it no longer

7      wanted the federal government and the taxpayers to bear the

8      risk of the ups and downs of the housing market.  And so

9      then Fannie still had a government charter, but then it had

10     shareholders.  That way, it would no longer be funded with

11     taxpayer money.  It would be funded with shareholder money.

12             The government told Fannie to raise money by

13     selling those shares to private shareholders.  So going

14     forward, as you can see here, the shareholders became the

15     funders for Fannie Mae, not Treasury.

16             Our clients, the shareholders, started to take on

17     the risk of what would happen with Fannie Mae and Freddie

18     Mac.

19             Now, you see that group of shareholders down

20     there, right?  You might be thinking to yourself, Now, who

21     are shareholders?  Are those just rich people?

22             Well, sometimes they are rich people, but

23     sometimes they're not.  Sometimes they are people from all

24     walks of life.  Many of you are shareholders, even if you

25     don't know it.

Opening Statement by Ms. Davis

1          See, you can be a shareholder if you pick stock

2     like Amazon or Google, Freddie Mac or Fannie Mae.  But you

3     can also be a shareholder if you invest through your TSP,

4     your 401(k), mutual funds, retirement funds.  And in those

5     instances, you're still a shareholder of those companies

6     that the fund is invested in.  Okay?

7          The point is that millions of regular Americans,

8     like some of our clients, Joe Cacciapalle, Tim Cassell,

9     Michelle Miller, invested their hard-earned money in Fannie

10    Mae and Freddie Mac for their families and for their

11    retirements.  In fact, you'll hear that Fannie and Freddie

12    were considered among the safest investments.  Fannie and

13    Freddie were considered safe because they were

14    government-chartered.  They had an incredibly strong and

15    profitable business model and they paid a regular dividend.

16         A dividend is a profit distribution to

17    shareholders.  You're going to hear a lot about dividends

18    during the course of this trial.

19         Those shareholders, our clients, Joe, Tim,

20    Michelle, nurses' pension funds, insurance companies, people

21    like our client Berkley Insurance, teachers' unions and

22    other investors large and small, invested their money in

23    Fannie and Freddie and became an essential part of the

24    housing system.

25         Now, some shareholders are called preferred and

 1   some are called common.  We need to understand what that
 2   means, though.
 3            There are some differences between preferred and
 4   common, but it doesn't mean that preferred is preferred
 5   people or special people.  Right?  It just means that there
 6   are certain rights that attach to preferred shares and
 7   certain rights that attach to common shares.  But anyone can
 8   buy common or preferred shares.
 9            The most important thing to remember is that
10   shareholders provided all of the funding for Fannie Mae and
11   Freddie Mac.  The evidence will show that shareholders
12   invested over $33 billion.  What that means is that they
13   were the ones enabling Fannie and Freddie to fulfill their
14   mission.  Without the shareholders, the core funding would
15   have been missing when the government stopped funding them.
16   The shareholders provided all of the funding for Fannie and
17   Freddie.  The shareholders are the owners of the company.
18            So if the companies make a profit, the
19   shareholders make a profit.  And when the company loses, the
20   shareholders don't make a profit.
21            Now, Ms. Davis, these companies are sometimes
22   referred to as government-sponsored entities.  How is it
23   that the shareholders are the owners of the company but it's
24   called government-sponsored entity?
25            Let me explain.

1          GSE:  We'll hear that term a lot during the course

2     of the trial.  Notice that it says government-sponsored

3     enterprises, not government-owned enterprises.  That's a

4     very important distinction.  Why?  Because Congress created

5     Fannie and Freddie, but from 1968 to 2008 the government did

6     not provide money to fund them.  Private shareholders like

7     our clients funded the GSEs' public mission of supporting

8     the mortgage market.

9          Now, I'm going to warn you:  There are some people

10    who don't like that system at all.  Some people feel that

11    private banks rather than government charter companies

12    should control the mortgage market.  These people tend to

13    believe that Fannie and Freddie's government charters caused

14    the U.S. Government to carry too much risk and that we

15    should get rid of Fannie and Freddie and let private

16    institutions run the entire housing system.

17         But it's important for you to know that some

18    people want to replace Fannie and Freddie, but only Congress

19    can do that.

20         I want you to put a pin in what I just said:  Only

21    Congress can change the structure of Fannie and Freddie,

22    even though people may have these ideas about how they feel

23    about Fannie and Freddie.

24         Now, in 2007, the housing market started to

25    collapse.  You all may remember that.  There were dark

1   clouds brewing.  And Fannie and Freddie's government

2   regulators forced them to seek additional support from

3   private shareholders.

4          Ms. Davis, what does that mean, "force"?

5          Well, I'll tell you.  That's not my word.  You'll

6   see that the chief government official overseeing Fannie and

7   Freddie at the time, James Lockhart, he used that word.  And

8   what he meant was, the government told Fannie and Freddie to

9   go raise more money from private shareholders to keep

10  entities afloat in the face of crisis.

11          When Fannie and Freddie and their government

12  regulators saw those storm clouds brewing on the horizon and

13  when they needed more capital, they didn't turn to the

14  government; they turned to private shareholders.  And

15  shareholders answered the call.  They invested

16  $19.7 billion additional investment on top of what already

17  had been invested in 2007 and 2008.

18          Their investment in Fannie and Freddie, especially

19  during this troubled time, helped Fannie and Freddie fulfill

20  their public mission, which was to allow Americans to buy

21  homes even in tough times.

22          The housing crisis had a major impact on everyone,

23  including Fannie and Freddie.

24          Even though Fannie and Freddie had very high

25  standards for the mortgages that they securitized, the

 1    crisis impacted the prices of all homes and dragged down the

 2    price of even those high-quality loans.

 3              By 2008, the nation was in full-blown housing

 4    crisis.  Fannie and Freddie played a key role in keeping

 5    mortgages flowing and keeping that secondary mortgage market

 6    stable, so the government decided it needed to take further

 7    action.

 8              That's when Congress created the FHFA, who placed

 9    Fannie and Freddie into conservatorship.

10              The first director of the FHFA was James Lockhart.

11    And during the course of this trial, you're going to see a

12    video of his testimony.

13              When Mr. Lockhart put Fannie and Freddie into

14    conservatorship in September of 2008, the FHFA became their

15    conservator.

16              Again, what's a conservator, Ms. Davis?

17              It's a guardian, a protector, a group that has

18    responsibility to the conservatee.  You may have heard of a

19    conservatorship being imposed to ensure the welfare of a

20    person, which exists until the person is able to take care

21    of themselves.

22              In this context, the conservator's job, as

23    Mr. James Lockhart and the FHFA told the public, was to make

24    sure that this conservatorship was of limited duration, a

25    fancy way for saying it needs to be temporary; preserve and

422

1   conserve the Fannie Mae and Freddie Mac assets; restore to

2   safe and solvent -- and "solvent" means restoring net worth,

3   positive net worth; and to fulfill their public mission.

4   This was his job as conservator.

5          Now, you might ask:  Why is it so important to

6   preserve and conserve assets?

7          Because earning profits and reinvesting them in

8   your company is really the only way that anyone, a company

9   or a person, can support themselves long-term.  It's

10  impossible for anyone to support themselves if someone takes

11  away all the money that they earn.  That's sort of just a

12  commonsense concept.  Right?

13         But as part of the conservatorship, the FHFA on

14  behalf of Fannie and Freddie made an agreement with the

15  United States Treasury to come alongside the shareholders

16  and the Treasury itself became another shareholder of Fannie

17  and Freddie.  That's an important fact for you to remember.

18  Treasury came alongside and became a shareholder along with

19  the private shareholders.

20         At first, the Treasury committed to invest

21  $100 billion into Fannie and Freddie.  100 billion into

22  Fannie and then 100 billion into Freddie.  Then it went up:

23  200 billion in Fannie and 2 00 billion in Freddie.  At one

24  point, it became unlimited.  They weren't going to let

25  Fannie and Freddie fail.  They were too essential and too

1    important to the housing economy.

2         The Treasury entered into an agreement with the

3    FHFA on behalf of Fannie and Freddie to purchase senior

4    preferred stock issued by the companies.  That agreement was

5    called the preferred stock purchase agreement.  Treasury

6    made the money available in something called a Treasury

7    commitment.

8         Now, what did Treasury get for that?  Because

9    that's a lot of money to commit, right?

10        Well, they got a billion dollars up front.  They

11   got warrants; they had the commitment of a PCF and they had

12   a 10 percent dividend on every draw.  So every time Fannie

13   and Freddie needed to draw money from Treasury, Treasury

14   also got an additional 10 percent dividend.

15        So the way that would work is, the GSEs could pay

16   in cash at an annual rate of 10 percent.  If Fannie drew 50

17   billion on the Treasury commitment, they'd pay a cash

18   dividend to Treasury of 5 billion.

19        Let me say that again for those of us like me who

20   struggle with math:  If they drew down 50 billion --

21   right? -- they would get a 10 percent dividend in addition.

22   5 billion.

23        But they didn't have to pay the dividend in cash.

24   There also was an option of a payment in kind, a safety

25   valve they could use.  It was a provision of the agreement

Opening Statement by Ms. Davis

1    that allowed the board of directors of Fannie and Freddie to

2    not pay the dividend in cash.  This was especially important

3    if they wanted to restore the GSEs to profitability.  They

4    could pay instead with a claim on the government's --

5    government's claim on the assets of Fannie and Freddie that

6    could be made available whenever Fannie and Freddie were

7    liquidated.  That's a bunch of words there.

8         "Liquidated" means if ever Fannie and Freddie got

9    sold and the assets were there after their sale, the

10   liquidation preference would tell who gets to get some of

11   those assets first and in order.  Okay?

12        There's going to be a professor, Dr. Dharan, who's

13   going to explain that more fully.  But I want you to get a

14   preview of what that looks like.

15        For now, it's important just to know that Fannie

16   and Freddie never had to pay the Treasury dividend in cash

17   and never had to draw down on the Treasury commitment to get

18   cash to pay the dividend if they thought it was going to be

19   some kind of problem.

20        Ladies and gentlemen, at the same time the U.S.

21   Treasury was making taxpayer money available to Fannie and

22   Freddie -- you're going to already know this -- it was also

23   making substantial investments to other private companies to

24   keep them afloat during the financial crisis.

25        Remember, insurance companies like AIG and banks

1    like Wells Fargo taken together got hundreds of billions of

2    dollars of money from Treasury to help save those companies.

3    But as you'll hear in this trial and when you listen to our

4    experts -- you will definitely hear it -- when the crisis

5    was over, the government treated Fannie and Freddie and

6    their shareholders very different than they did those other

7    companies.  Those other companies got fully restored and

8    their shareholders had their company back.  At this time,

9    Fannie and Freddie are still in conservatorship.

10          Now that you know about Fannie and Freddie's

11   conservatorship, I'm going to tell you what the shareholders

12   understood the conservatorship to mean for them.  Remember,

13   they're alongside Treasury now.  They used to be there by

14   themselves.  So what does this new arrangement, this new

15   agreement, mean for them, this preferred stock purchase

16   agreement?  What does it mean for them?

17          It's important for you to think about what the

18   this -- this document or what the PSPA means to the

19   shareholders because Judge Lamberth will tell you that the

20   key question for you to determine in this case is whether

21   FHFA's actions and agreeance to give away 100 percent of the

22   net worth of the GSEs arbitrarily or unreasonably violated

23   shareholders' reasonable expectations.

24          You'll hear a lot of evidence about what forms

25   shareholders' expectations.  What was it that they were told

1     and what did they think was going to be good faith and fair

2     dealing?

3                After FHFA implemented the conservatorship,

4     Mr. Lockhart was quite clear with the public and with our

5     clients and all other shareholders of Fannie and Freddie

6     about what they should expect during the conservatorship.

7                First, Mr. Lockhart told shareholders that during

8     the term of the conservatorship, they would temporarily lose

9     some of their rights, like the rights to vote on corporate

10    actions, their dividends.  Remember those profit

11    distributions that I talked about?  That was going to be

12    suspended.  They knew that.  And again, during the term of

13    the conservatorship, they wouldn't get those.

14               But he also told them that shareholders would not

15    lose all of their rights and they would be allowed to keep

16    their shares of stock.

17               Look at the date:  September 7th of 2008.  This is

18    what FHFA told shareholders.  They said:  The company's

19    stock will continue to trade.  However, by statute, the

20    powers of the stockholders are suspended until the

21    conservatorship is terminated.  Stockholders will continue

22    to retain all rights in the stock's financial worth as such

23    worth is determined by the market.

24               So again, lots of things were now off the table

25    for shareholders:  dividends suspended; can't vote on

1    corporate actions and what's happening in the company.  But

2    their shares are still there and their shares still have

3    value.

4         What was the direct promise that he was making to

5    them?  I'll show it to you again, because you're going to

6    hear it a lot:  limited duration of this conservatorship;

7    preserve and conserve Fannie and Freddie's assets; restore

8    to safe and solvent their net worth; and fulfill their

9    public mission.

10        Let's pause for a minute and talk about what is

11   "solvent."  So now we're going to talk about what is solvent

12   and what it means.

13        Solvent equals positive net worth.  And if you

14   think about this just with your own balance sheet at home,

15   think about it like this:  You've got your assets.  Right?

16   Things that you own, things that you have that are on the

17   positive.  Then you've got your liabilities, what you owe,

18   things that are going to definitely go out at some point.

19   Hopefully, hopefully, when things are good, you end up with

20   something at the bottom.  Right?  You end up with some net

21   worth, some positive net worth.  A very, very simple

22   concept.

23        So whenever you see that word "solvent," think

24   about that bottom part right there, that net worth, that one

25   line of money that you've got left, what you've got left

1    over.  That's -- when you have that, when you have that

2    positive net worth, then you're solvent.

3            Now, you're going to meet one of Mr. Lockhart's

4    deputies.  I talked about him already.  Mr. Edward DeMarco.

5    What was Edward DeMarco telling people as Mr. Lockhart's

6    deputy at FHFA about what the shareholders should expect?

7            They should expect -- guess what?  The same:

8    limited duration; preserve and conserve Fannie and Freddie's

9    assets; restore to safe and solvent; restore the net worth;

10   and fulfill their public mission.

11           The same exact thing he's saying.  The

12   shareholders are very clear on what they should expect.

13   They told the world explicitly what the plans were for

14   Fannie and Freddie.  They told them what the plans were for

15   during and for working toward the end of the

16   conservatorship, because the conservatorship was supposed to

17   end at some point.

18           Fannie and Freddie's shareholders heard this

19   message and reasonably understood that their investments in

20   Fannie and Freddie continued to exist and that they retained

21   value.

22           And on that, they had good faith and they thought

23   we got a fair deal.  Here we are.

24           They were reassured that FHFA would work to

25   restore the companies back to health and return them to the

1    shareholders and not do anything, anything, to purposely

2    diminish the value of their shares.

3         The evidence will show that shareholders'

4    objective reasonable expectation was that FHFA would manage

5    Fannie and Freddie during the conservatorship with the goal

6    of returning them as soon as possible, as soon as possible,

7    off of Treasury books and back to the shareholders.

8         Let's be clear about shareholder expectations at

9    this time:  We are bringing you this case because the

10   shareholders reasonably expected that the FHFA would do what

11   they said they were going to do, what they told our clients

12   and the whole world that they would do:  preserve and

13   conserve assets, restore to net worth, rebuild and make sure

14   that they were solvent, return Fannie and Freddie to their

15   shareholders.

16        Now, ladies and gentlemen, shareholders didn't

17   just go around and pull their reasonable expectations out of

18   the sky.  They were based on several things:  first and

19   foremost, that first contract that they got.  You'll

20   remember back when they first came in to Fannie and Freddie

21   as shareholders, you'll learn during this trial that there

22   was a basic bargain:  that shareholders would invest their

23   money into Fannie and Freddie.  And when the companies

24   earned money, they would get profits.  If the companies

25   weren't entitled -- when the companies weren't profitable,

1     they weren't necessarily entitled to the upside benefit.

2          The evidence will show that nothing in the

3     shareholder contract when they entered into this contract

4     with Fannie Mae and Freddie Mac would have had them

5     anticipate that at some point someone would come along and

6     take 100 percent of the net worth of those companies, all of

7     the upside for themselves.

8          The next thing that would inform their

9     expectations was the statute called HERA.  You're going to

10    hear about that during the course of the trial.  HERA stands

11    for Housing and Economic Recovery Act of 2008.  And it

12    informs the contract.

13         The judge will instruct you that they have their

14    shareholder contract and then there are pieces of

15    legislation that come along, there are announcements that

16    are made in the company that make it clear what the contract

17    still is and what it's not.  Right?

18         So just like they heard from FHFA that they

19    wouldn't get dividends, that their dividends would be

20    suspended, they wouldn't have the right to vote, but that

21    they would keep their shares and the shares would have

22    value, that informs their contract.

23         So again, when we're thinking about good faith and

24    fair dealing, we're looking at:  Okay.  What are they being

25    promised as they go along about what their shares are and

431

1    the value that their shares have?  So HERA would be another

2    thing that would inform them about what they have.

3            HERA gave the FHFA the power to make a lot of

4    decisions about Fannie and Freddie, such as whether to put

5    them in conservatorship and how to manage their operations

6    during conservatorship.

7            In addition, Congress made it very clear in HERA

8    that it was in the public interest to maintain Fannie and

9    Freddie's status as shareholder-owned and shareholder-funded

10   companies, not as companies that were indefinitely owned by

11   and controlled by the government.

12           Nothing in HERA would have caused shareholders to

13   think that at some point along the way 100 percent of the

14   net worth of these companies would go away and they would

15   not be able to benefit from the upside.

16           You'll hear that, while Mr. DeMarco was entitled

17   to act in the public interest, he couldn't just do anything

18   he wanted.  He could not act in an arbitrary or unreasonable

19   way in doing so.

20           The next thing that informed their expectation was

21   that contract that Treasury had with Fannie Mae and Freddie

22   Mac, that PSPA, that contract that told them that, Look,

23   Treasury has given a lot of money, so they're going to get

24   that 10 percent dividend.  They're going to get those

25   warrants.  They're going to get that billion dollars on the

 1     front end.  Right?

 2            All of that was information that the shareholders

 3     knew in order to be able to inform what they thought would

 4     be good faith, fair dealing.

 5            Last but not least, ladies and gentlemen, James

 6     Lockhart and Edward DeMarco, in at least what we've been

 7     able to uncover over ten presentations, they said over and

 8     over and over again, the slide that I've shown you, over and

 9     over and over again, that the conservatorship would be of

10     limited duration, that it would restore -- that they would

11     restore the net worth and solvency of those companies, that

12     they would restore those companies to normal operations and

13     so that those companies would carry on the public mission of

14     supporting the mortgage market.

15            Now, ladies and gentlemen, I want to be clear

16     about one thing, because you may be sitting there thinking,

17     Look, Ms. Davis.  When you invest in stock, you take a

18     chance.  You take a chance.  Maybe the stock won't do well.

19            That's true.  That's true.

20            But that's not why we're here.  We are here

21     because there's -- although there's no guarantee of

22     profitability, there was no guarantee that these companies

23     were going to ever become profitable again, we didn't know

24     that that day would ever come.

25            Our clients, all the shareholders understood when

1    they bought their shares that they were taking a risk that

2    these companies might not ever be profitable again.  Let me

3    say that again.

4           No one is here because they thought they were

5    guaranteed to be profitable or that they were guaranteed to

6    get a dividend or get some type of extra value for their

7    shares.

8           But what they were promised, what they were

9    promised, ladies and gentlemen, is that if and when these

10   companies became profitable again, these shareholders who

11   held $33 billion worth in these companies, would also

12   benefit from the profit and that there would be some value

13   left in their shares.  That was clear.

14          The evidence will show that the shareholders

15   reasonably expected that if and when Fannie and Freddie

16   became profitable again, the shareholders would have the

17   possibility to share in those profits.

18          And that evidence makes perfect sense, because why

19   would anyone, anyone, even a person who doesn't do stock all

20   the time, why would anyone ever take on the risk of losing

21   with zero possibility of ever getting something in return if

22   the business was profitable?  That's what any investor

23   expects, whether you're buying shares of stock, investing in

24   a pizza parlor or helping a friend's business get off the

25   ground.  The business might fail.  Sure.  And, look, if the

 1        business fails, everybody gets nothing.  Right?

 2               But if the business succeeds, you expect that if

 3        you've invested, you will get some profit.  Just common

 4        sense.

 5               Now, the other thing is -- for you to remember is

 6        that we're not here thinking we were supposed to be ahead of

 7        Treasury or that Treasury wasn't supposed to get a large

 8        benefit.  They did.  We knew that that was going to happen

 9        when we saw the PSPA.  Very clear.  They invested more;

10        they're going to get more.

11               They get in line before us.  We would get less,

12        but we would not get nothing.

13               The original deal that Treasury got was a lot, but

14        it wasn't everything.  Not 100 percent of all future profits

15        and upside.  The net worth sweep changed the deal so that

16        Treasury got 100 percent of all the upside no matter how

17        profitable Fannie and Freddie were.

18               I want to be clear.  If you're writing, write this

19        down, that this case is not about investors claiming that

20        they should be guaranteed a profit on their investment.

21        Instead, it's about how shareholders reasonably expected to

22        be treated when the companies they invested in actually did

23        make profits.

24               As the evidence will show, everything that

25        informed investors' reasonable expectations, the shareholder

1    contract, the HERA statute, the PSPAs and those FHFA public

2    statements, pointed to the same thing:  The FHFA would work

3    to restore Fannie and Freddie's net worth, not give it all

4    away.  FHFA said the plan was for the conservatorship to be

5    temporary, that it was not designed to restore Fannie and

6    Freddie to profitability.  And if Fannie and Freddie became

7    profitable again, all shareholders and all investors would

8    benefit, too.

9           This is the lens through which you need to see

10   every fact in this case:  shareholders' objective,

11   reasonable expectations.  When they saw all of that

12   information, the FHFA statements, the HERA statute, the

13   agreement that -- the new agreement that was going to be

14   happening with their fellow shareholder, Treasury, they were

15   informed of what their expectations were.  They didn't just

16   walk around saying, Oh, I expect that I'm going to get

17   $100 million.  No.  Their shareholder expectations, those

18   objective expectations, were set by what they had been told.

19          That's the lens through which you have to see this

20   case.

21          The judge is actually going to read you an

22   instruction about this, but I want you to hear it now:

23          While HERA authorized FHFA to act in the best

24   interest of the GSEs, the FHFA or the public, FHFA's

25   exercise of that statutory authority in a way that

1    arbitrarily or unreasonably violated reasonable shareholder

2    expectations would be a breach of that implied covenant of

3    good faith and fair dealing, that unwritten but understood,

4    ladies and gentlemen, part of every contract.

5           That is the law that the judge will tell you to

6    apply.  And the evidence will show that the breach is

7    exactly what happened here.

8           So they have their expectations.  Now, what else

9    do they know?  In 2012, they find out what the financial

10   news is of the day.  You'll learn by the end of 2011 there

11   were lots of signs that the housing market was rebounding.

12   Fannie and Freddie were projecting profits again in the

13   first half of 2012.  In fact, Fannie and Freddie posted

14   profits for the first time in four years.

15          You'll see here the profits for Fannie Mae in the

16   first quarter of 2012:  3.1 billion.

