1
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
2

3
Fairholme Funds, Inc., et al.,   ) Civil Action
                                 ) No. 1:13-cv-01053-RCL
                     Plaintiffs, )
4                                )
vs.                              ) **Jury Trial (Day 5)**
5                                ) **Morning Session**
Federal Housing Finance          )
6 Agency, et al.                 ) Washington, D.C.
                                 ) **July 28, 2023**
7                    Defendants. ) Time:  10:00 a.m.
  _____

8

  In re Fannie Mae/Freddie Mac   ) Civil Action
9 Senior Preferred Stock         ) No. 1:13-mc-1288-RCL
  Purchase Agreement Class       )
10 Action Litigations.           )

11 _____

        **Transcript of Jury Trial (Day 5) Morning Session**
12                      **Held Before**
             **The Honorable Royce C. Lamberth**
13         **United States Senior District Judge**

14 _____

               A P P E A R A N C E S
15

16 For the Fairholme Funds, Inc. Plaintiffs:
                        **Vincent J. Colatriano**
17                      COOPER & KIRK, PLLC
                        1523 New Hampshire Avenue, Northwest
                        Washington, D.C. 20036
18

   For the Defendant Federal Housing Finance Agency:
19                      **Asim Varma**
                        **David B. Bergman**
20                      **Ian S. Hoffman**
                        **R. Stanton Jones**
21                      **Jonathan L. Stern**
                        ARNOLD & PORTER KAYE SCHOLER LLP
22                      601 Massachusetts Avenue, Northwest
                        Washington, D.C. 20001

23

24

25

1          A P P E A R A N C E S (continued)

2     For the Class Plaintiffs:
                          **Hamish P. M. Hume**
3                         **Kenya D. Davis**
                          **Samuel C. Kaplan**
4                         BOIES SCHILLER FLEXNER LLP
                          1401 New York Avenue, Northwest
5                         Washington, D.C. 20005

6                         **Robert F. Kravetz**
                          **Adam H. Wierbowski**
7                         BERNSTEIN, LITOWITZ, BERGER &
                          GROSSMAN, LLP
8                         1251 Avenue of the Americas
                          New York, New York 10020
9
                          **Lee D. Rudy**
10                        KESSLER TOPAZ MELTZER & CHECK
                          280 King of Prussia Road
11                        Radnor, Pennsylvania 19087

12    _____

      Stenographic Official Court Reporter:
13                        Nancy J. Meyer
                          Registered Diplomate Reporter
14                        Certified Realtime Reporter
                          333 Constitution Avenue, Northwest
15                        Washington, D.C. 20001
                          202-354-3118
16

17    Proceedings recorded by mechanical stenography.  Transcript
      produced by computer-aided transcription.

18

19

20

21

22

23

24

25

1

<u>**I N D E X**</u>

2

<u>PAGE</u>:

3

<u>**Witnesses**</u>:

4

<u>Joseph Mason</u>
        Redirect Examination, Continued, By Mr. Rudy..... 853

5        Recross-Examination By Mr. Jones................. 855
        Redirect Examination By Mr. Rudy................. 857

6 <u>Anjan Thakor</u>
        Direct Examination By Mr. Hume................... 858

7

8

9

<u>**Exhibits Admitted**</u>:

        Plaintiffs' Exhibit 466-A....................... 869

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        P R O C E E D I N G S

2        (Proceedings held out of the presence of the jury.)

3        THE COURTROOM DEPUTY:  This is Civil Action 13-1053,

4    with related miscellaneous case 13-1288, In re:  Fannie

5    Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class

6    Action Litigations.

7        THE COURT:  I looked over the issues that we were

8    discussing when we recessed yesterday regarding Dr. Mason's

9    testimony, and I think I'm at the same position I was.

10        As I understood the testimony, Dr. Mason did not testify

11    on direct about the acceleration of the reduction issue.  He

12    had been asked a question, and I had overruled the objection

13    about what he did testify about on direct and that was left for

14    a very short a couple of sentences.

15        On cross, the slide showing that what would be relevant

16    on that issue of seeing some exhibit that had some rising stock

17    on it did not open the door.

18        And so I'm at the same point that I was last night; that

19    it would be beyond the scope to try to go into that whole issue

20    of opening the door to the acceleration of the reduction of the

21    expert testimony.

22        And so the objection is sustained, as I said last night.

23    It's something that's beyond the scope.  And that's not

24    something I would reconsider or give any curative instruction

25    about.

1          So is there anything else that anybody wants to state

2     for the record?

3          MR. RUDY:  Yes, Your Honor.  If you don't mind.  Lee

4     Rudy.  Good morning.

5          I don't -- first, I just want to clarify, we filed a

6     brief very last --

7          THE COURT:  I'm sorry?

8          MR. RUDY:  I wanted to make sure the Court did

9     receive a --

10          THE COURT:  I received it.  But I don't read stuff

11     like that at that length that's filed at 5:00 a.m., and I got

12     here at 10:00 a.m.

13          MR. RUDY:  I appreciate that, Your Honor.  I was

14     hoping, perhaps, that it might sneak into your inbox.  I know

15     that it was filed very late, and I apologize for that.

16          I only wanted to clarify what Your Honor said because I

17     was unclear.  There were two things that we were arguing about.

18     One was at the end of yesterday, and one was earlier in the

19     day.  So when you sustained the objection, I just wanted to

20     understand.  And if I could maybe just --

21          THE COURT:  The objection about beyond the scope to

22     get into the acceleration reduction?

23          MR. RUDY:  Okay.  That didn't relate to the chart

24     that was -- I wasn't asking for a curative instruction on that.

25     I was asking for a curative instruction on something else,

1    which was an objection that -- so that's not the issue that was

2    pending before Your Honor.

3          But what I was asking is there's something pending

4    before Your Honor at the end of yesterday, and there was

5    something else that I wanted to raise that was in our papers,

6    but I'm happy to do it orally, because I understand --

7          THE COURT:  All right.  What is that?

8          MR. RUDY:  That relates to a separate issue, which is

9    the defendants and the plaintiffs had reached an agreement

10   about the scope of permissible testimony about post-2012

11   stock-price movements.  And the defendants yesterday lodged an

12   objection to a question that I asked about that topic.

13         THE COURT:  But I overruled that objection; right?

14         MR. RUDY:  No.  You sustained it.  You sustained an

15   objection on this topic when I asked -- I can -- I can give you

16   the page cites, if you want.

17         But, Your Honor, what happened was I asked questions

18   about whether -- on direct examination, I asked Dr. Mason does

19   the damage -- the $1.6 billion of damage still persists today.

20   That was a question that was specifically negotiated over a

21   very long period of time with defendants that I was allowed to

22   ask.

23         On direct examination, the question came in.  On

24   redirect examination, after they crossed with this picture of

25   the stock-price movement, I wanted to reexamine it.  Defendants

 1   objected, and they said that was specifically ruled out.  I was

 2   accused of violating the agreement that we had reached with

 3   defendants.

 4        In fact, that specific question had been agreed to be --

 5   that was inbounds.  And, in fact, I think last night in

 6   conversations with defense counsel, I'm pretty confident that

 7   defense counsel will acknowledge to Your Honor that that was an

 8   appropriate question.  Now, Your Honor didn't have any basis

 9   to know what the agreement was.  So you just took it at face

10   value, and you sustained the objection.  And I don't quibble

11   with that, except that it was something that was negotiated

12   between the parties; that I was allowed to ask about it.

13        So, first, I should have been allowed to ask that

14   question.

15        And on redirect examination, after this chart was placed

16   on the screen and these questions -- six times in ten pages,

17   this happened 11 years ago, this happened 11 years ago, and you

18   see the stock price moving after -- it's just there in front of

19   the jury.  And then -- so our argument is that the redirect

20   would have been an appropriate way for me to explain, ask him

21   one more question, again.

22        The answer, which was delineated in our agreement, would

23   have been inbounds, and there shouldn't be any dispute that his

24   next answer would be inbounds.  So I do think I should have

25   been allowed to ask that question.

1      Relatedly, at the same time, defendants, by parading

2      that chart in front -- in front of the jury and then just

3      asking a series of, respectfully, kind of meaningless

4      questions -- well, what does the Y axis represent, and what

5      does that little dot represent?  All it was designed to do,

6      this happened 11 years ago, 11 years ago.  Six times.

7      The whole point of that was to just show the jury this

8      stock-price movement.  Now, why do I know?  Because this is the

9      exact same thing that happened in the last trial.  In the last

10     trial, Mr. Jones cross-examining Dr. Mason put up a slide

11     from -- I can show you slide, if you'd like to see it.  Put up

12     a slide --

13     Will you pull up 375, page 2.

14     Put up a slide that's in front of Your Honor, and this

15     third bullet point, he asked the witness I'm only going to ask

16     you to read the bullet point.  Please read the bullet point.

17     Price of the common stock recovered in September 2012 and that

18     of the junior stocks recovered during October 2012.

19     It is stipulated between the parties; there is no

20     analysis of why the share price after the net worth sweep went

21     up or went down.  It's a complete misleading insinuation to

22     have him, quote, read it.

23     So this is what prompted -- first we tried to file a

24     supplemental report, which Your Honor rejected because it was

25     untimely.  But then we negotiated that we agree that

1    post-August 2012 stock movements are not relevant to damages in

2    this case.  I don't think I'm going to hear the defendants

3    disagree with that proposition.  That's why we negotiated the

4    scope of what we can and can't do.

5         So I'm prevented from using the stuff we agree is

6    inbounds, and then they put on this sort of theatrical show of

7    showing a stock chart that had nothing to do with anything.

8    And then we get the same excuse in colloquy that we had last

9    time.

10        He says I don't understand why putting this in front of

11   the jury would have anything to do with stock-price movement.

12   Really?

13        He said the same thing about the bullet.  I don't

14   understand why having him just read a bullet point would be

15   misleading at it all.  This -- it's gamesmanship.

16        We had a specific understanding, and I should be able to

17   ask the questions I ask.  Now, I think at this point, I don't

18   particularly need to ask the question.  I'd rather Your Honor

19   just tell them stock-price movements after August 2012 are not

20   part of the case.

21        I think that's a better answer to it because, frankly,

22   if I ask more questions, then they're going to say they want to

23   ask more questions.  And then we're going to be on the phone

24   again, and we're going to be debating whether it violates the

25   agreement or not.

1          But it's very clear that we spent a lot of time

2     negotiating an understanding, and they just blew right through

3     it.  Not only did they blow right through it, I'm getting

4     emails handed to me while I'm doing my examination that counsel

5     is emailing saying, Lee just -- I'm on realtime and I see that

6     Lee just violated the agreement by asking that question, which

7     was patently false.  And I'm sure you're going to hear right

8     now that it was patently false.

9          So, Your Honor, respectfully, I accept that the second

10    issue is not related to the first issue.  The second issue is

11    simply a question of if you do a cross-examination on a topic

12    not in an expert report -- so you have an expert report that

13    says a bunch of stuff.  And then the cross-examination is:  I

14    read your expert report.  Isn't it true that you were convicted

15    of drunk driving three years ago?  And then he says:  Yeah, I

16    guess so.  And then I stand up on redirect and I say:  On that

17    drunk driving -- objection, not inside his report.  That's not

18    how evidence works.

19         So that was the second issue.  That was the issue that

20    was pending before Your Honor at the end of the day, which is

21    they did a whole series of questions on cross-examination about

22    the -- whether it was the retained reduction of the portfolio

23    that caused the stock price to drop or whether it was the

24    net worth sweep that caused the portfolio to drop.

25         They did this whole line of examination.  I want to ask,

1   like, three minutes of questions just to say:  Why is it.

2   In fact, they elicited another misleading admission during

3   that where they said to him:  Isn't it true that earlier in

4   this case you, Dr. Mason, gave the opinion that if an event

5   study cannot disaggregate between retained portfolio reduction

6   and net worth sweep, that opinion is not valid?  And that's

7   true.  And he said just simply yes, assuming I would be able

8   to reexamine him.  He said yes, that's true.  Why did he say

9   that?

10          He's referring to a bond study that the defendants'

11  expert did.  Completely unrelated study.  They did a bond

12  study.  They took a subset of bonds.  They showed that when the

13  net worth sweep was announced and the accelerated reduction was

14  renounced, the bond prices went up a little bit.  And from

15  that, they want to argue that the net worth sweep calmed the

16  bond market.

17          And so -- and it's junk.  It's junk science.  It doesn't

18  add up.  There's a lot of proof of that, but I should get to

19  ask him -- because all he said was yes, that's true.  And the

20  jury is now left with the impression that our expert conceded

21  that if you can't distinguish between these two things, then

22  your opinion is invalid.  That was the cross.  And it's just

23  sitting there.

24          And I understand, Your Honor, that we -- whether it had

25  gone into on direct or cross is a little bit amorphous, but

1    that question was a pretty good question that I expected and

2    expected to be able to say:  What was the context of that

3    opinion?  And he'll say that was in the context of a bond

4    study.  Well, why is a bond study different from your study?

5    It's a different.  And he'd explain bond prices do relate to

6    the reduction of the portfolio.  Stock prices do not.

7          So I -- I apologize because I said I was not going to

8    quibble with your earlier ruling.  But I do think that we

9    should be able to ask a few questions on that topic.

10         That's a separate issue, though, from the issue of

11   whether or not there was a violation of our very clear

12   understanding about stock-price recovery.  There's the

13   stock-price-recovery issue and there's the

14   accelerated-reduction-of-the-portfolio issue.  Those are two

15   separate evidentiary questions that --

16         I appreciate it was a 15-page brief; we filed it at 4:00

17   in the morning.  But I wanted to make very clear to Your Honor

18   when we got here that there are these two issues that I think,

19   one -- both are objections that should not be sustained.  One

20   is based on, frankly, a violation of an agreement.  And one, I

21   think, is based on a confusing argument that defendants made

22   about how not putting an opinion in your expert report should

23   then prevent you from responding to questions asked on

24   cross-examination, which I think is -- it's like apples and

25   oranges.

1          So I appreciate your indulgence, Your Honor, and I,

2     respectfully, would ask that when Dr. Mason takes the stand,

3     that two things happened:  One, that you give an instruction to

4     the jury saying:  I'm just going to tell you, Your Honor [sic],

5     stuff that happens after August 2012, it's not relevant.  Stock

6     price moved in 2012.  It fell by $1.6 billion.  There's no

7     evidence in the case -- Dr. Attari was given the opportunity to

8     give an opinion that post-2012 stock prices were -- were tied

9     to some evidentiary, you know, basis.  He declined to do so.

10          Dr. Mason's supplemental report said it had nothing to

11     do with anything.

12          So I think I should be able to -- I would like you to

13     give a curative instruction.  If you don't want to give a

14     curative instruction, I think I should get to ask him to

15     explain why post -- what happened post-2012.  It would be

16     within the scope of our agreement.

17          And then the second thing, Your Honor, I would ask that

18     I be allowed to ask a very short series of questions about

19     the -- the retained reduction of the portfolio -- the reduction

20     of the retained portfolio and how that is not -- you know,

21     what -- his testimony did not pertain to his opinion here.

22     It pertained to their expert on a bond study completely

23     unrelated.

24          I appreciate your indulgence, Your Honor.

25               MS. VARMA:  Your Honor, Asim Varma for the

1    defendants.

2         I'm going to be answering some of the questions or

3    issues raised by Mr. Rudy because I'm the one who issued the

4    agreement that is partly at issue here.

5         I want to be very clear, there was no intent to violate

6    any agreement.  I'll read the agreement to you.  It makes no

7    mention of not putting graphs on that are part of an exhibit

8    that they want to admit; that they have sought to admit and is

9    a sole basis for Dr. Mason's testimony.

10        We did not ask any questions about price recovery.  We

11   did not ask any questions about the stock-price increases after

12   August 17th, 2012.  Fundamentally, we agree with Mr. Rudy that

13   events that happened after August 2012 are not relevant.

14   They're not willing to actually take that position.  They have

15   a very narrow position in terms of damages and in terms of the

16   price reduction.

17        So our agreement was that there would be no argument

18   that post-third amendment prices would be relevant to the

19   damages.  There was no agreement that we would -- there was an

20   agreement that we would not ask any testimony -- ask any

21   questions about price recovery and that our expert, Dr. Attari,

22   would not provide any testimony about price recovery or about

23   the event study.  That was the scope of the agreement.  None of

24   that was violated.

25        Putting a graph up that was part of the exhibit that

1    plaintiffs admitted -- that was not precluded by the

2    agreement -- simply is not a violation of the agreement.

3            I'd also note that as -- as I understand it and read the

4    transcript, Mr. Rudy never objected to the fact that the graph

5    was up for close to 30 questions of defendants' counsel's

6    cross.  He then put the same graph up on redirect.

7            If the graph was so offensive and so clearly misleading,

8    he should have said something earlier.  And he didn't -- or he

9    should have negotiated -- plaintiffs should have negotiated

10   that we couldn't actually ask any questions about the graphs or

11   about anything having to do with the event study.  That's not

12   what the agreement was about.

13           And, also, I'd like to offer it's just completely

14   inappropriate to have a jury instruction based on some

15   speculation.  We do not agree that plaintiffs have proven

16   that their damages are 1.6 billion, and their proposed

17   instruction, basically, says that.  It's not an appropriate

18   instruction at this time.  It won't be an appropriate

19   instruction later.  And it's certainly not warranted by some

20   purported violation of an agreement.

21           I'm happy to answer any questions.

22               THE COURT:  All right.  I agree with the defendants'

23   position.  So I'll overrule the plaintiffs' objections.

24           Do you have other questions you want to cover with the

25   witness?

1          MR. RUDY:  I don't want to reargue anything.  I do

2     expect that Ms. Varma will put on the record what she said she

3     would, which is --

4          THE COURT:  I'm sorry?

5          MR. RUDY:  I don't want to reargue, but I do expect

6     that counsel will do what she said she was going to do, which

7     was to tell Your Honor that the question that I asked that was

8     sustained was a question that we had negotiated on a topic that

9     was permissible.

10         MS. VARMA:  What we had negotiated was that Dr. Mason

11    would be able to provide the following testimony:  The opinion

12    in my reply report, which refers to his second report,

13    regarding the 1.6 billion in damages estimated at the

14    announcement of the net worth sweep applies today as well as

15    2012.  And that's -- we did agree to that.  And to the extent

16    the objection was objecting to that statement, it was

17    incorrect.  And we apologize for that.

18         We did not agree to any further explanation of what that

19    means.  And that's -- so I apologize for misstating or

20    overstating the objection.

21         MR. RUDY:  Could you just give me and my team a

22    minute before you bring the jury in because I do need to think

23    about what redirect, if any, will be left after Your Honor's

24    ruling.

25         THE COURT:  All right.

```
 1                MR. RUDY:  Thank you.

 2                THE COURT:  Bring the jury.

 3                MR. KAPLAN:  Your Honor, may I raise one issue

 4       with Professor Thakor?

 5                THE COURT REPORTER:  Could you introduce yourself.

 6                MR. KAPLAN:  I'm sorry.  Sam Kaplan for the

 7       plaintiffs.

 8                THE COURT:  The answer was no.  I'm dealing with

 9       this, and then we'll see what else.

10                MR. KAPLAN:  Okay.  I apologize, Your Honor.

11                THE COURT:  You can bring Dr. Mason in.

12                (Proceedings held in the presence of the jury.)

13                THE COURT:  Good morning, ladies and gentlemen.  You

14       may be seated.

15           Dr. Mason, you can come forward and resume the stand.

16                MR. RUDY:  May I, Your Honor?

17                THE COURT:  You may proceed, Mr. Rudy.

18                MR. RUDY:  Again, it's Lee Rudy for the plaintiffs.

19           Good morning.  Good morning.  Good morning, ladies and

20       gentlemen.

21           Jenna, will you pull up Slide 17 from the PowerPoint

22       yesterday.  Can we display this.  Okay.  Thank you.

23                     REDIRECT EXAMINATION, continued

24       BY MR. RUDY:

25       Q.  Good morning, Dr. Mason.
```

MASON - REDIRECT

1   A.  Good morning.

2   Q.  I only have a couple more questions for you.  Sorry to keep

3   you overnight.

4       Do you recall that you were asked questions

5   yesterday about the fact that Fannie and Freddie's stock price

6   didn't go all the way to zero on the announcement of the

7   net worth sweep?

8   A.  Yes.

9   Q.  In your opinion, why did the stock not go all the way to

10  zero?

11  A.  The stock entails a bundle of rights.  One of those is the

12  right to share in the earnings of the firm.  And another could

13  be -- there could just be many others.  To litigate in this

14  case, for instance, to try to recover some money so there could

15  still be value to those rights.

16  Q.  If the stock price had gone all the way to zero, what would

17  the damages have been in this case?

18  A.  Well, they would have been the entire $2.93 billion.

19  Q.  Okay.  But that's not your opinion?  You're not expressing

20  the opinion that damages are 2.93 billion; right?

21  A.  No.

22  Q.  What is your opinion about the actual amount of damages

23  that are appropriate to award in this case?

24  A.  There -- the $1.6-billion drop in the stock price that

25  arose from the imposition of the net worth sweep.

1  Q.  So let me just ask you in conclusion, in light of your

2  expert opinion and all of your years of work in this field,

3  what is your expert opinion as to the cause of Fannie and

4  Freddie's $1.6-billion stock-price decline on August 17th,

5  2012?

6  A.  My analysis concluded that the cause was the

7  net worth sweep itself.

8            MR. RUDY:  Thank you, Your Honor.

9            MR. JONES:  Your Honor, I request permission for just

10  a brief recross, about three questions.

11            THE COURT:  All right.

12            MR. JONES:  Thank you, Your Honor.  Good morning,

13  members of the jury.

14                      RECROSS-EXAMINATION

15  BY MR. JONES:

16  Q.  Good morning, Dr. Mason.  Stanton Jones for the defendants.

17            You were asked a question just now about why, in your

18  view, the Fannie and Freddie share prices did not go all the

19  way to zero on August 17th, 2012, upon the announcement of the

20  third amendment.  Do you recall that?

21  A.  Yes.

22  Q.  And your answer -- part of your answer was that perhaps the

23  shares retained some value, market value, a positive, above

24  zero on that day, August 17th, 2012, in light of the

25  possibility that this litigation might result in some recovery

1   for the shareholders; is that -- am I understanding that

2   correctly?

3   A.  If I heard your question correctly, let me just answer,

4   that was one example of some rights that could remain.

5   Q.  Sure.  Dr. Mason, this lawsuit was filed in 2013.  This

6   lawsuit couldn't possibly have had any impact on the

7   market value of the Fannie and Freddie shares in August of

8   2012 when it wasn't filed until the next year; isn't that

9   right?

10  A.  I wasn't -- I said, for instance, through proceedings like

11  this lawsuit.  But this lawsuit would not be known at the time

12  of the net worth sweep; that's correct.

13  Q.  Are you aware of any lawsuits challenging the third

14  amendment that were in existence on August 17th, 2012, the day

15  of the third amendment's announcement?

16  A.  No.

17  Q.  You, in fact, know that there were no such lawsuits filed

18  that day, sir; right?

19  A.  That's correct.  And that was not my opinion that I

20  expressed earlier.  I merely expressed that the shares of

21  stock do contain a bundle of rights; that among those could

22  be the right to file a lawsuit.  I didn't say one had been

23  filed.

24  Q.  Okay.  So I just want to make sure it's totally clear to

25  the jury, because I felt like I heard you say --

```
 1              MR. RUDY:  Your Honor.  Can I object, please.

 2              THE COURT:  Sustained.

 3              MR. STERN:  No more questions.  Thank you.

 4              MR. RUDY:  Your Honor, I feel like -- I'm sorry to

 5     play ping-pong like this, Your Honor.

 6                      REDIRECT EXAMINATION

 7     BY MR. RUDY:

 8     Q.  Dr. Mason, did you just express the view that it would be

 9     this lawsuit, and this lawsuit alone, that would cause the

10     stock price not to go to zero?

11     A.  No.  In fact, I expressed the opinion it could be this

12     lawsuit or any lawsuit.  There could be a lot of things that

13     held that stock price above zero.

14     Q.  And any of those things could have caused shareholders to

15     see this event and say this just can't stand; correct?

16     A.  Right.

17     Q.  And if investors say this just can't stand, there's no way

18     this could be right, there could be investors who are going to

19     continue to hold that stock above zero and say I can't imagine

20     that this thing is going to be allowed to stick around the way

21     that the government just did it; right?

22              MR. JONES:  Objection.  Leading.

23              THE COURT:  Sustained.

24              MR. RUDY:  Nothing further.

25              THE COURT:  You can step down, Dr. Mason.
```

 1              (Witness excused.)

 2              THE COURT:  Next witness.

 3         Thank you, Dr. Mason.

 4              MR. HUME:  Plaintiff calls as their next witness,

 5    Professor Anjan Thakor.

 6         And, Your Honor, with the Court's permission, we'd like

 7    to put up an easel just for one segment of Professor Thakor's

 8    expected testimony.

 9              (Oath administered.)

