```
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3      * * * * * * * * * * * * * * *   )
        FAIRHOLME FUNDS, INC., et al.,  )   Civil Action
 4                                      )   No. 13-1053
                    Plaintiffs,         )
 5                                      )
          vs.                           )
 6                                      )
        FEDERAL HOUSING FINANCE AGENCY, )   Washington, D.C.
 7      et al.,                         )   July 31, 2023
                                        )   10:40 a.m.
 8                  Defendants.         )
                                        )
 9      * * * * * * * * * * * * * * *   )

10      IN RE:  FANNIE MAE/FREDDIE MAC  )
        SENIOR PREFERRED STOCK PURCHASE )   MC Case No. 13-1288
11      AGREEMENT CLASS ACTION LITIGATION )

12

13                    TRANSCRIPT OF JURY TRIAL
                      DAY 6 - MORNING SESSION
14            BEFORE THE HONORABLE ROYCE C. LAMBERTH,
                 UNITED STATES SENIOR DISTRICT JUDGE
15


16
        APPEARANCES:
17
        FOR THE BERKLEY          VINCENT COLATRIANO, ESQ.
18      PLAINTIFFS:              COOPER & KIRK, PLLC
                                 1523 New Hampshire Avenue, Northwest
19                               Washington, D.C. 20036

20      FOR THE CLASS            HAMISH P.M. HUME, ESQ.
        PLAINTIFFS:              KENYA KHALELAH DAVIS, ESQ.
21                               BOIES, SCHILLER & FLEXNER, LLP
                                 1401 New York Avenue, Northwest
22                               Washington, D.C. 20005

23                               LEE D. RUDY, ESQ.
                                 KESSLER, TOPAZ, MELTZER & CHECK, LLP
24                               280 King of Prussia Road
                                 Radnor, Pennsylvania 19087

25
```

```
 1      APPEARANCES, CONT'D:

 2      FOR THE CLASS           ROBERT F. KRAVETZ, ESQ.
        PLAINTIFFS:             ADAM H. WIERZBOWSKI, ESQ.
 3                              BERNSTEIN, LITOWITZ, BERGER &
                                  GROSSMAN, LLP
 4                              1251 Avenue of the Americas
                                New York, New York 10020
 5
        FOR THE DEFENDANTS      ASIM VARMA, ESQ.
 6      FHFA, FANNIE MAE &      IAN HOFFMAN, ESQ.
        FREDDIE MAC:            DAVID BERGMAN, ESQ.
 7                              JONATHAN LOUIS STERN, ESQ.
                                STANTON JONES, ESQ.
 8                              ARNOLD & PORTER KAYE SCHOLER
                                601 Massachusetts Avenue, Northwest
 9                              Washington, D.C. 20001

10      REPORTED BY:            LISA EDWARDS, RDR, CRR
                                Official Court Reporter
11                              United States District Court for the
                                  District of Columbia
12                              333 Constitution Avenue, Northwest
                                Room 6706
13                              Washington, D.C. 20001
                                (202) 354-3269
14

15

16

17

18

19

20

21

22

23

24

25
```

I N D E X

|                          | Direct | Cross | Red. |
|--------------------------|--------|-------|------|

WITNESSES FOR THE PLAINTIFFS:

Timothy Mayopoulos (video)          1083

Bala G. Dharan, Ph.D.               1086


EXHIBITS RECEIVED IN EVIDENCE                                    PAGE

Plaintiffs' Exhibit Nos. 3-A, 3-B, 33, 34,
154, 160, 216, 218, 228, 244, 245, 246, 247,
257, 259, 308 and 351                                           1082


Plaintiffs' Exhibit Nos. 205, 210, 226-A and 227               1083

```
1              THE COURTROOM DEPUTY:  This is Civil Action

2      13-1053, with related Miscellaneous Case 13-1288, In Re:

3      Fannie Mae/Freddie Mac Senior Preferred Stock Purchase

4      Agreement Class Action Litigations.

5              MR. KRAVETZ:  Good morning, your Honor.  Robert

6      Kravetz on behalf of the Plaintiffs.

7              We wanted to give the Court the lineup for today.

8              THE COURT:  Okay.

9              MR. KRAVETZ:  We have an approximately 25- or

10     26-minute video of Timothy Mayopoulos.  I'll ask to move in

11     some exhibits prior to that, your Honor.

12             THE COURT:  All right.

13             MR. KRAVETZ:  Then we will have Dr. Bala Dharan.

14     It is likely, with cross-examination and redirect, that that

15     may go the bulk of the day, the remainder of the day.

16             THE COURT:  Okay.

17             MR. KRAVETZ:  If it does not, we would have

18     Ms. Jill Belack again, who would come as our document reader

19     to testify about six different -- six additional documents.

20             THE COURT:  Go ahead the bring in the jury.

21             MR. KRAVETZ:  Your Honor, there will be one issue

22     that -- Dr. Dharan will go next -- that Mr. Bergman would

23     like to address.  We can do so at the phone or now, just to

24     put an understanding of the --

25             THE COURT:  Let's not keep the jury waiting.
```

```
 1              MR. KRAVETZ:  I understand, your Honor.

 2              THE COURTROOM DEPUTY:  Jury panel.

 3              (Whereupon, the jury entered the courtroom at

 4    10:42 a.m. and the following proceedings were had:)

 5              THE COURT:  You may be seated.

 6              Good morning, ladies and gentlemen.

 7              THE JURY:  Good morning.

 8              THE COURT:  We do have one more short deposition

 9    to play before we hear another expert.  So we'll play this

10    deposition first.

11              MR. KRAVETZ:  Thank you, your Honor.

12              Robert Kravetz on behalf of Plaintiffs.

13              Before we do, your Honor, we have some documents

14    to admit into the record.

15              THE COURT:  Okay.

16              MR. KRAVETZ:  The following are admitted, it is my

17    understanding, without objection:  Plaintiff's Exhibit 3-A,

18    3-B, 33, 34, 154, 160, 216, 218, 228, 244, 245, 246, 247,

19    257, 259, 308 and 351.

20              THE COURT:  After 259, what was it?

21              MR. KRAVETZ:  After 259, your Honor, 308 and 351.

22              THE COURT:  They're all received.

23              (Whereupon, Plaintiff's Exhibit Nos. 3-A, 3-B, 33,

24    34, 154, 160, 216, 218, 228, 244, 245, 246, 247, 257, 259,

25    308 and 351 were entered into evidence.)
```

```
 1              MR. KRAVETZ:  We have the following additional

 2    documents for which Defendants have informed us they are

 3    going to object for the record, your Honor.  These are

 4    Exhibits 205, 210, 226-A and 227.

 5              MR. JONES:  Stanton Jones for the Defendants.

 6              Defendants object to each of those last four, for

 7    the record.

 8              THE COURT:  Those objections are previously

 9    considered and they're overruled.  Those are received.

10              (Whereupon, Plaintiff's Exhibit Nos. 205, 210,

11    226-A and 227 were entered into evidence.)

12              MR. KRAVETZ:  At this time, your Honor, Plaintiffs

13    would play a 26-minute deposition video from former Fannie

14    Mae CEO Timothy Mayopoulos.

15              THE COURT:  You may proceed.

16              (Whereupon, the videotaped deposition of Timothy

17    Mayopoulos was published in open court.)

18              MR. KRAVETZ:  Your Honor, Plaintiffs call Dr. Bala

19    Dharan.

20              THE COURT:  Okay.

21              THE COURTROOM DEPUTY:  Remain standing and raise

22    your right hand.

23        BALA G. DHARAN, Ph.D., PLAINTIFFS' WITNESS, SWORN.

24              MR. KRAVETZ:  Your Honor, may I approach?

25              THE COURT:  Yes.
```

```
 1                MR. KRAVETZ:  (Tenders documents to the witness.)

 2           And before we begin, your Honor, we have one

 3      matter to address with your Honor on the phone.

 4                (Whereupon, the following proceedings were had at

 5      sidebar outside the presence of the jury:)

 6                MR. BERGMAN:  Your Honor, David Bergman for

 7      Defendants.

 8           The parties have a joint request with respect to

 9      some procedural issues around Mr. -- around Dr. Dharan's

10      testimony.

11           As the Court knows, Defendants filed a motion for

12      a jury instruction with respect to the interpretation of the

13      Treasury stock securities.  And that motion will be fully

14      briefed by Tuesday at midnight.

15           But in the meantime, we expect that Dr. Dharan may

16      testify in a way that implicates the interpretation of the

17      Treasury stock certificates.

18           And as the Court knows, it's our position that the

19      Treasury stock certificate required Fannie and Freddie to

20      pay a 10 percent cash dividend and did not give Fannie and

21      Freddie the choice to instead add 12 percent to the

22      liquidation preference, which Plaintiffs are calling a

23      payment in kind.

24           And so we understand that Dr. Dharan may testify

25      with at least a hypothetical or the premise that the
```

1    Treasury stock certificates gave Fannie and Freddie a choice

2    of paying either the cash dividend or the 12 percent

3    addition to the liquidation preference.

4           And rather than stand up and object each time

5    Dr. Dharan does that, we request, and I think the Plaintiffs

6    request as well, that Defendants be able to make one

7    objection now that would be a continuing or blanket

8    objection and that would apply to all of Dr. Dharan's

9    testimony or demonstratives to the extent that it may be

10   premised on or characterize the 10 percent cash dividend as

11   not required or that the 12 percent addition to liquidation

12   preference or payment in kind was an available option or

13   alternative under the contract.

14          And we'd ask to have that objection apply in a

15   continuing way; and we'd ask to preserve any right we may

16   have to later move to strike the testimony or for further

17   instruction.

18          MR. KRAVETZ:  Your Honor, Robert Kravetz on behalf

19   of Plaintiffs.

20          That's consistent with our understanding.  We have

21   no objection.

22          THE COURT:  I'll overrule the objection for now,

23   and then we'll see at the time of the instructions what I

24   do.

25          MR. BERGMAN:  Thank you very much.

```
1              MR. KRAVETZ:  Thank you, your Honor.
2              (Whereupon, the following proceedings were had in
3      open court:)
4                          DIRECT EXAMINATION
5      BY MR. KRAVETZ:
6      Q.  Good morning, Dr. Dharan.
7      A.  Good morning.
8      Q.  Can you please introduce yourself to the members of the
9      jury.
10     A.  Yes.  My name is Bala Dharan.  I'm an accounting
11     professor and a consultant.
12     Q.  And, Dr. Dharan, can you state -- can you spell your
13     name for the record, please?
14     A.  Yes.  First name, Bala, B-A-L-A.  Last name, Dharan,
15     D-H-A-R-A-N.  And I also use middle initial G.
16     Q.  Okay.  And, Dr. Dharan, do you have a general
17     understanding of why you're testifying today?
18     A.  Yes.
19     Q.  What is that?
20     A.  I've been asked to analyze the documents related to this
21     matter and analyze the two questions that I've been asked to
22     look at and come to a conclusion.
23     Q.  And, Dr. Dharan, have you prepared any demonstratives
24     relating to your testimony?
25     A.  Yes, I have.
```

 1   Q.  What do those demonstratives relate to?

 2   A.  They relate to the questions that I was asked to

 3   analyze.  They present the analysis that I did.  They

 4   present a relatively good set of slides to support the

 5   analysis and they also summarize my opinions.

 6   Q.  And will those demonstratives assist in the presentation

 7   of your testimony?

 8   A.  In what way, did you say?

 9   Q.  Will they assist in the presentation of your testimony

10   to the jury?

11   A.  Yes.  Yes, they will.

12           MR. KRAVETZ:  Your Honor, with the Court's

13   permission, we would request to show the demonstratives on

14   the screen.  We've provided copies of the demonstratives to

15   Defendants and to Dr. Dharan.

16           MR. BERGMAN:  No objection, your Honor.

17           THE COURT:  All right.

18   BY MR. KRAVETZ:

19   Q.  Dr. Dharan, does your first slide summarize your current

20   professional positions?

21   A.  Yes, it does.

22   Q.  And can you give the members of the jury a brief summary

23   of your current professional positions.

24   A.  Okay.  I have over 40 years of experience in --

25   professional experience in accounting and finance.  As I

1    said, I'm a professor and I'm also a consultant.

2            And currently I'm a professor at two places,

3    Harvard Law School, which is in Cambridge.  I'm a Robert &

4    Candice Haas visiting professor of accounting and finance.

5    And then I'm also a visiting professor at MIT Sloan School

6    of Management, which is also in Cambridge.  In addition, I'm

7    a managing director at a consulting firm called Berkeley

8    Research.

9    Q.  What courses do you currently teach at Harvard Law and

10   MIT?

11   A.  At both places I teach courses in accounting and finance

12   and related subjects such as business valuation and

13   financial statement analysis.

14   Q.  Dr. Dharan, can you briefly describe for us your prior

15   professional positions?

16   A.  Yes.  I have a slide for that.

17   Q.  Okay.

18   A.  And so I have a Ph.D. in accounting and -- it's really a

19   business administration Ph.D., focusing on accounting and

20   finance, from Carnegie Mellon University in Pittsburgh.

21           And after that, I worked briefly at Northwestern

22   University, but my primary job after that was at Rice

23   University in Houston.  So I consider myself a Texan.  I was

24   there for 26 years.

25           And then after -- during the time, I spent a year

1    as a visiting professor at Harvard Business School and also

2    one year at -- as a visiting professor at University of

3    California, Berkeley, during the time I was at Rice.

4            Also, I have worked periodically over the years

5    starting from around 2003 at the Wharton School as a senior

6    lecturer or lecturer in the executive programs.

7    Q.  And, Dr. Dharan, what subjects did you focus on over the

8    course of your academic career?

9    A.  The subjects are primarily accounting, finance, business

10   valuation, financial statement analysis and related subjects

11   such as corporate governance.

12   Q.  Have you received any awards or university service

13   honors relating to your academic career?

14   A.  Yes.  While I was at Rice, I also -- I received a best

15   teaching award once and also other teaching recognitions

16   during the time I was there.

17   Q.  Dr. Dharan, do you also have any professional

18   certifications?

19   A.  Yes, I do.

20   Q.  Do you list those on a slide?

21   A.  I have another slide for that.

22   Q.  What are your professional certifications, sir?

23   A.  So my -- I'm a certified public accountant.  We call it

24   CPA.  So I got my CPA around 1986.  And so that's my primary

25   professional certification.  I'm licensed as a CPA in the

 1    state of Texas.

 2          And I'm also -- I have two other certifications

 3    that are issued by a professional group that we CPAs belong

 4    to called AICPA.  And there are two of them.  One of them is

 5    a business valuation certification.  It's called ABC, or

 6    accredited in business valuation.  And the other one is

 7    forensic analysis certification.  It's called certified in

 8    financial forensics.

 9    Q.  You've mentioned that term "business valuation" now a

10    couple times.

11    A.  Yes.

12    Q.  What does that mean?

13    A.  Well, it's a methodology to value businesses.  This

14    could be as part of maybe a company selling their divisions

15    or maybe a company trying to acquire another company or

16    maybe just specific assets of another company.  So all of

17    these require valuing that business as a going business.

18    And that's the methodology that I've been trained in.

19    Q.  Dr. Dharan, do you have a slide listing your

20    professional memberships, publications and prior expert

21    testimony?

22    A.  Yes, I have.

23    Q.  And, Dr. Dharan, let's focus on the middle portion.  Are

24    you a published author?

25    A.  Yes, I am.

1   Q.  Have you authored any books?

2   A.  Yes.  I have authored books and also articles,

3   peer-reviewed articles.

4   Q.  And what is the nature of the books that you've

5   authored?

6   A.  I've authored two books.  One of them is on Enron and

7   other corporate fiascos or scandals, if you may.  And this

8   was published in -- I think 2003.  And a second edition was

9   published about two or three years later.  So there are two

10  editions of that.

11          I also published a textbook used in MBA programs

12  and accounting programs called *Readings and Notes on*

13  *Financial Accounting*.

14          And there have been five editions, but I was a

15  coauthor in two of them.  So between these two, I have

16  essentially published four textbooks.  And also, I have

17  published a lot of -- more than about 15 peer-reviewed

18  articles.

19  Q.  Have you ever been invited to testify before the United

20  States Congress?

21  A.  Yes.

22  Q.  In what capacity?

23  A.  So I was invited to testify in front of the U.S.

24  Congress three times.  The first one was right after the

25  Enron scandal broke out.  I think that Enron happened in

1    December 2001.  And I was asked to come to U.S. Congress in

2    early February 2002 to explain what happened, you know, what

3    was the potential causes of the bankruptcy of Enron and what

4    could be done by U.S. Congress to mitigate this and prevent

5    this in the future.

6    Q.  Have you ever been an employee of the federal

7    government?

8    A.  No.  I have not been an employee.

9    Q.  But has the federal government ever hired you as an

10   expert?

11   A.  Yes.

12   Q.  And who has hired you?

13   A.  The SEC hired me as a testifying expert on a case.  I've

14   also served as a consulting expert for the SEC and other

15   agencies.

16   Q.  And apart from being hired by government agencies, have

17   you also been retained as an expert or a consultant in other

18   matters?

19   A.  Yes.

20   Q.  Can you give us a rough estimate?

21   A.  I would say I've been retained as an expert in

22   consult -- a consulting expert in at least 50 different

23   lawsuits.  And I've testified in probably about a dozen of

24   them.

25   Q.  And has your work included consulting or expert analysis

1    on issues relating to financial institutions?

2    A.  Yes.

3    Q.  And through your training and experience, Dr. Dharan,

4    have you become familiar with accounting concepts that

5    relate to financial institutions such as Fannie Mae and

6    Freddie Mac?

7    A.  Yes.

8    Q.  Dr. Dharan, have you evaluated financial statements to

9    analyze the financial health of a company?

10   A.  Yes.  That's part of the work I described earlier as

11   both a valuation expert and also financial statement

12   analysis work.

13   Q.  And have you engaged in the process and analysis of

14   forecasting to assess a company's future financial

15   condition?

16   A.  Yes.  Very much.  Forecasting is an integral part of

17   valuation.  And in order to value a business, we first

18   forecast the cash flows to see how much cash flows the

19   business is going to generate over the next several years.

20   And then earnings also, financial statements, cash flows,

21   all of that.  Those are used to value the business as of

22   today.  So that's a very common part of business valuation.

23   Q.  And, Dr. Dharan, you're testifying in this case on

24   behalf of the Plaintiffs.  Correct?

25   A.  Yes.

1    Q.  All right.  And do you have a slide regarding the

2    general scope of your assignment?

3    A.  Yes.

4    Q.  Dr. Dharan, what was the general scope of your

5    assignment?

6    A.  Yes.  I was asked to examine the two questions that I've

7    shown on the screen.

8            I'll read out the questions.  Question 1 is:  Was

9    the net worth sweep consistent with FHFA's public statements

10   that the purpose of the conservatorship was to preserve and

11   conserve the assets of the GSEs and to restore the GSEs to a

12   sound and solvent financial condition?  So that's

13   Question 1.

14           And Question 2 was:  At the time of the third

15   amendment, was the net worth sweep reasonably necessary to

16   avoid insolvency or other significant financial harm to the

17   GSEs?

18   Q.  Now, without giving us the answers yet, what work did

19   you perform to address those questions and what materials

20   did you review?

21   A.  The work primarily involved the type of financial

22   analysis that I'm trained in and -- as well as examining

23   accounting and finance documents that I gathered for this

24   matter that I was provided with.

25           This included emails; it included memos; it

 1    included a variety of documents.  I also looked at -- so

 2    these are documents related to Fannie Mae and Freddie Mac,

 3    communications between them and the FHFA.  Also, some

 4    Treasury documents.

 5            In addition, I also looked at the data for the

 6    U.S. economy around the time of the third amendment, which

 7    was in August 2012.  So I looked at how the economy was

 8    doing, the housing market, all of these factors that

 9    mattered to the question that I'm -- that I was asked to

10    examine.

