1

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

2

Fairholme Funds, Inc., et al.,   ) Civil Action

3                                 ) No. 1:13-cv-01053-RCL
                  Plaintiffs,    )

4                                 )
vs.                              ) **Jury Trial (Day 6)**

5                                 ) **Afternoon Session**
Federal Housing Finance          )

6   Agency, et al.               ) Washington, D.C.
                                 ) **July 31, 2023**

7              Defendants.       ) Time:  1:30 p.m.
_____

8

In re Fannie Mae/Freddie Mac     ) Civil Action

9   Senior Preferred Stock        ) No. 1:13-mc-1288-RCL
Purchase Agreement Class         )

10  Action Litigations.          )
_____

11

**Transcript of Jury Trial (Day 6) Afternoon Session**

12              **Held Before**
**The Honorable Royce C. Lamberth**

13      **United States Senior District Judge**
_____

14

A P P E A R A N C E S

15

For the Fairholme Funds, Inc. Plaintiffs:

16              **Vincent J. Colatriano**
COOPER & KIRK, PLLC

17      1523 New Hampshire Avenue, Northwest
Washington, D.C. 20036

18

For the Defendant Federal Housing Finance Agency:

19              **Asim Varma**
**David B. Bergman**

20              **Ian S. Hoffman**
**R. Stanton Jones**

21              **Jonathan L. Stern**
ARNOLD & PORTER KAYE SCHOLER LLP

22      601 Massachusetts Avenue, Northwest
Washington, D.C. 20001

23

24

25

1          A P P E A R A N C E S (continued)

2    For the Class Plaintiffs:
                              **Hamish P. M. Hume**
3                             **Kenya Khalelah Davis**
                              BOIES SCHILLER FLEXNER LLP
4                             1401 New York Avenue, Northwest
                              Washington, D.C. 20005

5
                              **Robert Kravetz**
6                             **Adam H. Wierzbowski**
                              BERNSTEIN LITOWITZ BERGER & GROSSMANN
7                             LLP
                              1251 Avenue of the Americas
8                             New York, New York 10020

9                             **Caitlin Bozman**
                              BERNSTEIN LITOWITZ BERGER & GROSSMANN
10                            LLP
                              2121 Avenue of the Stars, Suite 2575
11                            Los Angeles, California 90067

12                            **Lee D. Rudy**
                              KESSLER TOPAZ MELTZER & CHECK
13                            280 King of Prussia Road
                              Radnor, Pennsylvania 19087

14   _____

15   Stenographic Official Court Reporter:
                              Nancy J. Meyer
16                            Registered Diplomate Reporter
                              Certified Realtime Reporter
17                            333 Constitution Avenue, Northwest
                              Washington, D.C. 20001
18                            202-354-3118

19   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.

20

21

22

23

24

25

1    **I N D E X**

2                                                              PAGE:

3    **Witnesses:**

4    Bala G. Dharan
          Direct Examination, Continued, By Mr. Kravetz.... 1155
5          Cross-Examination by Mr. Bergman ................ 1242

6

7    **Exhibits Admitted:**

8        Defendants' Exhibit 535.......................... 1276

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          P R O C E E D I N G S

2          (REPORTER'S NOTE:  The morning portion of the trial

3     was reported by Lisa Edwards, who prepared said transcript.)

4          (Proceedings held in the presence of the jury.)

5          THE COURT:  You may be seated.

6     All right.  Counsel, you may proceed.

7          MR. KRAVETZ:  Thank you, Your Honor.

8                DIRECT EXAMINATION, continued

9     BY MR. KRAVETZ:

10    Q.  Dr. Dharan, before the lunch break, we left off with your

11    first opinion, and now we're moving into your second opinion.

12    So just to reorient us, can you just describe to the members of

13    the jury what your second opinion is.

14    A.  Yes.  The second opinion is about the reasonable necessity.

15    So let me read out my opinion.  The net worth sweep was not

16    reasonably necessary to avoid insolvency or other significant

17    financial harm and was, thus, not something reasonable

18    shareholders could have expected.

19    Q.  When you're describing harm in the context of this opinion,

20    do you mean harm to Fannie, Freddie, and the secondary mortgage

21    market?

22    A.  Yes.

23    Q.  All right.  Now, you gave us a road map, an overall road

24    map.  Do you also have a road map for this portion of your --

25    for your second opinion?

1   A.  Yes, I do.  And this one I've written it down, unlike the

2   first one, which was relatively shorter.

3        So now the road map consisting of five items, and I'll

4   go through each of them in the next few minutes.

5        The first one is the one highlighted there.  I

6   talk about that first --

7        But very briefly, before getting into the details, let

8   me read out all five items of the road map.

9        So the first I'm going to look at the strong economic

10  fundamentals that existed at that time, in 2012, August of

11  2012, and the fact that Fannie and Freddie were on the path to

12  sustainable profit.  So that's the first thing I'll be talking

13  about.

14       I'll also -- the second I'll talk about is an accounting

15  item called deferred tax asset.  I'll call it DTA.  And then

16  I'm going to talk about how the prospect of that coming back to

17  the balance sheet is going to substantially increase the net

18  worth.  The first also increases the net worth.  The second

19  increases the net worth.

20       The third one I'll talk about the payment in kind, which

21  I discussed this morning, and also other alternatives to net

22  worth sweep that would address -- could have addressed any

23  remaining risk of circular draw, even beyond the first two,

24  which already take away the risk completely.

25       Then, finally, the fourth one I'll talk about is the

1    deficient process.  I'll talk about the process used by FHFA to

2    come -- come to the -- to arrive at the net worth sweep and

3    talk about how the process was deficient for a decision of this

4    magnitude.

5         And then lastly I'll talk about some other potential

6    harm that net worth sweep is going -- was -- was having on

7    Fannie Mae and Freddie Mac and the markets.

8    Q.  Let's start with the first step along your road map here.

9         That's entitled Strong Economic Fundamentals and

10   Sustainable Profits; is that correct?

11   A.  Yes.

12   Q.  All right.  Now, Dr. Dharan, in the first half of 2012, did

13   Fannie and Freddie start returning, in your opinion, to a

14   period of sustainable profitability?

15   A.  Yes.

16   Q.  All right.  Is that depicted -- starting to be depicted on

17   the first slide that we're viewing?

18   A.  Right.  The first slide I'm going to show is the condition

19   that they were in, the kind of profits they were already

20   starting to report in the first half of 2012.  You may recall,

21   Mr. Mayopoulos this morning, he wasn't sure if Fannie Mae made

22   profit in the first quarter or second quarter of 2012.  It's

23   been a long time, you know, several years, but I do have the

24   numbers on the screen.

25        They were profitable in the first quarter.  They made a

1    $3.1-billion profit.  In the second quarter, they made

2    $5.4 billion.  That's in the bottom half.  In the first

3    quarter, Freddie Mac made $1.8 billion, and in the second

4    quarter they made $2.9 billion.

5         And you can see that Fannie Mae covered the dividend --

6    cash dividend to Treasury completely in both quarters.

7    Freddie Mac fell short just by a little bit -- like, a hundred

8    million dollars or some amount below the 1.8 billion -- but

9    in the second quarter, Freddie Mac made significantly more --

10   more than a billion dollars more than the dividend owed to

11   Treasury.

12        So those were profits as they existed.  I'll also talk

13   about how the sustainable profitability data looked like.

14   Q.  And that term that you used in your slide and we also heard

15   that this morning, sustainable profitability, is that a

16   financial accounting term?

17   A.  It's a term used in accounting to refer to future profits

18   that are not just a one-time blip.

19   Q.  And when you refer to returning to sustainable

20   profitability, are you resting your opinion solely on the fact

21   that Fannie and Freddie had been profitable for one half of a

22   year?

23   A.  No.

24   Q.  Why not?

25   A.  So what I am doing is -- in addition to looking at the

1    first two quarters, which are obviously important, I also

2    looked at the housing market, the kind of information that was

3    going on around -- in August of 2012.  I looked at, for

4    example, the home price increases, the home sales had started

5    to improve.

6           I'll also mention after going through that in a couple

7    more slides, I'll come back and talk about the rest of the

8    items here, such as the fact that Fannie and Freddie were

9    finally getting rid of the pre-crisis high-risk loans that they

10   had made.  They were all running off their books.  And they

11   were getting better quality, high-quality, post-crisis loans on

12   their books.

13          I'll also mention that the main income source that I

14   mentioned for the two enterprises, g-fees, they were going up.

15   So that's other good news.  And then the credit risk was going

16   down at the same time, the losses from the loans.

17          So all these combined with the fact that Fannie and

18   Freddie are having a dominant market position by this time

19   meant that the profits they were reporting in the first two

20   quarters were not just one-time items.  They were sustainable

21   and growing profitability.

22   Q.  Dr. Dharan, as part of your review, did you consider the

23   overall economy and the housing market in or around the time of

24   August 2012?

25   A.  Yes, I did.

1  Q.  All right.  And why was that important?  Why was the

2  housing market important for you to review?

3  A.  Yes.  The housing market is a key determinant of Fannie Mae

4  and Freddie Mac's profitability.  The housing market did well.

5  They will do well because it determined the g-fees.  It

6  determined their credit losses.  Everything that you see on

7  this screen is a function of that.  So I wanted to look at

8  that.

9  Q.  And do you have a comparison of what changed in the housing

10  market between the time of the credit crisis and August 2012?

11  A.  Yes.

12      So this slide shows what the situation was during the

13  financial crisis.  That's the one on the left side, 2008, 2009.

14  And the right side shows how things had completely changed,

15  certainly changed for the better, by August 2012.

16      So the first item I have is home sales, by -- you know,

17  during the financial crisis, home sales were stagnant.  They

18  were often declining.  And by contrast, by August 12th --

19  August 2012, the home sales had started improving.  And that's

20  a big turnaround right there.

21      In addition, if you look at the second item there, the

22  home values -- these are the home prices.  As you know, the

23  credit financial crisis was all about falling home prices, but

24  by August 2012, the home prices had bottomed out by as early

25  as, like, February 2012.  And they were improving.  So by

 1    August 2012, we had three or four months of data on improving

 2    home values.

 3          And the financial crisis was mainly characterized by

 4    large credit losses for all the financial institutions,

 5    including Fannie and Freddie.  But by August 2012, both Fannie

 6    and Freddie were finding that the high-risk loans that they had

 7    made in 2008, '07, '06, and so on were getting smaller in

 8    percentage terms in their books.  They were running off.  And

 9    the new ones that are replacing them are higher-quality loans.

10    Q.  Now, to be clear, there's never any certainty in terms of

11    what direction home values will go; is that right?

12    A.  Right.  There's never a certainty, but these are trends

13    that they were seeing at the time.

14    Q.  And you were -- and when you say trends they were seeing,

15    did you see internal documents relating to what Fannie and

16    Freddie expected would happen in terms of home prices?

17    A.  Yes.

18    Q.  And -- but they --

19    A.  Not only was I observing it with my data, but I also see

20    the same reflected in Fannie and Freddie's internal data.

21    Q.  And what they expected -- did that ultimately come to

22    fruition?

23    A.  Yes.

24    Q.  Why, Dr. Dharan, were some of these structural housing

25    market changes important to Fannie and Freddie and their

1   financial picture as of August 2012?

2   A.  Well, I would say the main -- one of the main things

3   that are -- there are several things about importance of the

4   housing market.  But the most important thing I want to

5   highlight right now is the fact that when the housing market

6   does well, they have less losses, the credit loss.

7        The mortgages that they buy and hold are securitized.

8   They do better.  And the mortgages do better.  Finance really

9   do better.  So that's the main thing I wanted to talk about in

10  my next slide.

11  Q.  And is there an accounting entry that is associated with

12  credit losses relating to loans, in particular real estate

13  loans?

14  A.  Yes, there is.

15       So both Fannie and Freddie, as a matter of normal

16  accounting method that all companies use, they would make an

17  estimate of potentially how much loss are they going to have on

18  the mortgages and assets that they are guaranteeing or holding,

19  and they put that out in a reserve.  It's called a loan loss

20  reserve.  I have that in this picture on the -- on the

21  demonstrative here.

22       So the loans are either bought or securitized -- bought

23  and securitized by Fannie and Freddie, but they also -- every

24  quarter they take a look at the loans and make an estimate of

25  what do I need to set aside for the future regarding expected

1    losses, and that's called loan loss reserve.

2         You can think of it like a vault that they're putting

3    this in.  It's not real money.  So I don't want to give the

4    wrong impression there's real cash going into the vault, but

5    it's an accounting entry that gives an amount that they can use

6    against future actual losses.

7    Q.  So would it be fair to say that a loan loss reserve is a

8    write-down of loan assets?

9    A.  They're a temporary write-down.  If the loans do well,

10   they can write it up again, but they are a write-down at this

11   point.

12   Q.  And, generally, are loan loss reserves higher or lower

13   during a downturn in the economy?

14   A.  During a downturn, they definitely go up.  So you end up

15   with a higher loss loan reserve standing.  In 2008, everything

16   looks pretty terrible, and the loan loss reserves are going to

17   be bigger.  By 2012, you should see a difference; right?  So

18   they depend on the economy.

19   Q.  All right.  And, Dr. Dharan, what happens if loan losses

20   actually turn out to be lower than expected?

21   A.  Well, so if they -- the loan loss reserves -- again,

22   they're all estimated every quarter.  And then they're updated

23   and updated again every quarter; right?  So things have turned

24   around, and then by August 2012, you look at the same loans

25   that you were estimating high losses on earlier, and now those

1    loans are looking a lot better, perhaps; right?  So because the

2    economy is improved.

3         So if the loan losses turn out to be lower or less than

4    expected, then Fannie and Freddie would release those loan loss

5    reserves that they had held in that vault that I showed.  So

6    that release will add to profit.  So initially when they were

7    setting aside the losses -- loss reserve, profits go down.

8         But now they are releasing the loss reserves and the

9    profits would go up correspondingly.

10   Q.  And does the chart below list what would happen in -- in a

11   better economy than the chart above?

12   A.  Yes.  And it also shows how things were improving by

13   August 2012.

14   Q.  So in the bottom chart, they're taking less loan loss

15   reserves; correct?

16   A.  Right.

17   Q.  But it also says release of loan loss reserves.  Can you

18   describe that concept to the jury.

19   A.  Yes.  So the loan loss reserves is really reducing the

20   value of the loans on the balance sheet.  It's like a reserve

21   that I mentioned; accountants set aside as a mental accounting.

22   But when you release those reserves, they're added to the

23   income of that particular quarter when the release takes place.

24   So the release is actually adding to the profit.

25   Q.  And that's why there are four bricks of currency on the

1    bottom and only two on the top?

2    A.  Yes, I would think so.  Yes, exactly.

3    Q.  All right.  So, Dr. Dharan, have you reviewed Fannie's and

4    Freddie's credit losses during the beginning part of the

5    conservatorship through 2011?

6    A.  Well, yes.

7    Q.  Is that depicted on your next slide?

8    A.  Yes.  I have a diagram to show how things were and how

9    things changed during the period of conservators and also -- in

10   the 2012 and '13 and so forth.

11   Q.  And can you describe this -- this next slide for us.

12   A.  Okay.  So these are the first four years of the

13   conservatorship; keeping in mind that in 2008, Fannie and

14   Freddie entered conservatorship only in September.  Okay?  But

15   I have the whole-year number as reported on the financials.  So

16   there was a big credit loss of $28 billion -- I forgot to put a

17   B there.  But those are billions.  And then 73 billion in 2009.

18   Again, a loss of 25 billion, approximately, in 2010.  And

19   another loss of approximately 27 billion in 2011.  This is for

20   Fannie.

21        Similarly, for Freddie, 16 and, approximately, 30 and 17

22   and 11.  So when you add them up, they're a total credit loss

23   -- these are all loan loss reserves -- they're going into loan

24   loss reserves first and then they get used up -- of

25   $152 billion.  And for Freddie, that was $73.9 billion.  These

1    are put aside in the reserves, and then used up as loans go

2    bad.

3    Q.  So not actual cash losses, but they're put into this

4    accounting vault, so to speak?

5    A.  They're put into the accounting vault, and then when the

6    loans go sour, they're taken out of this vault.  If not,

7    they're sitting there to be used in the future.

8    Q.  Now, Dr. Dharan, does the next part of your demonstrative

9    include information about what happened in 2012 and 2013?

10   A.  Right.  So -- and I put them in green to show they really

11   have turned color and signed, and so -- by 2012, the loan loss

12   credit provision -- these are the annual provisions that Fannie

13   and Freddie were adding and then putting into the vault, those

14   are now positive for Fannie.  They were negative in 2012 for

15   Freddie and then became positive in 2012.  What this means is

16   that they're not anymore setting aside new reserves.

17        And that's the big difference.

18   Q.  Have you reviewed any internal Fannie and Freddie emails

19   referencing a change in credit losses early in 2012?

20   A.  Yes, I have.

21   Q.  And do you depict an example in your next slide?

22   A.  Yes, I have one slide on that.

23   Q.  And what is -- what is this document, Dr. Dharan, on the

24   slide?

25   A.  This document is an email sent to Mr. DeMarco at FHFA, but

1    it talks about the Fannie Mae's executive management meeting

2    Mr. Mayopoulos mentioned this morning.  The executives get

3    together.  It's called executive management meeting.  That

4    took place on January 9, but this email is dated January 12,

5    2012.

6    Q.  And why was this email -- why is this email important to

7    you in the context of what we've just been describing the

8    credit losses?

9    A.  Right.

10         This email is important because it's -- as early as

11   January 2012, the email already talks about the you inflection

12   point, the -- if I read the email, it says, "Susan said the

13   plan reflects the view that the company is at an inflection

14   point in the credit cycle with the loss allowance and

15   credit-related expenses projected to fall compared to 2011."

16   Just like what we were seeing in the earlier slide.

17         But what is interesting is that this is happening as

18   early as January 2012 that they are seeing a change of

19   direction, what Susan here refers to Ms. -- this chief

20   financial officer, McFarland.  And she's saying that it's an

21   inflection point in their credit cycle.

22   Q.  And did you review any testimony from Ms. McFarland that

23   was relevant to this point?

24   A.  Yes, I did.

25   Q.  Is that in your next slide?

1   A.  Yes, it is.

2   Q.  And why did you choose this portion of Ms. McFarland's

3   testimony for the jury?

4   A.  Yes.  If I remember right, she was asked about this

5   inflection point, and so she's describing, you know, why this

6   is an inflection point; and I like the concept of a double

7   tailwinds that she's using here.  So it really explains what's

8   going on.

9        First of all, she's saying something good is happening

10  with respect to the charge-off.  So that's something good

11  happening with new provisions.  So there are two tailwinds

12  she's describing.

13  Q.  And I think that's a new term, charge-off.  So what does it

14  mean to charge off a loan?

15  A.  So this actual -- charge-offs are -- remember I mentioned

16  earlier that management always anticipates loan losses and

17  sets them aside in a little vault.  But when the actual

18  charge-off happens, meaning you're going to get a phone call

19  saying this particular homeowner is going to default or they

20  already filed the papers saying they're not going to be paying

21  any more on their mortgage -- so those are actual -- actual

22  defaults.

23       So when that happens, that's -- that's taken out of the

24  vault also.

25  Q.  That's an actual loss?

1   A.  Actual loss.

2        And that is going down.  She says the actual charge-off

3   would begin to be lower than what they were in the earlier

4   periods, and then in addition, the new allowance that they're

5   building for future losses, they are also going down, which

6   means new expenses reported that year are also smaller.

7   Q.  Did you also analyze any internal emails from FHFA that

8   were relevant to your analysis of credit losses?

9   A.  Yes, I did.

10  Q.  And, Dr. Dharan, can you describe for us the next email

11  that's on your slide presentation.

12  A.  Yes.  So this email is dated May 29, 2012.  So we are moved

13  forward now four months.  We are at the end of May, almost

14  five months, and all the parties that are mentioned here,

15  Mr. -- the to and the copy, cc, they're all, I understand,

16  accountants at FHFA.  Mr. Satriano, he's an accountant.  And

17  the other two, I believe, are also accountants.

18        And maybe the from is also.

19        So these are accountants talking to each other, and so I

20  thought since it's at the end of May, it's very relevant.

21  Q.  And there's a reference to Fannie Mae's forecast showing an

22  upward price curve beginning after 2012.  What's your

23  understanding of what that means?

24  A.  There -- my understanding is they're referring to the home

25  price curve.  The home prices are going up.  That's an upward

1    price curve that -- that is happening during this period.   This

2    is actually Fannie Mae's forecast showing an upward price

3    curve.

4          And that's what they're referring --

5    Q.   There's also a reference to drawing down their

6    approximately 70 billion ALL and 03-3 loans.

7    A.   Yes.

8    Q.   Can you translate that for us.

9    A.   Yeah.   These are all -- this is how we accountants talk.

10   So this is our normal conversation style here.

11   Q.   Okay.   Lead us in.

12   A.   Yes.   So the ALL refers to allowance for loan loss.   And

13   that's basically the vault that I was showing in my diagram

14   earlier.   So that's where all the loan loss reserves are going

15   in.   They are about $70 billion -- I think it's, like,

16   72 billion at the time -- and that's going down.   That's --

17   they're going to be starting to draw down on that; meaning they

18   don't need as much as they thought they would need so they're

19   reducing that.   They're going to reduce that amount.

20          This is all forecast.   So they're going to reduce that

21   amount.   That's the first thing they're talking about.

22          Remember, when they reduce the loan loss provisions,

23   that's going to add to profit in that quarter when you take it

24   out of the vault.

25   Q.   And what's the conclusion of the writer of the email?

1    A.  The conclusion of?

2    Q.  What's the conclusion of the person who wrote the email

3    when you combine the upward price curve along with drawing down

4    on the ALL?

5    A.  Got it.

6         And I think overall what they're saying -- and they have

7    this phrase here -- that we would not be surprised if

8    Fannie Mae begins roaring recovery.  That's the main phrase

9    they are using, and I think they're talking about the roaring

10   recovery in the profits of these companies -- of this company.

11   Q.  Now, Dr. Dharan, did you also review internal documents

12   from Fannie and Freddie suggesting that the loss allowance had

13   reached its peak in late 2011?

14   A.  Yes, I did.  So this loss loan that we see on this

15   screen is shown in a graph in the next slide that I'm going to

16   show.

17   Q.  All right.  And this is dated from a presentation on

18   March 5th of 2012?

19   A.  Yes.

20   Q.  All right.  And what is this graph from the presentation

21   depicting?

22   A.  So this is showing the size of the loan loss allowance

23   that -- the amount of the accounting money that I mentioned

24   that is in the vault.  And you can see there's a peak at the

25   end of, maybe, February 2012 of -- sorry.  At the end of

1    quarter four 2011 of about $75.3 billion.  I mentioned 72

2    earlier.  It's actually $75 billion.

3            And it is showing -- everything on the right of the

4    vertical line are forecasts.  They're not actuals.  Okay?  So

5    they're sitting in March and then forecasting the future, and

6    they're saying that that provision is going to come down from

7    75 billion to as much as maybe $30 billion.

8            Some of it is coming down because they're going to have

9    real actual losses, and the rest of it is coming down because

10   they are taking out the loan loss provision that they don't

11   need anymore.

12   Q.  And some of that would be converted to profits?

13   A.  That second part of it will be converted to profit.

14   Q.  Dr. Dharan, have you also reviewed actual loan data as of

15   the end of the second quarter 2012; that is, as of June 30,

16   2012?

17   A.  Yes, I did.

18   Q.  And does that loan data reflect whether the quality of

19   Fannie Mae's loan portfolio had improved?

20   A.  Yes.

21   Q.  All right.  And before we get into the -- the graph that's

22   on the screen, I wanted to ask you about the concept of loan

23   vintages.  We heard a little bit about that this morning.

24   A.  Yes.

25   Q.  What are loan vintages?

1    A.  Yes.  As we heard on the clip this morning, I think it was

2    also Mr. Mayopoulos, a vintage is in the -- refers to the year

3    of the loan.  So if the loan was made -- if the mortgage was

4    made in, say, 2005 -- and typically Fannie and Freddie would

5    buy it pretty quickly after that.  So let's say it's a

6    2005-acquired loan, that would be called a 2005 vintage.

7         And so here on -- on this chart, you see loan vintages

8    shown in three groups based on that concept.

9    Q.  And what are the three groups that are shown on this

10   chart?

11   A.  So we have the -- the first one in -- in yellow is 2004 and

12   earlier.  Because that's before the financial crisis.

13        2005 to 2008 is the second one.  Although 2005 was not

14   really financial crisis, the housing market was in a bubble,

15   and a lot of loans written at the time were considered not as

16   good.  So let's group 2005 to 2008.  And then finally -- and

17   this is how they had grouped it.

18        And then finally 2009 to the second quarter of 2012.

19   Q.  What does this data tell you of the -- the state of

20   Fannie Mae's loan portfolio as of the second quarter 2012?

21   A.  Yeah.  It's a very nice chart in terms of lot of data, but

22   nicely summarizing here.  There are two things -- two takeaways

23   on this.  Number one is the -- the one in blue, those are the

24   good loans.  These are the high-quality loans that we bought --

25   that they bought -- Fannie bought in 2009 and beyond:  2009,

1    '10, '11, and '12.

2         That's a big chunk.  That's like 58 percent of their

3    total loan portfolio.  This is both the mortgages that they

4    have securitized and the loans that they are holding.  And

5    the takeaway is that that's a big one.

6         The other one from 2005 to 2008 is pretty small now,

7    only 26 percent.  And 2004 and earlier is also pretty small.

8         The second takeaway I want to note is the losses.  Over

9    the total loss of that 2012, only 4.2 percent is coming from

10   these high-quality loans, and 85 percent is coming from this

11   loan portfolio that is shrinking and going away, hopefully,

12   over time.

13        So that -- those are the two takeaways.

14        When you put them together, that means the profits in

15   the future will be sustainable.

16   Q.  And so 58 percent of the loan portfolio as of second

17   quarter 2012 represents only 4 percent of the losses; is that

18   right?

19   A.  Only 4 percent of the losses in 2012 Q2 were coming from

20   that 58 percent of the loans.

21   Q.  And just in terms of the graph, would you expect the blue

22   portion to grow over time in terms of the overall composition

23   of the loan portfolio?

24   A.  Yes.  Of course, the blue portfolio will also extend over

25   time.  And right now it says Q2 2012.  It will become, you

1    know, Q3 2012 and so on, but the other ones are going to shrink

2    on their own because those are getting paid off and they're

3    going to run off.  If they don't get paid off, they are written

4    off.

5         So those two are going to go down and this other -- the

6    blue one will keep growing bigger.

7    Q.  And are you aware, do loans generally suffer credit losses

8    earlier or later in the credit cycle of a loan?

9    A.  That's an interesting question.  I think they typically

10   suffer the losses earlier, and -- because that's when the

11   market size is big and the home prices still -- we just bought

12   the home so maybe it's still the same price.  So there's a

13   higher risk of potential default at that time, big mortgage on

14   a house.

15   Q.  And when you say "big mortgage," do you mean that there's

16   more principal in terms of a percentage of the loan at the

17   beginning of a mortgage?

18   A.  Yeah, exactly.  So if I -- if somebody took a $200,000

19   mortgage, you know, in 2012, that's a brand-new mortgage.  But

20   if they held the house for ten years, the mortgage is getting

21   paid off and the loan gets smaller and smaller.  And that makes

22   it less and less likely that they will default.

23   Q.  Now, Dr. Dharan, earlier you described that guarantee fees

24   or g-fees are one of the major sources of Fannie's and

25   Freddie's profitability; is that correct?

```
 1    A.  Yes.

 2    Q.  Are you aware as to whether Fannie and Freddie's g-fees

 3    were rising or falling in 2012 -- 2012?

 4    A.  They were rising.

 5    Q.  And can you give us some extent to the degree at which they

 6    were rising?

 7    A.  Yes.  From -- they certainly rose from 2011 to 2012.  Some

 8    of it didn't -- they were not -- they were not keeping it, but

 9    generally they were rising.  About 27 percent for that year.

10    And then in August of 2012, they were going to be -- there was

11    already an announcement that they would be rising by another 10

12    basis points.  You remember the basis-point concept that

13    Professor Thakor talked about.  Hundred basis points is like 1

14    percentage point.  So 10-basis-point increase was being --

15    being talked about and going to be done, and this was -- as

16    early as August, this had been announced.

17    Q.  And do you recall when that actually was announced, the

18    additional increase in g-fees?

19    A.  Sometime around August 8 or some date like that.  Before

20    the third amendment.  Before the net worth sweep.

21    Q.  And you touched on this earlier, but what -- is there a

22    relationship between lower credit losses and g-fees that are

23    paid by the banks to Fannie and Freddie?

24    A.  Yeah.  I think, essentially, they work together.  So I have

25    a slide to show that on the next slide.  So what's happening is
```

1   that in 2012, where we are August of 2012, the g-fees are going

2   up and they're expected to go up.  And the credit losses were

3   going down as we saw in the earlier slides.  There's a

4   connection that you asked about, which it's easier to explain

5   from the slide.

6        The g-fees are set -- I think I mentioned this

7   earlier -- in order to cover the credit losses that Fannie and

8   Freddie expect will happen, plus some margin that they need to

9   make also, plus to cover other operating costs; right?  So --

10  but here what's going on is that the g-fees are going up, but

11  the credit losses that they were anticipating, they're going

12  down.

13       So that's combining to create a higher profit in 2012

14  and beyond.

15  Q.  Dr. Dharan, did you also examine whether the Fannie and

16  Freddie's share of MBS that was issued increased or decreased

17  during the period of the conservatorship?

18  A.  The overall market share was increasing quite a bit.  It

19  was -- I have a chart to show that -- and so I can use this to

20  explain the market shares.  If you look at 2006 -- which is

21  where I start with -- this is before the financial crisis,

22  Fannie and Freddie only had 45 percent of the mortgage --

23  secondary mortgage market.  There were other companies, other

24  banks, all kinds of other institutional players that were also

25  buying mortgages and securitizing them.  Fannie and Freddie

1   were only 45 percent.

2        But during the financial crisis, all these other

3   companies, they left the business.  Many of them completely

4   went out of business, and many of them simply decided it was

5   too -- too much for them to handle.

6        So Fannie and Freddie stepped in.  They got 95 percent

7   of the market at the time.  That -- the bigger the market means

8   the more opportunity to charge g-fees and collect.  So that's

9   the reason I wanted to show this.

10       And by 2012, August, their market share was 97 percent.

11  Q.  And does that also lead to greater income?

12  A.  Exactly.  So 97 percent market, g-fees you pay on that, so

13  you get higher revenues and, therefore, higher profits.

14  Q.  And any indication at this time that even though g-fees had

15  been increased, that -- that even though g-fees had been

16  increased, that banks were selling less loans to FHFA -- or to

17  Fannie and Freddie?

18  A.  No.  I see the 97 percent market share on that.

19  Q.  There have been some references to shrinking the GSEs.  Had

20  the GS- -- had the -- the g-fee market shrunk by mid-2012?

21  A.  The g-fee market is expanding.  And the reference you're

22  talking about is for the retained portfolio.

23  Q.  And we'll talk about that in a few minutes.

24  A.  Okay.

25  Q.  All right.  Now, you mentioned -- you mentioned the

1   retained portfolio.  What's your understanding of the reduction

2   in -- that was supposed to occur in Fannie and Freddie's

3   retained portfolio?

4   A.  So before the third amendment already -- in one the

5   previous amendments, the retained portfolio that I described

6   earlier, you see loans and the MBS securities that Fannie and

7   Freddie are holding on their own, in their own balance sheet,

8   that was slated to go down at the rate of 10 percent every year

9   for -- until they reached a minimum of $250 billion.

10       So they were told to reduce that as part of the -- one

11  of the earlier PSPAs; right?  The third amendment is going to

12  speed that up to 15 percent.  So there's a speed-up of -- a

13  little bit of a speed-up of a reduction in the retained

14  portfolio.

15       That's your question, I think?

16  Q.  Yes.

17       And do you have an understanding as to whether that

18  reduction in the retained portfolio actually had an impact on

19  Fannie and Freddie's profits?

20  A.  Yes, I do.

21  Q.  What is that?

22  A.  So, obviously, if you reduce the retained portfolio, you're

23  going to get less investment income from the retained

24  portfolio; right?  But on the other hand, what is going on is

25  that the g-fees had gone up and the overall market share of

1    Fannie and Freddie of these security issuances has gone up.

2    And, in other words, there's like a book of business on the

3    security -- market securities had either increased or

4    stabilized at a large number.

5         So it turns out when you combine the two, the g-fees

6    went up, income from retained portfolio went down.  But,

7    overall, Fannie and Freddie were able to make up for the loss

8    of retained portfolio income with the g-fees.

9    Q.  And do you have a slide depicting what Fannie Mae told the

10   public was occurring in terms of that relationship between

11   g-fees and the retained portfolio?

12   A.  Yes, I do.

13   Q.  Okay.  And what is on your -- on the slide on the screen,

14   Dr. Dharan?

15   A.  Yes.  So these are some excerpts from the annual report

16   that Fannie Mae filed with the SEC.  This is also sometimes

17   known as 10-K.  This is for the year 2012.  And it says:  We

18   expect rising guaranty fee revenue will, in a number of years,

19   become the primary source of revenue because the, you know,

20   retained portfolio is going down.  So it says -- they're

21   saying particularly as we reduce the size of our market

22   portfolio.

23        But then combining the two, they go on to say that, in

24   the second highlight that I have on the screen:  We expect that

25   these declines in our revenues -- from the decline in the

1    market portfolio income -- will generally be offset by rising

2    guaranty fee revenue.  So they're saying one is going down but

3    the other is going up and making up for the first one.

4    Q.  Now, Dr. Dharan, I think you referenced earlier that --

5    that GSE executives also referred to the fact that the

6    companies had reached or were reaching sustained profitability;

7    is that correct?

8    A.  That's correct.  That's correct.

9    Q.  And were you present today to hear the testimony of

10   Mr. Mayopoulos, the former CEO of Fannie Mae?

11   A.  Yes.

12   Q.  And what do you recall by Mr. Mayopoulos saying about

13   sustainable profitability?

14   A.  I think he said the same thing that -- they were reaching a

15   sustainable profitability by the middle of 2012.

16   Q.  Did you also -- and just to -- for frame of reference, what

17   is the significance of that, again, from an accounting

18   standpoint?

19   A.  Well, it's very important for many accounting decisions

20   companies make to know whether the profits are just a one-time

21   item or more sustainable.  If they're more sustainable, then

22   they're allowed to recognize the value of some assets.  For

23   example, the item I'm going to discuss next called deferred tax

24   asset, that only has value when you have sustainable

25   profitability.  Otherwise, you need to write that down to maybe

1     even zero.

2          And so it is an important idea and important concept

3     that accountants look for in deciding how much to value or

4     whether to even put a value at all on some assets.  In our

5     case, that would be the differed tax asset.

6     Q.  And does your next slide refer to a similar statement from

7     Ms. McFarland about sustained profitability?

8     A.  Yes, it does.

9     Q.  All right.  And what did you choose to highlight in terms

10    of Ms. McFarland's testimony?

11    A.  Yes.  Well, Ms. McFarland is the chief financial officer of

12    Fannie Mae.  She had -- I know looking at -- reading from her

13    deposition, I understand she was previously an auditor for

14    Deloitte.  And then they worked at several banks -- mBank and

15    two or three other banks -- and then Capital One she was -- you

16    know, chief accounting officer at Capital One and then chief

17    financial here.  So she has a financial institution practice

18    background, both as an accountant and executive.

19          So I thought her opinion was relevant.

20    Q.  Her background is relevant to you?

21    A.  Her background is relevant, I should say.

22    Q.  Why is that?

23    A.  Because this is an accounting concept and she's describing

24    an accounting idea.

25    Q.  Now, have you reviewed any documents from -- from Freddie

1    Mac that are also relevant to this concept of sustainable

2    profitability?

3    A.  Yes, I did.

4    Q.  And is there an example on your next slide?

5    A.  Yes.

6    Q.  All right.  And, Dr. Dharan, just for the record, is this

7    Plaintiffs' Exhibit 228?

8    A.  Okay.

9    Q.  Well, I'm asking you on your slide.

10   A.  Yes.

11   Q.  Okay.

12   A.  Sorry.

13   Q.  All right.  So this particular excerpt that you've chosen

14   for the jury, you've highlighted certain items on the -- on the

15   document?

16   A.  Yes.

17   Q.  All right.  And why were the highlights important to you?

18   A.  Right.  Well, I -- this -- this highlights that I have

19   really talked to the same concept that I was describing -- in

20   this first part of my road map about home values and home

21   prices are going up and great losses are going down and overall

22   they're adding up to higher profits.

23       So this is really summarizing that from Mr. Kari's point

24   of view.  So he's providing this in the minutes of meeting on

25   August 6, 2012, and for the second quarter of Freddie Mac's

 1   financial statements.

 2   Q.  Is that similar information that you've been describing

 3   over the past few minutes?

 4   A.  It is very similar.  For example, he's talking about

 5   substantial improvement in house prices.  That's what we've

 6   been looking at in earlier slides, in one of the summary slides

 7   I had on financial crisis versus August 2012.

 8        He's talking about a significant reduction in the

 9   provision for loan losses.  We had that in the diagram also

10   showing how that was improving in 2012.

11        He's talking about how the comprehensive income exceeded

12   the dividend payment to the Treasury in the second quarter

13   resulting in no need for a draw request -- Treasury draw

14   request for the quarter.

15   Q.  All right.  And do you have one more document that you've

16   relied upon in this particular section?

17   A.  Yes, I have one -- one other document.

18   Q.  Okay.  And this is PX-205, sir?

19   A.  Right.

20   Q.  All right.  And what's your understanding of -- of this

21   document, Dr. Dharan?

22   A.  So this document is written to a Treasury official called

23   Mary Miller by -- and written by another Treasury high-ranking

24   official.  These are all high-ranking officials in the

25   Department of Treasury.  If I remember, Mary Miller was, like,

 1    the deputy -- assistant secretary of Treasury or something.

 2            And the memo is summarizing a meeting that Mr. DeMarco

 3    had with the Treasury secretary, Mr. Tim Geithner.  And so,

 4    again, this is a summary of the meeting by Michael Stegman.

 5    And I wanted to highlight what this memo says about the --

 6    the -- the profitability of Fannie and Freddie at that time.

 7    Q.  And what is Mr. DeMarco reported to have said that is

 8    relevant to your opinion?

 9    A.  Right.  According to this memo, Mr. DeMarco is reported to

10    have said that the GSEs will be generating large revenues over

11    the coming years.  So this is future-oriented, thereby enabling

12    them to pay the 10 percent annual dividend well into the

13    future, even with the caps.  So those -- that's, essentially,

14    talking about sustainable profitability as well.

15    Q.  All right.  And, Dr. Dharan, we've gone to the end of the

16    first stage of the road map here.

17    A.  Right.

18    Q.  But can you just give a brief summary in terms of the

19    sustainable profitability as of August 2012.

20    A.  Right.  This whole part of this road map step is all about

21    profitability and home values stabilizing.  I just wanted to

22    summarize all the things we've seen in the last few minutes.

23    Home sales improving, home prices improving.  The high-risk

24    loans are running off.  Low-risk loans are getting bigger and

25    bigger.  High-quality loans.  G-fees are increasing.  Credit

1    risk is decreasing.  And Fannie and Freddie have growing market

2    share.  When you combine these, you get sustainable and growing

3    profitability.

4    Q.  All right.  Now, you've previewed a few times this concept

5    of the deferred tax assets or the DTAs?

6    A.  Right.

7    Q.  And so I'll ask you next if you can just try your best to

8    describe for us what is a deferred tax asset from an accounting

9    standpoint.

10   A.  Absolutely.  I know it's after lunch, so this is not the

11   best time to teach, I don't think, but that's how it is.

12        All right.  So I'll keep it really brief and exciting,

13   but, you know, again, in terms of the road map, we already

14   talked about the buildup in net worth coming from sustainable

15   profits.  So that's already there.  We are adding an additional

16   element to the buildup in net worth.  So that's the reason to

17   talk about this.

18        And the way this is going to help net worth is in two

19   steps.  So let's talk about the first step.  The first step has

20   already happened.  But before that I'm going to quickly

21   describe in one line what deferred tax asset is.  And it's

22   basically a tax benefit that can be used to reduce future tax

23   payments.  That's really the best way to think about it.  The

24   government allows companies like Fannie and Freddie when they

25   have losses to use those losses as a credit in the future when

1    they make money.  So that loss, therefore, has actually some

2    value; right?  So that's the deferred tax asset.

3    Q.  So we talked about before loan loss reserves and this -- in

4    the context of write-downs and write-ups.

5    A.  Right.

6    Q.  Is the same thing true with respect to a deferred tax

7    asset?

8    A.  Exactly.  So the -- the only way that deferred tax asset

9    has value to the company is when they make future profits.

10        So if you think you're going to make sustainable future

11   profits, then the deferred tax asset has value because I know I

12   can use it to deduct in the future; right?  But if I don't make

13   profits, then I can't use this asset.  Okay?  So that's all --

14   it's as simple as that.  So you write down the deferred tax

15   asset if the company's financial projections do not show enough

16   future profits.

17        And then later on if you think you're going to make

18   sustainable profits or once the projections show that, you then

19   must write it up.  That's the second part of it.

20   Q.  And so prior to the financial crisis and the imposition of

21   the conservatorship, did Fannie and Freddie have deferred tax

22   assets?

23   A.  They did.

24   Q.  All right.  And what happened as a result of the financial

25   crisis?

1  A.  So as a result of the financial crisis, once they started

2  reporting these big losses, their company's financial

3  projections were not showing sustainable profit at the time so

4  they wrote down the deferred tax asset, which meant a big loss

5  in the financial statements.  And that big loss meant big drop

6  in the net worth, and that's why they had to draw from Treasury

7  to fill that hole; right?

8       And now the -- 2012 things have changed.

9  Q.  And when you say a loss, is it an accounting loss or a cash

10 loss?

11 A.  These are accounting losses.  These are not cash losses.

12 Q.  And even though they've been written down, just like

13 with the loan loss reserves, can they be written back up

14 again?

15 A.  Yes.

16 Q.  All right.  Now, do you have a sense, Dr. Dharan, as to

17 what the value of the deferred tax assets for Fannie and

18 Freddie potentially were as of 2012?

19 A.  Yes.

20 Q.  Is that on your next slide?

21 A.  Yes.  There is, yes.

22 Q.  All right.

23 A.  Again, with some caveats.  So this is based on 2011

24 numbers.  So December 2011 annual report.  So I have that in

25 the footnote there.  They don't have to disclose this every

1   quarter, but they do disclose it in -- in a footnote in the

2   2011 10-K.

3           I mention 10-K means annual report, and so these are

4   annual numbers.

5           So at the end of 2011, they had 64.1 billion of

6   write-down.  The technical name for that is valuation

7   allowance, but I'm just going to say write-down for, you know,

8   simplicity; but they're really called valuation allowance.

9           And Freddie Mac had a 35.7-billion write-down.  Adding

10  up total to $99.8 billion.  And this is up to -- I call it

11  up to because not all of this is going to reverse, and some it

12  of might be used up.  There are a lot of things happening

13  there.

14          But as they're reversed in the future, when it becomes

15  sustainably profitable, this is going to add to the net worth.

16  That's why I wanted to use these as my second step in the road

17  map.  So not only am I getting net worth increase from

18  sustainable profitability, but I'm also getting it because the

19  DTA is going to reverse when profits are sustainable.  That

20  could add up to 98 -- 99.8 billion into the net worth.  It's

21  probably going to be smaller, but I just want -- giving the

22  data from 2011.

23  Q.  And do you recall any trial testimony regarding restoring

24  some portion of Fannie Mae's deferred tax asset?

25  A.  Yes.

1   Q.  From whom?  Which executive from Fannie Mae?

2   A.  This is -- I think Ms. McFarland, the CFO.

3   Q.  And what do you recall from Ms. McFarland's testimony?

4   A.  What I recall is that she -- she says that she told the

5   Treasury that -- I think by mid-2013, she was expecting the

6   DTA -- this is 64 billion, but she was expecting this to

7   reverse and to come back to the balance sheet by mid-2013.  And

8   she was estimating $50 billion to come back to the balance

9   sheet.

10  Q.  And, Dr. Dharan, have you also reviewed any internal FHFA

11  emails relevant to the DTA issue?

12  A.  Yes.

13  Q.  All right.  And do you have one on your next slide?

14  A.  Yes.

15  Q.  All right.  And, Dr. Dharan, can you tell us what we're

16  looking at here on your next slide.

17  A.  Yes.  So this is the -- this is an email involving, again,

18  two FHFA accountants.  I mentioned earlier Mr. Satriano is an

19  accountant, and Mr. Griffin is also an accountant at FHFA.  And

20  so the email is dated August 14, 2012.  And it talks about the

21  two boards.  The boards here are the board of directors of

22  Fannie Mae and Freddie Mac.  And the email says -- according to

23  the email, Jeff indicated that both of the boards had discussed

24  this at the last meeting based on the view that they were going

25  to be profitable going forward.

```
 1            And that's why I wanted to use this to show the
 2      profitabilities expected to be sustainable, and as a result,
 3      they were -- the boards were discussing rerecording deferred
 4      tax assets that had been previously written off, which means
 5      they would come back to the balance sheet and add to the net
 6      worth.
 7      Q.  And, Dr. Dharan, what is the date of this email,
 8      Plaintiffs' Exhibit 259?
 9      A.  Yes.  It's dated August 14, 2012.
10      Q.  And can you remind us of the date of the net worth sweep?
11      A.  I think it's August 17th, 2012.
12      Q.  So three days beforehand?
13      A.  Three days before.
14      Q.  All right.  And just as you did with respect to loan loss
15      reserves, have you reviewed the write-downs and the write-ups
16      of the DTAs of Fannie Mae and Freddie Mac?
17      A.  Yes, I have.
18      Q.  And is that included on your next slide?
19      A.  Yes.
20      Q.  Okay.  All right.  Dr. Dharan, can you describe to us what
21      we're viewing here on the first part of your slide regarding
22      the deferred tax asset.
23      A.  Right.  So these four years that I have, just like I had
24      earlier with the credit loss table, so these are the time
25      periods before the third amendment, and so the first four years
```

 1   of the conservatorship.  Once again, keeping in mind that 2008,

 2   September, was when the enterprises entered into

 3   conservatorship.  Okay?  But I had the whole-year number.

 4        So these add up to -- these four -- all the negative

 5   numbers you see, these are all in parentheses, that means

 6   they're negative.  Again, they're all billions, although,

 7   again, the -- we forgot to put the B there.  So these are

 8   billions of dollars adding up to $64 billion -- 64.1, which I

 9   showed earlier of DTA write-off for Fannie Mae, and

10   35.7-billion write-off for Freddie Mac.

11   Q.  All right.  And in the next portion of the diagram, does it

12   depict what happened in 2012 and 2013?

13   A.  Right.  Primarily 2013, but I also wanted to include 2012.

14   2012, some of the DTA came back, not for reasons that are

15   relevant for our discussion, but some of it came back.  But

16   almost all of it, basically, came back to the balance sheet in

17   2013 for the -- in the case of Fannie Mae and Freddie Mac.  And

18   that's why you see -- plus 58.4.  That was 2013 for Fannie Mae,

19   and plus 31.7, 2013.  This is all billions again.

20        And, again, when they come back to the balance sheet,

21   that means the net worth has gone up by that much.  That's what

22   really coming back to the balance sheet means.

23   Q.  So for Freddie Mac, the entirety of the write-down came

24   back as a write-up?

25   A.  Yes.  To the balance sheet.

1  Q.  And for Fannie Mae, almost all but -- is that $500 million

2  came back?

3  A.  That is correct.

4  Q.  All right.  Have you also calculated what the final impact

5  on net worth was as of 2013?

6  A.  Yes.

7  Q.  And why is -- before you give us the numbers, why is there

8  a difference between what is restored to the balance sheet

9  versus the actual net worth?

10  A.  Well, they're usually the same, but there's some reasons

11  why they could be different, because some of them -- again,

12  these are mainly technical accounting reasons, such as we

13  get -- some of the DTA gets used up or some of it gets

14  revised.  But, in addition, the 2013 number that I'm showing on

15  the screen is for the entire year.  The one I'm showing on

16  the -- in blue is the impact just in the first quarter of 2013.

17  That's the 50.6 billion.

18        So that's the first time they decided to bring back the

19  bulk, if not, all of the DTA back to the balance sheet.  And

20  that's 50.6 billion for Fannie Mae.

21        And then the same thing happened with Freddie Mac in the

22  third quarter of 2013, and that was 23.9 billion.

23  Q.  And as a result of the net worth sweep, what happened with

24  respect to that $74.5 billion in net worth?

25  A.  Right.  So if you add the two, that's 74.5 billion.  All

1     of that is swept up and paid off as cash dividend to the

2     Treasury.

3     Q.  You testified that Ms. McFarland indicated that the DTA may

4     be released in mid-2013 and that it would be approximately

5     $50 billion; is that correct?

6     A.  That's correct.

7     Q.  Was she right?

8     A.  Yeah, she was right.  She got the number exactly right.

9     The 50 billion is what happened in the 2013 Q1.  She was

10    expecting by the middle of 2013.  It happened a little earlier,

11    in the first quarter of 2013.

12    Q.  How would you assess her performance?

13    A.  Very good.  I think she got that right.

14    Q.  Now, Dr. Dharan, adding this concept of the release of the

15    DTA on top of sustainable profitability, what does it tell you

16    in terms of the state of Fannie Mae and Freddie Mac as of

17    August 2012?

18    A.  Well, they were both building up the net worth.  So the

19    good news is sustainable profitability means more net worth.

20    Release of loss reserves adding up the net worth through the

21    profits, increased g-fees adding up to the net worth, again,

22    through the profit.  And now the second item I'm discussing

23    here, which is the DTA write-up, is also adding a significant,

24    substantial -- maybe I can even use the word huge -- amount to

25    the net worth.

1   Q.  What, if anything, did the conditions depicted on this

2   slide tell you about the foreseeability of whether the GSEs

3   would make the profits that they ended up making?

4   A.  Well, it certainly means that there was no need for

5   circular draw because the whole point of circular draw that we

6   discussed earlier in the draft is if the net worth is negative,

7   then, and only then, you end up with a circular draw.  You have

8   to take from Treasury draw in order to pay the cash dividend to

9   the Treasury.  You don't have to do that when you have net

10  worth.  And here we're talking about huge build-up in net

11  worth.  So there's no need for circular draw.

12  Q.  All right.  Dr. Dharan, in addition to the actual results

13  as of August of 2012 and what happened in terms of the release

14  of the DTA, have you also reviewed certain internal projections

15  from Fannie Mae and Freddie Mac regarding whether the -- they

16  expected the Treasury caps to materially erode in the future

17  once set?

18  A.  Yes, I have.

19  Q.  What's your answer?

20  A.  Yes.

21  Q.  Okay.  And that was for both Fannie Mae and Freddie Mac?

22  A.  Yes.

23  Q.  All right.  Let's start with Fannie.  Have you reviewed

24  certain documents from Fannie Mae providing a longer-term

25  projection regarding the availability of -- availability of

1    funding estimated to be left at Fannie and Freddie at the end

2    of a ten-year period?

3    A.  Yes, I have.

4    Q.  Okay.  And do you have a slide that depicts the conclusion

5    of those projections?

6    A.  Yes.

7    Q.  All right.  And can you describe to the members of the jury

8    what we're seeing on this slide.

9    A.  Yes.  Again, I already talked about my own analysis of how

10   sustainable profitability with DTA coming back is all adding up

11   to net worth.  So this is Fannie Mae's internal projections,

12   and they don't even do the DTA here, but they just only looking

13   at the sustainable profitability.

14        And so they are saying based on this ten-year projection

15   that Fannie Mae has done that they were projecting that

16   266.6 billion of Treasury commitment would still be available

17   at the end of 2022.  Unused.  Treasury commitment.

18   Q.  Now, did you hear the testimony of Mr. Mayopoulos earlier

19   that this was a longer term than Fannie Mae would typically

20   build out a projection?

21   A.  Right.  They, typically, were building only three years or

22   four, five years.  So this is a longer term.

23   Q.  Was this still a helpful tool to you as you look to see

24   whether there was any indication that there would be a material

25   erosion of the Treasury commitment?

 1    A.  Yes, it is.  It just corroborates my analysis.  I've

 2    already, you know, done the two steps that I talked about.

 3    This just provides additional corroboration to that.

 4    Q.  And under this ten-year projection -- and this was a

 5    projection for both Fannie Mae and Freddie Mac that was

 6    prepared by Fannie?

 7    A.  This was prepared by Fannie Mae, and they also used their

 8    own model to make the projections for Freddie Mac.  That's a

 9    little unusual too.

10    Q.  And what's the ultimate conclusion here in terms of what

11    Fannie and Freddie were projected to draw from the Treasury

12    commitment once imposed through 2022?

13    A.  Right.  Again, so that's the reason I used this chart.  The

14    main thing I want as a takeaway from this is what was their

15    expectation about how much they think they have to draw in

16    the next ten years from the Treasury and also are they

17    expecting any circular draw.  First of all, there's no circular

18    draw.

19         And, secondly, they're projecting to draw a total of

20    only six and a half billion dollars.  And there are some other

21    graphs where I'm going to show that number will go up a little

22    bit to, like, eight and a half billion.  But this, as a

23    percentage of the commitment available, we've got 266.6 billion

24    still available, so the draw as a percentage is approximately

25    3 percent -- 2 1/2 percent.  That's all they're expecting to

1    draw.

2         So even though it's a ten-year forecast and, you know,

3    Fannie is doing the forecast for Freddie, I just wanted to see

4    the magnitude and the difference or what they expected to draw

5    to be available at the end of the forecast period.

6    Q.  And you mentioned that there were a few versions of -- of

7    the document that contained these projections; is that correct?

8    A.  Right.

9    Q.  All right.  And do you include on your next slide some of

10   the other exhibit numbers that are -- also contained these

11   projections?

12   A.  Yes.

13   Q.  All right.  And what was the purpose, Dr. Dharan, of

14   providing this slide that's on the screen?

15   A.  Right.  Well, the one I just showed in the previous slide,

16   which is also the first bar on this slide, that was a draft

17   that was prepared in -- for the presentation to the board, but

18   there was still a draft.  But it was shared with the FHFA.  It

19   was sent in an email to the FHFA as early as July of 2012.  So

20   I thought that would be relevant information since FHFA's

21   sharing and getting this information from Fannie and Freddie --

22   or Fannie in this case about what they think is happening with

23   the Treasury draw for the next ten years.

24        But there was a revision to this, and by the time they

25   presented it to the board in August of -- later in July 2012,

1    the second bar shows the changes that they had made.  So by

2    this time, the projected draw had gone up to $8.7 billion.

3        So there was a revision.  But it is still a

4    significantly small percentage compared to the Treasury draw

5    available; right?  The draw is 264 billion.  So we're looking

6    at about 3 percent being used in ten years from the total

7    Treasury draw.

8        And just to complete, the third bar is the data that was

9    shared in August before the third amendment with the Treasury.

10   So that was an email that sent out the same data to the

11   Treasury, but that was in August -- early August, and this

12   showed a slightly revised number, but overall same as the one

13   in the middle.  So in terms of the two numbers that I have on

14   the screen, the 8.7 billion is the same.  The projected number

15   is down -- is up a little bit.

16   Q.  So somewhere in the range of 266 billion to 264 billion

17   remaining after the ten-year period?

18   A.  Correct, depending on the draft that you see.

19   Q.  Have you gone back and analyzed the impact of some of the

20   additional asset write-ups that you talked about a few minutes

21   ago?

22   A.  Right.  Right.

23   Q.  On top of the Treasury commitment --

24   A.  Yes.

25   Q.  -- to see how much funding might be available?

1    A.  Right.

2    Q.  All right.  And is that depicted in your next slide?

3    A.  Yes.  So the next slide kind of summarizes the, you know,

4    state of affairs at the end of my second step of the road map.

5    So I've done the profitability part.  I talked about the DTA

6    coming back and some of the loan loss reserves coming back.  So

7    I just wanted to summarize them here.

8         This -- and this is an approximation in some ways,

9    because the bottom number is the Treasury projection that was

10   made -- Treasury commitment available that was projected that I

11   got from the Fannie Mae forecast.

12        And the one in the top is the -- the amount of net worth

13   that could be written up based on DTA alone, but even if DTA is

14   not completely causing the increase, there's also the loan loss

15   provisions that are coming back and then this other class of

16   loans that was mentioned in the email -- one of the emails, the

17   '03-3 loans, and they're all coming back to the net worth.

18        So I just wanted to use the DTA number here as a visual

19   representation.

20   Q.  And why do you have net worth equals zero above the blue

21   bar that contains the projected Treasury commitment available

22   in 2022?

23   A.  Right.  If the net worth goes to zero, then the Treasury

24   commitment is available to draw from.

25        So you have $266 billion available to draw from if -- if

 1    and when -- if there's an operating loss, say, of $2 billion, a

 2    net worth goes to minus 2 billion, you can always use this,

 3    assuming the net worth was zero in the first place; right?

 4    That's why I showed that below the net worth equals zero.

 5    There's no need to draw from the Treasury if the net worth is

 6    positive and sufficient to pay the dividend.

 7          And then the net worth is going to go up by $99 billion.

 8    Again, whether or not it's 99 or a little more or less, it just

 9    gives the magnitude; plus, they're already making some profits

10    in 2012.  Two quarters they already made profits.  They paid

11    dividends on them.  The net of the profit minus the dividend,

12    that's about 4 billion dollars.  So they've got that added as

13    well.  These are real numbers in 2012.

14          So when you put it together, you have a huge amount, and

15    that's what I wanted to show.  I think I have that on the next

16    diagram, also, to summarize it.

17    Q.   Okay.  And then what's your summary to the extent that

18    there was, in fact, a $6-billion and $8-billion drawdown

19    through 2022, what would be the net impact?

20    A.   Right.  So assuming the -- the drawdown is 6 and a half to

21    8 and a half billion dollars or 8.7 billion, net worth is going

22    up because of DTA, and projected Treasury commitment according

23    to Fannie Mae is pretty large.  When you put it all together,

24    there's just no real concern about the circular draw becoming a

25    problem.

1   Q.  Now, you've just been describing certain documents from

2   Fannie Mae.

3   A.  Right.

4   Q.  Did you also review projection information from Freddie

5   Mac?

6   A.  Yes.

7   Q.  All right.  And was that also a ten-year projection?

8   A.  No.  That was -- basically, a three-year -- three- to

9   four-year projection.

10  Q.  All right.  And before asking you about a specific

11  document, are you familiar, in general, with the term stress

12  testing or stress scenario?

13  A.  Yes.

14  Q.  And what, in general, is stress testing?

15  A.  Well, stress testing is done -- often required by

16  regulators for financial institutions to see if they can

17  withstand their pretty stringent, maybe dire state of affairs,

18  catastrophic state sometimes, very extreme combination of

19  things.  And then see if in spite of all those bad

20  combinations, does the financial institution still stand and

21  does it still survive.

22       So that's very important for regulators to know,

23  especially when they try to control failure of one institution

24  leading to other institutions failing.  So they want to avoid a

25  so-called systemic risk.

1    And so the stress test is a common way to see if that

2    particular outcome is looking good and sort of bad.

3    Q.  Is stress testing typically used to perform forecasting?

4    A.  No.  It's not a forecasting tool.  It's not -- they're

5    not -- people are not expecting these scenarios to happen as

6    a base case.  It's just a worse -- even more than worst

7    case -- you know, the real extreme case, are we still able to

8    survive.

9    So it's like, you know, if you're building a house in an

10   earthquake-prone zone -- let's say you're building it in

11   San Francisco, you want to know whether the house will

12   withstand an earthquake.  In case there's an earthquake, is the

13   house still going to be standing; right?  That's a stress test.

14   Q.  All right.  And, Dr. Dharan, now, in terms of the actual

15   document, if you could go to Tab 20 of your binder.  It's

16   PX-262.

17   A.  Okay.

18   Q.  And are you familiar with that document?

19   A.  Yes.

20   Q.  And do you have a slide relating to that document?

21   A.  Yes, I have one slide from that document.  Maybe a couple

22   of slides.

23   Q.  All right.  So, Dr. Dharan, before we ask some questions

24   about it, just the document itself, can you tell us what the

25   date is of the document?

1  A.  So the date -- which is also on the screen -- is -- it's a

2  draft document and it's dated August 14, 2012.

3  Q.  And how many days, again, was that before the net worth

4  sweep?

5  A.  That was three days before the net worth sweep.

6  Q.  All right.  And on the first part that you have depicted on

7  the slide here, there's a table that states key assumptions.

8  A.  Right.

9  Q.  And there are a variety of cases that are listed.  What are

10  those cases?

11  A.  So this one has five cases.  The one at the very beginning,

12  the top one, is called a base case.  And then you have a better

13  case.  Then there's a worse case.  Those two, typically, are

14  usually, you know, just a little better than base and a little

15  worse than base; sometimes known as optimistic and pessimistic

16  cases.  So those are the three.

17       And then there's the stress test or stress case.

18  Q.  And on the right-hand side of the table, there's an acronym

19  HPA.  Do you know what that refers to?

20  A.  I think it's home price appreciation.

21  Q.  And it lists further decline on the left and a four-year

22  change on the right?

23  A.  Right.

24  Q.  All right.  And before asking about each of the key

25  assumptions, have you reviewed the testimony of Freddie Mac's

1  former CFO, Ross Kari?

2  A.  Yes, I have.

3  Q.  And are you aware as to how Mr. Kari describes the base

4  case?

5  A.  He called it the expected case.

6  Q.  All right.  So in terms of the -- the assumption under the

7  base or expected case, was there any anticipation of a further

8  decline in home prices under the base case?

9  A.  No further decline.

10  Q.  What was the expectation in terms of the change over a

11  four-year period?

12  A.  Over a four-year period, they are expecting a 9 percent

13  increase in home price, which is, in fact, conservative

14  considering in 2012 the home prices were already going up, but

15  that's -- that's what they assume in the base case.

16  Q.  And what about the better and the worse case?

17  A.  So in the better case, again, there's no decline -- no

18  further decline.  I'm understanding the further decline as the

19  rest of 2012.  And then the other's not defined here, but

20  further decline, more immediate, and then the four-year change

21  in the better case is a 15 percent increase in home prices.

22  Q.  And, finally, let's go to the stress case.

23  A.  Okay.

24  Q.  What's the estimation of a further decline in home price

25  appreciation in the stress case?

1  A.  So the stress case is assuming a 20 percent decline --

2  further decline.  That means in 2012 or more immediate.

3  Although, by this time in August 2012, that's not what's going

4  on.  The home prices are actually going up.  But that's the

5  stress case they're testing.  They're just testing to see what

6  happens.  They're not forecasting it.  This is 20 percent

7  decline for the --

8  Q.  And what about over a four-year period?

9  A.  It stays down 20 percent for four years.

10  Q.  Now, we looked at a lot of contemporaneous housing data

11  earlier in your presentation.  Can you put a 20 percent decline

12  in home price appreciation in the context of where Fannie and

13  Freddie were as of August 2012?

14  A.  Well, as of August 2012, the home prices were going up.

15  The -- you know, various -- there are a lot of indexes that are

16  reporting that and they were all showing increases, as much as

17  4 to 5 percent already in 2012 by that time.  And so this is

18  extraordinarily different.  It's like a complete reversal.  So

19  as of August 2012, suddenly the world collapses and, you know,

20  home prices go down.  The 20 percent is so extreme, that was

21  even more than what happened in 2008.

22  Q.  Now, Dr. Dharan, does this document then translate the key

23  assumptions under the various cases as to what Freddie Mac

24  expected would be a draw from the Treasury commitment through

25  2015?

1   A.  Right.

2   Q.  And do you have that on the next part of your slide?

3   A.  Yes, I do.

4   Q.  All right.  So, Dr. Dharan, under the base case -- the

5   better case and the base case --

6   A.  Okay.

7   Q.  -- were there any expected draws that Freddie Mac would

8   take through 2015?

9   A.  None.  So base case zero and better case zero.  You can see

10  the little dash on the tables -- in those tables.  That's --

11  dash is really -- that represents zero.  So that's just an

12  accounting way of writing the zero there.

13         So in the base case, you start with $149 billion.

14  $147 billion at the end of the 12/31/2012, and nothing gets

15  used up at the end of 2015.  You still have that.

16  Q.  And how does that compare to what we saw in the Fannie Mae

17  projections over the ten-year period?

18  A.  It's consistent with that.  If you look at the ten-year

19  period, it also includes, of course, 2013, '14, and '15.  It's

20  consistent with that.

21  Q.  Now, what about the stress case?

22  A.  Yes.  So that's the last column there.

23  Q.  Well, let -- I skipped over the worse case, if you want to

24  address the worse case first.  Thank you.

25  A.  Sure.  No problem.

1  The worse case, which is already a pretty bad decline,

2  14 percent decline in home price.  Only difference is that it

3  does come back.  So it's not going to stay down.  By four

4  years, total change is zero.  That's more realistic.  When home

5  prices come down, they usually come back pretty quickly.  And

6  so here the -- the remaining commitment is only used up by

7  $9 billion.  So 149 billion goes down to 140 billion.  So

8  approximately about 5 to 6 percent is used up.  That's --

9  that's the maximum, even for this really bad home price

10  decline.

11  Q.  All right.  And now the last column in the table, the

12  stress test or the stress case, can you describe to us what's

13  happenings in the stress case.

14  A.  Yeah.  The stress case, again, is -- pretty extraordinary

15  price decline is being assumed.  And it also states:

16  Important.  Remains the same for four years.  So that's pretty

17  incredibly extraordinary.

18  But in this case, the -- the Treasury draws do get used

19  up.  It's like, you know, having an umbrella when it's raining.

20  So you're able to open your umbrella and you're under the

21  umbrella now, but you are using up the Treasury commitment, but

22  not all of it.  So it ends up still with a $32-billion

23  remaining commitment.

24  Q.  Well, that's a large number.  Can you put it in the context

25  of stress testing in general.

1    A.   Yeah.   I think the stress testing, as I said earlier, is

2    intended to see if the existing setup is sufficient to -- that

3    you survive even these incredibly bad situations.   Nobody

4    expects the home price decline of 20 percent.   But if it did

5    happen, it looks like the protection that is given by Treasury

6    is available, and they are able to use it and survive and

7    remain with pretty significant commitments too.

8    Q.   Does your next slide depict --

9    A.   Sorry.   Let me finish.

10            At the end of four years.

11   Q.   Does your next slide depict a graph that was utilized in

12   connection with the numbers on the bottom portion here relating

13   to the cumulative Treasury draws?

14   A.   Yes.

15   Q.   Okay.   And, Dr. Dharan, what is this graph depicting?

16   A.   So this is -- these are all the cumulative Treasury draws

17   that are taking place under these different scenarios.   The

18   green is basically the base and the better.   And nothing is

19   used in any of those years, so it's the same green for all

20   four.

21            Seventy-one billion is still remaining.   Nothing gets --

22   nothing is used up.   So -- but if you look at the red line,

23   that is the worse case -- w-o-r-s-e case -- and then the stress

24   case is the blue line.

25   Q.   So the yellow dot there, 71 billion, does that represent

1   what Freddie Mac had drawn to date as of August 2012?

2   A.  I think so.

3   Q.  All right.  And in the context of the blue, it goes up to

4   82 billion; is that right?

5   A.  Right.

6   Q.  So that's an increase of how much?

7   A.  That's $11-billion increase.

8   Q.  And are you aware whether to this point in 2012 Freddie Mac

9   was profitable?

10  A.  Yes.  They were profitable by -- they were making about

11  $4 billion in profits, 4 to $5 billion in the first

12  two quarters.  So they were making money.  They were making

13  comprehensive income.  They covered their dividends in each --

14  you know, first quarter.  They didn't completely cover it.  A

15  teeny bit, they fell behind.  The second quarter, they covered

16  it and still had a billion dollars left.

17       So they were really profitable by the end of second

18  quarter.  That's the situation they were in as this graph is

19  drawn.

20  Q.  So what would have to happen from August until December for

21  the draw to increase by $11 billion?

22  A.  A huge turnaround.  So this is -- the stress test is

23  looking at something very catastrophic happening and the

24  71 billion all of a sudden is 82 billion.  That's a big change.

25  Q.  And this is Freddie Mac's document, but have you reviewed

1    deposition testimony that also puts the feasibility of a stress

2    scenario in context?

3    A.  Yes.

4    Q.  Is that on your next slide?

5    A.  Yes.

6    Q.  And, Dr. Dharan, this is testimony of Fannie Mae's chief

7    financial officer Susan McFarland; is that correct?

8    A.  Right.

9    Q.  Can you tell the jury why you selected this portion of

10   Ms. McFarland's testimony?

11   A.  Yes.  I think she was asked a question that is similar to

12   the kind of stress test that we are looking at.

13        So the question she was asked is can you think of some

14   situation where, you know, the house prices fall big

15   percentage, you know, and then, you know, can you think of how

16   this could happen.  So that's basically the setup for the

17   answer that I'm highlighting here.

18        And so I highlighted in the headline, "I can't think of

19   situations that could happen that would cause the outcome to be

20   so."  That summarizes what she thought.  I can read some key

21   items from the --

22   Q.  Yeah, go ahead.

23   A.  Okay.  So she says:  So if somebody had come to me and

24   given the scenario saying, can you think of housing prices

25   going down and you needing to draw some huge Treasury draw from

1    the Treasury commitment, she says, I don't know how that could

2    happen; right?  So she continues.  I would say:  Okay.  Tell me

3    what I missed.  What is it that you think is going to happen in

4    the last few months of the year -- that's August through

5    December -- that's going to completely wipe out the profits

6    that we've already posted and then, you know, take it a further

7    13 billion in the red?

8         That is for Fannie Mae.  Thirteen billion in the red.  I

9    would have a hard time.  I can't think of -- I cannot think of

10   situations that could happen that would cause that outcome to

11   be so.

12        MR. KRAVETZ:  You can take that down for a moment,

13   Ms. McGuire.

14   BY MR. KRAVETZ:

15   Q.  Dr. Dharan, are you aware whether Fannie Mae and

16   Freddie Mac filed quarterly and annual reports with the SEC?

17   A.  Yes.

18   Q.  And did they continue to file those reports during the

19   period of the conservatorship?

20   A.  Yes.

21   Q.  All right.  And what is the name of a quarterly report

22   filed with the SEC?

23   A.  The quarterly reports are called 10-Q.  I already mentioned

24   the annual report is called 10-K.  And the quarterly reports

25   are easier to remember.  They end in Q, like quarterly, so

1    10-Qs.

2    Q.  And are you familiar with the general structure of SEC

3    reports?

4    A.  Yes, I am.

5    Q.  What is the general structure?

6    A.  Well, these -- these -- again, when you say SEC reports,

7    we're mainly talking about the financial reports of the SEC,

8    the quarterly reports and the annual reports.  There are also

9    other reports that, you know, have other information, but these

10   are the two that have financial information, financial

11   statements and all that.

12         And the general structure that you asked, I would say

13   there are two parts you can think of.  One containing the

14   actual financial statements, the balance sheet, the income

15   statement, all of the accounting statements, along with all

16   the footnotes that supports -- schedules and footnotes.  We

17   call them notes, but colloquially people call it footnotes.

18   They're all right after the financials.  Okay?  That's one

19   part.

20         Usually preceding that, before that starts, there's

21   another part, which is more of a descriptive portion where the

22   management explains what these numbers are and how they differ

23   from the previous year.  That's called the management

24   discussion and analysis.  MD&A.  Okay?  So that's very popular.

25   People often read that for the descriptive portion.  So that's

1    the second part.

2    Q.  And are SEC reports issued as of particular dates?

3    A.  Yes.

4    Q.  What are those dates in general?

5    A.  For quarterly reports, that will be March 31st, June 30,

6    and September 30.  If they are, you know, annually or are

7    fiscally are being calendar year.  So they have Q1, Q2, and Q3.

8    They don't publish a Q4 quarterly report because that's when

9    they publish the annual report.

10   Q.  And within the MD&A section of an SEC report, are there

11   certain parts that describe risks and uncertainties?

12   A.  Yes.  So there is a section that is usually highlighted and

13   separated out within MD&A that provide what they call

14   forward-looking statements, and those will have risks and

15   uncertainties.

16   Q.  And what is the nature of those types of disclosures?

17   A.  Well, those are really exactly like the name says, risks

18   and uncertainties, especially the uncertainties.  Things that

19   management is not certain of, obviously.  These are

20   uncertainties that they face, and they want to share that with

21   investors.  And so they want to provide that information in

22   these reports.

23   Q.  And can sometimes uncertainties actually be positive?

24   A.  Yes.  So they could be positive numbers that they are

25   uncertain about and negatives they are uncertain about.

1    MR. KRAVETZ:  And if I could ask Ms. McGuire to pull

2    up the presentation.

3    BY MR. KRAVETZ:

4    Q.  And so, Dr. Dharan, in your slides, have you chosen a slide

5    that defendants showed in their opening presentation to the

6    jury?

7    A.  Yes.

8    Q.  And are you familiar with when these particular statements

9    were made?

10   A.  Yes.  The dates are -- these are August 8, 2012, for --

11   that's the date of the Fannie Mae 2012 Q2, meaning second

12   quarter, 10-Q; and August 7, 2012, for Freddie Mac 2012, 10-Q

13   for the second quarter.

14   Q.  And you just described the different types of statements

15   that one might see in an SEC report.  Are you familiar with the

16   types of statements that are listed on -- depicted on your

17   slide?

18   A.  These are the uncertainty statements.

19   Q.  All right.  And have you gone back and determined in

20   general how many risks or uncertainties are disclosed in the

21   SEC reports by Fannie Mae and Freddie Mac?

22   A.  Yes.

23   Q.  Can you give us an approximation?

24   A.  I would say quite a large number.  Approximately about

25   50 -- 50 different bullet points.

1   Q.  And like you said before, some uncertainties can be

2   positive.  Did you see any uncertainties listed in the report

3   that could be considered positive?

4   A.  Yes, of course.

5   Q.  Can you give us some examples?

6   A.  Like, we were expecting home prices to increase, credit

7   risk to go down, credit quality of our loans are going up, a

8   lot of the things that I already talked about.  They have that

9   as uncertainties.

10  Q.  Now, in these sections of the SEC reports where the

11  companies are disclosing risks and uncertainties, did you see

12  any disclosure of a risk that Fannie or Freddie might

13  materially erode the Treasury commitment once the caps were put

14  back in place?

15  A.  No, I did not see that.  It's a long list, like I said, 50

16  items, but nothing about erosion of Treasury commitment.

17  Q.  And from an accounting perspective, in your opinion,

18  Dr. Dharan, are the statements shown on defendants' slide

19  inconsistent with the statements about sustainable

20  profitability from former Fannie Mae executives?

21  A.  No, not really.

22  Q.  Why not?

23  A.  Well, again, they are really like apples and oranges.  The

24  financial statements are forecasts -- they're either actuals or

25  forecasts, and they are talking about base case, things that

1   are expected to happen.

2          These are not forecasts.  They are, in fact, labeled --

3   at the end of the section, there's usually description here --

4   there is a description here saying these are not forecasts.

5   These are just individual statements, but they're not really

6   intended to be a forecast.

7          So they're not forecasts.  They are just a various set

8   of statements about risks and uncertainties.

9   Q.  And are these statements inconsistent with your own views

10  that the GSEs were reaching sustainable profitability?

11  A.  They are consistent with my view that I already described;

12  that the GSEs have reached a state of sustained profitability.

13  Q.  All right.  And if we can go back to the chart that you

14  depicted before relating to the drawdown over the ten-year

15  period.

16  A.  Right.

17  Q.  Are the statements in the SEC report inconsistent with the

18  ten-year projections?

19  A.  No.  They didn't say anything inconsistent with the

20  ten-year projections.

21  Q.  All right.  Now, Dr. Dharan, have you reviewed other

22  Fannie Mae and Freddie Mac SEC filings with similar language in

23  terms of risks and uncertainties?

24  A.  Yes, I have.

25  Q.  All right.  Including in 2011 and 2012?

1    A.  Yes.

2    Q.  All right.  And I'd ask, Dr. Dharan, if you can open up

3    your binder to Tab 37.  And let me know when you're there.

4    A.  Okay.

5    Q.  And do you recognize this document to be an excerpt from an

6    SEC report for Fannie Mae?

7    A.  Yes.

8    Q.  All right.  And what is the period of this report?

9    A.  This is for the first quarter of 2012.

10   Q.  All right.  And do you recall on or around when this first

11   quarter 10-Q would have been filed?

12   A.  I think around May 8th of 2012.  May 8th or 9th.  I forget

13   the exact date.

14   Q.  If I can ask if you could go to the second page of your

15   document, which is page 11.

16   A.  Okay.

17   Q.  And if you can just take the time to confirm whether the

18   risk and uncertainty language on page 11 is consistent with

19   what we saw earlier on defendants' slide.

20   A.  I mean, they're basically the same.  I didn't compare word

21   by word, but same -- same theme and same uncertainty expressed,

22   especially about period-to-period volatility, earnings, and all

23   of that.

24   Q.  Now, the date of this report was in early May 2012; is that

25   correct?

 1    A.  Yes.

 2              MR. KRAVETZ:  If I can ask Ms. McGuire to pull up

 3    Plaintiffs' Exhibit 205, please.  And if we can call out the

 4    header and portion of the fifth bullet point.

 5    BY MR. KRAVETZ:

 6    Q.  Dr. Dharan, can you remind us, what was the date of PX-205,

 7    the memo that is reporting what Mr. DeMarco said to the

 8    Secretary of the Treasury?

 9    A.  June 25, 2012.

10    Q.  Is June 25, 2012, prior to or after May -- early May 2012?

11    A.  Right.  It's definitely after the 10-Q came out.

12    Q.  And between the May 9th risk statement and the reported

13    statement in PX-205, which turned out to be accurate?

14    A.  Well, in terms of what Mr. DeMarco is forecasting, those

15    turned out to be the -- the actual subsequently.

16              MR. KRAVETZ:  Thank you, Ms. McGuire.

17              THE COURT:  How much more do you have?

18              MR. KRAVETZ:  Your Honor, two short segments.  If

19    Your Honor would like to take a break at this time, it might be

20    appropriate.

21              THE COURT:  Let's take our ten minutes.

22              (Proceedings held out of the presence of the jury.)

23              THE COURT:  Let me see Mr. Stern, opposing counsel,

24    and Mr. Hume at the bench off the record.

25              (Off the record.)

```
1                    (Recess taken.)

2                    THE COURT:  Let me talk to Mr. Stern first and

3         Mr. Hume.

4                    (Off the record.)

5                    (Proceedings held in the presence of the jury.)

6                    THE COURT:  You may be seated.

7              You may proceed.

8                    MR. KRAVETZ:  Thank you, Your Honor.

9              If we can ask Ms. McGuire to please pull up the

10        presentation.

11        BY MR. KRAVETZ:

12        Q.   Okay.  Dr. Dharan, we're far along your road map here.  The

13        next section is entitled PIK plus NWS alternatives addressed

14        any remaining risk of circular draw; is that correct?

15        A.   Right.

16        Q.   Okay.  Now, we talked about using a payment in kind

17        provision of the PSPAs to satisfy the dividend obligations

18        earlier in your testimony this morning; is that correct?

19        A.   Right.

20        Q.   All right.  Now, if I can just go to the next slide, just

21        to reorient ourselves as to how this works.

22              Now, are you assuming for purpose of your -- for

23        purposes of your analysis that the payment in kind could be

24        available to satisfy the dividend obligation?

25        A.   Yes.
```

1   Q.  All right.

2   A.  Again, the first two steps that I described already makes

3   the circular draw problem go away, but I just wanted to also

4   look at this option.

5   Q.  Okay.  So remind us how the payment-in-kind option, if

6   invoked, and if available, would work?

7   A.  Okay.  So payment in kind is invoked -- basically, this is

8   going to be invoked in -- in a common situation would be when

9   the net worth is negative.  So you don't have the cash to --

10  money to pay the dividend in cash without drawing from

11  Treasury; right?

12          So the payment in kind says you don't have to draw from

13  Treasury.  Here's an alternative.  You can simply add the

14  dividend amount to the Treasury claim, which is the liquidation

15  preference.  So that's why I'm showing that little extra bar

16  added to the top of the black -- on top of the second graph --

17  second bar.  That's the amount of dividend that is paid in

18  kind, meaning additional Treasury claims are issued in the form

19  of liquidation preference.  The important thing is that there's

20  no change in the Treasury commitment.  There's no drawdown in

21  Treasury commitment.

22  Q.  Now, Dr. Dharan, if the payment-in-kind option is invoked,

23  are Fannie and Freddie able to pay down any increase that's --

24  and the liquidation preference that is caused by paying in

25  kind?

1    A.  Yes.  They can -- they are -- they can do that later on.

2    So the 12 percent remains as a 12 percent until that little

3    extra bar that I added, which is the amount added due to

4    payment in kind, is paid off.  So it can be paid off, and

5    when it's paid off, the interest rate comes back down to

6    10 percent.

7    Q.  And is that different in the context of circular draws?

8    A.  Yes.

9    Q.  In what way?

10   A.  Because the Treasury commitment is untouched.  So there's

11   still the same Treasury commitment that you have -- you didn't

12   have to draw from it.

13   Q.  And when you assumed in your analysis that the

14   payment-in-kind option could be invoked, did you cite any

15   documents for that proposition?

16   A.  Yes, I think I did.  The -- yes, I did.

17   Q.  And did you cite any other -- any other documents in your

18   report relating to the availability of that option?

19   A.  Yes, I -- I did cite a Treasury document also.

20        MR. KRAVETZ:  All right.  I'd ask if Ms. McGuire

21   could call up PX-210, which has been admitted into evidence.

22        And if you call out the second bullet point of PX-210.

23   BY MR. KRAVETZ:

24   Q.  And, Dr. Dharan, could you read that Treasury document to

25   the jury.

1    A.   Okay.   So this one says, "To the extent that required

2    dividend payments exceed net income, FHFA, as conservator,

3    could consider not declaring dividends pursuant to the

4    certificates of designation for the preferred shares, so that

5    draws on the PSPAs are not used to pay dividends, preserving as

6    much funding as possible to cover any unanticipated losses at

7    Fannie Mae and Freddie Mac."

8             MR. KRAVETZ:   And at this time, Your Honor, I would

9    ask to read a portion of a joint stipulation into the record.

10             THE COURT:   All right.

11             MR. KRAVETZ:   Ms. McGuire, can we call up JX-1 at

12    paragraph 20.   I'll read the highlighted portion, Your Honor.

13        "The PSPAs and their associated Treasury stock

14    certificates entitled Treasury to the following with respect to

15    each enterprise:   3, an annual cash dividend paid quarterly of

16    10 percent of Treasury's liquidation preference, or if not paid

17    in cash, an increase of the liquidation preference at a rate of

18    12 percent of Treasury's liquidation preference."

19        Thank you, Ms. McGuire.

20    BY MR. KRAVETZ:

21    Q.   Now, Dr. Dharan, just to reorient -- reorient us to where

22    we were before the break, was it your opinion that circular

23    draws would have been unlikely going into the future --

24    A.   Yes.

25    Q.   -- because there was remaining funding in the Treasury

1    commitment and likely increases in net worth on top of that?

2    A.   Exactly.  And also profits that are starting to come in at

3    that time.

4    Q.   So I would want you to assume that things would turn out

5    differently, however, and Fannie and Freddie would lack

6    available cash to pay the dividend without drawing down on the

7    Treasury commitment.

8         If invoked, would the payment in kind result in any

9    decrease of the Treasury commitment that is the amount of

10   available funding from the Treasury Department?

11   A.   No, it would keep that exactly the same.

12   Q.   Is that in contrast to circular draws?

13   A.   That's exactly right.

14   Q.   And I think you indicated that if the payment-in-kind

15   option is invoked to pay dividends, it would have a greater

16   impact on the liquidation preference?

17   A.   Yes.

18   Q.   And what is that greater impact?

19   A.   Well, you know, both the circular draw and the paid in kind

20   will affect the liquidation preference.  If I drew from -- did

21   a draw from Treasury and paid dividend in cash, the liquidation

22   preference would also go up by the 10 percent.  And if I

23   instead paid in kind, the liquidation preference also goes up.

24   It will go up 12 percent from the -- from the time you start

25   calculating it.

DHARAN - DIRECT

1   Q.  And can you remind us, does paying the dividend in kind

2   have any impact on the priority of the liquidation preference

3   for bond and MBS investors?

4   A.  It won't affect the bond investors, and it won't affect the

5   MBS investors.  So those investors -- that's why I have the

6   nice diagram, which I like a lot, and -- especially the green

7   pastures that -- you have to imagine there would be green grass

8   there, but the idea is that they're standing nice and

9   comfortably at the top of the hill.  And increasing the

10  Treasury liquidation preference from using the paid -- payment

11  in kind or circular draw, it doesn't make a difference to the

12  bond MBS investors.

13  Q.  All right.  Now, Dr. Dharan, as part of your opinion in

14  this matter, have you looked to determine whether there were

15  additional alternatives to the net worth sweep that would

16  result in the Treasury commitment not being materially eroded?

17  A.  Yes, I did.

18  Q.  All right.  And do you list some of those alternatives on

19  the slide here?

20  A.  Yes.  I list these in one of my reports, and I -- you know,

21  as I said in the report, this is not intended to be an

22  exhaustive list of all the alternatives.  Just a couple of

23  examples of additional alternatives that could have been

24  considered by FHFA instead of this really drastic net worth

25  sweep that they agreed to.  So this is just a few alternatives

1    that I'm listing here.

2    Q.  All right.  What's the first one on the list?

3    A.  The first one is there's just no urgency.  This is the

4    first time -- you know, the FHFA could wait for more

5    information because the GSEs are saying there's no circular

6    draw in 2012.  The sustainable profitability's in place.  DTA

7    is coming back to the balance sheet.  Given all this, the --

8    the option would be to just wait and see more in terms of how

9    the economy is doing or is the sustainable profitability really

10   to starting to show up.  That's the first alternative.

11   Q.  What about the second?

12   A.  The second one is they could have considered an alternative

13   where you modify the -- you keep the dividend the way it is,

14   but if the Treasury commitment falls below a threshold and that

15   threshold can be determined by talking to, you know, bond

16   holders and bond investors to see where is the paying point,

17   the point of -- you know, point where they want to see some

18   change.  And money for the dividend so that if the commitment

19   falls below that, that's a different dividend paid.

20   Q.  All right.  What about the third alternative that you have

21   listed?

22   A.  The third one is, you know, when -- similar to the second

23   one, but continue to pay the 10 percent, but if there's not

24   enough net worth to pay, pay the remainder later with interest.

25   Q.  And why is that last part important?

1227

 1    A.  Well, because we are not using up the Treasury commitment.

 2    That's the main -- using up the Treasury commitment in a

 3    circular draw fashion.

 4    Q.  And so because it would be repaid later with interest,

 5    would it have any negative impact on what Treasury would

 6    ultimately receive?

 7    A.  It won't change the amount the Treasury receives.  It's the

 8    same, but it will be -- it will at the same time protect the

 9    Treasury commitment.

10    Q.  And, finally, protect GSEs if profits substantially exceed

11    10 percent dividend.

12    A.  Right.

13    Q.  What do you mean by that?

14    A.  Well, this is to really think about the type of situation

15    that actually happened in 2013.  You suddenly had this huge

16    income, comprehensive income, 130 billion-plus, and all of a

17    sudden the two GSEs ended up paying $111 billion more in

18    dividends; right?  So the last one says think through these.

19    Think through what's going to happen if the profit

20    substantially exceed 10 percent.  Don't give up all of those

21    profits to the Treasury.  You could've considered an

22    alternative where you protected the excess -- profits in excess

23    of certain amount.

24    Q.  Now, Dr. Dharan, we're near the end of -- near the end of

25    the road now.

1   A.  Okay.

2   Q.  What's the next reason that you list as to why the net

3   worth sweep was not reasonably necessary to avoid insolvency or

4   other significant financial harm?

5   A.  Yeah.  Yes.  So this one, I actually have been already

6   addressing some aspects of the process, including most recently

7   when we just talked about the alternatives.  Like, I said, FHFA

8   could have considered other alternatives.  I just wanted to

9   summarize some of the things I mentioned, as well as maybe add

10  one or two aspects about the deficiency of the whole process

11  used to make this decision of this huge magnitude.

12  Q.  And before we do, just let me ask, as part of your

13  experience, are you familiar with the process that corporations

14  generally undertake to contemplate major transactions?

15  A.  Yes, I am.

16  Q.  What is that general process?

17  A.  This is a very simple intuitive process, actually.  It's a

18  management process.  Companies use it in order to make sure

19  that they bring in all the information that they need to.  So

20  if you get to the next slide, I indicate some key steps --

21  typical steps, and key steps, in fact, management would make

22  before they make a major decision.  Maybe they need to invest a

23  large amount of money on a project or a new investment, maybe a

24  new factory.  And in order to do that, they first will collect

25  a lot of information.

1       So in the case of FHFA, the FHFA could have updated

2   their forecasts for Fannie and Freddie and gathered relevant

3   information.  For example, they never updated their forecast

4   after October 2011.  The -- basically, they just never did.

5       And that could have been done.  So it lost -- the type

6   of information gathering that management does before making a

7   decision, that was not done.

8   Q.  Now, you just mentioned -- we looked before at some

9   forecasts of Fannie and Freddie; is that right?

10  A.  Yes.

11  Q.  Now, you referenced a different date, October 2011, in

12  relation to FHFA.  Can you tell the members of the jury what

13  you mean by that.

14  A.  Yeah.  I think, you know, the net worth sweep was done in

15  August 2012; right?  And we saw earlier information about the

16  inflexion point, how it -- from January 2012, the economy had

17  changed by March and May.  And people were talking about

18  eroding recovery.  And all of that information was not put in

19  forecast models within the FHFA to update them for -- before

20  making this net worth sweep decision, the previous one that was

21  made was October 2011.

22      There was a person who was in charge of the forecasting

23  group at FHFA, Ms. Tagoe.  And she said she was never asked to

24  update these forecasts.  In fact, she had never been informed

25  about the net worth sweep until she read it, like everybody

```
 1    else, after --
 2    Q.  So between the --
 3              THE COURT REPORTER:  Hold on.
 4    A.  After the sweep was announced.  Yes.  Go ahead.
 5    BY MR. KRAVETZ:
 6    Q.  So between the ten months from October 2011, the date of
 7    the last forecast for FHFA, and the date of the net worth
 8    sweep, those FHFA forecasts were not updated?
 9    A.  That's correct.  That's my understanding.
10    Q.  Now, what's the -- I think you've touched upon the second
11    item there, identify alternatives to circular draws.
12    A.  Right.  Yes, I just testified to that.  So just to repeat,
13    there's a variety of things the FHFA could have considered.
14    And this is in addition to the PIK I already mentioned, but all
15    the other alternatives.  And there was no documentation, there
16    was no memo, there's no analysis that showed that they had done
17    anything to identify these alternatives.
18    Q.  And why, typically, in your experience, do corporations
19    document major decisions?
20    A.  Well, it protects everybody.  It brings -- it gives an
21    opportunity for everybody to bring information in and make sure
22    that they are incorporated.  So these documentations are done
23    for a lot of purposes:  to get approvals, to get buy-in from
24    the people who are involved.  None of that was done.
25              So the third one, really, is talking about documenting
```

1  the analysis.  It's very surprising that there were no memos

2  and no reports, really, nothing that -- that FHFA did to come

3  to this net worth sweep decision.

4  Q.  And would you have expected to see something given the

5  decis- -- decision of this magnitude?

6  A.  Yeah, given this huge magnitude.  Here we are, you know,

7  talking about giving of a hundred percent of the profits of

8  Fannie Mae and Freddie Mac, really, forever; right?  Basically

9  for all future periods.  And -- and yet there was no

10  documentation saying why are we doing it and what are the

11  alternatives, what information do we need, and let's put it all

12  together.  Let's get all the buy-in from important -- the

13  people who are involved.  None of that was done.

14  Q.  And, finally, you list:  What would be expected, consider

15  effect on net worth, cash, and impact on business operations.

16  What do you mean by that?

17  A.  Right.  It doesn't look like they did anything to see what

18  would have happened if, for example, the DTA came back to the

19  balance sheet.  And suddenly the net worth goes up to 50 to a

20  hundred billion dollars, maybe 75 billion as it actually

21  happened, and then we are going to be paying $75 billion in

22  dividends to Treasury.  Is this what we really wanted?

23       That type of analysis, the impact on net worth, impact

24  on cash, impact on borrowing to pay for the dividend, impact on

25  business operations.  Nothing -- none of that was done.

1   Q.  And what you describe as a deficient process, does that

2   inform your opinion as to whether the net worth sweep was

3   reasonably necessary?

4   A.  Yes.

5   Q.  How?

6   A.  So, again, it reinforces my conclusion that I've been

7   building up in each of the steps that the net worth sweep was

8   not reasonably necessary.

9   Q.  All right.  And, finally, Dr. Dharan, we are at the end of

10  the road.  The last item here, the net worth sweep exposed

11  Fannie and Freddie to an increased risk of harm.

12  A.  Right.

13  Q.  Now, before I ask you questions about this, just a

14  reminder, can you remind all of us as to the basic features of

15  the third amendment.

16  A.  Right.  So we talked about this almost like the first

17  thing.  So it's been a while.  So what -- repeating the two

18  things that the net worth sweep did relative to the original

19  PSPAs.  Number one, the dividend is now a hundred percent of

20  net worth.  Before it was defined 10 percent of liquidation

21  preference.  Now it's a hundred percent.  After this, all net

22  worth, all capital is taken away.

23          So the second item is that Fannie and Freddie cannot

24  build or retain capital.  So there's no capital to really take

25  care of any short-term needs or long-term needs.

1    So that's really what I wanted to talk about as a

2    potential harm from the net worth sweep.

3    Q.  And do you have an opinion as to whether the net worth

4    sweep, because it prevented Fannie and Freddie from building or

5    retaining capital, exposed them to harm in the event of a

6    stress scenario?

7    A.  Yes, I do.

8    Q.  All right.  And is that depicted on your next slide?

9    A.  Yes.

10   Q.  Okay.  Now, let's start with the top of your slide here.

11   Harm from operating losses.  What are operating losses?

12   A.  These are your normal operation -- you know, not like a

13   recession or a big-time financial crisis, but sometimes you

14   may have maybe an extra set of loans that didn't do well or

15   maybe there was a small market decline in Florida or Arizona

16   and you had a lot of loans there.  So these are things that

17   could happen in any given year, and you -- you may end up

18   with a loss.  Not that it happens often, but it could happen;

19   right?

20   So when that happens, that -- having a net worth buffer,

21   like it was in the pre-net worth sweep time, building up the

22   net worth would have given that net worth as a buffer.  Would

23   have been -- the net worth would have worked as a buffer.  So

24   when you have a loss, you can dip into the net worth and pay

25   off the dividend without having to draw from the Treasury.

 1          But that's no longer possible.  Every time there's a

 2     loss now, since we're starting the net worth each time at

 3     basically zero, the minimum defined -- so you have to --

 4     maximum defined, you have to borrow -- you have to draw from

 5     the Treasury.

 6     Q.  And then in the bottom of the slide, you list harm from

 7     major asset write-downs?

 8     A.  Yeah.  So this is the bigger numbers.  So the first one

 9     could happen periodically, but the second one -- basically,

10     that's what happened in 2008.  So the DTAs were written down.

11     All of a sudden you have a big hole in your net worth and you

12     had to draw from Treasury.

13          And then later on, let's say, we write up the DTA under

14     the net worth sweep as it happened in 2013, you have to pay a

15     huge dividend to the Treasury.

16          So every time you write down DTAs, you have to draw from

17     Treasury, and that increases the liquidation preference.  And

18     then every time the DTA is written up again, at some point, you

19     have to pay dividends, which is basically a back-and-forth, and

20     so there's really no way to build a net worth buffer to prevent

21     this type of back-and-forth drawdown from Treasury.

22     Q.  Could that impact the mission of Fannie Mae and

23     Freddie Mac?

24     A.  Yes.

25     Q.  And in that scenario, in terms of harm from a major asset

1    write-down, could it -- could the lack of having net worth lead

2    to instability in the secondary mortgage market?

3    A.  It could, because we are talking about every time drawing

4    from the Treasury to take care of these situations.

5    Q.  Now, you're listing here particular write-downs, but is

6    there also the possibility when you have the write-up of an

7    asset that it could expose Fannie and Freddie to additional

8    harm?

9    A.  Yes, because -- yes, the answer is -- that's exactly what

10   happened in 2013.

11   Q.  And do you have a slide to describe what happened in 2013?

12   A.  Yes.

13   Q.  All right.  So, Dr. Dharan, I think you touched on this

14   before, but just remind us, when did the net worth sweep take

15   effect?

16   A.  On January 1st, 2013.

17   Q.  All right.  And we saw the charts before of when the DTAs

18   were restored to Fannie and Freddie's balance sheet and then

19   went -- and were converted to net income; correct?

20   A.  Yes.

21   Q.  When did that happen for Fannie?

22   A.  For Fannie, that -- that happened in the first quarter of

23   2013; and for Freddie, that happened in the third quarter of

24   2013.

25   Q.  All right.  And at that point, they restored approximately

1    74.5 billion in the DTAs?

2    A.  That is correct.

3    Q.  All right.  So what happened, then, when there was that

4    increase in net worth as an accounting item in terms of the

5    dividend payment?

6    A.  Right.  Exactly.  So the DTA reversal is purely an

7    accounting item.  There's no real -- it's not a cash item.  So

8    DTA goes up.  DTA goes down.  These are accounting entries.  So

9    this time DTA went up, accounting entry, but now because of the

10   net worth sweep, Fannie Mae in 2013, first quarter, had to pay

11   a huge -- some $55-billion dividend.  Fifty billion of that was

12   because of the DTA and -- DTA reversal.

13          That was a real cash dividend that they had to pay, and

14   they did that by borrowing from the bond market to have the

15   cash available.

16          Same thing happened with Freddie Mac in 2013, third

17   quarter.

18   Q.  So just so we're clear here, within the first nine months

19   of 2013, both Fannie and Freddie actually had to borrow money

20   in order to make the dividend payment?

21   A.  Yes.  There's some -- they didn't explicit -- they did, but

22   the exact amount is not disclosed, but there's indication that

23   they had to borrow pretty much substantially all of it.

24   Q.  And did they incur additional expenses as a result?

25   A.  Yes, because they were borrowing money, they had to pay

1    interest on that.  Although the interest rates were pretty low

2    back then.  Nevertheless, it adds up when you borrow a lot of

3    money.

4    Q.  Assuming that there wasn't a net worth sweep, would --

5    Fannie and Freddie would have had to have gone to the bond

6    market to borrow money in 2013 to make a dividend payment?

7    A.  No.

8    Q.  Why not?

9    A.  There was -- so, first -- so if it was a pre-net worth

10   sweep era, they would not have had to pay 53 billion in the

11   first place.  They would have paid 10 percent of the

12   liquidation preference.

13   Q.  Now, are you aware whether Freddie Mac recognized that

14   these accounting write-downs and write-ups could be a potential

15   risk to the entity?

16   A.  Yes.  They even disclosed that this creates a potential

17   risk for them.

18   Q.  And do you have that on your next slide?

19   A.  Yes, I have.

20   Q.  Okay.  All right.  And, Dr. Dharan, can you just walk us

21   through the first part of the disclosure that's on our screen

22   here.

23   A.  Yes.  So this is the Freddie Mac annual report 2013, and

24   they say that, you know -- the highlighted portion is before I

25   read -- let me read the first sentence.  So we do not have the

1    authority over the long term to build and retain capital from

2    the earnings generated by our business operations.  And, again,

3    this is because -- as a result of the net worth sweep dividend.

4        This increases the likelihood of draws in the future

5    periods.  So that's a really shocking disclosure there.  Well,

6    particularly as the permitted capital reserve amount, which is

7    2.4 billion, declines over time.  To clarify what this report

8    is saying, remember that the capital is declining rapidly to

9    zero.

10       So they were permitted to keep $3 billion in 2013

11   and 2.4 and then -- and on and on.  Six hundred million

12   decrease each year for five years goes down to zero.  So

13   they're saying this increases the likelihood of draws in the

14   future period.

15   Q.  So this first part is dealing with the situation where

16   there may be asset write-downs; correct?

17   A.  Yes.

18   Q.  Does the second part deal with potential harm to the extent

19   that there are asset writes-ups?

20   A.  Yes, because the second part is dealing with the noncash

21   increase in net worth.  This is, basically, our situation in

22   2013 when the DTAs were written up.  So that's a noncash

23   increase.

24       So this second one says it is possible that due to

25   noncash increases in net worth, the amount of the dividend for

```
 1    a quarter could exceed the amount available in cash, and which
 2    could have an adverse effect on our financial results.  Okay?
 3    What they're saying is we may not have the cash to pay this
 4    huge dividend that suddenly comes up.  We may have to go borrow
 5    money, et cetera.
 6    Q.  All right.  Now, Dr. Dharan, earlier, you referenced a
 7    provision in the PSPAs regarding the payment of a periodic
 8    commitment fee; is that correct?
 9    A.  Yes.
10    Q.  And did you create a slide relating to the periodic
11    commitment fee?
12    A.  Yes.
13    Q.  What's your understanding in terms of the factors in which
14    a periodic commitment fee would be imposed?
15    A.  Well, I have the slide to describe the process that they're
16    supposed to use.  It had to be mutually agreed.  It's not just
17    a mandatory number.  Mutually agreed, exercising reasonable
18    discretion to determine the market value.  So this is not just
19    a random number or arbitrary number.
20         It had to be mutually agreed with a reasonable
21    discretion to determine market value.  This process never
22    happened.  There was no process.  Never used to determine
23    market value that was supposed to be done.
24    Q.  And the second bullet point, had to be in consultation with
25    the chairman of the Federal Reserve.  What are you referring to
```

1    there?

2    A.  Yeah.  The chairman of the Federal Reserve Board is

3    supposed to also be part of this dialogue.  They have to be

4    consulted with before the amount is determined.  That never

5    happened.

6    Q.  And, finally, on your slide, it indicates could not have

7    justified the net worth sweep.  What do you mean by that?

8    A.  Well, the amount of the net worth sweep that we saw, the

9    amount that was paid off, the periodic commitment fee could not

10   be that type of an amount.  You know, we heard Professor Anjan

11   Thakor make his forecast of -- estimate of the periodic

12   commitment fee on two and a half basis points to 45 basis

13   points.  This is really far, far bigger than that.

14   Q.  All right.  And --

15   A.  This, meaning the net worth sweep.  I'm sorry.

16   Q.  Thank you.

17        You mentioned that there was no effort to impose the

18   PCF.

19   A.  Yes.

20   Q.  Is there any testimony in particular that is relevant to

21   your opinion?

22   A.  Yes.

23   Q.  And who was that testimony given by?

24   A.  Well, the next slide, this is Mr. Ugoletti.

25            MR. KRAVETZ:  And I'd ask if Ms. McGuire can just

1     please play the clip.

2                 (An audio-visual recording was played.)

3     BY MR. KRAVETZ:

4     Q.  Dr. Dharan, why is that particular testimony relevant to

5     your opinion regarding the PCF?

6     A.  Well, again, this reinforces the point I just made that the

7     periodic commitment fee was never calculated.  It was

8     never really -- it never happened.  This process never took

9     place.  There was no consultation, and, you know, they just

10    never really did any of that.

11    Q.  All right.  Now, Dr. Dharan, you've gotten to the end of

12    your direct testimony.  Can you just give us a very brief

13    summary of Opinion 1.

14    A.  Yes.  You know, it's been a while, so I think it's worth

15    repeating the two opinions, especially the Opinion 1, since we

16    discussed that more than a couple of hours ago.

17                 So this Opinion 1, I'm looking at the FHFA's public

18    statements and then comparing it with what the third amendment

19    net worth sweep really did.  And so my conclusion was that the

20    net worth sweep was inconsistent with the FHFA's public

21    statements that the purpose of the conservatorship was to

22    preserve and conserve the assets of the GSEs and to restore the

23    GSEs to a sound and solvent financial condition.

24    Q.  And, finally, a summary of your second opinion.

25    A.  The second opinion, we just went through all the five

1    steps, but the overall opinion, which I put on the title there,

2    is the net worth sweep was not reasonably necessary to avoid

3    insolvency or other significant financial harm and was, thus,

4    not something reasonable shareholders could have expected.

5    Q.  All right.

6          MR. KRAVETZ:  Your Honor, with the Court's

7    indulgence.

8          THE COURT:  All right.

9          MR. KRAVETZ:  Thank you, Your Honor.

10        Thank you, Dr. Dharan.  Nothing further on direct.

11        THE COURT:  All right.  Defendants may begin their

12   cross.

13        MR. BERGMAN:  Thank you, Your Honor.  David Bergman

14   for defendants.

15                    CROSS-EXAMINATION

16   BY MR. BERGMAN:

17   Q.  Dr. Dharan, nice to see you again.

18   A.  Good afternoon.

19   Q.  I'm going to start with what's fresh in my mind, if that's

20   okay.  And ask if we can pull up PX-262, which, Dr. Dharan, you

21   just testified about half an hour or so ago.  It's the

22   Freddie Mac corporate forecast draft of August 14, 2012.  And

23   you have that; correct?

24   A.  Right.

25   Q.  Okay.  And I think you -- you -- I don't recall if you

1    mentioned this, but if you'll look on page 3 of 8, there's a

2    statement that over -- over the long term it is likely that our

3    dividend obligation will exceed our comprehensive income,

4    resulting in additional Treasury draws.  Do you see that?

5    A.  Yes.

6    Q.  And that's -- the additional Treasury draws would be

7    circular draws in the parlance that we've used at times?  You

8    have to take a draw to pay the dividend obligation?

9    A.  If there was no net worth, that would be the case.  This

10   is -- this was done before the net worth sweep.  So there

11   could be net worth, in which case there would not be a draw.

12   And if there was a net worth, then they would be able to pay

13   it.

14   Q.  And I think you looked at page -- I'm sorry, page 4 of 8.

15   And we see this shows the various scenarios.  And under the

16   stress scenario, the draws go from 71 billion cumulative to

17   71 billion in 2012, up to $199 billion drawn in 2015; correct?

18   A.  Yes.

19   Q.  And by my math, that's $128 billion drawn in four years;

20   right?

21   A.  Well, if you -- are you looking at the blue line?

22   Q.  I am.

23   A.  So if you're looking at the blue line, you have to do the

24   calculation from 82 billion to 199 billion, and that difference

25   is the -- basically, the 117 billion you see in the last

1     column --

2     Q.  Okay.

3     A.  -- cumulative draws for 2013 to 2015.

4     Q.  Thank you.

5          And so that's at a rate of approximately $30 billion a

6     year, if you take the average?

7     A.  Yes.  If I can explain.  So this model, this stress test,

8     assumes that once the home prices go down in further remaining

9     2012 and so on, it stays there for the next three more years.

10    So each year you're going to be having the same draw because

11    it's the same model repeated three more years.

12    Q.  Well, it's not a drop each year.  It's a 20 percent decline

13    that persists for four years.

14    A.  Four years.  So once it goes down for four years.  So the

15    bad news continues each year.  So the Treasury draw continues

16    each year.

17    Q.  Okay.  And so in this scenario, it's showing about a

18    $30-billion draw for four years and at the end of that year,

19    $32 billion left in the Treasury commitment?

20    A.  Yes.

21    Q.  And so the math is not good for that; right?

22         You mentioned that the stress scenario here you thought

23    was worse than what had happened in 2008; is that correct?

24    A.  Well, again, it depends on the type of -- which index you

25    use.  And there are a lot of different ways to measure the

DHARAN - CROSS

1    housing decline in 2008.  But it is worse in a sense that it

2    all happens immediately, like in a few months, in this stress

3    scenario.

4         But as the housing crisis in 2008, built up in 2006,

5    2007, 2008.  And then it slowly recovered in '09, '10.  And by

6    2012, the prices were starting to go up.  So it was a crisis,

7    but this model assumes a pretty dramatic decline.

8    Q.  And I thought I heard you say it was worse than the

9    Great Recession of 2008.  Did I hear you right?

10   A.  No, you heard it right.  And that's what I met.  The way

11   the model is here down -- the model is done here in terms of

12   the housing price decline, it's different from the way it

13   happened; even worse than the way it happened in 2008.

14   Q.  Okay.  Let's see if we can pull up the Case-Shiller U.S.

15   home price index.  And we have a chart from July 1, 2006,

16   through October 1, 2012, I think.

17        Dr. Dharan, am I correct this is showing a drop

18   beginning in 2006, summer of 2006?

19   A.  Yes.

20   Q.  About a year and a half later it's down 20 percent, and it

21   persists down below 20 percent all the way through

22   October 2012?

23   A.  Exactly.  But I think, you know, as I said, once -- if you

24   look at how the 20 percent decline happened, it -- it was

25   happening all the way starting from 2006.  The markets are

1    going bad.  Everybody was starting to get this feeling that

2    things are not good.

3           2006, 2007, 2008, three full years, to get to the

4    20 percent decline.  And then it persists there.  And it

5    actually went down in 2011 and '12, long after the crisis had

6    ended.  Started going up later.  But this decline of 20 percent

7    we have in 2006 to '08.

8           Remember, the decline actually happened all the way

9    through 2009 to get to the 20 percent; right?  It happened

10   around 2009, June.  That's, like, three and a half years.  But

11   the same decline in this model, as I understand, is pretty

12   quick, immediate.

13   Q.  And by 2012 here, it's down about 27 percent; right?

14   A.  Yes.  Yes.

15   Q.  So this is actually a bigger decline that persists longer

16   than what was in the stress scenario that you said was worse

17   than the 2008 crisis?

18   A.  No.  I mean you are right in the way I'm presenting it.

19   You probably -- you know, you're looking at the total

20   difference, which is correct.

21          But what I described earlier was the Great Recession,

22   which is 2008 -- which we all think is 2008.  But I'm glad

23   you showed this diagram.  It's very helpful to the jury and

24   to myself and to all of us that the crisis started in 2006;

25   right?  And it took four years to get to the 20 percent

1    decline.

2         And policymakers had ample time to look at what is going

3    on, and everybody had time to react.

4         But in the stress scenario that we have in the

5    Freddie Mac, there's nothing wrong in modeling it, but in that

6    model, that entire 20 percent is happening immediately.

7              MR. BERGMAN:  We can take that down.  Thank you,

8    Mr. Montgomery.

9    BY MR. BERGMAN:

10   Q.  Dr. Dharan, the housing market is one of the most important

11   components of the U.S. economy, isn't it?

12   A.  Yes.

13   Q.  And Fannie and Freddie support the housing market?

14   A.  Yes.  They are there to support the secondary housing

15   market and support the mortgage -- homeowners to be able to

16   afford and buy homes.

17   Q.  It's a critically important role they play?

18   A.  Yes.  The housing market is critical, and their role is

19   critical.

20   Q.  And Fannie and Freddie own about half of the mortgages in

21   this country?

22   A.  I think so.  I know for sure they own 97 percent, according

23   to the chart I showed as of 2012; 97 percent of the -- the

24   so-called confirming mortgages that are smaller than a certain

25   number.  But they don't buy the bigger mortgages.  So if we

1    combined them, I don't know the market share, but I'm sure

2    you're right.

3    Q.   Okay.  And Fannie and Freddie guarantee more than

4    $5 trillion dollars in mortgage-backed securities?

5    A.   Yes.

6    Q.   And if Fannie and Freddie defaulted on their guarantees of

7    those mortgage-backed securities, that would be a disaster;

8    correct?

9    A.   More than disaster.

10   Q.   And that would affect all of us; correct?

11   A.   It would.  That's -- just to clarify, that's the whole

12   reason why U.S. Congress created Fannie and Freddie and made --

13   made them, really, a critical part.  They were both really

14   created by Congress.  They can only be taken away by Congress.

15   So they really are that important that Congress felt it had to

16   be protected in terms of who creates and who keeps them.  And

17   so that's very well known to everybody.

18   Q.   Thank you, sir.

19        You've never been a conservator; correct?

20   A.   I've not been a regulator or a conservator.

21   Q.   And you've never even worked with a conservator; right?

22   A.   Correct.  I've not worked for a government.

23   Q.   You never held any position in government?

24   A.   No.

25   Q.   You've never set public policy?

 1    A.  I've not been a government regulator, which is where the

 2    public policy is set.  So, yes, that's correct.

 3    Q.  And you've never implemented public policy?

 4    A.  Well, I think that's a fair statement.  I've been a

 5    consultant to companies and financial institutions, but I've

 6    not implemented public policy.

 7    Q.  And you have no experience regulating financial

 8    institutions?

 9    A.  That is correct.

10    Q.  You have no expertise in regulating financial institutions?

11    A.  Yeah, I think that's a fair statement, except I want to

12    clarify again that I have expertise in accounting and finance.

13         And as part of that, as I described earlier -- and I'm

14    sure you were here -- that I would, as consultant -- both in

15    litigation consulting, as well as business consulting with

16    financial institutions.  I have testified on behalf of

17    financial institutions.  And so I've done all of that to learn

18    how the regulation works.

19         I also mentioned briefly that I -- in my 40-plus years

20    of teaching, almost 43 years now, I've also taught about banks

21    in financial courses.  So I have the expertise, in that sense.

22    If you ask have I been a regulator or do I have experience

23    being a regulator, the answer is no.

24    Q.  So I asked you at one of your depositions:  Do you have any

25    expertise or experience regulating financial institutions.  And

1   you said no.

2   A.  Exactly.  I just wanted to clarify the context of that.

3   Q.  You agree that by the end of the fourth quarter of 2008 --

4   that is, at the end of December of 2008 -- both Fannie and

5   Freddie had negative net worth; correct?

6   A.  Yes.

7   Q.  And, in fact, on December 13, 2008, Freddie had negative

8   net worth of more than $30 billion; right?

9   A.  Well, I don't have the numbers in front of me.  If you

10  show, I can confirm it.  But I know that 2008, by the fourth

11  quarter, they may have had negative -- an index, brought --

12  brought it back to zero by drawing from Treasury in 2009 first

13  quarter.

14  Q.  Right.  So -- and that reflected -- that draw in the first

15  quarter of 2009 reflected that as of December 31, 2008, they

16  were -- had a negative net worth of the amount they drew?

17  A.  Yes, I agreed with you.  I just don't remember the number.

18          MR. BERGMAN:  Okay.  Let's pull up the joint

19  stipulation of facts.  It's JX-1.  And we can go to paragraph

20  34 for Freddie.

21  BY MR. BERGMAN:

22  Q.  And so Freddie Mac drew, first quarter of 2009,

23  $30.8 billion.  That means they had a negative net worth at the

24  end of 2008 in that amount?

25  A.  Correct.

1  Q.  And in the fourth quarter 2008, they drew $13.8 billion,

2  which means that at the end of September 2008, they already had

3  a negative net worth of $13.8 billion?

4  A.  Correct.

5  Q.  And negative net worth means their liability exceeded their

6  assets; right?

7  A.  That is correct.

8  Q.  And so if we look at this paragraph of JX-1, am I right

9  that Freddie had a negative net worth and had to draw on the

10  Treasury commitment 11 out of 15 quarters; correct?

11  A.  You're just counting the numbers.

12  Q.  Yeah, from fourth quarter of 2008 to second quarter of

13  2012.

14  A.  Yes.

15  Q.  Eleven of those 15 quarters, Freddie Mac drew on the

16  Treasury commitment; correct?

17  A.  Absolutely, yes.

18  Q.  I'm sorry.  Go ahead?

19  A.  I just wanted to confirm what you said.  There were some

20  quarters they didn't draw.  But, initially, there were large

21  draws.  And then 2009 there was hardly any draw for the

22  first -- for those three quarters and then first quarter of --

23  2010.  And then it goes smaller and smaller.  And then they

24  taper off.  And then they don't have any more draw from the

25  third quarter of 2012.

1    Q.  Thank you.

2         I'll try to ask the questions to elicit that kind of

3    information so you don't have to volunteer.  And I'll try to

4    keep mine directed.  Okay?

5    A.  Got it.

6    Q.  And so those 11 draws from 2008 to 2012, that means in

7    11 of the quarters, Freddie Mac had a negative net worth;

8    correct?

9    A.  Yes, on the preceding quarters.

10   Q.  And if we turn to paragraph 33, we'll see the same figures

11   for Fannie Mae.  And there are 13 quarters from first quarter

12   2009 to first quarter 2012.  For each and every one of those

13   13 quarters, Fannie Mae took a draw; correct?

14   A.  Yes.

15   Q.  And that means that Fannie Mae had a negative net worth

16   directly preceding each draw; correct?

17   A.  Yes.

18   Q.  And that's a clean sweep, 13 out of 13?

19   A.  Yes.

20   Q.  Under HERA, you know, the recovery act -- HERA, are you

21   familiar with it?  If the net worth of Fannie or Freddie falls

22   below zero for 60 days, then Fannie and Freddie must be placed

23   into receivership; correct?

24   A.  Yes.

25   Q.  That's a mandatory receivership; no discretion?

1    A.  I think so; correct.

2    Q.  And then we're talking about HERA's requirement that Fannie

3    and Freddie draw on the Treasury commitment in order to avoid

4    mandatory receivership.  That's also under GAAP, generally

5    accepted accounting principles; correct?

6    A.  You mean how they calculated?  Yes?

7    Q.  Yes.  And you're not opining there were any inaccuracies or

8    errors in Fannie and Freddie's GAAP accounting from 2008 to

9    2012; correct?

10   A.  That's correct.

11   Q.  You have no criticism of the GAAP accounting for Fannie and

12   Freddie in that period at all; right?

13   A.  Yes.  I have not looked at them, and I have no criticism

14   either.

15   Q.  And no criticism of the accounting that led them to take

16   the draws that they took in all of those quarters between 2008

17   and 2012?

18   A.  Right.  I mean, just to clarify, I have no criticisms

19   because I haven't seen anything to identify any criticism.  But

20   also that's not part of the scope of my work; right?  You saw

21   the two questions that I addressed.  But you're right.  I have

22   no criticism since I was not looking at those periods.

23   Q.  You showed the jury a slide from a presentation to

24   something called ABS East.  Do you recall that?

25   A.  Yes.  Yes.

1   Q.  Remind us, was it asset-backed security?

2   A.  Asset-back securities.

3   Q.  And that was October 2008.  And I think one of the points

4   you made was that at this time there was no capital in Fannie

5   and Freddie; correct?

6   A.  By October 2008?

7   Q.  Yes.

8   A.  Right.

9   Q.  And that the -- you later had a criticism they weren't

10  allowed to build up their capital subsequent to the net worth

11  sweep; right?

12  A.  That's part of my conclusion; right.

13  Q.  So there's no capital whatsoever from 2008 until 2012; is

14  that correct?

15  A.  Well, they had no capital, but they had the Treasury draw

16  that they were -- that was available to them.

17  Q.  I'm sorry.  The Treasury commitment was available to them?

18  A.  Treasury commitment, yes, available to them.

19  Q.  In fact, the Treasury commitment acted as capital; correct?

20  A.  It acted as -- not balance-sheet capital.  It acted as a

21  source that they could draw from.

22  Q.  A source of strength?

23  A.  A source of?

24  Q.  Strength.

25  A.  It's supposed to be a source of capital for them.

```
1              MR. BERGMAN:  If we turn to -- it's Exhibit PX-2-E.

2    And Mr. Montgomery, if you can pull it up for us, hopefully.

3    BY MR. BERGMAN:

4    Q.  This is the ABS slide, and I'm looking at Slide 19 of 40.

5    This is describing the initial PSPA, the very first agreement;

6    right?

7    A.  Okay.

8    Q.  That agreement had $100 billion commitment for each of

9    Fannie and Freddie; right?

10   A.  Right.

11   Q.  And this slide is describing that commitment.  You'll see:

12   Contract between Treasury and each GSE with a capacity of

13   $100 billion, $200 billion combined.  That's the Treasury

14   commitment; right?

15   A.  Yes.

16   Q.  And that's how it started out.  And then the bullet under

17   that says:  Nearly three and a quarter times the enterprises'

18   combined statutory minimum capital; right?

19   A.  Right.

20   Q.  So that's equating the Treasury commitment with capital in

21   terms of being able to provide support for these institutions

22   at this time; correct?

23   A.  Well, it's -- I'm not sure the math is working that

24   well, but what it's saying is we have had -- we made these

25   funds available remaining in this case, Treasury through FHFA.
```

 1    And it is acting as a source of capital as opposed to real

 2    capital.

 3         So when the Treasury commitment is drawn, then it goes

 4    to the balance sheet and it becomes capital.  Until it is

 5    drawn, the Treasury draw that is available, the Treasury

 6    commitment that is undrawn and available, is not on the balance

 7    sheet.  But it's available.  So it's a very different idea but,

 8    overall, they act together to provide this calculation that you

 9    see in the bullet.

10    Q.  You testified on direct, Dr. Dharan, about reasonable

11    shareholder expectations.  Am I right that you understand the

12    reasonable expectations that -- that matter here are as of

13    December 4th, 2009; correct?

14    A.  Yes.

15    Q.  And that's the date of the second amendment to the PSPA;

16    right?

17    A.  Yes.  I'm not an expert on it, but I understood that

18    from -- that's -- that's my understanding.

19    Q.  Okay.

20    A.  I could be wrong, but that's my understanding.

21    Q.  The second amendment increased the Treasury commitment from

22    what we just saw, $100 billion each, $200 billion total, to --

23    to unlimited for each, Fannie and Freddie; correct?

24    A.  Right.

25    Q.  But the commitment would be unlimited only through

1    December 31, 2012?

2    A.  Correct.

3    Q.  And then starting January 1, 2013, the Treasury commitment

4    is capped; right?

5    A.  Right.

6    Q.  Am I right, sir, that in December 2009, at the time of that

7    second amendment, it was understood by shareholders, by

8    everyone, that the Treasury commitment had started out at a

9    hundred billion dollars for each of the institutions in

10   September 2008; right?

11   A.  Yes.

12   Q.  And by May 2009, it was determined that was insufficient;

13   correct?

14   A.  I don't know what the process was.  So I didn't examine,

15   but I can take your word for it.

16   Q.  You didn't -- you didn't look into why there was an

17   increase from a $100 billion to $200 billion?

18   A.  I didn't need to look into it.  I'm not questioning you.  I

19   just didn't look into it.

20   Q.  You didn't think that would be relevant for shareholder

21   expectations?

22   A.  No.  I think that amount went up too.  I know that that's

23   factually correct.

24   Q.  And the reason for the first amendment doubling the

25   commitment to $200 billion each was, are you aware, to remove

1    any possible concerns debt and mortgage-backed securities

2    investors have about the strong commitment of the

3    U.S. government to support Fannie Mae and Freddie Mac?

4    A.  Are you reading off of a press release?

5    Q.  Yes.

6    A.  Yes.

7    Q.  You're aware of that?

8    A.  Now, I am aware of it.  I don't recall the -- looking at

9    it, but I do -- I do remember something to that effect.

10   Q.  Okay.  That was the announcement for the first amendment

11   was -- the reason was to remove concerns that debt and

12   mortgage-backed securities have about support for Fannie and

13   Freddie; right?

14   A.  Yeah.  Can I -- can I clarify that.  So you're talking

15   about the first amendment in May of 2009; is that right?

16   Q.  Yes.

17   A.  So by that time, you know, the tables that you show --

18   that you just showed from the joint stipulation, you saw

19   those big draws, especially Freddie Mac, not yet Fannie Mae.

20   But Freddie Mac was drawing far more earlier than Fannie Mae.

21        And if I remember, that was coming pretty close to a

22   hundred billion already by May.  So that was a very different

23   scenario than what was happening in August of 2012 where they

24   showed this large amount.  But you're right.  The commitment,

25   initial hundred billion, turned out to be used very quickly by

1    Freddie Mac; within three quarters.

2    Q.  Way faster than anybody expected; correct?

3    A.  I don't know about the expectations, but certainly it was

4    used up very quickly.

5    Q.  And in December 2009, six months later, there were concerns

6    that the Treasury commitment of $200 billion each would not be

7    sufficient to support the housing market's confidence in Fannie

8    and Freddie; correct?

9    A.  Are you -- again, you may have to remind me with any --

10   Q.  I'm sorry.

11   A.  You may have to remind me with a press release or whatever

12   that has the concern part.  I don't remember that.

13   Q.  Okay.  You don't -- you don't remember that the second

14   amendment to the Treasury commitment going from $200 billion to

15   unlimited was to support confidence of -- of investments in

16   Fannie and Freddie and the housing market?

17   A.  I don't remember.  I'm not questioning what you said, but I

18   just don't remember.  But once -- if you show a document, I'll

19   be happy to agree with that.

20   Q.  Okay.  But --

21   A.  It sounds right, but I just don't remember it.

22   Q.  Okay.  Let's review some other information that was known

23   to shareholders in December 2009.

24   A.  Okay.

25   Q.  At the time of the second amendment in December 2009,

1   Fannie had drawn about $60 billion from the Treasury

2   commitment; correct?

3   A.  Can you show the tables again so we can see the numbers.

4   Q.  Sure.  We can do it.

5           MR. BERGMAN:  It's JX-1, please.  And Fannie is

6   paragraph 34.  Sorry.  I'm sorry.  33.  Thankfully, they do the

7   math at this table.

8   BY MR. BERGMAN:

9   Q.  I'm seeing by the fourth quarter of 2009, there's

10  $59.9 billion drawn; correct?

11  A.  Yes.

12  Q.  And then the next paragraph, 34, we'll show for Freddie.

13  About $50.7 billion drawn; right?

14  A.  Yes, for Freddie 50.7 by the end of 2004 and -- out of 200

15  billion available.  And can you show the Fannie number again,

16  just so we can read it.

17  Q.  By -- I think you misspoke.  By the end of 2009; correct?

18  A.  Yeah, 2009 I meant to say.  2009 Q4.

19  Q.  Right.

20  A.  And then by end of Fannie Mae 2009 Q4, they had drawn --

21  they had drawn 59.9 billion out of the 200 billion.

22  Q.  So they caught up and exceeded Freddie Mac by this point?

23  A.  Yes.

24  Q.  The dividends at this point, December 2009, again,

25  information that was known by shareholders --

```
 1              MR. BERGMAN:  We can take this down, Mr. Montgomery.
 2    BY MR. BERGMAN:
 3    Q.  Shareholders knew there were no dividends on the private --
 4    on the private, common, and preferred stock; correct?
 5    A.  During the period of conservatorship, they cannot be paid
 6    dividends.
 7    Q.  I think you testified that dividends were suspended; is
 8    that how you viewed it?
 9    A.  I don't know if I said that, but dividends were described
10    as eliminated.
11    Q.  That's right.
12    A.  And then somebody -- not me, but somebody described that it
13    was eliminated.  But during the period of conservatorship, it
14    was eliminated.
15    Q.  Yes.  The announcement, the official announcement, is
16    dividends are eliminated for the private, preferred, and common
17    stock; correct?
18    A.  Yeah, I think the official announcements were dividends
19    were eliminated during the period of conservatorship.
20    Q.  Okay.  And, in fact, it was known all the way back
21    to September of 2008 that dividends were eliminated; correct?
22    A.  Yes.
23    Q.  And it was known by December 2009 -- in fact, it was
24    known in September of 2008 -- that Fannie and Freddie could not
25    pay dividends without Treasury's prior written consent;
```

1    correct?

2    A.  Yes.  While they were in conservatorship, dividends could

3    not be paid without the consent of the Treasury.

4    Q.  That was one of the rights or covenants that Treasury

5    received under the PSPA.  They had the authority to say --

6    they had to give approval for payment of dividends; correct?

7    A.  Correct.

8    Q.  And by December 2009, the time we're focused on for

9    shareholders' expectations, but also all the way back to

10   September of 2008, it was known that Fannie and Freddie could

11   not exit conservatorship without Treasury's prior written

12   consent; correct?

13   A.  Yes.  As long as the liquidation preference was

14   outstanding, the Treasury had to give consent to pay the

15   dividends.

16   Q.  So -- but also consent to leave conservatorship; correct?

17   A.  Leave the conservatorship also, the same thing.  Treasury

18   had to.

19   Q.  Treasury had to give consent?

20   A.  Right.  And in the sense they had to agree how the

21   liquidation preference paid back.

22   Q.  By December 2009, everybody knew these conservatorships

23   were not normal conservatorships; correct?

24               MR. KRAVETZ:  Objection.  Foundation.

25               THE COURT:  Sustained.

1    BY MR. BERGMAN:

2    Q.  By December 2009, these conservatorships had been going on

3    for more than a year; correct?

4    A.  Yes.

5    Q.  Can you name any other corporate conservatorships that have

6    lasted more than a year?

7    A.  I think you asked me before.  I don't remember -- I don't

8    recall any.  And I haven't -- I haven't studied all the

9    conservatorships, but certainly I don't think there were any

10   that lasted that long --

11   Q.  Can't even think of any?

12   A.  -- that far.  For financial institutions, they're usually

13   quickly taken care of and sold to somebody.

14   Q.  You can't even think of a financial institution

15   conservatorship that's lasted six months; correct?

16   A.  I can't think of any.  But, again, I'm not a historian.

17   But, certainly, I can't think of anything immediately.

18   Q.  So by December 2009, everyone knew this conservatorship

19   was already longer-lasting than any that anybody can think

20   of?

21              MR. KRAVETZ:  Objection.  Foundation.

22              THE COURT:  Sustained.

23   BY MR. BERGMAN:

24   Q.  Certainly, than any you can think of; correct?

25              MR. KRAVETZ:  Objection.

```
 1              THE COURT:  Overruled.
 2    A.  Again, I'm not a historian.  But certainly by
 3    December 2009, the liquidation preference, as we just saw, is
 4    already $60 billion in each case.  Until they are paid off --
 5    and that requires Treasury, you know, acceptance of that, until
 6    then, the conservatorship had to continue.  So there was --
 7    those facts were there in public domain.
 8    BY MR. BERGMAN:
 9    Q.  And by December 2009, it was known that Fannie and Freddie
10    were required to pay a 10 percent cash dividend to Treasury;
11    right?
12              MR. KRAVETZ:  Objection.  Foundation.
13              THE COURT:  Overruled.
14    A.  Can you repeat the question again.
15    BY MR. BERGMAN:
16    Q.  Yes.  By December of 2009, it was known that Fannie and
17    Freddie were required to pay a 10 percent cash dividend to
18    Treasury; correct?
19    A.  There -- if they are to pay cash dividend, they are to pay
20    a 10 percent cash dividend.
21    Q.  That was payable quarterly?
22    A.  Payable quarterly.
23              Just to clarify for the jury, payable quarterly at
24    one-fourth of 10 percent.
25    Q.  Yes.  And it was based on 10 percent of the liquidation
```

1   preference; correct?

2   A.  Yes.

3   Q.  And the Treasury preferred was designated as cumulative

4   stock; correct?

5   A.  Yes.

6   Q.  And a technical term, but cumulative means the Treasury

7   preferred dividend could not be skipped; right?

8   A.  Yes.

9   Q.  And, again, that goes back to September 2008; right?

10   A.  Again, I don't know all the legal provisions, but it

11   certainly goes back to September 2008.

12   Q.  By December 2009, Fannie and Freddie were telling the

13   public in their SEC filings that the 10 percent cash dividend

14   to Treasury exceeded the amounts of Fannie and Freddie's

15   historic earnings, was more than they ever could have paid in

16   their history except for one quarter.  One three-month period

17   for Freddie; correct?

18   A.  I don't remember the disclosure, but if you show it, I'll

19   be able to agree with that.

20          MR. BERGMAN:  Okay.  Let's put up DX137, page --

21   internal page 60.  It's page 66 of 350 of the exhibit.  And

22   this is --

23          MR. KRAVETZ:  Objection, Your Honor.  May we be

24   heard?

25          THE COURT:  No.  It's overruled.

```
 1            MR. BERGMAN:  Mr. Montgomery, could you -- just

 2   the first page for a moment to orient us.  There we go.  Thank

 3   you.

 4            THE COURTROOM DEPUTY:  Are you moving this into

 5   evidence?

 6            MR. BERGMAN:  No.  Just want to use with the witness

 7   and display to the jury, if I may.

 8            THE COURT:  It's Exhibit 11?

 9            MR. BERGMAN:  No, this is --

10            THE COURT:  Well, then the objection is sustained.

11            MR. BERGMAN:  Okay.  May I -- may I use with the

12   witness but not display it to the jury?

13            THE COURT:  Yes.

14            MR. BERGMAN:  So could we put this up so it's not

15   visible to the jury, please.

16        Thank you, Your Honor.

17   BY MR. BERGMAN:

18   Q.  So this is the Freddie 10-K for year ended 2008; correct?

19   A.  Yes.

20   Q.  And if we can now go to page 66 of 350.  And we can see it

21   says our -- I'm on, our annual dividend obligation will be

22   $4.6 billion at this -- at that time, and it's in excess of our

23   annual historical earnings in most periods; correct?

24   A.  Yes.

25   Q.  And that's for all periods but -- but one to that point;
```

```
 1    correct?

 2    A.  Yes.

 3              MR. BERGMAN:  We can take this down.

 4    A.  I don't know that for a fact, but it sounds like they say

 5    in most periods, or it sounds consistent.

 6              MR. BERGMAN:  Okay.  We can take it down,

 7    Mr. Montgomery.  Thank you.

 8    BY MR. BERGMAN:

 9    Q.  Dr. Dharan, you mentioned SEC filings, Securities and

10    Exchange Commission filings; correct?

11    A.  Yes.

12    Q.  And you displayed some of those in your direct testimony?

13    A.  I think I used one of the defense exhibits.

14    Q.  Yes.

15    A.  Yes.

16    Q.  You're quite familiar with SEC filings; correct?

17    A.  Yes.

18    Q.  And you described the 10-Qs, and the 10-Ks.

19              You know that companies should and do take their SEC

20    filings very seriously; correct?

21    A.  Yes.

22    Q.  And SEC filings normally go through a long process of

23    review by management, attorneys, auditors before they're

24    submitted to the SEC; right?

25    A.  That's the usual process; correct.
```

```
1    Q.  Shareholders rely on SEC filings and financial statements

2    and disclosures to verify that their investments are

3    safeguarded; correct?

4    A.  I don't know about the very last part, but the purpose of

5    the financial statements is to help shareholders assess the

6    company's future prospects and evaluate the company, all of

7    that information that shareholders need.  The purpose is to

8    provide that to the shareholders.

9    Q.  So you wrote in your book:  Since investors cannot

10   personally monitor a corporate board, a management's decision,

11   they rely entirely on the financial statements and other

12   financial disclosures from the company to verify that their

13   investments are safeguarded.

14   A.  Yes.  You said safeguarded.

15   Q.  Safeguarded, yes.  You recognize that as from your book and

16   agree?

17   A.  Once you said safeguarded, I recognized it.

18   Q.  Okay.  And you have reviewed and relied on Fannie and

19   Freddie's SEC filings in rendering your opinions in this case;

20   right?

21   A.  Yes.  I have looked at the financial statements from 2008

22   to 2012 and maybe one or two cases in 2013.

23   Q.  And when you say financial statements, those are SEC

24   filings; correct?

25   A.  Yes.
```

1    Q.  And, again, you're not -- well, you do typically rely on

2    SEC filings in the course of your expert work; correct?

3    A.  Yes.

4    Q.  And also in your academic work?

5    A.  Very much.

6    Q.  You're not opining that there are any misstatements or

7    inaccuracies in Fannie and Freddie's SEC filings; correct?

8    A.  Again, that's not part of my scope.  And in any case, I

9    have not seen anything to question it.

10            MR. BERGMAN:  Okay.  Your Honor, I'd like to pull up

11   an SEC filing.  Shall I -- not display it to the jury but just

12   have it in front of us.  This is DX136.

13   BY MR. BERGMAN:

14   Q.  And I just want to review -- again, this is the 10-K for

15   Fannie Mae for the year ended December 31st, 2008.  And you'll

16   agree this is information available to shareholders in December

17   of 2009; correct?

18   A.  Yes.  It might be -- it's part of the public domain by, I

19   guess, February or March of 2009.

20   Q.  And this is the kind of information that you were writing

21   about when you said this is important for investors to be aware

22   of and -- and protect their interest or be aware of their

23   interest; correct?

24   A.  Again, it's not like -- it's not intended to guarantee

25   their investments are safe, but it's intended to help them

1    assist whether or not their investments are safe.

2    Q.  And it's -- I think you said in your book, too, to monitor

3    and interpret the future economic prospects of the company;

4    correct?

5    A.  Exactly.

6    Q.  And so in December 2009 -- earlier in 2009, Fannie and

7    Freddie were making public statements along these lines.

8              MR. BERGMAN:  And maybe we can just pull up for

9    Dr. Dharan -- it's page -- internal page 20.

10   BY MR. BERGMAN:

11   Q.  And they were saying things like there can be no assurance

12   as to when or how the conservatorship will be terminated;

13   correct?

14   A.  Can you repeat which paragraph is that in.

15   Q.  Yes.  It's the second paragraph under conservatorship,

16   second sentence.  There can be no assurance to when or how the

17   conservatorship will be terminated; correct?

18   A.  Yes.  That's what Fannie is telling here, yes.

19   Q.  And they further say:  No assurance whether we will

20   continue to exist following conservatorship; correct?

21   A.  Let me -- can I read the whole sentence for a second.

22   Q.  Sure.

23   A.  Okay.  There can be -- I'll read it on my own.

24   Q.  Yes.  "There can be no assurance as to when or how the

25   conservatorship will be terminated, whether we will continue to

1   exist following conservatorship, or what changes to our

2   business structure will be made during or following the

3   conservatorship."  Correct, sir?

4   A.  Yes.

5   Q.  And let's turn to -- oh, no.  That same page.  I'm sorry.

6   It says:  There's a consensus that Fannie and Freddie pose a

7   systemic risk and that we would not continue in our

8   then-current form.  Do you see that?

9   A.  Yes.  Yes.

10  Q.  This is being communicated to the public -- to everyone in

11  early 2009; correct?

12  A.  Yes.

13          MR. BERGMAN:  We can take this down, please.

14  BY MR. BERGMAN:

15  Q.  Fannie and Freddie were also telling everyone that the

16  conservatorship has no specified termination date; correct?

17  A.  Yes.

18  Q.  In their SEC filings, Fannie and Freddie also told everyone

19  that they were no longer managed with a strategy to maximize

20  common shareholder returns; correct?

21  A.  I think I remember something to that effect.  Can you show

22  me the --

23  Q.  Sure.

24          MR. BERGMAN:  We'll pull it up, Mr. Montgomery.

25  Sorry to have you take it down.

1   BY MR. BERGMAN:

2   Q.  DX136, now we're at page 27 of 500.

3   A.  Okay.

4   Q.  And it's the bottom right of the page.

5          MR. BERGMAN:  If we can pull that up.

6   BY MR. BERGMAN:

7   Q.  This is a chart showing the difference in management

8   strategy before conservatorship and then during

9   conservatorship.  And before, you see there was a maximized

10  shareholder value over the long term and also to fulfill our

11  mission of providing liquidity, stability, affordability to the

12  mortgage market?

13  A.  Yes.

14  Q.  And then as of February 26, 2009, the date of this filing,

15  it says, "Their management strategy is they are directed to

16  provide liquidity, stability, and affordability in the mortgage

17  market and immediately provide additional assistance to this

18  market and the struggling housing market, and to the extent not

19  in conflict with our mission, to maintain positive net worth."

20         So the mission comes before maintaining positive net

21  worth; correct?

22  A.  Well, the -- they both come.  But to the extent not in

23  conflict with the mission; right.

24  Q.  Yes.  So the mission is priority?

25  A.  Yeah.  If they're in conflict, then the mission.  If

1    there's no conflict, then it's not a problem.

2    Q.  And the next bullet says, "No longer managed with the

3    strategy to maximize common shareholder returns."  Correct?

4    A.  Yes.

5    Q.  So that's information being communicated to everyone.

6    Shareholders.  Everyone -- about -- a big difference between

7    conservatorship operations and preconservatorship, correct?

8    A.  Yeah, this is being conveyed to the shareholders.

9    Q.  Yes.

10   A.  And the public.

11   Q.  And the public mission is A-number one?

12   A.  Well, I mean, it is exactly what it is.  And you're right.

13   But the public mission was always the -- the reason why Fannie

14   and Freddie were formed in the first place.

15   Q.  Yes.  But this is the time they say that takes priority

16   over maximizing shareholder value over the long term; correct?

17   A.  Yes.

18   Q.  So by December 2009 -- that date that's important for

19   shareholder expectations -- shareholders knew that there was no

20   assurance when or how the conservatorship would be terminated;

21   correct?

22   A.  Yes.  I think you showed something to that effect.

23   Q.  And they knew that Fannie and Freddie might not continue to

24   exist following conservatorship; correct?

25   A.  I think I would say they were told that there's a risk of

1    that; that they may not continue to exist in the same form.

2         Again, just to remind ourself, the congressional charter

3    that created Fannie and Freddie is the only way they can be

4    removed.  So -- but the form might change.  They might change

5    into Fannie 2 or Freddie 2.  And, yes, they were told that

6    there's a risk that this is not the same shape they might be

7    in.

8    Q.  And, in fact, there were -- the express language was they

9    may not continue to exist; correct?

10   A.  That's what it said.  I'm interpreting that not in the same

11   form.

12   Q.  Everyone was also told before December 2009 that Fannie and

13   Freddie probably would not be able to pay the 10 percent cash

14   dividend to Treasury without taking circular draws; correct?

15           MR. KRAVETZ:  Objection.  Foundation.

16           THE COURT:  All right.  Can you show -- is that the

17   SEC statement you're talking about, everyone was told?

18           MR. BERGMAN:  Yes.

19           THE COURT:  Everyone who read the SEC statement?

20           MR. BERGMAN:  Everyone who was listening, Your Honor.

21           THE COURT:  Just rephrase the question.

22           MR. BERGMAN:  Sure.  Sorry.

23   BY MR. BERGMAN:

24   Q.  Shareholders -- anyone who read the SEC filings was told

25   that Fannie and Freddie probably would not be able to pay the

1    10 percent cash dividend to Treasury without taking circular

2    draws; correct?

3    A.   Yeah.  I don't remember the exact language you showed, but

4    it's something to that effect.  So you -- if you want me to

5    confirm it, you can show me the language.

6    Q.   Okay.  You understand that the net worth sweep is one

7    component of the third amendment; correct?

8    A.   Yes.

9    Q.   And that net worth sweep changed from a fixed 10 percent

10   cash dividend to a variable dividend in the amount of net

11   worth; right?

12   A.   Well, I think of it as a net worth sweep as the -- as it

13   was described in the Treasury.  So the amount of the dividend

14   does vary, exactly; but only when the net worth is positive,

15   all of the net worth, to be paid.

16   Q.   Right.  So when there's no net worth, there's no obligation

17   even to pay a penny?

18   A.   That's correct.

19   Q.   And the net worth sweep was consideration for suspension of

20   the periodic commitment fee; right?

21   A.   Can you show some language to that effect?

22   Q.   Yes.

23            MR. BERGMAN:  Why don't we pull up as an example -- I

24   think the PX version is admitted into evidence.  Is that true?

25   I'll use the PX.  PX-3-A4 will be the Fannie version.

```
 1              And if we can just show the front page.  It says:  Third
 2      Amendment to Amended and Restated Preferred Stock Purchase
 3      Agreement, and that's dated August 17, 2012.
 4      BY MR. BERGMAN:
 5      Q.  Dr. Dharan, that's what we call the third amendment;
 6      correct?
 7      A.  Yes.
 8      Q.  And if we look at --
 9              MR. BERGMAN:  Oh, I'm sorry.
10              THE COURT:  It's in evidence.
11              MR. BERGMAN:  Thank you.
12              MR. KRAVETZ:  I don't believe the document is in
13      evidence, Your Honor.
14              MR. BERGMAN:  Sorry.  My apologies.  The DX version,
15      apparently, is evidence.  Do you want us to switch?
16              MR. KRAVETZ:  Yes.
17              MR. BERGMAN:  My apologies.  DX535.  It looks very
18      different.
19              THE COURTROOM DEPUTY:  It's not in evidence.
20              MR. BERGMAN:  I'm sorry.  May we move in DX535,
21      please?
22              MR. KRAVETZ:  No objection.
23              THE COURT:  Received.
24              (Defendants' Exhibit 535 admitted into evidence.)
25              MR. BERGMAN:  I apologize, Your Honor.
```

1    BY MR. BERGMAN:

2    Q.  So this is the Third Amendment to the Amended and Restated

3    Senior Preferred Stock Purchase Agreement.  And if we can turn

4    to 3.2 -- 3.2(d).  I think it's going on the next -- does that

5    continue?

6         Let's come back to this while I regroup.  I apologize.

7         Your testimony, Dr. Dharan, has been the net worth sweep

8    was not reasonably necessary; is that correct?

9    A.  Yes.  That was my Opinion No. 2.

10   Q.  Are you only opining with respect to the net worth sweep or

11   also with respect to the third amendment?

12   A.  Well, I'm opining on the effect of the net worth sweep on

13   all of the items that I talked about:  net worth and cash flow

14   and operations.  And so my wording is based on that net worth

15   sweep.

16   Q.  Are you offering an opinion whether the third amendment was

17   necessary?

18   A.  Well, this is the key part of the third amendment.  The

19   other part is the reduction in the retained portfolio at the

20   rate of 15 percent instead of 10 percent.  And that was the

21   other part.  It didn't have the same impact, and I'm really

22   mainly looking at the net worth sweep.

23   Q.  Okay.  And how about the suspension of the periodic

24   commitment fee for as long as the net worth sweep is in effect?

25   A.  Yes.  As I described earlier, the periodic commitment fee

1    was never assessed before, never determined, nor calculated,

2    and never imposed.  So to me, the before and the after the

3    third amendment on that are the same.

4         So from my point of view in terms of the impact on net

5    worth, impact on cash flows, and impact on the operations, that

6    was the -- it's the same before and after.  That's why I

7    focused on the net worth sweep.

8    Q.  Okay.  And so your bottom line is that the net worth sweep

9    itself, standing alone, was not necessary; correct?

10   A.  Well, that's the key part of the third amendment.

11   Q.  And by not necessary, you mean it was not an action that

12   had to be done to prevent insolvency-type developments that

13   were about to happen or had to be stopped; correct?

14   A.  Yes.  I mean, I'm looking at the hard cost by the net worth

15   sweep on the potential harm that I documented, the short-term

16   harm and the long-term harm.  And so I'm looking at the effect

17   of the net worth sweep on what Fannie and Freddie could have

18   done in terms of their operations, all the money that was taken

19   out from them.  So I'm looking at those financial impacts.

20   That's why it's consistent with the instruction that I had to

21   look at the insolvency or other significant harm, yes.

22   Q.  And you do not have an opinion as to whether the third

23   amendment or the net worth sweep was reasonable or

24   unreasonable; correct?

25   A.  Yes.  The -- the -- as I understand it, that's for the jury

1   to decide, whether it's reasonable or unreasonable.  So I'm

2   providing my analysis couched in words that -- that I'm

3   comfortable as an accountant, which is reasonably necessary.

4   That -- that's hopefully an input, along with other inputs that

5   the jury will use to decide on whether it's reasonable.

6   Q.  And you do not have an opinion whether the third amendment

7   or net worth sweep was in the best interests of members of the

8   public who rely on a stable mortgage market; right?

9   A.  Well, I -- I don't look at it the way you phrased it, but

10  I'm looking at the effect of the net worth sweep on the sound

11  and solvent financial condition that I described as -- as a --

12  you know, what the FHFA wanted from the conservatorship.

13        So I am looking at whether the net worth sweep would

14  bring these enterprises to a sound and solvent condition.  And

15  as I understand, that's needed in order for the enterprises to

16  do what you just described, all of the public missions.

17  Q.  Dr. Dharan, in your deposition I asked:  Do you have an

18  opinion as to whether the third amendment was in the best

19  interests of members of the public who rely on a stable

20  mortgage market.  That's what I just asked you here as well.

21        And you said:  I don't have an opinion, only because I

22  have a different scope that I was looking at.

23  A.  Right.  Exactly.

24  Q.  So you do not have an opinion as to whether the

25  third amendment or net worth sweep was in the best interests of

1   members of the public who rely on a stable mortgage market;

2   correct?

3   A.  I did not look at that question.  But what I described just

4   now is I'm looking at the financial side of the same question.

5   Essentially, you need to have a sound and solvent GSE in order

6   to do anything else.  And so the question I'm looking at is

7   just the financial end of the question.

8   Q.  And you have not analyzed whether the net worth sweep was

9   in the best interests of the public generally; correct?

10  A.  Right.  Not in a direct way, other than what I just said to

11  supplement my question -- my analysis.

12  Q.  And whether there was anything good about the net worth

13  sweep from anyone's perspective is beyond the scope of what you

14  were asked to do; right?

15  A.  I'm not sure I understand what that phrase means.  Are you

16  saying whether this is good for anybody?  I think you have

17  asked me this question before.  I had the same confusion.

18       What I would say, I'm looking at the well-defined

19  reason -- well-defined financial question because I remember

20  that the -- when FHFA was asked, you know, why did you do net

21  worth sweep -- Mr. Ugoletti and Mr. DeMarco did -- basically

22  said we did it because we want -- we were concerned with

23  circular draw.  We didn't want the Treasury commitment to be

24  eroded by circular draw.

25       So that's the question that -- that's the explanation

1    that they gave.  So I'm really looking at that finance question

2    to see is this true.  Was there a circular draw and, if so,

3    couldn't that have been addressed by other ways?  And that type

4    of analysis I did.

5    Q.  I did -- sir, I did ask you:  Do you believe there was

6    anything good about the net worth sweep from anyone's

7    perspective at your deposition.  You have a good memory.

8    A.  Yeah.

9    Q.  And you said:  This is clearly beyond the scope of what I

10   was asked to do.

11   A.  Yeah.  I'm thinking I still don't see the scope there, but

12   I certainly look at the finance side.  And that's pretty clear

13   from my analysis.

14   Q.  And you are not opining that the net worth sweep was done

15   for an improper reason; correct?

16   A.  Yeah.  I think the -- I don't -- if what I said in the

17   deposition is still true, I don't use words like improper

18   because those are not the words I use in my analysis.  Instead,

19   I use the defined phrase that I used, reasonably necessary.

20   That gives me the finance angle to look at.

21   Q.  And you don't have an opinion as to whether the net worth

22   sweep was done for an improper motive; correct?

23   A.  Yeah, I don't have an opinion on that.

24   Q.  And you don't have an opinion whether transferring earnings

25   to Treasury was proper or improper; correct?

1    A.  I believe -- I think I said I don't have an opinion earlier

2    also on that.

3    Q.  You are not opining that the net worth sweep was contrary

4    to law; correct?

5    A.  Yeah.  Again, on the previous question, I am looking at the

6    potential harm to the GSEs.  But the question you're asking

7    about the law, I was certainly not looking at that.

8    Q.  So on your Slide 29 -- you put up a slide that said only

9    Congress can dissolve, I think was the word, Fannie and

10   Freddie.

11   A.  I was quoting somebody on that, yes.

12   Q.  Pardon me?

13   A.  Yes.

14   Q.  And you are not intending to suggest that the

15   third amendment or net worth sweep was contrary to law in any

16   way; correct?

17   A.  I'm not saying that.

18   Q.  Okay.

19   A.  I'm not a lawyer or -- although I teach at the law school,

20   but I'm not a lawyer.

21   Q.  Okay.  And you know that the third amendment net worth

22   sweep was, in fact, authorized by HERA, which is an act of

23   Congress; correct?

24   A.  Yes.

25   Q.  You presented some slides, Dr. Dharan, that show what you

1   say Fannie and Freddie would have paid from 2013 to 2022 under

2   the 10 percent dividend as compared to what they actually paid

3   under the net worth sweep; correct?

4   A.  Yes.

5   Q.  Those were actual numbers using hindsight; right?

6   A.  Hindsight.

7   Q.  And you assumed in that slide that the 10 percent dividend

8   would have continued all during that time; right?

9   A.  Yes.

10  Q.  And you assumed that the results under a 10 percent

11  dividend as opposed to a net worth sweep, the financial results

12  would have been the same over all that time?

13  A.  Well, I had to make the assumption to make it simple,

14  although that would not be the case in the sense that if there

15  was no net worth sweep from 2013 onwards, the huge dividend

16  payments that were made under the net worth sweep would not

17  have been made.

18      So the enterprises would have had more resources.  They

19  would have built up more capital.  That might have led to more

20  business, all of those things that the capital allows.  I did

21  not include any of those.  I'm assuming the same operations

22  under the net worth sweep, at a minimum, would have continued.

23  Q.  And you didn't account for --

24  A.  So just to complete my answer, I was being conservative in

25  my calculations.

1   Q.  You did not account for the periodic commitment fee being

2   paid at all; correct?

3   A.  Yes.  I did not account for the periodic commitment

4   fee because it was never assessed, it was never calculated

5   and paid.  And Fannie Mae's forecast did not include it,

6   the one I showed.  The Freddie Mac forecast that I showed

7   did not include it.  I did the same.  I did not include it.

8   Q.  Okay.  Dr. Dharan, I don't want to have a replay of your

9   direct.  I know you explained all of that, and we're going to

10  be a long time if we do that.  So I'm trying to ask questions

11  that are susceptible to a shorter answer.

12  A.  Okay.

13          THE COURT:  We'll do it at 10:30 tomorrow.

14          MR. BERGMAN:  Thank you.

15          THE COURT:  Don't talk about the case.  Don't let

16  anyone talk to you about the case.  Don't Twitter or tweet or

17  X.

18          I'll see y'all at 10:30 tomorrow.

19          (Proceedings held out of the presence of the jury.)

20          THE COURT:  You can step down.

21      How much longer do you expect to go on cross?

22          MR. BERGMAN:  I think about an hour, Your Honor.

23          THE COURT:  How much redirect do you expect?

24          MR. KRAVETZ:  Tough to say, Your Honor.  Maybe 20 to

25  30 minutes so far.

1           THE COURT:  Okay.  So that will take us until noon.

2       We'll go off the record then.

3           (Off the record.)

4           (Proceedings were concluded at 5:02 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1286

1     <u>CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER</u>

2

3          I, Nancy J. Meyer, Registered Diplomate Reporter,

4     Certified Realtime Reporter, do hereby certify that the above

5     and foregoing constitutes a true and accurate transcript of my

6     stenograph notes and is a full, true, and complete transcript

7     of the proceedings to the best of my ability.

8

9                         Dated this 31st day of July, 2023.

10

11                    /s/ Nancy J. Meyer_____
                      Nancy J. Meyer
12                    Official Court Reporter
                      Registered Diplomate Reporter
13                    Certified Realtime Reporter
                      333 Constitution Avenue Northwest
14                    Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25

## $

**$100** [4] - 104:8, 104:13, 105:22, 106:17
**$11** [1] - 59:21
**$111** [1] - 76:17
**$128** [1] - 92:19
**$147** [1] - 56:14
**$149** [1] - 56:13
**$152** [1] - 14:25
**$199** [1] - 92:17
**$200** [6] - 104:13, 105:22, 106:17, 106:25, 108:6, 108:14
**$200,000** [1] - 24:18
**$250** [1] - 28:9
**$266** [1] - 49:25
**$28** [1] - 14:16
**$30** [3] - 21:7, 93:5, 99:8
**$32** [1] - 93:19
**$50** [2] - 39:8, 43:5
**$500** [1] - 42:1
**$60** [2] - 109:1, 113:4
**$64** [1] - 41:8
**$70** [1] - 19:15
**$75** [2] - 21:2, 80:21
**$99** [1] - 50:7

## '

**'06** [1] - 10:7
**'07** [1] - 10:7
**'08** [1] - 95:7
**'09** [1] - 94:5
**'10** [2] - 23:1, 94:5
**'11** [1] - 23:1
**'12** [2] - 23:1, 95:5
**'13** [1] - 14:10
**'14** [1] - 56:19
**'15** [1] - 56:19

## 0

**03-3** [2] - 19:6, 49:17

## 1

**1** [7] - 25:13, 90:13, 90:15, 90:17, 94:15, 94:16, 106:3
**1.8** [2] - 7:3, 7:8
**1/2** [1] - 46:25
**10** [24] - 25:11, 28:8, 34:12, 71:6, 72:16, 73:22, 75:23, 76:11, 76:20, 81:20, 86:11, 113:10, 113:17, 113:20, 113:24,

113:25, 114:13, 123:13, 124:1, 124:9, 126:20, 132:2, 132:7, 132:10
**10-basis-point** [1] - 25:14
**10-K** [6] - 29:17, 38:2, 38:3, 61:24, 115:18, 118:14
**10-Ks** [1] - 116:18
**10-Q** [5] - 61:23, 64:12, 67:11, 68:11
**10-Qs** [2] - 62:1, 116:18
**10:30** [2] - 133:13, 133:18
**11** [7] - 14:22, 67:15, 67:18, 100:10, 101:6, 101:7, 115:8
**11-billion** [1] - 59:7
**117** [1] - 92:25
**12** [5] - 16:4, 71:2, 72:18, 73:24
**12/31/2012** [1] - 56:14
**125** [1] - 3:8
**12th** [1] - 9:18
**13** [6] - 61:7, 99:7, 101:11, 101:13, 101:18
**13.8** [2] - 100:1, 100:3
**130** [1] - 76:16
**14** [5] - 39:20, 40:9, 53:2, 57:2, 91:22
**140** [1] - 57:7
**149** [1] - 57:7
**15** [5] - 28:12, 54:21, 100:10, 100:15, 126:20
**16** [1] - 14:21
**17** [2] - 14:21, 125:3
**17th** [1] - 40:11
**19** [1] - 104:4
**199** [1] - 92:24
**1st** [1] - 84:16

## 2

**2** [6] - 46:25, 50:1, 50:2, 123:5, 126:9
**2.4** [2] - 87:7, 87:11
**2.9** [1] - 7:4
**20** [19] - 52:15, 55:1, 55:6, 55:9, 55:11, 55:20, 58:4, 72:12, 93:12, 94:20, 94:21, 94:24, 95:4, 95:6, 95:9, 95:25, 96:6, 119:9, 133:24
**200** [2] - 109:14, 109:21

**2004** [3] - 22:11, 23:7, 109:14
**2005** [6] - 22:4, 22:6, 22:13, 22:16, 23:6
**2005-acquired** [1] - 22:6
**2006** [9] - 26:20, 94:4, 94:15, 94:18, 94:25, 95:3, 95:7, 95:24
**2007** [2] - 94:5, 95:3
**2008** [44] - 9:13, 10:7, 12:15, 14:13, 22:13, 22:16, 23:6, 44:1, 55:21, 83:10, 93:23, 94:1, 94:4, 94:5, 94:9, 94:13, 95:3, 95:17, 95:22, 99:3, 99:4, 99:7, 99:10, 99:15, 99:24, 100:1, 100:2, 100:12, 101:6, 102:8, 102:16, 103:3, 103:6, 103:13, 106:10, 110:21, 110:24, 111:10, 114:9, 114:11, 115:18, 117:21, 118:15
**2009** [42] - 9:13, 14:17, 22:18, 22:25, 95:9, 95:10, 99:12, 99:15, 99:22, 100:21, 101:12, 105:13, 106:6, 106:12, 107:15, 108:5, 108:23, 108:25, 109:9, 109:17, 109:18, 109:20, 109:24, 110:23, 111:8, 111:22, 112:2, 112:18, 113:3, 113:9, 113:16, 114:12, 118:17, 118:19, 119:6, 120:11, 121:14, 122:18, 123:12
**2010** [2] - 14:18, 100:23
**2011** [17] - 14:5, 14:19, 16:15, 20:13, 21:1, 25:7, 37:23, 37:24, 38:2, 38:5, 38:22, 66:25, 78:4, 78:11, 78:21, 79:6, 95:5
**2012** [113] - 5:10, 5:11, 6:12, 6:20, 6:22, 8:3, 8:24, 9:10, 9:15, 9:19, 9:24, 9:25, 10:1, 10:5, 11:1,

12:17, 12:24, 13:13, 14:10, 15:9, 15:11, 15:14, 15:15, 15:19, 16:5, 16:11, 16:18, 18:12, 18:22, 20:18, 20:25, 21:15, 21:16, 22:18, 22:20, 23:9, 23:17, 23:19, 23:25, 24:1, 24:19, 25:3, 25:7, 25:10, 26:1, 26:13, 27:10, 29:17, 30:15, 32:25, 33:7, 33:10, 34:19, 37:8, 37:18, 39:20, 40:9, 40:11, 41:12, 41:13, 41:14, 43:17, 44:13, 47:19, 47:25, 50:10, 50:13, 53:2, 54:14, 54:19, 55:2, 55:3, 55:13, 55:14, 55:17, 55:19, 59:1, 59:8, 64:10, 64:11, 64:12, 66:25, 67:9, 67:12, 67:24, 68:9, 68:10, 75:6, 78:15, 78:16, 91:22, 92:17, 93:9, 94:6, 94:16, 94:22, 95:13, 96:23, 100:13, 100:25, 101:6, 101:12, 102:9, 102:17, 103:13, 106:1, 107:23, 117:22, 125:3
**2013** [33] - 15:9, 41:12, 41:13, 41:17, 41:18, 41:19, 42:5, 42:14, 42:16, 42:22, 43:9, 43:10, 43:11, 56:19, 76:15, 83:14, 84:10, 84:11, 84:16, 84:23, 84:24, 85:10, 85:16, 85:19, 86:6, 86:23, 87:10, 87:22, 93:3, 106:3, 117:22, 132:1, 132:15
**2015** [5] - 55:25, 56:8, 56:15, 92:17, 93:3
**2022** [5] - 45:17, 46:12, 49:22, 50:19, 132:1
**205** [1] - 68:3
**228** [1] - 32:7
**23.9** [1] - 42:22
**25** [3] - 14:18, 68:9, 68:10
**259** [1] - 40:8
**26** [2] - 23:7, 121:14
**264** [2] - 48:5, 48:16
**266** [1] - 48:16

**266.6** [2] - 45:16, 46:23
**27** [4] - 14:19, 25:9, 95:13, 121:2
**29** [2] - 18:12, 131:8

## 3

**3** [5] - 46:25, 48:6, 72:15, 87:10, 92:1
**3.1-billion** [1] - 7:1
**3.2** [1] - 126:4
**3.2(d)** [1] - 126:4
**30** [5] - 14:21, 21:15, 63:5, 63:6, 133:25
**30-billion** [1] - 93:18
**30.8** [1] - 99:23
**31** [2] - 99:15, 106:1
**31.7** [1] - 41:19
**31st** [2] - 63:5, 118:15
**32-billion** [1] - 57:22
**33** [2] - 101:10, 109:6
**34** [3] - 99:20, 109:6, 109:12
**35.7-billion** [2] - 38:9, 41:10
**350** [2] - 114:21, 115:20
**37** [1] - 67:3

## 4

**4** [8] - 3:4, 23:17, 23:19, 50:12, 55:17, 59:11, 92:14
**4.2** [1] - 23:9
**4.6** [1] - 115:22
**40** [1] - 104:4
**40-plus** [1] - 98:19
**43** [1] - 98:20
**45** [3] - 26:22, 27:1, 89:12
**4th** [1] - 105:13

## 5

**5** [4] - 55:17, 57:8, 59:11, 97:4
**5.4** [1] - 7:2
**50** [5] - 43:9, 64:25, 65:15, 80:19
**50.6** [2] - 42:17, 42:20
**50.7** [2] - 109:13, 109:14
**500** [1] - 121:2
**53** [1] - 86:10
**535** [1] - 125:24
**535.........................** [1] - 3:8
**55-billion** [1] - 85:11
**58** [3] - 23:2, 23:16,

23:20
**58.4** [1] - 41:18
**59.9** [2] - 109:10, 109:21
**5:02** [1] - 134:4
**5th** [1] - 20:18

# 6

**6** [3] - 32:25, 50:20, 57:8
**6-billion** [1] - 50:18
**60** [2] - 101:22, 114:21
**64** [1] - 39:6
**64.1** [2] - 38:5, 41:8
**66** [2] - 114:21, 115:20

# 7

**7** [1] - 64:12
**70** [1] - 19:6
**71** [4] - 58:25, 59:24, 92:16, 92:17
**72** [2] - 19:16, 21:1
**73** [1] - 14:17
**73.9** [1] - 14:25
**74.5** [3] - 42:24, 42:25, 85:1
**75** [2] - 21:7, 80:20
**75.3** [1] - 21:1

# 8

**8** [5] - 25:19, 50:21, 64:10, 92:1, 92:14
**8-billion** [1] - 50:18
**8.7** [3] - 48:2, 48:14, 50:21
**82** [3] - 59:4, 59:24, 92:24
**85** [1] - 23:10
**8th** [2] - 67:12

# 9

**9** [3] - 16:4, 54:12, 57:7
**91** [1] - 3:5
**95** [1] - 27:6
**97** [5] - 27:10, 27:12, 27:18, 96:22, 96:23
**98** [1] - 38:20
**99** [1] - 50:8
**99.8** [2] - 38:10, 38:20
**9th** [2] - 67:12, 68:12

# A

**A-number** [1] - 122:11
**able** [11] - 29:7, 52:7, 57:20, 58:6, 70:23,

92:12, 96:15, 104:21, 114:19, 123:13, 123:25
**ABS** [2] - 102:24, 104:4
**absolutely** [2] - 35:10, 100:17
**academic** [1] - 118:4
**acceptance** [1] - 113:5
**accepted** [1] - 102:5
**according** [4] - 34:9, 39:22, 50:22, 96:22
**account** [3] - 132:23, 133:1, 133:3
**accountant** [5] - 18:16, 31:18, 39:19, 128:3
**accountants** [7] - 13:21, 18:16, 18:17, 18:19, 19:9, 31:3, 39:18
**accounting** [32] - 5:14, 7:16, 7:17, 11:11, 11:16, 12:5, 20:23, 30:17, 30:19, 31:16, 31:23, 31:24, 35:8, 37:9, 37:11, 42:12, 56:12, 62:15, 65:17, 85:4, 85:7, 85:8, 85:9, 86:14, 98:12, 102:5, 102:8, 102:11, 102:15
**accurate** [1] - 68:13
**acronym** [1] - 53:18
**act** [3] - 101:20, 105:8, 131:22
**acted** [3] - 103:19, 103:20
**acting** [1] - 105:1
**action** [1] - 127:11
**actual** [17] - 12:6, 15:3, 17:15, 17:17, 17:21, 17:25, 18:1, 18:2, 21:9, 21:14, 42:9, 44:12, 52:14, 62:14, 68:15, 132:5
**actuals** [2] - 21:4, 65:24
**add** [10] - 13:6, 14:22, 19:23, 38:15, 38:20, 40:5, 41:4, 42:25, 70:13, 77:9
**added** [5] - 13:22, 50:12, 70:16, 71:3
**adding** [11] - 13:24, 15:13, 32:22, 35:15, 38:9, 41:8, 43:14, 43:20, 43:21, 43:23, 45:10

**addition** [6] - 7:25, 9:21, 18:4, 42:14, 44:12, 79:14
**additional** [12] - 25:18, 35:15, 46:3, 48:20, 70:18, 74:15, 74:23, 84:7, 85:24, 92:4, 92:6, 121:17
**address** [2] - 5:22, 56:24
**addressed** [4] - 5:22, 69:13, 102:21, 130:3
**addressing** [1] - 77:6
**adds** [1] - 86:2
**Admitted** [1] - 3:7
**admitted** [3] - 71:21, 124:24, 125:24
**adverse** [1] - 88:2
**affairs** [2] - 49:4, 51:17
**affect** [4] - 73:20, 74:4, 97:10
**afford** [1] - 96:16
**affordability** [2] - 121:11, 121:16
**afternoon** [1] - 91:18
**ago** [3] - 48:21, 90:16, 91:21
**agree** [6] - 99:3, 108:19, 111:20, 114:19, 117:16, 118:16
**agreed** [6] - 74:25, 88:16, 88:17, 88:20, 99:17
**Agreement** [2] - 125:3, 126:3
**agreement** [2] - 104:5, 104:8
**ahead** [3] - 60:22, 79:4, 100:18
**ALL** [3] - 19:6, 19:12, 20:4
**allowance** [7] - 16:14, 18:4, 19:12, 20:12, 20:22, 38:7, 38:8
**allowed** [2] - 30:22, 103:10
**allows** [1] - 35:24, 132:20
**almost** [5] - 18:13, 41:16, 42:1, 81:16, 98:20
**alone** [2] - 49:13, 127:9
**alternative** [5] - 70:13, 75:10, 75:12, 75:20, 76:22
**alternatives** [13] - 5:21, 69:13, 74:15,

74:18, 74:22, 74:23, 74:25, 77:7, 77:8, 79:11, 79:15, 79:17, 80:11
**Amended** [2] - 125:2, 126:2
**amendment** [28] - 25:20, 28:4, 28:11, 40:25, 48:9, 81:15, 90:18, 105:15, 105:21, 106:7, 106:24, 107:10, 107:15, 108:14, 108:25, 124:7, 125:5, 126:11, 126:16, 126:18, 127:3, 127:10, 127:23, 128:6, 128:18, 128:25, 131:15, 131:21
**Amendment** [2] - 125:2, 126:2
**amendments** [1] - 28:5
**amount** [29] - 7:8, 12:5, 19:19, 19:21, 20:23, 43:24, 49:12, 50:14, 70:14, 70:17, 71:3, 73:9, 76:7, 76:23, 77:23, 85:22, 87:6, 87:25, 88:1, 89:4, 89:8, 89:9, 89:10, 99:16, 99:24, 106:22, 107:24, 124:10, 124:13
**amounts** [1] - 114:14
**ample** [1] - 96:2
**analysis** [14] - 18:8, 45:9, 46:1, 62:24, 69:23, 71:13, 79:16, 80:1, 80:23, 128:2, 129:11, 130:4, 130:13, 130:18
**analyze** [1] - 18:7
**analyzed** [2] - 48:19, 129:8
**angle** [1] - 130:20
**Anjan** [1] - 89:10
**announced** [3] - 25:16, 25:17, 79:4
**announcement** [4] - 25:11, 107:10, 110:15
**announcements** [1] - 110:18
**annual** [14] - 15:12, 29:15, 34:12, 37:24, 38:3, 38:4, 61:16, 61:24, 62:8, 63:9, 72:15, 86:23,

115:21, 115:23
**annually** [1] - 63:6
**answer** [6] - 44:19, 60:17, 84:9, 98:23, 132:24, 133:11
**anticipates** [1] - 17:16
**anticipating** [1] - 26:11
**anticipation** [1] - 54:7
**apologies** [2] - 125:14, 125:17
**apologize** [2] - 125:25, 126:6
**apples** [1] - 65:23
**appreciation** [3] - 53:20, 54:25, 55:12
**appropriate** [1] - 68:20
**approval** [1] - 111:6
**approvals** [1] - 79:23
**approximation** [2] - 49:8, 64:23
**arbitrary** [1] - 88:19
**Arizona** [1] - 82:15
**arrive** [1] - 6:2
**aside** [6] - 11:25, 13:7, 13:21, 15:1, 15:16, 17:17
**aspects** [2] - 77:6, 77:10
**assess** [2] - 43:12, 117:5
**assessed** [2] - 127:1, 133:4
**asset** [22] - 5:15, 30:24, 31:5, 35:8, 35:21, 36:2, 36:7, 36:8, 36:11, 36:13, 36:15, 37:4, 38:24, 40:22, 48:20, 83:7, 83:25, 84:7, 87:16, 87:19, 103:1, 103:2
**asset-back** [1] - 103:2
**asset-backed** [1] - 103:1
**assets** [10] - 11:18, 12:8, 30:22, 31:4, 35:5, 36:22, 37:17, 40:4, 90:22, 100:6
**assist** [1] - 119:1
**assistance** [1] - 121:17
**assistant** [1] - 34:1
**associated** [2] - 11:11, 72:13
**assume** [2] - 54:15, 73:4
**assumed** [4] - 57:15, 71:13, 132:7, 132:10
**assumes** [2] - 93:8,

94:7
**assuming** [6] - 50:3, 50:20, 55:1, 69:22, 86:4, 132:21
**assumption** [2] - 54:6, 132:13
**assumptions** [3] - 53:7, 53:25, 55:23
**assurance** [5] - 119:11, 119:16, 119:19, 119:24, 122:20
**attorneys** [1] - 116:23
**audio** [1] - 90:2
**audio-visual** [1] - 90:2
**auditor** [1] - 31:13
**auditors** [1] - 116:23
**August** [44] - 5:10, 8:3, 8:24, 9:10, 9:15, 9:18, 9:19, 9:24, 10:1, 10:5, 11:1, 12:24, 13:13, 25:10, 25:16, 25:19, 26:1, 27:10, 32:25, 33:7, 34:19, 39:20, 40:9, 40:11, 43:17, 44:13, 47:25, 48:9, 48:11, 53:2, 55:3, 55:13, 55:14, 55:19, 59:1, 59:20, 61:4, 64:10, 64:12, 78:15, 91:22, 107:23, 125:3
**authority** [2] - 87:1, 111:5
**authorized** [1] - 131:22
**availability** [3] - 44:25, 71:18
**available** [26] - 45:16, 46:23, 46:24, 47:5, 48:5, 48:25, 49:10, 49:21, 49:24, 49:25, 58:6, 69:24, 70:6, 73:6, 73:10, 85:15, 88:1, 103:16, 103:17, 103:18, 104:25, 105:5, 105:6, 105:7, 109:15, 118:16
**average** [1] - 93:6
**avoid** [5] - 4:16, 51:24, 77:3, 91:2, 102:3
**aware** [11] - 24:7, 25:2, 54:3, 59:8, 61:15, 86:13, 106:25, 107:7, 107:8, 118:21, 118:22

**B**

**back-and-forth** [2] - 83:19, 83:21
**backed** [5] - 97:4, 97:7, 103:1, 107:1, 107:12
**background** [3] - 31:18, 31:20, 31:21
**bad** [8] - 15:2, 51:19, 52:2, 57:1, 57:9, 58:3, 93:15, 95:1
**Bala** [1] - 3:4
**balance** [19] - 5:17, 13:20, 28:7, 39:7, 39:8, 40:5, 41:16, 41:20, 41:22, 41:25, 42:8, 42:19, 62:14, 75:7, 80:19, 84:18, 103:20, 105:4, 105:6
**balance-sheet** [1] - 103:20
**banks** [6] - 25:23, 26:24, 27:16, 31:14, 31:15, 98:20
**bar** [7] - 47:16, 48:1, 48:8, 49:21, 70:15, 70:17, 71:3
**base** [14] - 52:6, 53:12, 53:14, 53:15, 54:3, 54:7, 54:8, 54:15, 56:4, 56:5, 56:9, 56:13, 58:18, 65:25
**based** [7] - 22:8, 37:23, 39:24, 45:14, 49:13, 113:25, 126:14
**basic** [1] - 81:14
**basis** [3] - 25:12, 25:13, 89:12
**basis-point** [1] - 25:12
**became** [1] - 15:15
**become** [2] - 23:25, 29:19
**becomes** [2] - 38:14, 105:4
**becoming** [1] - 50:24
**beforehand** [1] - 40:12
**begin** [2] - 18:3, 91:11
**beginning** [5] - 14:4, 18:22, 24:17, 53:11, 94:18
**begins** [1] - 20:8
**behalf** [1] - 98:16
**behind** [1] - 59:15
**below** [7] - 7:8, 13:10, 50:4, 75:14, 75:19, 94:21, 101:22

**bench** [1] - 68:24
**benefit** [1] - 35:22
**Bergman** [2] - 3:5, 91:13
**BERGMAN** [51] - 91:13, 91:16, 96:7, 96:9, 99:18, 99:21, 104:1, 104:3, 109:5, 109:8, 110:1, 110:2, 112:1, 112:23, 113:8, 113:15, 114:20, 115:1, 115:6, 115:9, 115:11, 115:14, 115:17, 116:3, 116:6, 116:8, 118:10, 118:13, 119:8, 119:10, 120:13, 120:14, 120:24, 121:1, 121:5, 121:6, 123:18, 123:20, 123:22, 123:23, 124:23, 125:4, 125:9, 125:11, 125:14, 125:17, 125:20, 125:25, 126:1, 133:14, 133:22
**best** [7] - 35:7, 35:11, 35:23, 128:7, 128:18, 128:25, 129:9
**better** [15] - 8:11, 9:15, 11:8, 11:9, 13:1, 13:11, 53:12, 53:14, 54:16, 54:17, 54:21, 56:5, 56:9, 58:18, 128:9
**between** [10] - 9:10, 25:22, 29:10, 42:8, 68:12, 79:2, 79:6, 102:16, 104:12, 122:6
**beyond** [5] - 5:23, 22:25, 26:14, 129:13, 130:9
**big** [18] - 9:20, 14:16, 15:17, 23:2, 23:5, 24:11, 24:13, 24:15, 37:2, 37:4, 37:5, 59:24, 60:14, 82:13, 83:11, 107:19, 122:6
**big-time** [1] - 82:13
**bigger** [9] - 12:17, 24:6, 27:7, 34:24, 34:25, 83:8, 89:13, 95:15, 96:25
**billion** [108] - 7:2, 7:3, 7:4, 7:8, 7:10, 14:16, 14:17, 14:18, 14:19,

14:25, 19:6, 19:15, 19:16, 21:1, 21:2, 21:7, 28:9, 38:5, 38:10, 38:20, 39:6, 39:8, 41:8, 42:17, 42:20, 42:22, 42:24, 42:25, 43:5, 43:9, 45:16, 46:20, 46:22, 46:23, 48:2, 48:5, 48:14, 48:16, 49:25, 50:1, 50:2, 50:7, 50:12, 50:21, 56:13, 56:14, 57:7, 58:21, 58:25, 59:4, 59:11, 59:16, 59:21, 59:24, 61:7, 61:8, 76:16, 76:17, 80:20, 80:21, 85:1, 85:11, 86:10, 87:7, 87:10, 92:16, 92:17, 92:19, 92:24, 92:25, 93:5, 93:19, 99:8, 99:23, 100:1, 100:3, 104:8, 104:13, 105:22, 106:9, 106:17, 106:25, 107:22, 107:25, 108:6, 108:14, 109:1, 109:10, 109:13, 109:15, 109:21, 113:4, 115:22
**billion-plus** [1] - 76:16
**billions** [4] - 14:17, 41:6, 41:8, 41:19
**binder** [2] - 52:15, 67:3
**bit** [7] - 7:7, 21:23, 26:18, 28:13, 46:22, 48:15, 59:15
**black** [1] - 70:16
**blip** [1] - 7:18
**blue** [10] - 22:23, 23:21, 23:24, 24:6, 42:16, 49:20, 58:24, 59:3, 92:21, 92:23
**board** [4] - 39:21, 47:17, 47:25, 117:10
**Board** [1] - 89:2
**boards** [4] - 39:21, 39:23, 40:3
**bond** [7] - 74:3, 74:4, 74:12, 75:15, 75:16, 85:14, 86:5
**book** [4] - 29:2, 117:9, 117:15, 119:2
**books** [3] - 8:10, 8:12, 10:8
**borrow** [6] - 83:4, 85:19, 85:23, 86:2, 86:6, 88:4

**borrowing** [3] - 80:24, 85:14, 85:25
**bottom** [8] - 7:2, 13:14, 14:1, 49:9, 58:12, 83:6, 121:4, 127:8
**bottomed** [1] - 9:24
**bought** [6] - 11:22, 22:24, 22:25, 24:11
**brand** [1] - 24:19
**brand-new** [1] - 24:19
**break** [3] - 4:10, 68:19, 72:22
**bricks** [1] - 13:25
**brief** [3] - 34:18, 35:12, 90:12
**briefly** [2] - 5:7, 98:19
**bring** [4] - 42:18, 77:19, 79:21, 128:14
**brings** [1] - 79:20
**brought** [2] - 99:11, 99:12
**bubble** [1] - 22:14
**buffer** [4] - 82:20, 82:22, 82:23, 83:20
**build** [6] - 44:10, 45:20, 81:24, 83:20, 87:1, 103:10
**build-up** [1] - 44:10
**building** [8] - 18:5, 43:18, 45:21, 52:9, 52:10, 81:7, 82:4, 82:21
**buildup** [2] - 35:14, 35:16
**built** [2] - 94:4, 132:19
**bulk** [1] - 42:19
**bullet** [7] - 64:25, 68:4, 71:22, 88:24, 104:16, 105:9, 122:2
**business** [9] - 27:3, 27:4, 29:2, 80:15, 80:25, 87:2, 98:15, 120:2, 130:20
**buy** [6] - 11:7, 22:5, 79:23, 80:12, 96:16, 96:25
**buy-in** [2] - 79:23, 80:12
**buying** [1] - 26:25

**C**

**calculated** [5] - 42:4, 90:7, 102:6, 127:1, 133:4
**calculating** [1] - 73:25
**calculation** [2] - 92:24, 105:8
**calculations** [1] -

132:25
**calendar** [1] - 63:7
**cannot** [4] - 61:9,
81:23, 110:5, 117:9
**capacity** [1] - 104:12
**capital** [21] - 81:22,
81:24, 82:5, 87:1,
87:6, 87:8, 103:4,
103:10, 103:13,
103:15, 103:19,
103:20, 103:25,
104:18, 104:20,
105:1, 105:2, 105:4,
132:19, 132:20
**Capital** [2] - 31:15,
31:16
**capped** [1] - 106:4
**caps** [3] - 34:13,
44:16, 65:13
**care** [3] - 81:25, 84:4,
112:13
**Case** [1] - 94:14
**case** [51] - 31:5, 41:17,
47:22, 52:6, 52:7,
52:12, 53:12, 53:13,
53:17, 54:4, 54:5,
54:7, 54:8, 54:15,
54:16, 54:17, 54:21,
54:22, 54:25, 55:1,
55:5, 56:4, 56:5,
56:9, 56:13, 56:21,
56:23, 56:24, 57:1,
57:12, 57:13, 57:14,
57:18, 58:23, 58:24,
65:25, 78:1, 92:9,
92:11, 104:25,
113:4, 117:19,
118:8, 132:14,
133:15, 133:16
**Case-Shiller** [1] -
94:14
**cases** [6] - 53:9,
53:10, 53:11, 53:16,
55:23, 117:22
**cash** [30] - 7:6, 12:4,
15:3, 37:9, 37:11,
43:1, 44:8, 70:9,
70:10, 72:15, 72:17,
73:6, 73:21, 80:15,
80:24, 85:7, 85:13,
85:15, 88:1, 88:3,
113:10, 113:17,
113:19, 113:20,
114:13, 123:13,
124:1, 124:10,
126:13, 127:5
**catastrophic** [2] -
51:18, 59:23
**caught** [1] - 109:22
**caused** [1] - 70:24

**causing** [1] - 49:14
**caveats** [1] - 37:23
**cc** [1] - 18:15
**CEO** [1] - 30:10
**certain** [8] - 32:14,
44:14, 44:24, 51:1,
63:11, 63:19, 76:23,
96:24
**certainly** [11] - 9:15,
25:7, 44:4, 108:3,
112:9, 112:17,
112:24, 113:2,
114:11, 130:12,
131:7
**certainty** [2] - 10:10,
10:12
**certificates** [2] - 72:4,
72:14
**cetera** [1] - 88:5
**CFO** [2] - 39:2, 54:1
**chairman** [2] - 88:25,
89:2
**change** [12] - 15:19,
16:18, 53:22, 54:10,
54:20, 57:4, 59:24,
70:20, 75:18, 76:7,
123:4
**changed** [7] - 9:9,
9:14, 9:15, 14:9,
37:8, 78:17, 124:9
**changes** [3] - 10:25,
48:1, 120:1
**characterized** [1] -
10:3
**charge** [8] - 17:10,
17:13, 17:14, 17:15,
17:18, 18:2, 27:8,
78:22
**charge-off** [4] - 17:10,
17:13, 17:18, 18:2
**charge-offs** [1] - 17:15
**chart** [12] - 13:10,
13:11, 13:14, 22:7,
22:10, 22:21, 26:19,
46:13, 66:13, 94:15,
96:23, 121:7
**charter** [1] - 123:2
**charts** [1] - 84:17
**chief** [5] - 16:19,
31:11, 31:16, 60:6
**choose** [2] - 17:2,
31:9
**chosen** [2] - 32:13,
64:4
**chunk** [1] - 23:2
**circular** [24] - 5:23,
44:5, 44:7, 44:11,
46:17, 50:24, 69:14,
70:3, 71:7, 72:22,
73:12, 73:19, 74:11,

75:5, 76:3, 79:11,
92:7, 123:14, 124:1,
129:23, 129:24,
130:2
**cite** [3] - 71:14, 71:17,
71:19
**claim** [1] - 70:14
**claims** [1] - 70:18
**clarify** [7] - 87:7,
97:11, 98:12, 99:2,
102:18, 107:14,
113:23
**class** [1] - 49:15
**clean** [1] - 101:18
**clear** [3] - 10:10,
85:18, 130:12
**clearly** [1] - 130:9
**clip** [2] - 22:1, 90:1
**close** [1] - 107:21
**collapses** [1] - 55:19
**collect** [2] - 27:8,
77:24
**colloquially** [1] -
62:17
**color** [1] - 15:11
**column** [3] - 56:22,
57:11, 93:1
**combination** [1] -
51:18
**combinations** [1] -
51:20
**combine** [3] - 20:3,
29:5, 35:2
**combined** [4] - 8:17,
97:1, 104:13, 104:18
**combining** [2] - 26:13,
29:23
**comfortable** [1] -
128:3
**comfortably** [1] - 74:9
**coming** [16] - 5:16,
21:8, 21:9, 23:9,
23:10, 23:19, 34:11,
35:14, 41:22, 45:10,
49:6, 49:15, 49:17,
75:7, 107:21
**Commission** [1] -
116:10
**commitment** [65] -
45:16, 45:17, 45:25,
46:12, 46:23, 48:23,
49:10, 49:21, 49:24,
50:22, 55:24, 57:6,
57:21, 57:23, 61:1,
65:13, 65:16, 70:20,
70:21, 71:10, 71:11,
73:1, 73:7, 73:9,
74:16, 75:14, 75:18,
76:1, 76:2, 76:9,
88:8, 88:11, 88:14,

89:9, 89:12, 90:7,
93:19, 100:10,
100:16, 102:3,
103:17, 103:18,
103:19, 104:8,
104:11, 104:14,
104:20, 105:3,
105:6, 105:21,
105:25, 106:3,
106:8, 106:25,
107:2, 107:24,
108:6, 108:14,
109:2, 124:20,
126:24, 126:25,
129:23, 133:1, 133:3
**commitments** [1] -
58:7
**common** [6] - 52:1,
70:8, 110:4, 110:16,
120:20, 122:3
**communicated** [2] -
120:10, 122:5
**companies** [11] -
11:16, 20:10, 26:23,
27:3, 30:6, 30:20,
35:24, 65:11, 77:18,
98:5, 116:19
**company** [6] - 16:13,
20:10, 36:9, 117:6,
117:12, 119:3
**company's** [3] -
36:15, 37:2, 117:6
**compare** [2] - 56:16,
67:20
**compared** [3] - 16:15,
48:4, 132:2
**comparing** [1] - 90:18
**comparison** [1] - 9:9
**complete** [3] - 48:8,
55:18, 132:24
**completely** [7] - 5:24,
7:6, 9:14, 27:3,
49:14, 59:14, 61:5
**component** [1] - 124:7
**components** [1] -
96:11
**composition** [1] -
23:22
**comprehensive** [4] -
33:11, 59:13, 76:16,
92:3
**concept** [11] - 13:18,
17:6, 21:22, 22:8,
25:12, 31:2, 31:23,
32:1, 32:19, 35:4,
43:14
**concern** [2] - 50:24,
108:12
**concerned** [1] -
129:22

**concerns** [3] - 107:1,
107:11, 108:5
**concluded** [1] - 134:4
**conclusion** [8] -
19:25, 20:1, 20:2,
45:4, 46:10, 81:6,
90:19, 103:12
**condition** [4] - 6:18,
90:23, 128:11,
128:14
**conditions** [1] - 44:1
**confidence** [2] -
108:7, 108:15
**confirm** [4] - 67:17,
99:10, 100:19, 124:5
**confirming** [1] - 96:24
**conflict** [4] - 121:19,
121:23, 121:25,
122:1
**confusion** [1] - 129:17
**Congress** [6] - 97:12,
97:14, 97:15, 131:9,
131:23
**congressional** [1] -
123:2
**connection** [2] - 26:4,
58:12
**consensus** [1] - 120:6
**consent** [6] - 110:25,
111:3, 111:12,
111:14, 111:16,
111:19
**conservative** [2] -
54:13, 132:24
**conservator** [4] - 72:2,
97:19, 97:20, 97:21
**conservators** [1] -
14:9
**conservatorship** [33] -
14:5, 14:13, 14:14,
26:17, 36:21, 41:1,
41:3, 61:19, 90:21,
110:5, 110:13,
110:19, 111:2,
111:11, 111:16,
111:17, 112:15,
112:18, 113:6,
119:12, 119:15,
119:17, 119:20,
119:25, 120:1,
120:3, 120:16,
121:8, 121:9, 122:7,
122:20, 122:24,
128:12
**conservatorships** [5]
- 111:22, 111:23,
112:2, 112:5, 112:9
**conserve** [1] - 90:22
**consider** [3] - 8:22,
72:3, 80:14

**consideration** [1] - 124:19
**considered** [7] - 22:15, 65:3, 74:24, 75:12, 76:21, 77:8, 79:13
**considering** [1] - 54:14
**consistent** [6] - 56:18, 56:20, 66:11, 67:18, 116:5, 127:20
**consisting** [1] - 5:3
**consultant** [2] - 98:5, 98:14
**consultation** [2] - 88:24, 90:9
**consulted** [1] - 89:4
**consulting** [2] - 98:15
**contained** [2] - 47:7, 47:10
**containing** [1] - 62:13
**contains** [1] - 49:21
**contemplate** [1] - 77:14
**contemporaneous** [1] - 55:10
**context** [9] - 4:19, 16:7, 36:4, 55:12, 57:24, 59:3, 60:2, 71:7, 99:2
**continue** [10] - 61:18, 75:23, 113:6, 119:20, 119:25, 120:7, 122:23, 123:1, 123:9, 126:5
**Continued** [1] - 3:4
**continued** [3] - 4:8, 132:8, 132:22
**continues** [3] - 61:2, 93:15
**contract** [1] - 104:12
**contrary** [2] - 131:3, 131:15
**contrast** [2] - 9:18, 73:12
**control** [1] - 51:23
**conversation** [1] - 19:10
**converted** [3] - 21:12, 21:13, 84:19
**conveyed** [1] - 122:8
**copy** [1] - 18:15
**corporate** [3] - 91:22, 112:5, 117:10
**corporations** [2] - 77:13, 79:18
**correct** [122] - 6:10, 13:15, 24:25, 30:7, 30:8, 42:3, 43:5, 43:6, 47:7, 48:18,

60:7, 67:25, 69:14, 69:18, 79:9, 84:19, 85:2, 87:16, 88:8, 91:23, 92:17, 93:23, 94:17, 95:20, 97:8, 97:10, 97:19, 97:22, 98:2, 98:9, 99:5, 99:25, 100:4, 100:7, 100:10, 100:16, 101:8, 101:13, 101:16, 101:23, 102:1, 102:5, 102:9, 102:10, 103:5, 103:14, 103:19, 104:22, 105:13, 105:23, 106:2, 106:13, 106:23, 108:2, 108:8, 109:2, 109:10, 109:17, 110:4, 110:17, 110:21, 111:1, 111:6, 111:7, 111:12, 111:16, 111:23, 112:3, 112:15, 112:24, 113:18, 114:1, 114:4, 114:17, 115:18, 115:23, 116:1, 116:10, 116:16, 116:20, 116:25, 117:3, 117:24, 118:2, 118:7, 118:17, 118:23, 119:4, 119:13, 119:17, 119:20, 120:3, 120:11, 120:16, 120:20, 121:21, 122:3, 122:7, 122:16, 122:21, 122:24, 123:9, 123:14, 124:2, 124:7, 124:18, 125:6, 126:8, 127:9, 127:13, 127:24, 129:2, 129:9, 130:15, 130:22, 130:25, 131:4, 131:16, 131:23, 132:3, 133:2
**correspondingly** [1] - 13:9
**corroborates** [1] - 46:1
**corroboration** [1] - 46:3
**cost** [1] - 127:14
**costs** [1] - 26:9
**couched** [1] - 128:2
**could've** [1] - 76:21

**counsel** [2] - 4:6, 68:23
**counting** [1] - 100:11
**country** [1] - 96:21
**couple** [4] - 8:6, 52:21, 74:22, 90:16
**course** [4] - 23:24, 56:19, 65:4, 118:2
**courses** [1] - 98:21
**COURT** [28] - 4:5, 68:17, 68:21, 68:23, 69:2, 69:6, 72:10, 79:3, 91:8, 91:11, 111:25, 112:22, 113:1, 113:13, 114:25, 115:8, 115:10, 115:13, 123:16, 123:19, 123:21, 125:10, 125:23, 133:13, 133:15, 133:20, 133:23, 134:1
**Court's** [1] - 91:6
**COURTROOM** [2] - 115:4, 125:19
**covenants** [1] - 111:4
**cover** [4] - 26:7, 26:9, 59:14, 72:6
**covered** [3] - 7:5, 59:13, 59:15
**create** [2] - 26:13, 88:10
**created** [3] - 97:12, 97:14, 123:3
**creates** [2] - 86:16, 97:16
**credit** [28] - 8:15, 9:6, 9:10, 9:23, 10:4, 11:6, 11:12, 14:4, 14:16, 14:22, 15:12, 15:19, 16:8, 16:14, 16:15, 16:21, 18:8, 24:7, 24:8, 25:22, 26:2, 26:7, 26:11, 34:25, 35:25, 40:24, 65:6, 65:7
**credit-related** [1] - 16:15
**crisis** [21] - 8:9, 8:11, 9:10, 9:13, 9:17, 9:23, 10:3, 22:12, 22:14, 26:21, 27:2, 33:7, 36:20, 36:25, 37:1, 82:13, 94:4, 94:6, 95:5, 95:17, 95:24
**critical** [3] - 96:18, 96:19, 97:13
**critically** [1] - 96:17
**criticism** [6] - 102:11,

102:13, 102:15, 102:19, 102:22, 103:9
**criticisms** [1] - 102:18
**cross** [2] - 91:12, 133:21
**Cross** [1] - 3:5
**CROSS** [1] - 91:15
**Cross-Examination** [1] - 3:5
**CROSS-EXAMINATION** [1] - 91:15
**cumulative** [6] - 58:13, 58:16, 92:16, 93:3, 114:3, 114:6
**currency** [1] - 13:25
**current** [1] - 120:8
**curve** [5] - 18:22, 18:25, 19:1, 19:3, 20:3
**cycle** [3] - 16:14, 16:21, 24:8

**D**

**dash** [2] - 56:10, 56:11
**data** [12] - 7:13, 10:1, 10:19, 10:20, 21:14, 21:18, 22:19, 22:21, 38:22, 48:8, 48:10, 55:10
**date** [17] - 25:19, 40:7, 40:10, 52:25, 53:1, 59:1, 64:11, 67:13, 67:24, 68:6, 78:11, 79:6, 79:7, 105:15, 120:16, 121:14, 122:18
**dated** [7] - 16:4, 18:12, 20:17, 39:20, 40:9, 53:2, 125:3
**dates** [2] - 63:2, 63:4, 64:10
**David** [1] - 91:13
**days** [5] - 40:12, 40:13, 53:3, 53:5, 101:22
**deal** [1] - 87:18
**dealing** [2] - 87:15, 87:20
**debt** [2] - 107:1, 107:11
**December** [27] - 37:24, 59:20, 61:5, 99:4, 99:7, 99:15, 105:13, 106:1, 106:6, 106:8, 108:23, 108:25, 109:24, 110:23,

111:8, 111:22, 112:2, 112:18, 113:3, 113:9, 113:16, 114:12, 118:15, 118:16, 119:6, 122:18, 123:12
**decide** [2] - 128:1, 128:5
**decided** [2] - 27:4, 42:18
**deciding** [1] - 31:3
**decis** [1] - 80:5
**decision** [8] - 6:3, 77:11, 77:22, 78:7, 78:20, 80:3, 80:5, 117:10
**decisions** [2] - 30:19, 79:19
**declaring** [1] - 72:3
**decline** [30] - 29:25, 53:21, 54:8, 54:9, 54:17, 54:18, 54:20, 54:24, 55:1, 55:2, 55:7, 55:11, 57:1, 57:2, 57:10, 57:15, 58:4, 82:15, 93:12, 94:1, 94:7, 94:12, 94:24, 95:4, 95:6, 95:8, 95:11, 95:15, 96:1
**declines** [2] - 29:25, 87:7
**declining** [2] - 9:18, 87:8
**decrease** [2] - 73:9, 87:12
**decreased** [1] - 26:16
**decreasing** [1] - 35:1
**deduct** [1] - 36:12
**default** [3] - 17:19, 24:13, 24:22
**defaulted** [1] - 97:6
**defaults** [1] - 17:22
**defendants** [2] - 64:5, 91:11, 91:14
**Defendants'** [2] - 3:8, 125:24
**defendants'** [2] - 65:18, 67:19
**defense** [1] - 116:13
**deferred** [16] - 5:15, 30:23, 35:5, 35:8, 35:21, 36:2, 36:6, 36:8, 36:11, 36:14, 36:21, 37:4, 37:17, 38:24, 40:3, 40:22
**deficiency** [1] - 77:10
**deficient** [3] - 6:1, 6:3, 81:1

**defined** [7] - 54:19,
81:20, 83:3, 83:4,
129:18, 129:19,
130:19
**definitely** [2] - 12:14,
68:11
**degree** [1] - 25:5
**Deloitte** [1] - 31:14
**DeMarco** [7] - 15:25,
34:2, 34:7, 34:9,
68:7, 68:14, 129:21
**demonstrative** [2] -
11:21, 15:8
**Department** [2] -
33:25, 73:10
**depict** [4] - 15:21,
41:12, 58:8, 58:11
**depicted** [9] - 6:16,
14:7, 44:1, 49:2,
53:6, 64:16, 66:14,
82:8
**depicting** [3] - 20:21,
29:9, 58:15
**depicts** [1] - 45:4
**deposition** [5] - 31:13,
60:1, 128:17, 130:7,
130:17
**depositions** [1] -
98:24
**DEPUTY** [2] - 115:4,
125:19
**deputy** [1] - 34:1
**describe** [13] - 4:12,
13:18, 14:11, 18:10,
35:8, 35:21, 40:20,
45:7, 57:12, 63:11,
81:1, 84:11, 88:15
**described** [15] - 24:23,
28:5, 64:14, 66:11,
70:2, 95:21, 98:13,
110:9, 110:12,
116:18, 124:13,
126:25, 128:11,
128:16, 129:3
**describes** [1] - 54:3
**describing** [10] - 4:19,
16:7, 17:5, 17:12,
31:23, 32:19, 33:2,
51:1, 104:5, 104:11
**description** [2] - 66:3,
66:4
**descriptive** [2] -
62:21, 62:25
**designated** [1] - 114:3
**designation** [1] - 72:4
**details** [1] - 5:7
**determinant** [1] - 9:3
**determine** [4] - 74:14,
88:18, 88:21, 88:22
**determined** [7] - 9:5,

9:6, 64:19, 75:15,
89:4, 106:12, 127:1
**developments** [1] -
127:12
**Dharan** [64] - 3:4,
4:10, 6:12, 8:22,
10:24, 12:19, 14:3,
15:8, 15:23, 18:10,
20:11, 21:14, 24:23,
26:15, 29:14, 30:4,
32:6, 33:21, 34:15,
37:16, 39:10, 39:15,
40:7, 40:20, 43:14,
44:12, 47:13, 52:14,
52:23, 55:22, 56:4,
58:15, 60:6, 61:15,
64:4, 65:18, 66:21,
67:2, 68:6, 69:12,
70:22, 71:24, 72:21,
74:13, 76:24, 81:9,
84:13, 86:20, 88:6,
90:4, 90:11, 91:10,
91:17, 91:20, 94:17,
96:10, 105:10,
116:9, 119:9, 125:5,
126:7, 128:17,
131:25, 133:8
**diagram** [7] - 14:8,
19:13, 33:9, 41:11,
50:16, 74:6, 95:23
**dialogue** [1] - 89:3
**differ** [1] - 62:22
**differed** [1] - 31:5
**difference** [10] -
12:17, 15:17, 42:8,
47:4, 57:2, 74:11,
92:24, 95:20, 121:7,
122:6
**different** [14] - 42:11,
55:18, 58:17, 64:14,
64:25, 71:7, 75:19,
78:11, 93:25, 94:12,
105:7, 107:22,
125:18, 128:22
**differently** [1] - 73:5
**dip** [1] - 82:24
**dire** [1] - 51:17
**Direct** [1] - 3:4
**direct** [6] - 90:12,
91:10, 105:10,
116:12, 129:10,
133:9
**DIRECT** [1] - 4:8
**directed** [2] - 101:4,
121:15
**direction** [2] - 10:11,
16:19
**directly** [1] - 101:16
**directors** [1] - 39:21
**disaster** [2] - 97:7,

97:9
**disclose** [2] - 37:25,
38:1
**disclosed** [3] - 64:20,
85:22, 86:16
**disclosing** [1] - 65:11
**disclosure** [4] - 65:12,
86:21, 87:5, 114:18
**disclosures** [3] -
63:16, 117:2, 117:12
**discretion** [3] - 88:18,
88:21, 101:25
**discuss** [1] - 30:23
**discussed** [4] - 5:21,
39:23, 44:6, 90:16
**discussing** [2] - 40:3,
43:22
**discussion** [2] -
41:15, 62:24
**display** [3] - 115:7,
115:12, 118:11
**displayed** [1] - 116:12
**dissolve** [1] - 131:9
**dividend** [53] - 7:5,
7:6, 7:10, 33:12,
34:12, 43:1, 44:8,
50:6, 50:11, 69:17,
69:24, 70:10, 70:14,
70:17, 72:2, 72:15,
73:6, 73:21, 74:1,
75:13, 75:18, 75:19,
76:11, 80:24, 81:19,
82:25, 83:15, 85:5,
85:11, 85:13, 85:20,
86:6, 87:3, 87:25,
88:4, 92:3, 92:8,
113:10, 113:17,
113:19, 113:20,
114:7, 114:13,
115:21, 123:14,
124:1, 124:10,
124:13, 132:2,
132:7, 132:11,
132:15
**dividends** [20] - 50:11,
59:13, 72:3, 72:5,
73:15, 76:18, 80:22,
83:19, 109:24,
110:3, 110:6, 110:7,
110:9, 110:16,
110:18, 110:21,
110:25, 111:2,
111:6, 111:15
**document** [25] -
15:23, 15:25, 32:15,
33:15, 33:17, 33:21,
33:22, 47:7, 51:11,
52:15, 52:18, 52:20,
52:21, 52:24, 52:25,
53:2, 55:22, 59:25,

67:5, 67:15, 71:19,
71:24, 79:19,
108:18, 125:12
**documentation** [2] -
79:15, 80:10
**documentations** [1] -
79:22
**documented** [1] -
127:15
**documenting** [1] -
79:25
**documents** [7] -
10:15, 20:11, 31:25,
44:24, 51:1, 71:15,
71:17
**dollars** [10] - 7:8, 7:10,
41:8, 46:20, 50:12,
50:21, 59:16, 80:20,
97:4, 106:9
**domain** [2] - 113:7,
118:18
**dominant** [1] - 8:18
**done** [21] - 25:15,
45:15, 46:2, 49:5,
51:15, 78:5, 78:7,
78:14, 79:16, 79:22,
79:24, 80:13, 80:25,
88:23, 92:10, 94:11,
98:17, 127:12,
127:18, 130:14,
130:22
**dot** [1] - 58:25
**double** [1] - 17:6
**doubling** [1] - 106:24
**down** [62] - 5:1, 8:16,
12:8, 12:9, 12:10,
13:7, 18:2, 18:5,
19:5, 19:16, 19:17,
20:3, 21:6, 21:8,
21:9, 24:5, 26:3,
26:12, 28:8, 29:6,
29:20, 30:2, 30:25,
32:21, 36:14, 37:4,
37:12, 38:6, 38:7,
38:9, 41:23, 48:15,
55:9, 55:20, 57:3,
57:5, 57:7, 60:25,
61:12, 65:7, 70:23,
71:5, 73:6, 83:10,
83:16, 84:1, 85:8,
87:12, 93:8, 93:14,
94:11, 94:20, 94:21,
95:5, 95:13, 96:7,
110:1, 116:3, 116:6,
120:13, 120:25,
133:20
**downs** [6] - 36:4,
40:15, 83:7, 84:5,
86:14, 87:16
**downturn** [2] - 12:13,

12:14
**Dr** [63] - 4:10, 6:12,
8:22, 10:24, 12:19,
14:3, 15:8, 15:23,
18:10, 20:11, 21:14,
24:23, 26:15, 29:14,
30:4, 32:6, 33:21,
34:15, 37:16, 39:10,
39:15, 40:7, 40:20,
43:14, 44:12, 47:13,
52:14, 52:23, 55:22,
56:4, 58:15, 60:6,
61:15, 64:4, 65:18,
66:21, 67:2, 68:6,
69:12, 70:22, 71:24,
72:21, 74:13, 76:24,
81:9, 84:13, 86:20,
88:6, 90:4, 90:11,
91:10, 91:17, 91:20,
94:17, 96:10,
105:10, 116:9,
119:9, 125:5, 126:7,
128:17, 131:25,
133:8
**draft** [6] - 44:6, 47:16,
47:18, 48:18, 53:2,
91:22
**dramatic** [1] - 94:7
**drastic** [1] - 74:24
**draw** [63] - 5:23,
19:17, 33:13, 37:6,
44:5, 44:7, 44:8,
44:11, 46:11, 46:15,
46:17, 46:18, 46:19,
46:24, 47:1, 47:4,
47:23, 48:2, 48:4,
48:5, 48:7, 49:24,
49:25, 50:5, 50:24,
55:24, 59:21, 60:25,
69:14, 70:3, 70:12,
71:12, 73:19, 73:21,
74:11, 75:6, 76:3,
82:25, 83:4, 83:12,
83:16, 92:8, 92:11,
93:10, 93:15, 93:18,
99:14, 100:9,
100:20, 100:21,
100:24, 101:13,
101:16, 102:3,
103:15, 103:21,
105:5, 129:23,
129:24, 130:2
**drawdown** [5] - 50:18,
50:20, 66:14, 70:20,
83:21
**drawing** [7] - 19:5,
20:3, 70:10, 73:6,
84:3, 99:12, 107:20
**drawn** [11] - 59:1,
59:19, 92:17, 92:19,

105:3, 105:5, 109:1, 109:10, 109:13, 109:20, 109:21
**draws** [22] - 56:7, 57:18, 58:13, 58:16, 71:7, 72:5, 72:23, 73:12, 79:11, 87:4, 87:13, 92:4, 92:6, 92:7, 92:16, 93:3, 100:21, 101:6, 102:16, 107:19, 123:14, 124:2
**drew** [5] - 73:20, 99:16, 99:22, 100:1, 100:15
**drop** [3] - 37:5, 93:12, 94:17
**DTA** [29] - 5:15, 38:19, 39:6, 39:11, 41:9, 41:14, 42:13, 42:19, 43:3, 43:15, 43:23, 44:14, 45:10, 45:12, 49:5, 49:13, 49:18, 50:22, 75:6, 80:18, 83:13, 83:18, 85:6, 85:8, 85:9, 85:12
**DTAs** [7] - 35:5, 40:16, 83:10, 83:16, 84:17, 85:1, 87:22
**due** [2] - 71:3, 87:24
**during** [16] - 9:12, 9:17, 12:13, 12:14, 14:4, 14:9, 19:1, 26:17, 27:2, 61:18, 110:5, 110:13, 110:19, 120:2, 121:8, 132:8
**DX** [1] - 125:14
**DX136** [2] - 118:12, 121:2
**DX137** [1] - 114:20
**DX535** [2] - 125:17, 125:20

## E

**early** [10] - 9:24, 15:19, 16:10, 16:18, 25:16, 47:19, 48:11, 67:24, 68:10, 120:11
**earnings** [5] - 67:22, 87:2, 114:15, 115:23, 130:24
**earthquake** [3] - 52:10, 52:12
**earthquake-prone** [1] - 52:10
**easier** [2] - 26:4, 61:25
**East** [1] - 102:24
**Economic** [1] - 6:9

**economic** [2] - 5:9, 119:3
**economy** [8] - 8:23, 12:13, 12:18, 13:2, 13:11, 75:9, 78:16, 96:11
**Edwards** [1] - 4:3
**effect** [12] - 80:15, 84:15, 88:2, 107:9, 120:21, 122:22, 124:4, 124:21, 126:12, 126:24, 127:16, 128:10
**effort** [1] - 89:17
**eight** [1] - 46:22
**either** [4] - 11:22, 29:3, 65:24, 102:14
**element** [1] - 35:16
**eleven** [1] - 100:15
**elicit** [1] - 101:2
**eliminated** [6] - 110:10, 110:13, 110:14, 110:16, 110:19, 110:21
**email** [19] - 15:25, 16:4, 16:6, 16:10, 16:11, 16:12, 18:10, 18:12, 19:25, 20:2, 39:17, 39:20, 39:22, 39:23, 40:7, 47:19, 48:10, 49:16
**emails** [4] - 15:18, 18:7, 39:11, 49:16
**enabling** [1] - 34:11
**end** [33] - 12:14, 18:13, 18:20, 20:25, 21:15, 34:15, 38:5, 44:7, 45:1, 45:17, 47:5, 49:4, 56:14, 56:15, 58:10, 59:17, 61:25, 66:3, 76:24, 81:9, 82:17, 90:11, 93:18, 99:3, 99:4, 99:24, 100:2, 109:14, 109:17, 109:20, 129:7
**ended** [5] - 44:3, 76:17, 95:6, 115:18, 118:15
**ends** [1] - 57:22
**entered** [2] - 14:14, 41:2
**enterprise** [1] - 72:15
**enterprises** [5] - 8:14, 41:2, 128:14, 128:15, 132:18
**enterprises'** [1] - 104:17
**entire** [2] - 42:15, 96:6
**entirely** [1] - 117:11

**entirety** [1] - 41:23
**entitled** [3] - 6:9, 69:13, 72:14
**entity** [1] - 86:15
**entries** [1] - 85:8
**entry** [3] - 11:11, 12:5, 85:9
**equals** [2] - 49:20, 50:4
**equating** [1] - 104:20
**era** [1] - 86:10
**erode** [2] - 44:16, 65:13
**eroded** [2] - 74:16, 129:24
**eroding** [1] - 78:18
**erosion** [2] - 45:25, 65:16
**errors** [1] - 102:8
**especially** [6] - 51:23, 63:18, 67:22, 74:6, 90:15, 107:19
**essentially** [3] - 25:24, 34:13, 129:5
**estate** [1] - 11:12
**estimate** [3] - 11:17, 11:24, 89:11
**estimated** [2] - 12:22, 45:1
**estimating** [2] - 12:25, 39:8
**estimation** [1] - 54:24
**et** [1] - 88:5
**evaluate** [1] - 117:6
**event** [1] - 82:5
**evidence** [8] - 71:21, 115:5, 124:24, 125:10, 125:13, 125:15, 125:19, 125:24
**exact** [3] - 67:13, 85:22, 124:3
**exactly** [17] - 14:2, 24:18, 27:12, 36:8, 43:8, 63:17, 73:2, 73:11, 73:13, 84:9, 85:6, 94:23, 99:2, 119:5, 122:12, 124:14, 128:23
**Examination** [2] - 3:4, 3:5
**EXAMINATION** [2] - 4:8, 91:15
**examine** [2] - 26:15, 106:14
**example** [8] - 8:4, 15:21, 30:23, 32:4, 33:4, 78:3, 80:18, 124:23
**examples** [2] - 65:5,

74:23
**exceed** [5] - 72:2, 76:10, 76:20, 88:1, 92:3
**exceeded** [4] - 33:11, 100:5, 109:22, 114:14
**except** [2] - 98:11, 114:16
**excerpt** [2] - 32:13, 67:5
**excerpts** [1] - 29:15
**excess** [3] - 76:22, 115:22
**Exchange** [1] - 116:10
**exciting** [1] - 35:12
**executive** [4] - 16:1, 16:3, 31:18, 39:11
**executives** [3] - 16:2, 30:5, 65:20
**exercising** [1] - 88:17
**exhaustive** [1] - 74:22
**exhibit** [2] - 47:10, 114:21
**Exhibit** [7] - 3:8, 32:7, 40:8, 68:3, 104:1, 115:8, 125:24
**exhibits** [1] - 116:13
**Exhibits** [1] - 3:7
**exist** [5] - 119:20, 120:1, 122:24, 123:1, 123:9
**existed** [2] - 5:10, 7:12
**existing** [1] - 58:2
**exit** [1] - 111:11
**expanding** [1] - 27:21
**expect** [6] - 23:21, 26:8, 29:18, 29:24, 133:21, 133:23
**expectation** [2] - 46:15, 54:10
**expectations** [6] - 105:11, 105:12, 106:21, 108:3, 111:9, 122:19
**expected** [9] - 4:18, 10:16, 10:21, 11:25, 12:20, 13:4, 26:2, 40:2, 44:16, 47:4, 54:5, 54:7, 55:24, 56:7, 66:1, 80:4, 80:14, 91:4, 108:2
**expecting** [8] - 39:5, 39:6, 43:10, 46:17, 46:25, 52:5, 54:12, 65:6
**expects** [1] - 58:4
**expenses** [5] - 16:15, 18:6, 85:24
**experience** [5] -

77:13, 79:18, 98:7, 98:22, 98:25
**expert** [2] - 105:17, 118:2
**expertise** [4] - 98:10, 98:12, 98:21, 98:25
**explain** [3] - 26:4, 26:20, 93:7
**explained** [1] - 133:9
**explains** [2] - 17:7, 62:22
**explanation** [1] - 129:25
**explicit** [1] - 85:21
**expose** [1] - 84:7
**exposed** [2] - 81:10, 82:5
**express** [1] - 123:8
**expressed** [1] - 67:21
**extend** [1] - 23:24
**extent** [6] - 25:5, 50:17, 72:1, 87:18, 121:18, 121:22
**extra** [3] - 70:15, 71:3, 82:14
**extraordinarily** [1] - 55:18
**extraordinary** [2] - 57:14, 57:17
**extreme** [3] - 51:18, 52:7, 55:20

## F

**face** [1] - 63:20
**fact** [18] - 5:11, 7:20, 8:8, 8:17, 11:5, 30:5, 50:18, 54:13, 66:2, 77:21, 78:24, 99:7, 103:19, 110:20, 110:23, 116:4, 123:8, 131:22
**factors** [1] - 88:13
**factory** [1] - 77:24
**facts** [2] - 99:19, 113:7
**factually** [1] - 106:23
**failing** [1] - 51:24
**failure** [1] - 51:23
**fair** [3] - 12:7, 98:4, 98:11
**fall** [2] - 16:15, 60:14
**falling** [2] - 9:23, 25:3
**falls** [3] - 75:14, 75:19, 101:21
**familiar** [8] - 51:11, 52:18, 62:2, 64:8, 64:15, 77:13, 101:21, 116:16
**Fannie** [162] - 4:20, 5:11, 6:7, 6:13, 6:21,

7:5, 7:21, 8:8, 8:17, 9:3, 10:5, 10:15, 10:20, 10:25, 11:15, 11:23, 13:4, 14:13, 14:20, 15:12, 15:14, 15:18, 16:1, 18:21, 19:2, 20:8, 20:12, 21:19, 22:4, 22:20, 22:25, 25:2, 25:23, 26:7, 26:15, 26:22, 26:25, 27:6, 27:17, 28:2, 28:6, 28:19, 29:1, 29:7, 29:9, 29:16, 30:10, 31:12, 34:6, 35:1, 35:24, 36:21, 37:17, 38:24, 39:1, 39:22, 40:16, 41:9, 41:17, 41:18, 42:1, 42:20, 43:16, 44:15, 44:21, 44:23, 44:24, 45:1, 45:11, 45:15, 45:19, 46:5, 46:6, 46:7, 46:11, 47:3, 47:21, 47:22, 49:11, 50:23, 51:2, 55:12, 56:16, 60:6, 61:8, 61:15, 64:11, 64:21, 65:12, 65:20, 66:22, 67:6, 70:23, 72:7, 73:5, 78:2, 78:9, 80:8, 81:11, 81:23, 82:4, 83:22, 84:7, 84:18, 84:21, 84:22, 85:10, 85:19, 86:5, 96:13, 96:20, 97:3, 97:6, 97:12, 99:4, 101:11, 101:13, 101:15, 101:21, 101:22, 102:2, 102:8, 102:11, 103:4, 104:9, 105:23, 107:3, 107:12, 107:19, 107:20, 108:7, 108:16, 109:1, 109:5, 109:15, 109:20, 110:24, 111:10, 113:9, 113:16, 114:12, 114:14, 117:18, 118:7, 118:15, 119:6, 119:18, 120:6, 120:15, 120:18, 122:13, 122:23, 123:3, 123:5, 123:12, 123:25, 124:25, 127:17, 131:9, 132:1, 133:5
**Fannie's** [2] - 14:3, 24:24

**far** [6] - 69:12, 89:13, 107:20, 112:12, 133:25
**fashion** [1] - 76:3
**faster** [1] - 108:2
**feasibility** [1] - 60:1
**features** [1] - 81:14
**February** [4] - 9:25, 20:25, 118:19, 121:14
**Federal** [2] - 88:25, 89:2
**fee** [15] - 27:20, 27:21, 29:18, 30:2, 88:8, 88:11, 88:14, 88:9, 89:12, 90:7, 124:20, 126:24, 126:25, 133:1, 133:4
**fees** [20] - 8:14, 9:5, 24:23, 24:24, 25:2, 25:18, 25:22, 26:1, 26:6, 26:10, 27:8, 27:12, 27:14, 27:15, 28:25, 29:5, 29:8, 29:11, 34:25, 43:21
**fell** [2] - 7:7, 59:15
**felt** [1] - 97:15
**few** [10] - 5:4, 27:23, 33:3, 34:22, 35:4, 47:6, 48:20, 61:4, 74:25, 94:2
**FHFA** [26] - 6:1, 15:25, 18:7, 18:16, 27:16, 39:10, 39:18, 39:19, 47:18, 47:19, 72:2, 74:24, 75:4, 77:7, 78:1, 78:12, 78:19, 78:23, 79:7, 79:8, 79:13, 80:2, 104:25, 128:12, 129:20
**FHFA's** [3] - 47:20, 90:17, 90:20
**fifth** [1] - 68:4
**fifty** [1] - 85:11
**figures** [1] - 101:10
**file** [1] - 61:18
**filed** [5] - 17:20, 29:16, 61:16, 61:22, 67:11
**filing** [2] - 118:11, 121:14
**filings** [14] - 66:22, 114:13, 116:9, 116:10, 116:16, 116:20, 116:22, 117:1, 117:19, 117:24, 118:2, 118:7, 120:18, 123:24
**fill** [1] - 37:7
**final** [1] - 42:4

**finally** [10] - 5:25, 8:9, 22:16, 22:18, 54:22, 76:10, 80:14, 81:9, 89:6, 90:24
**finance** [5] - 11:8, 98:12, 130:1, 130:12, 130:20
**financial** [58] - 4:17, 7:16, 9:13, 9:17, 9:23, 10:3, 10:4, 11:1, 16:20, 22:12, 22:14, 26:21, 27:2, 31:11, 31:17, 33:1, 33:7, 36:15, 36:20, 36:24, 37:1, 37:2, 37:5, 51:16, 51:20, 60:7, 62:7, 62:10, 62:14, 65:24, 77:4, 82:13, 88:2, 90:23, 91:3, 98:5, 98:7, 98:10, 98:16, 98:17, 98:21, 98:25, 112:12, 112:14, 117:1, 117:5, 117:11, 117:12, 117:21, 117:23, 127:19, 128:11, 129:4, 129:7, 129:19, 132:11
**financials** [2] - 14:15, 62:18
**finish** [1] - 58:9
**first** [73] - 4:11, 5:2, 5:5, 5:6, 5:9, 5:12, 5:18, 5:23, 6:8, 6:12, 6:17, 6:18, 6:20, 6:22, 6:25, 7:2, 8:1, 8:19, 9:16, 14:12, 14:24, 17:9, 19:21, 22:11, 30:3, 32:20, 34:16, 35:19, 40:21, 40:25, 42:16, 42:18, 43:11, 46:17, 47:16, 50:3, 53:6, 56:24, 59:11, 59:14, 67:9, 67:10, 69:2, 70:2, 75:2, 75:3, 75:4, 75:10, 77:24, 81:16, 83:8, 84:22, 85:10, 85:18, 86:9, 86:11, 86:21, 86:25, 87:15, 99:12, 99:14, 99:22, 100:22, 101:11, 101:12, 104:5, 106:24, 107:10, 107:15, 115:2, 122:14
**fiscally** [1] - 63:7
**five** [7] - 5:3, 5:8, 18:14, 45:22, 53:11,

87:12, 90:25
**fixed** [1] - 124:9
**Florida** [1] - 82:15
**flow** [1] - 126:13
**flows** [1] - 127:5
**focused** [2] - 111:8, 127:7
**following** [5] - 72:14, 119:20, 120:1, 120:2, 122:24
**footnote** [2] - 37:25, 38:1
**footnotes** [3] - 62:16, 62:17
**forecast** [15] - 18:21, 19:2, 19:20, 47:2, 47:3, 47:5, 49:11, 66:6, 78:3, 78:19, 79:7, 89:11, 91:22, 133:5, 133:6
**forecasting** [6] - 21:5, 52:3, 52:4, 55:6, 68:14, 78:22
**forecasts** [10] - 21:4, 65:24, 65:25, 66:2, 66:4, 66:7, 78:2, 78:9, 78:24, 79:8
**foreseeability** [1] - 44:2
**forever** [1] - 80:8
**forget** [1] - 67:12
**forgot** [2] - 14:16, 41:7
**form** [5] - 70:18, 120:8, 123:1, 123:4, 123:11
**formed** [1] - 122:14
**former** [3] - 30:10, 54:1, 65:20
**forth** [3] - 14:10, 83:19, 83:21
**forward** [3] - 18:13, 39:25, 63:14
**forward-looking** [1] - 63:14
**foundation** [2] - 113:12, 123:15
**Foundation** [2] - 111:24, 112:21
**four** [26] - 10:1, 13:25, 14:12, 18:13, 21:1, 40:23, 40:25, 41:4, 45:22, 51:9, 53:21, 54:11, 54:12, 54:20, 55:8, 55:9, 57:3, 57:16, 58:10, 58:20, 92:19, 93:13, 93:14, 93:18, 95:25
**four-year** [6] - 51:9, 53:21, 54:11, 54:12, 54:20, 55:8

**fourth** [7] - 5:25, 99:3, 99:10, 100:1, 100:12, 109:9, 113:24
**frame** [1] - 30:16
**Francisco** [1] - 52:11
**Freddie** [140] - 4:20, 5:11, 6:7, 6:13, 7:3, 7:7, 7:9, 7:21, 8:8, 8:18, 9:4, 10:5, 10:6, 10:16, 10:25, 11:15, 11:23, 13:4, 14:14, 14:21, 14:25, 15:13, 15:15, 15:18, 20:12, 22:4, 25:23, 26:8, 26:22, 26:25, 27:6, 27:17, 28:7, 29:1, 29:7, 31:25, 32:25, 34:6, 35:1, 35:24, 36:21, 37:18, 38:9, 39:22, 40:16, 41:10, 41:17, 41:23, 42:21, 43:16, 44:15, 44:21, 45:1, 46:5, 46:8, 46:11, 47:3, 47:21, 51:4, 53:25, 55:13, 55:23, 56:7, 59:1, 59:8, 59:25, 61:16, 64:12, 64:21, 65:12, 66:22, 70:23, 72:7, 73:5, 78:2, 78:9, 80:8, 81:11, 81:23, 82:4, 83:23, 84:7, 84:23, 85:16, 85:19, 86:5, 86:13, 86:23, 91:22, 96:5, 96:13, 96:20, 97:3, 97:6, 97:12, 99:5, 99:7, 99:20, 99:22, 100:9, 100:15, 101:7, 101:21, 101:22, 102:3, 102:12, 103:5, 104:9, 105:23, 107:3, 107:13, 107:19, 107:20, 108:1, 108:8, 108:16, 109:12, 109:14, 109:22, 110:24, 111:10, 113:9, 113:17, 114:12, 114:17, 115:18, 119:7, 120:6, 120:15, 120:18, 122:14, 122:23, 123:3, 123:5, 123:13, 123:25, 127:17, 131:10, 132:1, 133:6
**Freddie's** [12] - 10:20,

1295

14:4, 24:25, 25:2, 26:16, 28:2, 28:19, 84:18, 102:8, 114:14, 117:19, 118:7
**fresh** [1] - 91:19
**front** [3] - 99:9, 118:12, 125:1
**fruition** [1] - 10:22
**fulfill** [1] - 121:10
**full** [1] - 95:3
**function** [1] - 9:7
**Fundamentals** [1] - 6:9
**fundamentals** [1] - 5:10
**funding** [5] - 45:1, 48:25, 72:6, 72:25, 73:10
**funds** [1] - 104:25
**future** [23] - 7:17, 11:25, 12:6, 15:7, 18:5, 21:5, 23:15, 34:11, 34:13, 35:22, 35:25, 36:9, 36:10, 36:12, 36:16, 38:14, 44:16, 72:23, 80:9, 87:4, 87:14, 117:6, 119:3
**future-oriented** [1] - 34:11

**G**

**g-fee** [2] - 27:20, 27:21
**g-fees** [19] - 8:14, 9:5, 24:24, 25:2, 25:18, 25:22, 26:1, 26:6, 26:10, 27:8, 27:12, 27:14, 27:15, 28:25, 29:5, 29:8, 29:11, 34:25, 43:21
**GAAP** [3] - 102:4, 102:8, 102:11
**gathered** [1] - 78:2
**gathering** [1] - 78:6
**Geithner** [1] - 34:3
**general** [9] - 51:11, 51:14, 57:25, 62:2, 62:5, 62:12, 63:4, 64:20, 77:16
**generally** [7] - 12:12, 24:7, 25:9, 30:1, 77:14, 102:4, 129:9
**generated** [1] - 87:2
**generating** [1] - 34:10
**given** [8] - 58:5, 60:24, 75:7, 80:4, 80:6, 82:17, 82:22, 89:23

**glad** [1] - 95:22
**government** [5] - 35:24, 97:22, 97:23, 98:1, 107:3
**graph** [8] - 20:15, 20:20, 21:21, 23:21, 58:11, 58:15, 59:18, 70:16
**graphs** [1] - 46:21
**grass** [1] - 74:7
**great** [1] - 32:21
**Great** [2] - 94:9, 95:21
**greater** [3] - 27:11, 73:15, 73:18
**green** [5] - 15:10, 58:18, 58:19, 74:6, 74:7
**Griffin** [1] - 39:19
**group** [2] - 22:16, 78:23
**grouped** [1] - 22:17
**groups** [2] - 22:8, 22:9
**grow** [1] - 23:22
**growing** [4] - 8:21, 24:6, 35:1, 35:2
**GS** [1] - 27:20
**GSE** [3] - 30:5, 104:12, 129:5
**GSEs** [11] - 27:19, 34:10, 44:2, 66:10, 66:12, 75:5, 76:10, 76:17, 90:22, 90:23, 131:6
**guarantee** [3] - 24:23, 97:3, 118:24
**guaranteeing** [1] - 11:18
**guarantees** [1] - 97:6
**guaranty** [2] - 29:18, 30:2
**guess** [1] - 118:19

**H**

**half** [13] - 6:12, 6:20, 7:2, 7:21, 46:20, 46:22, 50:20, 50:21, 89:12, 91:21, 94:20, 95:10, 96:20
**hand** [2] - 28:24, 53:18
**handle** [1] - 27:5
**happenings** [1] - 57:13
**happy** [1] - 108:19
**hard** [2] - 61:9, 127:14
**hardly** [1] - 100:21
**harm** [19] - 4:17, 4:19, 4:20, 6:6, 77:4, 81:11, 82:2, 82:5,

82:11, 83:6, 83:25, 84:8, 87:18, 91:3, 127:15, 127:16, 127:21, 131:6
**header** [1] - 68:4
**headline** [1] - 60:18
**hear** [3] - 30:9, 45:18, 94:9
**heard** [7] - 7:14, 21:23, 22:1, 89:10, 94:8, 94:10, 114:24
**held** [7] - 4:4, 13:5, 24:20, 68:22, 69:5, 97:23, 133:19
**help** [3] - 35:18, 117:5, 118:25
**helpful** [2] - 45:23, 95:23
**HERA** [3] - 101:20, 131:22
**HERA's** [1] - 102:2
**high** [10] - 8:9, 8:11, 10:6, 12:25, 22:24, 23:10, 33:23, 33:24, 34:23, 34:25
**high-quality** [4] - 8:11, 22:24, 23:10, 34:25
**high-ranking** [2] - 33:23, 33:24
**high-risk** [3] - 8:9, 10:6, 34:23
**higher** [8] - 10:9, 12:12, 12:15, 24:13, 26:13, 27:13, 32:22
**higher-quality** [1] - 10:9
**highlight** [4] - 11:5, 29:24, 31:9, 34:5
**highlighted** [6] - 5:5, 32:14, 60:18, 63:12, 72:12, 86:24
**highlighting** [1] - 60:17
**highlights** [2] - 32:17, 32:18
**hill** [1] - 74:9
**hindsight** [2] - 132:5, 132:6
**historian** [2] - 112:16, 113:2
**historic** [1] - 114:15
**historical** [1] - 115:23
**history** [1] - 114:16
**hold** [2] - 11:7, 79:3
**holders** [1] - 75:16
**holding** [3] - 11:18, 23:4, 28:7
**hole** [2] - 37:7, 83:11
**home** [38] - 8:4, 9:16, 9:17, 9:19, 9:22,

9:23, 9:24, 10:2, 10:11, 10:16, 18:24, 18:25, 24:11, 24:12, 32:20, 34:21, 34:23, 53:20, 54:8, 54:13, 54:14, 54:21, 54:24, 55:4, 55:12, 55:14, 55:20, 57:2, 57:4, 57:9, 58:4, 65:6, 93:8, 94:15
**homeowner** [1] - 17:19
**homeowners** [1] - 96:15
**homes** [1] - 96:16
**Honor** [17] - 4:7, 68:18, 68:19, 69:8, 72:8, 72:12, 91:6, 91:9, 91:13, 114:23, 115:16, 118:10, 123:20, 125:13, 125:25, 133:22, 133:24
**hopefully** [3] - 23:11, 104:2, 128:4
**hour** [2] - 91:21, 133:22
**hours** [1] - 90:16
**house** [7] - 24:14, 24:20, 33:5, 52:9, 52:11, 52:13, 60:14
**housing** [22] - 8:2, 8:23, 9:2, 9:3, 9:4, 9:9, 10:24, 11:4, 11:5, 22:14, 55:10, 60:24, 94:1, 94:4, 94:12, 96:10, 96:13, 96:14, 96:18, 108:7, 108:16, 121:18
**HPA** [1] - 53:19
**huge** [12] - 43:24, 44:10, 50:14, 59:22, 60:25, 76:15, 77:11, 80:6, 83:15, 85:11, 88:4, 132:15
**Hume** [2] - 68:24, 69:3
**hundred** [10] - 7:7, 25:13, 80:7, 80:20, 81:19, 81:21, 87:11, 106:9, 107:22, 107:25

**I**

**idea** [4] - 31:2, 31:24, 74:8, 105:7
**identify** [3] - 79:11, 79:17, 102:19
**imagine** [1] - 74:7
**immediate** [3] - 54:20,

55:2, 95:12
**immediately** [4] - 94:2, 96:6, 112:17, 121:17
**impact** [19] - 28:18, 42:4, 42:16, 48:19, 50:19, 73:16, 73:18, 74:2, 76:5, 80:15, 80:23, 80:24, 83:22, 126:21, 127:4, 127:5
**impacts** [1] - 127:19
**implemented** [2] - 98:3, 98:6
**importance** [1] - 11:3
**important** [21] - 8:1, 9:1, 9:2, 10:25, 11:4, 16:6, 16:10, 30:19, 31:2, 32:17, 51:22, 57:16, 70:19, 75:25, 80:12, 96:10, 96:17, 97:15, 118:21, 122:18
**impose** [1] - 89:17
**imposed** [3] - 46:12, 88:14, 127:2
**imposition** [1] - 36:20
**impression** [1] - 12:4
**improper** [4] - 130:15, 130:17, 130:22, 130:25
**improve** [1] - 8:5
**improved** [2] - 13:2, 21:19
**improvement** [1] - 33:5
**improving** [7] - 9:19, 9:25, 10:1, 13:12, 33:10, 34:23
**inaccuracies** [2] - 102:7, 118:7
**include** [7] - 15:9, 41:13, 47:9, 132:21, 133:5, 133:7
**included** [1] - 40:18
**includes** [1] - 56:19
**including** [3] - 10:5, 66:25, 77:6
**income** [15] - 8:13, 13:23, 27:11, 28:23, 29:6, 29:8, 30:1, 33:11, 59:13, 62:14, 72:2, 76:16, 84:19, 92:3
**inconsistent** [5] - 65:19, 66:9, 66:17, 66:19, 90:20
**incorporated** [1] - 79:22
**increase** [17] - 5:17, 25:14, 25:18, 38:17,

49:14, 54:13, 54:21, 59:6, 59:7, 59:21, 65:6, 70:23, 72:17, 85:4, 87:21, 87:23, 106:17
**increased** [7] - 26:16, 27:15, 27:16, 29:3, 43:21, 81:11, 105:21
**increases** [9] - 5:18, 5:19, 8:4, 55:16, 73:1, 83:17, 87:4, 87:13, 87:25
**increasing** [3] - 26:18, 34:25, 74:9
**incredibly** [2] - 57:17, 58:3
**incur** [1] - 85:24
**index** [3] - 93:24, 94:15, 99:11
**indexes** [1] - 55:15
**indicate** [1] - 77:20
**indicated** [3] - 39:23, 43:3, 73:14
**indicates** [1] - 89:6
**indication** [3] - 27:14, 45:24, 85:22
**individual** [1] - 66:5
**indulgence** [1] - 91:7
**inflection** [5] - 16:11, 16:13, 16:21, 17:5, 17:6
**inflexion** [1] - 78:16
**inform** [1] - 81:2
**information** [25] - 8:2, 15:9, 33:2, 47:20, 47:21, 51:4, 62:9, 62:10, 63:21, 75:5, 77:19, 77:25, 78:3, 78:6, 78:15, 78:18, 79:21, 80:11, 101:3, 108:22, 109:25, 117:7, 118:16, 118:20, 122:5
**informed** [1] - 78:24
**initial** [2] - 104:5, 107:25
**input** [1] - 128:4
**inputs** [1] - 128:4
**insolvency** [5] - 4:16, 77:3, 91:3, 127:12, 127:21
**insolvency-type** [1] - 127:12
**instability** [1] - 84:2
**instead** [4] - 73:23, 74:24, 126:20, 130:18
**institution** [4] - 31:17, 51:20, 51:23, 112:14
**institutional** [1] -

26:24
**institutions** [12] - 10:4, 51:16, 51:24, 98:5, 98:8, 98:10, 98:16, 98:17, 98:25, 104:21, 106:9, 112:12
**instruction** [1] - 127:20
**insufficient** [1] - 106:12
**intended** [5] - 58:2, 66:6, 74:21, 118:24, 118:25
**intending** [1] - 131:14
**interest** [7] - 71:5, 75:24, 76:4, 86:1, 118:22, 118:23
**interesting** [2] - 16:17, 24:9
**interests** [4] - 128:7, 128:19, 128:25, 129:9
**internal** [10] - 10:15, 10:20, 15:18, 18:7, 20:11, 39:10, 44:14, 45:11, 114:21, 119:9
**interpret** [1] - 119:3
**interpreting** [1] - 123:10
**intuitive** [1] - 77:17
**invest** [1] - 77:22
**investment** [2] - 28:23, 77:23
**investments** [5] - 108:15, 117:2, 117:13, 118:25, 119:1
**investors** [10] - 63:21, 74:3, 74:4, 74:5, 74:12, 75:16, 107:2, 117:9, 118:21
**invoked** [7] - 70:6, 70:7, 70:8, 70:22, 71:14, 73:8, 73:15
**involved** [2] - 79:24, 80:13
**involving** [1] - 39:17
**issuances** [1] - 29:1
**issue** [1] - 39:11
**issued** [3] - 26:16, 63:2, 70:18
**item** [12] - 5:15, 9:16, 9:21, 30:21, 30:23, 43:22, 79:11, 81:10, 81:23, 85:4, 85:7
**items** [8] - 5:3, 5:8, 8:8, 8:20, 32:14, 60:21, 65:16, 126:13
**itself** [2] - 52:24, 127:9

## J

**January** [7] - 16:4, 16:11, 16:18, 78:16, 84:16, 106:3
**Jeff** [1] - 39:23
**joint** [3] - 72:9, 99:18, 107:18
**July** [3] - 47:19, 47:25, 94:15
**June** [5] - 21:15, 63:5, 68:9, 68:10, 95:10
**jury** [22] - 4:4, 4:13, 13:18, 17:3, 32:14, 45:7, 60:9, 64:6, 68:22, 69:5, 71:25, 78:12, 95:23, 102:23, 113:23, 115:7, 115:12, 115:15, 118:11, 127:25, 128:5, 133:19
**justified** [1] - 89:7
**JX-1** [4] - 72:11, 99:19, 100:8, 109:5

## K

**Kari** [2] - 54:1, 54:3
**Kari's** [1] - 32:23
**keep** [6] - 24:6, 35:12, 73:11, 75:13, 87:10, 101:4
**keeping** [3] - 14:13, 25:8, 41:1
**keeps** [1] - 97:16
**key** [9] - 9:3, 53:7, 53:24, 55:22, 60:20, 77:20, 77:21, 126:18, 127:10
**kind** [23] - 5:20, 6:19, 8:2, 49:3, 60:12, 69:16, 69:23, 70:5, 70:7, 70:12, 70:18, 70:22, 70:25, 71:4, 71:14, 73:8, 73:14, 73:19, 73:23, 74:1, 74:11, 101:2, 118:20
**kinds** [1] - 26:24
**known** [11] - 29:17, 53:15, 97:17, 108:22, 109:25, 110:20, 110:23, 110:24, 111:10, 113:9, 113:16
**KRAVETZ** [32] - 4:7, 4:9, 61:12, 61:14, 64:1, 64:3, 68:2, 68:5, 68:16, 68:18, 69:8, 69:11, 71:20, 71:23, 72:8, 72:11,

72:20, 79:5, 89:25, 90:3, 91:6, 91:9, 111:24, 112:21, 112:25, 113:12, 114:23, 123:15, 125:12, 125:16, 125:22, 133:24
**Kravetz...** [1] - 3:4

## L

**labeled** [1] - 66:2
**lack** [2] - 73:5, 84:1
**language** [6] - 66:22, 67:18, 123:8, 124:3, 124:5, 124:21
**large** [9] - 10:4, 29:4, 34:10, 50:23, 57:24, 64:24, 77:23, 100:20, 107:24
**last** [11] - 34:22, 39:24, 56:22, 57:11, 61:4, 75:25, 76:18, 79:7, 81:10, 92:25, 117:4
**lasted** [3] - 112:6, 112:10, 112:15
**lasting** [1] - 112:19
**lastly** [1] - 6:5
**late** [1] - 20:13
**law** [4] - 131:4, 131:7, 131:15, 131:19
**lawyer** [2] - 131:19, 131:20
**lead** [3] - 19:11, 27:11, 84:1
**leading** [1] - 51:24
**learn** [1] - 98:17
**leave** [2] - 111:16, 111:17
**led** [2] - 102:15, 132:19
**left** [7] - 4:10, 9:13, 27:3, 45:1, 53:21, 59:16, 93:19
**legal** [1] - 114:10
**less** [8] - 11:6, 13:3, 13:14, 24:22, 27:16, 28:23, 50:8
**liability** [1] - 100:5
**likelihood** [2] - 87:4, 87:13
**likely** [3] - 24:22, 73:1, 92:2
**line** [7] - 21:4, 35:21, 58:22, 58:24, 92:21, 92:23, 127:8
**lines** [1] - 119:7
**liquidation** [19] - 70:14, 70:19, 70:24,

72:16, 72:17, 72:18, 73:16, 73:20, 73:21, 73:23, 74:2, 74:10, 81:20, 83:17, 86:12, 111:13, 111:21, 113:3, 113:25
**liquidity** [2] - 121:11, 121:16
**Lisa** [1] - 4:3
**list** [9] - 13:10, 65:15, 74:18, 74:20, 74:22, 75:2, 77:2, 80:14, 83:6
**listed** [4] - 53:9, 64:16, 65:2, 75:21
**listening** [1] - 123:20
**listing** [2] - 75:1, 84:5
**lists** [1] - 53:21
**litigation** [1] - 98:15
**loan** [48] - 11:19, 12:1, 12:7, 12:8, 12:12, 12:15, 12:16, 12:19, 12:21, 13:3, 13:4, 13:14, 13:17, 13:19, 14:23, 15:11, 17:14, 17:16, 19:12, 19:14, 19:22, 20:14, 20:22, 21:10, 21:14, 21:18, 21:19, 21:22, 21:25, 22:3, 22:6, 22:7, 22:20, 23:3, 23:11, 23:16, 23:23, 24:8, 24:16, 24:21, 33:9, 36:3, 37:13, 40:14, 49:6, 49:14
**loans** [33] - 8:9, 8:11, 8:16, 10:6, 10:9, 11:12, 11:13, 11:22, 11:24, 12:9, 12:24, 13:1, 13:20, 15:1, 15:6, 19:6, 22:15, 22:24, 23:4, 23:10, 23:20, 24:7, 27:16, 28:6, 34:24, 34:25, 49:16, 49:17, 65:7, 82:14, 82:16
**long-term** [2] - 81:25, 127:16
**longer-lasting** [1] - 112:19
**longer-term** [1] - 44:24
**look** [25] - 5:9, 9:7, 9:21, 11:24, 12:24, 26:20, 31:3, 45:23, 56:18, 58:22, 70:4, 80:17, 92:1, 94:24, 96:2, 100:8, 106:16, 106:18, 106:19, 125:8, 127:21,

128:9, 129:3,
130:12, 130:20
**looked** [9] - 7:13, 8:2,
8:3, 55:10, 74:14,
78:8, 92:14, 102:13,
117:21
**looking** [31] - 7:25,
13:1, 31:12, 33:6,
39:16, 45:12, 48:5,
52:2, 59:23, 60:12,
63:14, 90:17, 92:21,
92:23, 95:19,
102:22, 104:4,
107:8, 126:22,
127:14, 127:16,
127:19, 128:10,
128:13, 128:22,
129:4, 129:6,
129:18, 130:1,
131:5, 131:7
**looks** [3] - 12:16, 58:5,
125:17
**loss** [51] - 11:6, 11:17,
11:19, 12:1, 12:7,
12:12, 12:15, 12:16,
12:21, 13:4, 13:7,
13:8, 13:14, 13:17,
13:19, 14:16, 14:18,
14:19, 14:22, 14:23,
14:24, 15:11, 16:14,
17:25, 18:1, 19:12,
19:14, 19:22, 20:12,
20:14, 20:22, 21:10,
23:9, 29:7, 36:1,
36:3, 37:4, 37:5,
37:9, 37:10, 37:13,
40:14, 40:24, 43:20,
49:6, 49:14, 50:1,
82:18, 82:24, 83:2
**losses** [38] - 8:16, 9:6,
10:4, 11:6, 11:12,
12:1, 12:6, 12:19,
12:25, 13:3, 13:7,
14:4, 15:3, 15:19,
16:8, 17:16, 18:5,
18:8, 21:9, 23:8,
23:17, 23:19, 24:7,
24:10, 25:22, 26:2,
26:7, 26:11, 32:21,
33:9, 35:25, 37:2,
37:11, 72:6, 82:11
**lost** [1] - 78:5
**low** [2] - 34:24, 86:1
**low-risk** [1] - 34:24
**lower** [5] - 12:12,
12:20, 13:3, 18:3,
25:22
**lunch** [2] - 4:10, 35:10

# M

**Mac** [43] - 6:7, 7:3, 7:7,
7:9, 32:1, 38:9,
39:22, 40:16, 41:10,
41:17, 41:23, 42:21,
43:16, 44:15, 44:21,
46:5, 46:8, 51:5,
55:23, 56:7, 59:1,
59:8, 61:16, 64:12,
64:21, 66:22, 72:7,
80:8, 83:23, 85:16,
86:13, 86:23, 91:22,
96:5, 99:22, 100:15,
101:7, 107:3,
107:19, 107:20,
108:1, 109:22, 133:6
**Mac's** [4] - 9:4, 32:25,
53:25, 59:25
**Mae** [48] - 6:7, 6:21,
7:5, 9:3, 20:8, 29:9,
29:16, 30:10, 31:12,
39:1, 39:22, 40:16,
41:9, 41:17, 41:18,
42:1, 42:20, 43:16,
44:15, 44:21, 44:24,
45:15, 45:19, 46:5,
46:7, 49:11, 50:23,
51:2, 56:16, 61:8,
61:15, 64:11, 64:21,
65:20, 66:22, 67:6,
72:7, 80:8, 83:22,
85:10, 101:11,
101:13, 101:15,
107:3, 107:19,
107:20, 109:20,
118:15
**Mae's** [9] - 16:1,
18:21, 19:2, 21:19,
22:20, 38:24, 45:11,
60:6, 133:5
**magnitude** [6] - 6:4,
47:4, 50:9, 77:11,
80:5, 80:6
**main** [7] - 8:13, 11:2,
11:9, 20:8, 46:14,
76:2
**maintain** [1] - 121:19
**maintaining** [1] -
121:20
**major** [6] - 24:24,
77:14, 77:22, 79:19,
83:7, 83:25
**managed** [2] - 120:19,
122:2
**management** [12] -
16:1, 16:3, 17:16,
62:22, 62:23, 63:19,
77:18, 77:21, 78:6,
116:23, 121:7,

121:15
**management's** [1] -
117:10
**mandatory** [3] - 88:17,
101:25, 102:4
**map** [13] - 4:23, 4:24,
5:3, 5:8, 6:8, 32:20,
34:16, 34:20, 35:13,
38:17, 49:4, 69:12
**March** [5] - 20:18,
21:5, 63:5, 78:17,
118:19
**margin** [1] - 26:8
**market** [48] - 4:21, 8:2,
8:18, 8:23, 9:2, 9:3,
9:4, 9:10, 10:25,
11:4, 11:5, 22:14,
24:11, 26:18, 26:20,
26:23, 27:7, 27:10,
27:12, 27:18, 27:20,
27:21, 28:25, 29:3,
29:21, 30:1, 35:1,
82:15, 84:2, 85:14,
86:6, 88:18, 88:21,
88:23, 96:10, 96:13,
96:15, 96:18, 97:1,
108:16, 121:12,
121:17, 121:18,
128:8, 128:20, 129:1
**market's** [1] - 108:7
**markets** [2] - 6:7,
94:25
**Mary** [2] - 33:23, 33:25
**material** [1] - 45:24
**materially** [3] - 44:16,
65:13, 74:16
**math** [4] - 92:19,
93:21, 104:23, 109:7
**matter** [3] - 11:15,
74:14, 105:12
**maximize** [2] - 120:19,
122:3
**maximized** [1] - 121:9
**maximizing** [1] -
122:16
**maximum** [2] - 57:9,
83:4
**Mayopoulos** [6] -
6:21, 16:2, 22:2,
30:10, 30:12, 45:18
**mBank** [1] - 31:14
**MBS** [5] - 26:16, 28:6,
74:3, 74:5, 74:12
**McFarland** [7] - 16:20,
16:22, 31:7, 31:11,
39:2, 43:3, 60:7
**McFarland's** [4] -
17:2, 31:10, 39:3,
60:10
**McGuire** [9] - 61:13,

64:1, 68:2, 68:16,
69:9, 71:20, 72:11,
72:19, 89:25
**MD&A** [3] - 62:24,
63:10, 63:13
**mean** [14] - 4:20,
17:14, 24:15, 67:20,
76:13, 78:13, 80:16,
89:7, 95:18, 102:6,
102:18, 122:12,
127:11, 127:14
**meaning** [5] - 17:18,
19:17, 64:11, 70:18,
89:15
**means** [20] - 15:15,
18:6, 18:23, 23:14,
27:7, 38:3, 40:4,
41:5, 41:21, 41:22,
43:19, 44:4, 55:2,
99:23, 100:2, 100:5,
101:6, 101:15,
114:6, 129:15
**meant** [4] - 8:19, 37:4,
37:5, 109:18
**measure** [1] - 93:25
**meeting** [6] - 16:1,
16:3, 32:24, 34:2,
34:4, 39:24
**members** [6] - 4:12,
45:7, 78:12, 128:7,
128:19, 129:1
**memo** [5] - 34:2, 34:5,
34:9, 68:7, 79:16
**memory** [1] - 130:7
**memos** [1] - 80:1
**mental** [1] - 13:21
**mention** [3] - 8:6,
8:13, 38:3
**mentioned** [22] - 8:14,
13:21, 16:2, 17:15,
18:14, 20:23, 21:1,
26:6, 27:25, 39:18,
47:6, 49:16, 61:23,
77:9, 78:8, 79:14,
89:17, 92:1, 93:22,
98:19, 116:9
**met** [1] - 94:10
**method** [1] - 11:16
**Michael** [1] - 34:4
**mid-2012** [1] - 27:20
**mid-2013** [3] - 39:5,
39:7, 43:4
**middle** [3] - 30:15,
43:10, 48:13
**might** [11] - 38:12,
48:25, 64:15, 65:12,
68:19, 118:18,
122:23, 123:4,
123:6, 132:19
**Miller** [2] - 33:23,

33:25
**million** [3] - 7:8, 42:1,
87:11
**mind** [3] - 14:13, 41:1,
91:19
**mine** [1] - 101:4
**minimum** [4] - 28:9,
83:3, 104:18, 132:22
**minus** [2] - 50:2,
50:11
**minutes** [8] - 5:4,
27:23, 32:24, 33:3,
34:22, 48:20, 68:21,
133:25
**missed** [1] - 61:3
**mission** [9] - 83:22,
121:11, 121:19,
121:20, 121:23,
121:24, 121:25,
122:11, 122:13
**missions** [1] - 128:16
**misspoke** [1] - 109:17
**misstatements** [1] -
118:6
**model** [8] - 46:8, 93:7,
93:11, 94:7, 94:11,
95:11, 96:6
**modeling** [1] - 96:5
**models** [1] - 78:19
**modify** [1] - 75:13
**moment** [2] - 61:12,
115:2
**money** [13] - 12:3,
20:23, 36:1, 59:12,
70:10, 75:18, 77:23,
85:19, 85:25, 86:3,
86:6, 88:5, 127:18
**monitor** [2] - 117:10,
119:2
**Montgomery** [6] -
96:8, 104:2, 110:1,
115:1, 116:7, 120:24
**month** [1] - 114:16
**months** [9] - 10:1,
18:13, 18:14, 61:4,
79:6, 85:18, 94:2,
108:5, 112:15
**morning** [8] - 4:2,
5:21, 6:21, 7:15,
16:2, 21:23, 22:1,
69:18
**mortgage** [22] - 4:20,
17:21, 22:3, 24:13,
24:15, 24:17, 24:19,
24:20, 26:22, 26:23,
84:2, 96:15, 97:4,
97:7, 107:1, 107:12,
121:12, 121:16,
128:8, 128:20, 129:1
**mortgage-backed** [4]

- 97:4, 97:7, 107:1, 107:12
**mortgages** [8] - 11:7, 11:8, 11:18, 23:3, 26:25, 96:20, 96:24, 96:25
**most** [5] - 11:4, 77:6, 96:10, 115:23, 116:5
**motive** [1] - 130:22
**move** [1] - 125:20
**moved** [1] - 18:12
**moving** [2] - 4:11, 115:4
**must** [2] - 36:19, 101:22
**mutually** [3] - 88:16, 88:17, 88:20

## N

**name** [4] - 38:6, 61:21, 63:17, 112:5
**nature** [1] - 63:16
**near** [2] - 76:24
**nearly** [1] - 104:17
**necessary** [11] - 4:16, 77:3, 81:3, 81:8, 91:2, 126:8, 126:17, 127:9, 127:11, 128:3, 130:19
**necessity** [1] - 4:14
**need** [16] - 11:25, 19:18, 21:11, 26:8, 30:25, 33:13, 44:4, 44:11, 50:5, 77:19, 77:22, 80:11, 106:18, 117:7, 129:5
**needed** [1] - 128:15
**needing** [1] - 60:25
**needs** [2] - 81:25
**negative** [16] - 15:14, 41:4, 41:6, 44:6, 70:9, 76:5, 99:5, 99:7, 99:11, 99:16, 99:23, 100:3, 100:5, 100:9, 101:7, 101:15
**negatives** [1] - 63:25
**net** [150] - 4:15, 5:17, 5:18, 5:19, 5:21, 6:2, 6:6, 25:20, 35:14, 35:16, 35:18, 37:6, 38:15, 38:17, 38:20, 40:5, 40:10, 41:21, 42:5, 42:9, 42:23, 42:24, 43:18, 43:19, 43:20, 43:21, 43:25, 44:6, 44:9, 44:10, 45:11, 49:12, 49:17, 49:20, 49:23, 50:2, 50:3, 50:4, 50:5,

50:7, 50:11, 50:19, 50:21, 53:3, 53:5, 70:9, 72:2, 73:1, 74:15, 74:24, 75:24, 77:2, 78:14, 78:20, 78:25, 79:7, 80:3, 80:15, 80:19, 80:23, 81:2, 81:7, 81:10, 81:18, 81:20, 81:21, 82:2, 82:3, 82:20, 82:21, 82:22, 82:23, 82:24, 83:2, 83:11, 83:14, 83:20, 84:1, 84:14, 84:19, 85:4, 85:10, 86:4, 86:9, 87:3, 87:21, 87:25, 89:7, 89:8, 89:15, 90:19, 90:20, 91:2, 92:9, 92:10, 92:11, 92:12, 99:5, 99:8, 99:16, 99:23, 100:3, 100:5, 100:9, 101:7, 101:15, 101:21, 103:10, 121:19, 121:20, 124:6, 124:9, 124:10, 124:12, 124:14, 124:15, 124:16, 124:19, 126:7, 126:10, 126:12, 126:13, 126:14, 126:22, 126:24, 127:4, 127:7, 127:8, 127:14, 127:17, 127:23, 128:7, 128:10, 128:13, 128:25, 129:8, 129:12, 129:20, 130:6, 130:14, 130:21, 131:3, 131:15, 131:21, 132:3, 132:11, 132:15, 132:16, 132:22
**never** [24] - 10:10, 10:12, 78:3, 78:4, 78:23, 78:24, 88:21, 88:22, 89:4, 90:7, 90:8, 90:10, 97:19, 97:21, 97:23, 97:25, 98:3, 127:1, 127:2, 133:4
**nevertheless** [1] - 86:2
**new** [9] - 10:9, 15:16, 17:11, 17:13, 18:4, 18:6, 24:19, 77:23, 77:24
**news** [3] - 8:15, 43:19, 93:15

**next** [40] - 5:4, 11:10, 14:7, 14:11, 15:8, 15:21, 16:25, 18:10, 20:15, 25:25, 30:23, 31:6, 32:4, 35:7, 37:20, 39:13, 39:16, 40:18, 41:11, 46:16, 47:9, 47:23, 49:2, 49:3, 50:15, 56:2, 58:8, 58:11, 60:4, 69:13, 69:20, 77:2, 77:20, 82:8, 86:18, 89:24, 93:9, 109:12, 122:2, 126:4
**nice** [4] - 22:21, 74:6, 74:8, 91:17
**nicely** [1] - 22:22
**nine** [1] - 85:18
**nobody** [1] - 58:3
**noncash** [3] - 87:20, 87:22, 87:25
**none** [4] - 56:9, 79:24, 80:13, 80:25
**noon** [1] - 134:1
**normal** [4] - 11:15, 19:10, 82:12, 111:23
**normally** [1] - 116:22
**note** [1] - 23:8
**NOTE** [1] - 4:2
**notes** [1] - 62:17
**nothing** [9] - 56:14, 58:18, 58:21, 58:22, 65:16, 80:2, 80:25, 91:10, 96:5
**number** [22] - 14:15, 22:23, 29:4, 29:18, 41:3, 42:14, 43:8, 46:21, 48:12, 48:14, 49:9, 49:18, 57:24, 64:24, 81:19, 88:17, 88:19, 96:25, 99:17, 109:15, 122:11
**numbers** [16] - 6:24, 37:24, 38:4, 41:5, 42:7, 47:10, 48:13, 50:13, 58:12, 62:22, 63:24, 83:8, 99:9, 100:11, 109:3, 132:5
**NWS** [1] - 69:13

## O

**objection** [8] - 111:24, 112:21, 112:25, 113:12, 114:23, 115:10, 123:15, 125:22
**obligation** [5] - 69:24, 92:3, 92:8, 115:21, 124:16

**obligations** [1] - 69:17
**observing** [1] - 10:19
**obviously** [3] - 8:1, 28:22, 63:19
**occur** [1] - 28:2
**occurring** [1] - 29:10
**October** [8] - 78:4, 78:11, 78:21, 79:6, 94:16, 94:22, 103:3, 103:6
**offering** [1] - 126:16
**officer** [4] - 16:20, 31:11, 31:16, 60:7
**official** [4] - 33:22, 33:24, 110:15, 110:18
**officials** [1] - 33:24
**offs** [1] - 17:15
**offset** [1] - 30:1
**often** [4] - 9:18, 51:15, 62:25, 82:18
**once** [11] - 36:18, 37:1, 41:1, 44:17, 46:12, 65:13, 93:8, 93:14, 94:23, 108:18, 117:17
**one** [75] - 5:1, 5:2, 5:5, 5:20, 5:25, 7:18, 7:21, 8:20, 9:13, 11:2, 15:22, 22:11, 22:13, 22:23, 23:5, 23:6, 24:6, 24:24, 28:4, 28:10, 30:2, 30:3, 30:20, 33:6, 33:15, 33:17, 35:21, 39:13, 42:15, 47:15, 48:12, 49:12, 49:16, 51:23, 52:21, 53:11, 53:12, 58:21, 62:13, 62:18, 64:15, 72:1, 74:20, 75:2, 75:3, 75:12, 75:22, 75:23, 76:18, 77:5, 77:10, 78:20, 79:25, 81:19, 83:8, 83:9, 87:24, 96:10, 98:24, 101:12, 103:3, 111:4, 113:24, 114:16, 115:25, 116:13, 117:22, 122:11, 124:6, 133:6
**One** [2] - 31:15, 31:16
**one-fourth** [1] - 113:24
**one-time** [3] - 7:18, 8:20, 30:20
**ones** [2] - 10:9, 24:1
**onwards** [1] - 132:15
**open** [2] - 57:20, 67:2
**opening** [1] - 64:5

**operating** [4] - 26:9, 50:1, 82:11
**operation** [1] - 82:12
**operations** [8] - 80:15, 80:25, 87:2, 122:7, 126:14, 127:5, 127:18, 132:21
**opining** [6] - 102:7, 118:6, 126:10, 126:12, 130:14, 131:3
**opinion** [31] - 4:11, 4:13, 4:14, 4:15, 4:19, 4:25, 6:13, 7:20, 31:19, 34:8, 65:17, 72:22, 74:13, 81:2, 82:3, 89:21, 90:5, 90:24, 90:25, 91:1, 126:16, 127:22, 128:6, 128:18, 128:21, 128:24, 130:21, 130:23, 130:24, 131:1
**Opinion** [4] - 90:13, 90:15, 90:17, 126:9
**opinions** [2] - 90:15, 117:19
**opportunity** [2] - 27:8, 79:21
**opposed** [2] - 105:1, 132:11
**opposing** [1] - 68:23
**optimistic** [1] - 53:15
**option** [7] - 70:4, 70:5, 70:22, 71:14, 71:18, 73:15, 75:8
**oranges** [1] - 65:23
**order** [8] - 26:7, 44:8, 77:18, 77:24, 85:20, 102:3, 128:15, 129:5
**orient** [1] - 115:2
**oriented** [1] - 34:11
**original** [1] - 81:18
**otherwise** [1] - 30:25
**ourself** [1] - 123:2
**ourselves** [1] - 69:21
**outcome** [3] - 52:2, 60:19, 61:10
**outstanding** [1] - 111:10
**overall** [11] - 4:23, 8:23, 20:6, 23:22, 26:18, 28:25, 29:7, 32:21, 48:12, 91:1, 105:8
**overruled** [3] - 113:1, 113:13, 114:25
**owed** [1] - 7:10
**own** [9] - 24:2, 28:7,

45:9, 46:8, 66:9, 96:20, 96:22, 119:23

## P

**p.m** [1] - 134:4
**page** [17] - 67:14, 67:15, 67:18, 92:1, 92:14, 114:20, 114:21, 115:2, 115:20, 119:9, 120:5, 121:2, 121:4, 125:1
**PAGE** [1] - 3:2
**paid** [29] - 24:2, 24:3, 24:21, 25:23, 43:1, 50:10, 70:17, 71:4, 71:5, 72:15, 72:16, 73:19, 73:21, 73:23, 74:10, 75:19, 86:11, 89:9, 110:5, 111:3, 111:21, 113:4, 114:15, 124:15, 132:1, 132:2, 133:2, 133:5
**papers** [1] - 17:20
**paragraph** [8] - 72:12, 99:19, 100:8, 101:10, 109:6, 109:12, 119:14, 119:15
**pardon** [1] - 131:12
**parentheses** [1] - 41:5
**parlance** [1] - 92:7
**part** [35] - 8:22, 14:4, 15:8, 21:13, 28:10, 32:20, 34:20, 36:19, 40:21, 49:5, 53:6, 56:2, 62:19, 62:21, 63:1, 74:13, 75:25, 77:12, 86:21, 87:15, 87:18, 87:20, 89:3, 97:13, 98:13, 102:20, 103:12, 108:12, 117:4, 118:8, 118:18, 126:18, 126:19, 126:21, 127:10
**particular** [11] - 11:12, 13:23, 17:19, 32:13, 33:16, 52:2, 63:2, 64:8, 84:5, 89:20, 90:4
**particularly** [2] - 29:21, 87:6
**parties** [1] - 18:14
**parts** [2] - 62:13, 63:11
**past** [1] - 33:3
**pastures** [1] - 74:7

**path** [1] - 5:11
**pay** [32] - 27:12, 34:12, 44:8, 50:6, 70:10, 70:23, 72:5, 73:6, 73:15, 75:23, 75:24, 80:24, 82:24, 83:14, 83:19, 85:10, 85:13, 85:25, 86:10, 88:3, 92:8, 92:12, 110:25, 111:14, 113:10, 113:17, 113:19, 123:13, 123:25, 124:17
**payable** [3] - 113:21, 113:22, 113:23
**paying** [6] - 17:20, 70:24, 74:1, 75:16, 76:17, 80:21
**payment** [18] - 5:20, 33:12, 69:16, 69:23, 70:5, 70:7, 70:12, 70:22, 71:4, 71:14, 73:8, 73:14, 74:10, 85:5, 85:20, 86:6, 88:7, 111:6
**payment-in-kind** [4] - 70:5, 70:22, 71:14, 73:14
**payments** [3] - 35:23, 72:2, 132:16
**PCF** [2] - 89:18, 90:5
**peak** [2] - 20:13, 20:24
**penny** [1] - 124:17
**people** [6] - 52:5, 62:17, 62:25, 78:17, 79:24, 80:13
**percent** [73] - 23:2, 23:7, 23:9, 23:10, 23:16, 23:17, 23:19, 23:20, 25:9, 26:22, 27:1, 27:6, 27:10, 27:12, 27:18, 28:8, 28:12, 34:12, 46:25, 48:6, 54:12, 54:21, 55:1, 55:6, 55:9, 55:11, 55:17, 55:20, 57:2, 57:8, 58:4, 71:2, 71:6, 72:16, 72:18, 73:22, 73:24, 75:23, 76:11, 76:20, 80:7, 81:19, 81:20, 81:21, 86:11, 93:12, 94:20, 94:21, 94:24, 95:4, 95:6, 95:9, 95:13, 95:25, 96:6, 96:22, 96:23, 113:10, 113:17, 113:20, 113:24, 113:25, 114:13, 123:13, 124:1,

124:9, 126:20, 132:2, 132:7, 132:10
**percentage** [7] - 10:8, 24:16, 25:14, 46:23, 46:24, 48:4, 60:15
**perform** [1] - 52:3
**performance** [1] - 43:12
**perhaps** [1] - 13:1
**period** [23] - 6:14, 14:9, 19:1, 26:17, 45:2, 47:5, 48:17, 54:11, 54:12, 55:8, 56:17, 56:19, 61:19, 66:15, 67:8, 67:22, 87:14, 102:12, 110:5, 110:13, 110:19, 114:16
**period-to-period** [1] - 67:22
**periodic** [11] - 88:7, 88:10, 88:14, 89:9, 89:11, 90:7, 124:20, 126:23, 126:25, 133:1, 133:3
**periodically** [1] - 83:9
**periods** [8] - 18:4, 40:25, 80:9, 87:5, 102:22, 115:23, 115:25, 116:5
**permitted** [2] - 87:6, 87:10
**persists** [4] - 93:13, 94:21, 95:4, 95:15
**person** [2] - 20:2, 78:22
**personally** [1] - 117:10
**perspective** [3] - 65:17, 129:13, 130:7
**pessimistic** [1] - 53:15
**phone** [1] - 17:18
**phrase** [4] - 20:7, 20:8, 129:15, 130:19
**phrased** [1] - 128:9
**picture** [2] - 11:1, 11:20
**PIK** [2] - 69:13, 79:14
**place** [9] - 13:23, 16:4, 50:3, 58:17, 65:14, 75:6, 86:11, 90:9, 122:14
**placed** [1] - 101:22
**Plaintiffs'** [3] - 32:7, 40:8, 68:3
**plan** [1] - 16:13
**play** [2] - 90:1, 96:17
**played** [1] - 90:2
**players** [1] - 26:24

**plus** [7] - 26:8, 26:9, 41:18, 41:19, 50:9, 69:13, 76:16
**point** [26] - 12:11, 16:12, 16:14, 16:21, 16:23, 17:5, 17:6, 25:12, 25:14, 32:23, 44:5, 59:8, 68:4, 71:22, 75:16, 75:17, 78:16, 83:18, 84:25, 88:24, 90:6, 109:22, 109:24, 115:25, 127:4
**points** [6] - 25:12, 25:13, 64:25, 89:12, 89:13, 103:3
**policy** [4] - 97:25, 98:2, 98:3, 98:6
**policymakers** [1] - 96:2
**popular** [1] - 62:24
**portfolio** [22] - 21:19, 22:20, 23:3, 23:11, 23:16, 23:23, 23:24, 27:22, 28:1, 28:3, 28:5, 28:14, 28:18, 28:22, 28:24, 29:6, 29:8, 29:11, 29:20, 29:22, 30:1, 126:19
**portion** [14] - 4:2, 4:24, 17:2, 23:22, 38:24, 41:11, 58:12, 60:9, 62:21, 62:25, 68:4, 72:9, 72:12, 86:24
**pose** [1] - 120:6
**position** [2] - 8:18, 97:23
**positive** [10] - 15:14, 15:15, 50:6, 63:23, 63:24, 65:2, 65:3, 121:19, 121:20, 124:14
**possibility** [1] - 84:6
**possible** [4] - 72:6, 83:1, 87:24, 107:1
**post** [1] - 8:11
**post-crisis** [1] - 8:11
**posted** [1] - 61:6
**potential** [8] - 6:5, 24:13, 82:2, 86:14, 86:16, 87:18, 127:15, 131:6
**potentially** [2] - 11:17, 37:18
**practice** [1] - 31:17
**pre** [3] - 8:9, 82:21, 86:9
**pre-crisis** [1] - 8:9
**pre-net** [2] - 82:21,

86:9
**preceding** [3] - 62:20, 101:9, 101:16
**preconservatorship** [1] - 122:7
**preference** [19] - 70:15, 70:19, 70:24, 72:16, 72:17, 72:18, 73:16, 73:20, 73:22, 73:23, 74:2, 74:10, 81:21, 83:17, 86:12, 111:13, 111:21, 113:3, 114:1
**Preferred** [2] - 125:2, 126:3
**preferred** [5] - 72:4, 110:4, 110:16, 114:3, 114:7
**prepared** [4] - 4:3, 46:6, 46:7, 47:17
**presence** [4] - 4:4, 68:22, 69:5, 133:19
**present** [1] - 30:9
**presentation** [9] - 18:11, 20:17, 20:20, 47:17, 55:11, 64:2, 64:5, 69:10, 102:23
**presented** [2] - 47:25, 131:25
**presenting** [1] - 95:18
**preserve** [1] - 90:22
**preserving** [1] - 72:5
**press** [2] - 107:4, 108:11
**pretty** [17] - 12:16, 22:5, 23:6, 23:7, 50:23, 51:17, 57:1, 57:5, 57:14, 57:16, 58:7, 85:23, 86:1, 94:7, 95:11, 107:21, 130:12
**prevent** [2] - 83:20, 127:12
**prevented** [1] - 82:4
**previewed** [1] - 35:4
**previous** [5] - 28:5, 47:15, 62:23, 78:20, 131:5
**previously** [2] - 31:13, 40:4
**price** [17] - 8:4, 18:22, 18:25, 19:1, 19:2, 20:3, 24:12, 53:20, 54:13, 54:24, 55:12, 57:2, 57:9, 57:15, 58:4, 94:12, 94:15
**prices** [21] - 9:22, 9:23, 9:24, 10:16, 18:25, 24:11, 32:21, 33:5, 34:23, 54:8,

54:14, 54:21, 55:4, 55:14, 55:20, 57:5, 60:14, 60:24, 65:6, 93:8, 94:6
**primarily** [1] - 41:13
**primary** [1] - 29:19
**principal** [1] - 24:16
**principles** [1] - 102:5
**priority** [3] - 74:2, 121:24, 122:15
**private** [3] - 110:3, 110:4, 110:16
**problem** [4] - 50:25, 56:25, 70:3, 122:1
**proceed** [2] - 4:6, 69:7
**Proceedings** [5] - 4:4, 68:22, 69:5, 133:19, 134:4
**process** [17] - 6:1, 6:3, 77:6, 77:10, 77:13, 77:16, 77:17, 77:18, 81:1, 88:15, 88:21, 88:22, 90:8, 106:14, 116:22, 116:25
**Professor** [2] - 25:13, 89:10
**profit** [12] - 5:12, 6:22, 7:1, 13:6, 13:24, 19:23, 21:13, 26:13, 37:3, 43:22, 50:11, 76:19
**profitabilities** [1] - 40:2
**profitability** [28] - 6:14, 7:13, 7:15, 7:20, 8:21, 9:4, 24:25, 30:6, 30:13, 30:15, 30:25, 31:7, 32:2, 34:6, 34:14, 34:19, 34:21, 35:3, 38:18, 43:15, 43:19, 45:10, 45:13, 49:5, 65:20, 66:10, 66:12, 75:9
**profitability's** [1] - 75:6
**profitable** [7] - 6:25, 7:21, 38:15, 39:25, 59:9, 59:10, 59:17
**Profits** [1] - 6:10
**profits** [31] - 6:19, 7:12, 7:17, 8:19, 13:7, 13:9, 20:10, 21:12, 23:14, 27:13, 28:19, 30:20, 32:22, 35:15, 36:9, 36:11, 36:13, 36:16, 36:18, 38:19, 43:21, 44:3, 50:9, 50:10, 59:11, 61:5, 73:2, 76:10,

76:21, 76:22, 80:7
**project** [1] - 77:23
**projected** [7] - 16:15, 46:11, 48:2, 48:14, 49:10, 49:21, 50:22
**projecting** [2] - 45:15, 46:19
**projection** [9] - 44:25, 45:14, 45:20, 46:4, 46:5, 49:9, 51:4, 51:7, 51:9
**projections** [12] - 36:15, 36:18, 37:3, 44:14, 45:5, 45:11, 46:8, 47:7, 47:11, 56:17, 66:18, 66:20
**prone** [1] - 52:10
**proper** [1] - 130:25
**proposition** [1] - 71:15
**prospect** [1] - 5:16
**prospects** [2] - 117:6, 119:3
**protect** [3] - 76:8, 76:10, 118:22
**protected** [2] - 76:22, 97:16
**protection** [1] - 58:5
**protects** [1] - 79:20
**provide** [7] - 63:13, 63:21, 104:21, 105:8, 117:8, 121:16, 121:17
**provides** [1] - 46:3
**providing** [5] - 32:24, 44:24, 47:14, 121:11, 128:2
**provision** [6] - 15:12, 21:6, 21:10, 33:9, 69:17, 88:7
**provisions** [5] - 15:12, 17:11, 19:22, 49:15, 114:10
**PSPA** [3] - 104:5, 105:15, 111:5
**PSPAs** [6] - 28:11, 69:17, 72:5, 72:13, 81:19, 88:7
**public** [20] - 29:10, 90:17, 90:20, 97:25, 98:2, 98:3, 98:6, 113:7, 114:13, 118:18, 119:7, 120:10, 122:10, 122:11, 122:13, 128:8, 128:16, 128:19, 129:1, 129:9
**publish** [2] - 63:8, 63:9
**pull** [12] - 64:1, 68:2,

69:9, 91:20, 94:14, 99:18, 104:2, 118:10, 119:8, 120:24, 121:5, 124:23
**Purchase** [2] - 125:2, 126:3
**purely** [1] - 85:6
**purpose** [5] - 47:13, 69:22, 90:21, 117:4, 117:7
**purposes** [2] - 69:23, 79:23
**pursuant** [1] - 72:3
**puts** [1] - 60:1
**putting** [2] - 12:2, 15:13
**PX** [2] - 124:24, 124:25
**PX-2-E** [1] - 104:1
**PX-205** [3] - 33:18, 68:6, 68:13
**PX-210** [2] - 71:21, 71:22
**PX-262** [2] - 52:16, 91:20
**PX-3-A4** [1] - 124:25

## Q

**Q1** [2] - 43:9, 63:7
**Q2** [4] - 23:19, 23:25, 63:7, 64:11
**Q3** [2] - 24:1, 63:7
**Q4** [3] - 63:8, 109:18, 109:20
**quality** [8] - 8:11, 10:9, 21:18, 22:24, 23:10, 34:25, 65:7
**quarter** [51] - 6:22, 6:25, 7:1, 7:3, 7:4, 7:9, 11:24, 12:22, 12:23, 13:23, 19:23, 21:1, 21:15, 22:18, 22:20, 23:17, 32:25, 33:12, 33:14, 38:1, 42:16, 42:22, 43:11, 59:14, 59:15, 59:18, 64:12, 64:13, 67:9, 67:11, 84:22, 84:23, 85:10, 85:17, 88:1, 99:3, 99:11, 99:13, 99:15, 99:22, 100:1, 100:12, 100:22, 100:25, 101:11, 101:12, 104:17, 109:9, 114:16
**quarterly** [12] - 61:16, 61:21, 61:23, 61:24, 61:25, 62:8, 63:5,

63:8, 72:15, 113:21, 113:22, 113:23
**quarters** [15] - 7:6, 8:1, 8:20, 50:10, 59:12, 100:10, 100:15, 100:20, 100:22, 101:7, 101:9, 101:11, 101:13, 102:16, 108:1
**questioning** [2] - 106:18, 108:17
**questions** [5] - 52:23, 81:13, 101:2, 102:21, 133:10
**quick** [1] - 95:12
**quickly** [6] - 22:5, 35:20, 57:5, 107:25, 108:4, 112:13
**quite** [3] - 26:18, 64:24, 116:16
**quoting** [1] - 131:11

## R

**raining** [1] - 57:19
**random** [1] - 88:19
**range** [1] - 48:16
**ranking** [2] - 33:23, 33:24
**rapidly** [1] - 87:8
**rate** [5] - 28:8, 71:5, 72:17, 93:5, 126:20
**rates** [1] - 86:1
**reached** [4] - 20:13, 28:9, 30:6, 66:12
**reaching** [3] - 30:6, 30:14, 66:10
**react** [1] - 96:3
**read** [16] - 4:15, 5:8, 16:12, 60:20, 62:25, 71:24, 72:9, 72:12, 78:25, 86:25, 109:16, 119:21, 119:23, 123:19, 123:24
**reading** [2] - 31:12, 107:4
**real** [10] - 11:12, 12:3, 12:4, 21:9, 50:13, 50:24, 52:7, 85:7, 85:13, 105:1
**realistic** [1] - 57:4
**really** [38] - 11:8, 13:19, 15:10, 17:7, 22:14, 32:19, 32:23, 35:12, 35:23, 38:8, 41:22, 56:11, 57:9, 59:17, 63:17, 65:21, 65:23, 66:5, 74:24,

75:9, 76:14, 79:25, 80:2, 80:8, 80:22, 81:24, 82:1, 83:20, 87:5, 89:13, 90:8, 90:10, 90:19, 97:13, 97:15, 126:21, 130:1
**reason** [10] - 27:9, 35:16, 46:13, 77:2, 97:12, 106:24, 107:11, 122:13, 129:19, 130:15
**reasonable** [10] - 4:14, 4:17, 88:17, 88:20, 91:4, 105:10, 105:12, 127:23, 128:1, 128:5
**reasonably** [8] - 4:16, 77:3, 81:3, 81:8, 91:2, 126:8, 128:3, 130:19
**reasons** [3] - 41:14, 42:10, 42:12
**receive** [1] - 76:6
**received** [2] - 111:5, 125:23
**receivership** [3] - 101:23, 101:25, 102:4
**receives** [1] - 76:7
**recently** [1] - 77:6
**Recess** [1] - 69:1
**recession** [1] - 82:13
**Recession** [2] - 94:9, 95:21
**recognize** [3] - 30:22, 67:5, 117:15
**recognized** [2] - 86:13, 117:17
**record** [7] - 32:6, 68:24, 68:25, 69:4, 72:9, 134:2, 134:3
**recording** [1] - 90:2
**recovered** [1] - 94:5
**recovery** [4] - 20:8, 20:10, 78:18, 101:20
**red** [3] - 58:22, 61:7, 61:8
**redirect** [1] - 133:23
**reduce** [7] - 19:19, 19:20, 19:22, 28:10, 28:22, 29:21, 35:22
**reducing** [2] - 13:19, 19:19
**reduction** [5] - 28:1, 28:13, 28:18, 33:8, 126:19
**refer** [3] - 7:17, 7:19, 31:6
**reference** [4] - 18:21, 19:5, 27:21, 30:16

**referenced** [3] - 30:4, 78:11, 88:6
**references** [1] - 27:19
**referencing** [1] - 15:19
**referred** [1] - 30:5
**referring** [3] - 18:24, 19:4, 88:25
**refers** [4] - 16:19, 19:12, 22:2, 53:19
**reflect** [1] - 21:18
**reflected** [3] - 10:20, 99:14, 99:15
**reflects** [1] - 16:13
**regarding** [7] - 11:25, 38:23, 40:21, 44:15, 44:25, 88:7, 90:5
**regroup** [1] - 126:6
**regulating** [3] - 98:7, 98:10, 98:25
**regulation** [1] - 98:18
**regulator** [4] - 97:20, 98:1, 98:22, 98:23
**regulators** [2] - 51:16, 51:22
**reinforces** [2] - 81:6, 90:6
**related** [1] - 16:15
**relating** [7] - 10:15, 11:12, 52:20, 58:12, 66:14, 71:18, 88:10
**relation** [1] - 78:12
**relationship** [2] - 25:22, 29:10
**relative** [1] - 81:18
**relatively** [1] - 5:2
**release** [11] - 13:4, 13:6, 13:17, 13:22, 12:23, 13:24, 43:14, 43:20, 44:13, 107:4, 108:11
**released** [1] - 43:4
**releasing** [1] - 13:8
**relevant** [15] - 16:23, 18:8, 18:20, 31:19, 31:20, 31:21, 32:1, 34:8, 39:11, 41:15, 47:20, 78:2, 89:20, 90:4, 106:20
**relied** [2] - 33:16, 117:18
**rely** [6] - 117:1, 117:11, 118:1, 128:8, 128:19, 129:1
**remain** [1] - 58:7
**remainder** [1] - 75:24
**remaining** [9] - 5:23, 48:17, 57:6, 57:23, 58:21, 69:14, 72:25, 93:8, 104:25
**remains** [2] - 57:16,

71:2
**remember** [21] - 17:4, 17:15, 19:22, 25:12, 33:25, 61:25, 87:8, 95:8, 99:17, 107:9, 107:21, 108:12, 108:13, 108:17, 108:18, 108:21, 112:7, 114:18, 120:21, 124:3, 129:19
**remind** [10] - 40:10, 68:6, 70:5, 74:1, 81:14, 84:14, 103:1, 108:9, 108:11, 123:2
**reminder** [1] - 81:14
**remove** [2] - 106:25, 107:11
**removed** [1] - 123:4
**rendering** [1] - 117:19
**reorient** [4] - 4:12, 69:21, 72:21
**repaid** [1] - 76:4
**repeat** [3] - 79:12, 113:14, 119:14
**repeated** [1] - 93:11
**repeating** [2] - 81:17, 90:15
**rephrase** [1] - 123:21
**replacing** [1] - 10:9
**replay** [1] - 133:8
**report** [19] - 6:20, 29:15, 37:24, 38:3, 61:21, 61:24, 63:8, 63:9, 63:10, 64:15, 65:2, 66:17, 67:6, 67:8, 67:24, 71:18, 74:21, 86:23, 87:7
**reported** [6] - 4:3, 14:15, 18:6, 34:7, 34:9, 68:12
**REPORTER** [1] - 79:3
**REPORTER'S** [1] - 4:2
**reporting** [4] - 8:19, 37:2, 55:16, 68:7
**reports** [17] - 61:16, 61:18, 61:23, 61:24, 62:3, 62:6, 62:7, 62:8, 62:9, 63:2, 63:5, 63:22, 64:21, 65:10, 74:20, 80:2
**represent** [1] - 58:25
**representation** [1] - 49:19
**represents** [2] - 23:17, 56:11
**request** [2] - 33:13, 33:14
**required** [4] - 51:15, 72:1, 113:10, 113:17

**requirement** [1] - 102:2
**requires** [1] - 113:5
**rerecording** [1] - 40:3
**Reserve** [2] - 88:25, 89:2
**reserve** [8] - 11:19, 11:20, 12:1, 12:7, 12:15, 13:7, 13:20, 87:6
**reserves** [19] - 12:12, 12:16, 12:21, 13:5, 13:8, 13:15, 13:17, 13:19, 13:22, 14:23, 14:24, 15:1, 15:16, 19:14, 36:3, 37:13, 40:15, 43:20, 49:6
**resources** [1] - 132:18
**respect** [7] - 17:10, 36:6, 40:14, 42:24, 72:14, 126:10, 126:11
**rest** [3] - 8:7, 21:9, 54:19
**Restated** [2] - 125:2, 126:2
**resting** [1] - 7:20
**restore** [1] - 90:22
**restored** [3] - 42:8, 84:18, 84:25
**restoring** [1] - 38:23
**result** [8] - 36:24, 37:1, 40:2, 42:23, 73:8, 74:16, 85:24, 87:3
**resulting** [1] - 33:13, 92:4
**results** [4] - 44:12, 88:2, 132:10, 132:11
**retain** [2] - 81:24, 87:1
**retained** [13] - 27:22, 28:1, 28:3, 28:5, 28:13, 28:18, 28:22, 28:23, 29:6, 29:8, 29:11, 29:20, 126:19
**retaining** [1] - 82:5
**returning** [2] - 6:13, 7:19
**returns** [1] - 120:20, 122:3
**revenue** [3] - 29:18, 29:19, 30:2
**revenues** [3] - 27:13, 29:25, 34:10
**reversal** [3] - 55:18, 85:6, 85:12
**reverse** [3] - 38:11, 38:19, 39:7
**reversed** [1] - 38:14
**review** [8] - 8:22, 9:2,

16:22, 20:11, 51:4, 108:22, 116:23, 118:14
**reviewed** [12] - 14:3, 15:18, 21:14, 31:25, 39:10, 40:15, 44:14, 44:23, 53:25, 59:25, 66:21, 117:18
**revised** [2] - 42:14, 48:12
**revision** [2] - 47:24, 48:3
**rid** [1] - 8:9
**right-hand** [1] - 53:18
**rights** [1] - 111:4
**rising** [7] - 25:3, 25:4, 25:6, 25:9, 25:11, 29:18, 30:1
**risk** [21] - 5:23, 5:24, 8:9, 8:15, 10:6, 24:13, 34:23, 34:24, 35:1, 51:25, 65:7, 65:12, 67:18, 68:12, 69:14, 81:11, 86:15, 86:17, 120:7, 122:25, 123:6
**risks** [7] - 63:11, 63:14, 63:17, 64:20, 65:11, 66:8, 66:23
**road** [15] - 4:23, 4:24, 5:3, 5:8, 6:8, 32:20, 34:16, 34:20, 35:13, 38:16, 49:4, 69:12, 76:25, 81:10
**roaring** [2] - 20:8, 20:9
**role** [2] - 96:17, 96:18
**rose** [1] - 25:7
**Ross** [1] - 54:1
**run** [1] - 24:3
**running** [3] - 8:10, 10:8, 34:24

**S**

**safe** [2] - 118:25, 119:1
**safeguarded** [5] - 117:3, 117:13, 117:14, 117:15, 117:17
**sales** [5] - 8:4, 9:16, 9:17, 9:19, 34:23
**San** [1] - 52:11
**satisfy** [2] - 69:17, 69:24
**Satriano** [2] - 18:16, 39:18
**saw** [10] - 26:3, 56:16, 67:19, 78:15, 84:17, 89:8, 102:20,

105:22, 107:18, 113:3
**scenario** [12] - 51:12, 60:2, 60:24, 82:6, 83:25, 92:16, 93:17, 93:22, 94:3, 95:16, 96:4, 107:23
**scenarios** [3] - 52:5, 58:17, 92:15
**schedules** [1] - 62:16
**school** [1] - 131:19
**scope** [6] - 102:20, 118:8, 128:22, 129:13, 130:9, 130:11
**screen** [11] - 6:24, 9:7, 20:15, 21:22, 29:13, 29:24, 42:15, 47:14, 48:14, 53:1, 86:21
**seated** [2] - 4:5, 69:6
**SEC** [30] - 29:16, 61:16, 61:22, 62:2, 62:6, 62:7, 63:2, 63:10, 64:15, 64:21, 65:10, 66:17, 66:22, 67:6, 114:13, 116:9, 116:16, 116:19, 116:22, 116:24, 117:1, 117:19, 117:23, 118:2, 118:7, 118:11, 120:18, 123:17, 123:19, 123:24
**second** [56] - 4:11, 4:13, 4:14, 4:25, 5:14, 5:18, 6:22, 7:1, 7:3, 7:9, 9:21, 21:13, 21:15, 22:13, 22:18, 22:20, 23:8, 23:16, 29:24, 32:25, 33:12, 36:19, 38:16, 43:22, 48:1, 49:4, 59:15, 59:17, 63:1, 64:11, 64:13, 67:14, 70:16, 70:17, 71:22, 75:11, 75:12, 75:22, 79:10, 81:23, 83:9, 87:18, 87:20, 87:24, 88:24, 90:24, 90:25, 100:12, 105:15, 105:21, 106:7, 108:13, 108:25, 119:15, 119:16, 119:21
**secondary** [4] - 4:20, 26:23, 84:2, 96:14
**secondly** [1] - 46:19
**Secretary** [1] - 68:8
**secretary** [2] - 34:1, 34:3

**section** [5] - 33:16, 63:10, 63:12, 66:3, 69:13
**sections** [1] - 65:10
**Securities** [1] - 116:9
**securities** [7] - 28:6, 29:3, 97:4, 97:7, 103:2, 107:1, 107:12
**securitized** [4] - 11:7, 11:22, 11:23, 23:4
**securitizing** [1] - 26:25
**security** [3] - 29:1, 29:3, 103:1
**see** [47] - 7:5, 9:6, 10:15, 10:19, 12:17, 20:14, 20:24, 22:7, 27:18, 28:6, 41:5, 41:18, 45:23, 47:3, 48:18, 48:25, 51:16, 51:19, 52:1, 55:5, 56:9, 58:2, 64:15, 65:2, 65:11, 65:15, 68:23, 75:8, 75:16, 75:17, 80:4, 80:17, 91:17, 92:4, 92:15, 92:25, 94:14, 101:10, 104:11, 105:9, 109:3, 115:20, 120:8, 121:9, 130:2, 130:11, 133:18
**seeing** [6] - 10:13, 10:14, 16:16, 16:18, 45:8, 109:9
**segments** [1] - 68:18
**selected** [1] - 60:9
**selling** [2] - 27:16
**Senior** [1] - 126:3
**sense** [5] - 37:16, 94:1, 98:21, 111:20, 132:14
**sent** [3] - 15:25, 47:19, 48:10
**sentence** [3] - 86:25, 119:16, 119:21
**separated** [1] - 63:13
**September** [10] - 14:14, 41:2, 63:6, 100:2, 106:10, 110:21, 110:24, 111:10, 114:9, 114:11
**seriously** [1] - 116:20
**set** [8] - 11:25, 13:21, 26:6, 44:17, 66:7, 82:14, 97:25, 98:2
**sets** [1] - 17:17
**setting** [2] - 13:7, 15:16

**setup** [2] - 58:2, 60:16
**seventy** [1] - 58:21
**seventy-one** [1] - 58:21
**several** [3] - 6:23, 11:3, 31:14
**shall** [1] - 118:11
**shape** [1] - 123:6
**share** [8] - 26:16, 26:18, 27:10, 27:18, 28:25, 35:2, 63:20, 97:1
**shared** [2] - 47:18, 48:9
**shareholder** [7] - 105:11, 106:20, 120:20, 121:10, 122:3, 122:16, 122:19
**Shareholders** [1] - 122:6
**shareholders** [14] - 4:18, 91:4, 106:7, 108:23, 109:25, 110:3, 117:1, 117:5, 117:7, 117:8, 118:16, 122:8, 122:19, 123:24
**shareholders'** [1] - 111:9
**shares** [2] - 26:20, 72:4
**sharing** [1] - 47:21
**sheet** [19] - 5:17, 13:20, 28:7, 39:7, 39:9, 40:5, 41:16, 41:20, 41:22, 41:25, 42:8, 42:19, 62:14, 75:7, 80:19, 84:18, 103:20, 105:4, 105:7
**Shiller** [1] - 94:14
**shocking** [1] - 87:5
**short** [4] - 7:7, 68:18, 81:25, 127:15
**short-term** [2] - 81:25, 127:15
**shorter** [2] - 5:2, 133:11
**show** [26] - 6:18, 14:8, 15:10, 20:16, 25:25, 26:19, 27:9, 36:15, 36:18, 40:1, 46:21, 50:15, 75:10, 99:10, 107:17, 108:18, 109:3, 109:12, 109:15, 114:18, 120:21, 123:16, 124:5, 124:21, 125:1, 131:25
**showed** [16] - 13:5,

41:9, 47:15, 48:12, 50:4, 64:5, 79:16, 95:23, 96:23, 102:23, 107:18, 107:24, 122:22, 124:3, 133:6
**showing** [14] - 18:21, 19:2, 19:13, 20:22, 21:3, 33:10, 37:3, 42:14, 42:15, 55:16, 70:15, 93:17, 94:17, 121:7
**shown** [4] - 20:15, 22:8, 22:9, 65:18
**shows** [5] - 9:12, 9:14, 13:12, 48:1, 92:15
**shrink** [1] - 24:1
**shrinking** [2] - 23:11, 27:19
**shrunk** [1] - 27:20
**side** [5] - 9:13, 9:14, 53:18, 129:4, 130:12
**signed** [1] - 15:11
**significance** [1] - 30:17
**significant** [7] - 4:16, 33:8, 43:23, 58:7, 77:4, 91:3, 127:21
**significantly** [2] - 7:9, 48:4
**similar** [6] - 31:6, 33:2, 33:4, 60:11, 66:22, 75:22
**similarly** [1] - 14:21
**simple** [3] - 36:14, 77:17, 132:13
**simplicity** [1] - 38:8
**simply** [2] - 27:4, 70:13
**sitting** [2] - 15:7, 21:5
**situation** [7] - 9:12, 59:18, 60:14, 70:8, 76:14, 87:15, 87:21
**situations** [4] - 58:3, 60:19, 61:10, 84:4
**six** [4] - 46:20, 87:11, 108:5, 112:15
**size** [3] - 20:22, 24:11, 29:21
**skipped** [2] - 56:23, 114:7
**slated** [1] - 28:8
**slide** [64] - 6:17, 6:18, 7:14, 9:12, 11:10, 14:7, 14:11, 15:21, 15:22, 15:24, 16:16, 16:25, 18:11, 20:15, 25:25, 26:5, 29:9, 29:13, 31:6, 32:4, 32:9, 37:20, 39:13,

39:16, 40:18, 40:21, 44:2, 45:4, 45:8, 47:9, 47:14, 47:15, 47:16, 49:2, 49:3, 52:20, 52:21, 53:7, 56:2, 58:8, 58:11, 60:4, 64:4, 64:17, 65:18, 67:19, 69:20, 74:19, 77:20, 82:8, 82:10, 83:6, 84:11, 86:18, 88:10, 88:15, 89:6, 89:24, 102:23, 104:4, 104:11, 131:8, 132:7
**Slide** [2] - 104:4, 131:8
**slides** [7] - 8:7, 26:3, 33:6, 52:22, 64:4, 131:25
**slightly** [1] - 48:12
**slowly** [1] - 94:5
**small** [4] - 23:6, 23:7, 48:4, 82:15
**smaller** [8] - 10:7, 18:6, 24:21, 38:21, 96:24, 100:23
**so-called** [2] - 51:25, 96:24
**sold** [1] - 112:13
**solely** [1] - 7:20
**solvent** [4] - 90:23, 128:11, 128:14, 129:5
**sometime** [1] - 25:19
**sometimes** [5] - 29:16, 51:18, 53:15, 63:23, 82:13
**somewhere** [1] - 48:16
**sorry** [16] - 20:25, 32:12, 58:9, 89:15, 92:14, 100:18, 103:17, 108:10, 109:6, 120:5, 120:25, 123:22, 125:9, 125:14, 125:20
**sort** [1] - 52:2
**sound** [4] - 90:23, 128:10, 128:14, 129:5
**sounds** [3] - 108:21, 116:4, 116:5
**sour** [1] - 15:6
**source** [7] - 8:13, 29:19, 103:21, 103:22, 103:23, 103:25, 105:1
**sources** [1] - 24:24
**specific** [1] - 51:10

**specified** [1] - 120:16
**speed** [3] - 28:12, 28:13
**speed-up** [2] - 28:12, 28:13
**spite** [1] - 51:19
**stability** [2] - 121:11, 121:16
**stabilized** [1] - 29:4
**stabilizing** [1] - 34:21
**stable** [3] - 128:8, 128:19, 129:1
**stage** [1] - 34:16
**stagnant** [1] - 9:17
**stand** [1] - 51:20
**standing** [4] - 12:15, 52:13, 74:8, 127:9
**standpoint** [2] - 30:18, 35:9
**start** [8] - 6:8, 6:13, 26:21, 44:23, 56:13, 73:24, 82:10, 91:19
**started** [7] - 8:4, 9:19, 37:1, 95:6, 95:24, 104:16, 106:8
**starting** [10] - 6:16, 6:20, 19:17, 73:2, 75:10, 83:2, 94:6, 94:25, 95:1, 106:3
**starts** [1] - 62:20
**state** [6] - 22:19, 43:16, 49:4, 51:17, 51:18, 66:12
**statement** [9] - 31:6, 62:15, 68:12, 68:13, 92:2, 98:4, 98:11, 123:17, 123:19
**statements** [25] - 33:1, 37:5, 62:11, 62:14, 62:15, 63:14, 64:8, 64:14, 64:16, 64:18, 65:18, 65:19, 65:24, 66:5, 66:8, 66:9, 66:17, 90:18, 90:21, 117:1, 117:5, 117:11, 117:21, 117:23, 119:7
**states** [2] - 53:7, 57:15
**statutory** [1] - 104:18
**stay** [1] - 57:3
**stays** [2] - 55:9, 93:9
**Stegman** [1] - 34:4
**step** [7] - 6:8, 34:20, 35:19, 38:16, 49:4, 133:20
**stepped** [1] - 27:6
**steps** [8] - 35:19, 46:2, 70:2, 77:20, 77:21, 81:7, 91:1
**stern** [2] - 68:23, 69:2

**still** [18] - 24:11, 24:12, 45:16, 45:23, 46:24, 47:18, 48:3, 51:20, 51:21, 52:7, 52:13, 56:15, 57:22, 58:21, 59:16, 71:11, 130:11, 130:17
**stipulation** [3] - 72:9, 99:19, 107:18
**Stock** [2] - 125:2, 126:3
**stock** [4] - 72:13, 110:4, 110:17, 114:4
**stopped** [1] - 127:13
**strategy** [4] - 120:19, 121:8, 121:15, 122:3
**strength** [2] - 103:22, 103:24
**stress** [31] - 51:11, 51:12, 51:14, 51:15, 52:1, 52:3, 52:13, 53:17, 54:22, 54:25, 55:1, 55:5, 56:21, 57:12, 57:13, 57:14, 57:25, 58:1, 58:23, 59:22, 60:1, 60:12, 82:6, 92:16, 93:7, 93:22, 94:2, 95:16, 96:4
**stringent** [1] - 51:17
**Strong** [1] - 6:9
**strong** [2] - 5:9, 107:2
**structural** [1] - 10:24
**structure** [4] - 62:2, 62:5, 62:12, 120:2
**struggling** [1] - 121:18
**studied** [1] - 112:8
**style** [1] - 19:10
**submitted** [1] - 116:24
**subsequent** [1] - 103:10
**subsequently** [1] - 68:15
**substantial** [2] - 33:5, 43:24
**substantially** [4] - 5:17, 76:10, 76:20, 85:23
**sudden** [3] - 59:24, 76:17, 83:11
**suddenly** [4] - 55:19, 76:15, 80:19, 88:4
**suffer** [2] - 24:7, 24:10
**sufficient** [3] - 50:6, 58:2, 108:7
**suggest** [1] - 131:14
**suggesting** [1] - 20:12
**summarize** [4] - 34:22, 49:7, 50:16,

77:9
**summarizes** [2] - 49:3, 60:20
**summarizing** [3] - 22:22, 32:23, 34:2
**summary** [6] - 33:6, 34:4, 34:18, 50:17, 90:13, 90:24
**summer** [1] - 94:18
**supplement** [1] - 129:11
**support** [8] - 96:13, 96:14, 96:15, 104:21, 107:3, 107:12, 108:7, 108:15
**supports** [1] - 62:16
**supposed** [5] - 28:2, 88:16, 88:23, 89:3, 103:25
**surprised** [1] - 20:7
**surprising** [1] - 80:1
**survive** [4] - 51:21, 52:8, 58:3, 58:6
**Susan** [3] - 16:12, 16:19, 60:7
**susceptible** [1] - 133:11
**suspended** [1] - 110:7
**suspension** [2] - 124:19, 126:23
**sustainable** [31] - 5:12, 6:14, 7:13, 7:15, 7:19, 8:20, 23:15, 30:13, 30:15, 30:21, 30:24, 32:1, 34:14, 34:19, 35:2, 35:14, 36:10, 36:18, 37:3, 38:18, 38:19, 40:2, 43:15, 43:19, 45:10, 45:13, 65:19, 66:10, 75:6, 75:9
**Sustainable** [1] - 6:10
**sustainably** [1] - 38:15
**sustained** [6] - 30:6, 31:7, 66:12, 111:25, 112:22, 115:10
**sweep** [73] - 4:15, 5:22, 6:2, 6:6, 25:20, 40:10, 42:23, 53:4, 53:5, 74:15, 74:25, 77:3, 78:14, 78:20, 78:25, 79:4, 79:8, 80:3, 81:2, 81:7, 81:10, 81:18, 82:2, 82:4, 82:21, 83:14, 84:14, 85:10, 86:4, 86:10, 87:3, 89:7, 89:8, 89:15, 90:19,

90:20, 91:2, 92:10, 101:18, 103:11, 124:6, 124:9, 124:12, 124:19, 126:7, 126:10, 126:12, 126:15, 126:22, 126:24, 127:7, 127:8, 127:15, 127:17, 127:23, 128:7, 128:10, 128:13, 128:25, 129:8, 129:13, 129:21, 130:6, 130:14, 130:22, 131:3, 131:15, 131:22, 132:3, 132:11, 132:15, 132:16, 132:22
**swept** - 43:1
**switch** [1] - 125:15
**systemic** [2] - 51:25, 120:7

# T

**Tab** [2] - 52:15, 67:3
**table** [5] - 40:24, 53:7, 53:18, 57:11, 109:7
**tables** [4] - 56:10, 107:17, 109:3
**Tagoe** [1] - 78:23
**tailwinds** [2] - 17:7, 17:11
**takeaway** [3] - 23:5, 23:8, 46:14
**takeaways** [2] - 22:22, 23:13
**talks** [3] - 16:1, 16:11, 39:20
**taper** [1] - 100:24
**taught** [1] - 98:20
**tax** [19] - 5:15, 30:23, 31:5, 35:5, 35:8, 35:21, 35:22, 36:2, 36:6, 36:8, 36:11, 36:14, 36:21, 37:4, 37:17, 38:24, 40:4, 40:22
**teach** [2] - 35:11, 131:19
**teaching** [1] - 98:20
**technical** [3] - 38:6, 42:12, 114:6
**teeny** [1] - 59:15
**temporary** [1] - 12:9
**ten** [17] - 24:20, 45:2, 45:14, 46:4, 46:16, 47:2, 47:23, 48:6, 48:17, 51:7, 56:17,

56:18, 66:14, 66:18, 66:20, 68:21, 79:6
**ten-year** [11] - 45:2, 45:14, 46:4, 47:2, 48:17, 51:7, 56:17, 56:18, 66:14, 66:18, 66:20
**term** [17] - 7:14, 7:16, 7:17, 17:13, 44:24, 45:19, 45:22, 51:11, 81:25, 87:1, 92:2, 114:6, 121:10, 122:16, 127:15, 127:16
**terminated** [4] - 119:12, 119:17, 119:25, 122:20
**termination** [1] - 120:16
**terms** [29] - 10:8, 10:10, 10:16, 22:21, 23:21, 23:22, 24:16, 29:10, 31:9, 34:18, 35:13, 43:16, 44:13, 46:10, 48:13, 52:14, 54:6, 54:10, 66:23, 68:14, 75:8, 83:25, 85:4, 88:13, 94:11, 97:16, 104:21, 127:4, 127:18
**terrible** [1] - 12:16
**test** [7] - 52:1, 52:13, 53:17, 57:12, 59:22, 60:12, 93:7
**testified** [6] - 43:3, 79:12, 91:21, 98:16, 105:10, 110:7
**testimony** [18] - 16:22, 17:3, 30:9, 31:10, 38:23, 39:3, 45:18, 53:25, 60:1, 60:6, 60:10, 69:18, 89:20, 89:23, 90:4, 90:12, 116:12, 126:7
**testing** [8] - 51:12, 51:14, 51:15, 52:3, 55:5, 57:25, 58:1
**Thakor** [2] - 25:13, 89:11
**thankfully** [1] - 109:6
**theme** [1] - 67:21
**then-current** [1] - 120:8
**thereby** [1] - 34:11
**therefore** [2] - 27:13, 36:1
**they've** [2] - 37:12, 50:12
**thinking** [1] - 130:11
**third** [30] - 5:20, 25:20,

28:4, 28:11, 40:25, 42:22, 48:8, 48:9, 75:20, 75:22, 79:25, 81:15, 84:23, 85:16, 90:18, 100:25, 124:7, 125:1, 125:5, 126:11, 126:16, 126:18, 127:3, 127:10, 127:22, 128:6, 128:18, 128:25, 131:15, 131:21
**Third** [1] - 126:2
**thirteen** [1] - 61:8
**three** [19] - 10:1, 22:8, 22:9, 31:15, 40:12, 40:13, 45:21, 51:8, 53:5, 53:16, 93:9, 93:11, 95:3, 95:10, 100:22, 104:17, 108:1, 114:16
**three-month** [1] - 114:16
**three-year** [1] - 51:8
**threshold** [2] - 75:14, 75:15
**Tim** [1] - 34:3
**title** [1] - 91:1
**today** [1] - 30:9
**together** [7] - 16:3, 23:14, 25:24, 50:14, 50:23, 80:12, 105:8
**tomorrow** [2] - 133:13, 133:18
**took** [6] - 16:4, 24:18, 90:8, 95:25, 101:13, 102:16
**tool** [2] - 45:23, 52:4
**top** [10] - 14:1, 43:15, 48:23, 49:12, 53:12, 70:16, 73:1, 74:9, 82:10
**total** [9] - 14:22, 23:3, 23:9, 38:10, 46:19, 48:6, 57:4, 95:19, 105:22
**touched** [3] - 25:21, 79:10, 84:13
**tough** [1] - 133:24
**transactions** [1] - 77:14
**transcript** [1] - 4:3
**transferring** [1] - 130:24
**translate** [2] - 19:8, 55:22
**Treasury** [118] - 7:6, 7:11, 33:12, 33:13, 33:22, 33:23, 33:25, 34:1, 34:3, 37:6,

39:5, 43:2, 44:8,
44:9, 44:16, 45:16,
45:17, 45:25, 46:11,
46:16, 47:23, 48:4,
48:7, 48:9, 48:11,
48:23, 49:9, 49:10,
49:21, 49:23, 50:5,
50:22, 55:24, 57:18,
57:21, 58:5, 58:13,
58:16, 60:25, 61:1,
65:13, 65:16, 68:8,
70:11, 70:13, 70:14,
70:18, 70:20, 70:21,
71:10, 71:11, 71:19,
71:24, 72:13, 72:14,
72:25, 73:7, 73:9,
73:10, 73:21, 74:10,
74:16, 75:14, 76:1,
76:2, 76:5, 76:7,
76:9, 76:21, 80:22,
82:25, 83:5, 83:12,
83:15, 83:17, 83:21,
84:4, 92:4, 92:6,
93:15, 93:19, 99:12,
100:10, 100:16,
102:3, 103:15,
103:17, 103:18,
103:19, 104:12,
104:13, 104:20,
104:25, 105:3,
105:5, 105:21,
106:3, 106:8, 108:6,
108:14, 109:1,
111:3, 111:4,
111:14, 111:17,
111:19, 113:5,
113:10, 113:18,
114:3, 114:6,
114:14, 123:14,
124:1, 124:13,
129:23, 130:25
**Treasoury's** [4] - 72:16,
72:18, 110:25,
111:11
**trends** [2] - 10:12,
10:14
**trial** [2] - 4:2, 38:23
**trillion** [1] - 97:4
**true** [4] - 36:6, 124:24,
130:2, 130:17
**try** [4] - 35:7, 51:23,
101:2, 101:3
**trying** [1] - 133:10
**turn** [7] - 12:20, 13:3,
73:4, 101:10, 104:1,
120:5, 126:3
**turnaround** [1] - 9:20,
59:22
**turned** [5] - 12:23,
15:11, 68:13, 68:15,

107:25
**turns** [1] - 29:5
**tweet** [1] - 133:16
**Twitter** [1] - 133:16
**two** [34] - 5:23, 8:1,
8:14, 8:19, 14:1,
17:11, 18:17, 22:22,
23:13, 24:5, 29:5,
29:23, 31:15, 35:18,
39:18, 39:21, 42:25,
46:2, 48:13, 50:10,
53:13, 59:12, 62:10,
62:13, 68:18, 70:2,
76:17, 77:10, 81:17,
89:12, 90:15,
102:21, 117:22
**type** [8] - 76:14, 78:5,
80:23, 83:21, 89:10,
93:24, 127:12, 130:3
**types** [3] - 63:16,
64:14, 64:16
**typical** [1] - 77:21
**typically** [6] - 22:4,
24:9, 45:19, 45:21,
52:3, 53:13, 79:18,
118:1

## U

**U.S** [4] - 94:14, 96:11,
97:12, 107:3
**Ugoletti** [2] - 89:24,
129:21
**ultimate** [1] - 46:10
**ultimately** [2] - 10:21,
76:6
**umbrella** [3] - 57:19,
57:20, 57:21
**unanticipated** [1] -
72:6
**uncertain** [2] - 63:25
**uncertainties** [13] -
63:11, 63:15, 63:18,
63:20, 63:23, 64:20,
65:1, 65:2, 65:9,
65:11, 66:8, 66:23
**uncertainty** [3] -
64:18, 67:18, 67:21
**under** [19] - 46:4, 54:6,
54:8, 55:23, 56:4,
57:20, 58:17, 83:13,
92:15, 101:20,
102:4, 104:16,
111:5, 119:15,
132:1, 132:3,
132:10, 132:16,
132:22
**understood** [2] -
105:17, 106:7
**undertake** [1] - 77:14

**undrawn** [1] - 105:6
**unlike** [1] - 5:1
**unlikely** [1] - 72:23
**unlimited** [3] - 105:23,
105:25, 108:15
**unreasonable** [2] -
127:24, 128:1
**untouched** [1] - 71:10
**unused** [1] - 45:17
**unusual** [1] - 46:9
**up** [109] - 8:14, 12:10,
12:14, 13:9, 14:22,
14:24, 15:1, 18:25,
26:2, 26:10, 28:12,
28:13, 28:25, 29:1,
29:6, 29:7, 30:3,
32:21, 32:22, 36:19,
37:13, 38:10, 38:11,
38:12, 38:20, 41:4,
41:8, 41:21, 41:24,
42:13, 43:1, 43:18,
43:20, 43:21, 43:23,
44:3, 44:7, 44:10,
45:10, 46:21, 48:2,
48:15, 49:13, 50:7,
50:22, 54:14, 55:4,
55:14, 56:15, 57:6,
57:8, 57:19, 57:21,
57:22, 58:22, 59:3,
64:2, 65:7, 67:2,
68:2, 69:9, 71:21,
72:11, 73:22, 73:23,
73:24, 75:10, 76:1,
76:2, 76:17, 76:20,
80:19, 81:7, 82:17,
82:21, 83:13, 83:18,
84:6, 85:8, 85:9,
86:2, 87:22, 88:4,
91:20, 92:17, 94:4,
94:6, 94:14, 95:6,
99:18, 103:10,
104:2, 106:22,
108:4, 109:22,
114:20, 115:14,
118:10, 119:8,
120:24, 121:5,
124:23, 131:8,
132:19
**update** [2] - 78:19,
78:24
**updated** [5] - 12:22,
12:23, 78:1, 78:3,
79:8
**ups** [5] - 36:4, 40:15,
48:20, 86:14, 87:19
**upward** [4] - 18:22,
18:25, 19:2, 20:3
**urgency** [1] - 75:3
**usual** [1] - 116:25
**utilized** [1] - 58:11

## V

**valuation** [2] - 38:6,
38:8
**value** [14] - 13:20,
30:22, 30:24, 31:3,
31:4, 36:2, 36:9,
36:11, 37:17, 88:18,
88:21, 88:23,
121:10, 122:16
**values** [5] - 9:22, 10:2,
10:11, 32:20, 34:21
**variable** [1] - 124:10
**variety** [2] - 53:9,
79:13
**various** [4] - 55:15,
55:23, 66:7, 92:15
**vary** [1] - 124:14
**vault** [12] - 12:2, 12:4,
13:5, 15:4, 15:5,
15:6, 15:13, 17:17,
17:24, 19:13, 19:24,
20:24
**verify** [2] - 117:2,
117:12
**version** [3] - 124:24,
124:25, 125:14
**versions** [1] - 47:6
**versus** [2] - 33:7, 42:9
**vertical** [1] - 21:4
**view** [5] - 16:13,
32:24, 39:24, 66:11,
127:4
**viewed** [1] - 110:8
**viewing** [2] - 6:17,
40:21
**views** [1] - 66:9
**vintage** [2] - 22:2,
22:6
**vintages** [3] - 21:23,
21:25, 22:7
**visible** [1] - 115:15
**visual** [2] - 49:18, 90:2
**volatility** [1] - 67:22
**volunteer** [1] - 101:3

## W

**wait** [2] - 75:4, 75:8
**walk** [1] - 86:20
**ways** [3] - 49:8, 93:25,
130:3
**well-defined** [2] -
129:18, 129:19
**whatsoever** [1] -
103:13
**whole** [7] - 14:15,
34:20, 41:3, 44:5,
77:10, 97:11, 119:21
**whole-year** [2] -

14:15, 41:3
**wipe** [1] - 61:5
**withstand** [2] - 51:17,
52:12
**witness** [2] - 115:6,
115:12
**Witnesses** [1] - 3:3
**word** [5] - 43:24,
67:20, 67:21,
106:15, 131:9
**wording** [1] - 126:14
**words** [4] - 29:2,
128:2, 130:17,
130:18
**works** [2] - 69:21,
98:18
**world** [1] - 55:19
**worse** [13] - 52:6,
53:13, 53:15, 54:16,
56:23, 56:24, 57:1,
58:23, 93:23, 94:1,
94:8, 94:13, 95:16
**WORSE** [1] - 58:23
**worst** [1] - 52:6
**worth** [147] - 4:15,
5:18, 5:19, 5:22, 6:2,
6:6, 25:20, 35:14,
35:16, 35:18, 37:6,
38:15, 38:17, 38:20,
40:6, 40:10, 41:21,
42:5, 42:9, 42:23,
42:24, 43:18, 43:19,
43:20, 43:21, 43:25,
44:6, 44:10, 44:11,
45:11, 49:12, 49:17,
49:20, 49:23, 50:2,
50:3, 50:4, 50:5,
50:7, 50:21, 53:3,
53:5, 70:9, 73:1,
74:15, 74:24, 75:24,
77:3, 78:14, 78:20,
78:25, 79:7, 80:3,
80:15, 80:19, 80:23,
81:2, 81:7, 81:10,
81:18, 81:20, 81:22,
82:2, 82:3, 82:20,
82:21, 82:22, 82:23,
82:24, 83:2, 83:11,
83:14, 83:20, 84:1,
84:14, 85:4, 85:10,
86:4, 86:9, 87:3,
87:21, 87:25, 89:7,
89:8, 89:15, 90:14,
90:19, 90:20, 91:2,
92:9, 92:10, 92:11,
92:12, 99:5, 99:8,
99:16, 99:23, 100:3,
100:5, 100:9, 101:7,
101:15, 101:21,
103:10, 121:19,

121:21, 124:6,
124:9, 124:11,
124:12, 124:14,
124:15, 124:16,
124:19, 126:7,
126:10, 126:12,
126:13, 126:14,
126:22, 126:24,
127:5, 127:7, 127:8,
127:14, 127:17,
127:23, 128:7,
128:10, 128:13,
128:25, 129:8,
129:12, 129:21,
130:6, 130:14,
130:21, 131:3,
131:15, 131:21,
132:3, 132:11,
132:15, 132:16,
132:22
**write** [29] - 12:8, 12:9,
12:10, 30:25, 36:4,
36:14, 36:19, 38:6,
38:7, 38:9, 40:15,
41:9, 41:10, 41:23,
41:24, 43:23, 48:20,
83:7, 83:13, 83:16,
84:1, 84:5, 84:6,
86:14, 87:16
**write-down** [8] - 12:8,
12:9, 12:10, 38:6,
38:7, 38:9, 41:23,
84:1
**write-downs** [6] -
36:4, 40:15, 83:7,
84:5, 86:14, 87:16
**write-off** [2] - 41:9,
41:10
**write-up** [3] - 41:24,
43:23, 84:6
**write-ups** [4] - 36:4,
40:15, 48:20, 86:14
**writer** [1] - 19:25
**writes** [1] - 87:19
**writes-ups** [1] - 87:19
**writing** [2] - 56:12,
118:20
**written** [14] - 5:1,
22:15, 24:3, 33:22,
33:23, 37:12, 37:13,
40:4, 49:13, 83:10,
83:18, 87:22,
110:25, 111:11
**wrote** [3] - 20:2, 37:4,
117:9

## Y

**y'all** [1] - 133:18
**year** [43] - 7:22, 14:15,
18:6, 22:2, 25:9,

28:8, 29:17, 41:3,
42:15, 45:2, 45:14,
46:4, 47:2, 48:17,
51:7, 51:8, 51:9,
53:21, 54:11, 54:12,
54:20, 55:8, 56:17,
56:18, 61:4, 62:23,
63:7, 66:14, 66:18,
66:20, 82:17, 87:12,
93:6, 93:10, 93:12,
93:15, 93:16, 93:18,
94:20, 112:3, 112:6,
115:18, 118:15
**years** [30] - 6:23,
14:12, 24:20, 29:18,
34:11, 40:23, 40:25,
45:21, 45:22, 46:16,
47:23, 48:6, 55:9,
57:4, 57:16, 58:10,
58:19, 87:12, 92:19,
93:9, 93:11, 93:13,
93:14, 93:18, 95:3,
95:10, 95:25, 98:19,
98:20
**yellow** [2] - 22:11,
58:25

## Z

**zero** [15] - 31:1, 49:20,
49:23, 50:3, 50:4,
56:9, 56:11, 56:12,
57:4, 83:3, 87:9,
87:12, 99:12, 101:22
**zone** [1] - 52:10