```
 1                  UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2

 3    * * * * * * * * * * * * * * *   )
      FAIRHOLME FUNDS, INC., et al.,  )    Civil Action
 4                                    )    No. 13-1053
                   Plaintiffs,        )
 5                                    )
         vs.                          )
 6                                    )
      FEDERAL HOUSING FINANCE AGENCY, )    Washington, D.C.
 7    et al.,                         )    August 1, 2023
                                      )    1:49 p.m.
 8                 Defendants.        )
                                      )
 9    * * * * * * * * * * * * * * *   )

10    IN RE:  FANNIE MAE/FREDDIE MAC  )
      SENIOR PREFERRED STOCK PURCHASE )   MC Case No. 13-1288
11    AGREEMENT CLASS ACTION LITIGATION )

12

13                 TRANSCRIPT OF JURY TRIAL
                   DAY 7 - AFTERNOON SESSION
14          BEFORE THE HONORABLE ROYCE C. LAMBERTH,
                UNITED STATES SENIOR DISTRICT JUDGE
15


16

      APPEARANCES:
17

      FOR THE BERKLEY        VINCENT COLATRIANO, ESQ.
18    PLAINTIFFS:            COOPER & KIRK, PLLC
                             1523 New Hampshire Avenue, Northwest
19                           Washington, D.C. 20036

20    FOR THE CLASS          HAMISH P.M. HUME, ESQ.
      PLAINTIFFS:            KENYA KHALELAH DAVIS, ESQ.
21                           SAMUEL KAPLAN, ESQ.
                             BOIES, SCHILLER & FLEXNER, LLP
22                           1401 New York Avenue, Northwest
                             Washington, D.C. 20005
23
                             LEE D. RUDY, ESQ.
24                           KESSLER, TOPAZ, MELTZER & CHECK, LLP
                             280 King of Prussia Road
25                           Radnor, Pennsylvania 19087
```

1    APPEARANCES, CONT'D:

2    FOR THE CLASS            ROBERT F. KRAVETZ, ESQ.
     PLAINTIFFS:              ADAM H. WIERZBOWSKI, ESQ.
3                            CAITLIN BOZMAN, ESQ.
                             BERNSTEIN, LITOWITZ, BERGER &
4                              GROSSMAN, LLP
                             1251 Avenue of the Americas
5                            New York, New York 10020

6    FOR THE DEFENDANTS       ASIM VARMA, ESQ.
     FHFA, FANNIE MAE &       IAN HOFFMAN, ESQ.
7    FREDDIE MAC:             DAVID BERGMAN, ESQ.
                             JONATHAN LOUIS STERN, ESQ.
8                            STANTON JONES, ESQ.
                             ARNOLD & PORTER KAYE SCHOLER
9                            601 Massachusetts Avenue, Northwest
                             Washington, D.C. 20001
10
     REPORTED BY:            LISA EDWARDS, RDR, CRR
11                           Official Court Reporter
                             United States District Court for the
12                             District of Columbia
                             333 Constitution Avenue, Northwest
13                           Room 6706
                             Washington, D.C. 20001
14                           (202) 354-3269

15

16

17

18

19

20

21

22

23

24

25

I N D E X

|  | Direct | Cross | Red. |
|---|---|---|---|

WITNESSES FOR THE PLAINTIFFS:

James Lockhart (video)          1442

Timothy Mayopoulos (video)      1442

Ross Kari (deposition)          1448


Rule 50 Motion                                        Page 1500


EXHIBITS RECEIVED IN EVIDENCE                              PAGE

Plaintiffs' Exhibit Nos. 3-A-3, 3-A-4, 3-B-3,            1428
3-B-4, 4-1 through 4-40, 37, 40, 144, 186,
209, 215, 240, 254, 262, 269, 278, 282, 509,
523, 525, 526, 527, 528, 529, 530, 531, 533,
534, 550, 1-A, 1-C, 1-K, 1-L and 1-M


Defendants' Exhibit Nos. 318, 451, 527 and 736          1447

 1          MR. JONES:  Your Honor, Stanton Jones for the

 2   Defendants.

 3          We don't have to do this now.  I know the jury's

 4   coming.  There is one issue that we need to resolve between

 5   the parties related to the readout of Ross Kari, but we can

 6   do it by phone.

 7          THE COURTROOM DEPUTY:  Jury panel.

 8          (Whereupon, the jury entered the courtroom at 1:49

 9   p.m. and the following proceedings were had:)

10          THE COURT:  You may be seated.

11          The Plaintiffs may proceed.

12          MR. KRAVETZ:  Your Honor, before we call

13   Ms. Belack back to the stand, Plaintiffs would like to move

14   several documents in.

15          THE COURT:  Okay.

16          MR. KRAVETZ:  PX 3-A-3, 3-A-4, 3-B-3, 3-B-4,

17   Exhibits 4-1 through 4-40, so it's 40 exhibits; Plaintiffs'

18   Exhibit 37, 40, 144, 186, 209, 215, 240, 254, 262, 269, 278

19   and 282.  And then also, Exhibits -- Plaintiff's Exhibits

20   509, 523, 525, 526, 527, 528, 529, 530, 531, 533, 534 and

21   550.

22          We also have Exhibits 1-A, 1-C, 1-K, 1-L and 1-M.

23          MR. JONES:  Your Honor, Defendants object for the

24   record to PX-144 and PX 550.

25          THE COURT:  And otherwise, there are no

```
 1    objections?

 2              MR. JONES:  Correct.

 3              THE COURT:  Okay.  Those objections are overruled.

 4    They're all received.

 5              (Whereupon, Plaintiffs' Exhibit Nos. 3-A-3, 3-A-4,

 6    3-B-3, 3-B-4, 4-1 through 4-40, 37, 40, 144, 186, 209, 215,

 7    240, 254, 262, 269, 278, 282, 509, 523, 525, 526, 527, 528,

 8    529, 530, 531, 533, 534, 550, 1-A, 1-C, 1-K, 1-L and 1-M

 9    were entered into evidence.)

10              MR. KRAVETZ:  Thank you, your Honor.

11              Plaintiffs would call Ms. Belack.

12              THE COURT:  Okay.  As a reader?

13              MR. KRAVETZ:  That's correct, your Honor.

14                        READING BY JILL BELACK:

15    BY MR. KRAVETZ:

16    Q.  Good afternoon, Ms. Belack.

17    A.  Good afternoon.

18    Q.  You have your binder on the witness stand and also the

19    documents will be displayed on the screen.

20              MR. KRAVETZ:  Ms. McGuire, can you please call out

21    Exhibit 205.

22    BY MR. KRAVETZ:

23    Q.  Ms. Belack, can you please read out the header of this

24    document?

25    A.  "To Mary Miller from Michael Stegman.
```

```
 1                  Subject:  FHFA-related discussion at June 25
 2       morning meeting.
 3                  Date:  June 25, 2012."
 4       Q.  Can you read the first two sentences of the text.
 5       A.  "The secretary provided an overview of his and your
 6       previous day's meeting with Ed DeMarco.  This is the essence
 7       of the discussion that took place."
 8       Q.  And can you read the remainder into the record.
 9       A.  "Roman numeral I:  Increasing passivity.  The secretary
10       got a sense from yesterday's meeting that the acting
11       director is becoming more passive in his spearheading a
12       number of policy-relevant reforms, to wit."
13                  MR. KRAVETZ:  And if Ms. McGuire can call out the
14       next portion of the document.
15       BY MR. KRAVETZ:
16       Q.  Please read that into the record.
17       A.  "Through weeks of negotiating terms of possible
18       amendments to the PSPAs, he never questioned the need to
19       adjust the dividend schedule this year.
20                  "Since the secretary raised the possibility of a
21       PR covenant, DeMarco no longer sees the urgency of amending
22       the PSPAs this year.  He has raised two competing reasons
23       for this new position:
24                  "1:  The GSEs will be generating large revenues
25       over the coming years, thereby enabling them to pay the 10
```

Reading by Jill Belack

 1    percent annual dividend well into the future even with the

 2    caps.

 3                "2:  Instituting a net worth sweep in place of the

 4    dividend will further extend the lives of the GSEs to such

 5    an extent that it would remove the urgency for Congress to

 6    act on long-term housing finance reform."

 7    Q.  Thank you.

 8                MR. KRAVETZ:  Ms. McGuire, can you please pull up

 9    Exhibit 226-A.  If we can call out the header of the email,

10    the beginning portion at the bottom of the screen.

11    BY MR. KRAVETZ:

12    Q.  Ms. Belack, can you please read the header of the email

13    into the record.

14    A.  "From Williams, John.  Sent Tuesday, July 31, 2012,

15    10:40 a.m., to Foster, Jeff.

16                "Cc:  Tagoe, Naa Awaa; Calhoun, Peter; Carroll,

17    Barry; Chepenick, Adam.

18                "Subject:  2Q12 estimated results/timing."

19    Q.  Can you please read the text of the email into the

20    record.

21    A.  "Fannie Mae is currently scheduled to release its 2Q12

22    10-Q on Wednesday, August 8th, and Freddie Mac is currently

23    scheduled to release its 2Q12 10-Q on Tuesday, August 7th.

24                "The following reflects the current estimated 2Q12

25    financial results for both enterprises.

Reading by Jill Belack

```
 1              "Fannie Mae:  Net income:  $5.1 billion.
 2              "Dividends:  $2.92 billion.
 3              "Net worth, post-dividends:  $2.8 billion.
 4              "Net worth, pre-dividends:  $5.7 billion.
 5              "Freddie Mac, net income:  $3 billion.
 6              "Dividends:  $1.8 billion.
 7              "Net worth, post-dividends:  $1.1 billion.
 8              "Net worth, pre-dividends:  $2.9 billion."
 9    Q.  Can you read the signature block, please.
10    A.  "Regards, John H. Williams, manager, enterprise
11    financial performance reporting office of financial
12    analysis, modeling and simulations, Federal Housing Finance
13    Agency."
14              MR. KRAVETZ:  Ms. McGuire, we can call out the
15    next email in the chain.
16    BY MR. KRAVETZ:
17    Q.  Can you read the text of the email into the record.
18    A.  "FYI, see results below.  This is much stronger than we
19    thought/expected.
20              "Post-dividends, Fannie Mae will still have
21    $2.8 billion of net worth and Freddie will have $1.1 billion
22    of net worth."
23              MR. KRAVETZ:  And if we can call out the final
24    portion of the email.
25
```

```
 1    BY MR. KRAVETZ:

 2    Q.  Please read the text into the record.

 3    A.  "Really makes sense to push the net worth sweep this

 4    quarter.

 5             "It will, quote, 'make sense,' end quote, to GSE

 6    observers.  TJB."

 7    Q.  Thank you.

 8             MR. KRAVETZ:  Ms. McGuire, can you please call up

 9    Plaintiffs' Exhibit 247.  And can we enlarge the header.

10    Thank you.

11    BY MR. KRAVETZ:

12    Q.  Can you please read the highlighted portion of the

13    header into the record.

14    A.  "From Ugoletti, Mario.  Sent:  August 9, 2012, 10:52

15    a.m., to DeMarco, Edward.

16             "Subject:  PSPA alert."

17    Q.  And can you read the text into the record.

18    A.  "Close hold.

19             "As a heads-up, there appears to be a renewed push

20    to move forward on PSPA amendments.  I have not seen the

21    proposed documents yet, but my understanding is that largely

22    the same as previous versions we had reviewed in terms of

23    net income sweep, eliminating the commitment fee, faster

24    portfolio wind-down and a *de minimis* safe harbor for

25    ordinary course transactions."
```

1     Q.  Thank you.

2          MR. KRAVETZ:  Ms. McGuire, the final document,

3     please, Plaintiffs' Exhibit 259.  If we can call out the

4     email at the first part of the chain.  Thank you.

5     BY MR. KRAVETZ:

6     Q.  Can you read the header into the record, Ms. Belack.

7     A.  "From Griffin, Jr., James.  Sent Tuesday, August 14th,

8     2012, 7:33 a.m.

9          "To Satriano, Nicholas.

10         "Subject:  SPSPA meeting."

11    Q.  Can you read the text.

12    A.  "The meeting with Ed went well.  The amendment is

13    expected to be made public sometime on Friday.  The

14    enterprises will be informed tomorrow of the changes and

15    FHFA will work with them to ensure a consistent

16    communication message.

17         "Thanks."

18    Q.  Thank you.

19         MR. KRAVETZ:  Can we call out the next email in

20    the chain, please.

21    BY MR. KRAVETZ:

22    Q.  Can you please read the text into the record.

23    A.  "Hi.  Any discussion of reaching out to the auditors?

24    Given the changes, should be fine.

25         "Cheers, Nick."

Reading by Jill Belack

```
1              MR. KRAVETZ:  If we can go to the last part of the

2       email, please.

3       BY MR. KRAVETZ:

4       Q.  Can you please read the text of the email into the

5       record.

6       A.  "Nick, there was not.  I do not think there would be a

7       going-concern issue.

8              "There was a question about rerecording certain

9       deferred tax assets that had been written off.  Jeff

10      indicated both of the boards had discussed this at the last

11      meeting based on the view that they were going to be

12      profitable going forward.

13             "I do not think that makes sense, given the

14      amendments are designed to demonstrate wind-down.  This is

15      something we will need to work with the enterprises and

16      their auditors on.

17             "Thanks, Jim."

18      Q.  Thank you, Ms. Belack.

19             MR. KRAVETZ:  Your Honor, may we be heard briefly

20      by phone?

21             THE COURT:  Yes.

22             (Whereupon, the following proceedings were had at

23      sidebar outside the presence of the jury:)

24             MR. KRAVETZ:  Thank you, your Honor.

25             Robert Kravetz on behalf of Plaintiffs.
```

Reading by Jill Belack

1     We have several additional exhibits that are part

2     of Plaintiffs' Exhibit 1, the summary charts that were

3     displayed to the jury, that we would like to move into

4     evidence.

5          There is an objection.  It should not have an

6     impact on Plaintiffs' resting their case now.

7          If I could formally list the exhibit numbers,

8     Defendants can make their objection.  It's all in the record

9     so far.  It shouldn't have an impact.  Then we could have

10    argument on the admissibility of these exhibits prior to

11    arguing the Rule 50 motion later this afternoon.

12         THE COURT:  Go ahead.

13         MR. KRAVETZ:  Your Honor, they are Exhibits 1-E,

14    1-F, 1-G, 1-H, 1-I, 1-J, 1-N, as in Nancy, 1-O, 1-P, 1-Q and

15    1-R.

16         MR. JONES:  Your Honor, this is Stanton Jones for

17    the Defendants.

18         Defendants do object to those exhibits.  However,

19    we have no objection to handling the argument on those

20    objections later this afternoon after the jury is released.

21         THE COURT:  Okay.

22         MR. JONES:  Your Honor, Stanton Jones still.

23         The Defendants also with the Plaintiffs resting

24    their case will -- are making a motion for judgment as a

25    matter of law under Rule 50(a).  We've also discussed with

1    the Plaintiffs, and it's fine with us, to present that

2    motion orally also this afternoon after the jury is

3    released.

4            THE COURT:  Okay.  We'll consider it made at this

5    time.

6            They can do that in front of the jury.  And then

7    I'll just say to the jury:  We'll now let the Defendants

8    start their case, but because of some scheduling

9    difficulties they won't get very far.  I don't know how you

10   want me to say it.  They won't be able to get very far.  But

11   we'll go as much as we can today and then we'll resume

12   tomorrow.

13           MR. JONES:  Yes.  That's fine, your Honor.

14           I think we'll have probably about an hour and a

15   half or longer between the videos and the readout from

16   Mr. Kari.

17           As I indicated before the jury came in just now,

18   your Honor, there is one issue related to the readout from

19   the Kari deposition, which is that in the designated portion

20   of the deposition, of course, some of the deposition

21   questions were asked by the Plaintiffs' counsel and others

22   were asked by the defense counsel.

23           We had proposed to the Plaintiffs and asked that

24   they have one of their lawyers get up to essentially play

25   the part of themselves asking the Plaintiffs' questions.

 1           They indicated that they would not do that and

 2      believed that the defense counsel should present all the

 3      questions.

 4           We said that we were willing to do that as long as

 5      we could have two different lawyers get up to do it and have

 6      one of our lawyers tell the jury that we are playing the

 7      part of one of the Plaintiffs' lawyers who asked the

 8      questions.

 9           As you can imagine, the questions being asked by

10      Plaintiffs' counsel are not asked in a way that we would

11      present them.  They're leading, you know.  They focus, as

12      you'd imagine, on the Plaintiffs' theories and themes.

13           And -- but the Plaintiffs, I understand, also

14      object to that.

15           So we'd just like some guidance.  We're happy to

16      have two defense lawyers get up and do the reading, to ask

17      all the questions, as long as it's fine for us to just tell

18      the jury -- you know, if I'm going to stand up, I would just

19      say, "I'm now going to play the part of the Plaintiffs'

20      counsel who asked these questions at the deposition" so it's

21      clear to the jury and accurate which side was asking which

22      questions.

23           MR. RUDY:  I'm sorry.  Lee Rudy for Plaintiffs,

24      your Honor.

25           We're not trying to be difficult here.  I'm not

```
 1    aware of any statute or rule or any other procedure that
 2    requires an opponent lawyer to be part of the presentation
 3    of evidence in the opponent's case.
 4            So, your Honor, this is different from what
 5    happened with Ms. McFarland, where the Defendants actually
 6    designated pieces of the -- affirmatively designated pieces
 7    of Ms. McFarland's testimony and they wanted a lawyer to get
 8    up and demonstrate to the jury that they were part of that.
 9            We didn't designate anything from Mr. Kari.  None
10    of it's helpful to us.  We don't want to use our credibility
11    to be part of that.
12            THE COURT:  That's fine.  They can either use two
13    lawyers or just say it's the defense attorney, with another
14    lawyer asking whatever they want to say.
15            MR. RUDY:  Yes.
16            THE COURT:  This is not video, right?
17            MR. JONES:  Correct.  Correct, your Honor.  It's a
18    readout.
19            Just to be clear, your Honor, the Defendants will
20    have two different lawyers get up to do the reading; and
21    when each lawyer gets up to do the reading, they can
22    introduce themselves to the jury and explain who they're
23    playing.
24            THE COURT:  That's fine.
25            MR. RUDY:  Your Honor, there's one caveat to that.
```

1    It's not Plaintiffs and Defendants.  So the second lawyer is

2    not a defense lawyer; it's a lawyer for the Department of

3    Justice.  So by stipulation in the case we have excluded

4    that.

5           So none of the videos and none of the witnesses,

6    none of the depositions thus far, have ever identified who

7    the -- asked who the questions are being asked by.  We would

8    just say -- they can have two different people stand up and

9    the jury's going to go:  Okay.  These are two different

10   people.  I don't think the identity of the questioner should

11   be, frankly, relevant to this jury's consideration of the

12   testimony that's given.  I don't think they need to

13   introduce themselves.

14          MR. JONES:  Your Honor, I think that it's just

15   inaccurate and frankly could be misleading to the jury if

16   the jury is --

17          THE COURT:  You can say it's the Department of

18   Justice.

19          MR. JONES:  And for Plaintiffs, that it's the

20   Plaintiffs?

21          THE COURT:  Whose deposition was it?

22          MR. JONES:  It was the Plaintiffs' deposition of

23   Ross Kari, who's a -- who was the CFO of Freddie Mac.  And

24   many of the questions in the designated portions, including

25   parts that we designated and parts that they

1  counter-designated, are questions by Plaintiffs' counsel.

2  It's Mr. Colatriano, who is sitting at counsel table right

3  now.

4           MR. RUDY:  It was in the other -- it was in a

5  related action.  It was not in this case.  So it was between

6  counsel to a different plaintiff and the Department of

7  Justice.  Class counsel was not even present at this

8  deposition.

9           I think we should follow the protocol that we

10  followed through the case and not identify who the

11  questioners are.  They can pull a person out of the

12  audience, so the jury is going to have no idea who the

13  person is, to read one of the parts.  It's really up to

14  them.  But I don't think we should be involved in it and I

15  don't think that we need to identify who the questioners

16  are.

17           THE COURT:  Can I look at what we're reading at

18  the break?  What's the timing of this?

19           MR. JONES:  It would be 20 minutes from now after

20  the two deposition videos.

21           THE COURT:  Let's do those two and I'll give the

22  jury a break and look at what we're talking about.

23           MR. JONES:  Thank you, your Honor.

24           MR. RUDY:  Thank you, your Honor.

25           (Whereupon, the following proceedings were had in

1    open court:)

2              THE COURT:  First the good news.

3              MR. HUME:  Exactly.

4              Members of the jury, Judge Lamberth, Hamish Hume

5    for the Plaintiffs.

6              Subject to the minor issue with the exhibits we

7    just discussed, Plaintiffs rest their case.

8              THE COURT:  At this time, then, we have some legal

9    questions that we'll deal with after the jury goes.

10             The defense has the opportunity to begin the

11   presentation of their case.  As I said, we have some

12   scheduling problems, but we do have some things we're going

13   to go forward with.  Obviously, we have readings.

14   Obviously, we have some electronic depositions and other

15   depositions.  And we'll get started with those this

16   afternoon.

17             And we may have a little early break because of

18   scheduling difficulties.  But we're going to keep going.  So

19   we can start with what we have next.

20             MR. HOFFMAN:  Good afternoon, your Honor.  Ian

21   Hoffman on behalf of the Defendants.

22             Defendants call James Lockhart, former director of

23   FHFA, who will be presented via video deposition.

24             THE COURT:  We saw a little of Mr. Lockhart in an

25   earlier video.  We're going to see more of him now.  He was

1    the first director, as you'll recall.

2              (Whereupon, the videotaped deposition of James

3    Lockhart was published in open court.)

4              MR. HOFFMAN:  Ian Hoffman once again on behalf of

5    the Defendants.

6              The Defendants now call Mr. Timothy Mayopoulos,

7    the former CEO of Fannie Mae, also by video deposition.

8              (Whereupon, the videotaped deposition of Timothy

9    Mayopoulos was published in open court.)

10             MR. HOFFMAN:  Ian Hoffman again on behalf of the

11   Defendants.

12             We're prepared to call our next witness, who will

13   be a deposition readout; but there were some logistical

14   issues we wanted to discuss with the Court.

15             THE COURT:  Okay.  We're going to take a short

16   recess now before we do this next witness, then.  I'll

17   excuse the jury for a few minutes.

18             (Whereupon, the jury exited the courtroom at 2:29

19   p.m. and the following proceedings were had:)

20             THE COURT:  Can I see the transcript?

21             MR. JONES:  (Tenders document to the Court.)

22             THE COURT:  You can be seated.

23             MR. JONES:  Your Honor, for context, I've passed

24   you a copy of the portions of the deposition that have been

25   designated.  There are notations and you have little blue

1    tabs where it switches from the Plaintiffs' counsel's

2    question to defense counsel.

3             THE COURT:  This is on tape or not?

4             MR. JONES:  No.  There's no video of this

5    deposition, so this would be a reading.  I think the

6    question is whether -- if the Defendants have a lawyer to

7    get up to play the Plaintiffs' counsel part whether we would

8    be permitted to say to the jury, consistent with what

9    happened during the McFarland readout in the Plaintiffs'

10   case, that I'm up to play the part of the Plaintiffs'

11   counsel.

12            MR. RUDY:  It's Lee Rudy again, your Honor.

13            Just to remind the Court, there's nothing in that

14   transcript that the Plaintiffs affirmatively designated.  We

15   did designate fairness counter-designations if we thought

16   something was missing for clarity.

17            THE COURT:  Where's the first pages of the

18   deposition?  Do you have those?

19            MR. JONES:  I will look to see if we can get a

20   full copy of the Ross Kari deposition, start to finish.

21            I would note, your Honor, I was flipping through

22   and just happened to notice, there is a reference in one of

23   the questions which will be read out loud to the fact that

24   some of the earlier questioning had been done by the

25   Plaintiffs' counsel.  That's on Page 25 of what I've handed

1    up at the top.  It says, "And then last, I'd just like to

2    ask you, we've been -- I'm sorry -- Plaintiffs' counsel was

3    asking you a lot of questions today."  And it goes on.

4          So it isn't going to be a secret to the jury that

5    the first portion of this is questioning by Plaintiffs'

6    counsel.

7          And, your Honor, if I may approach, I have a full

8    copy.

9          (Tenders document to the Court.)

10          THE COURT:  Page 25 is Plaintiffs' counsel asking

11    questions.  And then where is the first place where you

12    would introduce some other counsel?

13          MR. JONES:  Your Honor, if you're looking at the

14    excerpted portion --

15          THE COURT:  Right.

16          MR. JONES:  -- on Page 21, just above the middle

17    of the page, it says "defense counsel reading."

18          THE COURT:  Okay.

19          MR. JONES:  That would be the first time where the

20    lawyer asking the questions would change.

21          THE COURT:  So that's by Hosford?

22          MR. JONES:  Yes.  Mr. Hosford is the lawyer for

23    the department -- Ms. Hosford was the lawyer for the

24    Department of Justice, starting at Page 21.

25          THE COURT:  The only things we're talking about

 1   start on Page 21 there?

 2           MR. JONES:  Well, your Honor, I think this would

 3   actually come up right at the beginning, because the

 4   deposition excerpts starting on Page 1 --

 5           THE COURT:  Plaintiffs' counsel are reading.

 6           MR. JONES:  -- are Plaintiffs counsel.

 7           What I would like to do is if I'm going to play

 8   the Plaintiffs' counsel, your Honor, I would just like to

 9   get up at the beginning and say the words, "For the record,

10   I'm Stanton Jones for the Defendants.  And I'll be reading

11   the part of the Plaintiffs' counsel in the deposition."

12           THE COURT:  And then when you get to Page 21?

13           MR. JONES:  At that point --

14           THE COURT:  Your preference is to have someone

15   else read it, but you could just say "defense counsel."

16           MR. JONES:  Correct.  Mr. Hoffman would be the

17   actor and he would say, "I'm playing the part of defense

18   counsel."

19           THE COURT:  All right.  Then what is the

20   Plaintiffs' objection to saying defense counsel and

21   plaintiffs' counsel reading?

22           MR. RUDY:  Well, your Honor, my objection has sort

23   of evolved as this has happened.

24           But at first my objection was we don't want to be

25   part of it.  It sounds like we're not going to be part of

```
1        it, be part of the reading.
2               And now my only objection is that there hasn't
3        been any identification of who the questioners are in any of
4        the readings.
5               THE COURT:  I don't see any reason not to allow
6        the -- who's doing what here, since they're not getting the
7        whole thing.
8               MR. RUDY:  So what I understood would happen is
9        Mr. Hoffman and Mr. Jones would do the reading and they
10       would say "the Plaintiffs for Defendants"?  That's -- that's
11       acceptable to Plaintiffs.
12              THE COURT:  All right.  We'll take a quick
13       bathroom break for everybody and then we'll come back and do
14       it.
15              Hand these back to counsel, please.
16              THE COURTROOM DEPUTY:  (Complies.)
17              THE COURT:  After that, the jury can go?  That's
18       all we're going to do with the jury?
19              MR. JONES:  Yes, your Honor.
20              THE COURT:  And how long does that take to read
21       it?
22              MR. JONES:  Almost an hour.
23              (Thereupon a recess was taken, after which the
24       following proceedings were had:)
25              THE COURTROOM DEPUTY:  Jury panel.
```

```
 1                  (Whereupon, the jury entered the courtroom at 2:57

 2      p.m. and the following proceedings were had:)

 3                  THE COURT:  You may be seated.

 4                  Mr. Jones?

 5                  MR. JONES:  Yes.  Thank you, your Honor.  Stanton

 6      Jones for the Defendants.

 7                  Before we call our next witness, Defendants would

 8      like to move into evidence the following four exhibits,

 9      which I believe are without objection.  They are DX-318,

10      DX-451, DX-527 and DX-736.

11                  THE COURT:  They're all received.

12                  (Whereupon, Defendants' Exhibit Nos. 318, 451, 527

13      and 736 were entered into evidence.)

14                  MR. JONES:  Thank you, your Honor.

15                  MR. RUDY:  No objection.

16                  MR. JONES:  Next, the Defendants call Ross Kari,

17      who's the former chief financial officer or CFO of Freddie

18      Mac.  We will be presenting Mr. Kari's testimony through a

19      readout from his deposition.  I will be playing the part of

20      the Plaintiffs' counsel.

21                  THE COURT:  Okay.

22                  MR. JONES:  Mr. Kari, of course, is also being

23      played by an actor.

24                  THE COURT:  Ross Kari is a male?

25                  MR. JONES:  Yes, your Honor.
```

```
 1            THE COURT:  Okay.  So we have a male actor.
 2             READING OF THE DEPOSITION OF ROSS KARI:
 3    AS READ BY MR. JONES:
 4    Q.  "You should have a document in front of you that's been
 5    marked DX-736.  It's a document that's marked at the top
 6    Freddie Mac biography - Ross J. Kari.  I will represent to
 7    you that we got this off the Freddie Mac website.
 8             Have you seen this document before?
 9    A.  Yes.
10    Q.  And obviously, if you need to familiarize yourself with
11    the document or any document, you need to let me know and
12    I'd be happy to give you the time to do that.
13             But is this an accurate -- is the information in
14    this biography an accurate summary of your professional
15    career, at least through your time with Freddie?
16    A.  It's an accurate, very high-level summary.  It's
17    certainly not comprehensive, but it's a high-level summary.
18    Q.  Okay.  You don't see anything that's inaccurate in it?
19    A.  No.
20    Q.  And this covers your time through your work with
21    Freddie.  But can you briefly summarize what you've done
22    professionally since leaving Freddie?
23    A.  I retired when I left Freddie Mac.
24    Q.  Okay.  And turning back to your biography, it says in
25    the next-to-the-last paragraph that you received a BS degree
```

1    in mathematics and an MBA in finance, both from the

2    University of Oregon.

3           Approximately when did you receive those degrees?

4    A.   The BS in mathematics was June of 1980 and the MBA,

5    concentration finance, was June of 1983.

6    Q.   Okay.  And did your work towards either of those degrees

7    include any kind of concentration in accounting or any kind

8    of accounting training?

9    A.   Certainly it was -- in an MBA curriculum, you do take

10   some accounting.

11   Q.   I take it you are not a CPA?

12   A.   I am not a CPA.

13   Q.   And did you start out at Wells Fargo directly out of the

14   MBA program?

15   A.   Yes.

16   Q.   And according to your biography, from 2002 to 2006, you

17   served as an executive vice president and chief operating

18   officer for the Federal Home Loan Bank of San Francisco.

19           Can you provide a little more detail about what

20   your duties were at the Federal Home Loan Bank of San

21   Francisco?

22   A.   As the chief operating officer, the CFO, treasurer,

23   enterprise risk manager, head of sales and marketing, head

24   of technology, controller all reported to me.  So

25   responsibility for all of those disciplines within the

```
 1    company.

 2    Q.  And did you -- when you left the Federal Home Loan Bank

 3    of San Francisco, is that when you went to Safeco

 4    Corporation?

 5    A.  Yes.

 6    Q.  And I note, was that in 2006?

 7    A.  Yes.

 8    Q.  Approximately when?  Do you know?

 9    A.  June of 2006.

10    Q.  And what line of business was Safeco Corporation

11    involved in?

12    A.  It was a property and casualty insurance company.  Also

13    in that had a surety business.

14    Q.  I'm sorry.  A --

15    A.  A surety business.  Another form of property and

16    casualty type of insurance.

17    Q.  And what -- can you elaborate a bit on what your duties

18    and responsibilities were as executive vice president and

19    CFO of Safeco Corporation?

20    A.  Again, I managed the various financial management

21    disciplines, which would have included financial planning

22    analysis, Treasury; managed the investment portfolio of the

23    company; oversaw the management of the investment portfolio

24    of the company; the controller of the company; also had the

25    surety business reporting to me.
```

1    Q.  And when did you leave Safeco?

2    A.  I left Safeco in September of 2008.

3    Q.  And is that when you went to Bancorp?

4    A.  I started at Fifth Third Bancorp in November of 2008.

5    Q.  And you were there until when?

6    A.  Until October -- actually, it was probably very late

7    September of 2009.

8    Q.  And can you elaborate a bit on what your duties and

9    responsibilities were as CFO of Fifth Third Bancorp?

10   A.  I managed the various financial disciplines of a large

11   regional commercial bank, financial planning analysis, the

12   controller, the treasurer, financial risk management

13   activities.

14   Q.  And so you left Fifth Third to go to Freddie?

15   A.  Yes.

16   Q.  And how did that come about?  Can you describe how you

17   came to be hired by Freddie Mac?

18   A.  I was contacted by a recruiter asking if I would take a

19   phone call from David Moffett, who at the time was the CEO

20   of Freddie Mac.  He was -- he became CEO of Freddie Mac

21   after the company went under conservatorship.  And I knew

22   David from my time when I was the CEO at Wells Fargo and he

23   was the CFO at another very large -- I'm sorry -- I was the

24   CFO at Wells Fargo and he was the CFO at another very large

25   national bank.  We would see each other occasionally at CFO

Deposition of Ross Kari

 1    roundtable meetings.  He had -- he needed to recruit a CFO;

 2    he knew me; reached out to me, asked if I would be

 3    interested in talking to him.

