### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA


FAIRHOLME FUNDS, INC., ET AL., et al,        Civil Action
                                             No. 1:13-1053
                    Plaintiffs,


        vs.
                                             August 4, 2023
                                             10:13 a.m.
FEDERAL HOUSING FINANCE
    AGENCY, et al,

                                             Washington, DC


                    Defendants.
_____


In re: FANNIE MAE/FREDDIE MAC               Civil Action
SENIOR PREFERRED STOCK PURCHASE            No. 1:13-1288
AGREEMENT CLASS ACTION
LITIGATIONS.
_____



### ***  MORNING SESSION  ***
TRANSCRIPT OF JURY TRIAL - DAY 9
**BEFORE THE HONORABLE ROYCE C. LAMBERTH**
UNITED STATES DISTRICT JUDGE




APPEARANCES:

**For Plaintiffs**        **VINCENT COLATRIANO**
**Fairholme Funds,et al:**   Cooper & Kirk, PLLC
                          1523 New Hampshire Avenue NW
                          Washington, D.C. 20036

APPEARANCES CONTINUED:

**For Class Plaintiffs:**    **LEE D. RUDY**
Kessler Topaz Meltzer & Check, LLP
280 King of Prussia Road
Radnor, Pennsylvania 19087

**HAMISH HUME**
**KENYA KHALELAH DAVIS**
Boies Schiller Flexner LLP
1401 New York Avenue NW
Washington, D.C. 20005

**ROBERT KRAVETZ**
**CAITLIN BOZMAN**
Bernstein Litowitz Berger &
Grossmann LLP
1251 Avenue of the Americas
New York, NY 10020

**For Defendants FHFA,**    **ASIM VARMA**
**Fannie Mae and**    **ROBERT STANTON JONES**
**Freddie Mac:**    **IAN S. HOFFMAN**
**DAVID BLOCK BERGMAN**
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue NW
Washington, D.C. 20001

**Reported By:**    **LORRAINE T. HERMAN, RPR, CRC**
Official Court Reporter
U.S. District & Bankruptcy Cts.
333 Constitution Avenue, NW
Room 6720
Washington, DC 20001
202-354-3196

*** Proceedings recorded by stenotype shorthand.
*** Transcript produced by computer-aided transcription.

## I N D E X

**WITNESS**                                                    **PAGE**

DONALD LAYTON

    Video Deposition                                    1837


MUKARRAM ATTARI

    Direct Examination by Ms. Varma                     1837

## E X H I B I T S

**EXHIBIT**                                                   **PAGE**

Defendants' No. DX-380-A    Received into Evidence   1829
Defendants' No. DX-339      Received into Evidence   1829
Defendants' No. 919-A       Received into Evidence   1840

1          **P R O C E E D I N G S**

2          **DEPUTY CLERK:**  This is Civil Action 13-1053, with

3    related Miscellaneous Case 13-288, In Re: Fannie Mae/Freddie

4    Mac Senior Preferred Stock Purchase Agreement Class Action

5    Litigations.

6          **THE COURT:**  All right.  Are we ready to go with

7    the next witness?

8          **MS. VARMA:**  Asim Varma for the defendants,

9    Your Honor.

10         There were a few issues we wanted to address

11   before the jury came in about the scope of Dr. Attari,

12   defendants' expert witness testimony --

13         **THE COURT:**  Okay.

14         **MS. VARMA:**  -- we have been discussing with

15   plaintiffs' counsel that I think it's probably time for the

16   Court to resolve.

17         Before I get to that, on Friday, defendants moved

18   to admit two exhibits, which were analyst reports.  I don't

19   believe we have a decision on that, yet.

20         **THE COURT:**  Which two were they?

21         **MS. VARMA:**  380-A -- DX-380-A and DX-339.

22      (Brief pause.)

23         I'm just raising it now because if they are

24   admitted, we would like Dr. Attari to present them to the

25   jury.

1    **THE COURT:**  Okay.  380-A will be admitted.

2    And what was the -- tell me a little more about

3    the 339.

4    **MS. VARMA:**  It's the Moody's report, Your Honor.

5    **MR. HOFFMAN:**  Your Honor, Ian Hoffman on behalf of

6    the defendants.  Just picking up where we left off

7    Wednesday.

8    339 is the Moody's report that is cited in

9    Mr. Ugoletti's --

10    **THE COURT:**  I don't have it.

11    **MR. HOFFMAN:**  It's the Moody's report, Your Honor,

12    that was cited in Mr. Ugoletti's declaration.

13    **THE COURT:**  Ugoletti later said in his deposition

14    he had similar stuff.  He didn't say at the time that he

15    looked at it, at the time, but it went by email to Ugoletti.

16    Right?

17    **MR. HOFFMAN:**  Your Honor, I believe the evidence

18    on 339, is the declaration --

19    **THE COURT:**  Oh, that's the other one that went to

20    him.  Okay.  Tell me how this one gets in.

21    **MR. HOFFMAN:**  Your Honor, there is evidence that

22    it was considered by him because of the declaration that was

23    put into evidence by plaintiffs.

24    **THE COURT:**  Right.

25    **MR. HOFFMAN:**  The declaration, which explains

1  FHFA's, you know, decision-making process and rationale says

2  that --

3          **THE COURT:**  All these kinds of reports.

4          **MR. HOFFMAN:**  It says that -- I'm pulling it up

5  now.  It says that FHFA considered market forecasts.

6          **THE COURT:**  Right.

7          **MR. HOFFMAN:**  And then it cites this as the first

8  type of market forecast.  This is Paragraph 15 of

9  Mr. Ugoletti's declaration.  It says, Market forecasts,

10  which FHFA monitored, predicted that the enterprise's

11  ongoing payment, that the 10 percent --

12          **THE COURT:**  He's talking about Moody's, not this

13  specific one.

14          **MR. HOFFMAN:**  No.  Then he cites this

15  Moody's-specific one in the next sentence.

16          **THE COURT:**  When was the declaration?

17          **MR. HOFFMAN:**  The declaration was submitted as

18  part of this litigation.  So it was December of 2013.  So it

19  is backwards-looking, Your Honor.

20          It cited -- the specific Moody's report is cited

21  and quoted in that paragraph, as well as a Deutsche Bank

22  analyst report, which has also come into evidence.

23          **THE COURT:**  Okay.  They are both admitted over

24  objection.

25          **MR. HOFFMAN:**  Thank you, Your Honor.

1    (Defendants' Exhibits DX-380-A & DX-339 were received.)

2    **MR. KRAVETZ:**  Your Honor, Robert Kravetz on behalf

3    of plaintiffs.

4    We had argued in the alternative to DX-380-A the

5    cover email, which essentially contains quadruple hearsay,

6    not be admitted into evidence, even if the Court is inclined

7    to admit the underlying report, because it is email from an

8    analyst from one firm, describing a conversation from

9    something from Moody's, in which the analyst disagreed,

10   sending it to a third person who worked at FHFA, and that

11   person sent it to Mr. Ugoletti.

12   Obviously, Mr. Ugoletti is not here, is not going

13   to testify about this.  There is no evidence at all that

14   Mr. Ugoletti relied on this particular document.  It's not

15   within his declaration and he did not testify about this at

16   his deposition.  So we add those points in moving to exclude

17   380-A.

18   For 339, we argued just a couple days ago,

19   Your Honor, that the timing of that document being in

20   September of 2011, and the fact that we had the post hoc

21   December 2013 document, where Mr. Ugoletti referred to it,

22   made it unduly prejudicial.  I just wanted to state that for

23   the record.

24   **THE COURT:**  Okay.  That's overruled.

25   **THE COURT:**  Defendants 380-A and 339 are received

1      over objection.

2             Okay.  You can bring in the jury.

3             **MS. VARMA:**  Thank you, Your Honor.

4             We have a couple of other issues.  The parties

5      have a dispute about the extent to which Dr. Attari can

6      testify that the Treasury commitment, when it was put in

7      place in 2008, restored confidence for the MBS investors.

8             The rationale here within the expert testimony and

9      is disclosed by Dr. Attari is that in 2008, the GSEs, as the

10     Court has heard, were on the brink of collapse.  The

11     Treasury stepped in, gave a commitment to both enterprises,

12     $100 billion each; and that restored confidence, not just

13     among bond holders and the market generally, but

14     specifically among MBS investors, who rely on the guaranty

15     by Fannie and Freddie, and their purchases of MBS

16     securities.

17            Therefore, they are very interested in and

18     require, if you will, confidence in the credit worthiness of

19     Fannie and Freddie; and that's what the commitment provides.

20            Plaintiffs argue that we can't use the word

21     "confidence" when we say that the commitment restored

22     confidence; and that we can't say that the investors need

23     confidence, MBS investors need confidence.  And that the

24     Court's prior ruling on, I believe it's 336 -- ECF-336,

25     precluded all testimony about the concerns of the MBS

1       investors and the credit worthiness of Fannie and Freddie

2       and the implication of the Treasury commitment to satisfy

3       that credit worthiness and to respond to those concerns.

4               Dr. Attari does not intend to connect those

5       concerns and general interest in the credit worthiness and

6       confidence that the Treasury commitment provided with the

7       third amendment itself.  We understand that the Court has

8       ruled that he cannot testify that the third amendment

9       relieved any concerns but the paradigm that was put in place

10      in 2008, that the commitment would be put in place so that

11      MBS investors would have confidence in the credit worthiness

12      of Fannie and Freddie, we believe is important testimony,

13      within expert testimony, and would be very helpful to the

14      jury.

15              **MR. KRAVETZ:**  Once again, Robert Kravetz on behalf

16      of plaintiffs.

17              Your Honor has already ruled on this issue.  In

18      our prior Motion in Limine we moved to exclude, "testimony

19      or argument concerning the state, sentiment or confidence of

20      mortgage-backed security investors prior to and immediately

21      after the net worth sweep."

22              We have no issue with Dr. Attari describing the

23      basic facts of the structure of the conservatorship.  But

24      it's that word "confidence" the Court has already precluded.

25      The Court has already granted our motion in full and

1   precluded any testimony from Dr. Attari as to the state of

2   the MBS market.

3           And in referring to analyst reports in particular,

4   the Court recognized, "concern that defendants are really

5   using this portion of testimony to sneak in otherwise

6   inadmissible hearsay, analyst reports under the guise of

7   expert testimony."

8           Your Honor, those concerns remain valid here.

9   That's why defendants repeatedly go back to the well in an

10  attempt to seek reconsideration relating to this particular

11  topic.  There's no basis to do so after extensive briefing

12  and argument here.  There hasn't been any recognition of any

13  clear error or manifest injustice in the Court's prior

14  ruling, which is the reconsideration standard.

15          And just to remind the Court of what we argued in

16  our briefing, three prior points.  First that Dr. Attari did

17  not perform any event study or quantitative analysis to show

18  that there was any concern in the MBS market prior to the

19  net worth sweep or that it was alleviated by the third

20  amendment or the net worth sweep.  And, specifically, we

21  moved on the basis that there were no, that there was no

22  evidence about any concerns about the Treasury commitment as

23  well.

24          Second, Dr. Attari acknowledged at trial, and in a

25  recent deposition, that FHFA internal documentation, after

1    the net worth sweep, in fact, on the day of the net worth

2    sweep, stated it had no impact whatsoever on the MBS market.

3    And for the record, that's Plaintiffs' Exhibit 282, at Page

4    2.

5         And our third argument, which the Court also

6    accepted, was that the analyst reports provided no

7    sufficient basis for Dr. Attari's testimony about MBS.

8         So while we don't dispute that Dr. Attari can

9    testify about the structure of the market or certain events

10   that occurred that would have been relevant to MBS

11   investors, using the word "confidence" at all in his

12   testimony is contrary to the Court's prior opinion.

13        Thank you.

14        **MS. VARMA:**  If I may, Your Honor, direct you to

15   the opinion itself.  It was clear from argument and from the

16   opinion that what plaintiffs were seeking and what the Court

17   granted was the effect of the third amendment on the MBS

18   market and precluded testimony on that.  2008 commitment,

19   when it was placed, and the sufficiency of that commitment

20   and that it restored confidence, we think it is not only

21   important background information for the jury, but is within

22   the scope of expert testimony.  He is not relying on any

23   particular analyst reports.

24        The Court has permitted Dr. Attari to rely on

25   analyst reports if he doesn't publish them.  There are

1    plenty to talk about the confidence that was restored in the

2    MBS investors by the commitment itself, not connecting the

3    concerns in 2012, which relate to the cap of the commitment

4    or post 2012 third amendment, which relate to the relief

5    that the MBS provided.

6              **THE COURT:**  All right.

7              The plaintiff's objection to this will be

8    sustained.  I don't think you can go there.

9              **MS. VARMA:**  I'm sorry?

10             **THE COURT:**  All right.  Any other?

11             **MS. VARMA:**  There's one other issue, Your Honor.

12   Before Dr. Attari testifies we will be playing Mr. Layton's

13   video deposition.  We would like to also have, within

14   Dr. Attari's testimony, play another squib or repeat the

15   squib, if you will, of Mr. Layton's testimony, so Dr. Attari

16   can direct the jury to it.

17             Plaintiffs object to that playing of the testimony

18   within Dr. Attari's testimony, because Dr. Attari, in his

19   expert disclosure, did not identify Mr. Layton's specific,

20   page and cite number, as something he relied on.

21             He did identify that he considered Mr. Layton's

22   testimony and specifically cited to other portions of it.

23   But plaintiffs now object because that specific pincite is

24   not in the expert disclosure, that he should not be

25   permitted to connect the dots, if you will, between his

1    opinion and Mr. Layton's testimony.

2              **THE COURT:**  All right.

3              **MR. KRAVETZ:**  Thank you, Your Honor.

4              Robert Kravetz on behalf of plaintiffs.

5              Your Honor, we are not moving to reconsider the

6    Court's ruling that Mr. Layton's testimony can be played.

7    But Dr. Attari did not rely on any of his reports, including

8    in his supplemental support report.

9              It's one thing if Dr. Attari had a reliable basis

10   as to an existing opinion in evidence at trial, supported

11   that, he would be able to testify about that.  And he

12   probably will testify about evidence and testimony that has

13   been introduced at trial.

14             But here there is nothing.  There has been no

15   ability to depose Dr. Attari about the Credit Suisse

16   information, despite having a chance to depose him over

17   three days and Dr. Attari testifying over the course of two

18   days at trial.  Here there would have been a very specific

19   line of cross-examination.

20             The same month that Mr. Layton spoke with Credit

21   Suisse, FHFA filed a lawsuit alleging that Credit Suisse

22   defrauded them in the amount of $14 billion relating to

23   misrepresentations in the mortgage-backed securities market.

24             So that is an item of bias that would never be a

25   collateral matter, that we would have had a chance to

1    explore with Dr. Attari during his deposition, particularly

2    if he is going to connect what was told to Freddie Mac from

3    Credit Suisse to FHFA.

4         If you recall, Your Honor, there is no evidence --

5    we will hear this from Mr. Layton.  Mr. Layton is not

6    unaware whether Credit Suisse relayed the same concerns to

7    FHFA.

8         We think Dr. Attari should be precluded from

9    testifying about something that was not in his report.  But

10   if he does, that we should be able to probe his

11   understanding of the lawsuit that was filed the exact same

12   month by FHFA against Credit Suisse, and whether that would

13   have him impacted his opinion.

14        **THE COURT:**  Your objection is sustained.  You can

15   bring the jury in.

16        (Jury entered the courtroom.)

17        **THE COURT:**  Good morning, ladies and gentlemen of

18   the jury.

19        Call your next witness.

20        **MR. JONES:**  Thank you, Your Honor.  Stanton Jones

21   for the defendants.

22        The defendants' next witness will be Donald

23   Layton, the former CEO of Freddie Mac.  Mr. Layton's

24   testimony will be presented by video deposition.  It's about

25   35 minutes

1      **VIDEO DEPOSITION OF DONALD LAYTON**

2              **THE COURT:**  All right.  You can call your next

3      witness.

4              **MS. VARMA:**  Asim Varma for the defendants.

5              The next witness will be Dr. Attari, defendants'

6      expert.

7          (Witness took the stand.)

8              **DEPUTY CLERK:**  Do you solemnly swear or affirm the

9      testimony you will give in this proceeding will be the

10     truth, the whole truth and nothing but the truth?

11             **THE WITNESS:**  Yes.

12             **DIRECT EXAMINATION OF MUKARRAM ATTARI**

13     BY MS. VARMA:

14         **Q.**   Good morning, Dr. Attari.  Please introduce

15     yourself to the jury.

16         **A.**   My name is Mukarram Attari.  I am an economist and

17     I work at a firm called Charles Rivers Associates.

18         **Q.**   Dr. Attari, were you retained by defendants to

19     provide expert testimony in this case?

20         **A.**   Yes, I was.

21         **Q.**   Could you tell us what you were asked to do by

22     defendants?

23         **A.**   I was asked to review the reasonableness of the

24     third amendment that FHFA agreed to.

25         **Q.**   Before we ask you more about your conclusions and

                   **DIRECT - M. ATTARI - by Ms. Varma**

1    your assignment, could you tell us a little bit more about

2    your background?  How long have you been employed with

3    Charles River?

4        **A.**    This is my 21st year at Charles River Associates.

5        **Q.**    What is your title at Charles River?

6        **A.**    I am vice president and the co-leader of the

7    finance practice Charles River Associates.

8        **Q.**    What does your economic consulting entail?

9        **A.**    I work on litigation matters and on regulatory

10   matters.  I provide financial analysis.  And a majority of

11   my clients are financial institutions.

12       **Q.**    Are Fannie and Freddie the type of financial

13   institutions that you come across in your work?

14       **A.**    Yes, I do.

15       **MS. VARMA:**  Can we get permission to put the

16   slides up?

17       **DEPUTY CLERK:**  [Complied]

18   **BY MS. VARMA:**

19       **Q.**    What is your educational background, Dr. Attari?

20       **A.**    I have a PhD in finance from the University of

21   Iowa.  Before that, I have an MBA undergraduate in

22   engineering.

23       **Q.**    Have you testified as an expert before?

24       **A.**    Yes, I have.  I have testified in nine matters,

25   before this one, on securities and finance.

                    **DIRECT - M. ATTARI - by Ms. Varma**

1    **Q.**    In which areas do you consider yourself an expert?

2    **A.**    I consider myself an expert in corporate finance,

3    securities markets, event studies, mortgage-backed

4    securities.

5    **Q.**    What experience did you draw in formulating your

6    opinions for this matter?

7    **A.**    My educational training, my research and the work

8    that I've done at CRA as a consultant.

9    **Q.**    Before you joined Charles River, were you a

10   professor?

11   **A.**    Yes, I was.  I was an assistant professor at the

12   University of Wisconsin.  Before that I taught as a PhD

13   student at the University of Iowa.

14   **Q.**    What courses did you teach?

15   **A.**    The list of courses that I've taught is up on the

16   slide.  I have taught courses in international finance,

17   corporate finance, investments; that's kind of securities

18   market, a specialized course in investments called Fixed

19   Income Securities, which is on bond markets and MBS, and

20   then courses on derivatives in advance asset pricing.

21   **Q.**    I believe the jury has heard the acronym MBS, but

22   can you remind us what it stands for?

23   **A.**    It stands for mortgage-backed securities.  When

24   banks issue mortgages, what they do is create pools of often

25   thousands of mortgages.  Then they issue securities that are

**DIRECT - M. ATTARI - by Ms. Varma**

1    backed by the cash flows, the payments that borrowers make

2    on those mortgages.

3        **Q.**   And have you published research?

4        **A.**   Yes, I have.  I have published in the top finance

5    journals.  All of my research has been published in the top

6    finance journals*:  The Journal of Financial Economics*, *The*

7    *Journal of Finance* and *The Journal of Financial and*

8    *Quantitative Analysis*, among others.

9            **MS. VARMA:**  Your Honor, the Court has already

10   admitted Dr. Attari's CV as Defendants' Exhibit 919-A.

11   Defendants tender Dr. Attari as an expert in the fields of

12   corporate finance and securities markets.

13           **MR. KRAVETZ:**  No objection, Your Honor.

14           **THE COURT:**  All right.  You may proceed.

15           The exhibit is received.

16       (Defendants' Exhibit 919-A was received.)

17   **BY MS. VARMA:**

18       **Q.**   Let's go back to what defendants asked you to do,

19   Dr. Attari.  Could you describe in greater detail what the

20   slide shows of the two assignments?

21       **A.**   Yes.  So my assignment had two key areas.  One was

22   to evaluate the reasonableness of FHFA's decision to agree

23   to the third amendment based on, kind of, information that

24   was available at that time of the third amendment; the

25   second was to respond to the filings -- the reports filed by

                     **DIRECT - M. ATTARI - by Ms. Varma**

1   plaintiffs' experts and their testimony.

2       Q.   What materials or information did you review to

3   determine whether it was reasonable for FHFA to agree to the

4   third amendment?

5       A.   I reviewed information, public information, that

6   was available at the time, you know, in August 2012.  I

7   reviewed filings from the companies as of August 2012 and

8   prior.  I reviewed information that had been produced in

9   this litigation that -- and I reviewed testimony that had

10  been, you know, depositions and so on, that had occurred in

11  this litigation.

12      Q.   Now you've prepared a slide to take us through how

13  you went about your analysis.

14      A.   Yes, I have.

15      Q.   Could you tell us, why did you start with what was

16  known and unknown as of August of 2012?

17      A.   So when you are trying to evaluate a decision that

18  was made at a particular point in time -- particularly, you

19  know, as we do often way after the fact.  In this case, more

20  than 10 years have passed.  It's almost 11 years -- it's

21  important to make sure that we are looking at the decision

22  in the context of information that was available at the time

23  the decision was made, not let our analysis be colored by

24  information or outcomes that happened since that time.

25           So that's why the first thing I did was try to

**DIRECT - M. ATTARI - by Ms. Varma**

1  understand what was known and unknown in August 2012, you

2  know, what was known with certainty, where there was

3  uncertainty and so on.

4      Q.   What do you mean by what was unknown as of August

5  2012?

6      A.   So, for example, one of the biggest drivers of the

7  performance of Fannie Mae and Freddie Mac is the performance

8  of house prices.  And house prices had been declining in the

9  years before 2012.  They had gone up.  They had gone down.

10  So it's important to know what the expected -- expectations

11  were going forward, and how confident people were in their

12  expectations.  Was it a range of possible outcomes they were

13  thinking about or were they very confident that things would

14  turn out one way or the other?

15      Q.   You inquired into FHFA's stated objective when it

16  agreed to the third amendment.  Why was important to refer

17  to FHFA's stated objective?

18      A.   You know, whether a decision is reasonable or not

19  depends on what the objective is.  Right?  And FHFA's stated

20  objective, at the time of the third amendment, was to reduce

21  the risk of circular draws or reduce the risk that the

22  commitment would be eroded through circular draws.  Right?

23          That provides context for the reasonableness of

24  the opinion; and that is different than, you know, the

25  result you would come to, if you looked at a different

**DIRECT - M. ATTARI - by Ms. Varma**

1     objective.

2         **Q.**   How did you determine what FHFA's stated objective

3     was in agreeing to the third amendment?

4         **A.**   I looked at what FHFA said it's objective was and

5     what people have said in this litigation about what the

6     objective was at the time of the third amendment.

7         **Q.**   Can you describe for us what facts you used in

8     reaching your conclusion?

9         **A.**   This slide lays out the information that was

10    available in 2012, at the time of the third amendment.  The

11    first was that the commitment -- you know, the commitment

12    had started in 2008 as 100 billion, then it had gone up to

13    200 billion, and then it was an unlimited commitment for a

14    while.

15        At the end of 2012, it was to be capped, and it

16    was to be fixed.  Then going forward from 2012, there would

17    be a fixed amount available, and if it got used up and, you

18    know, because the enterprises experienced loses or had to

19    make draws to pay the dividend, then the amount that would

20    be available would shrink over time.  So that was the first

21    piece.

22        The second was that if you look at the

23    enterprises' internal projections and the external

24    statements, they were basically saying that they did not

25    expect to earn enough to pay the dividend, which meant that

                **DIRECT - M. ATTARI - by Ms. Varma**

1844

1    these draws would continue.

