1
**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
2

Fairholme Funds, Inc., et al.,  ) Civil Action
3                                 ) No. 1:13-cv-01053-RCL
                     Plaintiffs,  )
4                                 )
vs.                               ) **Jury Trial (Day 10)**
5                                 ) **Morning Session**
Federal Housing Finance           )
6 Agency, et al.                  ) Washington, D.C.
                                  ) **August 7, 2023**
7                     Defendants.  ) Time:  10:00 a.m.
  _____
8

In re Fannie Mae/Freddie Mac     ) Civil Action
9 Senior Preferred Stock          ) No. 1:13-mc-1288-RCL
  Purchase Agreement Class        )
10 Action Litigations.            )

11 _____

12      Transcript of **Jury Trial (Day 10) Morning Session**
                       **Held Before**
13           **The Honorable Royce C. Lamberth**
              **United States Senior District Judge**
14 _____

                    A P P E A R A N C E S
15

16 For the Fairholme Funds, Inc. Plaintiffs:
                      **Vincent J. Colatriano**
17                    COOPER & KIRK, PLLC
                      1523 New Hampshire Avenue, Northwest
                      Washington, D.C. 20036
18

19 For the Defendant Federal Housing Finance Agency:
                      **Asim Varma**
20                    **David B. Bergman**
                      **Ian S. Hoffman**
21                    **R. Stanton Jones**
                      **Jonathan L. Stern**
22                    ARNOLD & PORTER KAYE SCHOLER LLP
                      601 Massachusetts Avenue, Northwest
23                    Washington, D.C. 20001

24

25

```
 1              A P P E A R A N C E S (continued)

 2      For the Class Plaintiffs:
                              Hamish P. M. Hume
 3                            Kenya Khalelah Davis
                              Samuel C. Kaplan
 4                            BOIES SCHILLER FLEXNER LLP
                              1401 New York Avenue, Northwest
 5                            Washington, D.C. 20005

 6                            Robert Kravetz
                              Adam H. Wierzbowski
 7                            BERNSTEIN LITOWITZ BERGER & GROSSMANN
                              LLP
 8                            1251 Avenue of the Americas
                              New York, New York 10020
 9
                              Caitlin Bozman
10                            BERNSTEIN LITOWITZ BERGER & GROSSMANN
                              LLP
11                            2121 Avenue of the Stars, Suite 2575
                              Los Angeles, California 90067
12
                              Lee D. Rudy
13                            Grant Goodhart
                              KESSLER TOPAZ MELTZER & CHECK
14                            280 King of Prussia Road
                              Radnor, Pennsylvania 19087
15      _____

16      Stenographic Official Court Reporter:
                              Nancy J. Meyer
17                            Registered Diplomate Reporter
                              Certified Realtime Reporter
18                            333 Constitution Avenue, Northwest
                              Washington, D.C. 20001
19                            202-354-3118

20      Proceedings recorded by mechanical stenography.  Transcript
        produced by computer-aided transcription.
21

22

23

24

25
```

1

<u>**I N D E X**</u>

2

<u>PAGE:</u>

3

<u>**Witnesses:**</u>

4

<u>Mukarram Attari</u>
        Cross-Examination, Continuing, By Mr. Kravetz.... 2051
5       Redirect Examination By Ms. Varma................ 2074
        Recross-Examination By Mr. Kravetz.............. 2088
6  <u>Ed DeMarco</u>
        Direct Examination By Mr. Stern................. 2105

7

8

<u>**Exhibits Admitted**</u>:

9

        Plaintiffs' Exhibit 111.......................... 2054
10       Plaintiffs' Exhibit 242.......................... 2060
        Plaintiffs' Exhibit 444.......................... 2093
11       Plaintiffs' Exhibit 445.......................... 2093
        Plaintiffs' Exhibit 597.......................... 2093
12       Plaintiffs' Exhibit 598.......................... 2093
        Plaintiffs' Exhibit 636.......................... 2093
13       Plaintiffs' Exhibit 637.......................... 2093
        Plaintiffs' Exhibit 638.......................... 2093

14

15

        Defendants' Exhibit 1............................ 2092
16       Defendants' Exhibit 4............................ 2092
        Defendants' Exhibit 49........................... 2092
17       Defendants' Exhibit 58........................... 2092
        Defendants' Exhibit 78........................... 2092
18       Defendants' Exhibit 79........................... 2092
        Defendants' Exhibit 84........................... 2092
19       Defendants' Exhibit 85........................... 2092
        Defendants' Exhibit 86........................... 2092
20       Defendants' Exhibit 89........................... 2092
        Defendants' Exhibit 90........................... 2092
21       Defendants' Exhibit 99........................... 2092
        Defendants' Exhibit 100.......................... 2092
22       Defendants' Exhibit 163.......................... 2092
        Defendants' Exhibit 164.......................... 2092
23       Defendants' Exhibit 206.......................... 2092
        Defendants' Exhibit 207.......................... 2092
24       Defendants' Exhibit 209.......................... 2092
        Defendants' Exhibit 233.......................... 2092
25       Defendants' Exhibit 282.......................... 2092
        Defendants' Exhibit 346.......................... 2092

1                    **I N D E X** (continued)

2                                                        PAGE:

**Exhibits Admitted**: (continued)

3

        Defendants' Exhibit 374......................... 2092
4        Defendants' Exhibit 404......................... 2092
        Defendants' Exhibit 444......................... 2092
5        Defendants' Exhibit 539......................... 2092
        Defendants' Exhibit 549......................... 2100

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

1          (Proceedings held out of the presence of the jury.)

2          THE COURTROOM DEPUTY:  This is Civil Action 13-1053,

3   with related Miscellaneous Case 13-1288, In re:  Fannie

4   Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class

5   Action Litigations.

6          MR. HOFFMAN:  Good morning.

7          THE COURT:  Good morning.

8        Bring the jury.

9          MR. HOFFMAN:  Yes, Your Honor.  I just wanted to flag

10   that we have nothing to discuss for the Court to resolve before

11   Dr. Attari's testimony.  We do have a few matters that we would

12   appreciate the Court's intervention on before we call our next

13   witness.

14          THE COURT:  We'll do that after we get this done.

15          MR. HOFFMAN:  Thank you, Your Honor.

16          THE COURT:  I don't want to have the jury waiting.

17          (Proceedings held in the presence of the jury.)

18          THE COURT:  You may be seated.  Good morning, ladies

19   and gentlemen.

20        Dr. Attari has resumed the stand.  You may continue your

21   examination.

22          MR. KRAVETZ:  Thank you, Your Honor.  Robert Kravetz

23   on behalf the plaintiffs.

24   ///

```
 1                      CROSS-EXAMINATION, continuing
 2     BY MR. KRAVETZ:
 3     Q.  Good morning, Dr. Attari.
 4     A.  Good morning.
 5     Q.  I wanted to ask a couple questions about the periodic
 6     commitment fee.
 7              MR. KRAVETZ:  And if I could ask Ms. McGuire to pull
 8     up Slide 70 of the revised presentation.
 9     BY MR. KRAVETZ:
10     Q.  And, Dr. Attari, this is a comparison between the terms of
11     AIG -- support given to AIG and support given to Fannie and
12     Freddie; is that correct?
13     A.  Yes.
14     Q.  And I think you acknowledged on direct examination that the
15     terms of the AIG support were renegotiated by November 2008; is
16     that correct?
17     A.  Yes.
18     Q.  And that there was an equity investment from Treasury at
19     the same time that the deal was renegotiated?
20     A.  Yes.  And there was restructuring that AIG had announced
21     prior to the time of that renegotiation.
22     Q.  And do you know the amount of what that equity investment
23     was?
24     A.  I believe it was $40 billion.
25     Q.  Okay.  And do you know the terms of the AIG loan from
```

1    November 2008 once it was renegotiated?

2    A.  Yes.  So -- and I think we talked about it.  The maximum

3    amount was reduced to 60 billion.  The initial commitment fee

4    and the warrants, you know, they had happened at the time of

5    September.  So they didn't change.  The interest rate fell to,

6    I think, 6 1/2 percent or higher, and the periodic commitment

7    fee fell to .75 percent.

8    Q.  .75 percent from 8.5 percent?

9    A.  Yes.

10             MR. KRAVETZ:  Okay.  Now -- we can take that down.

11   Thank you, Ms. McGuire.

12   BY MR. KRAVETZ:

13   Q.  Dr. Attari, on your slide you pointed to language from SEC

14   reports stating that the PCF could be substantial; is that

15   correct?

16   A.  Yes.

17   Q.  But just in terms of the specific language that was used,

18   the SEC reports do not state that the PCF would be substantial;

19   correct?

20   A.  Yes.

21   Q.  And, in fact, the SEC reports do not provide an actual

22   amount or a range of amounts that the PCF could be; is that

23   correct?

24   A.  Correct.

25   Q.  And the SEC reports do not describe whether FHFA, Fannie,

1   or Freddie had performed any work to calculate the periodic

2   commitment fee; is that correct?

3   A.  Correct.

4   Q.  And just to be clear, on direct examination, you did not

5   identify any evidence that either FHFA or Treasury had

6   attempted to determine a market-based PCF prior to the third

7   amendment; is that correct?

8   A.  Correct.  There was language in the Treasury documents

9   about what it believed the PCF would be or -- you know.  It

10  seemed to suggest all profits -- or profits, but there wasn't a

11  numerical value.

12  Q.  Okay.  And are you aware that Mr. Ugoletti has testified

13  that he's unaware whether anyone at FHFA ever tried to

14  calculate the value of the periodic commitment fee?

15  A.  That's my understanding; correct.

16  Q.  Okay.  And are you aware that Mr. DeMarco testified that

17  he never had anyone at FHFA calculate or run a model or try

18  to quantify what a reasonable periodic commitment fee would

19  be?

20  A.  That's my recollection; correct.

21  Q.  Now, was it your testimony on Friday that a $1-billion

22  periodic commitment fee would not have been substantial?

23  A.  I said that in the context of $260-billion commitment, the

24  1 billion would not be substantial, yes.

25         MR. KRAVETZ:  I'd ask if Ms. McGuire can call up

1    Plaintiffs' Exhibit 111, which has been introduced into

2    evidence.

3            Your Honor, plaintiffs move for the admission of

4    Exhibit PX-111.

5            THE COURT:  Plaintiffs' 111?

6            MR. KRAVETZ:  111, Your Honor.

7            THE COURT:  Any objection?

8            MR. HOFFMAN:  No objection.

9            THE COURT:  Received.

10           MR. KRAVETZ:  Thank you.

11           (Plaintiffs' Exhibit 111 admitted into evidence.)

12   BY MR. KRAVETZ:

13   Q.  And, Dr. Attari, you're familiar with this document;

14   correct?

15   A.  Yes.

16   Q.  All right.  This is a document from September 2000 --

17   September 9, 2011; correct?

18   A.  That's the date on the document, yes.

19   Q.  And it's entitled, just for the record, 2011 FHFA Scenario

20   Forecast-3Q Update:  4-Year Outlook; is that correct?

21   A.  Yes.

22           MR. KRAVETZ:  If I could ask Ms. McGuire to please

23   proceed to page 10.

24           And if we can focus on the last bullet point in the

25   lower right-hand corner, Ms. McGuire.

```
 1    BY MR. KRAVETZ:

 2    Q.  And, Dr. Attari, do you see that, first, on the document

 3    stamp in the upper right, it says Freddie Mac?

 4    A.  Yes.

 5    Q.  Okay.  And, Dr. Attari, the specific language indicates,

 6    quote, Our sensitivity to a commitment fee based on remaining

 7    commitment available beginning in 2013 of 149 billion shows

 8    that a 25-BPS fee results in a $0.4-billion annual impact on

 9    stockholder equity.

10         Did I read that correctly?

11    A.  Yes.

12    Q.  And so in -- and we've seen that $149-billion number

13    before; is that correct?

14    A.  Yes.

15    Q.  And for -- this particular document is modeling the earning

16    sensitivity based on the remaining commitment available; is

17    that correct?

18    A.  Yes.

19    Q.  And the remaining commitment available would be

20    $149 billion?

21    A.  Yes.

22    Q.  And according to this document under this particular

23    exercise, the commitment fee under this earning sensitivity

24    exercise would be $400 million; is that correct?

25    A.  They're considering various levels.  So this is something
```

```
1    fairly typical and you see this in the tables above the one

2    that we are talking about also.

3         Companies do sensitivity analysis for various levels of

4    different variables.  So on the previous table, they're looking

5    at what happens if -- I believe it is severity, which is kind

6    of, you know, losses on loans.  And so they're doing kind of

7    what happens if losses on loans go up by 2 percent, go down by

8    2 percent.  That doesn't mean that they expect them to be

9    2 percent.

10         Similarly, this is on the commitment fee.  They're doing

11   this analysis, and it's just telling them that if it's

12   1 percent, then the -- the cost is a billion and a half.  If

13   it's 10 percent, it will be 15 billion.  So it's just a simple

14   math exercise.

15   Q.  Right.  And for the purposes of the simple math exercise,

16   the number on this document on the text of the page is

17   $400 million; is that correct?

18   A.  Yes.

19   Q.  Okay.  And you're aware that there are similar documents

20   like this from Freddie where they modeled an earning

21   sensitivity for the periodic commitment fee; is that right?

22   A.  Sorry.  This is the Freddie document.

23   Q.  For Freddie.  Thank you for correcting me.

24         Are you aware that there's similar documents like this

25   from Freddie where Freddie modeled an earning sensitivity of
```

1    25 basis points for the periodic commitment fee?

2    A.  I mean, this is a document from Freddie.  So you're asking

3    me if there are other documents from Freddie?

4    Q.  Yes, sir.

5    A.  I recall seeing a document from Freddie.  I haven't seen

6    multiple, but that may well be.

7    Q.  Okay.  Thank you, sir.

8         MR. KRAVETZ:  Thank you, Ms. McGuire.

9    BY MR. KRAVETZ:

10   Q.  Dr. Attari, you described on direct examination how the

11   third amendment furthered the conservator's goal in all

12   economic conditions; is that correct?

13   A.  Yes.

14   Q.  And is it your testimony that the third amendment

15   completely eliminated the risk that Fannie and Freddie would

16   ever have to draw from the Treasury commitment again?

17   A.  No, it was the risk of circular draws.  The draws to pay

18   dividends.

19   Q.  Okay.  So even after the third amendment, there was still

20   the possibility that Fannie or Freddie would have to make a

21   draw; is that correct?

22   A.  Yes, if they experienced losses.

23   Q.  Okay.  Thank you.

24        I just want to briefly touch on mortgage-backed

25   securities.  And we had some testimony last week that the

1    mortgage-backed securities market was approximately

2    $5 trillion; is that correct?

3    A.  I believe it was 4, but, you know.

4    Q.  Somewhere in the neighborhood of 4 to 5 trillion?

5    A.  Fannie and Freddie had 4 of mortgage-backed securities and

6    1.2 trillion of other bonds.

7    Q.  And am I correct that you did not perform an event study or

8    other quantitative analysis regarding the impact of the third

9    amendment on mortgage-backed securities?

10   A.  Correct.

11   Q.  Okay.  And, Dr. Attari, you testified that on -- on Friday

12   that when the bond yield spread between enterprise bonds, GSE

13   bonds, and Treasury bonds declines, it signifies that the

14   enterprise bonds have become a safer investment; is that

15   correct?

16   A.  Yes.

17   Q.  And I want to focus you, sir, on the day before the net

18   worth sweep, August 16, 2012.  Sir, before the third

19   amendment -- so before bondholders knew about the third

20   amendment -- yield spreads on Fannie and Freddie had been in a

21   long-term trend of getting smaller; is that correct?

22   A.  Over the course of 2012, yes.

23   Q.  Okay.

24   A.  They were coming back from the crisis.

25   Q.  And you testified on direct that lower yield spreads

1    express less concern in the bond market about the ability of

2    the borrower to pay; is that correct?

3    A.  The -- the reduction in yield spreads on August 17th

4    indicated that -- or lenders became less concerned about Fannie

5    and Freddie's ability to pay.

6    Q.  But that would also be true leading up to August 16, 2012,

7    to the extent that yield spreads were declining throughout the

8    year; correct?

9    A.  That was more of a secular market-wide trend where, you

10   know, yield spreads on various kinds of bonds were declining as

11   markets became more settled after the financial crisis.

12   Q.  And are you aware, sir, that FHFA itself recognized in or

13   around the -- the time of the third amendment that agency

14   spreads have been tightening all year due to investors

15   designating them as a safe-asset cohort to Treasury?

16   A.  Yes.

17   Q.  Okay.  Thank you.

18        I'd like to show you one additional document that --

19   which is labeled PX-242.

20        If I could just ask you an initial question,

21   Dr. Attari --

22        MR. KRAVETZ:  If -- Ms. McGuire, if we could --

23   BY MR. KRAVETZ:

24   Q.  If I could just ask, Dr. Attari, in the lower right-hand

25   corner, do you see a Bates number beginning with FHFA?

```
 1    A.  Yes.

 2              MR. KRAVETZ:  All right.  And, Ms. McGuire, if we

 3    could just call out the header of the email.

 4    BY MR. KRAVETZ:

 5    Q.  And, Dr. Attari, do you see that this is an email dated

 6    August 9, 2012, to Edward DeMarco?

 7    A.  Yes.

 8    Q.  And that the title -- the subject is:  Fwd:  Fannie and

 9    Freddie Profitable in 1H [sic] 2012, High Five for FHFA.  Is

10    that correct?

11    A.  Yes.

12              MR. KRAVETZ:  All right.  Your Honor, plaintiffs move

13    for the admission of PX-242.

14              THE COURT:  What was the number?

15              MS. VARMA:  No objection.

16              MR. KRAVETZ:  242, Your Honor.

17              THE COURT:  242.

18          Any objection?

19              MS. VARMA:  No.  No objection, Your Honor.

20              THE COURT:  Received.

21              (Plaintiffs' Exhibit 242 admitted into evidence.)

22              MR. KRAVETZ:  And if we could just back out for one

23    moment, Ms. McGuire.

24    BY MR. KRAVETZ:

25    Q.  So this was an email -- just remind us, Dr. Attari, the net
```

ATTARI - CROSS

1    worth sweep, the third amendment, was dated August 17, 2012;

2    correct?

3    A.  Yes.

4    Q.  So August 9, 2012, would have been eight days before the

5    third amendment?

6    A.  Yes.

7              MR. KRAVETZ:  All right.  And I would ask if we could

8    highlight, please, or call out, Ms. McGuire, the final bullet

9    point on the document.

10   BY MR. KRAVETZ:

11   Q.  And, sir, this was a particular analyst from BNP Paribas;

12   is that correct?

13   A.  Yes.

14   Q.  And the email from the analyst refers to a, quote,

15   convincing return to profitability in the first half of 2012,

16   end quote; is that correct?

17   A.  Yes, but the first bullet notes that this is the first

18   quarter since Fannie and Freddie entered conservatorship in

19   September 2008, both GSEs has a positive net worth at the end

20   of 2Q, 2012.

21   Q.  Yes.  Yes.  I agree with that.

22             I'm just asking about the particular language now that's

23   on the callout.

24   A.  Yes, but I think the convincing return to profitability

25   needs to be kind of read in context of the rest of the

1    document.

2    Q.  All right.  And in the -- number one, it refers to stable

3    to rising home prices nationally have curtailed current and

4    projected future losses as -- at the GSEs.  Is that correct?

5    A.  That's what it says.

6    Q.  And number two states, quote, Delinquency rates continue to

7    slowly decline, and both GSEs expect that loan-loss reserves

8    peaked in 4Q 2011.  Is that correct?

9    A.  Yes.

10   Q.  All right.  And the final says:  Fierce protection of the

11   conservator mandate to minimize taxpayer losses by the FHFA

12   has, well, minimized taxpayer losses.  High five.

13        Did I read that correctly, sir?

14   A.  You read that correctly.

15   Q.  Thank you.

16        MR. KRAVETZ:  We can take that down.  Thank you,

17   Ms. McGuire.

18   BY MR. KRAVETZ:

19   Q.  Dr. Attari, do you recall that on Friday I asked you some

20   questions regarding some of the documents that you considered

21   in forming your opinion?

22   A.  You asked me many questions about that, yes.

23   Q.  And that particular document that we just had on the page,

24   that was not a document that you considered; is that correct?

25   A.  I -- yes.

1    Q.  Okay.  And in your expert report, you cited to several

2    documents that were produced by the Treasury Department; is

3    that correct?

4    A.  I cited to one, as you pointed out.

5    Q.  And also there's a section in your materials considered

6    which was entitled Treasury Resources; correct?

7    A.  Yes.

8    Q.  Okay.  And so the Treasury resources section listed a

9    number of other documents relating to the Department of the

10   Treasury; correct?

11   A.  Yes, but those, I believe, were public documents, not ones

12   produced in the litigation.

13   Q.  And these were documents that would have been important in

14   rendering your decision; correct?

15   A.  Yes.

16          MR. KRAVETZ:  All right.  If I could ask Ms. McGuire

17   to please call up Plaintiffs' Exhibit 226-A.

18          And if we could focus on the first email, Ms. McGuire.

19   BY MR. KRAVETZ:

20   Q.  And, Dr. Attari, do you see that this is an email dated

21   July 31st, 2012, at 10:40 a.m.?

22   A.  Yes.

23   Q.  And it's an email from FHFA personnel to an individual from

24   Treasury named Jeff Foster providing estimated second quarter

25   2012 financial results for Fannie and Freddie; correct?

2064

1    A.  It says Jeff Foster.  I'll take your word for the person

2    being at Treasury.

3    Q.  Now, the SEC reports for Fannie and Freddie were filed

4    publicly, externally, on or around August 7, 2012; is that

5    correct?

6    A.  Well, it says that Freddie's currently scheduled to release

7    on August 7th; Fannie on August 8th.

8    Q.  So one on the 8th; one on the 7th?

9    A.  That's what it says.

10   Q.  Okay.  And so this information here is being provided by

11   FHFA to Treasury before Fannie and Freddie filed their SEC

12   reports publicly; correct?

13   A.  Yes.

14   Q.  All right.  And it noted that both Fannie and Freddie would

15   have -- would have net worth for the second quarter after

16   satisfying the required dividend payments; correct?

17   A.  That's what it shows.

18        MR. KRAVETZ:  Okay.  If -- Ms. McGuire, if you could

19   call out the next email in the chain, please.

20   BY MR. KRAVETZ:

21   Q.  And, sir, do you see here that the email is now being

22   forwarded 10 minutes later by Mr. Foster on July 31st, 2012?

23   A.  I'm not sure about 10 minutes later, but it is being

24   forward on July 31st, 2010 -- 2012.

25   Q.  Okay.  And, sir, you see that the text of the email states:

ATTARI - CROSS

1    See results below.  This is much stronger than we

2    thought/expected.

3           Do you see that?

4    A.  Yes.

5           MR. KRAVETZ:  All right.  If we can just go to the

6    final email in the chain, Ms. McGuire.

7    BY MR. KRAVETZ:

8    Q.  And I think that we saw 10:50 a.m. was the last email,

9    Dr. Attari?

10   A.  Uh-huh.

11   Q.  This email now is 3 minutes later; is that correct?

12   A.  Yes.

13   Q.  And it's from a Timothy Bowler to Jeff Foster,

14   Michael Stegman, and Beth Mlynarczyk; is that correct?

15   A.  Yes.

16   Q.  And the language in the last email in the chain says,

17   quote, Really makes sense to push the net worth sweep this

18   quarter, end quote.

19           Do you see that, sir?

20   A.  Yes.

21   Q.  All right.  This was not a document that you considered in

22   providing your expert opinion; is that correct?

23   A.  I mean, it will depend on what the Bates stamp is.  So I

24   assume you've checked it, and so no.

25   Q.  Okay.  And now, would you agree with me, sir, on the face

1    of this particular document, there's no reference to circular

2    draws; correct?

3    A.  There's no reference to circular draws; correct.

4    Q.  Okay.  Now, Dr. Attari, this document referring to earnings

5    results being, quote, much stronger than we thought -- expected

6    then -- just to be sure -- is not a document that you

7    considered in assessing whether the third amendment furthered

8    the conservator's goal by eliminating potential draws on the

9    commitment to pay dividends; is that correct?

10   A.  Sorry.  Could you say that again.  I lost the question.

11   Q.  This is not a document that you considered in providing

12   your opinion regarding circular draws; correct?

13   A.  Yes, but it wouldn't change my opinion because this is one

14   quarter.

15   Q.  All right.  Show you one more document, sir.

16          MR. KRAVETZ:  If we can call up Plaintiffs'

17   Exhibit 227.

18   BY MR. KRAVETZ:

19   Q.  And, sir, this is another document with a UST Bates number;

20   is that correct?

21   A.  Yes.

22   Q.  All right.  And was this a document that you would have

23   considered in providing your opinion?

24   A.  I assume not.

25          MR. KRAVETZ:  Okay.  And if we can just call out the

ATTARI - CROSS

1    header of the document, please.  Thank you.

2    BY MR. KRAVETZ:

3    Q.  This is an email from Timothy Bowler dated August 6, 2012;

4    is that correct?

5    A.  Yes.

6    Q.  All right.  And the subject is:  PSPA Next Steps, August 6.

7    Is that right?

8    A.  Yes.

9    Q.  And so this would have been sent one day before Freddie

10   released its second quarter 2012 SEC report; correct?

11   A.  Yes.

12   Q.  And two days before Freddie would have released its second

13   quarter SEC report?

14   A.  Fannie.

15   Q.  Fannie.

16   A.  Yes.

17   Q.  And so in the email here with the subject entitled PSPA

18   Next Steps, August 6, Mr. Bowler writes:  Now very timely.

19   Correct?

20   A.  Yes.

21           MR. KRAVETZ:  All right.  If we can go to the next

22   page, Ms. McGuire.

23   BY MR. KRAVETZ:

24   Q.  And do you see, sir, the document itself is entitled PSPA

25   Next Steps?

 1    A.  Yes.

 2              MR. KRAVETZ:  All right.  If we can go down to the

 3    timing, Ms. McGuire.

 4    BY MR. KRAVETZ:

 5    Q.  And do you see, sir, that there's a heading in the document

 6    timing that says, quote, Announce the change in mid-August

 7    after each GSE releases record second-quarter earnings.  And

 8    the word record is in quotations; is that correct?

 9    A.  Yes.  I don't know when what it means, but it is in

10    quotations.

11    Q.  All right.  And the second bullet point notes that record

12    earnings will be driven by large credit loss reserve release;

13    correct?

14    A.  Yes, it does note that.  But that tells you that this is

15    not kind of the normal level of earnings.  This is driven by a

16    special event.

17              MR. KRAVETZ:  If we can just call out the rationale

18    section, please, Ms. McGuire.

19    BY MR. KRAVETZ:

20    Q.  And, sir, do you see in this document entitled Rationale

21    that the first bullet point states, quote, The GSEs will be

22    wound down faster and will not return to their past state?

23    A.  Yes.  I believe this language is also in some other

24    Treasury -- in the Treasury plan from 2011.

25    Q.  And do you see, sir, on the first sub-bullet point, the

1   Treasury document states, quote, GSEs will not be allowed to

2   build capital and exit conservatorship in their prior form,

3   end quote?

4   A.  Again, same language from the earlier Treasury plan.

5   Q.  All right.  Am I correct, sir, in rendering your opinion,

6   you did not consider whether a goal of the net worth sweep was

7   to cause that the GSEs would be wound down faster and will not

8   return to their prior state?

9   A.  Well, I believe this was common knowledge at the time.  So

10  that part of it would be my -- already accounted for in my

11  opinion.

12  Q.  Okay.  And am I correct, in rendering your opinion, you did

13  not consider whether a goal of the net worth sweep was to

14  prevent Fannie and Freddie from building capital and exiting

15  conservatorship in their prior form?

16  A.  Again, I mean, you know, this was part of the Treasury plan

17  from 2011 and, I mean, the wound-down faster is, you know --

18  there was this requirement of -- of winding down the retained

19  investments at 15 percent instead of 10 percent, so.

