1
2

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

3

Fairholme Funds, Inc., et al.,   ) Civil Action
                                 ) No. 1:13-cv-01053-RCL

4

                  Plaintiffs,    )
                                 )

5

vs.                              ) **Jury Trial (Day 11)**
                                 ) **Afternoon Session**

6

Federal Housing Finance          )
Agency, et al.                   ) Washington, D.C.
                                 ) **August 8, 2023**

7

                  Defendants.    ) Time:  1:30 p.m.

8

_____

9

In re Fannie Mae/Freddie Mac     ) Civil Action
Senior Preferred Stock           ) No. 1:13-mc-1288-RCL

10

Purchase Agreement Class         )
Action Litigations.              )

11

_____

12

**Transcript of Jury Trial (Day 11) Afternoon Session
Held Before
The Honorable Royce C. Lamberth
United States Senior District Judge**

13
14

_____

A P P E A R A N C E S

15

For the Fairholme Funds, Inc. Plaintiffs:

16

        **Vincent J. Colatriano**
        COOPER & KIRK, PLLC

17

        1523 New Hampshire Avenue, Northwest
        Washington, D.C. 20036

18

For the Defendant Federal Housing Finance Agency:

19

        **Asim Varma**
        **David B. Bergman**

20

        **Ian S. Hoffman**
        **R. Stanton Jones**

21

        **Jonathan L. Stern**
        ARNOLD & PORTER KAYE SCHOLER LLP

22

        601 Massachusetts Avenue, Northwest
        Washington, D.C. 20001

23
24
25

1            A P P E A R A N C E S (continued)

2    For the Class Plaintiffs:
                         **Hamish P. M. Hume**
3                        **Kenya Khalelah Davis**
                         **Samuel C. Kaplan**
4                        **Jessica Mugler**
                         BOIES SCHILLER FLEXNER LLP
5                        1401 New York Avenue, Northwest
                         Washington, D.C. 20005
6
                         **Robert Kravetz**
7                        BERNSTEIN LITOWITZ BERGER & GROSSMANN
                         LLP
8                        1251 Avenue of the Americas
                         New York, New York 10020
9
                         **Lee D. Rudy**
10                       **Grant Goodhart**
                         KESSLER TOPAZ MELTZER & CHECK
11                       280 King of Prussia Road
                         Radnor, Pennsylvania 19087
12   _____

13   Stenographic Official Court Reporter:
                         Nancy J. Meyer
14                       Registered Diplomate Reporter
                         Certified Realtime Reporter
15                       333 Constitution Avenue, Northwest
                         Washington, D.C. 20001
16                       202-354-3118

17   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.
18

19

20

21

22

23

24

25

1                            <u>**I N D E X**</u>

2                                                              <u>PAGE:</u>

3      <u>**Witnesses:**</u>

4      <u>Ed DeMarco</u>

            Direct Examination, Continuing, By Mr. Stern..... 2362
5            Cross-Examination By Mr. Hume.................... 2368

6

7      <u>**Exhibits Admitted**</u>:

8          Plaintiffs' Exhibit 248.......................... 2434
           Plaintiffs' Exhibit 500.......................... 2469
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          P R O C E E D I N G S

2          (REPORTER'S NOTE:  The a.m. portion of the trial was

3     reported by Lisa Edwards, who prepared said transcript.)

4          (Proceedings held out of the presence of the jury.)

5          MR. STERN:  Good afternoon, Your Honor.

6          THE COURT:  Is Mr. DeMarco here?

7          MR. STERN:  I'm sorry?

8          THE COURT:  Is Mr. DeMarco here?

9          MR. STERN:  Yes, he is.

10          (Proceedings held in the presence of the jury.)

11          THE COURT:  All right.  You may be seated.

12     All right.  Counsel, you may proceed.

13          MR. STERN:  Thank you, Your Honor.

14     Good afternoon, Mr. DeMarco, members of the jury.

15               DIRECT EXAMINATION, continuing

16 BY MR. STERN:

17 Q.  Mr. DeMarco, now we're going to come to the third amendment

18 itself.  And what was the date on which you signed the third

19 amendment?

20 A.  August 17th, 2012.

21 Q.  So let's pull up one more time Slide No. 10, and tell us

22 one more time, what does this chart show?

23 A.  It's showing the quarters in conservatorship that Fannie

24 Mae had negative net worth at the end of the quarter up until

25 the last quarter before I signed the third amendment.

1    Q.  And when we last visited with this chart, we were at the

2    end of Q4, Q [sic] 2011; correct?

3    A.  Yes.

4    Q.  And now as of August, we're past 2Q of 2012; right?

5    A.  Yes.

6    Q.  We're in the third quarter?

7    A.  Yes.

8            MR. STERN:  Okay.  So let's pull up DX535.

9        Go to the next page, please.

10   BY MR. STERN:

11   Q.  What are we looking at?

12   A.  We are looking at the third amendment for Fannie Mae.

13   Q.  And -- I'm sorry?

14   A.  For Fannie Mae.  They were the same, but this is Fannie's.

15   Q.  And was the third -- I'm sorry?

16   A.  The amendments were the same.  This particular one is for

17   Fannie Mae.

18   Q.  Okay.  And what is the date of -- the specific date of the

19   third amendment, just to get it in the record, please?

20   A.  August 17, 2012.

21   Q.  Okay.  So you signed for FHFA?

22   A.  Yes.

23   Q.  Who signed for Treasury?

24   A.  Treasury Secretary Geithner.

25   Q.  Let's walk through some of the provisions of the third

DEMARCO - DIRECT

1    amendment, and I want to highlight with you or ask you to

2    highlight for us some of the key terms.  So let's go to page 5,

3    No. 3.

4         What is this provision accomplishing?

5    A.  This is referencing the existing dividend rate, and it's

6    amending how the dividend --

7    Q.  You've got to keep your voice up, Mr. DeMarco.

8    A.  Yes.  It's referencing the dividend rate that was in the

9    PSPA, and it's amending how it shall be handled under this

10   amendment.

11   Q.  From what to what?

12   A.  From 10 percent cash dividend to a net worth sweep

13   beginning in 2013.

14   Q.  What was the net worth sweep?

15   A.  The net worth sweep was what was the net worth of a company

16   at the end of the quarter.  There was a small reserve amount

17   allowed for, and whatever the net worth was above that reserve

18   amount was to be swept to the Treasury Department in the form

19   of a dividend.

20   Q.  So let's go to Section 3.2, page 6.

21        What is this -- and an amendment is just a change to the

22   agreement; is that right?

23   A.  Yes.

24   Q.  And what is this amendment relating to?

25   A.  This amendment is relating to the periodic commitment fee.

1    Q.   And what does this amendment accomplish?

2    A.   This amendment is suspending the periodic commitment fee.

3    Q.   Let's go to page 7, No. 6.

4         What is this amendment accomplishing?

5    A.   This amendment is adjusting the rate at which Fannie Mae

6    and Freddie Mac need to reduce their retained portfolio of

7    mortgage assets.

8    Q.   And the jury has heard about the reduction -- accelerated

9    rate and reduction of the retained portfolio.  Is that what

10   this is about?

11   A.   Yes.

12   Q.   Mr. DeMarco, what problem were you trying to solve by

13   entering into the third amendment?

14   A.   I was trying to create a situation where we better assured

15   the stability of Fannie Mae and Freddie Mac for the duration of

16   their conservatorships.  Doing so by protecting the remaining

17   Treasury commitment that was going to be capped as of January 1

18   of 2013.

19   Q.   And, in particular, what threat to the remaining Treasury

20   commitment were you trying to solve for?

21   A.   A key risk that I was trying to solve for was future

22   obligations -- financial obligations to Treasury having to --

23   be exceeding the GSEs income; therefore, having to draw from

24   Treasury to pay Treasury.  That's what I was solving for.

25   Q.   And is that what you've referred to as the circular draw?

1    A.  Yes.

2    Q.  And what effect did the net worth sweep have on the

3    risk that there would have to be circular draws in the

4    future?

5    A.  It eliminated the risk of circular draws due to the

6    dividend.

7    Q.  Completely or just in part?

8    A.  Completely.

9    Q.  So one more area, Mr. DeMarco.  And that is a reaction to

10   the third amendment.  After it was announced, did you pay

11   attention to what the market and market analysts were saying

12   about the third amendment?

13   A.  Yes.

14   Q.  So let's pull up DX459.  I'm sorry.  549.

15       What -- I'm going to ask you more about the document

16   itself, but let's start with the email at the top.  What is

17   that?

18   A.  It's an email from Wanda DeLeo to -- to me and to

19   Mario Ugoletti.

20   Q.  And what's the next -- it's Ms. DeLeo forwarding another

21   email?

22   A.  Yes, she is.

23   Q.  And what email is she forwarding?

24   A.  She's forwarding an email that has the initial reaction of

25   Barclays' analyst to the third amendment.

1    Q.  Well, let's back up.

2          What's the email that she is immediately forwarding?

3    Who's it from?

4    A.  Oh, I'm sorry.  She's forwarding an email from Jamie Newell

5    to her and several other people.  Jamie is forwarding

6    information that says:  Some initial market feedback on PSPA

7    changes.

8    Q.  So let's go to the next email.  And this email is

9    forwarding what?

10   A.  It's forwarding an analyst report from Barclays providing,

11   quote, initial thoughts on the third amendment.

12   Q.  Is that what's referred to when it says Treasury changes

13   the PSPAs?

14   A.  Yes.

15   Q.  And what's the date of this?

16   A.  August 17th, 2012.

17   Q.  And that's the date of the third amendment?

18   A.  Yes.

19   Q.  And four lines -- I'm sorry.  Let's go to page 2.

20          MR. STERN:  Can you enlarge the top of that, please.

21   BY MR. STERN:

22   Q.  So if you look at the top of the page and go four lines

23   down, you see the sentence that begins:  With the change in

24   support?

25   A.  I do.

1    Q.  Why don't you read that sentence, please.

2    A.  With the change in support, we see virtually no chance of

3    the post year-end 2012 capital supports being exhausted over a

4    multi-decade period.

5    Q.  And the reference to capital supports, what -- what did you

6    understand that to be a reference to?

7    A.  To the Treasury commitment.

8    Q.  And what did you take away from this reaction by Barclays?

9    A.  That this was immediate affirmation that our goal of

10   improving market confidence in that Treasury commitment had

11   been realized.

12   Q.  And just one more question about the net worth sweep

13   itself.  Under the net worth sweep, in a quarter where

14   Fannie or Freddie had zero net worth or negative net worth,

15   how much of a dividend would they have to pay to Treasury?

16   A.  None.

17            MR. STERN:  Your Honor, nothing further at this time.

18            THE COURT:  Mr. Hume, you may cross-examine.

19            MR. HUME:  Good afternoon, Mr. DeMarco, members of

20   the jury.  Hamish Hume for the plaintiffs.

21                       CROSS-EXAMINATION

22   BY MR. HUME:

23   Q.  Mr. DeMarco, I'll be asking you some questions for the

24   plaintiffs.

25   A.  Very good.  Thank you, Mr. Hume.

1   Q.  I'd like to begin with Plaintiffs' Exhibit 205, which you

2   testified about on direct.

3              MR. HUME:  And I'd like to ask Ms. McGuire to bring

4   it up on the screen, if I could.

5   BY MR. HUME:

6   Q.  Now, PX-205 is a memorandum dated June 25th, 2012.  Do you

7   see that, Mr. DeMarco?

8   A.  I do.

9   Q.  You see it's a memorandum written from Michael Stegman --

10  that's -- that's an executive or an official at the Treasury

11  Department at the time; is that right?

12  A.  Yes.

13  Q.  And it's written to Mary Miller.  Do you see that?

14  A.  I do.

15  Q.  And Mary Miller was the undersecretary for domestic

16  finance, just one below the Secretary of the Treasury at that

17  time; correct?

18  A.  Well, there's a Deputy Secretary between them, but, yes,

19  she's -- yes.

20  Q.  Okay.  And the memorandum says -- the subject is:

21  FHFA-related discussion at June 25th morning meeting.  Do you

22  see that?

23  A.  I do.

24              MR. HUME:  And we don't need to highlight this,

25  Ms. McGuire.

1      BY MR. HUME:

2      Q.  But just for context, the first two sentences say:  The

3      secretary provided an overview of his and your previous day's

4      meeting with Ed DeMarco.  This is the essence of the discussion

5      that took place.  Do you see those two sentences?

6      A.  Yes, I do.

7      Q.  And I believe on direct you testified that you do recall

8      having a meeting with the Secretary of the Treasury -- Timothy

9      Geithner -- and Mary Miller on or around June 25th, 2012?

10     A.  Yes.

11     Q.  The memorandum then says -- under a heading saying

12     Increasing Passivity, it says:  The secretary got a sense from

13     yesterday's meeting that the acting director is becoming more

14     passive in his spearheading a number of policy-relevant reforms

15     to wit.  Do you see that?

16     A.  Yes, sir.

17     Q.  And then one of the bullet points further down the memo is

18     the one we've called out here.  Do you see that?

19     A.  Yes.

20     Q.  And you testified about this in your direct examination;

21     correct?

22     A.  Yes.

23     Q.  The first sentence says:  Since the secretary raised the

24     possibility of a PR covenant, DeMarco no longer sees the

25     urgency of amending the PSPAs this year.  Do you see that

1    sentence?

2    A.  Yes.

3    Q.  We're going to come back to that in a second.

4         It then goes on and says:  He has raised two competing

5    reasons for this new position.  One, the GSEs will be

6    generating large revenues over the coming years, thereby

7    enabling them to pay the 10 percent annual dividend well into

8    the future even with the caps.  Do you see that?

9    A.  Yes.

10   Q.  And, Mr. DeMarco, you understand that this document is an

11   important document in this case; correct?

12   A.  Yes.

13   Q.  And you understand that that sentence -- that the GSEs will

14   be generating large revenues over the coming years, thereby

15   enabling them to pay the 10 percent annual dividend well into

16   the future even with the caps.  That would mean, if true, that

17   there would not be a circular draw problem; correct?

18   A.  If true, yes.

19   Q.  Okay.  And that would be helpful to the plaintiffs'

20   position in this case and not helpful to the defendants'

21   position; correct?

22   A.  It is what it is.  It's --

23   Q.  Okay.  Now, I believe on direct, you said you did not say

24   that; correct?

25   A.  Correct.

1    Q.  Now, you remember in this case you were deposed -- and a

2    deposition is where you give sworn testimony under oath out of

3    court but with lawyers for both sides present.  Do you recall

4    that?

5    A.  I do.

6    Q.  Okay.  I'd like to show you what you said in your

7    deposition when you were asked about this document.  It's at

8    the -- page 214, lines 12 to 215, line 6, in your deposition,

9    but we have it on video, so we'll play DeMarco Clip 1, please.

10              (An audio-visual recording was played.)

11   BY MR. HUME:

12   Q.  Mr. DeMarco, was that truthful and accurate testimony?

13   A.  Yes.

14   Q.  Okay.  You were asked the same question a little

15   differently.  I'd like to play DeMarco Clip 2 from the same

16   deposition.

17              (An audio-visual recording was played.)

18   BY MR. HUME:

19   Q.  Mr. DeMarco, was that truthful and accurate testimony?

20   A.  Yes.

21   Q.  And I think you were asked one more time about the same

22   sentence.  Could we look at DeMarco Clip 3, please.

23              (An audio-visual recording was played.)

24   BY MR. HUME:

25   Q.  And, Mr. DeMarco, was that truthful and accurate testimony?

1   A.  Yes.

2   Q.  So, Mr. DeMarco, you've told this jury unequivocally four

3   or five times that you did not say that sentence that's written

4   in that memo, and yet three times in your deposition, you

5   admitted that you don't recall; correct?

6   A.  And this morning when I was asked about this, I said I do

7   not recall what was being discussed there that gave rise to

8   that being written down by Mr. Stegman.  I don't recall what

9   was being discussed that could have caused that to be written

10  down.

11  Q.  Okay.  Now --

12  A.  That's what I said this morning.

13  Q.  The record will show what it shows about what was said.

14        Let's go back to PX-205 and to the PR covenant, because

15  I don't believe this was explained.

16        And the beginning of this highlighted sentence says:

17  Since the secretary raised the possibility of a PR covenant.

18  Do you see that?

19  A.  Yes.

20  Q.  And a PR covenant was a reference to a principal reduction

21  covenant; correct?

22  A.  That's correct.

23  Q.  And am I correct that principal reduction is the concept

24  of -- at least in this context -- was the context of homeowners

25  who may have a mortgage higher than the value of their home.

1    That's sometimes called being underwater; is that right?

2    A.  That's correct.

3    Q.  And the concept was that the Treasury Department was

4    proposing that Fannie and Freddie under your leadership at the

5    FHFA would reduce some of that principal, just forgive it, to

6    bring the mortgages down for some or all of such homeowners.

7    Is that more or less correct?

8    A.  Yes.

9    Q.  And you were opposed to that; correct?

10   A.  Yes.

11   Q.  And that became an important part of this negotiation over

12   the third amendment; correct?

13   A.  It became an element of the negotiation over the third

14   amendment.  At this time we were -- actually had both issues

15   that we were engaged in discussions with Treasury.

16   Q.  Okay.  But Treasury wanted you to include in the third

17   amendment a covenant or a promise to engage in the kind of

18   principal reduction -- principal forgiveness that they thought

19   was a good idea; correct?

20   A.  Yes.

21   Q.  And you did not want to include that in the third amendment

22   because you did not think that was a good idea; correct?

23   A.  That's correct.

24   Q.  And isn't it correct that as long as they were asking for

25   there to be a principal reduction promise in the third

1    amendment, you saw no urgency in going forward with the third

2    amendment; isn't that correct?

3    A.   What I saw, what I discussed with them was I did -- one of

4    these topics kept separate.  That the discussions we were

5    having over principal forgiveness needed to be resolved as a

6    principal-forgiveness discussion.  And then what we did with

7    the third amendment should be -- stick to the issues that we

8    were dealing with under the third amendment.

9         And so what I'm -- what this was about here at this time

10   was me conveying to the Treasury Secretary I did not want to do

11   a third amendment that included a principal reduction covenant.

12   Q.   Okay.  Well, I -- let me ask you -- let me ask you about

13   the following statement from your deposition.

14        If we could play Clip 4, please.

15        (An audio-visual recording was played.)

16   BY MR. HUME:

17   Q.   Mr. DeMarco, was that truthful and accurate testimony?

18   A.   Yes.

19   Q.   And so isn't it true that as long as Treasury was asking

20   for principal reduction to be in the third amendment, you were

21   saying that you saw no urgency to doing the third amendment;

22   correct?

23   A.   I was saying that I did not want to do principal reduction

24   in the third amendment.  We were trying to wrap up the

25   principal reduction thing and there was a great deal of

1    attention and focus on getting this done.  And I wanted that

2    resolved separately.

3         And so we had time to get the third amendment done.  I

4    wanted the third amendment done.  I did not want these two

5    issues joined.  I did not want a principal reduction covenant

6    in the third amendment.  This discussion at this time with the

7    Treasury Department is focused on that point.

8    Q.  Isn't it true --

9         MR. HUME:  Can we pull up PX-205 again.

10   BY MR. HUME:

11   Q.  The first sentence that's highlighted says:  Since the

12   secretary raised the possibility of a PR covenant -- a

13   principal reduction covenant; correct?

14   A.  Yes.

15   Q.  It then says:  DeMarco no longer sees the urgency of

16   amending the PSPAs this year; correct?  That's what it says?

17   A.  That's what it says.

18   Q.  And on your direct testimony, you told this jury that you

19   did not say that; you did not tell them that you no longer saw

20   urgency.  Correct?

21   A.  I believe that's what I said.

22   Q.  Okay.  But, in fact, you admitted in your deposition that

23   as long as they wanted principal reduction, you no longer saw

24   any urgency in doing a third amendment; correct?

25   A.  I -- I believe the tape we just played said that I wanted

1    to keep these two things separate.

2    Q.  Okay.  Let's play it again.

3            MR. HUME:  Clip 4, please.

4        Actually, can we do -- just to be a little bit faster,

5    4-B, the key question and answer.  I want to make sure this is

6    accurate.

7            (An audio-visual recording was played.)

8    BY MR. HUME:

9    Q.  And, Mr. DeMarco, that was truthful testimony; correct?

10   A.  Yes.  It says I don't see the urgency in doing a third

11   amendment that has a principal reduction covenant in it.

12   Q.  Right.  And that's the same thing PX-205 says; right?

13   A.  Yes.

14   Q.  So PX-205 is accurate; correct?  Isn't it true, then, that

15   -- isn't it accurate, contrary to what you said on direct, that

16   since the Secretary raised the possibility of a PR covenant,

17   DeMarco no longer sees the urgency of amending the PSPAs this

18   year; that's accurate, isn't it?

19   A.  Those are saying two different things.

20   Q.  Okay.  Well, we'll let the record speak for itself.

21           Now, on this issue of principal reduction, isn't it true

22   that you were willing to walk away from the deal completely if

23   they insisted on principal reduction being in the third

24   amendment?  Isn't that true?

25   A.  I am telling them that I am not prepared to do the third

1    amendment with principal reduction in it.

2    Q.  I'm going to ask the same question.  I just appreciate a

3    yes or no.

4         Isn't it true that you were willing to walk away from

5    the third amendment if they insisted on including principal

6    reduction in the third amendment?

7    A.  I'm not sure we've ever established that one way or another

8    because it never came to that point.

9         MR. HUME:  Could we play Clip 7 from the deposition,

10   please.

11        (An audio-visual recording was played.)

12   BY MR. HUME:

13   Q.  And that was truthful and accurate testimony; correct?

14   A.  Yes.

15   Q.  Okay.  Now, I would like to show you another document.  I

16   don't believe it's in evidence yet.

17        MR. HUME:  So please show this to the witness and the

18   lawyers, but not the jury yet.  PX-584, please.

19   BY MR. HUME:

20   Q.  Do you recall, Mr. DeMarco, before we look at this

21   document, that before the June 25th meeting with Mr. --

22   Secretary Geithner and Ms. Miller, you had a premeeting a few

23   days earlier with Ms. Miller and Mr. Stegman.  Do you have any

24   recollection of that?

25   A.  It sounds correct.

1    Q.  Okay.  And, by the way, before we look at this document

2    together, I believe on direct you were shown notes, handwritten

3    notes, you had and memos from meetings you had with Treasury.

4    Do you recall seeing that?

5    A.  Yes.

6    Q.  And -- and you weren't shown any handwritten notes or any

7    memoranda of your meeting on June 25th; correct?

8    A.  I don't recall seeing any.  That's correct.

9    Q.  Do you recall if you took notes at that June 25th meeting?

10   A.  I don't recall.  I'm sorry.  Do I recall?  I mean --

11   Q.  Yeah.  Just do you recall?

12   A.  No.

13   Q.  Okay.  Now, this -- this email chain that's 584, let's

14   maybe start at the bottom on the next page.  Like most emails,

15   it reads from the bottom up.  And you see -- and since it's not

16   in evidence -- it's not in evidence, I'm just going to talk --

17             MR. STERN:  Objection.

18             THE COURT:  He's only showing it to the witness.

19             MR. HUME:  I'm just showing it to the witness,

20   establishing -- it's not on the screen with the jury.

21             MR. STERN:  Sorry.

22   BY MR. HUME:

23   Q.  You see the bottom email is from Mary Miller to -- the

24   first header in the "to" is TFG75.  Do you see that?

25   A.  I do.

1    Q.  Would it be your understanding that's Timothy Geithner's

2    email address?

3    A.  Yes.

4    Q.  Okay.  And then it's to a number of other people, including

5    copying Michael Stegman and Timothy Bowler.  Do you see that?

6    A.  I do.

7    Q.  And you see the first sentence refers to having --

8              MR. STERN:  Objection, Your Honor.

9              MR. HUME:  I'm not going to read it.

10             MR. STERN:  You just said the first sentence refers

11   to.

12             MR. HUME:  Well, I'm trying to establish a little bit

13   --

14             THE COURT:  What's the question you're going to ask

15   the witness?

16             MR. HUME:  I'm -- first, I want to establish what the

17   document contains generally.

18             THE COURT:  Has he ever seen it?

19             MR. HUME:  I'm not sure if --

20             THE COURT:  Well, ask him.

21             MR. HUME:  Okay.  Your Honor --

22             THE COURT:  If he hasn't seen it, I don't know what

23   you're showing it to him for.

24             MR. HUME:  Well, I'd like a chance to explain that to

25   the Court.

```
 1                  THE COURT:  I'm sorry?
 2                  MR. HUME:  I'd like to have an opportunity to explain
 3         that to the Court.
 4                  THE COURT:  You can't just show him something he's
 5         never seen and ask him about it.
 6                  MR. HUME:  Well, Your Honor, may we be heard briefly
 7         on that?
 8                  THE COURT:  Yeah, you can be heard.
 9                  (Bench conference on the record.)
10                  MR. HUME:  Your Honor, this is Mr. Hume.
11            This is an issue and a document of utmost importance to
12         the case, and before a ruling is made on whether it's
13         admissible, which we believe it is for two or three reasons, we
14         would request a short recess to have an opportunity to discuss
15         it with the Court.
16                  THE COURT:  But you can discuss it now.
17                  MR. HUME:  Okay, Your Honor.  The witness testified
18         unequivocally on direct that he never told anyone that he no
19         longer saw urgency in amending the PSPAs in the summer of 2012.
20         We've already established through the deposition clips that
21         that was not accurate.
22            This document further establishes that that was not
23         accurate because it is a contemporaneous email to the Secretary
24         of the Treasury right after a meeting with Mr. DeMarco from
25         senior Treasury officials reporting to the secretary on the
```

1    meeting and saying that he no longer saw urgency and was not

2    willing to do the deal if it had principal reduction.

3           It directly contradicts the witness's testimony.  It is

4    admissible as a public record.  It's a formal memo to the

5    Treasury Secretary about the meeting.  It's also a present

6    sense impression, and it demonstrates the state of mind of the

7    decision-makers at Treasury.

8                   THE COURT:  It hasn't been admitted?

9                   MR. HUME:  It has not yet been admitted, no.

10                  THE COURT:  Then you can't show it to him.

11                  MR. HUME:  But I'm going to move to admit it.

12                  THE COURT:  Well, you can move now.

13          Is there an objection?

14                  MR. STERN:  There certainly is, Your Honor.

15                  THE COURT:  The objection is sustained.

16                  (Proceedings held in open court.)

17   BY MR. HUME:

18   Q.  Now, Mr. DeMarco, at this premeeting that you had with

19   Ms. Miller, Mr. Stegman, Mr. Bowler, do you recall telling them

20   that -- this is a premeeting on or around June 21, let's say a

21   few days before the June 25th meeting discussed in PX-205.  Do

22   you understand?

23   A.  Yes.

24   Q.  Okay.  In that earlier premeeting, do you recall telling

25   Ms. Miller, Mr. Bowler, Mr. Stegman that you did not see any

```
1    urgency in pushing to amend the PSPAs?  Do you recall that?

2    A.  No.

3              MR. HUME:  Your Honor, I would request permission to

4    show the witness the portion of this document.

5              THE COURT:  Denied.

6              MR. STERN:  Objection, Your Honor.

7              MR. HUME:  Denied?

8              THE COURT:  Yes.

9              MR. HUME:  Okay.

10         Now, let's put PX-205 back up, if we could, Ms. McGuire.

11   BY MR. HUME:

12   Q.  The sentence in No. 1 again that says:  The GSEs will be

13   generating large revenues over the coming years, thereby

14   enabling them to pay the 10 percent annual dividend well into

15   the future even with the caps.  Do you see that?

16   A.  I do.

17   Q.  You have stayed -- you stayed at FHFA through to early

18   2014; correct?

19   A.  Yes.

20   Q.  And in your subsequent jobs, you have continued to be

21   observant as to Fannie Mae and Freddie Mac's performance;

22   correct?

23   A.  Yes.

24   Q.  Isn't it the case, Mr. DeMarco, that this sentence in No. 1

25   here turned out to be correct?
```

1    A.  Yes.  There are years in which they earned large revenues

2    that allowed -- would've allowed them to pay the 10 percent

3    dividend.

4    Q.  Not just years.  Overall, isn't it true that from

5    January 1st, 2013, to the end of 2022, the comprehensive income

6    earned by Fannie Mae and Freddie Mac, each of them, is larger

7    than the 10 percent dividend would have been had there been no

8    net worth sweep; isn't that correct?

9    A.  I have not calculated that, but that's my understanding,

10   yes.

11              MR. HUME:  Could we briefly show Slide 24.

12   BY MR. HUME:

13   Q.  We do have excerpts from all the SEC filings from 2013 to

14   the present, if you want to check our math.

15              MR. HUME:  Slide 21.  I'm sorry.  Slide 21.

16   BY MR. HUME:

17   Q.  For Fannie Mae, the dividend over ten years, if there had

18   been no net worth sweep, would have been approximately

19   $117 billion; is that correct?

20   A.  Yes.

21   Q.  And you don't have any reason to doubt that the income they

22   have earned, the comprehensive income over those ten years,

23   2013 to '22, has been 200.5 billion?

24   A.  No.

25   Q.  And Freddie Mac's dividend, you don't have any basis to

1    dispute, would've been about 72.3 billion over the ten years;

2    correct?

3    A.  Correct.

4    Q.  And you don't have any basis to dispute that their actual

5    comprehensive income has been 124 billion; correct?

6    A.  Correct.

7         MR. HUME:  Now, can we go back to PX-205.

8    BY MR. HUME:

9    Q.  It is a passingly strange thing, Mr. DeMarco, that a person

10   who said something that turned out to be accurate about the

11   next ten years wants to deny saying it, but you're sticking

12   with your denial?  Or are you saying you don't recall one way

13   or the other?

14   A.  I'm sticking with the testimony that I've given today.

15   Q.  Okay.  Now, could we -- I'd like to compare what you said

16   here in No. 1 with what was in the SEC disclosures from the end

17   of the second quarter 2012 that your counsel showed you.

18        MR. HUME:  So could we pull up DX476.

19   BY MR. HUME:

20   Q.  We've split the screen here, Mr. DeMarco, just so it's

21   clear.  On the top half, you recognize the passage from PX-205;

22   correct?

23   A.  I do.

24   Q.  And from the bottom, we have an excerpt from the 10-Q SEC

25   filing for Fannie Mae from the second quarter 2012 from --

1    which is DX476 at page 16.  And your counsel showed you this,

2    and I assume you'll recall generally looking at the language;

3    like the language we have highlighted.  Do you see that?

4    A.  Yes.

5    Q.  And that language from the SEC filing says:  Although we

6    may experience period-to-period volatility in earnings and

7    comprehensive income, we do not expect to generate net income

8    or comprehensive income in excess of our annual dividend

9    obligation to Treasury over the long term.  Do you see that?

10   A.  Yes.

11   Q.  Now, I just showed you the actual arithmetic for the last

12   ten years; correct?

13   A.  Yes, you did.

14   Q.  And it shows comprehensive income greater than the

15   10 percent dividend amount over that ten-year period; correct?

16   A.  Yes; that's correct.

17   Q.  Now, in the opening statement, counsel for the defendants

18   told this jury that if something's in an SEC statement, you can

19   take it to the bank because if it turns out not to be true,

20   really serious things can happen, like getting prosecuted by

21   the SEC, maybe even going to jail.

22          Now, you don't know -- you're not aware of anyone

23   getting prosecuted by the SEC or going to jail because of this

24   statement in the second quarter of 2012 turned out not to be

25   correct, are you?

```
1    A.  No.

2    Q.  And that's because it's a forward-looking projection about

3    a risk; right?  It can't -- it's not something they could know

4    for sure one way or the other; correct?

5    A.  That's what it says:  We do not expect.

6    Q.  Well, but it turns out that what they did not expect

7    happened; right?  So it turned out to be wrong; correct?

8    A.  Up to this point, yes.

9    Q.  Up to this point.  Well, that's an interesting point.

10        It says over the long term.  Do you see those words?

11   A.  I do.

12   Q.  What did the long term mean?

13   A.  Over the long term -- I mean, as I've said earlier, these

14   companies are issuing mortgage-backed securities backed by

15   30-year mortgages, a long term; it could mean that.  It could

16   mean that -- however long they were in conservatorship.  It

17   means a long time into the future.

18   Q.  Could mean 5 years.  Could mean 10 years.  Could be mean

19   30 years.  Not exactly clear; correct?

20   A.  Doesn't have a specific year to it.  That's correct.

21   Q.  Okay.  But you did testify on direct that the longer

22   out you look, once you get past two, three years, certainly

23   past five, it's really uncertain what you're predicting;

24   right?

25   A.  Yes.
```

1    Q.  And so you are familiar with the fact that when you put in

2    SEC disclosure about something that's going to happen in the

3    future, you're better off being super cautious and

4    conservative; right?

5    A.  You're supposed to be accurate and -- let me just -- you

6    used the word there prediction.  This is not a prediction.  All

7    right?  We're talking about projections.  We're talking about

8    possible outcomes.  These are understood not to be a prediction

9    with certainty this is what is going to happen.

10        And so, yes, I mean, the further out you go trying to

11   make projections, the more uncertain those projections are.

12   And that works in both directions.  Things can end up better

13   than you expect.  Things can end up worse than you expect.

14   Q.  Right.  Exactly.  That's -- the SEC statement, by the way,

15   you are supposed to disclose risks that could be material to

16   the companies; correct?

17        MR. STERN:  Objection to the extent it's calling for

18   a legal conclusion, Your Honor.

19        THE COURT:  Sustained.

20   BY MR. HUME:

21   Q.  Did you testify at all about SEC disclosures in your

22   direct?

23   A.  We reviewed SEC disclosures.

24   Q.  One or two, maybe?  Maybe a dozen or two dozen?  You said

25   quite a lot about the SEC disclosures, didn't you?

1    A.  I read -- I read a number of SEC disclosures that were put

2    in front of me, yes.

3    Q.  Okay.  All right.  Well, you've read this one; right?

4    A.  Yes, sir.

5    Q.  And you -- as acting director of FHFA, you were in charge

6    of finally approving what went into these SEC disclosures;

7    correct?

8    A.  Yes.  I reviewed them.

9    Q.  Okay.  And if you thought there was a serious risk to the

10   companies, you understood that's the type of thing you're

11   supposed to put into an SEC disclosure; correct?

12            MR. STERN:  Objection to the extent it's calling for

13   a legal conclusion.

14   BY MR. HUME:

15   Q.  I'm calling for your understanding as the acting director

16   of the FHFA who approved these SEC filings; that's what I'm

17   asking you about.  I know you're not a lawyer.

18            So I'm asking for your understanding, which I believe

19   was permitted on direct.  Did you understand that if there was

20   a serious risk to the companies, that's the type of thing that

21   should be disclosed?

22   A.  I understand it is the company's responsibility to put into

23   their SEC filings the risks that they perceived.  It was not my

24   responsibility to review and agree or disagree with the risk

25   they had.  I was reviewing it to learn what the results were

1    and to ensure the accuracy of the characterization of FHFA's

2    conservator.  I was not there to overrule the company's

3    perception and reporting of risks as required under securities

4    and exchange laws.

5    Q.  Okay.  Isn't it a fact, Mr. DeMarco, that there was no

6    disclosure that you're aware of and that you were shown --

7    there was no disclosure by Fannie Mae or Freddie Mac in the

8    second quarter of 2012 saying that circular draws could

9    materially erode the size of the Treasury commitment once the

10   caps came back at the end of 2012; correct?

11   A.  I believe both of those second quarter Qs talk about

12   not earning enough dividend -- or income to pay dividend and

13   that in the future that that could cause an erosion of the --

14   of the capital support.  I believe that's in those second

15   quarter Qs.

16   Q.  Well, we'll -- the record will be what it is, but my

17   question is:  Do you recall any statement about -- I understand

18   there's a disclosure about the potential for circular draws,

19   but you would agree with me -- wouldn't you? -- that you can

20   have circular draws every once in a while, maybe even every

21   other year, without it materially eroding a commitment that is

22   over 120 or over a $140 billion?  You understand that; correct?

23   A.  Of course it depends on the size of what that circular draw

24   is.

25   Q.  That's right.  It depends.  It could be large; it could be

1   small.  Correct?

2   A.  Yes.

3   Q.  You saw those Benson projections.  They projected circular

4   draws over ten years, but it was -- it only amounted over ten

5   years to an $8-billion erosion on a commitment of 124 billion;

6   correct?

7   A.  I don't remember the exact numbers in the Benson thing that

8   you just quoted, but --

9   Q.  Okay.  We're going to look at it.

10         But you don't recall anything in the SEC disclosures

11   that says how quickly, how much they thought they were going to

12   eat into the Treasury commitment?  They didn't say anything

13   about that?

14   A.  No.  They -- they identified it as a risk factor.  They

15   talk about the fact that the fixed dividend exceeded for one

16   company all of their historical annual earnings.  For the other

17   company, I think it was one year of their -- all but one year

18   of their annual historical earnings.  They were -- this was

19   reported in these Qs.

20   Q.  Yeah.  We all saw that.  I'm asking a different question,

21   but the record will speak for itself.

22         One other question about what wasn't in here.  There was

23   no disclosure in the second quarter SEC filings for either

24   Fannie Mae or Freddie Mac that there might well be a net worth

25   sweep imposed instead of the 10 percent dividend; correct?

