```
 1                   UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
 2

 3   * * * * * * * * * * * * * * *   )
     FAIRHOLME FUNDS, INC., et al.,  )   Civil Action
 4                                   )   No. 13-1053
                  Plaintiffs,        )
 5                                   )
        vs.                          )
 6                                   )
     FEDERAL HOUSING FINANCE AGENCY, )   Washington, D.C.
 7   et al.,                         )   August 9, 2023
                                     )   10:09 a.m.
 8                  Defendants.      )
                                     )
 9   * * * * * * * * * * * * * * *   )

10   IN RE:  FANNIE MAE/FREDDIE MAC  )
     SENIOR PREFERRED STOCK PURCHASE )   MC Case No. 13-1288
11   AGREEMENT CLASS ACTION LITIGATION )

12
                   TRANSCRIPT OF JURY TRIAL
13                 DAY 12 - MORNING SESSION
              BEFORE THE HONORABLE ROYCE C. LAMBERTH,
14              UNITED STATES SENIOR DISTRICT JUDGE

15

16   APPEARANCES:

17   FOR THE BERKLEY        VINCENT COLATRIANO, ESQ.
     PLAINTIFFS:            COOPER & KIRK, PLLC
18                         1523 New Hampshire Avenue, Northwest
                           Washington, D.C. 20036
19
     FOR THE CLASS          HAMISH P.M. HUME, ESQ.
20   PLAINTIFFS:            KENYA KHALELAH DAVIS, ESQ.
                           SAMUEL KAPLAN, ESQ.
21                         JESSICA MUGLER, ESQ.
                           BOIES, SCHILLER & FLEXNER, LLP
22                         1401 New York Avenue, Northwest
                           Washington, D.C. 20005
23
                           LEE D. RUDY, ESQ.
24                         GRANT GOODHART, ESQ.
                           KESSLER, TOPAZ, MELTZER & CHECK, LLP
25                         280 King of Prussia Road
                           Radnor, Pennsylvania 19087
```

```
 1     APPEARANCES, CONT'D:

 2     FOR THE CLASS          ROBERT F. KRAVETZ, ESQ.
       PLAINTIFFS:            ADAM H. WIERZBOWSKI, ESQ.
 3                            CAITLIN BOZMAN, ESQ.
                              BERNSTEIN, LITOWITZ, BERGER &
 4                              GROSSMAN, LLP
                              1251 Avenue of the Americas
 5                            New York, New York 10020

 6     FOR THE DEFENDANTS     ASIM VARMA, ESQ.
       FHFA, FANNIE MAE &     IAN HOFFMAN, ESQ.
 7     FREDDIE MAC:           DAVID BERGMAN, ESQ.
                              JONATHAN LOUIS STERN, ESQ.
 8                            STANTON JONES, ESQ.
                              ARNOLD & PORTER KAYE SCHOLER
 9                            601 Massachusetts Avenue, Northwest
                              Washington, D.C. 20001
10
       REPORTED BY:          LISA EDWARDS, RDR, CRR
11                           Official Court Reporter
                             United States District Court for the
12                             District of Columbia
                             333 Constitution Avenue, Northwest
13                           Room 6706
                             Washington, D.C. 20001
14                           (202) 354-3269

15

16

17

18

19

20

21

22

23

24

25
```

I N D E X

|  | Direct | Cross | Red. |
|---|---|---|---|

WITNESSES FOR THE DEFENSE:

Edward DeMarco                                    2512        2555


EXHIBITS RECEIVED IN EVIDENCE                                 PAGE

Defendants' Exhibit No. 338                                  2563

Defendants' Exhibit No. 293                                  2585

Defendants' Exhibit No. 928                                  2607

                THE COURTROOM DEPUTY:  This is Civil Action

```
1    13-1053, with related Miscellaneous Case 13-1288, In Re:

2    Fannie Mae/Freddie Mac Senior Preferred Stock Purchase

3    Agreement Class Action Litigations.

4              Ready for the jurors?

5              THE COURT:  Yes.

6              Good morning, counsel.

7              MR. HUME:  Good morning, your Honor.

8              MR. STERN:  Good morning, your Honor.

9              (Mr. DeMarco retakes the witness stand.)

10             THE COURT:  Good morning, Mr. DeMarco.

11             MR. DeMARCO:  Good morning, your Honor.

12             THE COURTROOM DEPUTY:  Jury panel.

13             (Whereupon, the jury entered the courtroom at

14   10:10 a.m. and the following proceedings were had:)

15             THE COURT:  You may be seated.

16             Good morning, ladies and gentlemen.

17             THE JURY:  Good morning.

18             THE COURT:  Mr. DeMarco has resumed the stand.

19             I'll remind you you're still under oath.

20             Mr. Hume, you may proceed with your

21   cross-examination.

22             MR. HUME:  Thank you, your Honor.

23             Good morning, Judge Lamberth.

24

25        (EDWARD DeMARCO, DEFENSE WITNESS, PREVIOUSLY SWORN.)
```

```
 1              CONTINUED CROSS-EXAMINATION
 2   BY MR. HUME:
 3   Q.  Good morning, Mr. DeMarco.
 4   A.  Good morning, Mr. Hume.
 5           MR. HUME:  Members of the jury, good morning.
 6   BY MR. HUME:
 7   Q.  I think yesterday your counsel showed you a number of
 8   documents with different projections and scenarios for what
 9   could happen.
10           Do you recall that, generally?
11   A.  Generally, yes.  We looked at a number of things.
12   Q.  Would you agree with me that the single biggest driver
13   of which path you go down, which scenario happens, is home
14   prices for Fannie Mae and Freddie Mac?
15   A.  The single biggest?  Yes.  I think in those projections,
16   house prices are -- they're certainly a significant factor.
17   Q.  Well, would you agree that, just to be clear, that if
18   home prices go up, then Fannie Mae and Freddie Mac are more
19   likely to have one of the positive projections turn out to
20   be the case?  Correct?
21   A.  Other things equal, Mr. Hume, yes.  As home prices go
22   up, that improves the credit outlook for Fannie Mae and
23   Freddie Mac.
24   Q.  And would you agree that which projection comes out to
25   be true or which path you go down is principally driven by
```

1    home prices?

2    A.  You're asking a technical question that requires

3    measurement and analysis that I don't have, Mr. Hume, in

4    front of me.

5           I am saying, yes, house prices are a significant

6    variable.

7    Q.  Okay.

8    A.  Unemployment is a significant variable, and so forth.

9    Q.  I understand.  I may not be --

10          MR. HUME:  Can I just show very quickly,

11   Ms. McGuire, a prior proceeding transcript, Page 824,

12   Page 22, through Page 825, Line 8 -- I'm sorry -- 824, Line

13   22, through 825, Line 8.

14   BY MR. HUME:

15   Q.  I just want to confirm, on Line 22, you were asked, I

16   think, by Mr. Stern:  "So this is being produced in '11, so

17   it's saying the next three years, 2012, 2013 and 2014, these

18   are the financial projections of how much would need to be

19   drawn from the Treasury Department under these particular

20   paths."

21          And you say:  "Maybe -- if I would, Mr. Stern,

22   just for greater clarification, seeing the words here, that

23   the particular paths are driven principally by house prices.

24   Are house prices going up like this or are they like that or

25   are they going down?  The paths are driven principally by

1     the path of house prices."

2              That was truthful and accurate testimony.

3     Correct?

4     A.  Yes, it was, Mr. Hume.

5     Q.  Okay.

6     A.  Mr. Hume, I really do need to point out, that answer

7     that you put up was about specific projections, a specific

8     set of things where the modeling assumption was based on

9     house prices.  You asked me a much more general question

10    about the credit outlook or credit performance and what was

11    a key variable.

12              I believe I've answered truthfully in both cases.

13    And the answers are appropriate.

14    Q.  Okay.  I appreciate that clarification.  I

15    wasn't appreciating the distinction, but I appreciate the

16    clarification.

17              You were shown --

18              MR. HUME:  If we could pull up DX-404,

19    Ms. McGuire.

20    BY MR. HUME:

21    Q.  You were shown this yesterday by Mr. Stern.  And on the

22    second page, I think you said these are your handwritten

23    notes.

24              Do you recall that?

25    A.  Yes.

1    Q.  And these would have been before the meeting with

2    Treasury on -- on or around March 7, 2012?

3    A.  Yes.  I said that's how it appears.

4    Q.  On No. 1, it says the word Transition.  Is that what --

5    am I reading that correctly?

6    A.  Yes.

7    Q.  Do you have a recollection of what you meant by that?

8    A.  Not specifically.  But I can say that, you know, at this

9    time, there was discussions going on about housing finance

10   reform and the paths that that could take.

11   Q.  Okay.

12              MR. HUME:  If we could look at No. 2.

13   BY MR. HUME:

14   Q.  You were shown this yesterday.  Under PSPA, the net

15   worth sweep is referenced.  Correct?

16   A.  Yes.

17   Q.  You said that yesterday.

18              And then under the next bullet, it says

19   Operational Covenants Within Strategic Plan.  Is that what

20   that says?

21   A.  Yes, it does.

22   Q.  And then the third bullet below that, am I reading it

23   correctly that that says Options For How to Wind Down F/F?

24   A.  Yes.

25   Q.  And.  F/F would be Fannie and Freddie.  Correct?

```
1    A.  Yes.
2              MR. HUME:  You can put that down, Ms. McGuire.
3    BY MR. HUME:
4    Q.  Now, am I also correct, Mr. DeMarco, that your
5    understanding is that in order to wind down and replace
6    Fannie Mae and Freddie Mac requires congressional action.
7    Correct?
8    A.  Yes.
9    Q.  Now, Mr. Ugoletti was your special advisor in 2012 at
10   the time of the net worth sweep.  Is that correct?
11   A.  Yes.
12   Q.  And he was also your point person on negotiations with
13   the Treasury over the third amendment and the net worth
14   sweep.  Correct?
15   A.  That's correct.
16   Q.  And had you worked with Mr. Ugoletti when you were both
17   at the Treasury Department?
18   A.  Yes, I had.
19   Q.  And what were the years -- you said yesterday the years
20   you were there.  But what were the years you were at
21   Treasury and Mr. Ugoletti was also there, that you were
22   there together?  If you recall.
23   A.  It's going to be 1995 or 1996 that Mr. Ugoletti joined
24   the Treasury Department.  I joined it in early 1994.
25   Q.  Then you were both there together for -- until when?
```

1    A.  Until I left the Treasury Department in 2003.

2    Q.  And did you work together at the Treasury Department

3    when you were there?

4    A.  Yes, we did.

5    Q.  And you brought Mr. Ugoletti to FHFA after you became

6    acting director; is that correct?

7    A.  That's correct.

8    Q.  And do you recall that for part of the time that

9    Mr. Ugoletti was at FHFA after you brought him over, he was

10   also detailed back to the Treasury Department and sort of

11   split his time between the two places?

12   A.  That's correct.

13   Q.  Ultimately, though, it was your decision, your decision

14   alone, to make the decision to enter the net worth sweep on

15   behalf of FHFA.  Correct?

16   A.  Yes, it was.

17   Q.  Now, for I think -- there was some documents yesterday

18   with the name Timothy Bowler.  I think that's -- am I

19   pronouncing his name correctly?

20   A.  Yes, you are.

21   Q.  And you remember Mr. Bowler?

22   A.  Yes, I do.

23   Q.  And is it fair to say that Mr. Bowler was the point

24   person for Treasury in the net worth sweep discussions?

25   A.  In terms of who paired off with Mario to lead that, yes.

1    Q.  He was sort of Mario Ugoletti's counterpart at Treasury?

2    A.  Yes.

3    Q.  So he was one of the also -- one of the principal

4    officials at Treasury that you would interact with when you

5    interacted with them.  Is that correct?

6    A.  I would say that Mr. Ugoletti interacted with Mr. Bowler

7    directly more than I did.  I would tend to interact more

8    with the undersecretary than with the secretary.  But I

9    certainly had meetings at which Mr. Bowler was part.

10   Q.  Okay.  Well, just so the record is clear --

11            MR. HUME:  Could we pull up the 2020 deposition

12   transcript, Page 178, Line 17, through Page 179, Line 1?

13   Sorry.  This is one of those over-the-page ones.  It's a

14   little harder.

15            Thank you, Ms. McGuire.  So 178, Line 17, to 179,

16   1.

17   BY MR. HUME:

18   Q.  Here, Mr. DeMarco was -- this is in your 2020

19   deposition.  Do you remember that deposition?

20   A.  I do.

21   Q.  The question was:  "And who else at Treasury did you

22   have occasion to interact with on the issue of the net worth

23   sweep?

24            "Answer:  The Treasury secretary, Mary Miller, Tim

25   Bowler would be the -- would be the principal officials at

DeMarco - CROSS - By Mr. Hume

1      Treasury that I would be interacting with."

2              Do you see that?

3      A.  Yes, I do.

4      Q.  And that was truthful and accurate testimony.  Correct?

5      A.  Yes, it was.

6      Q.  Now I'd like to pull up PX-640, which is a provision

7      from HERA, the statute, which you're familiar with.

8      Correct?

9      A.  Yes.

10     Q.  And you remember that there is a provision in HERA that

11     gives the Treasury Department authority --

12              MR. HUME:  Maybe, Ms. McGuire, if we could just

13     pull up -- highlight the title to A first.

14     BY MR. HUME:

15     Q.  Do you recall it gives -- that HERA has a provision that

16     authorizes the Treasury Department to purchase -- this may

17     be the wrong one -- to purchase securities in Fannie Mae and

18     Freddie Mac, to purchase stock?

19              MR. STERN:  Your Honor, I'd object on a number of

20     grounds.  Can we go to the phones?

21              (Whereupon, the following proceedings were had at

22     sidebar outside the presence of the jury:)

23              MR. STERN:  Your Honor, I don't believe that this

24     provision -- I guess my first objection is, this appears to

25     be headed towards asking Mr. DeMarco to opine or testify

1    about a statute and the meaning of a statute.  And I'd

2    object on that ground because it will be calling -- call for

3    having him draw a legal conclusion.

4            Second, this particular provision of HERA I don't

5    believe has been admitted into evidence.  And I see that, at

6    least on this page, the effective date is July 22nd, 2010.

7    I presume that the significance of that is that there are

8    provisions of HERA that have been changed since its original

9    passage.

10           And I just don't know enough about what Mr. Hume

11   is about to ask to know whether it's appropriate, even were

12   Mr. DeMarco a competent witness, to comment on it, which we

13   respectfully submit he's not.

14           MR. HUME:  Your Honor, this is Mr. Hume.

15           The provision I'm going to ask about is, first

16   off, simply Mr. DeMarco's understanding of Treasury's -- of

17   what Congress said about Treasury's -- the considerations

18   Treasury should take into account when exercising its

19   authority to buy stock at Fannie Mae and Freddie Mac.  It's

20   two provisions.  They're right together.  It's very simple.

21           So just his understanding of that, because it's

22   relevant to the PSPA; and those provisions that I'm going to

23   show were in the original HERA statute.  We can show this

24   not to the jury, but only the witness.  And it's really just

25   one question:  Were you aware of this?

```
 1              MR. STERN:  Well, your Honor, his --

 2              I'm sorry, Mr. Hume.  I don't know if you're done.

 3              MR. HUME:  No.  I think that's it.

 4              MR. STERN:  Your Honor, Mr. DeMarco's

 5      understanding, to ask him his understanding of what a

 6      statute means, is to ask him to opine, essentially, on the

 7      meaning of a legal statute that he's not in a position to

 8      comment on in a way that would be relevant for the jury.

 9              MR. HUME:  Your Honor, if I could just say, the

10      screen now shows the provision I'm going to ask about.  And

11      there was an exceptional amount of testimony on direct about

12      his understanding of HERA.  So I think it's fair to ask one

13      question about his understanding of HERA's provisions of

14      what Treasury should consider because he was negotiating

15      with Treasury.

16              THE COURT:  The objection is overruled.

17              (Whereupon, the following proceedings were had in

18      open court:)

19      BY MR. HUME:

20      Q.  Mr. DeMarco, to make this a little easier, we've put a

21      slide on the screen that I think you can see a provision

22      from HERA, the Housing and Economic Recovery Act.

23              Do you see that?

24      A.  Yes.

25      Q.  And really all I wanted to ask, Mr. DeMarco -- let's
```

1      just first look at it together.  Then I have one question.

2              It says -- there's a section here that says

3      Considerations.

4              Do you see that?

5      A.  Yes, I do.

6      Q.  And it says, "To protect the taxpayers, the secretary of

7      the Treasury shall take into consideration the following in

8      connection with exercising the authority contained in this

9      paragraph."

10             Do you see that?

11     A.  Yes, I do.

12     Q.  Now, if I may approach, I can show you the paragraph

13     unless you're familiar with the paragraph that relates to

14     Treasury's ability to buy stock in Fannie Mae and Freddie

15     Mac.  Are you generally familiar with that?

16     A.  I'm familiar that HERA allowed for the purchase of

17     securities of Fannie and Freddie by Treasury.  I have not

18     looked at the exact full text of this in many years,

19     Mr. Hume.

20     Q.  No.  I understand that.

21             The question is, this says, "Among the

22     considerations Treasury should take into account are..."

23             And romanette (iii):  "The corporation's plan for

24     the orderly resumption of private market funding of capital

25     market access."

1           Do you see that?

2    A.  Yes, I do.

3    Q.  And then in romanette (v) -- we've obviously pulled out

4    provisions; we're not showing everything, which we do have:

5    "The need to maintain the corporation's status as a private

6    shareholder company."

7           Do you see that?

8    A.  Yes, I do.

9    Q.  So my simple question is:  When you were discussing the

10   third amendment to the PSPA, were you generally aware that

11   Congress had told Treasury that when exercising its

12   authority to buy stock in Fannie Mae and Freddie Mac, it

13   should take into account various considerations, including

14   the need to maintain the corporation's status as a private

15   shareholder company?

16   A.  I don't recall whether I was generally aware about that

17   direction to the Treasury.  But I know that's how I was

18   operating as the acting director and the conservator.

19           MR. HUME:  You can take that down, Ms. McGuire.

20   Thank you.

21   BY MR. HUME:

22   Q.  Now, FHFA placed Fannie Mae and Freddie Mac into

23   conservatorship.  Am I correct that FHFA essentially fired

24   the existing board of directors at both companies and most

25   of the senior management?

1    A.  I would not speak quite so broadly, Mr. Hume, no.

2    Q.  Okay.  I mean, please, in your own words, say -- there

3    was a change in management.  Correct?

4    A.  At the time we appointed the FHFA as conservator, we

5    replaced the majority of board members on each board.  We

6    did not replace the entire board.  There were a couple

7    carryovers.

8            We replaced the CEOs of each company.  But at the

9    time the conservatorship was announced, those were the only

10   executive management changes that took place at that time.

11   Subsequently, of course, there were a number of executive

12   officials that either left or were asked to leave.

13   Q.  Okay.  And were you personally involved as acting

14   director in either recruiting or approving the hiring of

15   some of the senior executives at Fannie Mae and Freddie Mac?

16   A.  Some of -- no.  Yeah.  I'm sorry.  Directly, the CEOs.

17   Q.  Were you -- did you meet with Susan McFarland when she

18   was being recruited to be hired as the chief financial

19   officer?  Do you recall that?

20   A.  I don't recall.

21   Q.  Okay.

22            MR. HUME:  Could we quickly pull up PX-500.

23   BY MR. HUME:

24   Q.  We looked at this yesterday, Mr. DeMarco.  This is your

25   letter about principal reduction.  Do you recall?

1    A.  This is a letter about principal reduction.  Yes.

2    Q.  I think you still have a hard copy next to you.  Very

3    quickly, I just wanted to --

4              MR. HUME:  If we could go to Page 4 of the

5    document.

6    BY MR. HUME:

7    Q.  You see it's a 23-page document.  Correct?

8    A.  Yes.

9    Q.  Sorry.  Now I've made you juggle between the hard copy

10   and the screen.  Whichever you prefer.

11             On Page 4, at the top, it says, "Analysis provided

12   to Acting Director DeMarco in December 2010."

13             Do you see that?

14   A.  I do.

15   Q.  Okay.  And then there's a couple of pages of that

16   analysis.  But at Page 5, I just wanted to call out one

17   paragraph where it says Approach.

18             Do you see that?

19   A.  Yes.

20   Q.  And I just wanted to make sure one or two things are

21   clear here.

22             It says under -- after Approach, it says, "To

23   ensure that the agency was assessing the implementation of

24   principal reduction from a variety of perspectives, the

25   evaluation team was composed of senior staff from several

1    offices, including financial analysis, policy analysis and

2    research, credit risk, accounting, capital supervision,

3    enterprise regulation, conservatorship operations, housing

4    and community investment and congressional affairs and

5    communications."

6            Do you see that?

7    A.  Yes, I do.

8    Q.  And I just wanted to make sure it was clear.  Are those

9    all different offices or departments of the FHFA?

10   A.  Yes.

11   Q.  And then the next paragraph says, "The team began with a

12   comprehensive review of information provided to the agency

13   by Fannie Mae and Freddie Mac as well as discussions with

14   the two enterprises."

15           Do you see that?

16   A.  Yes, I do.

17   Q.  So there were discussions with Fannie Mae and Freddie

18   Mac about whether to do principal reduction?

19   A.  Yes.

20           MR. HUME:  You can take that down, Ms. McGuire.

21           THE WITNESS:  I'm sorry.  Let me -- there were

22   discussions with people at Fannie Mae and Freddie Mac about

23   principal reduction, including getting their intake on how

24   they did -- the decision was FHFA's.

25

1    BY MR. HUME:

2    Q.  Thank you.

3          MR. HUME:  Could you please pull up Slide 28,

4    Ms. McGuire?

5    BY MR. HUME:

6    Q.  I just wanted to go through a few people and make sure

7    it's clear who they are and whether they were consulted --

8    whether you discussed with them whether or not to do the net

9    worth sweep.

10         The first one, I believe, is a woman named Naa

11   Awaa Tagoe.  Oh, I have the clicker here.  I'm sorry.  Do

12   you see the picture here of Naa -- I hope I'm pronouncing

13   her name correctly -- Naa Awaa Tagoe?

14   A.  Naa Awaa Tagoe, yes.

15   Q.  Could you briefly explain who she is?

16   A.  So she headed FHFA's financial modeling and analysis

17   group.

18   Q.  Am I correct you did not discuss with her whether or not

19   to enter into the net worth sweep?

20   A.  I don't have an immediate recollection of having a

21   discussion with Ms. Tagoe about this.  The work that she and

22   her office did was important in forming my perspective on

23   what was going on with the conservatorships.

24   Q.  She would be -- it was her office that did the annual

25   scenario -- I don't know whether to call them projections or

1    something else -- but an annual financial model of various

2    what-if scenarios.  Correct?

3    A.  Yes.  Yes.

4    Q.  And she had done -- they had produced one in October

5    2011?

6    A.  That's correct.

7    Q.  And they produced another one in October 2012.  Correct?

8    A.  Yes.

9    Q.  Okay.

10   A.  Yes.  I believe they should have.  Yes.

11   Q.  You didn't ask her office to do an updated one before

12   agreeing to the net worth sweep.  Correct?

13   A.  No, I did not.

14   Q.  And just a "yes" or "no" answer:  Do you understand that

15   she only learned about the net worth sweep when it was

16   announced publicly?

17   A.  No.

18   Q.  You don't know one way or the other?

19   A.  I don't know one way or the other.

20   Q.  Now, Mr. Mayopoulos was at the time of the net worth

21   sweep the chief executive officer of Fannie Mae.  Correct?

22   A.  That's correct.

23   Q.  Had you helped to recruit him to come and be CEO of

24   Fannie Mae?

25   A.  He was already the general counsel of Fannie Mae when he

 1   was elevated to be CEO.  I was part of the final review

 2   process of the final applicants and involved in the

 3   determination to select Mr. Mayopoulos.

 4   Q.  You were the acting director.  So you would have had to

 5   approve the decision to make him CEO.  Correct?

 6   A.  That's correct.

 7   Q.  And are you aware of the fact that -- I'll withdraw

 8   that.  Let's just go through a little quicker.

 9           Am I correct you did not discuss whether or not to

10   enter the net worth sweep with Mr. Mayopoulos?

11   A.  I'm sorry.  Would you repeat that, Mr. Hume?

12   Q.  Sure.

13           Am I correct that you did not discuss whether or

14   not you should agree to the net worth sweep with

15   Mr. Mayopoulos?

16   A.  That's correct.

17   Q.  Now, you remember Mr. Layton, the chief executive

18   officer of Freddie Mac?

19   A.  Yes.  I remember him.

20   Q.  And did you have a role in helping to approve or recruit

21   him to be CEO?

22   A.  Yes, I did.

23   Q.  What was that role?

24   A.  Same as with Mr. Mayopoulos.  The board went through its

25   process.  We produced a list of final candidates.  I was

1    involved in interviewing him and approving the selection.

2    Q.  And am I correct you did not discuss with Mr. Layton

3    whether or not to agree to the net worth sweep?

4    A.  That is correct.

5    Q.  And Mr. Kari was the chief financial officer of Freddie

6    Mac.  Correct?

7    A.  Correct.

8    Q.  And am I correct you didn't discuss with him whether or

9    not to agree to the net worth sweep?

10   A.  That's correct.

11   Q.  There's two more.

12          And we talked about -- do you remember Susan

13   McFarland, the chief financial officer of Fannie Mae?  Do

14   you recall her?

15   A.  Yes.

16   Q.  And you didn't discuss with Ms. McFarland whether or not

17   to agree to the net worth sweep?

18   A.  I did not.

19   Q.  And you know Mr. Benson.  Correct?

20   A.  Yes.

21   Q.  Mr. Benson at the time -- I think you said you didn't

22   remember.  But at the time, does it sound correct to say he

23   was the senior executive vice president of Fannie Mae at the

24   time of the net worth sweep?

25   A.  That would sound -- that could certainly be correct.

DeMarco - CROSS - By Mr. Hume

 1    Yes.

 2    Q.  And currently, he's the president of Fannie Mae.

 3    Correct?

 4    A.  I believe he is.

 5    Q.  And you didn't discuss whether or not to do the net

 6    worth sweep with Mr. Benson.  Correct?

 7    A.  No, I did not.

 8    Q.  Thank you.

 9          Now, isn't one of the reasons that you didn't

10    consider some of the financial projections from Fannie Mae

11    and Freddie Mac that you had your own plans for what was

12    going to be happening with Fannie Mae and Freddie Mac that

13    they were not taking into account?

14    A.  Yes.  I had put out a strategic plan in February of 2012

15    that laid out the direction we were going.  But it is more

16    than that, Mr. Hume.  I mean, that was an important part of

17    it -- right? -- that we were, you know, outlining the

18    direction we were going to go in conservatorship.

19          But you asked, if I understood your question

20    correctly -- you asked it in the context of projections and,

21    you know, why we didn't do that.

22          And it's because we're looking out for, as I've

23    talked multiple times sitting here, looking at a very

24    long-term scenario where I've got to ensure that the

25    Treasury's commitment is going to be sustainable in all

1    kinds of, you know, potential and unforeseen market outcomes

2    in both the near term and in the long term, of which my

3    plans in terms the strategic plan was certainly an

4    important consideration in all that.

5    Q.   Okay.  Mr. DeMarco, my question is very simple.  Let's

6    make sure --

7              MR. HUME:  Can we pull up the 2020 deposition

8    transcript, Page 113, Lines 3 to 12.  This one doesn't go

9    over a page.  113, Lines 3 to 12.

10             Thank you, Ms. McGuire.

11   BY MR. HUME:

12   Q.   And in this deposition, you were asked, Mr. DeMarco,

13   Question:  "I believe in your prior deposition, when" --

14   you've had more than one deposition, haven't you?

15   A.   Yes, sir.

16   Q.   The question was:  "I believe in your prior deposition,

17   when shown a lot of company projections, which were much

18   more favorable in -- in 2012 than prior years, one of your

19   responses was in not considering those projections the fact

20   that the companies didn't really know the plans you had and

21   weren't accounting for that.  Is that correct?"

22             Answer:  "Yes."

23             Is that truthful and accurate testimony,

24   Mr. DeMarco?

25   A.   Yes; and consistent with what I just said.

1    Q.  Okay.  Is it also true that your plans that are

2    referenced in this answer were themselves uncertain, that

3    they faced uncertainty as to whether they would happen?

4    A.  Yes.

5            MR. HUME:  You can take that down, Ms. McGuire.

6    Thank you.

7    BY MR. HUME:

8    Q.  You were asked a question, I think, in direct

9    examination about a Deutsche Bank analyst report.  Do you

10   recall that?

