1

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

2

Fairholme Funds, Inc., et al.,    ) Civil Action

3                                 ) No. 1:13-cv-01053-RCL
                   Plaintiffs,    )
4                                 ) **Jury Trial - Closing**
      vs.                         ) **Arguments (Day 13)**
5                                 ) **Afternoon Session**
Federal Housing Finance           )
6     Agency, et al.              ) Washington, D.C.
                                  ) **August 10, 2023**
7                  Defendants.    ) Time:  1:30 p.m.
      _____

8

In re Fannie Mae/Freddie Mac      ) Civil Action
9     Senior Preferred Stock      ) No. 1:13-mc-1288-RCL
      Purchase Agreement Class     )
10    Action Litigations.         )

11    _____

**Transcript of <u>Jury Trial - Closing Arguments (Day 13)</u>**
12    **<u>Afternoon Session</u>**
**Held Before**
13    **The Honorable Royce C. Lamberth**
**United States Senior District Judge**
14    _____

15                    A P P E A R A N C E S

16    For the Fairholme Funds, Inc. Plaintiffs:
                        **Vincent J. Colatriano**
17                      COOPER & KIRK, PLLC
                        1523 New Hampshire Avenue, Northwest
18                      Washington, D.C. 20036

19    For the Defendant Federal Housing Finance Agency:
                        **Asim Varma**
20                      **David B. Bergman**
                        **Ian S. Hoffman**
21                      **R. Stanton Jones**
                        **Jonathan L. Stern**
22                      ARNOLD & PORTER KAYE SCHOLER LLP
                        601 Massachusetts Avenue, Northwest
23                      Washington, D.C. 20001

24

25

1              A P P E A R A N C E S (continued)

2      For the Class Plaintiffs:
                        **Hamish P. M. Hume**
3                       **Kenya Khalelah Davis**
                        **Samuel C. Kaplan**
4                       BOIES SCHILLER FLEXNER LLP
                        1401 New York Avenue, Northwest
5                       Washington, D.C. 20005

6                       **Robert Kravetz**
                        BERNSTEIN LITOWITZ BERGER & GROSSMANN
7                       LLP
                        1251 Avenue of the Americas
8                       New York, New York 10020

9                       **Lee D. Rudy**
                        **Grant Goodhart**
10                      KESSLER TOPAZ MELTZER & CHECK
                        280 King of Prussia Road
11                      Radnor, Pennsylvania 19087

12      _____

        Stenographic Official Court Reporter:
13                      Nancy J. Meyer
                        Registered Diplomate Reporter
14                      Certified Realtime Reporter
                        333 Constitution Avenue, Northwest
15                      Washington, D.C. 20001
                        202-354-3118
16

        Proceedings recorded by mechanical stenography.  Transcript
17      produced by computer-aided transcription.

18

19

20

21

22

23

24

25

1                          **I N D E X**

2                                                            PAGE:

3       **Closing Arguments:**

4          By Mr. Stern................................... 2864
           By Mr. Hume.................................... 2946
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2              (REPORTER'S NOTE:  The morning portion of the trial

3     was reported by Lorraine Herman, who prepared said transcript.)

4              (Proceedings held in the presence of the jury.)

5              THE COURT:  All right.  You may be seated.

6         Mr. Stern, you may proceed.

7              MR. STERN:  Thank you, Your Honor.

8         Good afternoon, members of the jury.

9         Mr. Hume and I are not going to agree on very much this

10    afternoon; that I can promise you.

11        But we do agree on this:  I and all of my colleagues you

12    see over here at this table, just like Mr. Hume and his

13    colleagues, can't thank you enough for all the time and

14    attention that you've paid in this courtroom to this case from

15    the very beginning, from the day that you walked in here to

16    have -- to be selected as jurors.

17        And I won't ask any of you how you felt when you got the

18    answer to that question.  But having been seated, you have been

19    wonderfully attentive.  And we know that you will be very

20    thoughtful in your consideration of Mr. Hume's remarks today

21    and my remarks today and, of course, your consideration of

22    His Honor's instructions, and then finally your deliberations.

23        So that's how I'd like to begin.

24        I want to take us back to August of 2012.  In August of

25    2012, Mr. DeMarco is looking back at literally years of

1    negative net worth for Fannie and for Freddie.  He's looking

2    back on 14 consecutive quarters, from the fourth quarter of

3    2008 to the first quarter of 2012; over three consecutive years

4    of liabilities exceeding assets.  Fourteen consecutive quarters

5    of being billions of dollars in the red.

6         Fourteen consecutive quarters of drawing from the

7    Treasury commitment that you've heard so much about.

8         He knows that Fannie and Freddie have just made filings

9    with the Securities and Exchange Commission, signed and

10   certified by their chief executive officers and their chief

11   financial officers that say, point blank, that they don't

12   expect to make enough money to cover their dividend payments to

13   Treasury over the long term.

14        Those are the words in those filings, members of the

15   jury -- I'll come back to them -- you heard them in the

16   evidence over the long term.  And you heard what that meant.

17   You heard from Mr. DeMarco, you heard from Dr. Thakor that we

18   are talking about 30-year mortgages.  So that is the long term.

19        And he's looking back at a stress scenario that has

20   Fannie and Freddie drawing $311 billion from the Treasury

21   commitment over the next three years.  He's hearing from the

22   marketplace that the market was very concerned about whether

23   the amount of the Treasury commitment was going to be enough

24   going forward.  He's a Ph.D. economist who knows his economic

25   history.  He knows about the financial crisis of 2007 and 2008,

1      not very far back in the rearview mirror.  And he knows that

2      the financial crisis nearly brought down Fannie and Freddie and

3      the secondary mortgage market with catastrophic consequences

4      for the entire United States economy.

5          He's a dedicated, lifelong public servant with an

6      awesome responsibility; an awesome responsibility placed on his

7      shoulders by Congress; an awesome responsibility to protect and

8      serve the public interest.

9          And he knows that every time that Fannie and Freddie

10     have to draw money from Treasury, just to pay the 10 percent

11     dividend that they owe to Treasury, they're drawing down on the

12     Treasury commitment.  He knows that the Treasury commitment

13     backing up Fannie and Freddie is all that's keeping them in

14     business.

15         And perhaps most important of all, members of the

16     jury, he hears the clock ticking, counting down to

17     December 31st, 2012, when the cap on the Treasury commitment

18     goes into place.

19         And once that cap hits, every dollar that Fannie and

20     Freddie draw from the Treasury commitment to pay the Treasury

21     dividend is going to erode that commitment, to bring it down

22     closer and closer to zero.

23         And he knows what that means.  He knows that the

24     Treasury commitment and the market confidence in the Treasury

25     commitment is absolutely vital to the financial health of

1    Fannie and Freddie.

2          And he knows that the financial health of Fannie and

3    Freddie is absolutely vital to the health of the United States

4    housing market.  And he knows that the financial health of the

5    housing market is absolutely vital to the financial health of

6    the United States economy.

7          That was the lesson that was learned at huge economic

8    and human cost during the financial crisis that began in 2007.

9          And what else does Mr. DeMarco know?  He knows that

10   under the law that Congress passed in 2008, under HERA, he has

11   to take action to protect the public interest.  He has to take

12   action to protect the interests of the American people who,

13   through the Treasury Department, have pumped hundreds of

14   billions of dollars into Fannie and Freddie to keep them from

15   going bankrupt.

16         Action to protect the public interest, not to maximize

17   profits for the shareholders of Fannie and Freddie.

18         And Mr. Hume didn't disagree with that this morning.

19   Mr. Hume and the plaintiffs agree that Mr. DeMarco had the

20   authority and the obligation to act in the public interest even

21   if that meant acting against the financial interest of the

22   shareholders in receiving dividends.

23         So that's what Mr. DeMarco did.  On August 17th, 2012,

24   Mr. DeMarco took action to make absolutely sure that the

25   Treasury commitment would be completely protected from erosion

1    by circular draws.  He took action to make absolutely sure that

2    the markets would know that the Treasury Department stood

3    behind those mortgage-backed securities.

4          And I'll return to this later on, ladies and

5    gentlemen -- members of the jury.  You heard a lot from

6    Mr. Hume this morning about what sounded like some sinister

7    conspiracy to put Fannie and Freddie out of business.  But the

8    evidence showed you, members of the jury, that Mr. DeMarco did

9    exactly the opposite.  Mr. DeMarco's actions were what kept

10   Fannie and Freddie in business.  They were what assured the

11   preservation of that Treasury commitment; that was the only

12   thing that was keeping the GSEs alive.

13         And when Mr. DeMarco took action on August 17th, 2012,

14   he did exactly what he was allowed to do under the shareholder

15   contracts and the law.  He acted reasonably to protect the

16   public interest.  And that action was not only reasonable; it

17   was crucial.

18         And you also know from the evidence that any shareholder

19   would reasonably expect Mr. DeMarco and FHFA to do exactly what

20   they did.  A reasonable shareholder knew that in December of

21   2009 their equity in the companies by December of 2009 -- their

22   equity in the companies had been virtually wiped out years

23   before.

24         You heard from Mr. Hume today that there were

25   investments that shareholders made in 2007 and 2008 buying

1    stock in the middle of the financial crisis.  He told you they

2    took a risk.  They surely did, and they lost.  Because those

3    equity investments were gone by the time of December 24th,

4    2009, which is the date that Judge Lamberth will instruct you

5    is the date by which you're to measure the shareholders'

6    reasonable expectations.

7        Shareholders knew as of December 24th, 2009, that the

8    only reason that the companies hadn't gone out of business was

9    that Treasury had stepped in with hundreds of billions of

10   dollars of taxpayer money.  Those shareholders knew that their

11   dividends had been eliminated, and by then, that had become

12   part of their shareholder contract.

13       And they also knew that Fannie and Freddie and FHFA

14   couldn't issue dividends without Treasury consent; and they, of

15   course, knew as of December 24th, 2009, that Fannie and Freddie

16   could not exit conservatorship without Treasury consent.

17       They knew as of December 24th, 2009, that under HERA,

18   FHFA was authorized to take action in the public interest, even

19   if it wasn't in their interests.  And that was part of their

20   contract too.

21       They knew that under conservatorship, the companies were

22   being managed to protect that public interest, not to maximize

23   returns for shareholders, and that was part of their

24   shareholder contract too.

25       And because they knew all of those things, members of

1    the jury, because all of those things were part of their

2    shareholder contracts, as of December 24th, 2009, we submit to

3    you, that it's crystal clear from the evidence that reasonable

4    shareholders would have expected FHFA to act in the public

5    interest by ensuring the safety and stability of the GSEs to

6    ensure the safety and stability of the United States housing

7    market.

8         That's what the evidence showed you, members of the

9    jury.  That FHFA acted reasonably when it agreed to the third

10   amendment to protect the public interest, and that action was

11   within the reasonable expectations of the shareholders.

12        That's what the evidence has shown you, and that's what

13   I'm going to talk about with you as I talk through the

14   evidence.  But before I do, I'd like to talk with you for a few

15   minutes about the questions you're going to be called on to

16   decide and about the instructions that I expect you'll be

17   getting from Judge Lamberth.  And you saw some of those during

18   Mr. Hume's remarks.  And I'm going to show you some of those

19   briefly again before I move on to consideration of the

20   evidence.

21        So those instructions are what are going to guide your

22   deliberations.  And I'll say right now, Mr. Hume had some

23   things to say about those instructions; and I will too.  But

24   what we have to say about the instructions isn't what counts.

25   It's what Judge Lamberth has to say about those instructions

 1    that counts, and you should keep that in mind as you hear the

 2    lawyers give their understanding of those instructions.  But

 3    with that said, I would like to talk about them for a few

 4    minutes because they're going to be your road map to -- in your

 5    deliberations, guiding you in the decisions that you have to

 6    make.

 7        So I'd like to spend some of our time talking about some

 8    of those instructions right from the jump.

 9        You're going to get a verdict form when you retire to

10    deliberate, and it's going to have a number of questions on

11    it.  But for right now, I want to focus just on the first

12    question.

13        Do we have a slide for that?  I'm told we don't have a

14    slide for that.

15        Okay.  Well, I will tell you what I expect

16    Judge Lamberth's instruction will have -- his verdict -- the

17    verdict form will have for you as the first question -- it will

18    be something very much like this:  Did the plaintiffs prove by

19    a preponderance of the evidence that FHFA in its role as the

20    conservator of Fannie and Freddie Mac arbitrarily or

21    unreasonably in entering into the -- acted arbitrarily or

22    unreasonably in entering into the third amendment, thereby

23    violating the reasonable expectations of sharehold- -- of

24    holders of Fannie Mae junior preferred stock, Freddie Mac

25    junior preferred stock, and/or Freddie Mac common stock?

1          So, again, the judge's instructions are what will guide
2     you, but I'd submit to you that you can think of that question
3     as having two parts or two components.  And the first one is:
4     Was FHFA's agreement to the third amendment a reasonable
5     response to the facts and circumstances known to FHFA in August
6     of 2012 that shareholders could have reasonably expected as of
7     December 24, 2009?

8          And that breaks down into two more parts, and I would
9     submit to you that this is how you should think about that
10    question.  First, was FHFA's agreement to enter into the third
11    amendment reasonable based on what FHFA knew as of August 17th,
12    2012?  And that "as of," members of the jury, is very
13    important.  And you're going to hear more about it from me in a
14    moment.

15         The second question is:  Was that agreement within the
16    plaintiffs' objectively reasonable contractual expectations as
17    of December 24th, 2009, based on their shareholder contracts as
18    of that date?  That's a mouthful.  So I'll go back for just a
19    moment to break it down.  Was that agreement within the
20    plaintiffs' objectively reasonable contractual expectations?
21    Was it within their reasonable expectations based on their
22    contract as that contract existed on December 24th, 2009?

23         And why am I using that phrase?  Well, as
24    Judge Lamberth's instructions will tell you, and as Mr. Hume
25    alluded this morning, shareholder contracts -- I'm going to

1    talk more about this later on -- they're not like regular

2    contracts.  They change over time.

3         So the time for you to focus on in deciding what

4    contract counts and what reasonable expectations would be under

5    that contract is December 24th, 2009.

6         I want to start with the question of whether the

7    decision to enter into the third amendment was reasonable based

8    on what FHFA knew as of August 17th, 2012.

9         And I expect that Judge Lamberth is going to instruct

10   you in -- in deciding that question that you can consider

11   whether FHFA was responding reasonably to its goals and

12   objectives under the facts and circumstances in August of 2012.

13   You saw that instruction this morning, and do we have that one?

14        I'm one for two.

15        This is the instruction that I expect that you will get

16   from Judge Lamberth and you saw it this morning.  You may

17   consider whether the decision-maker -- that's FHFA -- and

18   pretty soon we're going to start talking about Mr. DeMarco.

19   He's the human we're talking about.

20        Whether the decision-maker responded to its objectives,

21   obligations, and the facts and circumstances at the time the

22   action was taken.  And we submit to you, members of the jury,

23   that when FHFA agreed to enter into the third amendment, they

24   were responding directly to their goals.  FHFA was responding

25   directly to their objectives, and that response was completely

1    reasonable based on what they knew as of August 2012.

2            So I'm going to start with objectives and obligations.

3    What did the evidence show you about FHFA's objectives and

4    obligations?  I'm going to talk about those two together

5    because as you saw from the evidence, they're -- they're

6    closely related.

7            So what are the objectives and obligations?  Well, the

8    evidence starts with the corporate charters of Fannie and

9    Freddie.  It starts with their core purpose and the reason that

10   Congress created them in the first place; Fannie in 1938;

11   Freddie in 1970.

12           So can we just take a look at those charters again.

13   Just to remind you, members of the jury, you saw these in

14   opening statements, you saw these in the evidence, but these

15   are the charters.  These are the initial documents that set

16   forth the objectives and obligations of Fannie and Freddie.

17   And what's number one?  Provide stability in the secondary

18   market for residential mortgages.

19           You heard all about that over and over again, and I'm

20   not going to run through all of that evidence with you, but

21   you'll remember how the system worked; how there's the primary

22   mortgage market, those mortgages are packaged into the

23   mortgage-backed securities.  And the mortgage-backed securities

24   investors then buy those MBS securities.  And that's what keeps

25   the money flowing through the whole system to make mortgages

1    available and affordable for homeowners.

2         And that we also referred to during the trial -- and

3    there's no dispute about this -- that is the public mission of

4    Fannie, and it is the public mission of Freddie.

5         It was their core purpose, as I said, from the time they

6    were created.  And you learned how important that public

7    mission was for the housing market.

8         Can we have Slide 4.

9         It was important because -- and this is -- this is from

10   the joint statement of undisputed facts and you'll remember

11   that this is the document that we sometimes refer to as the

12   stipulation, the agreement between the parties, and you'll have

13   that available to you in your deliberations.

14        It was so critical to the housing market because as you

15   see from this agreed-upon fact, by 2007, Fannie's and Freddie's

16   mortgage portfolios had a combined value of approximately

17   $5 trillion and they owned almost half of the nation's existing

18   mortgages.

19        And you also learned that a stable and healthy housing

20   market is absolutely essential to a stable and health economy.

21   You heard evidence about what the experts called systemic risk.

22        And can we get Slide 5.

23        Mr. DeMarco told you what he understood systemic risk to

24   be.  He said it's when you've got companies that are

25   interconnected and a failure creates a spillover effect or

1   systematic effect on other companies.  A domino effect.  And

2   that's what he was talking about when he was talking about the

3   danger of defaults in the housing market.  And there's really

4   no dispute about any of this.

5        And, of course, you heard all of the evidence -- you can

6   take that down.

7        You heard all of the evidence about what happens when

8   things break bad, and I'll be coming back to this, but you

9   heard evidence about the financial crisis that began in 2007

10  and lasted literally for years.

11       You heard the plaintiffs' own expert tell you that he --

12  Dr. Dharan -- he and others didn't just call it the financial

13  crisis.  They called it the great financial crisis.  You also

14  referred -- heard it referred to as the Great Recession.  And

15  you heard evidence about how devastating that crisis was and

16  the very real and very horrible consequences the financial

17  crisis had for the millions of Americans who lost their homes

18  and their jobs.

19       What else did you learn about FHFA's objectives and

20  obligations?  You learned about HERA, the Housing and Recovery

21  Act, that law that was passed on July 30th of 2008.  You heard

22  that by July of 2008, things had gotten so bad for the housing

23  market, for the economy, and -- the government had to step in.

24       Can we get Slide 6, please.

25       So Congress passed HERA as a direct response to the

1    financial crisis of 2007, and the evidence showed you that HERA

2    created FHFA, and it also gave FHFA the authority to act as

3    conservator.

4         And the statute, as you know, is a key part of the case

5    because FHFA, when it got the authority to act as conservator,

6    also got powers from Congress to act as conservator.

7         And what powers did Congress give FHFA as conservator?

8    Congress doubled down on the public mission that Fannie and

9    Freddie had had from the beginning.  Because as the evidence

10   showed you and Judge Lamberth is going to instruct you -- and

11   there's no disagreement about this -- HERA specifically

12   authorized FHFA to act in the best interests of the public.

13   The public that relies on Fannie and Freddie to keep the

14   money flowing so that the public has access to affordable

15   mortgages.

16        And here's another very important part of the authority,

17   the power that Fannie and Freddie -- that FHFA's conservator

18   got from Congress.  As I said before and I'll say again, HERA

19   also specifically authorized FHFA as conservator to put the

20   best interests of the public ahead of the financial interests

21   of the shareholders.

22        And there's no dispute that once FHFA became the

23   conservator for Fannie and Freddie on September 6, 2008,

24   Mr. Lockhart, then the conservator, knew he was in charge.  And

25   later on, Mr. DeMarco knew that he was in charge.  And they

 1    both knew that they had the authority and the responsibility

 2    from HERA to protect the stable secondary mortgage market.  And

 3    that became FHFA's and Mr. DeMarco's overriding objective.  So

 4    when we think about the objectives of FHFA, number one, fulfill

 5    that public mission, protect the public interest.  That was a

 6    responsibility that the law gave him, and it was and remained

 7    his obligation under the law.

 8         What else did the evidence show you about FHFA's

 9    objectives and obligations as conservator?  Let's pull up DX84,

10    Slide 7, I think.

11         You saw the statement that Mr. Lockhart made on

12    September 7, 2008, announcing the conservatorship.  And he

13    said, first of all -- he talked about the critical

14    importance -- the critical mission of providing stability and

15    liquidity in the secondary mortgage market, and we've talked

16    about what that means.  He also talked about significant action

17    being needed.

18         And let's move forward in this.

19         And then he went on to say that conservatorship is a

20    statutory process designed to stabilize a troubled institution

21    with the objective -- and there's that word again -- objective

22    of returning the entities to normal business operations.

23         Now, there was a lot of back-and-forth during the trial

24    about returning the entities to normal business operations, and

25    whether or not Mr. DeMarco accomplished that and whether or not

1    the net worth sweep accomplished that; but the evidence is

2    absolutely clear, members of the jury, that everything that

3    Mr. Lockhart and Mr. DeMarco did was dedicated to that

4    objective.  And it succeeded, because you did not hear a shred

5    of evidence that there was 1 nanosecond between the time the

6    conservatorship began in August 17th, 2012, that Fannie and

7    Freddie were not doing normal business operations.

8         You did not hear a shred of evidence that Fannie and

9    Freddie ever failed during that entire time to fulfill their

10   public mission.

11        You didn't hear a shred of evidence that during that

12   entire time the lights weren't on, the doors weren't open, and

13   that people weren't working very hard every day to accomplish

14   the public mission and public interest of Fannie and Freddie.

15        And then he goes on to say, the goal:  The goal of these

16   actions is to help restore confidence in Fannie Mae and

17   Freddie Mac, enhance their capacity to fulfill their mission,

18   and mitigate the systemic risk that has contributed directly to

19   the instability of the -- in the current market.  And that was

20   September 7th, 2008.

21        That was FHFA's objective.  That was their goal.  That

22   was their obligation.  To help restore confidence, enhance

23   their capacity and mitigate the systemic risk; not to pay

24   dividends to private shareholders.  And there's some other

25   important announcements in this statement.

```
 1              Let's go to page 8.  It's Slide 9, maybe.  Still on

 2      Slide 9.

 3              So in order to conserve over $2 billion in capital every

 4      year, the common stock and preferred stock dividends will be

 5      eliminated.  Not suspended, eliminated.  And as I'll explain to

 6      you later on, this actually became part of the shareholder

 7      contract.  So as of September 7, 2008, the shareholders were

 8      parties to an agreement that provided that their dividends

 9      would be eliminated.

10              And it also goes on to say:  The common and preferred

11      stocks continue to remain outstanding.  That's not in dispute.

12      And Mr. Hume read to you a passage from somewhere about the

13      economic interests of the shareholders remained.  That's not in

14      dispute.  The shareholders retained their shares.  They lost

15      their dividends, but they retained their shares.  And that's

16      exactly -- when it says the stocks continued to remain

17      outstanding, that means that if you have a share of stock, no

18      one is going to snatch it away from you during the

19      conservatorship.

20              And then, perhaps the most important thing, as we

21      learned, is, lastly and importantly -- very importantly, there

22      will be the financing and investing relationship with the

23      Treasury.  And it talks about Treasury having the authority and

24      responsibility to provide financing for the GSEs.  And as you

25      know, that's what became the Treasury commitment.  That finance
```

1   authority was used by Treasury to create the commitment that

2   supported Fannie and Freddie.

3           So there's some other important points on the document

4   that I'll come back to later on when I talk to you about

5   shareholders' expectations, but to preview just one of them,

6   the document also made it very clear that the shareholders

7   shouldn't have any expectations of an exact time frame for the

8   termination of the conservatorship.

9           Put the other way around, no reasonable shareholder

10  would have any reasonable expectation about the exact time

11  frame for the conservatorship.  Because -- let's go to the fact

12  sheet.

13          So this is this FHFA fact sheet that was issued on

14  September 7th.  This got a lot of airtime during the trial.

15  I'm not going to review the whole thing.  You see the

16  reference to the mission.  I want to focus on the second box

17  and the highlighted bit, and it says:  At present, there is no

18  exact time frame that can be given as to when this

19  conservatorship may end.  So everybody knew, starting on

20  September 7th, 2008, that there was no exact time frame to end

21  the conservatorship.

22          And then it also says that the stock will continue to

23  trade.

24          But before I move on from this document, I want to talk

25  for just a moment about the statement in the document.

 1          Can we get to preserve and conserve.  From the fact

 2     sheet.  Top.  It was on the last slide.  I'm getting help.

 3     Last slide.  Top.  Oh, okay.  I'm sorry.  It's just not

 4     highlighted.

 5          So the question is:  What are the goals?  And the

 6     sentence that's highlighted -- responds to that question

 7     directly -- says:  The goals.  But before that, it says:  The

 8     purpose of appointing the conservator is to preserve and

 9     conserve the company's assets and to put the company in a safe

10     and solvent condition.  You heard a lot about this.

11          You heard the argument that the net worth sweep was the

12     opposite of preserving and conserving assets.  You heard that

13     the net worth sweep was the opposite of putting the company in

14     a sound and solvent condition.  And I'm going to talk about

15     this a little bit more later on, but I don't want to pass this

16     document without reminding you of Mr. DeMarco's testimony of

17     what it meant to preserve and conserve the assets.  It didn't

18     mean preserve and conserve dividends for private shareholders.

19     It didn't even mean preserve and conserve profits for Fannie

20     and Freddie.

21          Mr. DeMarco told you and, remember, we talked about the

22     speech that he gave, the four categories, the bottom line of

23     those four categories and his testimony was, when he as

24     conservator was dedicated to preserving and conserving the

25     company's assets, he was dedicated and committed to preserving

1    and conserving the company's business; to make sure that the

2    company could continue to do business day after day with the

3    doors open, the lights on, and people working hard.  And that

4    is exactly what happened during the entire period of the

5    conservatorship.

6         And here's -- you'll remember this from his testimony,

7    when he's talking about assets, he's talking about the

8    business, the -- the preconservatorship book of business, as

9    he called it, and the post-conservatorship book of business.

10   He's talking about the systems.  He's running an organization.

11   He's now running a business.  So when he talks about preserving

12   and conserving assets, this is what he's talking about:  The

13   systems that have been developed, the business platforms, the

14   people.  And he was dedicated to and successfully accomplished

15   preservation and conservation of those assets completely

16   consistently with what he committed to do, and that is what

17   from -- what the net worth sweep accomplished.

18        And I'm going to come to the third amendment as we move

19   forward in time, but just to jump ahead right now, by

20   completely eliminating the risk of erosion of the Treasury

21   commitment by circular draws, that is exactly what maintained

22   market confidence in Fannie and Freddie and exactly what

23   allowed them to continue doing what they had done, and never

24   stop doing, which is provide stability to the secondary

25   mortgage market.

1          And also on this point, Dr. Dharan told you -- he was

2     the witness who said that the net worth sweep was somehow

3     inconsistent with preserving and conserving the company's

4     assets and putting the company in a safe and solvent condition.

5     But you know from the other evidence you heard that Dr. Dharan

6     was way off base, because you know from the evidence that the

7     only thing that was keeping the GSEs safe and solvent was the

8     Treasury commitment.

9          You remember what solvent means.  Solvent means in the

10     black.  It means above the line.  And the only thing that was

11     keeping Fannie and Freddie above the line was the Treasury

12     commitment.  The Treasury commitment was the only thing that

13     was keeping the companies afloat.  So if the Treasury

14     commitment erodes too far because of circular draws, game over.

15     The entire purpose of the third amendment and the net worth

16     sweep was to protect that Treasury commitment from erosion by

17     circular draws to pay the Treasury dividend.

18          So not only was the third amendment consistent with

19     preserving and conserving the assets of the companies and

20     keeping them safe and solvent, preserving the Treasury

21     commitment was the only thing keeping the company safe and

22     solvent.

23          There's one other key piece of evidence about FHFA's

24     objectives and obligations as conservator of Fannie and Freddie

25     because you know that -- excuse me -- when FHFA took over as

1    conservator, they got the power and authority to direct the

2    affairs of Fannie and Freddie.

3           So here's the Fannie 10-Q for the third quarter of 2008.

4           Slide 14.

5           And this is a critically important piece of evidence

6    both for objectives and goals, and also shareholder reasonable

7    expectations.  So I'm going to come back to it.

8           So this covers -- this is the third quarter.  So it

9    covers the period from July 1st of 2008 through and including

10   October 31st of 2008.  You learned there's always a bit of a

11   lag between the end of the reporting period and the actual

12   filing.  So this was filed, as you see -- the Fannie was filed

13   on November 10th.  The Freddie was filed on November 14th.  But

14   this is for that third quarter of 2008.

15          Before I go on about the SEC filings, members of the

16   jury, there was some discussion in some of the testimony that

17   seemed to suggest that somehow you shouldn't rely on these

18   filings because there was some phrase about a material weakness

19   in procedures or something.  But the bottom line, members of

20   the jury, is everybody relied on these filings.  Dr. Dharan,

21   the plaintiffs' main expert witness -- Dr. Dharan said he

22   relies on them.  He relies on them in his work as a paid

23   witness.  He relies on them in his academic work.  He relies on

24   them all the time.

25          So we respectfully submit to -- and -- to you, members

1    of the jury, that when a CEO and a CFO sign an official

2    certification that -- when they know that if that's not right,

3    they could have a problem, that these are something you can

4    take to the bank.

5        So I want to look at these just briefly.  What does it

6    say about obligations and objectives with respect to managing

7    for the benefit of shareholders?  I'm pointing to the Fannie

8    one, but they're both almost identical.  So the topic -- you

9    remember this is from a bigger chart.  The topic is managing

10   for the benefit of the shareholders.  And it's got a before

11   conservatorship column and a during conservatorship column.

12   Before conservatorship:  Maximize shareholder value over the

13   long term.  And then the second bullet is:  Fulfill the public

14   mission.  Because those two things were together for a long

15   time.

16       But not after September 7th, 2008.  After September 7th,

17   2008, the first bullet now says:  No longer managed with a

18   strategy to maximize common shareholder returns.  Maintain

19   positive net worth.  And you know how positive net worth was

20   maintained?  Positive net worth was maintained by the existence

21   of the Treasury commitment.

22       So that's what the evidence showed you about FHFA's

23   objectives and obligations.  Those objectives and obligations

24   were clear from day one of the conservatorship on

25   September 27th [sic], 2008, and they were in place from that

1    day through and including August 17th, 2012.

2         So that brings us to the other key consideration that

3    Judge Lamberth will tell you you can consider in evaluating

4    whether FHFA's decision, whether Mr. DeMarco's decision to

5    enter into the third agreement [sic] was reasonable.  And that

6    consideration is the facts and circumstances that were known to

7    Mr. DeMarco as of August 17th, 2012, the date of the third

8    amendment.

9         Why do I slow down and say that like that?  Because

10   August 17th is a critically important date, and the instruction

11   that you are to consider, whether the decision was reasonable

12   based on what Mr. DeMarco knew as of that date, is also

13   critically important.

14        Because you've heard a lot about what happened after

15   August 17th, 2012.  Mr. Hume spent some of his time today

16   talking about 2013.  He spent some of his time today talking

17   about 2012 to 2022.  He spent some of his time today talking

18   about how things turned out after August 17th, 2012.  But it's

19   critically important, members of the jury, for you to keep in

20   mind something that we all know as a matter of the common sense

21   that Mr. Hume invoked.

22        On August 17th, 2012, no one knows what's going to

23   happen in 2013.  No one knows what's going to happen before two

24   thousand -- between 2012 and 2022.  And Mr. DeMarco certainly

25   didn't know himself.

1          Mr. Hume, I suspect -- by the way, he's going get a

2     chance to talk again.  This is it for me, so I'm going to try

3     to anticipate some of the things he's going to say, and I

4     suspect that one of the things he may say is, well, sure, he

5     didn't know, but it was foreseeable.  But, members of the jury,

6     Mr. DeMarco's job wasn't to plan for what was foreseeable.  His

7     job was to plan for what wasn't foreseeable.  His job was to

8     protect the public interest in the event something happened

9     that no one could expect.  And not just in 2013 or even between

10    2012 and 2022.  Because the mortgage-backed security that went

11    out on August 17th, 2012, had to be backed up by a guaranty

12    that was going to be good for 30 years.

13         And if at any time in that 30 years the world hit a

14    stretch that looked like two thousand -- 2007 to 2009, '10,

15    '11, that would have wiped out the entire commitment.  That's

16    what Mr. DeMarco had to plan for.

17         So, in any event, I want to -- in considering what

18    Mr. DeMarco knew, the facts and circumstances known to him as

19    of August 17th, 2012, I'm going to take us back to the

20    beginning of the conservatorship as we just talked about.  It's

21    September of 2008.  The country's in the depths of the worst of

22    the financial crisis.  I think Mr. DeMarco may have said since

23    the Great Depression, and there's really no debate about that.

24    And Fannie and Freddie were also in danger for all the reasons

25    Mr. Lockhart explained when he put them in conservatorship.

 1           And you know that on the very next day after the
 2     conservatorship was imposed, FHFA and Treasury entered into the
 3     senior -- this is really a mouthful -- the senior preferred
 4     stock purchase agreements, sometimes called in the case the
 5     SPSPAs.  I'm going to go with a mildly shorter version, PSPA.
 6           One with Fannie and one with Freddie.
 7           And under those stock purchase agreements, Treasury, by
 8     making an investment using the authority that HERA granted,
 9     committed $100 billion each to Fannie and Freddie, and that's
10     not in dispute either.
11           And why did the government have to step in with hundreds
12     of billions of dollars?  It all goes back to how the secondary
13     mortgage market works, and I'll talk just very briefly about
14     that.
15           When Fannie and Freddie sell those mortgage-backed
16     securities, they guarantee -- you'll remember this testimony --
17     the MBS investors that they'll get a steady stream of income
18     from those mortgages even if the homeowner, unfortunately,
19     can't make a payment.  And the evidence showed you that that
20     guaranty is absolutely critical to the stability of the
21     secondary mortgage market.
22           That's not just defense witnesses saying that, members
23     of the jury.  It was -- Dr. Dharan said the same thing to you.
24           Do we have a slide on that?
25           Here's Dr. Dharan's testimony.  Not our friend in this

1    case.  He said:  The investors are also concerned -- and that's

2    the MBS investors -- about whether or not the mortgages are

3    going to get paid.  If the mortgages didn't get paid by the

4    homeowners, then the investors don't get their money; right?

5    So that's an issue that Fannie and Freddie resolved by giving a

6    guaranty.  So they have a guaranty, essentially, that says, if

7    the mortgages don't get paid, then we -- Fannie and Freddie --

8    will step up and pay the mortgage-backed securities' investors.

9    This is -- this guaranty is really what makes the system

10   function.

11        And we didn't agree with Dr. Dharan on much, but we

12   certainly agree with him about that.  And it is the Treasury

13   commitment that you know that's been called the government

14   backstop of that guaranty.

15        Because by September 2008, that guaranty was in danger.

16   The shareholder equity in Fannie and Freddie was completely

17   exhausted.  So under the authority they got from HERA, Treasury

18   stepped in to commit a hundred billion dollars each to Fannie

19   and Freddie.  But there were other terms of that PSPA, and

20   those other terms are really the root and the genesis in the

21   beginning of why we're all here today.

22        What were they?  Well, first and most importantly,

23   Fannie and Freddie had to pay what you know now is a fixed

24   10 percent dividend based on the amount of the commitment that

25   they actually drew down.  And as you know, that fixed dividend

1    became the heart of the matter for all of us.

2         The PSPA also established a right for Treasury to

3    receive a periodic commitment fee, the PCF, that was the

4    subject of a lot of testimony.  And as you heard -- and there's

5    no dispute about this -- that was a fee that Treasury was

6    entitled to just for making the commitment available; and

7    Treasury was entitled to that fee above and beyond their

8    10 percent dividend.

9         You also heard how the commitment works.  If in a given

10   quarter, Fannie's or Freddie's net worth was negative, if their

11   liabilities exceeded their assets, they could draw on the

12   commitment to get back into the black, to get back to positive

13   net worth.

14        And the availability of that commitment was the thing.

15   It was the only thing that assured MBS investors that Fannie's

16   and Freddie's guaranty was still good.

17        So what else did the PSPA say?  This initial preferred

18   stock purchase agreement.  It also said that Fannie and Freddie

19   were -- well, FHFA and Fannie and Freddie were absolutely

20   prohibited from issuing dividends to private shareholders

21   unless Treasury said they could.

22        And this is completely independent of the elimination

23   under conservatorship of the dividends.  What else did the PSPA

24   say?  The PSPA said, FHFA, you're the conservator.  We get

25   that.  Fannie and Freddie, you're in conservatorship.  We get

 1    that.

 2            But here's why.  Under the terms of this agreement,

 3    which is getting $200 billion to you, you can't exit

 4    conservatorship, you can't exit the state that you're in now

 5    without our written permission.  And here's an absolutely

 6    critical cite we'd ask you not to lose sight of, members of the

 7    jury.  As I said a few moments ago, as of September 7th, 2008,

 8    the date of the PSPA, shareholder equity was gone.  The GSEs

 9    were entirely dependent on the $200-billion Treasury

10    commitment.

