# EXHIBIT A

1    Q.   What does the blue bar here on the left represent?
2    A.   The blue bar shows the day before the announcement of
3    the net worth sweep, the companies' stock was worth a total
4    of $2.93 billion.
5    Q.   Are you aware in this case that Defendants are arguing
6    that by 2009 the $33 billion that the shareholders had
7    previously invested in Fannie and Freddie had already been
8    wiped out?
9    A.   I've heard that.  Yes.
10   Q.   Is a market capitalization of $2.9 billion on August
11   16th, 2012, before the net worth sweep consistent with the
12   argument that Fannie and Freddie's stockholders' previous
13   investment had been, quote, "wiped out"?
14   A.   No.
15   Q.   Would you agree at that time in 2012 Fannie and
16   Freddie's stockholders were down, but they were not out?
17   A.   That's an apt characterization, yes.
18   Q.   Professor, what financial methodology did you use as the
19   basis for your conclusion that Fannie and Freddie's
20   stockholders suffered $1.61 billion in damages?
21   A.   I used a tool from financial economics called an event
22   study.
23   Q.   And what is an event study?
24   A.   An event study is a structured analytical method for
25   looking at a stock price movement that one might think would

Mason - DIRECT - By Mr. Rudy

1    be associated with new news released to the marketplace and
2    evaluating whether that stock price movement is
3    statistically significant or meaningful and then evaluating
4    other potential causes that might have interfered before
5    reaching a conclusion that that stock price movement can be
6    attributed to the new information announced to the market
7    that day.
8    Q.  What was the particular piece of news that you were
9    testing in the event study that you relied on?
10   A.  Here I was interested in the net worth sweep.
11   Q.  And what specifically about the net worth sweep were you
12   testing?
13   A.  I was testing the effect upon shareholder value between
14   the day before and the end of the day after it was
15   announced.
16   Q.  You see on this slide in front of you that Fannie and
17   Freddie's stock price fell by about 50 percent.  Is that
18   about right?
19   A.  Yes.
20   Q.  Did you look at whether the entire stock market went
21   down on August 17th?
22   A.  I did.
23   Q.  And did it go down that day?
24   A.  No, it didn't.
25   Q.  Well, what if the entire stock market had gone down on

Mason - DIRECT - By Mr. Rudy

1    August 17th, 2012?  What would you have -- what would you
2    have done in creating an event study with that information?
3    A.  Well, then I'd have to break up this amount of decline
4    into that which would be attributed to the stock market
5    overall and that which would be attributed to the
6    announcements of the net worth sweep.
7    Q.  Is there any academic or legal support for using an
8    event study to determine the impact on a share price of new
9    information?
10   A.  Yes.
11   Q.  Is an event study commonly used in your work?
12   A.  Yes.  Event studies are used in the field of financial
13   economics quite regularly.  It's been estimated there are
14   tens of thousands of academic papers that use this
15   technique.
16   Q.  Did you actually yourself perform the event study that
17   you're relying on in your testimony here today?
18   A.  No.  I did not gather the data and write the code.
19   Defendants' experts did that.
20   Q.  I'm sorry.  Who --
21   A.  Defendants' experts did that.
22   Q.  Okay.  Can you tell us a little bit more about what you
23   mean by that?
24   A.  Well, earlier, you played the video from the deposition
25   of Dr. Attari, where he said that he performed this event

1    study.  I was given those materials and I validated his
2    approach, his data, made sure everything was done accurately
3    before using it to express my opinion that the damages in
4    this matter to shareholders are $1.61 billion.
5    Q.   So you relied on the Defendants' expert's event study
6    that concluded that the stock price fell by $1.6 billion as
7    a result of information released on August 17th, 2012?
8    A.   Yes.
9    Q.   Have you yourself performed your own event studies?
10   A.   Yes, I have.
11   Q.   How many times, would you say?
12   A.   Hundreds of times in the course of my career.
13   Q.   And based on your experience performing event studies
14   and your analysis of the event study performed by the
15   Defendants' expert in this matter, do you have an opinion as
16   to whether or not this particular event study as to the
17   stock price movement was properly constructed and performed?
18   A.   Yes.
19   Q.   What's your opinion?
20   A.   My opinion is that it was properly constructed and
21   performed.
22   Q.   Are the facts and the data in Defendants' event study
23   the kind of facts and data that financial economists
24   reasonably rely on in performing an event study?
25   A.   Yes.

