**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BERKLEY INSURANCE CO., *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 1:13-cv-1053 (RCL) |
| FEDERAL HOUSING FINANCE AGENCY, *et al.*, | |
| Defendants. | |
| In re Fannie Mae / Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations | |
| _____ | Case No. 1:13-mc-01288 (RCL) |
| This document relates to: ALL CASES | |

## DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW

Pursuant to Federal Rule of Civil Procedure 50(b), Defendants respectfully move for judgment as a matter of law.  The bases for this motion are set forth in the accompanying memorandum in support.

Dated: April 17, 2024              Respectfully submitted,

 */s/ Asim Varma*
Asim Varma (D.C. Bar # 426364)
Jonathan L. Stern (D.C. Bar # 375713)
David B. Bergman (D.C. Bar # 435392)
Ian S. Hoffman (D.C. Bar # 983419)
R. Stanton Jones (D.C. Bar # 987088)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave. NW
Washington, DC 20001
(202) 942-5000

Asim.Varma@arnoldporter.com
Jonathan.Stern@arnoldporter.com
David.Bergman@arnoldporter.com
Ian.Hoffman@arnoldporter.com
Stanton.Jones@arnoldporter.com

*Attorneys for Defendant Federal Housing
Finance Agency*

/s/ Michael J. Ciatti
Michael J. Ciatti (D.C. Bar # 467177)
KING & SPALDING LLP
1700 Pennsylvania Ave. N.W.
Washington, DC 20006
Tel: (202) 661-7828
Fax: (202) 626-3737
mciatti@kslaw.com

*Attorney for the Federal Home Loan
Mortgage Corporation*

/s/ Meaghan VerGow
Meaghan VerGow (D.C. Bar # 977165)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
Tel: (202) 383-5300
Fax: (202) 383-5414
mvergow@omm.com

*Attorney for the Federal National Mortgage
Association*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BERKLEY INSURANCE CO., *et al*.,<br><br>    Plaintiffs,<br><br>    v.<br><br>FEDERAL HOUSING FINANCE<br>AGENCY, *et al.*,<br><br>    Defendants. | Case No. 1:13-cv-1053 (RCL) |
| In re Fannie Mae / Freddie Mac Senior<br>Preferred Stock Purchase Agreement Class<br>Action Litigations<br><br>_____<br><br>This document relates to:<br>ALL CASES | Case No. 1:13-mc-01288 (RCL) |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF**
**MOTION FOR JUDGMENT AS A MATTER OF LAW**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 6

    A.    The Enterprises and Their Contracts with Private Shareholders ............................ 6

    B.    HERA, the Conservatorships, and the PSPAs ...................................................... 7

    C.    The Third Amendment to the PSPAs ..................................................................... 10

    D.    Procedural History ................................................................................................. 11

            1.    Motions to Dismiss ........................................................................................ 11

            2.    The Supreme Court's Intervening Decision in *Collins* ............................... 14

            3.    Class Certification and Summary Judgment ................................................. 15

            4.    The Trials ...................................................................................................... 16

LEGAL STANDARD ......................................................................................................... 17

ARGUMENT ....................................................................................................................... 19

I.    DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW AS TO ALL PLAINTIFFS ....................................................................................................... 19

    A.    The Shareholder Contracts Specify the Scope of FHFA's Contractual Discretion and Thus Leave No "Gap" for the Implied Covenant to Fill ............. 19

    B.    The Supreme Court's Decision in *Collins* Forecloses Plaintiffs' Claim ............. 24

    C.    Plaintiffs' Claim Improperly Seeks To Recover for Anticipatory Breach of Dividend-Related Obligations Contained in Unilateral Contracts ....................... 29

    D.    Plaintiffs Failed To Prove with Reasonable Certainty That the Third Amendment or the Net Worth Sweep Harmed Them ........................................... 35

            1.    Plaintiffs Introduced No Evidence To Show That Current Shareholders Are Worse Off Today Due to the Third Amendment ........ 37

            2.    Plaintiffs Introduced No Evidence Accounting for the Sizeable Share-Price Increases Shortly After the Third Amendment .................... 39

            3.    Plaintiffs Introduced No Evidence To Account for a Potential Alternative Cause of the One-Day Decline in Share Prices ................... 42

i

II.   AT A MINIMUM, DEFENDANTS ARE ENTITLED TO JUDGMENT AS A
      MATTER OF LAW AS TO POST-THIRD AMENDMENT PURCHASERS
      BECAUSE THEY SUFFERED NO INJURY AND THUS LACK STANDING ...............44

      A.    The Majority View Is That a Sale of a Security Does Not Automatically
            Assign a Claim and That an Express Assignment of the Claim Is Required........ 45

            1.    Under Federal Law, Choses in Action Relating to Securities Are
                  Not Automatically Assigned When the Securities Are Sold .................... 47

            2.    Under State Law, Choses in Action Relating to Securities
                  Generally Are Not Automatically Assigned When the Securities
                  Are Sold ...................................................................................................... 48

      B.    The Claim Here Was Not Automatically Assigned Under Virginia Law ........... 50

      C.    The Claim Here Was Not Automatically Assigned Under Delaware Law .......... 52

CONCLUSION ....................................................................................................................55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACA Fin. Guar. Corp. v. City of Buena Vista,*
  917 F.3d 206 (4th Cir. 2019) ................................................20

*Acticon AG v. China Ne. Petroleum Holdings Ltd.,*
  692 F.3d 34 (2d Cir. 2012)................................................40, 41

*In re Activision Blizzard, Inc. S'holder Litig.,*
  124 A.3d 1025 (Del. Ch. 2015)................................................53, 54

*In re AMC Ent. Holdings, Inc. S'holder Litig.,*
  299 A.3d 501 (Del. Ch. 2023)................................................53

*Beach TV Props., Inc. v. Solomon,*
  2016 WL 6068806 (D.D.C. Oct. 14, 2016) ................................................46

*Berkley Ins. Co. v. Fed. Hous. Fin. Agency,*
  2023 WL 3790739 (D.D.C. June 2, 2023) ................................................6

*Bluebird Partners, L.P. v. First Fid. Bank, N.A. N.J.,*
  85 F.3d 970 (2d Cir. 1996)................................................5, 47

*Brown v. Bank of Am., N.A.,*
  660 F. App'x 506 (9th Cir. 2016) ................................................46

*Carr v. Fed. Nat'l Mortg. Ass'n,*
  92 Va. Cir. 472, 2013 WL 12237855 (2013) ................................................32

*In re Cfs-Related Sec. Fraud Litig.,*
  2001 U.S. Dist. LEXIS 27387 (N.D. Okla. Dec. 21, 2001)................................................49

*\*Cheatham I.R.A. v. Huntington Nat'l Bank,*
  137 N.E.3d 45 (Ohio 2019)................................................5, 50, 51, 55

*\*Collins v. Yellen,*
  141 S. Ct. 1761 (2021) ................................................ *passim*

*Day v. MCC Acquisition, LC,*
  848 S.E.2d 800 (Va. 2020)................................................50

*\*DG BF, LLC v. Ray,*
  2021 WL 776742 (Del. Ch. Mar. 1, 2021)................................................2, 20, 22

*Dieckman v. Regency GP LP*,
  2018 WL 1006558 (Del. Ch. Feb. 20, 2018) ........................................................33

*DNAML Pty, Ltd. v. Apple Inc.*,
  2015 WL 9077075 (S.D.N.Y. Dec. 16, 2015) ............................................... *passim*

*Dura Pharmaceuticals v. Broudo*,
  544 U.S. 336 (2005) .........................................................................................40, 41

*eCommerce Indus., Inc. v. MWA Intel., Inc.*,
  2013 WL 5621678 (Del. Ch. Sept. 30, 2013) ......................................................35

*In re Estee Lauder Companies*,
  2007 WL 1522620 (S.D.N.Y. May 21, 2007) .......................................................40

*\*Fairfax-Falls Church Cmty. Servs. Bd. v. Herren*,
  337 S.E.2d 741 (Va. 1985) ...................................................................................30

*Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency*,
  2018 WL 4680197 (D.D.C. Sept. 28, 2018) ................................................ *passim*

*Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency*,
  2022 WL 11110548 (D.D.C. Oct. 19, 2022) ............................................... *passim*

*Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency*,
  2022 WL 4745970 (D.D.C. Oct. 3, 2022) ................................................... *passim*

*Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency*,
  636 F. Supp. 3d 144 (D.D.C. 2022) ......................................................................13

*Fairholme Funds, Inc. v. United States*,
  26 F.4th 1274 (Fed. Cir. 2022) ...................................................................2, 14, 26

*In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigs.*,
  2021 WL 5799379 (D.D.C. Dec. 7, 2021) ..........................................6, 13, 15, 44

*Frank Brunckhorst Co., L.L.C. v. Coastal Atl., Inc.*,
  542 F. Supp. 2d 452 (E.D. Va. 2008) ...................................................................32

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*,
  479 F. Supp. 2d 349 (S.D.N.Y. 2007) ...................................................................49

*Gerber v. Enter. Prod. Holdings, LLC*,
  67 A.3d 400 (Del. 2013) .......................................................................................33

*Glaxo Grp. Ltd. v. DRIT LP*,
  248 A.3d 911 (Del. 2021) ......................................................................................20

*Glenn v. Fay*,
    281 F. Supp. 3d 130 (D.D.C. 2017) .......................................................................30

*Heritage Handoff Holdings, LLC v. Fontanella*,
    2018 WL 3580287 (D. Del. July 25, 2018) ............................................................21

*Herr v. U.S. Forest Serv.*,
    803 F.3d 809 (6th Cir. 2015) .................................................................................46

*Huthnance v. District of Columbia*,
    793 F. Supp. 2d 183 (D.D.C. 2011) .......................................................................18

*I.A.T.S.E. Loc. No. One Pension Fund v. Gen. Elec. Co.*,
    2016 WL 7100493 (Del. Ch. Dec. 6, 2016) ...........................................................55

*In re Immucor, Inc. Sec. Litig.*,
    2011 WL 3844221 (N.D. Ga. Aug. 29, 2011) .......................................................40

*Indep. Inv. Protective League v. Saunders*,
    64 F.R.D. 564 (E.D. Pa. 1974) .......................................................................47, 53

*Keystone Assocs. LLC v. Fulton*,
    2019 WL 3731722 (D. Del. Aug. 8, 2019) ............................................................48

*Lowry v. Baltimore & Ohio R.R. Co.*,
    707 F.2d 721 (3d Cir. 1983) ............................................................................47, 48

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ...............................................................................................44

*Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*,
    62 A.3d 62 (Del. Ch. 2013) ...................................................................................30

*MHS Capital LLC v. Goggin*,
    2018 WL 2149718 (Del. Ch. May 10, 2018) .........................................................33

*Mut. Pharm. Co. v. Bartlett*,
    570 U.S. 472 (2013) ...............................................................................................24

*Old Dominion Elec. Coop. v. Ragnar Benson, Inc.*,
    2006 WL 2252514 (E.D. Va. Aug. 4, 2006) ......................................................2, 20

*Ortiz v. Jordan*,
    562 U.S. 180 (2011) ...............................................................................................18

*Pac. Life Ins. Co. v. Bank of N.Y. Mellon*,
    2022 WL 1446552 (S.D.N.Y. Feb. 22, 2022) ...................................................49, 51

*Pac. Life Ins. Co. v. Bank of N.Y. Mellon*,
  2023 WL 5128079 (S.D.N.Y. Aug. 10, 2023) ........................................................49

*Perry Cap. LLC v. Lew*,
  70 F. Supp. 3d 208 (D.D.C. 2014) ...............................................................6, 11, 12

*Perry Cap. LLC v. Mnuchin*,
  864 F.3d 591 (D.C. Cir. 2017) ................................................................. *passim*

*\*Policemen's Annuity & Benefit Fund of Chi. v. DV Realty Advisors LLC*,
  2012 WL 3548206 (Del. Ch. Aug. 16, 2012) .............................................3, 20, 21

*Racepoint Partners, LLC v. JPMorgan Chase Bank*,
  2006 WL 3044416 (S.D.N.Y. Oct. 26, 2006) ........................................................49

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000) ...............................................................................................18

*Rice v. District of Columbia*,
  818 F. Supp. 2d 47 (D.D.C. 2011) .........................................................................18

*Richardson ex rel. Richardson v. Richardson-Merrell, Inc.*,
  857 F.2d 823 (D.C. Cir. 1988) ...............................................................................18

*Robinson v. Wash. Metro. Area Transit Auth.*,
  774 F.3d 33 (D.C. Cir. 2014) .................................................................................18

*Ross v. Walton*,
  668 F. Supp. 2d 32 (D.D.C. 2009) .........................................................................40

*Royal Park Invs. SA/NV v. U.S. Bank Nat'l Assoc.*,
  324 F. Supp. 3d 387 (S.D.N.Y. 2018) ....................................................................49

*Saks Fifth Ave., Inc. v. James, Ltd.*,
  630 S.E.2d 304 (Va. 2006) .....................................................................................35

*Scott v. District of Columbia*,
  101 F.3d 748 (D.C. Cir. 1996) ...............................................................................18

*\*Shareholder Representative Services LLC v. Medidata Solutions, Inc.*,
  2020 WL 972618 (D. Del. Feb. 24, 2020) .............................................................21

*Steffan v. Perry*,
  41 F.3d 677 (D.C. Cir. 1994) .................................................................................44

*In re Telectronics Pacing Sys., Inc.*,
  221 F.3d 870 (6th Cir. 2000) .................................................................................54

*Tisdale v. Enhanced Recovery Co.*,
   2023 WL 1810413 (E.D. Tex. Jan. 17, 2023) .........................................................45

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) ..............................................................................................44

*Twin Cities Bakery Workers Health and Welfare Fund v. Biovail Corp.*,
   2005 WL 3675999 (D.D.C. Mar. 31, 2005) ...........................................................39

*United States v. Kennedy*,
   643 F.3d 1251 (9th Cir. 2011) ...............................................................................37

*United States v. Texas*,
   507 U.S. 529 (1993) ..............................................................................................48

*Urdan v. WR Capital Partners, LLC*,
   244 A.3d 668 (Del. 2020) ..........................................................................52, 53, 55

*US Fax Law Ctr., Inc. v. iHire, Inc.*,
   476 F.3d 1112 (10th Cir. 2007) .............................................................................45

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
   720 F. Supp. 1379 (D. Ariz. 1989) ........................................................................48

*In re Williams Sec. Litig.-WCG Subclass*,
   558 F.3d 1130 (10th Cir. 2009) .............................................................................42

*Williams v. Johnson*,
   870 F. Supp. 2d 158 (D.D.C. 2012) .......................................................................18

*Winn-Dixie Stores, Inc. v. Eastern Mushroom Mktg. Coop.*,
   2020 WL 5211035 (E.D. Pa. Sept. 1, 2020) ..........................................................54

**Statutes**

12 U.S.C.
   § 4617(b)(2)(J) ..............................................................................................1, 22, 23
   § 4617(f) ...........................................................................................................3, 26

N.Y. Gen. Oblig. Law § 13-107(1) .........................................................................49

Va. Code Ann. § 8.01-26 ........................................................................................50

Va. Code § 8.1A-103(a)(3) ......................................................................................51

**Rules**

Fed. R. Civ. P. 23(c)(2)(B) ........................................................................54

Fed. R. Civ. P. 50(b)(2)...........................................................................18

Fed. R. Civ. P. 50(b)(3)...........................................................................18

**Other Authorities**

17A Am. Jur. 2d Contracts § 673 (Feb. 2024) ............................................32

Restatement (Second) of Contracts § 253 ..................................................30

29 Williston on Contracts § 74:6 (4th ed. 2023) ........................................47

## INTRODUCTION

This case is one of a series of lawsuits brought by Plaintiffs and others challenging steps the Federal Housing Finance Agency ("FHFA"), in its special role as Conservator, successfully took to protect the public by ensuring the viability of Fannie Mae and Freddie Mac (the "Enterprises") and, by extension, the U.S. housing market.  In the bleak, uncertain days of the Great Recession and near-collapse of the national housing market, Congress, through the Housing and Economic Recovery Act of 2008 ("HERA"), established FHFA and authorized it to take any action that FHFA, as Conservator, determines is in the "best interests" of the Enterprises or, importantly, the public.  12 U.S.C. § 4617(b)(2)(J).  As the Supreme Court has explained, "the FHFA's powers under [HERA] differ critically from those of most conservators and receivers," in that "when the FHFA acts as a conservator, it may aim to rehabilitate the regulated entity in a way that, while not in the best interests of the regulated entity, is beneficial to the Agency and, by extension, the public it serves."  *Collins v. Yellen*, 141 S. Ct. 1761, 1776, 1785 (2021).

