# EXHIBIT A

1    but when you're in the jury room I will send in written

2    instructions to you so you'll have those with you during the

3    time of your deliberations.

4          With that, the Plaintiffs will begin their opening

5    statement.

6          MR. HUME:  Thank you, Judge Lamberth.  My partner,

7    Ms. Davis, will deliver the opening for Plaintiffs.

8          THE COURT:  Ms. Davis.

9          MS. DAVIS:  Thank you, your Honor.

10          Ladies and gentlemen, we are here today for one

11    reason and one reason only.  We are here today because a

12    government official exercised his power in a way that was

13    extreme and unprecedented and in a way that caused

14    $1.6 billion worth of financial harm to thousands of

15    Americans.

16          During the financial crisis in 2008, this official

17    inherited the job of being the conservator for Fannie Mae

18    and Freddie Mac, two enormous companies that sit at the

19    center of our housing finance system and our global economy.

20          Both he and the government agency that he took

21    charge of said that they would work hard to make sure that

22    they could restore the net worth of Fannie and Freddie, that

23    they would conserve and preserve the assets of Fannie and

24    Freddie and that they would return Fannie and Freddie to its

25    shareholders.  That was his job.

Opening Statement by Ms. Davis

1          And as I've said before, the evidence will show

2     that all signs were good that they were about to have

3     sustained profitability.  That would mean they barely need

4     to draw down on the Treasury commitment at all, much less

5     draw down so much that it would threaten to exhaust the

6     commitment or use up all of that 266.6 billion.

7          Next, you're going to see the other people were

8     recognizing this benefit that was coming.  Susan McFarland.

9     She's the former CFO of Fannie Mae, chief financial officer.

10    She's saying and she's telling people that the DTA write-up

11    was possible.  We're going to talk about what that means.

12    But the most important part is this:  I expressed the view

13    that I believed that we were now at sustained profitability,

14    that we would be able to deliver substantial profits --

15    sustainable profits over time.

16          I even mentioned the possibility that it could get

17    to a point in the not-so-distant future where the factors

18    might exist whereby the allowance of the deferred tax asset,

19    DTA -- that's the DTA -- would be released.

20          What is she talking about?  Well, the DTA, it's

21    the concept that -- again, Dr. Dharan is going to have to

22    break it down for you.

23          But I can tell you this much about what this woman

24    knew at the time:  When Fannie and Freddie were losing

25    money, they had to do an accounting concept called writing

1    than Treasury was entitled to under the previous agreement.

2    A little analysis.  Maybe you would know that, you know, the

3    next year, it's going to go from 18.3 billion that you're

4    going to be paying to Treasury to 130 billion that you're

5    going to be paying to Treasury.  But there's no memo and

6    there's no analysis.

7         You will learn that Mr. DeMarco did not consult

8    with his own financial experts who were responsible for

9    making financial projections to determine what might happen

10   under the net worth sweep.  He also didn't consult with

11   anyone at Fannie and Freddie to see what they thought about

12   the future of their companies.

13        What's worse, Mr. DeMarco did this extreme,

14   unprecedented sweep of Fannie and Freddie's net worth when

15   there was a complete answer built into the original PSPA

16   that would solve any concerns about the Treasury caps, the

17   safety valve provision that I've talked to you about.  And

18   sometimes it's referred to as a payment in kind.

19        Mr. DeMarco said it was important to address

20   circular draws because bond and -- remember what he said his

21   reason was:  Bond and MBS investors would worry about them.

22   But the safety valve provided total protection for the bond

23   and MBS investors.  Why total protection?  Dr. Dharan will

24   explain.  If they used the safety valve, the payment-in-kind

25   option, they don't need to draw on the commitment at all.

1      liquidation preference.

2              And you see what happens when the Treasury

3      liquidation preference increases?  The grass is still green

4      for the bond and MBS investors.  It doesn't impact them at

5      all.  They don't look back and say, Oh, what's your

6      liquidation preference and how much are you going to get?

7      Because they're first in line.  They've got the bonds.

8      They've got the debts.  They get paid first.  Right?  Before

9      anybody else.  They're not caring about what's happening

10     with the Treasury liquidation preference.

11             They can use -- they could have used that safety

12     valve instead of doing the circular draws, and that would

13     protect the Treasury commitment.  The very thing that

14     Mr. DeMarco said he was worried about.

15             The safety valve was a foolproof solution to the

16     so-called problem that he was trying to solve.  Mr. DeMarco

17     will admit to you that he understands how that safety valve

18     works and that it would not have led to any erosion of the

19     Treasury cap of the commitment and that the bond and MBS

20     investors would not have anything to worry about.  But

21     again, he didn't even consider it.

22             The evidence will show that the net worth sweep

23     made it impossible to restore Fannie and Freddie to safe and

24     solvent conditions, impossible to restore Fannie and Freddie

25     to shareholders, as FHFA will repeatedly -- as FHFA

1    system run by private banks.  So the net worth sweep didn't

2    result in Fannie and Freddie being wound down and it

3    certainly didn't result in Fannie and Freddie getting

4    restored to sound and solvent conditions.

5            And so now they're in limbo, even though they've

6    had 11 years of sustained profitability.  They're still in

7    conservatorship.

8            The net worth sweep has had terrible consequences.

9    One consequence is that it destroyed the value of the shares

10   owned by our clients, the shareholders of Fannie Mae and

11   Freddie Mac.  Listen, the shares weren't trading at a high

12   level in August of 2012 anyway.  Right?  It was 2.92

13   billion, is where we were.  Okay.

14           But in one day, we went from that 2.92 billion

15   down to 1.31 billion and lost $1.6 billion worth of value.

16           That $1.6 billion worth of value, that's what

17   we're asking you to award our clients for the harm that the

18   government did to them.  And I'll note, you'll not hear a

19   different number from the defense.

20           Another consequence of the net worth sweep is that

21   government control of Fannie and Freddie, which was supposed

22   to be temporary, has become permanent.  So today, 15 years

23   after it began, the conservatorship still exists with no end

24   in sight.  Only Congress can replace the GSEs.  They'd have

25   to get Congress to agree to it, and they never have.

1    Q.  What does the blue bar here on the left represent?

2    A.  The blue bar shows the day before the announcement of

3    the net worth sweep, the companies' stock was worth a total

4    of $2.93 billion.

5    Q.  Are you aware in this case that Defendants are arguing

6    that by 2009 the $33 billion that the shareholders had

7    previously invested in Fannie and Freddie had already been

8    wiped out?

9    A.  I've heard that.  Yes.

10   Q.  Is a market capitalization of $2.9 billion on August

11   16th, 2012, before the net worth sweep consistent with the

12   argument that Fannie and Freddie's stockholders' previous

13   investment had been, quote, "wiped out"?

14   A.  No.

15   Q.  Would you agree at that time in 2012 Fannie and

16   Freddie's stockholders were down, but they were not out?

17   A.  That's an apt characterization, yes.

18   Q.  Professor, what financial methodology did you use as the

19   basis for your conclusion that Fannie and Freddie's

20   stockholders suffered $1.61 billion in damages?

21   A.  I used a tool from financial economics called an event

22   study.

