# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BERKLEY INSURANCE, CO., *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 1:13-cv-1053 (RCL) |
| FEDERAL HOUSING FINANCE AGENCY, *et al.*, | |
| *Defendants*. | |
| In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations | |
| This document relates to: ALL CASES | Case No. 1:13-mc-1288 (RCL) |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' <u>MOTION FOR JUDGMENT AS A MATTER OF LAW</u>

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................... 1

BACKGROUND ..................................................................... 1

    A.    The Enterprises and their Private Shareholders .................... 1

    B.    The 2008 Recession, The Creation Of The FHFA, And The Conservatorship ............................................................ 2

    C.    The Senior Preferred Stock Purchase Agreements ................. 3

    D.    The Market Recovery And The GSEs' Return To Sustained Profitability ................................................................... 4

    E.    The Third Amendment And Its Net Worth Sweep ................. 5

    F.    Procedural History .......................................................... 8

        1.    Plaintiffs Successfully Appealed This Court's Dismissal Of The Action To The District Of Columbia Circuit ........................... 8

        2.    On Remand, This Court Upheld Plaintiffs' Breach Of The Implied Covenant Claim ..................................... 9

        3.    This Court Certified Classes Of Current Holders And Plaintiffs Issued Notice To Potential Class Members ................. 10

        4.    The Summary Judgment Order .................................... 11

        5.    The Trials ............................................................... 11

LEGAL STANDARD ............................................................. 12

ARGUMENT ....................................................................... 13

    I.    THE DEFENDANTS' ARGUMENTS ARE FORECLOSED BY THE LAW-OF-THE-CASE DOCTRINE. .................................... 13

    II.    THE COURT SHOULD REJECT DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW FOR ALL PLAINTIFFS .......... 15

    A.    The Court Has Twice Correctly Rejected That The HERA "Best Interests" Provision Left "No Gap" For The Implied Covenant To Fill. ............................................................................ 15

    B.    As This Court Has Already Correctly Ruled, *Collins* Does Not Foreclose Plaintiffs' Implied Covenant Claim. ......................... 19

1.  The Jury In This Case Addressed A Question Not Presented In *Collins* ................................................................................. 19

2.  Because It Addressed A Different Question, The Jury Considered Evidence Not Considered In *Collins*. ........................ 21

C.  The Court Correctly Concluded That Plaintiffs' Implied Covenant Claim Is Not A Claim For Anticipatory Breach. ...................................... 27

D.  Plaintiffs Proved With Reasonable Certainty That The Third Amendment's Net Worth Sweep Caused Them Harm. ............................ 29

1.  A Reasonable Jury Could Find From The Evidence That The Net Worth Sweep Has Harmed Current Shareholders. ................. 30

2.  A Reasonable Jury Could Find That Share Price Increases After The Third Amendment Are Irrelevant And In No Way Mitigate The Harm Caused By The Net Worth Sweep. .............. 31

3.  A Reasonable Jury Could Find That The One-Day Decline In Share Prices On August 17, 2012 Was Caused Solely By The Net Worth Sweep. .............................................................. 35

III.  THE COURT SHOULD REJECT DEFENDANTS' EFFORT TO OBTAIN JUDGMENT AS A MATTER OF LAW AGAINST POST-THIRD AMENDMENT PURCHASERS AS JUST ANOTHER MERITLESS ATTEMPT TO ATTACK THE DEFINITION OF THE CERTIFIED CLASSES. ........................................................................................... 40

A.  The Court Has Repeatedly And Correctly Rejected Defendants' Efforts To Attack The Definition Of The Certified Classes To Which They Stipulated. ........................................................................... 40

B.  Defendants' Challenge to the Class Definition Is Not a Proper Standing Argument or Basis for a Rule 50(b) Motion. ............................. 43

C.  Plaintiffs' Implied Covenant Claims Against Fannie Mae Travel With The Shares Under Delaware Law. .................................................... 44

D.  Plaintiffs' Implied Covenant Claims Against Freddie Mac Travel With The Shares Under Virginia Law. .................................................... 47

E.  Defendants Invoke Inapposite Case Law That Merely Shows That Personal Claims Are Not Automatically Assigned, Which Thus Does Nothing To Undermine This Court's Prior Rulings. ...................... 49

F.  Defendants Have Waived The Right To Challenge The Class Definitions, And Are Also Estopped From Doing So. ............................. 52

1.      Defendants Agreed To The Class Definitions. ............................ 52

2.      It Would Be Unfairly Prejudicial To Allow Defendants To
        Challenge The Classes At This Late Stage. ................................. 54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abella v. Universal Leaf Tobacco Co. Inc.*,
    546 F. Supp. 495 (E.D. Va. 1982 ..........................................................................48

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
    692 F.3d 34 (2d Cir. 2012)..................................................................................34

*In re Activision Blizzard, Inc. S'holder Litig.*,
    124 A.3d 1025 (Del. Ch. 2015) ..................................................................... *passim*

*Allen v. Yellen*,
    2023 WL 3933723 (D.D.C. June 9, 2023) ...........................................................13

*In re Allergan PLC Securities Litigation*,
    2021 WL 4077942 (S.D.N.Y. Sept. 8, 2021) .......................................................38

*In re AMC Ent. Holdings, Inc. Stockholder Litig.*,
    299 A.3d 501 (Del. Ch. 2023 .............................................................................45

*Anderson v. Group Hospitalization, Inc.*,
    820 F.2d 465 (D.C. Cir. 1987) ...........................................................................12

*Baker v. SeaWorld Ent., Inc.*,
    423 F. Supp. 3d 878 (S.D. Cal. 2019)..................................................................40

*Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*,
    2009 WL 1124451 (Del. Ch. Apr. 20, 2009) ......................................................18

*Boelter v. Hearst Commc'ns, Inc.*,
    192 F. Supp. 3d 427 (S.D.N.Y. 2016).................................................................54

*Breeden v. Novartis Pharms. Corp.*,
    646 F.3d 43 (D.C. Cir. 2011) .............................................................................12

*Cheatham IRA v. Huntington Nat'l Bank*,
    157 Ohio St.3d 358 (2019) .................................................................................51

*Cheatham IRA v. Huntington National Bank*,
    137 N.E.3d 45 (Ohio 2019) ................................................................................51

*Collins v. Yellen*,
    141 S. Ct. 1761 (2021) ................................................................................ *passim*

iv

*Colon v. Bumble, Inc.*,
305 A.3d 352 (Del. Ch. 2023) ...........................................................................45

*Day v. MCC Acquisition, LC*,
299 Va. 199 (Va. 2020) ......................................................................................48

*Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*,
624 A.2d 1199 (Del. 1993) .................................................................................18

*DNAML Pty Limited v Apple Inc.*,
2015 WL 9077075 (S.D.N.Y. Dec. 16, 2015) ...................................................49

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ...................................................................................34, 35

*Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency*,
2018 WL 4681097 (D.D.C. Sept. 28, 2018) ............................................ *passim*

*Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency*,
2022 WL 4745970 (D.D.C. Oct. 3, 2022) ................................................ *passim*

*FEC v. Cruz*,
596 U.S. 289 (2022) ...........................................................................................43

*Freeman v. Giuliani*,
2023 WL 8472723 (D.D.C. Dec. 7, 2023) ...................................................14, 43

*Gerber v. Enter. Prod. Holdings, LLC*,
67 A.3d 400 (Del. 2013), *overruled in part on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013) ..........................................................18

*Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*,
594 U.S. 113 (2021) ...........................................................................................35

*Halifax Fund, L.P. v. Response USA, Inc.*,
1997 WL 33173241 (Del. Ch. May 13, 1997) ....................................................45

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
791 F.3d 90 (D.C. Cir. 2015) .......................................................................34, 38

*Heritage Handoff Holdings, LLC v. Fontanella*,
2018 WL 3580287 (D. Del. July 25, 2018) ........................................................17

*Herr v. United States Forest Service*,
803 F.3d 809 (6th Cir. 2015) ..............................................................................52

*I.A.T.S.E. Local No. One Pension Fund v. Gen. Elec. Co.*,
2016 WL 7100493 (Del. Ch., Dec. 6, 2016) ...........................................16, 45, 50

*In re Immucor, Inc. Sec. Litig.*,
  2011 WL 3844221 (N.D. Ga. Aug. 29, 2011) ...................................................................34

*In Def. of Animals v. United States Dep't of Agric.*,
  589 F. Supp. 2d 41 (D.D.C. 2008)....................................................................................54

*Independent Investor Protective League v. Saunders*,
  64 F.R.D. 564 (E.D. Pa. 1974)..........................................................................................46

*Keepseagle v. Perdue*,
  856 F.3d 1039 (D.C. Cir. 2017).........................................................................................53

*Konstantinidis v. Chen*,
  626 F.2d 933 (D.C. Cir. 1980)...........................................................................................54

*Malin v. XL Capital Ltd.*,
  2005 WL 2146089 (D. Conn. 2005) ..................................................................................34

*Martin v. Howard Univ.*,
  2006 WL 2850656 (D.D.C. Oct. 4, 2006), *aff'd*, 275 F. App'x 2 (D.C. Cir.
  2008) ............................................................................................................................14, 44

*McRitchie v. Zuckerberg*,
  2024 WL 1874060 (Del. Ch. Apr. 30, 2024) .....................................................................45

*Metrocare v. Wash. Metro. Area Transit Auth.*,
  679 F.2d 922 (D.C. Cir. 1982)...........................................................................................12

*Missouri Dep't of Social Servs. v. United States Dep't of Health & Human Servs.*,
  2019 WL 4709685 (D.D.C. Sept. 26, 2019) ......................................................................53

*New Hampshire v. Maine*,
  532 U.S. 742 (2001)...........................................................................................................54

*Pacific Life Ins. Co. v. BNY Mellon*,
  2022 WL 1446552 (S.D.N.Y. Feb. 22, 2022).....................................................................48

*Pagliara v. Federal Home Loan Mort. Corp.*,
  203 F. Supp. 3d 678 (E.D. Va. 2016) ................................................................................48

*Parker v. District of Columbia*,
  478 F.3d 370 (D.C. Cir. 2007)...........................................................................................43

*Perry Cap. LLC v. Lew*,
  70 F. Supp. 3d 208 (D.D.C. 2014)......................................................................................8

*Perry Cap. LLC v. Mnuchin*,
  864 F.3d 591 (D.C. Cir. 2017).................................................................................. *passim*

*Policemen's Annuity and Benefit Fund of Chicago v. DV Realty Advisors LLC*,
   2012 WL 3548206 (Del. Ch. Aug. 16, 2012) ..........................................................17

*In re Prodigy Comm. Corp. Shareholders Litig.*,
   2002 WL 1767543 (Del. Ch. July 26, 2002)...........................................................45

*In re Prodigy Commc'ns Corp. S'holders Litig.*,
   2022 WL 1767543 (Del. Ch. July 26, 2002)...........................................................47

*Radtke v. Lifecare Mgmt. Partners*,
   795 F.3d 159 (D.C. Cir. 2015) ................................................................................12

*In re Resorts Int'l S'holders Litig.*,
   1988 WL 92749 ......................................................................................................47

*Ross v. Walton*,
   668 F. Supp. 2d 32 (D.D.C. 2009) ....................................................................33, 34

*Scott v. District of Columbia*,
   101 F.3d 748 (D.C. Cir. 1996) ................................................................................13

*SEC v. Jacoby*,
   2022 WL 982542 (D. Md. Mar. 30, 2022)...............................................................40

*SEC v. Ustian*,
   2020 WL 416289 (N.D. Ill. Jan. 26, 2020) .............................................................40

*Shareholder Representative Services LLC v. Medidata Solutions, Inc*,
   2020 WL 972618 (D. Del. Feb. 24, 2020) ..........................................................16, 17

*Sherley v. Sebelius*,
   689 F.3d 776 (D.C. Cir. 2012) ................................................................................13

*Stella v. Boodoo*,
   21 F.3d 1157 (D.C. Cir. 1994) ................................................................................12

*Tesla Securities Litigation*,
   2022 WL 7374936 (N.D. Cal. Oct. 13, 2022).....................................................38, 39

*U.S. Inspect Inc. v. McGreevy*,
   2000 WL 33232337 (Va. Cir. Ct. Nov. 27, 2000) ...................................................48

*Urdan v. WR Cap. Partners, LLC*,
   244 A.3d 668 (Del. 2020) ............................................................................... *passim*

*W. Palm Beach Firefighters' Pension Fund v. Moelis & Co.*,
   2024 WL 747180 (Del. Ch. Feb. 23, 2024) .............................................................45

*W.G. Cornell Co. of Washington, D. C. v. Ceramic Coating Co.*,
    626 F.2d 990 (D.C. Cir. 1980) ..................................................................33

*Walker v. England*,
    590 F. Supp. 2d 113 (D.D.C. 2008) ........................................................54

*West Palm Beach Firefighters' Pension Fund v. Moelis & Co.*,
    310 A.3d 985 (Del. Ch. 2024) .................................................................45

*Wilmington Leasing v. Parrish Leasing Co., L.P.*,
    1996 WL 560190 (Del. Ch. Sept. 25, 1996) .......................................17, 18

*Wye Oak Tech., Inc. v. Republic of Iraq*,
    24 F.4th 686 (D.C. Cir. 2022) .................................................................13

**Statutes**

Delaware Code Title 6 Section 8-302(a) ...........................................................44, 47

12 U.S.C § 1719(g)(1)(C)(iii), (v) ........................................................................2

12 U.S.C. § 1723(b), § 1452(a)(2)(A) ...................................................................1

12 U.S.C. § 4617(b)(2)(D) .....................................................................................2

12 U.S.C. § 4617(b)(2)(J) ....................................................................................15

12 U.S.C. § 4617(f) ..............................................................................................19

Delaware General Corporation Law ....................................................................51

Housing and Economic Recovery Act of 2008 ................................................2, 9, 20

Va. Code Ann. § 8.8A-302 ..............................................................................47, 48

**Other Authorities**

F.R.C.P 23(b)(1) ..............................................................................................52, 54

F.R.C.P. 23(b)(3) .......................................................................................41, 52, 54

F.R.C.P. 23(b)(1), (2), and (3) .........................................................................10, 52

F.R.C.P. 23(a) and 23(b)(3) .......................................................................10, 52, 53

F.R.C.P. 50 ................................................................................................... *passim*

## PRELIMINARY STATEMENT

In a motion styled as one under Rule 50(b), Defendants ask the Court to overrule its 2018 decision denying their motion to dismiss the implied covenant claims, its 2021 decision certifying Classes that include all current stockholders since the implied covenant claims run with the shares (to which Defendants agreed), and its 2022 decision denying Defendants' summary judgment argument based on *Collins v. Yellen*, 141 S. Ct. 1761, 1778 (2021). This is not the proper stuff of Rule 50(b) motions. The law of the case bars the relief Defendants seek, and they have made no effort to meet the standard for overcoming the law of the case doctrine. To the contrary, their arguments are as meritless now as when the Court correctly rejected them in the past. Indeed, they are more meritless now: as shown below, the evidence presented at the trial in this case was more than sufficient to allow a reasonable jury to find in favor of Plaintiffs, as they did. Defendants do not come close to meeting the standard to obtain the highly disfavored relief of throwing out that jury verdict. Their motion should be denied.

