# EXHIBIT A

1     A.   "Conservatorship.

2          "Conservatorship is defined as a statutory process to

3     stabilize a troubled institution which is intended to have a

4     limited duration and has as its objective to return the entity

5     to normal business operations once stabilized.  Conservatorship

6     statutes provide broad authority for a conservator to operate

7     the institution until it is stabilized and then returned to the

8     shareholders.

9          "FHFA is Conservator."

10    Q.   Can we go to the next part of the document, please.  If we

11    can go to the next document, which is Plaintiffs' Exhibit 521.

12         Can you please read the title page of the presentation

13    into the record.

14    A.   "Federal Housing Finance Agency, Stable Value Investment

15    Association, October 8, 2008."

16    Q.   And can we go to the next part of the document.

17    A.   "Conservatorship.

18         "Conservatorship is defined as a statutory process to

19    stabilize a troubled institution which is intended to have a

20    limited duration and has as its objective to return the entity

21    to normal business operations once stabilized.  Conservatorship

22    statutes provide broad authority for a conservator to operate

23    the institution until it is stabilized and then returned to the

24    shareholders.

25         "FHFA is Conservator."

```
 1    Q.  And if we can go to the last document, Plaintiffs'

 2    Exhibit 524, please.

 3          Can you please read into the record the title page of

 4    the presentation.

 5    A.  "National Association of Realtors.  James B. Lockhart, III,

 6    Director, Conventional Finance & Lending Committee, November 7,

 7    2008, Orlando, Florida."

 8          MR. KRAVETZ:  And can we go to the last excerpt,

 9    please, Ms. McGuire.

10    A.  "Conservatorship to Support Mission.

11          "Conservatorship is a legal process to stabilize a

12    troubled institution with the objective of returning the GSEs

13    to normal business operations.

14          "FHFA as a conservator has broad authority to oversee

15    the GSEs until stabilized and returned to shareholders."

16    Q.  Thank you, Ms. Belack.

17          MR. KRAVETZ:  Nothing further from plaintiffs,

18    Your Honor.

19          THE COURT:  Okay.

20          MR. JONES:  Thank you, Your Honor.

21          Good afternoon, members of the jury.

22                         CROSS-EXAMINATION

23    BY MR. JONES:

24    Q.  And good afternoon, Ms. Belack.  I'm Stanton Jones, one of

25    the lawyers for the defendants.
```

1    certain facts, the parties may agree or stipulate to those

2    facts.  You must accept the stipulated fact as evidence and

3    treat it as having been proved here in court.

4            So both sides have agreed on these facts as

5    stipulated.  You may consider that as having been proven.

6            **MS. DAVIS:**  Thank you, Your Honor.

7            So the first portion I will read of JX-1 that's

8    been admitted is Paragraph 7.

9            "Each of the series of shares, which plaintiffs

10   hold and are at issue in this case, all of the junior

11   preferred shares issued by both of the enterprises and the

12   common shares issued by Freddie Mac, are governed by

13   documents called certificates of designation.

14           "Each of these certificates of designation entitle

15   the stockholders to the payment of dividends, if declared,

16   by the boards of the respective enterprises.  The

17   certificates of designation do not require the board of

18   either enterprise to declare dividends.  The preferred stock

19   dividends, if approved by the enterprise's board of

20   directors are calculated based on a percentage of the

21   stock's face value.  If the board of either enterprise

22   declares a dividend, the certificates of designation

23   establish an order in which the dividends on the various

24   series must be paid.

25           "All dividends must be paid to all preferred

1   stockholders before any dividends are paid on any common

2   shares.  The certificates of designation also provide an

3   order in which the holders of the various series of shares,

4   may share in any distribution of assets, upon liquidation of

5   the enterprise."

6          And then we are going to read Paragraphs 42 and

7   44.  "On December 21st, 2017, Treasury and FHFA, acting as

8   conservator to the enterprises, entered into letter

9   agreements that changed the terms of the senior-preferred

10  stock certificates in each enterprise, issued under the

11  PSPAs, which is also referred to as the 2017 Letter

12  Agreements, to permit each enterprise to retain a $3 billion

13  capital reserve.  The 2017 letter agreements also increase

14  Treasury's liquidation preference with respect to each

15  enterprise by $3 billion, which comes to 6 billion total.

16         "Under the 2017 letter agreements, each enterprise

17  paid a dividend to Treasury, equal to the amount its net

18  worth, at the end of each quarter, when it exceeded 3

19  billion.  Those terms apply to the December 31st, 2017

20  dividend payment and the dividend payments for each quarter

21  thereafter, until the execution of the September 30th, 2019

22  letter agreements.

23         "On September 30th, 2019, Treasury and FHFA,

24  acting as conservator to the enterprises, entered into

25  letter agreements that changed the terms of senior-preferred

1    stock certificates in each enterprise issued under the

2    PSPAs, this is referred to as the 2019 letter agreements, to

3    permit each enterprise to retain earnings beyond the $3

4    billion capital reserves previously allowed through 2017

5    letter agreements.

6              "The 2019 letter agreements also provided that the

7    liquidation preferences for Treasury senior preferred stock

8    would increase by the amount of capital the enterprises

9    retained each quarter.  Fannie Mae and Freddie Mac were

10   permitted to retain Capitol reserves of 25 and 20 billion

11   respectively.

12             "On January 14th, 2021, Treasury and FHFA, acting

13   as conservator to the enterprises, entered into letter

14   agreements that changed the terms of the senior preferred

15   stock certificates in each enterprise issued under the

16   PSPAs, the 2021 letter agreements.

17             "Among other things, the 2021 letter agreement

18   suspended the cash dividend owed in order to permit each

19   enterprise to retain earnings until it satisfied the

20   requirements of the 2020 enterprise capital rule and

21   provided that the liquidation preference for each enterprise

22   would increase each quarter by the amount in earnings each

23   enterprise was permitted to retain in lieu of the cash

24   dividend."

25             At this time, Your Honor, we call Susan Hartman.

1    Treasury in 2013?

2        **A.**   $130 billion.

3        **Q.**   Okay.

4            Now, I'm going to direct your attention to PX-1-P.

5    PX-1-P.  How much in dividends did the GSEs pay to Treasury

6    from the inception of the conservatorship in 2008, to before

7    the net worth sweep went into effect in 2012?

8        **A.**   In total, the dividends paid for both entities,

9    from the fourth quarter of 2008 through 2012, was $55.2

10   billion.

11       **Q.**   And in 2013 alone, how much in dividends did GSEs

12   pay to Treasury?

13       **A.**   $130 billion.

14       **Q.**   And so, in 2013 alone, the first year after the

15   implementation of the net worth sweep, the GSEs paid cash

16   dividends to Treasury in an amount well over twice what the

17   GSEs paid to Treasury over the previous four years combined?

18       **A.**   That's correct.

19       **Q.**   Now, again, from the inception of the

20   conservatorship to before the net worth sweep, how much in

21   total value did the GSEs transfer to Treasury?

22       **A.**   I'm sorry?  Before the net worth sweep?

23       **Q.**   Yes, ma'am.

24       **A.**   55.2 billion.

25       **Q.**   And is that in the form of cash dividends?

1    A.  No.

2    Q.  Have all of these companies been returned to their

3    stockholders?

4    A.  Yes.

5    Q.  When Congress put Fannie and Freddie into

6    conservatorship in 2008, what did the FHFA say that its

7    responsibility was?

8    A.  They said their responsibility was kind of the typical

9    responsibility in conservatorship that we've seen since the

10   1930s:  To preserve and conserve the company's assets and

11   property and also to restore the institution to safety and

12   soundness so that they could be -- according to the playbook

13   since the 1930s, so the firms could be released back into

14   the private sector.

15           MR. RUDY:  Janna, could you highlight the words on

16   the third line, "sound and solvent"?  Oh, it's a .pdf.

17   BY MR. RUDY:

18   Q.  I'll direct you to the third line, where you see the

19   words "sound and solvent."

20   A.  Yes.

21   Q.  And can you describe what soundness and solvency means?

22   A.  That means that the firm's assets are worth more than

23   their liabilities and they can pay their bills on time and

24   in full.

25   Q.  Based on your expert opinion, did the net worth sweep

1    study.  I was given those materials and I validated his

2    approach, his data, made sure everything was done accurately

3    before using it to express my opinion that the damages in

4    this matter to shareholders are $1.61 billion.

5    Q.  So you relied on the Defendants' expert's event study

6    that concluded that the stock price fell by $1.6 billion as

7    a result of information released on August 17th, 2012?

8    A.  Yes.

9    Q.  Have you yourself performed your own event studies?

10   A.  Yes, I have.

11   Q.  How many times, would you say?

12   A.  Hundreds of times in the course of my career.

13   Q.  And based on your experience performing event studies

14   and your analysis of the event study performed by the

15   Defendants' expert in this matter, do you have an opinion as

16   to whether or not this particular event study as to the

17   stock price movement was properly constructed and performed?

18   A.  Yes.

19   Q.  What's your opinion?

20   A.  My opinion is that it was properly constructed and

21   performed.

22   Q.  Are the facts and the data in Defendants' event study

23   the kind of facts and data that financial economists

24   reasonably rely on in performing an event study?

25   A.  Yes.

1    Q.  And is Dr. Attari, the Defendants' expert -- is his

2    event study the kind of analysis that financial economists

3    and other experts in the field reasonably rely on to

4    evaluate stock price movements in response to new

5    information?

6    A.  Yes, it is.

7    Q.  Were you in the courtroom a few minutes ago when the

8    short video clip from Dr. Attari was played?

9    A.  Yes, I was.

10   Q.  Can you just explain to the jury in case they weren't --

11   in case it wasn't totally obvious what the purpose of that

12   video was?

13   A.  Well, that video --

14           MR. JONES:  Objection, your Honor.

15           THE COURT:  Overruled.

16           Go ahead.

17           THE WITNESS:  That video confirmed that Dr. Attari

18   himself did create this event study along with his staff.

19   BY MR. RUDY:

20   Q.  So did you limit your analysis in this case just to the

21   work that Dr. Attari did?

22   A.  No.

23   Q.  Other than relying on Dr. Attari's event study, what

24   other materials or information, if any, did you consider in

25   performing your assignment?

```
1    A.  I reviewed a wealth of materials, including financial

2    filings by Fannie Mae and Freddie Mac, FHFA reports,

3    documents produced in this case, emails, deposition

4    testimony, court documents.  A lot of materials and

5    background.

6    Q.  Do you recognize this slide?

7    A.  I do.

8    Q.  What is it?

9    A.  This is the cover page from the PowerPoint presentation

10   that was prepared to summarize the results of that event

11   study.

12   Q.  Prepared by Dr. Attari?

13   A.  Yes.

14   Q.  And it has on it PX-375 that was just moved into

15   evidence.  Do you see that?

16   A.  Yes.

17   Q.  At the time that you reviewed this event study, PX-375,

18   did you also analyze the underlying computer programs and

19   the data that generated the conclusions reached in the event

20   study?

21   A.  Absolutely.  Yes.

22   Q.  Okay.  In your binder, you have several exhibits.  I'll

23   list them:   PX-495-2, 496-2, 497-2, 497-3, 497-4, 497-5.

24   Dr. Mason, do you have all those exhibits in the binder

25   there?
```

1    stock.  Is that right?

2    A.  That's right.

3    Q.  Is it your understanding that Fannie Mae common shares

4    are just not part of this lawsuit?

5    A.  That's my understanding.  Correct.

6    Q.  And the lawsuit is about the three classes of stock that

7    are in yellow boxes.  Right?

8    A.  Yes.

9    Q.  Dr. Mason, did you corroborate that these numbers found

10   by Dr. Attari were actually the correct numbers?

11   A.  Yes.

12   Q.  This is Page 14 of Dr. Attari's report, PX-375.  Can you

13   explain what this page of his report shows?

14   A.  The bottom row of this page expresses what you just saw

15   in dollar terms and percent terms.  And the asterisks, the

16   little stars by those percent numbers, represent the

17   statistical significance of the decline or rather represent

18   that the statistical significance is at least 95 percent.

19   Q.  Okay.  So looking at Fannie Mae common and junior

20   preferred on August 17th, it says negative 47.1 percent.

21   What does that refer to?

22   A.  That is the amount expressed in percent terms that the

23   Fannie Mae common and junior preferred stock moved as a

24   result of the net worth sweep.

25   Q.  And then the Freddie Mac stock on that day fell by 56.8

1    something like that.  This is a valid observation that we

2    can rely upon to measure the value of the information

3    announced this day.

4    Q.  Can you just remind the jury again, what was the net

5    worth sweep?

6    A.  Colloquially -- I can't cite the law, but the net worth

7    sweep was the movement by which the Treasury would now take

8    all of the profits of Fannie Mae and Freddie Mac.  All those

9    profits would not be available to the companies to reinvest

10   in new operations or distribute to shareholders as dividends

11   now or anytime in the future.

12   Q.  And given that that's what the net worth sweep was, is

13   the type of price reaction identified in the event study

14   what you would expect from an announcement like this?

15   A.  Absolutely.

16   Q.  And why is that?

17   A.  This was a very dramatic movement.  As I said before, in

18   my study of financial crises from my entire career, I've

19   never seen this done before, just taking all the profits and

20   saying to shareholders, You'll never see a thing and the

21   companies will never get to benefit from that money.  The

22   Treasury will just take them all.  It's really quite

23   dramatic.

24   Q.  In light of that dramatic and without-historic-precedent

25   event, would you expect to see a stock price drop consistent

Mason - DIRECT - By Mr. Rudy

1    with what you saw?

2    A.  Yes.  Absolutely.

3    Q.  Are you aware that the Defendants are arguing in this

4    case the shareholders should have reasonably expected a net

5    worth sweep?

6    A.  I've heard that argument.

7              MR. JONES:  Objection, your Honor.

8              THE COURT:  Overruled.

9    BY MR. RUDY:

10   Q.  Is the stock price drop of approximately 50 percent

11   consistent with an event that investors or the market

12   reasonably already expected?

13             MR. JONES:  Objection.

14             THE COURT:  Overruled.

15             THE WITNESS:  No.  If investors expected this was

16   coming up, they wouldn't have responded in this dramatic way

17   on the day when it was announced.

18   BY MR. RUDY:

19   Q.  If the shareholders and the market already should have

20   known that their dividends were, quote, "eliminated

21   forever," would you have expected to see the share price

22   fall by 50 percent in one day?

23   A.  No.  If they knew that, they would have been told by

24   this announcement this day only a confirmation of what they

25   already knew, and there would be no reason for a change in

Mason - DIRECT - By Mr. Rudy

1    the stock price.

2    Q.  Professor Mason, does the $1.6 billion in damages from

3    the net worth sweep still persist today?

4    A.  Yes.

5              MR. JONES:  Objection, your Honor.

6              THE COURT:  Overruled.

7              THE WITNESS:  Yes.

8    BY MR. RUDY:

9    Q.  Are you aware that the Defendants are arguing that the

10   stockholders weren't really harmed by the net worth sweep

11   because they weren't receiving dividends anyway during the

12   conservatorship?

13   A.  I've heard that argument as well.  Yes.

14   Q.  Do you have a reaction to that?

15   A.  Yes.  It doesn't make a bit of sense.  The value of a

16   stock comes from the company's future performance.  What

17   happened in the past is in the past.

18   Q.  But weren't stockholders' dividend rights already

19   suspended during the conservatorship before the net worth

20   sweep?  Why would the stock price fall if they weren't

21   getting dividends anyway?

22   A.  I would say their dividends were suspended like a

23   company that's paying zero dividends for a period of time.

24   But they still had rights to dividends in the future should

25   the company take earnings, reinvest them in the firm,

1    companies should pay dividends, those dividends would be

2    much higher than they would have been otherwise.

3    BY MR. RUDY:

4    Q.  Here, after the net worth sweep, the dividends that

5    aren't being paid to stockholders, are they being reinvested

6    to Fannie and Freddie?

7    A.  No.  They're being taken by Treasury.

8    Q.  Professor, in your opinion, is there any reason to

9    believe that anything besides the net worth sweep could have

10   caused the huge decline in stock price on August 17th, 2012?

11   A.  No.

12   Q.  Is it true that at the same time that the FHFA announced

13   the net worth sweep, it also announced that Fannie and

14   Freddie would accelerate the reduction of Fannie and

15   Freddie's retained mortgage portfolio from a 10 percent

16   reduction per year to a 15 percent reduction per year?

17   A.  Yes.

18   Q.  In your view, did that news cause the stock price

19   declines on that day?

20   A.  No.

21   Q.  Why is that?

22   A.  Because the overriding effect here comes from Treasury

23   taking all the money generated by the firms no matter

24   whether that was a little larger or a little smaller as a

25   result of this change to the target for the retained

1    A.  That's right.

2    Q.  And the title of the PowerPoint of the summary of the

3    event study is Third Amendment:  Event Study.  And that's

4    because the event that's being studied in this event study

5    is the announcement of the entire third amendment.  Correct?

6    A.  That's right.  The PowerPoint deck that you see with

7    these results focused on the third amendment.  Yes.

8    Q.  It focused on the third amendment as a whole because the

9    event that's being studied is the announcement to the public

10   of the entire third amendment.  Right?

11   A.  The event that's being studied by whom?

12   Q.  The event that's being studied in this event study.

13   A.  This is -- whom?  I am studying the effect of the net

14   worth sweep, which is certainly a portion of the third

15   amendment.

16   Q.  Okay.  The event that's being studied in this event

17   study, the summary of which is on the screen, is the third

18   amendment as reflected in, well, the title right there?

19   A.  That's what the title says.  Correct.

20   Q.  Okay.  And this event study shows that the market value

21   of Fannie Mae and Freddie Mac's shares or Fannie Mae junior

22   preferred shares and Freddie Mac junior preferred and common

23   shares, to be specific, the event study shows that the

24   market value of those Fannie and Freddie shares declined by

25   a total of $1.6 billion on the day the third amendment was

THAKOR - DIRECT

1    on reasonable discretion to provide full compensation to

2    Treasury.

3    Q.  Where did you get the third bullet from?

4    A.  I'm sorry?

5    Q.  What about the third bullet on this slide?

6    A.  So the third bullet, basically, says that it would not be

7    used as a pretext to give away all of the GSEs' profits.

8         So once we determined what the PCF is, it's going to

9    turn out that that reasonable PCF to provide full compensation

10   to Treasury was not equal to a hundred percent of the profits.

11   Not even close.

12        And so the 2 and a half basis points or 45 basis points,

13   as I'll show you, the amount of compensation that it implies is

14   significantly lower than taking a hundred percent of the

15   profits of the GSEs.  So to argue that if the PCF had been

16   determined, it would have been so big that it justified taking

17   all of the profits of the GSE.  It's not a reasonable argument

18   based on the analysis that I've done.

19   Q.  Now, did you also -- in addition to looking at the

20   contract, did you look at the documents produced in the case to

21   see if either Treasury or the FHFA or Fannie and Freddie had

22   done any calculations or even some kind of work to try to

23   calculate what a periodic commitment fee would be?

24   A.  Yes, I did.  Because if Treasury or FHFA had actually done

25   any analysis of the PCF and how much it should be in terms of

1   quantification, that would have been very helpful.  But not

2   only did I not find anything in the internal documents that

3   indicated that Treasury had done any such analysis, but, in

4   fact, there were documents that indicated that they had not.

5        So there were exchanges between Anne Eberhardt of

6   Grant Thornton and Jeff Foster at Treasury, which actually was

7   an exchange about have you relied on any literature to

8   determine the PCF.  And the response was no, we just waived it.

9   So they did not, as far as I can tell, do any internal analysis

10  to quantify the PCF.

11  Q.  And did you -- did you review any testimony, from

12  depositions or otherwise, other proceedings, from Mr. DeMarco

13  or others about whether they had tried to calculate it from the

14  FHFA's side?

15  A.  Sure.  Yeah, Mr. DeMarco's testimony also indicated that

16  they had not attempted to quantify the PCF.  Mr. Ugoletti's

17  testimony indicated something similar.

18  Q.  Okay.  So you looked at market -- the best market

19  comparables you could identify; is that right?

20  A.  Correct.

21  Q.  And can you summarize for the jury what those were again,

22  briefly.

23  A.  Right.  So, you know, because the PCFs did not include a

24  specific formula for computing the fee, I thought that the best

25  sources for determining the pricing of the commitment fee based

1   the crisis was a good idea because not only did we save the

2   financial system and serve the public interest of financial

3   stability, but the government actually made money.  That it

4   didn't lose money.  So these were not contracts where they were

5   providing subsidies by the government's own claim after the

6   fact.

7   Q.  Now -- and they -- they did those aids to all these groups

8   for the public interest?

9   A.  Yeah.  So both -- both AIG, as well as the CPP assistance,

10  were explicitly to serve the public interest of financial

11  stability, which is the same rationale given for providing

12  assistance to the GSEs.

