# EXHIBIT B

1     MR. STERN: Your Honor, I was jumping the gun.
2 Mr. Hume and I were going to discuss scheduling with the Court.
3 I know the Court usually does that off the record at the bench.
4 We have just a few comments. We will wait until the Court is
5 ready for us.
6     THE COURT: Was there a motion for judgment?
7     MR. JONES: Yes. Would you like us to go ahead and
8 make our motion for judgment now?
9     THE COURT: The record's now closed; right?
10    MR. HUME: Yes, Your Honor, subject to that judicial
11 notice issue, yes.
12    MR. JONES: Thank you, Your Honor. Stanton Jones for
13 the defendants.
14   The defendants move, pursuant to --
15    THE COURT: I gave you a compliment yesterday, and
16 already you're in charge? Just teasing.
17    MR. JONES: Very good, Your Honor. Thank you.
18   Pursuant to Federal Rule of Civil Procedure 50(a),
19 defendants move for judgment as a matter of law.
20   As Your Honor knows, the standard under Rule 50(a) is
21 basically the summary judgment standard and whether a reasonable
22 jury would not have a legally sufficient evidentiary basis to
23 find for the plaintiffs, and that is the case here for multiple
24 reasons.
25   First, plaintiffs have failed to prove harm or damages to

1    class members with reasonable certainty.  At summary judgment,
2    the Court held that plaintiffs could try to prove that class
3    members were harmed by the stock price drop on August 17th,
4    2012, so ten years ago.
5         Plaintiffs have not supplied a valid evidentiary basis for
6    a jury to find harm to class members based on that one-day stock
7    price drop ten years ago.  And here's why:  The class members --
8    under the class definitions, the class members are all current
9    shareholders, only current shareholders, people holding the
10   shares today.
11        And plaintiffs have introduced no evidence at all and no
12   basis for a jury to conclude that the value of Fannie Mae and
13   Freddie Mac stock would be higher than it actually is today but
14   for the Third Amendment.  And that's fatal to their claim as a
15   matter of law.
16        Now, plaintiffs rely on the event study to show that the
17   stock prices dropped on the day of the Third Amendment back ten
18   years ago.  But even if a jury were to accept that the event
19   study establishes that stock price drop from ten years ago, the
20   event study tells them nothing, and there is no other evidence
21   to tell them what the stock price would be today in the absence
22   of the Third Amendment.
23        That's true for all class members, whether they purchased
24   their shares before the Third Amendment or after the Third
25   Amendment.  And I would like to take those two in turn.

1    So start with class members who bought their shares before
2    the Third Amendment and have held them through all the way until
3    today, because those people would be in the class.  It's all
4    current shareholders.
5         Even if the stock price fell that one day ten years ago, if
6    you accept that the event study shows that stock price drop for
7    one day, plaintiffs have introduced no evidence that the price
8    of their shares today would be any different, any higher than it
9    is in the real world today if it weren't for the Third
10   Amendment.
11        These shareholders still hold the shares today.  They never
12   sold them.  So to establish harm from a stock price drop one day
13   ten years ago, they would need to prove by a preponderance of
14   the evidence that the value, the price of their shares today,
15   would be higher were it not for the Third Amendment.
16        And it's not intuitive that that's true.  It's not
17   intuitive that a one-day drop in the price of a stock -- we're
18   now over ten years ago -- is changing, depressing the price
19   value of the stock ten years later today.
20        And not only is it not intuitive, economically or
21   otherwise, there's absolutely no evidence that it's true.  There
22   is no evidence in the record from which the jury could conclude
23   based on an evidentiary basis that the stock price today for
24   class members who hold their shares today would be higher were
25   it not for the Third Amendment.  The jury would be left simply

1  to guess.
2       Again, even if the jury accepted the event study showing
3  the stock price drop ten years ago on that day in August 2012,
4  the jury would be left to guess whether these class members were
5  harmed and, if so, by how much on the basis of the value of
6  their shares today.
7       So that's class members who bought their shares before the
8  Third Amendment and still hold them today.
9       Now consider the other class members, which are those that
10 bought their shares after the Third Amendment and still hold
11 them today.  That's the rest of the class.  They have for
12 starters the same problem as class members who bought their
13 shares before the Third Amendment, which is that there's no
14 evidence and no basis for a jury to find that their shares today
15 would be worth more but for the Third Amendment.
16      So that's the same problem whether you're looking at
17 shareholders who bought before the Third Amendment or after.
18 But these shareholders who bought their shares after the Third
19 Amendment, they have an even bigger problem, which is if
20 anything, the evidence that has come in during the trial proves
21 that these shareholders who bought after the Third Amendment, it
22 proves that they were not harmed by the stock price drop.  And
23 if anything, they benefited from the stock price drop, because
24 as everybody knows, the objective in stock market investing is
25 to buy low and sell high.

