# EXHIBIT C

## INDEX TO EXHIBIT C

| Page No. | Trial Ex. No. | Description |
|---|---|---|
| 1 | JX-1 | Joint Statement of Undisputed Facts |
| 20 | PX-1-A | Amounts Invested by Private Preferred Shareholders Into Fannie Mae |
| 21 | PX-1-C | Amounts Invested by Private Preferred Shareholders Into Freddie Mac |
| 22 | PX-1-L | Case-Shiller Housing Index: January 2012 - June 2012 |
| 23 | PX-1-M | Case-Shiller Housing Index: 2007 - 2022 |
| 24 | PX-1-O | Dividends Paid to Treasury (Fannie Mae and Freddie Mac combined): 2012 vs. 2013 |
| 25 | PX-1-P | Total Dividends Paid to Treasury: 4Q 2008 - 2012 vs. 2013 alone |
| 26 | PX-2-C | FHFA Fact Sheet - Questions and Answers on Conservatorship |
| 29 | PX-2-E | Email from Edward DeMarco to Robert Collender re Treasury support for the GSEs-request for slides with FHFA Power Point Presentation |
| 69 | PX-33 | Fannie Mae Senior Preferred Stock Certificate |
| 78 | PX-34 | Freddie Mac Senior Preferred Stock Certificate |
| 87 | PX-144 | Email from Mary Miller to Edward DeMarco re: Agenda for Discussion with FHFA |
| 89 | PX-147 | Email from Bradford Martin to Edward DeMarco re: Fannie Mae Executive Management Meeting on January 9, 2012 |
| 94 | PX-196 | Email from Paul Bjarnason to Andre Galeano Re: called |
| 96 | PX-205 | Memo from Michael Stegman to Mary Miller re FHFA-Related Discussion at June 25 Morning Meeting |
| 97 | PX-210 | Email from Beth Mlynarczyk to Sam Valverde, et al. re Housing QnA Update |
| 148 | PX-211 | Fannie Mae Management Committee: May 2012 Financial Update Forecast Only |
| 178 | PX-213 | Email from Bradford Martin to Edward DeMarco, et al., re: Fannie Mae Executive Management Meeting on July 9, 2012 and attachments |
| 298 | PX-216 | Draft of Strategic Planning Session of Board of Directors of Fannie Mae |
| 326 | PX-218 | Fannie Mae Board Meeting Agenda of July 19, 2012 |
| 379 | PX-223 | Fannie Mae July 20, 2021 Board Meeting Packet |
| 427 | PX-226A | Email from Timothy Bowler to Jeff Foster, et al., re: 2Q12 estimated results/timing |
| 429 | PX-227 | Email from Timothy Bowler to Jim Parrott re PSPA Next Steps August 6 |
| 432 | PX-228 | Freddie Mac Audit Committee Meeting Minutes |
| 436 | PX-247 | Email from Mario Ugoletti to Edward DeMarco re: PSPA Alert |

| Page No. | Trial Ex. No. | Description |
|---|---|---|
| 437 | PX-259 | Email from James Griffin, Jr. to Nicholas Satriano re SPSPA Meeting |
| 438 | PX-262 | Freddie Mac 2012-2015 Corporate Foreast / Senior Preferred Stock Purchase Agreement - 3Q Update |
| 446 | PX-269 | Email from Judith Dunn to Timothy Mayopoulos re: Updated Treasury Meeting Presentation dated August 15, 2012 |
| 457 | PX-278 | U.S. Department of the Treasury Press Release dated August 17, 2012 |
| 460 | PX-282 | Email from Robert Hynes to FHFA re Capital Markets Update |
| 464 | PX-351 | Declaration of Mario Ugoletti |
| 474 | PX-375 | Charles River Associates - Third Amendment: Event Study |
| 490 | PX-458 | Freddie Mac Form 10-K for the Fiscal Year Ended December 31, 2012 |
| 492 | PX-460 | Federal National Mortgage Association (Fannie Mae) Form 10K for the fiscal year ended December 31, 2012 |
| 498 | PX-499 | Federal Home Loan Mortgage Corporation (Freddie Mac) Form 10-K for the fiscal year ended December 31, 2013 |
| 502 | PX-521 | Federal Housing Finance Agency, Federal Housing Finance Board & OFHEO, Stable Value Investment Association |
| 518 | PX-550 | Email from Timothy Bowler to Jeff Foster re: PSPA Covenant and Timing Proposal: July, 30 2012 |
| 520 | PX-566 | Email from Robert Hynes to !DER All Staff, et al. re Capital Markets Weekly from the Office of Systemic Risk and Market Surveillance with attachment |
| 524 | DX-89 | Treasury Stock Certificate (Fannie Mae): Certificate of Designation of Terms of Variable Liquidation Preference Senior Preferred Stock, Series 2008-2 |
| 533 | DX-90 | Treasury Stock Certificate (Freddie Mac): Certificate of Designation of Terms of Variable Liquidation Preference Senior Preferred Stock, Series 2008-2 |
| 542 | DX-102 | Fannie Mae 2008 Q3 Form 10-Q |
| 546 | DX-103 | Freddie Mac 2008 Q3 Form 10-Q |
| 550 | DX-404 | Meeting Notes re PSPA with Treasury |
| 552 | DX-420 | Fannie Mae 2012 Q1 Form 10-Q |
| 555 | DX-421 | Freddie Mac 2012 Q1 Form 10-Q |
| 559 | DX-476 | Fannie Mae 2012 Q2 Form 10-Q |
| 565 | DX-477 | Freddie Mac 2012 Q2 Form 10-Q |
| 567 | DX-645 | Fannie Mae 2013 Q1 Form 10-Q |
| 569 | DX-675 | Freddie Mac 2013 Q3 Form 10-Q |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BERKLEY INSURANCE CO., *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 13-cv-1053-RCL |
| FEDERAL HOUSING FINANCE AGENCY, *et al.*, | |
| Defendants. | |
| In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations | |
| _____ | Case No. 13-mc-1288-RCL |
| This document relates to: ALL CASES | |

## <u>JOINT STATEMENT OF UNDISPUTED FACTS</u>

The parties to the above-captioned actions hereby agree and stipulate to the following statement of undisputed facts, which may be accepted as true by the Court and the fact-finder, and as to which no further proof is necessary:

1.      Congress created Fannie Mae in 1938 and Freddie Mac (together, the "Enterprises") in 1970 to support the Nation's home mortgage system by increasing the funds available to lend to borrowers and thus increasing home ownership.

2.      The Enterprises purchase mortgages, some of which the Enterprises pool into mortgage-backed securities. The Enterprises guarantee the payment of principal and interest to

1

investors who buy those mortgage-backed securities. By purchasing the mortgages from private banks, the Enterprises enable them to make additional loans to individuals to purchase homes.

3.      By 2007, Fannie Mae's and Freddie Mac's mortgage portfolios had a combined value of approximately $5 trillion and they owned almost half of the Nation's existing mortgages.

4.      The Enterprises have issued common stock and numerous series of non-cumulative preferred stock (the "Preferred Stock"), all of which are publicly traded.

5.      Of the Fannie Mae Preferred Stock currently outstanding, the earliest series was issued in September 1998 (Fannie Mae, Series D (FDDXD)), and the latest series was issued in May 2008 (Fannie Mae, Series T (FNMAT)).  The funds raised by Fannie Mae by issuing Preferred Shares from September 1998 to May 2008 are as follows:

| Issuance Series | Date of Issuance | Proceeds (in millions of USD) |
|:---:|:---:|:---:|
| FDDXD | September 30, 1998 | $150 |
| FNMFM | April 15, 1999 | $150 |
| FNMAP | March 20, 2000 | $690 |
| FNMAO | August 8, 2000 | $288 |
| FNMAM | April 6, 2001 | $400 |
| FNMAG | October 28, 2002 | $300 |
| FNMAN | April 29, 2003 | $345 |
| FNMAL | June 10, 2003 | $460 |
| FNMAK | September 25, 2003 | $225 |
| FNMFN | December 30, 2004 | $2,500 |
| FNMFO | December 30, 2004 | $2,492 |
| FNMAH | September 28, 2007 | $1,000 |
| FNMAI | October 4, 2007 | $375 |
| FNMAJ | November 21, 2007 | $530 |

2

| | | |
|---|---|---|
| FNMAS | December 11, 2007 | $7,000 |
| FNMAT | May 19, 2008 | $2,225 |
| **TOTAL** | | $19,130 |

6.      Of the Freddie Mac Preferred Stock currently outstanding, the earliest series was issued in April 1996 (Freddie Mac, Series I (FMCCI)), and the latest series was issued in December 2007 (Freddie Mac, Series KJ (FMCKJ)).  The funds raised by Freddie Mac by issuing Junior Preferred Shares from April 1996 to December 2007 are as follows:

| Issuance Series | Date of Issuance | Proceeds (in millions of USD) |
|---|---|---|
| FMCCI | April 23, 1996 | $250 |
| FREGP | October 27, 1997 | $150 |
| FMCKK | March 23, 1998 | $400 |
| FMCCG | September 23, 1998 | $220 |
| FMCCH | September 23, 1998 | $400 |
| FREJP | October 28, 1998 | $200 |
| FREJO | March 19, 1999 | $150 |
| FMCCK | July 21, 1999 | $250 |
| FMCCL | November 5, 1999 | $287 |
| FMCCM | January 26, 2001 | $325 |
| FMCCN | March 23, 2001 | $230 |
| FMCCO | March 23, 2001 | $173 |
| FMCCP | May 30, 2001 | $173 |
| FMCCJ | May 30, 2001 | $201 |
| FMCKP | October 30, 2001 | $300 |
| FREJN | January 29, 2002 | $300 |
| FMCCS | July 17, 2006 | $750 |

3

| | | |
|---|---|---|
| FMCCT | July 17, 2006 | $250 |
| FMCKO | October 16, 2006 | $500 |
| FMCKM | January 16, 2007 | $1,100 |
| FMCKN | April 16, 2007 | $500 |
| FMCKL | July 24, 2007 | $500 |
| FMCKI | September 28, 2007 | $500 |
| FMCKJ | December 4, 2007 | $6,000 |
| **TOTAL** | | $14,109 |

7.       Each of the series of shares, which Plaintiffs hold and are at issue in this case – all of the Junior Preferred Shares issued by both of the Enterprises and the common shares issued by Freddie Mac – are governed by documents called "Certificates of Designation." Each of these Certificates of Designation entitle the stockholders to the payment of dividends if declared by the Boards of the respective Enterprises. The Certificates of Designation do not require the Board of either Enterprise to declare dividends. The Preferred Stock dividends, if declared by the Enterprises' board of directors, are calculated based on a percentage of the stock's face value. If the Board of either Enterprise declares a dividend, the Certificates of Designation establish an order in which the dividends on the various series must be paid. All dividends must be paid to all preferred stockholders before any dividends are paid on any common shares. The Certificates of Designation also provide an order in which the holders of the various series of shares may share in any distribution of assets upon liquidation of the Enterprise.

8.       A financial crisis began in the summer of 2007. The crisis led Congress and financial regulators to enact multiple, systemic reforms. One of those reforms was the enactment of a federal law called the Housing and Recovery Act of 2008 ("HERA") in July 2008.

4

9.      HERA established the Federal Housing Finance Agency ("FHFA") and made it responsible for, among other things, "the effective supervision, regulation, and housing mission oversight" of the Enterprises. HERA empowered the Director of FHFA to place the Enterprises into conservatorship or receivership under certain circumstances.

10.     HERA also amended the charters of the Enterprises by granting Treasury temporary authority to fund the Enterprises by purchasing Enterprise stock.

11.     On September 6, 2008, FHFA's Director appointed FHFA as conservator of both Fannie Mae and Freddie Mac.  The Boards of Directors of Fannie Mae and Freddie Mac each consented, by resolution, to the appointment of FHFA as conservator pursuant to HERA.

12.     In announcing the conservatorship on September 7, 2008, FHFA Director Lockhart stated that "in order to restore the balance between safety and soundness and mission, FHFA has placed Fannie Mae and Freddie Mac into conservatorship. That is a statutory process designed to stabilize a troubled institution with the objective of returning the entities to normal business operations. FHFA will act as the conservator to operate the Enterprises until they are stabilized."

13.     When the conservatorships were announced, FHFA's director also told the public that "in order to conserve over $2 billion in capital every year, the common stock and preferred stock dividends will be eliminated, but the common and all preferred stocks will continue to remain outstanding."

14.     On September 7, 2008, FHFA, acting as conservator of Fannie Mae and Freddie Mac, entered each Enterprise into a Senior Preferred Stock Purchase Agreement with the U.S. Department of the Treasury ("Treasury") (collectively, the "PSPAs") pursuant to which Treasury purchased preferred cumulative stock issued by each Enterprise.  Other than the senior preferred stock issued to Treasury pursuant to the PSPAs, no Preferred Stock has been issued by the Enterprises since the conservatorships began in September 2008.

5

000005

15.     Except for dividends paid to Treasury on its Senior Preferred Stock, the Enterprises have not declared and paid dividends on common stock or Preferred Stock during the conservatorships.

16.     Under the PSPAs, Treasury committed to invest up to $100 billion in each Enterprise as needed to ensure that every quarter each Enterprise maintained a positive net worth (the "Treasury Commitment" or "Commitment").  An Enterprise has a positive net worth if its assets exceed its liabilities as determined by Generally Accepted Accounting Principles ("GAAP").

17.     For quarters in which an Enterprise's liabilities exceed its assets under GAAP, the PSPAs allow the Enterprise to draw upon Treasury's Commitment in an amount equal to the difference between liabilities and assets.

18.     In return for the Treasury Commitment, Treasury received one million shares in a newly created class of non-voting cumulative stock in each Enterprise, known as Senior Preferred Stock.

19.     The specific terms of the Senior Preferred Stock were contained in a document called the Certificate of Designation of Terms of Variable Liquidation Preference Senior Preferred Stock, Series 2008-2, referred to herein as the "Treasury Stock Certificate."

20.     The PSPAs, and their associated Treasury Stock Certificates, entitled Treasury to the following with respect to each Enterprise: (i) a $1 billion senior liquidation preference—a priority right above all other stockholders, whether preferred or otherwise, to receive distributions from assets if the Enterprise was liquidated; (ii) a dollar-for-dollar increase in that liquidation preference each time an Enterprise drew on the Treasury Commitment; (iii) an annual cash dividend (paid quarterly) of 10% of Treasury's liquidation preference, or if not paid in cash, an increase of the liquidation preference at a rate of 12% of Treasury's liquidation preference; and (iv) warrants allowing Treasury to purchase up to 79.9% of each Enterprise's common stock at a price of $0.00001 per share through September 7, 2028.

6

21.     The total cost of exercising Treasury's common stock warrants in both Fannie Mae and Freddie Mac is less than $72,000.

22.     The PSPAs also provided for a quarterly Periodic Commitment Fee paid by each Enterprise to Treasury, and stated as follows:

> The Periodic Commitment Fee is intended to fully compensate Purchaser [Treasury] for the support provided by the ongoing Commitment following December 31, 2009. The amount of the Periodic Commitment Fee shall be set not later than December 31, 2009 with respect to the ensuing five-year period, shall be reset every five years thereafter and shall be determined with reference to the market value of the Commitment as then in effect.  The amount of the Periodic Commitment Fee shall be mutually agreed by Purchaser and Seller [Treasury and each respective Enterprise, acting by and through FHFA], subject to their reasonable discretion and in consultation with the Chairman of the Federal Reserve; provided, that Purchaser [Treasury] may waive the Periodic Commitment Fee for up to one year at a time, in its sole discretion, based on adverse conditions in the United States mortgage market.

23.     Treasury waived the Periodic Commitment Fee for 2010, 2011, and 2012.  The Enterprises have never paid any Periodic Commitment Fee to Treasury.

24.     The PSPAs barred the Enterprises from making any other distributions to Enterprise stockholders—including issuing dividends to shareholders—without Treasury's consent.

25.     On May 6, 2009, Treasury and FHFA, acting as conservator of the Enterprises, amended the PSPAs (the "First Amendment"). The First Amendment doubled the Treasury Commitment to each Enterprise, from $100 billion each ($200 billion total) to $200 billion each ($400 billion total).

26.     On December 24, 2009, Treasury and FHFA, acting as conservator of the Enterprises, again amended the PSPAs (the "Second Amendment"). The Second Amendment replaced the $200,000,000,000 Treasury Commitment to each Enterprise with a new commitment to provide as much funding as each Enterprise needed to prevent insolvency through December 31, 2012, after which time a cap on the Commitment would be reinstated and fixed pursuant to a formula.  The Second

7

Amendment also extended the date for Treasury to set the Periodic Commitment Fee from December 31, 2009 to December 31, 2010.

27.     In the first quarter of 2012, Fannie Mae recorded comprehensive income (i.e., earnings) of $3.1 billion, compared to a comprehensive loss of $6.3 billion in the first quarter of 2011; and Freddie Mac recorded comprehensive income of $1.8 billion, compared to a comprehensive income of $2.7 billion in the first quarter of 2011.

28.     In the second quarter of 2012, Fannie Mae recorded comprehensive income of $5.4 billion, compared to a comprehensive loss and net loss of $2.9 billion for the second quarter of 2011; and Freddie Mac recorded comprehensive income of $2.9 billion, compared to a comprehensive loss of $1.1 billion for the second quarter of 2011.

29.     From the outset of the conservatorships in 2008 through the first quarter of 2012, there were some quarters in which the Enterprises lacked the cash necessary to pay the 10% dividend to Treasury.  On such occasions, the Enterprises drew from the Treasury Commitment in order to pay Treasury its quarterly dividend.

30.     When the Enterprises drew against the Treasury's Commitment to pay Treasury dividends, such draws increased the size of the liquidation preference, thereby increasing the size of the Enterprises' dividend obligation.

31.     By August 2012, Fannie Mae's and Freddie Mac's annual dividend obligations on Treasury's senior preferred stock were $11.7 billion and $7.2 billion, respectively.

32.     As of August 17, 2012, Fannie Mae and Freddie Mac had drawn $116.1 billion and $71.3 billion, respectively, from the Treasury Commitment, increasing Treasury's total liquidation preferences to $189.4 billion ($117.1 billion for Fannie Mae and $72.3 billion for Freddie Mac).

8

33.    Since September 2008, Fannie Mae has drawn on the Treasury Commitment in the following quarterly amounts and cumulative amounts.  Fannie Mae has not drawn on the Treasury Commitment since 2018.

| Year (Quarter)[1] | Quarterly Draw (in millions of USD)[2] | Cumulative Draws (in millions of USD)[3] |
|---|---|---|
| 2008 (Q4) | - | - |
| 2009 (Q1) | $15,200 | $15,200 |
| 2009 (Q2) | $19,000 | $34,200 |
| 2009 (Q3) | $10,700 | $44,900 |
| 2009 (Q4) | $15,000 | $59,900 |
| 2010 (Q1) | $15,300 | $75,200 |
| 2010 (Q2) | $8,400 | $83,600 |
| 2010 (Q3) | $1,500 | $85,100 |
| 2010 (Q4) | $2,500 | $87,600 |
| 2011 (Q1) | $2,600 | $90,200 |
| 2011 (Q2) | $8,500 | $98,700 |
| 2011 (Q3) | $5,100 | $103,800 |
| 2011 (Q4) | $7,800 | $111,600 |
| 2012 (Q1) | $4,600 | $116,100 |
| 2012 (Q2) | - | $116,100 |
| 2012 (Q3) | - | $116,100 |
| 2012 (Q4) | - | $116,100 |

---

[1]    The quarterly draws identified in this table were taken in the identified quarter to eliminate a net worth deficit that existed as of the end of the prior quarter.  So, for example, the $4.6 billion draw taken in 2012 (Q1) was to eliminate a net worth deficit that existed as of the end of 2011 (Q4).

[2]    Figures rounded to the nearest $100 million.

[3]    Figures rounded to the nearest $100 million.

9

| | | |
|---|---|---|
| 2013 (Q1) | - | $116,100 |
| 2013 (Q2) | - | $116,100 |
| 2013 (Q3) | - | $116,100 |
| 2013 (Q4) | - | $116,100 |
| 2014 (Q1) | - | $116,100 |
| 2014 (Q2) | - | $116,100 |
| 2014 (Q3) | - | $116,100 |
| 2014 (Q4) | - | $116,100 |
| 2015 (Q1) | - | $116,100 |
| 2015 (Q2) | - | $116,100 |
| 2015 (Q3) | - | $116,100 |
| 2015 (Q4) | - | $116,100 |
| 2016 (Q1) | - | $116,100 |
| 2016 (Q2) | - | $116,100 |
| 2016 (Q3) | - | $116,100 |
| 2016 (Q4) | - | $116,100 |
| 2017 (Q1) | - | $116,100 |
| 2017 (Q2) | - | $116,100 |
| 2017 (Q3) | - | $116,100 |
| 2017 (Q4) | - | $116,100 |
| 2018 (Q1) | $3,700 | $119,800 |
| 2018 (Q2) | - | $119,800 |
| 2018 (Q3) | - | $119,800 |
| 2018 (Q4) | - | $119,800 |

10

**000010**

34.    Since September 2008, Freddie Mac has drawn on the Treasury Commitment in the following quarterly amounts and cumulative amounts.  Freddie Mac has not drawn on the Treasury Commitment since 2018.

| Year (Quarter)[4] | Quarterly Draw (in millions of USD)[5] | Cumulative Draws (in millions of USD)[6] |
|---|---|---|
| 2008 (Q4) | $13,800 | $13,800 |
| 2009 (Q1) | $30,800 | $44,600 |
| 2009 (Q2) | $6,100 | $50,700 |
| 2009 (Q3) | - | $50,700 |
| 2009 (Q4) | - | $50,700 |
| 2010 (Q1) | - | $50,700 |
| 2010 (Q2) | $10,600 | $61,300 |
| 2010 (Q3) | $1,800 | $63,100 |
| 2010 (Q4) | $100 | $63,200 |
| 2011 (Q1) | $500 | $63,700 |
| 2011 (Q2) | - | $63,700 |
| 2011 (Q3) | $1,500 | $65,200 |
| 2011 (Q4) | $6,000 | $71,200 |
| 2012 (Q1) | $100 | $71,300 |
| 2012 (Q2) | $19 | $71,300 |
| 2012 (Q3) | - | $71,300 |
| 2012 (Q4) | - | $71,300 |

---

[4]    The quarterly draws identified in this table were taken in the identified quarter to eliminate a net worth deficit that existed as of the end of the prior quarter.  So, for example, the $19 million draw taken in 2012 (Q2) was to eliminate a net worth deficit that existed as of the end of 2012 (Q1).

[5]    Figures rounded to the nearest $100 million except for the $19 million draw in 2012 (Q2).

[6]    Figures rounded to the nearest $100 million.

11

000011

| | | |
|---|---|---|
| 2013 (Q1) | - | $71,300 |
| 2013 (Q2) | - | $71,300 |
| 2013 (Q3) | - | $71,300 |
| 2013 (Q4) | - | $71,300 |
| 2014 (Q1) | - | $71,300 |
| 2014 (Q2) | - | $71,300 |
| 2014 (Q3) | - | $71,300 |
| 2014 (Q4) | - | $71,300 |
| 2015 (Q1) | - | $71,300 |
| 2015 (Q2) | - | $71,300 |
| 2015 (Q3) | - | $71,300 |
| 2015 (Q4) | - | $71,300 |
| 2016 (Q1) | - | $71,300 |
| 2016 (Q2) | - | $71,300 |
| 2016 (Q3) | - | $71,300 |
| 2016 (Q4) | - | $71,300 |
| 2017 (Q1) | - | $71,300 |
| 2017 (Q2) | - | $71,300 |
| 2017 (Q3) | - | $71,300 |
| 2017 (Q4) | - | $71,300 |
| 2018 (Q1) | $300 | $71,600 |
| 2018 (Q2) | - | $71,600 |
| 2018 (Q3) | - | $71,600 |
| 2018 (Q4) | - | $71,600 |

35.     On August 17, 2012, Treasury and FHFA, acting as conservator of the Enterprises,
amended the PSPAs a third time (the "Third Amendment").

12

36.     The Third Amendment replaced the fixed 10% dividend with a quarterly variable dividend equal to the positive net worth, if any, of Fannie Mae and Freddie Mac, exceeding a pre-determined capital reserve.  The capital reserve was originally set at $3 billion but would decline by $600 million each year until reaching zero in 2018.  The variable dividend is known as the "Net Worth Sweep."

37.     The Net Worth Sweep became effective on January 1, 2013.  The dividend paid by the Enterprises for the fourth quarter of 2012 was based on the 10% dividend that applied before the Net Worth Sweep, and the dividend paid for the first quarter of 2013 was based upon the Net Worth Sweep formula.

38.     In addition, the Third Amendment suspended the Enterprises' obligations to pay periodic commitment fees for so long as the Net Worth Sweep remained in effect.

39.     On August 16, 2012, the value of Fannie Mae's publicly traded Preferred Shares was $1.459 billion.  On August 17, 2012, the value of Fannie Mae's publicly traded Preferred Shares was $680 million, representing a decline in value of $779 million.

40.     On August 16, 2012, the value of Freddie Mac's common shares was $195 million, and the value of Freddie Mac's publicly traded Preferred Shares was $1.274 billion, for a combined total value of $1.469 billion.  On August 17, 2012, the value of Freddie Mac's common shares was $150 million, and the value of Freddie Mac's publicly traded Preferred Shares was $488 million, representing a decline in value of $46 million and $786 million, respectively, and a combined decline in value of $831 million.

41.     Pursuant to the terms of the PSPAs, as of January 1, 2013, the maximum amount of remaining funding to Fannie Mae and Freddie Mae under the Treasury Commitment was $117.6 billion and $140.5 billion, respectively.

13

42.     On December 21, 2017, Treasury and FHFA, acting as Conservator to the Enterprises, entered into letter agreements that changed the terms of the Senior Preferred Stock Certificates in each Enterprise, issued under the PSPAs (the "2017 Letter Agreements"), to permit each Enterprise to retain a $3 billion capital reserve. The 2017 Letter Agreements also increased Treasury's liquidation preference with respect to each Enterprise by $3 billion ($6 billion total). Under the 2017 Letter Agreements, each Enterprise paid a dividend to Treasury equal to the amount its net worth at the end of each quarter exceeded $3 billion. Those terms applied to the December 31, 2017 dividend payment and the dividend payments for each quarter thereafter, until the execution of the September 30, 2019 letter agreements.

43.     On September 30, 2019, Treasury and FHFA, acting as Conservator to the Enterprises, entered into letter agreements that changed the terms of the Senior Preferred Stock Certificates in each Enterprise, issued under the PSPAs (the "2019 Letter Agreements"), to permit each Enterprise to retain earnings beyond the $3 billion capital reserves previously allowed through the 2017 Letter Agreements. The 2019 Letter Agreements also provided that the liquidation preferences for Treasury's Senior Preferred Stock would increase by the amount of capital the Enterprises retained each quarter.  Fannie Mae and Freddie Mac were permitted to maintain capital reserves of $25 billion and $20 billion, respectively.

44.     On January 14, 2021, Treasury and FHFA, acting as Conservator to the Enterprises, entered into letter agreements that changed the terms of the Senior Preferred Stock Certificates in each Enterprise, issued under the PSPAs (the "2021 Letter Agreements").  Among other things, the 2021 Letter Agreements suspended the cash dividend owed in order to permit each Enterprise to retain earnings until it satisfied the requirements of the 2020 Enterprise capital rule, and provided that the liquidation preference for each Enterprise would increase each quarter by the amount in earnings each Enterprise was permitted to retain in lieu of the cash dividend.

14

45.     Since their entry into conservatorship, Fannie Mae and Freddie Mac paid quarterly dividends to Treasury in the following amounts:

| Year (Quarter) | Fannie Mae Dividends (in millions of USD) | Freddie Mac Dividends (in millions of USD) |
|---|---|---|
| 2008 (Q4) | $31 | $172 |
| 2009 (Q1) | $25 | $370 |
| 2009 (Q2) | $409 | $1,149 |
| 2009 (Q3) | $886 | $1,294 |
| 2009 (Q4) | $1,150 | $1,292 |
| 2010 (Q1) | $1,527 | $1,292 |
| 2010 (Q2) | $1,909 | $1,293 |
| 2010 (Q3) | $2,118 | $1,561 |
| 2010 (Q4) | $2,152 | $1,603 |
| 2011 (Q1) | $2,216 | $1,605 |
| 2011 (Q2) | $2,281 | $1,617 |
| 2011 (Q3) | $2,495 | $1,618 |
| 2011 (Q4) | $2,621 | $1,655 |
| 2012 (Q1) | $2,819 | $1,807 |
| 2012 (Q2) | $2,931 | $1,809 |
| 2012 (Q3) | $2,929 | $1,809 |
| 2012 (Q4) | $2,929 | $1,808 |
| 2013 (Q1) | $4,224 | $5,827 |
| 2013 (Q2) | $59,368 | $6,971 |
| 2013 (Q3) | $10,243 | $4,357 |
| 2013 (Q4) | $8,617 | $30,436 |
| 2014 (Q1) | $7,191 | $10,435 |
| 2014 (Q2) | $5,691 | $4,499 |

15

| | | |
|---|---|---|
| 2014 (Q3) | $3,712 | $1,890 |
| 2014 (Q4) | $4,000 | $2,786 |
| 2015 (Q1) | $1,920 | $851 |
| 2015 (Q2) | $1,796 | $746 |
| 2015 (Q3) | $4,359 | $3,913 |
| 2015 (Q4) | $2,203 | - |
| 2016 (Q1) | $2,859 | $1,740 |
| 2016 (Q2) | $919 | - |
| 2016 (Q3) | $2,869 | $933 |
| 2016 (Q4) | $2,977 | $2,310 |
| 2017 (Q1) | $5,471 | $4,475 |
| 2017 (Q2) | $2,779 | $2,234 |
| 2017 (Q3) | $3,117 | $1,986 |
| 2017 (Q4) | $648 | $2,250 |
| 2018 (Q1) | - | - |
| 2018 (Q2) | $938 | - |
| 2018 (Q3) | $4,459 | $1,585 |
| 2018 (Q4) | $3,975 | $2,560 |
| 2019 (Q1) | $3,240 | $1,477 |
| 2019 (Q2) | $2,361 | $1,665 |
| 2019 (Q3) | - | - |
| 2019 (Q4) | - | - |
| 2020 (Q1) | - | - |
| 2020 (Q2) | - | - |
| 2020 (Q3) | - | - |
| 2020 (Q4) | - | - |
| 2021 (Q1) | - | - |

16

| | | |
|---|---|---|
| 2021 (Q2) | - | - |
| 2021 (Q3) | - | - |
| 2021 (Q4) | - | - |
| 2022 (Q1) | - | - |
| 2022 (Q2) | - | - |
| 2022 (Q3) | - | - |
| 2022 (Q4) | - | - |
| **Total Before January 1, 2013** | $31,428 | $23,754 |
| **Total After January 1, 2013** | $149,936 | $95,926 |
| **TOTAL** | $181,364 | $119,680 |

46.     As of the end of the fourth quarter of 2022, the total amount by which Treasury's liquidation preference has been increased as a result of the 2017, 2019 and 2021 letter agreements is $94.8 billion.

17

Dated: July __, 2023

Respectfully submitted,

_/s/ Draft_____

Asim Varma (D.C. Bar # 426364)
Jonathan L. Stern (D.C. Bar # 375713)
David B. Bergman (D.C. Bar # 435392)
Ian S. Hoffman (D.C. Bar # 983419)
R. Stanton Jones (D.C. Bar # 987088)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave NW
Washington, D.C. 20001
(202) 942-5000
Asim.Varma@arnoldporter.com
Jonathan.Stern@arnoldporter.com
David.Bergman@arnoldporter.com
Ian.Hoffman@arnoldporter.com
Stanton.Jones@arnoldporter.com

_Attorneys for Defendant Federal Housing_
_Finance Agency_

_/s/ Draft_____

Michael J. Ciatti (D.C. Bar # 467177)
KING & SPALDING LLP
1700 Pennsylvania Ave. N.W.
Washington, DC 20006
Tel: (202) 661-7828
Fax: (202) 626-3737
mciatti@kslaw.com

_Attorney for the Federal Home Loan_
_Mortgage Corp._

_/s/ Draft_____

Meaghan VerGow (D.C. Bar # 977165)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
Tel: (202) 383-5300
Fax: (202) 383-5414
mvergow@omm.com

_Attorney for the Federal National Mortgage_
_Association_

18

/s/ Draft
Charles J. Cooper (Bar No. 24870)
David H. Thompson (Bar No. 450503)
Vincent J. Colatriano (Bar No. 429562)
Peter A. Patterson (Bar No. 998668)
Brian W. Barnes (*Pro Hac Vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, DC 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com
*Counsel for Berkley Plaintiffs, et al.*

/s/ Draft
Hamish P.M. Hume (Bar No. 449914)
Samuel C. Kaplan (Bar No. 463350)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave. NW
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
hhume@bsfllp.com skaplan@bsfllp.com

Eric L. Zagar (*Pro Hac Vice*)
KESSLER TOPAZ MELTZER & CHECK, LLP
280 King of Prussia Rd.
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
ezagar@ktmc.com

Michael J. Barry (*Pro Hac Vice*)
GRANT & EISENHOFER, P.A.
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100
mbarry@gelaw.com

Adam Wierzbowski (*Pro Hac Vice*)
BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
adam@blbglaw.com
*Co-Lead Counsel for the Class*

19

# Amounts Invested by Private Preferred Shareholders Into

 Fannie Mae

| Security Type | CUSIP | Ticker Symbol | Date of Issuance | Amount Invested |
|---|---|---|---|---|
| 5.25% Non-Cumulative Preferred Stock, Series D | 313 586 505 | FDDXD | 9/30/98 | $150 Million |
| 5.10% Non-Cumulative Preferred Stock, Series E | 313 586 604 | FNMFM | 4/15/99 | $150 Million |
| Variable Rate Non-Cumulative Preferred Stock, Series F | 313 586 703 | FNMAP | 3/20/00 | $690 Million |
| Variable Rate Non-Cumulative Preferred Stock, Series G | 313 586 802 | FNMAO | 8/8/00 | $288 Million |
| 5.81% Non-Cumulative Preferred Stock, Series H | 313 586 885 | FNMAM | 4/6/01 | $400 Million |
| 5.375% Non-Cumulative Preferred Stock, Series I | 313 586 877 | FNMAG | 10/28/02 | $300 Million |
| 5.125% Non-Cumulative Preferred Stock, Series L | 313 586 844 | FNMAN | 4/29/03 | $345 Million |
| 4.75% Non-Cumulative Preferred Stock, Series M | 313 586 836 | FNMAL | 6/10/03 | $460 Million |
| 5.50% Non-Cumulative Preferred Stock, Series N | 313 586 828 | FNMAK | 9/25/03 | $225 Million |
| Variable Rate Non-Cumulative Preferred Stock, Series O | 313 586 794 | FNMFN | 12/30/04 | $2.5 Billion |
| 5.375% Non-Cumulative Convertible Series 2004-1 Pref. Stock | 313 586 810 | FNMFO | 12/30/04 | $2.492 Billion |
| Variable Rate Non-Cumulative Preferred Stock, Series P | 313 586 786 | FNMAH | 9/28/07 | $1.0 Billion |
| 6.75% Non-Cumulative Preferred Stock, Series Q | 313 586 778 | FNMAI | 10/4/07 | $375 Million |
| 7.625% Non-Cumulative Preferred Stock, Series R | 313 586 760 | FNMAJ | 11/21/07 | $530 Million |
| Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series S | 313 586 752 | FNMAS | 12/11/07 | $7.0 Billion |
| 8.25% Non-Cumulative Preferred Stock, Series T | 313 586 737 | FNMAT | 5/19/08 | $2.225 Billion |
| | | | TOTAL | $19.130 Billion |

Compiled from data provided in FNMA 10Qs, 10Ks and stock offering circulars

1

# Amounts Invested by Private Preferred Shareholders Into

## Freddie Mac

| Security Type | CUSIP | Ticker Symbol | Date of Issuance | Amount Invested |
|---|---|---|---|---|
| 5.1% Preferred Stock, due 12/31/2049 | 313 400 814 | FREJO | 3/19/99 | $150 Million |
| 5.3% Non-Cumulative Perpetual Preferred Stock | 313 400 822 | FREJP | 10/28/98 | $200 Million |
| 5.81% Perpetual Preferred Stock | 313 400 889 | FREGP | 10/27/97 | $150 Million |
| Variable-Rate Preferred Stock, Series B | 313 400 608 | FMCCI | 4/23/96 | $250 Million |
| 5% Preferred Stock, Series F | 313 400 863 | FMCKK | 3/23/98 | $400 Million |
| Variable-Rate Preferred Stock, Series G | 313 400 848 | FMCCG | 9/23/98 | $220 Million |
| 5.1% Preferred Stock, Series H | 313 400 855 | FMCCH | 9/23/98 | $400 Million |
| 5.79% Preferred Stock, Series K | 313 400 830 | FMCCK | 7/21/99 | $250 Million |
| Variable-Rate Preferred Stock, Series L | 313 400 798 | FMCCL | 11/5/99 | $287 Million |
| Variable-Rate Preferred Stock, Series M | 313 400 780 | FMCCM | 1/26/01 | $325 Million |
| Variable-Rate Preferred Stock, Series N | 313 400 764 | FMCCN | 3/23/01 | $230 Million |
| 5.81% Preferred Stock, Series O | 313 400 772 | FMCCO | 3/23/01 | $173 Million |
| 6% Preferred Stock, Series P | 313 400 749 | FMCCP | 5/30/01 | $173 Million |
| Variable-Rate, Series Q | 313 400 756 | FMCCJ | 5/30/01 | $201 Million |
| 5.7% Preferred Stock, Series R | 313 400 731 | FMCKP | 10/30/01 | $300 Million |
| 5.81% Non-Cumulative Preferred Stock | 313 400 723 | FREJN | 1/29/02 | $300 Million |
| Variable-Rate, Series S | 313 400 715 | FMCCS | 7/17/06 | $750 Million |
| 6.42% Preferred Stock, Series T | 313 400 699 | FMCCT | 7/17/06 | $250 Million |
| 5.9% Preferred Stock, Series U | 313 400 681 | FMCKO | 10/16/06 | $500 Million |
| 5.57% Preferred Stock, Series V | 313 400 673 | FMCKM | 1/16/07 | $1.1 Billion |
| 5.66% Preferred Stock, Series W | 313 400 665 | FMCKN | 4/16/07 | $500 Million |
| 6.02% Preferred Stock, Series X | 313 400 657 | FMCKL | 7/24/07 | $500 Million |
| 6.55% Preferred Stock, Series Y | 313 400 640 | FMCKI | 9/28/07 | $500 Million |
| Fixed-to-Floating Rate Non-Cumulative Perpetual Preferred Stock, Series Z | 313 400 624 | FMCKJ | 12/4/07 | $6.0 Billion |
| | | | **TOTAL** | **$14.109 Billion** |

Compiled from data provided in FMCC 10Qs, 10Ks and stock offering circulars

3

# Case-Shiller Housing Index: January 2012 – June 2012



**PX-0001-L - p. 1 of 1**                    **000022**

# Case-Shiller Housing Index: 2007 – 2022



**PX-0001-M - p. 1 of 1**

# Dividends Paid to Treasury (Fannie Mae and Freddie Mac combined): 2012 vs. 2013



Source: Exhibit 7

000024

# Total Dividends Paid to Treasury: 4Q 2008 – 2012 vs. 2013 *alone*



**PX-0001-P - p. 1 of 1**

# FEDERAL HOUSING FINANCE AGENCY

 

## FACT SHEET

**Contact:**   Corinne Russell   (202) 414-6921
              Stefanie Mullin   (202) 414-6376

## QUESTIONS AND ANSWERS ON CONSERVATORSHIP

Q:   What is a conservatorship?

A:   A conservatorship is the legal process in which a person or entity is appointed to establish control and oversight of a Company to put it in a sound and solvent condition. In a conservatorship, the powers of the Company's directors, officers, and shareholders are transferred to the designated Conservator.

Q:   What is a Conservator?

A:   A Conservator is the person or entity appointed to oversee the affairs of a Company for the purpose of bringing the Company back to financial health.

In this instance, the Federal Housing Finance Agency ("FHFA") has been appointed by its Director to be the Conservator of the Company in accordance with the Federal Housing Finance Regulatory Reform Act of 2008 (Public Law 110-289) and the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 (12 U.S.C. 4501, et seq., as amended) to keep the Company in a safe and solvent financial condition.

Q:   How is a Conservator appointed?

A:   By statute, the FHFA is appointed Conservator by its Director after the Director determines, in his discretion, that the Company is in need of reorganization or rehabilitation of its affairs.

Q:   What are the goals of this conservatorship?



1

FHFA 0026

A:    The purpose of appointing the Conservator is to preserve and conserve the Company's assets and property and to put the Company in a sound and solvent condition.   The goals of the conservatorship are to help restore confidence in the Company, enhance its capacity to fulfill its mission, and mitigate the systemic risk that has contributed directly to the instability in the current market.

      There is no reason for concern regarding the ongoing operations of the Company.  The Company's operation will not be impaired and business will continue without interruption.

Q:    When will the conservatorship period end?

A:    Upon the Director's determination that the Conservator's plan to restore the Company to a safe and solvent condition has been completed successfully, the Director will issue an order terminating the conservatorship.  At present, there is no exact time frame that can be given as to when this conservatorship may end.

Q:    What are the powers of the Conservator?

A:    The FHFA, as Conservator, may take all actions necessary and appropriate to (1) put the Company in a sound and solvent condition and (2) carry on the Company's business and preserve and conserve the assets and property of the Company.

Q:    What happens upon appointment of a Conservator?

A:    Once an "Order Appointing a Conservator" is signed by the Director of FHFA, the Conservator immediately succeeds to the (1) rights, titles, powers, and privileges of the Company, and any stockholder, officer, or director of such the Company with respect to the Company and its assets, and (2) title to all books, records and assets of the Company held by any other custodian or third-party.  The Conservator is then charged with the duty to operate the Company.

Q:    What does the Conservator do during a conservatorship?

A:    The Conservator controls and directs the operations of the Company.  The Conservator may (1) take over the assets of and operate the Company with all the powers of the shareholders, the directors, and the officers of the Company and conduct all business of the Company; (2) collect all obligations and money due to the Company; (3) perform all functions of the Company which are consistent with the Conservator's appointment; (4) preserve and conserve the assets and property of the Company; and (5) contract for assistance in fulfilling any function, activity, action or duty of the Conservator.

Q:    How will the Company run during the conservatorship?

A:    The Company will continue to run as usual during the conservatorship.  The Conservator will delegate authorities to the Company's management to move forward with the

<div align="center">2</div>

business operations.  The Conservator encourages all Company employees to continue to perform their job functions without interruption.

Q:   Will the Company continue to pays its obligations during the conservatorship?

A:   Yes, the Company's obligations will be paid in the normal course of business during the Conservatorship.  The Treasury Department, through a secured lending credit facility and a Senior Preferred Stock Purchase Agreement, has significantly enhanced the ability of the Company to meet its obligations.  The Conservator does not anticipate that there will be any disruption in the Company's pattern of payments or ongoing business operations.

Q:   What happens to the Company's stock during the conservatorship?

A:   During the conservatorship, the Company's stock will continue to trade.  However, by statute, the powers of the stockholders are suspended until the conservatorship is terminated. Stockholders will continue to retain all rights in the stock's financial worth; as such worth is determined by the market.

Q:   Is the Company able to buy and sell investments and complete financial transactions during the conservatorship?

A:   Yes, the Company's operations continue subject to the oversight of the Conservator.

Q:   What happens if the Company is liquidated?

A:   Under a conservatorship, the Company is not liquidated.

Q:   Can the Conservator determine to liquidate the Company?

A:   The Conservator cannot make a determination to liquidate the Company, although, short of that, the Conservator has the authority to run the company in whatever way will best achieve the Conservator's goals (discussed above).  However, assuming a statutory ground exists and the Director of FHFA determines that the financial condition of the company requires it, the Director does have the discretion to place any regulated entity, including the Company, into receivership.  Receivership is a statutory process for the liquidation of a regulated entity. There are no plans to liquidate the Company.

Q:   Can the Company be dissolved?

A:   Although the company can be liquidated as explained above, by statute the charter of the Company must be transferred to a new entity and can only be dissolved by an Act of Congress.

PX-0002-C - p. 3 of 3                                                                000028

Message

| | |
|---|---|
| **From:** | DeMarco, Edward [/O=OFHEO/OU=OFHEO/CN=RECIPIENTS/CN=DEMARCOE] |
| **Sent:** | 10/30/2008 8:25:16 PM |
| **To:** | Collender, Robert [robert.collender@fhfa.gov] |
| **CC:** | Lawler, Patrick [patrick.lawler@fhfa.gov] |
| **Subject:** | RE: Treasury support for the GSEs--request for slides |
| **Attachments:** | ABS East 10-20-08.ppt; 10-20-08 Remarks to ABS East Conference EJD - Final.doc |

Here you go – my slides and notes from my talk to ABS East.  See especially slides 17 and 18 and the notes that go with slide 17.



ABS East
10-20-08.ppt



10-20-08 Remarks
to ABS East Con...

Ed DeMarco
COO & Sr. Deputy Director
Federal Housing Finance Agency
edward.demarco@fhfa.gov

_____

**From:** Collender, Robert
**Sent:** Thursday, October 30, 2008 4:51 PM
**To:** DeMarco, Edward
**Subject:** Treasury support for the GSEs--request for slides

Pat and Robin have asked me to put together a short mortgage market note on Treasury support for Fannie Mae and Freddie Mac.  Pat says you indicated you had put together some slides on the topic.  Could you send them to me?  Thank you.

**Robert N. Collender, Ph.D.**
Senior Policy Analyst
Office of Policy Analysis and Research
Office of Federal Housing Enterprise Oversight
1700 G St., NW
Washington, DC 20552

202.343.1510 (voice)
202.414.6502 (fax)

Protected Information To Be Disclosed Only In Accordance With Protective Order          FHFA00047704

# PLACEHOLDER

Comments:    Document Produced In Native Format

# PLACEHOLDER

Protected Information To Be Disclosed Only In Accordance With Protective Order        FHFA00047705

# Federal Housing Finance Agency

 

# ABS EAST

## OCTOBER 20, 2008

# Housing GSEs Exceed the Public U.S. Debt

**FHFA**



### Relative Size of Enterprise Obligations
### (August 2008)

Sources: Fannie Mae and Freddie Mac Monthly Volume Summaries, TreasuryDirect.gov, Federal Reserve H.4.1 Release.

**2**

# Enterprise and FHLB Shares of Originations

**FHFA**



### Fannie Mae, Freddie Mac, and FHLB Shares of Mortgage Originations
### January 2006 - June 2008

Sources: Enterprise Monthly Volume Summaries, FHLB Office of Finance, Inside Mortgage Finance.

3

# Combined Book of Business Continues to Grow



**FHFA**

### Enterprises' Combined Total Book of Business
### 1990 - August 2008

**Total Book of Business $5.3**

**Net MBS Outstanding $3.7**

**MBS Outstanding**

**Retained Portfolios**

**Retained Portfolio $1.5**

Sources: Fannie Mae and Freddie Mac Monthly Volume Summaries and 2007 OFHEO Report to Congress.

**4**

# FHLBanks' Portfolios Also Continuing to Grow

**FHFA**



**5**

**000035**

# MBS Issuance by Issuer

**FHFA**



**MBS Issuance by Issuer, in Billions**
**January 2007 - September 2008**

Sources: Inside Mortgage Finance Publications and Fannie Mae and Freddie Mac Monthly Volume Summaries.

**6**

# Quarterly Net Income for 2006Q1 through 2008Q2

**FHFA**

Both Enterprises reported significant net losses in the second half of 2007 and the first half of 2008, continuing a trend of volatile and unattractive financial results over the past several quarters.



Sources: Fannie Mae 2008 Q2 10-Q, Freddie Mac 2008 Q2 10-Q.

**7**

# House Prices Continue to Fall

**FHFA**

## OFHEO and S&P/Case-Shiller House Price Indexes



Note: For purposes of comparison, the OFHEO purchase-only index has been re-based to January 2000=100 (the standard series is set so that January 1991=100)

**8**    **8**

**000038**

# Serious Delinquencies Rising

**FHFA**



**Serious Delinquency Rates, 1998 - 2008Q2**

Source: Mortgage Bankers Association.

**9**

000039

# Federal Housing Finance Agency

**FHFA**

 **+**  **+** 

FHFB                 OFHEO                 HUD

*mission
compliance*

**10**

**000040**

# Federal Housing Finance Agency

**FHFA**

- **Single, unified and independent GSE regulator**
  - ❖ FHFB and OFHEO
  - ❖ HUD's mission and new product authority

- **Enhanced safety and soundness authorities**
  - ❖ More complete set of regulatory and enforcement authorities
  - ❖ Authorities based on safety and soundness, not just capital
  - ❖ Flexibility to adjust capital requirements – minimum and risk based

- **Focus on mission**
  - ❖ Combines safety and soundness, charter compliance, and affordable housing goals in one agency
  - ❖ Establish criteria governing the Enterprises' retained portfolios

**11**

**000041**

# Agency Structure

**FHFA**

## Independent Agency

❖ **Director**

- 5-year term
- Current OFHEO Director serves until successor is appointed and confirmed
- Oversees the operations of each regulated entity and any joint office of the FHLBanks
- Ensures safety and soundness
- Ensures regulated entities comply with applicable laws, regulations, orders and guidelines, and that they carry out their missions only through permissible activities

❖ **Deputy Directors oversee**:

- Fannie Mae and Freddie Mac
- Federal Home Loan Banks
- Housing Mission and Goals -- mission functions of all the GSEs, including their respective affordable housing goals and programs

**12**

# New Authorities Given to FHFA

**FHFA**

■ **Fannie/Freddie Regulation**

❖ Prudential Management and Operations Standards

❖ Portfolio Limits

❖ Expanded Enforcement Authorities

❖ Capital Regulation
  • Risk-based
  • Minimum Capital

❖ Prompt Corrective Action broadened

❖ Receivership

**13**

# New Authorities Given to FHFA

**FHFA**

- **FHLBank Regulation**

  - ❖ Prudential Management and Operations Standards

  - ❖ Risk-based Capital Requirements

  - ❖ Capital Classification for Prompt Corrective Action

  - ❖ Temporary authority to provide letters of credit for tax-exempt bonds

  - ❖ Conservatorship/ Receivership Authority

**14**

**000044**

# New Authorities Given to FHFA

**FHFA**

- **Mission Supervision**

  - ❖ Combines FHFB oversight of Affordable Housing Program and Community Investment Program and HUD's setting of affordable housing goals

  - ❖ New product approval for all GSEs

**15**

**000045**

# Conservatorship

**FHFA**

❑ Conservatorship is defined as a statutory process to stabilize a troubled institution which is intended to have a limited duration and has as its objective to return the entity to normal business operations once stabilized.  Conservatorship statutes provide broad authority for a conservator to operate the institution until it is stabilized and then returned to the shareholders.

❑ FHFA is  Conservator

❑ New CEO's appointed

❑ Appointed new Chairmen who will reconstitute boards

16

000046

# Treasury Facilities

**FHFA**

- ❑ Senior Preferred Stock Purchase Agreement – no expiration date

    - ❑ Binding legal agreement that ensures that each GSE maintain a positive net worth through Treasury purchases of senior preferred stock as needed.  Means the United States stands behind the debt and the MBS of the GSEs.

    - ❑ Contract between Treasury and each GSE with a capacity of $100 billion ($200 billion combined).

        - ❑ nearly three and a quarter times the Enterprises combined statutory minimum capital.

    - ❑ Enterprises each paid Treasury $1 billion in senior preferred stock and warrants for 79.9 percent of common stock.

    - ❑ Portfolios allowed to grow to $850 billion and then shrink 10 percent p.a starting 2010

**17**

# Treasury Facilities

**FHFA**

❑    Senior Preferred Stock Purchase Agreement (continued)

   ❑   Holders of MBS, senior debt and subordinated debt, including all maturities and issuances are effectively guaranteed by the U. S. Treasury.

   ❑   Facility can only terminate if:

      1.  Facility is fully funded

      2.  GSE liquidates and Treasury has topped up net worth deficiency, if any

      3.  GSE satisfies all its liabilities

**18**

**000048**

# Treasury Facilities

**FHFA**

❑   GSE MBS Purchase Program – Expires 12/31/09

    ❑   Provides for Treasury to make unlimited purchases of Fannie Mae and Freddie Mac MBS in open market.  Over $15 billion purchased.

    ❑   Treasury may hold these securities to maturity.

❑   GSE Credit Facility – Expires 12/31/09

    ❑   Secured funding provided directly to Fannie Mae, Freddie Mac and FHLBanks by Treasury as a backstop.

    ❑   Unlimited borrowing facility with Federal Reserve Bank of New York as fiscal agent.

**19**

**000049**

# Emergency Economic Stabilization Act

**FHFA**

- TARP (Troubled Asset Relief Program) - $700 billion.

- Broad, flexible power to allow Treasury to purchase troubled assets, provide guarantees and provide capital.

  - $250 billion in Bank Preferred Stock

  - Other financial institutions eligible

  - Investment managers for Private Label MBS, whole mortgages

- Provides for heightened mortgage modification activities to avoid preventable foreclosures.

- Strong oversight established

20

000050

Remarks to ABS East Conference
October 20, 2008
Hollywood, Florida

Good Morning. I am honored to be here today to talk with you about a critical component of our nation's financial system.  You need no introduction to the turmoil our financial system is experiencing.  But there is a lot going on in Washington, DC in response to it, and I hope that I may be able to shed some light on some of these activities, and in the process, introduce the new federal agency that I represent, the Federal Housing Finance Agency, or FHFA.

My remarks will focus on our nation's secondary mortgage market, and in particular, the three housing-related government-sponsored enterprises that serve it – Fannie Mae, Freddie Mac, and the Federal Home Loan Bank System.  Despite the difficulties the first two of those GSEs have had, all three remain vital to the operation of the secondary mortgage market.

Over the next few minutes, I will review the creation of the Federal Housing Finance Agency, the Agency's appointment of conservatorships for Fannie Mae and Freddie Mac, and its role as supervisor of the Federal Home Loan Bank System.  I would like to describe the Treasury facilities put in place to support these housing GSEs, including the Senior Preferred Stock Purchase Agreement

Protected Information To Be Disclosed Only In Accordance With Protective Order      FHFA00047706

with Fannie Mae and Freddie Mac, and the GSE Credit Facility.  I will also touch on the GSEs continued support of the housing finance system.

To set the stage for this discussion, let me begin with a little data.

**SLIDE 2**

The first slide here shows the relative size of the three housing GSEs.  The combined debt and mortgage-backed securities of Fannie Mae and Freddie Mac equals that of the publicly held debt of the United States.  The FHLBank System adds another $1.3 trillion, meaning that the three housing GSEs together have $1.3 trillion more paper in circulation that the Treasury Department -- although Treasury is certainly on a path to catch up!

**SLIDE 3**

We see here the jump in GSE support of the mortgage market as problems really began emerging in the second half of last year.  Note in particular the spike in FHLBank advances in the third quarter last year.

{PAGE }

Protected Information To Be Disclosed Only In Accordance With Protective Order       FHFA00047707

The yellow bars show the share of quarterly mortgage originations represented by the net increase in FHLBank advances and the new mortgage business of Fannie Mae and Freddie Mac that quarter.  When the mortgage market turmoil took hold in the third quarter of last year, the GSEs' combined share of originations jumped from 40-some percent to over 90 percent and, since then, has been 75 percent or more.

**SLIDE 4**

F&F combined book of business continues to grow, particularly the MBS outstanding,          which          now          amounts          to          $3.7          trillion.

**SLIDE 5**

FHLBank portfolios have also been growing during this decade.

**SLIDE 6**

This slide shows the volume and relative shares of mortgage securitization just since the start of 2007.  Overall, mortgage securitization activity has declined

{PAGE }

Protected Information To Be Disclosed Only In Accordance With Protective Order          FHFA00047708

substantially since early 2007, and the composition of that activity has changed in two key ways.

As this slide shows, private label mortgage securitization activity has essentially vanished after constituting more than half of mortgage securitization in early 2007.

At the same time, in percentage terms, there has been substantial growth in Ginnie Mae securitization.

**SLIDE 7**

In a few minutes, I will describe the conservatorship actions we took last month. But these next few slides provide some insight into the contributing factors to that action.

Since the third quarter of 2006, Fannie Mae has shown losses in 5 of those 8 quarters, including the last 4 in a row. Freddie Mac has lost money in 7 of those 8 quarters.

{PAGE }

Protected Information To Be Disclosed Only In Accordance With Protective Order        FHFA00047709

**SLIDE 8**

The turning point in their profitability about matches the turning point in house prices.  This slide shows that the Case-Shiller 20-city house price index peaked in mid 2006 and has declined nearly 20 percent since.

The OFHEO nationwide, purchase-only house price index peaked in the spring of 2007 and has declined nearly 6 percent since.

**SLIDE 9**

Of course, declining house prices have been a key contributor to rising delinquency rates.  The serious delinquency rate for subprime loans now stands at 18 percent. But that is not all.  As the chart shows, this is no longer just a story about subprime loans.  The serious delinquency rate for prime mortgages is now at 2.35 percent.

{PAGE }

Protected Information To Be Disclosed Only In Accordance With Protective Order          FHFA00047710

**SLIDE 10**

With that as background, let me introduce the Federal Housing Finance Agency. After years of legislative attempts to reform the GSE regulatory structure, the deepening concerns for the housing finance system this summer helped push this legislation to the finish line.

At the end of July, the President signed the Housing and Economic Recovery Act.

As a first order matter, the new law replaced the balkanized approach to the housing GSEs by creating a single regulator for the housing GSEs, the Federal Housing Finance Agency.   Previously, there were 3 different Federal agencies with some responsibilities for the housing GSEs.   OFHEO, FHFB, and the Department of Housing and Urban Development's GSE mission oversight program.

**SLIDES 11 – 15**

Follow the slides.

{PAGE }

Protected Information To Be Disclosed Only In Accordance With Protective Order        FHFA00047711

So, FHFA was created at the end of July and has had all its authorities and responsibilities in effect since that time.

Note the major enhancements to OFHEO's regulatory authorities.

FHFA became effective upon enactment.

OFHEO and FHFB will cease to exist next July and are in wind-down mode now.

---

Now let me turn to the circumstances that led to the appointment of the conservatorships for Fannie Mae and Freddie Mac.

As I showed in one of the early slides, Fannie and Freddie's market share of all new mortgages was 76 percent during the first half of this year. During the turmoil that started last year, they have played a very important role in providing liquidity to the conforming mortgage market. That has required a careful and delicate balance of mission with safety and soundness. A key component of this balance has been their ability to raise and maintain capital.

{PAGE }

Protected Information To Be Disclosed Only In Accordance With Protective Order        FHFA00047712

Because of recent market conditions, that balance was upset. Unfortunately, as house prices, earnings and capital have continued to deteriorate, their ability to fulfill their mission deteriorated. In particular, the capacity to raise capital to absorb further losses without Treasury Department support vanished. That left both Enterprises unable to provide counter-cyclical support. Worse, it threatened to require substantial shedding of current positions with attendant further damage to mortgage and housing markets.

In retrospect and despite OFHEO's surplus capital requirements, portfolio caps, and repeated warnings about credit risk, the credit profile at both Enterprises followed the market down in 2006 and 2007 – without commensurate pricing for risk. They bought or guaranteed many more low documentation, low verification and non-standard ARM mortgages than they had in the past.

For example, for the first half of 2007, roughly one-third of the Enterprises' new business was composed of Alt-A, interest-only, or Option ARM products, and mortgages with layered risk characteristics vs. 14 percent in 2005.

The quality of their holdings of private-label mortgage securities, or PLS, issued by others also deteriorated. The portfolio caps OFHEO had in place restrained the

{PAGE }

Protected Information To Be Disclosed Only In Accordance With Protective Order      FHFA00047713

size of their PLS books, but maturing subprime and Alt-A PLS were replaced by PLS from the much riskier 2006 and 2007 origination years. As house prices turned down, delinquencies, foreclosures, real-estate owned, losses and reserves against future losses soared.

The result was that the Enterprises were unable to provide needed stability to the market. They also found themselves unable to meet their affordable housing mission. Rather than letting these conditions fester and worsen and put the mortgage and overall financial markets in further jeopardy, FHFA, after painstaking review, decided to take action.

In early September, we acted to place both companies into conservatorship.

The goal of these dual conservatorship actions is to help restore confidence in Fannie Mae and Freddie Mac, enhance their capacity to fulfill their mission, and reduce the systemic risk that would have exacerbated the instability in the current market.

{PAGE }

Protected Information To Be Disclosed Only In Accordance With Protective Order     FHFA00047714

FHFA based its determination that grounds existed to appoint a conservator for the Enterprises, and that it was necessary to do so, on five key areas, each of which worsened significantly during the summer:

1. Accelerating safety and soundness weaknesses, especially with regard to credit risk, earnings outlook, and capitalization;

2. Continued and substantial deterioration in equity, debt, and MBS market conditions;

3. The current and projected financial performance and condition of each company as reflected in its second quarter financial reports and our ongoing examinations;

4. The inability of the companies to raise capital or to issue debt according to normal practices and prices; and

5. The critical importance of each company in supporting the country's residential mortgage market.

For those interested in a more detailed explanation of the developments that led to this action, I would point you to the Director's recent congressional testimony, which may be found on OFHEO's website.

{PAGE }

Protected Information To Be Disclosed Only In Accordance With Protective Order          FHFA00047715

**SLIDE 16**

Let me now turn to the conservatorships. FHFA will act as the conservator to operate the Enterprises until they are stabilized. The Treasury's financial commitments, authorized by the new law, were critical to creating a workable conservatorship structure.

There are several key components of this conservatorship:

The companies have continued to operate as normal, only with much stronger backing for the holders of MBS, senior debt and subordinated debt as provided by the Treasury Department. Over the next 15 months each company may increase its portfolio, up to $850 billion, before requiring gradual declines in the portfolios of 10 percent per year. That is less than their runoff rate. The Enterprises are allowed to grow their guarantee MBS books without volume limits.

As the conservator, FHFA assumed the power of the board and management. However, new Chief Executive Officers and Boards of Directors will have significant powers.  Two new CEOs were named when the conservatorship were announced – Herb Allison at Fannie Mae and David Moffett at Freddie Mac.

{PAGE }

Protected Information To Be Disclosed Only In Accordance With Protective Order          FHFA00047716

FHFA has also named new non-executive Chairmen for each firm, Philip Laskawy has agreed to be the Chairman of Fannie Mae and John Koskinen has agreed to be the Chairman of Freddie Mac.  They will be working with FHFA to reconstitute boards for each company.

All political activities -- including all lobbying -- were halted immediately.

In order to conserve over $2 billion in capital every year, the common stock and preferred stock dividends were eliminated, but the common and all preferred stocks will continue to remain outstanding.   In other words, the economic interests of shareholders have not been eliminated, they continue to exist.

**SLIDE 17**

Finally and very importantly, there is the financial support provided by the U.S. Treasury at the time the conservatorships were established.   This support implements the authority Congress gave to the Treasury Department in late July in the same legislation that created the FHFA.   We believe that the Treasury Facilities provide the support needed to facilitate Freddie Mac and Fannie Mae

{PAGE }

Protected Information To Be Disclosed Only In Accordance With Protective Order      FHFA00047717

fulfilling their mission, most importantly of which is providing liquidity to the mortgage market.

Specifically, the Treasury Department established three facilities meant to assure market participants that the government stood behind the debt of the housing GSEs.  In the case of Fannie Mae and Freddie Mac, those facilities are:

- $100 billion <u>each</u> in senior preferred shares that protect the credit interests of all holders of the Enterprises' debt and mortgage-backed securities.  To put the combined $200 billion in perspective, that amount is nearly <u>three-and-a-quarter times</u> the Enterprises' statutory minimum capital requirement.

  - Put another way, from the perspective of GSE debt and MBS holders, this is as if each company went out and raised $100 Billion in new capital, creating a capital buffer more than 3 times greater than their statutory requirements.

  - In light of Treasury's senior preferred stock facility, we will continue to monitor capital levels, but the existing regulatory capital requirements will not be binding during the conservatorship.

{PAGE }

Protected Information To Be Disclosed Only In Accordance With Protective Order     FHFA00047718

o   The Senior Preferred facility supports all past and future debt and
    MBS issuances, until the terms of the facility are completely satisfied.

o   As SEC registrants the Enterprises will continue to report their
    financial results quarterly.

o   A few weeks ago, the Justice Department issued an opinion that the
    Senior Preferred Stock Purchase Agreement creates a binding
    obligation on the United States to provide the financial backstop set
    forth in the agreement without time limit, for the duration of the
    agreement and the liabilities protected by the agreement.

**SLIDE 18**

Read slide 18

{PAGE }

Protected Information To Be Disclosed Only In Accordance With Protective Order          FHFA00047719

**SLIDE 19**

- The second facility is an MBS Purchase program that provides for Treasury making unlimited purchases of Fannie Mae and Freddie Mac mortgage-backed securities in the open market.  This program is already in operation and Treasury has been purchasing agency MBS.

- The third facility is an unlimited borrowing facility, the GSE Credit Facility, which establishes the Treasury, with the Federal Reserve as its agent, as a lender of last resort, to all three housing GSEs.

The Federal Home Loan Bank System has not faced the problems experienced by the Enterprises, but this third facility is available to the FHLBank System, if it is ever needed.

So the FHLBanks are participants in the GSE Credit facility, which provides the System with backstop liquidity in the event that a market seizure or other liquidity event disrupts the System's funding or its ability to roll its debt.

{PAGE }

Protected Information To Be Disclosed Only In Accordance With Protective Order      FHFA00047720

The Federal Home Loan Banks have performed remarkably well over the last year as they have a different business model than Fannie Mae and Freddie Mac and a different capital structure that grows as their lending activity grows. They are jointly and severally liable for the Bank System's debt obligations and all but one of the 12 are profitable.  As I noted earlier, FHLBank advances have continued to grow since the Summer of 2007 and have been an important source of liquidity to the banking system.

**SLIDE 20**

Since the establishment of these facilities to support the GSEs, Congress has provided the Treasury Department with additional and broader authorities to provide support to the US financial system.

The TARP – or Troubled Asset Relief Program – gives the Treasury Department authority to allocate $700 billion in financial support.

TARP gives Treasury broad, flexible power to purchase troubled assets, provide guarantees and provide capital.  Last week, Treasury announced that it plans to

{PAGE }

Protected Information To Be Disclosed Only In Accordance With Protective Order      FHFA00047721

invest about $250 billion of TARP funds in Preferred Stock of the banking industry and other financial institutions.

It also plans to purchase troubled assets, particularly troubled mortgages and mortgage securities, using private investment managers and advisors.

**TURN OFF SLIDES – Conclusion**

In summary, as the financial system works through the many challenges facing it, the housing GSEs remain active and important players in support of housing finance.  Despite being in conservatorship, the Treasury senior preferred stock purchase agreement with Fannie Mae and Freddie Mac provides an effective guarantee of their debt and MBS.

Throughout this difficult period, the Federal Home Loan Banks have played their traditional role of providing liquidity to the banking and thrift industry and they continue to do so.

In addition to the programs I have described here, there are other substantial government supports that have been provided recently, including various facilities

{PAGE }

Protected Information To Be Disclosed Only In Accordance With Protective Order        FHFA00047722

and expanded lending activities of the Federal Reserve.  Much of this activity is very new and the market is continuing to adjust to these various interventions.  Our country and our financial system are remarkably resilient and we will get through this challenging period.

Thank you for your attention and again, I appreciate the opportunity to speak with you today.

{PAGE }

Protected Information To Be Disclosed Only In Accordance With Protective Order          FHFA00047723

## CERTIFICATE OF DESIGNATION OF TERMS OF
## VARIABLE LIQUIDATION PREFERENCE SENIOR
## PREFERRED STOCK, SERIES 2008-2

**1.    Designation, Par Value, Number of Shares and Priority**

The designation of the series of preferred stock of the Federal National Mortgage Association (the "Company") created by this resolution shall be "Variable Liquidation Preference Senior Preferred Stock, Series 2008-2" (the "Senior Preferred Stock"), and the number of shares initially constituting the Senior Preferred Stock is 1,000,000. Shares of Senior Preferred Stock will have no par value and a stated value and initial liquidation preference per share equal to $1,000 per share, subject to adjustment as set forth herein. The Board of Directors of the Company, or a duly authorized committee thereof, in its sole discretion, may reduce the number of shares of Senior Preferred Stock, provided such reduction is not below the number of shares of Senior Preferred Stock then outstanding.

The Senior Preferred Stock shall rank prior to the common stock of the Company as provided in this Certificate and shall rank, as to both dividends and distributions upon dissolution, liquidation or winding up of the Company, prior to (a) the shares of preferred stock of the Company designated "5.25% Non-Cumulative Preferred Stock, Series D", "5.10% Non-Cumulative Preferred Stock, Series E", "Variable Rate Non-Cumulative Preferred Stock, Series F", "Variable Rate Non-Cumulative Preferred Stock, Series G", "5.81% Non-Cumulative Preferred Stock, Series H", "5.375% Non-Cumulative Preferred Stock, Series I", "5.125% Non-Cumulative Preferred Stock, Series L", "4.75% Non-Cumulative Preferred Stock, Series M", "5.50% Non-Cumulative Preferred Stock, Series N", "Non-Cumulative Preferred Stock, Series O", "Non-Cumulative Convertible Series 2004-1 Preferred Stock", "Variable Rate Non-Cumulative Preferred Stock, Series P", "6.75% Non-Cumulative Preferred Stock, Series Q", "7.625% Non-Cumulative Preferred Stock, Series R", "Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series S", and "8.75% Non-Cumulative Mandatory Convertible Preferred Stock", Series 2008-1", (b) any other capital stock of the Company outstanding on the date of the initial issuance of the Senior Preferred Stock and (c) any capital stock of the Company that may be issued after the date of initial issuance of the Senior Preferred Stock.

**2.    Dividends**

(a)    For each Dividend Period from the date of the initial issuance of the Senior Preferred Stock, holders of outstanding shares of Senior Preferred Stock shall be entitled to receive, ratably, when, as and if declared by the Board of Directors, in its sole discretion, out of funds legally available therefor, cumulative cash dividends at the annual rate per share equal to the then-current Dividend Rate on the then-current Liquidation Preference. Dividends on the Senior Preferred Stock shall accrue from but not including the date of the initial issuance of the Senior Preferred Stock and will be payable in arrears when, as and if declared by the Board of Directors quarterly on March 31, June 30, September 30 and December 31 of each year (each, a "Dividend Payment Date"), commencing on December 31, 2008. If a Dividend Payment Date is not a "Business Day," the related dividend will be paid not later than the next Business Day with the same force and effect as though paid on the Dividend Payment Date, without any increase to

Protected Information To Be Disclosed Only In Accordance With Protective Order

account for the period from such Dividend Payment Date through the date of actual payment. "Business Day" means a day other than (i) a Saturday or Sunday, (ii) a day on which New York City banks are closed, or (iii) a day on which the offices of the Company are closed.

If declared, the initial dividend will be for the period from but not including the date of the initial issuance of the Senior Preferred Stock through and including December 31, 2008. Except for the initial Dividend Payment Date, the "Dividend Period" relating to a Dividend Payment Date will be the period from but not including the preceding Dividend Payment Date through and including the related Dividend Payment Date. The amount of dividends payable on the initial Dividend Payment Date or for any Dividend Period that is not a full calendar quarter shall be computed on the basis of 30-day months, a 360-day year and the actual number of days elapsed in any period of less than one month. For the avoidance of doubt, in the event that the Liquidation Preference changes in the middle of a Dividend Period, the amount of dividends payable on the Dividend Payment Date at the end of such Dividend Period shall take into account such change in Liquidation Preference and shall be computed at the Dividend Rate on each Liquidation Preference based on the portion of the Dividend Period that each Liquidation Preference was in effect.

(b)     To the extent not paid pursuant to Section 2(a) above, dividends on the Senior Preferred Stock shall accrue and shall be added to the Liquidation Preference pursuant to Section 8, whether or not there are funds legally available for the payment of such dividends and whether or not dividends are declared.

(c)     "Dividend Rate" means 10.0%; provided, however, that if at any time the Company shall have for any reason failed to pay dividends in cash in a timely manner as required by this Certificate, then immediately following such failure and for all Dividend Periods thereafter until the Dividend Period following the date on which the Company shall have paid in cash full cumulative dividends (including any unpaid dividends added to the Liquidation Preference pursuant to Section 8), the "Dividend Rate" shall mean 12.0%.

(d)     Each such dividend shall be paid to the holders of record of outstanding shares of the Senior Preferred Stock as they appear in the books and records of the Company on such record date as shall be fixed in advance by the Board of Directors, not to be earlier than 45 days nor later than 10 days preceding the applicable Dividend Payment Date. The Company may not, at any time, declare or pay dividends on, make distributions with respect to, or redeem, purchase or acquire, or make a liquidation payment with respect to, any common stock or other securities ranking junior to the Senior Preferred Stock unless (i) full cumulative dividends on the outstanding Senior Preferred Stock in respect of the then-current Dividend Period and all past Dividend Periods (including any unpaid dividends added to the Liquidation Preference pursuant to Section 8) have been declared and paid in cash (including through any pay down of Liquidation Preference pursuant to Section 3) and (ii) all amounts required to be paid pursuant to Section 4 (without giving effect to any prohibition on such payment under any applicable law) have been paid in cash.

(e)     Notwithstanding any other provision of this Certificate, the Board of Directors, in its discretion, may choose to pay dividends on the Senior Preferred Stock without the payment of any dividends on the common stock, preferred stock or any other class or series of stock from time

2

to time outstanding ranking junior to the Senior Preferred Stock with respect to the payment of dividends.

(f)     If and whenever dividends, having been declared, shall not have been paid in full, as aforesaid, on shares of the Senior Preferred Stock, all such dividends that have been declared on shares of the Senior Preferred Stock shall be paid to the holders pro rata based on the aggregate Liquidation Preference of the shares of Senior Preferred Stock held by each holder, and any amounts due but not paid in cash shall be added to the Liquidation Preference pursuant to Section 8.

3.     **Optional Pay Down of Liquidation Preference**

(a)     Following termination of the Commitment (as defined in the Preferred Stock Purchase Agreement referred to in Section 8 below), and subject to any limitations which may be imposed by law and the provisions below, the Company may pay down the Liquidation Preference of all outstanding shares of the Senior Preferred Stock pro rata, at any time, in whole or in part, out of funds legally available therefor, with such payment first being used to reduce any accrued and unpaid dividends previously added to the Liquidation Preference pursuant to Section 8 below and, to the extent all such accrued and unpaid dividends have been paid, next being used to reduce any Periodic Commitment Fees (as defined in the Preferred Stock Purchase Agreement referred to in Section 8 below) previously added to the Liquidation Preference pursuant to Section 8 below. Prior to termination of the Commitment, and subject to any limitations which may be imposed by law and the provisions below, the Company may pay down the Liquidation Preference of all outstanding shares of the Senior Preferred Stock pro rata, at any time, out of funds legally available therefor, but only to the extent of (i) accrued and unpaid dividends previously added to the Liquidation Preference pursuant to Section 8 below and not repaid by any prior pay down of Liquidation Preference and (ii) Periodic Commitment Fees previously added to the Liquidation Preference pursuant to Section 8 below and not repaid by any prior pay down of Liquidation Preference. Any pay down of Liquidation Preference permitted by this Section 3 shall be paid by making a payment in cash to the holders of record of outstanding shares of the Senior Preferred Stock as they appear in the books and records of the Company on such record date as shall be fixed in advance by the Board of Directors, not to be earlier than 45 days nor later than 10 days preceding the date fixed for the payment.

(b)     In the event the Company shall pay down of the Liquidation Preference of the Senior Preferred Stock as aforesaid, notice of such pay down shall be given by the Company by first class mail, postage prepaid, mailed neither less than 10 nor more than 45 days preceding the date fixed for the payment, to each holder of record of the shares of the Senior Preferred Stock, at such holder's address as the same appears in the books and records of the Company. Each such notice shall state the amount by which the Liquidation Preference of each share shall be reduced and the pay down date.

(c)     If after termination of the Commitment the Company pays down the Liquidation Preference of each outstanding share of Senior Preferred Stock in full, such shares shall be deemed to have been redeemed as of the date of such payment, and the dividend that would otherwise be payable for the Dividend Period ending on the pay down date will be paid on such date. Following such deemed redemption, the shares of the Senior Preferred Stock shall no longer be deemed to be

3

Protected Information To Be Disclosed Only In Accordance With Protective Order

outstanding, and all rights of the holders thereof as holders of the Senior Preferred Stock shall cease, with respect to shares so redeemed, other than the right to receive the pay down amount (which shall include the final dividend for such shares).  Any shares of the Senior Preferred Stock which shall have been so redeemed, after such redemption, shall no longer have the status of authorized, issued or outstanding shares.

**4.      Mandatory Pay Down of Liquidation Preference Upon Issuance of Capital Stock**

(a)      If the Company shall issue any shares of capital stock (including without limitation common stock or any series of preferred stock) in exchange for cash at any time while the Senior Preferred Stock is outstanding, then the Company shall, within 10 Business Days, use the proceeds of such issuance net of the direct costs relating to the issuance of such securities (including, without limitation, legal, accounting and investment banking fees) to pay down the Liquidation Preference of all outstanding shares of Senior Preferred Stock pro rata, out of funds legally available therefor, by making a payment in cash to the holders of record of outstanding shares of the Senior Preferred Stock as they appear in the books and records of the Company on such record date as shall be fixed in advance by the Board of Directors, not to be earlier than 45 days nor later than 10 days preceding the date fixed for the payment, with such payment first being used to reduce any accrued and unpaid dividends previously added to the Liquidation Preference pursuant to Section 8 below and, to the extent all such accrued and unpaid dividends have been paid, next being used to reduce any Periodic Commitment Fees (as defined in the Preferred Stock Purchase Agreement referred to in Section 8 below) previously added to the Liquidation Preference pursuant to Section 8 below; provided that, prior to the termination of the Commitment (as defined in the Preferred Stock Purchase Agreement referred to in Section 8 below), the Liquidation Preference of each share of Senior Preferred Stock shall not be paid down below $1,000 per share.

(b)      If the Company shall not have sufficient assets legally available for the pay down of the Liquidation Preference of the shares of Senior Preferred Stock required under Section 4(a), the Company shall pay down the Liquidation Preference per share to the extent permitted by law, and shall pay down any Liquidation Preference not so paid down because of the unavailability of legally available assets or other prohibition as soon as practicable to the extent it is thereafter able to make such pay down legally.  The inability of the Company to make such payment for any reason shall not relieve the Company from its obligation to effect any required pay down of the Liquidation Preference when, as and if permitted by law.

(c)      If after the termination of the Commitment the Company pays down the Liquidation Preference of each outstanding share of Senior Preferred Stock in full, such shares shall be deemed to have been redeemed as of the date of such payment, and the dividend that would otherwise be payable for the Dividend Period ending on the pay down date will be paid on such date.  Following such deemed redemption, the shares of the Senior Preferred Stock shall no longer be deemed to be outstanding, and all rights of the holders thereof as holders of the Senior Preferred Stock shall cease, with respect to shares so redeemed, other than the right to receive the pay down amount (which shall include the final dividend for such redeemed shares).  Any shares of the Senior Preferred Stock which shall have been so redeemed, after such redemption, shall no longer have the status of authorized, issued or outstanding shares.

4

Protected Information To Be Disclosed Only In Accordance With Protective Order

**5.**    **No Voting Rights**

Except as set forth in this Certificate or otherwise required by law, the shares of the Senior Preferred Stock shall not have any voting powers, either general or special.

**6.**    **No Conversion or Exchange Rights**

The holders of shares of the Senior Preferred Stock shall not have any right to convert such shares into or exchange such shares for any other class or series of stock or obligations of the Company.

**7.**    **No Preemptive Rights**

No holder of the Senior Preferred Stock shall as such holder have any preemptive right to purchase or subscribe for any other shares, rights, options or other securities of any class of the Company which at any time may be sold or offered for sale by the Company.

**8.**    **Liquidation Rights and Preference**

(a)    Except as otherwise set forth herein, upon the voluntary or involuntary dissolution, liquidation or winding up of the Company, the holders of the outstanding shares of the Senior Preferred Stock shall be entitled to receive out of the assets of the Company available for distribution to stockholders, before any payment or distribution shall be made on the common stock or any other class or series of stock of the Company ranking junior to the Senior Preferred Stock upon liquidation, the amount per share equal to the Liquidation Preference plus an amount, determined in accordance with Section 2(a) above, equal to the dividend otherwise payable for the then-current Dividend Period accrued through and including the date of payment in respect of such dissolution, liquidation or winding up; provided, however, that if the assets of the Company available for distribution to stockholders shall be insufficient for the payment of the amount which the holders of the outstanding shares of the Senior Preferred Stock shall be entitled to receive upon such dissolution, liquidation or winding up of the Company as aforesaid, then, all of the assets of the Company available for distribution to stockholders shall be distributed to the holders of outstanding shares of the Senior Preferred Stock pro rata based on the aggregate Liquidation Preference of the shares of Senior Preferred Stock held by each holder.

(b)    "Liquidation Preference" shall initially mean $1,000 per share and shall be:

(i)    increased each time a Deficiency Amount (as defined in the Preferred Stock Purchase Agreement) is paid to the Company by an amount per share equal to the aggregate amount so paid to the Company divided by the number of shares of Senior Preferred Stock outstanding at the time of such payment;

(ii)    increased each time the Company does not pay the full Periodic Commitment Fee (as defined in the Preferred Stock Purchase Agreement) in cash by an amount per share equal to the amount of the Periodic Commitment Fee that is not paid in cash divided by the number of shares of Senior Preferred Stock outstanding at the time such payment is due;

5

Protected Information To Be Disclosed Only In Accordance With Protective Order    FHFA-DDC-0337324

(iii)    increased on the Dividend Payment Date if the Company fails to pay in full the dividend payable for the Dividend Period ending on such date by an amount per share equal to the aggregate amount of unpaid dividends divided by the number of shares of Senior Preferred Stock outstanding on such date; and

(iv)    decreased each time the Company pays down the Liquidation Preference pursuant to Section 3 or Section 4 of this Certificate by an amount per share equal to the aggregate amount of the pay down divided by the number of shares of Senior Preferred Stock outstanding at the time of such pay down.

(c)    "Preferred Stock Purchase Agreement" means the Preferred Stock Purchase Agreement, dated September 7, 2008, between the Company and the United States Department of the Treasury.

(d)    Neither the sale of all or substantially all of the property or business of the Company, nor the merger, consolidation or combination of the Company into or with any other corporation or entity, shall be deemed to be a dissolution, liquidation or winding up for the purpose of this Section 8.

## 9.    Additional Classes or Series of Stock

The Board of Directors shall have the right at any time in the future to authorize, create and issue, by resolution or resolutions, one or more additional classes or series of stock of the Company, and to determine and fix the distinguishing characteristics and the relative rights, preferences, privileges and other terms of the shares thereof; provided that, any such class or series of stock may not rank prior to or on parity with the Senior Preferred Stock without the prior written consent of the holders of at least two-thirds of all the shares of Senior Preferred Stock at the time outstanding.

## 10.    Miscellaneous

(a)    The Company and any agent of the Company may deem and treat the holder of a share or shares of Senior Preferred Stock, as shown in the Company's books and records, as the absolute owner of such share or shares of Senior Preferred Stock for the purpose of receiving payment of dividends in respect of such share or shares of Senior Preferred Stock and for all other purposes whatsoever, and neither the Company nor any agent of the Company shall be affected by any notice to the contrary.  All payments made to or upon the order of any such person shall be valid and, to the extent of the sum or sums so paid, effectual to satisfy and discharge liabilities for moneys payable by the Company on or with respect to any such share or shares of Senior Preferred Stock.

(b)    The shares of the Senior Preferred Stock, when duly issued, shall be fully paid and non-assessable.

(c)    The Senior Preferred Stock may be issued, and shall be transferable on the books of the Company, only in whole shares.

6

(d)     For purposes of this Certificate, the term "the Company" means the Federal National Mortgage Association and any successor thereto by operation of law or by reason of a merger, consolidation, combination or similar transaction.

(e)     This Certificate and the respective rights and obligations of the Company and the holders of the Senior Preferred Stock with respect to such Senior Preferred Stock shall be construed in accordance with and governed by the laws of the United States, provided that the law of the State of Delaware shall serve as the federal rule of decision in all instances except where such law is inconsistent with the Company's enabling legislation, its public purposes or any provision of this Certificate.

(f)     Any notice, demand or other communication which by any provision of this Certificate is required or permitted to be given or served to or upon the Company shall be given or served in writing addressed (unless and until another address shall be published by the Company) to Fannie Mae, 3900 Wisconsin Avenue NW, Washington, DC 20016, Attn: Executive Vice President and General Counsel. Such notice, demand or other communication to or upon the Company shall be deemed to have been sufficiently given or made only upon actual receipt of a writing by the Company. Any notice, demand or other communication which by any provision of this Certificate is required or permitted to be given or served by the Company hereunder may be given or served by being deposited first class, postage prepaid, in the United States mail addressed (i) to the holder as such holder's name and address may appear at such time in the books and records of the Company or (ii) if to a person or entity other than a holder of record of the Senior Preferred Stock, to such person or entity at such address as reasonably appears to the Company to be appropriate at such time. Such notice, demand or other communication shall be deemed to have been sufficiently given or made, for all purposes, upon mailing.

(g)     The Company, by or under the authority of the Board of Directors, may amend, alter, supplement or repeal any provision of this Certificate pursuant to the following terms and conditions:

(i)     Without the consent of the holders of the Senior Preferred Stock, the Company may amend, alter, supplement or repeal any provision of this Certificate to cure any ambiguity, to correct or supplement any provision herein which may be defective or inconsistent with any other provision herein, or to make any other provisions with respect to matters or questions arising under this Certificate, provided that such action shall not adversely affect the interests of the holders of the Senior Preferred Stock.

(ii)     The consent of the holders of at least two-thirds of all of the shares of the Senior Preferred Stock at the time outstanding, given in person or by proxy, either in writing or by a vote at a meeting called for the purpose at which the holders of shares of the Senior Preferred Stock shall vote together as a class, shall be necessary for authorizing, effecting or validating the amendment, alteration, supplementation or repeal (whether by merger, consolidation or otherwise) of the provisions of this Certificate other than as set forth in subparagraph (i) of this paragraph (g). The creation and issuance of any other class or series of stock, or the issuance of additional shares of any existing class or series of stock, of the Company ranking junior to the Senior Preferred Stock shall not be deemed to constitute such an amendment, alteration, supplementation or repeal.

7

Protected Information To Be Disclosed Only In Accordance With Protective Order     FHFA-DDC-0337326

**000075**

(iii)     Holders of the Senior Preferred Stock shall be entitled to one vote per share on matters on which their consent is required pursuant to subparagraph (ii) of this paragraph (g).  In connection with any meeting of such holders, the Board of Directors shall fix a record date, neither earlier than 60 days nor later than 10 days prior to the date of such meeting, and holders of record of shares of the Senior Preferred Stock on such record date shall be entitled to notice of and to vote at any such meeting and any adjournment. The Board of Directors, or such person or persons as it may designate, may establish reasonable rules and procedures as to the solicitation of the consent of holders of the Senior Preferred Stock at any such meeting or otherwise, which rules and procedures shall conform to the requirements of any national securities exchange on which the Senior Preferred Stock may be listed at such time.

(h)     **RECEIPT AND ACCEPTANCE OF A SHARE OR SHARES OF THE SENIOR PREFERRED STOCK BY OR ON BEHALF OF A HOLDER SHALL CONSTITUTE THE UNCONDITIONAL ACCEPTANCE BY THE HOLDER (AND ALL OTHERS HAVING BENEFICIAL OWNERSHIP OF SUCH SHARE OR SHARES) OF ALL OF THE TERMS AND PROVISIONS OF THIS CERTIFICATE.  NO SIGNATURE OR OTHER FURTHER MANIFESTATION OF ASSENT TO THE TERMS AND PROVISIONS OF THIS CERTIFICATE SHALL BE NECESSARY FOR ITS OPERATION OR EFFECT AS BETWEEN THE COMPANY AND THE HOLDER (AND ALL SUCH OTHERS).**

8

IN WITNESS WHEREOF, I have hereunto set my hand and the seal of the Company this 7th day of September, 2008.

[Seal]

<div style="margin-left: 40%;">

FEDERAL NATIONAL MORTGAGE ASSOCIATION, by

The Federal Housing Finance Agency, its Conservator

_____

James B. Lockhart III
Director

</div>

*Signature Page to Certificate of Designations of Senior Preferred Stock*

Protected Information To Be Disclosed Only In Accordance With Protective Order

**FREDDIE MAC**

### CERTIFICATE OF CREATION, DESIGNATION, POWERS, PREFERENCES, RIGHTS, PRIVILEGES, QUALIFICATIONS, LIMITATIONS, RESTRICTIONS, TERMS AND CONDITIONS OF VARIABLE LIQUIDATION PREFERENCE SENIOR PREFERRED STOCK (PAR VALUE $1.00 PER SHARE)

The Federal Housing Finance Agency, as Conservator of the Federal Home Loan Mortgage Corporation, a government-sponsored enterprise of the United States of America (the "Company"), does hereby certify that, pursuant to authority vested in the Board of Directors of the Company by Section 306(f) of the Federal Home Loan Mortgage Corporation Act, and pursuant to the authority vested in the Conservator of the Company by Section 1367(b) of the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 (12 U.S.C. §4617), as amended, the Conservator adopted Resolution FHLMC 2008-___ on September 7, 2008, which resolution is now, and at all times since such date has been, in full force and effect, and that the Conservator approved the final terms of the issuance and sale of the preferred stock of the Company designated above.

The Senior Preferred Stock shall have the following designation, powers, preferences, rights, privileges, qualifications, limitations, restrictions, terms and conditions:

### 1.   Designation, Par Value, Number of Shares and Seniority

The class of preferred stock of the Company created hereby (the "Senior Preferred Stock") shall be designated "Variable Liquidation Preference Senior Preferred Stock," shall have a par value of $1.00 per share and shall consist of 1,000,000 shares. The Senior Preferred Stock shall rank prior to the common stock of the Company as provided in this Certificate and shall rank, as to both dividends and distributions upon liquidation, prior to (a) the Fixed-to-Floating Rate Non-Cumulative Perpetual Preferred Stock issued on December 4, 2007, (b) the 6.55% Non-Cumulative Preferred Stock issued on September 28, 2007, (c) the 6.02% Non-Cumulative Preferred Stock issued on July 24, 2007, (d) the 5.66% Non-Cumulative Preferred Stock issued on April 16, 2007, (e) the 5.57% Non-Cumulative Preferred Stock issued on January 16, 2007, (f) the 5.9% Non-Cumulative Preferred Stock issued on October 16, 2006, (g) the 6.42% Non-Cumulative Preferred Stock issued on July 17, 2006, (h) the Variable Rate, Non-Cumulative Preferred Stock issued on July 17, 2006, (i) the 5.81% Non-Cumulative Preferred Stock issued on January 29, 2002, (j) the 5.7% Non-Cumulative Preferred Stock issued on October 30, 2001, (k) the 6% Non-Cumulative Preferred Stock issued on May 30, 2001, (l) the Variable Rate, Non-Cumulative Preferred Stock issued on May 30, 2001 and June 1, 2001, (m) the 5.81% Non-Cumulative Preferred Stock issued on March 23, 2001, (n) the Variable Rate, Non-Cumulative Preferred Stock issued on March 23, 2001, (o) the Variable Rate, Non-Cumulative Preferred Stock issued on January 26, 2001, (p) the Variable Rate, Non-Cumulative Preferred Stock issued on November 5, 1999, (q) the 5.79% Non-Cumulative Preferred Stock issued on July 21, 1999, (r) the 5.1% Non-Cumulative Preferred Stock issued on March 19, 1999, (s) the 5.3% Non-Cumulative Preferred Stock issued on October 28, 1998, (t) the

Protected Information To Be Disclosed Only In Accordance With Protective Order

5.1% Non-Cumulative Preferred Stock issued on September 23, 1998, (u) the Variable Rate, Non-Cumulative Preferred Stock issued on September 23, 1998 and September 29, 1998, (v) the 5% Non-Cumulative Preferred Stock issued on March 23, 1998, (w) the 5.81% Non-Cumulative Preferred Stock issued on October 27, 1997, (x) the Variable Rate, Non-Cumulative Preferred Stock issued on April 26, 1996, (y) any other capital stock of the Company outstanding on the date of the initial issuance of the Senior Preferred Stock, and (z) any capital stock of the Company that may be issued after the date of initial issuance of the Senior Preferred Stock.

## 2.   Dividends

(a)   For each Dividend Period from the date of the initial issuance of the Senior Preferred Stock, holders of outstanding shares of Senior Preferred Stock shall be entitled to receive, ratably, when, as and if declared by the Board of Directors, in its sole discretion, out of funds legally available therefor, cumulative cash dividends at the annual rate per share equal to the then-current Dividend Rate on the then-current Liquidation Preference. Dividends on the Senior Preferred Stock shall accrue from but not including the date of the initial issuance of the Senior Preferred Stock and will be payable in arrears when, as and if declared by the Board of Directors quarterly on March 31, June 30, September 30 and December 31 of each year (each, a "Dividend Payment Date"), commencing on December 31, 2008. If a Dividend Payment Date is not a "Business Day," the related dividend will be paid not later than the next Business Day with the same force and effect as though paid on the Dividend Payment Date, without any increase to account for the period from such Dividend Payment Date through the date of actual payment. "Business Day" means a day other than (i) a Saturday or Sunday, (ii) a day on which New York City banks are closed, or (iii) a day on which the offices of the Company are closed.

If declared, the initial dividend will be for the period from but not including the date of the initial issuance of the Senior Preferred Stock through and including December 31, 2008. Except for the initial Dividend Payment Date, the "Dividend Period" relating to a Dividend Payment Date will be the period from but not including the preceding Dividend Payment Date through and including the related Dividend Payment Date. The amount of dividends payable on the initial Dividend Payment Date or for any Dividend Period that is not a full calendar quarter shall be computed on the basis of 30-day months, a 360-day year and the actual number of days elapsed in any period of less than one month. For the avoidance of doubt, in the event that the Liquidation Preference changes in the middle of a Dividend Period, the amount of dividends payable on the Dividend Payment Date at the end of such Dividend Period shall take into account such change in Liquidation Preference and shall be computed at the Dividend Rate on each Liquidation Preference based on the portion of the Dividend Period that each Liquidation Preference was in effect.

(b)   To the extent not paid pursuant to Section 2(a) above, dividends on the Senior Preferred Stock shall accrue and shall be added to the Liquidation Preference pursuant to Section 8, whether or not there are funds legally available for the payment of such dividends and whether or not dividends are declared.

(c)   "Dividend Rate" means 10.0%; provided, however, that if at any time the Company shall have for any reason failed to pay dividends in cash in a timely manner as required by this Certificate, then immediately following such failure and for all Dividend Periods thereafter until

2

the Dividend Period following the date on which the Company shall have paid in cash full cumulative dividends (including any unpaid dividends added to the Liquidation Preference pursuant to Section 8), the "Dividend Rate" shall mean 12.0%.

(d)     Each such dividend shall be paid to the holders of record of outstanding shares of the Senior Preferred Stock as they appear in the books and records of the Company on such record date as shall be fixed in advance by the Board of Directors, not to be earlier than 45 days nor later than 10 days preceding the applicable Dividend Payment Date.  The Company may not, at any time, declare or pay dividends on, make distributions with respect to, or redeem, purchase or acquire, or make a liquidation payment with respect to, any common stock or other securities ranking junior to the Senior Preferred Stock unless (i) full cumulative dividends on the outstanding Senior Preferred Stock in respect of the then-current Dividend Period and all past Dividend Periods (including any unpaid dividends added to the Liquidation Preference pursuant to Section 8) have been declared and paid in cash (including through any pay down of Liquidation Preference pursuant to Section 3) and (ii) all amounts required to be paid pursuant to Section 4 (without giving effect to any prohibition on such payment under any applicable law) have been paid in cash.

(e)     Notwithstanding any other provision of this Certificate, the Board of Directors, in its discretion, may choose to pay dividends on the Senior Preferred Stock without the payment of any dividends on the common stock, preferred stock or any other class or series of stock from time to time outstanding ranking junior to the Senior Preferred Stock with respect to the payment of dividends.

(f)     If and whenever dividends, having been declared, shall not have been paid in full, as aforesaid, on shares of the Senior Preferred Stock, all such dividends that have been declared on shares of the Senior Preferred Stock shall be paid to the holders pro rata based on the aggregate Liquidation Preference of the shares of Senior Preferred Stock held by each holder, and any amounts due but not paid in cash shall be added to the Liquidation Preference pursuant to Section 8.

**3.     Optional Pay Down of Liquidation Preference**

(a)     Following termination of the Commitment (as defined in the Preferred Stock Purchase Agreement referred to in Section 8 below), and subject to any limitations which may be imposed by law and the provisions below, the Company may pay down the Liquidation Preference of all outstanding shares of the Senior Preferred Stock pro rata, at any time, in whole or in part, out of funds legally available therefor, with such payment first being used to reduce any accrued and unpaid dividends previously added to the Liquidation Preference pursuant to Section 8 below and, to the extent all such accrued and unpaid dividends have been paid, next being used to reduce any Periodic Commitment Fees (as defined in the Preferred Stock Purchase Agreement referred to in Section 8 below) previously added to the Liquidation Preference pursuant to Section 8 below. Prior to termination of the Commitment, and subject to any limitations which may be imposed by law and the provisions below, the Company may pay down the Liquidation Preference of all outstanding shares of the Senior Preferred Stock pro rata, at any time, out of funds legally available therefor, but only to the extent of (i) accrued and unpaid dividends previously added to the Liquidation Preference pursuant to Section 8 below and not repaid by any prior pay down of Liquidation Preference and (ii) Periodic Commitment Fees previously added to the Liquidation

3

Preference pursuant to Section 8 below and not repaid by any prior pay down of Liquidation Preference. Any pay down of Liquidation Preference permitted by this Section 3 shall be paid by making a payment in cash to the holders of record of outstanding shares of the Senior Preferred Stock as they appear in the books and records of the Company on such record date as shall be fixed in advance by the Board of Directors, not to be earlier than 45 days nor later than 10 days preceding the date fixed for the payment.

(b)  In the event the Company shall pay down of the Liquidation Preference of the Senior Preferred Stock as aforesaid, notice of such pay down shall be given by the Company by first class mail, postage prepaid, mailed neither less than 10 nor more than 45 days preceding the date fixed for the payment, to each holder of record of the shares of the Senior Preferred Stock, at such holder's address as the same appears in the books and records of the Company. Each such notice shall state the amount by which the Liquidation Preference of each share shall be reduced and the pay down date.

(c)  If after termination of the Commitment the Company pays down the Liquidation Preference of each outstanding share of Senior Preferred Stock in full, such shares shall be deemed to have been redeemed as of the date of such payment, and the dividend that would otherwise be payable for the Dividend Period ending on the pay down date will be paid on such date. Following such deemed redemption, the shares of the Senior Preferred Stock shall no longer be deemed to be outstanding, and all rights of the holders thereof as holders of the Senior Preferred Stock shall cease, with respect to shares so redeemed, other than the right to receive the pay down amount (which shall include the final dividend for such shares). Any shares of the Senior Preferred Stock which shall have been so redeemed, after such redemption, shall no longer have the status of authorized, issued or outstanding shares.

**4.  Mandatory Pay Down of Liquidation Preference Upon Issuance of Capital Stock**

(a)  If the Company shall issue any shares of capital stock (including without limitation common stock or any series of preferred stock) in exchange for cash at any time while the Senior Preferred Stock is outstanding, then the Company shall, within 10 Business Days, use the proceeds of such issuance net of the direct costs relating to the issuance of such securities (including, without limitation, legal, accounting and investment banking fees) to pay down the Liquidation Preference of all outstanding shares of Senior Preferred Stock pro rata, out of funds legally available therefor, by making a payment in cash to the holders of record of outstanding shares of the Senior Preferred Stock as they appear in the books and records of the Company on such record date as shall be fixed in advance by the Board of Directors, not to be earlier than 45 days nor later than 10 days preceding the date fixed for the payment, with such payment first being used to reduce any accrued and unpaid dividends previously added to the Liquidation Preference pursuant to Section 8 below and, to the extent all such accrued and unpaid dividends have been paid, next being used to reduce any Periodic Commitment Fees (as defined in the Preferred Stock Purchase Agreement referred to in Section 8 below) previously added to the Liquidation Preference pursuant to Section 8 below; provided that, prior to the termination of the Commitment (as defined in the Preferred Stock Purchase Agreement referred to in Section 8 below), the Liquidation Preference of each share of Senior Preferred Stock shall not be paid down below $1,000 per share.

4

(b)     If the Company shall not have sufficient assets legally available for the pay down of the Liquidation Preference of the shares of Senior Preferred Stock required under Section 4(a), the Company shall pay down the Liquidation Preference per share to the extent permitted by law, and shall pay down any Liquidation Preference not so paid down because of the unavailability of legally available assets or other prohibition as soon as practicable to the extent it is thereafter able to make such pay down legally.  The inability of the Company to make such payment for any reason shall not relieve the Company from its obligation to effect any required pay down of the Liquidation Preference when, as and if permitted by law.

(c)     If after the termination of the Commitment the Company pays down the Liquidation Preference of each outstanding share of Senior Preferred Stock in full, such shares shall be deemed to have been redeemed as of the date of such payment, and the dividend that would otherwise be payable for the Dividend Period ending on the pay down date will be paid on such date.  Following such deemed redemption, the shares of the Senior Preferred Stock shall no longer be deemed to be outstanding, and all rights of the holders thereof as holders of the Senior Preferred Stock shall cease, with respect to shares so redeemed, other than the right to receive the pay down amount (which shall include the final dividend for such redeemed shares).  Any shares of the Senior Preferred Stock which shall have been so redeemed, after such redemption, shall no longer have the status of authorized, issued or outstanding shares.

## 5.     No Voting Rights

Except as set forth in this Certificate or otherwise required by law, the shares of the Senior Preferred Stock shall not have any voting powers, either general or special.

## 6.     No Conversion or Exchange Rights

The holders of shares of the Senior Preferred Stock shall not have any right to convert such shares into or exchange such shares for any other class or series of stock or obligations of the Company.

## 7.     No Preemptive Rights

No holder of the Senior Preferred Stock shall as such holder have any preemptive right to purchase or subscribe for any other shares, rights, options or other securities of any class of the Company which at any time may be sold or offered for sale by the Company.

## 8.     Liquidation Rights and Preference

(a)     Except as otherwise set forth herein, upon the voluntary or involuntary dissolution, liquidation or winding up of the Company, the holders of the outstanding shares of the Senior Preferred Stock shall be entitled to receive out of the assets of the Company available for distribution to stockholders, before any payment or distribution shall be made on the common stock or any other class or series of stock of the Company ranking junior to the Senior Preferred Stock upon liquidation, the amount per share equal to the Liquidation Preference plus an amount, determined in accordance with Section 2(a) above, equal to the dividend otherwise payable for the then-current Dividend Period accrued through and including the date of payment in respect of such dissolution, liquidation or winding up; provided, however, that if the assets of the Company

5

available for distribution to stockholders shall be insufficient for the payment of the amount which the holders of the outstanding shares of the Senior Preferred Stock shall be entitled to receive upon such dissolution, liquidation or winding up of the Company as aforesaid, then, all of the assets of the Company available for distribution to stockholders shall be distributed to the holders of outstanding shares of the Senior Preferred Stock pro rata based on the aggregate Liquidation Preference of the shares of Senior Preferred Stock held by each holder.

(b)    "Liquidation Preference" shall initially mean $1,000 per share and shall be:

(i)    increased each time a Deficiency Amount (as defined in the Preferred Stock Purchase Agreement) is paid to the Company by an amount per share equal to the aggregate amount so paid to the Company divided by the number of shares of Senior Preferred Stock outstanding at the time of such payment;

(ii)    increased each time the Company does not pay the full Periodic Commitment Fee (as defined in the Preferred Stock Purchase Agreement) in cash by an amount per share equal to the amount of the Periodic Commitment Fee that is not paid in cash divided by the number of shares of Senior Preferred Stock outstanding at the time such payment is due;

(iii)    increased on the Dividend Payment Date if the Company fails to pay in full the dividend payable for the Dividend Period ending on such date by an amount per share equal to the aggregate amount of unpaid dividends divided by the number of shares of Senior Preferred Stock outstanding on such date; and

(iv)    decreased each time the Company pays down the Liquidation Preference pursuant to Section 3 or Section 4 of this Certificate by an amount per share equal to the aggregate amount of the pay down divided by the number of shares of Senior Preferred Stock outstanding at the time of such pay down.

(c)    "Preferred Stock Purchase Agreement" means the Preferred Stock Purchase Agreement, dated September 7, 2008, between the Company and the United States Department of the Treasury.

(d)    Neither the sale of all or substantially all of the property or business of the Company, nor the merger, consolidation or combination of the Company into or with any other corporation or entity, shall be deemed to be a dissolution, liquidation or winding up for the purpose of this Section 8.

**9.    Additional Classes or Series of Stock**

The Board of Directors shall have the right at any time in the future to authorize, create and issue, by resolution or resolutions, one or more additional classes or series of stock of the Company, and to determine and fix the distinguishing characteristics and the relative rights, preferences, privileges and other terms of the shares thereof; provided that, any such class or series of stock may not rank prior to or on parity with the Senior Preferred Stock without the prior written consent of the holders of at least two-thirds of all the shares of Senior Preferred Stock at the time outstanding.

6

Protected Information To Be Disclosed Only In Accordance With Protective Order

**10.     Miscellaneous**

(a)     The Company and any agent of the Company may deem and treat the holder of a share or shares of Senior Preferred Stock, as shown in the Company's books and records, as the absolute owner of such share or shares of Senior Preferred Stock for the purpose of receiving payment of dividends in respect of such share or shares of Senior Preferred Stock and for all other purposes whatsoever, and neither the Company nor any agent of the Company shall be affected by any notice to the contrary.  All payments made to or upon the order of any such person shall be valid and, to the extent of the sum or sums so paid, effectual to satisfy and discharge liabilities for moneys payable by the Company on or with respect to any such share or shares of Senior Preferred Stock.

(b)     The shares of the Senior Preferred Stock, when duly issued, shall be fully paid and non-assessable.

(c)     The Senior Preferred Stock may be issued, and shall be transferable on the books of the Company, only in whole shares.

(d)     For purposes of this Certificate, the term "the Company" means the Federal Home Loan Mortgage Corporation and any successor thereto by operation of law or by reason of a merger, consolidation, combination or similar transaction.

(e)     This Certificate and the respective rights and obligations of the Company and the holders of the Senior Preferred Stock with respect to such Senior Preferred Stock shall be construed in accordance with and governed by the laws of the United States, provided that the law of the Commonwealth of Virginia shall serve as the federal rule of decision in all instances except where such law is inconsistent with the Company's enabling legislation, its public purposes or any provision of this Certificate.

(f)     Any notice, demand or other communication which by any provision of this Certificate is required or permitted to be given or served to or upon the Company shall be given or served in writing addressed (unless and until another address shall be published by the Company) to Freddie Mac, 8200 Jones Branch Drive, McLean, Virginia 22102, Attn: Executive Vice President and General Counsel.  Such notice, demand or other communication to or upon the Company shall be deemed to have been sufficiently given or made only upon actual receipt of a writing by the Company.  Any notice, demand or other communication which by any provision of this Certificate is required or permitted to be given or served by the Company hereunder may be given or served by being deposited first class, postage prepaid, in the United States mail addressed (i) to the holder as such holder's name and address may appear at such time in the books and records of the Company or (ii) if to a person or entity other than a holder of record of the Senior Preferred Stock, to such person or entity at such address as reasonably appears to the Company to be appropriate at such time.  Such notice, demand or other communication shall be deemed to have been sufficiently given or made, for all purposes, upon mailing.

(g)     The Company, by or under the authority of the Board of Directors, may amend, alter, supplement or repeal any provision of this Certificate pursuant to the following terms and conditions:

7

Protected Information To Be Disclosed Only In Accordance With Protective Order                    FHFA-DDC-0337382

     (i)     Without the consent of the holders of the Senior Preferred Stock, the Company may amend, alter, supplement or repeal any provision of this Certificate to cure any ambiguity, to correct or supplement any provision herein which may be defective or inconsistent with any other provision herein, or to make any other provisions with respect to matters or questions arising under this Certificate, provided that such action shall not adversely affect the interests of the holders of the Senior Preferred Stock.

     (ii)     The consent of the holders of at least two-thirds of all of the shares of the Senior Preferred Stock at the time outstanding, given in person or by proxy, either in writing or by a vote at a meeting called for the purpose at which the holders of shares of the Senior Preferred Stock shall vote together as a class, shall be necessary for authorizing, effecting or validating the amendment, alteration, supplementation or repeal (whether by merger, consolidation or otherwise) of the provisions of this Certificate other than as set forth in subparagraph (i) of this paragraph (g). The creation and issuance of any other class or series of stock, or the issuance of additional shares of any existing class or series of stock, of the Company ranking junior to the Senior Preferred Stock shall not be deemed to constitute such an amendment, alteration, supplementation or repeal.

     (iii)     Holders of the Senior Preferred Stock shall be entitled to one vote per share on matters on which their consent is required pursuant to subparagraph (ii) of this paragraph (g). In connection with any meeting of such holders, the Board of Directors shall fix a record date, neither earlier than 60 days nor later than 10 days prior to the date of such meeting, and holders of record of shares of the Senior Preferred Stock on such record date shall be entitled to notice of and to vote at any such meeting and any adjournment. The Board of Directors, or such person or persons as it may designate, may establish reasonable rules and procedures as to the solicitation of the consent of holders of the Senior Preferred Stock at any such meeting or otherwise, which rules and procedures shall conform to the requirements of any national securities exchange on which the Senior Preferred Stock may be listed at such time.

     (h)     **RECEIPT AND ACCEPTANCE OF A SHARE OR SHARES OF THE SENIOR PREFERRED STOCK BY OR ON BEHALF OF A HOLDER SHALL CONSTITUTE THE UNCONDITIONAL ACCEPTANCE BY THE HOLDER (AND ALL OTHERS HAVING BENEFICIAL OWNERSHIP OF SUCH SHARE OR SHARES) OF ALL OF THE TERMS AND PROVISIONS OF THIS CERTIFICATE. NO SIGNATURE OR OTHER FURTHER MANIFESTATION OF ASSENT TO THE TERMS AND PROVISIONS OF THIS CERTIFICATE SHALL BE NECESSARY FOR ITS OPERATION OR EFFECT AS BETWEEN THE COMPANY AND THE HOLDER (AND ALL SUCH OTHERS).**

8

IN WITNESS WHEREOF, I have hereunto set my hand and the seal of the Company this 7th day of September, 2008.

[Seal]

FEDERAL HOME LOAN MORTGAGE CORPORATION, by

The Federal Housing Finance Agency, its Conservator

_____

James B. Lockhart III
Director

*Signature Page to Certificate of Designations of Senior Preferred Stock*

Protected Information To Be Disclosed Only In Accordance With Protective Order

FHFA-DDC-0337384

000086

| | |
|---|---|
| **From:** | Mary.Miller@treasury.gov |
| **Sent:** | Wednesday, January 04, 2012 12:49 PM |
| **To:** | DeMarco, Edward |
| **Subject:** | Agenda for Discussion with FHFA |
| **Attachments:** | FHFA Agenda 1.4.12 v2.docx |

Ed – here is a draft agenda for discussion at 1pm.  Talk to you then.

Mary

1



Protected Information To Be Disclosed Only
In Accordance With Protective Order

FHFA00025815

*DRAFT / SENSITIVE / PRE-DECISIONAL*

**Agenda for Discussion w. FHFA**

**FHFA and Treasury share common goals to promote a strong housing market recovery, reduce government involvement in the housing market over time and to provide the public and financial markets with a clear plan to wind down the GSEs.**

**Actions necessary to facilitate this fall into three broad categories:**

1. Near-term targeted actions to help the housing market recovery
   - Are there further steps we can take to ensure success of HARP 2.0? For example:
     - Convergence in GSE standards for all refinancing
     - Increased competition for cross servicer refinancing
     - Monitoring of lender results, including development of public scorecard
   - Is FHFA willing to support (i) extension/expansion of HAMP and (ii) GSEs making NPV positive MHA principal reduction modifications if incentive payments tripled and GSEs are eligible?
   - Successful execution of REO to Rental program
     - January announcement pilot sales in Q1 2012, with broader roll-out in Q2 2012
     - Potentially expand into targeted NPL sales in Q2/Q3 2012?
   - Reduce lender overlays, R&W uncertainties and other barriers to mortgage lending for qualified borrowers; coordinate with FHA
     - Announce policy goals / changes before the spring selling season
   - Explore potential NPV positive equity building refinance strategies
2. Establish meaningful policies that demonstrate a commitment to winding down the GSEs
   - Implement guarantee fee increases to achieve "market" pricing over time
     - Implications of recent legislation and potential need for further clarification
   - Initiate credit risk syndication and non-guaranteed mortgage securitizations on a quarterly basis, starting in 2H 2012
   - Align payment and servicing standards to create a fungible TBA security by 2013
   - Complete servicer compensation reform policy work in 2012; implement in 2013
   - Develop plan to manage resolution and disposition of legacy assets, potentially including pursuing a good bank / bad bank-type strategy in 2012, if economic
3. Ensure sufficient capital support for the GSEs during the transition period and thereafter

**Treasury and the broader Administration are committed to help achieve these objectives**

1. Willingness to explore options to restructure the Preferred Stock Purchase Agreements to reduce the burden associated with the 10% dividend rate
2. Work with FHFA to draft policy paper(s) on these Housing Market and GSE Reform goals
3. Commitment of resources
   - Treasury and Administration personnel
   - Potential Treasury engagement of a Financial Agent to assist in transition initiatives
   - MHA principal reduction incentive payments
4. Coordinated outreach effort to Congress and the public to ensure the merits of the policy initiatives are communicated appropriately and well supported

Protected Information To Be Disclosed Only
In Accordance With Protective Order

FHFA00025816

**PX-0144 - p. 2 of 2**

**000088**

**To:**     DeMarco, Edward[Edward.DeMarco@fhfa.gov]; Spohn, Jeffrey[Jeffrey.Spohn@fhfa.gov]; Brereton, Peter[Peter.Brereton@fhfa.gov]; Burns, Meg[Meg.Burns@fhfa.gov]; Cross, Stephen[Stephen.Cross@fhfa.gov]; DeLeo, Wanda[Wanda.DeLeo@fhfa.gov]; Dickerson, Chris[Chris.Dickerson@fhfa.gov]; Laponsky, Mark[Mark.Laponsky@fhfa.gov]; Lawler, Patrick[Patrick.Lawler@fhfa.gov]; Ugoletti, Mario[Mario.Ugoletti@fhfa.gov]; Stauffer, Lawrence[Lawrence.Stauffer@fhfa.gov]; Greenlee, Jon[Jon.Greenlee@fhfa.gov]; Curtis, Christopher[Christopher.Curtis@fhfa.gov]
**Cc:**     Johnson, Mary[Mary.Johnson@fhfa.gov]; Keyes, Robert[Robert.Keyes@fhfa.gov]; Anderson, Philip[Philip.Anderson@fhfa.gov]; Highfill, Owen[Owen.Highfill@fhfa.gov]; Martin, Bradford[Bradford.Martin@fhfa.gov]
**From:**   Martin, Bradford
**Sent:**   Thur 1/12/2012 3:56:27 PM
**Subject:**  Fannie Mae Executive Management Meeting on January 9, 2012
Agenda 1.9.12 MC Meeting.pdf
Item III.a. GreenPoint Mortgage Resolution Agreement .pdf
Item IV.a. 2012 Plan.pdf
Item IV.b.CM Reperformer Update.pdf


**<u>Fannie Mae Executive Management Meeting on January 9, 2012</u>**


Mike Williams began the meeting by reporting that employee reaction to last Friday's announced EVP retirements (Linda Knight, Ken Bacon, Dave Hisey) and SVP promotions (Leslie Peeler - NSO, Nadine Bates - Treasurer, Brian McQuaid – HR) had been generally positive.  In line with newly assumed responsibilities, Mike noted that Jeff Hayward will now sit on the Management Committee and Judy Dunn will join the Operating Committee.   With FHFA still reviewing 2012 goals, Mike thought that Ed DeMarco might provide some clarity during his attendance at Friday's Board meeting.  Susan McFarland informed members of Tuesday's planned joint Fannie/Freddie meeting with FHFA on expense management guidelines.

# Redacted

Protected Information To Be Disclosed
Only In Accordance With Protective Order

FHFA00049970

Redacted

2012 Financial Plan:

Susan McFarland started discussion of the draft 2012 plan by highlighting that the financial base case projects a $1.5 billion profit. She noted that the number is very sensitive to fair value gains/losses with the company positioned to benefit if rates move up. Importantly, the base case anticipates no change in the current yield curve and therefore embeds no forecasted fair value change. When asked, she offered her view that the sensitivity around the $1.5 billion number was + or - $5 billion in the absence of any big policy change. Susan said the plan reflects the view that the company is at an "inflection point" in the credit cycle with the loss allowance and credit-related expenses projected to fall compared to 2011. Ann Gehring stressed that the forecast contains no unique settlements. If they occur, those amounts would go mostly to income. Anne highlighted the following items:


• ☐☐☐☐☐☐☐ Portfolio NII declines by $1.7 billion due to declining balances, increase in nonperforming asset percentage, and shift to longer-term debt

• ☐☐☐☐☐☐☐ Despite small decline in outstanding book, guaranty fee revenues rise by 10% or $0.6 billion as result of 2011 price increases

• ☐☐☐☐☐☐☐ Administrative expenses are essentially flat, though actually down compared to


Protected Information To Be Disclosed
Only In Accordance With Protective Order

FHFA00049971

000090

2011 Plan numbers (company exceeded 2011 cost reduction targets)

● ⬜⬜⬜⬜⬜⬜⬜ Project expense budget up 31% (given limited key-person staff resources, committee members questioned ability to complete all planned deliverables)

● ⬜⬜⬜⬜⬜⬜⬜ Total headcount declines by 93 people as a 301 reduction in the core base is offset by a 208 person increase in credit-related activities

Anne pointed out that the recently mandated 10 bps fee increase is not reflected in any of the budget numbers. Andrew Bon Salle then clarified how that might be an issue. The financial plan assumes that Fannie Mae gets to keep the guaranty running rate exiting 2011. The legislation states that the requisite "average" 10 bps increase be measured against the "average" fee entered into during 2011. With year-end fee levels higher than the average, it's possible that some of the prior year increase may go to the Treasury, especially if Fannie Mae is not allowed to keep the portion of the average increase that exceeds 10 bps.



Closing 'Round Table' Comments:

Susan McFarland indicated that she was working on the FHFA accounting alignment response. She raised the issue of personal liability attached to signing financial statements which she may not endorse. Members wondered whether the company might cease SEC reporting.

Zach Oppenheimer indicated that Fannie is continuing to increase guaranty fees outside of the 10

Protected Information To Be Disclosed
Only In Accordance With Protective Order

FHFA00049973

bps initiative. ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████

Meeting Adjourned.

---

Brad Martin

*Principal Advisor*

*Office of Conservatorship Operations*

*Federal Housing Finance Agency*

*(202) 649-3045 : Office* **(NEW)**

*(202) 680-2157 : Cell*

-

Protected Information To Be Disclosed
Only In Accordance With Protective Order

FHFA00049973_0001

**To:**    Galeano, Andre D.[Andre.Galeano@fhfa.gov]
**Cc:**    Creel, Duane V.[Duane.Creel@fhfa.gov]; Satriano, Nicholas[Nicholas.Satriano@fhfa.gov]
**From:**    Bjarnason, Paul
**Sent:**    Tue 5/29/2012 12:09:40 PM
**Subject:**    called

Hey Andre –

I attempted to reach you to discuss items 3 & 4 on the info request I sent over to FNM and FRE, last Friday. The reason is, I understand FNM (Leslie Dietch) has proposed that they give us their expected loss calculations, instead, and that you are considering whether to OK that.

I would appreciate it if you would give me a jingle when you have a moment, so I can explain what I was hoping to get out of those two items. Briefly, however, what I was looking for goes right to the heart of the FNM/FRE difference, what with the use of economic forecasts by FNM and the non-use by FRE. The issue is not just forward home prices, it includes the favorable forward looking home price curve which will reduce expected defaults. So, we have reduced expected defaults as well as reduced severity, when we compare FNM to FRE. There is also the large 03-3 loan population on the books at very look accounting book values, many of which have re-performed. The large discount from par (often referred to as the "shadow" ALL) will amortize into income or come into income in a lump sum, if prepaid under HARP II. What with FNM's forecasts showing an upward price curve beginning after 2012, we should not be surprised if FMM begins a roaring recovery, fueled in large part by drawing down their ~$70 billion ALL and the 03-3 loans.

I am not familiar with how FNM does its "expected loss" calculations and, thus, I am not sure this will get us what I was seeking, as explained above. On this a.m.'s controllers call, we discussed this briefly and Kirk Silva indicated he was not sure how the expected loss correlated with GAAP financial statements – or, whether it would provide the understanding I was hoping to obtain for us.

Perhaps this e-mail is sufficient, but please give me a call if you would like me to try to explain myself better. 703.627.1324

Best.



Protected Information To Be Disclosed Only In Accordance With Protective O...

**Exhibit
0007**
12/21/2020
DeMarco

Bj

Paul Bjarnason

Principal Accounting Examiner

FHFA – Office of the Chief Accountant

Mobile: 703.627.1324

Office:   202.649.3452

Protected Information To Be Disclosed Only In Accordance With Protective Order   FHFA00073825

To:      Mary Miller
From:    Michael Stegman
Subj.:   FHFA-Related Discussion at June 25 Morning Meeting
Date:    June 25, 2012

The Secretary provided an overview of his and your previous day's meeting with Ed DeMarco.  This is the essence of the discussion that took place.

## I.      Increasing Passivity

The Secretary got a sense from yesterday's meeting that the Acting Director is becoming more passive in his spearheading a number of policy-relevant reforms:  To wit:

- While he told us he would be directing Freddie Mac to provide same streamlined refinancing benefits to <80% LTV current borrowers that apply to >80% HARP 2.0 borrowers, he no longer thinks the benefits of doing so are worth the costs.

- He has reduced from a major new initiative to a small pilot a rebuild-equity refinancing program for current underwater borrowers. Since he viewed the at-scale program to counter moral hazard of a GSE HAMP-PRA program, shrinking this initiative may signal FHFA's decision not to do principal reduction.

- He is losing interest in REO-to-Rental, saying that the GSE retail REO execution is so efficient and attracting good prices, it's not worth the resources and efforts to do bulk sales.

- His schedule for rep and warranty reform for new books of business has also slipped. While he has announced his intention to direct the GSEs to adopt new reps and warrants featuring 36 month liability for material violations other than fraud, there is no time table for this.

- Through weeks of negotiating terms of possible amendments to the PSPAs, he never questioned the need to adjust the dividend schedule this year.  Since the Secretary raised the possibility of a PR covenant, DeMarco no longer sees the urgency of amending the PSPAs this year.  He has raised two competing reasons for this new position: (1) the GSEs will be generating large revenues over the coming years, thereby enabling them to pay the 10% annual dividend well into the future even with the caps; and, (2) instituting a net worth sweep in place of the dividend will further extend the lives of the GSEs to such an extent that it would remove the urgency for Congress to act on long-term housing finance reform.  He now sees the PSPA amendments as a backdoor way of keeping the GSEs alive—getting to an Option 3-type plan without the need for legislation.

The policy drift may indicate that the Acting Director is beginning to sense that he can outlast the Administration by slow-walking initiatives that are important to the Administration.

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00533645

| | |
|---|---|
| **From:** | Mlynarczyk, Beth |
| **Sent:** | Monday, July 09, 2012 5:10 PM |
| **To:** | Valverde, Sam; Stegman, Michael; Bowler, Timothy; Roberts, Benson; Chepenik, Adam; Foster, JeffDisabled; Grom, John (J.D.)Disabled; Goldblatt, Alan; Woolf, AndrewDisabled; Franco, Jamie; Kingsley, DariusDisabled; Gelber, AlexanderDisabled; Abraham, LisaDisabled |
| **Cc:** | Eagan, KristinDisabled; Hipple, Elizabeth; Lee, Sandra |
| **Subject:** | RE: Housing QnA Update |
| **Attachments:** | Housing QA wo OFS 7 9 12 with new sections V3 clean.doc; Housing QA wo OFS 7 9 12 with new sections V3 redline.doc |

All – Please find attached updated redline and clean housing Q&A (without the OFS section added). Please let me or Adam Chepenik know if you have any questions / comments. In particular, you will notice a new "near term initiatives" section at the front.

Thanks,
Beth

**From:** Valverde, Sam
**Sent:** Tuesday, July 03, 2012 9:34 AM
**To:** Mlynarczyk, Beth; Stegman, Michael; Bowler, Timothy; Roberts, Benson; Chepenik, Adam; Foster, Jeff; Grom, John (J.D.); Goldblatt, Alan; Woolf, Andrew; Franco, Jamie; Kingsley, Darius; Gelber, Alexander; Abraham, Lisa
**Cc:** Eagan, Kristin; Hipple, Elizabeth; Lee, Sandra
**Subject:** Housing QnA Update

Housing team,

TFG will be testifying on the 25th and 26th. While the hearing will focus on FSOC and their annual report, we anticipate housing will be a topic of discussion. To that end, we need you to review and revise the QnA on sharepoint. Many of you should have received the attached email from Kristin. If you can review the QnA by Kristin's deadline (Monday), we should be all set to get GC to review and then provide your QnA to senior staff.

Note that we intend to provide your completed QnA to Mary for her to clear and will then provide it to Neal.

1

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061557

Sensitive/Confidential/Pre-Decisional

**Domestic Finance Q&A on Housing Finance Reform – June 2012**

*Current as of 7/9/2012*

## Near Term Initiatives

**Risk Syndication**

***FHFA committed to gradually shift a portion of the mortgage credit exposure that the GSEs hold to private investors. Do you support this initiative? How might it be structured?***

- Treasury is actively engaged in helping to make this initiative work. Shifting mortgage credit risk to the private sector is important for several reasons:

  - It helps bring in private capital to absorb losses ahead of the government.

  - It can help determine how the market values the GSE guarantee because we will see how private market participants price the risk they purchase.

  - It can help disburse credit risk rather than keeping it concentrated in a few entities.

- These arrangements could be structured as securities that would allow private investors to bear some of the credit risk that the GSEs normally hold.

- We believe that this initiative could help support our broader efforts to restart the private mortgage market, shrink the government's footprint in housing finance, and protect the long-term interests of taxpayers.  It can also help determine how the market values a credit guarantee on conforming mortgages, which is a question that many stakeholders and policymakers have been closely analyzing.

- It is important for FHFA to get the structure and other details right. And some of these are fairly complex. It raises important challenges and questions which Treasury is helping FHFA and the GSEs to think through. For example,

  - How should such securities be structured in order to preserve the structure of the To-Be-Announced (or "TBA") market? FHFA wouldn't want to structure the securities in a way that would disrupt the TBA market. And since the entire loan must back MBS delivered into the market. A traditional senior / sub structure splits the loan interests between securities. Therefore, other structures must be considered to preserve the TBA market.

  - What are the necessary tax and legal treatments of these securities? The traditional senior / subordinate structure was traditionally securitized as a Real Estate Mortgage Investment Conduit (REMIC). These allow for certain tax

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061558

000098

Sensitive/Confidential/Pre-Decisional

treatment that allows investors to avoid double taxation. So determining what kind of structures are REMIC eligible versus not REMIC eligible will help determine investor appetite.

- o How should the securities be structured so that they both reduce the risk profiles of the GSEs and taxpayer exposure, while maintaining their appeal to a wide investor base to yield competitive pricing? Should the securities be structured so that they are similar to what traditional mortgage credit investors are used to buying and selling? The senior / subordinate structure is familiar to mortgage credit investors. Therefore, achieving an outcome that is similar, could be beneficial in terms of attracting a wider investor base.

**Single Securitization Platform**

***FHFA committed to the development of a single securitization platform. This is related to a single Fannie Mae and Freddie Mac security. Do you support this initiative? What are the steps that need to be taken for it to be successful?***

- *Background:* The single securitization platform put forth by FHFA refers to the technology and processes necessary to securitize pools of mortgage loans in order to create asset-backed securities based on the cashflows from those mortgage loans. Currently Fannie Mae and Freddie Mac have their own securitization functions, but both require infrastructure investment and modernization. FHFA believes it makes sense from cost and efficiency perspectives to do this only once. Securitization back-office operations benefit from economies of scale and therefore, as part of modernizing and updating systems, FHFA has proposed to create one single platform.

- The single platform could also be used for the purpose of creating a single security.

- The GSEs' MBS currently trade in separate TBA markets, and as a result, liquidity is reduced for both.  Freddie Mac in particular trades behind Fannie Mac securities.

- There may be ways that the GSEs can increase the standardization and comparability of their securities so that gradually overtime their securities could be viewed as interchangeable by market participants.

- This presents a number of important critical design and implementation questions to more closely align the terms of the securities, including things like payment dates, underwriting and servicing standards, representation and warranties, etc.

- If the standards can be more closely aligned and the market begins to view the securities as essentially the same, this would allow both Fannie Mae and Freddie Mac securities to be a part of a single TBA market.

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061559

000099

Sensitive/Confidential/Pre-Decisional

- These efforts would be a first step to consideration of developing a single security, where Fannie and Freddie would issue through one MBS/single securitizer.  Those efforts will require greater thinking and consideration about what the long term goals and objectives are of the GSEs and their infrastructure.

- FHFA is starting a process to consider the best ways to take the existing infrastructure and assets of the GSEs and develop a platform or platforms that can support the GSEs specifically, but the market more generally, in a way that supports a strong housing finance market that is built on private capital.

- There are a number of directions this could take and we look forward to working with FHFA on these efforts.

**Non-Performing Loan Sales**

***Does Treasury support non-performing loan sales by the GSEs? What can be done to support that initiative?***

- We are working with FHFA to explore strategies to manage the resolution and disposition of the GSEs significant book of non-performing loans. We propose this could be accomplished through note sales or servicing transfers.

- By transferring the credit exposure and servicing responsibility to special servicers with expertise in loan workouts, we would provide flexibility to servicers to determine appropriate modifications or faster resolutions for troubled borrowers.

- But NPL sales are complex

  o The GSEs accounting and loan tracking systems make note sales complex and currently it requires a manual process

  o Upgrading systems will require time and money – these efforts should be done as part of a broader process which considers what investments are appropriate to manage risk at the GSEs as well as build systems and platforms than can eventually be used support the future housing finance market

- There are real questions as to what is in the best interests of the taxpayers. A programmatic sales process that is transparent, well defined and consistent may provide the best results and best execution.

  o We want to see the size of the GSEs legacy investment (or retained portfolio) assets reduced – this is a prerequisite to be able to wind down the Enterprises.

  o However, assets sales should be carefully evaluated so that taxpayers are protected.  It may be in the best interests of taxpayers for the GSEs to hold non-

Page **3** of **50**

Protected Information To Be Disclosed Only
In Accordance With Protective Order

Sensitive/Confidential/Pre-Decisional

performing loans, rather than sell them at a lower price than internal models would suggest.

- Recently, there have been a few states that have started using or proposed using Treasury's Hardest Hit Funds for non-performing loan purchases from private lenders. We believe that these servicing transfers will help drive positive outcomes for borrowers as well as help to stabilize local housing markets by reducing the number of properties that reach REO.

- In addition to evaluating a programmatic approach to NPL sales, we are encouraging the GSEs to focus on foreclosure alternative strategies, such as short-sales and deed-for-lease programs, as well as finding ways to transfer servicing from poor performing servicers to specialty servicers.

## Causes of the Housing Crisis

*What caused the crisis in the housing market?*

- No single cause can fully explain the crisis.  Misbehavior, misjudgments, and missed opportunities – on Wall Street, on Main Street, and in Washington – all came together to push the economy to the brink of collapse.  Numerous structural flaws included:

  o Poor consumer protections allowed risky, low-quality mortgage products and predatory lending to proliferate.

  o An inadequate and outdated regulatory regime failed to keep the system in check.

  o A complex securitization chain lacked transparency, standardization, and accountability and allowed lenders to pass toxic product through the system without regard for its risk.

  o Inadequate capital in the system left financial institutions unprepared to absorb losses.

  o The servicing industry was ill-equipped to serve the needs of borrowers, lenders and investors once house prices fell.

*Were homeowners themselves to blame for the housing market collapse, because they took out loans they knew they couldn't afford and made speculative investments on their houses?*

- There were many causes of the crisis and no one factor or set of participants had full responsibility.

- Borrowers bear some responsibility for their decisions to take on more debt.  Some consumers took out unsustainable mortgages and used their houses as ATMs to access cash.

Page **4** of **50**

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061561

000101

Sensitive/Confidential/Pre-Decisional

- But many homeowners encountered problems not of their own making, including those who: could not reasonably foresee substantial national and regional price drops; lost their jobs during the recession; or were steered into higher cost products when they were eligible prime loans; or did not realize that lenders would make loans without a likelihood of repayment.

***Is the Community Reinvestment Act (CRA) to blame for the collapse of Fannie Mae and Freddie Mac and the overall financial crisis?***

- No.  Claims that the CRA caused the housing crisis are not supported by fact.

- CRA was enacted in 1977 and the last substantial administrative changes took effect in 1996. The major expansion of subprime and Alt-A lending did not begin until 2004.

- CRA loans comprised only 6 percent of all "high-cost" mortgages – the best available proxy for sub-prime mortgages – according Federal Reserve Board research. More than half of subprime loans were made by independent mortgage companies not subject to CRA and another 30% were made by affiliates of banks or thrifts that were not subject to CRA examination. Other loans were made by CRA lenders outside their CRA "assessment areas" or to middle- and upper-income borrowers in upper- and middle-income communities.

- Loans originated by CRA lenders show evidence of less risky lending practices.  CRA requires that lending be consistent with safety and soundness.

- Default rates on CRA loans were no higher than those on other similar loans that did not qualify for CRA.  Studies indicate that loans made by CRA lenders within their assessment area were less likely to be in foreclosure than those made by independent mortgage companies.

- CRA did not encourage lenders to buy subprime loans.  According to economists at the Federal Reserve Board, in 2006, less than 2% of mortgage originations sold by independent mortgage companies were higher-priced, CRA-credit-eligible, and purchased by CRA-covered banks.

***Did Fannie Mae / Freddie Mac cause the financial crisis by lowering their underwriting standards, allowing consumers to get loans they couldn't afford?***

- No. Rather than leading the market into subprime and other risky mortgages, Fannie Mae and Freddie Mac followed the private sector.  Initially, Fannie Mae and Freddie Mac continued to guarantee primarily highly-quality, fully-documented mortgages, while the private sector generated increasingly risky mortgages.  But as their market share declined (from 70% in 2003 to 40% in 2006), Fannie Mae and Freddie Mac pursued riskier business to chase market share and profits, just as house prices were peaking, including:

  o Increase in Alt-A loans in 2005-2007: About 75% of Fannie Mae and Freddie Mac's current Alt-A loans in the GSE guarantee book were originated from 2005-2007.  Only 24% came from 2004 or earlier.  In particular, of Freddie Mac's current Alt-A, 27% and 31% were originated in 2006 and 2007, respectively.

Page **5** of **50**

Protected Information To Be Disclosed Only
In Accordance With Protective Order

Sensitive/Confidential/Pre-Decisional

- o Higher LTV lending increased in 2007:  Loans with LTV above 90% were 15% of all loans purchased in 2007, as compared to just 9% of loans purchased earlier in the decade.  Loans of LTV at or below 80% were just 75% of 2007 originations, while they had comprised 86% of originations in 2003 and 2005.

- o Increase in share of loans with risky features in 2007: The share of loans with risky features such as a combination of low FICO score and high LTVs, increased materially at Fannie Mae and Freddie Mac in 2007.

### *Were Fannie Mae and Freddie Mac's affordability goals a major cause of the financial crisis or of the failures of Fannie Mae and Freddie Mac?*

- No. A combination of fundamental structural flaws – not the affordable housing goals – bears primary responsibility for both the losses at Fannie Mae and Freddie Mac and for the broader financial crisis.

- The mistakes that led to their losses closely mirrored mistakes in the private-label securities market, where affordability goals were not a factor.  Those mistakes include poor underwriting standards, underpriced risk, insufficient capital, and inadequate regulatory or investor oversight.

- Furthermore, GSE acquired loans had higher FICO scores and lower LTVs than the PLS backed loans:

  - o FICO scores are higher in GSE-purchased loans:  84% of GSE loans had FICO above 660, compared to only 47% in PLS backed loans.  Only 5% of GSE loans went to borrowers below 620 FICO, compared to 32% of PLS backed loans.

  - o LTVs are lower for GSE-purchased loans:  82% of GSE loans had an LTV of 80% or lower, compared to 2/3rds of PLS backed loans.

  - o Delinquency rates and default were higher on most private-label securities and other loans held by banks and other private market institutions as compared to the loans held by Fannie Mae and Freddie Mac, including loans qualifying for the affordability goals.

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061563

**000103**

Sensitive/Confidential/Pre-Decisional

**General Housing Finance Reform**

*Is your plan to "fix the flaws in the mortgage market" or just to implement the Dodd-Frank Act? What's new here?*

- The authorities and mandates handed down by Dodd-Frank are critical tools for bringing capital markets back into the housing finance system.  They fix fundamental flaws in the housing finance system, including consumer and investor protection, conflicts of interest, and systemic risk oversight.

- The Administration has also recommended important reforms for mortgage servicing, lien priority, disclosure, and FHA and other government housing finance programs. These reforms include regulatory reforms, legislative proposals, and industry best practices.

- As we have consistently made clear, our immediate obligation is to repair the damage caused by the crisis to homeowners, neighborhoods and the broader housing market.

- In Early February 2012, the President spoke about the range of tools we're utilizing to this end, including broad-based refinancing for responsible homeowners; putting forward a single set of standards to fix the mortgage servicing system; and, in conjunction with the FHFA, the conversion of foreclosed homes into rental properties.

- In our white paper released February 2011, the Administration outlined a broad strategy with several options for reforming the housing finance system.  We expect to lay out more detail around approaches to reform in the spring.

*What will be the components of housing reform?*

- Our plan for a more sustainable housing finance system calls for winding down the GSEs and bringing private capital back into the market to reduce the government's direct role in the housing finance.

- We will better target our support for first-time homebuyers and low- and moderate-income Americans, including the development of affordable rental options, stronger and clearer consumer protections, and a level playing field for all institutions participating in the housing finance system.

- For this to happen without hurting the broader economic recovery and adding further damage to those parts of the country hardest hit by the crisis, we need to get banks and private investors to come back into the market on a larger scale.

- This cannot happen without more clarity on the rules that will apply.  We will continue to work to provide that clarity and pull forward the prospects for broader reform.

*Why do we think the government is going to be more effective at regulating the housing finance this time around?*

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061564

**000104**

Sensitive/Confidential/Pre-Decisional

- As a result of the reforms that will be implemented as part of Dodd-Frank, regulation will be consolidated in the hands of stronger regulators who have the ability to effectively oversee and monitor entities in the housing finance system.

***How are you going to prevent predatory lending or liar loans and other consumer fraud?***

- The Dodd-Frank Act created the CFPB both to defend consumers from predatory and deceptive lending and to ensure consumers are able to understand the risks and obligations inherent in their financial transactions.

- The banking agencies issued supervisory guidance on nontraditional and subprime mortgage lending risks in 2006-2007 which targeted the types of products that could potentially lead to predatory lending.

- The Fed released regulations according to the Homeownership Equity Protection Act (HOEPA) that became effective beginning October 2009 to protect consumers from unfair or deceptive acts and practices in mortgage lending.  It requires additional disclosures, such as total points and fees, annual percentage rate disclosure, etc. and includes limitations on certain features of HOEPA loans, such as limitations regarding negative amortization, balloon payments, and other non-conforming characteristics.

Page **8** of **50**

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061565

Sensitive/Confidential/Pre-Decisional

**Preferred Stock Purchase Agreements**

***Who at Treasury is in charge of managing and overseeing the preferred stock investments under the Senior Preferred Stock Purchase Agreements (PSPAs)?***

- The Undersecretary for Domestic Finance is responsible for the management and oversight of the preferred stock investments under the Senior Preferred Stock Purchase Agreements.  The Office of Capital Markets and the Office of Financial Institution Policy provide support to the Undersecretary's office.   The Office of the Fiscal Assistant Secretary is responsible for disbursing funding advances as required under the Senior Preferred Stock Purchase Agreements.

***What is Treasury doing to ensure Fannie Mae and Freddie Mac are engaging in activity that reduces the chances Fannie Mae and Freddie Mac will need additional investments under the Senior Preferred Stock Purchase Agreements?***

- As Conservator of Fannie Mae and Freddie Mac, the Federal Housing Finance Administration (FHFA) is responsible for the oversight and management of the activities at Fannie Mae and Freddie Mac.

- Treasury has committed to provide capital support to Fannie Mae and Freddie Mac through the Senior Preferred Stock Purchase Agreements.  As part of these agreements, Treasury has certain protections on its investment, which include approval rights over any asset sales not at fair value or which are not in the ordinary course of business.

- Treasury approval is required for any transactions with affiliates or fundamental changes of their corporate structure.  In addition, to support the reduction of risk and support wind down, Fannie Mae and Freddie Mac are required reduce their retained portfolio by no less than 10% per annum until they reach $250 billion in assets.

***What are the terms of the PSPAs?***

- The initial cap on the Treasury Senior Preferred Stock funding commitment to each GSE was $100 billion.  In return for the commitments, Treasury received a preferred stock certificate from each GSE.  Treasury also received warrants with the right to purchase up to 79.9 percent of the common equity of each GSE.

-  Under the terms of each preferred stock certificate, the "liquidation preference" value increases dollar-for-dollar by the amount of each advance of funds made by Treasury to the respective GSE under the commitment.

- The cash dividend rate on the preferred stock under the PSPAs was set at 10 percent of the cumulative liquidation preference.

***Why were the PSPAs amended?***

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061566

Sensitive/Confidential/Pre-Decisional

- Since they were initially established, the PSPAs have been amended twice:  First, in May 2009, when the commitment caps were increased to $200 billion for each GSE;  Second, in December 2009, when the fixed $200 billion cap was amended to increase by the amount of draws between January 1, 2010 and December 31, 2012.

- After December 31, 2012, the commitment caps become fixed again and the unused balance of the respective commitments will be available to be drawn under the existing terms of the PSPAs.

***How much PSPA capacity is remaining?***

- As of March 31, 2012, Fannie Mae has drawn $116.2 billion and Freddie Mac had drawn $71.3 billion, excluding the initial $1.0 billion liquidation preference for which the GSEs did not receive cash proceeds.

- At the end of 2012, these caps become fixed and there will be ~$125 billion of capacity remaining for Fannie Mae and ~$149 billion for Freddie Mac.

- This remaining capacity will decline to the extent there are further draws from 2013 onward.

***Has the Administration considered modifying the PSPA agreements before the capacity becomes fixed at the end of 2012?***

- Under the conservative baseline stress test forecasts conducted by FHFA, both Fannie Mae and Freddie Mac are expected to have positive net income in 2013.  This will mean that Treasury is not expected to need to fund any operating losses at Fannie Mae and Freddie Mac after the expiration of the PSPA funding commitment.

- To the extent that required dividend payments exceed net income, FHFA, as conservator, could consider not declaring dividends pursuant to the certificates of designation for the preferred shares, so that draws on the PSPAs are not used to pay dividends, preserving as much funding as possible to cover any unanticipated losses at Fannie Mae and Freddie Mac.

- We expect that $275 billion, nearly twice the amount of net funding provided by Treasury to date, will provide a substantial cushion for any unexpected losses and should give market participants confidence about the government's commitment to these institutions.

- The Administration will continue to monitor the situation and consider whether any changes to the PSPAs would be appropriate.

- Our commitment to ensuring Fannie Mae and Freddie Mac have sufficient capital to honor any guarantees issued now or in the future and meet any of their debt obligations remains unchanged.  The Administration will not pursue policies or reforms in a way that would impair the ability of Fannie Mae and Freddie Mac to honor their obligations or diminish confidence in the solvency of Fannie Mae and Freddie Mac.

Page **10** of **50**

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061567

**000107**

Sensitive/Confidential/Pre-Decisional

- To the extent that required dividend payments exceed net income, FHFA, as conservator, could consider not declaring dividends pursuant to the certificates of designation for the preferred shares, so that draws on the PSPAs are not used to pay dividends, preserving as much funding as possible to cover any unanticipated losses at Fannie Mae and Freddie Mac.

***How does Treasury interpret FHFA's conservatorship mandate?***

- FHFA is an independent federal regulator and as such, it would not be appropriate for Treasury to comment on FHFA's mandate.

- In his testimony on February 28, 2012, Director DeMarco described the goals and his views of the Conservatorship and reiterated that FHFA views its "preserve and conserve" statutory requirement as a mandate to minimize losses on behalf of taxpayers.

***What power does Treasury actually have over Fannie Mae and Freddie Mac?***

- Under the Conservatorship mandate, Treasury has the responsibility for approving transactions at the GSEs that fall outside the ordinary course of business; however, Treasury does not control Fannie Mae and Freddie Mac.  Fannie Mae and Freddie Mac are under the conservatorship of their regulator, FHFA.

- As a member of the Federal Housing Finance Oversight Board (FHFOB), the Secretaries of Treasury and HUD provide policy guidance and recommendations to FHFA on a range of matters related to Fannie Mae and Freddie Mac.

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061568

**000108**

Sensitive/Confidential/Pre-Decisional

**Foreclosure Crisis and Servicer Reforms**

*What happened with the February 2012 settlement?*

- On February 9, 2012, several Federal agencies and 49 State attorneys general announced a landmark settlement of at least $25 billion with the nation's five largest mortgage servicers – Bank of America, JPMorgan Chase, Citigroup, Wells Fargo, and Ally Financial – to address mortgage loan servicing and foreclosure abuses.

- This historic agreement is good news for the housing market and good news for homeowners all across the country. The agreement represents the largest federal-state civil settlement ever agreed to.

- This agreement not only provides substantial financial relief to homeowners, it expands protections for borrowers through steps such as improving servicing standards.

*What are the terms and highlights of the Agreement?*

- $20 billion dedicated to relief for homeowners:

  o At least $10 billion is allocated to reduce principal for borrowers who owe more on their mortgages than their homes are worth, making it easier for them to avoid foreclosure.

  o At least $3 billion is allocated for a refinancing program for underwater homeowners who are current on their mortgages.

  o Up to $7 billion is allocated to provide other relief for homeowners, including forbearance for unemployed borrowers, support for anti-blight programs, short sales and transitional assistance, and benefits for our brave men and women in uniform who were forced to sell their homes at a loss because they were required to change bases.

- $5 Billion in cash to state and federal governments:

  o $1.5 billion to provide cash payments to borrowers whose homes were sold or taken in foreclosure between and including January 1, 2008 and December 31, 2011, and who meet other criteria. Affected borrowers will be eligible for a uniform payment which is expected to be about $2,000 per borrower, depending on the level of response.

  o $3.5 billion will go to state and federal governments to be used to repay public funds lost as a result of servicer misconduct, fund housing counselors, legal aid, and other similar purposes determined by state attorneys general. The funds coming to the federal government will primarily be allocated to the FHA Capital Reserve Account, with portions also going to the Veterans Housing Benefit Program Fund and to the Rural Housing Service..

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061569

**000109**

Sensitive/Confidential/Pre-Decisional

- This settlement also creates special protections for America's service members:

  - Mortgage servicers will be required to make payments to any service member who was a victim of a wrongful foreclosure or who was wrongfully charged a higher interest rate.  This compensation for service members is in addition to the $25 billion settlement amount.

### *How does the settlement fit in with the President's housing plan?*

- The President's plan announced in early February 2012 will provide responsible borrowers who are current on their payments with an opportunity to refinance and take advantage of today's historically low rates, cutting through the red tape that prevents these borrowers from saving an average of $3,000 per year.

- The President also put forward a single set of standards, or a Homeowner Bill of Rights, to make sure borrowers and lenders play by the same rules. Federal regulators are currently drafting extensive new servicing standards that would begin to implement these rules.

### *What does the Administration mean by national servicing standards and which ones would the Administration support?*

- The Administration is leading a broader interagency process working to develop national servicing standards.

- The work on this process is underway, including study of measures that would align incentives and provide clarity and consistency to borrowers and investors regarding their treatment by servicers, especially in the event of delinquency.

- The Administration is also working with FHFA, in coordination with HUD and Ginnie Mae, to explore alternative compensation structures to align industry incentives and promote foreclosure alternatives when in the best interest of both the borrower and the credit guarantor.

### *Does the Administration support a fee-for-service model for servicer compensation?*

- A fee-for-service compensation structure could help ensure servicers have the appropriate incentives to invest the time and effort to work with troubled borrowers to avoid default or foreclosure.  The Administration is receptive to comments on whether there are other effective means of addressing these concerns as well.

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061570

000110

Sensitive/Confidential/Pre-Decisional

## HARP 2.0

*What is the context for revising the HARP program?*

- Today, too many Americans who have done all the right things – they have paid their bills and are current on their mortgages –are still stuck in 6% or 7% mortgages because home price declines have made them ineligible for refinancing.

- While the original program helped nearly a million homeowners, it was not working at the scale we needed because there were too many barriers, especially for higher LTV mortgages.

- So the President asked his economic team to work with the Federal Housing Finance Agency and industry stakeholders to look into what could be done to remove these barriers.

- The steps announced by FHFA last October, and the servicer guidelines announced last November, provided a set of steps which will help responsible borrowers with little or no equity in their homes take advantage of today's low mortgage rates.

*What key barriers were addressed with HARP 2.0?*

- Removed Caps for Deeply Underwater Borrowers

  o FHFA removed the barrier that currently shuts out borrowers who are more than 25% underwater. (who had an LTV greater than 125 percent)

  o This means that if you are a homeowner who has paid your mortgage despite the unprecedented fall in home prices, you will not be denied a chance to refinance just because the value of your home has fallen.

- Cut the Costs of Refinancing

  o For underwater borrowers, risk-based fees charged by the GSEs added to the overall cost of refinancing and in some cases eliminated altogether the economic benefit to the borrower of lowering their future monthly mortgage payments.

    ▪ FHFA committed to eliminating those fees, making it easier and more attractive for underwater borrowers to get out of their higher interest rate loan and to obtain the benefit of lower mortgage payments.

  o A broader working group, including FHFA, lenders, Treasury and HUD, is also taking aggressive steps to reduce closing costs, which can add up to thousands of dollars for borrowers trying to refinance. We reduced the number of mortgages that will require a formal appraisal and reduced the cost of title insurance and lien processing. Together those efforts reduced some of the most significant costs to close on a mortgage.

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061571

**000111**

Sensitive/Confidential/Pre-Decisional

- Resolved GSE Reps and Warrants Concerns

  o In order to incentives banks to complete HARP refinancing, FHFA and the GSEs have agreed to remove historical representation and warranties on refinanced loans

  o This creates a "win win" for both the GSEs and the servicer/originator as a refinanced loan is significantly less risky than a higher cost legacy mortgage.

  o The release of reps and warranties will also help motivate competition for refinancing business

- Resolved Mortgage Insurance Reps and Warrant Concerns

  o Like the GSEs, mortgage insurers require lenders to rep and warrant that the loan has complied with certain rules when being made, and where it has not they have the right to rescind coverage.  This creates exactly the same barrier for lenders who might provide refinancing for high LTV loans: they do not want to assume the risk that the original loan was not consistent with the reps and warrants, which would leave them without coverage should that loan go bad.

    ▪ To address the problem, several of the nation's major mortgage insurers have agreed to transfer coverage from the old loan to the refinanced loan automatically without requiring the new lender to take on that rescission risk.

- Resubordination of Second Liens

  o Borrowers who have a second lien on their home also face a significant barrier to refinancing today, as the owner of that second must agree to re-subordinate behind the new refinancing for a new lender to agree to provide the new lower cost loan. The lack of agreement from second lien holders thwarted the refinance process for many borrowers.

  o To address this problem, all of the major lenders have agreed to automatically resubordinate behind the new mortgage in a HARP refinancing.

- Extension of the Term of the Program

  o FHFA committed to extending the program to the end of 2013.  This will give lenders more incentive to invest in making this program a success, optimizing the number of borrowers ultimately helped.  It will also give borrowers more time to bring themselves current so that they can qualify.

***What are the next steps to the HARP program?***

- Since too many barriers prevented the HARP program from working at the scale we anticipated, last October, several changes were announced to expand eligibility of the program.  These changes were designed to simplify eligibility and valuation requirements, make deeply underwater borrowers (above 125 percent LTV) eligible for

Page **15** of **50**

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061572

Sensitive/Confidential/Pre-Decisional

refinancing, lower the fees associated with refinancing, harmonize representation and warranty standards, and resolve mortgage insurance concerns.

- These are important steps, but work remains to be done.  How these changes are implemented by FHFA and lenders will determine how big a success this will be.

- We will work with FHFA, lenders and other industry groups to make sure that these changes are but a first step towards greater access to refinancing for more Americans.

***How successful will the revised HARP 2.0 program be?***

- The Home Affordable Refinance Program (HARP) was introduced by the Government Sponsored Enterprises (GSEs) in 2009 to assist responsible homeowners unable to access traditional refinancing channels due to a decline in their home value.

- To date, more than 1.0 million borrowers have refinanced through HARP across the country.

- According to a June 2012 report, by the Federal Housing Finance Agency, which oversees Fannie Mae and Freddie Mac, in the first quarter 180,000 mortgages were refinanced through what is known as HARP 2.0, almost double the 93,000 in the fourth quarter of 2011 and the highest quarterly number since the HARP program started in 2009.  Since the beginning of the year, 4,400 loans with L.T.V.'s greater than 125 percent were refinanced, according to the Federal Housing Finance Agency report.

- However, it is very difficult to project the exact number of mortgages that may be refinanced through the revised HARP program for many reasons, including the future path of interest rates, borrower willingness to undertake a refinance transaction and the number of lenders and servicers who choose to offer the program.   Given these uncertainties, we would caution against making forward looking projections of refinancing activity.

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061573

**000113**

Sensitive/Confidential/Pre-Decisional

**REO-To-Rental Initiative**

*Fannie Mae and Freddie Mac hold a large percentage of REO on their balance sheets. What is your plan for removing those assets?*

- We recognize that the housing market remains fragile and we will not pursue policies that threaten to disrupt the recovery. The pace of REO disposition should proceed in a fashion that would not overly disrupt the market, negatively affect house prices, and further destabilize communities.

- We will work with FHFA to consider all strategies for the disposition of these properties as long as those strategies maximize recovery for the taxpayer and do not disrupt the fragile housing market recovery.

*The Enterprises' REO stock is at a two year low. Why then is the federal government investigating alternative disposition strategies?*

- As of September 30, 2011, the Enterprises held approximately $325 billion in nonperforming loans on balance sheet, which dwarfs their approximate $17 billion of current Real Estate Owned (REO). If the transition rate of foreclosed properties to REO and the current pace of retail REO sales were held constant, the Enterprises would completely liquidate their stock of REO in two years. However, while foreclosure moratoriums and other frictions in the foreclosure process have created bottlenecks in the foreclosure process, it is possible that these frictions will be reduced in the intermediate term. This could result in a marked increase of REO inventory.

- While the prospect of two more years of a steady supply of REO coming to market through one-off retail transactions is significant in and of itself, the likelihood that the Enterprises' REO inflows will increase makes the consideration of alternative disposition strategies particularly relevant.

*What has been done since the joint issuance of the Request for Information?*

- Since the issuance of the Request for Information (RFI) on August 8, 2011, the FHFA and the Treasury Department have convened an interagency workgroup to assess the viability of alternative disposition strategies. The interagency workgroup is comprised of the Federal Deposit Insurance Corporation (FDIC), the Department of Housing and Urban Development (HUD), the Board of Governors of the Federal Reserve (Federal Reserve), the Enterprises, the FHFA and the Treasury Department.

- The REO Initiative will allow qualified investors to purchase pools of foreclosed properties with the condition that they rent the purchased properties for a number of years. In targeted markets where demand for rental homes is stronger than for homeownership, this strategy can help to stabilize communities and housing markets..

- Throughout this process, we have been cognizant of the challenges of these goals and the fact that no one has ever attempted an initiative of this size. That is why our initial

Page **17** of **50**

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061574

**000114**

Sensitive/Confidential/Pre-Decisional

Request for Information was so important.  We were pleased to receive over 4,000 responses, which along with many consultation meetings and discussions with a wide range of experienced and interested parties have informed our decisions.

- The first pilot involves the sale by Fannie Mae of about 2,500 properties in eight markets. Most of these properties already have short-term renters in place. This pilot is helping to build an infrastructure to support subsequent bulk asset sales.

- To have the stabilizing impact on communities we seek, we have to get more than a good price for the properties.  Investors must be responsible property managers.   We have no desire to trade one set of problems for another by selling properties to irresponsible investors who may neglect their properties' upkeep, mistreat their tenants, or abandon properties that are unprofitable.

### *What are some of the core components of this program's design?*

- The program will auction portfolios of distressed assets in a structured and transparent manner, providing seller financing to attract private capital to the market.

- The program may also include certain usage restrictions that require investors to rent properties instead of flipping them back into the housing market and further depressing prices.

- Additionally, the program may include certain financing products provided by the GSEs to interested buyers of distressed assets.

### *Does the Obama Administration believe too many Americans own homes? If not, then why will this program include rental usage restrictions?*

- Americans should be free to buy or rent a home. Right now rental demand in certain areas is at an all-time high relative to home prices, which makes the REO-to-rental model particularly attractive..

- Meeting this unprecedented demand of Americans has the added benefit of avoiding further depressing housing prices by selling thousands of homes into the challenged housing market.

- Recognizing the strong rental demand in certain regions, investors have expressed strong interest in this scattered site single family rental business model. This strong investor interest may actually reduce the need for specific usage restrictions.

### *When will the program be executed?*

- The FHFA announced the start of a pilot phase of this program on February 1, 2012. These pilot transactions will test specific transactions structures, including seller-financing and certain auction processes.

- On February 27, Fannie Mae announced the first pilot transaction. This initial transaction includes approximately 2,500 properties in eight markets.

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061575

000115

Sensitive/Confidential/Pre-Decisional

- On July 3, FHFA publicly announced it selected the winning bidders in the Fannie Mae REO pilot initiative.  The FHFA will release the names of the successful bidders when the deals close, expected early in the third quarter.

- After analyzing the execution of these pilot transactions, the FHFA and Treasury will make a determination on the future direction of the program.

***Can you give some indication of the intended scale of this program?***

- After analyzing the execution of these pilot transactions, the FHFA and Treasury will make a determination on the future direction of the program.

***What MSAs will the program be executed in?***

- We are currently working to assess which MSAs have the best market dynamics for this program.

- Rental demand, home prices, and the amount of REO stock that the Enterprises own are key drivers for MSA selection.

- Fannie Mae's initial pilot transaction includes properties in Atlanta, Chicago, Las Vegas, Los Angeles, Phoenix and parts of Florida

***How does this initiative relate to the options for housing finance reform that were discussed in the Administration's 2011 White Paper?***

- This effort is entirely consistent with the Administration's broader goals of stabilization and reform, as well as attracting private capital back into the housing market.

- This initiative is designed to help manage the disposition of distressed assets in a cost effective way that will not negatively impact the housing market.

***Why has the scattered site single family rental business model not developed on its own?***

- Because the Enterprises currently control such large market share, their preference for retail execution has limited the development of a bulk model; we feel strongly that if the Enterprises were to establish a regimented wholesale distribution channel, banks and other lenders would replicate the model.

- Specifically, investors are usually only able to acquire single family homes through one-off transactions, which results in significant friction costs for building scale.

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061576

Sensitive/Confidential/Pre-Decisional

**Federal Home Loan Banks (FHLBs) / Covered Bonds**

**Why do covered bonds not exist in the United States?**

- There are several reasons why covered bonds do not exist in the United States. Three of the most common reasons are:

  o The FHLBs currently provide funding options that would likely be more attractive than what could be realized through covered bond financing in the private market.

  o The lack of a statutory framework for covered bonds, specifically with regard to the FDIC's authority to repudiate contracts as receiver of an insured depository institution (commonly referred to as repudiation authority), makes covered bonds less attractive to investors.

  o Off balance sheet funding through the GSE and GNMA securitization markets continue to be more cost efficient and effective than balance sheet portfolio lending.

**Do we support a legislative framework covered bonds?**

- In order for a covered bond market to develop in the United States, we believe a legislative framework that provides clarity to the treatment of covered bonds in a bank's receivership is necessary.

**Do FHLB advances have a competitive advantage to covered bonds?**

- We are confident that if a statutory framework for covered bonds were developed that provided sufficient clarity regarding the treatment of covered bonds in receivership, banks would utilize this alternative funding model.

- While both FHLB advances and covered bonds remain on a bank's balance sheet, the FHLB advances have certain competitive advantages:

  o FHLB advances have priority of payment in receivership due to their statutorily-granted "super" lien, which affords them the ability to offer an ultra-competitive lending rate; and

  o Terms for FHLB advances can be tailored to the need of the borrower and individual FHLBs compete for the same business from large financial institutions.

**What changes to the business model for FHLB advances would motivate the growth of aa vibrant covered bond market?**

- The White Paper released February 2011 called for the establishment of a cap on the total level of advances any single financial institution could receive from the FHLB system.

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061577

**000117**

Sensitive/Confidential/Pre-Decisional

- The establishment of such a cap would create a natural demand for large financial institutions to move to covered bonds to replace that source of funding (which is predominantly used to support mortgage lending).

**What is the policy objective of reducing access to FHLB advances?**

- During the financial crisis, FHLBs were commonly referred to as the "next to last lender of last resort". Financial institutions that could not secure short term funding relied on FHLBs to fill their funding gap.

- The FHLBs were not created to be used in this manner. Their purpose is to provide liquidity to the housing market. Due to the FHLBs' super senior lien, the practical result of financial institutions relying on the FHLBs during the financial crisis was the effective transfer of risk to the Federal Deposit Insurance Corporation's balance sheet, as the FDIC's insurance on deposit was primed by the new FHLB advances.

**What would be the impact of imposing advance caps for U.S. financial institutions?**

- A $5 billion advance cap would only affect 14 financial institutions at current borrowing levels, but it would reduce total FHLB system advances by $186 billion (roughly one-third of total FHLB system advance volume).

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061578

**000118**

Sensitive/Confidential/Pre-Decisional

**Principal Reduction**

*How does the Administration think about principal reduction?*

- Principal reduction is a potential tool that could be used to assist struggling homeowners to make a mortgage payment more affordable.

- While there are important considerations about who should qualify and under what situations, principal reduction could potentially be part of the solution to help homeowners reduce the likelihood of foreclosure.

*How has the Administration used principal reduction?*

- To encourage principal reduction, Treasury provides incentives to investors who offer principal reduction to underwater borrowers with a hardship through our Principal Reduction Alternative (PRA) of a Home Affordable Modification Program (HAMP) modification.  While not all servicers participate in the program and many investors prohibit principal reduction, these programs are also intended to encourage the industry to analyze how principal reduction may make sense to help homeowners with negative equity achieve a sustainable alternative to foreclosure.

- Treasury also provides incentives to servicers and investors through the Second Lien Modification Program (2MP) who agree to reduce or extinguish the principal balance of a second lien loan that is matched to a HAMP first lien modification.

- States that suffered the steepest house price declines received assistance under the Hardest Hit Fund, and several have chosen to launch principal reduction programs to assist underwater homeowners in their states.

*How many homes have undergone principal modification?  What is the average principal reduced?*

- Through May 2012, over 85,000 PRA trial modifications and over 63,000 PRA permanent modifications were started.  The median principal reduction amount for the active PRA permanent modifications is over $69,000.

*FHFA has indicated it will not participate in principal reduction based on its own analysis. Has Treasury reviewed this analysis?  Has Treasury done its own analysis?  Does Treasury plan on doing its own analysis?  If not, why not?  Who at Treasury is in charge of analysis for housing market issues such as this?*

- Treasury has notified FHFA that Treasury is willing to fund principal reduction under the Home Affordable Modification Program (HAMP-PRA) to the GSEs at three times the prior incentive levels.

- The FHFA provided analysis to the public on the relative economic merits of applying principal forbearance to principal reduction on the entire aggregate loan portfolios of Fannie Mae and Freddie Mac.

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061579

000119

Sensitive/Confidential/Pre-Decisional

- Although we have reviewed that analysis at a high level, we cannot perform our own review of the FHFA's analysis because Treasury does not have access to the loan portfolio information of Fannie Mae and Freddie Mac that would allow Treasury to check the FHFA's analysis for accuracy, or perform its own analysis of the benefits of principal reduction on underwater loans where the borrower has a hardship.

- The HAMP-PRA program was developed jointly by the Office of Financial Stability's Homeownership Preservation Office, which administers HAMP, and the Office of Economic Policy.

***Has Treasury encouraged FHFA to re-evaluate their initial analysis in light of Treasury's recent announcement about the availability of incentive payments for principal reduction under the Administration's housing plan?  If so, what is FHFA's response?***

- Treasury has notified FHFA that Treasury is willing to fund principal reduction under the Home Affordable Modification Program (HAMP-PRA) to the GSEs at three times the prior incentive levels.

- We hope that FHFA elects to allow GSE participation in HAMP PRA.

- We have asked FHFA to analyze GSE participation in HAMP PRA with tripled incentives, and FHFA has informed us that they are working on such an analysis.

- We hope to hear from them shortly about the outcome of that analysis as well as participation in HAMP PRA.

Page **23** of **50**

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061580

**000120**

Sensitive/Confidential/Pre-Decisional

**Hardest Hit Funds**

*What was the Hardest Hit Funds program intended to do?*

- The Administration's Hardest Hit Fund program provides $7.6 billion to 18 states and the District of Columbia, which represent the areas hardest hit by steep home price declines and unemployment in the housing market downturn. The Hardest Hit Fund allows state housing finance agencies (HFAs) to design, implement and operate programs that are tailored to their local housing markets and prevent avoidable foreclosures in the housing markets most impacted by the housing crisis.

*What is the background of how the program was created?*

- On February 19, 2010, President Obama announced a plan to provide $1.5 billion to HFAs in the five states hardest hit by unemployment and foreclosure to help them administer new foreclosure prevention programs. The funds were sent to support HFA efforts in Arizona, California, Florida, Michigan, and Nevada.

- On March 29, 2010, the Obama Administration announced an expansion of its HFA Hardest-Hit Fund. While the first HFA Hardest-Hit Fund targeted five states with home price declines greater than 20 percent, the second Fund included $600 million in assistance, and targeted five new states with high concentrations of people living in economically distressed areas, defined as counties in which the unemployment rate exceeded 12 percent in 2009. The five states that received allocations based on this criterion were: North Carolina, Ohio, Oregon, Rhode Island, and South Carolina.

- On August 11, 2010, the Administration announced another expansion of the Hardest Hit Fund, providing $2 billion in Troubled Asset Relief Program (TARP) funds to 18 states and jurisdictions that have experienced sustained unemployment rates at or above the national average over the last 12 months (through June 2010). This included nine of the original HFA Hardest-Hit Fund states (California, Florida, Michigan, Nevada, North Carolina, Ohio, Oregon, Rhode Island and South Carolina), as well as Alabama, Washington DC, Georgia, Illinois, Indiana, Kentucky, Mississippi, New Jersey and Tennessee.

*How many programs are there?  Where are the program funds targeted?*

- There are currently 55 programs across 19 participating HFAs.

  - Approximately 70 percent of program funds are being targeted to help unemployed and underemployed homeowners, primarily through reinstatement and programs that help homeowners pay their mortgage while looking for work.

- Several states, including Arizona, Nevada and California have dedicated significant portions of their funds to address negative equity through incentivized principal reduction.

Page **24** of **50**

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061581

000121

Sensitive/Confidential/Pre-Decisional

- There are also programs that buy mortgages in order to modify them, provide additional funding to enable modifications, and programs that provide incentives for short sales. Under the Hardest Hit Fund, HFAs are able to design the programs they believe will be the most effective stabilizing their housing markets, and modify them in response to early experiences and changing conditions.

***Are all programs the same?***

- Each Housing Finance Agency (HFA) sought input from stakeholders across their state to design and implement programs to leverage their unique local resources and address the distinct challenges struggling homeowners in their area are facing. States are experimenting with a variety of different models to address the needs of struggling homeowners.

***How much funds have been drawn?***

- States draw money from Treasury on an as-needed basis.

  - Currently $894 million has been drawn by the states (11.8% of the total $7.6 billion), which has been used to set up programs as well provide assistance to homeowners.

- The 19 HFAs have created extensive infrastructure to operate these programs, including selecting and training networks of housing counselors to assist with applications, creating homeowner portals to apply for assistance, and hiring underwriters and other staff to review and approve applications.

- While states can utilize program funds until 2017 to assist struggling homeowners, these capabilities can endure beyond the life and scope of the HHF program.

***Why have so little funds been distributed by the States?***

- Each of the 19 HFAs faces a distinct set of challenges in their housing markets and economies and each has unique resources available to them.

- Most of the HFAs have had to create the extensive infrastructure needed to operate these programs, including selecting and training networks of housing counselors to assist with applications, creating homeowner portals to apply for assistance, and hiring underwriters and other staff to review and approve applications.

- Most states also had to launch pilots to ensure they had all the systems and controls in place needed to operate these programs.

- That said, there has been a substantial increase in volume for most states over the past two quarters, both in the number of borrowers assisted and amount of funds committed.

  - Assisted homeowners increased 61% and payments made on behalf of borrowers increased 93% last quarter alone.

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061582

**000122**

Sensitive/Confidential/Pre-Decisional

- It should also be noted that a substantial portion of assistance granted has been in the form of "bridge" mortgage payments for unemployed and underemployed homeowners.

  - These payments are staggered over 24 months or more in some states, which means that the total amount spent will grow over time if homeowners remain unemployed.

Page **26** of **50**

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061583

000123

Sensitive/Confidential/Pre-Decisional

**Risk Retention and QRM**

*Where does risk retention fit in to Treasury's overall approach to housing finance reform?*

- "Our goal is to strike a balance that preserves access to affordable mortgage credit in all communities for creditworthy borrowers across incomes, while strengthening the long-term health of the housing market and our economy. We believe that risk retention, as part of comprehensive housing reform, is an important part of that effort."

- The risk retention rules are designed to correct the alignment between the interests of originators and securitizers and the investors of mortgage-backed securities.

*How does Treasury's plan interact with the Qualified Residential Mortgage (QRM) and Risk Retention rules mandated by Section 941 of Dodd-Frank? Will the rules apply to Fannie Mae and Freddie Mac? Will the Administration's recommendations change once these rules are promulgated?*

- Reforming the securitization market and requiring "skin in the game" is critically important.

- The risk retention rulemaking process is still underway and final rules have not yet been issued. However, the Notice of Proposed Rulemaking, published by the rule writing agencies in April, propose that Fannie Mae and Freddie Mac, under conservatorship or receivership with capital support from Treasury, will satisfy the risk retention requirements.

- The Administration looks forward to working with Congress and the Section 941 rule writers to determine how the future reforms should incorporate the final risk retention rules once they are issued.

*What were the conclusions of the Study mandated by Section 946 of Dodd-Frank on the Macroeconomic Effects of Risk Retention?*

- The study, released in January 2011, concludes that risk retention can help reform the securitization market, protect the public and the economy against irresponsible lending practices, and facilitate economic growth by allowing for safe and sound credit formation for consumers, businesses, and homeowners, resulting in market participants pricing credit risk more accurately and allocating capital more efficiently.

- Risk retention alone cannot fix all of the flaws in the system, but it can help by aligning interests of participants in the securitization process and encouraging better underwriting standards.   Dodd-Frank has a number of other reforms intended to address these and other problems that became apparent during the financial crisis.

- There are many choices in designing a risk retention framework. The study discusses some of these choices and puts forth principles to use in determining how such a framework could be set.

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061584

000124

Sensitive/Confidential/Pre-Decisional

***What is the timing of the Section 941 risk retention rules? What is Treasury's role in the rulemaking process? When will a Notice of Proposed Rulemaking (NPR) be released? Will there be an Advanced Notice of Proposed Rulemaking? Will you meet the April deadline?***

- The Treasury Secretary, as Chairman of the FSOC, is the coordinator of the Section 941 rule writing process, but does not have rule writing authority.

- The rule writers published their Notice of Proposed Rulemaking (NPR) in April 2011 and received public comments through August 1, 2011. The rule writers are now considering the comments received and will consider these in developing the final rule. We are not able to indicate at this time when a final rule will be released, but the rule writers are working diligently and will release a final rule as soon as practicable. About 13,000 comments were received, of which approximately 500 were unique.

- "We are seriously considering feedback and are committed to getting this rule right, so that we can ensure securitization is a stable and reliable source of credit for consumers, businesses, and homeowners." The agencies must address many complex issues raised in the comment period, which will take time. Treasury, as coordinator, is putting every emphasis on releasing a final rule as soon as practicable. We recognize that it is important to provide certainty to the securitization markets. However, it is critical to take the time needed to get this rule right and make sure that each of the issues are dealt with appropriately.

***When will the final rule be released?***

- At this time, we cannot indicate timing as to the rule's release.

- There are many complex issues the rule writers must address and it is important for them to consider them carefully.

- The rule writers are working diligently to release a rule as soon as practicable.

***Will the rule be re-proposed?***

- At this time, we cannot indicate if the rule will be re-proposed for a second public comment period. This will depend on the decisions the rule writers make when considering the comments already received.

***Do you support the Qualified Residential Mortgage (QRM) definition?***

- As you know, Treasury is coordinator of the rule. We are not a rule writer.

  Therefore, while we are working to make sure that the rule writers consider all of the issues carefully – benefits, drawbacks, and potential unintended consequences – we do not have authority to weigh in on the policy and rule determinations.

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061585

**000125**

Sensitive/Confidential/Pre-Decisional

### GSE White Paper

*Will the administration's GSE plan raise mortgage rates?*

- One of the causes of the mortgage crisis was the use of exotic and irresponsible mortgage products that artificially reduced the cost of a mortgage for a few months but failed to take into account the borrowers ability to repay the loan over time.  Any credible reform plan to address the irresponsible aspects of the pre-crisis housing market will make credit less easily available than it was during the peak of the bubble.  We are coming out of a system in which institutions did not hold enough capital and priced guarantees at a level too low to cover their risk.

- We will work to ensure, however, that reforms occur at a measured pace,  allowing borrowers to adjust to the new market, preserving widespread access to affordable mortgages for creditworthy borrowers including lower-income Americans, and supporting, rather than threatening, the health of our nation's economic recovery.

*How will your GSE plan affect access to the 30-year fixed rate mortgage?*

- Access to the 30-year fixed rate mortgage will be a key consideration in the long-term structure of housing finance.  The 30-year fixed rate mortgage has provided homeowners with a simple and stable vehicle to finance their homes, and can protect American families from financial shocks.

- Although it is simple for homeowners, the 30-year fixed-rate mortgage is a complex financial product that is not common in other countries around the world.  Fannie Mae and Freddie Mac have helped promote the availability of the 30-year fixed-rate mortgage in the United States by guaranteeing the credit risk of mortgages.  This has allowed mortgage investors to take only the interest rate risk of the mortgage-backed security.  Without a guarantee, few investors would prefer to buy 30-year fixed rate mortgages, and, therefore, the ability for credit-worthy Americans to have access to that product may be greatly reduced.

- Designing a new system for housing finance will require making difficult trade-offs.  Some of these options for a future housing finance system are intended to reduce taxpayer risk by eliminating the role of the government beyond the FHA, which would make the 30-year fixed more difficult to come by. Moreover, to the extent that more borrowers seeking 30-year fixed-rate mortgages turned to FHA – for which taxpayers assume full risk – the total taxpayer risk exposure across the entire mortgage finance system could actually be greater.

*Does the Administration have a preferred option among those it has proposed? Do you favor a government guarantee?*

- The Administration believes that the right course forward is one where the government facilitates access to mortgage credit for creditworthy Americans, but not at the cost of excessive taxpayer risk or financial instability.

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061586

**000126**

Sensitive/Confidential/Pre-Decisional

- We evaluate three proposals according to four key criteria: access to mortgage credit; incentives for investment in the housing sector; taxpayer protection; and financial and economic stability.

- We ask Congress to work with us to determine the right balance of priorities for a new, predominantly private housing finance market as soon as possible.

***How will your reforms help prevent further market concentration in a few financial institutions that are effectively TBTF and that exert anti-competitive pricing pressure on both the primary and secondary market? Won't the full privatization options unduly advantage large institutions?***

- Potential impacts on consolidation in the financial system should be a consideration in determining the long-term structure of our nation's housing finance system. This should be part of the conversation that we have together as this Congress moves ahead with legislation.

***In Option 2, how would the government backstop mechanism work during a crisis? How would you ensure that it is only scaled up during a true crisis and that its use is reduced when the crisis ends?***

- One option is to prescribe a limit to the amount of mortgages that can be wrapped by a guarantee. The fee for this guarantee should be allowed to change depending on market conditions. In good economic times, the guarantee fee would be very high, but when the housing market deteriorates, it would be reduced.

- Alternatively, the cost of the guarantee could be fixed, but the amount of mortgage product that could be wrapped could vary depending on economic and housing conditions. In good economic times, there would be only a small amount of mortgage product able to be wrapped, but in stressful times, this amount would increase

***What analysis have you done / what support do you have to show that the government can accurately price the guarantee fee in Option 3?***

- Removing the conflicts of interests between private shareholders' profit motive and public mission would make and government reinsurer materially different from Fannie and Freddie.

- If the government did misprice the reinsurance, the system could be built with a mechanism to ensure that actors who participate in the system pay for any losses, and not taxpayers.

***Why is there any need at all for a government role in housing, given that other countries seem to get along fine without it?***

- International comparisons are difficult to make. While it is true that many countries don't directly support their housing finance systems through guarantees on MBS, they may provide support for the housing system in different ways. For instance, in many European systems, banks provide mortgage credit, and receive support from the

Page **30** of **50**

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061587

Sensitive/Confidential/Pre-Decisional

government. Discussion of what countries do and don't provide support for their mortgage markets is not as simple as many suggest.

- It is also important to recognize that the US is one of the only countries in the world where the majority of mortgages are pre-payable, 30-year fixed-rate mortgages.

***How long will it take to unwind Fannie Mae and Freddie Mac?  Why not unwind Fannie Mae and Freddie Mac at a faster pace?  Why did you not come out with a specific proposal for pace of unwind?***

- The pace will depend on market conditions.  We cannot forget that while we have made important progress stabilizing the housing market, this critical sector of the economy remains fragile.  Private capital has not yet fully returned to the market, and the government continues to play an outsized – though unfortunately necessary role – in ensuring the availability of mortgage credit.

- Proposals that prematurely constrain Fannie Mae and Freddie Mac's ability to guarantee loans could limit the availability of mortgage credit, shock the economy, and expose taxpayers to greater losses on the loans already guaranteed by Fannie Mae and Freddie Mac.

***Why does Treasury think it can compel independent agencies to follow its requests? Does your GSE plan conflict with FHFA's statutory mission as conservator?***

- Treasury cannot compel FHFA to act.  The joint working group of FHFA and FHA will consider changes to pricing and other standards and will seek comment from the public.  This working group will provide regular feedback to FHFOB and FSOC as reforms are implemented.

- The Administration's plan is consistent with FHFA's statutory mission as conservator.

***Doesn't your GSE plan require legislation?***

- Without additional legislation, Treasury, in conjunction with other agencies, can make substantial progress towards responsibly reducing the size of the government's role in housing finance and implement critical reforms to the housing finance market.

- Dodd-Frank and HERA provide the Administration, FHFA, and other independent regulators the tools necessary to complete many critically important reforms in the near-term.  Determining the long-term role for government will require serious dialogue with Congress about a difficult set of trade-offs. In all end states, legislation is required to change Fannie Mae and Freddie Mac's charters.

- We would be happy to work with Congress to provide any support necessary to advance comprehensive housing reform legislation. We believe that we should move as quickly as is prudent to provide certainty to our housing finance system and our economy.

***What approximate percentage of the market do you envision being covered by FHA in such a plan?***

Page **31** of **50**

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061588

000128

Sensitive/Confidential/Pre-Decisional

- The percentage of the market covered by FHA should be dictated by the types of borrowers who should be served, not by an abstract market share target.

- We look forward to working with Congress to develop policy to reduce the market share of FHA significantly from today's current unsustainable levels.

***Why does Option 1 reduce the government's ability to effectively step in to ensure access during a crisis? The Federal Reserve played a stabilizing role during this last crisis. Couldn't they do the same in a future crisis?***

- While the Federal Reserve, Treasury or other agency could step in and provide support during future crisis, there are several drawbacks to relying on such assistance in the future. Without a clear and transparent process established in advance, there is less certainty about how – if at all – support would be provided

- The associated moral hazard of ensuring government support without explicitly charging for it could result in the private sector taking on more risk than it should.

***In Option 1, wouldn't the FHA drastically expand its market share if Fannie Mae and Freddie Mac were no longer an available option?***

- In a privatized market with the government role limited to FHA, in order to prevent all mortgages going through FHA, strict limits would be necessary to ensure that FHA only provides loans to low and moderate income borrowers.

- By decreasing the conforming loan limit and increasing FHA guarantee fee pricing, the amount of market share that FHA will cover will decrease.

***Can the government credibly avoid stepping in amid a true crisis?  Won't the market still be left guessing if, when, and how the government might intervene under the "FHA only" model?***

- Predetermined rules will be needed to govern when the government would and would not step in during a crisis to avoid excessive risk taking and moral hazard.

- Ensuring that the government takes no action over the course of many cycles is, however difficult to control and predict ex ante and should be taken into consideration when designing such predetermined rules and reforms.

***Are options 1 and 2 radically different?***

- In Option 2, there would be an explicit mechanism to provide mortgage credit in a crisis. Option 1 does not have this.

- However, under normal economic conditions, Options 1 and 2 share many of the same benefits and drawbacks.

***Why do we need a separate mechanism?  Would FHA and the Federal Reserve alone have the capacity to respond with sufficient speed and force during a crisis to preserve access to mortgage credit for American families?***

Page **32** of **50**

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061589

Sensitive/Confidential/Pre-Decisional

- While the FHA and Federal Reserve have played a significant role in backstopping the housing market during the recent crisis, they should not be counted upon in future crises.

- The Federal Reserve is limited in its capacity to provide a liquidity backstop for all asset classes. Additionally, if the Federal Reserve stepped in during every crisis, it could promote financial recklessness. FHA, while allowing a significant portion of Americans to access mortgages during the recent crisis, has taken on an unsustainably large market share, which the Administration is committed to reducing. If the FHA is allowed to increase its market share during every crisis, there should be proper structuring and pricing in advance to avoid greater taxpayer risk.

***In Option 2, how would the government backstop mechanism work during a crisis? How would you ensure that it is only scaled up during a true crisis and that its use is reduced when the crisis ends?***

- One option is to prescribe a limit to the amount of mortgages that can be wrapped by a guarantee. The fee for this guarantee should be allowed to change depending on market conditions. In good economic times, the guarantee fee would be very high, but when the housing market deteriorates, it would be reduced.

- Alternatively, the cost of the guarantee could be fixed, but the amount of mortgage product that could be wrapped could vary depending on economic and housing conditions. In good economic times, there would be only a small amount of mortgage product able to be wrapped, but in stressful times, this amount would increase.

***How will you prevent a future Administration and Congress from changing the nature of the backstop so that it becomes a guarantee used extensively during all economic conditions?***

- While this is a risk for any reforms put in place, there are methods that this Congress and Administration can put in place to structure a backstop that can weather political change.

- Other provisions could be considered to limit the ability of future regulators to interfere with the proper functioning of a backstop. They might include auction mechanisms for guarantees where the private market determines the appropriate price for a guarantee. Additionally, the amount of guarantee offered could change based upon certain economic indicators, to ensure that the guarantee properly adjusts for changing economic conditions.

***Won't the presence of a government reinsurer in option three just institutionalize more bailouts and moral hazard?***

- An actuarially fair fee in return for reinsurance gives the government the ability to charge for the risk that it takes prior to any crisis. It also provides a mechanism to recoup losses.

- A government reinsurance program would provide clearer "rules of the game" so stakeholders and investors are not stuck in a guessing game about if, when, and how the government might take action in future housing or financial crises.

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061590

**000130**

Sensitive/Confidential/Pre-Decisional

- The fact that the government is in a very remote risk position through the structuring of reinsurance reduces moral hazard risk to taxpayers.

***In the reinsurer option, won't there only be a handful of private mortgage guarantors that are all Too Big To Fail?***

- It will be essential to ensure adequate capital standards and strong regulation of the private mortgage guarantors to protect taxpayers.

- Broad reinsurance will likely attract a larger pool of investors to the mortgage market, enough to support a number of private mortgage guarantors. If large number of mortgage guarantors take additional risk, it will encourage competition, more appropriate and efficient pricing, and reduce the likelihood of "too big to fail" through competition.

- It is important to note that the government reinsurance would only cover the loan or security itself, and would not be available to the mortgage guarantor .

- Additionally, if any of these entities is designated by the FSOC as systemically significant, they will be regulated by the Federal Reserve, pursuant to Dodd-Frank.

***How would a government reinsurance scheme be different from the old Fannie/Freddie system?***

- A well-capitalized set of private mortgage guarantors would put substantially more private capital at risk of first loss in front of the taxpayer than Fannie and Freddie, who held insufficient capital. Instead of building capital reserves by retaining earnings, Fannie and Freddie disbursed their profits to managers and shareholders.

- An explicit guarantee would be more transparent.

- A priced guarantee with a put-back mechanism and a first-loss position would encourage robust underwriting.

- Removing the conflicts of interests between private shareholders' profit motive and public missions would make the government reinsurer materially different from Fannie and Freddie.

***How will you prevent private mortgage guarantors from competing on market share and engaging in a "race to the bottom" with lower underwriting standards, especially over the course of multiple housing cycles?***

- The fact that these institutions are the first to bear losses related to borrower delinquency or default gives them a strong incentive to maintain credit standards.

- The deterioration of underwriting standards in the recent crisis was caused by several factors that will no longer be issues under this plan.

- Mortgage guarantors would be wholly private entities, unable to use public resources to absorb losses.

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061591

**000131**

Sensitive/Confidential/Pre-Decisional

- Additionally, in the previous system many mortgage chain participants were able to pass all of the credit risk to the entity that purchased the loans. In this model, the mortgage guarantor would retain significant (and first) credit exposure.

- Stronger oversight will also help maintain robust credit standards through multiple economic ups and downs.

- The explicit credit risk associated with government reinsurance would also encourage federal policymakers to consider potential budgetary effects,  and will encourage them to maintain rigorous oversight of the industry.

***Where will the reinsurance fees go when they are collected?***

- There are two leading options.  Reinsurance fees could be returned to general revenue fund as is done by GNMA, or they could be placed into a separate trust fund, as the FDIC does with the Deposit Insurance Fund (DIF).

***How is the reinsurer different than GNMA?  Would the reinsurance be accomplished through GNMA?***

- The function of the reinsurer is very similar to that of GNMA, and we could consider having GNMA become the reinsurer.

***What steps are you going to take to promote a covered bond market?***

- There are a number of ideas that could be considered by Congress in enacting housing finance reform – including covered bonds.  Legislation could be helpful in promoting a covered bond market as an alternative funding mechanism for banks.

***Why is it necessary to make adjustments to FHA's single family business?***

- This is necessary to bring private capital back into the mortgage market and reduce taxpayer exposure. As Fannie Mae and Freddie Mac increase their pricing, without corresponding changes at FHA, Fannie Mae and Freddie Mac's old business will flow to FHA rather than the private market as FHA will become the cheapest source of mortgage financing in the market.  This would actually result in increased risk for taxpayers and would not reduce the government's footprint.

- Our goal is to return FHA to its traditional role as a targeted provider of mortgage credit and to reduce taxpayer exposure.

***But, FHA has not cost the taxpayers any money.  Why are we concerned about scaling back their footprint?***

- FHA currently has increased its market share to serve as a countercyclical source of credit in the housing downturn.  Its current market share is close to 25% compared to a historic average closer to 10-15% and as low as 3% in 2006. Moreover, FHA, together with VA and USDA, now supports a majority of all newly originated home purchase mortgages.

Page **35** of **50**

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061592

000132

Sensitive/Confidential/Pre-Decisional

- The maximum FHA conforming loan limits was also increased to $729,500, which represented a departure from FHA's traditional role as a targeted provider of mortgage credit and access to low and moderate income and first-time homebuyers.

- While FHA has not required a bailout, the agency is currently operating below its statutory minimum capital requirement.  If there were another downward shock to house prices, it is possible that taxpayers would face losses on loans guaranteed by the FHA.

Page **36** of **50**

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061593

000133

Sensitive/Confidential/Pre-Decisional

**Affordability**

***Why is increased borrower equity being required at FHA and in a reformed housing finance system?  Risky loan features during the bubble were not tied to low equity, but to poor underwriting, not escrowing for taxes and insurance, and payment shocks due to adjustable payments.***

- Lower LTVs provide protection against home price depreciation, so equity is less quickly wiped out by drops in home values.

- LTV should be just one of a number of factors lenders consider in evaluating borrowers in a reformed housing finance system.  Other factors often include: (1) housing cost-to-income and overall debt-to-income ratios; (2) credit scores; (3) whether the loan has an adjustable interest rate and when and how much payments may increase; (4) how much savings an owner has available for unexpected expenses; (5) whether the owner has received counseling; (6) the condition of the property and its major systems; and (7) the extent to which the owner's future housing expenses will exceed previous housing expenses.

***How will proposed housing finance reforms address the racial wealth gap, and the severe losses in homeownership rates during the housing crisis that disproportionately impacted communities of color?***

- Unsustainable loans during the housing bubble disproportionately hurt low-income and minority borrowers and communities.  Implementation of Dodd-Frank Act reforms, including the establishment of qualified mortgage standards and the Bureau of Consumer Financial Protection, are important and integral early elements of housing finance reform to curb those abusive practices in the future.

- Access to mortgage credit for all credit-worthy families and all communities is a critical element in any long-term housing finance system.  Low- and moderate-income borrowers and communities comprise over 40 percent of the home purchase mortgage market. Any adjustments made to mortgage standards will affect individual borrowers and communities in America differently. We believe that any changes to the system should be taken with sensitivity to the potentially disparate impacts those changes might have, appropriately balanced against systemic risk.

- We will also ensure that housing finance providers comply with antidiscrimination laws. We will work with Congress to establish increased data transparency in the secondary market, to track where and to whom mortgage credit is flowing.  This data will help ensure that all mortgage market participants are complying with antidiscrimination laws. And we will consider ways to ensure that secondary market securitizers and guarantors serve all communities, consistent with primary market providers and safety and soundness.

***What role will FICO scoring play in any reforms of the housing finance system?***

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061594

**000134**

Sensitive/Confidential/Pre-Decisional

- A reformed housing finance system should have stronger underwriting standards. FICO scores are one of several factors lenders should consider to determine a borrower's creditworthiness.  Because of Dodd-Frank reforms, and increased skin in the game by lenders, lenders should engage in a more robust analysis of borrower creditworthiness in a future housing finance system.

**Won't larger capital requirements lead to slower loan growth in the near term and slower economic growth?**

- Safety and soundness of the financial system is critical to promote our economy's vitality and its ability to take risk and promote innovation.  Ultimately, we must strike an appropriate balance, instituting sufficient reforms to ensure a safe and sound system, while continuing to encourage innovation and sound investment.

- As the recent crisis demonstrated, excessive and reckless growth can be destabilizing for the entire economy and is not in the country's long-term interest.

**How can the USG provide targeted support for "hard-to-reach" segments without increasing its risk exposure? Aren't the "hard-to-reach" segments the least creditworthy?**

- Hard-to-reach segments can be served in a creditworthy and responsible manner.

- Many private mortgage lenders, FHA, State HFAs, nonprofits, and CDFIs have all provided responsible underwriting to hard-to-reach segments with low rates of loss.

- Many subprime borrowers could have qualified for prime loans but were subject to discriminatory pricing and predatory products. When given access to safe, stable, well-underwritten mortgages, hard-to-reach borrowers have consistently demonstrated an ability to meet their obligations.

- Private credit markets, particularly secondary markets, tend to systematically under serve certain market segments because (1) secondary markets favor standardization, volume and information, making it difficult to introduce new products designed to meet the needs of underserved markets; (2) less standardized products are more difficult to underwrite and securitize; (3) low-balance loans are less profitable to originate.

- With respect to multifamily rental housing, Fannie Mae and Freddie Mac successfully targeted properties the private secondary markets seldom reach, including buildings affordable to moderate income families and buildings with government subsidies.  Fannie Mae's and Freddie Mac's low rates of loss in its multifamily portfolio demonstrate that such segments can be served in a safe, sensible and efficient manner.

- The Administration is exploring different ways to provide greater support for rental housing, and a housing finance system that helps provide liquidity and capital to affordable rentals would help alleviate the problems of low-income households.

***Shouldn't all high LTV lending be eliminated?  Otherwise, we will just keep pushing homes on people who can't afford them and shouldn't be in them.***

Page **38** of **50**

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061595

000135

Sensitive/Confidential/Pre-Decisional

- It is essential that home owners have sufficient financial resources to contribute a down payment and carry monthly mortgage and other expenses. Homeownership is not right for everyone. But not all high LTV lending is risky and providing homeownership opportunities for credit-worthy families should remain an important policy goal. Historically, about two-thirds of all first-time buyers have made downpayments of 10 percent or less.

- LTV ratios are only one factor in determining risk and should be considered as part of an overall risk profile. Appropriate borrower and loan characteristics can keep overall risk low even without a large down payment.

- We should empower consumers to avoid unfair practices and make fully informed decisions.  Requiring lenders to verify borrower ability to pay will ensure that mortgages are more sustainable and affordable in a reformed housing finance system.

***Aren't higher down payments and premiums at FHA going to unfairly restrict access to mortgage loans for creditworthy borrowers in need? Isn't increased down-payment assistance a poor substitute for your proposed reduced role and higher cost of FHA?***

- The Administration is committed to ensuring creditworthy first-time homebuyers and families with modest incomes can access a mortgage. Government has an important role to play in ensuring that capital is available to creditworthy borrowers in all communities, including rural areas, economically distressed regions, and low-income communities.

- It is important to balance two homeownership objectives: access and sustainability. Mortgage defaults and foreclosures are damaging to families and communities, as well as to mortgage lenders, investors and the FHA and the taxpayers that stand behind it.

- Strengthening FHA's capital reserve account is necessary to enable FHA to manage housing downturns and to protect taxpayers. Reforms to FHA will ensure that creditworthy borrowers with low- and moderate- incomes will continue to have access to mortgage credit.

- We believe that the private sector should take the lead role in supplying mortgage credit to all Americans.  FHA should provide an upper limit on pricing and encourage the private sector to compete successfully, as it did in the 1990s. Changes at FHA are necessary to gradually shrink its market share and allow the private market to grow.

- We will seek ways to support down payment assistance, counseling and other mechanisms to allow creditworthy borrowers without access to personal or family wealth to become homeowners.

***During transition, will Fannie Mae and Freddie Mac continue their multifamily business? Without Fannie Mae and Freddie Mac's support, won't rents increase to unaffordable levels for middle- and lower-income Americans? Will you institute any substantial federal support for multifamily rental markets?***

Page **39** of **50**

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061596

**000136**

Sensitive/Confidential/Pre-Decisional

- We will work with FHFA to ensure liquidity and steady financing remains available to the middle of the rental market, where housing is generally affordable to moderate-income families.

- As we wind down Fannie Mae and Freddie Mac, it will be critical to find ways to maintain liquidity in this segment of the market and to ensure that new sources of capital enter the market.

- FHA currently insures mortgages for multifamily rental properties, and will continue to do so.  Furthermore, the Administration will explore ways to expand FHA's capacity to support multifamily markets.

- We will consider a range of reforms, such as risk-sharing with private lenders and developing programs dedicated to hard-to-reach property segments, including the smaller properties that contain one-third of all rental apartments.

***How specifically do you plan to expand FHA's capacity in multi-family lending? What does your proposal for "FHA risk-sharing with private lenders" in multifamily housing mean specifically?***

- FHA would benefit from reforms that incorporate current best practices in the multifamily finance industry.  These include streamlined underwriting and approval processes that require private lenders to share losses on loans the FHA insures.

- New flexibilities related to internal infrastructure, processes and human capital development and retention would be required for FHA to have expanded capacity.

- There are a number of ways in which risk sharing can be implemented. Overall, risk sharing with private lenders would put the lender at risk for at least part of the losses in cases of default.  Fannie Mae's current multifamily business uses risk sharing to align lenders' incentives with their own and could serve as a model for future FHA activities. We will consider using a version of Fannie Mae's delegated underwriting & servicing system (DUS).

***Why have you not proposed an expansion of the Low-Income Housing Tax Credit (LIHTC) to produce and preserve more affordable rental housing?***

- Some component of tax reform should be considered as a potential tool for long-term housing reform.  Moving forward, we will work with Congress to evaluate a range of proposals to achieve our goals of rebalancing support between homeownership and rental and providing targeted, transparent, and effective support.

***Doesn't increased support for rental housing disadvantage rural and suburban communities at the expense of urban areas?***

- Support for rental housing is important in all communities, including urban, suburban, and rural communities.  Wherever located, rental housing should provide families access to good jobs for parents and quality schools for children and contribute to community stability.

Page **40** of **50**

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061597

000137

Sensitive/Confidential/Pre-Decisional

- Federal support for smaller multifamily properties is an important component of rental housing finance.  Smaller rental buildings are woven into the fabric of the suburban, rural and urban communities and are an important resource to working families.

***Why is secondary market access important?***

- Secondary market access provides liquidity, the ability for banks to shift risk to the capital markets and the opportunity to attract more capital.

- In a more privatized housing market, there is a risk that many communities may face contractions in mortgage credit.  Underserved markets, including rural areas, economically distressed regions, and low- and moderate-income LMI borrowers and communities account for about one-half of all home purchase mortgages.  LMI borrowers and communities alone account for over 40%.

***Isn't your proposal to "make sure that secondary market participants reflect primary market activity" just Fannie Mae/Freddie Mac affordability goals by another name?***

- No. Fannie Mae and Freddie Mac's affordability goals were poorly designed and implemented in some important ways.

- Mis-alignment with primary market.  Fannie Mae and Freddie Mac's goals were set as a share of their overall mortgage purchases, but did not reflect primary market lending activity, changing economic conditions, or even safe and sound lending practice.  Future policy should better align activities in the primary and secondary markets, consistent with safety and soundness.

- Better targeting of underserved households and areas.  Fannie Mae and Freddie Mac's goals were insufficiently targeted.  They did not reach all underserved market segments. They included middle-income communities and borrowers, and did not target rural communities.

- Consumer sustainability.  Prior to HERA, Fannie Mae and Freddie Mac were allowed to count certain mortgages that were unsustainable for consumers towards their goals targets.

- Establishing a system where the secondary market reflects primary market activity will help credit flow to all market segments and geographies Going forward, secondary market access should be better targeted and financially sustainable for families, communities, and for financial institutions, and be consistent with safety and soundness.

- Recognizing the dynamic interplay between the primary and secondary markets, we will work with Congress to determine the best measures to ensure that all creditworthy Americans in all communities are able to access mortgage credit in a reformed housing finance system.

***Won't secondary market access cause rates to rise for middle-class families to subsidize people for whom homeownership isn't appropriate?***

Page **41** of **50**

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061598

Sensitive/Confidential/Pre-Decisional

- No. Secondary market access does not imply unprofitable or unsafe lending. Homeownership is not right for everyone, but the secondary markets should serve creditworthy borrowers in all communities.

- The secondary market should support the full range of primary market activity. Because the secondary market would mirror the primary market, it should not distort underwriting standards or push inappropriate loans on would-be homeowners.  In fact, secondary market access is an important tool to ensure that credit is flowing to middle- as well as low-income families in all communities, including rural and economically distressed areas.

### *How does the proposal address racial and ethnic discrimination in the housing finance system?*

- We will work with Congress to require greater transparency in the mortgage market, requiring securitizers to disclose information on the credit, geographic and demographic characteristics of the underlying loans they support.  This will make it easier to determine whether market participants are complying with their legal obligations, and also make clear to the public what communities these institutions are and are not serving.

### *Doesn't your proposal for more transparency and data disclosure by securitizers place an undue burden on the private sector and unnecessarily raise rates for all Americans?*

- Securitizers should collect loan-level data as part of their due diligence and performance analysis. Better and more transparent data will help protect consumers while also improving market efficiency and accountability.

- Data disclosure can help the private sector identify new opportunities in markets it had previously overlooked.  Data disclosure can help firms to improve metrics to assess the loan performance.

### *Why should affordable housing programs receive a dedicated funding source?*

- The scale of affordable housing needs will require more support from the federal government.  HUD's 2009 Worst Case Housing Needs Report (released in 2011) indicates there were 7.1 million worst-case needs households in the country, up significantly from 5.9 million two years prior.

- Half of all renters spend more than 30% of their income on housing – the most common affordability standard – and a quarter of all renters spend more than half.

- The problems are most acute for low-income renters.  HUD's 2009 Worst Case Housing Needs Report indicates there are only 32 adequate, affordable and available units for every 100 extremely low-income renters and only 60 for every 100 very low-income renters.

  - Extremely low-income (ELI) renters are defined as those renters with household income below 35 percent of the Area Median Income (AMI).

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061599

**000139**

Sensitive/Confidential/Pre-Decisional

- - Very low-income (ELI) renters are defined as those renters with household income between 35 percent and 50 percent of the Area Median Income (AMI).

- There are several reasons for this lack of availability, including:

  - Competition from higher income renters: higher income renters occupy a substantial portion (approximately 40%) of affordable units to those with incomes less than 50% of area median income.

  - Sub-standard conditions: many available units are not in standard or adequate physical condition.

  - Renter income losses: the number of renters with very low incomes has increased by over 1 million people due to the recession.

- Increased down payment requirements in a reformed system may require more support for creditworthy borrowers to access mortgage credit.

***Doesn't the federal government already have a large array of affordable rental and homeownership programs? Why should new programs be created and funded?***

- Current policies and programs do not fully support a range of critical needs in affordable rental and homeownership, including:

- Supply shortages in affordable rental housing for the lowest income families, similar to the Affordable Housing Trust Fund proposed to be capitalized in the President's 2012 Budget;

- Access to down payment assistance and counseling for creditworthy borrowers in a form that does not expose them or financial institutions to excessive risk or cost;

- Scaling up proven nonprofit partnerships that can attract much larger amounts of private capital; and

- Overcoming market failures that make it hard to develop a secondary market for targeted affordable housing mortgages, such as that for small rental properties and location- and energy-efficient mortgages.

- New programs can better engage a range of partners with proven track records of success, including state housing finance agencies, non-profits, and CDFIs.

- To begin to re-balance support for homeownership and rental, greater support of renters and rental housing finance is appropriate.

***Do you support the HERA affordable housing programs, including the Affordable Housing Trust Fund and the Capital Magnet Fund?***

- The Administration's recommended uses of the dedicated funds are consistent with those of the HERA programs. The Affordable Housing Trust Fund primarily addresses the production and preservation of rental housing by the lowest-income families. The Capital

Page **43** of **50**

Protected Information To Be Disclosed Only
In Accordance With Protective Order

Sensitive/Confidential/Pre-Decisional

Magnet Fund provides seed money that effective CDFIs and nonprofit organizations use for affordable housing that attracts substantial additional funds.

***What funding sources is the Administration considering for its proposed set of affordable housing initiatives? How much funding would be involved?***

- The Administration will work with Congress to determine appropriate amounts and sources for dedicated, budget-neutral financing mechanisms.

***Shouldn't they be part of the regular appropriations process to be properly overseen by Congress?  You are just trying to bypass proper government oversight of affordable housing, just like during the Fannie Mae/Freddie Mac goals era.***

- Transparency in all affordable housing programs is an important component of reform.

- Congress will retain all oversight powers over any targeted homeownership and affordable rental programs which use dedicated funding sources.

Page **44** of **50**

Protected Information To Be Disclosed Only
In Accordance With Protective Order

Sensitive/Confidential/Pre-Decisional

**Practical GSE Questions**

***Explain "price Fannie Mae and Freddie Mac's guarantees as if they were held to the same capital standards as private banks or financial institutions"?***

- Fannie Mae and Freddie Mac over time were required to hold far less capital then regulated private institutions. Since they did not have to maintain higher levels of capital, they could set the fee that they charged to guarantee mortgage-backed securities at artificially low levels.

- Fannie Mae and Freddie Mac will over time increase their pricing as if they had to hold 250-400 basis points of capital depending on the risk characteristics of the loans guaranteed, which is the level that other private banks would have to hold against the same risk. This will increase guarantee fees from approximately 25 basis points to approximately 70-100 basis points over time.

- These price increases are exclusive of the 10 basis point increase required to serve as a pay-for for the recently passed temporary payroll cut legislation.

***What is physically going to happen to the operations at Fannie Mae and Freddie Mac including the infrastructure, systems, and human capital? Is just letting these institutions wither away in the best interest of taxpayers?***

- FHFA and the administration will seek to maximize taxpayer recovery in Fannie Mae and Freddie Mac. Where appropriate, FHFA and the administration will consider selling certain business lines and pieces of the infrastructure to private entities.

- However, it is likely that certain pieces of the operation will simply be wound down.

- We will continue to work with FHFA to ensure that talent is retained so that mortgage credit continues to flow during the transition, and that wind down is successful and supports taxpayers' interests.

***Why do you say that you are going to "reward" the current employees of Fannie Mae and Freddie Mac for a successful unwind?***

- It is in the taxpayers' best interest that Fannie Mae and Freddie Mac have the ability to maintain the highest quality people and operations to effectively continue to support a stable housing market.

- The greatest risk to the taxpayer is in contracting the availability of new mortgage finance in such a way that would destabilize the market. A significant number of employees with critical knowledge of the GSEs business operations have already left or have announced their departure, including the CEOs at both entities. Additional departures may potentially threaten the flow of mortgage credit.

Page **45** of **50**

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061602

**000142**

Sensitive/Confidential/Pre-Decisional

***Since the Administration has no plan for Fannie Mae and Freddie Mac to emerge from conservatorship, why hasn't OMB added these entities to the budget as if their operations were conducted by a federal agency?***

- The Budget maintains the existing non-budgetary presentation for Fannie Mae and Freddie Mac, as it does for the other GSEs. This consistent with financial accounting standards that do not require consolidation if ownership control is temporary.

- All of the federal programs that provide direct support to Fannie Mae and Freddie Mac, including the Senior Preferred Stock Purchase Agreements (PSPAs), are shown on-budget.

***How does OMB's estimate of Fannie Mae and Freddie Mac's deficit impact differ from CBO's approach?***

- The 2013 Budget maintains the existing non-budgetary presentation for Fannie Mae and Freddie Mac.

  - This is consistent with governmental financial accounting standards that do not require consolidation of an entity if ownership control is temporary, as it is for Fannie Mae and Freddie Mac during the period of their conservatorship.

  - However, all of the federal programs that provide direct support to Fannie Mae and Freddie Mac, including the Senior Preferred Stock Purchase Agreements (PSPAs), are shown on-budget.

- As we understand it, CBO's estimates of the deficit impact of Fannie Mae and Freddie Mac are considerably higher than the Administration's because CBO defines the budget impact as capturing what a private entity would require as compensation for assuming Fannie Mae and Freddie Mac's commitments.

- The compensation is represented in CBO's description as the difference in market value between Fannie Mae and Freddie Mac's assets and their liabilities on a "risk adjusted" basis.

- This "risk premium" assigned by CBO does not constitute a federal outlay, and is not comparable to the budgetary estimates of Fannie Mae and Freddie Mac's costs included in the President's Budget.

- The Administration presents the budget impact as the estimated amount attributable to transactions between Treasury and Fannie Mae and Freddie Mac under the PSPAs.

***If Fannie Mae and Freddie Mac have room under the retained portfolio ceilings, and if mortgages cheapen, will Fannie Mae and Freddie Mac be able to purchase MBS for their portfolios?***

- The Administration will ensure that Fannie Mae and Freddie Mac's retained portfolios are wound down at a pace no less than 10 percent per year.

Page **46** of **50**

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061603

**000143**

Sensitive/Confidential/Pre-Decisional

- Both Fannie Mae and Freddie Mac are ahead of this schedule and we support the efforts to continue to responsibly reduce the size of these portfolios.

***Are there any conditions where the Administration would support a faster wind down of Fannie Mae and Freddie Mac's portfolios?***

- There is no rigid set of conditions that will be used to increase the pace of the portfolio unwind.  However, we will constantly monitor the market, and if there is an opportunity to increase the pace of the unwind that will not disrupt markets and is in taxpayers' best interest, we could consider increasing the pace of disposition.

- We recognize that a minimal retained portfolio supplies certain important functions, such as providing liquidity to small lenders through the cash window and providing the ability to purchase delinquent loans out of MBS pools.

***Is the plan for Fannie Mae and Freddie Mac to begin to re-build a capital base?***

- No.  Treasury will ensure that Fannie Mae and Freddie Mac have sufficient capital to meet their obligations, but Fannie Mae and Freddie Mac will not increase their capital as if they were being returned to their pre-conservatorship status.

- Treasury remains committed to protecting taxpayers and ensuring that future positive earnings of the Enterprises are returned to taxpayers.

***How many loans do Fannie Mae and Freddie Mac currently guarantee in their single family book?  How do you view that number changing over time as pricing increases and these entities are wound down?***

- Combined, Fannie Mae and Freddie Mac currently guarantee $4.6 trillion mortgages.

- The ultimate pace of Fannie Mae and Freddie Mac's unwind will be a function of market conditions and the ultimate recommendations to FHFA.

***Why aren't you cutting Fannie Mae and Freddie Mac's excessively high 10 percent dividend rate on the PSPA?  If it weren't for the dividend, those firms would be profitable.***

- Treasury remains committed to protecting taxpayers and ensuring that future positive earnings of Fannie Mae and Freddie Mac are returned to taxpayers as compensation for their investment.

- According to the FHFA stress tests in the base case, the dividend payments will cover all positive earnings at Fannie Mae and Freddie Mac and return that money to taxpayers.

***Why did you choose to waive the Periodic Commitment Fee?  Isn't the Periodic Commitment Fee an opportunity to recoup some of the taxpayers' investments in Fannie Mae and Freddie Mac?***

- Fannie Mae and Freddie Mac are currently required to pay a dividend equal to 10% of the taxpayers' total investment.  According to the FHFA stress tests in the base case, both Fannie Mae and Freddie Mac are expected to require additional draws through the end of

Page **47** of **50**

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061604

**000144**

Sensitive/Confidential/Pre-Decisional

2011 to cover net income losses and required dividend payments meaning that no excess income would be available for taxpayer recoupment.

- Given the size of the current draws from Fannie Mae and Freddie Mac, imposing the Periodic Commitment Fee would only lead to increased Treasury draws and not generate increased net proceeds for the taxpayer.

***Why not merge the assets of Fannie Mae and Freddie Mac to cut costs for taxpayers?***

- FHFA and the administration should consider managing certain assets of Fannie Mae and Freddie Mac jointly and outsourcing certain non-core operations functions in instances where that is in taxpayers' best interest.

- However, Fannie Mae and Freddie Mac have different systems and different risk management tools that aren't easily compatible.  Undertaking a large scale project to consolidate all of the operations would take many years and result in large taxpayer expense.

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061605

**000145**

Sensitive/Confidential/Pre-Decisional

### GSE Executive Compensation

*Who is responsible for setting compensation at the GSEs?*

- Under the Housing and Economic Recovery Act of 2008—which was passed by Congress and signed into law by President Bush—the Federal Housing Finance Agency (FHFA) is solely responsible for approving executive compensation at Fannie Mae and Freddie Mac, as recommended by the boards of those institutions.

*Does FHFA need to get approval from Treasury before approving executive compensation?*

- FHFA is the independent regulator of Fannie Mae and Freddie Mac, and it oversees their operations while they are in conservatorship.

- FHFA is required to consult with Treasury about GSE executive compensation (under the terms of the capital commitment that Treasury has provided to Fannie Mae and Freddie Mac).

- Treasury has delegated its consultation function to the Office of the Special Master.

- Unlike with the largest TARP recipients, the Office of Special Master does not have authority to approve or disapprove executive compensation at the GSEs.

*Did the FHFA seek out Treasury's approval regarding executive compensation?*

- FHFA has consulted with the Office of the Special Master to assist in establishing the levels and structure of compensation for Fannie Mae and Freddie Mac executives.  Ultimately, however, FHFA—as the GSEs' independent regulator—is solely responsible for approving annual compensation levels.

*What is Treasury doing to stop this from happening again?*

- We understand and share the frustration that Americans feel about large compensation packages at firms that were supported by extraordinary taxpayer assistance.  The President has made clear that there needs to be accountability and responsibility in compensation practices.

- Wall Street Reform included say on pay, which lets shareholders have a voice in compensation practices, and claws back bonuses and compensation from failing CEOs.  We need to ensure that these provisions remain the law of the land and are not watered down.

*What is FHFA doing to stop this from happening again?*

Page **49** of **50**

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061606

Sensitive/Confidential/Pre-Decisional

- It is important that FHFA explain in clear and certain terms how the GSE compensation packages are designed in the best interests of taxpayers.  To that end, FHFA Acting Director DeMarco recently testified before Congress that:

- As Conservator, he needs to ensure that the GSEs have people with the skills needed to manage the credit and interest rate risks of $5 trillion worth of mortgage assets and $1 trillion of annual new business that the American taxpayer is supporting;

- Major changes to compensation, for executives or staff, cannot be done safely and soundly in a short period of time and attempting to do so would pose substantial risk to the mortgage market and a greater risk of loss to taxpayers; and

- His plan for executive compensation is to continue to seek opportunities for gradual reductions, particularly when executives leave.  This approach is consistent with the Administration's notion of a gradual wind down.

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00061607

**000147**

# May 2012 Financial Update
# Forecast Only

## Management Committee

## July 9, 2012

## DRAFT

Confidential – Restricted



Protected Information To Be Disclosed Only In Accordance With Protective Order

FHFA00047951

000148

DRAFT

## Table of Contents

| Description | Page |
|---|---|
| Executive Summary | 2 |
| Consolidated Financial Results | 3 – 12 |
| Net Revenues | 13 – 16 |
| Credit | 17 – 22 |
| Appendix | 23 – 29 |

Confidential – Restricted

1

Protected Information To Be Disclosed Only In Accordance With Protective Order

FannieMae

FHFA00047952

**000149**

DRAFT

## Executive Summary

- Q2 comprehensive income projected at $6.2B which is double Q1 comprehensive income of $3.1B and is primarily driven by the quarter's credit-related benefit, slightly offset by fair value losses due to the declining interest rate environment

- Full year 2012 projection continues to be favorable to Plan, primarily driven by lower credit-related expenses resulting from an improved book profile, higher national house prices and REO values, as well as the low interest rate environment impact on the individually impaired reserve. 2012 comprehensive income is expected to be sufficient to cover the dividend obligations for the full year

- Current five year forecast is for the years 2012-2016. Cumulative forecasted comprehensive income is $56.6B, which is $12.3B higher than the May BOD forecast for that period due to an improved credit outlook

Confidential – Restricted

2

Protected Information To Be Disclosed Only In Accordance With Protective Order

FannieMae

FHFA00047953

DRAFT

# Consolidated Financials

Confidential – Restricted

3

Protected Information To Be Disclosed Only In Accordance With Protective Order



FHFA00047954

DRAFT

## Improved credit environment drives projected FY 2012 comprehensive income favorable to Plan and prior year . . .

($'s in billions)

| | Current Projection[1] | 2012 Plan | Variance Fav / (Unfav) | Prior Year | Variance Fav / (Unfav) |
|---|---|---|---|---|---|
| | | | **Full Year 2012** | | |
| Net revenues................................................ | $ 22.1 | $ 20.3 | $ 1.8 | $ 20.4 | $ 1.6 |
| Fair value (losses) / gains, net............... | (1.5) | 0.4 | (2.0) | (6.6) | 5.1 |
| Charge-offs..................................................... | (17.5) | (19.8) | 2.3 | (17.4) | (0.1) |
| Foreclosed property expenses................ | (1.5) | (2.2) | 0.7 | (1.9) | 0.4 |
| Credit losses.............................................. | (19.0) | (22.1) | 3.0 | (19.3) | 0.3 |
| Reduction in allowance.......................... | 11.7 | 4.0 | 7.7 | (10.7) | 22.4 |
| SOP 03-3...................................................... | 1.7 | 2.2 | (0.5) | 2.5 | (0.8) |
| Credit-related expenses........................ | (5.5) | (15.9) | 10.3 | (27.5) | 22.0 |
| Administrative expenses.......................... | (2.5) | (2.5) | 0.0 | (2.4) | (0.1) |
| Other expenses........................................... | (1.3) | (1.5) | 0.2 | (0.9) | (0.4) |
| Total expenses and other losses............ | $ (10.9) | $ (19.4) | $ 8.5 | $ (37.4) | $ 26.5 |
| Income / (loss) before federal income taxes. | 11.2 | 1.0 | 10.3 | (16.9) | 28.2 |
| Taxes and non-controlling interests....... | (0.0) | (0.0) | 0.0 | 0.1 | (0.1) |
| Net income / (loss) attributable to Fannie Mae.. | $ 11.2 | $ 0.9 | $ 10.3 | $ (16.9) | $ 28.1 |
| Accumulated other comprehensive income change. | 0.4 | 0.5 | (0.1) | 0.4 | (0.0) |
| Comprehensive income / (loss) attributable to Fannie Mae. | $ 11.6 | $ 1.5 | $ 10.2 | $ (16.4) | $ 28.0 |
| Cumulative infusion received, plus new draw.. | $ 116.1 | $ 126.2 | $ 10.1 | $ 116.1 | $ - |
| Dividends.......................................................... | $ (11.6) | $ (11.8) | $ 0.2 | $ (9.6) | $ (2.0) |

[1] July 2012 Board Forecast reflects actual results through May and mark-to-market activity through June 06, 2012                    Numbers may not foot due to rounding.

**Forecast vs. Plan:**

- **Net revenues $1.8B favorable . . .** lower funding costs, partially offset by lower income from mortgage portfolio.  The impact of 10 bps price increase is expected to be $150M in 2012

- **Fair value gains / (losses), net $2.0B unfavorable . . .** losses on risk management derivatives as interest rates declined in April and May

- **Credit-related expenses $10.3B favorable . . .** lower severity and fewer delinquencies driven by improved REO values and actual home prices, along with better prepayment expectations due to low interest rate environment

**Forecast vs. Prior Year:**

- **Net revenues $1.6B favorable . . .** lower funding costs and lower non-accrued interest resulting from fewer SDQ loans, partially offset by lower interest income from mortgage portfolio

- **Fair value gains / (losses), net $5.1B favorable . . .** prior year results driven by derivatives losses due to decreasing rates in Q3 2011

- **Credit-related expenses $22.0B favorable . . .** no additional allowance required in 2012 as a result of fewer delinquencies. Allowance projected to have peaked in Q4 2011

> **Current projection favorable to Plan primarily due to actual trends realized year to date in credit-related expenses**

**FannieMae**

Protected Information To Be Disclosed Only In Accordance With Protective Order

FHFA00047955

000152

DRAFT

## Q2 comprehensive income is projected to be $6.2B, double Q1 results . . .

($'s in billions)

| | April Results | May Results | June Projection[1] | Q2 Current Projection[1] | Variance to Plan Fav/(Unfav) | Variance to Prior Qtr Fav/(Unfav) |
|---|---|---|---|---|---|---|
| Net revenues............................................... | $ 2.1 | $ 1.9 | $ 1.8 | $ 5.8 | $ 0.6 | $ 0.3 |
| Fair value (losses) / gains.......................... | (1.1) | (1.3) | 0.3 | (2.1) | (2.2) | (2.4) |
| Charge-offs............................................... | (1.2) | (1.3) | (1.4) | (4.0) | 0.8 | 0.6 |
| Foreclosed property expenses..................... | (0.1) | (0.0) | (0.2) | (0.2) | 0.4 | 0.2 |
| Credit losses........................................ | (1.3) | (1.4) | (1.6) | (4.2) | 1.2 | 0.9 |
| Reduction / (build) in allowance................... | 1.7 | 4.3 | 1.4 | 7.3 | 6.0 | 5.0 |
| SOP 03-3................................................. | 0.1 | 0.1 | 0.1 | 0.4 | (0.1) | (0.0) |
| Credit-related benefit / (expenses)........... | 0.5 | 3.0 | (0.1) | 3.5 | 7.1 | 5.8 |
| Other expenses.......................................... | (0.2) | (0.2) | (0.4) | (0.9) | 0.1 | (0.1) |
| Total (expenses) / income and other (losses) / gains................ | $ (0.7) | $ 1.5 | $ (0.2) | $ 0.5 | $ 5.0 | $ 3.4 |
| Income before federal income taxes.............. | 1.3 | 3.4 | 1.6 | 6.4 | 5.6 | 3.6 |
| Taxes and noncontrolling interests................ | (0.0) | 0.0 | (0.0) | (0.0) | (0.0) | (0.0) |
| Net income attributable to Fannie Mae.......... | $ 1.3 | $ 3.4 | $ 1.6 | $ 6.4 | $ 5.6 | $ 3.6 |
| Accumulated other comprehensive income change.................... | 0.1 | (0.1) | (0.1) | (0.2) | (0.3) | (0.5) |
| Comprehensive income attributable to Fannie Mae............. | $ 1.4 | $ 3.3 | $ 1.5 | $ 6.2 | $ 5.3 | $ 3.1 |
| Cumulative infusion received, plus new draw... | N/A | N/A | N/A | $ 116.1 | (5.0) | 0.0 |
| Dividends................................................... | $ 0 | $ 0 | $ 0 | $ (2.9) | $ (2.9) | (0.1) |

[1] July 2012 Board Forecast reflects actual results through May and mark-to-market activity through June 6, 2012

Numbers may not foot due to rounding.

| | Activity | Estimated Impact to Q2 | |
|---|---|---|---|
| **Recent Trends** | Mark to market update for June 7, 2012 to June 29, 2012 indicates fair value losses on derivatives as a result of decreasing interest rates, partially offset by gains on HFT and AFS securities due to tightening spreads | Fair value losses | ($161M) |
| | | AOCI change | $112M |
| | | **Net worth impact** | **($49M)** |
| **Upcoming Actions** | Nothing identified at this time | | |

FannieMae

Protected Information To Be Disclosed Only In Accordance With Protective Order

FHFA00047956

000153

DRAFT

## Lower credit-related expenses projected to eliminate the need to draw in 2012. . .

($'s in billions)



2012 Comprehensive Income / (Loss) & Dividend Payment

| Cumulative Treasury Draw | | | | |
|---|---|---|---|---|
| | Q1 2012 | Q2 2012 | Q3 2012 | Q4 2012 |
| July BOD[1] | $116.1 | $116.1 | $116.1 | $116.1 |
| 2012 Plan | $115.9 | $119.2 | $121.2 | $123.4 |

[1] July 2012 Board Forecast reflects actual results through May and mark-to-market through June 6, 2012

**Commentary:**

- **Q1 Actuals . . .** comprehensive income of $3.1B was sufficient to cover the quarter's dividend obligation of $2.8B
- **Q2 and Q3 Projections . . .** comprehensive income driven by a larger than expected allowance reduction earlier in 2012 than anticipated
- **Q4 Projection . . .** comprehensive loss is reflective of the expected impact of seasonal house prices and delinquency trends on the allowance build/reduction as home price growth is slowest, and delinquency transitions tend to be highest towards year end

> **Current projection foresees comprehensive income through remainder of 2012 sufficient to cover Q2 to Q4 dividend obligations**

Confidential – Restricted

𝕱 FannieMae

Protected Information To Be Disclosed Only In Accordance With Protective Order

FHFA00047957

000154

DRAFT

## FY 2012 comprehensive income projection improved by $4.9B to $11.6B . . .

($'s in billions)

**2012 Comprehensive Income Walk by Activity**



**Commentary:**

- **Net revenues $0.4B favorable . . .** lower funding costs due to decreased interest rates

- **Fair value $1.4B unfavorable . . .** losses on derivatives as a result of declining interest rates

- **Credit-related expenses $5.7B favorable . . .** improved severity as a result of better REO values and national house prices, along with better book profile driving lower collective and individually impaired reserves. The total allowance is still projected to have reached its highest levels in Q4 2011

**2012 Comprehensive Income / (Loss) by Quarter**



— July 2012 BOD   — May 2012 BOD

- **Comprehensive income favorable through Q3 . . .** year to date improvement in realized national house prices and REO values as well as fewer delinquencies caused the allowance to decline sooner in 2012 and to a lower balance than anticipated in the prior forecast

- **Q4 projected comprehensive loss . . .** the expected seasonal impact of house prices and delinquency trends on the allowance build/reduction results in a net loss

Numbers may not foot due to rounding.

---

**Full year 2012 improvement largely due to the larger than anticipated reduction in the allowance experienced year to date**

DRAFT

**FY 2012 comprehensive income forecast continues to trend upwards . . .**

($'s in billions)

### 2012 Comprehensive Income / (Loss) Walk by Forecast



| | Sep '11 BOD | Nov '11 BOD[1] | Jan '12 BOD | Mar '12 BOD | May '12 BOD | Jul '12 BOD | Jul '12 BOD |
|---|---|---|---|---|---|---|---|
| **Comprehensive Income ($)** | | 1.0 | 1.5 | 4.5 | 6.7 | 11.6 | |

[1] Nov '11 BOD does not include a full run of the Single-Family credit forecast and primarily reflects an update for actual results through September 2011

Numbers may not foot due to rounding.

> **Current 2012 projection reflects further improvements since Plan primarily driven by actual results in first half of the year**

Confidential – Restricted
Protected Information To Be Disclosed Only In Accordance With Protective Order

8

FannieMae

FHFA00047959

DRAFT

## Allowance reduction drives full year 2012 and 2013 comprehensive income . . .

($'s in billions)

| | Full Year 2012 [1] | | | | Full Year 2013 [1] | | | |
|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| Net interest income - portfolio and other | $ 3.7 | $ 3.9 | $ 3.5 | $ 3.3 | $ 3.2 | $ 3.4 | $ 3.2 | $ 3.1 |
| Net interest income - MBS guaranty fee | 1.5 | 1.5 | 1.6 | 1.7 | 1.7 | 1.5 | 1.6 | 1.7 |
| Net interest income | $ 5.2 | $ 5.5 | $ 5.2 | $ 5.0 | $ 4.9 | $ 4.9 | $ 4.9 | $ 4.8 |
| Guaranty fees | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Fee and other income | 0.3 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| Net revenues | $ 5.6 | $ 5.8 | $ 5.4 | $ 5.2 | $ 5.1 | $ 5.2 | $ 5.1 | $ 5.0 |
| Fair value gains / (losses), net | 0.3 | (2.1) | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| Credit losses | (5.1) | (4.2) | (4.5) | (5.2) | (4.6) | (5.0) | (5.1) | (4.4) |
| Reduction / (build) in allowance | 2.3 | 7.3 | 2.6 | (0.5) | 1.7 | 2.0 | 2.4 | 1.4 |
| SOP 03-3 | 0.4 | 0.4 | 0.5 | 0.4 | 0.5 | 0.5 | 0.5 | 0.4 |
| Credit-related (expenses) / benefit | $ (2.3) | $ 3.5 | $ (1.4) | $ (5.3) | $ (2.4) | $ (2.5) | $ (2.2) | $ (2.6) |
| Administrative expenses | (0.6) | (0.6) | (0.6) | (0.7) | (0.6) | (0.6) | (0.6) | (0.6) |
| Other expenses | (0.2) | (0.3) | (0.4) | (0.4) | (0.3) | (0.4) | (0.4) | (0.4) |
| Total (expenses) / income and other (losses) / gains | $ (2.9) | $ 0.5 | $ (2.3) | $ (6.2) | $ (3.2) | $ (3.3) | $ (3.0) | $ (3.5) |
| Income / (loss) before federal income taxes | 2.7 | 6.4 | 3.1 | (1.0) | 2.0 | 1.8 | 2.1 | 1.5 |
| Taxes and non-controlling interests | 0.0 | (0.0) | (0.0) | (0.0) | 0.0 | (0.0) | (0.0) | (0.0) |
| Net income / (loss) attributable to Fannie Mae | $ 2.7 | $ 6.4 | $ 3.1 | $ (1.0) | $ 2.0 | $ 1.8 | $ 2.1 | $ 1.5 |
| Accumulated other comprehensive income change | 0.4 | (0.2) | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 |
| Comprehensive income / (loss) attributable to Fannie Mae | $ 3.1 | $ 6.2 | $ 3.2 | $ (0.9) | $ 2.0 | $ 1.9 | $ 2.1 | $ 1.6 |
| Cumulative infusion received, plus new draw | $ 116.1 | $ 116.1 | $ 116.1 | $ 116.1 | 117.1 | $ 118.2 | $ 119.0 | $ 120.5 |
| Dividends | $ (2.8) | $ (2.9) | $ (2.9) | $ (2.9) | $ (2.9) | $ (2.9) | $ (3.0) | $ (3.0) |
| Ending net worth | $ 0.3 | $ 3.5 | $ 3.8 | $ 0.0 | $ (0.9) | $ (1.1) | $ (0.8) | $ (1.4) |

[1] July 2012 Board Forecast reflects actual results through May and mark-to-market activity through June 06, 2012        Numbers may not foot due to rounding

**Quarterly trend:**

- **Net revenues** . . . trend downward throughout 2012 and 2013 resulting from lower portfolio income due to liquidation of the portfolio.  The benefit to NII from lower funding costs is slightly diminished quarter-over-quarter as the cost of debt increases approximately 20 bps from Q1 2012 to Q4 2013. FY 2012 impact of TCCA-mandated 10 bps guaranty fee increase is $150M and FY 2013 impact is $570M (both offset in other expenses)

- **Fair value gains / (losses)** . . . $2.1B loss in Q2 based on mark-to-market through June 6, 2012. The remainder of the forecast is for mark-to-market gains as sold options expire

- **Credit-related expenses** . . . credit losses are expected to be relatively stable from 2012 to 2013 as delays in foreclosures are pushing out defaults into later years. The quarterly allowance decreases slightly from 2012 to 2013, as 2012 year to date trends are not expected to continue into 2013. The home price trough is expected to occur in Q1 2013 which is then followed by a period of slow home price growth

> **Earnings in 2012 projected to be sufficient to cover 2012 dividend obligation, however this is not expected to recur in any of the quarters in 2013**

Protected Information To Be Disclosed Only In Accordance With Protective Order        FHFA00047960

**DRAFT**

## 2013 trends are a continuation of those projected for the remainder of 2012 . . .



Commentary:
- **Total SF defaults . . .** quarterly variations in activity follow seasonality observed in historical periods
- **SF net sales / UPB . . .** trailing indicator that follows home price forecast that bottomed in Q1 2013; subsequent periods are expected to increase in conjunction with increasing home prices

> **Quarterly indicators consistent with longer-term trends, except in quarters impacted by seasonality**

DRAFT

## The Company is projected to achieve sustainable profitability beginning 2012 . . .

($'s in billions)

| | July 2012 Board Forecast | | | | | |
| --- | :---: | :---: | :---: | :---: | :---: | :---: |
| | 2012 [1] | 2013 | 2014 | 2015 | 2016 | Cumulative 2012-2016 |
| Net revenues........................................... | $ 22.1 | $ 20.5 | $ 19.8 | $ 19.3 | 18.4 | $ 100.0 |
| Fair value (losses) / gains, net.......................... | (1.5) | 0.5 | 0.5 | 0.5 | 0.4 | 0.3 |
| Credit losses........................................ | (19.0) | (19.0) | (17.7) | (13.3) | (9.5) | (78.5) |
| Reduction / (build) in allowance...................... | 11.7 | 7.5 | 11.0 | 9.0 | 7.7 | 47.1 |
| SOP 03-3........................................... | 1.7 | 1.9 | 1.6 | 1.1 | 0.8 | 7.1 |
| Credit-related expenses............................ | (5.5) | (9.6) | (5.1) | (3.2) | (1.0) | (24.4) |
| Administrative expenses............................... | (2.5) | (2.5) | (2.5) | (2.3) | (2.1) | (11.8) |
| Other expenses...................................... | (1.3) | (1.5) | (1.7) | (1.9) | (2.0) | (8.3) |
| Total expenses and other................................ | $ (10.9) | $ (13.0) | $ (8.8) | $ (6.9) | $ (4.6) | $ (44.2) |
| Income before federal income taxes...................... | 11.2 | 7.4 | 11.0 | 12.4 | 13.8 | 55.8 |
| Taxes and non-controlling interests...................... | (0.0) | (0.0) | 0.0 | (0.0) | (0.0) | (0.0) |
| Net income attributable to Fannie Mae................. | $ 11.2 | $ 7.4 | $ 11.0 | $ 12.4 | $ 13.8 | $ 55.8 |
| Accumulated other comprehensive income change.......... | 0.4 | 0.1 | 0.1 | 0.1 | 0.1 | 0.7 |
| Comprehensive income attributable to Fannie Mae......... | $ 11.6 | $ 7.5 | $ 11.0 | $ 12.5 | $ 13.9 | $ 56.6 |
| Cumulative infusion received, plus new draw................ | $ 116.1 | $ 120.4 | $ 121.5 | $ 121.5 | $ 121.5 | $ 121.5 |
| Dividends............................................ | $ (11.6) | $ (11.8) | $ (12.1) | $ (12.2) | $ (12.2) | $ (60.0) |
| **Other Metrics:** | | | | | | |
| Ending allowance.................................... | $ 65.2 | $ 57.7 | $ 46.6 | $ 37.6 | $ 29.9 | $ 29.9 |
| Guaranty book of business............................ | $ 3,042 | $ 2,991 | $ 2,945 | $ 2,923 | $ 2,916 | $ 2,916 |
| Mortgage securities.................................. | $ 256 | $ 217 | $ 186 | $ 161 | $ 131 | $ 131 |
| Mortgage loans...................................... | $ 369 | $ 331 | $ 295 | $ 264 | $ 238 | $ 238 |
| Gross mortgage portfolio............................ | $ 625 | $ 548 | $ 481 | $ 424 | $ 369 | $ 369 |

[1] July 2012 Board Forecast reflects actual results through May 2012 and mark-to-market activity through June 06, 2012          Numbers may not foot due to rounding.

**Commentary:**

- **Net revenues in 2013 lower than 2012** . . . decreasing portfolio drives down overall revenues

- **Credit-related expenses in 2013 higher than 2012** . . . allowance declines at a slower rate in 2013 than 2012 as 2012 year to date trends are not expected to continue

> **Five year forecast is expected to be a period of slow home price growth with sustained lower severity**

Confidential – Restricted                 11
Protected Information To Be Disclosed Only In Accordance With Protective Order          FHFA00047962

⚡ FannieMae

**DRAFT**

## 5 year forecast increased by $12.3B primarily driven by lower credit-related expenses . . .

($'s in billions)



Cumulative 2012- 2016 Comprehensive Income Walk by Activity

| May '12 BOD | Net Revenue | Fair Value | Credit-Related Expenses | AOCI | Other | Jul '12 BOD |
|---|---|---|---|---|---|---|
| $44.3 | 2.1 | (1.3) | 11.2 | (0.0) | 0.3 | $56.6 |



Cumulative 2012- 2016 Comprehensive Income by Year

— May '12 BOD    Jul '12 BOD

Numbers may not foot due to rounding.

### Commentary:

- **Net revenues $2.1B favorable . . .** variance due to lower funding costs as a result of decreased interest rates, in addition to lower non-accrued interest

- **Fair value $1.3B unfavorable . . .** increased expense from risk management activity resulting from lower hedging requirements

- **Credit-related expenses $11.2B favorable . . .** improvement in credit losses of $12B due to lower severity with better REO values and REO execution, as well as a higher percentage of pre-foreclosure sales and lower defaults with an improved book profile

- **Comprehensive income through 2016 favorable . . .** primarily driven by reduction in credit-related expenses

| Improvement in the five year forecast primarily due to lower severities and fewer defaults |
|---|



DRAFT

# Net Revenues

Confidential – Restricted

13

Protected Information To Be Disclosed Only In Accordance With Protective Order



FHFA00047964

**000161**

DRAFT

## FY 2012 net revenue of $22.1B trending better than Plan . . .

($'s in billions)

| | Full Year 2012 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Current Projection [1] | Plan | Variance Fav / (Unfav) | | Prior Year | Variance Fav / (Unfav) |
| Net interest income - portfolio and other........................ | $  14.5 | $  13.4 | $  1.1 | | $  13.8 | $  0.7 |
| Net interest income - MBS guaranty fee.......................... | 6.3 | 6.0 | 0.3 | | 5.5 | 0.8 |
| **Net interest income.................................** | **$  20.8** | **$  19.5** | **$  1.4** | | **$  19.3** | **$  1.5** |
| Guaranty fees......................................... | 0.2 | 0.2 | 0.0 | | 0.2 | (0.0) |
| Fee and other income.................................. | 1.1 | 0.7 | 0.4 | | 0.9 | 0.1 |
| **Net revenues.........................................** | **$  22.1** | **$  20.3** | **$  1.8** | | **$  20.4** | **$  1.6** |
| Avg NIM - portfolio and other (bps)................... | 198 | 182 | 16 | | 171 | 28 |
| Gross mortgage portfolio, ending ($B)................. | 625 | 634 | (9) | | 708 | (84) |
| % distressed assets, ending........................... | 40% | 38% | 2% | | 36% | -4% |
| % short-term debt, ending............................. | 14% | 13% | 0% | | 21% | -7% |
| SF weighted avg charge fee on new acq (bps) [2]....... | 36 | 32 | 4 | | 29 | 8 |
| MF weighted avg charge fee on new acq (bps)........... | 75 | 65 | 10 | | 79 | (3) |

[1] July 2012 Board Forecast reflects actuals through May 2012
[2] Includes HARP, RP Flex and government acquisitions, UPB weighted; Includes TCCA impact of 10 bps price increase

Numbers may not foot due to rounding.

**Commentary:**

- **Net interest income – portfolio and other $1.1B higher than Plan . . .** lower funding costs resulting from higher short-term debt mix than Plan and lower interest rates, partially offset by lower portfolio income

- **Net interest income – portfolio and other $0.7B higher than prior year . . .** lower funding costs and lower non-accrued interest resulting from fewer SDQ loans, partially offset by lower income from mortgage portfolio as a result of the portfolio liquidation

- **Net interest income – MBS guaranty fee $0.8B higher than prior year . . .** higher effective guaranty fees as older vintages are replaced by new business with higher charge fee and higher amortization income from up-front cash associated with risk-based pricing. FY 2012 impact of 10 bps increase mandated by the Temporary Payroll Tax Cut Continuation Act is estimated at $150M

> ### Lower funding costs, offset by decreasing portfolio, drive full year favorability to Plan and prior year

Protected Information To Be Disclosed Only In Accordance With Protective Order                    FHFA00047965

000162

DRAFT

## Net revenues forecast to decline year over year . . .

($'s in billions)



**Commentary:**

- **NII: Portfolio & Other . . .** decline driven by portfolio liquidation in accordance with portfolio cap, in addition to the increased percentage of distressed assets resulting from the liquidation of performing assets and the repurchase of non-performing loans

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|
| **NII: Portfolio & Other** | | | | | | |
| Avg net interest margin - portfolio and other (bps) | 171 | 198 | 196 | 201 | 206 | 200 |
| Gross mortgage portfolio, ending ($B) | 708 | 625 | 548 | 481 | 424 | 369 |
| Distressed assets, ending ($B) | 258 | 250 | 238 | 216 | 195 | 178 |
| % Distressed assets, ending | 36% | 40% | 43% | 45% | 46% | 48% |
| % Short-term debt, ending | 21% | 14% | 14% | 14% | 14% | 14% |
| **NII: MBS Guaranty Fee** | | | | | | |
| SF weighted avg charge fee on new acq (bps)[2] | 29 | 36 | 41 | 42 | 43 | 43 |
| MF weighted avg charge fee on new acq (bps) | 79 | 75 | 60 | 60 | 60 | 60 |

[2] Includes HARP, RP Flex and government acquisitions; UPB weighted; Includes TCCA impact of 10 bps price increase

Numbers may not foot due to rounding.

- **NII: MBS Guaranty Fee . . .** increase as a result of higher effective guaranty fees as the legacy book is replaced by new business at higher charge fee and higher amortization income from up-front cash associated with risk based pricing. SF average charge fee reflects increase due to the 10 bps Treasury increase

> **Total net revenues are decreasing net of 10 bps guaranty fee increase primarily driven by lower income from portfolio liquidation**

Protected Information To Be Disclosed Only In Accordance With Protective Order
FHFA00047966

*FannieMae*

DRAFT

## Total guaranty book remains stable at $3.0T year over year . . .

($'s in billions)



### Guaranty Fee in NII by Vintage

| | FY11 | FY12 | FY13 | FY14 | FY15 | FY16 |
|---|---|---|---|---|---|---|
| Total | $5.5 | $6.3 | $7.0 | $7.5 | $8.0 | $8.6 |
| MF | $0.5 | $0.7 | $0.7 | $0.8 | $0.9 | $1.0 |
| TCCA¹ | | $0.2 | $0.6 | $0.9 | $1.2 | $1.4 |
| SF 2009+² | $3.0 | $3.9 | $4.3 | $4.7 | $5.1 | $5.6 |
| SF Pre-2009 | $2.0 | $1.6 | $1.4 | $1.1 | $0.9 | $0.7 |

**Guaranty Book of Business**

| | FY11 | FY12 | FY13 | FY14 | FY15 | FY16 |
|---|---|---|---|---|---|---|
| Single-Family | $2,842 | $2,849 | $2,809 | $2,772 | $2,759 | $2,761 |
| Multifamily | $195 | $198 | $199 | $204 | $206 | $210 |
| Total | $3,038 | $3,047 | $3,008 | $2,976 | $2,966 | $2,971 |

¹ Temporary Payroll Tax Cut Continuation Act (TCCA): requires that all single-family loans acquired between 4/1/2012 and 12/31/2021 include a 10 bps increase in guaranty fee
² Includes HARP and Refi Plus

**Commentary:**

- **SF Guaranty fees . . .** higher charge fees on new acquisitions after 2008 contribute to the increase in guaranty fees; in addition, all remaining upfront cash fees on pre-2009 loans were recognized on 1/1/10 as a result of consolidation accounting

- **MF Guaranty fees . . .** increase in fees driven by higher charge fee on new business as overall book remains flat at $200B

> **SF 2009+ vintage continues to contribute a larger portion to overall guaranty fees reflecting higher average charge fees on new acquisitions**

Confidential – Restricted

16



Protected Information To Be Disclosed Only In Accordance With Protective Order

FHFA00047967

DRAFT

# Credit



FHFA00047968

DRAFT

## Single-Family 2012 credit-related expenses projected to be $10.1B favorable to Plan . . .

($'s in billions & #'s in thousands)

| | | Full Year 2012 | | | | | |
|---|---|---|---|---|---|---|---|
| | Current Projection[1] | Plan | Variance Fav / (Unfav) | | Prior Year | Variance Fav / (Unfav) | |
| **Single-Family Credit-Related Expenses:** | | | | | | | |
| Charge-offs............................................ | $ (17.2) | $ (19.5) | $ | 2.3 | $ (17.0) | $ | (0.2) |
| Foreclosed property expenses.................. | (1.5) | (2.2) | | 0.7 | (1.9) | | 0.4 |
| Credit losses[2]......................................... | (18.7) | (21.6) | | 3.0 | (18.9) | | 0.2 |
| Reduction / (build) in allowance............... | 11.4 | 3.8 | | 7.6 | (10.8) | | 22.2 |
| SOP 03-3............................................... | 1.7 | 2.2 | | (0.5) | 2.5 | | (0.8) |
| **Total credit-related expenses................** | **$ (5.5)** | **$ (16.6)** | **$** | **10.1** | **$ (27.2)** | **$** | **21.7** |
| Ending SDQ loans (#)............................. | 597 | 622 | | 25 | 691 | | 94 |
| Total initiated trial modifications (#).......... | 179 | 164 | | (15) | 217 | | 37 |
| Completed modifications (HAMP and non-HAMP) (#). | 154 | 121 | | (33) | 214 | | 60 |
| Total defaults (#).................................... | 284 | 296 | | 12 | 291 | | 7 |
| Credit loss severity (%)........................... | 41% | 42% | | 1% | 39% | | -2% |
| Ending REO inventory (#)......................... | 123 | 134 | | 11 | 119 | | (4) |
| Ending REO inventory ($)......................... | $ 11 | $ 11 | $ | 0 | $ 10 | $ | (1) |
| **Single-Family Ending Allowance:** | | | | | | | |
| FAS 5 ending allowance.......................... | $ 21.3 | $ 26.9 | $ | 5.5 | $ 28.1 | $ | 6.7 |
| FAS 114 ending allowance........................ | 42.5 | 44.8 | | 2.3 | 47.2 | | 4.7 |
| **Total ending allowance........................** | **$ 63.8** | **$ 71.7** | **$** | **7.8** | **$ 75.3** | **$** | **11.4** |

[1] Reflects the July 2012 Board Forecast and includes actual results through May 2012
[2] Prior year actual results exclude the impact of the write-off of HSA loans in Q4 2011

Numbers may not foot due to rounding.

**Commentary:**

- **Charge-offs $2.3B favorable to Plan . . .** fewer defaults and improved severity due to better REO values and REO sales execution experienced year to date
- **Reduction in allowance $7.6B favorable to Plan . . .** both reserves benefit from higher REO values and an improved book profile reflecting higher realized home prices and fewer delinquencies. The reduction in individually impaired reserve (FAS 114) is further enhanced by impact of higher prepayment expectations resulting from the low interest rate environment
- **Reduction / (build) in allowance $22.2B favorable to prior year . . .** improvement due to lower severities and fewer delinquencies

> **Favorability in 2012 current projection is primarily reflective of the allowance decreasing sooner and faster than originally anticipated**

18

FannieMae

Protected Information To Be Disclosed Only In Accordance With Protective Order

FHFA00047969

000166

DRAFT

## 2016 Single-Family credit-related expenses down $26.4B from 2011 . . .



($'s in billions and #'s in thousands)

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|
| FAS 5 Ending Allowance | $ 28.1 | $ 21.3 | $ 18.0 | $ 14.2 | $ 11.1 | $ 7.8 |
| FAS 114 Ending Allowance | 47.2 | 42.5 | 38.5 | 31.4 | 25.7 | 21.3 |
| Total Ending Allowance ($) | $ 75.3 | $ 63.8 | $ 56.5 | $ 45.6 | $ 36.8 | $ 29.1 |
| | | | | | | |
| Ending SDQ Loan (#) | 691 | 597 | 501 | 385 | 295 | 229 |
| Ending SDQ Rate (%) | 3.9% | 3.4% | 2.8% | 2.2% | 1.7% | 1.3% |
| | | | | | | |
| Total Initiated Modifications (#) | 217 | 179 | 149 | 71 | 46 | 36 |
| Completed Modifications (#)[2] | 214 | 154 | 136 | 77 | 43 | 33 |
| | | | | | | |
| Total Defaults (#) | 291 | 284 | 282 | 284 | 243 | 196 |
| Credit Loss Severity (%) | 39% | 41% | 40% | 37% | 33% | 30% |
| | | | | | | |
| Ending REO Inventory (#) | 119 | 123 | 125 | 127 | 113 | 94 |
| Ending REO Inventory ($) | $ 10 | $ 11 | $ 13 | $ 14 | $ 13 | $ 12 |

[1] Includes actual results through May
[2] Completed modification numbers include actuals results through May 2012

Numbers may not foot due to rounding.

**Commentary:**

- **Credit losses . . .** Credit losses remain steady through 2014 as delays in foreclosures have caused more of the defaults to be pushed out to later years in the forecast period. Defaults of the loans originated prior to 2009 comprise 92% of total defaults over the five year forecast period 2012-2016 and drive approximately 91% of credit losses during that period

- **Allowance . . .** projected to decrease from Q4 2011 peak and reduce to $64B by year-end 2012; remains elevated at year-end 2016 due high volume loans in the individually impaired reserve

> **Continuously declining delinquencies along with improving home prices and severities cause credit-related expenses to decline year over year**

DRAFT

## Single-Family credit activities are expected to reduce credit losses . . .

| Credit Loss Reduction (2009 - 2016) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Actual[1] | Forecast | 2009-2015 | Prior Forecast | | 2016 | 2009-2016 |
| **Modifications** | $24.1 | $8.2 | $32.2 | $32.6 | | ($0.6) | $31.6 |
| **Preferred Loss Mitigation Strategies (PLMS)** | 1.3 | 1.3 | 2.6 | 6.2 | | 0.8 | 3.4 |
| **Make-Whole Receipts[2] (Pursuing recoveries)** | 10.9 | 7.0 | 17.9 | 18.5 | | 0.7 | 18.7 |
| **Total** | $36.3 | $16.5 | $52.7 | $57.3 | | $0.9 | $53.7 |

**Note:** Based on June 2012 Corporate Forecast. Data is approximate and may change based on market conditions and other factors. Above may not foot due to rounding. Above reductions are already reflected in the current forecast.
[1]Actuals represent 2009 – April 2012 activity.
[2]Actuals represent make-whole receipts. Forecast figure reflects receipts as well as make-whole equivalents for forecasted repurchase requests

Commentary:
- 2009-2015 change from prior forecast:
  - **Forecast loss reduction driven by completed modifications is slightly lower** . . . reflecting reduced probability of default
  - **Forecast loss reduction driven by PLMS is significantly lower** . . . continued improvement in REO values negatively affects the marginal effectiveness of PLMS

- Extension of forecast through 2016:
  - **Forecast loss reduction driven by completed modifications is further reduced…** as the benefits from the incremental modification counts in 2016 are offset by additional failed modifications from the older vintages
  - **Forecast loss reduction driven by PLMS and Make-Whole receipts are higher** . . . driven primarily by the additional volumes

**Lower credit loss reduction primarily due to the continuing improvement in REO values**

Confidential – Restricted

20

FannieMae

Protected Information To Be Disclosed Only In Accordance With Protective Order

FHFA00047971

**000168**

DRAFT

## Multifamily 2012 credit forecast shows improvement from Plan . . .

($'s in millions)

| | Full Year 2012 | | | | | |
|---|---|---|---|---|---|---|
| | Current Projection[1] | Plan | Variance Fav / (Unfav) | | Prior Year | Variance Fav / (Unfav) |
| **Multifamily Credit-Related Expenses:** | | | | | | |
| Charge-offs......................... | $ (321) | $ (358) | $ 37 | | $ (374) | $ 53 |
| Foreclosed property expenses..................... | (11) | (50) | 39 | | (16) | 5 |
| Credit losses.................................... | (331) | (408) | 77 | | (390) | 58 |
| Reduction in allowance.................................... | 324 | 205 | 119 | | 102 | 222 |
| SOP 03-3.................................... | 2 | - | 2 | | 8 | (6) |
| **Total credit-related expenses..................** | **$ (5)** | **$ (203)** | **$ 197** | | **$ (280)** | **$ 275** |
| **Multifamily Credit Metrics:** | | | | | | |
| FAS 5 ending allowance.................................... | $ 781 | $ 690 | $ (91) | | $ 922 | $ 141 |
| FAS 114 ending allowance.................................... | 569 | 719 | 150 | | 750 | 181 |
| **Total ending allowance..........................** | **$ 1,350** | **$ 1,409** | **$ 59** | | **$ 1,672** | **$ 322** |
| Average SDQ rate (%)................................... | 0.36% | 0.50% | 0.14% | | 0.57% | 0.21% |
| Total loss severity (%).................................... | 41% | 44% | 3% | | 41% | 0% |
| Annualized credit loss ratio (bps)................... | 17 | 21 | 4 | | 20 | 3 |
| Ending REO inventory (#).............................. | 228 | 281 | 53 | | 262 | 34 |

[1] Reflects the July 2012 Board Forecast reflects and includes actual results through May 2012          Numbers may not foot due to rounding.

<u>Commentary:</u>

- While local economic  weaknesses continue to exist in areas of the multifamily sector, FY 2012 credit performance is projected to be better than Plan as improving market conditions and fewer delinquencies result in lower credit losses and higher allowance reduction

| **Allowance reduction accelerated in 2012 behind increased charge-offs in Q1** |
|---|

**FannieMae**

Protected Information To Be Disclosed Only In Accordance With Protective Order          FHFA00047972

DRAFT

## Multifamily credit performance expected to improve through forecast horizon . . .



($'s in millions)

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|
| **Total Credit-Related Expenses** | $280 | $5 | $46 | $55 | $11 | $125 |
| **Credit Losses** | 390 | 331 | 235 | 214 | 166 | 167 |
| **Build / (Reduction) in Allowance** | (102) | (324) | (189) | (159) | (156) | (42) |
| **SOP 03-3** | (8) | | | | | |

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|
| FAS 5 Ending Allowance | $ 922 | $ 781 | $ 666 | $ 657 | $ 584 | $ 539 |
| FAS 114 Ending Allowance | $ 750 | $ 569 | $ 495 | $ 345 | $ 263 | $ 266 |
| **Total Ending Allowance ($)** | **$ 1,672** | **$ 1,350** | **$ 1,161** | **$ 1,002** | **$ 847** | **$ 805** |
| Average SDQ Rate (%) | 0.57% | 0.36% | 0.30% | 0.17% | 0.13% | 0.13% |
| Total Net Loss Severity (%) | 41% | 41% | 40% | 36% | 32% | 30% |
| Annualized Credit Loss Ratio (bps) | 20 | 17 | 12 | 10 | 8 | 8 |
| Ending REO Inventory (#) | 262 | 228 | 197 | 176 | 145 | 122 |

Numbers may not foot due to rounding.

**Commentary:**

- **Credit losses . . .** expected to decline in out years as we see fewer new delinquencies

- **MF allowance . . .** (approx. 0.8% of book) remains lower than commercial competitors due to better overall credit performance

- **Both FAS 5 and FAS 114 allowance expected to decrease through 2015** . . . while FAS 114 allowance declined approx. $180M in Q1, reduction is expected to slow due to fewer exits and continued anticipation of loan modifications at below market terms in the coming years (troubled debt restructuring, TDR)

**Improvement expected through forecast horizon, though future individually impaired loans may slow allowance reductions in later years**

22
Protected Information To Be Disclosed Only In Accordance With Protective Order

FannieMae

FHFA00047973

**000170**

# Appendix

Confidential – Restricted

23

Protected Information To Be Disclosed Only In Accordance With Protective Order



FHFA00047974

000171

DRAFT

## Macro Economic Assumptions [1]







**Additional Assumptions:**

- **Fair value gains / (losses)** . . . no assumption as to future market movements and associated fair value impact are included in the current forecast

- **Credit-related expenses** . . . includes periodic make-whole, mortgage insurance, and servicing payments; no settlements are included in the current forecast

- **Guaranty fee** . . . increases per normal business activities are incorporated in the current forecast. The current forecast includes the 10 bps increase to fund extended payroll tax cut

- **Gross mortgage portfolio** . . . no asset sales will be required to keep portfolio under the Treasury mandated cap

1. Jul '12 BOD: May 2012 Fannie Mae economic forecast
May '12 BOD: March 2012 Fannie Mae economic forecast
Jan '12 BOD: November 2011 Fannie Mae economic forecast

Confidential – Restricted                          24



Protected Information To Be Disclosed Only In Accordance With Protective Order                FHFA00047975

DRAFT

## Single-Family Credit Sensitivities to Current Forecast

| | Assumption | | Sensitivity Impact to Net Worth ($B) | |
|---|---|---|---|---|
| | 2012 – 2016 Current Forecast | Sensitivity [1] | 2012 | 2012 – 2016 |
| **Current Forecast of Single-Family Credit-Related Expenses** | | | ($5.5) | ($24.2) |
| NSO: Modification Effectiveness | 41% | increase to 46% | $0.6 [2] | $3.9 [2] |
| NSO: Modification Volumes | 372K | 10% increase | $0.0 | $0.6 |
| REO Sales Execution Ratio | 100% | 2% increase | $0.2 | $1.9 |
| PLMS Sales Execution Ratio | 68% | 5% increase | $1.7 | $2.8 |
| NUC Recovery Rates | 75% | increase to 85% | N/A | $1.9 |
| REO Acquisition Volumes | 875k | 10% decrease through Q2 2013, corresponding increase in outer | $0.2 | $0.2 |
| Average REO Default Expense per Loan | $13K | 10% increase | ($0.1) | ($1.1) |
| Home Price Index: June 2012 Home Price Scenario [3] | -24% | peak-to-trough of -21% with trough in Q1 2012 | N/A | $5.0 to $7.0 |
| Home Price Index: Severe Home Price Scenario | -24% | down 5 scenario, peak-to-trough of -31% with trough in Q1 2015 | ($4.6) | ($41.1) |

[1] Sensitivity assumes existing and forecasted modifications from 2009 to 2016
[2] Reflects impact to credit losses, which may differ from impact to net worth
[3] The sensitivity is for the June 2012 HPF only and all other July 2012 BOD forecast assumptions are held constant. The provided range is an estimate that is not calculated through the standard production process.

Confidential – Restricted

25

**FannieMae**

Protected Information To Be Disclosed Only In Accordance With Protective Order

FHFA00047976

**000173**

DRAFT

## Net Revenue / Fair Value Sensitivities to Current Forecast

|  | Sensitivity Impact to Net Worth ($B) | |
| --- | :---: | :---: |
|  | **2012** | **2012 - 2016** |
| **Current Forecast of Net Revenues** | **$22.1** | **$100.0** |
| Down 100 bps Rate Shock on Net Interest Income | 0.4 | $7.4 |
| Borrower Behavior: | | |
| Higher non-accrued interest due to faster transition to SDQ for significantly underwater loans one month earlier | ($0.5) | ($1.2) |
| **Current Forecast of Fair Value Gains / (Losses)** | **($1.5)** | **$0.3** |
| Instantaneous Down 100 bps Rate Movement on Fair Value | ($2.0) | ($2.0) |
| Instantaneous Up 100 bps Spread Movement on Fair Value | ($2.4) | ($2.4) |

*Exogenous Factors*

Confidential – Restricted

26



Protected Information To Be Disclosed Only In Accordance With Protective Order

FHFA00047977

**000174**

DRAFT

## Detailed Current 5 Year Forecast

($'s in billions)

|  | July 2012 Board Forecast | | | | | Cumulative |
|  | 2012 [1] | 2013 | 2014 | 2015 | 2016 | 2012-2016 [1] |
|---|---|---|---|---|---|---|
| **Statement of Operations:** | | | | | | |
| Net interest income - portfolio and other | $ 14.5 | $ 12.5 | $ 11.3 | $ 10.3 | $ 8.9 | $ 57.5 |
| Net interest income - MBS guaranty fee | 6.3 | 7.0 | 7.5 | 8.0 | 8.6 | 37.4 |
| Net interest income | 20.8 | 19.5 | 18.8 | 18.4 | 17.5 | 95.0 |
| Guaranty fee income | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.9 |
| Fee and other income | 1.1 | 0.8 | 0.7 | 0.8 | 0.8 | 4.1 |
| **Net revenues** | $ 22.1 | $ 20.5 | $ 19.8 | $ 19.3 | $ 18.4 | $ 100.0 |
| Investment gains, net | 0.2 | - | - | - | - | 0.2 |
| Net other-than-temporary impairments | (0.4) | - | - | - | - | (0.4) |
| Fair value (losses) / gains, net | (1.5) | 0.5 | 0.5 | 0.5 | 0.4 | 0.3 |
| Income from partnership investments | 0.0 | 0.0 | 0.1 | 0.0 | 0.1 | 0.3 |
| Administrative expenses | (2.5) | (2.5) | (2.5) | (2.3) | (2.1) | (11.8) |
| Charge-offs | (17.5) | (17.2) | (16.0) | (11.9) | (8.5) | (71.2) |
| Foreclosed property expenses | (1.5) | (1.8) | (1.7) | (1.4) | (0.9) | (7.3) |
| Reduction in allowance | 11.7 | 7.5 | 11.0 | 9.0 | 7.7 | 47.1 |
| SOP 03-3 | 1.7 | 1.9 | 1.6 | 1.1 | 0.8 | 7.1 |
| Credit-related expenses | (5.5) | (9.6) | (5.1) | (3.2) | (1.0) | (24.4) |
| Other expenses | (1.1) | (1.5) | (1.8) | (1.9) | (2.0) | (8.3) |
| **Total expenses and other losses** | $ (10.9) | $ (13.0) | $ (8.8) | $ (6.9) | $ (4.6) | $ (44.2) |
| Income before federal income taxes | 11.2 | 7.4 | 11.0 | 12.4 | 13.8 | 55.8 |
| (Provision) / benefit for federal income taxes | (0.0) | 0.0 | 0.0 | (0.0) | (0.0) | (0.0) |
| Net (loss) / income attributable to noncontrolling interests | (0.0) | (0.0) | - | - | - | (0.0) |
| **Net income attributable to Fannie Mae** | $ 11.2 | $ 7.4 | $ 11.0 | $ 12.4 | $ 13.8 | $ 55.8 |
| Accumulated other comprehensive income change | 0.4 | 0.1 | 0.1 | 0.1 | 0.1 | 0.7 |
| **Comprehensive income attributable to Fannie Mae** | $ 11.6 | $ 7.5 | $ 11.0 | $ 12.5 | $ 13.9 | $ 56.6 |
| | | | | | | |
| **Net Worth Roll-Forward:** | | | | | | |
| **Beginning net worth** | $ (4.6) | $ 0.0 | $ (1.4) | $ (0.3) | $ 0.2 | $ (4.6) |
| Net income attributable to Fannie Mae | 11.2 | 7.4 | 11.0 | 12.4 | 13.8 | 55.8 |
| Accumulated other comprehensive income change | 0.4 | 0.1 | 0.1 | 0.1 | 0.1 | 0.7 |
| Preferred infusion | 4.6 | 2.8 | 2.2 | 0.3 | - | 9.9 |
| Dividends | (11.6) | (11.8) | (12.1) | (12.2) | (12.2) | (60.0) |
| Other equity | (0.0) | (0.0) | 0.0 | (0.0) | (0.0) | (0.0) |
| **Ending net worth** | $ 0.0 | $ (1.4) | $ (0.3) | $ 0.2 | $ 1.9 | $ 1.9 |
| | | | | | | |
| **Other Metrics:** | | | | | | |
| Cumulative infusion received, plus new draw | $ 116.1 | $ 120.4 | $ 121.5 | $ 121.5 | $ 121.5 | $ 121.5 |
| Ending allowance | $ 65.2 | $ 57.7 | $ 46.6 | $ 37.6 | $ 29.9 | $ 29.9 |

[1] July 2012 Board Forecast reflects actual results through May 2012 and mark-to-market activity through June 06, 2012

Numbers may not foot due to rounding.

Protected Information To Be Disclosed Only In Accordance With Protective Order     FHFA00047978

DRAFT

## Cumulative 2011-2015 Forecast-Over-Forecast Comparison

($'s in billions)

| | July 2012 Board Forecast | | | | | | May 2012 Board Forecast | | | | | | Linked Variance | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2012[1] | 2013 | 2014 | 2015 | 2016 | Cumulative 2012-2016[1] | 2012[2] | 2013 | 2014 | 2015 | 2016 | Cumulative 2012-2016[2] | 2013 | 2014 | 2015 | 2016 |
| **Statement of Operations:** | | | | | | | | | | | | | | | | |
| Net interest income – portfolio and other | 14.5 | 12.5 | 11.3 | 10.3 | 8.9 | 57.5 | 14.2 | 12.2 | 11.0 | 9.0 | 8.2 | 55.3 | 3% | 3% | 7% | 8% |
| Net interest income – MBS guaranty fee | 6.3 | 7.0 | 7.5 | 8.0 | 8.6 | 37.4 | 6.2 | 6.8 | 7.3 | 8.1 | 8.9 | 37.3 | 3% | 2% | -1% | -3% |
| Net interest income | 20.8 | 19.5 | 18.8 | 18.4 | 17.5 | 95.0 | 20.5 | 18.9 | 18.3 | 17.7 | 17.2 | 92.6 | 3% | 3% | 4% | 2% |
| Guaranty fee income | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.9 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 1.1 | -12% | -17% | -21% | -25% |
| Fee and other income | 1.1 | 0.8 | 0.7 | 0.8 | 0.8 | 4.1 | 1.0 | 0.8 | 0.8 | 0.8 | 0.8 | 4.2 | -9% | -7% | 0% | -6% |
| **Net revenues** | 22.1 | 20.5 | 19.8 | 19.3 | 18.4 | 100.0 | 21.6 | 20.0 | 19.3 | 18.8 | 18.2 | 97.9 | 2% | 2% | 3% | 1% |
| Investment gains, net | 0.2 | - | - | - | - | 0.2 | 0.2 | - | - | - | - | 0.1 | n/a | n/a | n/a | n/a |
| Net other-than-temporary impairments | (0.4) | - | - | - | - | (0.4) | (0.4) | - | - | - | - | (0.4) | n/a | n/a | n/a | n/a |
| Fair value (losses) / gains, net | (1.5) | 0.5 | 0.5 | 0.5 | 0.4 | 0.3 | (0.1) | 0.5 | 0.4 | 0.4 | 0.3 | 1.6 | 0% | 8% | 7% | 13% |
| Income / (losses) from partnership investments | 0.0 | 0.0 | 0.1 | 0.0 | 0.1 | 0.3 | 0.0 | 0.0 | 0.1 | 0.0 | 0.1 | 0.3 | 0% | 0% | 0% | 0% |
| Administrative expenses | (2.5) | (2.5) | (2.5) | (2.3) | (2.1) | (11.8) | (2.5) | (2.5) | (2.5) | (2.3) | (2.2) | (11.9) | 0% | 0% | 0% | -5% |
| Charge-offs | (17.5) | (17.2) | (16.0) | (11.9) | (8.5) | (71.2) | (19.0) | (20.4) | (17.5) | (13.1) | (9.7) | (79.7) | -16% | -9% | -9% | -12% |
| Foreclosed property expenses | (1.5) | (1.8) | (1.7) | (1.4) | (0.9) | (7.3) | (2.0) | (2.6) | (2.7) | (2.1) | (1.6) | (11.1) | -37% | -35% | -34% | -41% |
| Reduction in allowance | 11.7 | 7.5 | 11.0 | 9.0 | 7.7 | 47.1 | 7.9 | 7.7 | 12.3 | 11.5 | 8.5 | 48.0 | -3% | -11% | -22% | -9% |
| SOP 03-3 | 1.7 | 1.9 | 1.6 | 1.1 | 0.8 | 7.1 | 1.9 | 2.1 | 1.6 | 1.0 | 0.7 | 7.3 | -11% | -2% | 8% | 10% |
| Credit-related expenses | (5.5) | (9.6) | (5.1) | (3.2) | (1.0) | (24.4) | (11.2) | (13.4) | (6.2) | (2.6) | (2.1) | (35.6) | -28% | -18% | 21% | -55% |
| Other expenses | (1.1) | (1.5) | (1.8) | (1.9) | (2.0) | (8.3) | (1.3) | (1.5) | (1.7) | (1.9) | (2.1) | (8.4) | 4% | 5% | 0% | -4% |
| **Total expenses and other losses** | (10.9) | (12.4) | (8.8) | (6.9) | (4.6) | (44.2) | (15.4) | (16.8) | (9.8) | (6.4) | (6.9) | (54.4) | -22% | -11% | 8% | -23% |
| Income before federal income taxes | 11.2 | 7.4 | 11.0 | 12.4 | 13.8 | 55.8 | 6.2 | 3.2 | 9.5 | 12.4 | 12.2 | 43.5 | 132% | 16% | 0% | 13% |
| (Provision) / benefit for federal income taxes | (0.0) | 0.0 | 0.0 | (0.0) | (0.0) | (0.0) | 0.0 | (0.0) | 0.0 | (0.0) | (0.0) | (0.0) | -682% | 50% | -73% | 1300% |
| Net (loss) / income attributable to noncontrolling interests | (0.0) | - | - | - | - | (0.0) | (0.0) | - | - | - | - | - | 0% | n/a | n/a | n/a |
| **Net income attributable to Fannie Mae** | 11.2 | 7.4 | 11.0 | 12.4 | 13.8 | 55.6 | 6.2 | 3.2 | 9.5 | 12.4 | 12.2 | 43.5 | 132% | 19% | 0% | 13% |
| Accumulated other comprehensive income change | 0.4 | 0.1 | 0.1 | 0.1 | 0.1 | 0.7 | 0.5 | 0.1 | 0.1 | 0.1 | 0.1 | 0.7 | 14% | 14% | 14% | 14% |
| **Comprehensive income attributable to Fannie Mae** | 11.6 | 7.5 | 11.0 | 12.5 | 13.9 | 56.6 | 6.7 | 3.3 | 9.6 | 12.4 | 12.3 | 44.3 | 130% | 19% | 0% | 13% |
| | | | | | | 0 | | | | | | 0 | | | | |
| **Net Worth Roll-Forward:** | | | | | | 0 | | | | | | 0 | | | | |
| Beginning net worth | (4.6) | 9.0 | (1.4) | (0.3) | 0.2 | (4.6) | (4.6) | (2.4) | (2.7) | (1.2) | (0.2) | (4.6) | -191% | -48% | -77% | -191% |
| Net income attributable to Fannie Mae | 11.2 | 7.4 | 11.0 | 12.4 | 13.8 | 55.8 | 6.2 | 3.2 | 9.5 | 12.4 | 12.2 | 43.5 | 132% | 16% | 0% | 13% |
| Accumulated other comprehensive income change | 0.4 | 0.1 | 0.1 | 0.1 | 0.1 | 0.7 | 0.5 | 0.1 | 0.1 | 0.1 | 0.1 | 0.7 | 14% | 14% | 14% | 14% |
| Preferred infusion | 4.6 | 2.8 | 2.2 | 0.3 | - | 9.9 | 7.1 | 8.7 | 5.1 | 1.9 | 1.1 | 24.0 | -67% | -57% | -86% | -100% |
| Dividends | (11.6) | (11.8) | (12.1) | (12.2) | (12.2) | (60.0) | (11.8) | (12.3) | (13.1) | (13.5) | (13.6) | (64.1) | -4% | -8% | -9% | -10% |
| Other equity | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | 0.0 | 0.0 | (0.0) | (0.0) | 0.0 | 0.0 | N/A | N/A | N/A | N/A |
| **Ending net worth** | 0.0 | (1.4) | (0.3) | 0.2 | 1.9 | 1.9 | (4.6) | (2.7) | (1.2) | (0.2) | (0.4) | (0.4) | -48% | -77% | -191% | -525% |
| **Other Metrics:** | | | | | | | | | | | | | | | | |
| Cumulative infusion received, plus new draw | 116.1 | 120.4 | 121.5 | 121.5 | 121.5 | 121.5 | 121.1 | 130.2 | 133.7 | 134.6 | 136.1 | 134.8 | -8% | -9% | -10% | -11% |
| Ending allowance | 65.2 | 57.7 | 46.6 | 37.6 | 29.9 | 37.6 | 69.1 | 61.1 | 49.0 | 37.5 | 29.0 | 37.5 | -6% | -5% | 0% | 3% |

[1] Updated for actual results through May 2012 and mark-to-market activity through June 06, 2012
[2] Updated for actual results through March 2012 and mark-to-market activity through April 11, 2012

Numbers may not foot due to rounding.

DRAFT

## Forecast Development: Net Income / (Loss) and Credit-Related Expenses

($'s in billions)

The tables to the left reflect annual projections of the Expected Case forecasts presented to the Board of Directors through July 2012.

### Forecast Development - Net Income / (Loss)

| Date of Estimation (Select BOD Meetings) | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY2015 | FY2016 | Cumulative 2011-2015 | Cumulative 2012-2016 |
|---|---|---|---|---|---|---|---|---|
| January 2009 | $(1.1) | $ 3.5 | $ 2.6 | N/A | N/A | N/A | N/A | N/A |
| May 2009 | $(4.0) | $ 19.9 | $ 21.8 | N/A | N/A | N/A | N/A | N/A |
| September 2009 | $(11.2) | $ 7.9 | $ 16.8 | N/A | N/A | N/A | N/A | N/A |
| November 2009 | $(2.0) | $ 9.7 | $ 14.2 | $ 10.7 | N/A | N/A | N/A | N/A |
| January 2010 | $(7.9) | $ 1.4 | $ 8.5 | $ 9.8 | N/A | N/A | N/A | N/A |
| May 2010 | $(10.4) | $ 10.4 | $ 14.1 | $ 14.9 | N/A | N/A | N/A | N/A |
| October 2010 | $(15.9) | $(1.5) | $ 8.7 | $ 8.4 | N/A | N/A | N/A | N/A |
| January 2011 | $(21.6) | $(5.1) | $ 7.4 | $ 7.7 | N/A | N/A | N/A | N/A |
| March 2011 | $(20.0) | $(5.4) | $ 7.0 | $ 7.0 | N/A | N/A | N/A | N/A |
| May 2011 | $(24.7) | $(5.7) | $ 5.1 | $ 8.4 | $ 8.7 | N/A | $ (8.2) | N/A |
| July 2011 | $(25.9) | $(5.1) | $ 4.7 | $ 7.4 | $ 9.1 | N/A | $ (9.8) | N/A |
| September 2011 | $(21.1) | $(2.1) | $ 2.6 | $ 8.3 | $ 10.1 | N/A | $ (2.2) | N/A |
| November 2011 | $(17.7) | $ 0.6 | $ 4.0 | $ 9.3 | $ 11.1 | N/A | $ 7.4 | N/A |
| January 2012 | $(16.0) | $ 0.9 | $ 6.5 | $ 12.6 | $ 13.2 | N/A | $ 17.2 | N/A |
| March 2012 | $(16.9) | $ 3.7 | $ 5.2 | $ 11.6 | $ 13.7 | N/A | $ 17.3 | N/A |
| May 2012 | $(16.9) | $ 6.2 | $ 3.2 | $ 9.5 | $ 12.4 | $ 12.4 | $ 14.4 | $ 43.5 |
| July 2012 | $(16.9) | $ 11.2 | $ 7.4 | $ 11.0 | $ 12.4 | $ 13.8 | $ 25.1 | $ 55.8 |

### Forecast Development - Total Credit-Related Expenses

| Date of Estimation (Select BOD Meetings) | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY2015 | FY2016 | Cumulative 2011-2015 | Cumulative 2012-2016 |
|---|---|---|---|---|---|---|---|---|
| January 2009 | $(8.4) | $(0.8) | $(0.3) | N/A | N/A | N/A | N/A | N/A |
| May 2009 | $(16.1) | $ 8.3 | $ 10.6 | N/A | N/A | N/A | N/A | N/A |
| September 2009 | $(17.2) | $ 0.9 | $ 9.4 | N/A | N/A | N/A | N/A | N/A |
| November 2009 | $(9.1) | $ 3.7 | $ 3.7 | $ 3.0 | N/A | N/A | N/A | N/A |
| January 2010 | $(18.0) | $(0.4) | $(1.0) | $(1.8) | N/A | N/A | N/A | N/A |
| May 2010 | $(22.6) | $(1.6) | $ 3.4 | $ 4.3 | N/A | N/A | N/A | N/A |
| October 2010 | $(28.1) | $(13.4) | $(2.0) | $(1.3) | N/A | N/A | N/A | N/A |
| January 2011 | $(33.6) | $(17.7) | $(4.0) | $(3.2) | N/A | N/A | N/A | N/A |
| March 2011 | $(33.3) | $(17.7) | $(4.0) | $(3.2) | N/A | N/A | N/A | N/A |
| May 2011 | $(37.2) | $(18.3) | $(7.0) | $(2.7) | $(2.0) | N/A | $(67.2) | N/A |
| July 2011 | $(37.5) | $(19.3) | $(8.7) | $(4.8) | $(2.7) | N/A | $(73.1) | N/A |
| September 2011 | $(32.0) | $(17.1) | $(11.7) | $(5.1) | $(2.8) | N/A | $(68.6) | N/A |
| November 2011 | $(29.7) | $(16.0) | $(11.8) | $(5.8) | $(3.4) | N/A | $(66.8) | N/A |
| January 2012 | $(28.1) | $(15.9) | $(9.6) | $(2.6) | $(1.0) | N/A | $(57.2) | N/A |
| March 2012 | $(27.5) | $(12.4) | $(11.2) | $(4.0) | $(0.8) | N/A | $(56.0) | N/A |
| May 2012 | $(27.5) | $(11.2) | $(13.4) | $(6.2) | $(2.6) | $(2.1) | $(61.0) | $(35.6) |
| July 2012 | $(27.5) | $(5.5) | $(9.6) | $(5.1) | $(3.2) | $(1.0) | $(50.9) | $(24.4) |

Numbers may not foot due to rounding.

① Increase in cumulative net loss and credit-related expenses primarily driven by worsening home price forecast during 2009 (-21% to -27% peak-to-trough).

② Improvement in expected home price path to -21% peak-to-trough resulted in lower projected SDQs and defaults.

③ Other factors contributing to variations in the forecasts include (1) refinement of HAMP estimates, (2) impact of consolidation accounting, (3) updates to non-accrued interest projections and (4) changing book profile.

④ Increase in credit-related expenses primarily driven by deterioration in home price expectations and an increase in modification volumes, partially offset by higher net interest income driven by a decline in rates and a shift to less long term debt issuance.

⑤ Driven by continued foreclosure delays (aging delinquencies) and changes in the home price forecast, partially offset by higher modification volumes.

⑥ Driven by lower funding costs on long and short term debt due to a significant overall decline in rates.

⑦ Driven by reduced default volumes due to better expected performance of underwater and modified loans, in addition to reduced MI haircut due to lower projected MI claims.

Confidential – Restricted

29


FannieMae

Protected Information To Be Disclosed Only In Accordance With Protective Order

FHFA00047980

000177

Message

| | |
|---|---|
| **From:** | Martin, Bradford [/O=FHFA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MARTINB] |
| **Sent:** | 7/13/2012 3:36:21 PM |
| **To:** | DeMarco, Edward [edward.demarco@fhfa.gov]; Greenlee, Jon [jon.greenlee@fhfa.gov]; DeLeo, Wanda [wanda.deleo@fhfa.gov]; Pollard, Alfred [alfred.pollard@fhfa.gov]; Ugoletti, Mario [mario.ugoletti@fhfa.gov]; Burns, Meg [meg.burns@fhfa.gov]; Lawler, Patrick [patrick.lawler@fhfa.gov]; Spohn, Jeffrey [jeffrey.spohn@fhfa.gov] |
| **CC:** | Johnson, Mary [mary.johnson@fhfa.gov]; Keyes, Robert [robert.keyes@fhfa.gov]; Highfill, Owen [owen.highfill@fhfa.gov]; Bungenstock, Lindsey [lindsey.bungenstock@fhfa.gov]; Anderson, Philip [philip.anderson@fhfa.gov]; Martin, Bradford [bradford.martin@fhfa.gov] |
| **Subject:** | Fannie Mae Executive Management Meeting on July 9, 2012 |
| **Attachments:** | Agenda 7.9.12 MC Meeting.pdf; Strategy Update - July 2012_070612_v1.pptx; Item IV.b ASF WhitePaper2012.pdf; Item IV.c.2012 FHFA Scorecard May Assessment and FHFA Summary Combined 7-5-12.pdf; Item IV.d. May 2012 Financial Update_Forecast v6.pdf |

Fannie Mae Executive Management Meeting on July 9, 2012

Tim Mayopoulos began by welcoming Pascal Boillat as a new committee member to replace Ed Watson. Tim then recited a list of recent activities. He thought last week's joint Fannie/Freddie/FHFA meeting comparing notes on securitization efforts was both productive and illuminating. Fannie had pursued a technology focus whereas Freddie had concentrated on larger 'ecosystem' issues involving rules, guides and standards posed by the new regime. In many ways, the two approaches were "very additive". While Fannie would wait for FHFA to set up the next meeting, he wondered when Fannie might share with Freddie what they were actively building.

Tim told members that he had initiated a series of personal introduction calls to all key customers. A similar introductory letter would soon go out to all 1,400 business heads. As a prelude to next week's Board meeting, Phil Laskawy would attend this week's Operating Committee meeting.

GSE Strategy Update

Dave Benson walked through a draft copy of next week's Board strategy planning discussion intended to review areas where Fannie might facilitate the ongoing secondary market transition. The discussion was divided into three sections: (a) recap of current open questions (the existence and form of guarantee, prospects for private capital, potential business models); (b) the strategic goal of building a new infrastructure (the 'engine on the bench' plus integration of surrounding securitization functions); and (c) promoting public support for the goals of conservatorship through defined initiatives (e.g., credit risk transfer; REO-to-rental). Dave focused on the GSEs return to profitability as a key factor in building public support for the conservatorship. Current projections show that cumulative GSE dividends paid will surpass cumulative GSE Treasury draws by 2020. He referred to the next 8 years as likely to be "the golden years of GSE earnings". How the government divests itself of the GSEs is not yet clear – the legacy GSE debt and MBS book cannot be fully privatized. Dave intends to close by noting that SPSA amendments might be used to better serve conservatorship goals.

ASF Single Security White Paper

Dave Benson gave a brief recap of the American Securitization Forum's recent white paper – published "as a resource to FHFA" – that outlines somewhat disparate originator, investor and dealer views on a unified agency security. To achieve the goal of making GSE securities "fungible", all parties agree on the need for Fannie/Freddie standardization of : (1) underwriting guidelines; (2) loan delivery and pooling requirements; (3) payment and remittance schedules; (4) servicing

Protected Information To Be Disclosed Only In Accordance With Protective Order          FHFA00047889

standards and loan repurchase policies; (5) data disclosure policies; and (6) refinance programs terms.  However, originators and investors disagree on the need for uniform guarantee pricing and public identification of GSE guarantor.  Originators want fee competition, investors want identical terms.  Investors want to know the counterparty, originators want a joint credit guarantee.  Dave found it "fascinating" that the white paper promoted  a near-term solution whereby Freddie Mac would outsource its loan delivery mechanism to Fannie Mae which would then issue a Single Agency Security.

### 2012 FHFA Scorecard Update

Susan McFarland summarized a thick packet on scorecard status to be presented at next week's Board meeting.  She said that all items are either "on track or haven't yet started".  When pressed, she agreed that several items could quickly turn to yellow or even red (i.e., initiate new risk sharing transactions) if FHFA were to disagree with Fannie Mae's prioritization proposals.  The packet highlighted areas where Fannie required further guidance from FHFA to define the actual 2012 scorecard deliverable.  Andrew Bon Salle mentioned that completion of the state-level pricing grid now rests entirely with FHFA.

### Financial Forecast Update

Ann Gehring discussed highlights of the latest financial forecast.  She noted that Q2's record projected income of $6.2 billion [since reduced to $5.5 billion] was twice the first quarter's and was all due to improved credit-related expenses.  A planned new loss model release should make Q3 and Q4 results look better than previously forecast.  Comprehensive income is now expected to be sufficient to cover the dividend obligation throughout 2012.  Small Treasury draws are forecast throughout 2013.  Cumulative 2012-2016 income is now forecast at $ 56.6 billion, $12.3 billion higher than the last projection.  Given this large change from the prior forecast, Tim Mayopoulos wondered whether the Board might question the credibility of management's financial projections.  He noted that the models seem to lag or underestimate both downturns and upturns.  Ann explained that projections are closely tied to recent history and thus aren't well suited to capturing accelerating trends.  Terry Edwards reminded members that a 1% change in home price projections produces a $6 - $7 billion income delta.  As regards home prices, Anne said that Fannie Mae's projections have been shown to be consistently more accurate than other sources.  Terry noted that the housing market seems to be improving despite the fact the shadow inventory is still massive – "it's as if the market is saying that it's going to remain out there and not flow through".  Susan McFarland added that Jon Greenlee believes that a more conservative approach to projecting future market conditions may be warranted given the limited number of improved data points.

### Roundtable Discussion

Zach Oppenheimer said that June loan deliveries topped $63 billion with 25% coming through the cash window.  Total mortgage originations for the full year are now estimated at $1.5 trillion.  Fannie Mae had about a 50% share of the $762 billion originated in the year's first half.   Zach noted that the average charged guarantee fee had increased by another 2.5 bps to a level of 42.5 bps in June.  With most of the increases hitting larger lenders, the favorable gap enjoyed by large lenders had now declined to about 1.7 bps.  Despite offering some of the highest mortgage rates, Zach said that BofA still appeared to be volume constrained.

Jeff Hayward said that multifamily volumes are on track to hit $25 billion for the year, up from around $20 billion last year.  The average charged fee is now 80 bps.  Jeff said that this fee level reflected market price levels, mentioning Freddie as the other market player.  Some expressed concern that banks and life insurance companies seemed to be largely out of the market.  John Nichols wondered whether their absence might indicate that the market was getting a bit frothy.

Protected Information To Be Disclosed Only In Accordance With Protective Order        FHFA00047890

Dave Benson said that BlackRock's Green Package analytic software was now up and running.  Fannie Mae's June lender conduit activity was a record $500 million.

John Nichols relayed that 11 MRAs had been submitted for closeout in June.

Pascal Boillat said that Fannie's main campus, unlike Freddie's, had not experienced any power problems during the recent storms.

Andrew Bon Salle said that HARP deliveries totaled 61,000 loans in June, up from 40,000 in May.   More than 21,000 of these were from >125% LTV borrowers.  Andrew noted that most of these came through the Quicken / Seterus pipeline which investors recognize as showing faster prepay speeds and should therefore tighten the Fannie/Freddie price spread.

Susan McFarland said that internal audit had completed its exam of the forecasting process with the finding that senior management should be more involved given that the forecast impacts financial statements.

**Meeting Adjourned.**
\*\*\*\*\* PLEASE DO NOT FORWARD EXECUTIVE MEETING MINUTES \*\*\*\*\*

Brad Martin
*Principal Advisor*
*Office of Conservatorship Operations*

Protected Information To Be Disclosed Only In Accordance With Protective Order          FHFA00047891

**AGENDA**
**MANAGEMENT COMMITTEE WEEKLY MEETING**
July 9, 2012
4:00 p.m. – 6:00 p.m.
3900 Building, Room 1543

| | | Topic | Recommender/ Presenter | Time allotment |
|---|---|---|---|---|
| I. | 4:00 p.m. | Opening Remarks | Mayopoulos | 15 minutes |
| II. | 4:15 p.m. | Tracking Review: Prior Week's Decisions, Follow-up Items and Open Issues | Mayopoulos | 5 minutes |
| III. | | Scheduled Decisions<br>  a) None | | |
| IV. | 4:20 p.m. | Discussion Items<br>  a) Strategy Update<br>  b) American Securitization Forum White Paper<br>  c) Review 2012 FHFA and Corporate Scorecard Materials for July Board Meeting<br>  d) Forecast Update<br>  e) Roundtable | Benson<br>Benson<br>All MC Members<br><br>McFarland<br>All MC Members | 35 minutes<br>15 minutes<br>15 minutes<br><br>15 minutes<br>15 minutes |
| V. | 5:55 p.m. | Tracking Review: Follow-up Items, New Open Issues, and Assignments and Review Agenda for Next Meeting | Mayopoulos | 5 minutes |
| VI. | 6:00 p.m. | Adjourn | Mayopoulos | |

| Plan to attend meeting? | | | |
|---|---|---|---|
| David Benson | Y | Tim Mayopoulos | Y |
| Andrew Bon Salle | Y | Susan McFarland | Y |
| Terry Edwards | P | John Nichols | Y |
| Jeff Hayward | Y | Zach Oppenheimer | Y |

*Y=Will attend; N=Will not attend; P=Will attend by phone*

**Additional Attendees:**  Nicola Fraser, Anne Gehring, Brad Martin, Danielle McCoy, Jeff Spohn, and Anna Tilton

Protected Information To Be Disclosed Only In Accordance With Protective Order     FHFA00047892

# PLACEHOLDER

Comments:    Document Produced In Native Format

# PLACEHOLDER

Protected Information To Be Disclosed Only In Accordance With Protective Order          FHFA00047893

DRAFT

As of 7/06 – 6pm

# Strategic Planning Session

## Board of Directors

## David Benson

## July 19, 2012

Confidential – Restricted



**DRAFT**

# Executive summary

- Policy makers continue to debate housing finance reform, but the final outcome remains uncertain.

- Discussions center on the two fundamental issues that we discussed in last year's strategic session:
  - The nature of a government guarantee, if any, and
  - The institutional framework that would succeed the current GSE-based structure.

- In the interim, FHFA, as conservator, and the Treasury, through the Senior Preferred Stock Purchase Agreements (SPSPAs), are responsible for making progress on the path towards the future of the housing finance system.

- In order to transition the market to many of the proposed potential future states, new industry standards and operational capabilities will need to be developed and implemented.  These are key goals of the FHFA Strategic Plan for the GSEs in conservatorship.

- Public support for these and other goals of the conservatorship can be fostered as GSE profitability improves.  We expect to see a trend where dividend payments will exceed capital draws into the future.

- The alignment of conservator and Treasury objectives can be enabled and be made more transparent by updating the terms of the SPSPAs.

Confidential – Restricted

**Fannie Mae**

**000184**

DRAFT

# Agenda

- **Status of Housing Finance Reform**

- **Strategic Goal: Building a New "Infrastructure"**

- **Strategic Enabler: Stakeholder and Public Support**

- **Conclusion**

- **Appendix**

Confidential – Restricted

2



**000185**

DRAFT

# Housing finance proposals: The end-state remains uncertain



**1** **Will some form of government guarantee likely be utilized in the future state conventional secondary market?**
- Alternatively, would bank portfolios and private label securities be the only potential execution channels?

**2** **If a government guarantee is made available, which business model and institutional structure would be deployed?**
- Specialized firms that provide credit risk insurance only and access the government guarantee through a separate securitization utility?
- Integrated firms that underwrite and manage credit risk as well as issue proprietary securities?

**Policy makers continue to debate the fundamental questions that we discussed at last year's Board strategy session.**

Confidential – Restricted

3

000186

**DRAFT**

# Prospects for private capital



| **Impediments to the return of private capital to the market** |
|---|

- Regulatory reform (Dodd-Frank, QRM, etc.)
- Basel III
- Rating agency standards
- Pooling and Servicing Agreement (PSA) contractual terms

- Investor demand
- "Eminent domain"
- Level of GSE guaranty fee pricing
- Bank portfolio demand (both jumbo and conforming)

---

**Private capital has not returned to the non-agency market.**



Banks have been divesting their portfolio holdings

| Net Change in Portfolios | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|---|
| | $204 | $393 | $290 | $204 | $140 | -$176 | -$203 | -$75 | -$77 |



PLS issuance has been minimal

| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|---|
| Non-Conforming Jumbo Originations | $650 | $515 | $570 | $480 | $348 | $98 | $97 | $104 | $118 |
| Jumbo PLS Securitizations | $271 | $294 | $449 | $409 | $336 | $7.6 | $6.4 | $0.48 | $0.67 |

**Some form of government guarantee for the conventional market appears to be needed for the foreseeable future.**

Confidential – Restricted

4

**FannieMae**

**000187**

**DRAFT**

# Potential business models: Functional view

| Potential Business Models | **Guarantor / Insurer** | **Aggregator** | **Securitizer** |
|---|---|---|---|
| | Underwriting & Pricing · Credit Loss Mitigation | Whole Loan Conduit | Issue Security · Bond Administration · Master Servicing · Disclosures |
| **Who** | ▪ Private mortgage insurers<br>▪ Banks / Originators<br>▪ GSE successors<br>▪ FHA<br>▪ FHLB | ▪ Guarantors<br>▪ Securitizers<br>▪ Independents | ▪ GSE successors<br>▪ GNMA or other government entity<br>▪ Independent / private entity<br>▪ FHLB |
| **Competitive Differentiators** | ▪ Regulatory capital requirements<br>▪ Risk/Return assessment<br>▪ Diversification opportunities | ▪ Warehouse funding<br>▪ Lender network<br>▪ Hedging capabilities | ▪ Scale, efficiency, and cost<br>▪ Liquidity of security<br>▪ Operational risk management |
| **Difficult Issues to Tackle** | ▪ Availability of capital<br>▪ Taxpayer protection<br>▪ Availability of credit during market downturn<br>▪ Correlated risk among issuers<br>▪ Regulatory constraints | ▪ Availability of warehouse funding in a downturn<br>▪ Needs of small to medium sized lenders | ▪ Technology and operational processes<br>▪ Legacy securities<br>▪ Government guarantees<br>▪ PSAs |

**GSE functions could conceivably be disaggregated and performed by different entities.**



**DRAFT**

# Agenda

- **Status of Housing Finance Reform**

- **Strategic Goal: Building a New "Infrastructure"**

- **Strategic Enabler: Stakeholder and Public Support**

- **Conclusion**

- **Appendix**

Confidential – Restricted

6

**Fannie Mae**

**000189**

**DRAFT**

# FHFA Strategic Plan calls for building a new infrastructure without full knowledge of the final end state

| Guarantor Initiatives | |
|---|---|
| ▪ Reps & warrants | ▪ Servicing standards |
| ▪ Underwriting standards | ▪ Appraisal |
| ▪ Pricing | ▪ MERS 2.0 |

| Securitization Initiatives | |
|---|---|
| ▪ Back office functions | ▪ TBA "single" security |
| ▪ Disclosures | ▪ Non-guaranteed securities |
| ▪ PSAs | ▪ Multiple issuers |

**Public Statements**

*"The Strategic Plan provides an outline for the next chapter of conservatorship, one that focuses in earnest on building a secondary mortgage market infrastructure that will live beyond the Enterprises. The steps envisioned in the Strategic Plan are consistent with various approaches to housing finance reform."* – Edward DeMarco (February 2012)

*"The first [FHFA] strategic goal – building for the future – recognizes that the country lacks the infrastructure for trillions of dollars in mortgage securitization in the absence of Fannie Mae and Freddie Mac. So the goal here is to have Fannie Mae and Freddie Mac start building that infrastructure so that it can continue to function even if they do not."* – National Association of Realtors (May 2012)

*"FHFA should follow a phased approach for the Strategic Plan where the initial stage prioritizes the alignment of the operations of the GSEs. Aligning the operations of the GSEs will set the stage for the second phase of the Strategic Plan and the longer-term future of the GSEs and mortgage finance more broadly."* – Securities Industry and Financial Markets Association (SIFMA) (June 2012)

*"Implemented correctly, a Single Agency Security could benefit all participants in the mortgage market, including borrowers, originators, investors and the U.S. government, which owns the controlling stake in the GSEs."* – American Securitization Forum (July 2012)

**The FHFA has proposed a multi-year agenda for the GSEs that will evolve business practices and enable potential future state alternatives.**

Confidential – Restricted

7

**FannieMae**

**000190**

DRAFT

# Integration of "guarantor" and "securitization" functions

Functions **independent** of Securitization

Functions **affected** by Securitization

Securitization Utility

| Lender Management | Credit Price & Guaranty | Loan Information Exchange | Loan Aggregation / Warehouse | Securitization Utility | Loss Mitigation |
|---|---|---|---|---|---|
| Prospect & Onboard Lenders | Define Underwriting & Eligibility | Set Industry Standards | Purchase Loans | Issue Security | Oversee Servicers |
| Manage Relationships | Price Credit Risk / Guaranty Fees | Generate All-in Price | Manage Loans | Administer Bond | Manage / Sell REO |
| Provide Technology Solutions | Manage Portfolio Credit Risk | Manage Commitments | Transform / Pool Loans | Perform Master Servicing | Manage Loan Reviews & Repurchases |
| Provide Customer Service | | Acquire Loan and Collateral Data | Sell Pools / Loans | Generate Disclosures | |

**Infrastructure**

| Technology | Accounting | Risk Mgmt. (Market & Counterparty) | MBS & Treasury |
|---|---|---|---|

**Through conservatorship, and perhaps beyond, the guarantor and securitization functions of the GSEs will need to operate seamlessly in order to sustain the secondary market.**

DRAFT

# Agenda

- **Status of Housing Finance Reform**

- **Strategic Goal: Building a New "Infrastructure"**

- **Strategic Enabler: Stakeholder and Public Support**

- **Conclusion**

- **Appendix**

Confidential – Restricted

9

**FannieMae**

**000192**

DRAFT

# FHFA strategic goals: Promoting stakeholder and public support

- The FHFA Strategic Plan primarily consists of goals that support market recovery, minimizes taxpayer losses, and builds for the future of housing finance.

- In addition, some goals have the objective of bringing private capital into the market but may have their biggest short-term impact on promoting stakeholder and public support.

  Examples of these include:

  - Sale of non-performing loans

  - Credit risk transfer

  - REO-to-rental pilot

**Initiatives that appeal to key constituencies can help to achieve broader support for the goals of the conservatorship**

FannieMae

**DRAFT**

# GSE profitability trends: An opportunity

- The current terms of the SPSPAs do not permit the GSEs to repay taxpayers through retained earnings.

- The Treasury department has recently publicized the payment of dividends from recipients of government support as recovery amounts.

  - *"Treasury currently has a net investment of $151B in Fannie Mae and Freddie Mac, which is expected to be reduced over time as those firms generate positive earnings."* – The US Department of the Treasury, "The Financial Crisis Response In Charts" (April 2012)

  - *"It is important to emphasize that Treasury has already recovered $5.5B [of which ~$2.9B are dividends], or almost one-third, of our investment in Ally. And the company has played a critical and necessary role in the successful rescue of the American automobile industry."* – Timothy Massad, Assistant Secretary for Financial Stability at the US Department of the Treasury (May 2012)

- The FHFA has taken a negative view on the prospects for the GSEs to repay the government.

  - *"The Enterprises' losses are of such magnitude that the companies cannot repay taxpayers in any foreseeable scenario."* – FHFA Strategic Plan (Feb. 2012)

**A more transparent and consistent message from FHFA and Treasury may help to gain public support for the goals of the conservatorship.**



**DRAFT**

# Key modeling assumptions (2012 – 2022)

| | | Combined GSEs | Comments |
|---|---|---|---|
| **Mortgage Market** | **Single-Family (SF) market share of total originations** | **Minimal market share decline 60% → 55%** | **Current differences in guaranty fee pricing between GSEs are eliminated in future** |
| | **SF mortgage debt growth** | **Gradual recovery in origination market leads to average growth of 3.5%** | |
| **Revenue** | **SF Guaranty Fee [1]** | **Effective guaranty fee approaches 35 bps as a result of annual pricing increases and liquidation of older vintages** | **10 bps proceeds from the TCCA do not accrue to the entities [2]** |
| | **Net Spread on Interest Earning Assets** | **Net interest margin (NIM) contracts from ~200 bps toward ~100 bps as higher yielding mortgage assets run-off and funding cost increases** | **Freddie has higher NIM as a result of its significantly lower distressed loan population** |
| **Expense** | **SF Credit Loss Ratio** | **Credit expense declines as legacy assets liquidate 65 bps → 10 bps** | **$2.4B → $2.0B (Fannie) $1.5B → $1.2B (Freddie) (~ 7 bps/year)** |
| | **Administrative Expenses** | **Assumed decline in project spend and credit loss management; future growth based on book size** | |
| | **Taxes** | **No taxes due to Deferred Tax Asset (DTA) utilization** | |
| | **Dividends to US Treasury on SPSPA** | **10%** | |

[1] SF charged guaranty fee projections are as of the July corporate forecast and exclusive of price increases not yet approved; effective guaranty fee of 35 bps is net of the 10 bps Temporary Payroll Tax Cut Continuation Act (TCCA) of 2011 fee remitted to the government

[2] TCCA is a 10 bps fee that applies to all SF vintages from April 2012 through December 2021 and was created by Congress to primarily extend payroll tax cuts

Confidential – Restricted





**DRAFT**

# Strategic enabler: Profitable GSEs



| | Cumulative "Repayment" for Both GSEs | |

*$ in Billions*

Cumulative Dividend Payments
Cumulative Infusion

| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net "Repayment" to Government ($B) | ($30) | ($120) | ($134) | ($152) | ($134) | ($117) | ($100) | ($81) | ($62) | ($42) | ($23) | ($3) | $16 | $35 | $54 |
| Residual Equity ($B) | - | - | - | - | $3 | $4 | $7 | $9 | $14 | $18 | $20 | $22 | $23 | $23 | $25 |

**The cumulative dividends from both GSEs exceed government investment by 2020 in baseline scenario.**

Confidential – Restricted

13



000196

DRAFT

# Annual view of net "repayment" to the US Government

**Fannie Mae**

| ($ in billions) | 2008-2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Comprehensive Income* | | 11.2 | 7.4 | 11.0 | 12.4 | 13.8 | 12.9 | 12.2 | 11.6 | 11.2 | 10.9 | 11.2 |
| *Preferred Dividend Payment* | 19.8 | 11.6 | 11.8 | 12.1 | 12.2 | 12.2 | 12.1 | 12.1 | 12.1 | 12.1 | 12.2 | 12.2 |
| *Residual Equity* | 0.0 | 0.0 | 0.0 | 0.0 | 0.2 | 1.8 | 2.5 | 2.5 | 2.0 | 1.0 | 0.0 | 0.0 |
| Cumulative Dividends | 19.8 | 31.4 | 43.2 | 55.3 | 67.6 | 79.8 | 92.0 | 104.1 | 116.3 | 128.4 | 140.6 | 152.8 |
| Cumulative Infusion | (116.1) | (116.1) | (119.0) | (121.2) | (121.5) | (121.5) | (121.5) | (121.5) | (121.5) | (121.5) | (121.7) | (122.7) |
| Net "Repayment" to Gov't | *(96.3)* | *(84.7)* | *(75.8)* | *(65.9)* | *(53.9)* | *(41.7)* | *(29.5)* | *(17.4)* | *(5.2)* | *6.9* | *18.9* | *30.1* |
| SPSPA Funding Cap | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 |
| Remaining Funding under SPSPA | 124.8 | 124.8 | 122.0 | 119.7 | 119.5 | 119.5 | 119.5 | 119.5 | 119.5 | 119.5 | 119.3 | 118.3 |

> **Combined GSE "repayment" could occur in 2020**

**Freddie Mac**

| ($ in billions) | 2008-2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Comprehensive Income* | | 7.3 | 8.1 | 8.9 | 9.4 | 9.8 | 10.2 | 9.8 | 9.4 | 9.1 | 8.9 | 9.0 |
| *Preferred Dividend Payment* | 16.3 | 7.2 | 7.2 | 7.2 | 7.2 | 7.2 | 7.2 | 7.2 | 7.2 | 7.2 | 7.2 | 7.2 |
| *Residual Equity* | 0.0 | 3.1 | 4.5 | 6.6 | 9.2 | 12.2 | 15.2 | 17.7 | 19.9 | 21.8 | 23.4 | 25.2 |
| Cumulative Dividends | 16.3 | 23.5 | 30.8 | 38.0 | 45.2 | 52.5 | 59.7 | 66.9 | 74.1 | 81.4 | 88.6 | 95.8 |
| Cumulative Infusion | (72.2) | (72.3) | (72.3) | (72.3) | (72.3) | (72.3) | (72.3) | (72.3) | (72.3) | (72.3) | (72.3) | (72.3) |
| Net "Repayment" to Gov't | *(55.9)* | *(48.8)* | *(41.6)* | *(34.3)* | *(27.1)* | *(19.9)* | *(12.6)* | *(5.4)* | *1.8* | *9.1* | *16.3* | *23.5* |
| SPSPA Funding Cap | 220.5 | 220.6 | 220.6 | 220.6 | 220.6 | 220.6 | 220.6 | 220.6 | 220.6 | 220.6 | 220.6 | 220.6 |
| Remaining Funding under SPSPA | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 | 148.3 |

**Our approach is analogous to analyses by Moody's, OMB, and Millstein.**

Note: Numbers may not foot due to rounding

Confidential – Restricted

14

FannieMae

000197

**DRAFT**

# Government divestment of GSEs: Incomplete by necessity

*End-state exposure*



- Functions of current GSEs consolidated into government agency

- GSEs are privatized or liquidated
- Government provides catastrophic insurance on eligible new MBS and all MBS issued during and prior to conservatorship

- Given the nature of the guaranty on existing GSE MBS and debt, the government will not be able to fully privatize the legacy book.

- At a minimum, a catastrophic guaranty will need to be offered on the legacy book.

**How the government decides to end the conservatorship will shape perception of the ultimate cost of government support.**



**DRAFT**

# Senior Preferred Stock Purchase Agreements: Built to last?

| Original Objectives | Key Assumptions & Issues |
|---|---|

**Explicit**
- Provide stability to the financial market
- Prevent disruptions in the availability of mortgage finance
- Protect taxpayers

**Implicit**
- Avoid mandatory triggers for receivership to allow GSEs to fulfill their financial obligations
- Provide Congress with a short period of time to determine the nature of government involvement in the housing market
- Require the GSE charters to be revisited
- Create framework for Treasury to influence GSE matters separate from FHFA's legislated authority
- Construct penal terms for use of the funding facility to discourage future use

The conservatorship would be temporary; important political and practical issues would be resolved in a reasonable amount of time.

Since 2008, GSE reform has not been enacted. Timing of this reform remains uncertain.

The funding facility was necessary to bolster debt and MBS investor confidence.

Significant funding was required and the SPSPAs needed to be amended to increase Treasury's commitment in May and December of 2009.



**September 7, 2008** – SPSPAs signed by FHFA on behalf of GSEs

**May 6, 2009** – Amendments made to double the Treasury commitment to each Enterprise, increase the maximum size of each Enterprise's retained mortgage portfolio, and allow each Enterprise to increase its indebtedness

| 2008 | 2009 | 2010 | 2011 | 2012 | 2013+ |
|---|---|---|---|---|---|

**September 26, 2008** – Amendment made to clarify third-party beneficiary rights and ensure market confidence in Treasury's support of GSEs

**December 24, 2009** – Amendments made to provide additional financial support for GSEs through the end of 2012 and to change the limits on their retained mortgage portfolios

**The SPSPAs were designed for a reasonably short conservatorship.**

Source: FHFA
Confidential – Restricted

16



**000199**

**DRAFT**

# SPSPA: An opportunity to fortify the transition to a new housing finance system

**Objectives**

- Facilitate recovery of government financial support

- Sustain debt and MBS investor confidence

- Increase transparency and bolster public support

- Align GSE actions with desired policy objectives

- Provide a path to replace government support with private capital

- Align the interests of the conservator with Treasury

**Thoughtful amendments or changes to the SPSPA can serve to make the conservatorship more successful.**

Confidential – Restricted

17

**Fannie Mae**

**000200**

**DRAFT**

# Agenda

- **Status of Housing Finance Reform**

- **Strategic Goal: Building a New "Infrastructure"**

- **Strategic Enabler: Stakeholder and Public Support**

- **Conclusion**

- **Appendix**

**PX-0213 - p. 24 of 120**

**000201**

**DRAFT**

# Closing thoughts

- It may take several years to accomplish the goals, including "building a new infrastructure," embedded in the FHFA Strategic Plan.

- While Congress debates the future of housing finance, the GSE conservatorships will need to be effective in improving and transitioning the market into the future.

- Profitability of the GSEs may help FHFA and Treasury gain support for the goals of the conservatorship.

- However, the contractual terms of the SPSPAs should be reexamined as the needs of the conservatorships have changed over the past four years.

Confidential – Restricted

FannieMae

**PX-0213 - p. 25 of 120**

**000202**

DRAFT

# Agenda

- **Status of Housing Finance Reform**

- **Strategic Goal: Building a New "Infrastructure"**

- **Strategic Enabler: Stakeholder and Public Support**

- **Conclusion**

- **Appendix**

Confidential – Restricted

20

FannieMae

000203

DRAFT

# Appendix

- **FHFA Strategic Plan Observations**

- **Government Support Phases**

- **Public Quotes on "Repayment"**

- **Fannie Mae / Freddie Mac P&L**

- **TCCA Proceeds**

- **Single Agency Security**

Confidential – Restricted

**FannieMae**

**PX-0213 - p. 27 of 120**

**000204**

<span style="color:red">**DRAFT**</span>

# FHFA Strategic Plan: Observations

- *The FHFA strategy paper and the Enterprise goals scorecard are consistent with the Administration's white paper on housing finance reform as well as various Congressional proposals.*

- *We believe the intent is to make progress on de facto GSE reform, effectively beginning a transition period, while the legislative process continues down its uncertain and potentially time-consuming path.*

- *Although many options for GSE reform remain open, the additional guidance is clearly designed to enable significant change from the historical GSE business model and to facilitate fundamental restructuring of the GSEs.*

| **On the role of the company in today's market…** | **On fundamental change to the GSE securitization model…** | **On the future of the corporate entity…** |
|---|---|---|

"…..the country would be without a secondary market for non-government-insured mortgages without the Enterprises."

"In the absence of other comparable market infrastructure, minimizing future taxpayer losses and ensuring market liquidity and stability requires preserving the Enterprises as working companies."

"FHFA will determine how Fannie Mae and Freddie Mac can work together to build a single securitization platform that would replace their current separate proprietary systems."

"In the intermediate term, a single platform would allow for a single mortgage-backed security."

"….this platform could become a type of public utility (in effect) that would outlast the Enterprises as we know them today…."

"…the goal is not to rebuild Fannie Mae and Freddie Mac but rather to leverage the experience and human capital expertise at these firms to build a new infrastructure for the future."

"This plan does not anticipate Fannie Mae and Freddie Mac continuing as they existed before conservatorship."

"The Enterprises' losses are of such magnitude that the companies cannot repay taxpayers in any foreseeable scenario."

Source: BOD Operating Plan Update (March 2012)
Confidential – Restricted



**000205**

**DRAFT**

# What others are saying regarding "repayment" of Treasury's support

- "*Taxpayers Could Recover All Investments in Fannie and Freddie.*"
  - Jim Millstein, Chairman and CEO, Millstein and Company (Presentation to the Woodrow Wilson International Center for Scholars – May 22, 2012)

- "*Fannie Mae and Freddie Mac should continue to function, whether in or out of conservatorship, and honor the guarantees of the agencies at least until such time as necessary to repay substantially all their current government debts.*"
  - National Association of Federal Credit Unions (Letter from President and CEO Fred Becker to Chairman Johnson and Ranking Member Shelby, Senate Banking Committee – March 14, 2011)

- "*Although the 2012 Plan suggests that taxpayer assistance accumulated by the enterprises may be too great to repay in a short period of time, the CMLA believes that they can and should repay taxpayers fully through creative and thoughtful planning.*"
  - Community Mortgage Lenders of America (Letter from Chairman Mark McDougald to Secretaries Geithner and Donovan; Chairman Johnson and Ranking Member Shelby, Senate Banking Committee; Chairman Bachus and Ranking Member Frank, House Financial Services Committee; and FHFA Director DeMarco – May 30, 2012)

**FannieMae**

<span style="color:red">DRAFT</span>

# Fannie Mae Income Statement 2011 – 2022

| Income Statement GAAP ($B) | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Actuals | | | | | | | | | | | |
| Net Interest Income - Portfolio & Other | 13.8 | 14.5 | 12.5 | 11.3 | 10.3 | 8.9 | 7.1 | 5.6 | 4.8 | 4.1 | 3.5 | 3.0 |
| Net Interest Income - MBS Guaranty Fee | 5.5 | 6.3 | 7.0 | 7.5 | 8.0 | 8.6 | 9.0 | 9.9 | 10.8 | 11.6 | 12.7 | 14.0 |
| Net Interest Income | 19.3 | 20.8 | 19.5 | 18.8 | 18.4 | 17.5 | 16.2 | 15.5 | 15.5 | 15.7 | 16.2 | 17.0 |
| Guaranty Fee Income | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 0.4 | 0.4 | 0.4 |
| Total Fee & Other Income | 0.9 | 1.1 | 0.8 | 0.7 | 0.8 | 0.8 | 0.9 | 0.9 | 1.0 | 1.0 | 1.1 | 1.1 |
| Net Revenues | 20.4 | 22.1 | 20.5 | 19.8 | 19.3 | 18.4 | 17.3 | 16.7 | 16.8 | 17.1 | 17.7 | 18.5 |
| | | | | | | | | | | | | |
| Total FV Adj, OTTI, Inv Gains/(Losses) | (6.4) | (1.8) | 0.5 | 0.5 | 0.5 | 0.4 | 0.3 | 0.3 | 0.2 | 0.1 | 0.1 | - |
| | | | | | | | | | | | | |
| Charge Offs | (17.4) | (17.5) | (17.2) | (16.0) | (11.9) | (8.5) | (7.0) | (5.4) | (4.3) | (3.6) | (3.2) | (3.0) |
| Reduction/(Build) in Allowance | (10.7) | 11.7 | 7.5 | 11.0 | 9.0 | 7.7 | 6.6 | 5.3 | 3.8 | 2.7 | 1.8 | 1.1 |
| SOP03-03 Charges, Net | 2.5 | 1.7 | 1.9 | 1.6 | 1.1 | 0.8 | 0.5 | 0.3 | 0.2 | 0.1 | 0.1 | 0.0 |
| Foreclosed Property Expense | (1.9) | (1.5) | (1.8) | (1.7) | (1.4) | (0.9) | (0.6) | (0.4) | (0.3) | (0.2) | (0.2) | (0.2) |
| Total Credit Related Expenses | (27.5) | (5.5) | (9.6) | (5.1) | (3.2) | (1.0) | (0.5) | (0.3) | (0.6) | (1.0) | (1.5) | (2.0) |
| | | | | | | | | | | | | |
| Total administrative expenses | (2.4) | (2.5) | (2.5) | (2.5) | (2.3) | (2.1) | (2.0) | (2.0) | (2.0) | (2.0) | (2.0) | (2.0) |
| TCCA Pass Through | - | (0.2) | (0.6) | (0.9) | (1.2) | (1.4) | (1.7) | (1.9) | (2.1) | (2.3) | (2.6) | (2.5) |
| Other Expenses/Losses | (1.2) | (1.0) | (1.0) | (0.9) | (0.7) | (0.6) | (0.6) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) |
| Total Non-Credit Related Expenses | (3.5) | (3.6) | (3.9) | (4.1) | (4.2) | (4.1) | (4.3) | (4.5) | (4.7) | (5.0) | (5.3) | (5.3) |
| | | | | | | | | | | | | |
| Income Before Taxes & Extra. Items | (16.9) | 11.2 | 7.4 | 11.0 | 12.4 | 13.8 | 12.9 | 12.2 | 11.6 | 11.2 | 10.9 | 11.2 |
| Taxes | (0.1) | 0.0 | (0.0) | (0.0) | 0.0 | 0.0 | (0.0) | 0.0 | (0.0) | (0.0) | (0.0) | (0.0) |
| Net Income | (16.9) | 11.2 | 7.4 | 11.0 | 12.4 | 13.8 | 12.9 | 12.2 | 11.6 | 11.2 | 10.9 | 11.2 |
| | | | | | | | | | | | | |
| Other Comprehensive Income (Loss) | 0.4 | 0.4 | 0.1 | 0.1 | 0.1 | 0.1 | - | - | - | - | - | - |
| Total Comprehensive Income (Loss) | (16.4) | 11.6 | 7.5 | 11.0 | 12.5 | 13.9 | 12.9 | 12.2 | 11.6 | 11.2 | 10.9 | 11.2 |
| | | | | | | | | | | | | |
| Treasury Preferred Dividends | (9.6) | (11.6) | (11.8) | (12.1) | (12.2) | (12.2) | (12.1) | (12.1) | (12.1) | (12.1) | (12.2) | (12.2) |
| Net Income (Loss) to Common Equity | (26.5) | (0.4) | (4.3) | (1.2) | 0.1 | 1.6 | 0.7 | 0.0 | (0.5) | (1.0) | (1.2) | (1.0) |

Note: 2012-2016 figures from Fannie Mae July corporate forecast.

Confidential – Restricted

24

FannieMae

000207



**DRAFT**

# Freddie Mac Income Statement 2011 – 2022

| Income Statement GAAP ($B) | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | *Actuals* | | | | | | | | | | | |
| Net Interest Income - Portfolio & Other | 16.2 | 14.2 | 10.7 | 8.5 | 7.2 | 6.1 | 5.6 | 4.5 | 4.0 | 3.6 | 3.2 | 2.9 |
| Net Interest Income - MBS Guaranty Fee | 3.1 | 3.4 | 3.8 | 4.2 | 4.6 | 5.1 | 5.5 | 5.9 | 6.4 | 6.8 | 7.4 | 8.0 |
| Net Interest Income | 18.9 | 17.6 | 14.5 | 12.7 | 11.8 | 11.2 | 11.1 | 10.4 | 10.3 | 10.4 | 10.6 | 11.0 |
| Guaranty Fee Income | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Fee & Other Income | 1.7 | 1.8 | 1.6 | 1.5 | 1.6 | 1.6 | 1.7 | 1.7 | 1.8 | 1.9 | 2.0 | 2.1 |
| *Net Revenues* | *20.6* | *19.4* | *16.1* | *14.2* | *13.4* | *12.8* | *12.8* | *12.1* | *12.1* | *12.2* | *12.5* | *13.1* |
| | | | | | | | | | | | | |
| Total FV Adj, OTTI, Inv Gains/(Losses) | (13.0) | (0.9) | 1.0 | 0.9 | 0.9 | 0.7 | 0.6 | 0.5 | 0.4 | 0.2 | 0.1 | - |
| | | | | | | | | | | | | |
| Charge Offs | (11.2) | (10.2) | (10.1) | (9.3) | (7.0) | (5.0) | (4.3) | (3.3) | (2.6) | (2.1) | (1.9) | (1.7) |
| Reduction/(Build) in Allowance | 0.5 | 1.6 | 4.2 | 6.4 | 5.2 | 4.4 | 3.8 | 3.3 | 2.4 | 1.7 | 1.1 | 0.7 |
| SOP03-03 Charges, Net | - | - | - | - | - | - | - | - | - | - | - | - |
| Foreclosed Property Expense | (0.6) | (0.6) | (0.9) | (0.8) | (0.6) | (0.5) | (0.3) | (0.2) | (0.1) | (0.1) | (0.1) | (0.1) |
| *Total Credit Related Expenses* | *(11.3)* | *(9.1)* | *(6.7)* | *(3.8)* | *(2.5)* | *(1.1)* | *(0.7)* | *(0.2)* | *(0.4)* | *(0.6)* | *(0.8)* | *(1.1)* |
| | | | | | | | | | | | | |
| Total administrative expenses | (1.5) | (1.6) | (1.6) | (1.6) | (1.5) | (1.4) | (1.2) | (1.2) | (1.2) | (1.2) | (1.2) | (1.2) |
| TCCA Pass Through | - | (0.1) | (0.3) | (0.5) | (0.7) | (1.0) | (1.1) | (1.2) | (1.3) | (1.4) | (1.5) | (1.5) |
| Other Expenses/Losses | (0.4) | (0.4) | (0.3) | (0.3) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.2) | (0.3) |
| *Total Non-Credit Related Expenses* | *(1.9)* | *(2.0)* | *(2.2)* | *(2.4)* | *(2.5)* | *(2.6)* | *(2.5)* | *(2.6)* | *(2.7)* | *(2.8)* | *(3.0)* | *(2.9)* |
| | | | | | | | | | | | | |
| Income Before Taxes & Extra. Items | (5.7) | 7.3 | 8.1 | 8.9 | 9.4 | 9.8 | 10.2 | 9.8 | 9.4 | 9.1 | 8.9 | 9.0 |
| Taxes | (0.4) | (0.0) | 0.0 | (0.0) | 0.0 | 0.0 | 0.0 | 0.0 | (0.0) | (0.0) | (0.0) | (0.0) |
| *Net Income* | *(5.3)* | *7.3* | *8.1* | *8.9* | *9.4* | *9.8* | *10.2* | *9.8* | *9.4* | *9.1* | *8.9* | *9.0* |
| | | | | | | | | | | | | |
| Other Comprehensive Income (Loss) | 4.0 | - | - | - | - | - | - | - | - | - | - | - |
| *Total Comprehensive Income (Loss)* | *(1.2)* | *7.3* | *8.1* | *8.9* | *9.4* | *9.8* | *10.2* | *9.8* | *9.4* | *9.1* | *8.9* | *9.0* |
| | | | | | | | | | | | | |
| Treasury Preferred Dividends | (6.5) | (7.2) | (7.2) | (7.2) | (7.2) | (7.2) | (7.2) | (7.2) | (7.2) | (7.2) | (7.2) | (7.2) |
| *Net Income (Loss) to Common Equity* | *(11.8)* | *0.1* | *0.9* | *1.7* | *2.1* | *2.6* | *2.9* | *2.6* | *2.2* | *1.8* | *1.6* | *1.8* |

Confidential – Restricted

25

FannieMae

000208

DRAFT

# The Payroll Tax Cut Continuation Act (TCCA) pass-through fee generates revenue for the government



**Cumulative Proceeds from TCCA Fee for Both GSEs**

*$ in Billions*

| Year | Value |
|------|-------|
| 2012 | $0 |
| 2013 | $1 |
| 2014 | $2 |
| 2015 | $4 |
| 2016 | $7 |
| 2017 | $9 |
| 2018 | $13 |
| 2019 | $16 |
| 2020 | $20 |
| 2021 | $24 |
| 2022 | $27 |

Note: TCCA fee of 10 bps is a "tax" remitted to the US government on new SF originations beginning April 1, 2012 through 2021

- Multiple factors influence the revenue associated with the TCCA (i.e. origination volumes, prepayments, GSE market share, etc.)

- Specific language in the TCCA legislation prohibits 10 bps "tax" revenue from being considered a reimbursement
  - "*The fees charged pursuant to this section shall not be considered a reimbursement to the Federal Government for the costs or subsidy provided to [Fannie Mae and Freddie Mac].*" (12 USC 1327(b)(3))

- TCCA proceeds are dependent on and funded by the GSEs even though the proceeds cannot be counted towards "repayments"

Confidential – Restricted

**Fannie Mae**

**000209**

DRAFT

# Single Agency Security

- TBD

Confidential – Restricted



**000210**