| | |
|---|---|
| **From:** | Bowler, Timothy |
| **Sent:** | Tuesday, July 31, 2012 10:53 AM |
| **To:** | Foster, Jeff; Stegman, Michael; Mlynarczyk, Beth |
| **Cc:** | Chepenik, Adam; Goldblatt, Alan |
| **Subject:** | Re: 2Q12 estimated results/timing |

Really makes sense to push the net worth sweep this quarter

It will "make sense" to GSE observers

TJB

----- Original Message -----
From: Foster, Jeff
Sent: Tuesday, July 31, 2012 10:50 AM
To: Bowler, Timothy; Stegman, Michael; Mlynarczyk, Beth
Cc: Chepenik, Adam; Goldblatt, Alan
Subject: Fw: 2Q12 estimated results/timing

Fyi.  See results below, this is much stronger than we thought / expected.  Post dividends, Fannie Mae will still have $2.8 bn of net worth and Freddie will have $1.1 bn of net worth. ██████████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

----- Original Message -----
From: Williams, John [mailto:John.Williams@fhfa.gov]
Sent: Tuesday, July 31, 2012 10:40 AM
To: Foster, Jeff
Cc: Tagoe, Naa Awaa <NaaAwaa.Tagoe@fhfa.gov>; Calhoun, Peter <Peter.Calhoun@fhfa.gov>; Carroll, Barry <Barry.Carroll@fhfa.gov>; Chepenik, Adam
Subject: 2Q12 estimated results/timing

Fannie Mae is currently scheduled to release its 2Q12 10-Q on Wednesday, August 8th, and Freddie Mac is currently scheduled to release its 2Q12 10-Q on Tuesday, August 7th.

The following reflects the current estimated 2Q12 financial results for both Enterprises.

Fannie Mae:
Net Income:          $5.1B
Dividends:           $2.9B
Net Worth (post dividends):     $2.8B
Net Worth (pre dividends):      $5.7B

1

Protected Information To Be Disclosed Only In Accordance With Protective Order          UST00504506

Freddie Mac
Net Income:       $3.0B
Dividends:        $1.8B
Net Worth (post dividends):    $1.1B
Net Worth (pre dividends):     $2.9B


Regards,

John H. Williams
Manager, Enterprise Financial  Performance Reporting Office of Financial Analysis, Modeling and Simulations Federal Housing Finance Agency
400 7th Street SW, Washington DC 20552
(202) 649-3159


Confidentiality Notice: The information contained in this e-mail and any attachments may be confidential or privileged under applicable law, or otherwise may be protected from disclosure to anyone other than the intended recipient(s). Any use, distribution, or copying of this e-mail, including any of its contents or attachments by any person other than the intended recipient, or for any purpose other than its intended use, is strictly prohibited. If you believe you have received this e-mail in error: permanently delete the e-mail and any attachments, and do not save, copy, disclose, or rely on any part of the information contained in this e-mail or its attachments. Please call
202-649-3800 if you have questions.

Protected Information To Be Disclosed Only In Accordance With Protective Order          UST00504507

**PX-0226-A - p. 2 of 2**                                                    **000428**

| | |
|---|---|
| **From:** | Bowler, Timothy |
| **Sent:** | Monday, August 06, 2012 5:31 PM |
| **To:** | Parrott, Jim |
| **Cc:** | Stegman, Michael |
| **Subject:** | PSPA Next Steps August 6 |
| **Attachments:** | PSPA Next Steps August 6.doc |

Let me know when you can discuss

Now very timely

TJB

1

Protected Information To Be Disclosed
Only In Accordance With Protective Order

UST00504498

**000429**

DRAFT / SENSITIVE / PRE-DECISIONAL

# PSPA Next Steps

### *Term Sheet: Recommended Changes*

| Proposed Change | Details |
|---|---|
| Modify 10% Dividend To A Net Worth Sweep | • Quarterly dividend payments starting in 2013 will equal the Net Worth of the GSE (i.e. GAAP Assets *less* Liabilities at quarter end) *less* a predefined Capital Reserve.<br><br>• The Capital Reserve will equal [$3.0B] between Jan-'13 to Dec-'13. Thereafter it will amortize yearly on a pro-rata basis until it is zero starting in Jan-'18. |
| Accelerated Wind-down of Retained Investment Portfolios | • The mandatory "run off" factor for the retained investment portfolios will be increased from 10% per annum to 15% until such time that each GSE's portfolio reaches a target $250B balance ($250B was set in the original PSPA).<br><br>• A 15% requirement results in meeting the $250B target in 2018 (vs. 2022 with the 10% run off factor). |
| Annual Risk Management Plan Delivered To Treasury | • On an annual basis each GSE will submit to Treasury a plan that details the steps they will take to reduce the <u>financial</u> and <u>operational</u> risk profile associated with both their mortgage guarantee and retained investment portfolio businesses in order to help protect taxpayers from future losses. |

### *Timing*
Announce the change in mid August after each GSE releases "record" second quarter earnings.
- *Earnings will be in excess of current 10% dividend paid to Treasury.*
- Record earnings will be driven by large credit loss reserve release.

### *Rationale*
- The changes will reduce the risk of potential financial market uncertainty and volatility.
- The changes protect the taxpayer.
  - Taxpayer will now benefit from all future earnings at the GSEs.
  - GSEs will need to take pro-active steps to reduce their risk profile.
- The GSEs will be wound down faster and will not return to their past state.
  - GSEs will not be allowed to build capital and exit conservatorship in their prior form.
  - Faster portfolio reduction could help encourage NPL sales to entities that are more aggressive in writing down principal for troubled homeowners.

1

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00504499

**000430**

DRAFT / SENSITIVE / PRE-DECISIONAL

<u>**Working Draft Clearance Sheet**</u>

**PSPA Next Steps**

Drafted:      Capital Markets – Tim Bowler

Approved:     Mary Miller, Under Secretary for Domestic Finance
                Michael Stegman, Counselor to the Secretary for Housing Finance Policy

Reviewing:    OGC – Chris Weideman

2

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00504500

**000431**



| | Audit Committee | **Confidential** |
|---|---|---|
| | Board of Directors | |



**MINUTES OF MEETING**
**AUGUST 6, 2012**

A meeting of the Audit Committee (the "Committee") of the Board of Directors of the Federal Home Loan Mortgage Corporation ("Freddie Mac" or the "Company") was held on Monday, August 6, 2012.  The meeting was convened at 1:02 p.m. by telephone in such manner that each participant could hear and be heard by all.

The following Committee members, constituting the entire membership of the Committee, were present: Carolyn Byrd, Christopher Lynch and Anthony Williams.

The following member of the Board of Directors also was present:  Donald Layton.

The following individuals from Freddie Mac were present: Joseph Amato, Timothy Bogan, Donald Dawn, Ross Kari, Timothy Kenny, Kevin MacKenzie, Robert Mailloux, William McDavid, Timothy Morgan, Jodi Morton and Alicia Myara.  Hyacinth Kucik joined the meeting in progress as noted below.

The following individuals also were present: Jeffrey Spohn and James Griffin of the Federal Housing Finance Agency ("FHFA"); and Wesley Bricker, Michael English and John Oliver of PricewaterhouseCoopers LLP ("PwC").

Ms. Byrd, the Chair, called the meeting to order.

**FINANCIAL REPORTING MATTERS**

Mr. Kari reviewed the Company's financial results for the second quarter, noting that they were driven primarily by the recent substantial improvement in house prices.  He indicated that this improvement contributed to a significant reduction in the provision for loan losses and in impairments of available for sale securities. He added that the Company's other comprehensive income exceeded its dividend payment to the U.S. Department of the Treasury ("Treasury") under the Senior Preferred Stock Purchase Agreement ("Purchase Agreement"), resulting in no need for a draw request for the quarter.

Mr. Amato reviewed the Company's draft earnings press release, noting that it was based on information contained in the draft Form 10-Q, and that it had been revised from the first quarter release in certain respects to focus more prominently on the Company's financial results, the impact of its activities on conditions in the housing market, and trends in the credit quality of the Company's loan portfolio.  Questions and discussion ensued.  Topics included differences between the judgments made by Freddie Mac and Fannie Mae in determining their respective loan loss provisions and impairment charges.  Mr. Mailloux explained that in establishing its loan loss provision, Fannie Mae appeared to be giving greater weight than Freddie Mac to the recent improvement in house prices. He noted that Freddie Mac does not expect house prices to continue to increase at the same rate they did in the second quarter, but to improve more gradually over the next year and a period of several years thereafter.  He also explained that the third-party model Fannie Mae uses for financial reporting purposes in determining impairment charges was recently revised to project higher loss severities, based on expectations concerning the continuation of extended foreclosure timelines.  He noted that Freddie Mac does not believe these expectations to

O:\Legal BDRESO\AUD\2012 Mins\AUD Mins_060612.Docs

Protected Information to Be Disclosed
Only In Accordance With Protective Order

Fairholme Funds, Inc. et al. v. United States
No. 13-465C (Fed. Cl.)

FHLMC_00000739

Audit Committee
August 6, 2012
Page 2 of 4

be fully supportable. He indicated that, as a result of these differences, Freddie Mac expects to report a higher loan loss provision but lower impairment charges than Fannie Mae.

Mr. Amato then reviewed in greater detail management's determinations with respect to impairment charges on available for sale securities. He noted that the combination of low interest rates and improving house prices resulted in a reduction in these charges as compared to the first quarter. He also discussed the factors management considered in determining that the higher loss severities projected by the third-party model used by Fannie Mae, which Freddie Mac incorporated into its benchmarking, should not also be used for financial reporting purposes. Mr. Kari indicated that management discussed this issue extensively with PwC, FHFA and the third-party model provider. In response to a question from the Committee, Mr. Bricker indicated that PwC believes management's judgments on this issue to be reasonable and supportable. In response to a further question from the Committee, Mr. Griffin indicated that FHFA is comfortable with the approach Freddie Mac has taken on the issue. The Committee requested that management provide further reports at future meetings concerning management's impairment judgments and plans to adopt the third-party model for financial reporting purposes.

Ms. Morton next reviewed management's judgments and estimates in establishing the Company's single-family loan loss reserves. She noted that disposition prices for the Company's real-estate owned ("REO") improved significantly during the second quarter, due to both seasonality and supply factors. She indicated that management has generally considered REO loss severity experience over a three-month look-back period when establishing the Company's single-family loan loss reserves. She explained, however, that in light of the factors contributing to the recent improvement in disposition prices, management determined for the second quarter to instead use a six-month look-back period. She added that management has continued to record on-top adjustments to the output of its reserving model to mitigate the transition rate impact of significant increases in payoff rates and a sharp decline in projected redefaults on future modifications. She also discussed management's expectations concerning recoveries from mortgage insurance counterparties. She noted that one of these counterparties recently disclosed the conditions Freddie Mac has set as the basis for approval of the counterparty's doing business through a new insurance subsidiary. Questions and discussion ensued concerning these conditions.

In response to a question from the Committee, Mr. English indicated that PwC believes management's judgments in establishing the Company's single-family loan loss reserves to be reasonable and supportable. He added that management will need to continue to assess the impact on the Company's reserves of various programs to assist borrowers.

Mr. Mailloux briefly reviewed management's judgments and estimates in establishing the Company's multifamily loan loss reserve. He noted that these included the correction of a relatively modest error that occurred in connection with the recent conversion to a new process for establishing the multifamily reserve. In response to a question from the Committee, Mr. Oliver indicated that PwC concurred in management's determinations concerning the multifamily reserve.

Mr. Mailloux noted that the second quarter change in the REO loss severity look-back period is regarded as a change in estimate and is disclosed as such in the notes to the financial statements in the draft Form 10-Q. He also briefly reviewed the expected financial statement impact of a

Protected Information to Be Disclosed
Only In Accordance With Protective Order

Fairholme Funds, Inc. et al. v. United States
No. 13-465C (Fed. Cl.)

FHLMC_00000740

**Audit Committee**
**August 6, 2012**
**Page 3 of 4**

recent determination by the Internal Revenue Service not to adjust certain impairment deductions previously claimed by Freddie Mac.

Mr. Mailloux next reviewed the materiality assessment included in the written meeting materials. He discussed the impact of prior period errors, unadjusted differences and simplifying assumptions under both the rollover and iron curtain approaches. He noted that the percentages for the second quarter were relatively low, and he reported that, based on consideration of both quantitative information and qualitative factors, management has determined that the items at issue are not material for any of the periods presented. In response to a question from the Committee, Mr. Oliver indicated that PwC concurs with management's assessment that the items at issue are not material.

Mr. Mailloux noted that the Company recently received a comment letter from the staff of the Securities and Exchange Commission ("SEC") concerning the Company's 2011 Form 10-K and first quarter 2012 Form 10-Q. He indicated that, based on a review of the comment letter by the Company's Disclosure Committee and discussion with PwC, management is comfortable in proceeding with the filing of the Company's second quarter Form 10-Q as planned, and expects to respond to the comment letter in due course at a later date. He added that the SEC staff's comments generally focus on seeking greater clarity in future filings concerning certain of the Company's disclosures. He noted that Fannie Mae and the Federal Home Loan Banks also received comment letters from the SEC staff, and that FHFA is in the process of reviewing the letters, but is expected to agree with management's view that their receipt should not affect the filing of the Company's second quarter Form 10-Q.

Mr. Mailloux then reviewed disclosures that management proposed to add to the Company's second quarter Form 10-Q in response to recent developments, including certain recent announcements by FHFA.

<u>**INTERNAL CONTROLS MATTERS**</u>

Mr. Bogan referred the Committee to the report on internal control over financial reporting included in the written meeting materials. He indicated that management has not identified any new material weaknesses or significant deficiencies, and he briefly summarized the status of efforts to remediate the existing weaknesses and deficiencies. Mr. Mailloux noted that there is a risk that management will not meet the original timeline for remediation of the existing deficiency relating to the performance of the Company's DEFCAP model. In response to a question from the Committee, he explained that management continues to mitigate the risk from this deficiency by performing analytic procedures that compare the results of the DEFCAP model with those of the Company's more current loan loss reserving model.

Mr. Bogan reported on the status of management's efforts to enhance its controls testing processes, including progress in reducing the number of key controls and in performing design walk-throughs. He noted that the design walk-through process has fallen somewhat behind schedule, but that management is taking additional steps to ensure that the testing problems encountered with respect to 2011 will not recur. In response to a question from the Committee, Mr. Oliver confirmed that the design walk-through process is taking longer than originally anticipated, but that it has been a productive effort. He added that continued progress in the development of testing plans over the next two months will be essential in avoiding the problems encountered with

Protected Information to Be Disclosed
Only in Accordance With Protective Order

Fairholme Funds, Inc. et al. v. United States
No. 13-465C (Fed. Cl.)

FHLMC_00000741

**000434**

Audit Committee
August 6, 2012
Page 4 of 4

respect to 2011. Mr. Mailloux noted that management expects to be in a position to provide the Committee with a more detailed update on these efforts at its next regular meeting.

Mr. Mailloux then reviewed management's assessment of the Company's disclosure controls and procedures. He indicated that this assessment was reviewed by the Company's Disclosure Committee. Mr. McDavid left the meeting following this discussion.

## INDEPENDENT PUBLIC ACCOUNTANT ITEM

Mr. Oliver referred the Committee to PwC's report included in the written meeting materials. He reviewed the status of PwC's work in relation to the overall timeline and fee estimate previously provided to the Committee. He indicated that PwC had no issues to report relating to the Company's second quarter Form 10-Q. He also referred the Committee to PwC's reaffirmation of its independence, included as an appendix to the report.

Messrs. Amato, Bogan, Dawn, Kari, Kenny, MacKenzie, Mailloux and Morgan and Mses. Morton and Myara left the meeting following this discussion.

## EXECUTIVE SESSION

The Committee went into executive session at 2:05 p.m. with Messrs. Layton, Bricker, English, Griffin, Oliver and Spohn present. Messrs. Bricker, English and Oliver left the meeting, Messrs. Kari, MacKenzie and McDavid and Ms. Myara rejoined the meeting, and Ms. Kucik joined the meeting at 2:09 p.m. Ms. Kucik provided a legally privileged update concerning recent developments in connection with pending litigation. Mr. MacKenzie noted that, in connection with PwC's completion of its work relating to the Company's second quarter Form 10-Q, PwC is also in the process of completing agreed upon procedures relating to the Company's compliance with certain covenants in the Purchase Agreement with Treasury during the first and second quarters of 2012, as requested by FHFA. Messrs. MacKenzie and McDavid and Mses. Kucik and Myara left the meeting at 2:25 p.m., and the Committee continued in executive session with Messrs. Layton, Kari, Griffin and Spohn present. Messrs. Kari, Griffin and Spohn left the meeting at 2:31 p.m. and Mr. Layton left the meeting at 2:37 p.m.

The meeting adjourned at 2:39 p.m.

By signing below, I confirm that the foregoing minutes were approved by the Committee on September 6, 2012.

Alicia A. Prather
Assistant Secretary

Protected Information to Be Disclosed
Only in Accordance With Protective Order

Fairholme Funds, Inc. et al. v. United States
No. 13-465C (Fed. Cl.)

FHLMC_00000742

PX-0228 - p. 4 of 4

000435

Message

| | |
|---|---|
| **From:** | Ugoletti, Mario [/O=FHFA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=UGDETTIM] |
| **Sent:** | 8/9/2012 10:52:11 AM |
| **To:** | DeMarco, Edward [edward.demarco@fhfa.gov]; Pollard, Alfred [alfred.pollard@fhfa.gov]; Laponsky, Mark [mark.laponsky@fhfa.gov]; Spohn, Jeffrey [jeffrey.spohn@fhfa.gov]; Greenlee, Jon [jon.greenlee@fhfa.gov]; Lawler, Patrick [patrick.lawler@fhfa.gov]; DeLeo, Wanda [wanda.deleo@fhfa.gov]; Satriano, Nicholas [nicholas.satriano@fhfa.gov] |
| **CC:** | Brown, Jan [jan.brown@fhfa.gov] |
| **Subject:** | PSPA Alert |

Close Hold

As a heads up, there appears to be a renewed push to move forward on PSPA amendments.  I have not seen the proposed documents yet, but my understanding is that largely the same as previous versions we had reviewed in terms of net income sweep, eliminating the commitment fee, faster portfolio wind down, and a deminimus safe harbor for ordinary course transactions.  The one potential difference is not having separate covenants on g-fees, risk reduction, etc., but potentially one covenant requiring the Enterprises to present a plan to Treasury on how they are managing or reducing risk.  Depending on the language that could be an improvement.

I am leaving for the day at around 11:00.  When I get the proposed language I will have Jan forward it to this group.  I have told Treasury we should plan on meeting on Monday morning, perhaps around 11:00 to discuss further.  Mario.



EXHIBIT
41
DeMARCO
5-7-15    RLS

Protected Information To Be Disclosed Only In Accordance With Protective Order

FHFA00103596

**To:**       Satriano, Nicholas[Nicholas.Satriano@fhfa.gov]
**From:**     Griffin Jr., James
**Sent:**     Tue 8/14/2012 12:49:45 PM
**Subject:**  Re: SPSPA Meeting

Nick,

There was not. I do not thing there would be a going concern issue.  There was a question about re-recording certain deferred tax assets that had been written-off. Jeff indicated both of the Boards had discussed this at the last meeting based on the view that they were going to be profitable going forward. I do not think that makes sense given the amendments are designed to demonstrate wind down. This is something we will need to work with the Enterprises and their auditors on.

Thanks,

Jim

----- Original Message -----
From: Satriano, Nicholas
Sent: Tuesday, August 14, 2012 12:37 PM
To: Griffin Jr., James
Subject: Re: SPSPA Meeting

Hi
Any discussion of reaching out to the auditors?  Given the changes, should be fine.
Cheers,
Nick

----- Original Message -----
From: Griffin Jr., James
Sent: Tuesday, August 14, 2012 07:33 AM
To: Satriano, Nicholas
Subject: SPSPA Meeting

The meeting with Ed went well. The amendment is expected to be made public sometime on Friday. The Enterprises will be informed tomorrow of the changes and FHFA will work with them to ensure a consistent communication message.

Thanks

Protected Information To Be Disclosed Only In Accordance With Protective Order

**Exhibit
0006**
12/21/2020
DeMarco

Protected Information to be Disclosed
Only in Accordance with Protective Order



We make home possible®

# Freddie Mac

# 2012-2015 Corporate Forecast / Senior Preferred Stock Purchase Agreement - 3Q Update

**Financial Planning & Analysis**

**August xx, 2012**

**DRAFT – 8/14/12**
**(Has not been fully reviewed)**

Fairholme Funds, Inc., et al. v. Fed. Hous.
Fin. Agency, et al., No. 13-1053 (D.D.C.)

FRE-FAIRHOLME-0001164

# Forecast Highlights: 2012 Base Case



- Net income is projected at $6.9 billion.

- Comprehensive income is projected at $9.7 billion and exceeds $7.2 billion of dividend payments on senior preferred stock.

- No additional Treasury Draw is required in 3Q12 and 4Q12.

- Comprehensive income is a favorable variance to Plan of $0.8 billion.

| 2012 GAAP Results ($ Billions)<br>Base Case | Actual<br>YTD 2Q12 | Fcst<br>3Q12 | Fcst<br>4Q12 | Fcst<br>2012 | Variance<br>to Plan |
|---|---|---|---|---|---|
| 1 Net Income / (Loss) | $ 3.6 | $ 2.4 | $ 1.0 | $ 6.9 | $ (0.6) |
| 2 Change in AOCI | 1.1 | 1.3 | 0.4 | 2.8 | 1.4 |
| 3 **Comprehensive Income / (Loss)** | $ 4.7 | $ 3.7 | $ 1.4 | $ 9.7 | $ 0.8 |
| 4 Current Period Draw | 0.0 | - | - | 0.0 | (0.0) |
| 5 Senior Preferred Stock Dividend | (3.6) | (1.8) | (1.8) | (7.2) | 0.0 |

Note: Numbers may not foot due to rounding.
Protected Information to be Disclosed
Only in Accordance with Protective Order

Fairholme Funds, Inc., et al. v. Fed. Hous.
Fin. Agency, et al., No. 13-1053 (D.D.C.)

FRE-FAIRHOLME-0001165

1
Confidential

000439

# Projected Comprehensive Income Through 2015



| GAAP Results ($B) | 2012-15 Worse | 2012-15 Base | 2012-15 Better |
|---|---|---|---|
| 1 Net Interest Income | $ 55.1 | $ 53.4 | $ 52.5 |
| 2 Provision for Credit Losses | (24.1) | (15.7) | (5.8) |
| 3 Non-Interest Income / (Loss) | (7.8) | (4.1) | (1.2) |
| 4 Non-Interest Expense & Tax Benefit | (9.6) | (9.2) | (8.9) |
| 5 Net Income / (Loss) | $ 13.7 | $ 24.3 | $ 36.6 |
| 6 Change in AOCI [1] | 5.1 | 6.0 | 8.1 |
| 7 Comprehensive Income / (Loss) | $ 18.7 | $ 30.3 | $ 44.7 |
| 8 Total Stockholders' Equity | $ (0.2) | $ 1.4 | $ 15.8 |
| 9 Current Period Draw | 12.8 | 0.0 | 0.0 |
| 10 Senior Preferred Stock Dividend | (31.5) | (28.9) | (28.9) |

**Cumulative 2012-2015 Results**

Net Income / (Loss) — Worse $13.7, Base $24.3, Better $36.6

Comprehensive Income / (Loss) — Worse $18.7, Base $30.3, Better $44.7

☐ Worse ☐ Base ☐ Better

- Comprehensive income through 2015 ranges from $18.7 billion to $44.7 billion.
- No additional funding is required through 2015 in the Base and Better Cases, while the Worse Case Treasury Draw is $12.8 billion.
- Variability in earnings and draw are driven by changes in house prices, spreads and interest rates.
- Over the long term it is likely that our dividend obligation will exceed comprehensive income, resulting in additional Treasury draws.

(1) Change in AOCI includes gains on AFS securities, impairments net of taxes, amortization of closed cash flow hedge positions and other.
Note: 2012 forecast reflects YTD June actuals and mark-to-market results as of August 7, 2012.
Protected Information to be Disclosed Only in Accordance with Protective Order
Fairholme Funds, Inc., et al. v. Fed. Hous. Fin. Agency, et al., No. 13-1053 (D.D.C.)
FRE-FAIRHOLME-0001166 Confidential
PX-0262 - p. 3 of 8   000440

# Cumulative Treasury Draws Through 2015





### Cumulative Treasury Draw Required (1)

Legend: Base/Better — Worse — Stress

2011 Actual: $71

2012: $71, $75, $82
2013: $71, $82, $156
2014: $71, $83, $178
2015: $71, $84, $199 (2)

### Cumulative Treasury Draw less Dividends (1)

Legend: Base/Better — Worse — Stress

2011 Actual: $55

2012: $48, $51, $58
2013: $40, $50, $123
2014: $33, $43, $128
2015: $26, $36, $132 (2)

| Remaining Funding After 2012 Under | Better | Base | Worse | Stress |
|---|---|---|---|---|
| 1 Remaining Commitment plus Equity | 149 | 149 | 149 | 149 |
| 2 Less: Positive Equity at 12/31/12 | (11) | (2) | - | - |
| 3 Remaining Commitment 12/31/2012 | $ 138 | $ 147 | 149 | 149 |
| 2 Less: Cumulative Draws 2013-2015 | - | - | (9) | (117) |
| 3 Remaining Commitment 12/31/2015 | $ 138 | $ 147 | $ 140 | $ 32 |

- Cumulative Treasury Draw ranges from $71 billion to $199 billion.

- Cumulative Treasury Draw less Dividends ranges from $26 billion to $132 billion.

- Under the Senior Preferred Stock Purchase Agreement, the remaining funding commitment in the Stress Case is $32 billion as of the end of 2015.

(1) Represents cumulative Treasury Draw required at the end of period.
(2) Stress Case may not be consistent with Fed stress test scenario.

Protected Information to be Disclosed Only in Accordance with Protective Order

Fairholme Funds, Inc. et al v. Fed. Hous. Fin. Agency, et al., No. 13-1053 (D.D.C.)

FRE-FAIRHOLME-0001167

3
Confidential

PX-0262 - p. 4 of 8

000441

# Guarantee Fee and Retained Portfolio Sensitivities


Freddie Mac

- A market share increase up to 40% and a g-fee increase up to 10 bps results in additional cumulative income of $0.5 billion to $1.5 billion.

- Purchases of 50%-100% of our SPSPA limit results in an incremental income increase of $1.3 billion to $2.4 billion.

## Single Family Base Case Assumptions

| Single Family Assumptions | YTD Avg 2Q2012 | 2012 | Ending 2013 | 2014 | 2015 |
|---|---|---|---|---|---|
| 1 Market Share | 34% | 35% | 35% | 35% | 35% |
| 2 G-Fee on New Purchases (bps) | 28 bps | 30 bps | 32 bps | 35 bps | 38 bps |

## Guarantee Fee Income Sensitivities: Incremental Income 2013-2015 (1)

| ($ Billions) | 5 bps Increase | 10bps Increase | Balance 2Q2012 | 2012 | 2013 | Ending 2014 | Balance 2015 |
|---|---|---|---|---|---|---|---|
| 3 35% Market Share | $ 0.5 | $ 1.0 | | | 1,699 | | 1,459 |
| 4 40% Market Share | $ 1.0 | $ 1.5 | | | 1,699 | | 1,541 |
| 5 Ending New Business G-Fee 2015 | 43 bps | 48 bps | | | | | |

## Retained Portfolio Base Case Assumptions

| ($ Billions) | Balance 2Q2012 | 2012 | Ending 2013 | 2014 | 2015 |
|---|---|---|---|---|---|
| 6 Ending Balance | $ 581 | $ 541 | $ 460 | $ 394 | $ 334 |

## Retained Portfolio Sensitivities: Incremental Income 2013-2015

| ($ Billions) | Incremental Income | Balance 2Q2012 | 2012 | 2013 | Balance 2015 | Treasury Limit 2015 |
|---|---|---|---|---|---|---|
| 7 Up to 50% of SPSPA Limit | $ 1.3 | $ 581 | $ 581 | $ 418 | $ 478 | $ 478 |
| 8 Up to 100% of SPSPA Limit | $ 2.4 | $ 581 | $ 581 | $ 478 | $ 478 | $ 478 |

(1)   The increased g-fee and market share begins in 2013

Protected Information to be Disclosed Only in Accordance with Protective Order

Fairholme Funds, Inc. et al v. Fed. Hous. Fin. Agency, et al., No. 13-1053 (D.D.C.)

FRE-FAIRHOLME-0001168

4
Confidential

PX-0262 - p. 5 of 8

000442

Protected Information to be Disclosed
Only in Accordance with Protective Order

Fairholme Funds, Inc., et al. v. Fed. Hous.
Fin. Agency, et al., No. 13-1053 (D.D.C.)

# Appendix

FRE-FAIRHOLME-0001169

000443

# 2012 Forecast Assumptions - 3Q Update



- The range of HPA, spreads, and interest rates varies widely across all scenarios.
- Both the Retained Portfolio and the Single-Family Loan Portfolio balances decline over the forecast horizon.
- Single-Family new business G-fee is higher than Plan and is substantially increasing over the forecast horizon.

| Key Assumptions | HPA | | Spread [1] | | Interest Rates [1] |
| --- | --- | --- | --- | --- | --- |
| | Further Decline | 4-Year Change | ABS/CMBS Price | Agency OAS [2] | |
| 1 Base Case | No Decline | 9% | $57 / $89 | 0 | Fwd Curve |
| 2 Better Case | No Decline | 15% | $62 / $94 | -50 | +100 |
| 3 Worse Case | -14% | 0% | $52 / $84 | +50 | -50/-100 |
| 4 Stress Case [3] | -20% | -20% | $47 / $79 | +100 | -50/-100 |
| 5 2012 Plan Base Case | -2% | 9% | $58 / $89 | 0 | Fwd Curve |

| Portfolio Balances - Base Case | Actual 2012 | 2012 3Q Forecast Update | | | | 2012 Plan Base Case |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2012 | 2013 | 2014 | 2015 | |
| 6 Retained Portfolio ($B) | $ 581 | $ 541 | $ 460 | $ 394 | $ 334 | $ 600 |
| 7 Single-Family Loan Portfolio ($T) | $ 1.70 | $ 1.66 | $ 1.59 | $ 1.51 | $ 1.46 | $ 1.75 |

| Other Key Assumptions - Base Case | Actual 2012 | 2012 3Q Forecast Update | | | | 2012 Plan Base Case |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2012 | 2013 | 2014 | 2015 | |
| 8 Single-Family G-fee on New Purchases (bps) [4] | 30 | 30 | 32 | 35 | 38 | 29 |
| 9 Multifamily Purchase Volumes ($B) | $ 7 | $ 25 | $ 25 | $ 25 | $ 26 | $ 22 |
| 10 Multifamily Spread on New Purchases (bps) | 146 | 156 | 153 | 143 | 133 | 104 |

(1) Spread and Interest Rate changes in the scenarios represent an immediate shock to the results.
(2) OAS level reflects Non-Freddie Agency securities and Freddie CMO securities.
(3) Stress Case results may not be consistent with Fed stress test scenario.
(4) Single-Family new business G-fee does not include the 10 bps Treasury imposed increase.

Protected Information to be Disclosed
Only in Accordance with Protective Order

Fairholme Funds, Inc., et al. v. Fed. Hous.
Fin. Agency, et al., No. 13-1053 (D.D.C.)

FRE-FAIRHOLME-0001170

6
Confidential

# GAAP Forecast Relative to 2012 Plan



- 2012 Forecast comprehensive income is $9.7 billion, $0.8 billion higher relative to the Plan. Key components of the variance are:

  - **Provision for Credit Losses**: $1.9 billion favorable variance primarily driven by improvements in house prices and a decrease in severity.

  - **Net Interest Income**: $1.9 billion lower driven by the decline in the Retained and Single-Family portfolio balances relative to the Plan.

  - **Non-Interest Income / (Loss)**: $1.1 billion unfavorable variance primarily driven by higher derivative & trading losses relative to the Plan.

