**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BERKLEY INSURANCE CO., *et al*., | |
| Plaintiffs, | |
| v. | Case No. 1:13-cv-1053 (RCL) |
| FEDERAL HOUSING FINANCE AGENCY, *et al.*, | |
| Defendants. | |
| In re Fannie Mae / Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations | |
| _____ | Case No. 1:13-mc-01288 (RCL) |
| This document relates to: ALL CASES | |

**DEFENDANTS' REPLY IN SUPPORT OF**
**MOTION FOR JUDGMENT AS A MATTER OF LAW**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ...................................................................................................................1

ARGUMENT ...........................................................................................................................2

I.     PLAINTIFFS MISSTATE THE APPLICABLE LEGAL STANDARD ...........................2

II.    DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW .............3

       A.   The Shareholder Contracts Leave No "Gap" for the Implied Covenant to Fill ...... 3

       B.   The Supreme Court's *Collins* Decision Forecloses Plaintiffs' Claim ................... 8

       C.   Plaintiffs' Claim Improperly Alleges an Anticipatory Breach ............................ 11

       D.   Plaintiffs Failed To Prove Any Amount of Harm with Reasonable Certainty ..... 15

            1.   Plaintiffs Introduced No Evidence To Show That Current
                 Shareholders Are Worse Off Today Due to the Third Amendment ........ 15

            2.   Plaintiffs Introduced No Evidence Accounting for the Sizeable
                 Share-Price Increases Shortly After the Third Amendment ................... 17

            3.   Plaintiffs Introduced No Evidence To Account for a Potential
                 Alternative Cause of the One-Day Decline in Share Prices ................... 19

III.   POST-THIRD AMENDMENT PURCHASERS LACK STANDING TO SUE .............20

       A.   This Claim Does Not Travel With the Shares Under Virginia Law .................... 20

       B.   This Claim Does Not Travel With the Shares Under Delaware Law .................. 22

       C.   Standing Is a Jurisdictional Issue That Cannot Be Waived or Estopped ............. 24

CONCLUSION........................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 3M Combat Arms Earplug Products Liab. Litig.*,
  2021 WL 4146699 (N.D. Fla. Apr. 2, 2021) ..........................................................21

*Abella v. Universal Leaf Tobacco Co.*,
  546 F. Supp. 2d 795 (E.D. Va. 1982) ..................................................................22

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
  692 F.3d 34 (2d Cir. 2012) ...........................................................................18, 19

*In re Activision Blizzard, Inc. S'holder Litig.*,
  124 A.3d 1025 (Del. Ch. 2015) .....................................................................22, 23

*Allen v. El Paso Pipeline GP Co.*,
  113 A.3d 167 (Del. Ch. 2014) ..........................................................................6

*Baker v. Kroger Co.*,
  784 F.2d 1172 (4th Cir. 1986) .........................................................................20

*Beach TV Props., Inc. v. Solomon*,
  2016 WL 6068806 (D.D.C. Oct. 14, 2016) ........................................................25

*Blaustein v. Lord Baltimore Cap. Corp.*,
  84 A.3d 954 (Del. 2014) ...................................................................................5

*Bluebird Partners, LP v. First Fid. Bank, N.A. N.J.*,
  85 F.3d 970 (2d Cir. 1996) .............................................................................25

*Bluebird Partners, LP v. First Fidelity Bank*,
  896 F. Supp. 152 (S.D.N.Y. 1995) .............................................................21, 23

*Buckley Fam. Tr. v. McCleary*,
  2020 WL 1522549 (Del. Ch. Mar. 31, 2020) .......................................................3

*In re Cattell*,
  2021 WL 1100068 (Bankr. D. Or. Mar. 22, 2021) ...............................................2

*Cheatham I.R.A. v. Huntington Nat'l Bank*,
  137 N.E.3d 45 (Ohio 2019) ..........................................................................21, 22

*Collins v. Yellen*,
  594 U.S. 220 (2020) .................................................................................. *passim*

*DG BF, LLC v. Ray,
    2021 WL 776742 (Del. Ch. Mar. 1, 2021)..........................................................3, 5

Dura Pharmaceuticals v. Broudo,
    544 U.S. 336 (2005)..........................................................................................18

Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency,
    2018 WL 4680197 (D.D.C. Sept. 28, 2018) ......................................................11

Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency,
    2022 WL 11110548 (D.D.C. Oct. 19, 2022) ...............................................15, 16

Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency,
    2022 WL 4745970 (D.D.C. Oct. 3, 2022) .................................................. passim

Glaxo Grp. Ltd. v. DRIT LP,
    248 A.3d 911 (Del. 2021) ...................................................................................6

Glenn v. Fay,
    281 F. Supp. 3d 130 (D.D.C. 2017) ..................................................................14

Hurd v. District of Columbia,
    -- F. Supp. 3d --, 2023 WL 8697829 (D.D.C. Dec. 15, 2023) ...........................21

I.A.T.S.E. Local No. One Pension Fund v. General Electric Co.
    2016 WL 7100493 (Del. Ch. Dec. 6, 2016).........................................23, 24, 25

Jaroslawicz v. M&T Bank Corp.,
    2024 WL 474846 (D. Del. Feb. 7, 2024) ...........................................................16

Martin v. Howard Univ.,
    275 F. App'x 2 (D.C. Cir. 2008).........................................................................2

Mut. Pharm. Co. v. Bartlett,
    570 U.S. 472 (2013)............................................................................................7

Pac. Life Ins. Co. v. Bank of N.Y. Mellon,
    2023 WL 5128079 (S.D.N.Y. Aug. 19, 2023) ....................................................25

Perry Cap. LLC v. Mnuchin,
    864 F.3d 591 (D.C. Cir. 2017) .................................................................. passim

*Policemen's Annuity & Benefit Fund of Chi. v. DV Realty Advisors LLC,
    2012 WL 3548206 (Del. Ch. Aug. 16, 2012) .....................................................4

Ross v. Walton,
    668 F. Supp. 2d 32 (D.D.C. 2009) .....................................................................18

*Rupolo v. Oshkosh Truck Corp.*,
   2013 WL 5520756 (E.D.N.Y. Sept. 30, 2013) .........................................................................2

*Shareholder Representative Servs. LLC v. Albertsons Cos., Inc.*,
   2021 WL 2311455 (Del. Ch. June 7, 2021) ............................................................................5

*In re Sunstates Corp. S'holder Litig.*,
   2001 WL 432447 (Del. Ch. Apr. 18, 2001) ..........................................................................24

*United States v. All Assets Held at Bank Julius*,
   480 F. Supp. 3d 1 (D.D.C. 2020) ..........................................................................................25

*Urdan v. WR Cap. Partners, LLC*,
   244 A.3d 668 (Del. 2020) .....................................................................................................23

*US Fax Law Ctr., Inc. v. iHire, Inc.*,
   476 F.3d 1112 (10th Cir. 2007) ............................................................................................25

*Wilmington Leasing, Inc. v. Parrish Leasing Co.*,
   1996 WL 560190 (Del. Ch. Sept. 25, 1996) .......................................................................6, 7

*Wye Oak Tech., Inc. v. Republic of Iraq*,
   24 F.4th 686 (D.C. Cir. 2022) ................................................................................................3

**Statutes**

12 U.S.C. § 4617(b)(2)(J)(ii) ...............................................................................................3, 6

12 U.S.C. § 4617(d)(1) ..............................................................................................................7

12 U.S.C. § 4617(d)(2) ..............................................................................................................7

12 U.S.C. § 4617(d)(3) ..............................................................................................................7

12 U.S.C. § 4617(f) .................................................................................................................24

UCC § 8-302 ...............................................................................................................20, 21, 22

Va. Code § 8.1A-103(a)(3) ......................................................................................................21

**Rules**

Fed. R. Civ. P. 50(b) ..................................................................................................................2

**Other Authorities**

Restatement (Second) of Contracts § 253 (1981) ....................................................................14

## INTRODUCTION

FHFA agreed to the Net Worth Sweep to eliminate the risk that circular draws would deplete the Treasury Commitment and cause catastrophic harm to the U.S. economy.  Plaintiffs' opposition exposes contradictions that doom their sole remaining state-law claim—that this statutorily authorized agreement breached the implied covenant of good faith and fair dealing.