17          Second quarter:  5.4 billion.

18          Freddie Mac:  1.8 billion in that first quarter.

19          Then in that second quarter:  Up 2.9 billion.

20          They're getting churning.  They're getting

21   started.  They're starting to become profitable again.

22   Right?

23          So I want to be clear that 2012 was not 2008.  In

24   2008, it was bad.  But by 2012, here's what's happening with

25   them.  They're starting to really come out of the woods.

1            We all know that in a town like this, a lot can
2     change in four years.  You'll hear that the efforts to
3     improve the economy actually were working.  Fannie and
4     Freddie's book of mortgages were less risky and more
5     profitable.  Moreover, the housing market was rebounding,
6     too.  Let's look at that.
7            Home prices skyrocketed in 2012.  You see here in
8     February where the home prices are?  But by August, they're
9     up.  They're way up.  And let's look at that trend on sort
10    of a larger scale.
11           The overall economy, how is that doing?  Well,
12    look.  In 2007, 2008, 2009, it's bottoming out.  But at the
13    end of this chart, you see Quarter 1, Quarter 3 of 2012.
14    It's up higher than it was in 2007 when everything started
15    dipping down.  We're talking about a major rebound happening
16    in the larger economy.  That's what this shows.  The last
17    chart showed you in the housing economy -- right? -- there
18    was an improvement.  And as you would expect, Fannie and
19    Freddie in Quarter 1 and Quarter 2 were starting to make
20    profits.  They were just getting going.
21           During this trial, the defense is going to try to
22    meld these years together.  They're going to try to convince
23    you that 2012 was just as risky and bleak a time as 2008
24    was.
25           But, ladies and gentlemen, your job is to look at

1    the evidence.  And the evidence will show you that it was

2    not the same.  By the middle of 2012, Fannie and Freddie's

3    shareholders were poised with hope to one day be able to

4    reap the benefits of their investment and their patience,

5    because the companies were becoming profitable again.  This

6    is what it was looking like in 2012.  And our shareholders

7    expected some good stuff to start happening.

8           But what happened?  On August 17th, 2012, the net

9    worth sweep.  Just as Fannie and Freddie were beginning to

10   have that turnaround in mid-2012, Mr. DeMarco and the

11   Treasury got together and abruptly decided to rewrite the

12   terms of their agreement.

13          The FHFA and the Treasury decided between

14   themselves, without Congress, without Fannie and Freddie's

15   senior management, certainly without the private

16   shareholders, they decided that instead of paying Treasury a

17   10 percent dividend each year, the amount -- on the

18   liquidation preference, which was the amount that was drawn

19   from Treasury, remember that 50 billion, paying that 5

20   billion dividend, Fannie and Freddie would have to pay

21   Treasury 100 percent of their profit each quarter, quarter

22   after quarter, year after year, forever.  Forever.

23          This was the deal before:  Remember, 10 percent on

24   the amount drawn.

25          They canceled that completely out.  They made that

1    announcement in one day.  It was called the net worth sweep.

2    And when I say "sweep," you can think, you know, the NBA

3    finals sweep, where they win all the games.  That's what

4    we're talking about.  Entire.  100 percent.

5         Through the net worth sweep, all of Fannie and

6    Freddie's profits each quarter, no matter how much they

7    made, they could do well or they could do very well.  It

8    didn't matter.  All the profits, all of it, were going to go

9    to Treasury.

10        That left Fannie and Freddie with zero net worth.

11   How was that consistent with restoring net worth?  How is

12   that consistent with making sure that the companies are

13   profitable again?

14        The impact of this in one year -- let me show

15   you -- the dividends that were supposed to be paid, that

16   year, 2018:  18.9 billion.

17        Do you know how much they ended up paying that

18   year to Treasury?  130 billion.  In one year.

19        That's an excess of $111.2 billion.  That's the

20   first year of the net worth sweep.

21        How is that possible?  Imagine the shareholders'

22   shock.  Surprise is an understatement.  What did they miss?

23   What was the information that came out that told them this

24   was about to happen?

25        What significant event or dire prediction had

1    happened that would prompt an extreme measure like this?

2    What was communicated?  What research had been done?  What

3    process had taken place to do such a radical thing?

4           Why did the FHFA tell shareholders that Fannie and

5    Freddie would be restored to safe and solvent conditions

6    with positive net worth, but then in 2012 FHFA gave away all

7    of their net worth?  Why did the FHFA tell shareholders that

8    the conservatorship would be of limited duration, but here

9    we are today in 2013, 15 years later, and they are still in

10   conservatorship?

11          Ladies and gentlemen, ask yourselves.  Is that

12   good faith?  Is that fair dealing?

13          Do you know what?  Let's look at what they said

14   about what they did, because maybe there was a reason.

15          We went looking.  We went looking for the excuses.

16   Mario Ugoletti:  He was the special advisor to Edward

17   DeMarco.  He submitted a sworn declaration in this court

18   explaining why they did it.  December 17, 2013, Washington,

19   D.C.:  I declare under penalty of perjury under the laws of

20   the United States of America that the foregoing is true and

21   correct.

22          What did he say?  The intention of the third

23   amendment was not to increase compensation to Treasury --

24   the amendment would not do that -- but to protect the

25   enterprises from the erosion of the Treasury commitment that

1    was threatened by the fixed dividend.

2             Wait a minute.  He says here, the intention of the

3    third amendment -- that's the net worth sweep -- was not to

4    increase compensation to Treasury.  The amendment would not

5    do that.

6             Ladies and gentlemen, the amendment would not do

7    that?  Look at this.  Look at this amount.  In the first

8    year, the first year with the effect of the amendment in

9    place, $111 billion of excess that goes to Treasury.

10            I beg to differ, Mr. Ugoletti.

11            So he says that the reason is, we needed to

12   protect those enterprises from the erosion of the Treasury

13   commitment.

14            The evidence will show that the decision to do the

15   net worth sweep was made by Mr. DeMarco and his point

16   person, Mr. Ugoletti.  And it was basically just the two of

17   them who decided to agree to this net worth sweep.

18            And just in a classic case of "Whose side are you

19   on," Mr. Ugoletti was working at Treasury when the first

20   PSPA was put in place.  You know, that first agreement with

21   Treasury where they got a 10 percent dividend and all of

22   that?  He was working over there, so he helped draft the

23   agreement over there.

24            Then he gets recruited by Mr. DeMarco to come

25   across the street to the FHFA.  And guess who is helping

1   Mr. DeMarco negotiate the third amendment that caused this?

2   Mr. Ugoletti.

3             They say the reason that they agreed to the net

4   worth sweep was to protect Fannie and Freddie.  They gave

5   away 100 percent of the net worth of these companies to

6   protect them, to keep them from losing money.  What sense

7   does that make?

8             What are they trying to protect them from?

9   Because if you're trying to make sure that they have net

10  worth, why would you give away all of their net worth?  Why

11  would you change the deal to where it started to look like

12  that?

13            Well, from 2008 to 2011, Fannie and Freddie had

14  not been making enough profit to pay the 10 percent dividend

15  in cash.  So Fannie and Freddie had been drawing cash from

16  the Treasury commitment under Mr. DeMarco's direction to pay

17  the dividend to Treasury in cash.  This was called the

18  circular draw.

19            Now, the experts are going to explain it to you

20  more clearly.  Let me just say this about the circular draw:

21  The commonsense answer is, when you kind of think about

22  somebody saying, Oh, I'm robbing Peter to pay Paul, this is

23  robbing Peter to pay Peter back.  It just doesn't make any

24  sense to do this.  So you're borrowing from the person -- or

25  you're drawing down from the person that you draw money

1    from.

2              So instead of just drawing down the 50 billion,

3    you also draw the 5 billion down to pay Treasury back.

4              Mr. DeMarco says they agreed to the change of the

5    10 percent cash dividend to a dividend equal to 100 percent

6    of the net worth of Fannie and Freddie forever because that

7    way they didn't have to do these circular draws anymore.

8              He said this was important because the Treasury

9    commitment, which at the time had no upper limit, was going

10   to be capped again starting on January 1st, 2013, at a very

11   large number, but that there would be a cap.

12             Mr. DeMarco says he was concerned that the future

13   circular draws would erode or eat into the capped Treasury

14   commitment just to pay the dividend to Treasury.  And that

15   erosion could worry bond investors who loaned the GSEs money

16   and the MBS investors who did business with Fannie and

17   Freddie.  That's the explanation that they're going to give

18   you.

19             I want you to see what that looks like.  The

20   circular draw happens.  The money I said was drawn from

21   Treasury.  The 10 percent dividend is also drawn from

22   Treasury.  The Treasury commitment is decreased.  You see

23   that gray line there with the arrows coming down?  The

24   Treasury commitment is decreased by the 55 billion and the

25   liquidation preference is increased -- the Treasury

1    commitment is decreased by the 55 billion and the

2    liquidation preference is increased by 55 billion.

3         But the Treasury commitment is what you focus on,

4    because they say, Hey, if you kept going, 55 billion, then

5    you had to draw again the next year to be able to pay that

6    draw -- to pay the 10 percent dividend, it would just keep

7    going down and down and down till there would be nothing

8    left.  That's what they say the justification was for doing

9    the net worth sweep.

10        Ladies and gentlemen, I have to put this in

11   context.  The projected draws, the projected amount of money

12   that was going to be drawn down, for ten years, 2012 to

13   2022:  6.5 billion.  A lot of money.  That's a lot of money.

14   But what it's not is 266.6 billion, which was what was

15   projected to be available during those years.

16        So what they're saying to you and what you're

17   going to hear and what you're going to start to understand

18   as you start to unpack these terms and unpack this evidence

19   is that this is what they were afraid of, that they would

20   run through all of that money, that $266.6 billion that was

21   projected to be available in the commitment?

22        It just really doesn't make any sense.  It doesn't

23   make any sense at all.

24        They will try to convince you that the pending

25   caps on the Treasury commitment were causing people to be

1    nervous and lose confidence in Fannie and Freddie; and that

2    the net worth sweep taking all of their money, that was just

3    to calm everybody down.  That's what that was all about.

4         Each time you hear them refer to the fear of the

5    cap coming back, the fear of the caps, the caps, the caps,

6    the caps -- you're going to hear that over and over again --

7    I want you to think about this illustration, because this

8    is -- this is what would have been available:  aplenty.

9    Aplenty would have been available.

10        And you don't have to take my word for it that

11   they weren't going to hit the cap.  I've got a better source

12   for you.  Because this doesn't make any sense.

13        Guess who was saying they weren't going to hit the

14   caps?  June 25th, 2012.  Pay attention to the timing.  June

15   25th, 2012, in a meeting with Treasury, the secretary of

16   Treasury provided an overview of his and your previous day's

17   meeting with -- who?  Ed DeMarco.  Ed DeMarco.  This is the

18   essence of the discussion that took place.  What did

19   Mr. DeMarco say?

20        DeMarco says there's no -- he no longer sees the

21   urgency of amending the PSPAs this year.  No urgency in

22   doing a third amendment and certainly no urgency to do a net

23   worth sweep.

24        What does he say about the caps?  He says the GSEs

25   will be generating large revenues over the coming years,

1    thereby enabling them to pay the 10 percent annual dividend

2    well into the future even with the caps.

3            That picture I showed you of the cap that was

4    going to be available, I wasn't the only person that saw

5    that picture.  Mr. DeMarco knew that.  And he knew that in

6    June of 2012.  When did the net worth sweep happen?  August

7    of 2012.

8            So he knows there's no urgency to do this.  He's

9    saying that himself.

10           All of the evidence is showing that these

11   companies are becoming profitable again and that their

12   economic fundamentals are strong.  In fact, you're going to

13   learn that 2012 was an inflection point for Fannie and

14   Freddie and the overall economy.  This means that it was a

15   key moment for Fannie and Freddie.  There were lots of

16   positive signs of improvement in the housing market and

17   Fannie and Freddie were starting to show signs of what one

18   official called a roaring recovery.

19           Now, to be clear, we know Mr. DeMarco didn't have

20   a crystal ball.  And we know that he couldn't say for

21   certain that they would continue to be profitable.  We're

22   not making that claim.  We're not making that claim.

23           But what you're going to see is that they were

24   nowhere close to the caps, just like he said.  They weren't

25   anywhere close to the caps of the Treasury commitment.

1          And as I've said before, the evidence will show

2     that all signs were good that they were about to have

3     sustained profitability.  That would mean they barely need

4     to draw down on the Treasury commitment at all, much less

5     draw down so much that it would threaten to exhaust the

6     commitment or use up all of that 266.6 billion.

7          Next, you're going to see the other people were

8     recognizing this benefit that was coming.  Susan McFarland.

9     She's the former CFO of Fannie Mae, chief financial officer.

10    She's saying and she's telling people that the DTA write-up

11    was possible.  We're going to talk about what that means.

12    But the most important part is this:  I expressed the view

13    that I believed that we were now at sustained profitability,

14    that we would be able to deliver substantial profits --

15    sustainable profits over time.

16         I even mentioned the possibility that it could get

17    to a point in the not-so-distant future where the factors

18    might exist whereby the allowance of the deferred tax asset,

19    DTA -- that's the DTA -- would be released.

20         What is she talking about?  Well, the DTA, it's

21    the concept that -- again, Dr. Dharan is going to have to

22    break it down for you.

23         But I can tell you this much about what this woman

24    knew at the time:  When Fannie and Freddie were losing

25    money, they had to do an accounting concept called writing

1    down their deferred tax asset.  If a company's financial

2    projections do not show enough profits to use the DTA, the

3    asset is written down.  That's the sign that, look, things

4    are bad.  And we've got to make sure we preserve any

5    possibility of being able to write these things up later on.

6           You'll learn that when the future starts to look

7    better, though, when there's a chance of profitability and

8    your financial projections are showing enough future profits

9    to use the DTA, the asset has to be written up; and the

10   focus is on the asset must be written up.  It's not like

11   this is something that they could do possibly, that there's

12   a chance.

13          No.  When the profitability is starting to show,

14   like what we were seeing in Q1 and Q2 of 2012, that's when

15   those DTAs have to be written up.

16          Now, deferred tax asset, again, is a concept that

17   Dr. Dharan is going to explain to you.  But what I can tell

18   you about it is that it was a lot of money.  In fact,

19   $74 billion in net worth was suspected to be coming onto the

20   books of Fannie and Freddie in 2013.

21          See, once you start making profits, you have to

22   write those assets up.  And Fannie and Freddie were starting

23   to talk about writing up those deferred tax assets.  That

24   was viewed as a real possibility.  And they knew if they did

25   it, their net worth would increase in tens of billions of

1     dollars.

2          What Mr. DeMarco says or what he will tell you all

3     is that he really didn't consider that when he was making

4     his decision about the net worth sweep.  He didn't think

5     about these DTAs possibly being written up when he was

6     making the decision, him and Mr. Ugoletti were making the

7     decision about doing the net worth sweep.  He didn't -- and

8     he didn't think that was something that he should worry

9     about.

10          You're actually going to hear from the Defendants

11     that it's foolish that their own executives concluded that

12     Fannie and Freddie had reached the same profitability just

13     because they had six months of positive results.  But the

14     evidence will show that that's not the only reason that we

15     are saying that they knew the good was coming, that they

16     knew they were on the -- that they knew that they were on

17     the road to sustained profitability.

18          It's not just those six months.  What you're going

19     to learn from the evidence in this case is there had been

20     fundamental structural changes in the housing market that

21     had addressed many of the problems that existed before the

22     financial crisis, making those loans that Fannie and Freddie

23     acquired from banks significantly less risky and less likely

24     to default.

25          Dr. Dharan is going to walk you through those

1       structural changes in the housing market and how they

2       impacted Fannie and Freddie backed by actual facts and

3       numbers.  You'll see how FHFA caused Fannie and Freddie to

4       charge much higher fees to banks to acquire loans of lower

5       risk and leading to the largest profits in the history of

6       those companies.

7               You'll see evidence of how Fannie and Freddie

8       themselves characterized those changes.

9               Water break.  Thank you.

10              The Defendants are going to claim that we have

11      hindsight bias, that we're looking at all this good stuff

12      happening, but we're seeing it sort of 2020.  Right?  Like

13      we're looking in the rear-view mirror and we're seeing all

14      the good stuff.

15              But, ladies and gentlemen, you're going to

16      carefully look at the evidence and see -- you're going to

17      look at those dates and you're going to see exactly what was

18      available as information at the time that they made the

19      decision to do the net worth sweep.

20              Of course, Fannie and Freddie were not completely

21      out of the woods.  But the sun was coming up and the birds

22      were starting to sing.  Look at these profits that are

23      coming onto the books.

24              In fact, sustained profitability for Fannie and

25      Freddie is exactly what happened.  You've heard me say that

1      the very first year of the net worth sweep in 2013, they

2      made over 130 billion in profit.

3              And since 2012, Fannie and Freddie have indeed had

4      11 years of sustained profitability.  Fannie and Freddie

5      have generated record profits since 2012.  But all of those

6      profits have gone to Treasury, foreclosing any opportunity

7      of the GSEs to come out of conservatorship.

8              So even though they're making money, they're

9      improving, they're doing all the things that they're

10     supposed to do, because of this net worth sweep, they can't

11     come out of conservatorship.

12             So how was this decision made and these things

13     not been -- having these things not been taken into account?

14     Well, we wanted to know, too.  So we looked and we looked

15     and we looked.

16             We wanted to see:  Okay.  Well, what process did

17     they follow?

18             But it was nothing like a reasonable shareholder

19     would expect for a decision of this magnitude.  You would

20     think that they would really, really study this issue,

21     analyze it.  You'd see some financial analysis.  You'd see

22     some modeling going on, something, some evidence.  Right?

23     Reams and reams of evidence is what we're used to dealing

24     with.  Right?

25             Wrong.  Concerning this trial, I want you to play

1    close attention to the record of what Mr. DeMarco did to

2    study the circular draw and to analyze the pros and cons of

3    the net worth sweep before he agreed to it, because even if

4    he disregarded all of the positive news he was seeing and

5    only believed in the worst-case scenario, he should have

6    actually examined the alleged problem and the proposed

7    solution.  Right?  You would expect that.

8            I mean, come on.  This is the government.  The

9    government has analysis and memos if they're going to change

10   the vending machine from a Pepsi machine to a Coca-Cola

11   machine.  Every decision in the government has a memo.

12   Every decision in the government has some type of analysis.

13   You're going to get ready to do something like this where

14   you're going to sweep 100 percent of the net worth of these

15   two companies that are at the center of our economy?  100

16   percent of net worth forever?

17           We looked and we looked.  No memo.  No studies.

18   No analysis of the net worth sweep.

19           And I don't want you -- don't do this.  Don't say,

20   Oh, they had to have done -- they had to have -- there had

21   to have been a memo somewhere.  Don't speculate.

22           The judge instructed you, the evidence that comes

23   into this courtroom, that's the evidence you look at as to

24   whether or not a memo was generated, studies happened,

25   analysis.  Don't do that, "Yeah, they must have.  They

1   couldn't have done that.  That's just impossible.  It's

2   preposterous."

3          It is preposterous that they did that, that

4   there's no memo, that there's no study, that there's no

5   analysis.  It is preposterous for a decision of this

6   magnitude.  It's bare minimum to expect that we see

7   something, that we see some notice.

8          And it wasn't like Mr. DeMarco was by himself.  He

9   had a team.  Michael Jordan had a team.  He had a team.

10  Experts, financial experts in doing financial analysis.

11  People who could do the financial modeling to see, Hmm, you

12  know, maybe we should use the safety valve instead of

13  continuing to do these circular draws.  Let's study that.

14  Let's see if we can maybe do that instead of doing this 100

15  percent net worth sweep.

16         Maybe, you know, okay, we're concerned about the

17  caps coming again.  We're concerned about running up to

18  those caps.  Well, we're going to do some type analysis to

19  show us, you know, how fast are we going to hit that cap?

20  When is it going to happen?  Let's do some analysis.  Let's

21  do some problems to figure out when that's going to happen

22  and compare that against what the impact of the net worth

23  sweep would be.

24         You'd expect to see a memo analyzing the risks

25  that the net worth sweep would cause them to pay far more

454

1      than Treasury was entitled to under the previous agreement.

2      A little analysis.  Maybe you would know that, you know, the

3      next year, it's going to go from 18.3 billion that you're

4      going to be paying to Treasury to 130 billion that you're

5      going to be paying to Treasury.  But there's no memo and

6      there's no analysis.

7              You will learn that Mr. DeMarco did not consult

8      with his own financial experts who were responsible for

9      making financial projections to determine what might happen

10     under the net worth sweep.  He also didn't consult with

11     anyone at Fannie and Freddie to see what they thought about

12     the future of their companies.

13             What's worse, Mr. DeMarco did this extreme,

14     unprecedented sweep of Fannie and Freddie's net worth when

15     there was a complete answer built into the original PSPA

16     that would solve any concerns about the Treasury caps, the

17     safety valve provision that I've talked to you about.  And

18     sometimes it's referred to as a payment in kind.

19             Mr. DeMarco said it was important to address

20     circular draws because bond and -- remember what he said his

21     reason was:  Bond and MBS investors would worry about them.

22     But the safety valve provided total protection for the bond

23     and MBS investors.  Why total protection?  Dr. Dharan will

24     explain.  If they used the safety valve, the payment-in-kind

25     option, they don't need to draw on the commitment at all.

1    So that's a complete solution for anyone that's worried

2    about the commitment getting eaten up.

3                So remember the circular draw?  The commitment was

4    being drawn down, 50 billion, 55 billion, going on and on

5    and on?

6                Well, with the payment in kind, there's an

7    increase in the percentage.  After the initial payment in

8    kind, 10 percent, there's an increase in the percentage.

9    It's 12 percent.  But it only impacts the liquidation

10   preference.  That's what increased.  But there's no change

11   on the draw.  There's no change on the Treasury commitment.

12   So it doesn't draw down every time if you use the payment in

13   kind.

14               Now, why is this important to the MBS investors?

15   First, let's look at whether or not anybody thought the

16   safety valve was a good idea, because, you know, I didn't

17   just pull it out of my pocket.  It was something that was

18   talked about.  It was already in the original PSPA.

19               The secretary of Treasury is talking about it.

20   This is a set of talking points that were done for him when

21   he was testifying in front of Congress.

22               In the email it says, you might get asked this

23   question:  Has the Administration considered modifying the

24   PSPA agreements before the capacity becomes fixed at the end

25   of 2012?

1          And it says, one answer that you can give them is:

2     To the extent that required dividend payments exceed net

3     income, FHFA, as conservator, could consider not declaring

4     dividends pursuant to the certificates of designation for

5     the preferred shares so that draws on the PSPAs are not used

6     to pay dividends, preserving as much funding as possible to

7     cover any unanticipated losses at Fannie Mae and Freddie

8     Mac.

9          That's the payment-in-kind option.  That's the

10    safety valve that I just showed you.

11         This is the Treasury secretary saying, Hey, you

12    know, there is another option that they can use.

13         Now, you might wonder and you might hear

14    Defendants say, Well, if they do that safety valve thing,

15    doesn't the liquidation preference increase?

16         Yes, it does.  But here's the answer to why that

17    doesn't matter to what Mr. DeMarco has said or is going to

18    say that he's concerned about.

19         He says, Look, if those -- those circular draws

20    keeping happening and the commitment keeps coming down, the

21    MBS and bond investors are going to freak and leave and

22    they're not going to invest in Fannie and Freddie anymore.