10              THE WITNESS:  I do.

11              THE COURTROOM DEPUTY:  Thank you.

12                        DIRECT EXAMINATION

13    BY MR. HUME:

14    Q.  Good morning, Professor Thakor.

15    A.  Good morning.

16    Q.  Could you just introduce yourself again to the members of

17    the jury.

18    A.  Good morning.

19    Q.  Could you state your name for the record and for the jury.

20    A.  Anjan Thakor.

21    Q.  And without giving any opinion, could you just briefly

22    explain to the members of the jury the topic about which you're

23    going to testify today.

24    A.  So I'm going to discuss today what an appropriate periodic

25    commitment fee would have been if it had been charged.

1    Q.  And could you -- again, without giving any opinion -- just

2    briefly explain your understanding of what the periodic

3    commitment fee was and what the relevance of this may be.

4    A.  Sure.  So my understanding is that the third amendment, in

5    addition to the net worth sweep, also eliminated the PCF, the

6    periodic commitment fee.  It was never actually charged, but

7    the third amendment, basically, eliminated it.

8         And so the question is if, in fact, instead of the

9    net worth sweep a PCF had been charged to the GSEs, what would

10   have been an appropriate amount?  Because my understanding is

11   that the defendants are claiming that it would have been huge

12   or very substantial and that that's a justification for the

13   net worth sweep.

14        So plaintiffs asked me to render my opinion on what the

15   appropriate PCF would have been had it been charged.

16   Q.  Thank you.

17        Could we now talk about your professional and

18   educational background.  Do you have a degree, a Ph.D., in

19   economics?

20   A.  Financial economics from Northwestern University.

21   Q.  And where do you currently work?

22   A.  So I'm a professor of finance at the Olin Business School

23   at Washington University in St. Louis.

24   Q.  And what positions do you hold there?

25   A.  So currently I am professor of finance, director of the

THAKOR - DIRECT                                              860

1    Center for Finance and Accounting Research, and also interim

2    dean until the end of August.

3    Q.  I should ask, did you have -- work on preparing some

4    demonstrative slides to assist you in preparing your testimony

5    today?

6    A.  Yes, I do.

7              MR. HUME:  And with the Court's permission, may I

8    show those to the jury?

9              THE COURT:  Yes.

10   BY MR. HUME:

11   Q.  Does this slide currently on the screen show some of your

12   professional background?

13   A.  Yes.  So I began -- I'm sorry.

14   Q.  Yes.  So could you explain your -- the different positions

15   you've had, at least over the last --

16   A.  Right.  So currently I'm at the Olin Business School at

17   Washington University in St. Louis.

18            Prior to that I was at the University of Michigan.  I

19   was chairman of the financial department until 2003.

20            And my first job was at Indiana University in

21   Bloomington.  So I've been in the Big 10 until I moved to

22   Washington U.

23   Q.  And what subjects have you been teaching at all these

24   universities?

25   A.  Mainly corporate finance and banking and the economics of

1    information.

2    Q.  And how long have you been doing that?

3    A.  About 40 years.

4    Q.  And have you published any articles or books about finance

5    and economics?

6    A.  Yes, I have.

7    Q.  Can you briefly explain what you've written to the jury.

8    A.  Yes.  I've published a number of books on banking,

9    corporate finance; 11 books in all.  I've published over a

10   hundred peer-reviewed research articles and numerous

11   monographs.

12   Q.  Could you just briefly explain to the members of the jury

13   what -- what it means to have a peer-reviewed article.

14   A.  So peer-reviewed is the gold standard for publication and

15   academic journals.  And so when you submit a paper through a

16   journal, the editor decides to have it peer reviewed by other

17   academics.  And you receive anonymous referees' reports on the

18   journal -- from the journal.  And, typically, the top journals

19   publish less than 10 percent of the papers they receive that go

20   through this peer-review process.

21        So the purpose of the peer review is to ensure

22   that the quality of the paper meets the threshold standards of

23   the journal and that the research methods that are used are

24   sound.

25   Q.  And this mentions monographs too.  Just briefly explain to

1    the members of the jury what a monograph is.

2    A.  So a monograph is an in-depth study on a specific topic.

3    And it's in length somewhere between a textbook and a

4    peer-reviewed article.  Peer-reviewed article in economics

5    or finance would be 30 or 40 pages, typically.  Books,

6    obviously, as you know, would be hundreds of pages.  So this

7    would be somewhere in between.  But it's dedicated to a

8    specific topic.

9    Q.  Now, have you written on the subject of commitment fees?

10   A.  Yes, I have.

11   Q.  And just briefly could you explain what a commitment fee

12   is.

13   A.  Sure.  So a commitment fee is the price of a promise that

14   a provider of finance makes to the customer to provide funding

15   at some future date.

16        So let's say you're a firm that thinks that it might

17   need funding at some future date.  You want to make sure that

18   when you need it, you'll get it; right?  That when you approach

19   the -- the institution providing the financing, that they'll

20   make funding available to you.

21        In exchange for that promise to make the funding

22   available to you, the institution will typically charge you a

23   small fee.  Okay?  It is not the interest on the actual loan

24   or the dividend on the actual preferred stock.  It's simply

25   the price on the promise to make funding available in the

 1    future.

 2          Now, if you actually take the funding, there will be an

 3    additional price, like an interest rate on a loan.

 4    Q.  And which is typically larger?  The interest or dividend

 5    rate?  Or the commitment fee?

 6    A.  Sorry.  Say that again.

 7    Q.  Which is typically larger?  The interest rate you pay when

 8    you actually borrow or the commitment fee?

 9    A.  Oh, the interest rate on the actual borrowing.  The

10    commitment fee is typically, on most of these commercial

11    contracts, less than 1 percent.  But then when you actually

12    take the loan or you actually access the funding, that will be

13    an interest rate that will be a much higher amount.

14    Q.  And have you -- can you summarize for the jury some of the

15    work you've done in your career on commitment fees.

16    A.  Yes.  I began early in my career working on bank loan

17    commitments.  And I published the first paper on this in 1981,

18    and it was a formal analysis of how you would price these

19    commitments.

20          And then since then I've published numerous

21    peer-reviewed papers in top academic journals on bank loan

22    commitments.

23          And in 1977 my co-author and I published the first

24    theoretical and empirical paper on loan commitments, which

25    developed a theoretical model.  And then we looked at the data

1    on about 2,500 loan commitment contracts to test the

2    predictions of the model and actually provide a lot of detail

3    on what these contracts look like in practice.

4    Q.  And could you briefly summarize for the members of the jury

5    what this next slide shows that you prepared about other

6    publications you have on commitment fees.

7    A.  Sure.  So this is a list of the peer-reviewed articles that

8    I've published on bank loan commitments.  And these are some of

9    the top journals in finance and economics.  For example, the

10   *American Economic Review* is the official journal of the

11   American Economic Association.

12        The *Journal of Money, Credit and Banking* is one of the

13   top macroeconomics and banking journals in the field.

14        So this is just a list of all the peer-reviewed articles

15   I've published.

16   Q.  And have you always written or published on the topic of

17   the 2007 to 2008 financial crisis?

18   A.  Yes.

19   Q.  And does this slide summarize some of those publications?

20   A.  Sure.  So like a number of other researchers in finance and

21   economics, the financial crisis led to a lot of research, and I

22   did some of this research.

23        So this is a list of the peer-reviewed papers that I've

24   published in finance and economic journals on the '07-'08,

25   financial crisis.

 1   Q.  And I don't want to embarrass you, but I am doing this to

 2   make a record for tender of you as an expert.

 3        Have you received any awards or recognition for your

 4   work?

 5   A.  Yes, I have.  So a couple of years back, the Financial

 6   Intermediation Research Society gave me a lifetime

 7   achievement award for research contributions to financial

 8   intermediation.

 9            THE COURT REPORTER:  Financial -- say the last word.

10            THE WITNESS:  Financial Intermediation Research

11   Society.  We call it FIRS.

12   BY MR. HUME:

13   Q.  And FIRS is F-I-R-S?

14   A.  F-I-R-S, yes.

15   Q.  And maybe briefly, just briefly, explain what financial

16   intermediation means.

17   A.  So it's the leading global research society for organizing

18   conferences all over the world on topics related to financial

19   intermediation.  So that's a much broader term than banking.

20   But it includes banking, investment banking, insurance

21   companies, bank regulations, even many aspects of corporate

22   finance, financial markets.

23        And so the society organizes annual conferences in

24   different places.  So this year, for example, the conference

25   was in Vancouver.  And so they give annual awards for lifetime

1    contributions to financial intermediation research.

2    Q.  Just -- the concept of intermediation, not a word most of

3    us use.  Just very briefly, what is the concept of financial

4    intermediation.

5    A.  So it's, actually, a very simple concept.  An intermediary

6    is an institution that intermediates between the providers of

7    funds and the users of funds.

8           So a bank is a financial intermediary because it takes

9    in deposits and uses the money to make loans.

10          An insurance company is an intermediary because it

11   provides insurance in exchange for insurance premiums that you

12   provide, and it has investors that invest in the insurance

13   company.

14          An investment bank is a financial intermediary.

15          A credit-rating agency is a financial intermediary.

16          So the financial system includes various types of

17   financial intermediates.

18          The GSEs, Fannie and Freddie, are financial

19   intermediaries.

20          So financial intermediation is a topic that deals with

21   the role of these financial intermediaries, the economic

22   services that they provide, and their regulation.

23   Q.  Moving on from that, have you done any consulting for

24   private businesses in the area of finance?

25   A.  Yes, I've -- I've consulted extensively with many

1    companies:  Citibank; Anheuser-Busch before the acquisition by

2    InBev, AB InBev after the acquisition; AT&T.  A number of

3    companies.

4    Q.  And have you ever been hired to provide consulting

5    or advice to branches or agencies at the federal government?

6    A.  Yes.  I've worked pretty extensively with the Federal

7    Reserve Banks.  That includes the board of governors, as well

8    as the Federal Reserve Banks of New York, Philadelphia,

9    Cleveland, and others.

10   Q.  Have you ever been hired by the federal government as an

11   expert witness in a legal case, in a lawsuit?

12   A.  Yes, I have.  So I've worked as an expert witness for the

13   Department of Justice and with the SEC, the Securities and

14   Exchange Commission.

15   Q.  Prior to this case, had you ever been engaged by a party

16   that was adverse, opposite to, a government -- federal

17   government agency?  Had you ever done that before?

18   A.  No.

19   Q.  And are you being compensated for your work in this case?

20   A.  Yes, I am.

21   Q.  Is your compensation in any way contingent on the opinions,

22   the independent opinions, you reached in this case?

23   A.  No.

24   Q.  Is your compensation contingent in any way on the outcome

25   of this case?

THAKOR - DIRECT

```
 1    A.  No.

 2              MR. HUME:  Your Honor, at this particular time, I

 3    would like to tender Professor Thakor as an expert in the

 4    fields of finance and loan commitments.

 5              MR. HOFFMAN:  No objection.

 6              THE COURT:  All right.  You may proceed.

 7    BY MR. HUME:

 8    Q.  And, Professor Thakor, at your -- you have a witness binder

 9    in front of you.  And I believe -- could you just open to

10    Tab 1.  And there should be there a document marked as

11    PX-466-A.  Do you have that?

12    A.  Yes.

13    Q.  And can you identify that for the record.  Is that a copy

14    of your résumé?

15    A.  Yes, it is.

16              MR. HUME:  Your Honor, I would --

17    BY MR. HUME:

18    Q.  Did you prepare it and make sure it's accurate?

19    A.  Yes, I did.

20    Q.  Does it accurately describe your background, education,

21    publications, et cetera?

22    A.  That's correct.

23              MR. HUME:  Your Honor, at this point we'd like to

24    move into evidence PX-466-A.

25              MR. HOFFMAN:  No objection.
```

```
1                  THE COURT:  Received.

2                  (Plaintiffs' Exhibit 466-A admitted into evidence.)

3       BY MR. HUME:

4       Q.  Professor Thakor, can you explain to the jury what

5       your assignment was from the plaintiffs in this case.

6            What question did they ask you to give your independent

7       opinion on?

8       A.  Sure.  So I was asked to assume that some periodic

9       commitment fee would have been charged if the net worth sweep

10      had not occurred.  Conditional on that assumption, what

11      would have been an appropriate periodic commitment fee.

12      Q.  And just so it's totally clear, are you giving an opinion

13      one way or the other whether had it not been for the

14      net worth sweep there would have been a period commitment fee

15      charged?

16      A.  No.  I'm assuming that if it had been charged.  So that

17      assumption I'm taking is a given, and then determining what the

18      fee should have been.

19      Q.  So you're not giving an opinion on whether it would have

20      been charged?

21      A.  That's correct.

22      Q.  And, again, as you did earlier, perhaps before giving your

23      conclusion, can you explain to the jury, again, what exactly a

24      commitment fee is.

25      A.  Okay.  So this -- and this picture illustrates this.  So
```

1    you've got a company on the right that wants to ensure that it

2    will have some funding available in the future.  And so it goes

3    to a bank, and it says I would like a funding commitment.  In

4    this case it could be a loan commitment.

5         So let's say that I need the commitment because I plan

6    to do an acquisition in the future or I have some working

7    capital needs in the future that will require some finance and

8    I want to make sure that I get it when I need it.

9         And so in exchange for the promise to make that funding

10   available in the future, the bank would charge you a commitment

11   fee.  It's typically a small fee, like I said, typically less

12   than a percent, and it's paid upfront before you actually get

13   the funding.

14   Q.  And does the next slide show your ultimate bottom-line

15   conclusion in response to the question you were asked?

16   A.  That's correct.  So my opinion, based on the analysis that

17   I did and the documents that I examined, is that assuming that

18   some fee would have been charged, the appropriate fee would

19   have been between 2 and a half basis points and 45 basis

20   points.

21   Q.  And for the members of the jury who may not be familiar

22   with the term basis point or who, like me, need a reminder,

23   could you just explain, what is a basis point.

24   A.  Sure.  So one basis point is 100th of 1 percent.

25        So, you know, 2 and a half basis points is 2.5 divided

1    by a hundred percent; right?

2    Q.  So 100 basis points would be --

3    A.  Would be 1 percent, yes.  Correct.

4    Q.  And just to show that, does -- do these percentages show

5    what -- another way of showing the basis points?

6    A.  Correct.  So 2.5 basis points is basically 0.025 percent.

7    And 45 basis points is 0.45 percent.

8           So these might look like small numbers, and they are.

9    But you've got to remember, this is not the price of the

10   funding.  That's going to be an additional price that you'll

11   have to pay when you actually take the funds.  This is simply

12   the price of the promise that the financier is making that

13   funds will be available in the future.

14   Q.  Now, could you briefly describe for the jury your

15   methodology and the structure of your analysis in reaching this

16   opinion.

17   A.  Sure.  So first step was to assume that some fee would have

18   been charged.  And then the second step was to go and look at

19   the contract, the PSPAs or the PSPA, and related case

20   materials.

21          And so when I looked at the PSPA, I saw that it did not

22   give me a formula for computing the PCF, the periodic

23   commitment fee, even though it refers to determination of the

24   PCF, with reference to market value based on the reasonable

25   discretion of the contracting parties.

THAKOR - DIRECT

1            And that told me that I needed some market-based measure

2     to determine what the PCF should be, and then to get that

3     market-based measure, I examined the all-in cost of the

4     commercially reasonable market comparables.

5            And so I looked at commercial loan commitments.  I

6     looked at the assistance that the government provided to banks

7     during the financial crisis.  I looked at the assistance that

8     the government provided to AIG, the world's largest insurance

9     company at the time during the financial crisis.  And then I

10     also looked at the deposit insurance fees that the FDIC charges

11     banks for insuring deposits.

12            And then based on all this analysis, I determined what

13     commitment fee was appropriate in this case.

14     Q.  And does this also, sort of, outline the structure of your

15     testimony that you're going to give?  We're going to go through

16     each of these steps with the jury.

17     A.  That's exactly right.

18     Q.  Okay.  And you've done -- you've explained the assumption.

19     So let's go to Step 2.  What does this slide show?

20     A.  So this is the SPSPA, the senior preferred stock purchase

21     agreement.  And so I've highlighted the portions that I think

22     are very relevant for the determination of the PCF.

23            So it says that "The Periodic Commitment Fee is intended

24     to fully compensate" -- and I take that to mean not

25     overcompensate, but fully compensate, the "Purchaser" -- in

1    this case, Treasury -- "for the support provided by the ongoing

2    Commitment . . .   The amount of the [PCF] shall be set not

3    later than December 31[st], 2009."  Of course, they waived

4    that.  So they never set it.

5          And then it ". . . shall be determined with reference to

6    the market value of the Commitment" -- so that's what I

7    referred to earlier.  That you need some sort of market

8    comparables to provide guidance on what this should be.

9          And it ". . . shall be mutually agreed [upon] by [the]

10   Purchaser and Seller, subject to their reasonable

11   discretion" -- so there will be some reasonable negotiation

12   that would lead to what those fees should be -- "and in

13   consultation with the Chairman of the Federal Reserve."

14   Q.  And so you highlighted the phrases that you thought

15   were important in terms of telling you what the main concepts

16   were?

17   A.  That's correct.

18   Q.  And -- and there's no formula, is that --

19   A.  There is no formula, as you can see here.  It simply guides

20   you to look at market value.

21   Q.  So does this next slide summarize what -- the takeaway for

22   you on the actual contract?

23   A.  Right.  So I took all of those highlighted phrases and put

24   them together to ask myself what it implied.  The fact that

25   there's no formula given in the PCF, the fact that they said it

1    would be negotiated, that it would not be used as a pretext to

2    basically give away all of the GSEs' profits; instead, it would

3    be set with reference to market value based on reasonable

4    discretions.

5          So these were, sort of, the guiding principles as I did

6    my analysis.

7    Q.  Let's just go back to the slide with the language again for

8    one second.  That first phrase you highlighted "intended to

9    fully compensate," what -- what relevance did that -- why did

10   you think that was relevant to the concept here?

11   A.  So the idea was that if you looked at market-based

12   comparables, they would give you guidance on how much

13   Treasury ought to be compensated for this promise.

14         Because you look at other contracts, other forms of

15   assistance that Treasury provided to other banks, and you get

16   some guidance on what Treasury felt or what contracting parties

17   and commercial transactions believed the financier needed to be

18   fully compensated.  And then that serves as a guidance for

19   determining the PCF.

20         So the idea is that full compensation doesn't mean you

21   take everything that the GSEs introduce in terms of profits.

22   Q.  So does that phrase have something to do with the third

23   bullet on the next slide?

24   A.  Right.  That it would be negotiated, presumably in

25   good faith, and set with reference to market value based

1    on reasonable discretion to provide full compensation to

2    Treasury.

3    Q.  Where did you get the third bullet from?

4    A.  I'm sorry?

5    Q.  What about the third bullet on this slide?

6    A.  So the third bullet, basically, says that it would not be

7    used as a pretext to give away all of the GSEs' profits.

8         So once we determined what the PCF is, it's going to

9    turn out that that reasonable PCF to provide full compensation

10   to Treasury was not equal to a hundred percent of the profits.

11   Not even close.

12        And so the 2 and a half basis points or 45 basis points,

13   as I'll show you, the amount of compensation that it implies is

14   significantly lower than taking a hundred percent of the

15   profits of the GSEs.  So to argue that if the PCF had been

16   determined, it would have been so big that it justified taking

17   all of the profits of the GSE.  It's not a reasonable argument

18   based on the analysis that I've done.

19   Q.  Now, did you also -- in addition to looking at the

20   contract, did you look at the documents produced in the case to

21   see if either Treasury or the FHFA or Fannie and Freddie had

22   done any calculations or even some kind of work to try to

23   calculate what a periodic commitment fee would be?

24   A.  Yes, I did.  Because if Treasury or FHFA had actually done

25   any analysis of the PCF and how much it should be in terms of

THAKOR - DIRECT

1      quantification, that would have been very helpful.  But not

2      only did I not find anything in the internal documents that

3      indicated that Treasury had done any such analysis, but, in

4      fact, there were documents that indicated that they had not.

5              So there were exchanges between Anne Eberhardt of

6      Grant Thornton and Jeff Foster at Treasury, which actually was

7      an exchange about have you relied on any literature to

8      determine the PCF.  And the response was no, we just waived it.

9      So they did not, as far as I can tell, do any internal analysis

10     to quantify the PCF.

11     Q.  And did you -- did you review any testimony, from

12     depositions or otherwise, other proceedings, from Mr. DeMarco

13     or others about whether they had tried to calculate it from the

14     FHFA's side?

15     A.  Sure.  Yeah, Mr. DeMarco's testimony also indicated that

16     they had not attempted to quantify the PCF.  Mr. Ugoletti's

17     testimony indicated something similar.

18     Q.  Okay.  So you looked at market -- the best market

19     comparables you could identify; is that right?

20     A.  Correct.

21     Q.  And can you summarize for the jury what those were again,

22     briefly.

23     A.  Right.  So, you know, because the PCFs did not include a

24     specific formula for computing the fee, I thought that the best

25     sources for determining the pricing of the commitment fee based

1    on market value were commercial loan commitments.

2         In fact, the pricing structure of this commitment seems

3    to mimic quantitatively the pricing structure of bank loan

4    commitments.  So I looked at the research on commercial loan

5    commitments.  I looked at actual commercial loan commitment

6    contracts.  So that was one thing that I looked at.

7         Then I also looked at the compensation that was provided

8    by banks to Treasury for assistance during the financial

9    crisis, because the GSEs were not the only institutions that

10   received assistance from Treasury.  Many banks did.  AIG did.

11        So looking at how much they paid for the assistance was

12   useful as well.  And then AIG received a very substantial

13   amount of financial assistance from both the New York Fed and

14   Treasury.  So the terms of those contracts were also

15   informative.

16        And, finally, deposit insurance fees.

17   Q.  So we're going to go through each of those, but you

18   mentioned on the earlier slide something about all-in cost.  Is

19   that right?

20   A.  Yes.  So when you look at all of these market comparables,

21   you have to focus on all-in costs because a lot of these

22   contracts have multiple features.  It's not just one price.

23        So remember when I talked about the loan commitment,

24   it's not just the interest rate on the loan itself or the cost

25   of the funding that you take from the financier, but it's also

1    the price that you pay upfront as a commitment fee.  So the

2    all-in cost looks comprehensively at the total cost that the

3    borrower or the customer faces.

4    Q.  So with, I think, the Court's permission, I've been granted

5    to just move the easel.  Do you have --

6    A.  Sure.  I can actually demonstrate it with a very simple

7    example that I think we're all very familiar with in our

8    day-to-day lives.

9    Q.  Judge Lambert said it would be okay for you to just briefly

10   come and illustrate for us.

11   A.  May I step down?

12   Q.  You may.

13   A.  All right.  So let's say -- let's say you want a mortgage.

14   Okay?  So -- and you want to borrow $300,000 to buy a home.

15   Okay?  And let's say you do what I normally do, which I always

16   go for a fixed-rate mortgage.  So let's say it's a 30-year

17   fixed-rate mortgage.

18        And you get two offers.  There are two banks.  Let's

19   call them A and B.  And Bank B says the mortgage interest rate

20   will be 6 and a half percent, and Bank A says it's going to be

21   6.25 percent.

22        Now, if that's all I gave you, it's obvious which is a

23   better mortgage; right?  This is cheaper.  In fact, this will

24   cost you about $1896 per month.  This will cost you about

25   1846.47.  So this is about -- you'll save $50 a month by going

1    with Bank A, which charges you 6.25 percent.

2         But this is not the end of the story; right?  You've got

3    to read the fine print.  The fine print is Bank A is going to

4    charge you one point -- one mortgage point, and Bank B is going

5    to charge you zero.

6         Okay.  Now, as you know, points are the money that you

7    pay upfront at the time that you close, and then you get a

8    lower interest rate.  Okay?  And so this is going to be about

9    $3,000.  Okay?  This one point on this mortgage.

10        And then there's a closing cost for Bank A that's a

11   little bit higher than that for Bank B.  It's higher because

12   they're going to charge you another one and a half points for

13   mortgage origination.  So there's an origination fee of one and

14   a half points.  That's going to be another four and a half

15   thousand dollars.  And Bank B has waived the origination fee.

16        But there's some other closing costs, but they're the

17   same for both banks; right?

18        Now if I were to ask you, which mortgage would you like,

19   the answer for most people, actually the 6 and a half percent

20   mortgage is a better mortgage because you're not paying the

21   $3,000 for the mortgage points, and you're not paying the one

22   and a half points, which is another four and a half thousand

23   dollars for the origination fee.

24        So all-in costs says you simply can't just focus on the

25   6 and a quarter and the 6 and a half percent.  You have to look

1    at the all-in cost of the mortgage with -- with Bank A and the

2    all-in cost of the mortgage for Bank B.  And when you look at

3    the all-in cost, this is actually cheaper.

4         So everything I'm representing to you today, I want to

5    focus on all-in costs as opposed to just one piece of the

6    contract, or the cost.  That's the basic point.

7         And so I think when we deal with mortgages, this seems

8    very intuitive to us and we all think about it this way.  But

9    it's the same principle that's going to apply to the PCF and

10   the market comparables that I'm going to present to you.