11    Q.  And did you review any deposition testimony?

12    A.  Yes, I did.  Several deposition testimonies of various

13    witnesses in this matter.

14    Q.  And, sir, did you apply your training and experience to

15    form the opinions that you are going to present to the jury

16    in this case?

17    A.  Yes, I did.

18            MR. KRAVETZ:  Your Honor, at this time, Plaintiffs

19    would tender Dr. Dharan as an expert in the field of finance

20    and accounting for purposes of analyzing the net worth sweep

21    in this case.

22            THE COURT:  Any voir dire?

23            MR. BERGMAN:  No.  And no objection, your Honor.

24            THE COURT:  You may proceed.

25            MR. KRAVETZ:  Thank you, your Honor.

1   BY MR. KRAVETZ:

2   Q.  Dr. Dharan, you have on the screen here the questions

3   that formed your assignment.

4           Do you have a slide depicting the answer for

5   Question 1?

6   A.  Yes.

7   Q.  So what is your expert opinion with respect to

8   Question 1, Dr. Dharan?

9   A.  Sure.  In this slide, I'm just giving my overall

10  conclusion.  And I will have different additional slides

11  later to explain how I arrived at them.

12          So the answer to Question 1, Was the net worth

13  sweep consistent with FHFA's public statement that the

14  purpose of the conservatorship was to preserve and conserve

15  the assets of the GSEs and to restore the GSE to see a sound

16  and solvent financial condition, my conclusion is:  No.

17  It's not consistent with the FHFA's stated purpose, "it"

18  meaning the net worth sweep.  And it did not advance FHFA's

19  stated purpose.

20  Q.  And what about with respect to Question 2?

21  A.  Okay.  So I have a slide on that.

22          So the question again is:  At the time of the

23  third amendment, was the net worth sweep reasonably

24  necessary to avoid insolvency or other significant financial

25  harm to the GSEs?

1          And my conclusion is:  No.  The net worth sweep

2    was not reasonable.  And there are two parts to that answer.

3    One is, the net worth sweep was not reasonably necessary to

4    address a circular draw problem.  And I'll explain what that

5    phrase means.

6          But this was a reason -- this was the reason given

7    by FHFA for doing the net worth sweep.  So I wanted to know:

8    Was it -- did it justify it?

9          And my conclusion was the net worth sweep was not

10   reasonably necessary to address that problem.

11         The second part is, since the net worth sweep

12   could not be viewed as reasonably necessary, it's not

13   something reasonable shareholders could expect.

14   Q.  And you've used the term "reasonably necessary."  Why is

15   that?

16   A.  Well, that's a phrase that I find the right phrase to

17   use for the type of financial analysis that I did.  The

18   questions that I was asked are finance and accounting

19   questions.  In other words:  Here's the circular draw

20   problem, and here we did the net worth sweep.  Was it the

21   right thing to do for the circular draw?

22         These are finance and accounting questions.  So I

23   looked at them.  So I wanted to use a phrase that captured

24   that particular focus that I had.  And that's why I call it

25   "reasonably necessary."

1   Q.  And as part of your presentation today, Dr. Dharan, will

2   you walk the jury through the reasons why you formed these

3   two opinions?

4   A.  Yes, I will.

5   Q.  All right.  Before we do that, was it important for you

6   to understand some of the background of Fannie Mae and

7   Freddie Mac?

8   A.  Yes.  Very much.

9   Q.  All right.  And I'd ask first whether you're familiar

10  with the general history and background of Fannie and

11  Freddie.

12  A.  Yes, I am.  And I have a slide to summarize some of the

13  key points.

14          And so I have, really very quick, almost like a

15  brief summary of the background to Fannie Mae and Freddie

16  Mac.  They were created by Congress to support homeownership

17  and in particular to support the mortgage process and what

18  we call a secondary mortgage market.  So that market really

19  functions because of Fannie Mae and Freddie Mac.

20          And originally Fannie Mae, when it was created, it

21  was owned by taxpayers.  And then -- I think from the late

22  1930s to 1968.  And then it was subsequent to that it was

23  owned by private shareholders.

24          Freddie Mac was also founded sometime in the early

25  1970s, around '71.  And it was owned by private

 1   shareholders.

 2   Q.  And you mentioned private shareholders, Dr. Dharan.

 3   Prior to the conservatorship, who were the shareholders?

 4   A.  Well, these are people.  These could be individuals;

 5   they could be pension funds; they could be municipalities;

 6   they could be maybe, you know, a mutual fund that we all

 7   invest in, our retirement money.  So it could be any of

 8   these institutions.  But it also did have individual

 9   shareholders.

10   Q.  Were there two classes of shareholders?

11   A.  Yes, there were.

12   Q.  What were they?

13   A.  One is called -- one group is called preferred

14   shareholders and the other group is called common

15   shareholders.

16   Q.  What's the difference between the two?

17   A.  Well, the common shareholders are the most -- they are

18   the last residual owners of the companies.  Every company --

19   every public company will have common shareholders.

20           Preferred shareholders are just a little ahead of

21   common shareholders in terms of ownership, residual rights.

22   And they get dividends that are paid to them before they are

23   paid to common shareholders.  And that's why they are called

24   preferred shareholders.

25   Q.  Not preferred in terms of anyone from the public being

1   able to purchase them or not?

2   A.  Right.  It's not anything specific to who can own it;

3   it's just that if you own those shares, then dividends, if

4   they are paid, they are paid to the preferred shareholders

5   first before they could be paid to common shareholders.

6   Q.  And did Fannie Mae and Freddie Mac operate in what's

7   known as the secondary mortgage market?

8   A.  Yes.  They were really designed to operate in that

9   market and support that market.

10  Q.  And do you have a slide diagramming how the secondary

11  mortgage market operates?

12  A.  Yes, I do.

13  Q.  All right.  And so, Dr. Dharan, let's start at the

14  bottom of the slide.  You have an icon for homeowners and

15  also an image for private lenders.

16  A.  Right.

17  Q.  Can you describe to the members of the jury what that is

18  depicting?

19  A.  Absolutely.  So the one on the left, you have, you know,

20  your typical home.  So these are the homeowners.  Let's say

21  we want to buy a house.  We put a down payment and then we

22  need extra money to close the deal.  Right?  We don't -- we

23  usually don't put all the money down.

24          So we go to a bank and take the mortgage.  Right?

25  So that's what I have on the right side.  That could be a

1    bank or it could be a credit union.  It could be any other

2    financial institution that wants to provide the mortgage.

3    So that's what's going on down there.

4    Q.  Is that referred to typically as the primary mortgage

5    market?

6    A.  Exactly.  I think that's what I would call it.  That's

7    the primary mortgage market.

8    Q.  Okay.  And then how does the secondary mortgage market

9    come into play?

10   A.  So to talk about -- to explain -- let me add one other

11   feature of the primary market.

12   Q.  Sure.

13   A.  What happens when the private lender makes the mortgage

14   is their money is now tied up.  So they don't have all the

15   money in the world.  Right?  So their money is tied up.  And

16   if they want to make another loan to another homeowner,

17   that's not there.  The money's already tied up.

18           So the secondary mortgage market is there, Fannie

19   and Freddie are there, mainly to help out this very critical

20   problem.  They will buy out the mortgage from the primary

21   lender so -- and then essentially the money goes back to the

22   primary lender so that they can continue on lending to

23   others.

24           And then Fannie and Freddie take those mortgages

25   that they bought from the private lenders, put them in

1    bundles, maybe packages, and for each of those bundles they

2    are now able to issue additional securities to other

3    investors.  So these investors can buy these securities.

4    They are called mortgage-backed securities, because they are

5    backed by the mortgage bundles.  And we'll call it MBS in

6    some other slides.  I have an abbreviation for that.  So

7    these investors, they get their money when these mortgages

8    get paid by homeowners.  And that money is used to pay the

9    MBS investors.

10   Q.  Let me ask you, is there a difference between MBS

11   investors and then the common and preferred shareholders we

12   saw on your previous slide?

13   A.  Yes.  They are very different.  The common and preferred

14   shareholders get their rights -- cash-flow rights from the

15   companies, from the enterprises.

16        But the MBS investors, they are only dependent on

17   the -- that bundle of mortgages that I mentioned; and no

18   more, no less, essentially.  So in a sense, their rights for

19   the cash flows are coming from those mortgages.

20   Q.  Now, when the private lenders, when the bank, provides

21   the pool of different mortgages to Fannie and Freddie, do

22   they also pay something that's known as a guaranty fee or a

23   g-fee?

24   A.  Yes, they do.  I have a slide to explain that on the

25   next one.

Dharan - DIRECT - By Mr. Kravetz

```
 1    Q.  I know you're going to talk about that at length.  But

 2    before we move off the diagram, can you just explain in

 3    general the concept?

 4    A.  Okay.  As I said, the main thing Fannie and Freddie do

 5    is a really critical function -- and when I say "main

 6    thing," I'm really talking about the main function for

 7    them -- is to bundle these mortgages and then issue the

 8    securities.  Right?  So these investors are buying.

 9         But the investors are also concerned about whether

10    or not the mortgages are going to be paid.  If the mortgages

11    didn't get paid by the homeowners, then the investors don't

12    get their money.  Right?

13         So that's an issue that Fannie and Freddie

14    resolved by giving a guaranty.  So they have a guaranty

15    essentially that says, if the mortgages don't get paid, then

16    we will step up and pay.

17         And this is -- this guaranty is really what makes

18    the system function.  And for this guaranty, they charge a

19    fee.  And they -- that fee they collect from the private

20    lenders, and that's the fee that we call guaranty fee.

21    Q.  And do the private lenders pass that fee along to

22    borrowers?

23    A.  Yes, they do.

24    Q.  Now, Dr. Dharan, are you familiar with the factors that

25    historically led to Fannie and Freddie's profitability?
```

1    A.  Yes.

2    Q.  And do you have a slide for that?

3    A.  Yes, I do.

4           So I just mentioned the guaranty fee.  Again, to

5    repeat a minute -- what I said a minute ago, these bundles

6    of loans that they put together, they issue mortgage

7    securities based on them.  They're called mortgage-backed

8    securities.  Right?

9           So Fannie and Freddie charge a fee to guarantee

10   the payment of the principal and interest on these

11   securities.  And that guaranty is like an insurance, almost,

12   premium.  That guaranty is like an insurance.  So they

13   charge a premium, what you could call a premium to the

14   private lenders.  And that's the g-fee.

15          It's a very small fee, essentially, so that

16   homeowners don't have too much cost to bear.  But it is a

17   fee that they collect as part of their revenue.

18   Q.  And is the expectation that the money that Fannie and

19   Freddie receive from the g-fee will be enough to cover any

20   losses suffered by the MBS investors?

21   A.  Exactly.  The way they set the g-fee typically is to

22   make an estimate of how much potential losses they may have

23   due to defaults and so on, and then they also add a bit of a

24   profit for themselves so they can pay for everything and

25   also for the risk they take.  And that together is the

1   guaranty fee.

2   Q.  Now, the second driver of profitability on your screen

3   is investment income.  Can you describe to us what that

4   means?

5   A.  Right.  So over time, Fannie and Freddie also had

6   started doing the second one, which is instead of taking all

7   the loans, all the mortgages, and putting them in bundles,

8   they sometimes would keep the loans themselves.  Some of the

9   loans they would keep themselves.

10          And in addition, instead of selling all of the

11  MBS, mortgage-backed securities, to the investors, sometimes

12  they would keep some of the MBS themselves as investors

13  themselves.

14          So they had the MBS and loans together that they

15  managed on their own, but they called it a retained

16  portfolio.  And they're collecting interest on those.  So

17  when the MBS pays interest, Fannie Mae is collecting that

18  interest.  When the loans are paid off or the homeowners pay

19  interest, they are collecting that interest.

20          And then of course they're also -- they also have

21  some interest costs.  They issue debt in the debt market,

22  outside market.  So they've got to pay some interest.  The

23  difference is their income.  So this is the second one:

24  investment income.

25  Q.  Dr. Dharan, I want to take you to the years 2007 and

1    2008.

2            Did something happen during that period in the

3    overall global economy?

4    A.  Yes.  2007 and 2008, and I will add maybe even 2009 to

5    that, they were pretty bad times.  I mean, if any of us

6    remember that time, they were not great.  And the U.S.

7    economy had a major problem because the housing market had

8    issues.  The prices went down and home sales stagnated or

9    declined, and that led to a lot of financial difficulties

10   where people lost jobs, institutions went bankrupt, all of

11   that.  And so we call the whole thing the financial crisis.

12   Sometimes I might -- I even call it the great financial

13   crisis, so people can remember that it's not just any

14   financial crisis.

15   Q.  And have you heard others refer to it as the Great

16   Recession as well?

17   A.  I've heard people refer to it as the great recession.  I

18   think the name is well justified.  And I've also heard

19   people refer to it as the credit crisis, because the real

20   reason for the financial crisis was the lack of availability

21   of credit to a lot of people.

22   Q.  Now, you mentioned that there was a downturn in the

23   housing market during the -- during that time; is that

24   correct?

25   A.  That's correct.

1    Q.  Now, did the downtown in the housing market have an

2    impact on Fannie and Freddie and their entry into the

3    conservatorship?

4    A.  Yes.  The downturn in the housing market led to losses

5    for Fannie and Freddie, and that led to a conservatorship.

6    Q.  And, Dr. Dharan, following the imposition of the

7    conservatorship, did Fannie and Freddie through FHFA enter

8    into what's known as a senior preferred stock purchase

9    agreement with the Treasury Department?

10   A.  Yes, they did.

11   Q.  And, now, a few minutes ago, you described how Fannie

12   and Freddie for several decades had only private

13   shareholders.

14           Upon the conservatorship, did that structure

15   change?

16   A.  Yes, it did.

17   Q.  How did it change?

18   A.  I have a slide to explain that, too.  But basically, the

19   government -- the Treasury Department also acquired kind of

20   preferred shares.  We'll call that senior preferred stock.

21   And so essentially the Treasury Department also became a

22   preferred shareholder, but senior to the existing

23   shareholders.  So this is the primary additional shareholder

24   group that entered into the picture.

25   Q.  And I know that you're going to go over some of these

1    functions or features in greater detail.  But can we just

2    briefly go through the first line item, a $1 billion initial

3    value as an initial commitment fee paid as liquidation

4    preference.

5    A.  Right.

6    Q.  Can you describe what you mean by that?

7    A.  Yes.  There are a lot of phrases there.  And I'll

8    explain especially the liquidation preference some more as

9    we need.

10          But really what is going on on the first item is

11   when this agreement was signed, the Treasury Department got

12   a $1 billion fee from each enterprises, so 1 billion from

13   Fannie, 1 billion from Freddie.  But they were not paid in

14   cash.  Instead, they were added to the final liquidation

15   value of the Treasury senior preferred stock.

16          So you can think of it as liquidation preference.

17   That's the ultimate Treasury claim.  And so if and when one

18   day everything is liquidated, the Treasury will get that

19   amount.  So that's where it got added.

20          And so the phrase for that is "liquidation

21   preference."

22   Q.  And then the second item, ability to draw from Treasury

23   commitment, initially up to $100 billion:  What does that

24   mean?

25   A.  Right.  Well, the Treasury commitment is the potential

1    amount that could be drawn by Fannie Mae and Freddie Mac.

2    And up to $100 billion available in this Treasury

3    commitment.

4            So the liquidation preference is the Treasury

5    claim that actually has already been taken, perhaps.  And

6    this one, you can think of it as potential available.

7    Q.  What about the next item?  What about the liquidation

8    preference increases?

9    A.  Right.  So every time you draw from the Treasury

10   commitment, the Treasury claim on Fannie and Freddie

11   increases by that amount.  So if Fannie Mae draws

12   $10 billion, then the liquidation preference, which is the

13   Treasury claim, increases by $10 billion.

14   Q.  And then the next item, dividend paid as a percentage of

15   liquidation preference:  Is it my understanding you have

16   several slides depicting what happens through the dividend

17   process?

18   A.  Right.

19   Q.  Okay.

20   A.  But essentially, dividends are paid and -- but they are

21   calculated as a percentage of the liquidation preference.

22   Q.  And the final item, periodic commitment fee:  What was

23   the periodic commitment fee?

24   A.  So I mentioned earlier there was an initial commitment

25   fee.  The commitment fee is what the Treasury gets for

1    providing this Treasury commitment to Fannie Mae and to

2    Freddie Mac.  And they also had a provision to charge a

3    periodic commitment fee.

4         But it was never really calculated, never really

5    determined and never charged in the time period between 2008

6    and 2012.

7    Q.  And, Dr. Dharan, earlier, you mentioned the liquidation

8    preference.  Have you created a diagram to depict it?

9    A.  Yes.

10   Q.  Is that on your next slide?

11   A.  Yes, it is.

12   Q.  So, Dr. Dharan, can you describe to us what in general

13   was the liquidation preference in relation to the diagram

14   you have on the screen?

15   A.  Right.  So the diagram has four parties.  On the left

16   are the bond investors and the MBS investors.  I mentioned

17   MBS investors earlier.  And these are the investors who

18   bought those mortgage-backed securities.

19        I also mentioned that Fannie and Freddie

20   periodically might also issue bonds to finance their

21   retained portfolio, mainly.  So those are the bond

22   investors.  So these are investors that -- I put them on the

23   left, on those green pastures, so they're standing ahead of

24   everybody else.

25   Q.  And just -- can you describe to us, what does it mean to

1    stand ahead?  What is the chart or the graph or I guess the

2    diagram actually depicting?

3    A.  Right.  So in the event of, say, liquidating Fannie Mae

4    and Freddie Mac, or in a typical company it could be also at

5    the time of a sale of a company or a mergers and acquisition

6    happens.  The company says:  Okay.  Here's all the money we

7    have now for you.

8          So when that happens, when some kind of a

9    distribution liquidation happens, this is the sequence in

10   which the cash is distributed.  First, the bond and MBS

11   investors get paid for their claims and then the Treasury

12   gets paid for its claim.  So remember the Treasury claim

13   that I mentioned earlier called liquidation preference?  So

14   they get paid next.

15         And then if there is still anything left, the

16   private preferred shareholders get paid.

17         And then if there's still anything left, the

18   common shareholders get paid.

19         So that's the sequence in which the cash is

20   distributed at the time of liquidation.

21   Q.  And it appears as if the Treasury liquidation

22   preference, the figure who is in the diagram, is holding

23   something.

24   A.  Yes.

25   Q.  What is that designed to represent?

1    A.   Those are the Treasury liquidation preference values,

2    essentially.

3    Q.   Okay.  Now, we'll come back to this slide a little bit

4    later.

5              You mentioned before, Dr. Dharan, that part of the

6    PSPAs involved a payment of dividends to the Treasury

7    Department that was a percentage of the liquidation

8    preference.  Is that correct?

9    A.   Right.

10   Q.   And do you have a slide to describe the different types

11   of dividend payments?

12   A.   Yes.

13   Q.   Let's start first on the left.  Just to be clear, you

14   have a few diagrams that we'll walk through to depict this?

15   A.   Yes.

16   Q.   Can you just briefly summarize how it works if dividends

17   are paid in cash?

18   A.   Okay.  So dividends are paid, if they are paid in

19   cash -- dividends are typically paid out of net worth.  So

20   if you have net worth, you can pay dividends.  If you don't

21   have net worth, then there's a problem.  So I'll come to

22   that.

23             But let's start with maybe the easy situation.

24   Let's say you have net worth.  Net worth, by the way, just

25   exactly is what the phrase means to the public.  In

1    accounting, it means the same as what we all know it is.

2    Basically, it's all the assets of a company minus all the

3    obligations of a company.  What's left is the net worth.