 4              I said yes, I would be.

 5              A week later, David Moffett resigned as the CEO.

 6              A couple months later, they called me back and

 7    said, Well, we've just hired a CEO, Ed Haldeman, asked if I

 8    would be interested in meeting with Ed Haldeman.

 9              I said certainly.  We met for a couple of hours on

10    a street corner in Cincinnati on a Sunday afternoon, and I

11    enjoyed the conversation with Ed.  I recognized the

12    importance that both Fannie Mae and Freddie Mac -- the

13    important role they played in the financial system at the

14    time of severe liquidity constraints, and I thought it to be

15    fascinating to be part of a recovery effort and the

16    inevitable discussions about what to do as far as the future

17    of the two significant housing GSEs.

18    Q.  Turning back to your biography --

19    A.  Uh-huh.

20    Q.  -- the first paragraph has a brief description of some

21    of your responsibilities as executive vice president and CFO

22    of Freddie Mac, and I'd like to go over those with you to

23    make sure I understand what they entailed.

24              So it says, first of all, in this position you

25    were responsible for the company's financial controls.  What

 1   does that mean, being responsible for the company's

 2   financial controls?

 3   A.  Being responsible for identifying necessary controls and

 4   monitoring the operation of those controls to ensure

 5   accuracy of financial statements.

 6           In addition, certain aspects of risk management

 7   would be described as financial controls, risk management

 8   such as hedging various types of financial risks such as

 9   interest rate risk.

10   Q.  Were there other aspects of risk management that came

11   within your responsibility that you can recall?

12   A.  Well, a broad view of risk management would include

13   Sarbanes-Oxley testing and reporting to ensure accuracy of

14   financial statements.

15           Most other risk management activities were managed

16   under Paige Wisdom, who was the chief enterprise risk

17   manager.

18   Q.  And you've referred to couple of times already to

19   ensuring the accuracy of the financial statements.

20   A.  Uh-huh.

21   Q.  I take it that that was your -- part of your

22   responsibility as well?  You were responsible for ensuring

23   the accuracy of Freddie Mac's financial statements?

24   A.  I was responsible for managing the process that was

25   focused on ensuring the accuracy of the financial

Deposition of Ross Kari

1   statements.

2   Q.  And when you talk about financial statements, are you

3   talking about 10-Ks and 10-Qs and things like that?

4   A.  10-Ks and 10-Qs are the primary regulatory financial

5   statements.  It's also earnings releases, you know, various

6   forms of reporting to the board, forms of reporting to the

7   regulator.

8   Q.  And what types of reporting was made to FHFA?

9   A.  Typically, they would review financial statements.  I

10  know they on a regular basis reviewed the 10-Ks and 10-Qs

11  and -- including drafts prior to those being finalized.

12           I don't recall whether or not they looked at

13  monthly financial statements, though that's certainly

14  possible, so...

15  Q.  In connection with the discussion we've been having, I

16  know you've already made a reference to financial planning

17  and things like that.

18           But can you -- to what extent were you involved in

19  the preparation of forward-looking financial analyses or

20  projections at Freddie?

21  A.  Staff that reported to me would coordinate the

22  development of assumptions that drove those, manage the

23  models that -- that the assumptions were put into, produce

24  draft documents.  You know, I would be involved in reviewing

25  projections, may ask questions, but typically more of an

1    oversight role personally, with my staff executing the

2    actual.

3    Q.  And I know you made reference earlier to the fact that

4    there were some aspects of the projections done in

5    connection with the financial plan.

6           Can you give me other examples of activities that

7    involved the use of projections?

8    A.  Well, we would have weekly meetings -- typically Friday

9    mornings, I believe -- to discuss projections, very

10   short-term projections.

11          For example, this month, you know, what do we

12   anticipate we're going to earn this month and what are the

13   factors that have caused changes in that, say, versus what

14   we expected a week ago, you know, as we'd go through the

15   month or the quarter.

16          Those meetings would focus on, what does the

17   quarter look like.  So those were all very short-term

18   discussions.

19          On a quarterly basis, we would update a slightly

20   longer-term projection.  What does the year look like?  And

21   then an update on, you know, if you extrapolate that out,

22   how does that look for a three-year period?

23   Q.  So you've talked about very short-term projections and

24   quarterly projections.

25   A.  Uh-huh.

```
 1    Q.  And I take it in the financial plan you did even longer
 2    terms than that?
 3    A.  In the financial plan, you would go into great detail on
 4    the upcoming year and then somewhat of an extrapolation out
 5    to a three-year period.
 6    Q.  I'm sorry.  To a two- or three-year --
 7    A.  To a three-year period.
 8    Q.  Okay.  As you go further into the future, the
 9    accuracy" --
10         MR. JONES:  Oh, sorry.  That's not a question.
11    AS READ BY MR. JONES:
12    Q.  "Okay.
13    A.  As you go further into the future, the accuracy is
14    obviously going to be more challenged.
15    Q.  Okay.  So we've talked about very short-term, quarterly
16    and up to a three-year projection?
17    A.  Uh-huh.
18    Q.  Were you involved in the preparation of any projections
19    that were any longer-term than those?
20    A.  Beginning in 2012, when the question was raised whether
21    or not the valuation allowance of the -- against the
22    deferred tax assets were done, we did run longer-term
23    projections.  I believe we went out 20 years to determine
24    whether or not we should consider eliminating the valuation
25    allowance.
```

Deposition of Ross Kari

1   Q.  When you say the question was raised about that

2   valuation allowance --

3   A.  Well --

4   Q.  -- what are you referring to?  Who raised the question

5   about it?

6   A.  The valuation allowance analysis was done at a lower

7   level in my organization on a quarterly basis in support of

8   maintaining the valuation allowance.  I was not involved in

9   that.

10        When both Fannie Mae and Freddie Mac began

11  generating more income, a conversation with our auditors and

12  some comments that Fannie Mae made publicly, it became

13  apparent that we thought they might be considering that they

14  had enough earnings in the future to -- to reserve that

15  valuation allowance.  That's -- that's my recollection of

16  the -- the thought process that gave rise to that.

17  Q.  You say that began when Freddie began generating more

18  income?

19  A.  More net income, still with a great deal of

20  quarter-to-quarter volatility.

21  Q.  But when would you say that Freddie began generating

22  more net income?

23  A.  I don't -- I don't recall specifically focusing at my

24  level on the deferred tax asset until very late third

25  quarter or early fourth quarter of 2012.

1   Q.  But analyses were done before that regarding the

2   valuation analysis on the deferred tax assets?

3   A.  Yes.

4   Q.  I'm sorry?

5   A.  Yes.  That's correct.

6   Q.  And you said those were people -- those analyses done,

7   it wasn't in your level, but was it within your group?

8   A.  Yes.  It would have been Greg Metz, the individual that

9   ran the tax department, working in connection with Rob

10  Mailloux, the controller, as well as Joe Amato, who ran

11  financial planning analysis and was responsible for managing

12  the process of developing projections.

13  Q.  And those analyses were done throughout your tenure at

14  Freddie Mac?

15  A.  Yes.

16  Q.  And how often were those done?

17  A.  They would have been required for the quarterly

18  accounting files, given the size of the valuation allowance.

19  Q.  Required by what or by whom?

20  A.  Adequate documentation controls, reviewed by the outside

21  auditors.

22  Q.  And those quarterly reviews, was documentation prepared

23  in connection with those quarterly reviews?

24  A.  As I said, I was not involved, so I would have to refer

25  that question to Rob Mailloux, the auditor, in terms of what

Deposition of Ross Kari

1    documentation, if any, was in the file.  But I would

2    anticipate that, yes.

3    Q.  That, yes, there would be documentation?

4    A.  Yeah.

5    Q.  Mr. Kari, in front of you is a document that's been

6    marked DX-318.  It's the minutes of a Freddie Mac board of

7    directors meeting dated June 3rd, 2011.  I'm just going to

8    ask you a few questions about this.

9         The third paragraph on the first page, it

10   indicates you were in attendance at that meeting.  Correct?

11   A.  Yes.

12   Q.  And in the next paragraph, it says also present at the

13   meeting were Jeffrey Spohn and Robert Keyes of FHFA.  Do you

14   see that?

15   A.  Yes, I do.

16   Q.  Do you know what their positions were or what their role

17   was?

18   A.  They typically observed as opposed to participating at

19   board meetings.

20   Q.  Did FHFA have somebody who was at Freddie Mac more or

21   less full-time during, say, 2011-2012?

22   A.  That is my recollection, yes.

23   Q.  How many people?

24   A.  I don't recall how many people.

25   Q.  Do you know -- can you tell me the names of any of them?

Deposition of Ross Kari

1   Do you recall?

2   A.  I think Bob Keyes was the one that was -- at least to me

3   seemed to be on site most.

4   Q.  Okay.  If you turn to Page 6 of the document, at the

5   bottom there's a discussion that begins Financial Update

6   Report.  And there's a discussion of a -- I gather of a

7   presentation you gave to the board.

8         Do you see that discussion?

9   A.  Uh-huh.

10  Q.  I'm sorry.  Yes?

11  A.  I see the discussion, yes.

12  Q.  Near the bottom of that bottom paragraph, he -- there's

13  a discussion, 'He,' which I think is referring to you -- and

14  this is the very last line on that page -- 'He then noted

15  that for the longer-term forecast, the company expects to

16  have small draws from Treasury for the third and fourth

17  quarters of 2011; however, no draws are expected for 2012

18  and 2013.'

19        Do you see that discussion?

20  A.  Okay.

21  Q.  And this longer-term forecast that's being referred to

22  here, is that one of the three-year forecasts that you were

23  referring to earlier?

24  A.  I don't have specific memory about this period of time.

25  The three-year forecasts would have been updated on a

Deposition of Ross Kari

1   quarterly basis.

2   Q.  And when it says, 'The company expects to have small

3   draws from Treasury for the third and fourth quarters;

4   however, no draws are expected for 2012 and 2013,' and

5   focusing on those two years, 2012 and 2013, does this mean

6   that the forecast indicated that for those years Freddie

7   expected to have enough net income to cover its dividend

8   obligations on -- on the PSPAs?

9   A.  Net income wouldn't ultimately be the driver.  It would

10  be comprehensive income.

11  Q.  Okay.  And with that clarification -- well, let me

12  rephrase.

13          Does this -- does that cushion, that no draws are

14  expected for 2012 and 2013, does that mean that the -- the

15  forecasts indicated that for those years Freddie expected to

16  have enough comprehensive income to cover its dividend

17  obligations on the PSPAs?

18  A.  That would be a fair assumption.

19  Q.  Okay.  Another topic according to this that was

20  discussed during those meetings was actions that the company

21  could take to reduce the draws from Treasury?

22  A.  Well, I think I would interpret that as I do recall

23  discussions about how we can make more money, which

24  ultimately would result in a reduced draw.  And basically,

25  that's what the focus was :  to improve the financial

1    performance of the company, which would have the result

2    of -- of reducing the draw."

3              MR. HOFFMAN:  I think we just skipped a question,

4    so we're going to go back.  Can you go to the bottom of your

5    Page 11?

6              THE WITNESS:  Sorry.  Yes.

7              MR. HOFFMAN:  I'm going to read the question at

8    the bottom of Page 11.  Then we'll just pick up from there.

9              THE WITNESS:  Thank you.

10   AS READ BY MR. HOFFMAN:

11   Q.  "Okay.  Another topic according to this that was

12   discussed during these meetings was actions that the company

13   could take to reduce the draws from Treasury.

14   A.  Uh-huh.

15   Q.  Do you recall discussions with FHFA, FHFA or Treasury or

16   internally about actions that Freddie Mac could take to

17   reduce the Treasury draws?

18   A.  Well, I think I would interpret that as I do recall

19   discussions about how we can make more money, which

20   ultimately would result in a reduced draw.  And basically,

21   that's what the focus was:  to improve the financial

22   performance of the company, which would have the result

23   of -- of reducing the draw.

24   Q.  Do you recall -- and I don't want to limit it to this

25   time period, but let's say the last six months of 2011

1    through the third amendment, which is August of 2012.  Do

2    you recall discussions either internally or with FHFA or

3    Treasury about other types of actions that could be taken to

4    reduce Treasury draws other than to make more money?

5    A.  Again, what time period are you focused on?

6    Q.  The second half of 2011, first seven and a half months

7    of 2012.

8    A.  I don't -- I don't recall.

9    Q.  And just to be clear, do you recall those types of

10   discussions, but just don't recall when they happened?

11   A.  Early in my time there, there were discussions about the

12   dividend rate of 10 percent and whether that was something

13   that could be reduced.  It -- it was never something that

14   was pursued, though.

15   Q.  Discussions with who?

16   A.  Well, I think general discussions with FHFA comparing

17   the dividend rate that Fannie Mae and Freddie Mac were

18   paying on the capital provided by Treasury versus the

19   dividend rate being paid by commercial banks that received

20   TARP funds.  That's the type of discussions that took place.

21   And Fannie Mae and Freddie Mac were paying a higher dividend

22   rate.  The question was:  Could that be reduced?  Obviously,

23   it never was.

24   Q.  Do you recall an explanation being provided --

25   A.  No.

Deposition of Ross Kari

```
 1    Q.  -- as to why it never was?

 2    A.  No, I don't.

 3    Q.  Was it FHFA who told you it would not be reduced?

 4    A.  I don't recall specifically.

 5    Q.  If you go on in the same paragraph, another topic was

 6    the lack of inclination by Treasury to reduce the interest

 7    rate on our draws from Treasury.

 8    A.  Uh-huh.

 9    Q.  Is that the same type of thing you were just talking

10    about, reducing the dividend rate?

11    A.  Yes.

12    Q.  So this is 2011 now?

13    A.  True.

14    Q.  Does that refresh your recollection about whether there

15    was discussion of that topic during this timeframe?

16    A.  Well, my recollection is that those were discussions

17    that took place in 2010, shortly after I got there, but I

18    don't know whether those were discussions that were

19    continued -- continued with other members of the management

20    team, such as Mr. Golding, so...

21    Q.  Okay.  In preparing projections of future performance,

22    did Freddie typically prepare those projections under

23    various scenarios?

24    A.  Yes.

25    Q.  What were those scenarios based on?
```

Deposition of Ross Kari

1   A.  Based on input from various experts throughout the

2   company on what's an expected case for assumptions, such as

3   house price path, what would be a more pessimistic case and

4   what would be a more optimistic case.  And we would go

5   through the same type of range of scenarios for other items

6   such as credit spreads, default rates, any number of inputs,

7   including the size of the balance sheet.  That was a major

8   driver that I didn't mention earlier today.

9          You know, will the retained portfolio shrink more

10  rapidly than our base case or will it shrink less rapidly?

11  So...

12  Q.  And then in the course of that answer, you referred to

13  two things:  expected case and base case.  Are those the

14  same thing?

15  A.  They're the same thing.  Excuse me.

16  Q.  No.  That's fine.  I just wanted to make sure I

17  understood.

18  A.  Yes.

19  Q.  And I know we talked about this a little bit earlier.  I

20  want to get into a little more detail now.  But would you

21  agree that the realization of deferred tax assets or the

22  recording of valuation allowances on deferred tax assets had

23  a significant impact on Freddie's profitability?

24  A.  I agree that at the time that the valuation allowance

25  was put in place, that had a significant impact on Freddie

1    Mac's profitability.  I was not there at the time.  Also, a

2    decision whether or not to maintain the valuation allowance

3    was a -- changing that assumption would have had a material

4    impact on Freddie Mac's profitability.

5    Q.  And describe for me the nature of that analysis, the

6    analysis of whether the valuation allowance should be

7    reversed or the deferred tax asset realized.

8    A.  Well, as I indicated earlier, I was not a part of the

9    team that, early in my time there, performed the assessment.

10   It would have been done by the director of tax and his

11   staff, as well as working with both the controller as well

12   as the financial planning analysis department that did the

13   projections.

14   Q.  And I'm sorry.  I don't mean to interrupt, but do all

15   these people that you just mentioned --

16   A.  Yes.

17   Q.  -- they all reported to you?  Right?

18   A.  Yes.

19   Q.  I'm sorry.  Go ahead.

20   A.  No problem.

21            And given that the size of -- of the valuation

22   allowance was significant, I would anticipate -- though I

23   did not in the late 2011-2012 timeframe have conversations

24   with PWC, the outside auditor, I would anticipate that is

25   one of those items that they reviewed on a periodic basis in

1   order for them to sign off on the financial statements.

2   Q.  Okay.  And I know that it was the people working for

3   those departments that were under you --

4   A.  Yes.

5   Q.  -- that performed this analysis.  But to the extent you

6   can describe what the analysis was, what it entailed, I'd

7   like you to do that.

8   A.  The analysis would focus on the detailed components of

9   the deferred tax asset, what transactions gave rise to the

10  deferred tax assets.  And there are a number of -- of types

11  of transactions where the accounting -- the accounting

12  timing for tax filing purposes and for GAAP financial

13  statement purposes are different.

14         So your recognition of tax liability is different

15  between your cash tax return and your book financial

16  statements.  And to reconcile that creates an asset or a

17  liability, a deferred tax asset or a liability, depending on

18  the type transaction.

19         The assessment would look at those transactions

20  that gave rise to the deferred tax asset and, over the

21  future, how would those deferred tax assets age?  Some of

22  them may turn around naturally and whether or not at the

23  time that you actually have -- get the cash tax benefit of

24  the deduction, whether or not you would have any tax

25  liability.

1       A deduction is only worth something if there's a

2    tax liability to offset it.  That would involve a long-term

3    forecast of earnings and a detailed knowledge of the types

4    of transactions that give rise to the deferred tax asset,

5    the components of the deferred tax asset and the lives of

6    those components of the deferred tax asset.

7       If by the time that in your cash tax return you

8    would have the potential benefit of a deduction, you don't

9    have income to offset that, you can't recognize the tax

10   receivable benefit in your financial statements, and that's

11   what the valuation allowance basically said, that when we

12   get those cash tax deductions, we're not going to have

13   income to offset it or tax liability to offset it.

14       So that's the type of assessment, and that would

15   have been done.

16   Q.  And to what extent were the analyses of the valuation

17   allowance for the deferred tax asset shared with Freddie

18   Mac's audit committee?

19   A.  I do not recall sharing that assessment with the audit

20   committee in my time there until -- until -- it may have

21   been fourth quarter of 2012, may have been first quarter of

22   2013.

23   Q.  Was Freddie's CEO briefed on the decisions relating to

24   the deferred tax asset valuation allowance?  All these

25   questions are for the period 2011 to 2012 as I've defined

1    it.

2    A.  When we began -- well, as I said, fourth quarter of 2012

3    or first quarter of 2013, we would have gone through a

4    detailed discussion with the CEO.

5    Q.  I take it the board of directors was not briefed on this

6    type of analysis again during the period of 2011 to 2012 as

7    I've defined it?

8    A.  As I said, by fourth quarter of 2012 or early 2013, I --

9    in one of those periods, we began discussions with them

10   about the possibility that this could happen.

11   Q.  And prior to that time, do you know if --

12   A.  I don't recall --

13   Q.  Okay.

14   A.  -- having that conversation prior.

15   Q.  You would consider yourself a member of Freddie's senior

16   management?

17   A.  Uh-huh.

18   Q.  When did Freddie's senior management first learn about

19   the net worth sweep decision?

20   A.  I do not recall the specific sequence of events.  It was

21   after the decision had been made.  I believe it was first

22   communicated to our CEO and then communicated through him to

23   the other members of the senior management.

24   Q.  And what was the reaction of senior management to the

25   net worth sweep?

Deposition of Ross Kari

```
 1    A.  I can't recall each individual's reaction or whether

 2    there was a -- a consensus on a reaction.

 3    Q.  What was your reaction?

 4    A.  My reaction was that it simplified some things

 5    operationally and it eliminated a sort of circular process

 6    with respect to the payment of dividends and the additional

 7    need for a draw, so...

 8    Q.  Is that it?

 9    A.  Uh-huh.

10    Q.  No other reactions?

11    A.  No.

12    Q.  You said you didn't remember each and every executive's

13    reaction to it?

14    A.  Uh-huh.

15    Q.  If you remember any of the senior management's reactions

16    to it, what do you recall?

17    A.  Only that in some of the documents I reviewed over the

18    last couple days, there was an email that Don Layton wrote,

19    which I think communicated to the management team what had

20    happened and conveyed some view that it -- at least the

21    wording in the press release that the Treasury put out may

22    have had some wording that was thought to be targeted at a

23    political audience.

24    Q.  Did anything about the third amendment concern you as

25    chief financial officer of Freddie?
```

Deposition of Ross Kari

```
 1    A.   No.  It did not concern me.
 2    Q.   Did Freddie ever have discussions with FHFA during the
 3    period of 2011-2012 as I've defined it regarding potential
 4    alternatives to a net worth sweep?
 5    A.   None that I presently recall.
 6    Q.   I think we already talked earlier about whether there
 7    was any consideration by Freddie about paying dividends in
 8    kind.  I think you said there was no evaluation of that.
 9    Correct?
10    A.   Not in my time there.
11    Q.   Okay.
12    A.   There may have -- it may have preceded my arrival there.
13    Q.   Do you know whether there was any discussion during your
14    time there, and focusing against on the 2011-2012 time
15    period, regarding an alternative such as reducing dividend
16    payments or deferring them?
17    A.   As I indicated earlier, I believe, that there was a
18    discussion about perhaps the logic of reducing the dividend
19    rate below the 10 percent dividend rate.  That did not
20    trigger any change.
21    Q.   Was there any discussion during your time at Freddie,
22    and again focusing on the 2011-2012 period as I've defined
23    it, about converting the preferred stock into some other
24    equity instrument?
25    A.   Not that I recall.
```

Deposition of Ross Kari

1    Q.  And my question to you is:  Did Freddie consider private

2    shareholders a stakeholder in the GSEs?

3    A.  We believed that the conservator represented the

4    interests of the shareholders as defined in the

5    conservatorship agreement.

6    Q.  Did you have a view regarding whether the net worth

7    sweep was beneficial to private shareholders?

8    A.  I recall having the view that it was neither beneficial

9    nor detrimental.

10   Q.  Why was that?

11   A.  A view that the long-term financial performance of the

12   company would be -- those trends would be dominated by the

13   contraction in the balance sheet driven by the constraints

14   on the retained portfolio and that, even with a period of

15   earnings in excess of the 10 percent dividend over time, the

16   contraction of the retained portfolio would lead to a period

17   of time where earnings were not adequate to sustain any

18   meaningful value for the common shareholders.

19   Q.  When you say 'over time,' how long a period of time were

20   you thinking about?

21   A.  I was -- I don't have a specific timeline.  I'm thinking

22   trends, in terms of future outlook, you know, once the

23   retained portfolio dropped from $900 billion, which is what

24   it was when I got there, to $200 billion or even smaller,

25   the bulk of the earnings power of the company would have

1   gone away.

2   Q.  Did you have a view as to whether the net worth sweep

3   was beneficial to private shareholders over the short term,

4   beneficial or detrimental?

5   A.  No.  No perspective that was different from the long

6   term, since the interest of the long term -- of the private

7   shareholders should be a reflection of the long-term

8   financial potential of the company.

9   Q.  Did you have a view as to whether under the net worth

10   sweep Treasury would in the short term be paid more than it

11   would have otherwise?

12   A.  At the time, based upon the forecasts that were provided

13   to me just before the net worth sweep, there were periods

14   where the U.S. government would have received a greater

15   dividend than they would have under the 10 percent dividend.

16   However, I believe in the longer term, that would reverse

17   itself.

18   Q.  During the 2011-2012 time period as I've defined it, did

19   you have a view as to Freddie's prospects for building its

20   capital through profit improvements that were resulting from

21   better asset quality and things like that?

22   A.  As I had mentioned, I viewed the long-term prospects of

23   generating adequate earnings to both cover the dividend --

24   prior to the third amendment, as -- as being perhaps short

25   term.

Deposition of Ross Kari

 1          But over the long term, because of the runoff of

 2     the retained portfolio and the constraints that we were

 3     operating under in terms of pricing new products, so on and

 4     so forth, I viewed those prospects as being very limited in

 5     terms of the ability to build the capital.

 6     Q.  And is it still your belief that the financial

 7     statements that the company submitted that were prepared

 8     during your tenure -- and let's concentrate on 2011 to

 9     2012 -- were accurate and complete in all material respects?

10     A.  Is it still -- I have not learned of anything that would

11     change that opinion."

12          MR. HOFFMAN:  Good afternoon.  I'm Ian Hoffman and

13     I'll be playing the part of defense counsel.

14     AS READ BY MR. HOFFMAN:

15     Q.  "Mr. Kari, I just have a few questions.

16          First, I'm showing you what's been marked as

17     DX-508.  It's Form 10-Q for Federal Home Loan Mortgage

18     Corporation for the quarterly period ending June 30th, 2012.

19     And I will represent that this is an excerpt from the

20     document.

21          So if you wouldn't mind turning to page -- are you

22     familiar with this document, first of all?  Is this a

23     document you would have seen when you were at Freddie Mac?

24     A.  I would have seen this document while I was at Freddie

25     Mac.

Deposition of Ross Kari

```
1   Q.  And I think you testified earlier that you were

2   responsible for ensuring the accuracy of financial

3   statements.  Is that correct?

4   A.  That's right, through the work of all of the staff that

5   report to me.

6   Q.  Exactly.  Okay.

7           If you could turn to Page 10, please.  And just

8   look under where the paragraph -- the paragraph that's

9   headed Long-Term Financial Sustainability, and then I'll

10  just read into the record.  Quote:  'There is significant

11  uncertainty as to our long-term financial sustainability,'

12  end quote.

13          Now, look at the second paragraph.  Quote:  'We

14  expect to request additional draws under the purchase

15  agreement in future periods.  Over time, our dividend

16  obligation to Treasury will increasingly drive future draws.

17  Although we may experience period-to-period variability in

18  earnings and comprehensive income, it is unlikely that we

19  will generate net income or comprehensive income in excess

20  of our annual dividends payable to Treasury over the

21  long-term,' end quote.

22          Was that -- to your knowledge, was that accurate

23  at the time?

24  A.  To my knowledge, that was accurate at the time.

25  Q.  Okay.  Let's turn now to Page 92, which is only a couple
```

Deposition of Ross Kari

1   pages behind that.

2         Under Capital Resources, the second paragraph

3   says, quote:  'We expect to request additional draws under

4   the purchase agreement in future periods.  Over time, our

5   dividend obligation to Treasury on the senior preferred

6   stock will increasingly drive future draws.

7         'Although we may experience period-to-period

8   variability in earnings and comprehensive income, it is

9   unlikely that we will generate net income or comprehensive

10  income in excess of our annual dividend payable to Treasury

11  over the long term.

12        'In addition, we are required under the purchase

13  agreement to pay a quarterly commitment fee to Treasury,

14  which could contribute to future draws if Treasury does not

15  continue to waive the fee,' end quote.

16        Was that an accurate statement?

17  A.  Yes.

18  Q.  Okay.  Thank you.  I have no more questions on this

19  document.

20        Now, if you wouldn't mind turning to DX-369.  I'd

21  like to draw your attention on Page 9 to the third paragraph

22  from the bottom that starts, quote, 'We expect,' end quote.

23  And what I'm going to read is going to be similar to what I

24  read before.

25        Quote:  'We expect to request additional draws

Deposition of Ross Kari

1    under the purchase agreement in future periods.  Over time,

2    our dividend obligation to Treasury will increasingly drive

3    future draws.  Although we may experience period-to-period

4    variability in the earnings and comprehensive income, it is

5    unlikely that we will generate net income or comprehensive

6    income in excess of our annual dividends payable to Treasury

7    over the long term.

8             'In addition, we are required under the purchase

9    agreement to pay a quarterly commitment fee to Treasury,

10   which could contribute to future draws if the fee is not

11   waived.

12            'Treasury waived the fee for all quarters of 2011

13   and the first quarter of 2012, but it has indicated that it

14   remains committed to protecting the taxpayers and ensuring

15   that our future positive earnings are returned to taxpayers

16   as compensation for their investment.  The amount of the

17   quarterly commitment fee has not yet been established and

18   could be substantial,' end quote.

19            Was that your understanding at the time?

20   A.  That's correct.

21   Q.  Now if we could turn to DX-527.

22   A.  Okay.

23   Q.  I would just like to -- and the date on this document

24   is -- it's draft, August 14th, 2012.  I think we established

25   that already.

Deposition of Ross Kari

1        If you wouldn't mind turning back to Page 2, and

2    if you look at the fourth bullet point on the right-hand

3    side --

4    A.  Uh-huh.

5    Q.  -- it states, quote:  'Over the long term, it is likely

6    that our dividend obligation will exceed comprehensive

7    income, resulting in additional Treasury draws.'

8        Do you see that?

9    A.  Yes, I do.

10   Q.  Was that your understanding at the time?

11   A.  Yes, it is -- yes, it was.  Excuse me.

12   Q.  And.  And the last document I'd like you to turn to is

13   DX-451.  And that was the 2012 corporate forecast three-year

14   outlook dated May 22nd, 2012.

15   A.  Uh-huh.

16   Q.  And that's a Freddie Mac document?

17   A.  Uh-huh.

18   Q.  If you wouldn't mind turning to Page 2311.

19   A.  Uh-huh.

20   Q.  At the top, it says, 'Cumulative Treasury draws through

21   2014.'

22       Do you see that?

23   A.  Yes.

24   Q.  And then the first bullet point says, 'Projected

25   cumulative Treasury draws through 2014 under a range of

Deposition of Ross Kari

```
 1    scenarios, including the stress case, is between $71 billion

 2    and $194 billion,' end quote.

 3              Is that a forecast that was issued by Freddie Mac

 4    as of May of 2012?

 5    A.  It was, yes.

 6    Q.  And then last, I'd like to ask you, we've been -- I'm

 7    sorry.  Plaintiffs' counsel was asking you a lot of

 8    questions today about the so-called commitment under the

 9    PSPAs.

10              And what is your understanding of the amount of

11    the commitment in August of 2012, approximately?

12    A.  I don't recall the specific amount of the commitment.

13    The commitment, in my memory, our stress scenario cumulative

14    draws did not exceed the maximum amount of the commitment in

15    any of our three-year forecasts.

16    Q.  Do you recall -- if I represent to you that the amount

17    of the -- the maximum of the commitment under the agreement

18    at that time was around 200 billion, would you disagree with

19    that?

20    A.  The maximum amount --

21    Q.  That you could draw?

22    A.  Yeah.  Yes.  I think that is approximately correct.

23    Q.  Okay.  And --

24    A.  It wasn't a nice round number because it continued to

25    change through the end of 2011 based upon the draws taken
```

Deposition of Ross Kari

1     through that period.

2     Q.  Okay.

3     A.  Okay.

4     Q.  To your recollection and knowledge, could you have

5     obtained a $200 billion commitment from any entity in the

6     private market at that time?

7     A.  It is my opinion that we could not retain -- achieve any

8     kind of commitment like that in the private market --

9     Q.  Okay.  Thank you.

10    A.  -- given the constraints that we were operating under."

11         MR. JONES:  Now I'll pick up again playing the

12    part of the Plaintiffs' counsel.

13    BY MR. JONES:

14    Q.  "Counsel asked you about the discussions of

15    comprehensive income projections on Page 2 of DX-527.

16    A.  Uh-huh.

17    Q.  I take it, based on our previous discussion, that these

18    projections did not include any item for comprehensive

19    income resulting from recovery or writing down the valuation

20    allowance on the deferred tax assets.  Is that correct?

21    A.  That's correct.

22    Q.  And is that true as well for the May 2012 document --

23    A.  That's correct.

24    Q.  -- that counsel showed you?

25    A.  Yes.

1    Q.  Did any of these projections take into account future

2    payment of a periodic commitment fee?

3    A.  They did not.

4    Q.  Just to make clear, when counsel asked you, 'Did any of

5    those projections,' did you understand that question to be

6    referring to the two projections that I just asked you

7    about?  To clarify the record, this would be DX-527 and

8    DX-45.

9    A.  The base case earnings scenario and the stress and

10   worst-case scenarios did not consider payment of the

11   commitment fee, though in one of the documents there was a

12   table that indicated, in response to a what-if, what were

13   some possible payments that could be required?

14   Q.  Okay.  That's what I wanted to clarify, that there was,

15   at least one of these documents, a discussion, in an

16   estimate --

17   A.  Yes."

18          MR. JONES:  Nothing further.

19          THE COURT:  All right.  You can step down.

20          I'm going to give you all a break and let you all

21   go today because of some scheduling problems and also

22   because I have to deal with some legal questions that I

23   would excuse the jury for anyway.

24          You can have an early afternoon off.  I think the

25   weather is okay.  Hopefully, you won't get a rainstorm on

 1    the way home.

 2              We'll start at 10:00 tomorrow.  Don't talk about

 3    the case.  Don't let anyone talk to you about the case.