2         The third was that even if they earned enough to

3    make these payments, the dividend payments, Treasury had

4    been waiving a periodic commitment fee that it had said it

5    would start collecting on; and that all of the parties,

6    FHFA, Treasury and enterprise had said that they expected

7    the commitment fee to be substantial.  So it wasn't just

8    that they had to earn enough to pay the dividend.  They had

9    earn enough to pay the dividend and the PCF before they

10   started accumulating the capital.

11        Q.   Can you remind the jury what the PCF or commitment

12   fee is?

13        A.   So the commitment itself, you can think of it as

14   two parts.  One was the part that had already been used up

15   and was the senior preferred stock on which the enterprises

16   had to pay 10 percent.  And there was roughly another $260

17   billion that was available to, you know -- it basically

18   acted as capital that allowed the companies to continue to

19   operate.  And the periodic commitment fee was the fee that

20   Treasury was to be paying for that 200 billion of capital

21   that it was providing to allow the companies to operate.

22        Q.   And are the last two built points on this slide

23   your conclusions?

24        A.   Yes.

25             So based on the situation at the time of the third

**DIRECT - M. ATTARI - by Ms. Varma**

1    amendment, I concluded that it was reasonable for FHFA to

2    try to reduce the risk or eliminate -- reduce the risk of

3    circular draws, to eliminate the erosion of the commitment

4    by circular draws.  I also concluded that the third

5    amendment did, in fact, end the erosion of the commitment by

6    circular draws.

7        **Q.**    So your overrule conclusion?

8        **A.**    My overrule conclusion was it was reasonable for

9    FHFA to agree to the third amendment; and that's because it

10   furthered the conservator's goal to promote stability of the

11   secondary mortgage market in all economic conditions, by

12   eliminating draws on the commitment to pay the dividends.

13           And, here, the "all economic conditions" is what

14   is important because it is really when things turn out

15   poorly that it was important to have the money that allowed

16   these companies to operate.

17       **Q.**    By "money" you mean the amount of the commitment?

18       **A.**    Yes, the amount of the unused portion of the

19   commitment.

20       **Q.**    We'll discuss your findings in greater detail but,

21   first, let me ask you about the opinions of plaintiffs'

22   experts and your review of them.

23           Dr. Dharan testified the net worth sweep was not

24   reasonably necessary to address circular draw problem.  Do

25   you agree?

**DIRECT - M. ATTARI - by Ms. Varma**

1      **A.**    No, I do not agree.

2            The reason I don't agree -- I think the reason he

3      got it wrong is that his analysis doesn't fully take into

4      account that FHFA's stated goal was to promote the stability

5      of the secondary mortgage market.  The third amendment

6      helped by eliminating the risk of circular draws, which

7      would, kind of, erode the commitment.

8            And the second is that -- and this goes back to

9      what we talked about earlier, that it's important to look at

10     the information that is available at a point in time.  And

11     the second reason I think that he doesn't get it right is

12     that the optimism that Dr. Dharan thinks, you know, about

13     the situation in 2012 was not really shared by either the

14     enterprises or by FHFA.

15     **Q.**    When you say "not shared" what do you mean?

16     **A.**    Their views of the future were both less, kind of,

17     positive and had much more uncertainty around them than

18     Dr. Dharan -- than what Dr. Dharan uses in his analysis.

19     **Q.**    Okay.

20           You were also asked to consider Dr. Thakor's

21     opinion of what a reasonable PCF would be, if one were

22     agreed to.  Do you agree with Dr. Thakor's opinion?

23     **A.**    No, I do not.

24     **Q.**    He testified that if a PCF were agreed to, it

25     would be between 65 million and 1.16 billion annually for

**DIRECT - M. ATTARI - by Ms. Varma**

1 both enterprises.  Can you describe why you disagree with

2 that?

3     **A.**   So the first reason is that we are talking about a

4 fee on $260 billion of capital that was being provided to

5 these companies that allowed them to operate.  I think his

6 analysis just doesn't take that -- or fully account for that

7 fact.  It was the amount of money and, kind of, what the

8 money allows.

9     And I think the other thing that he doesn't get

10 right is when he -- he uses the FDIC's fee to determine what

11 the companies would pay, but that's a completely incorrect

12 application of the FDIC's fee.  Banks that have no capital,

13 don't get to continue to operate.  These companies had no

14 capital since 2008.  They only were able to operate because

15 of the commitment.  If you have a bank that has no capital,

16 it will not be operating three and a half years later.  I

17 think his application of the FDIC fee is incorrect.

18     He also ignores statements by the various parties,

19 Treasury, FHFA and the enterprises, that say that they

20 expected the PCF to be substantial.  And, you know, he also

21 acknowledges -- I am not very sure why he has some of his

22 comparables in there, because he acknowledges that they are

23 not relevant to estimating a positive PCF.

24     **Q.**   Thank you.

25     Let's go back to what you said was one of the

**DIRECT - M. ATTARI - by Ms. Varma**

1    first things you said you looked at, which was what was

2    FHFA's stated objective.

3              In order to understand the stated objective, did

4    you first try to understand how the enterprises work and

5    what their public mission was?

6        **A.**   Yes, I did.

7        **Q.**   And could you describe what you concluded?

8        **A.**   So the enterprise's public mission was to

9    provide -- you know, I've written down what they say their

10   public mission is, "Is to provide liquidity, stability and

11   affordability to the U.S. housing finance system under all

12   economic conditions."  Right?  The "under all economic

13   conditions" is important because they need to be able to

14   operate when times are -- you know, in good times and in bad

15   times; that's kind of, I think, the important part.

16             The mission itself is important; that is to

17   provide liquidity, stability and affordability.  The

18   stability part, kind of, is that you are able to do what you

19   are supposed to do under all economic conditions.

20             The way they provide liquidity is that they

21   increase the money that's available, that banks can lend --

22   banks and other lenders can lend to borrowers to purchase a

23   home.  People want to take out a mortgage, they go to their

24   bank, you know, the bank actually has money to lend to them.

25   The way they accomplish that is they buy up mortgages and

**DIRECT - M. ATTARI - by Ms. Varma**

1   add on a guaranty on the mortgages.  So basically -- and

2   they add on that guarantee.  And those mortgages are pooled

3   and securities are sold.

4           What that process does, that guaranty does, is

5   that the ultimate buyers of the securities don't need to

6   worry about the individual mortgage borrower's abilities to

7   pay.  Right?  All they have to be concerned about or ...

8           You know, prior to 2008 they weren't even

9   concerned so much about it.  What they have in their heads

10   is that Fannie Mae and Freddie Mac will step in and make

11   payments, make them whole, if the mortgage borrower is

12   unable to pay.  To accomplish all of this, to make this

13   work, Fannie Mae and Freddie Mac borrow money by issuing

14   bonds to fund their operations.

15   **Q.**   For the guaranty to work, must the MBS investors

16   consider the credit worthiness of Fannie and Freddie?

17   **A.**   Yes, they must.  Because, you know, the guaranty

18   is typically on a mortgage with a life of 30 years.  And,

19   you know, the guaranty is only valuable if you are -- if you

20   can be sure that you will -- the guarantor will actually,

21   you know, show up and pay on the guaranty.

22   **Q.**   You also stated the enterprises borrow money.  Why

23   to Fannie and Freddie borrow money?

24   **A.**   You know, most companies need -- so the

25   mortgage-backed securities are the product of Fannie Mae and

**DIRECT - M. ATTARI - by Ms. Varma**

1   Freddie Mac.  If you think of any company, it has to buy raw

2   materials, it has to pay employees.  It has to, you know, do

3   various things for which it needs money, before it can sell

4   its finished products.

5          In much the same way, Fannie Mae and Freddie Mac

6   need to borrow money to facilitate their operations.  In

7   their case, it's to buy mortgage loans where the borrower

8   has defaulted back out of pools and make those payments

9   until they can resolve the loan.  They buy up loans and hold

10  them to facilitate the process and so on.  So they are

11  borrowing large amounts of money to make this whole process

12  work.

13     **Q.**   You mentioned that Fannie Mae and Freddie Mac

14  issue bonds.  What is the difference between the

15  mortgage-backed securities and a bond?

16     **A.**   So when Fannie Mae and Freddie Mac issue bonds,

17  they are borrowing for themselves.  They then use the money

18  for various purposes to help the companies run and to make

19  investments that are necessary to help the companies run.

20  If Fannie Mae and Freddie Mac are unable to pay, the entire

21  amount that a bondholder has lent to Fannie Mae and Freddie

22  Mac is at risk.  Right?

23          On the other hand, in the case of mortgage-backed

24  securities, what is happening is that Fannie Mae and Freddie

25  Mac act as a pipeline, if you will, between the banks that

**DIRECT - M. ATTARI - by Ms. Varma**

1    lend money to borrowers on mortgages and investors.  In that

2    case, there's a whole set of mortgages that are sitting

3    there.  And the investors on the mortgage-backed securities,

4    the risk they face is that the borrowers won't pay, right,

5    and Fannie Mae and Freddie Mac won't be able to come through

6    on the guaranty.  So the risk is different than in the case

7    of a mortgage, where it's just the risk that Fannie Mae and

8    Freddie Mac won't be able to pay.

9        Q.    Where do shareholders fit into this picture?

10       A.    So as a normal company, you know, to make all of

11   this work, you know, to give employees comfort that their

12   salaries will be paid to, you know, make the people who

13   provide raw materials comfortable, that they will get paid

14   for the materials they provide and the services they provide

15   and so on, a company needs to have capital.  Finance usually

16   call it equity capital; that is what the owners of the

17   company put in to help make the business work.  Shareholders

18   provide that equity capital.

19       Q.    The shareholders in this litigation are both

20   preferred and common shareholders.  You said they were

21   owners of the enterprises.  In what way are preferred and

22   common shareholders different?

23       A.    Well, when the profits are to be distributed, the

24   preferred shareholders have to be paid what is due to them.

25   And then the remaining profits can be distributed to common

**DIRECT - M. ATTARI - by Ms. Varma**

1    shareholders.

2         You know, if the company goes under, where the

3    assets of the company, what the company owns, is less than

4    it's obligations, then too, if there is any money left over,

5    preferred shareholders get paid first before common.

6    **Q.**   You noted some points about events leading up to

7    the conservatorship.  What impact did the financial crisis

8    have on Fannie Mae and Freddie Mac?

9    **A.**   So as we progressed through the financial crisis,

10   Fannie Mae and Freddie Mac started experiencing losses.  The

11   shareholder capital, that had already been put in those

12   companies, started to become -- you know, was eaten away by

13   those losses, and was less and less available.

14        The companies tried to raise capital and they

15   actually did raise capital at various points.  But they got

16   to a point where they could not raise new capital, you know,

17   from private shareholders.

18        They were left then at a point they weren't able

19   to raise capital.  The capital that was available was

20   shrinking.  Borrowers were beginning to lose confidence in

21   the enterprises.  And the cost of borrowing was increasing.

22   And the mortgage markets, you know, that we talked about,

23   where Fannie Mae and Freddie Mac act as facilitators, as

24   that pipeline, those were freezing up.

25   **Q.**   When you say "freezing up," what do you mean?

**DIRECT - M. ATTARI - by Ms. Varma**

1     **A.**    It was becoming more expensive and more difficult

2     to borrow, to get a mortgage loan.

3     **Q.**    Okay.

4            So it's not just Fannie and Freddie that were

5     having borrowing, as they do with issuing bonds, but it was

6     beyond that.

7     **A.**    Yes.

8     **Q.**    And is that because Fannie and Freddie essentially

9     facilitate the flow of money through the housing finance

10    system?

11    **A.**    Yes.

12    **Q.**    Tell us about the Treasury commitment.

13    **A.**    So Treasury stepped in to -- you know, to help

14    improve Fannie Mae and Freddie Mac's situation.  They

15    purchased preferred shares in both Fannie Mae and Freddie

16    Mac, and they became equity holders in the enterprises.  And

17    they committed to purchasing up to 100 billion, initially,

18    of additional preferred stock in the companies, if they

19    experienced losses.

20           So each time the companies experienced losses,

21    they could draw money or they could, basically, get money

22    from Treasury to make their net worth positive.  Because if

23    a company has negative net worth, it's difficult to operate.

24    In many situations practically impossible to continue to

25    operate.

**DIRECT - M. ATTARI - by Ms. Varma**

1    **Q.**   What do you mean by net worth?

2    **A.**   So net worth is kind of the assets minus the

3    obligations or the liabilities.  You know, if the assets

4    become less than the liabilities, then the companies owe

5    more than the assets they have.  So they can't fulfill all

6    of their obligations.

7    **Q.**   Is it fair to say that at a negative net worth,

8    the companies would be insolvent?

9    **A.**   One of the definitions of insolvency has to do

10   with net worth.  Companies with negative net worth are

11   considered to be insolvent under that definition.

12   **Q.**   And negative net worth, is that the same as the

13   equity capital being exhausted?

14   **A.**   Yes, it is.

15   **Q.**   And what does that mean, that equity capital has

16   been exhausted?

17   **A.**   So what that means is that the losses have

18   exceeded whatever the owners have put into the business.

19   **Q.**   Would it be fair to call equity capital the

20   cushion that creditors are looking at to make sure their

21   obligations are paid?

22   **A.**   Yes.

23   **Q.**   And so once the equity capital is exhausted, the

24   cushion is no longer there, would it be reasonable for

25   creditors to be concerned about whether they should continue

**DIRECT - M. ATTARI - by Ms. Varma**

1    to do business with the company?

2         **A.**   Yes.   Often creditors will stop doing business

3    with a company, even when the equity capital is positive,

4    but it has become small, relevant to the company.   So they

5    don't necessarily wait until you get to negative equity

6    capital.   Often they will stop way before then.

7         **Q.**   What was the purpose of the Treasury commitment?

8         **A.**   The purpose of -- the screen went off.

9         **Q.**   Sorry.

10        **A.**   The purpose of the Treasury commitment that's on

11   this slide, it was to "support market stability" and to

12   "support mortgage availability."   That's from a statement by

13   Treasury Secretary Paulson on September 7, 2008.

14        **Q.**   And FHFA also issued a statement at the same time.

15        **A.**   Yes.   FHFA stated that "The goal of the

16   conservatorship" -- you know, these statements are similar.

17   "The goals of the conservatorship are to help restore

18   confidence in the Company, enhance its capacity to fulfill

19   its mission" -- so we were talking about the flow of money

20   into the housing finance system -- "and mitigate the

21   systemic risk that has contributed directly to the

22   instability in the current market."

23        **Q.**   We heard the term "systemic risk" before.   Can you

24   describe what that means in relation to Fannie and Freddie?

25        **A.**   Systemic risk generally is when you have the

**DIRECT - M. ATTARI - by Ms. Varma**

1    failure of one institution, it kind of spreads and causes

2    other failures.  In the context of Fannie and Freddie, it

3    would be the banks that work with Fannie and Freddie and,

4    you know, sold the mortgages to Fannie and Freddie.  And

5    then you could even think of it in the wider context where

6    it's borrowers were looking for mortgages being affected.

7        **Q.**    You then, I understand, looked at the events

8    proceeding the third amendment.  Could you describe to us

9    the facts that you looked at in your conclusions?

10       **A.**    Sure.  So -- and we will go through each of these

11   kind of systematically but, really, the facts were that the

12   companies had drawn 189 billion on the Treasury commitment.

13   And on that 189 billion they had drawn, they owed almost

14   19 billion in dividend to Treasury each year.

15         The 19 billion in dividends that they owed

16   exceeded the profits they had historically made.  In

17   Fannie's case, they never -- you know, Fannie owed 12 and

18   Freddie owed 7.  Fannie had never made 12 billion in a year

19   going back to the beginning of time.  Freddie had made it

20   only once, the 7 billion they needed to pay, only one year

21   to, you know, to the start of that company.

22         Future profit.  So this was the history.  History

23   is often a great place to start when thinking about the

24   future.  Future profits were expected to be smaller because

25   of changes that had been put in place since the crisis.

**DIRECT - M. ATTARI - by Ms. Varma**

1   There were additional changes that FHFA had laid

2   out that it planned to have the enterprises make, which

3   would further reduce profits.  So all of that taken together

4   meant that the companies would need to draw to pay the

5   dividend, and those draws would erode the commitment.  The

6   commitment, remember, was going to be capped at the end of

7   2012.  So once you hit the end of 2012, every time there was

8   a draw, the remaining commitment would become smaller and

9   smaller.

10   **Q.**   When you say "draws to pay the dividends," that's

11   what we have been referring to as circular draws?

12   **A.**   Yes.

13   **Q.**   Let's go back to each of the points that you've

14   made.  Here's Fannie's net worth.  Can you describe what

15   this table shows?

16   **A.**   So this is a chart of Fannie's net worth since

17   the -- since the end of 2008.  And what you are seeing,

18   essentially, is the -- you know, the losses the dividends --

19   you know, a combination of the losses and dividends -- the

20   effect of a combination of losses and dividends for Fannie

21   each quarter.

22   So what you have is, basically, a string of 13

23   quarters where Fannie lost money and was unable to meet the

24   dividend payments, followed by two quarters where it earned

25   enough to meet the dividend payment.

**DIRECT - M. ATTARI - by Ms. Varma**

1  **Q.**  And what do you conclude from the two quarters

2  that they earned enough to pay the dividend?

3  **A.**  Well, so -- you know, we had -- a big part of what

4  we are trying to do is think about the future.  And, you

5  know, the question is how much confidence can we have in

6  whatever we project, given that we have two quarters, you

7  know, only two quarters of -- you know, of profits that

8  exceeded dividends, and how much uncertainty we should --

9  you know, how much confidence we should have in any

10  projection we should make.

11  **Q.**  Okay.  Let' take a look at Freddie.  What do you

12  conclude from Freddie's pattern of earnings?

13  **A.**  So Freddie, unlike Fannie, which had consistently

14  made losses and then had two you quarters of profits

15  exceeding dividends, Freddie had kind of, you know, had

16  losses and profits in excess of dividends alternating in

17  time.

18  In Freddie's case, there was only one quarter at

19  the end where profits exceeded dividends; so that's one

20  thing.  The other is, earlier in time, Freddie had actually

21  earned more than dividends for a couple of quarters, but

22  then things turned around again.  So this kind of goes back

23  to the point I was making about uncertainty and confidence,

24  you know?

25  **Q.**  I understand you also looked at Fannie Mae and

**DIRECT - M. ATTARI - by Ms. Varma**

1    Freddie Mac's securities filings to see what they were

2    saying about the relationship between dividends and their

3    earnings.

4         A.   Yes, I did, because they give us information on a

5    longer history.  Fannie Mae -- the statements from two

6    filings, one is at the end of 2011.  There they say, "The

7    amount of this dividend payment exceeds our reported annual

8    net income for every year since our inception."

9              Two years later, in August of 2012, when they've

10   earned, you know, profits in excess of the dividend payments

11   for two quarters, the statement is still the same.  They are

12   still saying, "The amount of this dividend payment exceeds

13   our reported annual net income for every year since our

14   inception."

15        Q.   When you say "filings," what are you referring to?

16   Where are these filed?

17        A.   These are periodic statements, so quarterly and

18   annual statements, that companies file with the Securities

19   and Exchange Commission.

20        Q.   Let's take a look at Freddie's SEC filing.

21        A.   So Freddie Mac had similar statements, except that

22   what they noted is that the cash dividend to the Treasury

23   "exceeded the annual historical earnings in all but one

24   period."  So, you know, one period over their life had

25   actually earned more than 7.2 billion.

                    **DIRECT - M. ATTARI - by Ms. Varma**

1    **Q.**   So this is the past.  You also mentioned that you

2    looked at future expectations.

3    **A.**   Yes.  So I looked at future expectations in two

4    different ways.  One is I looked at internal documents,

5    which is what this is.  And then I also looked at what the

6    companies said in their SEC filings.

7         So this is an internal document that, you know, a

8    set of projections Fannie did.  It covers the 10 years

9    through 2022.  And the line, you know, that is easiest to

10   see what is happening is the residual equity line.  You can

11   see that the left over equity all the way in 2022 is zero,

12   which means that they do not consistently earn in excess of

13   the dividends.

14   **Q.**   Do you recall the date for these projections?

15   **A.**   These are from August of 2012, before the third

16   amendment.

17   **Q.**   Are these the same prohibitions that Dr. Dharan

18   relied on in formulating his opinion?

19   **A.**   I believe so, yes.

20   **Q.**   What do these projections telling you in terms of

21   Fannie Mae's expected profits?

22   **A.**   That they are going to be insufficient to pay the

23   10 percent dividend.

24   **Q.**   What is the best line for us to look at that?

25   **A.**   The residual equity line.  You can look at the

**DIRECT - M. ATTARI - by Ms. Varma**

first two lines, the comprehensive income and the preferred

dividend payment, and then you can compare the numbers year

by year.  You will see that in many -- in most of the years

the dividend exceeds the comprehensive income.  There are a

few years where the income was going -- was projected to

increase, to exceed the dividend payment, but that reversed

back again starting in 2018 and 2019.

Q.   Now Fannie Mae's projections, this particular

projection, is only one scenario compared to what Freddie

Mac did, correct, at the same time?

A.    Yes.  So they only have -- Fannie Mae only has a

base case.  And one way to think about it is -- what they

are saying is more than 50 percent of the time they won't

earn enough to pay the dividend.

Freddie Mac has multiple scenarios and, kind of,

they do the analysis.  But in their internal slides, they

actually straight up have an observation that says that

"over the long term it is likely that our dividend

obligation will exceed comprehensive income resulting in

additional Treasury draws."  So they are talking about

circular draws in this slide.

Q.   These were all internal projections to Fannie and

Freddie.  You also looked at public statements made by

Fannie and Freddie around the same time before the third

amendment.  Correct?

**DIRECT - M. ATTARI - by Ms. Varma**

1    **A.**    Yes.  The public statements were consistent with

2    the internal projections.  So Fannie kind of talks about the

3    fact that the profits could vary from period to period --

4    which, you know, if you think about it makes sense because

5    profits will vary.  But, remember the dividend is fixed, so

6    it's 10 percent of whatever's being drawn; so that's not

7    going to vary.

8         And then they go on to say that "we do not expect

9    to generate net income or comprehensive income in excess of

10   our annual dividend obligation to Treasury over the long

11   term."

12   **Q.**    And remind us what the dividend obligation to

13   Treasury would be.

14   **A.**    At this time it would be a little bit under

15   approximately $12 billion.  A little under $12 billion.

16   **Q.**    And Freddie Mac made a similar announcement?

17   **A.**    Yes, Freddie Mac said, "it is unlikely that we

18   will generate net income or comprehensive income in excess

19   of our annual dividends payable to Treasury over the long

20   term."  Just like we saw in the internal documents.

21   **Q.**    Both the Fannie Mae and Freddie Mac statements

22   were in their 10-Qs.  What is a 10-Q?

23   **A.**    So the form that the companies file their results

24   in each quarter is a quarterly filing, so it has the Q.

25   It's Form 10-Q.  When they file their annual results, it's a

**DIRECT - M. ATTARI - by Ms. Varma**

1    different form.  It's more detailed and longer.  It's 10-K.

2        **Q.**    And do you recall when these particular 10-Qs that

3    we have been looking at were issued?

4        **A.**    These were issued about a week or 10 days before

5    the third amendment, which was on August 17, 2012.  So this

6    would be somewhere around August 7th of 2012.

7        **Q.**    If Fannie and Freddie did not have enough

8    comprehensive income to cover the dividend obligations to

9    Treasury, would they draw from the commitment?

10       **A.**    Yes, they would.

11       **Q.**    Do you interpret these statements as saying that

12   circular draws were potentially going to continue?

13       **A.**    Yes.  I mean, the language suggests they were

14   likely to continue or viewed as being likely to continue.

15       **Q.**    You also mentioned that you looked at the plans

16   that the conservator had for Fannie and Freddie.

17       **A.**    Yes, I did.

18       **Q.**    Were you referring to this plan?

19       **A.**    Yes.  So in February of 2012, FHFA had put

20   together a strategic plan for the enterprises and this was

21   provided to Congress and it was a public document.

22       **Q.**    You titled the slide, "Shrink and De-Risk".  What

23   does shrink and de-risk mean?

24       **A.**    Shrink means to make smaller and de-risk means to

25   reduce the risk.

**DIRECT - M. ATTARI - by Ms. Varma**

1          You know, part of what they were going to do --

2    so, remember, during the financial crisis, Fannie Mae and

3    Freddie Mac fail.  And part of the reason was that they were

4    large.  And the failure was considered to be systemic or to

5    pose systemic risk.  Part of the reason for all of that is

6    that they were large and they held a lot of risk.