20  Q.  And your testimony -- your interpretation of this document

21  when it says that the GSEs will not be allowed to build capital

22  refers to an accelerated wind-down from 15 percent to

23  10 percent in the retained portfolio?

24  A.  Well, so the -- if you look, the first bullet -- the main

25  bullet is that there will be wound-down faster, and I believe

 1    it's a reference to the 15 percent requirement because the

 2    Treasury plan had already, you know, indicated that they

 3    couldn't be wound down without legislative action.

 4    Q.  Sir, as part of your expert opinion, am I correct that you

 5    have not pointed to any evidence that FHFA sought to

 6    renegotiate the third amendment in 2013 after Treasury received

 7    in excess of $110 billion in net worth beyond what Treasury

 8    would have received pursuant to the 10 percent dividend?

 9              MS. VARMA:  Objection.  Scope.

10              MR. KRAVETZ:  Goes to the reason.

11              THE COURT:  Overruled.

12    BY MR. KRAVETZ:

13    Q.  Go ahead, sir.

14    A.  My analysis was up to the third amendment, not, you know,

15    beyond it.

16    Q.  And have you seen any evidence in your review of the

17    documents from -- from 2013 that anyone from FHFA expressed any

18    surprise that the $100 billion in excess dividend payments went

19    to Treasury under the net worth sweep?

20              MS. VARMA:  Same objection.

21              THE COURT:  Overruled.

22    A.  You said documents from FHFA?

23    BY MR. KRAVETZ:

24    Q.  Yes, sir.

25    A.  I did not get documents from FHFA after the third

```
 1   amendment.
 2   Q.  Okay.  Well, sir, you've previously acknowledged that
 3   when you're assessing whether something is economically
 4   reasonable, it's necessary to think about the range of
 5   alternatives that are available to the person making the
 6   decision; correct?
 7   A.  Yes.
 8   Q.  And am I correct that you've also previously acknowledged
 9   that as part of your analysis in forming your expert opinion in
10   this case, you did not consider whether there were any
11   alternatives to the net worth sweep for addressing circular
12   draws; correct?
13   A.  Well, there weren't.
14   Q.  So the answer is you haven't performed that analysis?
15   A.  I have not.
16   Q.  You have not?
17   A.  Yeah.
18   Q.  Okay.  And just a few more questions.
19        Do you recall testifying on direct that the conservator
20   was planning for the stress scenario?
21   A.  Well, planning for, as in yes.  Planning for -- it's like
22   in, like, California, you keep a bag full of emergency supplies
23   for an earthquake; not because you think an earthquake will
24   strike, but because if it strikes, you don't want to be caught
25   out.  So in that sense, planning for a stress scenario.
```

1    Q.  Right.  But my very specific question, sir, is when you're

2    testifying about what the conservator was planning for, you're

3    relying upon the testimony of Mr. DeMarco in this case;

4    correct?

5    A.  Yes.

6    Q.  Okay.  And so that testimony would have been given several

7    years after the decision to enter into the net worth sweep; am

8    I right?

9    A.  I don't know when -- I don't know the date of the

10   deposition, so.

11   Q.  Does 2015 sound about right?

12   A.  I think there were multiple depositions, so if you tell me

13   that was the first time, yes.

14   Q.  All right.  And in your direct testimony and in your

15   slides, you did not refer to a contemporaneous memo or email

16   from Mr. DeMarco describing how he viewed projections from

17   Fannie and Freddie; correct?

18   A.  Correct.

19   Q.  Okay.  And do you know, sir, sitting here, whether in

20   determining that Fannie and Freddie would restore all or part

21   of the deferred tax asset, if the accounting rules require that

22   decision to be based on a stress scenario or a base or expected

23   scenario?

24            MS. VARMA:  Objection to the scope.

25            THE COURT:  Sustained.

```
1    A.  That would be based --
2              THE COURT:  I sustained the objection.
3              THE WITNESS:  Oh, sorry.
4    BY MR. KRAVETZ:
5    Q.  Sir, do you know whether FHFA itself prepared quarterly
6    home price indices?
7    A.  Projections or backward-looking?
8    Q.  Backward-looking.
9    A.  I don't know.
10   Q.  Okay.  And since you don't know, you haven't reviewed the
11   FHFA home price indices in connection with your expert opinion?
12   A.  I may have.  I don't recall.  I know that Fannie and
13   Freddie each had them, so I wouldn't be surprised if FHFA had a
14   series too.
15   Q.  And, sir -- you know, sir, that there is not a single memo
16   prepared by FHFA analyzing the pros and cons of agreeing to the
17   net worth sweep at the time the decision was made; correct?
18   A.  There were no memos.
19   Q.  Thank you.
20             MR. KRAVETZ:  Court's indulgence.
21         Thank you, Dr. Attari.
22         Thank you, Your Honor.
23             THE WITNESS:  Thank you.
24             THE COURT:  Redirect.
25             MS. VARMA:  Good morning, Your Honor.
```

```
1              Short redirect.

2                    REDIRECT EXAMINATION

3    BY MS. VARMA:

4    Q.  Good morning, Dr. Attari.

5    A.  Good morning.

6    Q.  You were asked a number of questions by Mr. Kravetz, and

7    I'd like to follow up on a couple of them.

8              You were asked, in particular, about the bond rating --

9    the GSE credit ratings, bond ratings?

10   A.  Yes.

11   Q.  So let me just remind the jury where we're going with this.

12             Before the third amendment, did the bonds issued by

13   Fannie and Freddie have the same credit rating as United States

14   Treasury bonds?

15   A.  Yes.

16   Q.  Are Treasury bonds deemed to have no credit risk; that is,

17   no risk of default?

18   A.  Practically.

19   Q.  Did Fannie and Freddie have the same credit rating as

20   Treasury bonds because the bonds were backed by the Treasury

21   commitment?

22   A.  Yes.

23   Q.  If the Treasury commitment did not exist at that time,

24   would Fannie and Freddie bonds have the same credit rating as

25   Treasury bonds?
```

```
1              MR. KRAVETZ:  Objection.  Foundation.

2              THE COURT:  Overruled.

3    A.  No, they wouldn't.  In fact, one of the ratings agency

4    reports we saw noted that the -- if there was no commitment,

5    the ratings would be significantly lower.

6    BY MS. VARMA:

7    Q.  If the Treasury commitment were significantly lower as

8    opposed to nonexistent, could the ratings of Fannie and Freddie

9    bonds be downgraded as well?

10             MR. KRAVETZ:  Objection.  Beyond the scope of the

11   expert report.

12             THE COURT:  Overruled.

13   A.  Yes.

14             MS. VARMA:  Can we pull up PX-2-E.

15   BY MS. VARMA:

16   Q.  This was a document Mr. Kravetz showed you.  He showed you

17   page 3, but I'd like to actually take you to page 31.

18             MS. VARMA:  Let's blow up the last two paragraphs.

19   BY MS. VARMA:

20   Q.  Dr. Attari, could you read starting with, "In early

21   September."

22   A.  "In early September, we acted to place both companies into

23   conservatorship.

24        "The goal of these dual conservatorship actions is to

25   help restore confidence in Fannie Mae and Freddie Mac, enhance
```

ATTARI - REDIRECT

1    their capacity to fulfill their mission, and reduce the

2    systemic risk that would have exacerbated the instability in

3    the current market."

4    Q.  In your opinion, was the third amendment consistent with

5    the goals Mr. DeMarco stated in this presentation in

6    October 2008?

7    A.  Yes.

8    Q.  How so?

9    A.  Well, they kind of -- two circular draws -- they eliminated

10   circular draws.  They helped kind of ensure that creditors,

11   you know, bondholders, and other people that Fannie and Freddie

12   had obligations to were confident that the obligations would be

13   met over the long term because the commitment wouldn't get

14   eroded.

15   Q.  And that maintained the stability of the secondary mortgage

16   market?

17   A.  Yes, and to fulfill their mission.

18              MS. VARMA:  Can you pull up PX-211.

19   BY MS. VARMA:

20   Q.  Mr. Kravetz showed you this document as well.  It's

21   May 2012 financial update forecast, only -- I'm just reading

22   from the front page -- but dated July 9, 2012, in front of the

23   management committee.

24   A.  Yes.

25   Q.  He asked you some questions about page 9 --

1           MS. VARMA:  If we could briefly pull that up.

2      BY MS. VARMA:

3      Q.  -- about Fannie -- these are the cartoon bar graphs --

4      about Fannie's projections of home prices indicating they were

5      projecting that they would increase through 2016; is that

6      correct?

7      A.  Yes.

8      Q.  Let me take you to the next page.

9           MS. VARMA:  And if you could blow up the last box on

10     the page.  There.

11     BY MS. VARMA:

12     Q.  Could you read that, please.

13     A.  It says:  Earnings in 2012 projected to be sufficient to

14     cover 2012 dividend obligation.  However, this is not expected

15     to recur in any of the quarters in 2013.

16     Q.  What do you interpret Fannie to be saying as of

17     July 2012 as to whether they would be taking circular draws in

18     2013?

19     A.  They're saying that they will need to make a circular

20     draw in every quarter in 2013.  So, you know, in March -- in

21     the quarter ending March, June, September, and December of

22     2013.

23          MS. VARMA:  Okay.  Can you please bring up PX-257.

24     BY MS. VARMA:

25     Q.  This is another document that Mr. Kravetz showed you.

1    Fitch analyst report.  Could you remind the jury what Fitch is.

2    A.  Fitch is a ratings agency, just like Moody's and

3    Standard & Poor's.  They provide ratings on, you know, bonds

4    issued by companies, including those of the -- of Fannie Mae

5    and Freddie Mac.

6    Q.  Mr. Kravetz directed you to the language that talks about

7    second quarter results being improved or stronger.

8            MS. VARMA:  I'd like you to turn to page 2.  And

9    let's blow up the paragraph that starts:  The sustainability of

10   nascent.

11   BY MS. VARMA:

12   Q.  If you could read that, please.

13   A.  So it says:  The sustainability of the nascent U.S. home

14   price recovery remains uncertain, and we believe GSE results

15   could be volatile over coming quarters.

16           So what they're talking about is the home price

17   increase, whether it will continue or not.  And they're saying

18   it's uncertain and the -- the earnings will kind of, you know,

19   have -- experience ups and downs.

20           While both agencies are now funding preferred dividends

21   to Treasury (11.7 billion annually for Fannie and 7.2 billion

22   for Freddie) both GSEs will be limited in their ability to

23   build reserves to consistently fund dividends if solid

24   profitability is not sustained.

25           So they're making the point that circular draws --

ATTARI - REDIRECT

1      there's a risk of circular draws if profits are not sustained.

2             And the previous sentence they said that profits depend

3      on home prices.

4             Fannie and Freddie reported net worth of 2.8 billion

5      and 1.1 billion in the second quarter, respectfully, which is

6      still de minimus in the context of their overall balance

7      sheets.

8             So this is the point that, you know, they had 5 trillion

9      in assets and roughly, you know, 3.9 trillion in equity.  So

10     it's -- it's a huge mismatch.

11     Q.  And what does de minimis, in the context of the balance

12     sheets, mean?

13     A.  Essentially, negligible or zero.

14     Q.  So what is the comparison here?  Between net worth and what

15     else?

16     A.  Assets, which is what they're talking about, and what --

17     the point they're making is that the net worth, which is the

18     capital, is basically .1 percent of assets, which, you know, is

19     practically zero for most people.

20     Q.  And would that level or de minimis level of assets be

21     giving confidence to creditors?

22     A.  No.  So the de minimis level of net worth or equity would

23     not be giving confidence to creditors or even employees, for

24     that matter.

25             MS. VARMA:  Let's pull up PX-111.  There we are.

ATTARI - REDIRECT

```
 1    BY MS. VARMA:
 2    Q.  Mr. Kravetz showed you this document this morning, the
 3    Freddie scenario forecast.  Do you recall that?
 4    A.  Yes.
 5    Q.  Let's go over to the page that he showed you, which is, I
 6    think, page 10.
 7         And there's a box at the bottom:  Sensitivity and
 8    Commitment Fee.
 9    A.  Yes.
10         MS. VARMA:  Actually, let's go to the left box.
11    BY MS. VARMA:
12    Q.  Do you see there are a number of different commitment fees
13    that are evaluated here for sensitivity?
14    A.  Yes.  And this is typical of all of the boxes on this page
15    -- on the left-hand side of this page.  They're looking at
16    sensitivity, which is, you know, if the fee is so much, how
17    much is earnings affected.  And what they're saying is if the
18    fee is, you know, .25 percent, it's 400 million and then kind
19    of from there it's basically math.  You know, the top line
20    multiplies by four to get from 25 to 100.  The -- the impact on
21    equity multiplies by four, and with the rounding, you get from
22    400 million to 1.5 billion.
23         And if you kept going, you'd get to higher levels of
24    fees and higher levels of sensitivity of impact on equity.
25    Q.  Now, the 25, 50, and 75 and 100, are those what we call
```

ATTARI - REDIRECT

1    BPS?

2    A.  Yes.

3    Q.  And can you tell us what that means, again.

4    A.  So it's .25 percent, .5 percent, .75 percent, and

5    1 percent.

6    Q.  Do you recall Dr. Thakor testifying that his range for the

7    PCF was 2.5 basis points to 45 basis points?

8    A.  Yes.

9    Q.  Would it be correct in interpreting this document as saying

10   that Freddie was actually evaluating a PCF of close to 100

11   basis points -- or 25 through 100 basis points?

12   A.  Yes.

13   Q.  So this would be --

14   A.  Again, this is just a sensitivity.  They're not saying that

15   it's going to be a hundred.

16   Q.  Why do you think they're comparing sensitivity of 25

17   through a hundred basis points?

18   A.  That's what is done for a number of different, you know,

19   factors that these companies have exposure to.  So there would

20   be one for interest rates.  You know, interest rates go up and

21   down by a certain amount.

22        There's one for -- on this page on, you know, losses

23   on loans going up and down.  Then there will be one for

24   default rates and so on.  So all of the different things that

25   matter.

ATTARI - REDIRECT

1    Q.  Now, under these assumptions and the sensitivity analysis,

2    we saw from Dr. Thakor's testimony that 45 basis points

3    applying to both Fannie and Freddie, meaning the full

4    260-billion commitment equaled 1.16 billion.  Do you recall

5    that?

6    A.  Yes.

7    Q.  If we took this sensitivity of a hundred basis points, just

8    for Freddie, and applied that to Fannie and Freddie -- I don't

9    know if that's too much math to do in -- on the stand or not,

10   but do you have an idea of how much that would be?

11   A.  That would be 1 percent of the 260 billion.  So for

12   combined Fannie and Freddie it would be 2.6 billion per year.

13   Q.  Significantly more than what Dr. Thakor testified to?

14   A.  Yes.  I mean, even the AIG fee after the restructuring was

15   75 basis points.  So even that was above the range he -- he

16   considered.

17          MS. VARMA:  Let's pull up 226-A.

18   BY MS. VARMA:

19   Q.  Mr. Kravetz showed you this document.  It was marked with a

20   UST Bates stamp number.

21   A.  Yes.

22   Q.  Am I correct that you had not seen this document before?

23   A.  Correct.

24   Q.  Do you see anyone copied on this document that you

25   recognize as being from FHFA?

ATTARI - REDIRECT

```
 1    A.  No, not -- not on the document.

 2    Q.  Not on the top two?

 3            MS. VARMA:  Let's go all the way down.

 4    BY MS. VARMA:

 5    Q.  Now, there is someone copied from FHFA on the bottom;

 6    correct?

 7    A.  Yes.

 8    Q.  And that's the information that's being provided as to the

 9    expected 10-Q release; correct?

10    A.  Yes.  So it's being sent by people at FHFA to -- to

11    various people at -- by someone at FHFA to people at FHFA and

12    Treasury.

13    Q.  But the -- go ahead.

14    A.  I'm done.

15    Q.  But the responding emails that were -- that it was

16    forwarding it, those are not FHFA people, are they?

17    A.  Correct.

18    Q.  They're -- this is internal to Treasury, their view?

19    A.  Yes.

20            MS. VARMA:  Let's also pull up PX-227.

21    BY MS. VARMA:

22    Q.  This is also a Treasury document you had not seen before;

23    correct?

24    A.  Yes.

25    Q.  Let's walk through this as well.  See if you recognize
```

ATTARI - REDIRECT

```
 1    anyone from FHFA on it.

 2    A.  No.

 3    Q.  No.

 4           MS. VARMA:  Let's go to the next page.

 5    BY MS. VARMA:

 6    Q.  There's the second bullet point or second block that says:

 7    Accelerated wind-down of retained investment portfolio.  The

 8    mandatory run-off was increased.  Is this what you were

 9    referring to as wind-down?

10    A.  Yes.  That's what the document seems to be referring to as

11    wind-down.

12           MS. VARMA:  Okay.  Let's pull up -- keep everybody in

13    suspense -- 210 -- PX-210.

14    BY MS. VARMA:

15    Q.  This is another Treasury document that Mr. Kravetz showed

16    you.  Do you recognize any FHFA people on this document?

17    A.  No.

18    Q.  Had you seen this document before your examination by

19    Mr. Kravetz on Friday?

20    A.  I don't believe so.

21    Q.  Let's go to page 10 of the document.  And the second bullet

22    point under -- the first bullet point under:  What is Treasury

23    Doing.  Mr. Kravetz showed you this bullet point.  Actually,

24    I'm not sure that's the one I want.

25           MS. VARMA:  The one I want is under the
```

1   conservator -- conservative baseline stress test scenario.

2   There it is.

3   BY MS. VARMA:

4   Q.  Could you read that into the record again.

5   A.  Yes.  So the question was:  Has the administration

6   considered modifying the PSPA agreements before the capacity

7   becomes fixed at the end of 2012?

8       The bullet says:  Under the conservative baseline stress

9   test conducted by FHFA, both Fannie Mae and Freddie Mac are

10  expected to have positive net income in 2012.  This will mean

11  that Treasury is not expected to need to fund any operating

12  loss at Fannie Mae and Freddie Mac after the expiration of the

13  PSPA funding commitment.

14  Q.  I think it was 2013.  I think you said 2012.

15  A.  Sorry.  2013, yes.

16  Q.  And you expressed some puzzlement as to what conservative

17  baseline stress test forecasts conducted by FHFA means.

18  A.  Correct.

19      MS. VARMA:  So let's pull up the FHFA projections,

20  which are DX346.  You can go to the next page.

21  BY MS. VARMA:

22  Q.  Do you recognize this document, Dr. Attari?

23  A.  Yes.

24  Q.  And have you reviewed this document before?

25  A.  Yes.

1    Q.  And did you consider it as part of your expert opinion?

2    A.  Yes.

3              MS. VARMA:  Let's go to page 5 of the PDF, Figure 1.

4    BY MS. VARMA:

5    Q.  Can you tell from this document, Dr. Attari, how many

6    scenarios FHFA considered?

7    A.  Three.

8    Q.  And can you tell from this document, in Figure 1 in

9    particular, whether any of the three scenarios showed that

10   Fannie or Freddie would be taking circular draws?

11   A.  The first one, Fannie would be taking circular draws.

12   Freddie would not in -- in Scenario 1, but would in Scenario 2

13   and 3.

14   Q.  And Fannie in Scenario 2 and 3?

15   A.  Fannie in all three scenarios in 2013.  Because it's --

16   the -- the amount, cumulative draws goes up from 136 in 2012 to

17   142 in 2013.

18   Q.  Okay.  Let's go to the next page, which has Figure 6.

19        These graphs, Figure 2, page 6, identify cumulative

20   Treasury draws less dividends paid.  So would you interpret

21   that to mean that they identify net income?

22   A.  Yes.

23   Q.  And do both Fannie and Freddie show positive net income for

24   2013 under all scenarios?

25   A.  No.

1    Q.  Let's pull up the demonstratives.

2          Are you familiar with the Case-Shiller housing index --

3    A.  Yes.

4    Q.  -- Dr. Attari?

5          You testified earlier that housing prices were a key

6    factor in Fannie and Freddie's financial performance; correct?

7    A.  Yes.

8    Q.  Dr. Dharan put up this slide to show how the housing index

9    increased from January 2012 to June 2012.  Let me zoom out of

10   this to put you -- and give you a little bit more context.

11          This graph provides the housing index from 2007 to

12   June 2012.  So the bulk of what we've been calling the housing

13   crisis.

14          When -- what is the index left -- on the left line show,

15   on the left graph?

16   A.  It's the level of the index, and it starts out above 180,

17   and then by -- in -- in 2007.  And by 2012 -- the beginning of

18   2012, it has fallen below 140, and then in 2012, it -- it's

19   risen a little bit to a little above 140.

20   Q.  In your opinion, was the increase in housing price index

21   from January 1, 2012, to January -- to June 30th, 2012, a sign

22   that there would be a roaring recovery for Fannie and Freddie?

23   A.  No, because it had -- you can see even in 2010 and -- and

24   even in 2009 there were small ups and downs, and that was, in

25   fact, what the -- the various analysts and -- who followed the

ATTARI - REDIRECT

1   housing market noted; that there was a great deal of

2   uncertainty about what would happen.

3   Q.  Do you know when the housing index by Case-Shiller comes

4   out?

5   A.  No.

6   Q.  Okay.  Do you know if there's a lag between the time the

7   housing index comes out and the period of time covered by it?

8           MR. KRAVETZ:  Objection.  Foundation.

9           THE COURT:  Sustained.

10          MS. VARMA:  Nothing further.

11          MR. KRAVETZ:  May I ask one question, Your Honor.

12       Ms. McGuire, can we please call up DX346.

13                    RECROSS-EXAMINATION

14   BY MR. KRAVETZ:

15   Q.  All right.  Dr. Attari, you were asked questions about this

16   projections document from FHFA dated October 27, 2011; correct?

17   A.  Yes.

18   Q.  And, sir, you're aware that FHFA did not update these

19   projections at any time prior to the third amendment dated

20   August 17, 2012; correct?

21   A.  Yes.

22          MR. KRAVETZ:  Thank you.  Nothing further.

23          THE COURT:  All right.  You can step down.

24          (Witness excused.)

25          THE COURT:  I need to speak to counsel for a minute.

```
1                  (Bench conference on the record.)

2             MR. HOFFMAN:  Your Honor, Ian Hoffman on behalf of

3     the defendants.

4             We have several exhibits that we would like to move into

5     evidence before Mr. DeMarco, to which there's going to be an

6     objection.  So that's one item.

7             The second item is that we want to present -- defendants

8     would like to present a very short piece of a deposition, and

9     it's approximately two minutes long, and it will be a readout

10    just by defendants' counsel.  And we understand that there's an

11    objection to that.  We were attempting to resolve that before

12    there was a break.  It hasn't been successful yet, and so we'd

13    be prepared to argue that.

14            And I can present it to you now, Your Honor.  I think it

15    is short, but I think Mr. Rudy wanted to address that, and he's

16    currently in the audience.

17            Your Honor, I can set up the issue, if you'd like.

18            THE COURT:  Is it going to take long enough that I

19    should send the jury out?

20            MR. HOFFMAN:  Your Honor, again, Ian Hoffman on

21    behalf of the defendants.

22            I don't -- it depends on how extensive the argument is

23    from Mr. Rudy and plaintiffs.  I don't think this issue should

24    take very long to resolve for presenting the two minutes of

25    deposition testimony.
```

1       However, I do think that arguing the exhibit objections

2   would warrant a break, and we need to do that anyway,

3   Your Honor.

4       THE COURT:  All right.  All right.  I'll let the jury

5   go for a few minutes.

6       (Proceedings held in open court.)

7       THE COURT:  We have a couple legal things to resolve;

8   so I'm going to excuse y'all for a few minutes while we do

9   that.

10      Don't talk about -- anything about the case.

11      (Proceedings held out of the presence of the jury.)

12      THE COURT:  Y'all have at it for a couple minutes and

13  see if you can work any of it out.

14      (Recess taken.)

15      THE COURT:  Okay.  Mr. Hoffman.

16      MR. HOFFMAN:  Good morning.  Ian Hoffman, again, on

17  behalf of the defendants.

18      The parties are making a good faith effort, and have

19  been, to try to narrow the areas of dispute, and I think we

20  have.  So we've narrowed it down to just one document that is

21  in dispute and also this deposition --

22      THE COURT:  Did I come back too quick?

23      MR. HOFFMAN:  I have -- well, if -- the Court's

24  indulgence for one minute because I was going to ask Mr. Hume

25  one more thing.  We only had about one minute left.

1           So thank you, Your Honor.  Just a moment.

2                THE COURT:  Okay.

3                (REPORTER'S NOTE:  A sotto voce conference was held

4      between plaintiffs' counsel and defendants' counsel.)

5                MR. HOFFMAN:  Thank you very much, Your Honor.

6                THE COURT:  You guys know you run some risk of me

7      because you never know what I'm going to do, so.  Either side.

8           The more you can work out, the better.

9                MR. HOFFMAN:  Exactly.  That's why we're so furiously

10     trying to work this out, to minimize some risk on both sides.

11     So thank you, Your Honor.

12          So we have reached an agreement with respect to most of

13     the exhibits that we were --

14                THE COURT:  Okay.

15                MR. HOFFMAN:  - discussing, and so what I will do now

16     is I'll move in various defendants' objections -- I'm sorry.

17     Various defendants' exhibits to which I believe there's no

18     objection.

19                THE COURT:  Okay.

20                MR. HOFFMAN:  And then we will -- I'll argue the one

21     to which there is an objection, and then I can take up the

22     deposition issue.

23                THE COURT:  All right.

24                MR. HOFFMAN:  Okay, Your Honor.  So defendants move

25     into evidence -- and these are all DX numbers -- so Defendants'

1    Exhibit 1, DX4, DX49, DX58, DX78, DX79, DX84, DX85, DX86, DX89,

2    DX90, DX99, DX100, DX163, DX164, DX206, DX207, DX209, DX282,

3    DX346, DX539, DX374, DX404, DX444, and DX233.

4           And on DX233, we've negotiated an excerpt of 233, which

5    we will submit to the Court instead of the full version.  I

6    don't have the excerpt, the copy yet, Your Honor, but we will

7    supply DX233.

8           THE COURT:  All right.

9           MR. HOFFMAN:  That is all the ones, I believe, to

10   which there is no objection, but plaintiffs may confirm.

11          THE COURT:  All right.  Those are all received.

12          (Defendants' Exhibit 1, 4, 49, 58, 78, 79, 84, 85,

13   86, 89, 90, 99, 100, 163, 164, 206, 207, 209, 233, 282, 346,

14   374, 404, 444, and 539 admitted into evidence.)

15          MR. HOFFMAN:  Thank you very much, Your Honor.

16          And just for the record, there are several plaintiffs'

17   exhibits that we have agreed that defendants will not object

18   to, and I will let plaintiffs move those in when they wish.

19          But we have records of that.

20          THE COURT:  Okay.

21          MR. HOFFMAN:  Okay.  No objection to plaintiffs just

22   doing it now to get it done.

23          THE COURT:  Okay.

24          MR. GOODHART:  Good morning, Your Honor.  Grant

25   Goodhart for the plaintiffs.

1          Plaintiffs move in PX-444, PX-445 --

2              THE COURT:  I'm sorry.  You're saying DX?

3              MR. GOODHART:  PX, plaintiffs' exhibit.

4              THE COURT:  PX.  Okay.

5          444?

6              MR. GOODHART:  PX, yeah.  And that's for all of

7      these.  444, 445, 636.

8              THE COURT:  6?

9              MR. GOODHART:  636, 637, 638, 597, and 598.

10             THE COURT:  What was the last one?

11             MR. GOODHART:  PX-598.

12             MR. HOFFMAN:  Your Honor, defendants do not object to

13     their admission.  The defendants reserve right with respect to

14     the use of these documents with certain witnesses.

15             THE COURT:  Okay.  They're all received.

16             (Plaintiffs' Exhibit 444, 445, 597, 598, 636, 637,

17     and 638 admitted into evidence.)