1    A.  Correct.

2    Q.  But you'd been discussing that since January; correct?

3    A.  Yes.

4    Q.  Okay.  Now, you stayed at FHFA until the early part of

5    2014; correct?

6    A.  Yes.

7    Q.  Okay.  And so you recall that in the first year, Fannie Mae

8    and Freddie Mac -- the first -- let's just make sure it's

9    totally clear to the jury.

10        The net worth sweep took effect on January 1st, 2013,

11   for that calendar year; correct?

12   A.  That's correct.

13   Q.  Okay.  So more accurately, it took effect in the first

14   quarter of 2013; correct?

15   A.  Yes.

16        MR. HUME:  And if we could show Slide 2, please.  And

17   we're showing it now to the jury again.

18   BY MR. HUME:

19   Q.  This is a slide put together by our summary witness just

20   taken from the -- actually, by our expert, Professor Dharan,

21   using some of our summary witness.  On the left side it shows

22   what the 10 percent dividend would have been combined for

23   Fannie Mae and Freddie Mac of about 18.9 billion.  You don't

24   dispute that that's what the dividend would have been if it had

25   stayed at the 10 percent level; correct?

1    A.  Correct.

2    Q.  And you don't dispute that the actual dividends paid to

3    Treasury under the net worth sweep for 2013 -- in 2013 was

4    130.1 billion; correct?

5    A.  Correct.

6    Q.  And so you don't dispute that the difference between those

7    two numbers is 111.2 billion; correct?

8    A.  I trust the math.  No, I don't dispute it.

9    Q.  Okay.  Now, sitting here today, knowing this, knowing the

10   other things you know in hindsight, you're still proud of the

11   net worth sweep even in hindsight; correct?

12   A.  Yes.

13   Q.  And am I also correct that when you learned these results

14   as acting FHFA director during 2013 and early 2014, the large

15   income levels above the dividend amount, you didn't go to

16   anyone and say, geez, that's not really what we had in mind

17   when we agreed to the net worth sweep?  You didn't go to anyone

18   and say that; correct?

19   A.  Correct.

20   Q.  And you weren't shown on direct -- they didn't show you any

21   emails or memos expressing shock or surprise at this result in

22   2013, did they?

23   A.  We did not review any such emails.

24   Q.  You don't remember any emails seeing these results and

25   saying this is really disappointing that we've agreed to the

1    net worth sweep because look at all this money Fannie and

2    Freddie are now making?  You haven't seen any emails or memos

3    like that, have you?

4    A.  I was never disappointed when the companies started to show

5    positive results.

6    Q.  No?

7    A.  The answer is no.

8    Q.  Even when they then had to send all that positive result to

9    Treasury?  That's my point.  You didn't see any emails or memos

10   expressing disappointment and you didn't write any emails or

11   memos expressing disappointment that the net worth sweep was

12   going to require to sweep away over 110 billion profit --

13   $110 billion in profit in the very first year?

14   A.  Correct.

15   Q.  Now, you said in your direct testimony that projections

16   have all sorts of scenarios:  best case, better, worse, stress,

17   or worst case.  Do you remember that?

18   A.  Yes.

19   Q.  And you said that what you were worried about was the

20   stress case, the worst case -- right? -- the catastrophe case?

21   A.  Yes.  I had to -- yes.

22   Q.  Isn't it true, Mr. DeMarco, that if there had been a stress

23   case, a pandemic, a war, an economic meltdown, Fannie Mae and

24   Freddie Mac would have been way better -- if that happened in

25   2014, let's say, Fannie Mae and Freddie Mac would have been way

1    better with this $111 billion on their books as well as the

2    Treasury commitment than only having the Treasury commitment

3    without this 111; correct?

4    A.  The added 111 would have given an additional buffer;

5    correct.

6    Q.  Because when you have that -- when Fannie and Freddie have

7    that net worth on their balance sheet, then that protects them

8    before they even need the commitment from any downturn, from

9    any losses; correct?

10   A.  That's correct.

11   Q.  And, likewise, when they have that buffer on their balance

12   sheet of net worth, if they do hit a year in the future where

13   the 10 percent dividend amount would've been higher than the

14   income, they can eat into their net worth to cover that?  They

15   don't have to draw from the commitment; correct?

16   A.  That's correct.

17   Q.  And so if -- if Fannie and Freddie had been able to keep

18   this 111 billion on their books, then it would have taken -- it

19   would have taken a lot of circular draws of a huge amount of

20   money before they would have had to draw from the commitment;

21   correct?  They could have used this instead?

22   A.  Yes.

23           MR. HUME:  And just because there was a complaint

24   earlier about combining things.  Can we show this slide in a

25   way that breaks out Fannie Mae and Freddie Mac.  We have it.

DEMARCO - CROSS

1    It's the last slide, I believe.  Slide 30.

2    BY MR. HUME:

3    Q.  So this one shows the same thing.  You see the 82 and the

4    47 roughly adds up -- 82.5 plus 47.6 roughly adds up to the

5    130 billion they paid, combined, in 2013; correct?

6    A.  Correct.

7    Q.  Okay.  So what we just said about the excess 111 billion

8    would be true for both Fannie and Freddie using the numbers

9    reflected on this chart in terms of the difference between the

10   net worth amount -- or the dividend amount under the net worth

11   sweep versus the 10 percent amount; correct?

12   A.  Correct.

13   Q.  And just as it would have helped Fannie and Freddie in a

14   stress scenario to have that extra net worth, that would've

15   instilled or given more confidence to bond and MBS investors --

16   correct? -- if they -- if Fannie and Freddie had that extra

17   130 billion split between them, as this chart shows, that would

18   have given more confidence to bond and MBS investors about the

19   safety of their investment; correct?

20   A.  All the elements of your hypothetical carried through and

21   they had that kind of retained earnings, yes.  We have not

22   addressed the periodic commitment fee, and this is the

23   particular outcome that occurred in this period right after --

24   in the -- in 2013.

25        So the answer to your hypothetical is yes.

1    Q.  The answer to my hypothetical is yes.  We're going to talk

2    about the periodic commitment fee.

3         But surely it's not your testimony that the difference

4    between these numbers -- it's not your testimony that the

5    periodic commitment fee in 2013 for both Fannie and Freddie

6    could have been $111 billion, is it?

7    A.  It could have been.

8    Q.  You think it would have been a reasonable periodic

9    commitment fee for Fannie Mae and Freddie Mac to have paid a

10   periodic commitment fee in 2013 alone of $111 billion?

11   A.  It was reasonable to expect -- because the Treasury

12   Department had been writing this and we had been thinking about

13   it -- that the periodic commitment fee could be set as a net

14   worth sweep.  So if there was earnings above the 10 percent

15   dividend, that that would have been compensation for the value

16   of the commitment provided.  So that was possible.

17   Q.  Okay.  Isn't it true that you never had anyone at FHFA go

18   through an exercise to calculate what a reasonable periodic

19   commitment fee would be?

20   A.  Correct.

21   Q.  Now, isn't it also true that Fannie Mae and Freddie Mac's

22   SEC filings from after the net worth sweep disclosed the

23   material adverse consequences that could come from the net

24   worth sweep?  Do you recall that?

25             MR. STERN:  Objection, Your Honor, to events after

DEMARCO - CROSS

1    August 17, 2012.  Not generally, but in this respect.

2                THE COURT:  Sustained.

3                MR. HUME:  Your Honor, may I be heard on this?

4                THE COURT:  Yeah.

5                (Bench conference on the record.)

6                MR. HUME:  Your Honor, this is Mr. Hume.

7         The defendants yesterday persuaded you to admit into

8    evidence an analyst report that was received after the net

9    worth sweep was announced, and that could not possibly

10   influence the decision-making that Mr. DeMarco had.

11        What I'm trying to show is that Fannie Mae and

12   Freddie Mac, after the net worth sweep was implemented, in the

13   very first quarter, and then in the very first year, disclosed

14   material risks that the net worth sweep caused to them,

15   including causing them to have an increased risk of needing to

16   make future draws on the Treasury commitment.

17        That is material evidence that goes to the heart of the

18   question of whether the net worth sweep reasonably did or even

19   could have been designed to do what Mr. DeMarco has been

20   saying.

21               MR. STERN:  Your Honor, we object on relevance

22   grounds.  It's a classically post hoc analysis and the jury is

23   going to be instructed that the reasonableness of Mr. DeMarco's

24   decision should be based on the facts and circumstances known

25   to him as of August 17th.  The analyst report is a same-day

1    reaction to the net worth sweep and not a retrospective

2    analysis of the consequences of the net worth sweep that the --

3    that were unknown to Mr. DeMarco.

4            We object on relevance grounds and 403 grounds,

5    Your Honor.

6            THE COURT:  The objection is sustained.

7            (Proceedings held in open court.)

8            MR. HUME:  Your Honor, may I show -- just so I

9    understand, may I -- there is an SEC filing in evidence that

10   the defendants put in evidence.  Actually, the -- it's a

11   plaintiffs' exhibit that went into evidence from 2013.  May I

12   show that, even though -- because it's in evidence?

13           MR. STERN:  Objection, Your Honor.

14           THE COURT:  You can put it up and I'll see if they

15   object.

16           MR. HUME:  Okay.  I just want to be clear.

17   BY MR. HUME:

18   Q.  Now, Mr. DeMarco, you do realize, I hope, that the

19   plaintiffs agree that you cannot predict the future with

20   certainty?  Do you understand that?

21   A.  Yes.

22   Q.  And you understand that -- would you agree with me that all

23   you can do is make reasonable projections about what is likely,

24   what is most likely, and then worry about other things that

25   might happen even if they're not that likely?  Would you

DEMARCO - CROSS

```
 1    generally agree with that?

 2    A.  You can take that approach.

 3    Q.  Well, isn't that generally --

 4    A.  Yes.

 5    Q.  -- what you would do in your position as acting director?

 6    A.  Yes.

 7    Q.  In other words, just because you can't predict the future

 8    with certainty doesn't mean you don't do anything to think

 9    about the future; correct?

10    A.  Correct.

11    Q.  You try to plan for it.  You try to estimate what might

12    happen.  You project different scenarios, and you try to

13    project likelihood, and also worry about things that might be

14    very important, even if not likely.  Would you agree with that?

15              MR. STERN:  Object to the form of the question,

16    Your Honor, as compound.

17              THE COURT:  Overruled.

18    A.  I'm sorry.  Would you please restate the question,

19    Mr. Hume.

20    BY MR. HUME:

21    Q.  Sure.

22              Would you agree with me that even though you can't know

23    the future with certainty, that what a reasonable person would

24    do, particularly if you're managing large institutions, is to

25    try to make reasonable predictions about what's most likely to
```

1    happen and then also run scenarios for things that might

2    happen, even if they may be less likely?  Would you agree with

3    that?

4    A.  I wouldn't use the word predictions at all.  But if you

5    take projections of various outcomes, you think about what are

6    the range of possible outcomes, and you might assign some

7    degree of greater or lesser competence to them.  Yes, that

8    would be normal.

9    Q.  But isn't it a fact, Mr. DeMarco, a simple fact, that

10   before you agreed to the net worth sweep, before you agreed to

11   give away 100 percent of Fannie and Freddie's profits and net

12   worth forever, you never had anyone do a study or written

13   analysis or memo of any kind trying to determine the likelihood

14   of an outcome like the 2013 outcome?  Isn't that correct?

15   A.  That's correct.

16          MR. HUME:  Put Slide 2 back up.

17   BY MR. HUME:

18   Q.  There is no memo or written analysis of any kind at FHFA

19   trying to predict whether something like this might happen

20   under the net worth sweep; correct?

21   A.  Correct.

22   Q.  In fact, there's no analysis of whether Fannie and Freddie

23   were more likely to end up paying more or less to Treasury

24   under the net worth sweep than under the 10 percent dividend;

25   isn't that correct?

```
1    A.  Correct.

2    Q.  And there are no memos analyzing the pros and cons of

3    whether to do the net worth sweep; correct?

4    A.  Correct.

5    Q.  And there are no emails with long analysis of whether or

6    not to do the net worth sweep; correct?

7    A.  Correct.

8    Q.  In fact, there are no emails back and forth between FHFA

9    and Treasury negotiating whether or not to do the net worth

10   sweep; correct?

11   A.  Correct.

12   Q.  Is there a single document, a single memorandum analyzing

13   the pros and cons of entering into the net worth sweep on

14   behalf of Fannie Mae and Freddie Mac?

15   A.  Well, let's start with there is my request to the Treasury

16   Secretary in January 2012 of why I wanted to enter into a third

17   amendment with him, and it set forth my reasons for doing so.

18   There were no memos of -- summarizing that at the end.  There

19   were meetings and discussions that took place.

20        And then an agreement was reached that satisfied my

21   objectives.

22              MR. HUME:  Ms. McGuire, could you please pull up the

23   prior proceeding transcript at page 753.  753, lines 10 to 13.

24   BY MR. HUME:

25   Q.  Mr. DeMarco, you remember there was another proceeding in
```

DEMARCO - CROSS

1     this case, do you recall that, in 2022?

2     A.  Yes, sir.

3     Q.  About nine months ago.

4          You were asked:  QUESTION:  Is there a single document,

5     a single memorandum, analyzing the pros and cons of entering

6     into the net worth sweep on behalf of Fannie Mae and

7     Freddie Mac?

8          ANSWER:  No.

9          Was that truthful and accurate testimony?

10    A.  Yes.

11    Q.  And isn't it also true that --

12         MR. HUME:  If you put Slide 2 back up.

13    BY MR. HUME:

14    Q.  Isn't it also true, Mr. DeMarco, that you never made

15    any effort to negotiate with the Treasury Department a

16    provision in the third amendment that would deal with this

17    kind of outcome to make sure that if Fannie and Freddie

18    ended up having extraordinary profits, very large profits,

19    not all of them would be swept or maybe they'd be treated

20    as a redemption of principal or something?  There's no

21    effort to negotiate a provision to deal with this scenario;

22    correct?

23    A.  Correct.

24    Q.  Now, isn't it also true --

25         MR. HUME:  You can take that down now, Ms. McGuire.

1    BY MR. HUME:

2    Q.  Isn't it also true -- we talked about your testimony about

3    urgency and whether you would refuse to do the third amendment

4    if there was a principal reduction component.  Do you recall

5    that questioning?

6    A.  I do.

7    Q.  Now, in terms of the bond and MBS investors -- let's take

8    the bond investors first.  You talked about them on direct;

9    correct?

10   A.  Correct.

11   Q.  Would you -- are you familiar with what a yield spread is;

12   a yield curve that shows how the Fannie Mae and Freddie Mac

13   bonds are trading compared to the United States Treasury?

14   A.  Yes, I'm familiar with the concept.

15   Q.  And you're familiar with the concept that, first of all,

16   the United States Treasury debt is widely considered to be the

17   safest financial instrument on the planet; correct?

18   A.  Yes.

19   Q.  And so it generally trades at comparatively high price,

20   which means a low yield, a low percentage return; correct?

21   A.  Well, I believe you're asking this in the context of other

22   security instruments, yes.

23   Q.  Correct.

24        And so the Fannie Mae and Freddie Mac bonds, to the

25   extent they were trading very close in price with a similar

1    yield, that would generally indicate a high level of confidence

2    by investors that the Fannie and Freddie bonds were safe;

3    correct?

4    A.  Correct.

5    Q.  And by contrast, if the Fannie and Freddie bonds start to

6    have lower prices and higher yields, the spread with the

7    Treasury gets bigger, that shows a little bit less confidence,

8    generally; correct?

9    A.  Yeah.  One has to be kind of careful with this because it

10   also depends upon the actual absolute levels of the yield

11   curve.  These things are not fixed.  But they vary based upon

12   the size -- the height and shape of the yield curve.  But the

13   general concept, yes.

14   Q.  There are other factors that could influence pricing --

15   correct? -- like if they -- if there was a perception that

16   there was going to be a reduced supply of Fannie and Freddie

17   bonds, that could impact pricing; correct?

18   A.  There are other factors that could affect the pricing, yes,

19   sir.

20   Q.  Okay.  Did you -- did you yourself or people working at

21   your direction when you were studying or gathering information

22   about market participants, the bond investors, and the

23   mortgage-backed securities investors -- did you have people go

24   out and -- and look at trading activity and pricing of Fannie

25   and Freddie debt?

1    A.  So FHFA did have people that monitored that, yes.

2            MR. HUME:  Okay.  I'd like to show, if you could,

3    Ms. McGuire, PX-597.

4    BY MR. HUME:

5    Q.  And PX-597, Mr. DeMarco --

6            MR. HUME:  Which maybe we can blow up a little bit so

7    we can see the numbers a little bit bigger.

8    BY MR. HUME:

9    Q.  -- is a printout from a Bloomberg terminal of a -- the

10   five-year -- or a representative sample of five-year Fannie and

11   Freddie bonds compared to Treasury's, the yield spread.  Are

12   you familiar with this kind of chart that is tracking the yield

13   spread?  Do you understand that?

14   A.  Yes.

15   Q.  And so you understand that -- you can, obviously, notice

16   the huge spike in the middle is in the latter part of 2008.  Do

17   you see that?

18   A.  Yes.

19   Q.  And so that's showing -- that's showing market concern at a

20   high level in the middle of the financial crisis; correct?

21   A.  Leading up to it, the conservatorship's immediately after,

22   yes.

23   Q.  So you see it's spiking up and up throughout the latter

24   part of 2007, 2008; correct?

25   A.  Yes.

1    Q.  And, in fact, if you look at the numbers on the right-hand

2    index, you can see the basis points -- you see that it goes

3    from a hund- -- zero to 160?  Do you see that?

4    A.  Yes.

5    Q.  And that shows --

6           MR. HUME:  You can put that back, now, Ms. McGuire.

7    BY MR. HUME:

8    Q.  That's the basis point spread between the Fannie and

9    Freddie bonds and the U.S. Treasury's; right?

10   A.  Yes.

11          MR. HUME:  Okay.  And if you pull back up,

12   Ms. McGuire, just from the last quadrant there of 2012.

13   BY MR. HUME:

14   Q.  This -- this chart, Mr. DeMarco, on the exhibit -- we can

15   show you the full thing, has an explanation of how it was

16   pulled out -- but it ends -- I'll represent to you, it ends on

17   August 16th, 2012, before the net worth sweep.  Do you

18   understand that?

19   A.  I'm understanding your representation to me, yes, sir.

20   Q.  I understand you can't -- I understand.

21          But do you see here that throughout 2012, the general

22   trend is that the yield curve is going down?  These bonds are

23   getting closer and closer to U.S. Treasury's, and the yield

24   spread is getting lower and lower throughout 2012 up to

25   August 16th, 2012?  Do you see that?

1    A.  I wouldn't want to overstate that, but yes.  I mean, the --

2    from the start of the year to the date you've picked, it is

3    lower.

4    Q.  Right.  I mean, if you look at the latter part -- between

5    September-December in 2011, it tops 40 basis points.  Do you

6    see that?

7    A.  I do.

8    Q.  And when you get to the end of the chart, it looks like

9    it's less than 10.  It has a 5.4-basis point.  Do you see that?

10   A.  I do.

11   Q.  And that's before the net worth sweep was announced?  That

12   was -- it was announced on August 17th; correct?

13   A.  Yes.

14   Q.  And as you're going through 2012 and those yield spreads

15   are getting closer and closer to Treasury, that's the same

16   time -- the December 31, 2012, caps are getting closer and

17   closer in time; correct?

18   A.  Yes.

19   Q.  Okay.

20          MR. HUME:  You can take that down.

21       And could you briefly put up PX-636.

22   BY MR. HUME:

23   Q.  This is a similar chart, Mr. DeMarco.  You said several

24   times in direct that because most homeowners buy a 30-year

25   mortgage, 30 years is kind of -- you've got to think long term

 1    at Fannie Mae and Freddie Mac; correct?

 2    A.  Yes.

 3    Q.  And Fannie Mae and Freddie Mac did themselves issue 30-year

 4    bonds; correct?

 5    A.  Yes.

 6    Q.  Okay.  So this -- this exhibit, PX-636, which is also in

 7    evidence, this shows the same Bloomberg printout but for the

 8    30-year bonds.  Do you see that at the top?

 9    A.  Yes.

10    Q.  And you see, again, if we can try to make the numbers a

11    little bigger -- that again, similar in 2008, you see that

12    massive spike, that's the middle of the financial crisis when

13    people are worried about the safety of Fannie and Freddie

14    bonds; correct?

15    A.  Yes.

16    Q.  And do you see, again, at the end of the chart from 2011

17    to August -- this, again -- I will represent to you, we cut

18    this off on August 16th, 2012.  Do you see, again, that, in

19    general, from 2011 -- from -- let's say, December 2012 has gone

20    down by August 16th, 2012, from where it was in December;

21    correct?

22    A.  Yes, I'd say it's generally looking pretty flat for most of

23    2012.  But yes, from the date you picked as the start to the

24    date at the end, it comes down.

25              MR. HUME:  Okay.  Thank you.  You can take that down,

1        Ms. McGuire.

2        BY MR. HUME:

3    Q.  Now, let me try to level-set here with a few -- few general

4    questions.

5            First of all, when you were the acting director at FHFA

6    and negotiating with Treasury, did you view yourself to be in

7    an arm's length negotiation?

8    A.  Yes.

9    Q.  And also recognizing -- we talked about principal

10   reduction, you had a different policy view with Treasury, but

11   would you characterize that as a heated but reasonable policy

12   disagreement?

13   A.  Debating on the word heated.  It certainly was a policy

14   debate.

15   Q.  I didn't mean to add too much characterization, because I

16   just wanted -- I think the next question will be clear that

17   it's a little -- I'm asking a different kind of thing, which

18   is:  Putting aside a policy debate that reasonable people could

19   disagree on, would you generally agree that the Treasury would

20   not do something that would deliberately tank or harm the

21   United States economy?

22   A.  I would agree with that.

23   Q.  Okay.  And let's just briefly go back to some of the

24   chronology in the beginning.

25           First of all, you're not -- you're not trained as an

1    accountant; correct?

2    A.  That's correct.

3    Q.  You don't have a CPA?

4    A.  I do not.

5    Q.  Okay.  And when you were at OFHEO, the regulator that

6    preceded FHFA, you had -- you were chief operating officer;

7    correct?

8    A.  That's correct.

9    Q.  And you were -- OFHEO was the main safety and soundness

10   regulator for Fannie Mae and Freddie Mac; correct?

11   A.  Correct.

12   Q.  And isn't it true that you told the financial crisis

13   inquiry commission that OFHEO took its eye off the ball in its

14   regulation of Fannie Mae and Freddie Mac?

15   A.  Mr. Hume, that was a very long time ago.  I have not

16   reviewed it.  So I do not want to swear exactly what I said to

17   the financial crisis inquiry commission, what is now probably

18   close to 15 years ago.  If you show it to me, that would be

19   great.

20   Q.  Okay.  I'm not sure it's necessary, but I appreciate that.

21        Now, you talked about how you became acting director,

22   very Washington thing, acting director versus director.

23        I just wanted to make sure a few things were clear.

24   When -- when Director Lockhart retired from FHFA, you were one

25   of three deputy directors; correct?

1    A.   That's correct.

2    Q.   And am I correct that you were the most senior of the three

3    deputy directors?

4    A.   Mr. Lockhart had designated me as the senior deputy

5    director, yes.  He wanted to make that distinction.

6    Q.   Okay.  And isn't it true that for appointing an acting

7    director who's supposed to fill the post while a full-time

8    director is appointed and confirmed by the Senate -- that's

9    what an acting director is; correct?

10   A.   Correct.

11   Q.   And isn't it true that under -- under HERA, under the

12   statute, President Obama had only -- could only choose for an

13   acting director -- he had to choose one of those three deputy

14   directors; correct?

15   A.   Correct.

16   Q.   Okay.  And President Obama never appointed you to serve as

17   the full director; correct?

18   A.   He never nominated me to be the permanent director.

19   Q.   Okay.  And -- but he did -- in 2010, he nominated someone

20   named Joseph Smith to become the permanent director; correct?

21   A.   Yes, he did.

22   Q.   And the Republicans controlled the Senate then, and they

23   returned his nomination --

24        MR. STERN:  Your Honor, objection.  Going a little

25   far afield here.  Relevance.

1          THE COURT:  Overruled.

2          MR. HUME:  Your Honor, this won't take long.

3     BY MR. HUME:

4     Q.  The Republicans returned Mr. Smith's nomination.  So he

5     wasn't confirmed; correct?

6     A.  Mr. Smith was not confirmed.  That's correct.

7     Q.  Okay.  And then the Democrats won the election in November

8     2012, and then President Obama nominated Mel Watt to be the

9     permanent director; correct?

10    A.  In 2013.

11    Q.  In 2013.  And --

12    A.  Yes.

13    Q.  And -- but Mr. Watt's cloture vote failed because of a

14    filibuster.  That was the first thing that happened; right?

15          MR. STERN:  Objection, Your Honor.  Relevance at this

16    point.

17          THE COURT:  Overruled.

18    BY MR. HUME:

19    Q.  Well, it took a while is all I'm saying.  It took a while

20    for -- it required the -- Democrats then had to get rid of the

21    filibuster, and then it was -- it took a while, until the end

22    of 2013, for Mr. Watt to be confirmed; correct?

23    A.  Correct.

24          MR. HUME:  Your Honor, I'm happy to keep going, but

25    if now is a good time to take a break.

 1              THE COURT:  We can take a break.  Ten minutes.

 2              (Proceedings held out of the presence of the jury.)

 3              (Recess taken.)

 4              (Proceedings held in the presence of the jury.)

 5              THE COURT:  All right.  You may be seated.

 6         Mr. Hume, you may proceed.

 7              MR. HUME:  Thank you, Judge Lamberth, members of the

 8    jury, Mr. DeMarco.

 9    BY MR. HUME:

10    Q.  Yesterday, Mr. DeMarco -- sorry.  Yesterday -- I think it

11    was yesterday, you were asked some questions about the

12    statements you and others at FHFA made about the purpose of

13    conservatorship.  Do you recall that?

14    A.  Yes.

15    Q.  And -- and you gave some testimony about how some things

16    changed after that and -- I just want to ask you some questions

17    about that.  Okay?

18              MR. HUME:  First of all, could I -- could we pull up

19    PX-2-C-1.

20    BY MR. HUME:

21    Q.  And do you recognize this, Mr. DeMarco, as the questions

22    and answers -- a version of the question-and-answer fact sheet

23    that was put out by FHFA on or around the date the

24    conservatorship was imposed?

25    A.  Yes.

1    Q.  Okay.  And you see the first question is:  What is a

2    conservatorship?  And the answer is:  A conservatorship is the

3    legal process in which a person or entity is appointed to

4    establish control and oversight of a company to put it in a

5    sound and solvent condition.

6         Do you see that?

7    A.  Yes.

8    Q.  And you agreed yesterday, I think, in your testimony, that

9    solvent means having positive net worth; correct?

10   A.  Yes.

11   Q.  Okay.  Now, a little further down the page, you were asked

12   about the question that says:  What are the goals of the

13   conservatorship?

14        Do you see that?  Do you see that question?

15   A.  Yes, I do.

16   Q.  And your counsel said the first sentence didn't really

17   answer the question.  Do you remember that?

18           MR. HUME:  It's okay.  Sorry.  Could we -- this is --

19   this document is a version of the same document, PX-2-C, that's

20   in evidence.  May we publish it to the jury?

21           THE COURT:  Yes.

22   BY MR. HUME:

23   Q.  This question:  What are the goals of the conservatorship?

24   What -- could you just read into -- read for the jury the first

25   question -- the first sentence of the answer.

1    A.   The first sentence says:  The purpose of appointing the

2    conservator is to preserve and conserve the company's assets

3    and property and to put the company in a sound and solvent

4    condition.

5    Q.   Okay.  And am I correct, that sentence is part of the

6    answer to the question:  What are the goals of the

7    conservatorship?

8    A.   Well, I mean, the goals are listed in the next sentence.

9    But this is conveying accurate information about what it means

10   to appoint a conservator.  This language comes from the

11   statute.

12   Q.   You should read both -- the whole answer together to

13   get the FHFA's full answer to the question.  Would you agree?

14   A.   Sure.  The FHFA put both sentences in at the time, and so

15   both sentences constitute an answer.

16   Q.   Okay.  And if we can just look at the top left corner of

17   this document.  Do you see that it's got a printout date of

18   August 1st, 2023?  Do you see that?

19   A.   I do.

20   Q.   I'll represent to you this came off the FHFA's website last

21   week, on August 1st.  We printed it out.

22        Does it surprise you in any way that this is still on

23   the FHFA's website?

24   A.   No.

25   Q.   And you're not aware of any time while you were at FHFA

 1     when the FHFA put out any kind of publications saying that what

 2     was in this fact sheet was no longer accurate or reliable?

 3     A.  No, I don't recall such a thing.

 4     Q.  Okay.  Could we look at PX-2-E, which I think you were also

 5     shown yesterday.

 6               MR. HUME:  If I can just blow up the first email

 7     header to remind everyone what this is.

 8     BY MR. HUME:

 9     Q.  Mr. DeMarco, you were shown -- this is an email from you to

10     others at FHFA on October 30th, 2008.  Do you recall seeing

11     this?

12     A.  Yes.

13     Q.  This has your presentation slides and a copy of your speech

14     to the ABS conference, the asset-backed security conference, I

15     think it is; is that right?

16     A.  Correct.

17     Q.  And that was from October 2008; correct?

18     A.  Yes.

19     Q.  And on page 18 of this document --

20               MR. HUME:  Could we go to page 18.

21     BY MR. HUME:

22     Q.  -- it says -- in the last sentence of the first bullet,

23     it says:  Conservatorship statutes provide broad authority

24     for a conservator to operate the institution until it is

25     stabilized and then returned to shareholders.  Do you see that?

1    A.  Yes.

2    Q.  And that was part of your presentation at ABS East;

3    correct?

4    A.  Yes.

5    Q.  Okay.  Was there any time between October 2008 and

6    December 2009 when you told shareholders that FHFA was

7    rescinding what you said about the potential return of the --

8    Fannie Mae and Freddie Mac to shareholders?

9    A.  Did I issue a formal statement rescinding that?

10   Q.  Yes.  Did you?

11   A.  No, because that's -- that's one of the targeted outcomes

12   and possible outcomes of a conservatorship.

13   Q.  Okay.  And was there any time between October 2008 and

14   December 2009 when you told shareholders that there would no

15   longer be any effort to return Fannie Mae and Freddie Mac to

16   normal business operations and return to their shareholders?

17   A.  I don't recall issuing any communication ever that was

18   directed at the shareholders of the companies.

19   Q.  This is a communication -- okay.  Sorry.  Fair enough.  So

20   let's -- let me rephrase the question.

21        Was there any time between October 2008 and

22   December 2009 when you or FHFA issued any communication saying

23   to anyone that there would no longer be any effort to return

24   Fannie Mae and Freddie Mac to normal business operations and

25   return to their shareholders?

1   A.  Well, returning them to normal business operations was and

2   remained the -- you know, the goal.  In fact, that was what we

3   were trying to achieve from day one, is to get them to continue

4   to -- to be able to operate normally; right?  That was the

5   purpose of the conservatorship.  And then the PSPA.

6       In terms of returning them to the shareholders, I don't

7   believe I addressed that question one way or another after

8   that -- that particular slide that you showed me.

9   Q.  Okay.  You did give testimony yesterday about your

10  understanding of the -- Freddie's preserve and conserve assets.

11  Do you recall that?

12  A.  Yes.

13  Q.  I just want to make sure the jury and I understood what

14  your testimony was.  You're not trying to say -- are you? --

15  that hundreds of billions of dollars of money on the balance

16  sheet of Fannie Mae and Freddie Mac are not assets that FHFA

17  was supposed to try to preserve and conserve, are you?

18  A.  No, I was not.

19  Q.  Okay.  You made references to the assets being kind of the

20  business mechanics and the people.  And putting that aside, I

21  just want to make clear, money and assets of any kind on the

22  balance sheet -- the assets that are shown on the balance

23  sheet, those are assets that were supposed to be preserved and

24  conserved as well; correct?

25  A.  Yes, and I believe I said that yesterday.

1    Q.  Okay.  I just wanted to make sure I was clear.  Thank you.

2         Now, in December 2009, when you did the second

3    amendment, you knew that the commitment from Treasury would be

4    capped at the end of 2012; correct?

5    A.  Yes.

6    Q.  And in December 2009, you didn't know what Fannie or

7    Freddie's financial condition would be in 2013 or any time

8    after 2013; correct?

9    A.  Correct.

10   Q.  And in December 2009, you didn't know what the condition of

11   the housing market would be in 2013 or any time after 2013?

12   A.  Correct.

13   Q.  The second amendment could have said when the caps come

14   back on December 31st, 2012, the dividend rate is going to

15   change from a 10 percent rate to a net worth sweep.  That -- it

16   could have said that -- right? -- but it doesn't say that;

17   correct?

18   A.  It does not say that.

19   Q.  Okay.  Let's go back to some of the things that were said

20   in the SEC statements of 2009 and 2008.

21        You were shown, I believe, the following SEC statements,

22   and there are just a few things I don't think were pointed out.

23   So could we pull up Defendants' Exhibit 188.

24        And this is -- if you look at the cover, Mr. DeMarco --

25   the 10-Q filing for the third quarter of 2009 -- do you see

1    that? -- for, I believe, Fannie Mae?

2    A.  Yes, I see that.

3    Q.  And if we could just quickly go to page 188 of 243.

4         And this sentence on page 188 says:  FHFA has directed

5    us during the time we are under conservatorship to focus on

6    managing to a positive net worth.  Do you see that sentence?

7    A.  Yes.

8    Q.  And was that a true statement when it was made,

9    Mr. DeMarco?

10   A.  Yes.

11   Q.  And at no time prior to December 24th, 2009, did FHFA

12   direct Fannie Mae not to focus on managing to a positive net

13   worth; correct?

14   A.  Correct.

15   Q.  Okay.

16        MR. HUME:  If we can put that down, Ms. McGuire.  And

17   let's just quickly look at Defendants' Exhibit 189, which is

18   the third quarter 10-Q filing for Freddie Mac.

19   BY MR. HUME:

20   Q.  Do you see that, Mr. DeMarco?

21   A.  Yes.

22   Q.  And at page 73 of this document, I'd like to call your

23   attention to a sentence that says:  We are focusing our risk

24   and capital management consistent with the objectives of

25   conservatorship on, among other things, maintaining a positive

1    balance of GAAP equity in order to reduce the likelihood that

2    we will need to make additional draws on the purchase agreement

3    with Treasury while returning to long-term profitability.

4         Do you see that?

5    A.  Yes.

6    Q.  And the statement -- the reference to positive balance of

7    GAAP equity is another way of saying positive net worth;

8    correct?

9    A.  Yes.

10   Q.  And on the same document at page 162, there's another

11   sentence about positive GAAP equity.  It says:  Following our

12   entry into conservatorship, we have focused our risk and

13   capital management consistent with the objectives of

14   conservatorship on, among other things, maintaining a

15   positive balance of GAAP equity in order to reduce the

16   likelihood that we will need to make additional draws on the

17   purchase agreement with Treasury while returning to long-term

18   profitability.

19        Do you see that?

20   A.  Yes.

21   Q.  And was that also a true statement when made in -- in the

22   third quarter of 2009?

23   A.  Yes.

24   Q.  And at no time prior to December 24th, 2009, did FHFA

25   direct Freddie Mac not to focus on maintaining and managing to

1    a positive net worth; correct?

2    A.  Correct.

3    Q.  In fact, Mr. DeMarco, isn't it true none of the SEC filings

4    in 2009, 2010, or 2011, or through to the first two quarters of

5    2012 say that FHFA had given up trying to have Fannie and

6    Freddie build positive net worth; correct?

7    A.  Correct.

8    Q.  None of the SEC filings in 2009, 2010, or 2011, or the

9    first two quarters of 2012 say that building positive net worth

10   at Fannie Mae and Freddie Mac was somehow in conflict with the

11   public mission; correct?

12   A.  That's correct.

13   Q.  None of the SEC filings in 2009, 2010, 2011, or the first

14   two quarters of 2012 say that Fannie and Freddie having zero

15   net worth would somehow be better for the mortgage market or

16   MBS investors or the general public than if they had positive

17   net worth; correct?

18   A.  Correct.

19   Q.  And none of the SEC filings in 2009, 2010, or 2011, or the

20   first two quarters of 2012 say that FHFA intended that GSEs,

21   Fannie and Freddie, to have zero net worth forever; correct?

22   A.  Correct.

23   Q.  And none of those SEC filings said it was in the public

24   interest for Fannie and Freddie to be in conservatorship

25   forever; correct?

1    A.  I'm sorry.  Repeat that last one, Mr. Hume.  I want to make

2    sure I understood you.

3    Q.  Sure.  None of the SEC filings in 2009, 2010, or 2011 say

4    it was in the public interest for Fannie and Freddie to be in

5    conservatorship forever; correct?

6    A.  I don't believe they addressed such a question.

7    Q.  And isn't it true that you yourself are surprised that

8    they're still in conservatorship?

9    A.  Yes.

10   Q.  Okay.  I just want to look briefly at some -- two quick

11   2008 SEC filings that I don't believe you were shown.  DX103,

12   page 9.

13           MR. HUME:  And I don't believe these are yet in

14   evidence, but we will be moving them in.  So perhaps don't

15   display to the jury.