11   A.  I don't recall the particulars of the exchange on it,

12   Mr. Hume, but I recall that there was a Deutsche Bank --

13           MR. HUME:  Well, let's briefly pull up DX-412.

14   BY MR. HUME:

15   Q.  Do you see the cover email from Mr. Ugoletti says, "A

16   reasonable summary; I am noting as your appearance in

17   New York is listed right before this piece"?  Do you see

18   that?

19   A.  Yes, I do.

20   Q.  Do you recall that sometimes you would appear on panels

21   with some of the -- with people; and you'd -- the fact that

22   you'd be appearing on panels would be referenced in these

23   analyst reports?  Correct?

24   A.  Appear on panels or speaking solo, which I believe was

25   the case here.

```
 1    Q.  And my question -- and then the next page --

 2              MR. HUME:  Ms. McGuire, if we could show it --

 3    BY MR. HUME:

 4    Q.  -- do you see it's something from Deutsche Bank?  Do you

 5    see that?

 6    A.  Yes.

 7    Q.  Okay.  And were you -- first of all, this is March 2012.

 8    Correct?

 9    A.  Yes.

10    Q.  So that's before the financial results for either the

11    first quarter or the second quarter were either known or

12    publicly released.  Correct?

13    A.  That's correct.

14    Q.  Now, were you aware that these analysts reports had

15    disclaimers because of the conflict of interest faced by, in

16    this case, Deutsche Bank?

17    A.  No.

18    Q.  Okay.

19              MR. HUME:  Could we --

20    BY MR. HUME:

21    Q.  Were you aware -- do you see here on the screen, it

22    says, "Deutsche Bank does and seeks to do business with

23    companies covered in its research reports.  Thus, investors

24    should be aware that the firm may have a conflict of

25    interest that could affect the objectivity of this report."
```

```
 1                    Do you see that?

 2   A.  Yes, I do.

 3   Q.  And were you generally aware that Deutsche Bank itself

 4   could have a significant position holding Fannie or Freddie

 5   bonds or mortgage-backed securities?

 6   A.  Yes.

 7   Q.  And were you generally aware that the banks who send out

 8   these analyst reports make money, make profits, when people

 9   engage in trades because they make commissions on those

10   trades?  Correct?

11   A.  Yes.

12   Q.  Okay.

13            MR. HUME:  You can put that down, Ms. McGuire.

14   BY MR. HUME:

15   Q.  Now, on mortgage-backed securities, I want to just

16   briefly show you two excerpts from the annual reports.  FHFA

17   would submit annual reports to Congress about Fannie Mae and

18   Freddie Mac.  Correct?

19   A.  Yes.

20   Q.  Okay.  I'd like to show you PX-388-A and PX-646-A.

21   That's the 2011 and 2012 annual reports that FHFA submitted

22   to Congress.

23            MR. HUME:  Can we pull those up?  I think these

24   are not yet in evidence.  Please don't display those to the

25   jury.
```

1    BY MR. HUME:

2    Q.  There's the cover page.  Do you recognize those two

3    documents as what the cover page would look like for these

4    annual reports?

5    A.  Yes.

6    Q.  I'd like to show you page -- a table found on Page 5 of

7    each report.

8    A.  I'm sorry, Mr. Hume.  Before you show me this, would you

9    indulge me to remind me the dates that these things were

10   finalized?

11   Q.  Sure.

12          MR. HUME:  Can we go back to the first page?

13   BY MR. HUME:

14   Q.  I'm assuming that -- I don't know if the date is on the

15   next page, but I'm assuming since it's an annual report the

16   2011 one is done in early 2012.  There it is.  June the

17   following year.  So the 2011 report --

18   A.  Thank you.

19   Q.  -- would be June of 2012.  The 2012 report would be

20   submitted June of 2013.

21          Do you see that?

22   A.  I do.  Thank you.

23   Q.  Okay.  So -- and I understand that you would only

24   know -- there's some information in both reports you would

25   know in August 2012 and some information in the 2012 report

1    you wouldn't know.  I understand that.  I'm going to point

2    that out.

3              Do you understand that?

4    A.  Yes.

5              MR. HUME:  If we could go to Page 5.

6    BY MR. HUME:

7    Q.  This is comparing -- do you understand these two charts

8    to be comparing --

9              MR. STERN:  Your Honor, before Mr. Hume refers to

10   the document, we have an objection if it's going to be moved

11   in.

12             MR. HUME:  Well, we do want to move it into

13   evidence.  These are FHFA -- we can discuss it on the

14   phones.  So I'll move it into evidence now.

15             (Whereupon, the following proceedings were had at

16   sidebar outside the presence of the jury:)

17             MR. STERN:  Your Honor, thank you.

18             We object to this document.  I'm going to ask the

19   Court's indulgence, your Honor.  Part of our objection

20   relates to an issue that came up earlier in the case that

21   Mr. -- that's in Mr. Hoffman's portfolio.  And I would ask

22   the Court's indulgence to have Mr. Hoffman argue this

23   objection.

24             THE COURT:  All right.

25             MR. HOFFMAN:  Thank you, your Honor.  Ian Hoffman

1     on behalf of Defendants.

2              So one of these two exhibits -- we object to both.

3     One of the two of them, Plaintiffs' Exhibit 646-A, was

4     served yesterday, Judge, for the first time.  The disclosure

5     deadline for exhibits was in April.

6              And as Mr. Rudy stood up and objected, and the

7     Court sustained the objection, to our putting in one

8     additional snippet of deposition testimony, the argument and

9     objection was that it was due four months ago.  And that

10    objection was sustained.

11             Now Plaintiffs have sought to introduce this

12    yesterday.  And we object on related timeliness grounds.

13             There's an additional problem with this document,

14    your Honor.  The same data that is being highlighted here

15    was part of Dr. Dharan's supplemental report that this Court

16    also excluded in June as unwarranted and untimely.

17             And so this is clearly an attempt to just get in

18    the same expert evidence and have their expert talk about

19    it.

20             Your Honor, that's -- 646-A is the one that was

21    disclosed yesterday.

22             388-A was also disclosed yesterday.  But, your

23    Honor, to be totally fair and transparent, Plaintiffs'

24    Exhibit 388 without the A has been on Plaintiffs' exhibit

25    list, so the timeliness objection does not apply to the full

1    exhibit and so it also obviously wouldn't apply to an

2    excerpt.

3              But again, we think that this is irrelevant and

4    prejudicial in that they are trying to just bolster their

5    expert evidence that the Court already has rejected.

6              And it's also just very far afield, your Honor.

7    So 646-A:  402, 403 and most significantly the fact that it

8    was disclosed yesterday.

9              And 388:  On the same 402 and 403 grounds,

10   including as it relates to their attempt to supplement their

11   expert testimony that was denied.

12             MR. HUME:  Judge Lamberth, briefly.

13             The fact that it was in the supplemental expert

14   report actually addresses the timeliness issue.

15             Expert opinion is one thing.  A fact in a document

16   from FHFA is quite another.  And that's all this is.  It is

17   hardly far afield.  It is showing the level of purchases of

18   mortgage-backed securities, a $4 trillion market that

19   Defendants say is what they were worried about that drove

20   them to the net worth sweep.

21             What this shows is the purchases were going up.

22   Purchases of mortgage-backed securities were going up.

23             Now, in an abundance of caution -- you know, we

24   put a lot of things in that supplemental report that we

25   think our expert could have testified about.  But what he's

1    allowed to say, what the expert's allowed to say, is a

2    different issue than right now.

3                    MR. HOFFMAN:  Your Honor, Ian Hoffman again.

4                    MR. HUME:  I'm sorry.  I wasn't finished.

5                    MR. HOFFMAN:  I'm sorry, Mr. Hume.

6                    MR. HUME:  And so the other point I would make on

7    timeliness is that it does not apply when you are showing a

8    document for impeachment and the whole purpose of

9    Mr. DeMarco's -- the thrust of his testimony on direct was

10   that he was trying to protect the mortgage-backed securities

11   markets.  And this is showing that there was robust positive

12   activity in that market.

13                   So thank you.

14                   You may speak now.

15                   MR. HOFFMAN:  Your Honor, Ian Hoffman again.

16                   I didn't hear any response or any dispute that

17   Plaintiffs' Exhibit 646 was disclosed yesterday and is

18   untimely.

19                   The only response I heard was that this was part

20   of Dr. Dharan's supplemental report, which was served also

21   months ago, and it still wasn't on their exhibit list.  It's

22   late.

23                   THE COURT:  The objection to 646-A is sustained.

24                   You can use the other exhibit.  Not the table.

25   Not the second one that was not disclosed until yesterday.

```
 1              (Whereupon, the following proceedings were had in
 2      open court:)
 3              MR. HUME:  Ms. McGuire, you can take down the
 4      slide, please.  Thank you.
 5      BY MR. HUME:
 6      Q.  Mr. DeMarco, were you generally aware in August 2012
 7      that the level of purchase activity for mortgage-backed
 8      securities issued by Fannie Mae and Freddie Mac was going
 9      up?  A higher volume of mortgage-backed securities being
10      purchased than had been the case a year earlier?
11      A.  Yes.
12      Q.  I'd like to now -- I think on direct examination, you
13      said something about the certificates of designation related
14      to the preferred stock purchase agreement.
15              Do you recall that?
16      A.  Yes.  We discussed that.
17      Q.  And I think you discussed how it provided for the
18      dividend if it's paid in cash to be at 10 percent.
19              Do you recall that?
20      A.  Yes.
21      Q.  And I think you said something about how if the dividend
22      was not paid in cash at 10 percent, it would accrue to the
23      liquidation preference and then the rate would go to 12
24      percent.
25              Do you recall that?
```

DeMarco - CROSS - By Mr. Hume

1    A.  I recall we discussed that paragraph, yes, that that's

2    what it provides.

3    Q.  Okay.

4           MR. HUME:  And if I could just ask Ms. McGuire to

5    put up PX-33.

6    BY MR. HUME:

7    Q.  Do you recognize this, Mr. DeMarco, as the certificate

8    of designation for the senior preferred stock that was

9    issued to Treasury?

10   A.  Yes.

11          MR. HUME:  And if we could briefly show Paragraphs

12   2-A and 2-B.

13   BY MR. HUME:

14   Q.  Do you see Paragraph 2 is called Dividends?

15   A.  Yes.

16   Q.  And you see that under A, it says, "For each dividend

17   period from the date of the initial issuance of the senior

18   preferred stock, holders of outstanding shares of senior

19   preferred stock shall be entitled to receive, ratably, when,

20   as and if declared by the board of directors, in its sole

21   discretion, out of funds legally available therefor,

22   cumulative cash dividends."

23          Do you see that?

24   A.  Yes, I do.

25   Q.  Do you see that B then says, in Paragraph 2-B, that "To

1   the extent not paid pursuant to Section 2-A above, dividends

2   on the senior preferred stock shall accrue and shall be

3   added to the liquidation preference pursuant to Section 8,

4   whether or not there are funds legally available for the

5   payment of such dividends and whether or not dividends are

6   declared."

7           Do you see that?

8   A.  Yes, I do.

9   Q.  Let's quickly look at what Section 8 says about that.

10          Section 8 is entitled Liquidation Rights and

11  Preference.  Do you see that?

12  A.  Yes, I do.

13  Q.  And Subparagraph B says, "Liquidation preference shall

14  initially mean $1,000 per share."

15          Do you see that?

16  A.  Yes, I do.

17  Q.  And there were a million shares, correct?

18  A.  I believe that's right.  Yes.

19  Q.  So that's the billion?  The initial billion is that they

20  were worth -- 1,000 times a million is a billion.  Correct?

21  A.  Correct.

22  Q.  Okay.  But then it would be increased, the liquidation

23  preference would be increased, by any amounts that were

24  drawn down from the Treasury commitment.  Correct?

25  A.  I'm sorry.  Say that again.  I got lost in --

1    Q.  Sure.  The liquidation preference would be increased

2    from the initial billion by any amounts that were drawn upon

3    by Fannie Mae or Freddie Mac from the commitment that each

4    of them had?

5    A.  Yes.  That's correct.

6    Q.  But it could also be increased by other things such

7    as what I call romanette (iii).  It says, "The liquidation

8    preference shall be increased on the dividend payment date

9    if the company fails to pay in full the dividend payable for

10   the dividend period ending on such date by an amount per

11   share equal to the aggregate amount of unpaid dividends

12   divided by the number of shares of senior preferred stock

13   outstanding on such date."

14           Do you see that?

15   A.  Yes, I do.

16   Q.  And you would agree with me that if the company chose

17   not to pay a dividend, that would be a failure to pay under

18   this paragraph.  Correct?

19   A.  Yes.

20           MR. HUME:  If we could just then pull --

21   BY MR. HUME:

22   Q.  Do you recall that for this -- let's do it this way

23   first:  When the companies drew down on the commitment and

24   that added to the liquidation preference, the companies

25   could not repay that unless Treasury consented.  Correct?

```
 1    A.  That's correct.  We discussed that before.  That's

 2    correct.

 3    Q.  Yes.

 4         But by "repay," I mean they couldn't pay down the

 5    liquidation preference that came from the draws unless

 6    Treasury consented.  Correct?

 7    A.  That's correct.

 8    Q.  But when it was -- when the liquidation preference was

 9    increased under this provision for a failure to pay a

10    dividend, the companies could pay that down.  Correct?

11    A.  Yes.

12         MR. HUME:  And can we look at Paragraph 3 on this.

13    BY MR. HUME:

14    Q.  Paragraph 3 is entitled Optional Paydown of Liquidation

15    Preference.  Do you see that?

16    A.  Yes, I do.

17    Q.  And there's a lot of verbiage and legalese.  But if you

18    go down to what we've highlighted, it says, "The company may

19    pay down the liquidation preference to the extent of accrued

20    and unpaid dividends previously added to the liquidation

21    preference pursuant to Section 8 below and not repaid by any

22    prior paydown of liquidation preference."

23         Do you see that?

24    A.  Yes.  Actually, it should say in the highlight "but only

25    to the extent of."
```

1    Q.  Sure.  "Only to the extent."

2          Then there's another thing.  But this says that to

3    these extents -- to this extent, anyway, you could pay it

4    down?

5    A.  That's what it says.

6    Q.  And then Paragraph 2-C.  It says that the dividend rate

7    is 10 percent.  Correct?  That's the first thing it says?

8    Yes?

9    A.  That's correct.

10   Q.  And it then says, "Provided, however, that if at any

11   time the company shall have for any reason failed to pay

12   dividends in cash in a timely manner as required by this

13   certificate, then immediately following such failure and for

14   all dividend periods thereafter until the dividend period

15   following the date on which the company shall have paid in

16   cash full cumulative dividends, the dividend rate shall be

17   12 percent."

18          Do you see that?

19   A.  Yes, I do.

20   Q.  Okay.  So that means of a -- in the period after you

21   fail to pay a dividend, it then goes up to 12 percent until

22   you pay it back down.  Correct?

23   A.  That's correct.

24   Q.  When you pay it back down, the rate goes back to 10

25   percent?

```
1    A.  That's what it says.

2    Q.  And I don't recall exactly what you said when Mr. Stern

3    was asking you questions about this provision, but I just

4    want the record to be clear.  It's accurate, isn't it, that

5    this provision -- those provisions, whatever you want to

6    call them, did not come up in any of your considerations

7    about whether to enter into the net worth sweep.  Correct?

8    A.  They did not.

9    Q.  And so you did not consider it.  Correct?

10   A.  No.  As we've -- as I pointed out in the discussion with

11   Mr. Stern, that this says clearly that if the company shall

12   for any reason to fail to pay the dividends immediately

13   following such failure -- this was viewed as a failure under

14   the contract to meet an obligation to pay a 10 percent

15   dividend.  And then the penalty that ensues is that the

16   dividend rate goes up by 20 percent.

17            So no.  We did not consider this when we were

18   doing the net worth sweep.

19   Q.  What's confusing here and that I'm trying to make clear,

20   Mr. DeMarco, is it would be inaccurate to tell the jury that

21   you considered it and rejected it for the reasons you just

22   gave, wouldn't it?

23   A.  That's -- that's not what I said.  I said we did not

24   consider it.  I said that -- I thought I said that very

25   clearly.
```

1    Q.  And it never came up in all of your discussions while at

2    the conservatorship.  Correct?

3    A.  No.

4    Q.  No, it never came up?

5    A.  Did I -- I was the acting -- I was there for a long

6    time.  You're asking me, did it ever come up that there was

7    some mention or discussion of this provision from the time

8    the conservatorship was appointed?  I don't remember.

9         I can tell you that in the context of the work on

10   the third amendment, it never came up.

11        MR. HUME:  Ms. McGuire, could you please pull up

12   the prior proceeding transcript, Page 751, Lines 10 to 19.

13   BY MR. HUME:

14   Q.  Now, in this proceeding you were asked, Question:  "Now,

15   at the time of the net worth sweep, you didn't consider the

16   potential solution to the circular draw problem -- that

17   potential solution."

18        And if you wish, we can go back to show that this

19   is discussing what we call the payment-in-kind provisions we

20   just went through.

21   A.  Okay.

22   Q.  Are you willing to accept that?

23   A.  I'm willing to accept that.  So we can keep moving.

24   Q.  "Now, at the time of the net worth sweep, you didn't

25   consider that potential solution to the circular draw

 1    problem.  Correct?"

 2                  Answer:  "No, I did not."

 3                  Is that accurate testimony, truthful?

 4    A.  It was then and it was when I said it two minutes ago.

 5    Yes.

 6    Q.  Okay.  I just want to make sure it's clear.  The next

 7    question is:  "And no one brought that to your attention?"

 8                  Answer:  "No one had discussed this at any point

 9    during these years in conservatorship, that going to that 12

10    percent was an alternative that could be used instead of

11    paying."

12                  Question:  "It never came up?"

13                  Answer:  "No."

14                  Are those answers truthful and accurate?

15    A.  Yes.

16                  MR. HUME:  You may take that down, Ms. McGuire.

17    BY MR. HUME:

18    Q.  Subsequent to leaving your time as acting director,

19    you've obviously been subjected to a number of questions and

20    depositions and proceedings.  Correct?

21    A.  Yes, Mr. Hume, I have.

22    Q.  I sympathize with that, because you've been here a long

23    time.  And I appreciate your patience.  I'm almost done.

24                  But isn't it true that you've been asked about

25    those provisions we just went through before?  Correct?

```
 1    A.  Yes.
 2    Q.  And isn't it true that you've called that a backstop?
 3              MR. STERN:  Objection to the form of the question,
 4    your Honor.  Vague.
 5              THE COURT:  Overruled.
 6              THE WITNESS:  I'm sorry, Mr. Hume.  Would you say
 7    the question again?
 8    BY MR. HUME:
 9    Q.  Sure.
10              Isn't it true that you referred to those
11    provisions that we sometimes call payment-in-kind
12    provisions -- you've referred to them as a backstop?
13    A.  I may have, yes.
14    Q.  Well, I'd like to make it clear that you have, if you
15    don't mind.
16    A.  Okay.  That's fine.
17              MR. HUME:  Can we pull up trial transcript --
18    sorry; excuse me -- a prior proceeding transcript, Page 748,
19    Page 25 -- Line 25 -- I'm sorry, Ms. McGuire -- Line 25 to
20    the next page, 749.  We may not need to go all the way.
21    Let's just see.
22    BY MR. HUME:
23    Q.  It says -- the question at the top here on Line 2 says,
24    "Are you familiar, Mr. DeMarco, with the fact that the
25    original preferred stock purchase agreement had a provision
```

1    to deal with the problem when Fannie Mae or Freddie Mac did

2    not have enough cash to pay the 10 percent dividend?"

3              Answer:  "I believe you're referring to am I aware

4    that there was a provision about what would happen if the

5    companies failed to make the cash payment as required by the

6    agreement.  Yes.  I'm aware of what that backstop was."

7              Do you see that?

8    A.  Yes, I do.

9    Q.  And that was truthful and accurate testimony.  Correct?

10   A.  Yes, it was.

11   Q.  Last set of questions here, Mr. DeMarco.  I'll try to be

12   quick -- go through it quickly.

13             First of all, when you made the decision to agree

14   to the net worth sweep, is it fair to say you did not give

15   any consideration to the economic interests of private

16   shareholders?

17   A.  That's correct.

18   Q.  And is it also true that, while you were at OFHEO,

19   O-F-H-E-O, when you were at OFHEO with Mr. Lockhart in 2007

20   and 2008, OFHEO encouraged Freddie Mac and Fannie Mae to

21   raise money from private shareholders to deal with the

22   beginning stages of the financial crisis?

23   A.  Yes.

24   Q.  And isn't it also true when the conservatorship began,

25   HERA, the statute, gave FHFA power to repudiate or terminate

1    any contracts that Fannie Mae or Freddie Mac had that

2    predated the conservatorship?

3    A.  Yes.

4    Q.  And it had to do that within a reasonable period of

5    time.  Do you recall that?

6    A.  Yes.

7    Q.  And if it did, HERA also set forth provisions about how

8    anyone who had a contract that was terminated at the time of

9    conservatorship could then -- had a very specific process

10   for suing for damages and could get certain kinds of damages

11   for compensation, but not punitive damages.

12           Do you recall that?

13   A.  Mr. Hume, I recall generally that there was an

14   opportunity to repudiate contracts.  I do not remember the

15   legal processes or anything associated with that.  We put

16   them in conservatorship nearly 15 years ago.  I just don't

17   remember any of those details.

18   Q.  That's fair enough.  Let's just look at PX-2-A quickly.

19           Do you recognize this as one of the main

20   provisions of HERA, Section 4617?

21           MR. STERN:  Objection to the commentary, your

22   Honor.

23           THE COURT:  Sustained.

24           MR. HUME:  I'd just like to show Section --

25   Subsection D.

DeMarco - CROSS - By Mr. Hume

1    BY MR. HUME:

2    Q.  Do you see this provision relating to contracts entered

3    into before appointment of conservator or receiver?  Do you

4    see that?

5    A.  Yes.

6    Q.  And so this is consistent with what you've already said,

7    that there was this power to terminate or repudiate

8    contracts.  Correct?

9    A.  Yes.

10   Q.  And then the next callout I think is going to show the

11   next provision, which says:  The conservator should try to

12   do this within a reasonable period following its

13   appointment.

14           Do you see that?

15   A.  Yes, I do.

16   Q.  And then the next provision says Claims For Damages For

17   Repudiation.  Do you see that?

18   A.  Yes.

19   Q.  And it says, "The liability of the conservator or

20   receiver, the disaffirmance or repudiation of any contract,

21   shall be limited to actual direct compensatory damages."

22           Do you see that?

23   A.  Yes.

24   Q.  And then it goes on to have other provisions.

25           Do you -- does that generally refresh your

DeMarco - CROSS - By Mr. Hume

1    recollection?

2    A.   Generally.

3    Q.   Okay.  It's not inconsistent with anything that you

4    remember?

5    A.   No.

6    Q.   And am I correct that the FHFA did not exercise this

7    authority to repudiate or disaffirm or terminate any of the

8    contracts with private shareholders?  Is that correct?

9    A.   That's correct.

10   Q.   Finally, when -- shortly after the conservatorship, you

11   gave a speech --

12            MR. HUME:  If we can pull up PX-2.

13   BY MR. HOFFMAN:

14   Q.   Do you remember your speech to the ABS East conference?

15   You've been shown this before.  Correct?

16   A.   Yes.

17   Q.   Okay.  On Page 34 -- I think after the presentation it

18   has the actual script of your speech -- this includes the

19   sentence that says, "In order to conserve over $2 billion in

20   capital every year, the common stock and preferred stock

21   dividends were eliminated, but the common and all preferred

22   stocks will continue to remain outstanding."

23            Let me just ask you a question about that first

24   before the highlighted sentence.  When you used the word

25   "eliminated" for the dividends to private shareholders, am I

1    correct that you meant eliminated during the

2    conservatorship?

3    A.  Yes.  I mean, the start of the sentence refers to

4    conserving capital, which was an essential goal of the

5    conservator.  So yes.  It's referring to that.

6    Q.  And the next sentence says, "In other words, the

7    economic interests of shareholders have not been eliminated.

8    They continue to exist."

9           Do you see that?

10   A.  Yes.

11   Q.  And was that consistent with your understanding as

12   acting director of FHFA?

13   A.  Yes.

14          MR. HUME:  Mr. DeMarco, thank you very much.  No

15   more questions.

16          THE COURT:  Mr. Stern, redirect?

17          MR. STERN:  Yes, your Honor.  The Court's

18   indulgence.  Thank you, your Honor.

19                    REDIRECT EXAMINATION

20   BY MR. STERN:

21   Q.  Good morning, Mr. DeMarco.

22          MR. STERN:  Good morning, members of the jury.

23   BY MR. STERN:

24   Q.  Mr. DeMarco, you were asked some questions actually

25   today about home prices.  Correct?

1    A.  Yes.

2    Q.  Earlier this morning?

3    A.  Yes.

4    Q.  And let me just start with this.  You were asked

5    whether -- I think I took this down correctly.  If I didn't,

6    someone will correct me, I'm sure.  You were asked a

7    question along the lines of whether you would agree that

8    which projection comes out to be true depends on, among

9    other things, housing prices.

10             Do you recall that question?

11   A.  Yes.

12   Q.  As you were thinking about whether or not to agree to

13   enter into the third amendment and the net worth sweep, were

14   you trying to predict which projection would come out to be

15   true?

16   A.  No, I was not.

17   Q.  What was your thought process, if it wasn't that?

18   A.  My thought process was that I needed to -- part of what

19   I needed to preserve and conserve was the remaining Treasury

20   commitment, which is -- and we've spoken about it a number

21   of times -- was going to be capped beginning in 2013.  And

22   so my objective was to conserve that to be able to make good

23   on the company's guaranties to debt and MBS holders through

24   any possible state of the world that would result going

25   forward.

 1    Q.  And when you say "any possible state of the world," had

 2    you recently seen a state of the world that would create the

 3    very problem you're talking about?

 4    A.  Yes.  I had just seen a disastrous state of the world

 5    that harmed millions of families and did great damage to the

 6    U.S. economy.

 7    Q.  So let's talk about home prices.

 8          MR. STERN:  Can we pull up PX-1-L, please.

 9          This is in evidence, your Honor.

10    BY MR. STERN:

11    Q.  This says at the top Case-Shiller Housing Index.  The

12    members of the jury have seen this a number of times and

13    have heard references to this index.

14          Was this data generally available to you during

15    your time as acting conservator?

16    A.  Yes.

17    Q.  How do you get to it?

18    A.  Well, as it says right here, it is accessible on the

19    St. Louis Federal Reserve Bank's website.  They manage

20    access to a number of data sources there.

21    Q.  And I believe that Ms. Hartman may have testified about

22    this.  But when you go to the website, does the website

23    itself generate these graphs if you put in the dates?

24    A.  Yes.

25    Q.  Okay.  So when you were shown this particular graph, did

1    you have a reaction to it?

2    A.  Yes.

3    Q.  And what's your reaction to it?

4    A.  That it's covering a five-month period and it's being

5    blown up on the scale to make it look like this dramatic

6    increase in five months.

7    Q.  And when you say "to look like a dramatic increase,"

8    what do you mean?

9    A.  Meaning that if one were to look at this over a longer

10   period of time, you're probably going to have a different

11   impression about what's going on here.

12   Q.  Okay.  We'll do that in a moment.

13           But let me first ask you, the line that we're

14   seeing goes from approximately 136.5 -- right? --

15   A.  Yes.

16   Q.  -- to 141.5 over that time period.  Is that correct?

17   A.  Yes.

18   Q.  That's an increase of five points?

19   A.  Yes.

20   Q.  And I had some people do the math for me; and if you

21   don't accept it or want to go through it, let me know.

22           But would you accept that that would be

23   approximately a 3.66 percent increase?

24   A.  Yes.

25   Q.  Less than 4 percent?

1   A.  Yes.

2   Q.  Okay.  And if someone on your staff had come to you in

3   August of 2012 and said, You can tell from this graph that

4   housing prices had hit bottom in February of 2012 and

5   everything after that was just going to keep climbing this

6   line, what would your reaction to that have been?

7   A.  To have to counsel the employee on better use and

8   analysis of data.

9   Q.  And would that have affected your decision to enter into

10  the third amendment?

11  A.  No.

12  Q.  Okay.  So let's look at another graph.

13          MR. STERN:  Can we pull up the next slide?

14  BY MR. STERN:

15  Q.  So this is an excerpt from Plaintiffs' Exhibit 1-M in

16  evidence.  What's the title of this slide?

17  A.  Case-Shiller Housing Index, 2007 to June 2012.

18  Q.  And what are we looking at here?

19  A.  It looks to me like we're looking at the same

20  information but over a longer period of time.

21  Q.  So I was about to ask you that.  Well, what does this

22  chart tell you that the other graph -- I'm going to

23  interchangeably use "chart" and "graph."  I'll call it a

24  graph.