11            But the GSEs continued to be in trouble.  They had

12    negative net worth for the last quarter of 2008 and the first

13    quarter of 2009.  They hadn't completely used up the initial

14    commitment, but you heard what Mr. Mayopoulos told you.  And I

15    think Mr. Hume himself acknowledged this this morning.

16    Mr. Mayopoulos had been the CEO of Fannie.  You heard from him

17    by video.  He told you that he assumed that market participants

18    would get nervous long before that number got to zero.

19            Do we have a slide with his testimony?

20            Did you worry about the financial consequences of draws?

21    We assume that at some point if Fannie or Freddie needed to

22    continue to draw on the commitment, market participants might

23    start to wonder whether there was sufficient capital there.

24    But we also assume that market participants, if they're going

25    to get nervous about it, they would get nervous about it long

1    before that number dropped to zero.  We didn't know exactly --

2    but we didn't know exactly what would be the tipping point.

3         So you heard Mr. Hume today -- I'm going make a

4    confession.  I didn't understand it before the case started.  I

5    didn't understand it during the case, and I'm not sure I really

6    understood it in closing -- that graph.

7         But you heard about that graph and the bond-yield graph

8    with the black and the blue.  I'm sure some of you understand

9    it far better than I do.  In any event, we heard testimony

10   about it.  But the point I want to make is that Mr. Hume

11   pointed to 2012, and he said, look, here, this shows that MBS

12   investors weren't panicking.  Well, exactly.  You can't wait

13   until the MBS investors are panicking.  You have to take action

14   before they start to panic because once the MBS investors are

15   panicking, once they're running, once they're no longer buying

16   these mortgage-backed securities, that starts the spiral that

17   ends in a very bad place.

18        So just after Treasury -- it's eight months, give or

19   take; right?  May -- May 6th -- from September '08 to May 6,

20   '09, just eight months later, FHFA and Treasury amended or

21   modified the PSP again, and that's because they continued to be

22   in trouble for the last quarter of 2008 and the first quarter

23   of 2009.  And by that first amendment, Treasury doubled the

24   commitment, 200 billion to 400 billion to stand behind the

25   guaranty.

1          But you learned, skipping ahead again, that 400 billion

2     wasn't enough.  Fannie and Freddie were taking huge losses.

3     They were in the red by billions of billions of dollars in

4     every quarter of 2009, and that meant that they had to take

5     draws to draw down on that commitment in every single quarter.

6          Can we get Slide 21.

7          So you saw this slide during the evidence.  This slide

8     shows Fannie's net worth from the fourth quarter of 2008 to the

9     second quarter of 2012.  And I'm going to come back to what we

10    submit you should and should not make of these green bars, but

11    there's no debate about the red ones.  They're all red from

12    2008 fourth quarter to 2011 fourth quarter, and they range

13    from -- whatever that one is, in the billions anyway, all the

14    way up to nearly 20 billion in a single quarter.

15         That is Fannie's net worth.  So as we're sitting here in

16    2009, May 6, 2009, there's been $50 billion of negative net

17    worth in the fourth quarter of '08 and almost $20 billion of

18    negative net worth in the first quarter of 2009.

19         And here's the important thing.  That 10 percent fixed

20    dividend was causing a huge problem, because as you saw,

21    they -- when you heard the testimony about this, Fannie and

22    Freddie had to take draws -- draws from the commitment -- just

23    to pay the 10 percent dividend.  That meant the dividend got

24    bigger the next quarter and they had to draw more to pay the

25    larger dividend, and that's what everybody was talking about

1    when they talked about the circular draws.  And it was that

2    circular draw problem that was digging Fannie and Freddie into

3    a deeper and deeper hole.

4         And I -- I believe that I heard Mr. Hume agree this

5    morning, as would be sensible to do, given the evidence, that

6    there's really no dispute in the case that circular draws

7    happened; that Fannie and Freddie were being forced to draw on

8    the commitment just to pay the dividend.  And that -- that was

9    something that started beginning in 2008.

10         And that was the situation -- excuse me -- when

11    Mr. DeMarco became acting director of FHFA in August of 2009,

12    because as the losses continued, the circular draw problem got

13    worse, and it became clear that even 400 billion may not be

14    enough to keep Fannie and Freddie above water.

15         It became clear that even 400 billion of taxpayer money

16    may not be enough to maintain investor confidence that the

17    United States continued to stand behind their mortgage-backed

18    securities investments.

19         So on December 12th, 2009, less than eight months after

20    the Treasury commitment had to be doubled for the second time,

21    the commitment had to be upped again, but this time there

22    wasn't even a number.  The commitment was unlimited.  That

23    meant that the Treasury Department was committing a literally

24    unlimited amount of money to stand behind Fannie and Freddie.

25         And I think it was yesterday that there was some

1    back-and-forth about -- I think it was Dr. Thakor.  There was

2    some back-and-forth about what it -- what the state of the

3    commitment was leading up to December 24th, 2009.  And he was

4    talking about the cap and hundreds of billions of dollars.  I'm

5    going get to that.  That cap was not in play until January 1st

6    of 2012.  Between the time of the second amendment in

7    December 20 -- on December 24th, 2009, and the imposition of

8    the cap, Fannie and Freddie had access to unlimited

9    United States money.

10          So no matter how far in the hole, no matter how deep in

11   the red they were in any given quarter, Treasury was standing

12   right there to be the backstop of their guaranty for the MBS

13   investors.

14          But there's another key fact about the second amendment,

15   obviously, and it comes into play very soon after the end of

16   2009; and that is that, as you've heard many times now, as of

17   January 1st, 2013, whatever money was in the commitment by the

18   formula -- and I'll talk about it -- a number in a little bit,

19   but there was a number in the hundreds of billions of dollars

20   that was available as of January 1st, 2013.

21          But after that, there's no more "let's double the

22   commitment, we don't have enough."  There's no more "let's

23   double it again, we don't have enough."  There's no more "let's

24   make it unlimited."  What the cap meant was whatever was

25   available on January 1st, 2013, by this formula -- remember, we

1    go from unlimited to something on the 1st -- it's available by

2    formula -- whatever is in the commitment on that date has to

3    last forever.  Certainly has to last for the life of a 30-year

4    mortgage.

5         And that becomes a very important fact, because when

6    Mr. DeMarco is looking ahead to the future to try to solve the

7    problem of the circular draws, he can't be thinking just about

8    2013.  He can't be thinking about 2012 to 2022.  He knows that

9    the cap on this commitment isn't going anywhere, at least not

10   that he can have anything to do with; because the evidence was

11   clear that the only way that got changed was literally an act

12   of Congress.

13        FHFA and Treasury could not agree to lift that cap.  So

14   every dollar that came out of that commitment after

15   January 1st, 2013, couldn't be replaced.  So what happens?

16   2010.

17        Let's get the negative net worth slide up again, please.

18        2010, red, red, red, red.  2011, red, red, red, red.

19   That entire period Fannie had negative net worth.

20        Let's see the Freddie slide just for completeness.

21        They had some quarters where they had some positive net

22   worth, but it was mostly negative and it went up and down.

23        So -- and let's get the Fannie draw slide.

24        So this shows you whether Fannie had to take draws in

25   the quarters between 2009 Q1 and 2012 Q1, and you see that

1       Fannie had to take draws in every single one of those quarters.

2            So, remember, December 24th, '09, is the second

3       amendment, but that doesn't solve the problem, because there

4       are draws in every single quarter all the way up to the first

5       quarter of 2012.

6            Let's look at the Freddie draws.

7            So I actually think -- it's hard to see.  There --

8       there -- these quarters that look blank, some of them aren't.

9       They're four quarters in here when they didn't have to take a

10      draw, but you see Freddie is also consistently taking draws

11      during that entire period.

12           So that brings us to late 2011.  By then, Fannie will

13      have had, like, 14 quarters of negative net worth.  They will

14      have drawn $100 billion from the commitment.  And you have all

15      the SEC filings from this time period in evidence, members of

16      the jury, and I'm not going to go over all of them.  We'll just

17      take a look at a few of them in a few moments, but you'll see

18      Fannie and Freddie saying over and over that they didn't think

19      they would generate enough income to pay the dividend.

20           And there's also no dispute that from the Q4 '08 to

21      Q1 2012, the GSEs were drawing.  In fact, the total --

22           Do we have a slide for that?  Slide 25.

23           The total draws for Fannie and Freddie from Q4 '08 to Q1

24      2012 were $187.4 billion.

25           Gesundheit.

 1          So when you see that there's 274 -- I think the math

 2     worked out to.  When you see that there's $274 billion

 3     available on January 1st, 2013, to last -- forget forever.

 4     Let's just pick the 30-year mortgage -- that it gets

 5     securitized and sold on that date.

 6          When you see that there's $274 billion to backstop the

 7     guaranty as of January 1st, 2013, that's going to have to last

 8     30 years for a -- an MBS of that date, you know that in just

 9     four years -- actually, that's less than four years --

10     right? -- '09, '10, '11, and two quarters.  That in just three

11     and a half years, Fannie and Freddie drew 187.4 billion.

12          So you also heard about the stress scenario that was in

13     the FHFA 2011 -- October 2011 projections.

14          Let's see Slide 26.

15          So there was a lot of talk about the stress scenario and

16     the worst-case scenario and the base-case scenario, and

17     Mr. DeMarco told you which one was important to him.  And it

18     makes sense, because he's got to plan for the worst.  So if all

19     he's planning for is the best, he's not doing a very good job.

20     And when the worst happens and he throws up his hands and said,

21     well, I didn't know.  I thought things were going to be great,

22     well, that's not going to cut it given his public role and

23     public responsibility.

24          So he says, my concern was a worst-case scenario, but he

25     also told you, it's not an abstract idea.  It's not like

1    anything could be the worst-case scenario.  There was what -- I

2    forgot what phrase he used.  A proxy, an example for him of

3    what he thought of as the worst-case scenario, it had just

4    happened.  It wasn't a fantasy.  It was a reality.  It was

5    history, and it was very recent history.  So when he's

6    thinking I've got to plan for the worst case happening at some

7    point in the next -- and I'll just pick 30 years -- then what

8    he has in mind is what had happened so recently in the

9    financial crisis.

10           And it makes sense that he should do that.  He explained

11   why.  And you also heard from Mr. Layton.

12           Can we get Slide 27.

13           So this is Don Layton.  He testified by video, and he

14   was the CEO of Freddie Mac.  And he was asked:  You're more

15   concerned with the downside than the median or upside?  And in

16   context, I think you can infer that median was like the middle

17   case.

18           And he says, yes, you're concerned about all of it, but

19   the one that causes the most problems is clearly the downside.

20   And why is that?  This isn't rocket science.  Because that can

21   threaten the viability of a big company if the worst thing

22   happens.  So Mr. DeMarco is looking forward, first of all, to

23   the cap on January 1st, 2013, and also to the future that he

24   was trying to protect.

25           So he begins having conversations with Treasury in

 1     January of 2012.  Now, you actually saw that email exchange

 2     between Mr. DeMarco and Mr. Ugoletti that started, like, right

 3     before the new year.

 4          So Mr. DeMarco is starting to think about what to do to

 5     plan for this cap coming in on -- on January 1st, 2013.  And he

 6     is thinking about what will happen if Fannie and Freddie don't

 7     have enough money to pay the dividend after January 1st, 2013.

 8     He is thinking about what will happen if there are circular

 9     draws after that date.  He is thinking about the worst-case

10     scenario, not the happy scenario.

11          And it's very important to remember, members of the

12     jury, that those conversations started happening in January of

13     2012.  Because the plaintiffs have suggested that there was --

14     that FHFA had some sort of motivation to come up with a net

15     worth sweep when they saw the positive financial results in the

16     first half of 2012.  They've suggested that when Treasury or

17     FHFA, and sometimes it's not even clear who they're really

18     talking about -- but they've suggested that when someone saw

19     that there was the beginning of some positive news for the

20     GSEs, that they came up with the net worth sweep as a way to

21     nip that positive news in the bud.

22          But what does the evidence show?  The evidence will

23     show -- has shown that the net worth sweep was on the table

24     long, long before that glimmer of positive news.  And you know

25     that because the correspondence that Mr. Ugoletti and

1    Mr. DeMarco had led to the Treasury meeting in the first week

2    of January 2012.

3           Can we get PX-144.  Slide 28.

4           So I just want to focus on the heading here:  Treasury

5    and the broader administration are committed to help achieve

6    these objectives.  And one of them is:  Reduce the burden

7    associated with the 10 percent dividend rate.  So on

8    January 4th, 2012, long before the second quarter results have

9    been out, they haven't happened yet, long before the first

10   quarter results were out, they hadn't even happened yet,

11   Treasury and FHFA were concerned with the burden associated

12   with the 10 percent dividend rate.

13          So this was the first formal meeting to begin to discuss

14   how to address the very serious housing issues here.  And I'd

15   like to pause for a moment, because as you consider the

16   question of whether Mr. DeMarco and FHFA acted reasonably,

17   Mr. DeMarco was getting information in real time, and he was

18   evaluating that information in real time.

19          This meeting happened in early January and was the

20   beginning of the process -- and I'm going to talk more about

21   process because that got a lot of airtime this morning also.

22   It was the beginning of the negotiations between FHFA and

23   Treasury about amending the PSPAs, the negotiations that led to

24   the third amendment, and you see that those negotiations began

25   long before the positive financial results.

1          I just used the word process, and I want to talk about

2     that for just a minute, because there's been a lot of

3     discussion throughout the trial and in Mr. Hume's remarks today

4     about process.  Because the plaintiffs have tried to suggest to

5     you that there should be some big memo about all this; that

6     there should be all sorts of analyses that they could have

7     found in their pile of documents.  They seem to be suggesting

8     that Mr. DeMarco sat in his office and cooked up the third

9     amendment sitting in the dark without consulting anyone.  They

10    said didn't consult this person, didn't consult that person.

11         Well, members of the jury, with all due respect, nothing

12    could be further from the truth and you know that from the

13    evidence, because you heard -- I was quoted -- I'll quote

14    myself:  Mr. DeMarco gathered all of the relevant information

15    from all of the relevant people.  All the people that were on

16    that chart, Mr. Hume said they weren't consulted, you know from

17    the testimony -- and this isn't disputed -- that they were

18    consulted on a regular basis.

19         Mr. DeMarco was meeting with his staff.  He had his

20    point person, Mr. Ugoletti, meeting with his staff.  He was

21    gathering information on an almost daily basis.  He's having

22    monthly meetings.  He's having weekly meetings.  You know

23    he's meeting with Treasury in a process that lasted eight

24    months.  It's not all in his head.  You saw an example.  When

25    he goes to a meeting, he takes notes.  He's discussing these

1    issues with Treasury.  He is deliberating about this decision

2    for -- from late December through the time the decision was

3    made in August.

4         And that testimony was corroborated and confirmed by the

5    CEOs of Fannie and Freddie.  Let's take a look at, as an

6    example, Slide 33.

7         Mr. Mayopoulos, Director DeMarco regularly attended

8    meetings of the board, representatives on site.  They had

9    complete open access to everything that was happening.

10   Mr. DeMarco had all of this information, and he told you -- I

11   asked him:  Did that information inform your decision-making?

12   And he said yes.

13        If what the plaintiffs are trying to say is that if the

14   evidence were the same and there were some memo that they

15   wouldn't be making their claim, that would be pretty

16   surprising, and it would be surprising because that's not the

17   point.

18        The point is not whether there was a memo.  The point is

19   whether there was a process.  The point is was Mr. DeMarco

20   consulting and conferring with his people?  Was he consulting

21   and conferring with Fannie and Freddie?  Was he consulting and

22   conferring with Treasury?  Was he fully informed?  And the

23   evidence was crystal clear that he was fully informed.

24        So that first meeting with Treasury was followed up by a

25   meeting, as we know, on January 19th.

```
 1            Let's take a look at Slide 35.

 2            Okay.  This -- we submit to you, members of the jury,

 3     that this is an important piece of evidence.  I'm even going to

 4     call out the DX number.  The DX number is 381 if you happen to

 5     be taking notes or if you just want to try to remember that

 6     number, so that if you'd like, you can look at this piece of

 7     evidence during your deliberations.

 8            But this is January 19th of 2012.

 9            Do we have the cover page for this?  Can we pull it up.

10     Just to orient us.

11            So this is Mr. DeMarco's PowerPoint dated January 19th.

12     Mortgage Market Issues.  Discussion with Treasury

13     Secretary Geithner.  Mr. DeMarco, Secretary Geithner.  And

14     Secretary Geithner is, of course, the Secretary of the

15     Treasury.

16            And he is at the top of all of this.  He is the

17     decision-maker, and he is the one who declares officially what

18     Treasury's positions are and what their intent and goals and

19     objectives are.

20            So let's go to the next page.

21            I'm sorry.  Let's go back to Slide 35.

22            So Mr. DeMarco's PowerPoint, January 19th.  Not after

23     the first quarter results have come out, not after the second

24     quarter results have come out, not after the sun has started to

25     shine and the birds have started to sing; this is January 19th,
```

1    2012.

2          And it says -- the first one says:  Current agreement

3    resets the Treasury funding cap based on losses for the

4    three years ending in December 31st, 2012.

5          That's the cap.  Item No. 1:  Cap coming December 31st,

6    2012, based on a formula.  And we now know that the way the

7    formula worked out, that number -- I'm sure Mr. Hume will

8    correct me if I'm wrong about this -- that number was about

9    274 billion.

10          Next bullet:  Some market participants have begun to

11    raise questions regarding whether this will be sufficient to

12    justify continued investment in enterprise securities.  This is

13    not something that Mr. DeMarco and Treasury cooked up at the

14    end of June 2012.  This is a concern that Mr. DeMarco is

15    describing in January.  Some market participants, MBS investors

16    have begun to raise questions whether this will be sufficient

17    to justify continued investment.

18          And what that means is that the market participants are

19    looking at this cap.  They're saying, wait a minute.  Can we

20    have confidence in the government backstop if this cap is

21    coming on December 31st, 2012.

22          So it goes on to say, well, FHFA's projections show

23    draws leveling off, more adverse house price paths, and the

24    operational changes at the enterprises could lead to dividends

25    eating into the future cap space.  That is another way of

1        saying erosion of the commitment by circular draws.

2             January 19th.  Not June, not July, not early August.

3        January 19th.

4             And then it says:  The period commitment fee has been

5        waived to date and the setting of this fee could also impact

6        near-term stability.  And what does that mean?  That's the

7        periodic commitment fee that I'll touch on later on.  You heard

8        a lot of testimony.

9             Was it known?  Was it unknown?  Was it going to be big?

10       Was it going to be small?  Well, Treasury and FHFA, as I'll

11       come to later on, they were the ones who were going to decide

12       what it is.  And Mr. DeMarco is expressing concern to Treasury

13       that if Treasury doesn't continue to waive the fee, that the

14       setting of the fee could also impact near-term stability.

15            So what does it say then?  FHFA is willing to consider

16       PSPA changes -- and that became the third amendment -- that add

17       to the stability of the market.  Let's develop a list of items

18       for consideration, establish an FHFA Treasury working group to

19       work through the list and set a time line to wrap this up

20       before the end of the second quarter.  Why is that -- why do I

21       think that one's important?  Why do I think you should think

22       it's important?

23            Because it's got two things in it that are important.

24       One is it's about process.  Mr. DeMarco and Secretary Geithner,

25       they're the ones in charge.  They're not the ones who were

1   going to be out there writing all the memos, if there were

2   memos.  They're -- that's not going to come from them.

3   They're not going to be the ones in the working group.  They're

4   giving the orders.  So Mr. DeMarco says to Secretary Geithner,

5   let's establish a working group to work through the list; and

6   that, as you know, from the other correspondence, is what

7   happened.

8          There was a lot of back-and-forth between FHFA and

9   Treasury, a lot of deliberations, a lot of process.

10         So why else is this important?  Because it says:  Set up

11  a timeline to wrap this up before the second quarter.

12         I'm going to get to that -- we call it the Stegman memo;

13  the memo by Mr. Stegman that was the subject of testimony by

14  Mr. DeMarco and cross-examination by Mr. Hume.  I'm going to

15  get to that, but for right now, I'd like to focus you on this,

16  because this says -- this expresses Mr. DeMarco's desire to

17  wrap this up, what eventually became the third amendment,

18  before the end of the third -- second quarter.  And the second

19  quarter ends on June 30th, 2012.

20         So here in January, Mr. DeMarco is saying, let's go.

21  Let's get it done.  Let's get it done by June 30th.  That's

22  what I want.  And you heard later on that -- how many weeks are

23  there?  Four weeks in July.  Then two and a half weeks in

24  August.  We're talking about a period of only six and a half

25  weeks.  And during that period, Mr. DeMarco told you, he said,

1    I was waiting on them.  I wanted this done June 30th.  And I

2    always wanted it done June 30th.  And when he couldn't get it

3    done on June 30th, I was happy to have it happen as soon

4    thereafter as it could.  And he is saying -- this in January

5    of 2019 [sic] -- long before the positive results are known

6    from the first and second quarter.

7         So let's -- as he's waiting on Treasury, what other

8    information is coming to Mr. DeMarco in the early part of 2012.

9    Well, in February, both Fannie and Freddie filed their 10-Ks

10   for 2011.  And by now, you can decode that.  You know that

11   means their annual securities filings that cover the year 2011.

12   And let's just take a look at Fannie's 10-K and see what

13   they're saying on February 29th about their expected dividend

14   obligation.

15        Fannie is saying the prospective 11.7 billion annual

16   dividend obligation exceeds our reported annual net income for

17   every year since our inception.  So what they're saying is

18   since 1938, we've never made this much money.  And I'm not

19   going to do Fannie, Freddie, Fannie, Freddie.  You'll have the

20   evidence, and they're saying, essentially, the same thing.

21        So let's go to Slide 38 -- I'm sorry.  Slide 37.  I'm

22   sorry.  Slide 38 -- nope.  Keep it on 37.

23        So they're saying:  As a result of our draws, we do not

24   expect to earn profits in excess of our annual dividend

25   obligation to Treasury.  That's February 29th, 2012.  That's

1    the information Mr. DeMarco is getting, but I didn't read the

2    whole sentence.  Because it says:  As a result of our draws, we

3    do not expect to earn profits in excess of our annual dividend

4    obligation to Treasury for the indefinite future.  The message

5    here is for -- we have no idea when it's going to be that we're

6    going to be able to pay this dividend out of our profits.

7         And Freddie's is a little different.  It's a little bit

8    more nuanced.  It's got a little bit more texture.  It says:

9    Although we may experience period-to-period variability in

10   earnings and comprehensive income -- meaning some quarters may

11   be good; some may be bad -- it is unlikely that we will

12   regularly generate net income or comprehensive income in excess

13   our annual dividends payable to Treasury.

14        As a result, there is significant uncertainty as to our

15   long-term financial instability.

16        And it's exactly that uncertainty that Mr. DeMarco has

17   to plan for.

18        Let's go to the next slide.

19        So I'm not going to read through all these, but you'll

20   see that these are references to not only the dividend

21   obligations, but are for Fannie, a reference to a potentially

22   substantial quarterly commitment fee.  So they are anticipating

23   that the PCF that was debated back-and-forth for -- I don't

24   even remember how long -- Fannie is anticipating that that may

25   be substantial.

1          And you also -- at some point, there was some suggestion

2     that there was nothing in the SEC filings that referred to the

3     problem of the circular draws.  Take a look at Freddie's,

4     March 9th.  We expect to request additional circular draws.

5     Over time, our dividend obligation will increasingly drive

6     future draws.

7          That's talking about draws not just for operating

8     losses.  That's talking about draws to cover the dividend

9     payments and, again, uncertain if we'll have the money.

10         So it's not just what's on the pieces of paper.  It's

11    also the people who signed them.  Let's take a look at

12    Slide 39.

13         This is Ms. McFarland.  She's talking about the K, and

14    she's asked in her -- in her testimony, here's the statement:

15    We do not expect to earn profits in excess of our annual

16    dividend obligation to Treasury for the indefinite future.  Was

17    that an accurate statement when it was made?  Yes.

18         So you heard some stuff from Ms. McFarland suggesting

19    that it's her testimony about the inflection point and some

20    other testimony that may have suggested some optimism, but when

21    she had to sign her name to the SEC filing, this is what she

22    said.  When she had to swear under oath, this is what she said,

23    that the statement was accurate; that they don't expect to earn

24    profits in excess of their dividend obligation for the

25    indefinite future.

 1          Let's take a look at Slide 42.

 2          Same thing.  Mr. Kari, Freddie's CFO.  He has read a

 3    passage from the SEC filing, the two thousand -- the 10-K from

 4    2011.  Same thing.  He had certified that draws -- I'm sorry.

 5    That the required dividend and commitment fee could contribute

 6    to future draws if the fee is not waived.  He talks about the

 7    amount of the quarterly commitment fee has not yet been

 8    established and could be substantial.  And not only did he sign

 9    that, he swore to it.

10          Let's -- let's go now to see what else was in the

11    information mix in the fourth -- the first quarter.

12          Let's go to Slide 43.

13          You saw this Bank of America report in evidence, and you

14    saw what the Bank of America in this analyst report was saying.

15    You saw that no plan has been put in place to make sure these

16    two GSEs have enough capital to weather even a moderately bad

17    economic scenario beyond 2012.  And, again, this is referring

18    to the caps:  Based on the fact that we have now entered the

19    final year of unlimited capital availability and no plan has

20    been put in place.  This is what Mr. DeMarco is reading and

21    seeing in the market.

22          Let's go to Slide 44.

23          This is that Deutsche Bank analyst report, and

24    Mr. DeMarco told you how he understood the report; that it's

25    expressing concern that there's a -- expressing concern that

1    once capped, the Treasury commitment -- what he's referring to

2    as the backstop -- is going to be sufficient for ensuring the

3    resiliency that the guaranty will last.

4         And then he goes on to say:  It's basically saying if

5    you have, you know, a very bad outcome, it's referring to the

6    great financial crisis, you have that kind of repeat.  This

7    concern they're raising here becomes very heightened.  And the

8    language from the analyst report is the risk becomes greater in

9    a housing market catastrophe, such as the one that started in

10   the U.S. after 2006.

11        So I'm going to acknowledge something that I suspect

12   Mr. Hume may point out when he stands back up, which is:

13   There's analyst reports all over the place.  There are some

14   that are positive.  There are some that are negative.  There

15   are some that are pessimistic.  There are some that are

16   optimistic.

17        I'm not here to debate which one you should believe or

18   anyone else should believe, but I am here to tell you this:

19   That Mr. DeMarco can't just look at the ones that have the rosy

20   outlooks.  He can't just count the ones that are all happy

21   news.  He has to take into consideration the ones that report

22   that market participants are gravely concerned about what will

23   happen when this cap hits.

24        So as he comes to the end of the first quarter of 2012,

25   he's looking back on all those quarters of negative net worth.

1    He's looking back at the GSEs having drawn almost

2    $200 billion.  I think the exact number is, probably, 187.4,

3    but close enough.

4          He's got a recent stress-scenario projection from

5    Ms. Tagoe.  Those came annually.  And the one -- the most

6    recent in terms of the annual reporting shows the GSEs drawing

7    300 billion -- $311 billion from the commitment by 2014, which

8    was less than two years away, but after the cap and certainly

9    far less than 30 years away.

10         He's got Fannie and Freddie telling him and -- and the

11   world that they don't think they can meet their dividend

12   obligations.  He's got concerns about market confidence in the

13   GSEs based on the analyst reports.

14         And he knows -- and there's no dispute -- that that

15   commitment is going to be capped as of the beginning of 2013.

16   So let's see what he had to say about that.

17         Slide 45.

18         So here he was talking about the difference between 2008

19   and 2012.  And what did he say -- right? -- because, remember,

20   in 2008, he gave a speech.  He talked about return to

21   shareholders.  But he explained what changed between 2008 and

22   2012.  He said what changed was the losses came in and they

23   came in fast and they came in significant.

24         The companies' losses exceeded the value of the

25   shareholder equity.  Shareholder equity gone that was there,

1    and both companies were now needing to take draws from the

2    Treasury Department just to stay in the black.

3            And that was the -- the news that continued throughout

4    2011.  So if we look at the first -- can we take a look at

5    Slide 47.  I'm sorry.  Slide 48.

6            So here we are.  May of 2012.  We expect to request

7    additional draws, both entities.

8            A period-to-period volatility, but, again, we don't

9    expect to generate income sufficient to pay our dividends.

10           Let's take a look at Slide 49.

11           Just -- again, Ms. McFarland.  So if you hear about her

12   when Mr. Hume stands up and she thought things were going to be

13   fine, you have her sworn testimony and her certified SEC filing

14   where she is saying -- she's endorsing what those filings are

15   saying about the inability to generate income to pay the

16   dividends.

17           Slide 51.

18           Same thing; right?  We'll not generate net income in

19   excess of our dividend obligations.  That statement was also

20   true and accurate when it was made.

21           So that's the information that Mr. DeMarco is getting.

22   It's getting into the mix with the other information that he's

23   getting, almost constantly, from lots of sources.

24           So when you see in the jury instructions a decision

25   being based on facts, Mr. DeMarco was getting facts in real

1   time.  He was getting facts from these filings.  He was getting

2   facts from his staff.  He was getting facts from Treasury.  He

3   was getting facts from Fannie and Freddie.

4        He also gets some more information for the mix later in

5   May.  You heard testimony about a forecast that Freddie did

6   that was dated May 22nd, 2012.

7        Can we pull this up.  Slide 53, I think.

8        So this is just the cover of it.  It's cumulative

9   Treasury draws through 2014, and the range is 71 to 194 for the

10  stress scenario.  And you heard from Mr. DeMarco why he was

11  focused on the stress scenario.

12       Let's go to Slide 54.

13       So this one you may recall.  This has the scenarios and

14  Freddie called them better, base, worst, and stress.  So under

15  the stress scenario, this is accounting for the cap, you know,

16  how much is going to be available as of December 1st, 2013.

17       Accounting for that cap, Freddie's projection is that in

18  the stress case, as of January 1st, 2017 -- I'm sorry.  The

19  cumulative draws through the end of 2015 are 117 billion.  And

20  what's left on December 31st, 2016, is 32 -- that should be a

21  5 -- yes, '15.  What's left as of December 31st, 2015, is

22  $32 billion.

23       Under this stress scenario, they've drawn about 40 -- I

24  think it comes to $39 billion a year if you divide 117 by 3 and

25  annualize it.  And it goes up and down, but annualize just the

1    average; 117 divided by 3 is 39.  They've got 32 left.  That

2    means on this Freddie projection that Mr. DeMarco has in his

3    information mix, Freddie uses up its entire commitment.  Not

4    30 years from 2012, but three years from 2012.

5         This is the information that he has as he's thinking

6    about how to solve this problem.  Now, Dr. Dharan testified

7    about this, and Dr. Dharan agreed that under the stress

8    scenario, this is what the draws would be and this is how much

9    would be left in the commitment.

10        So let's take Slide 55.

11        So I want to make one thing clear.  You saw a lot of

12   projections.  I just used one to show something that we think

13   is important.  But Mr. DeMarco was not trying to predict which

14   projection would come out to be true.  What he said was -- was

15   that he needed to preserve and conserve the commitment that was

16   going to be capped.  So his objective was to be able to make

17   good on the guaranties.  He'd seen a disastrous state of the

18   world.  He was thinking of the worst-case scenario.  He wasn't

19   trying to predict the actual future.  He was thinking about

20   what would happen if, oh, there were another financial crisis.

21   How do I protect the public interest?

22        And he's also continuing to meet with Treasury.  We saw

23   that process had gone back-and-forth.  And now I want to talk

24   about this PX-205.

25        So this -- take off the highlighting.  Can we get rid of

1    the highlighting?  Doesn't matter.

2         So I want to -- this is the language that the plaintiffs

3    keep focusing on:  The GSEs will be generating large revenues

4    over the upcoming years.  But let's take a look at what this

5    memo is.

6         This is a memo that was written by someone who wasn't at

7    a meeting, and it says at the top -- actually, let me try to

8    read from a paper copy.

9         You'll have this evidence, and the plaintiffs have said

10   that this is an important document to them.

11        So this is Mr. Stegman -- he was not at the meeting.

12   He's writing to Ms. Miller, who was at the meeting, and he is

13   saying the secretary, Mr. Geithner, who was at the meeting,

14   provided an overview of the discussion that you and he had.  So

15   someone who's not at the meeting is talking to someone who was

16   at the meeting and trying to write down what that person is

17   telling them so that they can say something to someone else who

18   was at the meeting.  I would suggest to you, members of the

19   jury, that this is a -- a game of telephone and not a reliable

20   record.

21        And the bottom line is -- and there's no quotation

22   marks.  There's no actual quotes.  It says it's an overview,

23   and Mr. Stegman didn't hear a single word of this discussion.

24   The whole thing is a bit odd.

25        But, in any event, the plaintiffs have made much of a

1      couple of sentences in the email.  One of them is:  Since the

2      secretary raised the possibility of a PR covenant, DeMarco no

3      longer sees the urgency of amending the PSPAs this year.

4           And Mr. DeMarco also answered Mr. Hume's questions about

5      that on cross-examination.  And he made really clear what he

6      was saying.  Mr. DeMarco said, look, principal reduction was a

7      completely separate topic.  It wasn't part of the PSPA.  It

8      wasn't part of the first amendment.  It wasn't part of the

9      second amendment.  So I didn't think it should be part of the

10     third amendment.  And when he -- when he said that he didn't

11     see the urgency, he's talking about the urgency of putting

12     principal reduction in the third amendment that it had nothing

13     to do with.

14          And you heard his testimony on that point, and you can

15     evaluate it, but the important point, I think, members of the

16     jury, relates to the other passage that the plaintiffs have

17     quoted and examined Mr. DeMarco at length on.

18          And that is -- let's go back to the first slide.  We can

19     do it right here.

20          So the GSEs will be generating large revenues over the

21     coming years, thereby enabling them to pay the 10 percent

22     annual dividend well into the future even with the caps.

23     Members of the jury, you should conclude Mr. DeMarco never said

24     that.  Mr. Hume says the best evidence is this memo written by

25     the person who wasn't even at the meeting without quotation

1   marks in a document that Mr. DeMarco was never given a chance

2   to review.  I submit to you, the best evidence of what

3   Mr. DeMarco did and did not say at that meeting is his sworn

4   testimony.

5        You heard his sworn testimony.  That's why I asked him

6   those questions that way.  I wanted to ask point-blank

7   questions that got point-blank answers, and that's what you

8   got.

9        Now, Mr. Hume then went back to -- with Mr. DeMarco to

10  his deposition testimony and said, aha, here you said I don't

11  recall the exact specifics of the discussion, and here you say

12  there's something that you know that you didn't say.  Well,

13  members of the jury, those two things are not inconsistent.  He

14  didn't say this.  He told you he didn't say this.  And whether

15  he says I don't recall if I said it or I didn't say it, he

16  didn't say it.  If you think that he was lying to you under

17  oath, that's not a decision for me to make; that's a decision

18  for you to make.

19       But we would submit to you that when he told you he

20  didn't say that, he was telling you the truth.

21       And how else do you know -- and he said he wouldn't say

22  that, and he wouldn't think that.  Well, of course not, because

23  in June of 2012, no one had evidence that the GSEs would be

24  generating large revenues over the coming years, thereby

25  enabling them to pay the dividend well into the future even

 1    with the caps.

 2          That's not something anyone could have known.  It's

 3    certainly not something Mr. DeMarco knew, and it's certainly

 4    not something that he believed.

 5          But as long as we're on this document, I want to point

 6    out something else.

 7          Do we have another slide for this one?  We can -- we can

 8    leave it on this one.

 9          The plaintiffs have tried to suggest -- and I'm going to

10    come back to this and Mr. Hume said it in his argument today --

11    and I forget what his exact words.  I wrote them down on my

12    pad -- that Mr. DeMarco and Treasury were trying to do away

13    with the GSEs, to eliminate the GSEs.

14          Well, let's go back -- go back to the slide with the

15    highlighting.

16          Look at the other thing Mr. Stegman wrote.  He wrote

17    that Mr. DeMarco was saying something about instituting a net

18    worth sweep in place of the dividend will further extend the

19    lives of the GSEs.  So even according to their most important

20    document in the case, Mr. DeMarco's goal is not to get rid of

21    the GSEs.  His purpose in instituting the net worth sweep is

22    not to eliminate the GSEs.  If you're going to put weight on

23    this document -- and, frankly, we submit you shouldn't, but if

24    you are, you should put weight on that; that Mr. DeMarco was

25    saying that the purpose of the net worth sweep was to extend

1      the lives of the GSEs.

2              And how else do you know that all of this talk about

3      Mr. DeMarco wanting to get rid of the GSEs doesn't make sense?

4      Well -- you can take that down.

5              Well, first of all, Mr. DeMarco explained to you that he

6      was laser-focused on making sure that the GSEs could continue

7      to fulfill their public mission and serve the public interest.