Mason - DIRECT - By Mr. Rudy

1   Q.   And is Dr. Attari, the Defendants' expert -- is his
2   event study the kind of analysis that financial economists
3   and other experts in the field reasonably rely on to
4   evaluate stock price movements in response to new
5   information?
6   A.   Yes, it is.
7   Q.   Were you in the courtroom a few minutes ago when the
8   short video clip from Dr. Attari was played?
9   A.   Yes, I was.
10  Q.   Can you just explain to the jury in case they weren't --
11  in case it wasn't totally obvious what the purpose of that
12  video was?
13  A.   Well, that video --
14            MR. JONES:  Objection, your Honor.
15            THE COURT:  Overruled.
16            Go ahead.
17            THE WITNESS:  That video confirmed that Dr. Attari
18  himself did create this event study along with his staff.
19  BY MR. RUDY:
20  Q.   So did you limit your analysis in this case just to the
21  work that Dr. Attari did?
22  A.   No.
23  Q.   Other than relying on Dr. Attari's event study, what
24  other materials or information, if any, did you consider in
25  performing your assignment?

Mason - DIRECT - By Mr. Rudy

1    A.  I reviewed a wealth of materials, including financial
2    filings by Fannie Mae and Freddie Mac, FHFA reports,
3    documents produced in this case, emails, deposition
4    testimony, court documents.  A lot of materials and
5    background.
6    Q.  Do you recognize this slide?
7    A.  I do.
8    Q.  What is it?
9    A.  This is the cover page from the PowerPoint presentation
10   that was prepared to summarize the results of that event
11   study.
12   Q.  Prepared by Dr. Attari?
13   A.  Yes.
14   Q.  And it has on it PX-375 that was just moved into
15   evidence.  Do you see that?
16   A.  Yes.
17   Q.  At the time that you reviewed this event study, PX-375,
18   did you also analyze the underlying computer programs and
19   the data that generated the conclusions reached in the event
20   study?
21   A.  Absolutely.  Yes.
22   Q.  Okay.  In your binder, you have several exhibits.  I'll
23   list them:   PX-495-2, 496-2, 497-2, 497-3, 497-4, 497-5.
24   Dr. Mason, do you have all those exhibits in the binder
25   there?

```
 1    A.   I do.
 2    Q.   Okay.  And have you had the opportunity to review those
 3    exhibits?
 4    A.   Yes, I have.
 5    Q.   What are they?
 6    A.   These are what you might call the guts of the model, the
 7    data, the computer code behind it.  And I reviewed all of
 8    that before opining that this model was a reasonable and
 9    reliable estimate of damages in this matter.
10    Q.   Okay.  And so those guts, as you call it, of the event
11    study, those are the supporting materials to PX-375?
12    A.   Yes.
13    Q.   Okay. And then those results from the code, et cetera,
14    are then summarized in PX-375, the actual PowerPoint event
15    study Dr. Attari prepared?
16    A.   Yes.
17    Q.   Okay.
18             MR. RUDY:  I'm going to offer those documents into
19    evidence.
20             MR. JONES:  No objection.
21             THE COURT:  Received.
22             (Whereupon, Plaintiffs' Exhibit Nos. 495-2, 496-2,
23    497-2, 497-3, 497-4 and 497-5 were entered into evidence.)
24    BY MR. RUDY:
25    Q.   Did Dr. Attari's event study analyze the stock price
```