Among the actions FHFA reasonably determined to be in the best interests of the public was the Third Amendment to the Senior Preferred Stock Purchase Agreements (the "PSPAs")— the 2008 agreements with the Treasury Department under which the Conservator, acting on behalf of the Enterprises, authorized Treasury to infuse the Enterprises with capital by purchasing their securities so that they could continue operating.  The Third Amendment to the PSPAs included the so-called "Net Worth Sweep" that is the focus of this lawsuit.  The Net Worth Sweep "eliminated th[e] risk" that the Enterprises "would have consumed some or all of the [Treasury Department's] remaining capital commitment in order to pay their dividend obligations" under the PSPAs to Treasury, thus "ensur[ing] that all of Treasury's capital was available to backstop the companies' operations during difficult quarters."  *Id.* at 1777.

Nevertheless, the Enterprises' private shareholders sued, alleging that FHFA's agreement to the Net Worth Sweep was arbitrary and unreasonable, thus breaching the implied covenant of good faith and fair dealing.  In *Collins*, the Supreme Court held that HERA "authorized the Agency" to agree to the Net Worth Sweep because "the FHFA could have reasonably concluded that it was in the best interests of members of the public who rely on a stable secondary mortgage market." *Id.* at 1777.  And the Federal Circuit recently affirmed the dismissal of Plaintiffs' constitutional and contract claims against the United States, observing that *Collins* found "that the FHFA lawfully adopted the net worth sweep." *Fairholme Funds, Inc. v. United States*, 26 F.4th 1274, 1297 (Fed. Cir. 2022).  Respectfully, and as explained in detail below, this case likewise should have been dismissed as a matter of law before it was presented to a jury.

> ***Defendants are entitled to judgment as a matter of law.***  Plaintiffs' sole claim is that, in agreeing to the Net Worth Sweep and thereby breaching the implied covenant of good faith and fair dealing, Defendants purportedly harmed Enterprise shareholders by causing a $1.6-billion decline in the relevant shares' market valuation on August 17, 2012, the day that the Third Amendment was announced.  *E.g.*, Trial II Tr. 409:11-15, 465:14-18 (attached as **Exhibit A**).  Plaintiffs' claim fails as a matter of law for multiple independent reasons.

First, the implied covenant does not even apply here.  "An essential predicate for the application of the implied covenant is the existence of a 'gap' in the relevant agreement." *DG BF, LLC v. Ray*, 2021 WL 776742, at *15 (Del. Ch. Mar. 1, 2021).  Key here, "[w]hen a contract confers discretion on one party," "the implied covenant does not come into play when 'the scope of discretion is specified,' because in that instance, 'there is no gap.'" *Id.* (citations omitted); *see Old Dominion Elec. Coop. v. Ragnar Benson, Inc.*, 2006 WL 2252514, at *9 (E.D. Va. Aug. 4, 2006) (similar under Virginia law).  Thus, if a contract specifies that a party must exercise its

discretion "reasonably" or in "good faith," or in the "best interest" of an entity, or otherwise specifies the scope of the party's contractual discretion in any way, then the implied covenant simply does not apply. *Policemen's Annuity & Benefit Fund of Chi. v. DV Realty Advisors LLC*, 2012 WL 3548206, at *12 (Del. Ch. Aug. 16, 2012) (holding that implied covenant did not apply because contract specified discretion must be exercised in "good faith" and in "best interest" of company). Here, Plaintiffs' shareholder contracts with the Enterprises incorporate HERA's provision stating that FHFA may take actions it determines are in the "best interests" of the public, thereby specifying the scope of FHFA's contractual discretion. The shareholder contracts thus contain no "gap" for the implied covenant to fill, and Plaintiffs' claim fails as a matter of law.

Second, the Supreme Court's decision in *Collins* squarely forecloses Plaintiffs' sole claim regarding the Net Worth Sweep. To begin with, *Collins* made clear that the Conservator's "business decisions are protected from judicial review" under 12 U.S.C. § 4617(f). 141 S. Ct. at 1785. Moreover, *Collins* rejected the central element that Plaintiffs had to prove to establish a breach of the implied covenant—namely, that FHFA acted "arbitrarily or unreasonably" by agreeing to the Third Amendment. *Collins* held that the Third Amendment was within FHFA's expansive statutory authority to act in the "best interests" of the public because FHFA "*reasonably* viewed [the Third Amendment] as more certain to ensure market stability" than the alternative approaches Plaintiffs favor. *Id.* at 1777 (emphasis added). In the Supreme Court's words, "[w]hether or not this new arrangement was in the best interests of the [Enterprises] or their shareholders, the FHFA could have *reasonably* concluded that it was in the best interests of members of the public who rely on a stable secondary mortgage market." *Id.* (emphasis added). As a matter of law, shareholders' reasonable expectations necessarily incorporated HERA's

broad grant of authority to act in what FHFA determines are the "best interests" of the public, and the Supreme Court's unanimous holding that FHFA acted reasonably in agreeing to the Third Amendment forecloses Plaintiffs' claim that FHFA acted *unreasonably*.

Third, Plaintiffs' implied covenant claim alleges a non-cognizable anticipatory breach of contract. This Court previously held that Plaintiffs' breach of contract claims regarding the Third Amendment's effect on liquidation preferences "sound in anticipatory breach." *Fairholme Funds*, *Inc. v. Fed. Hous. Fin. Agency* ("*MTD Ruling II*"), 2018 WL 4680197, at *6 (D.D.C. Sept. 28, 2018). And as the Court explained, Plaintiffs' liquidation preference rights cannot be violated unless and until there is a liquidation, and Plaintiffs may not treat a future breach of those rights upon liquidation as a present breach. *Id.* Plaintiffs' implied covenant claim is no different. Plaintiffs' alleged injury is based on a loss of potential future dividends due to the Third Amendment, and they value that injury based on the decline in Enterprise share prices on August 17, 2012. But Plaintiffs may not treat a failure to pay potential future dividends as a present breach. Indeed, as this Court has noted, multiple legal and practical obstacles wholly separate from the Net Worth Sweep (such as the PSPAs' restriction on the Enterprises' ability to pay down Treasury's liquidation preference) still stand between Plaintiffs and any future dividends. *Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency* ("*MSJ Ruling*"), 2022 WL 4745970, at *9 (D.D.C. Oct. 3, 2022).

Finally, Plaintiffs failed at trial to prove with reasonable certainty that the one-day decline in Enterprise share prices on August 17, 2012, harmed or damaged Plaintiffs. Specifically, Plaintiffs failed to introduce evidence (1) showing that current shareholders are worse off today than they would be absent the Third Amendment; (2) accounting for the substantial share-price *increases* that occurred shortly after the Third Amendment; or

(3) showing that the one-day share-price decline on August 17, 2012, was attributable solely to the Net Worth Sweep as opposed to other terms of the Third Amendment.  Absent evidence on all of these issues, the jury had no basis to find with reasonable certainty that current shareholders were harmed by the Third Amendment.

**_Alternatively, putting aside FHFA's unique statutory powers as Conservator, Defendants are entitled to judgment as a matter of law on claims for shares purchased after the Third Amendment because Plaintiffs lack standing to assert them._**  With respect to shares that were purchased _after_ the Third Amendment and the ensuing one-day share-price drop, Plaintiffs lack standing because the Third Amendment caused them no harm.  If anything, post-Third Amendment purchasers benefitted because they bought shares at prices that were lower as a result of the August 17, 2012, price drop.  At the very least, those purchasers bought the shares with any impact caused by the Third Amendment already included in the share price.

Indeed, Plaintiffs do not assert that post-Third Amendment purchasers were harmed by the share-price drop.  Instead, they assert that the _sellers_ were harmed, and that the sellers' implied covenant claims were _automatically_ assigned to post-Third Amendment purchasers solely by virtue of the sale of the shares.  But this theory that the legal claim "travels with the share" conflicts with prevailing law that legal claims related to a security "are not automatically assigned to a subsequent purchaser upon the sale of the underlying security."  _Bluebird Partners, L.P. v. First Fid. Bank, N.A. N.J._, 85 F.3d 970, 974 (2d Cir. 1996); _accord DNAML Pty, Ltd. v. Apple Inc._, 2015 WL 9077075, at *4 (S.D.N.Y. Dec. 16, 2015) (same under common law); _Cheatham I.R.A. v. Huntington Nat'l Bank_, 137 N.E.3d 45, 52 (Ohio 2019) (same for breach of contract claims).  It also conflicts with Plaintiffs' position that a shareholder's decision to opt out of the classes here does _not_ travel with the share.  And it would be anomalous to hold that those

who held stock at the time of the Third Amendment and *sold* shares at a loss *cannot* sue, but those who *purchased* at prices already reflecting the Third Amendment's impact *can* sue. Because the sellers' claims did not automatically travel with the shares, Plaintiffs lack standing with respect to the shares purchased after the Third Amendment. The Court therefore lacks jurisdiction to hear claims associated with those shares, and such claims must be dismissed.

## BACKGROUND

This Court and the D.C. Circuit have described the background of this case in prior opinions.[1]  Set forth below are the key facts relevant to this motion.

### A.    The Enterprises and Their Contracts with Private Shareholders

The Enterprises are government-sponsored financial institutions whose public mission is to provide liquidity and stability to the nation's housing finance market. "Fannie Mae originated as a government-owned entity designed to 'provide stability in the secondary market for residential mortgages,' to 'increas[e] the liquidity of mortgage investments,' and to 'promote access to mortgage credit throughout the Nation.'"  *Perry II*, 864 F.3d at 599 (quoting 12 U.S.C. § 1716). Congress created Freddie Mac to "increase the availability of mortgage credit for the financing of urgently needed housing." *Id.* (quoting Pub. L. No. 91-351, 84 Stat. 450 (1970)). The Enterprises are "vital for the Nation's economic health," and their collapse would "imperil"

---

[1]  *E.g.*, *Perry Cap. LLC v. Lew* ("*Perry I*"), 70 F. Supp. 3d 208, 214-19 (D.D.C. 2014) (original order dismissing action); *Perry Cap. LLC v. Mnuchin* ("*Perry II*"), 864 F.3d 591, 598-603 (D.C. Cir. 2017) (decision reversing dismissal in part); *MTD Ruling II*, 2018 WL 4680197, at *1-4 (order on motion to dismiss following remand); *In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigs.* ("*Class Cert. Ruling*"), 2021 WL 5799379, at *1-4 (D.D.C. Dec. 7, 2021) (order on class certification); *MSJ Ruling*, 2022 WL 4745970, at *1-3 (order on summary judgment); *Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency* ("*SJ Reconsideration Ruling*"), 2022 WL 11110548, at *1 (D.D.C. Oct. 19, 2022) (order on Plaintiffs' motion to reconsider summary judgment); *Berkley Ins. Co. v. Fed. Hous. Fin. Agency*, 2023 WL 3790739, at *1-2 (D.D.C. June 2, 2023) (order denying Plaintiffs' motion to allow supplemental expert discovery).

the national economy.  *Id.* at 598-99; *see* Trial II Tr. 1927:8-17, 2118:10-2121:11, 2274:4-21
(Ex. A).

      The Enterprises have long had private shareholders, who through their purchase of shares
enter into contracts with the Enterprises.  Those contracts consist of "not only documents such as
the stock certificate, certificate of designations, the corporate charter, and bylaws, but also the
corporate law under which the corporation is formed and regulated."  *MTD Ruling II*, 2018 WL
4680197, at *8.  By law, shareholders agree to the terms of the shareholder contract, including as
those terms may change over time, simply by purchasing shares.  *Id.* at *9; *see* Final Jury
Instructions at 8 (Class ECF No. 383, Berkley ECF No. 393).[2]

      The Enterprises' private shareholders have no legal entitlement to dividends.  The
shareholder contracts "do not require the Board of either Enterprise to declare dividends."  Joint
Statement of Undisputed Facts ("JX-1") ¶ 7 (Class ECF No. 335-1, Berkley ECF No. 345-1).
Rather, the contracts "provide for dividends 'if declared by the Board of Directors, in its sole
discretion.'"  *Perry II*, 864 F.3d at 631 (citation omitted); *see, e.g.*, Trial II Tr. 2942:2-7 (Ex. A)
(referencing DX-49).

### B.      HERA, the Conservatorships, and the PSPAs

      "Fannie Mae and Freddie Mac became major players in the United States' housing
market.  Indeed, in the lead up to 2008, Fannie Mae's and Freddie Mac's mortgage portfolios
had a combined value of $5 trillion and accounted for nearly half of the United States mortgage
market.  But in 2008, the United States economy fell into a severe recession, in large part due to
a sharp decline in the national housing market.  Fannie Mae and Freddie Mac suffered a
precipitous drop in the value of their mortgage portfolios, pushing the Companies to the brink of

---

[2] "Class ECF No." refers to Case No. 1:13-mc-1288-RCL, and "Berkley ECF No." refers to Case
No. 1:13-cv-1053-RCL.

default." *Perry II*, 864 F.3d at 599.  The companies "lost more that year than they had earned in the previous 37 years combined.  Though they remained solvent, many feared the companies would eventually default and throw the housing market into a tailspin." *Collins*, 141 S. Ct. at 1771 (citation omitted).  Indeed, Congress was "[c]oncerned that a default by Fannie and Freddie would imperil the already fragile national economy." *Perry II*, 864 F.3d at 599.

In response, in July 2008, Congress enacted HERA, which established FHFA as the Enterprises' safety and soundness regulator and empowered FHFA's Director to place each Enterprise into conservatorship or receivership.  JX-1 ¶¶ 8-9.  HERA also authorized the U.S. Department of the Treasury to purchase Enterprise securities and thereby infuse them with capital to ensure their continued liquidity and stability.  *Perry II*, 864 F.3d at 600; *see* Trial II Tr. 2133:9-22 (Ex. A).