23   Q.  And what is an event study?

24   A.  An event study is a structured analytical method for

25   looking at a stock price movement that one might think would

1    be associated with new news released to the marketplace and

2    evaluating whether that stock price movement is

3    statistically significant or meaningful and then evaluating

4    other potential causes that might have interfered before

5    reaching a conclusion that that stock price movement can be

6    attributed to the new information announced to the market

7    that day.

8    Q.  What was the particular piece of news that you were

9    testing in the event study that you relied on?

10   A.  Here I was interested in the net worth sweep.

11   Q.  And what specifically about the net worth sweep were you

12   testing?

13   A.  I was testing the effect upon shareholder value between

14   the day before and the end of the day after it was

15   announced.

16   Q.  You see on this slide in front of you that Fannie and

17   Freddie's stock price fell by about 50 percent.  Is that

18   about right?

19   A.  Yes.

20   Q.  Did you look at whether the entire stock market went

21   down on August 17th?

22   A.  I did.

23   Q.  And did it go down that day?

24   A.  No, it didn't.

25   Q.  Well, what if the entire stock market had gone down on

```
1    August 17th, 2012?  What would you have -- what would you
2    have done in creating an event study with that information?
3    A.  Well, then I'd have to break up this amount of decline
4    into that which would be attributed to the stock market
5    overall and that which would be attributed to the
6    announcements of the net worth sweep.
7    Q.  Is there any academic or legal support for using an
8    event study to determine the impact on a share price of new
9    information?
10   A.  Yes.
11   Q.  Is an event study commonly used in your work?
12   A.  Yes.  Event studies are used in the field of financial
13   economics quite regularly.  It's been estimated there are
14   tens of thousands of academic papers that use this
15   technique.
16   Q.  Did you actually yourself perform the event study that
17   you're relying on in your testimony here today?
18   A.  No.  I did not gather the data and write the code.
19   Defendants' experts did that.
20   Q.  I'm sorry.  Who --
21   A.  Defendants' experts did that.
22   Q.  Okay.  Can you tell us a little bit more about what you
23   mean by that?
24   A.  Well, earlier, you played the video from the deposition
25   of Dr. Attari, where he said that he performed this event
```

```
 1    study.  I was given those materials and I validated his

 2    approach, his data, made sure everything was done accurately

 3    before using it to express my opinion that the damages in

 4    this matter to shareholders are $1.61 billion.

 5    Q.  So you relied on the Defendants' expert's event study

 6    that concluded that the stock price fell by $1.6 billion as

 7    a result of information released on August 17th, 2012?

 8    A.  Yes.

 9    Q.  Have you yourself performed your own event studies?

10    A.  Yes, I have.

11    Q.  How many times, would you say?

12    A.  Hundreds of times in the course of my career.

13    Q.  And based on your experience performing event studies

14    and your analysis of the event study performed by the

15    Defendants' expert in this matter, do you have an opinion as

16    to whether or not this particular event study as to the

17    stock price movement was properly constructed and performed?

18    A.  Yes.

19    Q.  What's your opinion?

20    A.  My opinion is that it was properly constructed and

21    performed.

22    Q.  Are the facts and the data in Defendants' event study

23    the kind of facts and data that financial economists

24    reasonably rely on in performing an event study?

25    A.  Yes.
```

1   Q.  And is Dr. Attari, the Defendants' expert -- is his

2   event study the kind of analysis that financial economists

3   and other experts in the field reasonably rely on to

4   evaluate stock price movements in response to new

5   information?

6   A.  Yes, it is.

7   Q.  Were you in the courtroom a few minutes ago when the

8   short video clip from Dr. Attari was played?

9   A.  Yes, I was.

10  Q.  Can you just explain to the jury in case they weren't --

11  in case it wasn't totally obvious what the purpose of that

12  video was?

13  A.  Well, that video --

14          MR. JONES:  Objection, your Honor.

15          THE COURT:  Overruled.

16          Go ahead.

17          THE WITNESS:  That video confirmed that Dr. Attari

18  himself did create this event study along with his staff.

19  BY MR. RUDY:

20  Q.  So did you limit your analysis in this case just to the

21  work that Dr. Attari did?

22  A.  No.

23  Q.  Other than relying on Dr. Attari's event study, what

24  other materials or information, if any, did you consider in

25  performing your assignment?

```
1     the stock price.
2     Q.  Professor Mason, does the $1.6 billion in damages from
3     the net worth sweep still persist today?
4     A.  Yes.
5               MR. JONES:  Objection, your Honor.
6               THE COURT:  Overruled.
7               THE WITNESS:  Yes.
8     BY MR. RUDY:
9     Q.  Are you aware that the Defendants are arguing that the
10    stockholders weren't really harmed by the net worth sweep
11    because they weren't receiving dividends anyway during the
12    conservatorship?
13    A.  I've heard that argument as well.  Yes.
14    Q.  Do you have a reaction to that?
15    A.  Yes.  It doesn't make a bit of sense.  The value of a
16    stock comes from the company's future performance.  What
17    happened in the past is in the past.
18    Q.  But weren't stockholders' dividend rights already
19    suspended during the conservatorship before the net worth
20    sweep?  Why would the stock price fall if they weren't
21    getting dividends anyway?
22    A.  I would say their dividends were suspended like a
23    company that's paying zero dividends for a period of time.
24    But they still had rights to dividends in the future should
25    the company take earnings, reinvest them in the firm,
```

1    that day.  The market was moving the other direction.  So

2    the market didn't require me to do anything more than adding

3    up.  Had I in fact included that market effect, damages

4    would be greater.

5            I also looked at other potential effects within

6    the third amendment.  So there was a bit more than adding

7    up.

8            But you're right:  The result comes about at the

9    end of the day as the adding up.

10   Q.  Okay.  So just to make sure we're on the same page,

11   mathematically speaking, the $1.6 billion is the sum of

12   three numbers.  And those three numbers are just the market

13   value decline that we looked at for the orange here and the

14   gray here and the gray for Fannie Mac [sic] on that one day,

15   August 17th, 2012, about 11 years ago?

16   A.  Yes.  I think you meant to say Fannie Mae, but that's

17   fine.

18   Q.  Great.  Thank you.  Sorry if I misspoke.

19           MR. JONES:  We can pull this down.

20   BY MR. JONES:

21   Q.  You testified earlier that this event study which you

22   did not prepare measures the impact of the third amendment

23   on the enterprises' stock prices.  Correct?

24   A.  The event study prepared by Defendants' expert measures

25   the effect of the third amendment.  That's correct.

```
1    Q.  And you know and you've said before that in order to be
2    a properly conducted event study, the event study must have
3    a method to exclude alternative potential causes of the
4    purported impact of the event in question.  Right?
5    A.  Sure.
6    Q.  And you know and you've said before that if the expert
7    has no such method for excluding alternative potential
8    causes, then their event study has no way of accounting for
9    potential alternative causes of the decline in prices that
10   the expert attributes to the net worth sweep.  Right?
11   A.  Right.
12   Q.  So we know that one thing that the third amendment did
13   was the net worth sweep.  Right?
14   A.  Correct.
15   Q.  The net worth sweep is just a component or one provision
16   of the overall third amendment.  Right?
17   A.  Right.
18   Q.  Okay.  And in addition to the net worth sweep, the third
19   amendment -- well, let's start generally.  It has other
20   provisions.  You know that.  Right?
21   A.  Sure.
22   Q.  Okay.  And in addition to the net worth sweep, one of
23   the other provisions of the third amendment required Fannie
24   Mae and Freddie Mac to do something that you've referred to
25   as accelerating the wind-down of their retained mortgage
```

1   portfolios.  Right?