## BACKGROUND

### A.    The Enterprises and their Private Shareholders

Fannie Mae and Freddie Mac are Government-Sponsored Enterprises (the "GSEs" or "Companies") chartered by the U.S. Congress to facilitate liquidity and stability in the secondary market for home mortgages. *Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency*, 2018 WL 4681097, at *1 (D.D.C. Sept. 28, 2018) ("*MTD Ruling*"). Congress provided for both Companies to operate as for-profit corporations financed by private investors, with equity securities privately owned by individual and institutional investors. *Id.* The Companies' stock certificates provide that each Company's Board of Directors decides whether and when to pay stock dividends, Ex. C at 69 (PX-33); Ex. C at 79 (PX-0034), and federal statutes provide that the boards are elected annually by the shareholders. 12 U.S.C. § 1723(b), § 1452(a)(2)(A). Between 1996 and 2008, private

shareholders invested over $33 billion into Fannie Mae and Freddie Mac in exchange for a series of preferred stock issuances.  Ex. C at 20 (PX-1-A); Ex. C at 21 (PX-1-C).  Of that, $19.7 billion was invested at the urging of the Companies' government regulator during 2007 and 2008, in response to the crisis in the housing market.  *Id.*

### B.    The 2008 Recession, The Creation Of The FHFA, And The Conservatorship

In July 2008, Congress passed the Housing and Economic Recovery Act of 2008 ("HERA" or the "Recovery Act"), creating the FHFA.  *MTD Ruling*, 2018 WL 4681097, at *2.  HERA granted the FHFA the authority to place the Companies into a conservatorship, through which FHFA could take such actions as necessary to "preserve and conserve the assets" of the Companies and to place them into a "sound and solvent condition." 12 U.S.C. § 4617(b)(2)(D).  HERA expressly required the Secretary of the Treasury, in exercising any authority as to the Companies, to take into consideration the Companies' "plan for the orderly resumption of private market funding or capital market access" and "[t]he need to maintain the corporation's status as a private shareholder-owned company."  12 U.S.C § 1719(g)(1)(C)(iii), (v).

On September 6, 2008, the FHFA placed the Companies into conservatorship.  In a "Fact Sheet" published the same day, the FHFA stated that "The purpose of appointing the Conservator is to preserve and conserve the Company's assets and property and to put the Company in a sound and solvent condition."  Ex. C at 27 (PX-2-C).  In numerous public presentations, FHFA leadership, including then-Senior Deputy Director Edward DeMarco ("DeMarco"), stated that the "Conservatorship statutes provide broad authority for a conservator to operate the institution until it is stabilized and then returned to the shareholders."  Ex. C at 46 (PX-2-E).  The objective of the Conservatorship was to return the Companies "to normal business operations once stabilized." *Id.* Mr. DeMarco stated that the "economic interests of shareholders have not been eliminated, they continue to exist."  *Id.*  Likewise, the GSEs' securities filings stated that the Companies were

required to "maintain positive net worth" throughout the Conservatorship, and that the GSEs would "focus on returning to long-term profitability if it does not adversely affect our ability to maintain net worth or fulfill our mission."  Ex. C at 544 (DX102); Ex. C at 548 (DX103); Ex. A at 1977.

C.    **The Senior Preferred Stock Purchase Agreements**

Upon inception of the Conservatorship, the Companies each entered into a Senior Preferred Stock Purchase Agreement ("PSPA") with the U.S. Treasury.  Ex. C. at 5 (JX-1).  Under the PSPAs, the Treasury Department agreed to invest in the Companies in exchange for senior preferred stock with an initial liquidation preference of $1 billion, reflecting an initial commitment fee, as well as warrants to acquire 79.9% of the Common Stock of the Companies at a nominal price.  *Id*.; Ex. C at 6 (JX-1).  The Government Preferred Stock ranked senior in priority to all other series of the Companies' stock, and it accrued an annual dividend, paid quarterly.  The annualized amount of the dividend was as follows:  if paid in cash, it was 10% of the outstanding liquidation preference (which would equal the total amount invested by the U.S. Treasury into that company plus the initial $1 billion value); if the Companies failed to pay the dividend in cash, then the dividend would be paid through an increase to the liquidation preference equal to 12% times the outstanding liquidation preference.  Ex. C at 524 (DX89); *id.* at 533 (DX90).  Any increase to the liquidation preference caused by such a 12% dividend could be paid down by the Companies in later periods.  Ex. C. at 524 (DX89); Ex. C at 533 (DX90).

Treasury and the FHFA amended the PSPAs on two occasions prior to August 2012, neither of which changed the underlying dividend structure.  In the May 6, 2009 "First Amendment," Treasury increased the cap on its funding commitment from $100 billion to $200 billion per Company.  Ex. A at 1119.  In the December 24, 2009 "Second Amendment," Treasury removed the cap on the funding commitment until December 31, 2012, at which point it would be

reimposed based on a formula. *Id.* As of July 2012, Treasury predicted that the funding cap would be approximately $275 billion—or "nearly twice the amount of net funding provided by Treasury to date." Ex. C at 108 (PX-210).

### D.    The Market Recovery And The GSEs' Return To Sustained Profitability

Shortly after placing the Companies into conservatorship in 2008, the FHFA directed the Companies to declare large losses in the form of accounting write downs, based largely on predictive judgments about the housing market's future performance and the level of expected mortgage defaults. Ex. A at 1161-1166. These accounting judgments required the Companies to take large draws from the Treasury to maintain a positive net worth, thereby increasing their dividend obligations owed to the Treasury. *Id.* at 1188-1189. However, because the losses were caused almost entirely by accounting write downs, it was foreseeable that if the market recovered, the Companies would enjoy historic profits. *Id.* at 1194-1195.

By 2012, both the broader economy and the housing market began a period of sustained recovery. Housing values improved, home sales increased, and the Companies' post-crisis loans were of higher quality with lower default rates. Ex. A at 1160-1161; Ex. C at 22, 23, 148 (PX-1-L; PX-1-M; PX-211). In both the first and second quarter of 2012, both Companies recorded large net profits that equaled or exceeded the dividend they owed to Treasury. Ex. C at 8, 553-554, 557, 560, 562, 566 (DX420; DX421; DX476; DX477; JX-1); Ex. A at 1157-58.

Specific financial metrics also led to an expectation of even-greater success in the second half of 2012 and beyond. *See, e.g.*, Ex. A at 1176-77. For example, the GSEs' credit loss allowance peaked in 2011, and the Companies began releasing loan loss reserves (thus increasing profits) in the first half of 2012. Ex. C at 432 (PX-228). The decrease in loan defaults and loan loss reserves, coupled with an increase in the guarantee-fees (G-Fees) charged by the Companies to private lenders, combined "to create a higher profit in 2012 and beyond." *See, e.g.*, Ex. A at

1176-77, 1167-68.  GSE executives testified that that they believed the Companies had entered a period of "sustained profitability" prior to August 2012, such that the GSEs could cover their dividend obligations under the PSPAs.  *See, e.g.,* Ex. A at 1181-82; Ex. C. at 390 (PX-223) ("2012 comprehensive income is expected to be sufficient to cover the dividend obligations for the full year"); Ex. C. at 441 (PX-262) (no additional funding required through 2015 under the base-case forecast); PX-0213 at 1 (describing 2012-18 as the "golden years of GSE earnings"); Ex. C at 94 (PX-196) (predicting "a roaring recovery").  Consistent with this testimony and documentary evidence, and "based on the view that they were going to be profitable going forward," the Companies' Boards of Directors began discussing "re-recording certain deferred tax assets that had been written-off" (Ex. C. at 437 (PX-259)), which could lead to an increase of the GSEs' net worth of close to $75 billion.  Ex. A at 1191-94; *see also* Ex. A at 999:15-18, 1004:4-6.

### E.    The Third Amendment And Its Net Worth Sweep

On August 17, 2012, the Treasury and the FHFA executed the Third Amendment to the PSPAs.  It replaced the prior dividend rate (of 10% in cash or 12% in liquidation preference increases) with a dividend equal to 100% of the net worth of each GSE, subject to a small reserve that would shrink to zero by 2018.  Ex. C. at 12-13 (JX-1).  The FHFA and Treasury officials who agreed to the Third Amendment at the time referred to this as the "Net Worth Sweep."

In 2013, the first year the Net Worth Sweep took effect, the Companies paid over $130 billion in cash dividends—which was $111.2 billion more than they would have paid under the pre-existing 10% cash dividend.  Ex. A at 1136-38; 2022-23; 2395-96.  Mr. DeMarco acknowledged at trial that the GSEs would have been "better off" in a stress scenario with this additional "buffer" of $111 billion of capital on their books, rather than paid over to Treasury.  *Id.* at 2394-95.  Yet there is not a single document from FHFA, Treasury, or the Companies expressing surprise, regret, disappointment, or any desire to renegotiate the PSPAs in response to seeing this

dramatic and immediate negative impact of the Net Worth Sweep on the GSEs.  As of the latest information available at the time of the second trial, it was shown that the Net Worth Sweep had caused Treasury to receive $151.2 billion more from the GSEs than it would have received under the pre-existing 10% cash dividend.  *Id.* at 1138-39.[1]

After FHFA and Treasury executed the Third Amendment, the GSEs recognized in their SEC reports that, rather than helping the GSEs, the Net Worth Sweep "could have an adverse effect on our financial results."  Ex. C. at 500 (PX-499).  In particular, the GSEs acknowledged that their inability to build and retain capital "as a result of the net worth sweep dividend . . . increases the likelihood of draws [from the U.S. Treasury] in future periods."  *Id.* at 499.  The GSEs also noted that "non-cash changes in net worth"—such as the reversal of the deferred tax assets—"could exceed the amount of available cash, which could have an adverse effect on our financial results."  Ex. C. at 491 (PX-458).  That is in fact what happened.  In 2013, the GSEs were required by the accounting rules to write up their deferred tax assets.  This resulted in large non-cash increases in net worth on the GSEs' books that, in turn, required them to borrow from the private markets in order to pay massive cash dividends to Treasury under the Net Worth Sweep.  Ex. A at 1236-37.

The FHFA has stated that it agreed to the Net Worth Sweep in order to avoid the risk that the Companies would have to engage in repeated "circular draws"—drawing money from Treasury in order to pay Treasury the 10% cash dividend.  The FHFA has asserted that such draws, if taken, could potentially cause a material erosion to the Treasury Commitment that would become capped as of the end of 2012.  But the evidence at trial showed the following:

- The Companies, the FHFA, and Treasury were all projecting that the Companies were likely to generate sufficient profits to cover the 10% dividend for the foreseeable future,

---

[1] In 2019, an amendment caused Treasury to receive the Net Worth Sweep through an increase in its liquidation preference equal to each increase in net worth for each Company, rather than in cash.  Ex. C. at 4 (JX-1); Ex. A at 621-623.

and would likely not need more than modest draws from Treasury to cover occasional shortfalls—if that. Ex. C at 298, 326, 446 (PX-216, PX-218, PX-269) (Benson projections as shown to FHFA and Treasury); Ex. C at 96, 97 (PX-210; PX-205).

- A June 25, 2012, Treasury memorandum recorded Acting-FHFA Director DeMarco telling Treasury Secretary Geithner that he "no longer sees the urgency of amending the PSPAs this year because "the GSEs will be generating large revenues over the coming years, thereby enabling them to pay the 10% annual dividend well into the future…" Ex. C at 96 (PX-205).

- A July 9, 2012 Treasury memo that was intended to prepare Secretary Geithner to give testimony to Congress stated that the GSEs were likely to have about $275 billion in total funding available once the caps were re-imposed at the end of 2012, which would provide a "substantial cushion for any unexpected losses," and that "Treasury is not expected to fund any operating losses at Fannie Mae and Freddie Mac after the expiration of the PSPA funding commitment." Ex. C at 97 (PX-210); *see also* Ex. C at 430 (PX-227) ("Earnings will be in excess of current" dividend; "[r]ecord earnings will be driven by large credit loss reserve release").

- This same July 9, 2012 memo further recognized that "To the extent that required dividend payments exceed net income, FHFA, as conservator, could consider not declaring dividends pursuant to the certificates of designation for the preferred shares, so that draws on the PSPAs are not used to pay dividends, preserving as much funding as possible to cover any unanticipated losses at Fannie Mae and Freddie Mac." Ex. C at 107 (PX-210).

- Former Fannie Mae CEO Timothy Mayopoulos testified "there was still plenty of capacity left in the PSPA commitment" after the caps were going to be re-imposed in 2013 (Ex. B at 57), and the GSEs' financial projections did not suggest "a near-term threat that Fannie is going to make draws so large on Treasury's funding commitment that it would exhaust the available funds." *Id*. at 56 (Fannie Mae's model projected $118.3 billion in available funding as of 2020); *see also* Ex. A at 1920 (defense expert Dr. Attari testifying "there was very little risk that the commitment would run out, for example, in 2013 or 2014").

- Prior to agreeing to the Net Worth Sweep, FHFA and Treasury learned that both Companies were discussing the near-term likelihood of writing up the value of their deferred tax assets, which would add $50 billion or more to their net worth. Ex. C at 90 (PX-147); Ex. C at 94 (PX-196); Ex. C. at 437 (PX-259).

- While accounting and finance professionals at the Companies and at FHFA were predicting that the GSEs were poised to enter their "golden years of earnings" and enjoy a "roaring recovery," with accounting write ups leading to historic profits, Mr. DeMarco chose not to consult with any of these professionals about the decision to agree to the Net Worth Sweep. Ex. A at 1471, 2527-31. Mr. DeMarco never asked anyone to analyze the pros and cons of the Net Worth Sweep, or whether the Net Worth Sweep might cause the Companies to pay more in dividends (as it ended up doing, dramatically). Ex. A at 2401:9-2403:23. The only person Mr. DeMarco consulted was his former colleague from the Treasury Department, Mario Ugoletti. *Id.* at 2268, 2289-2290, 2472-2473, 2516, 2527-2532.

7

- There is not a single FHFA memo analyzing the decision to agree to the Net Worth Sweep. *Id.* at 2401-2403 (noting that that there were no memos, email analysis, internal meetings, or documents regarding the Net Worth Sweep).

- Mr. DeMarco admitted he did not consider the ability to use the 12% payment-in-kind option to address any supposed concern over any future inability to pay cash dividends without using "circular draws." *Id.* at 2546:20-2548:10. The evidence shows Mr. DeMarco did not consider any alternatives to the Net Worth Sweep. *Id.* at 2403; 1225-1227 (testimony of Plaintiffs' expert Dr. Bala Dharan listing potential alternatives).

- Treasury drove the timing of the Net Worth Sweep, and Treasury was motivated to push for the Net Worth Sweep because the GSEs were starting to make profits that exceeded the 10% dividend – precisely the opposite concern FHFA claims was the reason for the Net Worth Sweep. On July 31, 2012, FHFA sent Treasury the expected GSE financial results for the second quarter of 2012, showing profits in excess of the dividend amount, allowing each GSE to build positive net worth from earnings for the first time since conservatorship began. Ex. C at 427 (PX-226A). When this was forwarded on within Treasury to Timothy Bowler, the Treasury point person for the Third Amendment, Bowler responded: "Really makes sense to push the net worth sweep this quarter." *Id.* A little over a week later, Mr. Ugoletti reported to Mr. DeMarco that there was "a renewed push" from Treasury for the Third Amendment and its Net Worth Sweep. *Id.* at 436 (PX-247); Ex. A at 2472:21-2474:3.

- Documents show that Treasury believed the purpose of the Net Worth Sweep was to "demonstrate wind down" and ensure that the GSEs "will not be allowed to retain profits, rebuild capital, and return to the market in their prior form"—directly contradicting the purpose FHFA has given in this lawsuit. Ex. C. at 458, 460, 520, 551 (PX-278), (PX-282), (PX-566), (DX404). An FHFA document shows that at least one FHFA official, shortly after a meeting with Mr. Demarco, had also formed the understanding that the purpose of the Net Worth Sweep was to "demonstrate wind down." *Id.* at 437 (PX-259).