13  Q.  Now, in any of those other assistance deals under the

14  Capital Purchase Program to the 700 banks or the aid that the

15  Federal Reserve and the Treasury gave to AIG, in any of them,

16  did the government say that in the public interest they needed

17  to take 100 percent of all future earnings of those

18  institutions forever?

19  A.  No, they did not.  It's unprecedented.

20  Q.  Now, you also looked at something to do with the FDIC as a

21  comparator.  Can you explain to the jury -- they may all know,

22  but just for all of us, what is the FDIC?

23  A.  So in 1933, after the Great Depression, Congress authorized

24  the creation of the federal deposit insurance.  And that means

25  that a government agency, the Federal Deposit Insurance

1     $11.6 billion.

2     Q.  Did you compare that to the amount Fannie and Freddie paid

3     under the net worth sweep that was in excess of what they would

4     have paid under the 10 percent dividend?

5     A.  Yes, I did.

6     Q.  Is that what this slide shows?

7     A.  And that's on this chart.  So absent the net worth sweep,

8     the PCF between 2013 and '22, that ten-year time period, would

9     have been 11.6 billion; again, at the high end of my range.

10         And, in effect, because of the net worth sweep, the GSEs

11    ended up paying $150.2 billion -- not in total -- but in excess

12    of the 10 percent dividend.  So over and above the 10 percent

13    dividend.

14    Q.  The 10 percent dividend was 18.9 billion a year?

15    A.  That's in one year, yeah.

16    Q.  So over ten years, that would have been 189 billion?

17    A.  That's right.

18    Q.  And the 150 is on top of the 189?

19    A.  Exactly.

20    Q.  Now, you said this is the PCF they would have paid.  But is

21    it your opinion -- your opinion is this is the high end of your

22    estimate of what it could have been?

23    A.  That's correct.

24    Q.  Did you look -- compare also to the low end?

25    A.  Yes.

1      to take.

2              It also can help inform other constituents as to

3      what the expectations of performance will be for a company.

4      So Fannie was no different than the companies I had worked

5      for previously.  So we would prepare forecasts input on a

6      quarterly basis and then update the FHFA and the Treasury on

7      what our expectations for performance were.  Also, those

8      forecasts might inform disclosures that we may want to make

9      within our public filings.

10      **Q.**   In 2012, did anyone at Treasury tell you that your

11      projections at Fannie Mae were too optimistic?

12      **A.**   No.

13      **Q.**   Did anyone at FHFA in 2012 tell you that Fannie

14      Mae's projections were too optimistic?

15      **A.**   No.

16      **Q.**   And what was your reaction when you learned of the

17      third amendment a couple of days beforehand?  Is that right?

18      **A.**   Correct.

19      **Q.**   All right.  And what was your reaction to it?

20      **A.**   But I had, shortly before that, had a meeting with

21      Treasury whereby we reviewed our forecasts.  I had expressed

22      a view that I believed we were now in a sustainable

23      profitability, that we would be able to deliver sustainable

24      profits over time.

25              I even mentioned the possibility that it could get

       **DIRECT EXAMINATION S. McFARLAND - read by Ms. Davis**

1    to the point in the not-so-distant future where the factors

2    might exist whereby the allowance on the deferred tax asset

3    would be released.  We were not there yet, but, you know,

4    you could see positive things occurring.

5        **Q.**   And with whom at Treasury did you have this

6    meeting?

7        **A.**   So the -- which meeting?

8        **Q.**   The one you just referenced where --

9        **A.**   Where I had the discussion about the forecasts?

10        **Q.**   Yes.

11        **A.**   So it was a common practice for us to meet with

12    Treasury on a quarterly basis to review our results from the

13    past quarter and to undate them on our forecasts, you know

14    our updated forecasts.

15            In that meeting, I don't remember every specific

16    person in the meeting.  I was there, Tim Mayopoulos, who was

17    the CEO of Fannie Mae was there.  Dave Benson, I think,

18    would have been there.  He -- he was the Treasurer of Fannie

19    Mae at the time.  That would have been normal for him to be

20    in attendance.  Mary Miller, the secretary of the Treasury

21    was there.  Tim --

22        **Q.**   Bowler?

23        **A.**   Thank you.  I believe he was there.  He was

24    normally at those meetings.  I believe there was a

25    gentleman, and I can't remember his name who used to work at

**DIRECT EXAMINATION S. McFARLAND - read by Ms. Davis**

1   Fannie that was now at Treasury that was like a financial

2   analyst.  I think he was there because they knew part of the

3   topic we wanted to talk about was these projections.

4          And then there were probably other members of --

5   excuse me -- FHFA, the U.S. Treasury and Fannie Mae to talk

6   about some other topics that were going to be covered in

7   that meeting because, normally, we reviewed financials but

8   they were, you know, there may be one, two or three other

9   topics that would be discussed, and both Fannie and Treasury

10  would then make sure they had the -- the personnel around

11  the table to facilitate those conversations.  I don't

12  remember in this particular meeting what those topics were

13  and who those individuals were.

14     **Q.**    And so would it be fair to say that there were at

15  least five or six Treasury officials at this meeting?

16     **A.**    Probably, yes.

17     **Q.**    And did the meeting take place at Treasury?

18     **A.**    Yes, it did.

19     **Q.**    And was this within less than a month before the

20  net worth sweep?

21     **A.**    I believe it was the week before.

22     **Q.**    Okay.

23     **A.**    It was very -- it was within the week or two.  It

24  was very close to.

25     **Q.**    Would it surprise you to know that there's an

**DIRECT EXAMINATION S. McFARLAND - read by Ms. Davis**

1    email from Tim Bowler where he's saying we need to make a

2    renewed push on the net worth sweep?

3        **A.**    I don't have knowledge of that email.

4        **Q.**    And was this meeting -- I'm sorry if I've asked

5    you this.  Was it at Treasury?

6        **A.**    Yes.

7        **Q.**    Did you take notes of this meeting?

8        **A.**    No.  I don't generally take notes in those types

9    of meetings.

10        **Q.**    Would there have been anyone on your team who

11    would typically take notes on those meetings?

12        **A.**    No one on my team was present.  In other words,

13    nobody on the finance team was present at the meeting other

14    than me.

15        **Q.**    Did you ever have any similar type conversations

16    with anyone at the FHFA about the deferred tax asset prior

17    to the third amendment?

18        **A.**    Yes.

19        **Q.**    And tell me about that meeting?

20        **A.**    Well, I don't -- so just as we -- you know, we had

21    a formal quarterly sit-down with Treasury.  We had more

22    regular interactions with individuals at FHFA.  So one,

23    either, Jeff Spohn and/or Brad Martin would attend our

24    Executive Committee meetings.

25            And so, generally, anything I was going to say at

**DIRECT EXAMINATION S. McFARLAND - read by Ms. Davis**

1    Treasury I was already telling the executive board, and Brad

2    or Jeff would have been present at those meetings.  And as

3    such, my reviews of actuals and forecasts and even the --

4    the -- the raising of the potential that that allowance

5    might be reversed in the not-so-distant future, I would have

6    mentioned at an Executive Committee meeting.  And Jeff

7    and/or Brad would have been present to hear that.

8         Q.   And just to be clear on that, that would have been

9    within a month of the third amendment?

10        A.   It would have been prior to that.

11        Q.   Yes.

12        A.   Because it's all part of the discussions we have

13   through the quarter and closed process and forecast

14   preparation and board prep and all of that kind of stuff

15   that takes place in that cycle.

16        Q.   So just so the record is clear, when you say

17   "prior to that," what period would that have been?

18        A.   Well, it would have been probably -- I would

19   suspect it was -- something that occurred in July would be

20   my -- because of the timing, you know, you're closing the

21   books for the second quarter.

22             We're prepping for the upcoming board meetings,

23   getting the forecasts done, letting the team know when the

24   results are coming out for the quarter.  All of those kinds

25   of conversations that would happen internal at Fannie Mae

**DIRECT EXAMINATION S. McFARLAND - read by Ms. Davis**

1    that regard.

2           As far as the deferred tax asset, I don't

3    recollect that we had some big formal meeting to break the

4    news to them, okay.  I believe that it was just something

5    that we talked about in the normal course of keeping them

6    informed about kind of what we're seeing.

7           And also Jeff Spohn and/or Brad Martin would

8    attend our board meetings.  So they would also hear that the

9    same comments I was making to Treasury, I was making to the

10   board.

11        **Q.**   In the same timetable?

12        **A.**   I don't remember exactly when the board meetings

13   were within that window, but it would have been board

14   meetings shortly before that that I would have reviewed this

15   very same information.

16        **Q.**   When you say you would have had dialogue with

17   people at FHFA about the deferred tax asset, with who would

18   you have had the dialogue?  Would that have been Mario

19   Ugoletti?

20        **A.**   Yes.  Early on, it's probably through the chief

21   accountant's office of FHFA because it's a technical

22   accounting matter.

23        **Q.**   Do you happen to recall --

24        **A.**   I can pick them out of a lineup.

25        **Q.**   Okay.  We will show you some names later on.

**DIRECT EXAMINATION S. McFARLAND - read by Ms. Davis**

1    **A.**   I tell you, ask me a number, I can probably give

2    it to you.  People's names...

3         It would have started there.  Eventually, there

4    were conversations with Director DeMarco and key direct

5    reports of his and that -- these -- those -- the DeMarco

6    conversations occurred when we were actually in the serious

7    motive potentially.  We were looking.

8         We did a full analysis at the end of the second

9    quarter.  No release.  We did a full analysis at the end of

10   the third quarter.  No release.

11        When we were doing the analysis for the fourth

12   quarter of 2012, we started to get to a point where we were

13   tipping towards release.  And that's when I began to have

14   conversations with more senior folks at FHFA on it.  But

15   they were already -- but they were already aware of the

16   statement that I made to Treasury.  I mean, in general, I

17   put it on people's radar screens that it's something that

18   could happen in the not-so-distant future.

19        I will say that I believe Mary Miller asked me in

20   this meeting about how large would it be and did I have any

21   idea of when.

22   **Q.**   Yeah?

23   **A.**   And I believe my response was around 50 billion,

24   but that could be larger or smaller depending upon when.

25   The further out in time it is, the smaller it probably would

**DIRECT EXAMINATION S. McFARLAND - read by Ms. Davis**

1    be.  It is part of the evidence that it might be good.  So

2    the further out in time that it would be released, the

3    smaller the release size would be.

4         But I said, Probably in the $50 billion range and

5    probably some time mid-2013 at that time when I met with

6    them late July/early August 2012.  But I said we had not

7    done a real in-depth analysis.  So I was just kind of giving

8    her kind of my off-the-cuff perspective in the moment.

9    **Q.**   And FHFA was on notice that you had sent this

10   message to Treasury?

11   **A.**   Yes, yes.

12   **Q.**   And they were on notice of that fact before the

13   third amendment; is that right?

14   **A.**   Yes.

15   **Q.**   Now, the periodic commitment fee, do you recall

16   there being any discussion while you were at Fannie Mae

17   about the amount of the periodic commitment fee?  As I said

18   at the beginning, the assumption is that I'm asking about --

19   **A.**   The main discussion were the -- that they were

20   continuing to waive our need to pay the commitment fee.

21   **Q.**   Was the commitment fee regarded by yourself as

22   akin -- not the commitment fee but the commitment itself as

23   akin to a line of credit?

24   **A.**   Yeah.  I mean, obviously the preferred stock

25   purchase agreement provides for funding, access to funding

**DIRECT EXAMINATION S. McFARLAND - read by Ms. Davis**

1    Treasury on this.

2           It will affect the private preferred shareholders.

3    It'll affect the common shareholders.  But it doesn't affect

4    the MBS and bond investors.

5    Q.  Dr. Dharan, are you aware of whether there were

6    subsequent amendments to the PSPAs?

7    A.  Yes, there were.

8    Q.  Have you summarized those amendments on a slide?

9    A.  Yes.  I have a very brief summary of that.

10   Q.  Can you describe the amendments to the members of the

11   jury?

12   A.  Okay.  Just to recall, the original Treasury commitment

13   that I mentioned earlier is $100 billion, up to $100 billion

14   available to Fannie and to Freddie to draw from Treasury.

15   Right?  So there was a first amendment on May 6th, 2009.

16   The first -- the original one was in September 2008.  Right?

17          The first amendment was May 6th, 2009.  It

18   increased the Treasury commitment to $200 billion for each

19   of Fannie and Freddie.

20          Then there was a second amendment in December, on

21   December 24th, 2009.  And this essentially removed the cap.

22   It said:  No cap until December 31, 2012.  And there was a

23   formula given to calculate what the cap would be on that

24   date.

25   Q.  And, Dr. Dharan, was there a third amendment to the

Dharan - DIRECT - By Mr. Kravetz

1       on the original PSPAs.  These are the ones that were signed

2       in September of 2008 and then May 2009.  Yes.  So executed

3       in September of 2008, May of 2009, all the things I showed

4       earlier.  Okay?

5               So these ones, the dividend is 10 percent of

6       liquidation preference if paid in cash and 12 percent if

7       payment in kind is invoked.  Right?  I mentioned this

8       earlier.

9               But the other thing I wanted to mention is there

10      is also a capital part.  I'll mention that in a second.  In

11      the net worth sweep, the dividend is completely different.

12      The dividend now is going to be 100 percent of the net

13      worth.  So whatever the positive net worth of the

14      enterprises is, that entire amount is paid as dividends.

15      Sometimes it's described as swept as dividends, where it's

16      entirely swept up to the Treasury as dividends.  So that's a

17      very different feature.

18              And the second one I want to highlight is the

19      capital.  So in the original PSPAs, let's say Fannie Mae had

20      a $10 billion profit and just -- I'm using hypothetical

21      numbers.  Okay?  So let's say they have a $10 billion profit

22      and the dividend to be paid is $7 billion in cash dividend.

23      The remaining $3 billion then, 10 billion profits minus 7

24      billion dividend, that is added to capital.  So Fannie's

25      capital is increased by that amount.

1    And so Fannie and Freddie could build and retain

2    capital, basically unlimited capital.  So they can become

3    stronger and so on.  Right?

4    The net worth sweep is very different on that.

5    So -- and the reason is, the entire net worth is swept to

6    the -- to Treasury every quarter.  Right?  Completely gone.

7    So there's really no capital left for Fannie and Freddie.  I

8    mean, technically, they were allowed to keep $3 billion each

9    initially and then -- kind of a small number and then slowly

10   reduce it to zero over five years.  Compared to the

11   enterprises' size, that's very small.

12   But that's going to go to zero pretty quickly.  So

13   I'm going to say every now and then "zero capital" when I

14   want to talk about this.  And that's what I mean by that.

15   But they can't build or retain any capital.

16   That's the main second feature of that.

17   Q.  Now, just to be clear, that term, "net worth sweep," is

18   that a term that you came up with?

19   A.  No.  This is a term that was used, I believe, even in

20   Treasury's announcement of the third amendment.

21   Q.  It's the government's own term?

22   A.  It's the government's term.  Right.

23   Q.  Now, Dr. Dharan, in your decades of experience, have you

24   ever seen a transaction like the net worth sweep before?

25   A.  No.  Never.

1    Q.  And have you created a slide describing what it is about

2    the net worth sweep that you find to be unprecedented?

3    A.  Sure.  I have a slide for that.

4            Again, this essentially -- there are two things I

5    just mentioned.  I wanted to put them together on this one

6    slide.  But the dividend payment is the entire net worth.

7    The entire positive net worth is paid out, regardless of the

8    amount.  It could be $100 billion, any number.  It's all

9    paid out.  Right?

10           So that's very unprecedented.  Typically, dividend

11   payments are a percentage.  But this is entirely paid out,

12   unprecedented.

13           The second one is Fannie and Freddie as a result

14   cannot build or retain capital.  And the reason why I want

15   to explain why this is unprecedented is remember that Fannie

16   and Freddie are financial institutions.  Right?  These are

17   like your banks and other financial institutions.

18           Typically, regulators normally will impose a

19   minimum capital.  They will tell the bank, You must maintain

20   a minimum capital in order to be solvent and stable and so

21   on or a safe and sound operation.

22           Here, by contrast, the net worth sweep is

23   essentially saying:  You have to have a maximum capital.

24   The maximum capital is going to be zero, starting from

25   $3 billion and quickly going down to zero.

1   than the $3 billion that I mentioned as a caveat, just to

2   make sure everybody knows that I mean that as well.

3            But really the net worth is down to zero very

4   quickly.  And that's the opposite of preserving and

5   conserving and especially the opposite of sound and solvent,

6   because it can't be solvent and sound if you continue to

7   have zero net worth.

8   Q.  Dr. Dharan, are you familiar with the term "liquidation"

9   from an accounting standpoint?

10  A.  Yes.

11  Q.  And do you have a slide listing certain statements made

12  about whether the companies would be -- the GSEs would be

13  liquidated by the conservator?

14  A.  Yes, I have.

15  Q.  Dr. Dharan, why was it important for you to highlight

16  these statements to the jury?

17  A.  Again, this is part of making sure I documented what the

18  FHFA said initially and comparing it with what the third

19  amendment and the net worth sweep in particular did.  So

20  these phrases are relevant for that purpose.

21  Q.  And what does it mean that the companies would not be

22  liquidated?

23  A.  It means they will not be liquidated.  Right?  It

24  basically means that they will be operated as a sound and

25  solvent -- they will be allowed to operate.  At some point

1    in time, they will be returned -- they will be taken off of

2    conservatorship and returned back to shareholders, because

3    conservatorship is really not intended to be a permanent

4    thing.  Right?  So this is really saying that they won't be

5    liquidated, which means that they will be brought up to a

6    condition where they could be returned to shareholders.  And

7    there are no plans to liquidate the company.

8              And the third one says -- recognizes that although

9    the company can be liquidated by statute, the charter of the

10   company must be transferred to a new entity and can only be

11   dissolved by an act of Congress.

12             So these two enterprises, Fannie and Freddie, were

13   created by Congress; and only Congress can decide if they

14   want to liquidate it.

15   Q.  Dr. Dharan, is there anything in PX 2-C, Plaintiffs'

16   Exhibit 2-C, that to you is consistent with the concept of a

17   net worth sweep?

18   A.  No.

19   Q.  I'd ask if you can next open up your binder to Tab 2.

20   A.  Okay.

21   Q.  This is Plaintiffs' Exhibit 2-E.

22   A.  Yes.

23   Q.  Are you aware this is a document that was admitted into

24   evidence during the course of this trial?

25   A.  Yes.

1   broad authority for a conservator to operate the institution

2   until it is stabilized and then returned to the

3   shareholders," end quotes.

4           Why did you choose that excerpt to present to the

5   jury?

6   A.  Well, again, it kind of reinforces the earlier comment

7   in a more specific way, so I thought this might be helpful.

8   And it -- he talks about until it is stabilized and then

9   returned to the shareholders, which again implies a

10  temporary conservatorship.

11          But we can't return to the shareholders without

12  building up the net worth and capital.  And the net worth

13  sweep is inconsistent with that.  So that's why I wanted to

14  show this.

15  Q.  And is there one more part of PX Exhibit 2-E that was

16  relevant to your opinion that you've highlighted for the

17  jury?

18  A.  Yes.

19  Q.  And, Dr. Dharan, this states, quote:  "The economic

20  interests of shareholders have not been eliminated; they

21  continue to exist," end quote.

22          Why did you choose that excerpt to present to the

23  jury?

24  A.  I thought the previous slide and this together provided

25  a better -- you know, a fuller picture of what Mr. DeMarco

1   was talking about in the earlier slide that I showed,

2   "returned to the shareholders."

3           So here, he's being more explicit in saying that

4   the economic interests of shareholders have not been

5   eliminated.

6           So conservatorship means -- remember the four

7   parties that I showed earlier, the four people standing in

8   line?  The shareholders are still standing in line.  So they

9   are still in there, the third and the fourth people that I

10  showed in my diagram.

11          And so that is what Mr. DeMarco is describing

12  here.

13  Q.  And that's even though dividend rights had been

14  suspended during the period of the conservatorship?

15  A.  That's correct.

16  Q.  Dr. Dharan, have you reviewed the amount that was

17  transferred as a result of the net worth sweep in 2013, the

18  year that the net worth sweep went into effect, compared to

19  what the amount would have been under a 10 percent dividend?

20  A.  Yes, I have.

21  Q.  Do you show that on a slide?

22  A.  Sure.

23  Q.  And can you describe to the members of the jury what

24  we're seeing on this slide?

25  A.  Right.  So what I'm showing here is what actually

1    happened in 2013.  And we already know how much dividend was

2    paid in 2012, cash dividends were paid in 2012.

3            I'm showing that amount here as what the dividend

4    would have been if we had -- if you didn't have the net

5    worth sweep.  If all we had was the previous amendments, the

6    original PSPA, and there's no more draw going on any longer

7    by the middle of 2012, so in 2013 the dividend would have

8    been $18.9 billion.