1         And so we have all of these people in the class who bought
2    their shares after the Third Amendment, when on plaintiffs'
3    theory of the case the stock price was depressed, it was lower,
4    and they got to buy low.  Being able to buy low is not harm to
5    an investor in the stock market.  It's an advantage.  It's a
6    financial benefit to those people.
7         So because plaintiffs' theory of the case, of harm is that
8    the stock prices were depressed, were declined, dropped after
9    the Third Amendment, these shareholders who bought low, they got
10   the benefit of any price reduction that's attributable to the
11   Third Amendment.
12        If anything, Your Honor, it's the people who bought before
13   the Third Amendment and sold their shares after the Third
14   Amendment who may have been harmed by the stock price drop on
15   August 17th, 2012, ten years ago, because they did the thing you
16   don't want to do in the stock market.  They bought high or they
17   sold lower.
18        But none of those people are in the class, because by
19   definition, if you have sold your share, you are not in the
20   class, because the class is only the current shareholders.
21        So as to all class members, Your Honor, in sum on this
22   argument, a stock price drop during a 24-hour window ten years
23   ago is simply not informative, it isn't probative of whether the
24   market value of a current shareholder's stock in 2022 is lower
25   than it would be today but for the Third Amendment.

1     And plaintiffs have put in no evidence at all that would
2  allow a jury to make any determination one way or the other on
3  that issue, and they cannot just intuit it, because it isn't
4  intuitive.
5     And so for this reason, a jury could not find that the
6  plaintiffs have proven harm or damages with reasonable certainty
7  to any members of the class.  That's the first argument.
8     The second argument is related but distinct, and that is,
9  the evidence affirmatively establishes, similar to what I was
10 just describing, that the class now includes many people, many
11 class members who bought their shares after the Third Amendment.
12 They suffered no harm.  The evidence, I think, actually proves
13 that they did not suffer harm.
14    So the first argument you could think of as a failure of
15 proof.  This is a problem that the evidence affirmatively proves
16 no harm to many class members, all of them who purchased their
17 shares after the Third Amendment.
18    This argument, Your Honor, is a basis for judgment as a
19 matter of law under Rule 50(a).
20    We also think it's a basis for decertifying the classes,
21 because you have classes that now consist of a lot of people,
22 the entire universe of people who own shares today that they
23 purchased after the Third Amendment, who suffered no harm.
24    Your Honor may recall the Court certified these classes at
25 a time in the case before the stock price drop theory had even

1    been introduced into the case.  Dr. Mason's reply report with
2    the event study hadn't even been served yet.  The only theory in
3    the case at that time was lost dividends, and Your Honor's class
4    certification decision says explicitly -- finds the Rule 23
5    requirements of commonality and predominance were satisfied
6    exclusively and explicitly on the basis that lost dividends
7    harm -- so the theory that's out of the case -- was a viable
8    basis for proving an injury to all class members with common
9    proof.
10        So this is a Rule 50(a) judgment as a matter of law
11   problem.  It's also a class certification problem, having all of
12   these class members for whom the evidence proves they were
13   unharmed and, in fact, were financially benefited by having the
14   opportunity to buy when the stock price was lower as a result of
15   the Third Amendment on plaintiffs' own telling of the evidence
16   in the case.
17        So I will anticipate here that the plaintiffs will argue
18   that even if the seller was harmed, the person who sold the
19   shares who had bought high/sold low, because of the Third
20   Amendment, that person was harmed, they will say that -- well,
21   that person's not in the class, but I anticipate the plaintiffs
22   will say that this claim travels with the share, which is a
23   concept that has come up in several contexts in the case.
24        The problem, Your Honor, is that, unlike the prior lost
25   dividends theory where the theory was that the share was

1    entitled to receive dividends in perpetuity, forever, and that
2    those should have been received but were not, that claim
3    traveled with the share, but the claim now based on a drop in
4    the stock price, that is the type of claim that is personal to
5    the shareholders and does not travel with the share.
6         This concept of traveling with the share comes from UCC,
7    the Uniform Commercial Code, Section 8-302, and there is an Ohio
8    Supreme Court decision from 2018 that is the leading national
9    decision on this issue, and it is directly on point.
10        The Court held there -- it's called *Cheatham v. Huntington*
11   *National Bank*.  It's 157 Ohio State 3d 358.  And as a Michigan
12   guy, it hurts me to say Ohio State out loud.  But it's just a
13   citation, not a name of a school.
14        That is directly on point.  It holds that a court cannot
15   certify a class of all current -- it was bondholders, not
16   stockholders, just a different type of security.  The Court
17   cannot certify a class of all current bondholders on a theory
18   that they were harmed by a prior stock price drop because the
19   people who had bought after weren't harmed and that type of
20   claim does not travel with the share.  It doesn't travel with
21   the share.
22        The Delaware case law, which, Your Honor, you may recall
23   from prior contexts in this case, is consistent with that Ohio
24   decision.  The Delaware case law establishes that this type of
25   claim, that claims that are personal to the shareholder as