  - **Change in AOCI**: $1.4 billion favorable variance driven by fair value gains on AFS securities due to declining interest rates, while the Plan assumed a gradual increase in rates.

- Required Treasury funding is flat relative to the Plan.

|  | Base Case | | |
| --- | --- | --- | --- |
| GAAP Results ($ Millions) | Current Fcst 2012 [1] | Plan 2012 | Fcst-Plan Variance |
| 1 Net Interest Income | $ 16,900 | $ 18,763 | $ (1,862) |
| 2 Provision for Credit Losses | (4,405) | (6,339) | 1,933 |
| 3 Non-Interest Income / (Loss) | (3,502) | (2,353) | (1,149) |
| 4 Non-Interest Expense & Tax Benefit | (2,057) | (2,548) | 491 |
| 5 Net Income / (Loss) | $ 6,936 | $ 7,523 | $ (587) |
| 6 Change in AOCI [2] | 2,776 | 1,365 | 1,411 |
| 7 Comprehensive Income / (Loss) | $ 9,712 | $ 8,888 | $ 824 |
| 8 Total Stockholders' Equity | $ 2,500 | $ 1,640 | $ 860 |
| 9 Current Period Draw | 19 | - | (19) |
| 10 Senior Preferred Stock Dividend | (7,233) | (7,249) | 16 |
| **UPB ($ Billions)** | | | |
| 11 Retained Portfolio Ending Balance | $ 541 | $ 600 | $ (59) |
| 12 SF Loan Portfolio Ending Balance | 1,658 | 1,751 | (93) |

(1) 2012 Forecast reflects YTD-June actuals and mark-to-market results as of August 7, 2012.
(2) Change in AOCI includes gains on AFS securities, impairments net of taxes, amortization of closed cash flow hedge positions and other.

Protected Information to be Disclosed
Only in Accordance with Protective Order

Fairholme Funds, Inc. et al. v. Fed. Hous.
Fin. Agency, et al., No. 13-1053 (D.D.C.)

FRE-FAIRHOLME-0001171

7
Confidential

| From: | Dunn, Judith C [/O=FANNIE MAE/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=F2UJHD] |
|---|---|
| Sent: | 8/15/2012 12:24:10 PM |
| To: | Mayopoulos, Timothy [timothy_mayopoulos@fanniemae.com] |
| Subject: | FW: Updated Treasury Meeting Presentation |
| Attachments: | Treasury Slides_8 9 12_v12_FINAL_v3.pdf |

Tim -- Here is the revised Treasury deck; see Nicola's email below.  I just wanted to make sure that you have the final one in case you need it.
Judy

This e-mail and its attachments are confidential and solely for the intended addressee(s). Do not share or use them without Fannie Mae's approval.  If received in error, delete them and contact the sender.

**From:** Fraser, Nicola
**Sent:** Wednesday, August 15, 2012 12:21 PM
**To:** Susi, Alan R; Dunn, Judith C
**Cc:** Gehring, Anne
**Subject:** Updated Treasury Meeting Presentation

Alan and Judy –

Attached is the updated presentation for your meeting with the Treasury this afternoon.

This update includes the corrections we made to the Freddie numbers that were incorrect in the prior version.  We reviewed the revised Freddie numbers and some additional minor edits we made to those pages with Dave Benson over the weekend.

Please let me know if you have any further questions or need anything else.

Thanks,
Nicola

This e-mail and its attachments are confidential and solely for the intended addressee(s). Do not share or use them without Fannie Mae's approval. If received in error, delete them and contact the sender.



MAYOPOULOS
EXHIBIT 15
3/10//20 JVC

Protected Information
Confidential

FNM-FAIRHOLME-0056576

# Fannie Mae Update

## Treasury Meeting

## August 9, 2012

### (Updated on 8/15/2012)

**Confidential Commercial Information - Confidential Treatment and FOIA Exemption Requested**

Protected Information
Confidential



FNM-FAIRHOLME-0056577

# Agenda

- Introduction of Fannie Mae Management Team

- Fannie Mae Corporate Update

- Status of Key Initiatives

- Discussion

1

Protected Information
Confidential

Confidential Commercial Information - Confidential Treatment and FOIA Exemption Requested



FNM-FAIRHOLME-0056578

000448

# Fannie Mae Corporate Update

The Fannie Mae forecasts included in these materials are forward-looking statements, and actual outcomes may differ materially from these forecasts as a result of numerous factors, including the assumptions contained in this analysis, changes in macro-economic variables, government policy, the housing and credit markets, and actions we take in the future and the success of those actions, as well as those discussed in Fannie Mae's most recent Form 10-Q and Form 10-K filed with the Securities and Exchange Commission.

2

Protected Information
Confidential

Confidential Commercial Information - Confidential Treatment and FOIA Exemption Requested



FNM-FAIRHOLME-0056579

000449

# 2012 Quarterly Earnings

*($ in Billions)*

| | Actual | | | | Forecast [1] | | |
|---|---|---|---|---|---|---|---|
| | Q3 2011 | Q4 2011 | Q1 2012 | Q2 2012 | Q3 2012 | Q4 2012 | Full Year 2012 |
| Net interest income - portfolio and other................................ | 3.9 | 2.7 | 3.7 | 3.7 | 3.5 | 3.3 | 14.2 |
| Net interest income - MBS guaranty fee................................ | 1.3 | 1.5 | 1.5 | 1.8 | 1.6 | 1.7 | 6.5 |
| Other revenues................................................................ | 0.3 | 0.4 | 0.4 | 0.4 | 0.3 | 0.3 | 1.3 |
| **Net revenues**........................................................ | $ 5.5 | $ 4.5 | $ 5.6 | $ 5.8 | $ 5.4 | $ 5.2 | $ 22.1 |
| Credit losses................................................................ | (4.5) | (5.2) | (5.1) | (3.9) | (4.5) | (5.2) | (18.6) |
| (Build) / reduction in allowance...................................... | (0.9) | (1.3) | 2.3 | 6.6 | 2.6 | (0.5) | 11.0 |
| SOP 03-3................................................................... | 0.5 | 1.0 | 0.4 | 0.4 | 0.5 | 0.4 | 1.7 |
| **Credit-related (expenses) / benefit**........................ | $ (4.9) | $ (5.5) | $ (2.3) | $ 3.1 | $ (1.4) | $ (5.3) | $ (5.9) |
| Other expenses............................................................. | (1.2) | (0.7) | (0.8) | (1.4) | (1.1) | (1.1) | (4.3) |
| **(Loss) / earnings before mark-to-market activity**........ | $ (0.6) | $ (1.7) | $ 2.4 | $ 7.6 | $ 3.0 | $ (1.1) | $ 11.9 |
| Fair value (losses) / gains, net........................................ | (4.5) | (0.8) | 0.3 | (2.4) | 0.1 | 0.1 | (1.9) |
| Accumulated other comprehensive income change................ | (0.2) | 0.5 | 0.4 | 0.3 | 0.1 | 0.1 | 0.9 |
| **Mark-to-market**...................................................... | (4.7) | (0.3) | 0.6 | (2.1) | 0.2 | 0.2 | (1.0) |
| **Total comprehensive (loss) / income**........................ | $ (5.3) | $ (1.9) | $ 3.1 | $ 5.4 | $ 3.2 | $ (0.9) | $ 10.9 |
| Cumulative infusion received, plus new draw....................... | $ 111.6 | $ 116.1 | $ 116.1 | $ 116.1 | $ 116.1 | $ 116.8 | $ 116.8 |
| Dividends.................................................................... | $ (2.5) | $ (2.6) | $ (2.8) | $ (2.9) | $ (2.9) | $ (2.9) | $ (11.6) |

[1] Forecast periods reflect July 2012 BoD corporate forecast updated for actuals through June 2012

Note: Numbers may not foot due to rounding.

Protected Information
Confidential

**Confidential Commercial Information - Confidential Treatment and FOIA Exemption Requested**

FannieMae

FNM-FAIRHOLME-0056580

## 2012 – 2016 Annual Earnings

*($ in Billions)*

|  | Forecast [1] | | | | |
|---|---|---|---|---|---|
|  | **2012** | **2013** | **2014** | **2015** | **2016** |
| Net interest income - portfolio and other............................................ | 14.2 | 12.5 | 11.3 | 10.3 | 8.9 |
| Net interest income - MBS guaranty fee............................................ | 6.5 | 7.0 | 7.5 | 8.0 | 8.6 |
| Other revenues.............................................................................. | 1.3 | 1.0 | 0.9 | 0.9 | 1.0 |
| **Net revenues**.......................................................... | $ **22.1** | $ **20.5** | $ **19.8** | $ **19.3** | $ **18.4** |
|  |  |  |  |  |  |
| Credit losses.................................................................................. | (18.6) | (19.0) | (17.7) | (13.3) | (9.5) |
| Reduction in allowance.................................................................... | 11.0 | 7.5 | 11.0 | 9.0 | 7.7 |
| SOP 03-3........................................................................................ | 1.7 | 1.9 | 1.6 | 1.1 | 0.8 |
| **Credit-related expenses**........................................... | $ **(5.9)** | $ **(9.6)** | $ **(5.1)** | $ **(3.2)** | $ **(1.0)** |
|  |  |  |  |  |  |
| Other expenses............................................................................... | (4.3) | (3.9) | (4.1) | (4.2) | (4.1) |
| **Earnings before mark-to-market activity**................... | $ **11.9** | $ **6.9** | $ **10.5** | $ **11.9** | $ **13.4** |
|  |  |  |  |  |  |
| Fair value (losses) / gains, net........................................................ | (1.9) | 0.5 | 0.5 | 0.5 | 0.4 |
| Accumulated other comprehensive income change............................ | 0.9 | 0.1 | 0.1 | 0.1 | 0.1 |
| **Mark-to-market**....................................................... | (1.0) | 0.6 | 0.5 | 0.5 | 0.5 |
| **Total comprehensive income**.................................... | $ **10.9** | $ **7.5** | $ **11.0** | $ **12.5** | $ **13.9** |
|  |  |  |  |  |  |
| Cumulative infusion received, plus new draw..................................... | $ 116.8 | $ 121.2 | $ 122.4 | $ 122.4 | $ 122.4 |
| Dividends........................................................................................ | $ (11.6) | $ (11.8) | $ (12.2) | $ (12.3) | $ (12.3) |

[1] Forecast periods reflect July 2012 BoD corporate forecast updated for actuals through June 2012          Note: Numbers may not foot due to rounding.

**Confidential Commercial Information - Confidential Treatment and FOIA Exemption Requested**



Protected Information
Confidential

FNM-FAIRHOLME-0056581

**PX-0269 - p. 6 of 11**

**000451**

## Fannie Mae vs. Moody's Case-Shiller Home Price Forecasts



Note: Applied Fannie Mae Seasonality Adjustment

Case-Shiller forecast updates reflect significant variability



With more up to date data, Fannie Mae is able to capture the most recent trends

Protected Information
Confidential

Confidential Commercial Information - Confidential Treatment and FOIA Exemption Requested



FNM-FAIRHOLME-0056582

**PX-0269 - p. 7 of 11**

**000452**

## Cumulative GSE Dividend Payments vs. Cumulative SPSPA Draws

*($ in Billions)*



| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SPSPA Draws Less Dividends ($B) | ($14) | ($104) | ($131) | ($147) | ($133) | ($117) | ($100) | ($80) | ($61) | ($41) | ($22) | ($2) | $17 | $36 | $53 |
| Residual Equity ($B) | - | - | - | - | $0 | $1 | $2 | $4 | $8 | $10 | $11 | $11 | $9 | $8 | $8 |

Note: Figures above based on extended earnings forecast for both Fannie Mae and Freddie Mac. Forecast incorporates actual results through May 2012 for Fannie Mae and through 2011 for Freddie Mac.

6

Protected Information
Confidential

**Confidential Commercial Information - Confidential Treatment and FOIA Exemption Requested**



FNM-FAIRHOLME-0056583

# Annual Detail of Modeled Cumulative Dividends and SPSPA Draws

**Fannie Mae**

| ($ in Billions) | 2008-2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Comprehensive Income | | 11.6 | 7.5 | 11.0 | 12.5 | 13.9 | 13.2 | 12.2 | 11.4 | 10.9 | 10.5 | 10.5 |
| Preferred Dividend Payment | 19.8 | 11.6 | 11.8 | 12.1 | 12.2 | 12.2 | 12.2 | 12.2 | 12.2 | 12.2 | 12.3 | 12.5 |
| Residual Equity | 0.0 | 0.0 | 0.0 | 0.0 | 0.2 | 1.8 | 2.8 | 2.7 | 1.9 | 0.5 | 0.0 | 0.0 |
| Cumulative Dividends | 19.8 | 31.4 | 43.2 | 55.3 | 67.6 | 79.8 | 92.1 | 104.3 | 116.6 | 128.8 | 141.1 | 153.6 |
| Cumulative SPSPA Draws [1] | (111.6) | (116.1) | (119.0) | (121.2) | (121.5) | (121.5) | (121.5) | (121.5) | (121.5) | (121.5) | (122.9) | (124.8) |
| Cumulative Draws Less Dividends | (91.8) | (84.7) | (75.8) | (65.9) | (53.9) | (41.7) | (29.4) | (17.2) | (4.9) | 7.3 | 18.3 | 28.8 |
| SPSPA Funding Cap [2] | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 | 240.9 |
| Remaining Funding under SPSPA | 124.8 | 124.8 | 121.9 | 119.7 | 119.4 | 119.4 | 119.4 | 119.4 | 119.4 | 119.4 | 118.0 | 116.1 |

1 Draw requests related to net deficit occurring in Q4 are included in the following year. Treasury draw requests do not include the initial $1B liquidation preference of Fannie Mae's senior preferred stock, for which Fannie Mae did not receive any cash proceeds.

2 Pursuant to the amended senior preferred stock purchase agreement, cash draws attributable to deficits occurring in 2010-2012 do not count against the $200B funding cap.

Note: Figures from Fannie Mae July BoD corporate forecast incorporate actual results through May 2012. 2017-2022 figures are based on simplifying assumptions derived from trends observed within the 2012-2016 horizon.

**Freddie Mac**

| ($ in Billions) | 2008-2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Comprehensive Income | | 6.7 | 7.8 | 8.7 | 9.1 | 9.6 | 8.7 | 8.4 | 7.7 | 7.2 | 6.7 | 6.6 |
| Preferred Dividend Payment | 16.3 | 7.3 | 7.3 | 7.3 | 7.3 | 7.3 | 7.3 | 7.3 | 7.3 | 7.3 | 7.3 | 7.3 |
| Residual Equity | 0.0 | 0.0 | 0.5 | 2.0 | 3.8 | 6.1 | 7.5 | 8.6 | 9.0 | 8.9 | 8.3 | 7.6 |
| Cumulative Dividends | 16.3 | 23.6 | 30.8 | 38.1 | 45.4 | 52.7 | 60.0 | 67.3 | 74.5 | 81.8 | 89.1 | 96.4 |
| Cumulative SPSPA Draws [1] | (71.2) | (71.8) | (71.8) | (71.8) | (71.8) | (71.8) | (71.8) | (71.8) | (71.8) | (71.8) | (71.8) | (71.8) |
| Cumulative Draws Less Dividends | (54.9) | (48.3) | (41.0) | (33.7) | (26.4) | (19.2) | (11.9) | (4.6) | 2.7 | 10.0 | 17.3 | 24.6 |
| SPSPA Funding Cap [2] | 220.6 | 221.1 | 221.1 | 221.1 | 221.1 | 221.1 | 221.1 | 221.1 | 221.1 | 221.1 | 221.1 | 221.1 |
| Remaining Funding under SPSPA | 149.3 | 149.3 | 149.3 | 149.3 | 149.3 | 149.3 | 149.3 | 149.3 | 149.3 | 149.3 | 149.3 | 149.3 |

1 Draw requests related to net deficit occurring in Q4 are included in the following year. Treasury draw requests do not include the initial $1B liquidation preference of Freddie Mac's senior preferred stock, for which Freddie Mac did not receive any cash proceeds.

2 Pursuant to the amended senior preferred stock purchase agreement, cash draws attributable to deficits occurring in 2010-2012 do not count against the $200B funding cap.

Note: 2012-2022 figures are based on simplifying assumptions derived from Fannie Mae forecast trends and observed relationships between key Fannie Mae and Freddie Mac performance metrics. These figures incorporate actual results through 2011 only.

Note: Numbers may not foot due to rounding

7

Confidential Commercial Information - Confidential Treatment and FOIA Exemption Requested

**FannieMae**

FNM-FAIRHOLME-0056584

Protected Information
Confidential

# Status of Key Initiatives

8

Protected Information
Confidential

Confidential Commercial Information - Confidential Treatment and FOIA Exemption Requested



FNM-FAIRHOLME-0056585

000455

# Status of Key Initiatives

### Securitization and Pooling & Servicing Agreement (PSA)

Fannie Mae and Freddie Mac will draft a white paper for public comment. A plan for a securitization platform and model PSA will be completed by both Enterprises incorporating the resulting industry commentary by the end of the year.

### Credit Pricing Update

Focused on a 10bps average guaranty fee price increase across both Enterprises.

### REO Sales

Obtained bids for potential REO joint venture deal and presented to Pricing Committee, FHFA and the US Treasury in June. FHFA announced the winning bidders on July 3, 2012. Targeted execution of REO joint transaction in Q3 2012 (dependent upon FHFA approval).

### Rep & Warrant Changes

Selling Rep & Warrant framework, expected to become effective January 1, 2013, eliminates liability after 36 months of timely payments.

### Credit Risk Transfer

Currently projecting to complete first transaction in early 2013.

### HARP 2.0

Significant increase in volume in June and July is attributable to the release of the MBS execution for the greater-than 125 LTV category, resulting in 35K loans delivered in this bucket for June and July, representing 31% of total volume in these months.

### Non-Performing Loan Sales

Preparing a pilot transaction for the competitive disposition of Non-Performing Assets (NPA) and announcing transaction to the market by the end of 2012.

9

Confidential Commercial Information - Confidential Treatment and FOIA Exemption Requested



FNM-FAIRHOLME-0056586

# U.S. DEPARTMENT OF THE TREASURY

## Treasury Department Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac

August 17, 2012

*(Archived Content)*

*Modifications to Preferred Stock Purchase Agreements Will Make Sure That Every Dollar of Earnings Fannie Mae and Freddie Mac Generate Will Benefit Taxpayers*

*Announcement Will Support the Continued Flow of Mortgage Credit during a Responsible Transition to a Reformed Housing Finance Market*

**WASHINGTON --** The U.S. Department of the Treasury today announced a set of modifications to the Preferred Stock Purchase Agreements (PSPAs) between the Treasury Department and the Federal Housing Finance Agency (FHFA) as conservator of Fannie Mae and Freddie Mac (the Government Sponsored Enterprises or GSEs) that will help expedite the wind down of Fannie Mae and Freddie Mac, make sure that every dollar of earnings each firm generates is used to benefit taxpayers, and support the continued flow of mortgage credit during a responsible transition to a reformed housing finance market.

"With today's announcement, we are taking the next step toward responsibly winding down Fannie Mae and Freddie Mac, while continuing to support the necessary process of repair and recovery in the housing market," said Michael Stegman, Counselor to the Secretary of the Treasury for Housing Finance Policy.  "As we continue to work toward bi-partisan housing finance reform, we are committed to putting in place measures right now that support continued access to mortgage credit for American families, promote a responsible transition, and protect taxpayer interests."

The modifications to the PSPAs announced today are consistent with FHFA's strategic plan for the conservatorship of Fannie Mae and Freddie Mac that it released in February 2012. The modifications include the following key components:

**PX-0278 - p. 1 of 3**                                                                        **000457**

## Accelerated Wind Down of the Retained Mortgage Investment Portfolios at Fannie Mae and Freddie Mac

The agreements require an accelerated reduction of Fannie Mae and Freddie Mac's investment portfolios. Those portfolios will now be wound down at an annual rate of 15 percent – an increase from the 10 percent annual reduction required in the previous agreements. As a result of this change, the GSEs' investment portfolios must be reduced to the $250 billion target set in the previous agreements four years earlier than previously scheduled.

### Annual Taxpayer Protection Plan

To support a thoughtfully managed wind down, the agreements require that on an annual basis, each GSE will – under the direction of their conservator, the Federal Housing Finance Agency – submit a plan to Treasury on its actions to reduce taxpayer exposure to mortgage credit risk for both its guarantee book of business and retained investment portfolio.

## Full Income Sweep of All Future Fannie Mae and Freddie Mac Earnings to Benefit Taxpayers for Their Investment

The agreements will replace the 10 percent dividend payments made to Treasury on its preferred stock investments in Fannie Mae and Freddie Mac with a quarterly sweep of every dollar of profit that each firm earns going forward.

This will help achieve several important objectives, including:

- Making sure that every dollar of earnings that Fannie Mae and Freddie Mac generate will be used to benefit taxpayers for their investment in those firms.
- Ending the circular practice of the Treasury advancing funds to the GSEs simply to pay dividends back to Treasury.
- Acting upon the commitment made in the Administration's 2011 White Paper that the GSEs will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form.
- Supporting the continued flow of mortgage credit by providing borrowers, market participants, and taxpayers with additional confidence in the ability of the GSEs to meet their

PX-0278 - p. 2 of 3                                    000458

commitments while operating under conservatorship.

- Providing greater market certainty regarding the financial strength of the GSEs.

For a copy of the modification agreements for the PSPAs, please visit, link    and link    .

### 

**PX-0278 - p. 3 of 3**

**000459**

Message

| | |
|---|---|
| **From:** | Hynes, Robert [/O=FHFA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=HYNESR] |
| **Sent:** | 8/17/2012 3:22:08 PM |
| **To:** | !DHMG Office of Systemic Risk and Market Surveillance [osrms@fhfa.gov]; !OFA [!ofa@fhfa.gov]; Ashley, Timothy [timothy.ashley@fhfa.gov]; Barnes, Kenneth [kenneth.barnes@fhfa.gov]; Bartholomew, Alexandra (Intern) [alexandra.bartholomew@fhfa.gov]; Beard, Michael [michael.beard@fhfa.gov]; Bell, James [james.bell@fhfa.gov]; Bravenec, Bill [bill.bravenec@fhfa.gov]; Breitkopf, Mendy [mendy.breitkopf@fhfa.gov]; Burns, Meg [meg.burns@fhfa.gov]; Callahan, Jim [jim.callahan@fhfa.gov]; Campbell, Linda [linda.campbell@fhfa.gov]; Christopher Poor [christopher.poor@fhfaoig.gov]; Chu, Sai-Cheong [sai-cheong.chu@fhfa.gov]; Collender, Robert [robert.collender@fhfa.gov]; Cross, Stephen [stephen.cross@fhfa.gov]; DeMarco, Edward [edward.demarco@fhfa.gov]; Dickerson, Chris [chris.dickerson@fhfa.gov]; Dickey, Jerimiah (Intern) [jerimiah.dickey@fhfa.gov]; DiVenti, Theresa [theresa.diventi@fhfa.gov]; Duarte, Ricardo [ricardo.duarte@fhfa.gov]; Dunsky, Robert [robert.dunsky@fhfa.gov]; Freimuth, David [david.freimuth@fhfa.gov]; Galeano, Andre D. [andre.galeano@fhfa.gov]; Galloway, Chris [chris.galloway@fhfa.gov]; Graham, Fred C. [fred.graham@fhfa.gov]; Greenlee, Jon [jon.greenlee@fhfa.gov]; Gubich, Denise [denise.gubich@fhfa.gov]; Hemphill, James M [mike.hemphill@fhfa.gov]; Steven Henderson-White [steven.henderson@fhfaoig.gov]; Holmes, Ira [ira.holmes@fhfa.gov]; Hornsby, Richard [rick.hornsby@fhfa.gov]; Kane, Michael [michael.kane@fhfa.gov]; Koon, Jon [jon.koon@fhfa.gov]; Kornstein, Randi [randi.kornstein@fhfa.gov]; Kvartunas, Deirdre [deirdre.kvartunas@fhfa.gov]; Lawler, Patrick [patrick.lawler@fhfa.gov]; Lee, Timothy [timothy.lee@fhfa.gov]; Levine, Martin [martin.levine@fhfa.gov]; Levinson, Masha [masha.levinson@fhfa.gov]; Linick, Steve [steve.linick@fhfa.gov]; Martin, Bradford [bradford.martin@fhfa.gov]; McNicholas, John [john.mcnicholas@fhfa.gov]; McWilliams, Bruce [bruce.mcwilliams@fhfa.gov]; Millman, Phillip [phillip.millman@fhfa.gov]; Newell, Jamie [jamie.newell@fhfa.gov]; Pafenberg, Forrest [forrest.pafenberg@fhfa.gov]; Patrabansh, Saty [saty.patrabansh@fhfa.gov]; Peden, Sheila [sheila.peden@fhfa.gov]; Petrillo, Guy [guy.petrillo@fhfa.gov]; Phelps, Jack [jack.phelps@fhfa.gov]; Phillips, Wesley [wesley.phillips@fhfa.gov]; Pocsik, Peter [peter.pocsik@fhfa.gov]; Prendergast, Joseph [joseph.prendergast@fhfa.gov]; Rhinesmith, Alan [alan.rhinesmith@fhfa.gov]; Rizopoulos, Doreen [doreen.rizopoulos@fhfa.gov]; Roberts, Peter [peter.roberts@fhfa.gov]; Sar, Prasant [prasant.sar@fhfa.gov]; Seide, David [david.seide@fhfa.gov]; Sharpley, Christopher [christopher.sharpley@fhfa.gov]; Silva, Stacey [stacey.silva@fhfa.gov]; Smith, Stephen [stephen.smith@fhfa.gov]; Stewart, Randal [randal.stewart@fhfa.gov]; Taylor, Mary Ellen [maryellen.taylor@fhfa.gov]; Tirinnanzi, Martha [martha.tirinnanzi@fhfa.gov]; Ugoletti, Mario [mario.ugoletti@fhfa.gov]; Walter, Karen [karen.walter@fhfa.gov]; Wisz, Gerald [gerald.wisz@fhfa.gov]; Heath Wolfe [heath.wolfe@fhfaoig.gov]; Woody, Adam (Brock) [adam.woody@fhfa.gov]; Wu, Simon [simon.wu@fhfa.gov]; Youmans, Russell [russell.youmans@fhfa.gov]; Zhang, Min [min.zhang@fhfa.gov] |
| **Subject:** | Capital Markets Update...Treasuries bouncing from worst levels of week...Credit spreads...Consumer Confidence...Treasury announcement tightens agency debt spreads, less impact on MBS...EU...Later |

Treasuries are rebounding this morning after a week that saw the 10YR Note lose 25 basis points from last Friday's close. Traders are split regarding whether this constitutes the beginning of a new trading range for the benchmark or whether today's supportive bid is simply short covering in front of the weekend. If the latter is true Treasuries might turnaround as the day wears on.

**Exhibit
0002**

Protected Information To Be Disclosed Only In Accordance With Protective Order



Credit spreads are generally wider today. 3-month libor was set higher at 0.43450 in the morning fixing and swap spreads/Tsy are incrementally wider.



The Treasury Department's announcement earlier today regarding changes to the Preferred Stock Purchase Agreements (PSPAs) that are intended to expedite the wind-down of Fannie Mae and Freddie Mac is having more of an immediate impact on agency debt than MBS. While spreads across the curve are tighter, the farther out the maturity, the tighter the spread. 2- and 3-year bullets are 1.0 to 1.5 bps tighter, 5-year paper is 2.0-3.0 bps tighter and the 10YR Freddie Mac Reference Note (FHLMC 2.375% 1/13/2022) is 6 bps tighter. The rationale is that as the Enterprises wind down there will be less longer term debt issued, leaving investors to fight over existing supply. Also, it is more likely that buyers will squirrel away existing holdings, reducing the float of available supply in the secondary market. The Fannie Mae 3YR Benchmark Note that was priced +12.0 bps/Tsy earlier this week is currently quoted 9.5 – 8.5 on the broker screens.

The reaction in MBS trading has been almost a non-event. The reason is that the Enterprises still remain the primary conduit for mortgage finance, so production is unlikely to be effected by today's announcement. The current coupon MBS continues to widen vs. long Treasuries this morning even though the current coup's yield is the highest in two months. The takeaway is that investors are still cautious about catching a falling market and that the 10YR Note could just as easily be above 2.00% a week from now as below 1.70%.

Protected Information To Be Disclosed Only In Accordance With Protective Order

FHFA-DDC-0410593



The coupon stack reflects the price action in Treasuries; cusp coupons are higher while higher coups are close to unchanged. One exception is the Freddie 6.00% coup, but the spike higher may be more a function of a lack of supply than anything else.

| Fannie Cpn. | Px. | Change |
|---|---|---|
| 3.00 | 102-06 | +6/32 |
| 3.50 | 104-22 | +4/32 |
| 4.00 | 106-10 | +3/32 |
| 4.50 | 107-18 | +1/32 |
| 5.00 | 108-20 | +1/32 |
| 5.50 | 109-12 | +1/32 |
| 6.00 | 110-00 | +1/32 |
| Freddie Cpn. | Px. | Change |
| 3.00 | 101-28 | +5/32 |
| 3.50 | 104-16 | +4/32 |
| 4.00 | 106-02 | +4/32 |
| 4.50 | 106-27 | +1/32 |
| 5.00 | 107-30 | +2/32 |
| 5.50 | 109-00 | +3/32 |
| 6.00 | 109-26 | +7/32 |

EU…Developments today:
- German Chancellor Angela Merkel's comments supportive of the ECB yesterday happened concurrent with the close of European markets and thus were not fully priced in when trading ceased yesterday. The knock-on effect is showing up in today's prices, though, and yields for Spanish, Portuguese and Italian sovereign debt are trending lower.

Protected Information To Be Disclosed Only In Accordance With Protective Order



- According to press reports Merkel may also be reevaluating her stance against modifying terms for the Greek bailout. While Germany is still likely to hold a strident line on austerity measures, easing timelines for those moves will allow the situation to play out over a longer span, which in turn takes out some of the urgency to move into "safe" assets such as German bunds and U.S. Treasuries.
- The euro is trading lower at 1.2304 vs. the dollar.

Later…Traders are having to recalibrate their thinking regarding "over the weekend" headline risk. Whereas that overhang has been supportive of Treasury yields for much of this year the past month has shown that the needle can point in more than one direction. Look for agency debt spreads to tighten on the Treasury Dept. news but for yields to rise as investors may decide to lighten up on Treasuries as the 10YR Note struggles to establish a support level.

Bob Hynes

**Robert F. Hynes, Jr.**
Principal Financial Analyst – Capital Markets
Office of Systemic Risk and Market Surveillance
Federal Housing Finance Agency
202-834-3798 (office)
781-635-6144 (mobile)
Robert.Hynes@fhfa.gov

Protected Information To Be Disclosed Only In Accordance With Protective Order

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| PERRY CAPITAL LLC,<br><br>    Plaintiff,<br><br>v.<br><br>JACOB J. LEW, *et al.*,<br><br>    Defendants. | Civil Action No. 13-cv-1025 (RLW) |
| FAIRHOLME FUNDS, INC., *et al.*<br><br>    Plaintiffs,<br><br>v.<br><br>FEDERAL HOUSING FINANCE AGENCY,<br>*et al.*,<br><br>    Defendants. | Civil Action No. 13-cv-1053 (RLW) |
| ARROWOOD INDEMNITY COMPANY,<br>*et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>FEDERAL NATIONAL MORTGAGE<br>ASSOCIATION, *et al.*,<br><br>    Defendants. | Civil Action No. 13-cv-1439 (RLW) |

## DECLARATION OF MARIO UGOLETTI

Protected Information to Be Disclosed Only in Accordance With Protective Order

I, Mario Ugoletti, hereby declare, based on personal knowledge of the facts, as follows:

1.      I am Special Advisor to the Office of the Director of the Federal Housing Finance Agency ("FHFA"), a role I assumed in September 2009.  As Special Advisor, my responsibilities include advising FHFA's Acting Director Edward DeMarco concerning the Senior Preferred Stock Purchase Agreements ("PSPAs"), described *infra*.  Additionally, I serve as the primary liaison with Treasury concerning the PSPAs and any amendments to the PSPAs.