Plaintiffs claim that the implied covenant applies because the shareholder contracts contain a "gap" as to the scope of FHFA's discretion, but they do not deny that a HERA provision incorporated into the shareholder contracts specifies that FHFA may act in the "best interests" of the public.  That contractual standard favoring the *public* interest fills any supposed gap and precludes reading into the contracts an implied obligation to favor *shareholder* interests.

Plaintiffs claim that FHFA violated the implied covenant by "unreasonably" frustrating the expectations of shareholders, but they do not dispute that, in *Collins*, the Supreme Court held that FHFA "reasonably" subordinated the interests of shareholders to those of the public.  *Collins* explicitly rejected each of Plaintiffs' main theories for why the Net Worth Sweep was unreasonable.  The jury was not free to find otherwise.  As a matter of law, shareholders *must* expect FHFA to act in the public's best interests, as HERA and the shareholder contracts allow— and as the Supreme Court held FHFA did in agreeing to the Third Amendment.

Plaintiffs claim that the Net Worth Sweep was a "present breach" of the shareholder contracts, but their case rests on a "repudiation" of future performance.  Following summary judgment, their sole remaining theory of harm was that the Net Worth Sweep "eliminat[ed] any possibility of *future* dividends."  *Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency* ("*MSJ Ruling*"), 2022 WL 4745970, at *11 (D.D.C. Oct. 3, 2022) (emphasis added).  And there can be no "present breach" when today—and for the foreseeable future—private shareholders are legally barred from receiving dividends for reasons wholly independent of the Net Worth Sweep.

1

Acknowledging this Court's rejection of future dividends as impermissibly speculative, Plaintiffs seek damages tied to a one-day decline in share prices 12 years ago.  But they do not dispute that the shares recovered most of their market value within weeks.  Plaintiffs also offered no evidence that the Net Worth Sweep impacts share prices today, and their damages expert admitted that the evidence failed to isolate the impact of the Net Worth Sweep on share prices.

Finally, Plaintiffs claim that they have standing because their claim "travels with the shares," but longstanding federal caselaw and the overwhelming majority view among the states reject any notion of automatic assignment.  Plaintiffs' outlier view would deliver a windfall to shareholders who bought at reduced prices, while boxing out those who sold at a loss.

Plaintiffs urge this Court to brush aside these contradictions based on prior rulings spanning years.  The Court should reject this invitation to truncate its analysis and should instead fully address all of these important legal issues on a complete trial record.

## ARGUMENT

## I.  PLAINTIFFS MISSTATE THE APPLICABLE LEGAL STANDARD

Plaintiffs attempt to short-circuit this Court's consideration of Defendants' motion by invoking the law-of-the-case doctrine.  Opp. 13-14.  But law of the case does not apply here. Rule 50(b) motions, which by definition are "renewed," Fed. R. Civ. P. 50(b), "would be the emptiest of technicalities if law of the case applied" to them, *In re Cattell*, 2021 WL 1100068, at *6 (Bankr. D. Or. Mar. 22, 2021).  Indeed, "application of the law-of-the-case doctrine in the context of Rule 50(b) motions would effectively alter the provisions of that Rule." *Rupolo v. Oshkosh Truck Corp.*, 2013 WL 5520756, at *17 (E.D.N.Y. Sept. 30, 2013).  All of Plaintiffs' cases but one arose outside the Rule 50(b) context; and in the remaining case, the D.C. Circuit held that a prior ruling was *not* law of the case.  *Martin v. Howard Univ.*, 275 F. App'x 2, 6 (D.C. Cir. 2008).  Anyway, law of the case "is a principle that guides courts in the exercise of

their discretion, not a binding rule." *Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 697

(D.C. Cir. 2022).  And here, any relevant prior rulings should be revisited for the reasons below.

## II.      DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW

### A.      The Shareholder Contracts Leave No "Gap" for the Implied Covenant to Fill

Plaintiffs do not dispute that "[a]n essential predicate for the application of the implied

covenant is the existence of a 'gap' in the relevant agreement." *DG BF, LLC v. Ray*, 2021 WL

776742, at *15 (Del. Ch. Mar. 1, 2021).  Nor do they dispute that, "[w]hen a contract confers

discretion on one party," "the implied covenant does not come into play when the scope of

discretion is specified," because then, "there is no gap." *Id.* (cleaned up); *see* Mot. 20 n.5

(Virginia law).  And Plaintiffs do not dispute that the shareholder contracts incorporate HERA's

"best interests" provision.  *See* Opp. 15.  Thus, the only question is whether the "best interests"

provision specifies the scope of FHFA's discretion; if so, "there is no gap" in the shareholder

contracts, and the implied covenant does not apply.  *DG BF, LLC*, 2021 WL 776742, at *15.

As Defendants explained, HERA's "best interests" provision specifies the scope of

FHFA's discretion.  Mot. 22.  To begin, the stock certificates grant "sole discretion" specifically

over "dividends," DX-49 at 55 (**Ex. J**), a matter courts have long held is peculiarly within the

purview of a company's board as it pursues the company's business objectives.  *See Buckley*

*Fam. Tr. v. McCleary*, 2020 WL 1522549, at *5 (Del. Ch. Mar. 31, 2020).  HERA then goes

further, providing that FHFA may "take any action authorized by [HERA] which the Agency

determines is in the best interests of … the Agency," even if the action does *not* further the

Enterprises' business objectives.  12 U.S.C. § 4617(b)(2)(J)(ii).  That "best interests" language is

strikingly similar to language courts have found displaces the implied covenant.  *See* Mot. 20-22.

Plaintiffs respond by suggesting that *Perry II* already held that the implied covenant

applies here.  Pointing to the D.C. Circuit's observation that the implied covenant applies when a

contract confers "sole discretion," Plaintiffs assert that the discretion specified by HERA's "best interests" provision is no "different" from that conferred by the stock certificates. Opp. 15-16 (citing *Perry Cap. LLC v. Mnuchin* ("*Perry II*"), 864 F.3d 591, 631 (D.C. Cir. 2017)). That is wrong. The D.C. Circuit expressly directed this Court to decide whether Plaintiffs' implied covenant claim is viable in light of HERA's "best interests" provision, *Perry II*, 864 F.3d at 631, which would be an empty exercise if, as Plaintiffs suggest, the two provisions mean the same thing. Moreover, by incorporating the "best interests" provision, the shareholder contracts do more than merely grant "sole discretion." Under HERA, FHFA need not pursue the Enterprises' business objectives at all, but may act in its *own* best interests, which include "the best interests of … the public," "[w]hether or not [an action] [i]s in the best interests of the [Enterprises] or their shareholders." *Collins v. Yellen*, 594 U.S. 220, 238-39 (2020). The "best interests" provision thus specifies the scope of FHFA's discretion over and above the stock certificates.