23         But the payment-in-kind option addresses that

24    issue, because under the payment in kind there's no draw on

25    the Treasury commitment.  There's only an increase of

1    liquidation preference.

2          And you see what happens when the Treasury

3    liquidation preference increases?  The grass is still green

4    for the bond and MBS investors.  It doesn't impact them at

5    all.  They don't look back and say, Oh, what's your

6    liquidation preference and how much are you going to get?

7    Because they're first in line.  They've got the bonds.

8    They've got the debts.  They get paid first.  Right?  Before

9    anybody else.  They're not caring about what's happening

10   with the Treasury liquidation preference.

11         They can use -- they could have used that safety

12   valve instead of doing the circular draws, and that would

13   protect the Treasury commitment.  The very thing that

14   Mr. DeMarco said he was worried about.

15         The safety valve was a foolproof solution to the

16   so-called problem that he was trying to solve.  Mr. DeMarco

17   will admit to you that he understands how that safety valve

18   works and that it would not have led to any erosion of the

19   Treasury cap of the commitment and that the bond and MBS

20   investors would not have anything to worry about.  But

21   again, he didn't even consider it.

22         The evidence will show that the net worth sweep

23   made it impossible to restore Fannie and Freddie to safe and

24   solvent conditions, impossible to restore Fannie and Freddie

25   to shareholders, as FHFA will repeatedly -- as FHFA

1    repeatedly said that they were going to do.  That's what

2    they told the shareholders.

3           So if you've got this option and you don't use it,

4    you don't study anything, you don't think about any other

5    alternatives, what's happening?  What's really, really

6    happening?

7           Well, ladies and gentlemen, the saying goes,

8    timing is everything.  Timing can tell you a lot about what

9    was going on back up inside of Mr. DeMarco's head while this

10   was happening.

11          June 25th, 2012:  PX-205.  That's a document

12   you're going to hear at about in this case.  Mr. DeMarco is

13   saying:  No longer sees the urgency of amending the PSPAs

14   this year.  This is what he's saying in June.

15          The GSEs will be generating large revenues over

16   the coming years, thereby enabling them to pay the 10

17   percent annual dividend well into the future even with the

18   caps.  This is what he is saying in June.

19          So why is it less than two months later he is

20   giving away 100 percent of the net worth of the companies to

21   guard against drawing down on the Treasury commitment?  Why

22   is he doing that?

23          Remember when I told you way back when I first

24   started that some people have different beliefs about how

25   the housing finance system should work?  And I told you that

1    that would be important.

2              Well, here's where that comes in:  The net worth

3    sweep, we posit, happened not because government officials

4    were worried that Fannie and Freddie would lose money and

5    have to draw down on the Treasury commitment to pay Treasury

6    its dividends.

7              Instead, it happened because Fannie and Freddie

8    were starting to make money.  That's what made it urgent

9    when he's saying in June of -- June of 2012 that it's not

10   urgent.  That's what made it urgent, because they start to

11   show profit.  They start to show growth.  And those

12   responsible for driving the net worth sweep didn't want that

13   to happen.

14             Let me repeat:  It happened, the net worth sweep

15   happened, because Fannie and Freddie were starting to be

16   profitable.

17             So remember when I said, you know, shareholders

18   were looking for the reason, they were looking for what

19   could we have -- what could we have looked at to tell us

20   that this was going to happen?  How would we have been able

21   to predict that this was going to occur?

22             That's why they couldn't find it.  Because it

23   wasn't about the companies losing.  The true motivation for

24   DeMarco and Treasury was that Fannie and Freddie were

25   getting ready to come out.  They were making money.  And

1    they didn't want that to happen.

2          Again, good faith?  Fair dealing?  You're telling

3    me one thing, but there's another motivation?  You came to

4    this court and said under penalty of perjury it was because

5    of the Treasury draws.

6          But they're making money and they're becoming

7    profitable.  The evidence will show that the Treasury

8    secretary and his top deputies didn't like the housing

9    finance system the way it was before the conservatorship

10   with Fannie and Freddie at its center.  They wanted to

11   change the system.  They wanted to wind down Fannie and

12   Freddie, eliminate them altogether.  And that couldn't

13   happen if the GSEs became successful and built net worth and

14   emerged out of the conservatorship.

15         Ladies and gentlemen, that wasn't their decision

16   to make.  Winding down Fannie and Freddie was not their

17   decision to make.  Only Congress has the power to do that.

18   They didn't have the power to change Fannie and Freddie and

19   replace it with a new system.

20         And so they couldn't have Congress see them become

21   successful and profitable because then they'd never have a

22   chance of convincing Congress to wind them down.  They'd

23   never have a chance of putting Fannie and Freddie out of

24   business.

25         So the reason why in August of 2012 there was such

1    urgency, "We have to do it, we have to do it now," is

2    because those profits were showing up and people were

3    starting to see them.  And Treasury, you're going to see in

4    documents, renewed their push for the net worth sweep.

5    Renewed their push.

6             Now, Treasury can say that.  Treasury actually put

7    it in a press release.  "Yeah.  We're doing this net worth

8    sweep.  It's good.  It's going to help to wind down the

9    GSEs."

10            But Mr. DeMarco, Mr. DeMarco is the conservator.

11   Remember at the beginning I kept telling you what the

12   conservator was supposed to do?  Preserve and conserve

13   assets, build net worth, bring the companies back to the

14   shareholders.

15            He couldn't be blatant like Treasury and tell the

16   real reason why he agreed to the net worth sweep, because he

17   was the conservator.  He was supposed to preserve and

18   conserve assets, restore the GSEs to profitability to get

19   them out of conservatorship.  He was supposed to be putting

20   himself out of a job.  So he couldn't say, you know -- he

21   couldn't mention wind-down.

22            But the evidence is going to leave no doubt that

23   that was his real reason.  It showed that the reason that he

24   gave about drawing down the Treasury commitment doesn't make

25   any sense, as I've explained.  The evidence shows what

462

1       DeMarco -- that DeMarco knew what Treasury was up to.  The

2       evidence will show that he reviewed and edited that Treasury

3       press release before it went out.

4              He knew why Treasury was making the renewed push.

5       He knew it was because Treasury wanted to convince Congress

6       to wind down the GSE, and letting Fannie and Freddie keep

7       all their profits that they were about to make would mess up

8       that plan.

9              You will learn that Mr. DeMarco agreed with them.

10      You'll see he believed that the GSEs were a flawed model.

11      You'll see he wanted to replace that system with one of

12      private banks, just like Treasury did.

13             And the evidence will show that the real reason

14      Mr. DeMarco agreed to the net worth sweep was not to

15      preserve and conserve the assets of Fannie and Freddie.  It

16      was not to restore them to safety and solvency.  And it

17      wasn't to fulfill their public mission.

18             The net worth sweep was an attempt to try to wind

19      down Fannie and Freddie.  He did it to wind them down.  And

20      whether you think Mr. DeMarco deliberately wanted to wind

21      down Fannie and Freddie or whether he just acquiesced to

22      what Treasury wanted, either way, he did the opposite of his

23      job, of what he was supposed to be doing.  He got out of his

24      lane.  He was the conservator.  He was supposed to preserve

25      and conserve Fannie and Freddie's assets.  He was supposed

1    to build their net worth, not give it all away in the hopes

2    that some wind-down thing would happen.

3          What he did was arbitrary and unreasonable,

4    especially in light of the shareholders' objective

5    expectations.

6          Stripping the GSEs of their profits so that they

7    would be wound down is the opposite of what FHFA and the

8    conservator told shareholders and the world was the purpose

9    of a conservatorship.

10         Listen, Mr. DeMarco, he's entitled to his personal

11   beliefs.  We all are.  But when you work in the government,

12   you have a mission.  You have an assignment.  It's always

13   very clear what your assignment is.  He wasn't entitled to

14   arbitrarily and unreasonably violate shareholders'

15   expectations by using his conservatorship powers to strip

16   them of their assets.

17         As conservator, the FHFA's first director,

18   Mr. Lockhart, he told the shareholders and the world that

19   the FHFA would act to preserve and conserve Fannie and

20   Freddie's assets and restore them to sound and solvent

21   condition where they continued to play a role that they had

22   played in the housing market.

23         And when Mr. Lockhart's deputy, Mr. DeMarco --

24   when Mr. Lockhart was the director and Mr. DeMarco was the

25   deputy, he said the same thing.

1          But in August 2012, listen, Mr. Lockhart had

2     retired and Mr. DeMarco was in the seat.  He had the pen and

3     he could decide what he thought he should do.

4          The Treasury Department pressed him to agree to

5     the net worth sweep, if you want to believe that was the

6     motivation, or that he just came to it on his own.  But they

7     wanted to advance the goal of winding down the GSEs.

8          And instead of standing up to the Treasury

9     Department, negotiating and advocating as a conservator

10    should on the behalf of Fannie Mae and Freddie Mac, he

11    didn't.  He went on to the other side of the table with his

12    old colleagues from Treasury and signed that PSPA and that

13    net worth sweep.

14         And even if Mr. DeMarco genuinely thought that

15    depriving Fannie and Freddie of their net worth was somehow

16    in their best interest, even if he thought that, you'll be

17    instructed that Plaintiffs still win this case if he

18    exercised his authority in a manner that from the

19    shareholders' perspective arbitrarily or unreasonably

20    violated their reasonable expectations.  Not his own

21    expectations, not FHFA's or Treasury's expectations.

22    Shareholder expectations.

23         It's important to note, ladies and gentlemen, that

24    the plan didn't work anyway.  Congress has never decided to

25    do away with Fannie and Freddie and replace them with a

1   system run by private banks.  So the net worth sweep didn't

2   result in Fannie and Freddie being wound down and it

3   certainly didn't result in Fannie and Freddie getting

4   restored to sound and solvent conditions.

5        And so now they're in limbo, even though they've

6   had 11 years of sustained profitability.  They're still in

7   conservatorship.

8        The net worth sweep has had terrible consequences.

9   One consequence is that it destroyed the value of the shares

10  owned by our clients, the shareholders of Fannie Mae and

11  Freddie Mac.  Listen, the shares weren't trading at a high

12  level in August of 2012 anyway.  Right?  It was 2.92

13  billion, is where we were.  Okay.

14       But in one day, we went from that 2.92 billion

15  down to 1.31 billion and lost $1.6 billion worth of value.

16       That $1.6 billion worth of value, that's what

17  we're asking you to award our clients for the harm that the

18  government did to them.  And I'll note, you'll not hear a

19  different number from the defense.

20       Another consequence of the net worth sweep is that

21  government control of Fannie and Freddie, which was supposed

22  to be temporary, has become permanent.  So today, 15 years

23  after it began, the conservatorship still exists with no end

24  in sight.  Only Congress can replace the GSEs.  They'd have

25  to get Congress to agree to it, and they never have.

1          Mr. DeMarco knew that that was true.  He himself

2     said in a strategic plan:  Only Congress can write an end to

3     this story.

4          Meanwhile, the government has gutted Fannie and

5     Freddie and taken all of the money it invested in them

6     during the financial crisis, plus hundreds of billions more.

7     You're going to learn more about what got added to that

8     111 billion over time.

9          But you already know about the 111.  That's the

10    excess in the first year.  That's money that's not going to

11    go to the public mission of Fannie and Freddie.  It's not

12    going to go to affordable homeownership.  It's not going to

13    shore up any uncertainty in the housing market.

14         Not to allow Fannie and Freddie to build capital

15    on their way to exit conservatorship, which is what the

16    executives thought was possible.  Remember Ms. McFarland?

17         Fannie and Freddie's executives thought, Hey,

18    we're getting ready.  We're showing profits.  But then they

19    had the rug pulled right from under them.  Even though

20    they're showing that profit, it doesn't stay at Fannie and

21    Freddie.  It goes to Treasury.

22         And believe it or not, there's more.  There's

23    actually more to this story.

24         What you're going to learn is that eventually, in

25    2019, after six and a half years of taking 100 percent of

1   Fannie and Freddie's profits, the Treasury and FHFA did

2   something that might be even worse, if that's possible.

3   Finally realizing that they were not going to be able to

4   wind down Fannie and Freddie, they decided to finally allow

5   Fannie and Freddie to keep some of their profits to try and

6   build capital.

7          But at the same time, they made clear in an

8   agreement that 100 percent of those profits would still

9   belong to Treasury.  But every dollar of profit Fannie and

10  Freddie made, Treasury's liquidation preference would go up

11  by a dollar.

12         As I explained earlier, that liquidation

13  preference is the value of the Treasury's senior preferred

14  stock and had been defined as the amount Fannie and Freddie

15  drew down from the commitment.  But since 2019, every time

16  Fannie and Freddie make a profit, the liquidation preference

17  is increased by the amount of that profit.

18         So Treasury still owns all the profit.  The

19  evidence will show that Treasury has taken over 95 billion

20  of Fannie and Freddie's profits just in this way, just in

21  doing this new arrangement.

22         You'll soon hear from the lawyer for the

23  Defendants.  I suspect he's going to tell you that by August

24  of 2012, the shareholders had already been wiped out by the

25  financial crisis and the conservatorship, so they had no

1     business complaining about anything.

2              But please remember, in August of 2012, the

3     shareholders were down.  We were down, but not out.  Yes,

4     the 33 billion investment was worth a whole lot less, but it

5     was not worth zero.  They had a right that would be worth a

6     great deal if Fannie and Freddie returned to profitability

7     and exited conservatorship, like the FHFA said it was

8     working towards before the net worth sweep.

9              Those rights were worth about 2.9 billion.  And

10    then at the day of the announcement of the net worth sweep,

11    the value dropped 1.6 billion in a single day.

12             Ladies and gentlemen, that's called kicking you

13    when you're down.  And it's not right.  Even in boxing,

14    you're allowed -- you're not allowed to knock somebody out

15    when they're down on one knee and they're trying to stand

16    up.

17             And here, the guy, Mr. DeMarco, who knocked them

18    down, was the same person who was supposed to be making sure

19    that they could stand up again.

20             He certainly shouldn't have done this when there

21    was so much data indicating that the shareholders were close

22    to being able to get back up, given how much money Fannie

23    and Freddie were making and how much more they were

24    projected to make going forward.

25             You're going to also hear the Defendants talk

1      about some SEC statements.  I want to address that.

2             You're going to hear folks say that they might not

3      have even earned enough money over the loan term to pay the

4      dividend.  And what you're going to learn about the SEC

5      statements, these future risk assessments that are in the

6      SEC's statements, that these are given by cautious people

7      managing companies that were looking strong but coming out

8      of a terrible financial crisis.

9             And you don't get in trouble for having low

10     expectations and high deliverables.  You get in trouble when

11     you have high expectations and low deliverables.  Right?

12            But what Mr. DeMarco did was the opposite of being

13     cautious.  He gave away all of their profits forever,

14     despite the signs that things were looking up, despite the

15     fact that he himself told Treasury that there was no

16     urgency, despite that he said he would work to make sure the

17     GSEs were sound and solvent.  Build net worth.  Not give it

18     all away.

19            And remember what we're saying.  We're not saying

20     there was a guarantee of profitability.  That's not what the

21     shareholders are saying.  They're saying that the net worth

22     sweep guaranteed that there would never be any chance of

23     profitability and there certainly would be no chance of the

24     private shareholders taking part in profits.

25            You're also going to hear the defense counsel say

1    that Mr. DeMarco was acting in the public interest, that he

2    was entitled to act in the public interest even if it hurt

3    shareholders.

4        But please be careful when you hear that.  Judge

5    Lamberth is going to instruct you that even if Mr. DeMarco

6    and FHFA were acting in the public interest, they are still

7    liable for breaching the covenant of good faith and fair

8    dealing if they arbitrarily and unreasonably violated

9    shareholders' reasonable expectations.  And the evidence

10   will show that that's exactly what they did.

11       When a government agency has a contract with

12   someone, it doesn't get to say, Well, I was acting in the

13   public interest.  Too bad for you.  Too bad, so sad.  Too

14   bad my action destroyed your contractual rights.

15       No.  The government cannot just take people's

16   property and fall back on the public interest as

17   justification.  If a government official made a decision and

18   he didn't have a good reason, didn't engage in an

19   appropriate process to study that reason, that government

20   agency has acted arbitrarily and unreasonably.  And they are

21   liable for it.  That's what the judge will instruct.

22       Mr. DeMarco made a decision that cost Fannie and

23   Freddie $111 billion in the very first year.  And he

24   couldn't even be bothered.  He couldn't be bothered to have

25   someone study the decision, to document the reasons for it,

1 to provide a written analysis of any aspect of this.

2 Nothing.  Remember that when they tell you that he was just

3 acting in the public interest.

4   It's like they're saying the public interest is

5 like a get-out-of-jail-free card.  But it's not, because it

6 matters how you make decisions and why you make decisions,

7 when you're telling shareholders that "There's no chance for

8 you anymore.  100 percent of the net worth of this company

9 is going to that new shareholder, Treasury."

10   Especially when this man had all of these

11 alternatives to choose from, the safety valve being the

12 first in line.  Dr. Dharan is going to talk about several

13 others.

14   We're almost there.

15   It was shareholders in Treasury, sticking it out

16 through the crisis.  And the net worth sweep comes.  The

17 Treasury just kicks them to the curb.

18   It's not right.  That's not good faith and that's

19 not fair dealing.

20   So you're going to get a verdict form at the end

21 of this.  This is what the questions will be.  You need to

22 know the questions for you to know what to look for as

23 you're hearing the evidence come in.  Okay?

24   The first question:  Did the FHFA's decision to

25 agree to the net worth sweep arbitrarily or unreasonably

1    violate the reasonable expectations of shareholders, thus

2    breaching the covenant of good faith and fair dealing?

3         The second question:  Did the net worth sweep

4    cause damage to shareholders?

5         Those are your two questions.

6         We believe that both are -- the answer to both is

7    a resounding yes.

8         I want to give you a roadmap of the different

9    types of evidence you're going to hear, because this is not

10   TV.  I hate to give it to you.  But it's not TV and it's not

11   a movie.

12        Because our case is based on a decision that FHFA

13   made on something that none of our clients are class members

14   or were in any way a part of, the shareholders we represent

15   don't have the ability to come in here and tell you

16   everything that happened and why it made no sense.  They

17   aren't allowed to do that under the rules.  And we follow

18   the rules.

19        As Judge Lamberth will explain, the shareholders

20   are very, very limited in what they are allowed to testify

21   about.  So you'll hear from a few of them, but they will

22   just establish a few basic facts about themselves and won't

23   be allowed to tell you why what FHFA did was wrong.

24        MR. STERN:  Objection, your Honor.  I said

25   objection.

```
 1              MS. DAVIS:  The Court's indulgence.

 2              MR. STERN:  I just said objection, your Honor.

 3              (Whereupon, the following proceedings were had at

 4      sidebar outside the presence of the jury:)

 5              MR. STERN:  Your Honor, I said I objected.  And

 6      the point at which I objected was where Ms. Davis said that

 7      you are going to explain that the shareholders are limited

 8      in what they're allowed to testify about.

 9              As far as I know, that is not an instruction that

10      the Court intends to give or that either party has

11      requested.

12              MR. RUDY:  Lee Rudy for Plaintiffs.

13              In the last trial, you gave a specific instruction

14      at the Defendants' request before the clients testified

15      about what they were and weren't allowed to talk about

16      consistent with your Honor's motion in limine ruling.

17              This is completely outrageous, to object to

18      Ms. Davis's summation at this moment.

19              MR. STERN:  We haven't made that request, your

20      Honor.  And I tried to -- I forgot about the mic.  I tried

21      to make the objection in a way that was not obtrusive.  But

22      it was not my intent to disrupt Ms. Davis.

23              But to predict an instruction that no one has even

24      requested yet I would respectfully submit is objectionable.

25      And that's all I have to say.
```

```
 1                 MR. RUDY:  Lee Rudy again.
 2                 It was not only before the clients testified; it
 3       was in the closing instruction that is agreed to.  The
 4       Defendants are entitled -- or supposed to know what the
 5       instructions are.
 6                 THE COURT:  The objection is overruled.
 7                 (Whereupon, the following proceedings were had in
 8       open court:)
 9                 MS. DAVIS:  So like I said, as Judge Lamberth will
10       explain, the shareholders are very, very limited in what
11       they're allowed to testify about.  So you will hear from a
12       few of them, but they will just establish a few facts about
13       themselves and won't be allowed to tell you why what FHFA
14       did was wrong.
15                 For that, we rely on the documents and the simple
16       undisputable financial facts that show what happened and
17       from some independent experts on economics and accounting.
18                 So the first thing you're going to see, which
19       again may seem a bit unusual compared to TV or what's shown
20       in movies and courtroom drama, is you'll see a document
21       reader, just a person who's going to read some important
22       documents to show you what some of the really important
23       documents say.
24                 You'll also hear what is called a summary witness,
25       a person who's reviewed a lot of financial information,
```

Opening Statement by Ms. Davis

1    10-Ks, 10-Qs, certificates of designation, a lot of

2    information.

3            But we're not going to bring you all of that

4    information in here.  She's going to present her charts and

5    graphs that summarize that information.  Okay?  Don't worry.

6            You're also going to hear and see some testimony

7    through video deposition.  Now, a deposition is where a

8    person testifies under oath out of court with lawyers from

9    both sides present so they both can ask questions and so to

10   make sure that it's going to be fair.

11           Witnesses that can't come to court -- when there

12   are witnesses that can't come to court, parties can play

13   their deposition.  And that testimony counts the same as if

14   that witness came in here and sat on the witness stand and

15   held their hand up and took the oath to tell the truth.

16   Okay?

17           So, for example, you're going to hear the video

18   deposition testimony from Mr. Lockhart, who was the first

19   director of the FHFA, who said the point of the

20   conservatorship was to preserve and conserve assets and to

21   make Fannie and Freddie sound and solvent.  And again, that

22   word "solvent" means having positive net worth.

23           You're also going to be seeing videos of prior

24   testimony from several other witnesses and a live reading of

25   at least one person's deposition testimony that was not

1    videotaped.

2         Finally, you'll be hearing from several witnesses

3    who are experts in the fields of accounting and finance.

4    They will help you -- help explain to you and us some of the

5    facts in this case.  Right?  Their expert opinions are

6    independent.  And many of them are professors, so they have

7    that teaching tool that they're going to use to be able to

8    teach about these financial concepts.

9         The judge -- again, he will allow you to take

10   notes.  And for those who might want to, I'd encourage that.

11        I want to say that this is very much a team

12   effort.  You'll see me do some things; you'll see Mr. Hume,

13   Mr. Kravetz, Vince and Mr. Rudy.  We share responsibility in

14   presenting this case.  So I don't want you to read anything

15   into who's doing what, because we've all got different

16   elements of this case that we worked on.

17        Like I said, this is not going to be exciting like

18   what you see on TV.  But we still hope you'll recognize the

19   importance of what we are bringing to you.  You're going to

20   get to see an inside look at how huge decisions sometimes

21   get made by government officials.

22        And like I said, decisions that impact Fannie and

23   Freddie impact all of us because of the housing finance

24   system that they are at the center of.

25        This decision impacted hundreds of billions of

Opening Statement by Ms. Davis

1       dollars.  And it caused harm to the shareholders we

2       represent of 1.6 billion.