11        Thank you.

12   BY MR. HUME:

13   Q.  Thank you, Professor Thakor.

14            MR. HUME:  We can move the easel, but we'll keep it.

15        And thank you, Judge Lamberth, for allowing the witness

16   to do that.

17   BY MR. HUME:

18   Q.  Now, on -- the next slide carries that concept over to a

19   situation a little different than a mortgage.  The Treasury

20   commitment here.  What can you explain what the all-in cost

21   concept entails when looking at the agreement between the

22   Treasury and the GSEs?

23   A.  Sure.  So when you look at the contract between Treasury

24   and the GSEs, the GSEs, even before you get to the PCF, were

25   already paying fairly substantial compensation to Treasury.

1    They paid -- each of them had paid a billion dollars in the

2    initial commitment fee.  Okay?  That was added to the

3    liquidation preference.

4         They were paying a 10 percent annual dividend, which by

5    the time of the third amendment was $18.9 billion.  And in

6    addition to this, Treasury had warrants, which are really

7    options, to purchase almost 80 percent of Fannie and Freddie

8    common stock for a very nominal amount, almost rounding -- or

9    less than a hundred thousand dollars.

10        For less than a hundred thousand dollars, Treasury could

11   get almost 80 percent ownership of the common stock in these

12   GSEs; which means that not only does it get the 10 percent

13   annual dividend on the preferred stock, but then it also gets

14   80 percent of the dividend on the common stock once the

15   warrants are exercised.

16        So when you think of the all-in cost, you really have to

17   take all of these costs into account and not just focus

18   narrowly on the PCF.

19   Q.  And just because I'm not sure that the jury has heard much

20   about it, the $1-billion initial commitment, just explain

21   again, when was that charged and how did that work?

22   A.  Sure.  So the billion-dollar initial commitment fee was

23   added to the liquidation preference.  And, therefore, the GSEs,

24   basically, every quarter paid dividends on that.  Because they

25   paid -- they paid dividends on -- on the amount essentially

1    drawn down under the commitment.  And this was considered

2    equivalent to that.

3    Q.  So it was 1 billion right at the beginning that Treasury

4    got before any amounts were drawn upon the commitment.  They

5    got -- Treasury got 1 billion as a commitment fee?

6    A.  That's correct.  That's correct.

7    Q.  Was it called the initial commitment fee?

8    A.  It was the initial commitment fee.  And at the time that

9    the commitment was made, this was 1 percent of the committed

10   amount.

11   Q.  And then later, the commitment increased and the fee stayed

12   the same?  It was still the 1 billion.  So it was half a

13   percent?

14   A.  So after the first amendment, when they increased the

15   commitment amount from a hundred billion to 200 billion, then

16   it was a half a percent of the committed amount.

17   Q.  Now, was it also relevant at all that, in general --

18   subject to a few exceptions -- the GSEs were not allowed to

19   pay down or redeem Treasury's interest in the senior

20   preferred stock, subject to a few exceptions?  Is that

21   relevant?

22   A.  That's correct.  So the GSEs, unlike many of the market

23   comparables that I want to talk about, did not have an exit

24   option.  So they could not redeem without permission from

25   Treasury -- the Treasury preferred stock -- to exit the

1    arrangement.  So that, obviously, is a disadvantage to the GSEs

2    relevant to all of the market comparables that I'm going to

3    show you.

4         And so, you know, we should keep that in mind that when

5    we compare these prices, the fact that the GSEs did not have

6    the exit options, that most of the other contracting parties

7    that I'm going to talk about had, actually made the price even

8    higher, the effective price.

9    Q.  So let's turn now to the first group of comparables,

10   commercial loan commitments.  Can you explain what data you

11   looked at to do that analysis.

12   A.  Sure.  So I looked at -- so there's a fair amount of

13   research that's been done on commercial loan commitments, and

14   so I used the many decades of research and the experience that

15   I have in the area.  It's an area of research, specialization

16   for me.

17        And the 1997 paper that I published in the *Journal of*

18   *Money, Credit and Banking* examines 2,513 actual loan commitment

19   contracts, and it studies the properties, the pricing, and so

20   on.

21        And then in 2016, there's a paper published in the

22   *Journal of Finance* that examined over a different time period

23   an even bigger sample of loan commitments, over 32,000.

24        So I looked at the findings in both of these papers.

25   Q.  And does the next slide show some of those findings?

1    A.  Right.  So what this -- and what this table summarizes is

2    what my research revealed as the prices of bank loan

3    commitments, what the subsequent study revealed about the

4    prices of bank loan commitments, and then I compared to the

5    prices that the GSEs paid under the PSPAs.

6    Q.  So on the left side of this chart, you have three rows:

7    Interest/dividend rate, Upfront fee, Periodic fee.  Is that an

8    attempt to look at all-in cost for each of these?

9    A.  Yes.  So when we look at the actual price of the

10   commitment, we need to consider not only the interest or the

11   dividend on the funds actually borrowed or -- or procured, but

12   also the upfront fee that was paid, the analogue of the billion

13   dollars that the GSEs paid, as well as the periodic commitment

14   fee, which is the analogue of the PCF.

15   Q.  So, just briefly, can you explain, on the top row for

16   interest and dividend rate, you have 2.10 from your research;

17   2.91.  Can you explain just briefly how you got to those

18   numbers.

19   A.  Okay.  Yeah.  Sure.  So what I did is when you look at

20   these papers, you'll see that most of these loan commitment

21   contracts have interest rates that are specified as a function

22   of LIBOR.  LIBOR is the London Interbank Offered Rate.  It's an

23   index rate that's commonly used in contracts.

24           And so what the research shows is, okay, these loan

25   commitment contracts were priced at LIBOR plus something.  The

1     plus something is the add-on to LIBOR.

2          And so what I did is I took those add-ons from the

3     papers and I added them to the three-month LIBOR that existed

4     in August of 2012, the time of the third amendment.  And so had

5     these commercial loan commitment contracts been offered in

6     August of 2012, then the interest rate on the loans suggested

7     by my research would have been on average 2.1 percent.  And

8     based on the subsequent study, on average 2.91 percent.

9          So it -- because it's specified as LIBOR plus an add-on,

10    I can, basically, use the research to compute the interest rate

11    at any given point in time.  In this case, August 2012.

12    Q.  And then how does that compare to the interest rate on the

13    preferred stock for Treasury?

14    A.  Well, we know GSEs are paid 10 percent.  So those rates are

15    substantially lower than the 10 percent dividend that the GSEs

16    paid on their preferred stock to Treasury.

17    Q.  Then what about when we look at the upfront fee?  How do

18    they compare?

19    A.  Right.  So the upfront fee suggested by my research, on

20    average -- this is for the three largest categories of

21    commitment -- commitments is 21 basis points or .21 percent,

22    and the subsequent study suggests 61 basis points or

23    .61 percent.

24    Q.  Okay.  And then the periodic commitment fees for -- for

25    these two studies were what?

1    A.  Right.  So in my paper, we found that the average periodic

2    commitment fee -- and this is for the three largest categories

3    of commitments in the sample -- is 26 basis points or

4    .26 percent, and the subsequent study finds it to be

5    .38 percent.

6    Q.  And is that the same as saying 26 basis points or 38 basis

7    points?

8    A.  That's correct.

9    Q.  Okay.  And then does the bottom-right chart -- box in the

10   chart show your -- what your conclusion -- what this particular

11   comparator showed you?

12   A.  Right.  So, you know, you can't just simply add up the

13   numbers in these columns because some of them apply to the

14   commitment and some of them apply to the amount actually

15   borrowed.

16        But as a very rough approximation, if you look at what

17   my research suggests and if you just added up the numbers

18   again, with the caveat that I just mentioned, you know, you get

19   about 2.6, 2.7 percent max.  Okay?  Total cost, all-in cost.

20   And the subsequent study, you're going to get something like 3

21   and a half to 4 percent.  Okay?

22        If you look at what the GSEs paid, just the 10 percent

23   dividend is so much in excess of these two costs that even if

24   you ignore the upfront fee and the 80 -- 79.9 percent warrants,

25   you're still way above the all-in costs suggested by the two

1    loan commitment contract studies.  And so these would yield

2    0 PCF.

3          You don't need to have a positive PCF to fully

4    compensate Treasury, given the other compensation that it's

5    already receiving under the contract, the 10 percent dividend,

6    the 50 basis points upfront fee, plus the warrants.

7    Q.  So we're going to move on to the next comparator, but on

8    this one, just a couple more questions quickly.

9          First of all, this one didn't help you get to an actual

10   rate for PCF because just this particular comparator would --

11   would yield -- would not yield a PCF; is that right?

12   A.  That's correct.  So it doesn't give me -- if -- if -- if

13   the assignment was to compute a positive PCF, assuming that it

14   would have been charged, this basically doesn't give me that

15   positive number because it's saying Treasury is already

16   compensated fully by the other terms of the contract.

17   Q.  But if you were to just ignore the all-in-cost analysis and

18   use the average PCFs from these commercial loan contract

19   studies, then it would -- would it show a range of somewhere

20   between 26 and 38 basis points?

21   A.  That's correct.  So, I mean, I could just simply say, all

22   right, let's -- you know, even though all-in cost is an

23   important concept, suppose for the time being we just set it

24   aside and ask ourselves what should the PCF be -- if we just

25   focused on the analogue of the PCF in these commercial loan

1    contracts, loan commitment contracts, that would give you a

2    range of 26 to 38 basis points.

3    Q.  Which is consistent, ultimately, with your opinion; is that

4    right?

5    A.  And it'll fall within the eventual range that I indicated

6    earlier.

7    Q.  And another question before we move to the next comparator.

8    These commercial loan contracts generally in the studies, both

9    your study and the other one, are not as large as the

10   200 billion-type thing that we're dealing with with Treasury in

11   the GSEs.  You know that?

12   A.  Yes.

13   Q.  That -- did you consider that in your analysis?

14   A.  Yes, I did.  You know, I thought about that.  So the

15   point is that, you know, these -- the three largest categories

16   of loan commitments in my paper, for example, range from, you

17   know, about 150 million to 557 million dollars.  So they're not

18   big as the $200-billion commitment that Treasury made.  So

19   sometimes the point is made that because the sizes are not

20   comparable, that maybe the comparison is not proper.

21        Now, if you look at the loan commitment data, what you

22   find is that actually bigger commitments are less expensive in

23   percentage terms.  You know, they have lower interest rates and

24   they have lower periodic commitment fees and sometimes they

25   don't even have an upfront fee, or a finance charge that's

THAKOR - DIRECT

1   smaller.  So bigger commitments actually tend to have smaller

2   fees.  Okay?  So size would, in fact, suggest lower fees, not

3   higher fees.

4       But in any case, I'm going to talk about some other

5   market comparables that are very large, larger than bank loan

6   commitments.

7   Q.  So let's move to one of the -- the next ones.  Can you

8   explain to the jury what the capital purchase program was.

9   A.  Sure.  So when we had the financial crisis, Congress

10   authorized about $700 billion to Treasury under something

11   called TARP.  You heard about it yesterday.  The Troubled Asset

12   Relief Program.

13       Part of TARP was something called the Capital Purchase

14   Program where Treasury was basically given a certain amount of

15   money to provide assistance to banks that needed additional

16   capital to survive the crisis.  And so Treasury ended up

17   investing about $205 billion in 707 banks as a part of the CPP.

18   And the investment was made in the form of purchasing preferred

19   stock in these banks, just like they invested with GSEs.

20   Q.  And that is a helpful reminder, which I've received from a

21   colleague.  From the Capital Purchase Program, Treasury

22   generally got preferred stock similar to what happened with the

23   GSEs?

24   A.  Correct.

25   Q.  But with the previous comparator, commercial loans, those

1    were loans, not preferred stock?

2    A.   That's correct.

3    Q.   Just very briefly, does that -- did you consider the

4    difference between a loan and a senior preferred stock, and did

5    that -- did you consider that in your analysis of the loan

6    commitments?

7    A.   Absolutely.  So the point is that when we look at the

8    commercial loan commitment data, these are loans; right?  So

9    they're bank instruments, not preferred stock.  Preferred stock

10   has a lower priority than debt.  So the debt holders get paid

11   first, and then preferred stockholders get paid.  So the risk

12   for the preferred shareholders is typically higher than the

13   risk for the bondholder in the same company.

14        And so the argument can be made, well, you know, in that

15   case, would you not expect that the yield on the preferred

16   stock should be higher than the interest rate on debt.  From a

17   risk standpoint, that argument is true.  But it turns out

18   empirically -- there's a research paper that actually looked at

19   the data and found the opposite; that for -- for firms in the

20   capital market, the yield on preferred stock is actually lower

21   than the yield on debt, which is surprising.  But it has to do

22   with the tax treatment of preferred stock dividends for

23   corporations.

24        So, if anything, the numbers that I gave you actually

25   understate the point that I was making.

1    Q.  And in the commercial context, you don't typically see a

2    commitment fee for a preferred stock facility the way you do

3    for loans; is that fair?

4    A.  Right.  You don't.  In some cases you do, but in the

5    majority of cases, you don't.

6    Q.  In any event, the Capital Purchase Program did involve

7    preferred stock?

8    A.  The Capital Purchase Program that Treasury provided to

9    these 707 banks was preferred stock, but there was no PCF.

10   There was no commitment fee.

11   Q.  So let's look at that.  Do you have a similar chart here

12   for this comparator?

13   A.  Yes.

14   Q.  And -- and the dividend rates -- and what did they tell

15   you?

16   A.  So the CPP banks, in exchange for the preferred stock that

17   Treasury purchased in these banks, they were charged a dividend

18   of 5 percent for the first five years.  And then it stepped up.

19   But most of these banks exited the -- the program because they

20   had an exit option, unlike the GSEs, after -- within

21   five years.  And compared to that, the GSEs, were charged a

22   10 percent annual dividend.  So twice the price.

23   Q.  And the upfront fee, was there no upfront fee for the

24   Capital Purchase Program?

25   A.  Right.  So the CPP banks had no upfront fee; whereas the

1    GSEs had a 50 basis point or .5 percent fee after the first

2    amendment from the commitment, was increased to $200 billion;

3    plus warrants to purchase 79.9 percent of the common stock that

4    actually had fairly substantial value, even in September of

5    2008, and were always positively valued.

6    Q.  So on this comparator, when you look at all-in compensation

7    for the PSPAs with Fannie and Freddie, was Treasury getting

8    more or less than it got under the Capital Purchase Program for

9    the first three lines in the all-in-cost analysis?

10   A.  Yeah.  I mean, the GSEs were paying significantly more than

11   the banks under the CPP paid for receiving assistance from the

12   same entity, the U.S. Treasury; in essentially the same form,

13   preferred stock; for essentially the same reason, which is the

14   public interest and financial stability.

15   Q.  And this Capital Purchase Program came out of the 2007-2008

16   financial crisis?

17   A.  That's correct.  It was created to basically -- it had a

18   sunset provision.  It was created to provide assistance to

19   these commercial banks so that the financial system would not

20   collapse.  So it was in the public interest to foster financial

21   stability and bring the financial system back to normalcy.

22   Q.  So just bottom line, did this comparator give you any way

23   to arrive at a positive PCF or periodic commitment fee for

24   the --

25   A.  No.  So when I look at this, I'm, again, left to the same

1     conclusion that based on this comparison Treasury was already

2     being compensated significantly more than it was with the CPP

3     banks.  And so this yielded a zero PCF as well with this

4     comparison.

5     Q.  Okay.  So let's move to the next comparison, AIG.  Very

6     briefly, could you just explain to the jury what -- who AIG is?

7     A.  So at the time of the financial crisis, AIG was the world's

8     largest insurance company, and it had very significant exposure

9     to the housing market.  So it was exposed to the same stresses

10    and the same risks as the GSEs were.  And, in particular, it

11    had two subsidiaries -- financial product subsidiary and its

12    life insurance sub -- that both had very significant exposure

13    to mortgages, mortgage-backed securities, and house prices.

14          And it was the collapse of the housing market that

15    basically brought AIG to the brink of collapse, and so

16    financial stability was threatened.  So, again, in the public

17    interest, in the interest of financial stability, the

18    government stepped in and provided assistance to -- to prevent

19    failure.

20    Q.  And both the Federal Reserve Bank of New York and the

21    Treasury?

22    A.  Yes.  So the initial assistance came from the Federal

23    Reserve Bank of New York in September of 2008, and they

24    provided an $85-billion line of credit.

25    Q.  And what was the -- what were the terms of that for your

1    all-in-cost analysis?

2    A.  So it was initially -- it started in September, but then

3    they rapidly renegotiated the terms.  So I'm going to give you

4    terms as of November of 2008.

5         So under the $85-billion line of credit, they could

6    borrow at the three-month LIBOR.  This is what I mentioned

7    before, the London Interbank Offer Rate, plus 3 percent.  And

8    so back then, in 2008 at this time, back in November, I

9    believe -- the -- the LIBOR was 2.9 percent.  So 3 percent,

10   plus 2.9.  So they could borrow at 4.9 percent back then.

11        If you look at August 2012, when the third amendment

12   came in place, they could have borrowed at that time at

13   3.43 percent because LIBOR was only .43 percent in August 2012.

14   Q.  And LIBOR, is it similar to, like, the Fed funds overnight

15   rate or just a, sort of, standard borrowing rate that's used as

16   a baseline?

17   A.  Yeah.  It's basically the rate at which a group of large

18   banks can borrow and lend from each other on a short-term basis

19   unsecured.  So it serves as sort of an index rate, like the Fed

20   funds rate or the prime rate.

21   Q.  So what did this comparator ultimately yield for your

22   analysis?

23   A.  So if you just look at the Federal Reserve Bank of

24   New York's assistance to AIG, the terms of the contract were an

25   $85-billion line of credit.  In August of 2012, they would

1    borrow at 3.43 percent.  The PCF was 75 basis points.  So --

2    and compared to that, the GSEs are paying a 10 percent annual

3    dividend.  And so, again, on an all-in-cost basis, this

4    comparison yields a PCF of zero.

5    Q.  Okay.  And then the Treasury also provided assistance to

6    AIG; is that right?

7    A.  Yes.  So Treasury stepped in a short time later and,

8    basically, provided $40 billion in preferred stock.  So they

9    purchased $40 billion of preferred stock in AIG, which was then

10   used by AIG to reduce the Fed's line of credit -- Federal

11   Reserve Bank of New York's line of credit from 85 to 60 billion

12   dollars.

13   Q.  So on the all-in-cost analysis, it's a little -- little

14   more moving parts here for Treasury's assistance to AIG.  But

15   can you just briefly explain it and how it compares to the

16   Treasury senior preferred stock for the GSEs.

17   A.  Right.  So the Treasury assistance to AIG was basically --

18   started out as 10 percent cumulative preferred, which is,

19   basically, similar to the GSEs.  But then they switched to

20   10 percent noncumulative preferred stock after four months.

21   And then they reduced the 10 percent dividend down to

22   5 percent.  So they ended up after a short time with a contract

23   that had them paying 5 percent dividend on the preferred stock,

24   but it was noncumulative preferred stock.

25   Q.  And so let's briefly -- could you briefly explain what

1    cumulative and noncumulative mean for preferred stock.

2    A.  So -- so -- well, there are many types of preferred stock.

3    But noncumulative preferred stock means that if I miss a

4    dividend, then I don't have to make up for it in the future.

5    Okay?  The only cost imposed on me -- the only restriction is

6    that I cannot pay a dividend to my common shareholders if I

7    don't pay a dividend to my preferred shareholders.  But in the

8    future, I don't have to make up for a dividend that I didn't

9    pay in the past.

10          With cumulative preferred stock, it keeps track of all

11   missed dividends.  So when I resume paying dividends, I have to

12   make up for the dividends that I missed in the past.  So,

13   basically, noncumulative preferred stock should have a higher

14   yield than cumulative preferred stock because cumulative

15   preferred stock is more onerous on the borrower or on the -- on

16   the company that -- that sold the preferred stock.

17   Q.  And so what did your all-in-cost analysis of the Treasury

18   $40-billion preferred stock investment in AIG yield for your

19   analysis?

20   A.  So, again, when I compare the terms of the GSEs received to

21   Treasury's assistance to AIG, I find that the terms for the

22   GSEs were significantly more expensive to them.  And, again,

23   this comparison yields a PCF of zero.  That even with the zero

24   PCF, the compensation for Treasury from the GSEs exceeds what

25   they received from AIG.

1    Q.  By the way, it's not on the chart, but let me ask you this:

2    Did the government and its assistance to AIG also get warrants

3    to acquire common stock in AIG?

4    A.  Yes.  So that's not the basis on which I'm making a

5    distinction because they're also -- actually, the warrants were

6    the Federal Reserve Bank of New York at 79.9 percent of, you

7    know, warrants to acquire 79.9 percent of the common stock

8    that -- under the $85-billion line of credit.  So -- yeah, so

9    they had warrants there as well.

10        So that's not the basis on which I make a distinction

11   between the GSEs and AIG.

12   Q.  Well, 79.9 sounds familiar.  Was it similar to the warrant

13   in this case for the GSEs?

14   A.  Exactly the same as in the case of GSEs.  But another

15   difference that I haven't listed here is that AIG did have an

16   exit option -- and, in fact, they did exit the arrangement --

17   unlike the GSEs, which were not allowed to.

18   Q.  And so, in general, do you have an understanding of whether

19   the government and these various -- the Capital Purchase

20   Program and then the aid to AIG, did the government make money

21   on its investment, generally?

22   A.  Yes.  So, you know, it -- it's interesting because there

23   were a lot of newspaper articles that came out where the

24   federal government basically said that providing this

25   assistance to AIG and other institutions, the CPP banks during

1    the crisis was a good idea because not only did we save the

2    financial system and serve the public interest of financial

3    stability, but the government actually made money.  That it

4    didn't lose money.  So these were not contracts where they were

5    providing subsidies by the government's own claim after the

6    fact.

7    Q.  Now -- and they -- they did those aids to all these groups

8    for the public interest?

9    A.  Yeah.  So both -- both AIG, as well as the CPP assistance,

10   were explicitly to serve the public interest of financial

11   stability, which is the same rationale given for providing

12   assistance to the GSEs.

13   Q.  Now, in any of those other assistance deals under the

14   Capital Purchase Program to the 700 banks or the aid that the

15   Federal Reserve and the Treasury gave to AIG, in any of them,

16   did the government say that in the public interest they needed

17   to take 100 percent of all future earnings of those

18   institutions forever?

19   A.  No, they did not.  It's unprecedented.

20   Q.  Now, you also looked at something to do with the FDIC as a

21   comparator.  Can you explain to the jury -- they may all know,

22   but just for all of us, what is the FDIC?

23   A.  So in 1933, after the Great Depression, Congress authorized

24   the creation of the federal deposit insurance.  And that means

25   that a government agency, the Federal Deposit Insurance

1    Corporation, was created to provide insurance for deposit

2    accounts at commercial banks, depository institutions.

3         So today if you put your money in a bank, then that

4    account is insured up to $250,000.  So if the bank fails, you

5    don't lose your money.  The FDIC will step up and make sure

6    your deposits are protected.  And in exchange for that deposit

7    insurance, banks pay a premium to the FDIC.

8    Q.  So that -- can you explain the next slide and the data that

9    you looked at here.  Can you explain what the premium is or the

10   fee, briefly.

11   A.  Right.  So the FDIC insures the deposits, and then in

12   exchange for receiving that deposit insurance, banks pay a

13   premium to the FDIC if they're part of the deposit insurance

14   system.  They don't have to be.

15   Q.  Why did you view this -- you know, as an appropriate source

16   for determining a periodic commitment fee, assuming a fee is

17   going to be charged?

18   A.  Right.  For a number of reasons.  One is that FDIC

19   insurance is huge.  So when we talk about size, like we

20   discussed earlier, you know, you take -- you know, even back in

21   2012, we're talking about $7 trillion dollars, with a T, in

22   insured deposits in the U.S.  It's bigger now.

23        Even individual banks are very big; right?  So if you

24   look at, like, Bank of America, 2012, you're talking about

25   $800 billion in insured deposits.  Or Citibank, $295 billion of

1    insured deposits.  Or JPMorgan Chase, $665 billion, with a B,

2    in insured deposits.  So even individual bank-insured deposit

3    accounts are huge, even compared to the GSE commitments.

4            So one is size.

5            And the other is that the nature of FDIC deposit

6    insurance is, in many dimensions, similar to the assistance

7    provided to the GSEs in that the FDIC is standing ready to

8    provide funds to a bank that is in financial distress when

9    there's a run on its deposit so that depositors can be paid

10   off.

11           So we're providing money when you need it to pay off

12   your depositors to ensure confidence in the system and

13   financial stability.

14           And so -- so for those reasons, I thought this was an

15   appropriate comparison, and the insurance premium is analogous

16   to the PCF.

17   Q.  Okay.  So can you explain the summary of what you concluded

18   from this data and also, specifically, which data you used to

19   reach this conclusion that you're showing here?

20   A.  Sure.  So the FDIC website provides information on how they

21   price their insurance fees.  And so I looked at large and

22   highly complex institutions.  So these would be -- you know, if

23   you're part of a bank holding company, you would have more than

24   $500 billion in assets.