4    And the dividend is 10 percent of, say, Treasury's

5    liquidation preference, is paid from net worth.

6            Now, if there is not enough net worth, then the

7    enterprise will have to draw from the Treasury commitment in

8    order to pay the cash dividend.  And this is the phrase you

9    heard already Ms. Davis use and others have used.  And this

10   is called a circular draw.  You take a draw from the

11   Treasury from this commitment and then pay the Treasury this

12   dividend.  If I remember, Ms. Davis called it, I think, take

13   from Peter and pay Peter or steal from Peter and pay Peter,

14   something like that.  Rob Peter to pay Peter.  That's what

15   she said.  Yes.

16   Q.  And, Dr. Dharan, do you have graphical depictions of

17   each of these two to show how it works in practice?

18   A.  Yes.

19   Q.  All right.  And let's start with explaining to the

20   members of the jury how the cash dividend payment would work

21   out of net worth.

22   A.  Okay.  So this is again just a cash dividend payment.

23   I'm assuming in this chart, in this diagram, that there is

24   enough net worth at this point to pay the cash dividend.

25   Then if there is, you take it out of the net worth and you

```
 1    pay the Treasury.

 2           If you look on the right side, there is no change

 3    in Treasury commitment and there's no change in the Treasury

 4    claim that is called the liquidation preference.  But

 5    there's no change on those because you have the net worth to

 6    pay the cash.

 7    Q.  And just for purposes of the record, because we're

 8    seeing the graphs -- the charts for the first time, the

 9    light blue represents what?

10    A.  The light blue represents the remaining Treasury

11    commitment from which you can draw, from which Fannie can

12    draw.  And then Freddie would have a similar chart for their

13    commitment.

14    Q.  And what does the black represent?

15    A.  The black represents the value of the liquidation

16    preference at that point.  This is the Treasury claim.  But

17    this includes all the previous draws and then the $1 billion

18    initial fee that I mentioned.  But mainly, the previous

19    draws.

20    Q.  But in this particular diagram that you have on the

21    screen, this is a situation where although there have been

22    previous draws in this particular situation, there's

23    sufficient cash out of net worth to pay the dividend?

24    A.  That's correct.

25    Q.  Okay.
```

1    A.  So there's no change to the two bars on the right side.

2    Q.  All right, sir.  Do you also have a diagram of dividend

3    payments using the Treasury commitment?

4    A.  Yes.

5    Q.  Okay.  Can you describe to us what we're viewing on the

6    diagram?

7    A.  Right.  So this is the one where we don't have enough

8    net worth so we have to now -- in this diagram, we are

9    taking cash dividends when we don't have net worth.  And we

10   are going to be in this diagram drawing from the Treasury

11   commitment.  Okay?

12          So if you look at the first chart -- first bar on

13   the right, the Treasury commitment, the amount available has

14   been reduced by the amount of dividends that's going to be

15   paid out of the Treasury commitment.  So we draw from the

16   Treasury commitment and then pay it back to the Treasury as

17   dividend.

18          Now, when you do this, when you draw from the

19   commitment, the Treasury claim goes up.  Right?  The

20   liquidation preference value goes up by that amount as well.

21   Q.  And so because the liquidation preference on this

22   diagram is higher than the last, would the dividend payment

23   then be higher in this situation the following quarter?

24   A.  Yes.  So what this circular draw is doing is it's

25   increasing the liquidation preference, reducing the Treasury

1    commitment remaining that's available for future, but it is

2    also increasing the future dividends because those dividends

3    are based on liquidation preference.

4    Q.  Is there also another way in which the dividend may be

5    satisfied?

6    A.  Yes.

7    Q.  All right.  Do you have a diagram for that as well?

8    A.  Yes, I do.

9    Q.  Before we get there, it says "Dividends if paid in

10   kind."  Right?

11   A.  Right.

12   Q.  Assuming that paying dividends in kind would be

13   appropriate, how would it work in practice?

14   A.  Well, in practice, if the dividend is paid in kind, that

15   simply means you're giving more liquidation preference to

16   the Treasury.  So rather than paying cash, in this

17   description that I have here, the payment in kind, you don't

18   pay cash.  Instead, you simply add the dividend amount to

19   the Treasury's claim; that is, the liquidation preference.

20   Q.  Is the rate higher?

21   A.  Yes.  Once you do that, the rate is going to be 12

22   percent dividend rate.  And so it's a higher rate than what

23   we saw earlier, the 10 percent rate.

24   Q.  You also indicate no circular draw?

25   A.  Right.  Because the main feature here that is really

Dharan - DIRECT - By Mr. Kravetz

1    important to see here is that we are not drawing from the

2    Treasury commitment to pay the dividends.  So the Treasury

3    commitment is unchanged.

4            And so that's why we call this no circular draw.

5    The circular draw happens when you draw from the Treasury

6    commitment to pay the Treasury.  Here, we are not doing

7    that.

8    Q.  And do you also depict this on a diagram?

9    A.  Yes, I have.

10   Q.  So can you explain to the members of the jury how this

11   would work?

12   A.  Right.  So the payment-in-kind diagram, we have a

13   negative net worth.  We don't have net worth to pay cash

14   dividends.  We are paying the dividend in kind.  And so the

15   payment is made and then the rate is going to be 12 percent

16   until the amount you paid in this manner is repaid.  Okay?

17   The 12 percent is going to be the higher rate until that

18   time.

19           But the interesting thing on the right side of the

20   diagram, the one that I really want to emphasize, is there

21   is no change in the Treasury commitment.  So if somebody's

22   saying, "I'm very concerned about the Treasury commitment;

23   I'm worried about the commitment being exhausted or eroded,"

24   in this diagram you see that nothing is happening to that

25   Treasury commitment.  So that amount is unchanged.

1    Q.  And so assuming that the payment-in-kind dividend is

2    available, there would be no change in the Treasury

3    commitment?

4    A.  That is correct.

5    Q.  Now, if we can go back to your slide regarding the

6    liquidation preference that Treasury holds.  You indicate on

7    the slide the rate is higher if the payment in kind is

8    invoked.

9    A.  Right.

10   Q.  And what's the difference in the rate, if you can remind

11   us?

12   A.  12 percent rate instead of 10 percent rate.

13   Q.  Okay.  And so if the rate is higher than, is it true

14   that, if invoked, the Treasury's liquidation preference

15   would be higher?

16   A.  Yes.

17   Q.  Does that have any impact on where the bond and MBS

18   investors stand in terms of the liquidation preference?

19   A.  No.  It does not change that.  So if you notice the way

20   the diagram shows how each party is standing, the MBS

21   investors are ahead of the Treasury liquidation preference.

22   So if the payment in kind is made, the Treasury liquidation

23   preference goes up; and then obviously, that amount is going

24   to increase in size.  But then it doesn't really affect the

25   bond and MBS investors in their standing ahead of the

1   Treasury on this.

2           It will affect the private preferred shareholders.

3   It'll affect the common shareholders.  But it doesn't affect

4   the MBS and bond investors.

5   Q.  Dr. Dharan, are you aware of whether there were

6   subsequent amendments to the PSPAs?

7   A.  Yes, there were.

8   Q.  Have you summarized those amendments on a slide?

9   A.  Yes.  I have a very brief summary of that.

10  Q.  Can you describe the amendments to the members of the

11  jury?

12  A.  Okay.  Just to recall, the original Treasury commitment

13  that I mentioned earlier is $100 billion, up to $100 billion

14  available to Fannie and to Freddie to draw from Treasury.

15  Right?  So there was a first amendment on May 6th, 2009.

16  The first -- the original one was in September 2008.  Right?

17          The first amendment was May 6th, 2009.  It

18  increased the Treasury commitment to $200 billion for each

19  of Fannie and Freddie.

20          Then there was a second amendment in December, on

21  December 24th, 2009.  And this essentially removed the cap.

22  It said:  No cap until December 31, 2012.  And there was a

23  formula given to calculate what the cap would be on that

24  date.

25  Q.  And, Dr. Dharan, was there a third amendment to the

Dharan - DIRECT - By Mr. Kravetz

 1    PSPAs?

 2    A.  Yes.  There was a third amendment that happened in 2012.

 3    Q.  Do you recall what month?

 4    A.  I believe August 17, 2012.

 5    Q.  And --

 6    A.  I forgot to mention the last item here.

 7    Q.  Go ahead, Dr. Dharan.  I was going to ask you about

 8    that.

 9    A.  So I wanted to mention that none of these amendment --

10    these amendments did not change what I described earlier

11    about the dividend structure, the 10 percent cash and, if

12    invoked, the 12 percent PIK.

13    Q.  Now, you noted that there was a third amendment to the

14    PSPAs in August of 2012.  Correct?

15    A.  Yes.

16    Q.  And a component of the third amendment was something

17    called the net worth sweep.  Is that correct?

18    A.  That is correct.

19    Q.  Have you prepared a slide summarizing the earlier

20    amendments as against the net worth sweep?

21    A.  Yes, I have.

22    Q.  So starting on the left-hand side of your slide,

23    Dr. Dharan, what is the first item that was comprised within

24    the original PSPAs?

25    A.  Yes.  The -- there are two things I wanted to highlight

1    on the original PSPAs.  These are the ones that were signed

2    in September of 2008 and then May 2009.  Yes.  So executed

3    in September of 2008, May of 2009, all the things I showed

4    earlier.  Okay?

5            So these ones, the dividend is 10 percent of

6    liquidation preference if paid in cash and 12 percent if

7    payment in kind is invoked.  Right?  I mentioned this

8    earlier.

9            But the other thing I wanted to mention is there

10   is also a capital part.  I'll mention that in a second.  In

11   the net worth sweep, the dividend is completely different.

12   The dividend now is going to be 100 percent of the net

13   worth.  So whatever the positive net worth of the

14   enterprises is, that entire amount is paid as dividends.

15   Sometimes it's described as swept as dividends, where it's

16   entirely swept up to the Treasury as dividends.  So that's a

17   very different feature.

18           And the second one I want to highlight is the

19   capital.  So in the original PSPAs, let's say Fannie Mae had

20   a $10 billion profit and just -- I'm using hypothetical

21   numbers.  Okay?  So let's say they have a $10 billion profit

22   and the dividend to be paid is $7 billion in cash dividend.

23   The remaining $3 billion then, 10 billion profits minus 7

24   billion dividend, that is added to capital.  So Fannie's

25   capital is increased by that amount.

1          And so Fannie and Freddie could build and retain

2    capital, basically unlimited capital.  So they can become

3    stronger and so on.  Right?

4          The net worth sweep is very different on that.

5    So -- and the reason is, the entire net worth is swept to

6    the -- to Treasury every quarter.  Right?  Completely gone.

7    So there's really no capital left for Fannie and Freddie.  I

8    mean, technically, they were allowed to keep $3 billion each

9    initially and then -- kind of a small number and then slowly

10   reduce it to zero over five years.  Compared to the

11   enterprises' size, that's very small.

12          But that's going to go to zero pretty quickly.  So

13   I'm going to say every now and then "zero capital" when I

14   want to talk about this.  And that's what I mean by that.

15          But they can't build or retain any capital.

16   That's the main second feature of that.

17   Q.  Now, just to be clear, that term, "net worth sweep," is

18   that a term that you came up with?

19   A.  No.  This is a term that was used, I believe, even in

20   Treasury's announcement of the third amendment.

21   Q.  It's the government's own term?

22   A.  It's the government's term.  Right.

23   Q.  Now, Dr. Dharan, in your decades of experience, have you

24   ever seen a transaction like the net worth sweep before?

25   A.  No.  Never.

1   Q.  And have you created a slide describing what it is about

2   the net worth sweep that you find to be unprecedented?

3   A.  Sure.  I have a slide for that.

4         Again, this essentially -- there are two things I

5   just mentioned.  I wanted to put them together on this one

6   slide.  But the dividend payment is the entire net worth.

7   The entire positive net worth is paid out, regardless of the

8   amount.  It could be $100 billion, any number.  It's all

9   paid out.  Right?

10         So that's very unprecedented.  Typically, dividend

11   payments are a percentage.  But this is entirely paid out,

12   unprecedented.

13         The second one is Fannie and Freddie as a result

14   cannot build or retain capital.  And the reason why I want

15   to explain why this is unprecedented is remember that Fannie

16   and Freddie are financial institutions.  Right?  These are

17   like your banks and other financial institutions.

18         Typically, regulators normally will impose a

19   minimum capital.  They will tell the bank, You must maintain

20   a minimum capital in order to be solvent and stable and so

21   on or a safe and sound operation.

22         Here, by contrast, the net worth sweep is

23   essentially saying:  You have to have a maximum capital.

24   The maximum capital is going to be zero, starting from

25   $3 billion and quickly going down to zero.

```
 1     Q.  And --
 2     A.  So both of these are unprecedented.
 3     Q.  And, Dr. Dharan, have you ever worked as a regulator
 4     before for the federal government?
 5     A.  No, I have not.
 6     Q.  So how are you familiar with these concepts regarding
 7     minimum capital?
 8     A.  Regarding what regulators will do and so on?  Well, I
 9     worked in this consulting project that I mentioned; some
10     litigation matters as well, business consulting with banks,
11     particularly after the financial crisis happened.
12              Quite a number of banks and a number of financial
13     institutions had a need for consulting on what happened and
14     how to fix it, what are the causes of their problems.  So I
15     have experience from that as well as also from teaching.
16     I've been teaching accounting and finance for 40 years.  You
17     really need to teach about banking to students, because
18     that's such a critical part of the economy.
19              So I have both teaching experience and also
20     business consulting experience.
21     Q.  Thank you.
22              MR. KRAVETZ:  Your Honor, we're about to go into
23     the first opinion.  I didn't know if this would be a time
24     for the morning break or not.
25              THE COURT:  I think we'll -- let's just go a
```

Dharan - DIRECT - By Mr. Kravetz

 1    little further, and then we'll take our lunch break at

 2    12:30.

 3              MR. KRAVETZ:  Thank you, your Honor.

 4    BY MR. KRAVETZ:

 5    Q.  Dr. Dharan, as you referenced before, you formed

 6    opinions in this case.  Correct?

 7    A.  Yes, I have.

 8    Q.  And let's start with your first opinion, sir.

 9              And can you just remind the jury of your first

10    opinion?

11    A.  Yes.  The first one is:  The net worth sweep was

12    inconsistent with FHFA's public statements that the purpose

13    of the conservatorship was to preserve and conserve the

14    assets of the GSEs and to restore the GSEs to a sound and

15    solvent financial condition.

16    Q.  And in the course of reviewing this opinion with the

17    jury, did you review certain documents that were issued by

18    FHFA in or around the time of the imposition of the

19    conservatorship?

20    A.  Yes, I have.  So just -- so just before I show that, let

21    me mention that essentially the roadmap that you are going

22    to see in the slides coming up is, I'm going to first look

23    at what the FHFA's public statements were; and then I'm

24    going to see if the third amendment and the net worth sweep

25    in particular was consistent with those public statements.

1   And so that's going to be the roadmap of what I'm going to

2   show.

3   Q.  And have you incorporated some of the statements that

4   we'll review into the slides?

5   A.  Yes.

6   Q.  And, Dr. Dharan, you have a binder at the witness stand

7   with you.  I would just point initially to Tab 1 of your

8   binder.

9   A.  Okay.

10  Q.  It's Plaintiffs' Exhibit 2-C that has been admitted into

11  evidence.

12          Do you recognize that document?

13  A.  Yes, I do.

14  Q.  Is that a document that is -- that is relevant in

15  forming your opinion?

16  A.  Yes.

17  Q.  Now, Dr. Dharan, will you show information from the

18  entirety of that document on the screen to the jury?

19  A.  Not the entirety of the document.  It'll be hard to

20  read.  I'll often highlight some key phrases instead of

21  showing the entire document.  But the document is in the

22  binder.

23  Q.  And you have the entire document in case you read it --

24  or need it; is that correct?

25  A.  Yes; in case I need it.

1    Q.  Now, in terms of PX 2-C, what is the first statement

2    that you've highlighted for the jury?

3    A.  Right.  So this document is a FHFA document that was put

4    out in connection with the conservatorship.  And it's really

5    a question-and-answer-type document.  And it says -- this

6    one is on Page 2.  And FHFA says:  The purpose of appointing

7    the conservator is to preserve and conserve the company's

8    assets and property and to put the company in a sound and

9    solvent condition.

10   Q.  Are you familiar with that phrase, "preserve and

11   conserve"?

12   A.  Yes.

13   Q.  And what does that mean from a bank, accounting or

14   regulatory context?

15   A.  Basically, what it says here; but it also implies not

16   just conserving and preserving, but using them in a way that

17   supports the sound operation of the enterprise.  So it also

18   sometimes usually -- usually, it means growing the assets,

19   too, not just keeping them, not letting them dissipate, but

20   also letting them grow, in order to support the soundness of

21   the company.

22   Q.  Well, there's a reference to assets and property.  Can

23   you just give us an example of what an asset might be of

24   Fannie Mae or Freddie Mac?

25   A.  Cash would be a good example that we can all relate to.

1    Yes.

2    Q.  And that second -- the third phrase that's highlighted,

3    "sounds and solvent condition":  What does it mean to be

4    solvent?

5    A.  "Solvent" means positive net worth, to have capital.  I

6    use the term "capital" and "net worth" more or less the same

7    here.  I think they basically mean the same.

8           And so solvent here means to be -- to have

9    positive net worth, to have capital, to build them.

10          And "sound" really is -- the best way to

11   understand sound is that you are able to operate the

12   enterprise in a normal way.  So normal business operation

13   would be a sound condition.

14   Q.  And just again, if a company's goal is to be sound and

15   solvent, can you remind us, how does that relate to net

16   worth?

17   A.  You have to have a positive net worth.

18   Q.  Now, you indicated that prior to trial you reviewed

19   deposition testimony of former FHFA Fannie Mae and Freddie

20   Mac executives.  Is that correct?

21   A.  Yes, I did.

22   Q.  All right.  And have you in particular had the chance to

23   review the testimony of former FHFA Director James Lockhart?

24   A.  I have done that.

25   Q.  And in terms of the goal to preserve and conserve the

1    company's assets and property, have you reviewed any

2    testimony consistent with that goal?

3    A.  Yes, I have.

4    Q.  And have you selected a portion of Mr. Lockhart's

5    testimony about preserving and conserving assets that is

6    relevant to your opinion?

7    A.  Yes.  I have done that.

8            MR. KRAVETZ:  Ms. McGuire, if we can please play

9    Clip 1.

10            (Whereupon, Clip 1 of Plaintiffs' Exhibit No. 2-C

11   was published in open court.)

12   BY MR. KRAVETZ:

13   Q.  Dr. Dharan, is the statement of Mr. Lockhart consistent

14   or inconsistent with your understanding of preserving and

15   conserving assets or property?

16   A.  It's consistent.

17   Q.  In your opinion, sir, is the net worth sweep consistent

18   or inconsistent with preserving and conserving assets?

19   A.  No, it's not.

20   Q.  Why not?

21   A.  Well, I'll show some diagrams later, too.  But the main

22   thing the net worth sweep did -- I showed two items there --

23   essentially, they are related.  It took away the entire net

24   worth every quarter and sent it over to Treasury.  So there

25   was no net worth left at the end of every quarter, other

1     than the $3 billion that I mentioned as a caveat, just to

2     make sure everybody knows that I mean that as well.

3              But really the net worth is down to zero very

4     quickly.  And that's the opposite of preserving and

5     conserving and especially the opposite of sound and solvent,

6     because it can't be solvent and sound if you continue to

7     have zero net worth.

8     Q.  Dr. Dharan, are you familiar with the term "liquidation"

9     from an accounting standpoint?

10    A.  Yes.

11    Q.  And do you have a slide listing certain statements made

12    about whether the companies would be -- the GSEs would be

13    liquidated by the conservator?