 4              I think we're pretty on track.  I think we're

 5    looking at possibly finishing Friday, possibly finishing the

 6    evidence Friday and getting to closings on Monday.  So we're

 7    on track.  Don't be dismayed.  We're getting there.  I'll

 8    see you all tomorrow at 10:00.

 9              (Whereupon, the jury exited the courtroom at 3:45

10    p.m. and the following proceedings were had:)

11              THE COURT:  Just a few dropped jaws there.

12              Who wants to start?  Ms. Davis?

13              MS. DAVIS:  Yes, Judge.

14              THE COURT:  You've done a few of these.  Usually

15    in criminal, though.

16              MS. DAVIS:  Yes, sir.  It's just as fiery, though.

17              So, your Honor --

18              THE COURT:  In those, you always won, of course.

19              MS. DAVIS:  Yes.

20              Your Honor, I'm before you on the Susan Hartman

21    exhibits.  If your Honor will remember, at the first trial,

22    all of those exhibits went back to the jury as

23    demonstratives -- as substantive evidence.

24              They are indeed summary exhibits under Rule 1006.

25    We of course can pass these up to your Honor, but we can

1    also display them for your Honor.

2              The very first one I'd like to show your Honor is

3    one that is not in dispute, PX-1-K.  As you can see, this is

4    an exhibit that the defense has not raised an objection to.

5    It is a summary exhibit of those draws as they came in from

6    year to year.

7              It's our position that she was not confronted with

8    any allegation that anything that she gave you was

9    inaccurate or anything like that.

10             Our understanding is that the defense want to now

11   raise an objection to the remaining bar charts that start at

12   PX-1-O all the way through to the end of our presentation,

13   which was PX-1-R.

14             And it would be our position, your Honor, that

15   those exhibits are really no different than PX-1-K in that

16   they summarize and provide for the jury in bar form the

17   financials that they've already been exposed to and they've

18   been talked about during the course of the trial.

19             And of course, as your Honor noted in your ruling,

20   we did in fact need to bring the underlying evidence into --

21   the underlying documents that support these numbers into

22   evidence; and we indeed have admitted those in the PX-5

23   series.

24             So it is our position, your Honor, that you should

25   admit those exhibits, PX-1-O through PX-1-R, under that

 1    theory.

 2              So that is our argument as to those.  And the

 3    methodology for PX-1-K is the same that was used for those

 4    others.

 5              Now I'd like to direct your Honor's attention to

 6    another exhibit that is not in dispute, PX-1-L.

 7              If we can display that, please.

 8              Now, your Honor, you've seen this one a few times

 9    because it came up during the course of her examination.  We

10    pulled this document -- we pulled this chart down from the

11    government website, as she explained.  And there, of course,

12    is no objection to this PX-1-L or PX-1-M.

13              But defense now raise an objection to PX-1-N.  And

14    our position there, your Honor -- and if we can display

15    PX-1-N -- our position there, your Honor, is that the

16    methodology used to pull down PX-1-L and M is the same exact

17    methodology that's used to pull down 1-N.  There's no

18    allegation that Ms. Hartman did anything to manipulate this

19    chart, that she did anything to manipulate the data.  And in

20    fact, the way in which it's displayed here is the exact way

21    it comes off of the website.

22              The last thing I'll say is that there was no --

23    there was no point during the course of her examination that

24    any of the accuracy with which she gathered these numbers,

25    that she calculated the numbers from her summary exhibit,

1    none of that was confronted.  None -- there was no

2    indication that it was inaccurate and no -- there would be

3    no basis to do so, because she's pulling from the exact same

4    documents that are used throughout the course of this trial,

5    those SEC statements.

6            And all that we're trying to do, your Honor -- I

7    tried to do it with the acronym list, but was

8    unsuccessful -- but all we're trying to do is make sure that

9    the jury has an aid back there.  We don't want them to have

10   to comb through all of these documents, comb through that

11   Excel spreadsheet in order to get the numbers that we know

12   are going to be at issue in this case.

13           So with that, I'll rest.

14           Thank you.

15           MR. JONES:  Thank you, your Honor.  Stanton Jones

16   for the Defendants.  Just a few points.

17           First of all, I heard Ms. Davis say that these

18   documents were admitted into substantive evidence and given

19   to the jury last time.

20           That's not our understanding, based on both the

21   transcript from the first trial and also the email

22   correspondence from -- between the parties at the time.

23           On Page 387 of the transcript from the first

24   trial, Plaintiffs moved these exhibits in only as

25   demonstratives.  They said, "Your Honor, at this time,

1      Plaintiffs would like to present" -- the exhibit numbers

2      were different, but it was Exhibits PX-4-A through PX-4-Y --

3      "simply as a demonstrative at this time."

4              And then some of the records had indicated

5      something different.  So Plaintiffs actually emailed us

6      later in the same day and said, "Ms. Jenkins has these

7      admitted.  However, we moved them as demonstratives," citing

8      to the page of the transcript that I just read.

9              So our understanding at the first trial was that

10     these are demonstratives that were used during Ms. Hartman's

11     testimony.  They're PowerPoint slides that were created,

12     presumably by Ms. Hartman and counsel, very much in the

13     nature of demonstratives, not the actual summary evidence.

14              Just to be clear, I believe for all of the

15     PowerPoint slides here to which we have objected, the

16     underlying information, the numbers, the summary evidence,

17     the spreadsheets and data, I believe it's all been moved

18     into evidence and admitted.  I don't think that we objected

19     to any of it.

20              What we do object to is the use of these

21     demonstrative slides as substantive evidence to give them to

22     the jury.

23              If I could just call up just a couple of examples

24     of the ones that we have objected to.  I'd start with --

25     let's see.  I'll start where Ms. Davis started, just to be

 1    consistent.

 2         Can we pull up PX-1-O as in orange?  Okay.

 3         So this is a slide presenting the dividends that

 4    the enterprises paid to Treasury combined, Fannie and

 5    Freddie together, for just two select years, 2012 and 2013.

 6         Now, your Honor, all of the dividends that Fannie

 7    Mae paid to Treasury and all of the dividends that Freddie

 8    Mac paid to Treasury are in evidence through Ms. Hartman's

 9    spreadsheets and data, the Rule 1006 summary evidence that

10    was admitted without objection.

11         What has been done on this slide, your Honor, is a

12    clear demonstrative.  It has merged, added together, the

13    Fannie Mae and Freddie Mac dividends paid to Treasury only

14    for two select years.  And the clear purpose of that is to

15    draw some inference, right?  To make some point to the jury.

16         If there's a concern that the jury shouldn't have

17    to sift through all of the data themselves to get this,

18    well, that's fine.  The Plaintiffs can use this slide as one

19    of their closing slides.  They can present these numbers,

20    this exact bar chart, in closing.

21         But it isn't evidence.  The evidence, the summary

22    evidence, which is all of the dividends that Fannie paid to

23    Treasury and all of the dividends that Freddie paid to

24    Treasury, which were separate dividends paid by each

25    enterprise over a whole -- many -- a whole range of years,

 1    not just these two, those are in evidence.  This is not

 2    evidence.

 3            If I could go to -- I'm just going to pull up a

 4    few other of the slides just to demonstrate other objections

 5    that we have.

 6            Can we pull up PX-1-B.

 7            And Ms. Davis didn't talk about this one.  It was

 8    1-B and D.  I'm told those are not being moved.

 9            MS. DAVIS:  No.

10            MR. JONES:  Okay.  B?  E?

11            MS. DAVIS:  E.

12            MR. JONES:  Let's pull up 1-E.  So this is one of

13    the PowerPoint slides from Ms. Hartman's trial testimony

14    that Plaintiffs are moving in.

15            We object to admitting this as substantive

16    evidence.

17            Again, same thing:  These are amounts that Fannie

18    and Freddie private preferred shareholders merged together,

19    added together, combined, invested in total over a 20-year

20    period.  And then also the bottom number, 19.7 billion, that

21    is just pulling out again for some -- to make some point to

22    the jury, pulling out the amount that Fannie and Freddie

23    private preferred shareholders invested in the two

24    enterprises together just for two specific years, 2007 to

25    2008.

 1           Again, all of the amounts that all Fannie private

 2     preferred shareholders invested in Fannie over the whole

 3     life is in evidence through the Rule 1006 summary evidence,

 4     the data, the spreadsheets.  Same for Freddie:  All the

 5     amounts that Freddie private preferred shareholders paid in,

 6     invested over all the time, it's in evidence.

 7           What's not summary evidence and instead

 8     constitutes a demonstrative is adding them together and then

 9     pulling out certain years and making this comparison for

10     purposes of making -- drawing some inference or making some

11     point to the jury.

12           Again, Plaintiffs can do that during their closing

13     argument and they can use this exact slide to make the point

14     so that the jury doesn't have to go fishing around for

15     numbers.  But what they can't do is admit this demonstrative

16     as substantive evidence.

17           Let me touch on just one other one that Ms. Davis

18     mentioned, which I believe is -- which is a little bit of a

19     different nature.  So this is PX-1-N, as in Nancy.  This is

20     a chart of U.S. gross domestic product, or GDP, for a

21     six-year period, from 2006 to 2012.

22           Your Honor, this might constitute appropriate

23     summary evidence, I guess.  Our issue with this is a

24     relevance and prejudice objection.

25           There has been no testimony from any expert or --

1    I don't believe any witness at all -- about the significance

2    of U.S. GDP or how it bears on any issue in this case.

3              And so without anything -- without any testimony

4    connecting U.S. GDP to any issue in the case, we don't

5    believe that just lobbing a chart of U.S. GDP into evidence

6    through the summary witness with no further elaboration is

7    appropriate.

8              And so that's the reasoning on that one, that that

9    objection is a little bit different.  So I wanted to call it

10   out.

11             But for the other ones that were moved in, the

12   objection is that they are not -- they're not proper

13   substantive evidence.  They're not proper summary evidence.

14   Again, summary evidence, the data, the spreadsheets, are in.

15   These are demonstratives, not substantive evidence.

16             Thank you, your Honor.

17             MS. DAVIS:  Your Honor, just briefly.

18             The first thing I'll say is about that last

19   exhibit, the GDP chart.

20             There has been throughout the course of this trial

21   a large discussion about the Great Recession, how economic

22   conditions were in 2008 versus 2012.  It is a relevant

23   discussion when we can show to the jury what those

24   conditions were.

25             Ms. Hartman testified to them.  But also, your

1    Honor, these are charts that, quite frankly, we disclosed

2    very early in the course of our discussions with defense

3    about how we would do this second trial.

4          And even though this was the one chart -- and I

5    should have had raised this with your Honor before -- this

6    is one chart that was different from what was brought before

7    your Honor before.  Part of the discussion has been this

8    Great Recession and just helping the jury orient from what

9    was happening in 2008 versus 2012.  And it's just another

10   economic indicator.

11         The next --

12         THE COURT:  But I don't recall any testimony about

13   that, gross --

14         MS. DAVIS:  Aside from Ms. Hartman.  But our

15   argument, your Honor, is that Ms. Hartman of course did

16   testify about it.

17         But you're right:  You don't remember any

18   testimony from Dr. Bala.  But again -- I mean, Dr. Bala

19   Dharan.  But there is plenty of discussion about the Great

20   Recession and how the economic conditions were in the

21   country at the time.

22         THE COURT:  All right.  The other two specific

23   objections he had, I would sustain.

24         Are there other arguments you have regarding the

25   others?

```
 1              MS. DAVIS:  Yes.

 2              THE COURT:  He didn't give me other specifics, so

 3      he needs to give me the specifics.

 4              MS. DAVIS:  So the others I would --

 5              THE COURT:  But he's saying you can show the

 6      demonstratives, but they're not evidence.

 7              MS. DAVIS:  Right.  I'll bring the Court back to

 8      1-K, because I think it is very illustrative.

 9              THE COURT:  Which one?

10              MS. DAVIS:  1-K, your Honor.  That's the one where

11      there's no objection.

12              THE COURT:  Then I've already admitted it.

13              MS. DAVIS:  Right.  But I want to show how it's

14      connected to the others --

15              THE COURT:  Okay.

16              MS. DAVIS:  -- because he talked about sort of all

17      of the information being sort of merged together for Fannie

18      Mae and Freddie Mac and that, you know, it's showing these

19      sort of final numbers, putting them forth.

20              This all took calculation; this all took an effort

21      from her to be able to pull this down and --

22              THE COURT:  But they're separate.

23              MS. DAVIS:  Huh?

24              THE COURT:  They're separated.

25              MS. DAVIS:  I know.  But they're here on the graph
```

```
 1   together.
 2              THE COURT:  Right.
 3              MS. DAVIS:  And the chart --
 4              THE COURT:  I don't think they're on the graph
 5   together as long as it shows Fannie and Freddie separate.
 6              MS. DAVIS:  Can I ask you this question, your
 7   Honor?
 8              THE COURT:  Yes.
 9              MS. DAVIS:  If the charts that your Honor is
10   thinking about possibly not allowing us to show the jury --
11   if they were more like this in that they split out Fannie
12   and Freddie, is that something that we would be able to
13   though the -- to admit as substantive evidence?
14              THE COURT:  Yes.
15              MS. DAVIS:  I think that is --
16              THE COURT:  I think lumping them together is
17   not -- I then, there are too many differences in Fannie and
18   Freddie to lump them together in one sum amount.
19              MS. DAVIS:  Okay.  So just to be clear for the
20   record, on those exhibits that -- I think they start there
21   at --
22              THE COURT:  The ones he's shown me are 1 --
23              MS. DAVIS:  1-O, P, Q, R.
24              THE COURT:  Yes.
25              MS. DAVIS:  Those are the ones where --
```

```
 1              THE COURT:  Where it's combining Fannie and
 2      Freddie together.  I think that's not good.
 3              MS. DAVIS:  If we separate them out, would that
 4      address your Honor's concern?
 5              THE COURT:  Yes.  Yes.
 6              MS. DAVIS:  I think that's an adjustment we can
 7      make.
 8              MR. JONES:  Your Honor, just for the record, the
 9      Defendants would object to that.  We had understood their
10      case is actually closed, other than just moving in these.
11      We would object to them changing their exhibits at this
12      point in the trial and putting in new exhibits.
13              MS. DAVIS:  Your Honor, I think we reserved this
14      argument in good faith thinking that it would be something
15      that we could argue fully.  And --
16              THE COURT:  You can switch them.
17              MS. DAVIS:  Thank you, your Honor.
18              The next thing that I will say just to his first
19      point was that these documents, as far as my records show,
20      they were, in fact, received into evidence on October 18th,
21      2022.
22              THE COURT:  I don't care what I did at the first
23      trial.
24              MS. DAVIS:  Okay.  Understood.
25              THE COURT:  Forget all that.
```

```
 1              MS. DAVIS:  The last thing I'll say --

 2              THE COURT:  You've got to offer them this time.

 3              MS. DAVIS:  Yes.

 4         The charts show the summaries in a way that the

 5    jury can understand.  That's all we're trying to do here, is

 6    just aid the jury.

 7         So if we make that adjustment -- the last thing

 8    I'll say is, we did not address --

 9              THE COURT:  I don't mean in terms of legal

10    questions, but in terms of exhibits what I did at the first

11    trial.

12              MS. DAVIS:  I understand.  I understand the

13    distinction you were drawing.

14         And --

15              THE COURT:  Legally, I'm trying to stick to my

16    guns.

17              MS. DAVIS:  Yes.  And you've been very successful

18    with that.

19         The last thing I'll ask for clarity purposes is

20    for 1-I and 1-H.

21         And if we could just pull up --

22              THE COURT:  What are they?

23              MS. DAVIS:  Those are the ones he addressed at

24    first, I think.  Those are the ones where we stripped out

25    the heading.
```

```
 1                THE COURT:  Oh, yes.

 2                MS. DAVIS:  Is this one --

 3                THE COURT:  He didn't make that objection to them

 4    being lumped at that time.

 5                MS. DAVIS:  No, he didn't.

 6                MR. JONES:  So, your Honor, I was only responding

 7    to the ones that Ms. Davis had raised during her argument.

 8    I didn't realize that others were on the table.

 9                MS. DAVIS:  Well, you raised the other chart.

10                THE COURT:  I understand.  But I've admitted

11    those.  I'm not going to reconsider that.

12                MS. DAVIS:  So that is -- just so we're clear for

13    the record, the ones that we stripped out the labels, 1-I

14    and 1-H, are in?

15                THE COURT:  Right.

16                MS. DAVIS:  Okay.  The Court's indulgence.  I want

17    to make sure I didn't miss anything.

18                THE COURT:  Okay.

19                MS. DAVIS:  Thank you, your Honor.

20                THE COURT:  Does the clerk show that I admitted

21    those at the time, 1-I and H, without the labels?

22                THE COURTROOM DEPUTY:  I only just have that you

23    just admitted them right now.

24                THE COURT:  Oh.  I did not show them admitted at

25    the time?  I had thought if the labels are off I admitted
```

 1    them.

 2                MS. DAVIS:  I thought that was their position,

 3    too.

 4                MR. JONES:  Your Honor, my records show they were

 5    not admitted.  Your prior ruling was that they could be

 6    shown as demonstratives during Ms. Hartman's testimony

 7    without the --

 8                THE COURT:  Well, they're demonstratives.  You're

 9    not showing them now, anyway.  You're talking about

10    demonstratives?

11                MS. DAVIS:  No.  I'm talking about --

12                THE COURT:  You're moving to admit them?

13                MS. DAVIS:  Yes, sir.

14                THE COURT:  What are you all doing with

15    demonstratives?  Are you -- all these things you just

16    admitted before these, were those demonstratives, too?

17                MS. DAVIS:  No.  My understanding is that we were

18    moving everything in as substantive evidence, those charts

19    that they did not object to --

20                THE COURT:  Right.

21                MS. DAVIS:  -- N being one of them.

22                THE COURT:  So those are some demonstratives?

23                MS. DAVIS:  Yes.

24                THE COURT:  Actually, you're right.  When I

25    admitted those, that was showing them as demonstratives.

```
 1                  MR. JONES:  Correct.

 2                  THE COURT:  To be consistent, then, I can't admit

 3       those as evidence.  I wouldn't admit those as evidence.

 4                  MR. JONES:  Thank you.

 5                  THE COURT:  H and I, I would not.

 6                  MS. DAVIS:  You're talking about H and I, you will

 7       not?

 8                  THE COURT:  Yes, because what I did before was

 9       only as demonstratives.

10                  You're right.

11                  MS. DAVIS:  So for those, with the edit of --

12                  THE COURT:  You've got to separate out Fannie and

13       Freddie.

14                  MS. DAVIS:  Okay.

15                  THE COURT:  All I was doing then was saying you

16       could do it as demonstratives.  I did not admit them.

17       You're right.

18                  MS. DAVIS:  I've got you.

19                  But for them to be admitted as substantive, they

20       would need to be unhinged --

21                  THE COURT:  Right.

22                  MS. DAVIS:  -- meaning Fannie and Freddie need to

23       be shown separately?

24                  THE COURT:  Yes.

25                  MS. DAVIS:  Okay.
```

```
 1                 THE COURT:  And then I would --

 2                 MS. DAVIS:  Okay.  Thank you, your Honor.

 3                 THE COURT:  -- over their objection that it's too

 4      late.

 5                 MS. DAVIS:  Yes, sir.

 6                 THE COURT:  Because -- but I wouldn't admit them

 7      as demonstratives.  Over objection, I'm not admitting the

 8      demonstratives.

 9                 MS. DAVIS:  Okay.

10                 THE COURT:  Is all of that clear to both sides?

11                 MS. DAVIS:  Yes.  We need to unhinge them.

12                 THE COURT:  Okay.  The next motion in order, I

13      guess, would be the Defendants' motion for judgment on Rule

14      50.

15                 MR. JONES:  Yes.  Thank you, your Honor.  Stanton

16      Jones.

17                 THE COURT:  The evidence now having been closed.

18                 MR. JONES:  Thank you.

19                 THE COURT:  Now, have you all checked with the

20      clerk in terms of -- do we have straight which evidence is

21      in and out?

22                 MR. JONES:  I believe that we had done that work

23      prior to the exchange just now.  We'll need to confer again

24      with what just happened.  But otherwise, yes.  Thank you.

25                 THE COURT:  All right.  You can make your
```

```
 1        argument.

 2              MR. JONES:  Thank you.  Stanton Jones for the

 3        Defendants, your Honor.

 4              Pursuant to Rule 50(a), the Defendants move for

 5        judgment as a matter of law.

 6              Judgment for the Defendants is warranted at this

 7        time because, on this record, a reasonable jury would not

 8        have a legally sufficient evidentiary basis to find for the

 9        Plaintiffs.

10              I'd like to focus on two arguments today.  Both

11        relate to the absence of any injury or harm to class

12        members.

13              And just to set the stage, recall two things:

14        First, Plaintiffs' only theory of harm remaining in the case

15        is the stock price drop, the alleged harm to shareholders

16        from a one-day decline in Fannie and Freddie's share prices

17        on August 17th, 2012, 11 years ago.

18              The other thing to bear in mind is that the

19        certified classes in this case are comprised of only current

20        shareholders.  So anyone who sold their shares when the

21        prices were down is by definition not in these classes

22        because they sold their shares.

23              Those facts, the harm from a one-day drop in the

24        share prices 11 years ago and certified classes of only

25        current shareholders excluding anyone who sold their shares,
```

1    those facts require a judgment as a matter of law in

2    Defendants' favor for two reasons:

3              First, your Honor, class members who bought their

4    shares after the third amendment, after August 17th, 2012,

5    they lack Article III standing because they have no injury

6    in fact.

7              And it's undisputed the classes include many

8    post-third amendment purchasers, many individuals and

9    entities that purchased their shares that they hold today

10   for the first time after the day of the third amendment.

11             And Plaintiffs do not contend that these

12   post-third amendment purchasers suffered any injury to

13   themselves as a result of the stock price drop.  And they

14   couldn't.

15             Post-third amendment purchasers, the people and

16   entities who bought their shares after the stock price drop,

17   they benefited from that stock price drop.  They were not

18   harmed by it.  If anyone was harmed by the stock price drop,

19   it's the people who sold their shares when the price was

20   down.  They were the ones who took the loss from the share

21   prices declining as a result of the third amendment.

22             But again, as I said up front, those sellers, the

23   people who sold their shares to the post-third amendment

24   purchasers, none of those people are in the class, because

25   the class is only current shareholders.

1    Plaintiffs' only argument for injury in fact as to

2    post-third amendment purchasers is a notion that the claim

3    travels with the share.

4    In other words, Plaintiffs contend that when these

5    post-third amendment purchasers bought their shares, the

6    seller's legal claim or cause of action for a breach of the

7    implied covenant automatically assigned to the purchaser

8    with the transfer of the share.

9    There's no express assignment.  There's no written

10   assignment of any legal claim.  Plaintiffs' theory is that

11   the sale of the security, the sale of the share itself,

12   entails an automatic assignment of the legal claim.

13   And I know your Honor has addressed this notion

14   that the claim travels with the share in other contexts.

15   But respectfully, we submit the issue has not been raised in

16   the context of standing.  And it bears particularly --

17   particular significance when this is obviously a

18   jurisdictional issue.

19   When standing -- when a Plaintiff's standing is

20   based on assignment of the underlying legal claim, the

21   Plaintiff bears the burden to prove that there was a valid

22   assignment of the legal claim.

23   And Plaintiffs have not established a valid

24   assignment here for either Fannie or Freddie.

25   The overwhelming majority view in this country is

1    that legal claims, causes of action related to a piece of

2    property, including a security, are not automatically

3    assigned to the purchaser through the sale of the security.

4          The overwhelming majority view across the country

5    is that in order to assign a legal claim related to a piece

6    of property, including a security, an express assignment is

7    required.

8          Under very well-settled common law, there is no

9    automatic assignment.  And this position was explained in a

10   decision from 2015 by Judge Sutton of the Sixth Circuit, who

11   wrote in describing the common law, quote:  "Once a right of

12   action accrues, it becomes a piece of intangible personal

13   property called a chose in action.  Choses in action to

14   enforce property rights do not as a general matter

15   automatically transfer when the underlying property changes

16   hands.

17         "No doubt, one may assign a chose in action to

18   another party.  But that requires the assignor to manifest

19   an intention to transfer the right to the assignee."

20         That's from *Herr*, H-E-R-R, *versus U.S. Forest

21   *Service*, 803 F.3d 809, Sixth Circuit, 2015, a decision by

22   Judge Sutton.

23         That principle, that common-law principle, applies

24   fully in the context of securities transactions, sales of

25   bonds and stocks or other securities, like the ones at issue

1    here.

2              For decades, federal courts have held that the

3    common-law rule of no automatic assignment of legal claims

4    applies equally to the sale of securities.

5              State courts around the country, likewise, have

6    overwhelmingly applied this common-law rule of no automatic

7    assignment of legal claims to the securities context.

8              And there is a decision from 2019 by the U.S.

9    District Court for the District of Delaware where the Court

10   said, quote:  "Courts considering this issue have adopted

11   the rule applied to federal securities law claims; i.e.,

12   there is no automatic transfer."

13             That's *Keystone Association, LLC, v. Fulton*, 2019

14   Westlaw 3731722, District of Delaware, from August 8th,

15   2019.

16             Your Honor, to try to establish an automatic

17   assignment of a legal claim here, Plaintiffs rely on a

18   provision of the Uniform Commercial Code, the UCC, Section

19   8-302.  But state and federal courts have overwhelmingly

20   held that that provision, UCC Section 8-302, does not

21   automatically assign claims upon the sale of a security.

22   And the Courts have held overwhelmingly that an express

23   written assignment or an express assignment is required to

24   transfer the claim.

25             It appears from our research that Delaware is the

```
 1    only state that has construed Section 8-302 to automatically
 2    assign some claims.  I'll get to the Delaware law.  Even
 3    under the Delaware law, the claim here did not automatically
 4    assign under the Delaware case law.
 5              But let's start with Virginia applicable to
 6    Freddie Mac:  Virginia courts have not addressed this
 7    question of whether Virginia's version of Section 8-302 of
 8    the UCC automatically assigns claims.
 9              But Virginia's adopted version of the UCC does say
10    that its statute should be construed, quote, "to make
11    uniform the laws among the various jurisdictions."  That's
12    Virginia Code, Section 8.1A-103(a)(3).
13              Virginia's UCC should be construed to make uniform
14    the law among the various jurisdictions.  And the only
15    position that results in uniformity is the overwhelming
16    majority view that UCC Section 8-302 does not automatically
17    assign legal claims upon the sale of a security.  The
18    overwhelming majority view of federal and state courts
19    around the country that that provision of the UCC does not
20    abrogate the common law and that the common-law rule remains
21    effective that upon the sale of a security, an express
22    assignment is required to transfer a legal claim related to
23    the security.
24              So we think that, setting aside Delaware for just
25    a moment, under Virginia, the answer is clear in this eerie
```

1    context where this federal court is making predictions about

2    Virginia law.  The only reasonable determination is that

3    Virginia's version of Section 3-302 of the UCC would be

4    construed and should be construed consistent with the

5    overwhelming majority of federal and state courts across the

6    country over a very long period of time, that that provision

7    does not abrogate the common law and that even under that

8    provision an automatic assignment of a legal claim does not

9    apply upon the sale of a security.

10              As for Delaware, the Delaware Supreme Court has

11   held that, as I said, some legal claims automatically assign

12   with the sale of a security, but that others don't.

13              And frankly, the Delaware courts have struggled to

14   differentiate between which types of claims, which claims do

15   automatically assign and which don't.

16              It's a point that I think supports the

17   overwhelming majority view that 8-302 of the UCC should not

18   be construed in this way to transfer -- to automatically

19   assign any claims.

20              But in any event, the prevailing rule in Delaware

21   is that a claim or right, quote, "in the security travels

22   with the share," but, quote, "personal rights do not

23   transfer with the share."

24              And most notably, under this Delaware view, claims

25   do not travel with the share and are considered personal

1    rights that remain with the seller rather than automatically

2    assigning to the borrower unless there is evidence that the

3    buyer paid value for the legal claim.

4            If there is evidence that the price that the buyer

5    paid to the seller reflects some particular value that was

6    attributable to the legal claim, then under Delaware law

7    it's considered to be a claim or right in the security

8    rather than a personal right, and therefore automatically

9    assigns with the security.

10           In this case, your Honor, there is zero evidence

11   of that.  There is no evidence that the price that any

12   post-third amendment purchaser -- any purchaser paid in that

13   period when the stock price was down reflected or conveyed

14   value for the legal claim.

15           And in fact, your Honor heard Plaintiffs' damages

16   expert, Dr. Mason, agree during the recross-examination that

17   in essence the share prices in August 2012 and the rest of

18   2012 were not based on the legal claim in this case, which

19   of course was not asserted until 2013.

20           So in sum, under Virginia law and Delaware law,

21   certainly under Virginia law, which we think is clear, and

22   also under the best application of the Delaware law, there

23   is no automatic assignment of the legal claim here when the

24   shares were sold to purchasers after the third amendment;

25   and therefore the class members, all class members who

1    purchased their shares after the third amendment, have no

2    injury in fact and no standing, no Article III standing.

3    The Court should grant judgment as a matter of law for

4    Defendants on that basis.

5         The second argument that I'd like to present

6    today, your Honor, is that as to all Plaintiffs, all class

7    members, there is insufficient evidence for the jury to find

8    that class members, current shareholders who are all the

9    class members -- there's insufficient evidence to find that

10   they proved harm or damages with reasonable certainty.  As

11   the Court has found is required by both Virginia and

12   Delaware law, harm and damages need to be proven by the

13   Plaintiffs with reasonable certainty.

14        Even if the evidence establishes that the share

15   prices dropped on August 17th, 2012, that day 11 years ago,

16   as a result of the third amendment, there is no evidence

17   that the share prices -- that Fannie or Freddie's share

18   prices would be any higher than they actually are today in

19   the absence of a third amendment, if the third amendment has

20   never happened.

21        And without any of that evidence, without any

22   evidence that share prices would be higher today than they

23   actually are, if the third amendment had never happened,

24   there is no basis, no evidentiary basis, for the jury to

25   conclude that current shareholders, the people who still own

1    the shares today, have any cognizable harm or damage based

2    on a one-day drop in the share prices 11 years ago.

3             And separately, your Honor, Dr. Mason's own

4    testimony refutes his reliance on the equity event study

5    that forms the central basis of his damages opinion.

6             Dr. Mason acknowledged that -- and in fact

7    acknowledged that he has said -- that an event study is

8    invalid or unreliable if it doesn't account for possible

9    alternative causes in general.  And specifically, the event

10   study is invalid or unreliable if it fails to address

11   whether the observed price decline is attributable to the

12   net worth sweep or the accelerated reduction of the

13   enterprises' retained mortgage portfolios.

14            So on this record, your Honor, we believe the jury

15   could not find that the Plaintiffs proved harm or damages to

16   current shareholders with reasonable certainty.  And

17   Defendants are entitled to judgment as a matter of law for

18   this reason as well.

19            There are two other issues that we raised at

20   summary judgment and that the Court rejected.  I believe

21   that under the Supreme Court's recent decision in *Dupree v.*

22   *Younger*, these arguments are already preserved for appeal

23   because they are purely legal.  Nevertheless, in an

24   abundance of caution, I'll just state them briefly.

25            So the Defendants would renew our arguments from

 1    summary judgment that as a matter of law, first, there is no

 2    gap in the shareholder contracts here for the implied

 3    covenant to fill because HERA, which is part of the

 4    shareholder contract, already specifies the scope of FHFA's

 5    discretion to act by virtue of HERA's best interests

 6    provision and that that best interests provision, requiring

 7    FHFA to act in best interests of the public, is already the

 8    proper and complete contractual specification of FHFA's

 9    discretion, leaving no gap to fill in the shareholder

10    contract.

11         And secondly, the argument that we made at summary

12    judgment that the Supreme Court's decision in *Collins*

13    entitles Defendants to judgment as a matter of law on the

14    basis of the Court's statement that FHFA had acted on the

15    basis of what it found was in the best interest of the

16    public.

17         Thank you, your Honor.

18         MR. HUME:  Good afternoon, your Honor.  Hamish

19    Hume for the Plaintiffs.

20         Your Honor, I'll be brief.  I mean, if the Court

21    would like briefing, we're happy to address it; but I don't

22    think it's necessary.

23         This is essentially the identical Rule 50 argument

24    Defendants made in the last trial.

25         And as I said then, and I'll say again, on the

1    first issue of whether class members -- current class

2    members have been injured, there's ample evidence showing

3    the net worth sweep has never been undone.  They changed it

4    to transfer liquidation preference instead of cash.  The

5    evidence is that the net worth sweep has transferred $151

6    billion more to the Treasury than would have been

7    transferred without it.

8         The evidence also shows that 100 percent of the

9    profits of Fannie and Freddie go to Treasury.  None of it

10   goes to the shareholders.

11        That is an injury to the shares.  It is an

12   impairment to the shares that travels with the shares.

13        And the stock drop is simply one reasonable

14   measure of that harm.  It is not that the case is limited to

15   the people who owned then, because that is simply the

16   measurement of the impairment to the shares for anyone who

17   owns those shares.