7          And so part of what FHFA was planning to do is to

8    make them smaller and to reduce the risk.  There were

9    various ways that both of these plans were to be

10   accomplished.  In the case of de-risking, remember I said

11   that Fannie Mae and Freddie Mac provided the guaranties.

12   And Fannie Mae and Freddie Mac were exposed to the risk that

13   borrowers would not be able to pay, and they would have to

14   step in.

15         So part of the de-risking was to, you know, sell

16   that risk on to other people, so that now other people would

17   bear the risk and they would earn the return for bearing

18   that risk.

19   Q.   And what would be the implications for Fannie and

20   Freddie's profits?

21   A.   Fannie and Freddie's profits would shrink, but

22   they would also become less variable.  Because, you know,

23   you are getting rid of risks.  And now there is less

24   uncertainty, but you are also going to have smaller profits.

25   Q.   And is the risk of less uncertainty related to the

                DIRECT - M. ATTARI - by Ms. Varma

1  goal of stability in the secondary housing market?

2  **A.**   Yes, because you reduce the risk, you are kind of

3  increasing, you know, reducing the risk that they might fail

4  if things go poorly.  And you are making the housing finance

5  market, which they are at the center of, more stable.

6  **Q.**   Now, the enterprises are still "the dominant

7  presence" in the marketplace.  Are they not?

8  **A.**   Yes, they are.

9  **Q.**   Do you know if the shrinking and de-risking was

10  actually implemented by FHFA?

11  **A.**   I know there were attempts to implement it.  I

12  don't believe they were as successful as FHFA intended or

13  hoped for.

14  **Q.**   Were the plans to shrink and de-risk taken into

15  account or included in the projections that we saw earlier

16  from Fannie Mae and Freddie Mac?

17  **A.**   I believe they were not.  So in the case of Fannie

18  Mae in particular, there was some projected shrinking of the

19  firm.  But then it was projected, you know, to start growing

20  again after 2015 or 2016.

21  **Q.**   You identified statements by the GSEs on what they

22  expected with respect to their ability to pay dividends.

23  Would you expect that the profits would be more or less than

24  expected depending on the year?

25  **A.**   Yes.

**DIRECT - M. ATTARI - by Ms. Varma**

1    **Q.**    And how would that affect the ability to pay the

2    dividends?

3    **A.**    Well, if the profits came out as expected, you

4    know, they wouldn't have the ability to pay the full

5    dividend.  If the profits turned out to be smaller than

6    expected, you know, they would be able to cover even less of

7    the dividend, and they would have to make an even bigger

8    draw to cover the full dividend.

9    **Q.**    Those are the circular draws?

10   **A.**    Those were the circular draws.

11   **Q.**    And what if profits turned out to be higher than

12   the 10 percent dividend?

13   **A.**    So if profits turned out to be higher than the

14   10 percent dividend, then there was this periodic commitment

15   fee that Treasury had been waiving.  It was part of the

16   initial preferred stock purchase agreement.  They had waived

17   it in 2010 and 2011 and for the first half of 2012.  But

18   each time they had waived it, they had said that they would

19   start to collect it when the enterprises were able to pay

20   it, which is when the profits exceeded the dividends.

21   **Q.**    Let's start with the purpose of the PCF.  What do

22   you understand the purpose to be?

23   **A.**    So the purpose was to compensate purchaser, which

24   is -- to fully compensate purchaser, which is Treasury, for

25   the support provided by the ongoing commitment.  And the

**DIRECT - M. ATTARI - by Ms. Varma**

1   ongoing commitment is the remaining amount.  So in 2012, we

2   are talking about the roughly 260 billion unused portion of

3   the commitment that was there.

4       **Q.**   The date provided in the original agreement is

5   December 31st, 2009.  Did that change?

6       **A.**   Sorry.  Say that again, please.

7       **Q.**   The date in the document excerpt here is

8   December 31st, 2009.  Do you know if that date changed?

9       **A.**   That was the date on which -- yes, that date

10  changed.  They waived it in 2010.  They waived it in 2011.

11  They waived it for the first two quarters of 2012.

12      **Q.**   And how was the PCF to be determined?

13      **A.**   It said that it would be determined with reference

14  to the market value of the commitment as then in effect.  So

15  it's the market value, essentially, of someone providing

16  260 billion of equity to a company that has no equity.

17      **Q.**   The purpose clause also says, "the fee would be

18  mutually agreed by Purchaser and Seller," which would be

19  Treasury and FHFA as conservator on behalf of Fannie and

20  Freddie.  Correct?

21      **A.**   Yes.

22      **Q.**   "Subject to their reasonable discretion and in

23  consultation with the Chairman of the Federal Reserve".  Is

24  the reason that the fee would be mutually agreed, one of the

25  reasons you looked at what the purchaser and the seller were

**DIRECT - M. ATTARI - by Ms. Varma**

1    saying about what they expected of the fees?

2        **A.**   Yes.

3        **Q.**   Well, let's take a look at what they've said.

4    These are the enterprise SEC filings.  And these are the two

5    that you looked at for Freddie and Fannie?

6        **A.**   Yes, these are the ones that I looked at.  These

7    are the annual filings from the end of 2011.  So they would

8    have been filed in February or March of 2012.

9        **Q.**   And what do they say?

10       **A.**   Fannie says that -- you know, the highlighted

11   portion is part of a sentence.  They say, "The substantial

12   dividend obligations" -- which at this point are roughly

13   12 billion -- "and the potentially substantial quarterly

14   commitment fees on the senior preferred stock..."  So they

15   are saying it is substantial.  They are not giving the

16   number.

17       **Q.**   And so the commitment fees would be in addition to

18   the 10 percent dividend?

19       **A.**   Yes.

20       **Q.**   And Freddie's filing?

21       **A.**   Freddie's filing says, "The amount of the

22   quarterly commitment fee has not yet been established"

23   -- it's noting it is still being decided -- "and could be

24   substantial."

25       **Q.**   Freddie's filing also refers to indication by

**DIRECT - M. ATTARI - by Ms. Varma**

1    Treasury, which we can go into the next slide.  What does

2    this refer to?

3         **A.**    So this is a waiver letter sent by Treasury in

4    December 2010, waiving the fee for the first quarter of

5    2011.  And, you know, as part of that, they are saying --

6    they are laying out their thinking about the PCF.  What they

7    are saying is that the payment -- the dividend payments are

8    forecast to be larger than the earnings.  Right?

9              They are noting the fact that we are going to have

10   circular draws in 2011 because the enterprises are not going

11   to earn enough to pay the dividends; that's the first

12   sentence.

13             Then they go on to say, therefore -- you know,

14   because of that, all of the net income of the enterprises is

15   going to be paid to Treasury already as dividend.  Right?

16   So they are laying out this context and saying because they

17   are going to get all of the income already, they don't

18   believe that the imposition of the PCF at this time would

19   provide additional proceeds to the American taxpayer.  They

20   are just stating a fact.  We are already going to get all of

21   the profits as dividends.  Imposing a PCF isn't going to

22   increase the amount the taxpayers get.

23        **Q.**    And the next paragraph?

24        **A.**    So, you know, to make sure this wasn't

25   misunderstood as they would never impose a fee, they go on

                  **DIRECT - M. ATTARI - by Ms. Varma**

1    to say they will reevaluate the situation during the next

2    quarter to determine whether a PCF would be set.  So this

3    was only a waiver for one quarter.

4             And then they go on to say they "remain committed

5    to protecting taxpayers and ensuring that future positive

6    earnings of the enterprises are returned to taxpayers as

7    compensation for their investment."

8        Q.   How does this waiver relaying what Treasury says

9    support your report that Treasury viewed the PCF as

10   substantial?

11       A.   Well, the way I read this, Treasury is saying that

12   the profits -- that they believe the profits should be

13   returned to taxpayers.  And so, you know, they are saying

14   it's substantial.

15       Q.   The amount of the PCF would depend on profits, you

16   mean?

17       A.   Yes.

18            **THE COURT:**  Can we take a short convenience break

19   now?

20            **MS. VARMA:**  Yes.

21            **THE COURT:**  Let's take 10 minutes.

22        (Jury exited the courtroom.)

23        (Witness stepped down.)

24            **THE COURT:**  What's your timing, do you think?  I

25   probably want to stop around 12:30.  I have three January 6

                **DIRECT - M. ATTARI - by Ms. Varma**

1    cases to do.  I could go a little later.  They are all by

2    Zoom.

3              **MS. VARMA:**  We won't finish by lunch.  What time

4    did you want to take a break?

5              **THE COURT:**  12:30 or thereabouts.

6              **MS. VARMA:**  It will go after then.

7         (Jury entered the courtroom.)

8         (Witness resumed the stand.)

9              **THE COURT:**  You may be seated.

10             **MS. VARMA:**  You may proceed.

11   BY MS. VARMA:

12        **Q.**   Now, Dr. Attari, I understand you read some market

13   analyst reports.

14        **A.**   Yes, I did.

15        **Q.**   Before we go through what you learned from them,

16   can you tell us what a market analyst is?

17        **A.**   So the big financial institutions that help

18   companies sell bonds and trade -- you know, help investors

19   trade those bonds, they put out research reports.  And this

20   can be -- you know, contain quantitative analysis, it can

21   contain qualitative analysis.  But they put out these

22   reports and they publish them and they are referred to as

23   market analyst reports.

24        **Q.**   And do experts rely on these market analyst

25   reports?

              **DIRECT - M. ATTARI - by Ms. Varma**

1    **A.**   Yes, we do.

2         So they are very commonly used in -- when we do

3    corporate finance type of analysis or securities, markets

4    type of analysis, because they tell us what these analysts

5    are saying at the time of the events that we are trying to

6    analyze.

7    **Q.**   And these events happened more than 11 years ago?

8    **A.**   Right.   These events happened almost 11 years ago.

9    So if you wanted to find out what people's views were or at

10   least what their stated views were, you know, this ends up

11   being a very efficient way of doing it, because this is what

12   they actually published, you know, at the time.

13   **Q.**   You said there were financial institutions.   What

14   kinds of financial institutions are they?   What business do

15   they do?

16   **A.**   So there's two kinds of financial institutions

17   that put out market analyst reports, that are going to be

18   relevant for the analysis here.   One is the credit rating

19   agencies.

20        Just like the companies that give us credit

21   scores, there are companies that analyze and publish credit

22   ratings on Fannie Mae and Freddie Mac and other companies;

23   and that's Moody's and Fitch.

24        Some of you may have read about Fitch, which

25   recently, kind of, changed the ratings on the U.S.

**DIRECT - M. ATTARI - by Ms. Varma**

1   government securities.  So they have been in the news the

2   last few days.  Moody's is kind of a bigger company than

3   Fitch or more widely used than Fitch.  So that's two of the

4   three credit rating agencies that I have up there.

5            And Deutsche Bank, Barclays and RBC Capital

6   Markets, these are large -- you know, they are banks but

7   they do much more than what we typically think of as

8   banking.  One of the things they do is help companies sell

9   their bonds to investors and then subsequently help

10  investors create those bonds.  So they put out research

11  reports to help, you know, their clients understand the risk

12  and reward to buying and selling these securities.

13      **Q.**   What was your methodology for identifying market

14  analyst reports to review?

15      **A.**   We have a subscription to a service that gathers

16  analyst reports and then makes them available to companies

17  like us, you know, the collection of analyst reports.  So I

18  had my team pull reports from that service.

19      **Q.**   And what period of time did you pull the reports

20  for?

21      **A.**   We primarily pulled reports for 2012.  But over

22  the course of the analysis, off our work on this, we pulled

23  reports from 2008 through 2013.

24      **Q.**   And how many reports do you estimate you pulled?

25      **A.**   So over the course of 2008 through 2013 we got

                  **DIRECT - M. ATTARI - by Ms. Varma**

1    about 200 reports, but we were using a fairly -- you know, a

2    search criteria that would pull in a fairly wide range of

3    reports.  Many of these mentioned Fannie Mae and Freddie Mac

4    in passing.

5         **Q.**   How did your team decide which reports to review?

6         **A.**   What we typically do is we review and focus on

7    reports that are on the company in question; and that's the

8    process we used here.

9              We had pulled the larger set because the more

10   targeted search resulted in a smaller number of results and

11   we wanted to make sure we weren't missing something because

12   we were using a targeted search.

13        **Q.**   Can you take us through how the market analyst

14   reports assisted you?

15        **A.**   They helped us understand the -- you know, the --

16   what investors and analysts were looking at and what their

17   views were at the time of the third amendment.

18        **Q.**   You brought some examples of reports.  These have

19   all been admitted into evidence so the jury can see them as

20   well but let's go through some exempts?

21        **A.**   Sure.

22        **Q.**   This is a Moody's report from September 26, 2011.

23   Do you think a report from September 2011 is still relevant

24   to your analysis?

25        **A.**   Yes, because it provides context.  You know, often

**DIRECT - M. ATTARI - by Ms. Varma**

1  in this type of work you want to know how the thinking

2  evolved over time or how the stated opinions evolved over

3  time.  So looking at a report, even though it's almost a

4  year prior to the third amendment, helps with that.

5      **Q.**  And what is Moody's saying in this report?

6      **A.**  In September 2011 they are saying that the

7  "dividends on the Treasury's senior preferred stock will

8  eliminate Fannie Mae's contingent capital by 2019 and

9  Freddie Mac's by 2022."

10      What they mean when they say "contingent capital"

11  is basically the remainder of the commitment.  And what they

12  are saying, essentially, what that first statement is saying

13  is that they view circular draws as, kind of, causing the

14  capital of Fannie Mae to be used up, the remaining amount of

15  the commitment for Fannie Mae to be used up by 2012 and for

16  Freddie Mac by 2022.

17      **Q.**  Are you reading this as circular draws or total

18  losses?  How are you interpreting it?

19      **A.**  Well, so it's the combination of losses and

20  circular draws.  But the way it is written "dividends on the

21  U.S. Treasury preferred stock," so that's the piece they are

22  focusing on.

23      **Q.**  Okay.

24      And the next paragraph that you've highlighted,

25  what does that refer to?

**DIRECT - M. ATTARI - by Ms. Varma**

1    **A.**   So what they are saying is that -- what they are

2    discussing there is, you know, GSE reform, which is kind of

3    trying to restructure the companies.

4         What they are noting is that if that process is

5    too contentious, as in people can't get to an agreement or

6    that it excludes explicit support, which is, you know,

7    something like the commitment but it makes it even more

8    concrete and "results in less-relevant GSEs with

9    insufficient contingent capital it would be a credit

10   negative."

11        They are talking about three different scenarios

12   that would be negative and would prompt a review of their

13   Aaa ratings, which is that their ratings would be reduced.

14   **Q.**   What do you understand GSE reform to refer to?

15   **A.**   At the time there were various proposals -- you

16   know, we seen one by FHFA of plans for the future.  Treasury

17   had one.  You know, in Congress there were various proposals

18   floating around.  So they are talking about that.

19   **Q.**   What does it mean to have a credit negative?

20   **A.**   So because the GSEs had this Treasury commitment,

21   their credit ratings were capped at the same level as the

22   credit ratings of the United States government.  And what

23   they are saying is that, you know, depending on how the

24   situation plays out, you know, one of the avenues or

25   scenarios that they are worried about is insufficient

**DIRECT - M. ATTARI - by Ms. Varma**

1    contingent capital.  So if that commitment -- the remaining

2    commitment somehow is smaller or becomes smaller, then it

3    might prompt them to reduce the credit rating of the GSEs

4    below Aaa, so they would be different at that point than

5    that of the government.

6         Q.   These are credit ratings specifically for bonds?

7         A.   Yes, these are the credit ratings of the bonds of

8    the GSEs.

9         Q.   Let's take another look --

10        A.   Sorry.  The last bit of that is that it wouldn't

11   just be -- so these credit ratings are often reduced by one

12   notch.  So you go from Aaa to Aa.  What they are saying is

13   that it would be a multiple-notch reduction below Aaa.

14        Q.   And that's because if the commitment is reduced to

15   a level that creates concern about the ability of the GSEs

16   to fulfill their obligations, they won't follow the credit

17   rating of the U.S.?

18        A.   Yes.

19        Q.   Assuming the credit rating of the U.S. is still

20   Aaa.

21        A.   Yes.

22        Q.   Let's take a look at another report.  This has

23   also been admitted.  This is from Barclays Capital, December

24   14, 2011.  What is Barclays Capital?

25        A.   Barclays Capitol is part of a large banking

**DIRECT - M. ATTARI - by Ms. Varma**

1    institution in London called Barclays.  They purchased

2    Lehman Brothers, which failed during the credit crisis in

3    2008.  They purchased Lehman Brothers.  So you can think of

4    this sort of as Lehman Brothers and Barclays in 2011.

5        **Q.**   What is Barclays Capital conclusion?

6        **A.**   It is based on the fact that the GSEs are saying

7    that they are unlikely to regularly generate net income in

8    excess of dividends payable to Treasury.  So they are noting

9    that fact.

10        Then they are saying that, you know, they refer to

11   this as continued losses, but it's really the circular draws

12   that they are talking about.  Because if you look at the

13   parenthetical they say "driven by senior preferred

14   dividends" at a time when they don't have the benefit of an

15   unlimited capital backstop.

16        Once that comes into play, it would pose a threat

17   to global financial stability in our view.  They view the

18   circular draws, combined with the cap on the commitment, as

19   potentially causing the entire world to collapse or the

20   financial world to collapse.

21        **Q.**   We are getting closer to the third amendment, this

22   is now March 14, 2012.

23        **A.**   Uh-huh.

24        **Q.**   Just to remind everyone, the third amendment was

25   August 17th, 2012.

**DIRECT - M. ATTARI - by Ms. Varma**

1       **A.**   Yes.

2       **Q.**   And this is Deutsche Bank.  What is Deutsche Bank?

3       **A.**   Deutsche Bank is a large German bank, that once

4   again is one of the banks that helps Fannie Mae and Freddie

5   Mac sell bonds to investors and then helps those investors

6   create the bonds.

7       **Q.**   Okay.

8           Let's take a look at what they've said.  We have a

9   number of slides from Deutsche Bank.  If you could take us

10  through them.  "December 31 of this year marks the scheduled

11  end to the unlimited U.S. Treasury support."  They are

12  referring to the cap there?

13      **A.**   Yes, that is in reference to the cap.  They then

14  talk about "The agencies will need that support" -- they are

15  talking about the commitment -- "along with the reserves and

16  income to cover future losses on mortgage-backed securities

17  and repay debt" -- they are what we talked about.  Repaid

18  debt is to repay bonds, you know, that the companies have

19  used to borrow money -- "and pay dividend on preferred stock

20  issued to the US Treasury."  So that's the 10 percent

21  dividend on the, you know, senior preferred stock.

22      **Q.**   And the agencies refer to Fannie Mae and Freddie

23  Mac?

24      **A.**   Yes.  The financial markets refer to Fannie Mae

25  and Freddie Mac as either the GSEs or the agencies, to note

**DIRECT - M. ATTARI - by Ms. Varma**

1   the fact that they are related to the government in some

2   way.

3       Q.   And the last sentence that is highlighted, "Both

4   Fannie Mae and Freddie Mac have subsequently said that the

5   need to pay dividends to Treasury creates 'significant

6   uncertainty about our long-term financial sustainability.'

7   That puts uncertainty puts both their MBS and debt at risk."

8   That was to Congress.  Correct?

9       A.   Yes.

10      Q.   What do you interpret "significant uncertainty

11  about our long-term financial stability" to mean?

12      A.   Basically -- this is, again, the circular draws,

13  because they are talking about the need to pay dividends to

14  Treasury.  The circular draws and how that, you know, their

15  inability to earn enough to pay the dividends and the

16  resulting circular draws and the erosion of the commitment

17  that creates risk.

18      Q.   Now, this analyst report also had some charts and

19  graphs.

20      A.   Yes.

21      Q.   What do they show.

22      A.   They made various assumptions about the profits

23  that Fannie Mae and Freddie Mac would earn and the sources

24  of profit that they would have and so on.

25           And in the best case scenario, they say that

**DIRECT - M. ATTARI - by Ms. Varma**

1    Fannie Mae will run out of the commitment by 2025.  Which,

2    you know, we are in 2012.  So this is about 13 years.  And

3    Freddie Mac will run out of the commitment in 2037, which is

4    about 25 years.

5        Q.   Do you understand what the assumptions are behind

6    these scenarios and the impact they show?

7        A.   Yes.  So g-fee income refers to the guarantee fees

8    that Fannie Mae and Freddie Mac were charging.  They have

9    assumptions about the level of the guarantee fee, the level

10   of losses and, kind of, the profits that will result.

11            G-fee and portfolio income is the guarantee fee

12   plus the income on the retained portfolio.  So the retained

13   portfolio -- and we will see this in a later slide.  The

14   retained portfolio was viewed as being highly profitability

15   for Fannie Mae and Freddie Mac.  So they are taking into

16   account all of the various components of the profit.

17       Q.   Could you describe for us how the retained

18   portfolio differs from an MBS?

19       A.   So the MBS -- Fannie Mae and Freddie Mac provided

20   guarantees.  They did not really own the mortgages.  The

21   mortgages sat in these little companies that were called

22   trusts.  Fannie Mae and Freddie Mac provided the guarantees

23   and the profits and losses of Fannie Mae and Freddie Mac

24   were the difference between the fee they charged for the

25   guarantee and the losses they had to, kind of, make

                    **DIRECT - M. ATTARI - by Ms. Varma**

1    investors hold on.

2              Fannie Mae and Freddie Mac also directly invested

3    in mortgages and held them for their own account.  And so

4    the portfolio income is, basically, that second piece.  The

5    income that they earn from owning the mortgages and other,

6    kind of, assets.

7    **Q.**   How does an analyst like Deutsche Bank get enough

8    information to create these projections?

9    **A.**   So, you know, for a typical company, analysts will

10   look at the financial statements that are published and they

11   look at -- you know, they will talk to the companies and

12   kind of get information that way.  For Fannie Mae and

13   Freddie Mac they obviously did the same.  They looked at the

14   financial statements and talked to the companies.

15             But Fannie Mae and Freddie Mac actually publish a

16   lot of very granular information.  So they publish

17   loan-level data that's available to investors and that these

18   institutions are able to use to make projections.

19             They also, you know, at the center of the housing

20   finance system.  And there's lots of information about

21   housing prices and housing finance generally.  How many

22   homes were sold.  What the prices were and so on.  So all of

23   that gets Hoovered up by these people and analyzed.

24   **Q.**   You referred to loan-level pricing data.  What is

25   that?

                 **DIRECT - M. ATTARI - by Ms. Varma**

1      **A.**    So each month Fannie Mae and Freddie Mac

2   provide -- and this is primarily for investors in MBS --

3   they provide information on the performance of their loans

4   in the MBS trusts.

5      **Q.**    And that information is available to analysts?

6      **A.**    That information is publicly available.

7      **Q.**    Okay.

8           We have one more snippet from Deutsche Bank.  "For

9   MBS investors, diminishing Treasury support raises the risk

10  that the agencies one day might face challenges in covering

11  MBS losses."  Is this also referring to a declining Treasury

12  commitment?

13     **A.**    Yes.  The erosion of the commitment may get to a

14  point where the enterprises are no longer able to make MBS

15  investors whole, if there are losses on mortgage-backed

16  securities.

17     **Q.**    We will do one more for Deutche Bank.  This is

18  another squib from the same analyst report, which refers to

19  what you were referring to as the portfolio.  What is the

20  point Deutche is making here?

21     **A.**    So, you know, this is the retained portfolio.  And

22  if you read midway down it says, "Traditionally, these

23  portfolios have provided the bulk of agency revenue, often

24  exceeding two-thirds of the total before the financial

25  crisis."

**DIRECT - M. ATTARI - by Ms. Varma**

1          These retained assets were, you know, to be shrunk

2     at 10 percent a year, roughly, as part of the PSPAs already.

3     And so, you know, they were to be shrunk down to 250

4     billion.  And that was -- you know, this was pre third

5     amendment.  They were to get to that level by 2022.  You are

6     shrinking the most profitable part of your business, which

7     is obviously going to have implications for profits.

8          **MS. VARMA:**  Should we take our lunch break now?