18             MR. HOFFMAN:  Okay.  Thank you, Your Honor.

19         That takes us to Defendants' Exhibit 549, which

20     defendants would move into evidence at this time, and to which

21     I understand there is an objection from the plaintiffs.

22         I have -- I'll ask Mr. Montgomery to put up Defendants'

23     Exhibit 549.  I also have a paper copy, Your Honor.  I can hand

24     it up, if that's okay.

25             Okay, Your Honor.  Defendants' Exhibit 549, this is

1   another analyst report from Barclays, and this is another

2   analyst report that was sent to both Mr. Ed DeMarco and also

3   Mario Ugoletti.  The FHFA decision-makers here.

4        Your Honor, I just want to set the stage a little bit

5   for the significance of this document.  So this is from the

6   same Barclays analyst, Mr. Rajiv Setia, S-e-t-i-a, who reported

7   on market concern in early 2012, Your Honor.  And the earlier

8   Barclays report was admitted on, I believe, Friday by the

9   Court, at DX380-A.  This particular Barclays report that we're

10  looking at now, 549, this is the follow-up to that that's being

11  sent to FHFA.

12       In this one, Barclays is talking -- references the prior

13  report, and addresses -- and talks about the third amendment,

14  which has been announced on the same day, August 17th, 2012.

15       And in this report, the Barclays analyst is talking

16  about how the third amendment addresses the exact concerns that

17  Barclays previously identified and that Barclays shared with

18  FHFA, including Mr. Ugoletti.

19       Among other things, in this report, Your Honor, Barclays

20  says that the third amendment puts to rest any worries over

21  Fannie and Freddie ratings and puts to rest worries about GSE

22  credit risk.

23       Your Honor, there's a lot of connections between this

24  report and the other evidence in this case that the jury has

25  heard, and I'll just give a few examples.  The initial email

1      from Barclays is to Jamie Newell, who is at FHFA, and

2      Doc Ghose -- this is on the bottom of the email there,

3      Mr. Montgomery -- D-o-c, first name.  Last name Ghose,

4      G-h-o-s-e.  And Your Honor might remember that's kind of a

5      unique name.

6           Mr. Layton, who gave testimony as the former CEO of

7      Freddie Mac, he testified that he had an important meeting with

8      Credit Suisse.  And in that meeting -- and where Credit Suisse

9      talked about the market concern.  In that meeting, Mr. Ghose

10     from Freddie Mac attended.  So this is also a market analyst

11     reporting market concern to Freddie Mac.

12          Next, it gets shared within FHFA, the second-most email,

13     including to -- from Jamie Newell to Ms. Wanda DeLeo.  The jury

14     has heard Ms. DeLeo's name because Mr. Satriano testified that

15     he shared his assessment of the third amendment and how it

16     addressed the going concern issues, and he shared that with

17     Ms. DeLeo and he testified his belief that Ms. DeLeo was

18     reporting to Mr. DeMarco.

19          Finally, the last email in the chain, very consistent

20     with Mr. Satriano's testimony, Ms. DeLeo shares this assessment

21     with Mr. DeMarco and Mr. Ugoletti himself.

22          So, Your Honor, as with the other analyst reports, this

23     is not being offered for its truth but, rather, to show its

24     impact on Mr. DeMarco and Mr. Ugoletti.

25          Among other things, Your Honor, this shows that

1    Mr. DeMarco and Mr. Ugoletti were continuing to monitor analyst

2    reports when the third amendment was executed.  And if the

3    plaintiffs' theory were correct that Mr. DeMarco and Ugoletti

4    weren't really acting based on market concerns, there would be

5    no reason for them to continue monitoring them like this.

6        This will also -- this document also shows -- and

7    Mr. DeMarco's testimony upcoming will be consistent with

8    this -- that this is just the kind of reaction, market

9    reaction, that Mr. DeMarco was hoping for.  Namely, that the

10   market was expressing more confidence.  And this shows that

11   he is monitoring that and receiving that information in real

12   time.

13       Further, Dr. Attari just gave testimony.  In that

14   testimony, among other things, he talked about how the third

15   amendment was reasonable because it matched FHFA's goals.  This

16   document is relevant independently to showing whether the third

17   amendment matched the goals because Mr. DeMarco was monitoring,

18   you know, the -- the market reaction.  And, you know, calming

19   the markets was part of Mr. DeMarco's concerns, as you will --

20   you and the jury will soon hear.

21       Additionally, Your Honor, plaintiffs', you know, counsel

22   just asked Dr. Attari a series of questions about whether

23   Mr. Attari -- Dr. Attari had seen evidence of FHFA attempting

24   to renegotiate the third amendment -- I believe was the word

25   Mr. Kravetz used -- after the third amendment when they saw

1    what happened.  And there might have been a question or

2    suggestion about did you see any evidence, Dr. Attari, that

3    FHFA was surprised at things that happened after the third

4    amendment.

5          This is -- is pertinent and relevant for the same

6    nonhearsay purposes to show that he was monitoring what

7    actually happened and what the analyst reports were -- analysts

8    were saying and whether it was having the intended impact that

9    Mr. DeMarco had.

10         And, again, big picture, Your Honor, plaintiffs have put

11   in reams of post-third amendment evidence, and we recognize

12   this is announced on the same day as the third amendment, and

13   so the third amendment is -- is public by this point.

14         But plaintiffs have put in reams of post-third amendment

15   evidence that they contend is relevant to showing the

16   unreasonableness of the third amendment including post-third

17   amendment financial performance.  And this is just one single

18   piece of evidence showing what Mr. DeMarco considered on the

19   day the third amendment was announced.  And it will facilitate

20   his testimony that the third amendment accomplished its goal of

21   alleviating market concern.

22         And so because it's highly relevant and it's being

23   offered for those nonhearsay purposes, Your Honor, including

24   all the connections with the process and who was monitoring

25   what, that's consistent with what the jury has heard, these

1    are -- this document is -- is relevant for its nonhearsay

2    purposes and should be admitted.

3         I'll argue the witness issue after plaintiffs address

4    this document, Your Honor.

5              THE COURT:  All right.

6              MR. GOODHART:  Good morning, Your Honor.

7    Grant Goodhart on behalf of the plaintiffs.

8         Janet, can we bring up DX549.

9         So, Your Honor, plaintiffs believe that this document is

10   just rank hearsay; and admission of defendants' position

11   contravenes Your Honor's ruling on the motion *in limine*, where,

12   at page 13 in the omnibus motion *in limine* opinion, Your Honor

13   said that defendants may not offer securities analysts' reports

14   unless they can show that any specific report factored into

15   FHFA's decision-making process.

16        And, of course, this document -- this analyst --

17   specific analyst report could not have factored into the

18   decision-making process because it postdates the decision to

19   agree to the third amendment and net worth sweep.  It's -- it's

20   market commentary from after the -- the amendment had been made

21   public.

22        And I just heard Mr. Hoffman argue, well, it relates to

23   a previous analyst report issued by Barclays, and it confirms

24   that it -- that the third amendment met their concerns, but

25   the -- this still could not have factored into Mr. DeMarco's

1    decision-making process.  And there's no way for us to, like,

2    cross-examine the person making this statement in this

3    document.  And I'd like -- for example, if we can focus on the

4    bottom of the paragraph on the first page on this screen right

5    there.  There's a statement that says -- where Barclays is

6    saying the push forward and the time line puts to rest any

7    worries over Fannie Mae, Freddie Mac's ratings.  For example,

8    Moody's had indicated it could downgrade Fannie Mae,

9    Freddie Mac independently of the U.S.-govern sovereign ratings

10   if the coupon were not changed.

11        Defendants are trying to put this evidence in to show

12   the truth of these statements, not to show its effect on

13   anybody or its effect on DeMarco or his decision-making

14   process.  Simply because they're forwarding around press

15   coverage of the third amendment after it was announced doesn't

16   show that this was the reason or factored into their

17   decision-making; and there's no email back from DeMarco or

18   something where he even -- it's even clear that he read or

19   received -- received or read this document.

20        So I don't even think that it satisfies the purpose for

21   which defendants just offered it to Your Honor.  It's just --

22   it's press coverage.  It's not relevant.  And DeMarco's state

23   of mind, you know, after the net worth sweep was agreed to is

24   just -- it's not relevant here.

25        So we -- we think it contravenes Your Honor's order and

1    should not be admitted.

2              THE COURT:  Okay.  The objection is overruled and

3    it's received.  I think what happened after and his

4    continued monitoring does make it admissible.  So it will be

5    received.

6              (Defendants' Exhibit 549 admitted into evidence.)

7              THE COURT:  What's the other question then?

8              MR. HOFFMAN:  Your Honor, thank you.

9         The next issue is that right now, in fact, before

10   Mr. DeMarco takes the stand, defendants would like to present a

11   short portion of deposition testimony.  It's -- it's another

12   readout, Your Honor.  I read it to myself yesterday, as slowly

13   as I could, and it took just under two minutes.  Your Honor, it

14   is a portion of the deposition testimony of Mr. Ross Kari,

15   who's the former CFO of Freddie Mac.

16        Your Honor, other portions of Mr. Kari's deposition were

17   presented earlier in the case -- earlier in defendants' case to

18   the jury through a reader, an actor, Your Honor, and this would

19   be an extremely short, one-page follow-up to that.

20        Plaintiffs have indicated to us that they object, and I

21   understand that they have two objections only.  But, first,

22   Your Honor, just to back up.  I understand they have no

23   substantive objections to any of the testimony.  They're not

24   contending it's hearsay or lack of foundation, anything like

25   that.

1          Additionally, we disclosed this to them last week that

2     we intended to present this, and I've asked them multiple times

3     do you have any counter-designations for completeness and

4     they've provided none.  Their own objection is too late.

5          And they're arguing that this was not disclosed as part

6     of the original exchange of deposition designations, and

7     they're correct, Your Honor.  This has been added recently.

8          But to date, Your Honor, just as was demonstrated before

9     Your Honor took the bench, the parties have been very

10    collaborative with each other in allowing some supplementation

11    and adjustments to their pretrial disclosures.  Just this

12    weekend, Your Honor, plaintiffs added a whole host of five or

13    six or seven new exhibits, obviously, months after the

14    deadline, but we're not standing on those.  I believe we just

15    allowed some of those into evidence.  There's no prejudice to

16    the plaintiffs here.

17         There's also -- because it's so short and they've had

18    the opportunity to object substantively and also to add

19    counters.  They also object, I believe, that we should have

20    done this with the witness when the reader was here.

21         Your Honor, again, I don't think there's any basis to

22    exclude it on that ground.  It's one page here.  I would simply

23    be reading it and the judge -- or I can give context that this

24    is additional testimony from --

25              THE COURT:  Can I see it?

1          MR. HOFFMAN:  Yes, Your Honor.  Apologies.

2      I would simply state, Your Honor, as it indicates on the

3  page, that this is an additional portion of testimony from

4  Mr. Ross Kari.

5          THE COURT:  What lines are you talking about reading?

6          MR. HOFFMAN:  It would be this -- it would be -- this

7  full page is the full extent.

8          THE COURT:  Stop talking for a little while.

9          MR. HOFFMAN:  The last point, Your Honor, I was just

10  going to address, plaintiffs object to having us read this, in

11  addition to having Mr. Kari's testimony earlier in the case.

12  But, Your Honor, again, the parties have been flexible here.

13  The document-reader witness from plaintiffs has taken the stand

14  multiple times to read out unobjected-to portions of documents.

15  This is in the same vein, Your Honor.

16      So given the two minutes of testimony, no substantive

17  objections, we should be permitted, Your Honor, we believe, to

18  read this testimony before Mr. DeMarco.

19      Thank you.

20          MR. RUDY:  Thank you, Your Honor.  Lee Rudy for

21  plaintiffs.

22      A couple of points on this.  First, as counsel just

23  acknowledged, this is super late.  The -- the deadline for

24  disclosing affirmative deposition designations was in -- on

25  April 14th.

1          The deadline for counter-designations was April 28th.

2     The parties over months and months and months negotiated back

3     and forth over all the deposition clips that were played,

4     including as to Mr. Kari, and for defendants to show up on

5     Friday in the middle of their case and offer an additional

6     piece of evidence is just far too late.

7          Second, the fact that the parties have been

8     collaborative and have tried to resolve and have succeeded in

9     resolving, many, many, many disputes before Your Honor does not

10    create sort of -- that doesn't allow them to do stuff that's

11    not proper under the rules.

12         As Your Honor, I'm sure, is aware, many times lawyers

13    say no further questions, sit down, and go, oh, shoot, I wish I

14    had asked him one more question.  That's what's happening.  The

15    defendants designated an hour of Mr. Kari's testimony.  It was

16    presented to the jury, and now they say, oh, I forgot to ask

17    him something, and they want to give it to the jury.

18         It's not how trials go.  There's direct, there's cross,

19    there's redirect, sometimes there's recross, but there's not

20    recall of a witness.

21         The reference to the document reader presenting

22    documents twice during our case in chief, first of all, that

23    was not a witness as the defendants made clear to tell

24    Your Honor.  That was not a witness.  That was a person reading

25    documents.

 1          Second of all, that was not disputed.  The defendants

 2     agreed when we gave them case law and we explained how the

 3     protocols work that we should be allowed to do that and so we

 4     did it with no dispute.  It creates no precedent that gives

 5     them the ability to do this.

 6          Third of all, Your Honor, I think it's important to

 7     just set a little bit of context for why they're doing this and

 8     why it would be prejudicial if Your Honor would like to hear

 9     that.

10          THE COURT:  I don't need to hear it.  The objection

11     is sustained.

12          MR. RUDY:  Thank you.

13          THE COURT:  You can hand this back to defendants.

14     Anything else?

15          MR. HOFFMAN:  Nothing else.

16     Thank you, Your Honor.

17          THE COURT:  Mr. DeMarco here?

18          MR. STERN:  He is, Your Honor.

19          THE COURT:  All right.  Bring the jury.

20          (Proceedings held in the presence of the jury.)

21          THE COURT:  You may be seated.

22     All right.  Defendants may call your next witness.

23          MR. STERN:  Thank you, Your Honor.

24     Good morning, Your Honor.  Good morning, members of the

25     jury.

```
 1                 Defendants call Mr. Ed DeMarco.

 2                 THE COURT:  Good morning.

 3                 THE COURTROOM DEPUTY:  Raise your right hand.

 4                 (Oath administered.)

 5                 THE WITNESS:  I do.

 6                 THE COURTROOM DEPUTY:  Thank you.

 7                 MR. STERN:  May I proceed, Your Honor?

 8                 THE COURT:  (Nods head.)

 9                 MR. STERN:  Thank you.

10                      DIRECT EXAMINATION

11     BY MR. STERN:

12     Q.  Good morning, Mr. DeMarco.

13     A.  Good morning, Mr. Stern.

14     Q.  Could you please introduce yourself to the members of the

15     jury.

16     A.  Yes.  Good morning, members of the jury.  My name is

17     Ed DeMarco.

18     Q.  Mr. DeMarco, could you tell us about your educational

19     background.

20     A.  Yes.  I have a bachelor's degree and a master's and Ph.D.

21     in economics.

22     Q.  Where are those from?

23     A.  My bachelor's degree is from the University of Notre Dame.

24     My master's and Ph.D. in economics is from the University of

25     Maryland in College Park.
```

1    Q.  So I've been calling you Mr. DeMarco.  I guess you're

2    really Dr. DeMarco.  What do you go by?

3    A.  I go about Mr. DeMarco.

4    Q.  So, Mr. DeMarco, could you describe your employment

5    history -- the members of the jury by now know full well that

6    at some point you became acting director of FHFA; is that

7    right?

8    A.  Yes, it is.

9    Q.  So could you tell us about your employment history before

10   you got to FHFA.

11   A.  Certainly.  I spent 28 years as a career civil servant.  I

12   began my career at the U.S. -- what was then called the U.S.

13   General Accounting Office.  It's now called the Government

14   Accountability Office.  I spent seven, seven and a half years

15   there.  From GAO, I went to the Treasury Department, and I

16   spent about ten years at the Treasury Department.

17        From the Treasury Department, I went to the Social

18   Security Administration and spent three years at the Social

19   Security Administration.

20        From there, I went to OFHEO, the Office of Federal

21   Housing Enterprise Oversight.  In that role I came to OFHEO

22   as the deputy director and chief operating officer of the

23   agency.

24        When OFHEO became the Federal Housing Finance Agency, I

25   was --

1    Q.  Mr. DeMarco, let me -- I want to ask you to do two things.

2    I want to ask you to stop, because I'm going to go backwards a

3    little bit.

4    A.  Okay.

5    Q.  And I'm going to ask you to slow down just a little bit.

6    A.  Sure.

7    Q.  Let's go back to GAO.  When you were at GAO, did you have

8    any involvement with the housing market or housing finance or

9    anything related to that?

10   A.  Yes, I did.

11   Q.  Could you please explain that.

12   A.  Yes.  So at GAO -- I started at GAO in 1986.  So this is --

13   the savings and loan crisis was -- was brewing, and so I was

14   directly involved in housing finance matters leading up to

15   the -- the savings and loan crisis and legislation that was

16   passed as a result of that in 1989.

17        Following that, I then spent a -- most of the rest of my

18   time at GAO working on housing finance issues; in particular,

19   doing studies for Congress on the so-called

20   government-sponsored enterprises.

21   Q.  That the members of the jury know to be Fannie Mae and

22   Freddie Mac; is that right?

23   A.  Yes, those are two of them.

24   Q.  Now -- and you told us after that you went to Treasury;

25   right?

1    A.  Yes.

2    Q.  What positions did you have at Treasury, and what sorts of

3    things did you work on?  What responsibilities did you have?

4    A.  Yes.  So I was a senior economist initially at the Treasury

5    Department.  I worked for the assistant secretary for financial

6    institutions, which meant that I worked on various financial

7    institution, financial regulatory matters.  In particular, I

8    did a lot of work with regard to government-sponsored

9    enterprises, particularly in the -- in the housing finance

10   space.

11       I became -- Treasury actually created an office

12   of government-sponsored enterprise policy, and I was promoted

13   and made the -- the director of that office during my time at

14   Treasury.  And then later in my time at Treasury, that office

15   that I ran merged with an office called the Office of Financial

16   Institutions Policy, and I became the director of that.

17       So I had both GSE policy as well as an array of

18   financial regulatory issues.  I was the senior career person at

19   the Treasury Department in this particular part of Treasury,

20   and I reported to political appointees.

21   Q.  And you told us that after Treasury you went to the

22   Social Security Administration?

23   A.  Yes, I did.

24   Q.  What was your job title?  And just if you could briefly

25   tell us about your responsibilities there.

```
 1    A.  Yes.  I started as an assistant commissioner for research

 2    and statistics and then was promoted to deputy assistant --

 3    deputy commissioner for policy.  So I oversaw policy work,

 4    policy research, and economic research at the Social Security

 5    Administration.

 6    Q.  So next, to OFHEO; is that right?

 7    A.  Yes.

 8    Q.  And for our court reporter, and those who may be taking

 9    note, that's O-F-H-E-O?

10    A.  Yes.

11    Q.  What does that stand for?

12    A.  The Office of Federal Housing Enterprise Oversight.

13    Q.  And what were your -- first, I just want to know what your

14    job titles were at OFHEO.

15    A.  Initially, I was the director deputy and chief operating

16    officer.

17    Q.  And then?

18    A.  And then when OFHEO -- that's the only title I had at OFHEO

19    before it became FHFA.

20    Q.  So focusing on OFHEO, before it became FHFA, can you tell

21    the members of the jury a little bit about what OFHEO was and

22    what it did.

23    A.  Yes.  So OFHEO was the safety and soundness regulator for

24    Fannie Mae and Freddie Mac.  That was its basic responsibility;

25    was to supervise and oversee Fannie and Freddie.  And it had
```

```
 1    been created in the early 1990s.
 2    Q.  As deputy director and chief operating officer -- that's
 3    sometimes abbreviated as COO?
 4    A.  Yes.
 5    Q.  As deputy director and COO at OFHEO, who did you report to?
 6    A.  I reported to the director of the agency, Director
 7    Lockhart.
 8    Q.  And what were your -- just briefly, your responsibilities
 9    while you were at OFHEO?
10    A.  So as chief operating officer, I was responsible for the
11    day-to-day operations of the -- of the agency.  And then I also
12    was -- given my background, I was, of course, a senior advisor
13    to the director on policy matters, and I oversaw a lot of
14    policy work there.
15    Q.  Now, the members of the jury have heard about HERA, the
16    Housing and Economic Recovery Act.  They've heard a lot about
17    FHFA.  They're going to hear more from you; right?
18    A.  Yes.
19    Q.  But could you please explain the difference -- when was
20    FHFA created?
21    A.  FHFA was created in July of 2008.
22    Q.  And was there a relationship between that and HERA?
23    A.  Yes.  HERA -- HERA is the legislation that created FHFA.
24    Q.  Okay.  So what happened, if anything, to OFHEO once FHFA
25    was created in July of 2008?
```

 1    A.  So in the HERA legislation, Congress directed that OFHEO

 2    and another federal agency, Federal Housing Finance -- the

 3    regulator of the Federal Home Loan Banks -- that those two

 4    agencies were to be merged and create FHFA.  And they also took

 5    some responsibilities that were at the Department of Housing

 6    and Urban Development, merged that into FHFA.

 7          So upon enactment, basically, FHFA was created.  OFHEO

 8    went away, and we were folded right into FHFA.  The director of

 9    OFHEO, Mr. Lockhart, upon enactment became the director of

10    FHFA, and all the staff at OFHEO merged right in.

11    Q.  And how, if at all, was FHFA different from OFHEO?

12    A.  So FHFA was different from OFHEO in several important

13    respects.  First, it had a broader mission.  It was responsible

14    for overseeing now not just Fannie Mae and Freddie Mac, but for

15    overseeing the Federal Home Loan Banks.  OFHEO was just a

16    safety and soundness regulator.  It did not oversee Fannie and

17    Freddie for their housing mission.

18          In HERA, that housing mission oversight was given to

19    FHFA.  So now we have an expanded scope both in terms of, you

20    know, what it is we're supposed to oversee as well as who it is

21    we're supposed to oversee.  And FHFA had broader authorities.

22    They had stronger authorities to carry out this regulatory

23    function that they were given.

24    Q.  And what was your role -- you may have just said this.  I

25    apologize if I missed it.  What was your role at OFHEO -- at

1   FHFA when FHFA replaced OFHEO?

2   A.  So Director Lockhart named me the senior deputy director

3   for the Division of Housing Mission and Goals.  He also had me

4   retain my role and title as chief operating officer.  So I had

5   both those titles and both those responsibilities.

6       The thing about the deputy director position that I was

7   put in is -- it was one of three positions that are actually

8   named in the HERA legislation.  The FHFA was required to create

9   these three deputy director positions.  And I was appointed to

10  one of them.

11  Q.  Did there come a time when your job status and title at

12  FHFA changed?

13  A.  Yes.

14  Q.  When was that and what was the change?

15  A.  Officially in September -- unofficially in August -- of

16  2000, I became the acting director of -- of FHFA.  Director

17  Lockhart had stepped down.  And President Obama designated me

18  to be the acting director of the agency.  Again, that is

19  pursuant to authority that was in this HERA legislation.

20  Q.  And how long did you serve as acting director?

21  A.  For about four and a half years.

22  Q.  And when did you leave FHFA -- what -- what were -- what

23  were the years?

24  A.  Yeah.  So I -- so I officially started in September of

25  2009, and I was no longer the acting director as of January of

DEMARCO - DIRECT

1    2014.  I was still with the agency.

2         The cause for me to no longer be the acting director

3    is President Obama had nominated a successor, and the

4    Senate confirmed that successor in December.  He took over in

5    January.

6         I remained with the agency through the end of April of

7    that year -- so through April of 2014 -- to assist with the

8    transition and because I had a -- you know, a position there at

9    the agency.

10   Q.  And just briefly, can you catch us up to date.  What have

11   you been doing since you left FHFA?

12   A.  Yeah.  So since I left FHFA, I spent three years as a

13   senior fellow and resident at the Milken Institute.  It's a

14   think-tank.  So it's a policy think-tank here in Washington.

15   And I did work and writings on housing policy.

16        In 2017 I was offered a position that I accepted to be

17   the president of the Housing Policy Council.  That remains my

18   position today.  The Housing Policy Council is a trade

19   association that represents a number of firms that operate in

20   the housing finance space.  These are banks and nonbanks and

21   mortgage insurance companies and title companies and so forth.

22   So I represent this -- these members as the head of this trade

23   organization.

24   Q.  And I think you added this up for us before, but can you

25   remind us, how many years in total have you spent in your

1    career in public service?

2    A.   Twenty-eight years.

3    Q.   And I tried to do this math in my opening statement.  I'm

4    not sure I got it right so I'm going to ask you.

5         During those 28 years, under how many presidents did you

6    serve?

7    A.   Five.

8    Q.   Can you name them?

9    A.   Yes, I can.  Reagan, Bush 41, Clinton, Bush 43, and

10   President Obama.

11   Q.   And for those keeping score, how many Republicans and how

12   many Democrats is that?

13   A.   That would be three Republicans and two Democrats.

14   Q.   So let's talk now about FHFA and what it does.

15        So you told us your roles and responsibilities.  I'm not

16   going to ask you for those again.  But you used a phrase a

17   couple of times, safety and soundness.  You also referred to

18   FHFA as at least, in part, a safety and soundness regulator.

19   Did I -- those are the terms you used?

20   A.   Yes, I did.

21   Q.   Could you explain what it means for FHFA to be a safety and

22   soundness regulator.

23   A.   Certainly.  It means that we have a responsibility for

24   overseeing the companies that the agency regulates to ensure --

25   because these are major financial institutions -- to make sure

1    that they are operating safely and soundly.

2         That's a term of art that's used in financial

3    regulatory-land to mean that the companies are what it sounds

4    like.  That they are safe in terms of their financial balance

5    sheet; that they have sufficient capital and forth; and they're

6    operating soundly.  That is, they have good risk management

7    practices, good risk controls, and so forth.

8    Q.  Are Fannie and Freddie -- I'm using the shorthand.  Fannie

9    is short for Fannie Mae and Fannie Mae is short?

10   A.  Federal National Mortgage Association.

11   Q.  And just to make sure we're all using the same lingo,

12   Freddie, short for Freddie Mac, which is short for?

13   A.  The Federal Home Loan Mortgage Corporation.

14   Q.  Okay.  I'm going to go back to Fannie and Freddie.

15        So are Fannie and Freddie subject -- you talked about

16   regulations.  Are those government regulations or some other

17   kind of regulations?

18   A.  Government regulations.

19   Q.  Are Fannie and Freddie subject to regulations that other

20   companies are not?

21   A.  Yes, they have a -- you know, their own regulator and own

22   set of regulations that apply to them.

23   Q.  And why -- if you know, based on your experience, why are

24   Fannie and Freddie subject to regulations that other companies

25   aren't?

1    A.  Yes.  Because these companies were chartered by Congress.

2    Congress created Fannie Mae and Freddie Mac.  It created them

3    to be -- as private corporations but with a public mission.  It

4    said these are the things we want you to do.

5          And if Congress gave Fannie and Freddie certain benefits

6    to help them accomplish this mission, but also certain

7    restrictions in terms of what they're allowed to do in order to

8    accomplish their -- their mission.

9          Because these are major financial institutions operating

10   in our financial markets, Congress also deemed it important to

11   have a -- a safety and soundness oversight regime to ensure

12   that they remain safe and sound so that they can accomplish

13   their mission.

14         Similar -- it's analogous to what we do with commercial

15   banks; where we are safety and soundness regulators that

16   oversee commercial banks for their safety and soundness.

17   Q.  So what is the difference between the regulations that

18   Fannie and Freddie are subject to and the regulations that the

19   commercial banks are subject to?

20   A.  So there certainly are some parallels that there be -- but

21   the bank regulations are designed, you know, for commercial

22   banks and to reflect the fact that commercial banks have

23   federal deposit insurance.