16           THE COURTROOM DEPUTY:  They're in evidence.  103 is

17   in evidence.

18           MR. HUME:  It is?  Okay.

19   BY MR. HUME:

20   Q.  DX103, which is the Freddie Mac third quarter 2009 Form

21   10-Q.  Sorry.  2008.  This is the 10-Q for the third quarter

22   2008, which is the first quarter -- really the first SEC filing

23   after the conservatorship began; correct?

24   A.  That's correct.

25   Q.  Okay.  And at page 9, there's a chart similar to charts you

1    were shown yesterday about -- saying, among other things, that

2    once they're in conservatorship, the -- Fannie and Freddie are

3    no longer managed to maximize shareholder returns.  Do you

4    recall that?

5    A.  Yes, I do.

6    Q.  I think it says before conservatorship, it is operated to

7    maximize shareholder returns.  Do you recall that, Mr. DeMarco?

8    A.  Yes.

9    Q.  And then after, it says:  No longer managed with the

10   strategy to maximize shareholder returns.  Do you recall that?

11   A.  Yes.

12   Q.  What I don't think you were shown is that underneath that,

13   here on page 9 of DX103, it does say as a -- during

14   conservatorship goal, maintain positive net worth and fulfill

15   our mission of providing liquidity, stability, and

16   affordability to the housing market.  Do you see that?

17   A.  I do.

18   Q.  And do you see -- it says:  Focus on returning to long-term

19   profitability if it does not adversely affect our ability to

20   maintain net worth or fulfill our mission.  Do you see that?

21   A.  Yes.

22   Q.  And those would've been accurate statements; correct?

23   A.  Yes.  And they would be consistent with the goals of

24   conservatorship that we went over earlier.

25               MR. HUME:  Okay.  And, again, I was told this wasn't

```
 1    in evidence, but if you're showing it is, that's great.
 2          Then could we just show DX102, which, if not in
 3    evidence, I will move into evidence.  It's in evidence?  Okay.
 4    BY MR. HUME:
 5    Q.  And this is the same third quarter 2008 10-Q filing for
 6    Fannie Mae.  I think the last one was Freddie Mac, and, again,
 7    I just wanted to look at page 11, a similar chart.  And, again,
 8    it says here that one of the goals is maintain positive net
 9    worth.  Do you see that?
10    A.  Yes, I do.
11    Q.  And it says:  Focus on returning to long-term profitability
12    if it does not adversely affect our ability to maintain
13    positive net worth or fulfill our mission.  Do you see that?
14    A.  Yes, I do.
15    Q.  And those are -- were accurate statements; correct?
16    A.  Yes.
17    Q.  Okay.  Thank you.
18          Mr. DeMarco, I'd now like to get back to questions about
19    the run-up to the net worth sweep and the commitment.  Because
20    the focus was, in your testimony, making sure you preserve the
21    size of the commitment; correct?
22    A.  Yes.
23    Q.  Now, am I correct that the second amendment in
24    December 2009 set forth a formula for how the commitment would
25    be calculated on December 31st, 2012; is that correct?
```

1    A.  Yes.

2    Q.  And that formula -- do you remember the formula?

3    A.  Generally, yes.

4    Q.  Okay.  We can -- we can get the second amendment out, but

5    let's see if the general description I give is accurate or

6    acceptable.

7         The formula was to say that the commitment size at the

8    end of the 2012 would be 200 billion minus the amount they had

9    drawn through 2009, and minus any positive net worth they had,

10   but it would -- they could draw as much as needed in 2010, '11,

11   or '12; that wouldn't reduce the size of the commitment.  Is

12   that generally correct?

13   A.  Yes.

14   Q.  And so in -- December 24th, 2009, when you signed the

15   second amendment, you would have known how much had been drawn

16   for the -- from the beginning of the conservatorship to the end

17   of the third quarter 2009; correct?

18   A.  Yes.

19   Q.  And you might not know exactly what's going to be drawn for

20   the fourth quarter, but you would have some sense of how things

21   were going; correct?

22   A.  Yes.

23   Q.  Okay.  So it wouldn't have been impossible -- let's put it

24   this way:  It would have been possible to get a rough

25   prediction of how much commitment was going to be left?

1    Somewhere between 100 billion and 200 billion was what it was

2    going to be at the end of the 2012; correct?

3    A.  Not knowing what the net worth was at the end of 2012,

4    there's no way you're going to know that three years earlier.

5    We do know what the 200 minus the draws that had been taken

6    through the third quarter.  That's known with certainty.

7    Q.  That's the only -- if you assume that the net worth would

8    either be zero or very small, then you could estimate, roughly,

9    that the commitment on December 31st, 2012, was going to be

10    200 billion minus what had been drawn in -- through to the end

11    of 2009; correct?

12    A.  If you make that assumption, yes.

13    Q.  Okay.  And at the time that you and -- you did the second

14    amendment with Secretary Geithner; correct?

15    A.  Correct.

16    Q.  Okay.  And at the time you did it, I assume you both

17    believed that was a reasonable formula for putting together a

18    commitment that should be sufficient to deal with the cap that

19    at that point would be set and unmovable, unless you got

20    Congress to act; correct?

21    A.  Yes.

22    Q.  Okay.  Now, during 2012, as the date approached when the

23    caps would be reimposed, again, you could predict what it would

24    be or project what would it be by calculating the formula based

25    on some assumptions; correct?

1    A.  Yes.

2    Q.  The main variable being whether they're going to have net

3    worth that gets subtracted out; correct?

4    A.  Yes.

5    Q.  And do you recall having anyone at FHFA prepare an

6    independent kind of projection of what the caps were going to

7    be?

8    A.  No.

9    Q.  Okay.  But you were sent some documents that I think

10   counsel for defendants showed you on direct, which -- which I

11   don't know that I want to belabor all of them, but let's pull

12   up PX-213, if we could.

13        And, again, I think you were shown this on direct.  If

14   we look at the email header, this is an email sent to you by

15   someone named Bradford Martin at FHFA.  Do you see that?

16   A.  Yes.

17   Q.  Okay.  And the subject is:  Fannie Mae Executive Management

18   Meeting on July 9th, 2012.  Do you see that?

19   A.  Yes.

20   Q.  Okay.  And you recall this attached a PowerPoint that

21   included some projections, including -- if you look at page 20,

22   we can see, I think, the same slide counsel showed you on

23   direct examination.  Do you remember seeing this?

24   A.  Excuse me.  Yes, sir.

25   Q.  And you see at the bottom, it says:  Our approach is

1    analogous to analyses by Moody's, OMB, and Millstein.  Do you

2    see that?

3    A.  I do.

4    Q.  Okay.

5         MR. HUME:  You can put that back, Ms. McGuire.

6    BY MR. HUME:

7    Q.  Now, I'd like to focus on the bottom line of -- do you see

8    there's a chart?  On the top half of this chart is Fannie Mae,

9    and on the bottom half, it refers to Freddie Mac.  Do you see

10   that?

11   A.  I do.

12   Q.  So looking, I think, at both, can we look at the line --

13   the bottom line.  It's called Remaining Funding under SPSPA.

14   Do you see that line?

15   A.  Yes.

16   Q.  And that remaining funding is the projection of what the

17   cap will be; correct?  That would have been your understanding?

18   A.  Yes.

19   Q.  Okay.  And so it shows in 2012 for Fannie Mae a cap that

20   would be $124.8 billion.  Do you see that?

21   A.  I do.

22   Q.  And it shows for Freddie Mac a cap of $148.3 billion.  Do

23   you see that?

24   A.  I do.

25   Q.  And then do you see that -- it projects out based on a

1   projection of ten years' earnings what that funding cap will be

2   at the end of ten years?

3   A.  I do.

4   Q.  And for Fannie Mae, it shows it going down a little bit to

5   118.3 billion.  Do you see that?

6   A.  I do.

7   Q.  And then for Freddie Mac, it shows staying the same at

8   148.3.  No reduction in the commitment; correct?

9   A.  I see that.

10  Q.  Okay.  Now, you understand that there were multiple

11  versions of this -- and let's just quickly show it.  If we

12  show -- PX-218 is a version of this.  You see that this is a

13  Fannie Mae board meeting?

14  A.  Yes.

15  Q.  And you understand there's testimony in this case that --

16  from the CEO, Mr. Mayopoulos -- you knew Mr. Mayopoulos;

17  correct?

18  A.  Yes.

19  Q.  And I assume it would not surprise you to learn that he

20  said they wouldn't send something to the board unless they

21  thought they were credible, reasonable, and reliable

22  projections?

23  A.  That would not surprise me.

24  Q.  Okay.  And if we look at page 20 on this document, it shows

25  the same slide.  It may be slightly different.  If we can just

1   pull out that same line for remaining funding, you see the same

2   two numbers to begin with for Fannie Mae.  It says the cap is

3   going to be $124.8 billion at the end of 2012.  Do you see

4   that?

5   A.  I do.

6   Q.  And you see that for Freddie Mac, it's 148.3 billion;

7   correct?

8   A.  Yes, I see that.

9   Q.  And it says after ten years, under these projections,

10  Freddie Mac will be the same, 148.3.  There will be no erosion

11  of the commitment.  That's what this shows; correct?

12  A.  That's what it shows.

13  Q.  And for Fannie Mae, it shows an erosion down to

14  116.1 billion.  Do you see that?

15  A.  Yes, I do.

16  Q.  Okay.  And you didn't have anyone at FHFA prepare a similar

17  analysis to this that projected the cap and how much it might

18  be eroded; correct?

19  A.  Correct.

20  Q.  One more of these I'd like to show, PX-248.

21      And this is -- do you see that this is called Fannie Mae

22  Update Treasury Meeting August 9, 2012, Updated August 15th?

23  Do you see that?

24  A.  I see that.

25  Q.  And are you aware of the fact that there was a meeting

1    between senior executives of Fannie and Freddie with Treasury

2    on or around August 9th, 2012?

3    A.  Okay.

4    Q.  You're not aware of that meeting?

5    A.  Sure.

6    Q.  A meeting -- let's put it this way.  I understand the

7    specific date, 11 years ago.  My question is this -- let me try

8    to make it a little more reasonable.

9         You may not -- but are you generally aware of a meeting

10   that senior executives -- CFO, CEO of Fannie and Freddie, and

11   some FHFA people had with Treasury -- very soon, within a week

12   or so, ten days or so, of the net worth sweep being announced?

13   A.  Yes, I generally believe that's correct.  I was not at such

14   meeting.

15   Q.  Okay.  I think this may not be on the -- on the screen.

16              THE COURTROOM DEPUTY:  It's not in evidence.

17              MR. HUME:  Fair enough.  That's one of the reasons I

18   wanted to show this one.

19        PX-248 is a Fannie Mae document, and plaintiffs move it

20   into evidence.

21              MR. STERN:  Your Honor, may we be heard briefly on

22   the phone?

23              THE COURT:  Yes.

24              (Bench conference on the record.)

25              MR. STERN:  We don't object to the admission of the

1    document.  We do object to using it with Mr. DeMarco.  He was

2    not at the meeting.  I don't -- I don't know the answer to the

3    question, whether he's ever seen this document before, but I

4    suspect the answer is no.  And if he has not seen the document,

5    he didn't attend the meeting, we would object to using this

6    document at his examination.

7                    THE COURT:  You can ask him if he's seen it.

8                    MR. HUME:  Okay.  Thank you.

9                    (Proceedings held in open court.)

10                   MR. HUME:  First, for the record, plaintiffs move --

11                   THE COURT:  You can display the document only and ask

12   him if he's seen it.  To the witness only.

13                   MR. HUME:  And we'd move for it to be admitted.

14                   THE COURT:  It's admitted.

15                   MR. HUME:  Thank you, Your Honor.

16                   (Plaintiffs' Exhibit 248 admitted into evidence.)

17   BY MR. HUME:

18   Q.  Mr. DeMarco, I just want to ask first, from the cover page,

19   do you believe you've seen this document before?

20   A.  I'm not sure, Mr. Hume.

21   Q.  Could we look at page 8 of the document.

22           Do you believe you've seen this page, similar to the

23   last two documents we've looked at, with the ten-year

24   projection for Fannie Mae and Freddie Mac?

25                   MR. STERN:  Objection.  The form of the question,

DEMARCO - CROSS

```
 1    Your Honor.
 2              THE COURT:  Obviously, he's seen that page.  It's the
 3    same page.
 4              MR. STERN:  It's actually --
 5              THE COURT:  Go to page 2.
 6              MR. STERN:  It's -- if I may -- that last page is --
 7    I can represent, Your Honor --
 8              THE COURT:  Wasn't the first page the same one we
 9    just saw?
10              MR. STERN:  No, Your Honor.  It's different.
11              MR. HUME:  Let's do it this way --
12              THE COURT:  You can look at page 1 and see if it's
13    the same one.  I thought --
14              MR. HUME:  Maybe we could -- all I wanted to ask you
15    about --
16              THE COURT:  Have you ever seen page 1 there before?
17    Do you know?
18    BY MR. HUME:
19    Q.  The page -- the page that's before you on the screen here,
20    do you think you've seen it before?
21    A.  I don't know.
22    Q.  Okay.
23              THE COURT:  Okay.  He doesn't know.
24              MR. HUME:  So then let's put that down and bring back
25    PX-213.
```

DEMARCO - CROSS

1    BY MR. HUME:

2    Q.  Yes, PX-213, page 20, this was one that was emailed to you.

3    And what I'd like to ask here is similar to the question your

4    counsel asked you, actually.  Very similar.

5            MR. HUME:  I don't know, Ms. McGuire, if you're able

6    to do this.

7    BY MR. HUME:

8    Q.  But you recall the SEC disclosures the second quarter of

9    2012 say we may have fluctuation in earnings, but we don't --

10   we can't predict that we're going to have income over the

11   dividend amount every single year, something to that effect?

12   A.  At least to that effect, yes.

13   Q.  The record will show the exact words, but you recall the

14   language I'm referring to?

15   A.  Yes.

16   Q.  And all I really wanted to ask you is -- first of all, just

17   for the record, for Freddie Mac, it actually does show income

18   above the dividend amount each year on this particular

19   projection; correct?

20   A.  It does, odd as it is for Fannie Mae to be projecting for

21   Freddie Mac, but yes.

22   Q.  I think the evidence addresses how and why they did that.

23   A.  Okay.

24   Q.  But for Fannie Mae, your counsel asked you and said some

25   years the income amount is above the dividend amount; some

DEMARCO - CROSS

1    years it's below.  Correct?

2    A.  Yes.

3    Q.  And all I wanted to ask is that is -- would you agree with

4    me that that projection out for Fannie Mae is an illustration

5    of one scenario that is entirely consistent with the disclosure

6    in the SEC statement?

7    A.  Yes.

8    Q.  Would you also agree with me -- and maybe we can pull up

9    the remaining funding amounts here, just -- which we looked

10   at before -- that under this particular scenario, it shows

11   the commitment for Fannie Mae being 124 billion, and then ten

12   years later going down to, I think, 118 billion.  Do you see

13   that?

14          MR. HUME:  Can we show the rest of it, Ms. McGuire.

15   BY MR. HUME:

16   Q.  That's what it shows; correct?

17   A.  It does show that, yes.

18   Q.  So under this scenario, anyway, that is not a material

19   erosion of the commitment.  Would you agree with me?

20   A.  No.  Again, that -- that's correct; it's not a material

21   erosion.  There's no indication that there's a periodic

22   commitment fee and it is just one scenario.  But, yes, that is

23   not a significant erosion.

24   Q.  Okay.  Now, on the -- on the periodic commitment fee, isn't

25   it true that -- first one had never been agreed, yet; right?

```
 1    That hadn't happened.  It actually -- it had to be agreed

 2    between Fannie Mae -- I mean, between FHFA and Treasury;

 3    correct?

 4    A.  Correct.

 5    Q.  But isn't it true that Fannie Mae and Freddie Mac, once

 6    there was a periodic commitment fee -- if they didn't want to

 7    pay it in cash, if they didn't have enough income, they could

 8    simply have it added to the liquidation preference without

 9    having to draw down on the commitment; isn't that correct?

10    A.  Yes.  That was an option.

11    Q.  Okay.  Now, back to this question about the commitment.

12    The SEC disclosure statement said that the issue with the

13    commitment is really that sometimes they're going to have

14    income that's less than the 10 percent dividend, and that's

15    going to require more draws and that's a -- that's what the

16    circular draw issue is; correct?

17    A.  Yes.

18    Q.  And so just to make sure it's clear, the main reason -- at

19    least according to your testimony, why you agreed to give

20    Treasury the net worth sweep, was to protect Fannie and

21    Freddie's commitment from being used up by draws taken simply

22    to pay dividends to Treasury; correct?

23    A.  That was the key reason, yes.

24    Q.  I'm sorry?

25    A.  Yes.
```

1   Q.  Now, I'd like to go back to all those charts that counsel

2   showed you from 2008, '09, '10, '11.  All the big red numbers

3   or red bars and all the losses.

4       There were parts of your testimony -- you explained how

5   housing prices have a big impact on Fannie and Freddie profits;

6   correct?

7   A.  Yes.

8   Q.  And you talked about delinquencies, when people default on

9   their mortgage; correct?

10  A.  I did.

11  Q.  And you talked about foreclosures and how when somebody

12  leaves their house and it's foreclosed, it's very hard to get

13  enough money even to pay the mortgage --

14  A.  Correct.

15  Q.  -- correct?

16  A.  Yes.

17  Q.  But isn't it true, Mr. DeMarco, that most of the

18  losses that Fannie and Freddie suffered in 2008, '09, '10, '11,

19  were from accounting adjustments based on predictions about

20  that kind of thing happening in the future?  Isn't that

21  correct?

22  A.  No, Mr. Hume.  The -- the way this works under accounting

23  rules is that you need to create reserves for anticipated

24  losses.  An accountant will give you the exact, you know,

25  guidance here, but you need to reserve for this, and that

1   reserve becomes a deduction against income, which led to these

2   draws.  The amount of money that Treasury put in under these

3   draws was driven primarily by credit losses incurred by these

4   companies.

5   Q.  I'm not sure what -- based on your answer what you

6   disagreed with about what I said.  So let me try to show you a

7   chart.

8           MR. HUME:  Can we put up Slide 4 from the -- from the

9   PowerPoint.

10  BY MR. HUME:

11  Q.  I'm showing you a chart one of our experts put together.

12  It's just a demonstrative.  Sorry.  That is not Chart 4.

13  Chart 5 -- Slide 5.

14      Slide 5 shows the total amount for Fannie Mae and

15  Freddie Mac separately that was taken as a -- what's called a

16  provision for a credit loss.  Do you see the numbers there?  It

17  shows over the years 2008 to '11, 152.2 billion for Fannie Mae.

18  Do you see that?

19  A.  Yes.

20  Q.  And for Freddie Mac, it shows 73.9 billion?  Do you see

21  that?

22  A.  Yes.

23  Q.  Now, do you understand what a provision for credit loss is?

24  A.  Yes.  I thought that's what I just described.

25  Q.  Okay.  But let's see if we agree then.  A provision for a

1    credit loss is taking a portfolio of mortgages that are still

2    paying -- there's no defaults -- but over the entire population

3    of those mortgages, there's a concern because of declining

4    housing prices, that there will be defaults in the future;

5    correct?  So you need to take a provision now; isn't that

6    correct?

7    A.  No, that's not correct.

8    Q.  Okay.  You're not an accountant; correct?

9    A.  I am not.  So let me say I do not believe that is a correct

10   statement.

11   Q.  Okay.  Well, fortunately, we have some accountants that can

12   help set the record straight.

13          THE COURT:  No, don't make a comment on the answer.

14          MR. HUME:  I'm sorry, Your Honor.  I'm sorry.

15   BY MR. HUME:

16   Q.  Let me ask -- let me see if I can figure out where we're

17   disagreeing.

18          Would you agree that part of what was happening --

19   because my understanding is also imperfect.  Part of what was

20   happening at Fannie Mae and Freddie Mac was write-downs of

21   assets because of a risk of future nonperformance, however they

22   go about calculating that risk, but it's a write-down in the

23   present because of a concern about the future because of things

24   like house price decline and other things?

25   A.  It's only in part.  The other part is you've got a large

DEMARCO - CROSS

1     portfolio of actually delinquent mortgages, and that's also

2     part of what this reserve is representing.

3     Q.   Okay.  Well, let me put it to you this way:  Did you have

4     an understanding when you were acting director -- and

5     particularly in 2012 -- that just as there had been write-downs

6     on assets, there could be some very large future gains if the

7     market turned and got a lot better?  Did you have that

8     understanding?

9     A.   As to magnitude, I had no idea, but, yes, I understood the

10    market got better, that that would improve the -- the loss

11    outlook and adjust reserves.  Just like if it got worse, it

12    would go in the other direction and --

13    Q.   Yes.  I'm not asking about magnitude, just about the

14    concept that a write-down could become a write-up if trends

15    changed.  Is that conceptually correct?

16    A.   Yes.

17    Q.   And, similarly, did you understand, generally, that -- and

18    this may be a little different -- there was something called a

19    deferred tax asset that each Fannie and Freddie had?

20    A.   Yes.

21    Q.   And did you understand that, as this chart shows, the --

22    the write-down -- I'm sorry.

23    A.   I'm sorry.  We just put up a different --

24    Q.   We did.  I changed the slide.  I'm sorry.  Sorry.  I

25    changed the slide with a clicker.  So we're now showing a new

1   slide showing what our expert put together on the deferred tax

2   asset valuation allowance.  Do you see that?

3   A.  Yes.

4   Q.  Okay.  So let's see if we can agree on what a deferred tax

5   asset valuation allowance is between two nonaccountants here.

6           MR. STERN:  Objection.  Beyond the scope, Your Honor.

7   Not part of direct.

8           THE COURT:  I didn't hear your objection.

9           MR. STERN:  Beyond the scope, Your Honor.

10          THE COURT:  Overruled.

11  BY MR. HUME:

12  Q.  So would you agree with me, generally, Mr. DeMarco, that

13  when a company has had some losses, if it expects to have

14  future profits, the tax law says, well, then you have an asset

15  because you're going to be able to offset your losses against

16  your future gains, and that's an asset you can put on your

17  balance sheet?

18  A.  For purposes of making tax payments, yes.

19  Q.  And so that's what a deferred tax asset is, generally?

20  A.  Generally, yes.

21  Q.  But you also generally understand that if you do not

22  expect or have a high degree of confidence that you're going to

23  have future taxable profits, the accounting rules -- that

24  neither of us are experts in -- require you to take a valuation

25  allowance on that deferred tax asset to reduce the value on the

1    balance sheet?

2    A.  Yes, there's a specific accounting standard that gets

3    applied to make that judgment.  But, yes, if you can't use it,

4    then -- then you're required to create a valuation allowance,

5    which basically means you lose it.

6    Q.  Okay.  And as acting director of FHFA from 2009 through to

7    2013, did you understand that Fannie Mae and Freddie Mac had a

8    combined amount of -- close to a hundred billion dollars of

9    deferred tax assets that had been reduced in value, basically,

10   to zero during the 2008 to '11 time period?

11   A.  Yes, I was aware that both companies had significant

12   valuation allowances for their tax assets.

13   Q.  And did you understand that these numbers here, the

14   negative -- you understand, by the way, the numbers that are in

15   parentheses are negative numbers?  You understand that --

16   A.  Yes.

17   Q.  -- convention?

18         And did you generally have an understanding -- I'm not

19   asking for perfect recollection, of course -- that that roughly

20   hundred billion dollars of reserves or valuation allowance on

21   the deferred tax asset, that went straight -- that contributed

22   to the losses that Fannie and Freddie were suffering in these

23   years?

24   A.  Yes.  That's correct.

25   Q.  So that's $100 billion of losses from an accounting

1    adjustment on a deferred tax asset; correct?

2    A.  Yes.  It's creating the valuation allowance because you no

3    longer believe you can use the -- the asset.  You're following

4    the conventions to make that determination.

5    Q.  And that write-down of those deferred tax assets caused

6    losses and would have caused Fannie and Freddie to have to draw

7    money from Treasury to get to at least a zero net worth;

8    correct?

9    A.  If the valuation allowance put them below zero, yes, it

10   would have led to a draw against the Treasury commitment to get

11   them back to zero.  That's correct.

12   Q.  But isn't it also true that when and if Fannie and Freddie

13   concluded under the accounting rules as they apply, that they

14   were more likely than not going to be able to use this deferred

15   tax asset against future taxable income, they would be required

16   to write those assets back up, adding net worth to their

17   balance sheet; correct?

18   A.  Once they could make the appropriate judgment or assessment

19   about that, yes.

20   Q.  And am I correct that in deciding whether or not to agree

21   to the net worth sweep, you didn't ask anyone at FHFA to write

22   a memo or an analysis of the likelihood of this $100 billion

23   being returned to the balance sheet of Fannie Mae and

24   Freddie Mac?

25   A.  No, I did not.

1    Q.  Now, would you agree with me that by 2012 there were a lot

2    of, sort of, positive macroeconomic trends in the country?

3    A.  I would say we had a very slow recovery out of the great

4    financial crisis.  I don't remember all the particulars of the

5    economic -- broad or macroeconomic trends in 2012.  There was

6    slow recovery coming out of the great financial crisis, and we

7    know that housing was particularly slow to recover.  We still

8    had, for example, many underwater homeowners.

9    Q.  Well, GDP had been growing; correct?

10   A.  Yes.

11   Q.  And the stock market was going up; correct?

12   A.  I don't remember what the stock market was doing in 2012,

13   Mr. Hume.

14   Q.  Would you agree that -- that's fine.  The -- if we can look

15   at -- let's talk about home prices.  I think it's a little more

16   relevant for Fannie Mae and Freddie Mac.  If we can look at

17   Slide 11.

18        Now, you're familiar with the Case-Shiller housing

19   index?

20   A.  Yes.

21   Q.  And this shows that from February 2012 to the end of

22   June 2012, it was going up; correct?

23   A.  Yes, it is showing that.

24   Q.  Is that consistent with your general recollection?

25   A.  My general recollection is that in 2012 house prices

1    started to -- started to rise.

2    Q.  Now --

3          MR. HUME:  That's okay.  You can take that down,

4    Ms. McGuire.  Thank you.

5    BY MR. HUME:

6    Q.  Let's talk about Fannie and Freddie and the work you did

7    and your colleagues did at FHFA during those very difficult

8    years, 2009 to 2011.  Isn't it fair to say that you and your

9    colleagues and the people at Fannie and Freddie worked very

10   hard to improve the quality of their mortgage and loan

11   portfolio?

12   A.  Yes.

13   Q.  And would you agree with me that -- let's talk about this

14   word vintages.  Can you explain -- are you familiar with the

15   use of the word vintages in connection with mortgages?

16   A.  Yes, I am.

17   Q.  Could you just briefly explain to the jury what that means.

18   A.  Vintage is -- let's put it this way:  The birth year of the

19   mortgage.  So a 2007 vintage mortgage means that the loan was

20   taken out in 2007.  A 2012 vintage mortgage means the mortgage

21   was originated in 2012.

22   Q.  Okay.  And would you agree with me that by the summer of

23   2012, the overall loans on -- that Fannie and Freddie either

24   owned or were guaranteeing had better vintages than they had

25   had during the prior few years?

1    A.  I understood the question.  If you're asking me did the

2    most recent vintages -- right? -- were they better, the answer

3    would be yes.

4    Q.  Yes.  And -- and they had more of the -- because you had

5    worked hard to improve the underwriting standards; correct?

6    A.  Yes.

7    Q.  And the underwriting standards are the standards that

8    govern how somebody actually gets a mortgage; correct?

9    A.  Yes.  What qualifies a person to get a mortgage.

10   Q.  And so part of the work through all these years of the

11   conservatorship was to make sure it was more rigorous in terms

12   of making sure that the people who got mortgages were going to

13   be able to pay them -- more likely than not; correct?

14   A.  Yes.

15   Q.  And so the quality of the loans was going up as those

16   underwriting standards took effect and more and more loans were

17   issued using those standards; correct?

18   A.  That's correct.

19   Q.  Now, I'd like to show you, going back to -- I'd like to

20   briefly show you PX-147.

21        This is a -- this should be in evidence.  This should be

22   possible to show.  This is an email to you, again, from

23   Bradford Martin.  Do you see that?

24   A.  Yes.

25   Q.  And it's about a Fannie Mae executive management meeting.

1    Do you see that?

2    A.  Yes.

3    Q.  And these are where you said you had regular meetings with

4    senior management; correct?

5    A.  I'm sorry.  Say that again.

6    Q.  You said you had regular meetings with senior management of

7    Fannie and Freddie?

8    A.  I did, yes.

9    Q.  Okay.  So if we just move down to the next paragraph, it

10   says 2012 Financial Plan.  Do you see that?

11   A.  Yes.

12   Q.  And it says:  Susan McFarland started discussion of the

13   draft 2012 plan by highlighting that the financial base case

14   projects a $1.5-billion profit.  Do you see that?

15   A.  Yes.

16   Q.  By the way, you saw --

17         MR. HUME:  Maybe we can go back, Ms. McGuire.

18   BY MR. HUME:

19   Q.  The date of this document's in January, 2012.  Did you see

20   that?  Let's just quickly look at the date.

21         The date is January 12th.  Do you see that?

22   A.  Yes.

23   Q.  Okay.

24         MR. HUME:  Sorry, Ms. McGuire.  Thank you.  Can we go

25   back to what the document shows.

1    BY MR. HUME:

2    Q.  And she then goes on, but I just want to go to the

3    sentence halfway down where it says:  Susan said the plan

4    reflects the view that the company is at an inflexion point, in

5    quotes, in the credit cycle with the loss allowance and

6    credit-related expenses projected to fall compared to 2011.  Do

7    you see that?

8    A.  Yes.

9    Q.  Do you recall hearing people talking about reaching an

10   inflection point in 2012?

11   A.  In January of 2012, no.

12           MR. HUME:  Can we look at PX-196, please.

13           And can we look at who this is to and from.

14   BY MR. HUME:

15   Q.  This is, actually, from FHFA people that I assume you may

16   remember.  Some of whom you've mentioned.  It's from someone

17   whose name I hope you'll help me pronounce, Paul -- do you say

18   Bjarnason?

19   A.  Bjarnason.

20   Q.  Bjarnason.

21           And it's to Andre Galeano and copying some other people,

22   including Nick Satriano.  Do you see that?

23   A.  I do.

24   Q.  And this is dated May 29th, 2012.  Do you see that?

25   A.  Yes.

1   Q.  Okay.  Now, you remember Mr. Bjarnason?

2   A.  Vaguely, yes.

3   Q.  Okay.  At the bottom of the email, it gives his position.

4   He was principal accounting examiner.  Do you see that?

5   A.  Okay.  I see that.

6   Q.  All right.  Can we just look back at the body of the -- of

7   the document and what it's reporting.

8        Now, this is -- a lot of stuff in here, there's -- he's

9   talking about differences between Fannie and Freddie.  And

10  please feel free to read all of it.  But, first, let me just

11  ask you:  Do you know what the 03-3 loan portfolio is?

12  A.  I'm sorry.  Where are we looking?

13  Q.  Well, in the last sentence, it refers to 03-3 loans.  Is

14  that familiar to you?

15  A.  It's not immediately coming to me, no, Mr. Hume.

16  Q.  Okay.  Well, let's look at the whole last sentence in

17  context.  It says -- and this is written by Mr. Bjarnason at

18  FHFA.  He says:  What with Fannie Mae's forecast showing an

19  upward price curve beginning after 2012, we should not be

20  surprised if Fannie Mae begins a roaring recovery fueled in

21  large part by drawing down their approximately 7 billion --

22  $70-billion ALL and the 03-3 loans.  Do you see that?

23  A.  I do.

24  Q.  Now, when you were acting director at FHFA, and these

25  people all worked for you, would you have understood that --

1    what -- what it would mean to say drawing down approximately

2    $70 billion in ALL?  Would that mean something to you?

3    A.  Yes.

4    Q.  Would the ALL have meant to you allowance for loan losses?

5    A.  Yes.

6    Q.  And would the drawing down of it mean reducing the

7    write-down leading to, essentially, a write-up of the assets?

8    A.  Yes.

9    Q.  Okay.  And let's go up two sentences on the 03-3.  I know

10   you said you don't remember.  But do you see it says:  There is

11   also -- the sentence that begins:  There is also?

12   A.  I see it.

13   Q.  There is also the large 03-3 loan population on the books

14   at very look accounting book values -- that may be a typo for

15   low.  We don't have Mr. Bjarnason to tell us.  We'll just keep

16   going -- many of which have reperformed.  Do you see that?

17   A.  I do.

18   Q.  Does that refresh your recollection in any way as to what

19   it would mean to have an 03-3 population of nonperforming loans

20   that you buy, some of which then start to perform or not?

21   A.  Mr. Hume, I do not know what this is referring to.

22   Q.  That's fine.

23   A.  I simply don't remember.

24   Q.  I understand.

25        Now, going back to the deferred tax asset, it is true,

1    isn't it, Mr. DeMarco, that before you agreed to the net worth

2    sweep, FHFA was aware that the boards -- the board of directors

3    of both Fannie Mae and Freddie Mac were discussing the

4    possibility of reversing those valuation allowances and

5    increasing to their net worth the value of those deferred tax

6    assets; correct?

7    A.  No, I don't -- I don't recall that.  The boards had to

8    assess the valuation allowances every quarter as part of their

9    review of the submission of the -- of the quarterly SEC filings

10   because that had to be reviewed each time.

11   Q.  Well, you're not saying that the board of directors would

12   discuss it every single quarter, are you?

13   A.  I'm saying that the process of putting that together

14   required the company to.  The board's direct involvement or

15   review of that, I can't speak to.

16   Q.  Right.  Well, if it gets to the board of directors, it

17   might be pretty -- something that they're taking seriously;

18   correct?

19   A.  Something that they're -- that they're talking about, yes.

20   Q.  Okay.  Can we look at PX-245, please.  It's in evidence.

21       And this is an email from people at Fannie Mae

22   regarding -- from a woman named Vicki Lyons to a woman named

23   Chryssa Halley and others.  And you see it says:  Subject:

24   Revised Board Deck.  Do you see that?

25   A.  I do.

```
 1    Q.  And you see the date is August 9th, 2012?

 2    A.  Yes.

 3    Q.  And the email --

 4         MR. HUME:  You don't have to highlight this part,

 5    Ms. McGuire.

 6    BY MR. HUME:

 7    Q.  Just to orient, it says:  Chryssa:  Attached is the deck

 8    and some items to consider below.  Do you see that?

 9    A.  I do.

10    Q.  It says:  Helen was very helpful in providing her comments,

11    and I incorporated most of them in the deck.  A few are

12    contained in the comments below.  Do you see that?

13    A.  I do.

14    Q.  Number 1, it says:  Consider an introductory slide.  State

15    that the DTA -- you would understand that to be the deferred

16    tax asset; correct?

17    A.  Yes.

18    Q.  It says, quote, State that the DTA of $62 billion has a

19    full valuation allowance since 2008.  Recent book income has

20    resulted in decrease to the DTA and stating the purpose of this

21    presentation is to discuss the process and considerations for

22    evaluating the release of the valuation allowance.  Do you see

23    that?

24         MR. STERN:  Your Honor, I object to the questioning

25    about this document without appropriate foundation.
```

DEMARCO - CROSS

1           THE COURT:  Overruled.

2           MR. HUME:  Your Honor, let me attempt to lay more of

3      a foundation.

4      BY MR. HUME:

5      Q.  Mr. DeMarco, it's correct that at least one person from

6      FHFA would attend the Fannie Mae and Freddie Mac board

7      meetings; correct?

8      A.  Yes.

9      Q.  And I think for some time that person was Jeff Spohn?

10     A.  Or a member of his staff.

11     Q.  Okay.  And Jeff Spohn is somebody you said was one of the

12     three people you discussed things most regularly with at FHFA;

13     correct?

14     A.  I don't remember putting a number on it, but he certainly

15     was one of the people I consulted with the most.

16     Q.  Okay.  Now -- and FHFA, I think you said yesterday, stood

17     in the shoes of the Fannie Mae and Freddie Mac board; correct?

18     A.  Yes.

19     Q.  Okay.  So if the Fannie Mae board is talking about

20     something while they're in conservatorship and you're the

21     acting director of the FHFA that has stood in the shoes of the

22     board, FHFA would know what's being discussed at that board

23     meeting; correct?