25          What does this graph tell you, if anything, that

1    the previous graph did not?

2    A.  It tells me that for the period of time being shown

3    here, virtually the entire period of time, house prices were

4    declining.

5    Q.  And if you were -- do you see the line for 2010?

6    A.  Yes.

7    Q.  And just after that, do you see -- there's a dip and a

8    rise.  Am I interpreting it correctly?

9    A.  Yes, you are.

10   Q.  So that meant that housing prices went down at whatever

11   that point was in 2010?  Let me put it the other way.  They

12   went up at that point in 2010.  Is that right?

13   A.  Yes.

14   Q.  And did they stay up?

15   A.  No.  They then reverted and continued to decline.

16   Q.  So if you put yourself back into early 2010, would you

17   know that the prices had hit bottom in 2009?

18   A.  No.

19   Q.  Would you know which way they were going after 2010?

20   A.  No.

21              MR. STERN:  Can we do the insert?  Is that

22   available?

23   BY MR. STERN:

24   Q.  So let me just ask you generally, how did your

25   experience with the financial crisis and this -- let me back

1    up for a minute.

2           What are you seeing as a trend here from before

3    2008 into 2012?

4    A.  The trend of declining house prices and a decline --

5    yes.  Declining house prices.

6    Q.  And how -- I'm sorry.

7    A.  I've answered.  Declining house prices.

8    Q.  And how did your experience with declining house prices

9    and what you had seen in the financial crisis affect your

10   thinking about protecting against the worst-case scenario?

11   A.  It informed me that this sort of thing can happen and

12   when -- if and when it happens, it can have devastating

13   effects on families and on the economy and a more directly

14   devastating effect on Fannie Mae and Freddie Mac and their

15   capacity to carry out their mission.

16   Q.  So I want to switch topics now.

17          Mr. Hume in his cross-examination asked you

18   questions about statements that you made back in 2008 about

19   returning to shareholders.  Is that right?

20   A.  Yes.

21   Q.  And you explained -- and correct me if I'm being too

22   colloquial here -- there was sort of a "That was then; this

23   is now" comparison that you drew between the state of the

24   world in 2008, when you made that statement, and the state

25   of the world as it evolved toward 2012.  Did I understand

1    your testimony correctly?

2    A.  Yes.

3    Q.  And Mr. Hume asked you whether you ever took it back or

4    made it clear that things were changing.

5             Do you recall that?

6    A.  Yes.

7    Q.  So I want to direct your attention to a speech that you

8    gave in 2011.

9             MR. STERN:  Can we pull up DX-338?

10            I move this, your Honor.

11            MR. HUME:  Just one moment, your Honor.

12   Defendants' Exhibit 338?

13            MR. STERN:  Yes.  338.  DX-338.

14            THE COURT:  Received without objection.

15            MR. HUME:  We'd object, your Honor.  If we could

16   be heard.

17            (Whereupon, the following proceedings were had at

18   sidebar outside the presence of the jury:)

19            MR. STERN:  Your Honor, this is directly

20   responsive to the cross-examination --

21            MR. HUME:  Well --

22            MR. STERN:  Sorry.

23            MR. HUME:  -- normally our practice is the

24   objecting party goes first, if I may.

25            We object upon -- for two reasons:  One, it's a

 1    hearsay document.  But -- as all documents are.

 2           But second, it's not relevant to shareholder

 3    expectations because the date is after December 2009.

 4           MR. STERN:  Your Honor, the question that Mr. Hume

 5    put, I believe, was just broadly:  Did you ever take it

 6    back?  Did you ever tell anyone?

 7           And this directly rebuts that line of

 8    cross-examination.  It's essentially for the fact that it

 9    was said to rebut the inference that Mr. Hume sought to be

10    drawing.

11           THE COURT:  The objection is overruled.

12           (Whereupon, the following proceedings were had in

13    open court:)

14           MR. STERN:  So can we pull up DX-338 and display

15    it?

16           THE COURT:  Received.

17           (Whereupon, Defendants' Exhibit No. 338 was

18    entered into evidence.)

19    BY MR. STERN:

20    Q.  What is this that we're looking at, Mr. DeMarco?

21    A.  These are the prepared remarks for the speech I gave at

22    the American Mortgage Conference on September 19th, 2011.

23    Q.  And you see that thing at the top says Publicly

24    Available?

25    A.  Yes.  It is.  It's available on the FHFA's website.

```
 1                  MR. STERN:  And so let's go to Page 5,

 2    Paragraph 2, the section Look Ahead.  Let's go to the last

 3    sentence of this paragraph.

 4    BY MR. STERN:

 5    Q.  What does that say?

 6    A.  I'm sorry, Mr. Stern.  You want me to read the

 7    paragraph?

 8    Q.  Yes.

 9    A.  "It ought to be clear to everyone at this point,

10    given" --

11    Q.  No.  Just the last sentence.

12    A.  Oh, I'm sorry.  That's what I -- thank you.  I

13    apologize.

14                  "Conservatorship allows the enterprises to

15    continue serving their public purpose while lawmakers

16    determine the ultimate resolution of the conservatorships

17    and the future legal structure for housing finance."

18    Q.  And what was this communicating about return to

19    shareholders?

20    A.  It's communicating that that's not going to happen.

21    What I'm expecting to happen is lawmakers are going to end

22    these conservatorships and make the ultimate resolution of

23    what happens to Fannie Mae and Freddie Mac.

24    Q.  So let's go also to DX-188.  This is -- the jury has

25    seen this.  This is the Fannie Q from the third quarter of
```

1   2009.  Is that right?

2   A.  Yes, it is.

3   Q.  And this was issued on November 5th, 2009?

4   A.  It sounds right.  Yes.

5   Q.  So let's look at the second paragraph from the bottom on

6   Page 135.

7           Can you read this?  Then I'll ask you a question.

8   A.  "The conservatorship has no specified termination date.

9   There can be no assurance as to when or how the

10  conservatorship will be terminated, whether we will continue

11  to exist following the conservatorship or what our business

12  structure will be during or following the conservatorship."

13  Q.  So this is November 5th, 2009?

14  A.  Yes, it is.

15  Q.  And that's before December 24th, 2009?

16  A.  Yes, it is.

17  Q.  And what is this telling shareholders and anyone who's

18  reading this filing about return to shareholders?

19  A.  That there's no assurance that that's going to happen.

20          MR. STERN:  Now let's go to Page 7, the last

21  paragraph.  Page 7, the last paragraph.  Second line from

22  the bottom -- wait.

23          The Court's indulgence.  I'm sorry.

24          Let's have the last sentence going into the next

25  page.  Mr. Montgomery, can you make it so we can see both

1    pages?

2    BY MR. STERN:

3    Q.  So this last sentence says, "Further, there is

4    significant uncertainty regarding the future of our business

5    and our regulators, the Administration and Congress" -- I'm

6    sorry.  Let me start over.

7            "Further, there is significant uncertainty

8    regarding the future of our business.  And our regulators,

9    the Administration and Congress are discussing options for

10   reform of the GSEs."

11           What does this communicate about return to

12   shareholders?

13   A.  There's significant uncertainty; and furthermore, that

14   the outcome of this is being debated among public policy

15   leaders, the Administration and Congress.  And they're

16   considering various options for what's going to happen here.

17   Q.  So let's look at DX-189.  So this is the Freddie third

18   quarter 10-Q.  Is that right?

19   A.  Yes.

20   Q.  And for 2009?  Yes?

21   A.  Yes.  Yes.  For the third quarter, 2009.

22   Q.  And let's check the date on this one.  The last page.

23   November 6th, 2009.  Is that right?

24   A.  Yes.

25   Q.  Again, before December 24, 2009?

1    A.  Yes.

2              MR. STERN:  So let's go to Page 6, the third

3    paragraph.  It's under Business Objectives.  Blow up the

4    third paragraph.

5    BY MR. STERN:

6    Q.  You don't need to keep reading the same thing all over

7    again, but would you agree with me this Freddie Mac filing

8    is making the same statement, essentially, that we saw in

9    the Fannie Mae filing?

10   A.  Yes.

11   Q.  And again, what's your understanding about what

12   shareholders were being told about return to shareholders

13   here on November 6, 2009?

14   A.  They're being told that there's significant uncertainty,

15   including whether Freddie Mac's even going to continue to

16   exist.

17   Q.  So is this message that we're seeing in your speech and

18   especially in these filings, is this the same message or a

19   different message that was being sent in early 2008 when,

20   for example, you gave your speech to ABS East?

21   A.  A different message.

22   Q.  Why did the message change from September of 2008 to --

23   I'll just pick November 6th of 2009?

24   A.  Because the facts and circumstances had changed.

25   Q.  And elaborate on that.

 1   A.  Sure.

 2        When I gave that speech, at that point in time,

 3   the companies had just been placed into conservatorship.

 4   The Treasury had put Treasury commitment on the line to

 5   instill confidence in these companies.  Companies still had

 6   positive shareholder equity at this point in time.

 7        That positive shareholder equity was gone by the

 8   end of December of 2008.  And the draws that were taken on

 9   the Treasury were substantial such that in 2009 we had to

10   twice adjust the PSPA to increase the value of the

11   commitment.

12   Q.  So I want to stick with the SEC filings.  Mr. Hume asked

13   you some questions about what Fannie and Freddie expected in

14   the future based on some excerpts from the filings that

15   Mr. Hume showed you.

16        I want to show you some of those same filings with

17   some different excerpts.

18        MR. STERN:  Let's pull up 476.

19   BY MR. STERN:

20   Q.  This is a Fannie Q -- a Fannie 10-Q for the second

21   quarter of 2012?

22   A.  Yes.

23   Q.  And this is one of the filings that Mr. Hume showed you

24   and talked about with you on cross-examination?

25   A.  I believe so.

```
1                 MR. STERN:  Let's go to page --

2    BY MR. STERN:

3    Q.  Let's look to see who signed this one.  That's Susan

4    McFarland.  Who is she?

5    A.  She was the chief financial officer of Fannie Mae.

6    Q.  And that's of course the same Susan McFarland that you

7    were talking about this morning?

8    A.  Yes.

9                 MR. STERN:  Let's go to the previous page, please.

10   BY MR. STERN:

11   Q.  Who signed this?

12   A.  Tim --

13   Q.  Who signed this as --

14   A.  Tim -- I'm sorry.

15   Q.  I'll go first.  Who signed this as CEO?

16   A.  Time Mayopoulos.

17   Q.  Okay.

18                 MR. STERN:  Let's go back to Page 16, the last

19   paragraph, please.

20   BY MR. STERN:

21   Q.  You see the sentence that begins, "Although we may

22   experience"?

23   A.  Yes.

24   Q.  So to move us along, I'm going to read this and skip

25   some words.
```

1          Although we may experience volatility -- what does

2     "volatility" mean in this context?

3     A.  It means something that can go up or down.

4     Q.  Although we may experience volatility in earnings and

5     income, we do not expect to generate income -- net income or

6     comprehensive income in excess of our annual dividend

7     obligation to Treasury over the long term.

8          Now, Mr. Hume, I believe, read you the next

9     sentence:  We expect that in some quarters we will be able

10    to generate comprehensive income sufficient to cover at

11    least a portion of our quarterly dividend to Treasury.

12          Putting these two sentences together, what is

13    Fannie saying in this filing that was signed by

14    Mr. Mayopoulos and Ms. McFarland about whether or not --

15    about what they expect?

16    A.  What they expect was to not be able to make the required

17    dividend payment to Treasury every quarter.

18    Q.  And do you see the reference there to "over the long

19    term"?

20    A.  Yes.

21    Q.  And when Fannie was telling shareholders and the public

22    that they don't expect to generate income in excess of their

23    dividend obligations to Treasury over the long term, what

24    message was that sending?

25    A.  That's saying that we -- that we're continuing to be

1    reliant upon the Treasury Department.  We're going to have

2    to continue to draw from the Treasury Department's

3    commitment in order to stay solvent.

4    Q.  And are they distinguishing between expecting in some

5    future quarters to generate sufficient income on the one

6    hand and the long term on the other?

7    A.  No -- I'm sorry.  Did I --

8    Q.  Look at the two sentences.

9    A.  I'm sorry.  Would you repeat the sentence?  I may have

10   misunderstood the sentence --

11   Q.  Yes.

12   A.  -- or the question.

13   Q.  The first -- there is a reference -- it says although --

14   it says:  We do not expect to generate net income or

15   comprehensive income in excess of our obligation over the

16   long term.  They do expect that in some quarters they'll be

17   able to generate income for a portion.

18          Was Fannie drawing a distinction between what they

19   might be able to do in some quarters and what they expect to

20   happen over the long term?

21   A.  Oh, yes.  Now I understand the question.  Yes, they are.

22   Q.  And what's the distinction they're drawing?

23   A.  The distinction they're making is, some quarters, we may

24   be able to cover some or all of the dividend.  But over the

25   long term, we do not expect that our earnings are going to

1    cover the dividend.

2    Q.  And to your understanding, was that statement accurate

3    as to what Fannie and Freddie expected in November of 2009?

4    A.  Yes.

5    Q.  So let's take a look at the Freddie Q -- I'm sorry.  I

6    meant August of 2012.  I apologize.

7            Same answer?

8    A.  Same answer.

9    Q.  Let's look at Freddie's 10-Q for the second quarter of

10   2012.  I got the date right.

11           MR. STERN:  Let's pull up DX-477.

12   BY MR. STERN:

13   Q.  This is also one of the filings that Mr. Hume showed

14   you?

15   A.  Yes.

16   Q.  Let's go to the last page.

17           Who signed that and what's the date?

18   A.  Ross Kari, chief financial officer, August 7th, 2012.

19   Q.  The same Ross Kari we've been talking about here?

20   A.  Yes.

21           MR. STERN:  Previous page, please.

22   BY MR. STERN:

23   Q.  Who's this?  When was it signed?

24   A.  Don Layton, CEO; August 7th, 2012.

25   Q.  Okay.  So let's go now to Page 14.  Do you see where it

1    says Long-Term Financial Sustainability?

2    A.  Yes.

3    Q.  So what's the first sentence under there?

4    A.  "There is significant uncertainty as to our long-term

5    financial sustainability."

6    Q.  And was it your understanding in November of -- I'm

7    sorry.

8              MR. STERN:  Can we get the date again?  And now

9    let's go back to the page.

10   BY MR. STERN:

11   Q.  Was it your understanding as of August 7, 2012, that

12   there was significant uncertainty as to Freddie's long-term

13   financial sustainability?

14   A.  Yes.

15   Q.  And were they making this statement about uncertainty

16   before or after the positive results of the first and second

17   quarters of 2012 had come out?

18   A.  They're making it in concert with announcing the

19   positive results of the second quarter; and of course, the

20   first quarter was already known to them.

21   Q.  And at the risk of having my head taken off by a lot of

22   people in the room, I'm going to go backwards for a minute

23   to DX-476, the Fannie statements that I won't repeat.  But

24   the Fannie statement that you read out, were those being

25   made before or after Fannie had put out the positive news

1    about the first and second quarter?

2    A.  After.

3    Q.  So --

4    A.  Or simultaneous with the second quarter and after the

5    first quarter.

6    Q.  So let's come back to the Freddie filing.  Can you read

7    the second paragraph?

8    A.  "We expect to request additional draws under the

9    purchase agreement in future periods.  Over time, our

10   dividend obligation to Treasury will increasingly drive

11   future draws.  Although we may experience period-to-period

12   variability in earnings and comprehensive income, it is

13   unlikely that we will generate net income or comprehensive

14   income in excess of our annual dividends payable to Treasury

15   over the long term."

16   Q.  And what were they saying here even after they had

17   gotten the positive results in the first and second quarter?

18   A.  Same thing Fannie Mae is saying.  They don't expect --

19   while they expect some periods they will have up-or-down

20   earnings that may cover the dividend, that over the long

21   term they do not expect to generate enough income -- income

22   in excess of this dividend obligation to the Treasury.

23   Q.  So going back to the question Mr. Hume asked you about

24   what Fannie and Freddie expected, was it your understanding

25   that all of these statements were accurate with respect to

 1   what Freddie expected on August 7th of 2012?

 2   A.  Yes.

 3   Q.  I'm going to switch topics now.

 4        You were asked some questions about principal

 5   reduction.  Do you recall those questions?

 6   A.  Yes.

 7   Q.  And the efforts by the Treasury Department to include

 8   principal reduction in the third amendment.  Do you recall

 9   those questions?

10   A.  Yes.

11   Q.  And I believe that you testified that you did not want

12   to address principal reduction in the third amendment.  Is

13   that right?

14   A.  That's correct.

15   Q.  And did I understand correctly that that meant that you

16   wanted to have the discussion of principal reduction kept

17   separate from the discussion of how to deal with what you

18   saw as the problem of the circular draws?

19   A.  Yes.

20   Q.  And why did you want to keep those two things separate?

21   A.  Because the decision over principal reduction was mine

22   as the conservator.  And the third amendment was something

23   that needed to be decided jointly by the two parties to the

24   preferred stock purchase agreement.

25   Q.  So from your perspective, was principal reduction

```
 1    something that would have been part of a negotiation over

 2    the PSPA?

 3    A.  No.

 4    Q.  Had principal reduction been addressed in the PSPA?

 5    A.  No.

 6    Q.  Was it a term of the PSPA?

 7    A.  No.

 8    Q.  So if you were looking to amend the PSPA -- let me ask

 9    you:  Was that your intent with respect to the third

10    amendment, to amend the PSPA?

11    A.  Yes.

12    Q.  So would principal reduction not having been a term in

13    the PSPA -- would that in your mind have anything to do with

14    amending the PSPA?

15    A.  No.

16    Q.  So let me just digress for just a moment, because you

17    were asked more questions about principal reduction this

18    morning.

19          You were opposed at least to the form -- you told

20    us, I think, on cross-examination that you were opposed to

21    the form of principal reduction that was being put forward

22    by Treasury.  Am I -- was that your position?

23    A.  Yes.  I did not think it was in the best interest of the

24    companies or the broader market or public interest.

25    Q.  I'm sorry.  Say it again.
```

1   A.  I did not believe it was in the best interest of either

2   the companies or the public interest.

3   Q.  Did you have an alternative plan or proposal to

4   principal reduction that you thought would be better for the

5   public interest and for that matter for homeowners?

6   A.  Yes, I did.  And it wasn't just a plan; it was something

7   that we were already implementing.

8   Q.  Without -- I don't want to go too far down this trail.

9   But can you briefly summarize the alternative that you had

10  that you thought was better for the public interest and for

11  homeowners?

12  A.  Yes.  We were modifying loans of people that were having

13  trouble paying their mortgage and were underwater.  We were

14  providing them a lower monthly payment than what they would

15  have received under the Treasury proposal.  We were taking

16  the underwater portion of their mortgage and setting it

17  aside.  We were not charging any interest on it.  There were

18  no payments required on that underwater principal amount.

19  And that allowed the homeowner to get an even lower payment.

20          And then ultimately, when they sold the house, if

21  house prices had recovered, if they had succeeded, it would

22  help them stay in their home.

23          Then, if they were able to sell at a higher price,

24  then the taxpayer, the Treasury, the companies, Fannie and

25  Freddie, shared in that upside with the homeowner and gave

1    the benefit to the homeowner of having that lower monthly

2    payment.

3    Q.  So --

4    A.  So it was a good balance between protecting the

5    homeowner, giving them an opportunity to save their house;

6    and if this worked out, then everybody could benefit from it

7    working out.

8    Q.  Let me now ask you a new topic.  You were asked a lot of

9    questions on cross-examination about DTAs.  Do you recall

10   that?

11   A.  Yes.

12   Q.  And tell us again, what does DTA stand for?

13   A.  Deferred tax asset.

14   Q.  I'll keep calling them DTAs.

15            So you were asked about what was referred to as

16   the possible write-up of Fannie and Freddie DTAs?

17   A.  Yes.

18   Q.  And I believe you testified, just to direct your

19   attention -- and correct me if I'm wrong -- that in

20   substance, at least, Fannie and Freddie each went through

21   every quarter to update or determine whether the DTA should

22   be written up or whether it should stay written down?

23   A.  Yes.

24   Q.  So does that mean that in every quarter, Fannie's --

25   based on your testimony -- let me just ask you:  Had

1    Fannie's management determined up to that point in August of

2    2012, when the third amendment had been agreed to, that they

3    did or did not expect Fannie to earn enough taxable income

4    to use the DTAs?

5    A.  They had not made that determination.

6    Q.  And that was Fannie management; is that right?

7    A.  Yes.

8    Q.  Same question about Freddie:  From late 2008 through the

9    second quarter of 2012, what determination had Freddie made

10   with respect to the DTAs?  Write them up or keep them

11   written down?

12   A.  Keep them written down.

13   Q.  And did that mean that every quarter Freddie's

14   management had determined that they did not expect Freddie

15   to earn enough taxable income to use the DTAs?

16   A.  That's correct.

17   Q.  And these determinations by Fannie and Freddie to keep

18   the DTAs written down, were they revisited every quarter?

19   A.  Yes.

20   Q.  And were they -- were those determinations included in

21   the SEC filings made by Fannie and Freddie?

22   A.  Yes.

23   Q.  And were those determinations as part of the filings

24   certified as accurate by the CEOs and CFOs of Fannie and

25   Freddie?

```
 1    A.  Yes.

 2    Q.  So I now want to switch gears again.

 3              MR. STERN:  Your Honor, I'll just keep going until

 4    the Court tells me to stop.

 5              THE COURT:  We could take ten minutes.

 6              (Whereupon, the jury exited the courtroom at 11:38

 7    a.m. and the following proceedings were had:)

 8              (Thereupon a recess was taken, after which the

 9    following proceedings were had:)

10              THE COURTROOM DEPUTY:  Jury panel.

11              (Whereupon, the jury entered the courtroom at

12    11:53 a.m. and the following proceedings were had:)

13              THE COURT:  You may be seated.

14              All right, Mr. Stern.  You may proceed.

15              MR. STERN:  Yes, your Honor.

16    BY MR. STERN:

17    Q.  Mr. DeMarco, you were asked some questions by Mr. Hume,

18    I believe, this morning about DX-412.

19              MR. STERN:  Can we pull that up?

20              Next page, please.

21    BY MR. STERN:

22    Q.  Tell us what this is again.

23    A.  This is a Deutsche Bank analyst report dated March 14th,

24    2012.

25    Q.  And on direct examination, you focused us, I think,
```

1    on --

2              MR. STERN:  If we can go to Page 7 of the exhibit,

3    the lower left-hand corner.  Blow up that paragraph,

4    Mr. Montgomery.

5    BY MR. STERN:

6    Q.  And I think you focused us during direct examination on

7    the first sentence that says, "For MBS investors,

8    diminishing Treasury support raises the risk that the

9    agencies might one day face -- one day might face challenges

10   in covering MBS losses."

11             Do you see that?

12   A.  Yes.

13   Q.  I don't want to replow all this ground, but just so

14   we're clear, "diminishing Treasury support" refers to the

15   problem of the erosion of the commitment.  Is that right?

16   A.  Yes.

17   Q.  And "circular draws" are about erosion of the commitment

18   from draws to pay the dividend?

19   A.  Yes.

20   Q.  And then you also focused us on the sentence that

21   begins, "The risk" that says, "The risk becomes greater in a

22   housing market catastrophe such as the one that started in

23   the U.S. after 2006."

24             And you talked about the impression that this made

25   on you and what you took away from it.  I'm not going to ask

1    you to repeat that testimony.

2            I'm only going to ask you to tell us:  Is anything

3    that Mr. Hume pointed out to you this morning about Deutsche

4    Bank as an analyst -- does any of that change the impression

5    and understanding that you had gotten from this analyst

6    report that you described to the jury on your direct

7    testimony?

8    A.  No, not at all.

9    Q.  So you were also asked some questions about the language

10   in Mr. Lockhart's statement and other places.  And it varies

11   slightly, but essentially it relates to "preserve and

12   conserve assets and property."  Do you remember those

13   questions?

14   A.  Yes.

15   Q.  And you told Mr. Hume what you understood that to mean.

16   Right?

17   A.  Yes.

18   Q.  And he asked you questions about that and raised

19   questions with you about that.  Do you recall that?

20   A.  Yes.  We discussed that.

21   Q.  Was your testimony here in court the first time that you

22   have talked about what it means to you to preserve and

23   conserve assets?

24   A.  No.

25   Q.  Have you made public speeches about what it means to you

1   to preserve and conserve assets?

2   A.  Yes, I have.

3   Q.  So --

4           MR. STERN:  Your Honor, I need to check on a

5   technical point here.

6           Your Honor, I'm going to ask for something to be

7   pulled up on the screen, but not for the jury just yet.

8           Mr. Montgomery, just for counsel and the Court and

9   the witness, DX-293.

10          Your Honor, I'm going to ask Mr. DeMarco to

11  identify the document, which is not yet in evidence.

12  BY MR. STERN:

13  Q.  Mr. DeMarco, without getting into the substance just

14  yet, can you tell us just what this is?

15  A.  It's the text of a speech I delivered in March of 2011.

16          MR. STERN:  Your Honor, I would move DX-293.

17          MR. HUME:  Your Honor, we object.

18          (Whereupon, the following proceedings were had at

19  sidebar outside the presence of the jury:)

20          MR. HUME:  Your Honor, if it's okay, I'd like

21  to -- and Mr. Stern didn't ask my colleague -- to have

22  Mr. Kravetz to articulate our objection.

23          Are you able to do that?

24          MR. KRAVETZ:  Yes, I am.

25          Your Honor, at this time we're unclear as to what

1    the foundation is to ask the witness about this document.

2    To the extent Mr. Stern is trying to bolster with a prior

3    consistent statement, as your Honor knows, there must be an

4    indication that the --

5            THE COURT:  Let him say it first.

6            MR. KRAVETZ:  Exactly.

7            MR. STERN:  Yes, your Honor.

8            This document is consistent with Mr. DeMarco's

9    in-court testimony.  The theme -- a theme of the Plaintiffs

10   has been that "preserve and conserve assets" is flatly

11   inconsistent with the decision that Mr. DeMarco made to

12   enter into the third amendment.

13           In his testimony, he defended his understanding of

14   preserve and conserve assets.  And I don't remember the

15   exact questions, but Mr. Hume was hostile to that.  I don't

16   mean personally hostile, but Mr. Hume attacked -- and again,

17   I don't mean personally -- Mr. Hume attacked Mr. DeMarco's

18   current testimony.

19           And we're entitled to show that he has previous --

20   that he has consistently in a prior statement made

21   essentially the same observations about that phrase that he

22   did in court.

23           MR. KRAVETZ:  Your Honor, our objection would be

24   that Mr. Stern has not satisfied the basis under Rule 801

25   for a prior consistent statement, which would mean that --

1    where he has to show that there's no prior motive to

2    fabricate.

3                This is a statement from 2011.  So the statement

4    would not be applicable in terms of Rule 801 to meet the

5    standard for a prior consistent statement.

6                MR. STERN:  Your Honor --

7                THE COURT:  The objection is overruled.

8                (Whereupon, the following proceedings were had in

9    open court:)

10               MR. STERN:  If we could now -- with the Court's

11   permission, Mr. Montgomery, if we could show this to the

12   jury.

13               THE COURT:  Received.

14               (Whereupon, Defendants' Exhibit No. 293 was

15   entered into evidence.)

16   BY MR. STERN:

17   Q.  Now, Mr. DeMarco, tell us again what this is.

18   A.  This is a speech I gave in March of 2011.

19   Q.  To whom?

20   A.  To the Global Association of Risk Professionals.  It was

21   their annual convention.

22   Q.  I'd like --

23               MR. STERN:  Let's go to Page 7 of the exhibit.

24   BY MR. STERN:

25   Q.  Do you see the heading What to Preserve and Conserve and

DeMarco - REDIRECT - By Mr. Stern

1    Why?

2    A.  Yes.

3    Q.  And you say there, "I have made frequent references

4    today to FHFA's statutory responsibility as conservator to

5    preserve and conserve the assets and property of Fannie Mae

6    and Freddie Mac."

7              Do you see that?

8    A.  Yes.

9    Q.  It was only that -- it wasn't only that day that that

10   sentence came up.  Right?

11   A.  That's correct.

12   Q.  That's in the original -- the statements that the jury

13   has seen by Mr. Lockhart and others at the beginning of the

14   conservatorship?

15   A.  That's correct.

16   Q.  So why don't you tell us what you told this group about

17   your understanding of the responsibility to preserve and

18   conserve assets.

19   A.  That -- our responsibility to it -- so the first thing I

20   do is I explain:  What do I think we mean here by "assets

21   and property"?

22   Q.  And that's really -- right.  I want you to focus, just

23   to keep us moving, on what you meant by "preserve and

24   conserve."