8      He told you about his strategic plan.  He told you about

9      preserving and conserving assets.  You also heard a lot about

10     emails going back-and-forth at Treasury that the plaintiffs

11     have argued show that the Treasury Department was trying to do

12     away with the GSEs and that Mr. DeMarco somehow shared that

13     intent.

14             Well, on that last point, you heard Mr. DeMarco's

15     testimony.  He said and -- this is a quote from my notes and

16     your recollection should control, but what I have in my notes

17     is their motivation wasn't my key concern.  My key concern was

18     they were going to reach a similar conclusion to me to do what

19     we wanted to do here.

20             So he's saying, look, they had their reasons.  I had

21     mine.  I wanted and needed the net worth sweep because I

22     thought it was going to solve this problem of the circular draw

23     erosion, and extend the lives of the GSEs.  I wanted to get

24     that done.  So whatever their motivation was, that was my -- my

25     key concern.

1          I want to show you another document that's in

2    evidence that you didn't see during the trial.  Can we pull up

3    PX-486.

4          So this is a callout from a document that's called

5    Action Memorandum for Secretary Geithner.  And this document is

6    dated August 15th, 2012.  And you saw a lot of back-and-forth

7    in email with Treasury staffers.  This isn't a Treasury

8    staffer.  This is the Secretary of the Treasury of the

9    United States, and this is the formal action memorandum for

10   approval of the third amendment.

11         And it says at the beginning of the document:  The

12   recommendation is that you approve and execute the attached

13   third amendment.  And those are Mr. Geithner's initials.  He

14   approves.

15         Do we have the next slide on this?

16         So you heard a lot from the plaintiffs about Treasury's

17   motives and reasons, and you heard that their main purpose was

18   to get rid of the GSEs.  You heard that their purpose was the

19   opposite of preserving and conserving.

20              THE COURT:  Mr. Stern, would this be a good point for

21   us to take ten minutes?

22              MR. STERN:  Sure, Your Honor.

23              THE COURT:  This is going to go a while yet.  So

24   let's take ten minutes.

25              (Recess taken.)

```
 1              (Proceedings held out of the presence of the jury.)

 2              MR. HUME:  Judge Lamberth, may I raise one quick

 3     issue?  Which can be addressed after the closings, but a

 4     document was shown to the jury, and they were told it was in

 5     evidence that was not in evidence:  DX-377.  We can address it

 6     after.

 7              THE COURT:  All right.

 8              (Proceedings held in the presence of the jury.)

 9              THE COURT:  You may be seated.

10          All right, Mr. Stern, you may proceed.

11              MR. STERN:  Thank you, Your Honor.

12              Members of the jury, let's -- can we get DX -- PX-486

13     back up.

14              So let me just set the stage again.  This is the

15     Treasury action memo.  And you heard a lot from the plaintiffs

16     about Treasury's purpose being to eliminate the GSEs to end

17     their operations and, at some point, Mr. Hume may have said

18     something about Treasury's purpose being the opposite of

19     FHFA's; that Treasury wasn't concerned about circular draws as

20     Mr. DeMarco told you that he was.

21          And you heard that Treasury thought that Fannie and

22     Freddie would make too much money and that the purpose of the

23     net worth sweep was to capture all that money.

24              Well, members of the jury, when it comes to Treasury's

25     purpose, this is the document that sets forth that purpose.
```

1    This is the action memo by -- approved by Secretary Geithner

2    announcing the official action of the third amendment.  And

3    what does this --

4         Can we get the last page of this exhibit.  So -- can we

5    blow that up.

6         So this is evidence of the formal process that these

7    action memos have to go through.  You saw Mr. Geithner signed

8    off by his initials approving the recommendation, and then

9    there's this clearance sheet which shows who drafted it; who

10   approved it, including Mr. Stegman and Ms. Miller; and who

11   cleared it; and then a long list of Treasury personnel, some --

12   at least a name that you're familiar with, Mr. Bowler.

13        Let's go back to the slide.

14        So after all the dust had settled and Treasury had

15   decided that it wanted to agree to the third amendment and had

16   decided why it wanted to agree to the third amendment, this is

17   the formal announcement by the Treasury Department.  Not by any

18   individual person at Treasury, but by Treasury, the

19   institution.

20        And this is what Treasury says -- Treasury says:

21   Purpose of Amendments.  And the very first item under Purpose

22   of Amendments is:  Replace the fixed 10 percent dividend with a

23   net worth sweep dividend.

24        And what does it say the reason for that is?  It doesn't

25   say so that we can get all the profits.  It doesn't say to

1      prevent the GSEs from rebuilding capital.  It says that the

2      modification should also help maintain market stability by

3      preserving Treasury's ability -- actually, you know what?  Can

4      we get the document itself?

5              I apologize, members of the jury.

6              Next page, please.  Could you blow up that first

7      paragraph.  Here's what -- no.  Under Purpose of Amendments.

8              Okay.  Here's what it says:  Replacing the fixed

9      10 percent dividend with a net worth sweep dividend is

10     necessary to avoid the risk of the GSEs potentially exhausting

11     the finite amount of funding capacity that will remain

12     available to them under the PSPAs beginning in 2013 through the

13     payment of dividends back to Treasury.

14             This is what Secretary Geithner signed off on as the

15     first purpose of the third amendment.

16             And he goes on to say:  Under the current financial

17     arrangement, the GSEs draw to pay dividends if they are unable

18     to generate enough comprehensive income to meet the fixed

19     10 percent dividend requirement.

20             This modification will end the circularity of Treasury

21     funding the dividend payments that the GSEs pay back to

22     Treasury so that any future draws on the PSPAs are only used to

23     fund operating losses.

24             Treasury is saying the purpose of the net worth sweep is

25     to end circular draws and to eliminate the risk of erosion of

1    the commitment from those circular draws.

2         But there's more in this memo.  Let's go to the next

3    page -- top of the next page.

4         It says:  Under Treasury's projections and the

5    projections of certain third-party experts, the GSEs will not

6    generate enough income to meet their dividend requirements in

7    the long term.  Absent a modification, the continued draws

8    under the PSPAs to pay the dividends will exhaust the GSEs

9    finite amount -- their limited amount -- of remaining funding

10   capacity and thereby lead to their insolvency.  Investors in

11   mortgage-backed securities guaranteed by the GSEs are focused

12   on this issue given the long life of the GSEs' guaranties.  And

13   you know that that's referring to the life of the mortgages,

14   the typical mortgage being 30 years.  This is what Treasury

15   is -- has decided, officially, are the reasons for the net

16   worth sweep.

17        So let's go further down the page to the paragraph that

18   begins:  The modification.

19        It says:  The modification should also help maintain

20   market stability by preserving Treasury's ability to support

21   the continued solvency of the GSEs over a longer-time horizon.

22   As a result of the change, the GSEs will be more financially

23   sound which should lower their funding costs and improve future

24   profitability.

25        GSE-based mortgage rates should also benefit as

 1     investors will likely be more confident in purchasing

 2     longer-term GSE mortgage-backed securities.

 3              There's no plan here, members of the jury, to eliminate

 4     the GSEs.  The objective here, the goal here, is exactly what

 5     Mr. DeMarco described to be the objective and the goal of the

 6     net worth sweep, which is to eliminate circular draws and to

 7     eliminate the risk that the Treasury commitment will be eroded

 8     by those circular draws.

 9              That's what Treasury had to say when all was said and

10     done.

11              You can take it down.

12              I'm advised that I called out the wrong exhibit number.

13     In the jury room -- or at least in your collection of

14     exhibits -- this will be DX928.

15              What else did you hear on that point?  Well, it's not

16     just us telling you that Treasury and Mr. DeMarco shared the

17     goal of protecting the commitment, shared the goal of

18     protecting the public interest.  The plaintiffs' own witness

19     told you the same thing, Dr. Thakor.  He told you more than

20     once that when FHFA and Treasury were negotiating the third

21     amendment, they were both acting in the public interest.  Not

22     to be in some sort of conspiracy.  Let's take a look at

23     Dr. Thakor's testimony.

24              Slide 63.  There's a mutual interest, do you have that

25     slide?

1          Well, you'll recall Dr. Thakor's testimony, members of

2     the jury.  When he was being cross-examined about the

3     negotiations between Treasury and FHFA, he told you that

4     there's a mutual interest shared by FHFA and Treasury to

5     protect the public interest.  That was Dr. Thakor's testimony.

6          And, in any event, there's no dispute that if something

7     was going to happen with the GSEs, that wasn't Mr. DeMarco's

8     call.  Mr. Hume told you that this morning.  It wasn't even

9     Treasury's call.  You learned from Dr. Dharan -- and there's no

10    dispute about this -- that if something is going to happen to

11    the GSEs, that has to come from Congress.  So Mr. DeMarco saw

12    his role, as he told you, as keeping the GSEs going, keeping

13    them in normal business operations, keeping them fulfilling

14    their public mission unless and until Congress wanted to do

15    something different.

16          And you saw the reference in the Treasury action memo,

17    again, to market confidence.  And what was Mr. DeMarco hearing

18    about that in the summer of 2012 leading up to the third

19    amendment?  You heard Mr. Layton's testimony and here's what he

20    said.

21          Let's get Slide 66.

22          So here's Mr. Layton.  And he is -- he testified that he

23    had known from earlier in the summer there was an issue to be

24    addressed that was concerning to the markets which was

25    extremely important to resolve.  And it had to do with using up

```
 1      the limited amount -- leaving too small amounts in the Treasury

 2      commitment -- to maintain the market's confidence that the

 3      government was standing behind the guaranty.

 4            And why is this testimony important, members of the

 5      jury?  Well, first of all, it confirms and corroborates exactly

 6      what Mr. DeMarco told you.  He's describing the problem of the

 7      circular draw eroding the commitment, and he's describing the

 8      connection between erosion of the commitment and market

 9      confidence in the government standing behind the guaranty.

10      This isn't something that was a figment of Mr. DeMarco's

11      imagination.  This was a real problem that was known at the

12      highest levels of Fannie and Freddie.

13            And then he's asked how he knows that erosion of the

14      commitment was a concern of the markets.  And he didn't say,

15      well, I have no idea.  That's just something Ed DeMarco told

16      me.  Here's what he said.

17            Can we get Slide 67.

18            So he's asked in his testimony:  How do you know that

19      was a concern of the markets?  And he told you about this

20      meeting with Credit Suisse.  And he told you that they came to

21      him, a delegation, one of the major mortgage-securities dealers

22      to see -- talk about this problem, and they told him that this

23      was highly concerning to them because it could lead to a real

24      financeability issue.  These are the market participants

25      expressing their concern in late May of two thousand -- in
```

1    sometime in June of 2012 about erosion of the commitment and

2    the guaranty.

3         This is exactly what Mr. DeMarco told you he was so

4    worried about.  And while I'm on this point, I want to say

5    this:  You heard testimony from a lot of people who were

6    actually involved in all of this as it was happening.  You

7    heard from Mr. DeMarco, of course, and from Mr. Mayopoulos --

8    and on the subject of Mr. Mayopoulos, I think the slide that I

9    put up before was incomplete.  Can we have -- can we have that

10   slide?

11        Court's indulgence.

12        So this is that slide, and I just want to point out,

13   when he's asked about the financial consequence of the draws,

14   he says:  Not in any immediate way, because there was still

15   plenty capacity left in the PSPA commitment.  Of course, he's

16   only referring to the near term, not the long term.

17        And he goes on to say:  We assume that at some point if

18   Fannie or Freddie needed to continue to draw, market

19   participants might be concerned.  He then says:  We didn't

20   think they were anywhere close to that risk at that point in

21   time, but that he understood that market participants would get

22   nervous long before it dropped to zero.

23        So not a single one of -- you heard from Mr. Layton.

24   You heard from Mr. Kari.  You heard from Ms. McFarland.  You

25   heard from Mr. Mayopoulos.  You heard from Mr. Satriano.  And

1    not a single one of those witnesses told you that sitting there

2    in the summer of 2012 that the circular draws were not a

3    potential concern; not a single one of those witnesses told you

4    that.

5            Now, I'm going to skip ahead to August of 2012.  So on

6    August 8th of 2012, Fannie makes another SEC filing.  This time

7    for the second quarter of 2012.  That's the period ending on

8    June 30th.  That filing is signed and certified by

9    Mr. Mayopoulos, the CEO, and Ms. McFarland, the CFO.  And what

10   does that filing say?

11           Can we get Slide 73.

12           There was good news in the second quarter for both

13   Fannie and Freddie, but they are still saying:  We do not

14   expect to generate net income or comprehensive income in excess

15   of our annual dividend obligation.  They have announced, as of

16   the second quarter, that after 14 quarters of negative net

17   worth and draws, they finally had two quarters -- Fannie has --

18   in which their assets exceeded their liabilities.  And

19   Mr. DeMarco didn't say, drat, that's not what I was going for.

20   He said that was good news.  But he also knew that Fannie and

21   Freddie were still saying that they did not think that they

22   would be able to generate income sufficient to pay their

23   dividend obligations over the long term.

24           And they also say that that dividend obligation is

25   increasingly going to drive future draws.  So they are saying,

 1     again, that we are concerned about the circular draw problem.

 2          So let's get Slide 73.

 3          So we don't have evidence just from the filing.  We

 4     have -- and I'm just going to talk about Mr. Kari.  Mr. Kari

 5     affirmed under oath that that was indeed accurate; that as of

 6     August 7, 2012, ten days before the third amendment, Freddie

 7     was saying that they expected the dividend obligation would

 8     drive the future draws and they didn't expect to generate

 9     income in excess of their dividends over the long term.

10          And that, again, members of the jury, is the key phrase.

11     Over the long term.  Because that is the term that Mr. DeMarco

12     was concerned about.  Because to fulfill his public mission, to

13     protect the public interest, to fulfill his obligations, he had

14     to protect the Treasury commitment over the long term.  That

15     was the whole ball game.

16          You also heard critical evidence that showed that

17     the market didn't have confidence in Fannie and Freddie.

18     Let's take a look at the Moody's projection that you saw.

19     Slide 75.

20          And you saw this during the testimony.  And it shows the

21     concern that GSE -- I'm sorry -- government-sponsored

22     enterprises' ultimate path remains unchanged.  They will

23     deplete their capital bases because the dividends they'll be

24     paying on their preferred securities will be greater than their

25     earnings.

1          So the time has come, members of the jury, for

2    Mr. DeMarco to act.  He has to act in the public interest.  He

3    has to protect the Treasury commitment.  And as we have

4    submitted to you, that action was completely reasonable.

5          But I just want to touch, before moving on to

6    shareholder expectations, on a few topics that plaintiffs'

7    counsel talked about this morning, you heard about during the

8    trial.

9          The first topic is the DTAs, the deferred tax assets.

10   And that was the write-up of some -- I think it's $70 billion

11   is probably about the right number -- that happened in 2013

12   after the third amendment was executed.  Plaintiffs' counsel

13   have suggested that FHFA knew or should have known that the

14   write-up was coming.  But you heard the testimony of

15   Mr. Satriano, FHFA's chief accountant, and he told you there

16   was a formal quarterly review process to discuss whether there

17   should be a write-up of the DTA.  And you heard him testify

18   about the most recent quarterly review that happened before the

19   third amendment.

20         Can we get Slide 76, please.

21         So you heard his testimony, and he told you that he

22   understood what was being said was that the negative evidence

23   that they have outweighs the positive evidence, and, therefore,

24   it will be more likely than not -- that standard -- that they

25   will be unable to use the benefit of the deferred tax asset.

1          That was his testimony.  And in any event, members of

2    the jury, that DTA write-up was a one-time event.  It was not

3    something that anybody could count on happening quarter after

4    quarter, year after year, decade after decade.  So as

5    Mr. DeMarco was considering protecting the Treasury commitment

6    going 30 years into the future, a happy event that was going to

7    occur one time in the next year was not something that was

8    going to change his thinking.

9          I also want to talk for just a moment about the

10   periodic commitment fee, because, again, lots of debate about

11   that.  But I'll just leave it at this:  You will see that the

12   periodic commitment fee was intended to compensate the American

13   taxpayer for making hundreds of billions of dollars and, for a

14   period of time, unlimited money available.  And the people who

15   were going to negotiate that -- FHFA and Treasury -- both

16   believed that that would be substantial.

17         So in the third amendment, when Treasury agreed to waive

18   the periodic commitment fee during the entire period of time

19   that the net worth sweep was in effect, they were giving up

20   something that from their perspective and from FHFA's

21   perspective was likely to be very substantial.

22         So the time has come for Mr. DeMarco to act.  And it all

23   boiled down to this:  The risk to the GSEs, the housing market,

24   and the economy from the potential erosion of the commitment

25   was -- from circular draws was so great, the future was so

1    uncertain, that Mr. DeMarco decided that he needed to

2    eliminate that risk entirely.  He needed to take it down to

3    zero.  And that is exactly what the net worth sweep

4    accomplished.

5         And to be completely clear, there is absolutely no

6    dispute in this case that the net worth sweep completely

7    eliminated that risk.  And not a single witness in the case

8    told you that the net worth sweep was not in the public

9    interest.  Dr. Thakor didn't tell you that.  In fact, he told

10   you the opposite.  He told you that in their negotiations, FHFA

11   and Treasury were both working to protect the public interest.

12   Dr. Dharan said he didn't even have an opinion on that because

13   the plaintiffs didn't ask him to look at that.

14        And you know from the evidence that the threat to the

15   companies in the housing market that came from the risk that

16   the circular draws would erode the commitment once the cap went

17   into place was completely eliminated by the net worth sweep.

18        So when you ask yourselves the question:  Did

19   Mr. DeMarco's action solve the problem?  Did it meet the goal

20   and the objective?  You know that the answer is yes.  And you

21   heard the evidence that almost the minute the net worth sweep

22   was announced, the market breathed a sigh of relief -- and you

23   also heard from Mr. Mayopoulos.

24        Can we get Slide 83.

25        He told you that he thought that the third amendment

 1    was -- he's asked:  Was he surprised?

 2          I don't remember being surprised.  I think I understood

 3    the issues.  There were a number of ways those issues could be

 4    addressed.  My recollection is I thought that what the third

 5    amendment was was in line with what I thought would be in the

 6    range of possibilities.  I think it was trying to preserve as

 7    much of the amount of the Treasury commitment under the PSPA as

 8    possible and trying to reduce the possibility that future draws

 9    for dividend payments might diminish the amount available.

10          That's Fannie's CEO.  Now let's take a look at Slide 84.

11          This is Mr. Kari at Freddie.  What was the reaction of

12    senior management?

13          I can't recall each individual's reaction or a

14    consensus.

15          What was your reaction?

16          My reaction was that it simplified some things

17    operationally.  It eliminated a sort of circular process with

18    respect to payment of dividends and the additional need for a

19    draw.

20          So before I move on to the shareholders' expectations,

21    members of the jury, I just want to take a few minutes talking

22    about this question of alternatives that's been raised by the

23    plaintiffs.

24          The principal alternative that was discussed was the

25    12 percent.  And you heard what Mr. DeMarco told you.  He told

1    you that it wasn't a choice.  He called that the 12 percent

2    penalty, and he said that it was a penalty for failure to meet

3    his contractual obligations.

4         Can we get page 2 of the certificate of designation,

5    DX89.

6         Mr. Hume showed you part of this document.  Here's the

7    part that refers to the 10 percent dividend.  It says:  If at

8    any time the company shall for any reason fail to pay dividends

9    in cash, then immediately following, there's an addition to

10   liquidation of 12 percent.

11        And Mr. DeMarco told you that he did not see that as an

12   option that he could pick.  He saw that as a penalty for

13   failure to meet a contractual obligation, and he told you that

14   it was part of his job to meet his contractual obligations as

15   acting director of FHFA.  And it wasn't just Mr. DeMarco who

16   called the failure to pay the 10 percent dividend failure to

17   meet a contractual obligation.  You'll recall that Dr. Thakor

18   told you the same thing.

19        Mr. DeMarco was not focused on allowing the GSEs to

20   rebuild capital.  He was not focused on getting dividends to

21   shareholders.  He was focused on protecting the public interest

22   and fulfilling the public mission.  And that is what his action

23   did.  It matched his goal.  It met his purposes.  It met his --

24   FHFA's -- objectives as those objectives were commanded by

25   HERA.

1      And when he did that, members of the jury, he acted

2  completely within the reasonable contractual expectations of

3  the shareholders based on their contracts as of December 24th,

4  2009.  And I'm going to use my remaining time to talk about

5  that.

6      But before I do, I'd like to put up one more jury

7  instruction.  Slide 94, please.

8      Because in considering whether the net worth sweep was

9  in the reasonable contractual expectations of the shareholders,

10  we would ask you to keep in mind something that His Honor will

11  ask you to keep in mind or suggest to you that you should keep

12  in mind, and that is that in some cases, there may be more than

13  one option that could reasonably be expected under the

14  circumstances.  So when you hear all this talk about all the

15  alternatives and all the other options, keep your eye on the

16  ball.

17      The question is:  Is the option that Mr. DeMarco chose

18  that completely eliminated the risk of erosion from circular

19  draws, did that meet his objective?  And if it did, it was

20  reasonable.  There may have been something else that was

21  reasonable, but that's not the question before you.

22      The question before you will be to evaluate whether what

23  Mr. DeMarco did was, one, among a range of possible legal

24  options; and that is what this instruction is about.

25      So we also -- Mr. Hume and I also both referred to the

1    shareholders' objectively reasonable expectations.  Can we get

2    Slide 95.

3           This is that reference to objectively reasonable

4    expectations under the contract.  And as I expect

5    Judge Lamberth is going to instruct you, and as you know, the

6    claim in the case is breach of the implied covenant of good

7    faith and fair dealing.  And he is going to tell you that an

8    implied covenant is something that's not spelled out in the

9    express terms of the contract.

10          I expect he's going to instruct you that the implied

11   covenant is an obligation to be faithful to the meaning and

12   purpose of Fannie and Freddie's contracts with the

13   shareholders.  And because everything comes back to the

14   shareholder contracts, it's really important to keep in mind

15   how they work.  Because as I told you in opening and as

16   Judge Lamberth is going to instruct you, the contracts between

17   Fannie and Freddie and the private shareholders aren't like

18   other contracts.  They're different in some important ways.

19          First, unlike other contracts, they're not all

20   contained -- all of the terms are not contained in a single

21   document.  The contract is made up of a number of different

22   documents, including the stock certificates, the corporate

23   charters, the acts of Congress under which they were formed,

24   and the laws that regulate Fannie and Freddie.

25          And, second, the shareholder contracts aren't negotiated

1    like other contracts.  Whenever a shareholder buys a share of

2    stock, they agree to the terms of that contract just by buying

3    the stock.  And that's a -- there's a key point here for our

4    case because as His Honor will instruct you, the terms of the

5    contract change over time.  They change over time even without

6    a specific agreement of the parties.  So that means when a

7    shareholder buys a share of stock, the shareholder agrees not

8    only to the terms that existed at the time they buy the stock,

9    but as they change over time.  And how do they change over

10   time?

11         Well, Judge Lamberth is going to give you instructions

12   about that also, and he's going to give you an example.  He's

13   going to tell you that when HERA was passed, HERA became part

14   of the contract.  And he's also going to talk to you about the

15   other ways the contract changes over time.

16         So, what did the evidence show you about the shareholder

17   contracts in this case as they existed on December 24th, 2009?

18   Well, first of all, under their stock certificates, they agreed

19   to buy a share of stock that carried no guaranty that they'd

20   ever see a dividend.  And you saw that -- and you saw the

21   certificate, and you saw that the dividend is issued if and as

22   declared by the board of directors.  So when you buy that share

23   of stock, you are saying, I agree that I have no guaranteed

24   right to a dividend.

25         And there's also a piece of evidence that I don't know

1    you saw during the trial.

2           Can we pull up DX 49.

3           So this is from what's called the offering circular of

4    the stock, and it says, again, if you buy this stock, you will

5    only get a dividend if and as declared by the board of

6    directors in its sole discretion.  So that's the stock

7    certificate.

8           What else was part of the shareholder contract as of

9    December 24th, 2009?  Well, Judge Lamberth is going to instruct

10   you that the contract includes the corporate charters of Fannie

11   and Freddie.  And you know what those corporate charters said.

12   So that you know when a shareholder agreed to buy a share of

13   stock, they agreed that they were buying a share of stock in a

14   company that had a public mission.

15          What else is included?  Well, Judge Lamberth is going to

16   instruct you, as I said, that HERA became part of the contract

17   when HERA was passed on July 30th, and that is critically

18   important, members of the jury, because that meant that as of

19   that date, under the shareholder contracts, once FHFA became

20   the conservator, FHFA was authorized to act in the best

21   interests of the public.

22          So that's now part of the agreement with the

23   shareholders.  So the shareholders themselves are in an

24   agreement where they have agreed that FHFA can act in the best

25   interests of the public, even if that was not in their best

1    financial interests.

2         So from that day forward, every shareholder not only

3    reasonably expected, they knew that if FHFA were faced with a

4    situation that required action to protect the public interest,

5    FHFA was authorized to take that action.  So when Mr. DeMarco

6    was faced with the situation that faced him in August of 2012

7    with the cap bearing down, his action to protect the public

8    interest was completely within the range of options that a

9    reasonable shareholder would have expected.

10        And how else do you know that option was in that range?

11   Well, Judge Lamberth is going to tell you that you can also

12   consider FHFA's public statements around the beginning of the

13   conservatorship.  And you know that in those statements,

14   Mr. Lockhart made clear he was eliminating dividends; that the

15   conservatorship would be operated not to maximize shareholder

16   returns.

17        So the shareholders from that day forward were in a

18   contract that said that the conservator was going to act in the

19   public interest.  FHFA also told everyone that the

20   conservatorship wasn't permanent.  And, yes, members of the

21   jury, at the beginning of the conservatorship, as I said

22   before, Mr. DeMarco made statements about the limited duration

23   of the conservatorship.  But as you know, that was before

24   hundreds of billions of dollars in draws.

25        You also will be told that the PSPAs are part of the

1    shareholder contract.  And that means that every shareholder

2    was in an agreement with Fannie and Freddie that said that

3    dividends could never be issued unless Treasury consented in

4    writing, and that the conservatorship could never be exited

5    unless Treasury consented in writing.

6         And that's how you know that when the conservator had to

7    come up with a way to solve the circular draw problem -- and

8    one way to do that was to give Treasury the GSEs' profits to

9    stop the erosion of the Treasury commitment, shareholders would

10   certainly have reasonably expected that that would at least be

11   an option.

12        And make no mistake about it, members of the jury,

13   shareholders knew as of December 24th, 2009, that erosion of

14   the commitment from the circular draws was a looming problem.

15   They knew that from Fannie and Freddie's securities' filings.

16   You've seen evidence of the filings in November of 2009 where

17   both -- both Fannie and Freddie said over and over again that

18   they expected the dividend requirement to exceed their income.

19        So they certainly would have reasonably expected,

20   members of the jury, that faced with what faced him in 2012,

21   Mr. DeMarco would have acted in the public interest, even if

22   that wasn't in the shareholders' financial interests.  They

23   certainly would have reasonably expected, based on their

24   shareholder contracts, that Mr. DeMarco would choose an option

25   that eliminated completely the risk of circular draws further

1    eroding the commitment.  And that, of course, is exactly what

2    the net worth sweep accomplished.

3         There is no dispute about that.  There is no dispute

4    that there was a circular draw problem.  There is no dispute

5    that the Treasury commitment was going to be capped.  There was

6    no dispute that further draws to bring down the Treasury

7    commitment to pay dividends would erode that commitment, and

8    there is no dispute that erosion of the commitment leads to a

9    decline in market confidence that the United States Treasury is

10   standing behind that guaranty.

11        So, members of the jury, we respectfully submit that you

12   can and should conclude that Mr. DeMarco acted reasonably; that

13   he acted reasonably in a way that was within the shareholders'

14   reasonable expectations.  And when you get to Question 1 on the

15   verdict form, we respectfully submit that you should conclude

16   that the plaintiffs have not met their burden of proof to

17   establish what they need to prove.

18        Now, I'm just going to talk for two minutes about some

19   remaining questions on the verdict form.  One of them has to do

20   with damages.  And we respectfully submit, members of the jury,

21   you shouldn't get to that question.  We submit you shouldn't

22   get past Question 1.  But since it's on the form, I'm just

23   going to say a few words about it.

24        And what I'll say about damages is that Dr. Mason's

25   testimony about damages was based on a study that someone else

1     did.  And you should also bear in mind when you're considering

2     if -- that you should -- judges -- I'm sorry.  You should also

3     bear in mind Judge Lamberth's instruction that damages have to

4     be proved with reasonable certainty.

5          The last thing I'll touch on is the prejudgment interest

6     point that Mr. Hume made, just to ask you that you read

7     Judge Lamberth's prejudgment interest instruction, just as you

8     read all of his other instructions.

9          And we are confident that after you have considered all

10    of the evidence and the arguments of counsel and His Honor's

11    instructions and you have deliberated about all of that

12    evidence, that you will return a verdict in favor of FHFA,

13    Fannie Mae, and Freddie Mac.

14         I thank you very much for your time.

15         THE COURT:  All right.  Thank you, Mr. Stern.

16         Mr. Hume, the plaintiffs get the last word.

17         MR. HUME:  Members of the jury, thank you.  Hamish

18    Hume.  Good afternoon.  We're almost at the end.  Thank you for

19    your attention.

20         As I said this morning, I think the question that I

21    invite you to consider is whether what you're hearing is

22    something that takes into account the full story, the full

23    facts.  I don't think what you've heard from defendants really

24    explains why it is that that time line I showed you, what's

25    going on there, why is it that Treasury was pushing for the net

1    worth sweep after the profits.

2         Why is it that they said they didn't want to let them

3    retain capital and retain earnings and rebuild capital?  Why is

4    it that there's no memo analyzing this momentous decision?  Why

5    is there no evidence of reaction to the enormous 2013 profits?

6         Mr. Stern said that was just a one-off.  It's not true.

7    They made more profits for ten years than that 10 percent

8    increment amount.  I'll show you that.  Why is it that the SEC

9    disclosures that I showed you from right after the net worth

10   sweep say that this could materially increase the risks --

11   material adverse consequence and it risks increasing the draws?

12        And why is it that the bond market was getting better

13   before the net worth sweep and the mortgage-backed security

14   markets were getting better, and yet they're saying that's what

15   they were -- those are the markets they were trying to appease.

16   We're not saying they had to panicking.  The point is the

17   markets were doing well.

18        So I don't think the sum of all the evidence makes

19   sense, if you listen to what the defendants are saying.  I'm

20   hopeful it makes a little more sense with what we're saying and

21   if you understand that what we're saying is that there was a

22   subtext to these discussions.  Yes, they talked about the

23   circular draw problem in January of 2012 and ways to try to

24   amend the agreement by the end of the second quarter to deal

25   with them.  That's true.  But by the end of the second quarter,

1    they had profits above the dividend amount.  They didn't amend

2    the PSPAs, and there was no urgency to do so.

3           Second, there's no back-and-forth between them saying

4    why the net worth sweep is the right way to do that.  It is an

5    elephant gun for a mouse.  It is an enormously consequential

6    decision that risks giving away hundreds of billions of dollars

7    of future profits.  It's not that it's one of several

8    reasonable ways to do it.  It is the one unequivocally

9    unreasonable way to do it when there are clear reasonable

10   alternatives that could have been done.

11          Where are the memos analyzing those alternatives?  In

12   the document, he said they were going to look at a list of

13   issues.  Where is it?  What did they look at?  It's because

14   they also at the same time -- yes, they were talking about

15   circular draw, but at the same time, there was this other

16   thing going on where there was a plan to wind them down.

17   The Treasury Department was hoping they were going to wind

18   them down.  Some people in Congress were saying that.

19   Mr. DeMarco was sympathetic to that.  He thought the charters

20   were flawed.

21          So to him, the net worth sweep is kind of like -- sure,

22   why not.  We want to wind these guys down anyway.  And what he

23   didn't think about is -- talk about unpredictable future.  What

24   if those plans don't happen?  What if Congress doesn't get on

25   board with the wind-down?  What if it's just not possible?  And

1     what if all this good news that you're hearing about internally

2     happens and all those write-downs become write-ups?  Well, then

3     you've given away the store, and then you've made them more

4     vulnerable to the public interest.  Sorry.  You've made them

5     more vulnerable to the stress scenario and undermined the

6     public interest you said you were trying to fulfill.  And

7     that's what happened.

8          He admitted it.  The SEC disclosures admit it.  Without

9     that 110 billion they would have had in 2013, they were more

10    vulnerable to a stress scenario.  Yeah, they're doing fine

11    because they've been growing and making profits for ten years.

12    But for a number of years, they would have been doing way

13    better if they'd been able to keep the capital than had the

14    sweep to Treasury.

15         Now, let me try to address some of the specific

16    arguments as efficiently as I can.  Obviously, the biggest

17    argument you hear from defendants is the public interest.  They

18    were acting in the public interest.  But it's one of several

19    false binary choices.  By which I mean, it's a false

20    presentation to you that you've got to choose A versus B.  It's

21    A versus B.  It's public interest versus shareholders.  Who

22    wins?  Well, if that were truly what this was about, then I

23    would understand why you would think the public interest maybe

24    should win.  But it's a false choice.

25         The public interest was served by maximizing net worth.

1    Public interest -- let me, first of all, show you what

2    Judge Lamberth's instructions are.

3         Could we put up Slide 26.

4         This is what the judge's instructions are.  While the

5    statute authorized FHFA to act in the best interests of Fannie

6    and Freddie, the FHFA, or the public, its exercise of that

7    authority can still have violated the implied covenant of good

8    faith and fair dealing if it exercised that authority in a way

9    that arbitrarily or unreasonably violated plaintiffs'

10   reasonable expectations under the contract.

11        So that's the instruction on public interest and

12   shareholders.  But, more fundamentally, the public interest was

13   served by maximizing the net worth.  And you don't have to take

14   my word for it.  Let's look at what FHFA had Fannie and Freddie

15   say on their SEC disclosures, which I think we're going to find

16   on Slide 154, Ms. McGuire.

17        This is their SEC disclosures.  It's a little small.

18   Hopefully, on the screens you can see.  These are the same ones

19   that say that -- the defendants showed you, they always show

20   you the part that we don't dispute at all -- that says:  During

21   conservatorship, you operate -- before conservatorship you

22   operate to maximize shareholder returns.

23        In conservatorship, that's no longer your goal.  Your

24   goal is stabilize the market, make sure the public mission of

25   these enterprises is fulfilled.  But to do that it says:

1    Maintain net worth.  It says maintain net worth.  It's not

2    highlighted here because this is defendants' slide.

3          So let me just make sure it's clear because we're

4    highlighting what's not highlighted.  Defendants have

5    highlighted this language.  In the middle of that is:  Maintain

6    positive net worth and fulfill our mission of providing

7    liquidity.  I don't -- I'm reminded that I'm -- I'm the one at

8    fault here.  If I click, you'll see that's what -- that's what

9    we're pointing to that they're not showing you.

10         Maintain positive net worth.  Focus on profitability if

11   it does not adversely affect our ability to maintain net worth.

12         Could we go -- I'd like to see -- Slide 156, I believe,

13   makes clear that Mr. DeMarco testified that in none of the SEC

14   filings in 2009, 2010, or '11, or before the net worth sweep

15   did they say that FHFA had given up trying to have Fannie and

16   Freddie build positive net worth.

17         That was part of their public mission.  It was also good

18   for shareholders.  It is a false binary, it's a false position

19   to say it's either/or in all circumstances.  Remember, these

20   shareholders invested money with the profit motive as

21   investment for their retirement earnings or otherwise.  But it

22   also helped Fannie and Freddie fulfill their public mission.

23   And that's why the regulators went out in 2007, 2008 and asked

24   Fannie and Freddie to get that money.

25         Mr. DeMarco also admitted that none of the SEC filings

1    in -- before the net worth sweep said it was -- it was in the

2    public interest for Fannie and Freddie to forever be in

3    conservatorship.  So it's a false choice.

4          He also -- Mr. Stern said that there was no expert who

5    came in and said that the net worth sweep was not in the public

6    interest.  I just want to be clear.  You understand, to come

7    into court and testify as an expert, you have to qualify that

8    you have the credentials to be the expert.  I'm not -- I'm not

9    aware of anyone who could be qualified to be a public interest

10   expert.  Not either side presented that to you.

11         And when our expert says he's not giving an opinion on

12   that, that doesn't mean he doesn't have an opinion.  It's that

13   he's not allowed to give an expert opinion on something like

14   that.

15         You should decide whether this net worth sweep was

16   something that reasonably satisfied the public interest or

17   whether it was arbitrary and unreasonable.  That's for you to

18   decide.

19         Now, Mr. Stern also said that Mr. DeMarco succeeded in

20   keeping Fannie and Freddie in business.  And it's true they've

21   been in business and they've made money.  And they said there

22   was not one nanosecond that they did not have their doors open.