On September 6, 2008, amidst the Enterprises' historic losses, FHFA's Director placed the Enterprises into conservatorships.  JX-1 ¶ 11; *see Perry II*, 864 F.3d at 600-01.  HERA "invests FHFA as conservator with broad authority and discretion over the operation of Fannie Mae and Freddie Mac.  For example, upon appointment as conservator, FHFA 'shall . . . immediately succeed to . . . all rights, titles, powers, and privileges of the regulated entity, and of any stockholder, officer, or director of such regulated entity with respect to the regulated entity and the assets of the regulated entity.'" *Perry II*, 864 F.3d at 600 (quoting 12 U.S.C. § 4617(b)(2)(A)).  "Consistent with Congress's mandate that FHFA's Director protect the 'public interest,' 12 U.S.C. § 4513(a)(1)(B)(v), [HERA] invested FHFA as conservator with the authority to exercise its statutory authority . . . in the manner that 'the Agency [FHFA] determines is in the best interests of the regulated entity *or the Agency*.'" *Id.* (quoting 12 U.S.C.

§ 4617(b)(2)(J)).  HERA's "best interests" provision is incorporated into Plaintiffs' shareholder contracts.  *See MTD Ruling II*, 2018 WL 4680197, at *9.

At the outset of the conservatorships, FHFA, as Conservator, announced that "the common stock and preferred stock dividends will be eliminated."  JX-1 ¶ 13.  The next day, the Conservator entered into PSPAs with Treasury on behalf of each Enterprise.  Under the PSPAs, Treasury committed to make up to $100 billion available to each Enterprise (the "Treasury Commitment" or "Commitment") to ensure that the Enterprises maintained a positive net worth. *Id.* ¶ 16.  "In exchange for that extraordinary capital infusion, Treasury received one million senior preferred shares in each company.  Those shares entitled Treasury to: (i) a $1 billion senior liquidation preference—a priority right above all other stockholders, whether preferred or otherwise, to receive distributions from assets if the entities were dissolved; (ii) a dollar-for-dollar increase in that liquidation preference each time Fannie and Freddie drew upon Treasury's funding commitment; (iii) quarterly dividends that the Companies could either pay at a rate of 10% of Treasury's liquidation preference or a commitment to increase the liquidation preference by 12%; (iv) warrants allowing Treasury to purchase up to 79.9% of Fannie's and Freddie's common stock; and (v) the possibility of periodic commitment fees over and above any dividends."  *Perry II*, 864 F.3d at 601; *see* JX-1 ¶ 20.  The PSPAs also "barred the Enterprises from making any other distributions to Enterprise stockholders—including issuing dividends to shareholders—without Treasury's consent."  JX-1 ¶ 24; *see* DX-85 § 5.1 (Fannie Mae) (attached as **Exhibit B**); DX-86 § 5.1 (Freddie Mac) (attached as **Exhibit C**).

In 2009, as the Enterprises' losses deepened and their draws on the Treasury Commitment continued to grow, the PSPAs were amended twice to increase the Commitment and ensure the Enterprises' continued access to capital to prevent their collapse.  The first

amendment doubled the Commitment to $200 billion for each Enterprise.  JX-1 ¶ 25.  When

even that seemed potentially insufficient, the second amendment increased the Commitment to

an unlimited amount through December 31, 2012, when it would again become capped.  *Id.* ¶ 26.

Even after these two amendments to the PSPAs, the Enterprises' financial struggles

persisted.  "Through the first quarter of 2012, Fannie and Freddie repeatedly struggled to

generate enough capital to pay the 10% dividend they owed to Treasury . . . .  FHFA and

Treasury stated publicly that they worried about perpetuating the 'circular practice of the

Treasury advancing funds to [the Enterprises] simply to pay dividends back to Treasury' . . . ."

*Perry II*, 864 F.3d at 601 (quoting August 17, 2012, Treasury press release).  Through the second

quarter of 2012, Fannie Mae had drawn $116.1 billion on the Treasury Commitment, and

Freddie Mac had drawn $71.3 billion.  JX-1 ¶¶ 33-34.

### C.    The Third Amendment to the PSPAs

On August 17, 2012, the Conservator and Treasury amended the PSPAs for a third time.

"The Third Amendment replaced the fixed 10% dividend with a quarterly variable dividend

equal to the positive net worth, if any, of Fannie Mae and Freddie Mac, exceeding a

predetermined capital reserve."  JX-1 ¶ 36.  Under this "Net Worth Sweep," "[i]f the net worth of

Fannie Mae or Freddie Mac at the end of a quarter exceeded the capital reserve, the amendment

required the company to pay all of the surplus to Treasury.  But if a company's net worth at the

end of a quarter did not exceed the reserve or if it lost money during a quarter, the amendment

did not require the company to pay anything."  *Collins*, 141 S. Ct. at 1774 (emphasis omitted).

FHFA agreed to the Net Worth Sweep to place the Enterprises on sounder financial footing.  *Id.*

at 1774, 1777.  The companies had been drawing "sizeable amounts from Treasury's capital

commitment," but "because of the fixed-rate dividend formula, the more money they drew, the

larger their dividend obligations became."  *Id.* at 1773.  The Net Worth Sweep ended "the

circular practice of drawing funds from Treasury's capital commitment just to hand those funds back as a quarterly dividend." *Id.* It thus eliminated the risk that the Enterprises would "consume[] some or all of the remaining capital commitment in order to pay their dividend obligations, which were themselves increasing in size every time the companies made a draw." *Id.* at 1777.

In addition, the Third Amendment required the Enterprises to shrink their retained mortgage portfolios at an accelerated pace to "reduce risk exposure." DX-539 (attached as **Exhibit D**). It also "suspended the companies' obligations to pay periodic commitment fees" to Treasury. *Collins*, 141 S. Ct. at 1774.[3]

###    D.    Procedural History

####       1.    Motions to Dismiss

Initially, "[t]his matter [was] brought before the Court by both a class action lawsuit and [multiple] individual lawsuits." *Perry I*, 70 F. Supp. 3d at 214. The Class Plaintiffs "brought claims of breach of contract, regarding allegedly promised dividends and liquidation preferences, breach of the implied covenant of good faith and fair dealing, and an unconstitutional taking, as well as derivative claims of breach of fiduciary duty." *Id.* at 218. The Berkley Plaintiffs brought claims under the Administrative Procedure Act ("APA"), "as well as claims of breach of contract, regarding allegedly promised dividends and liquidation preferences, and breach of the implied covenant of good faith and fair dealing," plus "an additional claim of breach of fiduciary duty against FHFA." *Id.*

---

[3]  Later, FHFA and Treasury adopted a fourth amendment to the PSPAs, which "eliminated the variable dividend formula that had [allegedly] caused the shareholders' injury" under the Third Amendment and replaced it with increases to the liquidation preference that allowed the Enterprises to build capital. *Collins*, 141 S. Ct. at 1780.

This Court dismissed the action in its entirety, concluding that "the plaintiffs' grievance is really with Congress itself.  It was Congress, after all, that parted the legal seas so that FHFA and Treasury could effectively do whatever they thought was needed to stabilize and, if necessary, liquidate, the GSEs."  *Id.* at 246.  The Court held that "HERA's unambiguous statutory provisions, coupled with the unequivocal language of the plaintiffs' original GSE stock certificates, compels the dismissal of all of the plaintiffs' claims."  *Id.*

The D.C. Circuit affirmed the dismissal in most respects.  *Perry II*, 864 F.3d at 598-99.  It held that Plaintiffs "have no enforceable right to dividends because the [stock] certificates accord the Companies complete discretion to declare or withhold dividends."  *Id.* at 629.  But the court of appeals remanded for further proceedings on other potential claims, including claims for breach of contract with respect to liquidation preferences and breach of the implied covenant of good faith and fair dealing with respect to liquidation preferences and dividends.  *Id.* at 633-34.  The court explained that "one generally cannot base a claim for breach of the implied covenant on conduct authorized by the terms of the agreement," and that the stock certificates granted the Enterprises' Boards of Directors "sole discretion" to declare dividends.  *Id.* at 631.  But, the court added, if a contract grants *unspecified* discretion, "[a] party to a contract providing for such discretion violates the implied covenant if it 'act[s] arbitrarily or unreasonably'" in violation of the parties' "reasonable expectations."  *Id.*

On remand, Plaintiffs amended their complaint to add additional claims.  "[A]ll plaintiffs [brought] claims for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, and violations of Delaware and Virginia statutory law governing dividends.  Additionally, the Class Plaintiffs [brought] derivative claims against FHFA for breach of fiduciary duties.  And the individual plaintiffs [brought] APA claims."

*MTD Ruling II*, 2018 WL 4680197, at *4 (footnote and citations omitted).  In 2018, this Court dismissed all claims except the implied covenant claim.  *Id.* at *7.  Because the Enterprises were not being liquidated, the Court held that "Plaintiffs' claims for breach of contract with respect to liquidation preferences sound in anticipatory breach."  *Id.* at *6.  But "Plaintiffs' contract with the GSEs with respect to liquidation preferences is a unilateral contract," and "the doctrine traditionally does not apply to unilateral contracts, especially when the only remaining performance is the payment of money."  *Id.* at *5-6.  The Court also held that Plaintiffs stated a viable claim for breach of the implied covenant with respect to liquidation preferences and dividends, but the Court did not address how the anticipatory breach doctrine applied to the implied covenant claim.  *See id.* at *7-14.[4]

Defendants moved for reconsideration, arguing that the Court's rationale for dismissing the breach of contract claim regarding liquidation preferences under the anticipatory breach doctrine applied equally to the implied covenant claim regarding liquidation preferences and dividends.  The Court denied the motion, holding that "[t]he limitation on anticipatory breach

---

[4]  In addressing a dispute about the implied covenant claim, the Court held for the first time that Plaintiffs' claims "related to dividends and liquidation preferences traveled with the shares to subsequent purchasers."  *MTD Ruling II*, 2018 WL 4680197, at *8.  The Court reiterated this view that the claim here "traveled" with the shares in multiple subsequent orders, even after Plaintiffs' theory of harm fundamentally changed from seeking lost future dividends to seeking compensation for the share-price drop.  *See Class Cert. Ruling*, 2021 WL 5799379, at *8 ("[B]ecause the '[r]ights associated with dividends and liquidation preferences inhere in the security,' the Court need not further divide the classes for those who purchased their shares after the Third Amendment." (quoting *MTD Ruling II*, 2018 WL 4680197, at *8)); *id.* ("Those stockholders that held stock on August 12 [*sic*], 2012, but sold shares thereafter are no longer members of the class and their claims traveled to the purchasers of their shares."); *Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency*, 636 F. Supp. 3d 144, 158 (D.D.C. 2022) ("Because 'the contractual rights [plaintiffs] seek to enforce . . . inhere in the security, traveling to each subsequent acquirer,' the time that any plaintiff purchased GSE shares is irrelevant . . . ." (quoting *MTD Ruling II*, 2018 WL 4680197, at *8)).

does not apply to the alleged breaches of the implied covenant because those breaches are not anticipatory."  Order Denying Reconsideration at 4 (Class ECF No. 104, Berkley ECF No. 99).

## 2.    The Supreme Court's Intervening Decision in *Collins*

Plaintiffs and other private shareholders also brought claims against the federal government challenging the Net Worth Sweep in other courts, which uniformly dismissed them. Most relevant is *Collins v. Yellen*, 141 S. Ct. 1761 (2021), an action by shareholders challenging the Net Worth Sweep under the U.S. Constitution and the APA.  Like Plaintiffs here, the *Collins* shareholders "claim[ed] that the FHFA adopted the third amendment at a time when the companies were on the precipice of a financial uptick and that they would soon have been in a position not only to pay cash dividends, but also to build up capital buffers to absorb future losses."  *Id.* at 1777.  The shareholders also "contend[ed] that the FHFA could have protected Treasury's capital commitment by ordering the companies to pay the dividends in kind rather than in cash."  *Id.*

The Supreme Court unanimously rejected those arguments.  In dismissing the APA claim, the Court held that FHFA, in its capacity as Conservator, acted within its statutory powers and functions under HERA's "best interests" provision because FHFA "could have reasonably concluded that [the Third Amendment] was in the best interests of members of the public who rely on a stable secondary mortgage market."  *Id.*  "[T]here was a realistic possibility that the [Enterprises] would have consumed some or all of the remaining capital commitment in order to pay their dividend obligations, which were themselves increasing in size every time the [Enterprises] made a draw.  The third amendment eliminated this risk . . . ."  *Id.*  The Court thus held that FHFA acted reasonably to "ensure[] that all of Treasury's capital was available to backstop the [Enterprises]' operations during difficult quarters."  *Id.*; *see also Fairholme Funds, Inc. v. United States*, 26 F.4th 1274, 1297 (Fed. Cir. 2022) (dismissing shareholders' suit against

the United States alleging that the Net Worth Sweep violated their constitutional and contractual rights, noting that *Collins* held "the FHFA lawfully adopted the net worth sweep").

### 3.    Class Certification and Summary Judgment

Later in 2021, Plaintiffs filed an unopposed motion for class certification, and this Court certified three classes of "current holders" of certain Enterprise shares (including successors). *See* Class Certification Order (Class ECF No. 139).  These "current holders" include those who have held their shares continuously since before the Third Amendment and those who purchased their shares after the Third Amendment.  *See id.*  In certifying the classes, the Court noted that "[t]he complained-of injuries" that were "common to the class members" consisted of alleged "lost dividends and liquidation preference."  *Class Cert. Ruling*, 2021 WL 5799379, at *6.

In September 2022, the Court granted in part and denied in part Defendants' motion for summary judgment.  *MSJ Ruling*, 2022 WL 4745970, at *1.  The Court rejected Defendants' arguments that there was no "gap" in the shareholder contracts for the implied covenant of good faith and fair dealing to fill and that the Supreme Court's decision in *Collins* foreclosed Plaintiffs' implied covenant claim as a matter of law.  *Id.* at *5-7.  But the Court granted partial summary judgment for Defendants, rejecting as impermissibly speculative Plaintiffs' attempt to establish that they would have received additional dividends in the future absent the Third Amendment.  *Id.* at *9-10.  The Court observed that "plaintiffs appear to offer two different theories of harm . . . .  First, and primarily, they argue that the Third Amendment deprived them of future dividends that they otherwise would have received," which the Court called "the lost-dividends theory."  *Id.* at *8.  Second, "and in the alternative," Plaintiffs advanced "the lost-value theory"—"that by eliminating any possibility of future dividends, the Third Amendment at least caused their shares to decline significantly in value."  *Id.*  The Court held that "defendants are

entitled to summary judgment on the lost-dividends theory but that a genuine dispute of material fact precludes summary judgment on the lost-value theory." *Id.*

Plaintiffs sought damages under this lost-value theory based on the one-day, $1.6 billion decline in the market value of the relevant Enterprise shares on August 17, 2012, the day the Third Amendment was announced. In calculating that lost value, Plaintiffs' damages expert, Dr. Mason, relied on an event study conducted by Defendants' expert, Dr. Attari, which demonstrated that the prices of the relevant Enterprise shares declined that day, resulting in a loss of market value totaling $1.6 billion. The event study also showed that the Enterprises' share prices increased over the subsequent few months. *See* PX-375 at 3-4 (attached as **Exhibit E**).