2   A.  Right.  The provision was to start reducing those

3   retained portfolios by 15 percent rather than 10 percent

4   until they ultimately hit a floor of 250 billion for each

5   enterprise, at which point that would stop.

6   Q.  And those words, "accelerating the wind-down of the

7   retained mortgage portfolios," that's just a fancy way of

8   saying that Fannie Mae and Freddie Mac were going to shrink

9   a part of their business faster than they had been shrinking

10  it before.  Right?

11  A.  Sure.  I'd agree with that characterization.

12  Q.  Okay.  So one part of the third amendment was that

13  Fannie and Freddie were going to shrink the business that

14  they were doing faster.  Right?

15          MR. RUDY:  Objection.  Mischaracterizes his

16  testimony.

17          THE WITNESS:  No.  In your prior question, you

18  characterized it as shrinking one part of the business,

19  which I would agree with.  There, you're talking about

20  shrinking the entire business, which I would not agree with.

21  BY MR. JONES:

22  Q.  So one part of the third amendment is fancy words, "to

23  accelerate the wind-down," was that Fannie Mae and Freddie

24  Mac were going to shrink a part of their business faster?

25  A.  Correct.

1    Q.  Okay.  So the third amendment, which was announced on

2    that one day, August 17th, 2012, it did both of those

3    things.  It did the net worth sweep and it accelerated the

4    reduction of the retained mortgage portfolios.  Right?

5    A.  Yes.

6    Q.  Okay.  The event study that you testified about this

7    afternoon and that we've been looking at, which you did not

8    prepare, it does not say anything about that other

9    provision, the acceleration of the reduction of the retained

10   mortgage portfolios.  Right?  It just doesn't mention it?

11   A.  That's right.

12   Q.  The event study, which you did not prepare, does not

13   conduct any statistical analysis or regression attempting to

14   distinguish between the impact of the net worth sweep on the

15   stock prices and any impact of the acceleration of the

16   reduction of the retained mortgage portfolios.  Right?  It

17   doesn't do that?

18   A.  Correct.  Defendants' event study does not do that.

19   Q.  Okay.  The event study then does not try to analyze how

20   much of the $1.6 billion stock price drop may have been

21   caused by the net worth sweep and how much of that drop may

22   have been caused by this other acceleration of the reduction

23   of the retained mortgage portfolios.  Right?

24   A.  That's right.  Defendants' event study does not do that.

25   Q.  Okay.  And you know and you have said that when an event

1    study cannot distinguish between the impact of the net worth

2    sweep and the impact of the acceleration of the reduction of

3    the retained mortgage portfolios, your opinion, which you

4    have expressed in writing in this case, is that the expert

5    lacks any economically sound basis for concluding that the

6    net worth sweep had the effect that the expert claims.

7    Right?  That was your view?

8    A.  Yes.

9    Q.  The market prices, the market values or share prices of

10   Fannie Mae and Freddie Mac shares on August 17th, 2012 --

11   I'm just focused on that one day about 11 years ago -- the

12   share prices didn't go to zero.  Right?  They always stayed

13   positive, above zero territory.  Right?

14   A.  Yes.

15   Q.  And the above-zero share prices, again just focused on

16   August 17th, 2012, those above-zero share prices reflect a

17   view of at least some shareholders that, notwithstanding the

18   net worth sweep being put into place, shareholders might

19   still be able to receive financial benefits from owning

20   those shares in Fannie Mae and Freddie Mac.  Right?

21   A.  I think that's an appropriate characterization.  Yes.

22   Q.  So you would agree, then, that, again, just talking

23   about on August 17th, 2012, upon the announcement of the net

24   worth sweep and third amendment, that positive above-zero

25   trading price of the Fannie and Freddie shares reflects a

```
 1   view that there was still value in the shares, meaning there
 2   may be money available to shareholders at some point in the
 3   future.  Right?
 4   A.  Sure.
 5            MR. JONES:  Nothing further.  Thank you,
 6   Dr. Mason.
 7            THE COURT:  Any redirect?
 8            MR. RUDY:  Briefly.  Thank you, your Honor.
 9                    REDIRECT EXAMINATION
10   BY MR. RUDY:
11   Q.  Dr. Mason, you were asked some followup questions about
12   the other companies that got bailed out in the 2008
13   financial crisis.  Right?
14   A.  Yes.
15   Q.  Are you aware of what TARP is?
16   A.  Yes.
17   Q.  What is TARP?
18   A.  Did you say TARP or HARP?
19   Q.  With a T, as in Tom.
20   A.  The Troubled Asset Relief Program.  TARP.
21   Q.  What was that program?
22   A.  That was a program where companies could put up some of
23   their assets as collateral for borrowing.
24   Q.  And was that a way that the federal government bailed
25   out many of the companies listed on that slide that you were
```

1    looking at?

2    A.  Well, there was the borrowing component.  There was also

3    a preferred stock component.  And that was my point, that

4    there's a combination of things that benefit these

5    companies.  Yes.

6    Q.  Right.

7         So all of those companies that received bailout

8    funds in 2008 from the federal government, all of those

9    companies on the slide, is it your understanding that

10   they've all been allowed to pay back the government, exit

11   from government involvement and return their companies to

12   stockholders?

13              MR. JONES:  Objection.  Leading.

14              THE COURT:  Overruled.

15              THE WITNESS:  Yes.

16   BY MR. RUDY:

17   Q.  You were asked some questions about whether you yourself

18   prepared the event study that's at issue in this case.

19         Do you recall those questions?

20   A.  Yes.

21   Q.  And you were asked whether you yourself prepared the

22   guts of the study.  Right?

23   A.  Correct.

24   Q.  Is it your testimony here today that the event study

25   conducted by Professor Attari as to the stock drop of Fannie

1    A.  Yes.

2    Q.  Your testimony earlier was that the damages from the net

3    worth sweep still persist today.  Is that a quote from your

4    testimony?

5            MR. JONES:  Objection, your Honor.  Could we go to

6    the phones briefly?

7            (Whereupon, the following proceedings were had at

8    sidebar outside the presence of the jury:)

9            MR. JONES:  Your Honor, Stanton Jones for the

10   Defendants.

11           The parties reached an agreement before this trial

12   about the scope of Dr. Mason's testimony.  And on the

13   Plaintiffs' side, they agreed that they would not present

14   testimony from Dr. Mason's supplemental report which they

15   had attempted -- they filed a motion to serve out of time

16   and the Court denied it; and they agreed they would not

17   elicit testimony from that supplemental report.

18           This is the testimony from that supplemental

19   report, that share prices would be higher today, that the

20   damages persist into the future.

21           MR. RUDY:  Lee Rudy.

22           It's completely wrong.

23           The agreement that we reached was that we were not

24   allowed to talk about any subsequent stock price movements

25   both on either side.  The sentence that I'm asking about was

Mason - REDIRECT - By Mr. Rudy

1    specifically carved out of the agreement.  That's something

2    he can talk about.