- The Net Worth Sweep was unprecedented in the history of government financing. Ex. A at 1122-23 (Plaintiffs' expert Dr. Dharan: the Net Worth Sweep was "very unprecedented"); *Id.* at 765 (Plaintiffs' expert Dr. Mason: "[I]n my study of financial crises from my entire career, I've never seen this done before…"); *Id.* at 898 (Plaintiffs' expert Dr. Anjan Thakor: "It's unprecedented.").

### F. Procedural History

#### 1. Plaintiffs Successfully Appealed This Court's Dismissal Of The Action To The District Of Columbia Circuit.

In 2014, this Court granted Defendants' motion to dismiss Plaintiffs' amended complaint.

*Perry Cap. LLC v. Lew*, 70 F. Supp. 3d 208 (D.D.C. 2014) ("*Perry I*"). Plaintiffs appealed *Perry*

*I*, and, on July 17, 2017, the U.S. Court of Appeals for the District of Columbia Circuit ("D.C.

Circuit") reversed in part, holding that Plaintiffs could pursue their claim that the Companies (through the FHFA as their conservator) violated the implied covenant of good faith and fair dealing by depriving shareholders of the opportunity to receive dividends. *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 629-32 (D.C. Cir. 2017) ("*Perry II*").

First, the D.C. Circuit held that the implied covenant claim was not preempted by federal law, stating, "[i]nsofar as the FHFA argues (and the district court held) that the Recovery Act preempts state law imposing an implied covenant, this approach is foreclosed by the plain text of the Recovery Act and by our precedent." *Id*. at 630.  The D.C. Circuit explained that Virginia and Delaware law regarding the implied covenant is no obstacle to the objectives of Congress and therefore not preempted by HERA.  *Id*.  Second, the D.C. Circuit directed this Court to evaluate the claim under the "correct legal standard," namely, "whether the Third Amendment violated the reasonable expectations of the parties." *Id*. at 631.  As the D.C. Circuit ruled, "the stock certificates upon which the plaintiffs rely provide for dividends if declared by the Board of Directors, in its sole discretion.  A party to a contract providing for such discretion violates the implied covenant if it acts arbitrarily or unreasonably." *Id*.

### 2. On Remand, This Court Upheld Plaintiffs' Breach Of The Implied Covenant Claim

After *Perry II*, Plaintiffs filed their Second Amended Complaint (Class ECF 70), and Defendants moved to dismiss it.  Class ECF  66.  In this Court's September 28, 2018 decision, it held that Plaintiffs stated a claim for breach of the implied covenant of good faith and fair dealing, finding that Plaintiffs pled sufficient facts to support a finding that the Third Amendment violated their reasonable expectations.  *MTD Ruling*, 2018 WL 4681097, at *7-12.

This Court also found that HERA's "best interests" provision does not foreclose Plaintiffs' implied covenant claims: "Defendants cannot simply say that since HERA permits the conservator

9

to act in its own best interests, the FHFA can do whatever it wants and Plaintiffs could not expect otherwise." *Id*. at *13; *see also id*. (FHFA may not "act with impunity"). The Court thereafter denied Defendants' motion for reconsideration, finding that Plaintiffs sought "to hold Defendants presently accountable for a present breach of an implied promise inherent in every contract—that both parties will operate in good faith and not violate their co-contracting party's reasonable expectations." Class ECF 104 at 3.

### 3. This Court Certified Classes Of Current Holders And Plaintiffs Issued Notice To Potential Class Members

On August 12, 2021, Plaintiffs filed their motion to certify this action as a class action under Federal Rules of Civil Procedure 23(b)(1), (2), and (3) (ECF No. 132). On October 14, 2014, the parties stipulated to certification of classes under Rules 23(a) and (b)(3). ECF No. 133. On December 7, 2021, the Court issued an Order granting Plaintiffs' motion for class certification and certified the following Classes: (1) "All current holders of junior preferred stock in Fannie Mae as of the date of certification, or their successors in interest to the extent shares are sold after the date of certification and before any final judgment or settlement (the 'Fannie Preferred Class')"; (2) "All current holders of junior preferred stock in Freddie Mac as of the date of certification, or their successors in interest to the extent shares are sold after the date of certification and before any final judgment or settlement (the 'Freddie Preferred Class')"; and (3) "All current holders of common stock in Freddie Mac as of the date of certification, or their successors in interest to the extent shares are sold after the date of certification and before any final judgment or settlement (the 'Freddie Common Class')." Class ECF 139.

On January 24, 2022, this Court entered an Order directing that notice of the class certification be sent to potential members of the Certified Classes ("Certified Class Notice"). ECF No. 141. Beginning on February 22, 2022, the Court-appointed claims administrator sent the

Certified Class Notice to potential Certified Class members.  Class ECF 153.  As of May 2022, the claims administrator had mailed 146,017 copies of the Certified Class Notice to potential members of the Certified Class.  *Id.* Ultimately, only 32 individual shareholders submitted valid requests to opt-out of the Classes.  Class ECF 153 at Ex. D; Class ECF 415, at Ex. B.

### 4.    The Summary Judgment Order

On September 23, 2022, this Court issued its ruling on the parties' cross motions for summary judgment.  The Court denied the Plaintiffs' motion for partial summary judgment on the narrow issue of whether the periodic commitment fee would have been enforceable in a world without the Third Amendment.  *Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency,* 2022 WL 4745970, at *13-14 (D.D.C. Oct. 3, 2022) ("*MSJ Ruling*").   The Court partially granted Defendants' motion by ruling that Plaintiffs were not permitted to seek damages based on a theory of lost dividends or based on a theory of restitution.  *Id.* at *9-10, *11-12.  However, the Court ruled that Plaintiffs were entitled to seek damages based on their assertion that the Net Worth Sweep caused their shares to be worth less than they otherwise would be worth, as measured by the drop in stock price on the date the Net Worth Sweep was announced.  *Id.* at *11.  The Court also rejected Defendants' arguments seeking summary judgment on liability, including (a) the argument that the implied covenant did not apply because the HERA "best interests" provision left no "gap" to be filled by the implied covenant, and (b) the argument that the Supreme Court's *Collins* decision foreclosed Plaintiffs' implied covenant claim.  *Id.* at *5-7.

### 5.    The Trials

This Court presided over two trials in this action.  The first trial occurred in October 2022 and ended in a deadlocked jury and thus a mistrial. The second trial occurred in July and August 2023, and it resulted in a verdict for Plaintiffs.

At both trials, Defendants moved for judgment as a matter of law under Rule 50(a) on the same grounds advanced in their present motion, including that: (1) there was supposedly no "gap" in the shareholder contracts for the implied covenant to fill; (2) *Collins* purportedly forecloses Plaintiffs' implied covenant claim here; (3) Plaintiffs failed to prove harm or damages with reasonable certainty; and (4) post-Third Amendment purchasers were not harmed and thus lacked standing. *See* Ex. B at 1821-1827; Class ECF 248; Ex. A at 2600:18-21.  This Court denied both Rule 50(a) motions.  Ex. B at 1830, 2449-2450; Class ECF 271; Ex. A at 2600:22.  At the end of the first trial, Defendants also moved to decertify the Classes, arguing that under Plaintiffs' damages theory the Classes include a substantial number of members who suffered no injury or, at best, highly disparate injuries and damages that make Class treatment unworkable and inappropriate.  Class ECF 249.  This Court denied that motion as well.  Class ECF 271.

## LEGAL STANDARD

Federal Rule of Civil Procedure 50(b) provides that, once a jury has rendered its verdict, a party "may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial."  Fed. R. Civ. P. 50(b). The Court "do[es] not . . . lightly disturb a jury verdict."  *Radtke v. Lifecare Mgmt. Partners*, 795 F.3d 159, 163 (D.C. Cir. 2015) (ellipsis in original).  Judgment as a matter of law is "highly disfavored" because it "intrudes upon the rightful province of the jury." *Stella v. Boodoo*, 21 F.3d 1157, 1161 (D.C. Cir. 1994)

In ruling on a Rule 50(b) motion, the Court must resolve all reasonable inferences in the nonmovant's favor.  *Breeden v. Novartis Pharms. Corp.*, 646 F.3d 43, 53 (D.C. Cir. 2011).  The Court may grant a motion for judgment as a matter of law only if "no reasonable juror could reach the verdict rendered in the case."  *Anderson v. Group Hospitalization, Inc.,* 820 F.2d 465, 473 (D.C. Cir. 1987).  Because the fundamental function of the jury is "to select, from among conflicting inferences and conclusions, that which it finds most reasonable," *Metrocare v. Wash.*

*Metro. Area Transit Auth.,* 679 F.2d 922, 925 (D.C. Cir. 1982), "the court cannot substitute its view for that of the jury, and can assess neither the credibility nor weight of the evidence." *Scott v. District of Columbia,* 101 F.3d 748, 753 (D.C. Cir. 1996). Consequently, "[e]ven if the Court finds the evidence that led to the jury verdict unpersuasive, or that it would have reached a different result if it were sitting as the fact-finder, that is not a basis for overturning the jury's verdict and granting judgment as a matter of law." *Allen v. Yellen,* 2023 WL 3933723, at *1 (D.D.C. June 9, 2023) (citation omitted).

## ARGUMENT

### I.   THE DEFENDANTS' ARGUMENTS ARE FORECLOSED BY THE LAW-OF-THE-CASE DOCTRINE.

Section I of Defendants' brief repeats arguments this Court has previously rejected, in some cases more than once. Likewise, Defendants' misplaced "standing" arguments in Section II are nothing more than the same attacks on the Class definitions that Defendants have raised repeatedly, despite agreeing to the Class definitions more than two years ago, and that this Court has repeatedly rejected. The Court should again reject all of these arguments, both because they are wrong and because they are precluded by the law-of-the-case doctrine.

The "[l]aw-of-the-case doctrine refers to a family of rules embodying the general concept that a court involved in later phases of a lawsuit should not re-open questions decided ... by that court or a higher one in earlier phases." *Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 697 (D.C. Cir. 2022) (citation omitted). The doctrine reflects the principle that "courts are ... loathe to reconsider issues already decided, except in the case of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice." *Sherley v. Sebelius*, 689 F.3d 776, 781 (D.C. Cir. 2012).

The law of the case doctrine applies at the Rule 50 stage.  Rule 50(b) is not meant "to rehash decisions that were made pre-trial, but to determine whether the jury verdict was supported by the evidence presented at trial." *Martin v. Howard Univ.*, 2006 WL 2850656, at *5 (D.D.C. Oct. 4, 2006), *aff'd*, 275 F. App'x 2 (D.C. Cir. 2008).  Therefore, courts should not depart from the law-of-the-case doctrine in deciding a Rule 50 motion where the movant has offered no "intervening change of law or any other basis for concluding that [the] prior decision[] [is] clearly erroneous." *Freeman v. Giuliani*, 2023 WL 8472723, at *3 (D.D.C. Dec. 7, 2023) (internal citations omitted).

As shown below, Defendants have previously raised the arguments they make in their Rule 50(b) motion, and this Court has previously rejected all of them.[2]  Defendants assert that the Court should reconsider its prior decisions, but they make no effort to address the law-of-the-case doctrine or to meet its demanding standards.  Accordingly, while Plaintiffs address each of Defendants' arguments fully and demonstrate again why they are wrong, the Court can and should reject these arguments at the threshold because Defendants have not even attempted to meet the standard that applies to such recycled arguments at this stage.

---

[2]  Specifically, Defendants made the Section I(A) "no gap to fill" argument in both their motion to dismiss and their motion for summary judgment, with the Court rejecting it both times. *MTD Ruling*, 2018 WL 4680197, at *12-13; *MSJ Ruling*, 2022 WL 4745970, at *6-7; Defendants made the Section I(B) argument that *Collins* foreclosed Plaintiffs' implied covenant claims on summary judgment, which the Court correctly rejected, *MSJ Ruling*, 2022 WL 4745970, at *5-6; Defendants made the Section I(C) argument about anticipatory breach in their motion for reconsideration of the Court's motion to dismiss ruling, and the Court rejected it in denying that motion, Class ECF 104 at 2-4; Defendants made their Section I(D) arguments at summary judgment and in trial and the Court rejected them both times, Ex. A at 1508-1512; *MSJ Ruling*, 2022 WL 4745970, at *7, *11 ; and Defendants made all their Section II arguments in both trials, sometimes more than once, *see* Ex. A at 1821-1827; Class ECF 248, 249; Ex. A at 1500-1510, which the Court correctly rejected all times. Ex. B at 1830, 2449-2450; Class ECF 271; Ex. A at 1512.

II.   **THE COURT SHOULD REJECT DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW FOR ALL PLAINTIFFS.**

A.   **The Court Has Twice Correctly Rejected That The HERA "Best Interests" Provision Left "No Gap" For The Implied Covenant To Fill.**

Defendants first repeat their argument that the PSPAs expressly authorized the Net Worth Sweep and thus left no gap for the implied covenant to fill.  They base this argument on 12 U.S.C. § 4617(b)(2)(J), which authorizes the conservator to "take any action authorized by this section, which the Agency determines is in the best interests of the regulated entity or the Agency." According to Defendants (Mot. at 19), the PSPAs incorporate that section and "by incorporating HERA's 'best interests' provision," the PSPAs "specify the scope of FHFA's contractual discretion" and preclude application of the implied covenant.  This Court has twice rejected this argument— first in its *MTD Ruling*, 2018 WL 4680197, at *13, and then in its *MSJ Ruling*, 2022 WL 4745970, at *7.  It should reject it again now—based both on the law of the case doctrine and on the fact that it is dead wrong for all the reasons the Court found previously.

As both the D.C. Circuit and this Court have explained, under applicable state law, grants of discretionary rights in contracts do not preclude application of the implied covenant.  To the contrary, when "exercising a discretionary right, a party to the contract must exercise its discretion reasonably," and so a "party to a contract providing for such discretion violates the implied covenant if it acts unreasonably or arbitrarily."  *Perry II*, 864 F.3d at 631 (cleaned up, citations omitted).  Because "HERA only authorizes the *discretion* through which FHFA agreed to the Third Amendment, rather than the Third Amendment itself, the prohibition of implied covenant claims based on contractually authorized conduct does not bar plaintiffs' claims."  *MSJ Ruling*, 2022 WL 4745970, at *7 (emphasis in original).  Defendants "cannot simply say that since HERA permits the conservator to act in its own best interests, the FHFA can do whatever it wants and Plaintiffs could not expect otherwise.  The question is whether Defendants exercised their discretion

arbitrarily or unreasonably in a way that frustrated Plaintiffs' expectations under the contract." *Id.*; *see also MTD Ruling*, 2018 WL 4680197, at *13 (citing Delaware and Virginia case law re same).

As this Court previously recognized, Defendants' argument that the implied covenant does not apply because of the "best interests" provision "is directly contrary to the D.C. Circuit's opinion" in *Perry II*.  *MTD Ruling*, 2018 WL 4680197, at *13.  *Perry II* held that the implied covenant applied notwithstanding stock certificate provisions providing that whether to declare dividends is in the "sole discretion" of the Board of Directors.  *Perry II*, 864 F.3d at 631.  Just as they failed to do in their motion to dismiss and motion for summary judgment, Defendants fail to explain why the discretion-conferring language in the "best interests" provision is any different. They cannot.  Neither the "sole discretion" language nor the "best interests of the Agency" language required FHFA to enter into the Net Worth Sweep; instead, both constitute the type of broad "discretionary right" that is subject to the implied covenant.

Defendants base their-re-argument on three inapposite cases they cited previously.  Mot. 19. But it is simply untrue that the contractual language in those cases is "materially indistinguishable" from the HERA "best interests" provision.  Mot. 22.  Each of Defendants' cases involves contractual language that contains its own good faith or similar standard, and hence does not call for application of the implied covenant.