9            And that's the same as 2012.

10   Q.  That's combined for Fannie and Freddie.  Correct?

11   A.  That's combined for Fannie and Freddie.  But what

12   actually was transferred to Treasury in 2013 as cash

13   dividend was $130.1 billion.  So that's a huge different --

14   a huge difference between the two.  A big difference.

15   Q.  And is that difference relevant to your opinion?

16   A.  Yes, because this -- as I said in my roadmap for my

17   Opinion 1, I examined what FHFA said the purpose was and

18   then I'm comparing that with what the net worth sweep

19   actually did.  So this is the reason for showing this.

20   Q.  And, Dr. Dharan, you indicated that you've reviewed a

21   number of case documents; is that correct?

22   A.  Yes.

23   Q.  In your review of case documents, have you seen a single

24   FHFA document stating that the net worth sweep was

25   unintended?

1   A.  I didn't see any of them that said, "Oh, my God, we paid

2   $111 billion more.  That's not what we intended."  So there

3   was no document saying the net worth sweep -- the effect of

4   the net worth sweep was unintended.

5   Q.  Any document asking whether FHFA could use that result,

6   that excess $111 billion, to potentially renegotiate the

7   amendment with the Treasury Department?

8   A.  No.  I didn't see anything like that.

9   Q.  Have you gone beyond 2013, the first year of the net

10  worth sweep, to determine what the difference is between the

11  imposition of the net worth sweep versus what the dividend

12  would have been through the end of 2022?

13  A.  Yes.  I have done that.

14  Q.  Is that depicted on your next slide?

15  A.  Yes.

16  Q.  And can you describe to the members of the jury what

17  this slide is depicting?

18  A.  Right.  So the top line here is the total value sent to

19  Treasury under the net worth sweep.  It could be cash

20  dividends; it could be increase in liquidation preference,

21  all combined.  So overall, how much value was transferred to

22  Treasury.  That's $340.7 billion.

23          So this is from 2013 to the end of 2022, fourth

24  quarter, meaning December 31, 2022.  And remember I

25  mentioned earlier that if they didn't have the net worth

1    sweep, they were paying at the rate of $18.9 billion in cash

2    dividends.

3           So in the second line, I'm showing how much would

4    that add up to for these ten years if you continued to pay

5    that 18.9 billion each year.  The exact number on that would

6    be $189.5 billion.

7           So if you take the difference, that's the excess

8    value that was sent to Treasury from both Fannie Mae and

9    Freddie Mac together since the net worth sweep.  And that's

10   $151.2 billion.

11   Q.  And since there was an excess value sent to Treasury of

12   $151.2 billion, is that also relevant to your opinion?

13   A.  Yes, it is.

14   Q.  Why?

15   A.  Again, remember I'm -- in my roadmap, I'm comparing what

16   the FHFA said the purpose was and then comparing that with

17   what actually happened.

18           So FHFA said, you know, the purpose was to

19   preserve and conserve the assets and also to create a

20   positive net worth and stabilize the company, to create all

21   of those normal business operations.

22           This amount has been transferred out of Fannie Mae

23   and Freddie Mac, so this is a relevant number for that --

24   for my analysis.

25   Q.  And in terms of your roadmap, Dr. Dharan, does that

1    deficient process.  I'll talk about the process used by FHFA to

2    come -- come to the -- to arrive at the net worth sweep and

3    talk about how the process was deficient for a decision of this

4    magnitude.

5         And then lastly I'll talk about some other potential

6    harm that net worth sweep is going -- was -- was having on

7    Fannie Mae and Freddie Mac and the markets.

8    Q.  Let's start with the first step along your road map here.

9         That's entitled Strong Economic Fundamentals and

10   Sustainable Profits; is that correct?

11   A.  Yes.

12   Q.  All right.  Now, Dr. Dharan, in the first half of 2012, did

13   Fannie and Freddie start returning, in your opinion, to a

14   period of sustainable profitability?

15   A.  Yes.

16   Q.  All right.  Is that depicted -- starting to be depicted on

17   the first slide that we're viewing?

18   A.  Right.  The first slide I'm going to show is the condition

19   that they were in, the kind of profits they were already

20   starting to report in the first half of 2012.  You may recall,

21   Mr. Mayopoulos this morning, he wasn't sure if Fannie Mae made

22   profit in the first quarter or second quarter of 2012.  It's

23   been a long time, you know, several years, but I do have the

24   numbers on the screen.

25        They were profitable in the first quarter.  They made a

1    $3.1-billion profit.  In the second quarter, they made

2    $5.4 billion.  That's in the bottom half.  In the first

3    quarter, Freddie Mac made $1.8 billion, and in the second

4    quarter they made $2.9 billion.

5         And you can see that Fannie Mae covered the dividend --

6    cash dividend to Treasury completely in both quarters.

7    Freddie Mac fell short just by a little bit -- like, a hundred

8    million dollars or some amount below the 1.8 billion -- but

9    in the second quarter, Freddie Mac made significantly more --

10   more than a billion dollars more than the dividend owed to

11   Treasury.

12        So those were profits as they existed.  I'll also talk

13   about how the sustainable profitability data looked like.

14   Q.  And that term that you used in your slide and we also heard

15   that this morning, sustainable profitability, is that a

16   financial accounting term?

17   A.  It's a term used in accounting to refer to future profits

18   that are not just a one-time blip.

19   Q.  And when you refer to returning to sustainable

20   profitability, are you resting your opinion solely on the fact

21   that Fannie and Freddie had been profitable for one half of a

22   year?

23   A.  No.

24   Q.  Why not?

25   A.  So what I am doing is -- in addition to looking at the

1   Q.  All right.  And why was that important?  Why was the

2   housing market important for you to review?

3   A.  Yes.  The housing market is a key determinant of Fannie Mae

4   and Freddie Mac's profitability.  The housing market did well.

5   They will do well because it determined the g-fees.  It

6   determined their credit losses.  Everything that you see on

7   this screen is a function of that.  So I wanted to look at

8   that.

9   Q.  And do you have a comparison of what changed in the housing

10  market between the time of the credit crisis and August 2012?

11  A.  Yes.

12       So this slide shows what the situation was during the

13  financial crisis.  That's the one on the left side, 2008, 2009.

14  And the right side shows how things had completely changed,

15  certainly changed for the better, by August 2012.

16       So the first item I have is home sales, by -- you know,

17  during the financial crisis, home sales were stagnant.  They

18  were often declining.  And by contrast, by August 12th --

19  August 2012, the home sales had started improving.  And that's

20  a big turnaround right there.

21       In addition, if you look at the second item there, the

22  home values -- these are the home prices.  As you know, the

23  credit financial crisis was all about falling home prices, but

24  by August 2012, the home prices had bottomed out by as early

25  as, like, February 2012.  And they were improving.  So by

1    August 2012, we had three or four months of data on improving

2    home values.

3         And the financial crisis was mainly characterized by

4    large credit losses for all the financial institutions,

5    including Fannie and Freddie.  But by August 2012, both Fannie

6    and Freddie were finding that the high-risk loans that they had

7    made in 2008, '07, '06, and so on were getting smaller in

8    percentage terms in their books.  They were running off.  And

9    the new ones that are replacing them are higher-quality loans.

10   Q.  Now, to be clear, there's never any certainty in terms of

11   what direction home values will go; is that right?

12   A.  Right.  There's never a certainty, but these are trends

13   that they were seeing at the time.

14   Q.  And you were -- and when you say trends they were seeing,

15   did you see internal documents relating to what Fannie and

16   Freddie expected would happen in terms of home prices?

17   A.  Yes.

18   Q.  And -- but they --

19   A.  Not only was I observing it with my data, but I also see

20   the same reflected in Fannie and Freddie's internal data.

21   Q.  And what they expected -- did that ultimately come to

22   fruition?

23   A.  Yes.

24   Q.  Why, Dr. Dharan, were some of these structural housing

25   market changes important to Fannie and Freddie and their

1   financial picture as of August 2012?

2   A.  Well, I would say the main -- one of the main things

3   that are -- there are several things about importance of the

4   housing market.  But the most important thing I want to

5   highlight right now is the fact that when the housing market

6   does well, they have less losses, the credit loss.

7        The mortgages that they buy and hold are securitized.

8   They do better.  And the mortgages do better.  Finance really

9   do better.  So that's the main thing I wanted to talk about in

10  my next slide.

11  Q.  And is there an accounting entry that is associated with

12  credit losses relating to loans, in particular real estate

13  loans?

14  A.  Yes, there is.

15       So both Fannie and Freddie, as a matter of normal

16  accounting method that all companies use, they would make an

17  estimate of potentially how much loss are they going to have on

18  the mortgages and assets that they are guaranteeing or holding,

19  and they put that out in a reserve.  It's called a loan loss

20  reserve.  I have that in this picture on the -- on the

21  demonstrative here.

22       So the loans are either bought or securitized -- bought

23  and securitized by Fannie and Freddie, but they also -- every

24  quarter they take a look at the loans and make an estimate of

25  what do I need to set aside for the future regarding expected

1    losses, and that's called loan loss reserve.

2         You can think of it like a vault that they're putting

3    this in.  It's not real money.  So I don't want to give the

4    wrong impression there's real cash going into the vault, but

5    it's an accounting entry that gives an amount that they can use

6    against future actual losses.

7    Q.  So would it be fair to say that a loan loss reserve is a

8    write-down of loan assets?

9    A.  They're a temporary write-down.  If the loans do well,

10   they can write it up again, but they are a write-down at this

11   point.

12   Q.  And, generally, are loan loss reserves higher or lower

13   during a downturn in the economy?

14   A.  During a downturn, they definitely go up.  So you end up

15   with a higher loss loan reserve standing.  In 2008, everything

16   looks pretty terrible, and the loan loss reserves are going to

17   be bigger.  By 2012, you should see a difference; right?  So

18   they depend on the economy.

19   Q.  All right.  And, Dr. Dharan, what happens if loan losses

20   actually turn out to be lower than expected?

21   A.  Well, so if they -- the loan loss reserves -- again,

22   they're all estimated every quarter.  And then they're updated

23   and updated again every quarter; right?  So things have turned

24   around, and then by August 2012, you look at the same loans

25   that you were estimating high losses on earlier, and now those

 1    loans are looking a lot better, perhaps; right?  So because the

 2    economy is improved.

 3          So if the loan losses turn out to be lower or less than

 4    expected, then Fannie and Freddie would release those loan loss

 5    reserves that they had held in that vault that I showed.  So

 6    that release will add to profit.  So initially when they were

 7    setting aside the losses -- loss reserve, profits go down.

 8          But now they are releasing the loss reserves and the

 9    profits would go up correspondingly.

10    Q.  And does the chart below list what would happen in -- in a

11    better economy than the chart above?

12    A.  Yes.  And it also shows how things were improving by

13    August 2012.

14    Q.  So in the bottom chart, they're taking less loan loss

15    reserves; correct?

16    A.  Right.

17    Q.  But it also says release of loan loss reserves.  Can you

18    describe that concept to the jury.

19    A.  Yes.  So the loan loss reserves is really reducing the

20    value of the loans on the balance sheet.  It's like a reserve

21    that I mentioned; accountants set aside as a mental accounting.

22    But when you release those reserves, they're added to the

23    income of that particular quarter when the release takes place.

24    So the release is actually adding to the profit.

25    Q.  And that's why there are four bricks of currency on the

1    bottom and only two on the top?

2    A.  Yes, I would think so.  Yes, exactly.

3    Q.  All right.  So, Dr. Dharan, have you reviewed Fannie's and

4    Freddie's credit losses during the beginning part of the

5    conservatorship through 2011?

6    A.  Well, yes.

7    Q.  Is that depicted on your next slide?

8    A.  Yes.  I have a diagram to show how things were and how

9    things changed during the period of conservators and also -- in

10   the 2012 and '13 and so forth.

11   Q.  And can you describe this -- this next slide for us.

12   A.  Okay.  So these are the first four years of the

13   conservatorship; keeping in mind that in 2008, Fannie and

14   Freddie entered conservatorship only in September.  Okay?  But

15   I have the whole-year number as reported on the financials.  So

16   there was a big credit loss of $28 billion -- I forgot to put a

17   B there.  But those are billions.  And then 73 billion in 2009.

18   Again, a loss of 25 billion, approximately, in 2010.  And

19   another loss of approximately 27 billion in 2011.  This is for

20   Fannie.

21        Similarly, for Freddie, 16 and, approximately, 30 and 17

22   and 11.  So when you add them up, they're a total credit loss

23   -- these are all loan loss reserves -- they're going into loan

24   loss reserves first and then they get used up -- of

25   $152 billion.  And for Freddie, that was $73.9 billion.  These

1   are put aside in the reserves, and then used up as loans go

2   bad.

3   Q.  So not actual cash losses, but they're put into this

4   accounting vault, so to speak?

5   A.  They're put into the accounting vault, and then when the

6   loans go sour, they're taken out of this vault.  If not,

7   they're sitting there to be used in the future.

8   Q.  Now, Dr. Dharan, does the next part of your demonstrative

9   include information about what happened in 2012 and 2013?

10  A.  Right.  So -- and I put them in green to show they really

11  have turned color and signed, and so -- by 2012, the loan loss

12  credit provision -- these are the annual provisions that Fannie

13  and Freddie were adding and then putting into the vault, those

14  are now positive for Fannie.  They were negative in 2012 for

15  Freddie and then became positive in 2012.  What this means is

16  that they're not anymore setting aside new reserves.

17        And that's the big difference.

18  Q.  Have you reviewed any internal Fannie and Freddie emails

19  referencing a change in credit losses early in 2012?

20  A.  Yes, I have.

21  Q.  And do you depict an example in your next slide?

22  A.  Yes, I have one slide on that.

23  Q.  And what is -- what is this document, Dr. Dharan, on the

24  slide?

25  A.  This document is an email sent to Mr. DeMarco at FHFA, but

1   it talks about the Fannie Mae's executive management meeting

2   Mr. Mayopoulos mentioned this morning.  The executives get

3   together.  It's called executive management meeting.  That

4   took place on January 9, but this email is dated January 12,

5   2012.

6   Q.  And why was this email -- why is this email important to

7   you in the context of what we've just been describing the

8   credit losses?

9   A.  Right.

10       This email is important because it's -- as early as

11  January 2012, the email already talks about the you inflection

12  point, the -- if I read the email, it says, "Susan said the

13  plan reflects the view that the company is at an inflection

14  point in the credit cycle with the loss allowance and

15  credit-related expenses projected to fall compared to 2011."

16  Just like what we were seeing in the earlier slide.

17       But what is interesting is that this is happening as

18  early as January 2012 that they are seeing a change of

19  direction, what Susan here refers to Ms. -- this chief

20  financial officer, McFarland.  And she's saying that it's an

21  inflection point in their credit cycle.

22  Q.  And did you review any testimony from Ms. McFarland that

23  was relevant to this point?

24  A.  Yes, I did.

25  Q.  Is that in your next slide?

1    A.  Yes, it is.

2    Q.  And why did you choose this portion of Ms. McFarland's

3    testimony for the jury?

4    A.  Yes.  If I remember right, she was asked about this

5    inflection point, and so she's describing, you know, why this

6    is an inflection point; and I like the concept of a double

7    tailwinds that she's using here.  So it really explains what's

8    going on.

9         First of all, she's saying something good is happening

10   with respect to the charge-off.  So that's something good

11   happening with new provisions.  So there are two tailwinds

12   she's describing.

13   Q.  And I think that's a new term, charge-off.  So what does it

14   mean to charge off a loan?

15   A.  So this actual -- charge-offs are -- remember I mentioned

16   earlier that management always anticipates loan losses and

17   sets them aside in a little vault.  But when the actual

18   charge-off happens, meaning you're going to get a phone call

19   saying this particular homeowner is going to default or they

20   already filed the papers saying they're not going to be paying

21   any more on their mortgage -- so those are actual -- actual

22   defaults.

23        So when that happens, that's -- that's taken out of the

24   vault also.

25   Q.  That's an actual loss?

1    A.  Yes.

2    Q.  Are you aware as to whether Fannie and Freddie's g-fees

3    were rising or falling in 2012 -- 2012?

4    A.  They were rising.

5    Q.  And can you give us some extent to the degree at which they

6    were rising?

7    A.  Yes.  From -- they certainly rose from 2011 to 2012.  Some

8    of it didn't -- they were not -- they were not keeping it, but

9    generally they were rising.  About 27 percent for that year.

10   And then in August of 2012, they were going to be -- there was

11   already an announcement that they would be rising by another 10

12   basis points.  You remember the basis-point concept that

13   Professor Thakor talked about.  Hundred basis points is like 1

14   percentage point.  So 10-basis-point increase was being --

15   being talked about and going to be done, and this was -- as

16   early as August, this had been announced.

17   Q.  And do you recall when that actually was announced, the

18   additional increase in g-fees?

19   A.  Sometime around August 8 or some date like that.  Before

20   the third amendment.  Before the net worth sweep.

21   Q.  And you touched on this earlier, but what -- is there a

22   relationship between lower credit losses and g-fees that are

23   paid by the banks to Fannie and Freddie?

24   A.  Yeah.  I think, essentially, they work together.  So I have

25   a slide to show that on the next slide.  So what's happening is

 1    that in 2012, where we are August of 2012, the g-fees are going

 2    up and they're expected to go up.  And the credit losses were

 3    going down as we saw in the earlier slides.  There's a

 4    connection that you asked about, which it's easier to explain

 5    from the slide.

 6         The g-fees are set -- I think I mentioned this

 7    earlier -- in order to cover the credit losses that Fannie and

 8    Freddie expect will happen, plus some margin that they need to

 9    make also, plus to cover other operating costs; right?  So --

10    but here what's going on is that the g-fees are going up, but

11    the credit losses that they were anticipating, they're going

12    down.

13         So that's combining to create a higher profit in 2012

14    and beyond.

15    Q.  Dr. Dharan, did you also examine whether the Fannie and

16    Freddie's share of MBS that was issued increased or decreased

17    during the period of the conservatorship?

18    A.  The overall market share was increasing quite a bit.  It

19    was -- I have a chart to show that -- and so I can use this to

20    explain the market shares.  If you look at 2006 -- which is

21    where I start with -- this is before the financial crisis,

22    Fannie and Freddie only had 45 percent of the mortgage --

23    secondary mortgage market.  There were other companies, other

24    banks, all kinds of other institutional players that were also

25    buying mortgages and securitizing them.  Fannie and Freddie

1    were only 45 percent.

2           But during the financial crisis, all these other

3    companies, they left the business.  Many of them completely

4    went out of business, and many of them simply decided it was

5    too -- too much for them to handle.

6           So Fannie and Freddie stepped in.  They got 95 percent

7    of the market at the time.  That -- the bigger the market means

8    the more opportunity to charge g-fees and collect.  So that's

9    the reason I wanted to show this.

10          And by 2012, August, their market share was 97 percent.

11   Q.  And does that also lead to greater income?

12   A.  Exactly.  So 97 percent market, g-fees you pay on that, so

13   you get higher revenues and, therefore, higher profits.

14   Q.  And any indication at this time that even though g-fees had

15   been increased, that -- that even though g-fees had been

16   increased, that banks were selling less loans to FHFA -- or to

17   Fannie and Freddie?

18   A.  No.  I see the 97 percent market share on that.

19   Q.  There have been some references to shrinking the GSEs.  Had

20   the GS- -- had the -- the g-fee market shrunk by mid-2012?

21   A.  The g-fee market is expanding.  And the reference you're

22   talking about is for the retained portfolio.

23   Q.  And we'll talk about that in a few minutes.

24   A.  Okay.

25   Q.  All right.  Now, you mentioned -- you mentioned the

1    retained portfolio.  What's your understanding of the reduction

2    in -- that was supposed to occur in Fannie and Freddie's

3    retained portfolio?

4    A.  So before the third amendment already -- in one the

5    previous amendments, the retained portfolio that I described

6    earlier, you see loans and the MBS securities that Fannie and

7    Freddie are holding on their own, in their own balance sheet,

8    that was slated to go down at the rate of 10 percent every year

9    for -- until they reached a minimum of $250 billion.

10           So they were told to reduce that as part of the -- one

11   of the earlier PSPAs; right?  The third amendment is going to

12   speed that up to 15 percent.  So there's a speed-up of -- a

13   little bit of a speed-up of a reduction in the retained

14   portfolio.

15           That's your question, I think?

16   Q.  Yes.

17           And do you have an understanding as to whether that

18   reduction in the retained portfolio actually had an impact on

19   Fannie and Freddie's profits?

20   A.  Yes, I do.

21   Q.  What is that?

22   A.  So, obviously, if you reduce the retained portfolio, you're

23   going to get less investment income from the retained

24   portfolio; right?  But on the other hand, what is going on is

25   that the g-fees had gone up and the overall market share of

1   Fannie and Freddie of these security issuances has gone up.

2   And, in other words, there's like a book of business on the

3   security -- market securities had either increased or

4   stabilized at a large number.