1    opposed to being something affixed to the share, do not travel
2    with the share.  And a claim that the shareholder -- that the
3    share dropped in value is a claim that's personal to the
4    shareholder, again because it harms the person when they sell
5    the share, not the person when they buy the share.
6         And if you just think about it for a minute, it really
7    doesn't make sense to think of this claim traveling with the
8    share.  The seller, the person who owned the share before, is
9    selling at a depressed price.  They are harmed by that
10   potentially.  The person who is buying the share is getting the
11   opportunity to buy the share at a lower price.  They are being
12   advantaged.  The idea that the buyer is somehow automatically
13   acquiring from the seller the right to assert the seller's harm
14   from having sold to the buyer low does not make any sense.
15        And the case law supports this, but I just wanted to make
16   sure that we convey that there is an incoherence to the notion
17   of applying this "claims travels with the share" concept when
18   you're talking about a harm based on a stock price drop.
19        Virginia hasn't addressed this issue at all under its
20   version of the Uniform Commercial Code, but I will say that
21   Delaware, Virginia, and Ohio have all adopted the model UCC
22   provision that says that their state's UCC statutes should be
23   construed, quote, to make uniform the law among the various
24   jurisdictions.
25        So all of these states have an objective to have their UCC

1  statutes construed uniformly.  And as I said, the 2018 Ohio
2  Supreme Court decision on this precise issue is the leading
3  national decision.
4          THE COURT:  And it's doing it under the UCC?
5          MR. JONES:  It is doing it specifically under this
6  exact same provision of the UCC, yes.
7      So for that reason, Your Honor -- that's our second
8  argument.
9      And the third argument, I'm saying this exclusively for
10 preservation purposes.  We understand from the summary judgment
11 stage that the arguments that we made related to *Collins* and
12 reasonableness, as well as the other argument, the public
13 interest provision, best interest provision of HERA is
14 incorporated into the contract and supplies the standard.  We
15 would renew those arguments now at the Rule 50(a) stage for
16 preservation purposes.
17     Oh, one more.  There is a sufficient evidentiary basis for
18 a jury to find that FHFA acted arbitrarily or unreasonably in
19 violation of the reasonable expectations of shareholders, just
20 an insufficient evidentiary basis.
21     Thank you, Your Honor.
22         MR. HUME:  This is Hamish Hume for the plaintiffs.
23     Your Honor, I think I can briefly respond.
24         THE COURT:  Sure.
25         MR. HUME:  The stock drop measures the harm that was

1    inflicted by the net worth sweep.  And it's a minimal measure.
2        The evidence in the record that supports harm to the
3    shareholders is that under the net worth sweep 100 percent of
4    everything goes to Treasury, and there is zero possibility of
5    anything ever going to the private shareholders.
6        And the evidence shows that that resulted in the Treasury
7    getting $150 billion more than it would have gotten.  That money
8    would have been with the GSEs --  130 billion of that would have
9    been with the GSEs, about 123.
10       The evidence also shows that Fannie and Freddie were
11   extremely profitable from 2012 onwards.  2012, Fannie Mae made
12   7.6 billion, and that was a record.  You know what they made in
13   2013?  86 billion.  And they kept making profits year after year
14   after year.
15       August 16, 2012, things were still a little shaky.  They
16   were getting better, but the outside parties didn't know how
17   good things looked inside.
18       What was the market price?  The market price was the
19   estimate, the estimated value the market put on the potential
20   that private shareholders would one day participate in the
21   earnings of these companies and get dividends.  That's what that
22   2.6 billion was or 2.9 billion.
23       The net worth sweep took away the possibility of getting
24   those dividends, and the stock dropped 1.6 billion, the three
25   classes, and that is a stipulated fact.