2.      I was employed at Treasury from 1995 to 2009, serving as Director of the Office of Financial Institutions Policy from 2004-2009.  In that capacity, I participated in the creation and implementation of the PSPAs.

3.      FHFA is an independent federal agency with regulatory authority over the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac") (together, the "Enterprises") and the twelve Federal Home Loan Banks ("Banks").  12 U.S.C. § 4511.

4.      On September 6, 2008, FHFA's Director appointed FHFA as Conservator of the Enterprises, and on September 7, 2008 FHFA as Conservator of the Enterprises entered into two materially identical Senior Preferred Stock Purchase Agreements (together, the "PSPAs") with the United States Treasury ("Treasury")—one for Fannie Mae and one for Freddie Mac.  The Amended and Restated Agreements dated September 26, 2008 and subsequent amendments are currently available at http://www.fhfa.gov/Default.aspx?Page=364.

5.      The PSPAs were a last resort after it became apparent that no infusions of capital from the private sector were forthcoming to save the Enterprises.  *See Oversight Hearing to Examine Recent Treasury and FHFA Actions Regarding the Housing GSEs Before the H. Comm. on Financial Services*, 110th Cong., at 5 (Sep. 25, 2008) (statement of James B. Lockhart III,

2

FHFA 0002

 000465

Director, Federal Housing Finance Agency), currently *available at*

http://archives.financialservices.house.gov/hearing110/lockhart092508.pdf ("After substantial

effort and communication with market participants, each company reported to FHFA and to

Treasury that it was unable to access capital markets to bolster its capital position without

Treasury financing. FHFA's and Treasury's own discussions with investment bankers and

investors corroborated this conclusion."). The PSPAs provided the market with assurances that

Treasury would provide a backstop to the Enterprises. Absent the commitments of Treasury, the

Enterprises would have collapsed. *See id.* at 5-6 ("In the absence of access to new capital, the only

alternative left to the firms was to cease new business and shed assets in a weak market. That would

have been disastrous for the mortgage markets as mortgage rates would have continued to move

higher and, in turn, disastrous for the Enterprises as the prices of their securities would have fallen

and credit losses would have increased."); Timothy F. Geithner, Secretary, U.S. Dep't of the

Treasury, Written Testimony Before the H. Comm. on Financial Services (Mar. 23, 2010),

currently *available at* http://www.treasury.gov/press-center/press-releases/Pages/tg603.aspx ("In

2007, the GSEs reported combined losses of over $5 billion . . . The GSEs ultimately reported

combined 2008 losses in excess of $108 billion. . . . Both companies were severely

undercapitalized and would not have been able to meet their obligations without the intervention

and financial support of the government."). With the PSPAs and the market assurance they

provided, the Enterprises were able to remain in operation.

6.      The PSPAs provided that the Enterprises would draw funds from Treasury against

the Treasury commitment if the Enterprises exhausted all of their stockholder equity and had a

negative net worth (defined as liabilities exceeding assets). If Enterprise liabilities exceeded

assets, the provision for mandatory receivership in the Housing and Economic Recovery Act of

2008 ("HERA") would be triggered. The PSPAs were designed so that the Enterprises could

draw funds from Treasury in amounts necessary to cure their negative net worth and bring their

capital to zero.  By the end of 2008, all shareholder equity had been exhausted and the

Enterprises drew on the Treasury commitment to avoid mandatory receivership.  *See* FHFA Data

as of November 14, 2013 on Treasury and Federal Reserve Purchase Programs for GSE &

Mortgage-Related Securities at 2, currently *available at*

http://www.fhfa.gov/webfiles/25784/TSYSupport%202013-11-13.pdf (Freddie Mac draw of

$13.8 billion for third quarter 2008; Fannie Mae draw of $15.2 billion for fourth quarter 2008).

      7.     The PSPAs gave Treasury an expansive bundle of rights and entitlements in

exchange for the lifeline that Treasury provided, without which the Enterprises would have gone

out of business.  For example, Treasury received warrants to acquire 79.9% of the common stock

of the Enterprises for a nominal payment.  In addition, under the PSPAs, Treasury obtained

Senior Preferred Stock that is senior in priority over all other series of preferred stock.  The

Treasury Senior Preferred Stock in each Enterprise had an initial face value of $1 billion, which

increases by any amount that the Enterprises draw from Treasury under the Treasury

Commitment.  Further, the Treasury Senior Preferred Stock has a liquidation preference so that

Treasury has priority over any other preferred or common shareholders in the event of a

liquidation — that is, Treasury is entitled to the value of its Senior Preferred Stock (face value

plus any amounts drawn from Treasury by the Enterprises, without reduction for dividends or

other amounts that the Enterprises might pay to Treasury) before any other shareholders —

preferred or common — are paid anything in liquidation.

      8.     The Treasury Senior Preferred Stock also included payment obligations from the

Enterprises to Treasury, commensurate with the enormous risks and financial commitments that

Treasury assumed.  The Enterprises were obligated to pay a 10% annual dividend together with a

Periodic Commitment Fee ("PCF") that was "intended to fully compensate [Treasury] for the support provided by the ongoing Commitment." Amended and Restated Agreements, § 3.2(b) (Sept. 26, 2008). The PSPAs provided that the amount of the PCF to be imposed beginning January 2010 "shall be determined with reference to the market value of the Commitment as then in effect." *Id.*

9.      The PSPA gave Treasury the right, in its sole discretion, to waive the PCF for a year at a time "based on adverse conditions in the United States mortgage market." Treasury exercised this right to waive the PCF for 2010 and 2011, years in which the Enterprises had insufficient funds to pay even the 10% dividend, let alone an additional PCF, stating that "the imposition of the PCF at this time would not fulfill its intended purpose of generating increased compensation to the American taxpayer." Periodic Commitment Fee Waiver Letters from Dept. of Treasury to FHFA (Dec. 29, 2010; Mar. 31, 2011; Jun. 30, 2011; Sept. 30, 2011; Dec. 21, 2011). It was clear by this time that, given the risks of the Enterprises and the enormity of the Treasury commitment, the value of the PCF was incalculably large.

10.      Under the Second Amendment to the PSPAs (executed December 24, 2009), Treasury was obligated to commit any amount of funds necessary to maintain the Enterprises' positive net worth through December 31, 2012, subject to an initial cap of $200 billion for each of the Enterprises plus the amount of draws between January 1, 2010 and December 31, 2012. As of January 1, 2013, however, Treasury's financial commitment cap became fixed: the amount

5

FHFA 0005

remaining available to Fannie Mae under the cap was $117.6 billion, and the amount remaining available to Freddie Mac under the cap was $140.5 billion.[1]

11.     By late 2011, analysts and key stakeholders, including institutional and Asian investors in the Enterprises' debt and mortgage backed securities (MBS), began expressing concerns about the adequacy of Treasury's financial commitment to the Enterprises after January 1, 2013, when the cap on Treasury's funding commitment would become fixed.

12.     The principal driver of these concerns about the adequacy of Treasury's capital commitment were questions about the Enterprises' ability to pay the 10% annual dividend to Treasury without having to draw additional funds from Treasury, thereby eating away at the amount remaining available under the capped Treasury commitment.  From the outset of the PSPAs, the Enterprises could not at times generate enough income to make these dividend payments.

13.     The Enterprises drew funds from Treasury to pay the required 10% dividend back to Treasury.  Of the $188 billion the Enterprises drew from Treasury from the outset of the PSPAs (September 2008) to the execution of the Third Amendment (August 2012), $45.7 billion was drawn solely to pay the 10% annual dividend back to Treasury.  *See* FHFA, Data as of November 14, 2013 on Treasury and Federal Reserve Purchase Programs for GSE and

---

[1]     Under the Second Amendment to the PSPAs, Treasury committed to provide each Enterprise the greater of: (i) $200 billion or (ii) $200 billion plus the Enterprise's cumulative draws for 2010, 2011, and 2012, less the Enterprise's positive net worth, if any, on December 31, 2012.  Second Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement, at 3.

For Fannie Mae, alternative (ii) provided the greater amount: $200 billion + $40.9 billion (cumulative draws for 2010-2012) – $7.2 billion (positive net worth on December 31, 2012) – $116.1 billion (total draws from 2008-2012) = $117.6 billion.

For Freddie Mac, alternative (ii) provided the greater amount:  $200 billion + $20.6 billion (cumulative draws for 2010-2012) – $8.8 billion (positive net worth on December 31, 2012) – $71.3 (total draws from 2008-2012) = $140.5 billion.

Mortgage-Related Securities at 2, 3. Additionally, each time the Enterprises drew funds to pay the 10% dividend, the total amount of the Treasury draw increased, in turn increasing the amount of the next 10% dividend payment.

14.     By mid-2012, the amount of the annual 10% dividend had grown so large—$11.7 billion for Fannie Mae and $7.2 billion for Freddie Mac—that it appeared unlikely that either of the Enterprises would be able to meet that amount consistently without drawing additional funds from Treasury. *See* Freddie Mac, Quarterly Report (Form 10-Q) at 10, 85 (May 3, 2012), currently *available at* http://www.freddiemac.com/investors/sec_filings/index.html ("Over time, our dividend obligation to Treasury will increasingly drive future draws.  Although we may experience period-to-period variability in earnings and comprehensive income, it is unlikely that we will generate net income or comprehensive income in excess of our annual dividends payable to Treasury over the long term."); Freddie Mac, Quarterly Report (Form 10-Q) at 10, 92 (Aug. 7, 2012), currently *available at* http://www.freddiemac.com/investors/sec_filings/index.html (same); Fannie Mae, Quarterly Report (Form 10-Q) at 11, 81 (May 9, 2012), currently *available at* http://www.fanniemae.com/resources/file/ir/pdf/quarterly-annual-results/2012/q12012.pdf ("Although we may experience period-to-period volatility in earnings and comprehensive income, we do not expect to generate net income or comprehensive income in excess of our annual dividend obligation to Treasury over the long term."); Fannie Mae, Quarterly Report (Form 10-Q) at 12-13, 83 (Aug. 8, 2012), currently *available at* http://www.fanniemae.com/resources/file/ir/pdf/quarterly-annual-results/2012/q22012.pdf (same).  Because the cap on the Treasury commitment became fixed on January 1, 2013, each dollar drawn from Treasury merely to repay the Treasury dividend was one less dollar available

to the Enterprises to draw in the event the Enterprise suffered losses due, for example, to a decline in the housing market or broader economic turbulence.

15.     Market forecasts—which FHFA monitored—predicted that the Enterprises' ongoing payment of the 10% dividend would completely exhaust Treasury's funding commitment within ten years, leading to potential downgrades in the Enterprises' credit ratings. Moody's rating service opined that the 10% dividend payments would "eliminate Fannie Mae's contingent capital by 2019 and Freddie Mac's by 2022 . . . [even] assum[ing] that the GSEs are able to fully offset credit losses, which we believe is unlikely." Moody's, Sector Comment, "Plan To Raise Fannie Mae and Freddie Mac Guarantee Fees Raises Question of Support," at 2 (Sept. 26, 2011). Moody's stated that this "would be credit negative and prompt a review of [the Enterprises'] Aaa ratings." *Id.* Likewise, Deutsche Bank observed that "diminishing Treasury support raises the risk that the agencies one day might face challenges in covering MBS losses" and that such a risk "becomes greater in a housing market catastrophe, such as the one that started in the US after 2006." Deutsche Bank, *The Path of US Support for Fannie Mae, Freddie Mac*, THE OUTLOOK, Mar. 14, 2012, at 6.

16.     FHFA shared the concerns that the 10% annual dividend to Treasury would reduce the amount of the Treasury commitment starting in 2013. Treasury also generated and provided certain forecasts to FHFA that were similar to those prepared by market participants.

17.     These concerns about the adequacy of Treasury's financial commitment undermined the purpose of the PSPAs to express financial support to holders of Enterprise debt (*i.e.*, bondholders) and mortgage backed securities. *See* FHFA Mortgage Market Note (Dec. 5, 2008), currently *available at* http://www.fhfa.gov/webfiles/1241/mmnote084.pdf. The strength of that support depends upon the Enterprises having a sufficiently large pool of available funds

from Treasury that will permit the Enterprises to continue to operate under adverse market conditions that may arise in the coming years.

18.     To resolve these concerns, FHFA and Treasury agreed on the provisions that were incorporated into the Third Amendment, executed on August 17, 2012. The Third Amendment (1) eliminated the 10% annual dividend, (2) added a quarterly variable dividend in the amount (if any) of each Enterprises' positive net worth (above net worth values that were specified in the Third Amendment), and (3) suspended the PCF for as long as the quarterly variable dividend is in effect. The new dividend structure eliminated the risk that borrowings to make fixed dividend payments would lead to the exhaustion of the Treasury commitment.

19.     These changes in structure did not change the underlying economics of the PSPAs. It was my belief at this time, given the size and importance of the Treasury commitment, that through the liquidation preference, fixed dividends, and the market value of the PCF, Treasury would receive as much from the Enterprises under the Second Amendment as it would under the Third Amendment. Thus, the intention of the Third Amendment was not to increase compensation to Treasury — the Amendment would not do that — but to protect the Enterprises from the erosion of the Treasury commitment that was threatened by the fixed dividend. The Third Amendment was therefore consistent with the intent of the original PSPAs to (1) fully compensate Treasury for the value of its financial support, without which the Enterprises would have been forced into receivership, and (2) protect the Enterprises and the national housing market.

20.     At the time of the negotiation and execution of the Third Amendment, the Conservator and the Enterprises had not yet begun to discuss whether or when the Enterprises would be able to recognize any value to their deferred tax assets. Thus, neither the Conservator

nor Treasury envisioned at the time of the Third Amendment that Fannie Mae's valuation allowance on its deferred tax assets would be reversed in early 2013, resulting in a sudden and substantial increase in Fannie Mae's net worth, which was paid to Treasury in mid-2013 by virtue of the net worth dividend.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 17 day of DECEMBER 2013 at Washington, D.C.

By: _____
MARIO UGOLETTI

*Special Advisor to the Office of the Director,*
*Federal Housing Finance Agency*

10

FHFA 0010

# Third Amendment:
# Event Study



February 25, 2021

Protected Information To Be Disclosed Only In Accordance With Protective Order



Exhibit
0021

000474

# Overview

- On August 17, 2012, Treasury and the GSEs amended the SPSPA for the third time ("Third Amendment").
  - The value of Fannie Mae and Freddie Mac's common and junior preferred stock decreased by $847 and $831 million respectively.
  - The value of Fannie Mae and Freddie Mac's debt increased by $152 and $499 million respectively.

- Equity values of Fannie Mae and Freddie Mac increased significantly a week before the Third Amendment upon the Q2 2012 earnings release.

- Price of the common stock recovered in September 2012 and that of the junior preferred stocks recovered during October 2012.

- Agency bond spreads decreased during the second half of 2012.

1   **Privileged and Confidential**
    **Prepared at the Request of Counsel**

**Preliminary Work Product**
**Draft – Subject to Revision**



Protected Information To Be Disclosed Only In Accordance With Protective Order

FHFA-DDC-0119087

# Common and Junior Preferred Stock: *Fannie Mae*



2   **Privileged and Confidential**
    **Prepared at the Request of Counsel**

**Preliminary Work Product**
**Draft – Subject to Revision**



Protected Information To Be Disclosed Only In Accordance With Protective Order

FHFA-DDC-0119088

# Common and Junior Preferred Stock: *Freddie Mac*



$ million

8/8: Fannie earnings release, Q3 2012

8/7: Freddie earnings release, Q2 2012

3/9: Freddie earnings release, FY 2011

5/3: Freddie earnings release, Q1 2012

11/6: Freddie earnings release, Q3 2012

10/26: FHFA updated projections of potential draws

8/17: Third Amendment

10/9: FHFA releases strategic plan 2013-2017, "Preparing a Foundation for a More Efficient and Effective Housing Finance System"

Freddie Common + Junior Preferred — Common — Junior Preferred

**Privileged and Confidential Prepared at the Request of Counsel**

**Preliminary Work Product Draft – Subject to Revision**

CRA Charles River Associates

Protected Information To Be Disclosed Only In Accordance With Protective Order

FHFA-DDC-0119089

# Change in equity and debt values around the Third Amendment

- We consider four periods in calculating the impact of the Third Amendment on the value of Fannie and Freddie's common equity, junior preferred equity, and debt.



4   **Privileged and Confidential**
   **Prepared at the Request of Counsel**

**Preliminary Work Product**
**Draft – Subject to Revision**

Protected Information To Be Disclosed Only In Accordance With Protective Order



FHFA-DDC-0119090

**000478**

# Common and Junior Preferred Stock: *Change in value in four periods*

| Date | Fannie Mae ($ million) | | | Freddie Mac ($ million) | | | |
|------|--------|---------------------|-------|--------|---------------------|-------|---|
| | Common | Junior Preferred | Total | Common | Junior Preferred | Total | |
| 8/16/2012 | 342 | 1,459 | 1,801 | 195 | 1,274 | 1,469 | On the date of Third Amendment |
| 8/17/2012 | 273 | 680 | 954 | 150 | 488 | 637 | |
| **Change** | **-68** | **-779** | **-847** | **-46** | **-786** | **-831** | |
| | | | | | | | |
| 8/16/2012 | 342 | 1,459 | 1,801 | 195 | 1,274 | 1,469 | Prior to Third Amendment until FHFA projections update |
| 10/25/2012 | 308 | 1,010 | 1,318 | 170 | 778 | 947 | |
| **Change** | **-33** | **-449** | **-483** | **-25** | **-496** | **-522** | |
| | | | | | | | |
| 8/16/2012 | 342 | 1,459 | 1,801 | 195 | 1,274 | 1,469 | Prior to Third Amendment until Q3 2012 earnings release |
| 11/5/2012 | 312 | 1,130 | 1,442 | 170 | 876 | 1,047 | |
| **Change** | **-30** | **-329** | **-359** | **-25** | **-398** | **-422** | |
| | | | | | | | |
| 8/6/2012 | 279 | 1,120 | 1,399 | 154 | 906 | 1,061 | Prior to Q2 2012 earnings release until Q3 2012 earnings release |
| 11/5/2012 | 312 | 1,130 | 1,442 | 170 | 876 | 1,047 | |
| **Change** | **33** | **9** | **42** | **16** | **-30** | **-14** | |



5   **Privileged and Confidential**
    **Prepared at the Request of Counsel**

**Preliminary Work Product**
**Draft – Subject to Revision**

Protected Information To Be Disclosed Only In Accordance With Protective Order

FHFA-DDC-0119091

**000479**

# Debt: *Agency bonds index*

## Credit Suisse Liquid US Agency Index (LUAI)

The Credit Suisse Liquid US Agency Index (LUAI) is a composite of liquid, tradable issues from US agencies with large programmatic issuance programs. Programmatic issuance is defined by a minimum of consistent quarterly issuance over one year. Currently, the index includes Fannie Mae notes and bonds, Freddie Mac reference notes, and the Federal Home Loan Bank Global Debt Program.

**Figure 11: CS Liquid US Agency Index (LUAI) Inclusion Rules**

| | |
|---|---|
| Currency | USD |
| Securities | Bullet structures; fixed, non-zero coupon bonds only. |
| | Non-subordinated issues only. |
| Minimum Outstanding | $3 billion for maturities of 11 years or less; $1 billion for maturities longer than 11 years. |
| Index Pricing | Calculated each trading day using third-party vendor pricing. |
| Rebalancing | Index composition is updated once a month on the first business day of the month. All new issues must settle prior to the first business day of the month to be included in the index. |
| Maturity Breakdown | 1-3, 3-5, 5-7, 7-10, 10+ years |
| Index Inception | 1/3/2000 |
| Index Launch Date | 2/3/2003 |
| Coupon Reinvestment | USD 1M LIBOR rate |
| Minimum Maturity | Bonds must have at least one year remaining to maturity. |
| Trading & Settlement | Bonds are traded on a clean price basis and adhere to local settlement conventions. |
| Transaction Cost | The index does not take transaction costs (bid-offer spreads) into account. |
| Website | https://plus.credit-suisse.com/usgi/home.aspx |
| Bloomberg Ticker | CSBG <GO> |

Source: Credit Suisse

6   **Privileged and Confidential**
    **Prepared at the Request of Counsel**

**Preliminary Work Product**
**Draft – Subject to Revision**



Protected Information To Be Disclosed Only In Accordance With Protective Order

# Debt: *Agency bonds index*



Credit Suisse Liquid US Agency 3-5 Year Spread over Benchmark

7   **Privileged and Confidential**
    **Prepared at the Request of Counsel**

**Preliminary Work Product**
**Draft – Subject to Revision**



Protected Information To Be Disclosed Only In Accordance With Protective Order

FHFA-DDC-0119093

# Debt: *Median spread of GSE bonds*



**Fannie and Freddie Bond Spreads of Benchmark Securities**
**Normalized to 0 on 8/16/2012**

- Credit Suisse Liquid US Agency 3-5 Year Spread over Benchmark
- Median Spread of 13 Fannie Mae Benchmark Bonds
- Median Spread of 23 Freddie Mac Benchmark Bonds



8   **Privileged and Confidential**
**Prepared at the Request of Counsel**

**Preliminary Work Product**
**Draft – Subject to Revision**

Protected Information To Be Disclosed Only In Accordance With Protective Order

FHFA-DDC-0119094

000482

# Debt: *Change in debt value from the date prior to the Third Amendment until the Q3 2012 earnings*

|  | Fannie Mae | Freddie Mac |
|---|---|---|
| Change in spread (bps) | -4.0 | -10.1 |
| Median Maturity of benchmark bonds (years) | 3 | 4 |
| Face Value of Debt ($ millions) | 659,389 | 581,743 |
| Change in debt value ($ millions) | 790 | 2,374 |

**Notes and sources:**

- Change in value of debt = Change in spread (%) X Median Maturity of benchmark bonds X Face Value of debt
  - For example: Fannie Mae's change in debt value is equal to 0.04% X 3 X $659,389 million= $790 million
- Median maturity of Fannie and Freddie's benchmark bonds is 3 years and 4 years; remaining maturity of benchmark bonds as of 8/16/2012, Bloomberg.
- Face value of Fannie's debt is equal to $659 billion as of Q2 2012; Fannie Mae, Form 10-Q for the quarterly period ended June 30, 2012, p. 39.
- Face value of Freddie's debt is equal to $582 billion as of Q2 2012; Freddie Mac, Form 10-Q for the quarterly period ended June 30, 2012, p. 107.

9  **Privileged and Confidential
Prepared at the Request of Counsel**

**Preliminary Work Product
Draft – Subject to Revision**



Protected Information To Be Disclosed Only In Accordance With Protective Order

FHFA-DDC-0119095

# Debt: *Change in debt value in four periods*

| | Fannie Mae | Freddie Mac | |
|---|---|---|---|
| Change in spread (bps) | -0.8 | -2.1 | On the date of Third Amendment |
| Change in debt value ($ millions) | 152 | 499 | |
| Change in spread (bps) | -3.9 | -7.4 | Prior to Third Amendment until FHFA projections update |
| Change in debt value ($ millions) | 764 | 1,728 | |
| Change in spread (bps) | -4.0 | -10.1 | Prior to Third Amendment until Q3 2012 earnings |
| Change in debt value ($ millions) | 790 | 2,374 | |
| Change in spread (bps) | -6.1 | -11.7 | Prior to Q2 2012 earnings until Q3 2012 earnings |
| Change in debt value ($ millions) | 1,204 | 2,744 | |

Notes:
1. Change in value of debt = Change in spread (%) X Median Maturity of benchmark bonds X Value of debt
2. Median maturity of Fannie and Freddie's benchmark bonds is 3 years and 4 years as of 8/16/2012 respectively; remaining maturity of benchmark bonds as of 8/16/2012, Bloomberg.
3. Value of Fannie and Freddie's debt is $659 billion and $582 billion as of Q2 2012 respectively.

10  **Privileged and Confidential**                            **Preliminary Work Product**
    **Prepared at the Request of Counsel**                  **Draft – Subject to Revision**

Protected Information To Be Disclosed Only In Accordance With Protective Order



FHFA-DDC-0119096

# Total change in GSEs' debt and equity

|  | On the date of Third Amendment | Prior to Third Amendment until FHFA projections update | Prior to Third Amendment until Q3 2012 earnings | Prior to Q2 2012 earnings until Q3 2012 earnings |
|---|---|---|---|---|
| **Fannie Mae** | | | | |
| Change in value of debt ($ millions) | 152 | 764 | 790 | 1,204 |
| Change in equity value ($ millions) | -847 | -483 | -359 | 42 |
| **Total change ($ millions)** | **-695** | **281** | **431** | **1,246** |
| **Freddie Mac** | | | | |
| Change in value of debt ($ millions) | 499 | 1,728 | 2,374 | 2,744 |
| Change in equity value ($ millions) | -831 | -522 | -422 | -14 |
| **Total change ($ millions)** | **-332** | **1,207** | **1,952** | **2,730** |

**Privileged and Confidential**
**Prepared at the Request of Counsel**

**Preliminary Work Product**
**Draft – Subject to Revision**



Protected Information To Be Disclosed Only In Accordance With Protective Order                    FHFA-DDC-0119097

**000485**

# Q2 2012 earnings: *Change in equity and debt value*

- Fannie Mae and Freddie Mac released their Q2 2012 earnings on 8/7/2012 and 8/8/2012 respectively.
- The value of debt and equity for Fannie Mae and Freddie Mac increased by $522 million and $483 million respectively.

|  | Fannie Mae ($ millions) | Freddie Mac ($ millions) |
|---|---|---|
| Change in spread (bps) | -0.6 | -0.5 |
| Change in value of debt | 117 | 108 |
| Change in equity value | 406 | 375 |
| Change in common equity | 72 | 45 |
| Change in junior preferred equity | 334 | 329 |
| **Total change in debt and equity value** | **522** | **483** |

**Notes:**
1. The change in debt and equity value is calculated between 8/6/2012 and 8/8/2012.

12 **Privileged and Confidential**
**Prepared at the Request of Counsel**

**Preliminary Work Product**
**Draft – Subject to Revision**



Protected Information To Be Disclosed Only In Accordance With Protective Order

FHFA-DDC-0119098

**PX-0375 - p. 13 of 16**

**000486**

# Dates with significant excess returns

| Date | Fannie Mae Equity – Common + Junior preferred | Freddie Mac Equity – Common + Junior Preferred |
|---|---|---|
| 8/7/2012 | 11.1%* | 18.0%* |
| 8/8/2012 | 15.7%* | 14.9%* |
| 8/17/2012 | -47.1%* | -56.8%* |
| 8/20/2012 | -7.0%* | -4.8% |
| 10/10/2012 | 7.6%* | 4.9% |
| 10/15/2012 | 3.7% | 12.9%* |
| 10/16/2012 | 5.3%* | 4.9% |
| 10/17/2012 | 6.3%* | 8.8%* |
| 10/22/2012 | 8.6%* | 8.3%* |

- Based on a market model for a 1-year period from 8/7/2011 to 8/6/2012 (prior to the Q2 2012 earnings)

- Significance of excess returns is based on a 5% level.

- The table shows the dates with significant excess returns during 8/7/2012 to 12/31/2012.

13   **Privileged and Confidential**
   **Prepared at the Request of Counsel**

**Preliminary Work Product**
**Draft – Subject to Revision**



Protected Information To Be Disclosed Only In Accordance With Protective Order

FHFA-DDC-0119099

# News (1/2)

| Date | News |
|------|------|
| 8/7/2012 | Freddie Mac issues 2Q earnings release reporting net income of $3.0 billion, making it the first profitable quarter since 1Q2011, and the second quarter since 2008 that it has not required a draw from the Treasury. |
| | Fannie Mae releases results from its July 2012 National Housing Survey, showing that although *"consumers' attitudes about their household finances remain cautious in this month's survey… consumer expectations regarding housing largely continue to be upbeat." (Doug Duncan, Fannie Mae chief economist)* |
| 8/8/2012 | Fannie Mae issues 2Q earnings release reporting net income of $5.1 billion, making it the second straight quarterly profit after a 10-quarter loss streak. Fannie Mae president and CEO says that *"[w]hile it is too early to declare a national housing recovering… we expect our financial results in 2012 to be substantially better than the past few years."* |
| | Freddie Mac releases August 2012 U.S. Economic and Housing Market Outlook showing that the U.S. House Price Index saw a quarterly gain of 4.8%, the largest quarterly pick up since 2004. |
| 8/17/2012 8/20/2012 8/21/2012 | U.S. Treasury announces 3rd amendment terms on 8/17 re Fannie and Freddie, nixing 10% dividend for net worth sweep and requiring accelerated reduction of mortgage holdings. Following announcement, *"the companies' corporate debt price rallied as the new policy alleviated the need for Fannie Mae and Freddie Mac to borrow from the government just to make dividend payments"* and *"preferred [and common] shares lost more than half their value in heavy trading as investors saw the plan as undercutting the ability of either company to ever emerge from government conservatorship as profitable entities." (Reuters, August 17, 2012)* |
| 9/13/2012 | Federal Reserve announces plan to buy $40 billion of MBS a month in latest program to stimulate U.S. economy. Announcement "topped expectations" of the market, with a Nomura analyst speculating *"[t]he central bank likely will be buying half of the $140 billion of the mortgage-backed debt that Fannie Mae, Freddie Mac and Ginnie Mae sell each month." (Wall Street Journal, September 13, 2012)* |
| | FHFA Inspector General publishes report saying Freddie Mac will recover up to $3.4 billion after scrutinizing soured loans purchased from US banks. |
| | Fannie Mae releases results from its August 2012 National Housing Survey, showing *"[c]onsumer attitudes toward the housing market remain modestly positive, despite signs of increased concern over the direction of the economy." (Doug Duncan, Fannie Mae chief economist)* |

 **Privileged and Confidential
Prepared at the Request of Counsel**

**Preliminary Work Product
Draft – Subject to Revision**



Protected Information To Be Disclosed Only In Accordance With Protective Order

FHFA-DDC-0119100

**000488**

# News (2/2)

| Date | News |
|------|------|
| 10/9/2012 | Fannie Mae releases results from its September 2012 National Housing Survey. Fannie Mae chief economist states: *"[c]onsumers are showing increasing faith in the nascent housing recovery… the Federal Reserve's latest round of quantitative easing has caused a large drop in mortgage rate expectations,"* also citing to the positive September jobs report published the Friday prior (10/5) showing unemployment reaching a 3-year low. |
| | FHFA releases strategic plan for 2013-2017 subtitled "Preparing a Foundation for a More Efficient and Effective Housing Finance." Fannie Mae and Freddie Mac are expected to continue to support housing finance, but also *"contribute to an increase in the role of private sources in capital in housing finance, ultimately diminishing direct and indirect government support."* Plan includes returning GSEs to "safe and sound" status. |
| 10/15/2012 | Freddie Mac announces the dismissal of class-action lawsuit filed in August 2008 alleging securities fraud. |
| 10/17/2012 | FINRA arbitration panel rules Merrill Lynch must pay $1.34 million to a couple alleging the broker misrepresented the risks of Fannie Mae preferred shares in 2008. |
| | FHFA Inspector General publishes report urging Fannie and Freddie to accelerate efforts to recover losses from soured loans and for FHFA to develop foreclosure-sale guidelines. FHFA agrees with report's recommendations, saying it expects to provide new guidance to the GSEs by September 2013. |
| | Former CFO of Fannie Mae is dismissed from class-action lawsuit alleging Fannie's former executives and accountants of hiding the company's deteriorating financial condition in 2004. |
| 10/22/2012 | Securities arbitration law firm Klayman & Toskes announces 10/19 after trading hours that it is continuing to investigate the sale of Fannie preferred stock by brokerage firms to their customers. PR Newswire reports that Fannie Mae stock is up 15% midday 10/22, and this news *"may have something to do with [it]."*  (PR Newswire, October 22, 2012) |
| 10/26/2012 | FHFA releases updated projections of potential Treasury draws for Fannie Mae and Freddie Mac. Projections show improved outlook: Freddie Mac won't require any more support from the U.S. government, and Fannie will only need additional aid in subsequent years if home prices fall sharply. |

**Preliminary Work Product**
**Draft – Subject to Revision**



Protected Information To Be Disclosed Only In Accordance With Protective Order

FHFA-DDC-0119101

**000489**

EDGARpro
by EDGAR Online®

# FEDERAL HOME LOAN MORTGAGE CORP

## FORM 10-K
(Annual Report)

## Filed 02/28/13 for the Period Ending 12/31/12

| | |
|---|---|
| Address | 8200 JONES BRANCH DR |
| | MCLEAN, VA, 22102 |
| Telephone | 7039032000 |
| CIK | 0001026214 |
| Symbol | FMCC |
| SIC Code | 6111 - Federal and Federally-Sponsored Credit Agencies |
| Industry | Corporate Financial Services |
| Sector | Financials |
| Fiscal Year | 12/31 |

http://pro.edgar-online.com
© Copyright 2022, EDGAR Online, a division of Donnelley Financial Solutions. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, a division of Donnelley Financial Solutions, Terms of Use.