Contrary to Plaintiffs' suggestion, Defendants are not arguing that the shareholder contracts "expressly authorized the Net Worth Sweep," or that "grants of discretionary rights in contracts" *always* "preclude application of the implied covenant." Opp. 15. The key principle (which Plaintiffs do not contest) is that the implied covenant is inapplicable when the contract itself specifies the scope of a party's discretion. And a contract can specify the scope of discretion by "provid[ing] a contractual standard for evaluating the decision." *Policemen's Annuity & Benefit Fund of Chi. v. DV Realty Advisors LLC*, 2012 WL 3548206, at *12 (Del. Ch. Aug. 16, 2012), *aff'd sub nom. DV Realty Advisors LLC v. Policemen's Annuity & Benefit Fund of Chi.*, 75 A.3d 101 (Del. 2013). HERA's "best interests" provision supplies just such a standard. Indeed, the Supreme Court in *Collins* evaluated FHFA's decision to agree to the Net Worth Sweep based on that standard, holding that FHFA acted within its specified discretion.

594 U.S. at 239.  That standard is set forth in the terms of the shareholder contracts, thus foreclosing any implied covenant claim.

Nor are Defendants arguing that the "best interests" provision "gave the conservator carte blanche," Opp. 19, or that "FHFA can do whatever it wants," *MSJ Ruling*, 2022 WL 4745970, at *7.  To be sure, HERA "grants the FHFA expansive authority in its role as a conservator." *Collins*, 594 U.S. at 221.  But FHFA may not—and did not—"exceed its authority as a conservator."  *Id.* at 242.  Again, *Collins* shows that the "best interests" provision establishes a concrete standard against which to evaluate FHFA's decision to agree to the Net Worth Sweep.  Indeed, this Court has described the "best interests" provision as establishing a "reasonableness" standard, albeit one that the Court found "differ[s]" from the reasonableness required by the implied covenant.  *MSJ Ruling*, 2022 WL 4745970, at *5.  And Plaintiffs *concede* that a "reasonableness" standard "obviat[es]" application of the implied covenant.  Opp. 17.

Plaintiffs' attempts to distinguish the relevant caselaw are unpersuasive.  They stress that the cited cases involved "contractual language that contains its own good faith or similar standard," Opp. 16, but that misses the point.  The key factor in those cases was that "the scope of discretion [wa]s specified" by the contract, *DG BF, LLC*, 2021 WL 776742, at *15 (citation omitted), *not* that the contract used the words "good faith" or similar language, Mot. 19-22 & n.5.  Plaintiffs cite no case holding that, to displace the implied covenant, a contract must provide for discretion "similar" in scope to the implied covenant.  Delaware courts have rejected implied covenant claims even when the contractual language does not mention "good faith" or any similar concept.  *Blaustein v. Lord Baltimore Cap. Corp.*, 84 A.3d 954, 959 (Del. 2014).  The *Blaustein* court even likened the relevant contract language to a "best interest" provision.  *Id.*; *see also Shareholder Representative Servs. LLC v. Albertsons Cos., Inc.*, 2021 WL 2311455, at

*9 (Del. Ch. June 7, 2021) (contract displaced implied covenant without "good faith" or similar words).  Further refuting Plaintiffs' point, other caselaw stresses that contracting parties may agree to confer discretion of whatever scope they choose, even if it ends up being a "bad deal." *Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 919 (Del. 2021).  Freedom of contract is precisely why, "[w]hen presented with an implied covenant claim, a court first must engage in the process of contract construction to determine whether there is a gap that needs to be filled." *Allen v. El Paso Pipeline GP Co.*, 113 A.3d 167, 183 (Del. Ch. 2014).  If the only way to close a contractual gap were to agree to terms that mirror the implied covenant, parties could not choose the terms of their bargain, and the entire inquiry into the existence of a "gap" would be circular and pointless.

Nor does it matter that the gap-filling contract provisions in some cases were "specific to a particular action."  Opp. 17.  Plaintiffs cite no case suggesting a distinction between "general" and "specific" provisions; the only question is whether a provision specifies the scope of discretion.  And Plaintiffs identify no logical reason why only "specific" provisions establishing the scope of discretion would displace the implied covenant.  Moreover, HERA's "best interests" provision is "specific" to particular actions—it specifies the scope of FHFA's discretion to take actions that are "authorized by" HERA.  12 U.S.C. § 4617(b)(2)(J)(ii).

Plaintiffs' reliance (Opp. 17-18) on *Wilmington Leasing, Inc. v. Parrish Leasing Co.*, 1996 WL 560190 (Del. Ch. Sept. 25, 1996), is misplaced.  The court there recognized an implied covenant claim where a partnership agreement authorized the limited partners to remove the general partner if they determined that he "has failed or is unable to perform satisfactorily as General Partner."  *Id.* at *1.  "In these specific circumstances, an implied requirement that the limited partners' discretion be exercised reasonably and in good faith is appropriate, for without that limitation, the contractual condition would be marginalized."  *Id.* at *2.  That is, the implied

covenant was needed to give that condition "significance and effect." *Id.* "[A]bsent such an implied requirement, the limited partners could remove … a general partner who was performing satisfactorily," and if that was what the parties intended, "they could have drafted [the agreement] to permit removal without requiring the satisfaction of any predicate standard." *Id.*

Here, there is no need to read any additional requirements into HERA's "best interests" provision in order to give that provision "significance and effect." *Id.* To the contrary, such a reading would turn the "best interests" provision on its head—it makes no sense to say the implied covenant requires FHFA to prioritize *shareholder* expectations when the contract specifies that FHFA instead may act in the *public* interest. The point of the "best interests" provision is to allow FHFA to "*subordinate* the best interests of the company to its own best interests and those of the public." *Collins*, 594 U.S. at 254 (emphasis added). Applying the implied covenant thus would not give effect to the "best interests" provision; it would nullify it. Worse, contrary to the Supremacy Clause, it would allow Delaware and Virginia law to supplant HERA, nullifying FHFA's congressionally-conferred power to act in the public interest *regardless* of shareholders' interests. *See Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 480 (2013).

HERA's contract-repudiation provision, Opp. 18-19, does not help Plaintiffs. That provision authorizes limited damages in specific circumstances when FHFA, as Conservator, repudiates certain Enterprise contracts. 12 U.S.C. §§ 4617(d)(1)-(3). Plaintiffs' sole claim does not fit within § 4617(d), which on its face does not apply for multiple reasons. *See, e.g.*, *id.* § 4617(d)(2), (d)(3)(A)(ii). Recognizing that § 4617(d) textually does not apply here, Plaintiffs argue that it "confirms FHFA must pay damages" if FHFA breaches a contractual obligation. Opp. 19. But that skips the key question whether the implied covenant imposes any contractual obligation here in the first place. It does not because the shareholder contracts contain no gap.

**B.     The Supreme Court's *Collins* Decision Forecloses Plaintiffs' Claim**

To prevail on their claim, Plaintiffs needed to prove that FHFA acted "arbitrarily or unreasonably" in determining that the Net Worth Sweep was in the public's best interests.  Final Jury Instructions at 8 (Class ECF No. 383, Berkley ECF No. 393).  But in *Collins*, the Supreme Court held—at the pleading stage, accepting as true allegations materially indistinguishable from Plaintiffs' and drawing all inferences in the plaintiffs' favor—that FHFA "reasonably" determined that the Net Worth Sweep was in the public's best interests.  594 U.S. at 239. That *Collins* decided the reasonableness issue "on the pleadings," Opp. 22, just confirms that this issue has been resolved *as a matter of law* and is not open to reconsideration by a jury.  Plaintiffs ignore everything *Collins* determined about § 4617(f) and the reasonableness of FHFA's decision, *see* Mot. 3, 24, 26, 28, and Plaintiffs' attempts to cabin or distinguish *Collins* fail.