3               So this case is important because of the amount of

4       money that's at stake, but it's also important because of

5       the principles that are at stake.

6               A key principle that we talked about over and

7       over, and I want it to be a part of how you hear everything

8       that comes into this case:  good faith, fair dealing.

9       Remember, that's that principle that when you're a party to

10      a contract, they can't take actions that unreasonably

11      destroy the ability of your side to ever get the benefit of

12      the contract.  They can't just shut you off and cut you off.

13              That's not right.  And the law says you can't do

14      that.

15              And the evidence will show that that's what

16      happened here.

17              At the end of this case, we'll ask you for a

18      verdict in favor of the Plaintiff shareholders in the amount

19      of $1.6 billion, because we believe the evidence will show

20      you that that's the just result.

21              Thank you so much for your attention.  I really

22      appreciate it.  And I appreciate your public service.  We're

23      incredibly grateful for you.

24              Thank you.

25              THE COURT:  Rather than taking a short recess and

1     coming back for a short time, we'll go ahead and take our

2     lunch recess now.  We'll come back at 1:15.

3              Don't talk about the case.  Don't let anyone talk

4     to you about the case.  Have a nice lunch.  You can leave

5     your materials here or in the jury room, either one.

6              Don't go Twitter or tweet or any of those things,

7     although I was told yesterday I shouldn't say Twitter.  I

8     guess it's X now or something or other.

9              [Laughter.]

10             THE COURT:  I'm not up to date on any of that.

11    But don't go do any of those things about the case.

12             I'll see you all at 1:15.

13             (Whereupon, the jury exited the courtroom at 12:04

14    p.m. and the following proceedings were had:)

15             THE COURT:  I'll see you all back at 1:15.

16             (Proceedings concluded.)

17

18

19

20

21

22

23

24

25

**CERTIFICATE**

I, LISA EDWARDS, RDR, CRR, do hereby

certify that the foregoing constitutes a true and accurate

transcript of my stenographic notes, and is a full, true,

and complete transcript of the proceedings produced to the

best of my ability.


Dated this 26th day of July, 2023.


/s/ Lisa Edwards, RDR, CRR
Official Court Reporter
United States District Court for the
  District of Columbia
333 Constitution Avenue, Northwest
Washington, D.C. 20001
(202) 354-3269

**$**

**$100** [2] - 22:21, 35:17
**$111** [2] - 41:9, 70:23
**$33** [3] - 10:23, 18:12, 33:11
**$74** [1] - 48:19

**/**

**/s** [1] - 79:12

**0**

**00** [1] - 22:23

**1**

**1** [2] - 37:13, 37:19
**1.31** [1] - 65:15
**1.6** [6] - 9:14, 65:15, 65:16, 68:11, 77:2, 77:19
**1.8** [1] - 36:18
**10** [15] - 23:12, 23:14, 23:16, 23:21, 31:24, 38:17, 38:23, 43:21, 44:6, 46:1, 55:8, 58:16
**10-Ks** [1] - 75:1
**10-Qs** [1] - 75:1
**100** [21] - 10:5, 11:21, 12:3, 22:21, 22:22, 25:21, 30:6, 31:13, 34:14, 34:16, 38:21, 39:4, 42:5, 43:5, 52:14, 52:15, 53:14, 58:20, 66:25, 67:8, 71:8
**10020** [1] - 2:4
**10:08** [1] - 1:7
**10:11** [1] - 5:17
**11** [2] - 51:4, 65:6
**111** [2] - 66:8, 66:9
**111.2** [1] - 39:19
**12** [1] - 55:9
**1251** [1] - 2:3
**12:04** [1] - 78:13
**13-1053** [2] - 1:4, 4:2
**13-1288** [2] - 1:10, 4:2
**130** [3] - 39:18, 51:2, 54:4
**1401** [1] - 1:21
**15** [2] - 40:9, 65:22

**1523** [1] - 1:18
**17** [1] - 40:18
**17th** [2] - 10:2, 38:8
**18.3** [1] - 54:3
**18.9** [1] - 39:16
**19.7** [1] - 20:16
**19087** [1] - 1:24
**1930s** [1] - 15:25
**1968** [2] - 16:6, 19:5
**1:15** [3] - 78:2, 78:12, 78:15
**1st** [1] - 43:10

**2**

**2** [2] - 22:23, 37:19
**2.9** [2] - 36:19, 68:9
**2.92** [2] - 65:12, 65:14
**20** [1] - 22:23
**20001** [3] - 2:8, 2:12, 79:14
**20005** [1] - 1:22
**20036** [1] - 1:19
**2007** [4] - 19:24, 20:17, 37:12, 37:14
**2008** [13] - 9:16, 11:12, 19:5, 20:17, 21:3, 21:14, 26:17, 30:11, 36:23, 36:24, 37:12, 37:23, 42:13
**2009** [1] - 37:12
**2011** [2] - 36:10, 42:13
**2012** [30] - 10:2, 36:9, 36:13, 36:16, 36:23, 36:24, 37:7, 37:13, 37:23, 38:2, 38:6, 38:8, 40:6, 44:12, 45:14, 45:15, 46:6, 46:7, 46:13, 48:14, 51:3, 51:5, 55:25, 58:11, 59:9, 60:25, 64:1, 65:12, 67:24, 68:2
**2013** [5] - 40:9, 40:18, 43:10, 48:20, 51:1
**2018** [1] - 39:16
**2019** [2] - 66:25, 67:15
**202** [2] - 2:13, 79:15
**2020** [1] - 50:12
**2022** [1] - 44:13
**2023** [2] - 1:7, 79:10
**25th** [2] - 45:14, 45:15, 58:11
**26** [1] - 1:7
**266.6** [3] - 44:14,

**44:20, 47:6
**26th** [1] - 79:10
**280** [1] - 1:24

**3**

**3** [3] - 1:13, 4:17, 37:13
**3.1** [1] - 36:16
**33** [1] - 68:4
**333** [2] - 2:11, 79:14
**354-3269** [2] - 2:13, 79:15

**4**

**401(k** [1] - 17:4

**5**

**5** [4] - 23:18, 23:22, 38:19, 43:3
**5.4** [1] - 36:17
**50** [5] - 23:16, 23:20, 38:19, 43:2, 55:4
**55** [5] - 43:24, 44:1, 44:2, 44:4, 55:4

**6**

**6.5** [1] - 44:13
**601** [1] - 2:8
**6706** [1] - 2:12

**7**

**7th** [1] - 26:17

**9**

**9** [1] - 3:2
**95** [1] - 67:19

**A**

**a.m** [2] - 1:7, 5:17
**ability** [4] - 13:5, 72:15, 77:11, 79:7
**able** [14] - 13:17, 15:4, 21:20, 31:15, 32:3, 32:7, 38:3, 44:5, 47:14, 48:5, 59:20, 67:3, 68:22, 76:7
**abruptly** [1] - 38:11
**access** [1] - 7:13

**account** [1] - 51:13
**accounting** [3] - 47:25, 74:17, 76:3
**accurate** [1] - 79:4
**acquiesced** [1] - 62:21
**acquire** [1] - 50:4
**acquired** [1] - 49:23
**acronym** [1] - 11:1
**acronyms** [1] - 11:2
**Act** [1] - 30:11
**act** [5] - 31:17, 31:18, 35:23, 63:19, 70:2
**acted** [1] - 70:20
**acting** [6] - 10:25, 11:3, 70:1, 70:6, 70:12, 71:3
**Action** [3] - 1:3, 4:1, 4:4
**action** [8] - 6:8, 6:16, 6:17, 6:20, 7:1, 10:12, 21:7, 70:14
**ACTION** [1] - 1:11
**actions** [5] - 8:19, 25:21, 26:10, 27:1, 77:10
**acts** [1] - 11:7
**actual** [1] - 50:2
**added** [1] - 66:7
**addition** [3] - 6:17, 23:21, 31:7
**additional** [3] - 20:2, 20:16, 23:14
**address** [4] - 4:11, 54:19, 69:1
**addressed** [1] - 49:21
**addresses** [1] - 56:23
**Administration** [1] - 55:23
**admit** [1] - 57:17
**advance** [1] - 64:7
**advisor** [1] - 40:16
**advocating** [1] - 64:9
**affecting** [1] - 8:4
**affordable** [2] - 14:17, 66:12
**afloat** [2] - 20:10, 24:24
**afraid** [1] - 44:19
**agency** [5] - 9:20, 11:7, 16:1, 70:11, 70:20
**AGENCY** [1] - 1:6
**Agency** [2] - 7:3, 11:3
**agree** [4] - 41:17, 64:4, 65:25, 71:25
**agreeance** [1] -

25:21
**agreed** [7] - 42:3, 43:4, 52:3, 61:16, 62:9, 62:14, 74:3
**agreement** [15] - 12:25, 22:14, 23:2, 23:4, 23:5, 23:25, 25:15, 25:16, 35:13, 38:12, 41:20, 41:23, 54:1, 67:8
**Agreement** [1] - 4:4
**AGREEMENT** [1] - 1:11
**agreements** [1] - 55:24
**ahead** [3] - 12:21, 34:6, 78:1
**AIG** [1] - 24:25
**al** [2] - 1:3, 1:7
**alleged** [1] - 52:6
**allow** [4] - 20:20, 66:14, 67:4, 76:9
**allowance** [1] - 47:18
**allowed** [11] - 24:1, 26:15, 68:14, 72:17, 72:20, 72:23, 73:8, 73:15, 74:11, 74:13
**allowing** [1] - 14:5
**allows** [2] - 14:16, 15:4
**almost** [1] - 71:14
**alongside** [3] - 22:15, 22:18, 25:13
**alternatives** [2] - 58:5, 71:11
**altogether** [1] - 60:12
**Amazon** [1] - 17:2
**amend** [1] - 8:5
**amending** [2] - 45:21, 58:13
**amendment** [8] - 40:23, 40:24, 41:3, 41:4, 41:6, 41:8, 42:1, 45:22
**America** [1] - 40:20
**American** [1] - 10:12
**Americans** [5] - 9:15, 14:16, 15:7, 17:7, 20:20
**Americas** [1] - 2:3
**amount** [9] - 38:17, 38:18, 38:24, 41:7, 44:11, 67:14, 67:17, 77:3, 77:18
**analysis** [12] - 51:21, 52:9, 52:12, 52:18, 52:25, 53:5, 53:10, 53:18, 53:20, 54:2, 54:6, 71:1

**analyze** [2] - 51:21, 52:2
**analyzing** [1] - 53:24
**angle** [1] - 4:25
**announcement** [2] - 39:1, 68:10
**announcements** [1] - 30:15
**annual** [3] - 23:16, 46:1, 58:17
**answer** [5] - 42:21, 54:15, 56:1, 56:16, 72:6
**answered** [1] - 20:15
**anticipate** [1] - 30:5
**anticipated** [1] - 13:8
**anyway** [2] - 64:24, 65:12
**apartment** [1] - 12:11
**aplenty** [2] - 45:8, 45:9
**APPEARANCES** [1] - 2:1
**aPPEARANCES** [1] - 1:16
**apply** [2] - 12:25, 36:6
**appoint** [1] - 11:4
**appreciate** [2] - 77:22
**appropriate** [1] - 70:19
**arbitrarily** [8] - 8:20, 25:22, 36:1, 63:14, 64:19, 70:8, 70:20, 71:25
**arbitrary** [2] - 31:18, 63:3
**ARNOLD** [1] - 2:7
**arrangement** [2] - 25:14, 67:21
**arrows** [1] - 43:23
**ASIM** [1] - 2:5
**aspect** [1] - 71:1
**assessments** [1] - 69:5
**asset** [6] - 47:18, 48:1, 48:3, 48:9, 48:10, 48:16
**assets** [19] - 9:23, 22:1, 22:6, 24:5, 24:9, 24:11, 27:7, 27:15, 28:9, 29:13, 48:22, 48:23, 61:13, 61:18, 62:15, 62:25, 63:16, 63:20, 75:20
**assignment** [2] - 63:12, 63:13
**Association** [1] -

6:13
**attach** [2] - 18:6, 18:7
**attempt** [1] - 62:18
**attention** [3] - 45:14, 52:1, 77:21
**attorneys** [3] - 5:22, 5:25, 6:3
**August** [9] - 10:1, 37:8, 38:8, 46:6, 60:25, 64:1, 65:12, 67:23, 68:2
**authority** [1] - 35:25, 64:18
**authorized** [1] - 35:23
**available** [9] - 23:6, 24:6, 24:21, 44:15, 44:21, 45:8, 45:9, 46:4, 50:18
**Avenue** [6] - 1:18, 1:21, 2:3, 2:8, 2:11, 79:14
**average** [1] - 15:4
**award** [1] - 65:17

**B**

**backed** [3] - 15:17, 15:18, 50:2
**bad** [5] - 36:24, 48:4, 70:13, 70:14
**balance** [1] - 27:14
**ball** [1] - 46:20
**banks** [11] - 10:21, 14:20, 14:25, 15:5, 19:11, 24:25, 49:23, 50:4, 62:12, 65:1
**bare** [1] - 53:6
**barely** [1] - 47:3
**bargain** [1] - 29:22
**bargained** [2] - 12:16, 13:6
**Barry** [1] - 6:10
**based** [2] - 29:18, 72:12
**basic** [2] - 29:22, 72:22
**bear** [1] - 16:7
**became** [10] - 16:14, 17:23, 21:14, 22:16, 22:18, 22:24, 33:10, 33:16, 35:6, 60:13
**become** [6] - 10:3, 15:17, 32:23, 36:21, 60:20, 65:22
**becomes** [1] - 55:24
**becoming** [3] - 38:5, 46:11, 60:6

**BEFORE** [1] - 1:14
**beg** [1] - 41:10
**began** [1] - 65:23
**begin** [3] - 6:6, 8:23, 9:4
**beginning** [3] - 4:20, 38:9, 61:11
**behalf** [4] - 6:10, 22:14, 23:3, 64:10
**beliefs** [2] - 58:24, 63:11
**belong** [1] - 67:9
**benefit** [9] - 12:16, 13:6, 30:1, 31:15, 33:12, 34:8, 35:8, 47:8, 77:11
**benefits** [1] - 38:4
**BERGER** [1] - 2:2
**BERGMAN** [1] - 2:6
**Berkley** [5] - 6:19, 6:23, 7:1, 17:21
**BERKLEY** [1] - 1:17
**BERNSTEIN** [1] - 2:2
**best** [3] - 35:23, 64:16, 79:7
**better** [2] - 45:11, 48:7
**between** [3] - 12:6, 18:3, 38:13
**bias** [1] - 50:11
**big** [1] - 11:8
**billion** [55] - 9:14, 10:23, 18:12, 20:16, 22:21, 22:22, 22:23, 23:10, 23:17, 23:18, 23:20, 23:22, 31:25, 33:11, 36:16, 36:17, 36:18, 36:19, 38:19, 38:20, 39:16, 39:18, 39:19, 41:9, 43:2, 43:3, 43:24, 44:1, 44:2, 44:4, 44:13, 44:14, 44:20, 47:6, 48:19, 51:2, 54:3, 54:4, 54:4, 65:13, 65:14, 65:15, 65:16, 66:8, 67:19, 68:4, 68:9, 68:11, 70:23, 77:2, 77:19
**billions** [4] - 25:1, 48:25, 66:6, 76:25
**birds** [1] - 50:21
**bit** [1] - 74:19
**blatant** [1] - 61:15
**bleak** [1] - 37:23
**blown** [1] - 21:3
**board** [1] - 24:1
**BOIES** [1] - 1:21
**bond** [10] - 15:10, 15:11, 15:20, 43:15,

54:20, 54:21, 54:22, 56:21, 57:4, 57:19
**bonds** [1] - 57:7
**book** [1] - 37:4
**books** [3] - 29:7, 48:20, 50:23
**borne** [1] - 16:4
**Borodkin** [1] - 6:10
**borrow** [1] - 14:20
**borrowing** [1] - 42:24
**bothered** [2] - 70:24
**bottom** [2] - 27:20, 27:24
**bottoming** [1] - 37:12
**bought** [1] - 33:1
**boxing** [1] - 68:13
**brain** [1] - 12:22
**breach** [4] - 8:13, 12:5, 36:2, 36:6
**breached** [2] - 8:8, 8:19, 11:20
**breaching** [2] - 70:7, 72:2
**break** [2] - 47:22, 50:9
**brewing** [2] - 20:1, 20:12
**bring** [5] - 4:5, 4:9, 5:14, 61:13, 75:3
**bringing** [2] - 29:9, 76:19
**brought** [2] - 6:8, 11:19
**build** [5] - 61:13, 63:1, 66:14, 67:6, 69:17
**building** [1] - 10:3
**built** [2] - 54:15, 60:13
**bunch** [1] - 24:7
**business** [9] - 17:15, 33:22, 33:24, 33:25, 34:1, 34:2, 43:16, 60:24, 68:1
**buy** [9] - 12:10, 12:11, 14:24, 15:4, 15:8, 15:15, 15:19, 18:8, 20:20
**buying** [1] - 33:23
**BY** [1] - 2:9
**bylaws** [1] - 8:1

**C**

**Cacciapalle** [2] - 6:9, 17:8
**calm** [1] - 45:3

**canceled** [1] - 38:25
**cannot** [2] - 12:15, 70:15
**cap** [6] - 43:11, 45:5, 45:11, 46:3, 53:19, 57:19
**capacity** [1] - 55:24
**capital** [4] - 15:6, 20:13, 66:14, 67:6
**capped** [2] - 43:10, 43:13
**caps** [14] - 44:25, 45:5, 45:6, 45:14, 45:24, 46:2, 46:24, 46:25, 53:17, 53:18, 54:16, 58:18
**car** [2] - 12:10, 12:11
**card** [1] - 71:5
**care** [4] - 13:14, 13:15, 13:16, 21:20
**careful** [2] - 12:24, 70:4
**carefully** [1] - 50:16
**caring** [1] - 57:9
**carry** [2] - 19:14, 32:13
**case** [42] - 4:17, 5:25, 6:2, 6:6, 6:7, 6:25, 7:2, 7:19, 8:7, 8:23, 8:24, 11:2, 11:20, 12:8, 12:20, 12:25, 13:2, 13:15, 13:16, 14:10, 15:21, 15:22, 25:20, 29:9, 34:19, 35:10, 35:20, 41:18, 49:19, 52:5, 58:12, 64:17, 72:12, 76:5, 76:14, 76:16, 77:3, 77:8, 77:17, 78:3, 78:4, 78:11
**Case** [2] - 1:10, 4:2
**cash** [10] - 23:16, 23:17, 23:23, 24:2, 24:16, 24:18, 42:15, 42:17, 43:5
**Cassell** [2] - 6:9, 17:8
**caused** [7] - 9:13, 10:15, 19:13, 31:12, 42:1, 50:3, 77:1
**causing** [1] - 44:25
**cautious** [2] - 69:6, 69:13
**center** [5] - 9:19, 15:3, 52:15, 60:10, 76:24
**certain** [3] - 18:6, 18:7, 46:21
**certainly** [5] - 38:15, 45:22, 65:3, 68:20,

69:23
**CERTIFICATE** [1] - 79:1
**certificates** [4] - 7:24, 7:25, 56:4, 75:1
**certify** [1] - 79:4
**CFO** [1] - 47:9
**chance** [9] - 32:18, 48:7, 48:12, 60:22, 60:23, 69:22, 69:23, 71:7
**change** [9] - 19:21, 37:2, 42:11, 43:4, 52:9, 55:10, 55:11, 60:11, 60:18
**changed** [1] - 34:15
**changes** [4] - 8:3, 49:20, 50:1, 50:8
**characterized** [1] - 50:8
**charge** [2] - 9:21, 50:4
**chart** [2] - 37:13, 37:17
**charter** [3] - 7:25, 16:9, 19:11
**chartered** [1] - 17:14
**charters** [1] - 19:13
**charts** [1] - 75:4
**CHECK** [1] - 1:23
**chief** [2] - 20:6, 47:9
**choose** [1] - 71:11
**chosen** [1] - 12:8
**churning** [1] - 36:20
**circular** [11] - 42:18, 42:20, 43:7, 43:13, 43:20, 52:2, 53:13, 54:20, 55:3, 56:19, 57:12
**Civil** [2] - 1:3, 4:1
**claim** [7] - 8:7, 8:11, 24:4, 24:5, 46:22, 50:10
**claiming** [1] - 34:19
**class** [6] - 6:8, 6:15, 6:17, 6:20, 6:25, 72:13
**CLASS** [3] - 1:11, 1:20, 2:2
**Class** [1] - 4:4
**classes** [1] - 6:21
**classic** [1] - 41:18
**clear** [13] - 26:4, 28:12, 29:8, 30:16, 31:7, 32:15, 33:13, 34:9, 34:18, 36:23, 46:19, 63:13, 67:7
**clearly** [1] - 42:20
**client** [1] - 17:21
**clients** [18] - 10:18,

11:17, 12:7, 13:25, 14:4, 14:9, 16:16, 17:8, 17:19, 19:7, 26:5, 29:11, 32:25, 65:10, 65:17, 72:13, 73:14, 74:2
**close** [5] - 8:12, 46:24, 46:25, 52:1, 68:21
**closing** [1] - 74:3
**clouds** [2] - 20:1, 20:12
**Coca** [1] - 52:10
**Coca-Cola** [1] - 52:10
**Cola** [1] - 52:10
**Colatriano** [1] - 14:4
**COLATRIANO** [1] - 1:17
**collapse** [1] - 19:25
**colleagues** [2] - 14:2, 64:12
**Columbia** [2] - 2:11, 79:13
**COLUMBIA** [1] - 1:1
**coming** [13] - 43:23, 45:5, 45:25, 47:8, 48:19, 49:15, 50:21, 50:23, 53:17, 56:20, 58:16, 69:7, 78:1
**commit** [1] - 23:9
**commitment** [30] - 23:7, 23:11, 23:17, 24:17, 40:25, 41:13, 42:16, 43:9, 43:14, 43:22, 43:24, 44:1, 44:3, 44:21, 44:25, 46:25, 47:4, 47:6, 54:25, 55:2, 55:3, 55:11, 56:20, 56:25, 57:13, 57:19, 58:21, 59:5, 61:24, 67:15
**committed** [1] - 22:20
**common** [8] - 6:10, 6:17, 7:20, 18:1, 18:4, 18:7, 18:8, 34:3
**commonsense** [2] - 22:12, 42:21
**communicated** [1] - 40:2
**communities** [1] - 10:21
**companies** [50] - 6:18, 6:24, 7:6, 7:17, 7:22, 9:18, 10:2, 10:5, 10:16, 10:21, 11:13, 11:14, 17:5, 17:20, 18:18, 18:21, 19:11, 23:4, 24:23, 24:25,