25           The range of insurance fees was 2 and a half to 45 basis

1    points.  So remember, one basis point is 100th of a percent

2    during this April 2011 through June 2016 time period.  And --

3    and so I can go into more detail, if you want.

4    Q.  Sure.  Let me -- let's just do it one step at a time.

5         So this 2.5 to 45 basis points, that -- those are the

6    same numbers as your ultimate opinion in this case?

7    A.  That's correct.

8    Q.  And, again, a hundred basis points is how much?

9    A.  Is 1 percent.

10   Q.  Okay.  So the high end of this range, 45 basis points, is

11   less than half a percent?

12   A.  Correct.  It's less than half a percent, yes.

13   Q.  And, now, you say large and highly complex institutions on

14   this slide.  Just, again, which -- how many institutions and

15   which ones generally, conceptually, did you look at?  You don't

16   need the names, but conceptually.

17   A.  Right.  So the FDIC website doesn't give you the names of

18   the institutions, but I -- there was an article that was

19   published that had nine of the largest banks of the U.S.  So

20   names that would be very familiar to you.  JPMorgan Chase,

21   Bank of America, Citi, Wells Fargo.

22        So there are nine of these really large institutions,

23   which have hundreds of billions of dollars in insured deposits.

24   And so I looked at those nine institutions.  And the reason why

25   there's a range is that the FDIC has a whole set of adjustments

1    that they make based on whether you have broker deposits, how

2    much unsecured debt you have, your CAMELS rating, and so on.

3           And so different institutions in this group can be

4    charge different premiums, or the same institution at different

5    points in time could be charged a different premium depending

6    on the adjustments.

7    Q.  And so that's the reason for the range?

8    A.  Yes.

9    Q.  Now, did you do anything to sort of double-check this or

10   run a cross-check on this range?

11   A.  Right.  So it turns out that, you know, traditionally the

12   FDIC would always state the insurance premium as a percent of

13   insured deposits.  Since the financial crisis, they also

14   changed their methodology a little bit to have the premium

15   assessed on assets minus tangible equity, which seems to

16   suggest all liabilities, but then they have a whole series of

17   adjustments.

18          And so when you take the adjustments into account, you

19   come to something quite similar to insured deposits.  So what I

20   did, just to simplify things and make it more transparent, was

21   I went to these nine banks and looked at the actual deposit

22   insurance premium that each bank had paid during this time

23   period, and then I divided the premium they actually paid by

24   the deposits that were insured in that bank.

25          So that gave me a premium as a percentage of insured

1    deposits.  Just very simple.  And when I looked at that, I

2    found that the range is 13 to 43 basis points for these nine

3    banks, and the average was 23 basis points.

4    Q.  So the first slide that shows the 2.5 to 45 is sort of the

5    range of statutory rates based on all the different variables?

6    A.  Right.

7    Q.  And the second range is just doing sort of a cross-check,

8    where you take the dollar amount of the fee and divide it into

9    the total amount of insured deposits?

10    A.  Exactly.  I just wanted to see how that translated in the

11    real data into a deposit insurance premium expressed as a

12    percentage of insured deposits.  And you see that this 13 to

13    43 basis points falls right within that 2-and-a-half- to

14    45-basis-points range.

15    Q.  Now, does the United States Treasury have a commitment to

16    the FDIC?

17    A.  Right.  So it's interesting that, you know, the -- sort of

18    in the old days, meaning, you know, after the S&L crisis back

19    in the '80s, the FDIC would sometimes have to make so many

20    payouts for failed banks that it would run out of money and

21    have to go to Congress to get additional approval to refurbish

22    the FDIC fund.

23          So what they've done now is there is a line of credit

24    that Treasury offers to the FDIC.  It's a hundred billion

25    dollars.  And the FDIC can basically draw down on that line if

1    the money in its deposit reserve account is not enough to pay

2    off depositors.

3        So, again, this is done in the public interest for

4    financial stability so that nobody would doubt the commitment

5    of the federal government to protecting depositors, and

6    nobody would doubt the ability of the FDIC to cover its

7    obligations.

8    Q.  Okay.  And so does the Treasury for that $100 -- sorry,

9    that $100-billion commitment that the United States Treasury

10   makes as a standing commitment to the FDIC, what is the

11   periodic commitment fee that the Treasury charges to the FDIC?

12   A.  Zero.  So there is no PCF here.

13   Q.  If the FDIC needs to draw on the commitment and actually

14   take some money, what is the interest rate they pay?

15   A.  So the interest rate is actually tied to the Treasury rate.

16   So they're allowed to borrow from Treasury at the same rate at

17   which the U.S. government borrows in the capital market.  So

18   it's tied to the U.S. Treasury rate.

19       So, you know, if you look at the ten-year Treasury,

20   which is one of the most popular Treasury people look at, for

21   long-term Treasury bonds, that would be, like, 1.81 percent.

22   Q.  That's -- that's what it would have been around

23   August 2012?

24   A.  Right.  So it says that the rate is determined by

25   current market yields and outstanding market obligations of

THAKOR - DIRECT

905

1    the United States of comparable maturities.  So,

2    effectively, the FDIC can borrow at the same rate as the U.S.

3    government.

4         So if you go back and look at what the ten-year T-bond

5    rate was in -- on August 17th, 2012, it was 1.81 percent.  So

6    you can compare that to the 10 percent.  But the GSEs are

7    required to pay Treasury for their commitment.

8    Q.  Was this relevant in reaching your ultimate opinion in

9    this case as a -- what a reasonable periodic commitment fee

10   would be?

11   A.  Right.  So this, again, tells me that if you look at

12   everything on an all-in-cost basis, it yields a zero PCF, if

13   you look at the commitment that the Treasury is providing to

14   the FDIC.

15   Q.  So looking, again, at your range, assuming there had been a

16   commitment -- periodic commitment fee charged by the Treasury

17   to Fannie and Freddie, and they negotiated one, does this slide

18   show what that would have been, the range?

19   A.  Yes.  So, basically, this chart says that -- it takes

20   the entire range, the 2 and a half basis points to 45 basis

21   points.  And, you know, at the time of the third amendment, the

22   undrawn commitment amount for two GSEs combined was

23   $258 billion.

24        Remember, the PCF is not charged on the amount actually

25   drawn down.  It's charged on the amount that is still undrawn.

1     And at that point, the undrawn amount was $258 billion.

2           So if you look at the low end of the range, you get

3     $65 million as the PCF.  And if you look at the high end of my

4     range, then you get $1.16 billion.

5     Q.  So, now, that's quite a big range, and I want to ask you a

6     question about that.

7           I'd like to just do a little time travel with you and

8     ask you to put yourself back in August 2012.

9     A.  Uh-huh.

10    Q.  And imagine that the acting director of the FHFA,

11    Mr. DeMarco, called you up and said:  The Treasury Department

12    wants to negotiate a periodic commitment fee.  Would you come

13    and advise me on behalf of FHFA and Fannie and Freddie?  If you

14    had accepted that request, what would you have told him to do

15    in that negotiation?

16               MR. HOFFMAN:  Objection, Your Honor.  May I be heard?

17               THE COURT:  All right.

18               (Bench conference on the record.)

19               MR. HOFFMAN:  Apologies, Your Honor.  Ian Hoffman on

20    behalf of the defendants.

21          Dr. Thakor testified at his deposition, and I believe

22    also today, he is not offering any opinion on what the parties

23    to the PSPAs would have agreed to in the -- in this sort of

24    but-for world.  And so the very question that Mr. Hume is

25    asking him to answer is like they're -- with what Dr. Thakor

1    has said he is not opining on, what the parties would have

2    done.

3              MR. KAPLAN:  Your Honor, Stan Kaplan for -- for the

4    plaintiffs.

5         That's not true.  The way that Mr. Hume has phrased

6    the question isn't about what Mr. DeMarco would have done.

7    Mr. Hume is using this to illustrate how -- how his

8    analysis would play out and -- and what the significance of

9    the range is given the size of the range.  And that's the way

10   the testimony will come in.  That's what he's going to testify

11   to.

12             MR. HOFFMAN:  Your Honor, Dr. Thakor said I can't

13   speak for what any of the parties to the PSPAs would have done

14   in sum or substance.  And this is asking him to go back in

15   time.  Those were the words from Mr. Hume.

16        The only opinion that he's disclosed and he's offered

17   today is what he believes an appropriate PSPA would be.  And

18   this question is way beyond that.

19             MR. KAPLAN:  And it's not, Your Honor.  It's what

20   he would have advised.  It's not what Mr. DeMarco would have

21   done.

22             MR. HOFFMAN:  Your Honor, Ian Hoffman.

23        He provided no expert testimony on what he would have

24   advised Mr. DeMarco.

25             THE COURT:  Why don't you rephrase the question.

```
 1              (Proceedings held in open court.)

 2    BY MR. HUME:

 3    Q.  Professor Thakor, in light of your bottom-line expert

 4    opinion in this case, in light of the range, and in light

 5    of the fact that the contract says it would be a negotiation,

 6    what would your opinion be if you were asked to give it to

 7    the parties on the GSEs' side how to begin that negotiation?

 8              MR. HOFFMAN:  Same objection, Your Honor.

 9              THE COURT:  Overruled.

10    A.  I mean, I would -- if I was in a negotiation with Treasury

11    over what the PCF should be --

12    BY MR. HUME:

13    Q.  Professor Thakor, I just want to be clear.  I don't want to

14    know what you would do.  I want to know what you would advise

15    if you were asked to give advice to the FHFA.

16              MR. HOFFMAN:  Same objection, Your Honor.

17              THE COURT:  Overruled.

18    A.  I would begin at the 2 and a half basis points, which is

19    the low end of the range and instead of -- 45 basis points

20    would be kind of my walk-away upper limit.  And so that's the

21    range.

22          And then, you know, I would hope to -- again, depending

23    on how the negotiations go, I would hope to get something in

24    that range, but 2 and a half basis points is where I would

25    start.
```

1    BY MR. HUME:

2    Q.  Would you advise to try to get something closer to the

3    bottom of the range?

4    A.  Well, I mean, if I'm -- if I'm -- if I'm going to have to

5    pay the PCF, then I want it to be closer to the lower end of

6    the range.

7    Q.  Now, did you look at how the high end and the low end of

8    your opinion would compare to the amount of money transferred

9    under the net worth sweep?

10   A.  Yes, I did.

11   Q.  And, very briefly, does this slide show the difference

12   between what the 10 percent dividend would have been in 2013

13   before looking at the commitment fee and what it was under the

14   net worth sweep?

15   A.  Yes, it does.

16   Q.  And did you ask the people who were preparing the slides to

17   add to the 10 percent dividend amount both the high end of the

18   range and the low end to see what it would look like?

19   A.  Yes.  So what the -- the way I wanted this chart prepared

20   was that first small bar that you see on the left, the

21   10 percent dividend, was about $18.9 billion, as we saw

22   earlier.  And then I wanted to put on top of that, the PCF

23   applied, by my analysis, the high end of that range and the low

24   end of the range as well.

25   Q.  So does this show what the high end would look like as an

1    addition?

2    A.  Right.  So you can see it's a very thin red line.

3    Actually, initially I had them put a blue line.  I couldn't

4    even see it.  Maybe my eyesight is not as good anymore as it

5    used to be.  But it was so small it was hard to see.  So I said

6    let's change the color to red so I can see it more easily.

7         But the reason why it's hard to see is that it's so

8    small.  And so the 18.9 billion is the green bar.  And then the

9    red line is the PCF of 1.16 billion that sits on top of it.

10   Q.  So that red line is $1.16 billion.  That's a lot of money.

11   A.  Yes.

12   Q.  But does this show it in proportion to the scale of the

13   other amounts of money?

14   A.  Exactly.  It's a lot of money, but it's very small compared

15   to the total magnitude of the dividends that they would have

16   paid absent the net worth sweep.

17   Q.  Well, is it large or small in comparison to the dividend

18   they actually did pay under the net worth sweep?

19   A.  Right.  And so on the right you've got the actual dividends

20   that they paid, which is $130.1 billion.  As you can see,

21   that -- the bottom of that -- that bar on the right, the light

22   green color represents what they would have paid absent the

23   net worth sweep, which is 18.9 billion.  They actually paid

24   130.1.

25        So they paid $111.2 billion more after the

THAKOR - DIRECT

1    net worth sweep than they would have paid absent the

2    net worth sweep if they paid the 10 percent dividends under

3    the -- under the contract.

4        So, you know, if you -- if you don't have the

5    net worth sweep and you ask them to pay a PCF, even at the high

6    end of the range, what you get is that bar on the left, the

7    green bar, plus the red line.

8        So it adds up to 18.9 plus 1.16 billion dollars, and

9    we're talking about a little bit over $20 billion.

10   Q.  And this is --

11   A.  They paid 130.

12   Q.  This chart is just in one year, for 2013?

13   A.  That's correct, 2013.

14   Q.  Did you ask them -- the graphics people to illustrate your

15   low end on this chart?

16   A.  I -- I actually tried.  And the graphics people came back

17   and said:  Sorry.  Can't do it.  Because it's so tiny that --

18   yeah, we could put something there, but you're not going to be

19   able to see it.  So I gave up.

20   Q.  Now, that was one year.  Did you look at it over ten years?

21   A.  Right.

22   Q.  And now you've just got the high end.  Does this show what

23   the high end would be multiplied over ten years?

24   A.  Correct.  So one year it's 1.16 billion.  If you do it over

25   ten years, then it's 1.16 multiplied by ten.  So it's

1    $11.6 billion.

2    Q.  Did you compare that to the amount Fannie and Freddie paid

3    under the net worth sweep that was in excess of what they would

4    have paid under the 10 percent dividend?

5    A.  Yes, I did.

6    Q.  Is that what this slide shows?

7    A.  And that's on this chart.  So absent the net worth sweep,

8    the PCF between 2013 and '22, that ten-year time period, would

9    have been 11.6 billion; again, at the high end of my range.

10        And, in effect, because of the net worth sweep, the GSEs

11   ended up paying $150.2 billion -- not in total -- but in excess

12   of the 10 percent dividend.  So over and above the 10 percent

13   dividend.

14   Q.  The 10 percent dividend was 18.9 billion a year?

15   A.  That's in one year, yeah.

16   Q.  So over ten years, that would have been 189 billion?

17   A.  That's right.

18   Q.  And the 150 is on top of the 189?

19   A.  Exactly.

20   Q.  Now, you said this is the PCF they would have paid.  But is

21   it your opinion -- your opinion is this is the high end of your

22   estimate of what it could have been?

23   A.  That's correct.

24   Q.  Did you look -- compare also to the low end?

25   A.  Yes.

1    Q.  Is that what this shows?

2    A.  Right.  So at the lower end, basically, it's $65 million

3    per year.  So ten years is $650 million; whereas what they paid

4    in excess of the 10 percent dividend was $150.2 billion.

5         So there's just no comparison whether you look at the

6    high end or the low end between what the GSEs ended up paying

7    because of the net worth sweep and what they would have paid

8    absent the net worth sweep if a PCF had actually been

9    determined.

10   Q.  Thank you, Professor Thakor.

11        MR. HUME:  I have no more questions at this time.

12   We'll pass the witness.

13        Thank you.

14        THE COURT:  I think in light of the hour, we better

15   take our lunch and recess now, and we'll come back at 1:30.

16        Don't talk about the case.  Don't let anyone talk to you

17   about the case.  We'll come back at 1:30.

18        (Recess taken.)

19        (REPORTER'S NOTE:  The afternoon session of the trial

20   was reported by Lorraine Herman, who prepared said transcript.)

21

22

23

24

25

1      <u>CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER</u>

2

3      I, Nancy J. Meyer, Registered Diplomate Reporter,

4 Certified Realtime Reporter, do hereby certify that the above

5 and foregoing constitutes a true and accurate transcript of my

6 stenograph notes and is a full, true, and complete transcript

7 of the proceedings to the best of my ability.

8

9      Dated this 28th day of July, 2023.

10

11      /s/ Nancy J. Meyer
           Nancy J. Meyer
12     Official Court Reporter
           Registered Diplomate Reporter
13     Certified Realtime Reporter
           333 Constitution Avenue Northwest
14     Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25

**$**

**$1.16** [2] - 70:4, 74:10
**$100** [1] - 68:8
**$1896** [1] - 42:24
**$2.93** [1] - 18:18
**$20** [1] - 75:9
**$200** [1] - 56:2
**$205** [1] - 53:17
**$250,000** [1] - 63:4
**$258** [2] - 69:23, 70:1
**$295** [1] - 63:25
**$3,000** [1] - 43:9, 43:21
**$300,000** [1] - 42:14
**$40** [2] - 59:8, 59:9
**$50** [1] - 42:25
**$500** [1] - 64:24
**$65** [2] - 70:3, 77:2
**$650** [1] - 77:3
**$665** [1] - 64:1
**$700** [1] - 53:10
**$800** [1] - 63:25

**'**

**'07-'08** [1] - 28:24
**'22** [1] - 76:8
**'80s** [1] - 67:19

**0**

**0** [1] - 51:2
**0.025** [1] - 35:6
**0.45** [1] - 35:7

**1**

**1** [9] - 27:11, 32:10, 34:24, 35:3, 46:3, 46:5, 46:9, 46:12, 65:9
**1-billion** [1] - 45:20
**1.16** [4] - 74:9, 75:8, 75:24, 75:25
**1.6** [4] - 6:19, 13:6, 15:16, 16:13
**1.6-billion** [2] - 18:24, 19:4
**1.81** [2] - 68:21, 69:5
**10** [23] - 24:21, 25:19, 45:4, 45:12, 49:14, 49:15, 50:22, 51:5, 55:22, 59:2, 59:18, 59:20, 59:21, 69:6, 73:12, 73:17, 73:21, 75:2, 76:4, 76:12, 76:14, 77:4
**100** [2] - 35:2, 62:17
**100-billion** [1] - 68:9
**100th** [2] - 34:24, 65:1

**10:00** [1] - 5:12
**11** [5] - 7:17, 8:6, 25:9
**11.6** [2] - 76:1, 76:9
**111.2** [1] - 74:25
**13** [2] - 67:2, 67:12
**13-1053** [1] - 4:3
**13-1288** [1] - 4:4
**130** [1] - 75:11
**130.1** [2] - 74:20, 74:24
**15-page** [1] - 12:16
**150** [2] - 52:17, 76:18
**150.2** [1] - 76:11, 77:4
**17** [2] - 3:5, 17:21
**17th** [6] - 14:12, 19:4, 19:19, 19:24, 20:14, 69:5
**18.9** [6] - 45:5, 73:21, 74:8, 74:23, 75:8, 76:14
**189** [2] - 76:16, 76:18
**19** [1] - 3:6
**1933** [1] - 62:23
**1977** [1] - 27:23
**1981** [1] - 27:17
**1997** [1] - 47:17
**1:30** [2] - 77:15, 77:17

**2**

**2** [9] - 8:13, 34:19, 34:25, 36:19, 39:12, 64:25, 69:20, 72:18, 72:24
**2,500** [1] - 28:1
**2,513** [1] - 47:18
**2-and-a-half** [1] - 67:13
**2.1** [1] - 49:7
**2.10** [1] - 48:16
**2.5** [4] - 34:25, 35:6, 65:5, 67:4
**2.6** [1] - 50:19
**2.7** [1] - 50:19
**2.9** [2] - 58:9, 58:10
**2.91** [2] - 48:17, 49:8
**2.93** [1] - 18:20
**200** [2] - 46:15, 52:10
**200-billion** [1] - 52:18
**2003** [1] - 24:19
**2007** [1] - 28:17
**2007-2008** [1] - 56:15
**2008** [5] - 28:17, 56:5, 57:23, 58:4, 58:8
**2009** [1] - 37:3
**2011** [1] - 65:2
**2012** [25] - 8:17, 8:18, 9:1, 9:19, 13:5, 13:6, 14:12, 14:13, 16:15,

19:5, 19:19, 19:24, 20:8, 20:14, 49:4, 49:6, 49:11, 58:11, 58:13, 58:25, 63:21, 63:24, 68:23, 69:5, 70:8
**2013** [5] - 20:5, 73:12, 75:12, 75:13, 76:8
**2016** [2] - 47:21, 65:2
**21** [3] - 3:6, 49:21
**22** [1] - 3:7
**23** [1] - 67:3
**26** [5] - 50:3, 50:4, 50:6, 51:20, 52:2

**3**

**3** [3] - 50:20, 58:7, 58:9
**3.43** [2] - 58:13, 59:1
**30** [2] - 15:5, 26:5
**30-year** [1] - 42:16
**31[st** [1] - 37:3
**32,000** [1] - 47:23
**33** [1] - 3:10
**375** [1] - 8:13
**38** [4] - 50:5, 50:6, 51:20, 52:2

**4**

**4** [1] - 50:21
**4.9** [1] - 58:10
**40** [2] - 25:3, 26:5
**40-billion** [1] - 60:18
**43** [3] - 58:13, 67:2, 67:13
**45** [9] - 34:19, 35:7, 39:12, 64:25, 65:5, 65:10, 67:4, 69:20, 72:19
**45-basis-points** [1] - 67:14
**466-A** [1] - 33:2
**466-A.....................** [1] - 3:10
**4:00** [1] - 12:16

**5**

**5** [4] - 55:18, 56:1, 59:22, 59:23
**50** [2] - 51:6, 56:1
**557** [1] - 52:17
**5:00** [1] - 5:11

**6**

**6** [4] - 42:20, 43:19, 43:25
**6.25** [2] - 42:21, 43:1

**60** [1] - 59:11
**61** [2] - 49:22, 49:23

**7**

**7** [1] - 63:21
**700** [1] - 62:14
**707** [2] - 53:17, 55:9
**75** [1] - 59:1
**79.9** [5] - 50:24, 56:3, 61:6, 61:7, 61:12

**8**

**80** [1] - 45:7, 45:11, 45:14, 50:24
**85** [1] - 59:11
**85-billion** [4] - 57:24, 58:5, 58:25, 61:8

**A**

**a.m** [2] - 5:11, 5:12
**AB** [1] - 31:2
**ability** [1] - 68:6
**able** [7] - 9:16, 11:7, 12:2, 12:9, 13:12, 16:11, 75:19
**absent** [5] - 74:16, 74:22, 75:1, 76:7, 77:8
**absolutely** [1] - 54:7
**academic** [2] - 25:15, 27:21
**academics** [1] - 25:17
**accelerated** [2] - 11:13, 12:14
**accelerated-reduction-of-the-portfolio** [1] - 12:14
**acceleration** [3] - 4:11, 4:20, 5:22
**accept** [1] - 10:9
**accepted** [1] - 70:14
**access** [1] - 27:12
**account** [4] - 45:17, 63:4, 66:18, 68:1
**Accounting** [1] - 24:1
**accounts** [2] - 63:2, 64:3
**accurate** [1] - 32:18
**accurately** [1] - 32:20
**accused** [1] - 7:2
**achievement** [1] - 29:7
**acknowledge** [1] - 7:7
**acquire** [2] - 61:3, 61:7
**acquisition** [3] - 31:1, 31:2, 34:6
**acting** [1] - 70:10

**Action** [2] - 4:3, 4:6
**actual** [11] - 18:22, 26:23, 26:24, 27:9, 37:22, 41:5, 47:18, 48:9, 51:9, 66:21, 74:19
**add** [6] - 11:18, 49:1, 49:2, 49:9, 50:12, 73:17
**add-on** [1] - 49:1, 49:9
**add-ons** [1] - 49:2
**added** [4] - 45:2, 45:23, 49:3, 50:17
**addition** [4] - 23:5, 39:19, 45:6, 74:1
**additional** [4] - 27:3, 35:10, 53:15, 67:21
**adds** [1] - 75:8
**adjustments** [4] - 65:25, 66:6, 66:17, 66:18
**administered** [1] - 22:9
**admission** [1] - 11:2
**admit** [2] - 14:8
**Admitted** [1] - 3:9
**admitted** [2] - 15:1, 33:2
**adverse** [1] - 31:16
**advice** [2] - 31:5, 72:15
**advise** [3] - 70:13, 72:14, 73:2
**advised** [2] - 71:20, 71:24
**afternoon** [1] - 77:19
**agencies** [1] - 31:5
**agency** [2] - 30:15, 31:17, 62:25
**ago** [5] - 7:17, 8:6, 10:15
**agree** [7] - 8:25, 9:5, 14:12, 15:15, 15:22, 16:15, 16:18
**agreed** [3] - 7:4, 37:9, 70:23
**Agreement** [1] - 4:5
**agreement** [21] - 6:9, 7:2, 7:9, 7:22, 9:25, 10:6, 12:20, 13:16, 14:4, 14:6, 14:17, 14:19, 14:20, 14:23, 15:2, 15:12, 15:20, 36:21, 44:21
**aid** [2] - 61:20, 62:14
**aids** [1] - 62:7
**AIG** [24] - 36:8, 41:10, 41:12, 57:5, 57:6, 57:7, 57:15, 58:24, 59:6, 59:9, 59:10,