14    A.  Yes, I have.

15    Q.  Dr. Dharan, why was it important for you to highlight

16    these statements to the jury?

17    A.  Again, this is part of making sure I documented what the

18    FHFA said initially and comparing it with what the third

19    amendment and the net worth sweep in particular did.  So

20    these phrases are relevant for that purpose.

21    Q.  And what does it mean that the companies would not be

22    liquidated?

23    A.  It means they will not be liquidated.  Right?  It

24    basically means that they will be operated as a sound and

25    solvent -- they will be allowed to operate.  At some point

1    in time, they will be returned -- they will be taken off of

2    conservatorship and returned back to shareholders, because

3    conservatorship is really not intended to be a permanent

4    thing.  Right?  So this is really saying that they won't be

5    liquidated, which means that they will be brought up to a

6    condition where they could be returned to shareholders.  And

7    there are no plans to liquidate the company.

8              And the third one says -- recognizes that although

9    the company can be liquidated by statute, the charter of the

10   company must be transferred to a new entity and can only be

11   dissolved by an act of Congress.

12             So these two enterprises, Fannie and Freddie, were

13   created by Congress; and only Congress can decide if they

14   want to liquidate it.

15   Q.  Dr. Dharan, is there anything in PX 2-C, Plaintiffs'

16   Exhibit 2-C, that to you is consistent with the concept of a

17   net worth sweep?

18   A.  No.

19   Q.  I'd ask if you can next open up your binder to Tab 2.

20   A.  Okay.

21   Q.  This is Plaintiffs' Exhibit 2-E.

22   A.  Yes.

23   Q.  Are you aware this is a document that was admitted into

24   evidence during the course of this trial?

25   A.  Yes.

1   Q.  And, sir, there's a reference in this presentation to an

2   entity known as ABS East.

3   A.  Yes.

4   Q.  Are you aware, what is that entity, that organization?

5   A.  Yes.  So ABS stands for asset-based securities.  And

6   remember I mentioned earlier MBS, mortgage-backed

7   securities?  And these are asset-backed securities.  I'm

8   sorry.  I said earlier asset-based.  I mean asset-backed

9   securities.

10          So these are really a broader form of

11  mortgage-backed securities.  So there are all kinds of

12  assets that can be used to form the securities.  And there's

13  a whole organization, a pretty large one, of people in the

14  finance profession who work in this industry of asset-backed

15  securities.  They include college loans and they include all

16  kinds of -- maybe rents and so on, all kinds of assets.  And

17  that's a conference -- this is ABS East, so I assume it was

18  an eastern division of the conference.

19  Q.  And have you chosen additional information from this

20  document to present to the jury?

21  A.  Yes, I have.

22  Q.  Dr. Dharan, on the slide, it states:  Conservatorship is

23  intended to have a limited duration and has as its objective

24  to return the entity to normal business operations once

25  stabilized.

1        Why did you choose that to discuss with the jury?

2   A.  Sure.  So this was a presentation made by Edward

3   DeMarco, Mr. DeMarco, who was the acting director of the

4   FHFA, although at this time during the stock he was the

5   deputy director of FHFA.

6        So this -- I used this again to understand what

7   FHFA told the public regarding the purpose of the

8   conservatorship.  So this is an example of that.

9   Q.  And why in particular did you choose this excerpt?

10  A.  So in this excerpt, Mr. DeMarco is saying that the

11  conservatorship is intended to have a limited duration -- I

12  mentioned this earlier, that typically conservatorships are

13  really intended to be temporary -- and has as its objective

14  to return the entity to normal business operations.  So

15  normal business operations is what I described earlier as a

16  sound and solvent condition, where you have a net worth

17  that's building up so you can do your business operations

18  like a normal business.

19  Q.  We saw some testimony before from Mr. Lockhart about

20  preserving and conserving assets.

21       Was there also testimony from Mr. Lockhart

22  regarding normal business operations that is relevant to

23  your opinion?

24  A.  Yes, there is.

25       MR. KRAVETZ:  I'd ask if we could play Clip 2,

1   please, Ms. McGuire.

2           (Whereupon, Clip 2 of Plaintiffs' Exhibit 2-E was

3   published in open court.)

4   BY MR. KRAVETZ:

5   Q.   And, Dr. Dharan, does that statement further inform your

6   understanding of what constitutes normal business

7   operations?

8   A.   Yes.

9   Q.   In your opinion, did the net worth sweep permit Fannie

10  Mae and Freddie Mac to return to normal business operations

11  as set forth in the slide and in the testimony?

12  A.   No.

13  Q.   Why not?

14  A.   Again, as Mr. Lockhart himself said, normal business

15  operation means you have to have capital that is positive.

16  And the whole point of the net worth sweep was to take away

17  the capital.  So the whole capital is swept out every

18  quarter and sent over to the Treasury.  So there's no

19  capital.  And that's not normal business operation.  So yes.

20  That's the reason the net worth sweep is inconsistent with

21  this.

22  Q.   Do you have another excerpt from Mr. DeMarco's

23  PowerPoint slide that is relevant to your opinion?

24  A.   Yes.

25  Q.   That states, quote, "Conservatorship statutes provide

1    broad authority for a conservator to operate the institution

2    until it is stabilized and then returned to the

3    shareholders," end quotes.

4            Why did you choose that excerpt to present to the

5    jury?

6    A.  Well, again, it kind of reinforces the earlier comment

7    in a more specific way, so I thought this might be helpful.

8    And it -- he talks about until it is stabilized and then

9    returned to the shareholders, which again implies a

10   temporary conservatorship.

11           But we can't return to the shareholders without

12   building up the net worth and capital.  And the net worth

13   sweep is inconsistent with that.  So that's why I wanted to

14   show this.

15   Q.  And is there one more part of PX Exhibit 2-E that was

16   relevant to your opinion that you've highlighted for the

17   jury?

18   A.  Yes.

19   Q.  And, Dr. Dharan, this states, quote:  "The economic

20   interests of shareholders have not been eliminated; they

21   continue to exist," end quote.

22           Why did you choose that excerpt to present to the

23   jury?

24   A.  I thought the previous slide and this together provided

25   a better -- you know, a fuller picture of what Mr. DeMarco

 1    was talking about in the earlier slide that I showed,

 2    "returned to the shareholders."

 3           So here, he's being more explicit in saying that

 4    the economic interests of shareholders have not been

 5    eliminated.

 6           So conservatorship means -- remember the four

 7    parties that I showed earlier, the four people standing in

 8    line?  The shareholders are still standing in line.  So they

 9    are still in there, the third and the fourth people that I

10    showed in my diagram.

11           And so that is what Mr. DeMarco is describing

12    here.

13    Q.  And that's even though dividend rights had been

14    suspended during the period of the conservatorship?

15    A.  That's correct.

16    Q.  Dr. Dharan, have you reviewed the amount that was

17    transferred as a result of the net worth sweep in 2013, the

18    year that the net worth sweep went into effect, compared to

19    what the amount would have been under a 10 percent dividend?

20    A.  Yes, I have.

21    Q.  Do you show that on a slide?

22    A.  Sure.

23    Q.  And can you describe to the members of the jury what

24    we're seeing on this slide?

25    A.  Right.  So what I'm showing here is what actually

 1    happened in 2013.  And we already know how much dividend was

 2    paid in 2012, cash dividends were paid in 2012.

 3           I'm showing that amount here as what the dividend

 4    would have been if we had -- if you didn't have the net

 5    worth sweep.  If all we had was the previous amendments, the

 6    original PSPA, and there's no more draw going on any longer

 7    by the middle of 2012, so in 2013 the dividend would have

 8    been $18.9 billion.

 9           And that's the same as 2012.

10    Q.  That's combined for Fannie and Freddie.  Correct?

11    A.  That's combined for Fannie and Freddie.  But what

12    actually was transferred to Treasury in 2013 as cash

13    dividend was $130.1 billion.  So that's a huge different --

14    a huge difference between the two.  A big difference.

15    Q.  And is that difference relevant to your opinion?

16    A.  Yes, because this -- as I said in my roadmap for my

17    Opinion 1, I examined what FHFA said the purpose was and

18    then I'm comparing that with what the net worth sweep

19    actually did.  So this is the reason for showing this.

20    Q.  And, Dr. Dharan, you indicated that you've reviewed a

21    number of case documents; is that correct?

22    A.  Yes.

23    Q.  In your review of case documents, have you seen a single

24    FHFA document stating that the net worth sweep was

25    unintended?

1    A.  I didn't see any of them that said, "Oh, my God, we paid

2    $111 billion more.  That's not what we intended."  So there

3    was no document saying the net worth sweep -- the effect of

4    the net worth sweep was unintended.

5    Q.  Any document asking whether FHFA could use that result,

6    that excess $111 billion, to potentially renegotiate the

7    amendment with the Treasury Department?

8    A.  No.  I didn't see anything like that.

9    Q.  Have you gone beyond 2013, the first year of the net

10   worth sweep, to determine what the difference is between the

11   imposition of the net worth sweep versus what the dividend

12   would have been through the end of 2022?

13   A.  Yes.  I have done that.

14   Q.  Is that depicted on your next slide?

15   A.  Yes.

16   Q.  And can you describe to the members of the jury what

17   this slide is depicting?

18   A.  Right.  So the top line here is the total value sent to

19   Treasury under the net worth sweep.  It could be cash

20   dividends; it could be increase in liquidation preference,

21   all combined.  So overall, how much value was transferred to

22   Treasury.  That's $340.7 billion.

23          So this is from 2013 to the end of 2022, fourth

24   quarter, meaning December 31, 2022.  And remember I

25   mentioned earlier that if they didn't have the net worth

 1    sweep, they were paying at the rate of $18.9 billion in cash

 2    dividends.

 3         So in the second line, I'm showing how much would

 4    that add up to for these ten years if you continued to pay

 5    that 18.9 billion each year.  The exact number on that would

 6    be $189.5 billion.

 7         So if you take the difference, that's the excess

 8    value that was sent to Treasury from both Fannie Mae and

 9    Freddie Mac together since the net worth sweep.  And that's

10    $151.2 billion.

11    Q.  And since there was an excess value sent to Treasury of

12    $151.2 billion, is that also relevant to your opinion?

13    A.  Yes, it is.

14    Q.  Why?

15    A.  Again, remember I'm -- in my roadmap, I'm comparing what

16    the FHFA said the purpose was and then comparing that with

17    what actually happened.

18         So FHFA said, you know, the purpose was to

19    preserve and conserve the assets and also to create a

20    positive net worth and stabilize the company, to create all

21    of those normal business operations.

22         This amount has been transferred out of Fannie Mae

23    and Freddie Mac, so this is a relevant number for that --

24    for my analysis.

25    Q.  And in terms of your roadmap, Dr. Dharan, does that

1    conclude your testimony regarding your first opinion?

2    A.  Yes, it does.

3    Q.  But does your first opinion remain relevant to your

4    second opinion as well?

5    A.  Exactly.

6              THE COURT:  We'll start that one at 1:30.

7              MR. KRAVETZ:  Thank you, your Honor.

8              THE COURT:  Have a nice lunch.  Don't talk about

9    the case.  I'll see you all back at 1:30.

10             (Whereupon, the jury exited the courtroom at 12:26

11   p.m. and the following proceedings were had:)

12             (Thereupon, a luncheon recess was taken, after

13   which the following proceedings were had:)

14             (Proceedings concluded.)

15

16

17

18

19

20

21

22

23

24

25

1

**<u>CERTIFICATE</u>**

2

3          I, LISA EDWARDS, RDR, CRR, do hereby

4     certify that the foregoing constitutes a true and accurate

5     transcript of my stenographic notes, and is a full, true,

6     and complete transcript of the proceedings produced to the

7     best of my ability.

8

9

10          Dated this 31st day of July, 2023.

11

12          <u>/s/ Lisa Edwards, RDR, CRR</u>
            Official Court Reporter
13          United States District Court for the
              District of Columbia
14          333 Constitution Avenue, Northwest
            Washington, D.C. 20001
15          (202) 354-3269

16

17

18

19

20

21

22

23

24

25

## $

**$10** [4] - 32:12, 32:13, 44:20, 44:21
**$100** [5] - 31:23, 32:2, 42:13, 46:8
**$111** [2] - 61:2, 61:6
**$200** [1] - 42:18

## '

**'71** [1] - 21:25

## /

**/s** [1] - 64:12

## 1

**1** [14] - 17:8, 17:13, 19:5, 19:8, 19:12, 31:2, 31:12, 31:13, 37:17, 49:7, 52:9, 52:10, 60:17
**10** [9] - 7:20, 8:10, 36:4, 39:23, 41:12, 43:11, 44:5, 44:23, 59:19
**100** [1] - 44:12
**10020** [1] - 2:4
**10:40** [1] - 1:7
**10:42** [1] - 5:4
**12** [9] - 7:21, 8:2, 8:11, 39:21, 40:15, 40:17, 41:12, 43:12, 44:6
**1251** [1] - 2:4
**12:26** [1] - 63:10
**12:30** [1] - 48:2
**13-1053** [2] - 1:4, 4:2
**13-1288** [2] - 1:10, 4:2
**130.1** [1] - 60:13
**1401** [1] - 1:21
**15** [1] - 14:17
**151.2** [2] - 62:10, 62:12
**1523** [1] - 1:18
**154** [3] - 3:11, 5:18, 5:24
**160** [3] - 3:11, 5:18, 5:24
**17** [1] - 43:4
**18.9** [3] - 60:8, 62:1, 62:5
**189.5** [1] - 62:6
**19087** [1] - 1:24

## 2

**1930s** [1] - 21:22
**1968** [1] - 21:22
**1970s** [1] - 21:25
**1986** [1] - 12:24
**1:30** [2] - 63:6, 63:9

## 2

**2** [6] - 17:14, 19:20, 50:6, 54:19, 56:25, 57:2
**2-C** [5] - 49:10, 50:1, 52:10, 54:15, 54:16
**2-E** [3] - 54:21, 57:2, 58:15
**20001** [3] - 2:9, 2:13, 64:14
**20005** [1] - 1:22
**2001** [1] - 15:1
**2002** [1] - 15:2
**2003** [2] - 12:5, 14:8
**20036** [1] - 1:19
**2007** [2] - 28:25, 29:4
**2008** [6] - 29:1, 29:4, 33:5, 42:16, 44:2, 44:3
**2009** [6] - 29:4, 42:15, 42:17, 42:21, 44:2, 44:3
**2012** [10] - 18:7, 33:6, 42:22, 43:2, 43:4, 43:14, 60:2, 60:7, 60:9
**2013** [6] - 59:17, 60:1, 60:7, 60:12, 61:9, 61:23
**202** [2] - 2:13, 64:15
**2022** [3] - 61:12, 61:23, 61:24
**2023** [2] - 1:7, 64:10
**205** [3] - 3:14, 6:4, 6:10
**210** [3] - 3:14, 6:4, 6:10
**216** [3] - 3:11, 5:18, 5:24
**218** [3] - 3:11, 5:18, 5:24
**226-A** [3] - 3:14, 6:4, 6:11
**227** [3] - 3:14, 6:4, 6:11
**228** [3] - 3:11, 5:18, 5:24
**244** [3] - 3:11, 5:18, 5:24
**245** [3] - 3:11, 5:18, 5:24
**246** [3] - 3:11, 5:18,

5:24
**247** [3] - 3:11, 5:18, 5:24
**24th** [1] - 42:21
**25** [1] - 4:9
**257** [3] - 3:12, 5:19, 5:24
**259** [5] - 3:12, 5:19, 5:20, 5:21, 5:24
**26** [1] - 11:24
**26-minute** [2] - 4:10, 6:13
**280** [1] - 1:24

## 3

**3** [4] - 44:23, 45:8, 46:25, 53:1
**3-A** [3] - 3:11, 5:17, 5:23
**3-B** [3] - 3:11, 5:18, 5:23
**308** [4] - 3:12, 5:19, 5:21, 5:25
**31** [3] - 1:7, 42:22, 61:24
**31st** [1] - 64:10
**33** [3] - 3:11, 5:18, 5:23
**333** [2] - 2:12, 64:14
**34** [3] - 3:11, 5:18, 5:24
**340.7** [1] - 61:22
**351** [4] - 3:12, 5:19, 5:21, 5:25
**354-3269** [2] - 2:13, 64:15

## 4

**40** [2] - 10:24, 47:16

## 5

**5** [1] - 3:12
**50** [1] - 15:22

## 6

**6** [3] - 1:13, 3:6, 3:14
**601** [1] - 2:8
**6706** [1] - 2:12
**6th** [2] - 42:15, 42:17

## 7

**7** [2] - 44:22, 44:23

## 9

**9** [1] - 3:7

## A

**a.m** [2] - 1:7, 5:4
**abbreviation** [1] - 25:6
**ABC** [1] - 13:5
**ability** [2] - 31:22, 64:7
**able** [4] - 8:6, 23:1, 25:2, 51:11
**ABS** [3] - 55:2, 55:5, 55:17
**absolutely** [1] - 23:19
**academic** [2] - 12:8, 12:13
**accountant** [1] - 12:23
**Accounting** [1] - 14:13
**accounting** [17] - 9:10, 10:25, 11:4, 11:11, 11:18, 11:19, 12:9, 14:12, 16:4, 17:23, 18:20, 20:18, 20:22, 36:1, 47:16, 50:13, 53:9
**accredited** [1] - 13:6
**accurate** [1] - 64:4
**acquire** [1] - 13:15
**acquired** [1] - 30:19
**acquisition** [1] - 34:5
**act** [1] - 54:11
**acting** [1] - 56:3
**Action** [3] - 1:3, 4:1, 4:4
**ACTION** [1] - 1:11
**ADAM** [1] - 2:2
**add** [6] - 7:21, 24:10, 27:23, 29:4, 39:18, 62:4
**added** [3] - 31:14, 31:19, 44:24
**addition** [5] - 8:3, 8:11, 11:6, 18:5, 28:10
**additional** [6] - 4:19, 6:1, 19:10, 25:2, 30:23, 55:19
**address** [5] - 4:23,

7:3, 17:19, 20:4, 20:10
**administration** [1] - 11:19
**admit** [1] - 5:14
**admitted** [3] - 5:16, 49:10, 54:23
**advance** [1] - 19:18
**affect** [4] - 41:24, 42:2, 42:3
**agencies** [2] - 15:15, 15:16
**AGENCY** [1] - 1:6
**ago** [2] - 27:5, 30:11
**agreement** [2] - 30:9, 31:11
**AGREEMENT** [1] - 1:11
**Agreement** [4] - 4:4, 22:20, 33:23, 34:1, 41:21, 41:25, 43:7
**AICPA** [1] - 13:4
**al** [2] - 1:3, 1:7
**allowed** [2] - 45:8, 53:25
**almost** [2] - 21:14, 27:11
**alternative** [1] - 8:13
**amendment** [15] - 17:15, 18:6, 19:23, 42:15, 42:17, 42:20, 42:25, 43:2, 43:9, 43:13, 43:16, 45:20, 48:24, 53:19, 61:7
**amendments** [6] - 42:6, 42:8, 42:10, 43:10, 43:20, 60:5
**Americas** [1] - 2:4
**amount** [17] - 31:19, 32:1, 32:11, 38:13, 38:14, 38:20, 39:18, 40:16, 40:25, 41:23, 44:14, 44:25, 46:8, 59:16, 59:19, 60:3, 62:22
**analysis** [11] - 10:3, 10:5, 11:13, 12:10, 13:7, 15:25, 16:12, 16:13, 17:22, 20:17, 62:24
**analyze** [4] - 9:20, 9:21, 10:3, 16:9
**analyzing** [1] - 18:20
**announcement** [1] - 45:20
**answer** [4] - 19:4, 19:12, 20:2, 50:5
**answers** [1] - 17:18
**apart** [1] - 15:16