18        And to the extent those shares have been bought by

19   anyone -- and there's no evidence about that, because we had

20   an agreement not to get into that -- that those people are

21   necessarily buying a claim to seek a remedy from the net

22   worth sweep.

23        On the second issue of damages not being shown

24   with reasonable certainty, that's not correct.  The evidence

25   shows -- they say there's no evidence that the price would

 1    be higher today.

 2            There is evidence.  Again, two things:  Number

 3    one, the evidence shows that under the net worth sweep,

 4    $150 billion extra has been transferred to Treasury and that

 5    under the net worth sweep 100 percent of all profits go to

 6    Treasury.  That is evidence that shares held by private

 7    shareholders are necessarily impaired and harmed today.

 8            Also, Professor Mason expressly testified the net

 9    worth sweep has never been remedied, has never been undone,

10    and the harm persists to today.

11            So unless -- we won't repeat our response on

12    summary judgment points.  Our briefing on that is already

13    before the Court.

14            Thank you, your Honor.

15            THE COURT:  The motion under Rule 50 is denied.

16            What other issues?  You wanted to raise something

17    else?

18            MR. JONES:  Your Honor, very briefly.

19            Would we be able to file a brief on the Rule 50

20    motion just to make sure that the record is totally clear

21    for preservation purposes?

22            THE COURT:  I think that you can order the

23    transcript.

24            MR. KAPLAN:  Sam Kaplan for the Plaintiffs.

25            Your Honor, the only other issue, assuming your

```
 1    Honor wants to hear it this afternoon, is our motion to --
 2              THE COURT:  Attari?
 3              MR. KAPLAN:  Yes.  Attari.
 4              THE COURT:  We can hear that.
 5              MR. KAPLAN:  Your Honor, obviously --
 6              THE COURT:  When are we getting to Attari?
 7    Tomorrow or not?
 8              MR. HOFFMAN:  Ian Hoffman for the Defendants.
 9              Yes, if we can make it through Mr. Satriano, which
10    I expect we would.
11              MR. KAPLAN:  Your Honor, because I've obviously
12    been before the Court on the Attari event study a couple
13    times, I want to be clear about what is at issue and what is
14    not at issue.
15              What is not at issue is the admissibility of the
16    event study and Dr. Attari's ability to assert that the
17    third amendment caused a small decline in yield -- in bond
18    yield spreads.
19              Also before -- also, what is not before the Court
20    is we recognize that the Court has viewed essentially as
21    immaterial at least for purposes of admissibility the fact
22    that Dr. Attari cannot distinguish the impact -- not
23    separate the impact of different aspects of the third
24    amendment.  And we do not rely on that point at this stage.
25              What is at issue is Dr. Attari's opinion that the
```

1    third amendment caused the decline in yield spreads because

2    it increased investors' confidence in the GSEs'

3    creditworthiness.

4           That opinion is not one that he has offered the

5    jury or he is capable of offering the jury a reliable

6    methodology for assessing.

7           The reason he has not been able to do that is

8    because there is an obvious alternative explanation that is

9    reflected in FHFA's own documents and that he has given the

10   jury no basis for sorting out.

11          Your Honor, that explanation is that the third

12   amendment collectively, whether you're talking about the

13   accelerated decline in the retained portfolio, the net worth

14   sweep or both of them combined, it doesn't matter.  Those --

15   the third amendment as a whole created an expectation of

16   declining supply in the market, because what it signaled to

17   the market was:  It looks like the GSEs are being wound

18   down.  There's going to be fewer issuances in the future.

19          And this is reflected in FHFA's own documents.

20   And if I can just show your Honor two such documents that

21   are attached to our motion.

22          Ms. McGuire, if we can look at Exhibit B, please.

23   Look at Page 3 of Exhibit B, Ms. McGuire, please.

24          Your Honor, if you look at the paragraph under

25   Chart of the Week, and we'll just -- to save time, we can

1     just look at the second sentence.  It's alluding to how this

2     is reminiscent of something that happened in 2008.  It says:

3     This time around, the tightening was caused by the Treasury

4     Department's announcement that it would accelerate the

5     wind-down of the enterprises.

6          For agency debt investors, that points to fewer

7     remaining new issues since the lifespan of Fannie/Freddie

8     just got shorter.

9          That's the explanation of FHFA for the net worth

10    sweep.  And to save time, there's an important sentence

11    right below the graph, but let's just move to Exhibit A.

12    Page 3.

13         The Treasury Department's announcement earlier

14    today regarding changes to the preferred stock purchase

15    agreements that are intended to expedite the wind-down of

16    Fannie Mae and Freddie Mac changes.  It's having more of an

17    immediate impact on agency debt than MBS.  While spreads

18    across the curve are tighter, the farther out the maturity,

19    the tighter the spread.

20         And, your Honor, they have no answer to this point

21    on the merits.  And it's not -- it does not require

22    exclusion of all of Dr. Attari's testimony in the event

23    study.  The particular testimony that we're talking about is

24    really most clearly expressed if you look at the last trial

25    at 1968, Line 11, through 1969, Line 1.  That is where he

1    expresses this opinion that he cannot reliably support.

2              The Defendants have but one response to this other

3    than "We've seen this before."  And that is that they say,

4    "Well, the accelerated decline in the retained portfolio

5    could not have caused an expectation of declining supply

6    among the type of bonds that Dr. Attari looked at because he

7    looked at a small set of longer-term bonds."

8              That, your Honor, is a completely specious

9    response.  And the reason it is is because our argument

10   doesn't depend -- well, there's a couple reasons.  One is,

11   it doesn't depend in any way on the accelerated decline

12   having caused the drop.

13             Because as I said at the start, our argument is

14   that -- and what these documents reflect -- is that it's the

15   collection of changes under the third amendment that caused

16   that expectation of declining supply.

17             And so it's a nonresponsive argument.  It doesn't

18   even address the point.

19             And it's also wrong because, as these documents

20   show, it was specifically among longer-term bonds that you

21   saw the greatest decline.

22             So, your Honor, this specific opinion is not one

23   that can be reliably offered.  The only other thing that the

24   Defendants say in response is, "Well, we've seen this

25   before."  Your Honor has already addressed this.

```
 1              But your Honor has never addressed this issue.
 2     And the way I know your Honor has never addressed this issue
 3     is that the one thing that they have pointed to in defense
 4     of it on the merits is not an argument that has ever -- that
 5     is addressed anywhere in the Court's prior rulings on the
 6     event study.  Your Honor doesn't evaluate it one way or the
 7     other, say it's good, say it's bad.  It's an issue that has
 8     not been resolved and it is an issue to which they have no
 9     answer.
10              Their only other answer, your Honor, is the last
11     refuge of people with no good argument:  Oh, well, these
12     documents go to weight.
13              But that is not true, your Honor.  Under Daubert,
14     the gatekeeping function requires that there be a reliable
15     methodology for excluding compounding factors.  And there is
16     no reliable methodology here.
17              Thank you, your Honor.
18              THE COURT:  All right.  Mr. Hoffman?
19              MR. HOFFMAN:  Good afternoon, your Honor.  Ian
20     Hoffman on behalf of the Defendants.
21              And as Mr. Kaplan noted, with his presentation,
22     this is the third time I'm before you talking about
23     Dr. Attari's bond event study.
24              This is a motion for reconsideration framed as a
25     motion for clarification, your Honor.
```

 1          We pointed out in our opposition brief to this,

 2    the myriad ways that Plaintiffs argued in their pretrial

 3    motion filed before this trial that Dr. Attari's opinion

 4    about the bond event study should be excluded according to

 5    Plaintiffs because he cannot conclude from the event study

 6    that the change in bond prices shows that the third

 7    amendment increased investor confidence.

 8          Investor confidence is the subject of their

 9    clarification motion.  Investor confidence is all over their

10    prior motion, your Honor.

11          And despite asserting that the Court hasn't

12    reached the issue, we actually put in our brief what the

13    Court said about it in its pretrial opinion issued a little

14    over a week ago.

15          And the Court specifically addressed the investor

16    confidence point that Mr. Kaplan is raising.  And again,

17    just to make the record absolutely clear -- and we can pull

18    this up -- this is the Court's July 21st opinion.

19          I'll direct Mr. Montgomery, if he's able, to Page

20    3, the paragraph that starts "The only new argument."  We

21    can zoom in on that.

22          Here, obviously, your Honor, you don't have to

23    read the entire thing.  But at the end of the first line,

24    it's framed as:  Dr. Attari in his testimony and defense

25    counsel in closing arguments made statements implying that

1    the event study actually showed investors were responding

2    positively to the net worth sweep in particular.

3           And I'll just pause there, because there was also

4    an argument about this representation which the Court also

5    rejected.

6           The Court goes on to conclude that the trial

7    transcript passages in Plaintiffs' own motion show

8    Dr. Attari was careful never to use the words "net worth

9    sweep" in describing his event study.

10          And then -- I'll just paraphrase this to move it

11   along -- the Court also allowed defense counsel to argue

12   specifically in closing -- permitted that argument that the

13   net worth sweep addressed market concerns because it was a

14   permissible inference based on the evidence.

15          So, your Honor, you know, the issue of investor

16   confidence and Dr. Attari's conclusion that the event study

17   shows that the third amendment increased bondholder

18   confidence, it was in Dr. Attari's original report.  It was

19   addressed before the first trial.  He testified to it in the

20   second trial.  It was the subject of the prior motion before

21   the second trial.  And now the Court addressed it in its

22   opinion.

23          You can take that down, Mr. Montgomery.

24          So clearly, it's -- in our view, your Honor, it's

25   subject to the law of the case and a reconsideration

1    standard.  Other than just arguing -- Plaintiffs just

2    arguing that they got it right and we got it wrong, there's

3    no basis here to talk about reconsidering that opinion or

4    that anything was missed, especially because the Court

5    specifically addressed the investor confidence point.

6           Again, which -- and neither their motion for

7    clarification nor their reply attempts to grapple with those

8    words that I just read where the Court itself addressed this

9    issue.

10          So we think the Court need not even reach the

11   merits of this issue in light of Plaintiffs' inability to

12   overcome this standard.

13          But in all events, your Honor, you can take

14   comfort in ruling in Defendants' favor because Dr. Attari

15   does have a reliable methodology to support his opinion.

16          Dr. Attari, the design of his bond event study

17   focuses only on long-term bonds.  And so that necessarily

18   has the effect of excluding potential causation that's

19   related to the accelerated reduction in the retained

20   portfolio, which happens over a shorter period of time.

21          The documents that Mr. Kaplan showed talk about

22   wind-down.  And we believe the evidence is clear that those

23   references to wind-down are talking about the wind-down of

24   the accelerated portfolio.

25          And their argument, though it's recently morphed a

1     little bit to sort of pan out -- Plaintiffs' argument has

2     always been that the result -- the cause of the

3     accelerated -- I'm sorry -- the cause of the bond price

4     reaction is this accelerated reduction in the retained

5     portfolio.

6              We believe that the documents don't undermine

7     Dr. Attari's methodology in the least.  And at most, they

8     are fodder for cross-examination.

9              Because those documents are not talking about the

10    types of bonds that were the subject of Dr. Attari's event

11    study, which were the long-term bonds.

12             Granted, there's one reference in there, your

13    Honor, to longer-term bonds.  But in the context -- and

14    Dr. Attari will testify about this when cross-examined about

15    it -- in the context there, there's a range of bond maturity

16    years that are being discussed, from two to three to five to

17    ten.  And so the references there to longer-term bonds are

18    not talking -- or longer-term maturities are not talking

19    about the types of bond that are at issue in Dr. Attari's

20    study.

21             His design of the study focusing only on long-term

22    bonds makes it reliable for his conclusion.

23             The only arguments that Plaintiffs make to try to

24    say that methodology is unreliable is just that here's a few

25    documents that they point to to say, Dr. Attari got it

1    wrong.

2            But those documents aren't attacks fundamentally

3    on the methodology, which was to not pick all bonds

4    indiscriminantly, but to pick a specific type of bond that

5    is not going to be affected by certain parts of the third

6    amendment.  The accelerated reduction in the retained

7    portfolio will not affect the long-term bonds because the

8    retained portfolio was already going to be shrunk by the

9    time those bonds came to maturity.

10           So for those long-term bonds, his methodology

11   allows him to conclude and to present to the jury that for

12   those bonds, it shows that the third amendment increased the

13   bond market confidence.

14           And, you know, a document here, a document there

15   is proper for cross-examination of Dr. Attari.  But his

16   opinion is reliable and the methodology is reliable and

17   sufficiently reliable to overcome the objections.

18           Again, that's all on the merits, though, your

19   Honor, because the Court has already rejected their motion.

20           Thank you.

21           THE COURT:  All right.  I'll give you the last

22   word, Mr. Kaplan.

23           MR. KAPLAN:  I appreciate it, your Honor.  Sam

24   Kaplan for the Plaintiffs.

25           Ms. McGuire, could we call up Exhibit B, please.

1        You heard, your Honor, that wind-down just refers

2    to the accelerated decline in the retained portfolio.

3        No.  The last sentence of this paragraph says:

4    For agency debt investors, that points to fewer remaining

5    new issues since the lifespan of Fannie/Freddie just got

6    shorter.

7        Not their retained portfolio.

8        And by the way, your Honor, the accelerated

9    decline in the retained portfolio did not -- all it did was

10    increase by four years the decline of the retained portfolio

11    to the same amount, $250 billion.  It didn't change the

12    amount by which -- the size of the portfolio that they could

13    maintain under the PSPAs.

14        If we could turn, Ms. McGuire, to Exhibit A,

15    Page 2.

16        The Treasury Department's announcement earlier

17    today regarding changes to the preferred stock purchase

18    agreements that are intended to expedite the wind-down of

19    Fannie Mae and Freddie Mac, not their retained portfolio,

20    which again was just being reduced a little faster to the

21    same $250 billion.

22        All they have, your Honor, is *ipse dixit*.

23        And, your Honor, when your Honor ruled on their

24    loan -- on their motion to say that we shouldn't be able to

25    refer to the PSPAs as a loan, that that would be too

1   confusing for the jury, your Honor aptly observed how

2   complex this case is.

3           The notion that the jury should be sent back to

4   deliberate, to sort out the declining supply and -- the

5   declining supply and investor confidence rationales for this

6   point one -- or this point decline in yield spreads,

7   there's -- they would be completely left at sea, your Honor.

8   All they would have is Dr. Attari's *ipse dixit* that his

9   30-year bonds wouldn't have been affected by this, when

10  FHFA's own documents say that the longer-term bond -- the

11  longer the maturity date on the bond, the more affected it

12  would be by the expectation of wind-down, for obvious

13  reasons, because if they're not going to be around very

14  long, there's going to be fewer and fewer of the longer-term

15  bonds.

16          As for the notion that your Honor has addressed

17  this already, the language that they quote was specifically

18  directed at an argument that we are not making here.

19          Your Honor articulated our argument -- and this

20  was one of our arguments -- as his inability to distinguish

21  between different aspects of the third amendment.

22          It's not the argument we're making here.  It's not

23  the argument you addressed.

24          And your Honor, when I -- we often -- when a

25  person takes a deposition, you'll get sometimes the

1   objection "asked and answered."  They're absolutely correct

2   that we've made these arguments before.  But they have never

3   answered them, and they have not been addressed.

4          And so I'll end there.

5          Thank you, your Honor.

6          THE COURT:  I'll issue something tonight about

7   that.

8          I guess the other -- the only other thing is

9   that -- is the other motion about, what are we going to do

10  with the motion to strike?  And we'll try to get to that

11  tomorrow.

12         MR. HOFFMAN:  Your Honor, Ian Hoffman on behalf of

13  the Defendants.

14         There are a handful of documents that Defendants

15  would like to move in.  I expect there's going to be an

16  objection to them, so I thought we could handle that now.

17         THE COURT:  All right.

18         MR. HOFFMAN:  If your Honor would indulge me for

19  30 seconds to respond to Mr. --

20         THE COURT:  No.  I gave him the last word.

21         MR. HOFFMAN:  Fair enough, your Honor.  Let me get

22  my binder.

23         MS. DAVIS:  Your Honor, I may be able to save him

24  some time.

25         We are not prepared to argue about those

1    particular exhibits.  I think they were only raised today.

2    So if we could take a pass and express that -- deal with

3    that another time.

4              THE COURT:  About which?

5              MS. DAVIS:  These exhibits that he is bringing up

6    now.

7              THE COURT:  What are you all planning to start

8    with tomorrow?  What's his name?

9              MR. HOFFMAN:  Mr. Satriano.

10             THE COURT:  Satriano.  How long is that expected

11   to go?

12             MR. HOFFMAN:  I think about -- maybe a little

13   under two hours, for direct.

14             THE COURT:  On direct.  Okay.

15             MR. HOFFMAN:  Yes, your Honor.

16             THE COURT:  Then where are we going?

17             MR. HOFFMAN:  Dr. Attari.  Dr. Attari after that.

18             THE COURT:  Okay.

19             MR. HOFFMAN:  And --

20             THE COURT:  That'll take the day, anyway.

21             MR. HOFFMAN:  That's right, your Honor.

22             These documents, we disclosed these yesterday.

23   And Mr. Goodhart, Plaintiffs' counsel, told us this morning

24   that --

25             THE COURT:  They're in Satriano's case?

1          MR. HOFFMAN:  No, your Honor.  But they're in

2      Dr. Attari's case.  So --

3              THE COURT:  We can do it at lunch.

4          MR. HOFFMAN:  Okay.  Thank you, your Honor.

5              THE COURT:  Court will be in recess.  I'll see you

6      at 10:00 tomorrow.

7              (Proceedings concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1528

1        <u>**CERTIFICATE**</u>

2

3            I, LISA EDWARDS, RDR, CRR, do hereby

4    certify that the foregoing constitutes a true and accurate

5    transcript of my stenographic notes, and is a full, true,

6    and complete transcript of the proceedings produced to the

7    best of my ability.

8

9

10            Dated this 1st day of August, 2023.

11

12            <u>/s/ Lisa Edwards, RDR, CRR</u>
             Official Court Reporter
13           United States District Court for the
               District of Columbia
14           333 Constitution Avenue, Northwest
             Washington, D.C. 20001
15           (202) 354-3269

16

17

18

19

20

21

22

23

24

25

## $

**$150** [1] - 89:4
**$151** [1] - 88:5
**$194** [1] - 56:2
**$2.92** [1] - 8:2
**$200** [2] - 49:24, 57:5
**$250** [2] - 100:11, 100:21
**$71** [1] - 56:1
**$900** [1] - 49:23

## '

**'although** [1] - 53:7
**'Cumulative** [1] - 55:20
**'Did** [1] - 58:4
**'He** [2] - 37:13, 37:14
**'in** [2] - 53:12, 54:8
**'make** [1] - 9:5
**'over** [2] - 49:19, 55:5
**'Projected** [1] - 55:24
**'The** [1] - 38:2
**'there** [1] - 52:10
**'Treasury** [1] - 54:12
**'we** [4] - 52:13, 53:3, 53:22, 53:25

## /

**/s** [1] - 105:12

## 1

**1** [6] - 1:7, 6:24, 12:2, 22:4, 70:22, 92:25
**1-A** [3] - 3:14, 4:22, 5:8
**1-B** [1] - 65:8
**1-C** [3] - 3:14, 4:22, 5:8
**1-E** [2] - 12:13, 65:12
**1-F** [1] - 12:14
**1-G** [1] - 12:14
**1-H** [3] - 12:14, 72:20, 73:14
**1-I** [4] - 12:14, 72:20, 73:13, 73:21
**1-J** [1] - 12:14
**1-K** [5] - 3:14, 4:22, 5:8, 69:8, 69:10
**1-L** [3] - 3:14, 4:22, 5:8
**1-M** [3] - 3:14, 4:22, 5:8

**1-N** [2] - 12:14, 61:17
**1-O** [2] - 12:14, 70:23
**1-P** [1] - 12:14
**1-Q** [1] - 12:14
**1-R** [1] - 12:15
**1.1** [2] - 8:7, 8:21
**1.8** [1] - 8:6
**10** [6] - 6:25, 40:12, 48:19, 49:15, 50:15, 52:7
**10-Ks** [3] - 31:3, 31:4, 31:10
**10-Q** [3] - 7:22, 7:23, 51:17
**10-Qs** [3] - 31:3, 31:4, 31:10
**100** [2] - 88:8, 89:5
**10020** [1] - 2:5
**1006** [3] - 59:24, 64:9, 66:3
**10:00** [3] - 59:2, 59:8, 104:6
**10:40** [1] - 7:15
**10:52** [1] - 9:14
**11** [7] - 39:5, 39:8, 77:17, 77:24, 85:15, 86:2, 92:25
**1251** [1] - 2:4
**13-1053** [1] - 1:4
**13-1288** [1] - 1:10
**1401** [1] - 1:22
**144** [3] - 3:13, 4:18, 5:6
**14th** [2] - 10:7, 54:24
**1523** [1] - 1:18
**17th** [3] - 77:17, 78:4, 85:15
**186** [3] - 3:13, 4:18, 5:6
**18th** [1] - 71:20
**19** [2] - 3:6, 3:7
**19.7** [1] - 65:20
**19087** [1] - 1:25
**1968** [1] - 92:25
**1969** [1] - 92:25
**1980** [1] - 26:4
**1983** [1] - 26:5
**1:49** [2] - 1:7, 4:22
**1st** [1] - 105:10

## 2

**2** [4] - 7:3, 55:1, 57:15, 100:15
**2.8** [2] - 8:3, 8:21
**2.9** [1] - 8:8
**20** [2] - 17:19, 33:23
**20-year** [1] - 65:19
**200** [1] - 56:18

**20001** [3] - 2:9, 2:13, 105:14
**20005** [1] - 1:22
**2002** [1] - 26:16
**20036** [1] - 1:19
**2006** [4] - 26:16, 27:6, 27:9, 66:21
**2007** [1] - 65:24
**2008** [6] - 28:2, 28:4, 65:25, 67:22, 68:9, 92:2
**2009** [1] - 28:7
**2010** [1] - 41:17
**2011** [10] - 36:7, 37:17, 39:25, 40:6, 41:12, 45:25, 46:6, 51:8, 54:12, 56:25
**2011-2012** [6] - 36:21, 43:23, 48:3, 48:14, 48:22, 50:18
**2012** [35] - 6:3, 7:14, 9:14, 10:8, 33:20, 34:25, 37:17, 38:4, 38:5, 38:14, 40:1, 40:7, 45:21, 45:25, 46:2, 46:6, 46:8, 51:9, 51:18, 54:13, 54:24, 55:13, 55:14, 56:4, 56:11, 57:22, 64:5, 66:21, 67:22, 68:9, 77:17, 78:4, 84:17, 84:18, 85:15
**2013** [9] - 37:18, 38:4, 38:5, 38:14, 45:22, 46:3, 46:8, 64:5, 84:19
**2014** [2] - 55:21, 55:25
**2015** [2] - 80:10, 80:21
**2019** [3] - 81:8, 81:13, 81:15
**202** [2] - 2:14, 105:15
**2022** [1] - 71:21
**2023** [2] - 1:7, 105:10
**205** [1] - 5:21
**209** [3] - 3:13, 4:18, 5:6
**21** [4] - 21:16, 21:24, 22:1, 22:12
**215** [3] - 3:13, 4:18, 5:6
**21st** [1] - 95:18
**226-A** [1] - 7:9
**22nd** [1] - 55:14
**2311** [1] - 55:18
**24** [1] - 3:16
**240** [3] - 3:13, 4:18, 5:7
**247** [1] - 9:9

**25** [5] - 3:8, 6:1, 6:3, 20:25, 21:10
**254** [3] - 3:13, 4:18, 5:7
**259** [1] - 10:3
**262** [3] - 3:13, 4:18, 5:7
**269** [3] - 3:13, 4:18, 5:7
**278** [3] - 3:13, 4:18, 5:7
**280** [1] - 1:24
**282** [3] - 3:14, 4:19, 5:7
**2:29** [1] - 19:18
**2:57** [1] - 24:1
**2Q12** [4] - 7:18, 7:21, 7:23, 7:24

## 3

**3** [4] - 8:5, 91:23, 92:12, 95:20
**3-302** [1] - 83:3
**3-A-3** [3] - 3:12, 4:16, 5:5
**3-A-4** [3] - 3:12, 4:16, 5:5
**3-B-3** [3] - 3:12, 4:16, 5:6
**3-B-4** [3] - 3:13, 4:16, 5:6
**30** [1] - 102:19
**30-year** [1] - 101:9
**30th** [1] - 51:18
**31** [1] - 7:14
**318** [2] - 3:16, 24:12
**333** [2] - 2:12, 105:14
**354-3269** [2] - 2:14, 105:15
**37** [3] - 3:13, 4:18, 5:6
**3731722** [1] - 81:14
**387** [1] - 62:23
**3:45** [1] - 59:9
**3rd** [1] - 36:7

## 4

**4-1** [3] - 3:13, 4:17, 5:6
**4-40** [3] - 3:13, 4:17, 5:6
**40** [4] - 3:13, 4:17, 4:18, 5:6
**451** [2] - 3:16, 24:12

**5**

**5** [1] - 3:12
**5.1** [1] - 8:1
**5.7** [1] - 3:4
**50** [6] - 3:10, 12:11, 76:14, 87:23, 89:15, 89:19
**50(a** [1] - 77:4
**50(a)** [1] - 12:25
**509** [3] - 3:13, 4:20, 5:7
**523** [3] - 3:14, 4:20, 5:7
**525** [3] - 3:14, 4:20, 5:7
**526** [3] - 3:14, 4:20, 5:7
**527** [5] - 3:14, 3:16, 4:20, 5:7, 24:12
**528** [3] - 3:14, 4:20, 5:7
**529** [3] - 3:14, 4:20, 5:8
**530** [3] - 3:14, 4:20, 5:8
**531** [3] - 3:14, 4:20, 5:8
**533** [3] - 3:14, 4:20, 5:8
**534** [3] - 3:14, 4:20, 5:8
**550** [4] - 3:14, 4:21, 4:24, 5:8

## 6

**6** [1] - 37:4
**601** [1] - 2:9
**6706** [1] - 2:13

## 7

**7** [1] - 1:13
**736** [2] - 3:16, 24:13
**77** [1] - 3:10
**7:33** [1] - 10:8
**7th** [1] - 7:23

## 8

**8-302** [6] - 81:19, 81:20, 82:1, 82:7, 82:16, 83:17
**8.1A-103(a)(3)** [1] - 82:12
**803** [1] - 80:21

**809** [1] - 80:21
**8th** [2] - 7:22, 81:14

**9**

**9** [2] - 9:14, 53:21
**92** [1] - 52:25

**A**

**a.m** [3] - 7:15, 9:15, 10:8
**ability** [3] - 51:5, 90:16, 105:7
**able** [8] - 13:10, 69:21, 70:12, 89:19, 91:7, 95:19, 100:24, 102:23
**abrogate** [2] - 82:20, 83:7
**absence** [2] - 77:11, 85:19
**absolutely** [2] - 95:17, 102:1
**abundance** [1] - 86:24
**accelerate** [1] - 92:4
**accelerated** [11] - 86:12, 91:13, 93:4, 93:11, 97:19, 97:24, 98:3, 98:4, 99:6, 100:2, 100:8
**acceptable** [1] - 23:11
**according** [4] - 26:16, 38:19, 39:11, 95:4
**account** [2] - 58:1, 86:8
**accounting** [6] - 26:7, 26:8, 26:10, 35:18, 44:11
**accrues** [1] - 80:12
**accuracy** [9] - 30:5, 30:13, 30:19, 30:23, 30:25, 33:9, 33:13, 52:2, 61:24
**accurate** [9] - 14:21, 25:13, 25:14, 25:16, 51:9, 52:22, 52:24, 53:16, 105:4
**achieve** [1] - 57:7
**acknowledged** [2] - 86:6, 86:7
**acronym** [1] - 62:7
**act** [3] - 7:6, 87:5, 87:7
**acted** [1] - 87:14
**acting** [1] - 6:10

**Action** [1] - 1:3
**action** [7] - 17:5, 79:6, 80:1, 80:12, 80:13, 80:17
**ACTION** [1] - 1:11
**actions** [4] - 38:20, 39:12, 39:16, 40:3
**activities** [3] - 28:13, 30:15, 32:6
**actor** [3] - 22:17, 24:23, 25:1
**actual** [2] - 32:2, 63:13
**ADAM** [1] - 2:2
**Adam** [1] - 7:17
**added** [2] - 64:12, 65:19
**adding** [1] - 66:8
**addition** [3] - 30:6, 53:12, 54:8
**additional** [6] - 12:1, 47:6, 52:14, 53:3, 53:25, 55:7
**address** [3] - 71:4, 72:8, 86:10, 87:21, 93:18
**addressed** [16] - 72:23, 79:13, 82:6, 93:25, 94:1, 94:2, 94:5, 95:15, 96:13, 96:19, 96:21, 97:5, 97:8, 101:16, 101:23, 102:3
**adequate** [3] - 35:20, 49:17, 50:23
**adjust** [1] - 6:19
**adjustment** [2] - 71:6, 72:7
**admissibility** [3] - 12:10, 90:15, 90:21
**admit** [6] - 60:25, 66:15, 70:13, 74:12, 75:2, 75:3, 75:16, 76:6
**admitted** [15] - 60:22, 62:18, 63:7, 63:18, 64:10, 69:12, 73:10, 73:20, 73:23, 73:24, 73:25, 74:5, 74:16, 74:25, 75:19
**admitting** [2] - 65:15, 76:7
**adopted** [2] - 81:10, 82:9
**affect** [1] - 99:7
**affected** [3] - 99:5, 101:9, 101:11
**affirmatively** [2] - 15:6, 20:14
**afternoon** [13] - 5:16,

5:17, 12:11, 12:20, 13:2, 18:16, 18:20, 29:10, 51:12, 58:24, 87:18, 90:1, 94:19
**AFTERNOON** [1] - 1:13
**age** [1] - 44:21
**agency** [3] - 92:6, 92:17, 100:4
**AGENCY** [1] - 1:6
**Agency** [1] - 8:13
**ago** [6] - 32:14, 77:17, 77:24, 85:15, 86:2, 95:14
**agree** [3] - 42:21, 42:24, 84:16
**agreement** [8] - 49:5, 52:15, 53:4, 53:13, 54:1, 54:9, 56:17, 88:20
**AGREEMENT** [1] - 1:11
**agreements** [2] - 92:15, 100:18
**ahead** [2] - 12:12, 43:19
**aid** [2] - 62:9, 72:6
**al** [2] - 1:3, 1:7
**alert** [1] - 9:16
**allegation** [2] - 60:8, 61:18
**alleged** [1] - 77:15
**allow** [1] - 23:5
**allowance** [15] - 33:21, 33:25, 34:2, 34:6, 34:8, 34:15, 35:18, 42:24, 43:2, 43:6, 43:22, 45:11, 45:17, 45:24, 57:20
**allowances** [1] - 42:22
**allowed** [1] - 96:11
**allowing** [1] - 70:10
**allows** [1] - 99:11
**alluding** [1] - 92:1
**almost** [1] - 23:22
**alternative** [3] - 48:15, 86:9, 91:8
**alternatives** [1] - 48:4
**Amato** [1] - 35:10
**amending** [1] - 6:21
**amendment** [31] - 10:12, 40:1, 47:24, 50:24, 78:4, 78:8, 78:10, 78:12, 78:15, 78:21, 78:23, 79:2, 79:5, 84:12, 84:24, 85:1, 85:16, 85:19, 85:23, 90:17, 90:24,

91:1, 91:12, 91:15, 93:15, 95:7, 96:17, 99:6, 99:12, 101:21
**amendments** [3] - 6:18, 9:20, 11:14
**Americas** [1] - 2:4
**amount** [10] - 54:16, 56:10, 56:12, 56:14, 56:16, 56:20, 65:22, 70:18, 100:11, 100:12
**amounts** [3] - 65:17, 66:1, 66:5
**ample** [1] - 88:2
**analyses** [5] - 31:19, 35:1, 35:6, 35:13, 45:16
**analysis** [13] - 8:12, 27:22, 28:11, 34:6, 35:2, 35:11, 43:5, 43:6, 43:12, 44:5, 44:6, 44:8, 46:6
**announcement** [3] - 92:4, 92:13, 100:16
**annual** [4] - 7:1, 52:20, 53:10, 54:6
**answer** [5] - 42:12, 82:25, 92:20, 94:9, 94:10
**answered** [2] - 102:1, 102:3
**anticipate** [4] - 32:12, 36:2, 43:22, 43:24
**anyway** [3] - 58:23, 74:9, 103:20
**apparent** [1] - 34:13
**appeal** [1] - 86:22
**aPPEARANCES** [1] - 1:16
**APPEARANCES** [1] - 2:1
**applicable** [1] - 82:5
**application** [1] - 84:22
**applied** [2] - 81:6, 81:11
**applies** [2] - 80:23, 81:4
**apply** [1] - 83:9
**appreciate** [1] - 99:23
**approach** [1] - 21:7
**appropriate** [2] - 66:22, 67:7
**aptly** [1] - 101:1
**argue** [2] - 71:15, 96:11, 102:25
**argued** [1] - 95:2
**arguing** [3] - 12:11, 97:1, 97:2