9          **THE COURT:**  We will take our luncheon recess at

10    this time and come back at 1:45.  Don't talk about the case.

11    I will see you all at 1:45.

12         (Jury exited the courtroom.)

13         **THE COURT:**  All right.

14         The Court will be in recess.  I have three

15    January 6th hearings all by Zoom they are all by video.

16         **MR. KRAVETZ:**  Your Honor, should we --

17         **THE COURT:**  You can leave everything because

18    everybody is by Zoom.

19         **MR. KRAVETZ:**  Thank you, Your Honor.

20         (Lunch recess at 12:34 p.m.)

21

22

23

24

25

1

**C E R T I F I C A T E**

2

3          I, **Lorraine T. Herman, Official Court Reporter,**

4    certify that the foregoing is a true and correct transcript

5    of the record of proceedings in the above-entitled matter.

6

7

8

9    _August 4, 2023_          _/s/  Lorraine T. Herman_
                **DATE**                    **Lorraine T. Herman**
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**BY MS. VARMA: [4]**
1837/13 1838/18
1840/17 1871/11
**DEPUTY CLERK: [3]**
1826/2 1837/8 1838/17
**MR. HOFFMAN: [10]**
1827/5 1827/11
1827/17 1827/21
1827/25 1828/4 1828/7
1828/14 1828/17
1828/25
**MR. JONES: [1]**
1836/20
**MR. KRAVETZ: [6]**
1829/2 1831/15 1835/3
1840/13 1884/16
1884/19
**MS. VARMA: [16]**
1826/8 1826/14
1826/21 1827/4 1830/3
1833/14 1834/9
1834/11 1837/4
1838/15 1840/9
1870/20 1871/3 1871/6
1871/10 1884/8
**THE COURT: [30]**
1826/6 1826/13
1826/20 1827/1
1827/10 1827/13
1827/19 1827/24
1828/3 1828/6 1828/12
1828/16 1828/23
1829/24 1829/25
1834/6 1834/10 1835/2
1836/14 1836/17
1837/2 1840/14
1870/18 1870/21
1870/24 1871/5 1871/9
1884/9 1884/13
1884/17
**THE WITNESS: [1]**
1837/11

**$**

**$100 [1]** 1830/12
**$12 [2]** 1862/15
1862/15
**$12 billion [1]** 1862/15
**$14 [1]** 1835/22
**$260 [2]** 1844/16
1847/4

**'significant [1]** 1880/5

**-**

**-- it's [1]** 1868/23
**-- which [1]** 1868/12

**/**

**/s [1]** 1885/9

**1**

**1.16 [1]** 1846/25
**10 [12]** 1828/11
1841/20 1844/16
1860/8 1860/23 1862/6
1863/4 1866/12
1868/18 1870/21
1879/20 1884/2
**10 percent [1]** 1866/14
**10-K [1]** 1863/1
**10-Q [2]** 1862/22
1862/25
**10-Qs [2]** 1862/22
1863/2
**100 [2]** 1843/12
1853/17
**10020 [1]** 1824/10
**1053 [2]** 1823/4 1826/2
**10:13 [1]** 1823/6
**11 [3]** 1841/20 1872/7
1872/8
**12 [2]** 1856/17 1856/18
**12 billion [1]** 1868/13
**1251 [1]** 1824/10
**1288 [1]** 1823/11
**12:30 [2]** 1870/25
1871/5
**12:34 [1]** 1884/20
**13 [2]** 1857/22 1881/2
**13-1053 [1]** 1826/2
**13-288 [1]** 1826/3
**14 [2]** 1877/24 1878/22
**1401 [1]** 1824/6
**15 [1]** 1828/8
**1523 [1]** 1823/21
**17 [1]** 1863/5
**17th [1]** 1878/25
**189 [2]** 1856/12
1856/13
**19 billion [2]** 1856/14
1856/15
**19087 [1]** 1824/3
**1:13-1053 [1]** 1823/4
**1:13-1288 [1]** 1823/11

**1:45 [2]** 1884/10
1884/11

**2**

**200 [3]** 1843/13
1844/20 1874/1
**20001 [2]** 1824/15
1824/20
**20005 [1]** 1824/7
**20036 [1]** 1823/22
**2008 [12]** 1830/7
1830/9 1831/10
1833/18 1843/12
1847/14 1849/8
1855/13 1857/17
1873/23 1873/25
1878/3
**2009 [2]** 1867/5 1867/8
**2010 [3]** 1866/17
1867/10 1869/4
**2011 [12]** 1829/20
1859/6 1866/17
1867/10 1868/7 1869/5
1869/10 1874/22
1874/23 1875/6
1877/24 1878/4
**2012 [28]** 1834/3
1834/4 1841/6 1841/7
1841/16 1842/1 1842/5
1842/9 1843/10
1843/15 1843/16
1846/13 1857/7 1857/7
1859/9 1860/15 1863/5
1863/6 1863/19
1866/17 1867/1
1867/11 1868/8
1873/21 1875/15
1878/22 1878/25
1881/2
**2013 [4]** 1828/18
1829/21 1873/23
1873/25
**2015 [1]** 1865/20
**2016 [1]** 1865/20
**2018 [1]** 1861/7
**2019 [2]** 1861/7 1875/8
**202-354-3196 [1]**
1824/21
**2022 [5]** 1860/9
1860/11 1875/9
1875/16 1884/5
**2023 [2]** 1823/6 1885/9
**2025 [1]** 1881/1
**2037 [1]** 1881/3

**21st [1]** 1838/4
**25 [1]** 1881/4
**250 [1]** 1884/3
**26 [1]** 1874/22
**260 billion [2]** 1867/2
1867/16
**280 [1]** 1824/3
**282 [1]** 1833/3
**288 [1]** 1826/3

**3**

**30 [1]** 1849/18
**31 [1]** 1879/10
**3196 [1]** 1824/21
**31st [2]** 1867/5 1867/8
**333 [1]** 1824/19
**336 [1]** 1830/22
1830/24
**339 [7]** 1826/21 1827/3
1827/8 1827/18 1829/1
1829/18 1829/25
**35 [1]** 1836/25
**380-A [4]** 1826/21
1827/1 1829/17
1829/25

**5**

**50 [1]** 1861/13

**6**

**601 [1]** 1824/14
**65 [1]** 1846/25
**6720 [1]** 1824/20
**6th [1]** 1884/15

**7**

**7.2 [1]** 1859/25
**7th [1]** 1863/6

**9**

**919-A [2]** 1840/10
1840/16

**A**

**a.m [1]** 1823/6
**Aa [1]** 1877/12
**Aaa [5]** 1876/13
1877/4 1877/12
1877/13 1877/20
**abilities [1]** 1849/6
**ability [5]** 1835/15
1865/2 1866/1 1866/4
1877/15
**able [13]** 1835/11
1836/10 1847/14

**able... [10]** 1848/13
1848/18 1851/5 1851/8
1852/18 1864/13
1866/6 1866/19
1882/18 1883/14
**about [65]**
**above [1]** 1885/5
**above-entitled [1]**
1885/5
**accepted [1]** 1833/6
**accomplish [2]**
1848/25 1849/12
**accomplished [1]**
1864/10
**account [5]** 1846/4
1847/6 1865/15
1881/16 1882/3
**accumulating [1]**
1844/10
**acknowledged [1]**
1832/24
**acknowledges [2]**
1847/21 1847/22
**acronym [1]** 1839/21
**across [1]** 1838/13
**act [2]** 1850/25
1852/23
**acted [1]** 1844/18
**Action [5]** 1823/3
1823/10 1823/11
1826/2 1826/4
**actually [9]** 1848/24
1849/20 1852/15
1858/20 1859/25
1861/17 1865/10
1872/12 1882/15
**add [3]** 1829/16
1849/1 1849/2
**addition [1]** 1868/17
**additional [4]** 1853/18
1857/1 1861/20
1869/19
**address [2]** 1826/10
1845/24
**admit [2]** 1826/18
1829/7
**admitted [7]** 1826/24
1827/1 1828/23 1829/6
1840/10 1874/19
1877/23
**advance [1]** 1839/20
**affect [1]** 1866/1
**affected [1]** 1856/6

**affirm [1]** 1837/8
**affordability [2]**
1848/11 1848/17
**after [6]** 1831/21
1832/11 1832/25
1841/19 1865/20
1871/6
**again [7]** 1831/15
1858/22 1861/7
1865/20 1867/6 1879/4
1880/12
**against [1]** 1836/12
**agencies [6]** 1872/19
1873/4 1879/14
1879/22 1879/25
1883/10
**agency [2]** 1823/7
1883/23
**ago [3]** 1829/18
1872/7 1872/8
**agree [7]** 1840/22
1841/3 1845/9 1845/25
1846/1 1846/2 1846/22
**agreed [6]** 1837/24
1842/16 1846/22
1846/24 1867/18
1867/24
**agreeing [1]** 1843/3
**agreement [5]** 1823/11
1826/4 1866/16 1867/4
1876/5
**aided [1]** 1824/23
**al [4]** 1823/3 1823/3
1823/7 1823/21
**all [37]** 1826/6 1828/3
1829/13 1830/25
1833/11 1834/6
1834/10 1835/2 1837/2
1840/5 1840/14 1844/5
1845/11 1845/13
1848/11 1848/12
1848/19 1849/7
1849/12 1851/10
1854/5 1857/3 1859/23
1860/11 1861/22
1864/5 1869/14
1869/17 1869/20
1871/1 1874/19
1881/16 1882/22
1884/11 1884/13
1884/15 1884/15
**alleging [1]** 1835/21
**alleviated [1]** 1832/19
**allow [1]** 1844/21

**allowed [3]** 1844/18
1845/15 1847/5
**allows [1]** 1847/8
**almost [4]** 1841/20
1856/13 1872/8 1875/3
**along [1]** 1879/15
**already [10]** 1831/17
1831/24 1831/25
1840/9 1844/14
1852/11 1869/15
1869/17 1869/20
1884/2
**also [23]** 1828/22
1833/5 1834/13 1845/4
1846/20 1847/18
1847/20 1849/22
1855/14 1858/25
1860/1 1860/5 1861/23
1863/15 1864/22
1864/24 1867/17
1868/25 1877/23
1880/18 1882/2
1882/19 1883/11
**alternating [1]**
1858/16
**alternative [1]** 1829/4
**am [3]** 1837/16 1838/6
1847/21
**amendment [27]**
1831/7 1831/8 1832/20
1833/17 1834/4
1837/24 1840/23
1840/24 1841/4
1842/16 1842/20
1843/3 1843/6 1843/10
1845/1 1845/5 1845/9
1846/5 1856/8 1860/16
1861/25 1863/5
1874/17 1875/4
1878/21 1878/24
1884/5
**American [1]** 1869/19
**Americas [1]** 1824/10
**among [3]** 1830/13
1830/14 1840/8
**amount [14]** 1835/22
1843/17 1843/19
1845/17 1845/18
1847/7 1850/21 1859/7
1859/12 1867/1
1868/21 1869/22
1870/15 1875/14
**amounts [1]** 1850/11
**analysis [16]** 1832/17

**analyst [21]** 1826/18
1828/22 1829/8 1829/9
1832/3 1832/6 1833/6
1833/23 1833/25
1871/13 1871/16
1871/23 1871/24
1872/17 1873/14
1873/16 1873/17
1874/13 1880/18
1882/7 1883/18
**analysts [4]** 1872/4
1874/16 1882/9 1883/5
**analyze [2]** 1872/6
1872/21
**analyzed [1]** 1882/23
**announcement [1]**
1862/16
**annual [8]** 1859/7
1859/13 1859/18
1859/23 1862/10
1862/19 1862/25
1868/7
**annually [1]** 1846/25
**another [5]** 1834/14
1844/16 1877/9
1877/22 1883/18
**any [13]** 1831/9 1832/1
1832/12 1832/12
1832/17 1832/18
1832/22 1833/22
1834/10 1835/7 1850/1
1852/4 1858/9
**APPEARANCES [2]**
1823/19 1823/23
**application [2]**
1847/12 1847/17
**approximately [1]**
1862/15
**are [125]**
**areas [2]** 1839/1
1840/21
**argue [1]** 1830/20
**argued [3]** 1829/4
1829/18 1832/15
**argument [4]** 1831/19
1832/12 1833/5
1833/15

1840/8
1841/13 1841/23
1846/3 1846/18 1847/6
1861/16 1871/20
1871/21 1872/3 1872/4
1872/18 1873/22
1874/24

**A**

**Arnold [1]**  1824/14
**around [6]**  1846/17
1858/22 1861/24
1863/6 1870/25
1876/18
**as [56]**  1828/7 1828/17
1828/21 1828/21
1830/9 1832/1 1832/22
1834/20 1835/10
1838/23 1839/8
1839/12 1840/10
1840/11 1841/7
1841/16 1841/19
1842/4 1843/12
1844/13 1844/18
1850/25 1851/10
1852/9 1852/23
1852/23 1853/5
1854/12 1857/11
1863/11 1863/14
1865/12 1865/12
1866/3 1867/14
1867/19 1869/5
1869/15 1869/21
1869/25 1870/6 1870/9
1871/22 1873/7
1874/19 1875/13
1875/17 1876/5
1876/21 1878/4
1878/11 1878/18
1879/25 1881/14
1883/19 1884/2
**ASIM [3]**  1824/12
1826/8 1837/4
**ask [2]**  1837/25
1845/21
**asked [4]**  1837/21
1837/23 1840/18
1846/20
**asset [1]**  1839/20
**assets [6]**  1852/3
1854/2 1854/3 1854/5
1882/6 1884/1
**assignment [2]**  1838/1
1840/21
**assignments [1]**
1840/20
**assistant [1]**  1839/11
**assisted [1]**  1874/14
**Associates [3]**
1837/17 1838/4 1838/7
**Assuming [1]**  1877/19
**assumptions [3]**

**Attari [29]**  1826/11
1826/24 1830/5 1830/9
1831/4 1831/22 1832/1
1832/16 1832/24
1833/8 1833/24
1834/12 1834/15
1834/18 1835/7 1835/9
1835/15 1835/17
1836/1 1836/8 1837/5
1837/12 1837/14
1837/16 1837/18
1838/19 1840/11
1840/19 1871/12
**Attari's [4]**  1833/7
1834/14 1834/18
1840/10
**attempt [1]**  1832/10
**attempts [1]**  1865/11
**August [12]**  1823/6
1841/6 1841/7 1841/16
1842/1 1842/4 1859/9
1860/15 1863/5 1863/6
1878/25 1885/9
**availability [1]**
1855/12
**available [15]**  1840/24
1841/6 1841/22
1843/10 1843/17
1843/20 1844/17
1846/10 1848/21
1852/13 1852/19
1873/16 1882/17
1883/5 1883/6
**Avenue [5]**  1823/21
1824/6 1824/10
1824/14 1824/19
**avenues [1]**  1876/24
**away [1]**  1852/12

**B**

**back [10]**  1832/9
1840/18 1846/8
1847/25 1850/8
1856/19 1857/13
1858/22 1861/7
1884/10
**backed [11]**  1831/20
1835/23 1839/3
1839/23 1840/1
1849/25 1850/15
1850/23 1851/3
1879/16 1883/15
**background [3]**

1838/19
**backstop [1]**  1878/15
**backwards [1]**
1828/19
**backwards-looking [1]**
1828/19
**bad [1]**  1848/14
**bank [13]**  1828/21
1847/15 1848/24
1848/24 1873/5 1879/2
1879/2 1879/3 1879/3
1879/9 1882/7 1883/8
1883/17
**banking [2]**  1873/8
1877/25
**Bankruptcy [1]**
1824/19
**banks [8]**  1839/24
1847/12 1848/21
1848/22 1850/25
1856/3 1873/6 1879/4
**Barclays [7]**  1873/5
1877/23 1877/24
1877/25 1878/1 1878/4
1878/5
**base [1]**  1861/12
**based [3]**  1840/23
1844/25 1878/6
**basic [1]**  1831/23
**basically [8]**  1843/24
1844/17 1849/1
1853/21 1857/22
1875/11 1880/12
1882/4
**basis [4]**  1832/11
1832/21 1833/7 1835/9
**be [84]**
**bear [1]**  1864/17
**bearing [1]**  1864/17
**became [1]**  1853/16
**because [32]**  1826/23
1827/22 1829/7
1834/18 1834/23
1843/18 1845/9
1845/14 1847/14
1847/22 1848/13
1849/17 1853/8
1853/22 1856/24
1859/4 1862/4 1864/22
1865/2 1869/10
1869/14 1869/16
1872/4 1872/11 1874/9
1874/11 1874/25

1876/20 1877/14
1878/12 1880/13
1884/17
**become [5]**  1852/12
1854/4 1855/4 1857/8
1864/22
**becomes [1]**  1877/2
**becoming [1]**  1853/1
**been [24]**  1826/14
1832/12 1833/10
1835/13 1835/14
1835/18 1838/2 1840/5
1841/8 1841/10 1842/8
1844/4 1844/14
1852/11 1854/16
1856/25 1857/11
1863/3 1866/15 1868/8
1868/22 1873/1
1874/19 1877/23
**before [21]**  1823/16
1826/11 1826/17
1834/12 1837/25
1838/21 1838/23
1838/25 1839/9
1839/12 1842/9 1844/9
1850/3 1852/5 1855/6
1855/23 1860/15
1861/24 1863/4
1871/15 1883/24
**beginning [2]**  1852/20
1856/19
**behalf [5]**  1827/5
1829/2 1831/15 1835/4
1867/19
**behind [1]**  1881/5
**being [9]**  1829/19
1847/4 1854/13 1856/6
1862/6 1863/14
1868/23 1872/11
1881/14
**believe [10]**  1826/19
1827/17 1830/24
1831/12 1839/21
1860/19 1865/12
1865/17 1869/18
1870/12
**below [2]**  1877/4
1877/13
**benefit [1]**  1878/14
**Berger [1]**  1824/9
**BERGMAN [1]**
1824/13
**Bernstein [1]**  1824/9
**best [2]**  1860/24

**B**

**best... [1]** 1880/25
**between [6]** 1834/25 1846/25 1850/14 1850/25 1859/2 1881/24
**beyond [1]** 1853/6
**bias [1]** 1835/24
**big [2]** 1858/3 1871/17
**bigger [2]** 1866/7 1873/2
**biggest [1]** 1842/6
**billion [22]** 1830/12 1835/22 1843/12 1843/13 1844/17 1844/20 1846/25 1847/4 1853/17 1856/12 1856/13 1856/14 1856/15 1856/18 1856/20 1859/25 1862/15 1862/15 1867/2 1867/16 1868/13 1884/4
**bit [3]** 1838/1 1862/24 1877/10
**BLOCK [1]** 1824/13
**Boies [1]** 1824/6
**bond [3]** 1830/13 1839/19 1850/15
**bondholder [1]** 1850/21
**bonds [13]** 1849/14 1850/14 1850/16 1853/5 1871/18 1871/19 1873/9 1873/10 1877/6 1877/7 1879/5 1879/6 1879/18
**borrow [6]** 1849/13 1849/22 1849/23 1850/6 1853/2 1879/19
**borrower [2]** 1849/11 1850/7
**borrower's [1]** 1849/6
**borrowers [7]** 1840/1 1848/22 1851/1 1851/4 1852/20 1856/6 1864/13
**borrowing [4]** 1850/11 1850/17 1852/21 1853/5
**both [10]** 1828/23 1830/11 1846/16 1847/1 1851/19

1853/15 1862/24 1864/9 1880/3 1880/7
**BOZMAN [1]** 1824/8
**break [3]** 1870/18 1871/4 1884/8
**Brief [1]** 1826/22
**briefing [2]** 1832/11 1832/16
**bring [2]** 1830/2 1836/15
**brink [1]** 1830/10
**Brothers [3]** 1878/2 1878/3 1878/4
**brought [1]** 1874/18
**built [1]** 1844/22
**bulk [1]** 1883/23
**business [6]** 1851/17 1854/18 1855/1 1855/2 1872/14 1884/6
**buy [4]** 1848/25 1850/1 1850/7 1850/9
**buyers [1]** 1849/5
**buying [1]** 1873/12

**C**

**CAITLIN [1]** 1824/8
**call [4]** 1836/19 1837/2 1851/16 1854/19
**called [4]** 1837/17 1839/18 1878/1 1881/21
**came [2]** 1826/11 1866/3
**can [35]** 1830/2 1830/5 1833/8 1834/8 1834/16 1835/6 1836/14 1837/2 1838/15 1839/22 1843/7 1844/11 1844/13 1847/1 1848/21 1848/22 1849/20 1850/3 1850/9 1851/25 1855/23 1857/14 1858/5 1860/10 1860/25 1861/2 1869/1 1870/18 1871/16 1871/20 1871/20 1874/13 1874/19 1878/3 1884/17
**can't [4]** 1830/20 1830/22 1854/5 1876/5
**cannot [1]** 1831/8
**cap [4]** 1834/3 1878/18 1879/12 1879/13

**capacity [1]** 1855/18
**capital [32]** 1844/10 1844/18 1844/20 1847/4 1847/12 1847/14 1847/15 1851/15 1851/16 1851/18 1852/11 1852/14 1852/15 1852/16 1852/19 1852/19 1854/13 1854/15 1854/19 1854/23 1855/3 1855/6 1873/5 1875/8 1875/10 1875/14 1876/9 1877/1 1877/23 1877/24 1878/5 1878/15
**Capitol [1]** 1877/25
**capped [3]** 1843/15 1857/6 1876/21
**case [14]** 1826/3 1837/19 1841/19 1850/7 1850/23 1851/2 1851/6 1856/17 1858/18 1861/12 1864/10 1865/17 1880/25 1884/10
**cases [1]** 1871/1
**cash [2]** 1840/1 1859/22
**causes [1]** 1856/1
**causing [2]** 1875/13 1878/19
**center [2]** 1865/5 1882/19
**CEO [1]** 1836/23
**certain [1]** 1833/9
**certainty [1]** 1842/2
**certify [1]** 1885/4
**Chairman [1]** 1867/23
**challenges [1]** 1883/10
**chance [2]** 1835/16 1835/25
**change [1]** 1867/5
**changed [3]** 1867/8 1867/10 1872/25
**changes [2]** 1856/25 1857/1
**charged [1]** 1881/24
**charging [1]** 1881/8
**Charles [6]** 1837/17 1838/3 1838/4 1838/5 1838/7 1839/9
**chart [1]** 1857/16

**charts [1]** 1880/18
**Check [1]** 1824/2
**circular [21]** 1842/21 1842/22 1845/3 1845/4 1845/6 1845/24 1846/6 1857/11 1861/21 1863/12 1866/9 1866/10 1869/10 1875/13 1875/17 1875/20 1878/11 1878/18 1880/12 1880/14 1880/16
**cite [1]** 1834/20
**cited [5]** 1827/8 1827/12 1828/20 1828/20 1834/22
**cites [2]** 1828/7 1828/14
**Civil [3]** 1823/3 1823/10 1826/2
**CLASS [3]** 1823/11 1824/2 1826/4
**clause [1]** 1867/17
**clear [2]** 1832/13 1833/15
**clients [2]** 1838/11 1873/11
**closer [1]** 1878/21
**co [1]** 1838/6
**co-leader [1]** 1838/6
**COLATRIANO [1]** 1823/20
**collapse [3]** 1830/10 1878/19 1878/20
**collateral [1]** 1835/25
**collect [1]** 1866/19
**collecting [1]** 1844/5
**collection [1]** 1873/17
**colored [1]** 1841/23
**COLUMBIA [1]** 1823/1
**combination [3]** 1857/19 1857/20 1875/19
**combined [1]** 1878/18
**come [5]** 1828/22 1838/13 1842/25 1851/5 1884/10
**comes [1]** 1878/16
**comfort [1]** 1851/11
**comfortable [1]** 1851/13
**Commission [1]** 1859/19
**commitment [58]**