24         Fannie Mae and Freddie Mac are overseen similarly, to

25   operate safely and soundly, but there is no equivalent to a

```
 1    deposit insurance corporation.  And there is just the two of
 2    them.  But they have a very important mission that Congress
 3    gave them.
 4    Q.  So another matter of vocabulary.  The jury has heard a lot
 5    about conservatorship.  And I know you're going to talk more
 6    about it today.  There's also been a reference in the case to
 7    receivership.
 8         What is the difference between conservatorship and
 9    receivership?
10    A.  Yes.  So conservatorship, you're keeping the company
11    operating.  The conservator takes over the -- the control and
12    the direction of the company.  As conservator -- the
13    conservator stands in the shoes of the boards of directors, and
14    the senior management is responsible for the decision-making,
15    but the company continues to operate.
16         In a receivership, a receivership is like bankruptcy.
17    This is where the company has failed and now the government has
18    appointed a receiver to oversee the conclusion of that firm and
19    the handling of all the claims and what happens to the assets
20    and so forth.
21    Q.  Okay.  Now, I want to talk about Fannie and Freddie and
22    what they do.  And the jury has heard from lawyers and from
23    witnesses about how the primary mortgage market worked and the
24    secondary mortgage market works.  So I'm not going to review
25    all of that with you.  But I would like to get your sense and
```

DEMARCO - DIRECT

1    your understanding of the background of Fannie and Freddie and

2    how they operate.

3         So let's start.  Can you explain at a high level a

4    little of the history of Fannie and Freddie; for example, how

5    they were created.

6    A.  Right.  So Fannie Mae was created in 1938.  It was created

7    to create a mechanism for these newly created FHA loans,

8    Federal Housing Administration loans, so that they would buy

9    FHA-backed mortgages from lenders.

10   Q.  Let's back up for a second.  Let's stop there for a second.

11   Let's pull up DX1.

12   A.  Okay.

13   Q.  Do you recognize what this is?

14   A.  Yes.  This is the -- this is the charter act for

15   Fannie Mae.

16   Q.  And do you see at the beginning of the charter where it

17   talks about -- where it says Congress declares the purposes?

18   A.  Yes, I do.

19   Q.  What's the first numbered item there?

20   A.  Provide stability in the secondary market for residential

21   mortgages.

22   Q.  And what's the significance of that to you?  And what --

23   more importantly, what was the significance of that to you

24   during your time as acting director of FHFA?

25   A.  All right.  So this first purpose that Congress gave to

1    Fannie Mae was critical to decisions I made as conservator.

2    First duty as conservator was to -- sorry.  Let me step back.

3         As conservator, I have to make sure that the companies

4    are carrying out their public mission.  The first part of that

5    mission is stability in the market -- in the residential

6    mortgage market.  So in overseeing Fannie Mae and Freddie Mac's

7    operations in conservatorship, it was critical for me to ensure

8    that through any potential and economic path and environment we

9    have, these companies bring stability to the market.

10   Q.  And we're going to talk more about that in detail, but for

11   right now, can you describe, again, briefly -- understanding

12   the members of the jury have -- have heard evidence about this

13   already -- just from your perspective and the way you would

14   articulate it, how did Fannie and Freddie fulfill that mission?

15   Are you familiar with the phrase providing liquidity?

16   A.  Yes.

17   Q.  What does that mean?

18   A.  It means ensuring that there's funding, financing that is

19   flowing to keep mortgage activity happening.

20   Q.  So how do Fannie and Freddie ful- -- and is that part of

21   the public mission?

22   A.  Yes, it is.

23   Q.  So how do Fannie and Freddie fulfill their public mission

24   to provide liquidity and provide stability in the secondary

25   mortgage market?

DEMARCO - DIRECT

1    A.  In simple terms, what they do is they intermediate.  They

2    act in between the companies that actually make mortgage loans

3    to consumers and the entities that actually provide the

4    long-term financing, the 30 years of financing, for a 30-year

5    mortgage.

6         So Fannie Mae and Freddie Mac buy up mortgages from

7    individual lenders, pay the lender for that mortgage.  Now the

8    lender can go make more mortgages.

9         They bundle those mortgages up and they package them for

10   investment by the ultimate investors in this.  This is through

11   a process called securitization.  And so the investors are the

12   ultimate funders of these mortgages.

13   Q.  So what -- what happens to the holder of the MBS if a

14   borrower doesn't pay on their mortgage?

15   A.  The borrower -- the holder of the MBS still gets the

16   payment that the borrower fails to make because that is the --

17   what the -- what Fannie Mae and Freddie Mac do.  They guarantee

18   to the MBS investors that if a borrower doesn't make their

19   mortgage payment, we will make it on their behalf so the

20   investor gets the expected payment.

21   Q.  And how important is that guaranty by Fannie and Freddie?

22   A.  It's -- that -- that's -- that's the business.  That's --

23   that it is -- it is of complete importance.  The investors in

24   mortgage-backed securities, they're not looking at individual

25   200,000- or 400,000-dollar mortgages and judging the borrower.

1    They are counting on Fannie Mae and Freddie Mac to do that and

2    counting on Fannie and Freddie's guaranty that if the borrower

3    fails, this is how I know I'm going to get paid.

4    Q.  So in a preview of coming attractions, from your

5    perspective, how long does that guaranty have to be good for?

6    A year?  Two years?  Five years?  How long does that guaranty

7    have to be good for in order for MBS investors to be confident

8    in the guaranty?

9    A.  It has to be good for the life of the mortgage.  And since

10   most consumers choose a 30-year mortgage, in most cases we're

11   looking at 30 years -- or up to 30 years.

12   Q.  And just so we're clear -- I think this is clear, but to

13   make sure.  The jury has heard, of course, about shareholders

14   and private shareholders and, as I believe you know, plaintiffs

15   in the case are shareholders.

16        In this context, are the shareholders the same as the

17   MBS investors or different?

18   A.  No, they're different parties.

19   Q.  Okay.  Who are the -- who are the shareholders?

20   A.  The shareholders are the companies that bought the shares.

21   They bought equity investments in Fannie Mae and Freddie Mac.

22   They're providing the capital to Fannie Mae and Freddie Mac

23   that was the -- the backstop on that guaranty that Fannie and

24   Freddie were making to MBS investors.

25   Q.  And, again, as a preview, was there a guaranty that --

1    guaranty to the MBS investors that they would get their income

2    stream?  Is that -- am I understanding that right?

3    A.  Yes.

4    Q.  Was there a guaranty to private shareholders that they

5    would receive dividends?

6    A.  No.

7    Q.  Before conservatorship were dividends to private

8    shareholders guaranteed?

9    A.  No.

10   Q.  And in conservatorship, again, as a preview, what happened

11   to dividends?

12   A.  Dividends were suspended at the time the conservator was

13   created under the funding agreement that was signed between

14   Treasury and FHFA.

15   Q.  Okay.  We'll come back to that.  That's the PSPA?

16   A.  Yes.

17   Q.  So I want to take us back now to 2007, 2008.

18          And I want to ask you about what the jury has heard

19   referred to as the financial crisis.  One witness referred to

20   it as the great financial crisis.  But before I ask you about

21   that, I want to ask you some context.

22          But, first, remind us, where were you in 2007, 2008?

23   A.  I was at the Office of Federal Housing Enterprise

24   Oversight.

25   Q.  And in that capacity, did you have knowledge and an

1   understanding of what was going on in the housing market

2   leading up to, say, 2006?

3   A.  I'm sorry.  Leading up to 2006 or leading up to --

4   Q.  To 2006.  Do you have an understanding of what was going on

5   in the housing market leading up to 2006?

6   A.  I had some.  But since I'd been at Social Security between

7   2003 and 2006, that was not what my primary focus was.  It

8   certainly became my focus when I joined OFHEO in late 2006.

9   Q.  Let me focus you specifically on housing prices.  And if

10  you can't answer, don't.  Did you have a sense of what was

11  going on with housing prices leading up to 2006?

12  A.  Yes.  Housing prices were going up.

13  Q.  And what was happening to the housing market in 2007?

14  A.  In 2007, we start to see cracks in the housing market.  We

15  start to see certain lenders are failing.  A segment of this

16  market called the subprime mortgage market was showing a great

17  deal of distress.  And some of the major subprime mortgage

18  lenders failed in 2007.  And it's around this time that housing

19  prices hit their peak and start to show weakness and we start

20  to seeing mortgage delinquencies arising.

21          MR. STERN:  Court's indulgence, Your Honor.

22          Thank you, members of the jury.  Thank you, Mr. DeMarco.

23  BY MR. STERN:

24  Q.  And what was -- I -- you may have just said this.  If you

25  did, I apologize.

DEMARCO - DIRECT

1      What was happening to home prices starting in 2007?

2   A.  In 2007, home prices start to decline.

3   Q.  And how, if at all, did the decline in home prices affect

4   the rest of the economy?

5   A.  So this affects the rest of the economies because as home

6   prices decline, we have a slowdown in mortgage activity.  We

7   see borrowers that are going delinquent and failing on their

8   mortgage.  Now the lender can't recover what they expected to

9   on these delinquent mortgages because the house prices declined

10  from the time it was -- the loan was first made.

11      So now you have lenders that are losing money.  As

12  lenders lose money, then you have these defaults coming.

13  I've already talked about how some of these companies were

14  failing.  This starts to spill over into the -- into the

15  broader economy.

16  Q.  So let me ask you about that, actually.

17      So when borrowers couldn't make their payments and

18  defaulted, what would happen to their homes and what effect did

19  that have on the banks?

20  A.  So when borrowers defaulted because they couldn't pay their

21  mortgage, then, you know, when they go through a foreclosure

22  process, the bank or the mortgage servicer has to dispose of

23  that property, which means they have to sell it.  House prices

24  are coming down.  Now they're getting less for it.  That means

25  the bank is taking a loss on this property.

1    Q.  And did that phenomena spread beyond the housing market?

2    A.  Yes.  It started to.

3    Q.  And how did that manifest itself?

4    A.  It manifested itself in an increase in unemployment and

5    bank failures.

6    Q.  And did it have any -- if you know, did it have any effect

7    on the stock market?

8    A.  Yes, it did.  It was a negative effect on the stock market

9    because the stock market is seeing that the economy is -- is in

10   distress and we've got financial institutions failing and

11   households defaulting on their mortgages and so forth.

12   Q.  And what was the effect of -- have you heard the phrase

13   systemic risk?

14   A.  Yes, I have.

15   Q.  What does that mean to you?

16   A.  Systemic risk is when you've got companies that are

17   interconnected; that is, if -- if a failure at one company

18   creates a spillover effect or a systemic effect on other

19   companies.  So if one -- Company A fails and it's

20   interconnected with Companies B and C, that failure of

21   Company A imposes losses on B and C that threaten their --

22   their survival.

23   Q.  So when you were talking just now about the relationship

24   between the defaults on the mortgages and the bank losses and

25   the stock market and people losing their jobs, is that an

1    example of what you're describing as systemic risk?

2    A.  Yes.

3    Q.  So what was the effect of -- and I'm going to call this the

4    economic crisis.  Is that a term that you've heard?

5    A.  Yes.

6    Q.  Okay.  Or sometimes the financial crisis?

7    A.  Yes.

8    Q.  So I'll use those interchangeably, unless you tell me not

9    to.

10   A.  Fine.

11   Q.  So what was the effect of the financial crisis beginning --

12   that you've described beginning in 2007?  What was the effect

13   of that financial crisis, if any, on Fannie and Freddie?

14   A.  So it was catastrophic for Freddie Mac and Fannie Mae.

15   Q.  Why is that bad?

16   A.  Yeah.  So Fannie Mae and Freddie Mac, because their

17   business was guaranteeing mortgage credit -- that is, what we

18   talked about earlier, that if a borrower didn't make their

19   mortgage payment, that Fannie and Freddie had to make that

20   payment to the MBS investor for them; right?

21        If you're in a world where house prices are going down

22   across the country, mortgage delinquencies are going up, people

23   aren't able to pay their mortgage, now the unemployment is

24   going up, the economy is getting weaker, that's putting more

25   and more of a strain on Fannie and Freddie.  Because that means

1   more borrowers are not paying their mortgage.  And,

2   furthermore, as house prices continue to go down, when Fannie

3   and Freddie foreclose on these mortgages, they're getting less

4   and less.  And so their losses are going up.

5       So the bursting of the housing bubble was catastrophic

6   to Fannie and Freddie because their losses, you know, came

7   right into the -- right into them.  And their thin capital

8   wasn't enough to -- to withstand this.

9   Q.  When you -- I want to pick up on that phrase.  When you say

10  their thin capital wasn't enough to withstand this, hum a few

11  more bars of that.  What does that mean?

12  A.  Sure.  So Fannie Mae and Freddie Mac had capital to be

13  able -- that's -- that was what backed that guaranty to the MBS

14  investors.  We already talked about; how the -- the Fannie and

15  Freddie capital is what backed their guaranty.  But as the

16  losses started to grow -- and, ultimately, what ends up

17  happening is these losses overwhelming the amount of capital

18  these companies had.

19      Absent government stepping in -- right? -- Fannie Mae

20  and Freddie Mac would have gone bankrupt and the guaranty would

21  have been -- they would have been unable to honor their

22  guaranty.  And now we're in a systemic risk world where all

23  these MBS holders, who thought that, you know, this guaranty

24  was going to make sure they got paid, are suddenly finding

25  that's not the case.

1    Q.  So by mid-2008 was there market concern about what you've

2    just described?

3    A.  Yes, there was.

4    Q.  And what was that market concern?

5    A.  So it showed up a couple ways.  It showed up in Freddie Mac

6    and -- Freddie Mac and Fannie Mae's borrowing costs; right?

7    That their cost to borrow money to operate their business

8    day-to-day, like they normally did, went up.  And then over the

9    course of the summer, they couldn't even borrow longer term

10   like they usually did.  It also showed up in their stock price,

11   which was plummeting in the summer of 2008.

12   Q.  So stock price and the market, I'm going to draw a

13   distinction here, if you'll accept it.  That's Wall Street.

14        What about the impact of all of this on Main Street?

15   A.  Yes.  So, I mean, the impact on Main Street is now we're

16   threatening -- now there is a direct threat to the country's

17   mortgage market.

18        As we've talked about, lenders originate mortgages.

19   Then they sold them to Fannie Mae and Freddie Mac to get their

20   cash back to go make new mortgages; right?  If Fannie Mae and

21   Freddie Mac are in extreme risk and the investors and their

22   mortgage-backed securities, the MBS holders, are now

23   questioning the resiliency of these companies to make good on

24   their guaranty -- right? -- then Fannie and Freddie can't sell

25   those mortgages off to MBS investors.  And that, you know --

1   that locks up the whole system.  Now lenders can't make a

2   mortgage and know that they can sell it into the secondary

3   market.

4   Q.  And what impact, if any, does all of this have on regular

5   people?

6   A.  It affects regular people directly because as the mortgage

7   market is getting into this kind of trouble, the cost of a

8   mortgage is going up and the willingness of lenders to make

9   mortgages is going down; because the risk in the market's

10  getting greater and greater, and the ability to sell these

11  mortgages into the secondary mortgage market is becoming more

12  and more questionable.

13       So this has a direct impact on everyday people in terms

14  of their ability to get a mortgage at all or what the mortgage

15  rate would be on those mortgages.

16  Q.  You also referred to rising unemployment.  What --

17  what's -- what's the connection there?

18  A.  Connection there is as unemployment goes up, people don't

19  have the money to make their mortgage payment.  And so now you

20  see mortgage delinquencies going up, and so you see the cycle

21  getting worse.

22       Fannie and Freddie have -- as delinquencies go up,

23  they've got more and more mortgage payments they're responsible

24  for covering.  And, again, that's eating away at their capital

25  to do that.

1   Q.  And you talked about bank losses.  Is there a relationship

2   between bank losses and Main Street?  Bank losses and small

3   businesses?  Bank losses and employment?  Is there a

4   relationship there?

5   A.  Sure.  I mean, as banks are getting into trouble and some

6   of them failing, then these banks are themselves becoming

7   either unable or more and more conservative about making loans.

8   Not just mortgage loans, but commercial loans, other consumer

9   loans, and so forth.

10        Because as they see the economy getting into this kind

11  of difficulty, they've got to protect their own capital as

12  well.  And so it slows down the funding of economic activity,

13  and it contributes to this downturn.

14  Q.  So just a couple more vocabulary points.  The jury has

15  heard the word solvent means having positive net worth.  Would

16  you agree with that definition?

17  A.  Yes.

18  Q.  And they have also heard that one way to describe positive

19  net worth is assets exceed liabilities.  Would you agree with

20  that definition?

21  A.  Yes.

22  Q.  And, again, the jury has heard negative net worth described

23  as liabilities exceeding assets.  Would you agree with that

24  definition?

25  A.  Yes.

1    Q.  And would that mean the same thing to you as insolvent?

2    A.  Yes.

3    Q.  And if I could go colloquial again, are you familiar with

4    the term "in the red"?

5    A.  Yes.

6    Q.  And do you understand that also to be the scenario where

7    liability is what you owe; exceed assets, what you have?

8    A.  Yes.

9    Q.  Okay.  You've described what was happening leading up to

10   the summer of 2008.  And you referred in one of your answers

11   to the government stepping in.  I want to ask you more about

12   that.

13        Did Congress take action in response to the economic

14   crisis that you've been describing?  Action as it related to

15   Fannie and Freddie.

16   A.  Yes.

17   Q.  What did they do?

18   A.  They enacted something called the Housing and Economic

19   Recovery Act, or HERA.

20   Q.  And what did HERA -- let me just -- is HERA part of the

21   United States Code?  Is that a law?

22   A.  Yes, it is.

23   Q.  Okay.  Could you please describe the main points of HERA as

24   you understood them.

25   A.  Yes.  With regard to Fannie Mae and Freddie Mac and the

 1    agency I work with, as we already described, it created the

 2    Federal Housing Finance Agency.  It gave the Federal Housing

 3    Finance Agency added authorities that it did not have; that

 4    it's predecessor did not have.

 5          And that is the authority to put Fannie Mae and Freddie

 6    Mac into conservatorship, if necessary.  But it did not give

 7    FHFA any funding to manage a conservatorship.  Instead, what it

 8    did is it gave expanded funding authority to the Treasury

 9    Department.  In fact --

10    Q.  Let's back up just for a minute.  And just so the members

11    of the jury can see what it looks like, let's put up DX58.

12          So do you recognize what this is?

13    A.  Looks like an excerpt from HERA.

14    Q.  Okay.  How long is HERA itself?

15    A.  It's got to be over a hundred pages.

16    Q.  Okay.  So does this look like the beginning of the statute?

17    A.  I'm -- I'm --

18    Q.  As it relates to FHFA.

19    A.  Yeah, probably does.

20    Q.  And with regard to -- did HERA have anything to say about

21    conservatorship?

22    A.  Yes, it did.

23    Q.  What did it have to say about conservatorship?

24    A.  As we see right here, it granted FHFA the authority to

25    appoint the agency as a conservator of its regulated entities,

1    an authority that its predecessor did not have.

2    Q.  So translated into English, this is saying that FHFA can

3    appoint itself to become the conservator of Fannie Mae and

4    Freddie Mac; is that correct?

5    A.  Yes.

6    Q.  And what authority -- I think you're about to get into

7    this, but I want to break it out.  What authority did HERA give

8    to Treasury that Treasury did not have before HERA?

9    A.  It gave Treasury unlimited funding authority to purchase

10   obligations of Fannie Mae and Freddie Mac.

11   Q.  So break that down for us.  What do you mean unlimited

12   funding authority to purchase?

13   A.  It means it could invest in the stock of -- among other

14   things, that it could invest in the stock or the bonds of

15   Fannie Mae or Freddie Mac.

16   Q.  And what's the practical significance of Treasury

17   now having that authority to invest in Fannie Mae and

18   Freddie Mac?

19   A.  The practical significance is that in combination with the

20   authority given to FHFA to appoint itself as conservator or

21   receiver, it now meant that FHFA had a funding source to

22   actually manage the conservatorship or receivership.

23   Q.  And we're going to get to that, but did there come a time

24   when Treasury provided funding?

25   A.  Yes.

1    Q.  So let's -- I think this will work.  Page 3, bottom left

2    column.

3              THE COURT:  Okay.  Let's do that at 1:30.

4         Don't talk about the case.  Don't let anyone talk to you

5    about the case.  Have a nice lunch.  We'll get into the details

6    at 1:30.

7              (Proceedings held out of the presence of the jury.)

8              (REPORTER'S NOTE:  The p.m. portion of the trial was

9    reported by Lisa Edwards, who prepared said transcript.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DEMARCO - DIRECT

1                CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER

2

3              I, Nancy J. Meyer, Registered Diplomate Reporter,

4     Certified Realtime Reporter, do hereby certify that the above

5     and foregoing constitutes a true and accurate transcript of my

6     stenograph notes and is a full, true, and complete transcript

7     of the proceedings to the best of my ability.

8

9                       Dated this 7th day of August, 2023.

10

11                       /s/ Nancy J. Meyer
                         Nancy J. Meyer
12                       Official Court Reporter
                         Registered Diplomate Reporter
13                       Certified Realtime Reporter
                         333 Constitution Avenue Northwest
14                       Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25

## $

**$100** [1] - 25:18
**$110** [1] - 25:7
**$149** [1] - 10:20
**$40** [1] - 6:24
**$400** [2] - 10:24, 11:17

## 0

**0.4-billion** [1] - 10:8

## 1

**1** [11] - 8:24, 11:12, 34:18, 36:5, 37:11, 41:3, 41:8, 41:12, 42:21, 47:1, 47:12
**1-billion** [1] - 8:21
**1........................** [1] - 3:15
**1.1** [1] - 34:5
**1.16** [1] - 37:4
**1.2** [1] - 13:6
**1.5** [1] - 35:22
**1/2** [1] - 7:6
**10** [9] - 9:23, 11:13, 19:22, 19:23, 24:19, 24:23, 25:8, 35:6, 39:21
**10-Q** [1] - 38:9
**100** [5] - 35:20, 35:25, 36:10, 36:11, 47:13
**100........................** [1] - 3:21
**10:40** [1] - 18:21
**10:50** [1] - 20:8
**11.7** [1] - 33:21
**111** [4] - 9:1, 9:5, 9:6, 9:11
**111........................** [1] - 3:9
**13** [1] - 53:12
**13-1053** [1] - 5:3
**13-1288** [1] - 5:4
**136** [1] - 41:16
**140** [2] - 42:18, 42:19
**142** [1] - 41:17
**149** [1] - 10:7
**149-billion** [1] - 10:12
**14th** [1] - 57:25
**15** [5] - 3:10, 11:13, 24:19, 24:22, 25:1
**16** [2] - 13:18, 14:6
**163** [1] - 47:13
**163........................** [1] - 3:22
**164** [1] - 47:13
**164........................** [1] - 3:22

**17** [2] - 16:1, 43:20
**17th** [2] - 14:3, 49:14
**180** [1] - 42:16
**1938** [1] - 73:6
**1986** [1] - 62:12
**1989** [1] - 62:16
**1990s** [1] - 65:1
**1:30** [2] - 89:3, 89:6
**1H** [1] - 15:9

## 2

**2** [7] - 11:7, 11:8, 11:9, 33:8, 41:12, 41:14, 41:19
**2.5** [1] - 36:7
**2.6** [1] - 37:12
**2.8** [1] - 34:4
**200,000** [1] - 75:25
**2000** [2] - 9:16, 67:16
**2003** [1] - 78:7
**2006** [7] - 78:2, 78:3, 78:4, 78:5, 78:7, 78:8, 78:11
**2007** [10] - 42:11, 42:17, 77:17, 77:22, 78:13, 78:14, 78:18, 79:1, 79:2, 81:12
**2008** [10] - 6:15, 7:1, 16:19, 31:6, 65:21, 65:25, 77:17, 77:22, 83:11, 86:10
**2009** [2] - 42:24, 67:25
**2010** [2] - 19:24, 42:23
**2011** [6] - 9:17, 9:19, 17:8, 23:24, 24:17, 43:16
**2012** [36] - 13:18, 13:22, 14:6, 15:6, 15:9, 16:1, 16:4, 16:15, 16:20, 18:21, 18:25, 19:4, 19:22, 19:24, 22:3, 22:10, 31:21, 31:22, 32:13, 32:14, 32:17, 40:7, 40:10, 40:14, 41:16, 42:9, 42:12, 42:17, 42:18, 42:21, 43:20, 49:7, 49:14
**2013** [12] - 10:7, 25:6, 25:17, 32:15, 32:18, 32:20, 32:22, 40:14, 40:15, 41:15, 41:17, 41:24
**2014** [2] - 68:1, 68:7
**2015** [1] - 27:11
**2016** [1] - 32:5
**2017** [1] - 68:16
**206** [1] - 47:13
**206........................** [1]

- 3:23
**207** [1] - 47:13
**207........................** [1]
- 3:23
**209** [1] - 47:13
**209........................** [1]
- 3:24
**210** [1] - 39:13
**226-A** [2] - 18:17, 37:17
**227** [1] - 21:17
**233** [2] - 47:4, 47:13
**233........................** [1]
- 3:24
**242** [3] - 15:16, 15:17, 15:21
**242........................** [1]
- 3:10
**25** [7] - 12:1, 35:18, 35:20, 35:25, 36:4, 36:11, 36:16
**25-BPS** [1] - 10:8
**260** [1] - 37:11
**260-billion** [2] - 8:23, 37:4
**27** [1] - 43:16
**28** [2] - 61:11, 69:5
**282** [1] - 47:13
**282........................** [1]
- 3:25
**28th** [1] - 58:1
**29** [1] - 3:5
**2Q** [1] - 16:20

## 3

**3** [5] - 20:11, 30:17, 41:13, 41:14, 89:1
**3.9** [1] - 34:9
**30** [3] - 75:4, 76:11
**30-year** [2] - 75:4, 76:10
**30th** [1] - 42:21
**31** [1] - 30:17
**31st** [3] - 18:21, 19:22, 19:24
**346** [1] - 47:13
**346........................** [1]
- 3:25
**374** [1] - 47:14
**374........................** [1]
- 4:3

## 4

**4** [4] - 13:3, 13:4, 13:5, 47:12
**4-Year** [1] - 9:20
**4........................** [1] -
3:16

**400** [2] - 35:18, 35:22
**400,000-dollar** [1] -
75:25
**404** [1] - 47:14
**404........................** [1]
- 4:4
**41** [1] - 69:9
**43** [2] - 3:5, 69:9
**444** [4] - 47:14, 48:5, 48:7, 48:16
**444........................** [2]
- 3:10, 4:4
**445** [2] - 48:7, 48:16
**445........................** [1]
- 3:11
**45** [2] - 36:7, 37:2
**47** [25] - 3:15, 3:16, 3:16, 3:17, 3:17, 3:18, 3:18, 3:19, 3:19, 3:20, 3:20, 3:21, 3:21, 3:22, 3:22, 3:23, 3:23, 3:24, 3:24, 3:25, 3:25, 4:3, 4:4, 4:4, 4:5
**48** [7] - 3:10, 3:11, 3:11, 3:12, 3:12, 3:13, 3:13
**49** [1] - 47:12
**49........................** [1]
- 3:16
**4Q** [1] - 17:8

## 5

**5** [5] - 13:2, 13:4, 34:8, 36:4, 41:3
**50** [1] - 35:25
**539** [1] - 47:14
**539........................** [1]
- 4:5
**549** [5] - 48:19, 48:23, 48:25, 49:10, 55:6
**549........................** [1]
- 4:5
**55** [1] - 4:5
**58** [1] - 47:12
**58........................** [1]
- 3:17
**597** [2] - 48:9, 48:16
**597........................** [1]
- 3:11
**598** [2] - 48:9, 48:16
**598........................** [1]
- 3:12

## 6

**6** [8] - 3:4, 7:6, 22:3, 22:6, 22:18, 41:18,

**41**:19, 48:8
**60** [2] - 3:6, 7:3
**636** [3] - 48:7, 48:9, 48:16
**636........................** [1]
- 3:12
**637** [2] - 48:9, 48:16
**637........................** [1]
- 3:13
**638** [2] - 48:9, 48:17
**638........................** [1]
- 3:13