24     A.  Yes.

25     Q.  Okay.  And this document says --

```
 1            MR. STERN:  Objection.  Objection, Your Honor, with

 2    respect to questioning about this document.

 3            THE COURT:  The objection is overruled.  It's talking

 4    about slides of the board meeting; right?

 5            MR. HUME:  That's correct.

 6    BY MR. HUME:

 7    Q.  And, Mr. DeMarco, my question is, I understand that no

 8    human being can remember every single thing that happened

 9    ten years ago.  But I'm asking you to help testify about what

10    either you recall directly or that based on the document you

11    would think the FHFA would know or wouldn't know or anything

12    else that you can say on behalf of the FHFA.

13            Do you understand that?

14    A.  Okay.

15            MR. STERN:  Objection for that.

16            THE COURT:  Sustained.

17            MR. HUME:  Okay.  I apologize.  I thought --

18    BY MR. HUME:

19    Q.  My question is, you're not testifying, are you, that every

20    single quarter the board of Fannie and Freddie were meeting to

21    have a discussion like this, that's represented in this

22    document, about discussing the process and considerations for

23    releasing 50 to 60 billion dollars' worth of assets from the

24    deferred tax asset?

25            MR. STERN:  Objection, Your Honor.
```

```
 1                THE COURT:  I don't understand the question.

 2                MR. HUME:  Oh, let me try again.  I apologize.

 3     BY MR. HUME:

 4     Q.  I just want to make clear.  I understand the companies --

 5     your testimony is the companies would regularly review whether

 6     to write up the deferred tax asset; correct?

 7                THE COURT:  And attend the board meetings.

 8     A.  Yes.

 9                MR. STERN:  An objection to relevance, Your Honor,

10     given the date here.

11                THE COURT:  What's the question you're posing now?

12     BY MR. HUME:

13     Q.  The question is, there was a discussion at the board

14     meetings of Fannie Mae and Freddie Mac shortly before the net

15     worth sweep was agreed about writing up these deferred tax

16     assets; correct?

17                MR. STERN:  Objection, Your Honor, with respect to

18     this document, as I understand it.

19                THE COURT:  Overruled.  You can answer it, if you

20     know.

21     A.  So, first of all, this is just Fannie Mae.  I have not been

22     shown any evidence about Freddie Mac.

23                Second, the date of this document is August 9th.  And

24     it's in anticipation of a future date of this board meeting.  I

25     don't know when this board meeting took place, and I don't know
```

DEMARCO - CROSS

1     when -- what I learned about it.

2          I would also point out that at this point we've already

3     heard from the Treasury Department that we're proceeding to

4     finalize the -- the third amendment.

5          So all and all, Mr. Hume, I -- I would say that the --

6     as I've said earlier, the companies had to assess the -- the

7     DTA on a quarterly basis as part of preparing their SEC

8     filings.  And I would not say that because there's a bunch

9     of -- several Fannie Mae staff here -- none of whom I'm

10    familiar with -- that they're preparing a slide deck for a

11    future meeting.  I don't even see -- you know, was this -- was

12    this put into the slide deck?  Did the board discuss it?  Was

13    it this version or some subsequent version?

14         Mr. Hume, I simply don't know, but I can't draw any of

15    those inferences from this little bit of email that you've put

16    in front of me.

17    BY MR. HUME:

18    Q.   Okay.  Fair enough.  I'm going to show you one more email,

19    but there's one part of your answer I do want to make sure I

20    understand.  You said this is after Treasury had already come

21    back to you.  This is August 9th; correct?

22    A.   Yes.

23    Q.   And you signed the net worth sweep on August 17th; correct?

24    A.   Yes.

25    Q.   So just so we're clear, your -- it's not your testimony, is

1    it, that if someone had come to you between August 9th and

2    August 17th saying there could be 50 to 100 billion dollars

3    added to Fannie and Freddie's net worth within the next couple

4    of quarters -- it's looking reasonably likely -- is it your

5    testimony that would have had no impact on your decision?

6    A.   That is not my testimony.  My testimony was that this is

7    about a future board meeting.  I don't know when that board

8    meeting is.  That's what I was trying to say.

9    Q.   Okay.  Let's look at PX-259.  PX-259, let's just quickly

10   orient ourselves here.

11        At the bottom is an email from Mr. Griffin, who is

12   an accountant at FHFA.  I do believe you know him; is that

13   right?

14   A.   Yes.

15   Q.   And it's to Nick Satriano, who would be his boss, the head

16   of accounting at FHFA; correct?

17   A.   Yes.

18   Q.   And this is dated August 14th, 2012.  Do you see that?

19   A.   I do.

20   Q.   And the first sentence of this email says:  The meeting

21   with Ed went well.  Do you see that?

22   A.   I do.

23   Q.   Okay.  And both of these gentlemen, Mr. Griffin and

24   Mr. Satriano, worked for you at FHFA; is that correct?

25   A.   They did.

1    Q.  Okay.  And Mr. Griffin says:  The amendment is expected to

2    be made public sometime on Friday.  That would be Friday,

3    August 17th; is that correct?

4    A.  Yes.

5    Q.  And it says:  The enterprises will be informed tomorrow.

6    Do you see that?

7    A.  I do.

8    Q.  That means Fannie and Freddie, the senior executives,

9    anyway, were told about the net worth sweep two days before it

10   was announced; correct?

11   A.  Correct.

12   Q.  Okay.  Let's go to the next email up.

13        Mr. Satriano asks a question about reaching out to the

14   auditors.  Do you see that?

15   A.  I do.

16   Q.  And then let's look at Mr. Griffin's response.  Mr. Griffin

17   responds:  There was not a discussion about reaching to the

18   auditors.  He says --

19        MR. HUME:  You don't need to highlight this

20   Ms. McGuire.

21   BY MR. HUME:

22   Q.  Do you see he says:  I do not think there would be a going

23   concern issue.  Do you see that?

24   A.  I do.

25   Q.  He then says -- and, again, these people work at FHFA;

1   correct?

2   A.  Yes.

3   Q.  The next sentence says:  There was a question -- you

4   remember the first email we just looked at was a meeting that

5   Mr. Griffin had with you -- with you?

6   A.  Yes.

7   Q.  I'm not sure I made that clear.

8       The first sentence said there was a meeting with you.

9   Do you remember that?

10  A.  Why don't we go back and look at it.

11  Q.  Let's go back and look at the bottom email.

12      You see Mr. Griffin is saying:  The meeting with Ed went

13  well.  Do you see that?

14  A.  I do.

15  Q.  I apologize for missing this earlier.

16      Does this -- and is this consistent with your memory

17  that you likely had a meeting with Mr. Griffin and maybe others

18  on the morning of Tuesday, August 14th, to discuss the

19  amendments?

20  A.  It would have had to have been an awfully early meeting,

21  since the email was sent at 7:30 in the morning.  So probably

22  not that morning.

23  Q.  Could have been the day before?

24  A.  Could have been, yes.

25  Q.  Is it likely you had a meeting with him to discuss what was

1    happening?

2    A.  Based on this email, it appears, yes.

3    Q.  Okay.  So then, now, let's go back to Mr. Griffin's email

4    at the time.  And he says:  There was a question about

5    rerecording certain deferred tax assets --

6            MR. HUME:  Could you highlight, Ms. McGuire.

7    BY MR. HUME:

8    Q.  -- that had been written off.  Do you see that?

9    A.  I do.

10   Q.  Does that in any way refresh your recollection that at a

11   meeting with Mr. Griffin on August 14th you were told about a

12   question of rerecording; meaning writing up certain deferred

13   tax assets that had been written off?

14   A.  Does it refresh my memory of having that discussion?  I'm

15   sorry.  I want to make sure I understand your question.

16   Q.  That's what I asked, yeah.

17   A.  No, it does not refresh my memory of discussing this.

18   Q.  I know it's a very lawyerly way of asking a question.  I'll

19   try it another way.

20          Does this appear to show to you that there was a

21   discussion at a meeting that you had with Mr. Griffin and

22   others about rerecording certain deferred tax assets that had

23   been written off?

24   A.  What it says there is that someone that was part of this

25   meeting asked a question about the deferred tax assets.  We

DEMARCO - CROSS

1    don't know what that question was.  Maybe it was a question of

2    how would this work in the context of the third amendment.  We

3    don't -- we don't know.  It doesn't say.

4    Q.  Well, let's just read it again.  We know that the question

5    was about rerecording certain deferred tax assets; correct?

6    A.  That's what it says, yes.

7    Q.  Wouldn't you understand that as writing up those deferred

8    tax assets?

9    A.  Yes.

10   Q.  Okay.  Then it does go on to state:  Jeff indicated both of

11   the boards -- let's stop there.  Would you understand that to

12   be Jeff Spohn?

13   A.  Yes.

14   Q.  It says:  Jeff indicated both of the boards had discussed

15   this at the last meeting based on the view that they were going

16   to be profitable going forward.  Do you see that?

17   A.  I do.

18   Q.  Doesn't that mean to you that there was a discussion there

19   about writing up these assets pretty soon because of the

20   expectation of future profitability?

21   A.  Well, Mr. Hume, it doesn't say anything about when.

22           MR. STERN:  Your Honor, I would object to further

23   questioning on this document that --

24           THE COURT:  He can try.  You're squeezing a lot out

25   of two sentences.

1    BY MR. HUME:

2    Q.  The next sentence says:  I do not think that made sense --

3              THE COURT:  For somebody who wasn't even there.

4              MR. STERN:  That's the --

5              THE COURT:  Actually, I'll sustain the objection.

6    You've got to get somebody who was there if you want to parse

7    words.

8              MR. HUME:  May I ask him a question about the next

9    sentence?

10             THE COURT:  No.

11             MR. HUME:  All right.

12             THE COURT:  Parsing words of somebody who wasn't even

13   there isn't great.

14   BY MR. HUME:

15   Q.  You do recall, Mr. DeMarco, that -- I think you went

16   through this with Mr. Stern -- that there was profitability at

17   both?

18             THE COURT:  We want to end this trial someday.

19             MR. HUME:  Yes, Judge Lamberth, we agree, and I'll

20   try to move it along.

21   BY MR. HUME:

22   Q.  Let's talk very briefly about principal reduction.  You

23   remember principal reduction we talked about earlier?

24   A.  I do.

25   Q.  Would you agree that there was a great deal of analysis,

1    written analysis, and financial modeling done on principal

2    reduction?

3    A.  Yes.

4    Q.  And you had a number of people running financial models and

5    other kinds of analyses on that?

6    A.  Yes.

7    Q.  And they reported back in multiple memos and emails to you?

8    A.  Yes.

9            MR. HUME:  If we just briefly pull up PX-500.  This

10   may not be in evidence yet.

11   BY MR. HUME:

12   Q.  PX-500 is a letter that you wrote to a committee on

13   oversight?

14           MR. STERN:  Your Honor, I'm going to object, even to

15   further identification of this.

16           MR. HUME:  I'm just going to say the committee,

17   Mr. Stern, and talk about it.

18           THE COURT:  It's a letter from who?

19           MR. HUME:  I'm sorry?

20           THE COURT:  Who's it from?

21           MR. HUME:  It's from --

22           MR. STERN:  Your Honor, if -- that's the -- may we go

23   to the phone, Your Honor?

24           THE COURT:  All right.

25           (Bench conference on the record.)

1        MR. STERN:  Your Honor, we objected to -- as the

2   Court may recall, this is -- this is a letter to -- to -- can I

3   get a copy, please.  Yeah.

4        So this is correspondence with then-ranking member

5   Elijah Cummings of the House Committee on Oversight and

6   Government Reform.  And it's a part of correspondence that

7   includes -- I believe there's something from

8   Representative Cummings.  In any event, Your Honor, this was

9   the subject of discussion at the last trial, and a redacted

10  version was used.  And we would renew our objection on

11  relevance grounds.

12       And I -- and also 403 grounds to the entire

13  correspondence.  Any, in any event, even if the Court overrules

14  that objection, we would ask that it be redacted the way it was

15  the last time.

16       MR. HUME:  So, Your Honor, this was admitted into

17  evidence last time with the redaction of Mr. Cummings' name.

18  We agreed to that because we identified the document very late.

19  There was a timeliness issue, and it was a compromise.

20       The -- the document is a letter signed by Mr. DeMarco.

21  It shows an extensive amount of work, and it goes to the issue

22  of what appropriate -- what an appropriate process and study

23  for a major decision does entail.  And I don't intend to ask

24  him more than one or two questions about it, but I do think it

25  should come into evidence.

1          I wasn't even going to mention Mr. Cummings' name.

2     We're not trying to play politics here.  And if it's

3     necessary -- we really don't think it's necessary to redact his

4     name, but if that's the price of admitting it, then we'll do

5     so.  We'll agree to that.

6          But I think it is relevant.  Principal reduction is the

7     most important document in the case.  It's highly relevant.

8     The witness felt extremely strongly about it.  He worked very

9     hard on it.  It seemed to be a very big focus of his attention,

10    and he engaged in a very fulsome process with extensive

11    analysis and financial modeling on it into the net worth sweep.

12          MR. STERN:  Your Honor, we would maintain our

13    objection to the relevance of this; that whether or not

14    principal reduction was a good or appropriate idea is not a

15    subject at issue in the case.  And this goes, in our respectful

16    submission, way too far afield on this topic.  We would object

17    to the admission of the entire document on relevance and 403

18    grounds.

19          And should the Court be inclined to admit it, we would

20    move to redact the -- the -- Representative Cummings' name.

21          THE COURT:  Can I look at it.

22          MR. STERN:  Sure.

23          MR. HUME:  And there was no objection to this.  It

24    was disclosed since April, and I'm told there was no objection.

25    We'll get you a copy.

```
 1                   (Proceedings held in open court.)

 2                   THE COURT:  The objection is overruled and it's

 3        received.

 4                   MR. STERN:  Your Honor, may we go to the phone just

 5        to clarify one point?

 6                   THE COURT:  All right.

 7                   (Bench conference on the record.)

 8                   MR. STERN:  Your Honor, just so the record is clear,

 9        we did -- the exhibit to which we did not object was the

10        redacted version of this letter.  And I understand the Court's

11        ruling.  But we would ask just that there be a rider to the

12        Court's overruling of the objection that the exhibit be

13        redacted in the same way that it was when it was admitted at

14        the last trial.

15                   THE COURT:  What was the redaction last time?

16                   MR. STERN:  I think it's just the header, Your Honor.

17                   THE COURT:  Why does it need to be redacted?

18                   MR. STERN:  Because there was some concern that

19        identifying Mr. Cummings may have an unintended prejudicial

20        effect one way or the other, and the parties agreed to redact

21        the header.  And that was the basis on which we did not object

22        this time.

23                   MR. HUME:  Your Honor, we don't intend to draw

24        attention to that, but the -- the defendants made clear to

25        bring out in direct that Mr. DeMarco met with civil rights
```

1    groups and President Obama appointed him and --

2                THE COURT:  The objection is overruled.

3                (Proceedings held in open court.)

4                (Plaintiffs' Exhibit 500 admitted into evidence.)

5    BY MR. HUME:

6    Q.  So very quickly on PX-500, Mr. DeMarco.  I really just

7    wanted -- I think we can now put it on the screen to confirm.

8         This is a letter you sent to a member of Congress at the

9    Committee on Oversight and Government Reform on January 20th of

10   2012.  Do you see that?

11   A.  I see it's from FHFA addressed to Mr. Cummings.  So I

12   assume I'm the signatory at the end.

13                MR. HUME:  Could we show the signature at the end,

14   Ms. McGuire?

15   BY MR. HUME:

16   Q.  So you can see on the last page, it's from you.  Do you see

17   that?

18   A.  Thank you.  I appreciate that.  Thank you, Mr. Hume.

19   Q.  Yeah, no.  An electronic presentation is helpful in many

20   ways, but in some ways it's cumbersome in that way.

21        I really just wanted to quickly go through it.  Would

22   you agree it's a 23-page document with tables and models

23   attached?

24   A.  Well, I've only seen the first page and the signature page,

25   but I will take it at your word.

1    Q.  That was a terrible question in light of what I just

2    recognized.

3         Let's do this:  Just let's page through it and look at

4    the next page, second page, page 2.  You see that at the top it

5    says:  FHFA consideration, at the top.  Let's just look at the

6    first couple of paragraphs here.

7         And do you see that this is basically -- yes, maybe if I

8    could --

9              MR. HUME:  If I may approach; give the hard copy.

10             THE COURT:  Yes.

11   BY MR. HUME:

12   Q.  Maybe you could take a moment to look through it because I

13   don't want to belabor it.  I just want to identify a few things

14   for the record.

15   A.  Okay.

16   Q.  And on page -- would you agree this document contains some

17   of the FHFA analysis and work done on the issue of principal

18   reduction?

19   A.  Yes.

20   Q.  And it attaches some updates that were given to you -- if

21   you flip through to some of the later pages -- that were

22   provided by FHFA to you on the issue of principal reduction,

23   some analyses?

24   A.  I see there's an analysis provided and there's a date to

25   it.  And then there's additional analysis with a different

1   date.  So, yes, I see that.

2   Q.  Okay.  Would you agree with me that at your direction, FHFA

3   did a great deal of analysis on the issue of principal

4   reduction?

5   A.  We examined the -- the -- the issue several times, yes.

6   Q.  You'd agree that there was a great deal of analysis done?

7   A.  I agree that we studied this issue carefully.

8   Q.  Would you agree that there were more memos written on

9   principal reduction than on the net worth sweep?

10  A.  Yes.

11  Q.  Okay.  You can put that aside.

12        Let's do this, Mr. DeMarco:  PX-205, you remember

13  seeing, was June 25th, 2012, that memo?  Do you remember that?

14  A.  Yes.

15  Q.  Okay.  And the net worth sweep was signed on August 17th,

16  2012 -- correct? -- almost two months later?

17  A.  Yes.

18  Q.  Now, during your direct examination, defendants didn't show

19  you any documents, any emails, or other documents saying --

20  from FHFA saying we really need to get this net worth sweep

21  done by the end of the summer?  They didn't show you anything

22  that like?

23  A.  Yes, they did.

24        MR. STERN:  Objection.  I objected, Your Honor.  The

25  witness has answered.  I'll withdraw the objection.

DEMARCO - CROSS

1          MR. HUME:  The objection has been drawn.

2          MR. STERN:  Given the witness's answer, I'll withdraw

3    the objection.

4    BY MR. HUME:

5    Q.  So your answer is?

6    A.  Well, in terms of what we've gone over, the January

7    PowerPoint presentation I made to Secretary Geithner, it's

8    actually quite specific on this point; making the case to him

9    and requesting his assistance in getting a third amendment done

10   by -- I had set a target date of having it done by June 30th.

11   And I went through -- in that deck, we went through the

12   different bullets, the arguments I had for why I thought this

13   was necessary.

14   Q.  Maybe my question wasn't clearly asked.  I'll say it again.

15   My question was, after June 25th -- from June 25th onward, did

16   you see and have you seen today or yesterday any emails or

17   other documents from FHFA saying we've really got to push to

18   get this net worth sweep done before the end of the summer or

19   before the end of the year?  A document from after June 25th?

20   A.  No.

21   Q.  Now, you were shown a document about a renewed push.

22   Do you remember that?  I think it's PX-247.  Do I have that

23   right?  Yes.

24          Let's look at this again.  Your counsel showed this.

25   This is to you from Mr. Ugoletti.  This is August 9th, 2012.

1   Do you see that?

2   A.  Yes.

3   Q.  Okay.  And it says:  Close hold.  Do you see that?

4   A.  I do.

5   Q.  And then the first sentence is:  As a heads-up, there

6   appears to be a renewed push to move forward on SPSPA

7   amendments.  Do you see that?

8   A.  Yes.

9   Q.  And that renewed push came from Treasury; correct?

10   A.  Yes, we were waiting on Treasury.  Yes.

11   Q.  Just so the record is clear, the renewed push that

12   Mr. Ugoletti is referencing here you understood at the time was

13   a renewed push from Treasury; correct?

14   A.  Correct.

15   Q.  Okay.  And this August 9th was a day or two after -- let's

16   do it this way.

17        Do you recall, generally, that Fannie Mae and

18   Freddie Mac released their second quarter SEC filings with

19   their profits on August 7th and 8th, 2012?

20   A.  Yes.

21   Q.  So this renewed push comes right after those SEC filings

22   were published; correct?

23   A.  Yes.

24   Q.  And those SEC filings showed that Fannie Mae and

25   Freddie Mac both -- each -- each of them had comprehensive

1    income substantially above the 10 percent dividend amount;

2    correct?

3    A.  Yes.

4    Q.  And those SEC filings filed on August 7th and 8th, 2012,

5    showed that because of that income above the dividend amount,

6    both Fannie Mae and Freddie Mac were building positive net

7    worth for the first time, really; correct?

8    A.  For Fannie, yes.  We had seen Freddie had built it and then

9    lost it, built it and lost it.

10   Q.  Yeah.  The first time part, I -- let's just say because

11   their income was above the dividend amount, the filing showed

12   they were building positive net worth?

13   A.  Yes.  Because the dividend -- because the earnings were

14   above the dividend amount.  Once they paid the dividend, there

15   was an incremental -- there was an increase to retained

16   earnings.

17   Q.  Now, Mr. DeMarco, we're at the end of the day, and I know

18   we're all trying to move this along.  But isn't it true that

19   you knew that the reason the Treasury was pushing for the net

20   worth sweep, particularly after those SEC filings, was that the

21   Treasury did not want Fannie and Freddie to retain profits or

22   rebuild their net worth?

23   A.  I do not know why on August 8th or 9th Treasury decided it

24   was time to get moving on the PSPA amendments again.  All I

25   know, I was glad to see that they were ready to do it.  And we

1   got it done within the next week or so.

2   Q.  Mr. DeMarco, you knew -- you knew that Treasury -- you were

3   negotiating with Treasury; correct?

4   A.  I had been for months, yes.

5   Q.  Okay.  And the net worth sweep was a pretty big deal to

6   negotiate with them; correct?

7   A.  Yes.

8   Q.  Okay.  So when you're in a negotiation like that, isn't it

9   important to try to understand what the other person wants and

10   what their motivations are?

11   A.  I can -- yes, that certainly can be helpful in doing a

12   negotiation.  Yes, I agree.

13   Q.  And isn't it true that in August 2012 you knew that what

14   Treasury wanted was to make sure that Fannie Mae and

15   Freddie Mac would not be allowed to retain profits or rebuild

16   net worth?

17   A.  That's something they had been saying for a long time.

18   Q.  Okay.  So you knew that was part of their motivation;

19   correct?

20   A.  But their motivation wasn't -- wasn't my key concern.  My

21   key concern was were they going to reach a similar conclusion

22   as to me, to what we needed to do here.

23   Q.  So their motivation was that they were worried that

24   Fannie Mae and Freddie Mac were going to make too much money

25   above the dividend amount and start building profits.  And that

1    was their motivation.  That would be the opposite of your

2    motivation; correct?

3    A.  Yes.

4    Q.  Okay.  So you understood that the Treasury Department was

5    pushing for the net worth sweep for a reason that was the

6    opposite of the reason you had; is that correct?

7    A.  No.  We started this discussion in January.  We had an

8    agreement in principal on doing this net worth sweep by early

9    March.

10         Mr. Hume, we had -- we had this well on its way, an

11   agreement in principal, that this was the appropriate thing to

12   do to preserve the stability of these companies and retain that

13   commitment.  The fact that it took until August to get this

14   done is -- is -- is a different matter.

15         But you're trying to ascribe all the motivation and

16   decision to do this based on, you know, what was going on in

17   one week in August.  And I'm trying to say that this is

18   something that we were well underway with since January and had

19   general agreement on the net worth sweep by March.  And that

20   was what I wanted to have happen.

21   Q.  Let's go back to January then.

22   A.  Okay.

23   Q.  Let's look at PX-144.  This is in evidence.

24         And the cover page, let's look at it, because it's

25   from -- you see this is a -- an email from Ms. Miller at the

1   Treasury Department to you dated January 4th, 2012?

2   A.  I see that.

3   Q.  Okay.  It says:  Agenda for discussion with FHFA.  Do you

4   see that?

5   A.  Yes.

6   Q.  And the text says:  Ed, here is a draft agenda for

7   discussion at 1:00 p.m.  Do you see that?

8   A.  I do.

9   Q.  Okay.  Let's look at the next page.  And let's just look at

10  that top paragraph.

11      It says:  FHFA and Treasury share common goals to

12  promote a strong housing market recovery, reduce government

13  involvement in the housing market over time, and to provide the

14  public and financial markets with a clear plan to wind down the

15  GSEs.  Do you see that?

16  A.  I do.

17  Q.  So from January 2012 you were discussing with Treasury a

18  shared common goal to wind down Fannie Mae and Freddie Mac;

19  correct?

20  A.  Mr. Hume, this is Ms. Miller's assertion sent to me

21  11 minutes before this meeting begins in which she's saying

22  that it's her understanding that we share common goals.  And we

23  did share common goals.  A lot of the stuff we have in here we

24  did share.

25  Q.  I don't think that answers the question.  My question

 1    was -- if -- if the answer is no, just say no.

 2         But my question was, isn't it true -- as this document

 3    reflects, written by Ms. Miller, isn't it true that since

 4    January 2012, FHFA and Treasury had a common goal to provide

 5    the public and financial markets with a clear plan to wind down

 6    Fannie Mae and Freddie Mac?

 7    A.  No.

 8    Q.  Okay.  So you disagree with what Ms. Miller wrote here?

 9    A.  That portion of it.

10    Q.  But you were aware that Treasury had that goal?

11    A.  Yes.  I already said that.

12    Q.  And by wind down, that means eliminate Fannie Mae and

13    Freddie Mac; correct?

14    A.  So my understanding of Treasury with wind down is that they

15    wanted to prepare these companies to be -- for the

16    conservatorships to end by way of legislation and they were

17    working on a path to do that.  And they wanted Congress and the

18    public and me to know that they wanted to see a resolution of

19    these companies in conservatorship by way of legislation that

20    would legislate an end to these two companies as we had known

21    them.

22    Q.  Well, did you understand in August of 2012 that the

23    Treasury Department wanted the net worth sweep because it would

24    aid their plan to wind down Fannie and Freddie by making sure

25    they could not build positive net worth?

1    A.  I can't speak to all the particular motivations of the

2    Treasury Department while doing this.  I know that they had a

3    goal and a publicly stated objective of wanting to wind down

4    the GSEs.  I know they agreed with me that we needed to amend

5    the PSPA to provide greater stability to these companies.

6         In fact, any path of winding down the GSEs -- to take

7    that term as they use it -- in fact, creates the kind of

8    stability questions that help motivate my concern to want to

9    get the third amendment done in the first place.

10        MR. HUME:  I'd like to ask my counsel's help.  I'd

11   like to show the formal final press release from the Treasury.

12   I don't have the PX number.  I apologize.  It's in evidence.

13   278.

14        So, Ms. McGuire, please pull up 278.

15   BY MR. HUME:

16   Q.  Now, PX-278, Mr. DeMarco, is the press release put out by

17   the Department of Treasury on the day it announced the net

18   worth sweep.  Do you see that?

19   A.  I do.

20   Q.  And do you see the title is Treasury Department Announces

21   Further Steps to Expedite Wind Down of Fannie Mae and

22   Freddie Mac?  Do you see that?

23   A.  I do.

24   Q.  And so you knew before you signed the third amendment that

25   they were signing it because they thought it was a way to wind

1    down Fannie Mae and Freddie Mac; correct?

2    A.   As I said, Mr. Hume, Treasury had been saying their

3    objective to wind down the GSEs for a very long time.

4    Q.   Okay.  Let's look at the second page.

5         There's -- there's a header halfway down that says

6    Full Income Sweep.  Do you see that?

7    A.   I do.

8    Q.   And then let's look at the third bullet, if we can.

9         MR. HUME:  Blow that up.

10   BY MR. HUME:

11   Q.   Do you see it says:  Full income sweep -- which is the net

12   worth sweep.  That's another word for the net worth sweep;

13   correct?

14   A.   Yes.

15   Q.   And it says here in the third bullet -- above it says:

16   This will help achieve several important objectives.  Do you

17   see that?

18   A.   I do.

19   Q.   And it references, you know, making sure that all the money

20   goes to Treasury, nothing to private shareholders.  That's the

21   first one; right?

22   A.   Yes.

23   Q.   And the second one is ending the circular draw; right?

24   A.   Yes.

25   Q.   Because that goes away.  But the third one says:  Acting

1    upon the commitment made in the administration's 2011 white

2    paper that the GSEs will be wound down and will not be allowed

3    to retain profits, rebuild capital, and return to the market in

4    their prior form.  Do you see that?

5    A.  I do.

6    Q.  And you understood before you signed the net worth sweep

7    that that was Treasury's motivation; correct?

8    A.  Well, a motivation.  And, yes, that's -- I've been saying

9    several times now that they've been saying this for a long

10   time.  And this is referring to their 2011 white paper, which

11   was, I believe -- I believe it was February of 2011.

12   Q.  But they pushed for the net worth sweep right after the

13   second quarter profits showing income above the 10 percent

14   dividend amount; correct?

15   A.  Yes.

16   Q.  And you saw -- do you recall that you saw and reviewed and

17   provided edits on this press release before it was finalized?

18   A.  Yes.

19   Q.  So you would have known this before you -- you would have

20   known what this said before you signed the net worth sweep;

21   correct?

22   A.  Yes.

23   Q.  Okay.  Now, Mr. DeMarco, it's your view that the charters

24   of Fannie Mae and Freddie Mac are fundamentally flawed;

25   correct?

```
 1    A.  Yes.
 2    Q.  And you believed that at the time you were acting director
 3    of FHFA?
 4    A.  Yes.
 5    Q.  Okay.  And after you left your position as acting director
 6    of FHFA, I believe you said you went to a place called the
 7    Milken Institute; is that right?
 8    A.  That's correct.
 9    Q.  And while you were there, you produced a paper that
10    proposed converting Fannie and Freddie into mutual associations
11    that would be owned by private lenders; is that right?
12    A.  Yes.
13    Q.  Okay.  And you joined the Milken Institute a few months
14    after leaving government service; is that right?
15    A.  I did, yes.
16            MR. STERN:  Objection, Your Honor.  Relevance, given
17    the time frame.
18            MR. HUME:  It's not going to be very much more on
19    this.
20            THE COURT:  Overruled.
21    BY MR. HUME:
22    Q.  And then you went to the housing policy center; is that
23    right.
24    A.  I went to the Housing Policy Council.
25    Q.  Housing Policy Council.  And you're the head of that;
```

```
 1    correct?

 2    A.  Yes, I am.

 3    Q.  Okay.  And the Housing Policy Council is a trade

 4    association with banks and insurance companies as its members;

 5    is that right?

 6    A.  Among its membership, yes.

 7    Q.  And some of its members include some of the largest banks,

 8    like Chase Manhattan, Wells Fargo, Citibank; correct?

 9    A.  Yes.  That's correct.

10    Q.  Okay.  And while you've been at the Housing Policy Council,

11    you've released proposals to convert Fannie and Freddie into

12    entities owned by those banks and by mortgage servicing

13    companies; correct?

14    A.  No, I have not.

15    Q.  Well, have you released proposals to have Fannie and

16    Freddie converted into entities owned by private lenders?

17              MR. STERN:  Your Honor, objection.  402, 403, time

18    frame.

19              THE COURT:  Overruled.

20    A.  No, I have not.

21    BY MR. HUME:

22    Q.  Well, would you say -- would you agree that the Housing

23    Policy Council is a trade association that generally takes

24    positions that align with its members?

25    A.  Yes.
```

DEMARCO - CROSS

```
 1    Q.  Would you agree that it generally tries to advance the

 2    interests of its members, including through lobbying?

 3    A.  Yes.

 4    Q.  And they -- and the members of the trade association are

 5    the ones who provide funding -- not to the association, but the

 6    members of the Housing Policy Council are the ones who provide

 7    the funding for the Housing Policy Council; correct?

 8              MR. STERN:  I'm sorry, Your Honor.  Objection.  402,

 9    403.

10              THE COURT:  Overruled.

11    A.  Yes, they do.

12    BY MR. HUME:

13    Q.  And when you were first hired, was the Housing Policy

14    Council part of an organization called the Financial Services

15    Roundtable?

16    A.  Yes, it was.

17    Q.  And is it correct that the Housing Policy Council strategic

18    plan includes restoring the private market to expand the level

19    of private capital and reformulating Fannie Mae and Freddie Mac

20    to remove the public loss and private gain model?

21    A.  Yes.

22    Q.  Now, that's one of the reasons you think they're

23    fundamentally flawed -- right? -- because you think that --

24    have private gains and government losses; is that right?

25    A.  It's kind of how it worked out, yes.
```

DEMARCO - CROSS

1    Q.  Well, I'd like to show you just one or two slides on that.

2    The --

3               MR. HUME:  Could I see Slide 27.

4    BY MR. HUME:

5    Q.  Slide 27 was prepared by an expert in this case,

6    Mr. DeMarco.  On the left side is a chart.  That's the total

7    amount that Fannie and Freddie have drawn from the Treasury

8    Department, 191 billion.  Do you see that?

9    A.  I do.

10   Q.  And you understand that a small amount of that, 2 or 3, 4,

11   5 billion -- I think 4 billion was during the net worth sweep

12   because they had no capital and the tax rules changed.  Do you

13   remember that, or you're not familiar with that?

14   A.  Yes, I recall that.

15   Q.  Okay.

16   A.  I don't recall the amount, but yes.

17   Q.  Okay.  Now, you understand that in 2019 there was an

18   agreement to change how the net worth sweep worked so that

19   instead of it being swept in cash, Fannie and Freddie would

20   finally be able to keep capital; but whatever profit --

21   whatever net worth they built would be added to Treasury's

22   liquidation preference.  Do you understand that?

23   A.  Yes.

24   Q.  Okay.  So our expert added up everything Treasury has

25   received in dividends, both in cash and increases in

1    liquidation preference from net worth increases. And this is

2    what that adds up to: 395.8 billion. Do you see that?

3    A. I do.

4    Q. Do you have any basis to dispute that?

5    A. No.

6    Q. So that's not showing a government loss; right? That's

7    showing over $200 billion of gain to the United States Treasury

8    Department; correct?

9    A. Yes.

10   Q. Could I show Slide No. 16 -- Slide No. 26.

11        Now, you understand that in this case we represent the

12   private preferred shareholders in both Fannie Mae and

13   Freddie Mac?

14   A. I do.

15   Q. And do you have any basis to dispute that -- actually,

16   let's go back to Slide 25.

17        Do you have any basis to dispute that the total amount

18   invested by those private shareholders was 19.1 billion in --

19   in Fannie Mae? Do you have any basis to dispute that?

20   A. No.

21   Q. Any basis to dispute that the amount preferred shareholders

22   invested in Freddie Mac was 14.1 billion?

23   A. No.

24   Q. And that the arithmetic adds to up 33.2 billion. Do you

25   see that?

```
 1    A.  Yes.

 2    Q.  Okay.  And do you have any basis to dispute that the

 3    total dividends paid on those shares were as shown in the

 4    chart here?

 5    A.  No.

 6    Q.  Total of 5 billion?

 7    A.  I don't.

 8              MR. STERN:  Objection, Your Honor.  Based on the

 9    Court's order.

10              MR. HUME:  The witness has testified about his view

11    on --

12              THE COURT:  I'll take the objection on the phone.

13              (Bench conference on the record.)

14              MR. STERN:  Your Honor, based on the Court's order,

15    the comparison that they cannot draw, the direct comparison, is

16    between amounts invested and dividends paid.  That is the

17    comparison that they cannot draw.  It appears that that is

18    exactly the comparison that's being drawn by this slide.

19              MR. HUME:  That was not the Court's ruling,

20    Your Honor.  The Court's ruling was that we couldn't use the

21    difference to argue that that's the damages we're entitled to.

22    We could show it -- as I explained now multiple times, the only

23    reason to show it is so people don't think when they see the

24    investment number that, well, we might have gotten dividends

25    above that amount.
```

```
1              The reality is the private shareholders invested more
2       than they received.  It's just the simple fact, and I'm not
3       arguing anything with the witness.  I'm just showing it to him.
4              MR. STERN:  This is --
5              THE COURT:  Was this displayed during the expert?
6              MR. STERN:  I don't --
7              MR. HUME:  I didn't hear the question, Your Honor.
8              THE COURT:  Was this displayed during the expert?
9              MR. HUME:  Yes.  This was -- well, this summary
10      witness -- the summary witness displayed these numbers.
11             MR. STERN:  But the slide was not displayed,
12      Your Honor.  It's --
13             THE COURT:  The objection is sustained.
14             (Proceedings held in open court.)
15             THE COURT:  The objection is sustained.  The jury
16      will disregard the slide.
17             MR. HUME:  I've taken it down.
18      BY MR. HUME:
19      Q.  Just let me ask it this way, Mr. DeMarco:  You don't have
20      any basis to dispute, do you, that the private preferred
21      shareholders put in way more money into Fannie and Freddie than
22      they received back?
23             MR. STERN:  Objection, Your Honor.
24             MR. HUME:  I'll rephrase.
25             THE COURT:  Sustained.
```

DEMARCO - CROSS

```
1              MR. STERN:  Move to --

2      BY MR. HUME:

3      Q.  Mr. DeMarco --

4              THE COURT:  The objection was sustained.  Don't

5      argue.

6              MR. HUME:  No, no.  I'm not arguing.  I'm sorry,

7      Your Honor.

8      BY MR. HUME:

9      Q.  The -- you don't dispute that the private preferred

10     shareholders have lost money?

11             MR. STERN:  Objection, Your Honor.  That's --

12             THE COURT:  Sustained.

13             MR. HUME:  Okay.  Your Honor, I wish I could say I

14     was done, but I'm not.  It's 4 minutes to 5:00.  I'm probably

15     going to move on to a new subject.

16             THE COURT:  We'll stop now.  We'll start at 10:00.

17     Don't talk about the case.  Don't let anyone else talk about

18     the case.  I'll see y'all at 10 o'clock.

19         I'll talk to counsel off the record.

20             (Proceedings held out of the presence of the jury.)

21             (Off the record.)

22             THE COURT:  I'll see y'all tomorrow morning.

23             (Proceedings were concluded at 5:01 p.m.)

24

25
```

1       <u>CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER</u>

2

3            I, Nancy J. Meyer, Registered Diplomate Reporter,

4       Certified Realtime Reporter, do hereby certify that the above

5       and foregoing constitutes a true and accurate transcript of my

6       stenograph notes and is a full, true, and complete transcript

7       of the proceedings to the best of my ability.