25   A.  So to maintain and, where possible, enhance the value of

1   these assets.  We're trying to avoid a dissipation, which is

2   the opposite of that, where they go down in value or they're

3   not well-maintained, so they lose value and harm the

4   company.

5   Q.  I see bullets here.  Did you identify specific -- when

6   you were talking about the enterprises' assets that were

7   being preserved and conserved, did you identify categories

8   of assets?

9   A.  Yes, I did.

10  Q.  And what were they?

11  A.  I identified four broad categories of assets.  You see

12  here with the four bullets, the first is what I term the

13  legacy, pre-conservatorship book of business.  This is

14  basically the mortgages and the investments that Fannie and

15  Freddie had up to the point of going into conservatorship.

16          The second category is the post-conservatorship

17  book of new business; that is, once FHFA became conservator,

18  business has continued.  We made a lot of changes in their

19  operations.  There was new business that came in.  That's

20  the second category.

21          The third category is the business platforms and

22  the operations and their processes.  This is the systems

23  they've developed, the protocols, the standards, the risk

24  management apparatus and so forth.  That's the third.

25          And then the final one, also really important, is

1    the people who work at the companies, the human capital,

2    those that run the business, manage the risk, support the

3    operations.  We needed to preserve and conserve them because

4    they were essential to the functioning of the companies.

5    Q.  So when -- with that understanding of "preserve and

6    conserve assets," was the net worth sweep consistent or

7    inconsistent with preserving and conserving assets as you've

8    just explained it?

9    A.  Consistent.

10   Q.  How was it consistent?

11   A.  It's consistent because we're trying to ensure the

12   strength of the Treasury commitment.  Right?  The whole

13   point is, we've got this cap.  We don't want to erode the

14   cap because that is the capital, the equity, that investors

15   in the debt and MBS are looking to.

16            If that were to erode, markets started to become,

17   you know, uncertain about the resiliency of that guaranty,

18   then you're in the same situation or could be in the same

19   situation Fannie and Freddie were looking at in the summer

20   of 2008 of dumping assets in order to stay alive, to stay

21   liquid, to be able to get the cash they need to operate

22   their business.

23   Q.  Let's switch over now to DX-89.  I want to ask you --

24   you were asked questions by Mr. Hume today about the 10

25   percent dividend and the 12 percent addition to the

1    liquidation preference.  And that's where we're going next.

2            MR. STERN:  So let's pull up DX-89.  If we have

3    it, pull up PX-33, which is the Plaintiffs' exhibit version

4    of the same document.  That's what Mr. Hume had on the

5    screen.

6    BY MR. STERN:

7    Q.  Let's use this one, since it's what we saw earlier

8    today.

9            So what is this?

10   A.  This is the certificate of designation for the Treasury

11   senior preferred stock.  It's the stock agreement between,

12   in this case, Fannie and Treasury.

13   Q.  So I just want to as a program note draw a distinction

14   among three different things.  So this certificate of

15   designation between -- and there's one for Fannie and one

16   for Freddie.  I'm just going to refer to Fannie for the sake

17   of convenience.

18   A.  Yes.

19   Q.  The certificate of designation involving Fannie and

20   Treasury is the stock certificate that Treasury had for its

21   stock with -- for its equity investment.  Is that right?

22   A.  Yes.

23   Q.  The PSPA is something different; is that right?

24   A.  Yes.

25   Q.  The PSPA is an agreement between FHFA and Treasury?

1    A.  Between FHFA and conservator.

2             MR. HUME:  Objection.  I'm sorry.  Objection.

3    Calls for a legal conclusion.

4             THE COURT:  Overruled.

5    BY MR. STERN:

6    Q.  So the PSPA is the agreement between FHFA and Treasury

7    that we've heard about.  Right?

8    A.  Yes.

9    Q.  And the third -- a third agreement we've heard about is

10   the shareholder contract between the shareholders and Fannie

11   and Freddie.  Is that right?

12   A.  Yes.

13   Q.  Those are three separate things?

14   A.  Yes.

15   Q.  Okay.  So now we're looking at the certificate of

16   designation or the stock certificate that relates to

17   Treasury and Fannie.  Is that right?

18   A.  Yes.

19   Q.  Okay.  So let's go to Page 2 of the exhibit, Paragraph

20   C, Subparagraph C.

21             So this is what you were looking at with Mr. Hume

22   earlier today; is that right?

23   A.  Yes, it is.

24   Q.  So I'm not sure that Mr. Hume read out this part:

25   "Dividend rate means 10 percent" -- or maybe he did --

1    "provided, however, that if at any time the company shall

2    have for any reason failed to pay dividends in cash" -- and

3    then it goes on.  Is that right?

4    A.  Yes.

5    Q.  So did you see the 10 percent dividend obligation as a

6    contractual obligation of the enterprises to Treasury?

7              MR. HUME:  Objection.  Calls for a legal

8    conclusion.

9              THE WITNESS:  Yes.

10             THE COURT:  Overruled.

11             THE WITNESS:  Yes, I did.

12   BY MR. STERN:

13   Q.  Your answer?

14   A.  Yes, I did.

15   Q.  And if Fannie, taking Fannie as an example, failed to

16   pay the 10 percent cash dividend, would that have been a

17   failure to meet a contractual obligation?

18   A.  Yes.

19   Q.  And in your role as acting director, did you have any

20   concern about what would happen if the market were to see a

21   failure to meet the contractual obligation?

22   A.  Yes.

23   Q.  And what was your concern?

24   A.  My concern is that that would immediately have market

25   participants questioning, Whoa, what's going on?  They can't

1    make this contractual obligation to the Treasury.  It would

2    raise some serious questions about the condition or -- of

3    the companies and their ability to perform on other

4    obligations.

5    Q.  And then Mr. Hume went on to ask you questions about

6    this 12 percent.  Do you recall that?

7    A.  Yes.

8    Q.  And you said something to the effect of that if there

9    was a failure to meet that contractual obligation, and

10   instead there were a 12 -- this other path we're

11   following --

12   A.  Yes.

13   Q.  -- that the rate goes up by 20 percent.  Can you please

14   explain that?  I don't see 20 percent here in the --

15   A.  It's the increase from 10 percent to 12 percent.  That's

16   a 20 percent increase in the dividend rate.

17   Q.  And I believe -- did you tell us on direct you saw that

18   as a penalty?

19   A.  Yes.

20   Q.  And what did you mean by that?

21   A.  A 20 percent increase in a required dividend is a pretty

22   significant increase in the dividend.  I viewed that as a

23   penalty.  The fact that if you failed then you're going to

24   have a 20 percent higher obligation going forward, it sounds

25   like a penalty to me.

1    Q.  So I'm now going to switch gears again to the questions

2    that Mr. Hume asked you today about HERA.  Okay?

3    A.  All right.

4    Q.  And I don't have it in front of me.  So again, someone

5    will correct me or the jurors will remember, I'm sure, the

6    testimony.

7           But what Mr. Hume showed you, first of all,

8    those -- were those obligations imposed on Treasury or on

9    FHFA?

10   A.  Treasury.

11   Q.  Did HERA impose all of the same obligations on both

12   Treasury and FHFA or were different obligations imposed on

13   Treasury and FHFA?

14   A.  Different.

15   Q.  So what Mr. Hume read to you had to do with a provision

16   in the statute about Treasury giving consideration to the

17   economic -- well, to the economic interests of shareholders.

18   Right?

19   A.  Yes.

20   Q.  And he asked you whether you gave consideration to those

21   economic interests?

22   A.  Yes.

23   Q.  You said no.  Right?

24   A.  That's correct.

25   Q.  Whose interests were you serving when you agreed to

1    enter into the net worth sweep?

2    A.  I was trying to act in the best interest of the public.

3    Q.  And what did acting in the best interest of the public

4    have to do, if anything, with obligations imposed on FHFA by

5    HERA?

6    A.  Well, that was FHFA's obligation under HERA.

7    Q.  Mr. Hume showed you a slide that had pictures of a whole

8    bunch of people on it.  Right?

9    A.  Yes, he did.

10   Q.  I'm not going to go -- some of those people, Ms. Tagoe,

11   for example, that's someone inside of FHFA?

12   A.  Yes.

13   Q.  And I believe that all the other people were outside of

14   FHFA?

15   A.  Yes, they were.

16   Q.  And I think -- were they all Fannie or Freddie types?

17   A.  Yes, they were.

18   Q.  Just briefly on this, Ms. Tagoe:  Did you ever talk to

19   Ms. Tagoe?

20   A.  Yes.

21   Q.  Did she participate in the weekly meetings you talked

22   about?

23   A.  I believe so, although the participants in that changed

24   from time to time.  So she certainly was there for some.

25   Whether all the way through my acting directorship, I don't

1    remember.

2    Q.  And you referred to monthly meetings.  Were there

3    regularly scheduled monthly meetings with Ms. Tagoe?

4    A.  Yes.  With Ms. Tagoe and her entire staff.  I met with

5    them monthly.

6    Q.  And when you had those meetings with Ms. Tagoe and her

7    staff monthly, did you get information from them?

8    A.  Yes.

9    Q.  And did that information inform your decision-making

10   about the third amendment?

11   A.  Yes.

12              MR. HUME:  Objection.  Lacks foundation.

13              THE COURT:  Overruled.

14   BY MR. STERN:

15   Q.  Your answer?

16   A.  Yes.

17   Q.  And I'm not going to go through every single one of

18   those other people.

19              But you described on your direct testimony the

20   engagement that you had with each of those people, I

21   believe.  Am I remembering correctly?

22   A.  Yes.

23   Q.  And in that engagement with all of those people, did you

24   gather information from them?

25   A.  Yes.

1    Q.  About Fannie from the Fannie people?

2    A.  Yes.

3    Q.  Freddie from the Freddie people?

4    A.  Yes.

5    Q.  And did that information inform your decision-making

6    about whether or not to enter into the third amendment?

7    A.  Yes.

8    Q.  These are famous last words when they come out of a

9    lawyer's mouth, but this is the last line of questioning for

10   you.  Don't look at your watch.

11   A.  I'm not.  I'm stretching my arms.

12   Q.  So Mr. Hume asked you about dividends and the

13   elimination of dividends.

14            Do you recall that?

15   A.  Yes.  I believe so.

16   Q.  Let me try to focus you a little bit more.

17            My recollection is that he asked you whether

18   dividends were eliminated during conservatorship.

19   A.  Yes.  I remember that now.  Yes.

20   Q.  And I believe that you testified in response to his

21   question that at least under the terms of the

22   conservatorship the dividends were eliminated during the

23   duration of the conservatorship?

24   A.  Yes.

25   Q.  Let's take a look at Exhibit DX-85.  Just so we're

DeMarco - REDIRECT - By Mr. Stern

1    clear, your understanding -- the basis for the testimony

2    that you gave Mr. Hume was your understanding that at least

3    as far as the provisions of the conservatorship were

4    concerned, that elimination of dividends would last as long

5    as the conservatorship lasted.  Right?

6    A.  Yes.

7    Q.  So as long as the conservatorship was in place, no

8    dividends.  Correct?

9    A.  Yes.

10   Q.  But if the conservatorship were ever to end, that

11   particular elimination would no longer be in play.  Right?

12   A.  Yes.

13   Q.  All right, sir.  But there was another provision having

14   to do with dividends to private shareholders that's found in

15   the PSPAs.  Is that right?

16   A.  Yes.

17            MR. STERN:  So let's pull up DX-85.

18   BY MR. STERN:

19   Q.  So just to move us along, I'm going to tell you what

20   this is.  You can agree or disagree.  This is the original

21   senior preferred stock purchase agreement.  Right?

22   A.  Yes.

23   Q.  Dated September 7th, 2008?

24   A.  Yes.

25   Q.  Let's go to Page 8 of the exhibit, which is also Page 8

1      of the document.

2              Under Covenants -- again, tell us what a covenant

3      is, as you understand it.

4      A.  It's a specific contractual restriction or requirement.

5      Q.  And let's look at 5.1, Restricted Payments.  It says,

6      "Seller shall not, and shall not permit any of its" -- I'm

7      just going to read selectively.  Somebody can call me out if

8      I'm missing something important.

9              Seller shall not permit, without the prior written

10     consent of purchaser, declare or pay any dividend, whether

11     in cash, property, blah, with respect to any seller's equity

12     interests other than the senior preferred stock.

13             Did this mean that under the terms of the PSPA --

14     I think you may have talked about this on direct -- is it

15     correct that under this term of the PSPA, dividends could

16     not be issued by -- to private shareholders by Fannie or

17     Freddie or FHFA, for that matter, without Treasury's written

18     consent?

19     A.  Dividends could not be issued to them.  Yes.

20     Q.  So if FHFA or Fannie or Freddie had decided to no longer

21     eliminate dividends, that couldn't happen without Treasury's

22     consent?

23     A.  Without their written consent, yes.

24     Q.  Going to the point that was raised this morning, this is

25     independent of the conservatorship provision.  Is that

1    right?

2              MR. HUME:  Objection.  Lacks foundation as to what

3    provision.

4    BY MR. STERN:

5    Q.  We talked about the elimination of dividends during

6    conservatorship.  Right?

7    A.  Yes.

8    Q.  This is independent of that.  Correct?

9    A.  Right.  This is the agreement between Treasury and FHFA

10   as conservator.  Yes.

11   Q.  So even if the conservatorship had ended, this provision

12   would still have been in place?

13   A.  As long as this agreement's still applicable, yes.

14   Q.  And that provision did not change through all the

15   amendments.  Correct?

16   A.  That's correct.

17   Q.  So even if the conservatorship ended, private

18   shareholders still couldn't get dividends unless Treasury

19   gave prior written consent.  Is that my -- am I

20   understanding that correctly?

21             MR. HUME:  Objection.  Calls for a legal

22   conclusion.

23             THE COURT:  Overruled.

24             THE WITNESS:  That's correct.  As long as --

25             THE COURT:  That was your understanding?

1          THE WITNESS:  Yes, it was.

2          MR. STERN:  Your Honor, I have nothing further.

3          THE COURT:  Mr. DeMarco, thank you.  You may step

4    down.

5          (Witness excused.)

6          MR. STERN:  May I be heard briefly?

7          THE COURT:  Yes.

8          (Whereupon, the following proceedings were had at

9    sidebar outside the presence of the jury:)

10          MR. STERN:  Your Honor, before we rest, we have

11    one more document to offer.

12          As the Court may recall and I was reminded

13    yesterday, Mr. DeMarco was actually called by agreement of

14    the parties in a single appearance, appearing both as a

15    defense witness and a Plaintiffs' witness.  So technically

16    speaking, the Plaintiffs' case remained open until

17    Mr. DeMarco's testimony had concluded.

18          We have now reached that point.  So I would move

19    the Court pursuant to Rule 50(a) for judgment as a matter of

20    law.  And we will submit on the arguments previously made

21    and on the record.

22          THE COURT:  That motion is denied.

23          MR. STERN:  Your Honor, we now have an exhibit to

24    move.  And Mr. Hoffman is going to handle this because there

25    is an objection, with the Court's permission.  I apologize

2601

 1    for the tag-teaming, your Honor.

 2         MR. HOFFMAN:  Your Honor, Ian Hoffman on behalf of

 3    the Defendants.

 4         I understand there's an objection to this.  I'm

 5    prepared to argue it now or during a break.  I'd like to

 6    show it to your Honor and we can discuss it.  I'm happy to

 7    do it on the phones if you wish; or if the jury's going to

 8    be released for lunch, we can argue it then.

 9         THE COURT:  Subject to that, and you've rested,

10    what's the Plaintiff doing next?

11         MR. HUME:  Your Honor, we would be calling

12    Professor Thakor as our witness in rebuttal.

13         THE COURT:  And then what are you anticipating?

14         MR. HUME:  Then we would be calling Professor

15    Dharan.  And that would be our rebuttal case.

16         THE COURT:  What's the time as to them?  I want to

17    tell the jury something now.

18         MR. HUME:  Ms. Davis is in a better position to

19    answer that.

20         MS. DAVIS:  Your Honor, Kenya Davis for the

21    Plaintiffs.

22         For Dr. Thakor, we expected his direct will be

23    between 30 and 40 minutes.

24         And, you know, we don't have any representations

25    to make as to the cross.

1          And for Dr. Dharan, we expect the timing will be

2     just about the same.

3          THE COURT:  What are the Defendants thinking

4     about?

5          MR. HOFFMAN:  Your Honor, Ian Hoffman on behalf of

6     the Defendants.

7          I would estimate about the same as the directs, if

8     not a little bit shorter.  Certainly not longer, your Honor.

9          THE COURT:  Let me explain to the jury where we

10    are, then.

11         MR. HOFFMAN:  Thank you, your Honor.

12         (Whereupon, the following proceedings were had in

13    open court:)

14         THE COURT:  All right, ladies and gentlemen.

15    Subject to a couple of legal questions about exhibits, the

16    Defendants have now rested.

17         The Plaintiffs have an opportunity to call

18    rebuttal witnesses.  They're going to re-call two of their

19    experts for short rebuttal testimony.  So we have a little

20    bit of rebuttal evidence before we begin the closing

21    arguments.

22         We will begin the closing arguments this

23    afternoon, and we will finish the closing arguments tomorrow

24    morning.

25         So we're there.  We're almost there.  I'm going to

1    go in recess for lunch now.  We'll come back at 1:30.  Don't

2    talk about the case.  I'll see you all back at 1:30.

3              (Whereupon, the jury exited the courtroom at 12:21

4    p.m. and the following proceedings were had:)

5              MR. HOFFMAN:  Your Honor, Ian Hoffman again on

6    behalf of the Defendants.  I'm happy to argue our motion --

7    not our motion, but our document, now or after --

8              THE COURT:  Now is fine.

9              MR. HOFFMAN:  Okay.  So, your Honor, Defendants

10   move into evidence PX -- that's Plaintiffs' Exhibit -- 486.

11             I have -- I'll ask Mr. Montgomery to pull up PX, P

12   as in Plaintiffs', Exhibit 486.

13             I have a copy for the Court.

14             (Tenders document to the Court.)

15             Your Honor, as you can see, the first page of

16   Plaintiffs' Exhibit 486 is an email dated August 16th, 2012,

17   which as your Honor knows is the day before the third

18   amendment was signed.

19             This is a Treasury document, your Honor.  And as

20   you take a look at Page 2, 2 through 6, this is the formal

21   action memorandum for Secretary Geithner recommending --

22   senior Treasury officials recommending that he enter into --

23   approve and enter into the third amendment.

24             And there on the first page of the memo, Page 2 of

25   the document, your Honor, you can see Secretary Geithner's

1    handwritten initials next to the approve box.

2            I believe the objection to this, your Honor, is

3    hearsay.

4            But your Honor has already admitted several

5    Treasury documents under the public records exception.  And

6    to be transparent, your Honor, you know, we resisted that

7    for many of those documents because, your Honor, they are --

8    they were internal Treasury emails that were predecisional

9    and frankly, your Honor, just very informal, draft questions

10   and answers and things like that.  And we obviously respect

11   and appreciate the Court's ruling on those.

12           But Plaintiffs' Exhibit 486, your Honor, is --

13   there is no more formal and highly official document as the

14   official action memorandum signed by the secretary himself.

15           If your Honor looks at the final page, 6 of 6 of

16   486, there is a clearance sheet indicating the one, two,

17   three, four, five, six -- at least seven, eight, nine

18   persons, other Treasury officials, who reviewed and signed

19   off on this.  There's even one handwritten signature on this

20   clearance sheet.

21           And then again, it's signed by the secretary

22   himself.

23           There's obviously no authenticity objection to

24   this.  That's confirmed by the cover email as well.

25           If there are any documents, your Honor, that set

1    forth the official actions of the Treasury Department and

2    set forth their -- the office's activities under 803(3),

3    this is that kind of document, your Honor.

4         And so this is -- again, I won't belabor it, your

5    Honor, but we can pull up several --

6         THE COURT:  Please don't.

7         MR. HOFFMAN:  Understood, your Honor.

8         THE COURT:  I'll hear the objection before I

9    overrule it.

10        MR. KAPLAN:  Thank you, your Honor.

11        THE COURT:  I've allowed in all these others that

12    are drafts.  Why wouldn't I allow this in?

13        MR. KAPLAN:  Number one, your Honor, this is

14    another eleventh-hour special by Defendants.  This was not

15    even on their exhibit list; it was on ours.  They objected

16    to it on both 403 and relevance grounds.

17        THE COURT:  And I've overruled all those on

18    drafts.  This is the authentic original.  Why wouldn't I

19    allow this in?

20        MR. KAPLAN:  Because, your Honor, part of the

21    issue in this case is FHFA's process.  And at this point,

22    first of all, the jury is going to conclude -- is going

23    to -- excuse me -- the jury will consider it for the truth

24    of the matter asserted.  They're likely to do that.

25        But also, this is Treasury's document.  It was --

1      there's no evidence it was ever communicated to Mr. DeMarco.

2      And that has been an important point for your Honor on a lot

3      of documents in this case.

4              It did not figure into his decision-making

5      process, which is what's at issue.  We've heavily emphasized

6      FHFA's decision-making process, the lack of a memo.  They

7      even admitted that there was no memo.

8              And so now to at the eleventh hour talk about

9      Treasury's memo when there wasn't a single witness who

10     talked about it in this entire case and it wasn't even on

11     their exhibit list and they objected to our --

12             THE COURT:  I admitted them all.  I'll admit this

13     one.

14             Your objection is overruled.

15             MR. KAPLAN:  Thank you, your Honor.

16             THE COURT:  What's the exhibit number you're going

17     to place on that for the Defendants' exhibit?

18             MR. HOFFMAN:  Your Honor, that one is PX-486.  We

19     can supply a DX number if we need.

20             THE COURT:  We need a Defendant number, since they

21     don't want it in.

22             MR. HOFFMAN:  I will get the next number in line,

23     your Honor.  I'll check with my team.

24             THE COURT:  All right.  I'll see you all at 1:30.

25             MR. HOFFMAN:  Thank you.

 1                 THE COURT REPORTER:  Mr. Hoffman, could I have

 2       that number within the next few minutes so I can put it in

 3       the record?

 4                 MR. HOFFMAN:  I'm going to give it to you now.

 5                 We'll call it DX-928.

 6                 (Whereupon, Defendants' Exhibit No. 928 was

 7       entered into evidence.)

 8                 (Thereupon, a luncheon recess was taken, after

 9       which the following proceedings were had:)

10                 (Proceedings concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **<u>CERTIFICATE</u>**

2

3                    I, LISA EDWARDS, RDR, CRR, do hereby

4      certify that the foregoing constitutes a true and accurate

5      transcript of my stenographic notes, and is a full, true,

6      and complete transcript of the proceedings produced to the

7      best of my ability.

8

9

10                   Dated this 9th day of August, 2023.

11

12              <u>/s/ Lisa Edwards, RDR, CRR</u>
                Official Court Reporter
13              United States District Court for the
                  District of Columbia
14              333 Constitution Avenue, Northwest
                Washington, D.C. 20001
15              (202) 354-3269

16

17

18

19

20

21

22

23

24

25

## $

**$1,000** [1] - 36:14

## '

**'11** [1] - 6:17

## /

**/s** [1] - 101:12

## 1

**1** [3] - 8:5, 11:13, 11:17
**1,000** [1] - 36:20
**1-M** [1] - 52:15
**10** [12] - 34:18, 34:22, 39:7, 39:24, 40:14, 41:12, 44:2, 81:24, 83:25, 84:5, 84:16, 85:15
**10-Q** [3] - 59:18, 61:20, 65:9
**100** [1] - 3:11
**10020** [1] - 2:5
**10:09** [1] - 1:7
**10:10** [1] - 4:15
**113** [2] - 25:8, 25:9
**11:38** [1] - 73:6
**11:53** [1] - 73:12
**12** [11] - 1:13, 25:8, 25:9, 34:23, 39:17, 39:21, 42:9, 81:25, 85:6, 85:10, 85:15
**1251** [2] - 2:4
**12:21** [1] - 96:3
**13-1053** [2] - 1:4, 4:2
**13-1288** [2] - 1:10, 4:2
**135** [1] - 58:6
**136.5** [1] - 51:14
**14** [1] - 65:25
**1401** [1] - 1:22
**141.5** [1] - 51:16
**14th** [1] - 73:23
**15** [1] - 45:16
**1523** [1] - 1:18
**16** [1] - 62:18
**16th** [1] - 96:16
**17** [2] - 11:13, 11:16
**178** [2] - 11:13, 11:16
**179** [2] - 11:13, 11:16
**19** [1] - 41:12
**19087** [1] - 1:25
**1994** [1] - 9:25

**1995** [1] - 9:24
**1996** [1] - 9:24
**19th** [1] - 56:22
**1:30** [3] - 96:1, 96:2, 99:24

## 2

**2** [9] - 8:13, 35:14, 43:23, 47:19, 57:2, 83:19, 96:20, 96:24
**2-A** [2] - 35:12, 36:1
**2-B** [2] - 35:12, 35:25
**2-C** [1] - 39:6
**20** [6] - 40:16, 85:13, 85:14, 85:16, 85:21, 85:24
**20001** [3] - 2:9, 2:13, 101:14
**20005** [1] - 1:22
**2003** [1] - 10:2
**20036** [1] - 1:18
**2006** [1] - 74:23
**2007** [2] - 44:19, 52:17
**2008** [10] - 44:20, 54:3, 54:18, 54:24, 60:19, 60:22, 61:8, 72:8, 81:20, 90:23
**2009** [14] - 53:17, 56:3, 58:1, 58:3, 58:13, 58:15, 59:20, 59:21, 59:23, 59:25, 60:13, 60:23, 61:9, 65:3
**2010** [7] - 13:7, 18:13, 53:5, 53:11, 53:12, 53:16, 53:19
**2011** [9] - 21:5, 28:21, 29:16, 29:17, 55:8, 56:22, 76:15, 78:3, 78:18
**2012** [31] - 6:18, 8:3, 9:10, 21:7, 24:14, 25:18, 27:7, 28:21, 29:16, 29:19, 29:25, 34:6, 52:3, 52:4, 52:17, 54:3, 54:25, 61:21, 65:6, 65:10, 65:18, 65:24, 66:11, 66:17, 68:1, 72:2, 72:9, 73:24, 96:16
**2013** [3] - 6:18, 29:20, 49:21
**2014** [1] - 6:18
**202** [2] - 2:14, 101:15
**2020** [3] - 11:12, 11:19, 25:7
**2023** [2] - 1:7, 101:10

## 22

**22** [3] - 6:13, 6:14, 6:16
**22nd** [1] - 13:7
**23-page** [1] - 18:8
**24** [1] - 59:25
**24th** [1] - 58:15
**25** [3] - 43:19
**28** [1] - 20:3
**280** [1] - 1:25
**293** [2] - 3:10, 78:14

## 3

**3** [4] - 25:8, 25:9, 38:12, 38:14
**3.66** [1] - 51:23
**30** [1] - 94:23
**333** [2] - 2:12, 101:14
**338** [4] - 3:9, 55:12, 55:13, 56:17
**34** [1] - 47:17
**354-3269** [2] - 2:14, 101:15
**388** [2] - 31:24, 32:9
**388-A** [1] - 31:22

## 4

**4** [4] - 18:5, 18:12, 32:18, 51:25
**40** [1] - 94:23
**402** [2] - 32:7, 32:9
**403** [3] - 32:7, 32:9, 98:16
**4617** [1] - 45:20
**476** [1] - 61:18
**48** [1] - 3:6
**486** [5] - 96:10, 96:12, 96:16, 97:12, 97:16

## 5

**5** [5] - 3:6, 18:17, 29:6, 30:5, 57:1
**5.1** [1] - 91:5
**50(a** [1] - 93:19
**56** [1] - 3:9
**5th** [2] - 58:3, 58:13

## 6

**6** [5] - 60:2, 60:13, 96:20, 97:15
**601** [1] - 2:9
**646** [1] - 33:17
**646-A** [4] - 31:3,

**31:20, 32:7, 33:23
6706** [1] - 2:13
**6th** [2] - 59:23, 60:23

## 7

**7** [6] - 8:3, 58:20, 58:21, 66:11, 74:2, 78:23
**748** [1] - 43:18
**749** [1] - 43:20
**751** [1] - 41:12
**78** [1] - 3:10
**7th** [4] - 65:18, 65:24, 68:1, 90:23

## 8

**8** [8] - 6:13, 6:14, 36:3, 36:9, 36:10, 38:21, 90:25
**801** [2] - 77:24, 78:4
**803(3** [1] - 98:2
**824** [2] - 6:12, 6:13
**825** [2] - 6:13, 6:14