23   But as I said to you earlier, the net worth sweep increased the

24   risk of that.

25         Let me just quickly show you again Slide 128.

1          Slide 128 just shows the money they would have had on

2     their books if it hadn't been for the net worth sweep,

3     111 billion, and they had to go out and borrow money to pay

4     that dividend.  And then their SEC statements, they said that

5     increases the likelihood of future draws on the commitment.

6     That was not a good result for Fannie Mae and Freddie Mac, for

7     their public mission, for their bond and MBS investors.  They

8     survived it, and they've grown because they've continued to

9     make very large profits.

10          And, Ms. McGuire, I don't know if Slide 193 -- the last

11     slide of -- does it maybe show the profits?  No.  Sorry.  So

12     that's okay.

13          Let me show you another slide, because the other point

14     they make -- they're constantly saying that the SEC

15     statements -- another false binary, false choice -- is that the

16     SEC statements are gospel truth and all this internal

17     projections and optimism you can't trust.  It's not a

18     false choice.  It's not either/or.

19          The evidence shows -- and I think your common sense and

20     experience can draw on this -- that you put in your SEC --

21     statements when you made a forward-looking prediction, you're

22     disclosing risks, and you want to be cautious.  The last thing

23     you want to do is tell people a lot of really great things are

24     about to happen and then if they don't happen, you're going to

25     regret that.  People might come after you.

1          Nobody gets in trouble for underpromising and

2     overdelivering.  You get in trouble when you promise something

3     good or predict something good and then it doesn't happen.  So

4     people are cautious, especially in SEC statements.

5          But what they're saying internally is not inconsistent.

6     But it is showing optimism.  It's showing cause to believe that

7     what actually happened could happen.  And Mr. Stern said that

8     that deferred tax asset write-up -- first of all, he said that

9     he didn't think Fannie and Freddie -- you know, it wasn't

10    foreseeable it would happen.  Well, you heard from

11    Professor Dharan on that, and you've seen evidence on that.

12         I'd like to show Slide 116, please.

13         PX-259, which is one of the more important documents in

14    the case, right before the net worth sweep, between two

15    accountants.  The head of accounting, Mr. Satriano, receives an

16    email from another accountant, Mr. Griffin, and he says -- and

17    he's reporting on a meeting with Mr. DeMarco about the net

18    worth sweep.  And he says:  There was a question about

19    rerecording certain deferred tax assets that had been written

20    off.  Jeff -- and that's Jeff Spohn, who is an FHFA person who

21    attended all the board meetings -- indicated both of the boards

22    had discussed this at the last meeting based on the view they

23    were going to be profitable going forward.  This was discussed

24    at the board meetings that occurred before the net worth sweep

25    was agreed and announced.

1          So, yes, they knew it was foreseeable.  And the reason

2     they were discussing a technical accounting issue at the level

3     of the board was because it could add $50 billion to the

4     Fannie Mae balance sheet and $25 billion to the Freddie Mac

5     balance sheet.  It was significant.

6          And I'm going to come back to this document in a minute.

7     But just for a moment, I'm going to turn the slide off because

8     I want to address something else.

9          Mr. Stern also said something that's flatly wrong.  And

10     if Mr. DeMarco said this, it's quite astonishing.  Because if I

11     understand what was argued is that even if Mr. DeMarco knew

12     that they were writing it up, right then, that quarter, it

13     wouldn't have made a difference.

14          Just make sure -- I really want to make sure you

15     understand what that means.  He's saying that even if they

16     added $50 billion to Fannie Mae's net worth and $25 billion to

17     Freddie Mac's net worth, he still would have done the net worth

18     sweep.  That's insane.  That is utterly insane, if that's what

19     they're arguing and that's what he tried to say, because that

20     net worth provides a cushion against future losses, against

21     future quarters in which you don't make enough money to pay the

22     dividend.  You don't have to touch that Treasury commitment

23     when you have that net worth buffer.

24          And Mr. DeMarco admitted that when I asked him.  But he

25     may have also said something about how it wouldn't have

1    mattered to him, which doesn't make any sense at all.

2          Now, let me go back to PX-259 because it says something

3    important after the discussion of the deferred tax assets.

4    After reporting on the fact that this was discussed,

5    Mr. Griffin, who had been at a meeting with Mr. DeMarco before

6    this email chain, said that he didn't think it made sense to

7    write up the value of the deferred tax assets at 50 or

8    70 billion because the amendments are designed to demonstrate

9    wind-down.

10         Now, that would make sense if you're trying to wind them

11   down; then, yeah, then you'd want to sweep the net worth out

12   because you don't want them to build net worth.  What I'm

13   saying would be insane is that if Mr. DeMarco's goal was, as he

14   said, to protect the commitment at all costs -- "at all

15   costs" -- and to make sure bond and MBS investors are

16   comfortable, you would never want to get rid of that DTA

17   write-up.

18         It would be a godsend.  You would be adding net worth.

19   You would be adding a buffer above the commitment.  What this

20   is saying from an accountant who was just at a meeting with

21   Ed DeMarco, that it doesn't make sense to write up the assets

22   because the amendments are designed to demonstrate wind-down.

23   The only way to understand that is a major motivating factor

24   behind the net worth sweep had become -- or was always to make

25   sure that Fannie and Freddie, if they made money, were not

1    going to retain capital and build capital and look like they

2    might come out of conservatorship, because people didn't want

3    that to happen.

4         Sure, they talked about the circular draw too.  You're

5    going to see that.  You have seen that.  But the circular

6    draw -- you wouldn't do the circular draw in the summer of 2012

7    with all this news.  You wouldn't use the net worth sweep to

8    address the circular draw.  It wouldn't make sense.  But it

9    would make sense if your goal was to demonstrate wind-down and

10   make sure they don't build capital.

11        Now, Mr. Stern showed you a Treasury memo, a memo of the

12   kind you don't see from FHFA, a formal approval memo for the

13   net worth sweep.  And he said, look, it talks about the

14   circular draw.  And fair enough.

15        I'm asking you to look at all the evidence.  You should

16   look at that.  And it is a curious thing that it says -- some

17   of the same things, but it doesn't say all of the same things

18   that other Treasury documents say.  So what I'd like to do is

19   make sure you see the full picture and show you what some of

20   the other Treasury documents say.

21        So let's go, first, if we could, to Slide 11.

22        Slide 11 -- I showed you this morning -- is the Treasury

23   press release the day the net worth sweep was announced.  And

24   it says we're doing this to expedite the wind-down.  And this

25   document does also say there's going to be a full income sweep,

1    and it lists the benefits.  One of them is we don't have to

2    worry about the weird circular draw problem.  But another one

3    of them -- they're very clear to say -- is this:  We're acting

4    on our commitment that these guys -- these guys, Fannie and

5    Freddie, the GSEs, will be wound down and will not be allowed

6    to retain profits, rebuild capital, and return to the market in

7    their prior form.

8         Mr. DeMarco saw this the day before.  He admitted

9    that on the stand.  He reviewed it.  He provided edits.  He

10   knew this was their motive.  This is the only motive that

11   makes sense of the time line I showed you.  This is the only

12   motive that makes sense of the next document I'm going to show

13   you.

14        Slide 8, please.

15        Timothy Bowler, Treasury point person, on the

16   negotiations of the third amendment, gets an email on July 31

17   that says, look at how much money Fannie and Freddie are

18   making, more money than the dividend amount.  Opposite of the

19   circular draw problem.  Better than what we thought.  And his

20   response is:  Really makes sense to push the net worth sweep

21   this quarter.

22        That's not the way you react if you're doing this for

23   the circular draw problem.  Ask yourself, why did the

24   defendants have such a hard time saying this is part of what

25   was going on.  This subtext drove the timing.  They're telling

1    you -- they're telling you that, well, Mr. DeMarco had said we

2    need this done by the second quarter and he's just waiting,

3    tapping his foot.  Why hasn't Treasury done it?

4         Well, if that were true and if it were -- and if this

5    decision about the net worth sweep were so important that he

6    had to do it to save the world economy, and it was so important

7    he had to do it that year, that summer, you would see memos or

8    emails -- at least an email or two internally at FHFA saying

9    why hasn't Treasury gotten back to us.  We said we wanted this

10   by the second quarter.  I'm worried about the bond markets.

11   I'm worried about the stress scenario.  What are we waiting on?

12        You'd see that.  Nothing like that.  Crickets.  Zippo.

13   Then this happened -- this happens.  And it's like presto.

14   Treasury is pushing for it.  He says they will -- FHFA was

15   pushing for it.

16        Remember, Mr. Ugoletti sends an email saying renewed

17   push.  I think that's the next email.  Right here.  The renewed

18   push comes from Treasury.  Treasury drove the timing.  Treasury

19   was pushing this.

20        And there's another document that you have to consider

21   in context with that formal memo of Treasury.

22        Slide 115, please.  PX-227.

23        Again, Mr. Bowler, who drove this -- Mr. DeMarco

24   admitted, he was the point person on these negotiations.  He's

25   talking about the net worth sweep.  Timing.  Announce the

1    change in mid-August after each GSE releases record second

2    quarter earnings.  Earnings will be in excess of current

3    10 percent dividend paid to Treasury.  Record earnings will be

4    driven by large credit loss reserve release.

5          Remember what I said about accounting write-downs

6    becomes write-ups?  That's what I'm talking about.  That's

7    the timing.  This admits what drove the timing.  It also says:

8    GSEs -- Fannie and Freddie -- will not be allowed to build

9    capital and exit conservatorship in their prior form.  This

10   drove it.  It drove the timing.  It drove the net worth

11   sweep.

12         Sure, they're going to say it also deals with the

13   circular draw problem, should that ever arise again.  This is

14   what drove it.  And this is something they're not willing to

15   own up to, they're not willing to address, and they're not

16   willing to explain the full truth of what happened here.

17         This is our government.  And this is what happened.  And

18   it hurt tens of thousands of private shareholders who put

19   billions of dollars into these enterprises when the regulators

20   asked those enterprises to raise money to help them.  And if

21   those private shareholders that we represent didn't put all

22   those billions of dollars in -- $20 billion in 2007, 2008 -- by

23   definition, the Treasury Department would have had to put more

24   in.

25         Because as Mr. DeMarco said and Professor Dharan said,

1    when the losses started, first you eat through the equity from

2    the shareholders, and then you get to negative net worth; then

3    you draw from the Treasury.  The money our clients put in

4    helped those enterprises, and it helped -- it helped lessen the

5    amount Treasury put in.  They still put in an enormous amount.

6    No one is denying that.  No one is denying they were the only

7    game in town in 2008.

8         But this is 2012.  This is when they changed the deal.

9    They made a really generous deal.  The basics of this case --

10   okay? -- is they came in in an emergency and they made a deal.

11   They gave Treasury almost everything; a 10 percent dividend on

12   the full amount invested, which is a huge return, higher than

13   they charged basically everyone else.  You heard that from

14   Dr. Thakor.

15        And the ability to buy 79.9 percent of the common stock

16   for a nominal value of about $72,000 for both companies.

17   Common stock that could be worth, if they came back, billions;

18   that was always worth hundreds of millions, even -- even in

19   conservatorship.  They got a good deal.  Then they start making

20   profits and they say we're taking everything.

21        Now, we're not saying necessarily -- this is not a case

22   about personal enrichment.  This is not a bribery case or an

23   embezzlement case.  But we are saying that Treasury was driven

24   principally by this:  a desire to not let them rebuild.  And

25   this contradicts shareholders reasonable expectations.

1        FHFA never said -- Mr. DeMarco admitted -- they never

2    said, we're abandoning all our goals, we're no longer trying to

3    rebuild capital.  And he never changed the contract in that

4    way.  December 2009, you're not going to see anything in --

5    that says this; that this is what FHFA is trying to do.

6        Sure, things were tough, but they didn't say this.  And

7    our contract was formed then.  And the instructions from the

8    judge tell you the five specific things to look at for our

9    contracts.  I went through every one of them quite

10   meticulously.  Defendants, I thought, were not quite so

11   careful.  That's what you look at for our expectations that are

12   violated by this.

13       Now, Mr. Stern also talked a little bit about

14   alternatives that he didn't think were reasonable.  And I want

15   to make two points about this real quickly.  He talked about

16   what Mr. DeMarco told you about what we call the

17   payment-in-kind or safety-valve provision.  And he said he

18   viewed it as a penalty.  Wasn't going to do that.  Penalty,

19   12 percent.  I don't know.

20       But let's be very clear.  Can we have Slide 194.

21       I want to be very clear about what Mr. DeMarco was and

22   was not able to say about this.  Is this one ninety -- this

23   one.  I had to ask him from his deposition.  The next question

24   is:  And no one brought that to your attention?  This is about

25   the payment-in-kind provision.

1      ANSWER:  No one had discussed this at any point during

2   these years in conservatorship that going to that 12 percent

3   was an alternative that could be used instead of paying.

4      QUESTION:  It never came up?

5      ANSWER:  No.

6      And he confirmed that was the truth.  He didn't know

7   about it.  Let's just be honest.  He didn't know about it.  He

8   didn't ask.  He wasn't told.  And then he comes on and takes

9   the stand and explains all these reasons why it wasn't a good

10   idea.  It was a penalty.  God forbid they'd have a 2 percent

11   penalty.  Go from 10 to 12.  But the way, it's not called a

12   penalty in the contract.  But God forbid they do that.

13      Let's instead -- I've got a better idea -- give away

14   100 percent of our future net worth forever.  And let's not

15   analyze.  Maybe you should analyze that might be a lot of

16   money.  Nah.  We're cool.  A hundred percent of the net worth

17   forever.  We're not going to worry about the fact that DTAs

18   might be written up, loan loss reserves might be written up.

19   We might make $136 billion.  No, no probs.  Let's just give it

20   all away.

21      It doesn't make any sense unless your goal -- or the

22   other side's goal, to which you're sympathetic, is we don't

23   want these guys rebuilding capital.  Then it's going to look

24   like they're going to come out of conservatorship, and we don't

25   want that.  We want to do -- we want to get Congress to act and

1   get them replaced.  It wasn't his call to make.  It wasn't what

2   his job was as conservator, let alone that he was the acting

3   director.

4        There's a whole lot of other little points that I

5   suspect you would prefer I not test your patience with.  You

6   know, every time you hear the defendants talk about the

7   dividends being eliminated, they just say eliminate, like it's

8   all eternity.  It's eliminated during conservatorship.

9   Treasury could veto it.  FHFA -- both Treasury and FHFA would

10  have to agree.  No one is quarreling with that, but it was

11  meant to be temporary.  And we're -- also agree that no one

12  could predict when exactly conservatorship would end.  We agree

13  with that.

14       Our case doesn't depend on knowing exactly when

15  conservatorship would end.  It doesn't depend on us proving

16  that would have received a dividend but for the net worth

17  sweep.  That is not our case.

18       Our case is that we had contractual rights.  The Hill

19  slide I showed you earlier.  We had a place in line.  If

20  they made profits, we would benefit.  We benefit because it

21  would look more likely that they would come out of

22  conservatorship.  It would be more likely they might be able to

23  raise capital on the private markets, which was part of the

24  plan.

25       Exit conservatorship, Treasury would make a lot of

1      money.  Our shareholders would make some money.  Not -- not

2      everything.  But they would share a small part.  All those

3      things become more likely if Fannie and Freddie are making

4      profits and allowed to keep them.

5              That's why the stock price goes up after the August 7th

6      and 8th profits are released, because our -- the rights those

7      shares have became more valuable.  And when Treasury and FHFA

8      said your rights are worth nothing because 100 percent is going

9      to Treasury forever, no matter how much they make, those

10     contractual rights are nullified.  Are nullified.  That's why

11     the stock drops over 50 percent.

12             Now, you heard counsel for defendants address PX-205;

13     that memo that was written to Treasury about the meeting

14     between Mr. DeMarco and Secretary Geithner.  He called it a

15     game of telephone, disparaged it, said there are no quotes.

16     No -- it's not a transcription.  No one called it a

17     transcription.  It's a summary of what was said at the meeting

18     based on Secretary Geithner's report to his senior official

19     colleague.

20             So you have to ask yourself, what do you think is more

21     reliable.  You don't have to peer into Mr. DeMarco's soul, if

22     you don't want to.  You'll just have to ask yourself, what's

23     more reliable.  He didn't recall when he was asked three times.

24     He doesn't recall -- and the Treasury Department has written

25     this down -- what incentive -- there's been no evidence or

1    argument made as to what incentive Mr. Geithner would have to

2    lie to Mr. Stegman or Mr. Stegman would have to lie in what he

3    wrote.

4         For you to conclude that what's in the written document

5    from the time from June 25th, 2012, is wrong, you have to

6    conclude that one of them is lying.  So you should rely on that

7    and just take Mr. DeMarco at his word that he doesn't recall.

8    Although I think what he said on the stand would allow you to

9    reach a harsher judgment if you were -- if you saw it that way.

10   And you can use your common sense and experience based on how

11   he -- how you perceived him and his testimony.

12        You also saw that there were notes from all these

13   meetings that FHFA had with Treasury.  I don't know if

14   Ms. McGuire is able to pull that up; some examples of notes

15   upon notes upon notes of meetings.

16        And can we see the handwritten notes?  Is that possible?

17        I think these were both attached with handwritten notes

18   from Mr. DeMarco.  What are the notes from the June 25th

19   meeting?  He admitted there was a meeting, but no notes.

20        Now, if you could, Ms. McGuire -- sorry to do this on

21   the fly.  I'd like to show something on DX404 in particular.

22        This was in evidence.  This was shown to Mr. DeMarco

23   because -- it talks about the net worth sweep on the number

24   two.  It says net worth sweep there in the, sort of, second --

25   under PSPA there.  There you go.  It says net worth sweep.  Do

1     you see that?

2          What they didn't draw attention to in this same meeting

3     is that three bullets down from the -- it says:  Options for

4     how to wind down Fannie and Freddie.  I showed that to

5     Mr. DeMarco.  He confirmed that's what that says.  And yet they

6     say it has nothing to do with it.

7          They make it sound like the only way -- what we're

8     trying to say, it's a sinister conspiracy.  No.  What we're

9     saying is Treasury had a policy that they wanted to push.

10    Congress would have to act for it to actually be implemented.

11    Mr. DeMarco was sympathetic to that as a policy or ideological

12    matter.  He thought they were fundamentally flawed.  He

13    submitted proposals after leaving, saying they should be

14    replaced.

15         He's entitled to that opinion, but he's not entitled to

16    act on it when his job is to act as the conservator.  His job

17    was to act as the conservator and to preserve and conserve

18    assets and to make them sound and solvent.  That means to

19    maintain net worth and to build net worth because that was

20    their mission.

21         And that mission did not conflict in any way with the

22    public interest.  That mission was the public interest.  It was

23    also good for shareholders.  It didn't guarantee that they were

24    going to make a lot of money.  It didn't guarantee anything.

25    But it was good for shareholders if they could build net worth.

1     That's why price goes up when they make money.  That's why they

2     got -- it went way down when the net worth sweep was

3     implemented.

4          So you have to ask yourself, members of the jury, who

5     you believe in this case, to some degree.  And we leave that in

6     your capable hands.  As I said, you use all your common sense

7     and experience, and we want you to look at the full story.

8          You saw Mr. DeMarco change his testimony several times

9     on what he said in his deposition.  You saw Mr. Satriano say

10    that that document that said demonstrate wind-down had

11    something to do with the retained portfolio that was just

12    slightly changing the reduction rate.  Doesn't make any sense.

13    You saw Dr. Attari come in here and try to tell you this was

14    some amazing thing, and he looked at less than 2 percent of the

15    bonds.

16         And you've heard the defendants, who are excellent

17    lawyers, make their arguments, but their arguments don't take

18    into account all of the facts.  I'm trying to show all of the

19    facts.

20         And I do want to just address one more thing, because

21    the circular draw -- there's a false -- another false binary.

22    Mr. Stern said that there's been a suggestion that the SEC

23    disclosure said nothing about circular draw.  That is false.

24    No one has ever said that.  No one could possibly say that

25    because their whole case is to show you that time and again.

1        What we said is there's no disclosure in the SEC

2    statements about a risk of material erosion of the commitment.

3    There's no disclosure that, hey, because of circular draws,

4    when the caps come into effect in six months, at the end of

5    2012, we might face a risk of material erosion.

6        The whole point of the statement is to -- those

7    forward-looking statements is to disclose risks.  They didn't

8    disclose that risk.  If they thought it was a material risk,

9    they would have disclosed it.

10       A circular draw -- if you show, quickly, Slide 151 --

11   does not mean you're going to put the material -- the

12   commitment materially at -- at risk.  It's entirely consistent

13   with the projections that showed no material erosion.  I showed

14   this to Mr. DeMarco, these Benson projections, that show almost

15   no erosion over ten years.  And he agreed that is consistent

16   with and an illustration of what they were disclosing in the

17   SEC statement.  Again, another false binary choice.

18       Mr. Stern acknowledged there are lots of analyst reports

19   that say good things.  So he'll save me the trouble of having

20   to show you those.  I would just make a few points about

21   analysts reports; that they don't know the inside information

22   that's going on in the company.  And when you are asked to look

23   at -- if any of you look at them back in evidence, look at the

24   date because most of them are before the good news.  And like

25   the SEC disclosures, but from a different perspective, they're

1    trying to identify risks.  They're trying to identify risks of

2    what might happen.

3         And so I wanted to give a short list of -- of the most

4    important documents, because you are able to access exhibits.

5    You'll be given the exhibits that were in evidence.  Just in

6    case for those -- and you have, obviously, been very diligent;

7    many of you taking notes.  But if those of you wish, I think

8    some of the important exhibits for you to understand and look

9    at this in case are PX-550-M, as in Mary.  That shows the total

10   amounts of dividends and liquidation preference increases to

11   Treasury.  Shows you the 395 billion at the bottom of the --

12   bottom right of the chart.

13        PX-1-A and 1-C.  Those show the shareholder investments

14   from the preferred shareholders.

15        PX-2-E shows you Mr. DeMarco's speech after the

16   conservatorship began.

17        Obviously, PX-205 we've talked about, the Treasury

18   memorandum.

19        PX-210, at page 11, are the talking points for the

20   Secretary of the Treasury to go talk to Congress, what his

21   answer to the question about do you need to amend the

22   agreements in light of the caps, is very similar to what the

23   plaintiffs are saying in this case.

24        PX-226-A -- don't worry I'm only going to do about

25   five or six more.

1          PX-227, PX-242, PX-246.

2          PX-247, which is the renewed push document showing the

3    Treasury push for this.

4          And PX-259, which I just showed you, where they say they

5    know about the effort to write up the DTAs on the horizon but

6    it doesn't make sense because we're -- the whole point of these

7    amendments is to demonstrate wind-down.  And remember to read

8    that email from the bottom up.  Mr. Griffin had just had a

9    meeting with Mr. DeMarco when he wrote that.

10         PX-196 talks about the roaring recovery from a lot of

11   complicated accounting stuff, but it's the write-downs becoming

12   write-ups, is what it boils down to.

13         And, finally, PX-500 is the principal reduction letter

14   to Congress.  Because it shows you what a real process would

15   have looked like.  And they could have done that for principal

16   reduction -- they did do that and much more.  They should have

17   done something like that for this momentous decision.

18         Now, we're going to leave this case with you.  It's --

19   it's a process.  This -- and it takes a lot out of us.  It

20   demands an enormous amount out of you, and you sit there

21   patiently listening.  You finally get to go back -- maybe

22   tomorrow -- and talk about this.

23         This is a big case.  It's an important case.  And it's

24   not an easy thing to do justice.  This isn't justice in the way

25   some of us think about it, like a murder case, a civil rights

1   case.  But this is a case that raises fundamental issues.  Like

2   my partner Ms. Davis told you, it's important.  But it's not

3   just important because of the money at stake.  It's

4   important -- we represent tens of thousands of shareholders who

5   are counting on us.

6        And it's important because of the principles at stake,

7   the basic principles, that when you have a contract, you can't

8   do anything that destroys the other side's ability to get the

9   benefit of that contract.  It's an unwritten part of every

10  contract in this country:  implied covenant, good faith, fair

11  dealing.  Ms. Davis talked to you about that and why you should

12  care, why it matters, and why it's fundamental.

13       It's also the other principle, to some degree, about

14  holding the government accountable when it does something

15  wrong.  And that's not an easy thing to do either.  We all

16  respect our government.  The government did some very good

17  things that everyone should be grateful for, including stepping

18  in to provide funding for Fannie Mae and Freddie Mac in

19  September of 2008.  We recognize that.

20       But it doesn't excuse what happened in August 2012,

21  which was simply unfair, unreasonable, arbitrary, and

22  completely destroyed the rights of private shareholders who had

23  lost a lot, taken a risk.  They hadn't lost everything.  They

24  were down, but they were not out.

25       So I hope you will feel emboldened to do justice.  I

1       hope you will feel ennobled by what you're doing.

2               Thank you.

3               THE COURT:  All right.  Thank you, Mr. Hume.

4           In light of the hour, I'm not going to try to read the

5       instructions tonight.  They're too long.  We'll start back

6       tomorrow at 10 o'clock.

7           You can't discuss the case until after I've read you my

8       instructions.  I will have written instructions to be with you

9       in your deliberations as well.  We'll order lunch for you here

10      so you won't -- you'll stay together, except when you're

11      excused.  Your deliberations will be up to you, and we'll --

12      I'll give you instructions about how to deliberate and when

13      we'll take recesses and things like that.

14          Don't talk about the case, except after I give you

15      the instructions tomorrow.  Don't Twitter or tweet or X or

16      whatever it is these days.  And I'll see y'all tomorrow at

17      10 o'clock.

18          There is going to be a hearing in the Trump case

19      tomorrow at 10 o'clock.  Trump is not appearing so I don't

20      expect any real commotion.  But be sure to bring your badges

21      with you so we can expedite your entry into the courthouse

22      tomorrow.

23          Have a nice evening.  Thanks for your patience today.

24              (Proceedings held out of the presence of the jury.)

25              THE COURT:  Y'all can be seated.

1          Mr. Hume, you had something else you wanted to put on

2     the record about an objection.

3               MR. HUME:  It's not necessary, Your Honor.

4               THE COURT:  All right.  Anything else y'all want to

5     raise?

6          I have -- my clerk received your changes to the final

7     jury instructions.  They look okay to me.  So I'll just read

8     that tomorrow morning at 10 o'clock then.

9          If y'all have difficulties getting in the building --

10     hopefully you wouldn't, but -- hopefully.  I think the jurors

11     are all recognized by the marshals.  Maybe most of y'all are by

12     now too.  So I think we'll be able to start on time.  And all I

13     propose to do is just read the standard instructions.

14               Anything else y'all want to raise?

15               Okay.  See y'all tomorrow.

16               (Proceedings were concluded at 4:43 p.m.)

17

18

19

20

21

22

23

24

25

1        CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER

2

3            I, Nancy J. Meyer, Registered Diplomate Reporter,

4    Certified Realtime Reporter, do hereby certify that the above

5    and foregoing constitutes a true and accurate transcript of my

6    stenograph notes and is a full, true, and complete transcript

7    of the proceedings to the best of my ability.

8

9                        Dated this 10th day of August, 2023.

10

11                   /s/ Nancy J. Meyer
                     Nancy J. Meyer
12                   Official Court Reporter
                     Registered Diplomate Reporter
13                   Certified Realtime Reporter
                     333 Constitution Avenue Northwest
14                   Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25

## $

**$100** [2] - 29:9, 38:14
**$136** [1] - 103:19
**$20** [2] - 34:17, 100:22
**$200** [2] - 32:3, 54:2
**$25** [2] - 95:4, 95:16
**$274** [2] - 39:2, 39:6
**$311** [2] - 5:20, 54:7
**$32** [1] - 56:22
**$39** [1] - 56:24
**$50** [3] - 34:16, 95:3, 95:16
**$70** [1] - 74:10
**$72,000** [1] - 101:16

## '

**'08** [4] - 33:19, 34:17, 38:20, 38:23
**'09** [3] - 33:20, 38:2, 39:10
**'10** [2] - 28:14, 39:10
**'11** [3] - 28:15, 39:10, 91:14
**'15** [1] - 56:21

## 1

**1** [4] - 19:5, 46:5, 85:14, 85:22
**1-C** [1] - 110:13
**10** [21] - 6:10, 30:24, 31:8, 34:19, 34:23, 42:7, 42:12, 59:21, 65:22, 66:9, 66:19, 78:7, 78:16, 87:7, 100:3, 101:11, 103:11, 113:6, 113:17, 113:19, 114:8
**10-K** [2] - 49:12, 52:3
**10-Ks** [1] - 49:9
**10-Q** [1] - 25:3
**100** [2] - 103:14, 105:8
**10th** [1] - 25:13
**11** [3] - 97:21, 97:22, 110:19
**11.7** [1] - 49:15
**110** [1] - 89:9
**111** [1] - 93:3
**115** [1] - 99:22
**116** [1] - 94:12
**117** [3] - 56:19, 56:24, 57:1
**12** [6] - 77:25, 78:1, 78:10, 102:19, 103:2, 103:11
**128** [2] - 92:25, 93:1
**12th** [1] - 35:19

**14** [4] - 5:2, 25:4, 38:13, 72:16
**14th** [1] - 25:13
**151** [1] - 109:10
**154** [1] - 90:16
**156** [1] - 91:12
**15th** [1] - 63:6
**17th** [13] - 7:23, 8:13, 12:11, 13:8, 19:6, 27:1, 27:7, 27:10, 27:15, 27:18, 27:22, 28:11, 28:19
**187.4** [3] - 38:24, 39:11, 54:2
**193** [1] - 93:10
**1938** [2] - 14:10, 49:18
**194** [2] - 56:9, 102:20
**1970** [1] - 14:11
**19th** [7] - 44:25, 45:8, 45:11, 45:22, 45:25, 47:2, 47:3
**1st** [14] - 25:9, 36:5, 36:17, 36:20, 36:25, 37:1, 37:15, 39:3, 39:7, 40:23, 41:5, 41:7, 56:16, 56:18

## 2

**2** [4] - 20:3, 78:4, 103:10, 108:14
**20** [2] - 34:14, 36:7
**200** [1] - 33:24
**200-billion** [1] - 32:9
**2006** [1] - 53:10
**2007** [9] - 5:25, 7:8, 8:25, 15:15, 16:9, 17:1, 28:14, 91:23, 100:22
**2008** [33] - 5:3, 5:25, 7:10, 8:25, 16:21, 16:22, 17:23, 18:12, 19:20, 20:7, 21:20, 25:3, 25:9, 25:10, 25:14, 26:16, 26:17, 26:25, 28:21, 30:15, 32:7, 32:12, 33:22, 34:8, 34:12, 35:9, 54:18, 54:20, 54:21, 91:23, 100:22, 101:7, 112:19
**2009** [31] - 8:21, 9:4, 9:7, 9:15, 9:17, 10:2, 12:7, 12:17, 12:22, 13:5, 28:14, 32:13, 33:23, 34:4, 34:16, 34:18, 35:11, 35:19, 36:3, 36:7, 36:16, 37:25, 79:4, 81:17, 82:9, 84:13, 84:16,

91:14, 102:4
**2010** [3] - 37:16, 37:18, 91:14
**2011** [9] - 34:12, 37:18, 38:12, 39:13, 49:10, 49:11, 52:4, 55:4
**2012** [69] - 4:24, 4:25, 5:3, 6:17, 7:23, 8:13, 12:6, 12:12, 13:8, 13:12, 14:1, 19:6, 27:1, 27:7, 27:15, 27:17, 27:18, 27:22, 27:24, 28:10, 28:11, 28:19, 33:11, 34:9, 36:6, 37:8, 37:25, 38:5, 38:21, 38:24, 41:1, 41:13, 41:16, 42:2, 42:8, 45:8, 46:1, 46:4, 46:6, 46:14, 46:21, 48:19, 49:8, 49:25, 52:17, 53:24, 54:19, 54:22, 55:6, 56:6, 57:4, 60:23, 63:6, 69:18, 71:1, 72:2, 72:5, 72:6, 72:7, 73:6, 83:6, 84:20, 87:23, 97:6, 101:8, 106:5, 109:5, 112:20
**2013** [19] - 27:16, 27:23, 28:9, 36:17, 36:20, 36:25, 37:8, 37:15, 39:3, 39:7, 40:23, 41:5, 41:7, 54:15, 56:16, 66:12, 74:11, 87:5, 89:9
**2014** [2] - 54:7, 56:9
**2015** [2] - 56:19, 56:21
**2016** [1] - 56:20
**2017** [1] - 56:18
**2019** [1] - 49:5
**2022** [4] - 27:17, 27:24, 28:10, 37:8
**21** [1] - 34:6
**22nd** [1] - 56:6
**24** [1] - 12:7
**24th** [5] - 9:3, 9:7, 9:15, 9:17, 10:2, 12:17, 12:22, 13:5, 36:3, 36:7, 38:2, 79:3, 81:17, 82:9, 84:13
**25** [1] - 38:22
**25th** [2] - 106:5, 106:18
**26** [2] - 39:14, 90:3
**27** [1] - 40:12
**274** [2] - 39:1, 46:9
**27th** [1] - 26:25

**28** [1] - 42:3
**29th** [2] - 49:13, 49:25

## 3

**3** [2] - 56:24, 57:1
**30** [8] - 28:12, 28:13, 39:8, 40:7, 54:9, 57:4, 67:14, 75:6
**30-year** [3] - 5:18, 37:3, 39:4
**300** [1] - 54:7
**30th** [8] - 16:21, 48:19, 48:21, 49:1, 49:2, 49:3, 72:8, 82:17
**31** [1] - 98:16
**31st** [7] - 6:17, 25:10, 46:4, 46:5, 46:21, 56:20, 56:21
**32** [2] - 56:20, 57:1
**33** [1] - 44:6
**35** [2] - 45:1, 45:21
**37** [2] - 49:21, 49:22
**38** [2] - 49:21, 49:22
**381** [1] - 45:4
**39** [2] - 51:12, 57:1
**395** [1] - 110:11

## 4

**4** [2] - 3:4, 15:8
**40** [1] - 56:23
**400** [4] - 33:24, 34:1, 35:13, 35:15
**42** [1] - 52:1
**43** [1] - 52:12
**44** [1] - 52:22
**45** [1] - 54:17
**47** [1] - 55:5
**48** [1] - 55:5
**49** [2] - 55:10, 82:2
**4:43** [1] - 114:16
**4th** [1] - 42:8

## 5

**5** [3] - 15:17, 15:22, 56:21
**50** [2] - 96:7, 105:11
**51** [1] - 55:17
**53** [1] - 56:7
**54** [1] - 56:12
**55** [1] - 57:10

## 6

**6** [4] - 16:24, 17:23, 33:19, 34:16
**63** [1] - 68:24
**66** [1] - 69:21
**67** [1] - 70:17

**6th** [1] - 33:19

## 7

**7** [4] - 18:10, 18:12, 20:7, 73:6
**70** [1] - 96:8
**71** [1] - 56:9
**73** [2] - 72:11, 73:2
**75** [1] - 73:19
**76** [1] - 74:20
**79.9** [1] - 101:15
**7th** [7] - 19:20, 21:14, 21:20, 26:16, 32:7, 105:5

## 8

**8** [2] - 20:1, 98:14
**83** [1] - 76:24
**84** [1] - 77:10
**86** [1] - 3:4
**8th** [2] - 72:6, 105:6

## 9

**9** [2] - 20:1, 20:2
**94** [1] - 79:7
**95** [1] - 80:2
**9th** [1] - 51:4

## A

**abandoning** [1] - 102:2
**ability** [5] - 66:3, 67:20, 91:11, 101:15, 112:8
**able** [9] - 50:6, 57:16, 72:22, 89:13, 102:22, 104:22, 106:14, 110:4, 114:12
**absent** [1] - 67:7
**absolutely** [11] - 6:25, 7:3, 7:5, 7:24, 8:1, 15:20, 19:2, 29:20, 31:19, 32:5, 76:5
**abstract** [1] - 39:25
**academic** [1] - 25:23
**access** [4] - 17:14, 36:8, 44:9, 110:4
**accomplish** [1] - 19:13
**accomplished** [6] - 18:25, 19:1, 23:14, 23:17, 76:4, 85:2
**according** [1] - 61:19
**account** [2] - 86:22, 108:18
**accountable** [1] -