### 4.    The Trials

The Court presided over two trials. The first occurred in October and November of 2022, and ended in a mistrial. The second took place in July and August of 2023.

At the close of Plaintiffs' case in the second trial, Defendants orally moved for judgment as a matter of law under Rule 50(a) on the grounds that (1) there is no "gap" in the shareholder contracts for the implied covenant to fill; (2) *Collins* forecloses Plaintiffs' implied covenant claim as a matter of law; (3) Plaintiffs failed to prove harm or damages with reasonable certainty; and (4) post-Third Amendment purchasers were not harmed by the share-price drop and thus lack standing. Trial II Tr. 1500:4-1512:14 (Ex. A); *see also* Defs.' Mot. for a Judgment As a Matter of Law (Class ECF No. 248, Berkley ECF No. 239) (written motion at first trial); Trial I Tr. 1830:2, 2449:3-2450:6 (oral motion and ruling at first trial) (attached as **Exhibit F**). The Court denied the motion. *See* Aug. 1, 2023, Minute Entry; *see also* Oct. 26, 2022, Minute Entry (denying motion at first trial).

On August 14, 2023, the jury returned a verdict for Plaintiffs, awarding $299.4 million to Fannie Mae junior preferred shareholders, $281.8 million to Freddie Mac junior preferred

shareholders, and $31.2 million to Freddie Mac common shareholders.  *See* Verdict Form at 1 (Class ECF No. 392, Berkley ECF No. 402).  The jury, tasked with deciding prejudgment interest under Virginia law (which applies to Freddie Mac), denied prejudgment interest to Freddie Mac shareholders.  *See id.* at 2.  The Court, tasked with deciding prejudgment interest under Delaware law (which applies to Fannie Mae), awarded prejudgment interest to Fannie Mae junior preferred shareholders at a fixed rate of 5.13% simple interest.  Order at 1 (Class ECF No. 402, Berkley ECF No. 413).

Thereafter, Plaintiffs submitted their proposed plan of allocation, and Defendants submitted their objections.  *See* Class ECF Nos. 415, 417, 418, Berkley ECF Nos. 423, 424, 425. On March 30, 2024, the Court entered judgment in the amount of (1) $299,400,000 in favor of the Fannie Mae Preferred Class, plus $199,650,000 in prejudgment interest; (2) $281,800,000 in favor of the Freddie Mac Preferred Class; and (3) $31,200,000 in favor of the Freddie Mac Common Class, for a total judgment in the amount of $812,050,000.  Final Judgment at 3 (Class ECF No. 421, Berkley ECF No. 428).  The Court also adopted a plan of allocation, *see* Order Governing Plan of Allocation (Class ECF No. 421-1, Berkley ECF No. 428-1), which "reduce[d] the damages to be distributed by the amount of the jury's damages award attributable to shares held by the few opt-outs other than the Berkley Plaintiffs" and "reserve[d] decision on the disposition of unclaimed funds."  Memorandum and Order at 1-2 (Class ECF No. 420, Berkley ECF No. 427).

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 50(b), a motion for judgment as a matter of law must be granted "if, after viewing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences, it is clear that a reasonable jury could only have

found for the moving party." *Robinson v. Wash. Metro. Area Transit Auth.*, 774 F.3d 33, 37 (D.C. Cir. 2014) (Garland, C.J.) (citation omitted).

The standard for a Rule 50 motion "mirrors" that for summary judgment under Federal Rule of Civil Procedure 56, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000), and is the same under Rule 50(b) as it is for a pre-verdict motion under Rule 50(a), *Rice v. District of Columbia*, 818 F. Supp. 2d 47, 54 (D.D.C. 2011). As at summary judgment, on a motion for judgment as a matter of law, the court must draw all reasonable inferences in favor of the nonmoving party and may not make credibility determinations or weigh the evidence. *Reeves*, 530 U.S. at 150. But the court must give credence to the "evidence supporting the moving party that is uncontradicted and unimpeached, as least to the extent that the evidence comes from disinterested witnesses." *Huthnance v. District of Columbia*, 793 F. Supp. 2d 183, 197 (D.D.C. 2011) (Lamberth, J.) (quoting *Reeves*, 530 U.S. at 151). The evidence in support of the verdict must "be more than merely colorable; it must [be] significantly probative." *Richardson ex rel. Richardson v. Richardson-Merrell, Inc.*, 857 F.2d 823, 828-29 (D.C. Cir. 1988); *see also Williams v. Johnson*, 870 F. Supp. 2d 158, 162 (D.D.C. 2012). "[I]f the court finds that the evidence was legally insufficient to sustain the verdict," *Ortiz v. Jordan*, 562 U.S. 180, 189 (2011), then the court may "direct the entry of judgment as a matter of law" in favor of the verdict loser or "order a new trial," Fed. R. Civ. P. 50(b)(2), (b)(3). The central question "is whether there was sufficient evidence upon which the jury could base a verdict in [the prevailing party's] favor." *Scott v. District of Columbia*, 101 F.3d 748, 752 (D.C. Cir. 1996).

## ARGUMENT

### I.   DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW AS TO ALL PLAINTIFFS

Defendants are entitled to judgment as a matter of law for four independent reasons.

First, the shareholder contracts, by incorporating HERA's "best interests" provision, already specify the scope of FHFA's contractual discretion and thus contain no "gap" for the implied covenant to fill.  Second, even if the implied covenant applied, the Supreme Court's decision in *Collins* forecloses Plaintiffs' claim.  Third, Plaintiffs' claim that share prices fell because the Third Amendment eliminated any possibility of future dividends is a claim for anticipatory breach, which this Court has correctly recognized is not cognizable.  Finally, Plaintiffs failed at trial to prove harm or damages with reasonable certainty, as Delaware and Virginia law require.

### A.   The Shareholder Contracts Specify the Scope of FHFA's Contractual Discretion and Thus Leave No "Gap" for the Implied Covenant to Fill

Plaintiffs' implied covenant claim fails as a matter of law because the implied covenant does not apply here.  An implied covenant claim exists under Delaware or Virginia law only where the parties' contract confers discretion without specifying its scope, thus leaving a "gap" for the implied covenant to fill.  Here, the shareholder contracts—by incorporating HERA's "best interests" provision—specify the scope of FHFA's contractual discretion.  Thus, the shareholder contracts contain no "gap" for the implied covenant to fill, and Plaintiffs' implied covenant claim fails as a matter of law.

"Under Delaware and Virginia law . . . an implied covenant of good faith and fair dealing 'attaches to every contract.'"  *MSJ Ruling*, 2022 WL 4745970, at *4 (citations omitted).  As this Court has explained, "an implied covenant claim . . . involves a 'cautious enterprise' whereby the court 'infer[s] contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated.'"  *Id.* (citations omitted).  The implied covenant "should

not be used to imply terms that modify or negate an unrestricted contractual right authorized by an agreement." *Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 920-21 (Del. 2021).

Critically here, "[a]n essential predicate for the application of the implied covenant is the existence of a 'gap' in the relevant agreement." *DG BF, LLC v. Ray*, 2021 WL 776742, at *15 (Del. Ch. Mar. 1, 2021). Even "[w]hen a contract confers discretion on one party," "the implied covenant does not come into play when 'the scope of discretion is specified,' because in that instance, 'there is no gap.'" *Id.* (citations omitted). Contracts can define the scope of discretion in a variety of ways, including by "identify[ing] factors that the decision-maker can consider" or "provid[ing] a contractual standard for evaluating the decision." *Policemen's Annuity & Benefit Fund of Chi. v. DV Realty Advisors LLC*, 2012 WL 3548206, at *12 (Del. Ch. Aug. 16, 2012) (citation omitted), *aff'd sub nom. DV Realty Advisors LLC v. Policemen's Annuity & Benefit Fund of Chi.*, 75 A.3d 101 (Del. 2013). "When a contract provision states how a grant of discretion is to be exercised, there is no place for the implied covenant in that provision." *Id.* (citation omitted).[5]

In *Policemen's Annuity & Benefit Fund of Chicago*, for instance, a partnership's limited partners exercised their discretion under the partnership agreement to remove the managing partner. 2012 WL 3548206, at *1. The managing partner challenged his removal under an implied covenant theory, arguing that the Delaware court "should imply, in [the removal

---

[5] Virginia law is in accord. *See Old Dominion Elec. Co-op.*, 2006 WL 2252514, at *9 (under Virginia law, implied covenant applies only when contract confers "unfettered discretion of one party," and not when party's discretion is "expressly 'fettered'" by contract (quoting *Riggs Nat'l Bank of Wash., D.C. v. Linch*, 36 F.3d 370, 373 (4th Cir. 1994))); *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 216 (4th Cir. 2019) (affirming dismissal of claim that Virginia municipality breached implied covenant by failing to appropriate funds to make rent payments because contract's express terms specified that payment was "subject to appropriation" and parties cannot use implied covenant "to impose new terms to their deal that save them from the consequences of the express terms of their agreements").

provision], a requirement that the Limited Partners must act reasonably if they exercise their discretion to remove the Managing Partner." *Id.* at *11. The court rejected that claim. Although the partnership agreement's removal provision "allows for discretion," it "provides how discretion is to be exercised—the Limited Partners must 'in good faith determine that removal of the Managing Partner is necessary for the best interest of the Limited Partnership.'" *Id.* at *12 (alterations omitted). The plaintiff thus could pursue an *express* breach of contract claim for an alleged failure to act "in good faith," but because the contract specified a standard for the exercise of the limited partners' discretion, there could be no implied covenant claim. *Id.* The court explained that, "if the scope of discretion is specified, there is no gap in the contract as to the scope of the discretion, and there is no reason for the Court to look to the implied covenant to determine how discretion should be exercised." *Id.*

Similarly, in *Shareholder Representative Services LLC v. Medidata Solutions, Inc.*, the plaintiff-shareholder sold his shares in a company to the defendant for an amount "based on a calculation flowing from revenues that Defendant generated from the sale and licensing of . . . [a] software solution product." 2020 WL 972618, at *1 (D. Del. Feb. 24, 2020). The plaintiff asserted that the defendant breached the implied covenant by "fail[ing] to take commercially reasonable steps to sell the [software] product and (relatedly) to maximize the Earnout Purchase Price." *Id.* The court dismissed the implied covenant claim because there was no gap in the contracts at issue, as they specified that the defendant may operate his business "in any manner in which [Defendant] deems appropriate in its sole and good faith discretion." *Id.* at *5 (emphasis omitted). The contracts thus "expressly delineated the limits on Defendant's discretion," mandating dismissal of the implied covenant claim. *Id.*; *see also Heritage Handoff Holdings, LLC v. Fontanella*, 2018 WL 3580287, at *3 & n.1 (D. Del. July 25, 2018) (holding

that implied covenant did not apply because "[w]here a contract states that a party must act 'reasonably' . . . it appropriately states the scope of the party's discretion; thus, there is no gap for the implied covenant to fill" (citation omitted)).

Likewise, here, there is no "gap" in the shareholder contracts as to the scope of FHFA's discretion.  The shareholder contracts incorporate HERA's "best interests" provision, *see MTD Ruling II*, 2018 WL 4680197, at *9, which specifies that FHFA, as Conservator, may "take any action authorized by [HERA] which the Agency determines is in the best interests of the regulated entity or the Agency."  12 U.S.C. § 4617(b)(2)(J)(ii); *see Collins*, 141 S. Ct. at 1776-77 (HERA authorizes FHFA to act in "the best interests of . . . the public" "[w]hether or not [that] [i]s in the best interests of the [Enterprises] or their shareholders").  That language is materially indistinguishable from the contract language that foreclosed implied covenant claims in *Policemen's Annuity*, *Shareholder Representative Services*, and *Heritage Handoff Holdings*; it even uses the "best interest" standard that *Policemen's Annuity* found dispositive.  As in those cases, HERA's "best interests" provision, which defines the scope of FHFA's contractual discretion, leaves "no gap" in the shareholder contracts, and thus "the implied covenant does not come into play."  *DG BF, LLC*, 2021 WL 776742, at *15 (citation omitted).

This conclusion is consistent with the D.C. Circuit's prior decision in this case, which expressly directed this Court to consider the effect of HERA's "best interests" provision on Plaintiffs' implied covenant claim.  In remanding the implied covenant claim, the D.C. Circuit noted that the shareholder stock certificates "provide for dividends 'if declared by the Board of Directors, in its *sole discretion*,'" and that, under Delaware and Virginia law, "[a] party to a contract providing for *such discretion* violates the implied covenant if it 'act[s] arbitrarily or unreasonably.'"  *Perry II*, 864 F.3d at 631 (emphases added) (citations omitted).  But the D.C.

Circuit also directed this Court to "evaluate [the implied covenant claim] under the correct legal standard," and instructed that the Court "should consider," among other things, whether the provision in HERA "authorizing the FHFA to act 'in the best interests of the [Companies] or the Agency'" affected shareholders' reasonable expectations and their ability to bring an implied covenant claim. *Id.* (quoting 12 U.S.C. § 4617(b)(2)(J)(ii)). That is exactly what Defendants are asking this Court to do. Under "the correct legal standard," because HERA's "best interests" provision delineates the scope of FHFA's contractual discretion, the implied covenant does not apply.

On summary judgment, this Court held that, notwithstanding HERA's "best interests" provision, the shareholder contracts contain a gap because "whether a certain act falls within FHFA's statutorily authorized discretion and whether FHFA may incur monetary damages for exercising that discretion in a manner inconsistent with its independent contractual obligations are two separate inquiries." *MSJ Ruling*, 2022 WL 4745970, at *7. Respectfully, that conclusion is incorrect. Because HERA's "best interests" provision is incorporated into the shareholder contracts, *see MTD Ruling II*, 2018 WL 4680197, at *9, the scope of FHFA's statutorily authorized discretion and its contractual discretion are coextensive. The statute *defines* the scope of FHFA's contractual discretion—FHFA may exercise its discretion to act in what it determines are the "best interests" of the Enterprises or the public. Just as in the cases discussed above, this means that Plaintiffs' implied covenant claim fails as a matter of law because there is no contractual "gap" to be filled.

The Court also reasoned that just because FHFA is authorized by HERA to take an act does not mean that it is insulated from incurring money damages for that act. In so doing, the Court relied on HERA's repudiation provision, which "authoriz[es] FHFA, in its capacity as

conservator of the GSEs, to repudiate contracts, while also providing for the assessment of damages when FHFA does so." *MSJ Ruling*, 2022 WL 4745970, at *7 (citations omitted). But the question here is not whether FHFA can be held liable for a contract repudiation covered by HERA's repudiation provision. The question is whether the implied covenant applies in this case given that Plaintiffs' shareholder contracts, by incorporating HERA's "best interests" provision, already specify the scope of FHFA's contractual discretion. Under Delaware and Virginia law, the answer to that question is "no." Indeed, Delaware and Virginia law cannot— and do not—prohibit conduct that *Collins* held HERA authorized. *See Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 480 (2013) (holding that federal law controls over contrary state law).

### B. The Supreme Court's Decision in *Collins* Forecloses Plaintiffs' Claim

Defendants are independently entitled to judgment as a matter of law because the Supreme Court's decision in *Collins* conclusively establishes that FHFA acted reasonably in agreeing to the Third Amendment, and that the Conservator's business decision to enter the Third Amendment for the public's benefit is not subject to judicial review under § 4617(f).