3              And the sentence reads from the supplemental

4    report -- and this was specifically listed, you know,

5    chapter and verse.  The sentence says:  "The opinion in my

6    reply report regarding the 1.6 billion in damages estimated

7    at the announcement of the net worth sweep applies today as

8    well as in 2012."

9              That's the sentence that we agreed was entirely

10   proper testimony at this time.  And it's also completely in

11   bounds from the line of cross-examination that Mr. Jones

12   undertook.

13             THE COURT:  What is it you're seeking to elicit

14   now?

15             MR. RUDY:  Your Honor, I'm seeking to elicit now a

16   response to the fact that Mr. Jones has basically insinuated

17   by saying -- by showing a picture of stock -- subsequent

18   stock price movements, but then carefully not asking about

19   it, but showing it to the jury for ten minutes, so they see

20   that the stock price goes up after the net worth sweep and

21   asks "11 years ago, 11 years ago."  He's leaving the --

22   leaving a misleading impression in front of the jury that

23   this stock price may have sort of evaporated over the last

24   11 years.

25             I want to go back to the direct testimony where I

Mason - REDIRECT - By Mr. Rudy

1    asked him, Does this damage still persist today, which is

2    something the parties agreed was entirely appropriate, and

3    ask him to explain what he meant by that.

4            MR. JONES:  Your Honor, this is Mr. Jones.

5            I would note there were no objections to the

6    references to 11 years ago or to displaying that graph,

7    which is simply a page in an admitted exhibit that's the

8    Plaintiffs' exhibit that they've just admitted into

9    evidence.  I'm not sure how it could be misleading simply to

10   display a page in one of the Plaintiffs' own decks.

11           But in any event, the question even as I think

12   Mr. Rudy just described it was already asked and answered

13   during the direct examination.

14           MR. RUDY:  During the direct examination, I asked:

15   Does the damage still persist today?

16           He said yes.

17           Then we get a series of questions about "It was 11

18   years ago, 11 years ago."

19           I'd like to ask him:  What did you mean by "still

20   persists today"?

21           THE COURT:  The objection is sustained.

22           (Whereupon, the following proceedings were had in

23   open court:)

24           MR. RUDY:  Thank you, your Honor.

25

Mason - REDIRECT - By Mr. Rudy

```
 1   Q.  So that didn't change in the third amendment.  Right?
 2   A.  Correct.
 3   Q.  So the news that it would take -- do you know how many
 4   years was it going to take in 2012 -- how many more years
 5   was it going to take to get them to that 250 billion target?
 6   Do you know?
 7   A.  I don't remember how many more years it would take at
 8   this point.  I remember it -- you got to the 250 billion
 9   about four years earlier.
10   Q.  Four years earlier under the accelerated?
11   A.  Under the accelerated provision.  Yeah.
12   Q.  So what is your opinion about whether it was the net
13   worth sweep or what we've just been talking about, this
14   accelerated reduction, that actually caused Fannie and
15   Freddie's preferred and common stock to fall by 50 percent
16   on one day?
17            MR. JONES:  Objection, your Honor.  Could we be
18   heard on this briefly?
19            (Whereupon, the following proceedings were had at
20   sidebar outside the presence of the jury:)
21            MR. JONES:  Your Honor, Stanton Jones for the
22   Defendants.
23            Dr. Mason's expert reports don't disclose
24   anything, anything at all, about the possibility of
25   something other than the net worth sweep causing or
```

1   contributing either in whole or in part to the $1.6 billion

2   decline.  The entire sum and substance of his discussion of

3   the $1.6 billion damages expert is in a reply expert report.

4   It's two paragraphs.  And, your Honor, it just points to the

5   event study.

6            And the event study by Dr. Attari, as he

7   acknowledged on my cross-examination, it simply doesn't

8   mention this other thing, the accelerated reduction of the

9   mortgage portfolio.  There's no analysis, no statistical

10  analysis, no regression, no attempt to separate those two

11  things and isolate the impact of the net worth sweep from

12  the accelerated reduction.

13           MR. RUDY:  Your Honor, Lee Rudy.

14           This is the exact subject of his testimony that's

15  been disclosed and that's been examined and that's been

16  cross-examined and that's been deposed on.

17           He testified already with no objection on direct

18  that it was not the reduction of the retained mortgage

19  portfolio, but the net worth sweep.

20           The subject -- this is our expert, who's called to

21  testify that the net worth sweep caused the stock price to

22  fall by 50 percent.

23           Defendants seem to think that they can

24  cross-examine him and say there's another cause and he can't

25  respond to that line of cross-examination when he actually

1    did the analysis and has disclosed it to them and they've

2    deposed him on it and they've cross-examined him on it.

3            Your Honor, his report references the

4    methodological consistency of what Dr. Attari did and he's

5    also able to say what he did beyond that, which he's --

6    we've already widely disclosed to the Defendant and they've

7    had an opportunity with no objection, with no motion.

8    They've never lodged, you know -- sought to lodge the

9    objection to him testifying that the net worth sweep

10   actually caused this reduction.

11           And they're going to do it on redirect examination

12   at this moment and leave the Plaintiffs with no opportunity

13   to actually explain that this confounding cause that he

14   studied and they know he studied -- he can't testify about

15   it?

16           Your Honor, this should have been the subject of a

17   motion.  This isn't like an objection to leave us with no

18   recourse, that he can't actually explain what the net worth

19   sweep did.