In *Shareholder Representative Services LLC v. Medidata Solutions, Inc.*, the court concluded that the implied covenant did not apply because the contract contained language that is *not* in the HERA provision at issue here—*i.e.*, it provided for the defendant's right to operate the business "in any manner in which" the defendant "deems appropriate in its sole and *good faith* discretion."  2020 WL 972618, *5 (D. Del. Feb. 24, 2020) (emphasis in original).  In their brief, Defendants misleadingly removed the italics from the words "*good faith*"—revealing their

inability to accept the court's reasoning.  Mot. 21.  Defendants likewise fail to acknowledge that the contract in *Shareholder Representative* also required the defendants there to "use *commercially reasonable* efforts to achieve the full payment of the Earnout Purchase Price."  2020 WL 972618, at *5 (emphasis in original).  The court emphasized the words "good faith" and "commercially reasonable" because those words prescribed the use of discretion and hence left no room for the implied covenant.  Defendants ignore those words and distort the holding.

Defendants likewise ignore the language that was at issue in *Policemen's Annuity and Benefit Fund of Chicago v. DV Realty Advisors LLC*, 2012 WL 3548206 (Del. Ch. Aug. 16, 2012).  There, as in the *Shareholder Representative* decision, the contract stated that the Limited Partners must "*in good faith* determine" that removal of the Managing Partner "is necessary for the best interest of the" limited partnership.  *Id*. at *12 (emphasis added).  Thus, unlike here, where defendants rely on a general grant of statutory discretion that is not specific to a particular action and does not specify how the discretion is to be exercised, the contractual provision in *Policemen's Annuity* authorized discretion to engage in a particular act (removal of the Managing Partner) *and* specified how that discretion was to be exercised ("in good faith").  Because the contract expressly required the parties to act in good faith, there was no basis for implying an obligation to do so.

In the third case Defendants cite without discussing, *Heritage Handoff Holdings, LLC v. Fontanella*, 2018 WL 3580287, at *3 & n.1 (D. Del. July 25, 2018), the contract language required plaintiff to "cooperate fully, as and to the extent reasonably requested."  This is akin to imposing a good faith "reasonableness" standard, thus obviating the need for the implied covenant.  There is no such language in the PSPAs, so there is no basis for declining to apply the implied covenant.

Defendants also ignore that the *Policemen's Annuity* case they invoke cites *Wilmington Leasing v. Parrish Leasing Co., L.P.*, 1996 WL 560190 (Del. Ch. Sept. 25, 1996), a decision that

confirms the implied covenant applies even when the contract sets forth a standard for exercising contractual discretion. In *Wilmington Leasing*, the court held that the implied covenant applied to a contract granting the right to remove the General Partner if "the Limited Partners determine that the General Partner has failed or is unable to perform satisfactorily as General Partner." *Id.* at *1. While the contract delegated discretion to take a particular action according to a particular standard (removing a partner based on a determination of unsatisfactory performance), it did not prescribe *how* the discretion was to be exercised—and thus the implied covenant applied. *Id.* at *2.

Numerous other cases confirm this. *See Gerber v. Enter. Prod. Holdings, LLC*, 67 A.3d 400, 419–20 (Del. 2013) (applying implied covenant to contractual safe harbor provision providing that defendant would be conclusively presumed to be in compliance with an express contractual duty by obtaining a third-party fairness opinion), *overruled in part on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013); *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *6 (Del. Ch. Apr. 20, 2009) (implied covenant applied where contract granted the "power and authority" to, inter alia, "take all proper and necessary actions *reasonably required* to cause" the defendant "to perform and comply with the provisions" of "any loan commitment . . . or other contract, instrument or agreement to which" the defendant "is a party"); *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1207 (Del. 1993) (implied duty to act reasonably applied to a contractual provision that permitted the General Partner to prevent a Limited Partner from making a capital contribution upon making the determination it could have a material adverse effect).

Moreover, as this Court has also recognized, Defendants' argument is inconsistent with HERA's authorization for FHFA to repudiate contracts "while also providing for the assessment of damages when FHFA does so." *MSJ Ruling*, 2022 WL 4745970, at *7 (citing 12 U.S.C. §§

4617(d)(1), (3)).  Defendants argue (Mot. at 24) that this provision is irrelevant because the question "is whether the implied covenant applies in this case given that Plaintiffs' shareholder contracts, by incorporating HERA's 'best interests' provision, already specify the scope of FHFA's contractual discretion."  Defendants miss the point:  both sections 4617(b)(2)(J) and 4617(d) are incorporated into the contract, and the latter provision confirms FHFA must pay damages for a breach of contract and precludes any suggestion that HERA gave the conservator carte blanche to act in an arbitrary or unreasonable way that frustrates contractual expectations without paying damages.

> **B.    As This Court Has Already Correctly Ruled, *Collins* Does Not Foreclose Plaintiffs' Implied Covenant Claim.**

Defendants recycle their summary judgment argument that *Collins* forecloses Plaintiffs' implied covenant claim, asserting that, "*Collins* rejected the central element that Plaintiffs had to provide in order to establish a breach of the implied covenant—namely, that FHFA acted 'arbitrarily or unreasonably' by agreeing to the Third Amendment."  Mot. 24.  The Court rejected that argument in its summary judgment decision, *MSJ Ruling*, 2022 WL 4745970, at *5–6, and thus the law of the case doctrine requires its rejection here.  It is also meritless, as set forth below.

> **1.    The Jury In This Case Addressed A Question Not Presented In *Collins*.**

*Collins* addressed "whether FHFA exceeded its statutory authority under HERA by enacting the Third Amendment."  *MSJ Ruling*, 2022 WL 4745970, at *5.  The *Collins* plaintiffs sought to enjoin the Net Worth Sweep in an APA action, but 12 U.S.C. § 4617(f) provided that "no court may take any action to restrain or affect the exercise of powers or functions of the Agency as a conservator or a receiver."  The only way to get around that was for the plaintiffs to show that, on its face, the Net Worth Sweep could not reasonably fall within even the outer boundaries of FHFA's statutory powers.  The Supreme Court expressly limited its holding to a rejection of that

claim: "we conclude *only* that under the terms of the Recovery Act, the FHFA did not exceed its authority as a conservator, and therefore the anti-injunction clause bars the shareholders' statutory claim." *Collins*, 141 S. Ct. at 1778 (emphasis added).

By contrast, the trial in this action required the jury to apply "a different type of reasonableness analysis" based on the standard for evaluating damages claims for violation of the implied covenant of good faith and fair dealing. *MSJ Ruling*, 2022 WL 4745970, at *5. A "party to a contract violates the implied covenant of good faith and fair dealing if it acts arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected." *Id.* (cleaned up). Under this inquiry, the "question is not whether defendants acted reasonably *in the abstract*," but rather whether they acted arbitrarily or reasonably "in reference to" shareholders' reasonable expectations. *Id*. at *5–*6 (emphasis in original). What is arbitrary or reasonable thus depends upon "the parties' reasonable expectations." *Id*. at *5. In *Collins*, the Supreme Court was not applying Delaware and Virginia law governing the implied covenant of good faith and fair dealing, did not purport to define the content of shareholders' "reasonable expectations," and did not purport to assess the Net Worth Sweep's reasonableness or arbitrariness with reference to those expectations. The D.C. Circuit's opinion in *Perry II* confirmed that these are different inquiries: it remanded the implied covenant claim while affirming the dismissal of the APA claim by holding that the Net Worth Sweep was within FHFA's statutory authority, precisely as *Collins* did.

Defendants ignore this and assert that "Plaintiffs' evidence and arguments to the jury at trial" were "materially indistinguishable" from the arguments made in *Collins*. Mot. 27. They say (Mot. at 28) that because HERA was part of shareholders' expectations, any action within that authority must be within the "reasonable expectations" shareholders had. These arguments are

wrong.

First, Defendants ignore the difference in the legal standards that the Supreme Court applied and the nature of the implied covenant inquiry. As shown in Section II(A), an act can simultaneously fall within the scope of delegated discretion *and* violate the implied covenant because the implied covenant measures whether ***the manner*** in which that discretionary power was exercised was arbitrary or unreasonable in relation to contractual expectations.

Second, under the prior rulings of this Court and the D.C. Circuit in *Perry II*, HERA was not the sole source of shareholders' reasonable expectations. Rather, those expectations stemmed from various sources, including FHFA's contemporaneous statements explaining that the purpose of the conservatorship was to "preserve and conserve" the assets of the Companies, and to "stabilize a troubled institution with the objective of returning the entities to normal business operations." *Perry II*, 864 F.3d at 631; *see also MTD Ruling*, 2018 WL 4680197, at *9; Ex. A 3016-17 (jury instructions).

Third, the whole point of *Collins* was that the Supreme Court did not determine whether the Net Worth Sweep was arbitrary and capricious under the APA. To the contrary, it held that no such APA review of the substantive reasonableness of the Net Worth Sweep was permitted because the action was not *ultra vires*. The Supreme Court has never held, and FHFA would never concede, that an argument over whether an FHFA action is *ultra vires* depends upon the substantive reasonableness of that action. It does not. Thus, the question of the substantive reasonableness of the Net Worth Sweep simply was not presented or resolved in *Collins*—let alone the question of its reasonableness when compared to the reasonable contractual expectations of shareholders.

> **2.   Because It Addressed A Different Question, The Jury Considered Evidence Not Considered In *Collins*.**

Defendants presented the Court with a chart intended to show that the evidence and

arguments made to the Supreme Court are "materially indistinguishable" from those made to the jury. That is false for three reasons. First, the arguments made in *Collins* were directed at a different legal question and standard, as shown above. Second, *Collins* was decided on the pleadings, without consideration of any evidence or factual record. Third, Defendants' disingenuous chart ignores most of the evidence presented at trial. Defendants summarize just two arguments: (i) that the Net Worth Sweep was unreasonable because the GSEs had reached sustained profitability, and (ii) that the payment in kind option was a foolproof solution to the circular dividend problem the FHFA was purportedly trying to solve. This "summary" ignores at least three categories of evidence and associated arguments derived from days of trial testimony from fact and expert witnesses, as well as scores of trial exhibits: (a) evidence of shareholder expectations about the conservatorship, (b) evidence that the circular dividend rationale was pretextual, including for an alternate agenda that contradicted reasonable contractual expectations, and (c) evidence that Defendants followed an arbitrary process that shareholders could not reasonably have expected. Each of these disproves Defendants' contention that the Supreme Court somehow based its *ultra vires* analysis on a rejection of "the same evidence."

        a.      **The jury was presented evidence of shareholder expectations that was not relevant in *Collins* and thus not considered in *Collins*.**

In rejecting precisely the same APA claim and *ultra vires* argument that was rejected in *Collins*, the D.C. Circuit remanded the implied covenant claim and held that the reasonable contractual expectations of shareholders needed to be considered in light of "pertinent statements by the FHFA" about the conservatorship. *Perry II*, 864 F.3d at 631. In denying the motion to dismiss on remand, this Court likewise held that such statements were relevant to the reasonable contractual expectations of shareholders. *MTD Ruling*, 2018 WL 4680197, at *9, *13.

At trial, Plaintiffs presented extensive evidence showing that, at the time the

conservatorship was imposed in September 2008, FHFA repeatedly said the conservatorship was intended to restore Fannie and Freddie to sound and "solvent" condition (meaning having a positive net worth), to "preserve and conserve" their assets (not give them away), to be of "limited duration," and to return the Companies to "normal business operations" so they can be "returned to the shareholders," as the "economic interests of shareholders have not been eliminated."[3] Plaintiffs also showed that HERA provided that "Treasury was required to consider" the plan "for the orderly resumption of private market funding or capital market access" and the "need to maintain" each GSE's status "as a private shareholder-owned company." Ex. A at 2522:21-2523:6. As this Court held, these "provisions signal to shareholders a Congressional expectation that the GSEs would work back towards normalcy, and lend support to Plaintiffs who claim they could not reasonably expect the Net Worth Sweep (which essentially closed access to capital markets)." *MTD Ruling*, 2018 WL 4680197, at *13.

The above evidence was not relevant to the *ultra vires* question resolved in *Collins* and *Perry II*. But in resolving the implied covenant claim remanded by *Perry II*, a jury could reasonably conclude from such evidence that the Net Worth Sweep was inconsistent with the reasonable contractual expectations of shareholders.

> **b.    The jury was presented evidence of motive and pretext that was not relevant in *Collins* and thus not considered in *Collins*.**

The *ultra vires* question resolved in *Collins* did not depend on the factual question of whether FHFA may have acquiesced to the Net Worth Sweep for reasons other than, or in addition to, a concern about future circular dividends potentially eroding the Treasury Commitment. By

---

[3] Ex. A at 575:2-8 (reading Ex. C at 29 (PX-2E)); *id.* at 575:18-24 (reading Ex. C at 502 (PX-521)); *id.* at 576:14-15; *id.* at 746:5-14; *id.* at 1130:25-1131:6; *id.* at 1135:8–10; *id.* at 1135:19-20; *id.* at 2425:12-17, 2426:5-17 (reading Ex. C at 542, 546 (DX-102; DX-103)).

contrast, in this case, the question of whether FHFA agreed to the Net Worth Sweep for reasons that are inconsistent with the reasonable expectations of shareholders was directly relevant. *MTD Ruling*, 2018 WL 4680197, at \*13 (ruling that evidence of "pretext" was relevant to showing breach of implied covenant). At trial, Plaintiffs presented ample evidence from which a reasonable jury could conclude that the FHFA acquiesced to the Net Worth Sweep for reasons that directly contradicted the reasonable contractual expectations of shareholders.

Specifically, Plaintiffs presented evidence that at the time it agreed to the Net Worth Sweep, FHFA knew that:

- the GSEs had reached a period of "sustainable profitability" and would be generating large revenues in the coming years in excess of the 10% dividend, Ex. A at 996:20-24, 997:15-21, 998:4-11, 999:15-18; Ex. C at 96 (PX-205);

- the GSEs were looking forward to the "golden years" of GSE earnings and "a roaring recovery" based on an inflection point in the credit cycle and the reversal of the massive write downs they had taken for loan loss reserves, Ex. C at 178, 279 (PX-213); Ex. C at 94 (PX-196); Ex. C at 90 (PX-147);

- the GSEs were projecting that by 2020, cumulative dividends to Treasury would exceed Treasury's investment, Ex. C at 311 (PX-216);

- the boards of both GSEs were anticipating being required to reverse the accounting write down on their deferred tax assets in the near future, which would add over $70 billion to their net worth (which is exactly what happened in 2013), Ex. A at 996:21-997:4, 999:15-1000:7, 1002:2-6, 1003:17-1004:6, 1004:9-14; *see also* Ex. C at 568 (DX-645); Ex. C at 570 (DX-675); *see also* Ex. A at 650:4-18; Ex. C at 24 (PX-1-O); Ex. C at 25 (PX-1-P);

- a June 25, 2012 Treasury memo recorded Acting FHFA Director Mr. DeMarco telling Secretary Geithner that he saw "no urgency" to agree to the Third Amendment because "the GSEs will be generating large revenues over the coming years, thereby enabling them to pay the 10% annual dividend well into the future…" (Ex. C at 96 (PX-205));

- during the seven week period between that late June 2012 meeting and the August 17, 2012 agreement to the Net Worth Sweep, there is not a single FHFA document expressing any concern about the impending imposition of caps on the Treasury commitment or about the risk of future circular draws eroding those capped commitments—nor any memo discussing the need for the Net Worth Sweep to address that risk, Ex. A at 2401-03;

- when the Treasury point person on the Third Amendment discussions learned on July 31, 2012 that the Companies were about to record large profits in the second quarter of 2012

in amounts that exceeded the 10% dividend and allowed them to start building net worth, he wrote "Really makes sense to push the net worth sweep this quarter."  Ex. C at 427 (PX-226A);

- a little over a week later, Mr. Ugoletti reported to Mr. DeMarco that there was "a renewed push" from Treasury for the Third Amendment and its Net Worth Sweep, Ex. C at 436 (PX-247); Ex. A at 2472:21-2474:14; Ex. A at 2305:2-5 (referencing Ex. C at 436 (PX-247)) ("renewed push" for PSPA amendment came from Treasury);

- the Treasury made clear that its goal in pushing the Net Worth Sweep was to "demonstrate wind down" and to ensure the GSEs "will not be allowed to retain profits, rebuild capital, and return to the market in their prior form," Ex. C at 458 (PX-278); Ex. C at 460 (PX-282); Ex. C at 520 (PX-566); Ex. C at 551 (DX-404)—this was the "message" Treasury wanted the Net Worth Sweep to convey, Ex. C at 519 (PX-550);

- likewise, when the FHFA's senior accountant learned on August 14, 2012, about the potential restoration of the deferred tax assets, he thought it did not make sense because the Net Worth Sweep was "designed to demonstrate wind down"—an understanding he expressed shortly after having a meeting with Mr. DeMarco to discuss the Third Amendment, Ex. C at 437 (PX-259); *see also* Ex. A at 1434:8-14 (reading Ex. C at 437 (PX-259);

- at least one document stated that "FHFA and Treasury share common goals to promote a strong housing market recovery, reduce government involvement in the housing market over time and to provide the public and financial markets with a clear plan to wind down the GSEs."  Ex. C at 88 (PX-144).