5       So it turns out when you combine the two, the g-fees

6   went up, income from retained portfolio went down.  But,

7   overall, Fannie and Freddie were able to make up for the loss

8   of retained portfolio income with the g-fees.

9   Q.  And do you have a slide depicting what Fannie Mae told the

10  public was occurring in terms of that relationship between

11  g-fees and the retained portfolio?

12  A.  Yes, I do.

13  Q.  Okay.  And what is on your -- on the slide on the screen,

14  Dr. Dharan?

15  A.  Yes.  So these are some excerpts from the annual report

16  that Fannie Mae filed with the SEC.  This is also sometimes

17  known as 10-K.  This is for the year 2012.  And it says:  We

18  expect rising guaranty fee revenue will, in a number of years,

19  become the primary source of revenue because the, you know,

20  retained portfolio is going down.  So it says -- they're

21  saying particularly as we reduce the size of our market

22  portfolio.

23      But then combining the two, they go on to say that, in

24  the second highlight that I have on the screen:  We expect that

25  these declines in our revenues -- from the decline in the

1     market portfolio income -- will generally be offset by rising

2     guaranty fee revenue.  So they're saying one is going down but

3     the other is going up and making up for the first one.

4     Q.  Now, Dr. Dharan, I think you referenced earlier that --

5     that GSE executives also referred to the fact that the

6     companies had reached or were reaching sustained profitability;

7     is that correct?

8     A.  That's correct.  That's correct.

9     Q.  And were you present today to hear the testimony of

10    Mr. Mayopoulos, the former CEO of Fannie Mae?

11    A.  Yes.

12    Q.  And what do you recall by Mr. Mayopoulos saying about

13    sustainable profitability?

14    A.  I think he said the same thing that -- they were reaching a

15    sustainable profitability by the middle of 2012.

16    Q.  Did you also -- and just to -- for frame of reference, what

17    is the significance of that, again, from an accounting

18    standpoint?

19    A.  Well, it's very important for many accounting decisions

20    companies make to know whether the profits are just a one-time

21    item or more sustainable.  If they're more sustainable, then

22    they're allowed to recognize the value of some assets.  For

23    example, the item I'm going to discuss next called deferred tax

24    asset, that only has value when you have sustainable

25    profitability.  Otherwise, you need to write that down to maybe

1   even zero.

2          And so it is an important idea and important concept

3   that accountants look for in deciding how much to value or

4   whether to even put a value at all on some assets.  In our

5   case, that would be the differed tax asset.

6   Q.  And does your next slide refer to a similar statement from

7   Ms. McFarland about sustained profitability?

8   A.  Yes, it does.

9   Q.  All right.  And what did you choose to highlight in terms

10  of Ms. McFarland's testimony?

11  A.  Yes.  Well, Ms. McFarland is the chief financial officer of

12  Fannie Mae.  She had -- I know looking at -- reading from her

13  deposition, I understand she was previously an auditor for

14  Deloitte.  And then they worked at several banks -- mBank and

15  two or three other banks -- and then Capital One she was -- you

16  know, chief accounting officer at Capital One and then chief

17  financial here.  So she has a financial institution practice

18  background, both as an accountant and executive.

19          So I thought her opinion was relevant.

20  Q.  Her background is relevant to you?

21  A.  Her background is relevant, I should say.

22  Q.  Why is that?

23  A.  Because this is an accounting concept and she's describing

24  an accounting idea.

25  Q.  Now, have you reviewed any documents from -- from Freddie

1   A.  So as a result of the financial crisis, once they started

2   reporting these big losses, their company's financial

3   projections were not showing sustainable profit at the time so

4   they wrote down the deferred tax asset, which meant a big loss

5   in the financial statements.  And that big loss meant big drop

6   in the net worth, and that's why they had to draw from Treasury

7   to fill that hole; right?

8        And now the -- 2012 things have changed.

9   Q.  And when you say a loss, is it an accounting loss or a cash

10  loss?

11  A.  These are accounting losses.  These are not cash losses.

12  Q.  And even though they've been written down, just like

13  with the loan loss reserves, can they be written back up

14  again?

15  A.  Yes.

16  Q.  All right.  Now, do you have a sense, Dr. Dharan, as to

17  what the value of the deferred tax assets for Fannie and

18  Freddie potentially were as of 2012?

19  A.  Yes.

20  Q.  Is that on your next slide?

21  A.  Yes.  There is, yes.

22  Q.  All right.

23  A.  Again, with some caveats.  So this is based on 2011

24  numbers.  So December 2011 annual report.  So I have that in

25  the footnote there.  They don't have to disclose this every

 1     quarter, but they do disclose it in -- in a footnote in the

 2     2011 10-K.

 3             I mention 10-K means annual report, and so these are

 4     annual numbers.

 5             So at the end of 2011, they had 64.1 billion of

 6     write-down.  The technical name for that is valuation

 7     allowance, but I'm just going to say write-down for, you know,

 8     simplicity; but they're really called valuation allowance.

 9             And Freddie Mac had a 35.7-billion write-down.  Adding

10     up total to $99.8 billion.  And this is up to -- I call it

11     up to because not all of this is going to reverse, and some it

12     of might be used up.  There are a lot of things happening

13     there.

14             But as they're reversed in the future, when it becomes

15     sustainably profitable, this is going to add to the net worth.

16     That's why I wanted to use these as my second step in the road

17     map.  So not only am I getting net worth increase from

18     sustainable profitability, but I'm also getting it because the

19     DTA is going to reverse when profits are sustainable.  That

20     could add up to 98 -- 99.8 billion into the net worth.  It's

21     probably going to be smaller, but I just want -- giving the

22     data from 2011.

23     Q.  And do you recall any trial testimony regarding restoring

24     some portion of Fannie Mae's deferred tax asset?

25     A.  Yes.

1    And that's why I wanted to use this to show the

2    profitabilities expected to be sustainable, and as a result,

3    they were -- the boards were discussing rerecording deferred

4    tax assets that had been previously written off, which means

5    they would come back to the balance sheet and add to the net

6    worth.

7    Q.  And, Dr. Dharan, what is the date of this email,

8    Plaintiffs' Exhibit 259?

9    A.  Yes.  It's dated August 14, 2012.

10   Q.  And can you remind us of the date of the net worth sweep?

11   A.  I think it's August 17th, 2012.

12   Q.  So three days beforehand?

13   A.  Three days before.

14   Q.  All right.  And just as you did with respect to loan loss

15   reserves, have you reviewed the write-downs and the write-ups

16   of the DTAs of Fannie Mae and Freddie Mac?

17   A.  Yes, I have.

18   Q.  And is that included on your next slide?

19   A.  Yes.

20   Q.  Okay.  All right.  Dr. Dharan, can you describe to us what

21   we're viewing here on the first part of your slide regarding

22   the deferred tax asset.

23   A.  Right.  So these four years that I have, just like I had

24   earlier with the credit loss table, so these are the time

25   periods before the third amendment, and so the first four years

1    of the conservatorship.  Once again, keeping in mind that 2008,

2    September, was when the enterprises entered into

3    conservatorship.  Okay?  But I had the whole-year number.

4         So these add up to -- these four -- all the negative

5    numbers you see, these are all in parentheses, that means

6    they're negative.  Again, they're all billions, although,

7    again, the -- we forgot to put the B there.  So these are

8    billions of dollars adding up to $64 billion -- 64.1, which I

9    showed earlier of DTA write-off for Fannie Mae, and

10   35.7-billion write-off for Freddie Mac.

11   Q.  All right.  And in the next portion of the diagram, does it

12   depict what happened in 2012 and 2013?

13   A.  Right.  Primarily 2013, but I also wanted to include 2012.

14   2012, some of the DTA came back, not for reasons that are

15   relevant for our discussion, but some of it came back.  But

16   almost all of it, basically, came back to the balance sheet in

17   2013 for the -- in the case of Fannie Mae and Freddie Mac.  And

18   that's why you see -- plus 58.4.  That was 2013 for Fannie Mae,

19   and plus 31.7, 2013.  This is all billions again.

20        And, again, when they come back to the balance sheet,

21   that means the net worth has gone up by that much.  That's what

22   really coming back to the balance sheet means.

23   Q.  So for Freddie Mac, the entirety of the write-down came

24   back as a write-up?

25   A.  Yes.  To the balance sheet.

1    Q.  And for Fannie Mae, almost all but -- is that $500 million

2    came back?

3    A.  That is correct.

4    Q.  All right.  Have you also calculated what the final impact

5    on net worth was as of 2013?

6    A.  Yes.

7    Q.  And why is -- before you give us the numbers, why is there

8    a difference between what is restored to the balance sheet

9    versus the actual net worth?

10   A.  Well, they're usually the same, but there's some reasons

11   why they could be different, because some of them -- again,

12   these are mainly technical accounting reasons, such as we

13   get -- some of the DTA gets used up or some of it gets

14   revised.  But, in addition, the 2013 number that I'm showing on

15   the screen is for the entire year.  The one I'm showing on

16   the -- in blue is the impact just in the first quarter of 2013.

17   That's the 50.6 billion.

18        So that's the first time they decided to bring back the

19   bulk, if not, all of the DTA back to the balance sheet.  And

20   that's 50.6 billion for Fannie Mae.

21        And then the same thing happened with Freddie Mac in the

22   third quarter of 2013, and that was 23.9 billion.

23   Q.  And as a result of the net worth sweep, what happened with

24   respect to that $74.5 billion in net worth?

25   A.  Right.  So if you add the two, that's 74.5 billion.  All

1  of that is swept up and paid off as cash dividend to the

2  Treasury.

3  Q.  You testified that Ms. McFarland indicated that the DTA may

4  be released in mid-2013 and that it would be approximately

5  $50 billion; is that correct?

6  A.  That's correct.

7  Q.  Was she right?

8  A.  Yeah, she was right.  She got the number exactly right.

9  The 50 billion is what happened in the 2013 Q1.  She was

10  expecting by the middle of 2013.  It happened a little earlier,

11  in the first quarter of 2013.

12  Q.  How would you assess her performance?

13  A.  Very good.  I think she got that right.

14  Q.  Now, Dr. Dharan, adding this concept of the release of the

15  DTA on top of sustainable profitability, what does it tell you

16  in terms of the state of Fannie Mae and Freddie Mac as of

17  August 2012?

18  A.  Well, they were both building up the net worth.  So the

19  good news is sustainable profitability means more net worth.

20  Release of loss reserves adding up the net worth through the

21  profits, increased g-fees adding up to the net worth, again,

22  through the profit.  And now the second item I'm discussing

23  here, which is the DTA write-up, is also adding a significant,

24  substantial -- maybe I can even use the word huge -- amount to

25  the net worth.

1    Q.  What, if anything, did the conditions depicted on this

2    slide tell you about the foreseeability of whether the GSEs

3    would make the profits that they ended up making?

4    A.  Well, it certainly means that there was no need for

5    circular draw because the whole point of circular draw that we

6    discussed earlier in the draft is if the net worth is negative,

7    then, and only then, you end up with a circular draw.  You have

8    to take from Treasury draw in order to pay the cash dividend to

9    the Treasury.  You don't have to do that when you have net

10   worth.  And here we're talking about huge build-up in net

11   worth.  So there's no need for circular draw.

12   Q.  All right.  Dr. Dharan, in addition to the actual results

13   as of August of 2012 and what happened in terms of the release

14   of the DTA, have you also reviewed certain internal projections

15   from Fannie Mae and Freddie Mac regarding whether the -- they

16   expected the Treasury caps to materially erode in the future

17   once set?

18   A.  Yes, I have.

19   Q.  What's your answer?

20   A.  Yes.

21   Q.  Okay.  And that was for both Fannie Mae and Freddie Mac?

22   A.  Yes.

23   Q.  All right.  Let's start with Fannie.  Have you reviewed

24   certain documents from Fannie Mae providing a longer-term

25   projection regarding the availability of -- availability of

1    Q.  All right.

2    A.  Again, the first two steps that I described already makes

3    the circular draw problem go away, but I just wanted to also

4    look at this option.

5    Q.  Okay.  So remind us how the payment-in-kind option, if

6    invoked, and if available, would work?

7    A.  Okay.  So payment in kind is invoked -- basically, this is

8    going to be invoked in -- in a common situation would be when

9    the net worth is negative.  So you don't have the cash to --

10   money to pay the dividend in cash without drawing from

11   Treasury; right?

12        So the payment in kind says you don't have to draw from

13   Treasury.  Here's an alternative.  You can simply add the

14   dividend amount to the Treasury claim, which is the liquidation

15   preference.  So that's why I'm showing that little extra bar

16   added to the top of the black -- on top of the second graph --

17   second bar.  That's the amount of dividend that is paid in

18   kind, meaning additional Treasury claims are issued in the form

19   of liquidation preference.  The important thing is that there's

20   no change in the Treasury commitment.  There's no drawdown in

21   Treasury commitment.

22   Q.  Now, Dr. Dharan, if the payment-in-kind option is invoked,

23   are Fannie and Freddie able to pay down any increase that's --

24   and the liquidation preference that is caused by paying in

25   kind?

DHARAN - DIRECT

1    Q.  And can you remind us, does paying the dividend in kind

2    have any impact on the priority of the liquidation preference

3    for bond and MBS investors?

4    A.  It won't affect the bond investors, and it won't affect the

5    MBS investors.  So those investors -- that's why I have the

6    nice diagram, which I like a lot, and -- especially the green

7    pastures that -- you have to imagine there would be green grass

8    there, but the idea is that they're standing nice and

9    comfortably at the top of the hill.  And increasing the

10   Treasury liquidation preference from using the paid -- payment

11   in kind or circular draw, it doesn't make a difference to the

12   bond MBS investors.

13   Q.  All right.  Now, Dr. Dharan, as part of your opinion in

14   this matter, have you looked to determine whether there were

15   additional alternatives to the net worth sweep that would

16   result in the Treasury commitment not being materially eroded?

17   A.  Yes, I did.

18   Q.  All right.  And do you list some of those alternatives on

19   the slide here?

20   A.  Yes.  I list these in one of my reports, and I -- you know,

21   as I said in the report, this is not intended to be an

22   exhaustive list of all the alternatives.  Just a couple of

23   examples of additional alternatives that could have been

24   considered by FHFA instead of this really drastic net worth

25   sweep that they agreed to.  So this is just a few alternatives

1   that I'm listing here.

2   Q.  All right.  What's the first one on the list?

3   A.  The first one is there's just no urgency.  This is the

4   first time -- you know, the FHFA could wait for more

5   information because the GSEs are saying there's no circular

6   draw in 2012.  The sustainable profitability's in place.  DTA

7   is coming back to the balance sheet.  Given all this, the --

8   the option would be to just wait and see more in terms of how

9   the economy is doing or is the sustainable profitability really

10  to starting to show up.  That's the first alternative.

11  Q.  What about the second?

12  A.  The second one is they could have considered an alternative

13  where you modify the -- you keep the dividend the way it is,

14  but if the Treasury commitment falls below a threshold and that

15  threshold can be determined by talking to, you know, bond

16  holders and bond investors to see where is the paying point,

17  the point of -- you know, point where they want to see some

18  change.  And money for the dividend so that if the commitment

19  falls below that, that's a different dividend paid.

20  Q.  All right.  What about the third alternative that you have

21  listed?

22  A.  The third one is, you know, when -- similar to the second

23  one, but continue to pay the 10 percent, but if there's not

24  enough net worth to pay, pay the remainder later with interest.

25  Q.  And why is that last part important?

1    A.  Well, because we are not using up the Treasury commitment.

2    That's the main -- using up the Treasury commitment in a

3    circular draw fashion.

4    Q.  And so because it would be repaid later with interest,

5    would it have any negative impact on what Treasury would

6    ultimately receive?

7    A.  It won't change the amount the Treasury receives.  It's the

8    same, but it will be -- it will at the same time protect the

9    Treasury commitment.

10   Q.  And, finally, protect GSEs if profits substantially exceed

11   10 percent dividend.

12   A.  Right.

13   Q.  What do you mean by that?

14   A.  Well, this is to really think about the type of situation

15   that actually happened in 2013.  You suddenly had this huge

16   income, comprehensive income, 130 billion-plus, and all of a

17   sudden the two GSEs ended up paying $111 billion more in

18   dividends; right?  So the last one says think through these.

19   Think through what's going to happen if the profit

20   substantially exceed 10 percent.  Don't give up all of those

21   profits to the Treasury.  You could've considered an

22   alternative where you protected the excess -- profits in excess

23   of certain amount.

24   Q.  Now, Dr. Dharan, we're near the end of -- near the end of

25   the road now.

1   A.   Okay.

2   Q.   What's the next reason that you list as to why the net

3   worth sweep was not reasonably necessary to avoid insolvency or

4   other significant financial harm?

5   A.   Yeah.  Yes.  So this one, I actually have been already

6   addressing some aspects of the process, including most recently

7   when we just talked about the alternatives.  Like, I said, FHFA

8   could have considered other alternatives.  I just wanted to

9   summarize some of the things I mentioned, as well as maybe add

10  one or two aspects about the deficiency of the whole process

11  used to make this decision of this huge magnitude.

12  Q.   And before we do, just let me ask, as part of your

13  experience, are you familiar with the process that corporations

14  generally undertake to contemplate major transactions?

15  A.   Yes, I am.

16  Q.   What is that general process?

17  A.   This is a very simple intuitive process, actually.  It's a

18  management process.  Companies use it in order to make sure

19  that they bring in all the information that they need to.  So

20  if you get to the next slide, I indicate some key steps --

21  typical steps, and key steps, in fact, management would make

22  before they make a major decision.  Maybe they need to invest a

23  large amount of money on a project or a new investment, maybe a

24  new factory.  And in order to do that, they first will collect

25  a lot of information.

1           So in the case of FHFA, the FHFA could have updated

2     their forecasts for Fannie and Freddie and gathered relevant

3     information.  For example, they never updated their forecast

4     after October 2011.  The -- basically, they just never did.

5           And that could have been done.  So it lost -- the type

6     of information gathering that management does before making a

7     decision, that was not done.

8     Q.  Now, you just mentioned -- we looked before at some

9     forecasts of Fannie and Freddie; is that right?

10    A.  Yes.

11    Q.  Now, you referenced a different date, October 2011, in

12    relation to FHFA.  Can you tell the members of the jury what

13    you mean by that.

14    A.  Yeah.  I think, you know, the net worth sweep was done in

15    August 2012; right?  And we saw earlier information about the

16    inflexion point, how it -- from January 2012, the economy had

17    changed by March and May.  And people were talking about

18    eroding recovery.  And all of that information was not put in

19    forecast models within the FHFA to update them for -- before

20    making this net worth sweep decision, the previous one that was

21    made was October 2011.

22          There was a person who was in charge of the forecasting

23    group at FHFA, Ms. Tagoe.  And she said she was never asked to

24    update these forecasts.  In fact, she had never been informed

25    about the net worth sweep until she read it, like everybody

1    else, after --

2    Q.  So between the --

3              THE COURT REPORTER:  Hold on.

4    A.  After the sweep was announced.  Yes.  Go ahead.

5    BY MR. KRAVETZ:

6    Q.  So between the ten months from October 2011, the date of

7    the last forecast for FHFA, and the date of the net worth

8    sweep, those FHFA forecasts were not updated?

9    A.  That's correct.  That's my understanding.

10   Q.  Now, what's the -- I think you've touched upon the second

11   item there, identify alternatives to circular draws.

12   A.  Right.  Yes, I just testified to that.  So just to repeat,

13   there's a variety of things the FHFA could have considered.

14   And this is in addition to the PIK I already mentioned, but all

15   the other alternatives.  And there was no documentation, there

16   was no memo, there's no analysis that showed that they had done

17   anything to identify these alternatives.

18   Q.  And why, typically, in your experience, do corporations

19   document major decisions?

20   A.  Well, it protects everybody.  It brings -- it gives an

21   opportunity for everybody to bring information in and make sure

22   that they are incorporated.  So these documentations are done

23   for a lot of purposes:  to get approvals, to get buy-in from

24   the people who are involved.  None of that was done.

25              So the third one, really, is talking about documenting

1    the analysis.  It's very surprising that there were no memos

2    and no reports, really, nothing that -- that FHFA did to come

3    to this net worth sweep decision.

4    Q.  And would you have expected to see something given the

5    decis- -- decision of this magnitude?

6    A.  Yeah, given this huge magnitude.  Here we are, you know,

7    talking about giving of a hundred percent of the profits of

8    Fannie Mae and Freddie Mac, really, forever; right?  Basically

9    for all future periods.  And -- and yet there was no

10   documentation saying why are we doing it and what are the

11   alternatives, what information do we need, and let's put it all

12   together.  Let's get all the buy-in from important -- the

13   people who are involved.  None of that was done.