1            And there can be no -- it is inconceivable that a jury
2    could not rationally find that that was caused by the
3    announcement of the net worth sweep.  It would be irrational for
4    a jury to find otherwise.
5            But that's not -- I don't even think that's their argument.
6    The point is, that is a measure of the harm inflicted on the
7    shares, and this Court has ruled that the rights in those shares
8    travel when they're sold.  Page 8 of this Court's 2018 ruling.
9            And it is not a stock -- it is not the loss on the sale of
10   the shares that we are suing over.  It is the infliction of harm
11   on the shares themselves that no longer have that right to
12   potential dividends.  And the fact that they didn't go to zero
13   is only because somebody out there is betting that this thing is
14   going to go away.  It's the only way rationally they could be
15   anything other than zero.
16           And there is plenty of evidence in this record to support
17   the judgment that it would be higher than that, that right now,
18   given how well they've done, that $2.9 billion valuation before
19   the net worth sweep would be way higher, and the delta caused by
20   the net worth sweep would therefore be way higher.
21           So the evidence supports 1.6 billion as a minimal measure
22   of a harm that was inflicted on the shares and that runs with
23   the shares, as this Court has already ruled several times.
24           My colleagues have passed me lots of notes, but to me,
25   that's all we need to say.  If the Court is even remotely

```
 1      considering it, I think my colleagues would want to brief.
 2              THE COURT:  I agree.  The motion is denied.
 3         Now, in terms of tomorrow morning, there's still some
 4      argument about Attari which we may convene early to dispose of
 5      since I'm tired.
 6              MR. HOFFMAN:  That's fine with defendants, Your Honor.
 7              THE COURT:  We will start at 9:30, since I told the
 8      jury 10:00.  Can we do it in 30 minutes?
 9              MR. HOFFMAN:  Yes, Your Honor.
10              MR. STERN:  Your Honor, the plaintiffs and defendants
11      have a joint proposal and request about scheduling.  I don't
12      know if the Court wants to do it like this or up at the bench.
13              THE COURT:  Yeah.
14              MR. STERN:  Your Honor, I think Mr. Hume and I are --
15      we join each other in this.  We were a bit over-ambitious in
16      thinking that we would be able to close and instruct and send
17      the jury out on Friday.  If the Court will indulge me.
18          The timing seems to evolve like this:  We expect that
19      Dr. Attari's direct examination will be in the range of two and
20      a half to three hours.  Obviously, Plaintiffs don't know yet how
21      long their cross will take; they haven't heard the direct.  But
22      if we presume one-half the time of direct examination, which is
23      probably a minimum, that would be four and a half hours of
24      testimony from Dr. Attari.
25          We then have Mr. Satriano.  We anticipate his direct will
```

1    brief recess.
2         (Recess)
3         **THE COURT:**  All right.  First, I would like to
4    state some reasons for my denying the defendants' motions
5    for judgment as a matter of law and for denying the motion
6    for decertification of the class.
7         Defendants' motions for judgment as a matter of
8    law and decertification of the classes are denied.  As
9    plaintiffs' argued and as I indicated on the record, I agree
10   that the plaintiffs' -- both of these motions misunderstand
11   the theory of harm that I allowed to proceed to trial in the
12   summary judgment opinion under the lost value theory of harm
13   that plaintiffs have taken to trial.
14        The drop in the stock price is not itself the
15   alleged injury.  The alleged injury is that the net worth
16   sweep effectively eliminated the dividend rights that came
17   with the shares as they were originally issued.
18        In other words, when someone buys a share in a
19   company, they're purchasing a bundle of rights.  And
20   plaintiffs are arguing here that the net worth sweep removed
21   one of the most valuable sticks from that bundle.  That's a
22   type of claim that travels with the shares, so there's not a
23   proof problem that would justify a judgment as a matter of
24   law.  And there's no reason to decertify the class.
25        The drop in stock prices is just a measure of

1    damages if plaintiffs have developed the expert testimony on
2    an alternate measure before the close of discovery, they
3    might have been permitted to seek a measure other than the
4    drop in the stock prices.  But as it turns out, that's what
5    developed at the trial is the measure of damages, and
6    they'll be allowed to proceed to the trial on that theory.
7             The Court has distributed to counsel a summary of
8    the Court's changes to the proposed jury instructions it had
9    received as of Friday and the Court's final draft
10   instructions as of Friday night.
11            The Court has some other changes its received in
12   the meantime, two received from plaintiffs this morning.
13   And I think there are some others as well.  I know there's
14   one on the prejudgment interest from the defendants that
15   looked to me that it was in more detail than is necessary.
16   If you look at what I have in the instructions on the
17   prejudgment interests, it looked adequate as I had it.
18            But any other objections, I've distributed to you
19   all what I had on final instructions.  And any other
20   objections you all want to put on the record now to the
21   instructions or any additional instructions, I am certainly
22   happy to consider.
23            As to the two on deposition excerpts and analyst
24   reports that the plaintiffs submitted this morning, was
25   there any objection to either of those from defendants?