Table of Contents

***We may request additional draws under the Purchase Agreement in future periods.***

We may request additional draws under the Purchase Agreement in future periods. The need for any such future draws will be determined by a variety of factors that could adversely affect our net worth or our ability to generate comprehensive income, including the following:

- how long and to what extent the U.S. economy and housing market, including home prices, remain weak, which could increase credit expenses and cause additional other-than-temporary impairments of the non-agency mortgage-related securities we hold;

- foreclosure prevention and other loss mitigation efforts, and foreclosure processing delays, which could increase our expenses;

- competitiveness with other mortgage market participants, including Fannie Mae;

- adverse changes in interest rates, the yield curve, implied volatility or mortgage-to-debt OAS, which could increase realized and unrealized mark-to-fair value losses recorded in earnings or AOCI;

- required reductions in the size of our mortgage-related investments portfolio and other limitations on our investment activities that reduce the earnings capacity of our investment activities;

- adverse changes in our funding costs or limitations in our access to public debt markets;

- changes in accounting practices or guidance;

- effects of the MHA Program and other government initiatives, including any future requirements to reduce the principal amount of loans;

- losses resulting from control failures, including any control failures because of our inability to retain staff;

- prohibition on developing new products and limitations on our ability to enter into new lines of business;

- introduction of additional public mission-related initiatives that may adversely affect our financial results;

- establishment of additional valuation allowances for our remaining net deferred tax asset; or

- changes in business practices resulting from legislative and regulatory developments or direction from our Conservator.

Through the fourth quarter of 2012, we paid cash dividends to Treasury on the senior preferred stock at an annual rate of 10%. In past periods, this fixed-rate dividend obligation substantially contributed to draws under the Purchase Agreement. However, on August 17, 2012, Freddie Mac, acting through FHFA, as Conservator, and Treasury entered into an amendment to the Purchase Agreement. Under this amendment, the fixed dividend rate was replaced with a net worth sweep dividend beginning in the first quarter of 2013. This effectively ends the circular practice of Treasury advancing funds to us to pay dividends back to Treasury. As a result, beginning in 2013, the need for future draws will not be driven by the dividend obligation. This amendment also suspended the periodic commitment fee, beginning in the first quarter of 2013. The amount of the net worth sweep dividend could vary substantially from quarter to quarter for a number of reasons, including as a result of non-cash changes in net worth. It is possible that, due to non-cash changes in net worth, the amount of our dividend for a quarter could exceed the amount of available cash, which could have an adverse effect on our financial results.

Although additional draws under the Purchase Agreement will allow us to remain solvent and avoid mandatory receivership, they will also increase the liquidation preference of the senior preferred stock, which was $72.3 billion as of December 31, 2012. In addition, draws we take for deficits in our net worth will reduce the amount of available funding remaining under the Purchase Agreement, which beginning January 1, 2013, is $140.5 billion. Additional draws and corresponding increases in the already substantial liquidation preference, along with limited flexibility to redeem the senior preferred stock, may add to the uncertainty regarding our long-term financial sustainability.

***Our business objectives and strategies have in some cases been significantly altered since we were placed into conservatorship, and may continue to change, in ways that negatively affect our future financial condition and results of operations.***

Our current business objectives reflect direction we have received from the Conservator (including the Conservatorship Scorecard), and have changed considerably since we entered into conservatorship. See "BUSINESS — Executive Summary — *Our Primary Business Objectives*" for more information.



# FEDERAL NATIONAL MORTGAGE ASSOCIATION FANNIE MAE

## FORM 10-K
(Annual Report)

### Filed 04/02/13 for the Period Ending 12/31/12

| | |
|---|---|
| Address | MIDTOWN CENTER |
| | 1100 15TH ST, NW |
| | WASHINGTON, DC, 20005 |
| Telephone | 800-232-6643 |
| CIK | 0000310522 |
| Symbol | FNMA |
| SIC Code | 6111 - Federal and Federally-Sponsored Credit Agencies |
| Industry | Banks |
| Sector | Financials |
| Fiscal Year | 12/31 |

http://pro.edgar-online.com

© Copyright 2022, EDGAR Online, a division of Donnelley Financial Solutions. All Rights Reserved.

Distribution and use of this document restricted under EDGAR Online, a division of Donnelley Financial Solutions, Terms of Use.

private firms, which is one of the goals set forth in FHFA's strategic plan for Fannie Mae's and Freddie Mac's conservatorships. See "Legislative and Regulatory Developments—Changes to Our Single-Family Guaranty Fee Pricing and Revenue" for more information on changes to our guaranty fee pricing.

### Credit Risk Characteristics of Loans Acquired under HARP

Since 2009, our acquisitions have included a significant number of loans that are refinancings of existing Fannie Mae loans under the Administration's Home Affordable Refinance Program ("HARP"). HARP is designed to expand refinancing opportunities for borrowers who may otherwise be unable to refinance their mortgage loans due to a decline in home values. Accordingly, HARP loans have LTV ratios at origination in excess of 80%. In addition, a HARP loan cannot (1) be an adjustable-rate mortgage loan, or ARM, if the initial fixed period is less than five years; (2) have an interest-only feature, which permits the payment of interest without a payment of principal; (3) be a balloon mortgage loan; or (4) have the potential for negative amortization. We acquire HARP loans under our Refi Plus ™ initiative, which provides expanded refinance opportunities for eligible Fannie Mae borrowers. In the fourth quarter of 2012, we revised how we present these loans to reflect all Refi Plus loans with LTV ratios at origination in excess of 80% as HARP loans. Previously we did not reflect loans that were backed by second homes or investor properties as HARP loans.

Many of the loans we acquire under HARP have higher LTV ratios than we would otherwise permit, greater than 100% in some cases. Some borrowers under HARP and Refi Plus also have lower FICO credit scores than we would otherwise require. The volume of loans with high LTV ratios that we acquired under HARP increased in 2012 as a result of changes we implemented in the first half of 2012 to make the benefits of HARP available to more borrowers, combined with historically low interest rates in the second half of 2012. Loans we acquired under HARP in the fourth quarter of 2012 constituted 16% of our single-family acquisitions for the period, measured by unpaid principal balance, compared with 7% in the fourth quarter of 2011. As a result of this increase, loans with LTV ratios greater than 100% constituted 8% of our acquisitions in 2012, compared with 2% in 2011, and the weighted average LTV ratio at origination of loans we acquired in 2012 increased to 75% from 69 % in 2011. The average original LTV ratio of single-family loans we acquired in 2012, excluding HARP loans, was 68% , compared with 111% for HARP loans.

Loans we acquire under HARP represent refinancings of loans that are already in our guaranty book of business. The credit risk associated with loans we acquire under HARP essentially replaces the credit risk that we already held prior to the refinancing. Loans we acquire under HARP have higher serious delinquency rates and may not perform as well as the other loans we have acquired since the beginning of 2009. However, we expect these loans will perform better than the loans they replace because HARP loans should reduce the borrowers' monthly payments and/or provide more stable terms than the borrowers' old loans (for example, by refinancing into a mortgage with a fixed interest rate instead of an adjustable rate).

We expect that if interest rates remain low we will continue to acquire a high volume of refinancings under HARP for the program's duration or until there is no longer a large population of borrowers with high LTV loans who would benefit from refinancing. We expect to acquire many refinancings with LTV ratios greater than 125% in particular, because borrowers were unable to refinance loans with LTV ratios greater than 125% in large numbers until changes to HARP were fully implemented in the second quarter of 2012. For a description of these changes to HARP, see "MD&A—Risk Management—Credit Risk Management—Single-Family Credit Risk Management—Home Affordable Refinance Program ('HARP') and Refi Plus Loans." HARP is scheduled to end in December 2013, although we will continue to accept deliveries of HARP loans through September 30, 2014 for loans with application dates on or before December 31, 2013.

Loans we acquired under HARP represented 13% of our new single-family book of business as of December 31, 2012 and had a serious delinquency rate of 0.93% , compared with a serious delinquency rate for our new single-family book of business overall of 0.35% . See " Table 42 : Selected Credit Characteristics of Single-Family Conventional Loans Acquired under HARP and Refi Plus."

### Factors that May Affect the Credit Risk Profile and Performance of Loans We Acquire in the Future

Whether the loans we acquire in the future will exhibit an overall credit profile and performance similar to our more recent acquisitions will depend on a number of factors, including our future pricing and eligibility standards and those of mortgage insurers and the Federal Housing Administration ("FHA"), the percentage of loan originations representing refinancings, our future objectives, government policy, market and competitive conditions, and the volume and characteristics of loans we acquire under HARP. See "MD&A—Risk Management—Credit Risk Management—Single-Family Mortgage Credit Risk Management" for more detail regarding the credit risk characteristics of our single-family guaranty book of business.

### Reducing Credit Losses on Our Legacy Book of Business

To reduce the credit losses we ultimately incur on our legacy book of business, we have been focusing our efforts on the following strategies:

8

000493

- Helping eligible Fannie Mae borrowers with high LTV loans, including those whose loans are underwater, refinance to more sustainable loans, including loans that significantly reduce their monthly payments, through HARP;

- Reducing defaults by offering borrowers loan modifications that can significantly reduce their monthly payments and other solutions that enable them to stay in their homes (collectively, "home retention solutions");

- Pursuing short sales, which are also known as preforeclosure sales, as well as deeds-in-lieu of foreclosure; these "foreclosure alternatives" help borrowers avoid foreclosure and reduce the overall severity of the losses we incur;

- Efficiently managing timelines for home retention solutions, foreclosure alternatives and foreclosures;

- Improving servicing standards and servicers' execution and consistency;

- Managing our REO inventory to minimize costs and maximize sales proceeds; and

- Pursuing contractual remedies from lenders, servicers and providers of credit enhancement.

As we work to reduce credit losses, we also seek to assist distressed borrowers, help stabilize communities, and support the housing market. For example, in November 2012 we, along with Freddie Mac, put into effect new, streamlined rules for short sales to enable servicers to quickly evaluate a borrower's eligibility for a short sale.

We view foreclosure as a last resort, and we offer alternatives to foreclosure to homeowners in need. These solutions have enabled 1.2 million homeowners to avoid foreclosure since 2009. In dealing with distressed borrowers, we first seek home retention solutions before turning to foreclosure alternatives. When there is no viable home retention solution or foreclosure alternative that can be applied, we seek to move to foreclosure expeditiously; prolonged delinquencies hurt local home values and destabilize communities, as these homes often go into disrepair.

We provide information on our efforts to reduce our credit losses in "MD&A—Risk Management—Credit Risk Management—Single-Family Mortgage Credit Risk Management" and "MD&A—Risk Management—Institutional Counterparty Credit Risk Management." See also "Risk Factors," where we describe factors that may adversely affect the success of our efforts, including our reliance on third parties to service our loans, conditions in the foreclosure environment, and risks relating to our mortgage insurer counterparties.

**Credit Performance**

Table 4 presents information for each of the last three years about the credit performance of mortgage loans in our single-family guaranty book of business and our workouts. The term "workouts" refers to home retention solutions and foreclosure alternatives. The workout information in Table 4 does not reflect repayment plans and forbearances that have been initiated but not completed, nor does it reflect trial modifications that have not become permanent.

9

**Table 4 : Credit Statistics, Single-Family Guaranty Book of Business** [1]

| | 2012 | | 2011 | | 2010 | |
|---|---|---|---|---|---|---|
| | | | (Dollars in millions) | | | |
| **As of the end of each period:** | | | | | | |
| Serious delinquency rate [2] | 3.29 % | | 3.91 % | | 4.48 % | |
| Seriously delinquent loan count | 576,591 | | 690,911 | | 801,640 | |
| Nonperforming loans [3] | $ 247,823 | | $ 248,379 | | $ 251,631 | |
| Foreclosed property inventory: | | | | | | |
| Number of properties [4] | 105,666 | | 118,528 | | 162,489 | |
| Carrying value | $ 9,505 | | $ 9,692 | | $ 14,955 | |
| Combined loss reserves [5] | $ 58,809 | | $ 71,512 | | $ 60,163 | |
| Total loss reserves [6] | $ 61,396 | | $ 75,264 | | $ 64,469 | |
| **During the period:** | | | | | | |
| Foreclosed property (number of properties): | | | | | | |
| Acquisitions [4] | 174,479 | | 199,696 | | 262,078 | |
| Dispositions | (187,341) | | (243,657) | | (185,744) | |
| Credit-related income (expenses) [7] | $ 919 | | $ (27,218) | | $ (26,420) | |
| Credit losses [8] | $ 14,392 | | $ 18,346 | | $ 23,133 | |
| REO net sales prices to unpaid principal balance [9] | 59 % | | 54 % | | 56 % | |
| **Loan workout activity (number of loans):** | | | | | | |
| Home retention loan workouts [10] | 186,741 | | 248,658 | | 440,276 | |
| Short sales and deeds-in-lieu of foreclosure | 88,732 | | 79,833 | | 75,391 | |
| Total loan workouts | 275,473 | | 328,491 | | 515,667 | |
| Loan workouts as a percentage of delinquent loans in our guaranty book of business [11] | 26.38 % | | 27.05 % | | 37.30 % | |

---

[1]   Our single-family guaranty book of business consists of (a) single-family mortgage loans held in our mortgage portfolio, (b) single-family mortgage loans underlying Fannie Mae MBS, and (c) other credit enhancements that we provide on single-family mortgage assets, such as long-term standby commitments. It excludes non-Fannie Mae mortgage-related securities held in our mortgage portfolio for which we do not provide a guaranty.

[2]   Calculated based on the number of single-family conventional loans that are 90 days or more past due and loans that have been referred to foreclosure but not yet foreclosed upon, divided by the number of loans in our single-family conventional guaranty book of business. We include all of the single-family conventional loans that we own and those that back Fannie Mae MBS in the calculation of the single-family serious delinquency rate. As of January 31, 2013, our single-family serious delinquency rate was 3.18% .

[3]   Represents the total amount of nonperforming loans including troubled debt restructurings ("TDR"). A TDR is a restructuring of a mortgage loan in which a concession is granted to a borrower experiencing financial difficulty. We generally classify loans as nonperforming when the payment of principal or interest on the loan is 60 days or more past due.

[4]   Includes held-for-use properties (properties that we do not intend to sell or that are not ready for immediate sale in their current condition), which are reported in our consolidated balance sheets as a component of "Other assets" and acquisitions through deeds-in-lieu of foreclosure.

[5]   Consists of the allowance for loan losses for loans recognized in our consolidated balance sheets and the reserve for guaranty losses related to both single-family loans backing Fannie Mae MBS that we do not consolidate in our consolidated balance sheets and single-family loans that we have guaranteed under long-term standby commitments. For additional information on the change in our loss reserves see "Consolidated Results of Operations—Credit-Related (Income) Expenses—Benefit (Provision) for Credit Losses."

[6]   Consists of (a) the combined loss reserves, (b) allowance for accrued interest receivable, and (c) allowance for preforeclosure property taxes and insurance receivables.

[7]   Consists of (a) the benefit (provision) for credit losses and (b) foreclosed property (income) expense.

[8]   Consists of (a) charge-offs, net of recoveries and (b) foreclosed property (income) expense, adjusted to exclude the impact of fair value losses resulting from credit-impaired loans acquired from MBS trusts.

[9]   Calculated as the amount of sale proceeds received on disposition of REO properties during the respective periods, excluding those subject to repurchase requests made to our seller/servicers, divided by the aggregate UPB of the related loans at the time of foreclosure. Net sales price represents the contract sale price less selling costs for the property and other charges paid by the seller at closing.

[10]  Consists of (a) modifications, which do not include trial modifications or repayment plans or forbearances that have been initiated but not completed and (b) repayment plans and forbearances completed. See " Table 47 : Statistics on Single-Family Loan Workouts" in

000495

| Business Segment | Primary Business Activities | Primary Drivers of Revenue | Primary Drivers of Expense |
|---|---|---|---|
| Capital Markets | *Mortgage and other investments:* Purchases mortgage assets and makes investments in non-mortgage interest-earning assets<br><br>*Mortgage securitizations:* Purchases loans from a large group of lenders, securitizes them, and may sell the securities to dealers and investors<br><br>*Structured mortgage securitizations and other customer services:* Issues structured Fannie Mae MBS for customers in exchange for a transaction fee and provides other fee-related services to our lender customers<br><br>*Interest rate risk management:* Manages the interest rate risk on our portfolio by issuing a variety of debt securities in a wide range of maturities and by using derivatives | *Net interest income:* Generated from the difference between the interest income earned on our interest-earning assets and the interest expense associated with the debt funding those assets<br><br>*Fee and other income:* Compensation received for engaging in structured transactions and providing other lender services | *Fair value gains and losses:* Primarily consists of fair value gains and losses on derivatives and trading securities<br><br>*Investment gains and losses:* Primarily consists of gains and losses on the sale or securitization of mortgage assets<br><br>*Other-than-temporary impairment:* Consists of impairment recognized on our investments<br><br>*Administrative expenses:* Consists of salaries and benefits, occupancy costs, professional services, and other expenses associated with our Capital Markets business operations |

**Revenues from our Business Segments**

The following table displays the percentage of our total net revenues accounted for by our business segments for each of the last three years. For more information about the financial results and performance of each of our segments, see "MD&A—Business Segment Results" and "Note 13 , Segment Reporting."

**Business Segment Revenues** [1]

|  | For the Year Ended December 31, | | |
|---|---|---|---|
|  | 2012 | 2011 | 2010 |
| Single-Family Credit Guaranty | 35% | 28% | 12% |
| Multifamily [2] | 5 | 5 | 5 |
| Capital Markets | 55 | 63 | 77 |

---

[1]  Amounts presented represent the percentage of our total net revenues accounted for by each of our business segments. The sum of net revenues for our three business segments does not equal our consolidated total net revenues because we separate the activity related to our consolidated trusts from the results generated by our three segments.

[2]  These amounts do not include the net interest income we earn on our multifamily investments in our mortgage portfolio, which is reflected in the revenues of our Capital Markets segment.

**Single-Family Business**

Working with our lender customers, our Single-Family business provides funds to the mortgage market by acquiring single-family loans through lender swap transactions or, working also with our Capital Markets group, through purchases of loans. Our Single-Family business has primary responsibility for pricing and managing the credit risk on our single-family guaranty book of business, which consists of single-family mortgage loans underlying Fannie Mae MBS and single-family loans held in our mortgage portfolio.

A single-family loan is secured by a property with four or fewer residential units. Our Single-Family business and Capital Markets group securitize and purchase primarily conventional (not federally insured or guaranteed) single-family fixed-rate or adjustable-rate, first-lien mortgage loans, or mortgage-related securities backed by these types of loans. We also securitize or purchase loans insured by FHA, loans guaranteed by the Department of Veterans Affairs ("VA"), loans guaranteed by the Rural Development Housing and Community Facilities Program of the Department of Agriculture (the "Department of Agriculture"), manufactured housing loans and other mortgage-related securities.

20

Revenues for our Single-Family business are derived primarily from guaranty fees received as compensation for assuming the credit risk on the mortgage loans underlying single-family Fannie Mae MBS. We also allocate guaranty fee revenues to the Single-Family business for assuming and managing the credit risk on the single-family mortgage loans held in our portfolio. The aggregate amount of single-family guaranty fees we receive or that are allocated to our Single-Family business in any period depends on the amount of single-family Fannie Mae MBS outstanding and loans held in our mortgage portfolio during the period and the applicable guaranty fee rates. The amount of Fannie Mae MBS outstanding at any time is primarily determined by the rate at which we issue new Fannie Mae MBS and by the repayment rate for the loans underlying our outstanding Fannie Mae MBS. Other factors affecting the amount of Fannie Mae MBS outstanding are the extent to which (1) borrower defaults lead us to purchase loans from our MBS trusts (with the amount of these purchases affected by the rate of borrower defaults on the loans and the extent of loan modification programs in which we engage) and (2) sellers and servicers repurchase loans from us upon our demand based on a breach in the selling representations and warranties provided upon delivery of the loans.

We describe the credit risk management process employed by our Single-Family business, including its key strategies in managing credit risk and key metrics used in measuring and evaluating our single-family credit risk in "MD&A—Risk Management—Credit Risk Management—Single-Family Credit Risk Management."

### Single-Family Mortgage Securitizations and Other Acquisitions

Our Single-Family business securitizes single-family mortgage loans and issues single-class Fannie Mae MBS, which are described above in "Mortgage Securitizations—Single-Class and Multi-Class Fannie Mae MBS," for our lender customers. Unlike our Capital Markets group, which securitizes loans from our portfolio, our Single-Family business securitizes loans solely in lender swap transactions, in which lenders deliver to us pools of mortgage loans, which are placed immediately in a trust, in exchange for Fannie Mae MBS backed by these loans. We describe lender swap transactions, and how they differ from portfolio securitizations, in "Mortgage Securitizations—Lender Swaps and Portfolio Securitizations." Our Single-Family business also works with our Capital Markets group to acquire single-family loans through purchases of loans.

Loans from our lender customers are delivered to us through either our "flow" or "bulk" transaction channels. In our flow business, we enter into agreements that generally set agreed-upon guaranty fee prices for a lender's future delivery of individual loans to us over a specified time period. Our bulk business generally consists of transactions in which a set of loans is delivered to us in bulk, typically with guaranty fees and other contract terms negotiated individually for each transaction.

### Single-Family Mortgage Servicing, REO Management, and Lender Repurchases

#### Servicing

Generally, the servicing of the mortgage loans that are held in our mortgage portfolio or that back our Fannie Mae MBS is performed by mortgage servicers on our behalf. Typically, lenders who sell single-family mortgage loans to us service these loans for us. For loans we own or guarantee, the lender or servicer must obtain our approval before selling servicing rights to another servicer.

Our mortgage servicers typically collect and deliver principal and interest payments, administer escrow accounts, monitor and report delinquencies, perform default prevention activities, evaluate transfers of ownership interests, respond to requests for partial releases of security, and handle proceeds from casualty and condemnation losses. Our mortgage servicers are the primary point of contact for borrowers and perform a key role in the effective implementation of our homeownership assistance initiatives, negotiation of workouts of troubled loans, and other loss mitigation activities. If necessary, mortgage servicers inspect and preserve properties and process foreclosures and bankruptcies. Because we generally delegate the servicing of our mortgage loans to mortgage servicers and do not have our own servicing function, our ability to actively manage troubled loans that we own or guarantee is limited. For more information on the risks of our reliance on servicers, refer to "Risk Factors" and "MD&A—Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management."

We compensate servicers primarily by permitting them to retain a specified portion of each interest payment on a serviced mortgage loan as a servicing fee. Servicers also generally retain prepayment premiums, assumption fees, late payment charges and other similar charges, to the extent they are collected from borrowers, as additional servicing compensation. We also compensate servicers for negotiating workouts on problem loans.

#### REO Management

If a loan defaults and we acquire a home through foreclosure or a deed-in-lieu of foreclosure, we market and sell the home through local real estate professionals. Our primary objectives are both to minimize the severity of loss to Fannie Mae by maximizing sales prices and to stabilize neighborhoods—to prevent empty homes from depressing home values. In cases

21

# FEDERAL HOME LOAN MORTGAGE CORP

## FORM 10-K
(Annual Report)

## Filed 02/27/14 for the Period Ending 12/31/13

| | |
|---|---|
| Address | 8200 JONES BRANCH DR |
| | MCLEAN, VA, 22102 |
| Telephone | 7039032000 |
| CIK | 0001026214 |
| Symbol | FMCC |
| SIC Code | 6111 - Federal and Federally-Sponsored Credit Agencies |
| Industry | Corporate Financial Services |
| Sector | Financials |
| Fiscal Year | 12/31 |

http://pro.edgar-online.com
© Copyright 2022, EDGAR Online, a division of Donnelley Financial Solutions. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, a division of Donnelley Financial Solutions, Terms of Use.

- effects of the MHA Program and other government initiatives, including any future requirements to reduce the principal amount of loans, which could increase the likelihood of prepayment of mortgages and potentially reduce our net interest income;

- changes in housing or economic conditions, legislation, or other factors that affect our assessment of our ability to realize our net deferred tax asset, and cause us to establish a valuation allowance against our net deferred tax asset; or

- changes in business practices resulting from legislative and regulatory developments or direction from our Conservator.

We do not have the authority over the long term to build and retain capital from the earnings generated by our business operations, as a result of the net worth sweep dividend. This increases the likelihood of draws in future periods, particularly as the permitted Capital Reserve Amount (which is $2.4 billion for 2014) declines over time. Additional draws under the Purchase Agreement will increase the liquidation preference of the senior preferred stock, which was $72.3 billion as of December 31, 2013. In addition, draws we take for deficits in our net worth will reduce the amount of available funding remaining under the Purchase Agreement, which was $140.5 billion as of December 31, 2013. Additional draws and corresponding increases in the already substantial liquidation preference, along with limited flexibility to redeem the senior preferred stock, may add to the uncertainty regarding our long-term financial sustainability.

***We are under the control of FHFA, and our business activities are subject to significant restrictions. We may be required to take actions that materially adversely affect our business and financial results.***

We may be required to undertake activities that are unprofitable, costly to implement, expose us to additional credit and other risks, or that otherwise adversely affect our business over the short- or long-term. We are under the control of FHFA, as our Conservator, and are not managed to maximize stockholder returns. FHFA determines the strategic direction of our company. FHFA has changed our business objectives significantly since we entered into conservatorship, and could make additional changes at any time. We are also subject to significant restrictions under the Purchase Agreement and senior preferred stock. Other agencies of the U.S. government, as well as Congress, also could require us to take actions that adversely affect our business and financial results.

FHFA has required us to make changes to our business that have adversely affected our financial results, and may require us to make additional changes in the future. For example, FHFA is requiring us to contract our presence in the mortgage market and simplify our operations. These actions will adversely affect our profitability over the long term. FHFA also may require us to provide additional support for the mortgage market in a manner that serves our public mission, but that adversely affects our financial results, such as by engaging in more expensive loss mitigation efforts. From time to time, FHFA and Treasury have prevented us from engaging in business activities or transactions that we believe would benefit our business and financial results, and may do so in the future. FHFA may require us to engage in activities that are operationally difficult to implement. FHFA, as our Conservator, could also take a number of actions that could materially adversely affect our company, such as reducing the maximum UPB of single-family loans we are permitted to purchase or limiting the amount of securities we could sell for liquidity management purposes. Significant strategy changes, either from FHFA or Treasury, could have an adverse impact on the earnings of our business.

We currently face a variety of different, and potentially competing, business objectives and new FHFA-mandated activities (e.g., the initiatives we are pursuing under the 2013 Conservatorship Scorecard). It may be difficult for us to devote sufficient resources and management attention to these multiple priorities, some of which present significant operational challenges to us. See "BUSINESS — Executive Summary — Our Primary Business Objectives" for more information.

The Purchase Agreement and terms of the senior preferred stock include significant restrictions on our ability to manage our business, including limitations on the amount of indebtedness we may incur, the size of our mortgage-related investments portfolio, and the circumstances in which we may pay dividends, transfer certain assets, raise capital, and pay down the liquidation preference on the senior preferred stock. These limitations could have a material adverse effect on our future results of operations and financial condition. Over the long-term, as a result of the net worth sweep dividend provisions of the senior preferred stock, we do not have the authority to build and retain capital from the earnings generated by our business operations and will not be able to build or retain any net worth surplus or return capital to stockholders other than Treasury. In deciding whether or not to consent to any request for approval it receives from us under the Purchase Agreement, Treasury has the right to withhold its consent for any reason and is not required by the agreement to consider any particular factors, including whether or not management believes that the transaction would benefit the company. The warrant held by Treasury, the restrictions on our business contained in the Purchase Agreement, and the senior status and net worth dividend provisions of the senior preferred stock issued to Treasury under the Purchase Agreement also could adversely affect our ability to attract new private sector capital in the future should the company be in a position to seek such capital.

***Our regulator may, and in some cases must, place us into receivership, which would result in the liquidation of our assets; if this occurs, there may not be sufficient funds to pay the claims of the company, repay the liquidation preference of our preferred stock, or make any distribution to the holders of our common stock.***

increased competition. In addition, FHFA's efforts to decrease our presence in this market (e.g., the requirement to reduce our new multifamily business volume by at least 10% in 2013) could encourage further competition.

***Our investment activities may be adversely affected by limited availability of financing and increased funding costs.***

The amount, type and cost of our unsecured funding, including financing from other financial institutions and the capital markets, directly affects our interest expense and results of operations. A number of factors could make such financing more difficult to obtain, more expensive or unavailable on any terms, both domestically and internationally, including:

- changes in our government support;
- reduced demand for our debt securities;
- competition for debt funding from other debt issuers; and
- downgrades in our credit ratings or the credit ratings of the U.S. government.

Our ability to obtain funding in the public unsecured debt markets or by pledging mortgage-related securities as collateral to other institutions could cease or change rapidly, and the cost of available funding could increase significantly, due to changes in market confidence and other factors. We may incur costs, including potentially higher funding costs, for our liquidity management practices and procedures and there can be no assurance that such practices and procedures would provide us with sufficient liquidity to meet our ongoing cash obligations under all circumstances. In particular, we believe that our liquidity contingency plans may be difficult or impossible to execute during a liquidity crisis or period of significant market turmoil. If we cannot access the unsecured debt markets, our ability to repay maturing indebtedness and fund our operations could be eliminated or significantly impaired, as our alternative sources of liquidity (e.g., cash and other investments) may not be sufficient to meet our liquidity needs.

Wider spreads could cause a reduction in long-term debt issuances and an increased reliance on short-term debt issuances. Significant issuances of short-term debt could lead to a funding gap between short- and long-term debt and could increase rollover risk (i.e., the risk that we may be unable to refinance our debt when it becomes due), and could increase the use of derivatives and the volatility of reported net income.

Our mortgage-related investments portfolio has contracted significantly since we entered into conservatorship. A significant portion of the assets remaining in the portfolio are those we consider to be less liquid, and our ability to use these assets as a significant source of liquidity (for example, through sales or use as collateral in secured lending transactions) is limited.

We pay cash dividends (known as the net worth sweep dividend) to Treasury on the senior preferred stock on a quarterly basis. The amount of the net worth sweep dividend could vary substantially from quarter to quarter for a number of reasons, including as a result of non-cash changes in net worth. It is possible that, due to non-cash increases in net worth, the amount of our dividend for a quarter could exceed the amount of available cash, which could have an adverse effect on our financial results.

<u>Changes in Government Support</u>

Treasury supports us through the Purchase Agreement and Treasury's ability to purchase up to $2.25 billion of our obligations under its permanent statutory authority. Unlike certain of our competitors, we do not have access to the Federal Reserve's discount window. Changes or perceived changes in the government's support of us could have a severe negative effect on our access to the unsecured debt markets and our debt funding costs. As of December 31, 2013, the amount of available funding remaining under the Purchase Agreement was $140.5 billion. This amount will be reduced by any future draws. While we believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the unsecured debt markets and to have adequate liquidity to conduct our normal business activities, our access to the unsecured debt markets and the costs of our debt funding could be adversely affected by a number of factors, including (a) uncertainty about the future of the GSEs; (b) if debt investors believe that the risk that we could be placed into receivership is increasing; and (c) if we were to make significant draws in the future, and thereby significantly reduce the amount of available funding remaining under the Purchase Agreement. For more information, see "MD&A — LIQUIDITY AND CAPITAL RESOURCES — Liquidity — *Capital Resources, the Purchase Agreement, and the Dividend Obligation on the Senior Preferred Stock* ."