Plaintiffs stress the Supreme Court's statement that "we conclude *only* that under the terms of the Recovery Act, the FHFA did not exceed its authority as conservator."  Opp. 20 (quoting *Collins*, 594 U.S. at 242 (emphasis by Plaintiffs)).  But *Collins* held that FHFA did not exceed its authority under the "best interests" provision *because* "the FHFA chose a path of rehabilitation that *was designed to serve public interests*."  594 U.S. at 238 (emphasis added).  In other words, "[w]hether or not [the Third Amendment] was in the best interests of the companies or their shareholders, the FHFA could have *reasonably* concluded that it was in the best interests of members of the public who rely on a stable secondary mortgage market."  *Id.* at 239 (emphasis added).  Plaintiffs ignore these essential elements of *Collins*'s holding.

Plaintiffs also ignore the Supreme Court's detailed explanation of *why* FHFA acted "reasonably."  *Id.  Collins* explained that, based on the history of circular draws preceding the Third Amendment, "there was a realistic possibility that the companies would have consumed some or all of the remaining [Treasury] capital commitment in order to pay their dividend

obligations" to Treasury, and that "[t]he third amendment eliminated this risk by replacing the fixed-rate dividend formula with a variable one" that "ensured that all of Treasury's capital was available to backstop the companies' operations during difficult quarters." *Id.* That explanation forecloses Plaintiffs' contention that FHFA's determination was arbitrary or unreasonable.

Plaintiffs' attempts to distort *Collins* only highlight its parallels to this case. Plaintiffs argue that the Net Worth Sweep was *not* in the public's best interests because, in their view, it was "foreseeable" that the Enterprises would soon "enjoy historic profits," and because FHFA should have addressed any concern about circular draws by paying dividends to Treasury "in-kind." Opp. 4, 6-8; *see* Opp. 22. But those are the *exact* arguments *Collins* rejected as a matter of law. Mot. 27-28. In the Supreme Court's view, the shareholder plaintiffs' prediction that the Enterprises would have a "financial uptick" rested on "speculative projections about future earnings," and FHFA "*reasonably* viewed [the Third Amendment] as more certain to ensure market stability" and "less risky." *Collins*, 594 U.S. at 240 (emphasis added). *Collins* also concluded that the shareholder plaintiffs' theory regarding "in kind" payment of dividends to Treasury "rest[ed] on a misunderstanding of the [PSPAs]." *Id.* Plaintiffs ignore all of this.

Plaintiffs point to "three [other] categories of evidence and associated arguments" from trial, Opp. 22, but none meaningfully differs from the allegations accepted as true but found wanting in *Collins*. *See* Compl., *Collins v. Fed. Hous. Fin. Agency*, No. 4:16-cv-03113 (S.D. Tex. Oct. 20, 2016), ECF 1. Like Plaintiffs here, the *Collins* plaintiffs alleged that FHFA's statements at the outset of the conservatorships were inconsistent with the Net Worth Sweep, *id.* ¶¶ 4-7, 55-61, that FHFA's concerns about circular draws were pretextual, *id.* ¶¶ 17-24, 89-103, and that FHFA used flawed procedures in agreeing to the Net Worth Sweep, *id.* ¶¶ 84, 138, 147. All those allegations were before the Supreme Court and necessarily accepted as true in *Collins*.

Yet *Collins* still found that FHFA acted reasonably.  The jury here was not free to disagree.

Plaintiffs repeat (Opp. 19) this Court's ruling that this case "involve[s] a different type of reasonableness analysis."  *MSJ Ruling*, 2022 WL 4745970, at *5.  The Court stated that "[a]t issue in *Collins* was whether FHFA could reasonably have determined that adopting the Third Amendment was 'in the *best interests* of the *regulated entity* or the *Agency*,'" whereas "the issue [here] is whether FHFA 'violated the reasonable *expectations* of the *parties*' by adopting the Third Amendment."  *Id.* (citations omitted, emphases by this Court).  But the "best interests" provision is incorporated into the shareholder contracts and thus, as a matter of law, is part of shareholders' reasonable expectations.  Mot. 9, 28.  Plaintiffs do not explain how FHFA could violate shareholders' expectations by *reasonably* determining, *under a provision incorporated into the shareholder contracts*, that the Net Worth Sweep was in the public interest.

*Perry II* did not, as Plaintiffs claim, "confirm[] that these are different inquiries."  Opp. 20.  For starters, *Perry II* was decided in 2017, three years *before Collins*.  And while the D.C. Circuit remanded for further proceedings, it instructed this Court, in evaluating Plaintiffs' implied covenant claim, to consider whether and how HERA's "best interests" provision affected shareholders' reasonable expectations.  *Perry II*, 864 F.3d at 631.

Plaintiffs contend that the "best interests" provision "was not the sole source of shareholders' reasonable expectations," which, they say, also were informed by FHFA statements in 2008 that the conservatorships should advance the Enterprises' interests.  Opp. 21.  But whatever shareholders thought those statements meant, shareholders could not have reasonably expected that FHFA would prioritize Enterprise interests over public interests.  As *Collins* held, HERA's "best interests" provision authorizes FHFA to "*subordinate* the best interests of the [Enterprises] to its own best interests and those of the public."  594 U.S. at 254

(emphasis added).  Thus, "the FHFA could have reasonably concluded that [the Third Amendment] was in the best interests of members of the public" "[w]hether or not [it] was in the best interests of the companies or their shareholders."  *Id.* at 239.  In light of HERA's "best interests" provision, it would have been manifestly *unreasonable* for shareholders to expect otherwise.

Finally, Plaintiffs note that *Collins* did not reach the merits of the APA claim because it held that claim barred by 12 U.S.C. § 4617(f).  Opp. 21.  That only underscores Defendants' point.  *Collins* held that FHFA's "business decisions are protected from judicial review" under § 4617(f).  594 U.S. at 254; *see* Mot. 3, 24, 26, 28.  *Collins* also held that the Third Amendment was within FHFA's authority under HERA because FHFA "reasonably" determined that it was in the public's best interests.  594 U.S. at 239.  Those holdings cannot be reconciled with a jury reviewing the Conservator's business decision to enter into the Third Amendment and finding it "unreasonable."

## C.    Plaintiffs' Claim Improperly Alleges an Anticipatory Breach

If a contracting party breaches a *present* contractual obligation, the other party generally may sue for damages immediately.  But if a party "repudiat[es]" a *future* obligation, the other party may *not* sue for damages immediately—unless the anticipatory breach doctrine applies. *Perry II*, 864 F.3d at 632.  As this Court has recognized, that doctrine does not apply if the parties' contract is "unilateral."  *Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency* ("*MTD Ruling II*"), 2018 WL 4680197, at *5-6 (D.D.C. Sept. 28, 2018).  And Plaintiffs do not dispute that the shareholder contracts here are unilateral, with Plaintiffs already having performed all their obligations.  Opp. 27, 29.  Instead, Plaintiffs argue that the Net Worth Sweep was not a repudiation of a future obligation but rather a breach of a present obligation.  That is incorrect.