25:2, 25:7, 28:25, 29:23, 29:24, 29:25, 30:6, 31:10, 31:14, 32:11, 32:12, 32:13, 32:22, 33:2, 33:10, 33:11, 34:22, 38:5, 39:12, 42:5, 46:11, 50:6, 52:15, 54:12, 58:20, 59:23, 61:13, 69:7
**company** [9] - 18:17, 18:19, 18:23, 22:8, 25:8, 27:1, 30:16, 71:8
**Company** [2] - 6:19, 6:23
**company's** [2] - 26:18, 48:1
**compare** [1] - 53:22
**compared** [1] - 74:19
**compensation** [2] - 40:23, 41:4
**complaining** [1] - 68:1
**complete** [1] - 54:15, 55:1, 79:6
**completely** [4] - 13:5, 38:25, 50:20, 73:17
**concept** [7] - 11:24, 13:9, 22:12, 27:22, 47:21, 47:25, 48:16
**concepts** [2] - 13:22, 76:8
**concerned** [5] - 5:2, 53:12, 53:16, 53:17, 56:18
**concerning** [1] - 51:25
**concerns** [1] - 54:16
**concluded** [2] - 49:11, 78:16
**condition** [1] - 63:21
**conditions** [3] - 40:5, 57:24, 65:4
**confidence** [1] - 45:1
**confirmed** [1] - 11:5
**conflict** [1] - 14:5
**Congress** [20] - 7:12, 14:14, 15:1, 15:24, 16:6, 19:4, 19:18, 19:21, 21:8, 31:7, 38:14, 55:21, 60:17, 60:20, 60:22, 62:5, 64:24, 65:24, 65:25, 66:2
**cons** [1] - 52:2
**consequence** [2] - 65:9, 65:20
**consequences** [1] -

65:8
**conservatee** [1] - 21:18
**conservator** [16] - 7:7, 7:8, 9:17, 11:8, 11:9, 21:15, 21:16, 22:4, 56:3, 61:10, 61:12, 61:17, 62:24, 63:8, 63:17, 64:9
**conservator's** [1] - 21:22
**conservatorship** [36] - 21:9, 21:14, 21:19, 21:24, 22:13, 25:9, 25:11, 25:12, 26:3, 26:6, 26:8, 26:13, 26:21, 27:6, 28:16, 29:5, 31:5, 31:6, 32:9, 35:4, 40:8, 40:10, 51:7, 51:11, 60:9, 60:14, 61:19, 63:9, 63:15, 65:7, 65:23, 66:15, 67:25, 68:7, 75:20
**conserve** [12] - 9:23, 22:1, 22:6, 27:7, 28:8, 29:13, 61:12, 61:18, 62:15, 62:25, 63:19, 75:20
**consider** [3] - 49:3, 56:3, 57:21
**considered** [3] - 17:12, 17:13, 55:23
**consistent** [3] - 39:11, 39:12, 73:16
**constitutes** [1] - 79:4
**Constitution** [2] - 2:11, 79:14
**consult** [2] - 54:7, 54:10
**CONT'D** [1] - 2:1
**context** [2] - 21:22, 44:11
**continue** [3] - 26:19, 26:21, 46:21
**continued** [2] - 28:20, 63:21
**continuing** [1] - 53:13
**contract** [32] - 7:23, 8:6, 8:16, 12:1, 12:9, 12:10, 12:14, 12:16, 12:17, 12:18, 12:19, 13:3, 13:5, 13:6, 13:18, 13:19, 13:23, 13:25, 29:19, 30:3, 30:12, 30:14, 30:16, 30:22, 31:21, 31:22, 35:1, 36:4, 70:11, 77:10, 77:12

**contracts** [6] - 7:22, 8:9, 8:16, 11:17, 11:20, 12:12
**contractual** [3] - 8:21, 10:13, 70:14
**control** [4] - 11:12, 11:16, 19:12, 65:21
**controlled** [1] - 31:11
**convince** [3] - 37:22, 44:24, 62:5
**convincing** [1] - 60:22
**COOPER** [1] - 1:18
**core** [1] - 18:14
**corporate** [4] - 7:25, 8:1, 26:9, 27:1
**Corporation** [1] - 6:11
**corporation** [3] - 7:23, 8:2, 13:10
**correct** [1] - 40:21
**cost** [1] - 70:22
**counsel** [2] - 4:18, 69:25
**counts** [1] - 75:13
**course** [8] - 6:1, 11:9, 15:22, 17:18, 19:1, 21:11, 30:10, 50:20
**Court** [7] - 2:10, 2:10, 4:15, 5:1, 73:10, 79:12, 79:13
**COURT** [17] - 1:1, 4:5, 4:7, 4:12, 4:14, 4:20, 4:23, 5:9, 5:11, 5:14, 5:18, 5:21, 9:8, 74:6, 77:25, 78:10, 78:15
**court** [6] - 40:17, 60:4, 74:8, 75:8, 75:11, 75:12
**Court's** [1] - 73:1
**courtroom** [5] - 4:16, 52:23, 74:20, 78:13
**COURTROOM** [2] - 4:1, 5:15
**covenant** [10] - 8:8, 8:14, 8:15, 8:18, 11:25, 12:5, 13:12, 36:2, 70:7, 72:2
**cover** [1] - 56:7
**created** [6] - 7:12, 14:14, 15:1, 15:24, 19:4, 21:8
**crisis** [12] - 9:16, 20:10, 20:22, 21:1, 21:4, 24:24, 25:4, 49:22, 66:6, 67:25, 69:8, 71:16

**CRR** [3] - 2:9, 79:3, 79:12
**crystal** [1] - 46:20
**curb** [1] - 71:17
**current** [1] - 11:22
**cut** [1] - 77:12

# D

**D.C** [7] - 1:6, 1:19, 1:22, 2:8, 2:12, 40:19, 79:14
**damage** [1] - 72:4
**dark** [1] - 19:25
**data** [1] - 68:21
**date** [2] - 26:17, 78:10
**Dated** [1] - 79:10
**dates** [1] - 50:17
**DAVID** [1] - 2:6
**Davis** [10] - 3:2, 9:7, 9:8, 14:2, 18:21, 20:4, 21:16, 32:17, 73:6, 73:22
**DAVIS** [4] - 1:20, 9:9, 73:1, 74:9
**Davis's** [1] - 73:18
**DAY** [1] - 1:13
**day's** [1] - 45:16
**deal** [7] - 10:15, 28:23, 34:13, 34:15, 38:23, 42:11, 68:6
**dealing** [19] - 8:9, 11:25, 12:6, 12:7, 12:13, 12:23, 13:10, 26:2, 30:24, 32:4, 36:3, 40:12, 51:23, 60:2, 70:8, 71:19, 72:2, 77:8
**debts** [1] - 57:8
**decades** [2] - 14:9, 15:25
**December** [1] - 40:18
**decide** [2] - 12:8, 64:3
**decided** [8] - 16:6, 21:6, 38:11, 38:13, 38:16, 41:17, 64:24, 67:4
**decision** [22] - 10:9, 10:11, 10:14, 12:2, 41:14, 49:4, 49:6, 49:7, 50:19, 51:12, 51:19, 52:11, 52:12, 53:5, 60:15, 60:17, 70:17, 70:22, 70:25, 71:24, 72:12, 76:25
**decisions** [5] - 31:4,

71:6, 76:20, 76:22
**declaration** [1] - 40:17
**declare** [1] - 40:19
**declaring** [1] - 56:3
**decreased** [3] - 43:22, 43:24, 44:1
**default** [1] - 49:24
**Defendant** [1] - 11:7
**DEFENDANTS** [1] - 2:5
**Defendants** [14] - 1:8, 4:10, 4:18, 7:2, 7:9, 8:7, 8:11, 8:19, 49:10, 50:10, 56:14, 67:23, 68:25, 74:4
**Defendants'** [1] - 73:14
**defense** [3] - 37:21, 65:19, 69:25
**deferred** [4] - 47:18, 48:1, 48:16, 48:23
**defined** [1] - 67:14
**definitely** [3] - 13:13, 25:4, 27:18
**deliberately** [1] - 62:20
**deliberations** [2] - 8:23, 9:3
**deliver** [2] - 9:7, 47:14
**deliverables** [2] - 69:10, 69:11
**DeMarco** [47] - 10:25, 28:4, 28:5, 31:16, 32:6, 38:10, 40:17, 41:15, 41:24, 42:1, 43:4, 43:12, 45:17, 45:19, 45:20, 46:5, 46:19, 49:2, 52:1, 53:8, 54:7, 54:13, 54:19, 56:17, 57:14, 57:16, 58:12, 59:24, 61:10, 62:1, 62:9, 62:14, 62:20, 63:10, 63:23, 63:24, 64:2, 64:14, 66:1, 68:17, 69:12, 70:1, 70:5, 70:22
**DeMarco's** [2] - 42:16, 58:9
**deny** [1] - 8:11
**Department** [2] - 64:4, 64:9
**deposition** [5] - 75:7, 75:13, 75:18, 75:25
**Depression** [1] - 15:25
**depriving** [1] - 64:15
**deputies** [2] - 28:4,

60:8
**DEPUTY** [2] - 4:1, 5:15
**deputy** [3] - 28:6, 63:23, 63:25
**description** [1] - 5:24
**designation** [2] - 56:4, 75:1
**designations** [1] - 7:25
**designed** [1] - 35:5
**despite** [3] - 69:14, 69:16
**destroy** [1] - 77:11
**destroyed** [2] - 65:9, 70:14
**detail** [1] - 6:15
**detailed** [1] - 8:22
**details** [1] - 12:21
**determine** [2] - 25:20, 54:9
**determined** [1] - 26:23
**Dharan** [6] - 24:12, 47:21, 48:17, 49:25, 54:23, 71:12
**differ** [1] - 41:10
**differences** [1] - 18:3
**different** [5] - 25:6, 58:24, 65:19, 72:8, 76:15
**diminish** [1] - 29:2
**dipping** [1] - 37:15
**dire** [2] - 4:21, 39:25
**direct** [1] - 27:4
**direction** [2] - 42:16
**director** [5] - 10:25, 21:10, 63:17, 63:24, 75:19
**directors** [1] - 24:1
**discussion** [2] - 11:9, 45:18
**disregarded** [1] - 52:4
**disrupt** [1] - 73:22
**distant** [1] - 47:17
**distinction** [1] - 19:4
**distribution** [1] - 17:16
**distributions** [1] - 26:11
**district** [1] - 79:13
**District** [2] - 2:10, 2:11, 79:13
**DISTRICT** [3] - 1:1, 1:1, 1:14
**dividend** [27] - 17:15, 17:16, 23:12, 23:14, 23:18, 23:21,

23:23, 24:2, 24:16, 24:18, 31:24, 33:6, 38:17, 38:20, 41:1, 41:21, 42:14, 42:17, 43:5, 43:14, 43:21, 44:6, 46:1, 56:2, 58:17, 69:4
**dividends** [9] - 17:17, 26:10, 26:25, 30:19, 39:15, 56:4, 56:6, 59:6
**document** [4] - 25:18, 58:11, 70:25, 74:20
**documents** [5] - 7:24, 61:4, 74:15, 74:22, 74:23
**dollar** [2] - 67:9, 67:11
**dollars** [5] - 23:10, 25:2, 31:25, 49:1, 77:1
**done** [5] - 40:2, 52:20, 53:1, 55:20, 68:20
**doubt** [1] - 61:22
**down** [47] - 16:19, 21:1, 23:20, 24:17, 34:19, 37:15, 42:25, 43:2, 43:3, 43:23, 44:7, 44:12, 45:3, 47:4, 47:5, 47:22, 48:1, 48:3, 55:4, 55:12, 56:20, 58:21, 59:5, 60:11, 60:16, 60:22, 61:8, 61:21, 61:24, 62:6, 62:19, 62:21, 63:2, 63:7, 64:7, 65:2, 65:15, 67:4, 67:15, 68:3, 68:13, 68:15, 68:18
**downs** [1] - 16:8
**Dr** [6] - 24:12, 47:21, 48:17, 49:25, 54:23, 71:12
**draft** [1] - 41:22
**dragged** [1] - 21:1
**drama** [1] - 74:20
**draw** [19] - 23:12, 23:13, 24:17, 42:18, 42:20, 42:25, 43:3, 43:20, 44:5, 44:6, 47:4, 47:5, 52:2, 54:25, 55:3, 55:11, 55:12, 56:24, 59:5
**drawing** [5] - 42:15, 42:25, 43:2, 58:21, 61:24
**drawn** [6] - 38:18, 38:24, 43:20, 43:21,

44:12, 55:4
**draws** [9] - 43:7, 43:13, 44:11, 53:13, 54:20, 56:5, 56:19, 57:12, 60:5
**dream** [1] - 14:17
**drew** [3] - 23:16, 23:20, 67:15
**driving** [1] - 59:12
**dropped** [1] - 68:11
**DTA** [6] - 47:10, 47:19, 47:20, 48:2, 48:9
**DTAs** [2] - 48:15, 49:5
**duration** [5] - 21:24, 27:6, 28:8, 32:10, 40:8
**during** [21] - 9:2, 9:16, 11:9, 15:22, 15:24, 17:18, 19:1, 20:19, 21:11, 24:24, 26:6, 26:7, 26:12, 28:15, 29:5, 29:21, 30:10, 31:6, 37:21, 44:15, 66:6

# E

**earn** [1] - 22:11
**earned** [3] - 17:9, 29:24, 69:3
**earning** [1] - 22:7
**eat** [1] - 43:13
**eaten** [1] - 55:2
**Economic** [1] - 30:11
**economic** [1] - 46:12
**economics** [1] - 74:17
**economy** [8] - 9:19, 23:1, 37:3, 37:11, 37:16, 37:17, 46:14, 52:15
**Ed** [2] - 45:17
**edited** [1] - 62:2
**Edward** [5] - 10:25, 28:4, 28:5, 32:6, 40:16
**Edwards** [1] - 79:12
**EDWARDS** [2] - 2:9, 79:3
**effect** [2] - 10:10, 41:8
**effort** [1] - 76:12
**efforts** [1] - 37:2
**egregious** [1] - 13:7
**either** [5] - 12:9, 12:10, 62:22, 73:10, 78:5

484

**elderly** [1] - 10:19
**elements** [1] - 76:16
**eliminate** [1] - 60:12
**email** [1] - 55:22
**emerged** [1] - 60:14
**employment** [1] - 12:10
**enabling** [3] - 18:13, 46:1, 58:16
**encourage** [1] - 76:10
**end** [14] - 8:22, 8:24, 27:19, 27:20, 28:15, 28:17, 32:1, 36:10, 37:13, 55:24, 65:23, 66:2, 71:20, 77:17
**ended** [1] - 39:17
**engage** [1] - 70:18
**enormous** [1] - 9:18
**ensure** [1] - 21:19
**entered** [3] - 5:16, 23:2, 30:3
**entering** [1] - 13:3
**enterprises** [6] - 7:5, 7:12, 19:3, 40:25, 41:12
**entire** [2] - 19:16, 39:4
**entities** [2] - 18:22, 20:10
**entitled** [8] - 29:25, 30:1, 31:16, 54:1, 63:10, 63:13, 70:2, 74:4
**entity** [1] - 18:24
**equal** [1] - 43:5
**equals** [1] - 27:13
**erode** [1] - 43:13
**erosion** [4] - 40:25, 41:12, 43:15, 57:18
**especially** [4] - 20:18, 24:2, 63:4, 71:10
**ESQ** [10] - 1:17, 1:20, 1:20, 1:23, 2:2, 2:5, 2:5, 2:6, 2:6, 2:7
**essence** [1] - 45:18
**essential** [2] - 17:23, 22:25
**establish** [2] - 72:22, 74:12
**et** [2] - 1:3, 1:7
**event** [1] - 39:25
**eventually** [1] - 66:24
**evidence** [42] - 6:1, 6:3, 6:4, 8:12, 10:8, 11:23, 12:2, 12:20, 18:11, 25:24, 29:3, 30:2, 33:14, 33:18,

34:24, 36:6, 38:1, 41:14, 44:18, 46:10, 47:1, 49:14, 49:19, 50:7, 50:16, 51:22, 51:23, 52:22, 52:23, 57:22, 60:7, 61:22, 61:25, 62:2, 62:13, 67:19, 70:9, 71:23, 72:9, 77:15, 77:19
**exact** [1] - 28:11
**exactly** [5] - 10:4, 36:7, 50:17, 50:25, 70:10
**examined** [1] - 52:6
**example** [1] - 75:17
**exceed** [1] - 54:2
**excess** [3] - 39:19, 41:9, 66:10
**exchange** [2] - 11:13, 15:12
**exciting** [1] - 76:17
**excuses** [1] - 40:15
**executives** [3] - 49:11, 66:16, 66:17
**exercise** [1] - 35:25
**exercised** [2] - 9:12, 64:18
**exhaust** [1] - 47:5
**exist** [2] - 28:20, 47:18
**existed** [1] - 49:21
**exists** [3] - 12:1, 21:20, 65:23
**exit** [1] - 66:15
**exited** [2] - 68:7, 78:13
**expect** [11] - 26:6, 28:6, 28:7, 28:12, 34:2, 35:16, 37:18, 51:19, 52:7, 53:6, 53:24
**expectation** [2] - 29:4, 31:20
**expectations** [24] - 8:21, 13:1, 25:23, 25:25, 29:8, 29:17, 30:9, 34:25, 35:11, 35:15, 35:17, 35:18, 36:2, 36:8, 63:5, 63:15, 64:20, 64:21, 64:22, 69:10, 69:11, 70:9, 72:1
**expected** [4] - 29:10, 33:15, 34:21, 38:7
**expects** [2] - 13:3, 33:23
**expert** [1] - 76:5
**experts** [7] - 25:4, 42:19, 53:10, 54:8, 74:17, 76:3

**explain** [6] - 6:15, 18:25, 24:13, 42:19, 48:17, 54:24, 72:19, 73:7, 74:10, 76:4
**explained** [3] - 7:19, 61:25, 67:12
**explaining** [1] - 40:18
**explanation** [1] - 43:17
**explicitly** [1] - 28:13
**expressed** [1] - 47:12
**extent** [1] - 56:2
**extra** [1] - 33:6
**extreme** [2] - 9:13, 40:1, 54:13

## F

**face** [1] - 20:10
**facing** [1] - 5:1
**fact** [8] - 17:11, 22:17, 35:10, 36:13, 46:12, 48:18, 50:24, 69:15
**factors** [1] - 47:17
**facts** [5] - 50:2, 72:22, 74:12, 74:16, 76:5
**fail** [2] - 22:25, 33:25
**fails** [1] - 34:1
**fair** [18] - 8:9, 11:25, 12:5, 12:7, 12:13, 12:23, 26:1, 28:23, 30:24, 32:4, 36:3, 40:12, 60:2, 70:7, 71:19, 72:2, 75:10, 77:8
**FAIRHOLME** [1] - 1:3
**fairness** [1] - 13:21
**faith** [17] - 8:9, 11:25, 12:5, 12:7, 12:13, 12:23, 26:1, 28:22, 30:23, 32:4, 36:3, 40:12, 60:2, 70:7, 71:18, 72:2, 77:8
**fall** [1] - 70:16
**families** [1] - 17:10
**fancy** [1] - 21:25
**FANNIE** [1] - 1:10, 2:5
**Fannie** [179] - 4:3, 6:14, 7:4, 7:7, 7:9, 7:11, 7:15, 7:20, 8:3, 8:10, 9:17, 9:22, 9:23, 9:24, 10:23, 11:12, 11:17, 11:21, 12:4,

12:6, 14:7, 14:8, 14:11, 14:14, 14:24, 15:2, 15:3, 15:12, 15:15, 15:24, 16:1, 16:2, 16:9, 16:12, 16:15, 16:17, 17:2, 17:9, 17:11, 17:12, 17:23, 18:10, 18:13, 18:16, 19:5, 19:13, 19:15, 19:18, 19:21, 19:23, 20:1, 20:6, 20:8, 20:11, 20:18, 20:19, 20:23, 20:24, 21:4, 21:9, 21:13, 22:1, 22:14, 22:16, 22:21, 22:22, 22:23, 22:25, 23:3, 23:12, 23:16, 24:1, 24:5, 24:6, 24:8, 24:15, 24:21, 25:5, 25:9, 25:10, 26:5, 27:7, 28:8, 28:14, 28:18, 28:20, 29:5, 29:14, 29:20, 29:23, 30:4, 31:4, 31:8, 31:21, 33:15, 34:17, 35:3, 35:5, 35:6, 36:12, 36:13, 36:15, 37:3, 37:18, 38:2, 38:9, 38:14, 38:20, 39:5, 39:10, 40:4, 42:4, 42:13, 42:15, 43:6, 43:16, 45:1, 46:13, 46:15, 46:17, 47:9, 47:24, 48:20, 48:22, 49:12, 49:22, 50:2, 50:3, 50:7, 50:20, 50:24, 51:3, 51:4, 54:11, 54:14, 56:7, 56:22, 57:23, 57:24, 59:4, 59:7, 59:15, 59:24, 60:10, 60:11, 60:16, 60:18, 60:23, 62:6, 62:15, 62:19, 62:21, 62:25, 63:19, 64:10, 64:15, 64:25, 65:2, 65:3, 65:10, 65:21, 66:4, 66:11, 66:14, 66:17, 66:20, 67:1, 67:4, 67:5, 67:9, 67:14, 67:16, 67:20, 68:6, 68:22, 70:22, 75:21, 76:22
**far** [2] - 53:25, 73:9
**Fargo** [1] - 25:1
**fast** [1] - 53:19
**favor** [1] - 77:18
**fear** [2] - 45:4, 45:5
**February** [1] - 37:8
**Federal** [4] - 6:11,

6:13, 7:2, 11:2
**federal** [5] - 8:3, 16:1, 16:3, 16:4, 16:7
**FEDERAL** [1] - 1:6
**fees** [1] - 50:4
**fellow** [1] - 35:14
**few** [4] - 72:21, 72:22, 74:12
**FHFA** [49] - 2:5, 7:3, 7:6, 7:9, 10:25, 11:7, 11:12, 11:16, 11:20, 12:2, 12:6, 21:8, 21:10, 21:14, 21:23, 22:13, 23:3, 26:3, 26:18, 28:6, 28:24, 29:4, 29:10, 30:18, 31:3, 35:1, 35:2, 35:4, 35:12, 35:23, 35:24, 38:13, 40:4, 40:6, 40:7, 41:25, 50:3, 56:3, 57:25, 63:7, 63:19, 67:1, 68:7, 70:6, 72:12, 72:23, 74:13, 75:19
**FHFA's** [5] - 25:21, 35:24, 63:17, 64:21, 71:24
**fields** [1] - 76:3
**figure** [1] - 53:21
**finally** [3] - 67:3, 67:4, 76:2
**finals** [1] - 39:3
**Finance** [2] - 7:3, 11:3
**FINANCE** [1] - 1:6
**finance** [5] - 9:19, 58:25, 60:9, 76:3, 76:23
**financial** [21] - 9:14, 9:16, 24:24, 26:22, 36:9, 47:9, 48:1, 48:8, 49:22, 51:21, 53:10, 53:11, 54:8, 54:9, 66:6, 67:25, 69:8, 74:16, 74:25, 76:8
**first** [31] - 14:7, 15:11, 15:25, 21:10, 22:20, 24:11, 26:7, 29:18, 29:19, 29:20, 36:13, 36:14, 36:16, 36:18, 39:20, 41:7, 41:8, 41:19, 41:20, 51:1, 55:15, 57:7, 57:8, 58:23, 63:17, 66:10, 70:23, 71:12, 71:24, 74:18, 75:18
**fit** [1] - 15:23
**fixed** [2] - 41:1, 55:24
**flawed** [1] - 62:10