59:14, 59:17, 60:18, 60:21, 60:25, 61:2, 61:3, 61:11, 61:15, 61:20, 61:25, 62:9, 62:15
**all-in** [16] - 36:3, 41:18, 41:21, 42:2, 43:24, 44:1, 44:2, 44:3, 44:5, 44:20, 45:16, 48:8, 50:19, 50:25, 51:22, 56:6
**all-in-cost** [7] - 51:17, 56:9, 58:1, 59:3, 59:13, 60:17, 69:12
**allowed** [9] - 6:21, 7:12, 7:13, 7:25, 13:18, 21:20, 46:18, 61:17, 68:16
**allowing** [1] - 44:15
**almost** [3] - 45:7, 45:8, 45:11
**alone** [1] - 21:9
**amendment** [11] - 14:18, 19:20, 20:14, 23:4, 23:7, 45:5, 46:14, 49:4, 56:2, 58:11, 69:21
**amendment's** [1] - 20:15
**America** [2] - 63:24, 65:21
**American** [2] - 28:10, 28:11
**amorphous** [1] - 11:25
**amount** [23] - 18:22, 23:10, 27:13, 37:2, 39:13, 41:13, 45:8, 45:25, 46:10, 46:15, 46:16, 47:12, 50:14, 53:14, 67:8, 67:9, 69:22, 69:24, 69:25, 70:1, 73:8, 73:17, 76:2
**amounts** [2] - 46:4, 74:13
**analogous** [1] - 64:15
**analogue** [3] - 48:12, 48:14, 51:25
**analysis** [23] - 8:20, 19:6, 27:18, 34:16, 35:15, 36:12, 38:6, 39:18, 39:25, 40:3, 40:9, 47:11, 51:17, 52:13, 54:5, 56:9, 58:1, 58:22, 59:13, 60:17, 60:19, 71:8, 73:23
**Anheuser** [1] - 31:1
**Anheuser-Busch** [1] -

31:1
**Anjan** [3] - 3:7, 22:5, 22:20
**Anne** [1] - 40:5
**announced** [1] - 11:13
**announcement** [4] - 16:14, 18:6, 19:19, 20:15
**annual** [6] - 29:23, 29:25, 45:4, 45:13, 55:22, 59:2
**anonymous** [1] - 25:17
**answer** [10] - 7:22, 7:24, 9:21, 15:21, 17:8, 19:22, 20:3, 43:19, 70:25
**answering** [1] - 14:2
**apologies** [1] - 70:19
**apologize** [5] - 5:15, 12:7, 16:17, 16:19, 17:10
**apples** [1] - 12:24
**applied** [1] - 73:23
**applies** [1] - 16:14
**apply** [3] - 44:9, 50:13, 50:14
**appreciate** [4] - 5:13, 12:16, 13:1, 13:24
**approach** [1] - 26:18
**appropriate** [14] - 7:8, 7:20, 15:17, 15:18, 18:23, 22:24, 23:10, 23:15, 33:11, 34:18, 36:13, 63:15, 64:15, 71:17
**approval** [1] - 67:21
**approximation** [1] - 50:16
**April** [1] - 65:2
**area** [3] - 30:24, 47:15
**argue** [2] - 11:15, 39:15
**arguing** [1] - 5:17
**argument** [6] - 7:19, 12:21, 14:17, 39:17, 54:14, 54:17
**arose** [1] - 18:25
**arrangement** [1] - 47:1, 61:16
**arrive** [1] - 56:23
**article** [4] - 25:13, 26:4, 65:18
**articles** [5] - 25:4, 25:10, 28:7, 28:14, 61:23
**aside** [1] - 51:24
**Asim** [1] - 13:25
**aspects** [1] - 29:21
**assessed** [1] - 66:15

**Asset** [1] - 53:11
**assets** [2] - 64:24, 66:15
**assignment** [2] - 33:5, 51:13
**assist** [1] - 24:4
**assistance** [23] - 36:6, 36:7, 38:15, 41:8, 41:10, 41:11, 41:13, 53:15, 56:11, 56:18, 57:18, 57:22, 58:24, 59:5, 59:14, 59:17, 60:21, 61:2, 61:25, 62:9, 62:12, 62:13, 64:6
**Association** [1] - 28:11
**assume** [2] - 33:8, 35:17
**assuming** [6] - 11:7, 33:16, 34:17, 51:13, 63:16, 69:15
**assumption** [3] - 33:10, 33:17, 36:18
**AT&T** [1] - 31:2
**Attari** [2] - 13:7, 14:21
**attempt** [1] - 48:8
**attempted** [1] - 40:16
**August** [20] - 9:1, 9:19, 13:5, 14:12, 14:13, 19:4, 19:19, 19:24, 20:7, 20:14, 24:2, 49:4, 49:6, 49:11, 58:11, 58:13, 58:25, 68:23, 69:5, 70:8
**author** [1] - 27:23
**authorized** [2] - 53:10, 62:23
**available** [6] - 26:20, 26:22, 26:25, 34:2, 34:10, 35:13
**average** [6] - 49:7, 49:8, 49:20, 50:1, 51:18, 67:3
**award** [2] - 18:23, 29:7
**awards** [2] - 29:3, 29:25
**aware** [1] - 20:13
**axis** [1] - 8:4

---

### B

**backed** [1] - 57:13
**background** [3] - 23:18, 24:12, 32:20
**Bank** [17] - 42:19, 42:20, 43:1, 43:3, 43:4, 43:10, 43:11, 43:15, 44:1, 44:2,

57:20, 57:23, 58:23, 59:11, 61:6, 63:24, 65:21
**bank** [20] - 27:16, 27:21, 28:8, 29:21, 30:8, 30:14, 34:3, 34:10, 41:3, 48:2, 48:4, 53:5, 54:9, 63:3, 63:4, 64:2, 64:8, 64:23, 66:22, 66:24
**bank-insured** [1] - 64:2
**banking** [6] - 24:25, 25:8, 28:13, 29:19, 29:20
**Banking** [2] - 28:12, 47:18
**Banks** [2] - 31:7, 31:8
**banks** [29] - 36:6, 36:11, 38:15, 41:8, 41:10, 42:18, 43:17, 53:15, 53:17, 53:19, 55:9, 55:16, 55:17, 55:19, 55:25, 56:11, 56:19, 57:3, 58:18, 61:25, 62:14, 63:2, 63:7, 63:12, 63:23, 65:19, 66:21, 67:3, 67:20
**bar** [5] - 73:20, 74:8, 74:21, 75:6, 75:7
**based** [17] - 12:20, 12:21, 15:14, 34:16, 35:24, 36:1, 36:3, 36:12, 38:3, 38:11, 38:25, 39:18, 40:25, 49:8, 57:1, 66:1, 67:5
**baseline** [1] - 58:16
**basic** [1] - 44:6
**basis** [43] - 7:8, 13:9, 14:9, 34:19, 34:22, 34:23, 34:24, 34:25, 35:2, 35:5, 35:6, 35:7, 39:12, 49:21, 49:22, 50:3, 50:6, 51:6, 51:20, 52:2, 56:1, 58:18, 59:1, 59:3, 61:4, 61:10, 64:25, 65:1, 65:5, 65:8, 65:10, 67:2, 67:3, 67:13, 69:12, 69:20, 72:18, 72:19, 72:24
**began** [2] - 24:13, 27:16
**begin** [2] - 72:7, 72:18
**beginning** [1] - 46:3
**behalf** [2] - 70:13,

70:20
**believes** [1] - 71:17
**Bench** [1] - 70:18
**best** [2] - 40:18, 40:24
**better** [4] - 9:21, 42:23, 43:20, 77:14
**between** [17] - 7:12, 8:19, 11:5, 11:21, 26:3, 26:7, 30:6, 34:19, 40:5, 44:21, 44:23, 51:20, 54:4, 61:11, 73:12, 76:8, 77:6
**beyond** [4] - 4:19, 4:23, 5:21, 71:18
**big** [4] - 39:16, 52:18, 63:23, 70:5
**Big** [1] - 24:21
**bigger** [4] - 47:23, 52:22, 53:1, 63:22
**billion** [46] - 6:19, 13:6, 15:16, 16:13, 18:18, 18:20, 45:1, 45:5, 45:22, 46:3, 46:5, 46:12, 46:15, 48:12, 52:10, 53:10, 53:17, 56:2, 59:8, 59:9, 59:11, 63:25, 64:1, 64:24, 67:24, 69:23, 70:1, 70:4, 73:21, 74:8, 74:9, 74:10, 74:20, 74:23, 74:25, 75:8, 75:9, 75:24, 76:1, 76:9, 76:11, 76:14, 76:16, 77:4
**billion-dollar** [1] - 45:22
**billion-type** [1] - 52:10
**billions** [1] - 65:23
**binder** [1] - 32:8
**bit** [5] - 11:14, 11:25, 43:11, 66:14, 75:9
**blew** [1] - 10:2
**Bloomington** [1] - 24:21
**blow** [1] - 10:3
**blue** [1] - 74:3
**board** [1] - 31:7
**bond** [9] - 11:10, 11:11, 11:14, 11:16, 12:3, 12:4, 12:5, 13:22, 69:4
**bondholder** [1] - 54:13
**bonds** [2] - 11:12, 68:21
**books** [4] - 25:4, 25:8, 25:9, 26:5
**borrow** [8] - 27:8,

42:14, 58:6, 58:10, 58:18, 59:1, 68:16, 69:2
**borrowed** [3] - 48:11, 50:15, 58:12
**borrower** [2] - 42:3, 60:15
**borrowing** - 27:9, 58:15
**borrows** [1] - 68:17
**bottom** [6] - 34:14, 50:9, 56:22, 72:3, 73:3, 74:21
**bottom-line** [2] - 34:14, 72:3
**bottom-right** [1] - 50:9
**box** [1] - 50:9
**branches** [1] - 31:5
**brief** [3] - 5:6, 12:16, 19:10
**briefly** [22] - 22:21, 23:2, 25:7, 25:12, 25:25, 26:11, 28:4, 29:15, 30:3, 35:14, 40:22, 42:9, 48:15, 48:17, 54:3, 57:6, 59:15, 59:25, 63:10, 73:11
**bring** [4] - 16:22, 17:2, 17:11, 56:21
**brink** [1] - 57:15
**broader** [1] - 29:19
**broker** [1] - 66:1
**brought** [1] - 57:15
**bullet** [9] - 8:15, 8:16, 9:13, 9:14, 38:23, 39:3, 39:5, 39:6
**bunch** [1] - 10:13
**bundle** [2] - 18:11, 20:21
**Busch** [1] - 31:1
**Business** [2] - 23:22, 24:16
**businesses** [1] - 30:24
**but-for** [1] - 70:24
**buy** [1] - 42:14

---

# C

**calculate** [2] - 39:23, 40:13
**calculations** [1] - 39:22
**calmed** [1] - 11:15
**CAMELS** [1] - 66:2
**cannot** [2] - 11:5, 60:6
**capital** [5] - 34:7, 53:8, 53:16, 54:20, 68:17
**Capital** [9] - 53:13,

53:21, 55:6, 55:8, 55:24, 56:8, 56:15, 61:19, 62:14
**career** [2] - 27:15, 27:16
**carries** [1] - 44:18
**case** [29] - 4:4, 9:2, 9:20, 11:4, 13:7, 18:14, 18:17, 18:23, 31:11, 31:15, 31:19, 31:22, 31:25, 33:5, 34:4, 35:19, 36:13, 37:1, 39:20, 49:11, 53:4, 54:15, 61:13, 61:14, 65:6, 69:9, 72:4, 77:16, 77:17
**cases** [2] - 55:4, 55:5
**categories** [3] - 49:20, 50:2, 52:15
**caused** [3] - 10:23, 10:24, 21:14
**caveat** [1] - 50:18
**Center** [1] - 24:1
**certain** [1] - 53:14
**certainly** [1] - 15:19
**cetera** [1] - 32:21
**chairman** [1] - 24:19
**Chairman** [1] - 37:13
**challenging** [1] - 20:13
**change** [1] - 74:6
**changed** [1] - 66:14
**charge** [7] - 26:22, 34:10, 43:4, 43:5, 43:12, 52:25, 66:4
**charged** [19] - 22:25, 23:6, 23:9, 23:15, 33:9, 33:15, 33:16, 33:20, 34:18, 35:18, 45:21, 51:14, 55:17, 55:21, 63:17, 66:5, 69:16, 69:24, 69:25
**charges** [2] - 36:10, 43:1, 68:11
**chart** [14] - 5:23, 7:15, 8:2, 9:7, 48:6, 50:9, 50:10, 55:11, 61:1, 69:19, 73:19, 75:12, 75:15, 76:7
**Chase** [2] - 64:1, 65:20
**cheaper** [2] - 42:23, 44:3
**check** [3] - 66:9, 66:10, 67:7
**cites** [1] - 6:16
**Citi** [1] - 65:21
**Citibank** [2] - 31:1, 63:25
**Civil** [1] - 4:3

---

**claim** [1] - 62:5
**claiming** [1] - 23:11
**clarify** [2] - 5:5, 5:16
**Class** [1] - 4:5
**clear** [7] - 10:1, 12:11, 12:17, 14:5, 20:24, 33:12, 72:13
**clearly** [1] - 15:7
**Cleveland** [1] - 31:9
**close** [3] - 15:5, 39:11, 43:7
**closer** [2] - 73:2, 73:5
**closing** [2] - 43:10, 43:16
**co** [1] - 27:23
**co-author** [1] - 27:23
**collapse** [3] - 56:20, 57:14, 57:15
**colleague** [1] - 53:21
**colloquy** [1] - 9:8
**color** [2] - 74:6, 74:22
**columns** [1] - 50:13
**combined** [1] - 69:22
**commercial** [17] - 27:10, 36:5, 38:17, 41:1, 41:4, 41:5, 47:10, 47:13, 49:5, 51:18, 51:25, 52:8, 53:25, 54:8, 55:1, 56:19, 63:2
**commercially** [1] - 36:4
**Commission** [1] - 31:14
**Commitment** [3] - 36:23, 37:2, 37:6
**commitment** [75] - 22:25, 23:3, 23:6, 26:9, 26:11, 26:13, 27:5, 27:8, 27:10, 27:15, 28:1, 28:6, 33:9, 33:11, 33:14, 33:24, 34:3, 34:4, 34:5, 34:10, 35:23, 36:13, 39:23, 40:25, 41:2, 41:5, 41:23, 42:1, 44:20, 45:2, 45:20, 45:22, 46:1, 46:4, 46:5, 46:7, 46:8, 46:9, 46:11, 46:15, 47:18, 48:10, 48:13, 48:20, 48:25, 49:5, 49:21, 49:24, 50:2, 50:14, 51:1, 52:1, 52:18, 52:21, 52:24, 54:8, 55:2, 55:10, 56:2, 56:23, 63:16, 67:15, 68:4, 68:9, 68:10, 68:11, 68:13, 69:7, 69:9,

---

69:13, 69:16, 69:22, 70:12, 73:13
**commitments** [23] - 27:17, 27:19, 27:22, 27:24, 28:8, 32:4, 36:5, 41:1, 41:4, 41:5, 47:10, 47:13, 47:23, 48:3, 48:4, 49:21, 50:3, 52:16, 52:22, 53:1, 53:6, 54:6, 64:3
**committed** [2] - 46:9, 46:16
**common** [8] - 8:17, 45:8, 45:11, 45:14, 56:3, 60:6, 61:3, 61:7
**commonly** [1] - 48:23
**companies** [3] - 29:21, 31:1, 31:3
**company** [8] - 30:10, 30:13, 34:1, 36:9, 54:13, 57:8, 60:16, 64:23
**comparable** [2] - 52:20, 69:1
**comparables** [10] - 36:4, 37:8, 38:12, 40:19, 41:20, 44:10, 46:23, 47:2, 47:9, 53:5
**comparator** [10] - 50:11, 51:7, 51:10, 52:7, 53:25, 55:12, 56:6, 56:22, 58:21, 62:21
**compare** [8] - 47:5, 49:12, 49:18, 60:20, 69:6, 73:8, 76:2, 76:24
**compared** [5] - 48:4, 55:21, 59:2, 64:3, 74:14
**compares** [1] - 59:15
**comparison** [9] - 52:20, 57:1, 57:4, 57:5, 59:4, 60:23, 64:15, 74:17, 77:5
**compensate** [4] - 36:24, 36:25, 38:9, 51:4
**compensated** [5] - 31:19, 38:13, 38:18, 51:16, 57:2
**compensation** [11] - 31:21, 31:24, 38:20, 39:1, 39:9, 39:13, 41:7, 44:25, 51:4, 56:6, 60:24
**complete** [1] - 8:21

---

**completely** [3] - 11:11, 13:22, 15:13
**complex** [2] - 64:22, 65:13
**comprehensively** [1] - 42:2
**compute** [2] - 49:10, 51:13
**computing** [2] - 35:22, 40:24
**conceded** [1] - 11:20
**concept** [7] - 30:2, 30:3, 30:5, 38:10, 44:18, 44:21, 51:23
**concepts** [1] - 37:15
**conceptually** [2] - 65:15, 65:16
**concluded** [2] - 19:6, 64:17
**conclusion** [6] - 19:1, 33:23, 34:15, 50:10, 57:1, 64:19
**conditional** [1] - 33:10
**conference** [2] - 29:24, 70:18
**conferences** [2] - 29:18, 29:23
**confidence** [1] - 64:12
**confident** [1] - 7:6
**confusing** [1] - 12:21
**Congress** [3] - 53:9, 62:23, 67:21
**consider** [4] - 48:10, 52:13, 54:3, 54:5
**considered** [1] - 46:1
**consistent** [1] - 52:3
**consultation** [1] - 37:13
**consulted** [1] - 30:25
**consulting** [2] - 30:23, 31:4
**contain** [1] - 20:21
**context** [3] - 12:2, 12:3, 55:1
**contingent** [2] - 31:21, 31:24
**continue** [1] - 21:19
**Continued** [1] - 3:5
**continued** [1] - 17:23
**contract** [13] - 35:19, 37:22, 39:20, 44:6, 44:23, 51:1, 51:5, 51:16, 51:18, 58:24, 59:22, 72:5, 75:3
**contracting** [3] - 35:25, 38:16, 47:6
**contracts** [16] - 27:11, 28:1, 28:3, 38:14, 41:6, 41:14, 41:22, 47:19, 48:21, 48:23,

48:25, 49:5, 52:1,
52:8, 62:4
**contributions** [2] -
29:7, 30:1
**conversations** [1] -
7:6
**convicted** [1] - 10:14
**copy** [1] - 32:13
**corporate** [3] - 24:25,
25:9, 29:21
**Corporation** [1] - 63:1
**corporations** [1] -
54:23
**correct** [24] - 20:12,
20:19, 21:15, 32:22,
33:21, 34:16, 35:3,
35:6, 37:17, 40:20,
46:6, 46:22, 50:8,
51:12, 51:21, 53:24,
54:2, 56:17, 65:7,
65:12, 75:13, 75:24,
76:23
**correctly** [2] - 20:2,
20:3
**cost** [26] - 36:3, 41:18,
41:24, 42:2, 42:24,
43:10, 44:1, 44:2,
44:3, 44:6, 44:20,
45:16, 48:8, 50:19,
51:17, 51:22, 56:9,
58:1, 59:3, 59:13,
60:5, 60:17, 69:12
**costs** [7] - 41:21,
43:16, 43:24, 44:5,
45:17, 50:23, 50:25
**counsel** [4] - 7:6, 7:7,
10:4, 16:6
**counsel's** [1] - 15:5
**couple** [4] - 4:14,
18:2, 29:5, 51:8
**course** [1] - 37:3
**COURT** [29] - 4:7, 5:7,
5:10, 5:21, 6:7, 6:13,
15:22, 16:4, 16:25,
17:2, 17:5, 17:8,
17:11, 17:13, 17:17,
19:11, 21:2, 21:23,
21:25, 22:2, 24:9,
29:9, 32:6, 33:1,
70:17, 71:25, 72:9,
72:17, 77:14
**Court** [1] - 5:8
**court** [1] - 72:1
**Court's** [3] - 22:6,
24:7, 42:4
**COURTROOM** [2] -
4:3, 22:11
**cover** [2] - 15:24, 68:6
**CPP** [7] - 53:17, 55:16,
55:25, 56:11, 57:2,

61:25, 62:9
**created** [3] - 56:17,
56:18, 63:1
**creation** [1] - 62:24
**Credit** [2] - 28:12,
47:18
**credit** [8] - 30:15,
57:24, 58:5, 58:25,
59:10, 59:11, 61:8,
67:23
**credit-rating** [1] -
30:15
**crisis** [13] - 28:17,
28:21, 28:25, 36:7,
36:9, 41:9, 53:9,
53:16, 56:16, 57:7,
62:1, 66:13, 67:18
**cross** [11] - 4:15, 8:10,
10:11, 10:13, 10:21,
11:22, 11:25, 12:24,
51:15, 66:10, 67:7
**cross-check** [1] -
66:10, 67:7
**cross-examination** [4]
- 10:11, 10:13,
10:21, 12:24
**cross-examining** [1] -
8:10
**crossed** [1] - 6:24
**cumulative** [5] -
59:18, 60:1, 60:10,
60:14
**curative** [4] - 4:24,
5:24, 5:25, 13:13,
13:14
**current** [1] - 68:25
**customer** [2] - 26:14,
42:3

# D

**damage** [2] - 6:19
**damages** [8] - 9:1,
14:15, 14:19, 15:16,
16:13, 18:17, 18:20,
18:22
**data** [9] - 27:25, 47:10,
52:21, 54:8, 54:19,
63:8, 64:18, 67:11
**date** [2] - 26:15, 26:17
**day-to-day** [1] - 42:8
**days** [1] - 67:18
**deal** [1] - 44:7
**dealing** [2] - 17:8,
52:10
**deals** [2] - 30:20,
62:13
**dean** [1] - 24:2
**debating** [1] - 9:24
**debt** [5] - 54:10,

54:16, 54:21, 66:2
**decades** [1] - 47:14
**December** [1] - 37:3
**decides** [1] - 25:16
**decline** [1] - 19:4
**declined** [1] - 13:9
**dedicated** [1] - 26:7
**defendants** [12] - 6:9,
6:11, 6:21, 6:25, 7:3,
8:1, 9:2, 12:21, 14:1,
19:16, 23:11, 70:20
**defendants'** [3] -
11:10, 15:5, 15:22
**defense** [2] - 7:6, 7:7
**degree** [1] - 23:18
**delineated** [1] - 7:22
**DeMarco** [5] - 40:12,
70:11, 71:6, 71:20,
71:24
**DeMarco's** [1] - 40:15
**demonstrate** [1] - 42:6
**demonstrative** [1] -
24:4
**Department** [2] -
31:13, 70:11
**department** [1] - 24:19
**Deposit** [1] - 62:25
**deposit** [13] - 36:10,
41:16, 62:24, 63:1,
63:6, 63:12, 63:13,
64:2, 64:5, 64:9,
66:21, 67:11, 68:1
**deposition** [1] - 70:21
**depositions** [1] -
40:12
**depositors** [4] - 64:9,
64:12, 68:2, 68:5
**depository** [1] - 63:2
**deposits** [16] - 30:9,
36:11, 63:6, 63:11,
63:22, 63:25, 64:1,
64:2, 65:23, 66:1,
66:13, 66:19, 66:24,
67:1, 67:9, 67:12
**Depression** [1] -
62:23
**depth** [1] - 26:2
**DEPUTY** [2] - 4:3,
22:11
**describe** [2] - 32:20,
35:14
**designed** [1] - 8:5
**detail** [2] - 28:2, 65:3
**determination** [1] -
35:23, 36:22
**determine** [2] - 36:2,
40:8
**determined** [6] -
36:12, 37:5, 39:8,
39:16, 68:24, 77:9

**determining** [4] -
33:17, 38:19, 40:25,
63:16
**developed** [1] - 27:25
**difference** [3] - 54:4,
61:15, 73:11
**different** [11] - 12:4,
12:5, 24:14, 29:24,
44:19, 47:22, 66:3,
66:4, 66:5, 67:5
**dimensions** [1] - 64:6
**Direct** [1] - 3:7
**DIRECT** [1] - 22:12
**direct** [5] - 4:11, 4:13,
6:18, 6:23, 11:25
**director** [2] - 23:25,
70:10
**disadvantage** [1] -
47:1
**disaggregate** [1] -
11:5
**disagree** [1] - 9:3
**disclosed** [1] - 71:16
**discretion** [3] - 35:25,
37:11, 39:1
**discretions** [1] - 38:4
**discuss** [1] - 22:24
**discussed** [1] - 63:20
**discussing** [1] - 4:8
**display** [1] - 17:22
**dispute** [1] - 7:23
**distinction** [2] - 61:5,
61:10
**distinguish** [1] - 11:21
**distress** [1] - 64:8
**divide** [1] - 67:8
**divided** [2] - 34:25,
66:23
**dividend** [29] - 26:24,
27:4, 45:4, 45:13,
45:14, 48:11, 48:16,
49:15, 50:23, 51:5,
55:14, 55:17, 55:22,
59:3, 59:21, 59:23,
60:4, 60:6, 60:7,
60:8, 73:12, 73:17,
73:21, 74:17, 76:4,
76:12, 76:13, 76:14,
77:4
**dividends** [9] - 45:24,
45:25, 54:22, 60:11,
60:12, 74:15, 74:19,
75:2
**document** [1] - 32:10
**documents** [4] -
34:17, 39:20, 40:2,
40:4
**dollar** [2] - 45:22, 67:8
**dollars** [12] - 43:15,
43:23, 45:1, 45:9,