1143

aPPEARANCES [1] - 1:16

APPEARANCES [1] - 2:1

apply [3] - 8:8, 8:14, 18:14

appointing [1] - 50:6

approach [1] - 6:24

appropriate [1] - 39:13

ARNOLD [1] - 2:8

arrived [1] - 19:11

articles [1] - 14:2, 14:3, 14:18

ASIM [1] - 2:5

assess [1] - 16:14

asset [6] - 50:23, 55:5, 55:7, 55:8, 55:14

asset-backed [3] - 55:7, 55:8, 55:14

asset-based [2] - 55:5, 55:8

assets [16] - 13:16, 17:11, 19:15, 36:2, 48:14, 50:8, 50:18, 50:22, 52:1, 52:5, 52:15, 52:18, 55:12, 55:16, 56:20, 62:19

assignment [3] - 17:2, 17:5, 19:3

assist [2] - 10:6, 10:9

assume [1] - 55:17

assuming [3] - 36:23, 39:12, 41:1

August [3] - 18:7, 43:4, 43:14

author [1] - 13:24

authored [4] - 14:1, 14:2, 14:5, 14:6

authority [1] - 58:1

availability [1] - 29:20

available [7] - 8:12, 32:2, 32:6, 38:13, 39:1, 41:2, 42:14

Avenue [6] - 1:18, 1:21, 2:4, 2:8, 2:12, 64:14

avoid [2] - 17:16, 19:24

award [1] - 12:15

awards [1] - 12:12

aware [3] - 42:5, 54:23, 55:4

## B

B-A-L-A [1] - 9:14

backed [10] - 25:4, 25:5, 27:7, 28:11, 33:18, 55:6, 55:7, 55:8, 55:11, 55:14

background [3] - 21:6, 21:10, 21:15

bad [1] - 29:5

Bala [5] - 3:7, 4:13, 6:18, 9:10, 9:14

BALA [1] - 6:23

bank [5] - 23:24, 24:1, 25:20, 46:19, 50:13

banking [1] - 47:17

bankrupt [1] - 29:10

bankruptcy [1] - 15:3

banks [3] - 46:17, 47:10, 47:12

bar [1] - 38:12

bars [1] - 38:1

based [4] - 27:7, 39:3, 55:5, 55:8

bear [1] - 27:16

became [1] - 30:21

become [2] - 16:4, 45:2

BEFORE [1] - 1:14

begin [1] - 7:2

behalf [4] - 4:6, 5:12, 8:18, 16:24

Belack [1] - 4:18

belong [1] - 13:3

BERGER [1] - 2:3

Bergman [2] - 4:22, 7:6

BERGMAN [5] - 2:6, 7:6, 8:25, 10:16, 18:23

Berkeley [2] - 11:7, 12:3

BERKLEY [1] - 1:17

BERNSTEIN [1] - 2:3

best [3] - 12:14, 51:10, 64:7

better [1] - 58:25

between [7] - 14:15, 18:3, 22:16, 25:10, 33:5, 60:14, 61:10

beyond [1] - 61:9

big [1] - 60:14

billion [32] - 31:2, 31:12, 31:13, 31:23, 32:2, 32:12, 32:13, 37:17, 42:13, 42:18, 44:20, 44:21, 44:22, 44:23, 44:24, 45:8, 46:8, 46:25, 53:1, 60:8, 60:13, 61:2, 61:6, 61:22, 62:1,

62:5, 62:6, 62:10, 62:12

binder [4] - 49:6, 49:8, 49:22, 54:19

bit [2] - 27:23, 35:3

black [2] - 37:14, 37:15

blanket [1] - 8:7

blue [2] - 37:9, 37:10

BOIES [1] - 1:21

bond [6] - 33:16, 33:21, 34:10, 41:17, 41:25, 42:4

bonds [1] - 33:20

books [4] - 14:1, 14:2, 14:4, 14:6

borrowers [1] - 26:22

bottom [1] - 23:14

bought [2] - 24:25, 33:18

break [2] - 47:24, 48:1

brief [3] - 10:22, 21:15, 42:9

briefed [1] - 7:14

briefly [4] - 11:14, 11:21, 31:2, 35:16

bring [1] - 4:20

broad [1] - 58:1

broader [1] - 55:10

broke [1] - 14:25

brought [1] - 54:5

build [4] - 45:1, 45:15, 46:14, 51:9

building [2] - 56:17, 58:12

bulk [1] - 4:15

bundle [2] - 25:17, 26:7

bundles [5] - 25:1, 25:5, 27:5, 28:7

business [26] - 11:12, 11:19, 12:9, 13:5, 13:6, 13:9, 13:17, 16:17, 16:19, 16:21, 16:22, 47:10, 47:20, 51:12, 55:24, 56:14, 56:15, 56:17, 56:18, 56:22, 57:6, 57:10, 57:14, 57:19, 62:21

Business [1] - 12:1

businesses [1] - 13:13

buy [3] - 23:21, 24:20, 25:3

buying [1] - 26:8

BY [7] - 2:10, 9:5, 10:18, 19:1, 48:4,

52:12, 57:4

## C

calculate [1] - 42:23

calculated [2] - 32:21, 33:4

California [1] - 12:3

Cambridge [2] - 11:3, 11:6

Candice [1] - 11:4

cannot [1] - 46:14

cap [3] - 42:21, 42:22, 42:23

capacity [1] - 14:22

capital [23] - 44:10, 44:19, 44:24, 44:25, 45:2, 45:7, 45:13, 45:15, 46:14, 46:19, 46:20, 46:23, 46:24, 47:7, 51:5, 51:6, 51:9, 57:15, 57:17, 57:19, 58:12

captured [1] - 20:23

career [2] - 12:8, 12:13

Carnegie [1] - 11:20

Case [2] - 1:10, 4:2

case [10] - 15:13, 16:23, 18:16, 18:21, 48:6, 49:23, 49:25, 60:21, 60:23, 63:9

cash [31] - 7:20, 8:2, 8:10, 16:18, 16:20, 25:14, 25:19, 31:14, 34:10, 34:19, 35:17, 35:19, 36:8, 36:20, 36:22, 36:24, 37:6, 37:23, 38:9, 39:16, 39:18, 40:13, 43:11, 44:6, 44:22, 50:25, 60:2, 60:12, 61:19, 62:1

cash-flow [1] - 25:14

causes [2] - 15:3, 47:14

caveat [1] - 53:1

CEO [1] - 6:14

certain [2] - 48:17, 53:11

CERTIFICATE [1] - 64:1

certificate [1] - 7:19

certificates [2] - 7:17, 8:1

certification [3] - 12:25, 13:5, 13:7

certifications [3] - 12:18, 12:22, 13:2

certified [2] - 12:23, 13:7

certify [1] - 64:4

chance [1] - 51:22

change [10] - 30:15, 30:17, 37:2, 37:3, 37:5, 38:1, 40:21, 41:2, 41:19, 43:10

characterize [1] - 8:10

charge [4] - 26:18, 27:9, 27:13, 33:2

charged [1] - 33:5

chart [4] - 34:1, 36:23, 37:12, 38:12

charter [1] - 54:9

charts [1] - 37:8

CHECK [1] - 1:23

choice [2] - 7:21, 8:1

choose [4] - 56:1, 56:9, 58:4, 58:22

chosen [1] - 55:19

circular [8] - 20:4, 20:19, 20:21, 36:10, 38:24, 39:24, 40:4, 40:5

Civil [2] - 1:3, 4:1

claim [10] - 31:17, 32:5, 32:10, 32:13, 34:12, 37:4, 37:16, 38:19, 39:19

claims [1] - 34:11

Class [1] - 4:4

CLASS [3] - 1:11, 1:20, 2:2

classes [1] - 22:10

clear [1] - 35:13, 45:17

Clip [4] - 52:9, 52:10, 56:25, 57:2

close [1] - 23:22

coauthor [1] - 14:15

COLATRIANO [1] - 1:17

collect [2] - 26:19, 27:17

collecting [3] - 28:16, 28:17, 28:19

college [1] - 55:15

Columbia [2] - 2:11, 64:13

COLUMBIA [1] - 1:1

combined [3] - 60:10, 60:11, 61:21

coming [2] - 25:19, 48:22

comment [1] - 58:6

commitment [33] - 31:3, 31:23, 31:25, 32:3, 32:10, 32:22,

32:23, 32:24, 32:25, 33:1, 33:3, 36:7, 36:11, 37:3, 37:11, 37:13, 38:3, 38:11, 38:13, 38:15, 38:16, 38:19, 39:1, 40:2, 40:3, 40:6, 40:21, 40:22, 40:23, 40:25, 41:3, 42:12, 42:18

**common** [11] - 16:22, 22:14, 22:17, 22:19, 22:21, 22:23, 23:5, 25:11, 25:13, 34:18, 42:3

**communications** [1] - 18:3

**companies** [4] - 22:18, 25:15, 53:12, 53:21

**company** [18] - 13:14, 13:15, 13:16, 16:9, 22:18, 22:19, 34:4, 34:5, 34:6, 36:2, 36:3, 50:8, 50:21, 54:7, 54:9, 54:10, 62:20

**company's** [4] - 16:14, 50:7, 51:14, 52:1

**compared** [2] - 45:10, 59:18

**comparing** [4] - 53:18, 60:18, 62:15, 62:16

**complete** [1] - 64:6

**completely** [2] - 44:11, 45:6

**component** [1] - 43:16

**comprised** [1] - 43:23

**concept** [2] - 26:3, 54:16

**concepts** [2] - 16:4, 47:6

**concerned** [2] - 26:9, 40:22

**conclude** [1] - 63:1

**concluded** [1] - 63:14

**conclusion** [5] - 9:22, 19:10, 19:16, 20:1, 20:9

**condition** [9] - 16:15, 17:12, 19:16, 48:15, 50:9, 51:3, 51:13, 54:6, 56:16

**conference** [2] - 55:17, 55:18

**Congress** [8] -

14:20, 14:24, 15:1, 15:4, 21:16, 54:11, 54:13

**connection** [1] - 50:4

**conservator** [3] - 50:7, 53:13, 58:1

**conservatorship** [19] - 17:10, 19:14, 22:3, 30:3, 30:5, 30:7, 30:14, 48:13, 48:19, 50:4, 54:2, 54:3, 55:22, 56:8, 56:11, 57:25, 58:10, 59:6, 59:14

**conservatorships** [1] - 56:12

**conserve** [7] - 17:11, 19:14, 48:13, 50:7, 50:11, 51:25, 62:19

**conserving** [6] - 50:16, 52:5, 52:15, 52:18, 53:5, 56:20

**consider** [1] - 11:23

**considered** [1] - 6:9

**consistent** [10] - 8:20, 17:9, 19:13, 19:17, 48:25, 52:2, 52:13, 52:16, 52:17, 54:16

**constitutes** [2] - 57:6, 64:4

**Constitution** [2] - 2:12, 64:14

**consult** [1] - 15:22

**consultant** [3] - 9:11, 11:1, 15:17

**consulting** [8] - 11:7, 15:14, 15:22, 15:25, 47:9, 47:10, 47:13, 47:20

**CONT'D** [1] - 2:1

**context** [1] - 50:14

**continue** [3] - 24:22, 53:6, 58:21

**continued** [1] - 62:4

**continuing** [2] - 8:7, 8:15

**contract** [1] - 8:13

**contrast** [1] - 46:22

**COOPER** [1] - 1:18

**copies** [1] - 10:14

**corporate** [2] - 12:11, 14:7

**correct** [15] - 16:24, 29:24, 29:25, 35:8, 37:24, 41:4, 43:14, 43:17, 43:18, 48:6, 49:24, 51:20, 59:15, 60:10, 60:21

**cost** [1] - 27:16

**costs** [1] - 28:21

**couple** [1] - 13:10

**course** [4] - 12:8, 28:20, 48:16, 54:24

**courses** [2] - 11:9, 11:11

**Court** [7] - 2:10, 2:11, 4:7, 7:11, 7:18, 64:12, 64:13

**COURT** [22] - 1:1, 4:8, 4:12, 4:16, 4:20, 4:25, 5:5, 5:8, 5:15, 5:20, 5:22, 6:8, 6:15, 6:20, 6:25, 8:22, 10:17, 18:22, 18:24, 47:25, 63:6, 63:8

**court** [4] - 6:17, 9:3, 52:11, 57:3

**Court's** [1] - 10:12

**COURTROOM** [3] - 4:1, 5:2, 6:21

**courtroom** [2] - 5:3, 63:10

**cover** [1] - 27:19

**CPA** [3] - 12:24, 12:25

**CPAs** [1] - 13:3

**create** [2] - 62:19, 62:20

**created** [5] - 21:16, 21:20, 33:8, 46:1, 54:13

**credit** [3] - 24:1, 29:19, 29:21

**crisis** [6] - 29:11, 29:13, 29:14, 29:19, 29:20, 47:11

**critical** [3] - 24:19, 26:5, 47:18

**Cross** [1] - 3:4

**cross** [1] - 4:14

**cross-examination** [1] - 4:14

**CRR** [3] - 2:10, 64:3, 64:12

**current** [2] - 10:19, 10:23

---

# D

**D-H-A-R-A-N** [1] - 9:15

**D.C** [6] - 1:6, 1:19, 1:22, 2:9, 2:13, 64:14

**data** [1] - 18:5

**date** [1] - 42:24

**Dated** [1] - 64:10

**David** [1] - 7:6

**DAVID** [1] - 2:6

**Davis** [2] - 36:9, 36:12

**DAVIS** [1] - 1:20

**DAY** [1] - 1:13

**deal** [1] - 23:22

**debt** [2] - 28:21

**decades** [2] - 30:12, 45:23

**December** [5] - 15:1, 42:20, 42:21, 42:22, 61:24

**decide** [1] - 54:13

**declined** [1] - 29:9

**defaults** [1] - 27:23

**DEFENDANTS** [1] - 2:5

**Defendants** [8] - 1:8, 6:2, 6:5, 6:6, 7:7, 7:11, 8:6, 10:15

**DeMarco** [5] - 56:3, 56:10, 58:25, 59:11

**DeMarco's** [1] - 57:22

**demonstratives** [6] - 8:9, 9:23, 10:1, 10:6, 10:13, 10:14

**Department** [6] - 30:9, 30:19, 30:21, 31:11, 35:7, 61:7

**dependent** [1] - 25:16

**depict** [3] - 33:8, 35:14, 40:8

**depicted** [1] - 61:14

**depicting** [5] - 19:4, 23:18, 32:16, 34:2, 61:17

**depictions** [1] - 36:16

**deposition** [7] - 5:8, 5:10, 6:13, 6:16, 18:11, 18:12, 51:19

**deputy** [1] - 56:5

**DEPUTY** [3] - 4:1, 5:2, 6:21

**describe** [11] - 11:14, 23:17, 28:3, 31:6, 33:12, 33:25, 35:10, 38:5, 42:10, 59:23, 61:16

**described** [5] - 16:10, 30:11, 43:10, 44:15, 56:15

**describing** [2] - 46:1, 59:11

**description** [1] - 39:17

**designed** [2] - 23:8, 34:25

**detail** [1] - 31:1

**determine** [1] - 61:10

**determined** [1] - 33:5

**DHARAN** [1] - 6:23

**Dharan** [56] - 3:7, 4:13, 4:22, 6:19, 7:15, 7:24, 8:5, 9:6, 9:10, 9:12, 9:14, 9:16, 9:23, 10:15, 10:19, 11:14, 12:7, 12:17, 13:19, 13:23, 16:3, 16:8, 16:23, 17:4, 18:19, 19:2, 19:8, 21:1, 22:2, 23:13, 26:24, 28:25, 30:6, 33:7, 33:12, 35:5, 36:16, 42:5, 42:25, 43:7, 43:23, 45:23, 47:3, 48:5, 49:6, 49:17, 52:13, 53:8, 53:15, 54:15, 55:22, 57:5, 58:19, 59:16, 60:20, 62:25

**Dharan's** [2] - 7:9, 8:8

**diagram** [20] - 26:2, 33:8, 33:13, 33:15, 34:2, 34:22, 36:23, 37:20, 38:2, 38:6, 38:8, 38:10, 38:22, 39:7, 40:8, 40:12, 40:20, 40:24, 41:20, 59:10

**diagramming** [1] - 23:10

**diagrams** [2] - 35:14, 52:21

**difference** [9] - 22:16, 25:10, 28:23, 41:10, 60:14, 60:15, 61:10, 62:7

**different** [10] - 4:19, 15:22, 19:10, 25:13, 25:21, 35:10, 44:11, 44:17, 45:4, 60:13

**difficulties** [1] - 29:9

**dire** [1] - 18:22

**Direct** [1] - 3:4

**DIRECT** [1] - 3:4

**Director** [1] - 51:23

**director** [3] - 11:7, 56:3, 56:5

**discuss** [1] - 56:1

**dissipate** [1] - 50:19

**dissolved** [1] - 54:11

**distributed** [2] - 34:10, 34:20

**distribution** [1] - 34:9

**district** [1] - 64:13

**DISTRICT** [3] - 1:1,

1:1, 1:14
**District** [3] - 2:11, 2:11, 64:13
**dividend** [38] - 7:20, 8:2, 8:10, 32:14, 32:16, 35:11, 36:4, 36:8, 36:12, 36:20, 36:22, 36:24, 37:23, 38:2, 38:17, 38:22, 39:4, 39:14, 39:18, 39:22, 40:14, 41:1, 43:11, 44:5, 44:11, 44:12, 44:22, 44:24, 46:6, 46:10, 59:13, 59:19, 60:1, 60:3, 60:7, 60:13, 61:11
**dividends** [22] - 22:22, 23:3, 32:20, 35:6, 35:16, 35:18, 35:19, 35:20, 38:9, 38:14, 39:2, 39:9, 39:12, 40:2, 40:14, 44:14, 44:15, 44:16, 60:2, 61:20, 62:2
**division** [1] - 55:18
**divisions** [1] - 13:14
**document** [16] - 4:18, 49:12, 49:14, 49:18, 49:19, 49:21, 49:23, 50:3, 50:5, 54:23, 55:20, 60:24, 61:3, 61:5
**documented** [1] - 53:17
**documents** [12] - 4:19, 5:13, 6:2, 7:1, 9:20, 17:23, 18:1, 18:2, 18:4, 48:17, 60:21, 60:23
**done** [4] - 15:4, 51:24, 52:7, 61:13
**down** [6] - 23:21, 23:23, 24:3, 29:8, 46:25, 53:3
**downtown** [1] - 30:1
**downturn** [2] - 29:22, 30:4
**dozen** [1] - 15:23
**Dr** [55] - 4:13, 4:22, 6:18, 7:9, 7:15, 7:24, 8:5, 8:8, 9:6, 9:12, 9:16, 9:23, 10:15, 10:19, 11:14, 12:7, 12:17, 13:19, 13:23, 16:3, 16:8, 16:23, 17:4, 18:19, 19:2, 19:8, 21:1, 22:2, 23:13, 26:24, 28:25, 30:6, 33:7, 33:12, 35:5, 36:16, 42:5,

42:25, 43:7, 43:23, 45:23, 47:3, 48:5, 49:6, 49:17, 52:13, 53:8, 53:15, 54:15, 55:22, 57:5, 58:19, 59:16, 60:20, 62:25
**draw** [19] - 20:4, 20:19, 20:21, 31:22, 32:9, 36:7, 36:10, 37:11, 37:12, 38:15, 38:18, 38:24, 39:24, 40:4, 40:5, 42:14, 60:6
**drawing** [2] - 38:10, 40:1
**drawn** [1] - 32:1
**draws** [4] - 32:11, 37:17, 37:19, 37:22
**driver** [1] - 28:2
**due** [1] - 27:23
**duration** [2] - 55:23, 56:11
**during** [9] - 11:25, 12:3, 12:16, 29:2, 29:23, 54:24, 56:4, 59:14