**argument** [26] - 12:10, 12:19, 61:2, 66:13, 68:15, 71:14, 73:7, 77:1, 79:1, 85:5, 87:11, 87:23, 93:9, 93:13, 93:17, 94:4, 94:11, 95:20, 96:4, 96:12, 97:25, 98:1, 101:18, 101:19, 101:22, 101:23
**arguments** [8] - 68:24, 77:10, 86:22, 86:25, 95:25, 98:23, 101:20, 102:2
**ARNOLD** [1] - 2:8
**arrival** [1] - 48:12
**Article** [2] - 78:5, 85:2
**articulated** [1] - 101:19
**AS** [4] - 25:3, 33:11, 39:10, 51:14
**aside** [2] - 68:14, 82:24
**ASIM** [1] - 2:6
**aspects** [5] - 30:6, 30:10, 32:4, 90:23, 101:21
**assert** [1] - 90:16
**asserted** [1] - 84:19
**asserting** [1] - 95:11
**assessing** [1] - 91:6
**assessment** [4] - 43:9, 44:19, 45:14, 45:19
**asset** [12] - 34:24, 43:7, 44:9, 44:16, 44:17, 44:20, 45:4, 45:5, 45:6, 45:17, 45:24, 50:21
**assets** [8] - 11:9, 33:22, 35:2, 42:21, 42:22, 44:10, 44:21, 57:20
**assign** [9] - 80:5, 80:17, 81:21, 82:2, 82:4, 82:17, 83:11, 83:15, 83:19
**assigned** [2] - 79:7, 80:3
**assignee** [1] - 80:19
**assigning** [1] - 84:2
**assignment** [16] - 79:9, 79:10, 79:12, 79:20, 79:22, 79:24, 80:6, 80:9, 81:3, 81:7, 81:17, 81:23, 82:22, 83:8, 84:23
**assignor** [1] - 80:18
**assigns** [2] - 82:8,

84:9
  **Association** [1] - 81:13
  **assuming** [1] - 89:25
  **assumption** [2] - 38:18, 43:3
  **assumptions** [3] - 31:22, 31:23, 42:2
  **attached** [1] - 91:21
  **attacks** [1] - 99:2
  **Attari** [15] - 90:2, 90:3, 90:6, 90:12, 90:22, 93:6, 95:24, 96:8, 97:14, 97:16, 98:14, 98:25, 99:15, 103:17
  **Attari's** [12] - 90:16, 90:25, 92:22, 94:23, 95:3, 96:16, 96:18, 98:7, 98:10, 98:19, 101:8, 104:2
  **attempts** [1] - 97:7
  **attendance** [1] - 36:10
  **attention** [2] - 53:21, 61:5
  **attorney** [1] - 15:13
  **attributable** [2] - 84:6, 86:11
  **audience** [2] - 17:12, 47:23
  **audit** [2] - 45:18, 45:19
  **auditor** [2] - 35:25, 43:24
  **auditors** [4] - 10:23, 11:16, 34:11, 35:21
  **August** [14] - 1:7, 7:22, 7:23, 9:14, 10:7, 40:1, 54:24, 56:11, 77:17, 78:4, 81:14, 84:17, 85:15, 105:10
  **automatic** [8] - 79:12, 80:9, 81:3, 81:6, 81:12, 81:16, 83:8, 84:23
  **automatically** [13] - 79:7, 80:2, 80:15, 81:21, 82:1, 82:3, 82:8, 82:16, 83:11, 83:15, 83:18, 84:1, 84:8
  **Avenue** [6] - 1:18, 1:22, 2:4, 2:9, 2:12, 105:14
  **Awaa** [1] - 7:16
  **aware** [1] - 15:1

## B

  **bad** [1] - 94:7
  **bala** [1] - 68:18
  **Bala** [1] - 68:18
  **balance** [2] - 42:7, 49:13
  **Bancorp** [3] - 28:3, 28:4, 28:9
  **Bank** [3] - 26:18, 26:20, 27:2
  **bank** [2] - 28:11, 28:25
  **banks** [1] - 40:19
  **bar** [3] - 60:11, 60:16, 64:20
  **Barry** [1] - 7:17
  **base** [3] - 42:10, 42:13, 58:9
  **based** [11] - 11:11, 41:25, 42:1, 50:12, 56:25, 57:17, 62:20, 79:20, 84:18, 86:1, 96:14
  **basis** [15] - 31:10, 32:19, 34:7, 38:1, 43:25, 62:3, 77:8, 85:4, 85:24, 86:5, 87:14, 87:15, 91:10, 97:3
  **bathroom** [1] - 23:13
  **bear** [1] - 77:18
  **bears** [3] - 67:2, 79:16, 79:21
  **became** [2] - 28:20, 34:12
  **becomes** [1] - 80:12
  **becoming** [1] - 6:11
  **BEFORE** [1] - 1:14
  **began** [6] - 34:10, 34:17, 34:21, 46:2, 46:9
  **begin** [1] - 18:10
  **beginning** [4] - 7:10, 22:3, 22:9, 33:20
  **begins** [1] - 37:5
  **behalf** [6] - 11:25, 18:21, 19:4, 19:10, 94:20, 102:12
  **behind** [1] - 53:1
  **Belack** [7] - 4:13, 5:11, 5:16, 5:23, 7:12, 10:6, 11:18
  **BELACK** [1] - 5:14
  **belief** [1] - 51:6
  **below** [3] - 8:18, 48:19, 92:11
  **beneficial** [4] - 49:7, 49:8, 50:3, 50:4

  **benefit** [3] - 44:23, 45:8, 45:10
  **benefited** [1] - 78:17
  **BERGER** [1] - 2:3
  **BERGMAN** [1] - 2:7
  **BERKLEY** [1] - 1:17
  **BERNSTEIN** [1] - 2:3
  **best** [6] - 84:22, 87:5, 87:6, 87:7, 87:15, 105:7
  **better** [1] - 50:21
  **between** [8] - 4:4, 13:15, 17:5, 44:15, 56:1, 62:22, 83:14, 101:21
  **billion** [21] - 8:1, 8:2, 8:3, 8:4, 8:5, 8:6, 8:7, 8:8, 8:21, 49:23, 49:24, 56:1, 56:2, 56:18, 57:5, 65:20, 88:6, 89:4, 100:11, 100:21
  **binder** [2] - 5:18, 102:22
  **biography** [5] - 25:6, 25:14, 25:24, 26:16, 29:18
  **bit** [6] - 27:17, 28:8, 42:19, 66:18, 67:9, 98:1
  **block** [1] - 8:9
  **blue** [1] - 19:25
  **board** [5] - 31:6, 36:6, 36:19, 37:7, 46:5
  **boards** [1] - 11:10
  **Bob** [1] - 37:2
  **BOIES** [1] - 1:21
  **bond** [12] - 90:17, 94:23, 95:4, 95:6, 97:16, 98:3, 98:15, 98:19, 99:4, 99:13, 101:10, 101:11
  **bondholder** [1] - 96:17
  **bonds** [17] - 80:25, 93:6, 93:7, 93:20, 97:17, 98:10, 98:11, 98:13, 98:17, 98:22, 99:3, 99:7, 99:9, 99:10, 99:12, 101:9, 101:15
  **book** [1] - 44:15
  **borrower** [1] - 84:2
  **bottom** [8] - 7:10, 37:5, 37:12, 39:4, 39:8, 53:22, 65:20
  **bought** [4] - 78:3, 78:16, 79:5, 88:18
  **BOZMAN** [1] - 2:3

  **breach** [1] - 79:6
  **break** [5] - 17:18, 17:22, 18:17, 23:13, 58:20
  **brief** [5] - 29:20, 87:20, 89:19, 95:1, 95:12
  **briefed** [2] - 45:23, 46:5
  **briefing** [2] - 87:21, 89:12
  **briefly** [5] - 11:19, 25:21, 67:17, 86:24, 89:18
  **bring** [2] - 60:20, 69:7
  **bringing** [1] - 103:5
  **broad** [1] - 30:12
  **brought** [1] - 68:6
  **BS** [2] - 25:25, 26:4
  **build** [1] - 51:5
  **building** [1] - 50:19
  **bulk** [1] - 49:25
  **bullet** [2] - 55:2, 55:24
  **burden** [1] - 79:21
  **business** [4] - 27:10, 27:13, 27:15, 27:25
  **buyer** [1] - 84:3, 84:4
  **buying** [1] - 88:21
  **BY** [17] - 2:10, 5:14, 5:15, 5:22, 6:15, 7:11, 8:16, 9:1, 9:11, 10:5, 10:21, 11:3, 25:3, 33:11, 39:10, 51:14, 57:13

## C

  **CAITLIN** [1] - 2:3
  **calculated** [1] - 61:25
  **calculation** [1] - 69:20
  **Calhoun** [1] - 7:16
  **cannot** [3] - 90:22, 93:1, 95:5
  **capable** [1] - 91:5
  **capital** [3] - 40:18, 50:20, 51:5
  **Capital** [1] - 53:2
  **caps** [1] - 7:2
  **care** [1] - 71:22
  **career** [1] - 25:15
  **careful** [1] - 96:8
  **Carroll** [1] - 7:16
  **case** [35] - 12:6, 12:24, 13:8, 15:3, 16:3, 17:5, 17:10,

  18:7, 18:11, 20:10, 42:2, 42:3, 42:4, 42:10, 42:13, 56:1, 58:9, 58:10, 59:3, 62:12, 67:2, 67:4, 71:10, 77:14, 77:19, 82:4, 84:10, 84:18, 88:14, 96:25, 101:2, 103:25, 104:2
  **Case** [1] - 1:10
  **cash** [5] - 44:15, 44:23, 45:7, 45:12, 88:4
  **casualty** [2] - 27:12, 27:16
  **causation** [1] - 97:18
  **caused** [7] - 32:13, 90:17, 91:1, 92:3, 93:5, 93:12, 93:15
  **causes** [2] - 80:1, 86:9
  **caution** [1] - 86:24
  **caveat** [1] - 15:25
  **cc** [1] - 7:16
  **central** [1] - 86:5
  **CEO** [9] - 19:7, 28:19, 28:20, 28:22, 29:5, 29:7, 45:23, 46:4, 46:22
  **certain** [4] - 11:8, 30:6, 66:9, 99:5
  **certainly** [5] - 25:17, 26:9, 29:9, 31:13, 84:21
  **certainty** [4] - 85:10, 85:13, 86:16, 88:24
  **CERTIFICATE** [1] - 105:1
  **certified** [2] - 77:19, 77:24
  **certify** [1] - 105:4
  **CFO** [11] - 16:23, 24:17, 26:22, 27:19, 28:9, 28:23, 28:24, 28:25, 29:1, 29:21
  **chain** [3] - 8:15, 10:4, 10:20
  **challenged** [1] - 33:14
  **change** [6] - 21:20, 48:20, 51:11, 56:25, 95:6, 100:11
  **changed** [1] - 88:3
  **changes** [8] - 10:14, 10:24, 32:13, 80:15, 92:14, 92:16, 93:15, 100:17
  **changing** [2] - 43:3, 71:11
  **Chart** [1] - 91:25

**chart** [10] - 61:10, 61:19, 64:20, 66:20, 67:5, 67:19, 68:4, 68:6, 70:3, 73:9
**charts** [6] - 12:2, 60:11, 68:1, 70:9, 72:4, 74:18
**CHECK** [1] - 1:24
**checked** [1] - 76:19
**cheers** [1] - 10:25
**Chepenick** [1] - 7:17
**chief** [5] - 24:17, 26:17, 26:22, 30:16, 47:25
**chose** [2] - 80:13, 80:17
**choses** [1] - 80:13
**Cincinnati** [1] - 29:10
**Circuit** [2] - 80:10, 80:21
**circular** [1] - 47:5
**citing** [1] - 63:7
**Civil** [1] - 1:3
**claim** [21] - 79:2, 79:6, 79:10, 79:12, 79:14, 79:20, 79:22, 80:5, 81:17, 81:24, 82:3, 82:22, 83:8, 83:21, 84:3, 84:6, 84:7, 84:14, 84:18, 84:23, 88:21
**claims** [13] - 80:1, 81:3, 81:7, 81:11, 81:21, 82:2, 82:8, 82:17, 83:11, 83:14, 83:19, 83:24
**clarification** [4] - 38:11, 94:25, 95:9, 97:7
**clarify** [2] - 58:7, 58:14
**clarity** [2] - 20:16, 72:19
**class** [12] - 17:7, 77:11, 78:3, 78:24, 78:25, 84:25, 85:6, 85:8, 85:9, 88:1
**CLASS** [3] - 1:11, 1:20, 2:2
**classes** [4] - 77:19, 77:21, 77:24, 78:7
**clear** [16] - 14:21, 15:19, 40:9, 58:4, 63:14, 64:12, 64:14, 70:19, 73:12, 76:10, 82:25, 84:21, 89:20, 90:13, 95:17, 97:22
**clearly** [2] - 92:24, 96:24

**clerk** [2] - 73:20, 76:20
**close** [1] - 9:18
**closed** [2] - 71:10, 76:17
**closing** [5] - 64:19, 64:20, 66:12, 95:25, 96:12
**closings** [1] - 59:6
**Code** [2] - 81:18, 82:12
**cognizable** [1] - 86:1
**COLATRIANO** [1] - 1:17
**Colatriano** [1] - 17:2
**collection** [1] - 93:15
**collectively** [1] - 91:12
**Collins** [1] - 87:12
**Columbia** [2] - 2:12, 105:13
**COLUMBIA** [1] - 1:1
**comb** [2] - 62:10
**combined** [3] - 64:4, 65:19, 91:14
**combining** [1] - 71:1
**comfort** [1] - 97:14
**coming** [2] - 4:4, 6:25
**comments** [1] - 34:12
**commercial** [2] - 28:11, 40:19
**Commercial** [1] - 81:18
**commitment** [14] - 9:23, 53:13, 54:9, 54:17, 56:8, 56:11, 56:12, 56:13, 56:14, 56:17, 57:5, 57:8, 58:2, 58:11
**committed** [1] - 54:14
**committee** [2] - 45:18, 45:20
**common** [9] - 49:18, 80:8, 80:11, 80:23, 81:3, 81:6, 82:20, 83:7
**common-law** [4] - 80:23, 81:3, 81:6, 82:20
**communicated** [3] - 46:22, 47:19
**communication** [1] - 10:16
**company** [17] - 27:1, 27:12, 27:23, 27:24, 28:21, 37:15, 38:2, 38:20, 39:1, 39:12,

39:22, 42:2, 49:12, 49:25, 50:8, 51:7
**company's** [1] - 29:25, 30:1
**comparing** [1] - 40:16
**comparison** [1] - 66:9
**compensation** [1] - 54:16
**competing** [1] - 6:22
**complete** [3] - 51:9, 87:8, 105:6
**completely** [1] - 93:8, 101:7
**complex** [1] - 101:2
**complies** [1] - 23:16
**components** [3] - 44:8, 45:5, 46:6
**compounding** [1] - 94:15
**comprehensive** [12] - 25:17, 38:10, 38:16, 52:18, 52:19, 53:8, 53:9, 54:4, 54:5, 55:6, 57:15, 57:18
**comprised** [1] - 77:19
**concentrate** [1] - 51:8
**concentration** [2] - 26:5, 26:7
**concern** [5] - 11:7, 47:24, 48:1, 64:16, 71:4
**concerns** [1] - 96:13
**conclude** [4] - 85:25, 95:5, 96:6, 99:11
**concluded** [1] - 104:7
**conclusion** [2] - 96:16, 98:22
**conditions** [3] - 67:22, 67:24, 68:20
**confer** [1] - 76:23
**confidence** [10] - 91:2, 95:7, 95:8, 95:9, 95:16, 96:16, 96:18, 97:5, 99:13, 101:5
**confronted** [2] - 60:7, 62:1
**confusing** [1] - 101:1
**Congress** [1] - 7:5
**connected** [1] - 69:14
**connecting** [1] - 67:4
**connection** [4] - 31:15, 32:5, 35:9, 35:23
**consensus** [1] - 47:2

**conservator** [1] - 49:3
**conservatorship** [2] - 28:21, 49:5
**consider** [5] - 13:4, 33:24, 46:15, 49:1, 58:10
**consideration** [2] - 16:11, 48:7
**considered** [2] - 83:25, 84:7
**considering** [2] - 34:13, 81:10
**consistent** [5] - 10:15, 20:8, 64:1, 75:2, 83:4
**constitute** [1] - 66:22
**constitutes** [2] - 66:8, 105:4
**Constitution** [2] - 2:12, 105:14
**constraints** [4] - 29:14, 49:13, 51:2, 57:10
**construed** [6] - 82:1, 82:10, 82:13, 83:4, 83:18
**CONT'D** [1] - 2:1
**contacted** [1] - 28:18
**contend** [2] - 78:11, 79:4
**context** [7] - 19:23, 79:16, 80:24, 81:7, 83:1, 98:13, 98:15
**contexts** [1] - 79:14
**continue** [1] - 53:15
**continued** [3] - 41:19, 56:24
**contract** [2] - 87:4, 87:10
**contraction** [2] - 49:13, 49:16
**contracts** [1] - 87:2
**contractual** [1] - 87:8
**contribute** [2] - 53:14, 54:10
**controller** [5] - 26:24, 27:24, 28:12, 35:10, 43:11
**controls** [6] - 29:25, 30:2, 30:3, 30:4, 30:7, 35:20
**conversation** [3] - 29:11, 34:11, 46:14
**conversations** [1] - 43:23
**converting** [1] - 48:23
**conveyed** [2] -

47:20, 84:13
**COOPER** [1] - 1:18
**coordinate** [1] - 31:21
**copy** [3] - 19:24, 20:20, 21:8
**corner** [1] - 29:10
**corporate** [1] - 55:13
**Corporation** [4] - 27:4, 27:10, 27:19, 51:18
**correct** [17] - 5:2, 5:13, 5:17, 22:16, 35:5, 36:10, 48:9, 52:3, 54:20, 56:22, 57:20, 57:21, 57:23, 75:1, 88:24, 102:1
**correspondence** [1] - 62:22
**counsel** [38] - 13:21, 13:22, 14:2, 14:10, 14:20, 17:1, 17:2, 17:6, 17:7, 20:2, 20:7, 20:11, 20:25, 21:2, 21:6, 21:10, 21:12, 21:17, 22:5, 22:6, 22:8, 22:11, 22:15, 22:18, 22:20, 22:21, 23:15, 24:20, 51:13, 56:7, 57:12, 57:14, 57:24, 58:4, 63:12, 95:25, 96:11, 103:23
**counsel's** [1] - 20:1
**counter** [2] - 17:1, 20:15
**counter-designated** [1] - 17:1
**counter-designations** [1] - 20:15
**country** [6] - 68:21, 79:25, 80:4, 81:5, 82:19, 83:6
**couple** [8] - 29:6, 29:9, 30:18, 47:18, 52:25, 63:23, 90:12, 93:10
**course** [16] - 9:25, 13:20, 24:22, 42:12, 59:18, 59:25, 60:18, 60:19, 61:9, 61:11, 61:23, 62:4, 67:20, 68:2, 68:15, 84:19
**COURT** [120] - 1:1, 4:10, 4:15, 4:25, 5:3, 5:12, 11:21, 12:12, 12:21, 13:4, 15:12, 15:16, 15:24, 16:17, 16:21, 17:17, 17:21, 18:2, 18:8, 18:24,

1533

19:15, 19:20, 19:22,
20:3, 20:17, 21:10,
21:15, 21:18, 21:21,
21:25, 22:5, 22:12,
22:14, 22:19, 23:5,
23:12, 23:17, 23:20,
24:3, 24:11, 24:21,
24:24, 25:1, 58:19,
59:11, 59:14, 59:18,
68:12, 68:22, 69:2,
69:5, 69:9, 69:12,
69:15, 69:22, 69:24,
70:2, 70:4, 70:8,
70:14, 70:16, 70:22,
70:24, 71:1, 71:5,
71:16, 71:22, 71:25,
72:2, 72:9, 72:15,
72:22, 73:1, 73:3,
73:10, 73:15, 73:18,
73:20, 73:24, 74:8,
74:12, 74:14, 74:20,
74:22, 74:24, 75:2,
75:5, 75:8, 75:12,
75:15, 75:21, 75:24,
76:1, 76:3, 76:6,
76:10, 76:12, 76:17,
76:19, 76:25, 89:15,
89:22, 90:2, 90:4,
90:6, 94:18, 99:21,
102:6, 102:17,
102:20, 103:4, 103:7,
103:10, 103:14,
103:16, 103:18,
103:20, 103:25,
104:3, 104:5
   **court** [5] - 18:1, 19:3,
19:9, 83:1, 104:5
   **Court** [31] - 2:11,
2:11, 19:14, 19:21,
20:13, 21:9, 69:7,
81:9, 83:10, 85:3,
85:11, 86:20, 87:20,
89:13, 90:12, 90:19,
90:20, 95:11, 95:13,
95:15, 96:4, 96:6,
96:11, 96:21, 97:4,
97:8, 97:10, 99:19,
105:12, 105:13
   **Court's** [6] - 73:16,
86:21, 87:12, 87:14,
94:5, 95:18
   **COURTROOM** [4] -
4:7, 23:16, 23:25,
73:22
   **courtroom** [4] - 4:8,
19:18, 24:1, 59:9
   **Courts** [1] - 81:22
   **courts** [8] - 81:2,
81:5, 81:10, 81:19,
82:6, 82:18, 83:5,

83:13
   **covenant** [3] - 6:21,
79:7, 87:3
   **cover** [3] - 38:7,
38:16, 50:23
   **covers** [1] - 25:20
   **CPA** [2] - 26:11,
26:12
   **created** [2] - 63:11,
91:15
   **creates** [1] - 44:16
   **credibility** [1] - 15:10
   **credit** [1] - 42:6
   **creditworthiness** [1]
- 91:3
   **criminal** [1] - 59:15
   **cross** [3] - 98:8,
98:14, 99:15
   **Cross** [1] - 3:4
   **cross-examination**
[2] - 98:8, 99:15
   **cross-examined** [1]
- 98:14
   **CRR** [3] - 2:10,
105:3, 105:12
   **cumulative** [2] -
55:25, 56:13
   **current** [8] - 7:24,
77:19, 77:25, 78:25,
85:8, 85:25, 86:16,
88:1
   **curriculum** [1] - 26:9
   **curve** [1] - 92:18
   **cushion** [1] - 38:13

# D

   **D.C** [6] - 1:6, 1:19,
1:22, 2:9, 2:13,
105:14
   **damage** [1] - 86:1
   **damages** [6] - 84:15,
85:10, 85:12, 86:5,
86:15, 88:23
   **data** [6] - 61:19,
63:17, 64:9, 64:17,
66:4, 67:14
   **date** [3] - 6:3, 54:23,
101:11
   **Dated** [1] - 105:10
   **dated** [2] - 36:7,
55:14
   **Daubert** [1] - 94:13
   **David** [3] - 28:19,
28:22, 29:5
   **DAVID** [1] - 2:7
   **Davis** [6] - 59:12,
62:17, 63:25, 65:7,
66:17, 73:7

   **DAVIS** [57] - 1:20,
59:13, 59:16, 59:19,
65:9, 65:11, 67:17,
68:14, 69:1, 69:4,
69:7, 69:10, 69:13,
69:16, 69:23, 69:25,
70:3, 70:6, 70:9,
70:15, 70:19, 70:23,
70:25, 71:3, 71:6,
71:13, 71:17, 71:24,
72:1, 72:3, 72:12,
72:17, 72:23, 73:2,
73:5, 73:9, 73:12,
73:16, 73:19, 74:2,
74:11, 74:13, 74:17,
74:21, 74:23, 75:6,
75:11, 75:14, 75:18,
75:22, 75:25, 76:2,
76:5, 76:9, 76:11,
102:23, 103:5
   **DAY** [1] - 1:13
   **day's** [1] - 6:6
   **days** [1] - 47:18
   **de** [1] - 9:24
   **deal** [4] - 18:9, 34:19,
58:22, 103:2
   **debt** [3] - 92:6,
92:17, 100:4
   **decades** [1] - 81:2
   **decision** [8] - 43:2,
46:19, 46:21, 80:10,
80:21, 81:8, 86:21,
87:12
   **decisions** [1] - 45:23
   **decline** [12] - 77:16,
86:11, 90:17, 91:1,
91:13, 93:4, 93:11,
93:21, 100:2, 100:9,
100:10, 101:6
   **declining** [6] - 78:21,
91:16, 93:5, 93:16,
101:4, 101:5
   **deduction** [3] -
44:24, 45:1, 45:8
   **deductions** [1] -
45:12
   **default** [1] - 42:6
   **Defendants** [38] -
1:8, 4:2, 4:23, 12:8,
12:17, 12:18, 12:23,
13:7, 15:5, 15:19,
16:1, 18:21, 18:22,
19:5, 19:6, 19:11,
20:6, 22:10, 23:10,
24:6, 24:7, 24:16,
62:16, 71:9, 77:3,
77:4, 77:6, 85:4,
86:17, 86:25, 87:13,
87:24, 90:8, 93:2,
93:24, 94:20, 102:13,

102:14
   **DEFENDANTS** [1] -
2:6
   **Defendants'** [5] -
3:16, 24:12, 76:13,
78:2, 97:14
   **defense** [19] - 13:22,
14:2, 14:16, 15:13,
16:2, 18:10, 20:2,
21:17, 22:15, 22:17,
22:20, 51:13, 60:4,
60:10, 61:13, 68:2,
94:3, 95:24, 96:11
   **deferred** [18] - 11:9,
33:22, 34:24, 35:2,
42:21, 42:22, 43:7,
44:9, 44:10, 44:17,
44:20, 44:21, 45:4,
45:5, 45:6, 45:17,
45:24, 57:20
   **deferring** [1] - 48:16
   **defined** [6] - 45:25,
46:7, 48:3, 48:22,
49:4, 50:18
   **definition** [1] - 77:21
   **degree** [1] - 25:25
   **degrees** [2] - 26:3,
26:6
   **Delaware** [16] - 81:9,
81:14, 81:25, 82:2,
82:3, 82:4, 82:24,
83:10, 83:13, 83:20,
83:24, 84:6, 84:20,
84:22, 85:12
   **deliberate** [1] - 101:4
   **DeMarco** [3] - 6:6,
6:21, 9:15
   **demonstrate** [3] -
11:14, 15:8, 65:4
   **demonstrative** [5] -
63:3, 63:21, 64:12,
66:8, 66:15
   **demonstratives** [18]
- 59:23, 62:25, 63:7,
63:10, 63:13, 67:15,
69:6, 74:6, 74:8,
74:10, 74:15, 74:16,
74:22, 74:25, 75:9,
75:16, 76:7, 76:8
   **denied** [1] - 89:15
   **department** [3] -
21:23, 35:9, 43:12
   **Department** [4] -
16:2, 16:17, 17:6,
21:24
   **Department's** [3] -
92:4, 92:13, 100:16
   **departments** [1] -
44:3
   **DEPOSITION** [1] -

25:2
   **deposition** [22] - 3:8,
13:19, 13:20, 14:20,
16:21, 16:22, 17:8,
17:20, 18:23, 19:2,
19:7, 19:8, 19:13,
19:24, 20:5, 20:18,
20:20, 22:4, 22:11,
24:19, 101:25
   **depositions** [3] -
16:6, 18:14, 18:15
   **DEPUTY** [4] - 4:7,
23:16, 23:25, 73:22
   **describe** [3] - 28:16,
43:5, 44:6
   **described** [1] - 30:7
   **describing** [2] -
80:11, 96:9
   **description** [1] -
29:20
   **design** [2] - 97:16,
98:21
   **designate** [2] - 15:9,
20:15
   **designated** [8] -
13:19, 15:6, 16:24,
16:25, 17:1, 19:25,
20:14
   **designations** [1] -
20:15
   **designed** [1] - 11:14
   **despite** [1] - 95:11
   **detail** [3] - 26:19,
33:3, 42:20
   **detailed** [3] - 44:8,
45:3, 46:4
   **determination** [1] -
83:2
   **determine** [1] - 33:23
   **detrimental** [2] -
49:9, 50:4
   **developing** [1] -
35:12
   **development** [1] -
31:22
   **Dharan** [1] - 68:19
   **differences** [1] -
70:17
   **different** [17] - 14:5,
15:4, 15:20, 16:8,
16:9, 17:6, 44:13,
44:14, 50:5, 60:15,
63:2, 63:5, 66:19,
67:9, 68:6, 90:23,
101:21
   **differentiate** [1] -
83:14
   **difficult** [1] - 14:25
   **difficulties** [2] - 13:9,
18:18

1534

**Direct** [1] - 3:4
**direct** [4] - 61:5, 95:19, 103:13, 103:14
**directed** [1] - 101:18
**directly** [1] - 26:13
**director** [4] - 6:11, 18:22, 19:1, 43:10
**directors** [2] - 36:7, 46:5
**disagree** [1] - 56:18
**disciplines** [3] - 26:25, 27:21, 28:10
**disclosed** [2] - 68:1, 103:22
**discretion** [2] - 87:5, 87:9
**discuss** [2] - 19:14, 32:9
**discussed** [6] - 11:10, 12:25, 18:7, 38:20, 39:12, 98:16
**discussion** [21] - 6:1, 6:7, 10:23, 31:15, 37:5, 37:6, 37:8, 37:11, 37:13, 37:19, 41:15, 46:4, 48:13, 48:18, 48:21, 57:17, 58:15, 67:21, 67:23, 68:7, 68:19
**discussions** [17] - 29:16, 32:18, 38:23, 39:15, 39:19, 40:2, 40:10, 40:11, 40:15, 40:16, 40:20, 41:16, 41:18, 46:9, 48:2, 57:14, 68:2
**dismayed** [1] - 59:7
**display** [3] - 60:1, 61:7, 61:14
**displayed** [3] - 5:19, 12:3, 61:20
**dispute** [2] - 60:3, 61:6
**distinction** [1] - 72:13
**distinguish** [2] - 90:22, 101:20
**district** [1] - 105:13
**District** [6] - 2:11, 2:12, 81:9, 81:14, 105:13
**DISTRICT** [3] - 1:1, 1:1, 1:14
**dividend** [22] - 6:19, 7:1, 7:4, 38:7, 38:16, 40:12, 40:17, 40:19, 40:21, 41:10, 48:15, 48:18, 48:19, 49:15, 50:15, 50:23, 52:15, 53:5, 53:10, 54:2,

55:6
**dividends** [18] - 8:2, 8:3, 8:4, 8:6, 8:7, 8:8, 8:20, 47:6, 48:7, 52:20, 54:6, 64:3, 64:6, 64:7, 64:13, 64:22, 64:23, 64:24
**dixit** [2] - 100:22, 101:8
**document** [24] - 5:24, 6:14, 10:2, 19:21, 21:9, 25:4, 25:5, 25:8, 25:11, 36:5, 37:4, 51:20, 51:22, 51:23, 51:24, 53:19, 54:23, 55:12, 55:16, 57:22, 61:10, 99:14
**documentation** [4] - 35:20, 35:22, 36:1, 36:3
**documents** [26] - 4:14, 5:19, 9:21, 31:24, 47:17, 58:11, 58:15, 60:21, 62:4, 62:10, 62:18, 71:19, 91:9, 91:19, 91:20, 93:14, 93:19, 94:12, 97:21, 98:6, 98:9, 98:25, 99:2, 101:10, 102:14, 103:22
**domestic** [1] - 66:20
**dominated** [1] - 49:12
**Don** [1] - 47:18
**done** [14] - 20:24, 25:21, 32:4, 33:22, 34:6, 35:1, 35:6, 35:13, 35:16, 43:10, 45:15, 59:14, 64:11, 76:22
**doubt** [1] - 80:17
**down** [21] - 9:24, 11:14, 57:19, 58:19, 61:10, 61:16, 61:17, 69:21, 77:21, 78:20, 84:13, 91:18, 92:5, 92:15, 96:23, 97:22, 97:23, 100:1, 100:18, 101:12
**Dr** [28] - 68:18, 84:16, 86:3, 86:6, 90:16, 90:22, 90:25, 92:22, 93:6, 94:23, 95:3, 95:24, 96:8, 96:16, 96:18, 97:14, 97:16, 98:7, 98:10, 98:14, 98:19, 98:25, 99:15, 101:8, 103:17, 104:2