**C**

**commitment... [58]**
1830/6 1830/11
1830/19 1830/21
1831/2 1831/6 1831/10
1832/22 1833/18
1833/19 1834/2 1834/3
1842/22 1843/11
1843/11 1843/13
1844/4 1844/7 1844/11
1844/13 1844/19
1845/3 1845/5 1845/12
1845/17 1845/19
1846/7 1847/15
1853/12 1855/7
1855/10 1856/12
1857/5 1857/6 1857/8
1863/9 1866/14
1866/25 1867/1 1867/3
1867/14 1868/14
1868/17 1868/22
1875/11 1875/15
1876/7 1876/20 1877/1
1877/2 1877/14
1878/18 1879/15
1880/16 1881/1 1881/3
1883/12 1883/13
**committed [2]** 1853/17
1870/4
**common [4]** 1851/20
1851/22 1851/25
1852/5
**commonly [1]** 1872/2
**companies [33]**
1841/7 1844/18
1844/21 1845/16
1847/5 1847/11
1847/13 1849/24
1850/18 1850/19
1852/12 1852/14
1853/18 1853/20
1854/4 1854/8 1854/10
1856/12 1857/4
1859/18 1860/6
1862/23 1871/18
1872/20 1872/21
1872/22 1873/8
1873/16 1876/3
1879/18 1881/21
1882/11 1882/14
**company [17]** 1850/1
1851/10 1851/15
1851/17 1852/2 1852/3
1852/3 1853/23 1855/1

1855/3 1855/4 1855/18
1856/21 1867/16
1873/2 1874/7 1882/9
**comparables [1]**
1847/22
**compare [1]** 1861/2
**compared [1]** 1861/9
**compensate [2]**
1866/23 1866/24
**compensation [1]**
1870/7
**completely [1]**
1847/11
**Complied [1]** 1838/17
**components [1]**
1881/16
**comprehensive [6]**
1861/1 1861/4 1861/19
1862/9 1862/18 1863/8
**computer [1]** 1824/23
**computer-aided [1]**
1824/23
**concern [3]** 1832/4
1832/18 1877/15
**concerned [3]** 1849/7
1849/9 1854/25
**concerning [1]**
1831/19
**concerns [8]** 1830/25
1831/3 1831/5 1831/9
1832/8 1832/22 1834/3
1836/6
**conclude [2]** 1858/1
1858/12
**concluded [3]** 1845/1
1845/4 1848/7
**conclusion [4]** 1843/8
1845/7 1845/8 1878/5
**conclusions [3]**
1837/25 1844/23
1856/9
**concrete [1]** 1876/8
**conditions [5]**
1845/11 1845/13
1848/12 1848/13
1848/19
**confidence [19]**
1830/7 1830/12
1830/18 1830/21
1830/22 1830/23
1830/23 1831/6
1831/11 1831/19
1831/24 1833/11
1833/20 1834/1

1858/5 1858/9 1858/23
**confident [2]** 1842/11
1842/13
**Congress [3]** 1863/21
1876/17 1880/8
**connect [3]** 1831/4
1834/25 1836/2
**connecting [1]** 1834/2
**conservator [2]**
1863/16 1867/19
**conservator's [1]**
1845/10
**conservatorship [4]**
1831/23 1852/7
1855/16 1855/17
**consider [4]** 1839/1
1839/2 1846/20
1849/16
**considered [5]**
1827/22 1828/5
1834/21 1854/11
1864/4
**consistent [1]** 1862/1
**consistently [2]**
1858/13 1860/12
**Constitution [1]**
1824/19
**consultant [1]** 1839/8
**consultation [1]**
1867/23
**consulting [1]** 1838/8
**contain [2]** 1871/20
1871/21
**contains [1]** 1829/5
**contentious [1]**
1876/5
**context [6]** 1841/22
1842/23 1856/2 1856/5
1869/16 1874/25
**contingent [4]** 1875/8
1875/10 1876/9 1877/1
**continue [8]** 1844/1
1844/18 1847/13
1853/24 1854/25
1863/12 1863/14
1863/14
**continued [2]** 1824/1
1878/11
**contrary [1]** 1833/12
**contributed [1]**
1855/21
**convenience [1]**
1870/18

**conversation [1]**
1829/8
**Cooper [1]** 1823/21
**corporate [4]** 1839/2
1839/17 1840/12
1872/3
**correct [5]** 1861/10
1861/15 1867/20
1880/8 1885/4
**cost [1]** 1852/21
**could [15]** 1837/21
1838/1 1840/19
1841/15 1848/7
1852/16 1853/21
1853/21 1856/5 1856/8
1862/3 1868/23 1871/1
1879/9 1881/17
**counsel [1]** 1826/15
**couple [3]** 1829/18
1830/4 1858/21
**course [4]** 1835/17
1839/18 1873/22
1873/25
**courses [4]** 1839/14
1839/15 1839/16
1839/20
**COURT [16]** 1823/1
1824/18 1826/16
1829/6 1830/10 1831/7
1831/24 1831/25
1832/4 1832/15 1833/5
1833/16 1833/24
1840/9 1884/14 1885/3
**Court's [4]** 1830/24
1832/13 1833/12
1835/6
**courtroom [4]** 1836/16
1870/22 1871/7
1884/12
**cover [5]** 1829/5
1863/8 1866/6 1866/8
1879/16
**covering [1]** 1883/10
**covers [1]** 1860/8
**CRA [1]** 1839/8
**CRC [1]** 1824/18
**create [4]** 1839/24
1873/10 1879/6 1882/8
**creates [3]** 1877/15
1880/5 1880/17
**credit [27]** 1830/18
1831/1 1831/3 1831/5
1831/11 1835/15
1835/20 1835/21

**C**

**credit... [19]** 1836/3 1836/6 1836/12 1849/16 1872/18 1872/20 1872/21 1873/4 1876/9 1876/19 1876/21 1876/22 1877/3 1877/6 1877/7 1877/11 1877/16 1877/19 1878/2
**creditors [3]** 1854/20 1854/25 1855/2
**crisis [6]** 1852/7 1852/9 1856/25 1864/2 1878/2 1883/25
**criteria [1]** 1874/2
**cross [1]** 1835/19
**cross-examination [1]** 1835/19
**Cts [1]** 1824/19
**current [1]** 1855/22
**cushion [2]** 1854/20 1854/24
**CV [1]** 1840/10

**D**

**D.C [3]** 1823/22 1824/7 1824/15
**data [2]** 1882/17 1882/24
**date [7]** 1860/14 1867/4 1867/7 1867/8 1867/9 1867/9 1885/9
**DAVID [1]** 1824/13
**DAVIS [1]** 1824/5
**day [3]** 1823/15 1833/1 1883/10
**days [5]** 1829/18 1835/17 1835/18 1863/4 1873/2
**DC [2]** 1823/8 1824/20
**de [7]** 1863/22 1863/23 1863/24 1864/10 1864/15 1865/9 1865/14
**de-risk [4]** 1863/22 1863/23 1863/24 1865/14
**de-risking [3]** 1864/10 1864/15 1865/9
**debt [3]** 1879/17 1879/18 1880/7
**December [7]** 1828/18 1829/21 1867/5 1867/8

1879/10
**December 31st [2]** 1867/5 1867/8
**decide [1]** 1874/5
**decided [1]** 1868/23
**decision [7]** 1826/19 1828/1 1840/22 1841/17 1841/21 1841/23 1842/18
**decision-making [1]** 1828/1
**declaration [8]** 1827/12 1827/18 1827/22 1827/25 1828/9 1828/16 1828/17 1829/15
**declining [2]** 1842/8 1883/11
**defaulted [1]** 1850/8
**defendants [14]** 1823/9 1824/12 1826/8 1826/17 1827/6 1829/25 1832/4 1832/9 1836/21 1837/4 1837/18 1837/22 1840/11 1840/18
**defendants' [6]** 1826/12 1829/1 1836/22 1837/5 1840/10 1840/16
**definition [1]** 1854/11
**definitions [1]** 1854/9
**defrauded [1]** 1835/22
**depend [1]** 1870/15
**depending [2]** 1865/24 1876/23
**depends [1]** 1842/19
**depose [2]** 1835/15 1835/16
**deposition [8]** 1825/4 1827/13 1829/16 1832/25 1834/13 1836/1 1836/24 1837/1
**depositions [1]** 1841/10
**derivatives [1]** 1839/20
**describe [8]** 1840/19 1843/7 1847/1 1848/7 1855/24 1856/8 1857/14 1881/17
**describing [2]** 1829/8 1831/22

**despite [1]** 1835/16
**detail [2]** 1840/19 1845/20
**detailed [1]** 1863/1
**determine [4]** 1841/3 1843/2 1847/10 1870/2
**determined [2]** 1867/12 1867/13
**Deutche [2]** 1883/17 1883/20
**Deutsche [8]** 1828/21 1873/5 1879/2 1879/2 1879/3 1879/9 1882/7 1883/8
**Dharan [5]** 1845/23 1846/12 1846/18 1846/18 1860/17
**did [29]** 1829/15 1832/16 1834/19 1834/21 1835/7 1839/5 1839/14 1841/2 1841/15 1841/25 1843/2 1843/24 1845/5 1848/3 1848/6 1852/7 1852/15 1859/4 1860/8 1861/10 1863/7 1863/17 1867/5 1871/4 1871/14 1873/19 1874/5 1881/20 1882/13
**didn't [1]** 1827/14
**difference [2]** 1850/14 1881/24
**different [8]** 1842/24 1842/25 1851/6 1851/22 1860/4 1863/1 1876/11 1877/4
**differs [1]** 1881/18
**difficult [2]** 1853/1 1853/23
**diminishing [1]** 1883/9
**direct [4]** 1825/7 1833/14 1834/16 1837/12
**directly [2]** 1855/21 1882/2
**disagree [1]** 1847/1
**disagreed [1]** 1829/9
**disclosed [1]** 1830/9
**disclosure [2]** 1834/19 1834/24
**discretion [1]** 1867/22
**discuss [1]** 1845/20

**discussing [2]** 1826/14 1876/2
**dispute [2]** 1830/5 1833/8
**distributed [2]** 1851/23 1851/25
**DISTRICT [4]** 1823/1 1823/1 1823/16 1824/19
**dividend [35]** 1843/19 1843/25 1844/3 1844/8 1844/9 1856/14 1857/5 1857/24 1857/25 1858/2 1859/7 1859/10 1859/12 1859/22 1860/23 1861/2 1861/4 1861/6 1861/14 1861/18 1862/5 1862/10 1862/12 1863/8 1866/5 1866/7 1866/8 1866/12 1866/14 1868/12 1868/18 1869/7 1869/15 1879/19 1879/21
**dividends [26]** 1845/12 1856/15 1857/10 1857/18 1857/19 1857/20 1858/8 1858/15 1858/16 1858/19 1858/21 1859/2 1860/13 1862/19 1865/22 1866/2 1866/20 1869/11 1869/21 1875/7 1875/20 1878/8 1878/14 1880/5 1880/13 1880/15
**do [56]** 1832/11 1837/8 1837/21 1838/14 1839/1 1839/24 1840/18 1841/19 1842/4 1845/24 1846/1 1846/15 1846/22 1846/23 1848/18 1848/19 1850/24 1851/9 1852/25 1853/5 1854/1 1854/9 1855/1 1858/1 1858/4 1858/11 1860/12 1860/14 1860/20 1861/16 1862/8 1863/2 1863/11

# D

**do... [23]** 1864/1
1864/7 1865/9 1866/21
1867/8 1868/9 1870/24
1871/1 1871/24 1872/1
1872/2 1872/14
1872/15 1873/7 1873/8
1873/24 1874/6
1874/23 1876/14
1880/10 1880/21
1881/5 1883/17
**document [6]** 1829/14
1829/19 1829/21
1860/7 1863/21 1867/7
**documentation [1]**
1832/25
**documents [2]** 1860/4
1862/20
**does [12]** 1831/4
1836/10 1838/8 1849/4
1849/4 1854/15
1863/23 1869/1 1870/8
1875/25 1876/19
1882/7
**doesn't [5]** 1833/25
1846/3 1846/11 1847/6
1847/9
**doing [2]** 1855/2
1872/11
**dominant [1]** 1865/6
**don't [12]** 1826/18
1827/10 1833/8 1834/8
1846/2 1847/13 1849/5
1855/5 1865/12
1869/17 1878/14
1884/10
**Donald [2]** 1836/22
1837/1
**done [1]** 1839/8
**dots [1]** 1834/25
**down [5]** 1842/9
1848/9 1870/23
1883/22 1884/3
**Dr [1]** 1835/17
**Dr. [37]** 1826/11
1826/24 1830/5 1830/9
1831/4 1831/22 1832/1
1832/16 1832/24
1833/7 1833/8 1833/24
1834/12 1834/14
1834/15 1834/18
1834/18 1835/7 1835/9
1835/15 1836/1 1836/8
1837/5 1837/14

1837/16 1838/19
1840/10 1840/11
1840/19 1845/23
1846/12 1846/18
1846/18 1846/20
1846/22 1860/17
1871/12
**Dr. Attari [26]** 1826/11
1826/24 1830/5 1830/9
1831/4 1831/22 1832/1
1832/16 1832/24
1833/8 1833/24
1834/12 1834/15
1834/18 1835/7 1835/9
1835/15 1836/1 1836/8
1837/5 1837/14
1837/18 1838/19
1840/11 1840/19
1871/12
**Dr. Attari's [4]** 1833/7
1834/14 1834/18
1840/10
**Dr. Dharan [5]**
1845/23 1846/12
1846/18 1846/18
1860/17
**Dr. Thakor's [2]**
1846/20 1846/22
**draw [7]** 1839/5
1845/24 1853/21
1857/4 1857/8 1863/9
1866/8
**drawn [3]** 1856/12
1856/13 1862/6
**draws [26]** 1842/21
1842/22 1843/19
1844/1 1845/3 1845/4
1845/6 1845/12 1846/6
1857/5 1857/10
1857/11 1861/20
1861/21 1863/12
1866/9 1866/10
1869/10 1875/13
1875/17 1875/20
1878/11 1878/18
1880/12 1880/14
1880/16
**driven [1]** 1878/13
**drivers [1]** 1842/6
**due [1]** 1851/24
**during [4]** 1836/1
1864/22 1870/1 1878/2
**DX [5]** 1826/21
1826/21 1829/1 1829/1

**DX-339 [2]** 1826/21
1829/1
**DX-380-A [3]** 1826/21
1829/1 1829/4

# E

**each [9]** 1830/12
1853/20 1856/10
1856/14 1857/13
1857/21 1862/24
1866/18 1883/1
**earlier [3]** 1846/9
1858/20 1865/15
**earn [10]** 1843/25
1844/8 1844/9 1860/12
1861/14 1864/17
1869/11 1880/15
1880/23 1882/5
**earned [6]** 1844/2
1857/24 1858/2
1858/21 1859/10
1859/25
**earnings [5]** 1858/12
1859/3 1859/23 1869/8
1870/6
**easiest [1]** 1860/9
**eaten [1]** 1852/12
**ECF [1]** 1830/24
**ECF-336 [1]** 1830/24
**economic [6]** 1838/8
1845/11 1845/13
1848/12 1848/12
1848/19
**Economics [1]** 1840/6
**economist [1]** 1837/16
**educational [2]**
1838/19 1839/7
**effect [3]** 1833/17
1857/20 1867/14
**efficient [1]** 1872/11
**either [2]** 1846/13
1879/25
**eliminate [3]** 1845/2
1845/3 1875/8
**eliminating [2]**
1845/12 1846/6
**email [3]** 1827/15
1829/5 1829/7
**employed [1]** 1838/2
**employees [2]** 1850/2
1851/11
**end [9]** 1843/15
1845/5 1857/6 1857/7

1857/15 1858/19
1859/6 1868/7 1879/11
**ends [1]** 1872/10
**engineering [1]**
1838/22
**enhance [1]** 1855/18
**enough [11]** 1843/25
1844/2 1844/8 1844/9
1857/25 1858/2
1861/14 1863/7
1869/11 1880/15
1882/7
**ensuring [1]** 1870/5
**entail [1]** 1838/8
**entered [2]** 1836/16
1871/7
**enterprise [2]** 1844/6
1868/4
**enterprise's [2]**
1828/10 1848/8
**enterprises [19]**
1830/11 1843/18
1844/15 1846/14
1847/1 1847/19 1848/4
1849/22 1851/21
1852/21 1853/16
1857/2 1863/20 1865/6
1866/19 1869/10
1869/14 1870/6
1883/14
**enterprises' [1]**
1843/23
**entire [2]** 1850/20
1878/19
**entitled [1]** 1885/5
**equity [14]** 1851/16
1851/18 1853/16
1854/13 1854/15
1854/19 1854/23
1855/3 1855/5 1860/10
1860/11 1860/25
1867/16 1867/16
**erode [2]** 1846/7
1857/5
**eroded [1]** 1842/22
**erosion [4]** 1845/3
1845/5 1880/16
1883/13
**error [1]** 1832/13
**essentially [5]** 1829/5
1853/8 1857/18
1867/15 1875/12
**established [1]**
1868/22

**E**

**estimate [1]** 1873/24
**estimating [1]** 1847/23
**et [3]** 1823/3 1823/3
1823/7
**evaluate [2]** 1840/22
1841/17
**even [9]** 1829/6 1844/2
1849/8 1855/3 1856/5
1866/6 1866/7 1875/3
1876/7
**event [2]** 1832/17
1839/3
**events [6]** 1833/9
1852/6 1856/7 1872/5
1872/7 1872/8
**every [3]** 1857/7
1859/8 1859/13
**everybody [1]** 1884/18
**everyone [1]** 1878/24
**everything [1]** 1884/17
**evidence [14]** 1825/12
1825/12 1825/13
1827/17 1827/21
1827/23 1828/22
1829/6 1829/13
1832/22 1835/10
1835/12 1836/4
1874/19
**evolved [2]** 1875/2
1875/2
**exact [1]** 1836/11
**examination [3]**
1825/7 1835/19
1837/12
**example [1]** 1842/6
**examples [1]** 1874/18
**exceed [2]** 1861/6
1861/19
**exceeded [6]** 1854/18
1856/16 1858/8
1858/19 1859/23
1866/20
**exceeding [2]** 1858/15
1883/24
**exceeds [3]** 1859/7
1859/12 1861/4
**except [1]** 1859/21
**excerpt [1]** 1867/7
**excess [6]** 1858/16
1859/10 1860/12
1862/9 1862/18 1878/8
**Exchange [1]** 1859/19
**exclude [2]** 1829/16

**excludes [1]** 1876/6
**exempts [1]** 1874/20
**exhausted [3]** 1854/13
1854/16 1854/23
**exhibit [5]** 1825/11
1833/3 1840/10
1840/15 1840/16
**exhibits [2]** 1826/18
1829/1
**existing [1]** 1835/10
**exited [2]** 1870/22
1884/12
**expect [3]** 1843/25
1862/8 1865/23
**expectations [4]**
1842/10 1842/12
1860/2 1860/3
**expected [10]** 1842/10
1844/6 1847/20
1856/24 1860/21
1865/22 1865/24
1866/3 1866/6 1868/1
**expensive [1]** 1853/1
**experience [1]** 1839/5
**experienced [3]**
1843/18 1853/19
1853/20
**experiencing [1]**
1852/10
**expert [13]** 1826/12
1830/8 1831/13 1832/7
1833/22 1834/19
1834/24 1837/6
1837/19 1838/23
1839/1 1839/2 1840/11
**experts [3]** 1841/1
1845/22 1871/24
**explains [1]** 1827/25
**explicit [1]** 1876/6
**explore [1]** 1836/1
**exposed [1]** 1864/12
**extensive [1]** 1832/11
**extent [1]** 1830/5
**external [1]** 1843/23

**F**

**face [2]** 1851/4
1883/10
**facilitate [3]** 1850/6
1850/10 1853/9
**facilitators [1]** 1852/23
**fact [11]** 1829/20
1833/1 1841/19 1845/5

1851/16
1869/20 1878/6 1878/9
1880/1
**facts [4]** 1831/23
1843/7 1856/9 1856/11
**fail [2]** 1864/3 1865/3
**failed [1]** 1878/2
**failure [2]** 1856/1
1864/4
**failures [1]** 1856/2
**fair [2]** 1854/7 1854/19
**FAIRHOLME [2]**
1823/3 1823/21
**fairly [2]** 1874/1
1874/2
**FANNIE [80]**
**Fannie's [3]** 1856/17
1857/14 1857/16
**FDIC [1]** 1847/17
**FDIC's [2]** 1847/10
1847/12
**February [2]** 1863/19
1868/8
**FEDERAL [2]** 1823/6
1867/23
**fee [20]** 1844/4 1844/7
1844/12 1844/19
1844/19 1847/4
1847/10 1847/12
1847/17 1866/15
1867/17 1867/24
1868/22 1869/4
1869/25 1881/7 1881/9
1881/11 1881/11
1881/24
**fees [4]** 1868/1
1868/14 1868/17
1881/7
**few [3]** 1826/10 1861/5
1873/2
**FHFA [26]** 1824/12
1828/5 1828/10
1829/10 1832/25
1835/21 1836/3 1836/7
1836/12 1837/24
1841/3 1843/4 1844/6
1845/1 1845/9 1846/14
1847/19 1855/14
1855/15 1857/1
1863/19 1864/7
1865/10 1865/12
1867/19 1876/16
**FHFA's [8]** 1828/1
1840/22 1842/15

1847/7 1862/3 1869/9
1869/20 1876/14
**fields [1]** 1840/11
**file [3]** 1859/18
1862/23 1862/25
**filed [5]** 1835/21
1836/11 1840/25
1859/16 1868/8
**filing [5]** 1859/20
1862/24 1868/20
1868/21 1868/25
**filings [8]** 1840/25
1841/7 1859/1 1859/6
1859/15 1860/6 1868/4
1868/7
**finance [19]** 1823/6
1838/7 1838/20
1838/25 1839/2
1839/16 1839/17
1840/4 1840/6 1840/7
1840/12 1848/11
1851/15 1853/9
1855/20 1865/4 1872/3
1882/20 1882/21
**financial [20]** 1838/10
1838/11 1838/12
1840/6 1840/7 1852/7
1852/9 1864/2 1871/17
1872/13 1872/14
1872/16 1878/17
1878/20 1879/24
1880/6 1880/11
1882/10 1882/14
1883/24
**find [1]** 1872/9
**findings [1]** 1845/20
**finish [1]** 1871/3
**finished [1]** 1850/4
**firm [3]** 1829/8
1837/17 1865/19
**first [16]** 1828/7
1832/16 1841/25
1843/11 1843/20
1845/21 1847/3 1848/1
1848/4 1852/5 1861/1
1866/17 1867/11
1869/4 1869/11
1875/12
**fit [1]** 1851/9
**Fitch [4]** 1872/23
1872/24 1873/3 1873/3
**fixed [4]** 1839/18
1843/16 1843/17
1862/5

1894

## F

**Flexner [1]** 1824/6
**floating [1]** 1876/18
**flow [2]** 1853/9 1855/19
**flows [1]** 1840/1
**focus [1]** 1874/6
**focusing [1]** 1875/22
**follow [1]** 1877/16
**followed [1]** 1857/24
**forecast [2]** 1828/8 1869/8
**forecasts [2]** 1828/5 1828/9
**foregoing [1]** 1885/4
**form [3]** 1862/23 1862/25 1863/1
**former [1]** 1836/23
**formulating [2]** 1839/5 1860/18
**forward [2]** 1842/11 1843/16
**FREDDIE [77]**
**Freddie's [8]** 1858/12 1858/18 1859/20 1864/20 1864/21 1868/20 1868/21 1868/25
**freezing [2]** 1852/24 1852/25
**Friday [1]** 1826/17
**fulfill [3]** 1854/5 1855/18 1877/16
**full [3]** 1831/25 1866/4 1866/8
**fully [3]** 1846/3 1847/6 1866/24
**fund [1]** 1849/14
**FUNDS [1]** 1823/3
**Funds,et [1]** 1823/21
**further [1]** 1857/3
**furthered [1]** 1845/10
**future [10]** 1846/16 1856/22 1856/24 1856/24 1858/4 1860/2 1860/3 1870/5 1876/16 1879/16