## 7

**7** [1] - 19:4
**7.2** [1] - 33:21
**70** [1] - 6:8
**75** [5] - 7:7, 7:8, 35:25, 36:4, 37:15
**78** [1] - 47:12
**78........................** [1]
- 3:17
**79** [1] - 47:12
**79........................** [1]
- 3:18
**7th** [2] - 19:7, 19:8

## 8

**8.5** [1] - 7:8
**84** [1] - 47:12
**84........................** [1]
- 3:18
**85** [1] - 47:12
**85........................** [1]
- 3:19
**86** [1] - 47:13
**86........................** [1]
- 3:19
**89** [1] - 47:13
**89........................** [1]
- 3:20
**8th** [2] - 19:7, 19:8

## 9

**9** [6] - 3:9, 9:17, 15:6, 16:4, 31:22, 31:25
**90** [1] - 47:13
**90........................** [1]
- 3:20
**99** [1] - 47:13
**99........................** [1]
- 3:21

## A

**a.m** [2] - 18:21, 20:8
**abbreviated** [1] - 65:3
**ability** [6] - 14:1, 14:5,

33:22, 59:5, 84:10, 84:14
**able** [2] - 81:23, 82:13
**absent** [1] - 82:19
**accelerated** [2] - 24:22, 39:7
**accept** [1] - 83:13
**accepted** [1] - 68:16
**accomplish** [3] - 71:6, 71:8, 71:12
**accomplished** [1] - 52:20
**according** [1] - 10:22
**Accountability** [1] - 61:14
**accounted** [1] - 24:10
**Accounting** [1] - 61:13
**accounting** [1] - 27:21
**acknowledged** [4] - 6:14, 26:2, 26:8, 57:23
**Act** [2] - 65:16, 86:19
**act** [2] - 73:14, 75:2
**acted** [1] - 30:22
**acting** [8] - 51:4, 61:6, 67:16, 67:18, 67:20, 67:25, 68:2, 73:24
**action** [2] - 25:3, 86:13, 86:14
**Action** [2] - 5:3, 5:6
**actions** [1] - 30:24
**activity** [3] - 74:19, 79:6, 85:12
**actor** [1] - 55:18
**actual** [1] - 7:21
**add** [1] - 56:18
**added** [4] - 56:7, 56:12, 68:24, 87:3
**addition** [1] - 57:11
**additional** [4] - 14:18, 56:24, 57:3, 58:5
**additionally** [2] - 51:21, 56:1
**address** [3] - 44:15, 53:3, 57:10
**addressed** [1] - 50:16
**addresses** [2] - 49:13, 49:16
**addressing** [1] - 26:11
**adjustments** [1] - 56:11
**administered** [1] - 60:4
**administration** [1] - 40:5
**Administration** [5] - 61:18, 61:19, 63:22, 64:5, 73:8
**admissible** [1] - 55:4

**admission** [4] - 9:3, 15:13, 48:13, 53:10
**Admitted** [2] - 3:8, 4:2
**admitted** [8] - 9:11, 15:21, 47:14, 48:17, 49:8, 53:2, 55:1, 55:6
**advisor** [1] - 65:12
**affect** [1] - 79:3
**affected** [1] - 35:17
**affects** [2] - 79:5, 84:6
**agencies** [2] - 33:20, 66:4
**agency** [14] - 14:13, 30:3, 33:2, 61:23, 65:6, 65:11, 66:2, 67:18, 68:1, 68:6, 68:9, 69:24, 87:1, 87:25
**Agency** [3] - 61:24, 87:2, 87:3
**agree** [6] - 16:21, 20:25, 53:19, 85:16, 85:19, 85:23
**agreed** [3] - 47:17, 54:23, 59:2
**agreeing** [1] - 28:16
**Agreement** [1] - 5:5
**agreement** [2] - 46:12, 77:13
**agreements** [1] - 40:6
**ahead** [2] - 25:13, 38:13
**AIG** [6] - 6:11, 6:15, 6:20, 6:25, 37:14
**alleviating** [1] - 52:21
**allow** [1] - 58:10
**allowed** [5] - 24:1, 24:21, 56:15, 59:3, 71:7
**allowing** [1] - 56:10
**alternatives** [2] - 26:5, 26:11
**amendment** [39] - 8:7, 12:11, 12:14, 12:19, 13:9, 13:19, 13:20, 14:13, 16:1, 16:5, 21:7, 25:6, 25:14, 26:1, 29:12, 31:4, 43:19, 49:13, 49:16, 49:20, 50:15, 51:2, 51:15, 51:17, 51:24, 51:25, 52:4, 52:11, 52:12, 52:13, 52:14, 52:16, 52:17, 52:19, 52:20, 53:19, 53:20, 53:24, 54:15
**amount** [6] - 6:22, 7:3, 7:22, 36:21, 41:16, 82:17

**amounts** [1] - 7:22
**analogous** [1] - 71:14
**analysis** [7] - 11:3, 11:11, 13:8, 25:14, 26:9, 26:14, 37:1
**analyst** [14] - 16:11, 16:14, 33:1, 49:1, 49:2, 49:6, 49:15, 50:10, 50:22, 51:1, 52:7, 53:16, 53:17, 53:23
**analysts** [2] - 42:25, 52:7
**analysts'** [1] - 53:13
**analyzing** [1] - 28:16
**Announce** [1] - 23:6
**announced** [5] - 6:20, 49:14, 52:12, 52:19, 54:15
**annual** [1] - 10:8
**annually** [1] - 33:21
**answer** [2] - 26:14, 78:10
**answers** [1] - 86:10
**anyway** [1] - 45:2
**apologies** [1] - 57:1
**apologize** [2] - 66:25, 78:25
**applied** [1] - 37:8
**apply** [1] - 70:22
**applying** [1] - 37:3
**appoint** [3] - 87:25, 88:3, 88:20
**appointed** [2] - 67:9, 72:18
**appointees** [1] - 63:20
**appreciate** [1] - 5:13
**April** [4] - 57:25, 58:1, 68:6, 68:7
**areas** [1] - 45:19
**argue** [4] - 44:13, 46:20, 53:3, 53:22
**arguing** [2] - 45:1, 56:5
**argument** [1] - 44:22
**arising** [1] - 78:20
**array** [1] - 63:17
**art** [1] - 70:2
**articulate** [1] - 74:14
**assessing** [2] - 21:7, 26:3
**assessment** [2] - 50:15, 50:20
**asset** [2] - 14:15, 27:21
**assets** [8] - 34:9, 34:16, 34:18, 34:20, 72:19, 85:19, 85:23, 86:7
**assist** [1] - 68:7

**assistant** [3] - 63:5, 64:1, 64:2
**association** [1] - 68:19
**Association** [1] - 70:10
**assume** [2] - 20:24, 21:24
**assumptions** [1] - 37:1
**Attari** [30] - 3:4, 5:21, 6:3, 6:10, 7:13, 9:13, 10:2, 10:5, 12:10, 13:11, 14:21, 14:24, 15:5, 15:25, 17:19, 18:20, 20:9, 21:4, 28:21, 29:4, 30:20, 40:22, 41:5, 42:4, 43:15, 51:13, 51:22, 51:23, 52:2
**Attari's** [1] - 5:12
**attempted** [1] - 8:6
**attempting** [2] - 44:11, 51:23
**attended** [1] - 50:10
**attractions** [1] - 76:4
**audience** [1] - 44:16
**August** [16] - 13:18, 14:3, 14:6, 15:6, 16:1, 16:4, 19:4, 19:7, 22:3, 22:6, 22:18, 23:6, 43:20, 49:14, 67:15
**authorities** [2] - 66:21, 66:22, 87:3
**authority** [11] - 67:19, 87:5, 87:8, 87:24, 88:1, 88:6, 88:7, 88:9, 88:12, 88:17, 88:20
**available** [4] - 10:7, 10:16, 10:19, 26:5
**aware** [7] - 8:12, 8:16, 11:19, 11:24, 14:12, 43:18, 58:12

**B**

**bachelor's** [2] - 60:20, 60:23
**backed** [10] - 12:24, 13:1, 13:5, 13:9, 29:20, 73:9, 75:24, 82:13, 82:15, 83:22
**background** [3] - 60:19, 65:12, 73:1
**backstop** [1] - 76:23
**backward** [2] - 28:7, 28:8
**backward-looking** [2]

- 28:7, 28:8
**backwards** [1] - 62:2
**bad** [1] - 81:15
**bag** [1] - 26:22
**balance** [3] - 34:6, 34:11, 70:4
**bank** [9] - 71:21, 79:22, 79:25, 80:5, 80:24, 85:1, 85:2, 85:3
**bankrupt** [1] - 82:20
**bankruptcy** [1] - 72:16
**Banks** [2] - 66:3, 66:15
**banks** [9] - 68:20, 71:15, 71:16, 71:19, 71:22, 79:19, 85:5, 85:6
**bar** [1] - 32:3
**Barclays** [12] - 49:1, 49:6, 49:8, 49:9, 49:12, 49:15, 49:17, 49:19, 50:1, 53:23, 54:5
**bars** [1] - 82:11
**base** [1] - 27:22
**based** [7] - 8:6, 10:6, 10:16, 27:22, 28:1, 51:4, 70:23
**baseline** [3] - 40:1, 40:8, 40:17
**basic** [1] - 64:24
**basis** [10] - 12:1, 36:7, 36:11, 36:17, 37:2, 37:7, 37:15, 56:21
**Bates** [4] - 14:25, 20:23, 21:19, 37:20
**became** [11] - 14:4, 14:11, 61:6, 61:24, 63:11, 63:16, 64:19, 64:20, 66:9, 67:16, 78:8
**become** [2] - 13:14, 88:3
**becomes** [1] - 40:7
**becoming** [2] - 84:11, 85:6
**began** [1] - 61:12
**beginning** [7] - 10:7, 14:25, 42:17, 73:16, 81:11, 81:12, 87:16
**behalf** [6] - 5:24, 44:2, 44:21, 45:17, 53:7, 75:19
**belief** [1] - 50:17
**below** [2] - 20:1, 42:18
**bench** [1] - 56:9
**Bench** [1] - 44:1
**benefits** [1] - 71:5
**Beth** [1] - 20:14

**better** [1] - 46:8
**between** [14] - 6:10, 13:12, 34:14, 43:6, 46:4, 49:23, 65:22, 71:17, 72:8, 75:2, 77:13, 78:6, 80:24, 85:2
**beyond** [4] - 25:7, 25:15, 30:10, 80:1
**big** [1] - 52:10
**billion** [17] - 6:24, 7:3, 8:24, 10:7, 10:20, 11:12, 11:13, 25:7, 25:18, 33:21, 34:4, 34:5, 35:22, 37:4, 37:11, 37:12
**bit** [7] - 42:10, 42:19, 49:4, 59:7, 62:3, 62:5, 64:21
**block** [1] - 39:6
**blow** [3] - 30:18, 32:9, 33:9
**BNP** [1] - 16:11
**boards** [1] - 72:13
**bond** [4] - 13:12, 14:1, 29:8, 29:9
**bondholders** [2] - 13:19, 31:11
**bonds** [16] - 13:6, 13:12, 13:13, 13:14, 14:10, 29:12, 29:14, 29:16, 29:20, 29:24, 29:25, 30:9, 33:3, 88:14
**borrow** [2] - 83:7, 83:9
**borrower** [8] - 14:2, 75:14, 75:15, 75:16, 75:18, 75:25, 76:2, 81:18
**borrowers** [4] - 79:7, 79:17, 79:20, 82:1
**borrowing** [1] - 83:6
**bottom** [5] - 35:7, 38:5, 50:2, 54:4, 89:1
**bought** [2] - 76:20, 76:21
**Bowler** [3] - 20:13, 22:3, 22:18
**box** [3] - 32:9, 35:7, 35:10
**boxes** [1] - 35:14
**BPS** [1] - 36:1
**break** [4] - 44:12, 45:2, 88:7, 88:17
**brewing** [1] - 62:13
**briefly** [6] - 12:24, 32:1, 63:24, 65:8, 68:10, 74:11
**bring** [5] - 5:9, 32:23,

53:8, 59:19, 74:9
**broader** [3] - 66:13, 66:21, 79:15
**bubble** [1] - 82:5
**build** [3] - 24:2, 24:21, 33:23
**building** [1] - 24:14
**bulk** [1] - 42:12
**bullet** [13] - 9:24, 16:8, 16:17, 23:11, 23:21, 23:25, 24:24, 24:25, 39:6, 39:21, 39:22, 39:23, 40:8
**bundle** [1] - 75:9
**bursting** [1] - 82:5
**Bush** [2] - 69:9
**business** [3] - 75:22, 81:17, 83:7
**businesses** [1] - 85:3
**buy** [2] - 73:8, 75:6

# C

**calculate** [3] - 8:1, 8:14, 8:17
**California** [1] - 26:22
**callout** [1] - 16:23
**calming** [1] - 51:18
**capacity** [3] - 31:1, 40:6, 77:25
**capital** [1] - 24:2, 24:14, 24:21, 34:18, 70:5, 76:22, 82:7, 82:10, 82:12, 82:15, 82:17, 84:24, 85:11
**career** [4] - 61:11, 61:12, 63:18, 69:1
**carry** [1] - 66:22
**carrying** [1] - 74:4
**cartoon** [1] - 32:3
**case** [15] - 26:10, 27:3, 45:10, 49:24, 55:17, 57:11, 58:5, 58:22, 59:2, 72:6, 76:15, 82:25, 89:4, 89:5
**Case** [3] - 5:4, 42:2, 43:3
**Case-Shiller** [2] - 42:2, 43:3
**cases** [1] - 76:10
**cash** [1] - 83:20
**catastrophic** [2] - 81:14, 82:5
**catch** [1] - 68:10
**caught** [1] - 26:24
**CEO** [1] - 50:6
**certain** [5] - 36:21, 48:14, 71:5, 71:6, 78:15
**certainly** [4] - 61:11,

69:23, 71:20, 78:8
**CFO** [1] - 55:15
**chain** [4] - 19:19, 20:6, 20:16, 50:19
**change** [4] - 7:5, 21:13, 23:6, 67:14
**changed** [2] - 54:10, 67:12
**charter** [2] - 73:14, 73:16
**chartered** [1] - 71:1
**checked** [1] - 20:24
**chief** [6] - 58:22, 61:22, 64:15, 65:2, 65:10, 67:4
**choose** [1] - 76:10
**circular** [13] - 12:17, 21:1, 21:3, 21:12, 26:11, 31:9, 31:10, 32:17, 32:19, 33:25, 34:1, 41:10, 41:11
**cited** [2] - 18:1, 18:4
**civil** [1] - 61:11
**Civil** [1] - 5:3
**claims** [1] - 72:19
**Class** [1] - 5:5
**clear** [5] - 8:4, 54:18, 58:23, 76:12
**Clinton** [1] - 69:9
**clips** [1] - 58:3
**close** [1] - 36:10
**Code** [1] - 86:21
**cohort** [1] - 14:15
**collaborative** [2] - 56:10, 58:8
**College** [1] - 60:25
**colloquial** [1] - 86:3
**column** [1] - 89:2
**combination** [1] - 88:19
**combined** [1] - 37:12
**coming** [5] - 13:24, 33:15, 76:4, 79:12, 79:24
**commentary** [1] - 53:20
**commercial** [6] - 71:14, 71:16, 71:19, 71:21, 71:22, 85:8
**commissioner** [2] - 64:1, 64:3
**Commitment** [1] - 35:8
**commitment** [26] - 6:6, 7:3, 7:6, 8:2, 8:14, 8:18, 8:22, 8:23, 10:6, 10:7, 10:16, 10:19, 10:23, 11:10, 11:21, 12:1, 12:16, 21:9, 29:21,

29:23, 30:4, 30:7, 31:13, 35:12, 37:4, 40:13
**committee** [1] - 31:23
**common** [1] - 24:9
**Companies** [1] - 80:20
**companies** [20] - 11:3, 30:22, 33:4, 36:19, 68:21, 69:24, 70:3, 70:20, 70:24, 71:1, 74:3, 74:9, 75:2, 76:20, 79:13, 80:16, 80:19, 82:18, 83:23
**Company** [2] - 80:19, 80:21
**company** [5] - 72:10, 72:12, 72:15, 72:17, 80:17
**comparing** [1] - 36:16
**comparison** [2] - 6:10, 34:14
**complete** [1] - 75:23
**completely** [1] - 12:15
**completeness** [1] - 56:3
**concern** [8] - 14:1, 49:7, 50:9, 50:11, 50:16, 52:21, 83:1, 83:4
**concerned** [1] - 14:4
**concerns** [4] - 49:16, 51:4, 51:19, 53:24
**conclusion** [1] - 72:18
**conditions** [1] - 12:12
**conducted** [2] - 40:9, 40:17
**conference** [2] - 44:1, 46:3
**confidence** [4] - 30:25, 34:21, 34:23, 51:10
**confident** [2] - 31:12, 76:7
**confirm** [1] - 47:10
**confirmed** [1] - 68:4
**confirms** [1] - 53:23
**Congress** [10] - 62:19, 66:1, 71:1, 71:2, 71:5, 71:10, 72:2, 73:17, 73:25, 86:13
**connection** [3] - 28:11, 84:17, 84:18
**connections** [2] - 49:23, 52:24
**cons** [1] - 28:16
**conservative** [4] - 40:1, 40:8, 40:16, 85:7
**conservator** [14] - 17:11, 26:19, 27:2,

40:1, 72:11, 72:12, 72:13, 74:1, 74:2, 74:3, 77:12, 87:25, 88:3, 88:20
**conservator's** [2] - 12:11, 21:8
**conservatorship** [16] - 16:18, 24:2, 24:15, 30:23, 30:24, 72:5, 72:8, 72:10, 74:7, 77:7, 77:10, 87:6, 87:7, 87:21, 87:23, 88:22
**consider** [4] - 24:6, 24:13, 26:10, 41:1
**considered** [1] - 17:20, 17:24, 18:5, 20:21, 21:7, 21:11, 21:23, 37:16, 40:6, 41:6, 52:18
**considering** [1] - 10:25
**consistent** [4] - 31:4, 50:19, 51:7, 52:25
**consistently** [1] - 33:23
**consumer** [1] - 85:8
**consumers** [2] - 75:3, 76:10
**contemporaneous** [1] - 27:15
**contend** [1] - 52:15
**contending** [1] - 55:24
**context** [9] - 8:23, 16:25, 34:6, 34:11, 42:10, 56:23, 59:7, 76:16, 77:21
**continue** [5] - 5:21, 17:6, 33:17, 51:5, 82:2
**continued** [3] - 4:1, 4:2, 55:4
**continues** [1] - 72:15
**continuing** [2] - 6:1, 51:1
**Continuing** [1] - 3:4
**contravenes** [2] - 53:11, 54:25
**contributes** [1] - 85:13
**control** [1] - 72:11
**controls** [1] - 70:7
**convincing** [2] - 16:15, 16:24
**COO** [2] - 65:3, 65:5
**copied** [2] - 37:24, 38:5
**copy** [2] - 47:6, 48:23
**corner** [2] - 9:25, 14:25

**Corporation** [1] - 70:13
**corporation** [1] - 72:1
**corporations** [1] - 71:3
**correct** [81] - 6:12, 6:16, 7:15, 7:19, 7:23, 7:24, 8:2, 8:3, 8:7, 8:8, 8:15, 8:20, 9:14, 9:17, 9:20, 10:13, 10:17, 10:24, 11:17, 12:12, 12:21, 13:2, 13:7, 13:10, 13:15, 13:21, 14:2, 14:8, 15:10, 16:2, 16:12, 16:16, 17:4, 17:8, 17:24, 18:3, 18:6, 18:10, 18:14, 18:25, 19:5, 19:12, 19:16, 20:11, 20:14, 20:22, 21:2, 21:3, 21:9, 21:12, 21:20, 22:4, 22:10, 22:19, 23:8, 23:13, 24:5, 24:12, 25:4, 26:6, 26:8, 26:12, 27:4, 27:17, 27:18, 28:17, 32:6, 36:9, 37:22, 37:23, 38:6, 38:9, 38:17, 38:23, 40:18, 42:6, 43:16, 43:20, 51:3, 56:7, 88:4
**correcting** [1] - 11:23
**correctly** [3] - 10:10, 17:13, 17:14
**cost** [3] - 11:12, 83:7, 84:7
**costs** [1] - 83:6
**Council** [2] - 68:17, 68:18
**counsel** [6] - 43:25, 44:10, 46:4, 51:21, 57:22
**counter** [2] - 56:3, 58:1
**counter-designations** [2] - 56:3, 58:1
**counters** [1] - 56:19
**counting** [2] - 76:1, 76:2
**country** [1] - 81:22
**country's** [1] - 83:16
**couple** [8] - 6:5, 29:7, 45:7, 45:12, 57:22, 69:17, 83:5, 85:14
**coupon** [1] - 54:10
**course** [5] - 13:22, 53:16, 65:12, 76:13, 83:9

**COURT** [54] - 5:8, 5:15, 5:17, 5:19, 9:5, 9:7, 9:9, 15:14, 15:17, 15:20, 25:11, 25:21, 27:25, 28:2, 28:24, 30:2, 30:12, 43:9, 43:23, 43:25, 44:18, 45:4, 45:7, 45:12, 45:15, 45:22, 46:2, 46:6, 46:14, 46:19, 46:23, 47:8, 47:11, 47:20, 47:23, 48:2, 48:4, 48:8, 48:10, 48:15, 53:5, 55:2, 55:7, 56:25, 57:5, 57:8, 59:10, 59:13, 59:17, 59:19, 59:21, 60:2, 60:8, 89:3
**court** [2] - 45:6, 64:8
**Court** [3] - 5:11, 47:5, 49:9
**Court's** [4] - 5:13, 28:20, 45:23, 78:21
**COURTROOM** [3] - 5:3, 60:3, 60:6
**cover** [1] - 32:14
**coverage** [2] - 54:15, 54:22
**covered** [1] - 43:7
**covering** [1] - 84:24
**cracks** [1] - 78:14
**create** [4] - 58:10, 66:4, 67:8, 73:7
**created** [15] - 63:11, 65:1, 65:20, 65:21, 65:23, 65:25, 66:7, 71:2, 73:5, 73:6, 73:7, 77:13, 87:1
**creates** [2] - 59:4, 80:18
**Credit** [2] - 50:8
**credit** [8] - 23:12, 29:9, 29:13, 29:16, 29:19, 29:24, 49:22, 81:17
**creditors** [3] - 31:10, 34:21, 34:23
**crisis** [12] - 13:24, 14:11, 42:13, 62:13, 62:15, 77:19, 77:20, 81:4, 81:6, 81:11, 81:13, 86:14
**critical** [2] - 74:1, 74:7
**cross** [2] - 54:2, 58:18
**CROSS** [1] - 6:1
**Cross** [1] - 3:4
**CROSS-EXAMINATION** [1] - 6:1

**Cross-Examination** [1] - 3:4
**cross-examine** [1] - 54:2
**cumulative** [2] - 41:16, 41:19
**current** [2] - 17:3, 31:3
**curtailed** [1] - 17:3
**cycle** [1] - 84:20

---

# D

**Dame** [1] - 60:23
**date** [4] - 9:18, 27:9, 56:8, 68:10
**dated** [7] - 15:5, 16:1, 18:20, 22:3, 31:22, 43:16, 43:19
**day-to-day** [2] - 65:11, 83:8
**days** [2] - 16:4, 22:12
**de** [4] - 34:6, 34:11, 34:20, 34:22
**deadline** [3] - 56:14, 57:23, 58:1
**deal** [3] - 6:19, 43:1, 78:17
**December** [2] - 32:21, 68:4
**decision** [13] - 18:14, 26:6, 27:7, 27:22, 28:17, 49:3, 53:15, 53:18, 54:1, 54:13, 54:17, 72:14
**decision-makers** [1] - 49:3
**decision-making** [6] - 53:15, 53:18, 54:1, 54:13, 54:17, 72:14
**decisions** [1] - 74:1
**declares** [1] - 73:17
**decline** [4] - 17:7, 79:2, 79:3, 79:6
**declined** [1] - 79:9
**declines** [1] - 13:13
**declining** [2] - 14:7, 14:10
**deemed** [2] - 29:16, 71:10
**default** [2] - 29:17, 36:24
**defaulted** [2] - 79:18, 79:20
**defaulting** [1] - 80:11
**defaults** [2] - 79:12, 80:24
**defendants** [20] - 44:3, 44:7, 44:21, 45:17, 46:24, 47:17, 48:12, 48:13, 48:20,

53:13, 54:11, 54:21, 55:10, 58:4, 58:15, 58:23, 59:1, 59:13, 59:22, 60:1
**Defendants'** [32] - 3:15, 3:16, 3:16, 3:17, 3:17, 3:18, 3:18, 3:19, 3:19, 3:20, 3:20, 3:21, 3:21, 3:22, 3:22, 3:23, 3:23, 3:24, 3:24, 3:25, 3:25, 4:3, 4:4, 4:4, 4:5, 4:5, 46:25, 47:12, 48:19, 48:22, 48:25, 55:6
**defendants'** [6] - 44:10, 46:4, 46:16, 46:17, 53:10, 55:17
**deferred** [1] - 27:21
**definition** [3] - 85:16, 85:20, 85:24
**degree** [2] - 60:20, 60:23
**DeLeo** [4] - 50:13, 50:17, 50:20
**DeLeo's** [1] - 50:14
**delinquencies** [4] - 78:20, 81:22, 84:20, 84:22
**Delinquency** [1] - 17:6
**delinquent** [2] - 79:7, 79:9
**DeMarco** [32] - 3:6, 8:16, 15:6, 27:3, 27:16, 31:5, 44:5, 49:2, 50:18, 50:21, 50:24, 51:1, 51:3, 51:9, 51:17, 52:9, 52:18, 54:13, 54:17, 55:10, 57:18, 59:17, 60:1, 60:12, 60:17, 60:18, 61:1, 61:2, 61:3, 61:4, 62:1, 78:22
**DeMarco's** [4] - 51:7, 51:19, 53:25, 54:22
**Democrats** [2] - 69:12, 69:13
**demonstrated** [1] - 56:8
**demonstratives** [1] - 42:1
**Department** [9] - 18:2, 18:9, 61:15, 61:16, 61:17, 63:5, 63:19, 66:5, 87:9
**deposit** [2] - 71:23, 72:1
**deposition** [11] - 27:10, 44:8, 44:25,

45:21, 46:22, 55:11, 55:14, 55:16, 56:6, 57:24, 58:3
**depositions** [1] - 27:12
**deputy** [9] - 61:22, 64:2, 64:3, 64:15, 65:2, 65:5, 67:2, 67:6, 67:9
**DEPUTY** [3] - 5:3, 60:3, 60:6
**describe** [5] - 7:25, 61:4, 74:11, 85:18, 86:23
**described** [6] - 12:10, 81:12, 83:2, 85:22, 86:9, 87:1
**describing** [3] - 27:16, 81:1, 86:14
**designated** [2] - 58:15, 67:17
**designating** [1] - 14:15
**designations** [4] - 56:3, 56:6, 57:24, 58:1
**designed** [1] - 71:21
**detail** [1] - 74:10
**details** [1] - 89:5
**determine** [1] - 8:6
**determining** [1] - 27:20
**Development** [1] - 66:6
**Dharan** [1] - 42:8
**difference** [3] - 65:19, 71:17, 72:8
**different** [8] - 11:4, 35:12, 36:18, 36:24, 66:11, 66:12, 76:17, 76:18
**difficulty** [1] - 85:11
**direct** [9] - 6:14, 8:4, 12:10, 13:25, 26:19, 27:14, 58:18, 83:16, 84:13
**DIRECT** [1] - 60:10
**Direct** [1] - 3:6
**directed** [2] - 33:6, 66:1
**direction** [1] - 72:12
**directly** [2] - 62:14, 84:6
**Director** [3] - 65:6, 67:2, 67:16
**director** [20] - 61:6, 61:22, 63:13, 63:16, 64:15, 65:2, 65:5, 65:6, 65:13, 66:8, 66:9, 67:2, 67:6,