8

9                           Dated this 8th day of August, 2023.

10

11                     /s/ Nancy J. Meyer
                       Nancy J. Meyer
12                     Official Court Reporter
                       Registered Diplomate Reporter
13                     Certified Realtime Reporter
                       333 Constitution Avenue Northwest
14                     Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25

## $

**$100** [2] - 86:25, 87:22
**$110** [1] - 36:13
**$111** [3] - 37:1, 39:6, 39:10
**$117** [1] - 26:19
**$140** [1] - 32:22
**$200** [1] - 128:7
**$62** [1] - 96:18
**$70** [1] - 94:2

## '

**'09** [2] - 81:2, 81:18
**'10** [2] - 81:2, 81:18
**'11** [5] - 69:10, 81:2, 81:18, 82:17, 86:10
**'12** [1] - 69:11
**'22** [1] - 26:23

## 0

**03-3** [6] - 93:11, 93:13, 93:22, 94:9, 94:13, 94:19

## 1

**1** [8] - 7:17, 14:9, 25:12, 25:24, 27:16, 77:12, 77:16, 96:14
**1.5-billion** [1] - 91:14
**10** [24] - 3:5, 4:21, 6:12, 13:7, 13:15, 25:14, 26:2, 26:7, 28:15, 29:18, 33:25, 34:22, 34:25, 37:13, 38:11, 39:14, 43:24, 44:23, 50:9, 62:15, 80:14, 116:1, 123:13, 131:18
**10-Q** [6] - 27:24, 62:25, 63:18, 66:21, 68:5
**100** [3] - 43:11, 70:1, 101:2
**103** [1] - 66:16
**10:00** [1] - 131:16
**11** [4] - 68:7, 75:7, 88:17, 119:21
**110** [1] - 36:12
**111** [5] - 3:8, 37:3, 37:4, 37:18, 38:7
**111.2** [1] - 35:7
**116.1** [1] - 74:14
**118** [1] - 79:12
**118.3** [1] - 73:5
**12** [1] - 14:8
**120** [1] - 32:22
**124** [3] - 27:5, 33:5,

79:11
**124.8** [2] - 72:20, 74:3
**12th** [1] - 91:21
**13** [1] - 44:23
**130** [2] - 38:5, 38:17
**130.1** [1] - 35:4
**14.1** [1] - 128:22
**148.3** [4] - 72:22, 73:8, 74:6, 74:10
**14th** [3] - 101:18, 103:18, 104:11
**15** [1] - 53:18
**152.2** [1] - 82:17
**15th** [1] - 74:22
**16** [2] - 28:1, 128:10
**160** [1] - 49:3
**162** [1] - 64:10
**16th** [4] - 49:17, 49:25, 51:18, 51:20
**17** [2] - 5:20, 40:1
**17th** [8] - 4:20, 9:16, 40:25, 50:12, 100:23, 101:2, 102:3, 113:15
**18** [2] - 59:19, 59:20
**18.9** [1] - 34:23
**188** [3] - 62:23, 63:3, 63:4
**189** [1] - 63:17
**19.1** [1] - 128:18
**191** [1] - 127:8
**1:00** [1] - 119:7
**1st** [4] - 26:5, 34:10, 58:18, 58:21

## 2

**2** [8] - 9:19, 14:15, 34:16, 43:16, 45:12, 77:5, 112:4, 127:10
**20** [3] - 71:21, 73:24, 78:2
**200** [4] - 69:8, 70:1, 70:5, 70:10
**200.5** [1] - 26:23
**2007** [3] - 48:24, 89:19, 89:20
**2008** [18] - 48:16, 48:24, 51:11, 59:10, 59:17, 60:5, 60:13, 60:21, 62:20, 66:11, 66:21, 66:22, 68:5, 81:2, 81:18, 82:17, 86:10, 96:19
**2009** [24] - 60:6, 60:14, 60:22, 62:2, 62:6, 62:10, 62:20, 62:25, 63:11, 64:22, 64:24, 65:4, 65:8, 65:13, 65:19, 66:3, 66:20,

68:24, 69:9, 69:14, 69:17, 70:11, 86:6, 89:8
**2010** [7] - 54:19, 65:4, 65:8, 65:13, 65:19, 66:3, 69:10
**2011** [14] - 5:2, 50:5, 51:16, 51:19, 65:4, 65:8, 65:13, 65:19, 66:3, 89:8, 92:6, 123:1, 123:10, 123:11
**2012** [75] - 4:20, 5:4, 5:20, 9:16, 10:3, 11:6, 12:9, 23:19, 27:17, 27:25, 28:24, 32:8, 32:10, 40:1, 44:16, 49:12, 49:17, 49:21, 49:24, 49:25, 50:14, 50:16, 51:18, 51:19, 51:20, 51:23, 55:8, 62:4, 62:14, 65:5, 65:9, 65:14, 65:20, 68:25, 69:8, 70:2, 70:3, 70:9, 70:22, 71:18, 72:19, 74:3, 74:22, 75:2, 78:9, 84:5, 88:1, 88:5, 88:12, 88:21, 88:22, 88:25, 89:20, 89:21, 89:23, 91:10, 91:13, 91:19, 92:10, 92:11, 92:24, 93:19, 96:1, 101:18, 111:10, 113:13, 113:16, 114:25, 115:19, 116:4, 117:13, 119:1, 119:17, 120:4, 120:22
**2013** [25] - 6:13, 7:18, 26:5, 26:13, 26:23, 34:10, 34:14, 35:3, 35:14, 35:22, 38:5, 38:24, 39:5, 39:10, 41:11, 43:14, 55:10, 55:11, 55:22, 62:7, 62:8, 62:11, 86:7
**2014** [4] - 25:18, 34:5, 35:14, 36:25
**2019** [1] - 127:17
**2022** [2] - 26:5, 45:1
**2023** [1] - 58:18
**205** [1] - 11:1
**20th** [1] - 111:9
**21** [3] - 24:20, 26:15
**214** [1] - 14:8
**215** [1] - 14:8
**23-page** [1] - 111:22
**24** [1] - 26:11

**243** [1] - 63:3
**248** [1] - 76:16
**248**........................[1] - 3:8
**24th** [3] - 63:11, 64:24, 69:14
**25** [1] - 128:16
**25th** [11] - 11:6, 11:21, 12:9, 20:21, 21:7, 21:9, 24:21, 113:13, 114:15, 114:19
**26** [1] - 128:10
**27** [2] - 127:3, 127:5
**278** [2] - 121:13, 121:14
**29th** [1] - 92:24
**2Q** [1] - 5:4

## 3

**3** [3] - 6:3, 14:22, 127:10
**3.2** [1] - 6:20
**30** [3] - 29:19, 38:1, 50:25
**30-year** [4] - 29:15, 50:24, 51:3, 51:8
**30th** [2] - 59:10, 114:10
**31** [1] - 50:16
**31st** [3] - 62:14, 68:25, 70:9
**33.2** [1] - 128:24
**395.8** [1] - 128:2

## 4

**4** [8] - 3:4, 17:14, 19:3, 82:8, 82:12, 127:10, 127:11, 131:14
**4-B** [1] - 19:5
**40** [1] - 50:5
**402** [2] - 125:17, 126:8
**403** [5] - 41:4, 108:12, 109:17, 125:17, 126:9
**47** [1] - 38:4
**47.6** [1] - 38:4
**4th** [1] - 119:1

## 5

**5** [7] - 6:2, 29:18, 82:13, 82:14, 127:11, 129:6
**5.4-basis** [1] - 50:9
**50** [2] - 98:23, 101:2
**500** [1] - 111:4
**500**........................[1] - 3:8
**549** [1] - 8:14

**584** [1] - 21:13
**5:00** [1] - 131:14
**5:01** [1] - 131:23

## 6

**6** [3] - 6:20, 7:3, 14:8
**60** [1] - 98:23

## 7

**7** [3] - 7:3, 20:9, 93:21
**70-billion** [1] - 93:22
**72.3** [1] - 27:1
**73** [1] - 63:22
**73.9** [1] - 82:20
**753** [2] - 44:23
**76** [1] - 3:8
**7:30** [1] - 103:21
**7th** [2] - 115:19, 116:4

## 8

**8** [1] - 76:21
**8-billion** [1] - 33:5
**82** [1] - 38:3
**82.5** [1] - 38:4
**8th** [3] - 115:19, 116:4, 116:23

## 9

**9** [4] - 66:12, 66:25, 67:13, 74:22
**9th** [9] - 71:18, 75:2, 96:1, 99:23, 100:21, 101:1, 114:25, 115:15, 116:23

## A

**a.m** [1] - 4:2
**ability** [2] - 67:19, 68:12
**able** [7] - 37:17, 61:4, 78:5, 85:15, 87:14, 90:13, 127:20
**ABS** [2] - 59:14, 60:2
**absolute** [1] - 47:10
**accelerated** [1] - 7:8
**acceptable** [1] - 69:6
**accomplish** [1] - 7:1
**accomplishing** [2] - 6:4, 7:4
**according** [1] - 80:19
**accountant** [4] - 53:1, 81:24, 83:8, 101:12
**accountants** [1] - 83:11
**accounting** [9] - 81:19, 81:22, 85:23,

86:2, 86:25, 87:13, 93:4, 94:14, 101:16
**accuracy** [1] - 32:1
**accurate** [19] - 14:12, 14:19, 14:25, 17:17, 19:6, 19:14, 19:15, 19:18, 20:13, 23:21, 23:23, 27:10, 30:5, 45:9, 58:9, 59:2, 67:22, 68:15, 69:5
**accurately** [1] - 34:13
**achieve** [2] - 61:3, 122:16
**act** [1] - 70:20
**acting** [18] - 12:13, 31:5, 31:15, 35:14, 42:5, 52:5, 53:21, 53:22, 54:6, 54:9, 54:13, 84:4, 86:6, 93:24, 97:21, 122:25, 124:2, 124:5
**activity** [1] - 47:24
**actual** [4] - 27:4, 28:11, 35:2, 47:10
**add** [1] - 52:15
**added** [5] - 37:4, 80:8, 101:3, 127:21, 127:24
**adding** [1] - 87:16
**additional** [4] - 37:4, 64:2, 64:16, 112:25
**address** [1] - 22:2
**addressed** [4] - 38:22, 61:7, 66:6, 111:11
**addresses** [1] - 78:22
**adds** [4] - 38:4, 128:2, 128:24
**adjust** [1] - 84:11
**adjusting** [1] - 7:5
**adjustment** [1] - 87:1
**adjustments** [1] - 81:19
**administration's** [1] - 123:1
**admissible** [2] - 23:13, 24:4
**admission** [2] - 75:25, 109:17
**admit** [3] - 24:11, 40:7, 109:19
**Admitted** [1] - 3:7
**admitted** [10] - 15:5, 18:22, 24:8, 24:9, 76:13, 76:14, 76:16, 108:16, 110:13, 111:4
**admitting** [1] - 109:4
**advance** [1] - 126:1
**adverse** [1] - 39:23
**adversely** [2] - 67:19,

68:12
**affect** [3] - 47:18, 67:19, 68:12
**affirmation** [1] - 10:9
**affordability** [1] - 67:16
**afield** [2] - 54:25, 109:16
**afternoon** [3] - 4:5, 4:14, 10:19
**agenda** [2] - 119:3, 119:6
**ago** [5] - 45:3, 53:15, 53:18, 75:7, 98:9
**agree** [35] - 31:24, 32:19, 41:19, 41:22, 42:1, 42:14, 42:22, 43:2, 52:19, 52:22, 58:13, 79:3, 79:8, 79:19, 82:25, 83:18, 85:4, 85:12, 87:20, 88:1, 88:14, 89:13, 89:22, 106:19, 106:25, 109:5, 111:22, 112:16, 113:2, 113:6, 113:7, 113:8, 117:12, 125:22, 126:1
**agreed** [13] - 35:17, 35:25, 43:10, 57:8, 79:25, 80:1, 80:19, 95:1, 99:15, 108:18, 110:20, 121:4
**agreement** [8] - 6:22, 44:20, 64:2, 64:17, 118:8, 118:11, 118:19, 127:18
**aid** [1] - 120:24
**align** [1] - 125:24
**ALL** [3] - 93:22, 94:2, 94:4
**allowance** [11] - 85:2, 85:6, 85:25, 86:4, 86:20, 87:2, 87:9, 92:5, 94:4, 96:19, 96:22
**allowances** [3] - 86:12, 95:4, 95:8
**allowed** [5] - 6:17, 26:2, 117:15, 123:2
**almost** [1] - 113:16
**alone** [1] - 39:10
**amend** [2] - 25:1, 121:4
**amending** [6] - 6:6, 6:9, 12:25, 18:16, 19:17, 23:19
**amendment** [56] - 4:17, 4:19, 4:25, 5:12, 5:19, 6:1, 6:10,

6:21, 6:24, 6:25, 7:1, 7:2, 7:4, 7:5, 7:13, 8:10, 8:12, 8:25, 9:11, 9:17, 16:12, 16:14, 16:17, 16:21, 17:1, 17:2, 17:7, 17:8, 17:11, 17:20, 17:21, 17:24, 18:3, 18:4, 18:6, 18:24, 19:11, 19:24, 20:1, 20:5, 20:6, 44:17, 45:16, 46:3, 62:3, 62:13, 68:23, 69:4, 69:15, 70:14, 100:4, 102:1, 105:2, 114:9, 121:9, 121:24
**amendments** [4] - 5:16, 103:19, 115:7, 116:24
**amount** [30] - 6:16, 6:18, 28:15, 35:15, 37:13, 37:19, 38:10, 38:11, 69:8, 78:11, 78:18, 78:25, 82:2, 82:14, 86:8, 108:21, 116:1, 116:5, 116:11, 116:14, 117:25, 123:14, 127:7, 127:10, 127:16, 128:17, 128:21, 129:25
**amounted** [1] - 33:4
**amounts** [2] - 79:9, 129:16
**analogous** [1] - 72:1
**analyses** [3] - 72:1, 107:5, 112:23
**analysis** [16] - 40:22, 41:2, 43:13, 43:18, 43:22, 44:5, 74:17, 87:22, 106:25, 107:1, 109:11, 112:17, 112:24, 112:25, 113:3, 113:6
**analyst** [4] - 8:25, 9:10, 40:8, 40:25
**analysts** [1] - 8:11
**analyzing** [3] - 44:2, 44:12, 45:5
**Andre** [1] - 92:21
**announced** [7] - 8:10, 40:9, 50:11, 50:12, 75:12, 102:10, 121:17
**Announces** [1] - 121:20
**annual** [6] - 13:7, 13:15, 25:14, 28:8, 33:16, 33:18
**answer** [22] - 19:5,

36:7, 38:25, 39:1, 56:22, 57:2, 57:17, 57:25, 58:6, 58:12, 58:13, 58:15, 76:2, 76:4, 82:5, 83:13, 90:2, 99:19, 100:19, 114:2, 114:5, 120:1
**ANSWER** [1] - 45:8
**answered** [1] - 113:25
**answers** [2] - 56:22, 119:25
**anticipated** [1] - 81:23
**anticipation** [1] - 99:24
**anyway** [2] - 79:18, 102:9
**apologize** [4] - 98:17, 99:2, 103:15, 121:12
**appear** [1] - 104:20
**applied** [1] - 86:3
**apply** [1] - 87:13
**appoint** [1] - 58:10
**appointed** [4] - 54:8, 54:16, 57:3, 111:1
**appointing** [2] - 54:6, 58:1
**appreciate** [3] - 20:2, 53:20, 111:18
**approach** [3] - 42:2, 71:25, 112:9
**approached** [1] - 70:22
**appropriate** [6] - 87:18, 96:25, 108:22, 109:14, 118:11
**approved** [1] - 31:16
**approving** [1] - 31:6
**April** [1] - 109:24
**area** [1] - 8:9
**argue** [2] - 129:21, 131:5
**arguing** [2] - 130:3, 131:6
**arguments** [1] - 114:12
**arithmetic** [2] - 28:11, 128:24
**arm's** [1] - 52:7
**ascribe** [1] - 118:15
**aside** [3] - 52:18, 61:20, 113:11
**assertion** [1] - 119:20
**assess** [2] - 95:8, 100:6
**assessment** [1] - 87:18
**asset** [16] - 59:14, 84:19, 85:2, 85:5, 85:14, 85:16, 85:19,

85:25, 86:21, 87:1, 87:3, 87:15, 94:25, 96:16, 98:24, 99:6
**asset-backed** [1] - 59:14
**assets** [25] - 7:7, 58:2, 61:10, 61:16, 61:19, 61:21, 61:22, 61:23, 83:21, 84:6, 86:9, 86:12, 87:5, 87:16, 94:7, 95:6, 98:23, 99:16, 104:5, 104:13, 104:22, 104:25, 105:5, 105:8, 105:19
**assign** [1] - 43:6
**assistance** [1] - 114:9
**association** [4] - 125:4, 125:23, 126:4, 126:5
**associations** [1] - 124:10
**assume** [8] - 28:2, 70:7, 70:16, 73:19, 92:15, 111:12
**assumption** [1] - 70:12
**assumptions** [1] - 70:25
**assured** [1] - 7:14
**attached** [3] - 71:20, 96:7, 111:23
**attaches** [1] - 112:20
**attempt** [1] - 97:2
**attend** [3] - 76:5, 97:6, 99:7
**attention** [5] - 8:11, 18:1, 63:23, 109:9, 110:24
**audio** [6] - 14:10, 14:17, 14:23, 17:15, 19:7, 20:11
**audio-visual** [6] - 14:10, 14:17, 14:23, 17:15, 19:7, 20:11
**auditors** [2] - 102:14, 102:18
**August** [37] - 4:20, 5:4, 5:20, 9:16, 40:1, 40:25, 49:17, 49:25, 50:12, 51:17, 51:18, 51:20, 58:18, 58:21, 74:22, 75:2, 96:1, 99:23, 100:21, 100:23, 101:1, 101:2, 101:18, 102:3, 103:18, 104:11, 113:15, 114:25, 115:15, 115:19, 116:4,

116:23, 117:13, 118:13, 118:17, 120:22
**authority** [1] - 59:23
**aware** [9] - 28:22, 32:6, 58:25, 74:25, 75:4, 75:9, 86:11, 95:2, 120:10
**awfully** [1] - 103:20

# B

**backed** [4] - 29:14, 47:23, 59:14
**balance** [12] - 37:7, 37:11, 61:15, 61:22, 64:1, 64:6, 64:15, 85:17, 86:1, 87:17, 87:23
**ball** [1] - 53:13
**bank** [1] - 28:19
**banks** [3] - 125:4, 125:7, 125:12
**Barclays** [2] - 9:10, 10:8
**Barclays'** [1] - 8:25
**bars** [1] - 81:3
**base** [1] - 91:13
**based** [12] - 40:24, 47:11, 70:24, 72:25, 81:19, 82:5, 98:10, 104:2, 105:15, 118:16, 129:8, 129:14
**basis** [14] - 26:25, 27:4, 49:2, 49:8, 50:5, 100:7, 110:21, 128:4, 128:15, 128:17, 128:19, 128:21, 129:2, 130:20
**became** [3] - 16:11, 16:13, 53:21
**become** [2] - 54:20, 84:14
**becomes** [1] - 82:1
**becoming** [1] - 12:13
**began** [1] - 66:23
**begin** [2] - 11:1, 74:2
**beginning** [5] - 6:13, 15:16, 52:24, 69:16, 93:19
**begins** [4] - 9:23, 93:20, 94:11, 119:21
**behalf** [3] - 44:14, 45:6, 98:12
**belabor** [2] - 71:11, 112:13
**below** [5] - 11:16, 79:1, 87:9, 96:8,

96:12
**Bench** [6] - 23:9, 40:5, 75:24, 107:25, 110:7, 129:13
**Benson** [2] - 33:3, 33:7
**best** [1] - 36:16
**better** [11] - 7:14, 30:3, 30:12, 36:16, 36:24, 37:1, 65:15, 84:7, 84:10, 89:24, 90:2
**between** [19] - 11:18, 35:6, 38:9, 38:17, 39:4, 44:8, 49:8, 50:4, 60:5, 60:13, 60:21, 70:1, 75:1, 80:2, 85:5, 93:9, 101:1, 129:16
**beyond** [2] - 85:6, 85:9
**big** [4] - 81:2, 81:5, 109:9, 117:5
**bigger** [3] - 47:7, 48:7, 51:11
**billion** [50] - 26:19, 26:23, 27:1, 27:5, 32:22, 33:5, 34:23, 35:4, 35:7, 36:12, 36:13, 37:1, 37:18, 38:5, 38:7, 38:17, 39:6, 39:10, 69:8, 70:1, 70:10, 72:20, 72:22, 73:5, 74:3, 74:6, 74:14, 79:11, 79:12, 82:17, 82:20, 86:8, 86:20, 86:25, 87:22, 93:21, 94:2, 96:18, 98:23, 101:2, 127:8, 127:11, 128:2, 128:7, 128:18, 128:22, 128:24, 129:6
**billions** [1] - 61:15
**birth** [1] - 89:18
**bit** [7] - 19:4, 22:12, 47:7, 48:6, 48:7, 73:4, 100:15
**Bjarnason** [6] - 92:18, 92:19, 92:20, 93:1, 93:17, 94:15
**Bloomberg** [2] - 48:9, 51:7
**blow** [3] - 48:6, 59:6, 122:9
**Board** [1] - 95:24
**board** [19] - 73:13, 73:20, 95:2, 95:11, 95:16, 97:6, 97:17, 97:19, 97:22, 98:4, 98:20, 99:7, 99:13,

99:24, 99:25, 100:12, 101:7
**board's** [1] - 95:14
**boards** [4] - 95:2, 95:7, 105:11, 105:14
**body** [1] - 93:6
**bond** [5] - 38:15, 38:18, 46:7, 46:8, 47:22
**bonds** [11] - 46:13, 46:24, 47:2, 47:5, 47:17, 48:11, 49:9, 49:22, 51:4, 51:8, 51:14
**book** [2] - 94:14, 96:19
**books** [3] - 37:1, 37:18, 94:13
**boss** [1] - 101:15
**bottom** [11] - 21:14, 21:15, 21:23, 27:24, 71:25, 72:7, 72:9, 72:13, 93:3, 101:11, 103:11
**Bowler** [3] - 22:5, 24:19, 24:25
**Bradford** [2] - 71:15, 90:23
**break** [2] - 55:25, 56:1
**breaks** [1] - 37:25
**briefly** [10] - 23:6, 26:11, 50:21, 52:23, 66:10, 75:21, 89:17, 90:20, 106:22, 107:9
**bring** [4] - 11:3, 16:6, 77:24, 110:25
**broad** [2] - 59:23, 88:5
**buffer** [2] - 37:4, 37:11
**build** [2] - 65:6, 120:25
**building** [4] - 65:9, 116:6, 116:12, 117:25
**built** [3] - 116:8, 116:9, 127:21
**bullet** [2] - 12:17, 59:22, 122:8, 122:15
**bullets** [1] - 114:12
**bunch** [1] - 100:8
**business** [4] - 60:16, 60:24, 61:1, 61:20
**buy** [1] - 50:24, 94:20

# C

**calculate** [1] - 39:18
**calculated** [2] - 26:9, 68:25
**calculating** [2] - 70:24, 83:22

99:24, 99:25,
**calendar** [1] - 34:11
**cannot** [3] - 41:19, 129:15, 129:17
**cap** [7] - 70:18, 72:17, 72:19, 72:22, 73:1, 74:2, 74:17
**capital** [9] - 10:3, 10:5, 32:14, 63:24, 64:13, 123:3, 126:19, 127:12, 127:20
**capped** [2] - 7:17, 62:4
**caps** [8] - 13:8, 13:16, 25:15, 32:10, 50:16, 62:13, 70:23, 71:6
**careful** [1] - 47:9
**carefully** [1] - 113:7
**carried** [1] - 38:20
**Case** [1] - 88:18
**case** [21] - 13:11, 13:20, 14:1, 23:12, 25:24, 36:16, 36:17, 36:20, 36:23, 45:1, 73:15, 91:13, 109:7, 109:15, 114:8, 127:5, 128:11, 131:17, 131:18
**Case-Shiller** [1] - 88:18
**cash** [4] - 6:12, 80:7, 127:19, 127:25
**catastrophe** [1] - 36:20
**caused** [4] - 15:9, 40:14, 87:5, 87:6
**causing** [1] - 40:15
**cautious** [1] - 30:3
**center** [1] - 124:22
**CEO** [2] - 73:16, 75:10
**certain** [4] - 104:5, 104:12, 104:22, 105:5
**certainly** [5] - 24:14, 29:22, 52:13, 97:14, 117:11
**certainty** [5] - 30:9, 41:20, 42:8, 42:23, 70:6
**CFO** [1] - 75:10
**chain** [1] - 21:13
**chance** [2] - 10:2, 22:24
**change** [5] - 6:21, 9:23, 10:2, 62:15, 127:18
**changed** [5] - 56:16, 84:15, 84:24, 84:25, 127:12
**changes** [2] - 9:7, 9:12

**characterization** [2] - 32:1, 52:15
**characterize** [1] - 52:11
**charge** [1] - 31:5
**chart** [18] - 4:22, 5:1, 38:9, 38:17, 48:12, 49:14, 50:8, 50:23, 51:16, 66:25, 68:7, 72:8, 82:7, 82:11, 84:21, 127:6, 129:4
**Chart** [2] - 82:12, 82:13
**charters** [1] - 123:23
**charts** [2] - 66:25, 81:1
**Chase** [1] - 125:8
**check** [1] - 26:14
**chief** [1] - 53:6
**choose** [2] - 54:12, 54:13
**chronology** [1] - 52:24
**Chryssa** [2] - 95:23, 96:7
**circular** [12] - 7:25, 8:3, 8:5, 13:17, 32:8, 32:18, 32:20, 32:23, 33:3, 37:19, 80:16, 122:23
**circumstances** [1] - 40:24
**Citibank** [1] - 125:8
**civil** [1] - 110:25
**clarify** [1] - 110:5
**classically** [1] - 40:22
**clear** [17] - 27:21, 29:19, 34:9, 41:16, 52:16, 53:23, 61:21, 62:1, 80:18, 99:4, 100:25, 103:7, 110:8, 110:24, 115:11, 119:14, 120:5
**clearly** [1] - 114:14
**clicker** [1] - 84:25
**Clip** [6] - 14:9, 14:15, 14:22, 17:14, 19:3, 20:9
**clips** [1] - 23:20
**close** [4] - 46:25, 53:18, 86:8, 115:3
**closer** [6] - 49:23, 50:15, 50:16, 50:17
**cloture** [1] - 55:13
**colleagues** [2] - 89:7, 89:9
**combined** [3] - 34:22, 38:5, 86:8
**combining** [1] - 37:24

**coming** [5] - 13:6, 13:14, 25:13, 88:6, 93:15
**comment** [1] - 83:13
**comments** [2] - 96:10, 96:12
**commission** [2] - 53:13, 53:17
**commitment** [47] - 6:25, 7:2, 7:17, 7:20, 10:7, 10:10, 32:9, 32:21, 33:5, 33:12, 37:2, 37:8, 37:15, 37:20, 38:22, 39:2, 39:5, 39:9, 39:10, 39:13, 39:16, 39:19, 40:16, 62:3, 68:19, 68:21, 68:24, 69:7, 69:11, 69:25, 70:9, 70:18, 73:8, 74:11, 79:11, 79:19, 79:22, 79:24, 80:6, 80:9, 80:11, 80:13, 80:21, 87:10, 118:13, 123:1
**committee** [2] - 107:12, 107:16
**Committee** [2] - 108:5, 111:9
**common** [5] - 119:11, 119:18, 119:22, 119:23, 120:4
**communication** [3] - 60:17, 60:19, 60:22
**companies** [18] - 29:14, 30:16, 31:10, 31:20, 36:4, 60:18, 82:4, 86:11, 99:4, 99:5, 100:6, 118:12, 120:15, 120:19, 120:20, 121:5, 125:4, 125:13
**company** [8] - 6:15, 33:16, 33:17, 57:4, 58:3, 85:13, 92:4, 95:14
**company's** [3] - 31:22, 32:2, 58:2
**comparatively** [1] - 46:19
**compare** [1] - 27:15
**compared** [3] - 46:13, 48:11, 92:6
**comparison** [4] - 129:15, 129:17, 129:18
**compensation** [1] - 39:15
**competence** [1] - 43:7
**competing** [1] - 13:4
**complaint** [1] - 37:23

**completely** [3] - 8:7, 8:8, 19:22
**component** [1] - 46:4
**compound** [1] - 42:16
**comprehensive** [7] - 26:5, 26:22, 27:5, 28:7, 28:8, 28:14, 115:25
**compromise** [1] - 108:19
**concept** [6] - 15:23, 16:3, 46:14, 46:15, 47:13, 84:14
**conceptually** [1] - 84:15
**concern** [8] - 48:19, 83:3, 83:23, 102:23, 110:18, 117:20, 117:21, 121:8
**concluded** [2] - 87:13, 131:23
**conclusion** [3] - 30:18, 31:13, 117:21
**condition** [4] - 57:5, 58:4, 62:7, 62:10
**conference** [5] - 23:9, 40:5, 59:14, 75:24, 107:25, 110:7, 129:13
**confidence** [6] - 10:10, 38:15, 38:18, 47:1, 47:7, 85:22
**confirm** [1] - 111:7
**confirmed** [4] - 54:8, 55:5, 55:6, 55:22
**conflict** [1] - 65:10
**Congress** [3] - 70:20, 111:8, 120:17
**connection** [1] - 89:15
**cons** [3] - 44:2, 44:13, 45:5
**consequences** [2] - 39:23, 41:2
**conservative** [1] - 30:4
**conservator** [4] - 32:2, 58:2, 58:10, 59:24
**conservatorship** [28] - 4:23, 29:16, 56:13, 56:24, 57:2, 57:13, 57:23, 58:7, 59:23, 60:12, 61:5, 63:5, 63:25, 64:12, 64:14, 65:24, 66:5, 66:8, 66:23, 67:2, 67:6, 67:14, 67:24, 69:16, 90:11, 97:20, 120:19
**conservatorship's** [1] - 48:21
**conservatorships** [2]

- 7:16, 120:16
**conserve** [3] - 58:2, 61:10, 61:17
**conserved** [1] - 61:24
**consider** [2] - 96:8, 96:14
**consideration** [1] - 112:5
**considerations** [1] - 96:21, 98:22
**considered** [1] - 46:16
**consistent** [6] - 63:24, 64:13, 67:23, 79:5, 88:24, 103:16
**constitute** [1] - 58:15
**consulted** [1] - 97:15
**contained** [1] - 96:12
**contains** [2] - 22:17, 112:16
**contemporaneous** [1] - 23:19
**context** [6] - 12:2, 15:24, 46:21, 93:17, 105:2
**continue** [1] - 61:3
**continued** [1] - 25:20
**Continuing** [1] - 3:4
**continuing** [1] - 4:15
**contradicts** [1] - 24:3
**contrary** [1] - 19:15
**contrast** [1] - 47:5
**contributed** [1] - 86:21
**control** [1] - 57:4
**controlled** [1] - 54:22
**convention** [1] - 86:17
**conventions** [1] - 87:4
**convert** [1] - 125:11
**converted** [1] - 125:16
**converting** [1] - 124:10
**conveying** [2] - 17:10, 58:9
**copy** [4] - 59:13, 108:3, 109:25, 112:9
**copying** [2] - 22:5, 92:21
**corner** [1] - 58:16
**correct** [276] - 5:2, 11:17, 12:21, 13:11, 13:17, 13:21, 13:24, 13:25, 15:5, 15:21, 15:22, 15:23, 16:2, 16:7, 16:9, 16:12, 16:19, 16:22, 16:23, 16:24, 17:2, 17:22, 18:13, 18:16, 18:20, 18:24, 19:9, 19:14, 20:13, 20:25, 21:7, 21:8, 25:18, 25:22,

25:25, 26:8, 26:19, 27:2, 27:3, 27:5, 27:6, 27:22, 28:12, 28:15, 28:16, 28:25, 29:4, 29:7, 29:19, 29:20, 30:16, 31:7, 31:11, 32:10, 32:22, 33:1, 33:6, 33:25, 34:1, 34:2, 34:5, 34:11, 34:12, 34:14, 34:25, 35:1, 35:4, 35:5, 35:7, 35:11, 35:13, 35:18, 35:19, 36:14, 37:3, 37:5, 37:9, 37:10, 37:15, 37:16, 37:21, 38:5, 38:6, 38:11, 38:12, 38:16, 38:19, 39:20, 42:9, 42:10, 43:14, 43:15, 43:20, 43:21, 43:25, 44:1, 44:3, 44:4, 44:6, 44:7, 44:10, 44:11, 45:22, 45:23, 46:9, 46:10, 46:17, 46:20, 46:23, 47:3, 47:4, 47:8, 47:15, 47:17, 48:20, 48:24, 50:12, 50:17, 51:1, 51:4, 51:14, 51:21, 53:1, 53:2, 53:7, 53:8, 53:10, 53:11, 53:25, 54:1, 54:2, 54:9, 54:10, 54:14, 54:15, 54:17, 54:20, 55:5, 55:6, 55:9, 55:22, 55:23, 57:9, 58:5, 59:16, 59:17, 60:3, 61:24, 62:4, 62:8, 62:9, 62:12, 62:17, 63:13, 63:14, 64:8, 65:1, 65:2, 65:6, 65:7, 65:11, 65:12, 65:17, 65:18, 65:21, 65:22, 65:25, 66:5, 66:23, 66:24, 67:22, 68:15, 68:21, 68:23, 68:25, 69:12, 69:17, 69:21, 70:2, 70:11, 70:14, 70:15, 70:20, 70:25, 71:3, 72:17, 73:8, 73:17, 74:7, 74:11, 74:18, 74:19, 75:13, 78:19, 79:1, 79:16, 79:20, 80:3, 80:4, 80:9, 80:16, 80:22, 81:6, 81:9, 81:14, 81:15, 81:21, 83:5, 83:6, 83:7, 83:8, 83:9, 84:15, 86:24, 87:1, 87:8, 87:11,

87:17, 87:20, 88:9, 88:11, 88:22, 90:5, 90:8, 90:13, 90:17, 90:18, 91:4, 95:6, 95:18, 96:16, 97:5, 97:7, 97:13, 97:17, 97:23, 98:5, 99:6, 99:16, 100:21, 100:23, 101:16, 101:24, 102:3, 102:10, 102:11, 103:1, 105:5, 113:16, 115:9, 115:13, 115:14, 115:22, 116:2, 116:7, 117:3, 117:6, 117:19, 118:2, 118:6, 119:19, 120:13, 122:1, 122:13, 123:7, 123:14, 123:21, 123:25, 124:8, 125:1, 125:8, 125:9, 125:13, 126:7, 126:17, 128:8
**correspondence** [3] - 108:4, 108:6, 108:13
**Council** [9] - 124:24, 124:25, 125:3, 125:10, 125:23, 126:6, 126:7, 126:14, 126:17
**counsel** [12] - 4:12, 27:17, 28:1, 28:17, 57:16, 71:10, 71:22, 78:4, 78:24, 81:1, 114:24, 131:19
**counsel's** [1] - 121:10
**country** [1] - 88:2
**couple** [2] - 101:3, 112:6
**course** [2] - 32:23, 86:19
**court** [7] - 14:3, 24:16, 41:7, 76:9, 110:1, 111:3, 130:14
**Court** [6] - 22:25, 23:3, 23:15, 108:2, 108:13, 109:19
**COURT** [79] - 4:6, 4:8, 4:11, 10:18, 21:18, 22:14, 22:18, 22:20, 22:22, 23:1, 23:4, 23:8, 23:16, 24:8, 24:10, 24:12, 24:15, 25:5, 25:8, 30:19, 40:2, 40:4, 41:6, 41:14, 42:17, 55:1, 55:17, 56:1, 56:5, 57:21, 75:23, 76:7,

76:11, 76:14, 77:2,
77:5, 77:8, 77:12,
77:16, 77:23, 83:13,
85:8, 85:10, 97:1,
98:3, 98:16, 99:1,
99:7, 99:11, 99:19,
105:24, 106:3,
106:5, 106:10,
106:12, 106:18,
107:18, 107:20,
107:24, 109:21,
110:2, 110:6,
110:15, 110:17,
111:2, 112:10,
124:20, 125:19,
126:10, 129:12,
130:5, 130:8,
130:13, 130:15,
130:25, 131:4,
131:12, 131:16,
131:22
**Court's** [6] - 110:10,
110:12, 129:9,
129:14, 129:19,
129:20
**COURTROOM** [2] -
66:16, 75:16
**covenant** [12] - 12:24,
15:14, 15:17, 15:20,
15:21, 16:17, 17:11,
18:5, 18:12, 18:13,
19:11, 19:16
**cover** [4] - 37:14,
62:24, 76:18, 118:24
**CPA** [1] - 53:3
**create** [3] - 7:14,
81:23, 86:4
**creates** [1] - 121:7
**creating** [1] - 87:2
**credible** [1] - 73:21
**credit** [6] - 82:3,
82:16, 82:23, 83:1,
92:5, 92:6
**credit-related** [1] -
92:6
**crisis** [6] - 48:20,
51:12, 53:12, 53:17,
88:4, 88:6
**cross** [1] - 10:18
**Cross** [1] - 3:5
**CROSS** [1] - 10:21
**Cross-Examination**
[1] - 3:5
**CROSS-**
**EXAMINATION** [1] -
10:21
**cross-examine** [1] -
10:18
**cumbersome** [1] -
111:20