## 9

**9** [1] - 1:7
**928** [2] - 3:11, 100:6
**9th** [1] - 101:10

## A

**a.m** [4] - 1:7, 4:15, 73:7, 73:12
**ability** [3] - 15:15, 85:3, 101:7
**able** [9] - 49:22, 63:9, 63:16, 64:17, 64:19, 64:24, 70:23, 76:23, 81:21
**ABS** [2] - 47:14, 60:20
**abundance** [1] - 32:23
**accept** [4] - 41:22, 41:23, 51:21, 51:22
**access** [2] - 16:1, 50:20
**accessible** [1] - 50:18
**account** [4] - 13:19, 15:23, 16:14, 24:13
**accounting** [2] - 19:3, 25:21
**accrue** [2] - 34:22,

**36:2
accrued** [1] - 38:19
**accurate** [11] - 7:3, 12:5, 25:23, 40:4, 42:3, 42:14, 44:9, 65:2, 67:25, 72:24, 101:4
**act** [1] - 87:2
**Act** [1] - 14:23
**acting** [11] - 10:7, 16:19, 17:14, 22:4, 41:5, 42:18, 48:12, 50:15, 84:19, 87:3, 87:25
**Acting** [1] - 18:13
**Action** [3] - 1:3, 4:1, 4:4
**action** [3] - 9:7, 96:21, 97:14
**ACTION** [1] - 1:11
**actions** [1] - 98:1
**activities** [1] - 98:2
**activity** [2] - 33:12, 34:7
**actual** [2] - 46:21, 47:18
**ADAM** [1] - 2:2
**added** [3] - 36:3, 37:24, 38:20
**addition** [1] - 81:25
**additional** [3] - 31:8, 31:13, 67:8
**address** [1] - 68:12
**addressed** [1] - 69:4
**addresses** [1] - 32:14
**adjust** [1] - 61:10
**Administration** [3] - 59:5, 59:9, 59:15
**admit** [1] - 99:12
**admitted** [4] - 13:6, 97:4, 99:7, 99:12
**advisor** [1] - 9:10
**affairs** [1] - 19:5
**affect** [2] - 27:25, 54:9
**affected** [1] - 52:9
**afield** [2] - 32:6, 32:17
**afternoon** [1] - 95:23
**agencies** [1] - 74:9
**agency** [2] - 18:24, 19:13
**AGENCY** [1] - 1:6
**aggregate** [1] - 37:11
**ago** [4] - 31:9, 33:21, 42:4, 45:16
**agree** [13] - 5:13, 5:18, 5:25, 22:14, 23:3, 23:9, 23:17,

37:16, 44:13, 49:7, 49:12, 60:7, 90:20
**agreed** [2] - 72:2, 86:25
**agreeing** [1] - 21:12
**agreement** [12] - 34:14, 43:25, 44:6, 67:9, 68:24, 82:11, 82:25, 83:6, 83:9, 90:21, 92:9, 93:13
**Agreement** [1] - 4:4
**AGREEMENT** [1] - 1:11
**agreement's** [1] - 92:13
**Ahead** [1] - 57:2
**al** [2] - 1:3, 1:7
**alive** [1] - 81:20
**allow** [2] - 98:12, 98:19
**allowed** [5] - 15:17, 33:1, 70:19, 98:11
**allows** [1] - 57:14
**almost** [2] - 42:23, 95:25
**alone** [1] - 10:15
**alternative** [3] - 42:10, 70:3, 70:9
**amend** [2] - 69:8, 69:10
**amending** [1] - 69:14
**amendment** [15] - 9:14, 16:11, 41:10, 49:13, 52:10, 68:8, 68:12, 68:22, 69:10, 72:2, 77:12, 88:10, 89:6, 96:18, 96:23
**amendments** [1] - 92:15
**American** [1] - 56:22
**Americas** [1] - 2:4
**amount** [4] - 14:12, 37:10, 37:11, 70:18
**amounts** [2] - 36:23, 37:2
**analysis** [7] - 6:4, 18:12, 18:17, 19:2, 20:16, 52:8
**analyst** [6] - 26:9, 26:23, 28:8, 73:23, 75:4, 75:5
**analysts** [1] - 27:14
**announced** [2] - 17:10, 21:16
**announcing** [1] - 66:18
**annual** [10] - 20:24, 21:1, 28:16, 28:17, 28:21, 29:4, 29:15, 63:6, 67:14, 78:21

**answer** [13] - 7:7, 21:14, 25:22, 26:2, 42:2, 42:8, 42:13, 44:3, 65:7, 65:8, 84:13, 88:15, 94:19
**Answer** [1] - 11:25
**answered** [2] - 7:13, 54:7
**answers** [3] - 7:14, 42:14, 97:10
**anticipating** [1] - 94:13
**anyway** [1] - 39:3
**apologize** [3] - 57:13, 65:6, 93:25
**apparatus** [1] - 80:24
**appear** [2] - 26:20, 26:24
**appearance** [2] - 26:16, 93:14
**APPEARANCES** [1] - 2:1
**aPPEARANCES** [1] - 1:16
**appearing** [2] - 26:22, 93:14
**applicable** [2] - 78:4, 92:13
**applicants** [1] - 22:2
**apply** [3] - 31:25, 32:1, 33:7
**appointed** [2] - 17:5, 41:8
**appointment** [2] - 46:3, 46:13
**appreciate** [4] - 7:15, 7:16, 42:23, 97:11
**appreciating** [1] - 7:16
**approach** [1] - 15:13
**Approach** [2] - 18:18, 18:23
**appropriate** [2] - 7:14, 13:12
**approve** [4] - 22:5, 22:20, 96:23, 97:1
**approving** [2] - 17:15, 23:1
**April** [1] - 31:5
**are..** [1] - 15:23
**argue** [4] - 30:22, 94:5, 94:8, 96:6
**argument** [1] - 31:8
**arguments** [4] - 93:20, 95:21, 95:22, 95:23
**arms** [1] - 89:11
**ARNOLD** [1] - 2:8
**articulate** [1] - 76:22
**aside** [1] - 70:17

**ASIM** [1] - 2:6
**asserted** [1] - 98:24
**assessing** [1] - 18:24
**asset** [1] - 71:13
**assets** [15] - 75:12, 75:23, 76:1, 77:10, 77:14, 79:5, 79:18, 79:20, 80:1, 80:6, 80:8, 80:11, 81:6, 81:7, 81:20
**associated** [1] - 45:15
**Association** [1] - 78:20
**assuming** [2] - 29:14, 29:15
**assumption** [1] - 7:9
**assurance** [2] - 58:9, 58:19
**attacked** [2] - 77:16, 77:17
**attempt** [2] - 31:17, 32:10
**attention** [3] - 42:7, 55:7, 71:19
**August** [12] - 1:7, 29:25, 34:6, 52:3, 65:6, 65:18, 65:24, 66:11, 68:1, 72:1, 96:16, 101:10
**authentic** [1] - 98:18
**authenticity** [1] - 97:23
**authority** [5] - 12:12, 13:20, 15:9, 16:13, 47:7
**authorizes** [1] - 12:17
**available** [5] - 35:21, 36:4, 50:14, 53:22, 56:25
**Available** [1] - 56:24
**Avenue** [6] - 1:18, 1:22, 2:4, 2:9, 2:12, 101:14
**avoid** [1] - 80:1
**Awaa** [3] - 20:11, 20:13, 20:14
**aware** [12] - 14:1, 16:11, 16:17, 22:7, 27:14, 27:21, 27:24, 28:3, 28:7, 34:6, 44:3, 44:6

**B**

**backed** [7] - 28:5, 28:15, 32:18, 32:22,

33:10, 34:7, 34:9
**backstop** [3] - 43:2, 43:12, 44:6
**backwards** [1] - 66:22
**balance** [1] - 71:4
**Bank** [8] - 26:9, 26:12, 27:4, 27:16, 27:22, 28:3, 73:23, 75:4
**Bank's** [1] - 50:19
**banks** [1] - 28:7
**based** [3] - 7:9, 61:14, 71:25
**basis** [2] - 77:24, 90:1
**became** [2] - 10:6, 80:17
**become** [1] - 81:16
**becomes** [1] - 74:21
**BEFORE** [1] - 1:13
**began** [2] - 19:12, 44:24
**begin** [2] - 95:20, 95:22
**beginning** [3] - 44:22, 49:21, 79:13
**begins** [2] - 62:21, 74:21
**behalf** [5] - 10:16, 31:1, 94:2, 95:5, 96:6
**belabor** [1] - 98:4
**below** [2] - 8:23, 38:21
**benefit** [2] - 71:1, 71:6
**Benson** [3] - 23:19, 23:21, 24:6
**BERGER** [1] - 2:3
**BERGMAN** [1] - 2:7
**BERKLEY** [1] - 1:17
**BERNSTEIN** [1] - 2:3
**best** [5] - 69:23, 70:1, 87:2, 87:3, 101:7
**better** [4] - 52:7, 70:4, 70:10, 94:18
**between** [14] - 10:12, 18:10, 54:23, 64:4, 64:18, 71:4, 82:11, 82:15, 82:25, 83:1, 83:6, 83:10, 92:9, 94:23
**biggest** [2] - 5:13, 5:16
**billion** [5] - 36:19, 36:20, 37:2, 47:19
**bit** [3] - 89:16, 95:8, 95:20
**blah** [1] - 91:11

**blow** [2] - 60:3, 74:3
**blown** [1] - 51:5
**board** [6] - 16:25, 17:6, 17:7, 22:24, 35:20
**BOIES** [1] - 1:21
**bolster** [2] - 32:4, 77:2
**bonds** [1] - 28:5
**book** [2] - 80:13, 80:17
**bottom** [4] - 52:4, 53:17, 58:5, 58:22
**Bowler** [6] - 10:19, 10:22, 10:24, 11:7, 11:10, 12:1
**box** [1] - 97:1
**BOZMAN** [1] - 2:3
**break** [1] - 94:5
**briefly** [8] - 20:15, 26:13, 28:16, 32:12, 35:11, 70:9, 87:18, 93:6
**broad** [1] - 80:11
**broader** [1] - 69:24
**broadly** [2] - 17:2, 56:5
**brought** [3] - 10:6, 10:10, 42:7
**bullet** [2] - 8:19, 8:23
**bullets** [2] - 80:5, 80:12
**bunch** [1] - 87:8
**business** [11] - 27:22, 58:11, 59:4, 59:8, 80:13, 80:17, 80:18, 80:19, 80:21, 81:2, 81:22
**Business** [1] - 60:3
**buy** [3] - 13:20, 15:15, 16:13
**BY** [63] - 2:10, 5:3, 5:7, 6:15, 7:21, 8:14, 9:4, 11:18, 12:15, 14:20, 16:22, 17:24, 18:7, 20:1, 20:5, 25:11, 26:7, 26:14, 27:3, 27:20, 28:14, 29:1, 29:13, 30:6, 34:5, 35:6, 35:13, 37:21, 38:13, 41:13, 42:17, 43:8, 43:22, 46:1, 47:13, 48:20, 48:23, 50:10, 52:14, 53:23, 56:19, 57:4, 59:2, 60:5, 61:19, 62:2, 62:10, 62:20, 65:12, 65:22, 66:10, 73:16, 73:21, 74:5, 76:12, 78:16, 78:24,

82:6, 83:5, 84:12,
88:14, 90:18, 92:4

## C

**CAITLIN** [1] - 2:3
**callout** [1] - 46:10
**candidates** [1] -
22:25
**cap** [2] - 81:13, 81:14
**capacity** [1] - 54:15
**capital** [6] - 15:25,
19:3, 47:20, 48:4,
81:1, 81:14
**capped** [1] - 49:21
**carry** [1] - 54:15
**carryovers** [1] - 17:8
**Case** [4] - 1:10, 4:2,
50:11, 52:17
**case** [13] - 5:21,
26:25, 27:16, 30:20,
34:10, 54:10, 82:12,
93:16, 94:15, 96:2,
98:21, 99:3, 99:10
**Case-Shiller** [2] -
50:11, 52:17
**cases** [11] - 7:13
**cash** [11] - 34:18,
34:22, 35:22, 39:12,
39:16, 44:2, 44:5,
81:21, 84:2, 84:16,
91:11
**catastrophe** [1] -
74:22
**categories** [2] - 80:7,
80:11
**category** [3] - 80:16,
80:20, 80:21
**caution** [1] - 32:23
**CEO** [6] - 21:23,
22:1, 22:5, 22:21,
62:15, 65:24
**CEOs** [3] - 17:9,
17:17, 72:24
**certain** [1] - 45:10
**certainly** [6] - 5:17,
11:10, 23:25, 25:3,
87:24, 95:8
**certificate** [8] - 35:7,
39:13, 82:10, 82:14,
82:19, 82:20, 83:15,
83:16
**CERTIFICATE** [1] -
101:1
**certificates** [1] -
34:13
**certified** [1] - 72:24
**certify** [1] - 101:4
**CFOs** [1] - 72:24

**challenges** [1] - 74:9
**change** [4] - 17:4,
60:22, 75:4, 92:14
**changed** [3] - 13:9,
60:24, 87:23
**changes** [2] - 17:11,
80:18
**changing** [1] - 55:4
**charging** [1] - 70:17
**chart** [2] - 52:22,
52:23
**charts** [1] - 30:7
**check** [3] - 59:22,
76:4, 99:23
**CHECK** [1] - 1:24
**chief** [7] - 17:19,
21:21, 22:17, 23:5,
23:13, 62:5, 65:18
**chose** [1] - 37:16
**circular** [4] - 41:16,
41:25, 68:18, 74:17
**circumstances** [1] -
60:24
**Civil** [2] - 1:3, 4:1
**Claims** [1] - 46:16
**clarification** [3] -
6:23, 7:15, 7:17
**Class** [1] - 4:4
**CLASS** [3] - 1:11,
1:19, 2:2
**clear** [13] - 5:18,
11:11, 18:22, 19:9,
20:7, 40:4, 40:19,
42:6, 43:14, 55:4,
57:9, 74:14, 90:1
**clearance** [2] -
97:16, 97:20
**clearly** [3] - 31:17,
40:11, 40:25
**clicker** [1] - 20:11
**climbing** [1] - 52:5
**closing** [3] - 95:20,
95:22, 95:23
**COLATRIANO** [1] -
1:17
**colleague** [1] - 76:21
**colloquial** [1] - 54:22
**Columbia** [2] - 2:12,
101:13
**COLUMBIA** [1] - 1:1
**comment** [2] - 13:13,
14:9
**commentary** [1] -
45:21
**commissions** [1] -
28:9
**commitment** [11] -
24:25, 36:24, 37:3,
37:23, 49:20, 61:4,
61:11, 64:3, 74:15,

74:17, 81:12
**common** [2] - 47:20,
47:21
**communicate** [1] -
59:11
**communicated** [1] -
99:1
**communicating** [2] -
57:18, 57:20
**communications** [1]
- 19:6
**community** [1] - 19:5
**companies** [16] -
16:25, 25:20, 27:23,
37:23, 37:24, 38:10,
44:5, 61:3, 61:5,
69:24, 70:2, 70:24,
81:1, 81:4, 85:3
**company** [12] - 16:7,
16:16, 17:9, 25:17,
37:9, 37:16, 38:18,
39:11, 39:15, 40:11,
80:4, 84:1
**company's** [1] -
49:23
**comparing** [2] -
30:7, 30:8
**comparison** [1] -
54:23
**compensation** [1] -
45:11
**compensatory** [1] -
46:21
**competent** [1] -
13:13
**complete** [1] - 101:6
**composed** [1] - 19:1
**comprehensive** [6] -
19:13, 63:6, 63:10,
64:15, 67:12, 67:13
**concern** [3] - 84:20,
84:23, 84:24
**concerned** [1] - 90:4
**concert** [1] - 66:18
**conclude** [1] - 98:22
**concluded** [2] -
93:17, 100:10
**conclusion** [4] -
13:4, 83:3, 84:8,
92:22
**condition** [1] - 85:2
**Conference** [1] -
56:22
**conference** [1] -
47:14
**confidence** [1] - 61:5
**confirm** [1] - 6:16
**confirmed** [1] -
97:24
**conflict** [2] - 27:15,

27:24
**confusing** [1] - 40:19
**Congress** [7] -
13:18, 16:12, 28:17,
28:22, 59:5, 59:9,
59:15
**congressional** [2] -
9:7, 19:5
**connection** [1] - 15:9
**consent** [5] - 91:10,
91:18, 91:22, 91:23,
92:19
**consented** [2] -
37:25, 38:6
**conservator** [12] -
16:19, 17:5, 46:3,
46:11, 46:19, 48:5,
50:15, 68:22, 79:4,
80:17, 83:1, 92:10
**conservatorship** [34]
- 16:24, 17:10, 19:4,
24:18, 41:2, 41:8,
42:9, 44:24, 45:2,
45:9, 45:16, 47:10,
48:2, 57:14, 58:8,
58:10, 58:11, 58:12,
61:3, 79:14, 80:13,
80:15, 80:16, 89:18,
89:22, 89:23, 90:3,
90:5, 90:7, 90:10,
91:25, 92:6, 92:11,
92:17
**conservatorships**
[3] - 20:23, 57:16,
57:22
**Conserve** [1] - 78:25
**conserve** [13] -
47:19, 49:19, 49:22,
75:12, 75:23, 76:1,
77:10, 77:14, 79:5,
79:18, 79:24, 81:3,
81:6
**conserved** [1] - 80:7
**conserving** [2] -
48:4, 81:7
**consider** [8] - 14:15,
24:10, 40:9, 40:17,
40:24, 41:15, 41:25,
98:23
**consideration** [5] -
15:8, 25:4, 44:15,
86:16, 86:20
**considerations** [4] -
13:18, 15:23, 16:14,
40:6
**Considerations** [1] -
15:4
**considered** [1] -
40:21
**considering** [2] -

25:19, 59:16
**consistent** [11] -
25:25, 46:6, 48:11,
77:3, 77:8, 77:25,
78:5, 81:6, 81:9,
81:10, 81:11
**consistently** [1] -
77:20
**constitutes** [1] -
101:4
**Constitution** [2] -
2:12, 101:14
**consulted** [1] - 20:7
**CONT'D** [1] - 2:1
**contained** [1] - 15:9
**context** [3] - 24:20,
41:9, 63:2
**continue** [6] - 47:22,
48:8, 57:15, 58:10,
60:15, 64:2
**continued** [2] -
53:15, 80:18
**CONTINUED** [1] -
5:2
**continuing** [1] -
63:25
**contract** [4] - 40:14,
45:8, 46:20, 83:10
**contracts** [5] - 45:1,
45:14, 46:2, 46:8,
47:8
**contractual** [6] -
84:6, 84:17, 84:21,
85:1, 85:9, 91:4
**convenience** [1] -
82:17
**convention** [1] -
78:21
**COOPER** [1] - 1:17
**copy** [3] - 18:3,
18:10, 96:13
**corner** [1] - 74:3
**corporation's** [3] -
15:24, 16:6, 16:15
**correct** [96] - 5:21,
7:4, 8:16, 9:1, 9:5,
9:8, 9:11, 9:15, 9:16,
10:7, 10:8, 10:13,
10:16, 11:6, 12:5,
12:9, 16:24, 17:4,
18:8, 20:18, 21:2,
21:6, 21:7, 21:12,
21:21, 21:22, 22:5,
22:6, 22:9, 22:13,
22:16, 23:2, 23:4,
23:6, 23:7, 23:8,
23:10, 23:19, 23:22,
23:25, 24:3, 24:6,
25:21, 26:23, 27:8,
27:12, 27:13, 28:10,

28:18, 36:17, 36:20, 36:21, 36:24, 37:5, 37:18, 37:25, 38:1, 38:2, 38:6, 38:7, 38:10, 39:7, 39:9, 39:22, 39:23, 40:7, 40:9, 41:2, 42:1, 42:20, 42:25, 44:9, 44:17, 46:8, 47:6, 47:8, 47:9, 47:15, 48:1, 48:25, 49:6, 51:16, 54:21, 68:14, 71:19, 72:16, 79:11, 79:15, 86:5, 86:24, 90:8, 91:15, 92:8, 92:15, 92:16, 92:24

**correctly** [11] - 8:6, 8:24, 10:20, 20:13, 24:20, 49:5, 53:8, 55:1, 68:15, 88:21, 92:20

**counsel** [5] - 4:7, 5:8, 21:25, 52:7, 76:8

**counterpart** [1] - 11:2

**couple** [3] - 17:7, 18:16, 95:15

**course** [3] - 17:12, 62:6, 66:19

**court** [8] - 14:19, 34:2, 56:13, 75:21, 77:9, 77:22, 78:9, 95:13

**COURT** [43] - 1:1, 4:6, 4:11, 4:16, 4:19, 14:17, 30:24, 33:23, 43:5, 45:23, 48:16, 55:14, 56:11, 56:16, 73:5, 73:13, 77:5, 78:7, 78:13, 83:4, 84:10, 88:13, 92:23, 92:25, 93:3, 93:7, 93:22, 94:9, 94:13, 94:16, 95:3, 95:9, 95:14, 96:8, 98:6, 98:8, 98:11, 98:17, 99:12, 99:16, 99:20, 99:24, 100:1

**Court** [13] - 2:11, 2:11, 31:7, 31:15, 32:5, 73:4, 76:8, 93:12, 93:19, 96:13, 96:14, 101:12, 101:13

**Court's** [7] - 30:19, 30:22, 48:17, 58:23, 78:10, 93:25, 97:11

**courtroom** [4] - 4:14, 73:6, 73:11, 96:3

**COURTROOM** [3] - 4:1, 4:13, 73:10

**covenant** [1] - 91:2

**Covenants** [2] - 8:20, 91:2

**cover** [8] - 26:15, 29:2, 29:3, 63:10, 64:24, 65:1, 67:20, 97:24

**covered** [1] - 27:23

**covering** [2] - 51:4, 74:10

**create** [1] - 50:2

**credit** [4] - 5:23, 7:11, 19:3

**crisis** [3] - 44:22, 53:25, 54:9

**Cross** [1] - 3:4

**cross** [8] - 4:22, 54:17, 55:20, 56:8, 61:24, 69:20, 71:9, 94:25

**CROSS** [1] - 5:2

**cross-examination** [7] - 4:22, 54:17, 55:20, 56:8, 61:24, 69:20, 71:9

**CROSS-EXAMINATION** [1] - 5:2

**CRR** [3] - 2:10, 101:3, 101:12

**cumulative** [2] - 35:22, 39:16

**current** [1] - 77:18

## D

**D.C** [6] - 1:6, 1:18, 1:22, 2:9, 2:13, 101:14

**damage** [1] - 50:5

**Damages** [1] - 46:16

**damages** [4] - 45:10, 45:11, 46:21

**data** [4] - 31:14, 50:14, 50:20, 52:8

**date** [13] - 13:7, 29:14, 35:17, 37:8, 37:10, 37:13, 39:15, 56:3, 58:8, 59:22, 65:10, 65:17, 66:8

**Dated** [1] - 101:10

**dated** [3] - 73:23, 90:23, 96:16

**dates** [2] - 29:9, 50:23

**DAVID** [1] - 2:7

**DAVIS** [2] - 1:20, 94:20

**Davis** [2] - 94:18,

94:20

**DAY** [1] - 1:13

**deadline** [1] - 31:5

**deal** [3] - 44:1, 44:21, 68:17

**debated** [1] - 59:14

**debt** [2] - 49:23, 81:15

**December** [5] - 18:13, 56:3, 58:15, 59:25, 61:8

**decided** [2] - 68:23, 91:20

**decision** [13] - 10:14, 10:15, 19:25, 22:5, 44:13, 52:9, 68:21, 77:11, 88:9, 89:5, 99:4, 99:6

**decision-making** [4] - 88:9, 89:5, 99:4, 99:6

**declare** [1] - 91:10

**declared** [2] - 35:20, 36:6

**decline** [2] - 53:15, 54:4

**declining** [5] - 53:4, 54:4, 54:5, 54:7, 54:8

**Defendant** [1] - 99:20

**Defendants** [10] - 1:8, 31:1, 32:19, 94:3, 95:3, 95:6, 95:16, 96:6, 96:9, 98:14

**DEFENDANTS** [1] - 2:6

**Defendants'** [8] - 3:9, 3:10, 3:11, 55:12, 56:17, 78:14, 99:17, 100:6

**defended** [1] - 77:13

**defense** [1] - 93:15

**DEFENSE** [2] - 3:5, 5:1

**deferred** [1] - 71:13

**delivered** [1] - 76:15

**DeMarco** [35] - 3:6, 4:10, 4:11, 4:12, 4:19, 5:1, 5:4, 9:5, 11:19, 13:1, 13:13, 14:21, 15:1, 17:25, 18:13, 25:5, 25:12, 25:24, 34:6, 35:7, 40:20, 43:24, 44:11, 48:14, 48:21, 48:24, 56:20, 73:17, 76:10, 76:13, 77:11, 78:17, 93:3, 93:13, 99:1

**DeMarco's** [6] - 13:17, 14:5, 33:9,

77:8, 77:17, 93:17

**denied** [2] - 32:11, 93:22

**Department** [11] - 6:20, 9:18, 9:25, 10:2, 10:3, 10:11, 12:12, 12:17, 64:1, 68:7, 98:1

**Department's** [1] - 64:2

**departments** [1] - 19:10

**deposition** [9] - 11:12, 11:20, 25:7, 25:12, 25:13, 25:14, 25:16, 31:8

**depositions** [1] - 42:20

**DEPUTY** [3] - 4:1, 4:13, 73:10

**described** [2] - 75:6, 88:19

**designation** [6] - 34:13, 35:8, 82:10, 82:15, 82:19, 83:16

**detailed** [1] - 10:11

**details** [1] - 45:17

**determination** [3] - 22:3, 72:5, 72:9

**determinations** [3] - 72:17, 72:20, 72:23

**determine** [2] - 57:16, 71:21

**determined** [2] - 72:1, 72:14

**Deutsche** [8] - 26:9, 26:12, 27:4, 27:16, 27:22, 28:3, 73:23, 75:3

**devastating** [2] - 54:12, 54:14

**developed** [1] - 80:23

**Dharan** [2] - 94:15, 95:1

**Dharan's** [2] - 31:15, 33:20

**different** [11] - 5:9, 19:10, 33:2, 51:10, 60:19, 60:21, 61:17, 82:14, 82:23, 86:12, 86:14

**digress** [1] - 69:16

**diminishing** [2] - 74:8, 74:14

**dip** [1] - 53:7

**direct** [14] - 14:12, 26:8, 33:9, 34:12, 46:21, 55:7, 71:18, 73:25, 74:6, 75:6,

85:17, 88:19, 91:14, 94:22

**Direct** [1] - 3:4

**direction** [3] - 16:18, 24:15, 24:18

**directly** [5] - 11:8, 17:17, 54:13, 55:19, 56:7

**Director** [1] - 18:13

**director** [7] - 10:7, 16:19, 17:15, 22:4, 42:18, 48:12, 84:19

**directors** [2] - 16:25, 35:20

**directorship** [1] - 87:25

**directs** [1] - 95:7

**disaffirm** [1] - 47:7

**disaffirmance** [1] - 46:20

**disagree** [1] - 90:20

**disastrous** [1] - 50:4

**disclaimers** [1] - 27:15

**disclosed** [5] - 31:21, 31:22, 32:8, 33:17, 33:25

**disclosure** [1] - 31:4

**discretion** [1] - 35:21

**discuss** [9] - 20:18, 22:9, 22:13, 23:2, 23:8, 23:16, 24:5, 30:13, 94:6

**discussed** [7] - 20:8, 34:16, 34:17, 35:1, 38:1, 42:8, 75:20

**discussing** [3] - 16:10, 41:19, 59:9

**discussion** [5] - 20:21, 40:10, 41:7, 68:16, 68:17

**discussions** [6] - 8:10, 10:25, 19:14, 19:18, 19:23, 41:1

**display** [2] - 28:24, 56:14

**dispute** [1] - 33:16

**dissipation** [1] - 80:1

**distinction** [5] - 7:16, 64:18, 64:22, 64:23, 82:13

**distinguishing** [1] - 64:4

**district** [1] - 101:13

**District** [3] - 2:11, 2:12, 101:13

**DISTRICT** [3] - 1:1, 1:1, 1:14

**divided** [1] - 37:12

**dividend** [34] -

34:18, 34:21, 35:16,
37:8, 37:9, 37:10,
37:17, 38:10, 39:6,
39:14, 39:16, 39:21,
40:15, 40:16, 44:2,
63:6, 63:11, 63:17,
63:23, 64:24, 65:1,
67:10, 67:20, 67:22,
74:18, 81:25, 83:25,
84:5, 84:16, 85:16,
85:21, 85:22, 91:10
  **Dividends** [1] - 35:14
  **dividends** [25] -
35:22, 36:1, 36:5,
37:11, 38:20, 39:12,
39:16, 40:12, 47:21,
47:25, 67:14, 84:2,
89:12, 89:13, 89:18,
89:22, 90:4, 90:8,
90:14, 91:15, 91:19,
91:21, 92:5, 92:18
  **document** [21] -
18:6, 18:8, 30:10,
30:18, 31:13, 32:15,
33:8, 56:1, 76:11,
77:1, 77:8, 82:4, 91:1,
93:11, 96:7, 96:14,
96:19, 96:25, 97:13,
98:3, 98:25
  **documents** [8] - 5:9,
10:18, 29:3, 56:1,
97:5, 97:7, 97:25,
99:3
  **Don** [1] - 65:24
  **done** [4] - 14:3, 21:4,
29:16, 42:23
  **Down** [1] - 8:24
  **down** [31] - 5:14, 6:1,
7:1, 9:3, 9:6, 16:20,
19:21, 26:5, 28:13,
34:3, 36:24, 37:23,
38:4, 38:10, 38:18,
38:19, 39:4, 39:22,
39:24, 42:16, 49:5,
53:10, 63:3, 67:19,
70:8, 71:22, 72:11,
72:12, 72:18, 80:2,
93:4
  **Dr** [4] - 31:15, 33:20,
94:22, 95:1
  **draft** [1] - 97:9
  **drafts** [2] - 98:12,
98:18
  **dramatic** [2] - 51:5,
51:7
  **draw** [5] - 13:4,
41:16, 41:25, 64:2,
82:13
  **drawing** [3] - 56:10,
64:18, 64:22