112:14
**accountant** [3] -
  74:15, 94:16, 96:20
**accountants** [1] -
  94:15
**accounting** [6] -
  56:15, 56:17, 94:15,
  95:2, 100:5, 111:11
**accurate** [4] - 51:17,
  51:23, 55:20, 73:5
**achieve** [1] - 42:5
**acknowledge** [1] -
  53:11
**acknowledged** [2] -
  32:15, 109:18
**act** [19] - 7:20, 10:4,
  17:2, 17:5, 17:6,
  17:12, 37:11, 74:2,
  75:22, 82:20, 82:24,
  83:18, 90:5, 103:25,
  107:10, 107:16,
  107:17
**Act** [1] - 16:21
**acted** [8] - 8:15, 10:9,
  11:21, 42:16, 79:1,
  84:21, 85:12, 85:13
**acting** [7] - 7:21,
  35:11, 68:21, 78:15,
  89:18, 98:3, 104:2
**Action** [1] - 63:5
**action** [24] - 7:11,
  7:12, 7:16, 7:24, 8:1,
  8:13, 8:16, 9:18,
  10:10, 13:22, 18:16,
  33:13, 63:9, 64:15,
  65:1, 65:2, 65:7,
  69:16, 74:4, 76:19,
  78:22, 83:4, 83:5,
  83:7
**actions** [2] - 8:9,
  19:16
**acts** [1] - 80:23
**actual** [3] - 25:11,
  57:19, 58:22
**add** [2] - 47:16, 95:3
**added** [1] - 95:16
**adding** [2] - 96:18,
  96:19
**addition** [1] - 78:9
**additional** [3] - 51:4,
  55:7, 77:18
**address** [8] - 42:14,
  64:5, 89:15, 95:8,
  97:8, 100:15,
  105:12, 108:20
**addressed** [3] - 64:3,
  69:24, 77:4
**administration** [1] -
  42:5
**admit** [1] - 89:8

**admits** [1] - 100:7
**admitted** [7] - 89:8,
  91:25, 95:24, 98:8,
  99:24, 102:1, 106:19
**adverse** [2] - 46:23,
  87:11
**adversely** [1] - 91:11
**advised** [1] - 68:12
**affairs** [1] - 25:2
**affect** [1] - 91:11
**affirmed** [1] - 73:5
**affordable** [2] - 15:1,
  17:14
**afloat** [1] - 24:13
**afternoon** [3] - 4:8,
  4:10, 86:18
**ago** [1] - 32:7
**agree** [14] - 4:9, 4:11,
  7:19, 30:11, 30:12,
  35:4, 37:13, 65:15,
  65:16, 81:2, 81:23,
  104:10, 104:11,
  104:12
**agreed** [11] - 10:9,
  13:23, 15:15, 57:7,
  75:17, 81:18, 82:12,
  82:13, 82:24, 94:25,
  109:15
**agreed-upon** [1] -
  15:15
**agreement** [15] - 12:4,
  12:10, 12:15, 12:19,
  15:12, 20:8, 27:5,
  31:18, 32:2, 46:2,
  81:6, 82:22, 82:24,
  84:2, 87:24
**agreements** [3] - 29:4,
  29:7, 110:22
**agrees** [1] - 81:7
**aha** [1] - 60:10
**ahead** [5] - 17:20,
  23:19, 34:1, 37:6,
  72:5
**airtime** [2] - 21:14,
  42:21
**alive** [1] - 8:12
**allow** [1] - 106:8
**allowed** [6] - 8:14,
  23:23, 92:13, 98:5,
  100:8, 105:4
**allowing** [1] - 78:19
**alluded** [1] - 12:25
**almost** [10] - 15:17,
  26:8, 34:17, 43:21,
  54:1, 55:23, 76:21,
  86:18, 101:11,
  109:14
**alone** [1] - 104:2
**alternative** [2] - 77:24,
  103:3

**alternatives** [5] -
  77:22, 79:15, 88:10,
  88:11, 102:14
**amazing** [1] - 108:14
**amend** [3] - 87:24,
  88:1, 110:21
**amended** [1] - 33:20
**amending** [2] - 42:23,
  59:3
**amendment** [37] -
  10:10, 11:22, 12:4,
  12:11, 13:7, 13:23,
  23:18, 24:15, 24:18,
  27:8, 33:23, 36:6,
  36:14, 38:3, 42:24,
  43:9, 47:16, 48:17,
  59:8, 59:9, 59:10,
  59:12, 63:10, 63:13,
  65:2, 65:15, 65:16,
  66:15, 68:21, 69:19,
  73:6, 74:12, 74:19,
  75:17, 76:25, 77:5,
  98:16
**Amendments** [3] -
  65:21, 65:22, 66:7
**amendments** [3] -
  96:8, 96:22, 111:7
**America** [2] - 52:13,
  52:14
**American** [2] - 7:12,
  75:12
**Americans** [1] - 16:17
**amount** [17] - 5:23,
  30:24, 35:24, 52:7,
  66:11, 67:9, 70:1,
  77:7, 77:9, 87:8,
  88:1, 98:18, 101:5,
  101:12, 111:20
**amounts** [2] - 70:1,
  110:10
**analyses** [1] - 43:6
**analyst** [6] - 52:14,
  52:23, 53:8, 53:13,
  54:13, 109:18
**analysts** [1] - 109:21
**analyze** [2] - 103:15
**analyzing** [2] - 87:4,
  88:11
**announce** [1] - 99:25
**announced** [4] -
  72:15, 76:22, 94:25,
  97:23
**announcement** [1] -
  65:17
**announcements** [1] -
  19:25
**announcing** [2] -
  18:12, 65:2
**annual** [10] - 49:11,
  49:15, 49:16, 49:24,

50:3, 50:13, 51:15,
  54:6, 59:22, 72:15
**annualize** [2] - 56:25
**annually** [1] - 54:5
**ANSWER** [2] - 103:1,
  103:5
**answer** [3] - 4:18,
  76:20, 110:21
**answered** [1] - 59:4
**answers** [1] - 60:7
**anticipate** [1] - 28:3
**anticipating** [1] -
  50:22, 50:24
**anyway** [2] - 34:13,
  88:22
**apologize** [1] - 66:5
**appearing** [1] - 113:19
**appease** [1] - 87:15
**appointing** [1] - 22:8
**approval** [2] - 63:10,
  97:12
**approve** [1] - 63:12
**approved** [2] - 65:1,
  65:10
**approves** [1] - 63:14
**approving** [1] - 65:8
**arbitrarily** [3] - 11:20,
  11:21, 90:9
**arbitrary** [2] - 92:17,
  112:21
**argued** [2] - 62:11,
  95:11
**arguing** [1] - 95:19
**argument** [4] - 22:11,
  61:10, 89:17, 106:1
**Arguments** [1] - 3:3
**arguments** [4] - 86:10,
  89:16, 108:17
**arise** [1] - 100:13
**arrangement** [1] -
  66:17
**asset** [2] - 74:25, 94:8
**assets** [19] - 5:4, 22:9,
  22:12, 22:17, 22:25,
  23:7, 23:12, 23:15,
  24:4, 24:19, 31:11,
  62:9, 72:18, 74:9,
  94:19, 96:3, 96:7,
  96:21, 107:18
**associated** [2] - 42:7,
  42:11
**assume** [3] - 32:21,
  32:24, 71:17
**assumed** [1] - 32:17
**assured** [2] - 8:10,
  31:15
**astonishing** [1] -
  95:10
**attached** [2] - 63:12,
  106:17

**Attari** [1] - 108:13
**attended** [2] - 44:7,
  94:21
**attention** [4] - 4:14,
  86:19, 102:24, 107:2
**attentive** [1] - 4:19
**August** [30] - 4:24,
  7:23, 8:13, 12:5,
  12:11, 13:8, 13:12,
  14:1, 19:6, 27:1,
  27:7, 27:10, 27:15,
  27:18, 27:22, 28:11,
  28:19, 35:11, 44:3,
  47:2, 48:24, 63:6,
  72:5, 72:6, 73:6,
  83:6, 100:1, 105:5,
  112:20
**authority** [7] - 7:20,
  17:2, 17:5, 17:16,
  18:1, 20:23, 21:1,
  25:1, 29:8, 30:17,
  90:7, 90:8
**authorized** [6] - 9:18,
  17:12, 17:19, 82:20,
  83:5, 90:5
**availability** [2] - 31:14,
  52:19
**available** [11] - 15:1,
  15:13, 31:6, 36:20,
  36:25, 37:1, 39:3,
  56:16, 66:12, 75:14,
  77:9
**average** [1] - 57:1
**avoid** [1] - 66:10
**aware** [1] - 92:9
**awesome** [2] - 6:6, 6:7

**B**

**back-and-forth** [9] -
  18:23, 36:1, 36:2,
  48:8, 50:23, 57:23,
  62:10, 63:6, 88:3
**backed** [12] - 8:3,
  14:23, 28:10, 28:11,
  29:15, 30:8, 33:16,
  35:17, 67:11, 68:2,
  87:13
**backing** [1] - 6:13
**backstop** [5] - 30:14,
  36:12, 39:6, 46:20,
  53:2
**bad** [6] - 16:8, 16:22,
  33:17, 50:11, 52:16,
  53:5
**badges** [1] - 113:20
**balance** [2] - 95:4,
  95:5
**ball** [2] - 73:15, 79:16
**bank** [1] - 26:4

**Bank** [3] - 52:13, 52:14, 52:23
**bankrupt** [1] - 7:15
**bars** [1] - 34:10
**base** [3] - 24:6, 39:16, 56:14
**base-case** [1] - 39:16
**based** [19] - 12:11, 12:17, 12:21, 13:7, 14:1, 27:12, 30:24, 46:3, 46:6, 52:18, 54:13, 55:25, 67:25, 79:3, 84:23, 85:25, 94:22, 105:18, 106:10
**bases** [1] - 73:23
**basic** [1] - 112:7
**basics** [1] - 111:8
**basis** [2] - 43:18, 43:21
**bear** [2] - 86:1, 86:3
**bearing** [1] - 83:7
**became** [14] - 17:22, 18:3, 20:6, 20:25, 31:1, 35:11, 35:13, 35:15, 47:16, 48:17, 81:13, 82:16, 82:19, 105:7
**become** [4] - 9:11, 89:2, 96:24, 105:3
**becomes** [4] - 37:5, 53:7, 53:8, 100:6
**becoming** [1] - 111:11
**began** [5] - 7:8, 16:9, 19:6, 42:24, 110:16
**begin** [2] - 4:23, 42:13
**beginning** [13] - 4:15, 17:9, 28:20, 30:21, 35:9, 41:19, 42:20, 42:22, 54:15, 63:11, 66:12, 83:12, 83:21
**begins** [2] - 40:25, 67:18
**begun** [2] - 46:10, 46:16
**behind** [8] - 8:3, 33:24, 35:17, 35:24, 70:3, 70:9, 85:10, 96:24
**benefit** [7] - 26:7, 26:10, 67:25, 74:25, 104:20, 112:9
**benefits** [1] - 98:1
**Benson** [1] - 109:14
**best** [9] - 17:12, 17:20, 39:19, 59:24, 60:2, 82:20, 82:24, 82:25, 90:5
**better** [7] - 33:9, 56:14, 87:12, 87:14,

**89**:13, 98:19, 103:13
**between** [18] - 15:12, 19:5, 25:11, 27:24, 28:9, 36:6, 37:25, 41:2, 42:22, 48:8, 54:18, 54:21, 69:3, 70:8, 80:16, 88:3, 94:14, 105:14
**beyond** [2] - 31:7, 52:17
**big** [4] - 40:21, 43:5, 47:9, 111:23
**bigger** [2] - 26:9, 34:24
**biggest** [1] - 89:16
**billion** [37] - 5:20, 20:3, 29:9, 30:18, 32:3, 33:24, 34:1, 34:14, 34:16, 34:17, 35:13, 35:15, 38:14, 38:24, 39:2, 39:6, 39:11, 46:9, 49:15, 54:2, 54:7, 56:19, 56:22, 56:24, 74:10, 89:9, 93:3, 95:3, 95:4, 95:16, 96:8, 100:22, 103:19, 110:11
**billions** [15] - 5:5, 7:14, 9:9, 29:12, 34:3, 34:13, 36:4, 36:19, 75:13, 83:24, 88:6, 100:19, 100:22, 101:17
**binary** [5] - 89:19, 91:18, 93:15, 108:21, 109:17
**birds** [1] - 45:25
**bit** [8] - 21:17, 22:15, 25:10, 36:18, 50:7, 50:8, 58:24, 102:13
**black** [4] - 24:10, 31:12, 33:8, 55:2
**blank** [4] - 5:11, 38:8, 60:6, 60:7
**blow** [2] - 65:5, 66:6
**blue** [1] - 33:8
**board** [7] - 44:8, 81:22, 82:5, 88:25, 94:21, 94:24, 95:3
**boards** [1] - 94:21
**boiled** [1] - 75:23
**boils** [1] - 111:12
**bond** [5] - 33:7, 87:12, 93:7, 96:15, 99:10
**bond-yield** [1] - 33:7
**bonds** [1] - 108:15
**book** [2] - 23:8, 23:9
**books** [1] - 93:2
**borrow** [1] - 93:3

**bottom** [6] - 22:22, 25:19, 58:21, 110:11, 110:12, 111:8
**Bowler** [3] - 65:12, 98:15, 99:23
**box** [1] - 21:16
**breach** [1] - 80:6
**break** [2] - 12:19, 16:8
**breaks** [1] - 12:8
**breathed** [1] - 76:22
**bribery** [1] - 101:22
**briefly** [3] - 10:19, 26:5, 29:13
**bring** [3] - 6:21, 85:6, 113:20
**brings** [2] - 27:2, 38:12
**broader** [1] - 42:5
**brought** [2] - 6:2, 102:24
**bud** [1] - 41:21
**buffer** [2] - 95:23, 96:19
**build** [7] - 91:16, 96:12, 97:1, 97:10, 100:8, 107:19, 107:25
**building** [1] - 114:9
**bullet** [3] - 26:13, 26:17, 46:10
**bullets** [1] - 107:3
**burden** [3] - 42:6, 42:11, 85:16
**business** [17] - 6:14, 8:7, 8:10, 9:8, 18:22, 18:24, 19:7, 23:1, 23:2, 23:8, 23:9, 23:11, 23:13, 69:13, 92:20, 92:21
**buy** [7] - 14:24, 81:8, 81:19, 81:22, 82:4, 82:12, 101:15
**buying** [4] - 8:25, 33:15, 81:2, 82:13
**buys** [2] - 81:1, 81:7

# C

**callout** [1] - 63:4
**cap** [22] - 6:17, 6:19, 36:4, 36:5, 36:8, 36:24, 37:9, 37:13, 40:23, 41:5, 46:3, 46:5, 46:19, 46:20, 46:25, 53:23, 54:8, 56:15, 56:17, 76:16, 83:7
**capable** [1] - 108:6
**capacity** [5] - 19:17,

19:23, 66:11, 67:10, 71:15
**capital** [18] - 20:3, 32:23, 52:16, 52:19, 66:1, 73:23, 78:20, 87:3, 89:13, 97:1, 97:10, 98:6, 100:9, 102:3, 103:23, 104:23
**capped** [4] - 53:1, 54:15, 57:16, 85:5
**caps** [5] - 52:18, 59:22, 61:1, 109:4, 110:22
**capture** [1] - 64:23
**care** [1] - 112:12
**careful** [1] - 102:11
**carried** [1] - 81:9
**case** [45] - 4:14, 17:4, 29:4, 30:1, 33:4, 33:5, 35:6, 39:16, 39:24, 40:1, 40:3, 40:6, 40:17, 41:9, 56:18, 57:18, 61:20, 76:6, 76:7, 80:6, 81:4, 81:17, 94:14, 101:9, 101:21, 101:22, 101:23, 104:14, 104:17, 104:18, 108:5, 108:25, 110:6, 110:9, 110:23, 111:18, 111:23, 111:25, 112:1, 113:7, 113:14, 113:18
**cases** [1] - 79:12
**cash** [1] - 78:9
**catastrophe** [1] - 53:9
**catastrophic** [2] - 6:3
**categories** [2] - 22:22, 22:23
**causes** [1] - 40:19
**causing** [1] - 34:20
**cautious** [2] - 93:22, 94:4
**CEO** [5] - 26:1, 32:16, 40:14, 72:9, 77:10
**CEOs** [1] - 44:5
**certain** [2] - 67:5, 94:19
**certainly** [9] - 27:24, 30:12, 37:3, 54:8, 61:3, 84:10, 84:19, 84:23
**certainty** [1] - 86:4
**certificate** [3] - 78:4, 81:21, 82:7
**certificates** [2] - 80:22, 81:18

**certification** [1] - 26:2
**certified** [4] - 5:10, 52:4, 55:13, 72:8
**CFO** [3] - 26:1, 52:2, 72:9
**chain** [1] - 96:6
**chance** [2] - 28:2, 60:1
**change** [6] - 13:2, 67:22, 75:8, 81:5, 81:9, 100:1, 108:8
**changed** [5] - 37:11, 54:21, 54:22, 101:8, 102:3
**changes** [4] - 46:24, 47:16, 81:15, 114:6
**changing** [1] - 13:1
**charge** [3] - 17:24, 17:25, 47:25
**charged** [1] - 101:13
**chart** [3] - 26:9, 43:16, 110:12
**charters** [7] - 14:8, 14:12, 14:15, 80:23, 82:10, 82:11, 88:19
**chief** [3] - 5:10, 74:15
**choice** [6] - 78:1, 89:24, 92:3, 93:15, 93:18, 109:17
**choices** [1] - 89:19
**choose** [2] - 84:24, 89:20
**chose** [1] - 79:17
**circular** [46] - 8:1, 23:21, 24:14, 24:17, 35:1, 35:2, 35:6, 35:12, 37:7, 41:8, 47:1, 51:3, 51:4, 62:22, 64:19, 66:25, 67:1, 68:6, 68:8, 70:7, 72:2, 73:1, 75:25, 76:16, 77:17, 79:18, 82:3, 84:7, 84:14, 84:25, 85:4, 87:23, 88:15, 97:4, 97:5, 97:6, 97:8, 97:14, 98:2, 98:19, 98:23, 100:13, 108:21, 108:23, 109:3, 109:10
**circularity** [1] - 66:20
**circumstances** [7] - 12:5, 13:12, 13:21, 27:6, 28:18, 79:14, 91:19
**cite** [1] - 32:6
**civil** [1] - 111:25
**claim** [2] - 44:15, 80:6
**clear** [20] - 10:3, 19:2, 21:6, 26:24, 35:13, 35:15, 37:11, 41:17,

2979

44:23, 57:11, 59:5,
76:5, 83:14, 88:9,
91:3, 91:13, 92:6,
98:3, 102:20, 102:21
**clearance** [1] - 65:9
**cleared** [1] - 65:11
**clearly** [1] - 40:19
**clerk** [1] - 114:6
**click** [1] - 91:8
**clients** [1] - 101:3
**clock** [1] - 6:16
**close** [2] - 54:3, 71:20
**closely** [1] - 14:6
**closer** [2] - 6:22
**Closing** [1] - 3:3
**closing** [1] - 33:6
**closings** [1] - 64:3
**colleague** [1] - 105:19
**colleagues** [2] - 4:11,
4:13
**collection** [1] - 68:13
**column** [2] - 26:11
**combined** [1] - 15:16
**comfortable** [1] -
96:16
**coming** [8] - 16:8,
41:5, 46:5, 46:21,
49:8, 59:21, 60:24,
74:14
**commanded** [1] -
78:24
**Commission** [1] - 5:9
**commit** [1] - 30:18
**commitment** [91] -
5:7, 5:21, 5:23, 6:12,
6:17, 6:20, 6:21,
6:24, 6:25, 7:25,
8:11, 20:25, 21:1,
23:21, 24:8, 24:12,
24:14, 24:16, 24:21,
26:21, 28:15, 30:13,
30:24, 31:3, 31:6,
31:9, 31:12, 31:14,
32:10, 32:14, 32:22,
33:24, 34:5, 34:22,
35:8, 35:20, 35:21,
35:22, 36:3, 36:17,
36:22, 37:2, 37:9,
37:14, 38:14, 47:1,
47:4, 47:7, 50:22,
52:5, 52:7, 53:1,
54:7, 54:15, 57:3,
57:9, 57:15, 67:1,
68:7, 68:17, 70:2,
70:7, 70:8, 70:14,
71:1, 71:15, 73:14,
74:3, 75:5, 75:10,
75:12, 75:18, 75:24,
76:16, 77:7, 84:9,
84:14, 85:1, 85:5,

85:7, 85:8, 93:5,
95:22, 96:14, 96:19,
98:4, 109:2, 109:12
**committed** [4] - 22:25,
23:16, 29:9, 42:5
**committing** [1] - 35:23
**common** [10] - 11:25,
20:4, 20:10, 26:18,
27:20, 93:19,
101:15, 101:17,
106:10, 108:6
**commotion** [1] -
113:20
**companies** [11] - 8:21,
8:22, 9:8, 9:21,
15:24, 16:1, 24:13,
24:19, 55:1, 76:15,
101:16
**companies'** [1] -
54:24
**company** [9] - 22:9,
22:13, 23:2, 24:4,
24:21, 40:21, 78:8,
82:14, 109:22
**company's** [4] - 22:9,
22:25, 23:1, 24:3
**compensate** [1] -
75:12
**complete** [1] - 44:9
**completely** [17] - 7:25,
13:25, 23:15, 23:20,
30:16, 31:22, 32:13,
59:7, 74:4, 76:5,
76:6, 76:17, 79:2,
79:18, 83:8, 84:25,
112:22
**completeness** [1] -
37:20
**complicated** [1] -
111:11
**components** [1] - 12:3
**comprehensive** [4] -
50:10, 50:12, 66:18,
72:14
**concern** [14] - 39:24,
46:14, 47:12, 52:25,
53:7, 62:17, 62:25,
70:14, 70:19, 70:25,
72:3, 73:21
**concerned** [10] - 5:22,
30:1, 40:15, 40:18,
42:11, 53:22, 64:19,
71:19, 73:1, 73:12
**concerning** [2] -
69:24, 70:23
**concerns** [1] - 54:12
**conclude** [5] - 59:23,
85:12, 85:15, 106:4,
106:6
**concluded** [1] -

114:16
**conclusion** [1] - 62:18
**condition** [3] - 22:10,
22:14, 24:4
**conferring** [3] - 44:20,
44:21, 44:22
**confession** [1] - 33:4
**confidence** [12] - 6:24,
19:16, 19:22, 23:22,
35:16, 46:20, 54:12,
69:17, 70:2, 70:9,
73:17, 85:9
**confident** [2] - 68:1,
86:9
**confirmed** [3] - 44:4,
103:6, 107:5
**confirms** [1] - 70:5
**conflict** [1] - 107:21
**Congress** [18] - 6:7,
7:10, 14:10, 16:25,
17:6, 17:7, 17:8,
17:18, 37:12, 69:11,
69:14, 80:23, 88:18,
88:24, 103:25,
107:10, 110:20,
111:14
**connection** [1] - 70:8
**consecutive** [4] - 5:2,
5:3, 5:4, 5:6
**consensus** [1] - 77:14
**consent** [2] - 9:14,
9:16
**consented** [2] - 84:3,
84:5
**consequence** [2] -
71:13, 87:11
**consequences** [3] -
6:3, 16:16, 32:20
**consequential** [1] -
88:5
**conservation** [1] -
23:15
**conservator** [21] -
11:20, 17:3, 17:5,
17:6, 17:7, 17:17,
17:19, 17:23, 17:24,
18:9, 22:8, 22:24,
24:24, 25:1, 31:24,
82:20, 83:18, 84:6,
104:2, 107:16,
107:17
**conservatorship** [43] -
9:16, 9:21, 18:12,
18:19, 19:6, 20:19,
21:8, 21:11, 21:19,
21:21, 23:5, 23:9,
26:11, 26:12, 26:24,
28:20, 28:25, 29:2,
31:23, 31:25, 32:4,
83:13, 83:15, 83:20,

83:21, 83:23, 84:4,
90:21, 90:23, 92:3,
97:2, 100:9, 101:19,
103:2, 103:24,
104:8, 104:12,
104:15, 104:22,
104:25, 110:16
**conserve** [3] - 20:3,
22:1, 22:9, 22:17,
22:18, 22:19, 57:15,
107:17
**conserving** [8] -
22:12, 22:24, 23:1,
23:12, 24:3, 24:19,
62:9, 63:19
**consider** [9] - 13:10,
13:17, 27:3, 27:11,
42:15, 47:15, 83:12,
86:21, 99:20
**consideration** [7] -
4:20, 4:21, 10:19,
27:2, 27:6, 47:18,
53:21
**considered** [1] - 86:9
**considering** [4] -
28:17, 75:5, 79:8,
86:1
**consistent** [3] - 24:18,
109:12, 109:15
**consistently** [2] -
23:16, 38:10
**conspiracy** [3] - 8:7,
68:22, 107:8
**constantly** [2] - 55:23,
93:14
**consult** [2] - 43:10
**consulted** [2] - 43:16,
43:18
**consulting** [4] - 43:9,
44:20, 44:21
**contained** [2] - 80:20
**context** [2] - 40:16,
99:21
**continue** [8] - 20:11,
21:22, 23:2, 23:23,
32:22, 47:13, 62:6,
71:18
**continued** [11] -
20:16, 32:11, 33:21,
35:12, 35:17, 46:12,
46:17, 55:3, 67:7,
67:21, 93:8
**continuing** [1] - 57:22
**contract** [27] - 9:12,
9:20, 9:24, 12:22,
13:4, 13:5, 20:7,
80:4, 80:9, 80:21,
81:2, 81:5, 81:14,
81:15, 82:8, 82:10,
82:16, 83:18, 84:1,

90:10, 102:3, 102:7,
103:12, 112:7,
112:9, 112:10
**contracts** [17] - 8:15,
10:2, 12:17, 12:25,
13:2, 79:3, 80:12,
80:14, 80:16, 80:18,
80:19, 80:25, 81:1,
81:17, 82:19, 84:24,
102:9
**contractual** [10] -
12:16, 12:20, 78:3,
78:13, 78:14, 78:17,
79:2, 79:9, 104:18,
105:10
**contradicts** [1] -
101:25
**contribute** [1] - 52:5
**contributed** [1] -
19:18
**control** [1] - 62:16
**conversations** [2] -
40:25, 41:12
**cooked** [2] - 43:8,
46:13
**cool** [1] - 103:16
**copy** [1] - 58:8
**core** [2] - 14:9, 15:5
**corporate** [4] - 14:8,
80:22, 82:10, 82:11
**correct** [1] - 46:8
**correspondence** [2] -
41:25, 48:6
**corroborated** [1] -
44:4
**corroborates** [1] -
70:5
**cost** [1] - 7:8
**costs** [3] - 67:23,
96:14, 96:15
**counsel** [4] - 74:7,
74:12, 86:10, 105:12
**count** [2] - 53:20, 75:3
**counting** [2] - 6:16,
112:5
**country** [1] - 112:10
**country's** [1] - 28:21
**counts** [3] - 10:24,
11:1, 13:4
**couple** [1] - 59:1
**course** [8] - 4:21,
9:15, 16:5, 45:14,
60:22, 71:7, 71:15,
85:1
**court** [1] - 92:7
**COURT** [9] - 4:5,
63:20, 63:23, 64:7,
64:9, 86:15, 113:3,
113:25, 114:4
**Court's** [1] - 71:11

courthouse [1] - 113:21
courtroom [1] - 4:14
covenant [6] - 59:2, 80:6, 80:8, 80:11, 90:7, 112:10
cover [5] - 5:12, 45:9, 49:11, 51:8, 56:8
covers [2] - 25:8, 25:9
create [1] - 21:1
created [3] - 14:10, 15:6, 17:2
creates [1] - 15:25
credentials [1] - 92:8
credit [1] - 100:4
Credit [1] - 70:20
crickets [1] - 99:12
crisis [14] - 5:25, 6:2, 7:8, 9:1, 16:9, 16:13, 16:15, 16:17, 17:1, 28:22, 40:9, 53:6, 57:20
critical [6] - 15:14, 18:13, 18:14, 29:20, 32:6, 73:16
critically [5] - 25:5, 27:10, 27:13, 27:19, 82:17
cross [3] - 48:14, 59:5, 69:2
cross-examination [2] - 48:14, 59:5
cross-examined [1] - 69:2
crucial [1] - 8:17
crystal [2] - 10:3, 44:23
cumulative [2] - 56:8, 56:19
curious [1] - 97:16
current [4] - 19:19, 46:2, 66:16, 100:2
cushion [1] - 95:20
cut [1] - 39:22

**D**

daily [1] - 43:21
damages [4] - 85:20, 85:24, 85:25, 86:3
danger [3] - 16:3, 28:24, 30:15
dark [1] - 43:9
date [14] - 9:4, 9:5, 12:18, 27:7, 27:10, 27:12, 32:8, 37:2, 39:5, 39:8, 41:9, 47:5, 82:19, 109:24
dated [3] - 45:11, 56:6, 63:6

Davis [2] - 112:2, 112:11
days [2] - 73:6, 113:16
deal [5] - 87:24, 101:8, 101:9, 101:10, 101:19
dealers [1] - 70:21
dealing [3] - 80:7, 90:8, 112:11
deals [1] - 100:12
debate [4] - 28:23, 34:11, 53:17, 75:10
debated [1] - 50:23
decade [2] - 75:4
December [29] - 6:17, 8:20, 8:21, 9:3, 9:7, 9:15, 9:17, 10:2, 12:7, 12:17, 12:22, 13:5, 35:19, 36:3, 36:7, 38:2, 44:2, 46:4, 46:5, 46:21, 56:16, 56:20, 56:21, 79:3, 81:17, 82:9, 84:13, 102:4
decide [4] - 10:16, 47:11, 92:15, 92:18
decided [4] - 65:15, 65:16, 67:15, 76:1
deciding [2] - 13:3, 13:10
decision [17] - 13:7, 13:17, 13:20, 27:4, 27:11, 44:1, 44:2, 44:11, 45:17, 55:24, 60:17, 87:4, 88:6, 99:5, 111:17
decision-maker [3] - 13:17, 13:20, 45:17
decision-making [1] - 44:11
decisions [1] - 11:5
declared [2] - 81:22, 82:5
declares [1] - 45:17
decline [1] - 85:9
decode [1] - 49:10
dedicated [5] - 6:5, 19:3, 22:24, 22:25, 23:14
deep [1] - 36:10
deeper [2] - 35:3
defaults [1] - 16:3
defendants [10] - 86:23, 87:19, 89:17, 90:19, 91:4, 98:24, 102:10, 104:6, 105:12, 108:16
defendants' [1] - 91:2
defense [1] - 29:22
deferred [6] - 74:9,

74:25, 94:8, 94:19, 96:3, 96:7
definition [1] - 100:23
degree [2] - 108:5, 112:13
delegation [1] - 70:21
deliberate [2] - 11:10, 113:12
deliberated [1] - 86:11
deliberating [1] - 44:1
deliberations [8] - 4:22, 10:22, 11:5, 15:13, 45:7, 48:9, 113:9, 113:11
demands [1] - 111:20
DeMarco [123] - 4:25, 5:17, 7:9, 7:19, 7:23, 7:24, 8:8, 8:13, 8:19, 13:18, 15:23, 17:25, 18:25, 19:3, 22:21, 27:7, 27:12, 27:24, 28:16, 28:18, 28:22, 35:11, 37:6, 39:17, 40:22, 41:2, 41:4, 42:1, 42:16, 42:17, 43:8, 43:14, 43:19, 44:7, 44:10, 44:19, 45:13, 46:13, 46:14, 47:12, 47:24, 48:4, 48:14, 48:20, 48:25, 49:8, 50:1, 50:16, 52:20, 52:24, 53:19, 55:21, 55:25, 56:10, 57:2, 57:13, 59:2, 59:4, 59:6, 59:17, 59:23, 60:1, 60:3, 60:9, 61:3, 61:12, 61:17, 61:24, 62:3, 62:5, 62:12, 64:20, 68:5, 68:16, 69:11, 69:17, 70:6, 70:15, 71:3, 71:7, 72:19, 73:11, 74:2, 75:5, 75:22, 76:1, 77:25, 78:11, 78:15, 78:19, 79:17, 79:23, 83:5, 83:22, 84:21, 84:24, 85:12, 88:19, 91:13, 91:25, 92:19, 94:17, 95:10, 95:11, 95:24, 96:5, 96:21, 98:8, 99:1, 99:23, 100:25, 102:1, 102:16, 102:21, 105:14, 106:7, 106:18, 106:22, 107:5, 107:11, 108:8, 109:14, 111:9
DeMarco's [16] - 8:9, 18:3, 22:16, 27:4,

28:6, 45:11, 45:22, 48:16, 61:20, 62:14, 69:7, 70:10, 76:19, 96:13, 105:21, 110:15
demonstrate [5] - 96:8, 96:22, 97:9, 108:10, 111:7
denying [1] - 101:6
Department [9] - 7:13, 8:2, 35:23, 55:2, 62:11, 65:17, 88:17, 100:23, 105:24
dependent [1] - 32:9
deplete [1] - 73:23
deposition [2] - 60:10, 102:23, 108:9
Depression [1] - 28:23
depths [1] - 28:21
described [1] - 68:5
describing [3] - 46:15, 70:6, 70:7
designation [1] - 78:4
designed [3] - 18:20, 96:8, 96:22
desire [2] - 48:16, 101:24
destroyed [1] - 112:22
destroys [1] - 112:8
Deutsche [1] - 52:23
devastating [1] - 16:15
develop [1] - 47:17
developed [1] - 23:13
Dharan [13] - 16:12, 24:1, 24:5, 25:20, 25:21, 29:23, 30:11, 57:6, 57:7, 69:9, 76:12, 94:11, 100:25
Dharan's [1] - 29:25
difference [2] - 54:18, 95:13
different [5] - 50:7, 69:15, 80:18, 80:21, 109:25
difficulties [1] - 114:9
digging [1] - 35:2
diligent [1] - 110:6
diminish [1] - 77:9
direct [2] - 16:25, 25:1
directly [4] - 13:24, 13:25, 19:18, 22:7
director [3] - 35:11, 78:15, 104:3
Director [1] - 44:7
directors [2] - 81:22, 82:6
disagree [1] - 7:18
disagreement [1] -

17:11
disastrous [1] - 57:17
disclose [2] - 109:7, 109:8
disclosed [1] - 109:9
disclosing [2] - 93:22, 109:16
disclosure [2] - 108:23, 109:1, 109:3
disclosures [5] - 87:9, 89:8, 90:15, 90:17, 109:25
discretion [1] - 82:6
discuss [3] - 42:13, 74:16, 113:7
discussed [5] - 77:24, 94:22, 94:23, 96:4, 103:1
discussing [2] - 43:25, 95:2
discussion [7] - 25:16, 43:3, 45:12, 58:14, 58:23, 60:11, 96:3
discussions [1] - 87:22
disparaged [1] - 105:15
dispute [19] - 15:3, 16:4, 17:22, 20:11, 20:14, 29:10, 31:5, 35:6, 38:20, 54:14, 69:6, 69:10, 76:6, 85:3, 85:4, 85:6, 85:8, 90:20
disputed [1] - 43:17
divide [1] - 56:24
divided [1] - 57:1
dividend [58] - 5:12, 6:11, 6:21, 24:17, 30:24, 30:25, 31:8, 34:20, 34:23, 34:25, 35:8, 38:19, 41:7, 42:7, 42:12, 49:13, 49:16, 49:24, 50:3, 50:6, 50:20, 51:5, 51:8, 51:16, 51:24, 52:5, 54:11, 55:19, 59:22, 60:25, 61:18, 65:22, 65:23, 66:9, 66:19, 66:21, 67:6, 72:15, 72:23, 72:24, 73:7, 77:9, 78:7, 78:16, 81:20, 81:21, 81:24, 82:5, 84:18, 88:1, 93:4, 95:22, 98:18, 100:3, 101:11, 104:16
dividends [27] - 7:22, 9:11, 9:14, 19:24,

2981

20:4, 20:8, 20:15, 22:18, 31:20, 31:23, 46:24, 50:13, 55:9, 55:16, 66:13, 66:17, 67:8, 73:9, 73:23, 77:18, 78:8, 78:20, 83:14, 84:3, 85:7, 104:7, 110:10
**document** [28] - 15:11, 21:3, 21:6, 21:24, 21:25, 22:16, 58:10, 60:1, 61:5, 61:20, 61:23, 63:1, 63:4, 63:5, 63:11, 64:4, 64:25, 66:4, 78:6, 80:21, 88:12, 95:6, 97:25, 98:12, 99:20, 106:4, 108:10, 111:2
**documents** [7] - 14:15, 43:7, 80:22, 94:13, 97:18, 97:20, 110:4
**dollar** [2] - 6:19, 37:14
**dollars** [13] - 5:5, 7:14, 9:10, 29:12, 30:18, 34:3, 36:4, 36:19, 75:13, 83:24, 88:6, 100:19, 100:22
**domino** [1] - 16:1
**Don** [1] - 40:13
**done** [14] - 23:23, 48:21, 49:1, 49:2, 49:3, 62:24, 68:10, 88:10, 95:17, 99:2, 99:3, 111:15, 111:17
**doors** [3] - 19:12, 23:3, 92:22
**double** [2] - 36:21, 36:23
**doubled** [3] - 17:8, 33:23, 35:20
**down** [40] - 6:2, 6:11, 6:16, 6:21, 12:8, 12:19, 16:6, 17:8, 27:9, 30:25, 34:5, 37:22, 56:25, 58:16, 61:11, 62:4, 67:17, 68:11, 75:23, 76:2, 83:7, 85:6, 88:16, 88:18, 88:22, 88:25, 96:9, 96:11, 96:22, 97:9, 97:24, 98:5, 105:25, 107:3, 107:4, 108:2, 108:10, 111:7, 111:12, 112:24
**downs** [3] - 89:2, 100:5, 111:11
**downside** [2] - 40:15,