Even if the implied covenant applied here (and it does not), *Collins* squarely rejects the central element that Plaintiffs had to prove in order to establish a breach—namely, that FHFA, by agreeing to the Third Amendment, acted "arbitrarily or unreasonably." Final Jury Instructions at 8 (Class ECF No. 383, Berkley ECF No. 393); *see also MTD Ruling II*, 2018 WL 4680197, at *13. In *Collins*, the Supreme Court upheld the dismissal at the pleading stage of a claim by shareholder plaintiffs challenging the Third Amendment under the APA. The Court unanimously held—while assuming the truth of factual allegations materially identical to Plaintiffs' positions here, and drawing all reasonable inferences in the shareholder plaintiffs' favor—that FHFA's agreement to the Third Amendment was within the agency's statutory authority, and therefore not actionable under the APA, *because* it was reasonable.

Specifically, *Collins* held that the Third Amendment was within FHFA's statutory authority to act in the "best interests" of the public because FHFA "*reasonably* viewed [the Third Amendment] as more certain to ensure market stability" than the alternative approaches favored by the shareholder plaintiffs.  141 S. Ct. at 1777 (emphasis added).  "The facts alleged in the complaint," the Court explained, "demonstrate that the FHFA chose a path of rehabilitation that was designed to serve public interests by ensuring Fannie Mae's and Freddie Mac's continued support of the secondary mortgage market." *Id.* at 1776.  It was "undisputed" that the Enterprises "had repeatedly been unable to make their fixed quarterly dividend payments without drawing on Treasury's capital commitment," and that "the cap on Treasury's capital commitment was scheduled to be reinstated." *Id.* at 1777.  "If things had proceeded as they had in the past, there was a realistic possibility that the [Enterprises] would have consumed some or all of the remaining capital commitment in order to pay their dividend obligations, which were themselves increasing in size every time the [Enterprises] made a draw." *Id.*  "The third amendment eliminated this risk . . . ." *Id.*  The Court thus held that there was a *reasonable basis* for the Third Amendment—namely, to "ensure[] that all of Treasury's capital was available to backstop the [Enterprises]' operations during difficult quarters." *Id.*

As the Supreme Court explicitly stated, "[w]hether or not this new arrangement was in the best interests of the [Enterprises] or their shareholders, the FHFA could have *reasonably* concluded that it was in the best interests of members of the public who rely on a stable secondary mortgage market." *Id.* (emphasis added).  HERA's "best interests" provision—which, again, is incorporated into Plaintiffs' shareholder contracts—authorizes FHFA, as Conservator, to "subordinate the best interests of the company to its own best interests and those of the

public." *Id.* at 1785 (citing 12 U.S.C. § 4617(b)(2)(J)(ii)).  As a matter of law, that unanimous Supreme Court holding forecloses Plaintiffs' claim that, in fact, FHFA acted *unreasonably*.

Indeed, the Supreme Court in *Collins* emphasized that 12 U.S.C. § 4617(f), which "sharply circumscribe[s] judicial review of any action that the FHFA takes as a conservator," exists precisely to prevent interference with Conservator business judgments like those embodied in the Third Amendment.  *Collins*, 141 S. Ct. at 1775-76.  Section 4617(f) prohibits courts from taking "any action to restrain or affect the exercise of [the] powers or functions of the Agency as a conservator."  12 U.S.C. § 4617(f).  After having held that FHFA acted "reasonably" by entering into the Third Amendment to ensure market stability, the Supreme Court cited § 4617(f) for the broad proposition that the Conservator's "business decisions are protected from judicial review."  141 S. Ct. at 1785.  Thus, neither the jury nor this Court could assess whether the Conservator's decision to enter into to the Third Amendment and its Net Worth Sweep violated the implied covenant of good faith and fair dealing.  That was a quintessential Conservator business decision made in the public interest.  Congress intended that the Conservator could act for the sole benefit of the public, and the Supreme Court ruled that the Conservator acted reasonably, for the benefit of the public, "to ensure market stability."  *Id.* at 1777.  The Court unanimously recognized that this type of Conservator business decision made for the benefit of the public was not subject to judicial review under § 4617(f).  Indeed, the business decision challenged in this case was a core exercise of the Conservator's broad "powers under HERA" to "subordinat[e] the best interests of the Enterprises and [their] shareholders to [FHFA's] own best interests and those of the public."  *Fairholme Funds, Inc. v. United States*, 26 F.4th 1274, 1286-87 (Fed. Cir. 2022).  Thus, the finding by the jury that the Conservator violated the implied covenant of good faith and fair dealing is inconsistent with *Collins*.

Plaintiffs' evidence and arguments to the jury at trial confirm that their implied covenant claim contravenes *Collins*.  The following chart shows the two main reasons the shareholder plaintiffs in *Collins* argued that the Third Amendment was unreasonable, the materially indistinguishable arguments the Plaintiffs made here, and the reasons *Collins* gave for rejecting those arguments.

| Shareholder plaintiffs' arguments in *Collins* | Plaintiffs' arguments here | Supreme Court's reasoning in *Collins* |
|---|---|---|
| The shareholder plaintiffs "claim[ed] that the FHFA adopted the third amendment at a time when the companies were on the precipice of a financial uptick and . . . would soon have been in a position not only to pay cash dividends, but also to build up capital buffers to absorb future losses."  141 S. Ct. at 1777.  "Thus, the shareholders assert[ed], sweeping all the companies' earnings to Treasury increased rather than decreased the risk that the companies would make further draws and eventually deplete Treasury's commitment."  *Id.* | Plaintiffs argued that "all signs were good that [the Enterprises] were about to have sustained profitability," which "would mean they barely need to draw down on the Treasury commitment at all, much less draw down so much that it would threaten to exhaust the commitment." Trial II Tr. 447:2-6 (Ex. A); *see also, e.g., id.* at 2795:12-21 (closing) ("Maybe they are turning the corner.  Maybe they are going to make big profits.  Maybe those write-downs will become write-ups and they can get back on their feet. . . . But the net worth sweep changed that."). | "The nature of the conservatorship authorized by [HERA] permitted the Agency to reject the shareholders' suggested strategy in favor of one that the Agency reasonably viewed as more certain to ensure market stability.  The success of the strategy that the shareholders tout was dependent on speculative projections about future earnings, and recent experience had given the FHFA reasons for caution." 141 S. Ct. at 1777. |
| "[T]he shareholders contend[ed] that the FHFA could have protected Treasury's capital commitment by ordering the companies to pay the dividends in kind rather than in cash," which would have resulted only in a modest "penalty."  141 S. Ct. at 1777-78. | Plaintiffs argued that if the Enterprises just "used the safety valve, the payment-in-kind option, they don't need to draw on the commitment at all."  Trial II Tr. 454:24-25 (Ex. A).  Paying in kind was a "foolproof solution to the so-called problem that [FHFA] was trying to solve."  *Id.* at 457:15-16; *see also, e.g., id.* | "This argument rests on a misunderstanding of the agreement between the companies and Treasury.  The companies' stock certificates required Fannie Mae and Freddie Mac to pay their dividends 'in cash in a timely manner.'  If the companies had failed to do so, they would have incurred a |

| Shareholder plaintiffs' arguments in *Collins* | Plaintiffs' arguments here | Supreme Court's reasoning in *Collins* |
|---|---|---|
| | at 2820:16-18 (closing) ("So if you are worried about the bond and MBS investors and the commitment, the payment in kind is a really good option"); *id.* at 2823:15-18 ("Kind of like's payment in kind provision. They could have tried for that. They didn't. No evidence that they considered any of these alternatives"). | penalty[] . . . . Thus, paying Treasury in kind would not have satisfied the cash dividend obligation, and the risk that the companies' cash dividend obligations would consume Treasury's capital commitment in the future would have remained." 141 S. Ct. at 1777-78 (citation omitted). |

On summary judgment, this Court ruled that this case "involve[s] a different type of reasonableness analysis" from *Collins*. *MSJ Ruling*, 2022 WL 4745970, at *5. In the Court's view, "[a]t issue in *Collins* was whether FHFA could reasonably have determined that adopting the Third Amendment was 'in the *best interests* of the *regulated entity* or the *Agency*,' and thus acted within its statutory authority as conservator of the GSEs in so doing." *Id.* (citation omitted, emphasis by this Court). "Here, in contrast, the issue is whether FHFA 'violated the reasonable *expectations* of the *parties*' by adopting the Third Amendment." *Id.* (citation omitted, emphasis by this Court). Respectfully, that distinction does not reconcile Plaintiffs' claims with the Supreme Court's decision, nor does it recognize the Supreme Court's statement that § 4617(f) protects FHFA's business decisions made in the public interest (such as its decision to enter into the Third Amendment) from judicial review. As explained, HERA's "best interests" provision is incorporated into the shareholder contracts and thus, as a matter of law, forms part of any reasonable expectations shareholders might have had. And the Supreme Court held that FHFA *reasonably* determined that its actions served the public interest. Consequently, there is no meaningful difference between the holding in *Collins* and the issue here. Yet the jury in this case

was instructed, over Defendants' objection, that "[w]hile HERA authorized FHFA to act in the best interests of the GSEs, the FHFA, or the public, FHFA's exercise of that statutory authority can still have violated the implied covenant of good faith and fair dealing if it exercised that authority in a way that arbitrarily or unreasonably violated plaintiffs' reasonable expectations under the contract."  Final Jury Instructions at 9 (Class ECF No. 383, Berkley ECF No. 393). Putting to the jury the question of FHFA's reasonableness in agreeing to the Third Amendment was directly at odds with *Collins*.

### C.     Plaintiffs' Claim Improperly Seeks To Recover for Anticipatory Breach of Dividend-Related Obligations Contained in Unilateral Contracts

Plaintiffs' implied covenant claim fails as a matter of law for another independent reason: The claim asserts, in substance, an anticipatory breach of the Enterprises' obligation to reasonably exercise discretion to declare dividends at some point in the future yet fails to meet the necessary preconditions for such a claim under Delaware or Virginia law.

Under the doctrine of anticipatory breach, "a voluntary affirmative act which renders the obligor unable to perform is a repudiation that ripens into a breach prior to the time for performance if the promisee elects to treat it as such by, for instance, suing for damages."  *Perry II*, 864 F.3d at 632 (cleaned up).  Both Virginia and Delaware recognize the doctrine and thus generally allow such suits prior to the time for performance.  *See id.* (citing *Lenders Fin. Corp. v. Talton*, 455 S.E.2d 232, 236 (Va. 1995); *W. Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, 2009 WL 458779, at *5 & n.37 (Del. Ch. Feb. 23, 2009)).  As this Court has recognized, however, the anticipatory breach doctrine "does not apply to unilateral contracts, especially when the only remaining performance is the payment of money," *MTD Ruling II*, 2018 WL 4680197, at *5 (citing *Smyth v. United States*, 302 U.S. 329, 356 (1937)), nor to "bilateral contracts that have become unilateral by full performance on one side," *id.* (quoting 23 Williston on Contracts

§ 63:60). "In other words, 'if the payee has completely performed his side of the contract and is just awaiting payment, he can't declare a breach and sue for immediate payment just because he has reason (even compelling reason) to doubt that the other party will pay when due.'" *Id.* (quoting *Cent. States, Se. & Sw. Areas Pension Fund v. Basic Am. Indus., Inc.*, 252 F.3d 911, 915 (7th Cir. 2001)). Both Delaware and Virginia apply this limitation to claims for anticipatory breach. *See id.* at *6; *Fairfax-Falls Church Cmty. Servs. Bd. v. Herren*, 337 S.E.2d 741, 743 (Va. 1985); *Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*, 62 A.3d 62, 78 n.102 (Del. Ch. 2013); *see generally* Restatement (Second) of Contracts § 253, cmt. c; *Glenn v. Fay*, 281 F. Supp. 3d 130, 140 (D.D.C. 2017) (Lamberth, J.) (holding that lawyer's disavowal of contractual obligations to share potential monetary recovery with co-counsel was not actionable until judgment was actually collected and time for performance arrived).

Here, Plaintiffs' implied covenant claim asserts that the Net Worth Sweep made it impossible for the Enterprises to pay dividends in the future, but Plaintiffs cannot invoke the anticipatory breach doctrine to sue immediately because the shareholder contracts are unilateral. Indeed, this Court has already held that the shareholder contracts are unilateral because the shareholders already performed their only obligations by purchasing the shares and owe no further obligation to the Enterprises. In this Court's words, "Plaintiffs completed their end of the bargain by purchasing preferred shares." *MTD Ruling II*, 2018 WL 4680197, at *6.

Plaintiffs' implied covenant claim rests on future performance. As this Court instructed the jury, Plaintiffs claimed that FHFA "breached the implied covenant of good faith and fair dealing by eliminating any possibility that shareholders other than Treasury would receive dividends *in the future*." Final Jury Instructions at 9 (Class ECF No. 383, Berkley ECF No. 393) (emphasis added). Likewise, at summary judgment, this Court described Plaintiffs' "lost value"

theory as asserting "that the Third Amendment deprived plaintiffs' shares of much of their value" "by eliminating any possibility of *future* dividends for non-Treasury shareholders." *MSJ Ruling*, 2022 WL 4745970, at *11 (emphasis added).  As this Court explained, multiple legal and practical obstacles in addition to the Net Worth Sweep stand between Plaintiffs and any future dividend payments.  At a minimum, Plaintiffs cannot sue until "Treasury and FHFA . . . amend[] the PSPAs to allow a paydown of the Liquidation Preference," which has not occurred.  *Id.* at *9.

The D.C. Circuit's decision and this Court's 2018 motion-to-dismiss decision reinforce the conclusion that Plaintiffs' implied covenant claim is an unripe claim for anticipatory breach. The D.C. Circuit held that Plaintiffs' "claims for breach of contract with respect to liquidation preferences are better understood as claims for anticipatory breach," and remanded those claims on that basis.  *Perry II*, 864 F.3d at 633.  This Court then dismissed those claims, explaining that Plaintiffs' performance was complete and Defendants' performance was not yet due.  As to Plaintiffs, they "completed their end of the bargain by purchasing preferred shares," and as to Defendants, "[w]ith respect to the liquidation preference, the only remaining performance is payment of the preference by Fannie Mae or Freddie Mac upon liquidation (if it ever occurs)." *MTD Ruling II*, 2018 WL 4680197, at *6.  Thus, "Plaintiffs fail[ed] to state a claim for breach of contract."  *Id.*  The same logic applies to Plaintiffs' implied covenant claim.  Just as Plaintiffs claimed that the Net Worth Sweep eliminated the possibility that private shareholders could receive value for their liquidation preference rights in the event of a future liquidation, they claim that it also eliminated the possibility of future dividend payments.  The limitation on anticipatory breach claims for unilateral contracts accordingly applies to Plaintiffs' claim based on the elimination of possible future dividends in precisely the same way as this Court found it did for the claims based on the elimination of future liquidation preference rights.