20           THE COURT:  Why is this on redirect?

21           MR. RUDY:  It was on direct and then they followed

22   up on cross.  And I'm seeking to just clarify on redirect

23   why the arguments that Mr. Jones made don't work.  And I

24   want to ask him why it is that what he just got crossed on

25   is wrong.

```
 1              MR. JONES:  Your Honor, this is Mr. Jones.

 2              Dr. Mason testified that he relied on Dr. Attari's

 3    event study.  And the event study does not make any attempt

 4    to separate out the impact of the net worth sweep from the

 5    accelerated reduction.  Dr. Mason's expert reports in this

 6    case do not even mention this issue, make no attempt to --

 7    or even address the possibility of separating the impact of

 8    those two things.

 9              And --

10              THE COURT:  The objection is sustained.

11              MR. RUDY:  Your Honor, can I just note that this

12    line of examination was brought by the Defendants because

13    they're criticizing Dr. Mason for how he is criticizing

14    Dr. Attari?  And he should be able to respond to that line

15    of cross-examination.

16              He's disclosed that he did more than just rely on

17    Dr. Attari.  He's not a mouthpiece for Dr. Attari.  He's his

18    own person who did his own analysis.  And he needs to be

19    able to explain to the jury why the Defendants' entire line

20    of cross-examination was not correct.

21              THE COURT:  But you didn't call him for that in

22    his direct.

23              MR. RUDY:  We did.  I asked him that exact

24    question on direct.  And then he asked more questions about

25    it.
```

```
 1                    P R O C E E D I N G S
 2          (Proceedings held out of the presence of the jury.)
 3          THE COURTROOM DEPUTY:  This is Civil Action 13-1053,
 4    with related miscellaneous case 13-1288, In re:  Fannie
 5    Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class
 6    Action Litigations.
 7          THE COURT:  I looked over the issues that we were
 8    discussing when we recessed yesterday regarding Dr. Mason's
 9    testimony, and I think I'm at the same position I was.
10          As I understood the testimony, Dr. Mason did not testify
11    on direct about the acceleration of the reduction issue.  He
12    had been asked a question, and I had overruled the objection
13    about what he did testify about on direct and that was left for
14    a very short a couple of sentences.
15          On cross, the slide showing that what would be relevant
16    on that issue of seeing some exhibit that had some rising stock
17    on it did not open the door.
18          And so I'm at the same point that I was last night; that
19    it would be beyond the scope to try to go into that whole issue
20    of opening the door to the acceleration of the reduction of the
21    expert testimony.
22          And so the objection is sustained, as I said last night.
23    It's something that's beyond the scope.  And that's not
24    something I would reconsider or give any curative instruction
25    about.
```

```
 1    argument.

 2               MR. JONES:  Thank you.  Stanton Jones for the

 3    Defendants, your Honor.

 4               Pursuant to Rule 50(a), the Defendants move for

 5    judgment as a matter of law.

 6               Judgment for the Defendants is warranted at this

 7    time because, on this record, a reasonable jury would not

 8    have a legally sufficient evidentiary basis to find for the

 9    Plaintiffs.

10               I'd like to focus on two arguments today.  Both

11    relate to the absence of any injury or harm to class

12    members.

13               And just to set the stage, recall two things:

14    First, Plaintiffs' only theory of harm remaining in the case

15    is the stock price drop, the alleged harm to shareholders

16    from a one-day decline in Fannie and Freddie's share prices

17    on August 17th, 2012, 11 years ago.

18               The other thing to bear in mind is that the

19    certified classes in this case are comprised of only current

20    shareholders.  So anyone who sold their shares when the

21    prices were down is by definition not in these classes

22    because they sold their shares.

23               Those facts, the harm from a one-day drop in the

24    share prices 11 years ago and certified classes of only

25    current shareholders excluding anyone who sold their shares,
```

1    those facts require a judgment as a matter of law in

2    Defendants' favor for two reasons:

3         First, your Honor, class members who bought their

4    shares after the third amendment, after August 17th, 2012,

5    they lack Article III standing because they have no injury

6    in fact.

7         And it's undisputed the classes include many

8    post-third amendment purchasers, many individuals and

9    entities that purchased their shares that they hold today

10   for the first time after the day of the third amendment.

11        And Plaintiffs do not contend that these

12   post-third amendment purchasers suffered any injury to

13   themselves as a result of the stock price drop.  And they

14   couldn't.

15        Post-third amendment purchasers, the people and

16   entities who bought their shares after the stock price drop,

17   they benefited from that stock price drop.  They were not

18   harmed by it.  If anyone was harmed by the stock price drop,

19   it's the people who sold their shares when the price was

20   down.  They were the ones who took the loss from the share

21   prices declining as a result of the third amendment.

22        But again, as I said up front, those sellers, the

23   people who sold their shares to the post-third amendment

24   purchasers, none of those people are in the class, because

25   the class is only current shareholders.

1     Plaintiffs' only argument for injury in fact as to

2  post-third amendment purchasers is a notion that the claim

3  travels with the share.

4     In other words, Plaintiffs contend that when these

5  post-third amendment purchasers bought their shares, the

6  seller's legal claim or cause of action for a breach of the

7  implied covenant automatically assigned to the purchaser

8  with the transfer of the share.

9     There's no express assignment.  There's no written

10  assignment of any legal claim.  Plaintiffs' theory is that

11  the sale of the security, the sale of the share itself,

12  entails an automatic assignment of the legal claim.

13     And I know your Honor has addressed this notion

14  that the claim travels with the share in other contexts.

15  But respectfully, we submit the issue has not been raised in

16  the context of standing.  And it bears particularly --

17  particular significance when this is obviously a

18  jurisdictional issue.

19     When standing -- when a Plaintiff's standing is

20  based on assignment of the underlying legal claim, the

21  Plaintiff bears the burden to prove that there was a valid

22  assignment of the legal claim.

23     And Plaintiffs have not established a valid

24  assignment here for either Fannie or Freddie.

25     The overwhelming majority view in this country is

1     that legal claims, causes of action related to a piece of

2     property, including a security, are not automatically

3     assigned to the purchaser through the sale of the security.

4          The overwhelming majority view across the country

5     is that in order to assign a legal claim related to a piece

6     of property, including a security, an express assignment is

7     required.

8          Under very well-settled common law, there is no

9     automatic assignment.  And this position was explained in a

10    decision from 2015 by Judge Sutton of the Sixth Circuit, who

11    wrote in describing the common law, quote:  "Once a right of

12    action accrues, it becomes a piece of intangible personal

13    property called a chose in action.  Choses in action to

14    enforce property rights do not as a general matter

15    automatically transfer when the underlying property changes

16    hands.

17         "No doubt, one may assign a chose in action to

18    another party.  But that requires the assignor to manifest

19    an intention to transfer the right to the assignee."

20         That's from *Herr*, H-E-R-R, *versus U.S. Forest*

21    *Service*, 803 F.3d 809, Sixth Circuit, 2015, a decision by

22    Judge Sutton.

23         That principle, that common-law principle, applies

24    fully in the context of securities transactions, sales of

25    bonds and stocks or other securities, like the ones at issue

1    here.

2              For decades, federal courts have held that the

3    common-law rule of no automatic assignment of legal claims

4    applies equally to the sale of securities.

5              State courts around the country, likewise, have

6    overwhelmingly applied this common-law rule of no automatic

7    assignment of legal claims to the securities context.

8              And there is a decision from 2019 by the U.S.

9    District Court for the District of Delaware where the Court

10   said, quote:  "Courts considering this issue have adopted

11   the rule applied to federal securities law claims; i.e.,

12   there is no automatic transfer."

13             That's *Keystone Association, LLC, v. Fulton*, 2019

14   Westlaw 3731722, District of Delaware, from August 8th,

15   2019.

16             Your Honor, to try to establish an automatic

17   assignment of a legal claim here, Plaintiffs rely on a

18   provision of the Uniform Commercial Code, the UCC, Section

19   8-302.  But state and federal courts have overwhelmingly

20   held that that provision, UCC Section 8-302, does not

21   automatically assign claims upon the sale of a security.

22   And the Courts have held overwhelmingly that an express

23   written assignment or an express assignment is required to

24   transfer the claim.

25             It appears from our research that Delaware is the

```
1      only state that has construed Section 8-302 to automatically

2      assign some claims.  I'll get to the Delaware law.  Even

3      under the Delaware law, the claim here did not automatically

4      assign under the Delaware case law.

5              But let's start with Virginia applicable to

6      Freddie Mac:  Virginia courts have not addressed this

7      question of whether Virginia's version of Section 8-302 of

8      the UCC automatically assigns claims.

9              But Virginia's adopted version of the UCC does say

10     that its statute should be construed, quote, "to make

11     uniform the laws among the various jurisdictions."  That's

12     Virginia Code, Section 8.1A-103(a)(3).

13             Virginia's UCC should be construed to make uniform

14     the law among the various jurisdictions.  And the only

15     position that results in uniformity is the overwhelming

16     majority view that UCC Section 8-302 does not automatically

17     assign legal claims upon the sale of a security.  The

18     overwhelming majority view of federal and state courts

19     around the country that that provision of the UCC does not

20     abrogate the common law and that the common-law rule remains

21     effective that upon the sale of a security, an express

22     assignment is required to transfer a legal claim related to

23     the security.

24             So we think that, setting aside Delaware for just

25     a moment, under Virginia, the answer is clear in this eerie
```

1    context where this federal court is making predictions about

2    Virginia law.  The only reasonable determination is that

3    Virginia's version of Section 3-302 of the UCC would be

4    construed and should be construed consistent with the

5    overwhelming majority of federal and state courts across the

6    country over a very long period of time, that that provision

7    does not abrogate the common law and that even under that

8    provision an automatic assignment of a legal claim does not

9    apply upon the sale of a security.