A reasonable jury could have concluded from all this evidence that a principal driver for FHFA's decision to agree to the Net Worth Sweep was its desire to wind down the GSEs and prevent them from rebuilding capital, and that this would contradict the reasonable contractual expectations of shareholders.  At a minimum, a reasonable jury could have concluded from this evidence that FHFA acquiesced to Treasury's desire to fulfill those goals, and that doing so was inconsistent with the reasonable contractual expectations of shareholders.

Moreover, a reasonable jury could have found that testimony by key FHFA witnesses was not credible, further supporting a conclusion that FHFA's reasons for agreeing to the Net Worth Sweep were pretextual or otherwise inconsistent with reasonable shareholder expectations.  For example, by categorically and unequivocally denying that he ever made the statements

contemporaneously recorded in the June 25, 2012 Treasury memo, Ex. C at 96 (PX-205), Mr. DeMarco contradicted his prior sworn testimony—where, when directly asked if he made those statements, he repeatedly testified that he simply could not remember whether he did or did not make them. *Compare* Ex. A at 2301:14-2303, *with* Ex. A at 2371:23-2373:1; Ex. D (DeMarco Dep. Tr.).  A reasonable jury could have found this non-credible.  Likewise, a reasonable jury could have found non-credible the testimony of FHFA chief accountant Mr. Satriano, when he gave a highly implausible account of his understanding of the "demonstrate wind down" document, claiming he understood it to refer only to a slight acceleration in the reduction of the GSEs' "retained portfolio," rather than the decision to sweep all future profits to Treasury.  Ex A at 1728:24-1742:13; *see also* Ex. A at 1178:25-1181:3; Ex. C at 494, 496-497 (PX-460).  The jury also had reason to doubt the credibility of the FHFA's "point person" Mr. Ugoletti, both (a) as a negotiator, since he had negotiated earlier versions of the PSPAs on Treasury's behalf while employed there, and seemed oblivious to whether he might have a conflict of interest, Ex. D (Ugoletti Dep. Tr.) 37:6-9, 45:8-15, and (b) as a witness, since Mr. Ugoletti executed a sworn declaration at the outset of this litigation stating that the Net Worth Sweep "would not" increase compensation to Treasury, and that FHFA knew nothing about the potential reversal of the DTA allowances—both facts that Plaintiffs easily disproved, *compare* Ex. C at 472-473 (PX-351); Ex. A at 40:15-41:17, *with* Ex. C at 24 (PX-1-0); Ex. C at 437 (PX-259).

     **c.**    **The jury was presented evidence of an arbitrary and unreasonable process that was not relevant in *Collins* and thus not considered in *Collins*.**

*Collins* did not address the FHFA's process for agreeing to the Net Worth Sweep, as that by definition had no relevance to the *ultra vires* question it resolved.  By contrast, the jury in this case was asked whether ***the manner*** in which FHFA exercised its power to agree to the Net Worth

Sweep was arbitrary and unreasonable in a way that contradicted reasonable contractual expectations. There was ample evidence from which a reasonable jury could conclude that the answer to that question was Yes, including not just the evidence referenced above, but also this:

- The absence of a single FHFA memo evaluating whether to enter into the Net Worth Sweep, analyzing the pros and cons, or discussing it in any way, Ex. A at 2401:18-21;

- The failure to update projections in light of the favorable financial news and to consider whether the Net Worth Sweep was necessary in light of the revised projections, *id.* at 2527:24-2528:13;

- The failure to consider whether the Net Worth Sweep was advisable in light of the reasonably foreseeable write-up of the Deferred Tax Assets, *id.* at 2445:20-25;

- The failure to discuss the Net Worth Sweep with key GSE leadership, *id.* at 2527:6-2531:7;

- Expert testimony that such actions were inconsistent with how corporations typically reach such decisions, *id.* at 1228:12-1231;

- The failure to perform any analysis of an appropriate periodic commitment fee despite proffering that as a secondary rationale for the Net Worth Sweep. *Id.* at 2397:17-20; Ex. D (Ugoletti Dep. Tr.) 169:2-10 (played in Plaintiffs' case); Ex. A at 875:19-876:17;

- The failure to consider *any* alternatives. Ex. A at 1221:12-21 (failure to consider payment in kind alternative); *id.* at 1225:20-1226:24 (failure to consider other alternatives); *id.* at 1230:12-17 ("So just to repeat, there's a variety of things the FHFA could have considered. And this is in addition to the PIK I already mentioned, but all the other alternatives. And there was no documentation, there was no memo, there's no analysis that showed that they had done anything to identify these alternatives.").[4]

A reasonable jury could conclude that the utter lack of process or reasonable consideration of necessity or alternatives was totally inconsistent with reasonable contractual expectations. By contrast, that kind of inquiry was, by definition, irrelevant to the issue in *Collins*.

### C.   The Court Correctly Concluded That Plaintiffs' Implied Covenant Claim Is Not A Claim For Anticipatory Breach.

Defendants argue that Plaintiffs' implied covenant claim is an anticipatory breach claim

---

[4] Both parties' experts agreed that the failure to consider any alternatives is contrary to standard practice for a decision of the magnitude of the Net Worth Sweep. Ex. A at 1230:10-1231:13 (Dr. Dharan); *id.* at 2071:2-7 (Dr. Attari).

that is precluded by the rule that such claims cannot be brought in connection with unilateral contracts.   The Court rejected this argument when it rejected Defendants' motion for reconsideration of the 2018 *MTD Ruling*.  Class ECF 104 at 2-4.

As the Court explained in denying Defendants' motion for reconsideration, "Anticipatory breach is 'a doctrine of accelerated ripeness' . . . .  The implied covenant, on the other hand, is an ongoing obligation; performance is always due."  *Id.* at 3 (quoting *Perry I*, 864 F.3d at 633).  That ongoing obligation is to refrain from acting arbitrarily or unreasonably with respect to contractual expectations for the length of the contractual relationship.  *Id.*  Plaintiffs' implied covenant claims thus "do not seek to hold defendants presently accountable for a future breach of an express provision" but rather "seek to hold defendants presently accountable for a present breach of an implied promise inherent in every contract—that both parties will operate in good faith and not violate their co-contracting party's reasonable expectations."  *Id.*

Defendants have never had any credible answer to the Court's reasoning and still do not. Instead, they argue for several pages that an implied covenant claim is a claim for breach of contract.  That misses the point and the basis for this Court's conclusion.  The Court never said that an implied covenant claim is something other than a claim for breach of contract.  Instead, it held that implied covenant claims challenge "a *present breach* of an implied promise inherent in every contract" not to act arbitrarily or unreasonably with respect to contractual expectations.  *Id.* (emphasis added).

Defendants also claim that Plaintiffs' claim "rests on future performance" because part of the Net Worth Sweep's harm was that it eliminated the possibility of receiving dividends in the future.  Mot. 30.  Relatedly, Defendants argue that reliance on the immediate drop in value following the Net Worth Sweep is somehow inconsistent with the Court's conclusion because it is

based on an expectation that the Net Worth Sweep would preclude any future payment of dividends or liquidation preference.  Mot. 30-31.  These arguments are wrong.  Regardless of the harm that flows from a present breach, it remains the case that the Net Worth Sweep did not breach a future obligation to pay dividends but rather breached a present and ongoing obligation to act in good faith.

Finally, Defendants argue that if the Court does not reconsider its conclusion, "little would remain of the unilateral-contract limitation on anticipatory breach claims" because a plaintiff "could easily circumvent this limitation by recharacterizing the alleged anticipatory breach of contract as a present breach of the implied covenant."  Mot. 34.  But it is not easy to recharacterize an anticipatory breach claim as an implied covenant claim; there either is *present conduct* that breaches the implied covenant or there is not.  There is a material factual difference between conduct that has already occurred that breached the ongoing implied covenant obligation, and an anticipated future breach of an express contractual obligation that will only come due in the future. The Court's prior ruling was thus correct and should not be revisited.

### D.  Plaintiffs Proved With Reasonable Certainty That The Third Amendment's Net Worth Sweep Caused Them Harm.

This Court has repeatedly rejected Defendants' damages arguments, and it should do so again on the present motion.  At summary judgment, the Court correctly held that Plaintiffs base their claim on the fact that "the Third Amendment, by eliminating any possibility of future dividends for [private] shareholders, deprived plaintiffs' shares of much of their value, even if such dividends were not reasonably certain to occur in the foreseeable future."  *MSJ Ruling*, 2022 WL 4745970, at *11.  As the Court properly held, "an event study by one of defendants' experts showing a sharp decline in stock prices after the Third Amendment's announcement refutes the claim that this action caused no harm."  *Id*.  Likewise, at the close of evidence at both trials, the

Court correctly rejected arguments about the evidentiary support for Plaintiffs' damages claims that are recycled again here.  Ex. B at 1818:18-1830:2; Ex. A at 1508:5-1512:15.  Thus, for the reasons set forth in Section I, the law of the case doctrine bars Defendants' damages arguments. Nevertheless, we also show below that each of Defendants' three damages arguments is meritless.

> **1.    A Reasonable Jury Could Find From The Evidence That The Net Worth Sweep Has Harmed Current Shareholders.**

Defendants first argue that Plaintiffs had the burden of showing that "but for the Third Amendment, the market value of their shares would be higher today than it actually is," and that Plaintiffs failed to meet this burden by not showing "how much their shares would be worth *today* absent the Third Amendment."  Class ECF 423 at 37 (emphasis in original).  But Plaintiffs were not required to show what the share price would be "*today*" in order to meet their burden to prove that current shareholders are harmed.  Defendants are once again confusing the evidence that proves the existence of harm with the evidence that proves a reasonable estimate of that harm. Plaintiffs presented ample evidence that current shareholders are harmed by the Net Worth Sweep, including that:

- The Net Worth Sweep caused over $150 billion in value to be transferred to Treasury beyond what would have been transferred under the original 10% dividend.  *See* Ex. A at 912:2-13.

- The Net Worth Sweep gave Treasury 100% of all the Companies' future profits and net worth, making it impossible for private shareholders ever to receive anything.  *Id*. at 1121:9-1122:16.

- The Companies in which current shareholders own stock would obviously benefit from having over $111 billion in excess cash dividends the Net Worth Sweep caused them to transfer to Treasury, over and above what the 10% cash dividend would have required— as even Mr. DeMarco admitted.  *Id*. at 2392:19-2395:5.

- The harm from the Net Worth Sweep remains in place today (*id*. at 767:2-4), with 100% of the net worth generated by each Company each quarter still being transferred to Treasury—meaning that Treasury along among shareholders owns and benefits from all such increases in net worth.  *Id*. at 1231:6-9 (Plaintiffs' expert Dr. Dharan: "Here we are .

. . talking about giving of a hundred percent of the profits of Fannie Mae and Freddie Mac, really, ***forever***, right?  ***Basically for all future periods***." [5]

This is more than enough evidence to allow a reasonable jury to conclude that the Net Worth Sweep has caused, and is continuing to cause, substantial harm to all current private shareholders.  Defendants are simply wrong to assert that the only evidence of such harm was the one-day stock from the date the Net Worth Sweep was announced.  All of the foregoing evidence demonstrated harm to all current private shareholders.  The one-day stock drop was the evidence used to provide a reasonable estimate of the *measure* of that harm.  But it was far from the only evidence as to the *existence* of that harm, which included the list set forth above.

Defendants raise another red herring by claiming Plaintiffs relied on the "*ipse dixit*" of Dr. Mason that the harm caused by the Net Worth Sweep persists to this day.  Class ECF 423 at 39 (quoting Ex. A at 767:2-4).  But Dr. Mason's testimony was not *ipse dixit*; it was supported by his expert review of all of the evidence set forth above, including most importantly the obvious, common-sense fact that the Net Worth Sweep remains in place.  A reasonable jury could rely on all of the foregoing to conclude that the Net Worth Sweep has harmed (and is harming) current shareholders.

2.   **A Reasonable Jury Could Find That Share Price Increases After The Third Amendment Are Irrelevant And In No Way Mitigate The Harm Caused By The Net Worth Sweep.**

Defendants argue that price increases weeks or months after the Third Amendment "negate Plaintiffs' attempt to prove with reasonable certainty that the Third Amendment caused Plaintiffs (current holders) any actual harm."  Class ECF 423 at 39. That is incorrect for several reasons.

---

[5]   *See also* Ex. A at 2401:9-15 ("Q. But isn't it a fact Mr. DeMarco, a simple fact, that before you agreed to the net worth sweep, before you agreed to give away 100 percent of Fannie and Freddie's profits and net worth forever, you never had anyone do a study or written analysis or memo of any kind trying to determine the likelihood of an outcome like the 2013 outcome?  Isn't that correct? A. That's correct.").

First, Defendants' argument is based on a fundamental misconception about the relevance of the one-day stock drop. As this Court has previously ruled, "The drop in the stock is not itself the alleged injury" but is instead "just a measure of damages" for the injury—which is the harm caused by the Net Worth Sweep, which eliminated any possibility of dividends and permanently alienated shareholders from the profits of the Companies. Ex. B at 1830, 2449-2450. By contrast, in the securities fraud cases Defendants cite, plaintiffs sue to collect damages for the harm caused by the stock drop itself—meaning, the stock drop from a previously concealed disclosure is the harm itself that triggers the lawsuit, rather than a reasonable estimate used to measure the harm that triggered the lawsuit. By failing to recognize this distinction, Defendants are advancing completely misguided arguments to show that "the harm" was eliminated by subsequent share price rises. It was not. The harm from the Net Worth Sweep persists to this day because the Net Worth Sweep persists to this day, as Plaintiffs' expert testified. Ex. A at 767:2-4; *see also* Section III(A), above. Logically, any share price increases could only have been caused by developments unrelated to the Net Worth Sweep, which could not eliminate the harm caused by the Sweep.