14   Q.  And, finally, you list:  What would be expected, consider

15   effect on net worth, cash, and impact on business operations.

16   What do you mean by that?

17   A.  Right.  It doesn't look like they did anything to see what

18   would have happened if, for example, the DTA came back to the

19   balance sheet.  And suddenly the net worth goes up to 50 to a

20   hundred billion dollars, maybe 75 billion as it actually

21   happened, and then we are going to be paying $75 billion in

22   dividends to Treasury.  Is this what we really wanted?

23        That type of analysis, the impact on net worth, impact

24   on cash, impact on borrowing to pay for the dividend, impact on

25   business operations.  Nothing -- none of that was done.

1    74.5 billion in the DTAs?

2    A.  That is correct.

3    Q.  All right.  So what happened, then, when there was that

4    increase in net worth as an accounting item in terms of the

5    dividend payment?

6    A.  Right.  Exactly.  So the DTA reversal is purely an

7    accounting item.  There's no real -- it's not a cash item.  So

8    DTA goes up.  DTA goes down.  These are accounting entries.  So

9    this time DTA went up, accounting entry, but now because of the

10   net worth sweep, Fannie Mae in 2013, first quarter, had to pay

11   a huge -- some $55-billion dividend.  Fifty billion of that was

12   because of the DTA and -- DTA reversal.

13        That was a real cash dividend that they had to pay, and

14   they did that by borrowing from the bond market to have the

15   cash available.

16        Same thing happened with Freddie Mac in 2013, third

17   quarter.

18   Q.  So just so we're clear here, within the first nine months

19   of 2013, both Fannie and Freddie actually had to borrow money

20   in order to make the dividend payment?

21   A.  Yes.  There's some -- they didn't explicit -- they did, but

22   the exact amount is not disclosed, but there's indication that

23   they had to borrow pretty much substantially all of it.

24   Q.  And did they incur additional expenses as a result?

25   A.  Yes, because they were borrowing money, they had to pay

 1    interest on that.  Although the interest rates were pretty low

 2    back then.  Nevertheless, it adds up when you borrow a lot of

 3    money.

 4    Q.  Assuming that there wasn't a net worth sweep, would --

 5    Fannie and Freddie would have had to have gone to the bond

 6    market to borrow money in 2013 to make a dividend payment?

 7    A.  No.

 8    Q.  Why not?

 9    A.  There was -- so, first -- so if it was a pre-net worth

10    sweep era, they would not have had to pay 53 billion in the

11    first place.  They would have paid 10 percent of the

12    liquidation preference.

13    Q.  Now, are you aware whether Freddie Mac recognized that

14    these accounting write-downs and write-ups could be a potential

15    risk to the entity?

16    A.  Yes.  They even disclosed that this creates a potential

17    risk for them.

18    Q.  And do you have that on your next slide?

19    A.  Yes, I have.

20    Q.  Okay.  All right.  And, Dr. Dharan, can you just walk us

21    through the first part of the disclosure that's on our screen

22    here.

23    A.  Yes.  So this is the Freddie Mac annual report 2013, and

24    they say that, you know -- the highlighted portion is before I

25    read -- let me read the first sentence.  So we do not have the

```
1              MR. KRAVETZ:  If we can go to the last part of the
2     email, please.
3     BY MR. KRAVETZ:
4     Q.  Can you please read the text of the email into the
5     record.
6     A.  "Nick, there was not.  I do not think there would be a
7     going-concern issue.
8              "There was a question about rerecording certain
9     deferred tax assets that had been written off.  Jeff
10    indicated both of the boards had discussed this at the last
11    meeting based on the view that they were going to be
12    profitable going forward.
13             "I do not think that makes sense, given the
14    amendments are designed to demonstrate wind-down.  This is
15    something we will need to work with the enterprises and
16    their auditors on.
17             "Thanks, Jim."
18    Q.  Thank you, Ms. Belack.
19             MR. KRAVETZ:  Your Honor, may we be heard briefly
20    by phone?
21             THE COURT:  Yes.
22             (Whereupon, the following proceedings were had at
23    sidebar outside the presence of the jury:)
24             MR. KRAVETZ:  Thank you, your Honor.
25             Robert Kravetz on behalf of Plaintiffs.
```

Reading by Jill Belack

1    A.  No.  It did not concern me.

2    Q.  Did Freddie ever have discussions with FHFA during the

3    period of 2011-2012 as I've defined it regarding potential

4    alternatives to a net worth sweep?

5    A.  None that I presently recall.

6    Q.  I think we already talked earlier about whether there

7    was any consideration by Freddie about paying dividends in

8    kind.  I think you said there was no evaluation of that.

9    Correct?

10   A.  Not in my time there.

11   Q.  Okay.

12   A.  There may have -- it may have preceded my arrival there.

13   Q.  Do you know whether there was any discussion during your

14   time there, and focusing against on the 2011-2012 time

15   period, regarding an alternative such as reducing dividend

16   payments or deferring them?

17   A.  As I indicated earlier, I believe, that there was a

18   discussion about perhaps the logic of reducing the dividend

19   rate below the 10 percent dividend rate.  That did not

20   trigger any change.

21   Q.  Was there any discussion during your time at Freddie,

22   and again focusing on the 2011-2012 period as I've defined

23   it, about converting the preferred stock into some other

24   equity instrument?

25   A.  Not that I recall.

 1    argument.

 2              MR. JONES:  Thank you.  Stanton Jones for the

 3    Defendants, your Honor.

 4              Pursuant to Rule 50(a), the Defendants move for

 5    judgment as a matter of law.

 6              Judgment for the Defendants is warranted at this

 7    time because, on this record, a reasonable jury would not

 8    have a legally sufficient evidentiary basis to find for the

 9    Plaintiffs.

10              I'd like to focus on two arguments today.  Both

11    relate to the absence of any injury or harm to class

12    members.

13              And just to set the stage, recall two things:

14    First, Plaintiffs' only theory of harm remaining in the case

15    is the stock price drop, the alleged harm to shareholders

16    from a one-day decline in Fannie and Freddie's share prices

17    on August 17th, 2012, 11 years ago.

18              The other thing to bear in mind is that the

19    certified classes in this case are comprised of only current

20    shareholders.  So anyone who sold their shares when the

21    prices were down is by definition not in these classes

22    because they sold their shares.

23              Those facts, the harm from a one-day drop in the

24    share prices 11 years ago and certified classes of only

25    current shareholders excluding anyone who sold their shares,

1    those facts require a judgment as a matter of law in

2    Defendants' favor for two reasons:

3            First, your Honor, class members who bought their

4    shares after the third amendment, after August 17th, 2012,

5    they lack Article III standing because they have no injury

6    in fact.

7            And it's undisputed the classes include many

8    post-third amendment purchasers, many individuals and

9    entities that purchased their shares that they hold today

10   for the first time after the day of the third amendment.

11           And Plaintiffs do not contend that these

12   post-third amendment purchasers suffered any injury to

13   themselves as a result of the stock price drop.  And they

14   couldn't.

15           Post-third amendment purchasers, the people and

16   entities who bought their shares after the stock price drop,

17   they benefited from that stock price drop.  They were not

18   harmed by it.  If anyone was harmed by the stock price drop,

19   it's the people who sold their shares when the price was

20   down.  They were the ones who took the loss from the share

21   prices declining as a result of the third amendment.

22           But again, as I said up front, those sellers, the

23   people who sold their shares to the post-third amendment

24   purchasers, none of those people are in the class, because

25   the class is only current shareholders.

```
 1              Plaintiffs' only argument for injury in fact as to
 2      post-third amendment purchasers is a notion that the claim
 3      travels with the share.
 4              In other words, Plaintiffs contend that when these
 5      post-third amendment purchasers bought their shares, the
 6      seller's legal claim or cause of action for a breach of the
 7      implied covenant automatically assigned to the purchaser
 8      with the transfer of the share.
 9              There's no express assignment.  There's no written
10      assignment of any legal claim.  Plaintiffs' theory is that
11      the sale of the security, the sale of the share itself,
12      entails an automatic assignment of the legal claim.
13              And I know your Honor has addressed this notion
14      that the claim travels with the share in other contexts.
15      But respectfully, we submit the issue has not been raised in
16      the context of standing.  And it bears particularly --
17      particular significance when this is obviously a
18      jurisdictional issue.
19              When standing -- when a Plaintiff's standing is
20      based on assignment of the underlying legal claim, the
21      Plaintiff bears the burden to prove that there was a valid
22      assignment of the legal claim.
23              And Plaintiffs have not established a valid
24      assignment here for either Fannie or Freddie.
25              The overwhelming majority view in this country is
```

1     that legal claims, causes of action related to a piece of

2     property, including a security, are not automatically

3     assigned to the purchaser through the sale of the security.

4              The overwhelming majority view across the country

5     is that in order to assign a legal claim related to a piece

6     of property, including a security, an express assignment is

7     required.

8              Under very well-settled common law, there is no

9     automatic assignment.  And this position was explained in a

10    decision from 2015 by Judge Sutton of the Sixth Circuit, who

11    wrote in describing the common law, quote:  "Once a right of

12    action accrues, it becomes a piece of intangible personal

13    property called a chose in action.  Choses in action to

14    enforce property rights do not as a general matter

15    automatically transfer when the underlying property changes

16    hands.

17             "No doubt, one may assign a chose in action to

18    another party.  But that requires the assignor to manifest

19    an intention to transfer the right to the assignee."

20             That's from *Herr*, H-E-R-R, *versus U.S. Forest*

21    *Service*, 803 F.3d 809, Sixth Circuit, 2015, a decision by

22    Judge Sutton.

23             That principle, that common-law principle, applies

24    fully in the context of securities transactions, sales of

25    bonds and stocks or other securities, like the ones at issue

1    here.

2              For decades, federal courts have held that the

3    common-law rule of no automatic assignment of legal claims

4    applies equally to the sale of securities.

5              State courts around the country, likewise, have

6    overwhelmingly applied this common-law rule of no automatic

7    assignment of legal claims to the securities context.

8              And there is a decision from 2019 by the U.S.

9    District Court for the District of Delaware where the Court

10   said, quote:  "Courts considering this issue have adopted

11   the rule applied to federal securities law claims; i.e.,

12   there is no automatic transfer."

13             That's *Keystone Association, LLC, v. Fulton*, 2019

14   Westlaw 3731722, District of Delaware, from August 8th,

15   2019.

16             Your Honor, to try to establish an automatic

17   assignment of a legal claim here, Plaintiffs rely on a

18   provision of the Uniform Commercial Code, the UCC, Section

19   8-302.  But state and federal courts have overwhelmingly

20   held that that provision, UCC Section 8-302, does not

21   automatically assign claims upon the sale of a security.

22   And the Courts have held overwhelmingly that an express

23   written assignment or an express assignment is required to

24   transfer the claim.

25             It appears from our research that Delaware is the

 1     only state that has construed Section 8-302 to automatically

 2     assign some claims.  I'll get to the Delaware law.  Even

 3     under the Delaware law, the claim here did not automatically

 4     assign under the Delaware case law.

 5           But let's start with Virginia applicable to

 6     Freddie Mac:  Virginia courts have not addressed this

 7     question of whether Virginia's version of Section 8-302 of

 8     the UCC automatically assigns claims.

 9           But Virginia's adopted version of the UCC does say

10     that its statute should be construed, quote, "to make

11     uniform the laws among the various jurisdictions."  That's

12     Virginia Code, Section 8.1A-103(a)(3).

13           Virginia's UCC should be construed to make uniform

14     the law among the various jurisdictions.  And the only

15     position that results in uniformity is the overwhelming

16     majority view that UCC Section 8-302 does not automatically

17     assign legal claims upon the sale of a security.  The

18     overwhelming majority view of federal and state courts

19     around the country that that provision of the UCC does not

20     abrogate the common law and that the common-law rule remains

21     effective that upon the sale of a security, an express

22     assignment is required to transfer a legal claim related to

23     the security.

24           So we think that, setting aside Delaware for just

25     a moment, under Virginia, the answer is clear in this eerie

1    context where this federal court is making predictions about

2    Virginia law.  The only reasonable determination is that

3    Virginia's version of Section 3-302 of the UCC would be

4    construed and should be construed consistent with the

5    overwhelming majority of federal and state courts across the

6    country over a very long period of time, that that provision

7    does not abrogate the common law and that even under that

8    provision an automatic assignment of a legal claim does not

9    apply upon the sale of a security.

10          As for Delaware, the Delaware Supreme Court has

11    held that, as I said, some legal claims automatically assign

12    with the sale of a security, but that others don't.

13          And frankly, the Delaware courts have struggled to

14    differentiate between which types of claims, which claims do

15    automatically assign and which don't.

16          It's a point that I think supports the

17    overwhelming majority view that 8-302 of the UCC should not

18    be construed in this way to transfer -- to automatically

19    assign any claims.

20          But in any event, the prevailing rule in Delaware

21    is that a claim or right, quote, "in the security travels

22    with the share," but, quote, "personal rights do not

23    transfer with the share."

24          And most notably, under this Delaware view, claims

25    do not travel with the share and are considered personal

1    rights that remain with the seller rather than automatically

2    assigning to the borrower unless there is evidence that the

3    buyer paid value for the legal claim.

4         If there is evidence that the price that the buyer

5    paid to the seller reflects some particular value that was

6    attributable to the legal claim, then under Delaware law

7    it's considered to be a claim or right in the security

8    rather than a personal right, and therefore automatically

9    assigns with the security.

10        In this case, your Honor, there is zero evidence

11   of that.  There is no evidence that the price that any

12   post-third amendment purchaser -- any purchaser paid in that

13   period when the stock price was down reflected or conveyed

14   value for the legal claim.

15        And in fact, your Honor heard Plaintiffs' damages

16   expert, Dr. Mason, agree during the recross-examination that

17   in essence the share prices in August 2012 and the rest of

18   2012 were not based on the legal claim in this case, which

19   of course was not asserted until 2013.

20        So in sum, under Virginia law and Delaware law,

21   certainly under Virginia law, which we think is clear, and

22   also under the best application of the Delaware law, there

23   is no automatic assignment of the legal claim here when the

24   shares were sold to purchasers after the third amendment;

25   and therefore the class members, all class members who

1    purchased their shares after the third amendment, have no

2    injury in fact and no standing, no Article III standing.

3    The Court should grant judgment as a matter of law for

4    Defendants on that basis.

5         The second argument that I'd like to present

6    today, your Honor, is that as to all Plaintiffs, all class

7    members, there is insufficient evidence for the jury to find

8    that class members, current shareholders who are all the

9    class members -- there's insufficient evidence to find that

10   they proved harm or damages with reasonable certainty.  As

11   the Court has found is required by both Virginia and

12   Delaware law, harm and damages need to be proven by the

13   Plaintiffs with reasonable certainty.

14        Even if the evidence establishes that the share

15   prices dropped on August 17th, 2012, that day 11 years ago,

16   as a result of the third amendment, there is no evidence

17   that the share prices -- that Fannie or Freddie's share

18   prices would be any higher than they actually are today in

19   the absence of a third amendment, if the third amendment has

20   never happened.

21        And without any of that evidence, without any

22   evidence that share prices would be higher today than they

23   actually are, if the third amendment had never happened,

24   there is no basis, no evidentiary basis, for the jury to

25   conclude that current shareholders, the people who still own

1    the shares today, have any cognizable harm or damage based

2    on a one-day drop in the share prices 11 years ago.

3              And separately, your Honor, Dr. Mason's own

4    testimony refutes his reliance on the equity event study

5    that forms the central basis of his damages opinion.

6              Dr. Mason acknowledged that -- and in fact

7    acknowledged that he has said -- that an event study is

8    invalid or unreliable if it doesn't account for possible

9    alternative causes in general.  And specifically, the event

10   study is invalid or unreliable if it fails to address

11   whether the observed price decline is attributable to the

12   net worth sweep or the accelerated reduction of the

13   enterprises' retained mortgage portfolios.

14             So on this record, your Honor, we believe the jury

15   could not find that the Plaintiffs proved harm or damages to

16   current shareholders with reasonable certainty.  And

17   Defendants are entitled to judgment as a matter of law for

18   this reason as well.

19             There are two other issues that we raised at

20   summary judgment and that the Court rejected.  I believe

21   that under the Supreme Court's recent decision in *Dupree v.*

22   *Younger*, these arguments are already preserved for appeal

23   because they are purely legal.  Nevertheless, in an

24   abundance of caution, I'll just state them briefly.

25             So the Defendants would renew our arguments from

 1    summary judgment that as a matter of law, first, there is no

 2    gap in the shareholder contracts here for the implied

 3    covenant to fill because HERA, which is part of the

 4    shareholder contract, already specifies the scope of FHFA's

 5    discretion to act by virtue of HERA's best interests

 6    provision and that that best interests provision, requiring

 7    FHFA to act in best interests of the public, is already the

 8    proper and complete contractual specification of FHFA's

 9    discretion, leaving no gap to fill in the shareholder

10    contract.

11            And secondly, the argument that we made at summary

12    judgment that the Supreme Court's decision in *Collins*

13    entitles Defendants to judgment as a matter of law on the

14    basis of the Court's statement that FHFA had acted on the

15    basis of what it found was in the best interest of the

16    public.

17            Thank you, your Honor.

18            MR. HUME:  Good afternoon, your Honor.  Hamish

19    Hume for the Plaintiffs.

20            Your Honor, I'll be brief.  I mean, if the Court

21    would like briefing, we're happy to address it; but I don't

22    think it's necessary.

23            This is essentially the identical Rule 50 argument

24    Defendants made in the last trial.

25            And as I said then, and I'll say again, on the

 1     first issue of whether class members -- current class

 2     members have been injured, there's ample evidence showing

 3     the net worth sweep has never been undone.  They changed it

 4     to transfer liquidation preference instead of cash.  The

 5     evidence is that the net worth sweep has transferred $151

 6     billion more to the Treasury than would have been

 7     transferred without it.

 8              The evidence also shows that 100 percent of the

 9     profits of Fannie and Freddie go to Treasury.  None of it

10     goes to the shareholders.

11              That is an injury to the shares.  It is an

12     impairment to the shares that travels with the shares.

13              And the stock drop is simply one reasonable

14     measure of that harm.  It is not that the case is limited to

15     the people who owned then, because that is simply the

16     measurement of the impairment to the shares for anyone who

17     owns those shares.

18              And to the extent those shares have been bought by

19     anyone -- and there's no evidence about that, because we had

20     an agreement not to get into that -- that those people are

21     necessarily buying a claim to seek a remedy from the net

22     worth sweep.

23              On the second issue of damages not being shown

24     with reasonable certainty, that's not correct.  The evidence

25     shows -- they say there's no evidence that the price would

 1    be higher today.

 2              There is evidence.  Again, two things:  Number

 3    one, the evidence shows that under the net worth sweep,

 4    $150 billion extra has been transferred to Treasury and that

 5    under the net worth sweep 100 percent of all profits go to

 6    Treasury.  That is evidence that shares held by private

 7    shareholders are necessarily impaired and harmed today.

 8              Also, Professor Mason expressly testified the net

 9    worth sweep has never been remedied, has never been undone,

10    and the harm persists to today.

11              So unless -- we won't repeat our response on

12    summary judgment points.  Our briefing on that is already

13    before the Court.

14              Thank you, your Honor.

15              THE COURT:  The motion under Rule 50 is denied.

16              What other issues?  You wanted to raise something

17    else?

18              MR. JONES:  Your Honor, very briefly.

19              Would we be able to file a brief on the Rule 50

20    motion just to make sure that the record is totally clear

21    for preservation purposes?

22              THE COURT:  I think that you can order the

23    transcript.

24              MR. KAPLAN:  Sam Kaplan for the Plaintiffs.

25              Your Honor, the only other issue, assuming your

1      **A.**  Many years.

2      **Q.**  Okay.

3      He's not with FHFA anymore.  Right?

4      **A.**  Yes, he is.

5      **Q.**  Well, is he not at one of the banks that FHFA

6  oversees or is he actually back at the agency?

7      **A.**  No, he never left the agency once he came.

8      **Q.**  Oh, okay.

9      So he's still an employee of FHFA?

10     **A.**  Yes, he is.

11     **Q.**  Okay.

12     Are you aware of any reason why Mr. Griffin

13 couldn't come in here to say what he meant in this email

14 rather than you?

15     **MR. HOFFMAN:**  Objection, Your Honor.

16     **THE COURT:**  Sustained.

17 **BY MR. RUDY:**

18     **Q.**  I want to ask you about the phrase in this email

19 "I do not think that makes sense."

20     You understand what the plaintiff -- do you want

21 to take a moment?

22     **A.**  I got it.  Found it.  Sorry.

23     **Q.**  Sure.