<u>Demand for Debt Funding</u>

If investor demand for our debt securities were to decrease, our liquidity, business, and results of operations could be materially adversely affected. The willingness of domestic and foreign investors to purchase and hold our debt securities can be influenced by many factors, including changes in the world economy, changes in foreign-currency exchange rates, regulatory and political factors, as well as the availability of and preferences for other investments. If investors were to divest their holdings or reduce their purchases of our debt securities, our funding costs could increase and our business activities could be curtailed. The market for our debt securities may become less liquid as our mortgage-related investments portfolio winds down. This could lead to a decrease in demand for our debt securities and an increase in our funding costs.

<u>Competition for Debt Funding</u>

<div align="center">45</div>

<div align="right">*Freddie Mac*</div>

# Document Produced in Native Format

Protected Information To Be Disclosed Only In Accordance With Protective Order

FHFA-DDC-0072473

# Federal Housing Finance Agency

 

# STABLE VALUE INVESTMENT ASSOCIATION

## OCTOBER 8, 2008

000502

# Housing GSEs Exceed the Public U.S. Debt

**FHFA**



### Relative Size of Enterprise Obligations
### (August 2008)

Sources: Fannie Mae and Freddie Mac Monthly Volume Summaries, TreasuryDirect.gov, Federal Reserve H.4.1 Release.

000503

# GSE Share of MBS Issuance and Originations

FHFA



**Fannie Mae, Freddie Mac, and FHLB Shares of Mortgage Originations
January 2006 - June 2008**

Sources: Enterprise Monthly Volume Summaries, FHLB Office of Finance, Inside Mortgage Finance.

3

# Combined Book of Business Continues to Grow



Sources: Fannie Mae and Freddie Mac Monthly Volume Summaries and 2007 OFHEO Report to Congress.

# Quarterly Net Income for 2006Q1 through 2008Q2

**FHFA**

Both Enterprises reported significant net losses in the second half of 2007 and the first half of 2008, continuing a trend of volatile and unattractive financial results over the past several quarters.



Sources: Fannie Mae 2008 Q2 10-Q, Freddie Mac 2008 Q2 10-Q.

**5**

000506

# House Prices Continue to Fall

**FHFA**

### OFHEO and S&P/Case-Shiller House Price Indexes



Note: For purposes of comparison, the OFHEO purchase-only index has been re-based to January 2000=100 (the standard series is set so that January 1991=100)

**6** **6**

# Serious Delinquencies Rising



Source: Mortgage  Bankers Association.

7

000508

# Serious Delinquencies: Enterprises vs. All Prime





Beginning August 2006, Freddie Mac altered its calculation of the serious delinquency rate to exclude structured transactions.  Therefore, Freddie Mac's reported serious delinquency rates after that date are not comparable to prior periods or to contemporaneous delinquency rates reported by Fannie Mae or market rates provided by the Mortgage Bankers Association.

**8**

Sources: Mortgage Bankers Association, Fannie Mae, Freddie Mac.

# CONSERVATORSHIP

**FHFA**

❑ Conservatorship is defined as a statutory process to stabilize a troubled institution which is intended to have a limited duration and has as its objective to return the entity to normal business operations once stabilized.  Conservatorship statutes provide broad authority for a conservator to operate the institution until it is stabilized and then returned to the shareholders.

❑ FHFA is  Conservator

❑ New CEO's appointed

❑ Appointed new Chairmen who will reconstitute boards

9

000510

# TREASURY FACILITIES

**FHFA**

- ❑ GSE Credit Facility

  - ❑ Secured funding provided directly to Fannie Mae, Freddie Mac and FHLBanks by Treasury as a backstop.

  - ❑ Federal Reserve Bank of New York acts as fiscal agent to advance funds to the GSEs and administer collateral.

  - ❑ Expires 12/31/09

- ❑ GSE MBS Purchase Program

  - ❑ Treasury will hire investment managers to buy Enterprise MBS on open market.

  - ❑ Treasury may hold these securities to maturity.

  - ❑ Expires 12/31/09

**10**

**000511**

# TREASURY FACILITIES

**FHFA**

❑   Senior Preferred Stock Purchase Agreement

  ❑   Binding legal agreement that ensures that each GSE maintain a positive net worth.  Treasury purchases senior preferred stock as needed.

  ❑   Contract between Treasury and each GSE with a capacity of $100 billion.

  ❑   Enterprises each paid Treasury $1 billion in senior preferred stock and warrants for 79.9 percent of common stock.

  ❑   Portfolios allowed to grow to $850 billion and then shrink 10 percent p.a starting 2010

**11**

000512

# TREASURY FACILITIES

**FHFA**

❑   Senior Preferred Stock Purchase Agreement (continued)

  ❑   Holders of MBS, senior debt and subordinated debt, including all maturities and issuances after 12/31/09, are all protected.

  ❑   Facility can only terminate if

  1.   Facilitate is fully funded

  2.   GSE liquidates and Treasury has topped up net worth deficiency, if any

  3.   GSE satisfies all its liabilities

12

**000513**

# Senior Debt Spreads to Treasuries and Swaps

**FHFA**



Source: OFHEO based on data from Bloomberg Financial LP.

**13**

**CONFIDENTIAL SUPERVISION MATERIALS – CONTAINS PROPRIETARY AND NON-PUBLIC INFORMATION**

000514

# Mortgage Rates Are Finally Starting to Fall with Treasuries





**30-Year FRM Mortgage Commitment Rates and Yields on
Freddie Mac MBS and 5-Year Treasury**

Freddie Mac 5.5 Percent Coupon MBS — 5-Year CMT — 30-Year FRM Mortgage Commitment Rate

Sources: Bloomberg Financial LP, Freddie Mac, and Federal Reserve Board H15.

14

000515

# Housing Affordability is Recovering

**FHFA**



**National Association of Realtors' US
Composite Housing Affordability Index
2000 - August 2008**

Source: National Association of Realtors

**15**

000516

# EMERGENCY ECONOMIC STABILIZATION ACT

**FHFA**

- ❑ Important new authorities granted to The Treasury, The Federal Reserve and FDIC to address market strains.

- ❑ Broad, flexible power to allow Treasury to purchase troubled assets, provide guarantees and address capital raising up to $700 billion.

- ❑ Allows Treasury to directly strengthen the balance sheets of individual institutions and enhance their ability to raise additional private capital.

- ❑ Provides for heightened mortgage modification activities to avoid preventable foreclosures.

- ❑ Strong oversight established

**16**

**000517**

| | |
|---|---|
| **From:** | Bowler, Timothy |
| **Sent:** | Monday, July 30, 2012 11:44 AM |
| **To:** | Foster, JeffDisabled |
| **Subject:** | PSPA Covenant and Timing Proposal July 30 2012 |
| **Attachments:** | PSPA Covenant and Timing Proposal July 30 2012.doc |

Let me know your thoughts

We need to keep it to one page.....

1

Protected Information To Be Disclosed Only
In Accordance With Protective Order

UST00469357

# PSPA Covenant and Timing Proposal: July, 30 2012

***The Treasury housing team recommends finalizing the PSPA agreement changes next Friday. Key elements of the plan are:***

**Form and adjustments to the existing agreement**
- Finalized and signed changes to the PSPAs to be completed prior to public announcement
- Adjustments to the existing PSPAs
  1. Change 10% dividend to net worth sweep
     - Include a [$2-4B] buffer through year end 2018
  2. Increase the investments portfolio reduction rate from 10% to 15% per annum and require each GSE submit an annual plan to Treasury highlighting how the will reduce their financial and operational risk in conjunction with the reduction
     - This will result in the portfolios reaching their mandated $250B target in 2018, rather than 2022
     - Enables Treasury to have a more pro-active voice in encouraging the GSEs to sell non-core / higher risk legacy assets (NPLSs, PLS, etc…)
  3. Require the GSEs to submit annual plans to Treasury outlining the pro-active steps they are going to take to reduce credit risk with their guarantee business
     - Enables Treasury to have a more active role in encouraging / mandating the GSEs to be more aggressive in managing their credit risk profile as they are "wound down"

**Timing**
- Announce changes Friday August 10th after markets close. Rationale:
  - GSE's will report very strong earnings on August 7, that will be in-excess of the 10% dividend to be paid to Treasury
  - Highlight Treasury's focus on winding down the GSEs post the disappointing PRA announcement
    - Covenant 2 above could also be "messaged" within the context of our desire to see the GSEs sell NPLs to special servicers who will be "more creative" in how they manage troubled loans
  - Put to rest any near term market concerns on the financial stability of the GSEs

**Message**
- The proposed changes protect the tax payer interests
  - Tax payer will now benefit from all future earnings at the GSEs
  - GSEs will need to take pro active steps to reduce their risk profile
- The GSEs are being wound down faster and will not return to their past state
  - Investment portfolio reduction will be done in six years not ten
  - GSEs will not build capital and exit conservatorship in their prior form
- Changes will be beneficial to the financial markets as uncertainty will be removed
- Treasury will use the wind down of the portfolios as an opportunity to encourage the GSEs to more effectively manage troubled assets (i.e. sell NPLs to investors who will be more aggressive in loss mitigation)

Protected Information To Be Disclosed Only In Accordance With Protective Order

UST00469358

Message

| | |
|---|---|
| **From:** | Hynes, Robert [/O=FHFA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=HYNESR] |
| **Sent:** | 8/19/2012 11:24:48 PM |
| **To:** | !DER All Staff [!derallstaff@fhfa.gov]; !DHMG Office of Systemic Risk and Market Surveillance [osrms@fhfa.gov]; Depfer, James [james.depfer@fhfa.gov]; McKenzie, Joseph A. [joseph.mckenzie@fhfa.gov]; Prendergast, Joseph [joseph.prendergast@fhfa.gov]; Sacco, George [george.sacco@fhfa.gov]; !OFA [!ofa@fhfa.gov] Ashley, Timothy [timothy.ashley@fhfa.gov]; Barnes, Kenneth [kenneth.barnes@fhfa.gov]; Bartholomew, Alexandra (Intern) [alexandra.bartholomew@fhfa.gov]; Beard, Michael [michael.beard@fhfa.gov]; Bell, James [james.bell@fhfa.gov]; Bravenec, Bill [bill.bravenec@fhfa.gov]; Breitkopf, Mendy [mendy.breitkopf@fhfa.gov]; Burns, Meg [meg.burns@fhfa.gov]; Callahan, Jim [jim.callahan@fhfa.gov]; Campbell, Linda [linda.campbell@fhfa.gov]; Christopher Poor [christopher.poor@fhfaoig.gov]; Chu, Sai-Cheong [sai-cheong.chu@fhfa.gov]; Collender, Robert [robert.collender@fhfa.gov]; Cross, Stephen [stephen.cross@fhfa.gov]; DeMarco, Edward [edward.demarco@fhfa.gov]; Dickerson, Chris [chris.dickerson@fhfa.gov]; Dickey, Jerimiah (Intern) [jerimiah.dickey@fhfa.gov]; DiVenti, Theresa [theresa.diventi@fhfa.gov]; Duarte, Ricardo [ricardo.duarte@fhfa.gov]; Dunsky, Robert [robert.dunsky@fhfa.gov]; Freimuth, David [david.freimuth@fhfa.gov]; Galeano, Andre D. [andre.galeano@fhfa.gov]; Galloway, Chris [chris.galloway@fhfa.gov]; Graham, Fred C. [fred.graham@fhfa.gov]; Greenlee, Jon [jon.greenlee@fhfa.gov]; Gubich, Denise [denise.gubich@fhfa.gov]; Hemphill, James M [mike.hemphill@fhfa.gov]; Steven Henderson-White [steven.henderson@fhfaoig.gov]; Holmes, Ira [ira.holmes@fhfa.gov]; Hornsby, Richard [rick.hornsby@fhfa.gov]; Kane, Michael [michael.kane@fhfa.gov]; Koon, Jon [jon.koon@fhfa.gov]; Kornstein, Randi [randi.kornstein@fhfa.gov]; Kvartunas, Deirdre [deirdre.kvartunas@fhfa.gov]; Lawler, Patrick [patrick.lawler@fhfa.gov]; Lee, Timothy [timothy.lee@fhfa.gov]; Levine, Martin [martin.levine@fhfa.gov]; Levinson, Masha [masha.levinson@fhfa.gov]; Linick, Steve [steve.linick@fhfa.gov]; Martin, Bradford [bradford.martin@fhfa.gov]; McNicholas, John [john.mcnicholas@fhfa.gov]; McWilliams, Bruce [bruce.mcwilliams@fhfa.gov]; Millman, Phillip [phillip.millman@fhfa.gov]; Newell, Jamie [jamie.newell@fhfa.gov]; Pafenberg, Forrest [forrest.pafenberg@fhfa.gov]; Patrabansh, Saty [saty.patrabansh@fhfa.gov]; Peden, Sheila [sheila.peden@fhfa.gov]; Petrillo, Guy [guy.petrillo@fhfa.gov]; Phelps, Jack [jack.phelps@fhfa.gov]; Phillips, Wesley [wesley.phillips@fhfa.gov]; Pocsik, Peter [peter.pocsik@fhfa.gov]; Rhinesmith, Alan [alan.rhinesmith@fhfa.gov]; Rizopoulos, Doreen [doreen.rizopoulos@fhfa.gov]; Roberts, Peter [peter.roberts@fhfa.gov]; Sar, Prasant [prasant.sar@fhfa.gov]; Seide, David [david.seide@fhfa.gov]; Sharpley, Christopher [christopher.sharpley@fhfa.gov]; Silva, Stacey [stacey.silva@fhfa.gov]; Smith, Stephen [stephen.smith@fhfa.gov]; Stewart, Randal [randal.stewart@fhfa.gov]; Taylor, Mary Ellen [maryellen.taylor@fhfa.gov]; Tirinnanzi, Martha [martha.tirinnanzi@fhfa.gov]; Ugoletti, Mario [mario.ugoletti@fhfa.gov]; Walter, Karen [karen.walter@fhfa.gov]; Wisz, Gerald [gerald.wisz@fhfa.gov]; Heath Wolfe [heath.wolfe@fhfaoig.gov]; Woody, Adam (Brock) [adam.woody@fhfa.gov]; Wu, Simon [simon.wu@fhfa.gov]; Youmans, Russell [russell.youmans@fhfa.gov]; Zhang, Min [min.zhang@fhfa.gov] |
| **Subject:** | Capital Markets Weekly from the Office of Systemic Risk and Market Surveillance |
| **Attachments:** | Capital Markets Weekly-187 08192012.pdf |

Attached is this week's edition of Capital Markets Weekly.

<u>The Week Ahead</u>

*Treasuries could get hit again tonight (Sunday) following a Der Spiegel report that the ECB may look to "cap" sovereign bond yields with open-ended purchases, but there is another story circulating that Germany is balking at extending austerity targets for Greece, which could revive the "safe" asset rally. We will have an update in our Monday morning report.*

<u>Chart of the Week – Last Call…Concern About Future Supply of GSE Debt Sparked Friday's Spread Collapse</u>

Protected Information To Be Disclosed Only In Accordance With Protective Order        FHFA-DDC-0320331

| Spreads (bps) | **2yr** | **3yr** | **5yr** | **10yr** | **30yr** |
|---|---|---|---|---|---|
| 8/16/2012 | 0.7 | 7.1 | 21.0 | 26.3 | 20.7 |
| 8/17/2012 | 0.5 | 4.5 | 16.1 | 17.7 | 9.5 |
| 1-Day Change (more inside report) | **-0.2** | **-2.6** | **-4.9** | **-8.6** | **-11.2** |



## Agency Debt Spreads Tightened To Record Levels Friday



Bob Hynes

***Robert F. Hynes, Jr.***
Principal Financial Analyst – Capital Markets
Office of Systemic Risk and Market Surveillance
Federal Housing Finance Agency
202-834-3798 (office)
781-635-6144 (mobile)
Robert.Hynes@fhfa.gov

Protected Information To Be Disclosed Only In Accordance With Protective Order

FHFA-DDC-0320332



**Office of Systemic Risk and Market Surveillance**

## Capital Markets Weekly – 8/19/2012

Robert F. Hynes

Treasuries extended their retreat as hopeful news from Europe dimmed the safety bid. The 10YR Note closed out the week above 1.80% for the first time since May and the 3YR Note's closing yield on Thursday (0.4248%) was the highest since April 12th. On Friday GSE debt had its biggest one-day tightening since 2008 after the Treasury Department announced plans to accelerate the wind-down of Fannie Mae and Freddie Mac, instantaneously making outstanding issues more valuable given the prospect of less forward supply. MBS spreads had a more muted reaction.

### Spread Monitor

GSE Spreads to Treasuries (in basis points)          GSE Yields to Maturity

|            | 2yr | 3yr  | 5yr*  | 10yr  | 30yr  | 2yr  | 3yr  | 5yr  | 10yr | 30yr |
|------------|-----|------|-------|-------|-------|------|------|------|------|------|
| 08/10/2012 | 0.5 | 6.9  | 23.0  | 28.1  | 22.1  | 0.27 | 0.44 | 0.94 | 1.94 | 2.97 |
| 08/13/2012 | 0.5 | 5.8  | 22.5  | 27.6  | 21.5  | 0.27 | 0.43 | 0.93 | 1.94 | 2.97 |
| 08/14/2012 | 1.3 | 7.6  | 21.0  | 26.6  | 19.6  | 0.29 | 0.47 | 0.96 | 2.00 | 3.03 |
| 08/15/2012 | 0.6 | 6.1  | 21.2  | 25.9  | 18.7  | 0.29 | 0.48 | 1.01 | 2.08 | 3.11 |
| 08/16/2012 | 0.7 | 7.1  | 21.0  | 26.3  | 20.7  | 0.30 | 0.50 | 1.03 | 2.10 | 3.16 |
| 08/17/2012 | 0.5 | 4.5  | 16.1  | 17.7  | 9.5   | 0.29 | 0.46 | 0.96 | 1.99 | 3.03 |
| 1-week Chg | 0.0 | -2.4 | -6.9  | -10.4 | -12.6 | +2.0 | +2.0 | +2.0 | +5.0 | +6.0 |

*Transitioned to FNMA 0.875% 8/28/2017 as reference security for 5-year agency.

### Highlights

➢ Treasury yields rose to highest levels since April/May on continued optimism on Europe.

➢ GSE debt spreads gapped tighter after Treasury Department announcement sparked buying.

➢ MBS spreads widened early in the week before narrowing Friday, but performance lagged debt action.

➢ Fannie Mae priced a $4B Benchmark Note +12.0 bps/Tsy that tightened to +6.3/Tsy on Friday.



Sources: Bloomberg, FINRA TRACE (Trade Reporting and Compliance Engine) data, Fidelity Capital Markets

Protected Information To Be Disclosed Only In Accordance With Protective Order          FHFA-DDC-0320333

**Market Drivers**

- ➢ Treasuries will continue to be pressured if domestic data prints better than expectations.
- ➢ GSE debt spreads should stay tight given diminished forward supply on faster wind-down plans.
- ➢ Agency MBS spreads may not tighten as much as debt due to other inputs in valuations.
- ➢ FHLBanks has the option to price a Global Bond.

Chart of the Week – Last Call…Concern About Future Supply of GSE Debt Sparked Friday's Spread Collapse

Friday's grab-a-thon for agency debt was reminiscent of the dramatic tightening that occurred in late 2008 after the Fed announced it would be purchasing agency debt and MBS in the open market in what has since come to be known as QE1. This time around the tightening was caused by the Treasury Department's announcement that it would accelerate the wind-down of the Enterprises. For agency debt investors that points to fewer remaining new issues since the lifespan of Fannie/Freddie just got shorter.



Agency spreads have been tightening all year due to investors designating them as safe asset cohorts to Treasuries but the prospect of fewer years of new issues remaining served as a "last call" of sorts, particularly for longer maturities that may not be tapped again. The Freddie Mac 10YR Reference Note (FHLMC 2.375% 1/13/2022) warrants special since its closing quote on Friday left it 35 bps tighter than where it was priced in January, but all issues benefited to varying degrees. The "legacy 30YR" Freddie Mac 6.25% 7/15/2032 that rarely trade (issues with dollar prices of 149-00 tend to lose liquidity) saw round lots taken down 11 bps tighter than the previous day, with a yield only 6 bps over the reference 30YR Bond. Expect price talk for any future agency debentures to be commensurately tighter.

The Week Ahead

Treasuries could get hit again tonight (Sunday) following a *Der Spiegel* report that the ECB may look to "cap" sovereign bond yields with open-ended purchases, but there is another story circulating that Germany is balking at extending austerity targets for Greece, which could revive the "safe" asset rally. We will have an update in our Monday morning report.

Protected Information To Be Disclosed Only In Accordance With Protective Order

FHFA-DDC-0320334

000523

EXECUTION VERSION

## CERTIFICATE OF DESIGNATION OF TERMS OF
## VARIABLE LIQUIDATION PREFERENCE SENIOR
## PREFERRED STOCK, SERIES 2008-2

**1.    Designation, Par Value, Number of Shares and Priority**

The designation of the series of preferred stock of the Federal National Mortgage Association (the "Company") created by this resolution shall be "Variable Liquidation Preference Senior Preferred Stock, Series 2008-2" (the "Senior Preferred Stock"), and the number of shares initially constituting the Senior Preferred Stock is 1,000,000.  Shares of Senior Preferred Stock will have no par value and a stated value and initial liquidation preference per share equal to $1,000 per share, subject to adjustment as set forth herein. The Board of Directors of the Company, or a duly authorized committee thereof, in its sole discretion, may reduce the number of shares of Senior Preferred Stock, provided such reduction is not below the number of shares of Senior Preferred Stock then outstanding.

The Senior Preferred Stock shall rank prior to the common stock of the Company as provided in this Certificate and shall rank, as to both dividends and distributions upon dissolution, liquidation or winding up of the Company, prior to (a) the shares of preferred stock of the Company designated "5.25% Non-Cumulative Preferred Stock, Series D", "5.10% Non-Cumulative Preferred Stock, Series E", "Variable Rate Non-Cumulative Preferred Stock, Series F", "Variable Rate Non-Cumulative Preferred Stock, Series G", "5.81% Non-Cumulative Preferred Stock, Series H", "5.375% Non-Cumulative Preferred Stock, Series I", "5.125% Non-Cumulative Preferred Stock, Series L", "4.75% Non-Cumulative Preferred Stock, Series M", "5.50% Non-Cumulative Preferred Stock, Series N", "Non-Cumulative Preferred Stock, Series O", "Non-Cumulative Convertible Series 2004-1 Preferred Stock", "Variable Rate Non-Cumulative Preferred Stock, Series P", "6.75% Non-Cumulative Preferred Stock, Series Q", "7.625% Non-Cumulative Preferred Stock, Series R", "Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series S", and "8.75% Non-Cumulative Mandatory Convertible Preferred Stock", Series 2008-1", (b) any other capital stock of the Company outstanding on the date of the initial issuance of the Senior Preferred Stock and (c) any capital stock of the Company that may be issued after the date of initial issuance of the Senior Preferred Stock.

**2.    Dividends**

(a)    For each Dividend Period from the date of the initial issuance of the Senior Preferred Stock, holders of outstanding shares of Senior Preferred Stock shall be entitled to receive, ratably, when, as and if declared by the Board of Directors, in its sole discretion, out of funds legally available therefor, cumulative cash dividends at the annual rate per share equal to the then-current Dividend Rate on the then-current Liquidation Preference.  Dividends on the Senior Preferred Stock shall accrue from but not including the date of the initial issuance of the Senior Preferred Stock and will be payable in arrears when, as and if declared by the Board of Directors quarterly on March 31, June 30, September 30 and December 31 of each year (each, a "Dividend Payment Date"), commencing on December 31, 2008.  If a Dividend Payment Date is not a "Business Day," the related dividend will be paid not later than the next Business Day with the same force and effect as though paid on the Dividend Payment Date, without any increase to


DX89
FHFA/Fannie/Freddie Litig.
Case No. 1:13cv1053,
1:13mc1288 (D.D.C.)
000524

account for the period from such Dividend Payment Date through the date of actual payment. "Business Day" means a day other than (i) a Saturday or Sunday, (ii) a day on which New York City banks are closed, or (iii) a day on which the offices of the Company are closed.

If declared, the initial dividend will be for the period from but not including the date of the initial issuance of the Senior Preferred Stock through and including December 31, 2008. Except for the initial Dividend Payment Date, the "Dividend Period" relating to a Dividend Payment Date will be the period from but not including the preceding Dividend Payment Date through and including the related Dividend Payment Date. The amount of dividends payable on the initial Dividend Payment Date or for any Dividend Period that is not a full calendar quarter shall be computed on the basis of 30-day months, a 360-day year and the actual number of days elapsed in any period of less than one month. For the avoidance of doubt, in the event that the Liquidation Preference changes in the middle of a Dividend Period, the amount of dividends payable on the Dividend Payment Date at the end of such Dividend Period shall take into account such change in Liquidation Preference and shall be computed at the Dividend Rate on each Liquidation Preference based on the portion of the Dividend Period that each Liquidation Preference was in effect.

(b)     To the extent not paid pursuant to Section 2(a) above, dividends on the Senior Preferred Stock shall accrue and shall be added to the Liquidation Preference pursuant to Section 8, whether or not there are funds legally available for the payment of such dividends and whether or not dividends are declared.

(c)     "Dividend Rate" means 10.0%; provided, however, that if at any time the Company shall have for any reason failed to pay dividends in cash in a timely manner as required by this Certificate, then immediately following such failure and for all Dividend Periods thereafter until the Dividend Period following the date on which the Company shall have paid in cash full cumulative dividends (including any unpaid dividends added to the Liquidation Preference pursuant to Section 8), the "Dividend Rate" shall mean 12.0%.

(d)     Each such dividend shall be paid to the holders of record of outstanding shares of the Senior Preferred Stock as they appear in the books and records of the Company on such record date as shall be fixed in advance by the Board of Directors, not to be earlier than 45 days nor later than 10 days preceding the applicable Dividend Payment Date. The Company may not, at any time, declare or pay dividends on, make distributions with respect to, or redeem, purchase or acquire, or make a liquidation payment with respect to, any common stock or other securities ranking junior to the Senior Preferred Stock unless (i) full cumulative dividends on the outstanding Senior Preferred Stock in respect of the then-current Dividend Period and all past Dividend Periods (including any unpaid dividends added to the Liquidation Preference pursuant to Section 8) have been declared and paid in cash (including through any pay down of Liquidation Preference pursuant to Section 3) and (ii) all amounts required to be paid pursuant to Section 4 (without giving effect to any prohibition on such payment under any applicable law) have been paid in cash.

(e)     Notwithstanding any other provision of this Certificate, the Board of Directors, in its discretion, may choose to pay dividends on the Senior Preferred Stock without the payment of any dividends on the common stock, preferred stock or any other class or series of stock from time

2

TREASURY-0033

000525

to time outstanding ranking junior to the Senior Preferred Stock with respect to the payment of dividends.

(f)    If and whenever dividends, having been declared, shall not have been paid in full, as aforesaid, on shares of the Senior Preferred Stock, all such dividends that have been declared on shares of the Senior Preferred Stock shall be paid to the holders pro rata based on the aggregate Liquidation Preference of the shares of Senior Preferred Stock held by each holder, and any amounts due but not paid in cash shall be added to the Liquidation Preference pursuant to Section 8.

**3.    Optional Pay Down of Liquidation Preference**

(a)    Following termination of the Commitment (as defined in the Preferred Stock Purchase Agreement referred to in Section 8 below), and subject to any limitations which may be imposed by law and the provisions below, the Company may pay down the Liquidation Preference of all outstanding shares of the Senior Preferred Stock pro rata, at any time, in whole or in part, out of funds legally available therefor, with such payment first being used to reduce any accrued and unpaid dividends previously added to the Liquidation Preference pursuant to Section 8 below and, to the extent all such accrued and unpaid dividends have been paid, next being used to reduce any Periodic Commitment Fees (as defined in the Preferred Stock Purchase Agreement referred to in Section 8 below) previously added to the Liquidation Preference pursuant to Section 8 below. Prior to termination of the Commitment, and subject to any limitations which may be imposed by law and the provisions below, the Company may pay down the Liquidation Preference of all outstanding shares of the Senior Preferred Stock pro rata, at any time, out of funds legally available therefor, but only to the extent of (i) accrued and unpaid dividends previously added to the Liquidation Preference pursuant to Section 8 below and not repaid by any prior pay down of Liquidation Preference and (ii) Periodic Commitment Fees previously added to the Liquidation Preference pursuant to Section 8 below and not repaid by any prior pay down of Liquidation Preference. Any pay down of Liquidation Preference permitted by this Section 3 shall be paid by making a payment in cash to the holders of record of outstanding shares of the Senior Preferred Stock as they appear in the books and records of the Company on such record date as shall be fixed in advance by the Board of Directors, not to be earlier than 45 days nor later than 10 days preceding the date fixed for the payment.

(b)    In the event the Company shall pay down of the Liquidation Preference of the Senior Preferred Stock as aforesaid, notice of such pay down shall be given by the Company by first class mail, postage prepaid, mailed neither less than 10 nor more than 45 days preceding the date fixed for the payment, to each holder of record of the shares of the Senior Preferred Stock, at such holder's address as the same appears in the books and records of the Company. Each such notice shall state the amount by which the Liquidation Preference of each share shall be reduced and the pay down date.

(c)    If after termination of the Commitment the Company pays down the Liquidation Preference of each outstanding share of Senior Preferred Stock in full, such shares shall be deemed to have been redeemed as of the date of such payment, and the dividend that would otherwise be payable for the Dividend Period ending on the pay down date will be paid on such date. Following such deemed redemption, the shares of the Senior Preferred Stock shall no longer be deemed to be

outstanding, and all rights of the holders thereof as holders of the Senior Preferred Stock shall cease, with respect to shares so redeemed, other than the right to receive the pay down amount (which shall include the final dividend for such shares). Any shares of the Senior Preferred Stock which shall have been so redeemed, after such redemption, shall no longer have the status of authorized, issued or outstanding shares.

**4. Mandatory Pay Down of Liquidation Preference Upon Issuance of Capital Stock**

(a) If the Company shall issue any shares of capital stock (including without limitation common stock or any series of preferred stock) in exchange for cash at any time while the Senior Preferred Stock is outstanding, then the Company shall, within 10 Business Days, use the proceeds of such issuance net of the direct costs relating to the issuance of such securities (including, without limitation, legal, accounting and investment banking fees) to pay down the Liquidation Preference of all outstanding shares of Senior Preferred Stock pro rata, out of funds legally available therefor, by making a payment in cash to the holders of record of outstanding shares of the Senior Preferred Stock as they appear in the books and records of the Company on such record date as shall be fixed in advance by the Board of Directors, not to be earlier than 45 days nor later than 10 days preceding the date fixed for the payment, with such payment first being used to reduce any accrued and unpaid dividends previously added to the Liquidation Preference pursuant to Section 8 below and, to the extent all such accrued and unpaid dividends have been paid, next being used to reduce any Periodic Commitment Fees (as defined in the Preferred Stock Purchase Agreement referred to in Section 8 below) previously added to the Liquidation Preference pursuant to Section 8 below; provided that, prior to the termination of the Commitment (as defined in the Preferred Stock Purchase Agreement referred to in Section 8 below), the Liquidation Preference of each share of Senior Preferred Stock shall not be paid down below $1,000 per share.

(b) If the Company shall not have sufficient assets legally available for the pay down of the Liquidation Preference of the shares of Senior Preferred Stock required under Section 4(a), the Company shall pay down the Liquidation Preference per share to the extent permitted by law, and shall pay down any Liquidation Preference not so paid down because of the unavailability of legally available assets or other prohibition as soon as practicable to the extent it is thereafter able to make such pay down legally. The inability of the Company to make such payment for any reason shall not relieve the Company from its obligation to effect any required pay down of the Liquidation Preference when, as and if permitted by law.