As *Perry II* explains, a "repudiation" is "a voluntary affirmative act which renders the

obligor unable … to perform" in the future.  864 F.3d at 632.  Here, Plaintiffs claim that the Net

Worth Sweep violated the implied covenant by "by eliminating any possibility that shareholders

other than Treasury would receive dividends *in the future*."  Final Jury Instructions at 9 (Class

ECF No. 383, Berkley ECF No. 393) (emphasis added).  At summary judgment, this Court held

that Plaintiffs' only non-speculative "theory of harm" was "that the Third Amendment, by

eliminating any possibility of *future* dividends for non-Treasury shareholders, deprived

plaintiffs' shares of much of their value."  *MSJ Ruling*, 2022 WL 4745970, at *11 (emphasis

added).  Plaintiffs appear to acknowledge that at least "part of the Net Worth Sweep's harm was

that it eliminated the possibility of receiving dividends *in the future*."  Opp. 28 (emphasis added).

As the word "future" suggests, private shareholders have no present entitlement to

dividends.  To the contrary, since 2008 they have been *barred* from receiving dividends, for

reasons *independent* of the Third Amendment.  As this Court has explained, "even without the

Third Amendment, the GSEs would not have been able to resume paying plaintiffs dividends

without first paying down Treasury's Liquidation Preference," but "the PSPAs and Treasury

Stock Certificates prohibited the GSEs from paying down Treasury's Liquidation Preference

absent certain conditions that have never in fact occurred, and the Third Amendment did not

change that."  *MSJ Ruling*, 2022 WL 4745970, at *9; *see Perry II*, 864 F.3d at 631 (directing this

Court on remand to consider the PSPA provision "permitting the Companies to declare dividends

and make other distributions only with Treasury's consent").  Plaintiffs thus concede that, even

absent the Third Amendment, dividends to private shareholders "were not reasonably certain to

occur in the foreseeable future."  Opp. 29 (quoting *MSJ Ruling*, 2022 WL 4745970, at *11).

Having survived summary judgment solely on the theory that the Net Worth Sweep

"eliminat[ed] any possibility of future dividends," *MSJ Ruling*, 2022 WL 4745970, at *11,

Plaintiffs now assert that their claim is not about the future, but about the present.  They stress that the implied covenant imposes "a present and ongoing obligation to act in good faith."  Opp. 29.  Even so, the implied covenant is breached only when one party's conduct deprives the other of a bargained-for benefit.  As Plaintiffs acknowledge, a party breaches the implied covenant only if its conduct "frustrat[es] the fruits of the bargain that the [other] party reasonably expected."  Opp. 20 (quoting *MSJ Ruling*, 2022 WL 4745970, at *5); *see* Final Jury Instructions at 8 (Class ECF No. 383, Berkley ECF No. 393) (same).  And the *only* contractual benefit Plaintiffs have identified is the possible payment of future dividends.  Because the Net Worth Sweep has not *yet* deprived Plaintiffs of any dividends they otherwise could have received, it is not a present breach.  At most, it is an affirmative act that inhibits performance that could occur only in the future, if and when other independent impediments to dividends are removed.

Nor does it matter that, when the Net Worth Sweep was announced, Plaintiffs' shares experienced an "immediate drop in value."  Opp. 28.  Maintaining share prices is not a benefit that shareholders bargained for.  Also, Plaintiffs repeatedly argue that "[t]he drop in the stock is not itself the alleged injury."  Opp. 32 (quoting Opp., Ex. B, at 2449).  The injury, they say, is that the Net Worth Sweep "assign[ed] 100% of all *future* profits to the Treasury."  Opp. 50 (emphasis added); *see* Opp. 26, 29, 30.  Plaintiffs thus concede that the Net Worth Sweep will not deprive them of any contractual benefit until some indeterminate point in the "future."

Indeed, the Net Worth Sweep may *never* deprive Plaintiffs of any dividends.  Even without the Net Worth Sweep, private shareholders might never again have received dividends— for instance, if Treasury never consented, or if the Enterprises never paid down Treasury's liquidation preference.  Indeed, dividends remain prohibited today even though the Net Worth Sweep has been superseded by new agreements between FHFA and Treasury.  *See* Opp. 6 n.1.

Finally, Plaintiffs ignore that their position would all but eliminate the unilateral-contract limitation on anticipatory breach claims.  Mot. 34-35.  According to Plaintiffs, "it is not easy to recharacterize an anticipatory breach claim as an implied covenant claim" because "there either is *present conduct* that breaches the implied covenant or there is not."  Opp. 29.  But by definition, anticipatory breach claims *always* involve "*present conduct*."  The first requirement is that the defendant has undertaken "a voluntary affirmative act which renders the obligor unable … to perform."  *Perry II*, 864 F.3d at 632.  Recharacterizing that act as a present breach of the implied covenant, thus evading the unilateral-contract limitation, is trivially easy.

Consider *Glenn v. Fay*, 281 F. Supp. 3d 130 (D.D.C. 2017) (Lamberth, J.), where two lawyers (Fay and Perles) disavowed a contractual obligation to share a potential monetary recovery with a third lawyer (Glenn).  *Id.* at 133-34.  When Glenn sued, this Court held that the unilateral-contract limitation rendered the suit premature until the money was actually collected.  *Id.* at 140-41.  Under Plaintiffs' approach, however, the case would have come out the other way if Glenn simply recharacterized Fay and Perles's disavowal as a present breach of the implied covenant.  Or take an example from the Restatement, where, in exchange for immediate payment, a seller agrees to convey a parcel of land to a buyer in the future.  Restatement (Second) of Contracts § 253, cmt. c, illustration 4 (1981).  After the payment is made but before the deadline for conveyance to the buyer, the seller conveys the land to a third party instead.  *Id.* In that circumstance, the Restatement explains, the buyer "has no claim against [the seller] for damages … until performance is due."  *Id.*  Under Plaintiffs' approach, however, the buyer *could* sue for damages immediately—so long as the buyer characterizes the seller's conveyance of the land to a third party as a present breach of the implied covenant.  Plaintiffs' implied covenant claim is irreconcilable with the unilateral-contract limitation on anticipatory breach claims.

**D.      Plaintiffs Failed To Prove Any Amount of Harm with Reasonable Certainty**

This Court ruled at summary judgment that there was "a lingering dispute of material fact

as to whether the Third Amendment and its elimination of possible future dividends harmed

plaintiffs by depriving them of much of the value of their shares." *MSJ Ruling*, 2022 WL

4745970, at \*11.[1]  For three reasons, Plaintiffs failed at trial to prove with reasonable certainty

any amount of harm to them caused by the Third Amendment or the Net Worth Sweep.

**1.      Plaintiffs Introduced No Evidence To Show That Current
          Shareholders Are Worse Off Today Due to the Third Amendment**

Plaintiffs do not dispute that they are current shareholders seeking expectation damages

tied to the one-day August 17, 2012 share-price drop.  Mot. 37; Opp. 30.  Nor do they dispute

that expectation damages measure "the amount of money that would put [Plaintiffs] in the same

position as if" the Net Worth Sweep had not happened.  *Fairholme Funds, Inc. v. Fed. Hous.*

*Fin. Agency* ("*SJ Reconsideration Ruling*"), 2022 WL 11110548, at \*4 (D.D.C. Oct. 19, 2022)

(citation and quotation marks omitted).  But Plaintiffs undisputedly failed to introduce any

evidence about what their shares would be worth today absent the Net Worth Sweep.  Instead,

they argue that they were not "required to show what the share price would be '*today*'" because

they are only using the one-day price drop as an "estimate of [some other] harm."  Opp. 30.

This argument fails for two reasons.  First, even if the one-day price drop were just a

measure of another harm, "Plaintiffs b[ore] the burden of proving that measure of damages with

reasonable certainty."  Final Jury Instructions at 10 (Class ECF No. 383, Berkley ECF No. 393).