485

**FLEXNER** [1] - 1:21
**flowing** [1] - 21:5
**focus** [2] - 44:3, 48:10
**folks** [1] - 69:2
**follow** [2] - 51:17, 72:17
**following** [4] - 5:17, 73:3, 74:7, 78:14
**foolish** [1] - 49:11
**foolproof** [1] - 57:15
**FOR** [4] - 1:1, 1:17, 1:20, 2:5
**force** [1] - 20:4
**forced** [2] - 10:4, 20:2
**foreclosing** [1] - 51:6
**foregoing** [2] - 40:20, 79:4
**foremost** [1] - 29:19
**forever** [7] - 10:6, 11:22, 38:22, 43:6, 52:16, 69:13
**forgot** [1] - 73:20
**form** [1] - 71:20
**formed** [1] - 8:2
**former** [1] - 47:9
**forms** [1] - 25:24
**forward** [2] - 16:14, 68:24
**founded** [1] - 11:11
**four** [3] - 6:21, 36:14, 37:2
**freak** [1] - 56:21
**FREDDIE** [1] - 2:6
**Freddie** [152] - 6:12, 7:4, 7:7, 7:9, 7:11, 7:15, 7:21, 8:3, 8:10, 9:18, 9:22, 9:24, 10:23, 11:12, 11:17, 11:21, 12:4, 12:6, 14:8, 14:11, 14:14, 14:24, 15:2, 15:3, 15:12, 15:15, 16:17, 17:2, 17:10, 17:11, 17:13, 17:23, 18:11, 18:13, 18:17, 19:5, 19:15, 19:18, 19:21, 19:23, 20:7, 20:8, 20:11, 20:18, 20:19, 20:23, 20:24, 21:4, 21:9, 21:13, 22:1, 22:14, 22:17, 22:21, 22:22, 22:23, 22:25, 23:3, 23:13, 24:1, 24:5, 24:6, 24:8, 24:16, 24:22, 25:5, 25:9, 26:5, 28:14, 28:20, 29:5, 29:14,

29:20, 29:23, 30:4, 31:4, 31:21, 33:15, 34:17, 35:6, 36:12, 36:13, 36:18, 37:19, 38:9, 38:20, 39:10, 40:5, 42:4, 42:13, 42:15, 43:6, 43:17, 45:1, 46:14, 46:15, 46:17, 47:24, 48:20, 48:22, 49:12, 49:22, 50:2, 50:3, 50:7, 50:20, 50:25, 51:3, 51:4, 54:11, 56:7, 56:22, 57:23, 57:24, 59:4, 59:7, 59:15, 59:24, 60:10, 60:12, 60:16, 60:18, 60:23, 62:6, 62:15, 62:19, 62:21, 64:10, 64:15, 64:25, 65:2, 65:3, 65:11, 65:21, 66:5, 66:11, 66:14, 66:21, 67:4, 67:5, 67:10, 67:14, 67:16, 68:6, 68:23, 70:23, 75:21, 76:23
**Freddie's** [18] - 19:13, 20:1, 25:10, 27:7, 28:8, 28:18, 31:9, 35:3, 37:4, 38:2, 38:14, 39:6, 54:14, 62:25, 63:20, 66:17, 67:1, 67:20
**free** [1] - 71:5
**fresh** [1] - 10:20
**friend's** [1] - 33:24
**front** [3] - 23:10, 32:1, 55:21
**frustrate** [1] - 13:4
**frustrated** [1] - 8:20
**fulfill** [7] - 14:15, 18:13, 20:19, 22:3, 27:8, 28:10, 62:17
**full** [2] - 21:3, 79:5
**full-blown** [1] - 21:3
**fully** [2] - 24:13, 25:7
**fund** [1] - 14:9, 17:6, 19:6
**fundamental** [2] - 13:17, 49:20
**fundamentals** [1] - 46:12
**funded** [4] - 16:10, 16:11, 19:7, 31:9
**funders** [1] - 16:15
**funding** [5] - 18:10, 18:14, 18:15, 18:16, 56:6
**FUNDS** [1] - 1:3
**funds** [3] - 17:4,

17:20
**future** [11] - 11:22, 12:3, 34:14, 43:12, 46:2, 47:17, 48:6, 48:8, 54:12, 58:17, 69:5

**G**

**games** [1] - 39:3
**generated** [2] - 51:5, 52:24
**generating** [2] - 45:25, 58:15
**gentlemen** [18] - 5:19, 9:10, 11:19, 24:20, 29:16, 32:5, 32:15, 33:9, 36:4, 37:25, 40:11, 41:6, 44:10, 50:15, 58:7, 60:15, 64:23, 68:12
**genuinely** [1] - 64:14
**get-out-of-jail-free** [1] - 71:5
**given** [4] - 13:1, 31:23, 68:22, 69:6
**global** [1] - 9:19
**goal** [2] - 29:5, 64:7
**Google** [1] - 17:2
**governance** [1] - 8:4
**governed** [1] - 12:12
**Government** [1] - 19:14
**government** [49] - 7:5, 7:12, 7:16, 9:12, 9:20, 10:4, 10:24, 11:7, 13:11, 13:21, 13:22, 13:25, 16:2, 16:3, 16:4, 16:7, 16:9, 16:12, 17:14, 18:15, 18:22, 18:24, 19:2, 19:3, 19:5, 19:11, 19:13, 20:1, 20:6, 20:8, 20:11, 20:14, 21:6, 25:5, 31:11, 52:8, 52:9, 52:11, 52:12, 59:3, 63:11, 65:18, 65:21, 66:4, 70:11, 70:15, 70:17, 70:19, 76:21
**government's** [2] - 24:4, 24:5
**government-chartered** [1] - 17:14
**government-owned** [1] - 19:3
**government-sponsored** [6] - 7:5, 7:12, 7:16, 18:22,

18:24, 19:2
**graphs** [1] - 75:5
**grass** [1] - 57:3
**grateful** [1] - 77:23
**gray** [1] - 43:23
**great** [2] - 10:15, 68:6
**Great** [1] - 15:24
**green** [1] - 57:3
**grossly** [1] - 10:10
**GROSSMAN** [1] - 2:3
**ground** [1] - 33:25
**group** [4] - 15:11, 15:14, 16:19, 21:17
**groups** [3] - 15:10, 15:16, 15:20
**growth** [1] - 59:11
**GSE** [2] - 19:1, 62:6
**GSEs** [18] - 7:6, 8:4, 23:15, 24:3, 25:22, 35:24, 43:15, 45:24, 51:7, 58:15, 60:13, 61:9, 61:18, 62:10, 63:6, 64:7, 65:24, 69:17
**GSEs'** [1] - 19:7
**guarantee** [3] - 32:21, 32:22, 69:20
**guaranteed** [4] - 33:5, 34:20, 69:22
**guard** [1] - 58:21
**guardian** [1] - 21:17
**guess** [4] - 28:7, 41:25, 45:13, 78:8
**gutted** [1] - 66:4
**guy** [1] - 68:17

**H**

**half** [2] - 36:13, 66:25
**Hamish** [2] - 4:8, 14:3
**HAMISH** [1] - 1:20
**Hampshire** [1] - 1:18
**hand** [1] - 75:15
**hands** [1] - 14:6
**hard** [2] - 9:21, 17:9
**hard-earned** [1] - 17:9
**harder** [1] - 15:7
**harm** [4] - 9:14, 10:15, 65:17, 77:1
**harmed** [1] - 10:18
**hate** [1] - 72:10
**head** [1] - 58:9
**health** [1] - 28:25
**hear** [30] - 17:11, 17:17, 19:1, 25:3,

25:4, 25:24, 27:6, 30:10, 31:16, 35:22, 37:2, 44:17, 45:4, 45:6, 49:10, 56:13, 58:12, 65:18, 67:22, 68:25, 69:2, 69:25, 70:4, 72:9, 72:21, 74:11, 74:24, 75:6, 75:17, 77:7
**heard** [9] - 11:6, 11:24, 14:11, 14:12, 15:18, 21:18, 28:18, 30:18, 50:25
**hearing** [2] - 71:23, 76:2
**held** [4] - 8:17, 33:11, 75:15
**help** [4] - 25:2, 61:8, 76:4
**helped** [3] - 14:9, 20:19, 41:22
**helping** [2] - 33:24, 41:25
**HERA** [9] - 30:9, 30:10, 31:1, 31:3, 31:7, 31:12, 35:1, 35:12, 35:23
**hereby** [1] - 79:3
**high** [5] - 20:24, 21:2, 65:11, 69:10, 69:11
**high-quality** [1] - 21:2
**higher** [3] - 15:7, 37:14, 50:4
**himself** [5] - 46:9, 53:8, 61:20, 66:1, 69:15
**hindsight** [1] - 50:11
**history** [2] - 10:12, 50:5
**hit** [3] - 45:11, 45:13, 53:19
**Hmm** [1] - 53:11
**HOFFMAN** [1] - 2:5
**hold** [1] - 7:23
**holders** [1] - 7:20
**Home** [1] - 6:11
**home** [7] - 7:13, 7:14, 12:11, 14:18, 27:14, 37:7, 37:8
**homebuyers** [2] - 14:20, 15:1
**homeownership** [1] - 66:12
**homes** [4] - 15:4, 15:8, 20:21, 21:1
**Honor** [8] - 4:6, 4:22, 5:12, 9:9, 72:24, 73:2, 73:5, 73:20

486

**Honor's** [1] - 73:16
**HONORABLE** [1] -
1:14
**hope** [3] - 6:2, 38:3,
76:18
**hopefully** [2] - 27:19
**hopes** [1] - 63:1
**horizon** [1] - 20:12
**Housing** [3] - 7:3,
11:2, 30:11
**housing** [19] - 9:19,
16:8, 17:24, 19:16,
19:24, 20:22, 21:3,
23:1, 36:11, 37:5,
37:17, 46:16, 49:20,
50:1, 58:25, 60:8,
63:22, 66:13, 76:23
**HOUSING** [1] - 1:6
**huge** [1] - 76:20
**HUME** [10] - 1:20,
4:6, 4:8, 4:13, 4:15,
4:22, 4:24, 5:10, 5:13,
9:6
**Hume** [3] - 4:8, 14:3,
76:12
**hundreds** [3] - 25:1,
66:6, 76:25
**hurt** [1] - 70:2

**I**

**IAN** [1] - 2:5
**idea** [2] - 13:2, 55:16
**ideas** [1] - 19:22
**illustration** [1] - 45:7
**imagine** [1] - 39:21
**impact** [7] - 14:12,
20:22, 39:14, 53:22,
57:4, 76:22, 76:23
**impacted** [3] - 21:1,
50:2, 76:25
**impacts** [1] - 55:9
**implemented** [1] -
26:3
**implied** [8] - 8:8,
8:14, 8:15, 8:18,
11:25, 12:5, 13:12,
36:2
**importance** [1] -
76:19
**important** [20] -
13:21, 18:9, 19:4,
19:17, 22:5, 22:17,
23:1, 24:2, 24:15,
25:17, 43:8, 47:12,
54:19, 55:14, 59:1,
64:23, 74:21, 74:22,
77:3, 77:4
**imposed** [1] - 21:19

**impossible** [5] -
12:15, 22:10, 53:1,
57:23, 57:24
**improve** [1] - 37:3
**improvement** [2] -
37:18, 46:16
**improving** [1] - 51:9
**IN** [1] - 1:10
**inadequate** [1] -
10:10
**INC** [1] - 1:3
**include** [1] - 6:18
**includes** [1] - 7:24
**including** [3] - 6:19,
8:16, 20:23
**income** [1] - 56:3
**increase** [7] - 40:23,
41:4, 48:25, 55:7,
55:8, 56:15, 56:25
**increased** [4] -
43:25, 44:2, 55:10,
67:17
**increases** [1] - 57:3
**increasing** [1] - 7:13
**incredibly** [2] -
17:14, 77:23
**indeed** [1] - 51:3
**indefinitely** [1] -
31:10
**independent** [2] -
74:17, 76:6
**indicating** [1] - 68:21
**indulgence** [1] - 73:1
**inflection** [1] - 46:13
**inform** [4] - 8:5, 30:8,
31:2, 32:3
**information** [8] -
32:2, 35:12, 39:23,
50:18, 74:25, 75:2,
75:4, 75:5
**informed** [3] - 31:20,
34:25, 35:15
**informs** [2] - 30:12,
30:22
**inherited** [1] - 9:17
**initial** [1] - 55:7
**inside** [2] - 58:9,
76:20
**instances** [1] - 17:5
**instead** [9] - 24:4,
34:21, 38:16, 43:2,
53:12, 53:14, 57:12,
59:7, 64:8
**institutions** [3] -
10:22, 14:22, 19:16
**instruct** [4] - 8:12,
30:13, 70:5, 70:21
**instructed** [2] -
52:22, 64:17
**instruction** [6] -

4:16, 35:22, 73:9,
73:13, 73:23, 74:3
**Instruction** [1] - 4:17
**instructions** [5] -
5:23, 8:22, 8:25, 9:2,
74:5
**insurance** [5] - 6:18,
6:24, 10:21, 17:20,
24:25
**Insurance** [3] - 6:19,
6:23, 17:21
**intends** [1] - 73:10
**intent** [1] - 73:22
**intention** [2] - 40:22,
41:2
**interest** [11] - 31:8,
31:17, 35:24, 64:16,
70:1, 70:2, 70:6,
70:13, 70:16, 71:3,
71:4
**interfered** [1] - 8:20
**invest** [5] - 17:3,
22:20, 29:22, 32:17,
56:22
**invested** [1] - 10:22,
17:6, 17:9, 17:22,
18:12, 20:15, 20:17,
34:3, 34:9, 34:22,
66:5
**investing** [1] - 33:23
**investment** [5] -
20:16, 20:18, 34:20,
38:4, 68:4
**investments** [3] -
17:12, 24:23, 28:19
**investor** [2] - 8:6,
33:22
**investors** [19] - 14:8,
15:10, 15:11, 15:14,
15:19, 15:20, 15:21,
17:22, 34:19, 35:7,
43:15, 43:16, 54:21,
54:23, 55:14, 56:21,
57:4, 57:20
**investors'** [1] - 34:25
**involved** [2] - 12:9,
12:19
**issue** [2] - 51:20,
56:24
**issued** [2] - 7:17,
23:4
**itself** [2] - 16:1,
22:16

**J**

**jail** [1] - 71:5
**James** [4] - 20:7,
21:10, 21:23, 32:5

**January** [1] - 43:10
**job** [7] - 9:17, 9:25,
21:22, 22:4, 37:25,
61:20, 62:23
**Joe** [2] - 17:8, 17:19
**JONATHAN** [1] - 2:6
**JONES** [1] - 2:7
**Jordan** [1] - 53:9
**Joseph** [1] - 6:9
**JUDGE** [1] - 1:14
**Judge** [9] - 9:6, 11:6,
11:24, 25:19, 70:4,
72:19, 74:9
**judge** [6] - 30:13,
35:21, 36:5, 52:22,
70:21, 76:9
**July** [2] - 1:7, 79:10
**June** [8] - 45:14,
46:6, 58:11, 58:14,
58:18, 59:9
**junior** [1] - 7:20
**jurors** [1] - 5:3
**JURY** [2] - 1:13, 5:20
**jury** [17] - 4:5, 4:9,
5:6, 5:14, 5:15, 5:16,
9:1, 11:19, 73:4, 78:5,
78:13
**justification** [2] -
44:8, 70:17

**K**

**KAYE** [1] - 2:7
**keep** [8] - 20:9,
24:24, 26:15, 30:21,
42:6, 44:6, 62:6, 67:5
**keeping** [1] - 21:4,
21:5, 56:20
**keeps** [1] - 56:20
**Kenya** [1] - 14:2
**KENYA** [1] - 1:20
**kept** [3] - 13:22,
44:4, 61:11
**KESSLER** [1] - 1:23
**key** [4] - 21:4, 25:20,
46:15, 77:6
**KHALELAH** [1] -
1:20
**kicking** [1] - 68:12
**kicks** [1] - 71:17
**kind** [11] - 23:24,
24:19, 42:21, 54:18,
54:24, 55:6, 55:8,
55:13, 56:9, 56:23,
56:24
**King** [1] - 1:24
**KIRK** [1] - 1:18
**knee** [1] - 68:15
**knock** [1] - 68:14

**knocked** [1] - 68:17
**knows** [1] - 46:8
**KRAVETZ** [1] - 2:2
**Kravetz** [2] - 14:3,
76:13

**L**

**ladies** [18] - 5:19,
9:10, 11:19, 24:20,
29:16, 32:5, 32:15,
33:9, 36:4, 37:25,
40:11, 41:6, 44:10,
50:15, 58:7, 60:15,
64:23, 68:12
**Lamberth** [7] - 9:6,
11:6, 11:24, 25:19,
70:5, 72:19, 74:9
**LAMBERTH** [1] -
1:14
**lane** [1] - 62:24
**large** [5] - 17:22,
34:7, 43:11, 45:25,
58:15
**larger** [2] - 37:10,
37:16
**largest** [1] - 50:5
**last** [3] - 32:5, 37:16,
73:13
**laughter** [1] - 78:9
**law** [5] - 7:21, 8:1,
8:4, 36:5, 77:13
**laws** [1] - 40:19
**lawyer** [2] - 4:25,
67:22
**lawyers** [1] - 75:8
**leading** [1] - 50:5
**learn** [13] - 10:1,
10:8, 11:10, 29:21,
36:10, 46:13, 48:6,
49:19, 54:7, 62:9,
66:7, 66:24, 69:4
**least** [3] - 32:5, 32:6,
75:25
**leave** [3] - 56:21,
61:22, 78:4
**lectern** [1] - 4:24
**led** [1] - 57:18
**Lee** [4] - 14:3, 73:12,
74:1
**LEE** [1] - 1:23
**left** [5] - 27:25,
33:13, 39:10, 44:8
**legal** [1] - 8:13
**legislation** [1] -
30:15
**lemonade** [1] - 13:11
**lend** [2] - 15:6, 15:12
**lenders** [1] - 14:21

**lens** [2] - 35:9, 35:19
**less** [8] - 15:5, 34:11, 37:4, 47:4, 49:23, 58:19, 68:4
**letting** [1] - 62:6
**level** [1] - 65:12
**liabilities** [1] - 27:17
**liable** [2] - 70:7, 70:21
**life** [2] - 14:13, 16:24
**light** [1] - 63:4
**likely** [1] - 49:23
**limbo** [2] - 10:17, 65:5
**limine** [1] - 73:16
**limit** [1] - 43:9
**limited** [8] - 21:24, 27:6, 28:8, 32:10, 40:8, 72:20, 73:7, 74:10
**line** [5] - 27:25, 34:11, 43:23, 57:7, 71:12
**liquidated** [2] - 24:7, 24:8
**liquidation** [13] - 24:10, 38:18, 43:25, 44:2, 55:9, 56:15, 57:1, 57:3, 57:6, 57:10, 67:10, 67:12, 67:16
**liquidity** [1] - 7:13
**LISA** [2] - 2:9, 79:3
**Lisa** [1] - 79:12
**listen** [5] - 6:4, 25:3, 63:10, 64:1, 65:11
**LITIGATION** [1] - 1:11
**Litigations** [1] - 4:4
**LITOWITZ** [1] - 2:2
**live** [1] - 75:24
**LLP** [3] - 1:21, 1:23, 2:3
**Loan** [1] - 6:11
**loan** [2] - 15:1, 69:3
**loaned** [1] - 43:15
**loans** [3] - 21:2, 49:22, 50:4
**local** [1] - 14:20
**lock** [1] - 12:22
**Lockhart** [11] - 20:7, 21:10, 21:13, 21:23, 26:4, 26:7, 32:6, 63:18, 63:24, 64:1, 75:18
**Lockhart's** [3] - 28:3, 28:5, 63:23
**long-term** [1] - 22:9
**look** [20] - 26:17, 33:25, 37:6, 37:9,

37:12, 37:25, 40:13, 41:7, 42:11, 48:3, 48:6, 50:16, 50:17, 50:22, 52:23, 55:15, 57:5, 71:22, 76:20
**Look** [3] - 31:22, 32:17, 56:19
**looked** [6] - 51:14, 51:15, 52:17, 59:19
**looking** [10] - 30:24, 38:6, 40:15, 50:11, 50:13, 59:18, 69:7, 69:14
**looks** [2] - 24:14, 43:19
**lose** [4] - 26:8, 26:15, 45:1, 59:4
**loses** [1] - 18:19
**losing** [4] - 33:20, 42:6, 47:24, 59:23
**losses** [2] - 16:4, 56:7
**lost** [3] - 10:22, 16:3, 65:15
**LOUIS** [1] - 2:6
**low** [2] - 69:9, 69:11
**lower** [1] - 50:4
**lunch** [2] - 78:2, 78:4

---

## M

**Mac** [29] - 4:3, 6:12, 7:4, 7:7, 7:9, 7:11, 7:15, 7:21, 8:3, 8:10, 9:18, 12:4, 12:6, 14:8, 14:11, 14:14, 16:18, 17:2, 17:10, 18:11, 22:1, 30:4, 31:22, 36:18, 56:8, 64:10, 65:11
**MAC** [2] - 1:10, 2:6
**Mac's** [1] - 11:21
**machine** [3] - 52:10, 52:11
**MAE** [1] - 2:5
**Mae** [34] - 6:14, 7:4, 7:7, 7:9, 7:11, 7:15, 7:21, 8:3, 8:10, 9:17, 11:21, 12:4, 12:6, 14:7, 14:8, 14:11, 14:14, 15:24, 16:1, 16:2, 16:15, 16:17, 17:2, 17:10, 18:10, 22:1, 30:4, 31:21, 36:15, 47:9, 56:7, 22:1, 30:4, 31:21, 36:15, 47:9, 56:7, 65:10
**MAE/FREDDIE** [1] - 1:10
**Mae/Freddie** [1] - 4:3

**magnitude** [3] - 10:10, 51:19, 53:6
**main** [1] - 11:6
**maintain** [1] - 31:8
**major** [2] - 20:22, 37:15
**man** [1] - 71:10
**manage** [2] - 29:4, 31:5
**management** [1] - 38:15
**managing** [1] - 69:7
**manner** [1] - 64:18
**Mario** [1] - 40:16
**market** [18] - 7:14, 14:16, 14:19, 15:23, 16:8, 19:8, 19:12, 19:24, 21:5, 26:23, 32:14, 36:11, 37:5, 46:16, 49:20, 50:1, 63:22, 66:13
**Massachusetts** [1] - 2:8
**materials** [1] - 78:5
**math** [1] - 23:20
**matter** [4] - 34:16, 39:6, 39:8, 56:17
**matters** [1] - 71:6
**MBS** [11] - 15:10, 15:14, 15:19, 15:20, 43:16, 54:21, 54:23, 55:14, 56:21, 57:4, 57:19
**MC** [1] - 1:10
**McFarland** [2] - 47:8, 66:16
**mean** [11] - 6:21, 6:23, 6:25, 7:9, 18:4, 20:4, 25:12, 25:15, 25:16, 47:3, 52:8
**meaningful** [1] - 14:13
**means** [16] - 11:1, 11:3, 11:10, 11:11, 11:15, 12:14, 18:2, 18:5, 18:12, 22:2, 24:8, 25:18, 27:12, 46:14, 47:11, 75:22
**meant** [1] - 20:8
**meanwhile** [1] - 66:4
**measure** [1] - 40:1
**meet** [1] - 28:3
**meeting** [2] - 45:15, 45:17
**meld** [1] - 37:22
**MELTZER** [1] - 1:23
**members** [1] - 72:13
**memo** [7] - 52:11, 52:17, 52:21, 52:24, 53:4, 53:24, 54:5