45:10, 48:13, 52:17,
59:12, 63:21, 65:23,
67:25, 75:8
**done** [15] - 27:15,
30:23, 31:17, 36:18,
39:18, 39:22, 39:24,
40:3, 47:13, 67:23,
68:3, 71:2, 71:6,
71:13, 71:21
**door** [2] - 4:17, 4:20
**dot** [1] - 8:5
**double** [1] - 66:9
**double-check** [1] -
66:9
**doubt** [2] - 68:4, 68:6
**down** [8] - 8:21, 21:25,
42:11, 46:1, 46:19,
59:21, 67:25, 69:25
**Dr** [22] - 4:8, 4:10,
6:18, 8:10, 11:4,
13:2, 13:7, 13:10,
14:9, 14:21, 16:10,
17:11, 17:15, 17:25,
19:16, 20:5, 21:8,
21:25, 22:3, 70:21,
70:25, 71:12
**draw** [2] - 67:25, 68:13
**drawn** [3] - 46:1, 46:4,
69:25
**driving** [2] - 10:15,
10:17
**drop** [3] - 10:23,
10:24, 18:24
**drunk** [2] - 10:15,
10:17
**during** [8] - 8:18, 11:2,
36:7, 36:9, 41:8,
61:25, 65:2, 66:22

# E

**early** [1] - 27:16
**earnings** [2] - 18:12,
62:17
**easel** [3] - 22:7, 42:5,
44:14
**easily** [1] - 74:6
**Eberhardt** [1] - 40:5
**Economic** [2] - 28:10,
28:11
**economic** [2] - 28:24,
30:21
**economics** [7] -
23:19, 23:20, 24:25,
25:5, 26:4, 28:9,
28:21
**editor** [1] - 25:16
**education** [1] - 32:20
**educational** [1] -
23:18

**effect** [1] - 76:10
**effective** [1] - 47:8
**effectively** [1] - 69:2
**either** [1] - 39:21
**elicited** [1] - 11:2
**eliminated** [2] - 23:5, 23:7
**emailing** [1] - 10:5
**emails** [1] - 10:4
**embarrass** [1] - 29:1
**empirical** [1] - 27:24
**empirically** [1] - 54:18
**end** [27] - 5:18, 6:4, 10:20, 24:2, 43:2, 65:10, 70:2, 70:3, 72:19, 73:5, 73:7, 73:17, 73:18, 73:23, 73:24, 73:25, 75:6, 75:15, 75:22, 75:23, 76:9, 76:21, 76:24, 77:2, 77:6
**ended** [4] - 53:16, 59:22, 76:11, 77:6
**engaged** [1] - 31:15
**ensure** [3] - 25:21, 34:1, 64:12
**entails** [2] - 18:11, 44:21
**entire** [2] - 18:18, 69:20
**entity** [1] - 56:12
**equal** [1] - 39:10
**equity** [1] - 66:15
**equivalent** [1] - 46:2
**essentially** [3] - 45:25, 56:12, 56:13
**estimate** [1] - 76:22
**estimated** [1] - 16:13
**et** [1] - 32:21
**event** [5] - 11:4, 14:23, 15:11, 21:15, 55:6
**events** [1] - 14:13
**eventual** [1] - 52:5
**evidence** [4] - 10:18, 13:7, 32:24, 33:2
**evidentiary** [2] - 12:15, 13:9
**exact** [1] - 8:9
**exactly** [6] - 33:23, 36:17, 61:14, 67:10, 74:14, 76:19
**Examination** [4] - 3:5, 3:6, 3:6, 3:7
**EXAMINATION** [4] - 17:23, 19:14, 21:6, 22:12
**examination** [10] - 6:18, 6:23, 6:24, 7:15, 10:4, 10:11, 10:13, 10:21, 10:25,

12:24
**examined** [3] - 34:17, 36:3, 47:22
**examines** [1] - 47:18
**examining** [1] - 8:10
**example** [5] - 20:4, 28:9, 29:24, 42:7, 52:16
**exceeds** [1] - 60:24
**except** [1] - 7:11
**exceptions** [2] - 46:18, 46:20
**excess** [4] - 50:23, 76:3, 76:11, 77:4
**exchange** [7] - 26:21, 30:11, 34:9, 40:7, 55:16, 63:6, 63:12
**Exchange** [1] - 31:14
**exchanges** [1] - 40:5
**excuse** [1] - 9:8
**excused** [1] - 22:1
**exercised** [1] - 45:15
**Exhibit** [2] - 3:10, 33:2
**exhibit** [3] - 4:16, 14:7, 14:25
**Exhibits** [1] - 3:9
**existed** [1] - 49:3
**existence** [1] - 20:14
**exit** [6] - 46:23, 46:25, 47:6, 55:20, 61:16
**exited** [1] - 55:19
**expect** [3] - 16:2, 16:5, 54:15
**expected** [3] - 12:1, 12:2, 22:8
**expensive** [2] - 52:22, 60:22
**experience** [1] - 47:14
**expert** [17] - 4:21, 10:12, 10:14, 11:11, 11:20, 12:22, 13:22, 14:21, 19:2, 19:3, 29:2, 31:11, 31:12, 32:3, 71:23, 72:3
**explain** [27] - 7:20, 12:5, 13:15, 22:22, 23:2, 24:14, 25:7, 25:12, 25:25, 26:11, 29:15, 33:4, 33:23, 34:23, 44:20, 45:20, 47:10, 48:15, 48:17, 53:8, 57:6, 59:15, 59:25, 62:21, 63:8, 63:9, 64:17
**explained** [1] - 36:18
**explanation** [1] - 16:18
**explicitly** [1] - 62:10
**exposed** [1] - 57:9
**exposure** [2] - 57:8,

57:12
**express** [1] - 21:8
**expressed** [4] - 20:20, 21:11, 67:11
**expressing** [1] - 18:19
**extensively** [2] - 30:25, 31:6
**extent** [1] - 16:15
**eyesight** [1] - 74:4

---

**F**

---

**face** [1] - 7:9
**faces** [1] - 42:3
**facility** [1] - 55:2
**fact** [18] - 7:4, 7:5, 11:2, 15:4, 18:5, 20:17, 21:11, 23:8, 37:24, 37:25, 40:4, 41:2, 42:23, 47:5, 53:2, 61:16, 62:6, 72:5
**failed** [1] - 67:20
**fails** [1] - 63:4
**failure** [1] - 57:19
**fair** [2] - 47:12, 55:3
**fairly** [2] - 44:25, 56:4
**faith** [1] - 38:25
**fall** [1] - 52:5
**falls** [1] - 67:13
**false** [2] - 10:7, 10:8
**familiar** [4] - 34:21, 42:7, 61:12, 65:20
**Fannie** [12] - 4:4, 18:5, 19:3, 19:18, 20:7, 30:18, 39:21, 45:7, 56:7, 69:17, 70:13, 76:2
**far** [1] - 40:9
**Fargo** [1] - 65:21
**FDIC** [25] - 36:10, 62:20, 62:22, 63:5, 63:7, 63:11, 63:13, 63:18, 64:5, 64:7, 64:20, 65:17, 65:25, 66:12, 67:16, 67:19, 67:22, 67:24, 67:25, 68:6, 68:10, 68:11, 68:13, 69:2, 69:14
**features** [1] - 41:22
**Fed** [2] - 41:13, 58:14, 58:19
**Fed's** [1] - 59:10
**federal** [6] - 31:5, 31:10, 31:16, 61:24, 62:24, 68:5
**Federal** [10] - 31:6, 31:8, 37:13, 57:20, 57:22, 58:23, 59:10, 61:6, 62:15, 62:25

**fee** [60] - 22:25, 23:3, 23:6, 26:11, 26:13, 26:23, 27:5, 27:8, 27:10, 33:9, 33:11, 33:14, 33:18, 33:24, 34:11, 34:18, 35:17, 35:23, 36:13, 39:23, 40:24, 40:25, 42:1, 43:13, 43:15, 43:23, 45:2, 45:22, 46:5, 46:7, 46:8, 46:11, 48:7, 48:12, 48:14, 49:17, 49:19, 50:2, 50:24, 51:6, 52:25, 55:2, 55:10, 55:23, 55:25, 56:1, 56:23, 63:10, 63:16, 67:8, 68:11, 69:9, 69:16, 70:12, 73:13
**Fee** [1] - 36:23
**fees** [13] - 26:9, 27:15, 28:6, 36:10, 37:12, 41:16, 49:24, 52:24, 53:2, 53:3, 64:21, 64:25
**fell** [1] - 13:6
**felt** [2] - 20:25, 38:16
**few** [2] - 12:9, 46:18, 46:20
**FHFA** [5] - 39:21, 39:24, 70:10, 70:13, 72:15
**FHFA's** [1] - 40:14
**field** [2] - 19:2, 28:13
**fields** [1] - 32:4
**file** [2] - 8:23, 20:22
**filed** [8] - 5:5, 5:11, 5:15, 12:16, 16:20, 20:8, 20:17, 20:23
**finally** [1] - 41:16
**finance** [15] - 23:22, 23:25, 24:25, 25:4, 25:9, 26:5, 26:14, 28:9, 28:20, 28:24, 29:22, 30:24, 32:4, 34:7, 52:25
**Finance** [2] - 24:1, 47:22
**Financial** [3] - 29:5, 29:9, 29:10
**financial** [40] - 23:20, 24:19, 28:17, 28:21, 28:25, 29:7, 29:15, 29:18, 29:22, 30:1, 30:3, 30:8, 30:14, 30:15, 30:16, 30:17, 30:18, 30:20, 30:21, 36:7, 36:9, 41:8, 41:13, 53:9, 56:14, 56:16, 56:19, 56:20,

56:21, 57:7, 57:11, 57:16, 57:17, 62:2, 62:10, 64:8, 64:13, 66:13, 68:4
**financier** [3] - 35:12, 38:17, 41:25
**financing** [1] - 26:19
**findings** [2] - 47:24, 47:25
**fine** [2] - 43:3
**firm** [2] - 18:12, 26:16
**firms** [1] - 54:19
**FIRS** [4] - 29:11, 29:13, 29:14
**first** [18] - 5:5, 7:13, 8:23, 10:10, 14:20, 27:17, 27:23, 35:17, 38:8, 46:14, 47:9, 51:9, 54:11, 55:18, 56:1, 56:9, 67:4, 73:20
**five** [2] - 55:18, 55:21
**fixed** [2] - 42:16, 42:17
**fixed-rate** [2] - 42:16, 42:17
**focus** [4] - 41:21, 43:24, 44:5, 45:17
**focused** [1] - 51:25
**following** [1] - 16:11
**forever** [1] - 62:18
**form** [2] - 53:18, 56:12
**formal** [1] - 27:18
**forms** [1] - 38:14
**formula** [5] - 35:22, 37:18, 37:19, 37:25, 40:24
**forward** [1] - 17:15
**foster** [1] - 56:20
**Foster** [1] - 40:6
**four** [3] - 43:14, 43:22, 59:20
**frankly** [2] - 9:21, 12:20
**Freddie** [9] - 19:18, 20:7, 30:18, 39:21, 45:7, 56:7, 69:17, 70:13, 76:2
**Freddie's** [2] - 18:5, 19:4
**front** [6] - 7:18, 8:2, 8:14, 9:10, 32:9
**full** [3] - 38:20, 39:1, 39:9
**fully** [6] - 36:24, 36:25, 38:9, 38:18, 51:3, 51:16
**function** [1] - 48:21
**fund** [1] - 67:22
**fundamentally** [1] - 14:12

**funding** [13] - 26:14, 26:17, 26:20, 26:21, 26:25, 27:2, 27:12, 34:2, 34:3, 34:9, 34:13, 35:10, 41:25
**funds** [8] - 30:7, 35:11, 35:13, 48:11, 58:14, 58:20, 64:8
**future** [11] - 26:15, 26:17, 27:1, 34:2, 34:6, 34:7, 34:10, 35:13, 60:4, 60:8, 62:17

# G

**gamesmanship** [1] - 9:15
**general** [2] - 46:17, 61:18
**generally** [4] - 52:8, 53:22, 61:21, 65:15
**gentlemen** [2] - 17:13, 17:20
**given** [8] - 13:7, 33:17, 37:25, 49:11, 51:4, 53:14, 62:11, 71:9
**global** [1] - 29:17
**gold** [1] - 25:14
**government** [18] - 21:21, 31:5, 31:10, 31:16, 31:17, 36:6, 36:8, 57:18, 61:2, 61:19, 61:20, 61:24, 62:3, 62:16, 62:25, 68:5, 68:17, 69:3
**government's** [1] - 62:5
**governors** [1] - 31:7
**Grant** [1] - 40:6
**granted** [1] - 42:4
**graph** [4] - 14:25, 15:4, 15:6, 15:7
**graphics** [2] - 75:14, 75:16
**graphs** [2] - 14:7, 15:10
**Great** [1] - 62:23
**green** [3] - 74:8, 74:22, 75:7
**group** [3] - 47:9, 58:17, 66:3
**groups** [1] - 62:7
**GSE** [2] - 39:17, 64:3
**GSEs** [43] - 23:9, 30:18, 38:21, 39:15, 41:9, 44:22, 44:24, 45:12, 45:23, 46:18, 46:22, 47:1, 47:5, 48:5, 48:13, 49:14,

49:15, 50:22, 52:11, 53:19, 53:23, 55:20, 55:21, 56:1, 56:10, 57:10, 59:2, 59:16, 59:19, 60:20, 60:22, 60:24, 61:11, 61:13, 61:14, 61:17, 62:12, 64:7, 69:6, 69:22, 76:10, 77:6
**GSEs'** [3] - 38:2, 39:7, 72:7
**guess** [1] - 10:16
**guidance** [4] - 37:8, 38:12, 38:16, 38:18
**guides** [1] - 37:19
**guiding** [1] - 38:5

# H

**half** [20] - 34:19, 34:25, 39:12, 42:20, 43:12, 43:14, 43:19, 43:22, 43:25, 46:12, 46:16, 50:21, 64:25, 65:11, 65:12, 69:20, 72:18, 72:24
**handed** [1] - 10:4
**happy** [2] - 6:6, 15:21
**hard** [2] - 74:5, 74:7
**hear** [2] - 9:2, 10:7
**heard** [5] - 20:3, 20:25, 45:19, 53:11, 70:16
**held** [4] - 4:2, 17:12, 21:13, 72:1
**help** [1] - 51:9
**helpful** [2] - 40:1, 53:20
**Herman** [1] - 77:20
**high** [12] - 65:10, 70:3, 73:7, 73:17, 73:23, 73:25, 75:5, 75:22, 75:23, 76:9, 76:21, 77:6
**higher** [8] - 27:13, 43:11, 47:8, 53:3, 54:12, 54:16, 60:13
**highlighted** [4] - 36:21, 37:14, 37:23, 38:8
**highly** [2] - 64:22, 65:13
**hired** [2] - 31:4, 31:10
**Hoffman** [2] - 70:19, 71:22
**HOFFMAN** [8] - 32:5, 32:25, 70:16, 70:19, 71:12, 71:22, 72:8, 72:16
**hold** [2] - 21:19, 23:24

**holders** [1] - 54:10
**holding** [1] - 64:23
**home** [1] - 42:14
**Honor** [42] - 5:3, 5:13, 5:16, 6:2, 6:4, 6:17, 7:7, 7:8, 8:14, 8:24, 9:18, 10:9, 10:20, 11:24, 12:17, 13:1, 13:4, 13:17, 13:24, 13:25, 16:7, 17:3, 17:10, 17:16, 19:8, 19:9, 19:12, 21:1, 21:4, 21:5, 22:6, 32:2, 32:16, 32:23, 70:16, 70:19, 71:3, 71:12, 71:19, 71:22, 72:8, 72:16
**Honor's** [1] - 16:23
**hope** [2] - 72:22, 72:23
**hoping** [1] - 5:14
**hour** [1] - 77:14
**house** [1] - 57:13
**housing** [2] - 57:9, 57:14
**huge** [3] - 23:11, 63:19, 64:3
**HUME** [18] - 22:4, 22:13, 24:7, 24:10, 29:12, 32:2, 32:7, 32:16, 32:17, 32:23, 33:3, 44:12, 44:14, 44:17, 72:2, 72:12, 73:1, 77:11
**Hume** [4] - 70:24, 71:5, 71:7, 71:15
**Hume..................** [1] - 3:7
**hundred** [9] - 25:10, 35:1, 39:10, 39:14, 45:9, 45:10, 46:15, 65:8, 67:24
**hundreds** [2] - 26:6, 65:23

# I

**Ian** [2] - 70:19, 71:22
**idea** [3] - 38:11, 38:20, 62:1
**identify** [2] - 32:13, 40:19
**ignore** [2] - 50:24, 51:17
**illustrate** [3] - 42:10, 71:7, 75:14
**illustrates** [1] - 33:25
**imagine** [2] - 21:19, 70:10
**impact** [1] - 20:6

**implied** [1] - 37:24
**implies** [1] - 39:13
**important** [2] - 37:15, 51:23
**imposed** [1] - 60:5
**imposition** [1] - 18:25
**impression** [1] - 11:20
**in-depth** [1] - 26:2
**inappropriate** [1] - 15:14
**InBev** [1] - 31:2
**inbounds** [4] - 7:5, 7:23, 7:24, 9:6
**inbox** [1] - 5:14
**include** [1] - 40:23
**includes** [3] - 29:20, 30:16, 31:7
**incorrect** [1] - 16:17
**increased** [3] - 46:11, 46:14, 56:2
**increases** [1] - 14:11
**independent** [2] - 31:22, 33:6
**index** [2] - 48:23, 58:19
**Indiana** [1] - 14:20
**indicated** [5] - 40:3, 40:4, 40:15, 40:17, 52:5
**individual** [2] - 63:23, 64:2
**indulgence** [2] - 13:1, 13:24
**information** [2] - 25:1, 64:20
**informative** [1] - 41:15
**initial** [6] - 45:2, 45:20, 45:22, 46:7, 46:8, 57:22
**inside** [1] - 10:17
**insinuation** [1] - 8:21
**instance** [2] - 18:14, 20:10
**instead** [3] - 23:8, 38:2, 72:19
**institution** [4] - 26:19, 26:22, 30:6, 66:4
**institutions** [11] - 41:9, 61:25, 62:18, 63:2, 64:22, 65:13, 65:14, 65:18, 65:22, 65:24, 66:3
**instruction** [10] - 4:24, 5:24, 5:25, 13:3, 13:13, 13:14, 15:14, 15:17, 15:18, 15:19
**instruments** [1] - 54:9
**insurance** [23] - 29:20, 30:10, 30:11, 30:12, 36:8, 36:10, 41:16,

57:8, 57:12, 62:24, 63:1, 63:7, 63:12, 63:13, 63:19, 64:6, 64:15, 64:21, 64:25, 66:12, 66:22, 67:11
**Insurance** [1] - 62:25
**insured** [13] - 63:4, 63:22, 63:25, 64:1, 64:2, 65:23, 66:13, 66:19, 66:24, 66:25, 67:9, 67:12
**insures** [1] - 63:11
**insuring** [1] - 36:11
**intended** [2] - 36:23, 38:8
**intent** [1] - 14:5
**Interbank** [2] - 48:22, 58:7
**interest** [29] - 26:23, 27:3, 27:4, 27:7, 27:9, 27:13, 41:24, 42:19, 43:8, 46:19, 48:10, 48:16, 48:21, 49:6, 49:10, 49:12, 52:23, 54:16, 56:14, 56:20, 57:17, 62:2, 62:8, 62:10, 62:16, 68:3, 68:14, 68:15
**Interest/dividend** [1] - 48:7
**interesting** [2] - 61:22, 67:17
**interim** [1] - 24:1
**intermediaries** [2] - 30:19, 30:21
**intermediary** [5] - 30:5, 30:8, 30:10, 30:14, 30:15
**intermediates** [2] - 30:6, 30:17
**Intermediation** [2] - 29:6, 29:10
**intermediation** [7] - 29:8, 29:16, 29:19, 30:1, 30:2, 30:4, 30:20
**internal** [2] - 40:2, 40:9
**introduce** [3] - 17:5, 22:16, 38:21
**intuitive** [1] - 44:8
**invalid** [1] - 11:22
**invest** [1] - 30:12
**invested** [1] - 53:19
**investing** [1] - 53:17
**investment** [5] - 29:20, 30:14, 53:18, 60:18, 61:21
**investors** [3] - 21:17, 21:18, 30:12

**involve** [1] - 55:6
**issue** [16] - 4:11, 4:16, 4:19, 6:1, 6:8, 10:10, 10:19, 12:10, 12:13, 12:14, 14:4, 17:3
**issued** [1] - 14:3
**issues** [3] - 4:7, 12:18, 14:3
**it'll** [1] - 52:5
**itself** [2] - 19:7, 41:24

## J

**Jeff** [1] - 40:6
**Jenna** [1] - 17:21
**job** [1] - 24:20
**Jones** [2] - 8:10, 19:16
**JONES** [4] - 19:9, 19:12, 19:15, 21:22
**Jones**................ [1] - 3:6
**Joseph** [1] - 3:5
**journal** [5] - 25:16, 25:18, 25:23, 28:10
**Journal** [3] - 32:10, 47:17, 47:22
**journals** [6] - 25:15, 25:18, 27:21, 28:9, 28:13, 28:24
**JPMorgan** [1] - 64:1, 65:20
**Judge** [2] - 42:9, 44:15
**June** [1] - 65:2
**junior** [1] - 8:18
**junk** [2] - 11:17
**jury** [32] - 4:2, 7:19, 8:2, 8:7, 9:11, 11:20, 13:4, 15:14, 16:22, 17:2, 17:12, 19:13, 20:25, 22:17, 22:19, 22:22, 24:8, 25:7, 25:12, 26:1, 27:14, 28:4, 33:4, 33:23, 34:21, 35:14, 36:16, 40:21, 45:19, 53:8, 57:6, 62:21
**Justice** [1] - 31:13
**justification** [1] - 23:12
**justified** [1] - 39:16

## K

**KAPLAN** [5] - 17:3, 17:6, 17:10, 71:3, 71:19
**Kaplan** [2] - 17:6, 71:3
**keep** [3] - 18:2, 44:14, 47:4

**keeps** [1] - 60:10
**kind** [3] - 8:3, 39:22, 72:20
**known** [1] - 20:11

## L

**ladies** [2] - 17:13, 17:19
**Lambert** [1] - 42:9
**Lamberth** [1] - 44:15
**language** [1] - 38:7
**large** [7] - 52:9, 53:5, 58:17, 64:21, 65:13, 65:22, 74:17
**larger** [3] - 27:4, 27:7, 53:5
**largest** [6] - 36:8, 49:20, 50:2, 52:15, 57:8, 65:19
**last** [9] - 4:18, 4:22, 5:6, 7:5, 8:9, 9:8, 24:15, 29:9
**late** [1] - 5:15
**lawsuit** [10] - 20:5, 20:6, 20:11, 20:22, 21:9, 21:12, 31:11
**lawsuits** [2] - 20:13, 20:17
**lead** [1] - 37:12
**leading** [1] - 29:17
**Leading** [1] - 21:22
**least** [1] - 24:15
**led** [1] - 28:21
**Lee** [4] - 5:3, 10:5, 10:6, 17:18
**left** [7] - 4:13, 11:20, 16:23, 48:6, 56:25, 73:20, 75:6
**legal** [1] - 31:11
**lend** [1] - 58:18
**length** [2] - 5:11, 26:3
**less** [9] - 25:19, 27:11, 34:11, 45:9, 45:10, 52:22, 56:8, 65:11, 65:12
**liabilities** [1] - 66:16
**LIBOR** [10] - 48:22, 48:25, 49:1, 49:3, 49:9, 58:6, 58:9, 58:13, 58:14
**life** [1] - 57:12
**lifetime** [2] - 29:6, 29:25
**light** [7] - 19:1, 19:24, 72:3, 72:4, 74:21, 77:14
**limit** [1] - 72:20
**line** [17] - 10:25, 34:14, 56:22, 57:24,