**E**

**early** [2] - 15:2, 21:24
**earnings** [1] - 16:20
**East** [2] - 55:2, 55:17
**eastern** [1] - 55:18
**easy** [1] - 35:23
**economic** [2] - 58:19, 59:4
**economy** [5] - 18:6, 18:7, 29:3, 29:7, 47:18
**edition** [1] - 14:8
**editions** [2] - 14:10, 14:14
**Edward** [1] - 56:2
**Edwards** [1] - 64:12
**EDWARDS** [2] - 2:10, 64:3
**effect** [2] - 59:18, 61:3
**either** [1] - 8:2
**eliminated** [2] - 58:20, 59:5
**emails** [1] - 17:25
**emphasize** [1] - 40:20
**employee** [2] - 15:6, 15:8
**end** [5] - 52:25, 58:3, 58:21, 61:12, 61:23
**engaged** [1] - 16:13

**Enron** [4] - 14:6, 14:25, 15:3
**enter** [1] - 30:7
**entered** [4] - 5:3, 5:25, 6:11, 30:24
**enterprise** [3] - 36:7, 50:17, 51:12
**enterprises** [4] - 25:15, 31:12, 44:14, 54:12
**enterprises'** [1] - 45:11
**entire** [7] - 44:14, 45:5, 46:6, 46:7, 49:21, 49:23, 52:23
**entirely** [2] - 44:16, 46:11
**entirety** [2] - 49:18, 49:19
**entity** [5] - 54:10, 55:2, 55:4, 55:24, 56:14
**entry** [1] - 30:2
**eroded** [1] - 40:23
**especially** [2] - 31:8, 53:5
**ESQ** [11] - 1:17, 1:20, 1:20, 1:23, 2:2, 2:2, 2:5, 2:6, 2:6, 2:7, 2:7
**essentially** [13] - 14:16, 24:21, 25:18, 26:15, 27:15, 30:21, 32:20, 35:2, 42:21, 46:4, 46:23, 48:21, 52:23
**estimate** [2] - 15:20, 27:22
**et** [2] - 1:3, 1:7
**evaluated** [1] - 16:8
**event** [1] - 34:3
**evidence** [4] - 5:25, 6:11, 49:11, 54:24
**EVIDENCE** [1] - 3:10
**exact** [1] - 62:5
**exactly** [4] - 24:6, 27:21, 35:25, 63:5
**EXAMINATION** [1] - 9:4
**examination** [1] - 4:14
**examine** [2] - 17:6, 18:10
**examined** [1] - 60:17
**examining** [1] - 17:22
**example** [3] - 50:23, 50:25, 56:8
**excerpt** [5] - 56:9, 56:10, 57:22, 58:4, 58:22

**excess** [3] - 61:6, 62:7, 62:11
**executed** [1] - 44:2
**executive** [1] - 12:6
**executives** [1] - 51:20
**exhausted** [1] - 40:23
**Exhibit** [11] - 3:11, 3:14, 5:17, 5:23, 6:10, 49:10, 52:10, 54:16, 54:21, 57:2, 58:15
**exhibits** [1] - 4:17
**EXHIBITS** [1] - 3:10
**Exhibits** [1] - 6:4
**exist** [1] - 58:21
**existing** [1] - 30:22
**exited** [1] - 63:10
**expect** [2] - 7:15, 20:13
**expectation** [1] - 27:18
**experience** [8] - 10:24, 10:25, 16:3, 18:14, 45:23, 47:15, 47:19, 47:20
**expert** [12] - 5:9, 13:20, 15:10, 15:13, 15:14, 15:17, 15:21, 15:22, 15:25, 16:11, 18:19, 19:7
**explain** [10] - 15:2, 19:11, 20:4, 24:10, 25:24, 26:2, 30:18, 31:8, 40:10, 46:15
**explaining** [1] - 36:19
**explicit** [1] - 59:3
**extent** [1] - 8:9
**extra** [1] - 23:22

**F**

**factors** [2] - 18:8, 26:24
**FAIRHOLME** [1] - 1:3
**familiar** [6] - 16:4, 21:9, 26:24, 47:6, 50:10, 53:8
**Fannie** [50] - 4:3, 6:13, 7:19, 7:20, 8:1, 16:5, 18:2, 21:6, 21:10, 21:15, 21:19, 21:20, 23:6, 24:18, 24:24, 25:21, 26:4, 26:13, 26:25, 27:9, 27:18, 28:5, 28:17, 30:2, 30:5, 30:7,

30:11, 31:13, 32:1, 32:10, 32:11, 33:1, 33:19, 34:3, 37:11, 42:14, 42:19, 44:19, 45:1, 45:7, 46:13, 46:15, 50:24, 51:19, 54:12, 57:9, 60:10, 60:11, 62:8, 62:22
**FANNIE** [2] - 1:10, 2:6
**Fannie's** [1] - 44:24
**feature** [4] - 24:11, 39:25, 44:17, 45:16
**features** [1] - 31:1
**February** [1] - 15:2
**FEDERAL** [1] - 1:6
**federal** [3] - 15:6, 15:9, 47:4
**fee** [23] - 25:22, 25:23, 26:19, 26:20, 26:21, 27:4, 27:9, 27:14, 27:15, 27:17, 27:19, 27:21, 28:1, 31:3, 31:12, 32:22, 32:23, 32:25, 33:3, 37:18
**few** [2] - 30:11, 35:14
**FHFA** [18] - 2:6, 18:3, 20:7, 30:7, 48:18, 50:3, 50:6, 51:19, 51:23, 53:18, 56:4, 56:5, 56:7, 60:17, 60:24, 61:5, 62:16, 62:18
**FHFA's** [6] - 17:9, 19:13, 19:17, 19:18, 48:12, 48:23
**fiascos** [1] - 14:7
**field** [1] - 18:19
**figure** [1] - 34:22
**filed** [1] - 7:11
**final** [2] - 31:14, 32:22
**finance** [12] - 10:25, 11:4, 11:11, 11:20, 12:9, 17:23, 18:19, 20:18, 20:22, 33:20, 47:16, 55:14
**FINANCE** [1] - 1:6
**financial** [27] - 11:13, 12:10, 13:8, 16:1, 16:5, 16:8, 16:9, 16:11, 16:14, 16:20, 17:12, 17:16, 17:21, 19:16, 19:24, 20:17, 24:2, 29:9, 29:11, 29:12, 29:14, 29:20, 46:16, 46:17, 47:11, 47:12, 48:15
**Financial** [1] - 14:13

**firm** [1] - 11:7
**first** [27] - 5:10, 9:14, 10:19, 14:24, 16:17, 21:9, 23:5, 31:2, 31:10, 34:10, 35:13, 37:8, 38:12, 42:15, 42:16, 42:17, 43:23, 47:23, 48:8, 48:9, 48:11, 48:22, 50:1, 61:9, 63:1, 63:3
**five** [2] - 14:14, 45:10
**fix** [1] - 47:14
**FLEXNER** [1] - 1:21
**flow** [1] - 25:14
**flows** [4] - 16:18, 16:20, 25:19
**focus** [3] - 12:7, 13:23, 20:24
**focusing** [1] - 11:19
**following** [9] - 5:4, 5:16, 6:1, 7:4, 9:2, 30:6, 38:23, 63:11, 63:13
**FOR** [5] - 1:1, 1:17, 1:20, 2:5, 3:5
**forecast** [1] - 16:18
**forecasting** [2] - 16:14, 16:16
**foregoing** [1] - 64:4
**forensic** [1] - 13:7
**forensics** [1] - 13:8
**forgot** [1] - 43:6
**form** [3] - 18:15, 55:10, 55:12
**formed** [3] - 19:3, 21:2, 48:5
**former** [3] - 6:13, 51:19, 51:23
**forming** [1] - 49:15
**formula** [1] - 42:23
**forth** [1] - 57:11
**founded** [1] - 21:24
**four** [5] - 6:6, 14:16, 33:15, 59:6, 59:7
**fourth** [2] - 59:9, 61:23
**Freddie** [44] - 7:19, 7:21, 8:1, 16:6, 18:2, 21:7, 21:11, 21:15, 21:19, 21:24, 23:6, 24:19, 24:24, 25:21, 26:4, 26:13, 27:9, 27:19, 28:5, 30:2, 30:5, 30:7, 30:12, 31:13, 32:1, 32:10, 33:2, 33:19, 34:4, 37:12, 42:14, 42:19, 45:1, 45:7, 46:13, 46:16, 50:24, 51:19, 54:12, 57:10, 60:10,

60:11, 62:9, 62:23
**FREDDIE** [1] - 2:6
**Freddie's** [1] - 26:25
**front** [1] - 14:23
**full** [1] - 64:5
**fuller** [1] - 58:25
**fully** [1] - 7:13
**function** [1] - 26:5, 26:6, 26:18
**functions** [1] - 21:19, 31:1
**fund** [1] - 22:6
**FUNDS** [1] - 1:3
**funds** [1] - 22:5
**future** [4] - 15:5, 16:14, 39:1, 39:2

## G

**g-fee** [4] - 25:23, 27:14, 27:19, 27:21
**gathered** [1] - 17:23
**general** [6] - 9:16, 17:2, 17:4, 21:10, 26:3, 33:12
**generate** [1] - 16:19
**gentlemen** [1] - 5:6
**given** [2] - 20:6, 42:23
**global** [1] - 29:3
**goal** [3] - 51:14, 51:25, 52:2
**God** [1] - 61:1
**governance** [1] - 12:11
**government** [5] - 15:7, 15:9, 15:16, 30:19, 47:4
**government's** [2] - 45:21, 45:22
**graph** [1] - 34:1
**graphical** [1] - 36:16
**graphs** [1] - 37:8
**Great** [1] - 29:15
**great** [3] - 29:6, 29:12, 29:17
**greater** [1] - 31:1
**green** [1] - 33:23
**GROSSMAN** [1] - 2:3
**group** [4] - 13:3, 22:13, 22:14, 30:24
**grow** [1] - 50:20
**growing** [1] - 50:18
**GSE** [1] - 19:15
**GSEs** [8] - 17:11, 17:17, 19:15, 19:25, 48:14, 53:12
**guarantee** [1] - 27:9
**guaranty** [10] -

25:22, 26:14, 26:17, 26:18, 26:20, 27:4, 27:11, 27:12, 28:1
**guess** [1] - 34:1

## H

**Haas** [1] - 11:4
**HAMISH** [1] - 1:20
**Hampshire** [1] - 1:18
**hand** [2] - 6:22, 43:22
**hard** [1] - 49:19
**harm** [2] - 17:16, 19:25
**Harvard** [3] - 11:3, 11:9, 12:1
**health** [1] - 16:9
**hear** [1] - 5:9
**heard** [4] - 29:15, 29:17, 29:18, 36:9
**help** [1] - 24:19
**helpful** [1] - 58:7
**hereby** [1] - 64:3
**higher** [8] - 38:22, 38:23, 39:20, 39:22, 40:17, 41:7, 41:13, 41:15
**highlight** [4] - 43:25, 44:18, 49:20, 53:15
**highlighted** [3] - 50:2, 51:2, 58:16
**himself** [1] - 57:14
**hired** [4] - 15:9, 15:12, 15:13, 15:16
**historically** [1] - 26:25
**history** [1] - 21:10
**HOFFMAN** [1] - 2:6
**holding** [1] - 34:22
**holds** [1] - 41:6
**home** [2] - 23:20, 29:8
**homeowner** [1] - 24:16
**homeowners** [6] - 23:14, 23:20, 25:8, 26:11, 27:16, 28:18
**homeownership** [1] - 21:16
**Honor** [24] - 4:5, 4:11, 4:21, 5:1, 5:11, 5:13, 5:21, 6:3, 6:12, 6:18, 6:24, 7:2, 7:3, 7:6, 8:18, 9:1, 10:12, 10:16, 18:18, 18:23, 18:25, 47:22, 48:3, 63:7
**HONORABLE** [1] -

1:14
**honors** [1] - 12:13
**house** [1] - 23:21
**housing** [5] - 18:8, 29:7, 29:23, 30:1, 30:4
**HOUSING** [1] - 1:6
**Houston** [1] - 11:23
**huge** [2] - 60:13, 60:14
**HUME** [1] - 1:20
**hypothetical** [2] - 7:25, 44:20

## I

**IAN** [1] - 2:6
**icon** [1] - 23:14
**image** [1] - 23:15
**impact** [2] - 30:2, 41:17
**implicates** [1] - 7:16
**implies** [2] - 50:15, 58:9
**important** [3] - 21:5, 40:1, 53:15
**impose** [1] - 46:18
**imposition** [3] - 30:6, 48:18, 61:11
**IN** [2] - 1:10, 3:10
**INC** [1] - 1:3
**include** [2] - 55:15
**included** [4] - 15:25, 17:25, 18:1
**includes** [1] - 37:17
**income** [3] - 28:3, 28:23, 28:24
**inconsistent** [5] - 48:12, 52:14, 52:18, 57:20, 58:13
**incorporated** [1] - 49:3
**increase** [2] - 41:24, 61:20
**increased** [2] - 42:18, 44:25
**increases** [3] - 32:8, 32:11, 32:13
**increasing** [2] - 38:25, 39:2
**indicate** [2] - 39:24, 41:6
**indicated** [2] - 51:18, 60:20
**individual** [1] - 22:8
**individuals** [1] - 22:4
**industry** [1] - 55:14
**inform** [1] - 57:5
**information** [2] -

49:17, 55:19
**informed** [1] - 6:2
**initial** [5] - 9:15, 31:2, 31:3, 32:24, 37:18
**insolvency** [2] - 17:16, 19:24
**instead** [7] - 7:21, 28:6, 28:10, 31:14, 39:18, 41:12, 49:20
**institution** [2] - 24:2, 58:1
**institutions** [7] - 16:1, 16:5, 22:8, 29:10, 46:16, 46:17, 47:13
**instruction** [2] - 7:12, 8:17
**instructions** [1] - 8:23
**insurance** [2] - 27:11, 27:12
**integral** [1] - 16:16
**intended** [5] - 54:3, 55:23, 56:11, 56:13, 61:2
**interest** [8] - 27:10, 28:16, 28:17, 28:18, 28:19, 28:21, 28:22
**interesting** [1] - 40:19
**interests** [2] - 58:20, 59:4
**interpretation** [2] - 7:12, 7:16
**introduce** [1] - 9:8
**invest** [1] - 22:7
**investment** [2] - 28:3, 28:24
**investors** [23] - 25:3, 25:7, 25:9, 25:11, 25:16, 26:8, 26:9, 26:11, 27:20, 28:11, 28:12, 33:16, 33:17, 33:22, 34:11, 41:18, 41:21, 41:25, 42:4
**invited** [2] - 14:19, 14:23
**invoked** [4] - 41:8, 41:14, 43:12, 44:7
**involved** [2] - 17:21, 35:6
**issue** [7] - 4:21, 25:2, 26:7, 26:13, 27:6, 28:21, 33:20
**issued** [2] - 13:3, 48:17
**issues** [3] - 7:9, 16:1, 29:8
**it'll** [2] - 42:3, 49:19

**item** [8] - 31:2,
31:10, 31:22, 32:7,
32:14, 32:22, 43:6,
43:23
**items** [1] - 52:22

## J

**James** [1] - 51:23
**Jill** [1] - 4:18
**job** [1] - 11:22
**jobs** [1] - 29:10
**joint** [1] - 7:8
**JONATHAN** [1] - 2:7
**Jones** [1] - 6:5
**JONES** [2] - 2:7, 6:5
**JUDGE** [1] - 1:14
**July** [2] - 1:7, 64:10
**jury** [28] - 4:20, 4:25,
5:2, 5:3, 7:5, 7:12,
9:9, 10:10, 10:22,
18:15, 21:2, 23:17,
36:20, 40:10, 42:11,
48:9, 48:17, 49:18,
50:2, 53:16, 55:20,
56:1, 58:5, 58:17,
58:23, 59:23, 61:16,
63:10
**JURY** [2] - 1:13, 5:7
**justified** [1] - 29:18
**justify** [1] - 20:8

## K

**KAYE** [1] - 2:8
**keep** [5] - 4:25, 28:8,
28:9, 28:12, 45:8
**keeping** [1] - 50:19
**KENYA** [1] - 1:20
**KESSLER** [1] - 1:23
**key** [2] - 21:13, 49:20
**KHALELAH** [1] -
1:20
**kind** [16] - 7:23, 8:12,
30:19, 34:8, 39:10,
39:12, 39:14, 39:17,
40:12, 40:14, 41:1,
41:7, 41:22, 44:7,
45:9, 58:6
**kinds** [3] - 55:11,
55:16
**King** [1] - 1:24
**KIRK** [1] - 1:18
**known** [4] - 23:7,
25:22, 30:8, 55:2
**knows** [3] - 7:11,
7:18, 53:2
**Kravetz** [3] - 4:6,

5:12, 8:18
**KRAVETZ** [31] - 2:2,
4:5, 4:9, 4:13, 4:17,
4:21, 5:1, 5:11, 5:16,
5:21, 6:1, 6:12, 6:18,
6:24, 7:1, 8:18, 9:1,
9:5, 10:12, 10:18,
18:18, 18:25, 19:1,
47:22, 48:3, 48:4,
52:8, 52:12, 56:25,
57:4, 63:7

## L

**lack** [1] - 29:20
**ladies** [1] - 5:6
**LAMBERTH** [1] -
1:14
**large** [1] - 55:13
**last** [5] - 6:6, 9:14,
22:18, 38:22, 43:6
**late** [1] - 21:21
**Law** [2] - 11:3, 11:9
**lawsuits** [1] - 15:23
**least** [2] - 7:25, 15:22
**lecturer** [2] - 12:6
**led** [4] - 26:25, 29:9,
30:4, 30:5
**LEE** [1] - 1:23
**left** [10] - 23:19,
33:15, 33:23, 34:15,
34:17, 35:13, 36:3,
43:22, 45:7, 52:25
**left-hand** [1] - 43:22
**lender** [3] - 24:13,
24:21, 24:22
**lenders** [6] - 23:15,
24:25, 25:20, 26:20,
26:21, 27:14
**lending** [1] - 24:22
**length** [1] - 26:1
**less** [2] - 25:18, 51:6
**letting** [1] - 50:19,
50:20
**licensed** [1] - 12:25
**light** [2] - 37:9, 37:10
**likely** [1] - 4:14
**limited** [1] - 55:23,
56:11
**line** [5] - 31:2, 59:8,
61:18, 62:3
**lineup** [1] - 4:7
**liquidate** [2] - 54:7,
54:14
**liquidated** [6] -
31:18, 53:13, 53:22,
53:23, 54:5, 54:9
**liquidating** [1] - 34:3
**liquidation** [38] -

7:22, 8:3, 8:11, 31:3,
31:8, 31:14, 31:16,
31:20, 32:4, 32:7,
32:12, 32:15, 32:21,
33:7, 33:13, 34:9,
34:13, 34:20, 34:21,
35:1, 35:7, 36:5, 37:4,
37:15, 38:20, 38:21,
38:25, 39:3, 39:15,
39:19, 41:6, 41:14,
41:18, 41:21, 41:22,
44:6, 53:8, 61:20
**LISA** [2] - 2:10, 64:3
**Lisa** [1] - 64:12
**list** [1] - 12:20
**listing** [2] - 13:19,
53:11
**litigation** [1] - 47:10
**LITIGATION** [1] -
1:11
**Litigations** [1] - 4:4
**LITOWITZ** [1] - 2:3
**LLP** [3] - 1:21, 1:23,
2:3
**loan** [1] - 24:16
**loans** [7] - 27:6,
28:7, 28:8, 28:9,
28:14, 28:18, 55:15
**Lockhart** [5] - 51:23,
52:13, 56:19, 56:21,
57:14
**Lockhart's** [1] - 52:4
**look** [4] - 9:22, 37:2,
38:12, 48:22
**looked** [4] - 18:1,
18:5, 18:7, 20:23
**losses** [3] - 27:20,
27:22, 30:4
**lost** [1] - 29:10
**LOUIS** [1] - 2:7
**lunch** [2] - 48:1, 63:8
**luncheon** [1] - 63:12