**draft** [2] - 31:24, 54:24
**drafts** [1] - 31:11
**draw** [8] - 38:24, 39:2, 39:20, 39:23, 47:7, 53:21, 56:21, 64:15
**drawing** [2] - 66:10, 72:13
**draws** [24] - 37:16, 37:17, 38:3, 38:4, 38:13, 38:21, 39:13, 39:17, 40:4, 41:7, 52:14, 52:16, 53:3, 53:6, 53:14, 53:25, 54:3, 54:10, 55:7, 55:20, 55:25, 56:14, 56:25, 60:5
**drive** [3] - 52:16, 53:6, 54:2
**driven** [1] - 49:13
**driver** [2] - 38:9, 42:8
**drop** [9] - 77:15, 77:23, 78:13, 78:16, 78:17, 78:18, 86:2, 88:13, 93:12
**dropped** [3] - 49:23, 59:11, 85:15
**drove** [1] - 31:22
**Dupree** [1] - 86:21
**during** [20] - 20:9, 36:21, 38:20, 39:12, 41:15, 46:6, 48:2, 48:13, 48:21, 50:18, 51:8, 60:18, 61:9, 61:23, 63:10, 66:12, 73:7, 74:6, 84:16
**duties** [3] - 26:20, 27:17, 28:8
**DX-318** [2] - 24:9, 36:6
**DX-369** [1] - 53:20
**DX-45** [1] - 58:8
**DX-451** [2] - 24:10, 55:13
**DX-508** [1] - 51:17
**DX-527** [4] - 24:10, 54:21, 57:15, 58:7
**DX-736** [2] - 24:10, 25:5

**E**

**early** [7] - 18:17, 34:25, 40:11, 43:9, 46:8, 58:24, 68:2
**earn** [1] - 32:12
**earnings** [12] - 31:5, 34:14, 45:3, 49:15,

49:17, 49:25, 50:23, 52:18, 53:8, 54:4, 54:15, 58:9
**economic** [3] - 67:21, 68:10, 68:20
**Ed** [5] - 6:6, 10:12, 29:7, 29:8, 29:11
**edit** [1] - 75:11
**Edward** [1] - 9:15
**Edwards** [1] - 105:12
**EDWARDS** [2] - 2:10, 105:3
**eerie** [1] - 82:25
**effect** [1] - 97:18
**effective** [1] - 82:21
**effort** [2] - 29:15, 69:20
**either** [4] - 15:12, 26:6, 40:2, 79:24
**elaborate** [2] - 27:17, 28:8
**elaboration** [1] - 67:6
**electronic** [1] - 18:14
**eliminated** [1] - 47:5
**eliminating** [2] - 9:23, 33:24
**email** [12] - 7:9, 7:12, 7:19, 8:15, 8:17, 8:24, 10:4, 10:19, 11:2, 11:4, 47:18, 62:21
**emailed** [1] - 63:5
**enabling** [1] - 6:25
**end** [11] - 9:5, 52:12, 52:21, 53:15, 53:22, 54:18, 56:2, 56:25, 60:12, 95:23, 102:4
**ending** [1] - 51:18
**enforce** [1] - 80:14
**enjoyed** [1] - 29:11
**enlarge** [1] - 9:9
**ensure** [3] - 10:15, 30:4, 30:13
**ensuring** [5] - 30:19, 30:22, 30:25, 52:2, 54:14
**entailed** [2] - 29:23, 44:6
**entails** [1] - 79:12
**entered** [4] - 4:8, 5:9, 24:1, 24:13
**enterprise** [4] - 8:10, 26:23, 30:16, 64:25
**enterprises** [6] - 7:25, 10:14, 11:15, 64:4, 65:24, 92:5
**enterprises'** [1] - 86:13
**entire** [1] - 95:23
**entities** [2] - 78:9,

78:16
**entitled** [1] - 86:17
**entitles** [1] - 87:13
**entity** [1] - 57:5
**equally** [1] - 81:4
**equity** [2] - 48:24, 86:4
**especially** [1] - 97:4
**ESQ** [13] - 1:17, 1:20, 1:20, 1:21, 1:23, 2:2, 2:2, 2:3, 2:6, 2:6, 2:7, 2:7, 2:8
**essence** [2] - 6:6, 84:17
**essentially** [3] - 13:24, 87:23, 90:20
**establish** [1] - 81:16
**established** [3] - 54:17, 54:24, 79:23
**establishes** [1] - 85:14
**estimate** [1] - 58:16
**estimated** [2] - 7:18, 7:24
**et** [2] - 1:3, 1:7
**evaluate** [1] - 94:6
**evaluation** [1] - 48:8
**event** [11] - 83:20, 86:4, 86:7, 86:9, 90:12, 90:16, 92:22, 94:6, 94:23, 95:4, 95:5, 96:1, 96:9, 96:16, 97:16, 98:10
**events** [4] - 46:20, 97:13
**EVIDENCE** [1] - 3:11
**evidence** [62] - 5:9, 12:4, 15:3, 24:8, 24:13, 59:6, 59:23, 60:20, 60:22, 62:18, 63:13, 63:16, 63:18, 63:21, 64:8, 64:9, 64:21, 64:22, 65:1, 65:2, 65:16, 66:3, 66:6, 66:7, 66:16, 66:23, 67:5, 67:13, 67:14, 67:15, 69:6, 70:13, 71:20, 74:18, 75:3, 76:17, 76:20, 84:2, 84:4, 84:10, 84:11, 85:7, 85:9, 85:14, 85:16, 85:21, 85:22, 88:2, 88:5, 88:8, 88:19, 88:24, 88:25, 89:2, 89:3, 89:6, 96:14, 97:22
**evidentiary** [2] - 77:8, 85:24
**evolved** [1] - 22:23
**exact** [5] - 61:16,

61:20, 62:3, 64:20, 66:13
**exactly** [2] - 18:3, 52:6
**examination** [5] - 61:9, 61:23, 84:16, 98:8, 99:15
**examined** [1] - 98:14
**example** [1] - 32:11
**examples** [2] - 32:6, 63:23
**exceed** [2] - 55:6, 56:14
**Excel** [1] - 62:11
**excerpt** [1] - 51:19
**excerpted** [1] - 21:14
**excerpts** [1] - 22:4
**excess** [4] - 49:15, 52:19, 53:10, 54:6
**exchange** [1] - 76:23
**excluded** [2] - 16:3, 95:4
**excluding** [3] - 77:25, 94:15, 97:18
**exclusion** [1] - 92:22
**excuse** [4] - 19:17, 42:15, 55:11, 58:23
**executing** [1] - 32:1
**executive** [3] - 26:17, 27:18, 29:21
**executive's** [1] - 47:12
**Exhibit** [15] - 3:12, 3:16, 4:18, 5:5, 5:21, 7:9, 9:9, 10:3, 12:2, 24:12, 91:22, 91:23, 92:11, 99:25, 100:14
**exhibit** [7] - 12:7, 60:4, 60:5, 61:6, 61:25, 63:1, 67:19
**Exhibits** [6] - 4:17, 4:19, 4:22, 12:13, 63:2
**EXHIBITS** [1] - 3:11
**exhibits** [18] - 4:17, 12:1, 12:10, 12:18, 18:6, 24:8, 59:21, 59:22, 59:24, 60:15, 60:25, 62:24, 70:20, 71:11, 71:12, 72:10, 103:1, 103:5
**exited** [2] - 19:18, 59:9
**expect** [6] - 52:14, 53:3, 53:22, 53:25, 90:10, 102:15
**expectation** [4] - 91:15, 93:5, 93:16, 101:12
**expected** [10] -

10:13, 32:14, 37:17, 38:4, 38:7, 38:14, 38:15, 42:2, 42:13, 103:10
**expects** [2] - 37:15, 38:2
**expedite** [2] - 92:15, 100:18
**experience** [3] - 52:17, 53:7, 54:3
**expert** [2] - 66:25, 84:16
**experts** [1] - 42:1
**explain** [1] - 15:22
**explained** [2] - 61:11, 80:9
**explanation** [4] - 40:24, 91:8, 91:11, 92:9
**exposed** [1] - 60:17
**express** [6] - 79:9, 80:6, 81:22, 81:23, 82:21, 103:2
**expressed** [1] - 92:24
**expresses** [1] - 93:1
**expressly** [1] - 89:8
**extend** [1] - 7:4
**extent** [5] - 7:5, 31:18, 44:5, 45:16, 88:18
**extra** [1] - 89:4
**extrapolate** [1] - 32:21
**extrapolation** [1] - 33:4

---

## F

**F.3d** [1] - 80:21
**fact** [11] - 20:23, 32:3, 60:20, 61:20, 71:20, 78:6, 79:1, 84:15, 85:2, 86:6, 90:21
**factors** [2] - 32:13, 94:15
**facts** [2] - 77:23, 78:1
**fails** [1] - 86:10
**fair** [2] - 38:18, 102:21
**FAIRHOLME** [1] - 1:3
**fairness** [1] - 20:15
**faith** [1] - 71:14
**familiar** [1] - 51:22
**familiarize** [1] - 25:10

**Fannie** [30] - 7:21, 8:1, 8:20, 19:7, 29:12, 34:10, 34:12, 40:17, 40:21, 64:4, 64:6, 64:13, 64:22, 65:17, 66:1, 66:2, 69:17, 70:5, 70:11, 70:17, 71:1, 75:12, 75:22, 77:16, 79:24, 85:17, 88:9, 92:16, 100:19
**FANNIE** [1] - 1:10, 2:6
**Fannie/Freddie** [2] - 92:7, 100:5
**far** [6] - 12:9, 13:9, 13:10, 16:6, 29:16, 71:19
**Fargo** [3] - 26:13, 28:22, 28:24
**fascinating** [1] - 29:15
**faster** [2] - 9:23, 100:20
**favor** [2] - 78:2, 97:14
**federal** [6] - 81:2, 81:11, 81:19, 82:18, 83:1, 83:5
**FEDERAL** [1] - 1:6
**Federal** [3] - 8:12, 26:18, 26:20, 27:2, 51:17
**fee** [9] - 9:23, 53:13, 53:15, 54:9, 54:10, 54:12, 54:17, 58:2, 58:11
**few** [9] - 19:17, 36:8, 51:15, 59:11, 59:14, 61:8, 62:16, 65:4, 98:24
**fewer** [5] - 91:18, 92:6, 100:4, 101:14
**FHFA** [16] - 2:6, 6:1, 10:15, 18:23, 31:8, 36:13, 36:20, 39:15, 40:2, 40:16, 41:3, 48:2, 87:7, 87:14, 92:9
**FHFA's** [5] - 87:4, 87:8, 91:9, 91:19, 101:10
**FHFA-related** [1] - 6:1
**fiery** [1] - 59:16
**Fifth** [3] - 28:4, 28:9, 28:14
**file** [2] - 36:1, 89:19
**filed** [1] - 95:3
**files** [1] - 35:18

**filing** [1] - 44:12
**fill** [2] - 87:3, 87:9
**final** [3] - 8:23, 10:2, 69:19
**finalized** [1] - 31:11
**finance** [3] - 7:6, 26:1, 26:5
**FINANCE** [1] - 1:6
**Finance** [1] - 8:12
**financial** [42] - 7:25, 8:11, 24:17, 27:20, 27:21, 28:10, 28:11, 28:12, 29:13, 29:25, 30:2, 30:5, 30:7, 30:8, 30:14, 30:19, 30:23, 30:25, 31:2, 31:4, 31:9, 31:13, 31:16, 31:19, 32:5, 33:1, 33:3, 35:11, 38:25, 39:21, 43:12, 44:1, 44:12, 44:15, 45:10, 47:25, 49:11, 50:8, 51:6, 52:2, 52:11
**Financial** [2] - 37:5, 52:9
**financials** [1] - 60:17
**fine** [8] - 10:24, 13:1, 13:13, 14:17, 15:12, 15:24, 42:16, 64:18
**finish** [1] - 20:20
**finishing** [2] - 59:5
**first** [39] - 6:4, 10:4, 18:2, 19:1, 20:17, 21:5, 21:11, 21:19, 22:24, 29:20, 29:24, 36:9, 40:6, 45:21, 46:3, 46:18, 46:21, 51:16, 51:22, 54:13, 55:24, 59:21, 60:2, 62:17, 62:21, 62:23, 63:9, 67:18, 71:18, 71:22, 72:10, 72:24, 77:14, 78:3, 78:10, 87:1, 88:1, 95:23, 96:19
**fishing** [1] - 66:14
**five** [1] - 98:16
**FLEXNER** [1] - 1:21
**flipping** [1] - 20:21
**focus** [6] - 14:11, 32:16, 38:25, 39:21, 44:8, 77:10
**focused** [2] - 30:25, 40:5
**focuses** [1] - 97:17
**focusing** [5] - 34:23, 38:5, 48:14, 48:22, 98:21
**fodder** [1] - 98:8
**follow** [1] - 17:9

**followed** [1] - 17:10
**following** [9] - 4:9, 7:24, 11:22, 17:25, 19:19, 23:24, 24:2, 24:8, 59:10
**FOR** [5] - 1:1, 1:17, 1:20, 2:6, 3:5
**forecast** [5] - 37:15, 37:21, 38:6, 45:3, 55:13, 56:3
**forecasts** [5] - 37:22, 37:25, 38:15, 50:12, 56:15
**foregoing** [1] - 105:4
**Forest** [1] - 80:20
**forget** [1] - 71:25
**form** [2] - 27:15, 60:16
**Form** [1] - 51:17
**formally** [1] - 12:7
**former** [3] - 18:22, 19:7, 24:17
**forms** [3] - 31:6, 86:5
**forth** [2] - 51:4, 69:19
**forward** [4] - 9:20, 11:12, 18:13, 31:19
**forward-looking** [1] - 31:19
**Foster** [1] - 7:15
**four** [2] - 24:8, 100:10
**fourth** [7] - 34:25, 37:16, 38:3, 45:21, 46:2, 46:8, 55:2
**framed** [2] - 94:24, 95:24
**Francisco** [3] - 26:18, 26:21, 27:3
**frankly** [4] - 16:11, 16:15, 68:1, 83:13
**Freddie** [63] - 7:22, 8:5, 8:21, 16:23, 24:17, 25:6, 25:7, 25:15, 25:21, 25:22, 28:20, 29:12, 29:22, 30:23, 31:20, 34:10, 34:17, 34:21, 35:14, 36:6, 36:20, 38:6, 38:15, 39:16, 40:17, 40:21, 41:22, 42:25, 43:4, 45:17, 47:25, 48:2, 48:7, 48:21, 49:1, 51:23, 51:24, 55:16, 56:3, 64:5, 64:7, 64:13, 64:23, 65:18, 65:22, 66:4, 66:5, 69:18, 70:5, 70:12, 70:18, 71:2, 75:13, 75:22, 79:24,

1536

82:6, 88:9, 92:16,
100:19
  **FREDDIE** [1] - 2:7
  **Freddie's** [7] - 42:23,
45:23, 46:15, 46:18,
50:19, 77:16, 85:17
  **Friday** [4] - 10:13,
32:8, 59:5, 59:6
  **front** [4] - 13:6, 25:4,
36:5, 78:22
  **full** [4] - 20:20, 21:7,
36:21, 105:5
  **full-time** [1] - 36:21
  **fully** [2] - 71:15,
80:24
  **Fulton** [1] - 81:13
  **function** [1] - 94:14
  **fundamentally** [1] -
99:2
  **FUNDS** [1] - 1:3
  **funds** [1] - 40:20
  **future** [19] - 7:1,
29:16, 33:8, 33:13,
34:14, 41:21, 44:21,
49:22, 52:15, 52:16,
53:4, 53:6, 53:14,
54:1, 54:3, 54:10,
54:15, 58:1, 91:18
  **FYI** [1] - 8:18

# G

  **GAAP** [1] - 44:12
  **gap** [2] - 87:2, 87:9
  **gatekeeping** [1] -
94:14
  **gather** [1] - 37:6
  **gathered** [1] - 61:24
  **GDP** [5] - 66:20,
67:2, 67:4, 67:5,
67:19
  **general** [3] - 40:16,
80:14, 86:9
  **generate** [3] - 52:19,
53:9, 54:5
  **generating** [5] -
6:24, 34:11, 34:17,
34:21, 50:23
  **given** [8] - 10:24,
11:13, 16:12, 35:18,
43:21, 57:10, 62:18,
91:9
  **going-concern** [1] -
11:7
  **golding** [1] - 41:20
  **Goodhart** [1] -
103:23
  **government** [2] -
50:14, 61:11

  **grant** [1] - 85:3
  **granted** [1] - 98:12
  **graph** [3] - 69:25,
70:4, 92:11
  **grapple** [1] - 97:7
  **great** [2] - 33:3,
34:19
  **Great** [3] - 67:21,
68:8, 68:19
  **greater** [1] - 50:14
  **greatest** [1] - 93:21
  **Greg** [1] - 35:8
  **Griffin** [1] - 10:7
  **gross** [2] - 66:20,
68:13
  **GROSSMAN** [1] - 2:4
  **group** [1] - 35:7
  **GSE** [1] - 9:5
  **GSEs** [5] - 6:24, 7:4,
29:17, 49:2, 91:17
  **GSEs'** [1] - 91:2
  **guess** [3] - 66:23,
76:13, 102:8
  **guidance** [1] - 14:15
  **guns** [1] - 72:16

# H

  **Haldeman** [2] - 29:7,
29:8
  **half** [3] - 13:15, 40:6
  **HAMISH** [1] - 1:20
  **Hamish** [2] - 18:4,
87:18
  **Hampshire** [1] - 1:18
  **hand** [2] - 23:15,
55:2
  **handed** [1] - 20:25
  **handful** [1] - 102:14
  **handle** [1] - 102:16
  **handling** [1] - 12:19
  **hands** [1] - 80:16
  **happy** [3] - 14:15,
25:12, 87:21
  **harbor** [1] - 9:24
  **harm** [10] - 77:11,
77:14, 77:15, 77:23,
85:10, 85:12, 86:1,
86:15, 88:14, 89:10
  **harmed** [3] - 78:18,
89:7
  **hartman** [1] - 68:14
  **Hartman** [5] - 59:20,
61:18, 63:12, 67:25,
68:15
  **Hartman's** [4] -
63:10, 64:8, 65:13,
74:6
  **head** [2] - 26:23

  **headed** [1] - 52:9
  **header** [6] - 5:23,
7:9, 7:12, 9:9, 9:13,
10:6
  **heading** [1] - 72:25
  **heads** [1] - 9:19
  **heads-up** [1] - 9:19
  **hear** [2] - 90:1, 90:4
  **heard** [4] - 11:19,
62:17, 84:15, 100:1
  **hedging** [1] - 30:8
  **held** [5] - 81:2,
81:20, 81:22, 83:11,
89:6
  **helpful** [1] - 15:10
  **helping** [1] - 68:8
  **HERA** [1] - 87:3
  **HERA's** [1] - 87:5
  **hereby** [1] - 105:3
  **Herr** [1] - 80:20
  **HERR** [1] - 80:20
  **hi** [1] - 10:23
  **high** [2] - 25:16,
25:17
  **high-level** [2] -
25:16, 25:17
  **higher** [4] - 40:21,
85:18, 85:22, 89:1
  **highlighted** [1] -
9:12
  **hired** [2] - 28:17,
29:7
  **Hoffman** [11] - 18:21,
19:4, 19:10, 22:16,
23:9, 51:12, 90:8,
94:18, 94:20, 102:12
  **HOFFMAN** [22] - 2:6,
18:20, 19:4, 19:10,
39:3, 39:7, 39:10,
51:12, 51:14, 90:8,
94:19, 102:12,
102:18, 102:21,
103:9, 103:12,
103:15, 103:17,
103:19, 103:21,
104:1, 104:4
  **hold** [2] - 9:18, 78:9
  **home** [1] - 59:1
  **Home** [4] - 26:18,
26:20, 27:2, 51:17
  **Honor** [128] - 4:1,
4:12, 4:23, 5:10, 5:13,
11:19, 11:24, 12:13,
12:16, 12:22, 13:13,
13:18, 14:24, 15:4,
15:17, 15:19, 15:25,
16:14, 17:23, 17:24,
18:20, 19:23, 20:12,
20:21, 21:7, 21:13,
22:2, 22:8, 22:22,

23:19, 24:5, 24:14,
24:25, 59:17, 59:20,
59:21, 59:25, 60:1,
60:2, 60:14, 60:19,
60:24, 61:8, 61:14,
61:15, 62:6, 62:15,
62:25, 64:6, 64:11,
66:22, 67:16, 67:17,
68:1, 68:5, 68:7,
68:15, 69:10, 70:7,
70:9, 71:8, 71:13,
71:17, 73:6, 73:19,
74:4, 76:2, 76:15,
77:3, 78:3, 79:13,
81:16, 84:10, 84:15,
85:6, 86:3, 86:14,
87:17, 87:18, 87:20,
89:14, 89:18, 89:25,
90:1, 90:5, 90:11,
91:11, 91:20, 91:24,
92:20, 93:8, 93:22,
93:25, 94:1, 94:2,
94:6, 94:10, 94:13,
94:17, 94:19, 94:25,
95:10, 95:22, 96:15,
96:24, 97:13, 98:13,
99:19, 99:23, 100:1,
100:8, 100:22,
100:23, 101:1, 101:7,
101:16, 101:19,
101:24, 102:5,
102:12, 102:18,
102:21, 102:23,
103:15, 103:21,
104:1, 104:4
  **Honor's** [2] - 61:5,
71:4
  **HONORABLE** [1] -
1:14
  **hopefully** [1] - 58:25
  **Hosford** [3] - 21:21,
21:22, 21:23
  **hour** [2] - 13:14,
23:22
  **hours** [2] - 29:9,
103:13
  **house** [1] - 42:3
  **HOUSING** [1] - 1:6
  **Housing** [1] - 8:12
  **housing** [2] - 7:6,
29:17
  **Hume** [2] - 18:4,
87:19
  **HUME** [3] - 1:20,
18:3, 87:18

# I

  **i.e** [1] - 81:11
  **IAN** [1] - 2:6

  **Ian** [7] - 18:20, 19:4,
19:10, 51:12, 90:8,
94:19, 102:12
  **idea** [1] - 17:12
  **identical** [1] - 87:23
  **identification** [1] -
23:3
  **identified** [1] - 16:6
  **identify** [2] - 17:10,
17:15
  **identifying** [1] - 30:3
  **identity** [1] - 16:10
  **III** [2] - 78:5, 85:2
  **illustrative** [1] - 69:8
  **imagine** [2] - 14:9,
14:12
  **immaterial** [1] -
90:21
  **immediate** [1] -
92:17
  **impact** [8] - 12:6,
12:9, 42:23, 42:25,
43:4, 90:22, 90:23,
92:17
  **impaired** [1] - 89:7
  **impairment** [2] -
88:12, 88:16
  **implied** [2] - 79:7,
87:2
  **implying** [1] - 95:25
  **importance** [1] -
29:12
  **important** [2] -
29:13, 92:10
  **improve** [2] - 38:25,
39:21
  **improvements** [1] -
50:20
  **IN** [2] - 1:10, 3:11
  **inability** [2] - 97:11,
101:20
  **inaccurate** [4] -
16:15, 25:18, 60:9,
62:2
  **INC** [1] - 1:3
  **inclination** [1] - 41:6
  **include** [4] - 26:7,
30:12, 57:18, 78:7
  **included** [1] - 27:21
  **including** [6] - 16:24,
31:11, 42:7, 56:1,
80:2, 80:6
  **income** [25] - 8:1,
8:5, 9:23, 34:11,
34:18, 34:19, 34:22,
38:7, 38:9, 38:10,
38:16, 45:9, 45:13,
52:18, 52:19, 53:8,
53:9, 53:10, 54:4,
54:5, 54:6, 55:7,

57:15, 57:19
**increase** [1] - 100:10
**increased** [4] - 91:2, 95:7, 96:17, 99:12
**increasing** [1] - 6:9
**increasingly** [3] - 52:16, 53:6, 54:2
**indeed** [2] - 59:24, 60:22
**indicated** [10] - 11:10, 13:17, 14:1, 38:6, 38:15, 43:8, 48:17, 54:13, 58:12, 63:4
**indicates** [1] - 36:10
**indication** [1] - 62:2
**indicator** [1] - 68:10
**indiscriminantly** [1] - 99:4
**individual** [1] - 35:8
**individual's** [1] - 47:1
**individuals** [1] - 78:8
**indulge** [1] - 102:18
**indulgence** [1] - 73:16
**inevitable** [1] - 29:16
**inference** [3] - 64:15, 66:10, 96:14
**information** [3] - 25:13, 63:16, 69:17
**informed** [1] - 10:14
**injured** [1] - 88:2
**injury** [6] - 77:11, 78:5, 78:12, 79:1, 85:2, 88:11
**input** [1] - 42:1
**inputs** [1] - 42:6
**instead** [2] - 66:7, 88:4
**instituting** [1] - 7:3
**instrument** [1] - 48:24
**insufficient** [2] - 85:7, 85:9
**insurance** [2] - 27:12, 27:16
**intangible** [1] - 80:12
**intended** [2] - 92:15, 100:18
**intention** [1] - 80:19
**interest** [4] - 30:9, 41:6, 50:6, 87:15
**interested** [2] - 29:3, 29:8
**interests** [4] - 49:4, 87:5, 87:6, 87:7
**internally** [1] - 39:16, 40:2
**interpret** [2] - 38:22,

39:18
**interrupt** [1] - 43:14
**introduce** [3] - 15:22, 16:13, 21:12
**invalid** [2] - 86:8, 86:10
**invested** [4] - 65:19, 65:23, 66:2, 66:6
**investment** [3] - 27:22, 27:23, 54:16
**investor** [7] - 95:7, 95:8, 95:9, 95:15, 96:15, 97:5, 101:5
**investors** [3] - 92:6, 96:1, 100:4
**investors'** [1] - 91:2
**involve** [1] - 45:2
**involved** [8] - 17:14, 27:11, 31:18, 31:24, 32:7, 33:18, 34:8, 35:24
**ipse** [2] - 100:22, 101:8
**issuances** [1] - 91:18
**issue** [29] - 4:4, 11:7, 13:18, 18:6, 62:12, 66:23, 67:2, 67:4, 79:15, 79:18, 80:25, 81:10, 88:1, 88:23, 89:25, 90:13, 90:14, 90:15, 90:25, 94:1, 94:2, 94:7, 94:8, 95:12, 96:15, 97:9, 97:11, 98:19, 102:6
**issued** [2] - 56:3, 95:13
**issues** [5] - 19:14, 86:19, 89:16, 92:7, 100:5
**item** [1] - 57:18
**items** [2] - 42:5, 43:25
**itself** [3] - 50:17, 79:11, 97:8

## J

**James** [4] - 3:6, 10:7, 18:22, 19:2
**jaws** [1] - 59:11
**Jeff** [2] - 7:15, 11:9
**Jeffrey** [1] - 36:13
**Jenkins** [1] - 63:6
**JILL** [1] - 5:14
**Jim** [1] - 11:17
**Joe** [1] - 35:10
**John** [2] - 7:14, 8:10
**JONATHAN** [1] - 2:7

**Jones** [10] - 4:1, 12:16, 12:22, 22:10, 23:9, 24:4, 24:6, 62:15, 76:16, 77:2
**JONES** [51] - 2:8, 4:1, 4:23, 5:2, 12:16, 12:22, 13:13, 15:17, 16:14, 16:19, 16:22, 17:19, 17:23, 19:21, 19:23, 20:4, 20:19, 21:13, 21:16, 21:19, 21:22, 22:2, 22:6, 22:13, 22:16, 23:19, 23:22, 24:5, 24:14, 24:16, 24:22, 24:25, 25:3, 33:10, 33:11, 57:11, 57:13, 58:18, 62:15, 65:10, 65:12, 71:8, 73:6, 74:4, 75:1, 75:4, 76:15, 76:18, 76:22, 77:2, 89:18
**Jr** [1] - 10:7
**JUDGE** [1] - 1:14
**Judge** [4] - 18:4, 59:13, 80:10, 80:22
**judgment** [12] - 12:24, 76:13, 77:5, 77:6, 78:1, 85:3, 86:17, 86:20, 87:1, 87:12, 87:13, 89:12
**July** [2] - 7:14, 95:18
**June** [7] - 6:1, 6:3, 26:4, 26:5, 27:9, 36:7, 51:18
**jurisdictional** [1] - 79:18
**jurisdictions** [2] - 82:11, 82:14
**jury** [55] - 4:7, 4:8, 11:23, 12:3, 12:20, 13:2, 13:6, 13:7, 13:17, 14:6, 14:18, 14:21, 15:8, 15:22, 16:15, 16:16, 17:12, 17:22, 18:4, 18:9, 19:17, 19:18, 20:8, 21:4, 23:17, 23:18, 23:25, 24:1, 58:23, 59:9, 59:22, 60:16, 62:9, 62:19, 63:22, 64:15, 64:16, 65:22, 66:11, 66:14, 67:23, 68:8, 70:10, 72:5, 72:6, 77:7, 85:7, 85:24, 86:14, 91:5, 91:10, 99:11, 101:1, 101:3
**JURY** [1] - 1:13
**jury's** [3] - 4:3, 16:9, 16:11

**Justice** [4] - 16:3, 16:18, 17:7, 21:24

## K

**Kaplan** [6] - 89:24, 94:21, 95:16, 97:21, 99:22, 99:24
**KAPLAN** [6] - 1:21, 89:24, 90:3, 90:5, 90:11, 99:23
**Kari** [13] - 3:8, 4:5, 13:16, 13:19, 15:9, 16:23, 20:20, 24:16, 24:22, 24:24, 25:6, 36:5, 51:15
**KARI** [1] - 25:2
**Kari's** [1] - 24:18
**KAYE** [1] - 2:8
**keep** [1] - 18:18
**KENYA** [1] - 1:20
**KESSLER** [1] - 1:24
**Keyes** [2] - 36:13, 37:2
**Keystone** [1] - 81:13
**KHALELAH** [1] - 1:20
**kind** [4] - 26:7, 48:8, 57:8
**King** [1] - 1:24
**KIRK** [1] - 1:18
**knowledge** [4] - 45:3, 52:22, 52:24, 57:4
**Kravetz** [1] - 11:25
**KRAVETZ** [27] - 2:2, 4:12, 4:16, 5:10, 5:13, 5:15, 5:20, 5:22, 6:13, 6:15, 7:8, 7:11, 8:14, 8:16, 8:23, 9:1, 9:8, 9:11, 10:2, 10:5, 10:19, 10:21, 11:1, 11:3, 11:19, 11:24, 12:13

## L

**labels** [3] - 73:13, 73:21, 73:25
**lack** [2] - 41:6, 78:5
**LAMBERTH** [1] - 1:14
**Lamberth** [1] - 18:4
**language** [1] - 101:17
**large** [5] - 6:24, 28:10, 28:23, 28:24, 67:21
**largely** [1] - 9:21

**last** [21] - 11:1, 11:10, 21:1, 25:25, 37:14, 39:25, 47:18, 55:12, 56:6, 61:22, 62:19, 67:18, 72:1, 72:7, 72:19, 87:24, 92:24, 94:10, 99:21, 100:3, 102:20
**late** [4] - 28:6, 34:24, 43:23, 76:4
**law** [28] - 12:25, 77:5, 78:1, 80:8, 80:11, 80:23, 81:3, 81:6, 81:11, 82:2, 82:3, 82:4, 82:14, 82:20, 83:2, 83:7, 84:6, 84:20, 84:21, 84:22, 85:3, 85:12, 86:17, 87:1, 87:13, 96:25
**laws** [1] - 82:11
**lawyer** [11] - 15:2, 15:7, 15:14, 15:21, 16:1, 16:2, 20:6, 21:20, 21:22, 21:23
**lawyers** [7] - 13:24, 14:5, 14:6, 14:7, 14:16, 15:13, 15:20
**Layton** [1] - 47:18
**lead** [1] - 49:16
**leading** [1] - 14:11
**learn** [1] - 46:18
**learned** [1] - 51:10
**least** [6] - 25:15, 37:2, 47:20, 58:15, 90:21, 98:7
**leave** [1] - 28:1
**leaving** [2] - 25:22, 87:9
**Lee** [2] - 14:23, 20:12
**LEE** [1] - 1:23
**left** [5] - 25:23, 27:2, 28:2, 28:14, 101:7
**legal** [23] - 18:8, 58:22, 72:9, 79:6, 79:10, 79:12, 79:20, 79:22, 80:1, 80:5, 81:3, 81:7, 81:17, 82:17, 82:22, 83:8, 83:11, 84:3, 84:6, 84:14, 84:18, 84:23, 86:23
**legally** [2] - 72:15, 77:8
**less** [2] - 36:21, 42:10
**level** [5] - 25:16, 25:17, 34:7, 34:24, 35:7
**liability** [6] - 44:14,

44:17, 44:25, 45:2, 45:13
**life** [1] - 66:3
**lifespan** [2] - 92:7, 100:5
**light** [1] - 97:11
**likely** [1] - 55:5
**likewise** [1] - 81:5
**limit** [1] - 39:24
**limited** [2] - 51:4, 88:14
**Line** [2] - 92:25
**line** [3] - 27:10, 37:14, 95:23
**liquidation** [1] - 88:4
**liquidity** [1] - 29:14
**LISA** [2] - 2:10, 105:3
**Lisa** [1] - 105:12
**list** [2] - 12:7, 62:7
**LITIGATION** [1] - 1:11
**LITOWITZ** [1] - 2:3
**lives** [2] - 7:4, 45:5
**LLC** [1] - 81:13
**LLP** [3] - 1:21, 1:24, 2:4
**loan** [2] - 100:24, 100:25
**Loan** [4] - 26:18, 26:20, 27:2, 51:17
**lobbing** [1] - 67:5
**Lockhart** [4] - 3:6, 18:22, 18:24, 19:3
**logic** [1] - 48:18
**logistical** [1] - 19:13
**Long-Term** [1] - 52:9
**long-term** [12] - 7:6, 45:2, 49:11, 50:7, 50:22, 52:11, 52:21, 97:17, 98:11, 98:21, 99:7, 99:10
**longer-term** [12] - 32:20, 33:19, 33:22, 37:15, 37:21, 93:7, 93:20, 98:13, 98:17, 98:18, 101:10, 101:14
**look** [15] - 17:17, 17:22, 20:19, 32:17, 32:20, 32:22, 44:19, 52:8, 52:13, 55:2, 91:22, 91:23, 91:24, 92:1, 92:24
**looked** [3] - 31:12, 93:6, 93:7
**looking** [3] - 21:13, 31:19, 59:5
**looks** [1] - 91:17
**loss** [1] - 78:20
**loud** [1] - 20:23
**LOUIS** [1] - 2:7