## G

**g-fee [2]** 1881/7 1881/11
**gathers [1]** 1873/15
**gave [1]** 1830/11
**general [1]** 1831/5

**generally [3]** 1830/13 1855/25 1882/21
**generate [3]** 1862/9 1862/18 1878/7
**gentlemen [1]** 1836/17
**German [1]** 1879/3
**get [18]** 1826/17 1838/15 1846/11 1847/9 1847/13 1851/13 1852/5 1853/2 1853/21 1855/5 1869/17 1869/20 1869/22 1876/5 1882/7 1882/12 1883/13 1884/5
**gets [2]** 1827/20 1882/23
**getting [2]** 1864/23 1878/21
**give [4]** 1837/9 1851/11 1859/4 1872/20
**given [1]** 1858/6
**giving [1]** 1868/15
**global [1]** 1878/17
**go [19]** 1826/6 1832/9 1834/8 1840/18 1847/25 1848/23 1856/10 1857/13 1862/8 1865/4 1869/1 1869/13 1869/25 1870/4 1871/1 1871/6 1871/15 1874/20 1877/12
**goal [4]** 1845/10 1846/4 1855/15 1865/1
**goals [1]** 1855/17
**goes [3]** 1846/8 1852/2 1858/22
**going [20]** 1829/12 1836/2 1842/11 1843/16 1856/19 1857/6 1860/22 1861/5 1862/7 1863/12 1864/1 1864/24 1869/9 1869/10 1869/15 1869/17 1869/20 1869/21 1872/17 1884/7
**gone [3]** 1842/9 1842/9 1843/12
**good [3]** 1836/17 1837/14 1848/14
**got [4]** 1843/17 1846/3

**government [4]** 1873/1 1876/22 1877/5 1880/1
**granted [2]** 1831/25 1833/17
**granular [1]** 1882/16
**graphs [1]** 1880/19
**great [1]** 1856/23
**greater [2]** 1840/19 1845/20
**Grossmann [1]** 1824/9
**growing [1]** 1865/19
**GSE [2]** 1876/2 1876/14
**GSEs [9]** 1830/9 1865/21 1876/8 1876/20 1877/3 1877/8 1877/15 1878/6 1879/25
**guarantee [5]** 1849/2 1881/7 1881/9 1881/11 1881/25
**guarantees [2]** 1881/20 1881/22
**guaranties [1]** 1864/11
**guarantor [1]** 1849/20
**guaranty [8]** 1830/14 1849/1 1849/4 1849/15 1849/17 1849/19 1849/21 1851/6
**guise [1]** 1832/6

## H

**had [53]** 1827/14 1829/4 1829/20 1833/2 1835/9 1835/25 1840/21 1841/8 1841/9 1841/10 1842/8 1842/9 1842/9 1843/12 1843/12 1843/18 1844/3 1844/4 1844/6 1844/8 1844/8 1844/14 1844/16 1846/17 1847/13 1852/11 1856/12 1856/13 1856/16 1856/18 1856/19 1856/25 1857/1 1858/3 1858/13 1858/14 1858/15 1858/15 1858/20 1859/21 1859/24 1863/16 1863/19 1866/15 1866/16

1866/18 1873/18 1874/9 1876/17 1876/20 1880/18 1881/25
**half [2]** 1847/16 1866/17
**HAMISH [1]** 1824/5
**Hampshire [1]** 1823/21
**hand [1]** 1850/23
**happened [3]** 1841/24 1872/7 1872/8
**happening [2]** 1850/24 1860/10
**has [31]** 1828/22 1830/10 1831/7 1831/17 1831/24 1831/25 1833/24 1835/12 1835/14 1839/21 1840/5 1840/9 1847/15 1847/21 1848/24 1850/1 1850/2 1850/2 1850/8 1850/21 1853/23 1854/9 1854/15 1855/4 1855/21 1861/11 1861/15 1862/24 1867/16 1868/22 1877/22
**hasn't [1]** 1832/12
**have [70]**
**having [2]** 1835/16 1853/5
**he [26]** 1827/14 1827/14 1827/14 1828/14 1829/15 1831/8 1833/22 1833/25 1834/20 1834/21 1834/21 1834/24 1835/11 1835/11 1836/2 1836/10 1846/2 1846/11 1846/24 1847/9 1847/10 1847/10 1847/18 1847/20 1847/21 1847/22
**He's [1]** 1828/12
**heads [1]** 1849/9
**hear [1]** 1836/5
**heard [3]** 1830/10 1839/21 1855/23
**hearings [1]** 1884/15
**hearsay [2]** 1829/5

# H

**hearsay... [1]** 1832/6
**held [2]** 1864/6 1882/3
**help [10]** 1850/18
1850/19 1851/17
1853/13 1855/17
1871/17 1871/18
1873/8 1873/9 1873/11
**helped [2]** 1846/6
1874/15
**helpful [1]** 1831/13
**helps [3]** 1875/4
1879/4 1879/5
**here [11]** 1829/12
1830/8 1832/8 1832/12
1835/14 1835/18
1845/13 1867/7
1872/18 1874/8
1883/20
**Here's [1]** 1857/14
**HERMAN [4]** 1824/18
1885/3 1885/9 1885/9
**higher [2]** 1866/11
1866/13
**highlighted [3]**
1868/10 1875/24
1880/3
**highly [1]** 1881/14
**him [4]** 1827/20
1827/22 1835/16
1836/13
**his [18]** 1827/13
1829/15 1829/16
1833/11 1834/18
1834/25 1835/7 1835/8
1836/1 1836/9 1836/10
1836/13 1846/3
1846/18 1847/5
1847/17 1847/21
1860/18
**historical [1]** 1859/23
**historically [1]**
1856/16
**history [3]** 1856/22
1856/22 1859/5
**hit [1]** 1857/7
**hoc [1]** 1829/20
**HOFFMAN [2]** 1824/13
1827/5
**hold [2]** 1850/9 1882/1
**holders [2]** 1830/13
1853/16
**home [1]** 1848/23
**homes [1]** 1882/22

**Honor [23]** 1826/9
1827/4 1827/5 1827/11
1827/17 1827/21
1828/19 1828/25
1829/2 1829/19 1830/3
1831/17 1832/8
1833/14 1834/11
1835/3 1835/5 1836/4
1836/20 1840/9
1840/13 1884/16
1884/19
**HONORABLE [1]**
1823/16
**Hoovered [1]** 1882/23
**hoped [1]** 1865/13
**house [2]** 1842/8
1842/8
**housing [9]** 1823/6
1848/11 1853/9
1855/20 1865/1 1865/4
1882/19 1882/21
1882/21
**how [23]** 1827/20
1838/2 1841/12
1842/11 1843/2 1848/4
1858/5 1858/8 1858/9
1866/1 1867/12 1870/8
1873/24 1874/5
1874/13 1875/1 1875/2
1875/18 1876/23
1880/14 1881/17
1882/7 1882/21
**huh [1]** 1878/23
**HUME [1]** 1824/5

# I

**I'm [3]** 1826/23 1828/4
1834/9
**I've [3]** 1839/8 1839/15
1848/9
**IAN [2]** 1824/13 1827/5
**identified [1]** 1865/21
**identify [2]** 1834/19
1834/21
**identifying [1]** 1873/13
**ignores [1]** 1847/18
**immediately [1]**
1831/20
**impact [3]** 1833/2
1852/7 1881/6
**impacted [1]** 1836/13
**implement [1]** 1865/11
**implemented [1]**
1865/10

**implication [1]** 1837/2
**implications [2]**
1864/19 1884/7
**important [11]**
1831/12 1833/21
1841/21 1842/10
1842/16 1845/14
1845/15 1846/9
1848/13 1848/15
1848/16
**impose [1]** 1869/25
**Imposing [1]** 1869/21
**imposition [1]**
1869/18
**impossible [1]**
1853/24
**improve [1]** 1853/14
**inability [1]** 1880/15
**inadmissible [1]**
1832/6
**INC [1]** 1823/3
**inception [2]** 1859/8
1859/14
**inclined [1]** 1829/6
**included [1]** 1865/15
**including [1]** 1835/7
**income [21]** 1839/19
1859/8 1859/13 1861/1
1861/4 1861/5 1861/19
1862/9 1862/9 1862/18
1862/18 1863/8
1869/14 1869/17
1878/7 1879/16 1881/7
1881/11 1881/12
1882/4 1882/5
**incorrect [2]** 1847/11
1847/17
**increase [3]** 1848/21
1861/6 1869/22
**increasing [2]** 1852/21
1865/3
**indication [1]** 1868/25
**individual [1]** 1849/6
**information [19]**
1833/21 1835/16
1840/23 1841/2 1841/5
1841/5 1841/8 1841/22
1841/24 1843/9
1846/10 1859/4 1882/8
1882/12 1882/16
1882/20 1883/3 1883/5
1883/6
**initial [1]** 1866/16
**initially [1]** 1853/17

**injustice [1]** 1832/13
**inquired [1]** 1842/15
**insolvency [1]** 1854/9
**insolvent [2]** 1854/8
1854/11
**instability [1]** 1855/22
**institution [2]** 1856/1
1878/1
**institutions [7]**
1838/11 1838/13
1871/17 1872/13
1872/14 1872/16
1882/18
**insufficient [3]**
1860/22 1876/9
1876/25
**intend [1]** 1831/4
**intended [1]** 1865/12
**interest [1]** 1831/5
**interested [1]** 1830/17
**internal [8]** 1832/25
1843/23 1860/4 1860/7
1861/16 1861/22
1862/2 1862/20
**international [1]**
1839/16
**interpret [2]** 1863/11
1880/10
**interpreting [1]**
1875/18
**introduce [1]** 1837/14
**introduced [1]**
1835/13
**invested [1]** 1882/2
**investment [1]** 1870/7
**investments [3]**
1839/17 1839/18
1850/19
**investors [23]** 1830/7
1830/14 1830/22
1830/23 1831/1
1831/11 1831/20
1833/11 1834/2
1849/15 1851/1 1851/3
1871/18 1873/9
1873/10 1874/16
1879/5 1879/5 1882/1
1882/17 1883/2 1883/9
1883/15
**Iowa [2]** 1838/21
1839/13
**is [187]**
**isn't [1]** 1869/21
**issue [7]** 1831/17

## I

**issue... [6]** 1831/22 1834/11 1839/24 1839/25 1850/14 1850/16
**issued [4]** 1855/14 1863/3 1863/4 1879/20
**issues [2]** 1826/10 1830/4
**issuing [2]** 1849/13 1853/5
**it [113]**
**it's [30]** 1826/15 1827/4 1827/11 1829/14 1830/24 1831/24 1835/9 1836/24 1841/20 1841/20 1842/10 1843/4 1846/9 1850/7 1851/7 1852/4 1853/4 1853/23 1856/6 1862/6 1862/25 1862/25 1863/1 1863/1 1867/15 1868/23 1870/14 1875/3 1875/19 1878/11
**item [1]** 1835/24
**its [3]** 1850/4 1855/18 1855/19
**itself [5]** 1831/7 1833/15 1834/2 1844/13 1848/16

## J

**January [2]** 1870/25 1884/15
**January 6 [1]** 1870/25
**January 6th [1]** 1884/15
**joined [1]** 1839/9
**JONES [2]** 1824/12 1836/20
**Journal [3]** 1840/6 1840/7 1840/7
**journals [2]** 1840/5 1840/6
**JUDGE [1]** 1823/16
**jury [17]** 1823/15 1826/11 1826/25 1830/2 1831/14 1833/21 1834/16 1836/15 1836/16 1836/18 1837/15 1839/21 1844/11

1870/22 1871/4 1874/19 1884/12
**just [15]** 1826/23 1827/6 1829/18 1829/22 1830/12 1832/15 1844/7 1847/6 1851/7 1853/4 1862/20 1869/20 1872/20 1877/11 1878/24

## K

**Kaye [1]** 1824/14
**KENYA [1]** 1824/5
**Kessler [1]** 1824/2
**key [1]** 1840/21
**KHALELAH [1]** 1824/5
**kind [23]** 1839/17 1840/23 1846/7 1846/16 1847/7 1848/15 1848/18 1854/2 1856/1 1856/11 1858/15 1858/22 1861/15 1862/2 1865/2 1872/25 1873/2 1875/13 1876/2 1881/10 1881/25 1882/6 1882/12
**kinds [3]** 1828/3 1872/14 1872/16
**King [1]** 1824/3
**Kirk [1]** 1823/21
**know [93]**
**known [3]** 1841/16 1842/1 1842/2
**KRAVETZ [4]** 1824/8 1829/2 1831/15 1835/4

## L

**ladies [1]** 1836/17
**laid [1]** 1857/1
**LAMBERTH [1]** 1823/16
**language [1]** 1863/13
**large [6]** 1850/11 1864/4 1864/6 1873/6 1877/25 1879/3
**larger [2]** 1869/8 1874/9
**last [4]** 1844/22 1873/2 1877/10 1880/3
**later [5]** 1827/13 1847/16 1859/9 1871/1 1881/13
**lawsuit [2]** 1835/21

1836/1
**laying [2]** 1869/6 1869/16
**lays [1]** 1843/9
**Layton [5]** 1835/20 1836/5 1836/5 1836/23 1837/1
**Layton's [7]** 1834/12 1834/15 1834/19 1834/21 1835/1 1835/6 1836/23
**leader [1]** 1838/6
**leading [1]** 1852/6
**learned [1]** 1871/15
**least [1]** 1872/10
**leave [1]** 1884/17
**LEE [1]** 1824/2
**left [4]** 1827/6 1852/4 1852/18 1860/11
**Lehman [3]** 1878/2 1878/3 1878/4
**lend [4]** 1848/21 1848/22 1848/24 1851/1
**lenders [1]** 1848/22
**lent [1]** 1850/21
**less [11]** 1846/16 1852/3 1852/13 1852/13 1854/4 1864/22 1864/23 1864/25 1865/23 1866/6 1876/8
**less-relevant [1]** 1876/8
**let [2]** 1841/23 1845/21
**Let' [1]** 1858/11
**let's [11]** 1840/18 1847/25 1857/13 1859/20 1866/21 1868/3 1870/21 1874/20 1877/9 1877/22 1879/8
**letter [1]** 1869/3
**level [7]** 1876/21 1877/15 1881/9 1881/9 1882/17 1882/24 1884/5
**liabilities [2]** 1854/3 1854/4
**life [2]** 1849/18 1859/24
**like [7]** 1826/24 1834/13 1862/20 1872/20 1873/17

1876/7 1882/7
**likely [3]** 1861/18 1863/14 1863/14
**Limine [1]** 1831/18
**line [5]** 1835/19 1860/9 1860/10 1860/24 1860/25
**lines [1]** 1861/1
**liquidity [3]** 1848/10 1848/17 1848/20
**list [1]** 1839/15
**litigation [6]** 1828/18 1838/9 1841/9 1841/9 1843/5 1851/19
**LITIGATIONS [2]** 1823/12 1826/5
**Litowitz [1]** 1824/9
**little [6]** 1827/2 1838/1 1862/14 1862/15 1871/1 1881/21
**LLP [4]** 1824/2 1824/6 1824/9 1824/14
**loan [4]** 1850/9 1853/2 1882/17 1882/24
**loan-level [2]** 1882/17 1882/24
**loans [3]** 1850/7 1850/9 1883/3
**London [1]** 1878/1
**long [6]** 1838/2 1861/18 1862/10 1862/19 1880/6 1880/11
**long-term [2]** 1880/6 1880/11
**longer [4]** 1854/24 1859/5 1863/1 1883/14
**look [13]** 1843/22 1846/9 1858/11 1859/20 1860/24 1860/25 1868/3 1877/9 1877/22 1878/12 1879/8 1882/10 1882/11
**looked [17]** 1827/15 1842/25 1843/4 1848/1 1856/7 1856/9 1858/24 1860/2 1860/3 1860/4 1860/5 1861/23 1863/15 1867/25 1868/5 1868/6 1882/13
**looking [7]** 1828/19 1841/21 1854/20 1856/6 1863/3 1874/16

# L

**looking...** [1]  1875/3
**LORRAINE** [4]
 1824/18 1885/3 1885/9
 1885/9
**lose** [1]  1852/20
**loses** [1]  1843/18
**losses** [19]  1852/10
 1852/13 1853/19
 1853/20 1854/17
 1857/18 1857/19
 1857/20 1858/14
 1858/16 1875/18
 1875/19 1878/11
 1879/16 1881/10
 1881/23 1881/25
 1883/11 1883/15
**lost** [1]  1857/23
**lot** [2]  1864/6 1882/16
**lots** [1]  1882/20
**lunch** [3]  1871/3
 1884/8 1884/20
**luncheon** [1]  1884/9

# M

**MAC** [49]  1823/10
 1824/13 1826/4 1836/2
 1836/23 1842/7
 1849/10 1849/13
 1850/1 1850/5 1850/13
 1850/16 1850/20
 1850/22 1850/25
 1851/5 1851/8 1852/8
 1852/10 1852/23
 1853/16 1859/21
 1861/10 1861/15
 1862/16 1862/17
 1862/21 1864/3
 1864/11 1864/12
 1865/16 1872/22
 1874/3 1875/16 1879/5
 1879/23 1879/25
 1880/4 1880/23 1881/3
 1881/8 1881/15
 1881/19 1881/22
 1881/23 1882/2
 1882/13 1882/15
 1883/1
**Mac's** [3]  1853/14
 1859/1 1875/9
**made** [11]  1829/22
 1841/18 1841/23
 1856/16 1856/18
 1856/19 1857/14

 1858/4 1861/23
 1862/16 1880/22
**MAE** [48]  1823/10
 1824/12 1826/3 1842/7
 1849/10 1849/13
 1849/25 1850/5
 1850/13 1850/16
 1850/20 1850/21
 1850/24 1851/5 1851/7
 1852/8 1852/10
 1852/23 1853/14
 1853/15 1858/25
 1859/5 1861/11
 1862/21 1864/2
 1864/11 1864/12
 1865/16 1865/18
 1872/22 1874/3
 1875/14 1875/15
 1879/4 1879/22
 1879/24 1880/4
 1880/23 1881/1 1881/8
 1881/15 1881/19
 1881/22 1881/23
 1882/2 1882/12
 1882/15 1883/1
**Mae's** [3]  1860/21
 1861/8 1875/8
**MAE/FREDDIE** [2]
 1823/10 1826/3
**majority** [1]  1838/10
**make** [25]  1840/1
 1841/21 1843/19
 1844/3 1849/10
 1849/11 1849/12
 1850/8 1850/11
 1850/18 1851/10
 1851/12 1851/17
 1853/22 1854/20
 1857/2 1858/10
 1863/24 1864/8 1866/7
 1869/24 1874/11
 1881/25 1882/18
 1883/14
**makes** [3]  1862/4
 1873/16 1876/7
**making** [4]  1828/1
 1858/23 1865/4
 1883/20
**manifest** [1]  1832/13
**many** [5]  1853/24
 1861/3 1873/24 1874/3
 1882/21
**March** [2]  1868/8
 1878/22

**market** [26]  1828/5
 1828/8 1828/9 1830/13
 1832/2 1832/18 1833/2
 1833/9 1833/18
 1835/23 1839/18
 1845/11 1846/5
 1855/11 1855/22
 1865/1 1865/5 1867/14
 1867/15 1871/12
 1871/16 1871/23
 1871/24 1872/17
 1873/13 1874/13
**marketplace** [1]
 1865/7
**markets** [7]  1839/3
 1839/19 1840/12
 1852/22 1872/3 1873/6
 1879/24
**marks** [1]  1879/10
**Massachusetts** [1]
 1824/14
**materials** [4]  1841/2
 1850/2 1851/13
 1851/14
**matter** [3]  1835/25
 1839/6 1885/5
**matters** [3]  1838/9
 1838/10 1838/24
**may** [6]  1833/14
 1840/14 1871/9
 1871/10 1872/24
 1883/13
**MBA** [1]  1838/21
**MBS** [25]  1830/7
 1830/14 1830/15
 1830/23 1830/25
 1831/11 1832/2
 1832/18 1833/2 1833/7
 1833/10 1833/17
 1834/2 1834/5 1839/19
 1839/21 1849/15
 1880/7 1881/18
 1881/19 1883/2 1883/4
 1883/9 1883/11
 1883/14
**me** [3]  1827/2 1827/20
 1845/21
**mean** [12]  1842/4
 1845/17 1846/15
 1852/25 1854/1
 1854/15 1863/13
 1863/23 1870/16
 1875/10 1876/19
 1880/11

**means** [5]  1854/7
 1855/24 1860/12
 1863/24 1863/24
**meant** [2]  1843/25
 1857/4
**meet** [2]  1857/23
 1857/25
**Meltzer** [1]  1824/2
**mentioned** [4]  1850/13
 1860/1 1863/15 1874/3
**methodology** [1]
 1873/13
**midway** [1]  1883/22
**might** [3]  1865/3
 1877/3 1883/10
**million** [1]  1846/25
**minus** [1]  1854/2
**minutes** [2]  1836/25
 1870/21
**Miscellaneous** [1]
 1826/3
**misrepresentations** [1]
 1835/23
**missing** [1]  1874/11
**mission** [5]  1848/5
 1848/8 1848/10
 1848/16 1855/19
**misunderstood** [1]
 1869/25
**mitigate** [1]  1855/20
**money** [21]  1845/15
 1845/17 1847/7 1847/8
 1848/21 1848/24
 1849/13 1849/22
 1849/23 1850/3 1850/6
 1850/11 1850/17
 1851/1 1852/4 1853/9
 1853/21 1853/21
 1855/19 1857/23
 1879/19
**monitored** [1]  1828/10
**month** [3]  1835/20
 1836/12 1883/1
**Moody's** [11]  1827/4
 1827/8 1827/11
 1828/12 1828/15
 1828/20 1829/9
 1872/23 1873/2
 1874/22 1875/5
**Moody's-specific** [1]
 1828/15
**more** [21]  1827/2
 1837/25 1838/1
 1841/19 1846/17

**M**

more... **[16]** 1853/1
1853/1 1854/5 1858/21
1859/25 1861/13
1863/1 1865/5 1865/23
1872/7 1873/3 1873/7
1874/9 1876/7 1883/8
1883/17
**morning [3]** 1823/15
1836/17 1837/14
**mortgage [21]**
1831/20 1835/23
1839/3 1839/23
1845/11 1846/5
1848/23 1849/6
1849/11 1849/18
1849/25 1850/7
1850/15 1850/23
1851/3 1851/7 1852/22
1853/2 1855/12
1879/16 1883/15
**mortgage-backed [10]**
1831/20 1835/23
1839/3 1839/23
1849/25 1850/15
1850/23 1851/3
1879/16 1883/15
**mortgages [14]**
1839/24 1839/25
1840/2 1848/25 1849/1
1849/2 1851/1 1851/2
1856/4 1856/6 1881/20
1881/21 1882/3 1882/5
**most [3]** 1849/24
1861/3 1884/6
**motion [2]** 1831/18
1831/25
**moved [3]** 1826/17
1831/18 1832/21
**moving [2]** 1829/16
1835/5
**Mr [4]** 1827/12
1834/12 1834/15
1836/23
**Mr. [13]** 1827/9 1828/9
1829/11 1829/12
1829/14 1829/21
1834/19 1834/21
1835/1 1835/6 1835/20
1836/5 1836/5
**Mr. Layton [3]** 1835/20
1836/5 1836/5
**Mr. Layton's [4]**
1834/19 1834/21

**Mr. Ugoletti [4]**
1829/11 1829/12
1829/14 1829/21
**Mr. Ugoletti's [2]**
1827/9 1828/9
**Ms [1]** 1825/7
**much [7]** 1846/17
1849/9 1850/5 1858/5
1858/8 1858/9 1873/7
**MUKARRAM [2]**
1837/12 1837/16
**multiple [2]** 1861/15
1877/13
**multiple-notch [1]**
1877/13
**must [2]** 1849/15
1849/17
**mutually [2]** 1867/18
1867/24
**my [9]** 1837/16 1838/4
1838/11 1839/7 1839/7
1840/5 1840/21 1845/8
1873/18
**myself [1]** 1839/2

**N**

**name [1]** 1837/16
**necessarily [1]** 1855/5
**necessary [2]** 1845/24
1850/19
**need [10]** 1830/22
1830/23 1848/13
1849/5 1849/24 1850/6
1857/4 1879/14 1880/5
1880/13
**needed [1]** 1856/20
**needs [2]** 1850/3
1851/15
**negative [8]** 1853/23
1854/7 1854/10
1854/12 1855/5
1876/10 1876/12
1876/19
**net [22]** 1831/21
1832/19 1832/20
1833/1 1833/1 1845/23
1853/22 1853/23
1854/1 1854/2 1854/7
1854/10 1854/10
1854/12 1857/14
1857/16 1859/13
1859/13 1862/9
1862/18 1869/14