67:9, 67:16, 67:18, 67:20, 67:25, 68:2, 73:24
**directors** [1] - 72:13
**disclosed** [2] - 56:1, 56:5
**disclosing** [1] - 57:24
**disclosures** [1] - 56:11
**discuss** [1] - 5:11
**discussing** [1] - 46:15
**dispose** [1] - 79:22
**dispute** [3] - 45:19, 45:21, 59:4
**disputed** [1] - 59:1
**disputes** [1] - 58:9
**distinction** [1] - 83:13
**distress** [2] - 78:17, 80:10
**dividend** [4] - 19:16, 25:8, 25:18, 32:14
**dividends** [9] - 12:18, 21:9, 33:20, 33:23, 41:20, 77:5, 77:7, 77:11, 77:12
**Division** [1] - 67:3
**Doc** [1] - 50:2
**DOC** [1] - 50:3
**document** [61] - 9:13, 9:16, 9:18, 10:2, 10:15, 10:22, 11:16, 11:22, 12:2, 12:5, 14:18, 16:9, 17:1, 17:23, 17:24, 20:21, 21:1, 21:4, 21:6, 21:11, 21:15, 21:19, 21:22, 22:1, 22:24, 23:5, 23:20, 24:1, 24:20, 30:16, 31:20, 32:25, 35:2, 36:9, 37:19, 37:22, 37:24, 38:1, 38:22, 39:10, 39:15, 39:16, 39:18, 39:21, 40:22, 40:24, 41:5, 41:8, 43:16, 45:20, 49:5, 51:6, 51:16, 53:1, 53:4, 53:9, 53:16, 54:3, 54:19, 57:13, 58:21
**document-reader** [1] - 57:13
**documents** [16] - 8:8, 11:19, 11:24, 12:3, 17:20, 18:2, 18:9, 18:11, 18:13, 25:17, 25:22, 25:25, 48:14, 57:14, 58:22, 58:25
**done** [5] - 5:15, 16:18, 38:14, 47:22, 56:20
**down** [28] - 7:10, 11:7,

17:16, 23:2, 23:22, 24:7, 24:17, 24:18, 24:22, 24:25, 25:3, 36:21, 36:23, 38:3, 39:7, 39:9, 39:11, 43:23, 45:20, 58:13, 62:5, 67:17, 79:24, 81:21, 82:2, 84:9, 85:12, 88:11
**downgrade** [1] - 54:8
**downgraded** [1] - 30:9
**downs** [2] - 33:19, 42:24
**downturn** [1] - 85:13
**Dr** [34] - 5:12, 5:21, 6:3, 6:10, 7:13, 9:13, 10:2, 10:5, 12:10, 13:11, 14:21, 14:24, 15:5, 15:25, 17:19, 18:20, 20:9, 21:4, 22:9, 29:4, 30:20, 36:6, 37:2, 37:13, 40:22, 41:5, 42:4, 42:8, 43:15, 51:13, 51:22, 51:23, 52:2, 61:2
**draw** [4] - 12:16, 12:21, 32:20, 83:12
**draws** [16] - 12:17, 21:2, 21:3, 21:8, 21:12, 26:12, 31:9, 31:10, 32:17, 33:25, 34:1, 41:10, 41:11, 41:16, 41:20
**driven** [2] - 23:12, 23:15
**dual** [1] - 30:24
**due** [1] - 14:14
**during** [4] - 58:22, 63:13, 69:5, 73:24
**duty** [1] - 74:2
**DX** [2] - 46:25, 48:2
**DX1** [1] - 73:11
**DX100** [1] - 47:2
**DX163** [1] - 47:2
**DX164** [1] - 47:2
**DX206** [1] - 47:2
**DX207** [1] - 47:2
**DX209** [1] - 47:2
**DX233** [3] - 47:3, 47:4, 47:7
**DX282** [1] - 47:2
**DX346** [3] - 40:20, 43:12, 47:3
**DX374** [1] - 47:3
**DX380-A** [1] - 49:9
**DX4** [1] - 47:1
**DX404** [1] - 47:3
**DX444** [1] - 47:3
**DX49** [1] - 47:1

**DX539** [1] - 47:3
**DX549** [1] - 53:8
**DX58** [2] - 47:1, 87:11
**DX78** [1] - 47:1
**DX79** [1] - 47:1
**DX84** [1] - 47:1
**DX85** [1] - 47:1
**DX86** [1] - 47:1
**DX89** [1] - 47:1
**DX90** [1] - 47:2
**DX99** [1] - 47:2

## E

**early** [4] - 30:20, 30:22, 49:7, 65:1
**earning** [4] - 10:15, 10:23, 11:20, 11:25
**Earnings** [1] - 32:13
**earnings** [6] - 21:4, 23:7, 23:12, 23:15, 33:18, 35:17
**earthquake** [2] - 26:23
**eating** [1] - 84:24
**Economic** [2] - 65:16, 86:18
**economic** [6] - 12:12, 64:4, 74:8, 81:4, 85:12, 86:13
**economically** [1] - 26:3
**economics** [2] - 60:21, 60:24
**economies** [1] - 79:5
**economist** [1] - 63:4
**economy** [5] - 79:4, 79:15, 80:9, 81:24, 85:10
**Ed** [4] - 3:6, 49:2, 60:1, 60:17
**educational** [1] - 60:18
**Edward** [1] - 15:6
**Edwards** [1] - 89:9
**effect** [11] - 54:12, 54:13, 79:18, 80:6, 80:8, 80:12, 80:18, 81:3, 81:11, 81:12
**effort** [1] - 45:18
**eight** [2] - 16:4, 69:2
**either** [3] - 8:5, 46:7, 85:7
**eliminated** [2] - 12:15, 31:9
**eliminating** [1] - 21:8
**email** [22] - 15:3, 15:5, 15:25, 16:14, 18:18, 18:20, 18:23, 19:19, 19:21, 19:25, 20:6, 20:8, 20:11, 20:16,

22:3, 22:17, 27:15, 49:25, 50:2, 50:12, 50:19, 54:17
**emails** [1] - 38:15
**emergency** [1] - 26:22
**employees** [1] - 34:23
**employment** [3] - 61:4, 61:9, 85:3
**enacted** [1] - 86:18
**enactment** [2] - 66:7, 66:9
**end** [6] - 16:16, 16:19, 20:18, 24:3, 40:7, 68:6
**ending** [1] - 32:21
**ends** [1] - 82:16
**English** [1] - 88:2
**enhance** [1] - 30:25
**ensure** [4] - 31:10, 69:24, 71:11, 74:7
**ensuring** [1] - 74:18
**enter** [1] - 27:7
**entered** [1] - 16:18
**enterprise** [3] - 13:12, 13:14, 63:12
**Enterprise** [3] - 61:21, 64:12, 77:23
**enterprises** [2] - 62:20, 63:9
**entities** [2] - 75:3, 87:25
**entitled** [5] - 9:19, 18:6, 22:17, 22:24, 23:20
**environment** [1] - 74:8
**equaled** [1] - 23:20
**equity** [8] - 6:18, 6:22, 10:9, 34:9, 34:22, 35:21, 35:24, 76:21
**equivalent** [1] - 71:25
**eroded** [1] - 31:14
**essentially** [1] - 34:13
**estimated** [1] - 18:24
**evaluated** [1] - 35:13
**evaluating** [1] - 36:10
**event** [2] - 13:7, 23:16
**everyday** [1] - 84:13
**evidence** [22] - 8:5, 9:2, 9:11, 15:21, 25:5, 25:16, 44:5, 46:25, 47:14, 48:17, 48:20, 49:24, 51:23, 52:2, 52:11, 52:15, 52:18, 54:11, 55:6, 56:15, 58:6, 74:12
**exacerbated** [1] - 31:2
**exact** [1] - 49:16
**exactly** [1] - 46:9
**examination** [5] - 5:22, 6:14, 8:4,

12:10, 39:18
**Examination** [4] - 3:4, 3:5, 3:5, 3:6
**EXAMINATION** [4] - 6:1, 29:2, 43:13, 60:10
**examine** [1] - 54:2
**example** [4] - 54:3, 54:7, 73:4, 81:1
**examples** [1] - 49:25
**exceed** [2] - 85:19, 86:7
**exceeding** [1] - 85:23
**excerpt** [3] - 47:4, 47:6, 87:13
**excess** [2] - 25:7, 25:18
**exchange** [1] - 56:6
**exclude** [1] - 56:22
**excuse** [1] - 45:8
**excused** [1] - 43:24
**executed** [1] - 51:2
**exercise** [4] - 10:23, 10:24, 11:14, 11:15
**Exhibit** [48] - 3:9, 3:10, 3:10, 3:11, 3:11, 3:12, 3:12, 3:13, 3:13, 3:15, 3:16, 3:16, 3:17, 3:17, 3:18, 3:18, 3:19, 3:19, 3:20, 3:20, 3:21, 3:21, 3:22, 3:22, 3:23, 3:23, 3:24, 3:24, 3:25, 3:25, 4:3, 4:4, 4:4, 4:5, 4:5, 9:1, 9:4, 9:11, 15:21, 18:17, 21:17, 47:1, 47:12, 48:16, 48:19, 48:23, 48:25, 55:6
**exhibit** [2] - 45:1, 48:3
**Exhibits** [2] - 3:8, 4:2
**exhibits** [5] - 44:4, 46:13, 46:17, 47:17, 56:13
**exist** [1] - 29:23
**exit** [1] - 24:2
**exiting** [1] - 24:14
**expanded** [2] - 66:19, 87:8
**expect** [2] - 11:8, 17:7
**expected** [8] - 21:5, 27:22, 32:14, 38:9, 40:10, 40:11, 75:20, 79:8
**experience** [2] - 33:19, 70:23
**experienced** [1] - 12:22
**expert** [7] - 18:1,

20:22, 25:4, 26:9, 28:11, 30:11, 41:1
**expiration** [1] - 40:12
**explain** [4] - 62:11, 65:19, 69:21, 73:3
**explained** [1] - 59:2
**exposure** [1] - 36:19
**express** [1] - 14:1
**expressed** [2] - 25:17, 40:16
**expressing** [1] - 51:10
**extensive** [1] - 44:22
**extent** [2] - 14:7, 57:7
**externally** [1] - 19:4
**extreme** [1] - 83:21
**extremely** [1] - 55:19

## F

**face** [1] - 20:25
**facilitate** [1] - 52:19
**fact** [7] - 7:21, 30:3, 42:25, 55:9, 58:7, 71:22, 87:9
**factor** [1] - 42:6
**factored** [4] - 53:14, 53:17, 53:25, 54:16
**factors** [1] - 36:19
**failed** [2] - 72:17, 78:18
**failing** [5] - 78:15, 79:7, 79:14, 80:10, 85:6
**fails** [3] - 75:16, 76:3, 80:19
**failure** [1] - 80:17, 80:20
**failures** [1] - 80:5
**fairly** [1] - 11:1
**faith** [1] - 45:18
**fallen** [1] - 42:18
**familiar** [4] - 9:13, 42:2, 74:15, 86:3
**Fannie** [104] - 5:4, 6:11, 7:25, 12:15, 12:20, 13:5, 13:20, 14:4, 15:8, 16:18, 18:25, 19:3, 19:7, 19:11, 19:14, 22:14, 22:15, 24:14, 27:17, 27:20, 28:12, 29:13, 29:19, 29:24, 30:8, 30:25, 31:11, 32:3, 32:16, 33:4, 33:21, 34:4, 37:3, 37:8, 37:12, 40:9, 40:12, 41:10, 41:11, 41:14, 41:15, 41:23, 42:6, 42:22, 49:21, 54:7, 54:8, 62:21, 64:24,

64:25, 66:14, 66:16, 70:8, 70:9, 70:14, 70:15, 70:19, 70:24, 71:2, 71:5, 71:18, 71:24, 72:21, 73:1, 73:4, 73:6, 73:15, 74:1, 74:6, 74:14, 74:20, 74:23, 75:6, 75:17, 75:21, 76:1, 76:2, 76:21, 76:22, 76:23, 81:13, 81:14, 81:16, 81:19, 81:25, 82:2, 82:6, 82:12, 82:14, 82:19, 83:6, 83:19, 83:20, 83:24, 84:22, 86:15, 86:25, 87:5, 88:3, 88:10, 88:15, 88:17
**Fannie's** [1] - 32:4
**far** [1] - 58:6
**faster** [4] - 23:22, 24:7, 24:17, 24:25
**Federal** [12] - 61:20, 61:24, 64:12, 66:2, 66:3, 66:15, 70:10, 70:13, 73:8, 77:23, 87:2
**federal** [2] - 66:2, 71:23
**fee** [16] - 6:6, 7:3, 7:7, 8:2, 8:14, 8:18, 8:22, 10:6, 10:8, 10:23, 11:10, 11:21, 12:1, 35:16, 35:18, 37:14
**Fee** [1] - 35:8
**fees** [2] - 35:12, 35:24
**fell** [2] - 7:5, 7:7
**fellow** [1] - 68:13
**few** [6] - 5:12, 26:18, 45:5, 45:8, 49:25, 82:10
**FHA** [2] - 73:7, 73:9
**FHA-backed** [1] - 73:9
**FHFA** [77] - 7:25, 8:5, 8:13, 8:17, 9:19, 14:12, 14:25, 15:9, 17:11, 18:23, 19:11, 25:5, 25:17, 25:22, 25:25, 28:5, 28:11, 28:13, 28:16, 37:25, 38:5, 38:10, 38:11, 38:16, 39:1, 39:16, 40:9, 40:17, 40:19, 41:6, 43:16, 43:18, 49:3, 49:11, 49:18, 50:1, 50:12, 51:23, 52:3, 61:6, 61:10, 64:19, 64:20, 65:17, 65:20, 65:21, 65:23, 65:24, 66:4, 66:6,

66:7, 66:8, 66:10, 66:11, 66:12, 66:19, 66:21, 67:1, 67:8, 67:12, 67:16, 67:22, 68:11, 68:12, 69:14, 69:18, 69:21, 73:24, 77:14, 87:7, 87:18, 87:24, 88:2, 88:20, 88:21
**FHFA's** [2] - 51:15, 53:15
**Fierce** [1] - 17:10
**Figure** [4] - 41:3, 41:8, 41:18, 41:19
**filed** [2] - 19:3, 19:11
**final** [3] - 16:8, 17:10, 20:6
**finally** [1] - 50:19
**Finance** [4] - 61:24, 66:2, 87:2, 87:3
**finance** [5] - 62:8, 62:14, 62:18, 63:9, 68:20
**financial** [20] - 14:11, 18:25, 31:21, 42:6, 52:17, 63:5, 63:6, 63:7, 63:18, 69:25, 70:2, 70:4, 71:9, 71:10, 77:19, 77:20, 80:10, 81:6, 81:11, 81:13
**Financial** [1] - 63:15
**financing** [2] - 74:18, 75:4
**fine** [1] - 81:10
**firm** [1] - 72:18
**firms** [1] - 68:19
**first** [24] - 10:2, 16:15, 16:17, 18:18, 23:21, 23:25, 24:24, 27:13, 39:22, 41:11, 50:3, 54:4, 55:21, 57:22, 58:22, 64:13, 66:13, 73:19, 73:25, 74:2, 74:4, 77:22, 79:10
**Fitch** [3] - 33:1, 33:2
**five** [4] - 17:12, 56:12, 69:7, 76:6
**Five** [1] - 15:9
**fixed** [1] - 40:7
**flag** [1] - 5:10
**flexible** [1] - 57:12
**flowing** [1] - 74:19
**focus** [7] - 9:24, 13:17, 18:18, 54:3, 78:7, 78:8, 78:9
**focusing** [1] - 64:20
**folded** [1] - 66:8
**follow** [3] - 29:7, 49:10, 55:19

**follow-up** [2] - 49:10, 55:19
**followed** [1] - 42:25
**following** [1] - 62:17
**forecast** [2] - 31:21, 35:3
**Forecast-3Q** [1] - 9:20
**forecasts** [1] - 40:17
**foreclose** [1] - 82:3
**foreclosure** [1] - 79:21
**forgot** [1] - 58:16
**form** [2] - 24:2, 24:15
**former** [2] - 50:6, 55:15
**forming** [1] - 17:21, 26:9
**forth** [7] - 58:3, 68:21, 70:5, 70:7, 72:20, 80:11, 85:9
**forward** [2] - 19:24, 54:6
**forwarded** [1] - 19:22
**forwarding** [2] - 38:16, 54:14
**Foster** [3] - 18:24, 19:1, 20:13
**foster** [1] - 19:22
**foundation** [3] - 30:1, 43:8, 55:24
**four** [3] - 35:20, 35:21, 67:21
**Freddie** [108] - 6:12, 8:1, 10:3, 11:20, 11:22, 11:23, 11:25, 12:2, 12:3, 12:5, 12:15, 12:20, 13:5, 13:20, 15:9, 16:18, 18:25, 19:3, 19:11, 19:14, 22:9, 22:12, 24:14, 27:17, 27:20, 28:13, 29:13, 29:19, 29:24, 30:8, 30:25, 31:11, 33:5, 33:22, 34:4, 35:3, 36:10, 37:3, 37:8, 37:12, 40:9, 40:12, 41:10, 41:12, 41:23, 42:22, 49:21, 50:7, 50:10, 50:11, 54:7, 54:9, 55:15, 62:22, 64:24, 64:25, 66:14, 66:17, 70:8, 70:12, 70:14, 70:15, 70:19, 70:24, 71:2, 71:5, 71:18, 71:24, 72:21, 73:1, 73:4, 74:6, 74:14, 74:20, 74:23, 75:6, 75:17, 75:21, 76:1, 76:21, 76:22, 76:24, 81:13, 81:14, 81:16,

81:19, 81:25, 82:3, 82:6, 82:12, 82:15, 82:20, 83:5, 83:6, 83:19, 83:21, 83:24, 84:22, 86:15, 86:25, 87:5, 88:4, 88:10, 88:15, 88:18
**Freddie's** [4] - 14:5, 19:6, 42:6, 76:2
**Friday** [6] - 8:21, 13:11, 17:19, 39:19, 49:8, 58:5
**front** [2] - 31:22
**ful** [1] - 74:20
**fulfill** [4] - 31:1, 31:17, 74:14, 74:23
**full** [6] - 26:22, 37:3, 47:5, 57:7, 61:15
**function** [1] - 66:23
**fund** [2] - 33:23, 40:11
**funders** [1] - 75:12
**funding** [11] - 33:20, 40:13, 74:18, 77:13, 85:12, 87:7, 87:8, 88:9, 88:12, 88:21, 88:24
**furiously** [1] - 46:9
**furthered** [2] - 12:11, 21:7
**furthermore** [1] - 82:2
**future** [1] - 17:4
**Fwd** [1] - 15:8

## G

**G-h-o-s-e** [1] - 50:4
**GAO** [6] - 61:15, 62:7, 62:12, 62:18
**General** [1] - 61:13
**gentlemen** [1] - 5:20
**Ghose** [3] - 50:2, 50:3, 50:9
**given** [8] - 6:11, 27:6, 57:16, 65:12, 66:18, 66:23, 88:20
**goal** [6] - 12:11, 21:8, 24:6, 24:13, 30:24, 52:20
**Goals** [1] - 67:3
**goals** [3] - 31:5, 51:15, 51:17
**GOODHART** [6] - 47:24, 48:3, 48:6, 48:9, 48:11, 53:6
**Goodhart** [2] - 47:25, 53:7
**government** [8] - 62:20, 63:8, 63:12, 70:16, 70:18, 72:17, 82:19, 86:11

**Government** [1] - 61:13
**government-sponsored** [3] - 62:20, 63:8, 63:12
**Grant** [2] - 47:24, 53:7
**granted** [1] - 87:24
**graph** [2] - 42:11, 42:15
**graphs** [2] - 32:3, 41:19
**great** [3] - 43:1, 77:20, 78:16
**greater** [2] - 84:10
**ground** [1] - 56:22
**grow** [1] - 82:16
**GSE** [6] - 13:12, 23:7, 29:9, 33:14, 49:21, 63:17
**GSEs** [8] - 16:19, 17:4, 17:7, 23:21, 24:1, 24:7, 24:21, 33:22
**guarantee** [1] - 75:17
**guaranteed** [1] - 77:8
**guaranteeing** [1] - 81:17
**guaranty** [15] - 75:21, 76:2, 76:5, 76:6, 76:8, 76:23, 76:25, 77:1, 77:4, 82:13, 82:15, 82:20, 82:22, 82:23, 83:24
**guess** [1] - 61:1
**guys** [1] - 46:6

### H

**half** [4] - 11:12, 16:15, 61:14, 67:21
**hand** [6] - 9:25, 14:24, 35:15, 48:23, 59:13, 60:3
**handling** [1] - 72:19
**head** [2] - 60:8, 68:22
**header** [2] - 15:3, 22:1
**heading** [1] - 23:5
**hear** [4] - 51:20, 59:8, 59:10, 65:17
**heard** [16] - 49:25, 50:14, 52:25, 53:22, 65:15, 65:16, 72:4, 72:22, 74:12, 76:13, 77:18, 80:12, 81:4, 85:15, 85:18, 85:22
**hearsay** [2] - 53:10, 55:24
**held** [7] - 5:2, 5:18, 45:6, 45:11, 46:3, 59:20, 89:7

**help** [2] - 30:25, 71:6
**helped** [1] - 31:10
**HERA** [17] - 65:15, 65:22, 65:23, 66:1, 66:18, 67:8, 67:19, 86:19, 86:20, 86:23, 87:13, 87:14, 87:20, 88:7, 88:8
**high** [2] - 17:12, 73:3
**High** [1] - 15:9
**higher** [3] - 7:6, 35:23, 35:24
**highlight** [1] - 16:8
**highly** [1] - 52:22
**himself** [1] - 50:21
**history** [3] - 61:5, 61:9, 73:4
**hit** [1] - 78:19
**HOFFMAN** [23] - 5:7, 5:10, 5:16, 9:8, 44:2, 44:20, 45:16, 45:23, 46:5, 46:9, 46:15, 46:20, 46:24, 47:9, 47:15, 47:21, 48:12, 48:18, 55:8, 57:1, 57:6, 57:9, 59:15
**Hoffman** [5] - 44:2, 44:20, 45:15, 45:16, 53:22
**holder** [2] - 75:13, 75:15
**holders** [2] - 82:23, 83:22
**home** [11] - 17:3, 28:6, 28:11, 32:4, 33:13, 33:16, 34:3, 79:1, 79:2, 79:3, 79:5
**Home** [3] - 66:3, 66:15, 70:13
**homes** [1] - 79:18
**Honor** [71] - 5:10, 5:16, 5:23, 9:3, 9:6, 15:12, 15:16, 15:19, 28:22, 28:25, 43:11, 44:2, 44:14, 44:17, 44:20, 45:3, 46:1, 46:5, 46:11, 46:24, 47:6, 47:15, 47:24, 48:12, 48:18, 48:23, 48:25, 49:4, 49:7, 49:19, 49:23, 50:4, 50:22, 50:25, 51:21, 52:10, 52:23, 53:4, 53:6, 53:9, 53:12, 54:21, 55:8, 55:12, 55:13, 55:16, 55:18, 55:22, 56:7, 56:8, 56:9, 56:12, 56:21, 57:1, 57:2, 57:9, 57:12, 57:15, 57:17,

57:20, 58:9, 58:12, 58:24, 59:6, 59:8, 59:16, 59:18, 59:23, 59:24, 60:7, 78:21
**honor** [1] - 82:21
**Honor's** [2] - 53:11, 54:25
**hoping** [1] - 51:9
**host** [1] - 56:12
**hour** [1] - 58:15
**house** [4] - 79:9, 79:23, 81:21, 82:2
**households** [1] - 80:11
**Housing** [14] - 61:21, 61:24, 64:12, 65:16, 66:2, 66:5, 67:3, 68:17, 68:18, 73:8, 77:23, 86:18, 87:2
**housing** [28] - 42:2, 42:5, 42:8, 42:11, 42:12, 42:20, 43:1, 43:3, 43:7, 62:8, 62:14, 62:18, 63:9, 66:17, 66:18, 68:15, 68:20, 78:1, 78:5, 78:9, 78:11, 78:12, 78:13, 78:14, 78:18, 80:1, 82:5
**huge** [1] - 34:10
**hum** [1] - 57:4
**Hume** [1] - 45:24
**hundred** [4] - 36:15, 36:17, 37:7, 87:15

### I

**Ian** [3] - 44:2, 44:20, 45:16
**idea** [1] - 37:10
**identified** [1] - 49:17
**identify** [3] - 8:5, 41:19, 41:21
**impact** [10] - 10:8, 13:8, 35:20, 35:24, 50:24, 52:8, 83:14, 83:15, 84:4, 84:13
**importance** [1] - 75:23
**important** [7] - 18:13, 50:7, 59:6, 66:12, 71:10, 72:2, 75:21
**importantly** [1] - 73:23
**imposes** [1] - 80:21
**improved** [1] - 33:7
**including** [6] - 33:4, 49:18, 50:13, 52:16, 52:23, 58:4
**income** [4] - 40:10, 41:21, 41:23, 77:1
**increase** [4] - 32:5,

33:17, 42:20, 80:4
**increased** [2] - 39:8, 42:9
**independently** [2] - 51:16, 54:9
**index** [8] - 42:2, 42:8, 42:11, 42:14, 42:16, 42:20, 43:3, 43:7
**indicated** [4] - 14:4, 25:2, 54:8, 55:20
**indicates** [2] - 10:5, 57:2
**indicating** [1] - 32:4
**indices** [2] - 28:6, 28:11
**individual** [3] - 18:23, 75:7, 75:24
**indulgence** [3] - 28:20, 45:24, 78:21
**information** [3] - 19:10, 38:8, 51:11
**initial** [3] - 7:3, 14:20, 49:25
**insolvent** [1] - 86:1
**instability** [1] - 31:2
**instead** [3] - 24:19, 47:5, 87:7
**Institute** [1] - 68:13
**institution** [1] - 63:7
**institutions** [4] - 63:6, 69:25, 71:9, 80:10
**Institutions** [1] - 63:16
**insurance** [3] - 68:21, 71:23, 72:1
**intended** [2] - 52:8, 56:2
**interchangeably** [1] - 81:8
**interconnected** [2] - 80:17, 80:20
**interest** [3] - 7:5, 36:20
**intermediate** [1] - 75:1
**internal** [1] - 38:18
**interpret** [2] - 32:16, 41:20
**interpretation** [1] - 24:20
**interpreting** [1] - 36:9
**intervention** [1] - 5:13
**introduce** [1] - 60:14
**introduced** [1] - 9:1
**invest** [3] - 88:13, 88:14, 88:17
**investment** [5] - 6:18, 6:22, 13:14, 39:7, 75:10
**investments** [2] - 24:19, 76:21
**investor** [2] - 75:20,

81:20
**investors** [12] - 14:14, 75:10, 75:11, 75:18, 75:23, 76:7, 76:17, 76:24, 77:1, 82:14, 83:21, 83:25
**involved** [1] - 62:14
**involvement** [1] - 62:8
**issue** [5] - 44:17, 44:23, 46:22, 53:3, 55:9
**issued** [3] - 29:12, 33:4, 53:23
**issues** [3] - 50:16, 62:18, 63:18
**item** [4] - 44:6, 44:7, 73:19
**itself** [4] - 14:12, 22:24, 28:5, 80:3, 80:4, 87:14, 88:3, 88:20