**Cummings** [4] -
108:5, 108:8,
110:19, 111:11
**Cummings'** [3] -
108:17, 109:1,
109:20
**curve** [5] - 46:12,
47:11, 47:12, 49:22,
93:19
**cut** [1] - 51:17
**cycle** [1] - 92:5

**D**

**damages** [1] - 129:21
**date** [22] - 4:18, 5:18,
9:15, 9:17, 50:2,
51:23, 51:24, 56:23,
58:17, 70:22, 75:7,
91:19, 91:20, 91:21,
96:1, 99:10, 99:23,
99:24, 112:24,
113:1, 114:10
**dated** [4] - 11:6,
92:24, 101:18, 119:1
**day's** [1] - 12:3
**days** [4] - 20:23,
24:21, 75:12, 102:9
**deal** [10] - 17:25,
19:22, 24:2, 45:16,
45:21, 70:18,
106:25, 113:3,
113:6, 117:5
**dealing** [1] - 17:8
**debate** [2] - 52:14,
52:18
**debating** [1] - 52:13
**debt** [2] - 46:16, 47:25
**decade** [1] - 10:4
**December** [17] - 50:5,
50:16, 51:19, 51:20,
60:6, 60:14, 60:22,
62:2, 62:6, 62:10,
62:14, 63:11, 64:24,
68:24, 68:25, 69:14,
70:9
**decided** [1] - 116:23
**deciding** [1] - 87:20
**decision** [6] - 24:7,
40:10, 40:24, 101:5,
108:23, 118:16
**decision-makers** [1] -
24:7
**decision-making** [1] -
40:10
**Deck** [1] - 95:24
**deck** [5] - 96:7, 96:11,
100:10, 100:12,
114:11
**decline** [1] - 83:24

**declining** [1] - 83:3
**decrease** [1] - 96:20
**deduction** [1] - 82:1
**default** [1] - 81:8
**defaults** [2] - 83:2,
83:4
**defendants** [6] -
28:17, 40:7, 41:10,
71:10, 110:24,
113:18
**defendants'** [1] -
13:20
**Defendants'** [2] -
62:23, 63:17
**deferred** [22] - 84:19,
85:1, 85:4, 85:19,
85:25, 86:9, 86:21,
87:1, 87:5, 87:14,
94:25, 95:5, 96:15,
98:24, 99:6, 99:15,
104:5, 104:12,
104:22, 104:25,
105:5, 105:7
**degree** [2] - 43:7,
85:22
**DeLeo** [2] - 8:18, 8:20
**deliberately** [1] -
52:20
**delinquencies** [1] -
81:8
**delinquent** [1] - 84:1
**DeMarco** [72] - 3:4,
4:6, 4:8, 4:14, 4:17,
6:7, 7:12, 8:9, 10:19,
10:23, 11:7, 12:4,
12:24, 13:10, 14:9,
14:12, 14:15, 14:19,
14:22, 14:25, 15:2,
17:17, 18:15, 19:9,
19:17, 20:20, 23:24,
24:18, 25:24, 27:9,
27:20, 32:5, 36:22,
40:10, 40:19, 41:3,
41:18, 43:9, 44:25,
45:14, 48:5, 49:14,
50:23, 56:8, 56:10,
56:21, 59:9, 62:24,
63:9, 63:20, 65:3,
67:7, 68:18, 76:1,
76:18, 81:17, 85:12,
95:1, 97:5, 98:7,
106:15, 108:20,
110:25, 111:6,
113:12, 116:17,
117:2, 121:16,
123:23, 127:6,
130:19, 131:3
**DeMarco's** [1] - 40:23
**Democrats** [2] - 55:7,
55:20

**demonstrates** [1] -
24:6
**demonstrative** [1] -
82:12
**denial** [1] - 27:12
**denied** [2] - 25:5, 25:7
**deny** [1] - 27:11
**Department** [15] -
6:18, 11:11, 16:3,
18:7, 39:12, 45:15,
100:3, 118:4, 119:1,
120:23, 121:2,
121:17, 121:20,
127:8, 128:8
**deposed** [1] - 14:1
**deposition** [9] - 14:2,
14:7, 14:8, 14:16,
15:4, 17:13, 18:22,
20:9, 23:20
**deputy** [4] - 53:25,
54:3, 54:4, 54:13
**DEPUTY** [2] - 66:16,
75:16
**Deputy** [1] - 11:18
**described** [1] - 82:24
**description** [1] - 69:5
**designated** [1] - 54:4
**designed** [1] - 40:19
**determination** [1] -
87:4
**determine** [1] - 43:13
**Dharan** [1] - 34:20
**difference** [7] - 35:6,
38:9, 39:3, 129:21
**differences** [1] - 93:9
**different** [12] - 19:19,
33:20, 42:12, 52:10,
52:17, 73:25, 77:10,
84:18, 84:23,
112:25, 114:12,
118:14
**differently** [1] - 14:15
**difficult** [1] - 89:7
**Direct** [1] - 3:4
**direct** [25] - 11:2, 12:7,
12:20, 13:23, 18:18,
19:15, 21:2, 23:18,
29:21, 30:22, 31:19,
35:20, 36:15, 46:8,
50:24, 63:12, 64:25,
71:10, 71:13, 71:23,
85:7, 95:14, 110:25,
113:18, 129:19
**DIRECT** [1] - 4:15
**directed** [2] - 60:18,
63:4
**direction** [3] - 47:21,
84:12, 113:2
**directions** [1] - 30:12
**directly** [2] - 24:3,

98:10
**Director** [1] - 53:24
**director** [24] - 12:13,
31:5, 31:15, 35:14,
42:5, 52:5, 53:21,
53:22, 54:5, 54:7,
54:8, 54:9, 54:13,
54:17, 54:18, 54:20,
55:9, 84:4, 86:6,
93:24, 97:21, 124:2,
124:5
**directors** [6] - 53:25,
54:3, 54:14, 95:2,
95:11, 95:16
**disagree** [3] - 31:24,
52:19, 120:8
**disagreed** [1] - 82:6
**disagreeing** [1] -
83:17
**disagreement** [1] -
52:12
**disappointed** [1] -
36:4
**disappointing** [1] -
35:25
**disappointment** [2] -
36:10, 36:11
**disclose** [1] - 30:15
**disclosed** [4] - 31:21,
39:22, 40:13, 109:24
**disclosure** [8] - 30:2,
31:11, 32:6, 32:7,
32:18, 33:23, 79:5,
80:12
**disclosures** [8] -
27:16, 30:21, 30:23,
30:25, 31:1, 31:6,
33:10, 78:8
**discuss** [7] - 23:14,
23:16, 95:12, 96:21,
100:12, 103:18,
103:25
**discussed** [7] - 15:7,
15:9, 17:3, 24:21,
97:12, 97:22, 105:14
**discussing** [5] - 34:2,
95:3, 98:22, 104:17,
119:17
**discussion** [15] -
11:21, 12:4, 17:6,
18:6, 91:12, 98:21,
99:13, 102:17,
104:14, 104:21,
105:18, 108:9,
118:7, 119:3, 119:7
**discussions** [3] -
16:15, 17:4, 44:19
**display** [2] - 66:15,
76:11
**displayed** [4] - 130:5,

130:8, 130:10, 130:11

**dispute** [14] - 27:1, 27:4, 34:24, 35:2, 35:6, 35:8, 128:4, 128:15, 128:17, 128:19, 128:21, 129:2, 130:20, 131:9

**disregard** [1] - 130:16

**distinction** [1] - 54:5

**dividend** [40] - 6:5, 6:6, 6:8, 6:12, 6:19, 8:6, 10:15, 13:7, 13:15, 25:14, 26:3, 26:7, 26:17, 26:25, 28:8, 28:15, 32:12, 33:15, 33:25, 34:22, 34:24, 35:15, 37:13, 38:10, 39:15, 43:24, 62:14, 78:11, 78:18, 78:25, 80:14, 116:1, 116:5, 116:11, 116:13, 116:14, 117:25, 123:14

**dividends** [6] - 35:2, 80:22, 127:25, 129:3, 129:16, 129:24

**document** [47] - 8:15, 13:10, 13:11, 14:7, 20:15, 20:21, 21:1, 22:17, 23:11, 23:22, 25:4, 44:12, 45:4, 57:19, 58:17, 59:19, 63:22, 64:10, 73:24, 75:19, 76:1, 76:3, 76:4, 76:6, 76:11, 76:19, 76:21, 91:25, 93:7, 96:25, 97:25, 98:2, 98:10, 98:22, 99:18, 99:23, 105:23, 108:18, 108:20, 109:7, 109:17, 111:22, 112:16, 114:19, 114:21, 120:2

**document's** [1] - 91:19

**documents** [5] - 71:9, 76:23, 113:19, 114:17

**dollars** [4] - 61:15, 86:8, 86:20, 101:2

**dollars'** [1] - 98:23

**domestic** [1] - 11:15

**done** [14] - 18:1, 18:3, 18:4, 107:1, 112:17, 113:6, 113:21, 114:9, 114:10, 114:18, 117:1,

118:14, 121:9, 131:14

**doubt** [1] - 26:21

**Down** [1] - 121:21

**down** [42] - 9:23, 12:17, 15:8, 15:10, 16:6, 45:25, 49:22, 50:20, 51:20, 51:24, 51:25, 57:11, 63:16, 73:4, 74:13, 77:24, 79:12, 80:9, 83:22, 84:14, 84:22, 87:5, 89:3, 91:9, 92:3, 93:21, 94:1, 94:6, 94:7, 119:14, 119:18, 120:5, 120:12, 120:14, 120:24, 121:3, 121:6, 122:1, 122:3, 122:5, 123:2, 130:17

**downs** [2] - 83:20, 84:5

**downturn** [1] - 37:8

**dozen** [1] - 30:24

**draft** [2] - 91:13, 119:6

**draw** [16] - 7:23, 7:25, 13:17, 32:23, 37:15, 37:20, 69:10, 80:9, 80:16, 87:6, 87:10, 100:14, 110:23, 122:23, 129:15, 129:17

**drawing** [3] - 93:21, 94:1, 94:6

**drawn** [7] - 69:9, 69:15, 69:19, 70:10, 114:1, 127:7, 129:18

**draws** [8] - 8:3, 8:5, 32:8, 32:18, 32:20, 33:4, 37:19, 40:16, 64:2, 64:16, 70:5, 80:15, 80:21, 82:2, 82:3

**driven** [1] - 82:3

**DTA** [4] - 96:15, 96:18, 96:20, 100:7

**due** [1] - 8:5

**duration** [1] - 7:15

**during** [11] - 35:14, 63:5, 67:13, 70:22, 86:10, 89:7, 89:25, 113:18, 127:11, 130:5, 130:8

**DX102** [1] - 68:2

**DX103** [3] - 66:11, 66:20, 67:13

**DX459** [1] - 8:14

**DX476** [2] - 27:18, 28:1

**DX535** [1] - 5:8

# E

**early** [5] - 25:17, 34:4, 35:14, 103:20, 118:8

**earned** [3] - 26:1, 26:6, 26:22

**earning** [1] - 32:12

**earnings** [9] - 28:6, 33:16, 33:18, 38:21, 39:14, 73:1, 78:9, 116:13, 116:16

**East** [1] - 60:2

**eat** [2] - 33:12, 37:14

**economic** [2] - 36:23, 88:5

**economy** [1] - 52:21

**Ed** [5] - 3:4, 12:4, 101:21, 103:12, 119:6

**edits** [1] - 123:17

**Edwards** [1] - 4:3

**effect** [7] - 8:2, 34:10, 34:13, 78:11, 78:12, 90:16, 110:20

**effort** [4] - 45:15, 45:21, 60:15, 60:23

**either** [4] - 33:23, 70:8, 89:23, 98:10

**election** [1] - 55:7

**electronic** [1] - 111:19

**element** [1] - 16:13

**elements** [1] - 38:20

**Elijah** [1] - 108:5

**eliminate** [1] - 120:12

**eliminated** [1] - 8:5

**email** [32] - 8:16, 8:18, 8:21, 8:23, 8:24, 9:2, 9:4, 9:8, 21:13, 21:23, 22:2, 23:23, 59:6, 59:9, 71:14, 90:22, 93:3, 95:21, 96:3, 100:15, 100:18, 101:11, 101:20, 102:12, 103:4, 103:11, 103:21, 104:2, 104:3, 118:25

**emailed** [1] - 78:2

**emails** [12] - 21:14, 35:21, 35:23, 35:24, 36:2, 36:9, 36:10, 44:5, 44:8, 107:7, 113:19, 114:16

**enabling** [3] - 13:7, 13:15, 25:14

**end** [33] - 4:24, 5:2, 6:16, 10:3, 26:5, 27:16, 30:12, 30:13, 32:10, 43:23, 44:18, 50:8, 51:16, 51:24,

55:21, 62:4, 69:8, 69:16, 70:2, 70:3, 70:10, 73:2, 74:3, 88:21, 106:18, 111:12, 111:13, 113:21, 114:18, 114:19, 116:17, 120:16, 120:20

**ended** [1] - 45:18

**ending** [1] - 122:23

**ends** [2] - 49:16

**engage** [1] - 16:17

**engaged** [2] - 16:15, 109:10

**enlarge** [1] - 9:20

**ensure** [1] - 32:1

**entail** [1] - 108:23

**enter** [1] - 44:16

**entering** [3] - 7:13, 44:13, 45:5

**enterprises** [1] - 102:5

**entire** [3] - 83:2, 108:12, 109:17

**entirely** [1] - 79:5

**entities** [2] - 125:12, 125:16

**entitled** [1] - 129:21

**entity** [1] - 57:3

**entry** [1] - 64:12

**equity** [4] - 64:1, 64:7, 64:11, 64:15

**erode** [1] - 32:9

**eroded** [1] - 74:18

**eroding** [1] - 32:21

**erosion** [7] - 32:13, 33:5, 74:10, 74:13, 79:19, 79:21, 79:23

**essence** [1] - 12:4

**essentially** [1] - 94:7

**establish** [3] - 22:12, 22:16, 57:4

**established** [2] - 20:7, 23:20

**establishes** [1] - 23:22

**establishing** [1] - 21:20

**estimate** [2] - 42:11, 70:8

**evaluating** [1] - 96:22

**event** [2] - 108:8, 108:13

**events** [1] - 39:25

**evidence** [31] - 20:16, 21:16, 40:8, 40:17, 41:9, 41:10, 41:11, 41:12, 51:7, 57:20, 66:14, 66:16, 66:17, 68:1, 68:3, 75:16, 75:20, 76:16, 78:22,

90:21, 95:20, 99:22, 107:10, 108:17, 108:25, 111:4, 118:23, 121:12

**exact** [3] - 33:7, 78:13, 81:24

**exactly** [5] - 29:19, 30:14, 53:16, 69:19, 129:18

**examination** [4] - 12:20, 71:23, 76:6, 113:18

**Examination** [2] - 3:4, 3:5

**EXAMINATION** [2] - 4:15, 10:21

**examine** [1] - 10:18

**examined** [1] - 113:5

**examiner** [1] - 93:4

**example** [1] - 88:8

**exceeded** [1] - 33:15

**exceeding** [1] - 7:23

**excerpt** [1] - 27:24

**excerpts** [1] - 26:13

**excess** [2] - 28:8, 38:7

**exchange** [1] - 32:4

**excuse** [1] - 71:24

**executive** [2] - 11:10, 90:25

**Executive** [1] - 71:17

**executives** [3] - 75:1, 75:10, 102:8

**exercise** [1] - 39:18

**exhausted** [1] - 10:3

**Exhibit** [7] - 3:8, 3:8, 11:1, 62:23, 63:17, 76:16, 111:4

**exhibit** [5] - 41:11, 49:14, 51:6, 110:9, 110:12

**Exhibits** [1] - 3:7

**existing** [1] - 6:5

**expand** [1] - 126:18

**expect** [7] - 28:7, 29:5, 29:6, 30:13, 39:11, 85:22

**expectation** [1] - 105:20

**expected** [1] - 102:1

**expects** [1] - 85:13

**Expedite** [1] - 121:21

**expenses** [1] - 92:6

**experience** [1] - 28:6

**expert** [6] - 34:20, 85:1, 127:5, 127:24, 130:5, 130:8

**experts** [2] - 82:11, 85:24

**explain** [4] - 22:24, 23:2, 89:14, 89:17

**explained** [3] - 15:15, 81:4, 129:22
**explanation** [1] - 49:15
**expressing** [3] - 35:21, 36:10, 36:11
**extensive** [2] - 108:21, 109:10
**extent** [3] - 30:17, 31:12, 46:25
**extra** [2] - 38:14, 38:16
**extraordinary** [1] - 45:18
**extremely** [1] - 109:8
**eye** [1] - 53:13

# F

**fact** [18] - 18:22, 30:1, 32:5, 33:15, 43:9, 43:22, 44:8, 49:1, 56:22, 59:2, 61:2, 65:3, 74:25, 118:13, 121:6, 121:7, 130:2
**factor** [1] - 33:14
**factors** [2] - 47:14, 47:18
**facts** [1] - 40:24
**failed** [1] - 55:13
**fair** [4] - 60:19, 75:17, 89:8, 100:18
**fall** [1] - 92:6
**familiar** [10] - 30:1, 46:11, 46:14, 46:15, 48:12, 88:18, 89:14, 93:14, 100:10, 127:13
**Fannie** [135] - 4:23, 5:12, 5:14, 5:17, 7:5, 7:15, 10:14, 16:4, 25:21, 26:6, 26:17, 27:25, 32:7, 33:24, 34:7, 34:23, 36:1, 36:23, 36:25, 37:6, 37:17, 37:25, 38:8, 38:13, 38:16, 39:5, 39:9, 39:21, 40:11, 43:11, 43:22, 44:14, 45:6, 45:17, 46:12, 46:24, 47:2, 47:5, 47:16, 47:24, 48:10, 49:8, 51:1, 51:3, 51:13, 53:10, 53:14, 60:8, 60:15, 60:24, 61:16, 62:6, 63:1, 63:12, 65:5, 65:10, 65:14, 65:21, 65:24, 66:4, 67:2, 68:6, 71:17, 72:8, 72:19, 73:4, 73:13, 74:2,

74:13, 74:21, 75:1, 75:10, 75:19, 76:24, 78:20, 78:24, 79:4, 79:11, 80:2, 80:5, 80:20, 81:5, 81:18, 82:14, 82:17, 83:20, 84:19, 86:7, 86:22, 87:6, 87:12, 87:23, 88:16, 89:6, 89:9, 89:23, 90:25, 91:7, 93:9, 93:18, 93:20, 95:3, 95:21, 97:6, 97:17, 97:19, 98:20, 99:14, 99:21, 100:9, 101:3, 102:8, 115:17, 115:24, 116:6, 116:8, 116:21, 117:14, 117:24, 119:18, 120:6, 120:12, 120:24, 121:21, 122:1, 123:24, 124:10, 125:11, 125:15, 126:19, 127:7, 127:19, 128:12, 128:19, 130:21
**Fannie's** [1] - 5:14
**far** [2] - 54:25, 109:16
**Fargo** [1] - 125:8
**faster** [1] - 19:4
**February** [2] - 88:21, 123:11
**fee** [12] - 6:25, 7:2, 38:22, 39:2, 39:5, 39:9, 39:10, 39:13, 39:19, 79:22, 79:24, 80:6
**feedback** [1] - 9:6
**felt** [1] - 109:8
**few** [10] - 20:22, 24:21, 52:3, 53:23, 62:22, 89:25, 96:11, 112:13, 124:13
**FHFA** [64] - 5:21, 11:21, 16:5, 25:17, 31:5, 31:16, 34:4, 35:14, 39:17, 43:18, 44:8, 48:1, 52:5, 53:6, 53:24, 56:12, 56:23, 58:14, 58:25, 59:1, 59:10, 60:6, 60:22, 61:16, 63:4, 63:11, 64:24, 65:5, 65:20, 71:5, 71:15, 74:16, 75:11, 80:2, 86:6, 87:21, 89:7, 92:15, 93:18, 93:24, 95:2, 97:6, 97:12, 97:16, 97:21, 97:22,

98:11, 98:12, 101:12, 101:16, 101:24, 102:25, 111:11, 112:5, 112:17, 112:22, 113:2, 113:20, 114:17, 119:3, 119:11, 120:4, 124:3, 124:6
**FHFA's** [4] - 32:1, 58:13, 58:20, 58:23
**FHFA-related** [1] - 11:21
**figure** [1] - 83:16
**filed** [1] - 116:4
**filibuster** [2] - 55:14, 55:21
**filing** [8] - 27:25, 28:5, 41:9, 62:25, 63:18, 66:22, 68:5, 116:11
**filings** [19] - 26:13, 31:16, 31:23, 33:23, 39:22, 65:3, 65:8, 65:13, 65:19, 65:23, 66:3, 66:11, 95:9, 100:8, 115:18, 115:21, 115:24, 116:4, 116:20
**fill** [1] - 54:7
**final** [1] - 121:11
**finalize** [1] - 100:4
**finalized** [1] - 123:17
**finally** [2] - 31:6, 127:20
**finance** [1] - 11:16
**Financial** [2] - 91:10, 126:14
**financial** [15] - 7:22, 46:17, 48:20, 51:12, 53:12, 53:17, 62:7, 88:4, 88:6, 91:13, 107:1, 107:4, 109:11, 119:14, 120:5
**fine** [2] - 88:14, 94:22
**first** [50] - 12:2, 12:23, 18:11, 21:24, 22:7, 22:10, 22:16, 34:7, 34:8, 34:13, 36:13, 40:13, 46:8, 46:15, 52:5, 52:25, 55:14, 56:18, 57:1, 57:16, 57:24, 57:25, 58:1, 59:6, 59:22, 65:4, 65:9, 65:13, 65:20, 66:22, 76:10, 76:18, 77:8, 78:16, 79:25, 93:10, 99:21, 101:20, 103:4, 103:8, 111:24,

112:6, 115:5, 116:7, 116:10, 121:9, 122:21, 126:13
**five** [4] - 15:3, 29:23, 48:10
**five-year** [2] - 48:10
**fixed** [2] - 33:15, 47:11
**flat** [1] - 51:22
**flawed** [2] - 123:24, 126:23
**flip** [1] - 112:21
**fluctuation** [1] - 78:9
**focus** [9] - 18:1, 63:5, 63:12, 64:25, 67:18, 68:11, 68:20, 72:7, 109:9
**focused** [2] - 18:7, 64:12
**focusing** [1] - 63:23
**following** [4] - 17:13, 62:21, 64:11, 87:3
**forecast** [1] - 93:18
**foreclosed** [1] - 81:12
**foreclosures** [1] - 81:11
**forever** [4] - 43:12, 65:21, 65:25, 66:5
**forgive** [1] - 16:5
**forgiveness** [3] - 16:18, 17:5, 17:6
**form** [4] - 6:18, 42:15, 76:25, 123:4
**Form** [1] - 66:20
**formal** [3] - 24:4, 60:9, 121:11
**formula** [6] - 68:24, 69:2, 69:7, 70:17, 70:24
**forth** [3] - 44:8, 44:17, 68:24
**fortunately** [1] - 83:11
**forward** [4] - 17:1, 29:2, 105:16, 115:6
**forward-looking** [1] - 29:2
**forwarding** [8] - 8:20, 8:23, 8:24, 9:2, 9:4, 9:5, 9:9, 9:10
**foundation** [2] - 96:25, 97:3
**four** [3] - 9:19, 9:22, 15:2
**fourth** [1] - 69:20
**frame** [2] - 124:17, 125:18
**Freddie** [114] - 7:6, 7:15, 10:14, 16:4, 25:21, 26:6, 26:25, 32:7, 33:24, 34:8, 34:23, 36:2, 36:24,

36:25, 37:6, 37:17, 37:25, 38:8, 38:13, 38:16, 39:5, 39:9, 39:21, 40:12, 43:22, 44:14, 45:7, 45:17, 46:12, 46:24, 47:2, 47:5, 47:16, 47:25, 48:11, 49:9, 51:1, 51:3, 51:13, 53:10, 53:14, 60:8, 60:15, 60:24, 61:16, 63:18, 64:25, 65:6, 65:10, 65:14, 65:21, 65:24, 66:4, 66:20, 67:2, 68:6, 72:9, 72:22, 73:7, 74:6, 74:10, 75:1, 75:10, 76:24, 78:17, 78:21, 80:5, 81:5, 81:18, 82:15, 82:20, 83:20, 84:19, 86:7, 86:22, 87:6, 87:12, 87:24, 88:16, 89:6, 89:9, 89:23, 91:7, 93:9, 95:3, 97:6, 97:17, 98:20, 99:14, 99:22, 102:8, 115:18, 115:25, 116:6, 116:8, 116:21, 117:15, 117:24, 119:18, 120:6, 120:13, 120:24, 121:22, 122:1, 123:24, 124:10, 125:11, 125:16, 126:19, 127:7, 127:19, 128:13, 128:22, 130:21
**Freddie's** [5] - 43:11, 61:10, 62:7, 80:21, 101:3
**free** [1] - 93:10
**Friday** [2] - 102:2
**front** [2] - 31:2, 100:16
**fueled** [1] - 93:20
**fulfill** [3] - 67:14, 67:20, 68:13
**Full** [1] - 122:6
**full** [6] - 49:15, 54:7, 54:17, 58:13, 96:19, 122:11
**full-time** [1] - 54:7
**fulsome** [1] - 109:10
**fundamentally** [2] - 123:24, 126:23
**Funding** [1] - 72:13
**funding** [6] - 72:16, 73:1, 74:1, 79:9, 126:5, 126:7
**future** [27] - 7:21, 8:4,

13:8, 13:16, 25:15, 29:17, 30:3, 32:13, 37:12, 40:16, 41:19, 42:7, 42:9, 42:23, 81:20, 83:4, 83:21, 83:23, 84:6, 85:14, 85:16, 85:23, 87:15, 99:24, 100:11, 101:7, 105:20

**G**

**GAAP** [4] - 64:1, 64:7, 64:11, 64:15
**gain** [2] - 126:20, 128:7
**gains** [3] - 84:6, 85:16, 126:24
**Galeano** [1] - 92:21
**gathering** [1] - 47:21
**GDP** [1] - 88:9
**geez** [1] - 35:16
**Geithner** [5] - 5:24, 12:9, 20:22, 70:14, 114:7
**Geithner's** [1] - 22:1
**general** [9] - 47:13, 49:21, 51:19, 52:3, 65:16, 69:5, 88:24, 88:25, 118:19
**generally** [23] - 22:17, 28:2, 40:1, 42:1, 42:3, 46:19, 47:1, 47:8, 51:22, 52:19, 69:3, 69:12, 75:9, 75:13, 84:17, 85:12, 85:19, 85:20, 85:21, 86:18, 115:17, 125:23, 126:1
**generate** [1] - 28:7
**generating** [3] - 13:6, 13:14, 25:13
**gentlemen** [1] - 101:23
**given** [9] - 27:14, 37:4, 38:15, 38:18, 65:5, 99:10, 112:20, 114:2, 124:16
**glad** [1] - 116:25
**goal** [7] - 10:9, 61:2, 67:14, 119:18, 120:4, 120:10, 121:3
**goals** [9] - 57:12, 57:23, 58:6, 58:8, 67:23, 68:8, 119:11, 119:22, 119:23
**govern** [1] - 90:8
**Government** [2] - 108:6, 111:9
**government** [4] -

119:12, 124:14, 126:24, 128:6
**great** [17] - 17:25, 53:19, 68:1, 88:3, 88:6, 106:13, 106:25, 113:3, 113:6
**greater** [3] - 28:14, 43:7, 121:5
**Griffin** [9] - 101:11, 101:23, 102:1, 102:16, 103:5, 103:12, 103:17, 104:11, 104:21
**Griffin's** [2] - 102:16, 104:3
**grounds** [6] - 40:22, 41:4, 108:11, 108:12, 109:18
**groups** [1] - 111:1
**growing** [1] - 88:9
**GSEs** [10] - 7:23, 13:5, 13:13, 25:12, 65:20, 119:15, 121:4, 121:6, 122:3, 123:2
**guaranteeing** [1] - 89:24
**guidance** [1] - 81:25

**H**

**half** [3] - 27:21, 72:8, 72:9
**halfway** [2] - 92:3, 122:5
**Halley** [1] - 95:23
**Hamish** [1] - 10:20
**hand** [1] - 49:1
**handled** [1] - 6:9
**handwritten** [2] - 21:2, 21:6
**happy** [1] - 55:24
**hard** [5] - 81:12, 89:10, 90:5, 109:9, 112:9
**harm** [1] - 52:20
**head** [2] - 101:15, 124:25
**header** [6] - 21:24, 59:7, 71:14, 110:16, 110:21, 122:5
**heading** [1] - 12:11
**heads** [1] - 115:5
**heads-up** [1] - 115:5
**hear** [2] - 85:8, 130:7
**heard** [6] - 7:8, 23:6, 23:8, 40:3, 75:21, 100:3
**hearing** [1] - 92:9
**heart** [1] - 40:17
**heated** [2] - 52:11,

52:13
**height** [1] - 47:12
**held** [11] - 4:4, 4:10, 24:16, 41:7, 56:2, 56:4, 76:9, 110:1, 111:3, 130:14, 131:20
**Helen** [1] - 96:10
**help** [6] - 83:12, 92:17, 98:9, 121:8, 121:10, 122:16
**helped** [1] - 38:13
**helpful** [5] - 13:19, 13:20, 96:10, 111:19, 117:11
**HERA** [1] - 54:11
**high** [4] - 46:19, 47:1, 48:20, 85:22
**higher** [3] - 15:25, 37:13, 47:6
**highlight** [6] - 6:1, 6:2, 11:24, 96:4, 102:19, 104:6
**highlighted** [3] - 15:16, 18:11, 28:3
**highlighting** [1] - 91:13
**highly** [1] - 109:7
**hindsight** [2] - 35:10, 35:11
**hired** [1] - 126:13
**historical** [2] - 33:16, 33:18
**hit** [1] - 37:12
**hoc** [1] - 40:22
**hold** [1] - 115:3
**home** [2] - 15:25, 88:15
**homeowners** [4] - 15:24, 16:6, 50:24, 88:8
**Honor** [63] - 4:5, 4:13, 10:17, 22:8, 22:21, 23:6, 23:10, 23:17, 24:14, 25:3, 25:6, 30:18, 39:25, 40:3, 40:6, 40:21, 41:5, 41:8, 41:13, 42:16, 54:24, 55:2, 55:15, 55:24, 75:21, 76:15, 77:1, 77:7, 77:10, 83:14, 85:6, 85:9, 96:24, 97:2, 98:1, 98:25, 99:9, 99:17, 105:22, 107:14, 107:22, 107:23, 108:1, 108:8, 108:16, 109:12, 110:4, 110:8, 110:16, 110:23,

113:24, 124:16, 125:17, 126:8, 129:8, 129:14, 129:20, 130:7, 130:12, 130:23, 131:7, 131:11, 131:13
**hope** [2] - 41:18, 92:17
**house** [3] - 81:12, 83:24, 88:25
**House** [1] - 108:5
**Housing** [9] - 124:24, 124:25, 125:3, 125:10, 125:22, 126:6, 126:7, 126:13, 126:17
**housing** [9] - 62:11, 67:16, 81:5, 83:4, 88:7, 88:18, 119:12, 119:13, 124:22
**huge** [2] - 37:19, 48:16
**human** [1] - 98:8
**Hume** [21] - 10:18, 10:20, 10:25, 23:10, 40:6, 42:19, 53:15, 56:6, 66:1, 76:20, 81:22, 88:13, 93:15, 94:21, 100:5, 100:14, 105:21, 111:18, 118:10, 119:20, 122:2
**HUME** [186] - 10:19, 10:22, 11:3, 11:5, 11:24, 12:1, 14:11, 14:18, 14:24, 17:16, 18:9, 18:10, 19:3, 19:8, 20:9, 20:12, 20:17, 20:19, 21:19, 21:22, 22:9, 22:12, 22:16, 22:19, 22:21, 22:24, 23:2, 23:6, 23:10, 23:17, 24:9, 24:11, 24:17, 25:3, 25:7, 25:9, 25:11, 26:11, 26:12, 26:15, 26:16, 27:7, 27:8, 27:18, 27:19, 30:20, 31:14, 34:16, 34:18, 37:23, 38:2, 40:3, 40:6, 41:8, 41:16, 41:17, 42:20, 43:16, 43:17, 44:22, 44:24, 45:12, 45:13, 45:25, 46:1, 48:2, 48:4, 48:6, 48:8, 49:6, 49:7, 49:11, 49:13, 50:20, 50:22, 51:25, 52:2, 55:2, 55:3,

55:18, 55:24, 56:7, 56:9, 56:18, 56:20, 57:18, 57:22, 59:6, 59:8, 59:20, 59:21, 63:16, 63:19, 66:13, 66:18, 66:19, 67:25, 68:4, 72:5, 72:6, 75:17, 76:8, 76:10, 76:13, 76:15, 76:17, 77:11, 77:14, 77:18, 77:24, 78:1, 78:5, 78:7, 79:14, 79:15, 82:8, 82:10, 83:14, 83:15, 85:11, 89:3, 89:5, 91:17, 91:18, 91:24, 92:1, 92:12, 92:14, 96:4, 96:6, 97:2, 97:4, 98:5, 98:6, 98:17, 98:18, 99:2, 99:3, 99:12, 100:17, 102:19, 102:21, 104:6, 104:7, 106:1, 106:8, 106:11, 106:14, 106:19, 106:21, 107:9, 107:11, 107:16, 107:19, 107:21, 108:16, 109:23, 110:23, 111:5, 111:13, 111:15, 112:9, 112:11, 114:1, 114:4, 121:10, 121:15, 122:9, 122:10, 124:18, 124:21, 125:21, 126:12, 127:3, 127:4, 129:10, 129:19, 130:7, 130:9, 130:17, 130:18, 130:24, 131:2, 131:6, 131:8, 131:13
**Hume** ................. [1] - 3:5
**hund** [1] - 49:3
**hundred** [2] - 86:8, 86:20
**hundreds** [1] - 61:15
**hypothetical** [3] - 38:20, 38:25, 39:1

**I**

**idea** [4] - 16:19, 16:22, 84:9, 109:14
**identification** [1] - 107:15
**identified** [2] - 33:14, 108:18
**identify** [1] - 112:13

**identifying** [1] - 110:19
**illustration** [1] - 79:4
**immediate** [1] - 10:9
**immediately** [3] - 9:2, 48:21, 93:15
**impact** [3] - 47:17, 81:5, 101:5
**imperfect** [1] - 83:19
**implemented** [1] - 40:12
**importance** [1] - 23:11
**important** [6] - 13:11, 16:11, 42:14, 109:7, 117:9, 122:16
**imposed** [2] - 33:25, 56:24
**impossible** [1] - 69:23
**impression** [1] - 24:6
**improve** [3] - 84:10, 89:10, 90:5
**improving** [1] - 10:10
**inclined** [1] - 109:19
**include** [3] - 16:16, 16:21, 125:7
**included** [2] - 17:11, 71:21
**includes** [2] - 108:7, 126:18
**including** [6] - 20:5, 22:4, 40:15, 71:21, 92:22, 126:2
**Income** [1] - 122:6
**income** [25] - 7:23, 26:5, 26:21, 26:22, 27:5, 28:7, 28:8, 28:14, 32:12, 35:15, 37:14, 78:10, 78:17, 78:25, 80:7, 80:14, 82:1, 87:15, 96:19, 116:1, 116:5, 116:11, 122:11, 123:13
**incorporated** [1] - 96:11
**increase** [1] - 116:15
**increased** [1] - 40:15
**increases** [2] - 127:25, 128:1
**increasing** [1] - 95:5
**Increasing** [1] - 12:12
**incremental** [1] - 116:15
**incurred** [1] - 82:3
**independent** [1] - 71:6
**index** [2] - 49:2, 88:19
**indicate** [1] - 47:1
**indicated** [2] - 105:10, 105:14
**indication** [1] - 79:21

**inferences** [1] - 100:15
**inflection** [1] - 92:10
**inflexion** [1] - 92:4
**influence** [2] - 40:10, 47:14
**information** [3] - 9:6, 47:21, 58:9
**informed** [1] - 102:5
**initial** [3] - 8:24, 9:6, 9:11
**inquiry** [2] - 53:13, 53:17
**insisted** [1] - 19:23, 20:5
**instead** [3] - 33:25, 37:21, 127:19
**instilled** [1] - 38:15
**Institute** [1] - 124:7, 124:13
**institution** [1] - 59:24
**institutions** [1] - 42:24
**instructed** [1] - 40:23
**instrument** [1] - 46:17
**instruments** [1] - 46:22
**insurance** [1] - 125:4
**intend** [2] - 108:23, 110:23
**intended** [1] - 65:20
**interest** [2] - 65:24, 66:4
**interesting** [1] - 29:9
**interests** [1] - 126:2
**introductory** [1] - 96:14
**invested** [4] - 128:18, 128:22, 129:16, 130:1
**investment** [2] - 38:19, 129:24
**investors** [8] - 38:15, 38:18, 46:7, 46:8, 47:2, 47:22, 47:23, 65:16
**involvement** [2] - 95:14, 119:13
**issue** [15] - 19:21, 23:11, 51:3, 60:9, 80:12, 80:16, 102:23, 108:19, 108:21, 109:15, 112:17, 112:22, 113:3, 113:5, 113:7
**issued** [2] - 60:22, 90:17
**issues** [3] - 16:14, 17:7, 18:5
**issuing** [2] - 29:14, 60:17