  **drawn** [3] - 6:20,
36:24, 37:2
  **draws** [7] - 38:5,
61:8, 67:8, 67:11,
68:18, 74:17, 74:18
  **drew** [2] - 37:23,
54:23
  **drive** [1] - 67:10
  **driven** [3] - 6:1, 6:24,
7:1
  **driver** [1] - 5:13
  **drove** [1] - 32:19
  **DTA** [2] - 71:12,
71:21
  **DTAs** [7] - 71:9,
71:14, 71:16, 72:4,
72:10, 72:15, 72:18
  **due** [1] - 31:9
  **dumping** [1] - 81:20
  **duration** [1] - 89:23
  **during** [9] - 42:9,
48:1, 50:14, 58:12,
74:6, 89:18, 89:22,
92:5, 94:5
  **DX** [1] - 99:19
  **DX-188** [1] - 57:24
  **DX-189** [1] - 59:17
  **DX-293** [2] - 76:9,
76:16
  **DX-338** [3] - 55:9,
55:13, 56:14
  **DX-404** [1] - 7:19
  **DX-412** [2] - 26:13,
73:18
  **DX-476** [1] - 66:23
  **DX-477** [1] - 65:11
  **DX-85** [2] - 89:25,
90:17
  **DX-89** [2] - 81:23,
82:2
  **DX-928** [1] - 100:5

# E

  **early** [4] - 9:25,
29:16, 53:16, 60:19
  **earn** [2] - 72:3, 72:15
  **earnings** [4] - 63:4,
64:25, 67:12, 67:20
  **easier** [1] - 14:21
  **East** [2] - 47:14,
60:20
  **economic** [5] -
44:15, 48:7, 86:17,
86:21
  **Economic** [1] - 14:23
  **economy** [2] - 50:6,
54:13
  **Edward** [1] - 3:6

  **EDWARD** [1] - 5:1
  **Edwards** [1] - 101:12
  **EDWARDS** [2] -
2:10, 101:3
  **effect** [2] - 54:14,
85:8
  **effective** [1] - 13:7
  **effects** [1] - 54:13
  **efforts** [1] - 68:7
  **eight** [1] - 97:17
  **either** [5] - 17:13,
17:15, 27:10, 27:11,
70:1
  **elaborate** [1] - 60:25
  **elevated** [1] - 22:1
  **eleventh** [2] - 98:14,
99:8
  **eleventh-hour** [1] -
98:14
  **eliminate** [1] - 91:21
  **eliminated** [6] -
47:21, 47:25, 48:1,
48:7, 89:18, 89:22
  **elimination** [4] -
89:13, 90:4, 90:11,
92:5
  **email** [3] - 26:15,
96:16, 97:24
  **emails** [1] - 97:8
  **emphasized** [1] -
99:5
  **employee** [1] - 52:7
  **encouraged** [1] -
44:20
  **end** [3] - 57:21, 61:8,
90:10
  **ended** [2] - 92:11,
92:17
  **ending** [1] - 37:10
  **engage** [1] - 28:9
  **engagement** [2] -
88:20, 88:23
  **enhance** [1] - 79:25
  **ensues** [1] - 40:15
  **ensure** [3] - 18:24,
24:24, 81:11
  **enter** [11] - 10:15,
20:19, 22:10, 40:7,
49:13, 52:9, 77:12,
87:1, 89:6, 96:22,
96:23
  **entered** [6] - 4:14,
46:2, 56:18, 73:11,
78:15, 100:7
  **enterprise** [1] - 19:4
  **enterprises** [3] -
19:15, 57:14, 84:6
  **enterprises'** [1] -
80:6
  **entire** [4] - 17:7,

53:3, 88:4, 99:10
  **entitled** [4] - 35:19,
36:10, 38:14, 77:19
  **equal** [2] - 5:22,
37:11
  **equity** [5] - 61:6,
61:7, 81:14, 82:21,
91:11
  **erode** [2] - 81:13,
81:16
  **erosion** [2] - 74:15,
74:17
  **especially** [1] - 60:18
  **ESQ** [15] - 1:17, 1:19,
1:20, 1:20, 1:21, 1:23,
1:24, 2:2, 2:2, 2:3,
2:6, 2:6, 2:7, 2:7, 2:8
  **essential** [2] - 48:4,
81:4
  **essentially** [6] -
14:7, 16:24, 56:8,
60:8, 75:11, 77:21
  **estimate** [1] - 95:7
  **et** [2] - 1:3, 1:7
  **evaluation** [1] - 19:1
  **evidence** [15] - 13:6,
28:24, 30:13, 30:14,
31:18, 32:5, 50:9,
52:16, 56:18, 76:11,
78:15, 95:20, 96:10,
99:1, 100:7
  **EVIDENCE** [1] - 3:8
  **evolved** [1] - 54:25
  **exact** [2] - 15:19,
77:15
  **exactly** [2] - 40:2,
77:6
  **examination** [11] -
4:22, 26:9, 34:12,
54:17, 55:20, 56:8,
61:24, 69:20, 71:9,
73:25, 74:6
  **EXAMINATION** [2] -
5:2, 48:19
  **example** [3] - 60:20,
84:15, 87:11
  **exception** [1] - 97:5
  **exceptional** [1] -
14:12
  **excerpt** [2] - 32:2,
52:15
  **excerpts** [3] - 28:16,
61:14, 61:17
  **excess** [5] - 63:6,
63:22, 64:15, 67:14,
67:22
  **exchange** [1] - 26:11
  **excluded** [1] - 31:16
  **excuse** [2] - 43:18,
98:23

  **excused** [1] - 93:5
  **executive** [5] -
17:11, 17:12, 21:21,
22:17, 23:23
  **executives** [1] -
17:16
  **exercise** [1] - 47:6
  **exercising** [3] -
13:19, 15:9, 16:12
  **exhibit** [14] - 31:24,
32:1, 33:21, 33:24,
74:2, 78:23, 82:3,
83:19, 90:25, 93:23,
98:15, 99:11, 99:16,
99:17
  **Exhibit** [16] - 3:9,
3:10, 3:11, 31:3,
31:24, 33:17, 52:15,
55:12, 56:17, 78:14,
89:25, 96:10, 96:12,
96:16, 97:12, 100:6
  **exhibits** [3] - 31:2,
31:5, 95:15
  **EXHIBITS** [1] - 3:8
  **exist** [3] - 48:8,
58:11, 60:16
  **existing** [1] - 16:25
  **exited** [2] - 73:6,
96:3
  **expect** [16] - 63:5,
63:9, 63:15, 63:16,
63:22, 64:14, 64:16,
64:19, 64:25, 67:8,
67:18, 67:19, 67:21,
72:3, 72:14, 95:1
  **expectations** [1] -
56:3
  **expected** [5] - 61:13,
65:3, 67:24, 68:1,
94:22
  **expecting** [2] -
57:21, 64:4
  **experience** [6] -
53:25, 54:8, 62:22,
63:1, 63:4, 67:11
  **expert** [7] - 31:18,
32:5, 32:11, 32:13,
32:15, 32:25
  **expert's** [1] - 33:1
  **experts** [1] - 95:19
  **explain** [4] - 20:15,
79:20, 85:14, 95:9
  **explained** [2] -
54:21, 81:8
  **extent** [6] - 36:1,
38:19, 38:25, 39:1,
39:3, 77:2
  **extents** [1] - 39:3

# F

**F/F** [2] - 8:24, 9:1
**fabricate** [1] - 78:2
**face** [2] - 74:9
**faced** [2] - 26:3, 27:15
**fact** [9] - 22:7, 25:19, 26:21, 32:7, 32:13, 32:15, 43:24, 56:8, 85:23
**factor** [1] - 5:17
**facts** [1] - 60:24
**fail** [2] - 39:21, 40:12
**failed** [5] - 39:11, 44:5, 84:2, 84:15, 85:23
**fails** [1] - 37:9
**failure** [8] - 37:17, 38:9, 39:13, 40:13, 84:17, 84:21, 85:9
**fair** [5] - 10:24, 14:13, 31:23, 44:14, 45:18
**FAIRHOLME** [1] - 1:3
**familiar** [5] - 12:8, 15:14, 15:16, 15:17, 43:24
**families** [2] - 50:5, 54:13
**famous** [1] - 89:8
**FANNIE** [2] - 1:10, 2:6
**Fannie** [72] - 4:3, 5:15, 5:19, 5:23, 9:1, 9:7, 12:18, 13:20, 15:15, 15:18, 16:13, 16:23, 17:16, 19:14, 19:18, 19:23, 21:21, 21:24, 21:25, 23:13, 23:23, 24:2, 24:10, 24:12, 28:4, 28:17, 34:8, 37:3, 44:1, 44:20, 45:1, 54:14, 57:23, 57:25, 60:9, 61:13, 61:20, 62:5, 63:13, 63:21, 64:18, 65:3, 66:23, 66:24, 66:25, 67:18, 67:24, 70:24, 71:16, 71:20, 72:3, 72:6, 72:17, 72:21, 72:24, 79:5, 80:14, 81:19, 82:12, 82:15, 82:16, 82:19, 83:10, 83:17, 84:15, 87:16, 89:1, 91:16, 91:20
**Fannie's** [2] - 71:24,

72:1
**far** [4] - 32:6, 32:17, 70:8, 90:3
**favorable** [1] - 25:18
**February** [2] - 24:14, 52:4
**Federal** [1] - 50:19
**FEDERAL** [1] - 1:6
**few** [2] - 20:6, 100:2
**FHFA** [28] - 2:6, 10:6, 10:10, 10:16, 16:23, 16:24, 17:5, 19:10, 28:16, 28:21, 30:13, 32:16, 44:25, 47:6, 48:12, 80:17, 82:25, 83:1, 83:6, 86:9, 86:12, 86:13, 87:4, 87:11, 87:14, 91:17, 91:20, 92:9
**FHFA's** [7] - 19:25, 20:16, 56:25, 79:4, 87:6, 98:21, 99:6
**figure** [1] - 99:4
**filing** [5] - 58:18, 60:7, 60:9, 63:13, 67:6
**filings** [8] - 60:18, 61:12, 61:14, 61:16, 61:23, 65:13, 72:21, 72:23
**final** [5] - 22:1, 22:2, 22:25, 80:25, 97:15
**finalized** [1] - 29:10
**finally** [1] - 47:10
**finance** [2] - 8:10, 57:17
**FINANCE** [1] - 1:6
**financial** [16] - 6:19, 17:19, 19:2, 20:16, 21:1, 23:5, 23:13, 24:10, 27:10, 44:22, 53:25, 54:9, 62:5, 65:18, 66:5, 66:13
**Financial** [1] - 66:1
**fine** [2] - 43:16, 96:8
**finish** [1] - 95:23
**finished** [1] - 33:4
**fired** [1] - 16:24
**firm** [1] - 27:24
**first** [32] - 12:14, 12:25, 13:16, 15:2, 20:10, 27:7, 27:11, 29:12, 31:4, 37:23, 39:7, 44:13, 47:23, 51:13, 55:24, 62:15, 64:13, 66:3, 66:16, 66:20, 67:1, 67:5, 67:17, 74:7, 75:21, 77:5, 79:19, 80:12, 86:7, 96:15, 96:24,

98:22
**five** [4] - 51:4, 51:6, 51:18, 97:17
**five-month** [1] - 51:4
**flatly** [1] - 77:10
**FLEXNER** [1] - 1:21
**focus** [2] - 79:22, 89:16
**focused** [3] - 73:25, 74:6, 74:20
**following** [25] - 4:15, 12:22, 14:18, 15:8, 29:17, 30:15, 34:1, 39:13, 39:15, 40:13, 46:12, 55:17, 56:12, 58:11, 58:12, 73:7, 73:9, 73:12, 76:18, 78:8, 85:11, 93:8, 95:12, 96:4, 100:9
**FOR** [5] - 1:1, 1:17, 1:19, 2:6, 3:5
**foregoing** [1] - 101:4
**form** [3] - 43:3, 69:19, 69:21
**formal** [2] - 96:20, 97:13
**forming** [1] - 20:22
**forth** [5] - 6:9, 45:7, 80:24, 98:1, 98:2
**forward** [3] - 49:25, 69:21, 85:24
**foundation** [3] - 77:1, 88:12, 92:2
**four** [4] - 31:9, 80:11, 80:12, 97:17
**frankly** [1] - 97:9
**Freddie** [56] - 5:15, 5:19, 5:24, 9:1, 9:7, 12:19, 13:20, 15:15, 15:18, 16:13, 16:23, 17:16, 19:14, 19:18, 19:23, 22:18, 23:5, 24:11, 24:12, 28:4, 28:18, 34:8, 37:3, 44:1, 44:20, 45:1, 54:14, 57:23, 59:17, 60:7, 60:15, 61:13, 65:3, 65:5, 67:6, 67:24, 68:1, 70:25, 71:16, 71:20, 72:8, 72:9, 72:14, 72:17, 72:21, 72:25, 79:6, 80:15, 81:19, 82:16, 83:11, 87:16, 89:3, 91:17, 91:20
**FREDDIE** [1] - 2:7
**Freddie's** [3] - 65:9, 66:12, 72:13
**frequent** [1] - 79:3
**front** [2] - 6:5, 86:4

**full** [5] - 15:19, 31:25, 37:9, 39:16, 101:5
**functioning** [1] - 81:4
**funding** [1] - 15:25
**funds** [2] - 35:21, 36:4
**FUNDS** [1] - 1:3
**furthermore** [1] - 59:13
**future** [7] - 57:17, 59:4, 59:8, 61:14, 64:5, 67:9, 67:11

# G

**gather** [1] - 88:24
**gears** [2] - 73:2, 86:1
**Geithner** [1] - 96:21
**Geithner's** [1] - 96:25
**general** [2] - 7:10, 21:25
**generally** [13] - 5:11, 5:12, 15:16, 16:11, 16:17, 28:3, 28:7, 34:6, 45:13, 46:25, 47:2, 50:14, 53:24
**generate** [9] - 50:23, 63:5, 63:10, 63:22, 64:5, 64:14, 64:17, 67:13, 67:21
**gentlemen** [2] - 4:17, 95:14
**given** [1] - 57:10
**Global** [1] - 78:20
**goal** [1] - 48:4
**GOODHART** [1] - 1:24
**GRANT** [1] - 1:24
**graph** [8] - 50:25, 52:3, 52:12, 52:22, 52:23, 52:24, 52:25, 53:1
**graphs** [1] - 50:23
**great** [1] - 50:5
**greater** [2] - 6:23, 74:21
**GROSSMAN** [1] - 2:4
**ground** [2] - 13:3, 74:13
**grounds** [4] - 12:21, 31:12, 32:9, 98:16
**group** [2] - 20:17, 79:16
**GSEs** [1] - 59:10
**guaranties** [1] - 49:23

**guaranty** [1] - 81:17
**guess** [1] - 12:25

# H

**HAMISH** [1] - 1:19
**Hampshire** [1] - 1:18
**hand** [2] - 64:6, 74:3
**handle** [1] - 93:24
**handwritten** [1] - 7:23, 97:1, 97:19
**happy** [2] - 94:6, 96:6
**hard** [2] - 18:3, 18:10
**harder** [1] - 11:15
**hardly** [1] - 32:17
**harm** [1] - 80:3
**harmed** [1] - 50:5
**Hartman** [1] - 50:21
**head** [1] - 66:21
**headed** [2] - 13:1, 20:16
**heading** [1] - 78:25
**hear** [2] - 33:16, 98:8
**heard** [6] - 33:19, 50:13, 55:16, 83:7, 83:9, 93:6
**hearsay** [2] - 56:1, 97:3
**heavily** [1] - 99:5
**help** [1] - 70:22
**helped** [1] - 21:23
**helping** [1] - 22:20
**HERA** [16] - 12:8, 12:11, 12:16, 13:5, 13:9, 13:24, 14:13, 14:23, 15:17, 44:25, 45:7, 45:20, 86:2, 86:11, 87:5, 87:6
**HERA's** [1] - 14:14
**hereby** [1] - 101:3
**higher** [3] - 34:9, 70:23, 85:24
**highlight** [2] - 12:14, 38:24
**highlighted** [3] - 31:14, 38:18, 47:24
**highly** [1] - 97:13
**highlighted** [2] - 97:14, 97:22
**hired** [1] - 17:19
**hiring** [1] - 17:15
**hit** [2] - 52:4, 53:17
**HOFFMAN** [16] - 2:6, 30:25, 33:3, 33:5, 33:15, 47:13, 94:2, 95:5, 95:11, 96:5, 96:9, 98:7, 99:18, 99:22, 99:25, 100:4

2615

**Hoffman** [9] - 30:22, 30:25, 33:3, 33:15, 93:24, 94:2, 95:5, 96:5, 100:1
**Hoffman's** [1] - 30:21
**holders** [2] - 35:18, 49:23
**holding** [1] - 28:4
**home** [7] - 5:14, 5:19, 5:22, 6:2, 48:25, 50:7, 70:22
**homeowner** [4] - 70:19, 70:25, 71:1, 71:5
**homeowners** [2] - 70:5, 70:11
**Honor** [78] - 4:8, 4:9, 4:12, 4:23, 12:20, 12:24, 13:15, 14:2, 14:5, 14:10, 30:9, 30:17, 30:19, 30:25, 31:14, 31:20, 31:23, 32:6, 33:3, 33:15, 43:4, 45:22, 48:17, 48:18, 50:9, 55:10, 55:11, 55:15, 55:19, 56:4, 73:3, 73:15, 76:4, 76:6, 76:10, 76:16, 76:17, 76:20, 76:25, 77:3, 77:7, 77:23, 78:6, 93:2, 93:10, 93:23, 94:1, 94:2, 94:6, 94:11, 94:20, 95:5, 95:8, 95:11, 96:5, 96:9, 96:15, 96:17, 96:19, 96:25, 97:2, 97:4, 97:6, 97:7, 97:9, 97:12, 97:15, 97:25, 98:3, 98:5, 98:7, 98:10, 98:13, 98:20, 99:2, 99:15, 99:18, 99:23
**HONORABLE** [1] - 1:13
**hope** [1] - 20:12
**hostile** [2] - 77:15, 77:16
**hour** [2] - 98:14, 99:8
**house** [14] - 5:17, 6:6, 6:24, 6:25, 7:2, 7:10, 53:3, 54:4, 54:5, 54:7, 54:8, 70:20, 70:21, 71:5
**HOUSING** [1] - 1:6
**housing** [7] - 8:10, 19:4, 49:9, 52:4, 53:10, 57:17, 74:22
**Housing** [3] - 14:23,

50:11, 52:17
**human** [1] - 81:1
**Hume** [47] - 4:21, 5:5, 5:22, 6:4, 7:5, 7:7, 13:11, 13:15, 14:3, 15:20, 17:2, 22:11, 24:16, 26:12, 29:8, 30:9, 33:5, 42:21, 43:6, 45:13, 54:17, 55:3, 56:4, 56:9, 61:12, 61:15, 61:23, 63:8, 65:13, 67:23, 73:17, 75:3, 75:15, 77:15, 77:16, 77:17, 81:24, 82:4, 83:21, 83:24, 85:5, 86:2, 86:7, 86:15, 87:7, 89:12, 90:2
**HUME** [89] - 1:19, 4:8, 4:23, 5:3, 5:6, 5:7, 6:11, 6:15, 7:19, 7:21, 8:13, 8:14, 9:3, 9:4, 11:12, 11:18, 12:13, 12:15, 13:15, 14:4, 14:10, 14:20, 16:20, 16:22, 17:23, 17:24, 18:5, 18:7, 19:21, 20:1, 20:3, 20:5, 25:7, 25:11, 26:5, 26:7, 26:13, 26:14, 27:2, 27:3, 27:19, 27:20, 28:13, 28:14, 28:23, 29:1, 29:12, 29:13, 30:5, 30:6, 30:12, 32:12, 33:4, 33:6, 34:3, 34:5, 35:4, 35:6, 35:11, 35:13, 37:20, 37:21, 38:12, 38:13, 41:11, 41:13, 42:16, 42:17, 43:8, 43:17, 43:22, 45:24, 46:1, 47:12, 48:14, 55:11, 55:15, 55:21, 55:23, 76:17, 76:20, 83:2, 84:7, 88:12, 92:2, 92:21, 94:11, 94:14, 94:18

---

# I

**Ian** [6] - 30:25, 33:3, 33:15, 94:2, 95:5, 96:5
**IAN** [1] - 2:6
**identified** [1] - 80:11
**identify** [3] - 76:11, 80:5, 80:7
**iii** [1] - 15:24
**iii)** [1] - 37:7
**immediate** [1] -

20:20
**immediately** [3] - 39:13, 40:12, 84:24
**impeachment** [1] - 33:8
**implementation** [1] - 18:24
**implementing** [1] - 70:7
**important** [6] - 20:22, 24:16, 25:4, 80:25, 91:8, 99:2
**impose** [1] - 86:11
**imposed** [3] - 86:8, 86:12, 87:4
**impression** [3] - 51:11, 74:24, 75:4
**improves** [1] - 5:23
**IN** [2] - 1:10, 3:8
**in-court** [1] - 77:9
**inaccurate** [1] - 40:20
**INC** [1] - 1:3
**include** [1] - 68:7
**included** [1] - 72:20
**includes** [1] - 47:18
**including** [5] - 16:14, 19:2, 19:24, 32:10, 60:15
**income** [17] - 63:5, 63:6, 63:10, 63:22, 64:5, 64:14, 64:15, 64:17, 67:12, 67:13, 67:14, 67:21, 72:3, 72:15
**inconsistent** [3] - 47:3, 77:11, 81:7
**increase** [9] - 51:6, 51:7, 51:18, 51:23, 61:10, 85:15, 85:16, 85:21, 85:22
**increased** [6] - 36:22, 36:23, 37:1, 37:6, 37:8, 38:9
**increasingly** [1] - 67:10
**independent** [2] - 91:25, 92:8
**Index** [2] - 50:11, 52:17
**index** [1] - 50:13
**indicating** [1] - 97:16
**indication** [1] - 77:4
**indulge** [1] - 29:9
**indulgence** [4] - 30:19, 30:22, 48:18, 58:23
**inference** [1] - 56:9
**inform** [2] - 88:9, 89:5

**informal** [1] - 97:9
**information** [8] - 19:13, 29:24, 29:25, 52:20, 88:7, 88:9, 88:24, 89:5
**informed** [1] - 54:11
**initial** [3] - 35:17, 36:19, 37:2
**initials** [1] - 97:1
**insert** [1] - 53:21
**inside** [1] - 87:11
**instead** [2] - 42:10, 85:10
**instill** [1] - 61:5
**intake** [1] - 19:24
**intent** [1] - 69:9
**interact** [3] - 11:5, 11:8, 11:23
**interacted** [2] - 11:6, 11:7
**interacting** [1] - 12:2
**interchangeably** [1] - 52:23
**interest** [11] - 27:15, 27:25, 69:23, 69:24, 70:1, 70:2, 70:5, 70:10, 70:17, 87:2, 87:3
**interests** [6] - 44:15, 48:7, 86:17, 86:21, 86:25, 91:12
**internal** [1] - 97:8
**interpreting** [1] - 53:8
**interviewing** [1] - 23:1
**introduce** [1] - 31:11
**investment** [2] - 19:5, 82:21
**investments** [1] - 80:14
**investors** [3] - 27:23, 74:7, 81:14
**involved** [3] - 17:14, 22:2, 23:1
**involving** [1] - 82:19
**irrelevant** [1] - 32:3
**issuance** [1] - 35:17
**issue** [6] - 11:23, 30:20, 32:14, 33:2, 98:21, 99:5
**issued** [5] - 34:8, 35:9, 58:3, 91:16, 91:19
**itself** [2] - 28:3, 50:23

---

# J

**JESSICA** [1] - 1:21
**joined** [2] - 9:24, 9:25
**jointly** [1] - 68:23
**JONATHAN** [1] - 2:7
**JONES** [1] - 2:8
**JUDGE** [1] - 1:14
**Judge** [3] - 4:24, 31:4, 32:12
**judgment** [1] - 93:19
**juggle** [1] - 18:10
**July** [1] - 13:7
**June** [5] - 29:16, 29:19, 29:20, 31:16, 52:17
**jurors** [2] - 4:5, 86:5
**JURY** [1] - 1:12, 4:18
**jury** [27] - 4:13, 4:14, 5:6, 12:23, 13:25, 14:9, 28:25, 30:16, 40:20, 48:22, 50:12, 55:18, 57:24, 73:6, 73:10, 73:11, 75:6, 76:7, 76:19, 78:12, 79:12, 93:9, 94:17, 95:9, 96:3, 98:22, 98:23
**jury's** [1] - 94:7

---

# K

**KAPLAN** [5] - 1:20, 98:10, 98:13, 98:20, 99:15
**Kari** [3] - 23:5, 65:18, 65:19
**KAYE** [1] - 2:8
**keep** [10] - 41:23, 52:5, 60:6, 68:20, 71:14, 72:10, 72:12, 72:17, 73:3, 79:23
**Kenya** [1] - 94:20
**KENYA** [1] - 1:20
**kept** [1] - 68:16
**KESSLER** [1] - 1:24
**key** [1] - 7:12
**KHALELAH** [1] - 1:20
**kind** [3] - 41:19, 43:11, 98:3
**kinds** [2] - 25:1, 45:10
**King** [1] - 1:25
**KIRK** [1] - 1:17
**known** [2] - 27:11, 66:20

2616

knows [2] - 77:3, 96:17
KRAVETZ [4] - 2:2, 76:24, 77:6, 77:23
Kravetz [1] - 76:22

## L

lack [1] - 99:6
lacks [2] - 88:12, 92:2
ladies [2] - 4:17, 95:14
laid [1] - 24:15
LAMBERTH [1] - 1:13
Lamberth [2] - 4:24, 32:12
language [1] - 75:9
last [13] - 44:11, 57:2, 57:11, 58:20, 58:21, 58:24, 59:3, 59:22, 62:18, 65:16, 89:8, 89:9, 90:4
lasted [1] - 90:5
late [2] - 33:22, 72:8
law [1] - 93:20
lawmakers [2] - 57:15, 57:21
lawyer's [1] - 89:9
Layton [3] - 22:17, 23:2, 65:24
lead [1] - 11:1
leaders [1] - 59:15
learned [1] - 21:15
least [7] - 13:7, 63:11, 69:19, 71:20, 89:21, 90:2, 97:17
leave [1] - 17:13
leaving [1] - 42:18
LEE [1] - 1:23
left [3] - 10:2, 17:13, 74:3
left-hand [1] - 74:3
legacy [1] - 80:13
legal [8] - 13:4, 14:8, 45:15, 57:17, 83:3, 84:7, 92:21, 95:15
legalese [1] - 38:17
legally [2] - 35:21, 36:4
less [1] - 51:25
letter [2] - 18:1, 18:2
level [2] - 32:17, 34:7
liability [1] - 46:19
likely [2] - 5:20, 98:24
limited [1] - 46:21
line [8] - 51:13, 52:6,