40:19
**Dr** [23] - 5:17, 16:12, 24:1, 24:5, 25:20, 25:21, 29:23, 29:25, 30:11, 36:1, 57:6, 57:7, 68:19, 68:23, 69:1, 69:5, 69:9, 76:9, 76:12, 78:17, 85:24, 101:14, 108:13
**drafted** [1] - 65:9
**drat** [1] - 72:19
**draw** [36] - 6:10, 6:20, 31:11, 32:22, 34:5, 34:24, 35:2, 35:7, 35:12, 37:23, 38:10, 62:22, 66:17, 70:7, 71:18, 73:1, 77:19, 84:7, 85:4, 87:23, 88:15, 93:20, 97:4, 97:6, 97:8, 97:14, 98:2, 98:19, 98:23, 100:13, 101:3, 107:2, 108:21, 108:23, 109:10
**drawing** [5] - 5:6, 5:20, 6:11, 38:21, 54:6
**drawn** [3] - 38:14, 54:1, 56:23
**draws** [57] - 8:1, 23:21, 24:14, 24:17, 32:20, 34:5, 34:22, 35:1, 35:6, 37:7, 37:24, 38:1, 38:4, 38:6, 38:10, 38:23, 41:9, 46:23, 47:1, 49:23, 50:2, 51:3, 51:4, 51:6, 51:7, 51:8, 52:4, 52:6, 55:1, 55:7, 56:9, 56:19, 57:8, 64:19, 66:22, 66:25, 67:1, 67:7, 68:6, 68:8, 71:13, 72:2, 72:17, 72:25, 73:8, 75:25, 76:16, 77:8, 79:19, 83:24, 84:14, 84:25, 85:6, 87:11, 93:5, 109:3
**drew** [2] - 30:25, 39:11
**drive** [3] - 51:5, 72:25, 73:8
**driven** [2] - 100:4, 101:23
**dropped** [2] - 33:1, 71:22
**drops** [1] - 105:11
**drove** [8] - 98:25, 99:18, 99:23, 100:7,

100:10, 100:14
**DTA** [3] - 74:17, 75:2, 96:16
**DTAs** [3] - 74:9, 103:17, 111:5
**due** [1] - 43:11
**duration** [1] - 83:22
**during** [23] - 7:8, 10:17, 15:2, 18:23, 19:9, 19:11, 20:18, 21:14, 23:4, 26:11, 33:5, 34:7, 38:11, 45:7, 48:25, 63:2, 73:20, 74:7, 75:18, 82:1, 90:20, 103:1, 104:8
**dust** [1] - 65:14
**DX** [4] - 45:4, 64:12, 82:2
**DX-377** [1] - 64:5
**DX404** [1] - 106:21
**DX84** [1] - 18:9
**DX89** [1] - 78:5
**DX928** [1] - 68:14

# E

**early** [3] - 42:19, 47:2, 49:8
**earn** [4] - 49:24, 50:3, 51:15, 51:23
**earnings** [7] - 50:10, 73:25, 87:3, 91:21, 100:2, 100:3
**easy** [2] - 111:24, 112:15
**eat** [1] - 101:1
**eating** [1] - 46:25
**economic** [4] - 5:24, 7:7, 20:13, 52:17
**economist** [1] - 5:24
**economy** [6] - 6:4, 7:6, 15:20, 16:23, 75:24, 99:6
**Ed** [2] - 70:15, 96:21
**edits** [1] - 98:9
**effect** [5] - 15:25, 16:1, 75:19, 109:4
**efficiently** [1] - 89:16
**effort** [1] - 111:5
**eight** [4] - 33:18, 33:20, 35:19, 43:23
**either** [3] - 29:10, 92:10, 112:15
**either/or** [2] - 91:19, 93:18
**elephant** [1] - 88:5
**eliminate** [9] - 61:13, 61:22, 64:16, 66:25, 68:3, 68:6, 68:7,

76:2, 104:7
**eliminated** [11] - 9:11, 20:5, 20:9, 76:7, 76:17, 77:17, 79:18, 84:25, 104:7, 104:8
**eliminating** [2] - 23:20, 83:14
**elimination** [1] - 31:22
**email** [10] - 41:1, 59:1, 63:7, 94:16, 96:6, 98:16, 99:8, 99:16, 99:17, 111:8
**emails** [2] - 62:10, 99:8
**embezzlement** [1] - 101:23
**emboldened** [1] - 112:25
**emergency** [1] - 101:10
**enabling** [2] - 59:21, 60:25
**end** [18] - 21:19, 21:20, 25:11, 36:15, 46:14, 47:20, 48:18, 53:24, 56:19, 64:16, 66:20, 66:25, 86:18, 87:24, 87:25, 104:12, 104:15, 109:4
**ending** [2] - 46:4, 72:7
**endorsing** [1] - 55:14
**ends** [2] - 33:17, 48:19
**enhance** [2] - 19:17, 19:22
**ennobled** [1] - 113:1
**enormous** [3] - 87:5, 101:5, 111:20
**enormously** [1] - 88:5
**enrichment** [1] - 101:22
**ensure** [1] - 10:6
**ensuring** [2] - 10:5, 53:2
**enter** [4] - 12:10, 13:7, 13:23, 27:5
**entered** [2] - 29:2, 52:18
**entering** [2] - 11:21, 11:22
**enterprise** [1] - 46:12
**enterprises** [5] - 46:24, 90:25, 100:19, 100:20, 101:4
**enterprises'** [1] - 73:22
**entire** [10] - 6:4, 19:9, 19:12, 23:4, 24:15, 28:15, 37:19, 38:11,

57:3, 75:18
**entirely** [3] - 32:9, 76:2, 109:12
**entities** [3] - 18:22, 18:24, 55:7
**entitled** [4] - 31:6, 31:7, 107:15
**entry** [1] - 113:21
**equity** [8] - 8:21, 8:22, 9:3, 30:16, 32:8, 54:25, 101:1
**erode** [3] - 6:21, 76:16, 85:7
**eroded** [1] - 68:7
**erodes** [1] - 24:14
**eroding** [2] - 70:7, 85:1
**erosion** [18] - 7:25, 23:20, 24:16, 47:1, 62:23, 66:25, 70:8, 70:13, 71:1, 75:24, 79:18, 84:9, 84:13, 85:8, 109:2, 109:5, 109:13, 109:15
**especially** [1] - 94:4
**essential** [1] - 15:20
**essentially** [2] - 30:6, 49:20
**establish** [3] - 47:18, 48:5, 85:17
**established** [2] - 31:2, 52:8
**eternity** [1] - 104:8
**evaluate** [2] - 59:15, 79:22
**evaluating** [2] - 27:3, 42:18
**evening** [1] - 113:23
**event** [8] - 28:8, 28:17, 33:9, 58:25, 69:6, 75:1, 75:2, 75:6
**eventually** [1] - 48:17
**evidence** [73] - 5:16, 8:8, 8:18, 10:3, 10:8, 10:12, 10:14, 10:20, 11:19, 14:3, 14:5, 14:8, 14:14, 14:20, 15:21, 16:5, 16:7, 16:9, 16:15, 17:1, 17:9, 18:8, 19:1, 19:5, 19:8, 19:11, 24:5, 24:6, 24:23, 25:5, 26:22, 29:19, 34:7, 35:5, 37:10, 38:15, 41:22, 43:13, 44:14, 44:23, 45:3, 45:7, 49:20, 52:13, 58:9, 59:24, 60:2, 60:23, 63:2, 64:5, 65:6, 73:3, 73:16,

74:22, 74:23, 76:14, 76:21, 81:16, 81:25, 84:16, 86:10, 86:12, 87:5, 87:18, 93:19, 94:11, 97:15, 105:25, 106:22, 109:23, 110:5
**exact** [7] - 21:7, 21:10, 21:18, 21:20, 54:2, 60:11, 61:11
**exactly** [18] - 8:9, 8:14, 8:19, 20:16, 23:4, 23:21, 23:22, 33:1, 33:2, 33:12, 50:16, 68:4, 70:5, 71:3, 76:3, 85:1, 104:12, 104:14
**examination** [2] - 48:14, 59:5
**examined** [2] - 59:17, 69:2
**example** [4] - 40:2, 43:24, 44:6, 81:12
**examples** [1] - 106:14
**exceed** [1] - 84:18
**exceeded** [3] - 31:11, 54:24, 72:18
**exceeding** [1] - 5:4
**exceeds** [1] - 49:16
**excellent** [1] - 108:16
**except** [2] - 113:10, 113:14
**excess** [9] - 49:24, 50:3, 50:12, 51:15, 51:24, 55:19, 72:14, 73:9, 100:2
**exchange** [1] - 41:1
**Exchange** [1] - 5:9
**excuse** [3] - 24:25, 35:10, 112:20
**excused** [1] - 113:11
**execute** [1] - 63:12
**executed** [1] - 74:12
**executive** [1] - 5:10
**exercise** [1] - 90:6
**exercised** [1] - 90:8
**exhaust** [1] - 67:8
**exhausted** [1] - 30:17
**exhausting** [1] - 66:10
**exhibit** [2] - 65:4, 68:12
**exhibits** [4] - 68:14, 110:4, 110:5, 110:8
**existed** [3] - 12:22, 81:8, 81:17
**existence** [1] - 26:20
**existing** [1] - 15:17
**exit** [5] - 9:16, 32:3, 32:4, 100:9, 104:25
**exited** [1] - 84:4

**expect** [19] - 5:12, 8:19, 10:16, 11:15, 13:9, 13:15, 28:9, 49:24, 50:3, 51:4, 51:15, 51:23, 55:6, 55:9, 72:14, 73:8, 80:4, 80:10, 113:20
**expectation** [1] - 21:10
**expectations** [20] - 9:6, 10:11, 11:23, 12:16, 12:20, 12:21, 13:4, 21:5, 21:7, 25:7, 74:6, 77:20, 79:2, 79:9, 80:1, 80:4, 85:14, 90:10, 101:25, 102:11
**expected** [11] - 10:4, 12:6, 49:13, 73:7, 79:13, 83:3, 83:9, 84:10, 84:18, 84:19, 84:23
**expedite** [2] - 97:24, 113:21
**experience** [4] - 50:9, 93:20, 106:10, 108:7
**expert** [8] - 16:11, 25:21, 92:4, 92:7, 92:8, 92:10, 92:11, 92:13
**experts** [2] - 15:21, 67:5
**explain** [2] - 20:5, 100:16
**explained** [4] - 28:25, 40:10, 54:21, 62:5
**explains** [2] - 86:24, 103:9
**express** [1] - 80:9
**expresses** [1] - 48:16
**expressing** [4] - 47:12, 52:25, 70:25
**extend** [3] - 61:18, 61:25, 62:23
**extremely** [1] - 69:25
**eye** [1] - 79:15

# F

**face** [1] - 109:5
**faced** [2] - 83:3, 83:6, 84:20
**fact** [11] - 15:15, 21:11, 21:13, 22:1, 36:14, 37:5, 38:21, 52:18, 76:9, 96:4, 103:17
**factor** [1] - 96:23
**facts** [15] - 12:5, 13:12, 13:21, 15:10,

27:6, 28:18, 55:25, 56:1, 56:2, 56:3, 86:23, 108:18, 108:19
**fail** [1] - 78:8
**failed** [1] - 19:9
**failure** [5] - 15:25, 78:2, 78:13, 78:16
**fair** [4] - 80:7, 90:8, 97:14, 112:10
**faith** [3] - 80:7, 90:8, 112:10
**faithful** [1] - 80:11
**false** [13] - 89:19, 89:24, 91:18, 92:3, 93:15, 93:18, 108:21, 108:23, 109:17
**familiar** [1] - 65:12
**Fannie** [112] - 5:1, 5:8, 5:20, 6:2, 6:9, 6:13, 6:19, 7:1, 7:2, 7:14, 7:17, 8:7, 8:10, 9:13, 9:15, 11:20, 11:24, 14:8, 14:10, 14:16, 15:4, 17:8, 17:13, 17:17, 17:23, 19:6, 19:8, 19:14, 19:16, 21:2, 22:19, 23:22, 24:11, 24:24, 25:2, 25:3, 25:12, 26:7, 28:24, 29:6, 29:9, 29:15, 30:5, 30:7, 30:16, 30:18, 30:23, 31:18, 31:19, 31:25, 32:16, 32:21, 34:2, 34:21, 35:2, 35:7, 35:14, 35:24, 36:8, 37:19, 37:23, 37:24, 38:1, 38:12, 38:18, 38:23, 39:11, 41:6, 44:5, 44:21, 49:9, 49:15, 49:19, 50:21, 50:24, 54:10, 56:3, 64:21, 70:12, 71:18, 72:6, 72:13, 72:17, 72:20, 73:17, 80:12, 80:17, 80:24, 82:10, 84:2, 84:15, 84:17, 86:13, 90:5, 90:14, 91:15, 91:22, 91:24, 92:2, 92:20, 93:6, 94:9, 95:4, 95:16, 96:25, 98:4, 98:17, 100:8, 105:3, 107:4, 112:18
**Fannie's** [7] - 15:15, 31:10, 31:15, 34:8, 34:15, 49:12, 77:10
**fantasy** [1] - 40:4

**far** [5] - 6:1, 24:14, 33:9, 36:10, 54:9
**fast** [1] - 54:23
**fault** [1] - 91:8
**favor** [1] - 86:12
**February** [2] - 49:9, 49:13, 49:25
**fee** [5] - 31:3, 31:5, 31:7, 47:4, 47:5, 47:7, 47:13, 47:14, 50:22, 52:5, 52:6, 52:7, 75:10, 75:12, 75:18
**felt** [1] - 4:17
**few** [9] - 10:14, 11:3, 32:7, 38:17, 74:6, 77:21, 85:23, 109:20
**FHFA** [67] - 8:19, 9:13, 9:18, 10:4, 10:9, 11:19, 12:5, 12:11, 13:8, 13:11, 13:17, 13:23, 13:24, 17:2, 17:5, 17:7, 17:12, 17:19, 17:22, 18:4, 21:13, 24:25, 29:2, 31:19, 31:24, 33:20, 35:11, 37:13, 39:13, 41:14, 41:17, 42:11, 42:16, 42:22, 47:10, 47:15, 47:18, 48:8, 68:20, 69:3, 69:4, 74:13, 75:15, 76:10, 78:15, 82:19, 82:20, 82:24, 83:3, 83:5, 83:19, 86:12, 90:5, 90:6, 90:14, 91:15, 94:20, 97:12, 99:8, 99:14, 102:1, 102:5, 104:9, 105:7, 106:13
**FHFA's** [17] - 12:4, 12:10, 14:3, 16:19, 17:17, 18:3, 18:8, 19:21, 24:23, 26:22, 27:4, 46:22, 64:19, 74:15, 75:20, 78:24, 83:12
**figment** [1] - 70:10
**filed** [4] - 25:12, 25:13, 49:9
**filing** [8] - 25:12, 51:21, 52:3, 55:13, 72:6, 72:8, 72:10, 73:3
**filings** [14] - 5:8, 5:14, 25:15, 25:18, 25:20, 38:15, 49:11, 51:2, 55:14, 56:1, 84:15, 84:16, 91:14, 91:25
**final** [2] - 52:19, 114:6
**finally** [4] - 4:22,

72:17, 111:13, 111:21
**finance** [1] - 20:25
**financeability** [1] - 70:24
**financial** [28] - 5:11, 5:25, 6:2, 6:25, 7:2, 7:4, 7:5, 7:8, 7:21, 9:1, 16:9, 16:12, 16:13, 16:16, 17:1, 17:20, 28:22, 32:20, 40:9, 41:15, 42:25, 50:15, 53:6, 57:20, 66:16, 71:13, 83:1, 84:22
**financially** [1] - 67:22
**financing** [2] - 20:22, 20:24
**fine** [2] - 55:13, 89:10
**finite** [2] - 66:11, 67:9
**first** [40] - 5:3, 11:11, 11:17, 12:3, 12:10, 14:10, 18:13, 26:17, 30:22, 32:12, 33:22, 33:23, 34:18, 38:4, 40:22, 41:16, 42:1, 42:9, 42:13, 44:24, 45:23, 46:2, 49:6, 52:11, 53:24, 55:4, 59:8, 59:18, 62:5, 65:21, 66:6, 66:15, 70:5, 74:9, 80:19, 81:18, 90:1, 94:8, 97:21, 101:1
**five** [2] - 102:8, 110:25
**fixed** [6] - 30:23, 30:25, 34:19, 65:22, 66:8, 66:18
**flatly** [1] - 95:9
**flawed** [2] - 88:20, 107:12
**flowing** [2] - 14:25, 17:14
**fly** [1] - 106:21
**focus** [6] - 11:11, 13:3, 21:16, 42:4, 48:15, 91:10
**focused** [6] - 56:11, 62:6, 67:11, 78:19, 78:20, 78:21
**focusing** [1] - 58:3
**followed** [1] - 44:24
**following** [1] - 78:9
**foot** [1] - 99:3
**forbid** [2] - 103:10, 103:12
**forced** [1] - 35:7
**forecast** [1] - 56:5
**foreseeable** [5] - 28:5, 28:6, 28:7, 94:10,

95:1
**forever** [6] - 37:3,
39:3, 92:2, 103:14,
103:17, 105:9
**forget** [2] - 39:3, 61:11
**forgot** [1] - 40:2
**form** [7] - 11:9, 11:17,
85:15, 85:19, 85:22,
98:7, 100:9
**formal** [7] - 42:13,
63:9, 65:6, 65:17,
74:16, 97:12, 99:21
**formed** [2] - 80:23,
102:7
**formula** [5] - 36:18,
36:25, 37:2, 46:6,
46:7
**forth** [11] - 14:16,
18:23, 36:1, 36:2,
48:8, 50:23, 57:23,
62:10, 63:6, 64:25,
88:3
**forward** [9] - 5:24,
18:18, 23:19, 40:22,
83:2, 83:17, 93:21,
94:23, 109:7
**forward-looking** [2] -
93:21, 109:7
**four** [6] - 22:22, 22:23,
38:9, 39:9, 48:23
**fourteen** [2] - 5:4, 5:6
**fourth** [6] - 5:2, 34:8,
34:12, 34:17, 52:11
**frame** [4] - 21:7,
21:11, 21:18, 21:20
**frankly** [1] - 61:23
**Freddie** [108] - 5:1,
5:8, 5:20, 6:2, 6:9,
6:13, 6:20, 7:1, 7:3,
7:14, 7:17, 8:7, 8:10,
9:13, 9:15, 11:20,
11:24, 11:25, 14:9,
14:11, 14:16, 15:4,
17:9, 17:13, 17:17,
17:23, 19:7, 19:9,
19:14, 19:17, 21:2,
22:20, 23:22, 24:11,
24:24, 25:2, 25:13,
28:24, 29:6, 29:9,
29:15, 30:5, 30:7,
30:16, 30:19, 30:23,
31:18, 31:19, 31:25,
32:21, 34:2, 34:22,
35:2, 35:7, 35:14,
35:24, 36:8, 37:20,
38:6, 38:10, 38:18,
38:23, 39:11, 40:14,
41:6, 44:5, 44:21,
49:9, 49:19, 54:10,
56:3, 56:5, 56:14,

57:2, 57:3, 64:22,
70:12, 71:18, 72:13,
72:21, 73:6, 73:17,
77:11, 80:17, 80:24,
82:11, 84:2, 84:17,
86:13, 90:6, 90:14,
91:16, 91:22, 91:24,
92:2, 92:20, 93:6,
94:9, 95:4, 95:17,
96:25, 98:5, 98:17,
100:8, 105:3, 107:4,
112:18
**Freddie's** [9] - 15:15,
31:10, 31:16, 50:7,
51:3, 52:2, 56:17,
80:12, 84:15
**friend** [1] - 29:25
**fulfill** [10] - 18:4, 19:9,
19:17, 26:13, 62:7,
73:12, 73:13, 89:6,
91:6, 91:22
**fulfilled** [1] - 90:25
**fulfilling** [2] - 69:13,
78:22
**full** [7] - 86:22, 97:19,
97:25, 100:16,
101:12, 108:7
**fully** [2] - 44:22, 44:23
**function** [1] - 30:10
**fund** [1] - 66:23
**fundamental** [2] -
112:1, 112:12
**fundamentally** [2] -
90:12, 107:12
**funding** [6] - 46:3,
66:11, 66:21, 67:9,
67:23, 112:18
**future** [24] - 37:6,
40:23, 46:25, 50:4,
51:6, 51:16, 51:25,
52:6, 57:19, 59:22,
60:25, 66:22, 67:23,
72:25, 73:8, 75:6,
75:25, 77:8, 88:7,
88:23, 93:5, 95:20,
95:21, 103:14

## G

**game** [5] - 24:14,
58:19, 73:15, 101:7,
105:15
**gathered** [1] - 43:14
**gathering** [1] - 43:21
**Geithner** [2] - 45:13,
45:14, 47:24, 48:4,
58:13, 63:5, 65:1,
65:7, 66:14, 105:14,
106:1
**Geithner's** [2] - 63:13,

105:18
**generate** [10] - 38:19,
50:12, 55:9, 55:15,
55:18, 66:18, 67:6,
72:14, 72:22, 73:8
**generating** [3] - 58:3,
59:20, 60:24
**generous** [1] - 101:9
**genesis** [1] - 30:20
**gentlemen** [1] - 8:5
**gesundheit** [1] - 38:25
**given** [10] - 21:18,
31:9, 35:5, 36:11,
39:22, 60:1, 67:12,
89:3, 91:15, 110:5
**glimmer** [1] - 41:24
**goal** [16] - 19:15,
19:21, 61:20, 68:4,
68:5, 68:17, 76:19,
78:23, 90:23, 90:24,
96:13, 97:9, 103:21,
103:22
**goals** [7] - 13:11,
13:24, 22:5, 22:7,
25:6, 45:18, 102:2
**God** [2] - 103:10,
103:12
**godsend** [1] - 96:18
**gospel** [1] - 93:16
**government** [11] -
16:23, 29:11, 30:13,
46:20, 70:3, 70:9,
73:21, 100:17,
112:14, 112:16
**government-
sponsored** [1] -
73:21
**granted** [1] - 29:8
**graph** [3] - 33:6, 33:7
**grateful** [1] - 112:17
**gravely** [1] - 53:22
**great** [5] - 16:13,
39:21, 53:6, 75:25,
93:23
**Great** [2] - 16:14,
28:23
**greater** [2] - 53:8,
73:24
**green** [1] - 34:10
**Griffin** [3] - 94:16,
96:5, 111:8
**group** [3] - 47:18,
48:3, 48:5
**growing** [1] - 89:11
**grown** [1] - 93:8
**GSE** [4] - 67:25, 68:2,
73:21, 100:1
**GSE-based** [1] - 67:25
**GSEs** [44] - 8:12, 10:5,
20:24, 24:7, 32:8,

32:11, 38:21, 41:20,
52:16, 54:1, 54:6,
54:13, 58:3, 59:20,
60:23, 61:13, 61:19,
61:21, 61:22, 62:1,
62:3, 62:6, 62:12,
62:23, 63:18, 64:16,
66:1, 66:10, 66:17,
66:21, 67:5, 67:8,
67:11, 67:21, 67:22,
68:4, 69:7, 69:11,
69:12, 75:23, 78:19,
98:5, 100:8
**GSEs'** [2] - 67:12, 84:8
**guarantee** [3] - 29:16,
107:23, 107:24
**guaranteed** [2] -
67:11, 81:23
**guaranties** [2] - 57:17,
67:12
**guaranty** [17] - 28:11,
29:20, 30:6, 30:9,
30:14, 30:15, 31:16,
33:25, 36:12, 39:7,
53:3, 70:3, 70:9,
71:2, 81:19, 85:10
**guide** [2] - 10:21, 12:1
**guiding** [1] - 11:5
**gun** [1] - 88:5
**guys** [4] - 88:22, 98:4,
103:23

## H

**half** [5] - 15:17, 39:11,
41:16, 48:23, 48:24
**Hamish** [1] - 86:17
**hands** [2] - 39:20,
108:6
**handwritten** [2] -
106:16, 106:17
**happy** [4] - 41:10,
49:3, 53:20, 75:6
**hard** [4] - 19:13, 23:3,
38:7, 98:24
**harsher** [1] - 106:9
**head** [2] - 43:24, 94:15
**heading** [1] - 42:4
**health** [6] - 6:25, 7:2,
7:3, 7:4, 7:5, 15:20
**healthy** [1] - 15:19
**hear** [11] - 11:1, 12:13,
19:4, 19:8, 19:11,
55:11, 58:23, 68:15,
79:14, 89:17, 104:6
**heard** [69] - 5:7, 5:15,
5:16, 5:17, 8:5, 8:24,
14:19, 15:21, 16:5,
16:7, 16:9, 16:11,
16:14, 16:15, 16:21,

22:10, 22:11, 22:12,
24:5, 27:14, 31:4,
31:9, 32:14, 32:16,
33:3, 33:7, 33:9,
34:21, 35:4, 36:16,
39:12, 40:11, 43:13,
47:7, 48:22, 51:18,
56:5, 56:10, 59:14,
60:5, 62:9, 62:14,
63:16, 63:17, 63:18,
64:15, 64:21, 69:19,
71:5, 71:7, 71:23,
71:24, 71:25, 73:16,
74:7, 74:14, 74:17,
74:21, 76:21, 76:23,
77:25, 86:23, 94:10,
101:13, 105:12,
108:16
**hearing** [5] - 5:21,
69:17, 86:21, 89:1,
113:18
**hears** [1] - 6:16
**heart** [1] - 31:1
**heightened** [1] - 53:7
**held** [4] - 4:4, 64:1,
64:8, 113:24
**help** [7] - 19:16, 19:22,
22:2, 42:5, 66:2,
67:19, 100:20
**helped** [4] - 91:22,
101:4
**HERA** [15] - 7:10,
9:17, 16:20, 16:25,
17:1, 17:11, 17:18,
18:2, 29:8, 30:17,
78:25, 81:13, 82:16,
82:17
**Herman** [1] - 4:3
**higher** [1] - 101:12
**highest** [1] - 70:12
**highlighted** [6] -
21:17, 22:4, 22:6,
91:2, 91:4, 91:5
**highlighting** [4] -
57:25, 58:1, 61:15,
91:4
**highly** [1] - 70:23
**Hill** [1] - 104:18
**himself** [2] - 27:25,
32:15
**history** [3] - 5:25, 40:5
**hit** [1] - 28:13
**hits** [2] - 6:19, 53:23
**holders** [1] - 11:24
**holding** [1] - 112:14
**hole** [2] - 35:3, 36:10
**homeowner** [1] -
29:18
**homeowners** [2] -
15:1, 30:4

2984

homes [1] - 16:17
honest [1] - 103:7
Honor [6] - 4:7, 63:22,
64:11, 79:10, 81:4,
114:3
Honor's [2] - 4:22,
86:10
hope [2] - 112:25,
113:1
hopeful [1] - 87:20
hopefully [3] - 90:18,
114:10
hoping [1] - 88:17
horizon [2] - 67:21,
111:5
horrible [1] - 16:16
hour [1] - 113:4
house [1] - 46:23
housing [12] - 7:4,
7:5, 10:6, 15:7,
15:14, 15:19, 16:3,
16:22, 42:14, 53:9,
75:23, 76:15
Housing [1] - 16:20
huge [4] - 7:7, 34:2,
34:20, 101:12
human [2] - 7:8, 13:19
Hume [33] - 4:9, 4:12,
7:18, 7:19, 8:6, 8:24,
10:22, 12:24, 20:12,
27:15, 27:21, 28:1,
32:15, 33:3, 33:10,
35:4, 43:16, 46:7,
48:14, 53:12, 55:12,
59:24, 60:9, 61:10,
64:17, 69:8, 78:6,
79:25, 86:6, 86:16,
86:18, 113:3, 114:1
HUME [3] - 64:2,
86:17, 114:3
Hume's [4] - 4:20,
10:18, 43:3, 59:4
Hume.......................
.............[1] - 3:4
hundred [2] - 30:18,
103:16
hundreds [9] - 7:13,
9:9, 29:11, 36:4,
36:19, 75:13, 83:24,
88:6, 101:18
hurt [1] - 100:18

I

idea [5] - 39:25, 50:5,
70:15, 103:10,
103:13
identical [1] - 26:8
identify [2] - 110:1
ideological [1] -

107:11
illustration [1] -
109:16
imagination [1] -
70:11
immediate [1] - 71:14
immediately [1] - 78:9
impact [2] - 47:5,
47:14
implemented [2] -
107:10, 108:3
implied [5] - 80:6,
80:8, 80:10, 90:7,
112:10
importance [1] - 18:14
important [41] - 6:15,
12:13, 15:6, 15:9,
17:16, 19:25, 20:20,
21:3, 25:5, 27:10,
27:13, 27:19, 34:19,
37:5, 39:17, 41:11,
45:3, 47:21, 47:22,
47:23, 48:10, 57:13,
58:10, 59:15, 61:19,
69:25, 70:4, 80:14,
80:18, 82:18, 94:13,
96:3, 99:5, 99:6,
110:4, 110:8,
111:23, 112:2,
112:3, 112:4, 112:6
importantly [3] -
20:21, 30:22
imposed [1] - 29:2
imposition [1] - 36:7
improve [1] - 67:23
inability [1] - 55:15
incentive [2] - 105:25,
106:1
inception [1] - 49:17
included [1] - 82:15
includes [1] - 82:10
including [5] - 25:9,
27:1, 65:10, 80:22,
112:17
income [17] - 29:17,
38:19, 49:16, 50:10,
50:12, 55:9, 55:15,
55:18, 66:18, 67:6,
72:14, 72:22, 73:9,
84:18, 97:25
incomplete [1] - 71:9
inconsistent [3] -
24:3, 60:13, 94:5
increase [1] - 87:10
increased [1] - 92:23
increases [2] - 93:5,
110:10
increasing [1] - 87:11
increasingly [2] -
51:5, 72:25

increment [1] - 87:8
indeed [1] - 73:5
indefinite [3] - 50:4,
51:16, 51:25
independent [1] -
31:22
indicated [1] - 94:21
individual [1] - 65:18
individual's [1] -
77:13
indulgence [1] - 71:11
infer [1] - 40:16
inflection [1] - 51:19
inform [1] - 44:11
information [15] -
42:17, 42:18, 43:14,
43:21, 44:10, 44:11,
49:8, 50:1, 52:11,
55:21, 55:22, 56:4,
57:3, 57:5, 109:21
informed [2] - 44:22,
44:23
initial [3] - 14:15,
31:17, 32:13
initials [2] - 63:13,
65:8
insane [3] - 95:18,
96:13
inside [1] - 109:21
insolvency [1] - 67:10
instability [2] - 19:19,
50:15
instead [2] - 103:3,
103:13
instituting [1] - 61:17,
61:21
institution [2] - 18:20,
65:19
instruct [9] - 9:4, 13:9,
17:10, 80:5, 80:10,
80:16, 81:4, 82:9,
82:16
instruction [9] -
11:16, 13:13, 13:15,
27:10, 79:7, 79:24,
86:3, 86:7, 90:11
instructions [24] -
4:22, 10:16, 10:21,
10:23, 10:24, 10:25,
11:2, 11:8, 12:1,
12:24, 55:24, 81:11,
86:8, 86:11, 90:2,
90:4, 102:7, 113:5,
113:8, 113:12,
113:15, 114:7,
114:13
intended [1] - 75:12
intent [2] - 45:18,
62:13
interconnected [1] -

15:25
interest [47] - 6:8,
7:11, 7:16, 7:20,
7:21, 8:16, 9:18,
9:22, 10:5, 10:10,
18:5, 19:14, 28:8,
57:21, 62:7, 68:18,
68:21, 68:24, 69:4,
69:5, 73:13, 74:2,
76:9, 76:11, 78:21,
83:4, 83:8, 83:19,
84:21, 86:5, 86:7,
89:4, 89:6, 89:17,
89:18, 89:21, 89:23,
89:25, 90:1, 90:11,
90:12, 92:2, 92:6,
92:9, 92:16, 107:22
interests [7] - 7:12,
9:19, 17:12, 17:20,
20:13, 82:21, 82:25,
83:1, 84:22, 90:5
internal [1] - 93:16
internally [3] - 89:1,
94:5, 99:8
invested [2] - 91:20,
101:12
investing [1] - 20:22
investment [4] - 29:8,
46:12, 46:17, 91:21
investments [4] -
8:25, 9:3, 35:18,
110:13
investor [1] - 35:16
investors [16] - 14:24,
29:17, 30:1, 30:2,
30:4, 30:8, 31:15,
33:12, 33:13, 33:14,
36:13, 46:15, 67:10,
68:1, 93:7, 96:15
invite [1] - 86:21
invoked [1] - 27:21
involved [1] - 71:6
issue [7] - 9:14, 30:5,
64:3, 67:12, 69:23,
70:24, 95:2
issued [3] - 21:13,
81:21, 84:3
issues [6] - 42:14,
44:1, 77:3, 88:13,
112:1
Issues [1] - 45:12
issuing [1] - 31:20
Item [1] - 46:5
item [1] - 65:21
items [1] - 47:17
itself [1] - 66:4

J

January [27] - 36:5,

36:17, 36:20, 36:25,
37:15, 39:3, 39:7,
40:23, 41:1, 41:5,
41:7, 41:12, 42:2,
42:8, 42:19, 44:25,
45:8, 45:11, 45:22,
45:25, 46:15, 47:2,
47:3, 48:20, 49:4,
56:18, 87:23
Jeff [2] - 94:20
job [8] - 28:6, 28:7,
39:19, 78:14, 104:2,
107:16
jobs [1] - 16:18
joint [1] - 15:10
Judge [19] - 9:4,
10:17, 10:25, 11:16,
12:24, 13:9, 13:16,
17:10, 27:3, 64:2,
80:5, 80:16, 81:11,
82:9, 82:15, 83:11,
86:3, 86:7, 90:2
judge [1] - 102:8
judge's [2] - 12:1, 90:4
judges [1] - 86:2
judgment [1] - 106:9
July [7] - 16:21, 16:22,
25:9, 47:2, 48:23,
82:17, 98:16
jump [2] - 11:8, 23:19
June [12] - 46:14,
47:2, 48:19, 48:21,
49:1, 49:2, 49:3,
60:23, 71:1, 72:8,
106:5, 106:18
junior [2] - 11:24,
11:25
jurors [2] - 4:16,
114:10
jury [54] - 4:4, 4:8,
5:15, 6:16, 8:5, 8:8,
10:1, 10:9, 12:12,
13:22, 14:13, 19:2,
25:16, 25:20, 26:1,
27:19, 28:5, 29:23,
32:7, 38:16, 41:12,
43:11, 45:2, 55:24,
58:19, 59:16, 59:23,
60:13, 64:1, 64:4,
64:8, 64:12, 64:24,
66:5, 68:3, 68:13,
69:2, 70:5, 73:10,
74:1, 75:2, 77:21,
79:1, 79:6, 82:18,
83:21, 84:12, 84:20,
85:11, 85:20, 86:17,
108:4, 113:24, 114:7
justice [3] - 111:24,
112:25
justify [2] - 46:12,

46:17

## K

**Kari** [5] - 52:2, 71:24, 73:4, 77:11
**keep** [14] - 7:14, 11:1, 17:13, 27:19, 35:14, 49:22, 58:3, 79:10, 79:11, 79:15, 80:14, 89:13, 105:4
**keeping** [11] - 6:13, 8:12, 24:7, 24:11, 24:13, 24:20, 24:21, 69:12, 69:13, 92:20
**keeps** [1] - 14:24
**kept** [1] - 8:9
**key** [9] - 17:4, 24:23, 27:2, 36:14, 62:17, 62:25, 73:10, 81:3
**kind** [5] - 53:6, 88:21, 97:12, 102:17, 102:25
**knowing** [1] - 104:14
**known** [9] - 12:5, 27:6, 28:18, 47:9, 49:5, 61:2, 69:23, 70:11, 74:13
**knows** [16] - 5:8, 5:24, 5:25, 6:1, 6:9, 6:12, 6:23, 7:2, 7:4, 7:9, 27:22, 27:23, 37:8, 54:14, 70:13

## L

**ladies** [1] - 8:4
**lag** [1] - 25:11
**Lamberth** [14] - 9:4, 10:17, 10:25, 13:9, 13:16, 17:10, 27:3, 64:2, 80:5, 80:16, 81:11, 82:9, 82:15, 83:11
**Lamberth's** [5] - 11:16, 12:24, 86:3, 86:7, 90:2
**language** [3] - 53:8, 58:2, 91:5
**large** [5] - 58:3, 59:20, 60:24, 93:9, 100:4
**larger** [1] - 34:25
**laser** [1] - 62:6
**laser-focused** [1] - 62:6
**last** [16] - 22:2, 22:3, 32:12, 33:22, 37:3, 39:3, 39:7, 53:3, 62:14, 65:4, 86:5, 86:16, 93:10, 93:22, 94:22