31

In its 2019 decision denying reconsideration, this Court declined to dismiss Plaintiffs' implied covenant claim based on the unilateral-contract limitation on the anticipatory breach doctrine because the Court perceived a distinction between breach of contract claims and implied covenant claims.  The Court held that implied covenant claims fall outside the anticipatory breach rubric because such claims seek to enforce "an ongoing obligation; performance is always due."  Order Denying Reconsideration at 3 (Class ECF No. 104, Berkley ECF No. 99).  The Court thus contrasted the dismissed breach of contract claims, which sought "to hold defendants presently accountable for a future breach of an express provision," with implied covenant claims, which "seek to hold defendants presently accountable for a present breach."  *Id*.

Respectfully, the Court should reconsider.  A party cannot evade the unilateral-contract limitation on the anticipatory breach doctrine by simply recharacterizing an anticipated future breach of contract as a present breach of the implied covenant.  To begin with, Delaware and Virginia treat the implied covenant of good faith and fair dealing as ancillary to the underlying express contract, not as a source of independent legal rights.  Breach of the implied covenant is a form of breach of contract.  *See* 17A Am. Jur. 2d Contracts § 673 (Feb. 2024) ("A violation of the implied covenant of good faith and fair dealing is a breach of contract, which is not separate from other breach of contract claims.").  Virginia courts require that implied covenant claims be pleaded as a form of breach of contract, and do not recognize such claims as standalone counts. *See Frank Brunckhorst Co., L.L.C. v. Coastal Atl., Inc.*, 542 F. Supp. 2d 452, 465 (E.D. Va. 2008) ("the breach of [implied covenant] duties gives rise to an action for breach of contract, not a separate claim"); *Carr v. Fed. Nat'l Mortg. Ass'n*, 92 Va. Cir. 472, 2013 WL 12237855, at *4 (2013) ("It is well-settled that Virginia law does not recognize an independent cause of action for

breach of the implied warranty of good faith and fair dealing, but it does give rise to a breach of contract claim.").

In Delaware, too, "a claim for breach of the implied covenant is contractual." *MHS Capital LLC v. Goggin*, 2018 WL 2149718, at *11 (Del. Ch. May 10, 2018).  The implied covenant is merely a doctrine "by which Delaware law cautiously supplies terms to fill gaps in the express provisions of a specific agreement." *Dieckman v. Regency GP LP*, 2018 WL 1006558, at *3 (Del. Ch. Feb. 20, 2018) (quoting *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 182 (Del. Ch. 2014)); *see Gerber v. Enter. Prod. Holdings, LLC*, 67 A.3d 400, 419 (Del. 2013) (implied covenant fills "residual nooks and crannies" in express contract), *overruled on other grounds by Winshall v. Viacom Int'l., Inc.*, 76 A.3d 808, 815 n.13 (Del. 2013).

At bottom, a breach of an express contractual term and a breach of the implied covenant are just alternate ways of complaining about being deprived of the fruits of one's bargain.  The former argues that the other party breached an express term of the contract thereby depriving plaintiff of the reasonably expected value of the contract, whereas the latter argues that the other party unreasonably took an action that would prevent the plaintiff from fully enjoying the fruits and thereby violates a contractual term implied by law.  *See MTD Ruling II,* 2018 WL 4680197, at *7; Final Jury Instructions at 8  (Class ECF No. 383, Berkley ECF No. 393) (violation of implied covenant involves "frustrating the fruits of the bargain that the asserting party reasonably expected").  But in both, if the alleged injury turns on expectations about future performance— fruits that need not yet be delivered—then the claim is for anticipatory breach.  And if the underlying contract is unilateral, such a claim will not lie.  Here, the shareholder contracts are unilateral, and Plaintiffs' implied covenant claim asserts that the Net Worth Sweep prevented shareholders from enjoying contractual benefits (dividends) that will not be due, if ever, until

well in the future.  Put another way, this Court's observation that the implied covenant is "ongoing" skirts the relevant question—when would the contractual benefits at issue become due, such that Plaintiffs would be harmed by not receiving them?  Because dividends could become due only at some indefinite point in the future, Plaintiffs' implied covenant claim based on the elimination of those benefits is anticipatory and thus unripe.

The fact that Plaintiffs' measure of damages (a one-day drop in share prices) is based on the market's immediate *perception* of the present value of the lost *possibility* of future dividends, rather than the actual value of potential future lost dividends themselves, does not avoid the bar on anticipatory breach suits for unilateral contracts.  To the contrary, Plaintiffs' reliance on the market's one-day response to the Third Amendment just reinforces that Plaintiffs' claim is anticipatory in nature.  The key point is that shareholders knew that contractual benefits were not due until far into the future, and the sale and purchase of shares was necessarily based on the market's speculation about the path of the Enterprises out of conservatorship.  Regardless of whether Defendants' alleged breach of future performance may also result in immediate share-price decline, it tells us nothing about the actual loss in dividends that the shareholders may incur in the future.  If Plaintiffs want to sue for the elimination of the possibility of receiving future dividends, they must wait to do so until they would have been entitled to that contractual benefit.  In all events, Plaintiffs cannot sue now.

If the distinction the Court made in its 2019 opinion were the law, little would remain of the unilateral-contract limitation on anticipatory breach claims.  A plaintiff could easily circumvent this limitation by recharacterizing the alleged anticipatory breach of contract as a present breach of the implied covenant.  And it would be easy for disappointed promisees to plausibly allege that an action purported to make it impossible for them to receive the fruits of

their bargain in the future was the result of arbitrary or unreasonable action now.  If such promisors can be liable for a "present breach" of the obligation to "operate in good faith and not violate their co-contracting party's reasonable expectations," Order Denying Reconsideration at 3 (Class ECF No. 104, Berkley ECF No. 99), the longstanding limitation on anticipatory breach claims would be rendered meaningless, as a plaintiff could virtually always recover the same damages under an implied covenant theory.

### D.       Plaintiffs Failed To Prove with Reasonable Certainty That the Third Amendment or the Net Worth Sweep Harmed Them

Beyond the issues above, to prevail on a claim for breach of the implied covenant in both Delaware and Virginia, plaintiffs must prove with "reasonable certainty" both "the existence of damages" and that those damages "flowed from the defendant's violation of the contract." *eCommerce Indus., Inc. v. MWA Intel., Inc.*, 2013 WL 5621678, at *13 (Del. Ch. Sept. 30, 2013); *see Saks Fifth Ave., Inc. v. James, Ltd.*, 630 S.E.2d 304, 311 (Va. 2006); *MSJ Ruling*, 2022 WL 4745970, at *4.  "Speculation and conjecture as to whether the plaintiff suffered any substantial amount of harm cannot form the basis for recovery."  *MSJ Ruling*, 2022 WL 4745970 at *8 (cleaned up).

Applying these principles, this Court granted partial summary judgment rejecting Plaintiffs' theory that the Third Amendment deprived Plaintiffs of dividends they otherwise would have received in the future.  *Id.* at *9-10.  The Court reasoned that this "lost-dividends" theory would "require[] the jury simply to *guess*" what would have happened "in a counterfactual world" without the Third Amendment.  *Id.* at *9; *see also id.* (discussing uncertainty as to whether, in a but-for world, Treasury would have allowed the Enterprises to pay down Treasury's liquidation preference, which was a condition precedent to the Enterprises paying dividends to private shareholders).  "Even a good guess," the Court explained, "would

require an inherently speculative logical leap that could not result in the reasonable certainty that Delaware and Virginia law require as to damages." *Id.* at *10.

The Court held, however, that genuine disputes of material fact foreclosed summary judgment on Plaintiffs' alternative "lost-value" theory—namely, "that the Third Amendment, by eliminating any possibility of future dividends for [private] shareholders, deprived plaintiffs' shares of much of their value, even if such dividends were not reasonably certain to occur in the foreseeable future." *Id.* at *11. The Court pointed to Plaintiffs' argument that "an event study by one of defendants' experts showing a sharp decline in stock prices after the Third Amendment's announcement refutes the claim that this action caused no harm." *Id.* (quotation marks omitted). The Court thus found that there was "a lingering dispute of material fact as to whether the Third Amendment and its elimination of possible future dividends harmed plaintiffs by depriving them of much of the value of their shares." *Id.*

At trial, Plaintiffs bore the burden to prove, with reasonable certainty, that current shareholders suffered a "substantial amount of harm," *id.* at *8, based on this lost-value theory. Plaintiffs failed to carry that burden, in three independent ways. In particular, Plaintiffs failed to introduce evidence (1) attempting to show that current shareholders are worse off today than they would be absent the Third Amendment; (2) attempting to account for the substantial *increases* in share prices that occurred shortly after the Third Amendment; or (3) showing that the one-day decline in share prices on August 17, 2012 was attributable solely to the Net Worth Sweep, as opposed to other terms of the Third Amendment. Absent evidence on these issues, the jury had no sufficient basis to find with reasonable certainty that current shareholders were harmed.

### 1. Plaintiffs Introduced No Evidence To Show That Current Shareholders Are Worse Off Today Due to the Third Amendment

As this Court has held, "expectation damages are the standard remedy in contract cases and are 'measured by the amount of money that would put the promisee in the same position as if the promisor had performed the contract.'" *SJ Reconsideration Ruling*, 2022 WL 11110548, at *4 (quoting *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001), and citing *Estate of Taylor v. Flair Prop. Assocs.*, 448 S.E.2d 413 (Va. 1994)). Here, the promisees are current shareholders who seek expectation damages based on a decline in the market value of their shares caused by the Third Amendment. Final Jury Instructions at 7-9 (Class ECF No. 383, Berkley ECF No. 393); *see MSJ Ruling*, 2022 WL 4745970, at *11. Plaintiffs thus needed to prove with reasonable certainty that current shareholders must be paid some amount of money today to be "put . . . in the same position as if" the Third Amendment had not happened. *SJ Reconsideration Ruling*, 2022 WL 11110548, at *4. In other words, Plaintiffs bore the burden at trial to demonstrate that, but for the Third Amendment, the market value of their shares would be higher today than it actually is.

Plaintiffs introduced no evidence attempting to show how much their shares would be worth *today* absent the Third Amendment.[6] The only damages evidence Plaintiffs presented was testimony of their expert, Dr. Mason, regarding an event study performed by Defendants' expert,

---

[6] Before the second trial, the parties agreed that (1) Dr. Mason would not testify as to any opinions in his supplemental report (which the Court had already rejected as untimely, *see supra* n.1), including his supplemental opinions regarding the impact of the Net Worth Sweep on current share prices; and (2) Defendants would not ask Dr. Mason questions about "price recovery" or otherwise argue to the jury that the share-price increases after August 17, 2012 mitigated Plaintiffs' alleged damages. This agreement did not relieve Plaintiffs of their burden to present legally sufficient evidence to support the elements of their claim, including harm and damages. *See, e.g.*, *United States v. Kennedy*, 643 F.3d 1251, 1257 (9th Cir. 2011) (recognizing that a party's agreement not to dispute certain facts does "not relieve [the other party] of its burden of proving those facts").

Dr. Attari.  *See* Trial II Tr. 748:18-23, 750:16-52:8 (Ex. A).  That event study measured the one-day decline in Enterprise share prices on August 17, 2012, as well as several other share-price movements, all in 2012.  PX-375 (Ex. E); *see* Trial II Tr. 748:18-22, 750:16-752:6 (Ex. A).  The event study did not address the price of the shares at any point after 2012, let alone measure how the shares' *current* price may (or may not) be affected by the Third Amendment.  No evidence introduced at trial addressed whether share prices today would be higher, lower, or the same absent the Third Amendment.  The jury thus had no evidentiary basis to conclude that current shareholders must be paid any amount of money at all today to be put in the "same position" they would occupy but for the Third Amendment.  *SJ Reconsideration Ruling*, 2022 WL 11110548, at *4.

A one-day decline in share prices over eleven years ago, standing alone, does not demonstrate harm to *current* shareholders because they never realized any loss on the shares.  To illustrate the point, consider a shareholder that has held shares continuously from before the Third Amendment through today.  The market price of those shares has varied substantially during that time, including a substantial *increase* in share prices shortly after the Third Amendment.  It is true that the market price of those shares declined substantially on August 17, 2012, but this continuous shareholder—by definition—did not sell the shares and realize any loss.  Instead, the shareholder continues to hold them today.  At trial, Plaintiffs offered no explanation for why erasing a one-day drop eleven years ago in the price of shares they still hold today would place them in the same position they would occupy but for the Third Amendment.

The only conceivable attempt by Plaintiffs to meet their burden to establish injury was conclusory and insufficient.  On direct examination, Dr. Mason was asked the question: "Professor Mason, does the $1.6 billion in damages [that plaintiffs then sought] from the net

worth sweep still persist today?"  Trial II Tr. 767:2-3 (Ex. A).  Dr. Mason responded, "Yes."  *Id.*
at 767:4.  Dr. Mason never provided any explanation or basis for this answer.  Such unreasoned
and conclusory *ipse dixit* falls far short of providing the "reasonable certainty" necessary to
establish harm and damages.  *See, e.g.*, *Twin Cities Bakery Workers Health and Welfare Fund v.
Biovail Corp.*, 2005 WL 3675999, at *5 (D.D.C. Mar. 31, 2005) (expert's *ipse dixit* "too
speculative to forge the chain of causation plaintiffs' proof of damages requires").  Plaintiffs
apparently recognized this deficiency and attempted to elicit some explanation from Dr. Mason
during their re-direct examination.  *See* Trial II Tr. 800:2-6 (Ex. A).  But the Court sustained
Defendants' objection on the ground that Dr. Mason's expert reports did not disclose any such
opinion.  *Id.* at 800:9-802:21.  A single word of testimony from Dr. Mason cannot plausibly meet
Plaintiffs' burden to prove with reasonable certainty that, but for the Third Amendment,
Enterprise share prices would be higher today.

> **2.      Plaintiffs Introduced No Evidence Accounting for the Sizeable Share-
>           Price Increases Shortly After the Third Amendment**

The evidence at trial undisputedly showed that, after the one-day decline on August 17,
2012, share prices increased substantially, recovering most of the lost market value within
weeks.  *See* PX-375 at 3-4 (Ex. E) (graphs in event study showing the Enterprises' share prices
throughout 2012, including both the one-day price drop and the subsequent price increases).  By
the end of October 2012, Enterprise share prices were actually *higher* than they had been just a
week before the Third Amendment, in early August 2012.  *See id.* at 6 (tables).  Those price
increases shortly after the Third Amendment negate Plaintiffs' attempt to prove with reasonable
certainty that the Third Amendment caused Plaintiffs (current holders) any actual harm.

To meet their burden to prove damages with reasonable certainty, Plaintiffs needed to
account for the share-price increases in the weeks following the initial drop on August 17, 2012.