10           As for Delaware, the Delaware Supreme Court has

11   held that, as I said, some legal claims automatically assign

12   with the sale of a security, but that others don't.

13           And frankly, the Delaware courts have struggled to

14   differentiate between which types of claims, which claims do

15   automatically assign and which don't.

16           It's a point that I think supports the

17   overwhelming majority view that 8-302 of the UCC should not

18   be construed in this way to transfer -- to automatically

19   assign any claims.

20           But in any event, the prevailing rule in Delaware

21   is that a claim or right, quote, "in the security travels

22   with the share," but, quote, "personal rights do not

23   transfer with the share."

24           And most notably, under this Delaware view, claims

25   do not travel with the share and are considered personal

 1     rights that remain with the seller rather than automatically

 2     assigning to the borrower unless there is evidence that the

 3     buyer paid value for the legal claim.

 4          If there is evidence that the price that the buyer

 5     paid to the seller reflects some particular value that was

 6     attributable to the legal claim, then under Delaware law

 7     it's considered to be a claim or right in the security

 8     rather than a personal right, and therefore automatically

 9     assigns with the security.

10          In this case, your Honor, there is zero evidence

11     of that.  There is no evidence that the price that any

12     post-third amendment purchaser -- any purchaser paid in that

13     period when the stock price was down reflected or conveyed

14     value for the legal claim.

15          And in fact, your Honor heard Plaintiffs' damages

16     expert, Dr. Mason, agree during the recross-examination that

17     in essence the share prices in August 2012 and the rest of

18     2012 were not based on the legal claim in this case, which

19     of course was not asserted until 2013.

20          So in sum, under Virginia law and Delaware law,

21     certainly under Virginia law, which we think is clear, and

22     also under the best application of the Delaware law, there

23     is no automatic assignment of the legal claim here when the

24     shares were sold to purchasers after the third amendment;

25     and therefore the class members, all class members who

1    purchased their shares after the third amendment, have no

2    injury in fact and no standing, no Article III standing.

3    The Court should grant judgment as a matter of law for

4    Defendants on that basis.

5              The second argument that I'd like to present

6    today, your Honor, is that as to all Plaintiffs, all class

7    members, there is insufficient evidence for the jury to find

8    that class members, current shareholders who are all the

9    class members -- there's insufficient evidence to find that

10   they proved harm or damages with reasonable certainty.  As

11   the Court has found is required by both Virginia and

12   Delaware law, harm and damages need to be proven by the

13   Plaintiffs with reasonable certainty.

14             Even if the evidence establishes that the share

15   prices dropped on August 17th, 2012, that day 11 years ago,

16   as a result of the third amendment, there is no evidence

17   that the share prices -- that Fannie or Freddie's share

18   prices would be any higher than they actually are today in

19   the absence of a third amendment, if the third amendment has

20   never happened.

21             And without any of that evidence, without any

22   evidence that share prices would be higher today than they

23   actually are, if the third amendment had never happened,

24   there is no basis, no evidentiary basis, for the jury to

25   conclude that current shareholders, the people who still own

1    the shares today, have any cognizable harm or damage based

2    on a one-day drop in the share prices 11 years ago.

3            And separately, your Honor, Dr. Mason's own

4    testimony refutes his reliance on the equity event study

5    that forms the central basis of his damages opinion.

6            Dr. Mason acknowledged that -- and in fact

7    acknowledged that he has said -- that an event study is

8    invalid or unreliable if it doesn't account for possible

9    alternative causes in general.  And specifically, the event

10   study is invalid or unreliable if it fails to address

11   whether the observed price decline is attributable to the

12   net worth sweep or the accelerated reduction of the

13   enterprises' retained mortgage portfolios.

14           So on this record, your Honor, we believe the jury

15   could not find that the Plaintiffs proved harm or damages to

16   current shareholders with reasonable certainty.  And

17   Defendants are entitled to judgment as a matter of law for

18   this reason as well.

19           There are two other issues that we raised at

20   summary judgment and that the Court rejected.  I believe

21   that under the Supreme Court's recent decision in *Dupree v.*

22   *Younger*, these arguments are already preserved for appeal

23   because they are purely legal.  Nevertheless, in an

24   abundance of caution, I'll just state them briefly.

25           So the Defendants would renew our arguments from

1    summary judgment that as a matter of law, first, there is no

2    gap in the shareholder contracts here for the implied

3    covenant to fill because HERA, which is part of the

4    shareholder contract, already specifies the scope of FHFA's

5    discretion to act by virtue of HERA's best interests

6    provision and that that best interests provision, requiring

7    FHFA to act in best interests of the public, is already the

8    proper and complete contractual specification of FHFA's

9    discretion, leaving no gap to fill in the shareholder

10   contract.

11           And secondly, the argument that we made at summary

12   judgment that the Supreme Court's decision in *Collins*

13   entitles Defendants to judgment as a matter of law on the

14   basis of the Court's statement that FHFA had acted on the

15   basis of what it found was in the best interest of the

16   public.

17           Thank you, your Honor.

18           MR. HUME:  Good afternoon, your Honor.  Hamish

19   Hume for the Plaintiffs.

20           Your Honor, I'll be brief.  I mean, if the Court

21   would like briefing, we're happy to address it; but I don't

22   think it's necessary.

23           This is essentially the identical Rule 50 argument

24   Defendants made in the last trial.

25           And as I said then, and I'll say again, on the

 1    first issue of whether class members -- current class

 2    members have been injured, there's ample evidence showing

 3    the net worth sweep has never been undone.  They changed it

 4    to transfer liquidation preference instead of cash.  The

 5    evidence is that the net worth sweep has transferred $151

 6    billion more to the Treasury than would have been

 7    transferred without it.

 8             The evidence also shows that 100 percent of the

 9    profits of Fannie and Freddie go to Treasury.  None of it

10    goes to the shareholders.

11             That is an injury to the shares.  It is an

12    impairment to the shares that travels with the shares.

13             And the stock drop is simply one reasonable

14    measure of that harm.  It is not that the case is limited to

15    the people who owned then, because that is simply the

16    measurement of the impairment to the shares for anyone who

17    owns those shares.

18             And to the extent those shares have been bought by

19    anyone -- and there's no evidence about that, because we had

20    an agreement not to get into that -- that those people are

21    necessarily buying a claim to seek a remedy from the net

22    worth sweep.