Indeed, the evidence before the jury made crystal clear that any subsequent price increase had nothing to do with any amendment or mitigation of the Net Worth Sweep. The Defendants' expert's own event study confirms that. It lists the events to which it attributes the subsequent changes in stock price, and none have anything to do with the Net Worth Sweep. Ex. C at 487-489 (PX-375). Ex. C at 474 (PX-375) was prepared by Defendants' expert Dr. Attari; if he believed any of the subsequent share price increases in the report mitigated Plaintiffs' damages, he could have testified to that. Instead, he chose not to testify about his event study at all.

Further, a reasonable jury could conclude that stock price increases several weeks or months after the Third Amendment were irrelevant. That positive developments at the GSEs

caused price increases is in no way inconsistent with this fundamental fact: the Net Worth Sweep causes permanent and ongoing harm to private shareholders by making it impossible for them to ever receive anything from the Companies, and by giving everything to Treasury.

In addition, to the extent Defendants are arguing that subsequent price increases mitigated the harm caused by the Net Worth Sweep, they are dead wrong as a matter of both substance and process.  Once Plaintiffs came forward with evidence of the harm resulting from the Net Worth Sweep, it was *Defendants'* burden to introduce logical evidence of mitigation of that harm, if they could.[6]  Defendants failed to make any effort to carry their burden to prove mitigation.  Defendants' expert Dr. Attari did not introduce any evidence related to purported mitigation of damages; indeed, he did not testify about damages at all.

Independent of all of the above, Defendants also waived this entire argument when they expressly agreed they "would not ask Dr. Mason questions about 'price recovery' *or otherwise argue to the jury that the share-price increases after August 17, 2012 mitigated Plaintiffs' alleged damages*."  Ex. E.  Defendants argue this agreement did not relieve Plaintiffs from their burden of proof (Class ECF 423 at 37 n. 6), but that makes no sense given that Plaintiff presented ample evidence of both harm and of how reasonably to measure that harm, and it was Defendants' burden to prove mitigation.

Defendants' fundamental misconception leads them to invoke obviously inapposite case law involving claims of securities fraud.  In *Ross v. Walton*, 668 F. Supp. 2d 32, 41 (D.D.C. 2009), the plaintiffs alleged that the defendants' issuance of a press release disclosing an indictment

---

[6] *W.G. Cornell Co. of Washington, D. C. v. Ceramic Coating Co.*, 626 F.2d 990, 993 (D.C. Cir. 1980) (citing 5 A. Corbin, Contracts s 1039 (1963) ("It is well established that the burden of proving damages could have been mitigated falls on the party who breached the contract…..."[h]aving failed to carry this burden, or even raise the question at trial, [the defendant] cannot now claim that the award was improper" because the damage was mitigated.")

caused them economic loss because it caused their stock price to drop.  Those plaintiffs were not suing over a permanent impairment and harm to their shares caused by a fundamental and permanent change to the capital structure of the company.  Instead, they were suing over the stock drop itself.  And the facts showed that on the very same day of the press release, the company's stock price *rose* immediately after the disclosure, thus undermining the proposition that it was the press release that caused any brief decline in price, or that any loss was suffered at all.  *Id*.  By contrast, in this case, Plaintiffs are suing over the permanent harm they have suffered from the Net Worth Sweep, which remains in effect to this day.  As for the measurement used to provide a reasonable estimate of that harm, as shown in Section III(C), below, the evidence overwhelmingly showed that the stock drop on August 17, 2012 was clearly caused by the announcement of the Net Worth Sweep.  *Ross* is thus completely inapposite.

    *Ross* is also irrelevant because it is based on the flawed reasoning of *Malin v. XL Capital Ltd.*, 2005 WL 2146089 (D. Conn. 2005), which the Second Circuit subsequently vacated in *Acticon AG v. China N. E. Petroleum Holdings Ltd*., 692 F.3d 34 (2d Cir. 2012), explaining that it was "improper to offset gains that the plaintiff recovers after the fraud" if "the stock recovers value for *completely unrelated* reasons."  *Acticon*, 692 F.3d at 41.  Notably, the *Acticon* court cited *Ross* and *In re Immucor, Inc. Sec. Litig*., 2011 WL 3844221, at *2 (N.D. Ga. Aug. 29, 2011)—both cited by Defendants here—as cases that are "inconsistent with both the traditional out-of-pocket measure for damages and the 'bounce back' cap imposed in the PSLRA."  692 F.3d at 39.  *See also In re Harman Int'l Indus., Inc. Sec. Litig*., 791 F.3d 90, 111 (D.C. Cir. 2015) (plaintiff may plead a loss by alleging "marked declines in the Company's stock price" following an alleged corrective disclosure, with no reference to supposed need to rule out a subsequent price increase).

    Defendants quote the Supreme Court's decision in *Dura Pharms., Inc. v. Broudo*, 544 U.S.

336 (2005), a securities fraud decision about loss causation, not mitigation.  Again, this case is irrelevant because it addresses claims that seek to recover for the harm of a stock drop, rather than a harm caused by a capital restructuring that is permanent, and that is reasonably estimated by a stock drop.  *Dura* held that a stock price decline might be caused by "changed economic circumstances" or other factors unrelated to discovery of an alleged misrepresentation. *Id.* at 347. That has no bearing here.  As shown below, the evidence showed that the only plausible cause for the August 17, 2012 stock drop used to estimate damages in this case was the Net Worth Sweep. As shown above, the events linked to subsequent price changes are unrelated to the Net Worth Sweep and those prices changes are thus irrelevant to measuring the harm caused by the Net Worth Sweep.[7]

### 3. A Reasonable Jury Could Find That The One-Day Decline In Share Prices On August 17, 2012 Was Caused Solely By The Net Worth Sweep.

Defendants claim that Plaintiffs "introduced no evidence to exclude an alternative cause of the share-price drop" that occurred on August 17, 2012—namely, that the Third Amendment's slight acceleration in the pace of the reduction of the retained portfolio from 10% per year to 15% per year.  Class ECF 423 at 42-43.  That is not correct.  It is also absurd, given the enormous difference between the Net Worth Sweep and marginal change in portfolio reduction.

Contrary to Defendants' assertions, Plaintiffs' expert Dr. Mason, who has performed "hundreds" of event studies over the course of his longstanding career, Ex. A at 751:9-12, testified that he considered the accelerated reduction of the retained portfolio in formulating his opinion on

---

[7] Likewise, *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, 594 U.S. 113 (2021), has nothing to do with the claim in this case.  It holds that a securities fraud plaintiff must show a nexus between a corrective disclosure and the price inflation linked to a prior misrepresentation; it did not hold that such a plaintiff must rule out subsequent price increases, let alone anything about what plaintiffs must do when recovering damages for permanent harm caused by a capital restructuring.

damages and ruled it out as a cause of the stock price decline on August 17, 2012:

> Q.    Professor, in your opinion, is there any reason to believe that anything besides the net worth sweep could have caused the huge decline in stock price on August 17th, 2012?
>
> A.    No.
>
> Q.    Is it true that at the same time that the FHFA announced the net worth sweep, it also announced that Fannie and Freddie would accelerate the reduction of Fannie and Freddie's retained mortgage portfolio from a 10 percent reduction per year to a 15 percent reduction per year?
>
> A.    Yes.
>
> Q.    In your view, did that news cause the stock price declines on that day?
>
> A.    No.

Ex. A at 769:8-20.  *See* Ex. A at 3009:18-3010:16 (jury instructed it may consider witness's "experience, training, or education" in accepting a witness's opinion).

Dr. Mason also testified why the accelerated reduction of the retained portfolio need not be disaggregated from other aspects of the Third Amendment: because, as a matter of financial economics, the effect of the accelerated reduction of the retained portfolio was entirely eclipsed by "*the overriding effect*" of the Net Worth Sweep. *Id.* at 769:22-770:1.  Dr. Mason also ruled out the accelerated reduction of the retained portfolio as something that had to be disaggregated "[b]ecause the overriding effect here comes from Treasury taking all the money generated by the firms no matter whether that was a little larger or a little smaller as a result of this change to the target for the retained portfolio, which is just a piece of the firm anyway." *Id.* at 769:21-71:1.

Further, while Defendants assert that Dr. Mason admitted that the Attari event study did not distinguish between the impact of the Net Worth Sweep and the acceleration of the reduction of the retained portfolio, they ignore that Dr. Mason also testified that he did not rely solely on Dr. Attari's event study in reaching his own conclusions.  When asked, "So did you limit your analysis

in this case just to the work that Dr. Attari did?" Dr. Mason responded "No" (*id*. at 752:20-22), and on cross-examination, Dr. Mason testified that "*I did look at things beyond this event study*." *Id*. at 780:7-8; *see id*. 752:23-753:5 ("I reviewed a wealth of materials, including financial filings by Fannie Mae and Freddie Mac, FHFA reports, documents produced in this case, emails, deposition testimony, court documents. A lot of materials and background."); *id*. 753:22-753:12, 757:9-11 (referencing Dr. Mason's independent corroboration of the underlying materials comprising the event study conclusions). Dr. Mason also stressed that his analysis was focused on "the effect of the net worth sweep" as a whole. *Id*. at 781:8-15. Further, Dr. Mason drew from his deep experience in financial economics and as an historian of past financial crises to conclude that the impact of the Net Worth Sweep was "very dramatic," and that "in my study of financial crises from my entire career, I've never seen this done before, just taking all the profits and saying to shareholders." *Id*. at 765:12-766:2. And Dr. Mason disagreed that he arrived at his damages number of $1.61 billion "just by adding up the decline in market value for that one day on August 17th, 2012", stating "*I also looked at other potential effects within the third amendment*. So there was a bit more than adding up." *Id*. at 790:16-791:7.

Defendants also ignore that Plaintiffs presented evidence showing that the increase in the Companies' G-fees outweighed any reduction in income caused by the reduction of the retained portfolio. *Id*. at 1179:17-1180:8; *see also* 1175:23-1176:20. Plaintiffs also presented evidence corroborating Dr. Mason's testimony that, in contrast to the marginal relevance of the reduction rate for the portfolio, the Net Worth Sweep was totally unprecedented in U.S. financial history. *Id*. at 1123:10 (Plaintiffs' expert Dr. Dharan: the Net Worth Sweep was "very unprecedented"); *id*. at 898:13-19 (Plaintiffs' expert Dr. Anjan Thakor: "It's unprecedented.").

Based on all the foregoing, a reasonable jury could have found that the Net Worth Sweep

was the sole cause of the massive share price drop on August 17, 2012, and that a slight change in the pace of retained portfolio reduction was not a significant financial event.

Defendants are wrong to suggest otherwise.  They seem to be suggesting that Dr. Mason was legally required to do an econometric disaggregation analysis of some kind in order to offer the testimony quoted above.  That is incorrect.

As the court held in *In re Allergan PLC Securities Litigation*, plaintiffs only "need to disaggregate any *legitimate* confounding factors to prove economic loss."  2021 WL 4077942, at *15 (S.D.N.Y. Sept. 8, 2021); *see also Harman*, 791 F.3d at 111; *Tesla Securities Litigation*, 2022 WL 7374936, at *11 (N.D. Cal. Oct. 13, 2022) (rejecting defendants' challenge to plaintiffs' expert for failure to disaggregate impact of two different aspects of Elon Musk post *because* there was "a factual basis for [the expert's] assumption that the [challenged portion of the statement] rather than [other portions of the statement] caused" the change in the company's stock price).

Here, the accelerated reduction in the size of the retained portfolio did not comprise a "legitimate confounding factor" separate from the overring impact of the Net Worth Sweep.  As shown above, it was the unrebutted opinion of Plaintiffs' experienced expert that he did not need to disaggregate it. Defendants' expert, Dr. Attari, conceded that he "agree[d] with th[e] characterization" of former Freddie Mac CEO Donald Layton that "the rate of reduction of the retained portfolio was only, quote, '***slightly speeded up***,' end quote, as a result of the third amendment, and that "quote 'The ***numbers were not that large at that point***,' end quote, ***relating to the retained portfolio***."  Ex. A at 2000:11-20 (emphasis added).

And as this court held in rejecting Plaintiffs' effort to preclude Dr. Attari from testifying, without doing any disaggregation analysis at all, that the Net Worth Sweep caused GSE bond prices to increase because it eased concerns over future circular draws eroding the Treasury

Commitment—rather than because it signaled a material reduction in supply of future GSE bonds (as FHFA documents said at the time, Ex. C at 460 (PX-282))—such criticisms go to the weight of the testimony for the jury to resolve. Class ECF 344 ("Dr. Attari has explained why he discounted that explanation" and "[i]f plaintiffs do not think his explanation is good enough, that is fodder for cross-examination or dueling expert testimony, not exclusion by the Court.").  At trial, Plaintiffs introduced PX-282, an internal FHFA email from August 17, 2012 (the day of the Net Worth Sweep) which attributed tightening yield spreads of longer-term GSE bonds post-Third Amendment to the fact that "as the Enterprises wind down there will be less longer term debt issued, leaving investors to fight over existing supply"—and not to the fact that the New Worth Sweep allayed any market concerns. Plaintiffs also attacked Dr. Attari's conclusions at trial, questioning him about the composition of his event study that included less than 2% of all relevant GSE bonds (Ex. A at 1958:6-1970:22); establishing that relevant GSE bond yield spreads had been declining throughout 2012 up to the Third Amendment, thus demonstrating the market had no concerns regarding circular draws (Ex. A at 2058:11-2059:17); showing that the high credit ratings of Fannie and Freddie did not change prior to the Third Amendment, also signifying a lack of concern (Ex. A at 1953:4-1956:13); and demonstrating that the reduction in the retained portfolio was immaterial (Ex. A at 2000:11-20).

Thus, even when faced with an actually dubious failure to disaggregate what was actually a legitimate confounding factor, this court has already held in this case (*see* Class ECF 333, 334), as courts have likewise held in other cases, that a disagreement about what constitutes a confounding variable goes to the weight of the expert's opinion, not its admissibility; and here, the jury resolved any dispute over weight in favor of Plaintiffs. *Id.  See also Tesla*, 2022 WL 7374936, at *12 (to extent defendant argued plaintiffs' expert relied on "an improper assumption, in general

such issues are for the jury to assess."); *SEC v. Ustian*, 2020 WL 416289, at *11 (N.D. Ill. Jan. 26, 2020) (same); *SEC v. Jacoby*, 2022 WL 982542, at *3 (D. Md. Mar. 30, 2022) (same); *Baker v. SeaWorld Ent., Inc.*, 423 F. Supp. 3d 878, 934 (S.D. Cal. 2019) (same).[8]

## III.   THE COURT SHOULD REJECT DEFENDANTS' EFFORT TO OBTAIN JUDGMENT AS A MATTER OF LAW AGAINST POST-THIRD AMENDMENT PURCHASERS AS JUST ANOTHER MERITLESS ATTEMPT TO ATTACK THE DEFINITION OF THE CERTIFIED CLASSES.

After agreeing to the Class definitions and consenting to certification of the Classes more than two years ago,[9] Defendants have subsequently made a habit of attacking the definition and certification of those Classes.  Their current challenge, which comes in the poorly packaged guise of a purported "standing" argument, is indistinguishable from those the Court previously has rejected.  The Court should again reject Defendants' meritless arguments.

### A.   The Court Has Repeatedly And Correctly Rejected Defendants' Efforts To Attack The Definition Of The Certified Classes To Which They Stipulated.

Defendants raise two primary arguments in Section II of their Brief: (i) post-Third Amendment purchasers suffered no injury-in-fact and thus lack Article III standing to be part of the Classes, and (ii) Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing does not run with the shares and, thus, post-Third Amendment purchasers lack standing. Defendants have asserted these arguments no fewer than three times, and the Court has consistently rejected them.  Pursuant to the law-of-the case doctrine, the Court should decline to reconsider them now.