24     So you understand that what the plaintiffs are

25 saying that this means is it doesn't make sense for Fannie

**CROSS - SATRIANO - Mr. Rudy**

1    and Freddie to write up the DTAs right now because it's

2    going to show Fannie and Freddie to be profitable, and the

3    third amendment is designed to demonstrate that they're

4    being wound down?

5            **MR. HOFFMAN:**  Objection, Your Honor, as to

6    plaintiffs' allegations.

7            **MR. RUDY:**  I think it's fair, Your Honor, to find

8    out if he understands what the lawsuit is about.

9            **THE COURT:**  I said overruled.

10           **MR. RUDY:**  Thank you.

11   **BY MR. RUDY:**

12       **Q.**   Do you understand that that's what the plaintiffs

13   are arguing in this case?

14       **A.**   I believe that what you're telling me is the true

15   statement.

16       **Q.**   Okay.

17           But your testimony here is that that's not what

18   you think that Mr. Griffin meant when he wrote this.  Right?

19       **A.**   Yes, it is.

20       **Q.**   It is true?

21       **A.**   Yes, it is my testimony.

22       **Q.**   Okay.

23           And so your testimony is, when he wrote, "I don't

24   think that makes sense," you think it meant, it doesn't make

25   sense to rerecord the deferred tax assets because the

**CROSS - SATRIANO - Mr. Rudy**

1       accelerated reduction of the mortgage portfolio is going to

2       make Fannie and Freddie less profitable moving forward.   Is

3       that basically right?

4           **A.**   Yes.

5           **Q.**   Okay.

6               When you were talking about this document on

7       direct examination, you said the board didn't know that.

8       Right?  And so I think what you were referring to as the

9       board didn't know that, the board didn't know that three

10      days later after this email that there would be a third

11      amendment announced.   Right?

12          **A.**   That's my understanding.  Yes, I said that.

13          **Q.**   So that's what you're saying that, you know, you

14      think that Mr. Griffin is saying, it doesn't make sense

15      because they don't know there's about to be this third

16      amendment announced, which is going to include an

17      accelerated wind-down of the deferred -- of the mortgage

18      portfolio.   Right?

19          **A.**   Yes.

20          **Q.**   Okay.

21              But the board did already know that that retained

22      mortgage portfolio was already being reduced.   Right?

23          **A.**   Yes.  What I have discussed earlier in the day,

24      when we talked about the third amendment, was how one of the

25      changes in the third amendment was an acceleration of the

                    **CROSS - SATRIANO - Mr. Rudy**

1    already ongoing wind-down of that portfolio.

2        **Q.**    Right.

3        **A.**    So there's a new covenant that made it wind-down

4    faster.

5        **Q.**    Correct.

6        **A.**    Relative to the previous version of the PSPA.

7        **Q.**    Okay.  Thank you.

8        **A.**    Uh-huh.

9        **Q.**    So the previous PSPA, in effect since 2008, FHFA

10   told Fannie and Freddie that you have all of these retained

11   mortgages in a portfolio?

12       **A.**    Yes.

13       **Q.**    That you testified made them -- made those

14   companies carry too much risk.  Right?

15       **A.**    I think that was the perspective, yes.

16       **Q.**    So FHFA told Fannie and Freddie, We want you to

17   hold less of those mortgages, and we want you to reduce the

18   size of that portfolio.  Right?

19       **A.**    Yes.

20       **Q.**    And they told them in 2008 that they wanted them

21   to reduce the size of that portfolio over time.  Correct?

22       **A.**    Correct.

23       **Q.**    And each year, they would need to reduce the size

24   of the portfolio by 10 percent each year.  Correct?

25       **A.**    That was the original standard, yes.

**CROSS - SATRIANO - Mr. Rudy**

1    **Q.**    So from 2008 to '09 to '10 to '11 to '12, 10

2    percent per year they were already reducing the size of that

3    portfolio.  Correct?

4    **A.**    Correct.

5    **Q.**    And the board knew that.  Right?

6    **A.**    Yes, they did.

7    **Q.**    The thing that the board didn't know about that,

8    sitting here on August 14th, was that it was going to go

9    from a reduction rate of 10 percent a year to a reduction

10   rate of 15 percent a year.  Right?

11   **A.**    Yes.

12   **Q.**    But the board knew about the reduction.  Right?

13   **A.**    Yes, they did, the original reduction, the 10

14   percent.

15   **Q.**    And the original reduction had, as its target,

16   that the portfolios would be reduced down to $250 billion

17   per GSE.  Right?

18   **A.**    Yes, I think that was the threshold.

19   **Q.**    So at the end of the reduction, that had been

20   going on since 2008, Fannie would have no more than 250

21   billion in their portfolio.  Right?  Right?

22   **A.**    Yes, I'm sorry.

23   **Q.**    And Freddie would have no more than 250 billion in

24   their portfolio.  Right?

25   **A.**    Yes.

**CROSS - SATRIANO - Mr. Rudy**

1     **Q.**   And the only thing that was going to change three

2     days later that the board didn't know was that instead of it

3     taking another 10 years to get there, it would take another

4     six years to get there; is that right?

5     **A.**   Yeah.  That's what acceleration means.

6     **Q.**   Right.  But the reduction was happening.  It was

7     getting to the same place, but it would get there a little

8     faster.  Right?

9     **A.**   Yes.

10    **Q.**   So it's your testimony that you think that what

11    this is referring to is the board didn't know that we're

12    going to get to the same place a little faster, and that's

13    going to make the companies so much less profitable that

14    writing up the DTAs doesn't make sense anymore.  That's your

15    testimony?

16    **A.**   My testimony, with respect to this email, is that

17    Jim Griffin in his sentence, "I do not think that makes

18    sense, given the amendments are designed to demonstrate

19    wind-down," refers to the prospects of them being profitable

20    going forward given that their profitability is about to be

21    slowed down.

22         And, therefore, when you think about -- so Jim and

23    I are accountants.  We're thinking about this from this

24    deferred tax asset sort of metric, matrix, it would likely

25    push that time out when they would have enough positive

**CROSS - SATRIANO - Mr. Rudy**

1      evidence compared to their negative evidence.

2              I think that's -- that's how I understand it.  And

3      I understand this sentence that you've highlighted to be

4      keyed off of this earnings speed as I said earlier.

5          Q.   Well, the profitability is already baked into the

6      company's forecast where they know they're going to end up

7      at 250 billion either way.  Right?

8          A.   [No response]

9          Q.   You talked on direct examination --

10         A.   No, that's not correct.

11         Q.   Well, on direct examination you talked about

12     revenues.  Now you're talking about profits.  Right?

13         A.   I just -- I think your statement "profitability

14     being baked into the 250" is not a clear statement.  So if

15     you could repeat that for me.

16         Q.   All right.

17         A.   Thank you.

18         Q.   I guess my question is, the third amendment didn't

19     demonstrate wind-down any more than the original PSPA

20     demonstrated wind-down; isn't that right?

21         A.   To me, the acceleration was indicative that they

22     wanted -- the government wanted this to happen quicker.  And

23     that's why they made that amendment.

24         Q.   Well, let me ask you, when Ms. McFarland found

25     out, she didn't know -- on August 14th, she didn't know

                    **CROSS - SATRIANO - Mr. Rudy**

1    about the net worth sweep or the third amendment.  Right?

2         **A.**   Yes, that's my understanding.

3         **Q.**   Okay.

4              But when she found out about it, she didn't think

5    that it was going to significantly affect the profits of

6    Fannie Mae, did she?

7              **MR. HOFFMAN:**  Objection.

8              **THE COURT:**  Sustained.

9              **MR. RUDY:**  Well, let me just put back up DX-560,

10   the memo you were just talking about.

11             **THE WITNESS:**  Okay.

12             **MS. McGUIRE:**  [Complied]

13             **MR. RUDY:**  Let's go to Paragraph 3, right above

14   it.

15             **MS. McGUIRE:**  [Complied]

16   **BY MR. RUDY:**

17        **Q.**   So this is the memo that you wrote after the third

18   amendment when you met with Ms. McFarland.  Right?

19        **A.**   Correct.

20        **Q.**   She says, "It may not change the long-term

21   forecast significantly."  Right?  That's what she told you

22   on August 23rd.  Right?

23        **A.**   "It may not change the long-term forecast

24   significantly."  Yes, that's what she said.

25        **Q.**   Right.  This certainly isn't her going, oh, my

                    **CROSS - SATRIANO - Mr. Rudy**

1   gosh, now that I know about the accelerated reduction of the

2   portfolio, all of my calculations are completely thrown into

3   chaos.  Right?  That's not what she's saying?

4        **A.**    No.   What she's saying is that it may not change

5   the long-term forecast significantly.

6        **Q.**    Okay.   Thank you.

7          **MR. RUDY:**   You can take this down.  Let's go back

8   to 259 again.

9          **MS. McGUIRE:**   [Complied]

10  **BY MR. RUDY:**

11       **Q.**    I'm going to bring us back to high school and

12  we're going to talk about grammar for a moment if that's

13  okay.  I know you were a history major, so I'm sure you

14  wrote a lot of papers in college.  Right?

15         So I'm going to ask you a couple of questions

16  about the phrase, "are designed to demonstrate."  You told

17  me Mr. Griffin was a clear communicator and good at his job

18  a minute ago.  Right?

19       **A.**    Yes.

20       **Q.**    We can agree that the third amendment included two

21  provisions, among others, two that we've talked about, a

22  provision for the net worth sweep.  Right?

23       **A.**    Yes.

24       **Q.**    And another provision for the accelerated

25  reduction of the retained mortgage portfolio.  Right?

**CROSS - SATRIANO - Mr. Rudy**

1      **A.**   Yes.

2      **Q.**   Okay.

3            So if you were correct about what Mr. Griffin

4   meant, would you agree that a simpler way to say this would

5   be, "I don't think that makes sense because the amendments

6   include wind-down."

7            **MR. RUDY:**  Could we show the slide to illustrate

8   that, Ms. McGuire?

9            **MS. McGUIRE:**   [Complied]

10  **BY MR. RUDY:**

11     **Q.**   Wouldn't that be a much simpler way to say this?

12     **A.**   I have no view on your edits.

13     **Q.**   Under your supposed interpretation of this email,

14  "the amendments are designed to demonstrate wind-down"

15  doesn't make grammatical sense though, does it?

16     **A.**   My understanding is my understanding.

17     **Q.**   Okay.

18            **MR. RUDY:**  Let's put up the next slide, if we

19  could.

20            **MS. McGUIRE:**   [Complied]

21  **BY MR. RUDY:**

22     **Q.**   You said already, the amendments, plural, refers

23  to these two things.  Right?  [Indicated]  Among others.

24  Right?

25     **A.**   Yes.

                    **CROSS - SATRIANO - Mr. Rudy**

1      **Q.**   So then the amendments, this is our reading.  You

2      understand the plaintiffs are saying it means the amendments

3      are designed to demonstrate -- next?

4          **MS. McGUIRE:**   [Complied]

5      **BY MR. RUDY:**

6      **Q.**   -- wind-down of Fannie Mae and Freddie Mac.  You

7      know that that's what we're arguing.  Right?

8      **A.**   If you tell me that, yes, I believe you.

9      **Q.**   Now let's go to what your interpretation is.  The

10     amendments are designed to demonstrate, accelerated

11     reduction of the retained portfolio.

12          So the amendments are demonstrating the

13     amendments.  Does that make any sense to you?

14     **A.**   Yes, it does.

15     **Q.**   Okay.

16     **A.**   Would you like me to explain?

17     **Q.**   No.

18     **A.**   Okay.  Thanks.

19     **Q.**   Mr. Satriano, you're aware that the Treasury

20     Department wanted to wind-down Fannie and Freddie at this

21     time.  Right?  You're aware of that?

22     **A.**   No, I am not.  I don't work for the Treasury.

23     **Q.**   So you don't know that, in 2012, the Treasury

24     Department wanted to wind-down Fannie and Freddie?

25     **A.**   I think, in the broader context of making the

**CROSS - SATRIANO - Mr. Rudy**

1    mortgage finance market sustainable, I think they were

2    looking for avenues of how to do that during that time.

3        Q.   Well, the avenue they were proposing was to

4    wind-down Fannie and Freddie.  You know that.  Right?

5        A.   Yes, in the context of replacing it with something

6    else.  Right?

7        Q.   I'm asking you.  A moment ago, you said you didn't

8    know that.  And now, do you know that or do you not know

9    that?

10       A.   Broadly, yes, I know that.

11       Q.   Okay.  Thank you.

12            I'm going to show you PX-158.  This is Fannie

13   Mae's 2011 Form 10-K.  Are you familiar with this document?

14            **THE WITNESS:**  Yes, I am.

15            **MR. RUDY:**  Is this in evidence?

16            **DEPUTY CLERK:**  [Shakes head]

17            **MR. RUDY:**  I'd like to move this into evidence.

18            **MR. HOFFMAN:**  No objection.

19            **THE COURT:**  Received.

20        (Plaintiffs' Exhibit 158 was received.)

21            **MR. RUDY:**  Let's go to Page 249 of 374.  Let's

22   highlight "in February 2011."  Okay.

23            **MS. McGUIRE:**  [Complied]

24   BY MR. RUDY:

25       Q.   So, Mr. Satriano, this is a Fannie Mae Form 10-K

                    **CROSS - SATRIANO - Mr. Rudy**

1   that you are familiar with.  And it says here, I'm assuming

2   you know this that "In February of 2011, Treasury and HUD

3   released a report to Congress on reforming America's housing

4   finance market.  The report provides that the administration

5   will work with FHFA to determine the best way to responsibly

6   reduce Fannie Mae's and Freddie Mac's role in the market and

7   ultimately wind-down both institutions."  Period.

8       A.   Yes.

9       Q.   So Fannie Mae was reporting to its investors that

10  the Treasury Department was saying, We want to wind-down,

11  Fannie Mae.  Right?

12      A.   Yes.

13      Q.   So you knew that.  Right?

14      A.   And that's why I answered in the context of

15  replacing it with something else.  So thinking about this

16  type of statement, I tried to provide a contextual answer.

17      Q.   Okay.

18          So the way they're using the word "wind-down" is

19  not referring to accelerated reduction of retained mortgage

20  portfolio.  They're talking about winding down Fannie and

21  Freddie.  Right?

22      A.   That's what I understand from reading this.

23      Q.   This is in a Fannie Mae Form 10-K annual report.

24  Right?

25      A.   Right, commenting on what happened in this last

CROSS - SATRIANO - Mr. Rudy

1   year.

2        **Q.**   Okay.

3             **MR. RUDY:**  I'm going to put up PX-594, please.

4             **MS. McGUIRE:**  [Complied]

5        (Published exhibit.)

6             **MR. RUDY:**  This is a February 2, 2012 Treasury

7   press release.  I'm going to offer this into evidence.

8             **MR. HOFFMAN:**  No objection.

9             **THE COURT:**  Received.

10       (Plaintiffs' Exhibit 594 was received.)

11  **BY MR. RUDY:**

12       **Q.**   And you see that this is an email from the

13  Treasury to you.  Right?

14       **A.**   Yes, it is.

15       **Q.**   And it appears that you subscribed to a service

16  that sends you press releases from the Treasury Department;

17  is that right?

18       **A.**   Yes.

19       **Q.**   Okay.

20            And the first sentence of this talks about

21  progress made on financial reform to date.  Do you see that?

22       **A.**   Yes, I see it.

23            **MR. RUDY:**  Now let's go down to, I have it as Page

24  6035.  That's probably not the document number.  That's it.

25  Okay.  Yeah.  So Page 4 of 6 here.

                    **CROSS - SATRIANO - Mr. Rudy**

1       **MS. McGUIRE:**  [Complied]

2    BY MR. RUDY:

3       **Q.**   And the first two sentences reference -- this is

4    from Treasury, treasury press release referencing the 2011

5    report to Congress.  Right?

6       **A.**   Yes.

7       **Q.**   And, again, the first sentence references,

8    including a path for winding down the GSEs.  Right?

9       **A.**   Yes.

10      **Q.**   So you know that, when Treasury talks about, at

11   least from Treasury's perspective, wind-down, wind-down

12   means winding down the GSEs.  Right?

13      **A.**   From Treasury's perspective, yes.

14      **Q.**   Thank you.

15          **MR. RUDY:**  You can pull this down.

16          **MS. McGUIRE:**  [Complied]

17   BY MR. RUDY:

18      **Q.**   Okay.

19          I want to turn to these SEC filings.  I'm going to

20   put back up DX-476.  This is the 2Q Form 10-Q.  On Page 16

21   there's a disclosure -- you see the sentence, "Although we

22   may experience period-to-period variability in earnings and

23   comprehensive income, we do not expect to generate net

24   income in excess of our annual dividend obligation to

25   Treasury over the long term."  Right?

**CROSS - SATRIANO - Mr. Rudy**

1    Individual issues can be two to four billion dollars, and

2    they are referred to as benchmark bonds or reference notes.

3    Fannie calls them benchmark bonds; Freddie calls them

4    reference notes.  And those have very simple structures that

5    make them, you know, easy to analyze.

6         They have other complicated bonds that have all

7    kinds of options embedded in there that allow buyers to sell

8    the bonds back to Fannie and Freddie or Fannie and Freddie

9    to buy the bonds back at some fixed price.  And those are

10   issued in smaller amounts and have very complicated

11   structures, which make them, you know, much more difficult

12   to analyze.

13   Q.  Why did you focus on long-term bonds?

14   A.  Well, so there was very little risk that the commitment

15   would run out, for example, in 2013 or 2014.  But, you know,

16   it was really ten years out; and beyond that, there was the

17   risk.  So the short-term bonds wouldn't be -- wouldn't

18   reflect the risk as much.

19        And, you know, so what I was interested in is

20   using bonds whose prices would be sensitive to the -- you

21   know, the risk of the commitment running out.  And those

22   prices would react as that risk changed.

23   Q.  And when you talk about risk, it's the risk of the

24   circular draws eroding the agreement -- the commitment?

25   A.  Yes.

```
 1    correct?

 2    A.  Yes.

 3    Q.  There's not a reference in this text here to preferred

 4    stockholders; is that right?

 5    A.  Yes.

 6    Q.  Then on the right-hand side, during conservatorship, you

 7    highlighted the first bullet point, which states "No longer

 8    managed with a strategy to maximize common stockholder

 9    returns."  Is that right?

10    A.  Yes.

11    Q.  But the second bullet point -- I'll read it, and let me

12    know if I read it correctly -- quote:  "Maintain positive

13    net worth and fulfill our mission of providing liquidity,

14    stability and affordability to the mortgage market."

15            Did I read that correctly, sir?

16    A.  Yes.

17    Q.  Okay.

18            MR. KRAVETZ:  We can take that down, Ms. McGuire.

19    Thank you.

20    BY MR. KRAVETZ:

21    Q.  Now, you included a number of slides relating to SEC

22    reports and language from SEC reports in your presentation.

23    Correct?

24    A.  Yes.

25    Q.  And other than the one we just saw, all of the SEC
```

```
 1                  THE WITNESS:  Yes.
 2                  MR. KRAVETZ:  The Court's indulgence one moment,
 3       your Honor.
 4                  Thank you, your Honor.
 5                  Ms. McGuire, can we call up Plaintiffs' Exhibit --
 6       I'm sorry -- Dharan Slide 33, please.
 7       BY MR. KRAVETZ:
 8       Q.  Sir, are you aware whether Dr. Dharan has calculated
 9       what the 10 percent dividend payment would have been in 2013
10       had the net worth sweep not been enacted?
11       A.  Sorry.  Could you say that again?  I missed the
12       question.
13       Q.  Sure.  Sure.
14                  Dr. Attari, are you aware whether Dr. Dharan has
15       calculated what the 10 percent dividend would have been
16       absent the net worth sweep in 2013?
17       A.  Yes.  I mean, it's right there.  Sorry.  That's why I
18       was a little confused by your question.
19       Q.  And would you agree that that amount is $18.9 billion?
20       A.  I have no reason to disagree.
21       Q.  And you gave reference to what the overall dividend
22       amount would have been in or around 2013.  Correct?
23       A.  Yeah.  I was doing it as of August 2012.  But that
24       number seems right.
25       Q.  Okay.  And do you dispute that the actual dividends that
```

1    were paid to the Treasury Department under the net worth

2    sweep in 2013 were approximately $130.1 billion?

3    A.  No.

4    Q.  And do you dispute at least in terms of the math that

5    the excess in those two numbers is approximately $111.2

6    billion?

7    A.  No.

8    Q.  Dr. Attari, I want to see if we can --

9            MR. KRAVETZ:  We can take that down, Ms. McGuire.

10   Thank you.

11   BY MR. KRAVETZ:

12   Q.  I want to see if we can agree on some of the basics of

13   the periodic commitment fee.  Okay?

14   A.  Sure.

15   Q.  Near the last part of your presentation, you had a

16   slide:  Reasons Why Dr. Thakor is Wrong.  Correct?