(c) If after the termination of the Commitment the Company pays down the Liquidation Preference of each outstanding share of Senior Preferred Stock in full, such shares shall be deemed to have been redeemed as of the date of such payment, and the dividend that would otherwise be payable for the Dividend Period ending on the pay down date will be paid on such date. Following such deemed redemption, the shares of the Senior Preferred Stock shall no longer be deemed to be outstanding, and all rights of the holders thereof as holders of the Senior Preferred Stock shall cease, with respect to shares so redeemed, other than the right to receive the pay down amount (which shall include the final dividend for such redeemed shares). Any shares of the Senior Preferred Stock which shall have been so redeemed, after such redemption, shall no longer have the status of authorized, issued or outstanding shares.

**5.      No Voting Rights**

Except as set forth in this Certificate or otherwise required by law, the shares of the Senior Preferred Stock shall not have any voting powers, either general or special.

**6.      No Conversion or Exchange Rights**

The holders of shares of the Senior Preferred Stock shall not have any right to convert such shares into or exchange such shares for any other class or series of stock or obligations of the Company.

**7.      No Preemptive Rights**

No holder of the Senior Preferred Stock shall as such holder have any preemptive right to purchase or subscribe for any other shares, rights, options or other securities of any class of the Company which at any time may be sold or offered for sale by the Company.

**8.      Liquidation Rights and Preference**

(a)      Except as otherwise set forth herein, upon the voluntary or involuntary dissolution, liquidation or winding up of the Company, the holders of the outstanding shares of the Senior Preferred Stock shall be entitled to receive out of the assets of the Company available for distribution to stockholders, before any payment or distribution shall be made on the common stock or any other class or series of stock of the Company ranking junior to the Senior Preferred Stock upon liquidation, the amount per share equal to the Liquidation Preference plus an amount, determined in accordance with Section 2(a) above, equal to the dividend otherwise payable for the then-current Dividend Period accrued through and including the date of payment in respect of such dissolution, liquidation or winding up; provided, however, that if the assets of the Company available for distribution to stockholders shall be insufficient for the payment of the amount which the holders of the outstanding shares of the Senior Preferred Stock shall be entitled to receive upon such dissolution, liquidation or winding up of the Company as aforesaid, then, all of the assets of the Company available for distribution to stockholders shall be distributed to the holders of outstanding shares of the Senior Preferred Stock pro rata based on the aggregate Liquidation Preference of the shares of Senior Preferred Stock held by each holder.

(b)      "Liquidation Preference" shall initially mean $1,000 per share and shall be:

(i)      increased each time a Deficiency Amount (as defined in the Preferred Stock Purchase Agreement) is paid to the Company by an amount per share equal to the aggregate amount so paid to the Company divided by the number of shares of Senior Preferred Stock outstanding at the time of such payment;

(ii)      increased each time the Company does not pay the full Periodic Commitment Fee (as defined in the Preferred Stock Purchase Agreement) in cash by an amount per share equal to the amount of the Periodic Commitment Fee that is not paid in cash divided by the number of shares of Senior Preferred Stock outstanding at the time such payment is due;

5

**DX89 Page 5 of 9**

000528

(iii)    increased on the Dividend Payment Date if the Company fails to pay in full the dividend payable for the Dividend Period ending on such date by an amount per share equal to the aggregate amount of unpaid dividends divided by the number of shares of Senior Preferred Stock outstanding on such date; and

(iv)    decreased each time the Company pays down the Liquidation Preference pursuant to Section 3 or Section 4 of this Certificate by an amount per share equal to the aggregate amount of the pay down divided by the number of shares of Senior Preferred Stock outstanding at the time of such pay down.

(c)    "Preferred Stock Purchase Agreement" means the Preferred Stock Purchase Agreement, dated September 7, 2008, between the Company and the United States Department of the Treasury.

(d)    Neither the sale of all or substantially all of the property or business of the Company, nor the merger, consolidation or combination of the Company into or with any other corporation or entity, shall be deemed to be a dissolution, liquidation or winding up for the purpose of this Section 8.

**9.    Additional Classes or Series of Stock**

The Board of Directors shall have the right at any time in the future to authorize, create and issue, by resolution or resolutions, one or more additional classes or series of stock of the Company, and to determine and fix the distinguishing characteristics and the relative rights, preferences, privileges and other terms of the shares thereof; provided that, any such class or series of stock may not rank prior to or on parity with the Senior Preferred Stock without the prior written consent of the holders of at least two-thirds of all the shares of Senior Preferred Stock at the time outstanding.

**10.    Miscellaneous**

(a)    The Company and any agent of the Company may deem and treat the holder of a share or shares of Senior Preferred Stock, as shown in the Company's books and records, as the absolute owner of such share or shares of Senior Preferred Stock for the purpose of receiving payment of dividends in respect of such share or shares of Senior Preferred Stock and for all other purposes whatsoever, and neither the Company nor any agent of the Company shall be affected by any notice to the contrary. All payments made to or upon the order of any such person shall be valid and, to the extent of the sum or sums so paid, effectual to satisfy and discharge liabilities for moneys payable by the Company on or with respect to any such share or shares of Senior Preferred Stock.

(b)    The shares of the Senior Preferred Stock, when duly issued, shall be fully paid and non-assessable.

(c)    The Senior Preferred Stock may be issued, and shall be transferable on the books of the Company, only in whole shares.

6

**000529**

(d)     For purposes of this Certificate, the term "the Company" means the Federal National Mortgage Association and any successor thereto by operation of law or by reason of a merger, consolidation, combination or similar transaction.

(e)     This Certificate and the respective rights and obligations of the Company and the holders of the Senior Preferred Stock with respect to such Senior Preferred Stock shall be construed in accordance with and governed by the laws of the United States, provided that the law of the State of Delaware shall serve as the federal rule of decision in all instances except where such law is inconsistent with the Company's enabling legislation, its public purposes or any provision of this Certificate.

(f)     Any notice, demand or other communication which by any provision of this Certificate is required or permitted to be given or served to or upon the Company shall be given or served in writing addressed (unless and until another address shall be published by the Company) to Fannie Mae, 3900 Wisconsin Avenue NW, Washington, DC 20016, Attn: Executive Vice President and General Counsel.  Such notice, demand or other communication to or upon the Company shall be deemed to have been sufficiently given or made only upon actual receipt of a writing by the Company.  Any notice, demand or other communication which by any provision of this Certificate is required or permitted to be given or served by the Company hereunder may be given or served by being deposited first class, postage prepaid, in the United States mail addressed (i) to the holder as such holder's name and address may appear at such time in the books and records of the Company or (ii) if to a person or entity other than a holder of record of the Senior Preferred Stock, to such person or entity at such address as reasonably appears to the Company to be appropriate at such time.  Such notice, demand or other communication shall be deemed to have been sufficiently given or made, for all purposes, upon mailing.

(g)     The Company, by or under the authority of the Board of Directors, may amend, alter, supplement or repeal any provision of this Certificate pursuant to the following terms and conditions:

(i)     Without the consent of the holders of the Senior Preferred Stock, the Company may amend, alter, supplement or repeal any provision of this Certificate to cure any ambiguity, to correct or supplement any provision herein which may be defective or inconsistent with any other provision herein, or to make any other provisions with respect to matters or questions arising under this Certificate, provided that such action shall not adversely affect the interests of the holders of the Senior Preferred Stock.

(ii)     The consent of the holders of at least two-thirds of all of the shares of the Senior Preferred Stock at the time outstanding, given in person or by proxy, either in writing or by a vote at a meeting called for the purpose at which the holders of shares of the Senior Preferred Stock shall vote together as a class, shall be necessary for authorizing, effecting or validating the amendment, alteration, supplementation or repeal (whether by merger, consolidation or otherwise) of the provisions of this Certificate other than as set forth in subparagraph (i) of this paragraph (g).  The creation and issuance of any other class or series of stock, or the issuance of additional shares of any existing class or series of stock, of the Company ranking junior to the Senior Preferred Stock shall not be deemed to constitute such an amendment, alteration, supplementation or repeal.

7

(iii)     Holders of the Senior Preferred Stock shall be entitled to one vote per share on matters on which their consent is required pursuant to subparagraph (ii) of this paragraph (g).  In connection with any meeting of such holders, the Board of Directors shall fix a record date, neither earlier than 60 days nor later than 10 days prior to the date of such meeting, and holders of record of shares of the Senior Preferred Stock on such record date shall be entitled to notice of and to vote at any such meeting and any adjournment. The Board of Directors, or such person or persons as it may designate, may establish reasonable rules and procedures as to the solicitation of the consent of holders of the Senior Preferred Stock at any such meeting or otherwise, which rules and procedures shall conform to the requirements of any national securities exchange on which the Senior Preferred Stock may be listed at such time.

(h)     **RECEIPT AND ACCEPTANCE OF A SHARE OR SHARES OF THE SENIOR PREFERRED STOCK BY OR ON BEHALF OF A HOLDER SHALL CONSTITUTE THE UNCONDITIONAL ACCEPTANCE BY THE HOLDER (AND ALL OTHERS HAVING BENEFICIAL OWNERSHIP OF SUCH SHARE OR SHARES) OF ALL OF THE TERMS AND PROVISIONS OF THIS CERTIFICATE.  NO SIGNATURE OR OTHER FURTHER MANIFESTATION OF ASSENT TO THE TERMS AND PROVISIONS OF THIS CERTIFICATE SHALL BE NECESSARY FOR ITS OPERATION OR EFFECT AS BETWEEN THE COMPANY AND THE HOLDER (AND ALL SUCH OTHERS).**

8

IN WITNESS WHEREOF, I have hereunto set my hand and the seal of the Company this 7th day of September, 2008.

[Seal]

FEDERAL NATIONAL MORTGAGE ASSOCIATION, by

Federal Housing Finance Agency, its Conservator

*James B. Lockhart III*
James B. Lockhart III
Director

*Signature Page to Certificate of Designations of Senior Preferred Stock*

TREASURY-0040

EXECUTION VERSION

## FREDDIE MAC

### CERTIFICATE OF CREATION, DESIGNATION, POWERS, PREFERENCES, RIGHTS, PRIVILEGES, QUALIFICATIONS, LIMITATIONS, RESTRICTIONS, TERMS AND CONDITIONS OF VARIABLE LIQUIDATION PREFERENCE SENIOR PREFERRED STOCK (PAR VALUE $1.00 PER SHARE)

The Federal Housing Finance Agency, as Conservator of the Federal Home Loan Mortgage Corporation, a government-sponsored enterprise of the United States of America (the "Company"), does hereby certify that, pursuant to authority vested in the Board of Directors of the Company by Section 306(f) of the Federal Home Loan Mortgage Corporation Act, and pursuant to the authority vested in the Conservator of the Company by Section 1367(b) of the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 (12 U.S.C. §4617), as amended, the Conservator adopted Resolution FHLMC 2008-___ on September 7, 2008, which resolution is now, and at all times since such date has been, in full force and effect, and that the Conservator approved the final terms of the issuance and sale of the preferred stock of the Company designated above.

The Senior Preferred Stock shall have the following designation, powers, preferences, rights, privileges, qualifications, limitations, restrictions, terms and conditions:

1.    **Designation, Par Value, Number of Shares and Seniority**

The class of preferred stock of the Company created hereby (the "Senior Preferred Stock") shall be designated "Variable Liquidation Preference Senior Preferred Stock," shall have a par value of $1.00 per share and shall consist of 1,000,000 shares. The Senior Preferred Stock shall rank prior to the common stock of the Company as provided in this Certificate and shall rank, as to both dividends and distributions upon liquidation, prior to (a) the Fixed-to-Floating Rate Non-Cumulative Perpetual Preferred Stock issued on December 4, 2007, (b) the 6.55% Non-Cumulative Preferred Stock issued on September 28, 2007, (c) the 6.02% Non-Cumulative Preferred Stock issued on July 24, 2007, (d) the 5.66% Non-Cumulative Preferred Stock issued on April 16, 2007, (e) the 5.57% Non-Cumulative Preferred Stock issued on January 16, 2007, (f) the 5.9% Non-Cumulative Preferred Stock issued on October 16, 2006, (g) the 6.42% Non-Cumulative Preferred Stock issued on July 17, 2006, (h) the Variable Rate, Non-Cumulative Preferred Stock issued on July 17, 2006, (i) the 5.81% Non-Cumulative Preferred Stock issued on January 29, 2002, (j) the 5.7% Non-Cumulative Preferred Stock issued on October 30, 2001, (k) the 6% Non-Cumulative Preferred Stock issued on May 30, 2001, (l) the Variable Rate, Non-Cumulative Preferred Stock issued on May 30, 2001 and June 1, 2001, (m) the 5.81% Non-Cumulative Preferred Stock issued on March 23, 2001, (n) the Variable Rate, Non-Cumulative Preferred Stock issued on March 23, 2001, (o) the Variable Rate, Non-Cumulative Preferred Stock issued on January 26, 2001, (p) the Variable Rate, Non-Cumulative Preferred Stock issued on November 5, 1999, (q) the 5.79% Non-Cumulative Preferred Stock issued on July 21, 1999, (r) the 5.1% Non-Cumulative Preferred Stock issued on March 19, 1999, (s) the 5.3% Non-Cumulative Preferred Stock issued on October 28, 1998, (t) the



5.1% Non-Cumulative Preferred Stock issued on September 23, 1998, (u) the Variable Rate, Non-Cumulative Preferred Stock issued on September 23, 1998 and September 29, 1998, (v) the 5% Non-Cumulative Preferred Stock issued on March 23, 1998, (w) the 5.81% Non-Cumulative Preferred Stock issued on October 27, 1997, (x) the Variable Rate, Non-Cumulative Preferred Stock issued on April 26, 1996, (y) any other capital stock of the Company outstanding on the date of the initial issuance of the Senior Preferred Stock, and (z) any capital stock of the Company that may be issued after the date of initial issuance of the Senior Preferred Stock.

## 2.    Dividends

(a)    For each Dividend Period from the date of the initial issuance of the Senior Preferred Stock, holders of outstanding shares of Senior Preferred Stock shall be entitled to receive, ratably, when, as and if declared by the Board of Directors, in its sole discretion, out of funds legally available therefor, cumulative cash dividends at the annual rate per share equal to the then-current Dividend Rate on the then-current Liquidation Preference.  Dividends on the Senior Preferred Stock shall accrue from but not including the date of the initial issuance of the Senior Preferred Stock and will be payable in arrears when, as and if declared by the Board of Directors quarterly on March 31, June 30, September 30 and December 31 of each year (each, a "Dividend Payment Date"), commencing on December 31, 2008.  If a Dividend Payment Date is not a "Business Day," the related dividend will be paid not later than the next Business Day with the same force and effect as though paid on the Dividend Payment Date, without any increase to account for the period from such Dividend Payment Date through the date of actual payment.  "Business Day" means a day other than (i) a Saturday or Sunday, (ii) a day on which New York City banks are closed, or (iii) a day on which the offices of the Company are closed.

If declared, the initial dividend will be for the period from but not including the date of the initial issuance of the Senior Preferred Stock through and including December 31, 2008.  Except for the initial Dividend Payment Date, the "Dividend Period" relating to a Dividend Payment Date will be the period from but not including the preceding Dividend Payment Date through and including the related Dividend Payment Date.  The amount of dividends payable on the initial Dividend Payment Date or for any Dividend Period that is not a full calendar quarter shall be computed on the basis of 30-day months, a 360-day year and the actual number of days elapsed in any period of less than one month.  For the avoidance of doubt, in the event that the Liquidation Preference changes in the middle of a Dividend Period, the amount of dividends payable on the Dividend Payment Date at the end of such Dividend Period shall take into account such change in Liquidation Preference and shall be computed at the Dividend Rate on each Liquidation Preference based on the portion of the Dividend Period that each Liquidation Preference was in effect.

(b)    To the extent not paid pursuant to Section 2(a) above, dividends on the Senior Preferred Stock shall accrue and shall be added to the Liquidation Preference pursuant to Section 8, whether or not there are funds legally available for the payment of such dividends and whether or not dividends are declared.

(c)    "Dividend Rate" means 10.0%; provided, however, that if at any time the Company shall have for any reason failed to pay dividends in cash in a timely manner as required by this Certificate, then immediately following such failure and for all Dividend Periods thereafter until

2

the Dividend Period following the date on which the Company shall have paid in cash full cumulative dividends (including any unpaid dividends added to the Liquidation Preference pursuant to Section 8), the "Dividend Rate" shall mean 12.0%.

(d)     Each such dividend shall be paid to the holders of record of outstanding shares of the Senior Preferred Stock as they appear in the books and records of the Company on such record date as shall be fixed in advance by the Board of Directors, not to be earlier than 45 days nor later than 10 days preceding the applicable Dividend Payment Date.  The Company may not, at any time, declare or pay dividends on, make distributions with respect to, or redeem, purchase or acquire, or make a liquidation payment with respect to, any common stock or other securities ranking junior to the Senior Preferred Stock unless (i) full cumulative dividends on the outstanding Senior Preferred Stock in respect of the then-current Dividend Period and all past Dividend Periods (including any unpaid dividends added to the Liquidation Preference pursuant to Section 8) have been declared and paid in cash (including through any pay down of Liquidation Preference pursuant to Section 3) and (ii) all amounts required to be paid pursuant to Section 4 (without giving effect to any prohibition on such payment under any applicable law) have been paid in cash.

(e)     Notwithstanding any other provision of this Certificate, the Board of Directors, in its discretion, may choose to pay dividends on the Senior Preferred Stock without the payment of any dividends on the common stock, preferred stock or any other class or series of stock from time to time outstanding ranking junior to the Senior Preferred Stock with respect to the payment of dividends.

(f)     If and whenever dividends, having been declared, shall not have been paid in full, as aforesaid, on shares of the Senior Preferred Stock, all such dividends that have been declared on shares of the Senior Preferred Stock shall be paid to the holders pro rata based on the aggregate Liquidation Preference of the shares of Senior Preferred Stock held by each holder, and any amounts due but not paid in cash shall be added to the Liquidation Preference pursuant to Section 8.

**3.     Optional Pay Down of Liquidation Preference**

(a)     Following termination of the Commitment (as defined in the Preferred Stock Purchase Agreement referred to in Section 8 below), and subject to any limitations which may be imposed by law and the provisions below, the Company may pay down the Liquidation Preference of all outstanding shares of the Senior Preferred Stock pro rata, at any time, in whole or in part, out of funds legally available therefor, with such payment first being used to reduce any accrued and unpaid dividends previously added to the Liquidation Preference pursuant to Section 8 below and, to the extent all such accrued and unpaid dividends have been paid, next being used to reduce any Periodic Commitment Fees (as defined in the Preferred Stock Purchase Agreement referred to in Section 8 below) previously added to the Liquidation Preference pursuant to Section 8 below. Prior to termination of the Commitment, and subject to any limitations which may be imposed by law and the provisions below, the Company may pay down the Liquidation Preference of all outstanding shares of the Senior Preferred Stock pro rata, at any time, out of funds legally available therefor, but only to the extent of (i) accrued and unpaid dividends previously added to the Liquidation Preference pursuant to Section 8 below and not repaid by any prior pay down of Liquidation Preference and (ii) Periodic Commitment Fees previously added to the Liquidation

Preference pursuant to Section 8 below and not repaid by any prior pay down of Liquidation Preference. Any pay down of Liquidation Preference permitted by this Section 3 shall be paid by making a payment in cash to the holders of record of outstanding shares of the Senior Preferred Stock as they appear in the books and records of the Company on such record date as shall be fixed in advance by the Board of Directors, not to be earlier than 45 days nor later than 10 days preceding the date fixed for the payment.

(b)     In the event the Company shall pay down of the Liquidation Preference of the Senior Preferred Stock as aforesaid, notice of such pay down shall be given by the Company by first class mail, postage prepaid, mailed neither less than 10 nor more than 45 days preceding the date fixed for the payment, to each holder of record of the shares of the Senior Preferred Stock, at such holder's address as the same appears in the books and records of the Company. Each such notice shall state the amount by which the Liquidation Preference of each share shall be reduced and the pay down date.

(c)     If after termination of the Commitment the Company pays down the Liquidation Preference of each outstanding share of Senior Preferred Stock in full, such shares shall be deemed to have been redeemed as of the date of such payment, and the dividend that would otherwise be payable for the Dividend Period ending on the pay down date will be paid on such date. Following such deemed redemption, the shares of the Senior Preferred Stock shall no longer be deemed to be outstanding, and all rights of the holders thereof as holders of the Senior Preferred Stock shall cease, with respect to shares so redeemed, other than the right to receive the pay down amount (which shall include the final dividend for such shares). Any shares of the Senior Preferred Stock which shall have been so redeemed, after such redemption, shall no longer have the status of authorized, issued or outstanding shares.

4.     **Mandatory Pay Down of Liquidation Preference Upon Issuance of Capital Stock**

(a)     If the Company shall issue any shares of capital stock (including without limitation common stock or any series of preferred stock) in exchange for cash at any time while the Senior Preferred Stock is outstanding, then the Company shall, within 10 Business Days, use the proceeds of such issuance net of the direct costs relating to the issuance of such securities (including, without limitation, legal, accounting and investment banking fees) to pay down the Liquidation Preference of all outstanding shares of Senior Preferred Stock pro rata, out of funds legally available therefor, by making a payment in cash to the holders of record of outstanding shares of the Senior Preferred Stock as they appear in the books and records of the Company on such record date as shall be fixed in advance by the Board of Directors, not to be earlier than 45 days nor later than 10 days preceding the date fixed for the payment, with such payment first being used to reduce any accrued and unpaid dividends previously added to the Liquidation Preference pursuant to Section 8 below and, to the extent all such accrued and unpaid dividends have been paid, next being used to reduce any Periodic Commitment Fees (as defined in the Preferred Stock Purchase Agreement referred to in Section 8 below) previously added to the Liquidation Preference pursuant to Section 8 below; provided that, prior to the termination of the Commitment (as defined in the Preferred Stock Purchase Agreement referred to in Section 8 below), the Liquidation Preference of each share of Senior Preferred Stock shall not be paid down below $1,000 per share.

4

TREASURY-0069

(b)     If the Company shall not have sufficient assets legally available for the pay down of the Liquidation Preference of the shares of Senior Preferred Stock required under Section 4(a), the Company shall pay down the Liquidation Preference per share to the extent permitted by law, and shall pay down any Liquidation Preference not so paid down because of the unavailability of legally available assets or other prohibition as soon as practicable to the extent it is thereafter able to make such pay down legally.  The inability of the Company to make such payment for any reason shall not relieve the Company from its obligation to effect any required pay down of the Liquidation Preference when, as and if permitted by law.

(c)     If after the termination of the Commitment the Company pays down the Liquidation Preference of each outstanding share of Senior Preferred Stock in full, such shares shall be deemed to have been redeemed as of the date of such payment, and the dividend that would otherwise be payable for the Dividend Period ending on the pay down date will be paid on such date.  Following such deemed redemption, the shares of the Senior Preferred Stock shall no longer be deemed to be outstanding, and all rights of the holders thereof as holders of the Senior Preferred Stock shall cease, with respect to shares so redeemed, other than the right to receive the pay down amount (which shall include the final dividend for such redeemed shares).  Any shares of the Senior Preferred Stock which shall have been so redeemed, after such redemption, shall no longer have the status of authorized, issued or outstanding shares.

**5.     No Voting Rights**

Except as set forth in this Certificate or otherwise required by law, the shares of the Senior Preferred Stock shall not have any voting powers, either general or special.

**6.     No Conversion or Exchange Rights**

The holders of shares of the Senior Preferred Stock shall not have any right to convert such shares into or exchange such shares for any other class or series of stock or obligations of the Company.

**7.     No Preemptive Rights**

No holder of the Senior Preferred Stock shall as such holder have any preemptive right to purchase or subscribe for any other shares, rights, options or other securities of any class of the Company which at any time may be sold or offered for sale by the Company.

**8.     Liquidation Rights and Preference**

(a)     Except as otherwise set forth herein, upon the voluntary or involuntary dissolution, liquidation or winding up of the Company, the holders of the outstanding shares of the Senior Preferred Stock shall be entitled to receive out of the assets of the Company available for distribution to stockholders, before any payment or distribution shall be made on the common stock or any other class or series of stock of the Company ranking junior to the Senior Preferred Stock upon liquidation, the amount per share equal to the Liquidation Preference plus an amount, determined in accordance with Section 2(a) above, equal to the dividend otherwise payable for the then-current Dividend Period accrued through and including the date of payment in respect of such dissolution, liquidation or winding up; provided, however, that if the assets of the Company

5

**DX90 Page 5 of 9**

000537

available for distribution to stockholders shall be insufficient for the payment of the amount which the holders of the outstanding shares of the Senior Preferred Stock shall be entitled to receive upon such dissolution, liquidation or winding up of the Company as aforesaid, then, all of the assets of the Company available for distribution to stockholders shall be distributed to the holders of outstanding shares of the Senior Preferred Stock pro rata based on the aggregate Liquidation Preference of the shares of Senior Preferred Stock held by each holder.

(b)     "Liquidation Preference" shall initially mean $1,000 per share and shall be:

(i)     increased each time a Deficiency Amount (as defined in the Preferred Stock Purchase Agreement) is paid to the Company by an amount per share equal to the aggregate amount so paid to the Company divided by the number of shares of Senior Preferred Stock outstanding at the time of such payment;

(ii)     increased each time the Company does not pay the full Periodic Commitment Fee (as defined in the Preferred Stock Purchase Agreement) in cash by an amount per share equal to the amount of the Periodic Commitment Fee that is not paid in cash divided by the number of shares of Senior Preferred Stock outstanding at the time such payment is due;

(iii)     increased on the Dividend Payment Date if the Company fails to pay in full the dividend payable for the Dividend Period ending on such date by an amount per share equal to the aggregate amount of unpaid dividends divided by the number of shares of Senior Preferred Stock outstanding on such date; and

(iv)     decreased each time the Company pays down the Liquidation Preference pursuant to Section 3 or Section 4 of this Certificate by an amount per share equal to the aggregate amount of the pay down divided by the number of shares of Senior Preferred Stock outstanding at the time of such pay down.

(c)     "Preferred Stock Purchase Agreement" means the Preferred Stock Purchase Agreement, dated September 7, 2008, between the Company and the United States Department of the Treasury.

(d)     Neither the sale of all or substantially all of the property or business of the Company, nor the merger, consolidation or combination of the Company into or with any other corporation or entity, shall be deemed to be a dissolution, liquidation or winding up for the purpose of this Section 8.

9.     **Additional Classes or Series of Stock**

The Board of Directors shall have the right at any time in the future to authorize, create and issue, by resolution or resolutions, one or more additional classes or series of stock of the Company, and to determine and fix the distinguishing characteristics and the relative rights, preferences, privileges and other terms of the shares thereof; provided that, any such class or series of stock may not rank prior to or on parity with the Senior Preferred Stock without the prior written consent of the holders of at least two-thirds of all the shares of Senior Preferred Stock at the time outstanding.

6

TREASURY-0071

**10.    Miscellaneous**

(a)    The Company and any agent of the Company may deem and treat the holder of a share or shares of Senior Preferred Stock, as shown in the Company's books and records, as the absolute owner of such share or shares of Senior Preferred Stock for the purpose of receiving payment of dividends in respect of such share or shares of Senior Preferred Stock and for all other purposes whatsoever, and neither the Company nor any agent of the Company shall be affected by any notice to the contrary.  All payments made to or upon the order of any such person shall be valid and, to the extent of the sum or sums so paid, effectual to satisfy and discharge liabilities for moneys payable by the Company on or with respect to any such share or shares of Senior Preferred Stock.

(b)    The shares of the Senior Preferred Stock, when duly issued, shall be fully paid and non-assessable.

(c)    The Senior Preferred Stock may be issued, and shall be transferable on the books of the Company, only in whole shares.

(d)    For purposes of this Certificate, the term "the Company" means the Federal Home Loan Mortgage Corporation and any successor thereto by operation of law or by reason of a merger, consolidation, combination or similar transaction.

(e)    This Certificate and the respective rights and obligations of the Company and the holders of the Senior Preferred Stock with respect to such Senior Preferred Stock shall be construed in accordance with and governed by the laws of the United States, provided that the law of the Commonwealth of Virginia shall serve as the federal rule of decision in all instances except where such law is inconsistent with the Company's enabling legislation, its public purposes or any provision of this Certificate.

(f)    Any notice, demand or other communication which by any provision of this Certificate is required or permitted to be given or served to or upon the Company shall be given or served in writing addressed (unless and until another address shall be published by the Company) to Freddie Mac, 8200 Jones Branch Drive, McLean, Virginia 22102, Attn: Executive Vice President and General Counsel. Such notice, demand or other communication to or upon the Company shall be deemed to have been sufficiently given or made only upon actual receipt of a writing by the Company.  Any notice, demand or other communication which by any provision of this Certificate is required or permitted to be given or served by the Company hereunder may be given or served by being deposited first class, postage prepaid, in the United States mail addressed (i) to the holder as such holder's name and address may appear at such time in the books and records of the Company or (ii) if to a person or entity other than a holder of record of the Senior Preferred Stock, to such person or entity at such address as reasonably appears to the Company to be appropriate at such time.  Such notice, demand or other communication shall be deemed to have been sufficiently given or made, for all purposes, upon mailing.

(g)    The Company, by or under the authority of the Board of Directors, may amend, alter, supplement or repeal any provision of this Certificate pursuant to the following terms and conditions:

7

(i)     Without the consent of the holders of the Senior Preferred Stock, the Company may amend, alter, supplement or repeal any provision of this Certificate to cure any ambiguity, to correct or supplement any provision herein which may be defective or inconsistent with any other provision herein, or to make any other provisions with respect to matters or questions arising under this Certificate, provided that such action shall not adversely affect the interests of the holders of the Senior Preferred Stock.

(ii)    The consent of the holders of at least two-thirds of all of the shares of the Senior Preferred Stock at the time outstanding, given in person or by proxy, either in writing or by a vote at a meeting called for the purpose at which the holders of shares of the Senior Preferred Stock shall vote together as a class, shall be necessary for authorizing, effecting or validating the amendment, alteration, supplementation or repeal (whether by merger, consolidation or otherwise) of the provisions of this Certificate other than as set forth in subparagraph (i) of this paragraph (g). The creation and issuance of any other class or series of stock, or the issuance of additional shares of any existing class or series of stock, of the Company ranking junior to the Senior Preferred Stock shall not be deemed to constitute such an amendment, alteration, supplementation or repeal.

(iii)   Holders of the Senior Preferred Stock shall be entitled to one vote per share on matters on which their consent is required pursuant to subparagraph (ii) of this paragraph (g). In connection with any meeting of such holders, the Board of Directors shall fix a record date, neither earlier than 60 days nor later than 10 days prior to the date of such meeting, and holders of record of shares of the Senior Preferred Stock on such record date shall be entitled to notice of and to vote at any such meeting and any adjournment. The Board of Directors, or such person or persons as it may designate, may establish reasonable rules and procedures as to the solicitation of the consent of holders of the Senior Preferred Stock at any such meeting or otherwise, which rules and procedures shall conform to the requirements of any national securities exchange on which the Senior Preferred Stock may be listed at such time.

(h)     **RECEIPT AND ACCEPTANCE OF A SHARE OR SHARES OF THE SENIOR PREFERRED STOCK BY OR ON BEHALF OF A HOLDER SHALL CONSTITUTE THE UNCONDITIONAL ACCEPTANCE BY THE HOLDER (AND ALL OTHERS HAVING BENEFICIAL OWNERSHIP OF SUCH SHARE OR SHARES) OF ALL OF THE TERMS AND PROVISIONS OF THIS CERTIFICATE. NO SIGNATURE OR OTHER FURTHER MANIFESTATION OF ASSENT TO THE TERMS AND PROVISIONS OF THIS CERTIFICATE SHALL BE NECESSARY FOR ITS OPERATION OR EFFECT AS BETWEEN THE COMPANY AND THE HOLDER (AND ALL SUCH OTHERS).**

IN WITNESS WHEREOF, I have hereunto set my hand and the seal of the Company this 7th day of September, 2008.