As current shareholders, Plaintiffs still own their shares.  Thus, the one-day drop could measure

---

[1] Plaintiffs falsely assert that this Court *held* that Dr. Attari's event study proves harm, Opp. 29,
but the Court was simply reporting *Plaintiffs'* argument.  *MSJ Ruling*, 2022 WL 4745970, at \*11
("Specifically, *plaintiffs argue* that [the event study] 'refutes the claim that [the Third
Amendment] caused no harm.'" (quoting Plaintiffs' opposition) (emphasis added)).

harm to them only if it carried forward as a reasonable estimate of the additional value Plaintiffs' shares would have *today* absent the Net Worth Sweep.  But the notion that "share price declines on a single day carry forward through time or are sustained within the share price on a later date" is "wholly speculative." *Jaroslawicz v. M&T Bank Corp.*, 2024 WL 474846, at *17-18 (D. Del. Feb. 7, 2024).  Courts thus cannot infer that "share price declines on individual days are sustained and internalized without alteration over long periods of time, given the complexity of markets and market forces acting on share prices on a continuous basis." *Id.* at *17.

Second, Plaintiffs do not identify any cognizable harm to current shareholders that the one-day share-price decline measures.  At summary judgment, this Court allowed Plaintiffs to proceed to trial only on a "theory of harm … that the Third Amendment, by eliminating any possibility of future dividends for non-Treasury shareholders, deprived Plaintiffs' shares of much of their value." *MSJ Ruling*, 2022 WL 4745970, at *11.  On reconsideration, the Court reiterated that "only one theory as to how the Net Worth Sweep harmed plaintiffs remains: that the Net Worth Sweep deprived plaintiffs' shares of much of their value by effectively extinguishing the dividend rights." *SJ Reconsideration Ruling*, 2022 WL 11110548, at *4; *see id.* (stating that the "*fact* of harm" was that Plaintiffs "ended up with less-valuable shares")*. But see* Trial I Tr. 2449-50 (Mot. Ex. F) (stating that "[th]e drop in stock prices is just a measure of damages").

Having failed to prove with reasonable certainty that they ended up with less-valuable shares, Plaintiffs now contend that the harm to current shareholders is something different— namely, the transfer of billions of dollars from the Enterprises to Treasury.  Opp. 30-31.  But Plaintiffs failed to provide evidence that, but for the Net Worth Sweep, any of those funds would have been paid to private shareholders as dividends, and this Court rejected any such argument as impermissibly speculative. *MSJ Ruling*, 2022 WL 4745970, at *9.

Plaintiffs' half-hearted invocation of Dr. Mason's testimony to support harm to current shareholders falls flat. Opp. 31. Dr. Mason's one-word "Yes" answer, in response to a single question whether the alleged harm "persists today," is the definition of "*ipse dixit*." *Id.* And his conclusory testimony was not grounded in *any* evidence, much less "all of the evidence," *id.*; indeed, the Court precluded any explanation from Dr. Mason precisely because his reports did not disclose any opinion about harm to current shareholders today, *see* Mot. 39.

> ### 2. Plaintiffs Introduced No Evidence Accounting for the Sizeable Share-Price Increases Shortly After the Third Amendment

Plaintiffs do not dispute that, after the one-day decline on August 17, 2012, share prices recovered most of their value within weeks. Mot. 39. Plaintiffs thus bore the burden to account for those price increases. *Id.* at 40-41. Yet Plaintiffs undisputedly made no attempt to do so.

Attempting to excuse this failure, Plaintiffs repeat that the share-price drop "is not itself the alleged injury but is instead just a measure of damages." Opp. 32 (quotation marks omitted). But again, Plaintiffs bore the burden to prove the amount of damages with reasonable certainty. They failed to do so because they made no attempt to account for the price recovery or to explain why one day is the proper period for measuring the Net Worth Sweep's impact on share values.

Plaintiffs assert there was "crystal clear" evidence that the price increases "had nothing to do with" the Net Worth Sweep. Opp. 32. But they identify no testimony on the cause of the increases after August 17, 2012, and there was none. Plaintiffs point to Dr. Attari's event study, but it merely lists events on a timeline without attributing those increases to particular causes. PX-375 at 3-4 (Mot. Ex. E). And while Plaintiffs assert that the Net Worth Sweep "permanently alienated shareholders from the profits of the Companies," Opp. 32-33, they never explain why, if that is so, share prices would *ever* increase while the Net Worth Sweep remained in effect.

Defendants did not "waive[] this entire argument" through stipulations that on their face

only involved limiting questioning of Dr. Mason or making particular arguments "to the jury." Opp. 33; Opp. Ex. E.  Defendants are making a legal argument to the Court, not questioning Dr. Mason or arguing anything to the jury.  Plaintiffs knew and do not dispute that, notwithstanding the stipulation, they still bore the burden to prove harm with reasonable certainty.  Mot. 37 n.6. For that reason, this is not a question of "mitigation" on which Defendants bore the burden. Opp. 33.  It is *Plaintiffs'* burden to demonstrate that the one-day share-price drop reasonably measures their harm even though share prices promptly recovered most of their value.

Defendants cited multiple cases holding that, if a plaintiff relies on a share-price drop for damages, they must account for subsequent price increases.  Mot. 40-41.  Plaintiffs' attempts to distinguish those cases are unpersuasive.  They argue that in *Ross v. Walton*, 668 F. Supp. 2d 32 (D.D.C. 2009), and *Dura Pharmaceuticals v. Broudo*, 544 U.S. 336 (2005), the share-price drop was itself the harm as opposed to a measure of another harm.  Opp. 34-35.  But as explained, that distinction does not relieve Plaintiffs of their burden to prove that a short-lived decline in the share values 12 years ago reasonably measures harm to current shareholders.  Plaintiffs also note (Opp. 34) the Second Circuit's disagreement with *Ross* in *Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34 (2d Cir. 2012).  But that disagreement concerned only whether a share-price rebound is a pleading-stage issue.  *Acticon* recognized that, at *later* stages, plaintiffs relying on a price drop must account for a subsequent price increase.  *Id.* at 41; Mot. 40 n.7.

Stepping back, Plaintiffs ignore these cases' economic rationale.  As *Acticon* explains, "[c]alculating damages based on the date [of a price drop] may substantially overestimate plaintiff's actual damages," because markets often overreact to new information.  692 F.3d at 38 (quoting PSLRA legislative history).  That is why courts "do[] not calculate damages based on a single day decline in price, but instead allow[] the security an opportunity to recover."  *Id.*

### 3.     Plaintiffs Introduced No Evidence To Account for a Potential Alternative Cause of the One-Day Decline in Share Prices

Plaintiffs do not dispute that they bore the burden to exclude legitimate alternative causes of the one-day share-price drop.  Opp. 38.  Nor do Plaintiffs dispute that, in addition to the Net Worth Sweep, the Third Amendment required the Enterprises to accelerate the reduction of their retained mortgage portfolios, thereby shrinking part of their businesses.  *Id.* at 36-38.  Plaintiffs also do not dispute that Dr. Attari's event study fails to exclude the accelerated reduction as an alternative cause of the price drop.  *Id.* at 36.  And Plaintiffs do not dispute that, as Dr. Mason admitted, the event study thus does not isolate the Net Worth Sweep's causal impact.  Mot. 43.

Instead, Plaintiffs claim that Dr. Mason's other testimony on direct examination excluded the accelerated reduction as a potential alternative cause.  Opp. 36.  But as Defendants explained, this Court held during trial that "Dr. Mason did not testify on direct about the acceleration of the reduction issue," that cross-examination "did not open the door," and that "it would be beyond the scope to try to go into that whole issue" on redirect.  Trial II Tr. 840:10-22 (Mot. Ex. A); *see* Mot. 43.  Plaintiffs never even acknowledge this Court's prior ruling, much less reconcile it with their misguided claim that Dr. Mason *did* testify about the accelerated reduction on direct.