**memos** [1] - 52:9
**mention** [1] - 61:21
**mentioned** [1] - 47:16
**mess** [1] - 62:7
**message** [1] - 28:19
**mic** [1] - 73:20
**Michael** [1] - 53:9
**Michelle** [3] - 6:9, 17:9, 17:20
**mid-2012** [1] - 38:10
**middle** [1] - 38:2
**might** [12] - 16:20, 22:5, 33:2, 33:25, 47:18, 54:9, 55:22, 56:13, 67:2, 69:2, 76:10
**Miller** [2] - 6:9, 17:9
**million** [1] - 35:17
**millions** [1] - 17:7
**minimum** [1] - 53:6
**minute** [2] - 27:10, 41:2
**mirror** [1] - 50:13
**Miscellaneous** [1] - 4:2
**miss** [1] - 39:22
**missing** [1] - 18:15
**mission** [11] - 14:15, 18:14, 19:7, 20:20, 22:3, 27:9, 28:10, 32:13, 62:17, 63:12, 66:11
**model** [2] - 17:15, 62:10
**modeling** [2] - 51:22, 53:11
**modifying** [1] - 55:23
**moment** [2] - 46:15, 73:18
**money** [42] - 14:20, 14:25, 16:3, 16:11, 16:12, 17:9, 17:22, 19:6, 20:9, 22:11, 23:6, 23:9, 23:13, 24:21, 25:2, 27:25, 29:23, 29:24, 31:23, 42:6, 42:25, 43:15, 43:20, 44:11, 44:13, 44:20, 45:2, 47:25, 48:18, 51:8, 59:4, 59:8, 59:25, 60:6, 66:5, 66:10, 68:22, 69:3, 77:4
**months** [3] - 49:13, 49:18, 58:19
**moreover** [1] - 37:5
**MORNING** [1] - 1:13
**morning** [2] - 5:19, 5:20

**mortgage** [11] - 14:15, 14:19, 14:22, 15:6, 15:17, 15:18, 15:23, 19:8, 19:12, 21:5, 32:14
**Mortgage** [2] - 6:11, 6:13
**mortgage-backed** [2] - 15:17, 15:18
**mortgages** [9] - 7:13, 7:14, 14:16, 14:21, 14:24, 15:16, 20:25, 21:5, 37:4
**most** [2] - 18:9, 47:12
**motion** [1] - 73:16
**motivation** [3] - 59:23, 60:3, 64:6
**movie** [1] - 72:11
**movies** [1] - 74:20
**MR** [16] - 4:6, 4:8, 4:13, 4:15, 4:22, 4:24, 5:10, 5:12, 5:13, 9:6, 72:24, 73:2, 73:5, 73:12, 73:19, 74:1
**MS** [2] - 9:9, 73:1, 74:9
**must** [3] - 13:23, 48:10, 52:25
**mutual** [1] - 17:4

---

## N

**name** [1] - 10:24
**named** [1] - 6:21
**nation** [1] - 21:3
**National** [1] - 6:13
**NBA** [1] - 39:2
**necessarily** [1] - 30:1
**need** [5] - 18:1, 35:9, 47:3, 54:25, 71:21
**needed** [4] - 20:13, 21:6, 23:13, 41:11
**needs** [1] - 21:25
**negotiate** [1] - 42:1
**negotiating** [1] - 64:9
**nervous** [1] - 45:1
**net** [86] - 9:22, 10:3, 10:5, 11:22, 12:4, 22:2, 22:3, 25:22, 27:8, 27:13, 27:20, 27:21, 27:24, 28:2, 28:9, 29:13, 30:6, 31:14, 32:11, 34:15, 35:3, 38:8, 39:1, 39:5, 39:10, 39:11, 39:20, 40:6, 40:7, 41:3,

488

41:15, 41:17, 42:3,
42:5, 42:9, 42:10,
43:6, 44:9, 45:2,
45:22, 46:6, 48:19,
48:25, 49:4, 49:7,
50:19, 51:1, 51:10,
52:3, 52:14, 52:16,
52:18, 53:15, 53:22,
53:25, 54:10, 54:14,
56:2, 57:22, 58:20,
59:2, 59:12, 59:14,
60:13, 61:4, 61:7,
61:13, 61:16, 62:14,
62:18, 63:1, 64:5,
64:13, 64:15, 65:1,
65:8, 65:20, 68:8,
68:10, 69:17, 69:21,
71:8, 71:16, 71:25,
72:3, 75:22

**neutral** [1] - 4:16
**never** [7] - 24:16,
24:17, 60:21, 60:23,
64:24, 65:25, 69:22
**new** [7] - 10:20,
25:14, 35:13, 60:19,
67:21, 71:9
**New** [4] - 1:18, 1:21,
2:4
**news** [2] - 36:10,
52:4
**next** [5] - 30:8,
31:20, 44:5, 47:7,
54:3
**nice** [1] - 78:4
**none** [1] - 72:13
**normal** [1] - 32:12
**normally** [2] - 6:12,
6:13
**Northwest** [5] - 1:18,
1:21, 2:8, 2:11, 79:14
**not-so-distant** [1] -
47:17
**note** [2] - 64:23,
65:18
**notes** [2] - 76:10,
79:5
**nothing** [7] - 30:2,
31:12, 34:1, 34:12,
44:7, 51:18, 71:2
**notice** [3] - 15:9,
19:2, 53:7
**nowhere** [1] - 46:24
**number** [2] - 43:11,
65:19
**numbers** [1] - 50:3
**nurses'** [1] - 17:20

# O

**oath** [2] - 75:8, 75:15
**object** [2] - 4:18,
73:17
**objected** [2] - 73:5,
73:6
**objection** [5] - 72:24,
72:25, 73:2, 73:21,
74:6
**objectionable** [1] -
73:24
**objective** [4] - 29:4,
35:10, 35:18, 63:4
**obtrusive** [1] - 73:21
**occur** [1] - 59:21
**OF** [2] - 1:1, 1:13
**officer** [1] - 47:9
**Official** [1] - 2:10
**official** [9] - 9:12,
9:16, 10:4, 10:14,
10:24, 20:6, 46:18,
70:17, 79:12
**officials** [2] - 59:3,
76:21
**old** [1] - 64:12
**once** [1] - 48:21
**one** [29] - 4:15, 4:19,
4:20, 9:10, 9:11,
10:17, 11:11, 12:14,
13:2, 22:23, 27:24,
28:3, 32:16, 33:4,
38:3, 39:1, 39:14,
39:18, 46:17, 56:1,
60:3, 62:11, 65:9,
65:14, 68:15, 73:23,
75:25, 78:5
**ones** [1] - 18:13
**open** [1] - 74:8
**opening** [4] - 5:22,
5:24, 9:4, 9:7
**Opening** [1] - 3:2
**operated** [1] - 16:1
**operations** [2] -
31:5, 32:12
**opinions** [1] - 76:5
**opportunity** [1] -
51:6
**opposite** [4] - 10:4,
62:22, 63:7, 69:12
**option** [6] - 23:24,
54:25, 56:9, 56:12,
56:23, 58:3
**order** [2] - 24:11,
32:3
**ordinary** [2] - 14:16,
15:7
**original** [3] - 34:13,
54:15, 55:18

**ourselves** [1] - 5:6
**outrageous** [1] -
73:17
**outside** [1] - 73:4
**overall** [2] - 37:11,
46:14
**overruled** [1] - 74:6
**overseeing** [1] - 20:6
**overview** [1] - 45:16
**owe** [2] - 14:23,
27:17
**own** [6] - 27:14,
27:16, 49:11, 54:8,
64:6, 64:20
**owned** [4] - 19:3,
31:9, 31:10, 65:10
**owners** [2] - 18:17,
18:23
**owning** [1] - 14:17
**owns** [1] - 67:18

# P

**p.m** [1] - 78:14
**P.M** [1] - 1:20
**packaged** [1] - 15:16
**Page** [1] - 3:2
**page** [1] - 4:19
**paid** [3] - 17:15,
39:15, 57:8
**panel** [1] - 5:15
**parlor** [1] - 33:24
**part** [9] - 8:16, 17:23,
22:13, 27:24, 36:4,
47:12, 69:24, 72:14,
77:7
**parties** [2] - 15:21,
75:12
**partly** [1] - 5:1
**partner** [1] - 9:6
**party** [9] - 11:16,
12:14, 12:15, 12:17,
13:3, 13:18, 13:22,
73:10, 77:9
**patience** [1] - 38:4
**Paul** [1] - 42:22
**pause** [1] - 27:10
**pay** [23] - 23:15,
23:17, 23:23, 24:2,
24:4, 24:16, 24:18,
38:20, 42:14, 42:16,
42:22, 42:23, 43:3,
43:14, 44:5, 44:6,
45:14, 46:1, 53:25,
56:6, 58:16, 59:5,
69:3
**paying** [3] - 38:16,
38:19, 39:17, 54:4,
54:5

**payment** [9] - 23:24,
54:18, 54:24, 55:6,
55:7, 55:12, 56:9,
56:23, 56:24
**payment-in-kind** [3]
- 54:24, 56:9, 56:23
**payments** [1] - 56:2
**PCF** [1] - 23:11
**pen** [1] - 64:2
**penalty** [2] - 40:19,
60:4
**pending** [1] - 44:24
**Pennsylvania** [1] -
1:24
**pension** [1] - 17:20
**pensions** [1] - 10:20
**people** [26] - 10:18,
10:19, 10:20, 10:22,
15:4, 15:11, 15:15,
16:21, 16:22, 16:23,
17:20, 18:5, 19:9,
19:10, 19:12, 19:18,
19:22, 28:5, 44:25,
47:7, 47:10, 53:11,
58:24, 61:2, 69:6
**people's** [1] - 70:15
**Pepsi** [1] - 52:10
**percent** [35] - 10:5,
11:21, 12:3, 23:12,
23:14, 23:16, 23:21,
25:21, 30:6, 31:13,
31:24, 34:14, 34:16,
38:17, 38:21, 38:23,
39:4, 41:21, 42:5,
42:14, 43:5, 43:21,
44:6, 46:1, 52:14,
52:16, 53:15, 55:8,
55:9, 58:17, 58:20,
66:25, 67:8, 71:8
**percentage** [2] -
55:7, 55:8
**perfect** [1] - 33:18
**perjury** [2] - 40:19,
60:4
**permanent** [1] -
65:22
**permissible** [1] -
5:10
**perpetual** [1] - 10:16
**person** [14] - 11:5,
13:20, 21:20, 22:9,
33:19, 41:16, 42:24,
42:25, 46:4, 68:18,
74:21, 74:25, 75:8
**person's** [1] - 75:25
**personal** [1] - 63:10
**perspective** [1] -
64:19
**Peter** [3] - 42:22,
42:23

**physically** [1] - 5:7
**pick** [1] - 17:1
**picture** [2] - 46:3,
46:5
**pieces** [1] - 30:14
**pin** [1] - 19:20
**pizza** [1] - 33:24
**place** [5] - 14:5, 40:3,
41:9, 41:20, 45:18
**placed** [1] - 21:8
**Plaintiff** [2] - 6:19,
77:18
**Plaintiffs** [20] - 1:4,
4:8, 4:10, 6:8, 6:17,
6:18, 6:20, 6:21, 6:23,
6:24, 6:25, 7:1, 7:19,
8:7, 8:17, 9:4, 9:7,
64:17, 73:12
**PLAINTIFFS** [3] -
1:18, 1:20, 2:2
**Plaintiffs'** [2] - 8:9,
8:11
**plan** [4] - 35:4, 62:8,
64:24, 66:2
**planned** [1] - 4:16
**plans** [2] - 28:13,
28:14
**play** [5] - 13:23,
13:24, 51:25, 63:21,
75:12
**played** [2] - 21:4,
63:22
**PLLC** [1] - 1:18
**plus** [1] - 66:6
**pocket** [1] - 55:17
**point** [12] - 5:21,
17:7, 22:24, 27:18,
28:17, 30:5, 31:13,
41:15, 46:13, 47:17,
73:6, 75:19
**pointed** [1] - 35:2
**points** [1] - 55:20
**poised** [1] - 38:3
**PORTER** [1] - 2:7
**posit** [1] - 59:3
**positioning** [1] - 5:6
**positive** [10] - 22:3,
27:13, 27:17, 27:21,
28:2, 40:6, 46:16,
49:13, 52:4, 75:22
**possibility** [5] -
33:17, 33:21, 47:16,
48:5, 48:24
**possible** [7] - 29:6,
39:21, 47:11, 56:6,
66:16, 67:2
**possibly** [2] - 48:11,
49:5
**posted** [1] - 36:13
**power** [4] - 9:12,

31:3, 60:17, 60:18
**powers** [2] - 26:20, 63:15
**predict** [2] - 59:21, 73:23
**prediction** [1] - 39:25
**prefer** [1] - 5:5
**preference** [13] - 24:10, 38:18, 43:25, 44:2, 55:10, 56:15, 57:1, 57:3, 57:6, 57:10, 67:10, 67:13, 67:16
**preferred** [15] - 6:10, 6:12, 7:17, 7:20, 17:25, 18:3, 18:4, 18:6, 18:8, 23:4, 23:5, 25:15, 56:5, 67:13
**PREFERRED** [1] - 1:10
**Preferred** [1] - 4:3
**preliminary** [1] - 5:23
**preposterous** [3] - 53:2, 53:3, 53:5
**presence** [1] - 73:4
**present** [2] - 12:3, 75:4, 75:9
**presentations** [1] - 32:7
**presenting** [1] - 76:14
**preserve** [13] - 9:23, 21:25, 22:6, 27:7, 28:8, 29:12, 48:4, 61:12, 61:17, 62:15, 62:24, 63:19, 75:20
**preserving** [1] - 56:6
**president** [1] - 11:4
**press** [2] - 61:7, 62:3
**pressed** [1] - 64:4
**preview** [1] - 24:14
**previous** [2] - 45:16, 54:1
**price** [1] - 21:2
**prices** [5] - 14:17, 15:6, 21:1, 37:7, 37:8
**principle** [4] - 12:13, 13:2, 77:6, 77:9
**principles** [1] - 77:5
**private** [15] - 10:18, 14:21, 16:13, 19:6, 19:11, 19:15, 20:3, 20:9, 20:14, 22:19, 24:23, 38:15, 62:12, 65:1, 69:24
**problem** [3] - 24:19, 52:6, 57:16
**problems** [2] - 49:21,

53:21
**proceedings** [5] - 5:17, 73:3, 74:7, 78:14, 79:6
**Proceedings** [1] - 78:16
**process** [5] - 10:9, 15:2, 40:3, 51:16, 70:19
**produced** [1] - 79:6
**professor** [1] - 24:12
**professors** [1] - 76:6
**profit** [17] - 17:16, 18:18, 18:19, 18:20, 26:10, 33:12, 34:3, 34:20, 38:21, 42:14, 51:2, 59:11, 66:20, 67:9, 67:16, 67:17, 67:18
**profitability** [16] - 24:3, 32:22, 35:6, 47:3, 47:13, 48:7, 48:13, 49:12, 49:17, 50:24, 51:4, 61:18, 65:6, 68:6, 69:20, 69:23
**profitable** [21] - 10:3, 16:2, 17:15, 29:25, 32:23, 33:2, 33:5, 33:10, 33:16, 33:22, 34:17, 35:7, 36:21, 37:5, 38:5, 39:13, 46:11, 46:21, 59:16, 60:7, 60:21
**profits** [34] - 10:6, 11:22, 12:3, 16:2, 22:7, 29:24, 33:17, 34:14, 34:23, 36:12, 36:14, 36:15, 37:20, 39:6, 39:8, 47:14, 47:15, 48:2, 48:8, 48:21, 50:5, 50:22, 51:5, 51:6, 61:2, 62:7, 63:6, 66:18, 67:1, 67:5, 67:8, 67:20, 69:13, 69:24
**projected** [5] - 44:11, 44:15, 44:21, 68:24
**projecting** [1] - 36:12
**projections** [3] - 48:2, 48:8, 54:9
**promise** [2] - 15:12, 27:4
**promised** [3] - 30:25, 33:8, 33:9
**promote** [1] - 7:13
**prompt** [1] - 40:1
**property** [1] - 70:16
**proposed** [1] - 52:6

**pros** [1] - 52:2
**protect** [6] - 40:24, 41:12, 42:4, 42:6, 42:8, 57:13
**protection** [2] - 54:22, 54:23
**protector** [1] - 21:17
**prove** [2] - 5:25, 6:2
**provide** [3] - 8:22, 19:6, 71:1
**provided** [4] - 18:10, 18:16, 45:16, 54:22
**proving** [1] - 8:13
**provision** [2] - 23:25, 54:17
**Prussia** [1] - 1:24
**PSPA** [8] - 25:18, 31:22, 34:9, 41:20, 34:15, 55:18, 55:24, 64:12
**PSPAs** [4] - 35:1, 45:21, 56:5, 58:13
**public** [25] - 11:12, 11:14, 14:15, 19:7, 20:20, 21:23, 22:3, 26:4, 27:9, 28:10, 31:8, 31:17, 32:13, 35:1, 35:24, 62:17, 66:11, 70:1, 70:2, 70:6, 70:13, 70:16, 71:3, 71:4, 77:22
**publicly** [1] - 7:16
**pull** [3] - 12:18, 29:17, 55:17
**pulled** [1] - 66:19
**purchase** [3] - 23:3, 23:5, 25:15
**PURCHASE** [1] - 1:10
**Purchase** [1] - 4:3
**purpose** [2] - 13:4, 13:19, 63:8
**purposely** [1] - 29:1
**pursuant** [1] - 56:4
**push** [3] - 61:4, 61:5, 62:4
**put** [6] - 19:20, 21:13, 31:4, 41:20, 44:10, 61:6
**putting** [2] - 60:23, 61:19
**PX-205** [1] - 58:11

**Q**

**Q1** [1] - 48:14
**Q2** [1] - 48:14
**quality** [1] - 21:2
**quarter** [8] - 36:16,

36:17, 36:18, 36:19, 38:21, 38:22, 39:6
**Quarter** [4] - 37:13, 37:19
**questions** [4] - 71:21, 71:22, 72:5, 75:9
**quick** [1] - 4:10
**quickly** [1] - 4:13
**quite** [1] - 26:4

**R**

**radical** [1] - 40:3
**Radnor** [1] - 1:24
**raise** [3] - 4:9, 16:12, 20:9
**rate** [1] - 23:16
**rather** [2] - 19:11, 77:25
**RDR** [3] - 2:9, 79:3, 79:12
**RE** [1] - 1:10
**Re** [1] - 4:2
**reached** [1] - 49:12
**read** [8] - 4:16, 4:18, 4:20, 6:5, 8:25, 35:21, 74:21, 76:14
**reader** [1] - 74:21
**reading** [1] - 75:24
**ready** [3] - 52:13, 59:25, 66:18
**real** [4] - 48:24, 61:16, 61:23, 62:13
**realize** [1] - 14:17
**realizing** [1] - 67:3
**really** [10] - 22:8, 36:25, 44:22, 49:3, 51:20, 58:5, 74:22, 77:21
**reams** [2] - 51:23
**reap** [1] - 38:4
**rear** [1] - 50:13
**rear-view** [1] - 50:13
**reason** [17] - 9:11, 10:7, 11:23, 40:14, 41:11, 42:3, 49:14, 54:21, 59:18, 60:25, 61:16, 61:23, 62:13, 70:18, 70:19
**reasonable** [11] - 8:21, 25:23, 29:4, 29:17, 34:25, 35:11, 36:1, 51:18, 64:20, 70:9, 72:1
**reasonably** [4] - 28:19, 29:10, 33:15, 34:21
**reasons** [1] - 70:25

**reassured** [1] - 28:24
**rebound** [1] - 37:15
**rebounding** [2] - 36:11, 37:5
**rebuild** [1] - 29:13
**recess** [2] - 77:25, 78:2
**recognize** [1] - 76:18
**recognizing** [1] - 47:8
**record** [2] - 51:5, 52:1
**Recovery** [1] - 30:11
**recovery** [1] - 46:18
**recruited** [1] - 41:24
**refer** [6] - 6:20, 6:22, 6:25, 7:3, 7:8, 45:4
**referred** [4] - 7:5, 7:8, 18:22, 54:18
**referring** [1] - 10:24
**regular** [2] - 17:7, 17:15
**regulated** [1] - 8:2
**regulators** [2] - 20:2, 20:12
**reinvesting** [1] - 22:7
**related** [1] - 4:2
**relationships** [1] - 8:5
**release** [2] - 61:7, 62:3
**released** [1] - 47:19
**rely** [1] - 74:15
**remember** [20] - 18:9, 19:25, 22:17, 24:25, 25:12, 26:10, 29:20, 34:5, 38:19, 38:23, 54:20, 55:3, 58:23, 59:17, 61:11, 66:16, 68:2, 69:19, 71:2, 77:9
**renewed** [3] - 61:4, 61:5, 62:4
**rent** [2] - 12:10, 12:11
**repayment** [1] - 15:13
**repeat** [1] - 59:14
**repeatedly** [2] - 57:25, 58:1
**replace** [5] - 19:18, 60:19, 62:11, 64:25, 65:24
**REPORTED** [1] - 2:9
**Reporter** [2] - 2:10, 79:12
**represent** [3] - 6:22, 72:14, 77:2
**request** [2] - 73:14, 73:19

requested [2] - 73:11, 73:24
required [1] - 56:2
reread [1] - 4:21
research [1] - 40:2
resounding [1] - 72:7
respect [1] - 5:1
respectfully [1] - 73:24
responsibility [2] - 21:18, 76:13
responsible [2] - 54:8, 59:12
restore [18] - 9:22, 22:1, 24:3, 27:7, 28:9, 28:25, 29:13, 32:10, 32:11, 32:12, 35:3, 35:5, 57:23, 57:24, 61:18, 62:16, 63:20
restored [3] - 25:7, 40:5, 65:4
restoring [2] - 22:2, 39:11
result [3] - 65:2, 65:3, 77:20
results [1] - 49:13
retain [1] - 26:22
retained [1] - 28:20
retired [1] - 64:2
retirement [1] - 17:4
retirements [1] - 17:11
return [4] - 9:24, 28:25, 29:14, 33:21
returned [1] - 68:6
returning [1] - 29:6
revenues [2] - 45:25, 58:15
reviewed [2] - 62:2, 74:25
rewrite [1] - 38:11
rich [2] - 16:21, 16:22
rid [1] - 19:15
rights [9] - 10:13, 18:6, 18:7, 26:9, 26:15, 26:22, 68:9, 70:14
risk [7] - 16:8, 16:17, 19:14, 33:1, 33:20, 50:5, 69:5
risks [1] - 53:24
risky [3] - 37:4, 37:23, 49:23
road [1] - 49:17
Road [1] - 1:24
roadmap [1] - 72:8
roaring [1] - 46:18
robbing [2] - 42:22,