58:5, 58:25, 59:10, 59:11, 61:8, 67:23, 67:25, 72:3, 74:2, 74:3, 74:9, 74:10, 75:7
**lines** [1] - 56:9
**liquidation** [2] - 45:3, 45:23
**list** [3] - 28:7, 28:14, 28:23
**listed** [1] - 61:15
**literature** [1] - 40:7
**litigate** [1] - 18:13
**litigation** [1] - 19:25
**Litigations** [1] - 4:6
**lives** [1] - 42:8
**loan** [37] - 26:23, 27:3, 27:12, 27:16, 27:21, 27:24, 28:1, 28:8, 32:4, 34:4, 36:5, 41:1, 41:3, 41:4, 41:5, 41:23, 41:24, 47:10, 47:13, 47:18, 47:23, 48:2, 48:4, 48:20, 48:24, 49:5, 51:1, 51:18, 51:25, 52:1, 52:8, 52:16, 52:21, 53:5, 54:4, 54:5, 54:8
**loans** [6] - 30:9, 49:6, 53:25, 54:1, 54:8, 55:3
**lodged** [1] - 6:11
**London** [2] - 48:22, 58:7
**long-term** [1] - 68:21
**look** [38] - 28:3, 35:8, 35:18, 37:20, 38:14, 39:20, 41:20, 43:25, 44:2, 44:23, 48:8, 48:9, 48:19, 49:17, 50:16, 50:22, 52:21, 54:7, 55:11, 56:6, 56:25, 58:11, 58:23, 63:24, 65:15, 68:19, 68:20, 69:4, 69:11, 69:13, 70:2, 70:3, 73:7, 73:18, 73:25, 75:20, 76:24, 77:5
**looked** [23] - 4:7, 27:25, 35:21, 36:5, 36:6, 36:7, 36:10, 38:11, 40:18, 41:4, 41:5, 41:6, 41:7, 47:11, 47:12, 47:24, 54:18, 62:20, 63:9, 64:21, 65:24, 66:21, 67:1
**looking** [5] - 39:19, 41:11, 44:21, 69:15,

73:13
**looks** [1] - 42:2
**Lorraine** [1] - 77:20
**lose** [2] - 62:4, 63:5
**Louis** [2] - 23:23, 24:17
**low** [8] - 70:2, 72:19, 73:7, 73:18, 73:23, 75:15, 76:24, 77:6
**lower** [10] - 39:14, 43:8, 49:15, 52:23, 52:24, 53:2, 54:10, 54:20, 73:5, 77:2
**lunch** [1] - 77:15

## M

**Mac** [1] - 4:5
**macroeconomics** [1] - 28:13
**Mae/Freddie** [1] - 4:5
**magnitude** [1] - 74:15
**main** [1] - 37:15
**majority** [1] - 55:5
**marked** [1] - 32:10
**market** [27] - 11:16, 19:23, 20:7, 35:24, 36:1, 36:3, 36:4, 37:6, 37:7, 37:20, 38:3, 38:11, 38:25, 40:18, 41:1, 41:20, 44:10, 46:22, 47:2, 53:5, 54:20, 57:9, 57:14, 68:17, 68:25
**market-based** [3] - 36:1, 36:3, 38:11
**markets** [1] - 29:22
**Mason** [2] - 3:5, 22:3
**mason** [13] - 4:10, 6:18, 8:10, 11:4, 13:2, 16:10, 17:11, 17:15, 17:25, 19:16, 20:5, 21:8, 21:25
**mason's** [1] - 13:10
**Mason's** [2] - 4:8, 14:9
**materials** [1] - 35:20
**maturities** [1] - 69:1
**max** [1] - 50:19
**mean** [7] - 36:24, 38:20, 51:21, 56:10, 60:1, 72:10, 73:4
**meaning** [1] - 67:18
**meaningless** [1] - 8:3
**means** [6] - 16:19, 25:13, 29:16, 45:12, 60:3, 62:24
**measure** [2] - 36:1, 36:3
**meets** [1] - 25:22
**members** [7] - 19:13,

22:16, 22:22, 25:12, 26:1, 28:4, 34:21
**mention** [1] - 14:7
**mentioned** [3] - 41:18, 50:18, 58:6
**mentions** [1] - 25:25
**merely** [1] - 20:20
**methodology** [2] - 35:15, 66:14
**methods** [1] - 25:23
**Michigan** [1] - 24:18
**might** [4] - 5:14, 19:25, 26:16, 35:8
**million** [5] - 52:17, 70:3, 77:2, 77:3
**mimic** [1] - 41:3
**mind** [2] - 5:3, 47:4
**minus** [1] - 66:15
**minute** [1] - 16:22
**minutes** [1] - 11:1
**miscellaneous** [1] - 4:4
**misleading** [4] - 8:21, 9:15, 11:2, 15:7
**miss** [1] - 60:3
**missed** [2] - 60:11, 60:12
**misstating** [1] - 16:19
**model** [2] - 27:25, 28:2
**money** [17] - 18:14, 30:9, 43:6, 53:15, 61:20, 62:3, 62:4, 63:3, 63:5, 64:11, 67:20, 68:1, 68:14, 73:8, 74:10, 74:13, 74:14
**Money** [2] - 28:12, 47:18
**monograph** [2] - 26:1, 26:2
**monographs** [2] - 25:11, 25:25
**month** [4] - 42:24, 42:25, 49:3, 58:6
**months** [1] - 59:20
**morning** [13] - 5:4, 12:17, 17:13, 17:19, 17:25, 18:1, 19:12, 19:16, 22:14, 22:15, 22:18
**mortgage** [16] - 42:13, 42:16, 42:17, 42:19, 42:23, 43:4, 43:9, 43:13, 43:18, 43:20, 43:21, 44:1, 44:2, 44:19, 57:13
**mortgage-backed** [1] - 57:13
**mortgages** [2] - 44:7,

57:13
**most** [7] - 27:10, 30:2, 43:19, 47:6, 48:20, 55:19, 68:20
**move** [7] - 32:24, 42:5, 44:14, 51:7, 52:7, 53:7, 57:5
**moved** [2] - 13:6, 24:21
**movement** [3] - 6:25, 8:8, 9:11
**movements** [3] - 6:11, 9:1, 9:19
**moving** [3] - 7:18, 30:23, 59:14
**multiple** [1] - 41:22
**multiplied** [2] - 75:23, 75:25
**mutually** [1] - 37:9

**N**

**name** [1] - 22:19
**names** [3] - 65:16, 65:17, 65:20
**narrow** [1] - 14:15
**narrowly** [1] - 45:18
**nature** [1] - 64:5
**need** [12] - 9:18, 16:22, 26:17, 26:18, 34:5, 34:8, 34:22, 37:7, 48:10, 51:3, 64:11, 65:16
**needed** [4] - 36:1, 38:17, 53:15, 62:16
**needs** [2] - 34:7, 68:13
**negotiate** [1] - 70:12
**negotiated** [11] - 6:20, 7:11, 8:25, 9:3, 15:9, 16:8, 16:10, 38:1, 38:24, 69:17
**negotiating** [1] - 10:2
**negotiation** [5] - 37:11, 70:15, 72:5, 72:7, 72:10
**negotiations** [1] - 72:23
**net** [28] - 8:20, 10:24, 11:6, 11:13, 11:15, 16:14, 18:7, 18:25, 19:7, 20:12, 23:5, 23:9, 23:13, 33:9, 33:14, 73:9, 73:14, 74:16, 74:18, 74:23, 75:1, 75:2, 75:5, 76:3, 76:7, 76:10, 77:7, 77:8
**never** [3] - 15:4, 23:6, 37:4
**New** [7] - 31:8, 41:13,

57:20, 57:23, 58:24, 59:11, 61:6
**newspaper** [1] - 61:23
**next** [15] - 7:24, 20:8, 22:2, 22:4, 28:5, 34:14, 37:21, 38:23, 44:18, 47:25, 51:7, 52:7, 53:7, 57:5, 63:8
**night** [3] - 4:18, 4:22, 7:5
**nine** [5] - 65:19, 65:22, 65:24, 66:21, 67:2
**nobody** [2] - 68:4, 68:6
**nominal** [1] - 45:8
**noncumulative** [5] - 59:20, 59:24, 60:1, 60:3, 60:13
**none** [1] - 14:23
**normalcy** [1] - 56:21
**normally** [1] - 42:15
**Northwestern** [1] - 23:20
**NOTE** [1] - 77:19
**note** [1] - 15:3
**nothing** [3] - 9:7, 13:10, 21:24
**November** [2] - 58:4, 58:8
**number** [5] - 25:8, 28:20, 31:2, 51:15, 63:18
**numbers** [6] - 35:8, 48:18, 50:13, 50:17, 54:24, 65:6
**numerous** [2] - 25:10, 27:20

**O**

**Oath** [1] - 22:9
**object** [1] - 21:1
**objected** [2] - 7:1, 15:4
**objecting** [1] - 16:16
**objection** [18] - 4:12, 4:22, 5:19, 5:21, 6:1, 6:12, 6:13, 6:15, 7:10, 10:17, 16:16, 16:20, 21:22, 32:5, 32:25, 70:16, 72:8, 72:16
**objections** [2] - 12:19, 15:23
**obligations** [2] - 68:7, 68:25
**obvious** [1] - 42:22
**obviously** [2] - 26:6, 47:1

**occurred** [1] - 33:10
**October** [1] - 8:18
**offensive** [1] - 15:7
**Offer** [1] - 58:7
**offer** [1] - 15:13
**Offered** [1] - 48:22
**offered** [2] - 49:5, 71:16
**offering** [1] - 70:22
**offers** [2] - 42:18, 67:24
**official** [1] - 28:10
**old** [1] - 67:18
**Olin** [2] - 23:22, 24:16
**once** [2] - 39:8, 45:14
**one** [40] - 5:18, 7:21, 12:19, 12:20, 13:3, 14:3, 17:3, 18:11, 20:4, 20:22, 22:7, 28:12, 33:13, 34:24, 38:8, 41:6, 41:22, 43:4, 43:9, 43:12, 43:13, 43:21, 44:5, 51:8, 51:9, 52:9, 53:7, 63:18, 64:4, 65:1, 65:4, 68:20, 69:17, 75:12, 75:20, 75:24, 76:15
**onerous** [1] - 60:15
**ones** [2] - 53:7, 65:15
**ongoing** [1] - 37:1
**ons** [1] - 49:2
**open** [3] - 4:17, 32:9, 72:1
**opening** [1] - 4:20
**opining** [1] - 71:1
**opinion** [34] - 11:4, 11:6, 11:22, 12:3, 12:22, 13:8, 13:21, 16:11, 18:9, 18:19, 18:20, 18:22, 19:2, 19:3, 20:19, 21:11, 22:21, 23:1, 23:14, 33:7, 33:12, 33:19, 34:16, 35:16, 52:3, 65:6, 69:8, 70:22, 71:16, 72:4, 72:6, 73:8, 76:21
**opinions** [2] - 31:21, 31:22
**opportunity** [1] - 13:7
**opposed** [1] - 44:5
**opposite** [2] - 31:16, 54:19
**option** [3] - 46:24, 55:20, 61:16
**options** [2] - 45:7, 47:6
**orally** [1] - 6:6
**oranges** [1] - 12:25

**organizes** [1] - 29:23
**organizing** [1] - 29:17
**origination** [4] - 43:13, 43:15, 43:23
**otherwise** [1] - 40:12
**ought** [1] - 38:13
**ourselves** [1] - 51:24
**outcome** [1] - 31:24
**outline** [1] - 36:14
**outstanding** [1] - 68:25
**overcompensate** [1] - 36:25
**overnight** [2] - 18:3, 58:14
**overrule** [1] - 15:23
**overruled** [4] - 4:12, 6:13, 72:9, 72:17
**overstating** [1] - 16:20
**own** [1] - 62:5
**ownership** [1] - 45:11

**P**

**PAGE** [1] - 3:2
**page** [2] - 6:16, 8:13
**pages** [3] - 7:16, 26:5, 26:6
**paid** [32] - 34:12, 41:11, 45:1, 45:24, 45:25, 48:5, 48:12, 48:13, 49:14, 49:16, 50:22, 54:10, 54:11, 56:11, 64:9, 66:22, 66:23, 74:16, 74:20, 74:22, 74:23, 74:25, 75:1, 75:2, 75:11, 76:2, 76:4, 76:20, 77:3, 77:7
**PCFs** [2] - 40:23, 51:18
**peer** [12] - 25:10, 25:13, 25:14, 25:16, 25:20, 25:21, 26:4, 27:21, 28:7, 28:14, 28:23
**peer-review** [1] - 25:20
**peer-reviewed** [9] - 25:10, 25:13, 25:14, 26:4, 27:21, 28:7, 28:14, 28:23
**pending** [3] - 6:2, 6:3, 10:20
**people** [5] - 43:19, 68:20, 73:16, 75:14, 75:16
**per** [2] - 42:24, 77:3
**percent** [73] - 25:19, 27:11, 34:12, 34:24, 35:1, 35:3, 35:6, 35:7, 39:10, 39:14, 42:20, 42:21, 43:1, 43:19, 43:25, 45:4, 45:7, 45:11, 45:12, 45:14, 46:9, 46:13, 46:16, 49:7, 49:8,

**pass** [1] - 77:12
**past** [2] - 60:9, 60:12
**patently** [2] - 10:7, 10:8
**pay** [17] - 27:7, 35:11, 42:1, 43:7, 46:19, 60:6, 60:7, 60:9, 63:7, 63:12, 64:11, 68:1, 68:14, 69:7, 73:5, 74:18, 75:5
**paying** [10] - 43:20, 43:21, 44:25, 45:4, 56:10, 59:2, 59:23, 60:11, 76:11, 77:6
**payouts** [1] - 67:20
**PCF** [48] - 23:5, 23:9, 23:15, 35:22, 35:24, 36:2, 36:22, 37:2, 37:25, 38:19, 39:8, 39:9, 39:15, 39:25, 40:8, 40:10, 40:16, 44:9, 44:24, 45:18, 48:14, 51:2, 51:3, 51:10, 51:11, 51:13, 51:24, 51:25, 55:9, 56:23, 57:3, 59:11, 59:4, 60:23, 60:24, 64:16, 68:12, 69:12, 69:24, 70:3, 72:11, 73:5, 73:22, 74:9, 75:5, 76:8, 76:20, 77:8
**PCFs** [2] - 40:23, 51:18
**peer** [12] - 25:10, 25:13, 25:14, 25:16, 25:20, 25:21, 26:4, 27:21, 28:7, 28:14, 28:23
**peer-review** [1] - 25:20
**peer-reviewed** [9] - 25:10, 25:13, 25:14, 26:4, 27:21, 28:7, 28:14, 28:23
**pending** [3] - 6:2, 6:3, 10:20
**people** [5] - 43:19, 68:20, 73:16, 75:14, 75:16
**per** [2] - 42:24, 77:3
**percent** [73] - 25:19, 27:11, 34:12, 34:24, 35:1, 35:3, 35:6, 35:7, 39:10, 39:14, 42:20, 42:21, 43:1, 43:19, 43:25, 45:4, 45:7, 45:11, 45:12, 45:14, 46:9, 46:13, 46:16, 49:7, 49:8,

49:14, 49:15, 49:21, 49:23, 50:4, 50:5, 50:19, 50:21, 50:22, 50:24, 51:5, 55:18, 55:22, 56:1, 56:3, 58:7, 58:9, 58:10, 58:13, 59:1, 59:2, 59:18, 59:20, 59:21, 59:22, 59:23, 61:6, 61:7, 62:17, 65:1, 65:9, 65:11, 65:12, 66:12, 68:21, 69:5, 69:6, 73:12, 73:17, 73:21, 75:2, 76:4, 76:12, 76:14, 77:4
**percentage** [1] - 52:23, 66:25, 67:12
**percentages** [1] - 35:4
**perhaps** [3] - 5:14, 19:22, 33:22
**period** [6] - 6:21, 33:14, 47:22, 65:2, 66:23, 76:8
**Periodic** [2] - 36:23, 48:7
**periodic** [17] - 22:24, 23:2, 23:6, 33:8, 33:11, 35:22, 39:23, 48:13, 49:24, 50:1, 52:24, 56:23, 63:16, 68:11, 69:9, 69:16, 70:12
**permissible** [2] - 6:10, 16:9
**permission** [5] - 19:9, 22:6, 24:7, 42:4, 46:24
**persists** [1] - 6:19
**pertain** [1] - 13:21
**pertained** [1] - 13:22
**Ph.D** [1] - 23:18
**Philadelphia** [1] - 31:8
**phone** [1] - 9:23
**phrase** [2] - 38:8, 38:22
**phrased** [1] - 71:5
**phrases** [2] - 37:14, 37:23
**picture** [2] - 6:24, 33:25
**piece** [1] - 44:5
**ping** [1] - 21:5
**ping-pong** [1] - 21:5
**place** [1] - 58:12
**placed** [1] - 7:15
**places** [1] - 29:24
**plaintiff** [1] - 22:4
**plaintiffs** [9] - 6:9, 15:1, 15:9, 15:15, 17:7, 17:18, 23:14,

33:5, 71:4
**plaintiffs'** [1] - 15:23
**Plaintiffs'** [2] - 3:10, 33:2
**plan** [1] - 34:5
**play** [2] - 21:5, 71:8
**plus** [9] - 48:25, 49:1, 49:9, 51:6, 56:3, 58:7, 58:10, 75:7, 75:8
**point** [23] - 4:18, 8:7, 8:15, 8:16, 9:14, 9:17, 32:23, 34:22, 34:23, 34:24, 43:4, 43:9, 44:6, 49:11, 52:15, 52:19, 54:7, 54:25, 56:1, 65:1, 70:1
**points** [36] - 34:19, 34:20, 34:25, 35:2, 35:5, 35:6, 35:7, 39:12, 43:6, 43:12, 43:14, 43:21, 43:22, 49:21, 49:22, 50:3, 50:6, 50:7, 51:6, 51:20, 52:2, 59:1, 65:1, 65:5, 65:8, 65:10, 66:5, 67:2, 67:3, 67:13, 69:20, 69:21, 72:18, 72:19, 72:24
**pong** [1] - 21:5
**popular** [1] - 68:20
**portfolio** [7] - 10:22, 10:24, 11:5, 12:6, 12:14, 13:19, 13:20
**portions** [1] - 36:21
**position** [4] - 4:9, 14:14, 14:15, 15:23
**positions** [2] - 23:24, 24:14
**positive** [5] - 19:23, 51:3, 51:13, 51:15, 56:23
**positively** [1] - 56:5
**possibility** [1] - 19:25
**possibly** [1] - 20:6
**post** [3] - 9:1, 13:15, 14:18
**post-2012** [3] - 6:10, 13:8, 13:15
**post-August** [1] - 9:1
**post-third** [1] - 14:18
**PowerPoint** [1] - 17:21
**practice** [1] - 28:3
**precluded** [1] - 15:1
**predictions** [1] - 28:2
**preference** [2] - 45:3, 45:23

**preferred** [40] - 26:24, 36:20, 45:13, 46:20, 46:25, 49:13, 49:16, 53:18, 53:22, 54:1, 54:4, 54:9, 54:11, 54:12, 54:15, 54:20, 54:22, 55:2, 55:7, 55:9, 55:16, 56:13, 59:8, 59:9, 59:16, 59:18, 59:20, 59:23, 59:24, 60:1, 60:2, 60:3, 60:7, 60:10, 60:13, 60:14, 60:15, 60:16, 60:18
**Preferred** [1] - 4:5
**premium** [1] - 63:7, 63:9, 63:13, 64:15, 66:5, 66:12, 66:14, 66:22, 66:23, 66:25, 67:11
**premiums** [2] - 30:11, 66:4
**prepare** [1] - 32:18
**prepared** [3] - 28:5, 73:19, 77:20
**preparing** [3] - 24:3, 24:4, 73:16
**presence** [2] - 4:2, 17:12
**present** [1] - 44:10
**presumably** [1] - 38:24
**pretext** [2] - 38:1, 39:7
**pretty** [3] - 7:6, 12:1, 31:6
**prevent** [2] - 12:23, 57:18
**prevented** [1] - 9:5
**previous** [1] - 53:25
**price** [37] - 6:11, 6:25, 7:18, 8:8, 8:17, 8:20, 9:11, 9:19, 10:23, 12:12, 12:13, 13:6, 14:10, 14:11, 14:16, 14:21, 14:22, 18:5, 18:16, 18:24, 19:4, 21:10, 21:13, 26:13, 26:25, 27:3, 27:18, 35:9, 35:10, 35:12, 41:22, 42:1, 47:7, 47:8, 48:9, 55:22, 64:21
**priced** [1] - 48:25
**prices** [11] - 11:14, 12:5, 12:6, 13:8, 14:18, 19:18, 47:5, 48:2, 48:4, 48:5, 57:13
**pricing** [4] - 40:25, 41:2, 41:3, 47:19

**prime** [1] - 58:20
**principle** [1] - 44:9
**principles** [1] - 38:5
**print** [2] - 43:3
**priority** [1] - 54:10
**private** [1] - 30:24
**proceed** [2] - 17:17, 32:6
**Proceedings** [3] - 4:2, 17:12, 72:1
**proceedings** [2] - 20:10, 40:12
**process** [1] - 25:20
**procured** [1] - 48:11
**produced** [1] - 39:20
**product** [1] - 57:11
**professional** [2] - 23:17, 24:12
**Professor** [1] - 17:4, 22:5, 22:7, 22:14, 32:3, 32:8, 33:4, 44:13, 72:3, 72:13, 77:10
**professor** [2] - 23:22, 23:25
**profits** [6] - 38:2, 38:21, 39:7, 39:10, 39:15, 39:17
**program** [2] - 53:8, 55:19
**Program** [10] - 53:12, 53:14, 53:21, 55:6, 55:8, 55:24, 56:8, 56:15, 61:20, 62:14
**promise** [6] - 26:13, 26:21, 26:25, 34:9, 35:12, 38:13
**prompted** [1] - 8:23
**proof** [1] - 11:18
**proper** [1] - 52:20
**properties** [1] - 8:17
**proportion** [1] - 74:12
**proposed** [1] - 15:16
**proposition** [1] - 9:3
**protected** [1] - 63:6
**protecting** [1] - 68:5
**proven** [1] - 15:15
**provide** [14] - 14:22, 16:11, 26:14, 28:2, 30:12, 30:22, 31:4, 37:8, 39:1, 39:9, 53:15, 56:18, 63:1, 64:8
**provided** [12] - 36:6, 36:8, 37:1, 38:15, 41:7, 55:8, 57:18, 57:24, 59:5, 59:8, 64:7, 71:23
**provider** [1] - 26:14
**providers** [1] - 30:6

**provides** [2] - 30:11, 64:20
**providing** [6] - 26:19, 61:24, 62:5, 62:11, 64:11, 69:13
**provision** [1] - 56:18
**PSPA** [3] - 35:19, 35:21, 71:17
**PSPAs** [5] - 35:19, 48:5, 56:7, 70:23, 71:13
**public** [8] - 56:14, 56:20, 57:16, 62:2, 62:8, 62:10, 62:16, 68:3
**publication** [1] - 25:14
**publications** [3] - 28:6, 28:19, 32:21
**publish** [1] - 25:19
**published** [13] - 25:4, 25:8, 25:9, 27:17, 27:20, 27:23, 28:8, 28:15, 28:16, 28:24, 47:17, 47:21, 65:19
**pull** [2] - 8:13, 17:21
**Purchase** [10] - 4:5, 53:13, 53:21, 55:6, 55:8, 55:24, 56:8, 56:15, 61:19, 62:14
**purchase** [4] - 36:20, 45:7, 53:8, 56:3
**purchased** [2] - 55:17, 59:9
**Purchaser** [2] - 36:25, 37:10
**purchasing** [1] - 53:18
**purported** [1] - 15:20
**purpose** [1] - 25:21
**putting** [4] - 9:10, 12:22, 14:7, 14:25
**PX-466-A** [2] - 32:11, 32:24

## Q

**quality** [1] - 25:22
**quantification** [1] - 40:1
**quantify** [2] - 40:10, 40:16
**quantitatively** [1] - 41:3
**quarter** [2] - 43:25, 45:24
**questions** [26] - 6:17, 7:16, 8:4, 9:17, 9:22, 9:23, 10:21, 11:1, 12:9, 12:15, 12:23, 13:18, 14:2, 14:10, 14:11, 14:21, 15:5,

15:10, 15:21, 15:24, 18:2, 18:4, 19:10, 21:3, 51:8, 77:11
**quibble** [2] - 7:10, 12:8
**quickly** [1] - 51:8
**quite** [2] - 66:19, 70:5
**quote** [1] - 8:22

**R**

**raise** [2] - 6:5, 17:3
**raised** [1] - 14:3
**range** [32] - 51:19, 52:2, 52:5, 52:16, 64:25, 65:10, 65:25, 66:7, 66:10, 67:2, 67:5, 67:7, 67:14, 69:15, 69:18, 69:20, 70:2, 70:4, 70:5, 71:9, 72:4, 72:19, 72:21, 72:24, 73:3, 73:6, 73:18, 73:23, 73:24, 75:6, 76:9
**rapidly** [1] - 58:3
**Rate** [2] - 48:22, 58:7
**rate** [32] - 27:3, 27:5, 27:7, 27:9, 27:13, 41:24, 42:16, 42:17, 42:19, 43:8, 48:7, 48:16, 48:23, 49:6, 49:10, 49:12, 51:10, 54:16, 58:15, 58:17, 58:19, 58:20, 68:14, 68:15, 68:16, 68:18, 68:24, 69:2, 69:5
**rates** [5] - 48:21, 49:14, 52:23, 55:14, 67:5
**rather** [1] - 9:18
**rating** [2] - 30:15, 66:2
**rationale** [1] - 62:11
**re** [1] - 4:4
**reach** [1] - 64:19
**reached** [3] - 6:9, 7:2, 31:22
**reaching** [2] - 35:15, 69:8
**read** [9] - 5:10, 8:16, 8:22, 9:14, 10:14, 14:6, 15:3, 43:3
**ready** [1] - 64:7
**real** [1] - 67:11
**really** [4] - 9:12, 45:6, 45:16, 65:22
**realtime** [1] - 10:5
**reargue** [2] - 16:1, 16:5
**reason** [4] - 56:13, 65:24, 66:7, 74:7