## M

**MAC** [2] - 1:10, 2:6
**Mac** [16] - 4:3, 16:6,
18:2, 21:7, 21:16,
21:19, 21:24, 23:6,
32:1, 33:2, 34:4,
50:24, 51:20, 57:10,
62:9, 62:23
**Mae** [19] - 6:14, 16:5,
18:2, 21:6, 21:15,
21:19, 21:20, 23:6,
28:17, 32:1, 32:11,
33:1, 34:3, 44:19,
50:24, 51:19, 57:10,
62:8, 62:22

**MAE** [1] - 2:6
**MAE/FREDDIE** [1] -
1:10
**Mae/Freddie** [1] - 4:3
**main** [6] - 26:4, 26:5,
26:6, 39:25, 45:16,
52:21
**maintain** [1] - 46:19
**major** [1] - 29:7
**managed** [1] - 28:15
**Management** [1] -
11:6
**managing** [1] - 11:7
**manner** [1] - 40:16
**market** [18] - 18:8,
21:18, 23:7, 23:9,
23:11, 24:5, 24:7,
24:8, 24:11, 24:18,
28:21, 28:22, 29:7,
29:23, 30:1, 30:4
**Massachusetts** [1] -
2:8
**materials** [1] - 17:19
**matter** [4] - 7:3, 9:21,
17:24, 18:13
**mattered** [1] - 18:9
**matters** [2] - 15:18,
47:10
**maximum** [2] -
46:23, 46:24
**Mayopoulos** [4] -
3:6, 4:10, 6:14, 6:17
**MBA** [1] - 14:11
**MBS** [17] - 25:5,
25:9, 25:10, 25:16,
27:20, 28:11, 28:12,
28:14, 28:17, 33:16,
33:17, 34:10, 41:17,
41:20, 41:25, 42:4,
55:6
**MC** [1] - 1:10
**McGuire** [2] - 52:8,
57:1
**mean** [13] - 13:12,
29:5, 31:6, 31:24,
33:25, 45:8, 45:14,
50:13, 51:3, 51:7,
53:2, 53:21, 55:8
**meaning** [2] - 19:18,
61:24
**means** [13] - 20:5,
28:4, 35:25, 36:1,
39:15, 50:18, 51:5,
51:8, 53:23, 53:24,
54:5, 57:15, 59:6
**meantime** [1] - 7:15
**Mellon** [1] - 11:20
**MELTZER** [1] - 1:23
**members** [8] - 9:8,
10:22, 23:17, 36:20,

40:10, 42:10, 59:23,
61:16
**memberships** [1] -
13:20
**memos** [1] - 17:25
**mention** [5] - 43:6,
43:9, 44:9, 44:10,
48:21
**mentioned** [20] -
13:9, 22:2, 25:17,
27:4, 29:22, 32:24,
33:7, 33:16, 33:19,
34:13, 35:5, 37:18,
42:13, 44:7, 46:5,
47:9, 53:1, 55:6,
56:12, 61:25
**mergers** [1] - 34:5
**methodology** [2] -
13:13, 13:18
**middle** [3] - 9:15,
13:23, 60:7
**midnight** [1] - 7:14
**might** [4] - 29:12,
33:20, 50:23, 58:7
**minimum** [3] - 46:19,
46:20, 47:7
**minus** [1] - 36:2,
44:23
**minute** [2] - 27:5
**minutes** [1] - 30:11
**Miscellaneous** [1] -
4:2
**MIT** [1] - 11:5, 11:10
**mitigate** [1] - 15:4
**money** [12] - 22:7,
23:22, 23:23, 24:14,
24:15, 24:21, 25:7,
25:8, 26:12, 27:18,
34:6
**money's** [1] - 24:17
**month** [1] - 43:3
**MORNING** [1] - 1:13
**morning** [6] - 4:5,
5:6, 5:7, 9:6, 9:7,
47:24
**mortgage** [20] -
21:17, 21:18, 23:7,
23:11, 23:24, 24:2,
24:4, 24:7, 24:8,
24:13, 24:18, 24:20,
25:4, 25:5, 27:6, 27:7,
28:11, 33:18, 55:6,
55:11
**mortgage-backed**
[6] - 25:4, 27:7, 28:11,
33:18, 55:6, 55:11
**mortgages** [10] -
24:24, 25:7, 25:17,
25:19, 25:21, 26:7,
26:10, 26:15, 28:7

**most** [1] - 22:17
**motion** [2] - 7:11, 7:13
**move** [3] - 4:10, 8:16, 26:2
**MR** [35] - 4:5, 4:9, 4:13, 4:17, 4:21, 5:1, 5:11, 5:16, 5:21, 6:1, 6:5, 6:12, 6:18, 6:24, 7:1, 7:6, 8:18, 8:25, 9:1, 9:5, 10:12, 10:16, 10:18, 18:18, 18:23, 18:25, 19:1, 47:22, 48:3, 48:4, 52:8, 52:12, 56:25, 57:4, 63:7
**municipalities** [1] - 22:5
**must** [2] - 46:19, 54:10
**mutual** [1] - 22:6

**N**

**name** [5] - 9:10, 9:13, 9:14, 29:18
**nature** [1] - 14:4
**necessary** [7] - 17:15, 19:24, 20:3, 20:10, 20:12, 20:14, 20:25
**need** [6] - 23:22, 31:9, 47:13, 47:17, 49:24, 49:25
**negative** [1] - 40:13
**net** [76] - 17:9, 17:15, 18:20, 19:12, 19:18, 19:23, 20:1, 20:3, 20:7, 20:9, 20:11, 20:20, 35:19, 35:20, 35:21, 35:24, 36:3, 36:5, 36:6, 36:21, 36:24, 36:25, 37:5, 37:23, 38:8, 38:9, 40:13, 43:17, 43:20, 44:11, 44:12, 44:13, 45:4, 45:5, 45:17, 45:24, 46:2, 46:6, 46:7, 46:22, 48:11, 48:24, 51:5, 51:6, 51:9, 51:15, 51:17, 52:17, 52:22, 52:23, 52:25, 53:3, 53:7, 53:19, 54:17, 56:16, 57:9, 57:16, 57:20, 58:12, 59:17, 59:18, 60:4, 60:18, 60:24, 61:3, 61:4, 61:9, 61:11, 61:19, 61:25, 62:9, 62:20

**never** [4] - 33:4, 33:5, 45:25
**new** [1] - 54:10
**New** [4] - 1:18, 1:21, 2:4
**next** [9] - 4:22, 16:19, 25:25, 32:7, 32:14, 33:10, 34:14, 54:19, 61:14
**nice** [1] - 63:8
**none** [1] - 43:9
**normal** [12] - 51:12, 55:24, 56:14, 56:15, 56:18, 56:22, 57:6, 57:10, 57:14, 57:19, 62:21
**normally** [1] - 46:18
**Northwest** [5] - 1:18, 1:21, 2:8, 2:12, 64:14
**Northwestern** [1] - 11:21
**Nos** [4] - 3:11, 3:14, 5:23, 6:10
**noted** [1] - 43:13
**notes** [1] - 64:5
**Notes** [1] - 14:12
**nothing** [1] - 40:24
**notice** [1] - 41:9
**number** [7] - 45:9, 46:8, 47:12, 60:21, 62:5, 62:23
**numbers** [1] - 44:21

**O**

**object** [3] - 6:3, 6:6, 8:4
**objection** [8] - 5:17, 8:7, 8:8, 8:14, 8:21, 8:22, 10:16, 18:23
**objections** [1] - 6:8
**objective** [2] - 55:23, 56:13
**obligations** [1] - 36:3
**obviously** [1] - 41:23
**OF** [2] - 1:1, 1:13
**official** [1] - 64:12
**Official** [1] - 2:10
**often** [1] - 49:20
**once** [3] - 12:15, 39:21, 55:24
**one** [31] - 4:21, 5:8, 7:2, 8:6, 12:2, 13:4, 13:6, 14:6, 14:24, 20:3, 22:13, 23:19, 24:10, 25:25, 28:6, 28:23, 31:17, 32:6, 38:7, 40:20, 42:16, 44:18, 46:5, 46:13,

48:11, 50:6, 54:8, 55:13, 58:15, 63:6
**ones** [2] - 44:1, 44:5
**open** [5] - 6:17, 9:3, 52:11, 54:19, 57:3
**operate** [5] - 23:6, 23:8, 51:11, 53:25, 58:1
**operated** [1] - 53:24
**operates** [1] - 23:11
**operation** [5] - 46:21, 50:17, 51:12, 57:15, 57:19
**operations** [8] - 55:24, 56:14, 56:15, 56:17, 56:22, 57:7, 57:10, 62:21
**opinion** [17] - 19:7, 47:23, 48:8, 48:10, 48:16, 49:15, 52:6, 52:17, 56:23, 57:9, 57:23, 58:16, 60:15, 62:12, 63:1, 63:3, 63:4
**Opinion** [1] - 60:17
**opinions** [4] - 10:5, 18:15, 21:3, 48:6
**opposite** [2] - 53:4, 53:5
**option** [1] - 8:12
**order** [4] - 16:17, 36:8, 46:20, 50:20
**organization** [2] - 55:4, 55:13
**original** [6] - 42:12, 42:16, 43:24, 44:1, 44:19, 60:6
**originally** [1] - 21:20
**outside** [2] - 7:5, 28:22
**overall** [3] - 19:9, 29:3, 61:21
**overrule** [1] - 8:22
**overruled** [1] - 6:9
**own** [4] - 23:2, 23:3, 28:15, 45:21
**owned** [3] - 21:21, 21:23, 21:25
**owners** [1] - 22:18
**ownership** [1] - 22:21

**P**

**p.m** [1] - 63:11
**P.M** [1] - 1:20
**packages** [1] - 25:1
**PAGE** [1] - 3:10
**Page** [1] - 50:6

**paid** [37] - 22:22, 22:23, 23:4, 23:5, 25:8, 26:10, 26:11, 26:15, 28:18, 31:3, 31:13, 32:14, 32:20, 34:11, 34:12, 34:14, 34:16, 34:18, 35:17, 35:18, 35:19, 36:5, 38:15, 39:9, 39:14, 40:16, 44:6, 44:14, 44:22, 46:7, 46:9, 46:11, 60:2, 61:1
**panel** [1] - 5:2
**part** [12] - 13:14, 16:10, 16:16, 16:22, 20:11, 21:1, 27:17, 35:5, 44:10, 47:18, 53:17, 58:15
**particular** [8] - 20:24, 21:17, 37:20, 37:22, 48:25, 51:22, 53:19, 56:9
**particularly** [1] - 47:11
**parties** [3] - 7:8, 33:15, 59:7
**parts** [1] - 20:2
**party** [1] - 41:20
**pass** [1] - 26:21
**pastures** [1] - 33:23
**pay** [23] - 7:20, 25:8, 25:22, 26:16, 27:24, 28:18, 28:22, 35:20, 36:8, 36:11, 36:13, 36:14, 36:24, 37:1, 37:6, 37:23, 38:16, 39:18, 40:2, 40:6, 40:13, 62:4
**paying** [5] - 8:2, 39:12, 39:16, 40:14, 62:1
**payment** [16] - 7:23, 8:12, 23:21, 27:10, 35:6, 36:20, 36:22, 38:22, 39:17, 40:12, 40:15, 41:1, 41:7, 41:22, 44:7, 46:6
**payment-in-kind** [2] - 40:12, 41:1
**payments** [3] - 35:11, 38:3, 46:11
**pays** [1] - 28:17
**peer** [2] - 14:3, 14:17
**peer-reviewed** [2] - 14:3, 14:17
**Pennsylvania** [1] - 1:24
**pension** [1] - 22:5
**people** [9] - 22:4, 29:10, 29:13, 29:17,

29:19, 29:21, 55:13, 59:7, 59:9
**percent** [18] - 7:20, 7:21, 8:2, 8:10, 8:11, 36:4, 39:22, 39:23, 40:15, 40:17, 41:12, 43:11, 43:12, 44:5, 44:6, 44:12, 59:19
**percentage** [4] - 32:14, 32:21, 35:7, 46:11
**perform** [1] - 17:19
**perhaps** [1] - 32:5
**period** [3] - 29:2, 33:5, 59:14
**periodic** [3] - 32:22, 32:23, 33:3
**periodically** [2] - 12:4, 33:20
**permanent** [1] - 54:3
**permission** [1] - 10:13
**permit** [1] - 57:9
**Peter** [2] - 36:13, 36:14
**Ph.D** [4] - 3:7, 6:23, 11:18, 11:19
**phone** [2] - 4:23, 7:3
**phrase** [9] - 20:5, 20:16, 20:23, 31:20, 35:25, 36:8, 50:10, 51:2
**phrases** [2] - 31:7, 49:20, 53:20
**picture** [2] - 30:24, 58:25
**PIK** [1] - 43:12
**Pittsburgh** [1] - 11:20
**places** [2] - 11:2, 11:11
**Plaintiff's** [5] - 5:17, 5:23, 6:10
**Plaintiffs** [10] - 1:4, 4:6, 5:12, 6:12, 6:18, 7:22, 8:5, 8:19, 16:24, 18:18
**PLAINTIFFS** [4] - 1:18, 1:20, 2:2, 3:5
**Plaintiffs'** [7] - 3:11, 3:14, 49:10, 52:10, 54:15, 54:21, 57:2
**PLAINTIFFS'** [1] - 6:23
**plans** [1] - 54:7
**play** [6] - 5:9, 6:13, 24:9, 52:8, 56:25
**PLLC** [1] - 1:18
**point** [5] - 36:24, 37:16, 49:7, 53:25,

57:16
**points** [1] - 21:13
**pool** [1] - 25:21
**PORTER** [1] - 2:8
**portfolio** [2] - 28:16, 33:21
**portion** [2] - 13:23, 52:4
**position** [1] - 7:18
**positions** [3] - 10:20, 10:23, 11:15
**positive** [7] - 44:13, 46:7, 51:5, 51:9, 51:17, 57:15, 62:20
**potential** [4] - 15:3, 27:22, 31:25, 32:6
**potentially** [1] - 61:6
**PowerPoint** [1] - 57:23
**practice** [3] - 36:17, 39:13, 39:14
**preference** [34] - 7:22, 8:3, 8:12, 31:4, 31:8, 31:16, 31:21, 32:4, 32:8, 32:12, 32:15, 32:21, 33:8, 33:13, 34:13, 34:22, 35:1, 35:8, 36:5, 37:4, 37:16, 38:20, 38:21, 38:25, 39:3, 39:15, 39:19, 41:6, 41:14, 41:18, 41:21, 41:23, 44:6, 61:20
**Preferred** [1] - 4:3
**PREFERRED** [1] - 1:10
**preferred** [14] - 22:13, 22:20, 22:24, 22:25, 23:4, 25:11, 25:13, 30:8, 30:20, 30:22, 31:15, 34:16, 42:2
**premise** [1] - 7:25
**premised** [1] - 8:10
**premium** [3] - 27:12, 27:13
**prepared** [2] - 9:23, 43:19
**presence** [1] - 7:5
**present** [6] - 10:3, 10:4, 18:15, 55:20, 58:4, 58:22
**presentation** [5] - 10:6, 10:9, 21:1, 55:1, 56:2
**preserve** [8] - 8:15, 17:10, 19:14, 48:13, 50:7, 50:10, 51:25, 62:19
**preserving** [6] -

50:16, 52:5, 52:14, 52:18, 53:4, 56:20
**pretty** [3] - 29:5, 45:12, 55:13
**prevent** [1] - 15:4
**previous** [6] - 25:12, 37:17, 37:18, 37:22, 58:24, 60:5
**previously** [1] - 6:8
**prices** [1] - 29:8
**primarily** [2] - 12:9, 17:21
**primary** [8] - 11:22, 12:24, 24:4, 24:7, 24:11, 24:20, 24:22, 30:23
**principal** [1] - 27:10
**private** [13] - 21:23, 21:25, 22:2, 23:15, 24:13, 24:25, 25:20, 26:19, 26:21, 27:14, 30:12, 34:16, 42:2
**problem** [2] - 20:4, 20:10, 20:20, 24:20, 29:7, 35:21
**problems** [1] - 47:14
**procedural** [1] - 7:9
**proceed** [2] - 6:15, 18:24
**proceedings** [6] - 5:4, 7:4, 9:2, 63:11, 63:13, 64:6
**Proceedings** [1] - 63:14
**process** [3] - 16:13, 21:17, 32:17
**produced** [1] - 64:6
**profession** [1] - 55:14
**professional** [9] - 10:20, 10:23, 10:25, 11:15, 12:17, 12:22, 12:25, 13:3, 13:20
**professor** [7] - 9:11, 11:1, 11:2, 11:4, 11:5, 12:1, 12:2
**profit** [3] - 27:24, 44:20, 44:21
**profitability** [2] - 26:25, 28:2
**profits** [1] - 44:23
**programs** [3] - 12:6, 14:11, 14:12
**project** [1] - 47:9
**property** [4] - 50:8, 50:22, 52:1, 52:15
**provide** [2] - 24:2, 57:25
**provided** [3] - 10:14, 17:24, 58:24

**provides** [1] - 25:20
**providing** [1] - 33:1
**provision** [1] - 33:2
**Prussia** [1] - 1:24
**PSPA** [1] - 60:6
**PSPAs** [7] - 35:6, 42:6, 43:1, 43:14, 43:24, 44:1, 44:19
**public** [10] - 12:23, 17:9, 19:13, 22:19, 22:25, 35:25, 48:12, 48:23, 48:25, 56:7
**publications** [1] - 13:20
**published** [9] - 6:17, 13:24, 14:8, 14:9, 14:11, 14:16, 14:17, 52:11, 57:3
**Purchase** [1] - 4:3
**purchase** [2] - 23:1, 30:8
**PURCHASE** [1] - 1:10
**purpose** [11] - 17:10, 19:14, 19:17, 19:19, 48:12, 50:6, 53:20, 56:7, 60:17, 62:16, 62:18
**purposes** [2] - 18:20, 37:7
**put** [9] - 4:24, 23:21, 23:23, 24:25, 27:6, 33:22, 46:5, 50:3, 50:8
**putting** [1] - 28:7
**PX** [3] - 50:1, 54:15, 58:15

## Q

**quarter** [6] - 38:23, 45:6, 52:24, 52:25, 57:18, 61:24
**question-and-answer-type** [1] - 50:5
**questions** [9] - 9:21, 10:2, 17:6, 17:8, 17:19, 19:2, 20:18, 20:19, 20:22
**quick** [1] - 21:14
**quickly** [3] - 45:12, 46:25, 53:4
**quite** [1] - 47:12
**quote** [3] - 57:25, 58:19, 58:21
**quotes** [1] - 58:3