**lower** [1] - 34:6
**lump** [1] - 70:18
**lumped** [1] - 73:4
**lumping** [1] - 70:16
**lunch** [1] - 104:3

# M

**MAC** [2] - 1:10, 2:7
**Mac** [29] - 7:22, 8:5, 16:23, 24:18, 25:6, 25:7, 25:23, 28:17, 28:20, 29:12, 29:22, 34:10, 35:14, 36:6, 36:20, 39:16, 40:17, 40:21, 51:23, 51:25, 55:16, 56:3, 64:8, 64:13, 69:18, 82:6, 92:16, 100:19
**Mac's** [4] - 30:23, 43:1, 43:4, 45:18
**Mae** [14] - 7:21, 8:1, 8:20, 19:7, 29:12, 34:10, 34:12, 40:17, 40:21, 64:7, 64:13, 69:18, 92:16, 100:19
**MAE** [1] - 2:6
**MAE/FREDDIE** [1] - 1:10
**Mailloux** [2] - 35:10, 35:25
**maintain** [2] - 43:2, 100:13
**maintaining** [1] - 34:8
**major** [1] - 42:7
**majority** [6] - 79:25, 80:4, 82:16, 82:18, 83:5, 83:17
**male** [2] - 24:24, 25:1
**manage** [1] - 31:22
**managed** [4] - 27:20, 27:22, 28:10, 30:15
**management** [14] - 27:20, 27:23, 28:12, 30:6, 30:7, 30:10, 30:12, 30:15, 41:19, 46:16, 46:18, 46:23, 46:24, 47:19
**management's** [1] - 47:15
**manager** [3] - 8:10, 26:23, 30:17
**managing** [2] - 30:24, 35:11
**manifest** [1] - 80:18
**manipulate** [2] - 61:18, 61:19
**Mario** [1] - 9:14

**marked** [4] - 25:5, 36:6, 51:16
**market** [6] - 57:6, 57:8, 91:16, 91:17, 96:13, 99:13
**marketing** [1] - 26:23
**Mary** [1] - 5:25
**Mason** [3] - 84:16, 86:6, 89:8
**Mason's** [1] - 86:3
**Massachusetts** [1] - 2:9
**material** [2] - 43:3, 51:9
**mathematics** [2] - 26:1, 26:4
**matter** [9] - 12:25, 77:5, 78:1, 80:14, 85:3, 86:17, 87:1, 87:13, 91:14
**maturities** [1] - 98:18
**maturity** [4] - 92:18, 98:15, 99:9, 101:11
**maximum** [3] - 56:14, 56:17, 56:20
**Mayopoulos** [3] - 3:7, 19:6, 19:9
**MBA** [4] - 26:1, 26:4, 26:9, 26:14
**MBS** [1] - 92:17
**MC** [1] - 1:10
**McFarland** [2] - 15:5, 20:9
**McFarland's** [1] - 15:7
**McGuire** [10] - 5:20, 6:13, 7:8, 8:14, 9:8, 10:2, 91:22, 91:23, 99:25, 100:14
**mean** [7] - 30:1, 38:5, 38:14, 43:14, 68:18, 72:9, 87:20
**meaning** [1] - 75:22
**meaningful** [1] - 49:18
**measure** [1] - 88:14
**measurement** [1] - 88:16
**meeting** [10] - 6:2, 6:6, 6:10, 10:10, 10:12, 11:11, 29:8, 36:7, 36:10, 36:13
**meetings** [6] - 29:1, 32:8, 32:16, 36:19, 38:20, 39:12
**MELTZER** [1] - 1:24
**member** [1] - 46:15
**members** [12] - 18:4, 41:19, 46:23, 77:12, 78:3, 84:25, 85:7,

85:8, 85:9, 88:1, 88:2
**memory** [2] - 37:24, 56:13
**mention** [1] - 42:8
**mentioned** [3] - 43:15, 50:22, 66:18
**merged** [3] - 64:12, 65:18, 69:17
**merits** [4] - 92:21, 94:4, 97:11, 99:18
**message** [1] - 10:16
**met** [1] - 29:9
**methodology** [12] - 61:3, 61:16, 61:17, 91:6, 94:15, 94:16, 97:15, 98:7, 98:24, 99:3, 99:10, 99:16
**Metz** [1] - 35:8
**Michael** [1] - 5:25
**middle** [1] - 21:16
**might** [2] - 34:13, 66:22
**Miller** [1] - 5:25
**mind** [5] - 51:21, 53:20, 55:1, 55:18, 77:18
**minimis** [1] - 9:24
**minor** [1] - 18:6
**minutes** [3] - 17:19, 19:17, 36:6
**misleading** [1] - 16:15
**miss** [1] - 73:17
**missed** [1] - 97:4
**missing** [1] - 20:16
**modeling** [1] - 8:12
**models** [1] - 31:23
**Moffett** [2] - 28:19, 29:5
**moment** [1] - 82:25
**Monday** [1] - 59:6
**money** [3] - 38:23, 39:19, 40:4
**monitoring** [1] - 30:4
**Montgomery** [2] - 95:19, 96:23
**month** [3] - 32:11, 32:12, 32:15
**monthly** [1] - 31:13
**months** [3] - 29:6, 39:25, 40:6
**morning** [2] - 6:2, 103:23
**mornings** [1] - 32:9
**morphed** [1] - 97:25
**mortgage** [1] - 86:13
**Mortgage** [1] - 51:17
**most** [5] - 30:15, 37:3, 83:24, 92:24, 98:7

**Motion** [1] - 3:10
**motion** [21] - 12:11, 12:24, 13:2, 76:12, 76:13, 89:15, 89:20, 90:1, 91:21, 94:24, 94:25, 95:3, 95:9, 95:10, 96:7, 96:20, 97:6, 99:19, 100:24, 102:9, 102:10
**move** [8] - 4:13, 9:20, 12:3, 24:8, 77:4, 92:11, 96:10, 102:15
**moved** [5] - 62:24, 63:7, 63:17, 65:8, 67:11
**moving** [4] - 65:14, 71:10, 74:12, 74:18
**MR** [112] - 4:1, 4:12, 4:16, 4:23, 5:2, 5:10, 5:13, 5:15, 5:20, 5:22, 6:13, 6:15, 7:8, 7:11, 8:14, 8:16, 8:23, 9:1, 9:8, 9:11, 10:2, 10:5, 10:19, 10:21, 11:1, 11:3, 11:19, 11:24, 12:13, 12:16, 12:22, 13:13, 14:23, 15:5, 15:17, 15:25, 16:14, 16:19, 16:22, 17:4, 17:19, 17:23, 17:24, 18:3, 18:20, 19:4, 19:10, 19:21, 19:23, 20:4, 20:12, 20:19, 21:13, 21:16, 21:19, 21:22, 22:2, 22:6, 22:13, 22:16, 22:22, 23:8, 23:19, 23:22, 24:5, 24:14, 24:15, 24:16, 24:22, 24:25, 25:3, 33:11, 39:3, 39:7, 39:10, 51:12, 51:14, 57:11, 57:13, 58:18, 62:15, 65:10, 65:12, 71:8, 73:6, 74:4, 75:1, 75:4, 76:15, 76:18, 76:22, 77:2, 87:18, 89:18, 89:24, 90:3, 90:5, 90:8, 90:11, 94:19, 99:23, 102:12, 102:18, 102:21, 103:9, 103:12, 103:15, 103:17, 103:19, 103:21, 104:1, 104:4
**MS** [56] - 59:13, 59:16, 59:19, 65:9, 65:11, 67:17, 68:14, 69:1, 69:4, 69:7, 69:10, 69:13, 69:16,

69:23, 69:25, 70:3,
70:6, 70:9, 70:15,
70:19, 70:23, 70:25,
71:3, 71:6, 71:13,
71:17, 71:24, 72:1,
72:3, 72:12, 72:17,
72:23, 73:2, 73:5,
73:9, 73:12, 73:16,
73:19, 74:2, 74:11,
74:13, 74:17, 74:21,
74:23, 75:6, 75:11,
75:14, 75:18, 75:22,
75:25, 76:2, 76:5,
76:9, 76:11, 102:23,
103:5
   **myriad** [1] - 95:2

### N

**Naa** [1] - 7:16
**name** [1] - 103:8
**names** [1] - 36:25
**Nancy** [2] - 12:14,
66:19
   **national** [1] - 28:25
   **naturally** [1] - 44:22
   **nature** [3] - 43:5,
63:13, 66:19
   **near** [1] - 37:12
   **necessarily** [3] -
88:21, 89:7, 97:17
   **necessary** [2] - 30:3,
87:22
   **need** [15] - 4:4, 6:18,
11:15, 16:12, 17:15,
25:10, 25:11, 47:7,
60:20, 75:20, 75:22,
76:11, 76:23, 85:12,
97:10
   **needed** [1] - 29:1
   **needs** [1] - 69:3
   **negotiating** [1] -
6:17
   **net** [37] - 7:3, 8:1,
8:3, 8:4, 8:5, 8:7, 8:8,
8:21, 8:22, 9:3, 9:23,
34:19, 34:22, 38:7,
38:9, 46:19, 46:25,
48:4, 49:6, 50:2, 50:9,
50:13, 52:19, 53:9,
54:5, 86:12, 88:3,
88:5, 88:21, 89:3,
89:5, 89:8, 91:13,
92:9, 96:2, 96:8,
96:13
   **never** [13] - 6:18,
40:13, 40:23, 41:1,
85:20, 85:23, 88:3,
89:9, 94:1, 94:2, 96:8,

102:2
   **nevertheless** [1] -
86:23
   **New** [4] - 1:18, 1:22,
2:5
   **new** [6] - 6:23, 51:3,
71:12, 92:7, 95:20,
100:5
   **news** [1] - 18:2
   **next** [13] - 6:14, 8:15,
10:19, 18:19, 19:12,
19:16, 24:7, 24:16,
25:25, 36:12, 68:11,
71:18, 76:12
   **next-to-the-last** [1] -
25:25
   **nice** [1] - 56:24
   **Nicholas** [1] - 10:9
   **Nick** [2] - 10:25, 11:6
   **none** [9] - 15:9, 16:5,
16:6, 48:5, 62:1,
78:24, 88:9
   **nonresponsive** [1] -
93:17
   **Northwest** [5] - 1:18,
1:22, 2:9, 2:12,
105:14
   **Nos** [4] - 3:12, 3:16,
5:5, 24:12
   **notably** [1] - 83:24
   **notations** [1] - 19:25
   **note** [2] - 20:21, 27:6
   **noted** [3] - 37:14,
60:19, 94:21
   **notes** [1] - 105:5
   **nothing** [2] - 20:13,
58:18
   **notice** [1] - 20:22
   **notion** [4] - 79:2,
79:13, 101:3, 101:16
   **November** [1] - 28:4
   **number** [6] - 6:12,
42:6, 44:10, 56:24,
65:20, 89:2
   **numbers** [10] - 12:7,
60:21, 61:24, 61:25,
62:11, 63:1, 63:16,
64:19, 66:15, 69:19
   **numeral** [1] - 6:9

### O

**object** [8] - 4:23,
12:18, 14:14, 63:20,
65:15, 71:9, 71:11,
74:19
   **objected** [3] - 63:15,
63:18, 63:24
   **objection** [23] - 12:5,

12:8, 12:19, 22:20,
22:22, 22:24, 23:2,
24:9, 24:15, 60:4,
60:11, 61:12, 61:13,
64:10, 66:24, 67:9,
67:12, 69:11, 73:3,
76:3, 76:7, 102:1,
102:16
   **objections** [6] - 5:1,
5:3, 12:20, 65:4,
68:23, 99:17
   **obligation** [4] -
52:16, 53:5, 54:2,
55:6
   **obligations** [2] -
38:8, 38:17
   **observed** [3] - 36:18,
86:11, 101:1
   **observers** [1] - 9:6
   **obtained** [1] - 57:5
   **obvious** [2] - 91:8,
101:12
   **obviously** [9] -
18:13, 18:14, 25:10,
33:14, 40:22, 79:17,
90:5, 90:11, 95:22
   **occasionally** [1] -
28:25
   **October** [2] - 28:6,
71:20
   **OF** [4] - 1:1, 1:13,
25:2
   **offer** [1] - 72:2
   **offered** [2] - 91:4,
93:23
   **offering** [1] - 91:5
   **office** [1] - 8:11
   **officer** [4] - 24:17,
26:18, 26:22, 47:25
   **Official** [1] - 2:11
   **official** [1] - 105:12
   **offset** [4] - 45:2,
45:9, 45:13
   **often** [2] - 35:16,
101:24
   **once** [3] - 19:4,
49:22, 80:11
   **one** [45] - 4:4, 13:18,
13:24, 14:6, 14:7,
15:25, 17:13, 20:22,
37:2, 37:22, 43:25,
46:9, 58:11, 58:15,
60:2, 60:3, 61:8,
64:18, 65:7, 65:12,
66:17, 67:8, 68:4,
68:6, 69:9, 69:10,
70:18, 73:2, 74:21,
77:16, 77:23, 80:17,
86:2, 88:13, 89:3,
91:4, 93:2, 93:10,

93:22, 94:3, 94:6,
98:12, 101:6, 101:20
   **one-day** [3] - 77:16,
77:23, 86:2
   **ones** [10] - 63:24,
67:11, 70:22, 70:25,
72:23, 72:24, 73:7,
73:13, 78:20, 80:25
   **open** [3] - 18:1, 19:3,
19:9
   **operating** [4] -
26:17, 26:22, 51:3,
57:10
   **operation** [1] - 30:4
   **operationally** [1] -
47:5
   **opinion** [14] - 51:11,
57:7, 86:5, 90:25,
91:4, 93:1, 93:22,
95:3, 95:13, 95:18,
96:22, 97:3, 97:15,
99:16
   **opponent** [1] - 15:2
   **opponent's** [1] -
15:3
   **opportunity** [1] -
18:10
   **opposed** [1] - 36:18
   **opposition** [1] - 95:1
   **optimistic** [1] - 42:4
   **orally** [1] - 13:2
   **orange** [1] - 64:2
   **order** [5] - 44:1,
62:11, 76:12, 80:5,
89:22
   **ordinary** [1] - 9:25
   **Oregon** [1] - 26:2
   **organization** [1] -
34:7
   **orient** [1] - 68:8
   **original** [1] - 96:18
   **otherwise** [3] - 4:25,
50:11, 76:24
   **outlook** [2] - 49:22,
55:14
   **outside** [3] - 11:23,
35:20, 43:24
   **overcome** [2] -
97:12, 99:17
   **overruled** [1] - 5:3
   **oversaw** [1] - 27:23
   **oversight** [1] - 32:1
   **overview** [1] - 6:5
   **overwhelming** [6] -
79:25, 80:4, 82:15,
82:18, 83:5, 83:17
   **overwhelmingly** [3] -
81:6, 81:19, 81:22
   **own** [6] - 85:25, 86:3,
91:9, 91:19, 96:7,

101:10
   **owned** [1] - 88:15
   **owns** [1] - 88:17
   **Oxley** [1] - 30:13

### P

**P.M** [1] - 1:20
   **p.m** [5] - 1:7, 4:9,
19:19, 24:2, 59:10
   **page** [5] - 21:17,
36:9, 37:14, 51:21,
63:8
   **Page** [22] - 3:10,
20:25, 21:10, 21:16,
21:24, 22:1, 22:4,
22:12, 37:4, 39:5,
39:8, 52:7, 52:25,
53:21, 55:1, 55:18,
57:15, 62:23, 91:23,
92:12, 95:19, 100:15
   **PAGE** [1] - 3:11
   **pages** [2] - 20:17,
53:1
   **paid** [13] - 40:19,
50:10, 64:4, 64:7,
64:8, 64:13, 64:22,
64:23, 64:24, 66:5,
84:3, 84:5, 84:12
   **Paige** [1] - 30:16
   **pan** [1] - 98:1
   **panel** [2] - 4:7, 23:25
   **paragraph** [14] -
25:25, 29:20, 36:9,
36:12, 37:12, 41:5,
52:8, 52:13, 53:2,
53:21, 91:24, 95:20,
100:3
   **paraphrase** [1] -
96:10
   **part** [24] - 10:4, 11:1,
12:1, 13:25, 14:7,
14:19, 15:2, 15:8,
15:11, 20:7, 20:10,
22:11, 22:17, 22:25,
23:1, 24:19, 29:15,
30:21, 43:8, 51:13,
57:12, 68:7, 87:3
   **participating** [1] -
36:18
   **particular** [5] -
79:17, 84:5, 92:23,
96:2, 103:1
   **particularly** [1] -
79:16
   **parties** [2] - 4:5,
62:22
   **parts** [4] - 16:25,
17:13, 99:5

**party** [1] - 80:18
**pass** [2] - 59:25, 103:2
**passages** [1] - 96:7
**passed** [1] - 19:23
**passive** [1] - 6:11
**passivity** [1] - 6:9
**path** [1] - 42:3
**pause** [1] - 96:3
**pay** [3] - 6:25, 53:13, 54:9
**payable** [3] - 52:20, 53:10, 54:6
**paying** [3] - 40:18, 40:21, 48:7
**payment** [3] - 47:6, 58:2, 58:10
**payments** [2] - 48:16, 58:13
**Pennsylvania** [1] - 1:25
**people** [15] - 16:8, 16:10, 35:6, 36:23, 36:24, 43:15, 44:2, 78:15, 78:19, 78:23, 78:24, 85:25, 88:15, 88:20, 94:11
**percent** [7] - 7:1, 40:12, 48:19, 49:15, 50:15, 88:8, 89:5
**performance** [5] - 8:11, 39:1, 39:22, 41:21, 49:11
**performed** [2] - 43:9, 44:5
**perhaps** [2] - 48:18, 50:24
**period** [28] - 32:22, 33:5, 33:7, 37:24, 39:25, 40:5, 45:25, 46:6, 48:3, 48:15, 48:22, 49:14, 49:16, 49:19, 50:18, 51:18, 52:17, 53:7, 54:3, 57:1, 65:20, 66:21, 83:6, 84:13, 97:20
**period-to-period** [3] - 52:17, 53:7, 54:3
**periodic** [2] - 43:25, 58:2
**periods** [5] - 46:9, 50:13, 52:15, 53:4, 54:1
**permissible** [1] - 96:14
**permitted** [2] - 20:8, 96:12
**persists** [1] - 89:10
**person** [3] - 17:11, 17:13, 101:25

**personal** [4] - 80:12, 83:22, 83:25, 84:8
**personally** [1] - 32:1
**perspective** [1] - 50:5
**pessimistic** [1] - 42:3
**Peter** [1] - 7:16
**phone** [3] - 4:6, 11:20, 28:19
**pick** [4] - 39:8, 57:11, 99:3, 99:4
**piece** [3] - 80:1, 80:5, 80:12
**pieces** [2] - 15:6
**place** [6] - 6:7, 7:3, 21:11, 40:20, 41:17, 42:25
**plaintiff** [1] - 17:6
**Plaintiff** [1] - 79:21
**Plaintiff's** [2] - 4:19, 79:19
**Plaintiffs** [40] - 1:4, 4:11, 4:13, 5:11, 11:25, 12:23, 13:1, 13:23, 14:13, 14:23, 16:1, 16:19, 16:20, 18:5, 18:7, 20:14, 22:6, 23:10, 23:11, 62:24, 63:1, 63:5, 64:18, 65:14, 66:12, 77:9, 78:11, 79:4, 79:23, 81:17, 85:6, 85:13, 86:15, 87:19, 89:24, 95:2, 95:5, 97:1, 98:23, 99:24
**PLAINTIFFS** [4] - 1:18, 1:20, 2:2, 3:5
**Plaintiffs'** [37] - 3:12, 4:17, 5:5, 9:9, 10:3, 12:2, 12:6, 13:21, 13:25, 14:7, 14:10, 14:12, 14:19, 16:22, 17:1, 20:1, 20:7, 20:9, 20:10, 20:25, 21:2, 21:5, 21:10, 22:8, 22:11, 22:20, 24:20, 56:7, 57:12, 77:14, 79:1, 79:10, 84:15, 96:7, 97:11, 98:1, 103:23
**plaintiffs'** [2] - 22:5, 22:21
**plan** [3] - 32:5, 33:1, 33:3
**planning** [6] - 27:21, 28:11, 31:16, 35:11, 43:12, 103:7
**play** [5] - 13:24, 14:19, 20:7, 20:10,

22:7
**played** [2] - 24:23, 29:13
**playing** [6] - 14:6, 15:23, 22:17, 24:19, 51:13, 57:11
**plenty** [1] - 68:19
**PLLC** [1] - 1:18
**point** [19] - 22:13, 55:2, 55:24, 61:23, 64:15, 65:21, 66:11, 66:13, 71:12, 71:19, 83:16, 90:24, 92:20, 93:18, 95:16, 97:5, 98:25, 101:6
**pointed** [2] - 94:3, 95:1
**points** [4] - 62:16, 89:12, 92:6, 100:4
**policy** [1] - 6:12
**policy-relevant** [1] - 6:12
**political** [1] - 47:23
**PORTER** [1] - 2:8
**portfolio** [21] - 9:24, 27:22, 27:23, 42:9, 49:14, 49:16, 49:23, 51:2, 91:13, 93:4, 97:20, 97:24, 98:5, 99:7, 99:8, 100:2, 100:7, 100:9, 100:10, 100:12, 100:19
**portfolios** [1] - 86:13
**portion** [7] - 6:14, 7:10, 8:24, 9:12, 13:19, 21:5, 21:14
**portions** [1] - 16:24, 19:24
**position** [10] - 6:23, 29:24, 60:7, 60:14, 60:24, 61:14, 61:15, 74:2, 80:9, 82:15
**positions** [1] - 36:16
**positive** [1] - 54:15
**positively** [1] - 96:2
**possibility** [2] - 6:20, 46:10
**possible** [4] - 6:17, 31:14, 58:13, 86:8
**possibly** [3] - 59:5, 70:10
**post** [10] - 8:3, 8:7, 8:20, 78:8, 78:12, 78:15, 78:23, 79:2, 79:5, 84:12
**post-dividends** [3] - 8:3, 8:7, 8:20
**post-third** [7] - 78:8, 78:12, 78:15, 78:23, 79:2, 79:5, 84:12

**potential** [4] - 45:8, 48:3, 50:8, 97:18
**power** [1] - 49:25
**PowerPoint** [3] - 63:11, 63:15, 65:13
**PR** [1] - 6:21
**pre** [2] - 8:4, 8:8
**pre-dividends** [2] - 8:4, 8:8
**preceded** [1] - 48:12
**predictions** [1] - 83:1
**preference** [2] - 22:14, 88:4
**PREFERRED** [1] - 1:10
**preferred** [8] - 48:23, 53:5, 65:18, 65:23, 66:2, 66:5, 92:14, 100:17
**prejudice** [1] - 66:24
**preparation** [2] - 31:19, 33:18
**prepare** [1] - 41:22
**prepared** [4] - 19:12, 35:22, 51:7, 102:25
**preparing** [1] - 41:21
**presence** [1] - 11:23
**present** [9] - 13:1, 14:2, 14:11, 17:7, 36:12, 63:1, 64:19, 85:5, 99:11
**presentation** [5] - 15:2, 18:11, 37:7, 60:12, 94:21
**presented** [1] - 18:23
**presenting** [2] - 24:18, 64:3
**presently** [1] - 48:5
**preservation** [1] - 89:21
**preserved** [1] - 86:22
**president** [3] - 26:17, 27:18, 29:21
**press** [1] - 47:21
**presumably** [1] - 63:12
**pretrial** [2] - 95:2, 95:13
**pretty** [1] - 59:4
**prevailing** [1] - 83:20
**previous** [3] - 6:6, 9:22, 57:17
**price** [13] - 42:3, 77:15, 78:13, 78:16, 78:17, 78:18, 78:19, 84:4, 84:11, 84:13, 86:11, 88:25, 98:3
**prices** [1] - 77:16, 77:21, 77:24, 78:21,

84:17, 85:15, 85:17, 85:18, 85:22, 86:2, 95:6
**pricing** [1] - 51:3
**primary** [1] - 31:4
**principle** [2] - 80:23
**private** [11] - 49:1, 49:7, 50:3, 50:6, 57:6, 57:8, 65:18, 65:23, 66:1, 66:5, 89:6
**problem** [1] - 43:20
**problems** [2] - 18:12, 58:21
**procedure** [1] - 15:1
**proceed** [1] - 4:11
**Proceedings** [1] - 104:7
**proceedings** [8] - 4:9, 11:22, 17:25, 19:19, 23:24, 24:2, 59:10, 105:6
**process** [4] - 30:24, 34:16, 35:12, 47:5
**produce** [1] - 31:23
**produced** [1] - 105:6
**product** [1] - 66:20
**products** [1] - 51:3
**professional** [1] - 25:14
**professionally** [1] - 25:22
**Professor** [1] - 89:8
**profit** [1] - 50:20
**profitability** [3] - 42:23, 43:1, 43:4
**profitable** [1] - 11:12
**profits** [2] - 88:9, 89:5
**program** [1] - 26:14
**projection** [2] - 32:20, 33:16
**projections** [19] - 31:20, 31:25, 32:4, 32:7, 32:9, 32:10, 32:23, 32:24, 33:18, 33:23, 35:12, 41:21, 41:22, 43:13, 57:15, 57:18, 58:1, 58:5, 58:6
**proper** [4] - 67:12, 67:13, 87:8, 99:15
**property** [7] - 27:12, 27:15, 80:2, 80:6, 80:13, 80:14, 80:15
**proposed** [2] - 9:21, 13:23
**prospects** [3] - 50:19, 50:22, 51:4
**protecting** [1] - 54:14

protocol [1] - 17:9
prove [1] - 79:21
proved [2] - 85:10, 86:15
proven [1] - 85:12
provide [2] - 26:19, 60:16
provided [4] - 6:5, 40:18, 40:24, 50:12
provision [7] - 81:18, 81:20, 82:19, 83:6, 83:8, 87:6
Prussia [1] - 1:24
PSPA [2] - 9:16, 9:20
PSPAs [7] - 6:18, 6:22, 38:8, 38:17, 56:9, 100:13, 100:25
public [3] - 10:13, 87:7, 87:16
publicly [1] - 34:12
published [2] - 19:3, 19:9
pull [11] - 7:8, 17:11, 61:16, 61:17, 64:2, 65:3, 65:6, 65:12, 69:21, 72:21, 95:17
pulled [2] - 61:10
pulling [4] - 62:3, 65:21, 65:22, 66:9
purchase [7] - 52:14, 53:4, 53:12, 54:1, 54:8, 92:14, 100:17
PURCHASE [1] - 1:10
purchased [2] - 78:9, 85:1
purchaser [4] - 79:7, 80:3, 84:12
purchasers [7] - 78:8, 78:12, 78:15, 78:24, 79:2, 79:5, 84:24
purely [1] - 86:23
purpose [1] - 64:14
purposes [6] - 44:12, 44:13, 66:10, 72:19, 89:21, 90:21
pursuant [1] - 77:4
pursued [1] - 40:14
push [2] - 9:3, 9:19
put [4] - 31:23, 42:25, 47:21, 95:12
putting [2] - 69:19, 71:12
PWC [1] - 43:24
PX [2] - 4:16, 4:24
PX-1-B [1] - 65:6
PX-1-K [3] - 60:3, 60:15, 61:3
PX-1-L [3] - 61:6,

61:12, 61:16
PX-1-M [1] - 61:12
PX-1-N [3] - 61:13, 61:15, 66:19
PX-1-O [3] - 60:12, 60:25, 64:2
PX-1-R [3] - 60:13, 60:25
PX-144 [1] - 4:24
PX-4-A [1] - 63:2
PX-4-Y [1] - 63:2
PX-5 [1] - 60:22

Q

quality [1] - 50:21
quarter [13] - 9:4, 32:15, 32:17, 34:20, 34:25, 45:21, 46:2, 46:3, 46:8, 54:13
quarter-to-quarter [1] - 34:20
quarterly [12] - 32:19, 32:24, 33:15, 34:7, 35:17, 35:22, 35:23, 38:1, 51:18, 53:13, 54:9, 54:17
quarters [3] - 37:17, 38:3, 54:12
questioned [1] - 6:18
questioner [1] - 16:10
questioners [3] - 17:11, 17:15, 23:3
questioning [2] - 20:24, 21:5
questions [24] - 13:21, 13:25, 14:3, 14:8, 14:9, 14:17, 14:20, 14:22, 16:7, 16:24, 17:1, 18:9, 20:23, 21:3, 21:11, 21:20, 31:25, 36:8, 45:25, 51:15, 53:18, 56:8, 58:22, 72:10
quick [1] - 23:12
quite [1] - 68:1
quote [20] - 9:5, 52:10, 52:12, 52:13, 52:21, 53:3, 53:15, 53:22, 53:25, 54:18, 55:5, 56:2, 80:11, 81:10, 82:10, 83:21, 83:22, 101:17

R

Radnor [1] - 1:25
rainstorm [1] - 58:25

raise [3] - 60:11, 61:13, 89:16
raised [12] - 6:20, 6:22, 33:20, 34:1, 34:4, 60:4, 68:5, 73:7, 73:9, 79:15, 86:19, 103:1
raising [1] - 95:16
ran [2] - 35:9, 35:10
range [4] - 42:5, 55:25, 64:25, 98:15
rapidly [2] - 42:10
rate [9] - 30:9, 40:12, 40:17, 40:19, 40:22, 41:7, 41:10, 48:19
rates [1] - 42:6
rather [2] - 84:1, 84:8
rationales [1] - 101:5
RDR [3] - 2:10, 105:3, 105:12
RE [1] - 1:10
reach [1] - 97:10
reached [2] - 29:2, 95:12
reaching [1] - 10:23
reaction [7] - 46:24, 47:1, 47:2, 47:3, 47:4, 47:13, 98:4
reactions [2] - 47:10, 47:15
READ [4] - 25:3, 33:11, 39:10, 51:14
read [26] - 5:23, 6:4, 6:8, 6:16, 7:12, 7:19, 8:9, 8:17, 9:2, 9:12, 9:17, 10:6, 10:11, 10:22, 11:4, 17:13, 20:23, 22:15, 23:20, 39:7, 52:10, 53:23, 53:24, 63:8, 95:23, 97:8
reader [1] - 5:12
reading [11] - 14:16, 15:20, 15:21, 17:17, 20:5, 21:17, 22:5, 22:10, 22:21, 23:1, 23:9
READING [2] - 5:14, 25:2
readings [2] - 18:13, 23:4
readout [7] - 4:5, 13:15, 13:18, 15:18, 19:13, 20:9, 24:19
realization [1] - 42:21
realize [1] - 73:8
realized [1] - 43:7
really [4] - 9:3, 17:13, 60:15, 92:24

reason [4] - 23:5, 86:18, 91:7, 93:9
reasonable [7] - 77:7, 83:2, 85:10, 85:13, 86:16, 88:13, 88:24
reasoning [1] - 67:8
reasons [4] - 6:22, 78:2, 93:10, 101:13
receivable [1] - 45:10
receive [1] - 26:3
received [6] - 5:4, 24:11, 25:25, 40:19, 50:14, 71:20
RECEIVED [1] - 3:11
recent [1] - 86:21
recently [1] - 97:25
recess [2] - 19:16, 23:23, 104:5
Recession [3] - 67:21, 68:8, 68:20
recognition [1] - 44:14
recognize [2] - 45:9, 90:20
recognized [1] - 29:11
recollection [5] - 34:15, 36:22, 44:14, 41:16, 57:4
reconcile [1] - 44:16
reconsider [1] - 73:11
reconsideration [2] - 94:24, 96:25
reconsidering [1] - 97:3
record [23] - 4:24, 6:8, 6:16, 7:13, 7:20, 8:17, 9:2, 9:13, 9:17, 10:6, 10:22, 11:5, 12:8, 22:9, 52:10, 58:7, 70:20, 71:8, 73:13, 77:7, 86:14, 89:20, 95:17
recording [1] - 42:22
records [2] - 63:4, 71:19, 74:4
recovery [2] - 29:15, 57:19
recross [1] - 84:16
recross-examination [1] - 84:16
recruit [1] - 29:1
recruiter [1] - 28:18
Red [1] - 3:4
reduce [5] - 38:21, 39:13, 39:17, 40:4,