**never [4]** 1835/24
1856/17 1856/18
1869/25
**new [4]** 1823/21
1824/6 1824/10
1852/16
**news [1]** 1873/1
**next [10]** 1826/7
1828/15 1836/19
1836/22 1837/2 1837/5
1869/1 1869/23 1870/1
1875/24
**nine [1]** 1838/24
**no [21]** 1823/4
1823/11 1828/14
1829/13 1831/22
1832/11 1832/21
1832/21 1833/2 1833/6
1835/14 1836/4
1840/13 1846/1
1846/23 1847/12
1847/13 1847/15
1854/24 1867/16
1883/14
**normal [1]** 1851/10
**not [43]** 1828/12
1829/6 1829/12
1829/12 1829/14
1829/15 1830/12
1831/4 1832/17
1833/20 1833/22
1834/2 1834/19
1834/24 1834/24
1835/5 1835/7 1836/5
1836/9 1841/23
1842/18 1843/24
1845/23 1846/1
1846/13 1846/15
1846/23 1847/16
1847/21 1847/23
1852/16 1853/4
1860/12 1862/6 1862/8
1863/7 1864/13 1865/7
1865/17 1868/15
1868/22 1869/10
1881/20
**notch [2]** 1877/12
1877/13
**note [1]** 1879/25
**noted [2]** 1852/6
1859/22
**nothing [2]** 1835/14
1837/10

**noting [1]** 1868/23
1869/9 1876/4 1878/8
**now [13]** 1826/23
1828/5 1834/23
1841/12 1861/8
1864/16 1864/25
1865/6 1870/19
1871/12 1878/22
1880/18 1884/8
**number [4]** 1834/20
1868/16 1874/10
1879/9
**numbers [1]** 1861/2
**NW [4]** 1823/21 1824/6
1824/14 1824/19
**NY [1]** 1824/10

**O**

**object [2]** 1834/17
1834/23
**objection [5]** 1828/24
1830/1 1834/7 1836/14
1840/13
**objective [10]** 1842/15
1842/17 1842/19
1842/20 1843/1 1843/2
1843/4 1843/6 1848/2
1848/3
**obligation [3]** 1861/19
1862/10 1862/12
**obligations [7]** 1852/4
1854/3 1854/6 1854/21
1863/8 1868/12
1877/16
**observation [1]**
1861/17
**obviously [3]** 1829/12
1882/13 1884/7
**occurred [2]** 1833/10
1841/10
**off [3]** 1827/6 1855/8
1873/22
**Official [2]** 1824/18
1885/3
**often [8]** 1839/24
1841/19 1855/2 1855/6
1856/23 1874/25
1877/11 1883/23
**Oh [1]** 1827/19
**Okay [12]** 1826/13
1827/1 1827/20
1828/23 1829/24
1830/2 1846/19 1853/3
1858/11 1875/23

**O**

**Okay... [2]** 1879/7
1883/7
**once [6]** 1831/15
1854/23 1856/20
1857/7 1878/16 1879/3
**one [37]** 1827/19
1827/20 1828/13
1828/15 1829/8
1834/11 1835/9
1838/25 1840/21
1842/6 1842/14
1844/14 1846/21
1847/25 1854/9 1856/1
1856/20 1858/18
1858/19 1859/6
1859/23 1859/24
1860/4 1861/9 1861/12
1867/24 1870/3
1872/18 1873/8
1876/16 1876/17
1876/24 1877/11
1879/4 1883/8 1883/10
1883/17
**ones [1]** 1868/6
**ongoing [3]** 1828/11
1866/25 1867/1
**only [11]** 1833/20
1847/14 1849/19
1856/20 1856/20
1858/7 1858/18 1861/9
1861/11 1861/11
1870/3
**operate [9]** 1844/19
1844/21 1845/16
1847/5 1847/13
1847/14 1848/14
1853/23 1853/25
**operating [1]** 1847/16
**operations [2]**
1849/14 1850/6
**opinion [10]** 1833/12
1833/15 1833/16
1835/1 1835/10
1836/13 1842/24
1846/21 1846/22
1860/18
**opinions [3]** 1839/6
1845/21 1875/2
**optimism [1]** 1846/12
**order [1]** 1848/3
**original [1]** 1867/4
**other [15]** 1827/19
1830/4 1834/10

1834/11 1834/22
1842/14 1847/9
1848/22 1850/23
1856/2 1858/20
1864/16 1864/16
1872/22 1882/5
**others [1]** 1840/8
**otherwise [1]** 1832/5
**our [18]** 1831/18
1831/25 1832/16
1833/5 1841/23 1859/7
1859/8 1859/13
1859/13 1861/18
1862/10 1862/19
1873/22 1878/17
1880/6 1880/11 1884/8
1884/9
**out [20]** 1842/14
1843/9 1845/14
1848/23 1850/8 1857/2
1866/3 1866/5 1866/11
1866/13 1869/6
1869/16 1871/19
1871/21 1872/9
1872/17 1873/10
1876/24 1881/1 1881/3
**outcomes [2]** 1841/24
1842/12
**over [15]** 1828/23
1830/1 1835/16
1835/17 1843/20
1852/4 1859/24
1860/11 1861/18
1862/10 1862/19
1873/21 1873/25
1875/2 1875/2
**overrule [2]** 1845/7
1845/8
**overruled [1]** 1829/24
**owe [1]** 1854/4
**owed [4]** 1856/13
1856/15 1856/17
1856/18
**own [2]** 1881/20
1882/3
**owners [3]** 1851/16
1851/21 1854/18
**owning [1]** 1882/5
**owns [1]** 1852/3

**P**

**p.m [1]** 1884/20
**page [4]** 1825/2
1825/11 1833/3

1834/20
**paid [6]** 1851/12
1851/13 1851/24
1852/5 1854/21
1869/15
**paradigm [1]** 1831/9
**paragraph [4]** 1828/8
1828/21 1869/23
1875/24
**parenthetical [1]**
1878/13
**part [16]** 1828/18
1844/14 1848/15
1848/18 1858/3 1864/1
1864/3 1864/5 1864/7
1864/15 1866/15
1868/11 1869/5
1877/25 1884/2 1884/6
**particular [8]** 1829/14
1832/3 1832/10
1833/23 1841/18
1861/8 1863/2 1865/18
**particularly [2]** 1836/1
1841/18
**parties [3]** 1830/4
1844/5 1847/18
**parts [1]** 1844/14
**passed [1]** 1841/20
**passing [1]** 1874/4
**past [1]** 1860/1
**pattern [1]** 1858/12
**Paulson [1]** 1855/13
**pause [1]** 1826/22
**pay [30]** 1843/19
1843/25 1844/8 1844/9
1844/16 1845/12
1847/11 1849/7
1849/12 1849/21
1850/2 1850/20 1851/4
1851/8 1856/20 1857/4
1857/10 1858/2
1860/22 1861/14
1864/13 1865/22
1866/1 1866/4 1866/19
1869/11 1879/19
1880/5 1880/13
1880/15
**payable [2]** 1862/19
1878/8
**paying [1]** 1844/20
**payment [7]** 1828/11
1857/25 1859/7
1859/12 1861/2 1861/6
1869/7

**payments [8]** 1840/1
1844/3 1844/3 1849/11
1850/8 1857/24
1859/10 1869/7
**PCF [14]** 1844/9
1844/11 1846/21
1846/24 1847/20
1847/23 1866/21
1867/12 1869/6
1869/18 1869/21
1870/2 1870/9 1870/15
**Pennsylvania [1]**
1824/3
**people [8]** 1842/11
1843/5 1848/23
1851/12 1864/16
1864/16 1876/5
1882/23
**people's [1]** 1872/9
**percent [10]** 1828/11
1844/16 1860/23
1861/13 1862/6
1866/12 1866/14
1868/18 1879/20
1884/2
**perform [1]** 1832/17
**performance [3]**
1842/7 1842/7 1883/3
**period [5]** 1859/24
1859/24 1862/3 1862/3
1873/19
**periodic [4]** 1844/4
1844/19 1859/17
1866/14
**permission [1]**
1838/15
**permitted [2]** 1833/24
1834/25
**person [2]** 1829/10
1829/11
**PhD [2]** 1838/20
1839/12
**picking [1]** 1827/6
**picture [1]** 1851/9
**piece [3]** 1843/21
1875/21 1882/4
**pincite [1]** 1834/23
**pipeline [2]** 1850/25
1852/24
**place [5]** 1830/7
1831/9 1831/10
1856/23 1856/25
**placed [1]** 1833/19
**plaintiff's [1]** 1834/7

**P**

**plaintiffs [11]** 1823/4
1823/20 1824/2
1827/23 1829/3
1830/20 1831/16
1833/16 1834/17
1834/23 1835/4
**plaintiffs' [4]** 1826/15
1833/3 1841/1 1845/21
**plan [2]** 1863/18
1863/20
**planned [1]** 1857/2
**planning [1]** 1864/7
**plans [4]** 1863/15
1864/9 1865/14
1876/16
**play [2]** 1834/14
1878/16
**played [1]** 1835/6
**playing [2]** 1834/12
1834/17
**plays [1]** 1876/24
**please [2]** 1837/14
1867/6
**plenty [1]** 1834/1
**PLLC [1]** 1823/21
**plus [1]** 1881/12
**point [9]** 1841/18
1846/10 1852/16
1852/18 1858/23
1868/12 1877/4
1883/14 1883/20
**points [6]** 1829/16
1832/16 1844/22
1852/6 1852/15
1857/13
**pooled [1]** 1849/2
**pools [2]** 1839/24
1850/8
**poorly [2]** 1845/15
1865/4
**Porter [1]** 1824/14
**portfolio [8]** 1881/11
1881/12 1881/13
1881/14 1881/18
1882/4 1883/19
1883/21
**portfolios [1]** 1883/23
**portion [4]** 1832/5
1845/18 1867/2
1868/11
**portions [1]** 1834/22
**pose [2]** 1864/5
1878/16

**positive [5]** 1846/17
1847/23 1853/22
1855/3 1870/5
**possible [1]** 1842/12
**post [2]** 1829/20
1834/4
**potentially [3]** 1863/12
1868/13 1878/19
**practically [1]** 1853/24
**practice [1]** 1838/7
**pre [1]** 1884/4
**precluded [5]** 1830/25
1831/24 1832/1
1833/18 1836/8
**predicted [1]** 1828/10
**preferred [17]** 1823/11
1826/4 1844/15
1851/20 1851/21
1851/24 1852/5
1853/15 1853/18
1861/1 1866/16
1868/14 1875/7
1875/21 1878/13
1879/19 1879/21
**prejudicial [1]** 1829/22
**prepared [1]** 1841/12
**presence [1]** 1865/7
**present [1]** 1826/24
**presented [1]** 1836/24
**president [1]** 1838/6
**prices [4]** 1842/8
1842/8 1882/21
1882/22
**pricing [2]** 1839/20
1882/24
**primarily [2]** 1873/21
1883/2
**prior [10]** 1830/24
1831/18 1831/20
1832/13 1832/16
1832/18 1833/12
1841/8 1849/8 1875/4
**private [1]** 1852/17
**probably [3]** 1826/15
1835/12 1870/25
**probe [1]** 1836/10
**problem [1]** 1845/24
**proceed [2]** 1840/14
1871/10
**proceeding [2]** 1837/9
1856/8
**proceedings [2]**
1824/23 1885/5
**proceeds [1]** 1869/19

**process [6]** 1828/1
1849/4 1850/10
1850/11 1874/8 1876/4
**produced [2]** 1824/23
1841/8
**product [1]** 1849/25
**products [1]** 1850/4
**professor [2]** 1839/10
1839/11
**profit [3]** 1856/22
1880/24 1881/16
**profitability [1]**
1881/14
**profitable [1]** 1884/6
**profits [30]** 1851/23
1851/25 1856/16
1856/24 1857/3 1858/7
1858/14 1858/16
1858/19 1859/10
1860/21 1862/3 1862/5
1864/20 1864/21
1864/24 1865/23
1866/3 1866/5 1866/11
1866/13 1866/20
1869/21 1870/12
1870/12 1870/15
1880/22 1881/10
1881/23 1884/7
**progressed [1]** 1852/9
**prohibitions [1]**
1860/17
**project [1]** 1858/6
**projected [3]** 1861/5
1865/18 1865/19
**projection [2]** 1858/10
1861/9
**projections [10]**
1843/23 1860/8
1860/14 1860/20
1861/8 1861/22 1862/2
1865/15 1882/8
1882/18
**promote [2]** 1845/10
1846/4
**prompt [2]** 1876/12
1877/3
**proposals [2]** 1876/15
1876/17
**protecting [1]** 1870/5
**provide [13]** 1837/19
1838/10 1848/9
1848/10 1848/17
1848/20 1851/13
1851/14 1851/14

1851/19 1869/19
1883/2 1883/3
**provided [11]** 1831/6
1833/6 1834/5 1847/4
1863/21 1864/11
1866/25 1867/4
1881/19 1881/22
1883/23
**provides [3]** 1830/19
1842/23 1874/25
**providing [2]** 1844/21
1867/15
**Prussia [1]** 1824/3
**PSPAs [1]** 1884/2
**public [7]** 1841/5
1848/5 1848/8 1848/10
1861/23 1862/1
1863/21
**publicly [1]** 1883/6
**publish [5]** 1833/25
1871/22 1872/21
1882/15 1882/16
**published [5]** 1840/3
1840/4 1840/5 1872/12
1882/10
**pull [3]** 1873/18
1873/19 1874/2
**pulled [4]** 1873/21
1873/22 1873/24
1874/9
**pulling [1]** 1828/4
**purchase [4]** 1823/11
1826/4 1848/22
1866/16
**purchased [3]** 1853/15
1878/1 1878/3
**purchaser [4]** 1866/23
1866/24 1867/18
1867/25
**purchases [1]** 1830/15
**purchasing [1]**
1853/17
**purpose [7]** 1855/7
1855/8 1855/10
1866/21 1866/22
1866/23 1867/17
**purposes [1]** 1850/18
**put [14]** 1827/23
1830/6 1831/9 1831/10
1838/15 1851/17
1852/11 1854/18
1856/25 1863/19
1871/19 1871/21
1872/17 1873/10

**P**

puts [2]  1880/7 1880/7

**Q**

Qs [2]  1862/22 1863/2
quadruple [1]  1829/5
qualitative [1]  1871/21
quantitative [3]
1832/17 1840/8
1871/20
quarter [6]  1857/21
1858/18 1862/24
1869/4 1870/2 1870/3
quarterly [4]  1859/17
1862/24 1868/13
1868/22
quarters [9]  1857/23
1857/24 1858/1 1858/6
1858/7 1858/14
1858/21 1859/11
1867/11
question [2]  1858/5
1874/7
quoted [1]  1828/21

**R**

Radnor [1]  1824/3
raise [4]  1852/14
1852/15 1852/16
1852/19
raises [1]  1883/9
raising [1]  1826/23
range [2]  1842/12
1874/2
rating [5]  1872/18
1873/4 1877/3 1877/17
1877/19
ratings [9]  1872/22
1872/25 1876/13
1876/13 1876/21
1876/22 1877/6 1877/7
1877/11
rationale [2]  1828/1
1830/8
raw [2]  1850/1 1851/13
RBC [1]  1873/5
re [2]  1823/10 1826/3
reaching [1]  1843/8
read [4]  1870/11
1871/12 1872/24
1883/22
reading [1]  1875/17
ready [1]  1826/6
really [6]  1832/4

1843/14 1846/13
1856/11 1878/11
1881/20
reason [7]  1846/2
1846/2 1846/11 1847/3
1864/3 1864/5 1867/24
reasonable [7]  1841/3
1842/18 1845/1 1845/8
1846/21 1854/24
1867/22
reasonableness [3]
1837/23 1840/22
1842/23
reasonably [1]
1845/24
reasons [1]  1867/25
recall [3]  1836/4
1860/14 1863/2
received [7]  1825/12
1825/12 1825/13
1829/1 1829/25
1840/15 1840/16
recent [1]  1832/25
recently [1]  1872/25
recess [3]  1884/9
1884/14 1884/20
recognition [1]
1832/12
recognized [1]  1832/4
reconsider [1]  1835/5
reconsideration [2]
1832/10 1832/14
record [3]  1829/23
1833/3 1885/5
recorded [1]  1824/23
reduce [9]  1842/20
1842/21 1845/2 1845/2
1857/3 1863/25 1864/8
1865/2 1877/3
reduced [3]  1876/13
1877/11 1877/14
reducing [1]  1865/3
reduction [1]  1877/13
reevaluate [1]  1870/1
refer [7]  1842/16
1869/2 1875/25
1876/14 1878/10
1879/22 1879/24
reference [2]  1867/13
1879/13
referred [3]  1829/21
1871/22 1882/24
referring [7]  1832/3
1857/11 1859/15

1863/16 1879/12
1883/11 1883/19
refers [3]  1868/25
1881/7 1883/18
reform [2]  1876/2
1876/14
regularly [1]  1878/7
regulatory [1]  1838/9
relate [2]  1834/3
1834/4
related [3]  1826/3
1864/25 1880/1
relating [2]  1832/10
1835/22
relation [1]  1855/24
relationship [1]
1859/2
relayed [1]  1836/6
relaying [1]  1870/8
relevant [6]  1833/10
1847/23 1855/4
1872/18 1874/23
1876/8
reliable [1]  1835/9
relied [3]  1829/14
1834/20 1860/18
relief [1]  1834/4
relieved [1]  1831/9
rely [4]  1830/14
1833/24 1835/7
1871/24
relying [1]  1833/22
remain [2]  1832/8
1870/4
remainder [1]  1875/11
remaining [5]  1851/25
1857/8 1867/1 1875/14
1877/1
remember [4]  1857/6
1862/5 1864/2 1864/10
remind [5]  1832/15
1839/22 1844/11
1862/12 1878/24
Repaid [1]  1879/17
repay [2]  1879/17
1879/18
repeat [1]  1834/14
repeatedly [1]  1832/9
report [16]  1827/4
1827/8 1827/11
1828/20 1828/22
1829/7 1835/8 1836/9
1870/9 1874/22
1874/23 1875/3 1875/5

1877/22 1880/18
1883/18
reported [3]  1824/18
1859/7 1859/13
Reporter [2]  1824/18
1885/3
reports [30]  1826/18
1828/3 1832/3 1832/6
1833/6 1833/23
1833/25 1835/7
1840/25 1871/13
1871/19 1871/22
1871/23 1871/25
1872/17 1873/11
1873/14 1873/16
1873/17 1873/18
1873/19 1873/21
1873/23 1873/24
1874/1 1874/3 1874/5
1874/7 1874/14
1874/18
require [1]  1830/18
research [5]  1839/7
1840/3 1840/5 1871/19
1873/10
Reserve [1]  1867/23
reserves [1]  1879/15
residual [2]  1860/10
1860/25
resolve [2]  1826/16
1850/9
respect [1]  1865/22
respond [2]  1831/3
1840/25
restore [1]  1855/17
restored [5]  1830/7
1830/12 1830/21
1833/20 1834/1
restructure [1]  1876/3
result [2]  1842/25
1881/10
resulted [1]  1874/10
resulting [2]  1861/19
1880/16
results [4]  1862/23
1862/25 1874/10
1876/8
resumed [1]  1871/8
retained [7]  1837/18
1881/12 1881/12
1881/14 1881/17
1883/21 1884/1
return [1]  1864/17
returned [2]  1870/6

# R

**returned... [1]** 1870/13
**revenue [1]** 1883/23
**reversed [1]** 1861/6
**review [7]** 1837/23
1841/2 1845/22
1873/14 1874/5 1874/6
1876/12
**reviewed [4]** 1841/5
1841/7 1841/8 1841/9
**reward [1]** 1873/12
**rid [1]** 1864/23
**right [21]** 1826/6
1827/16 1827/24
1828/6 1834/6 1834/10
1835/2 1837/2 1840/14
1842/19 1842/22
1846/11 1847/10
1848/12 1849/7
1850/22 1851/4 1869/8
1869/15 1872/8
1884/13
**risk [31]** 1842/21
1842/21 1845/2 1845/2
1846/6 1850/22 1851/4
1851/6 1851/7 1855/21
1855/23 1855/25
1863/22 1863/23
1863/24 1863/25
1864/5 1864/6 1864/8
1864/12 1864/16
1864/17 1864/18
1864/25 1865/2 1865/3
1865/14 1873/11
1880/7 1880/17 1883/9
**risking [3]** 1864/10
1864/15 1865/9
**risks [1]** 1864/23
**River [5]** 1838/3
1838/4 1838/5 1838/7
1839/9
**Rivers [1]** 1837/17
**Road [1]** 1824/3
**ROBERT [5]** 1824/8
1824/12 1829/2
1831/15 1835/4
**Room [1]** 1824/20
**roughly [4]** 1844/16
1867/2 1868/12 1884/2
**ROYCE [1]** 1823/16
**RPR [1]** 1824/18
**RUDY [1]** 1824/2
**ruled [2]** 1831/8
1831/17

**ruling [3]** 1830/24
1832/14 1835/6
**run [4]** 1850/18
1850/19 1881/1 1881/3

# S

**said [17]** 1827/13
1843/4 1843/5 1844/4
1844/6 1847/25 1848/1
1851/20 1860/6
1862/17 1864/10
1866/18 1867/13
1868/3 1872/13 1879/8
1880/4
**salaries [1]** 1851/12
**same [13]** 1835/20
1836/6 1836/11 1850/5
1854/12 1855/14
1859/11 1860/17
1861/10 1861/24
1876/21 1882/13
1883/18
**sat [1]** 1881/21
**satisfy [1]** 1831/2
**saw [2]** 1862/20
1865/15
**say [21]** 1827/14
1830/21 1830/22
1846/15 1847/19
1848/9 1852/25 1854/7
1857/10 1859/6
1859/15 1862/8 1867/6
1868/9 1868/11
1869/13 1870/1 1870/4
1875/10 1878/13
1880/25
**saying [22]** 1843/24
1859/2 1859/12
1861/13 1863/11
1868/1 1868/15 1869/5
1869/7 1869/16
1870/11 1870/13
1872/5 1875/5 1875/6
1875/12 1875/12
1876/1 1876/23
1877/12 1878/6
1878/10
**says [10]** 1828/1
1828/4 1828/5 1828/9
1861/17 1867/17
1868/10 1868/21
1870/8 1883/22
**scenario [2]** 1861/9
1880/25

**scenarios [4]** 1861/10
1876/11 1876/25
1881/6
**scheduled [1]** 1879/10
**Schiller [1]** 1824/6
**Scholer [1]** 1824/14
**scope [2]** 1826/11
1833/22
**scores [1]** 1872/21
**screen [1]** 1855/8
**search [3]** 1874/2
1874/10 1874/12
**seated [1]** 1871/9
**SEC [3]** 1859/20
1860/6 1868/4
**second [6]** 1832/24
1840/25 1843/22
1846/8 1846/11 1882/4
**secondary [3]** 1845/11
1846/5 1865/1
**Secretary [1]** 1855/13
**securities [23]**
1830/16 1835/23
1838/25 1839/3 1839/4
1839/17 1839/19
1839/23 1839/25
1840/12 1849/3 1849/5
1849/25 1850/15
1850/24 1851/3 1859/1
1859/18 1872/3 1873/1
1873/12 1879/16
1883/16
**security [1]** 1831/20
**see [7]** 1859/1 1860/10
1860/11 1861/3
1874/19 1881/13
1884/11
**seeing [1]** 1857/17
**seek [1]** 1832/10
**seeking [1]** 1833/16
**seen [1]** 1876/16
**sell [5]** 1850/3 1864/15
1871/18 1873/8 1879/5
**seller [2]** 1867/18
1867/25
**selling [1]** 1873/12
**sending [1]** 1829/10
**senior [7]** 1823/11
1826/4 1844/15
1868/14 1875/7
1878/13 1879/21
**sense [1]** 1862/4
**sent [2]** 1829/11
1869/3