### J

**Jamie** [2] - 50:1, 50:13
**Janet** [1] - 53:8
**January** [5] - 42:9, 42:21, 67:25, 68:5
**Jeff** [3] - 18:24, 19:1, 20:13
**job** [3] - 63:24, 64:14, 67:11
**jobs** [1] - 80:25
**joined** [1] - 78:8
**judge** [1] - 56:23
**judging** [1] - 75:25
**July** [7] - 18:21, 19:22, 19:24, 31:22, 32:17, 65:21, 65:25
**June** [4] - 32:21, 42:9, 42:12, 42:21
**jury** [35] - 5:2, 5:9, 5:17, 5:18, 29:11, 33:1, 44:19, 45:4, 45:11, 49:24, 50:13, 51:20, 52:25, 55:18, 58:16, 58:17, 59:19, 59:20, 59:25, 60:15, 60:16, 61:5, 62:21, 64:21, 65:15, 72:4, 72:22, 74:12, 76:13, 77:18, 78:22, 85:14, 85:22, 87:11, 89:7

### K

**Kari** [3] - 55:14, 57:4, 58:4
**Kari's** [3] - 55:16, 57:11, 58:15
**keep** [3] - 26:22,

39:12, 74:19
**keeping** [2] - 69:11, 72:10
**kept** [1] - 35:23
**key** [1] - 42:5
**kind** [13] - 11:5, 11:6, 16:25, 23:15, 31:9, 31:10, 33:18, 35:18, 50:4, 51:8, 70:17, 84:7, 85:10
**kinds** [1] - 14:10
**knowledge** [2] - 24:9, 77:25
**KRAVETZ** [53] - 5:23, 6:2, 6:7, 6:9, 7:10, 7:12, 8:25, 9:6, 9:10, 9:12, 9:22, 10:1, 12:8, 12:9, 14:22, 14:23, 15:2, 15:4, 15:12, 15:16, 15:22, 15:24, 16:7, 16:10, 17:16, 17:18, 18:16, 18:19, 19:18, 19:20, 20:5, 20:7, 21:16, 21:18, 21:25, 22:2, 22:21, 22:23, 23:2, 23:4, 23:17, 23:19, 25:10, 25:12, 25:23, 28:4, 28:20, 30:1, 30:10, 43:8, 43:11, 43:14, 43:22
**Kravetz** [12] - 5:23, 29:6, 30:16, 31:20, 32:25, 33:6, 35:2, 37:19, 39:15, 39:19, 39:23, 51:25
**Kravetz...** [1] - 3:4
**Kravetz..............** [1] - 3:5

## L

**labeled** [1] - 14:19
**lack** [1] - 55:24
**ladies** [1] - 5:19
**lag** [1] - 43:6
**land** [1] - 70:3
**language** [9] - 7:13, 7:17, 8:8, 10:5, 16:22, 20:16, 23:23, 24:4, 33:6
**large** [1] - 23:12
**Last** [1] - 50:3
**last** [10] - 9:24, 12:25, 20:8, 20:16, 30:18, 32:9, 48:10, 50:19, 56:1, 57:9
**late** [4] - 56:4, 57:23, 58:6, 78:8
**law** [2] - 59:2, 86:21

**lawyers** [2] - 58:12, 72:22
**Layton** [1] - 50:6
**leading** [8] - 14:6, 62:14, 78:2, 78:3, 78:5, 78:11, 86:9
**least** [1] - 69:18
**leave** [1] - 67:22
**Lee** [1] - 57:20
**left** [9] - 35:10, 35:15, 42:14, 42:15, 45:25, 68:11, 68:12, 89:1
**left-hand** [1] - 35:15
**legal** [1] - 45:7
**legislation** [5] - 62:15, 65:23, 66:1, 67:8, 67:19
**legislative** [1] - 25:3
**lender** [3] - 75:7, 75:8, 79:8
**lenders** [10] - 14:4, 73:9, 75:7, 78:15, 78:18, 79:11, 79:12, 83:18, 84:1, 84:8
**less** [6] - 14:1, 14:4, 41:20, 79:24, 82:3, 82:4
**level** [6] - 23:15, 34:20, 34:22, 42:16, 73:3
**levels** [4] - 10:25, 11:3, 35:23, 35:24
**liabilities** [2] - 85:19, 85:23
**liability** [1] - 86:7
**life** [1] - 76:9
**limine** [2] - 53:11, 53:12
**limited** [1] - 33:22
**line** [3] - 35:19, 42:14, 54:6
**lines** [1] - 57:5
**lingo** [1] - 70:11
**liquidity** [2] - 74:15, 74:24
**Lisa** [1] - 89:9
**listed** [1] - 18:8
**litigation** [1] - 18:12
**Litigations** [1] - 5:6
**loan** [5] - 6:25, 17:7, 62:13, 62:15, 79:10
**Loan** [1] - 66:3, 66:15, 70:13
**loan-loss** [1] - 17:7
**loans** [10] - 11:6, 11:7, 36:23, 73:7, 73:8, 75:2, 85:7, 85:8, 85:9
**Lockhart** [4] - 65:7, 66:9, 67:2, 67:17

**locks** [1] - 84:1
**long-term** [2] - 13:21, 75:4
**look** [2] - 24:24, 87:16
**looking** [7] - 11:4, 28:7, 28:8, 35:15, 49:10, 75:24, 76:11
**looks** [2] - 87:11, 87:13
**lose** [1] - 79:12
**losing** [2] - 79:11, 80:25
**loss** [4] - 17:7, 23:12, 40:12, 79:25
**losses** [17] - 11:6, 11:7, 12:22, 17:4, 17:11, 17:12, 36:22, 80:21, 80:24, 82:4, 82:6, 82:16, 82:17, 85:1, 85:2, 85:3
**lost** [1] - 21:10
**lower** [5] - 9:25, 13:25, 14:24, 30:5, 30:7
**lunch** [1] - 89:5

## M

**Mac** [36] - 5:5, 10:3, 30:25, 33:5, 40:9, 40:12, 50:7, 50:10, 50:11, 54:9, 55:15, 62:22, 64:24, 66:14, 70:12, 71:2, 71:24, 75:6, 75:17, 76:1, 76:21, 76:22, 81:14, 81:16, 82:12, 82:20, 83:5, 83:6, 83:19, 83:21, 86:25, 87:6, 88:4, 88:10, 88:15, 88:18
**Mac's** [2] - 54:7, 74:6
**Mae** [34] - 30:25, 33:4, 40:9, 40:12, 54:7, 54:8, 62:21, 64:24, 66:14, 70:9, 71:2, 71:24, 73:6, 73:15, 74:1, 74:6, 75:6, 75:17, 76:1, 76:21, 76:22, 81:14, 81:16, 82:12, 82:19, 83:19, 83:20, 86:25, 87:5, 88:3, 88:10, 88:15, 88:17
**Mae's** [1] - 83:6
**Mae/Freddie** [1] - 5:5
**main** [2] - 24:24, 86:23
**Main** [3] - 83:14, 83:15, 85:2
**maintained** [1] - 31:15
**major** [1] - 69:25,

71:9, 78:17
**makers** [1] - 49:3
**manage** [2] - 87:7, 88:22
**management** [3] - 31:23, 70:6, 72:14
**mandate** [1] - 17:11
**mandatory** [1] - 39:8
**manifest** [1] - 80:3
**manifested** [1] - 80:4
**March** [2] - 32:20, 32:21
**Mario** [1] - 49:3
**marked** [1] - 37:19
**market** [43] - 8:6, 13:1, 14:1, 14:9, 31:3, 31:16, 43:1, 49:7, 50:9, 50:10, 50:11, 51:4, 51:8, 51:10, 51:18, 52:21, 53:20, 62:8, 72:23, 72:24, 73:20, 74:5, 74:6, 74:9, 74:25, 78:1, 78:5, 78:13, 78:14, 78:16, 80:1, 80:7, 80:8, 80:9, 80:25, 83:1, 83:4, 83:12, 83:17, 84:3, 84:7, 84:11
**market's** [1] - 84:9
**market-based** [1] - 8:6
**market-wide** [1] - 14:9
**markets** [3] - 14:11, 51:19, 71:10
**Maryland** [1] - 60:25
**master's** [2] - 60:20, 60:24
**matched** [2] - 51:15, 51:17
**materials** [1] - 18:5
**math** [5] - 11:14, 11:15, 35:19, 37:9, 69:3
**matter** [3] - 34:24, 36:25, 72:4
**matters** [4] - 5:12, 62:14, 63:7, 65:13
**maximum** [1] - 7:2
**MBS** [12] - 75:13, 75:15, 75:18, 76:7, 76:17, 76:24, 77:1, 81:20, 82:13, 82:23, 83:22, 83:25
**McGuire** [19] - 6:7, 7:11, 8:25, 9:22, 9:25, 12:8, 14:22, 15:2, 15:23, 16:8, 17:17, 18:16, 18:18, 19:18, 20:6, 22:22, 23:3, 23:18, 43:12

**mean** [17] - 11:8, 12:2, 20:23, 24:16, 24:17, 34:12, 37:14, 40:10, 41:21, 70:3, 74:17, 80:15, 82:11, 83:15, 85:5, 86:1, 88:11
**meaning** [1] - 37:3
**means** [11] - 23:9, 36:3, 40:17, 69:21, 69:23, 74:18, 79:23, 79:24, 81:25, 85:15, 88:13
**meant** [2] - 63:6, 88:21
**mechanism** [1] - 73:7
**meeting** [3] - 50:7, 50:8, 50:9
**members** [11] - 59:24, 60:14, 60:16, 61:5, 62:21, 64:21, 65:15, 68:22, 74:12, 78:22, 87:10
**memo** [2] - 27:15, 28:15
**memos** [1] - 28:18
**merged** [4] - 63:15, 66:4, 66:6, 66:10
**met** [2] - 31:13, 53:24
**Michael** [1] - 20:14
**mid** [1] - 23:6
**mid-2008** [1] - 83:1
**mid-August** [1] - 23:6
**middle** [1] - 58:5
**might** [2] - 50:4, 52:1
**Milken** [1] - 68:13
**million** [4] - 10:24, 11:17, 35:18, 35:22
**mind** [1] - 54:23
**minimis** [3] - 34:11, 34:20, 34:22
**minimize** [2] - 17:11, 46:10
**minimized** [1] - 17:12
**minimus** [1] - 34:6
**minute** [4] - 43:25, 45:24, 45:25, 87:10
**minutes** [10] - 19:22, 19:23, 20:11, 44:9, 44:24, 45:5, 45:8, 45:12, 55:13, 57:16
**Miscellaneous** [1] - 5:4
**mismatch** [1] - 34:10
**missed** [1] - 66:25
**mission** [15] - 31:1, 31:17, 66:13, 66:17, 66:18, 71:3, 71:6, 71:8, 71:13, 72:2, 74:4, 74:5, 74:14, 74:21, 74:23

**Mission** [1] - 67:3
**Mlynarczyk** [1] - 20:14
**model** [1] - 8:17
**modeled** [2] - 11:20, 11:25
**modeling** [1] - 10:15
**modifying** [1] - 40:6
**moment** [2] - 15:23, 46:1
**money** [4] - 79:11, 79:12, 83:7, 84:19
**monitor** [1] - 51:1
**monitoring** [6] - 51:5, 51:11, 51:17, 51:17, 52:6, 52:24, 55:4
**Montgomery** [2] - 48:22, 50:3
**months** [4] - 56:13, 58:2
**Moody's** [2] - 33:2, 54:8
**morning** [18] - 5:7, 5:8, 5:19, 6:3, 6:4, 28:25, 29:4, 29:5, 35:2, 45:16, 47:24, 53:6, 59:24, 60:2, 60:12, 60:13, 60:16
**Mortgage** [2] - 70:10, 70:13
**mortgage** [43] - 12:24, 13:1, 13:5, 13:9, 31:15, 68:21, 72:23, 72:24, 74:6, 74:19, 74:25, 75:2, 75:5, 75:7, 75:14, 75:19, 75:24, 76:9, 76:10, 78:16, 78:17, 78:20, 79:6, 79:8, 79:21, 79:22, 81:17, 81:19, 81:22, 81:23, 82:1, 83:17, 83:22, 84:2, 84:6, 84:8, 84:11, 84:14, 84:19, 84:20, 84:23, 85:8
**mortgage-backed** [6] - 12:24, 13:1, 13:5, 13:9, 75:24, 83:22
**mortgages** [17] - 73:9, 73:21, 75:6, 75:8, 75:9, 75:12, 75:25, 79:9, 80:11, 80:24, 82:3, 83:18, 83:20, 83:25, 84:9, 84:11, 84:15
**most** [6] - 34:19, 46:12, 50:12, 62:17, 76:10
**motion** [2] - 53:11, 53:12
**move** [8] - 9:3, 15:12,

44:4, 46:16, 46:24, 47:18, 48:1, 48:20
**Mukarram** [1] - 3:4
**multiple** [4] - 12:6, 27:12, 56:2, 57:14
**multiplies** [2] - 35:20, 35:21

**N**

**name** [6] - 50:3, 50:5, 50:14, 60:16, 69:8
**named** [3] - 18:24, 67:2, 67:8
**namely** [1] - 51:9
**narrow** [1] - 45:19
**narrowed** [1] - 45:20
**nascent** [2] - 33:10, 33:13
**National** [1] - 70:10
**nationally** [1] - 17:3
**necessary** [2] - 26:4, 87:6
**need** [5] - 32:19, 40:11, 43:25, 45:2, 59:10
**needs** [1] - 16:25
**negative** [2] - 80:8, 85:22
**negligible** [1] - 34:13
**negotiated** [2] - 47:4, 58:2
**neighborhood** [1] - 13:4
**net** [24] - 13:17, 15:25, 16:19, 19:15, 20:17, 24:6, 24:13, 25:7, 25:19, 26:11, 27:7, 28:17, 34:4, 34:14, 34:17, 34:22, 40:10, 41:21, 41:23, 53:19, 54:23, 85:15, 85:19, 85:22
**never** [2] - 8:17, 46:7
**new** [2] - 56:13, 83:20
**Newell** [2] - 50:1, 50:13
**newly** [1] - 73:7
**Next** [3] - 22:6, 22:18, 22:25
**next** [11] - 5:13, 19:19, 22:21, 32:8, 39:4, 40:20, 41:18, 50:12, 55:9, 59:22, 64:6
**nice** [1] - 89:5
**nominated** [1] - 68:3
**nonbanks** [1] - 68:20
**none** [1] - 56:4
**nonexistent** [1] - 30:8
**nonhearsay** [3] - 52:6,

52:23, 53:1
**normal** [1] - 23:15
**normally** [1] - 83:8
**NOTE** [2] - 46:3, 89:8
**note** [2] - 23:14, 64:9
**noted** [3] - 19:14, 30:4, 43:1
**notes** [2] - 16:17, 23:11
**nothing** [4] - 5:11, 43:10, 43:22, 59:15
**Notre** [1] - 60:23
**November** [2] - 6:15, 7:1
**number** [13] - 10:12, 11:16, 14:25, 15:14, 17:2, 17:6, 18:9, 21:19, 29:6, 35:12, 36:18, 37:20, 68:19
**numbered** [1] - 73:19
**numbers** [1] - 46:25
**numerical** [1] - 8:11

**O**

**Oath** [1] - 60:4
**Obama** [3] - 67:17, 68:3, 69:10
**object** [6] - 47:17, 48:12, 55:20, 56:18, 56:19, 57:10
**objection** [22] - 9:7, 9:8, 15:15, 15:18, 15:19, 25:9, 25:20, 27:24, 28:2, 30:1, 30:10, 43:8, 44:6, 44:11, 46:18, 46:21, 47:10, 47:21, 48:21, 55:2, 56:4, 59:10
**objections** [5] - 45:1, 46:16, 55:21, 55:23, 57:17
**obligation** [1] - 32:14
**obligations** [3] - 31:12, 88:10
**obviously** [1] - 56:13
**October** [2] - 31:6, 43:16
**offer** [2] - 53:13, 58:5
**offered** [4] - 50:23, 52:23, 54:21, 68:16
**office** [4] - 63:11, 63:13, 63:14, 63:15
**Office** [6] - 61:13, 61:14, 61:20, 63:15, 64:12, 77:23
**officer** [5] - 61:22, 64:16, 65:2, 65:10, 67:4
**officially** [2] - 67:15,

67:24
**OFHEO** [24] - 61:20, 61:21, 61:24, 64:6, 64:9, 64:14, 64:18, 64:20, 64:21, 64:23, 65:5, 65:9, 65:24, 66:1, 66:7, 66:9, 66:10, 66:11, 66:12, 66:15, 66:25, 67:1, 78:8
**omnibus** [1] - 53:12
**once** [2] - 7:1, 65:24
**one** [37] - 11:1, 14:18, 15:22, 17:2, 18:4, 19:8, 21:13, 21:15, 22:9, 30:3, 36:20, 36:22, 36:23, 39:24, 39:25, 41:11, 43:11, 44:6, 45:20, 45:24, 45:25, 46:20, 48:10, 49:12, 52:17, 55:19, 56:22, 58:14, 67:7, 67:10, 77:19, 80:17, 80:19, 85:18, 86:10
**one-page** [1] - 55:19
**ones** [2] - 18:11, 47:9
**open** [1] - 45:6
**opening** [1] - 69:3
**operate** [5] - 68:19, 71:25, 72:15, 73:2, 83:7
**operating** [10] - 40:11, 61:22, 64:15, 65:2, 65:10, 67:4, 70:1, 70:6, 71:9, 72:11
**operations** [2] - 65:11, 74:7
**opinion** [15] - 17:21, 20:22, 21:12, 21:13, 21:23, 24:5, 24:11, 24:12, 25:4, 26:9, 28:11, 31:4, 41:1, 42:20, 53:12
**opportunity** [1] - 56:18
**opposed** [1] - 30:8
**order** [3] - 54:25, 71:7, 76:7
**organization** [1] - 68:23
**original** [1] - 56:6
**originate** [1] - 83:18
**Outlook** [1] - 9:20
**overall** [1] - 34:6
**overruled** [5] - 25:11, 25:21, 30:2, 30:12, 55:2
**oversaw** [2] - 64:3, 65:13
**oversee** [6] - 64:25,

66:16, 66:20, 66:21, 71:16, 72:18
**overseeing** [4] - 66:14, 66:15, 69:24, 74:6
**overseen** [1] - 71:24
**Oversight** [3] - 61:21, 64:12, 77:24
**oversight** [2] - 66:18, 71:11
**overwhelming** [1] - 82:17
**owe** [1] - 86:7
**own** [4] - 56:4, 70:21, 85:11

**P**

**p.m** [1] - 89:8
**package** [1] - 75:9
**PAGE** [2] - 3:2, 4:2
**page** [29] - 9:23, 11:16, 17:23, 22:22, 30:17, 31:22, 31:25, 32:8, 32:10, 33:8, 35:5, 35:6, 35:14, 35:15, 36:22, 39:4, 39:21, 40:20, 41:3, 41:18, 41:19, 53:12, 54:4, 55:19, 56:22, 57:3, 57:7, 89:1
**pages** [1] - 87:15
**paid** [3] - 41:20, 76:3, 82:24
**paper** [1] - 48:23
**paragraph** [2] - 33:9, 54:4
**paragraphs** [1] - 30:18
**parallels** [1] - 71:20
**Paribas** [1] - 16:11
**Park** [1] - 60:25
**part** [13] - 24:10, 24:16, 25:4, 26:9, 27:20, 41:1, 51:19, 56:5, 63:19, 69:18, 74:4, 74:20, 86:20
**particular** [12] - 10:15, 10:22, 16:11, 16:22, 17:23, 21:1, 29:8, 41:9, 49:9, 62:18, 63:7, 63:19
**particularly** [1] - 63:9
**parties** [6] - 45:18, 56:9, 57:12, 58:2, 58:7, 76:18
**passed** [1] - 62:16
**past** [1] - 23:22
**path** [1] - 74:8
**pay** [8] - 12:17, 14:2, 14:5, 21:9, 75:7,

75:14, 79:20, 81:23
**paying** [1] - 82:1
**payment** [6] - 75:16,
75:19, 75:20, 81:19,
81:20, 84:19
**payments** [4] - 19:16,
25:18, 79:17, 84:23
**PCF** [7] - 7:14, 7:18,
7:22, 8:6, 8:9, 36:7,
36:10
**PDF** [1] - 41:3
**peak** [1] - 78:19
**peaked** [1] - 17:8
**people** [13] - 31:11,
34:19, 38:10, 38:11,
38:16, 39:16, 80:25,
81:22, 84:5, 84:6,
84:13, 84:18
**per** [1] - 37:12
**percent** [22] - 7:6, 7:7,
7:8, 11:7, 11:8, 11:9,
11:12, 11:13, 24:19,
24:22, 24:23, 25:1,
25:8, 34:18, 35:18,
36:4, 36:5, 37:11
**perform** [1] - 13:7
**performance** [2] -
42:6, 52:17
**performed** [2] - 8:1,
26:14
**period** [1] - 43:7
**periodic** [8] - 6:5, 7:6,
8:1, 8:14, 8:18, 8:22,
11:21, 12:1
**permitted** [1] - 57:17
**person** [5] - 19:1,
26:5, 54:2, 58:24,
63:18
**personnel** [1] - 18:23
**perspective** [2] -
74:13, 76:5
**pertinent** [1] - 52:5
**Ph.D** [2] - 60:20, 60:24
**phenomena** [1] - 80:1
**phrase** [4] - 69:16,
74:15, 80:12, 82:9
**pick** [1] - 82:9
**picture** [1] - 52:10
**piece** [3] - 44:8, 52:18,
58:6
**place** [1] - 30:22
**plaintiffs** [22] - 5:24,
9:3, 15:12, 44:23,
47:10, 47:18, 47:21,
47:25, 48:1, 48:21,
52:10, 52:14, 53:3,
53:7, 53:9, 55:20,
56:12, 56:16, 57:10,
57:13, 57:21, 76:14
**plaintiffs'** [6] - 9:5,

46:4, 47:16, 48:3,
51:3, 51:21
**Plaintiffs'** [15] - 3:9,
3:10, 3:10, 3:11,
3:11, 3:12, 3:12,
3:13, 3:13, 9:1, 9:11,
15:21, 18:17, 21:16,
48:16
**plan** [4] - 23:24, 24:4,
24:16, 25:2
**planning** [5] - 26:20,
26:21, 26:25, 27:2
**played** [1] - 58:3
**plummeting** [1] -
83:11
**point** [15] - 9:24, 16:9,
23:11, 23:21, 23:25,
33:25, 34:8, 34:17,
39:6, 39:22, 39:23,
52:13, 57:9, 61:6
**pointed** [2] - 7:13,
18:4, 25:5
**points** [12] - 12:1,
36:7, 36:11, 36:17,
37:2, 37:7, 37:15,
57:22, 85:14, 86:23
**policy** [9] - 63:12,
63:17, 64:3, 64:4,
65:13, 65:14, 68:14,
68:15
**Policy** [3] - 63:16,
68:17, 68:18
**political** [1] - 63:20
**Poor's** [1] - 33:3
**portfolio** [2] - 24:23,
39:7
**portion** [4] - 55:11,
55:14, 57:3, 89:8
**portions** [2] - 55:16,
57:14
**position** [5] - 53:10,
67:6, 68:8, 68:16,
68:18
**positions** [3] - 63:2,
67:7, 67:9
**positive** [5] - 16:19,
40:10, 41:23, 85:15,
85:18
**possibility** [1] - 12:20
**post** [3] - 52:11,
52:14, 52:16
**post-third** [3] - 52:11,
52:14, 52:16
**postdates** [1] - 53:18
**potential** [2] - 21:8,
74:8
**practical** [2] - 88:16,
88:19
**practically** [2] - 29:18,
34:19

**practices** [1] - 70:7
**precedent** [1] - 59:4
**predecessor** [2] -
87:4, 88:1
**Preferred** [1] - 5:5
**preferred** [1] - 33:20
**prejudice** [1] - 56:15
**prejudicial** [1] - 59:8
**prepared** [4] - 28:5,
28:16, 44:13, 89:9
**presence** [5] - 5:2,
5:18, 45:11, 59:20,
89:7
**present** [5] - 44:7,
44:8, 44:14, 55:10,
56:2
**presentation** [2] - 6:8,
31:5
**presented** [2] - 55:17,
58:16
**presenting** [2] - 44:24,
58:21
**president** [1] - 68:17
**President** [3] - 67:17,
68:3, 69:10
**presidents** [1] - 69:5
**press** [2] - 54:14,
54:22
**pretrial** [1] - 56:11
**prevent** [1] - 24:14
**preview** [3] - 76:4,
76:25, 77:10
**previous** [3] - 11:4,
34:2, 53:23
**previously** [3] - 26:2,
26:8, 49:17
**price** [7] - 28:6, 28:11,
33:14, 33:16, 42:20,
83:10, 83:12
**prices** [16] - 17:3,
32:4, 34:3, 42:5,
78:9, 78:11, 78:12,
78:19, 79:1, 79:2,
79:3, 79:6, 79:9,
79:23, 81:21, 82:2
**primary** [2] - 72:23,
78:7
**private** [4] - 71:3,
76:14, 77:4, 77:7
**proceed** [2] - 9:23,
60:7
**Proceedings** [6] - 5:2,
5:18, 45:6, 45:11,
59:20, 89:7
**process** [7] - 52:24,
53:15, 53:18, 54:1,
54:14, 75:11, 79:22
**produced** [2] - 18:2,
18:12
**profitability** [3] -

16:15, 16:24, 33:24
**Profitable** [1] - 15:9
**profits** [4] - 8:10, 34:1,
34:2
**projected** [2] - 17:4,
32:13
**projecting** [1] - 32:5
**projections** [6] -
27:16, 28:7, 32:4,
40:19, 43:16, 43:19
**promoted** [2] - 63:12,
64:2
**proper** [1] - 58:11
**property** [2] - 79:23,
79:25
**pros** [1] - 28:16
**protect** [1] - 85:11
**protection** [1] - 17:10
**protocols** [1] - 59:3
**provide** [6] - 7:21,
33:3, 73:20, 74:24,
75:3
**provided** [4] - 19:10,
38:8, 56:4, 88:24
**provides** [1] - 42:11
**providing** [6] - 18:24,
20:22, 21:11, 21:23,
74:15, 76:22
**PSPA** [6] - 22:6,
22:17, 22:24, 40:6,
40:13, 77:15
**public** [8] - 18:11,
52:13, 53:21, 69:1,
71:3, 74:4, 74:21,
74:23
**publicly** [2] - 19:4,
19:12
**pull** [11] - 6:7, 30:14,
31:18, 32:1, 34:25,
37:17, 38:20, 39:12,
40:19, 42:1, 73:11
**Purchase** [1] - 5:5
**purchase** [2] - 88:9,
88:12
**purpose** [2] - 54:20,
73:25
**purposes** [5] - 11:15,
52:6, 52:23, 53:2,
73:17
**pursuant** [2] - 25:8,
67:19
**push** [2] - 20:17, 54:6
**puts** [3] - 49:20,
49:21, 54:6
**putting** [1] - 81:24
**puzzlement** [1] -
40:16
**PX** [2] - 48:3, 48:4
**pX** [1] - 48:6
**PX-111** [2] - 9:4, 34:25

**PX-2-E** [1] - 30:14
**PX-210** [1] - 39:13
**PX-211** [1] - 31:18
**PX-227** [1] - 38:20
**PX-242** [2] - 14:19,
15:13
**PX-257** [1] - 32:23
**PX-444** [1] - 48:1
**PX-445** [1] - 48:1
**PX-598** [1] - 48:11

## Q

**quantify** [1] - 8:18
**quantitative** [1] - 13:8
**quarter** [12] - 16:18,
18:24, 19:15, 20:18,
21:14, 22:10, 22:13,
23:7, 32:20, 32:21,
33:7, 34:5
**quarterly** [1] - 28:5
**quarters** [2] - 32:15,
33:15
**questionable** [1] -
84:12
**questioning** [1] -
83:23
**questions** [9] - 6:5,
17:20, 17:22, 26:18,
29:6, 31:25, 43:15,
51:22, 58:13
**quick** [1] - 45:22
**quotations** [2] - 23:8,
23:10
**quote** [1] - 10:6,
16:14, 16:16, 17:6,
20:17, 20:18, 21:5,
23:6, 23:21, 24:1,
24:3