**items** [1] - 96:8
**itself** [5] - 4:18, 8:16, 10:13, 19:20, 33:21

## J

**jail** [2] - 28:21, 28:23
**Jamie** [2] - 9:4, 9:5
**January** [16] - 7:17, 26:5, 34:2, 34:10, 44:16, 91:19, 91:21, 92:11, 111:9, 114:6, 118:7, 118:18, 118:21, 119:1, 119:17, 120:4
**Jeff** [5] - 97:9, 97:11, 105:10, 105:12, 105:14
**jobs** [1] - 25:20
**joined** [2] - 18:5, 124:13
**Joseph** [1] - 54:20
**Judge** [2] - 56:7, 106:19
**judgment** [2] - 86:3, 87:18
**July** [1] - 71:18
**June** [14] - 11:6, 11:21, 12:9, 20:21, 21:7, 21:9, 24:20, 24:21, 88:22, 113:13, 114:10, 114:15, 114:19
**jury** [23] - 4:4, 4:10, 4:14, 7:8, 10:20, 15:2, 18:18, 20:18, 21:20, 28:18, 34:9, 34:17, 40:22, 56:2, 56:4, 56:8, 57:20, 57:24, 61:13, 66:15, 89:17, 130:15, 131:20

## K

**keep** [6] - 6:7, 19:1, 37:17, 55:24, 94:15, 127:20
**kept** [1] - 17:4
**key** [6] - 6:2, 7:21, 19:5, 80:23, 117:20, 117:21
**kind** [16] - 16:17, 38:21, 43:13, 43:18, 45:17, 47:9, 48:12, 50:25, 52:17, 59:1, 61:19, 61:21, 71:6, 81:20, 121:7, 126:25
**kinds** [1] - 107:5
**knowing** [3] - 35:9, 70:3

**known** [6] - 40:24, 69:15, 70:6, 120:20, 123:19, 123:20

## L

**Lamberth** [2] - 56:7, 106:19
**language** [5] - 28:2, 28:3, 28:5, 58:10, 78:14
**large** [12] - 13:6, 13:14, 25:13, 26:1, 32:25, 35:14, 42:24, 45:18, 83:25, 84:6, 93:21, 94:13
**larger** [1] - 26:6
**largest** [1] - 125:7
**last** [20] - 4:25, 5:1, 28:11, 38:1, 49:12, 58:20, 59:22, 66:1, 68:6, 76:23, 77:6, 93:13, 93:16, 105:15, 108:9, 108:15, 108:17, 110:14, 110:15, 111:16
**late** [1] - 108:18
**latter** [3] - 48:16, 48:23, 50:4
**law** [1] - 85:14
**laws** [1] - 32:4
**lawyer** [1] - 31:17
**lawyerly** [1] - 104:18
**lawyers** [2] - 14:3, 20:18
**lay** [1] - 97:2
**leadership** [1] - 16:4
**leading** [2] - 48:21, 94:7
**learn** [2] - 31:25, 73:19
**learned** [2] - 35:13, 100:1
**least** [5] - 15:24, 78:12, 80:19, 87:7, 97:5
**leaves** [1] - 81:12
**leaving** [1] - 124:14
**led** [2] - 82:1, 87:10
**left** [5] - 34:21, 58:16, 69:25, 124:5, 127:6
**legal** [3] - 30:18, 31:13, 57:3
**legislate** [1] - 120:20
**legislation** [2] - 120:16, 120:19
**lenders** [2] - 124:11, 125:16
**length** [1] - 52:7

**less** [6] - 16:7, 43:2, 43:23, 47:7, 50:9, 80:14
**lesser** [1] - 43:7
**letter** [6] - 107:12, 107:18, 108:2, 108:20, 110:10, 111:8
**level** [5] - 34:25, 47:1, 48:20, 52:3, 126:18
**level-set** [1] - 52:3
**levels** [2] - 35:15, 47:10
**light** [1] - 112:1
**likelihood** [5] - 42:13, 43:13, 64:1, 64:16, 87:22
**likely** [12] - 41:23, 41:24, 41:25, 42:14, 42:25, 43:2, 43:23, 87:14, 90:13, 101:4, 103:17, 103:25
**likewise** [1] - 37:11
**line** [6] - 14:8, 72:7, 72:12, 72:13, 72:14, 74:1
**lines** [4] - 9:19, 9:22, 14:8, 44:23
**liquidation** [3] - 80:8, 127:22, 128:1
**liquidity** [1] - 67:15
**Lisa** [1] - 4:3
**listed** [1] - 58:8
**loan** [5] - 89:10, 89:19, 93:11, 94:4, 94:13
**loans** [6] - 89:23, 90:15, 90:16, 93:13, 93:22, 94:19
**lobbying** [1] - 126:2
**Lockhart** [2] - 53:24, 54:4
**long-term** [4] - 64:3, 64:17, 67:18, 68:11
**look** [46] - 9:22, 14:22, 20:20, 21:1, 29:22, 33:9, 36:1, 47:24, 49:1, 50:4, 58:16, 59:4, 62:24, 63:17, 66:10, 68:7, 71:14, 71:21, 72:12, 73:24, 76:21, 77:12, 88:14, 88:16, 91:20, 92:12, 92:13, 93:6, 93:16, 94:14, 95:20, 101:9, 102:16, 103:10, 103:11, 109:21, 112:3, 112:5, 112:12, 114:24, 118:23, 118:24, 119:9, 122:4, 122:8

**looked** [3] - 76:23, 79:9, 103:4
**looking** [8] - 5:11, 5:12, 28:2, 29:2, 51:22, 72:12, 93:12, 101:4
**looks** [1] - 50:8
**lose** [1] - 86:5
**loss** [7] - 82:16, 82:23, 83:1, 84:10, 92:5, 126:20, 128:6
**losses** [12] - 37:9, 81:3, 81:18, 81:24, 82:3, 85:13, 85:15, 86:22, 86:25, 87:6, 94:4, 126:24
**lost** [3] - 116:9, 131:10
**low** [3] - 46:20, 94:15
**lower** [4] - 47:6, 49:24, 50:3
**Lyons** [1] - 95:22

**M**

**Mac** [63] - 7:6, 7:15, 26:6, 32:7, 33:24, 34:8, 34:23, 36:24, 36:25, 37:25, 39:9, 40:12, 44:14, 45:7, 46:12, 46:24, 51:1, 51:3, 53:10, 53:14, 60:8, 60:15, 60:24, 61:16, 63:18, 64:25, 65:10, 66:20, 68:6, 72:9, 72:22, 73:7, 74:6, 74:10, 76:24, 78:17, 78:21, 80:5, 82:15, 82:20, 83:20, 86:7, 87:24, 88:16, 95:3, 97:6, 97:17, 99:14, 99:22, 115:18, 115:25, 116:6, 117:15, 117:24, 119:18, 120:6, 120:13, 121:22, 122:1, 123:24, 126:19, 128:13, 128:22
**Mac's** [3] - 25:21, 26:25, 39:21
**macroeconomic** [2] - 88:2, 88:5
**Mae** [82] - 4:24, 5:12, 5:14, 5:17, 7:5, 7:15, 25:21, 26:6, 26:17, 27:25, 32:7, 33:24, 34:7, 34:23, 36:23, 36:25, 37:25, 39:9, 39:21, 40:11, 44:14, 45:6, 46:12, 46:24, 51:1, 51:3, 53:10,

53:14, 60:8, 60:15, 60:24, 61:16, 63:1, 63:12, 65:10, 68:6, 71:17, 72:8, 72:19, 73:4, 73:13, 74:2, 74:13, 74:21, 75:19, 76:24, 78:20, 78:24, 79:4, 79:11, 80:2, 80:5, 82:14, 82:17, 83:20, 86:7, 87:23, 88:16, 90:25, 93:20, 95:3, 95:21, 97:6, 97:17, 97:19, 99:14, 99:21, 100:9, 115:17, 115:24, 116:6, 117:14, 117:24, 119:18, 120:6, 120:12, 121:21, 122:1, 123:24, 126:19, 128:12, 128:19
**Mae's** [1] - 93:18
**magnitude** [2] - 84:9, 84:13
**main** [3] - 53:9, 71:2, 80:18
**maintain** [5] - 67:14, 67:20, 68:8, 68:12, 109:12
**maintaining** [3] - 63:25, 64:14, 64:25
**major** [1] - 108:23
**makers** [1] - 24:7
**managed** [2] - 67:3, 67:9
**management** [5] - 63:24, 64:13, 90:25, 91:4, 91:6
**Management** [1] - 71:17
**managing** [4] - 42:24, 63:6, 63:12, 64:25
**Manhattan** [1] - 125:8
**March** [2] - 118:9, 118:19
**Mario** [1] - 8:19
**market** [17] - 8:11, 9:6, 10:10, 47:22, 48:19, 62:11, 65:15, 67:16, 84:7, 84:10, 88:11, 88:12, 119:12, 119:13, 123:3, 126:18
**markets** [2] - 119:14, 120:5
**Martin** [2] - 71:15, 90:23
**Mary** [4] - 11:13, 11:15, 12:9, 21:23
**massive** [1] - 51:12

**material** [6] - 30:15, 39:23, 40:14, 40:17, 79:18, 79:20
**materially** [2] - 32:9, 32:21
**math** [2] - 26:14, 35:8
**matter** [1] - 118:14
**maximize** [3] - 67:3, 67:7, 67:10
**Mayopoulos** [2] - 73:16
**MBS** [4] - 38:15, 38:18, 46:7, 65:16
**McFarland** [1] - 91:12
**McGuire** [21] - 11:3, 11:25, 25:10, 44:22, 45:25, 48:3, 49:6, 49:12, 52:1, 63:16, 72:5, 78:5, 79:14, 89:4, 91:17, 91:24, 96:5, 102:20, 104:6, 111:14, 121:14
**mean** [21] - 13:16, 21:10, 29:12, 29:13, 29:15, 29:16, 29:18, 30:10, 42:8, 50:1, 50:4, 52:15, 58:8, 80:2, 94:1, 94:2, 94:6, 94:19, 105:18
**meaning** [1] - 104:12
**means** [10] - 29:17, 46:20, 57:9, 58:9, 86:5, 89:17, 89:19, 89:20, 102:8, 120:12
**meant** [1] - 94:4
**mechanics** [1] - 61:20
**Meeting** [2] - 71:18, 74:22
**meeting** [40] - 11:21, 12:4, 12:8, 12:13, 20:21, 21:7, 21:9, 23:24, 24:1, 24:5, 24:21, 73:13, 74:25, 75:4, 75:6, 75:9, 75:14, 76:2, 76:5, 90:25, 97:23, 98:4, 98:20, 99:24, 99:25, 100:11, 101:7, 101:8, 101:20, 103:4, 103:8, 103:12, 103:17, 103:20, 103:25, 104:11, 104:21, 104:25, 105:15, 119:21
**meetings** [7] - 21:3, 44:19, 91:3, 91:6, 97:7, 99:7, 99:14
**Mel** [1] - 55:8
**meltdown** [1] - 36:23

**member** [3] - 97:10, 108:4, 111:8
**members** [9] - 4:14, 10:19, 56:7, 125:4, 125:7, 125:24, 126:2, 126:4, 126:6
**membership** [1] - 125:6
**memo** [7] - 12:17, 15:4, 24:4, 43:13, 43:18, 87:22, 113:13
**memoranda** [1] - 21:7
**memorandum** [6] - 11:6, 11:9, 11:20, 12:11, 44:12, 45:5
**memory** [3] - 103:16, 104:14, 104:17
**memos** [9] - 21:3, 35:21, 36:2, 36:9, 36:11, 44:2, 44:18, 107:7, 113:8
**mention** [1] - 109:1
**mentioned** [1] - 92:16
**met** [1] - 110:25
**Michael** [2] - 11:9, 22:5
**middle** [3] - 48:16, 48:20, 51:12
**might** [11] - 33:24, 41:25, 42:11, 42:13, 43:1, 43:6, 43:19, 69:19, 74:17, 95:17, 129:24
**Milken** [2] - 124:7, 124:13
**Miller** [9] - 11:13, 11:15, 12:9, 20:22, 21:23, 24:25, 118:25, 120:3, 120:8
**miller** [2] - 20:23, 24:19
**Miller's** [1] - 119:20
**Millstein** [1] - 72:1
**mind** [2] - 24:6, 35:16
**minus** [4] - 69:8, 69:9, 70:5, 70:10
**minutes** [3] - 56:1, 119:21, 131:14
**missing** [1] - 103:15
**mission** [4] - 65:11, 67:15, 67:20, 68:13
**model** [1] - 126:20
**modeling** [2] - 107:1, 109:11
**models** [2] - 107:4, 111:22
**moment** [1] - 112:12
**money** [11] - 36:1, 37:20, 61:15, 61:21, 81:13, 82:2, 87:7,

117:24, 122:19, 130:21, 131:10
**monitored** [1] - 48:1
**months** [4] - 45:3, 113:16, 117:4, 124:13
**Moody's** [1] - 72:1
**morning** [7] - 11:21, 15:6, 15:12, 103:18, 103:21, 103:22, 131:22
**mortgage** [16] - 7:7, 15:25, 29:14, 47:23, 50:25, 65:15, 81:9, 81:13, 89:10, 89:19, 89:20, 90:8, 90:9, 125:12
**mortgage-backed** [2] - 29:14, 47:23
**mortgages** [7] - 16:6, 29:15, 83:1, 83:3, 84:1, 89:15, 90:12
**most** [12] - 21:14, 41:24, 42:25, 50:24, 51:22, 54:2, 81:17, 90:2, 96:11, 97:12, 97:15, 109:7
**motivate** [1] - 121:8
**motivation** [8] - 117:18, 117:20, 117:23, 118:1, 118:2, 118:15, 123:7, 123:8
**motivations** [2] - 117:10, 121:1
**move** [13] - 24:11, 24:12, 68:3, 75:19, 76:10, 76:13, 91:9, 106:20, 109:20, 115:6, 116:18, 131:1, 131:15
**moving** [2] - 66:14, 116:24
**multi** [1] - 10:4
**multi-decade** [1] - 10:4
**multiple** [3] - 73:10, 107:7, 129:22
**mutual** [1] - 124:10

**N**

**name** [5] - 92:17, 108:17, 109:1, 109:4, 109:20
**named** [4] - 54:20, 71:15, 95:22
**necessary** [4] - 53:20, 109:3, 114:13
**need** [11] - 7:6, 11:24,

37:8, 64:2, 64:16, 81:23, 81:25, 83:5, 102:19, 110:17, 113:20
**needed** [4] - 17:5, 69:10, 117:22, 121:4
**needing** [1] - 40:15
**negative** [4] - 4:24, 10:14, 86:14, 86:15
**negotiate** [3] - 45:15, 45:21, 117:6
**negotiating** [3] - 44:9, 52:6, 117:3
**negotiation** [5] - 16:11, 16:13, 52:7, 117:8, 117:12
**net** [104] - 4:24, 6:12, 6:14, 6:15, 6:17, 8:2, 10:12, 10:13, 10:14, 26:8, 26:18, 28:7, 33:24, 34:10, 35:3, 35:11, 35:17, 36:1, 36:11, 37:7, 37:12, 37:14, 38:10, 38:14, 39:13, 39:22, 39:23, 40:8, 40:12, 40:14, 40:18, 41:1, 41:2, 43:10, 43:11, 43:20, 43:24, 44:3, 44:6, 44:9, 44:13, 45:6, 49:17, 50:11, 57:9, 62:15, 63:6, 63:12, 64:7, 65:1, 65:6, 65:9, 65:15, 65:17, 65:21, 67:14, 67:20, 68:8, 68:13, 68:19, 69:9, 70:3, 70:7, 71:2, 75:12, 80:20, 87:7, 87:16, 87:21, 95:1, 95:5, 99:14, 100:23, 101:3, 102:9, 109:11, 113:9, 113:15, 113:20, 114:18, 116:6, 116:12, 116:19, 116:22, 117:5, 117:16, 118:5, 118:8, 118:19, 120:23, 120:25, 121:17, 122:11, 122:12, 123:6, 123:12, 123:20, 127:11, 127:18, 127:21, 128:1
**never** [10] - 20:8, 23:5, 23:18, 36:4, 39:17, 43:12, 45:14, 54:16, 54:18, 79:25
**new** [3] - 13:5, 84:25,

131:15
**Newell** [1] - 9:4
**next** [16] - 5:9, 8:20, 9:8, 21:14, 27:11, 52:16, 58:8, 91:9, 101:3, 102:12, 103:3, 106:2, 106:8, 112:4, 117:1, 119:9
**Nick** [2] - 92:22, 101:15
**nine** [1] - 45:3
**nominated** [3] - 54:18, 54:19, 55:8
**nomination** [2] - 54:23, 55:4
**nonaccountants** [1] - 85:5
**none** [6] - 10:16, 65:3, 65:8, 65:13, 65:19, 65:23, 66:3, 100:9
**nonperformance** [1] - 83:21
**nonperforming** [1] - 94:19
**normal** [4] - 43:8, 60:16, 60:24, 61:1
**normally** [1] - 61:4
**NOTE** [1] - 4:2
**notes** [4] - 21:2, 21:3, 21:6, 21:9
**nothing** [2] - 10:17, 122:20
**notice** [1] - 48:15
**November** [1] - 55:7
**number** [7] - 12:14, 22:4, 31:1, 97:14, 107:4, 121:12, 129:24
**Number** [1] - 96:14
**numbers** [14] - 33:7, 35:7, 38:8, 39:4, 48:7, 49:1, 51:10, 74:2, 81:2, 82:16, 86:13, 86:14, 86:15, 130:10

## O

**o'clock** [1] - 131:18
**oath** [1] - 14:2
**Obama** [4] - 54:12, 54:16, 55:8, 111:1
**object** [13] - 40:21, 41:4, 41:15, 42:15, 75:25, 76:1, 76:5, 96:24, 105:22, 107:14, 109:16, 110:9, 110:21
**objected** [2] - 108:1, 113:24

**objection** [44] - 21:17, 22:8, 24:13, 24:15, 25:6, 30:17, 31:12, 39:25, 41:6, 41:13, 54:24, 76:25, 85:6, 85:8, 98:1, 98:3, 98:15, 98:25, 99:9, 99:17, 106:5, 108:10, 108:14, 109:13, 109:23, 109:24, 110:2, 110:12, 111:2, 113:24, 113:25, 114:1, 114:3, 124:16, 125:17, 126:8, 129:8, 129:12, 130:13, 130:15, 130:23, 131:4, 131:11
**Objection** [1] - 55:15
**objective** [2] - 121:3, 122:3
**objectives** [5] - 44:21, 63:24, 64:13, 122:16
**obligation** [1] - 28:9
**obligations** [2] - 7:22
**observant** [1] - 25:21
**obviously** [2] - 48:15, 77:2
**occurred** [1] - 38:23
**October** [5] - 59:10, 59:17, 60:5, 60:13, 60:21
**odd** [1] - 78:20
**officer** [1] - 53:6
**official** [1] - 11:10
**officials** [1] - 23:25
**offset** [1] - 85:15
**OFHEO** [3] - 53:5, 53:9, 53:13
**OMB** [1] - 72:1
**once** [7] - 29:22, 32:9, 32:20, 67:2, 80:5, 87:18, 116:14
**one** [54] - 4:21, 4:22, 5:16, 8:9, 10:12, 11:16, 12:17, 12:18, 13:5, 14:21, 17:3, 20:7, 27:12, 29:4, 30:24, 31:3, 33:15, 33:17, 33:22, 38:3, 47:9, 53:24, 54:13, 60:11, 61:3, 61:7, 66:1, 68:6, 68:8, 74:20, 75:17, 75:18, 77:8, 77:13, 78:2, 79:5, 79:22, 79:25, 82:11, 97:9, 97:11, 97:15, 100:18, 100:19, 108:24,

110:5, 110:20, 118:17, 122:21, 122:23, 122:25, 126:22, 127:1
**ones** [2] - 126:5, 126:6
**onward** [1] - 114:15
**open** [6] - 24:16, 41:7, 76:9, 110:1, 111:3, 130:14
**opening** [1] - 28:17
**operate** [2] - 59:24, 61:4
**operated** [1] - 67:6
**operating** [1] - 53:6
**operations** [3] - 60:16, 60:24, 61:1
**opportunity** [2] - 23:2, 23:14
**opposed** [1] - 16:9
**opposite** [2] - 118:1, 118:6
**option** [1] - 80:10
**order** [4] - 64:1, 64:15, 129:9, 129:14
**organization** [1] - 126:14
**orient** [2] - 96:7, 101:10
**originated** [1] - 89:21
**ourselves** [1] - 101:10
**outcome** [4] - 38:23, 43:14, 45:17
**outcomes** [5] - 30:8, 43:5, 43:6, 60:11, 60:12
**outlook** [1] - 84:11
**overall** [2] - 26:4, 89:23
**overrule** [1] - 32:2
**overruled** [12] - 42:17, 55:1, 55:17, 85:10, 97:1, 98:3, 99:19, 110:2, 111:2, 124:20, 125:19, 126:10
**overrules** [1] - 108:13
**overruling** [1] - 110:12
**oversight** [2] - 57:4, 107:13
**Oversight** [2] - 108:5, 111:9
**overstate** [1] - 50:1
**overview** [1] - 12:3
**owned** [4] - 89:24, 124:11, 125:12, 125:16

## P

**p.m** [2] - 119:7, 131:23

**page** [47] - 5:9, 6:2, 6:20, 7:3, 9:19, 9:22, 14:8, 21:14, 28:1, 44:23, 57:11, 59:19, 59:20, 63:3, 63:4, 63:22, 64:10, 66:12, 66:25, 67:13, 68:7, 71:21, 73:24, 76:18, 76:21, 76:22, 77:2, 77:3, 77:5, 77:6, 77:8, 77:12, 77:16, 77:19, 78:2, 111:16, 111:24, 112:3, 112:4, 112:16, 118:24, 119:9, 122:4
**PAGE** [1] - 3:2
**pages** [1] - 112:21
**paid** [6] - 35:2, 38:5, 39:9, 116:14, 129:3, 129:16
**pandemic** [1] - 36:23
**paper** [3] - 123:2, 123:10, 124:9
**paragraph** [2] - 91:9, 119:10
**paragraphs** [1] - 112:6
**parentheses** [1] - 86:15
**parse** [1] - 106:6
**parsing** [1] - 106:12
**part** [25] - 8:7, 16:11, 34:4, 48:16, 48:24, 50:4, 58:5, 60:2, 83:18, 83:19, 83:25, 84:2, 85:7, 90:10, 93:21, 95:8, 96:4, 100:7, 100:19, 104:24, 108:6, 116:10, 117:18, 126:14
**participants** [1] - 47:22
**particular** [7] - 5:16, 7:19, 38:23, 61:8, 78:18, 79:10, 121:1
**particularly** [4] - 42:24, 84:5, 88:7, 116:20
**particulars** [1] - 88:4
**parties** [1] - 110:20
**parts** [1] - 81:4
**passage** [1] - 27:21
**passingly** [1] - 27:9
**passive** [1] - 12:14
**Passivity** [1] - 12:12
**past** [3] - 5:4, 29:22, 29:23
**path** [2] - 120:17, 121:6
**Paul** [1] - 92:17

**pay** [12] - 7:24, 8:10, 10:15, 13:7, 13:15, 25:14, 26:2, 32:12, 80:7, 80:22, 81:13, 90:13

**paying** [2] - 43:23, 83:2

**payments** [1] - 85:18

**people** [22] - 9:5, 22:4, 47:20, 47:23, 48:1, 51:13, 52:18, 61:20, 75:11, 81:8, 89:9, 90:12, 92:9, 92:15, 92:21, 93:25, 95:21, 97:12, 97:15, 102:25, 107:4, 129:23

**perceived** [1] - 31:23

**percent** [19] - 6:12, 13:7, 13:15, 25:14, 26:2, 26:7, 28:15, 33:25, 34:22, 34:25, 37:13, 38:11, 39:14, 43:11, 43:24, 62:15, 80:14, 116:1, 123:13

**percentage** [1] - 46:20

**perception** [2] - 32:3, 47:15

**perfect** [1] - 86:19

**perform** [1] - 94:20

**performance** [1] - 25:21

**perhaps** [1] - 66:14

**period** [6] - 10:4, 28:6, 28:15, 38:23, 86:10

**period-to-period** [1] - 28:6

**periodic** [12] - 6:25, 7:2, 38:22, 39:2, 39:5, 39:8, 39:10, 39:13, 39:18, 79:21, 79:24, 80:6

**permanent** [3] - 54:18, 54:20, 55:9

**permission** [1] - 25:3

**permitted** [1] - 31:19

**person** [7] - 27:9, 42:23, 57:3, 90:9, 97:5, 97:9, 117:9

**persuaded** [1] - 40:7

**phone** [4] - 75:22, 107:23, 110:4, 129:12

**picked** [2] - 50:2, 51:23

**place** [5] - 12:5, 44:19, 99:25, 121:9, 124:6

**plaintiffs** [5] - 10:20, 10:24, 41:19, 75:19, 76:10

**Plaintiffs'** [5] - 3:8, 3:8, 11:1, 76:16, 111:4

**plaintiffs'** [2] - 13:19, 41:11

**Plan** [1] - 91:10

**plan** [7] - 42:11, 91:13, 92:3, 119:14, 120:5, 120:24, 126:18

**planet** [1] - 46:17

**play** [6] - 14:9, 14:15, 17:14, 19:2, 20:9, 109:2

**played** [7] - 14:10, 14:17, 14:23, 17:15, 18:25, 19:7, 20:11

**plus** [1] - 38:4

**point** [16] - 18:7, 20:8, 29:8, 29:9, 36:9, 49:8, 50:9, 55:16, 70:19, 92:4, 92:10, 100:2, 110:5, 114:8

**pointed** [1] - 62:22

**points** [3] - 12:17, 49:2, 50:5

**policy** [6] - 12:14, 52:10, 52:11, 52:13, 52:18, 124:22

**Policy** [9] - 124:24, 124:25, 125:3, 125:10, 125:23, 126:6, 126:7, 126:13, 126:17

**policy-relevant** [1] - 12:14

**politics** [1] - 109:2

**population** [3] - 83:2, 94:13, 94:19

**portfolio** [6] - 7:6, 7:9, 83:1, 84:1, 89:11, 93:11

**portion** [3] - 4:2, 25:4, 120:9

**posing** [1] - 99:11

**position** [6] - 13:5, 13:20, 13:21, 42:5, 93:3, 124:5

**positions** [1] - 125:24

**positive** [22] - 36:5, 36:8, 57:9, 63:6, 63:12, 63:25, 64:6, 64:7, 64:11, 64:15, 65:1, 65:6, 65:9, 65:16, 67:14, 68:8, 68:13, 69:9, 88:2, 116:6, 116:12, 120:25

**possibility** [5] - 12:24, 15:17, 18:12, 19:16, 95:4

**possible** [6] - 30:8, 39:16, 43:6, 60:12, 69:24, 90:22

**possibly** [1] - 40:9

**post** [3] - 10:3, 40:22, 54:7

**potential** [2] - 32:18, 60:7

**PowerPoint** [3] - 71:20, 82:9, 114:7

**PR** [6] - 12:24, 15:14, 15:17, 15:20, 18:12, 19:16

**preceded** [1] - 53:6

**predict** [5] - 41:19, 42:7, 43:19, 70:23, 78:10

**predicting** [1] - 29:23

**prediction** [4] - 30:6, 30:8, 69:25

**predictions** [3] - 42:25, 43:4, 81:19

**preference** [3] - 80:8, 127:22, 128:1

**preferred** [4] - 128:12, 128:21, 130:20, 131:9

**prejudicial** [1] - 110:19

**premeeting** [4] - 20:22, 24:18, 24:20, 24:24

**prepare** [3] - 71:5, 74:16, 120:15

**prepared** [3] - 4:3, 19:25, 127:5

**preparing** [2] - 100:7, 100:10

**presence** [5] - 4:4, 4:10, 56:2, 56:4, 131:20

**present** [4] - 14:3, 24:5, 26:14, 83:23

**presentation** [5] - 59:13, 60:2, 96:21, 111:19, 114:7

**preserve** [5] - 58:2, 61:10, 61:17, 68:20, 118:12

**preserved** [1] - 61:23

**President** [4] - 54:12, 54:16, 55:8, 111:1

**press** [3] - 121:11, 121:16, 123:17

**pretty** [4] - 51:22, 95:17, 105:19, 117:5

**previous** [1] - 12:3

**price** [5] - 46:19, 46:25, 83:24, 93:19, 109:4

**prices** [5] - 47:6, 81:5, 83:4, 88:15, 88:25

**pricing** [4] - 47:14, 47:17, 47:18, 47:24

**primarily** [1] - 82:3

**principal** [36] - 15:20, 15:23, 16:5, 16:18, 16:25, 17:5, 17:6, 17:11, 17:20, 17:23, 17:25, 18:5, 18:13, 18:23, 19:11, 19:21, 19:23, 20:1, 20:5, 24:2, 45:20, 46:4, 52:9, 93:4, 106:22, 106:23, 107:1, 109:6, 109:14, 112:17, 112:22, 113:3, 113:9, 118:8, 118:11

**principal-forgiveness** [1] - 17:6

**printed** [1] - 58:21

**printout** [3] - 48:9, 51:7, 58:17

**private** [12] - 122:20, 124:11, 125:16, 126:18, 126:19, 126:20, 126:24, 128:12, 128:18, 130:1, 130:20, 131:9

**problem** [2] - 7:12, 13:17

**proceed** [2] - 4:12, 56:6

**proceeding** [3] - 44:23, 44:25, 100:3

**Proceedings** [12] - 4:4, 4:10, 24:16, 41:7, 56:2, 56:4, 76:9, 110:1, 111:3, 130:14, 131:20, 131:23

**process** [6] - 57:3, 95:13, 96:21, 98:22, 108:22, 109:10

**produced** [1] - 124:9

**Professor** [1] - 34:20

**profit** [4] - 36:12, 36:13, 91:14, 127:20

**profitability** [6] - 64:3, 64:18, 67:19, 68:11, 105:20, 106:16

**profitable** [1] - 105:16

**profits** [12] - 43:11, 45:18, 81:5, 85:14, 85:23, 115:19, 116:21, 117:15, 117:25, 123:3, 123:13

**project** [3] - 42:12, 42:13, 70:24

**projected** [3] - 33:3, 74:17, 92:6

**projecting** [1] - 78:20

**projection** [7] - 29:2, 71:6, 72:16, 73:1, 76:24, 78:19, 79:4

**projections** [10] - 30:7, 30:11, 33:3, 36:15, 41:23, 43:5, 71:21, 73:22, 74:9

**projects** [2] - 72:25, 91:14

**promise** [2] - 16:17, 16:25

**promote** [1] - 119:12

**pronounce** [1] - 92:17

**property** [1] - 58:3

**proposals** [2] - 125:11, 125:15

**proposed** [1] - 124:10

**proposing** [1] - 16:4

**pros** [3] - 44:2, 44:13, 45:5

**prosecuted** [2] - 28:20, 28:23

**protect** [1] - 80:20

**protecting** [1] - 7:16

**protects** [1] - 37:7

**proud** [1] - 35:10

**provide** [6] - 59:23, 119:13, 120:4, 121:5, 126:5, 126:6

**provided** [5] - 12:3, 39:16, 112:22, 112:24, 123:17

**providing** [3] - 9:10, 67:15, 96:10

**provision** [7] - 6:4, 45:16, 45:21, 82:16, 82:23, 82:25, 83:5

**provisions** [1] - 5:25

**PSPA** [5] - 6:9, 9:6, 61:5, 116:24, 121:5

**PSPAs** [6] - 9:13, 12:25, 18:16, 19:17, 23:19, 25:1

**public** [10] - 24:4, 65:11, 65:16, 65:23, 66:4, 102:2, 119:14, 120:5, 120:18, 126:20

**publications** [1] - 59:1

**publicly** [1] - 121:3

**publish** [1] - 57:20

**published** [1] - 115:22

**pull** [14] - 4:21, 5:8, 8:14, 18:9, 27:18, 44:22, 49:11, 56:18,

2503

62:23, 71:11, 74:1, 79:8, 107:9, 121:14
**pulled** [1] - 49:16
**purchase** [2] - 64:2, 64:17
**purpose** [4] - 56:12, 58:1, 61:5, 96:20
**purposes** [1] - 85:18
**push** [7] - 114:17, 114:21, 115:6, 115:9, 115:11, 115:13, 115:21
**pushed** [1] - 123:12
**pushing** [3] - 25:1, 116:19, 118:5
**putting** [5] - 52:18, 61:20, 70:17, 95:13, 97:14
**PX** [1] - 121:12
**PX-144** [1] - 118:23
**PX-147** [1] - 90:20
**PX-196** [1] - 92:12
**PX-2-C** [1] - 57:19
**PX-2-C-1** [1] - 56:19
**PX-2-E** [1] - 59:4
**PX-205** [10] - 11:6, 15:14, 18:9, 19:12, 19:14, 24:21, 25:10, 27:7, 27:21, 113:12
**PX-213** [3] - 71:12, 77:25, 78:2
**PX-218** [1] - 73:12
**PX-245** [1] - 95:20
**PX-247** [1] - 114:22
**PX-248** [2] - 74:20, 75:19
**PX-259** [2] - 101:9
**PX-278** [1] - 121:16
**PX-500** [3] - 107:9, 107:12, 111:6
**PX-584** [1] - 20:18
**PX-597** [2] - 48:3, 48:5
**PX-636** [2] - 50:21, 51:6

## Q

**Q4** [1] - 5:2
**Qs** [3] - 32:11, 32:15, 33:19
**quadrant** [1] - 49:12
**qualifies** [1] - 90:9
**quality** [2] - 89:10, 90:15
**quarter** [30] - 4:24, 4:25, 5:6, 6:16, 10:13, 27:17, 27:25, 28:24, 32:8, 32:11, 32:15, 33:23, 34:14, 40:13, 62:25, 63:18,

64:22, 66:20, 66:21, 66:22, 68:5, 69:17, 69:20, 70:6, 78:8, 95:8, 95:12, 98:20, 115:18, 123:13
**quarterly** [2] - 95:9, 100:7
**quarters** [6] - 4:23, 65:4, 65:9, 65:14, 65:20, 101:4
**QUESTION** [1] - 45:4
**question-and-answer** [1] - 56:22
**questioning** [4] - 46:5, 96:24, 98:2, 105:23
**questions** [8] - 10:23, 52:4, 56:11, 56:16, 56:21, 68:18, 108:24, 121:8
**quick** [1] - 66:10
**quickly** [8] - 33:11, 63:3, 63:17, 73:11, 91:20, 101:9, 111:6, 111:21
**quite** [2] - 30:25, 114:8
**quote** [2] - 9:11, 96:18
**quoted** [1] - 33:8
**quotes** [1] - 92:5

## R

**raised** [5] - 12:23, 13:4, 15:17, 18:12, 19:16
**range** [1] - 43:6
**ranking** [1] - 108:4
**rate** [6] - 6:5, 6:8, 7:5, 7:9, 62:14, 62:15
**reach** [1] - 117:21
**reached** [1] - 44:20
**reaching** [3] - 92:9, 102:13, 102:17
**reaction** [4] - 8:9, 8:24, 10:8, 41:1
**read** [10] - 10:1, 22:9, 31:1, 31:3, 57:24, 58:12, 93:10, 105:4
**reads** [1] - 21:15
**ready** [1] - 116:25
**reality** [1] - 130:1
**realize** [1] - 41:18
**realized** [1] - 10:11
**really** [14] - 28:20, 29:23, 35:16, 35:25, 57:16, 66:22, 78:16, 80:13, 109:3, 111:6, 111:21, 113:20, 114:17, 116:7
**reason** [7] - 26:21,

80:18, 80:23, 116:19, 118:5, 118:6, 129:23
**reasonable** [11] - 39:8, 39:11, 39:18, 41:23, 42:23, 42:25, 52:11, 52:18, 70:17, 73:21, 75:8
**reasonableness** [1] - 40:23
**reasonably** [2] - 40:18, 101:4
**reasons** [5] - 13:5, 23:13, 44:17, 75:17, 126:22
**rebuild** [3] - 116:22, 117:15, 123:3
**received** [5] - 40:8, 110:3, 127:25, 130:2, 130:22
**recent** [2] - 90:2, 96:19
**recess** [1] - 23:14
**Recess** [1] - 56:3
**recognize** [2] - 27:21, 56:21
**recognized** [1] - 112:2
**recognizing** [1] - 52:9
**recollection** [6] - 20:24, 86:19, 88:24, 88:25, 94:18, 104:10
**record** [21] - 5:19, 15:13, 19:20, 23:9, 24:4, 32:16, 33:21, 40:5, 75:24, 76:10, 78:13, 78:17, 83:12, 107:25, 110:7, 110:8, 112:14, 115:11, 129:13, 131:19, 131:21
**recording** [6] - 14:10, 14:17, 14:23, 17:15, 19:7, 20:11
**recover** [1] - 88:7
**recovery** [4] - 88:3, 88:6, 93:20, 119:12
**red** [2] - 81:2, 81:3
**redact** [3] - 109:3, 109:20, 110:20
**redacted** [5] - 108:9, 108:14, 110:10, 110:13, 110:17
**redaction** [2] - 108:17, 110:15
**redemption** [1] - 45:20
**reduce** [7] - 7:6, 16:5, 64:1, 64:15, 69:11, 85:25, 119:12
**reduced** [2] - 47:16,