53:5, 56:7, 58:21, 61:4, 89:9, 99:22
Line [10] - 6:13, 6:14, 6:16, 11:13, 11:16, 43:19, 43:23
Lines [3] - 25:8, 25:9, 41:12
lines [1] - 49:7
liquid [1] - 81:21
liquidation [13] - 34:23, 36:3, 36:13, 36:22, 37:1, 37:7, 37:24, 38:5, 38:8, 38:19, 38:20, 38:22, 82:1
Liquidation [2] - 36:10, 38:14
Lisa [1] - 101:12
LISA [2] - 2:10, 101:3
list [5] - 22:25, 31:25, 33:21, 98:15, 99:11
listed [1] - 26:17
LITIGATION [1] - 1:11
Litigations [1] - 4:4
LITOWITZ [1] - 2:3
LLP [3] - 1:21, 1:24, 2:4
loans [1] - 70:12
Lockhart [2] - 44:19, 79:13
Lockhart's [1] - 75:10
Long-Term [1] - 66:1
long-term [3] - 24:24, 66:4, 66:12
Look [1] - 57:2
look [20] - 8:13, 15:2, 29:3, 36:9, 38:12, 45:18, 51:5, 51:7, 51:9, 52:12, 58:5, 59:17, 62:3, 64:8, 65:5, 65:9, 89:10, 89:25, 91:5, 96:20
looked [3] - 5:12, 15:19, 17:25
looking [10] - 24:22, 24:23, 52:18, 52:19, 56:20, 69:8, 81:15, 81:19, 83:15, 83:21
looks [2] - 52:19, 97:15
lose [1] - 80:3
losses [1] - 74:10
lost [1] - 36:25
LOUIS [1] - 2:7
Louis [1] - 50:19
lower [4] - 70:14, 70:19, 71:1, 74:3
lunch [2] - 94:8, 96:1

luncheon [1] - 100:8

## M

MAC [2] - 1:10, 2:7
Mac [28] - 4:3, 5:15, 5:19, 5:24, 9:7, 12:19, 13:20, 15:16, 16:13, 16:23, 17:16, 19:14, 19:19, 19:23, 22:18, 23:6, 24:11, 24:12, 28:18, 34:8, 37:3, 44:1, 44:20, 45:1, 54:14, 57:23, 60:7, 79:6
Mac's [1] - 60:15
MAE [1] - 2:6
Mae [33] - 5:15, 5:19, 5:23, 9:7, 12:18, 13:20, 15:15, 16:13, 16:23, 17:16, 19:14, 19:18, 19:23, 21:21, 21:24, 21:25, 23:13, 23:23, 24:2, 24:10, 24:12, 28:17, 34:8, 37:3, 44:1, 44:20, 45:1, 54:14, 57:23, 60:9, 62:5, 67:18, 79:5
MAE/FREDDIE [1] - 1:10
Mae/Freddie [1] - 4:3
main [1] - 45:19
maintain [3] - 16:6, 16:15, 79:25
maintained [1] - 80:3
majority [1] - 17:6
manage [2] - 50:19, 81:2
management [7] - 17:1, 17:4, 17:11, 72:1, 72:6, 72:14, 80:24
manner [1] - 39:12
March [5] - 8:3, 27:7, 73:23, 76:15, 78:18
Mario [1] - 11:1, 11:2
market [9] - 15:25, 16:1, 25:1, 32:18, 33:12, 69:24, 74:22, 84:20, 84:24
markets [2] - 33:11, 81:16
Mary [1] - 11:25
Massachusetts [1] - 2:9
math [1] - 51:20
matter [4] - 70:5, 91:17, 93:19, 98:24

Mayopoulos [7] - 21:20, 22:3, 22:10, 22:15, 22:24, 62:16, 63:14
MBS [4] - 49:23, 74:7, 74:10, 81:15
MC [1] - 1:10
McFarland [6] - 17:18, 23:13, 23:16, 62:4, 62:6, 63:14
McGuire [17] - 6:12, 7:20, 9:3, 11:16, 12:13, 16:20, 19:21, 20:4, 25:10, 26:5, 27:2, 28:13, 34:3, 35:4, 41:11, 42:16, 43:19
mean [16] - 17:3, 24:16, 36:14, 38:4, 48:3, 51:8, 63:2, 71:24, 72:13, 75:15, 77:16, 77:17, 77:25, 79:20, 85:20, 91:13
meaning [3] - 13:2, 14:8, 51:9
means [6] - 14:7, 39:20, 63:3, 75:22, 75:25, 83:25
meant [6] - 8:8, 48:1, 53:10, 65:6, 68:15, 79:23
measurement [1] - 6:4
meet [6] - 17:18, 40:14, 78:4, 84:17, 84:21, 85:9
meeting [1] - 8:2
meetings [5] - 11:10, 87:21, 88:2, 88:3, 88:6
MELTZER [1] - 1:24
members [4] - 5:6, 17:6, 48:22, 50:12
memo [4] - 96:24, 99:6, 99:7, 99:9
memorandum [2] - 96:21, 97:14
mention [1] - 41:7
message [6] - 60:17, 60:18, 60:19, 60:21, 60:22, 63:24
met [1] - 88:4
might [3] - 64:19, 74:9
Miller [1] - 11:25
million [2] - 36:17, 36:20
millions [1] - 50:5
mind [2] - 43:15, 69:13

mine [1] - 68:21
minute [2] - 54:1, 66:22
minutes [4] - 42:4, 73:5, 94:23, 100:2
Miscellaneous [1] - 4:2
missing [1] - 91:8
mission [1] - 54:15
misunderstood [1] - 64:10
model [1] - 21:1
modeling [2] - 7:9, 20:16
modifying [1] - 70:12
moment [3] - 51:12, 55:11, 69:16
money [2] - 28:8, 44:21
Montgomery [5] - 58:25, 74:4, 76:8, 78:11, 96:11
month [1] - 51:4
monthly [6] - 70:14, 71:1, 88:2, 88:3, 88:5, 88:7
months [3] - 31:9, 33:21, 51:6
morning [20] - 4:7, 4:8, 4:9, 4:11, 4:12, 4:17, 4:18, 4:24, 5:4, 5:5, 5:6, 48:21, 48:22, 49:2, 62:7, 69:18, 73:18, 75:3, 91:24, 95:24
MORNING [1] - 1:13
Mortgage [1] - 56:22
mortgage [9] - 28:5, 28:15, 32:18, 32:22, 33:10, 34:7, 34:9, 70:13, 70:16
mortgage-backed [7] - 28:5, 28:15, 32:18, 32:22, 33:10, 34:7, 34:9
mortgages [1] - 80:14
most [2] - 16:25, 32:7
motion [3] - 93:22, 96:6, 96:7
motive [1] - 78:1
mouth [1] - 89:9
move [9] - 30:12, 30:14, 55:10, 62:24, 76:16, 90:19, 93:18, 93:24, 96:10
moved [1] - 30:10
moving [2] - 41:23, 79:23

**MR** [185] - 4:8, 4:9, 4:12, 4:23, 5:3, 5:6, 5:7, 6:11, 6:15, 7:19, 7:21, 8:13, 8:14, 9:3, 9:4, 11:12, 11:18, 12:13, 12:15, 12:20, 12:24, 13:15, 14:2, 14:4, 14:5, 14:10, 14:20, 16:20, 16:22, 17:23, 17:24, 18:5, 18:7, 19:21, 20:1, 20:3, 20:5, 25:7, 25:11, 26:5, 26:7, 26:13, 26:14, 27:2, 27:3, 27:19, 27:20, 28:13, 28:14, 28:23, 29:1, 29:12, 29:13, 30:5, 30:6, 30:9, 30:12, 30:17, 30:25, 32:12, 33:3, 33:4, 33:5, 33:6, 33:15, 34:3, 34:5, 35:4, 35:6, 35:11, 35:13, 37:20, 37:21, 38:12, 38:13, 41:11, 41:13, 42:16, 42:17, 43:3, 43:8, 43:17, 43:22, 45:21, 45:24, 46:1, 47:12, 47:13, 48:14, 48:17, 48:20, 48:22, 48:23, 50:8, 50:10, 52:13, 52:14, 53:21, 53:23, 55:9, 55:11, 55:13, 55:15, 55:19, 55:21, 55:22, 55:23, 56:4, 56:14, 56:19, 57:1, 57:4, 58:20, 59:2, 60:2, 60:5, 61:18, 61:19, 62:1, 62:2, 62:9, 62:10, 62:18, 62:20, 65:11, 65:12, 65:21, 65:22, 66:8, 66:10, 73:3, 73:15, 73:16, 73:19, 73:21, 74:2, 74:5, 76:4, 76:12, 76:16, 76:17, 76:20, 76:24, 77:6, 77:7, 77:23, 78:6, 78:10, 78:16, 78:23, 78:24, 82:2, 82:6, 83:2, 83:5, 84:7, 84:12, 88:12, 88:14, 90:17, 90:18, 92:2, 92:4, 92:21, 93:2, 93:6, 93:10, 93:23, 94:2, 94:11, 94:14, 94:18, 95:5, 95:11, 96:5, 96:9, 98:7, 98:10, 98:13, 98:20, 99:15, 99:18, 99:22, 99:25, 100:4

**MS** [1] - 94:20
**MUGLER** [1] - 1:21
**multiple** [1] - 24:23
**must** [1] - 77:3

## N

**Naa** [4] - 20:10, 20:12, 20:13, 20:14
**name** [3] - 10:19, 10:20, 20:13
**named** [1] - 20:10
**near** [1] - 25:2
**nearly** [1] - 45:16
**need** [10] - 6:19, 7:7, 16:6, 16:15, 43:20, 60:6, 76:4, 81:21, 99:19, 99:20
**needed** [4] - 49:18, 49:19, 68:23, 81:3
**negotiating** [1] - 14:15
**negotiation** [1] - 69:1
**negotiations** [1] - 9:13
**net** [30] - 8:15, 9:11, 9:14, 10:15, 10:25, 11:23, 20:8, 20:19, 21:12, 21:15, 21:20, 22:10, 22:14, 23:3, 23:9, 23:17, 23:24, 24:5, 32:20, 40:7, 40:18, 41:15, 41:24, 44:14, 49:13, 63:5, 64:14, 67:13, 81:6, 87:1
**never** [4] - 41:1, 41:4, 41:10, 42:12
**New** [5] - 1:18, 1:22, 2:5, 26:17
**new** [3] - 71:8, 80:17, 80:19
**news** [1] - 66:25
**next** [21] - 6:18, 8:19, 18:3, 19:12, 27:1, 29:15, 42:6, 43:20, 46:10, 46:11, 46:16, 48:6, 52:13, 58:24, 63:8, 73:20, 82:1, 94:10, 97:1, 99:22, 100:2
**nine** [1] - 97:17
**normally** [1] - 55:23
**Northwest** [5] - 1:18, 1:22, 2:9, 2:12, 101:14
**note** [1] - 82:13
**notes** [2] - 7:24,

101:5
**nothing** [1] - 93:2
**noting** [1] - 26:16
**November** [7] - 58:3, 58:13, 59:23, 60:13, 60:23, 65:3, 66:6
**number** [15] - 5:8, 5:12, 12:20, 17:12, 37:12, 42:19, 49:20, 50:12, 50:20, 98:13, 99:16, 99:19, 99:20, 99:22, 100:2

## O

**oath** [1] - 4:20
**object** [8] - 12:20, 13:3, 30:18, 31:2, 31:12, 55:15, 55:25, 56:17
**objected** [3] - 31:6, 98:15, 99:11
**objecting** [1] - 55:24
**objection** [29] - 12:25, 14:17, 30:10, 30:19, 30:23, 31:7, 31:9, 31:10, 31:25, 33:23, 43:3, 45:21, 55:14, 56:11, 76:22, 77:23, 78:7, 83:2, 84:7, 88:12, 92:2, 92:21, 93:25, 94:4, 97:2, 97:23, 98:8, 99:14
**objective** [1] - 49:22
**Objectives** [1] - 60:3
**objectivity** [1] - 27:25
**obligation** [13] - 40:14, 63:7, 64:15, 67:10, 67:22, 84:5, 84:6, 84:17, 84:21, 85:1, 85:9, 85:24, 87:6
**obligations** [6] - 63:23, 85:4, 86:8, 86:11, 86:12, 87:4
**observations** [1] - 77:21
**obviously** [5] - 16:4, 32:1, 42:19, 97:10, 97:23
**occasion** [1] - 11:23
**October** [2] - 21:4, 21:7
**OF** [2] - 1:1, 1:12
**offer** [1] - 93:11
**office** [3] - 20:22, 20:24, 21:11

**office's** [1] - 98:2
**officer** [7] - 17:20, 21:21, 22:18, 23:5, 23:13, 62:5, 65:18
**offices** [2] - 19:2, 19:10
**Official** [1] - 2:11
**official** [4] - 97:13, 97:14, 98:1, 101:12
**officials** [5] - 11:5, 12:1, 17:13, 96:22, 97:18
**OFHEO** [4] - 44:18, 44:19, 44:20
**once** [1] - 80:17
**one** [52] - 5:20, 11:4, 11:14, 12:18, 14:1, 14:13, 15:2, 18:17, 18:21, 20:10, 21:4, 21:7, 21:11, 21:18, 21:19, 24:9, 25:8, 25:14, 25:18, 29:16, 31:2, 31:3, 31:7, 31:20, 32:15, 33:25, 42:7, 42:8, 45:19, 51:9, 55:11, 55:25, 59:22, 61:23, 62:3, 64:5, 65:13, 74:9, 74:22, 80:25, 82:7, 82:15, 88:17, 93:11, 97:16, 97:19, 98:13, 99:13, 99:18
**ones** [1] - 11:14
**open** [6] - 14:19, 34:2, 56:13, 78:9, 93:16, 95:13
**operate** [1] - 81:21
**operating** [1] - 16:19
**Operational** [1] - 8:20
**operations** [4] - 19:4, 80:19, 80:22, 81:3
**opine** [2] - 13:1, 14:7
**opinion** [1] - 32:15
**opportunity** [3] - 45:14, 71:5, 95:17
**opposed** [2] - 69:19, 69:20
**opposite** [1] - 80:2
**Optional** [1] - 38:14
**Options** [1] - 8:24
**options** [2] - 59:9, 59:16
**order** [4] - 9:6, 47:19, 64:3, 81:20
**orderly** [1] - 15:25
**original** [6] - 13:9, 13:24, 43:25, 79:12, 90:20, 98:18

**ought** [1] - 57:9
**outcome** [1] - 59:14
**outcomes** [1] - 25:1
**outlining** [1] - 24:17
**outlook** [2] - 5:23, 7:11
**outside** [6] - 12:23, 30:16, 55:18, 76:19, 87:13, 93:9
**outstanding** [3] - 35:18, 37:13, 47:22
**over-the-page** [1] - 11:14
**overrule** [1] - 98:9
**overruled** [10] - 14:17, 43:5, 56:11, 78:7, 83:4, 84:10, 88:13, 92:23, 98:17, 99:14
**own** [2] - 17:3, 24:11

## P

**p.m** [1] - 96:4
**P.M** [1] - 1:19
**PAGE** [1] - 3:8
**Page** [29] - 6:12, 6:13, 11:13, 18:5, 18:12, 18:17, 25:8, 29:6, 30:5, 41:12, 43:18, 43:19, 47:17, 57:1, 58:6, 58:20, 58:21, 60:2, 62:18, 65:25, 74:2, 78:23, 83:19, 90:25, 96:20, 96:24
**page** [22] - 7:23, 11:14, 13:7, 25:9, 27:1, 29:2, 29:3, 29:6, 29:12, 29:15, 43:20, 58:25, 59:22, 62:1, 62:9, 65:16, 65:21, 66:9, 73:20, 96:15, 96:24, 97:15
**pages** [2] - 18:16, 59:1
**paid** [4] - 34:18, 34:22, 36:1, 39:15
**paired** [1] - 11:1
**panel** [2] - 4:13, 73:10
**panels** [3] - 26:20, 26:22, 26:24
**paragraph** [17] - 15:10, 15:13, 15:14, 18:18, 19:12, 35:1, 37:18, 57:3, 57:7, 58:5, 58:21, 60:3, 60:4, 62:19, 67:7,

74:3
**Paragraph** [7] - 35:14, 35:25, 38:12, 38:14, 39:6, 57:2, 83:19
**Paragraphs** [1] - 35:11
**part** [12] - 10:9, 11:10, 22:1, 24:16, 30:19, 31:15, 33:19, 49:18, 69:1, 72:23, 83:24, 98:20
**participants** [2] - 84:25, 87:23
**participate** [1] - 87:21
**particular** [5] - 6:20, 6:24, 13:5, 50:25, 90:11
**particulars** [1] - 26:11
**parties** [2] - 68:23, 93:14
**party** [1] - 55:24
**passage** [1] - 13:10
**path** [4] - 5:14, 6:1, 7:2, 85:10
**paths** [4] - 6:21, 6:24, 7:1, 8:11
**patience** [1] - 42:23
**pay** [19] - 37:9, 37:17, 38:4, 38:9, 38:10, 38:19, 39:3, 39:11, 39:21, 39:22, 39:24, 40:12, 40:14, 44:2, 74:18, 84:2, 84:16, 91:10
**payable** [2] - 37:9, 67:14
**Paydown** [1] - 38:14
**paydown** [1] - 38:22
**paying** [2] - 42:11, 70:13
**payment** [9] - 36:5, 37:8, 41:19, 43:11, 44:5, 63:17, 70:14, 70:19, 71:2
**payment-in-kind** [2] - 41:19, 43:11
**payments** [1] - 70:18
**Payments** [1] - 91:5
**penalty** [4] - 40:15, 85:18, 85:23, 85:25
**Pennsylvania** [1] - 1:25
**people** [16] - 19:23, 20:6, 26:21, 28:8, 51:20, 66:22, 70:12, 81:1, 87:8, 87:10, 87:13, 88:18, 88:20,

88:23, 89:1, 89:3
**per** [2] - 36:14, 37:10
**percent** [26] - 34:18, 34:22, 34:24, 39:7, 39:17, 39:21, 39:25, 40:14, 40:16, 42:10, 44:2, 51:23, 51:25, 81:25, 83:25, 84:5, 84:16, 85:6, 85:13, 85:14, 85:15, 85:16, 85:21, 85:24
**perform** [1] - 85:3
**performance** [1] - 7:11
**period** [14] - 35:17, 37:10, 39:14, 39:20, 45:4, 46:12, 51:4, 51:10, 51:16, 52:20, 53:2, 53:3, 67:11
**period-to-period** [1] - 67:11
**periods** [3] - 39:14, 67:9, 67:19
**permission** [2] - 78:11, 93:25
**permit** [2] - 91:6, 91:9
**person** [2] - 9:13, 10:25
**personally** [3] - 17:14, 77:16, 77:17
**persons** [1] - 97:18
**perspective** [2] - 20:22, 68:25
**perspectives** [1] - 18:25
**phones** [3] - 12:21, 30:14, 94:7
**phrase** [1] - 77:21
**pick** [1] - 60:23
**picture** [1] - 20:12
**pictures** [1] - 87:7
**piece** [1] - 26:17
**place** [4] - 17:11, 90:7, 92:12, 99:17
**placed** [2] - 16:23, 61:3
**places** [2] - 10:12, 75:10
**Plaintiff** [1] - 94:10
**Plaintiffs** [1] - 1:4, 31:11, 77:9, 94:21, 95:17
**PLAINTIFFS** [3] - 1:17, 1:20, 2:2
**Plaintiffs'** [12] - 31:3, 31:23, 31:24, 33:17, 52:15, 82:3, 93:15, 93:16, 96:10, 96:12, 96:16, 97:12

**Plan** [1] - 8:20
**plan** [5] - 15:24, 24:14, 25:3, 70:3, 70:6
**plans** [4] - 24:11, 25:3, 25:20, 26:1
**platforms** [1] - 80:21
**play** [1] - 90:11
**PLLC** [1] - 1:17
**point** [19] - 7:7, 9:13, 10:24, 30:1, 33:6, 42:8, 53:11, 53:12, 57:9, 61:2, 61:6, 72:1, 76:5, 80:15, 81:13, 91:24, 93:18, 98:21, 99:2
**pointed** [2] - 40:10, 75:3
**points** [1] - 51:18
**policy** [2] - 19:2, 59:14
**PORTER** [1] - 2:8
**portfolio** [1] - 30:21
**portion** [3] - 63:11, 64:17, 70:16
**position** [4] - 14:8, 28:4, 69:22, 94:18
**positive** [8] - 5:20, 33:11, 61:6, 61:7, 66:16, 66:19, 66:25, 67:17
**possible** [4] - 49:24, 50:1, 71:16, 79:25
**post** [1] - 80:16
**post-conservatorship** [1] - 80:16
**potential** [4] - 25:1, 41:16, 41:17, 41:25
**power** [2] - 44:25, 46:7
**practice** [1] - 55:23
**pre** [1] - 80:13
**pre-conservatorship** [1] - 80:13
**predated** [1] - 45:2
**predecisional** [1] - 97:8
**predict** [1] - 49:14
**prefer** [1] - 18:11
**Preference** [2] - 36:11, 38:15
**preference** [13] - 34:23, 36:3, 36:13, 36:23, 37:1, 37:8, 37:24, 38:5, 38:8, 38:19, 38:21, 38:22, 82:1
**Preferred** [1] - 4:3

**preferred** [13] - 34:14, 35:8, 35:18, 35:19, 36:2, 37:12, 43:25, 47:20, 47:21, 68:24, 82:11, 90:21, 91:12
**PREFERRED** [1] - 1:10
**prejudicial** [1] - 32:4
**prepared** [2] - 56:21, 94:5
**presence** [5] - 12:23, 30:16, 55:18, 76:19, 93:9
**presentation** [1] - 47:17
**Preserve** [1] - 78:25
**preserve** [11] - 49:19, 75:11, 75:22, 76:1, 77:10, 77:14, 79:5, 79:17, 79:23, 81:3, 81:5
**preserved** [1] - 80:7
**preserving** [1] - 81:7
**president** [2] - 23:23, 24:2
**presume** [1] - 13:8
**pretty** [1] - 85:21
**previous** [4] - 53:1, 62:9, 65:21, 77:19
**previously** [2] - 38:20, 93:20
**PREVIOUSLY** [1] - 5:1
**price** [1] - 70:23
**prices** [22] - 5:15, 5:17, 5:19, 5:22, 6:2, 6:6, 6:24, 6:25, 7:2, 7:10, 48:25, 49:9, 50:7, 52:4, 53:3, 53:10, 53:17, 54:4, 54:5, 54:7, 54:8, 70:21
**principal** [19] - 11:4, 12:1, 18:1, 18:2, 18:25, 19:19, 19:24, 68:4, 68:8, 68:12, 68:16, 68:21, 68:25, 69:4, 69:12, 69:17, 69:21, 70:4, 70:18
**principally** [3] - 6:1, 6:24, 7:1
**private** [10] - 15:25, 16:6, 16:15, 44:15, 44:21, 47:8, 47:25, 90:14, 91:16, 92:17
**problem** [7] - 31:13, 41:16, 42:1, 44:1, 50:3, 68:18, 74:15
**proceed** [1] - 4:21,

73:14
**proceeding** [4] - 6:12, 41:12, 41:14, 43:18
**Proceedings** [1] - 100:10
**proceedings** [18] - 4:15, 12:22, 14:18, 30:15, 34:1, 42:20, 55:17, 56:12, 73:7, 73:9, 73:12, 76:18, 78:8, 93:8, 95:12, 96:4, 100:9, 101:6
**process** [8] - 22:2, 22:25, 45:9, 49:17, 49:18, 98:21, 99:5, 99:6
**processes** [2] - 45:15, 80:22
**produced** [5] - 6:17, 21:4, 21:7, 22:25, 101:6
**Professionals** [1] - 78:20
**Professor** [2] - 94:12, 94:14
**profits** [1] - 28:8
**program** [1] - 82:13
**projection** [3] - 5:25, 49:8, 49:14
**projections** [10] - 5:9, 5:16, 5:20, 6:19, 7:8, 20:25, 24:10, 24:20, 25:17, 25:19
**pronouncing** [2] - 10:20, 20:12
**property** [4] - 75:12, 79:5, 79:21, 91:11
**proposal** [2] - 70:3, 70:15
**protect** [2] - 15:7, 33:10
**protecting** [2] - 54:10, 71:4
**protocols** [1] - 80:23
**provided** [5] - 18:12, 19:13, 34:17, 39:10, 84:1
**provides** [1] - 35:2
**providing** [1] - 70:14
**provision** [23] - 12:7, 12:11, 12:16, 12:25, 13:5, 13:16, 14:11, 14:22, 38:9, 40:3, 40:5, 41:7, 43:25, 44:4, 46:2, 46:11, 46:16, 86:15, 90:13, 91:25, 92:3, 92:11, 92:14
**provisions** [14] -

13:9, 13:21, 13:23,
14:14, 16:5, 40:5,
41:19, 42:25, 43:11,
43:12, 45:7, 45:20,
46:24, 90:3
**Prussia** [1] - 1:25
**PSPA** [16] - 8:15,
13:23, 16:11, 61:10,
69:2, 69:4, 69:6, 69:8,
69:10, 69:13, 69:14,
82:23, 82:25, 83:6,
91:13, 91:15
**PSPAs** [1] - 90:15
**public** [11] - 57:15,
59:14, 63:21, 69:24,
70:2, 70:5, 70:10,
75:25, 87:2, 87:3,
97:5
**publicly** [2] - 21:16,
27:12
**Publicly** [1] - 56:23
**pull** [25] - 7:19,
11:12, 12:7, 12:14,
17:23, 20:3, 25:7,
26:13, 28:23, 37:20,
41:11, 43:17, 47:12,
50:8, 52:13, 55:9,
56:14, 61:18, 65:11,
73:19, 82:2, 82:3,
90:17, 96:11, 98:5
**pulled** [2] - 16:4,
76:7
**punitive** [1] - 45:11
**Purchase** [1] - 4:3
**PURCHASE** [1] -
1:10
**purchase** [10] -
12:17, 12:18, 12:19,
15:17, 34:7, 34:14,
43:25, 67:9, 68:24,
90:21
**purchased** [1] -
34:10
**purchaser** [1] -
91:10
**purchases** [3] -
32:17, 32:21, 32:22
**purpose** [2] - 33:8,
57:15
**pursuant** [4] - 36:1,
36:3, 38:21, 93:19
**put** [16] - 7:8, 9:3,
14:21, 24:14, 28:13,
32:24, 35:5, 45:15,
50:23, 53:11, 53:16,
56:5, 61:4, 66:25,
69:21, 100:2
**putting** [1] - 31:7,
63:12
**PX** [2] - 96:10, 96:11

## Q

**PX-1-L** [1] - 50:8
**PX-2** [1] - 47:12
**PX-2-A** [1] - 45:18
**PX-33** [2] - 35:5, 82:3
**PX-388-A** [1] - 28:20
**PX-486** [1] - 99:18
**PX-500** [1] - 17:23
**PX-640** [1] - 12:7
**PX-646-A** [1] - 28:20

## Q

**quarter** [19] - 27:11,
57:25, 59:18, 59:21,
61:21, 63:17, 65:9,
66:19, 66:20, 67:1,
67:4, 67:5, 67:17,
71:21, 71:24, 72:9,
72:13, 72:18
**quarterly** [1] - 63:11
**quarters** [6] - 63:9,
64:5, 64:16, 64:19,
64:23, 66:17
**questioning** [2] -
84:25, 89:9
**questions** [24] -
40:3, 42:19, 44:11,
48:15, 48:24, 54:18,
61:13, 68:4, 68:5,
68:9, 69:17, 71:9,
73:17, 75:9, 75:13,
75:18, 75:19, 77:15,
81:24, 85:2, 85:5,
86:1, 95:15, 97:9
**quick** [1] - 44:12
**quicker** [1] - 22:8
**quickly** [6] - 6:11,
17:23, 18:4, 36:9,
44:12, 45:18
**quite** [2] - 17:2,
32:16

## R

**Radnor** [1] - 1:25
**raise** [2] - 44:21,
85:2
**raised** [2] - 75:18,
91:24
**raises** [1] - 74:8
**ratably** [1] - 35:19
**rate** [8] - 34:23, 39:6,
39:16, 39:24, 40:16,
83:25, 85:13, 85:16
**RDR** [3] - 2:10,
101:3, 101:12
**RE** [1] - 1:10
**re** [1] - 95:18
**Re** [1] - 4:2