**lasted** [2] - 16:10, 43:23
**lastly** [1] - 20:21
**late** [3] - 38:12, 44:2, 70:25
**law** [5] - 7:10, 8:15, 16:21, 18:6, 18:7
**laws** [1] - 80:24
**lawyers** [2] - 11:2, 108:17
**Layton** [4] - 40:11, 40:13, 69:22, 71:23
**Layton's** [1] - 69:19
**lead** [3] - 46:24, 67:10, 70:23
**leading** [2] - 36:3, 69:18
**leads** [1] - 85:8
**learn** [1] - 16:19
**learned** [8] - 7:7, 15:6, 15:19, 16:20, 20:21, 25:10, 34:1, 69:9
**least** [5] - 37:9, 65:12, 68:13, 84:10, 99:8
**leave** [4] - 61:8, 75:11, 108:5, 111:18
**leaving** [2] - 70:1, 107:13
**led** [2] - 42:1, 42:23
**left** [5] - 56:20, 56:21, 57:1, 57:9, 71:15
**legal** [1] - 79:23
**length** [1] - 59:17
**less** [5] - 35:19, 39:9, 54:8, 54:9, 108:14
**lessen** [1] - 101:4
**lesson** [1] - 7:7
**letter** [1] - 111:13
**level** [1] - 95:2
**leveling** [1] - 46:23
**levels** [1] - 70:12
**liabilities** [3] - 5:4, 31:11, 72:18
**lie** [2] - 106:2
**life** [3] - 37:3, 67:12, 67:13
**lifelong** [1] - 6:5
**lift** [1] - 37:13
**light** [2] - 110:22, 113:4
**lights** [2] - 19:12, 23:3
**likelihood** [1] - 93:5
**likely** [6] - 68:1, 74:24, 75:21, 104:21, 104:22, 105:3
**limited** [3] - 67:9, 70:1, 83:22
**line** [10] - 22:22, 24:10, 24:11, 25:19, 47:19, 58:21, 77:5,

86:24, 98:11, 104:19
**liquidation** [2] - 78:10, 110:10
**liquidity** [2] - 18:15, 91:7
**list** [6] - 47:17, 47:19, 48:5, 65:11, 88:12, 110:3
**listen** [1] - 87:19
**listening** [1] - 111:21
**lists** [1] - 98:1
**literally** [4] - 4:25, 16:10, 35:23, 37:11
**lives** [3] - 61:19, 62:1, 62:23
**loan** [1] - 103:18
**Lockhart** [5] - 17:24, 18:11, 19:3, 28:25, 83:14
**long-term** [1] - 50:15
**longer-term** [1] - 68:2
**longer-time** [1] - 67:21
**look** [43] - 14:12, 26:5, 33:11, 38:6, 38:8, 38:17, 44:5, 45:1, 45:6, 49:12, 51:3, 51:11, 52:1, 53:19, 55:4, 55:10, 58:4, 59:6, 61:16, 62:20, 68:22, 73:18, 76:13, 77:10, 88:12, 88:13, 90:14, 97:1, 97:13, 97:15, 97:16, 98:17, 102:8, 102:11, 103:23, 104:21, 108:7, 109:22, 109:23, 110:8, 114:7
**looked** [3] - 28:14, 108:14, 111:15
**looking** [9] - 4:25, 5:1, 5:19, 37:6, 40:22, 46:19, 53:25, 54:1, 93:21, 109:7
**looming** [1] - 84:14
**Lorraine** [1] - 4:3
**lose** [1] - 32:6
**loss** [2] - 100:4, 103:18
**losses** [9] - 34:2, 35:12, 46:3, 51:8, 54:22, 54:24, 66:23, 95:20, 101:1
**lost** [5] - 9:2, 16:17, 20:14, 112:23
**lower** [1] - 67:23
**lunch** [1] - 113:9
**lying** [2] - 60:16, 106:6

## M

**Mac** [9] - 11:20, 11:24, 11:25, 19:17, 40:14, 86:13, 93:6, 95:4, 112:18
**Mac's** [1] - 95:17
**Mae** [6] - 11:24, 19:16, 86:13, 93:6, 95:4, 112:18
**Mae's** [1] - 95:16
**main** [2] - 25:21, 63:17
**maintain** [1] - 26:18, 35:16, 66:2, 67:19, 70:2, 91:1, 91:5, 91:10, 91:11, 107:19
**maintained** [3] - 23:21, 26:20
**major** [2] - 70:21, 96:23
**maker** [3] - 13:17, 13:20, 45:17
**managed** [2] - 9:22, 26:17
**management** [1] - 77:12
**managing** [2] - 26:6, 26:9
**map** [1] - 11:4
**March** [1] - 51:4
**Market** [1] - 45:12
**market** [46] - 5:22, 6:3, 6:24, 7:4, 7:5, 10:7, 14:18, 14:22, 15:7, 15:14, 15:20, 16:3, 16:23, 18:2, 18:15, 19:19, 23:22, 23:25, 29:13, 29:21, 32:17, 32:22, 32:24, 46:10, 46:15, 46:18, 47:17, 52:21, 53:9, 53:22, 54:12, 66:2, 67:20, 69:17, 70:8, 70:24, 71:18, 71:21, 73:17, 75:23, 76:15, 76:22, 85:9, 87:12, 90:24, 98:6
**market's** [1] - 70:2
**marketplace** [1] - 5:22
**markets** [9] - 8:2, 69:24, 70:14, 70:19, 87:14, 87:15, 87:17, 99:10, 104:23
**marks** [2] - 58:22, 60:1
**marshals** [1] - 114:11
**Mary** [1] - 110:9
**Mason's** [1] - 85:24
**matched** [1] - 78:23
**material** [7] - 25:18, 87:11, 109:2, 109:5,

109:8, 109:11, 109:13
**materially** [2] - 87:10, 109:12
**math** [1] - 39:1
**matter** [7] - 27:20, 31:1, 36:10, 58:1, 105:9, 107:12
**mattered** [1] - 96:1
**matters** [1] - 112:12
**maximize** [6] - 7:16, 9:22, 26:12, 26:18, 83:15, 90:22
**maximizing** [2] - 89:25, 90:13
**Mayopoulos** [8] - 32:14, 32:16, 44:7, 71:7, 71:8, 71:25, 72:9, 76:23
**MBS** [12] - 14:24, 29:17, 30:2, 31:15, 33:11, 33:13, 33:14, 36:12, 39:8, 46:15, 93:7, 96:15
**McFarland** [5] - 51:13, 51:18, 55:11, 71:24, 72:9
**McGuire** [4] - 90:16, 93:10, 106:14, 106:20
**mean** [6] - 22:18, 22:19, 47:6, 89:19, 92:12, 109:11
**meaning** [2] - 50:10, 80:11
**means** [13] - 6:23, 18:16, 20:17, 24:9, 24:10, 46:18, 49:11, 57:2, 81:6, 84:1, 95:15, 107:18
**meant** [9] - 5:16, 7:21, 22:17, 34:4, 34:23, 35:23, 36:24, 82:18, 104:11
**measure** [1] - 9:5
**median** [2] - 40:15, 40:16
**meet** [10] - 54:11, 57:22, 66:18, 67:6, 76:19, 78:2, 78:13, 78:14, 78:17, 79:19
**meeting** [29] - 42:1, 42:13, 42:19, 43:19, 43:20, 43:23, 43:25, 44:24, 44:25, 58:7, 58:11, 58:12, 58:13, 58:15, 58:16, 58:18, 59:25, 60:3, 70:20, 94:17, 94:22, 96:5, 96:20, 105:13,

105:17, 106:19,
107:2, 111:9
**meetings** [7] - 43:22,
44:8, 94:21, 94:24,
106:13, 106:15
**members** [45] - 4:8,
5:14, 6:15, 8:5, 8:8,
9:25, 10:8, 12:12,
13:22, 14:13, 19:2,
25:15, 25:19, 25:25,
27:19, 28:5, 29:22,
32:6, 38:15, 41:11,
43:11, 45:2, 58:18,
59:15, 59:23, 60:13,
64:12, 64:24, 66:5,
68:3, 69:1, 70:4,
73:10, 74:1, 75:1,
77:21, 79:1, 82:18,
83:20, 84:12, 84:20,
85:11, 85:20, 86:17,
108:4
**memo** [18] - 43:5,
44:14, 44:18, 48:12,
48:13, 58:5, 58:6,
59:24, 64:15, 65:1,
67:2, 69:16, 87:4,
97:11, 97:12, 99:21,
105:13
**Memorandum** [1] -
63:5
**memorandum** [2] -
63:9, 110:18
**memos** [5] - 48:1,
48:2, 65:7, 88:11,
99:7
**message** [1] - 50:4
**met** [3] - 78:23, 85:16
**meticulously** [1] -
102:10
**mid** [1] - 100:1
**mid-August** [1] -
100:1
**middle** [3] - 9:1,
40:16, 91:5
**might** [12] - 32:22,
71:19, 77:9, 93:25,
97:2, 103:15,
103:18, 103:19,
104:22, 109:5, 110:2
**mildly** [1] - 29:5
**Miller** [2] - 58:12,
65:10
**millions** [2] - 16:17,
101:18
**mind** [9] - 11:1, 27:20,
40:8, 79:10, 79:11,
79:12, 80:14, 86:1,
86:3
**mine** [1] - 62:21
**minute** [4] - 43:2,

46:19, 76:21, 95:6
**minutes** [6] - 10:15,
11:4, 63:21, 63:24,
77:21, 85:18
**mirror** [1] - 6:1
**mission** [24] - 15:3,
15:4, 15:7, 17:8,
18:5, 18:14, 19:10,
19:14, 19:17, 21:16,
26:14, 62:7, 69:14,
73:12, 78:22, 82:14,
90:24, 91:6, 91:17,
91:22, 93:7, 107:20,
107:21, 107:22
**mistake** [1] - 84:12
**mitigate** [2] - 19:18,
19:23
**mix** [4] - 52:11, 55:22,
56:4, 57:3
**moderately** [1] - 52:16
**modification** [5] -
66:2, 66:20, 67:7,
67:18, 67:19
**modified** [1] - 33:21
**moment** [6] - 12:14,
12:19, 21:25, 42:15,
75:9, 95:7
**momentous** [2] - 87:4,
111:17
**moments** [2] - 32:7,
38:17
**money** [33] - 5:12,
6:10, 9:10, 14:25,
17:14, 30:4, 35:15,
35:24, 36:9, 36:17,
41:7, 49:18, 51:9,
64:22, 64:23, 75:14,
91:20, 91:24, 92:21,
93:1, 93:3, 95:21,
96:25, 98:17, 98:18,
100:20, 101:3,
103:16, 105:1,
107:24, 108:1, 112:3
**monthly** [1] - 43:22
**months** [5] - 33:18,
33:20, 35:19, 43:24,
109:4
**Moody's** [1] - 73:18
**morning** [14] - 4:2,
7:18, 8:6, 12:25,
13:13, 13:16, 32:15,
35:5, 42:21, 69:8,
74:7, 86:20, 97:22,
114:8
**mortgage** [25] - 6:3,
8:3, 14:22, 14:23,
15:16, 18:2, 18:15,
23:25, 28:10, 29:13,
29:15, 29:21, 30:8,
33:16, 35:17, 37:4,

39:4, 45:12, 67:11,
67:14, 67:25, 68:2,
70:21, 87:13
**mortgage-backed** [11]
- 8:3, 14:23, 28:10,
29:15, 30:8, 33:16,
35:17, 67:11, 68:2,
87:13
**mortgage-securities**
[1] - 70:21
**mortgages** [11] - 5:18,
14:18, 14:22, 14:25,
15:18, 17:15, 29:18,
30:2, 30:3, 30:7,
67:13
**most** [10] - 6:15,
20:20, 30:22, 40:19,
54:5, 61:19, 74:18,
109:24, 110:3,
114:11
**mostly** [1] - 37:22
**motivating** [1] - 96:23
**motivation** [3] - 41:14,
62:17, 62:24
**motive** [4] - 91:20,
98:10, 98:12
**motives** [1] - 63:17
**mouse** [1] - 88:5
**mouthful** [2] - 12:18,
29:3
**move** [5] - 10:19,
18:18, 21:24, 23:18,
77:20
**moving** [1] - 74:5
**murder** [1] - 111:25
**mutual** [2] - 68:24,
69:4

**N**

**nah** [1] - 103:16
**name** [2] - 51:21,
65:12
**nanosecond** [2] -
19:5, 92:22
**nation's** [1] - 15:17
**near** [3] - 47:6, 47:14,
71:16
**near-term** [2] - 47:6,
47:14
**nearly** [2] - 6:2, 34:14
**necessarily** [1] -
101:21
**necessary** [2] - 66:10,
114:3
**need** [4] - 77:18,
85:17, 99:2, 110:21
**needed** [7] - 18:17,
32:21, 57:15, 62:21,
71:18, 76:1, 76:2

**needing** [1] - 55:1
**negative** [14] - 5:1,
31:10, 32:12, 34:16,
34:18, 37:17, 37:19,
37:22, 38:13, 53:14,
53:25, 72:16, 74:22,
101:2
**negotiate** [1] - 75:15
**negotiated** [1] - 80:25
**negotiating** [1] - 68:20
**negotiations** [7] -
42:22, 42:23, 42:24,
69:3, 76:10, 98:16,
99:24
**nervous** [4] - 32:18,
32:25, 71:22
**net** [97] - 5:1, 19:1,
22:11, 22:13, 23:17,
24:2, 24:15, 26:19,
26:20, 31:10, 31:13,
32:12, 34:8, 34:15,
34:16, 34:18, 37:17,
37:19, 37:21, 38:13,
41:14, 41:20, 41:23,
49:16, 50:12, 53:25,
55:18, 61:17, 61:21,
61:25, 62:21, 64:23,
65:23, 66:9, 66:24,
67:15, 68:6, 72:14,
72:16, 75:19, 76:3,
76:6, 76:8, 76:17,
76:21, 79:8, 85:2,
86:25, 87:9, 87:13,
88:4, 88:21, 89:25,
90:13, 91:1, 91:6,
91:10, 91:11, 91:14,
91:16, 92:1, 92:5,
92:15, 92:23, 93:2,
94:14, 94:17, 94:24,
95:16, 95:17, 95:20,
95:23, 96:11, 96:12,
96:18, 96:24, 97:7,
97:13, 97:23, 98:20,
99:5, 99:25, 100:10,
101:2, 103:14,
103:16, 104:16,
106:23, 106:24,
106:25, 107:19,
107:25, 108:2
**never** [11] - 23:23,
49:18, 59:23, 60:1,
84:3, 84:4, 96:16,
102:1, 102:3, 103:4
**new** [1] - 41:3
**news** [10] - 41:19,
41:21, 41:24, 53:21,
55:3, 72:12, 72:20,
89:1, 97:7, 109:24
**next** [15] - 5:21, 29:1,
34:24, 40:7, 45:20,

46:10, 50:18, 63:15,
66:6, 67:2, 67:3,
75:7, 98:12, 99:17,
102:23
**nice** [1] - 113:23
**ninety** [1] - 102:22
**nip** [1] - 41:21
**nobody** [1] - 94:1
**nominal** [1] - 101:16
**none** [2] - 91:13,
91:25
**normal** [4] - 18:22,
18:24, 19:7, 69:13
**NOTE** [1] - 4:2
**notes** [13] - 43:25,
45:5, 62:15, 62:16,
106:12, 106:14,
106:15, 106:16,
106:17, 106:18,
106:19, 110:7
**nothing** [7] - 43:11,
51:2, 59:12, 99:12,
105:8, 107:6, 108:23
**November** [3] - 25:13,
84:16
**nuanced** [1] - 50:8
**nullified** [2] - 105:10
**number** [20] - 11:10,
14:17, 18:4, 32:18,
33:1, 35:22, 36:18,
36:19, 45:4, 45:6,
46:7, 46:8, 54:2,
68:12, 74:11, 77:3,
80:21, 89:12, 106:23

**O**

**o'clock** [4] - 113:6,
113:17, 113:19,
114:8
**oath** [3] - 51:22,
60:17, 73:5
**objection** [1] - 114:2
**objective** [10] - 18:3,
18:21, 19:4, 19:21,
57:16, 68:4, 68:5,
76:20, 79:19
**objectively** [4] - 12:16,
12:20, 80:1, 80:3
**objectives** [19] -
13:12, 13:20, 13:25,
14:2, 14:3, 14:7,
14:16, 16:19, 18:4,
18:9, 24:24, 25:6,
26:6, 26:23, 42:6,
45:19, 78:24
**obligation** [16] - 7:20,
18:7, 19:22, 49:14,
49:16, 49:25, 50:4,
51:5, 51:16, 51:24,

72:15, 72:24, 73:7, 78:13, 78:17, 80:11
**obligations** [18] - 13:21, 14:2, 14:4, 14:7, 14:16, 16:20, 18:9, 24:24, 26:6, 26:23, 50:21, 54:12, 55:19, 72:23, 73:13, 78:3, 78:14
**obviously** [4] - 36:15, 89:16, 110:6, 110:17
**occur** [1] - 75:7
**occurred** [1] - 94:24
**October** [2] - 25:10, 39:13
**odd** [1] - 58:24
**offering** [1] - 82:3
**office** [1] - 43:8
**officers** [2] - 5:10, 5:11
**official** [3] - 26:1, 65:2, 105:18
**officially** [2] - 45:17, 67:15
**once** [9] - 6:19, 17:22, 33:14, 33:15, 53:1, 68:20, 76:16, 82:19
**one** [69] - 12:3, 13:13, 13:14, 14:17, 18:4, 20:18, 21:5, 24:23, 26:8, 26:24, 27:22, 27:23, 28:4, 28:9, 29:6, 34:13, 38:1, 39:17, 40:19, 42:6, 45:17, 46:2, 47:24, 53:9, 53:17, 54:5, 56:13, 57:11, 57:12, 59:1, 60:23, 61:7, 61:8, 64:2, 70:21, 71:23, 72:1, 72:3, 75:2, 75:7, 79:6, 79:13, 79:23, 84:8, 85:19, 87:6, 88:7, 88:8, 89:18, 91:7, 92:22, 94:13, 98:1, 98:2, 101:6, 102:9, 102:22, 102:23, 102:24, 103:1, 104:10, 104:11, 105:16, 106:6, 108:20, 108:24
**one's** [1] - 47:21
**one-off** [1] - 87:6
**one-time** [1] - 75:2
**ones** [9] - 34:11, 47:11, 47:25, 48:3, 53:19, 53:20, 53:21, 90:18
**open** [4] - 19:12, 23:3, 44:9, 92:22

**opening** [2] - 14:14, 80:15
**operate** [2] - 90:21, 90:22
**operated** [1] - 83:15
**operating** [2] - 51:7, 66:23
**operational** [1] - 46:24
**operationally** [1] - 77:17
**operations** [5] - 18:22, 18:24, 19:7, 64:17, 69:13
**opinion** [5] - 76:12, 92:11, 92:12, 92:13, 107:15
**opposite** [7] - 8:9, 22:12, 22:13, 63:19, 64:18, 76:10, 98:18
**optimism** [3] - 51:20, 93:17, 94:6
**optimistic** [1] - 53:16
**option** [6] - 78:12, 79:13, 79:17, 83:10, 84:11, 84:24
**options** [4] - 79:15, 79:24, 83:8, 107:3
**order** [2] - 20:3, 113:9
**orders** [1] - 48:4
**organization** [1] - 23:10
**orient** [1] - 45:10
**otherwise** [1] - 91:21
**outcome** [1] - 53:5
**outlooks** [1] - 53:20
**outstanding** [2] - 20:11, 20:17
**outweighs** [1] - 74:23
**overdelivering** [1] - 94:2
**overriding** [1] - 18:3
**overview** [2] - 58:14, 58:22
**owe** [1] - 6:11
**own** [3] - 16:11, 68:18, 100:15
**owned** [1] - 15:17

**P**

**p.m** [1] - 114:16
**packaged** [1] - 14:22
**pad** [1] - 61:12
**page** [10] - 20:1, 45:9, 45:20, 65:4, 66:6, 67:3, 67:17, 78:4, 110:19
**PAGE** [1] - 3:2
**paid** [6] - 4:14, 25:22, 30:3, 30:7, 100:3

**panic** [1] - 33:14
**panicking** [4] - 33:12, 33:13, 33:15, 87:16
**paper** [2] - 51:10, 58:8
**paragraph** [2] - 66:7, 67:17
**part** [26] - 9:12, 9:19, 9:23, 10:1, 17:4, 17:16, 20:6, 49:8, 59:7, 59:8, 59:9, 78:6, 78:7, 78:14, 81:13, 82:8, 82:16, 82:22, 83:25, 90:20, 91:17, 98:24, 104:23, 105:2, 112:9
**participants** [10] - 32:17, 32:22, 32:24, 46:10, 46:15, 46:18, 53:22, 70:24, 71:19, 71:21
**particular** [1] - 106:21
**parties** [3] - 15:12, 20:8, 81:6
**partner** [1] - 112:2
**parts** [2] - 12:3, 12:8
**party** [1] - 67:5
**pass** [1] - 22:15
**passage** [3] - 20:12, 52:3, 59:16
**passed** [5] - 7:10, 16:21, 16:25, 81:13, 82:17
**past** [1] - 85:22
**path** [1] - 73:22
**paths** [1] - 46:23
**patience** [2] - 104:5, 113:23
**patiently** [1] - 111:21
**pause** [1] - 42:15
**pay** [25] - 6:10, 6:20, 19:23, 24:17, 30:8, 30:23, 34:23, 34:24, 35:8, 38:19, 41:7, 50:6, 55:9, 55:15, 59:21, 60:25, 66:17, 66:21, 67:8, 72:22, 78:8, 78:16, 85:7, 93:3, 95:21
**payable** [1] - 50:13
**paying** [2] - 73:24, 103:3
**payment** [5] - 29:19, 66:13, 77:18, 102:17, 102:25
**payment-in-kind** [2] - 102:17, 102:25
**payments** [4] - 5:12, 5:19, 66:21, 77:9
**PCF** [2] - 31:3, 50:23
**peer** [1] - 105:21

**penalty** [8] - 78:2, 78:12, 102:18, 103:10, 103:11, 103:12
**people** [15] - 7:12, 19:13, 23:3, 23:14, 43:15, 44:20, 51:11, 71:5, 75:14, 88:18, 93:23, 93:25, 94:4, 97:2
**perceived** [1] - 106:11
**percent** [28] - 6:10, 30:24, 31:8, 34:19, 34:23, 42:7, 42:12, 59:21, 65:22, 66:9, 66:19, 77:25, 78:1, 78:7, 78:10, 78:16, 87:7, 100:3, 101:11, 101:15, 102:19, 103:2, 103:10, 103:14, 103:16, 105:8, 105:11, 108:14
**perhaps** [2] - 6:15, 20:20
**period** [16] - 23:4, 25:9, 25:11, 37:19, 38:11, 38:15, 47:4, 48:24, 48:25, 50:9, 55:8, 72:7, 75:14, 75:18
**period-to-period** [2] - 50:9, 55:8
**periodic** [5] - 31:3, 47:7, 75:10, 75:12, 75:18
**permanent** [1] - 83:20
**permission** [1] - 32:5
**person** [9] - 43:10, 43:20, 58:16, 59:25, 65:18, 94:20, 98:15, 99:24
**personal** [1] - 101:22
**personnel** [1] - 65:11
**perspective** [3] - 75:20, 75:21, 109:25
**pessimistic** [1] - 53:15
**Ph.D** [1] - 5:24
**phrase** [4] - 12:23, 25:18, 40:2, 73:10
**pick** [3] - 39:4, 40:7, 78:12
**picture** [1] - 97:19
**piece** [5] - 24:23, 25:5, 45:3, 45:6, 81:25
**pieces** [1] - 51:10
**pile** [1] - 43:7
**place** [10] - 6:18, 14:10, 26:25, 33:17,

52:15, 52:20, 53:13, 61:18, 76:17, 104:19
**placed** [1] - 6:6
**plaintiffs** [18] - 7:19, 11:18, 41:13, 43:4, 44:13, 58:2, 58:9, 58:25, 59:16, 61:9, 62:10, 63:16, 64:15, 76:13, 77:23, 85:16, 86:16, 110:23
**plaintiffs'** [12] - 12:16, 12:20, 16:11, 25:21, 68:18, 74:6, 74:12, 90:9
**plan** [13] - 28:6, 28:7, 28:16, 39:18, 40:6, 41:5, 50:17, 52:15, 52:19, 62:8, 68:3, 88:16, 104:24
**planning** [1] - 39:19
**plans** [1] - 88:24
**platforms** [1] - 23:13
**play** [2] - 36:5, 36:15
**plenty** [1] - 71:15
**point** [36] - 5:11, 24:1, 32:21, 33:2, 33:10, 40:7, 43:20, 44:17, 44:18, 44:19, 51:1, 51:19, 53:12, 59:14, 59:15, 60:6, 60:7, 61:5, 62:14, 63:20, 64:17, 68:15, 71:4, 71:12, 71:17, 71:20, 81:3, 86:6, 87:16, 93:13, 98:15, 99:24, 103:1, 109:6, 111:6
**point-blank** [2] - 60:6, 60:7
**pointed** [1] - 33:11
**pointing** [2] - 26:7, 91:9
**points** [5] - 21:3, 102:15, 104:4, 109:20, 110:19
**policy** [2] - 107:9, 107:11
**portfolio** [1] - 108:11
**portfolios** [1] - 15:16
**portion** [1] - 4:2
**position** [1] - 91:18
**positions** [1] - 45:18
**positive** [16] - 26:19, 26:20, 31:12, 37:21, 41:15, 41:19, 41:21, 41:24, 42:25, 49:5, 53:14, 74:23, 91:6, 91:10, 91:16
**possibilities** [1] - 77:6
**possibility** [2] - 59:2, 77:8

**possible** [4] - 77:8,
79:23, 88:25, 106:16
**possibly** [1] - 108:24
**post** [1] - 23:9
**post-
conservatorship** [1]
- 23:9
**potential** [2] - 72:3,
75:24
**potentially** [2] - 50:21,
66:10
**power** [2] - 17:17,
25:1
**PowerPoint** [2] -
45:11, 45:22
**powers** [2] - 17:6,
17:7
**PR** [1] - 59:2
**preconservatorship**
[1] - 23:8
**predict** [4] - 57:13,
57:19, 94:3, 104:12
**prediction** [1] - 93:21
**prefer** [1] - 104:5
**preference** [1] -
110:10
**preferred** [8] - 11:24,
11:25, 20:4, 20:10,
29:3, 31:17, 73:24,
110:14
**prejudgment** [2] -
86:5, 86:7
**prepared** [1] - 4:3
**preponderance** [1] -
11:19
**presence** [4] - 4:4,
64:1, 64:8, 113:24
**present** [1] - 21:21
**presentation** [1] -
89:20
**presented** [1] - 92:10
**preservation** [2] -
8:11, 23:15
**preserve** [8] - 22:1,
22:8, 22:17, 22:18,
22:19, 57:15, 77:6,
107:17
**preserving** [11] -
22:12, 22:24, 22:25,
23:11, 24:3, 24:19,
24:20, 62:9, 63:19,
66:3, 67:20
**press** [1] - 97:23
**presto** [1] - 99:13
**pretty** [2] - 13:18,
44:15
**prevent** [1] - 66:1
**preview** [1] - 21:5
**price** [3] - 46:23,
105:5, 108:1

**primary** [1] - 14:21
**principal** [5] - 59:6,
59:12, 77:24,
111:13, 111:15
**principally** [1] -
101:24
**principle** [1] - 112:13
**principles** [2] - 112:6,
112:7
**private** [8] - 19:24,
22:18, 31:20, 80:17,
100:18, 100:21,
104:23, 112:22
**problem** [22] - 26:3,
34:20, 35:2, 35:12,
37:7, 38:3, 51:3,
57:6, 62:22, 70:6,
70:11, 70:22, 73:1,
76:19, 84:7, 84:14,
85:4, 87:23, 98:2,
98:19, 98:23, 100:13
**problems** [1] - 40:19
**probs** [1] - 103:19
**procedures** [1] - 25:19
**proceed** [2] - 4:6,
64:10
**Proceedings** [5] - 4:4,
64:1, 64:8, 113:24,
114:16
**process** [15] - 18:20,
42:20, 42:21, 43:1,
43:4, 43:23, 44:19,
47:24, 48:9, 57:23,
65:6, 74:16, 77:17,
111:14, 111:19
**Professor** [2] - 94:11,
100:25
**profit** [1] - 91:20
**profitability** [2] -
67:24, 91:10
**profitable** [1] - 94:23
**profits** [22] - 7:17,
22:19, 49:24, 50:3,
50:6, 51:15, 51:24,
65:25, 84:8, 87:1,
87:5, 87:7, 88:1,
88:7, 89:11, 93:9,
93:11, 98:6, 101:20,
104:20, 105:4, 105:6
**prohibited** [1] - 31:20
**projection** [5] - 54:4,
56:17, 57:2, 57:14,
73:18
**projections** [8] -
39:13, 46:22, 57:12,
67:4, 67:5, 93:17,
109:13, 109:14
**promise** [2] - 4:10,
94:2
**proof** [1] - 85:16

**proposals** [1] - 107:13
**propose** [1] - 114:13
**prospective** [1] -
49:15
**protect** [21] - 6:7,
7:11, 7:12, 7:16,
8:15, 9:22, 10:10,
18:2, 18:5, 24:16,
28:8, 40:24, 57:21,
69:5, 73:13, 73:14,
74:3, 76:11, 83:4,
83:7, 96:14
**protected** [1] - 7:25
**protecting** [4] - 68:17,
68:18, 75:5, 78:21
**prove** [2] - 11:18,
85:17
**proved** [1] - 86:4
**provide** [4] - 14:17,
20:24, 23:24, 112:18
**provided** [3] - 20:8,
58:14, 98:9
**provides** [1] - 95:20
**providing** [2] - 18:14,
91:6
**proving** [1] - 104:15
**provision** [2] - 102:17,
102:25
**proxy** [1] - 40:2
**PSP** [1] - 33:21
**PSPA** [12] - 29:5,
30:19, 31:2, 31:17,
31:23, 31:24, 32:8,
47:16, 59:7, 71:15,
77:7, 106:25
**PSPAs** [7] - 42:23,
59:3, 66:12, 66:22,
67:8, 83:25, 88:2
**public** [70] - 6:5, 6:8,
7:11, 7:16, 7:20,
8:16, 9:18, 9:22,
10:4, 10:10, 15:3,
15:4, 15:6, 17:8,
17:12, 17:13, 17:14,
17:20, 18:5, 19:10,
19:14, 26:13, 28:8,
39:22, 39:23, 57:21,
62:7, 68:18, 68:21,
69:5, 69:14, 73:12,
73:13, 74:2, 76:8,
76:11, 78:21, 78:22,
82:14, 82:21, 82:25,
83:4, 83:7, 83:12,
83:19, 84:21, 89:4,
89:6, 89:17, 89:18,
89:21, 89:23, 89:25,
90:1, 90:6, 90:11,
90:12, 90:24, 91:17,
91:22, 92:2, 92:5,
92:9, 92:16, 93:7,

107:22
**pull** [6] - 18:9, 45:9,
56:7, 63:2, 82:2,
106:14
**pumped** [1] - 7:13
**purchase** [3] - 29:4,
29:7, 31:18
**purchasing** [1] - 68:1
**purpose** [17] - 14:9,
15:5, 22:8, 24:15,
61:21, 61:25, 63:17,
63:18, 64:16, 64:18,
64:22, 64:25, 65:21,
66:15, 66:24, 80:12
**Purpose** [2] - 65:21,
66:7
**purposes** [1] - 78:23
**push** [6] - 98:20,
99:17, 99:18, 107:9,
111:2, 111:3
**pushing** [4] - 86:25,
99:14, 99:15, 99:19
**putting** [2] - 22:13,
24:4, 59:11
**PX-1-A** [1] - 110:13
**PX-144** [1] - 42:3
**PX-196** [1] - 111:10
**PX-2-E** [1] - 111:15
**PX-205** [3] - 57:24,
105:12, 110:17
**PX-210** [1] - 110:19
**PX-226-A** [1] - 110:24
**PX-227** [2] - 99:22,
111:1
**PX-242** [1] - 111:1
**PX-246** [1] - 111:1
**PX-247** [1] - 111:2
**PX-259** [3] - 94:13,
96:2, 111:4
**PX-486** [2] - 63:3,
64:12
**PX-500** [1] - 111:13
**PX-550-M** [1] - 110:9

**Q**

**Q1** [4] - 37:25, 38:21,
38:23
**Q4** [2] - 38:20, 38:23
**qualified** [1] - 92:9
**qualify** [1] - 92:7
**quarreling** [1] -
104:10
**quarter** [46] - 5:2, 5:3,
25:3, 25:8, 25:14,
31:10, 32:12, 32:13,
33:22, 34:4, 34:5,
34:8, 34:9, 34:12,
34:14, 34:17, 34:18,
34:24, 36:11, 38:4,

38:5, 42:8, 42:10,
45:23, 45:24, 47:20,
48:11, 48:18, 48:19,
49:6, 52:11, 53:24,
72:7, 72:12, 72:16,
75:3, 75:4, 87:24,
87:25, 95:12, 98:21,
99:2, 99:10, 100:2
**quarterly** [4] - 50:22,
52:7, 74:16, 74:18
**quarters** [15] - 5:2,
5:4, 5:6, 37:21,
37:25, 38:1, 38:8,
38:9, 38:13, 39:10,
50:10, 53:25, 72:16,
72:17, 95:21
**QUESTION** [1] - 103:4
**questions** [8] - 10:15,
11:10, 46:11, 46:16,
59:4, 60:6, 60:7,
85:19
**quick** [1] - 64:2
**quickly** [3] - 92:25,
102:15, 109:10
**quite** [3] - 95:10,
102:9, 102:10
**quotation** [2] - 58:21,
59:25
**quote** [2] - 43:13,
62:15
**quoted** [2] - 43:13,
59:17
**quotes** [2] - 58:22,
105:15

**R**

**raise** [7] - 46:11,
46:16, 64:2, 100:20,
104:23, 114:5,
114:14
**raised** [2] - 59:2,
77:22
**raises** [1] - 112:1
**raising** [1] - 53:7
**range** [6] - 34:12,
56:9, 77:6, 79:23,
83:8, 83:10
**rate** [3] - 42:7, 42:12,
108:12
**rates** [1] - 67:25
**reach** [2] - 62:18,
106:9
**react** [1] - 98:22
**reaction** [5] - 77:11,
77:13, 77:15, 77:16,
87:5
**read** [12] - 20:12, 50:1,
50:19, 52:2, 58:8,
86:6, 86:8, 111:7,

113:4, 113:7, 114:7, 114:13
**reading** [1] - 52:20
**real** [9] - 16:16, 42:17, 42:18, 55:25, 70:11, 70:23, 102:15, 111:14, 113:20
**reality** [1] - 40:4
**really** [15] - 16:3, 28:23, 29:3, 30:9, 30:20, 33:5, 35:6, 41:17, 59:5, 80:14, 86:23, 93:23, 95:14, 98:20, 101:9
**rearview** [1] - 6:1
**reason** [5] - 9:8, 14:9, 65:24, 78:8, 95:1
**reasonable** [34] - 8:16, 8:20, 9:6, 10:3, 10:11, 11:23, 12:4, 12:11, 12:16, 12:20, 12:21, 13:4, 13:7, 14:1, 21:9, 21:10, 25:6, 27:5, 27:11, 74:4, 79:2, 79:9, 79:20, 79:21, 80:1, 80:3, 83:9, 85:14, 86:4, 88:8, 88:9, 90:10, 101:25, 102:14
**reasonably** [14] - 8:15, 8:19, 10:9, 12:6, 13:11, 42:16, 79:13, 83:3, 84:10, 84:19, 84:23, 85:12, 85:13, 92:16
**reasons** [5] - 28:24, 62:20, 63:17, 67:15, 103:9
**rebuild** [5] - 78:20, 87:3, 98:6, 101:24, 102:3
**rebuilding** [2] - 66:1, 103:23
**receive** [1] - 31:3
**received** [2] - 104:16, 114:6
**receives** [1] - 94:15
**receiving** [1] - 7:22
**recent** [4] - 40:5, 54:4, 54:6, 74:18
**recently** [1] - 40:8
**Recess** [1] - 63:25
**recesses** [1] - 113:13
**Recession** [1] - 16:14
**recognize** [1] - 112:19
**recognized** [1] - 114:11
**recollection** [2] - 62:16, 77:4