Indeed, in the context of a federal securities fraud claim, this Court has held that shareholders cannot assume they suffered harm from an immediate drop in share price without addressing a subsequent rebound in the price.  In *Ross v. Walton*, 668 F. Supp. 2d 32 (D.D.C. 2009), the plaintiffs alleged that they suffered an economic loss when the company's stock price dropped immediately following a corrective disclosure.  After that event, however, the company's stock returned to the pre-disclosure price soon after the class period ended.  The Court dismissed the case on the pleadings, explaining that it was "unaware of any authority in which actual economic loss was found when the stock value returned to the pre-disclosure prices and could have been sold at a profit just after the class period."  *Id.* at 43.  Other courts have reached the same conclusion and dismissed similar securities fraud actions on the pleadings.  *See, e.g.*, *In re Immucor, Inc. Sec. Litig.*, 2011 WL 3844221, at *2 (N.D. Ga. Aug. 29, 2011) ("Plaintiff failed to adequately plead economic loss and loss causation because Immucor's share price quickly rebounded to pre-disclosure levels …."); *In re Estee Lauder Companies*, 2007 WL 1522620, at *1 n.5 (S.D.N.Y. May 21, 2007) ("Plaintiff's contention that economic loss is sustained simply as a result of the fact that the price of the stock dropped following disclosure is unpersuasive.").[7]

These decisions rely on the Supreme Court's decision in *Dura Pharmaceuticals v. Broudo*, 544 U.S. 336 (2005), which held that a securities fraud plaintiff fails to establish loss causation where their complaint merely alleges that "the price on the date of purchase was

---

[7] Some courts have disagreed with the holding of *Ross* and similar decisions that a rebound in share price can provide a basis, at the pleading stage, to dismiss a cause of action for lack of harm.  *See, e.g.*, *Acticon AG v. China Ne. Petroleum Holdings Ltd.*, 692 F.3d 34, 39 (2d Cir. 2012).  But the D.C. Circuit has not rejected *Ross*.  Further, even *Acticon* held that, while the issue should not be resolved at the pleading stage, a plaintiff must submit proof that a rebound in share price is unrelated to the alleged wrongdoing.  *Id.* at 41 ("At this stage in the litigation, we do not know whether the price rebounds represent the market's reactions to the disclosure of the alleged fraud or whether they represent unrelated gains.").

inflated because of the misrepresentation." *Id.* at 342 (emphasis omitted).  The Court explained that "the logical link between the inflated share purchase price and any later economic loss is not invariably strong." *Id.*  "When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Id.* at 342-43.  Importantly, the Court noted that these principles were not unique to federal securities claims, but were long established in "[t]he common law." *Id.* at 343-44.[8]

Here, Plaintiffs at trial failed to prove exactly the same thing that the plaintiffs in *Ross* failed to allege—facts accounting for an increase in the relevant share price shortly after the event in question, in this case a substantial increase in Enterprise share prices within roughly six weeks after the Third Amendment.  If Plaintiffs are correct that share prices dropped on August 17, 2012 because the Third Amendment eliminated any possibility of future dividends to private shareholders, then what caused share prices to increase shortly thereafter?  Plaintiffs offered no explanation.  For this additional reason, the evidence at trial was insufficient to prove damages with the reasonable certainty required.

---

[8] The Private Securities Litigation Reform Act ("PSLRA") reinforces that litigants must account for a recovery in share price in any case where harm is premised on a one-day drop in share price.  The PSLRA "include[s] a 'bounce back' provision that caps the amount of damages available in a securities fraud action." *Acticon AG*, 692 F.3d at 38.  That provision "does not calculate damages based on a single day decline in price, but instead allows the security an opportunity to recover over a period of 90 days." *Id.* at 39 (quotation marks omitted).  Although this bounce-back provision is statutorily imposed, it is consistent with the "measure of damages traditionally applied by courts." *Id.*

### 3.    Plaintiffs Introduced No Evidence To Account for a Potential Alternative Cause of the One-Day Decline in Share Prices

Plaintiffs failed to prove damages with reasonable certainty for a third, independent reason: they introduced no evidence to exclude an alternative cause of the share-price drop.

As explained above, the only damages evidence Plaintiffs presented at trial was testimony from their expert, Dr. Mason, regarding an event study performed by Defendants' expert, Dr. Attari. *See* Trial II Tr. 748:18-23, 750:16-752:8 (Ex. A).  Dr. Mason acknowledged that, "in order to be a properly conducted event study, the event study must have a method to exclude alternative potential causes of the purported impact of the event in question." *Id.* at 792:1-5; *see also, e.g.*, *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1143 (10th Cir. 2009).  Here, while Dr. Attari's event study showed that the total market value of the relevant Enterprise shares dropped by $1.61 billion on August 17, 2012, Dr. Mason testified that this event study "measures the effect of the [T]hird [A]mendment" as a whole, even though "[t]he net worth sweep is just a component or one provision of the overall [T]hird [A]mendment." Trial II Tr. 791:21-25, 792:15-17 (Ex. A).  Beyond the Net Worth Sweep, Dr. Mason agreed that the Third Amendment also accelerated the reduction of the Enterprises' retained mortgage portfolios, which required the Enterprises to "shrink[] one part of the[ir] business." *Id.* at 793:22-794:25.

Yet Dr. Mason conceded on the stand that Dr. Attari's event study "does not … attempt[] to distinguish between the impact of the net worth sweep on the stock prices and any impact of the acceleration of the reduction of the retained mortgage portfolios." *Id.* at 794:12-24.  He further acknowledged that the event study "does not try to analyze how much of the $1.6 billion stock price drop may have been caused by the net worth sweep and how much of that drop may have been caused by this accelerated reduction of the retained mortgage portfolios." *Id.*  In Dr.

Mason's words, "Defendants' event study does not do that." *Id.* at 794:18, 794:24. Importantly, Dr. Mason *also* acknowledged that "when an event study cannot distinguish between the impact of the net worth sweep and the impact of the acceleration of the reduction of the retained mortgage portfolios," then an expert relying on that event study "lacks any economically sound basis for concluding that the net worth sweep had the effect that the expert claims." *Id.* at 794:25-795:8. Thus, Dr. Mason's *own testimony* shows that Plaintiffs did not present "any economically sound basis" for determining what portion of the share-price drop on August 17, 2012, may have been attributable to the Net Worth Sweep.

This Court need not take Defendants' word for it that Dr. Mason offered no testimony to isolate the effect of the Net Worth Sweep on share prices; this Court already so ruled during the trial. On redirect examination, Plaintiffs attempted to ask Dr. Mason for his "opinion about whether it was the net worth sweep or … this accelerated reduction[] that actually caused Fannie and Freddie's preferred and common stock to fall by 50 percent on one day." *Id.* at 805:12-16. Defendants objected that Dr. Mason's reports disclosed no such opinion, and the Court sustained the objection. *Id.* at 805:12-808:10. The Court then reiterated its ruling the following day, explaining that "Dr. Mason did not testify on direct about the acceleration of the reduction issue," that the questioning on cross-examination "did not open the door," and that "it would be beyond the scope to try to go into that whole issue." *Id.* at 840:10-22. Put simply, Dr. Mason's testimony—as construed and limited by this Court during the trial—provided the jury with no basis to determine with reasonable certainty what portion of the stock price drop may have been attributable to the Net Worth Sweep as opposed to an alternative cause, including the Third Amendment's acceleration of the reduction of the Enterprises' retained mortgage portfolios.

* * * * *

43

For multiple, independent reasons, Plaintiffs' claim fails as a matter of law.  The implied covenant does not even apply here because the shareholder contracts already specify the scope of FHFA's discretion and thus leave no gap to fill.  The Supreme Court's decision in *Collins* conclusively forecloses Plaintiffs' implied covenant claim.  Plaintiffs allege that the shareholder contracts had been breached when no dividends could be due until long into the future—an anticipatory breach theory this Court already rejected.  And Plaintiffs failed to provide sufficient evidence from the which the jury could conclude with reasonable certainty that shareholders were harmed.  The Court should grant judgment as a matter of law for Defendants in full.

## II. AT A MINIMUM, DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW AS TO POST-THIRD AMENDMENT PURCHASERS BECAUSE THEY SUFFERED NO INJURY AND THUS LACK STANDING

In a class action, "[e]very class member must have Article III standing in order to recover individual damages.  Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (citation and quotation marks omitted).  "Standing can be raised at any point in a case proceeding and, as a jurisdictional matter, may be raised, *sua sponte*, by the court." *Steffan v. Perry*, 41 F.3d 677, 697 n.20 (D.C. Cir. 1994) (en banc).  Here, all Plaintiffs who bought shares after the Third Amendment lack standing to pursue claims with respect to those shares because they suffered no injury from the share-price drop. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Even assuming Plaintiffs could prove with reasonable certainty that *some* shareholders suffered compensable harm based on the August 17, 2012 share-price drop, Plaintiffs failed as a matter of law to make that showing as to shares that current shareholders purchased *after* that price drop.  The classes here include (1) current shareholders who have owned their shares continuously since *before* the Third Amendment; *and* (2) current shareholders who bought their shares *after* the Third Amendment. *Class Cert. Ruling*, 2021 WL 5799379, at *1.  The Berkley

Plaintiffs similarly own some shares they purchased after the Third Amendment, and some shares they have held continuously since before it.  *See generally* Berkley Pls.' Supp. Answer to Defs.' First Interrog. (attached as **Exhibit G**); Berkley Pls.' Second Supp. Answer to Defs.' First Interrog. (attached as **Exhibit H**).  Plaintiffs do not contend that current shareholders who purchased after the Third Amendment suffered injury from the August 17, 2012 share-price drop that had already occurred.  Nor could they.  Rather, Plaintiffs contend—consistent with this Court's prior rulings that the claim here "traveled with the shares," *see supra* n.4—that the damage claims of the former shareholders who held shares at the time of the Third Amendment were automatically assigned to anyone who bought those shares afterwards.  In other words, Plaintiffs contend that shareholders who held shares at the time of the Third Amendment and then sold their shares "were damaged, but they . . . sold their rights to recovery when they sold the shares to the next buyer.  And if that buyer sold to another buyer, those rights were further passed."  Tr. of Dep. of J. Mason at 204:8-12 (Apr. 26, 2023) (attached as **Exhibit I**).

But this notion that the claim "travels with the share" is contrary to decades of authority from around the country and should be rejected as a matter of both Virginia and Delaware law. Under settled law, the claims of former holders who sold at a loss after the Third Amendment were not automatically transferred to the buyers, who bought the shares at a price that Plaintiffs contend was *lower* because of the Third Amendment.  Thus, the claims of current shareholders who bought their shares after August 17, 2012 fail as a matter of law for lack of standing.

### A.    The Majority View Is That a Sale of a Security Does Not Automatically Assign a Claim and That an Express Assignment of the Claim Is Required

A party can obtain standing by an assignment of a legal claim only if the assignment is valid.  "[A] valid assignment confers standing[;] an invalid assignment defeats standing . . . ." *US Fax Law Ctr., Inc. v. iHire, Inc.*, 476 F.3d 1112, 1120 (10th Cir. 2007); *see also, e.g.*, *Tisdale*

*v. Enhanced Recovery Co.*, 2023 WL 1810413, at *4 (E.D. Tex. Jan. 17, 2023) ("Plaintiff cannot have standing absent a valid assignment." (citing cases)); *Beach TV Props., Inc. v. Solomon*, 2016 WL 6068806, at *17 (D.D.C. Oct. 14, 2016) ("Because the attempted assignment … was invalid under Virginia law, [plaintiff] does not have standing to maintain this action.").

A plaintiff whose standing depends on an assignment of the claim has the burden of proving a valid assignment. *Brown v. Bank of Am., N.A.*, 660 F. App'x 506, 508-09 (9th Cir. 2016). Here, Plaintiffs cannot meet this burden because there was no express assignment of a claim, and, respectfully, the Court should reconsider its rulings that the claim "travels with the share," which were never fully briefed and were decided in different contexts. *See supra* n.4.

In general, a legal claim relating to property is not automatically assigned—*i.e.*, the claim does not "travel" with the property—when the property is sold. "As a matter of common law, the right to bring a 'chose in action' was a personal right separate from the property that gave rise to the right. … There was no presumption of an automatic assignment of the right to bring a claim associated with the property when the property was sold. Instead, the law has required an express assignment of the right to bring a cause of action." *DNAML Pty, Ltd. v. Apple, Inc.*, 2015 WL 9077075, at *4 (S.D.N.Y. Dec. 16, 2015) (citations omitted); *see also Herr v. U.S. Forest Serv.*, 803 F.3d 809, 821 (6th Cir. 2015) (Sutton, J.) (citations omitted) (Under the common law, "[c]hoses of action to enforce property rights do not, as a general matter, automatically transfer when the underlying property changes hands. No doubt, one may assign a chose in action to another party, but that requires the assignor to 'manifest an intention to transfer the right' to the assignee."). The *Restatement (Second) of Contracts* thus provides that an assignment of a chose in action for a contract-related claim is not automatic but instead "requires the assignor to 'manifest an intention to transfer the right' to the assignee." *Herr*, 803

F.3d at 821 (quoting *Restatement (Second) of Contracts* § 324); *see also* 29 *Williston on*

*Contracts* § 74:6 (4th ed. 2023) (likewise recognizing that "[t]he assignment of rights under a

continuing contract does not imply an assignment of rights of action for previous breaches").  All

of this makes clear that absent "an *express* assignment of the right to bring a cause of action," the

seller retains the claim.  *DNAML*, 2015 WL 9077075, at *4 (emphasis added).

In Plaintiffs' view, this common law rule does not apply here, and their claim for breach

of the implied covenant based on the August 17, 2012 share-price drop was *automatically*

assigned to every subsequent purchaser of the relevant Enterprise shares after that date.  That

contention is contrary to settled law that the common law rule requiring an express assignment of

a claim applies to the sale of securities like Enterprise shares.

### 1.    Under Federal Law, Choses in Action Relating to Securities Are Not Automatically Assigned When the Securities Are Sold

For decades, courts have held that the common law rule of no automatic assignment

applies equally to federal securities fraud claims.  In an early leading case, a district court

rejected arguments that securities fall outside the common law rule such that there is an

automatic assignment of a seller's claims, finding that "[t]his contention is entirely without any

support in precedent and, we think, totally without merit."  *Indep. Inv. Protective League v.*

*Saunders*, 64 F.R.D. 564, 572 (E.D. Pa. 1974).  In language that fits this case to a tee, that court

explained: "To adopt plaintiffs' extraordinary theory would be to deprive injured persons of their

rights and give their causes of action to one who has suffered no injury himself but who simply

has been shrewd or lucky enough to have put his hands on a security that once belonged to a

person who was defrauded."  *Id.*  Federal appellate courts adopted the same rule.  *See, e.g.*,

*Bluebird Partners, LP v. First Fid. Bank, N.A. N.J.*, 85 F.3d 970, 972-74 (2d Cir. 1996)

(rejecting proposed "rule of automatic assignment" for claims relating to securities); *Lowry v.*

*Baltimore & Ohio R.R. Co.*, 707 F.2d 721, 730 (3d Cir. 1983) (en banc) (plurality op.) (holding that, because the "action did not run with the debentures, the plaintiffs, as subsequent purchasers, . . . lack standing to assert their claims of federal securities fraud").  Again, the economic and fairness reason for the bar on automatic assignment is clear: "Such an approach is necessary to ensure that compensation for fraudulent securities dealings inures to those persons who were injured by the fraud, rather than to corporate bounty hunters."  *Lowry*, 707 F.2d at 729; *see also DNAML*, 2015 WL 9077075, at *4 ("By ensuring that the parties' expressed intent determines who receives redress for a wrong, the value of the cause of action will be figured into any sale of property, and a purchaser will be less likely to realize a windfall." (citation omitted)).

For decades, courts thus have held that, absent an express assignment of a legal claim relating to a security, the seller retains the claim and it is not assigned or transferred to the buyer.