23             On the second issue of damages not being shown

24    with reasonable certainty, that's not correct.  The evidence

25    shows -- they say there's no evidence that the price would

```
 1    be higher today.

 2              There is evidence.  Again, two things:  Number

 3    one, the evidence shows that under the net worth sweep,

 4    $150 billion extra has been transferred to Treasury and that

 5    under the net worth sweep 100 percent of all profits go to

 6    Treasury.  That is evidence that shares held by private

 7    shareholders are necessarily impaired and harmed today.

 8              Also, Professor Mason expressly testified the net

 9    worth sweep has never been remedied, has never been undone,

10    and the harm persists to today.

11              So unless -- we won't repeat our response on

12    summary judgment points.  Our briefing on that is already

13    before the Court.

14              Thank you, your Honor.

15              THE COURT:  The motion under Rule 50 is denied.

16              What other issues?  You wanted to raise something

17    else?

18              MR. JONES:  Your Honor, very briefly.

19              Would we be able to file a brief on the Rule 50

20    motion just to make sure that the record is totally clear

21    for preservation purposes?

22              THE COURT:  I think that you can order the

23    transcript.

24              MR. KAPLAN:  Sam Kaplan for the Plaintiffs.

25              Your Honor, the only other issue, assuming your
```

1    goals; and it's to restore confidence in the companies.  You

2    know, these were companies, like I noted.  They didn't have

3    their own capital.  The Treasury commitment was the capital.

4    And so protecting it, you know, helped maintain that

5    confidence.  If it had eroded, that would have reduced the

6    confidence.  So that's why I think, you know, that second

7    sentence is also important.

8          Why did they want to restore confidence and

9    maintain confidence?  Because that would enhance the

10   capacity of the enterprises to fulfill their mission.  And

11   also, kind of -- you know, if that confidence evaporated,

12   we'd probably end up in a situation where systemic risk

13   became a problem again and we'd have instability in the

14   marketplace.

15   Q.  You've also noted the Freddie Mac 10-K, which says "no

16   longer managed with a strategy to maximize common

17   stockholder returns."

18          How is that relevant in terms of the goals of

19   conservatorship?

20   A.  So shareholders will often want -- you know,

21   shareholders, especially if you think about Fannie Mae and

22   Freddie Mac, by the time you get to 2012, you know, they

23   will want to take actions that will, you know -- that they

24   may want to take actions that will increase the risk because

25   that increases the possibility of having a really good

```
 1    your understanding of the background of Fannie and Freddie and
 2    how they operate.
 3            So let's start.  Can you explain at a high level a
 4    little of the history of Fannie and Freddie; for example, how
 5    they were created.
 6    A.  Right.  So Fannie Mae was created in 1938.  It was created
 7    to create a mechanism for these newly created FHA loans,
 8    Federal Housing Administration loans, so that they would buy
 9    FHA-backed mortgages from lenders.
10    Q.  Let's back up for a second.  Let's stop there for a second.
11    Let's pull up DX1.
12    A.  Okay.
13    Q.  Do you recognize what this is?
14    A.  Yes.  This is the -- this is the charter act for
15    Fannie Mae.
16    Q.  And do you see at the beginning of the charter where it
17    talks about -- where it says Congress declares the purposes?
18    A.  Yes, I do.
19    Q.  What's the first numbered item there?
20    A.  Provide stability in the secondary market for residential
21    mortgages.
22    Q.  And what's the significance of that to you?  And what --
23    more importantly, what was the significance of that to you
24    during your time as acting director of FHFA?
25    A.  All right.  So this first purpose that Congress gave to
```

1    Fannie Mae was critical to decisions I made as conservator.

2    First duty as conservator was to -- sorry.  Let me step back.

3         As conservator, I have to make sure that the companies

4    are carrying out their public mission.  The first part of that

5    mission is stability in the market -- in the residential

6    mortgage market.  So in overseeing Fannie Mae and Freddie Mac's

7    operations in conservatorship, it was critical for me to ensure

8    that through any potential and economic path and environment we

9    have, these companies bring stability to the market.

10   Q.  And we're going to talk more about that in detail, but for

11   right now, can you describe, again, briefly -- understanding

12   the members of the jury have -- have heard evidence about this

13   already -- just from your perspective and the way you would

14   articulate it, how did Fannie and Freddie fulfill that mission?

15   Are you familiar with the phrase providing liquidity?

16   A.  Yes.

17   Q.  What does that mean?

18   A.  It means ensuring that there's funding, financing that is

19   flowing to keep mortgage activity happening.

20   Q.  So how do Fannie and Freddie ful- -- and is that part of

21   the public mission?

22   A.  Yes, it is.

23   Q.  So how do Fannie and Freddie fulfill their public mission

24   to provide liquidity and provide stability in the secondary

25   mortgage market?

1    A.  In simple terms, what they do is they intermediate.  They

2    act in between the companies that actually make mortgage loans

3    to consumers and the entities that actually provide the

4    long-term financing, the 30 years of financing, for a 30-year

5    mortgage.

6         So Fannie Mae and Freddie Mac buy up mortgages from

7    individual lenders, pay the lender for that mortgage.  Now the

8    lender can go make more mortgages.

9         They bundle those mortgages up and they package them for

10   investment by the ultimate investors in this.  This is through

11   a process called securitization.  And so the investors are the

12   ultimate funders of these mortgages.

13   Q.  So what -- what happens to the holder of the MBS if a

14   borrower doesn't pay on their mortgage?

15   A.  The borrower -- the holder of the MBS still gets the

16   payment that the borrower fails to make because that is the --

17   what the -- what Fannie Mae and Freddie Mac do.  They guarantee

18   to the MBS investors that if a borrower doesn't make their

19   mortgage payment, we will make it on their behalf so the

20   investor gets the expected payment.

21   Q.  And how important is that guaranty by Fannie and Freddie?

22   A.  It's -- that -- that's -- that's the business.  That's --

23   that it is -- it is of complete importance.  The investors in

24   mortgage-backed securities, they're not looking at individual

25   200,000- or 400,000-dollar mortgages and judging the borrower.

DEMARCO - DIRECT

1    They are counting on Fannie Mae and Freddie Mac to do that and

2    counting on Fannie and Freddie's guaranty that if the borrower

3    fails, this is how I know I'm going to get paid.

4    Q.  So in a preview of coming attractions, from your

5    perspective, how long does that guaranty have to be good for?

6    A year?  Two years?  Five years?  How long does that guaranty

7    have to be good for in order for MBS investors to be confident

8    in the guaranty?

9    A.  It has to be good for the life of the mortgage.  And since

10   most consumers choose a 30-year mortgage, in most cases we're

11   looking at 30 years -- or up to 30 years.

12   Q.  And just so we're clear -- I think this is clear, but to

13   make sure.  The jury has heard, of course, about shareholders

14   and private shareholders and, as I believe you know, plaintiffs

15   in the case are shareholders.

16       In this context, are the shareholders the same as the

17   MBS investors or different?

18   A.  No, they're different parties.

19   Q.  Okay.  Who are the -- who are the shareholders?

20   A.  The shareholders are the companies that bought the shares.

21   They bought equity investments in Fannie Mae and Freddie Mac.

22   They're providing the capital to Fannie Mae and Freddie Mac

23   that was the -- the backstop on that guaranty that Fannie and

24   Freddie were making to MBS investors.

25   Q.  And, again, as a preview, was there a guaranty that --

DEMARCO - DIRECT

1    an authority that its predecessor did not have.