Defendants first raised these arguments during the first trial, both orally and through a

---

[8] Finally, any argument by Defendants that Dr. Mason needed to do more expert work to offer the testimony he offered is a belated and waived *Daubert* argument, not a basis for seeking relief under Rule 50(b).

[9] *See* Class EFC 133 (Stipulation for Class Certification); 135 (Joint Response to Court Order of November 15, 2021).

written Rule 50(a) Motion and Motion to Decertify the Classes, which the Court denied.  *See* Ex.

B at 1821-1827; *see also* Class EFC 248 and 249.  After Plaintiffs' case-in-chief in the first trial

in this Action, Defendants orally argued that there were "many class members who bought their

shares after the Third Amendment" who "suffered no harm."  *See* Ex. B at 1823.  In their written

Motion to Decertify the Classes, Defendants argued that "the classes now include a substantial

number of class members who suffered no injury or, at best, highly disparate injuries and damages

that make class treatment unworkable and inappropriate—and excludes the individuals who sold

their shares at a loss after the Third Amendment."[10] And in their written Motion for Judgment as

a Matter of Law Under Federal Rule of Civil Procedure 50(a), Defendants also argued that "the

claims of those who sold shares after the Third Amendment do not travel to subsequent purchasers

(who include current members of the classes)," and that "post-Third Amendment shareholder

purchasers not only suffered no injury, they benefited from the price drop, and their claims must

be dismissed."

> The Court denied each of Defendants' motions, explaining that:
>
>> both of these motions misunderstand the theory of harm that I allowed to proceed to trial in the summary judgment opinion under the lost value theory of harm . . . .  The drop in the stock price is not itself the alleged injury.  The alleged injury is that the net worth sweep effectively eliminated the dividend rights that came with the shares as they were originally issued.  In other words, when someone buys a share in a company, they're purchasing a bundle of rights.  And plaintiffs are arguing here that the net worth sweep removed one of the most valuable sticks from that bundle.  That's a type of claim that travels with the shares…. The drop in stock prices is just a measure of damages[.]

Ex. B at 2449-2450; Class ECF 271.

---

[10] *See* Class ECF 248, 24. 10/31/2022 Motion to De-Certify the Classes, at 12 (stating "these classes no longer meet Rule 23(b)(3)'s predominance requirement or the requirements of Article III and the Rules Enabling Act"); 10/31/2022 Motion for Judgment as a Matter of Law Under Federal Rule of Civil Procedure 50(a), at 9.

This is the same fundamental misconception at the heart of Defendants' current motion. Their central contention is that post-Third Amendment purchasers "suffered no injury from the share-price drop." Class ECF 423 at 44. But as the Court correctly held, the injury here is the permanent harm caused by the Net Worth Sweep, which eliminates any possibility of private shareholders ever receiving dividends or profit distributions of any kind, since it gives everything to Treasury. All current shareholders have suffered (and continue to suffer) that injury, and thus have standing. *See* Section II(D)(1), above. The share-price drop is just the reasonable measure of that harm. Moreover, the Net Worth Sweep represents a non-personal impairment to the *stock*, as opposed to the stock*holder*, and therefore claims based on the Net Worth Sweep run with the shares. *E.g., Urdan v. WR Cap. Partners, LLC*, 244 A.3d 668, 677 (Del. 2020) ("A corporate charter violation claim travels with a stock sale because the injury 'is to the stock and not the holder.'"); Ex. B at 2449-2450.

After the close of Plaintiffs' case-in-chief in the second trial, Defendants again moved pursuant to Rule 50(a), re-arguing that the composition of the Classes was improper because post-Third Amendment buyers suffered no injury in fact and therefore lacked standing. Defendants also disputed that implied covenant claims travel with the shares upon a sale of the stock if there was no valid assignment. *See* Ex. A at 1500:4-1510:17. The Court again denied Defendants' motion. Ex. A at 1512:15.[11] Defendants then sought permission to file another written Rule 50(a) motion on these issues, which the Court denied. Ex. A at 1512:18-23.

Plaintiffs now redeploy the same arguments the Court has repeatedly rejected, citing

---

[11] Defendants thereafter sought to attack the Classes through their Opposition to Plaintiffs' Motion for Entry of Final Judgment and Plan of Allocation, arguing that Plaintiffs' proposed plan of allocation would improperly pay damages to holders of "shares that were opted out of the Classes." *See* Class ECF 417. The Court rejected Defendants' objection. *See* Class ECF 420, at 8-10.

many of the same inapposite authorities they did previously.[12]  Defendants do not even pretend to

raise any "intervening change of law or any other basis for concluding that the[] prior decision [is]

clearly erroneous."  *Freeman*, 2023 WL 8472723, at *3 (internal citations omitted).  Rather, they

expressly ask this Court to "reconsider its rulings that the claim 'travels with the share'" for no

valid reason.  Class ECF 423 at 46.  Having "offered no basis to disturb this Court's rulings, [and]

having 'raise[d] nothing new with respect to these issues,'" *Freeman*, 2024 WL 1616675, at *9,

Defendants have provided the Court no reason to upend the law of the case.

> ### B. Defendants' Challenge to the Class Definition Is Not a Proper Standing Argument or Basis for a Rule 50(b) Motion.

Likely because of Defendants' prior concession that post-Third Amendment purchasers

were properly in the Class definitions, they try to dress up their effort to abandon that concession

as a "standing" argument (because objections to "standing" cannot be waived).  But it is not a

"standing" argument; instead, it is simply an argument that certain members of the class have failed

to state a claim.  Defendants' argument contravenes the bedrock principle that "when considering

whether a plaintiff has Article III standing, a federal court must assume *arguendo* the merits of his

or her legal claim."  *Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007); *see also,*

*e.g., FEC v. Cruz*, 596 U.S. 289, 298 (2022).  On the merits, Plaintiffs' claim (and this Court has

held) that claims challenging the Net Worth Sweep as a breach of the implied covenant in the

shareholder certificates run with the shares, and thus are held by all current shareholders, including

post-Third Amendment purchasers.  The Court must assume that merits point is correct for

purposes of deciding Article III standing.  If that were not the rule, then every dispute about the

---

[12] *E.g., compare* Ex. B at 1825 (citing *Cheatham IRA v. Huntington Nat'l Bank*, 157 Ohio St.3d
358 (2019)); 10/31/2022 Motion to De-Certify the Classes, at 17-19 (citing *Cheatham IRA*);
10/31/2022 Motion for Judgment as a Matter of Law Under Federal Rule if Civil Procedure 50(a),
at 10-12 (citing *Cheatham IRA*); *with* Class ECF 423 at 5, 50, 51, 55 (citing *Cheatham IRA*).

validity of an assignment of contractual rights—and indeed, most arguments that a litigant has failed to state or prove a claim—would be an Article III standing issue, which is not the law.

In addition to not being a proper standing challenge, Defendants' effort to challenge the Class definitions is also not a proper basis for a Rule 50(b) motion.  Rule 50(b) is not meant "to rehash decisions that were made pre-trial, but to determine whether the jury verdict was supported by the evidence presented at trial." *Martin*, 2006 WL 2850656, at *5.  In challenging the ability of post-Net Worth Sweep purchasers to participate in the recovery, Defendants are not challenging the jury's verdict nor the evidence supporting it.  Instead, Defendants' challenge is directed at the Court's pre-trial class certification order that recognized the standing of post-Net Worth Sweep purchasers (ECF 137, ECF 138), and the Court's related pre-trial determination that the claims travel with the shares. *MSJ Ruling*, 2018 WL 4680197, at *8 (determining that rights associated with dividends and liquidation preferences inhere in the security, and travel with shares).  Such a challenge to pre-trial rulings is barred by the law of the case, and improper under Rule 50(b).

### C.    Plaintiffs' Implied Covenant Claims Against Fannie Mae Travel With The Shares Under Delaware Law.

Section 8-302(a) of Title 6 of the Delaware Code provides in relevant part that "a purchaser of a certificated or uncertificated security acquires all rights in the security that the transferor had or had power to transfer."  6 *Del. C.* § 8-302(a).  Thus, as Defendants acknowledge (ECF 423 at 52), under Delaware law, rights "in the security" travel with the security. *MTD Ruling*, 2018 WL 4680197, at *8 (citing Delaware law); *Urdan*, 244 A.3d at 668. Defendants' argument that the claims here did not travel with the shares rests on the false premise that the implied covenant claims are not "rights in the security."

Interpreting Section 8-302, the Delaware Supreme Court in *Urdan* observed that the "phrase 'all rights in the security' can be understood as distinguishing between personal rights of

the holder, on the one hand, and rights that inhere in the security itself, on the other.'" 244 A.3d at 677 (Del. 2020) (cite omitted).[13] Rights that inhere in the security "are rights 'arising from the relationship among stockholder, stock and the company.'" *Urdan*, 244 A.3d at 677 (cite omitted).

As the Delaware Supreme Court has repeatedly held, "[a] corporate charter violation claim travels with a stock sale because the injury is to the stock and not the holder." *Urdan*, 244 A.3d at 677; *see also In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1050 (Del. Ch. 2015).[14] Under Delaware law, a stock certificate is part of the corporate charter. *See e.g.*, *W. Palm Beach Firefighters' Pension Fund v. Moelis & Co.*, 2024 WL 747180, at *6 (Del. Ch. Feb. 23, 2024) ("The certificate of designations for … new preferred stock would become part of the Charter as a matter of law."); *Halifax Fund, L.P. v. Response USA, Inc.*, 1997 WL 33173241 (Del. Ch. May 13, 1997) ("The certificate of designations of the corporation … by statute is part of that corporation's charter…") *McRitchie v. Zuckerberg*, 2024 WL 1874060, at *25 (Del. Ch. Apr. 30, 2024). Thus, by claiming that the Net Worth Sweep violated the implied covenant in their stock

---

[13] Defendants assert that "Delaware's Supreme Court has noted [that] Delaware courts have struggled to distinguish rights that are "personal" from those "in the security . . ." Mot. 52. Defendants cite nothing for this meritless assertion.

[14] *See also See I.A.T.S.E. Local No. One Pension Fund v. Gen. Elec. Co.*, 2016 WL 7100493, at *5 (Del. Ch., Dec. 6, 2016) (distinguishing between "personal" claims and "non-personal" claims regarding securities); *West Palm Beach Firefighters' Pension Fund v. Moelis & Co.*, 310 A.3d 985, 1002-03 (Del. Ch. 2024) (claims that shareholder agreement violated Delaware law could be brought by purchases of stock after agreement went into effect because the right to assert the claim that agreement violated Delaware law passes with the shares from buyer to buyer); *Colon v. Bumble, Inc.*, 305 A.3d 352, 369 (Del. Ch. 2023) ("The claim that the right to vote was violated is not an injury personally to the holder of the shares; it is an injury to the rights appurtenant to the shares."); *In re AMC Ent. Holdings, Inc. Stockholder Litig.*, 299 A.3d 501, 532 (Del. Ch. 2023) ("Rights attached to shares include statutory rights under the DGCL and the right to enforce a claim for breach of fiduciary duty based on interference with the right to vote."); *In re Prodigy Comm. Corp. Shareholders Litig.*, 2002 WL 1767543, at *4 (Del. Ch. July 26, 2002) (overruling an objection from a shareholder who sold shares prior to the challenged deal, finding that where a shareholder "sold his shares in the marketplace, the claim relating to the fairness of the then-proposed transaction passed to his purchaser, who enjoyed the benefits of the settlement").

certificates, Plaintiffs are claiming a corporate charter violation, and that claim runs with the shares.

Defendants try to resist this straightforward conclusion by arguing that Plaintiffs' claims are "personal" because "'personal claims would include a contract claim for breach of an agreement to purchase or sell shares or a tort claim for fraud in connection with the purchase or sale of securities.'"  ECF 423 at 52.  But Plaintiffs' claims do not arise from an "agreement to purchase or sell shares" nor are they tort claims for fraud; instead, Plaintiffs assert that by fundamentally changing the capital structure and eliminating any possibility of dividends to private shareholders, the Net Worth Sweep violated the implied covenant in the Certificates of Designation, the contracts that govern the rights inherent in those shares.  While Defendants contend that Plaintiffs' claims "resemble" securities fraud claims, that reflects a fundamental misconception, as shown above and as this Court has already held.  Ex. B at 2449-2450.  Securities fraud claims are categorically distinct because the nature of the harm is the individual stockholder's actual or presumed reliance on fraudulent representation, which makes the harm personal in nature, like any fraud claim. *See, e.g., Activision*, 124 A.3d at 1056.  As this Court has ruled, the injury here is the impairment to the stockholder rights caused by the Net Worth Sweep, and the decline in share price is just the basis for a reasonable estimate for measuring that injury.  Ex. B at 1830, 2449-2450.  Plaintiffs' claims are not securities fraud claims, or any other species of "personal" claim.[15]  Rather, they are quintessential claims to vindicate "rights that inhere in the security itself." *Urdan*, 244 A.3d at 677.

---

[15] For this reason, Defendants' reliance on *Independent Investor Protective League v. Saunders* (*see* Mot. 53) gets them nowhere.  The claims at issue in that case were claims under federal securities law, and, unlike the claims here concerning violations of the stock's charter, "[t]hose rights belong to the *persons* who have suffered injury."  64 F.R.D. 564, 572 (E.D. Pa. 1974).

Equally unavailing is Defendants' suggestion that Plaintiffs' claims must be "personal" because the record does not contain evidence as to whether the market valued Plaintiffs' claims in the price of the stock.  No Delaware case requires such evidence to establish that a claim travels with the shares.  Rather, courts have merely acknowledged that the market prices in the value of claims about which it has notice.  *In re Resorts Int'l S'holders Litig.*, 1988 WL 92749, at (Del. Ch. Sept. 7, 1988); *see also In re Prodigy Commc'ns Corp. S'holders Litig.*, 2022 WL 1767543, at *4 (Del. Ch. July 26, 2002).

Finally, Defendants say the plan of allocation somehow shows Plaintiffs' claims to be personal. ECF 423 at 54. The Court has already rejected that argument. ECF No. 420, at 8-10.  It correctly held that Defendants rely "on the faulty premise that class membership is a feature of the share that may or may not be transferred to a successor in interest."  *Id.* at 9.  Defendants ignore that claims of corporate charter violations, such as claims that the Net Worth Sweep violated the implied covenant in the shareholder certificates, travel with the shares automatically, by operation of law (see above).  Thus, no assignment is necessary.

### D. Plaintiffs' Implied Covenant Claims Against Freddie Mac Travel With The Shares Under Virginia Law.

Like Section 8-302(a) of Title 6 of the Delaware Code, Section 8.8A-302 of Virginia's Code provides that "a purchaser of a certificated or uncertificated security acquires all rights in the security that the transferor had or had power to transfer." Va. Code Ann. § 8.8A-302. Plaintiffs who did not hold their shares at the time of the Third Amendment thus acquired "all rights in the security" that sellers of their shares had power to transfer.  As this Court has recognized, under Virginia law, "all rights in the security" "'means rights in the security itself as opposed to personal rights.'"  *MSJ Ruling*, 2018 WL 4680197, at *8.