17   A.  Yes.

18   Q.  Now, sir, do you agree that the amount of the periodic

19   commitment fee was to be mutually agreed between the FHFA

20   and the Treasury Department?

21   A.  Yes.

22   Q.  And that the amount of the periodic commitment fee was

23   to be determined in reference to the market value of the

24   commitment as then in effect?

25   A.  Yes.

1    amendment.

2    Q.  Okay.  Well, sir, you've previously acknowledged that

3    when you're assessing whether something is economically

4    reasonable, it's necessary to think about the range of

5    alternatives that are available to the person making the

6    decision; correct?

7    A.  Yes.

8    Q.  And am I correct that you've also previously acknowledged

9    that as part of your analysis in forming your expert opinion in

10   this case, you did not consider whether there were any

11   alternatives to the net worth sweep for addressing circular

12   draws; correct?

13   A.  Well, there weren't.

14   Q.  So the answer is you haven't performed that analysis?

15   A.  I have not.

16   Q.  You have not?

17   A.  Yeah.

18   Q.  Okay.  And just a few more questions.

19        Do you recall testifying on direct that the conservator

20   was planning for the stress scenario?

21   A.  Well, planning for, as in yes.  Planning for -- it's like

22   in, like, California, you keep a bag full of emergency supplies

23   for an earthquake; not because you think an earthquake will

24   strike, but because if it strikes, you don't want to be caught

25   out.  So in that sense, planning for a stress scenario.

1    Q.  And how did that go?

2    A.  Multiple channels again.  I had periodic meetings with

3    the Treasury Secretary Geithner, meetings even more regular

4    with the undersecretary of domestic finance, originally

5    Jeffrey Goldstein and then succeeded by Mary Miller.

6              I served on a couple of boards with the Treasury

7    secretary, and so I had opportunities to interact with him

8    and his senior staff in those capacities as well.  And those

9    were all focused on financial market conditions and so

10   forth.

11   Q.  Okay.

12   A.  That's just me personally.  And then, you know, my staff

13   interacted with the Treasury Department; and in particular,

14   Mario Ugoletti was my point person for interacting with

15   Treasury, and so I would have these communications with

16   Treasury through Mario.

17   Q.  And we keep talking about your staff.

18              Did you -- how big was the organization that you

19   were acting director of?

20   A.  About 600 people.

21   Q.  So did you rely on staff to support you in your running

22   of that organization?

23   A.  Most certainly.

24   Q.  Have you heard of something called the FHFA oversight

25   board?

1    A.  Yes.

2    Q.  So when you say "wrap this up," are you referring to

3    taking some action, amending the PSPAs, to try to solve this

4    problem by June 30th?

5    A.  Yes.  That's what I'm saying.

6    Q.  And were you laying down that marker before or after you

7    knew what the first- and second-quarter results would be?

8    A.  Before.

9    Q.  Did you ever change your mind about wanting to get this

10   done by June 30th or as soon thereafter as you could?

11   A.  No.

12   Q.  Could you do that all on your own?

13   A.  No.

14   Q.  Why not?

15   A.  Because it took two parties to make an amendment to the

16   PSPA.  So I needed both the attention and the willingness of

17   the Treasury secretary to engage in this amendment.

18   Q.  Were you about to say it takes two to tango, or is that

19   just what occurred to me?

20   A.  Swimming in the back of my mind.

21   Q.  All right.  And just to finish off on this page, I'll

22   just call this the next steps in this last bullet.  One of

23   the things that you asked for was to establish an

24   FHFA/Treasury working group to work through the list, to try

25   to get this done by June 30th.

1          Was that working group ever set up?

2     A.  Yes.

3     Q.  And who was it?

4     A.  So from Treasury -- from FHFA, the lead person was Mario

5     Ugoletti.  And Mario brought in and included other

6     executives at FHFA in meetings, depending on what the issues

7     were and so forth.

8          Then there was a small group at Treasury.  The

9     participants in any one meeting, you know, may vary.  But

10    anyway, there was a series of meetings that followed this

11    request.

12    Q.  And did you continue to be in contact directly with

13    Secretary Geithner?

14    A.  Yes.

15    Q.  How often did you meet or speak with him?

16    A.  At this point, we're having meetings -- it wasn't as

17    regulated in terms of the fixed, like, monthly.  But there

18    were times it was monthly.  There was times it was more than

19    once a month.  We might go a few months in between meetings.

20    But we were meeting here.

21         And I'm also having meetings from time to time

22    with, as I said, the undersecretary for domestic finance.

23    Q.  And I think you implied this.  But the working group,

24    the meetings with Secretary Geithner, would we be correct in

25    understanding that at least part of the topics in those

1    A.  In connection with proceedings associated with this --

2    with this trial, this lawsuit, this suit.  I did not see it

3    while I was employed at FHFA.

4    Q.  So when we're talking about seeing it in connection with

5    the case, if I understand correctly, that's years after the

6    meeting took place?

7    A.  Yes.

8    Q.  I want to focus on a few things that have been the topic

9    of some discussion in the trial.

10            You see in -- I'm trying to find the spot; bear

11   with me.  So in the bullet that begins Through Weeks of

12   Negotiating Terms -- do you see that?

13   A.  Yes.

14   Q.  The second sentence says, "DeMarco no longer sees the

15   urgency of amending the PSPAs this year."

16            Do you see that?

17   A.  I do.

18   Q.  Did you say that?

19   A.  No.

20   Q.  Would you have said that?

21   A.  No.

22   Q.  Did you think that?

23   A.  No.

24   Q.  Do you have any idea why Mr. Stegman wrote it in this

25   memo?

1      A.   No.

2      Q.   Do you know whether or not he was at that meeting?

3      A.   No.

4      Q.   You don't know one way or the other?

5      A.   I don't.

6      Q.   Then it goes on to say that you raise two competing

7      reasons for this new position.  And it says, "The GSEs will

8      be generating large revenues over the coming years, thereby

9      enabling them to pay the 10 percent annual dividend well

10     into the future even with the caps."

11               Do you see that?

12     A.   I do.

13     Q.   Did you say that?

14     A.   No.

15     Q.   Did you think that?

16     A.   No.

17     Q.   Would you have said that?

18     A.   No.

19     Q.   Did you have any information that would lead anyone to

20     believe -- well, withdrawn.

21               Did you have any information that could have led

22     you to believe that the GSEs will be generating large

23     revenues over the coming years?

24     A.   No.

25     Q.   Did you have any information that could have led you to

1     believe that the GSEs would be able to pay the 10 percent

2     well into the future even with the caps?

3     A.  No.

4     Q.  Do you have any idea why Mr. Stegman wrote this in this

5     memo?

6     A.  I do not.  I cannot explain and I do not recall what was

7     discussed that could have generated this statement in this

8     email.

9     Q.  Okay.  So let's talk now --

10              MR. STERN:  We can take that down.

11    BY MR. STERN:

12    Q.  So we've talked about these discussions and

13    communications you're having with Treasury about the third

14    amendment in the first quarter and early second quarter of

15    2012.

16              I want to talk to you now about what was going on

17    inside of FHFA with respect to the third amendment.  Okay?

18    A.  Okay.

19    Q.  So besides you and Mr. Ugoletti, were other people at

20    FHFA involved in any way with the third amendment?

21    A.  Yes.

22    Q.  Tell us about that.

23    A.  There were a number of other executives that were

24    involved in reviewing drafts of it, in providing information

25    and advice to Mario as he's talking to the Treasury and

1   And the subject is PSPA Alert.

2   Q.  And it refers to a renewed push.  Do you see that?

3   A.  Yes.

4   Q.  Who would that be from?

5   A.  The Treasury Department.

6   Q.  And was that good news or bad news to you?

7   A.  Good news.

8   Q.  How so?

9   A.  Because I wanted the PSPA amendments done; and we had

10  been waiting on the Treasury Department to be ready to wrap

11  this up.

12  Q.  It read -- this is August 9th.  I'm sorry.  Is this

13  email circulating something?

14  A.  No.  It's just the -- it's just the content of the

15  message.

16  Q.  Does it refer to earlier drafts of the third amendment?

17  A.  Yes.

18  Q.  And what does it say about those drafts?

19  A.  It says, "Mario is saying that his understanding of what

20  Treasury's going to be putting forward is largely the same

21  as the previous drafts that we've reviewed."  And he

22  specifically identifies components of those previous drafts

23  he expects to be the same.

24  Q.  And when he says "as previous revisions -- versions we

25  had reviewed," what -- who's the "we" there as you

1    sentence?

2    A.  Yes.

3    Q.  We're going to come back to that in a second.

4         It then goes on and says:  He has raised two competing

5    reasons for this new position.  One, the GSEs will be

6    generating large revenues over the coming years, thereby

7    enabling them to pay the 10 percent annual dividend well into

8    the future even with the caps.  Do you see that?

9    A.  Yes.

10   Q.  And, Mr. DeMarco, you understand that this document is an

11   important document in this case; correct?

12   A.  Yes.

13   Q.  And you understand that that sentence -- that the GSEs will

14   be generating large revenues over the coming years, thereby

15   enabling them to pay the 10 percent annual dividend well into

16   the future even with the caps.  That would mean, if true, that

17   there would not be a circular draw problem; correct?

18   A.  If true, yes.

19   Q.  Okay.  And that would be helpful to the plaintiffs'

20   position in this case and not helpful to the defendants'

21   position; correct?

22   A.  It is what it is.  It's --

23   Q.  Okay.  Now, I believe on direct, you said you did not say

24   that; correct?

25   A.  Correct.

DEMARCO - CROSS

1    Q.  Now, you remember in this case you were deposed -- and a

2    deposition is where you give sworn testimony under oath out of

3    court but with lawyers for both sides present.  Do you recall

4    that?

5    A.  I do.

6    Q.  Okay.  I'd like to show you what you said in your

7    deposition when you were asked about this document.  It's at

8    the -- page 214, lines 12 to 215, line 6, in your deposition,

9    but we have it on video, so we'll play DeMarco Clip 1, please.

10           (An audio-visual recording was played.)

11   BY MR. HUME:

12   Q.  Mr. DeMarco, was that truthful and accurate testimony?

13   A.  Yes.

14   Q.  Okay.  You were asked the same question a little

15   differently.  I'd like to play DeMarco Clip 2 from the same

16   deposition.

17           (An audio-visual recording was played.)

18   BY MR. HUME:

19   Q.  Mr. DeMarco, was that truthful and accurate testimony?

20   A.  Yes.

21   Q.  And I think you were asked one more time about the same

22   sentence.  Could we look at DeMarco Clip 3, please.

23           (An audio-visual recording was played.)

24   BY MR. HUME:

25   Q.  And, Mr. DeMarco, was that truthful and accurate testimony?

1    A.  Yes.

2    Q.  So, Mr. DeMarco, you've told this jury unequivocally four

3    or five times that you did not say that sentence that's written

4    in that memo, and yet three times in your deposition, you

5    admitted that you don't recall; correct?

6    A.  And this morning when I was asked about this, I said I do

7    not recall what was being discussed there that gave rise to

8    that being written down by Mr. Stegman.  I don't recall what

9    was being discussed that could have caused that to be written

10   down.

11   Q.  Okay.  Now --

12   A.  That's what I said this morning.

13   Q.  The record will show what it shows about what was said.

14        Let's go back to PX-205 and to the PR covenant, because

15   I don't believe this was explained.

16        And the beginning of this highlighted sentence says:

17   Since the secretary raised the possibility of a PR covenant.

18   Do you see that?

19   A.  Yes.

20   Q.  And a PR covenant was a reference to a principal reduction

21   covenant; correct?

22   A.  That's correct.

23   Q.  And am I correct that principal reduction is the concept

24   of -- at least in this context -- was the context of homeowners

25   who may have a mortgage higher than the value of their home.

1    A.  Correct.

2    Q.  But you'd been discussing that since January; correct?

3    A.  Yes.

4    Q.  Okay.  Now, you stayed at FHFA until the early part of

5    2014; correct?

6    A.  Yes.

7    Q.  Okay.  And so you recall that in the first year, Fannie Mae

8    and Freddie Mac -- the first -- let's just make sure it's

9    totally clear to the jury.

10         The net worth sweep took effect on January 1st, 2013,

11   for that calendar year; correct?

12   A.  That's correct.

13   Q.  Okay.  So more accurately, it took effect in the first

14   quarter of 2013; correct?

15   A.  Yes.

16             MR. HUME:  And if we could show Slide 2, please.  And

17   we're showing it now to the jury again.

18   BY MR. HUME:

19   Q.  This is a slide put together by our summary witness just

20   taken from the -- actually, by our expert, Professor Dharan,

21   using some of our summary witness.  On the left side it shows

22   what the 10 percent dividend would have been combined for

23   Fannie Mae and Freddie Mac of about 18.9 billion.  You don't

24   dispute that that's what the dividend would have been if it had

25   stayed at the 10 percent level; correct?

1    A.  Correct.

2    Q.  And you don't dispute that the actual dividends paid to

3    Treasury under the net worth sweep for 2013 -- in 2013 was

4    130.1 billion; correct?

5    A.  Correct.

6    Q.  And so you don't dispute that the difference between those

7    two numbers is 111.2 billion; correct?

8    A.  I trust the math.  No, I don't dispute it.

9    Q.  Okay.  Now, sitting here today, knowing this, knowing the

10   other things you know in hindsight, you're still proud of the

11   net worth sweep even in hindsight; correct?

12   A.  Yes.

13   Q.  And am I also correct that when you learned these results

14   as acting FHFA director during 2013 and early 2014, the large

15   income levels above the dividend amount, you didn't go to

16   anyone and say, geez, that's not really what we had in mind

17   when we agreed to the net worth sweep?  You didn't go to anyone

18   and say that; correct?

19   A.  Correct.

20   Q.  And you weren't shown on direct -- they didn't show you any

21   emails or memos expressing shock or surprise at this result in

22   2013, did they?

23   A.  We did not review any such emails.

24   Q.  You don't remember any emails seeing these results and

25   saying this is really disappointing that we've agreed to the

1    net worth sweep because look at all this money Fannie and

2    Freddie are now making?  You haven't seen any emails or memos

3    like that, have you?

4    A.  I was never disappointed when the companies started to show

5    positive results.

6    Q.  No?

7    A.  The answer is no.

8    Q.  Even when they then had to send all that positive result to

9    Treasury?  That's my point.  You didn't see any emails or memos

10   expressing disappointment and you didn't write any emails or

11   memos expressing disappointment that the net worth sweep was

12   going to require to sweep away over 110 billion profit --

13   $110 billion in profit in the very first year?

14   A.  Correct.

15   Q.  Now, you said in your direct testimony that projections

16   have all sorts of scenarios:  best case, better, worse, stress,

17   or worst case.  Do you remember that?

18   A.  Yes.

19   Q.  And you said that what you were worried about was the

20   stress case, the worst case -- right? -- the catastrophe case?

21   A.  Yes.  I had to -- yes.

22   Q.  Isn't it true, Mr. DeMarco, that if there had been a stress

23   case, a pandemic, a war, an economic meltdown, Fannie Mae and

24   Freddie Mac would have been way better -- if that happened in

25   2014, let's say, Fannie Mae and Freddie Mac would have been way

1    better with this $111 billion on their books as well as the

2    Treasury commitment than only having the Treasury commitment

3    without this 111; correct?

4    A.  The added 111 would have given an additional buffer;

5    correct.

6    Q.  Because when you have that -- when Fannie and Freddie have

7    that net worth on their balance sheet, then that protects them

8    before they even need the commitment from any downturn, from

9    any losses; correct?

10   A.  That's correct.

11   Q.  And, likewise, when they have that buffer on their balance

12   sheet of net worth, if they do hit a year in the future where

13   the 10 percent dividend amount would've been higher than the

14   income, they can eat into their net worth to cover that?  They

15   don't have to draw from the commitment; correct?

16   A.  That's correct.

17   Q.  And so if -- if Fannie and Freddie had been able to keep

18   this 111 billion on their books, then it would have taken -- it

19   would have taken a lot of circular draws of a huge amount of

20   money before they would have had to draw from the commitment;

21   correct?  They could have used this instead?

22   A.  Yes.

23            MR. HUME:  And just because there was a complaint

24   earlier about combining things.  Can we show this slide in a

25   way that breaks out Fannie Mae and Freddie Mac.  We have it.

1    It's the last slide, I believe.  Slide 30.

2    BY MR. HUME:

3    Q.  So this one shows the same thing.  You see the 82 and the

4    47 roughly adds up -- 82.5 plus 47.6 roughly adds up to the

5    130 billion they paid, combined, in 2013; correct?

6    A.  Correct.

7    Q.  Okay.  So what we just said about the excess 111 billion

8    would be true for both Fannie and Freddie using the numbers

9    reflected on this chart in terms of the difference between the

10   net worth amount -- or the dividend amount under the net worth

11   sweep versus the 10 percent amount; correct?

12   A.  Correct.

13   Q.  And just as it would have helped Fannie and Freddie in a

14   stress scenario to have that extra net worth, that would've

15   instilled or given more confidence to bond and MBS investors --

16   correct? -- if they -- if Fannie and Freddie had that extra

17   130 billion split between them, as this chart shows, that would

18   have given more confidence to bond and MBS investors about the

19   safety of their investment; correct?

20   A.  All the elements of your hypothetical carried through and

21   they had that kind of retained earnings, yes.  We have not

22   addressed the periodic commitment fee, and this is the

23   particular outcome that occurred in this period right after --

24   in the -- in 2013.

25        So the answer to your hypothetical is yes.

1    Q.  The answer to my hypothetical is yes.  We're going to talk

2    about the periodic commitment fee.

3         But surely it's not your testimony that the difference

4    between these numbers -- it's not your testimony that the

5    periodic commitment fee in 2013 for both Fannie and Freddie

6    could have been $111 billion, is it?

7    A.  It could have been.

8    Q.  You think it would have been a reasonable periodic

9    commitment fee for Fannie Mae and Freddie Mac to have paid a

10   periodic commitment fee in 2013 alone of $111 billion?

11   A.  It was reasonable to expect -- because the Treasury

12   Department had been writing this and we had been thinking about

13   it -- that the periodic commitment fee could be set as a net

14   worth sweep.  So if there was earnings above the 10 percent

15   dividend, that that would have been compensation for the value

16   of the commitment provided.  So that was possible.

17   Q.  Okay.  Isn't it true that you never had anyone at FHFA go

18   through an exercise to calculate what a reasonable periodic

19   commitment fee would be?

20   A.  Correct.

21   Q.  Now, isn't it also true that Fannie Mae and Freddie Mac's

22   SEC filings from after the net worth sweep disclosed the

23   material adverse consequences that could come from the net

24   worth sweep?  Do you recall that?

25             MR. STERN:  Objection, Your Honor, to events after

DEMARCO - CROSS

1    happen and then also run scenarios for things that might

2    happen, even if they may be less likely?  Would you agree with

3    that?

4    A.  I wouldn't use the word predictions at all.  But if you

5    take projections of various outcomes, you think about what are

6    the range of possible outcomes, and you might assign some

7    degree of greater or lesser competence to them.  Yes, that

8    would be normal.

9    Q.  But isn't it a fact, Mr. DeMarco, a simple fact, that

10   before you agreed to the net worth sweep, before you agreed to

11   give away 100 percent of Fannie and Freddie's profits and net

12   worth forever, you never had anyone do a study or written

13   analysis or memo of any kind trying to determine the likelihood

14   of an outcome like the 2013 outcome?  Isn't that correct?

15   A.  That's correct.

16          MR. HUME:  Put Slide 2 back up.

17   BY MR. HUME:

18   Q.  There is no memo or written analysis of any kind at FHFA

19   trying to predict whether something like this might happen

20   under the net worth sweep; correct?

21   A.  Correct.

22   Q.  In fact, there's no analysis of whether Fannie and Freddie

23   were more likely to end up paying more or less to Treasury

24   under the net worth sweep than under the 10 percent dividend;

25   isn't that correct?

1    A.  Correct.

2    Q.  And there are no memos analyzing the pros and cons of

3    whether to do the net worth sweep; correct?

4    A.  Correct.

5    Q.  And there are no emails with long analysis of whether or

6    not to do the net worth sweep; correct?

7    A.  Correct.

8    Q.  In fact, there are no emails back and forth between FHFA

9    and Treasury negotiating whether or not to do the net worth

10   sweep; correct?

11   A.  Correct.

12   Q.  Is there a single document, a single memorandum analyzing

13   the pros and cons of entering into the net worth sweep on

14   behalf of Fannie Mae and Freddie Mac?

15   A.  Well, let's start with there is my request to the Treasury

16   Secretary in January 2012 of why I wanted to enter into a third

17   amendment with him, and it set forth my reasons for doing so.

18   There were no memos of -- summarizing that at the end.  There

19   were meetings and discussions that took place.