[Seal]

FEDERAL HOME LOAN MORTGAGE CORPORATION, by

Federal Housing Finance Agency, its Conservator

_James B. Lockhart III_
James B. Lockhart III
Director

*Signature Page to Certificate of Designations of Senior Preferred Stock*

Table of Contents

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# Form 10-Q

☑ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 30, 2008**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from        to**

**Commission File No.: 0-50231**

# Federal National Mortgage Association

*(Exact name of registrant as specified in its charter)*

**Fannie Mae**

| | |
|---|---|
| **Federally chartered corporation** | **52-0883107** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **3900 Wisconsin Avenue, NW Washington, DC** | **20016** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**Registrant's telephone number, including area code:
(202) 752-7000**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☑        Accelerated filer ☐        Non-accelerated filer ☐        Smaller reporting company ☐
*(Do not check if a smaller reporting company)*

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☑

As of September 30, 2008, there were 1,076,207,174 shares of common stock outstanding.



**DX102**
FHFA/Fannie/Freddie Litig.
Case No. 1:13cv1053,
(D.D.C.)
**000542**

Table of Contents

The table below presents a summary comparison of various features of our business before and after we were placed into conservatorship. Following this table, we provide additional information about a number of aspects of our business now that we are in conservatorship under "Managing Our Business During Conservatorship."

| Topic | Before Conservatorship | During Conservatorship |
|---|---|---|
| Authority of Board of Directors, management and stockholders | • Board of Directors with right to determine the general policies governing the operations of the corporation and exercise all power and authority of the company, except as vested in stockholders or as the Board chooses to delegate to management<br><br>• Board of Directors delegated significant authority to management<br><br>• Stockholders with specified voting rights | • FHFA, as conservator, has all of the power and authority of the Board of Directors, management and the shareholders<br><br>• The conservator has delegated authority to management to conduct day-to-day operations so that the company can continue to operate in the ordinary course of business. The conservator retains overall management authority, including the authority to withdraw its delegations to management at any time.<br><br>• Stockholders have no voting rights |
| Regulatory Supervision | • Regulated by FHFA, our new regulator created by the Regulatory Reform Act<br><br>• Regulatory Reform Act gave regulator significant additional safety and soundness supervisory powers | • Regulated by FHFA, with powers as provided by Regulatory Reform Act<br><br>• Additional management authority by FHFA, which is serving as our conservator |
| Structure of Board of Directors | • 13 directors: 12 independent plus President and Chief Executive Officer; independent, non-executive Chairman of the Board<br><br>• Eight separate Board committees, including Audit Committee in which four of the five independent members were "audit committee financial experts" | • Currently four directors, consisting of a non-executive Chairman of the Board and three independent directors (who were also directors of Fannie Mae immediately prior to conservatorship), with neither the power nor the duty to manage, direct or oversee our business and affairs<br><br>• No Board committees have members or authority to act<br><br>• Conservator has indicated its intent to appoint a full Board of Directors to which it will delegate specified roles and responsibilities |
| Management | • Daniel H. Mudd served as President and Chief Executive Officer from June 2005 to September 6, 2008 | • Herbert M. Allison, Jr. began serving as President and Chief Executive Officer on September 7, 2008 |
| Capital | • Statutory and regulatory capital requirements<br><br>• Capital classifications as to adequacy of capital issued by FHFA on quarterly basis | • Capital requirements not binding<br><br>• Quarterly capital classifications by FHFA suspended |

5

Table of Contents

| Topic | Before Conservatorship | During Conservatorship |
|---|---|---|
| Net Worth[1] | • Receivership mandatory if we have negative net worth for 60 days | • Conservator has directed management to focus on maintaining positive stockholders' equity[1] in order to avoid both the need to request funds under the senior preferred stock purchase agreement and our mandatory receivership<br><br>• Receivership mandatory if we have negative net worth for 60 days[2] |
| Managing for the Benefit of Shareholders | • Maximize shareholder value over the long term<br><br>• Fulfill our mission of providing liquidity, stability and affordability to the mortgage market | • No longer managed with a strategy to maximize common shareholder returns<br><br>• Maintain positive net worth and fulfill our mission of providing liquidity, stability and affordability to the mortgage market<br><br>• Focus on returning to long-term profitability if it does not adversely affect our ability to maintain positive net worth or fulfill our mission |

[1]    Our "net worth" refers to our assets less our liabilities, as reflected on our GAAP balance sheet. If we have a negative net worth, then, if requested by the conservator (or by our Chief Financial Officer if we are not under conservatorship), Treasury is required to provide funds to us pursuant to the senior preferred stock purchase agreement. In addition, if we have a negative net worth for a period of 60 days, the Director of FHFA is required by the Regulatory Reform Act to place us in receivership. "Net worth" is substantially the same as "stockholders equity;" however, "net worth" also includes the minority interests that third parties own in our consolidated subsidiaries (which was $159 million as of September 30, 2008), which is excluded from stockholders' equity.

[2]    Treasury's funding commitment under the senior preferred stock purchase agreement is expected to enable us to maintain a positive net worth as long as Treasury has not yet invested the full $100 billion provided for in that agreement.

The conservatorship has no specified termination date. There can be no assurance as to when or how the conservatorship will be terminated, whether we will continue to exist following conservatorship, or what our business structure will be during or following our conservatorship. In a statement issued on September 7, 2008, the Secretary of the Treasury indicated that 2008 and 2009 should be viewed as a "time out" where we and Freddie Mac are stabilized while policymakers decide our future role and structure. He also stated that there is a consensus that we and Freddie Mac pose a systemic risk and that we cannot continue in our current form. For more information on the risks to our business relating to the conservatorship and uncertainties regarding the future of our business, see "Part II —Item 1A—Risk Factors."

**Managing Our Business During Conservatorship**

*Our Management*

FHFA, in its role as conservator, has overall management authority over our business. During the conservatorship, the conservator has delegated authority to management to conduct day-to-day operations so that the company can continue to operate in the ordinary course of business. We can, and have continued to, enter into and enforce contracts with third parties. The conservator retains the authority to withdraw its delegations to us at any time. The conservator is working actively with management to address and determine the strategic direction for the enterprise, and in general has retained final decision-making authority in areas regarding: significant impacts on operational, market, reputational or credit risk; major accounting determinations, including policy changes; the creation of subsidiaries or affiliates and transacting with them; significant litigation; setting executive compensation; retention of external auditors; significant mergers and

6

Table of Contents

acquisitions; and any other matters the conservator believes are strategic or critical to the enterprise in order for the conservator to fulfill its obligations during conservatorship. See "Conservatorship and Treasury Agreements—Conservatorship—General Powers of the Conservator Under the Regulatory Reform Act" for more information.

### Our Objectives

Based on the Federal National Mortgage Association Charter Act, or Charter Act, public statements from Treasury officials and guidance from our conservator, we have a variety of different, and potentially conflicting, objectives, including:

- providing liquidity, stability and affordability in the mortgage market;

- immediately providing additional assistance to the struggling housing and mortgage markets;

- maintaining a positive net worth and avoiding the need to draw funds from Treasury pursuant to the senior preferred stock purchase agreement;

- returning to long-term profitability; and

- protecting the interests of the taxpayers.

These objectives create conflicts in strategic and day-to-day decision making that will likely lead to less than optimal outcomes for one or more, or possibly all, of these objectives. For example, maintaining a positive net worth could require us to constrain some of our business activities, including activities that provide liquidity, stability and affordability to the mortgage market. Conversely, to the extent we increase or undertake new activities to assist the mortgage market, our financial results are likely to suffer, and we may be less able to maintain a positive net worth. We regularly consult with and receive direction from our conservator on how to balance these objectives. To the extent that we are unable to maintain a positive net worth, we will be required to obtain funding from Treasury under the senior preferred stock purchase agreement, which will increase our ongoing expenses and, therefore, extend the period of time until we might be able to return to profitability. These objectives also create risks that we discuss in "Part II—Item 1A—Risk Factors."

### Changes in Strategies to Meet New Objectives

Since September 6, 2008, we have made a number of changes in the strategies we use to manage our business in support of our new objectives outlined above. These include the changes we describe below.

Eliminating Planned Increase in Adverse Market Delivery Charge

As part of our efforts to increase liquidity in the mortgage market and make mortgage loans more affordable, we announced on October 2, 2008 that we were eliminating our previously announced 25 basis point increase in our adverse market delivery charge that was scheduled to take effect on November 1, 2008. The elimination of this charge will reduce our net income. We intend for our lenders to pass this savings on to borrowers in the form of lower mortgage costs. Whether this action will actually result in lower mortgage costs for borrowers, however, will depend on a variety of issues beyond our control, including whether or not lenders pass these savings on to borrowers, the overall level of credit that lenders are willing to extend to borrowers, the assessed riskiness of a particular borrower in the current market environment and other factors.

Increasing the Size of Our Mortgage Portfolio

Consistent with our ability under the senior preferred stock purchase agreement to increase the size of our mortgage portfolio through the end of 2009, FHFA has directed us to acquire and hold increased amounts of mortgage loans and mortgage-related securities in our mortgage portfolio to provide additional liquidity to the mortgage market. Our calculation of the mortgage portfolio, which has not been confirmed by Treasury, is our gross mortgage portfolio (defined as the unpaid principal balance of our mortgage loans and mortgage-related securities, excluding the effect of market valuation, premiums, discounts and impact of consolidations). As of September 30, 2008, our gross mortgage portfolio was $761.4 million. Our extremely limited ability to issue

000545

Table of Contents



DX103

FHFA/Fannie/Freddie Litig.
Case No. 1:13cv1053,
1:13mc1288 (D.D.C.)

000546

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

**For the quarterly period ended September 30, 2008**

**or**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

**For the transition period from          to**

**Commission File Number: 000-53330**

# Federal Home Loan Mortgage Corporation

*(Exact name of registrant as specified in its charter)*

**Freddie Mac**

| | |
|---|---|
| **Federally chartered corporation** | **52-0904874** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **8200 Jones Branch Drive, McLean, Virginia** | **22102-3110** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**(703) 903-2000**

*(Registrant's telephone number, including area code)*

Indicate by check mark whether the registrant:  (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    ☒  Yes  ☐  No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "accelerated filer," "large accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐                                                          Accelerated filer ☐

Non-accelerated filer *(Do not check if a smaller reporting company)* ☒                    Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   ☐  Yes  ☒  No

As of November 10, 2008, there were 647,158,633 shares of the registrant's common stock outstanding.

Table of Contents

| Topic | Before Conservatorship | During Conservatorship |
|---|---|---|
| Authority of Board of Directors, Management and Stockholders | • Board of Directors with right to determine the general policies governing the operations of the corporation and exercise all power and authority of the company except as vested in stockholders or as the Board chooses to delegate to management<br><br>• Board of Directors delegated significant authority to management<br><br>• Stockholders with specified voting rights | • FHFA, as Conservator, has all of the power and authority of the Board of Directors, management and the shareholders<br><br>• The Conservator has delegated authority to management to conduct day-to-day operations so that the company can continue to operate in the ordinary course of business. The Conservator retains overall management authority, including the authority to withdraw its delegations to us at any time.<br><br>• Stockholders have no voting rights |
| Regulatory Supervision | • Regulated by FHFA, our new regulator created by the Reform Act<br><br>• Reform Act gave regulator significant additional safety and soundness supervisory powers | • Regulated by FHFA, with powers as provided by Reform Act<br><br>• Additional management authority by FHFA, which is serving as our Conservator |
| Structure of Board of Directors | • 13 directors: 11 independent, plus Chairman and Chief Executive Officer, and one vacancy; independent, non-management lead director<br><br>• Five separate Board committees, including Audit Committee in which one of the five independent members was an "audit committee financial expert" | • Currently, four directors, consisting of a non-management Chairman of the Board and three independent directors (who were also directors of Freddie Mac immediately prior to conservatorship), with neither the power nor the duty to manage, direct or oversee our business and affairs<br><br>• No Board committees have members or authority to act<br><br>• Conservator has indicated its intent to appoint a full Board of Directors to which it will delegate specified roles and responsibilities |
| Management | • Richard F. Syron served as Chairman and Chief Executive Officer from December 2003 to September 6, 2008 | • David M. Moffett began serving as Chief Executive Officer on September 7, 2008 |
| Capital | • Statutory and regulatory capital requirements<br><br>• Capital classifications as to adequacy of capital provided by FHFA on quarterly basis | • Capital requirements not binding<br><br>• Quarterly capital classifications by FHFA suspended |
| Net Worth [1] | • Receivership mandatory if we have negative net worth for 60 days | • Conservator has directed management to focus on maintaining positive stockholders' equity in order to avoid both the need to request funds under the Purchase Agreement and our mandatory receivership<br><br>• Receivership mandatory if we have negative net worth for 60 days [2] |
| Managing for the Benefit of Shareholders | • Maximize shareholder value over the long term<br><br>• Fulfill our mission of providing liquidity, stability and affordability to the mortgage market | • No longer managed with a strategy to maximize common shareholder returns<br><br>• Maintain positive net worth and fulfill our mission of providing liquidity, stability and affordability to the mortgage market<br><br>• Focus on returning to long-term profitability if it does not adversely affect our ability to maintain net worth or fulfill our mission |

(1) Our net worth refers to our assets less our liabilities, as reflected on our GAAP balance sheet. If we have a negative net worth (which means that our liabilities exceed our assets, as reflected on our GAAP balance sheet), then, if requested by the Conservator (or by our Chief Financial Officer, if we are not under conservatorship), Treasury is required to provide funds to us pursuant to the Purchase Agreement. Net worth is substantially the same as stockholders' equity (deficit); however, net worth also includes the minority interests that third parties own in our consolidated subsidiaries (which was $95 million as of September 30, 2008). At September 30, 2008, we had a negative net worth of $13.7 billion. In addition, if the Director of FHFA were to determine in writing that our assets are, and would have been for a period of 60 days, less than our obligations to creditors and others, FHFA would be

required to place us into receivership.

(2) Treasury's funding commitment under the Purchase Agreement is expected to enable us to maintain a positive net worth as long as Treasury has not invested the full $100 billion provided for in that agreement.

4                                                                                          *Freddie Mac*



*File - Treasury*

*Subs: PSPA*

# Meeting with Treasury

**DATE:**           March 7, 2012

**TIME:**           4:00 p.m. – 5:30 p.m.

**SUBJECT:**        Treasury/GSE Meeting

**LOCATION:**       Director's Board Room

**ATTENDEES:**      Edward J. DeMarco
                    Mario Ugoletti

                    Assistant Secretary Mary Miller
                    Timothy Bowler
                    Michael Stegman
                    Barrett Hester
                    Sandra Lee

*File: 3-7-2012 Meeting Notes re PSPA with treasury. pdf*





3/7/12  Meet w/ Treasury re PSPA

1. Transition
   PSPA
   G-fees
   Strategic Plan
      − Single Securits
      − less syndication
      − platform

2. Financial framework for conservatorships

   PSPA
   − financial
      • net worth sweep
   − operational covenants w/ in strategic plan
      • single securitization
      • rich syndication ∧ non-guar MBS to
        demonstrate PV of guar
      • ~~options~~ for how to wind down F/F
      • where set g-fees in the future
      • managing legacy assets

000551

000552

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# Form 10-Q

☑  **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended March 31, 2012**

OR

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from            to**

**Commission File No.: 0-50231**

# Federal National Mortgage Association

*(Exact name of registrant as specified in its charter)*

**Fannie Mae**

| | |
|---|---|
| **Federally chartered corporation** | **52-0883107** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **3900 Wisconsin Avenue, NW Washington, DC** | **20016** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**Registrant's telephone number, including area code:**
**(202) 752-7000**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☑   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐        Accelerated filer ☐        Non-accelerated filer ☑        Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☑

As of March 31, 2012, there were 1,158,069,699 shares of common stock of the registrant outstanding.



Table of Contents

- We helped over 1,000,000 homeowners retain their homes or otherwise avoid foreclosure from January 1, 2009 through March 31, 2012, which helped to support neighborhoods, home prices and the housing market. Moreover, borrowers' ability to pay their modified loans has improved in recent periods as we have enhanced the structure of our modifications. One year after modification, 74% of the modifications we made in the first quarter of 2011 were current or paid off, compared with 65% of the modifications we made in the first quarter of 2010.

- We helped borrowers refinance loans through our Refi Plus™ initiative, which includes loans refinanced under the Obama Administration's Home Affordable Refinance Program ("HARP"). The Refi Plus initiative provides expanded refinance opportunities for eligible Fannie Mae borrowers. From April 1, 2009, the date we began accepting delivery of Refi Plus loans, through March 31, 2012, we have acquired approximately 2,000,000 loans refinanced under our Refi Plus initiative. Refinances delivered to us through Refi Plus in the first quarter of 2012 reduced borrowers' monthly mortgage payments by an average of $191. Some borrowers' monthly payments increased as they took advantage of the ability to refinance through Refi Plus to reduce the term of their loan, to switch from an adjustable-rate mortgage to a fixed rate mortgage, or to switch from an interest-only mortgage to a fully amortizing mortgage.

- We support affordability in the multifamily rental market. Over 85% of the multifamily units we financed from 2009 through 2011 were affordable to families earning at or below the median income in their area.

- In addition to purchasing and guaranteeing loans, we provide funds to the mortgage market through short-term financing and other activities. These activities are described in more detail in our 2011 Form 10-K in "Business—Business Segments—Capital Markets."

### 2012 Acquisitions and Market Share

In the first quarter of 2012, we purchased or guaranteed approximately $221 billion in loans, measured by unpaid principal balance, which includes $14.2 billion in delinquent loans we purchased from our single-family MBS trusts. These activities enabled our lender customers to finance approximately 934,000 single-family conventional loans and loans for approximately 117,000 units in multifamily properties during the first quarter of 2012.

We remained the largest single issuer of mortgage-related securities in the secondary market during the first quarter of 2012, with an estimated market share of new single-family mortgage-related securities issuances of 51%. Our estimated market share of new single-family mortgage-related securities issuances was 54% in the fourth quarter of 2011 and 49% in the first quarter of 2011.

We remained a constant source of liquidity in the multifamily market. We owned or guaranteed approximately 21% of the outstanding debt on multifamily properties as of December 31, 2011 (the latest date for which information was available).

### Summary of Our Financial Performance for the First Quarter of 2012

We experienced a significant improvement in our financial results in the first quarter of 2012 compared with the first quarter of 2011, even though our results continued to be impacted by weakness in the housing and mortgage markets.

### Total Comprehensive Income (Loss)

We recognized total comprehensive income of $3.1 billion in the first quarter of 2012, consisting of net income of $2.7 billion and other comprehensive income of $362 million. In comparison, we recognized a total comprehensive loss of $6.3 billion in the first quarter of 2011, consisting of a net loss of $6.5 billion and other comprehensive income of $181 million.

The significant improvement in our financial results in the first quarter of 2012 compared with the first quarter of 2011 was due to an $8.7 billion decrease in our credit-related expenses, primarily driven by: (1) a less significant decline in home prices as the housing market continued to stabilize; we estimate that home prices declined by

3

**DX420 Page 7 of 187**

000553

Table of Contents

0.8% in the first quarter of 2012 compared with a 2.0% decline in the first quarter of 2011, which represented over half of the 2011 home price decline; (2) a 25% decline in our inventory of single-family real-estate owned ("REO") properties compared with the first quarter of 2011 coupled with improved sales prices on dispositions of our REO properties resulting from strong demand in markets with limited REO supply; and (3) lower single-family serious delinquency rates, which declined to 3.67% as of the end of the first quarter of 2012 from 4.27% as of the end of the first quarter of 2011. We discuss below our expectations regarding our future credit-related expenses and loss reserves.

See "Consolidated Results of Operations" for more information on our results.

### Net Worth

Our net worth of $268 million as of March 31, 2012 reflects our total comprehensive income of $3.1 billion largely offset by our payment to Treasury of $2.8 billion in senior preferred stock dividends during the first quarter of 2012.

In the first quarter of 2012, we received $4.6 billion in funds from Treasury to eliminate our net worth deficit as of December 31, 2011. As a result of our positive net worth as of March 31, 2012, we will not request a draw this quarter from Treasury under the senior preferred stock purchase agreement. The aggregate liquidation preference on the senior preferred stock remains at $117.1 billion, which requires an annualized dividend payment of $11.7 billion. The amount of this dividend payment exceeds our reported annual net income for every year since our inception. As of March 31, 2012, we have paid an aggregate of $22.6 billion to Treasury in dividends on the senior preferred stock.

Table 1 below displays our senior preferred stock dividend payments to Treasury and Treasury draws since entering conservatorship on September 6, 2008.

**Table 1:   Treasury Draws and Dividend Payments**

|  | 2008 | 2009 | 2010 | 2011 | 2012 (first quarter) | Cumulative Total |
|---|---|---|---|---|---|---|
|  |  |  | (Dollars in billions) |  |  |  |
| Treasury draws[1][2] | $15.2 | $ 60.0 | $15.0 | $25.9 | $     — | $ 116.1 |
| Senior preferred stock dividends[3] | — | 2.5 | 7.7 | 9.6 | 2.8 | 22.6 |
| Treasury draws less senior preferred stock dividends | $15.2 | $57.5 | $ 7.3 | $ 16.3 | $  (2.8) | $  93.5 |
| Cumulative percentage of senior preferred stock dividends to Treasury draws | 0.2% | 3.3% | 11.3% | 17.1% | 19.5% | 19.5% |

[1]  Represents the total draws received from Treasury and / or being requested based on our quarterly net worth deficits for the periods presented. Draw requests are funded in the quarter following each quarterly net worth deficit.

[2]  Treasury draws do not include the initial $1.0 billion liquidation preference of the senior preferred stock, for which we did not receive any cash proceeds.

[3]  Represents total quarterly cash dividends paid to Treasury during the periods presented based on an annual rate of 10% per year on the aggregate liquidation preference of the senior preferred stock.

### Total Loss Reserves

Our total loss reserves consist of (1) our allowance for loan losses, (2) our allowance for accrued interest receivable, (3) our allowance for preforeclosure property taxes and insurance receivables, and (4) our reserve for guaranty losses. Our total loss reserves, which reflect our estimate of the probable losses we have incurred in our guaranty book of business, including concessions we granted borrowers upon modification of their loans, decreased to $74.6 billion as of March 31, 2012 from $76.9 billion as of December 31, 2011. Our total loss reserve coverage to total nonperforming loans was 30% as of March 31, 2012, compared with 31% as of December 31, 2011.

4

Table of Contents



**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 10-Q

☒  **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

**For the quarterly period ended March 31, 2012**

or

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

**For the transition period from            to**

Commission File Number: 001-34139

# Federal Home Loan Mortgage Corporation

*(Exact name of registrant as specified in its charter)*

**Freddie Mac**

| | | | |
|---|---|---|---|
| **Federally chartered corporation** | **8200 Jones Branch Drive**<br>McLean, Virginia 22102-3110 | **52-0904874** | **(703) 903-2000** |
| *(State or other jurisdiction of incorporation or organization)* | *(Address of principal executive offices, including zip code)* | *(I.R.S. Employer Identification No.)* | *(Registrant's telephone number, including area code)* |

Indicate by check mark whether the registrant:  (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports); and (2) has been subject to such filing requirements for the past 90 days.   ☒   Yes   ☐   No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   ☒   Yes   ☐   No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐                                           Accelerated filer ☒

Non-accelerated filer (Do not check if a smaller reporting company) ☐            Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   ☐   Yes   ☒   No

As of April 23, 2012, there were 650,033,623 shares of the registrant's common stock outstanding.

# PART I — FINANCIAL INFORMATION

*We continue to operate under the conservatorship that commenced on September 6, 2008, under the direction of FHFA as our Conservator. The Conservator succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any shareholder, officer or director thereof, with respect to the company and its assets. The Conservator has delegated certain authority to our Board of Directors to oversee, and management to conduct, day-to-day operations. The directors serve on behalf of, and exercise authority as directed by, the Conservator. See "BUSINESS — Conservatorship and Related Matters" in our Annual Report on Form 10-K for the year ended December 31, 2011, or 2011 Annual Report, for information on the terms of the conservatorship, the powers of the Conservator, and related matters, including the terms of our Purchase Agreement with Treasury.*

*This Quarterly Report on Form 10-Q includes forward-looking statements that are based on current expectations and are subject to significant risks and uncertainties. These forward-looking statements are made as of the date of this Form 10-Q and we undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date of this Form 10-Q. Actual results might differ significantly from those described in or implied by such statements due to various factors and uncertainties, including those described in: (a) "MD&A — FORWARD-LOOKING STATEMENTS" in this Form 10-Q and in the comparably captioned section of our 2011 Annual Report; and (b) the "BUSINESS" and "RISK FACTORS" sections of our 2011 Annual Report.*

*Throughout this Form 10-Q, we use certain acronyms and terms that are defined in the "GLOSSARY."*

## ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*You should read this MD&A in conjunction with our consolidated financial statements and related notes for the three months ended March 31, 2012 included in "FINANCIAL STATEMENTS," and our 2011 Annual Report.*

## EXECUTIVE SUMMARY

### Overview

Freddie Mac is a GSE chartered by Congress in 1970 with a public mission to provide liquidity, stability, and affordability to the U.S. housing market. We have maintained a consistent market presence since our inception, providing mortgage liquidity in a wide range of economic environments. We are working to support the recovery of the housing market and the nation's economy by providing essential liquidity to the mortgage market and helping to stem the rate of foreclosures. We believe our actions are helping communities across the country by providing America's families with access to mortgage funding at low rates while helping distressed borrowers keep their homes and avoid foreclosure, where feasible.

### *Summary of Financial Results*

Our financial performance in the first quarter of 2012 was impacted by the ongoing weakness in the economy, including in the mortgage market, and changes in interest rates. Our comprehensive income was $1.8 billion and $2.7 billion for the first quarters of 2012 and 2011, respectively, consisting of: (a) $577 million and $676 million of net income, respectively; and (b) $1.2 billion and $2.1 billion of total other comprehensive income, respectively.

Our total equity (deficit) was $(18) million at March 31, 2012, reflecting our comprehensive income of $1.8 billion for the first quarter of 2012 and our dividend payment of $1.8 billion on our senior preferred stock in March 2012. To address our deficit in net worth, FHFA, as Conservator, will submit a draw request on our behalf to Treasury under the Purchase Agreement for $19 million. Following receipt of the draw, the aggregate liquidation preference on the senior preferred stock owned by Treasury will be $72.3 billion.

### Our Primary Business Objectives

We are focused on the following primary business objectives: (a) developing mortgage market enhancements in support of a new infrastructure for the secondary mortgage market; (b) contracting the dominant presence of the GSEs in the marketplace; (c) providing credit availability for new or refinanced mortgages and maintaining foreclosure prevention activities; (d) minimizing our credit losses; (e) maintaining sound credit quality of the loans we purchase or guarantee; and (f) strengthening our infrastructure and improving overall efficiency while also focusing on retention of key employees.

*Freddie Mac*

Table of Contents

Our business objectives reflect direction we have received from the Conservator. On March 8, 2012, FHFA instituted a scorecard for use by both us and Fannie Mae that established objectives, performance targets and measures for 2012, and provides the implementation roadmap for FHFA's strategic plan for Freddie Mac and Fannie Mae. We are aligning our resources and internal business plans to meet the goals and objectives laid out in the 2012 conservatorship scorecard. See "LEGISLATIVE AND REGULATORY MATTERS — FHFA's Strategic Plan for Freddie Mac and Fannie Mae Conservatorships and 2012 Conservatorship Scorecard." Based on our charter, other legislation, public statements from Treasury and FHFA officials, and other guidance and directives from our Conservator, we have a variety of different, and potentially competing, objectives. For more information, see "BUSINESS — Conservatorship and Related Matters — *Impact of Conservatorship and Related Actions on Our Business* " in our 2011 Annual Report.

### *Developing Mortgage Market Enhancements in Support of a New Infrastructure for the Secondary Mortgage Market*

In the first quarter of 2012, we continued our efforts to build value for the industry and build the infrastructure for a future housing finance system. These efforts include the implementation of the Uniform Mortgage Data Program, or UMDP, which provides us with the ability to collect additional data that we believe will improve our risk management practices. The UMDP creates standard terms and definitions to be used throughout the industry and establishes standard reporting protocols. The UMDP is a key building block in developing a future secondary mortgage market. In the first quarter of 2012, we completed a key milestone of the UMDP with the launch of the Uniform Collateral Data Portal for the electronic submission of appraisal reports for conventional mortgages. We are also working with FHFA and others to develop a plan for the design and building of a single securitization platform that can be used in a future secondary mortgage market. FHFA also directed us and Fannie Mae to discuss harmonizing our seller/servicer contracts.

### *Contracting the Dominant Presence of the GSEs in the Marketplace*

We continue to take steps toward the goal of gradually shifting mortgage credit risk from Freddie Mac to private investors, while simplifying and shrinking certain of our operations. In the case of single-family credit guarantees, we are exploring several ways to accomplish this goal, including increasing guarantee fees, establishing loss-sharing arrangements, and evaluating new risk-sharing transactions beyond the traditional charter-required mortgage insurance coverage. In addition, we are studying the steps necessary for our competitive disposition of certain investment assets, including non-performing loans. To evaluate how to accomplish the goal of contracting our operations in the multifamily business, we are conducting a market analysis of the viability of our multifamily operations without government guarantees.

### *Providing Credit Availability for New or Refinanced Mortgages and Maintaining Foreclosure Prevention Activities*

We provide liquidity and support to the U.S. mortgage market in a number of important ways:

- Our support enables borrowers to have access to a variety of conforming mortgage products, including the prepayable 30-year fixed-rate mortgage, which historically has represented the foundation of the mortgage market.

- Our support provides lenders with a constant source of liquidity for conforming mortgage products. We estimate that we, Fannie Mae, and Ginnie Mae collectively guaranteed more than 90% of the single-family conforming mortgages originated during the first quarter of 2012.

- Our consistent market presence provides assurance to our customers that there will be a buyer for their conforming loans that meet our credit standards. We believe this liquidity provides our customers with confidence to continue lending in difficult environments.

- We are an important counter-cyclical influence as we stay in the market even when other sources of capital have withdrawn.

During the first quarters of 2012 and 2011, we guaranteed $105.1 billion and $97.6 billion in UPB of single-family conforming mortgage loans, respectively, representing approximately 491,000 and 461,000 loans, respectively.

Borrowers typically pay a lower interest rate on loans acquired or guaranteed by Freddie Mac, Fannie Mae, or Ginnie Mae. Mortgage originators are generally able to offer homebuyers and homeowners lower mortgage rates on conforming loan products, including ours, in part because of the value investors place on GSE-guaranteed mortgage-related securities. Prior to 2007, mortgage markets were less volatile, home values were stable or rising, and there were many sources of mortgage funds. We estimate that, for 20 years prior to 2007, the average effective interest rates on conforming, fixed-rate single-family mortgage loans were about 30 basis points lower than on non-conforming loans. Since 2007, this gap has widened, and, we estimate that interest rates on conforming, fixed-rate loans, excluding conforming jumbo loans, have been lower than those on non-conforming loans by as much as 184 basis points. In March 2012, we estimate that

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# Form 10-Q

☑ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended June 30, 2012

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from     to

Commission File No.: 0-50231

# Federal National Mortgage Association

*(Exact name of registrant as specified in its charter)*

**Fannie Mae**

| | |
|---|---|
| **Federally chartered corporation** | **52-0883107** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **3900 Wisconsin Avenue, NW Washington, DC** | **20016** |
| *(Address of principal executive offices)* | *(Zip Code)* |

Registrant's telephone number, including area code:
(202) 752-7000

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☑   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐                                                  Accelerated filer ☑
Non-accelerated filer ☐   (Do not check if a smaller reporting company)       Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐  No ☑

As of June 30, 2012, there were 1,158,069,699 shares of common stock of the registrant outstanding.



DX476
FHFA/Fannie/Freddie Litig.
Case No. 1:13cv1053,
1:13cv1288 (RCL)
000559

*Comprehensive Income (Loss)*

*Quarterly Results*

We recognized comprehensive income of $5.4 billion in the second quarter of 2012, consisting of net income of $5.1 billion and other comprehensive income of $328 million. In comparison, our comprehensive loss and net loss for the second quarter of 2011 were $2.9 billion.