Even if Dr. Mason *had* testified about the accelerated reduction on direct, it would not help Plaintiffs because he admitted on cross that he had no basis for any such testimony.  He conceded that the event study "does not … attempt[] to distinguish between the impact of the net worth sweep on the stock prices and any impact of the acceleration of the reduction," and that when an expert relies on an event study that "cannot distinguish between the impact of the net worth sweep and the impact of the acceleration of the reduction," he "lacks any economically sound basis for concluding that the net worth sweep had the effect that the expert claims."  Trial II Tr. at 794:12-795:8 (Mot. Ex. A).  That testimony also refutes Plaintiffs' assertion that the

19

accelerated reduction was not a "legitimate confounding factor separate from the overriding impact of the Net Worth Sweep." Opp. 38 (quotation marks omitted). Expert testimony on direct cannot prove an injury "to a reasonable degree of certainty" if an "assumption" underlying that testimony "was destroyed by" admissions elicited on cross. *Baker v. Kroger Co.*, 784 F.2d 1172, 1174-75 (4th Cir. 1986). And Dr. Mason's admission that the event study cannot isolate the Net Worth Sweep's impact on share prices is not a "*Daubert* argument" or a matter that goes only to "weight." Opp. 38-40 & n.8. The Fourth Circuit in *Baker* "reversed [a] damages award" because expert testimony did not prove damages with reasonable certainty. 784 F.2d at 1176.

Plaintiffs assert that Dr. Mason "did not rely solely on Dr. Attari's event study." Opp. 36. But Plaintiffs do not identify any other evidence that excludes the accelerated reduction as an alternative cause and isolates the Net Worth Sweep's impact on share prices—because there is none. Vague gestures at unspecified "emails" or "court documents," Trial II Tr. 753:1-5 (Opp. Ex. A), cannot prove over half a billion dollars in damages with reasonable certainty.

## III.   POST-THIRD AMENDMENT PURCHASERS LACK STANDING TO SUE

Plaintiffs do not dispute that post-Third Amendment purchasers can bring this implied covenant claim *only* if it was automatically assigned to them by the sellers—that is, if the claim "travels with the shares." Under the overwhelming majority view, it does not. Because the claim here did not travel with the shares, post-Third Amendment purchasers lack standing.

### A.   This Claim Does Not Travel With the Shares Under Virginia Law

Plaintiffs do not dispute that "the 'majority view' is that the sale of a security does not automatically assign to the transferee all of the claims associated with the security held by the transferor." Opp. 49 (emphasis omitted). Nor could they. Every federal decision interpreting UCC § 8-302 has held that it does not create an automatic assignment of claims. Mot. 47-48.

That rule makes sense: if a defendant's act caused a drop in the price of a security, the

injured party is the seller who sold at a loss, not the buyer who paid a reduced price.  Automatic

assignment would deprive the injured party of a remedy and give the uninjured purchaser a

windfall.  *See, e.g.*, *Bluebird Partners, LP v. First Fidelity Bank*, 896 F. Supp. 152, 157

(S.D.N.Y. 1995) ("The injury was sustained by the sellers who parted with these certificates at a

reduced price, not by plaintiff who purchased them ….").  That would be illogical and unfair.

Nevertheless, Plaintiffs argue that Virginia's UCC § 8-302 automatically assigned the

sellers' claim for share-price-drop damages to post-Third Amendment purchasers.  Opp. 47-48.

But Plaintiffs do not cite any Virginia case or statute supporting this view—because there is

none.  Rather, Plaintiffs ask this Court to make an *Erie* guess that Virginia's high court would

"look to Delaware for guidance."  Opp. 48.  That request contradicts the baseline *Erie* principle

that, in predicting how a state's high court would rule on an unresolved question, federal courts

"generally presume that state courts would adopt the majority view."  *Hurd v. District of*

*Columbia*, -- F. Supp. 3d --, 2023 WL 8697829, at *9 (D.D.C. Dec. 15, 2023) (cleaned up);

*accord, e.g.*, *In re 3M Combat Arms Earplug Products Liab. Litig.*, 2021 WL 4146699, at*3-4

(N.D. Fla. Apr. 2, 2021) (predicting that Alaska Supreme Court would adopt majority

interpretation of UCC).  Here, it is undisputed that the majority view is that UCC § 8-302 was

not intended to effect the assignment of causes of actions, but instead "primarily concerns issues

of title, such as defenses against enforcement of ownership rights."  *Cheatham I.R.A. v.*

*Huntington Nat'l Bank*, 137 N.E.3d 45, 52 (Ohio 2019) (citation omitted); *see* Mot. 49-50.

Plaintiffs offer nothing to suggest that Virginia's high court would reject that majority

interpretation of UCC § 8-302.  To the contrary, Virginia's UCC directs that it shall be construed

"to make uniform the law among the various jurisdictions."  Va. Code § 8.1A-103(a)(3).  To

maintain such uniformity, other state high courts have rejected similar calls to adopt an outlier

interpretation of UCC § 8-302. *Cheatham*, 137 N.E.3d at 53. That should end the matter.

Plaintiffs observe that Virginia courts occasionally look to Delaware decisions for guidance on corporate law. Opp. 48. But Plaintiffs cite no case where a Virginia court relied on a Delaware decision to adopt an outlier, minority interpretation, much less did so in the face of a statutory directive to make Virginia's law uniform with other jurisdictions. If anything, the decisions cited by Plaintiffs reflect Virginia courts' efforts to avoid adopting outlier interpretations on corporate law questions. *See, e.g.*, *Abella v. Universal Leaf Tobacco Co.*, 546 F. Supp. 2d 795, 799 (E.D. Va. 1982) (rejecting view of Virginia law that would be a "minority position") (cited at Opp. 48). That is the proper course here.

In any event, as discussed immediately below, even under Delaware's outlier interpretation of UCC § 8-302, the claim here does not travel with the shares.

## B.     This Claim Does Not Travel With the Shares Under Delaware Law

Plaintiffs do not dispute that Delaware stands alone in holding that UCC § 8-302 allows certain claims to travel with the shares. Opp. 49. Even then, Plaintiffs acknowledge that, under Delaware's interpretation of UCC § 8-302, "personal rights" do *not* travel with the shares. Opp. 44-45. Plaintiffs thus predictably cast their claims as non-personal. *Id.* That is incorrect.

To begin, under Delaware law, "[t]he personal nature of federal securities claims manifests itself in the fact that class certification generally must be obtained under Rule 23(b)(3)." *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1056 (Del. Ch. 2015). "By contrast, because Delaware corporate law claims are tied to the shares themselves, they are certified under Rules 23(b)(1) and (b)(2)." *Id.* This Court certified the classes under Rule 23(b)(3), reflecting that Plaintiffs' implied covenant claim is "personal."

Plaintiffs respond that they "never conceded that certification under F.R.C.P 23(b)(1) and/or (2) was inappropriate," Opp. 52 n.19, but that misses the point. Regardless of Plaintiffs'

position on hypothetical certification under Rule 23(b)(1) or (b)(2), the *actual* certification under Rule 23(b)(3) shows that Plaintiffs' claim is "personal." Plaintiffs also assert that this Court's certification order does not matter "because federal procedural law cannot govern a particular case in which the rule would displace a state law." Opp. 54 n.20. But there is no displacement. *Activision* is a *Delaware* case, and it relied on certification under *federal* Rule 23(b)(3) to find claims "personal" under *Delaware* law. 124 A.3d at 1056 n.22. The same logic applies here.