42:23
ROBERT [1] - 2:2
Robert [1] - 14:3
role [2] - 21:4, 63:21
Room [1] - 2:12
room [2] - 9:1, 78:5
ROYCE [1] - 1:14
RUDY [3] - 1:23, 73:12, 74:1
Rudy [5] - 14:3, 73:12, 74:1, 76:13
rug [2] - 12:18, 66:19
rules [5] - 13:23, 13:24, 72:17, 72:18
ruling [1] - 73:16
run [3] - 19:16, 44:20, 65:1
running [1] - 53:17
rushes [1] - 10:14

## S

sad [1] - 70:13
safe [6] - 17:13, 22:2, 27:8, 28:9, 40:5, 57:23
safest [1] - 17:12
safety [13] - 23:24, 53:12, 54:17, 54:22, 54:24, 55:16, 56:10, 56:14, 57:11, 57:15, 57:17, 62:16, 71:11
sale [1] - 24:9
sat [1] - 75:14
save [1] - 25:2
saw [4] - 20:12, 34:9, 35:11, 46:4
scale [1] - 37:10
scenario [1] - 52:5
SCHILLER [1] - 1:21
SCHOLER [1] - 2:7
seat [1] - 64:2
seated [1] - 5:18
SEC [2] - 69:1, 69:4
SEC's [1] - 69:6
second [4] - 4:24, 36:17, 36:19, 72:3
secondary [5] - 7:14, 14:15, 14:19, 15:23, 21:5
secretary [4] - 45:15, 55:19, 56:11, 60:8
securities [2] - 15:17, 15:18
securitized [1] - 20:25
see [46] - 12:20, 12:25, 16:14, 16:19, 17:1, 20:6, 21:11,

27:23, 35:9, 35:19, 36:15, 37:7, 37:13, 43:19, 43:22, 46:23, 47:7, 48:21, 50:3, 50:7, 50:16, 50:17, 51:16, 51:21, 53:6, 53:7, 53:11, 53:14, 53:24, 54:11, 57:2, 60:20, 61:3, 62:10, 62:11, 74:18, 74:20, 75:6, 76:12, 76:18, 76:20, 78:12, 78:15
seeing [5] - 48:14, 50:12, 50:13, 52:4, 75:23
seek [1] - 20:2
seem [1] - 74:19
sees [2] - 45:20, 58:13
sell [1] - 15:15
selling [1] - 16:13
Senate [1] - 11:5
send [1] - 9:1
Senior [1] - 4:3
SENIOR [2] - 1:10, 1:14
senior [3] - 23:3, 38:15, 67:13
sense [9] - 33:18, 34:4, 42:6, 42:24, 44:22, 44:23, 45:12, 61:25, 72:16
September [2] - 21:14, 26:17
service [1] - 77:22
SESSION [1] - 1:13
set [4] - 4:25, 5:2, 35:18, 55:20
several [5] - 6:18, 29:18, 71:12, 75:24, 76:2
share [2] - 33:17, 76:13
shareholder [22] - 8:9, 8:16, 11:16, 11:20, 16:11, 17:1, 17:3, 17:5, 22:16, 22:18, 29:8, 30:3, 30:14, 31:9, 34:25, 35:14, 35:17, 36:1, 51:18, 64:22, 71:9
shareholder's [1] - 7:23
shareholder-funded [1] - 31:9
shareholder-owned [1] - 31:9
shareholders [93] - 6:11, 6:12, 6:22, 7:21, 8:5, 8:21, 9:25, 10:13,

10:19, 11:18, 12:7, 13:1, 14:10, 16:10, 16:13, 16:14, 16:16, 16:19, 16:21, 16:24, 17:17, 17:19, 17:25, 18:10, 18:11, 18:14, 18:16, 18:17, 18:19, 18:20, 18:23, 19:6, 20:3, 20:9, 20:14, 20:15, 22:15, 22:19, 25:6, 25:8, 25:11, 25:19, 26:5, 26:7, 26:14, 26:18, 26:25, 28:6, 28:12, 28:18, 29:1, 29:7, 29:10, 29:15, 29:16, 29:21, 29:22, 31:12, 32:2, 32:25, 33:10, 33:14, 33:16, 34:21, 35:7, 38:3, 38:6, 38:16, 40:4, 40:7, 57:25, 58:2, 59:17, 61:14, 63:8, 63:18, 65:10, 67:24, 68:3, 68:21, 69:21, 69:24, 70:3, 71:7, 71:15, 72:1, 72:4, 72:14, 72:19, 73:7, 74:10, 77:1, 77:18
shareholders' [9] - 25:23, 25:25, 29:3, 35:10, 39:21, 63:4, 63:14, 64:19, 70:9
shares [19] - 16:13, 18:6, 18:7, 18:8, 26:16, 27:2, 29:2, 30:21, 30:25, 31:1, 33:1, 33:7, 33:13, 33:23, 56:5, 65:9, 65:11
sheet [1] - 27:14
shock [1] - 39:22
shore [1] - 66:13
short [3] - 4:16, 77:25, 78:1
show [31] - 10:9, 11:23, 12:2, 18:11, 27:5, 29:3, 30:2, 33:14, 34:24, 36:6, 38:1, 39:14, 41:14, 46:17, 47:1, 48:2, 48:13, 49:14, 53:19, 57:22, 59:11, 60:7, 62:2, 62:13, 67:19, 70:10, 74:16, 74:22, 77:15, 77:19
showed [4] - 37:17, 46:3, 56:10, 61:23
showing [5] - 46:10, 48:8, 61:2, 66:18,

66:20
shown [2] - 32:8, 74:19
shows [2] - 37:16, 61:25
shut [1] - 77:12
side [8] - 5:3, 12:18, 13:6, 13:18, 13:20, 41:18, 64:11, 77:11
sidebar [1] - 73:4
sides [1] - 75:9
sight [1] - 65:24
sign [1] - 48:3
signed [1] - 64:12
significant [1] - 39:25
significantly [1] - 49:23
signs [5] - 36:11, 46:16, 46:17, 47:2, 69:14
simple [3] - 13:11, 27:21, 74:15
sincerely [1] - 14:5
sing [1] - 50:22
single [1] - 68:11
sit [1] - 9:18
sitting [1] - 32:16
six [3] - 49:13, 49:18, 66:25
sky [1] - 29:18
skyrocketed [1] - 37:7
slide [2] - 15:9, 32:8
small [1] - 17:22
so-called [1] - 57:16
sold [1] - 24:9
solution [3] - 52:7, 55:1, 57:15
solve [2] - 54:16, 57:16
solvency [2] - 32:11, 62:16
solvent [17] - 22:2, 27:8, 27:11, 27:13, 27:23, 28:2, 28:9, 29:14, 40:5, 57:24, 63:20, 65:4, 69:17, 75:21, 75:22
someone [5] - 11:4, 22:10, 30:5, 70:12, 70:25
sometimes [9] - 7:5, 7:6, 7:7, 16:22, 16:23, 18:21, 54:18, 76:20
somewhere [1] - 52:21
soon [3] - 29:6, 67:22
sort [3] - 22:11, 37:9,

50:12
**sound** [4] - 63:20, 65:4, 69:17, 75:21
**source** [1] - 45:11
**special** [2] - 18:5, 40:16
**specific** [1] - 73:13
**speculate** [1] - 52:21
**sponsored** [6] - 7:5, 7:12, 7:16, 18:22, 18:24, 19:2
**stability** [1] - 7:14
**stable** [1] - 21:6
**stake** [2] - 77:4, 77:5
**stand** [4] - 13:11, 68:15, 68:19, 75:14
**standard** [1] - 8:13
**standards** [1] - 20:25
**standing** [1] - 64:8
**stands** [1] - 30:10
**STANTON** [1] - 2:7
**start** [6] - 38:7, 44:17, 44:18, 48:21, 59:10, 59:11
**started** [6] - 16:16, 19:24, 36:21, 37:14, 42:11, 58:24
**starting** [13] - 10:2, 10:20, 36:21, 36:25, 37:19, 43:10, 46:17, 48:13, 48:22, 50:22, 59:8, 59:15, 61:3
**starts** [1] - 48:6
**state** [1] - 10:16
**Statement** [1] - 3:2
**statement** [5] - 4:17, 6:2, 6:5, 6:7, 9:5
**statements** [8] - 5:22, 5:24, 6:3, 35:2, 35:12, 69:1, 69:5, 69:6
**STATES** [2] - 1:1, 1:14
**States** [4] - 2:10, 22:15, 40:20, 79:13
**status** [1] - 31:9
**statute** [4] - 26:19, 30:9, 35:1, 35:12
**statutory** [1] - 35:25
**stay** [1] - 66:20
**stenographic** [1] - 79:5
**Stern** [1] - 5:4
**STERN** [6] - 2:6, 5:12, 72:24, 73:2, 73:5, 73:19
**sticking** [1] - 71:15
**still** [17] - 10:16, 14:12, 16:9, 17:5, 25:9, 27:2, 30:17,

40:9, 57:3, 64:17, 65:6, 65:23, 67:8, 67:18, 70:6, 76:18
**STOCK** [1] - 1:10
**Stock** [1] - 4:3
**stock** [16] - 7:17, 7:20, 7:22, 7:24, 11:13, 17:1, 23:4, 23:5, 25:15, 26:16, 26:19, 32:17, 32:18, 33:19, 33:23, 67:14
**stock's** [1] - 26:22
**stockholders** [2] - 26:20, 26:21
**stocks** [1] - 11:13
**stopped** [1] - 18:15
**storm** [1] - 20:12
**story** [2] - 66:3, 66:23
**straighten** [1] - 5:5
**strategic** [1] - 66:2
**street** [1] - 41:25
**strip** [1] - 63:15
**stripping** [1] - 63:6
**strong** [3] - 17:14, 46:12, 69:7
**structural** [2] - 49:20, 50:1
**structure** [1] - 19:21
**struggle** [1] - 23:20
**studies** [2] - 52:17, 52:24
**study** [7] - 51:20, 52:2, 53:4, 53:13, 58:4, 70:19, 70:25
**stuff** [4] - 13:17, 38:7, 50:11, 50:14
**submit** [1] - 73:24
**submitted** [1] - 40:17
**substantial** [2] - 24:23, 47:14
**succeeds** [1] - 34:2
**successful** [2] - 60:13, 60:21
**summarize** [1] - 75:5
**summary** [1] - 74:24
**summation** [1] - 73:18
**sun** [1] - 50:21
**support** [5] - 14:15, 15:5, 20:2, 22:9, 22:10
**supported** [1] - 15:3
**supporting** [2] - 19:7, 32:14
**supposed** [14] - 28:16, 34:6, 34:7, 39:15, 51:10, 61:12, 61:17, 61:19, 62:23, 62:24, 62:25, 65:21,

68:18, 74:4
**surprise** [1] - 39:22
**Susan** [1] - 47:8
**suspect** [1] - 67:23
**suspected** [1] - 48:19
**suspended** [4] - 26:12, 26:20, 26:25, 30:20
**sustainable** [1] - 47:15
**sustained** [6] - 47:3, 47:13, 49:17, 50:24, 51:4, 65:6
**sweep** [48] - 34:15, 38:9, 39:1, 39:2, 39:3, 39:5, 39:20, 41:3, 41:15, 41:17, 42:4, 44:9, 45:2, 45:23, 46:6, 49:4, 49:7, 50:19, 51:1, 51:10, 52:3, 52:14, 52:18, 53:15, 53:23, 53:25, 54:10, 54:14, 57:22, 59:3, 59:12, 59:14, 61:4, 61:8, 61:16, 62:14, 62:18, 64:5, 64:13, 65:1, 65:8, 65:20, 68:8, 68:10, 69:22, 71:16, 71:25, 72:3
**sworn** [1] - 40:17
**system** [11] - 9:19, 17:24, 19:10, 19:16, 58:25, 60:9, 60:11, 60:19, 62:11, 65:1, 76:24

## T

**table** [2] - 26:24, 64:11
**tax** [4] - 47:18, 48:1, 48:16, 48:23
**taxpayer** [2] - 16:11, 24:21
**taxpayers** [2] - 16:5, 16:7
**teach** [1] - 76:8
**teachers'** [1] - 17:21
**teaching** [1] - 76:7
**team** [5] - 14:4, 53:9, 76:11
**temporarily** [2] - 11:4, 26:8
**temporary** [3] - 21:25, 35:5, 65:22
**ten** [2] - 32:7, 44:12
**tend** [1] - 19:12

**tens** [1] - 48:25
**term** [5] - 19:1, 22:9, 26:8, 26:12, 69:3
**terminated** [1] - 26:21
**terms** [2] - 38:12, 44:18
**terrible** [2] - 65:8, 69:8
**testified** [2] - 73:14, 74:2
**testifies** [1] - 75:8
**testify** [3] - 72:20, 73:8, 74:11
**testifying** [1] - 55:21
**testimony** [6] - 21:12, 75:6, 75:13, 75:18, 75:24, 75:25
**THE** [25] - 1:1, 1:14, 1:17, 1:20, 2:2, 2:5, 4:1, 4:5, 4:7, 4:12, 4:14, 4:20, 4:23, 5:9, 5:11, 5:14, 5:15, 5:18, 5:20, 5:21, 9:8, 74:6, 77:25, 78:10, 78:15
**themselves** [10] - 6:1, 21:21, 22:9, 22:10, 25:14, 30:7, 38:14, 50:8, 72:22, 74:13
**thereby** [2] - 46:1, 58:16
**they've** [3] - 57:7, 57:8, 65:5
**thinking** [4] - 16:20, 30:23, 32:16, 34:6
**third** [4] - 40:22, 41:3, 42:1, 45:22
**thousands** [1] - 9:14
**threaten** [1] - 47:5
**threatened** [1] - 41:1
**three** [1] - 15:25
**Tim** [2] - 17:8, 17:19
**timing** [3] - 45:14, 58:8
**Timothy** [1] - 6:9
**today** [5] - 9:10, 9:11, 10:16, 40:9, 65:22
**together** [6] - 7:1, 7:10, 15:16, 25:1, 37:22, 38:11
**took** [5] - 8:19, 9:20, 11:3, 45:18, 75:15
**tool** [1] - 76:7
**top** [2] - 20:16, 60:8
**total** [2] - 54:22, 54:23
**tough** [1] - 20:21
**toward** [1] - 28:15

**towards** [1] - 68:8
**town** [1] - 37:1
**trade** [2] - 11:13, 26:19
**traded** [1] - 7:16
**trading** [1] - 65:11
**transcript** [2] - 79:5, 79:6
**TRANSCRIPT** [1] - 1:13
**Treasury** [100] - 10:6, 16:15, 22:15, 22:16, 22:18, 22:20, 23:2, 23:5, 23:6, 23:8, 23:13, 23:17, 23:18, 24:16, 24:17, 24:21, 25:2, 25:13, 29:7, 31:21, 31:23, 34:7, 34:13, 34:16, 35:14, 38:11, 38:13, 38:16, 38:19, 38:21, 39:9, 39:18, 40:23, 40:25, 41:4, 41:9, 41:12, 41:19, 41:21, 42:16, 42:17, 43:3, 43:8, 43:13, 43:14, 43:21, 43:22, 43:24, 43:25, 44:3, 44:25, 45:15, 45:16, 46:25, 47:4, 51:6, 54:1, 54:4, 54:5, 54:16, 55:11, 55:19, 56:11, 56:25, 57:2, 57:10, 57:13, 57:19, 58:21, 59:5, 59:24, 60:5, 60:7, 61:3, 61:6, 61:15, 61:24, 62:1, 62:2, 62:4, 62:5, 62:12, 62:22, 64:4, 64:8, 64:12, 66:21, 67:1, 67:9, 67:18, 67:19, 69:15, 71:9, 71:15, 71:17
**Treasury's** [3] - 64:21, 67:10, 67:13
**treated** [4] - 7:21, 11:16, 25:5, 34:22
**trend** [1] - 37:9
**trial** [9] - 17:18, 19:2, 21:11, 25:3, 29:21, 30:10, 37:21, 51:25, 73:13
**TRIAL** [1] - 1:13
**tried** [2] - 73:20
**trouble** [2] - 69:9, 69:10
**troubled** [1] - 20:19
**true** [9] - 13:9, 32:19, 40:20, 59:23, 66:1, 79:4, 79:5
**trust** [2] - 13:17,

13:18
**truth** [1] - 75:15
**try** [5] - 37:21, 37:22, 44:24, 62:18, 67:5
**trying** [4] - 42:8, 42:9, 57:16, 68:15
**TSP** [1] - 17:3
**turn** [1] - 20:13
**turnaround** [1] - 38:10
**turned** [1] - 20:14
**TV** [4] - 72:10, 74:19, 76:18
**tweet** [1] - 78:6
**Twitter** [2] - 78:6, 78:7
**two** [8] - 4:9, 9:18, 10:16, 15:9, 41:16, 52:15, 58:19, 72:5
**type** [3] - 33:6, 52:12, 53:18
**types** [1] - 72:9

## U

**U.S** [2] - 19:14, 24:20
**Ugoletti** [6] - 40:16, 41:10, 41:16, 41:19, 42:2, 49:6
**ultimately** [1] - 16:4
**unanticipated** [1] - 56:7
**uncertainty** [1] - 66:13
**uncover** [1] - 32:7
**under** [12] - 8:1, 12:18, 40:19, 42:16, 54:1, 54:10, 56:24, 60:4, 66:19, 72:17, 75:8
**undermining** [1] - 13:5
**understatement** [1] - 39:22
**understood** [5] - 13:13, 25:12, 28:19, 32:25, 36:3
**undisputable** [1] - 74:16
**undo** [3] - 13:19, 13:25, 14:1
**unions** [1] - 17:21
**UNITED** [2] - 1:1, 1:14
**United** [3] - 22:15, 40:20, 79:13
**united** [1] - 2:10
**unlimited** [1] - 22:24
**unpack** [2] - 44:18

**unprecedented** [3] - 9:13, 10:12, 54:14
**unreasonable** [3] - 10:15, 31:18, 63:3
**unreasonably** [9] - 8:20, 25:22, 36:1, 63:14, 64:19, 70:8, 70:20, 71:25, 77:10
**unusual** [1] - 74:19
**unwritten** [3] - 8:15, 13:12, 36:3
**up** [34] - 22:22, 23:10, 27:19, 27:20, 36:19, 37:9, 37:14, 39:17, 47:6, 47:10, 48:5, 48:9, 48:10, 48:15, 48:22, 48:23, 49:5, 50:21, 53:17, 55:2, 58:9, 61:2, 62:1, 62:7, 64:8, 66:13, 67:10, 68:16, 68:19, 68:22, 69:14, 75:15, 78:10
**upper** [1] - 43:9
**ups** [1] - 16:8
**upside** [5] - 30:1, 30:7, 31:15, 34:15, 34:16
**urgency** [7] - 45:21, 45:22, 46:8, 58:13, 61:1, 69:16
**urgent** [3] - 59:8, 59:10
**useful** [1] - 4:19

## V

**value** [12] - 27:3, 28:21, 29:2, 30:22, 31:1, 33:6, 33:12, 65:9, 65:15, 65:16, 67:13, 68:11
**valve** [12] - 23:25, 53:12, 54:17, 54:22, 54:24, 55:16, 56:10, 56:14, 57:12, 57:15, 57:17, 71:11
**VARMA** [1] - 2:5
**vending** [1] - 52:10
**verdict** [2] - 71:20, 77:18
**video** [3] - 21:12, 75:7, 75:17
**videos** [1] - 75:23
**videotaped** [1] - 76:1
**view** [2] - 47:12, 50:13
**viewed** [1] - 48:24
**Vince** [1] - 14:3,

76:13
**VINCENT** [1] - 1:17
**violate** [2] - 63:14, 72:1
**violated** [5] - 10:13, 25:22, 36:1, 64:20, 70:8
**violation** [1] - 12:4
**voir** [1] - 4:21
**vote** [3] - 26:9, 26:25, 30:20
**vs** [1] - 1:5

## W

**wait** [1] - 41:2
**walk** [2] - 35:16, 49:25
**walks** [1] - 16:24
**warn** [2] - 12:21, 19:9
**warrants** [2] - 23:11, 31:25
**Washington** [7] - 1:6, 1:19, 1:22, 2:8, 2:12, 40:18, 79:14
**water** [1] - 50:9
**welfare** [1] - 21:19
**Wells** [1] - 25:1
**whereby** [1] - 47:18
**whole** [2] - 29:12, 68:4
**win** [2] - 39:3, 64:17
**wind** [10] - 60:11, 60:22, 61:8, 61:21, 62:6, 62:18, 62:19, 62:20, 63:2, 67:4
**wind-down** [2] - 61:21, 63:2
**winding** [2] - 60:16, 64:7
**wiped** [1] - 67:24
**wish** [1] - 4:10
**witness** [3] - 74:24, 75:14
**witnesses** [4] - 75:11, 75:12, 75:24, 76:2
**woman** [1] - 47:23
**wonder** [1] - 56:13
**woods** [2] - 36:25, 50:21
**word** [6] - 11:8, 20:5, 20:7, 27:23, 45:10, 75:22
**words** [2] - 12:17, 24:7
**works** [1] - 57:18
**world** [4] - 28:13,

29:12, 63:8, 63:18
**worried** [3] - 55:1, 57:14, 59:4
**worry** [5] - 43:15, 49:8, 54:21, 57:20, 75:5
**worse** [2] - 54:13, 67:2
**worst** [1] - 52:5
**worst-case** [1] - 52:5
**worth** [95] - 9:14, 9:22, 10:3, 10:5, 11:22, 12:4, 22:2, 22:3, 25:22, 26:22, 26:23, 27:8, 27:13, 27:21, 27:24, 28:2, 28:9, 29:13, 30:6, 31:14, 32:11, 33:11, 34:15, 35:3, 38:9, 39:1, 39:5, 39:10, 39:11, 39:20, 40:6, 40:7, 41:3, 41:15, 41:17, 42:4, 42:5, 42:10, 43:6, 44:9, 45:2, 45:23, 46:6, 48:19, 48:25, 49:4, 49:7, 50:19, 51:1, 51:10, 52:3, 52:14, 52:16, 52:18, 53:15, 53:22, 53:25, 54:10, 54:14, 57:22, 58:20, 59:2, 59:12, 59:14, 60:13, 61:4, 61:7, 61:13, 61:16, 62:14, 62:18, 63:1, 64:5, 64:13, 64:15, 65:1, 65:8, 65:15, 65:16, 65:20, 68:4, 68:5, 68:8, 68:9, 68:10, 69:17, 69:21, 71:8, 71:16, 71:25, 72:3, 75:22
**wound** [2] - 63:7, 65:2
**WR** [2] - 6:23, 7:1
**write** [5] - 34:18, 47:10, 48:5, 48:22, 66:2
**write-up** [1] - 47:10
**writing** [4] - 8:25, 34:18, 47:25, 48:23
**written** [7] - 9:1, 48:3, 48:9, 48:10, 48:15, 49:5, 71:1

## Y

**year** [17] - 38:17, 38:22, 39:14, 39:16, 39:18, 39:20, 41:8,

44:5, 45:21, 51:1, 54:3, 58:14, 66:10, 70:23
**years** [13] - 7:18, 36:14, 37:2, 37:22, 40:9, 44:12, 44:15, 45:25, 51:4, 58:16, 65:6, 65:22, 66:25
**yesterday** [2] - 5:24, 78:7
**York** [3] - 1:21, 2:4
**young** [1] - 10:20
**yourself** [2] - 12:19, 16:20
**yourselves** [1] - 40:11

## Z

**zero** [3] - 33:21, 39:10, 68:5