**reasonable** [9] - 35:24, 36:4, 37:10, 37:11, 38:3, 39:1, 39:9, 39:17, 69:9
**reasons** [2] - 63:18, 64:14
**receive** [3] - 5:9, 25:17, 25:19
**received** [8] - 5:10, 29:3, 33:1, 41:10, 41:12, 53:20, 60:20, 60:25
**receiving** [3] - 51:5, 56:11, 63:12
**recess** [1] - 77:15
**Recess** [1] - 77:18
**recessed** [1] - 4:8
**recognition** [1] - 29:3
**reconsider** [1] - 4:24
**record** [6] - 5:2, 16:2, 22:19, 29:2, 32:13, 70:18
**recover** [1] - 18:14
**recovered** [2] - 8:17, 8:18
**recovery** [6] - 12:12, 12:13, 14:10, 14:21, 14:22, 19:25
**recross** [1] - 19:10
**Recross** [1] - 3:6
**RECROSS** [1] - 19:14
**Recross-Examination** [1] - 3:6
**RECROSS-EXAMINATION** [1] - 19:14
**red** [5] - 74:2, 74:6, 74:9, 74:10, 75:7
**redeem** [2] - 46:19, 46:24
**redirect** [6] - 6:24, 7:15, 7:19, 10:16, 15:6, 16:23
**REDIRECT** [2] - 17:23, 21:6
**Redirect** [2] - 3:5, 3:6
**reduce** [1] - 59:10
**reduced** [1] - 59:21
**reduction** [11] - 4:11, 4:20, 5:22, 10:22, 11:5, 11:13, 12:6, 12:14, 13:19, 14:16
**reexamine** [2] - 6:25, 11:8
**referees'** [1] - 25:17
**reference** [4] - 35:24, 37:5, 38:3, 38:25
**referred** [1] - 37:7
**referring** [1] - 11:10

**refers** [2] - 16:12, 35:23
**refurbish** [1] - 67:21
**regarding** [2] - 4:8, 16:13
**regulation** [1] - 30:22
**regulations** [1] - 29:21
**rejected** [1] - 8:24
**relate** [2] - 5:23, 12:5
**related** [4] - 4:4, 10:10, 29:18, 35:19
**relatedly** [1] - 8:1
**relates** [1] - 6:8
**relevance** [2] - 23:3, 38:9
**relevant** [11] - 4:15, 9:1, 13:5, 14:13, 14:18, 36:22, 38:10, 46:17, 46:21, 47:2, 69:8
**relied** [1] - 40:7
**Relief** [1] - 53:12
**remain** [1] - 20:4
**remember** [4] - 35:9, 41:23, 65:1, 69:24
**reminder** [2] - 34:22, 53:20
**render** [1] - 23:14
**renegotiated** [1] - 58:3
**renounced** [1] - 11:14
**rephrase** [1] - 71:25
**reply** [1] - 16:12
**report** [9] - 8:24, 10:12, 10:14, 10:17, 12:22, 13:10, 16:12
**reported** [1] - 77:20
**REPORTER** [2] - 17:5, 29:9
**REPORTER'S** - 77:19
**reports** [1] - 25:17
**represent** [2] - 8:4, 8:5
**representing** [1] - 44:4
**represents** [1] - 74:22
**request** [2] - 19:9, 70:14
**require** [1] - 34:7
**required** [1] - 69:7
**Research** [3] - 24:1, 29:6, 29:10
**research** [19] - 25:10, 25:23, 28:21, 28:22, 29:7, 29:17, 30:1, 41:4, 47:13, 47:14, 47:15, 48:2, 48:16, 48:24, 49:7, 49:10, 49:19, 50:17, 54:18
**researchers** [1] -

28:20
**Reserve** [9] - 31:7, 31:8, 37:13, 57:20, 57:23, 58:23, 59:11, 61:6, 62:15
**reserve** [1] - 68:1
**respectfully** [3] - 8:3, 10:9, 13:2
**responding** [1] - 12:23
**response** [2] - 34:15, 40:8
**restriction** [1] - 60:5
**result** [1] - 19:25
**resume** [2] - 17:15, 60:11
**retained** [5] - 10:22, 11:5, 13:19, 13:20, 19:23
**revealed** [2] - 48:2, 48:3
**review** [3] - 25:20, 25:21, 40:11
**Review** [1] - 28:10
**reviewed** [10] - 25:10, 25:13, 25:14, 25:16, 26:4, 27:21, 28:7, 28:14, 28:23
**rights** [4] - 18:11, 18:15, 20:4, 20:21
**rising** [1] - 4:16
**risk** [3] - 54:11, 54:13, 54:17
**risks** [1] - 57:10
**role** [1] - 30:21
**rough** [1] - 50:16
**rounding** [1] - 45:8
**row** [1] - 48:15
**rows** [1] - 48:6
**RUDY** [18] - 5:3, 5:8, 5:13, 5:23, 6:8, 6:14, 16:1, 16:5, 16:21, 17:1, 17:16, 17:18, 17:24, 19:8, 21:1, 21:4, 21:7, 21:24
**Rudy** [6] - 5:4, 14:3, 14:12, 15:4, 17:17, 17:18
**Rudy....** [1] - 3:5
**Rudy................** [1] - 3:6
**ruled** [1] - 7:1
**ruling** [2] - 12:8, 16:24
**run** [3] - 64:9, 66:10, 67:20
**résumé** [1] - 32:14

**S**

**S&L** [1] - 67:18

**Sam** [1] - 17:6
**sample** [2] - 47:23, 50:3
**save** [2] - 42:25, 62:1
**saw** [2] - 35:21, 73:21
**scale** [1] - 74:12
**School** [3] - 23:22, 24:16
**science** [1] - 11:17
**scope** [7] - 4:19, 4:23, 5:21, 6:10, 9:4, 13:16, 14:23
**screen** [2] - 7:16, 24:11
**seated** [1] - 17:14
**SEC** [1] - 31:13
**second** [8] - 10:9, 10:10, 10:19, 13:17, 16:12, 35:18, 38:8, 67:7
**Securities** [1] - 31:13
**securities** [1] - 57:13
**see** [20] - 7:18, 8:11, 10:5, 17:9, 21:15, 37:19, 39:21, 48:20, 55:1, 67:10, 67:12, 73:18, 73:20, 74:2, 74:4, 74:5, 74:6, 74:7, 74:20, 75:19
**seeing** [1] - 4:16
**segment** [1] - 22:7
**Seller** [1] - 37:10
**Senior** [1] - 4:5
**senior** [4] - 36:20, 46:19, 54:4, 59:16
**sentences** [1] - 4:14
**separate** [3] - 6:8, 12:10, 12:15
**September** [4] - 8:17, 56:4, 57:23, 58:2
**series** [4] - 8:3, 10:21, 13:18, 66:16
**serve** [2] - 62:2, 62:10
**serves** [2] - 38:18, 58:19
**services** [1] - 30:22
**session** [1] - 77:19
**set** [6] - 37:2, 37:4, 38:3, 38:25, 51:23, 65:25
**shall** [2] - 37:2, 37:5, 37:9
**share** [3] - 8:20, 18:12, 19:18
**shareholders** [5] - 20:1, 21:14, 54:12, 60:6, 60:7
**shares** [3] - 19:23, 20:7, 20:20
**short** [5] - 4:14, 13:18,

58:18, 59:7, 59:22
**short-term** [1] - 58:18
**show** [19] - 8:7, 8:11, 9:6, 24:8, 24:11, 34:14, 35:4, 36:19, 39:13, 47:3, 47:25, 50:10, 51:19, 69:18, 73:11, 73:25, 74:12, 75:22
**showed** [2] - 11:12, 50:11
**showing** [4] - 4:15, 9:7, 35:5, 64:19
**shows** [5] - 28:5, 48:24, 67:4, 76:6, 77:1
**sic** [1] - 13:4
**side** [3] - 40:14, 48:6, 72:7
**significance** [1] - 71:8
**significant** [2] - 57:8, 57:12
**significantly** [4] - 39:14, 56:10, 57:2, 60:22
**similar** [8] - 40:17, 53:22, 55:11, 58:14, 59:19, 61:12, 64:6, 66:19
**simple** [3] - 30:5, 42:6, 67:1
**simplify** [1] - 66:20
**simply** [9] - 10:11, 11:7, 15:2, 26:24, 35:11, 37:19, 43:24, 50:12, 51:21
**sits** [1] - 74:9
**sitting** [1] - 11:23
**situation** [1] - 44:19
**six** [2] - 7:16, 8:6
**size** [4] - 53:2, 63:19, 64:4, 71:9
**sizes** [1] - 52:19
**slide** [23] - 4:15, 8:10, 8:11, 8:12, 8:14, 24:11, 28:5, 28:19, 34:14, 36:19, 37:21, 38:7, 38:23, 39:5, 41:18, 44:18, 47:25, 63:8, 65:14, 67:4, 69:17, 73:11, 76:6
**Slide** [1] - 17:21
**slides** [2] - 24:4, 73:16
**small** [8] - 26:23, 34:11, 35:8, 73:20, 74:5, 74:8, 74:14, 74:17
**smaller** [2] - 53:1
**sneak** [1] - 5:14
**Society** [2] - 29:6,

29:11
**society** [2] - 29:17, 29:23
**sold** [1] - 60:16
**sole** [1] - 14:9
**sometimes** [2] - 52:19, 52:24, 67:19
**somewhere** [3] - 26:3, 26:7, 51:19
**sorry** [10] - 5:7, 16:4, 17:6, 18:2, 21:4, 24:13, 27:6, 39:4, 68:8, 75:17
**sort** [11] - 9:6, 36:14, 37:7, 38:5, 58:15, 58:19, 66:9, 67:4, 67:7, 67:17, 70:23
**sought** [1] - 14:8
**sound** [1] - 25:24
**sounds** [1] - 61:12
**source** [1] - 63:15
**sources** [1] - 40:25
**specialization** [1] - 47:15
**specific** [5] - 7:4, 9:16, 26:2, 26:8, 40:24
**specifically** [3] - 6:20, 7:1, 64:18
**specified** [2] - 48:21, 49:9
**speculation** [1] - 15:15
**spent** [1] - 10:1
**SPSPA** [1] - 36:20
**St** [2] - 23:23, 24:17
**stability** [8] - 56:14, 56:21, 57:16, 57:17, 62:3, 62:11, 64:13, 68:4
**Stan** [1] - 71:3
**stand** [5] - 10:16, 13:2, 17:15, 21:15, 21:17
**standard** [2] - 25:14, 58:15
**standards** [1] - 25:22
**standing** [2] - 64:7, 68:10
**standpoint** [1] - 54:17
**Stanton** [1] - 19:16
**start** [1] - 72:25
**started** [2] - 58:2, 59:18
**state** [3] - 5:1, 22:19, 66:12
**statement** [1] - 16:16
**States** [3] - 67:15, 68:9, 69:1
**statutory** [1] - 67:5
**stayed** [1] - 46:11

**step** [6] - 21:25, 35:17, 35:18, 42:11, 63:5, 65:4
**Step** [1] - 36:19
**stepped** [3] - 55:18, 57:18, 59:7
**steps** [1] - 36:16
**STERN** [1] - 21:3
**stick** [1] - 21:20
**still** [5] - 6:19, 18:15, 46:12, 50:25, 69:25
**stipulated** [1] - 8:19
**Stock** [1] - 4:5
**stock** [69] - 4:16, 6:11, 6:25, 7:18, 8:8, 8:17, 9:1, 9:7, 9:11, 9:19, 10:23, 12:6, 12:12, 12:13, 13:5, 13:8, 14:11, 18:5, 18:9, 18:11, 18:16, 18:24, 19:4, 20:21, 21:10, 21:13, 21:19, 26:24, 36:20, 45:8, 45:11, 45:13, 45:14, 46:20, 46:25, 49:13, 49:16, 53:19, 53:22, 54:1, 54:4, 54:9, 54:16, 54:20, 54:22, 55:2, 55:7, 55:9, 55:16, 56:3, 56:13, 59:8, 59:9, 59:16, 59:20, 59:23, 59:24, 60:1, 60:2, 60:3, 60:10, 60:13, 60:14, 60:15, 60:16, 60:18, 61:3, 61:7
**stock-price** [8] - 6:11, 6:25, 8:8, 9:11, 9:19, 12:12, 14:11, 19:4
**stock-price-recovery** [1] - 12:13
**stockholders** [1] - 54:11
**stocks** [1] - 8:18
**story** [1] - 43:2
**stresses** [1] - 57:9
**structure** [4] - 35:15, 36:14, 41:2, 41:3
**studies** [5] - 47:19, 49:25, 51:1, 51:19, 52:8
**study** [17] - 11:5, 11:10, 11:11, 11:12, 12:4, 13:22, 14:23, 15:11, 26:2, 48:3, 49:8, 49:22, 50:4, 50:20, 52:9
**stuff** [4] - 5:10, 9:5, 10:13, 13:5
**sub** [1] - 57:12

**subject** [4] - 26:9, 37:10, 46:18, 46:20
**subjects** [1] - 24:23
**submit** [1] - 25:15
**subsequent** [5] - 48:3, 49:8, 49:22, 50:4, 50:20
**subset** [1] - 11:12
**subsidiaries** [1] - 57:11
**subsidiary** [1] - 57:11
**subsidies** [1] - 62:5
**substance** [1] - 71:14
**substantial** [4] - 23:12, 41:12, 44:25, 56:4
**substantially** [1] - 49:15
**suggest** [2] - 53:2, 66:16
**suggested** [3] - 49:6, 49:19, 50:25
**suggests** [2] - 49:22, 50:17
**sum** [1] - 71:14
**summarize** [5] - 27:14, 28:4, 28:19, 37:21, 40:21
**summarizes** [1] - 48:1
**summary** [1] - 64:17
**sunset** [1] - 56:18
**supplemental** [2] - 8:24, 13:10
**support** [1] - 37:1
**suppose** [1] - 51:23
**surprising** [1] - 54:21
**survive** [1] - 53:16
**sustained** [9] - 4:22, 5:19, 6:14, 7:10, 12:19, 16:8, 21:2, 21:23
**sweep** [28] - 8:20, 10:24, 11:6, 11:13, 11:15, 16:14, 18:7, 18:25, 19:7, 20:12, 23:5, 23:9, 23:13, 33:9, 33:14, 73:9, 73:14, 74:16, 74:18, 74:23, 75:1, 75:2, 75:5, 76:3, 76:7, 76:10, 77:7, 77:8
**switched** [1] - 59:19
**system** [6] - 30:16, 56:19, 56:21, 62:2, 63:14, 64:12

**T**

**T-bond** [1] - 69:4
**Tab** [1] - 32:10

**table** [1] - 48:1
**takeaway** [1] - 37:21
**tangible** [1] - 66:15
**TARP** [2] - 53:11, 53:13
**tax** [1] - 54:22
**teaching** [1] - 24:23
**team** [1] - 16:21
**ten** [10] - 7:16, 68:19, 69:4, 75:20, 75:23, 75:25, 76:8, 76:16, 77:3
**ten-year** [3] - 68:19, 69:4, 76:8
**tend** [1] - 53:1
**tender** [2] - 29:2, 32:3
**term** [4] - 29:19, 34:22, 58:18, 68:21
**terms** [14] - 14:15, 37:15, 38:21, 39:25, 41:14, 51:16, 52:23, 57:25, 58:3, 58:4, 58:24, 60:20, 60:21
**test** [1] - 28:1
**testified** [1] - 70:21
**testify** [4] - 4:10, 4:13, 22:23, 71:10
**testimony** [17] - 4:9, 4:10, 4:21, 6:10, 13:21, 14:9, 14:20, 14:22, 16:11, 22:8, 24:4, 36:15, 40:11, 40:15, 40:17, 71:10, 71:23
**textbook** [1] - 26:3
**Thakor** [15] - 3:7, 17:4, 22:5, 22:14, 22:20, 32:3, 32:8, 33:4, 44:13, 70:21, 70:25, 71:12, 72:3, 72:13, 77:10
**Thakor's** [1] - 22:7
**theatrical** [1] - 9:23
**theoretical** [2] - 27:24, 27:25
**therefore** [1] - 45:23
**they've** [1] - 67:23
**thin** [1] - 74:2
**thinks** [1] - 26:16
**third** [15] - 8:15, 14:18, 19:20, 20:13, 20:15, 23:4, 23:7, 38:22, 39:3, 39:5, 39:6, 45:5, 49:4, 58:11, 69:21
**Thornton** [1] - 40:6
**thousand** [4] - 43:15, 43:22, 45:9, 45:10
**threatened** [1] - 57:16
**three** [10] - 10:15,

11:1, 19:10, 48:6, 49:3, 49:20, 50:2, 52:15, 56:9, 58:6
**three-month** [2] - 49:3, 58:6
**threshold** [1] - 25:22
**tied** [3] - 13:8, 68:15, 68:18
**tiny** [1] - 75:17
**today** [9] - 6:19, 16:14, 22:23, 22:24, 24:5, 44:4, 63:3, 70:22, 71:17
**together** [1] - 37:24
**took** [4] - 7:9, 11:12, 37:23, 49:2
**top** [8] - 25:18, 27:21, 28:9, 28:13, 48:15, 73:22, 74:9, 76:18
**topic** [10] - 6:12, 6:15, 10:11, 12:9, 16:8, 22:22, 26:2, 26:8, 28:16, 30:20
**topics** [1] - 29:18
**total** [5] - 42:2, 50:19, 67:9, 74:15, 76:11
**totally** [2] - 20:24, 33:12
**track** [1] - 60:10
**traditionally** [1] - 66:11
**transactions** [1] - 38:17
**transcript** [2] - 15:4, 77:20
**transferred** [1] - 73:8
**translated** [1] - 67:10
**transparent** [1] - 66:20
**travel** [1] - 70:7
**Treasury** [62] - 37:1, 38:13, 38:15, 38:16, 39:2, 39:10, 39:21, 39:24, 40:3, 40:6, 41:8, 41:10, 41:14, 44:19, 44:22, 44:23, 44:25, 45:6, 45:10, 46:3, 46:5, 46:25, 49:13, 49:16, 51:4, 51:15, 52:10, 52:18, 53:10, 53:14, 53:16, 53:21, 55:8, 55:17, 56:7, 56:12, 57:1, 57:21, 59:5, 59:7, 59:16, 59:17, 60:17, 60:24, 62:15, 67:15, 67:24, 68:8, 68:9, 68:11, 68:15, 68:16, 68:18, 68:19, 68:20, 68:21, 69:7, 69:13,

69:16, 70:11, 72:10
**Treasury's** [3] - 46:19, 59:14, 60:21
**treatment** [1] - 54:22
**trial** [3] - 8:9, 8:10, 77:19
**tried** [3] - 8:23, 40:13, 75:16
**trillion** [1] - 63:21
**Troubled** [1] - 53:11
**true** [7] - 10:14, 11:3, 11:7, 11:8, 11:19, 54:17, 71:5
**try** [4] - 4:19, 18:14, 39:22, 73:2
**turn** [2] - 39:9, 47:9
**turns** [2] - 54:17, 66:11
**twice** [1] - 55:22
**two** [12] - 5:17, 11:21, 12:14, 12:18, 13:3, 42:18, 49:25, 50:23, 50:25, 57:11, 69:22
**type** [1] - 52:10
**types** [2] - 30:16, 60:2
**typically** [10] - 25:18, 26:5, 26:22, 27:4, 27:7, 27:10, 34:11, 54:12, 55:1

## U

**U.S** [6] - 56:12, 63:22, 65:19, 68:17, 68:18, 69:2
**Ugoletti's** [1] - 40:16
**ultimate** [3] - 34:14, 65:6, 69:8
**ultimately** [2] - 52:3, 58:21
**unclear** [1] - 5:17
**under** [16] - 46:1, 48:5, 51:5, 53:10, 56:8, 56:11, 58:5, 61:8, 62:13, 73:9, 73:13, 74:18, 75:2, 75:3, 76:3, 76:4
**understate** [1] - 54:25
**understood** [1] - 4:10
**undrawn** [3] - 69:22, 69:25, 70:1
**United** [1] - 67:15, 68:9, 69:1
**universities** [1] - 24:24
**University** [5] - 23:20, 23:23, 24:17, 24:18, 24:20
**unlike** [3] - 46:22, 55:20, 61:17

**unprecedented** [1] - 62:19
**unrelated** [2] - 11:11, 13:23
**unsecured** [2] - 58:19, 66:2
**untimely** [1] - 8:25
**up** [28] - 8:10, 8:11, 8:13, 8:14, 8:21, 10:16, 11:14, 11:18, 14:25, 15:5, 15:6, 17:21, 22:7, 50:12, 50:17, 53:16, 55:18, 59:22, 60:4, 60:8, 60:12, 63:4, 63:5, 70:11, 75:8, 75:19, 76:11, 77:6
**Upfront** [1] - 48:7
**upfront** [12] - 34:12, 42:1, 43:7, 48:12, 49:17, 49:19, 50:24, 51:6, 52:25, 55:23, 55:25
**upper** [1] - 72:20
**useful** [1] - 41:12
**users** [1] - 30:7
**uses** [1] - 30:9

## V

**valid** [1] - 11:6
**value** [12] - 7:10, 18:15, 19:23, 20:7, 35:24, 37:6, 37:20, 38:3, 38:25, 41:1, 56:4
**valued** [1] - 56:5
**Vancouver** [1] - 29:25
**variables** [1] - 67:5
**various** [2] - 30:16, 61:19
**VARMA** [2] - 13:25, 16:10
**Varma** [2] - 13:25, 16:2
**view** [3] - 19:18, 21:8, 63:15
**violate** [1] - 14:5
**violated** [2] - 10:6, 14:24
**violates** [1] - 9:24
**violating** [1] - 7:2
**violation** [4] - 12:11, 12:20, 15:2, 15:20

## W

**waived** [3] - 37:3, 40:8, 43:15
**walk** [1] - 72:20

**walk-away** [1] - 72:20
**wants** [3] - 5:1, 34:1, 70:12
**warrant** [1] - 61:12
**warranted** [1] - 15:19
**warrants** [9] - 45:6, 45:15, 50:24, 51:6, 56:3, 61:2, 61:5, 61:7, 61:9
**Washington** [3] - 23:23, 24:17, 24:22
**website** [2] - 64:20, 65:17
**Wells** [1] - 65:21
**whereas** [2] - 55:25, 77:3
**whole** [6] - 4:19, 8:7, 10:21, 10:25, 65:25, 66:16
**willing** [1] - 14:14
**witness** [9] - 8:15, 15:25, 22:2, 22:4, 31:11, 31:12, 32:8, 44:15, 77:12
**Witness** [1] - 22:1
**WITNESS** [2] - 22:10, 29:10
**Witnesses** [1] - 3:4
**word** [2] - 29:9, 30:2
**words** [1] - 71:15
**works** [1] - 10:18
**world** [2] - 29:18, 70:24
**world's** [2] - 36:8, 57:7
**worth** [28] - 8:20, 10:24, 11:6, 11:13, 11:15, 16:14, 18:7, 18:25, 19:7, 20:12, 23:5, 23:9, 23:13, 33:9, 33:14, 73:9, 73:14, 74:16, 74:18, 74:23, 75:1, 75:2, 75:5, 76:3, 76:7, 76:10, 77:7, 77:8
**written** [3] - 25:7, 26:9, 28:16

## Y

**year** [11] - 20:8, 29:24, 68:19, 69:4, 75:12, 75:20, 75:24, 76:8, 76:14, 76:15, 77:3
**years** [15] - 7:17, 8:6, 10:15, 19:2, 25:3, 29:5, 55:18, 55:21, 75:20, 75:23, 75:25, 76:16, 77:3
**yesterday** [7] - 4:8, 5:18, 6:4, 6:11,

17:22, 18:5, 53:11
**yield** [9] - 51:1, 51:11, 54:15, 54:20, 54:21, 58:21, 60:14, 60:18
**yielded** [1] - 57:3
**yields** [4] - 59:4, 60:23, 68:25, 69:12
**York** [5] - 31:8, 41:13, 57:20, 57:23, 61:6
**York's** [2] - 58:24, 59:11
**yourself** [3] - 17:5, 22:16, 70:8

## Z

**zero** [15] - 18:6, 18:10, 18:16, 19:19, 19:24, 21:10, 21:13, 21:19, 43:5, 57:3, 59:4, 60:23, 68:12, 69:12