## R

**Radnor** [1] - 1:24
**raise** [1] - 6:21
**rate** [13] - 39:20, 39:21, 39:22, 39:23, 40:15, 40:17, 41:7, 41:10, 41:12, 41:13, 62:1
**rather** [2] - 8:4, 39:16
**RDR** [3] - 2:10, 64:3, 64:12
**RE** [1] - 1:10
**Re** [1] - 4:2
**read** [3] - 17:8, 49:20, 49:23
**reader** [1] - 4:18
**Readings** [1] - 14:12
**real** [1] - 29:19
**really** [22] - 11:18, 21:14, 21:18, 23:8, 26:5, 26:6, 26:17, 31:10, 33:4, 39:25, 40:20, 41:24, 45:7, 47:17, 50:4, 51:10, 53:3, 54:3, 54:4, 55:10, 56:13
**reason** [7] - 20:6, 29:20, 45:5, 46:14, 57:20, 60:19
**reasonable** [2] - 20:2, 20:13
**reasonably** [7] - 17:15, 19:23, 20:3, 20:10, 20:12, 20:14, 20:25
**reasons** [1] - 21:2
**receive** [1] - 27:19
**received** [4] - 5:22, 6:9, 12:12, 12:14
**RECEIVED** [1] - 3:10
**recess** [1] - 63:12
**Recession** [1] - 29:16
**recession** [1] - 29:17
**recognitions** [1] - 12:15
**recognize** [1] - 49:12
**recognizes** [1] - 54:8
**record** [5] - 5:14, 6:3, 6:7, 9:13, 37:7
**Red** [1] - 3:4
**redirect** [1] - 4:14
**reduce** [1] - 45:10
**reduced** [1] - 38:14
**reducing** [1] - 38:25
**refer** [3] - 29:15, 29:17, 29:19
**reference** [2] - 50:22,

55:1
**referenced** [1] - 48:5
**referred** [1] - 24:4
**regarding** [7] - 17:1, 41:5, 47:6, 47:8, 56:7, 56:22, 63:1
**regardless** [1] - 46:7
**regulator** [1] - 47:3
**regulators** [2] - 46:18, 47:8
**regulatory** [1] - 50:14
**reinforces** [1] - 58:6
**relate** [5] - 10:1, 10:2, 16:5, 50:25, 51:15
**related** [6] - 4:2, 9:20, 11:12, 12:10, 18:2, 52:23
**relating** [3] - 9:24, 12:13, 16:1
**relation** [1] - 33:13
**relatively** [1] - 10:4
**relevant** [10] - 49:14, 52:6, 53:20, 56:22, 57:23, 58:16, 60:15, 62:12, 62:23, 63:3
**remain** [2] - 6:21, 63:3
**remainder** [1] - 4:15
**remaining** [9] - 37:10, 39:1, 44:23
**remember** [9] - 29:6, 29:13, 34:12, 36:12, 46:15, 55:6, 59:6, 61:24, 62:15
**remind** [3] - 41:10, 48:9, 51:15
**removed** [1] - 42:21
**renegotiate** [1] - 61:6
**rents** [1] - 55:16
**repaid** [1] - 40:16
**repeat** [1] - 27:5
**REPORTED** [1] - 2:10
**Reporter** [2] - 2:10, 64:12
**represent** [2] - 34:25, 37:14
**represents** [3] - 37:9, 37:10, 37:15
**request** [4] - 7:8, 8:5, 8:6, 10:13
**require** [1] - 13:17
**required** [2] - 7:19, 8:11
**Research** [1] - 11:8
**residual** [2] - 22:18, 22:21

**resolved** [1] - 26:14
**respect** [4] - 7:8,
7:12, 19:7, 19:20
**restore** [3] - 17:11,
19:15, 48:14
**result** [3] - 46:13,
59:17, 61:5
**retain** [3] - 45:1,
45:15, 46:14
**retained** [4] - 15:17,
15:21, 28:15, 33:21
**retirement** [1] - 22:7
**return** [4] - 55:24,
56:14, 57:10, 58:11
**returned** [6] - 54:1,
54:2, 54:6, 58:2, 58:9,
59:2
**revenue** [1] - 27:17
**review** [6] - 17:20,
18:11, 48:17, 49:4,
51:23, 60:23
**reviewed** [6] - 14:3,
14:17, 51:18, 52:1,
59:16, 60:20
**reviewing** [1] - 48:16
**Rice** [3] - 11:22,
12:3, 12:14
**rights** [5] - 22:21,
25:14, 25:18, 59:13
**risk** [1] - 27:25
**Road** [1] - 1:24
**roadmap** [5] - 48:21,
49:1, 60:16, 62:15,
62:25
**rob** [1] - 36:14
**Robert** [4] - 4:5,
5:12, 8:18, 11:3
**ROBERT** [1] - 2:2
**Room** [1] - 2:12
**rough** [1] - 15:20
**ROYCE** [1] - 1:14
**RUDY** [1] - 1:23

**S**

**safe** [1] - 46:21
**sale** [1] - 34:5
**sales** [1] - 29:8
**satisfied** [1] - 39:5
**saw** [3] - 25:12,
39:23, 56:19
**scandal** [1] - 14:25
**scandals** [1] - 14:7
**SCHILLER** [1] - 1:21
**SCHOLER** [1] - 2:8
**School** [4] - 11:3,
11:5, 12:1, 12:5
**scope** [2] - 17:2,
17:4

**screen** [7] - 10:14,
17:7, 19:2, 28:2,
33:14, 37:21, 49:18
**seated** [1] - 5:5
**SEC** [2] - 15:13,
15:14
**second** [14] - 14:8,
20:11, 28:2, 28:6,
28:23, 31:22, 42:20,
44:10, 44:18, 45:16,
46:13, 51:2, 62:3,
63:4
**secondary** [5] -
21:18, 23:7, 23:10,
24:8, 24:18
**securities** [17] - 7:13,
25:2, 25:3, 25:4, 26:8,
27:7, 27:8, 27:11,
28:11, 33:18, 55:5,
55:7, 55:9, 55:11,
51:2, 55:15
**see** [10] - 8:23,
16:18, 19:15, 40:1,
40:24, 48:22, 48:24,
61:1, 61:8, 63:9
**seeing** [2] - 37:8,
59:24
**selected** [1] - 52:4
**selling** [2] - 13:14,
28:10
**Senior** [1] - 4:3
**senior** [5] - 12:5,
30:8, 30:20, 30:22,
31:15
**SENIOR** [2] - 1:10,
1:14
**sense** [1] - 25:18
**sent** [5] - 52:24,
57:18, 61:18, 62:8,
62:11
**September** [3] -
42:16, 44:2, 44:3
**sequence** [2] - 34:9,
34:19
**served** [1] - 15:14
**service** [1] - 12:12
**SESSION** [1] - 1:13
**set** [3] - 10:4, 27:21,
57:11
**several** [4] - 16:19,
18:12, 30:12, 32:16
**shareholder** [2] -
30:22, 30:23
**shareholders** [34] -
20:13, 21:23, 22:1,
22:2, 22:3, 22:9,
22:10, 22:14, 22:15,
22:17, 22:19, 22:20,
22:21, 22:23, 22:24,
23:4, 23:5, 25:11,

25:14, 30:13, 30:23,
34:16, 34:18, 42:2,
42:3, 54:2, 54:6, 58:3,
58:9, 58:11, 58:20,
59:2, 59:4, 59:8
**shares** [2] - 23:3,
30:20
**short** [1] - 5:8
**show** [8] - 10:13,
36:17, 48:20, 49:2,
49:17, 52:21, 58:14,
59:21
**showed** [5] - 44:3,
52:22, 59:1, 59:7,
59:10
**showing** [5] - 49:21,
59:25, 60:3, 60:19,
62:3
**shown** [1] - 17:7
**shows** [1] - 41:20
**side** [5] - 23:25, 37:2,
38:1, 40:19, 43:22
**sidebar** [1] - 7:5
**signed** [2] - 31:11,
44:1
**significant** [2] -
17:16, 19:24
**similar** [1] - 37:12
**simply** [2] - 39:15,
39:18
**single** [1] - 60:23
**situation** [4] - 35:23,
37:21, 37:22, 38:23
**six** [2] - 4:19
**size** [2] - 41:24,
45:11
**slide** [37] - 10:19,
11:16, 12:20, 12:21,
13:19, 17:1, 19:4,
19:9, 19:21, 21:12,
23:10, 23:14, 25:12,
25:24, 27:2, 30:18,
33:10, 35:3, 35:10,
41:5, 41:7, 42:8,
43:19, 43:22, 46:1,
46:3, 46:6, 53:11,
55:22, 57:11, 57:23,
58:24, 59:1, 59:21,
59:24, 61:14, 61:17
**slides** [6] - 10:4,
19:10, 25:6, 32:16,
48:22, 49:4
**Sloan** [1] - 11:5
**slowly** [1] - 45:9
**small** [3] - 27:15,
45:9, 45:11
**solvent** [14] - 17:12,
19:16, 46:20, 48:15,
50:9, 51:3, 51:4, 51:5,
51:8, 51:15, 53:5,

53:6, 53:25, 56:16
**sometime** [1] - 21:24
**sometimes** [5] -
28:8, 28:11, 29:12,
44:15, 50:18
**sorry** [1] - 55:8
**sound** [14] - 17:12,
19:15, 46:21, 48:14,
50:8, 50:17, 51:10,
51:11, 51:13, 51:14,
53:5, 53:6, 53:24,
56:16
**soundness** [1] -
50:20
**sounds** [1] - 51:3
**specific** [3] - 13:16,
23:2, 58:7
**spell** [1] - 9:12
**spent** [1] - 11:25
**stabilize** [1] - 62:20
**stabilized** [3] -
55:25, 58:2, 58:8
**stable** [1] - 46:20
**stagnated** [1] - 29:8
**stand** [4] - 8:4, 34:1,
41:18, 49:6
**standing** [6] - 6:21,
33:23, 41:20, 41:25,
59:7, 59:8
**standpoint** [1] - 53:9
**stands** [1] - 55:5
**STANTON** [1] - 2:7
**Stanton** [1] - 6:5
**start** [6] - 23:13,
35:13, 35:23, 36:19,
48:8, 63:6
**started** [1] - 28:6
**starting** [3] - 12:5,
43:22, 46:24
**state** [2] - 9:12, 13:1
**statement** [7] -
11:13, 12:10, 16:11,
19:13, 50:1, 52:13,
57:5
**statements** [9] -
16:8, 16:20, 17:9,
48:12, 48:23, 48:25,
49:3, 53:11, 53:16
**STATES** [2] - 1:1,
1:14
**states** [3] - 55:22,
57:25, 58:19
**States** [3] - 2:11,
14:20, 64:13
**stating** [1] - 60:24
**statute** [1] - 54:9
**statutes** [1] - 57:25
**steal** [1] - 36:13
**stenographic** [1] -
64:5

**step** [1] - 26:16
**STERN** [1] - 2:7
**still** [4] - 34:15,
34:17, 59:8, 59:9
**stock** [8] - 7:13,
7:17, 7:19, 8:1, 30:8,
30:20, 31:15, 56:4
**STOCK** [1] - 1:10
**Stock** [1] - 4:3
**strike** [1] - 8:16
**stronger** [1] - 45:3
**structure** [2] - 30:14,
43:11
**students** [1] - 47:17
**subjects** [4] - 11:12,
12:7, 12:9, 12:10
**subsequent** [2] -
21:22, 42:6
**suffered** [1] - 27:20
**sufficient** [1] - 37:23
**summarize** [4] -
10:5, 10:19, 21:12,
35:16
**summarized** [1] -
42:8
**summarizing** [1] -
43:19
**summary** [3] - 10:22,
21:15, 42:9
**support** [5] - 10:4,
21:16, 21:17, 23:9,
50:20
**supports** [1] - 50:17
**suspended** [1] -
59:14
**sweep** [42] - 17:9,
17:15, 18:20, 19:13,
19:18, 19:23, 20:1,
20:3, 20:7, 20:9,
20:11, 20:20, 43:17,
43:20, 44:11, 45:4,
45:17, 45:24, 46:2,
46:22, 48:11, 48:24,
52:17, 52:22, 53:19,
54:17, 57:9, 57:16,
57:20, 58:13, 59:17,
59:18, 60:5, 60:18,
60:24, 61:3, 61:4,
61:10, 61:11, 61:19,
62:1, 62:9
**swept** [4] - 44:15,
44:16, 45:5, 57:17
**SWORN** [1] - 6:23
**system** [1] - 26:18

**T**

**Tab** [2] - 49:7, 54:19
**talks** [1] - 58:8

**taxpayers** [1] - 21:21
**teach** [3] - 11:9, 11:11, 47:17
**teaching** [5] - 12:15, 47:15, 47:16, 47:19
**technically** [1] - 45:8
**temporary** [2] - 56:13, 58:10
**ten** [1] - 62:4
**tender** [1] - 18:19
**tenders** [1] - 7:1
**term** [9] - 13:9, 20:14, 45:17, 45:18, 45:19, 45:21, 45:22, 51:6, 53:8
**terms** [6] - 22:21, 22:25, 41:18, 50:1, 51:25, 62:25
**testified** [1] - 15:23
**testify** [5] - 4:19, 7:16, 7:24, 14:19, 14:23
**testifying** [3] - 9:17, 15:13, 16:23
**testimonies** [1] - 18:12
**testimony** [16] - 7:10, 8:9, 8:16, 9:24, 10:7, 10:9, 13:21, 18:11, 51:19, 51:23, 52:2, 52:5, 56:19, 56:21, 57:11, 63:1
**Texan** [1] - 11:23
**Texas** [1] - 13:1
**textbook** [1] - 14:11
**textbooks** [1] - 14:16
**THE** [32] - 1:1, 1:14, 1:17, 1:20, 2:2, 2:5, 3:5, 4:1, 4:8, 4:12, 4:16, 4:20, 4:25, 5:2, 5:5, 5:7, 5:8, 5:15, 5:20, 5:22, 6:8, 6:15, 6:20, 6:21, 6:25, 8:22, 10:17, 18:22, 18:24, 47:25, 63:6, 63:8
**themselves** [5] - 27:24, 28:8, 28:9, 28:12, 28:13
**Thereupon** [1] - 63:12
**they've** [1] - 28:22
**third** [13] - 17:14, 18:6, 19:23, 42:25, 43:2, 43:13, 43:16, 45:20, 48:24, 51:2, 53:18, 54:8, 59:9
**three** [2] - 14:9, 14:24
**tied** [3] - 24:14, 24:15, 24:17

**Timothy** [4] - 3:6, 4:10, 6:14, 6:16
**today** [4] - 4:7, 9:17, 16:22, 21:1
**together** [6] - 27:6, 27:25, 28:14, 46:5, 58:24, 62:9
**took** [1] - 52:23
**top** [1] - 61:18
**total** [1] - 61:18
**trained** [2] - 13:18, 17:22
**training** [2] - 16:3, 18:14
**transaction** [1] - 45:24
**TRANSCRIPT** [1] - 1:13
**transcript** [2] - 64:5, 64:6
**transferred** [5] - 54:10, 59:17, 60:12, 61:21, 62:22
**Treasury** [68] - 7:13, 7:17, 7:19, 8:1, 18:4, 30:9, 30:19, 30:21, 31:11, 31:15, 31:17, 31:18, 31:22, 31:25, 32:2, 32:4, 32:9, 32:10, 32:13, 32:25, 33:1, 34:11, 34:12, 34:21, 35:1, 35:6, 36:7, 36:11, 37:1, 37:3, 37:10, 37:16, 38:3, 38:10, 38:13, 38:15, 38:16, 38:19, 38:25, 39:16, 40:2, 40:5, 40:6, 40:21, 40:22, 40:25, 41:2, 41:6, 41:21, 41:22, 42:1, 42:12, 42:14, 42:18, 44:16, 45:6, 52:24, 57:18, 60:12, 61:7, 61:19, 61:22, 62:8, 62:11
**Treasury's** [4] - 36:4, 39:19, 41:14, 45:20
**trial** [2] - 51:18, 54:24
**TRIAL** [1] - 1:13
**true** [3] - 41:13, 64:4, 64:5
**trying** [1] - 13:15
**Tuesday** [1] - 7:14
**two** [21] - 9:21, 11:2, 13:2, 13:4, 14:6, 14:9, 14:15, 17:6, 20:2, 21:3, 22:10, 22:16, 36:17, 38:1, 43:25, 46:4, 52:22, 54:12,

60:14
**type** [3] - 17:21, 20:17, 50:5
**types** [1] - 35:10
**typical** [2] - 23:20, 34:4
**typically** [6] - 24:4, 27:21, 35:19, 46:10, 46:18, 56:12

## U

**U.S** [5] - 14:23, 15:1, 15:4, 18:6, 29:6
**ultimate** [1] - 31:17
**unchanged** [2] - 40:3, 40:25
**under** [3] - 8:13, 59:19, 61:19
**unintended** [2] - 60:25, 61:4
**union** [1] - 24:1
**UNITED** [2] - 1:1, 1:14
**united** [1] - 2:11
**United** [2] - 14:19, 64:13
**University** [4] - 11:20, 11:22, 11:23, 12:2
**university** [1] - 12:12
**unlimited** [1] - 45:2
**unprecedented** [5] - 46:2, 46:10, 46:12, 46:15, 47:2
**up** [19] - 8:4, 24:14, 24:15, 24:17, 26:16, 31:23, 32:2, 38:19, 38:20, 41:23, 42:13, 44:16, 45:18, 48:22, 54:5, 54:19, 56:17, 58:12, 62:4

## V

**valuation** [8] - 11:12, 12:10, 13:5, 13:6, 13:9, 16:11, 16:17, 16:22
**value** [11] - 13:13, 16:17, 16:21, 31:3, 31:15, 37:15, 38:20, 61:18, 61:21, 62:8, 62:11
**values** [1] - 35:1
**valuing** [1] - 13:17
**variety** [1] - 18:1
**various** [1] - 18:12
**VARMA** [1] - 2:5

**versus** [1] - 61:11
**video** [3] - 3:6, 4:10, 6:13
**videotaped** [1] - 6:16
**viewed** [1] - 20:12
**viewing** [1] - 38:5
**VINCENT** [1] - 1:17
**visiting** [4] - 11:4, 11:5, 12:1, 12:2
**voir** [1] - 18:22
**vs** [1] - 1:5

## W

**waiting** [1] - 4:25
**walk** [2] - 21:2, 35:14
**wants** [1] - 24:2
**Washington** [6] - 1:6, 1:19, 1:22, 2:9, 2:13, 64:14
**Wharton** [1] - 12:5
**whole** [4] - 29:11, 55:13, 57:16, 57:17
**WIERZBOWSKI** [1] - 2:2
**WITNESS** [1] - 6:23
**witness** [2] - 7:1, 49:6
**WITNESSES** [1] - 3:5
**witnesses** [1] - 18:13
**words** [1] - 20:19
**works** [2] - 35:16, 36:17
**world** [1] - 24:15
**worried** [1] - 40:23
**worth** [76] - 17:9, 17:15, 18:20, 19:12, 19:18, 19:23, 20:1, 20:3, 20:7, 20:9, 20:11, 20:20, 35:19, 35:20, 35:21, 35:24, 36:3, 36:5, 36:6, 36:21, 36:24, 36:25, 37:5, 37:23, 38:8, 38:9, 40:13, 43:17, 43:20, 44:11, 44:13, 45:4, 45:5, 45:17, 45:24, 46:2, 46:6, 46:7, 46:22, 48:11, 48:24, 51:5, 51:6, 51:9, 51:16, 51:17, 52:17, 52:22, 52:24, 52:25, 53:3, 53:7, 53:19, 54:17, 56:16, 57:9, 57:16, 57:20, 58:12, 59:17, 59:18, 60:5, 60:18, 60:24, 61:3, 61:4, 61:10, 61:11, 61:19, 61:25,

62:9, 62:20

## Y

**year** [5] - 11:25, 12:2, 59:18, 61:9, 62:5
**years** [9] - 10:24, 11:24, 12:4, 14:9, 16:19, 28:25, 45:10, 47:16, 62:4
**York** [3] - 1:21, 2:4
**yourself** [1] - 9:8

## Z

**zero** [7] - 45:10, 45:12, 45:13, 46:24, 46:25, 53:3, 53:7