41:6
reduced [6] - 38:24, 39:20, 40:13, 40:22, 41:3, 100:20
reducing [5] - 39:2, 39:23, 41:10, 48:15, 48:18
reduction [4] - 86:12, 97:19, 98:4, 99:6
refer [2] - 35:24, 100:25
reference [4] - 20:22, 31:16, 32:3, 98:12
references [2] - 97:23, 98:17
referred [3] - 30:18, 37:21, 42:12
referring [3] - 34:4, 37:13, 37:23, 58:6
refers [1] - 100:1
reflect [1] - 93:14
reflected [3] - 84:13, 91:9, 91:19
reflection [1] - 50:7
reflects [2] - 7:24, 84:5
reform [1] - 7:6
reforms [1] - 6:12
refresh [1] - 41:14
refuge [1] - 94:11
refutes [1] - 86:4
regarding [7] - 35:1, 48:3, 48:15, 49:6, 68:24, 92:14, 100:17
regards [1] - 8:10
regional [1] - 28:11
regular [1] - 31:10
regulator [1] - 31:7
regulatory [1] - 31:4
rejected [3] - 86:20, 96:5, 99:19
relate [1] - 77:11
related [8] - 4:5, 6:1, 13:18, 17:5, 80:1, 80:5, 82:22, 97:19
relating [1] - 45:23
release [3] - 7:21, 7:23, 47:21
released [2] - 12:20, 13:3
releases [1] - 31:5
relevance [1] - 66:24
relevant [3] - 6:12, 16:11, 67:22
reliable [8] - 91:5, 94:14, 94:16, 97:15, 98:22, 99:16, 99:17
reliably [2] - 93:1, 93:23

reliance [1] - 86:4
rely [2] - 81:17, 90:24
remain [1] - 84:1
remainder [1] - 6:8
remaining [4] -
60:11, 77:14, 92:7,
100:4
remains [2] - 54:14,
82:20
remedied [1] - 89:9
remedy [1] - 88:21
remember [4] -
47:12, 47:15, 59:21,
68:17
remind [1] - 20:13
reminiscent [1] -
92:2
remove [1] - 7:5
renew [1] - 86:25
renewed [1] - 9:19
repeat [1] - 89:11
rephrase [1] - 38:12
reply [1] - 97:7
Report [1] - 37:6
report [2] - 52:5,
96:18
reported [3] - 26:24,
31:21, 43:17
REPORTED [1] -
2:10
Reporter [2] - 2:11,
105:12
reporting [6] - 8:11,
27:25, 30:13, 31:6,
31:8
represent [3] - 25:6,
51:19, 56:16
representation [1] -
96:4
represented [1] -
49:3
request [3] - 52:14,
53:3, 53:25
require [2] - 78:1,
92:21
required [9] - 35:17,
35:19, 53:12, 54:8,
58:13, 80:7, 81:23,
82:22, 85:11
requires [3] - 15:2,
80:18, 94:14
requiring [1] - 87:6
rerecording [1] -
11:8
research [1] - 81:25
reserve [1] - 34:14
reserved [1] - 71:13
resigned [1] - 29:5
resolve [1] - 4:4
resolved [1] - 94:8

Resources [1] - 53:2
respect [1] - 47:6
respectfully [1] -
79:15
respects [1] - 51:9
respond [1] - 102:19
responding [2] -
73:6, 96:1
response [5] - 58:12,
89:11, 93:2, 93:9,
93:24
responsibilities [3] -
27:18, 28:9, 29:21
responsibility [3] -
26:25, 30:11, 30:22
responsible [7] -
29:25, 30:1, 30:3,
30:22, 30:24, 35:11,
52:2
rest [3] - 18:7, 62:13,
84:17
resting [2] - 12:6,
12:23
result [8] - 38:24,
39:1, 39:20, 39:22,
78:13, 78:21, 85:16,
98:2
resulting [3] - 50:20,
55:7, 57:19
results [3] - 7:25,
8:18, 82:15
results/timing [1] -
7:18
resume [1] - 13:11
retain [1] - 57:7
retained [17] - 42:9,
49:14, 49:16, 49:23,
51:2, 86:13, 91:13,
93:4, 97:19, 98:4,
99:6, 99:8, 100:2,
100:7, 100:9, 100:10,
100:19
retired [1] - 25:23
return [2] - 44:15,
45:7
returned [1] - 54:15
revenues [1] - 6:24
reverse [1] - 50:16
reversed [1] - 43:7
review [1] - 31:9
reviewed [5] - 9:22,
31:10, 35:20, 43:25,
47:17
reviewing [1] - 31:24
reviews [2] - 35:22,
35:23
right-hand [1] - 55:2
rights [3] - 80:14,
83:22, 84:1
rise [4] - 34:16, 44:9,

44:20, 45:4
risk [9] - 26:23,
28:12, 30:6, 30:7,
30:9, 30:10, 30:12,
30:15, 30:16
risks [1] - 30:8
Road [1] - 1:24
Rob [2] - 35:9, 35:25
ROBERT [1] - 2:2
Robert [2] - 11:25,
36:13
role [3] - 29:13, 32:1,
36:16
Roman [1] - 6:9
Room [1] - 2:13
ROSS [1] - 25:2
Ross [7] - 3:8, 4:5,
16:23, 20:20, 24:16,
24:24, 25:6
round [1] - 56:24
roundtable [1] - 29:1
ROYCE [1] - 1:14
RUDY [10] - 1:23,
14:23, 15:15, 15:25,
17:4, 17:24, 20:12,
22:22, 23:8, 24:15
Rudy [2] - 14:23,
20:12
Rule [11] - 3:10,
12:11, 12:25, 59:24,
64:9, 66:3, 76:13,
77:4, 87:23, 89:15,
89:19
rule [6] - 15:1, 81:3,
81:6, 81:11, 82:20,
83:20
ruled [1] - 100:23
ruling [3] - 60:19,
74:5, 97:14
rulings [1] - 94:5
run [1] - 33:22
runoff [1] - 51:1

S

safe [1] - 9:24
Safeco [5] - 27:3,
27:10, 27:19, 28:1,
28:2
sale [9] - 79:11, 80:3,
81:4, 81:21, 82:17,
82:21, 83:9, 83:12
sales [2] - 26:23,
80:24
Sam [2] - 89:24,
99:23
SAMUEL [1] - 1:21
San [3] - 26:18,
26:20, 27:3

Sarbanes [1] - 30:13
Sarbanes-Oxley [1] -
30:13
Satriano [4] - 10:9,
90:9, 103:9, 103:10
Satriano's [1] -
103:25
save [3] - 91:25,
92:10, 102:23
saw [2] - 18:24,
93:21
scenario [2] - 56:13,
58:9
scenarios [5] -
41:23, 41:25, 42:5,
56:1, 58:10
schedule [1] - 6:19
scheduled [2] - 7:21,
7:23
scheduling [4] -
13:8, 18:12, 18:18,
58:21
SCHILLER [1] - 1:21
SCHOLER [1] - 2:8
scope [1] - 87:4
screen [2] - 5:19,
7:10
sea [1] - 101:7
seated [3] - 4:10,
19:22, 24:3
SEC [1] - 62:5
second [10] - 16:1,
40:6, 52:13, 53:2,
68:3, 85:5, 88:23,
92:1, 96:20, 96:21
secondly [1] - 87:11
seconds [1] - 102:19
secret [1] - 21:4
secretary [2] - 6:5,
6:9, 6:20
Section [7] - 81:18,
81:20, 82:1, 82:7,
82:12, 82:16, 83:3
securities [5] -
80:24, 80:25, 81:4,
81:7, 81:11
security [13] - 79:11,
80:2, 80:3, 80:6,
81:21, 82:17, 82:21,
82:23, 83:9, 83:12,
83:21, 84:7, 84:9
see [17] - 8:18,
18:25, 19:20, 20:19,
23:5, 25:18, 28:25,
36:14, 37:8, 37:11,
37:19, 55:8, 55:22,
59:8, 60:3, 63:25,
104:5
seek [1] - 88:21
sees [1] - 6:21

select [2] - 64:5,
64:14
seller [2] - 84:1, 84:5
seller's [1] - 79:6
sellers [1] - 78:22
senior [6] - 46:15,
46:18, 46:23, 46:24,
47:15, 53:5
SENIOR [2] - 1:10,
1:14
sense [4] - 6:10, 9:3,
9:5, 11:13
sent [4] - 7:14, 9:14,
10:7, 101:3
sentence [3] - 92:1,
92:10, 100:3
sentences [1] - 6:4
separate [6] - 64:24,
69:22, 70:5, 71:3,
75:12, 90:23
separated [1] - 69:24
separately [2] -
75:23, 86:3
September [2] -
28:2, 28:7
sequence [1] - 46:20
series [1] - 60:23
served [1] - 26:17
Service [1] - 80:21
SESSION [1] - 1:13
set [2] - 77:13, 93:7
setting [1] - 82:24
settled [1] - 80:8
seven [1] - 40:6
several [2] - 4:14,
12:1
severe [1] - 29:14
share [16] - 77:16,
77:24, 78:20, 79:3,
79:8, 79:11, 79:14,
83:22, 83:23, 83:25,
84:17, 85:14, 85:17,
85:22, 86:2
shared [1] - 45:17
shareholder [3] -
87:2, 87:4, 87:9
shareholders [19] -
49:2, 49:4, 49:7,
49:18, 50:3, 50:7,
65:18, 65:23, 66:2,
66:5, 77:15, 77:20,
77:25, 78:25, 85:8,
85:25, 86:16, 88:10,
89:7
shares [19] - 77:20,
77:22, 77:25, 78:4,
78:9, 78:16, 78:19,
78:23, 79:5, 84:24,
85:1, 86:1, 88:11,
88:12, 88:16, 88:17,

88:18, 89:6
**sharing** [1] - 45:19
**sheet** [2] - 42:7,
49:13
**short** [8] - 19:15,
32:10, 32:17, 32:23,
33:15, 50:3, 50:10,
50:24
**short-term** [4] -
32:10, 32:17, 32:23,
33:15
**shorter** [3] - 92:8,
97:20, 100:6
**shortly** [1] - 41:17
**show** [13] - 60:2,
67:23, 69:5, 69:13,
70:10, 71:19, 72:4,
73:20, 73:24, 74:4,
91:20, 93:20, 96:7
**showed** [3] - 57:24,
96:1, 97:21
**showing** [5] - 51:16,
69:18, 74:9, 74:25,
88:2
**shown** [4] - 70:22,
74:6, 75:23, 88:23
**shows** [7] - 70:5,
88:8, 88:25, 89:3,
95:6, 96:17, 99:12
**shrink** [2] - 42:9,
42:10
**shrunk** [1] - 99:8
**side** [2] - 14:21, 55:3
**sidebar** [1] - 11:23
**sides** [1] - 76:10
**sift** [1] - 64:17
**sign** [1] - 44:1
**signaled** [1] - 91:16
**signature** [1] - 8:9
**significance** [2] -
67:1, 79:17
**significant** [5] -
29:17, 42:23, 42:25,
43:22, 52:10
**similar** [1] - 53:23
**simplified** [1] - 47:4
**simply** [3] - 63:3,
88:13, 88:15
**simulations** [1] -
8:12
**site** [1] - 37:3
**sitting** [1] - 17:2
**six** [2] - 39:25, 66:21
**six-year** [1] - 66:21
**Sixth** [1] - 80:10,
80:21
**size** [4] - 35:18, 42:7,
43:21, 100:12
**skipped** [1] - 39:3
**slide** [4] - 64:3,

**slides** [6] - 63:11,
63:15, 63:21, 64:19,
65:4, 65:13
**slightly** [1] - 32:19
**small** [4] - 37:16,
38:2, 90:17, 93:7
**smaller** [1] - 49:24
**so-called** [1] - 56:8
**so..** [4] - 31:14,
41:20, 42:11, 47:7
**sold** [2] - 77:20,
77:22, 77:25, 78:19,
78:23, 84:24
**someone** [1] - 22:14
**sometime** [1] - 10:13
**sometimes** [1] -
101:25
**somewhat** [1] - 33:4
**sorry** [13] - 14:23,
21:2, 27:14, 28:23,
33:6, 33:10, 35:4,
37:10, 39:6, 43:14,
43:19, 56:7, 98:3
**sort** [7] - 22:22, 47:5,
69:16, 69:17, 69:19,
98:1, 101:4
**sorting** [1] - 91:10
**sounds** [1] - 22:25
**spearheading** [1] -
6:11
**specific** [8] - 37:24,
46:20, 49:21, 56:12,
65:24, 68:22, 93:22,
99:4
**specifically** [8] -
34:23, 41:4, 86:9,
93:20, 95:15, 96:12,
97:5, 101:17
**specification** [1] -
87:8
**specifics** [2] - 69:2,
69:3
**specifies** [1] - 87:4
**specious** [1] - 93:8
**split** [1] - 70:11
**Spohn** [1] - 36:13
**spread** [1] - 92:19
**spreads** [5] - 42:6,
90:18, 91:1, 92:17,
101:6
**spreadsheet** [1] -
62:11
**spreadsheets** [4] -
63:17, 64:9, 66:4,
67:14
**SPSPA** [1] - 10:10
**staff** [4] - 31:21,
32:1, 43:11, 52:4
**stage** [2] - 77:13,

90:24
**stakeholder** [1] -
49:2
**stand** [4] - 4:13,
5:18, 14:18, 16:8
**standard** [2] - 97:1,
97:12
**standing** [6] - 78:5,
79:16, 79:19, 85:2
**Stanton** [8] - 4:1,
12:16, 12:22, 22:10,
24:5, 62:15, 76:15,
77:2
**STANTON** [1] - 2:8
**start** [14] - 13:8,
18:19, 20:20, 22:1,
26:13, 59:2, 59:12,
60:11, 63:24, 63:25,
70:20, 82:5, 93:13,
103:7
**started** [3] - 18:15,
28:4, 63:25
**starting** [2] - 21:24,
22:4
**starts** [2] - 53:22,
95:20
**state** [6] - 81:5,
81:19, 82:1, 82:18,
83:5, 86:24
**statement** [3] -
44:13, 53:16, 87:14
**statements** [16] -
30:5, 30:14, 30:19,
30:23, 31:1, 31:2,
31:5, 31:9, 31:13,
44:1, 44:16, 45:10,
51:7, 52:3, 62:5,
95:25
**STATES** [2] - 1:1,
1:14
**states** [1] - 55:5
**States** [2] - 2:11,
105:13
**statute** [2] - 15:1,
82:10
**Stegman** [1] - 5:25
**stenographic** [1] -
105:5
**step** [1] - 58:19
**STERN** [1] - 2:7
**stick** [1] - 72:15
**still** [6] - 8:20, 12:22,
34:19, 51:6, 51:10,
85:25
**stipulation** [1] - 16:3
**STOCK** [1] - 1:10
**stock** [11] - 48:23,
53:6, 77:15, 78:13,
78:16, 78:17, 78:18,
84:13, 88:13, 92:14,

100:17
**stocks** [1] - 80:25
**straight** [1] - 76:20
**street** [1] - 29:10
**stress** [3] - 56:1,
56:13, 58:9
**strike** [1] - 102:10
**stripped** [2] - 72:24,
73:13
**stronger** [1] - 8:18
**struggled** [1] - 83:13
**study** [17] - 86:4,
86:7, 86:10, 90:12,
90:16, 92:23, 94:6,
94:23, 95:4, 95:5,
96:1, 96:9, 96:16,
97:16, 98:11, 98:20,
98:21
**subject** [9] - 6:1,
7:18, 9:16, 10:10,
18:6, 95:8, 96:20,
96:25, 98:10
**submit** [1] - 79:15
**submitted** [1] - 51:7
**substantial** [1] -
54:18
**substantive** [10] -
59:23, 62:18, 63:21,
65:15, 66:16, 67:13,
67:15, 70:13, 74:18,
75:19
**successful** [1] -
72:17
**suffered** [1] - 78:12
**sufficient** [1] - 77:8
**sufficiently** [1] -
99:17
**sum** [2] - 70:18,
84:20
**summaries** [1] - 72:4
**summarize** [2] -
25:21, 60:16
**summary** [21] - 12:2,
25:14, 25:16, 25:17,
59:24, 60:5, 61:25,
63:13, 63:16, 64:9,
64:21, 66:3, 66:7,
66:23, 67:6, 67:13,
67:14, 86:20, 87:1,
87:11, 89:12
**Sunday** [1] - 29:10
**supply** [5] - 91:16,
93:5, 93:16, 101:4,
101:5
**support** [4] - 34:7,
60:21, 93:1, 97:15
**supports** [1] - 83:16
**Supreme** [3] - 83:10,
86:21, 87:12
**surety** [3] - 27:13,

27:15, 27:25
**Susan** [1] - 59:20
**sustain** [2] - 49:17,
68:23
**Sustainability** [1] -
52:9
**sustainability** [1] -
52:11
**Sutton** [2] - 80:10,
80:22
**sweep** [22] - 7:3, 9:3,
9:23, 46:19, 46:25,
48:4, 49:7, 50:2,
50:10, 50:13, 86:12,
88:3, 88:5, 88:22,
89:3, 89:5, 89:9,
91:14, 92:10, 96:2,
96:9, 96:13
**switch** [1] - 71:16
**switches** [1] - 20:1
**system** [1] - 29:13

**T**

**table** [3] - 17:2,
58:12, 73:8
**tabs** [1] - 20:1
**Tagoe** [1] - 7:16
**tape** [1] - 20:3
**targeted** [1] - 47:22
**TARP** [1] - 40:20
**tax** [30] - 11:9, 33:22,
34:24, 35:2, 35:9,
42:21, 42:22, 43:7,
43:10, 44:9, 44:10,
44:12, 44:14, 44:15,
44:17, 44:20, 44:21,
44:23, 44:24, 45:2,
45:4, 45:5, 45:6, 45:7,
45:9, 45:12, 45:13,
45:17, 45:24, 57:20
**taxpayers** [2] -
54:14, 54:15
**team** [3] - 41:20,
43:9, 47:19
**technology** [1] -
26:24
**ten** [1] - 98:17
**tenders** [2] - 19:21,
21:9
**tenure** [2] - 35:13,
51:8
**term** [38] - 7:6, 32:10,
32:17, 32:20, 32:23,
33:15, 33:19, 33:22,
37:15, 37:21, 45:2,
49:11, 50:3, 50:6,
50:7, 50:10, 50:16,
50:22, 50:25, 51:1,

1544

52:11, 52:21, 53:11,
54:7, 55:5, 93:7,
93:20, 97:17, 98:11,
98:13, 98:17, 98:18,
98:21, 99:7, 99:10,
101:10, 101:14
**Term** [1] - 52:9
**terms** [10] - 6:17,
9:22, 33:2, 35:25,
49:22, 51:3, 51:5,
72:9, 72:10, 76:20
**testified** [4] - 52:1,
67:25, 89:8, 96:19
**testify** [2] - 68:16,
98:14
**testimony** [14] -
15:7, 16:12, 24:18,
63:11, 65:13, 66:25,
67:3, 68:12, 68:18,
74:6, 86:4, 92:22,
92:23, 95:24
**testing** [1] - 30:13
**text** [8] - 6:4, 7:19,
8:17, 9:2, 9:17, 10:11,
10:22, 11:4
**that'll** [1] - 103:20
**THE** [133] - 1:1, 1:14,
1:17, 1:20, 2:2, 2:6,
3:5, 4:7, 4:10, 4:15,
4:25, 5:3, 5:12, 11:21,
12:12, 12:21, 13:4,
15:12, 15:16, 15:24,
16:17, 16:21, 17:17,
17:21, 18:2, 18:8,
18:24, 19:15, 19:20,
19:22, 20:3, 20:17,
21:10, 21:15, 21:18,
21:21, 21:25, 22:5,
22:12, 22:14, 22:19,
23:5, 23:12, 23:16,
23:17, 23:20, 23:25,
24:3, 24:11, 24:21,
24:24, 25:1, 25:2,
39:6, 39:9, 58:19,
59:11, 59:14, 59:18,
68:12, 68:22, 69:2,
69:5, 69:9, 69:12,
69:15, 69:22, 69:24,
70:2, 70:4, 70:8,
70:14, 70:16, 70:22,
70:24, 71:1, 71:5,
71:16, 71:22, 71:25,
72:2, 72:9, 72:15,
72:22, 73:1, 73:3,
73:10, 73:15, 73:18,
73:20, 73:22, 73:24,
74:8, 74:12, 74:14,
74:20, 74:22, 74:24,
75:2, 75:5, 75:8,
75:12, 75:15, 75:21,

75:24, 76:1, 76:3,
76:6, 76:10, 76:12,
76:17, 76:19, 76:25,
89:15, 89:22, 90:2,
90:4, 90:6, 94:18,
99:21, 102:6, 102:17,
102:20, 103:4, 103:7,
103:10, 103:14,
103:16, 103:18,
103:20, 103:25,
104:3, 104:5
**themes** [1] - 14:12
**themselves** [5] -
13:25, 15:22, 16:13,
64:17, 78:13
**theories** [1] - 14:12
**theory** [3] - 61:1,
77:14, 79:10
**thereby** [1] - 6:25
**therefore** [2] - 84:8,
84:25
**Thereupon** [1] -
23:23
**they've** [1] - 60:17
**thinking** [4] - 49:20,
49:21, 70:10, 71:14
**third** [36] - 34:24,
36:9, 37:16, 38:3,
40:1, 47:24, 50:24,
53:21, 78:4, 78:8,
78:10, 78:12, 78:15,
78:21, 78:23, 79:2,
79:5, 84:12, 84:24,
85:1, 85:16, 85:19,
85:23, 90:17, 90:23,
91:1, 91:11, 91:15,
93:15, 94:22, 95:6,
96:17, 99:5, 99:12,
101:21
**Third** [3] - 28:4, 28:9,
28:14
**thought/expected**
[1] - 8:19
**three** [10] - 32:22,
33:5, 33:6, 33:7,
33:16, 37:22, 37:25,
55:13, 56:15, 98:16
**three-year** [9] -
32:22, 33:5, 33:6,
33:7, 33:16, 37:22,
37:25, 55:13, 56:15
**throughout** [4] -
35:13, 42:1, 62:4,
67:20
**tightening** [1] - 92:3
**tighter** [2] - 92:18,
92:19
**timeframe** [2] -
41:15, 43:23
**timeline** [1] - 49:21

**timing** [2] - 17:18,
44:12
**Timothy** [3] - 3:7,
19:6, 19:8
**TJB** [1] - 9:6
**today** [17] - 13:11,
21:3, 42:8, 56:8,
58:21, 77:10, 78:9,
85:6, 85:18, 85:22,
86:1, 89:1, 89:7,
89:10, 92:14, 100:17,
103:1
**together** [12] - 64:5,
64:12, 65:18, 65:19,
65:24, 66:8, 69:17,
70:1, 70:5, 70:16,
70:18, 71:2
**tomorrow** [8] -
10:14, 13:12, 59:2,
59:8, 90:7, 102:11,
103:8, 104:6
**tonight** [1] - 102:6
**took** [6] - 6:7, 40:20,
41:17, 69:20, 78:20
**top** [3] - 21:1, 25:5,
55:20
**topic** [4] - 38:19,
39:11, 41:5, 41:15
**total** [1] - 65:19
**totally** [1] - 89:20
**touch** [1] - 66:17
**towards** [1] - 26:6
**track** [2] - 59:4, 59:7
**training** [1] - 26:8
**transaction** [1] -
44:18
**transactions** [6] -
9:25, 44:9, 44:11,
44:19, 45:4, 80:24
**TRANSCRIPT** [1] -
1:13
**transcript** [9] -
19:20, 20:14, 62:21,
62:23, 63:8, 89:23,
96:7, 105:5, 105:6
**transfer** [9] - 79:8,
80:15, 80:19, 81:12,
81:24, 82:22, 83:18,
83:23, 88:4
**transferred** [3] -
88:5, 88:7, 89:4
**travel** [1] - 83:25
**travels** [4] - 79:3,
79:14, 83:21, 88:12
**treasurer** [2] - 26:22,
28:12
**Treasury** [39] -
27:22, 37:16, 38:3,
38:21, 39:13, 39:15,
39:17, 40:3, 40:4,

40:18, 41:6, 41:7,
47:21, 50:10, 52:16,
52:20, 53:5, 53:10,
53:13, 53:14, 54:2,
54:6, 54:9, 55:7,
55:20, 55:25, 64:4,
64:7, 64:8, 64:13,
64:23, 64:24, 88:6,
88:9, 89:4, 89:6, 92:3,
92:13, 100:16
**trends** [2] - 49:12,
49:22
**trial** [19] - 59:21,
60:18, 62:4, 62:21,
62:24, 63:9, 65:13,
67:20, 68:3, 71:12,
71:23, 72:11, 87:24,
92:24, 95:3, 96:6,
96:19, 96:20, 96:21
**TRIAL** [1] - 1:13
**tried** [1] - 62:7
**trigger** [1] - 48:20
**true** [5] - 41:13,
57:22, 94:13, 105:4,
105:5
**try** [3] - 81:16, 98:23,
102:10
**trying** [5] - 14:25,
62:6, 62:8, 72:5,
72:15
**Tuesday** [3] - 7:14,
7:23, 10:7
**turn** [7] - 37:4, 44:22,
52:7, 52:25, 54:21,
55:12, 100:14
**turning** [6] - 25:24,
29:18, 51:21, 53:20,
55:1, 55:18
**two** [29] - 6:4, 6:22,
14:5, 14:16, 15:12,
15:20, 16:8, 16:9,
17:20, 17:21, 29:17,
33:6, 38:5, 42:13,
58:6, 64:5, 64:14,
65:1, 65:23, 65:24,
68:22, 77:10, 77:13,
78:2, 86:19, 89:2,
91:20, 98:16, 103:13
**type** [9] - 27:16,
40:20, 41:9, 42:5,
44:18, 45:14, 46:6,
93:6, 99:4
**types** [9] - 30:8,
31:8, 40:3, 40:9,
44:10, 45:3, 83:14,
98:10, 98:19
**typically** [5] - 31:9,
31:25, 32:8, 36:18,
41:22

**U**

**U.S** [7] - 50:14,
66:20, 67:2, 67:4,
67:5, 80:20, 81:8
**UCC** [9] - 81:18,
81:20, 82:8, 82:9,
82:13, 82:16, 82:19,
83:3, 83:17
**Ugoletti** [1] - 9:14
**ultimately** [3] - 38:9,
38:24, 39:20
**uncertainty** [1] -
52:11
**under** [40] - 12:25,
28:21, 30:16, 41:22,
44:3, 50:9, 50:15,
51:3, 52:8, 52:14,
53:2, 53:3, 53:12,
54:1, 54:8, 55:25,
56:8, 56:17, 57:10,
59:24, 60:25, 80:8,
82:3, 82:4, 82:25,
83:7, 83:24, 84:6,
84:20, 84:21, 84:22,
86:21, 89:3, 89:5,
89:15, 91:24, 93:15,
94:13, 100:13, 103:13
**underlying** [5] -
60:20, 60:21, 63:16,
79:20, 80:15
**undermine** [1] - 98:6
**understood** [4] -
23:8, 42:17, 71:9,
71:24
**undisputed** [1] -
78:7
**undone** [2] - 88:3,
89:9
**unhinge** [1] - 76:11
**unhinged** [1] - 75:20
**uniform** [2] - 82:11,
82:13
**Uniform** [1] - 81:18
**uniformity** [1] -
82:15
**united** [1] - 2:11
**UNITED** [2] - 1:1,
1:14
**United** [1] - 105:13
**University** [1] - 26:2
**unless** [2] - 84:2,
89:11
**unlikely** [3] - 52:18,
53:9, 54:5
**unreliable** [3] - 86:8,
86:10, 98:24
**unsuccessful** [1] -
62:8

**up** [32] - 7:8, 9:8, 9:19, 13:24, 14:5, 14:16, 14:18, 15:8, 15:20, 15:21, 16:8, 17:13, 20:7, 20:10, 21:1, 22:3, 22:9, 33:16, 39:8, 57:11, 59:25, 61:9, 63:23, 64:2, 65:3, 65:6, 65:12, 72:21, 78:22, 95:18, 99:25, 103:5
**upcoming** [1] - 33:4
**Update** [1] - 37:5
**update** [2] - 32:19, 32:21
**updated** [1] - 37:25
**urgency** [2] - 6:21, 7:5

---

**V**

**valid** [2] - 79:21, 79:23
**valuation** [17] - 33:21, 33:24, 34:2, 34:6, 34:8, 34:15, 35:2, 35:18, 42:22, 42:24, 43:2, 43:6, 43:21, 45:11, 45:16, 45:24, 57:19
**value** [4] - 49:18, 84:3, 84:5, 84:14
**variability** [3] - 52:17, 53:8, 54:4
**various** [8] - 27:20, 28:10, 30:8, 31:5, 41:23, 42:1, 82:11, 82:14
**VARMA** [1] - 2:6
**version** [3] - 82:7, 82:9, 83:3
**versions** [1] - 9:22
**versus** [5] - 32:13, 40:18, 67:22, 68:9, 80:20
**via** [1] - 18:23
**vice** [3] - 26:17, 27:18, 29:21
**video** [7] - 3:6, 3:7, 15:16, 18:23, 18:25, 19:7, 20:4
**videos** [3] - 13:15, 16:5, 17:20
**videotaped** [2] - 19:2, 19:8
**view** [16] - 11:11, 30:12, 47:20, 49:6, 49:8, 49:11, 50:2, 50:9, 50:19, 79:25,

80:4, 82:16, 82:18, 83:17, 83:24, 96:24
**viewed** [3] - 50:22, 51:4, 90:20
**VINCENT** [1] - 1:17
**Virginia** [8] - 82:5, 82:6, 82:12, 82:25, 83:2, 84:20, 84:21, 85:11
**Virginia's** [4] - 82:7, 82:9, 82:13, 83:3
**virtue** [1] - 87:5
**volatility** [1] - 34:20
**vs** [1] - 1:5

---

**W**

**waive** [1] - 53:15
**waived** [2] - 54:11, 54:12
**wants** [2] - 59:12, 90:1
**warranted** [1] - 77:6
**Washington** [6] - 1:6, 1:19, 1:22, 2:9, 2:13, 105:14
**ways** [1] - 95:2
**weather** [1] - 58:25
**website** [3] - 25:7, 61:11, 61:21
**Wednesday** [1] - 7:22
**week** [3] - 29:5, 32:14, 95:14
**Week** [1] - 91:25
**weekly** [1] - 32:8
**weeks** [1] - 6:17
**weight** [1] - 94:12
**well-settled** [1] - 80:8
**Wells** [3] - 26:13, 28:22, 28:24
**Westlaw** [1] - 81:14
**what-if** [1] - 58:12
**whole** [5] - 23:7, 64:25, 66:2, 91:15
**WIERZBOWSKI** [1] - 2:2
**Williams** [2] - 7:14, 8:10
**willing** [1] - 14:4
**wind** [10] - 9:24, 11:14, 92:5, 92:15, 97:22, 97:23, 100:1, 100:18, 101:12
**wind-down** [10] - 9:24, 11:14, 92:5, 92:15, 97:22, 97:23, 100:1, 100:18, 101:12

**Wisdom** [1] - 30:16
**wit** [1] - 6:12
**WITNESS** [2] - 39:6, 39:9
**witness** [6] - 5:18, 19:12, 19:16, 24:7, 67:1, 67:6
**WITNESSES** [1] - 3:5
**witnesses** [1] - 16:5
**won** [1] - 59:18
**word** [2] - 99:22, 102:20
**wording** [2] - 47:21, 47:22
**words** [4] - 22:9, 79:4, 96:8, 97:8
**worst** [1] - 58:10
**worst-case** [1] - 58:10
**worth** [28] - 7:3, 8:3, 8:4, 8:7, 8:8, 8:21, 8:22, 9:3, 45:1, 46:19, 46:25, 48:4, 49:6, 50:2, 50:9, 50:13, 86:12, 88:3, 88:5, 88:22, 89:3, 89:5, 89:9, 91:13, 92:9, 96:2, 96:8, 96:13
**wound** [1] - 91:17
**writing** [1] - 57:19
**written** [3] - 11:9, 79:9, 81:23
**wrote** [2] - 47:18, 80:11

---

**Y**

**year** [16] - 6:19, 6:22, 32:20, 32:22, 33:4, 33:5, 33:6, 33:7, 33:16, 37:22, 37:25, 55:13, 56:15, 60:6, 66:21
**years** [16] - 6:25, 33:23, 38:5, 38:6, 38:15, 64:5, 64:14, 64:25, 65:24, 66:9, 77:17, 77:24, 85:15, 86:2, 98:16, 100:10
**yesterday** [1] - 103:22
**yesterday's** [1] - 6:10
**yield** [4] - 90:17, 90:18, 91:1, 101:6
**York** [3] - 1:22, 2:5
**younger** [1] - 86:22
**yourself** [2] - 25:10, 46:15

---

**Z**

**zero** [1] - 84:10
**zoom** [1] - 95:21