**sentence [4]** 1828/15
1868/11 1869/12
1880/3
**sentiment [1]** 1831/19
**September [5]**
1829/20 1855/13
1874/22 1874/23
1875/6
**service [2]** 1873/15
1873/18
**services [1]** 1851/14
**SESSION [1]** 1823/15
**set [4]** 1851/2 1860/8
1870/2 1874/9
**shared [2]** 1846/13
1846/15
**shareholder [1]**
1852/11
**shareholders [9]**
1851/9 1851/17
1851/19 1851/20
1851/22 1851/24
1852/1 1852/5 1852/17
**shares [1]** 1853/15
**short [1]** 1870/18
**shorthand [1]** 1824/23
**should [10]** 1834/24
1836/8 1836/10
1854/25 1858/8 1858/9
1858/10 1870/12
1884/8 1884/16
**show [4]** 1832/17
1849/21 1880/21
1881/6
**shows [2]** 1840/20
1857/15
**shrink [6]** 1843/20
1863/22 1863/23
1863/24 1864/21
1865/14
**shrinking [4]** 1852/20
1865/9 1865/18 1884/6
**shrunk [2]** 1884/1
1884/3
**significant [1]** 1880/10
**similar [4]** 1827/14
1855/16 1859/21
1862/16
**since [7]** 1841/24
1847/14 1856/25
1857/16 1857/17
1859/8 1859/13
**sitting [1]** 1851/2
**situation [5]** 1844/25

**S**

situation... [4]  1846/13
 1853/14 1870/1
 1876/24
situations [1]  1853/24
slide [10]  1839/16
 1840/20 1841/12
 1843/9 1844/22
 1855/11 1861/21
 1863/22 1869/1
 1881/13
slides [3]  1838/16
 1861/16 1879/9
small [1]  1855/4
smaller [10]  1856/24
 1857/8 1857/9 1863/24
 1864/8 1864/24 1866/5
 1874/10 1877/2 1877/2
sneak [1]  1832/5
snippet [1]  1883/8
so [121]
sold [3]  1849/3 1856/4
 1882/22
solemnly [1]  1837/8
some [9]  1847/21
 1852/6 1865/18
 1871/12 1872/24
 1874/18 1874/20
 1880/1 1880/18
somehow [1]  1877/2
someone [1]  1867/15
something [5]  1829/9
 1834/20 1836/9
 1874/11 1876/7
somewhere [1]  1863/6
sorry [4]  1834/9
 1855/9 1867/6 1877/10
sort [1]  1878/4
sources [1]  1880/23
specialized [1]
 1839/18
specific [6]  1828/13
 1828/15 1828/20
 1834/19 1834/23
 1835/18
specifically [4]
 1830/14 1832/20
 1834/22 1877/6
spoke [1]  1835/20
spreads [1]  1856/1
squib [3]  1834/14
 1834/15 1883/18
stability [9]  1845/10
 1846/4 1848/10

1848/17 1848/18
 1855/11 1865/1
 1878/17 1880/11
stable [1]  1865/5
stand [2]  1837/7
 1871/8
standard [1]  1832/14
stands [2]  1839/22
 1839/23
STANTON [2]  1824/12
 1836/20
start [7]  1841/15
 1844/5 1856/21
 1856/23 1865/19
 1866/19 1866/21
started [4]  1843/12
 1844/10 1852/10
 1852/12
starting [1]  1861/7
state [3]  1829/22
 1831/19 1832/1
stated [12]  1833/2
 1842/15 1842/17
 1842/19 1843/2 1846/4
 1848/2 1848/3 1849/22
 1855/15 1872/10
 1875/2
statement [4]  1855/12
 1855/14 1859/11
 1875/12
statements [14]
 1843/24 1847/18
 1855/16 1859/5
 1859/17 1859/18
 1859/21 1861/23
 1862/1 1862/21
 1863/11 1865/21
 1882/10 1882/14
STATES [3]  1823/1
 1823/16 1876/22
stating [1]  1869/20
stenotype [1]  1824/23
step [2]  1849/10
 1864/14
stepped [3]  1830/11
 1853/13 1870/23
still [6]  1859/11
 1859/12 1865/6
 1868/23 1874/23
 1877/19
stock [10]  1823/11
 1826/4 1844/15
 1853/18 1866/16
 1868/14 1875/7

1879/21
stop [3]  1855/2 1855/6
 1870/25
straight [1]  1861/17
strategic [1]  1863/20
string [1]  1857/22
structure [2]  1831/23
 1833/9
student [1]  1839/13
studies [1]  1839/3
study [1]  1832/17
stuff [1]  1827/14
Subject [1]  1867/22
submitted [1]  1828/17
subscription [1]
 1873/15
subsequently [2]
 1873/9 1880/4
substantial [8]  1844/7
 1847/20 1868/11
 1868/13 1868/15
 1868/24 1870/10
 1870/14
successful [1]
 1865/12
sufficiency [1]
 1833/19
sufficient [1]  1833/7
suggests [1]  1863/13
Suisse [6]  1835/15
 1835/21 1835/21
 1836/3 1836/6 1836/12
supplemental [1]
 1835/8
support [9]  1835/8
 1855/11 1855/12
 1866/25 1870/9 1876/6
 1879/11 1879/14
 1883/9
supported [1]  1835/10
supposed [1]  1848/19
sure [8]  1841/21
 1847/21 1849/20
 1854/20 1856/10
 1869/24 1874/11
 1874/21
sustainability.' [1]
 1880/6
sustained [2]  1834/8
 1836/14
swear [1]  1837/8
sweep [6]  1831/21
 1832/19 1832/20

1833/18 1833/2 1845/23
system [4]  1848/11
 1853/10 1855/20
 1882/20
systematically [1]
 1856/11
systemic [5]  1855/21
 1855/23 1855/25
 1864/4 1864/5

**T**

table [1]  1857/15
take [17]  1841/12
 1846/3 1847/6 1848/23
 1858/11 1859/20
 1868/3 1870/18
 1870/21 1871/4
 1874/13 1877/9
 1877/22 1879/8 1879/9
 1884/8 1884/9
taken [2]  1857/3
 1865/14
taking [1]  1881/15
talk [4]  1834/1 1879/14
 1882/11 1884/10
talked [4]  1846/9
 1852/22 1879/17
 1882/14
talking [10]  1828/12
 1847/3 1855/19
 1861/20 1867/2
 1876/11 1876/18
 1878/12 1879/15
 1880/13
talks [1]  1862/2
targeted [2]  1874/10
 1874/12
taught [3]  1839/12
 1839/15 1839/16
taxpayer [1]  1869/19
taxpayers [4]  1869/22
 1870/5 1870/6 1870/13
teach [1]  1839/14
team [2]  1873/18
 1874/5
tell [8]  1827/2 1827/20
 1837/21 1838/1
 1841/15 1853/12
 1871/16 1872/4
telling [1]  1860/20
tender [1]  1840/11
term [6]  1855/23
 1861/18 1862/11
 1862/20 1880/6

**term... [1]** 1880/11
**terms [1]** 1860/20
**testified [4]** 1838/23
1838/24 1845/23
1846/24
**testifies [1]** 1834/12
**testify [7]** 1829/13
1829/15 1830/6 1831/8
1833/9 1835/11
1835/12
**testifying [2]** 1835/17
1836/9
**testimony [26]**
1826/12 1830/8
1830/25 1831/12
1831/13 1831/18
1832/1 1832/5 1832/7
1833/7 1833/12
1833/18 1833/22
1834/14 1834/15
1834/17 1834/18
1834/22 1835/1 1835/6
1835/12 1836/24
1837/9 1837/19 1841/1
1841/9
**Thakor's [2]** 1846/20
1846/22
**than [21]** 1841/20
1842/24 1846/17
1846/18 1851/6 1852/3
1854/4 1854/5 1858/21
1859/25 1861/13
1865/23 1866/5
1866/11 1866/13
1869/8 1872/7 1873/2
1873/3 1873/7 1877/4
**Thank [7]** 1828/25
1830/3 1833/13 1835/3
1836/20 1847/24
1884/19
**that [326]**
**that's [24]** 1827/19
1829/24 1830/19
1832/9 1833/3 1839/17
1841/25 1845/9
1847/11 1848/15
1848/21 1855/10
1855/12 1857/10
1858/19 1862/6
1869/11 1872/23
1873/3 1874/7 1875/21
1877/14 1879/20
1882/17

**their [38]** 1830/15
1841/1 1842/11
1846/16 1848/5 1848/9
1848/23 1849/9
1849/14 1850/6 1850/7
1851/11 1853/22
1854/6 1854/20 1859/2
1859/24 1860/6
1861/16 1862/22
1862/23 1862/25
1865/22 1867/22
1869/6 1870/7 1872/10
1873/9 1873/11
1874/16 1876/12
1876/13 1876/21
1877/16 1880/7
1880/14 1882/3 1883/3
**them [18]** 1826/24
1833/25 1835/22
1845/22 1846/17
1847/5 1848/24
1849/11 1850/10
1851/24 1864/8
1871/15 1871/22
1873/16 1874/19
1877/3 1879/10 1882/3
**themselves [1]**
1850/17
**then [33]** 1828/7
1828/14 1839/20
1839/25 1843/12
1843/13 1843/16
1843/19 1850/17
1851/25 1852/4
1852/18 1854/4 1855/6
1856/5 1856/7 1858/14
1858/22 1860/5 1861/2
1862/8 1865/19
1866/14 1867/14
1869/13 1870/4 1871/6
1873/9 1873/16 1877/2
1878/10 1879/5
1879/13
**there [39]** 1826/10
1827/21 1829/13
1832/12 1832/18
1832/21 1832/21
1833/25 1834/8
1835/14 1835/14
1835/18 1836/4 1842/2
1843/16 1844/16
1847/22 1851/3 1852/4
1854/24 1857/1 1857/7
1858/18 1859/6 1861/4

1864/8 1864/23
1865/11 1865/18
1866/14 1867/3
1872/13 1872/21
1873/4 1876/2 1876/15
1876/17 1879/12
1883/15
**there's [5]** 1832/11
1834/11 1851/2
1872/16 1882/20
**thereabouts [1]**
1871/5
**therefore [2]** 1830/17
1869/13
**these [42]** 1828/3
1844/1 1844/3 1845/16
1847/5 1847/13
1855/16 1856/10
1859/16 1859/17
1860/14 1860/15
1860/17 1860/20
1861/22 1863/2 1863/4
1863/11 1864/9 1868/4
1868/4 1868/6 1868/6
1871/21 1871/24
1872/4 1872/7 1872/8
1873/6 1873/12 1874/3
1874/18 1877/6 1877/7
1877/11 1881/6
1881/21 1882/8
1882/17 1882/23
1883/22 1884/1
**they [199]**
**they've [3]** 1859/9
1868/3 1879/8
**thing [4]** 1835/9
1841/25 1847/9
1858/20
**things [7]** 1842/13
1845/14 1848/1 1850/3
1858/22 1865/4 1873/8
**think [20]** 1826/15
1833/20 1834/8 1836/8
1844/13 1846/2
1846/11 1847/5 1847/9
1847/17 1848/15
1850/1 1856/5 1858/4
1861/12 1862/4
1870/24 1873/7
1874/23 1878/3
**thinking [4]** 1842/13
1856/23 1869/6 1875/1
**thinks [1]** 1846/12
**third [30]** 1829/10

1831/7 1831/8 1832/19
1833/5 1833/17 1834/4
1837/24 1840/23
1840/24 1841/4
1842/16 1842/20
1843/3 1843/6 1843/10
1844/2 1844/25 1845/4
1845/9 1846/5 1856/8
1860/15 1861/24
1863/5 1874/17 1875/4
1878/21 1878/24
1884/4
**thirds [1]** 1883/24
**this [85]**
**those [16]** 1829/16
1831/3 1831/4 1832/8
1840/2 1849/2 1850/8
1852/11 1852/13
1852/24 1857/5 1866/9
1866/10 1871/19
1873/10 1879/5
**though [1]** 1875/3
**thousands [1]** 1839/25
**threat [1]** 1878/16
**three [7]** 1832/16
1835/17 1847/16
1870/25 1873/4
1876/11 1884/14
**through [13]** 1841/12
1842/22 1851/5 1852/9
1853/9 1856/10 1860/9
1871/15 1873/23
1873/25 1874/13
1874/20 1879/10
**time [36]** 1826/15
1827/14 1827/15
1840/24 1841/6
1841/18 1841/22
1841/24 1842/20
1843/6 1843/10
1843/20 1844/25
1846/10 1853/20
1855/14 1856/19
1857/7 1858/17
1858/20 1861/10
1861/13 1861/24
1862/14 1866/18
1869/18 1871/3 1872/5
1872/12 1873/19
1874/17 1875/2 1875/3
1876/15 1878/14
1884/10
**times [3]** 1848/14
1848/14 1848/15

**T**

**timing [2]** 1829/19 1870/24
**title [1]** 1838/5
**titled [1]** 1863/22
**together [2]** 1857/3 1863/20
**told [1]** 1836/2
**too [2]** 1852/4 1876/5
**took [1]** 1837/7
**top [2]** 1840/4 1840/5
**Topaz [1]** 1824/2
**topic [1]** 1832/11
**total [2]** 1875/17 1883/24
**trade [2]** 1871/18 1871/19
**Traditionally [1]** 1883/22
**training [1]** 1839/7
**transcript [3]** 1823/15 1824/23 1885/4
**transcription [1]** 1824/23
**Treasury [42]** 1830/6 1830/11 1831/2 1831/6 1832/22 1844/3 1844/6 1844/20 1847/19 1853/12 1853/13 1853/22 1855/7 1855/10 1855/13 1856/12 1856/14 1859/22 1861/20 1862/10 1862/13 1862/19 1863/9 1866/15 1866/24 1867/19 1869/1 1869/3 1869/15 1870/8 1870/9 1870/11 1875/21 1876/16 1876/20 1878/8 1879/11 1879/20 1880/5 1880/14 1883/9 1883/11
**Treasury's [1]** 1875/7
**trial [5]** 1823/15 1832/24 1835/10 1835/13 1835/18
**tried [1]** 1852/14
**true [1]** 1885/4
**trusts [2]** 1881/22 1883/4
**truth [3]** 1837/10 1837/10 1837/10

**try [3]** 1841/25 1845/23 1848/4
**trying [4]** 1841/17 1858/4 1872/5 1876/3
**turn [2]** 1842/14 1845/14
**turned [4]** 1858/22 1866/5 1866/11 1866/13
**two [22]** 1826/18 1826/20 1835/17 1840/20 1840/21 1844/14 1844/22 1857/24 1858/1 1858/6 1858/7 1858/14 1859/5 1859/9 1859/11 1860/3 1861/1 1867/11 1868/4 1872/16 1873/3 1883/24
**two-thirds [1]** 1883/24
**type [5]** 1828/8 1838/12 1872/3 1872/4 1875/1
**typical [1]** 1882/9
**typically [3]** 1849/18 1873/7 1874/6

**U**

**U.S [7]** 1824/19 1848/11 1872/25 1875/21 1877/17 1877/19 1879/11
**Ugoletti [6]** 1827/13 1827/15 1829/11 1829/12 1829/14 1829/21
**Ugoletti's [3]** 1827/9 1827/12 1828/9
**Uh [1]** 1878/23
**Uh-huh [1]** 1878/23
**ultimate [1]** 1849/5
**unable [3]** 1849/12 1850/20 1857/23
**unaware [1]** 1836/9
**uncertainty [9]** 1842/3 1846/17 1858/8 1858/23 1864/24 1864/25 1880/6 1880/7 1880/10
**under [8]** 1832/6 1848/11 1848/12 1848/19 1852/2 1854/11 1862/14 1862/15

**undergraduate [1]** 1838/21
**underlying [1]** 1829/7
**understand [12]** 1831/7 1842/1 1848/3 1848/24 1856/7 1858/25 1866/22 1871/12 1873/11 1874/15 1876/14 1881/5
**understanding [1]** 1836/11
**unduly [1]** 1829/22
**UNITED [3]** 1823/1 1823/16 1876/22
**University [3]** 1838/20 1839/12 1839/13
**unknown [3]** 1841/16 1842/1 1842/4
**unlike [1]** 1858/13
**unlikely [2]** 1862/17 1878/7
**unlimited [3]** 1843/13 1878/15 1879/11
**until [2]** 1850/9 1855/5
**unused [1]** 1845/18 1867/2
**up [21]** 1827/6 1828/4 1838/16 1839/15 1842/9 1843/12 1843/17 1844/14 1848/25 1849/21 1850/9 1852/6 1852/24 1852/25 1853/17 1861/17 1872/10 1873/4 1875/14 1875/15 1882/23
**us [20]** 1837/21 1838/1 1839/22 1841/12 1841/15 1843/7 1853/12 1856/8 1859/4 1860/24 1862/12 1871/16 1872/4 1872/20 1873/17 1874/13 1874/15 1879/9 1879/20 1881/17
**use [3]** 1830/20 1850/17 1882/18
**used [9]** 1843/7 1843/17 1844/14 1872/2 1873/3 1874/8 1875/14 1875/15 1879/19
**uses [2]** 1846/18

**undergraduate [1]** 1847/10

**using [4]** 1832/5 1833/11 1874/1 1874/12
**usually [1]** 1851/15

**V**

**valid [1]** 1832/8
**valuable [1]** 1849/19
**value [2]** 1867/14 1867/15
**variable [1]** 1864/22
**various [9]** 1847/18 1850/3 1850/18 1852/15 1864/9 1876/15 1876/17 1880/22 1881/16
**VARMA [4]** 1824/12 1825/7 1826/8 1837/4
**vary [3]** 1862/3 1862/5 1862/7
**very [8]** 1830/17 1831/13 1835/18 1842/13 1847/21 1872/2 1872/11 1882/16
**vice [1]** 1838/6
**video [5]** 1825/4 1834/13 1836/24 1837/1 1884/15
**view [3]** 1875/13 1878/17 1878/17
**viewed [3]** 1863/14 1870/9 1881/14
**views [4]** 1846/16 1872/9 1872/10 1874/17
**VINCENT [1]** 1823/20
**vs [1]** 1823/5

**W**

**wait [1]** 1855/5
**waived [5]** 1866/16 1866/18 1867/10 1867/10 1867/11
**waiver [3]** 1869/3 1870/3 1870/8
**waiving [3]** 1844/4 1866/15 1869/4
**want [4]** 1848/23 1870/25 1871/4 1875/1
**wanted [4]** 1826/10 1829/22 1872/9 1874/11

**W**

**was [114]**
**Washington [5]**
1823/8 1823/22 1824/7
1824/15 1824/20
**wasn't [2]** 1844/7
1869/24
**way [14]** 1841/19
1842/14 1848/20
1848/25 1850/5
1851/21 1855/6
1860/11 1861/12
1870/17 1872/11
1875/20 1880/2
1882/12
**ways [2]** 1860/4
1864/9
**we [88]**
**We'll [1]** 1845/20
**Wednesday [1]** 1827/7
**week [1]** 1863/4
**well [10]** 1828/21
1832/9 1832/23
1851/23 1858/3 1866/3
1868/3 1870/11
1874/20 1875/19
**went [4]** 1827/15
1827/19 1841/13
1855/8
**were [71]**
**weren't [3]** 1849/8
1852/18 1874/11
**what [130]**
**What's [1]** 1870/24
**whatever [2]** 1854/18
1858/6
**whatever's [1]** 1862/6
**whatsoever [1]** 1833/2
**when [27]** 1828/16
1830/6 1830/21
1833/19 1839/23
1841/17 1842/15
1845/14 1846/15
1847/10 1848/14
1850/16 1851/23
1852/25 1855/3
1855/25 1856/23
1857/10 1859/9
1859/15 1862/25
1863/2 1866/19
1866/20 1872/2
1875/10 1878/14
**where [16]** 1827/6
1829/21 1842/2 1850/7

1851/7 1851/9 1852/2
1852/16 1852/23
1856/5 1857/23
1857/24 1858/19
1859/16 1861/5
1883/14
**whether [6]** 1836/6
1836/12 1841/3
1842/18 1854/25
1870/2
**which [43]** 1826/18
1826/20 1827/25
1828/10 1828/22
1829/5 1829/9 1830/5
1832/14 1833/5 1834/3
1834/4 1839/1 1839/19
1843/25 1844/15
1846/6 1848/1 1850/3
1857/2 1858/13 1860/5
1860/12 1862/4 1863/5
1865/15 1866/20
1866/23 1866/24
1867/9 1867/18
1868/12 1869/1
1872/24 1874/5 1876/2
1876/6 1876/13 1878/2
1881/1 1881/3 1883/18
1884/6
**while [2]** 1833/8
1843/14
**who [3]** 1829/10
1830/14 1851/12
**whole [5]** 1837/10
1849/11 1850/11
1851/2 1883/15
**why [7]** 1832/9
1841/15 1841/25
1842/16 1847/1
1847/21 1849/22
**wide [1]** 1874/2
**widely [1]** 1873/3
**wider [1]** 1856/5
**will [41]** 1827/1
1830/18 1834/7
1834/12 1834/15
1834/25 1835/12
1836/5 1836/22
1836/24 1837/5 1837/9
1837/9 1847/16
1849/10 1849/20
1849/20 1850/25
1851/12 1851/13
1855/2 1855/6 1856/10
1861/3 1861/19 1862/5

1862/16 1870/7 1871/18
1875/7 1879/14 1881/1
1881/3 1881/10
1881/13 1882/9
1882/11 1883/17
1884/9 1884/11
1884/14
**Wisconsin [1]** 1839/12
**within [6]** 1829/15
1830/8 1831/13
1833/21 1834/13
1834/18
**witness [10]** 1825/2
1826/7 1826/12
1836/19 1836/22
1837/3 1837/5 1837/7
1870/23 1871/8
**won't [6]** 1851/4
1851/5 1851/8 1861/13
1871/3 1877/16
**word [3]** 1830/20
1831/24 1833/11
**work [13]** 1837/17
1838/9 1838/13 1839/7
1848/4 1849/13
1849/15 1850/12
1851/11 1851/17
1856/3 1873/22 1875/1
**worked [1]** 1829/10
**world [2]** 1878/19
1878/20
**worried [1]** 1876/25
**worry [1]** 1849/6
**worth [16]** 1831/21
1832/19 1832/20
1833/1 1833/1 1845/23
1853/22 1853/23
1854/1 1854/2 1854/7
1854/10 1854/10
1854/12 1857/14
1857/16
**worthiness [6]**
1830/18 1831/1 1831/3
1831/5 1831/11
1849/16
**would [69]**
**wouldn't [2]** 1866/4
1877/10
**written [2]** 1848/9
1875/20
**wrong [1]** 1846/3

**Y**

**year [12]** 1838/4

1851/19 1856/2 1856/18
1856/20 1859/8
1859/13 1861/2 1861/3
1865/24 1875/4
1879/10 1884/2
**years [13]** 1841/20
1841/20 1842/9
1847/16 1849/18
1859/9 1860/8 1861/3
1861/5 1872/7 1872/8
1881/2 1881/4
**yes [52]** 1837/11
1837/20 1838/14
1838/24 1839/11
1840/4 1840/21
1841/14 1844/24
1845/18 1848/6
1849/17 1853/7
1853/11 1854/14
1854/22 1855/2
1855/15 1857/12
1859/4 1860/3 1860/19
1861/11 1862/1
1862/17 1863/10
1863/13 1863/17
1863/19 1865/2 1865/8
1865/25 1867/9
1867/21 1868/2 1868/6
1868/19 1870/17
1870/20 1871/14
1872/1 1874/25 1877/7
1877/18 1877/21
1879/1 1879/13
1879/24 1880/9
1880/20 1881/7
1883/13
**yet [2]** 1826/19
1868/22
**York [2]** 1824/6
1824/10
**you [250]**
**you've [3]** 1841/12
1857/13 1875/24
**your [47]** 1826/9
1827/4 1827/5 1827/11
1827/17 1827/21
1828/19 1828/25
1829/2 1829/19 1830/3
1831/17 1832/8
1833/14 1834/11
1835/3 1835/5 1836/4
1836/14 1836/19
1836/20 1837/2
1837/25 1838/1 1838/2

# Y

**your... [22]**  1838/5
1838/8 1838/13
1838/19 1839/5 1840/9
1840/13 1841/13
1843/8 1844/23 1845/7
1845/20 1845/22
1856/9 1870/9 1870/24
1873/13 1874/5
1874/24 1884/6
1884/16 1884/19
**Your Honor [22]**
1826/9 1827/4 1827/5
1827/11 1827/17
1827/21 1828/19
1828/25 1829/19
1830/3 1831/17 1832/8
1833/14 1834/11
1835/3 1835/5 1836/4
1836/20 1840/9
1840/13 1884/16
1884/19
**yourself [2]**  1837/15
1839/1

# Z

**zero [1]**  1860/11
**Zoom [3]**  1871/2
1884/15 1884/18