## R

**raise** [1] - 60:3
**Rajiv** [1] - 49:6
**ran** [1] - 63:15
**range** [4] - 7:22, 26:4,
36:6, 37:15
**rank** [1] - 53:10
**rate** [2] - 7:5, 84:15
**rates** [4] - 17:6, 36:20,
36:24
**rather** [1] - 50:23
**rating** [4] - 29:8,
29:13, 29:19, 29:24
**ratings** [10] - 29:9,
30:3, 30:5, 30:8,
33:2, 33:3, 49:21,
54:7, 54:9
**rationale** [1] - 23:17
**Rationale** [1] - 23:20

re [1] - 5:4
reached [1] - 46:12
reaction [3] - 51:8, 51:9, 51:18
read [14] - 10:10, 16:25, 17:13, 17:14, 30:20, 32:12, 33:12, 40:4, 54:18, 54:19, 55:12, 57:10, 57:14, 57:18
reader [4] - 55:18, 56:20, 57:13, 58:21
reading [4] - 31:21, 56:23, 57:5, 58:24
readout [2] - 44:9, 55:12
Reagan [1] - 69:9
real [1] - 51:11
Really [1] - 20:17
really [2] - 51:4, 61:2
reams [2] - 52:11, 52:14
reason [3] - 25:10, 51:5, 54:16
reasonable [3] - 8:18, 26:4, 51:15
receive [1] - 77:5
received [10] - 9:9, 15:20, 25:6, 25:8, 47:11, 48:15, 54:19, 55:3, 55:5
receiver [2] - 72:18, 88:21
receivership [5] - 72:7, 72:9, 72:16, 88:22
receiving [1] - 51:11
recently [1] - 56:7
Recess [1] - 45:14
recognize [7] - 37:25, 38:25, 39:16, 40:22, 52:11, 73:13, 87:12
recognized [1] - 14:12
recollection [1] - 8:20
record [7] - 9:19, 23:7, 23:8, 23:11, 40:4, 44:1, 47:16
records [1] - 47:19
recover [1] - 79:8
recovery [2] - 33:14, 42:22
Recovery [2] - 65:16, 86:19
recross [1] - 58:19
RECROSS [1] - 43:13
Recross [1] - 3:5
RECROSS-
EXAMINATION[1] - 43:13
Recross-

Examination [1] - 3:5
recur [1] - 32:15
red [1] - 86:4
redirect [3] - 28:24, 29:1, 58:19
Redirect [1] - 3:5
REDIRECT [1] - 29:2
reduce [1] - 31:1
reduced [1] - 7:3
reduction [1] - 14:3
refer [1] - 27:15
reference [5] - 21:1, 21:3, 25:1, 58:21, 72:6
references [1] - 49:12
referred [5] - 69:17, 77:19, 84:16, 86:10
referring [3] - 21:4, 39:9, 39:10
refers [3] - 16:14, 17:2, 24:22
reflect [1] - 71:22
regard [3] - 63:8, 86:25, 87:20
regarding [3] - 13:8, 17:20, 21:12
regime [1] - 71:11
regular [2] - 84:4, 84:6
regulated [1] - 87:25
regulates [1] - 69:24
regulations [10] - 70:16, 70:17, 70:18, 70:19, 70:22, 70:24, 71:17, 71:18, 71:21
regulator [6] - 64:23, 66:3, 66:16, 69:18, 69:22, 70:21
regulators [1] - 71:15
regulatory [4] - 63:7, 63:18, 66:22, 70:3
regulatory-land [1] - 70:3
related [3] - 5:4, 62:9, 86:14
relates [2] - 53:22, 87:18
relating [1] - 18:9
relationship [4] - 65:22, 80:23, 85:1, 85:4
release [3] - 19:6, 23:12, 38:9
released [2] - 22:10, 22:12
releases [1] - 23:7
relevant [7] - 51:16, 52:5, 52:15, 52:22, 53:1, 54:22, 54:24
relying [1] - 27:3

remain [1] - 71:12
remained [1] - 68:6
remaining [3] - 10:6, 10:16, 10:19
remains [2] - 33:14, 68:17
remember [1] - 50:4
remind [5] - 15:25, 29:11, 33:1, 68:25, 77:22
rendering [3] - 18:14, 24:5, 24:12
renegotiate [2] - 25:6, 51:24
renegotiated [3] - 6:15, 6:19, 7:1
renegotiation [1] - 6:21
replaced [1] - 67:1
report [17] - 18:1, 22:10, 22:13, 30:11, 33:1, 49:1, 49:2, 49:8, 49:9, 49:13, 49:15, 49:19, 49:24, 53:14, 53:17, 53:23, 65:5
reported [5] - 34:4, 49:6, 63:20, 65:6, 89:9
reporter [1] - 64:8
REPORTER'S [2] - 46:3, 89:8
reporting [2] - 50:11, 50:18
reports [11] - 7:14, 7:18, 7:21, 7:25, 19:3, 19:12, 30:4, 50:22, 51:2, 52:7, 53:13
represent [1] - 68:22
represents [1] - 68:19
Republicans [2] - 69:11, 69:13
require [1] - 27:21
required [2] - 19:16, 67:8
requirement [2] - 24:18, 25:1
research [3] - 64:1, 64:4
reserve [2] - 23:12, 48:13
reserves [2] - 17:7, 33:23
resident [1] - 68:13
residential [2] - 73:20, 74:5
resiliency [1] - 83:23
resolve [5] - 5:11, 44:11, 44:24, 45:7,

58:8
resolving [1] - 58:9
Resources [1] - 18:6
resources [1] - 18:8
respect [2] - 46:12, 48:13
respectfully [1] - 34:5
respects [1] - 66:13
responding [1] - 38:15
response [1] - 86:13
responsibilities [6] - 63:3, 63:25, 65:8, 66:5, 67:5, 69:15
responsibility [2] - 64:24, 69:23
responsible [4] - 65:10, 66:13, 72:14, 84:23
rest [7] - 16:25, 49:20, 49:21, 54:6, 62:17, 79:4, 79:5
restore [2] - 27:20, 30:25
restrictions [1] - 71:7
restructuring [2] - 6:20, 37:14
result [1] - 62:16
results [6] - 10:8, 18:25, 20:1, 21:5, 33:7, 33:14
resumed [1] - 5:21
retain [1] - 67:4
retained [3] - 24:18, 24:23, 39:7
return [4] - 16:15, 16:24, 23:22, 24:8
review [2] - 25:16, 72:24
reviewed [1] - 28:10, 40:24
revised [1] - 6:8
right-hand [2] - 9:25, 14:24
risen [1] - 42:19
rising [2] - 17:3, 84:16
risk [17] - 12:15, 12:17, 29:16, 29:17, 31:2, 34:1, 46:6, 46:10, 49:22, 70:6, 70:7, 80:13, 80:16, 81:1, 82:22, 83:21, 84:9
roaring [1] - 42:22
Robert [1] - 5:23
role [4] - 61:21, 66:24, 66:25, 67:4
roles [1] - 69:15
Ross [2] - 55:14, 57:4
roughly [1] - 34:9

rounding [1] - 35:21
Rudy [3] - 44:15, 44:23, 57:20
RUDY [2] - 57:20, 59:12
rules [2] - 27:21, 58:11
ruling [1] - 53:11
run [3] - 8:17, 39:8, 46:6
run-off [1] - 39:8

## S

safe [3] - 14:15, 70:4, 71:12
safe-asset [1] - 14:15
safely [2] - 70:1, 71:25
safer [1] - 13:14
safety [8] - 64:23, 66:16, 69:17, 69:18, 69:21, 71:11, 71:15, 71:16
satisfies [1] - 54:20
satisfying [1] - 19:16
Satriano [1] - 50:14
Satriano's [1] - 50:20
savings [2] - 62:13, 62:15
saw [4] - 20:8, 30:4, 37:2, 51:25
Scenario [4] - 9:19, 41:12, 41:14
scenario [7] - 26:20, 26:25, 27:22, 27:23, 35:3, 40:1, 86:6
scenarios [4] - 41:6, 41:9, 41:15, 41:24
scheduled [1] - 19:6
scope [4] - 25:9, 27:24, 30:10, 66:19
score [1] - 69:11
screen [1] - 54:4
seated [2] - 5:19, 59:21
SEC [8] - 7:13, 7:18, 7:21, 7:25, 19:3, 19:11, 22:10, 22:13
second [17] - 18:24, 19:15, 22:10, 22:12, 23:7, 23:11, 33:7, 34:5, 39:6, 39:21, 44:7, 50:12, 58:7, 59:1, 73:10
second-most [1] - 50:12
second-quarter [1] - 23:7
secondary [6] - 31:15, 72:24, 73:20, 74:24,

84:2, 84:11
**secretary** [1] - 63:5
**section** [3] - 18:5,
18:8, 23:18
**secular** [1] - 14:9
**securities** [7] - 12:25,
13:1, 13:5, 13:9,
53:13, 75:24, 83:22
**securitization** [1] -
75:11
**Security** [5] - 61:18,
61:19, 63:22, 64:4,
78:6
**see** [30] - 10:2, 11:1,
14:25, 15:5, 18:20,
19:21, 19:25, 20:1,
20:3, 20:19, 22:24,
23:5, 23:20, 23:25,
35:12, 37:24, 38:25,
42:23, 45:13, 52:2,
56:25, 73:16, 78:14,
78:15, 79:7, 84:20,
85:10, 87:11, 87:24
**seeing** [3] - 12:5,
78:20, 80:9
**segment** [1] - 78:15
**sell** [4] - 79:23, 83:24,
84:2, 84:10
**Senate** [1] - 68:4
**send** [1] - 44:19
**senior** [6] - 63:4,
63:18, 65:12, 67:2,
68:13, 72:14
**Senior** [1] - 5:5
**sense** [4] - 20:17,
26:25, 72:25, 78:10
**sensitivity** [14] - 10:6,
10:16, 10:23, 11:3,
11:21, 11:25, 35:7,
35:13, 35:16, 35:24,
36:14, 36:16, 37:1,
37:7
**sent** [4] - 22:9, 38:10,
49:2, 49:11
**sentence** [1] - 34:2
**September** [9] - 7:5,
9:16, 9:17, 16:19,
30:21, 30:22, 32:21,
67:15, 67:24
**series** [2] - 28:14,
51:22
**servant** [1] - 61:11
**serve** [2] - 67:20, 69:6
**service** [1] - 69:1
**servicer** [1] - 79:22
**set** [4] - 44:17, 49:4,
59:7, 70:22
**Setia** [1] - 49:6
**SETIA** [1] - 49:6
**settled** [1] - 14:11

**seven** [3] - 56:13,
61:14
**several** [5] - 18:1,
27:6, 44:4, 47:16,
66:12
**severity** [1] - 11:5
**shared** [4] - 49:17,
50:12, 50:15, 50:16
**shareholders** [8] -
76:13, 76:14, 76:15,
76:16, 76:19, 76:20,
77:4, 77:8
**shares** [2] - 50:20,
76:20
**sheet** [1] - 70:5
**sheets** [2] - 34:7,
34:12
**Shiller** [2] - 42:2, 43:3
**shoes** [1] - 72:13
**shoot** [1] - 58:13
**short** [10] - 29:1, 44:8,
44:15, 55:11, 55:19,
56:17, 70:9, 70:12
**shorthand** [1] - 70:8
**show** [13] - 14:18,
21:15, 41:23, 42:8,
42:14, 50:23, 52:6,
53:14, 54:11, 54:12,
54:16, 58:4, 78:19
**showed** [13] - 30:16,
31:20, 32:25, 35:2,
35:5, 37:19, 39:15,
39:23, 41:9, 83:5,
83:10
**showing** [4] - 51:16,
52:15, 52:18, 78:16
**shows** [5] - 10:7,
19:17, 50:25, 51:6,
51:10
**sic** [1] - 15:9
**side** [2] - 35:15, 46:7
**sides** [1] - 46:10
**sign** [1] - 42:21
**signed** [1] - 77:13
**significance** [5] -
49:5, 73:22, 73:23,
88:16, 88:19
**significantly** [3] -
30:5, 30:7, 37:13
**signifies** [1] - 13:13
**similar** [3] - 11:19,
11:24, 71:14
**similarly** [2] - 11:10,
71:24
**simple** [3] - 11:13,
11:15, 75:1
**simply** [3] - 54:14,
56:22, 57:2
**single** [2] - 28:15,
52:17

**sit** [1] - 58:13
**sitting** [1] - 27:19
**six** [1] - 56:13
**Slide** [1] - 6:8
**slide** [2] - 7:13, 42:8
**slides** [1] - 27:15
**slow** [1] - 62:5
**slowdown** [1] - 79:6
**slowly** [2] - 17:7,
55:12
**slows** [1] - 85:12
**small** [2] - 42:24, 85:2
**smaller** [1] - 13:21
**so-called** [1] - 62:19
**Social** [5] - 61:17,
61:18, 63:22, 64:4,
78:6
**sold** [1] - 83:19
**solid** [1] - 33:23
**solvent** [1] - 85:15
**someone** [2] - 38:5,
38:11
**sometimes** [3] -
58:19, 65:3, 81:6
**somewhere** [1] - 13:4
**soon** [1] - 51:20
**sorry** [8] - 11:22,
21:10, 28:3, 40:15,
46:16, 48:2, 74:2,
78:3
**sort** [1] - 58:10
**sorts** [1] - 63:2
**sotto** [1] - 46:3
**sought** [1] - 25:5
**sound** [2] - 27:11,
71:12
**soundly** [3] - 70:1,
70:6, 71:25
**soundness** [8] -
64:23, 66:16, 69:17,
69:18, 69:22, 71:11,
71:15, 71:16
**sounds** [1] - 70:3
**source** [1] - 88:21
**sovereign** [1] - 54:9
**space** [2] - 63:10,
68:20
**special** [1] - 23:16
**specific** [5] - 7:17,
10:5, 27:1, 53:14,
53:17
**specifically** [1] - 78:9
**spent** [7] - 61:11,
61:14, 61:16, 61:18,
62:17, 68:12, 68:25
**spill** [1] - 79:14
**spillover** [1] - 80:18
**sponsored** [3] - 62:20,
63:8, 63:12

**spread** [2] - 13:12,
80:1
**spreads** [6] - 13:20,
13:25, 14:3, 14:7,
14:10, 14:14
**stability** [5] - 31:15,
73:20, 74:5, 74:9,
74:24
**stable** [1] - 17:2
**staff** [1] - 66:10
**stage** [1] - 49:4
**stamp** [3] - 10:3,
20:23, 37:20
**stand** [5] - 5:21, 37:9,
55:10, 57:13, 64:11
**Standard** [1] - 33:3
**standing** [1] - 56:14
**stands** [1] - 72:13
**start** [6] - 73:3, 78:14,
78:15, 78:19, 79:2
**started** [5] - 62:12,
64:1, 67:24, 80:2,
82:16
**starting** [2] - 30:20,
79:1
**starts** [3] - 33:9,
42:16, 79:14
**state** [5] - 7:18, 23:22,
24:8, 54:22, 57:2
**statement** [3] - 54:2,
54:5, 69:3
**statements** [1] - 54:12
**states** [4] - 17:6,
19:25, 23:21, 24:1
**States** [2] - 29:13,
86:21
**stating** [1] - 7:14
**statistics** [1] - 64:2
**status** [1] - 67:11
**statute** [1] - 87:16
**Stegman** [1] - 20:14
**step** [2] - 43:23, 74:2
**stepped** [1] - 67:17
**stepping** [2] - 82:19,
86:11
**Steps** [3] - 22:6,
22:18, 22:25
**STERN** [7] - 59:18,
59:23, 60:7, 60:9,
60:11, 78:21, 78:23
**stern** [1] - 60:13
**Stern**.................. [1] -
3:6
**still** [5] - 12:19, 34:6,
53:25, 68:1, 75:15
**Stock** [1] - 5:5
**stock** [8] - 80:7, 80:8,
80:9, 80:25, 83:10,
83:12, 88:13, 88:14
**stockholder** [1] - 10:9

**stop** [3] - 57:8, 62:2,
73:10
**strain** [1] - 81:25
**stream** [1] - 77:2
**Street** [4] - 83:13,
83:14, 83:15, 85:2
**stress** [6] - 26:20,
26:25, 27:22, 40:1,
40:8, 40:17
**strike** [1] - 26:24
**strikes** [1] - 26:24
**stronger** [4] - 20:1,
21:5, 33:7, 66:22
**studies** [1] - 62:19
**study** [1] - 13:7
**stuff** [1] - 58:10
**sub** [1] - 23:25
**sub-bullet** [1] - 23:25
**subject** [8] - 15:8,
22:6, 22:17, 70:15,
70:19, 70:24, 71:18,
71:19
**submit** [1] - 47:5
**subprime** [2] - 78:16,
78:17
**substantial** [4] - 7:14,
7:18, 8:22, 8:24
**substantive** [2] -
55:23, 57:16
**substantively** [1] -
56:18
**succeeded** [1] - 58:8
**successful** [1] - 44:12
**successor** [2] - 68:3,
68:4
**suddenly** [1] - 82:24
**sufficient** [2] - 32:13,
70:5
**suggest** [1] - 8:10
**suggestion** [1] - 52:2
**Suisse** [2] - 50:8
**summer** [2] - 83:9,
83:11, 86:10
**super** [1] - 57:23
**supervise** [1] - 64:25
**supplementation** [1] -
56:10
**supplies** [1] - 26:22
**supply** [1] - 47:7
**support** [3] - 6:11,
6:15
**supposed** [2] - 66:20,
66:21
**surprise** [1] - 25:18
**surprised** [2] - 28:13,
52:3
**survival** [1] - 80:22
**suspended** [1] - 77:12
**suspense** [1] - 39:13

**sustainability** [2] - 33:9, 33:13
**sustained** [6] - 27:25, 28:2, 33:24, 34:1, 43:9, 59:11
**sweep** [11] - 13:18, 16:1, 20:17, 24:6, 24:13, 25:19, 26:11, 27:7, 28:17, 53:19, 54:23
**system** [1] - 84:1
**systemic** [6] - 31:2, 80:13, 80:16, 80:18, 81:1, 82:22

**T**

**table** [1] - 11:4
**tables** [1] - 11:1
**talks** [3] - 33:6, 49:13, 73:17
**tank** [2] - 68:14
**tax** [1] - 27:21
**taxpayer** [2] - 17:11, 17:12
**ten** [1] - 61:16
**term** [7] - 13:21, 31:13, 70:2, 75:4, 81:4, 83:9, 86:4
**terms** [10] - 6:10, 6:15, 6:25, 7:17, 66:19, 69:19, 70:4, 71:7, 75:1, 84:13
**test** [3] - 40:1, 40:9, 40:17
**testified** [9] - 8:12, 8:16, 13:11, 13:25, 37:13, 42:5, 50:7, 50:14, 50:17
**testifying** [3] - 26:19, 27:2, 36:6
**testimony** [25] - 5:12, 8:21, 12:14, 12:25, 24:20, 27:3, 27:6, 27:14, 37:2, 44:25, 50:6, 50:20, 51:7, 51:13, 51:14, 52:20, 55:11, 55:14, 55:23, 56:24, 57:3, 57:11, 57:16, 57:18, 58:15
**text** [2] - 11:16, 19:25
**Thakor** [2] - 36:6, 37:13
**Thakor's** [1] - 37:2
**themselves** [1] - 85:6
**theory** [1] - 51:3
**they've** [5] - 56:4, 56:17, 65:16, 84:23, 85:11
**thin** [2] - 82:7, 82:10

**think-tank** [2] - 68:14
**third** [39] - 8:6, 12:11, 12:14, 12:19, 13:8, 13:18, 13:19, 14:13, 16:1, 16:5, 21:7, 25:6, 25:14, 25:25, 29:12, 31:4, 43:19, 49:13, 49:16, 49:20, 50:15, 51:2, 51:14, 51:16, 51:24, 51:25, 52:3, 52:11, 52:12, 52:13, 52:14, 52:16, 52:19, 52:20, 53:19, 53:24, 54:15, 59:6
**thought/expected** [1] - 20:2
**threat** [1] - 83:16
**threaten** [1] - 80:21
**threatening** [1] - 83:16
**three** [8] - 41:7, 41:9, 41:15, 61:18, 67:7, 67:9, 68:12, 69:13
**throughout** [1] - 14:7
**tightening** [1] - 14:14
**timely** [1] - 22:18
**timing** [2] - 23:3, 23:6
**Timothy** [2] - 20:13, 22:3
**title** [6] - 15:8, 63:24, 64:18, 67:4, 67:11, 68:21
**titles** [2] - 64:14, 67:5
**today** [2] - 68:18, 72:6
**took** [5] - 37:7, 55:13, 56:9, 66:4, 68:4
**top** [2] - 35:19, 38:2
**total** [1] - 68:25
**touch** [1] - 12:24
**trade** [2] - 68:18, 68:22
**transcript** [1] - 89:9
**transition** [1] - 68:8
**translated** [1] - 88:2
**Treasury** [56] - 6:18, 8:5, 8:8, 12:16, 13:13, 14:15, 18:2, 18:6, 18:8, 18:10, 18:24, 19:2, 19:11, 23:24, 24:1, 24:4, 24:16, 25:2, 25:6, 25:7, 25:19, 29:14, 29:16, 29:20, 29:23, 29:25, 30:7, 33:21, 38:12, 38:18, 38:22, 39:15, 39:22, 40:11, 41:20, 61:15, 61:16, 61:17, 62:24, 63:2, 63:4, 63:11, 63:14, 63:19, 63:21, 77:14,

87:8, 88:8, 88:9, 88:16, 88:24
**trend** [2] - 13:21, 14:9
**trial** [1] - 89:8
**trials** [1] - 58:18
**tried** [3] - 8:13, 58:8, 69:3
**trillion** [5] - 13:2, 13:4, 13:6, 34:8, 34:9
**trouble** [2] - 84:7, 85:5
**true** [1] - 14:6
**truth** [2] - 50:23, 54:12
**try** [2] - 8:17, 45:19
**trying** [2] - 46:10, 54:11
**turn** [1] - 33:8
**twenty** [1] - 69:2
**twenty-eight** [1] - 69:2
**twice** [1] - 58:22
**two** [16] - 17:6, 22:12, 30:18, 31:9, 38:2, 44:9, 44:24, 55:13, 55:21, 57:16, 62:1, 62:23, 66:3, 69:13, 72:1, 76:6
**typical** [2] - 11:1, 35:14

**U**

**U.S** [3] - 33:13, 61:12
**U.S.-govern** [1] - 54:9
**Ugoletti** [7] - 8:12, 49:3, 49:18, 50:21, 50:24, 51:1, 51:3
**ultimate** [2] - 75:10, 75:12
**ultimately** [1] - 82:16
**unable** [2] - 82:21, 85:7
**unaware** [1] - 8:13
**uncertain** [2] - 33:14, 33:18
**uncertainty** [1] - 43:2
**under** [13] - 10:22, 10:23, 25:19, 37:1, 39:22, 39:25, 40:8, 41:24, 55:13, 58:11, 69:5, 77:13
**understood** [1] - 86:24
**unemployment** [4] - 80:4, 81:23, 84:16, 84:18
**unique** [1] - 50:5
**United** [2] - 29:13, 86:21
**University** [2] - 60:23, 60:24
**unless** [1] - 53:14,

81:8
**unlimited** [2] - 88:9, 88:11
**unobjected** [1] - 57:14
**unobjected-to** [1] - 57:14
**unofficially** [1] - 67:15
**unreasonableness** [1] - 52:16
**up** [66] - 6:8, 8:25, 11:7, 14:6, 18:17, 21:16, 25:14, 29:7, 30:14, 30:18, 31:18, 32:1, 32:9, 32:23, 33:9, 34:25, 36:20, 36:23, 37:17, 38:20, 39:12, 40:19, 41:16, 42:1, 42:8, 43:12, 44:17, 46:21, 48:22, 48:24, 49:10, 53:8, 55:19, 55:22, 58:4, 62:14, 68:10, 68:24, 73:10, 73:11, 75:6, 75:9, 76:11, 78:2, 78:3, 78:5, 78:11, 78:12, 81:22, 81:24, 82:4, 82:9, 82:16, 83:5, 83:8, 83:10, 84:1, 84:8, 84:18, 84:20, 84:22, 86:9, 87:10, 87:11
**upcoming** [1] - 51:7
**Update** [1] - 9:20
**update** [2] - 31:21, 43:18
**upper** [1] - 10:3
**ups** [2] - 33:19, 42:24
**Urban** [1] - 66:6
**UST** [2] - 21:19, 37:20

**V**

**value** [2] - 8:11, 8:14
**variables** [1] - 11:4
**various** [8] - 10:25, 11:3, 14:10, 38:11, 42:25, 46:16, 46:17, 63:6
**VARMA** [43] - 15:15, 15:19, 25:9, 25:20, 27:24, 28:25, 29:3, 30:6, 30:14, 30:15, 30:18, 30:19, 31:18, 31:19, 32:1, 32:2, 32:9, 32:11, 32:23, 32:24, 33:8, 33:11, 34:25, 35:1, 35:10, 35:11, 37:17, 37:18, 38:3, 38:4, 38:20, 38:21, 39:4, 39:5,

39:12, 39:14, 39:25, 40:3, 40:19, 40:21, 41:3, 41:4, 43:10
**Varma...............** [1] - 3:5
**vein** [1] - 57:15
**version** [1] - 47:5
**view** [1] - 38:18
**viewed** [1] - 27:16
**vocabulary** [2] - 72:4, 85:14
**voce** [1] - 46:3
**volatile** [1] - 33:15

**W**

**waiting** [1] - 5:17
**walk** [1] - 38:25
**Wall** [1] - 83:13
**Wanda** [1] - 50:13
**warrant** [1] - 45:2
**warrants** [1] - 7:4
**Washington** [1] - 68:14
**ways** [1] - 83:5
**weaker** [1] - 81:24
**weakness** [1] - 78:19
**week** [2] - 12:25, 56:1
**weekend** [1] - 56:12
**whole** [2] - 56:12, 84:1
**wide** [1] - 14:9
**willingness** [1] - 84:8
**wind** [4] - 24:22, 39:7, 39:9, 39:11
**wind-down** [4] - 24:22, 39:7, 39:9, 39:11
**winding** [1] - 24:18
**wish** [2] - 47:18, 58:13
**withstand** [2] - 82:8, 82:10
**Witness** [1] - 43:24
**witness** [9] - 5:14, 53:3, 56:20, 57:13, 58:20, 58:23, 58:24, 59:22, 77:19
**WITNESS** [3] - 28:3, 28:23, 60:5
**Witnesses** [1] - 3:3
**witnesses** [2] - 48:14, 72:23
**word** [4] - 19:1, 23:8, 51:24, 85:15
**works** [1] - 72:24
**world** [2] - 81:21, 82:22
**worries** [3] - 49:20, 49:21, 54:7
**worse** [1] - 84:21
**worth** [21] - 13:18,

16:1, 16:19, 19:15,
20:17, 24:6, 24:13,
25:7, 25:19, 26:11,
27:7, 28:17, 34:4,
34:14, 34:17, 34:22,
53:19, 54:23, 85:15,
85:19, 85:22
**wound** [5] - 23:22,
24:7, 24:17, 24:25,
25:3
**wound-down** [2] -
24:17, 24:25
**writes** [1] - 22:18
**writings** [1] - 68:15

## Y

**y'all** [2] - 45:8, 45:12
**year** [5] - 14:8, 14:14,
37:12, 68:7, 76:6
**years** [16] - 27:7,
61:11, 61:14, 61:16,
61:18, 67:21, 67:23,
68:12, 68:25, 69:2,
69:5, 75:4, 76:6,
76:11
**yesterday** [1] - 55:12
**yield** [6] - 13:12,
13:20, 13:25, 14:3,
14:7, 14:10
**yourself** [1] - 60:14

## Z

**zero** [2] - 34:13, 34:19