86:9
**reducing** [1] - 94:6
**reduction** [31] - 7:8, 7:9, 15:20, 15:23, 16:18, 16:25, 17:11, 17:20, 17:23, 17:25, 18:5, 18:13, 18:23, 19:11, 19:21, 19:23, 20:1, 20:6, 24:2, 46:4, 52:10, 73:8, 106:22, 106:23, 107:2, 109:6, 109:14, 112:18, 112:22, 113:4, 113:9
**reference** [4] - 10:5, 10:6, 15:20, 64:6
**references** [2] - 61:19, 122:19
**referencing** [3] - 6:5, 6:8, 115:12
**referred** [2] - 7:25, 9:12
**referring** [3] - 78:14, 94:21, 123:10
**refers** [4] - 22:7, 22:10, 72:9, 93:13
**reflected** [1] - 38:9
**reflects** [2] - 92:4, 120:3
**Reform** [2] - 108:6, 111:9
**reforms** [1] - 12:14
**reformulating** [1] - 126:19
**refresh** [4] - 94:18, 104:10, 104:14, 104:17
**refuse** [1] - 46:3
**regarding** [1] - 95:22
**regular** [2] - 91:3, 91:6
**regularly** [2] - 97:12, 99:5
**regulation** [1] - 53:14
**regulator** [2] - 53:5, 53:10
**reimposed** [1] - 70:23
**related** [2] - 11:21, 92:6
**relating** [2] - 6:24, 6:25
**release** [4] - 96:22, 121:11, 121:16, 123:17
**released** [3] - 115:18, 125:11, 125:15
**releasing** [1] - 98:23
**relevance** [9] - 40:21, 41:4, 54:25, 55:15, 99:9, 108:11, 109:13, 109:17,

124:16
**relevant** [4] - 12:14, 88:16, 109:6, 109:7
**reliable** [2] - 59:2, 73:21
**remained** [1] - 61:2
**Remaining** [1] - 72:13
**remaining** [5] - 7:16, 7:19, 72:16, 74:1, 79:9
**remember** [23] - 14:1, 33:7, 35:24, 36:17, 44:25, 57:17, 69:2, 71:23, 88:4, 88:12, 92:16, 93:1, 94:10, 94:23, 97:14, 98:8, 103:4, 103:9, 106:23, 113:12, 113:13, 114:22, 127:13
**remind** [1] - 59:7
**remove** [1] - 126:20
**renew** [1] - 108:10
**renewed** [6] - 114:21, 115:6, 115:9, 115:11, 115:13, 115:21
**repeat** [1] - 66:1
**reperformed** [1] - 94:16
**rephrase** [2] - 60:20, 130:24
**report** [3] - 9:10, 40:8, 40:25
**reported** [3] - 4:3, 33:19, 107:7
**REPORTER'S** [1] - 4:2
**reporting** [3] - 23:25, 32:3, 93:7
**represent** [5] - 49:16, 51:17, 58:20, 77:7, 128:11
**representation** [1] - 49:19
**Representative** [2] - 108:8, 109:20
**representative** [1] - 48:10
**represented** [1] - 98:21
**representing** [1] - 84:2
**Republicans** [2] - 54:22, 55:4
**request** [3] - 23:14, 25:3, 44:15
**requesting** [1] - 114:9
**require** [3] - 36:12, 80:15, 85:24
**required** [5] - 32:3,

55:20, 86:4, 87:15, 95:14
**rerecording** [4] - 104:5, 104:12, 104:22, 105:5
**rescinding** [2] - 60:7, 60:9
**reserve** [5] - 6:16, 6:17, 81:25, 82:1, 84:2
**reserves** [3] - 81:23, 84:11, 86:20
**resolution** [1] - 120:18
**resolved** [2] - 17:5, 18:2
**respect** [3] - 40:1, 98:2, 99:17
**respectful** [1] - 109:15
**responds** [1] - 102:17
**response** [1] - 102:16
**responsibility** [2] - 31:22, 31:24
**rest** [1] - 79:14
**restate** [1] - 42:18
**restoring** [1] - 126:18
**result** [2] - 35:21, 36:8
**resulted** [1] - 96:20
**results** [4] - 31:25, 35:13, 35:24, 36:5
**retain** [4] - 116:21, 117:15, 118:12, 123:3
**retained** [4] - 7:6, 7:9, 38:21, 116:15
**retired** [1] - 53:24
**retrospective** [1] - 41:1
**return** [7] - 46:20, 60:7, 60:15, 60:16, 60:23, 60:25, 123:3
**returned** [4] - 54:23, 55:4, 59:25, 87:23
**returning** [6] - 61:1, 61:6, 64:3, 64:17, 67:18, 68:11
**returns** [3] - 67:3, 67:7, 67:10
**revenues** [4] - 13:6, 13:14, 25:13, 26:1
**reversing** [1] - 95:4
**review** [5] - 31:24, 35:23, 95:9, 95:15, 99:5
**reviewed** [5] - 30:23, 31:8, 53:16, 95:10, 123:16
**reviewing** [1] - 31:25
**revised** [1] - 95:24
**rid** [1] - 55:20
**rider** [1] - 110:11

**right-hand** [1] - 49:1
**rights** [1] - 110:25
**rigorous** [1] - 90:11
**rise** [2] - 15:7, 89:1
**risk** [13] - 7:21, 8:3, 8:5, 29:3, 31:9, 31:20, 31:24, 33:14, 40:15, 63:23, 64:12, 83:21, 83:22
**risks** [4] - 30:15, 31:23, 32:3, 40:14
**roaring** [1] - 93:20
**rough** [1] - 69:24
**roughly** [4] - 38:4, 70:8, 86:19
**Roundtable** [1] - 126:15
**rules** [4] - 81:23, 85:23, 87:13, 127:12
**ruling** [4] - 23:12, 110:11, 129:19, 129:20
**run** [2] - 43:1, 68:19
**run-up** [1] - 68:19
**running** [1] - 107:4

## S

**safe** [1] - 47:2
**safest** [1] - 46:17
**safety** [3] - 38:19, 51:13, 53:9
**same-day** [1] - 40:25
**sample** [1] - 48:10
**satisfied** [1] - 44:20
**Satriano** [4] - 92:22, 101:15, 101:24, 102:13
**saw** [13] - 17:1, 17:3, 17:21, 18:19, 18:23, 23:19, 24:1, 33:3, 33:20, 77:9, 91:16, 123:16
**scenario** [6] - 38:14, 45:21, 79:5, 79:10, 79:18, 79:22
**scenarios** [3] - 36:16, 42:12, 43:1
**scope** [2] - 85:6, 85:9
**screen** [6] - 11:4, 21:20, 27:20, 75:15, 77:19, 111:7
**seated** [2] - 4:11, 56:5
**SEC** [41] - 26:13, 27:16, 27:24, 28:5, 28:18, 28:21, 28:23, 30:2, 30:14, 30:21, 30:23, 30:25, 31:1, 31:6, 31:11, 31:16, 31:23, 33:10, 33:23,

39:22, 41:9, 62:20, 62:21, 65:3, 65:8, 65:13, 65:19, 65:23, 66:3, 66:11, 66:22, 78:8, 79:6, 80:12, 95:9, 100:7, 115:18, 115:21, 115:24, 116:4, 116:20
**second** [21] - 13:3, 27:17, 27:25, 28:24, 32:8, 32:11, 32:14, 33:23, 62:2, 62:13, 68:23, 69:4, 69:15, 70:13, 78:8, 99:23, 112:4, 115:18, 124:4, 122:23, 123:13
**Secretary** [12] - 5:24, 11:16, 11:18, 12:8, 17:10, 19:16, 20:22, 23:23, 24:5, 44:16, 70:14, 114:7
**secretary** [6] - 12:3, 12:12, 12:23, 15:17, 18:12, 23:25
**Section** [1] - 6:20
**securities** [3] - 29:14, 32:3, 47:23
**security** [2] - 46:22, 59:14
**see** [156] - 9:23, 10:2, 11:7, 11:9, 11:13, 11:22, 12:5, 12:15, 12:18, 12:25, 13:8, 15:18, 19:10, 21:15, 21:23, 21:24, 22:5, 22:7, 24:25, 25:15, 28:3, 28:9, 29:10, 36:9, 38:3, 41:14, 48:7, 48:17, 48:23, 49:2, 49:3, 49:21, 49:25, 50:6, 50:9, 51:8, 51:10, 51:11, 51:16, 51:18, 57:1, 57:6, 57:14, 58:17, 58:18, 59:25, 62:25, 63:2, 63:6, 63:20, 64:4, 64:19, 67:16, 67:18, 67:20, 68:9, 68:13, 69:5, 71:15, 71:18, 71:22, 71:25, 72:2, 72:7, 72:9, 72:14, 72:20, 72:23, 72:25, 73:5, 73:9, 73:12, 74:1, 74:3, 74:6, 74:8, 74:14, 74:21, 74:23, 74:24, 77:12, 79:12, 82:16, 82:18, 82:20, 82:25, 83:16, 85:2, 85:4,

90:23, 91:1, 91:10, 91:14, 91:19, 91:21, 92:7, 92:22, 92:24, 93:4, 93:5, 93:22, 94:10, 94:12, 94:16, 95:23, 95:24, 96:1, 96:8, 96:12, 96:22, 100:11, 101:18, 101:21, 102:6, 102:14, 102:22, 102:23, 103:12, 103:13, 104:8, 105:16, 111:10, 111:11, 111:16, 112:4, 112:7, 112:24, 113:1, 114:16, 115:1, 115:3, 115:7, 116:25, 118:25, 119:2, 119:4, 119:7, 119:15, 120:18, 121:18, 121:20, 121:22, 122:6, 122:11, 122:17, 123:4, 127:3, 127:8, 128:2, 128:25, 129:23, 131:18, 131:22
**seeing** [6] - 21:4, 21:8, 35:24, 59:10, 71:23, 113:13
**sees** [3] - 12:24, 18:15, 19:17
**Senate** [2] - 54:8, 54:22
**send** [2] - 36:8, 73:20
**senior** [8] - 23:25, 54:2, 54:4, 75:1, 75:10, 91:4, 91:6, 102:8
**sense** [4] - 12:12, 24:6, 69:20, 106:2
**sent** [5] - 71:9, 71:14, 103:21, 111:8, 119:20
**sentence** [33] - 9:23, 10:1, 12:23, 13:1, 13:13, 14:22, 15:3, 15:16, 18:11, 22:7, 22:10, 25:12, 25:24, 57:16, 57:25, 58:1, 58:5, 58:8, 59:22, 63:4, 63:6, 63:23, 64:11, 92:3, 93:13, 93:16, 94:11, 101:20, 103:3, 103:8, 106:2, 106:9, 115:5
**sentences** [6] - 12:2, 12:5, 58:14, 58:15,

94:9, 105:25
**separate** [2] - 17:4, 19:1
**separately** [2] - 18:2, 82:15
**September** [1] - 50:5
**September-December** [1] - 50:5
**serious** [3] - 28:20, 31:9, 31:20
**seriously** [1] - 95:17
**serve** [1] - 54:16
**service** [1] - 124:14
**Services** [1] - 126:14
**servicing** [1] - 125:12
**set** [7] - 39:13, 44:17, 52:3, 68:24, 70:19, 83:12, 114:10
**several** [6] - 9:5, 50:23, 100:9, 113:5, 122:16, 123:9
**shall** [1] - 6:9
**shape** [1] - 47:12
**share** [4] - 119:11, 119:22, 119:23, 119:24
**shared** [1] - 119:18
**shareholder** [3] - 67:3, 67:7, 67:10
**shareholders** [15] - 59:25, 60:6, 60:8, 60:14, 60:16, 60:18, 60:25, 61:6, 122:20, 128:12, 128:18, 128:21, 130:1, 130:21, 131:10
**shares** [1] - 129:3
**sheet** [11] - 37:7, 37:12, 56:22, 59:2, 61:16, 61:22, 61:23, 85:17, 86:1, 87:17, 87:23
**Shiller** [1] - 88:18
**shock** [1] - 35:21
**shoes** [2] - 97:17, 97:21
**short** [1] - 23:14
**shortly** [1] - 99:14
**show** [42] - 4:22, 14:6, 15:13, 20:15, 20:17, 23:4, 24:10, 25:4, 26:11, 34:16, 35:20, 36:4, 37:24, 40:11, 41:8, 41:12, 48:2, 49:15, 53:18, 68:2, 73:11, 73:12, 74:20, 75:18, 78:13, 78:17, 79:14, 79:17, 82:6, 90:19, 90:20, 90:22, 100:18, 104:20,

111:13, 113:18,
113:21, 121:11,
127:1, 128:10,
129:22, 129:23
**showed** [11] - 27:17,
28:1, 28:11, 61:8,
71:10, 71:22, 81:2,
114:24, 115:24,
116:5, 116:11
**showing** [17] - 4:23,
21:18, 21:19, 22:23,
34:17, 48:19, 68:1,
82:11, 84:25, 85:1,
88:23, 93:18,
123:13, 128:6,
128:7, 130:3
**shown** [15] - 21:2,
21:6, 32:6, 35:20,
59:5, 59:9, 61:22,
62:21, 66:11, 67:1,
67:12, 71:13, 99:22,
114:21, 129:3
**shows** [26] - 15:13,
28:14, 34:21, 38:3,
38:17, 46:12, 47:7,
49:5, 51:7, 72:19,
72:22, 73:4, 73:7,
73:24, 74:11, 74:12,
74:13, 79:10, 79:16,
82:14, 82:17, 82:20,
84:21, 88:21, 91:25,
108:21
**sic** [1] - 5:2
**side** [2] - 34:21, 127:6
**sides** [1] - 14:3
**signatory** [1] - 111:12
**signature** [2] - 111:13,
111:24
**signed** [11] - 4:18,
4:25, 5:21, 5:23,
69:14, 100:23,
108:20, 113:15,
121:24, 123:6,
123:20
**significant** [2] - 79:23,
86:11
**signing** [1] - 121:25
**similar** [10] - 46:25,
50:23, 51:11, 66:25,
68:7, 74:16, 76:22,
78:3, 78:4, 117:21
**similarly** [1] - 84:17
**simple** [2] - 43:9,
130:2
**simply** [4] - 80:8,
80:21, 94:23, 100:14
**single** [8] - 44:12,
45:4, 45:5, 78:11,
95:12, 98:8, 98:20
**sitting** [1] - 35:9

**situation** [1] - 7:14
**size** [6] - 32:9, 32:23,
47:12, 68:21, 69:7,
69:11
**slide** [18] - 26:15,
34:19, 37:24, 38:1,
61:8, 71:22, 73:25,
84:24, 84:25, 85:1,
96:14, 100:10,
100:12, 129:18,
130:11, 130:16
**Slide** [14] - 4:21,
26:11, 34:16, 43:16,
45:12, 82:8, 82:13,
82:14, 88:17, 127:3,
127:5, 128:10,
128:16
**slides** [3] - 59:13,
98:4, 127:1
**slightly** [1] - 73:25
**slow** [3] - 88:3, 88:6,
88:7
**small** [4] - 6:16, 33:1,
70:8, 127:10
**Smith** [2] - 54:20, 55:6
**Smith's** [1] - 55:4
**solve** [3] - 7:12, 7:20,
7:21
**solvent** [3] - 57:5,
57:9, 58:3
**solving** [1] - 7:24
**someday** [1] - 106:18
**someone** [5] - 54:19,
71:15, 92:16, 101:1,
104:24
**something's** [1] -
28:18
**sometime** [1] - 102:2
**sometimes** [2] - 16:1,
80:13
**somewhere** [1] - 70:1
**soon** [2] - 75:11,
105:19
**sorry** [31] - 4:7, 5:13,
5:15, 8:14, 9:4, 9:19,
21:10, 21:21, 23:1,
26:15, 42:18, 56:10,
57:18, 60:19, 66:1,
66:21, 80:24, 82:12,
83:14, 84:22, 84:23,
84:24, 91:5, 91:24,
93:12, 104:15,
107:19, 126:8, 131:6
**sort** [1] - 88:2
**sorts** [1] - 36:16
**sound** [2] - 57:5, 58:3
**soundness** [1] - 53:9
**sounds** [1] - 20:25
**spearheading** [1] -
12:14

**specific** [5] - 5:18,
29:20, 75:7, 86:2,
114:8
**speech** [1] - 59:13
**spike** [2] - 48:16,
51:12
**spiking** [1] - 48:23
**split** [2] - 27:20, 38:17
**Spohn** [3] - 97:9,
97:11, 105:12
**spread** [6] - 46:11,
47:6, 48:11, 48:13,
49:8, 49:24
**spreads** [1] - 50:14
**SPSPA** [2] - 72:13,
115:6
**squeezing** [1] -
105:24
**stability** [5] - 7:15,
67:15, 118:12,
121:5, 121:8
**stabilized** [1] - 59:25
**staff** [2] - 97:10, 100:9
**standard** [1] - 86:2
**standards** [5] - 90:5,
90:7, 90:16, 90:17
**start** [9] - 8:16, 21:14,
44:15, 47:5, 50:2,
51:23, 94:20,
117:25, 131:16
**started** [5] - 36:4,
89:1, 91:12, 118:7
**State** [1] - 96:18
**state** [3] - 24:6, 96:14,
105:10
**statement** [13] - 17:13,
28:17, 28:18, 28:24,
30:14, 32:17, 60:9,
63:8, 64:6, 64:21,
79:6, 80:12, 83:10
**statements** [5] -
56:12, 62:20, 62:21,
67:22, 68:15
**States** [4] - 46:13,
46:16, 52:21, 128:7
**stating** [1] - 96:20
**statute** [2] - 54:12,
58:11
**statutes** [1] - 59:23
**stayed** [4] - 25:17,
34:4, 34:25
**staying** [1] - 73:7
**Stegman** [6] - 11:9,
15:8, 20:23, 22:5,
24:19, 24:25
**Steps** [1] - 121:21
**stern** [2] - 106:16,
107:17
**STERN** [62] - 4:5, 4:7,
4:9, 4:13, 4:16, 5:8,

5:10, 9:20, 9:21,
10:17, 21:17, 21:21,
22:8, 22:10, 24:14,
25:6, 30:17, 31:12,
39:25, 40:21, 41:13,
42:15, 54:24, 55:15,
75:21, 75:25, 76:25,
77:4, 77:6, 77:10,
85:6, 85:9, 96:24,
98:1, 98:15, 98:25,
99:9, 99:17, 105:22,
106:4, 107:14,
107:22, 108:1,
109:12, 109:22,
110:4, 110:8,
110:16, 110:18,
113:24, 114:2,
124:16, 125:17,
126:8, 129:8,
129:14, 130:4,
130:6, 130:11,
130:23, 131:1,
131:11
**Stern....** [1] - 3:4
**stick** [1] - 17:7
**sticking** [2] - 27:11,
27:14
**still** [5] - 35:10, 58:22,
66:8, 83:1, 88:7
**stock** [2] - 88:11,
88:12
**stood** [2] - 97:16,
97:21
**stop** [2] - 105:11,
131:16
**straight** [2] - 83:12,
86:21
**strange** [1] - 27:9
**strategic** [1] - 126:17
**strategy** [1] - 67:10
**stress** [4] - 36:16,
36:20, 36:22, 38:14
**strong** [1] - 119:12
**strongly** [1] - 109:8
**studied** [1] - 113:7
**study** [2] - 43:12,
108:22
**studying** [1] - 47:21
**stuff** [2] - 93:8, 119:23
**subject** [6] - 11:20,
71:17, 95:23, 108:9,
109:15, 131:15
**submission** [2] - 95:9,
109:16
**subsequent** [2] -
25:20, 100:13
**substantially** [1] -
116:1
**subtracted** [1] - 71:3
**suffered** [1] - 81:18

**suffering** [1] - 86:22
**sufficient** [1] - 70:18
**summarizing** [1] -
44:18
**summary** [4] - 34:19,
34:21, 130:9, 130:10
**summer** [4] - 23:19,
89:22, 113:21,
114:18
**super** [1] - 30:3
**supply** [1] - 47:16
**support** [3] - 9:24,
10:2, 32:14
**supports** [2] - 10:3,
10:5
**supposed** [6] - 30:5,
30:15, 31:11, 54:7,
61:17, 61:23
**surely** [1] - 39:3
**surprise** [4] - 35:21,
58:22, 73:19, 73:23
**surprised** [2] - 66:7,
93:20
**Susan** [2] - 91:12,
92:3
**suspect** [1] - 76:4
**suspending** [1] - 7:2
**sustain** [1] - 106:5
**sustained** [10] - 24:15,
30:19, 40:2, 41:6,
98:16, 130:13,
130:15, 130:25,
131:4, 131:12
**swear** [1] - 53:16
**Sweep** [1] - 122:6
**sweep** [65] - 6:12,
6:14, 6:15, 8:2,
10:12, 10:13, 26:8,
26:18, 33:25, 34:10,
35:3, 35:11, 35:17,
36:1, 36:11, 36:12,
38:11, 39:14, 39:22,
39:24, 40:9, 40:12,
40:14, 40:18, 41:1,
41:2, 43:10, 43:20,
43:24, 44:3, 44:6,
44:10, 44:13, 45:6,
49:17, 50:11, 62:15,
68:19, 75:12, 80:20,
87:21, 95:2, 99:15,
100:23, 102:9,
109:11, 113:9,
113:15, 113:20,
114:18, 116:20,
117:5, 118:5, 118:8,
118:19, 120:23,
121:18, 122:11,
122:12, 123:6,
123:12, 123:20,
127:11, 127:18

**swept** [3] - 6:18, 45:19, 127:19
**sworn** [1] - 14:2

## T

**tables** [1] - 111:22
**tank** [1] - 52:20
**tape** [1] - 18:25
**target** [1] - 114:10
**targeted** [1] - 60:11
**tax** [26] - 84:19, 85:1, 85:4, 85:14, 85:18, 85:19, 85:25, 86:9, 86:12, 86:21, 87:1, 87:5, 87:15, 94:25, 95:5, 96:16, 98:24, 99:6, 99:15, 104:5, 104:13, 104:22, 104:25, 105:5, 105:8, 127:12
**taxable** [2] - 85:23, 87:15
**ten** [15] - 26:17, 26:22, 27:1, 27:11, 28:12, 28:15, 33:4, 73:1, 73:2, 74:9, 75:12, 76:23, 79:11, 98:9
**Ten** [1] - 56:1
**ten-year** [2] - 28:15, 76:23
**term** [11] - 28:9, 29:10, 29:12, 29:13, 29:15, 50:25, 64:3, 64:17, 67:18, 68:11, 121:7
**terminal** [1] - 48:9
**terms** [6] - 6:2, 38:9, 46:7, 61:6, 90:11, 114:6
**terrible** [1] - 112:1
**testified** [5] - 11:2, 12:7, 12:20, 23:17, 129:10
**testify** [3] - 29:21, 30:21, 98:9
**testifying** [1] - 98:19
**testimony** [28] - 14:2, 14:12, 14:19, 14:25, 17:17, 18:18, 19:9, 20:13, 24:3, 27:14, 36:15, 39:3, 39:4, 45:9, 46:2, 56:15, 57:8, 61:9, 61:14, 68:20, 73:15, 80:19, 81:4, 99:5, 100:25, 101:5, 101:6
**text** [1] - 119:6
**TFG75** [1] - 21:24
**themselves** [1] - 51:3
**then-ranking** [1] -

108:4
**thereby** [3] - 13:6, 13:14, 25:13
**therefore** [1] - 7:23
**they've** [1] - 123:9
**thinking** [1] - 39:12
**third** [54] - 4:17, 4:18, 4:25, 5:6, 5:12, 5:15, 5:19, 5:25, 7:13, 8:10, 8:12, 8:25, 9:11, 9:17, 16:12, 16:13, 16:16, 16:21, 16:25, 17:1, 17:7, 17:8, 17:11, 17:20, 17:21, 17:24, 18:3, 18:4, 18:6, 18:24, 19:10, 19:23, 19:25, 20:5, 20:6, 44:16, 45:16, 46:3, 62:25, 63:18, 64:22, 66:20, 66:21, 68:5, 69:17, 70:6, 100:4, 105:2, 114:9, 121:9, 121:24, 122:8, 122:15, 122:25
**thoughts** [1] - 9:11
**threat** [1] - 7:19
**three** [8] - 15:4, 23:13, 29:22, 53:25, 54:2, 54:13, 70:4, 97:12
**throughout** [3] - 48:23, 49:21, 49:24
**timeliness** [1] - 108:19
**Timothy** [3] - 12:8, 22:1, 22:5
**title** [1] - 121:20
**today** [3] - 27:14, 35:9, 114:16
**together** [7] - 21:2, 34:19, 58:12, 70:17, 82:11, 85:1, 95:13
**tomorrow** [2] - 102:5, 131:22
**took** [12] - 12:5, 21:9, 34:10, 34:13, 44:19, 53:13, 55:19, 55:21, 90:16, 99:25, 118:13
**top** [10] - 8:16, 9:20, 9:22, 27:21, 51:8, 58:16, 72:8, 112:4, 112:5, 119:10
**topic** [1] - 109:16
**topics** [1] - 17:4
**tops** [1] - 50:5
**total** [5] - 82:14, 127:6, 128:17, 129:3, 129:6
**totally** [1] - 34:9
**tracking** [1] - 48:12

**trade** [3] - 125:3, 125:23, 126:4
**trades** [1] - 46:19
**trading** [3] - 46:13, 46:25, 47:24
**trained** [1] - 52:25
**transcript** [2] - 4:3, 44:23
**Treasury** [86] - 5:23, 5:24, 6:18, 7:17, 7:19, 7:22, 7:24, 9:12, 10:7, 10:10, 10:15, 11:10, 11:16, 12:8, 16:3, 16:15, 16:16, 17:10, 17:19, 18:7, 21:3, 23:24, 23:25, 24:5, 24:7, 28:9, 32:9, 33:12, 35:3, 36:9, 37:2, 39:11, 40:16, 43:23, 44:9, 44:15, 45:15, 46:13, 46:16, 47:7, 50:15, 52:6, 52:10, 52:19, 62:3, 64:3, 64:17, 74:22, 75:1, 75:11, 80:2, 80:20, 80:22, 82:2, 87:7, 87:10, 100:3, 100:20, 115:9, 115:10, 115:13, 116:19, 116:21, 116:23, 117:2, 117:3, 117:14, 118:4, 119:1, 119:11, 119:17, 120:4, 120:10, 120:14, 120:23, 121:2, 121:11, 121:17, 121:20, 122:2, 122:20, 127:7, 127:24, 128:7
**Treasury's** [5] - 48:11, 49:9, 49:23, 123:7, 127:21
**treated** [1] - 45:19
**trend** [1] - 49:22
**trends** [3] - 84:14, 88:2, 88:5
**trial** [4] - 4:2, 106:18, 108:9, 110:14
**tries** [1] - 126:1
**true** [34] - 13:16, 13:18, 17:19, 18:8, 19:14, 19:21, 19:24, 20:4, 26:4, 28:19, 36:22, 38:8, 39:17, 39:21, 45:11, 45:14, 45:24, 46:2, 53:12, 54:6, 54:11, 63:8, 64:21, 65:3, 66:7,

79:25, 80:5, 81:17, 87:12, 94:25, 116:18, 117:13, 120:2, 120:3
**trust** [1] - 35:8
**truthful** [7] - 14:12, 14:19, 14:25, 17:17, 19:9, 20:13, 45:9
**try** [14] - 42:11, 42:12, 42:25, 51:10, 52:3, 61:17, 75:7, 82:6, 99:2, 104:19, 105:24, 106:20, 117:9
**trying** [18] - 7:12, 7:14, 7:20, 7:21, 17:24, 22:12, 30:10, 40:11, 43:13, 43:19, 61:3, 61:14, 65:5, 101:8, 109:2, 116:18, 118:15, 118:17
**Tuesday** [1] - 103:18
**turned** [5] - 25:25, 27:10, 28:24, 29:7, 84:7
**turns** [2] - 28:19, 29:6
**two** [27] - 12:2, 12:5, 13:4, 18:4, 19:1, 19:19, 23:13, 29:22, 30:24, 35:7, 65:4, 65:9, 65:14, 65:20, 66:10, 74:2, 76:23, 85:5, 94:9, 102:9, 105:25, 108:24, 113:16, 115:15, 120:20, 127:1
**type** [2] - 31:10, 31:20
**typo** [1] - 94:14

## U

**U.S** [2] - 49:9, 49:23
**Ugoletti** [3] - 8:19, 114:25, 115:12
**uncertain** [2] - 29:23, 30:11
**under** [23] - 6:9, 10:13, 12:11, 14:2, 16:4, 17:8, 32:3, 35:3, 38:10, 43:20, 43:24, 54:11, 63:5, 72:13, 74:9, 79:10, 79:18, 81:22, 82:2, 87:13
**underneath** [1] - 67:12
**undersecretary** [1] - 11:15
**understood** [10] - 30:8, 31:10, 61:13, 66:2, 84:9, 90:1,

93:25, 115:12, 118:4, 123:6
**underwater** [2] - 16:1, 88:8
**underway** [1] - 118:18
**underwriting** [3] - 90:5, 90:7, 90:16
**unequivocally** [2] - 15:2, 23:18
**unintended** [1] - 110:19
**United** [4] - 46:13, 46:16, 52:21, 128:7
**unknown** [1] - 41:3
**unless** [2] - 70:19, 73:20
**unmovable** [1] - 70:19
**up** [61] - 4:21, 4:24, 5:8, 6:7, 8:14, 9:1, 11:4, 17:24, 18:9, 21:15, 25:10, 27:18, 29:8, 29:9, 30:12, 30:13, 38:4, 41:14, 43:16, 43:23, 44:22, 45:12, 45:18, 48:6, 48:21, 48:23, 49:11, 49:24, 50:21, 56:18, 59:6, 62:23, 65:5, 68:19, 71:12, 79:8, 80:21, 82:8, 84:14, 84:23, 87:16, 88:11, 88:22, 90:15, 94:7, 94:9, 99:6, 99:15, 102:12, 104:12, 105:7, 105:19, 107:9, 115:5, 121:14, 122:9, 127:24, 128:2, 128:24
**Update** [1] - 74:22
**Updated** [1] - 74:22
**updates** [1] - 112:20
**upward** [1] - 93:19
**urgency** [12] - 12:25, 17:1, 17:21, 18:15, 18:20, 18:24, 19:10, 19:17, 23:19, 24:1, 25:1, 46:3
**utmost** [1] - 23:11

## V

**vaguely** [1] - 93:2
**valuation** [12] - 85:2, 85:5, 85:24, 86:4, 86:12, 86:20, 87:2, 87:9, 95:4, 95:8, 96:19, 96:22
**value** [5] - 15:25, 39:15, 85:25, 86:9,

95:5
**values** [1] - 94:14
**variable** [1] - 71:2
**various** [1] - 43:5
**vary** [1] - 47:11
**version** [7] - 56:22, 57:19, 73:12, 100:13, 108:10, 110:10
**versions** [1] - 73:11
**versus** [2] - 38:11, 53:22
**Vicki** [1] - 95:22
**video** [1] - 14:9
**view** [6] - 52:6, 52:10, 92:4, 105:15, 123:23, 129:10
**vintage** [3] - 89:18, 89:19, 89:20
**vintages** [4] - 89:14, 89:15, 89:24, 90:2
**virtually** [1] - 10:2
**visited** [1] - 5:1
**visual** [6] - 14:10, 14:17, 14:23, 17:15, 19:7, 20:11
**voice** [1] - 6:7
**volatility** [1] - 28:6
**vote** [1] - 55:13

## W

**waiting** [1] - 115:10
**walk** [3] - 5:25, 19:22, 20:4
**Wanda** [1] - 8:18
**wants** [2] - 27:11, 117:9
**war** [1] - 36:23
**Washington** [1] - 53:22
**Watt** [1] - 55:8
**watt** [1] - 55:22
**watt's** [1] - 55:13
**ways** [2] - 111:20
**website** [2] - 58:20, 58:23
**week** [4] - 58:21, 75:11, 117:1, 118:17
**Wells** [1] - 125:8
**white** [2] - 123:1, 123:10
**whole** [2] - 58:12, 93:16
**widely** [1] - 46:16
**willing** [3] - 19:22, 20:4, 24:2
**Wind** [1] - 121:21
**wind** [9] - 119:14, 119:18, 120:5,

120:12, 120:14, 120:24, 121:3, 121:25, 122:3
**winding** [1] - 121:6
**wish** [1] - 131:13
**wit** [1] - 12:15
**withdraw** [2] - 113:25, 114:2
**witness** [15] - 20:17, 21:18, 21:19, 22:15, 23:17, 25:4, 34:19, 34:21, 76:12, 109:8, 113:25, 129:10, 130:3, 130:10
**witness's** [2] - 24:3, 114:2
**Witnesses** [1] - 3:3
**woman** [2] - 95:22
**won** [1] - 55:7
**word** [7] - 30:6, 43:4, 52:13, 89:14, 89:15, 111:25, 122:12
**words** [5] - 29:10, 42:7, 78:13, 106:7, 106:12
**works** [2] - 30:12, 81:22
**worried** [3] - 36:19, 51:13, 117:23
**worry** [2] - 41:24, 42:13
**worse** [3] - 30:13, 36:16, 84:11
**worst** [2] - 36:17, 36:20
**worth** [104] - 4:24, 6:12, 6:14, 6:15, 6:17, 8:2, 10:12, 10:13, 10:14, 26:8, 26:18, 33:24, 34:10, 35:3, 35:11, 35:17, 36:1, 36:11, 37:7, 37:12, 37:14, 38:10, 38:14, 39:14, 39:22, 39:24, 40:9, 40:12, 40:14, 40:18, 41:1, 41:2, 43:10, 43:12, 43:20, 43:24, 44:3, 44:6, 44:9, 44:13, 45:6, 49:17, 50:11, 57:9, 62:15, 63:6, 63:13, 64:7, 65:1, 65:6, 65:9, 65:15, 65:17, 65:21, 67:14, 67:20, 68:9, 68:13, 68:19, 69:9, 70:3, 70:7, 71:3, 75:12, 80:20, 87:7, 87:16, 87:21, 95:1, 95:5, 98:23, 99:15,

100:23, 101:3, 102:9, 109:11, 113:9, 113:15, 113:20, 114:18, 116:7, 116:12, 116:20, 116:22, 117:5, 117:16, 118:5, 118:8, 118:19, 120:23, 120:25, 121:18, 122:12, 123:6, 123:12, 123:20, 127:11, 127:18, 127:21, 128:1
**would've** [5] - 26:2, 27:1, 37:13, 38:14, 67:22
**wound** [1] - 123:2
**wrap** [1] - 17:24
**write** [13] - 36:10, 83:20, 83:22, 84:5, 84:14, 84:22, 87:5, 87:16, 87:21, 94:7, 99:6
**write-down** [5] - 83:22, 84:14, 84:22, 87:5, 94:7
**write-downs** [2] - 83:20, 84:5
**write-up** [2] - 84:14, 94:7
**writing** [5] - 39:12, 99:15, 104:12, 105:7, 105:19
**written** [14] - 11:9, 11:13, 15:3, 15:8, 15:9, 43:12, 43:18, 93:17, 104:8, 104:13, 104:23, 107:1, 113:8, 120:3
**wrote** [2] - 107:12, 120:8

## Y

**y'all** [2] - 131:18, 131:22
**year** [22] - 10:3, 12:25, 18:16, 19:18, 28:15, 29:20, 32:21, 33:17, 34:7, 34:11, 36:13, 37:12, 40:13, 48:10, 50:2, 76:23, 78:11, 78:18, 89:18, 114:19
**year-end** [1] - 10:3
**years** [31] - 13:6, 13:14, 25:13, 26:1, 26:4, 26:17, 26:22, 27:1, 27:11, 28:12, 29:18, 29:19, 29:22, 33:4, 33:5, 50:25,

53:18, 70:4, 73:2, 74:9, 75:7, 78:25, 79:1, 79:12, 82:17, 86:23, 89:8, 89:25, 90:10, 98:9
**years'** [1] - 73:1
**yesterday** [11] - 40:7, 56:10, 56:11, 57:8, 59:5, 61:9, 61:25, 67:1, 97:16, 114:16
**yesterday's** [1] - 12:13
**yield** [11] - 46:11, 46:12, 46:20, 47:1, 47:10, 47:12, 48:11, 48:12, 49:22, 49:23, 50:14
**yields** [1] - 47:6
**yourself** [3] - 47:20, 52:6, 66:7

## Z

**zero** [9] - 10:14, 49:3, 65:14, 65:21, 70:8, 86:10, 87:7, 87:9, 87:11