**re-call** [1] - 95:18
**reached** [1] - 93:18
**reaction** [3] - 51:1,
51:3, 52:6
**read** [9] - 57:6, 58:7,
62:24, 63:8, 66:24,
67:6, 83:24, 86:15,
91:7
**reading** [4] - 8:6,
8:23, 58:18, 60:6
**ready** [1] - 4:5
**really** [6] - 7:7,
13:25, 15:1, 25:20,
79:22, 80:25
**reason** [3] - 39:11,
40:12, 84:2
**reasonable** [3] -
26:16, 45:4, 46:12
**reasons** [2] - 24:9,
40:21, 55:25
**rebut** [1] - 56:9
**rebuts** [1] - 56:7
**rebuttal** [5] - 94:12,
94:15, 95:18, 95:19,
95:20
**receive** [1] - 35:19
**received** [4] - 55:14,
56:16, 70:15, 78:13
**RECEIVED** [1] - 3:8
**receiver** [2] - 46:3,
46:20
**recently** [1] - 50:2
**recess** [3] - 73:8,
96:1, 100:8
**recognize** [3] - 29:2,
35:7, 45:19
**recollection** [4] - 8:8,
20:20, 47:1, 89:17
**recommending** [2] -
96:21, 96:22
**record** [4] - 11:11,
40:4, 93:21, 100:3
**records** [1] - 97:5
**recovered** [1] - 70:21
**Recovery** [1] - 14:23
**recruit** [2] - 21:23,
22:20
**recruited** [1] - 17:19
**recruiting** [1] - 17:15
**Red** [1] - 3:4
**redirect** [1] - 48:16
**REDIRECT** [1] -
48:19
**reduction** [16] - 18:1,
18:2, 18:25, 19:19,
19:24, 68:5, 68:8,
68:12, 68:16, 68:21,
68:25, 69:4, 69:12,
69:17, 69:21, 70:4
**refer** [1] - 82:16

**reference** [2] - 63:18,
64:13
**referenced** [3] -
8:16, 26:2, 26:22
**references** [2] -
50:13, 79:3
**referred** [4] - 43:10,
43:12, 71:15, 88:2
**referring** [2] - 44:3,
48:5
**refers** [3] - 30:9,
48:3, 74:14
**reform** [2] - 8:11,
59:10
**refresh** [1] - 46:25
**regarding** [2] - 59:4,
59:8
**regularly** [1] - 88:3
**regulation** [1] - 19:4
**regulators** [2] - 59:5,
59:8
**rejected** [2] - 32:5,
40:21
**related** [3] - 4:2,
31:12, 34:13
**relates** [5] - 15:14,
30:20, 32:10, 75:11,
83:16
**relating** [1] - 46:2
**released** [2] - 27:12,
94:8
**relevance** [1] - 98:16
**relevant** [3] - 13:23,
14:9, 56:2
**reliant** [1] - 64:1
**remain** [1] - 47:22
**remained** [1] - 93:16
**remaining** [1] - 49:19
**remarks** [1] - 56:21
**remember** [17] -
10:22, 11:20, 12:11,
22:17, 22:19, 23:12,
23:22, 41:8, 45:14,
45:17, 47:4, 47:14,
75:12, 77:14, 86:5,
88:1, 89:19
**remembering** [1] -
88:21
**remind** [2] - 4:20,
29:9
**reminded** [1] - 93:12
**repaid** [1] - 38:21
**repay** [2] - 37:25,
38:4
**repeat** [4] - 22:11,
64:9, 66:23, 75:1
**replace** [2] - 9:6,
17:7
**replaced** [2] - 17:6,
17:9

**replow** [1] - 74:13
**report** [13] - 26:9,
27:25, 29:7, 29:15,
29:17, 29:19, 29:25,
31:15, 32:14, 32:24,
33:20, 73:23, 75:6
**REPORTED** [1] -
2:10
**REPORTER** [1] -
100:1
**Reporter** [2] - 2:11,
101:12
**reports** [9] - 26:23,
27:14, 27:23, 28:8,
28:16, 28:17, 28:21,
29:4, 29:24
**representations** [1] -
94:24
**repudiate** [4] - 44:25,
45:14, 46:7, 47:7
**Repudiation** [1] -
46:17
**repudiation** [1] -
46:20
**request** [1] - 67:8
**required** [5] - 39:12,
44:5, 63:16, 70:18,
85:21
**requirement** [1] -
91:4
**requires** [2] - 6:3, 9:7
**research** [2] - 19:3,
27:23
**Reserve** [1] - 50:19
**resiliency** [1] - 81:17
**resisted** [1] - 97:6
**resolution** [2] -
57:16, 57:22
**respect** [5] - 67:25,
69:9, 72:10, 91:11,
97:10
**respectfully** [1] -
13:14
**response** [3] - 33:16,
33:19, 89:20
**responses** [1] -
25:19
**responsibility** [3] -
79:4, 79:17, 79:19
**responsive** [1] -
55:20
**rest** [1] - 93:10
**rested** [2] - 94:9,
95:16
**Restricted** [1] - 91:5
**restriction** [1] - 91:4
**result** [1] - 49:24
**results** [4] - 27:10,
66:16, 66:19, 67:17
**resumed** [1] - 4:19

**resumption** [1] - 15:25
**retakes** [1] - 4:10
**return** [4] - 57:18, 58:18, 59:11, 60:12
**returning** [1] - 54:19
**reverted** [1] - 53:15
**review** [2] - 19:13, 22:1
**reviewed** [1] - 97:18
**revisited** [1] - 72:18
**Rights** [1] - 36:10
**rise** [1] - 53:8
**risk** [7] - 19:3, 66:21, 74:8, 74:21, 80:23, 81:2
**Risk** [1] - 78:20
**Road** [1] - 1:25
**ROBERT** [1] - 2:2
**robust** [1] - 33:11
**role** [3] - 22:20, 22:23, 84:19
**romanette** [3] - 15:24, 16:4, 37:7
**Room** [1] - 2:13
**room** [1] - 66:22
**Ross** [2] - 65:18, 65:19
**ROYCE** [1] - 1:13
**RUDY** [1] - 1:23
**Rudy** [1] - 31:6
**Rule** [2] - 77:24, 78:4, 93:19
**ruling** [1] - 97:11
**run** [1] - 81:2

**S**

**sake** [1] - 82:16
**SAMUEL** [1] - 1:20
**satisfied** [1] - 77:24
**save** [1] - 71:5
**saw** [4] - 60:8, 68:18, 82:7, 85:17
**scale** [1] - 51:5
**scenario** [4] - 5:14, 20:25, 24:24, 54:10
**scenarios** [2] - 5:9, 21:2
**scheduled** [1] - 88:3
**SCHILLER** [1] - 1:21
**SCHOLER** [1] - 2:8
**screen** [6] - 14:11, 14:22, 18:11, 27:21, 76:7, 82:5
**script** [1] - 47:18
**seated** [2] - 4:16, 73:13
**SEC** [2] - 61:12,

72:21
**second** [18] - 7:23, 13:5, 27:11, 33:25, 56:2, 58:5, 58:21, 61:20, 65:9, 66:16, 66:19, 67:1, 67:4, 67:7, 67:17, 72:9, 80:16, 80:20
**Secretary** [2] - 96:21, 96:25
**secretary** [5] - 11:9, 11:25, 15:7, 97:14, 97:21
**section** [3] - 15:3, 36:10, 57:2
**Section** [6] - 36:1, 36:3, 36:9, 38:21, 45:20, 45:24
**securities** [9] - 12:18, 15:18, 28:5, 28:15, 32:18, 32:22, 33:10, 34:8, 34:9
**see** [60] - 12:3, 13:6, 14:22, 14:24, 15:5, 15:11, 16:2, 16:8, 18:8, 18:14, 18:19, 19:7, 19:16, 20:12, 26:15, 26:17, 27:4, 27:5, 27:21, 28:1, 29:21, 35:14, 35:16, 35:23, 35:25, 36:7, 36:11, 36:15, 37:14, 38:15, 38:23, 39:18, 43:21, 44:7, 46:2, 46:4, 46:14, 46:17, 46:22, 48:9, 53:5, 53:7, 56:23, 58:25, 62:3, 62:21, 63:18, 65:25, 74:11, 78:25, 79:7, 80:5, 80:11, 84:5, 84:20, 85:14, 96:2, 96:15, 96:25, 99:24
**seeing** [4] - 6:23, 51:14, 54:2, 60:17
**seeks** [1] - 27:22
**select** [1] - 22:3
**selection** [1] - 23:1
**selectively** [1] - 91:7
**sell** [1] - 70:23
**seller** [2] - 91:6, 91:9
**seller's** [1] - 91:11
**send** [1] - 28:7
**sending** [1] - 63:24
**Senior** [1] - 4:3
**SENIOR** [2] - 1:10, 1:14
**senior** [13] - 17:1, 17:16, 19:1, 23:23, 35:8, 35:17, 35:18,

36:2, 37:12, 82:11, 90:21, 91:12, 96:22
**sent** [1] - 60:19
**sentence** [16] - 47:19, 47:24, 48:3, 48:6, 57:3, 57:11, 58:24, 59:3, 62:21, 63:9, 64:9, 64:10, 66:3, 74:7, 74:20, 79:10
**sentences** [2] - 63:12, 64:8
**separate** [3] - 68:17, 68:20, 83:13
**September** [3] - 56:22, 60:22, 90:23
**serious** [1] - 85:2
**served** [2] - 31:4, 33:20
**serving** [2] - 57:15, 86:25
**SESSION** [1] - 1:13
**set** [5] - 7:9, 44:11, 45:7, 97:25, 98:2
**setting** [1] - 70:16
**seven** [1] - 97:17
**several** [3] - 19:1, 97:4, 98:5
**shall** [15] - 15:8, 35:19, 36:2, 36:13, 37:8, 39:11, 39:15, 39:16, 40:11, 46:21, 84:1, 91:6, 91:9
**share** [2] - 36:14, 37:11
**shared** [1] - 70:25
**shareholder** [6] - 16:7, 16:16, 56:2, 61:6, 61:7, 83:10
**shareholders** [18] - 44:16, 44:21, 47:8, 47:25, 48:7, 54:19, 57:19, 58:17, 58:18, 59:12, 60:12, 63:21, 83:10, 86:17, 90:14, 91:16, 92:18
**shares** [3] - 35:18, 36:17, 37:12
**sheet** [2] - 97:16, 97:20
**Shiller** [2] - 50:11, 52:17
**short** [1] - 95:19
**shorter** [1] - 95:8
**shortly** [1] - 47:10
**show** [18] - 6:11, 13:24, 15:13, 27:2, 28:16, 28:20, 29:6, 29:8, 35:11, 41:18, 45:24, 46:10, 61:16,

77:19, 78:1, 78:11, 94:6
**showed** [6] - 5:8, 61:15, 61:23, 65:13, 86:7, 87:7
**showing** [4] - 16:5, 32:17, 33:7, 33:11
**shown** [7] - 7:18, 7:22, 8:15, 25:17, 47:15, 50:25, 53:2
**shows** [2] - 14:11, 32:21
**sidebar** [5] - 12:23, 30:16, 55:18, 76:19, 93:9
**signature** [1] - 97:19
**signed** [11] - 62:3, 62:11, 62:13, 62:15, 63:13, 65:17, 65:23, 96:18, 97:14, 97:18, 97:21
**significance** [1] - 13:8
**significant** [11] - 5:17, 6:6, 6:9, 28:4, 59:4, 59:7, 59:13, 60:14, 66:4, 66:12, 85:22
**significantly** [1] - 32:7
**simple** [3] - 13:21, 16:10, 25:5
**simply** [1] - 13:17
**simultaneous** [1] - 67:4
**single** [5] - 5:13, 5:16, 88:17, 93:14, 99:9
**sitting** [1] - 24:23
**situation** [2] - 81:18, 81:19
**six** [1] - 97:17
**skip** [1] - 62:24
**slide** [5] - 14:22, 34:4, 52:13, 52:16, 87:7
**Slide** [1] - 20:3
**slightly** [1] - 75:11
**snippet** [1] - 31:8
**sold** [1] - 70:20
**sole** [1] - 35:20
**solo** [1] - 26:24
**solution** [3] - 41:16, 41:17, 41:25
**solvent** [1] - 64:3
**someone** [4] - 49:6, 52:2, 86:4, 87:11
**sometimes** [2] - 26:20, 43:11
**sorry** [28] - 6:13,

11:14, 14:3, 17:17, 18:10, 19:22, 20:11, 22:11, 29:8, 33:4, 33:5, 36:25, 43:6, 43:18, 43:19, 54:6, 55:22, 57:6, 57:12, 58:23, 59:6, 62:14, 64:7, 64:9, 65:5, 66:7, 69:25, 83:2
**sort** [4] - 10:11, 11:2, 54:11, 54:22
**sought** [2] - 31:11, 56:9
**sound** [2] - 23:22, 23:25
**sounds** [2] - 58:4, 85:24
**sources** [1] - 50:20
**speaking** [2] - 26:24, 93:16
**special** [2] - 9:10, 98:14
**specific** [5] - 7:8, 45:9, 80:5, 91:4
**specifically** [1] - 8:9
**specified** [1] - 58:8
**speech** [10] - 47:11, 47:14, 47:18, 55:7, 56:21, 60:17, 60:20, 61:2, 76:15, 78:18
**speeches** [1] - 75:25
**split** [1] - 10:12
**spoken** [1] - 49:20
**St** [1] - 50:19
**staff** [4] - 19:1, 52:2, 88:4, 88:7
**stages** [1] - 44:22
**stand** [3] - 4:10, 4:19, 71:12
**standard** [1] - 78:5
**standards** [1] - 80:23
**STANTON** [1] - 2:8
**start** [3] - 48:3, 49:4, 59:6
**started** [2] - 74:22, 81:16
**state** [6] - 49:24, 50:1, 50:2, 50:4, 54:23, 54:24
**statement** [12] - 54:24, 60:8, 65:2, 66:15, 66:24, 75:10, 77:3, 77:20, 77:25, 78:3, 78:5
**statements** [4] - 54:18, 66:23, 67:25, 79:12
**STATES** [2] - 1:1, 1:14
**States** [2] - 2:11,

101:13
**status** [2] - 16:6, 16:15
**statute** [8] - 12:8, 13:2, 13:24, 14:7, 14:8, 44:25, 86:16
**statutory** [1] - 79:4
**stay** [6] - 53:14, 64:3, 70:22, 71:22, 81:20
**stenographic** [1] - 101:5
**step** [1] - 93:3
**Stern** [11] - 6:17, 6:22, 7:22, 40:2, 40:11, 48:16, 57:6, 73:14, 76:21, 77:2, 77:24
**STERN** [75] - 2:7, 4:9, 12:20, 12:24, 14:2, 14:5, 30:9, 30:17, 43:3, 45:21, 48:17, 48:20, 48:22, 48:23, 50:8, 50:10, 52:13, 52:14, 53:21, 53:23, 55:9, 55:13, 55:19, 55:22, 56:4, 56:14, 56:19, 57:1, 57:4, 58:20, 59:2, 60:2, 60:5, 61:18, 61:19, 62:1, 62:2, 62:9, 62:10, 62:18, 62:20, 65:11, 65:12, 65:21, 65:22, 66:8, 66:10, 73:3, 73:15, 73:16, 73:19, 73:21, 74:2, 74:5, 76:4, 76:12, 76:16, 77:7, 78:6, 78:10, 78:16, 78:23, 78:24, 82:2, 82:6, 83:5, 84:12, 88:14, 90:17, 90:18, 92:4, 93:2, 93:6, 93:10, 93:23
**stick** [1] - 61:12
**still** [7] - 4:20, 18:3, 33:21, 61:5, 92:12, 92:13, 92:18
**stock** [21] - 12:19, 13:20, 15:15, 16:13, 34:14, 35:8, 35:18, 35:19, 36:2, 37:12, 43:25, 47:20, 68:24, 82:11, 82:20, 82:21, 83:16, 90:21, 91:12
**Stock** [1] - 4:3
**STOCK** [1] - 1:10
**stocks** [1] - 47:22
**stood** [1] - 31:6
**stop** [1] - 73:4
**strategic** [2] - 24:14,

25:3
**Strategic** [1] - 8:20
**strength** [1] - 81:12
**stretching** [1] - 89:11
**structure** [2] - 57:17, 58:12
**subject** [2] - 94:9, 95:15
**subjected** [1] - 42:19
**submit** [3] - 13:14, 28:17, 93:20
**submitted** [2] - 28:21, 29:20
**Subparagraph** [2] - 36:13, 83:20
**Subsection** [1] - 45:25
**subsequent** [1] - 42:18
**subsequently** [1] - 17:12
**substance** [2] - 71:20, 76:13
**substantial** [1] - 61:9
**succeeded** [1] - 70:21
**sufficient** [2] - 63:10, 64:5
**suing** [1] - 45:10
**summarize** [1] - 70:9
**summary** [1] - 26:16
**summer** [1] - 81:19
**supervision** [1] - 19:3
**supplement** [1] - 32:10
**supplemental** [4] - 31:15, 32:13, 32:24, 33:20
**supply** [1] - 99:19
**support** [3] - 74:8, 74:14, 81:2
**Susan** [4] - 17:18, 23:12, 62:3, 62:6
**Sustainability** [1] - 66:1
**sustainability** [2] - 66:5, 66:13
**sustainable** [1] - 24:25
**sustained** [4] - 31:7, 31:10, 33:23, 45:23
**sweep** [27] - 8:16, 9:11, 9:15, 10:15, 10:25, 11:24, 20:9, 20:19, 21:12, 21:15, 21:21, 22:10, 22:14, 23:3, 23:9, 23:17, 23:24, 24:6, 32:20,

40:7, 40:18, 41:15, 41:24, 44:14, 49:13, 81:6, 87:1
**switch** [5] - 54:16, 68:3, 73:2, 81:23, 86:1
**SWORN** [1] - 5:1
**sympathize** [1] - 42:22
**systems** [1] - 80:22

# T

**table** [2] - 29:6, 33:24
**tag** [1] - 94:1
**tag-teaming** [1] - 94:1
**Tagoe** [10] - 20:11, 20:13, 20:14, 20:21, 87:10, 87:18, 87:19, 88:3, 88:4, 88:6
**tax** [1] - 71:13
**taxable** [2] - 72:3, 72:15
**taxpayer** [1] - 70:24
**taxpayers** [1] - 15:7
**team** [3] - 19:1, 19:12, 99:23
**teaming** [1] - 94:1
**technical** [2] - 6:3, 76:5
**technically** [1] - 93:15
**ten** [1] - 73:5
**tend** [1] - 11:8
**tenders** [1] - 96:14
**Term** [1] - 66:1
**term** [18] - 24:24, 25:2, 63:7, 63:19, 63:23, 64:6, 64:16, 64:20, 64:25, 66:4, 66:12, 67:15, 67:21, 69:6, 69:12, 80:12, 91:15
**terminate** [3] - 44:25, 46:7, 47:7
**terminated** [2] - 45:8, 58:10
**termination** [1] - 58:8
**terms** [5] - 11:1, 25:3, 78:4, 89:21, 91:13
**testified** [5] - 32:25, 50:21, 68:11, 71:18, 89:20
**testify** [1] - 13:1
**testimony** [22] - 7:3,

12:5, 14:12, 25:23, 31:8, 32:11, 33:9, 42:3, 44:9, 55:1, 71:25, 75:1, 75:7, 75:21, 77:9, 77:13, 77:18, 86:6, 88:19, 90:1, 93:17, 95:19
**text** [2] - 15:19, 76:15
**Thakor** [2] - 94:12, 94:22
**THE** [59] - 1:1, 1:13, 1:17, 1:19, 2:2, 2:6, 3:5, 4:1, 4:6, 4:11, 4:13, 4:16, 4:18, 4:19, 14:17, 19:22, 30:24, 33:23, 43:5, 43:6, 45:23, 48:16, 55:14, 56:11, 56:16, 73:5, 73:10, 73:13, 77:5, 78:7, 78:13, 83:4, 84:9, 84:10, 84:11, 88:13, 92:23, 92:24, 92:25, 93:1, 93:3, 93:7, 93:22, 94:9, 94:13, 94:16, 95:3, 95:9, 95:14, 96:8, 98:6, 98:8, 98:11, 98:17, 99:12, 99:16, 99:20, 99:24, 100:1
**theme** [2] - 77:9
**themselves** [1] - 26:2
**thereafter** [1] - 39:14
**therefor** [1] - 35:21
**Thereupon** [2] - 73:8, 100:8
**they've** [1] - 80:23
**thinking** [3] - 49:12, 54:10, 95:3
**third** [25] - 8:23, 9:14, 16:11, 41:10, 49:13, 52:10, 57:25, 59:17, 59:21, 60:2, 60:4, 68:8, 68:12, 68:22, 69:9, 72:2, 77:12, 80:21, 80:24, 83:9, 88:10, 89:6, 96:17, 96:23
**three** [4] - 6:18, 82:14, 83:13, 97:17
**thrust** [1] - 33:9
**Tim** [2] - 11:25, 62:14
**tim** [1] - 62:12
**timeliness** [4] - 31:12, 31:25, 32:14, 33:7
**timely** [1] - 39:12
**timing** [1] - 95:1

**Timothy** [1] - 10:19
**title** [2] - 12:14, 52:16
**today** [6] - 48:25, 79:4, 81:24, 82:8, 83:22, 86:2
**together** [6] - 9:23, 10:1, 10:3, 13:21, 15:2, 63:12
**tomorrow** [1] - 95:23
**took** [4] - 17:11, 49:5, 55:3, 74:25
**top** [4] - 18:12, 43:23, 50:11, 56:23
**TOPAZ** [1] - 1:24
**topic** [1] - 71:8
**topics** [2] - 54:16, 68:3
**totally** [1] - 31:23
**toward** [1] - 54:25
**towards** [1] - 13:1
**trades** [2] - 28:9, 28:10
**trail** [1] - 70:8
**TRANSCRIPT** [1] - 1:12
**transcript** [8] - 6:12, 11:13, 25:8, 41:12, 43:17, 43:18, 101:5, 101:6
**Transition** [1] - 8:5
**transparent** [2] - 31:23, 97:6
**Treasury** [71] - 6:20, 8:3, 9:14, 9:18, 9:22, 9:25, 10:2, 10:3, 10:11, 10:25, 11:2, 11:5, 11:22, 11:25, 12:2, 12:12, 12:17, 13:19, 14:15, 14:16, 15:8, 15:18, 15:23, 16:12, 16:18, 35:9, 36:24, 37:25, 38:6, 49:19, 61:4, 61:9, 63:7, 63:11, 63:17, 63:23, 64:1, 64:2, 67:10, 67:14, 67:22, 68:7, 69:22, 70:15, 70:24, 74:8, 74:14, 81:12, 82:10, 82:12, 82:20, 82:25, 83:6, 83:17, 84:6, 85:1, 86:8, 86:10, 86:12, 86:13, 86:16, 92:9, 92:18, 96:19, 96:22, 97:5, 97:8, 97:18, 98:1
**Treasury's** [8] - 13:17, 13:18, 15:15, 24:25, 91:17, 91:21,

2622

98:25, 99:9
**trend** [2] - 54:2, 54:4
**trial** [1] - 43:17
**TRIAL** [1] - 1:12
**trillion** [1] - 32:18
**trouble** [1] - 70:13
**true** [11] - 6:1, 26:1, 42:24, 43:2, 43:10, 44:18, 44:24, 49:8, 49:15, 101:4, 101:5
**truth** [1] - 98:23
**truthful** [6] - 7:3, 12:5, 25:23, 42:3, 42:14, 44:9
**truthfully** [1] - 7:13
**try** [3] - 44:11, 46:11, 89:16
**trying** [8] - 32:4, 33:10, 40:19, 49:14, 77:2, 80:1, 81:11, 87:2
**turn** [1] - 5:20
**twice** [1] - 61:10
**two** [18] - 10:12, 13:21, 18:21, 19:15, 23:11, 28:16, 29:2, 30:7, 31:2, 31:3, 42:4, 55:25, 63:12, 64:8, 68:20, 68:23, 95:18, 97:16
**types** [1] - 87:16

### U

**U.S** [2] - 50:6, 74:23
**Ugoletti** [8] - 9:10, 9:17, 9:22, 9:24, 10:6, 10:10, 11:7, 26:15
**Ugoletti's** [1] - 11:2
**ultimate** [2] - 57:16, 57:22
**ultimately** [2] - 10:14, 70:20
**uncertain** [2] - 26:2, 81:17
**uncertainty** [8] - 26:3, 59:4, 59:7, 59:13, 60:14, 66:4, 66:12, 66:15
**unclear** [1] - 76:25
**under** [21] - 4:20, 6:20, 8:15, 8:19, 18:23, 35:16, 37:17, 38:9, 40:13, 60:3, 66:3, 67:8, 70:15, 77:24, 87:6, 89:21, 91:2, 91:13, 91:15, 97:5, 98:2
**undersecretary** [1] -

11:9
**understood** [3] -
24:19, 75:15, 98:7
**underwater** [3] -
70:13, 70:16, 70:18
**unemployment** [1] -
6:9
**unforeseen** [1] -
25:1
**United** [1] - 101:13
**united** [1] - 2:11
**UNITED** [2] - 1:1, 1:14
**unless** [4] - 15:14, 37:25, 38:5, 92:18
**unlikely** [1] - 67:13
**unpaid** [2] - 37:11, 38:20
**untimely** [2] - 31:16, 33:18
**unwarranted** [1] -
31:16
**up** [58] - 5:19, 5:23, 6:25, 7:8, 7:19, 11:12, 12:7, 12:14, 17:23, 20:3, 25:7, 26:13, 28:23, 30:20, 31:6, 32:21, 32:22, 34:9, 35:5, 39:21, 40:6, 40:16, 41:1, 41:4, 41:6, 41:10, 41:11, 42:12, 43:17, 47:12, 50:8, 51:5, 52:13, 53:12, 53:14, 54:1, 55:9, 56:14, 60:3, 61:18, 63:3, 65:11, 67:19, 71:16, 71:22, 72:1, 72:10, 73:19, 74:3, 76:7, 79:10, 80:15, 82:2, 82:3, 85:13, 90:17, 96:11, 98:5
**up-or-down** [1] -
67:19
**update** [1] - 71:21
**updated** [1] - 21:11
**upside** [1] - 70:25

### V

**vague** [1] - 43:4
**value** [4] - 61:10, 79:25, 80:2, 80:3
**variability** [1] - 67:12
**variable** [3] - 6:7, 6:9, 7:12
**varies** [1] - 75:10
**variety** [1] - 18:25
**various** [3] - 16:14,

21:1, 59:16
**VARMA** [1] - 2:6
**verbiage** [1] - 38:17
**version** [1] - 82:3
**vice** [1] - 23:23
**viewed** [2] - 40:13, 85:22
**VINCENT** [1] - 1:17
**virtually** [1] - 53:3
**volatility** [3] - 63:1, 63:2, 63:4
**volume** [1] - 34:9
**vs** [1] - 1:5

### W

**wait** [1] - 58:22
**Washington** [6] -
1:6, 1:18, 1:22, 2:9, 2:13, 101:14
**watch** [1] - 89:10
**website** [4] - 50:19, 50:22, 56:25
**weekly** [1] - 87:21
**well-maintained** [1] -
80:3
**what-if** [1] - 21:2
**whichever** [1] -
18:11
**Whoa** [1] - 84:25
**whole** [3] - 33:8, 81:12, 87:7
**WIERZBOWSKI** [1] -
2:2
**willing** [2] - 41:22, 41:23
**Wind** [1] - 8:24
**wind** [1] - 9:6
**wish** [2] - 41:18, 94:7
**withdraw** [1] - 22:7
**witness** [10] - 4:10, 13:13, 13:25, 76:9, 77:1, 93:5, 93:15, 94:12, 99:9
**WITNESS** [7] - 5:1, 19:22, 43:6, 84:9, 84:11, 92:24, 93:1
**WITNESSES** [1] - 3:5
**witnesses** [1] - 95:18
**woman** [1] - 20:10
**word** [2] - 8:5, 47:24
**words** [5] - 6:23, 17:3, 48:6, 62:25, 89:8
**world** [6] - 49:24, 50:1, 50:2, 50:4, 54:24, 54:25
**worried** [1] - 32:19
**worst** [1] - 54:10

**worst-case** [1] -
54:10
**worth** [28] - 8:16, 9:11, 9:14, 10:15, 10:25, 11:23, 20:9, 20:19, 21:12, 21:15, 21:20, 22:10, 22:14, 23:3, 23:9, 23:17, 23:24, 24:6, 32:20, 36:20, 40:7, 40:18, 41:15, 41:24, 44:14, 49:13, 81:6, 87:1
**write** [2] - 71:16, 72:10
**write-up** [1] - 71:16
**written** [9] - 71:22, 72:11, 72:12, 72:18, 91:9, 91:17, 91:23, 92:19

### Y

**year** [3] - 29:17, 34:10, 47:20
**years** [8] - 6:18, 9:20, 9:21, 15:19, 25:18, 42:9, 45:16
**yesterday** [15] - 5:8, 7:22, 8:15, 8:18, 9:20, 10:18, 17:25, 31:4, 31:12, 31:21, 31:22, 32:8, 33:17, 33:25, 93:13
**York** [4] - 1:22, 2:5, 26:17
**yourself** [1] - 53:16