**recommendation** [2] - 63:12, 65:8
**record** [4] - 58:20, 100:1, 100:3, 114:2
**recovery** [1] - 111:10
**Recovery** [1] - 16:20
**red** [13] - 5:5, 34:3, 34:11, 36:11, 37:18
**reduce** [2] - 42:6, 77:8
**reduction** [5] - 59:6, 59:12, 108:12, 111:13, 111:16
**refer** [1] - 15:11
**reference** [4] - 21:16, 50:21, 69:16, 80:3
**references** [1] - 50:20
**referred** [5] - 15:2, 16:14, 51:2, 79:25
**referring** [5] - 52:17, 53:1, 53:5, 67:13, 71:16
**refers** [1] - 78:7
**regarding** [1] - 46:11
**regret** [1] - 93:25
**regular** [2] - 13:1, 43:18
**regularly** [2] - 44:7, 50:12
**regulate** [1] - 80:24
**regulators** [2] - 91:23, 100:19
**related** [1] - 14:6
**relates** [1] - 59:16
**relationship** [1] - 20:22
**release** [2] - 97:23, 100:4
**released** [1] - 105:6
**releases** [1] - 100:1
**relevant** [2] - 43:14, 43:15
**reliable** [3] - 58:19, 105:21, 105:23
**relied** [1] - 25:20
**relief** [1] - 76:22
**relies** [5] - 17:13, 25:22, 25:23
**rely** [2] - 25:17, 106:6
**remain** [3] - 20:11, 20:16, 66:11
**remained** [2] - 18:6, 20:13
**remaining** [3] - 67:9, 79:4, 85:19
**remains** [1] - 73:22
**remarks** [4] - 4:20, 4:21, 10:18, 43:3
**remember** [18] - 14:21, 15:10, 22:21, 23:6, 24:9, 26:9,

29:16, 36:25, 38:2, 41:11, 45:5, 50:24, 54:19, 77:2, 91:19, 99:16, 100:5, 111:7
**remind** [1] - 14:13
**reminded** [1] - 91:7
**reminding** [1] - 22:16
**renewed** [3] - 99:16, 99:17, 111:2
**repeat** [1] - 53:6
**replace** [1] - 65:22
**replaced** [3] - 37:15, 104:1, 107:14
**replacing** [1] - 66:8
**report** [7] - 52:13, 52:14, 52:23, 52:24, 53:8, 53:21, 105:18
**reported** [2] - 4:3, 49:16
**REPORTER'S** [1] - 4:2
**reporting** [4] - 25:11, 54:6, 94:17, 96:4
**reports** [4] - 53:13, 54:13, 109:18, 109:21
**represent** [2] - 100:21, 112:4
**representatives** [1] - 44:8
**request** [2] - 51:4, 55:6
**required** [2] - 52:5, 83:4
**requirement** [2] - 66:19, 84:18
**requirements** [1] - 67:6
**rerecording** [1] - 94:19
**reserve** [1] - 100:4
**reserves** [1] - 103:18
**resets** [1] - 46:3
**residential** [1] - 14:18
**resiliency** [1] - 53:3
**resolve** [1] - 69:25
**resolved** [1] - 30:5
**respect** [4] - 26:6, 43:11, 77:18, 112:16
**respectfully** [4] - 25:25, 85:11, 85:15, 85:20
**responded** [1] - 13:20
**responding** [3] - 13:11, 13:24
**responds** [1] - 22:6
**response** [4] - 12:5, 13:25, 16:25, 98:20
**responsibility** [7] - 6:6, 6:7, 18:1, 18:6, 20:24, 39:23

**restore** [2] - 19:16, 19:22
**result** [5] - 49:23, 50:2, 50:14, 67:22, 93:6
**results** [7] - 41:15, 42:8, 42:10, 42:25, 45:23, 45:24, 49:5
**retain** [4] - 87:3, 97:1, 98:6
**retained** [3] - 20:14, 20:15, 108:11
**retire** [1] - 11:9
**retirement** [1] - 91:21
**return** [5] - 8:4, 54:20, 86:12, 98:6, 101:12
**returning** [1] - 18:22, 18:24
**returns** [4] - 9:23, 26:18, 83:16, 90:22
**revenues** [3] - 58:3, 59:20, 60:24
**review** [4] - 21:15, 60:2, 74:16, 74:18
**reviewed** [1] - 98:9
**rid** [5] - 57:25, 61:20, 62:3, 63:18, 96:16
**rights** [6] - 104:18, 105:6, 105:8, 105:10, 111:25, 112:22
**risk** [24] - 9:2, 15:21, 15:23, 19:18, 19:23, 23:20, 53:8, 66:10, 66:25, 68:7, 71:20, 75:23, 76:2, 76:7, 76:15, 79:18, 84:25, 92:24, 109:2, 109:5, 109:8, 109:12, 112:23
**risks** [7] - 87:10, 87:11, 88:6, 93:22, 109:7, 110:1
**road** [1] - 11:4
**roaring** [1] - 111:10
**rocket** [1] - 40:20
**role** [3] - 11:19, 39:22, 69:12
**room** [1] - 68:13
**root** [1] - 30:20
**rosy** [1] - 53:19
**run** [1] - 14:20
**running** [3] - 23:10, 23:11, 33:15

**S**

**safe** [5] - 22:9, 24:4, 24:7, 24:20, 24:21
**safety** [3] - 10:5, 10:6,

102:17
**safety-valve** [1] - 102:17
**sat** [1] - 43:8
**satisfied** [1] - 92:16
**Satriano** [4] - 71:25, 74:15, 94:15, 108:9
**save** [2] - 90:6, 109:19
**saw** [35] - 10:17, 13:13, 13:16, 14:5, 14:13, 14:14, 18:11, 34:7, 34:20, 41:1, 41:15, 41:18, 43:24, 52:13, 52:14, 52:15, 57:11, 57:22, 63:6, 65:7, 69:11, 69:16, 73:18, 73:20, 78:12, 81:20, 81:21, 82:1, 98:8, 106:9, 106:12, 108:8, 108:9, 108:13
**scenario** [21] - 5:19, 39:12, 39:15, 39:16, 39:24, 40:1, 40:3, 41:10, 52:17, 54:4, 56:10, 56:11, 56:15, 56:23, 57:8, 57:18, 89:5, 89:10, 99:11
**scenarios** [1] - 56:13
**science** [1] - 40:20
**screens** [1] - 90:18
**seated** [4] - 4:5, 4:18, 64:9, 113:25
**SEC** [22] - 25:15, 38:15, 51:2, 51:21, 52:3, 55:13, 72:6, 87:8, 89:8, 90:15, 90:17, 91:13, 91:25, 93:4, 93:14, 93:16, 93:20, 94:4, 108:22, 109:1, 109:17, 109:25
**second** [27] - 12:15, 21:16, 26:13, 34:9, 35:20, 36:6, 36:14, 38:2, 42:8, 45:23, 47:20, 48:11, 48:18, 49:6, 59:9, 72:7, 72:12, 72:16, 80:25, 87:24, 87:25, 88:3, 99:2, 99:10, 100:1, 106:24
**secondary** [7] - 6:3, 14:17, 18:2, 18:15, 23:24, 29:12, 29:21
**secretary** [2] - 58:13, 59:2
**Secretary** [13] - 45:13, 45:14, 47:24, 48:4, 63:5, 63:8, 65:1, 66:14, 105:14,

105:18, 110:20
**securities** [13] - 8:3,
14:23, 14:24, 29:16,
33:16, 35:18, 46:12,
49:11, 67:11, 68:2,
70:21, 73:24
**Securities** [1] - 5:9
**securities'** [2] - 30:8,
84:15
**securitized** [1] - 39:5
**security** [2] - 28:10,
87:13
**see** [38] - 4:12, 15:15,
21:15, 25:12, 37:20,
37:25, 38:7, 38:10,
38:17, 39:1, 39:2,
39:6, 39:14, 42:24,
49:12, 50:20, 52:10,
54:16, 55:24, 59:11,
63:2, 70:22, 75:11,
78:11, 81:20, 90:18,
91:8, 91:12, 97:5,
97:12, 97:19, 99:7,
99:12, 102:4,
106:16, 107:1,
113:16, 114:15
**seeing** [1] - 52:21
**seem** [1] - 43:7
**sees** [1] - 59:3
**selected** [1] - 4:16
**sell** [1] - 29:15
**sends** [1] - 99:16
**senior** [4] - 29:3,
77:12, 105:18
**sense** [21] - 27:20,
39:18, 40:10, 62:3,
87:19, 87:20, 93:19,
96:1, 96:6, 96:10,
96:21, 97:8, 97:9,
98:11, 98:12, 98:20,
103:21, 106:10,
108:6, 108:12, 111:6
**sensible** [1] - 35:5
**sentence** [2] - 22:6,
50:2
**sentences** [1] - 59:1
**separate** [1] - 59:7
**September** [14] -
17:23, 18:12, 19:20,
20:7, 21:14, 21:20,
26:16, 26:25, 28:21,
30:15, 32:7, 33:19,
112:19
**serious** [1] - 42:14
**servant** [1] - 6:5
**serve** [2] - 6:8, 62:7
**served** [2] - 89:25,
90:13
**set** [4] - 14:15, 47:19,
48:10, 64:14

**sets** [1] - 64:25
**setting** [2] - 47:5,
47:14
**settled** [1] - 65:14
**several** [3] - 88:7,
89:18, 108:8
**shall** [1] - 78:8
**share** [8] - 20:17,
81:1, 81:7, 81:19,
81:22, 82:12, 82:13,
105:2
**shared** [4] - 62:12,
68:16, 68:17, 69:4
**shareholder** [1] - 11:23
**shareholder** [35] -
8:14, 8:18, 8:20,
9:12, 9:24, 10:2,
12:17, 12:25, 20:6,
21:9, 25:6, 26:12,
26:18, 30:16, 32:8,
54:25, 74:6, 80:14,
80:25, 81:1, 81:7,
81:16, 82:8, 82:12,
82:19, 83:2, 83:9,
83:15, 84:1, 84:24,
90:22, 110:13
**shareholders** [44] -
7:17, 7:22, 8:25, 9:7,
9:10, 9:23, 10:4,
10:11, 12:6, 17:21,
19:24, 20:7, 20:13,
20:14, 21:6, 22:18,
26:7, 26:10, 31:20,
54:21, 78:21, 79:3,
79:9, 80:13, 80:17,
82:23, 83:17, 84:9,
84:13, 89:21, 90:12,
91:18, 91:20,
100:18, 100:21,
101:2, 101:25,
105:1, 107:23,
107:25, 110:14,
112:4, 112:22
**shareholders'** [6] -
9:5, 21:5, 77:20,
80:1, 84:22, 85:13
**shares** [3] - 20:14,
20:15, 105:7
**sheet** [6] - 21:12,
21:13, 22:2, 65:9,
95:4, 95:5
**shine** [1] - 45:25
**short** [1] - 110:3
**shorter** [1] - 29:5
**shoulders** [1] - 6:7
**show** [26] - 10:18,
14:3, 18:8, 41:22,
41:23, 46:22, 57:12,
62:11, 63:1, 81:16,
87:8, 90:1, 90:19,

92:25, 93:11, 93:13,
94:12, 97:19, 98:12,
106:21, 108:18,
108:25, 109:10,
109:14, 109:20,
110:13
**showed** [19] - 8:8,
10:8, 17:1, 17:10,
26:22, 29:19, 73:16,
78:6, 86:24, 87:9,
90:19, 97:11, 97:22,
98:11, 104:19,
107:4, 109:13, 111:4
**showing** [4] - 91:9,
94:6, 111:2
**shown** [4] - 10:12,
41:23, 64:4, 106:22
**shows** [12] - 33:11,
34:8, 37:24, 54:6,
65:9, 73:20, 93:1,
93:19, 110:9,
110:11, 110:15,
111:14
**shred** [3] - 19:4, 19:8,
19:11
**sic** [3] - 26:25, 27:5,
49:5
**side** [1] - 92:10
**side's** [2] - 103:22,
112:8
**sigh** [1] - 76:22
**sight** [1] - 32:6
**sign** [3] - 26:1, 51:21,
52:8
**signed** [5] - 5:9,
51:11, 65:7, 66:14,
72:8
**significant** [4] - 18:16,
50:14, 54:23, 95:5
**similar** [2] - 62:18,
110:22
**simplified** [1] - 77:16
**simply** [1] - 112:21
**sing** [1] - 45:25
**single** [10] - 34:5,
34:14, 38:1, 38:4,
58:23, 71:23, 72:1,
72:3, 76:7, 80:20
**sinister** [2] - 8:6,
107:8
**sit** [1] - 111:20
**site** [1] - 44:8
**sitting** [3] - 34:15,
43:9, 72:1
**situation** [3] - 35:10,
83:4, 83:6
**six** [3] - 48:24, 109:4,
110:25
**skip** [1] - 72:5
**skipping** [1] - 34:1

**slide** [29] - 11:13,
11:14, 22:2, 22:3,
29:24, 32:19, 34:7,
37:17, 37:20, 37:23,
38:22, 42:3, 50:18,
55:17, 59:18, 61:7,
61:14, 63:15, 65:13,
68:25, 71:8, 71:10,
71:12, 91:2, 93:11,
93:13, 95:7, 104:19
**Slide** [52] - 15:8,
15:22, 16:24, 18:10,
20:1, 20:2, 25:4,
34:6, 38:22, 39:14,
40:12, 44:6, 45:1,
45:21, 49:21, 49:22,
51:12, 52:1, 52:12,
52:22, 54:17, 55:5,
55:10, 56:7, 56:12,
57:10, 68:24, 69:21,
70:17, 72:11, 73:2,
73:19, 74:20, 76:24,
77:10, 79:7, 80:2,
90:3, 90:16, 91:12,
92:25, 93:1, 93:10,
94:12, 97:21, 97:22,
98:14, 99:22,
102:20, 109:10
**slightly** [1] - 108:12
**slow** [1] - 27:9
**small** [4] - 47:10, 70:1,
90:17, 105:2
**snatch** [1] - 20:18
**sold** [1] - 39:5
**sole** [1] - 82:6
**solve** [6] - 37:6, 38:3,
57:6, 62:22, 76:19,
84:7
**solvency** [1] - 67:21
**solvent** [9] - 22:10,
22:14, 24:4, 24:7,
24:9, 24:20, 24:22,
107:18
**someone** [6] - 41:18,
58:6, 58:15, 58:17,
85:25
**sometime** [1] - 71:1
**sometimes** [3] -
15:11, 29:4, 41:17
**somewhere** [1] -
20:12
**soon** [3] - 13:18,
36:15, 49:3
**sorry** [12] - 22:3,
45:21, 49:21, 49:22,
52:4, 55:5, 56:18,
73:21, 86:2, 89:4,
93:11, 106:20
**sort** [4] - 41:14, 68:22,
77:17, 106:24

**sorts** [1] - 43:6
**soul** [1] - 105:21
**sound** [4] - 22:14,
67:23, 107:7, 107:18
**sounded** [1] - 8:6
**sources** [1] - 55:23
**space** [1] - 46:25
**specific** [3] - 81:6,
89:15, 102:8
**specifically** [2] -
17:11, 17:19
**specifics** [1] - 60:11
**speech** [3] - 22:22,
54:20, 110:15
**spelled** [1] - 80:8
**spend** [1] - 11:7
**spent** [3] - 27:15,
27:16, 27:17
**spillover** [1] - 15:25
**spiral** [1] - 33:16
**Spohn** [1] - 94:20
**sponsored** [1] - 73:21
**SPSPAs** [1] - 29:5
**stability** [11] - 10:5,
10:6, 14:17, 18:14,
23:24, 29:20, 47:6,
47:14, 47:17, 66:2,
67:20
**stabilize** [2] - 18:20,
90:24
**stable** [3] - 15:19,
15:20, 18:2
**staff** [3] - 43:19,
43:20, 56:2
**staffer** [1] - 63:8
**staffers** [1] - 63:7
**stage** [1] - 64:14
**stake** [2] - 112:3,
112:6
**stand** [6] - 33:24,
35:17, 35:24, 98:9,
103:9, 106:8
**standard** [2] - 74:24,
114:13
**standing** [4] - 36:11,
70:3, 70:9, 85:10
**stands** [2] - 53:12,
55:12
**start** [8] - 13:6, 13:18,
14:2, 32:23, 33:14,
101:19, 113:5,
114:12
**started** [8] - 33:4,
35:9, 41:2, 41:12,
45:24, 45:25, 53:9,
101:1
**starting** [2] - 21:19,
41:4
**starts** [3] - 14:8, 14:9,
33:16

**state** [3] - 32:4, 36:2, 57:17

**statement** [10] - 15:10, 18:11, 19:25, 21:25, 51:14, 51:17, 51:23, 55:19, 109:6, 109:17

**statements** [11] - 14:14, 83:12, 83:13, 83:22, 93:4, 93:15, 93:16, 93:21, 94:4, 109:2, 109:7

**States** [8] - 6:4, 7:3, 7:6, 10:6, 35:17, 36:9, 63:9, 85:9

**statute** [2] - 17:4, 90:5

**statutory** [1] - 18:20

**stay** [2] - 55:2, 113:10

**steady** [1] - 29:17

**Stegman** [8] - 48:12, 48:13, 58:11, 58:23, 61:16, 65:10, 106:2

**step** [3] - 16:23, 29:11, 30:8

**stepped** [2] - 9:9, 30:18

**stepping** [1] - 112:17

**stern** [13] - 4:6, 63:20, 64:10, 86:15, 87:6, 92:4, 92:19, 94:7, 95:9, 97:11, 102:13, 108:22, 109:18

**STERN** [3] - 4:7, 63:22, 64:11

**Stern**........................
............ [1] - 3:4

**still** [8] - 20:1, 31:16, 71:14, 72:13, 72:21, 90:7, 95:17, 101:5

**stipulation** [1] - 15:12

**stock** [28] - 9:1, 11:24, 11:25, 20:4, 20:17, 21:22, 29:4, 29:7, 31:18, 80:22, 81:2, 81:3, 81:7, 81:8, 81:18, 81:19, 81:23, 82:4, 82:6, 82:13, 101:15, 101:17, 105:5, 105:11

**stocks** [2] - 20:11, 20:16

**stood** [1] - 8:2

**stop** [2] - 23:24, 84:9

**store** [1] - 89:3

**story** [2] - 86:22, 108:7

**strategic** [1] - 62:8

**strategy** [1] - 26:18

**stream** [1] - 29:17

**stress** [14] - 5:19, 39:12, 39:15, 54:4,

56:10, 56:11, 56:14, 56:15, 56:18, 56:23, 57:7, 89:5, 89:10, 99:11

**stress-scenario** [1] - 54:4

**stretch** [1] - 28:14

**study** [1] - 85:25

**stuff** [2] - 51:18, 111:11

**subject** [3] - 31:4, 48:13, 71:8

**submit** [14] - 10:2, 12:2, 12:9, 13:22, 25:25, 34:10, 45:2, 60:2, 60:19, 61:23, 85:11, 85:15, 85:20, 85:21

**submitted** [2] - 74:4, 107:13

**substantial** [5] - 50:22, 50:25, 52:8, 75:16, 75:21

**subtext** [2] - 87:22, 98:25

**succeeded** [2] - 19:4, 92:19

**successfully** [1] - 23:14

**sufficient** [6] - 32:23, 46:11, 46:16, 53:2, 55:9, 72:22

**suggest** [5] - 25:17, 43:4, 58:18, 61:9, 79:11

**suggested** [5] - 41:13, 41:16, 41:18, 51:20, 74:13

**suggesting** [2] - 43:7, 51:18

**suggestion** [2] - 51:1, 108:22

**Suisse** [1] - 70:20

**sum** [1] - 87:18

**summary** [1] - 105:17

**summer** [5] - 69:18, 69:23, 72:2, 97:6, 99:7

**sun** [1] - 45:24

**support** [1] - 67:20

**supported** [1] - 21:2

**surely** [1] - 9:2

**surprised** [2] - 77:1, 77:2

**surprising** [2] - 44:16

**survived** [1] - 93:8

**suspect** [4] - 28:1, 28:4, 53:11, 104:5

**suspended** [1] - 20:5

**swear** [1] - 51:22

**sweep** [58] - 19:1, 22:11, 22:13, 23:17, 24:2, 24:16, 41:15, 41:20, 41:23, 61:18, 61:21, 61:25, 62:21, 64:23, 65:23, 66:9, 66:24, 67:16, 68:6, 75:19, 76:3, 76:6, 76:8, 76:17, 76:21, 79:8, 85:2, 87:1, 87:10, 87:13, 88:4, 88:21, 89:14, 91:14, 92:1, 92:5, 92:15, 92:23, 93:2, 94:14, 94:18, 94:24, 95:18, 96:11, 96:24, 97:7, 97:13, 97:23, 97:25, 98:20, 99:5, 99:25, 100:11, 104:17, 106:23, 106:24, 106:25, 108:2

**swore** [1] - 52:9

**sworn** [3] - 55:13, 60:3, 60:5

**sympathetic** [3] - 88:19, 103:22, 107:11

**system** [3] - 14:21, 14:25, 30:9

**systematic** [1] - 16:1

**systemic** [4] - 15:21, 15:23, 19:18, 19:23

**systems** [2] - 23:10, 23:13

---

## T

**table** [2] - 4:12, 41:23

**Tagoe** [1] - 54:5

**talks** [6] - 20:23, 23:11, 52:6, 97:13, 106:23, 111:10

**tapping** [1] - 99:3

**tax** [6] - 74:9, 74:25, 94:8, 94:19, 96:3, 96:7

**taxpayer** [3] - 9:10, 35:15, 75:13

**technical** [1] - 95:2

**telephone** [2] - 58:19, 105:15

**temporary** [1] - 104:11

**ten** [6] - 63:21, 63:24, 73:6, 87:7, 89:11, 109:15

**tens** [2] - 100:18, 112:4

**term** [16] - 5:13, 5:16, 5:18, 26:13, 47:6, 47:14, 50:15, 67:7,

68:2, 71:16, 72:23, 73:9, 73:11, 73:14

**termination** [1] - 21:8

**terms** [9] - 30:19, 30:20, 32:2, 54:6, 80:9, 80:20, 81:2, 81:4, 81:8

**test** [1] - 104:5

**testified** [4] - 40:13, 57:6, 69:22, 91:13

**testify** [2] - 74:17, 92:7

**testimony** [38] - 22:16, 22:23, 23:6, 25:16, 29:16, 29:25, 31:4, 32:19, 33:9, 34:21, 43:17, 44:4, 47:8, 48:13, 51:14, 51:19, 51:20, 55:13, 56:5, 59:14, 60:4, 60:5, 60:10, 62:15, 68:23, 69:1, 69:5, 69:19, 70:4, 70:18, 71:5, 73:20, 74:14, 74:21, 75:1, 85:25, 106:11, 108:8

**texture** [1] - 50:8

**Thakor** [6] - 5:17, 36:1, 68:19, 76:9, 78:17, 101:14

**Thakor's** [3] - 68:23, 69:1, 69:5

**themselves** [1] - 82:23

**thereafter** [1] - 49:4

**thereby** [4] - 11:22, 59:21, 60:24, 67:10

**therefore** [1] - 74:23

**they've** [9] - 41:16, 41:18, 56:23, 57:1, 89:11, 92:20, 92:21, 93:8

**thinking** [10] - 37:7, 37:8, 40:6, 41:6, 41:8, 41:9, 57:5, 57:18, 57:19, 75:8

**third** [37] - 10:9, 11:22, 12:4, 12:10, 13:7, 13:23, 23:18, 24:15, 24:18, 25:3, 25:8, 25:14, 27:5, 27:7, 42:24, 43:8, 47:16, 48:17, 48:18, 59:10, 59:12, 63:10, 63:13, 65:2, 65:15, 65:16, 66:15, 67:5, 68:20, 69:18, 73:6, 74:12, 74:19, 75:17, 76:25, 77:4, 98:16

**third-party** [1] - 67:5

**thoughtful** [1] - 4:20

**thousand** [4] - 27:24,

28:14, 52:3, 70:25

**thousands** [2] - 100:18, 112:4

**threat** [1] - 76:14

**threaten** [1] - 40:21

**three** [7] - 5:3, 5:21, 39:10, 46:4, 57:4, 105:23, 107:3

**throughout** [2] - 43:3, 55:3

**throws** [1] - 39:20

**ticking** [1] - 6:16

**timeline** [1] - 48:11

**timing** [6] - 98:25, 99:18, 99:25, 100:7, 100:10

**Timothy** [1] - 98:15

**tipping** [1] - 33:2

**today** [11] - 4:20, 4:21, 8:24, 27:15, 27:16, 27:17, 30:21, 33:3, 43:3, 61:10, 113:23

**together** [3] - 14:4, 26:14, 113:10

**tomorrow** [8] - 111:22, 113:6, 113:15, 113:16, 113:19, 113:22, 114:8, 114:15

**tonight** [1] - 113:5

**took** [5] - 7:24, 8:1, 8:13, 9:2, 24:25

**top** [5] - 22:2, 22:3, 45:16, 58:7, 67:3

**topic** [4] - 26:8, 26:9, 59:7, 74:9

**topics** [1] - 74:6

**total** [3] - 38:21, 38:23, 110:9

**touch** [4] - 47:7, 74:5, 86:5, 95:22

**tough** [1] - 102:6

**town** [1] - 101:7

**trade** [1] - 21:23

**transcript** [1] - 4:3

**transcription** [2] - 105:16, 105:17

**Treasury** [155] - 5:7, 5:13, 5:20, 5:23, 6:10, 6:11, 6:12, 6:17, 6:20, 6:24, 7:13, 7:25, 8:2, 8:11, 9:9, 9:14, 9:16, 20:23, 20:25, 21:1, 23:20, 24:8, 24:11, 24:12, 24:13, 24:16, 24:17, 24:20, 26:21, 29:2, 29:7, 30:12, 30:17, 31:2, 31:5, 31:7, 31:21, 32:9,

33:18, 33:20, 33:23,
35:20, 35:23, 36:11,
37:13, 40:25, 41:16,
42:1, 42:4, 42:11,
42:23, 43:23, 44:1,
44:22, 44:24, 45:12,
45:15, 46:3, 46:13,
47:10, 47:12, 47:13,
47:18, 48:9, 49:7,
49:25, 50:4, 50:13,
51:16, 53:1, 55:2,
56:2, 56:9, 57:22,
61:12, 62:10, 62:11,
63:7, 63:8, 64:15,
64:19, 64:21, 65:11,
65:14, 65:17, 65:18,
65:20, 66:13, 66:20,
66:22, 66:24, 67:14,
68:7, 68:9, 68:16,
68:20, 69:3, 69:4,
69:16, 70:1, 73:14,
74:3, 75:5, 75:15,
75:17, 76:11, 77:7,
84:3, 84:5, 84:8,
84:9, 85:5, 85:6,
85:9, 86:25, 88:17,
89:14, 95:22, 97:11,
97:18, 97:20, 97:22,
98:15, 99:3, 99:9,
99:18, 99:21, 100:3,
100:23, 101:3,
101:5, 101:11,
101:23, 104:9,
104:25, 105:7,
105:9, 105:13,
105:24, 106:13,
107:9, 110:11,
110:17, 110:20,
111:3
**treasury** [1] - 99:14
**Treasury's** [9] - 45:18,
63:16, 64:16, 64:18,
64:24, 66:3, 67:4,
67:20, 69:9
**trial** [8] - 4:2, 15:2,
18:23, 21:14, 43:3,
63:2, 74:8, 82:1
**tried** [3] - 43:4, 61:9,
95:19
**trillion** [1] - 15:17
**trouble** [5] - 32:11,
33:22, 94:1, 94:2,
109:19
**troubled** [1] - 18:20
**true** [6] - 55:20, 57:14,
87:6, 87:25, 92:20,
99:4
**truly** [1] - 89:22
**Trump** [2] - 113:18,
113:19

**trust** [1] - 93:17
**truth** [5] - 43:12,
60:20, 93:16,
100:16, 103:6
**try** [8] - 28:2, 37:6,
45:5, 58:7, 87:23,
89:15, 108:13, 113:4
**trying** [19] - 40:24,
44:13, 57:13, 57:19,
58:16, 61:12, 62:11,
77:6, 77:8, 87:15,
89:6, 91:15, 96:10,
102:2, 102:5, 107:8,
108:18, 110:1
**turn** [1] - 95:7
**turned** [1] - 27:18
**tweet** [1] - 113:15
**Twitter** [1] - 113:15
**two** [22] - 12:3, 12:8,
13:14, 14:4, 26:14,
27:23, 28:14, 39:10,
47:23, 48:23, 52:3,
52:16, 54:8, 60:13,
70:25, 72:17, 85:18,
94:14, 99:8, 102:15,
106:24
**typical** [1] - 67:14

## U

**U.S** [1] - 53:10
**Ugoletti** [4] - 41:2,
41:25, 43:20, 99:16
**ultimate** [1] - 73:22
**unable** [2] - 66:17,
74:25
**uncertain** [2] - 51:9,
76:1
**uncertainty** [2] -
50:14, 50:16
**unchanged** [1] - 73:22
**under** [32] - 7:10, 8:14,
9:17, 9:21, 13:4,
13:12, 18:7, 29:7,
30:17, 31:23, 32:2,
51:22, 56:14, 56:23,
57:7, 60:16, 65:21,
66:7, 66:12, 66:16,
67:4, 67:8, 73:5,
77:7, 79:13, 80:4,
80:23, 81:18, 82:19,
90:10, 106:25
**undermined** [1] - 89:5
**underpromising** [1] -
94:1
**understood** [6] -
15:23, 33:6, 52:24,
71:21, 74:22, 77:2
**undisputed** [1] - 15:10
**unequivocally** [1] -

88:8
**unfair** [1] - 112:21
**unfortunately** [1] -
29:18
**United** [8] - 6:4, 7:3,
7:6, 10:6, 35:17,
36:9, 63:9, 85:9
**unknown** [1] - 47:9
**unless** [5] - 31:21,
69:14, 84:3, 84:5,
103:21
**unlike** [1] - 80:19
**unlikely** [1] - 50:11
**unlimited** [7] - 35:22,
35:24, 36:8, 36:24,
37:1, 52:19, 75:14
**unpredictable** [1] -
88:23
**unreasonable** [3] -
88:9, 92:17, 112:21
**unreasonably** [3] -
11:21, 11:22, 90:9
**unwritten** [1] - 112:9
**up** [59] - 6:13, 18:9,
28:11, 30:8, 32:13,
34:14, 36:3, 37:17,
37:22, 38:4, 39:20,
41:14, 41:20, 43:8,
44:24, 45:9, 46:13,
47:19, 48:10, 48:11,
48:17, 53:12, 55:12,
56:7, 56:25, 57:3,
63:2, 64:13, 65:5,
66:6, 69:18, 69:25,
71:9, 74:10, 74:14,
74:17, 75:2, 75:19,
79:6, 80:21, 82:2,
84:7, 90:3, 91:15,
94:8, 95:12, 96:7,
96:17, 96:21,
100:15, 103:4,
103:18, 105:5,
106:14, 108:1,
111:5, 111:8, 113:11
**upcoming** [1] - 58:4
**upped** [1] - 35:21
**ups** [3] - 89:2, 100:6,
111:12
**upside** [1] - 40:15
**urgency** [4] - 59:3,
59:11, 88:2
**uses** [1] - 57:3
**utterly** [1] - 95:18

## V

**valuable** [1] - 105:7
**value** [5] - 15:16,
26:12, 54:24, 96:7,
101:16

**valve** [1] - 102:17
**variability** [1] - 50:9
**verdict** [6] - 11:9,
11:16, 11:17, 85:15,
85:19, 86:12
**version** [1] - 29:5
**versus** [3] - 89:20,
89:21
**veto** [1] - 104:9
**viability** [1] - 40:21
**video** [2] - 32:17,
40:13
**view** [1] - 94:22
**viewed** [1] - 102:18
**violated** [3] - 90:7,
90:9, 102:12
**violating** [1] - 11:23
**virtually** [1] - 8:22
**vital** [3] - 6:25, 7:3, 7:5
**volatility** [1] - 55:8
**vulnerable** [3] - 89:4,
89:5, 89:10

## W

**wait** [2] - 33:12, 46:19
**waiting** [4] - 49:1,
49:7, 99:2, 99:11
**waive** [2] - 47:13,
75:17
**waived** [2] - 47:5, 52:6
**walked** [1] - 4:15
**water** [1] - 35:14
**ways** [5] - 77:3, 80:18,
81:15, 87:23, 88:8
**weakness** [1] - 25:18
**weather** [1] - 52:16
**week** [1] - 42:1
**weekly** [1] - 43:22
**weeks** [4] - 48:22,
48:23, 48:25
**weight** [2] - 61:22,
61:24
**weird** [1] - 98:2
**whole** [9] - 14:25,
21:15, 50:2, 58:24,
73:15, 104:4,
108:25, 109:6, 111:6
**willing** [4] - 47:15,
100:14, 100:15,
100:16
**win** [1] - 89:24
**wind** [12] - 88:16,
88:17, 88:22, 88:25,
96:9, 96:10, 96:22,
97:9, 97:24, 107:4,
108:10, 111:7
**wind-down** [7] -
88:25, 96:9, 96:22,
97:9, 97:24, 108:10,

111:7
**wins** [1] - 89:22
**wiped** [2] - 8:22, 28:15
**wish** [1] - 110:7
**witness** [5] - 24:2,
25:21, 25:23, 68:18,
76:7
**witnesses** [3] - 29:22,
72:1, 72:3
**wonder** [1] - 32:23
**wonderfully** [1] - 4:19
**word** [6] - 18:21, 43:1,
58:23, 86:16, 90:14,
106:7
**words** [3] - 5:14,
61:11, 85:23
**works** [2] - 29:13, 31:9
**world** [4] - 28:13,
54:11, 57:18, 99:6
**worried** [3] - 71:4,
99:10, 99:11
**worry** [4] - 32:20,
98:2, 103:17, 110:24
**worse** [1] - 35:13
**worst** [12] - 28:21,
39:16, 39:18, 39:20,
39:24, 40:1, 40:3,
40:6, 40:21, 41:9,
56:14, 57:18
**worst-case** [6] -
39:16, 39:24, 40:1,
40:3, 41:9, 57:18
**worth** [96] - 5:1, 19:1,
22:11, 22:13, 23:17,
24:2, 24:15, 26:19,
26:20, 31:10, 31:13,
32:12, 34:8, 34:15,
34:17, 34:18, 37:17,
37:19, 37:22, 38:13,
41:15, 41:20, 41:23,
53:25, 61:18, 61:21,
61:25, 62:21, 64:23,
65:23, 66:9, 66:24,
67:16, 68:6, 72:17,
75:19, 76:3, 76:6,
76:8, 76:17, 76:21,
79:8, 85:2, 87:1,
87:9, 87:13, 88:4,
88:21, 89:25, 90:13,
91:1, 91:6, 91:10,
91:11, 91:14, 91:16,
92:1, 92:5, 92:15,
92:23, 93:2, 94:14,
94:18, 94:24, 95:16,
95:17, 95:20, 95:23,
96:11, 96:12, 96:18,
96:24, 97:7, 97:13,
97:23, 98:20, 99:5,
99:25, 100:10,
101:2, 101:17,

101:18, 103:14,
103:16, 104:16,
105:8, 106:23,
106:24, 106:25,
107:19, 107:25,
108:2
**wound** [1] - 98:5
**wrap** [3] - 47:19,
48:11, 48:17
**write** [16] - 58:16,
74:10, 74:14, 74:17,
75:2, 89:2, 94:8,
96:7, 96:17, 96:21,
100:5, 100:6, 111:5,
111:11, 111:12
**write-downs** [3] -
89:2, 100:5, 111:11
**write-up** [6] - 74:10,
74:14, 74:17, 75:2,
94:8, 96:17
**write-ups** [3] - 89:2,
100:6, 111:12
**writing** [5] - 48:1,
58:12, 84:4, 84:5,
95:12
**written** [10] - 32:5,
58:6, 59:24, 94:19,
103:18, 105:13,
105:24, 106:4, 113:8
**wrote** [5] - 61:11,
61:16, 106:3, 111:9

## Y

**y'all** [7] - 113:16,
113:25, 114:4,
114:9, 114:11,
114:14, 114:15
**year** [11] - 20:4, 41:3,
49:11, 49:17, 52:19,
56:24, 59:3, 75:4,
75:7, 99:7
**years** [27] - 4:25, 5:3,
5:21, 8:22, 16:10,
28:12, 28:13, 39:8,
39:9, 39:11, 40:7,
46:4, 54:8, 54:9,
57:4, 58:4, 59:21,
60:24, 67:14, 75:6,
87:7, 89:11, 89:12,
103:2, 109:15
**yesterday** [1] - 35:25
**yield** [1] - 33:7
**yourself** [4] - 98:23,
105:20, 105:22,
108:4
**yourselves** [1] - 76:18

## Z

**zero** [5] - 6:22, 32:18,

33:1, 71:22, 76:3
**zippo** [1] - 99:12