### 2.    Under State Law, Choses in Action Relating to Securities Generally Are Not Automatically Assigned When the Securities Are Sold

With only a few exceptions, states follow the common law rule that the sale of a security does not automatically assign the seller's legal claims to the purchaser.  Rather, "courts considering the issue . . . have adopted the rule applied to federal securities law claims—*i.e.* there is no automatic transfer."  *Keystone Assocs. LLC v. Fulton*, 2019 WL 3731722, at *3 (D. Del. Aug. 8, 2019); *accord, e.g.*, *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 1420-21 (D. Ariz. 1989) (rejecting travels-with-the-share theory under Washington law).

For the law of a state to depart from this common law rule, the legislature "must 'speak directly' to the question addressed by the common law."  *United States v. Texas*, 507 U.S. 529, 534 (1993) (citations omitted).  New York did this when its legislature overrode the common law rule that claims are not automatically assigned on the sale of a security in New York General Obligations Law § 13-107, which states: "Unless expressly reserved in writing, a transfer of any

bond shall vest in the transferee all claims or demands" of the transferrer.  N.Y. Gen. Oblig. Law § 13-107(1).  Notably, "New York is the only state to have enacted such a provision for the automatic assignment of bondholders' claims."  *Racepoint Partners, LLC v. JPMorgan Chase Bank*, 2006 WL 3044416, at *4 (S.D.N.Y. Oct. 26, 2006); *accord Royal Park Invs. SA/NV v. U.S. Bank Nat'l Assoc.*, 324 F. Supp. 3d 387, 398 (S.D.N.Y. 2018) ("The majority rule is that there is no automatic assignment of an accompanying litigation right or claim when transferring property.  On the other hand, New York adopts the minority rule . . . ." (citation omitted)).

    Without a statute like New York's, some purchasers have argued, like Plaintiffs here, that state-law versions of Uniform Commercial Code § 8-302 similarly abrogate the common law rule of no automatic assignment.  They argue that Section 8-302, which provides that a purchaser of securities "acquires all rights in the security that the transferor had or had power to transfer," provides for automatic assignment of the seller's legal claims simply through the sale of the securities.  The vast majority of courts to consider the issue, however, have rejected this argument and held that Section 8-302 does *not* abrogate the common law rule.  *See, e.g.*, *In re Cfs-Related Sec. Fraud Litig.*, 2001 U.S. Dist. LEXIS 27387, at *44, *46-47 (N.D. Okla. Dec. 21, 2001) ("§ 8-302 is limited to the transfer of interests in a security only, and does not contemplate the transfer of causes of action for fraud which arise during the process of negotiating for and entering into a contract for the transfer of a particular security."); *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 373 n.126 (S.D.N.Y. 2007) (Section 8-302(a) "does not provide for the automatic transfer of fraud claims against third parties"); *Pac. Life Ins. Co. v. Bank of N.Y. Mellon*, 2022 WL 1446552, at *13 (S.D.N.Y. Feb. 22, 2022), *report and recommendation adopted in part, rejected in part*, 2023 WL 5128079 (S.D.N.Y. Aug. 10, 2023) (finding that seller had standing to sue in securities class action and

that state UCCs did not automatically assign claims to buyers); *Cheatham I.R.A. v. Huntington Nat'l Bank*, 137 N.E.3d 45, 49 (Ohio 2019) (holding that Ohio's § 8-302 "does not automatically assign rights to a purchaser upon a transfer of title" for breach of contract action).

Indeed, the Ohio Supreme Court directly rejected the very argument Plaintiffs make here and refused to certify classes based on a similar theory that breach of contract claims automatically traveled with the underlying securities. *See Cheatham*, 137 N.E.3d 56 (holding that "[t]he injury was sustained by the sellers who parted with these certificates at a reduced price, not by plaintiff who purchased them" after the alleged breach).

To Defendants' knowledge, Delaware is the only jurisdiction that has interpreted its version of UCC § 8-302 to adopt a travels-with-the-shares principle for certain claims. But as explained below, even in Delaware the claim asserted here would not travel with the share.

### B.     The Claim Here Was Not Automatically Assigned Under Virginia Law

Under Virginia law, Plaintiffs' implied covenant claim against Freddie Mac did not travel with the shares.

First, unlike New York, Virginia does not have an assignment statute that abrogates the common law rule to provide for automatic assignment of choses in action. To the contrary, Virginia's legislature has recognized that only certain choses in action *can* be assigned, and even then, there is no *automatic* assignment, as in New York. *See* Va. Code Ann. § 8.01-26 ("Only those causes of action for damage to real or personal property, whether such damage be direct or indirect, and causes of action ex contractu *are assignable*." (emphasis added)).

Second, Virginia's UCC § 8-302 does not abrogate the common law rule. To Defendants' knowledge, the only case that interprets Virginia's § 8-302 addresses issues concerning the title of shares. *Day v. MCC Acquisition, LC*, 848 S.E.2d 800, 807 (Va. 2020) ("Given the clarity of the UCC's intended reach, we agree that '[t]he provisions of Article 8

relating to transfer are concerned with the transfer of title . . . .'" (citation omitted)).  That is consistent with the prevailing view that Article 8 was never intended as an assignment-of-claims provision but rather "primarily concerns issues of title, such as defenses against enforcement of ownership rights."  *Cheatham*, 137 N.E.3d at 52 (citation omitted).  Indeed, Plaintiffs have never identified any Virginia jurisprudence supporting the view that the claim here traveled to subsequent purchasers of Freddie Mac junior preferred shares.

<u>Third</u>, interpreting Virginia's UCC to impose an automatic assignment of claims would contradict Virginia's statutory directive to construe its UCC "to make uniform the law among the various jurisdictions."  Va. Code § 8.1A-103(a)(3).  As noted above, virtually every jurisdiction that has considered the issue has held that Section 8-302 does not provide for the automatic assignment of a seller's accrued claim to a purchaser.  Ruling otherwise would do the opposite of making Virginia's UCC "uniform" with the laws of nearly every jurisdiction in the country.

<u>Finally</u>, adopting an outlier view of the UCC would present federalism issues.  In *Pacific Life Insurance*, for instance, secondary purchasers asserted standing to bring state-law securities claims and argued that the claims travelled with the shares under California's UCC § 8-302.  2022 WL 1446552, at *9.  California courts had not yet addressed the issue, and the federal court held that "it would be presumptuous and contrary to principles of comity" to adopt a travels-with-the-share interpretation of California's UCC that "is contrary to most every state's own rule."  *Id.* at *13.  The same is true here.

Thus, Plaintiffs who purchased Freddie Mac shares after the Third Amendment did not automatically acquire the implied covenant claim under Virginia law and lack standing.

### C.     The Claim Here Was Not Automatically Assigned Under Delaware Law

Plaintiffs' implied covenant claim against Fannie Mae also did not travel with the shares under Delaware law.  Although Delaware law allows certain types of claims to travel with the shares, the claim asserted here is not one of them.

Under Delaware's UCC § 8-302, rights "in the security" travel with the share, but "personal rights" do not.  *Urdan v. WR Capital Partners, LLC*, 244 A.3d 668, 677 (Del. 2020).  As Delaware's Supreme Court has noted, Delaware courts have struggled to distinguish rights that are "personal" from those "in the security," and have addressed the question on a claim-by-claim basis.  To guide this inquiry, the Delaware Supreme Court observed that "[a] breach of fiduciary duty claim for dilution" typically travels with the shares because it is "not a wrong personal to the stockholder."  *Id.* at 678.  "A corporate charter violation claim travels with a stock sale because the injury is to the stock and not to the holder."  *Id.* at 677 (citation and internal quotation marks omitted).  Key here, the court identified two examples of "personal" claims that do *not* travel with the shares.  First, "[q]uintessential examples of personal claims would include a contract claim for breach of an agreement to purchase or sell shares or a tort claim for fraud in connection with the purchase or sale of shares."  *Id.* (quoting *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1056 (Del. Ch. 2015)).  Second, claims are personal and thus do not travel where there is no evidence that the purchaser paid any value for the seller's cause of action—*i.e.*, "nothing in the record indicates that the market into which the Plaintiff sold its [shares] valued the potential breach-of-duty claim in the price of the stock."  *Id.* at 679 n.36 (quoting *I.A.T.S.E. Loc. No. One Pension Fund v. Gen. Elec. Co.*, 2016 WL 7100493, at *6 (Del. Ch. Dec. 6, 2016)).  That is consistent with the common law rule that a legal claim does not travel absent an express assignment showing that the purchase price reflected the value of the claim.  *See supra* Part II.A.

Here, Plaintiffs' claim is personal under Delaware law and thus did not travel with the shares.  To begin with, Plaintiffs' claim closely resembles the federal securities fraud share-price-drop claims discussed above and presents the very issue courts have identified to find that securities claims do not travel with the share.  Plaintiffs' claim also resembles a federal securities fraud claim where the alleged misconduct occurred before the sale and caused a drop in the share price before the shares were sold—under Plaintiffs' theory, when the Third Amendment was announced, the share prices fell, purportedly injuring then-holders of the shares.  As in the federal securities fraud context, absent an express assignment there is no way to determine by the mere sale of the securities whether the sellers *intended* to assign their accrued claims related to the Third Amendment to subsequent purchasers.  *See supra* Part II.A.1.  Indeed, "[t]o adopt plaintiffs' extraordinary theory would be to deprive injured persons of their rights" by depriving former shareholders who held shares at the time of the Third Amendment of their cause of action, "and give their causes of action to one who has suffered no injury himself but who simply has been shrewd or lucky enough to have put his hands on a security that once belonged to a person who was defrauded."  *Indep. Inv. Protective League*, 64 F.R.D. at 572.  Those shrewd or lucky enough to buy their Enterprise shares in the dip would essentially win a double recovery because the share prices quickly rebounded.

This Court's certification of the classes under Federal Rule of Civil Procedure 23(b)(3) reinforces that the claims with respect to Fannie Mae shares are personal under Delaware law.  Delaware courts have explained that "[t]he personal nature of federal securities claims manifests itself in the fact that class certification generally must be obtained under Rule 23(b)(3)."  *In re Activision Blizzard*, 124 A.3d at 1056; *see In re AMC Ent. Holdings, Inc. S'holder Litig.*, 299 A.3d 501, 530 n.164 (Del. Ch. 2023) (same); *Urdan*, 244 A.3d at 677-78 & nn.22, 26, 31

(quoting and citing *In re Activision Blizzard* with approval).  "By contrast, because Delaware corporate law claims are tied to the shares themselves, they are certified under Rules 23(b)(1) and (b)(2)."  *In re Activision Blizzard*, 124 A.3d at 1056.  That makes sense given the different types of class actions that can be certified under Rule 23.  Unlike in class actions certified under Rule 23(b)(1) or (2), class members in a class action certified under Rule 23(b)(3) are entitled to "personal notice and an opportunity to opt out."  *In re Telectronics Pacing Sys., Inc.*, 221 F.3d 870, 881 (6th Cir. 2000); *see* Fed. R. Civ. P. 23(c)(2)(B).  If Plaintiffs' implied covenant claim is sufficiently personal that it requires individual notice and an opportunity to opt out under Rule 23, it is likewise sufficiently personal that it does not travel with the shares under Delaware law.

Plaintiffs' proposed plan of allocation illustrates the practical problems that arise from allowing a claim certified for class treatment under Rule 23(b)(3) to travel with the shares.  In defending their plan of allocation, Plaintiffs maintained that their implied covenant claim is "in the security" and thus travels with the shares, but simultaneously claimed that shareholders' decisions whether to opt out are "personal" and do *not* travel with the shares.  Plaintiffs thus were forced to draw a sharp distinction between a shareholder's "legal claim" and the shareholder's "decision whether to opt out, which relates to how a particular person wishes to pursue [that] legal claim."  Pls.' Reply in Supp. of Mot. for Entry of Proposed J. at 12 (Class ECF No. 418, Berkley ECF No. 425); *see also id.* at 13 (attempting to distinguish between "the right to enforce the implied covenant" and "the exercised right to opt out").  That is contrary to basic principles of assignment law, which hold that "an assignee's right against the obligor is subject to all . . . defenses thereto," including "defenses based on where and how the claims may be prosecuted."  *Winn-Dixie Stores, Inc. v. Eastern Mushroom Mktg. Coop.*, 2020 WL 5211035, at *11 (E.D. Pa. Sept. 1, 2020) (citation omitted).  In addition, Plaintiffs have not met their burden of showing an express assignment of claims; "nothing in the record indicates that the market into

54

which the Plaintiff sold its [shares] valued the potential breach-of-duty claim in the price of the stock." *Urdan*, 244 A.2d at 679 n.36 (quoting *I.A.T.S.E. Loc.*, 2016 WL 7100493, at *6). Rather, the law presumes the opposite: "The heavily discounted price of the security reflects its diminished value, so the buyer is not paying for any existing choses in action." Brief of *Amici Curiae* Commercial Law Professors, *Cheatham*, 2018 WL 4256793, at *31.

Further, at trial, Plaintiffs presented no evidence that the sellers "made 'a conscious business decision to sell [their] stock, to which [their] duty claims adhered,' into a market that 'implicitly reflects the value of any prospective lawsuits.'" *I.A.T.S.E. Loc.*, 2016 WL 7100493, at *5 (cleaned up and citation omitted). This requirement under Delaware law is consistent with "the Restatement of Contracts, which requires an assignor to 'manifest an intention to transfer the right to another person without further action or manifestation of intention by the obligee.'" *DNAML*, 2015 WL 9077075, at *4 (quoting *Restatement (Second) of Contracts* § 324). Accordingly, shareholders who purchased Fannie Mae stock after the Third Amendment did not automatically acquire the implied covenant claim under Delaware law. Plaintiffs thus lack standing to pursue claims with respect to such shares.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request the Court grant judgment as a matter of law for Defendants.

Dated: April 17, 2024                    Respectfully submitted,

                                          /s/ Asim Varma
                                         Asim Varma (D.C. Bar # 426364)
                                         Jonathan L. Stern (D.C. Bar # 375713)
                                         David B. Bergman (D.C. Bar # 435392)
                                         Ian S. Hoffman (D.C. Bar # 983419)
                                         R. Stanton Jones (D.C. Bar # 987088)
                                         ARNOLD & PORTER KAYE SCHOLER LLP
                                         601 Massachusetts Ave. NW
                                         Washington, DC 20001

(202) 942-5000
Asim.Varma@arnoldporter.com
Jonathan.Stern@arnoldporter.com
David.Bergman@arnoldporter.com
Ian.Hoffman@arnoldporter.com
Stanton.Jones@arnoldporter.com

*Attorneys for Defendant Federal Housing Finance Agency*

 /s/ Michael J. Ciatti

Michael J. Ciatti (D.C. Bar # 467177)
KING & SPALDING LLP
1700 Pennsylvania Ave. N.W.
Washington, DC 20006
Tel: (202) 661-7828
Fax: (202) 626-3737
mciatti@kslaw.com

*Attorney for the Federal Home Loan Mortgage Corporation*

 /s/ Meaghan VerGow

Meaghan VerGow (D.C. Bar # 977165)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
Tel: (202) 383-5300
Fax: (202) 383-5414
mvergow@omm.com

*Attorney for the Federal National Mortgage Association*