2    Q.  So translated into English, this is saying that FHFA can

3    appoint itself to become the conservator of Fannie Mae and

4    Freddie Mac; is that correct?

5    A.  Yes.

6    Q.  And what authority -- I think you're about to get into

7    this, but I want to break it out.  What authority did HERA give

8    to Treasury that Treasury did not have before HERA?

9    A.  It gave Treasury unlimited funding authority to purchase

10   obligations of Fannie Mae and Freddie Mac.

11   Q.  So break that down for us.  What do you mean unlimited

12   funding authority to purchase?

13   A.  It means it could invest in the stock of -- among other

14   things, that it could invest in the stock or the bonds of

15   Fannie Mae or Freddie Mac.

16   Q.  And what's the practical significance of Treasury

17   now having that authority to invest in Fannie Mae and

18   Freddie Mac?

19   A.  The practical significance is that in combination with the

20   authority given to FHFA to appoint itself as conservator or

21   receiver, it now meant that FHFA had a funding source to

22   actually manage the conservatorship or receivership.

23   Q.  And we're going to get to that, but did there come a time

24   when Treasury provided funding?

25   A.  Yes.

1    A.  So I have a time horizon in mind.  And that's because

2    every -- you know, every week, Fannie Mae and Freddie Mac

3    are issuing new mortgage-backed securities.

4         And as we talked about yesterday, most homebuyers

5    choose to take a 30-year mortgage, which means

6    mortgage-backed securities, you know, are backed by these

7    30-year mortgages.  Fannie and Freddie are making a guaranty

8    to the investors in the MBS that for the 30-year life of

9    that mortgage, if something happens here, they're going to

10   make good on the payment, the Treasury commitment, now, and

11   the conservatorship has got to back up that guaranty.

12        So as long as we're operating, so every day we

13   open for business and issue a new 30-year MBS, I've got a

14   new 30-year time horizon that this guaranty has to cover.

15   And that's 30 years no matter what happens over those 30

16   years.  You know, recessions, wars, pandemics.  You know,

17   anything can happen.

18        And we've got to make sure we've got resiliency

19   behind that guaranty in order to have stability in the

20   mortgage market and make sure that these MBS can be sold

21   into the market.

22   Q.  And we'll hear in a few minutes how that related to your

23   decision to actually enter into the third amendment and to

24   agree to the net worth sweep.

25        But let's start at what you've said is the

DeMarco - DIRECT - By Mr. Stern

1          They'd invested $33 billion, over 33 billion.  The

2     value of their investment went down.  Because of all of

3     those losses.  Because of the conservatorship.  Because of

4     all of the things the defendants showed you about the

5     difficulties and the challenges of the conservatorship, the

6     huge write-downs, the huge losses.  It was uncertain what

7     was going to happen, whether Fannie or Freddie would emerge,

8     would make money.  Their investment was down.  But it wasn't

9     out.

10          In fact, when those profits were released, on

11     August 7th and 8th, the stock price went up, quite a lot,

12     because people are saying, All right.  Good news.  Maybe

13     they are turning the corner.  Maybe they are going to make

14     big profits.  Maybe those write-downs will become write-ups

15     and they can get back on their feet.  There were rights.

16     The shareholders had rights.  Not guaranteed but they were

17     part of the capital structure, part of the ownership

18     structure.  Even in conservatorship the dividends were

19     suspended, but their rights, their economic interests, were

20     not eliminated.  Mr. DeMarco said that.

21          But the net worth sweep changed that.  It said, No

22     matter how much money Fannie and Freddie make, a trillion

23     dollars, a trillion-trillion dollars, it doesn't matter.

24     Treasury is getting everything.  You guys will get nothing.

25     No matter what.

CLOSING STATEMENT BY MR. HUME

1    the certificates of designation it says that if you don't

2    pay the 10 percent dividend, for any reason, if you fail to

3    pay it, then the amount of that dividend gets added to the

4    liquidation preference -- that's what these hashes are

5    meaning.  The amount that Treasury has as liquidation will

6    go up.  That's one thing that will happen.  And going

7    forward, your rate goes to 12 percent.

8         Okay.  But here is the key thing.  No change on

9    the commitment.  This is the Treasury commitment.  It

10   doesn't go down under this option.

11        So if this is what you are worried about, the

12   commitment.  [Pointing to slide]  No change.  You are

13   worried about the bond and the MBS investors are worried

14   about this.  [Pointing to slide] They are not worried about

15   this. [Pointing to slide]

16        So if you are worried about the bond and MBS

17   investors and the commitment, the payment in kind is a

18   really good option.  Here is what it says.  In the opening

19   statement the defendant says, You are going to learn the

20   evidence shows it wasn't a choice.

21        Well, the stock certificate says, For each

22   dividend period -- it says holders of senior-preferred

23   stock; that's Treasury.  Although Treasury could sell it,

24   but that's Treasury -- shall be entitled to receive -- I

25   want this to be clear.  Does it highlight -- rateably when,

CLOSING STATEMENT BY MR. HUME

1   see.  We are going to make it through 2012 without a draw.

2   There might be a small draw in 2013.  It might not be a

3   problem.  It seems manageable and things are looking up.

4   Let's take our time on this.  How about we at least take

5   enough time to study it?  How about we do that rather than

6   an August rush pushed by Treasury after they see the

7   earnings?

8           Second, you could say, Look, if we hit a period

9   where we are going to have a huge draw, then we will

10  trigger.  Then we will trigger it.  Wouldn't that be a

11  reasonable thing to ask for, if you were trying to deal with

12  this?  Or go to Treasury and say, Look, here's what we will

13  do.  We will pay you the lesser of 10 percent or our net

14  worth.  If we pay you less, then the balance that we don't

15  pay, we will owe you and with interest.  Kind of like the

16  payment in kind provision.  They could have tried for that.

17  They didn't.  No evidence that they considered any of these

18  alternatives.

19          And most importantly, and Mr. DeMarco admitted

20  this, they could have said, Look, what if, as is

21  foreseeable, we end up making huge profits.  And it would be

22  good for Fannie and Freddie to keep some of that net worth.

23  It would be good for them and it would be good for the bond

24  and MBS investors, because it gives an extra cushion.  What

25  if that happens?  Let's make sure we don't have to overpay

CLOSING STATEMENT BY MR. HUME

1    you saw during the trial.

2          Can we pull up DX 49.

3          So this is from what's called the offering circular of

4    the stock, and it says, again, if you buy this stock, you will

5    only get a dividend if and as declared by the board of

6    directors in its sole discretion.  So that's the stock

7    certificate.

8          What else was part of the shareholder contract as of

9    December 24th, 2009?  Well, Judge Lamberth is going to instruct

10   you that the contract includes the corporate charters of Fannie

11   and Freddie.  And you know what those corporate charters said.

12   So that you know when a shareholder agreed to buy a share of

13   stock, they agreed that they were buying a share of stock in a

14   company that had a public mission.

15         What else is included?  Well, Judge Lamberth is going to

16   instruct you, as I said, that HERA became part of the contract

17   when HERA was passed on July 30th, and that is critically

18   important, members of the jury, because that meant that as of

19   that date, under the shareholder contracts, once FHFA became

20   the conservator, FHFA was authorized to act in the best

21   interests of the public.

22         So that's now part of the agreement with the

23   shareholders.  So the shareholders themselves are in an

24   agreement where they have agreed that FHFA can act in the best

25   interests of the public, even if that was not in their best