Defendants attempt to escape that ruling by now arguing that the common law did not

permit the claims to transfer to a purchaser absent an express assignment, and that Virginia's Section 8.8A-302 does not override the common law.  But Defendants fail to cite a single case applying Virginia law holding that claims arising from a breach of the Certificate of Designation, such as the implied covenant claims here, do not travel with the shares.  Defendants' lack of authority is unsurprising, as Virginia courts look to Delaware for guidance on matters of corporate law, and, as shown above, Delaware law is crystal clear that such claims travel with the shares. *See*, *e.g.*, *Pagliara v. Federal Home Loan Mort. Corp.*, 203 F. Supp. 3d 678, 689 n.18 (E.D. Va. 2016) ("It is not uncommon for courts interpreting Virginia corporate law to look for guidance from other courts, especially Delaware corporate law."); *Abella v. Universal Leaf Tobacco Co. Inc.*, 546 F. Supp. 495 (E.D. Va. 1982) ("The Code of Virginia contains provisions substantially the same as the Delaware provisions the [Delaware Supreme Court] in *Zapata* court construed"); *U.S. Inspect Inc. v. McGreevy*, 2000 WL 33232337, at *4 (Va. Cir. Ct. Nov. 27, 2000) ("Here, again, this court looks to the decisions of the Supreme Court of Delaware for guidance.").  The one Virginia case Defendants do cite, *Day v. MCC Acquisition, LC*, 299 Va. 199, 208 (Va. 2020), involved competing claims regarding title to certain corporate shares, not claims arising from rights inherent in the shares, and is therefore inapposite.

Relying on a case applying California law, Defendants say it would be "'presumptuous'" for this Court to "adopt a travels-with-the-shares interpretation" of Virginia law because it would be "'contrary to most every state's own rule.'"  Class ECF 423 at 50-51 (quoting *Pacific Life Ins. Co. v. BNY Mellon*, 2022 WL 1446552 (S.D.N.Y. Feb. 22, 2022)).  But *Pacific Life* analyzed the applicability of a New York statute automatically transferring *all* damage claims associated with a bond to the buyer of the bond, and held that such a law was no longer the prevailing rule for bond sales in most states, and thus should not be extended.  *Pacific Life* did not analyze a claim that

stock certificates had been permanently impaired by a fundamental restructuring of a company's capital structure.  It therefore did not address the well-established Delaware law that such claims inhere in the security, are not personal, and thus automatically travel with the shares.

### E. Defendants Invoke Inapposite Case Law That Merely Shows That Personal Claims Are Not Automatically Assigned, Which Thus Does Nothing To Undermine This Court's Prior Rulings.

Citing cases from outside Delaware and Virginia, Defendants argue that the "majority view" is that the sale of a security does not automatically assign to the transferee ***all*** of the claims associated with the security held by the transferor.  Class ECF 423 at 45-50.  Obviously, the authorities that matter are the Delaware and Virginia authorities cited above, not those from other jurisdictions.[16]  Moreover, none of Defendants' cases address the proposition that certain kinds of claims involving the fundamental relationship between the security and the corporation necessarily inhere in the security itself, and thus automatically run with the shares. That is the proposition articulated in *Urdan* and *Activision*.  *Urdan*, 244 A.3d at 677; *Activision*, 124 A.3d at 1050. Defendants cite no case casting doubt on those holdings or their reasoning, or refusing to apply them in another state. The fundamental principle this Court applied is thus not at odds with any authority Defendants cite.

Defendants cite no case analyzing claims that a company's capital restructuring, or its decision to re-allocate profits to a certain shareholder, has fundamentally and permanently impaired the rights inherent in its securities.  Defendants' case law is thus inapposite.  Instead of addressing the kind of claim at issue here, Defendants seek instead to support their assertion that

---

[16] Defendants' own cases acknowledge that "[u]nder virtually all choice-of-law regimes, the jurisdiction's law that governs whether a cause of action exists will also be the jurisdiction that decides whether that cause of action can be assigned."  *DNAML Pty Limited v Apple Inc.*, 2015 WL 9077075, at *3 (S.D.N.Y. Dec. 16, 2015).

"the claims of former holders who sold at a loss after the Third Amendment were not automatically transferred to the buyers." Class ECF 423 at 45. That assertion reflects their fundamental misconception about the nature of the claims here—*i.e.*, they insist that the claimed injury here is for the stock drop itself; but as this Court has repeatedly held, the injury here is the impairment of the shares through the Net Worth Sweep, and the stock drop is just a reasonable measure of that injury.[17]

Defendants persist in their distortion of the nature of the claim here by once again invoking federal securities case law, arguing that it has rejected any "rule of automatic assignment." Class ECF 423 at 47-48. But the claim here is not a federal securities claim, and thus such case law is irrelevant. Federal securities claims seek recovery for damages suffered by a stock price drop after a misrepresentation is discovered. Defendants cite case law holding that the people who sold the shares at a loss after the fraud is discovered should be the rightful owners of such a claim. But that kind of claim is completely different from the claim in this case: here, the Net Worth Sweep inflicted a permanent injury on the shares themselves by assigning 100% of all future profits to the Treasury; the shares are impaired no matter who owns them, and thus the claims automatically run with the shares. *Urdan*, 244 A.3d at 677; *Activision*, 124 A.3d at 1050.

Likewise, Defendants cite case law holding that state common law fraud claims do not automatically run with the shares. Class ECF 423 at 48-50. Again, this is not at odds with the governing principle from *Urdan* and *Activision*. Those cases simultaneously hold that (a) claims that inhere in a security, like claims of corporate charter violations, must automatically travel with

---

[17] Ex. B at 2449 (the Court explaining that "when someone buys a share in a company, they're purchasing a bundle of rights. And plaintiffs are arguing here that the net worth sweep removed one of the most valuable sticks from that bundle. That's a type of claim that travels with the shares, so there's not a proof problem that would justify a judgment as a matter of law. And there's no reason to decertify the class.").

the shares and (b) that claims of securities fraud are "[q]uintessential examples of personal claims" that do not automatically travel with the shares. *Urdan* 244 A.3d at 677 (quoting *Activision*, 124 A.3d at 1056). Again, no case casts doubt on that analysis.

To the contrary, the case Defendants seem to rely on the most, *Cheatham IRA v. Huntington National Bank*, 137 N.E.3d 45 (Ohio 2019), cites *Activision* without any negative comment. *Cheatham* involved the question of whether, under Ohio law, claims arising from the breach of bond indenture agreements are personal to the holder or instead automatically travel with the sale of those agreements. *Id.* at 54-55. The court acknowledged the Delaware Supreme Court's holding in *Activision*, noting that "*Activision* addressed corporate stock and 'the causes of action conferred on stockholders by specific statutory provisions of the [Delaware General Corporation Law].'" *Id.* at 56 (quoting *Activision*, 124 A.3d at 1049). Immediately after the language *Cheatham* quoted, the Delaware Supreme Court explained: "Direct claims also include causes of action to enforce contract rights that stockholders possess under the corporation's certificate of incorporation and bylaws, recognizing that the DGCL forms a part of every Delaware corporation's charter." *Activision*, 124 A.3d at 1049 (footnotes omitted). And in the very next paragraph: "When a share of stock is sold, the property rights associated with the shares, including any claim for breach of those rights and the ability to benefit from any recovery or other remedy, travel with the shares." *Id.* at 1050 (footnote omitted). *Cheatham* said nothing to cast doubt on this portion of *Activision*, either directly or indirectly. Defendants make no effort to show that its holding would be different in Delaware. Further, even if Ohio would reach a different result than Delaware or Virginia, that is not relevant here.[18]

---

[18] Defendants also cite cases involving the validity of purported assignments of statutory claims, none of which are analogous to the claims that inhere in the securities here. Class ECF 423 at 45-

**F.     Defendants Have Waived The Right To Challenge The Class Definitions, And Are Also Estopped From Doing So.**

      **1.     Defendants Agreed To The Class Definitions.**

On August 12, 2021, Plaintiffs filed their motion for class certification under Rule 23(b)(1), (2), and (3).  Class ECF No. 132; Class ECF No. 132-1. Thereafter, in order "to streamline and make efficient use of the Parties' and the Court's resources," Plaintiffs and Defendants conferred regarding class certification and agreed, subject to approval of the Court, to stipulate to certification of classes under Rules 23(a) and (b)(3).[19]   After reviewing the parties' class certification stipulation, the Court expressed doubts about the procedural propriety of the parties' proposal to withdraw Plaintiffs' motion for class certification and enter the stipulated order.  *See* Order, Class ECF 134.  The parties filed a joint response, asking the Court to construe Plaintiffs' motion for class certification as still pending and uncontested to the extent that it requested certification under Rule 23(b)(3).  *See* Joint Response to Court Order of November 15, 2021, Class ECF 135.

Thereafter, on December 7, 2021, the Court issued (i) a memorandum opinion containing a "rigorous analysis" of the factual bases for class certification, and (ii) an order granting Plaintiffs'

---

46 (citing *US Fax Law Center Inc v. iHire, Inc.*, 476 F.3d 1112, 1120 (10th Cir. 2007) (addressing assignability of claims under the Telephone Consumer Protection Act of 1991 under Colorado law), *Beach TV Properties, Inc. v. Solomon*, 2016 WL 6068806, at *17 (D.D.C. Oct. 14, 2016) (concerning invalid written assignment of legal malpractice claim); *DNAML Pty Limited*, 2015 WL 9077075 (whether a written asset purchase agreement sufficiently assigned the right to bring a private antitrust claim under the Clayton Act)).  They also cite *Herr v. United States Forest Service*, 803 F.3d 809, 819-821 (6th Cir. 2015) which addressed whether purchasers of real property had succeeded to a right of action that arose under federal when it was owned by previous owners..

[19] Stipulation for Class Certification, Class ECF 133.  Plaintiffs agreed to proceed with class certification only under F.R.C.P. 23(b)(3) because Defendants' consent was limited to that subsection, but Plaintiffs never conceded that certification under F.R.C.P 23(b)(1) and/or (2) was inappropriate.

motion for class certification under Rule 23(a) and 23(b)(3) and certifying the Classes.  Class ECF 138; Class ECF 139.  Under each of the definitions of the "Fannie Preferred Class," the "Freddie Preferred Class," and the "Freddie Common Class," a person can be a class member if: (i) "they held the relevant share on the date of certification," or (ii) "if they are a successor in interest to such a person and hold a share after certification but before final judgment."  Memorandum and Order, Class ECF 420 at 8.

By agreeing to these Class definitions, Defendants waived any right to argue, as they seek to do now, that "all Plaintiffs who bought shares after the Third Amendment lack standing to pursue claims with respect to those shares because they suffered no injury from the share-price drop."  Class ECF 423 at 44.  They knowingly relinquished that argument when they agreed not to oppose Plaintiffs' Motion for Class Certification, which made clear that as a matter of Delaware and Virginia law, stockholders' implied covenant claims "ran with the shares."  Class ECF 132.1 at 9.  If Defendants believed that was incorrect as a matter of Delaware and Virginia law, as they purport to argue now, they could and should have opposed certification on such grounds then. Instead, they knowingly relinquished their right to oppose certification of those classes, thus waiving their ability to do so now.  *See e.g., Missouri Dep't of Social Servs. v. United States Dep't of Health & Human Servs.*, 2019 WL 4709685, at *3 (D.D.C. Sept. 26, 2019) ("waiver . . . is the intentional relinquishment or abandonment of a known right [and] [w]hile courts may exercise their discretion in exceptional circumstances to consider forfeited arguments, they may not review arguments that have been waived."); *Keepseagle v. Perdue*, 856 F.3d 1039, 1051-53 (D.C. Cir. 2017) (claimant waived right to contest Class settlement agreement by failing to object to the provision the claimant later challenged).

### 2.      It Would Be Unfairly Prejudicial To Allow Defendants To Challenge The Classes At This Late Stage.

Defendants are also estopped from abandoning their earlier agreement to the Class definitions.  *E.g., New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (The purpose of judicial estoppel is to "protect the integrity of the judicial process ... by prohibiting parties from deliberately changing positions according to the exigencies of the moment."); *Konstantinidis v. Chen*, 626 F.2d 933, 937 (D.C. Cir. 1980); *Walker v. England*, 590 F. Supp. 2d 113, 136 (D.D.C. 2008) (applying judicial estoppel doctrine to bar new position that contradicts prior one where "Defendant's shifting positions would also have wasted party resources . . . and judicial resources").

Defendants' effort to abandon their agreement to the Class definitions threatens the orderly administration of litigation and the effective delivery of justice.  *In Def. of Animals v. United States Dep't of Agric.*, 589 F. Supp. 2d 41, 43 (D.D.C. 2008).  It also prejudices Plaintiffs.  Plaintiffs abandoned their arguments for certification of the Classes under Rule 23(b)(1) and (2) in reliance on Defendants' consent to certification under Rule 23(b)(3).   Plaintiffs and the Court have also expended significant time and resources, litigating two trials and various pre- and post-trial proceedings, and providing notice to thousands of thousands of potential Class members, with the understanding that the Class definitions were properly certified.[20]

---

[20] Defendants' argument that the Court's Class Certification Order pursuant to F.R.C.P. 23(b)(3) "reinforces" that the claims are personal under Delaware law is utterly false.  *See* Rule 50(b) Mot. at 53.  Whether the certification order gave class members the right to opt out has no effect on whether the claim travels with the shares because opt out rights are a matter of federal procedural law, not state substantive law.  *E.g., Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 443 (S.D.N.Y. 2016) (*citing Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co*., 559 U.S. 393 (2010)) (noting that "Rule 23—the rule that would govern the adjudication of Plaintiffs' class claims—is procedural").  Nor can the fact that the Court ordered certification under Rule 23(b)(3) alter that Plaintiffs' claims travel with the shares under Delaware law, because a federal procedural law cannot "govern a particular case in which the rule would displace a state law that is procedural in the ordinary use of the term but is so intertwined with a state right or remedy that it functions to define the scope of the state-created right."  *Id.*

* * *

Finally, even if the Court were somehow inclined to overlook all of the foregoing defects in Defendants' attack on the Class definitions, there is no basis for setting aside the judgment, since the jury clearly found for Plaintiffs on both liability and damages, and clearly had sufficient evidence to reasonably do so.

## CONCLUSION

For the foregoing reasons, the Court should deny the Rule 50(b) motion.

Dated: June 7, 2024                          Respectfully submitted,

/s/ Charles J. Cooper                        /s/ Eric L. Zagar
Charles J. Cooper (Bar No. 24870)            Eric L. Zagar (*Pro Hac Vice*)
David H. Thompson (Bar No. 450503)           **KESSLER TOPAZ**
Vincent J. Colatriano (Bar No. 429562)          **MELTZER & CHECK, LLP**
Peter A. Patterson (Bar No. 998668)          280 King of Prussia Rd.
Brian W. Barnes (*Pro Hac Vice*)             Radnor, PA 19087
**COOPER & KIRK, PLLC**                      Tel: (610) 667-7706
1523 New Hampshire Avenue, N.W.              Fax: (610) 667-7056
Washington, DC 20036                         ezagar@ktmc.com
Tel: (202) 220-9600
Fax: (202) 220-9601                          Hamish P.M. Hume (Bar No. 449914)
ccooper@cooperkirk.com                       Samuel C. Kaplan (Bar No. 463350)
                                             **BOIES SCHILLER FLEXNER LLP**
*Counsel for Berkley Plaintiffs, et al.*     1401 New York Ave. NW
                                             Washington, DC 20005
                                             Tel: (202) 237-2727
                                             Fax: (202) 237-6131
                                             hhume@bsfllp.com
                                             skaplan@bsfllp.com

                                             Michael J. Barry (*Pro Hac Vice*)
                                             **GRANT & EISENHOFER, P.A.**
                                             123 Justison Street
                                             Wilmington, DE 19801
                                             Tel: (302) 622-7000
                                             Fax: (302) 622-7100
                                             mbarry@gelaw.com

                                             Adam Wierzbowski (*Pro Hac Vice*)
                                             **BERNSTEIN LITOWITZ BERGER**
                                                **& GROSSMANN LLP**
                                             1251 Avenue of the Americas

New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
adam@blbglaw.com

*Co-Lead Counsel for the Class*