20        And then an agreement was reached that satisfied my

21   objectives.

22             MR. HUME:  Ms. McGuire, could you please pull up the

23   prior proceeding transcript at page 753.  753, lines 10 to 13.

24   BY MR. HUME:

25   Q.  Mr. DeMarco, you remember there was another proceeding in

1   this case, do you recall that, in 2022?

2   A.  Yes, sir.

3   Q.  About nine months ago.

4        You were asked:  QUESTION:  Is there a single document,

5   a single memorandum, analyzing the pros and cons of entering

6   into the net worth sweep on behalf of Fannie Mae and

7   Freddie Mac?

8        ANSWER:  No.

9        Was that truthful and accurate testimony?

10  A.  Yes.

11  Q.  And isn't it also true that --

12       MR. HUME:  If you put Slide 2 back up.

13  BY MR. HUME:

14  Q.  Isn't it also true, Mr. DeMarco, that you never made

15  any effort to negotiate with the Treasury Department a

16  provision in the third amendment that would deal with this

17  kind of outcome to make sure that if Fannie and Freddie

18  ended up having extraordinary profits, very large profits,

19  not all of them would be swept or maybe they'd be treated

20  as a redemption of principal or something?  There's no

21  effort to negotiate a provision to deal with this scenario;

22  correct?

23  A.  Correct.

24  Q.  Now, isn't it also true --

25       MR. HUME:  You can take that down now, Ms. McGuire.

1    were shown yesterday about -- saying, among other things, that

2    once they're in conservatorship, the -- Fannie and Freddie are

3    no longer managed to maximize shareholder returns.  Do you

4    recall that?

5    A.  Yes, I do.

6    Q.  I think it says before conservatorship, it is operated to

7    maximize shareholder returns.  Do you recall that, Mr. DeMarco?

8    A.  Yes.

9    Q.  And then after, it says:  No longer managed with the

10   strategy to maximize shareholder returns.  Do you recall that?

11   A.  Yes.

12   Q.  What I don't think you were shown is that underneath that,

13   here on page 9 of DX103, it does say as a -- during

14   conservatorship goal, maintain positive net worth and fulfill

15   our mission of providing liquidity, stability, and

16   affordability to the housing market.  Do you see that?

17   A.  I do.

18   Q.  And do you see -- it says:  Focus on returning to long-term

19   profitability if it does not adversely affect our ability to

20   maintain net worth or fulfill our mission.  Do you see that?

21   A.  Yes.

22   Q.  And those would've been accurate statements; correct?

23   A.  Yes.  And they would be consistent with the goals of

24   conservatorship that we went over earlier.

25            MR. HUME:  Okay.  And, again, I was told this wasn't

1    in evidence, but if you're showing it is, that's great.

2         Then could we just show DX102, which, if not in

3    evidence, I will move into evidence.  It's in evidence?  Okay.

4    BY MR. HUME:

5    Q.  And this is the same third quarter 2008 10-Q filing for

6    Fannie Mae.  I think the last one was Freddie Mac, and, again,

7    I just wanted to look at page 11, a similar chart.  And, again,

8    it says here that one of the goals is maintain positive net

9    worth.  Do you see that?

10   A.  Yes, I do.

11   Q.  And it says:  Focus on returning to long-term profitability

12   if it does not adversely affect our ability to maintain

13   positive net worth or fulfill our mission.  Do you see that?

14   A.  Yes, I do.

15   Q.  And those are -- were accurate statements; correct?

16   A.  Yes.

17   Q.  Okay.  Thank you.

18        Mr. DeMarco, I'd now like to get back to questions about

19   the run-up to the net worth sweep and the commitment.  Because

20   the focus was, in your testimony, making sure you preserve the

21   size of the commitment; correct?

22   A.  Yes.

23   Q.  Now, am I correct that the second amendment in

24   December 2009 set forth a formula for how the commitment would

25   be calculated on December 31st, 2012; is that correct?

1    adjustment on a deferred tax asset; correct?

2    A.  Yes.  It's creating the valuation allowance because you no

3    longer believe you can use the -- the asset.  You're following

4    the conventions to make that determination.

5    Q.  And that write-down of those deferred tax assets caused

6    losses and would have caused Fannie and Freddie to have to draw

7    money from Treasury to get to at least a zero net worth;

8    correct?

9    A.  If the valuation allowance put them below zero, yes, it

10   would have led to a draw against the Treasury commitment to get

11   them back to zero.  That's correct.

12   Q.  But isn't it also true that when and if Fannie and Freddie

13   concluded under the accounting rules as they apply, that they

14   were more likely than not going to be able to use this deferred

15   tax asset against future taxable income, they would be required

16   to write those assets back up, adding net worth to their

17   balance sheet; correct?

18   A.  Once they could make the appropriate judgment or assessment

19   about that, yes.

20   Q.  And am I correct that in deciding whether or not to agree

21   to the net worth sweep, you didn't ask anyone at FHFA to write

22   a memo or an analysis of the likelihood of this $100 billion

23   being returned to the balance sheet of Fannie Mae and

24   Freddie Mac?

25   A.  No, I did not.

1              MR. HUME:   The objection has been drawn.

2              MR. STERN:   Given the witness's answer, I'll withdraw

3       the objection.

4       BY MR. HUME:

5       Q.   So your answer is?

6       A.   Well, in terms of what we've gone over, the January

7       PowerPoint presentation I made to Secretary Geithner, it's

8       actually quite specific on this point; making the case to him

9       and requesting his assistance in getting a third amendment done

10      by -- I had set a target date of having it done by June 30th.

11      And I went through -- in that deck, we went through the

12      different bullets, the arguments I had for why I thought this

13      was necessary.

14      Q.   Maybe my question wasn't clearly asked.   I'll say it again.

15      My question was, after June 25th -- from June 25th onward, did

16      you see and have you seen today or yesterday any emails or

17      other documents from FHFA saying we've really got to push to

18      get this net worth sweep done before the end of the summer or

19      before the end of the year?   A document from after June 25th?

20      A.   No.

21      Q.   Now, you were shown a document about a renewed push.

22      Do you remember that?   I think it's PX-247.   Do I have that

23      right?   Yes.

24              Let's look at this again.   Your counsel showed this.

25      This is to you from Mr. Ugoletti.   This is August 9th, 2012.

1   Do you see that?

2   A.  Yes.

3   Q.  Okay.  And it says:  Close hold.  Do you see that?

4   A.  I do.

5   Q.  And then the first sentence is:  As a heads-up, there

6   appears to be a renewed push to move forward on SPSPA

7   amendments.  Do you see that?

8   A.  Yes.

9   Q.  And that renewed push came from Treasury; correct?

10  A.  Yes, we were waiting on Treasury.  Yes.

11  Q.  Just so the record is clear, the renewed push that

12  Mr. Ugoletti is referencing here you understood at the time was

13  a renewed push from Treasury; correct?

14  A.  Correct.

15  Q.  Okay.  And this August 9th was a day or two after -- let's

16  do it this way.

17      Do you recall, generally, that Fannie Mae and

18  Freddie Mac released their second quarter SEC filings with

19  their profits on August 7th and 8th, 2012?

20  A.  Yes.

21  Q.  So this renewed push comes right after those SEC filings

22  were published; correct?

23  A.  Yes.

24  Q.  And those SEC filings showed that Fannie Mae and

25  Freddie Mac both -- each -- each of them had comprehensive

1    income substantially above the 10 percent dividend amount;

2    correct?

3    A.  Yes.

4    Q.  And those SEC filings filed on August 7th and 8th, 2012,

5    showed that because of that income above the dividend amount,

6    both Fannie Mae and Freddie Mac were building positive net

7    worth for the first time, really; correct?

8    A.  For Fannie, yes.  We had seen Freddie had built it and then

9    lost it, built it and lost it.

10   Q.  Yeah.  The first time part, I -- let's just say because

11   their income was above the dividend amount, the filing showed

12   they were building positive net worth?

13   A.  Yes.  Because the dividend -- because the earnings were

14   above the dividend amount.  Once they paid the dividend, there

15   was an incremental -- there was an increase to retained

16   earnings.

17   Q.  Now, Mr. DeMarco, we're at the end of the day, and I know

18   we're all trying to move this along.  But isn't it true that

19   you knew that the reason the Treasury was pushing for the net

20   worth sweep, particularly after those SEC filings, was that the

21   Treasury did not want Fannie and Freddie to retain profits or

22   rebuild their net worth?

23   A.  I do not know why on August 8th or 9th Treasury decided it

24   was time to get moving on the PSPA amendments again.  All I

25   know, I was glad to see that they were ready to do it.  And we

1    A.  Yes.

2              MR. HUME:  You can put that down, Ms. McGuire.

3    BY MR. HUME:

4    Q.  Now, am I also correct, Mr. DeMarco, that your

5    understanding is that in order to wind down and replace

6    Fannie Mae and Freddie Mac requires congressional action.

7    Correct?

8    A.  Yes.

9    Q.  Now, Mr. Ugoletti was your special advisor in 2012 at

10   the time of the net worth sweep.  Is that correct?

11   A.  Yes.

12   Q.  And he was also your point person on negotiations with

13   the Treasury over the third amendment and the net worth

14   sweep.  Correct?

15   A.  That's correct.

16   Q.  And had you worked with Mr. Ugoletti when you were both

17   at the Treasury Department?

18   A.  Yes, I had.

19   Q.  And what were the years -- you said yesterday the years

20   you were there.  But what were the years you were at

21   Treasury and Mr. Ugoletti was also there, that you were

22   there together?  If you recall.

23   A.  It's going to be 1995 or 1996 that Mr. Ugoletti joined

24   the Treasury Department.  I joined it in early 1994.

25   Q.  Then you were both there together for -- until when?

1    just first look at it together.  Then I have one question.

2         It says -- there's a section here that says

3    Considerations.

4         Do you see that?

5    A.  Yes, I do.

6    Q.  And it says, "To protect the taxpayers, the secretary of

7    the Treasury shall take into consideration the following in

8    connection with exercising the authority contained in this

9    paragraph."

10        Do you see that?

11   A.  Yes, I do.

12   Q.  Now, if I may approach, I can show you the paragraph

13   unless you're familiar with the paragraph that relates to

14   Treasury's ability to buy stock in Fannie Mae and Freddie

15   Mac.  Are you generally familiar with that?

16   A.  I'm familiar that HERA allowed for the purchase of

17   securities of Fannie and Freddie by Treasury.  I have not

18   looked at the exact full text of this in many years,

19   Mr. Hume.

20   Q.  No.  I understand that.

21        The question is, this says, "Among the

22   considerations Treasury should take into account are..."

23        And romanette (iii):  "The corporation's plan for

24   the orderly resumption of private market funding of capital

25   market access."

1           Do you see that?

2    A.  Yes, I do.

3    Q.  And then in romanette (v) -- we've obviously pulled out

4    provisions; we're not showing everything, which we do have:

5    "The need to maintain the corporation's status as a private

6    shareholder company."

7           Do you see that?

8    A.  Yes, I do.

9    Q.  So my simple question is:  When you were discussing the

10   third amendment to the PSPA, were you generally aware that

11   Congress had told Treasury that when exercising its

12   authority to buy stock in Fannie Mae and Freddie Mac, it

13   should take into account various considerations, including

14   the need to maintain the corporation's status as a private

15   shareholder company?

16   A.  I don't recall whether I was generally aware about that

17   direction to the Treasury.  But I know that's how I was

18   operating as the acting director and the conservator.

19           MR. HUME:  You can take that down, Ms. McGuire.

20   Thank you.

21   BY MR. HUME:

22   Q.  Now, FHFA placed Fannie Mae and Freddie Mac into

23   conservatorship.  Am I correct that FHFA essentially fired

24   the existing board of directors at both companies and most

25   of the senior management?

1    Q.  Sure.  "Only to the extent."

2         Then there's another thing.  But this says that to

3    these extents -- to this extent, anyway, you could pay it

4    down?

5    A.  That's what it says.

6    Q.  And then Paragraph 2-C.  It says that the dividend rate

7    is 10 percent.  Correct?  That's the first thing it says?

8    Yes?

9    A.  That's correct.

10   Q.  And it then says, "Provided, however, that if at any

11   time the company shall have for any reason failed to pay

12   dividends in cash in a timely manner as required by this

13   certificate, then immediately following such failure and for

14   all dividend periods thereafter until the dividend period

15   following the date on which the company shall have paid in

16   cash full cumulative dividends, the dividend rate shall be

17   12 percent."

18        Do you see that?

19   A.  Yes, I do.

20   Q.  Okay.  So that means of a -- in the period after you

21   fail to pay a dividend, it then goes up to 12 percent until

22   you pay it back down.  Correct?

23   A.  That's correct.

24   Q.  When you pay it back down, the rate goes back to 10

25   percent?

1    A.  That's what it says.

2    Q.  And I don't recall exactly what you said when Mr. Stern

3    was asking you questions about this provision, but I just

4    want the record to be clear.  It's accurate, isn't it, that

5    this provision -- those provisions, whatever you want to

6    call them, did not come up in any of your considerations

7    about whether to enter into the net worth sweep.  Correct?

8    A.  They did not.

9    Q.  And so you did not consider it.  Correct?

10   A.  No.  As we've -- as I pointed out in the discussion with

11   Mr. Stern, that this says clearly that if the company shall

12   for any reason to fail to pay the dividends immediately

13   following such failure -- this was viewed as a failure under

14   the contract to meet an obligation to pay a 10 percent

15   dividend.  And then the penalty that ensues is that the

16   dividend rate goes up by 20 percent.

17          So no.  We did not consider this when we were

18   doing the net worth sweep.

19   Q.  What's confusing here and that I'm trying to make clear,

20   Mr. DeMarco, is it would be inaccurate to tell the jury that

21   you considered it and rejected it for the reasons you just

22   gave, wouldn't it?

23   A.  That's -- that's not what I said.  I said we did not

24   consider it.  I said that -- I thought I said that very

25   clearly.

1    Q.  And it never came up in all of your discussions while at

2    the conservatorship.  Correct?

3    A.  No.

4    Q.  No, it never came up?

5    A.  Did I -- I was the acting -- I was there for a long

6    time.  You're asking me, did it ever come up that there was

7    some mention or discussion of this provision from the time

8    the conservatorship was appointed?  I don't remember.

9            I can tell you that in the context of the work on

10   the third amendment, it never came up.

11           MR. HUME:  Ms. McGuire, could you please pull up

12   the prior proceeding transcript, Page 751, Lines 10 to 19.

13   BY MR. HUME:

14   Q.  Now, in this proceeding you were asked, Question:  "Now,

15   at the time of the net worth sweep, you didn't consider the

16   potential solution to the circular draw problem -- that

17   potential solution."

18           And if you wish, we can go back to show that this

19   is discussing what we call the payment-in-kind provisions we

20   just went through.

21   A.  Okay.

22   Q.  Are you willing to accept that?

23   A.  I'm willing to accept that.  So we can keep moving.

24   Q.  "Now, at the time of the net worth sweep, you didn't

25   consider that potential solution to the circular draw

1          THE WITNESS:  Yes, it was.

2          MR. STERN:  Your Honor, I have nothing further.

3          THE COURT:  Mr. DeMarco, thank you.  You may step

4    down.

5          (Witness excused.)

6          MR. STERN:  May I be heard briefly?

7          THE COURT:  Yes.

8          (Whereupon, the following proceedings were had at

9    sidebar outside the presence of the jury:)

10         MR. STERN:  Your Honor, before we rest, we have

11   one more document to offer.

12         As the Court may recall and I was reminded

13   yesterday, Mr. DeMarco was actually called by agreement of

14   the parties in a single appearance, appearing both as a

15   defense witness and a Plaintiffs' witness.  So technically

16   speaking, the Plaintiffs' case remained open until

17   Mr. DeMarco's testimony had concluded.

18         We have now reached that point.  So I would move

19   the Court pursuant to Rule 50(a) for judgment as a matter of

20   law.  And we will submit on the arguments previously made

21   and on the record.

22         THE COURT:  That motion is denied.

23         MR. STERN:  Your Honor, we now have an exhibit to

24   move.  And Mr. Hoffman is going to handle this because there

25   is an objection, with the Court's permission.  I apologize

1    statement was true.

2         Whether or not the prior inconsistent statement

3    was under oath, you may consider the inconsistency in

4    judging the witness's credibility.

5         If a witness testifies that a prior inconsistent

6    statement is the truth, then you may consider the prior

7    statement both to evaluate the witness's credibility and as

8    evidence of the truth of any fact contained in that

9    statement.

10         The relative weight of the evidence on a

11   particular issue is not determined by the number of

12   witnesses testifying for either side or the number of

13   exhibits on either side; it depends on the quality, and not

14   the quantity, of the evidence.  Presenting a greater number

15   of witnesses or exhibits does not necessarily prove a point.

16   Indeed, the testimony of a single witness which you believe

17   to be the truth is enough to prove any fact.

18         In this case, you have heard opinion testimony

19   from Professors Bala Dharan, Joseph Mason, Anjan Thakor and

20   Mukarram Attari, who have been identified by the parties as

21   expert witnesses on various economic issues.  The law allows

22   opinion testimony on such matters if the witnesses possess

23   significant knowledge, training, experience or education.

24         You're not bound to accept those witnesses'

25   opinions.  If you find that any opinions are not based on

The Court's Instructions to the Jury

1    sufficient evidence, experience, training or education or

2    that the reasons supporting the opinions are not sound or

3    that the opinion is outweighed by other evidence, you may

4    completely or partially disregard the opinion.

5         Opinion testimony should be judged just as any

6    other evidence.  You should consider opinion evidence with

7    all the other evidence in the case and give it as much

8    weight as you think it fairly deserves.

9         You have heard conflicting testimony from expert

10   witnesses in this case.  The way you resolve the conflict

11   between these witnesses is the same way that you decide

12   other fact questions and the same way you decide whether to

13   believe ordinary witnesses.  In addition, because they gave

14   their opinions, you should consider the soundness of each

15   opinion, the reasons for the opinion and the witness's

16   motive, if any, for testifying.

17        You may give the testimony of each of these

18   witnesses such weight, if any, that you think it deserves in

19   light of all the evidence.  You should not permit a

20   witness's opinion testimony to be a substitute for your own

21   reason, judgment and common sense.

22        You may reject the testimony of any opinion

23   witness in whole or in part if you conclude the reasons

24   given in support of an opinion are unsound or if you for

25   other reasons do not believe the witness.  The determination

1       caused them financial harm.

2              In this case, Plaintiffs allege that FHFA, in

3       agreeing to the net worth sweep as a part of the third

4       amendment to the PSPAs with Treasury, breached the implied

5       covenant of good faith and fair dealing by eliminating any

6       possibility that shareholders other than Treasury would

7       receive dividends in the future, thereby depriving

8       Plaintiffs' shares of much of their value.

9              Defendants respond that the net worth sweep was

10      reasonable based on the parties' expectations at the time of

11      contracting, because in agreeing to it, FHFA was responding

12      to the facts and circumstances known to FHFA in August 2012

13      in a manner that private shareholders reasonably could have

14      expected by December 24, 2009.

15             To establish a breach of the implied covenant of

16      good faith and fair dealing in this case, each class of

17      Plaintiffs must prove by a preponderance of the evidence

18      that, one, FHFA's actions in agreeing to the net worth sweep

19      arbitrarily or unreasonably violated shareholders'

20      objectively reasonable expectations under the shareholder

21      contracts; and, two, as a result, Plaintiffs' shares became

22      less valuable.

23             Your assessment of Plaintiffs' reasonable

24      expectations under the contracts in this case must be based

25      on their reasonable expectations as of December 24th, 2009.

The Court's Instructions to the Jury

1            That's again on Page 9.

2            In making that assessment, you must -- you may

3    consider the text of the certificates of designation that

4    came with Plaintiffs' shares as well as the terms of the

5    Housing and Economic Recovery Act, or HERA; the senior

6    preferred stock purchase agreements, or PSPAs, between

7    Treasury and FHFA and the first two amendments to those

8    agreements; the nature of Fannie Mae and Freddie Mac as

9    government-sponsored entities, or GSEs; and public

10   statements made by FHFA explaining the beginning of the

11   conservatorship in 2008.

12           While HERA authorized FHFA to act in the best

13   interests of the GSEs, the FHFA or the public, FHFA's

14   exercise of that statutory authority can still have violated

15   the implied covenant of good faith and fair dealing if it

16   exercised that authority in a way that arbitrarily or

17   unreasonably violated Plaintiffs' reasonable expectations

18   under the contract.

19           In addition, you should keep in mind that the

20   question is not what any actual shareholder, including any

21   of the Plaintiffs in this case, subjectively expected.

22   Instead, the question is what an imaginary or hypothetical

23   reasonable shareholder would have expected based on

24   information known or available to that hypothetical

25   reasonable shareholder as of December 24, 2009.