The significant improvement in our second quarter results was primarily due to recognition of a benefit for credit losses of $3.0 billion in the second quarter of 2012 compared with a provision for credit losses of $6.5 billion in the second quarter of 2011. This benefit for credit losses was due to a decrease in our total loss reserves driven primarily by an improvement in the profile of our single-family book of business resulting from an increase in actual home prices, including the sales prices of our REO properties. In addition, our single-family serious delinquency rate continued to decline, driven in large part by the quality and growth of our new single-family book of business, our modification efforts and current period foreclosures. Key factors impacting our credit-related results include:

- Home prices increased by 3.2% in the second quarter of 2012 compared with 1.2% in the second quarter of 2011. We historically see seasonal improvement in home prices in the second quarter; however, the home price increase in the second quarter of 2012 was larger than expected and the largest quarterly increase we have seen in the last few years. Higher home prices decrease the likelihood that loans will default and reduce the amount of credit loss on loans that do default.

- Sales prices on dispositions of our REO properties improved in the second quarter of 2012 as a result of strong demand. We received net proceeds from our REO sales equal to 59% of the loans' unpaid principal balance in the second quarter of 2012, compared with 56% in the first quarter of 2012 and 54% in the second quarter of 2011.

- Our single-family serious delinquency rate declined to 3.53% as of June 30, 2012 from 3.67% as of March 31, 2012 and 4.08% as of June 30, 2011.

- In addition to the reasons described above, the cash flow projections on our individually impaired loans improved due to accelerated expected prepayment speeds as a result of lower mortgage interest rates: the average 30-year fixed-rate mortgage interest rate was 3.68% in June 2012, compared with 3.95% in March 2012 and 4.51% in June 2011, according to Freddie Mac's Primary Mortgage Market Survey®. The accelerated expected prepayment speeds reduced the expected lives of modified loans and thus reduced the expected expense related to the concessions we have granted to borrowers.

As discussed below in "Our Expectations Regarding Future Loss Reserves and Credit-Related (Income) Expenses," due to the large size of our guaranty book of business, even small changes in home prices, economic conditions and other variables can result in significant volatility in the amount of credit-related expenses or income we recognize from period to period.

The improvement in our credit results in the second quarter of 2012 was partially offset by fair value losses of $2.4 billion, compared with fair value losses of $1.6 billion in the second quarter of 2011. Our fair value losses in the second quarter of 2012 were primarily due to risk management derivative losses on pay-fixed swaps, primarily driven by a decrease in swap rates in the quarter. Derivative instruments are an integral part of how we manage interest rate risk and an inherent part of the cost of funding and hedging our mortgage investments. We expect high levels of period-to-period volatility in our results because our derivatives are recorded at fair value in our financial statements while some of the instruments they hedge are not recorded at fair value in our financial statements.

*Year-to-Date Results*

Our comprehensive income for the first half of 2012 was $8.5 billion, consisting of net income of $7.8 billion and other comprehensive income of $690 million. In comparison, we recognized a comprehensive loss of $9.2 billion in the first half of 2011, consisting of a net loss of $9.4 billion and other comprehensive income of $183 million.

The significant improvement in our financial results was primarily due to recognizing a benefit for credit losses of $1.0 billion in the first half of 2012 compared with a provision of $17.1 billion in the first half of 2011. The improvement was a result of the same factors that impacted the second quarter of 2012, which are described above. The improvement in our credit results was partially offset by higher fair value losses on risk management derivatives.

See "Consolidated Results of Operations" for more information on our results.

**Net Worth**

Our net worth of $2.8 billion as of June 30, 2012 reflects our comprehensive income of $8.5 billion offset by our payment to Treasury of $5.8 billion in senior preferred stock dividends during the first half of 2012.

3

As a result of our positive net worth as of June 30, 2012, we are not requesting a draw from Treasury under the senior preferred stock purchase agreement. The aggregate liquidation preference on the senior preferred stock remains at $117.1 billion, which requires an annualized dividend payment of $11.7 billion. The amount of this dividend payment exceeds our reported annual net income for every year since our inception. As of June 30, 2012, we have paid an aggregate of $25.6 billion to Treasury in dividends on the senior preferred stock.

Table 1 below displays our Treasury draws and senior preferred stock dividend payments to Treasury since entering conservatorship on September 6, 2008.

**Table 1: Treasury Draws and Senior Preferred Stock Dividend Payments**

| | 2008 | 2009 | 2010 | 2011 | 2012 (first half) | Cumulative Total |
|---|---|---|---|---|---|---|
| | (Dollars in billions) | | | | | |
| Treasury draws[(1)(2)] | $ 15.2 | $ 60.0 | $ 15.0 | $ 25.9 | $ — | $ 116.1 |
| Senior preferred stock dividends[(3)] | — | 2.5 | 7.7 | 9.6 | 5.8 | 25.6 |
| Treasury draws less senior preferred stock dividends | $ 15.2 | $ 57.5 | $ 7.3 | $ 16.3 | $ (5.8) | $ 90.5 |
| Cumulative percentage of senior preferred stock dividends to Treasury draws | 0.2 % | 3.3 % | 11.3 % | 17.1 % | 22.0 % | 22.0 % |

---

[(1)] Represents the total draws received from Treasury based on our quarterly net worth deficits for the periods presented. Draw requests are funded in the quarter following each quarterly net worth deficit.

[(2)] Treasury draws do not include the initial $1.0 billion liquidation preference of the senior preferred stock, for which we did not receive any cash proceeds.

[(3)] Represents total quarterly cash dividends paid to Treasury during the periods presented based on an annual rate of 10% per year on the aggregate liquidation preference of the senior preferred stock.

### Total Loss Reserves

Our total loss reserves consist of (1) our allowance for loan losses, (2) our allowance for accrued interest receivable, (3) our allowance for preforeclosure property taxes and insurance receivables, and (4) our reserve for guaranty losses. Our total loss reserves, which reflect our estimate of the probable losses we have incurred in our guaranty book of business, including concessions we granted borrowers upon modification of their loans, decreased to $68.0 billion as of June 30, 2012 from $74.6 billion as of March 31, 2012 and $76.9 billion as of December 31, 2011. Our total loss reserve coverage to total nonperforming loans was 28% as of June 30, 2012, compared with 30% as of March 31, 2012 and 31% as of December 31, 2011.

### Our Expectations Regarding Future Loss Reserves and Credit-Related (Income) Expenses

We expect the trends of stabilizing home prices and declining single-family serious delinquency rates to continue, although we expect serious delinquency rates to decline at a slower pace than recent periods. As a result of these trends, we believe that our total loss reserves peaked as of December 31, 2011 and will not increase above $76.9 billion in the foreseeable future. We also believe that our credit-related expenses will be lower in 2012 than in 2011.

Although we expect these positive trends to continue, the amount of credit-related income or expenses we recognize in future periods could vary significantly from period to period and may be affected by many different factors, such as those described below. Moreover, although we believe that our total loss reserves peaked as of December 31, 2011, we expect our loss reserves will remain significantly elevated relative to historical levels for an extended period because (1) we expect future defaults on loans that we acquired prior to 2009 and the resulting charge-offs will occur over a period of years and (2) a significant portion of our reserves represents concessions granted to borrowers upon modification of their loans and will remain in our reserves until the loans are fully repaid or default.

Our expectations regarding our future credit-related expenses or income and loss reserves are based on our current expectations and assumptions about many factors that are subject to change. Factors that could result in higher credit-related expenses and loss reserves than we currently expect include: a drop in actual or expected home prices; an increase in our serious delinquency rate; an increase in interest rates; an increase in unemployment rates; future legislative or regulatory requirements that have a significant impact on our business, such as a requirement that we implement a principal forgiveness program; future updates to our models relating to our loss reserves, including the assumptions used by these models; future

4

senior preferred stock purchase agreement as of June 30, 2012. The aggregate liquidation preference of the senior preferred stock, including the initial aggregate liquidation preference of $1.0 billion, remains at $117.1 billion.

While we had a positive net worth as of June 30, 2012, in some future periods we expect to have a net worth deficit and therefore will be required to obtain additional funding from Treasury pursuant to the senior preferred stock purchase agreement.

The senior preferred stock purchase agreement provides that the $200 billion maximum amount of the commitment from Treasury will increase as necessary to accommodate any net worth deficiencies attributable to periods during 2010, 2011 and 2012. If we do not have a positive net worth as of December 31, 2012, then the amount of funding available under the senior preferred stock purchase agreement after 2012 will be $124.8 billion ($200 billion less $75.2 billion in cumulative draws for net worth deficiencies through December 31, 2009).

In the event we have a positive net worth as of December 31, 2012, then the amount of funding available after 2012 under the senior preferred stock purchase agreement will depend on the size of that positive net worth relative to the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011 and 2012, as follows:

- If our positive net worth as of December 31, 2012 is less than the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011 and 2012, then the amount of available funding will be $124.8 billion less our positive net worth as of December 31, 2012.

- If our positive net worth as of December 31, 2012 is greater than the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011 and 2012, then the amount of available funding will be $124.8 billion less the cumulative draws attributable to periods during 2010, 2011 and 2012.

As of August 8, 2012, the amount of the quarterly commitment fee payable by us to Treasury under the senior preferred stock purchase agreement had not been established; however, Treasury has waived the quarterly commitment fee under the senior preferred stock purchase agreement for each quarter of 2011 and the first, second and third quarters of 2012 due to the continued fragility of the U.S. mortgage market and Treasury's belief that imposing the commitment fee would not generate increased compensation for taxpayers. Treasury stated that it will reevaluate the situation during the next calendar quarter to determine whether the quarterly commitment fee should then be set.

We are not permitted to redeem the senior preferred stock prior to the termination of Treasury's funding commitment under the senior preferred stock purchase agreement. Moreover, we are not permitted to pay down the liquidation preference of the outstanding shares of senior preferred stock except to the extent of (1) accrued and unpaid dividends previously added to the liquidation preference and not previously paid down; and (2) quarterly commitment fees previously added to the liquidation preference and not previously paid down. In addition, if we issue any shares of capital stock for cash while the senior preferred stock is outstanding, the net proceeds of the issuance must be used to pay down the liquidation preference of the senior preferred stock; however, the liquidation preference of each share of senior preferred stock may not be paid down below $1,000 per share prior to the termination of Treasury's funding commitment. Following the termination of Treasury's funding commitment, we may pay down the liquidation preference of all outstanding shares of senior preferred stock at any time, in whole or in part. The limited circumstances under which Treasury's funding commitment will terminate are described in "Business— Conservatorship and Treasury Agreements" in our 2011 Form 10-K.

*Dividends*

Our second quarter dividend of $2.9 billion was declared by the conservator and paid by us on June 29, 2012. The annualized dividend on the senior preferred stock remains at $11.7 billion based on the 10% dividend rate. The level of dividends on the senior preferred stock will increase in future periods if, as we expect, the conservator requests additional funds on our behalf from Treasury under the senior preferred stock purchase agreement.

**OFF-BALANCE SHEET ARRANGEMENTS**

Our maximum potential exposure to credit losses relating to our outstanding and unconsolidated Fannie Mae MBS and other financial guarantees is primarily represented by the unpaid principal balance of the mortgage loans underlying outstanding and unconsolidated Fannie Mae MBS and other financial guarantees of $58.7 billion as of June 30, 2012 and $62.0 billion as of December 31, 2011.

We also provide assistance to housing finance agencies under the temporary credit and liquidity facilities programs in which Treasury has purchased participation interests. For a description of these programs, see "MD&A—Off-Balance Sheet Arrangements—Treasury Housing Finance Agency Initiative" in our 2011 Form 10-K.

## RISK MANAGEMENT

Our business activities expose us to the following three major categories of financial risk: credit risk, market risk (including interest rate and liquidity risk) and operational risk. We seek to actively monitor and manage these risks by using an established risk management framework. Our risk management framework is intended to provide the basis for the principles that govern our risk management activities. In addition to these financial risks, there is significant uncertainty regarding the future of our company, including how long we will continue to be in existence, which we discuss in more detail in "Legislative and Regulatory Developments—GSE Reform" in this report and in "Risk Factors" in our 2011 Form 10-K. We are also subject to a number of other risks that could adversely impact our business, financial condition, earnings and cash flow, including model, legal and reputational risks that may arise due to a failure to comply with laws, regulations or ethical standards and codes of conduct applicable to our business activities and functions.

In this section we provide an update on our management of our major risk categories. For a more complete discussion of the financial risks we face and how we manage credit risk, market risk and operational risk, see "MD&A—Risk Management" in our 2011 Form 10-K and "Risk Factors" in our 2011 Form 10-K and in this report.

### Credit Risk Management

We are generally subject to two types of credit risk: mortgage credit risk and institutional counterparty credit risk. Mortgage credit risk is the risk that a borrower will fail to make required mortgage payments. Institutional counterparty credit risk is the risk that our institutional counterparties may fail to fulfill their contractual obligations to us, including seller/servicers who are obligated to repurchase loans from us or reimburse us for losses in certain circumstances.

#### *Mortgage Credit Risk Management*

We are exposed to credit risk on our mortgage credit book of business because we either hold mortgage assets, have issued a guaranty in connection with the creation of Fannie Mae MBS backed by mortgage assets or provided other credit enhancements on mortgage assets. While our mortgage credit book of business includes all of our mortgage-related assets, both on- and off-balance sheet, our guaranty book of business excludes non-Fannie Mae mortgage-related securities held in our portfolio for which we do not provide a guaranty. We provide information on the performance of non-Fannie Mae mortgage-related securities held in our portfolio, including the impairment that we have recognized on these securities, in "Consolidated Balance Sheet Analysis—Investments in Mortgage-Related Securities—Investments in Private-Label Mortgage-Related Securities."

#### *Mortgage Credit Book of Business*

Table 33 displays the composition of our mortgage credit book of business as of the dates indicated. Our total single-family mortgage credit book of business accounted for 93% of our total mortgage credit book of business as of June 30, 2012 and December 31, 2011.

- Our expectation that the volume of refinancings we acquire in 2012 will be similar to or greater than the volume of refinancings we acquired in 2011;

- Our expectation that the volume of our loan acquisitions in 2012 will be similar to or greater than our loan acquisitions in 2011;

- Our estimation that total originations in the U.S. single-family mortgage market in 2012 will increase from 2011 levels by approximately 9%, from an estimated $1.36 trillion to an estimated $1.49 trillion, and that the amount of originations in the U.S. single-family mortgage market that are refinancings will increase from approximately $900 billion to approximately $980 billion;

- Our expectation that home prices may decline again through early 2013, and our additional expectation that, if current market trends continue, home prices will not decline on a national basis below their first quarter 2012 levels;

- Our expectation of continued significant regional variation in home price changes and the timing of home price stabilization;

- Our expectation that our credit-related expenses for all of 2012 will be lower than for 2011;

- Our expectation that our credit losses will remain high in 2012 relative to pre-housing crisis levels;

- Our expectation that our realization of some credit losses will be delayed to the extent delays in foreclosures continue in 2012;

- Our expectation that, although we may experience period-to-period volatility in earnings and comprehensive income, we will not generate net income or comprehensive income in excess of our annual dividend obligation to Treasury over the long term;

- Our expectation that, over time, our dividend obligation to Treasury will increasingly drive our future draws under the senior preferred stock purchase agreement;

- Our expectation that, in some future quarters, we will be able to generate comprehensive income sufficient to cover at least a portion of our quarterly dividend payment to Treasury;

- Our expectation that we will receive additional draws under the senior preferred stock purchase agreement, which will further increase the dividends we owe to Treasury on the senior preferred stock;

- Our expectation that uncertainty regarding the future of our company will continue;

- Our expectation that we will continue to purchase loans from MBS trusts as they become four or more consecutive monthly payments delinquent subject to market conditions, economic benefit, servicer capacity, and other factors, including the limit on the mortgage assets that we may own pursuant to the senior preferred stock purchase agreement;

- Our expectation that Congressional hearings on GSE reform will continue and additional legislation will be considered and proposals will be discussed, including proposals that would result in a substantial change to our business structure or that involve Fannie Mae's liquidation or dissolution;

- Our belief that, as drafted, bills introduced in Congress that would require FHFA to make a determination within two years of enactment regarding whether the GSEs were financially viable and, if the GSEs were determined to be not financially viable, to place them into receivership may, upon enactment, impair our ability to issue securities in the capital markets and therefore our ability to conduct our business, absent the federal government providing an explicit guarantee of our existing and future liabilities;

- Our expectation that our acquisitions of Alt-A mortgage loans (which are limited to refinancings of existing Fannie Mae loans) will continue to be minimal in future periods and the percentage of the book of business attributable to Alt-A will continue to decrease over time;

- Our expectation that loans we acquire under Refi Plus, including HARP, may not perform as well as the other loans we have acquired since the beginning of 2009;

- Our expectation that Refi Plus loans, including HARP loans, will perform better than the loans they replace because Refi Plus loans should reduce the borrowers' monthly payments or provide more stable terms than the borrowers' old loans (for example, by refinancing into a mortgage with a fixed interest rate instead of an adjustable rate);

- Our expectation that the current market premium portion of our current estimate of the fair value of our book of business will not impact future Treasury draws, which is based on our intention generally not to have other parties assume the credit risk inherent in our book of business;

83

**000564**

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

_____

# FORM 10-Q

_____

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

**For the quarterly period ended June 30, 2012**

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

**For the transition period from                to**

**Commission File Number: 001-34139**

_____

# Federal Home Loan Mortgage Corporation
*(Exact name of registrant as specified in its charter)*

**Freddie Mac**

| **Federally chartered corporation** | **8200 Jones Branch Drive** | **52-0904874** | **(703) 903-2000** |
|---|---|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *McLean, Virginia 22102-3110* *(Address of principal executive offices, including zip code)* | *(I.R.S. Employer Identification No.)* | *(Registrant's telephone number, including area code)* |

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports); and (2) has been subject to such filing requirements for the past 90 days.  ☒  Yes  ☐  No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  ☒  Yes  ☐  No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer  ☐                                                Accelerated filer  ☒

Non-accelerated filer (Do not check if a smaller reporting company)  ☐          Smaller reporting company  ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes  ☐    No  ☒

As of July 25, 2012, there were 650,033,623 shares of the registrant's common stock outstanding.



DX477
FHFA/Fannie/Freddie Litig.
Case No. 1:13cv1053,
1:1... C.)
000565

Table of Contents

# PART I — FINANCIAL INFORMATION

*We continue to operate under the conservatorship that commenced on September 6, 2008, under the direction of FHFA as our Conservator. The Conservator succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any shareholder, officer or director thereof, with respect to the company and its assets. The Conservator has delegated certain authority to our Board of Directors to oversee, and management to conduct, day-to-day operations. The directors serve on behalf of, and exercise authority as directed by, the Conservator. See "BUSINESS — Conservatorship and Related Matters" in our Annual Report on Form 10-K for the year ended December 31, 2011, or 2011 Annual Report, for information on the terms of the conservatorship, the powers of the Conservator, and related matters, including the terms of our Purchase Agreement with Treasury.*

*This Quarterly Report on Form 10-Q includes forward-looking statements that are based on current expectations and are subject to significant risks and uncertainties. These forward-looking statements are made as of the date of this Form 10-Q and we undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date of this Form 10-Q. Actual results might differ significantly from those described in or implied by such statements due to various factors and uncertainties, including those described in: (a) the "FORWARD-LOOKING STATEMENTS" sections of this Form 10-Q, our 2011 Annual Report, and our Quarterly Report on Form 10-Q for the first quarter of 2012; and (b) the "RISK FACTORS" and "BUSINESS" sections of our 2011 Annual Report.*

*Throughout this Form 10-Q, we use certain acronyms and terms that are defined in the "GLOSSARY."*

## ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*You should read this MD&A in conjunction with our consolidated financial statements and related notes for the three and six months ended June 30, 2012 included in "FINANCIAL STATEMENTS," and our 2011 Annual Report.*

## EXECUTIVE SUMMARY

### Overview

Freddie Mac is a GSE chartered by Congress in 1970 with a public mission to provide liquidity, stability, and affordability to the U.S. housing market. We have maintained a consistent market presence since our inception, providing mortgage liquidity in a wide range of economic environments. We are working to support the recovery of the housing market and the nation's economy by providing essential liquidity to the mortgage market and helping to stem the rate of foreclosures. We believe our actions are helping communities across the country by providing America's families with access to mortgage funding at low rates while helping distressed borrowers keep their homes and avoid foreclosure, where feasible.

### Summary of Financial Results

We continue to be affected by the ongoing weakness in the economy. However, certain actions taken since early 2009, including our participation in HAMP and HARP, are helping to stabilize the housing market. During the six months ended June 30, 2012, we observed certain signs of stabilization in the housing market, which contributed to our improved financial results in the second quarter of 2012. Our comprehensive income for the second quarter of 2012 was $2.9 billion, consisting of $3.0 billion of net income and $(128) million of total other comprehensive income (loss). By comparison, our comprehensive income (loss) for the second quarter of 2011 was $(1.1) billion, consisting of $(2.1) billion of net income (loss) and $1.0 billion of total other comprehensive income (loss).

Our total equity was $1.1 billion at June 30, 2012, reflecting our comprehensive income of $2.9 billion for the second quarter of 2012 and our dividend payment of $1.8 billion on our senior preferred stock in June 2012. As a result of our positive net worth at June 30, 2012, there is no need for a draw from Treasury under the Purchase Agreement for the second quarter of 2012.

### Our Primary Business Objectives

We are focused on the following primary business objectives: (a) providing credit availability for mortgages and maintaining foreclosure prevention activities; (b) minimizing our credit losses; (c) developing mortgage market enhancements in support of a new infrastructure for the secondary mortgage market; (d) contracting the dominant presence of

<div align="center">1</div>

*Freddie Mac*

### UNITED STATES SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# Form 10-Q

☑ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended March 31, 2013

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from    to

Commission File No.: 0-50231

# Federal National Mortgage Association

*(Exact name of registrant as specified in its charter)*

**Fannie Mae**

| | |
|---|---|
| **Federally chartered corporation** | **52-0883107** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **3900 Wisconsin Avenue, NW Washington, DC** | **20016** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**Registrant's telephone number, including area code:**
**(202) 752-7000**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☑    No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  Yes ☑    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer ☐ | Accelerated filer ☑ |
| Non-accelerated filer  ☐ | |
| (Do not check if a smaller reporting company) | Smaller reporting company ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐  No ☑

As of March 31, 2013, there were 1,158,077,970 shares of common stock of the registrant outstanding.



DX645
FHFA/Fannie/Freddie Litig.
Case No. 1:13cv1053,
1:13mc1288 (D.D.C.)
000567

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

### Use of Estimates

Preparing condensed consolidated financial statements in accordance with GAAP requires management to make estimates and assumptions that affect our reported amounts of assets and liabilities, and disclosure of contingent assets and liabilities as of the dates of our condensed consolidated financial statements, as well as our reported amounts of revenues and expenses during the reporting periods. Management has made significant estimates in a variety of areas including, but not limited to, valuation of certain financial instruments and other assets and liabilities, recoverability of our deferred tax assets, allowance for loan losses and reserve for guaranty losses, and other-than-temporary impairment of investment securities. Actual results could be different from these estimates.

As of March 31, 2013, we have concluded that it is more likely than not that our deferred tax assets, except the deferred tax assets relating to capital loss carryforwards, will be realized. As a result, we have released the valuation allowance on our deferred tax assets, but retained $491 million of the valuation allowance that pertains to our capital loss carryforwards. This conclusion was based upon the significance of the positive evidence of our ability to generate sufficient taxable income and utilize our net operating loss carryforwards. The release of the valuation allowance resulted in the recognition of $50.6 billion in our benefit for income taxes in our condensed consolidated statements of operations and comprehensive income for the three months ended March 31, 2013. See "Note 10, Income Taxes," for additional information regarding the factors that led to our conclusion to release the valuation allowance against our deferred tax assets.

### Earnings (Loss) per Share

Earnings (loss) per share ("EPS") is presented for both basic EPS and diluted EPS. We compute basic EPS by dividing net income (loss) available to common stockholders by the weighted-average number of shares of common stock outstanding during the period. In addition to common shares outstanding, the computation of basic EPS includes instruments for which the holder has (or is deemed to have) the present rights as of the end of the reporting period to share in current period earnings (loss) with common stockholders (*i.e.,* participating securities and common shares that are currently issuable for little or no cost to the holder). We include in the denominator of our basic EPS computation the weighted-average number of shares of common stock that would be issued upon the full exercise of the warrant issued to Treasury. Diluted EPS includes all the components of basic EPS, plus the dilutive effect of common stock equivalents such as convertible securities and stock options, but excludes those common stock equivalents from the calculation of diluted EPS when the effect of inclusion, assessed individually, would be anti-dilutive. The calculation of income available to common stockholders and earnings per share is based on the underlying premise that all income after payment of dividends on preferred shares is available to and will be distributed to the common stockholders. However, as a result of our conservatorship status and the terms of the senior preferred stock purchase agreement, no amounts will be available to distribute as dividends to common or preferred stockholders (other than to Treasury as holder of the senior preferred stock).

### Employee Retirement Benefits

We sponsor defined benefit plans for our employees that include qualified and nonqualified noncontributory plans. Pension plan benefits are based on years of credited service and a percentage of eligible compensation. In 2007, the defined benefit pension plans were amended to cease benefits accruals for employees that did not meet certain criteria to be grandfathered under the plan and to vest those employees in their frozen accruals. Effective June 30, 2013, the defined benefit pension plans will be further amended to cease benefit accruals for all employees.

### Adoption of New Accounting Guidance

Effective January 1, 2013, we retrospectively adopted guidance issued by the Financial Accounting Standards Board ("FASB") on additional disclosures about derivatives, repurchase agreements and reverse repurchase agreements, and securities borrowing and lending transactions that are either offset on the balance sheet or subject to a master netting arrangement or similar agreement. The additional disclosures about these instruments are intended to enable investors to understand the effect or potential effect of those arrangements on the company's financial positions. The required disclosures will enhance comparability between companies that prepare their financial statements in accordance with GAAP and those that follow international financial reporting standards. The updated guidance does not change existing offsetting eligibility criteria or the permitted balance sheet presentation for those instruments that meet the eligibility criteria. The adoption of this guidance did not have a material impact on our condensed consolidated financial statements; however, it required us to expand our disclosures. See "Note 15, Netting Arrangements," for additional information regarding the impact upon adoption of this guidance.

87

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

**For the quarterly period ended September 30, 2013**

<div align="center">or</div>

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

**For the transition period from                    to**

<div align="center">

**Commission File Number: 001-34139**

# Federal Home Loan Mortgage Corporation

*(Exact name of registrant as specified in its charter)*

**Freddie Mac**

</div>

| **Federally chartered corporation** | **8200 Jones Branch Drive** | **52-0904874** | **(703) 903-2000** |
|---|---|---|---|
| *(State or other jurisdiction of incorporation or organization)* | **McLean, Virginia 22102-3110** | *(I.R.S. Employer Identification No.)* | *(Registrant's telephone number, including area code)* |
| | *(Address of principal executive offices, including zip code)* | | |

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports); and (2) has been subject to such filing requirements for the past 90 days.   ☒ Yes   ☐ No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   ☒ Yes   ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer   ☐                                                                                   Accelerated filer   ☒

Non-accelerated filer (Do not check if a smaller reporting company)   ☐                Smaller reporting company   ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

As of October 24, 2013 , there were 650,039,533 shares of the registrant's common stock outstanding.



DX675
FHFA/Fannie/Freddie Litig.
Case No. 1:13cv1053,
(D.D.C.)
000569

Table of Contents

We invest principally in mortgage loans and mortgage-related securities, certain categories of which are largely unencumbered and highly liquid. Our primary source of liquidity among these mortgage assets is our holdings of agency securities. While our holdings of unsecuritized performing single-family mortgage loans and CMBS are also potential sources of liquidity, we consider them to be less liquid than agency securities. Our holdings of non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans are considered to be illiquid due to market conditions and the continued poor credit quality of the underlying assets. Our holdings of unsecuritized seriously delinquent and modified single-family mortgage loans are also considered to be illiquid.

We are subject to limits on the amount of mortgage assets we can sell in any calendar month without review and approval by FHFA and, if FHFA so determines, Treasury. See "EXECUTIVE SUMMARY — Limits on Investment Activity and Our Mortgage-Related Investments Portfolio" for more information on the relative liquidity of our mortgage assets.

**Cash Flows**

Our cash and cash equivalents increased by $1.0 billion to $9.5 billion during the nine months ended September 30, 2013, as compared to a decrease of $20.7 billion to $7.8 billion during the nine months ended September 30, 2012. Cash flows provided by operating activities during the nine months ended September 30, 2013 and 2012 were $9.4 billion and $6.2 billion, respectively, primarily driven by cash proceeds from net interest income. Cash flows provided by investing activities during the nine months ended September 30, 2013 and 2012 were $322.1 billion and $357.4 billion, respectively, primarily resulting from net proceeds received as a result of repayments of single-family held-for-investment mortgage loans. Cash flows used for financing activities during the nine months ended September 30, 2013 and 2012 were $330.4 billion and $384.2 billion, respectively, largely attributable to funds used to repay debt securities of consolidated trusts held by third parties.

**Capital Resources, the Purchase Agreement, and the Dividend Obligation on the Senior Preferred Stock**

Since our entry into conservatorship, Treasury and FHFA have taken a number of actions that affect our cash requirements and ability to fund those requirements. The conservatorship, and the resulting support we have received from Treasury, has enabled us to access debt funding on terms sufficient for our needs. Under the Purchase Agreement, Treasury made a commitment to provide us with funding, under certain conditions, to eliminate deficits in our net worth. The amount of available funding remaining under the Purchase Agreement is currently $140.5 billion. This amount will be reduced by any future draws.

At September 30, 2013, our assets exceeded our liabilities under GAAP; therefore no draw is being requested from Treasury under the Purchase Agreement. In future periods, we may experience variability in our net income and/or comprehensive income due to changes in factors such as interest rates, mortgage spreads, and home prices. Such changes could adversely affect our net worth and result in additional draws under the Purchase Agreement. For more information, see "RISK FACTORS — Conservatorship and Related Matters — *We may request additional draws under the Purchase Agreement in future periods* " in our 2012 Annual Report.

Under the GSE Act, FHFA must place us into receivership if FHFA determines in writing that our assets are and have been less than our obligations for a period of 60 days. Obtaining funding from Treasury pursuant to its commitment under the Purchase Agreement enables us to avoid being placed into receivership by FHFA. See "BUSINESS — Regulation and Supervision — *Federal Housing Finance Agency — Receivership* " in our 2012 Annual Report for additional information on mandatory receivership.

During the three months ended September 30, 2013, we experienced a significant non-cash increase in our net worth due to a benefit for federal income taxes of $23.9 billion that resulted from our conclusion to release our valuation allowance against our net deferred tax assets. Based on our Net Worth Amount at September 30, 2013, our dividend obligation to Treasury in December 2013 will be $30.4 billion. Once this dividend payment is made to Treasury, we will have paid slightly more in aggregate cash dividends to Treasury than aggregate cash draws received from Treasury under the Purchase Agreement. We paid dividends of $4.4 billion in cash on the senior preferred stock during the three months ended September 30, 2013, based on our Net Worth Amount at June 30, 2013. Through September 30, 2013, we have paid aggregate cash dividends to Treasury of $40.9 billion, an amount equal to 57% of our aggregate draws received under the Purchase Agreement.

At September 30, 2013, our aggregate funding received from Treasury under the Purchase Agreement was $71.3 billion. This aggregate funding amount does not include the initial $1.0 billion liquidation preference of senior preferred stock that we issued to Treasury in September 2008 as an initial commitment fee and for which no cash was received.

Under the Purchase Agreement, our ability to repay the liquidation preference of the senior preferred stock is limited and we will not be able to do so for the foreseeable future, if at all. In addition, under the Purchase Agreement, the payment of dividends cannot be used to reduce prior draws from Treasury. Accordingly, while we have paid aggregate cash dividends to Treasury of $40.9 billion, the liquidation preference on the senior preferred stock remains $72.3 billion.

*Freddie Mac*