Plaintiffs also try to distinguish their claim from securities claims on the ground that securities claims require proof of personal "reliance." Opp. 46. But courts have rejected that very distinction between contract and securities claims as "misguided." *Bluebird Partners*, 896 F. Supp. at 156. "In rejecting automatic assignment" in securities cases, courts "were concerned with restricting the right to sue to those who actually suffered the injury," and "[r]eliance was cited merely as an indication of injury, not as the basis for the holding." *Id.* "[T]he proper inquiry for determining the transferability of claims upon sale of a security is whether the subsequent purchaser was injured by the misconduct. If so, that purchaser acquired not only the security, but also standing to pursue existing claims." *Id.* Post-Third Amendment purchasers were *not* injured by the Third Amendment, which was priced into the shares they bought.

Plaintiffs fall back to a syllogism: (1) Delaware courts have stated that "a corporate charter violation claim travels with the stock," *Urdan v. WR Cap. Partners, LLC*, 244 A.3d 668, 677 (Del. 2020*)*; (2) "Plaintiffs are claiming a corporate charter violation," Opp. 46; therefore (3) their "claim runs with the shares." *Id.* But Delaware courts have rejected such an oversimplified approach. In *I.A.T.S.E. Local No. One Pension Fund v. General Electric Co.*, "[t]he Defendants point[ed] out the *Activision* distinction generally categorizes fiduciary duty claims as non-personal, and that Plaintiff's claims are fiduciary duty claims; they argue[d] that by extension,

the rationale of *Activision* mandates a finding that the Plaintiff's claims accordingly adhered to Plaintiff's stock." 2016 WL 7100493, at *5 (Del. Ch. Dec. 6, 2016). The court disagreed, holding that a claim's substance, not its label, determines whether it is personal. *Id.* at *6.

What is more, Delaware courts have recognized that, in suits "to enforce obedience to the charter," the proper remedy is typically "a declaration of rights and an order restoring the status quo ante [rather] than an award of money damages." *In re Sunstates Corp. S'holder Litig.*, 2001 WL 432447, at *3 (Del. Ch. Apr. 18, 2001). Courts thus have explained that "the right to receive payment of a lawfully declared dividend is a separate property right of the record stockholders and, thus, is not a right 'in the security.'" *Id.* Here, Plaintiffs contend that they were deprived of possible dividends in the indefinite future, and they seek only money damages—declaratory and injunctive relief is barred. *See* 12 U.S.C. § 4617(f); *Perry II*, 864 F.3d at 604-06. The remedy Plaintiffs seek thus reinforces that they are not asserting an ordinary corporate charter claim. They are asserting a personal damages claim, which does not travel with the share.

Finally, Plaintiffs do not dispute that the record lacks "evidence as to whether the market valued Plaintiffs' claim in the price of the stock." Opp. 47. In *I.A.T.S.E.*, the defendant's fiduciary breach allegedly sent a stock value plummeting, causing the plaintiff to sell at a loss. 2016 WL 7100493 at *2. The defendant argued that the plaintiff lacked standing because his claim traveled with the share, and thus the buyer, not the seller, owned the claim. *Id.* The court disagreed, finding the claim "personal" in part because "nothing in the record indicates that the market into which the Plaintiff sold its new [stock] valued the potential breach-of-duty claim in the price of the stock." *Id.* at *6 Plaintiffs assert that "[n]o Delaware case requires such evidence to establish that a claim travels with the shares," Opp. 47, but they ignore *I.A.T.S.E.*

## C.   Standing Is a Jurisdictional Issue That Cannot Be Waived or Estopped

Straining to evade this issue altogether, Plaintiffs argue that Defendants' argument

against automatic assignment is waived and barred by judicial estoppel.  Plaintiffs are wrong.

Plaintiffs admit that "objections to 'standing' cannot be waived."  Opp. 43.  Likewise, "because standing is a jurisdictional issue, judicial estoppel cannot apply."  *United States v. All Assets Held at Bank Julius*, 480 F. Supp. 3d 1, 26 (D.D.C. 2020).  Plaintiffs' reliance on a stipulation ignores that "[n]o action of the parties can confer subject-matter jurisdiction upon a federal court."  *Id.*; *see* Opp. 40 n.9, 52-54.  Contrary to Plaintiffs' assertion (Opp. 43), whether a person received a valid assignment of a claim goes to standing.  *Beach TV Props., Inc. v. Solomon*, 2016 WL 6068806, at *17 (D.D.C. Oct. 14, 2016); *US Fax Law Ctr., Inc. v. iHire, Inc.*, 476 F.3d 1112, 1120 (10th Cir. 2007).  Decisions addressing this travels-with-the-share issue have treated it as a question of "standing."  *I.A.T.S.E.*, 2016 WL 7100493, at *4; *Bluebird Partners, LP v. First Fid. Bank, N.A. N.J.*, 85 F.3d 970, 972-74 (2d Cir. 1996); *Pac. Life Ins. Co. v. Bank of N.Y. Mellon*, 2023 WL 5128079, at *9 (S.D.N.Y. Aug. 19, 2023).

Moreover, even if a stipulation theoretically could waive or estop a defendant from challenging standing (it cannot), the stipulation here allows Defendants to do so, stating that "Defendants do not waive any defenses, objections, or arguments that otherwise could be asserted in any motion … at any other stage of this litigation" and reserving Defendants' right to "contend that some or all members of the Classes do not have any right to recovery."  Class ECF No. 133 ¶¶ 13, 15.  And Plaintiffs' contention that it would be "unfairly prejudicial to allow Defendants to challenge the classes at this late stage," Opp. 54, is belied by the record.  After years of litigation, *Plaintiffs* changed their theory of harm to the one-day share-price drop.  Since then, as Plaintiffs concede, Opp. 52-53, Defendants have steadfastly maintained that the share-price drop did not cause any injury to post-Third Amendment purchasers.

## CONCLUSION

The Court should grant judgment as a matter of law for Defendants.

Dated: July 16, 2024                    Respectfully submitted,

                                        /s/ Asim Varma
                                        Asim Varma (D.C. Bar # 426364)
                                        Jonathan L. Stern (D.C. Bar # 375713)
                                        David B. Bergman (D.C. Bar # 435392)
                                        Ian S. Hoffman (D.C. Bar # 983419)
                                        R. Stanton Jones (D.C. Bar # 987088)
                                        ARNOLD & PORTER KAYE SCHOLER LLP
                                        601 Massachusetts Ave. NW
                                        Washington, DC 20001
                                        (202) 942-5000
                                        Asim.Varma@arnoldporter.com
                                        Jonathan.Stern@arnoldporter.com
                                        David.Bergman@arnoldporter.com
                                        Ian.Hoffman@arnoldporter.com
                                        Stanton.Jones@arnoldporter.com

                                        *Attorneys for Defendant Federal Housing
                                        Finance Agency*

 /s/ Michael J. Ciatti                  /s/ Meaghan VerGow
Michael J. Ciatti (D.C. Bar # 467177)   Meaghan VerGow (D.C. Bar # 977165)
KING & SPALDING LLP                     O'MELVENY & MYERS LLP
1700 Pennsylvania Ave. N.W.             1625 Eye Street, N.W.
Washington, DC 20006                    Washington, DC 20006
Tel: (202) 661-7828                     Tel: (202) 383-5300
Fax: (202) 626-3737                     Fax: (202) 383-5414
mciatti@kslaw.com                       mvergow@omm.com

*Attorney for the Federal Home Loan     *Attorney for the Federal National Mortgage
Mortgage Corporation*                   Association*