# EXHIBIT J

**OFFERING CIRCULAR**

## 80,000,000 Shares



## 8.25% Non-Cumulative Preferred Stock, Series T

| | |
|---|---|
| **Dividend Rate:** | 8.25% per annum |
| **Dividend Payment Dates:** | Quarterly; on each March 31, June 30, September 30, and December 31, beginning June 30, 2008, subject to the declaration of dividends by the Board of Directors in its discretion |
| **Optional Redemption by Fannie Mae:** | On or after May 20, 2013 at $25 per share plus accrued dividends from the most recent dividend payment date, whether or not the dividend was declared |
| **Stated Value:** | $25 per share |
| **Liquidation Preference:** | $25 per share plus accrued dividends from the most recent dividend payment date, whether or not the dividend was declared |
| **Issue Date:** | May 19, 2008 |

The 8.25% Non-Cumulative Preferred Stock, Series T (the "Preferred Stock") will rank equally with all other currently outstanding series of our preferred stock, and dividends may only be paid on our currently outstanding preferred stock to the extent of a pro rata dividend payment on the Preferred Stock.

**The obligations related to the Preferred Stock, including any dividend payments, are solely the obligation of Fannie Mae. The Preferred Stock is not guaranteed by, and is not a debt or obligation of, the United States or of any of its agencies or instrumentalities.**

We will apply to list the Preferred Stock on the New York Stock Exchange ("NYSE") under the symbol "FNMprT." If approved for listing, we expect trading on the NYSE to commence within a 30-day period after the initial delivery of the Preferred Stock.

**An investment in the Preferred Stock involves risks for investors. Some of these risks are described in the "Risk Factors" section beginning on page 9 of this Offering Circular.**

| | Initial Public Offering Price[1] | Underwriting Discount[2] | Proceeds to Fannie Mae[1][3] |
|---|---|---|---|
| Per Share . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $25.00 | $0.7875 | $24.2125 |
| Total[4] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $2,000,000,000 | $63,000,000 | $1,937,000,000 |

(1) Plus accrued dividends, if any, from May 19, 2008.
(2) We will pay the underwriters a commission of $0.50 per share of Preferred Stock offered hereby with respect to any share sold to institutional investors, which decreases the underwriting discount and increases the proceeds to us per share of Preferred Stock sold to such institutional investors by $0.2875 and total underwriting discount and total proceeds to us by $9,871,657.50 to $53,128,342.50 and $1,946,871,657.50, respectively.
(3) Before deducting estimated expenses of $200,000 of this offering (exclusive of any underwriting discount and advisory fees).
(4) Fannie Mae has granted the Underwriters an option to purchase up to an additional 12,000,000 shares of Preferred Stock within 30 days at the initial public offering price less an underwriting discount of $0.7875 per share for purposes of covering over-allotments, if any. If all such shares are purchased, the initial public offering price, underwriting discount and proceeds to Fannie Mae will be $2,300,000,000, $62,578,342.50 and $2,237,421,657.50.

Neither the U.S. Securities and Exchange Commission ("SEC") nor any state securities commission has approved or disapproved of the Preferred Stock or determined if this Offering Circular is truthful or complete. Any representation to the contrary is a criminal offense.

The Underwriters expect to deliver the Preferred Stock in book-entry form through the facilities of The Depository Trust Company against payment in New York, New York, on or about May 19, 2008.

Joint Book-Running Managers

**Merrill Lynch & Co.**
      **Citi**
           **Morgan Stanley**
                **UBS Investment Bank**
                      **Wachovia Securities**

**DX49**
FHFA/Fannie/Freddie Litig.
Case No. 1:13cv1053,
1:13mc1288 (D.D.C.)

Junior Co-Managers

| | | |
|---|---|---|
| **Banc of America Securities LLC** | **Barclays Capital** | **Deutsche Bank Securities** |
| **FTN Financial Capital Markets** | **Goldman, Sachs & Co.** | **Wells Fargo Securities** |

The date of this Offering Circular is May 13, 2008.

This Offering Circular relates to the offer of 80,000,000 shares of 8.25% Non-Cumulative Preferred Stock, Series T of the Federal National Mortgage Association ("Fannie Mae") (or 92,000,000 shares of Preferred Stock if the Underwriters exercise their over-allotment option in full).

We are not required to register the Preferred Stock with the SEC under the Securities Act of 1933, as amended. In March 2003, we voluntarily registered our common stock with the SEC under Section 12(g) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The voluntary registration of our common stock under Section 12(g) of the Exchange Act does not affect the exempt status of the debt, equity and mortgage-backed securities that we issue.

In some jurisdictions it may be unlawful to distribute this Offering Circular or offer, sell, or deliver the Preferred Stock. Persons who distribute or receive this Offering Circular should know about and observe these restrictions.

Any dividends paid on the Preferred Stock will not be exempt from federal, state or local taxation. See "United States Taxation."

## TABLE OF CONTENTS

**Page**

Summary of the Offering ........................................................................................................... 3

Fannie Mae ................................................................................................................................. 8

Risk Factors ............................................................................................................................... 9

Use of Proceeds ....................................................................................................................... 23

Recent Offerings ...................................................................................................................... 23

Capitalization ........................................................................................................................... 24

Selected Financial Data ........................................................................................................... 25

Previous Issuances of Preferred Stock .................................................................................... 29

Description of the Preferred Stock .......................................................................................... 32

Regulatory Capital Matters ..................................................................................................... 36

Legality of Investment ............................................................................................................ 40

United States Taxation ............................................................................................................ 41

Underwriting ............................................................................................................................ 45

Ratings ..................................................................................................................................... 50

Independent Registered Public Accounting Firm ................................................................... 50

Validity of the Preferred Stock ............................................................................................... 50

Additional Information ............................................................................................................ 50

Forward-Looking Statements .................................................................................................. 51

Certificate of Designation .................................................................................................... A-1

## SUMMARY OF THE OFFERING

This summary highlights select information about the Preferred Stock. You also should refer to the more detailed information contained elsewhere in this Offering Circular and in the documents incorporated by reference for information about us and the Preferred Stock.

### Fannie Mae

Fannie Mae is a federally chartered and stockholder-owned corporation organized and existing under the Federal National Mortgage Association Charter Act. We were established in 1938 as a United States government agency to provide supplemental liquidity to the mortgage market and were transformed into a stockholder-owned and privately managed corporation by legislation enacted in 1968.

### Recent Developments

On May 6, 2008, we reported financial results for the quarter ended March 31, 2008. An overview of these results is presented below. The following information should be read in conjunction with our unaudited condensed consolidated financial statements and other financial information set forth in our Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2008, filed with the SEC on May 6, 2008 (the "2008 First Quarter 10-Q").

- **Net loss** of ($2.2 billion), or ($2.57) per diluted share, compared with a ($3.6 billion) net loss, or ($3.80) per diluted share, for the fourth quarter of 2007.  Key drivers of first quarter results were as follows:

  - Net revenues rose to $3.8 billion from $3.1 billion in the fourth quarter of 2007, as guaranty fee income increased by $131 million and net interest income increased by $554 million. The increase in net revenues reflects growth in the guaranty business, higher guaranty fees, and lower debt costs.

  - Mark-to-market fair value losses rose to ($4.4 billion) from ($3.4 billion) in the fourth quarter of 2007, primarily due to continuing adverse market conditions, including a decline in interest rates that resulted in fair value losses on derivatives, and significant widening of credit spreads that resulted in fair value losses on trading securities.

  - Credit-related expenses – the provision for credit losses plus foreclosed property expenses – rose to $3.2 billion from $3.0 billion in the fourth quarter of 2007, primarily due to an increase in charge-offs.  This reflects higher defaults and average loan loss severities, driven by national home price declines and weak economic conditions in the Midwest.

- **Combined loan loss reserves** increased to $5.2 billion as of March 31, 2008 from $3.4 billion as of December 31, 2007, as we substantially increased our loan loss reserves to reflect losses we believe will be recorded over time in charge-offs.

- **Total mortgage credit book of business** grew by 3% during the quarter to $3.0 trillion as of March 31, 2008, compared with $2.9 trillion as of December 31, 2007.

3

- **Core capital** as of March 31, 2008 was $42.7 billion compared with $45.4 billion as of December 31, 2007, exceeding the statutory minimum capital requirement by $11.3 billion, and exceeding the statutory minimum capital requirement plus the 20% Office of Federal Housing Enterprise Oversight ("OFHEO")-directed capital surplus requirement by $5.1 billion.

- **Losses on certain guaranty contracts** have been eliminated, beginning January 1, 2008 and going forward, in connection with our adoption of Statement of Financial Accounting Standards No. 157, *Fair Value Measurements* ("SFAS 157").

- **Hedge accounting.**  Beginning in April 2008, we implemented fair value hedge accounting with respect to our derivatives used to hedge, for accounting purposes, the interest rate risk related to some of our mortgage assets.

- **Estimated fair value of net assets** as of March 31, 2008 was $12.2 billion, compared with $35.8 billion as of December 31, 2007.  The decline was due primarily to the impact of market volatility and home price declines, and also pricing changes on our existing guaranty obligations in connection with our adoption of SFAS 157.

- **Shareholders' equity** was $38.8 billion as of March 31, 2008, compared with $44.0 billion as of December 31, 2007.

- **Capital plan.**  On May 6, 2008, we announced our plan to raise $6 billion in new capital through underwritten public offerings of new securities, including the offering of the Preferred Stock described in this Offering Circular, and the recent offerings of our common stock and non-cumulative mandatory convertible preferred stock.  See "Recent Offerings."

- **Dividend reduction.**  As part of our announced plan to raise capital, our Board of Directors has indicated that it intends to reduce our quarterly common stock dividend beginning with the third quarter of 2008 to $0.25 per share.

- **Regulatory developments.**  OFHEO has informed us that it has lifted the May 2006 Consent Order effective May 6, 2008, and will reduce the current OFHEO-directed capital surplus requirement from 20% to 15% upon the successful completion of our capital-raising plan.  OFHEO has also indicated its intention to reduce the capital surplus requirement by an additional 5 percentage points to a 10% surplus requirement in September 2008, based upon our continued maintenance of excess capital well above OFHEO's regulatory requirement, and no material adverse change to our ongoing regulatory compliance.

- **Ratings and outlook announcements.** On May 6, 2008, the three U.S. ratings agencies that rate us and our securities made the following announcements: (a) Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies ("S&P"), announced that they placed our preferred stock, subordinated debt and "Risk to the Government" ratings on "CreditWatch Negative"; (b) Moody's Investors Service, Inc. ("Moody's") announced that they placed a "negative outlook" on our preferred stock rating and

4

downgraded our "Bank Financial Strength" rating from "B+" to "B," with a negative outlook; and (c) Fitch Ratings ("Fitch") announced that they placed our preferred stock rating on a "rating watch negative." Each ratings agency affirmed that our other ratings, including the ratings on our senior unsecured debt, remain unchanged.

**The Offering**

| | |
|---|---|
| Issuer ................................................ | Fannie Mae |
| Securities Offered ............................ | 80,000,000 shares (92,000,000 shares if the Underwriters exercise their over-allotment option in full) of 8.25% Non-Cumulative Preferred Stock, Series T, no par value, with a stated value of $25 per share. |
| Over-allotment Option ..................................... | We have granted the Underwriters an option to purchase up to 12,000,000 shares of Preferred Stock within 30 days for purposes of covering over-allotments, if any. |

Dividends:

| | |
|---|---|
| Dividend Rate ............................................ | 8.25% per annum |
| Day Count Convention .............................. | 30/360 |
| Dividend Payment Dates ........................... | Quarterly; on each March 31, June 30, September 30, and December 31, beginning June 30, 2008, subject to the declaration of dividends by the Board of Directors in its sole discretion. |
| Calculation Agent .............................................. | Fannie Mae |
| Preferences....................................................... | The Preferred Stock will be entitled to a preference, both as to dividends and upon liquidation, over the common stock (and any other junior stock) of Fannie Mae. The Preferred Stock will rank equally, both as to dividends and upon liquidation, with all other currently outstanding series of Fannie Mae preferred stock. |
| Maturity ........................................................ | Perpetual |
| Optional Redemption ...................................... | On or after May 20, 2013, we may redeem the Preferred Stock, in whole or in part, at any time at our option at the redemption price of $25 per share plus accrued dividends from the most recent Dividend Payment Date (whether or not declared but without accumulation of any undeclared dividends for prior periods). Holders of Preferred Stock will have no right to require the redemption of the Preferred Stock. |
| Liquidation Rights ......................................... | In the event of any dissolution, liquidation or winding up of Fannie Mae, holders of the Preferred Stock will be entitled to receive, out of any assets available for distribution to preferred stockholders, $25 per share plus accrued dividends from the most recent Dividend Payment Date (whether or not declared but without accumulation of any undeclared dividends for prior periods). |

**DX49 Page 6 of 64**

| | |
|---|---|
| Voting Rights .................................................. | None, except with respect to certain changes in the terms of the Preferred Stock. |
| Preemptive and Conversion Rights.................. | None |
| Ratings ........................................................... | On May 13, 2008, the ratings on our preferred stock were "AA–" (CreditWatch Negative) by S&P, "Aa3" (Negative Outlook) by Moody's and "AA–" (Rating Watch Negative) by Fitch.  A securities rating is not a recommendation to buy, sell or hold securities and may be revised or withdrawn at any time. See "—Recent Developments—Ratings and outlook announcements" and "Ratings." |
| Use of Proceeds.............................................. | To be used for general corporate purposes, including enhancing Fannie Mae's capital position, providing additional market liquidity, and pursuing new business opportunities. |
| Transfer Agent, Dividend Disbursing Agent and Registrar ........................................................ | Computershare Trust Company, N.A. |
| NYSE Listing.................................................. | We will apply to list the Preferred Stock on the NYSE under the symbol "FNMprT." If approved for listing, we expect trading on the NYSE to commence within a thirty-day period after the initial delivery of the Preferred Stock. |
| CUSIP Number .............................................. | 313586737 |
| Recent Offerings ............................................ | We recently offered 94,300,000 shares of our common stock at a public offering price of $27.50 per share and 51,750,000 shares of 8.75% Mandatory Convertible Preferred Stock, Series 2008-1 (the "Series 2008-1 Preferred Stock") at a public offering price of $50 per share.  Both the common stock and the Series 2008-1 Preferred Stock offerings are expected to settle on May 14, 2008. |

**DX49 Page 7 of 64**

## FANNIE MAE

Fannie Mae is a federally chartered and stockholder-owned corporation organized and existing under the Federal National Mortgage Association Charter Act, 12 U.S.C. § 1716 et seq. (the "Charter Act"). See "Business—Our Charter and Regulation of Our Activities" in our Annual Report on Form 10-K for the year ended December 31, 2007, filed with the SEC on February 27, 2008 (the "2007 10-K") for further information. We were established in 1938 as a United States government agency to provide stability and liquidity to the mortgage market and were transformed into a stockholder-owned and privately managed corporation by legislation enacted in 1968.

Our business operates within the U.S. residential mortgage market. We operate an integrated business that contributes to providing liquidity to the U.S. residential mortgage market and increasing the availability and affordability of housing in the United States. See "Business" in our 2007 10-K for further information.

Our principal customers are lenders that operate within the primary mortgage market by originating mortgage loans for homebuyers and for current homeowners refinancing their existing mortgage loans. Lenders originating mortgages in the primary market often sell them in the secondary market in the form of loans or mortgage-related securities. We operate in the secondary market, where we securitize mortgage loans originated by lenders into Fannie Mae mortgage-backed securities ("Fannie Mae MBS") and other mortgage-related securities and purchase mortgage loans (often referred to as "whole loans") and mortgage-related securities for our mortgage portfolio. By selling loans and mortgage-related securities to us, lenders replenish their funds and, consequently, are able to make additional loans. Pursuant to the Charter Act, we do not lend money directly to consumers in the primary mortgage market.

Our principal office is located at 3900 Wisconsin Avenue, NW, Washington, D.C. 20016 (telephone: (202) 752-7000).

## RISK FACTORS

Prospective investors should carefully consider the risk factors set forth below as well as all other information contained or incorporated by reference in this Offering Circular before making an investment decision to purchase our Preferred Stock.

## COMPANY RISKS

*Increased delinquencies and credit losses relating to the mortgage assets that we own or that back our guaranteed Fannie Mae MBS continue to adversely affect our earnings, financial condition and capital position.*

We are exposed to credit risk relating to both the mortgage assets that we hold in our investment portfolio and the mortgage assets that back our guaranteed Fannie Mae MBS. Borrowers of mortgage loans that we own or that back our guaranteed Fannie Mae MBS may fail to make required payments of principal and interest on those loans, exposing us to the risk of credit losses.

We have experienced increased mortgage loan delinquencies and credit losses, which had a material adverse effect on our earnings, financial condition and capital position in 2007 and the first quarter of 2008. Weak economic conditions in the Midwest and home price declines on a national basis, particularly in Florida, California, Nevada and Arizona, increased our single-family serious delinquency rate and contributed to higher default rates and loan loss severities in 2007 and the first quarter of 2008. We are experiencing high serious delinquency rates and credit losses across our conventional single-family mortgage credit book of business. In addition, in 2007 and the first quarter of 2008, we experienced particularly rapid increases in serious delinquency rates and credit losses in some higher risk loan categories, such as Alt-A loans, adjustable-rate loans, interest-only loans, negative amortization loans, loans made for the purchase of condominiums and loans with second liens. Many of these higher risk loans were originated in 2006 and 2007. Refer to "Part II—Item 7—Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A")—Risk Management—Credit Risk Management—Mortgage Credit Risk Management" in our 2007 10-K for the percentage that each of these loan categories represented of our total conventional single-family mortgage credit book of business as of December 31, 2007.

We expect these trends to continue and that we will experience increased delinquencies and credit losses in 2008 as compared with 2007. The amount by which delinquencies and credit losses will increase in 2008 will depend on a variety of factors, including the extent of national and regional declines in home prices, interest rates and employment rates. In particular, we expect that the onset of a recession, either in the United States as a whole or in specific regions of the country, would significantly increase the level of our delinquencies and credit losses. Increases in our credit-related expenses would reduce our earnings and adversely affect our capital position and financial condition.  In addition, we expect that we will further increase our loan loss reserves during 2008 and that credit losses will increase in 2009 relative to 2008.

*We may experience further write-downs and losses relating to our investment securities due to volatile and illiquid market conditions, which could adversely affect our earnings, liquidity, capital position and financial condition.*

During 2007 and the first quarter of 2008, we experienced an increase in losses on trading securities and in unrealized losses on available-for-sale securities due to a significant widening of credit spreads. As market conditions continue to evolve, the fair value of these securities could decline further. The credit ratings of some of the subprime and Alt-A private-label securities held in our portfolio have been downgraded or placed under review for possible downgrade in recent months. Mortgage loan delinquencies and credit losses have also increased in recent months, particularly in the subprime and Alt-

9

A sectors. If, in the future, we determine that additional subprime and Alt-A private-label securities classified as available-for-sale and in unrealized loss positions have become other-than-temporarily impaired, or if we change our investment intent with respect to these securities and no longer expect to hold the securities until they recover their value or until maturity, we would experience further significant losses or other-than-temporary impairment relating to these securities.

The significant widening of credit spreads that has occurred since July 2007 also could further reduce the fair value of our other investment securities, particularly those securities that are less liquid and more subject to volatility, such as commercial mortgage-backed securities and mortgage revenue bonds. As a result, we also could experience further significant losses or other-than-temporary impairment on other investment securities in our mortgage portfolio or our liquid investment portfolio. See "Part I—Item 2—MD&A—Consolidated Balance Sheet Analysis—Trading and Available for Sale Investment Securities" in our 2008 First Quarter 10-Q for more detailed information on our investment securities, including our investments in private-label securities backed by subprime and Alt-A loans.

In addition, market illiquidity has increased the amount of management judgment required to value certain of our securities. Subsequent valuations, in light of factors then prevailing, may result in significant changes in the value of our investment securities in the future. If we decide to sell any of these securities, the price we ultimately realize will depend on the demand and liquidity in the market at that time and may be materially lower than their current fair value. Any of these factors could require us to take further write-downs in the value of our investment portfolio, which would have an adverse effect on our earnings, liquidity, capital position and financial condition in the future.

***Continued declines in our earnings would have a negative effect on our regulatory capital position.***

We are required to meet various capital standards, including a requirement that our core capital equal or exceed both our statutory minimum capital requirement and a higher OFHEO-directed minimum capital requirement. Our retained earnings are a component of our core capital. Accordingly, the level of our core capital can fluctuate significantly depending on our financial results. We recorded a net loss of $2.1 billion in 2007 and $2.2 billion for the first quarter of 2008. We expect some or all of the market conditions that contributed to this loss to continue and therefore to continue to adversely affect our earnings and, as a result, the amount of our core capital. In order to continue to meet our statutory and OFHEO-directed minimum capital requirements, we may be required to take actions, or refrain from taking actions, to ensure that we maintain or increase our core capital. These actions have included, and in the future may include, reducing the size of our investment portfolio through liquidations or by selling assets at a time when we believe that it would be economically advantageous to continue to hold the assets, limiting or forgoing attractive opportunities to acquire or securitize assets, reducing or eliminating our common stock dividend, and issuing additional preferred equity securities, which in general is a more expensive method of funding our operations than issuing debt securities. We may issue convertible preferred securities or shares of common stock in the future to maintain or increase our core capital, which we expect would dilute the investment in the company of the existing holders of our common stock.  These actions also may reduce our future earnings.

***We depend on our institutional counterparties to provide services that are critical to our business. If one or more of our institutional counterparties defaults on its obligations to us or becomes insolvent, it could materially adversely affect our earnings, liquidity, capital position and financial condition.***

We face the risk that one or more of our institutional counterparties may fail to fulfill their contractual obligations to us. Our primary exposures to institutional counterparty risk are with: mortgage servicers that service the loans we hold in our investment portfolio or that back our Fannie Mae MBS; third-party providers of credit enhancement on the mortgage assets that we hold in our investment portfolio or that back our Fannie Mae MBS, including mortgage insurers, lenders with risk sharing arrangements, and financial guarantors; custodial depository institutions that hold principal and interest

payments for Fannie Mae MBS certificateholders; issuers of securities held in our liquid investment portfolio; and derivatives counterparties. Refer to "Part II—Item 7—MD&A—Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management" in our 2007 10-K and Part I— Item 2—MD&A—Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management" in our 2008 First Quarter 10-Q for a detailed description of the risk posed by each of these types of counterparties.

The challenging mortgage and credit market conditions have adversely affected, and will likely continue to adversely affect, the liquidity and financial condition of a number of our institutional counterparties, particularly those whose businesses are concentrated in the mortgage industry. One or more of these institutions may default in its obligations to us for a number of reasons, such as changes in financial condition that affect their credit ratings, a reduction in liquidity, operational failures or insolvency. Several of our institutional counterparties have experienced ratings downgrades and liquidity constraints, including Countrywide Financial Corporation and its affiliates, which is our largest lender customer and mortgage servicer. A number of our key institutional counterparties may become subject to serious liquidity problems that, either temporarily or permanently, negatively affect the viability of their business plans or reduce their access to funding sources. The financial difficulties that a number of our institutional counterparties are currently experiencing may negatively affect the ability of these counterparties to meet their obligations to us and the amount or quality of the products or services they provide to us. A default by a counterparty with significant obligations to us could result in significant financial losses to us and could materially adversely affect our ability to conduct our operations, which would adversely affect our earnings, liquidity, capital position and financial condition.

***We depend on our mortgage insurer counterparties to provide services that are critical to our business. If one or more of these counterparties defaults on its obligations to us or becomes insolvent, it could materially adversely affect our earnings, liquidity, financial condition and capital position.***

Recent increases in mortgage insurance claims due to higher credit losses in recent periods have adversely affected the financial results and condition of many mortgage insurers. The weakened financial condition of many of our mortgage insurer counterparties creates an increased risk that these counterparties will fail to fulfill their obligations to reimburse us for claims under insurance policies. If the financial condition of one or more of these mortgage insurer counterparties deteriorates further, it could result in a material increase in our loss reserves and the fair value of our guaranty obligations if we determine it is probable that we would not collect all of our claims from the affected mortgage insurer, which could adversely affect our earnings, liquidity, financial condition and capital position. In addition, if a mortgage insurer implements a run-off plan in which the insurer no longer enters into new business, the quality and speed of their claims processing could deteriorate.

If one or more of our primary mortgage insurer counterparties were to become insolvent or no longer enter into new business, or if we were no longer willing to conduct business with one or more of these counterparties, it is likely we would further increase our concentration risk with the remaining mortgage insurers in the industry. In addition, we are generally required pursuant to our charter to obtain credit enhancement on conventional single-family mortgage loans that we purchase or securitize with loan-to-value ratios over 80% at the time of purchase. Accordingly, if we are no longer able or willing to conduct business with some of our primary mortgage insurer counterparties and we do not find suitable alternative methods of obtaining credit enhancement for these loans, we may be restricted in our ability to purchase loans with high loan-to-value ratios. This restriction could negatively impact our competitive position and our earnings.

***Our business with many of our institutional counterparties is heavily concentrated, which increases the risk that we could experience significant losses if one or more of our institutional counterparties defaults in its obligations to us or becomes insolvent.***

Our business with our lender customers, mortgage servicers, mortgage insurers, financial guarantors, custodial depository institutions and derivatives counterparties is heavily concentrated. Moreover, many of our counterparties provide several types of services to us. For example, many of our lender customers or their affiliates also act as mortgage servicers, custodial depository institutions and document custodians for us. Accordingly, if one of these counterparties were to become insolvent or otherwise default on its obligations to us, it could harm our business and financial results in a variety of ways. A default by any counterparty with significant obligations to us could adversely affect our ability to conduct our operations efficiently and at cost-effective rates, which in turn could materially adversely affect our earnings, liquidity, capital position and financial condition. Refer to "Part II—Item 7— MD&A—Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management" in our 2007 10-K and "Part I—Item 2—MD&A—Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management" in our 2008 First Quarter 10-Q for a detailed description of our business concentrations with each type of counterparty.

***We have several key lender customers, and the loss of business volume from any one of these customers could adversely affect our business and result in a decrease in our market share and earnings.***

Our ability to generate revenue from the purchase and securitization of mortgage loans depends on our ability to acquire a steady flow of mortgage loans from the originators of those loans. We acquire a significant portion of our mortgage loans from several large mortgage lenders. During 2007, our top five lender customers accounted for approximately 56% of our single-family business volume. Accordingly, maintaining our current business relationships and business volumes with our top lender customers is critical to our business. Some of our lender customers are experiencing, or may experience in the future, liquidity problems that would affect the volume of business they are able to generate. If any of our key lender customers significantly reduces the volume or quality of mortgage loans that the lender delivers to us or that we are willing to buy from them, we could lose significant business volume that we might be unable to replace, which could adversely affect our business and result in a decrease in our market share and earnings. In addition, a significant reduction in the volume of mortgage loans that we securitize could reduce the liquidity of Fannie Mae MBS, which in turn could have an adverse effect on their market value.

Our largest lender customer, Countrywide Financial Corporation and its affiliates, accounted for approximately 28% of our single-family business volume during 2007. In January 2008, Bank of America Corporation announced that it had reached an agreement to purchase Countrywide Financial Corporation. Together, Bank of America and Countrywide accounted for approximately 32% of our single-family business volume in 2007. We cannot predict at this time whether or when this merger will be completed and what effect the merger, if completed, will have on our relationship with Countrywide and Bank of America. Following the merger, we could lose significant business volume that we might be unable to replace, which could adversely affect our business and result in a decrease in our earnings and market share.

***Changes in option-adjusted spreads or interest rates, or our inability to manage interest rate risk successfully, could have a material adverse effect on our earnings, liquidity, capital position and financial condition.***

We fund our operations primarily through the issuance of debt and invest our funds primarily in mortgage-related assets that permit the mortgage borrowers to prepay the mortgages at any time. These business activities expose us to market risk, which is the risk of loss from adverse changes in market conditions. Our most significant market risks are interest rate risk and option-adjusted spread risk. Changes in interest rates affect both the value of our mortgage assets and prepayment rates on our mortgage loans.

Option-adjusted spread risk is the risk that the option-adjusted spreads on our mortgage assets relative to those on our funding and hedging instruments (referred to as the "OAS of our net mortgage assets") may increase or decrease. These increases or decreases may be a result of market supply and demand dynamics. A widening, or increase, of the OAS of our net mortgage assets typically causes a decline in the fair value of the company and a decrease in our earnings and capital. A narrowing, or decrease, of the OAS of our net mortgage assets reduces our opportunities to acquire mortgage assets and therefore could have a material adverse effect on our future earnings and financial condition. We do not attempt to actively manage or hedge the impact of changes in the OAS of our net mortgage assets after we purchase mortgage assets, other than through asset monitoring and disposition.

Changes in interest rates could have a material adverse effect on our earnings, liquidity, capital position and financial condition. Our ability to manage interest rate risk depends on our ability to issue debt instruments with a range of maturities and other features at attractive rates and to engage in derivative transactions. We must exercise judgment in selecting the amount, type and mix of debt and derivative instruments that will most effectively manage our interest rate risk. The amount, type and mix of financial instruments we select may not offset possible future changes in the spread between our borrowing costs and the interest we earn on our mortgage assets.

***We rely on internal models to manage risk and to make business decisions. Our business could be adversely affected if those models fail to produce reliable results.***

We make significant use of business and financial models to measure and monitor our risk exposures. The information provided by these models is also used in making business decisions relating to strategies, initiatives, transactions and products. Models are inherently imperfect predictors of actual results because they are based on data available to us and our assumptions about factors such as future loan demand, prepayment speeds, default rates, severity rates and other factors that may overstate or understate future experience. When market conditions change rapidly and dramatically, as they have since July 2007, the assumptions that we use for our models may not keep pace with changing conditions. Incorrect data or assumptions in our models are likely to produce unreliable results. If our models fail to produce reliable results, we may not make appropriate risk management or business decisions, which could adversely affect our earnings, liquidity, capital position and financial condition.

***In many cases, our accounting policies and methods, which are fundamental to how we report our financial condition and results of operations, require management to make judgments and estimates about matters that are inherently uncertain. Management also may rely on the use of models in making estimates about these matters.***

Our accounting policies and methods are fundamental to how we record and report our financial condition and results of operations. Our management must exercise judgment in applying many of these accounting policies and methods so that these policies and methods comply with U.S. Generally Accepted Accounting Principles ("GAAP") and reflect management's judgment of the most appropriate manner to report our financial condition and results of operations. In some cases, management must select the

appropriate accounting policy or method from two or more alternatives, any of which might be reasonable under the circumstances but might affect the amounts of assets, liabilities, revenues and expenses that we report. See "Notes to Consolidated Financial Statements—Note 1, Summary of Significant Accounting Policies" in our 2007 10-K and "Notes to Unaudited Condensed Consolidated Financial Statements" in our 2008 First Quarter 10-Q for a description of our significant accounting policies.

We have identified four accounting policies as critical to the presentation of our financial condition and results of operations. These accounting policies are described in "Part II—Item 7—MD&A—Critical Accounting Policies and Estimates" in our 2007 10-K and "Part I—Item 2—MD&A—Critical Accounting Policies and Estimates" in our 2008 First Quarter 10-Q. We believe these policies are critical because they require management to make particularly subjective or complex judgments about matters that are inherently uncertain and because of the likelihood that materially different amounts would be reported under different conditions or using different assumptions. Due to the complexity of these critical accounting policies, our accounting methods relating to these policies involve substantial use of models. Models are inherently imperfect predictors of actual results because they are based on assumptions, including assumptions about future events. Our models may not include assumptions that reflect very positive or very negative market conditions and, accordingly, our actual results could differ significantly from those generated by our models. As a result, the estimates that we use to prepare our financial statements, as well as our estimates of our future results of operations, may be inaccurate, potentially significantly.

***Our ability to operate our business, meet our obligations and generate net interest income depends primarily on our ability to issue substantial amounts of debt frequently and at attractive rates.***

The issuance of short-term and long-term debt securities in the domestic and international capital markets is our primary source of funding for our purchases of assets for our mortgage portfolio and for repaying or refinancing our existing debt. Moreover, a primary source of our revenue is the net interest income we earn from the difference, or spread, between the return that we receive on our mortgage assets and our borrowing costs. Our ability to obtain funds through the issuance of debt, and the cost at which we are able to obtain these funds, depends on many factors, including:

- our corporate and regulatory structure, including our status as a government-sponsored enterprise ("GSE");

- legislative or regulatory actions relating to our business, including any actions that would affect our GSE status or add additional requirements that would restrict or reduce our ability to issue debt;

- our credit ratings, including rating agency actions relating to our credit ratings;

- our financial results and changes in our financial condition;

- significant events relating to our business or industry;

- the public's perception of the risks to and financial prospects of our business or industry;

- the preferences of debt investors;

- the breadth of our investor base;

- prevailing conditions in the capital markets;

- foreign exchange rates;

- interest rate fluctuations;

- the rate of inflation;

- competition from other issuers of AAA-rated agency debt;

- general economic conditions in the U.S. and abroad; and

- broader trade and political considerations among the U.S. and other countries.

If we are unable to issue debt securities at attractive rates in amounts sufficient to operate our business and meet our obligations, it would have a material adverse effect on our liquidity, earnings and financial condition.

***A decrease in our current credit ratings would have an adverse effect on our ability to issue debt on acceptable terms, which would reduce our earnings and materially adversely affect our ability to conduct our normal business operations and our liquidity and financial condition.***

Our borrowing costs and our broad access to the debt capital markets depend in large part on our high credit ratings, particularly on our senior unsecured debt. Our ratings are subject to revision or withdrawal at any time by the rating agencies. Any reduction in our credit ratings could increase our borrowing costs, limit our access to the capital markets and trigger additional collateral requirements under our derivatives contracts and other borrowing arrangements. A substantial reduction in our credit ratings would reduce our earnings and materially adversely affect our liquidity, our ability to conduct our normal business operations and our financial condition. Our credit ratings and ratings outlook is included in "Part I—Item 2—MD&A—Liquidity and Capital Management—Liquidity—Credit Ratings and Risk Ratings" in our 2008 First Quarter 10-Q.

***Our business is subject to laws and regulations that restrict our activities and operations, which may adversely affect our earnings, liquidity and financial condition.***

As a federally chartered corporation, we are subject to the limitations imposed by the Charter Act, extensive regulation, supervision and examination by OFHEO and the U.S. Department of Housing and Urban Development ("HUD"), and regulation by other federal agencies, including the Department of the Treasury and the SEC. We are also subject to many laws and regulations that affect our business, including those regarding taxation and privacy. In addition, the policy, approach or regulatory philosophy of these agencies can materially affect our business.

*Regulation by OFHEO could adversely affect our earnings and financial condition.* OFHEO has broad authority to regulate our operations and management in order to ensure our financial safety and soundness. For example, OFHEO has directed that we maintain a capital surplus over our statutory minimum capital requirement. See "Regulatory Capital Matters" for a discussion of our current capital surplus requirement and expected changes to our capital surplus requirement. The capital surplus requirement limits the amount of mortgage assets that we are able to purchase and securitize, which limits our ability to grow our mortgage credit book of business, and, as a result, could negatively impact our earnings. Similarly, any new or additional regulations that OFHEO may adopt in the future could adversely affect our future earnings and financial condition. If we fail to comply with any of our agreements with OFHEO or with any OFHEO regulation, including those relating to our capital requirements, we may incur penalties and could be subject to further restrictions on our activities and operations, or to investigation and enforcement actions by OFHEO.

*Regulation by HUD and Charter Act limitations could adversely affect our market share, earnings and financial condition.* HUD supervises our compliance with the Charter Act, which defines

15

our permissible business activities. For example, we may not purchase single-family loans in excess of the conforming loan limits. In addition, under the Charter Act, our business is limited to the U.S. housing finance sector. As a result of these limitations on our ability to diversify our operations, our financial condition and earnings depend almost entirely on conditions in a single sector of the U.S. economy, specifically, the U.S. housing market. Our substantial reliance on conditions in the U.S. housing market may adversely affect the investment returns we are able to generate. In addition, the Secretary of HUD must approve any new Fannie Mae conventional mortgage program that is significantly different from those that we engaged in or that had been approved prior to the enactment of the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 (the "1992 Act"). As a result, our ability to respond quickly to changes in market conditions by offering new programs designed to respond to these changes is subject to HUD's prior approval process. These restrictions on our business operations may negatively affect our ability to compete successfully with other companies in the mortgage industry from time to time, which in turn may reduce our market share, our earnings and our financial condition.

HUD has established housing goals and subgoals for our business. HUD's housing goals require that a specified portion of our mortgage purchases during each calendar year relate to the purchase or securitization of mortgage loans that finance housing for low- and moderate-income households, housing in underserved areas and qualified housing under the definition of special affordable housing. Most of these goals and subgoals have increased in 2008 over 2007 levels. These increases in goal levels and recent housing and mortgage market conditions, particularly the significant changes in the housing market that began in the third quarter of 2007, have made it increasingly challenging to meet our housing goals and subgoals. If we do not meet any housing goal or enforceable subgoal, we may become subject to increased HUD oversight for the following year or be subject to civil money penalties.

In addition, our efforts to meet the housing goals and subgoals established by HUD have reduced our profitability. In order to obtain business that contributes to our housing goals and subgoals, we made significant adjustments to our mortgage loan acquisition strategies during the past several years. These strategies included entering into some purchase and securitization transactions with lower expected economic returns than our typical transactions. We also relaxed some of our eligibility criteria to obtain goals-qualifying mortgage loans and increased our investments in higher risk mortgage loan products that were more likely to serve the borrowers targeted by HUD's goals and subgoals. These efforts to meet our housing goals and subgoals often result in our acquisition of higher risk loans, and we typically incur proportionately more credit losses on these loans than on other types of loans. Accordingly, these efforts contributed to our higher credit losses in 2007 and may lead to further increases in our credit losses.

*Regulation by the Department of the Treasury could adversely affect our liquidity, earnings and financial condition.* We are subject to regulation by the Department of the Treasury. In June 2006, the Department of the Treasury announced that it would undertake a review of its process for approving our issuances of debt, which could adversely impact our flexibility in issuing debt securities in the future, including our ability to issue securities that are responsive to the marketplace. Because our ability to operate our business, meet our obligations and generate net interest income depends primarily on our ability to issue substantial amounts of debt frequently, any limitations on our ability to issue debt could adversely affect our liquidity, earnings and financial condition. We cannot predict whether the outcome of this review will materially impact our current business activities.

**Legislation that would change the regulation of our business could, if enacted, reduce our competitiveness and adversely affect our liquidity, earnings and financial condition.**

The U.S. Congress continues to consider legislation that, if enacted, could materially restrict our operations and adversely affect our liquidity, earnings and financial condition. In May 2007, the House of Representatives approved a bill, H.R. 1427, that would establish a new, independent regulator for us and the other housing GSEs, with broad authority over both safety and soundness and mission. The House

passed a substantially similar version of the bill a second time on May 8, 2008, as part of a larger package of housing measures.  The bill, if enacted into law, would:

- authorize the regulator to establish standards for measuring the composition and growth of our mortgage investment portfolio;

- authorize the regulator to increase the level of our required capital, to the extent needed to ensure safety and soundness;

- require prior regulatory approval and a 30-day public notice and comment period for all new products;

- restructure the housing goals and change the method for enforcing compliance;

- authorize, and in some instances require, the appointment of a receiver if we become critically undercapitalized; and

- require us and Freddie Mac to contribute a percentage of our book of business—the sponsor of the bill has estimated a total contribution by us and Freddie Mac combined of $500 million to $600 million per year—to a fund to support affordable housing.

In addition, in October 2007, the House passed H.R. 2895, a bill to establish a National Affordable Housing Trust Fund to support housing that is affordable to low-income families. This Trust Fund would consist in part of amounts provided by us and Freddie Mac under the affordable housing fund provisions of H.R. 1427. H.R. 2895 does not seek to impose any new obligations on us that do not already exist under H.R. 1427 and is dependent upon passage of H.R. 1427 for funding.

As of May 13, 2008, the only comprehensive GSE reform bill that has been introduced in the Senate is S. 1100. This bill is substantially similar to a bill that was approved by the Senate Committee on Banking, Housing, and Urban Affairs in July 2005, and differs from H.R. 1427 in a number of respects. Another GSE reform bill is expected to be introduced in the Senate in May 2008. We cannot predict the content of any Senate bill that may be introduced or its prospects for Committee approval or passage by the full Senate.

In addition, S. 2391, the "GSE Mission Improvement Act," has been introduced in the Senate. This bill would establish an affordable housing program funded by us and Freddie Mac. The sponsor of the bill has estimated our combined payment under the bill to be $500 million to $900 million per year. The bill would also modify our affordable housing goals and create a new statutory duty to serve specified underserved markets.

Enactment of legislation similar to these bills could significantly increase the costs of our compliance with regulatory requirements and limit our ability to compete effectively in the market, resulting in a material adverse effect on our liquidity, earnings and financial condition. We cannot predict the prospects for the enactment, timing or content of any congressional legislation, or the impact that any enacted legislation could have on our liquidity, earnings or financial condition.

***We must evaluate our ability to realize the tax benefits associated with our deferred tax assets quarterly. In the future, we may be required to record a material expense to establish a valuation allowance against our deferred tax assets, which likely would materially adversely affect our earnings, financial condition and capital position.***

As of March 31, 2008, we had approximately $17.8 billion in net deferred tax assets on our consolidated balance sheet that we must evaluate for realization on a quarterly basis under Statement of

Financial Accounting Standards No. 109, *Accounting for Income Taxes*. Deferred tax assets refer to assets on our consolidated balance sheets that relate to amounts that may be used to reduce any subsequent period's income tax expense. Consequently, our ability to use these deferred tax assets in future periods depends on our ability to generate sufficient taxable income in the future.

If, in a future period, negative evidence regarding our ability to realize our deferred tax assets (such as a reduction in our projected future taxable income) outweighed positive evidence, we could be required to record a material expense to establish a valuation allowance against our deferred tax assets at that time. Recording a material expense of this type would likely have a material adverse effect on our earnings, financial condition and capital position. Refer to "Notes to Consolidated Financial Statements—Note 11, Income Taxes" in our 2007 10-K and "Notes to Unaudited Condensed Consolidated Financial Statements—Note 10, Income Taxes" and "Item 2—MD&A—Critical Accounting Policies and Estimates—Deferred Tax Assets Valuation Allowance" in our 2008 First Quarter 10-Q for a description of our deferred tax assets.

### Our business faces significant operational risks and an operational failure could materially adversely affect our business and our operations.

Shortcomings or failures in our internal processes, people or systems could have a material adverse effect on our risk management, liquidity, financial condition and results of operations; disrupt our business; and result in legislative or regulatory intervention, damage to our reputation and liability to customers. For example, our business is dependent on our ability to manage and process, on a daily basis, a large number of transactions across numerous and diverse markets. These transactions are subject to various legal and regulatory standards. We rely on the ability of our employees and our internal financial, accounting, cash management, data processing and other operating systems, as well as technological systems operated by third parties, to process these transactions and to manage our business. Due to events that are wholly or partially beyond our control, these employees or third parties could engage in improper or unauthorized actions, or these systems could fail to operate properly, which could lead to financial losses, business disruptions, legal and regulatory sanctions, and reputational damage.

### Mortgage fraud could result in significant financial losses and harm to our reputation.

Because we use a process of delegated underwriting in which lenders make specific representations and warranties about the characteristics of the single-family mortgage loans we purchase and securitize, we do not independently verify most borrower information that is provided to us. This exposes us to the risk that one or more of the parties involved in a transaction (the borrower, seller, broker, appraiser, title agent, lender or servicer) will engage in fraud by misrepresenting facts about a mortgage loan. We may experience significant financial losses and reputational damage as a result of mortgage fraud.

### We maintain a large volume of private borrower information. If this information is inadvertently exposed, it could result in significant financial losses, legal and regulatory sanctions, and harm to our reputation.

Our operations rely on the secure processing, storage and transmission of a large volume of private borrower information, such as names, residential addresses, social security numbers, credit rating data and other consumer financial information. Despite the protective measures we take to reduce the likelihood of information breaches, this information could be exposed in several ways, including through unauthorized access to our computer systems, employee error, computer viruses that attack our computer systems, software or networks, accidental delivery of information to an unauthorized party and loss of unencrypted media containing this information. Any of these events could result in significant financial losses, legal and regulatory sanctions, and reputational damage.

*Future material weaknesses in our internal control over financial reporting could result in errors in our reported results and could have a material adverse effect on our operations, investor confidence in our business and the trading prices of our securities.*

During 2007, we remediated eight material weaknesses in our internal control over financial reporting that existed as of December 31, 2006, as described in "Part II—Item 9A—Controls and Procedures" in our 2007 10-K and in our quarterly report on Form 10-Q for the quarter ended September 30, 2007. In order to remediate these material weaknesses, we implemented many new processes and reporting procedures in 2007. We may not effectively maintain these new controls. Remediated material weaknesses could recur, or we could identify new material weaknesses or significant deficiencies in our internal control over financial reporting that we have not identified to date. Any material weaknesses in our internal control over financial reporting could result in errors in our reported results and have a material adverse effect on our operations, investor confidence in our business and the trading prices of our securities.

*Competition in the mortgage and financial services industries may adversely affect our earnings and financial condition.*

We compete to acquire mortgage assets for our mortgage portfolio or to securitize mortgage assets into Fannie Mae MBS based on a number of factors, including our speed and reliability in closing transactions, our products and services, the liquidity of Fannie Mae MBS, our reputation and our pricing. We face competition in the secondary mortgage market from other GSEs and from the Federal Housing Administration (the "FHA"), from commercial banks, savings and loan institutions, securities dealers, investment funds, insurance companies and other financial institutions. In addition, increased consolidation within the financial services industry has created larger financial institutions, increasing pricing pressure. This competition may adversely affect our earnings and financial condition.

*If we are unable to develop, enhance and implement strategies to adapt to changing conditions in the mortgage industry and capital markets, our earnings and financial condition may be adversely affected.*

The manner in which we compete and the products for which we compete are affected by changing conditions in the mortgage industry and capital markets. If we do not effectively respond to these changes, or if our strategies to respond to these changes are not as successful as our prior business strategies, our earnings and financial condition could be adversely affected. Additionally, we may not be able to execute any new or enhanced strategies that we adopt to address changing conditions and, even if fully implemented, these strategies may not increase our earnings due to factors beyond our control.

*We are subject to pending civil litigation that, if decided against us, could require us to pay substantial judgments, settlements or other penalties.*

We are a party to several lawsuits that, if decided against us, could require us to pay substantial judgments, settlements or other penalties, including: a consolidated shareholder class action lawsuit relating to our accounting restatement; a proposed consolidated class action lawsuit alleging violations of the Employee Retirement Income Security Act of 1974; a proposed class action lawsuit alleging violations of federal and state antitrust laws and state consumer protection laws in connection with the setting of our guaranty fees; and a proposed class action lawsuit alleging that we violated purported fiduciary duties with respect to certain escrow accounts for FHA-insured multifamily mortgage loans. We are unable at this time to estimate our potential liability in these matters, but may be required to pay substantial judgments, settlements or other penalties and incur significant expenses in connection with these lawsuits, which could have a material adverse effect on our earnings, liquidity and financial condition. More information regarding these lawsuits is included in "Part I—Item 3—Legal Proceedings" and "Notes to Consolidated Financial Statements—Note 20, Commitments and Contingencies" in our

2007 10-K and "Part II—Item 1—Legal Proceedings" and "Notes to Unaudited Condensed Consolidated Financial Statements—Note 17, Commitments and Contingencies" in our 2008 First Quarter 10-Q.

## RISKS RELATING TO OUR INDUSTRY

***A continuing, or broader, decline in U.S. home prices or in activity in the U.S. housing market could negatively impact our earnings, capital position and financial condition.***

The continued deterioration of the U.S. housing market and national decline in home prices in 2007 and the first quarter of 2008, along with the expected continued decline throughout the remainder of 2008, are likely to result in increased delinquencies or defaults on the mortgage assets we own and that back our guaranteed Fannie Mae MBS. Further, the features of a significant portion of mortgage loans made in recent years, including loans with adjustable interest rates that may reset to higher payments either once or throughout their term, and loans that were made based on limited or no credit or income documentation, also increase the likelihood of future increases in delinquencies or defaults on mortgage loans. An increase in delinquencies or defaults will result in a higher level of credit losses and credit-related expenses, which in turn will reduce our earnings and adversely affect our capital position. Higher credit losses and credit-related expenses also could adversely affect our financial condition.

Our business volume is affected by the rate of growth in total U.S. residential mortgage debt outstanding and the size of the U.S. residential mortgage market. Recently, the rate of growth in total U.S. residential mortgage debt outstanding has slowed sharply in response to the reduced activity in the housing market and national declines in home prices. A decline in the rate of growth in mortgage debt outstanding reduces the number of mortgage loans available for us to purchase or securitize, which in turn could lead to a reduction in our net interest income and guaranty fee income. If we do not continue to increase our share of the secondary mortgage market, this decline in mortgage originations could adversely affect our earnings and financial condition.

***Changes in general market and economic conditions in the United States and abroad may adversely affect our earnings and financial condition.***

Our earnings and financial condition may be adversely affected by changes in general market and economic conditions in the United States and abroad. These conditions include short-term and long-term interest rates, the value of the U.S. dollar compared with the value of foreign currencies, the rate of inflation, fluctuations in both the debt and equity capital markets, employment growth and unemployment rates, and the strength of the U.S. national economy and local economies in the United States and economies of other countries with investors that hold our debt. These conditions are beyond our control and may change suddenly and dramatically.

Changes in market and economic conditions could adversely affect us in many ways, including the following:

- fluctuations in the global debt and equity capital markets, including sudden and unexpected changes in short-term or long-term interest rates, could decrease the fair value of our mortgage assets, derivatives positions and other investments, negatively affect our ability to issue debt at attractive rates, and reduce our net interest income; and

- a recession or other economic downturn, or rising unemployment, in the United States, either as a whole or in specific regions of the country, could decrease homeowner demand for mortgage loans and increase the number of homeowners who become delinquent or default on their mortgage loans. An increase in delinquencies or defaults would likely result in a higher level of credit losses and credit-related expenses, which would reduce our earnings. Also, decreased homeowner demand for mortgage loans could reduce our

guaranty fee income, net interest income and the fair value of our mortgage assets. A recession or other economic downturn could also increase the risk that our counterparties will default on their obligations to us or become insolvent, resulting in a reduction in our earnings and thereby adversely affecting our capital position and financial condition.

***Our business is subject to uncertainty as a result of the current disruption in the housing and mortgage markets.***

We expect the current disruption in the housing and mortgage markets to continue and worsen in 2008. The disruption has adversely affected the U.S. economy in general and the housing and mortgage markets in particular and likely will continue to do so. In addition, a variety of legislative, regulatory and other proposals have been or may be introduced in an effort to address the disruption. Depending on the scope and nature of legislative, regulatory or other initiatives, if any, that are adopted to respond to this disruption, our earnings, liquidity, capital position and financial condition could be adversely affected.

***Defaults by a large financial institution could adversely affect our business and financial markets generally.***

We routinely enter into a high volume of transactions with counterparties in the financial services industry. The financial soundness of many financial institutions may be closely interrelated as a result of credit, trading or other relationships between the institutions. As a result, concerns about, or a default or threatened default by, one institution could lead to significant market-wide liquidity problems, losses or defaults by other institutions. This may adversely affect financial intermediaries, such as clearing agencies, clearing houses, banks, securities firms and exchanges, with which we interact on a daily basis, and therefore could adversely affect our business.

***The occurrence of a major natural or other disaster in the United States could increase our delinquency rates and credit losses or disrupt our business operations and lead to financial losses.***

The occurrence of a major natural disaster, terrorist attack or health epidemic in the United States could increase our delinquency rates and credit losses in the affected region or regions, which could have a material adverse effect on our earnings, liquidity and financial condition. For example, we experienced an increase in our delinquency rates and credit losses in 2005 as a result of Hurricane Katrina.

The contingency plans and facilities that we have in place may be insufficient to prevent a disruption in the infrastructure that supports our business and the communities in which we are located from having an adverse effect on our ability to conduct business. Substantially all of our senior management and investment personnel work out of our offices in the Washington, D.C. metropolitan area. If a disruption occurs and our senior management or other employees are unable to occupy our offices, communicate with other personnel or travel to other locations, our ability to service and interact with each other and with our customers may suffer, and we may not be successful in implementing contingency plans that depend on communication or travel.

## RISKS RELATED TO AN INVESTMENT IN THE PREFERRED STOCK

***Our Board of Directors may be restricted in declaring or decide not to declare dividends.***

Dividends on the Preferred Stock are not mandatory. The Charter Act restricts the ability of our Board of Directors to declare dividends in certain circumstances, depending on whether or not we meet or exceed certain capital standards set by OFHEO. We are also restricted from declaring and paying dividends on the Preferred Stock if we have failed to declare and pay or set apart dividends on all of our then outstanding preferred stock for the then-current quarterly period.  Furthermore, our Board of Directors has the sole discretion to decide whether or not to declare dividends on the Preferred Stock and the timing and amount of any dividend.  The declaration of dividends will depend upon our results of

21

operations, cash flows, liquidity, financial condition, capital position and capital requirements, general business conditions, legal, tax, regulatory and contractual prohibitions or other restrictions, rating agency considerations, applicable law and any other factors that our Board of Directors deems relevant.

**Dividends on the Preferred Stock are non-cumulative.**

Dividends on the Preferred Stock are non-cumulative. Consequently, if our Board of Directors does not authorize and declare a dividend for any dividend period prior to the related dividend payment date, holders of the Preferred Stock would not be entitled to receive a dividend for that dividend period, and the unpaid dividend will not accrue or be payable at any future time. We will have no obligation to pay dividends for a dividend period after the dividend payment date for that period if our Board of Directors has not declared a dividend before the related dividend payment date, regardless of whether dividends on the Preferred Stock or any other series of preferred stock or common stock are declared for any future dividend period.

**The trading price of the Preferred Stock may be affected by various unpredictable factors.**

The trading price of the Preferred Stock will fluctuate after the date of your purchase.  Factors that may affect the trading price of the Preferred Stock include our actual and perceived creditworthiness, expectations regarding interest rate trends, the expected interest rate and preferred dividend yields for securities issued by companies having credit ratings similar to ours, the supply and demand for securities similar to the Preferred Stock, and the economic, financial, political and regulatory environment that affects us and the financial markets generally. We expect that the trading prices of the Preferred Stock would be adversely affected by any decision of our Board of Directors not to declare dividends on the Preferred Stock for one or more applicable dividend periods. Accordingly, you may not be able to sell your shares of our Preferred Stock at or above the public offering price, or at all.

**The Preferred Stock is subordinate to our debt securities.**

The Preferred Stock is subordinate to our debt securities. Our outstanding subordinated debt securities provide that during any period where interest payments on those debt securities are deferred, dividend payments on our equity securities, including the Preferred Stock, may not be paid.  In addition, our then outstanding debt securities have or will have a preference upon our dissolution, liquidation or winding up before any assets are available for distribution to our stockholders.  See "Capitalization."

**The terms of the Preferred Stock will not be adjusted for any change to the dividends-received deduction under the Internal Revenue Code.**

No adjustment in respect of the amount of dividends payable on the Preferred Stock will be made in the event of a change to the dividends-received deduction under the Internal Revenue Code of 1986, as amended (the "Code").

**There may be no active trading market for the Preferred Stock.**

Prior to this issuance, there has been no trading market for the Preferred Stock and there can be no assurance that an active market for the Preferred Stock will develop or be sustained in the future. We will apply to list the Preferred Stock on the NYSE, but there is no assurance that the Preferred Stock will be accepted for listing. If accepted for listing by the NYSE, we expect trading on the NYSE to commence within a thirty-day period after the initial delivery of the Preferred Stock. We cannot assure you regarding the liquidity of, or trading market for, the Preferred Stock, and, if such a market does develop, the trading price of the Preferred Stock could widely fluctuate in response to variations in our operating results, general market conditions, interest rates, and other events or factors.

## USE OF PROCEEDS

The capital raised from the sale of our Preferred Stock and the recent offerings referred to under "Recent Offerings" will be used for general corporate purposes, including enhancing Fannie Mae's capital position, providing additional market liquidity, and pursuing new business opportunities.

## RECENT OFFERINGS

On May 6, 2008, we announced our plan to raise $6 billion in new capital through underwritten public offerings of new securities.  This offering of our Preferred Stock is part of that capital raising plan, together with our announced offerings of 94,300,000 shares of our common stock at a public offering price of $27.50 per share and 51,750,000 shares of our Series 2008-1 Preferred Stock at a public offering price of $50 per share.  The offerings of our common stock and our Series 2008-1 Preferred Stock are expected to settle on May 14, 2008.

**DX49 Page 23 of 64**

## CAPITALIZATION

The following tables set forth our capitalization as of March 31, 2008, and our Stockholder's Equity table is adjusted to reflect the issuance of the Preferred Stock in this offering and the recent offerings of our common stock and the Series 2008-1 Preferred Stock (before giving effect to the payment of estimated offering expenses, any underwriting discount in each offering, any advisory fees and assuming that the underwriters' over-allotment option in this offering is not exercised). This information should be read together with our unaudited condensed consolidated financial statements and other financial information set forth in the 2008 First Quarter 10-Q.

|  | As of March 31, 2008 |
| --- | --- |
|  | (Dollars in millions) |
| **Short-Term Borrowings** | |
| Federal funds purchased and securities sold under agreements to repurchase ........... | $    711 |
| | |
| Fixed short-term debt: | |
| Discount notes ............................................................................................ | $209,751 |
| Foreign exchange discount notes ................................................................... | 320 |
| Other short-term debt................................................................................... | 1,344 |
| Total fixed short-term debt .......................................................................... | 211,415 |
| Floating-rate short-term debt ....................................................................... | 4,501 |
| Total short-term debt ................................................................................... | $215,916 |
| | |
| **Long-Term Debt** | |
| Senior fixed[1] .............................................................................................. | $501,192 |
| Senior floating[1] .......................................................................................... | 25,652 |
| Subordinated fixed....................................................................................... | 11,070 |
| Debt from consolidations .............................................................................. | 6,510 |
| | |
| Total long-term debt[2] .................................................................................. | $544,424 |
| | |
| **Other liabilities**........................................................................................... | 43,182 |
| Total liabilities ............................................................................................ | $804,233 |

(1)  Includes a portion of structured debt instruments at fair value.
(2)  Reported amounts include a net discount and other cost basis adjustments of $11.6 billion as of both March 31, 2008 and December 31, 2007, respectively.

| Stockholders' Equity | As of March 31, 2008 | As Adjusted |
| --- | --- | --- |
|  | (Dollars in millions) | |
| Preferred Stock, 466,375,000 shares issued and outstanding at March 31, 2008, 598,125,000 shares issued and outstanding as adjusted ................................. | $ 16,913 | $ 21,501 |
| Common Stock, 975,406,899 shares outstanding at March 31, 2008, 1,069,706,899 shares outstanding as adjusted; excluding shares of common stock held in treasury and restricted common stock ........................................ | 593 | 643 |
| Additional paid-in capital.......................................................................... | 1,622 | 4,165 |
| Retained earnings...................................................................................... | 30,844 | 30,844 |
| Accumulated other comprehensive loss ....................................................... | (3,841) | (3,841) |
| Treasury stock, at cost, 153,683,521 shares as of March 31, 2008...................... | (7,295) | (7,295) |
| Total stockholders' equity.......................................................................... | 38,836 | 46,017 |
| Total liabilities and stockholders' equity...................................................... | $843,227 | $850,408 |

We frequently issue debentures, notes, and other debt obligations, and from time to time we redeem such debt obligations. The amount of debentures, notes, other debt obligations outstanding, and stockholders' equity on any date subsequent to March 31, 2008 may differ from that shown in the table above. See also "Recent Offerings."

24

## SELECTED FINANCIAL DATA

The following selected financial data presented below is summarized or derived from our audited consolidated financial statements from the 2007 10-K and our unaudited condensed consolidated financial statements from the 2008 First Quarter 10-Q and other financial information for such periods. The data should be read in conjunction with the audited consolidated financial statements and notes to consolidated financial statements contained in the 2007 10-K and the unaudited condensed consolidated financial statements and notes to condensed consolidated financial statements contained in the 2008 First Quarter 10-Q, as well as management's discussion and analysis thereof.

On any date after March 31, 2008, our financial information may differ from the data contained in this table. In conjunction with this financial information, you should also read the "Risk Factors" section of this Offering Circular.

| | For the Three Months Ended March 31 | | For the Year Ended December 31 | | |
|---|---|---|---|---|---|
| | 2008 | 2007[1] | 2007[1] | 2006[1] | 2005[1] |
| | (Dollars and shares in millions, except per share amounts) | | | | |
| **Statement of Operations Data:** | | | | | |
| Net interest income | $ 1,690 | $ 1,194 | $ 4,581 | $ 6,752 | $ 11,505 |
| Guaranty fee income | 1,752 | 1,098 | 5,071 | 4,250 | 4,006 |
| Losses on certain guaranty contracts | – | (283) | (1,424) | (439) | (146) |
| Trust management income | 107 | 164 | 588 | 111 | – |
| Fair value losses, net[2] | (4,377) | (566) | (4,668) | (1,744) | (4,013) |
| Other income (expenses) net[3] | (170) | 400 | (955) | (447) | (990) |
| Credit-related expenses[4] | (3,243) | (321) | (5,012) | (783) | (428) |
| Net income (loss) | (2,186) | 961 | (2,050) | 4,059 | 6,347 |
| Preferred stock dividends and issuance costs at redemption | (322) | (135) | (513) | (511) | (486) |
| Net income (loss) available to common stockholders | (2,508) | 826 | (2,563) | 3,548 | 5,861 |
| | | | | | |
| **Common Share Data:** | | | | | |
| Earnings (loss) per share: | | | | | |
| Basic | $ (2.57) | $ 0.85 | $ (2.63) | $ 3.65 | $ 6.04 |
| Diluted | (2.57) | 0.85 | (2.63) | 3.65 | 6.01 |
| Weighted-average common shares outstanding: | | | | | |
| Basic | 975 | 973 | 973 | 971 | 970 |
| Diluted | 975 | 974 | 973 | 972 | 998 |
| Cash dividends declared per common share | $ 0.35 | $ 0.40 | $ 1.90 | $ 1.18 | $ 1.04 |
| | | | | | |
| **New Business Acquisition Data:** | | | | | |
| Fannie Mae MBS issues acquired by third parties[5] | $155,702 | $125,202 | $563,648 | $417,471 | $465,632 |
| Mortgage portfolio purchases[6] | 36,323 | 36,157 | 182,471 | 185,507 | 146,640 |
| New business acquisitions | $192,025 | $161,359 | $746,119 | $602,978 | $612,272 |

25

| | As of | | | |
|---|---|---|---|---|
| | March 31, 2008 | December 31, | | |
| | | 2007 | 2006 | 2005 |
| | | (Dollars in millions) | | |
| **Balance Sheet Data:** | | | | |
| Investments in securities: | | | | |
| Trading .................................................... | $ 110,573 | $ 63,956 | $ 11,514 | $ 15,110 |
| Available-for-sale ................................... | 228,228 | 293,557 | 378,598 | 390,964 |
| Mortgage loans: | | | | |
| Loans held for sale .................................. | 8,486 | 7,008 | 4,868 | 5,064 |
| Loans held for investment, net of allowance .............. | 402,449 | 396,516 | 378,687 | 362,479 |
| Total assets ................................................. | 843,227 | 879,389 | 841,469 | 831,686 |
| Short-term debt .......................................... | 215,916 | 234,160 | 165,810 | 173,186 |
| Long-term debt .......................................... | 544,424 | 562,139 | 601,236 | 590,824 |
| Total liabilities .......................................... | 804,233 | 835,271 | 799,827 | 792,263 |
| Preferred stock .......................................... | 16,913 | 16,913 | 9,108 | 9,108 |
| Total stockholders' equity ............................. | 38,836 | 44,011 | 41,506 | 39,302 |
| **Regulatory Capital Data:** | | | | |
| Core capital[(7)] ........................................... | $ 42,676 | $ 45,373 | $ 41,950 | $ 39,433 |
| Total capital[(8)] .......................................... | 47,666 | 48,658 | 42,703 | 40,091 |
| **Book of Business Data:** | | | | |
| Mortgage portfolio[(9)] ................................... | $ 726,705 | $ 727,903 | $ 728,932 | $ 737,889 |
| Fannie Mae MBS held by third parties[(10)] ........ | 2,200,958 | 2,118,909 | 1,777,550 | 1,598,918 |
| Other guarantees[(11)] .................................... | 40,817 | 41,588 | 19,747 | 19,152 |
| Mortgage credit book of business ............... | $2,968,480 | $2,888,400 | $2,526,229 | $2,355,959 |
| Guaranty book of business[(12)] ..................... | $2,827,370 | $2,744,237 | $2,379,986 | $2,219,201 |

| | For the Three Months Ended March 31, | | For the Year Ended December 31, | | |
|---|---|---|---|---|---|
| **Ratios:** | 2008 | 2007 | 2007 | 2006 | 2005 |
| Return on assets ratio[(13)]* ........................... | (1.16)% | 0.39% | (0.30)% | 0.42% | 0.63% |
| Return on equity ratio[(14)]* ........................... | (40.9) | 10.1 | (8.3) | 11.3 | 19.5 |
| Equity to assets ratio[(15)]* ............................. | 4.8 | 4.9 | 4.9 | 4.8 | 4.2 |
| Dividend payout ratio[(16)] ............................. | N/A | 47.2 | N/A | 32.4 | 17.2 |
| Average effective guaranty fee rate (in basis points)[(17)]* ................................... | 29.5 bp | 21.8 bp | 23.7 bp | 22.2 bp | 22.3 bp |
| Credit loss ratio (in basis points)[(18)]* ............ | 12.6 | 3.4 | 5.3 | 2.2 | 1.1 |
| Earnings to combined fixed charges and preferred stock dividends and issuance costs at redemption ratio[(19)] ...................... | 0.45:1 | 1.09:1 | 0.89:1 | 1.12:1 | 1.23:1 |

---

(1)  Certain prior period amounts have been reclassified to conform to the current period presentation.

(2)  Consists of the following: (a) derivatives fair value gains (losses), net; (b) gains (losses) on trading securities, net; (c) debt fair value gains (losses), net; and (d) debt foreign exchange gains (losses), net.

(3)  Consists of the following:  (a) investment gains (losses), net; (b) debt extinguishment losses, net; (c) losses from partnership investments; and (d) fee and other income.

(4)  Consists of provision for credit losses and foreclosed property expense.

(5)  Unpaid principal balance of Fannie Mae MBS issued and guaranteed by us and acquired by third-party investors during the reporting period.  Excludes securitizations of mortgage loans in our portfolio and the purchase of Fannie Mae MBS for our investment portfolio.

(6)  Unpaid principal balance of mortgage loans and mortgage-related securities we purchased for our investment portfolio during the reporting period.  Includes advances to lenders and mortgage-related securities acquired through the extinguishment of debt.  Includes capitalized interest beginning in 2006.

**DX49 Page 26 of 64**

(7)   The sum of: (a) the stated value of outstanding common stock (common stock less treasury stock); (b) the stated value of outstanding non-cumulative perpetual preferred stock; (c) paid-in-capital; and (d) our retained earnings. Core capital excludes accumulated other comprehensive income (loss).

(8)   The sum of (a) core capital and (b) the total allowance for loan losses and reserve for guaranty losses, less (c) the specific loss allowance (that is, the allowance required on individually impaired loans).

(9)   Unpaid principal balance of mortgage loans and mortgage-related securities held in our portfolio.

(10)  Unpaid principal balance of Fannie Mae MBS held by third-party investors. The principal balance of resecuritized Fannie Mae MBS is included only once in the reported amount.

(11)  Includes single-family and multifamily credit enhancements that we have provided and that are not otherwise reflected in the table.

(12)  Unpaid principal balance of mortgage loans held in our mortgage portfolio; Fannie Mae MBS (whether held in our mortgage portfolio or held by third parties); and other credit enhancements that we provide on mortgage assets. Excludes non-Fannie Mae mortgage-related securities held in our investment portfolio for which we do not provide a guaranty. The principal balance of resecuritized Fannie Mae MBS is included only once in the reported amount.

(13)  Annualized net income (loss) available to common stockholders divided by average total assets during the period.

(14)  Annualized net income (loss) available to common stockholders divided by average outstanding common equity during the period.

(15)  Average stockholders' equity divided by average total assets during the period.

(16)  Common dividends declared during the period divided by net income (loss) available to common stockholders for the period.  Because we experienced a loss for the three months ended March 31, 2008 and the year ended December 31, 2007, earnings for each of these periods were insufficient to cover dividends declared during those periods.

(17)  Average guaranty fee income as a percentage of average outstanding Fannie Mae MBS and other guaranties during the period.

(18)  Annualized (a) charge-offs, net of recoveries and (b) foreclosed property expense, as a percentage of the average guaranty book of business during the period. Effective January 1, 2007, we have excluded from our credit loss ratio any initial losses recorded on delinquent loans purchased from Fannie Mae MBS trusts pursuant to Statement of Position No. 03-3, *Accounting for Certain Loans or Debt Securities Acquired in a Transfer* ("SOP 03-3"), when the purchase price of seriously delinquent loans that we purchase from Fannie Mae MBS trusts exceeds the fair value of the loans at the time of purchase. Our credit loss ratio including the effect of these initial losses recorded pursuant to SOP 03-3 would have been 20.7 basis points and 4.2 basis points for the three months ended March 31, 2008 and 2007, respectively, and 9.8 basis points, 2.8 basis points and 2.0 basis points for the years ended December 31, 2007, 2006 and 2005 respectively. We previously calculated our credit loss ratio based on credit losses as a percentage of our mortgage credit book of business, which includes non-Fannie Mae mortgage-related securities held in our mortgage investment portfolio that we do not guarantee. Because losses related to non-Fannie Mae mortgage-related securities are not reflected in our credit losses, we revised the calculation of our credit loss ratio to reflect credit losses as a percentage of our guaranty book of business. Our credit loss ratio calculated based on our mortgage credit book of business would have been 12.0 basis points and 3.2 basis points for the three months ended March 31, 2008 and 2007, respectively, and 5.0 basis points, 2.1 basis points and 1.0 basis points for the years ended December 31, 2007, 2006 and 2005, respectively.

(19)  "Earnings" for purposes of calculating this ratio consists of reported income before extraordinary gains (losses), net of tax effect and cumulative effect of change in accounting principle, net of tax effect plus provision for federal income taxes, minority interest in earnings (losses) of consolidated subsidiaries, losses

Case 1:13-cv-01053-RCL Document 436-1 Filed 07/16/24 Page 29 of 65

from partnership investments, capitalized interest and total interest expense. "Combined fixed charges and preferred stock dividends and issuance costs at redemption" includes (a) fixed charges (b) preferred stock dividends and issuance costs on redemptions of preferred stock, defined as pretax earnings required to pay dividends on outstanding preferred stock using our effective income tax rate for the relevant periods. Fixed charges represent total interest expense and capitalized interest.

**Note:**

* Average balances for purposes of ratio calculations are based on beginning and end of period balances for the first quarter of 2008 and 2007. Average balances for purposes of ratio calculations are based on balances at the beginning of the year and at the end of each respective quarter for full year 2007. Average balances for purposes of ratio calculations for full year 2006 and 2005 are based on beginning and end of year balances.

**DX49 Page 28 of 64**

## PREVIOUS ISSUANCES OF PREFERRED STOCK

We are authorized by the Charter Act to have preferred stock on such terms and conditions as our Board of Directors may prescribe. Our bylaws authorize us to issue up to 700,000,000 shares of preferred stock. To date, we have issued the following:

- on March 1, 1996, 7,500,000 shares of 6.41% Non-Cumulative Preferred Stock, Series A (stated value $50 per share) (the "Series A Preferred Stock");

- on April 12, 1996, 7,500,000 shares of 6.50% Non-Cumulative Preferred Stock, Series B (stated value $50 per share) (the "Series B Preferred Stock");

- on September 20, 1996, 5,000,000 shares of 6.45% Non-Cumulative Preferred Stock, Series C (stated value $50 per share) (the "Series C Preferred Stock");

- on September 30, 1998, 3,000,000 shares of 5.25% Non-Cumulative Preferred Stock, Series D (stated value $50 per share) (the "Series D Preferred Stock");

- on April 15, 1999, 3,000,000 shares of 5.10% Non-Cumulative Preferred Stock, Series E (stated value $50 per share) (the "Series E Preferred Stock");

- on March 20, 2000, 13,800,000 shares of Variable Rate Non-Cumulative Preferred Stock, Series F (stated value $50 per share) (the "Series F Preferred Stock");

- on August 8, 2000, 5,750,000 shares of Variable Rate Non-Cumulative Preferred Stock, Series G (stated value $50 per share) (the "Series G Preferred Stock");

- on April 6, 2001, 8,000,000 shares of 5.81% Non-Cumulative Preferred Stock, Series H (stated value $50 per share) (the "Series H Preferred Stock");

- on October 28, 2002, 6,000,000 shares of 5.375% Non-Cumulative Preferred Stock, Series I (stated value $50 per share) (the "Series I Preferred Stock");

- on November 26, 2002, 14,000,000 shares of Variable Rate Non-Cumulative Preferred Stock, Series J (stated value $50 per share) (the "Series J Preferred Stock");

- on March 18, 2003, 8,000,000 shares of Variable Rate Non-Cumulative Preferred Stock, Series K (stated value $50 per share) (the "Series K Preferred Stock");

- on April 29, 2003, 6,900,000 shares of 5.125% Non-Cumulative Preferred Stock, Series L (stated value $50 per share) (the "Series L Preferred Stock");

- on June 10, 2003, 9,200,000 shares of 4.75% Non-Cumulative Preferred Stock, Series M (stated value $50 per share) (the "Series M Preferred Stock");

- on September 25, 2003, 4,500,000 shares of 5.50% Non-Cumulative Preferred Stock, Series N (stated value $50 per share) (the "Series N Preferred Stock");

- on December 30, 2004, 25,000 shares of Non-Cumulative Convertible Preferred Stock, Series 2004-1 (stated value $100,000 per share) (the "Series 2004-1 Preferred Stock");

- on December 30, 2004, 50,000,000 shares of Non-Cumulative Preferred Stock, Series O (stated value $50 per share) (the "Series O Preferred Stock");

**DX49 Page 29 of 64**

- on September 28, 2007, 40,000,000 shares of Variable Rate Non-Cumulative Preferred Stock, Series P (stated value $25 per share) (the "Series P Preferred Stock");

- on October 4, 2007, 15,000,000 shares of 6.75% Non-Cumulative Preferred Stock, Series Q (stated value $25 per share) (the "Series Q Preferred Stock");

- on November 21, 2007, 20,000,000 shares of 7.625% Non-Cumulative Preferred Stock, Series R (stated value $25 per share) and on December 14, 2007, an additional 1,200,000 under the same terms (stated value $25 per share) (the "Series R Preferred Stock");

- on December 11, 2007, 280,000,000 shares of Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series S (stated value $25 per share) (the "Series S Preferred Stock"); and

- on May 14, 2008, we expect to issue 51,750,000 shares of Series 2008-1 Preferred Stock (stated value $50 per share).

We redeemed all of our outstanding Series A Preferred Stock on March 1, 2001, all of our outstanding Series B Preferred Stock on February 28, 2002, all of our outstanding Series C Preferred Stock on July 31, 2002, all of our outstanding Series J Preferred Stock on February 28, 2007, and all of our outstanding Series K Preferred Stock on April 2, 2007.

Each of our outstanding series of preferred stock has no par value, is non-participating, is non-voting and has a liquidation preference equal to the stated value per share. None of our outstanding preferred stock is convertible into or exchangeable for any of our other stock or obligations, with the exception of the Series 2004-1 Preferred Stock issued in December 2004 and the Series 2008-1 Preferred Stock that is expected to be issued on May 14, 2008.

Shares of the Series 2004-1 Preferred Stock are convertible at any time, at the option of the holders, into shares of our common stock at a conversion price of $94.31 per share of common stock (equivalent to a conversion rate of 1,060.3329 shares of common stock for each share of Series 2004-1 Preferred Stock). The conversion price is adjustable, as necessary, to maintain the stated conversion rate into common stock. Events which may trigger an adjustment to the conversion price include certain changes in our common stock dividend rate, subdivisions of our outstanding common stock into a greater number of shares, combinations of our outstanding common stock into a smaller number of shares and issuances of any shares by reclassification of our common stock. No such events have occurred that a change in conversion price would be required.

Shares of the Series 2008-1 Preferred Stock are convertible at any time, at the option of the holders, into shares of our common stock at a conversion rate of 1.5408 shares of common stock for each share of Series 2008-1 Preferred Stock, subject to anti-dilution adjustments. On May 13, 2011, assuming no prior conversion at the option of the holders, the shares of the Series 2008-1 Preferred Stock will automatically convert into between an aggregate of 79,736,400 and 94,091,850 shares of our common stock, subject to anti-dilution adjustments, depending on the applicable market value of our common stock. Events which may trigger an adjustment to the conversion price include certain changes in our common stock dividend rate, subdivisions of our outstanding common stock into a greater number of shares, combinations of our outstanding common stock into a smaller number of shares and issuances of any shares by reclassification of our common stock. No such events have occurred such that a change in conversion price would be required.

Holders of our outstanding preferred stock are entitled to receive non-cumulative, quarterly dividends when, and if, declared by our Board of Directors but have no right to require redemption of any shares of preferred stock. Payment of dividends on our preferred stock is not mandatory but has priority over the declaration and payment of dividends on our common stock. If dividends on our outstanding

preferred stock are not paid or set aside for payment for a given dividend period, dividends may not be paid on our common stock for that period. For the years ended December 31, 2007, 2006 and 2005, dividends declared on our preferred stock were $503 million, $511 million and $486 million, respectively.

In accordance with the Certificate of Designation of Terms of each outstanding series of preferred stock, after a specified period we have the option to redeem each such series of preferred stock at the applicable redemption price plus the dividend (whether or not declared) for the then-current period accrued to, but excluding, the date of redemption.  For each series of preferred stock other than the Series O Preferred Stock and the Series 2004-1 Preferred Stock, the redemption price is equal to the stated value of such series of preferred stock.  For the Series O Preferred Stock, the redemption price is between $50 and $52.50 per share, depending on the year of redemption; and for the Series 2004-1 Preferred Stock, the redemption price is $105,000 per share.

All of our outstanding preferred stock, except for our Series D Preferred Stock, Series E Preferred Stock, Series O Preferred Stock and the Series 2004-1 Preferred Stock, is listed on the NYSE.  After the expected issuance of the Series 2008-1 Preferred Stock on May 14, 2008, we will apply to list the Series 2008-1 Preferred Stock on the NYSE under the symbol "FNA."

## DESCRIPTION OF THE PREFERRED STOCK

**General**

The Preferred Stock will have the terms set forth in the Certificate of Designation of Terms of 8.25% Non-Cumulative Preferred Stock, Series T (the "Certificate of Designation") attached as Exhibit A to this Offering Circular.

A duly authorized committee of our Board of Directors will authorize the issuance of the Preferred Stock. Without the consent of the holders of the Preferred Stock, the Board (or a designated committee of the Board) may increase the authorized number of shares of Preferred Stock and "re-open" this series at any time by issuing additional shares of the Preferred Stock at prices to be determined at that time.

Computershare Trust Company, N.A., will be the transfer agent, dividend disbursing agent, and registrar for the shares of Preferred Stock.

**The obligations of Fannie Mae under the terms of the Preferred Stock are obligations of Fannie Mae only and are not those of the United States or of any agency or instrumentality thereof.**

**Dividends**

Dividends on shares of the Preferred Stock will not be mandatory. If you own shares of the Preferred Stock you will be entitled to receive non-cumulative, quarterly cash dividends that will accrue from and including May 19, 2008 and will be payable on March 31, June 30, September 30, and December 31 of each year (each a "Dividend Payment Date"), beginning June 30, 2008. Dividends on the shares of the Preferred Stock accrue at an annual rate of 8.25% per share.  However, dividends are payable only if declared by our Board of Directors (or a designated committee of the Board) in its sole discretion, out of funds legally available for dividend payments. Dividends that are not declared for a Dividend Payment Date will not accrue on the Preferred Stock. The ability of the Board of Directors to declare dividends may be restricted by OFHEO. See "Regulatory Capital Matters—Classification and Dividends."  Unless dividends have been declared and paid on the Preferred Stock, no dividends may be declared or paid on our common stock.  See "—Preferences and Limitations" below.

If a Dividend Payment Date is not a Business Day, we will pay dividends (if declared) on the Preferred Stock on the next Business Day, without interest from that Dividend Payment Date to the date of actual payment. A "Business Day" is any day other than a Saturday, Sunday, or other day on which banking institutions in New York, New York are authorized or required by law to close. We will make dividend payments to the holders of record of the Preferred Stock on the record date established by our Board (or a designated committee of the Board), which will be not earlier than 45 days or later than 10 days prior to the applicable Dividend Payment Date.

If declared, the initial dividend, which will be for the period from and including the original date of issuance to but excluding June 30, 2008, will be $ 0.23490 per share and will be payable on June 30, 2008.  Thereafter, the "Dividend Period" relating to a Dividend Payment Date will be the period from and including the preceding Dividend Payment Date to but excluding the related Dividend Payment Date.  If declared, quarterly dividends for each full Dividend Period will be $ 0.51563 per share.  We will compute dividends payable on the Preferred Stock for any period greater or less than a full Dividend Period on the basis of a 360-day year consisting of twelve 30-day months. Dividends payable on the Preferred Stock for each full Dividend Period will be computed by dividing the per annum dividend rate by four, and multiplying the result by the stated value per share of $25, the product of which will be rounded to the fifth digit after the decimal point (if the sixth digit to the right of the decimal point is five or greater, the fifth digit will be rounded up by one).

No adjustment in respect of the amount of dividends payable on the Preferred Stock will be made in the event of a change to the dividends-received deduction under the Code.

**Preferences and Limitations**

The Preferred Stock will rank prior to our common stock with respect to the payment of dividends as set forth in the Certificate of Designation. As a result, unless dividends have been declared and paid or set apart on the Preferred Stock for the then-current quarterly Dividend Period, no dividend may be declared or paid or set apart for payment on our common stock (or on any other stock ranking junior to the Preferred Stock). The Preferred Stock will rank equally with respect to dividends with our outstanding preferred stock.

Dividends on the Preferred Stock will not be cumulative. If we do not pay a dividend on the Preferred Stock, you will have no claim in respect of such non-payment so long as no dividend is paid on our common stock, any of our other stock ranking, as to the payment of dividends, junior to the Preferred Stock or any of the outstanding preferred stock for the then-current quarterly Dividend Period. When dividends are not paid in full upon the Preferred Stock and our outstanding preferred stock and any other stock of equal priority as to the payment of dividends, all dividends declared upon shares of the Preferred Stock and our outstanding preferred stock and any other stock of equal priority as to the payment of dividends will be declared pro rata so that the amount of dividends declared thereon will in all cases bear to each other the same ratio that accrued dividends per share of Preferred Stock (but without accumulation of any undeclared dividends for prior periods) and such other stock bear to each other.

Our Board of Directors may, in its discretion, choose to pay dividends on the Preferred Stock without the payment of any dividends on our common stock.

No dividends may be declared or paid or set apart for payment on any shares of the Preferred Stock if at the same time any default exists in the payment of dividends on any outstanding class or series of our stock ranking prior to the Preferred Stock with respect to the payment of dividends.  There is currently no class or series of our stock which ranks prior to the Preferred Stock with respect to the payment of dividends.  Additionally, during periods when we defer payment of interest on our subordinated debt securities, we are not permitted to declare or pay dividends, or redeem, purchase, or acquire, any shares of the Preferred Stock, any of the outstanding preferred stock or our common stock.

As a holder of Preferred Stock, you will not be entitled to any dividends, whether payable in cash or property, other than as described above and will not be entitled to interest, or any sum in lieu of interest, in respect of any dividend payment.

See "Regulatory Capital Matters" for a description of certain regulatory restrictions on our payment of dividends.

**Optional Redemption**

The Preferred Stock will not be redeemable prior to May 20, 2013. At any time on or after that date, we may redeem the Preferred Stock, in whole or in part, out of legally available funds. The redemption price will be $25 per share plus an amount equal to the dividend for the then-current quarterly Dividend Period (whether or not declared but without accumulation of any undeclared dividends for prior periods) accrued to but excluding the date of redemption. The amount of dividends per share payable at redemption will be rounded to the fourth digit after the decimal point (if the fifth digit to the right of the decimal point is five or greater, the fourth digit will be rounded up by one).  If we redeem less than all of the outstanding shares of the Preferred Stock, we will select shares to be redeemed by lot or pro rata (as nearly as possible) or by any other method that we deem equitable.

We will give notice of any such redemption by written or electronic means to holders of Preferred Stock not less than 30 days before the redemption date. Each notice will state the number of shares of Preferred Stock to be redeemed, the redemption price, the redemption date and the place at which Preferred Stock certificates should be presented for redemption.

On and after the redemption date, dividends on the Preferred Stock called for redemption will cease to accrue and the Preferred Stock called for redemption will no longer be deemed outstanding, and all rights of the holders of those shares shall cease, except for the right to receive the redemption amount.

Holders of the Preferred Stock will have no right to require Fannie Mae to redeem the Preferred Stock.

**Liquidation Rights**

If we voluntarily or involuntarily dissolve, liquidate or wind-up our business, then, after payment or provision for our liabilities and the expenses of such dissolution, liquidation or winding up, the holders of the outstanding shares of the Preferred Stock will be entitled to receive, out of assets available for distribution to stockholders, the amount of $25 per share plus an amount equal to the dividend for the then-current quarterly Dividend Period (whether or not declared but without accumulation of any undeclared dividends on the Preferred Stock for prior periods) accrued to but excluding the liquidation date before any payment or distribution of assets is made to holders of our common stock or any of our other stock ranking, as to the distribution of assets upon our dissolution, liquidation or winding up, junior to the Preferred Stock. If our assets available for distribution in such event are insufficient to pay in full all of the holders of the Preferred Stock and our outstanding preferred stock and any other stock of equal priority upon liquidation, then the assets will be distributed pro rata, based on the respective preferential amounts of such preferred stock.

Notwithstanding the foregoing, holders of Preferred Stock will not be entitled to be paid any amount in respect of our dissolution, liquidation or winding up until holders of our debt securities and any class or series of our stock ranking, as to the distribution of assets upon our dissolution, liquidation or winding up, prior to the Preferred Stock have been paid all amounts to which such classes or series are entitled. There is currently no class or series of our stock ranking prior to the Preferred Stock with respect to liquidation rights.

Neither the sale, lease or exchange of all or substantially all of our property and assets, nor our merger, consolidation or business combination into or with any other entity or the merger, consolidation or business combination of any other entity into or with us, shall be deemed to be a dissolution, liquidation or winding up, voluntary or involuntary, of Fannie Mae for the purposes of these provisions on liquidation rights.

**Additional Preferred Stock**

We have the right to issue additional shares of Preferred Stock and to issue additional classes or series of preferred stock that rank prior to, on parity with, or junior to the Preferred Stock with respect to dividends, liquidation rights, or otherwise, without the consent of the holders of the Preferred Stock.

**Voting Rights; Amendments**

Except as described below, holders of Preferred Stock will not have voting rights.

Without the consent of the holders of the Preferred Stock, we will have the right to amend the Certificate of Designation to cure any ambiguity, correct or supplement any term which may be defective or inconsistent with any other term or to make any other provisions so long as the amendment does not materially and adversely affect the interest of the holders of the Preferred Stock. Increasing the authorized

34

**DX49 Page 34 of 64**

amount of the Preferred Stock or issuing a series of preferred stock ranking prior to, on parity with, or junior to the Preferred Stock will not be deemed to be materially and adversely affecting the interests of the holders of the Preferred Stock.

Otherwise, we may only amend the Certificate of Designation with the consent of the holders of at least two-thirds of the outstanding shares of the Preferred Stock, with each holder being entitled to one vote per share.

**No Preemptive Rights and No Conversion**

Holders of Preferred Stock will not have any preemptive rights to purchase or subscribe for any other shares, rights, options or other securities of Fannie Mae and will not have the right to convert or exchange their shares of Preferred Stock into any other Fannie Mae securities.

**New York Stock Exchange Listing**

We will apply to list the Preferred Stock on the NYSE under the symbol "FNMprT." If approved for listing, we expect trading of the Preferred Stock on the NYSE to commence within a thirty-day period after the initial delivery of the Preferred Stock.

## REGULATORY CAPITAL MATTERS

### General

We are subject to capital adequacy requirements established by the 1992 Act. OFHEO monitors our performance with respect to our regulatory capital standards by classifying our capital adequacy not less than quarterly.

The following are the relevant capital classification definitions and requirements:

### Core Capital

"Core capital" is defined as the sum of the stated value of outstanding common stock (common stock less treasury stock), the stated value of our outstanding non-cumulative perpetual preferred stock, paid-in capital, and retained earnings, as determined in accordance with GAAP. Core capital excludes accumulated other comprehensive income (loss).

### Total Capital

"Total capital" is defined as the sum of our core capital and our total allowance for loan losses and reserve for guaranty losses, less the specific loss allowance (that is, the allowance required on individually-impaired loans).

### Minimum Capital Requirements

OFHEO's minimum capital standard ties our capital requirements to the size of our book of business. For purposes of the statutory minimum capital requirement, we are in compliance if our core capital equals or exceeds our minimum capital requirement.

Our statutory minimum capital requirement is generally equal to the sum of:

- 2.50% of on-balance sheet assets;

- 0.45% of the unpaid principal balance of outstanding Fannie Mae MBS held by third parties; and

- up to 0.45% of other off-balance sheet obligations, which may be adjusted by the Director of OFHEO under certain circumstances. (See 12 C.F.R. 1750.4 for existing adjustments made by the Director of OFHEO.)

Each quarter, as part of its capital classification announcement, OFHEO publishes our standing relative to the statutory minimum capital requirement and the OFHEO-directed minimum capital requirement. OFHEO has informed us that it has lifted the May 2006 Consent Order effective May 6, 2008, and will reduce the current OFHEO-directed capital surplus requirement from 20% to 15% upon the successful completion of our capital raising plan. OFHEO also indicated its intention to reduce the capital surplus requirement by an additional 5 percentage points to a 10% surplus requirement in September 2008, based upon our continued maintenance of excess capital well above OFHEO's regulatory requirement and no material adverse change to our ongoing regulatory compliance.

### Critical Capital Requirement

The critical capital standard requires us to hold an amount of core capital that is generally equal to the sum of (i) 1.25% of on-balance sheet assets, (ii) 0.25% of the unpaid principal balance of

outstanding Fannie Mae MBS held by third parties, and (iii) up to 0.25% of other off-balance sheet obligations, which may be adjusted by the Director of OFHEO under certain circumstances.

**Risk-Based Capital Requirement**

OFHEO's risk-based capital standard ties our capital requirements to the risk in our mortgage credit book of business, as measured by a stress test model. The stress test simulates our financial performance over a ten-year period of severe economic conditions characterized by both extreme interest rate movements and high mortgage default rates. Simulation results indicate the amount of capital required to survive this prolonged period of economic stress without new business or active risk management action. In addition to this model-based amount, the risk-based capital requirement includes a 30% surcharge to cover unspecified management and operations risks. Our total capital base is used to meet our risk-based capital requirement.

Each quarter, OFHEO runs a detailed profile of our book of business through the stress test simulation model. The model generates cash flows and financial statements to evaluate our risk and measure our capital adequacy during the ten-year stress horizon. As part of its quarterly capital classification announcement, OFHEO makes these stress test results publicly available.

**Classification and Dividends**

The statutory capital framework incorporates two different assessments of capital – a minimum capital requirement and a risk based capital requirement. The 1992 Act requires us to maintain sufficient capital to meet both of these requirements in order to be classified as "adequately capitalized." OFHEO is permitted or required to take remedial action if we fail to meet our capital requirements, depending on which requirement we fail to meet. Even if we meet our capital requirements, OFHEO has the ability to take certain actions if it determines that we are engaging in unapproved conduct that could result in a rapid depletion of our core capital, or if the value of the property securing mortgage loans we hold or have securitized has decreased significantly.

We are subject to continuous examination by OFHEO to ensure that we are operating in a safe and sound manner. If we fail to meet the risk-based capital standard but meet the minimum capital standard, we cannot be classified higher than "undercapitalized." If we fail to meet the risk-based capital standard and the minimum capital requirement but exceed the critical capital requirement, we cannot be classified higher than "significantly undercapitalized." If we fail to meet the risk-based capital standard and the critical capital standard, we must be classified as "critically undercapitalized."

When we are classified as adequately capitalized, we generally can pay a dividend on our common or preferred stock or make other capital distributions (which includes common stock repurchases and preferred stock redemptions) without prior OFHEO approval, so long as the payment would not decrease total capital to an amount less than our risk-based capital requirement and would not decrease our core capital to an amount less than our minimum capital requirement.

If we were classified as undercapitalized, we would be prohibited from making a capital distribution that would result in our being reclassified as significantly undercapitalized or critically undercapitalized.  We also would be required to submit a capital restoration plan for OFHEO approval, which could adversely affect our ability to make capital distributions.

If we were classified as significantly undercapitalized, we would be prohibited from making any capital distribution that would result in our being reclassified as critically undercapitalized. We would otherwise be able to make a capital distribution only if OFHEO determined that the distribution would: (a) enhance our ability to meet the risk-based capital standard and the minimum capital standard promptly; (b) contribute to our long-term financial safety and soundness; or (c) otherwise be in the public

interest. Also under this classification, OFHEO could take action to limit our growth, require us to acquire new capital or restrict us from activities that create excessive risk. We also would be required to submit a capital restoration plan for OFHEO approval, which could adversely affect our ability to make capital distributions.

If we were classified as critically undercapitalized, OFHEO would be required to appoint a conservator for us, unless OFHEO made a written finding that such appointment could have certain serious adverse effects and the public interest would be better served with other enforcement actions and the Secretary of the Treasury concurred in that determination. We would be able to make a capital distribution only if OFHEO determined that the distribution would: (a) enhance our ability to meet the risk-based capital standard and the minimum capital standard promptly; (b) contribute to our long-term financial safety and soundness; or (c) otherwise be in the public interest.

**Performance Against Capital Standards**

To ensure compliance with each of our regulatory capital requirements, we maintain different levels of capital surplus for each capital requirement. Quarterly changes in economic conditions (such as interest rates, spreads and home prices) can materially impact the calculated risk-based capital requirement. As a consequence, we generally seek to maintain a larger surplus over the risk-based capital requirement to ensure continued compliance.

While we are able to reasonably estimate the size of our book of business and therefore our minimum capital requirement, the amount of our reported core capital holdings at each period end is less certain. Changes in the fair value of our derivatives may result in significant fluctuations in our capital holdings from period to period. Accordingly, we target a surplus above the statutory minimum capital requirement and OFHEO-directed minimum capital requirement to accommodate a wide range of possible valuation changes that might adversely impact our core capital base.

On March 11, 2008, OFHEO announced that we were classified as adequately capitalized as of December 31, 2007 (the most recent date for which results have been published by OFHEO). The table below displays our regulatory capital classification measures as of March 31, 2008 and December 31, 2007.

| | As of | |
| --- | --- | --- |
| | March 31, 2008[1] | December 31, 2007[1] |
| | (Dollars in millions) | |
| Core capital[2] | $42,676 | $45,373 |
| Statutory minimum capital[3] | 31,335 | 31,927 |
| Surplus of core capital over statutory minimum capital | $11,341 | $13,446 |
| Surplus of core capital percentage over statutory minimum capital | 36.2% | 42.1% |
| | | |
| Core capital[2] | $42,676 | $45,373 |
| OFHEO-directed minimum capital[4] | 37,602 | 41,505 |
| Surplus of core capital over OFHEO-directed minimum capital | $ 5,074 | $ 3,868 |
| Surplus of core capital percentage over OFHEO-directed minimum capital | 13.5% | 9.3% |
| | | |
| Total capital[5] | $47,666 | $48,658 |
| Statutory risk-based capital[6] | N/A | 24,700 |
| Surplus of total capital over statutory risk-based capital | N/A | $23,958 |
| Surplus of total capital percentage over statutory risk-based capital | N/A | 97.0% |
| | | |
| Core capital[2] | $42,676 | $45,373 |
| Statutory critical capital[7] | 16,251 | 16,525 |
| Surplus of core capital over statutory critical capital | $26,425 | $28,848 |
| Surplus of core capital percentage over statutory critical capital | 162.6% | 174.6% |

38

_____

(1) Amounts as of March 31, 2008 represent estimates that will be submitted to OFHEO for its certification and are subject to its review and approval.  The amounts as of December 31, 2007 represent OFHEO's announced capital classification measures.

(2) The sum of: (a) the stated value of our outstanding common stock (common stock less treasury stock); (b) the stated value of our outstanding non-cumulative perpetual preferred stock; (c) our paid-in capital; and (d) our retained earnings. Core capital excludes accumulated other comprehensive income (loss).

(3) Generally, the sum of: (a) 2.50% of on-balance sheet assets; (b) 0.45% of the unpaid principal balance of outstanding Fannie Mae MBS held by third parties; and (c) up to 0.45% of other off-balance sheet obligations, which may be adjusted by the Director of OFHEO under certain circumstances (See 12 C.F.R. 1750.4 for existing adjustments made by the Director of OFHEO).

(4) Effective March 19, 2008, defined as 20% surplus over the statutory minimum capital requirement.  Prior to March 19, 2008, defined as 30% surplus over the statutory minimum capital requirement.

(5) The sum of: (a) core capital and (b) the total allowance for loan losses and reserve for guaranty losses, less (c) the specific loss allowance (that is, the allowance required on individually-impaired loans). The specific loss allowance totaled $206 million as of March 31, 2008 and $106 million as of December 31, 2007.

(6) Defined as the amount of total capital required to be held to absorb projected losses flowing from future adverse interest rate and credit risk conditions specified by statute (see 12 C.F.R. 1750.13 for conditions), plus 30% mandated by statute to cover management and operations risk. Statutory risk-based capital measures as of March 31, 2008 were not available as of the date of this Offering Circular.

(7) Generally, the sum of: (a) 1.25% of on-balance sheet assets; (b) 0.25% of the unpaid principal balance of outstanding Fannie Mae MBS held by third parties and (c) up to 0.25% of other off-balance sheet obligations, which may be adjusted by the Director of OFHEO under certain circumstances.

**DX49 Page 39 of 64**

## LEGALITY OF INVESTMENT

You should consult with your own legal advisors to determine whether the Preferred Stock constitutes a legal investment for you, any investment limitations, and whether our Preferred Stock is eligible to be used as collateral for borrowings. In addition, financial institutions should consult their legal advisors or regulators in determining the appropriate treatment of the Preferred Stock under risk-based capital or similar rules.  An institution under the jurisdiction of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, the National Credit Union Administration, or any other federal or state agency with similar authority should review any applicable regulations, policy statements and guidelines before purchasing or pledging shares of the Preferred Stock.

**DX49 Page 40 of 64**

## UNITED STATES TAXATION

The Preferred Stock and payments thereon generally are subject to taxation. Therefore, you should consider the tax consequences of owning Preferred Stock before acquiring it.

In the opinion of Dewey & LeBoeuf LLP, our special tax counsel, the following discussion correctly describes the principal aspects of the U.S. federal income tax treatment of beneficial holders of the Preferred Stock ("Shareholders"). This discussion is based on the Code, its legislative history, existing and proposed Treasury regulations, revenue rulings and judicial decisions, changes to any of which subsequent to the date of this Offering Circular may affect, possibly on a retroactive basis, the tax consequences described herein.

The discussion contained under this heading was not intended or written to be used, and cannot be used, for the purpose of avoiding United States federal tax penalties.  This discussion was written to support the promotion or marketing of the transactions or matters addressed in this Offering Circular. You should seek advice based on your particular circumstances from an independent tax advisor.

This summary discusses only the Preferred Stock purchased in this offering and held as a capital asset (within the meaning of U.S. federal income tax law). This discussion does not purport to address all of the U.S. federal income tax consequences that may be applicable to particular investors in light of their individual circumstances or to Shareholders subject to special rules, such as dealers in securities, tax-exempt organizations, life insurance companies, persons liable for alternative minimum tax, persons that hold the Preferred Stock as part of a straddle or a hedging or conversion transaction, certain financial institutions, certain securities traders and U.S. Persons (as defined below) that have a functional currency for tax purposes that is not the U.S. dollar. In addition, this discussion does not address taxes imposed by any state, local or foreign taxing jurisdiction. In all cases, investors are advised to consult their own tax advisors regarding the U.S. federal tax consequences to them of holding, owning and disposing of Preferred Stock, as well as any tax consequences arising under the laws of any state or other taxing jurisdiction.

For purposes of this discussion, "U.S. Person" generally means (1) a citizen or individual resident of the United States, (2) a corporation, or other entity treated as a corporation for U.S. federal income tax purposes organized in or under the laws of the United States, any state thereof or the District of Columbia, (3) an estate the income of which is includible in its gross income for U.S. federal income tax purposes without regard to its source, or (4) a trust if a court within the United States is able to exercise primary supervision over its administration and at least one U.S. Person has the authority to control all substantial decisions of the trust.  If a partnership holds the Preferred Stock, the tax treatment of partners will generally depend upon the status of the partner and the activities of the partnership.  Partnerships acquiring, holding or disposing of the Preferred Stock, and partners in such partnerships, are encouraged to consult their own tax advisors.

**Dividends**

*U.S. Shareholders*.  Dividends declared and paid on the Preferred Stock (other than certain pro rata distributions of Preferred Stock) will be dividends for U.S. federal income tax purposes to the extent paid out of our current or accumulated earnings and profits, as determined for U.S. federal income tax purposes, and, except as described below, will be taxable as ordinary income. Although we expect that our current and accumulated earnings and profits will be such that all dividends paid with respect to the Preferred Stock will qualify as dividends for U.S. federal income tax purposes, we cannot guarantee that result. Our accumulated earnings and profits and our current earnings and profits in future years will depend in significant part on our future profits or losses, which we cannot accurately predict. To the extent that the amount of any dividend paid on a share of Preferred Stock exceeds our current or accumulated earnings and profits for U.S. federal income tax purposes attributable to that share, the

dividend will be treated first as a return of capital (rather than as ordinary income) and will be applied against and reduce the Shareholder's adjusted tax basis in that share of Preferred Stock. The amount of any such dividend in excess of the Shareholder's adjusted tax basis will then be taxed as capital gain. For purposes of the remainder of the discussion, it is assumed that dividends paid with respect to the Preferred Stock will constitute dividends for U.S. federal income tax purposes.

Dividends received by Shareholders that are corporations generally will be eligible for the 70% dividends-received deduction under section 243 of the Code. The 70% dividends-received deduction will not be available with respect to a dividend received on Preferred Stock that a Shareholder has held for 45 days or less (including the day of disposition but excluding the day of acquisition) during the 91-day period beginning on the day which is 45 days before the date on which the Preferred Stock becomes ex-dividend. The length of time that a corporate Shareholder is deemed to have held stock for these purposes is reduced by periods during which the Shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales or other similar transactions. The aggregate dividends-received deduction allowed a corporate Shareholder cannot exceed 70% of its taxable income (with certain adjustments). Moreover, the dividends-received deduction may be reduced if the stock is "debt financed." Stock is "debt financed" if a corporate Shareholder incurs indebtedness "directly attributable" to a "portfolio stock" investment in another company, which would include an investment in the Preferred Stock.

Individual U.S. Shareholders generally are subject to a reduced maximum tax rate of 15% on dividends received in taxable years beginning on or before December 31, 2010, after which date the rate applicable to dividends is scheduled to return to the rate generally applicable to ordinary income. The rate reduction does not apply to dividends received to the extent that the individual U.S. Shareholder elects to treat the dividends as "investment income," which may be offset against investment expense. Furthermore, the rate reduction does not apply to dividends that are paid to Shareholders with respect to Preferred Stock that is held by the Shareholder for 60 days or less during the 121-day period beginning on the date which is 60 days before the date on which the Preferred Stock becomes ex-dividend. The length of time that a Shareholder is deemed to have held stock for these purposes is reduced by periods during which the Shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales or other similar transactions. Investors are advised to consult their own tax advisor regarding the implementation of these rules in light of their particular circumstances.

Investors who are U.S. corporations should be aware that under certain circumstances, a corporation that receives an "extraordinary dividend" (as defined in section 1059 of the Code) is (1) required to reduce its stock basis (but not below zero) by the portion of such dividend that is not taxed because of the dividends-received deduction and (2) treat the non-taxed portion of such dividends as gain from the sale or exchange of the Preferred Stock for the taxable year in which such dividend is received (to the extent that the non-taxed portion of such dividend exceeds such U.S. holder's basis). Non-corporate U.S. holders who receive "extraordinary dividends" would be required to treat loss on the sale of the Preferred Stock as long-term capital losses to the extent such dividends received by them qualify for the reduced 15% tax rate. Investors should consult their tax advisor with respect to the potential application of the extraordinary dividend rules to an investment in the Preferred Stock.

*Non-U.S. Shareholders*. Distributions treated as dividends on the Preferred Stock held by a Shareholder who is not a U.S. Person (a "non-U.S. Shareholder") generally will be subject to U.S. federal withholding tax at a rate of 30%, or a lower rate if provided by an applicable income tax treaty and the non-U.S. Shareholder has provided the documentation required to claim benefits under such treaty. Generally, to claim the benefits of an income tax treaty, a non-U.S. Shareholder will be required to provide a properly executed Internal Revenue Service ("IRS") Form W-8BEN. If, however, a dividend is effectively connected with the conduct of a trade or business in the United States by the non-U.S. Shareholder (and, if an applicable tax treaty so provides, is attributable to a permanent establishment or

42

fixed base maintained by the non-U.S. Shareholder in the United States), the dividend will not be subject to the 30% U.S. federal withholding tax (provided the non-U.S. Shareholder has provided the appropriate documentation, generally an IRS Form W-8ECI, to the withholding agent), but the non-U.S. Shareholder generally will be subject to U.S. federal income tax in respect of the dividend on a net income basis, and at graduated rates, in substantially the same manner as a U.S. Person.  Dividends received by a non-U.S. Shareholder that is a corporation for U.S. federal income tax purposes and which are effectively connected with the conduct of a U.S. trade or business may also be subject to a "branch profits tax" at the rate of 30% (or a lower rate if provided by an applicable tax treaty).  A non-U.S. Shareholder that is eligible for a reduced rate of U.S. federal withholding tax under an income tax treaty may obtain a refund or credit of any excess amounts withheld by timely filing an appropriate claim for a refund together with the required information with the IRS.

**Sales or Other Dispositions, Including Redemptions**

*U.S. Shareholders*.  Any sale, exchange, redemption (except as discussed below) or other disposition of the Preferred Stock generally will result in taxable gain or loss equal to the difference between the amount realized upon the disposition and the Shareholder's adjusted tax basis in the Preferred Stock. Such gain or loss will be capital gain or loss and will be long-term capital gain or loss if the holding period for the Preferred Stock exceeds one year. Tax rates on capital gain for individual Shareholders will vary depending on each Shareholder's income and holding period for the Preferred Stock.  Individual U.S. Shareholders are subject to a reduced maximum tax rate of 15% on long term capital gain realized in taxable years beginning on or before December 31, 2010, after which date the maximum rate is scheduled to return to the rate generally applicable to long term capital gains. Shareholders that are individuals should contact their own tax advisor for more information or for the capital gains tax rate applicable to specific shares of Preferred Stock. The deduction of capital losses is subject to certain limitations.

A redemption of Preferred Stock may be treated as a dividend, rather than as payment in exchange for the Preferred Stock, unless the redemption (1) is "not essentially equivalent to a dividend" with respect to the Shareholder within the meaning of section 302(b)(1) of the Code; (2) "is in complete redemption of all of the stock" of Fannie Mae held by the Shareholder as described in section 302(b)(3) of the Code; or (3) otherwise meets the requirements of one of the other exceptions from dividend treatment provided in section 302(b) of the Code. In applying these rules, the Shareholder must take into account not only the Preferred Stock and our other stock that it owns directly, but also the Preferred Stock and our other stock that it constructively owns within the meaning of section 318 of the Code. Because of the complex nature of these rules, each Shareholder should consult its tax advisor to determine whether a redemption of Preferred Stock will be treated as a dividend or as payment in exchange for the Preferred Stock. If the redemption payment is treated as a dividend, the rules discussed above under "Dividends" apply.

*Non-U.S. Shareholders.*  Subject to the discussion of backup withholding below, a non-U.S. Shareholder generally will not be subject to U.S. federal income or withholding tax on gain realized on the sale or other disposition of the Preferred Stock unless (1) such non-U.S. Shareholder is an individual who is present in the United States for 183 days or more in the taxable year of such sale or disposition and certain other conditions are met; (2) such gain is effectively connected with the conduct by the non-U.S. Shareholder of a trade or business in the United States (and, if an applicable tax treaty so provides, is attributable to a permanent establishment or a fixed base maintained by the non-U.S. Shareholder in the United States); or (3) we are or have been a "United States real property holding corporation" for U.S. federal income tax purposes during a specified testing period and certain other conditions are met.

Gain realized by a non-U.S. Shareholder that is effectively connected with such non-U.S. Shareholder's conduct of a trade or business generally will be subject to U.S. federal income tax on a net income basis, and at graduated rates, in substantially the same manner as a U.S.

Person (except as provided by an applicable tax treaty). In addition, if such non-U.S. Shareholder is a corporation for U.S. federal income tax purposes, it may also be subject to a branch profits tax at the rate of 30% (or a lower rate if provided by an applicable tax treaty).

Generally, a corporation is a "United States real property holding corporation" if the fair market value of its United States real property interest equals or exceed 50% of the sum of the fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (all as determined for U.S. federal income tax purposes). We do not believe that we are or have been a "United States real property holding corporation" nor do we anticipate that we will become one. If, however, we were a "United States real property holding corporation" during the applicable testing period and no exception were available to a non–U.S. Shareholder, gain realized by any non-U.S. Shareholder who owns more than 5% of the Preferred Stock would be treated as income effectively connected with a U.S. trade or business. U.S. federal withholding tax will not apply to gain realized on the sale or disposition of the Preferred Stock by a non-U.S. Shareholder that owns 5% or less of the Preferred Stock so long as the Preferred Stock is regularly traded on an established securities market. We can provide no assurance that the Preferred Stock (if accepted for listing on the NYSE) will remain regularly traded. If the Preferred Stock is not so traded, the person to whom a non-U.S. Shareholder sells the Preferred Stock may be required to withhold an amount equal to 10% of the purchase price, which amount would be creditable against the non-U.S. Shareholder's income tax liability.

### Information Reporting and Backup Withholding

*U.S. Shareholders*. Payments of dividends on shares of Preferred Stock and payments of proceeds upon the sale or redemption of Preferred Stock generally are required to be reported to the IRS except in the case of a Shareholder that is an "exempt recipient." Individuals generally are not exempt recipients, whereas corporations and certain other entities generally are exempt recipients. Backup withholding of U.S. federal income tax may apply to payments made with respect to shares of Preferred Stock, as well as to payments of proceeds from the sale of shares of Preferred Stock, to Shareholders that are not exempt recipients and that fail to provide certain identifying information (such as the taxpayer identification number of the Shareholder) in the manner required.

*Non-U.S. Shareholders*. Generally, we must report annually to the IRS the amount of dividends paid, the name and address of the recipient, and the amount, if any, of tax withheld. A similar report is sent to the Shareholder. Pursuant to tax treaties or other agreements, the IRS may make its reports available to tax authorities in the recipient's country of residence. Payments of dividends or proceeds on the disposition of the Preferred Stock made to a non-U.S. Shareholder may be subject to additional information reporting and backup withholding unless the non-U.S. Shareholder establishes an exemption, for example, by properly certifying its non-U.S. status on a Form W-8BEN or another appropriate version of Form W-8. Notwithstanding the foregoing, backup withholding may apply if either we or our paying agent has actual knowledge or reason to know, that the beneficial owner is a U.S. Person. Backup withholding is not an additional tax. Rather, the U.S. income tax liability of persons subject to backup withholding will be reduced by the amount of tax withheld. If withholding results in an overpayment of taxes, a refund or credit may be obtained, provided that the required information is timely furnished to the IRS.

**The U.S. federal income tax discussion set forth above is included for general information only and may not be applicable depending upon a Shareholder's particular situation. Each Shareholder should consult its own tax advisor with respect to the tax consequences to it of the ownership and disposition of the Preferred Stock, including the tax consequences under the tax laws of the United States, states, localities, countries other than the United States and any other taxing jurisdiction and the possible effects of changes in such tax laws.**

## UNDERWRITING

Under the terms set forth in the underwriting agreement (the "Underwriting Agreement"), we have agreed to sell to each of the Underwriters named below and the Underwriters, for whom Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets Inc., Morgan Stanley & Co. Incorporated, UBS Securities LLC and Wachovia Capital Markets, LLC (the "Representatives") are acting as representatives, have severally agreed to purchase the number of shares of our Preferred Stock set forth below:

| **Underwriter** | **Number of Shares** |
| --- | --- |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | 14,176,000 |
| Citigroup Global Markets Inc. | 14,176,000 |
| Morgan Stanley & Co. Incorporated | 14,176,000 |
| UBS Securities LLC | 14,176,000 |
| Wachovia Capital Markets, LLC | 14,176,000 |
| Banc of America Securities LLC | 800,000 |
| Barclays Capital Inc. | 800,000 |
| Deutsche Bank Securities Inc. | 800,000 |
| FTN Financial Securities Corp. | 800,000 |
| Goldman, Sachs & Co. | 800,000 |
| Wells Fargo Securities LLC | 800,000 |
| Amherst Securities Group, L.P. | 160,000 |
| BNP Paribas Securities Corp. | 160,000 |
| Cantor Fitzgerald & Co. | 160,000 |
| Credit Suisse Securities (USA) LLC | 160,000 |
| Fidelity Capital Markets | 160,000 |
| Greenwich Capital Markets, Inc. | 160,000 |
| H&R Block Financial Advisors, Inc. | 160,000 |
| HSBC Securities (USA) Inc. | 160,000 |
| J.J.B. Hilliard, W.L. Lyons, Inc. | 160,000 |
| Keefe, Bruyette & Woods, Inc. | 160,000 |
| Morgan Keegan & Company, Inc. | 160,000 |
| Oppenheimer & Co. Inc. | 160,000 |
| Piper Jaffray & Co. | 160,000 |
| RBC Capital Markets Corporation | 160,000 |
| Raymond James & Associates, Inc. | 160,000 |
| Sandler, O'Neill & Partners, L.P. | 160,000 |
| Charles Schwab & Co., Inc. | 160,000 |
| Sterne, Agee & Leach, Inc. | 160,000 |
| SunTrust Robinson Humphrey, Inc. | 160,000 |
| Vining-Sparks IBG, Limited Partnership | 160,000 |
| TD Ameritrade, Inc. | 160,000 |
| BB&T Capital Markets, a division of Scott & Stringfellow, Inc. | 60,000 |
| William Blair & Company, L.L.C. | 60,000 |
| Blaylock Robert Van, LLC | 60,000 |
| Cabrera Capital Markets, LLC | 60,000 |
| Doley Securities, LLC. | 60,000 |
| E*TRADE Securities LLC | 60,000 |
| Guzman & Company | 60,000 |
| Janney Montgomery Scott LLC | 60,000 |
| Loop Capital Markets, LLC | 60,000 |
| MFR Securities, Inc. | 60,000 |

45

| | |
|---|---|
| Mischler Financial Group, Inc. | 60,000 |
| Samuel A. Ramirez & Co., Inc. | 60,000 |
| SBK-Brooks Investments Corp | 60,000 |
| Stone & Youngberg LLC | 60,000 |
| Walton Johnson & Company | 60,000 |
| The Williams Capital Group, L.P. | 60,000 |
| Total | 80,000,000 |

The Underwriting Agreement requires the Underwriters to purchase all of the Preferred Stock offered hereby (other than the shares of Preferred Stock covered by the Underwriters' over-allotment option as described below) if any is purchased.

We have granted the Underwriters an option, exercisable on up to two occasions within 30 days from the date of this Offering Circular, to purchase, from time to time and in whole or in part, up to an additional 12,000,000 shares of Preferred Stock for purposes of covering over-allotments, if any. If the Underwriters exercise their over-allotment option, the Underwriters have severally agreed to purchase shares in approximately the same proportion as shown in the table above.

Prior to this offering, there has been no public market for the Preferred Stock. We will apply to list the Preferred Stock on the NYSE under the symbol "FNMprT." If approved for listing, we expect trading on the NYSE to commence within a thirty-day period after the initial delivery of the Preferred Stock. The Representatives have advised us that they intend to make a market in the Preferred Stock prior to the commencement of trading on the NYSE, but they are not obligated to do so and may discontinue any such market making at any time without notice. There is no assurance that the Preferred Stock will be accepted for listing on the NYSE.

The following table shows the per share of Preferred Stock and total underwriting discounts to be paid to the Underwriters assuming both no exercise and full exercise of the Underwriters' over-allotment option.

| | Without exercise of over-allotment option | With full exercise of over-allotment option |
|---|---|---|
| Per Share[1] | $0.7875 | $0.7875 |
| Total | $53,128,342.50 | $62,578,342.50 |

(1) We will pay the Underwriters a commission of $0.50 per share of Preferred Stock with respect to any share sold to institutional investors, which decreases the underwriting discount per share of Preferred Stock sold to such institutional investors by $0.2875. However, this decrease to the underwriting discount will not apply to shares of Preferred Stock sold in connection with the exercise of the Underwriters' over-allotment option.

The Underwriters propose to offer the Preferred Stock to the public at the initial public offering price set forth on the cover page of this Offering Circular, and may reoffer the Preferred Stock to certain dealers at such price less a concession of not more than $0.50 per share (or $0.30 per share in the case of sales to institutional investors). The Underwriters may allow, and the dealers may reallow, a discount not in excess of $0.45 per share (or $0.25 per share in the case of sales to institutional investors) on sales to certain other dealers. After the initial offering, the public offering price, concession and discount may be changed.

The expenses of this offering that are payable by us are estimated to be approximately $200,000 (exclusive of any underwriting discount and advisory fees).

In the Underwriting Agreement, we and the Underwriters have agreed to indemnify each other against and contribute toward certain liabilities.

46

The Underwriters and certain affiliates thereof have engaged in the past, and may engage in the future, in transactions with and perform services for us in the ordinary course of business.  They have received, and are expected to receive, customary compensation and expense reimbursement for such transactions.

The Representatives may engage in stabilizing transactions, short sales and purchases to cover positions created by short sales, and penalty bids or purchases for the purpose of pegging, fixing or maintaining the price of the Preferred Stock, in accordance with Regulation M under the Exchange Act:

- Stabilizing transactions permit bids to purchase the underlying security so long as the stabilizing bids do not exceed a specified maximum.

- A short position involves a sale by the Underwriters of shares in excess of the number of shares the Underwriters are obligated to purchase in the offering, which creates the syndicate short position.  This short position may be either a covered short position or a naked short position.  In a covered short position, the number of shares involved in the sales made by the Underwriters in excess of the number of shares they are obligated to purchase is not greater than the number of shares that they may purchase by exercising their over-allotment option.  In a naked short position, the number of shares involved is greater than the number of shares in their over-allotment option.  The Underwriters may close out any short position by either exercising their over-allotment option and/or purchasing shares in the open market. In determining the source of shares to close out the short position, the Underwriters will consider, among other things, the price of shares available for purchase in the open market as compared to the price at which they may purchase shares through their over-allotment option.

- Syndicate covering transactions involve purchases of the Preferred Stock in the open market after the distribution has been completed in order to cover syndicate short positions.

- Penalty bids permit the Representatives to reclaim a selling concession from a syndicate member when the Preferred Stock originally sold by the syndicate member is purchased in a stabilizing or syndicate covering transaction to cover syndicate short positions.

These stabilizing transactions, syndicate covering transactions and penalty bids may have the effect of raising or maintaining the trading price of the Preferred Stock or preventing or retarding a decline in the trading price of the Preferred Stock.  As a result, the price of the Preferred Stock may be higher than the price that might otherwise exist in the open market.  The stabilizing transactions for the Preferred Stock may be effected on the NYSE, if and when the Preferred Stock is listed there, or otherwise and, if commenced, may be discontinued at any time.

Neither we nor any of the Underwriters make any representation or prediction as to the direction or magnitude of any effect that the transactions described above may have on the price of the Preferred Stock.  In addition, neither we nor any of the Underwriters make any representation that the Representatives will engage in these stabilizing transactions or that any transaction, once commenced, will not be discontinued without notice.  If the Representatives engage in stabilizing transactions they do so on their own behalf and not as our representative.

An Offering Circular in electronic format may be made available on the Internet sites or through other online services maintained by one or more of the Underwriters participating in this offering, or by their affiliates.  In those cases, prospective investors may view offering terms online and, depending upon the particular Underwriter, prospective investors may be allowed to place orders online.  Other than the Offering Circular in electronic format, the information on any Underwriter's web site and any information contained in any other web site maintained by an Underwriter is not part of the Offering Circular, has not

been approved and/or endorsed by us or any Underwriter in its capacity as underwriter and should not be relied upon by investors.

If you purchase shares of the Preferred Stock offered by this Offering Circular, you may be required to pay stamp taxes and other charges under the laws and practices of the country of purchase, in addition to the offering price listed on the cover page of this Offering Circular.

*Public Offer Selling Restrictions Under the Prospectus Directive*

In relation to each member state of the European Economic Area which has implemented the Prospectus Directive (each, a "Relevant Member State"), each Underwriter has represented and agreed that an offer to the public of any shares of the Preferred Stock may not be made in that Relevant Member State except that an offer to the public in that Relevant Member State of any shares of the Preferred Stock may be made at any time under the following exemptions under the Prospectus Directive, if they have been implemented in that Relevant Member State:

(a) to any legal entity that is authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

(b) to any legal entity that has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts;

(c) by the Underwriters to fewer than 100 natural or legal persons (other than qualified investors as defined in the Prospectus Directive) subject to obtaining the prior consent of the Representatives for any such offer; or

(d) in any other circumstances falling within Article 3(2) of the Prospectus Directive,

provided that no such offer of shares of the Preferred Stock is a requirement for the publication by us or any Underwriter of a prospectus pursuant to Article 3 of the Prospectus Directive.

For purposes of this provision, the expression an "offer of shares of the Preferred Stock to the public" in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the shares of the Preferred Stock to be offered so as to enable an investor to decide to purchase any shares of the Preferred Stock, as the same may be varied in that member state by any measure implementing the Prospectus Directive in that member state, and the expression "Prospectus Directive" means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

We have not authorized and do not authorize the making of any offer of securities through any financial intermediary on their behalf, other than offers made by the Underwriters with a view to the final placement of the securities as contemplated in this Offering Circular. Accordingly, no purchaser of the securities, other than the Underwriters, is authorized to make any further offer of the securities on behalf of us or the Underwriters.

*Selling Restrictions Addressing Additional United Kingdom Securities Laws*

Each Underwriter has represented and agreed that:

(a) it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the Financial Services and Markets Act 2000 ("FSMA")) received

48

by it in connection with the issue or sale of the shares in circumstances in which Section 21(1) of the FSMA does not apply to us; and

(b) it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the shares of the Preferred Stock in, from or otherwise involving the United Kingdom.

49

**DX49 Page 49 of 64**

## RATINGS

On May 13, 2008, S&P's rating on our preferred stock was "AA–," and that rating was on "CreditWatch Negative." An issue which is rated "AA" is considered by S&P to differ "from the highest-rated obligations only to a small degree." According to S&P, "the obligor's capacity to meet its financial commitment on the obligation is very strong." The modifier "–" indicates that the issue ranks in the lower end of the generic rating category "AA."

On May 13, 2008, Moody's rating on our preferred stock was "Aa3," and that rating had a rating outlook of negative. An issue which is rated "Aa" is considered by Moody's to be "of high quality" and "subject to very low credit risk." The numerical modifier "3" indicates that the issue ranks in the lower end of the generic rating category of "Aa." According to Moody's a "rating outlook is an opinion regarding the likely direction of a rating over the medium term."

On May 13, 2008, Fitch's rating on our preferred stock was "AA–," and that rating was on "Rating Watch Negative." An issue which is rated "AA" is considered by Fitch to be of "very high credit quality." According to Fitch, this rating indicates a "very strong capacity for payment of financial commitments." The modifier "–" indicates that the issue ranks in the lower end of the generic rating category "AA."

A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning rating organization.

## INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The consolidated financial statements of Fannie Mae and consolidated entities incorporated by reference in this Offering Circular from the 2007 10-K and the effectiveness of Fannie Mae's internal control over financial reporting have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their reports, which are incorporated herein by reference.

## VALIDITY OF THE PREFERRED STOCK

The validity of the Preferred Stock will be passed upon for us by Sidley Austin LLP, New York, New York, and for the Underwriters by Sullivan & Cromwell LLP, Washington, D.C. Certain U.S. federal income tax matters will be passed upon for us by Dewey & LeBoeuf LLP, Washington, D.C.

## ADDITIONAL INFORMATION

You should read this Offering Circular (including the Certificate of Designation of Terms of 8.25% Non-Cumulative Preferred Stock, Series T, attached hereto as Exhibit A) together with:

- our 2007 10-K;

- our 2008 First Quarter 10-Q;

- our Current Reports on Form 8-K filed with the SEC on March 6, 2008 and April 4, 2008 to the extent the information therein was deemed to be "filed" for purposes of Section 18 of the Exchange Act; and

- all proxy soliciting materials that we file with the SEC, and all documents that we file with the SEC pursuant to Section 13(a), 13(c) or 14 of the Exchange Act, in each case after the date of this Offering Circular and prior to the termination of the offering of the common stock, excluding any information we "furnish" to the SEC on Form 8-K.

This Offering Circular incorporates these documents by reference, which means that we are disclosing information to you by referring to them rather than by providing you with separate copies. They are considered part of this Offering Circular and you should read them before you consider an investment in the Preferred Stock.  You should rely only on the most up-to-date information regarding any matter that is discussed or described in this Offering Circular and in one or more of the incorporated documents.

Our common stock is registered with the SEC under the Exchange Act, and our SEC filings are available on our website at www.fanniemae.com and on the SEC's website at www.sec.gov. We are referring these websites to you for your reference only, and we are not incorporating in this Offering Circular all of the information available on these websites.  You should rely only on the information included or incorporated by reference or deemed to be incorporated by reference in this Offering Circular in deciding whether or not to invest in the Preferred Stock.  We have not authorized anyone to provide you with any different or additional information.

You can obtain copies of this Offering Circular and the documents incorporated by reference herein without charge by contacting our Office of Investor Relations, Fannie Mae, 3900 Wisconsin Avenue, NW, Washington D.C. 20016, telephone: (202) 752-7115. You may also read and copy any document we file with or furnish to the SEC by visiting the SEC's Public Reference Room at 100 F Street, NE, Washington D.C. 20549; telephone: 1-800-SEC-0330 for further information.  In addition, you may read our SEC filings at the offices of the New York Stock Exchange, which is located at 20 Broad Street, New York, NY 10005.

### FORWARD-LOOKING STATEMENTS

This Offering Circular and the documents incorporated herein by reference contain forward-looking statements, which are statements about matters that are not historical facts. In addition, our senior management may from time to time make forward-looking statements orally to analysts, investors, the news media and others. Forward-looking statements often include words such as "expects," "anticipates," "intends," "plans," "believes," "seeks," "estimates," "would," "should," "could," "may," or similar words.

Among the forward-looking statements in this Offering Circular and the documents incorporated by reference herein are statements relating to:

- our expectations regarding the future of the housing and mortgage markets, including our expectation of continued housing market weakness in 2008 and our expectations relating to declines in home prices, increases in mortgage delinquencies, defaults and foreclosures, and slower growth in U.S. residential mortgage debt outstanding in 2008;

- our expectation that our credit-related expenses and credit loss ratio will significantly increase in 2008 relative to 2007, and our belief that our credit losses will increase in 2009 relative to 2008;

- our belief that our delinquencies, defaults and loan loss severities will increase in 2008, and that we will further increase our loss reserves during 2008;

- our belief that our single-family guaranty book of business will continue to grow at a faster rate than the rate of overall growth in U.S. residential mortgage debt outstanding, and that our guaranty fee income will grow in 2008 compared to 2007;

- our expectation that we will experience increased competition from the FHA in 2008;

- our expectation that, if current market conditions continue, our taxable equivalent net interest yield (excluding the benefit we received from the redemption of step-rate debt

**DX49 Page 51 of 64**

securities during the first quarter of 2008) will continue to increase for the remainder of 2008;

- our expectation that our results of future operations will generate sufficient taxable income to allow us to realize our deferred tax assets;

- our expectation that our election to report a larger portion of our financial instruments at fair value pursuant to SFAS 159 and our implementation of hedge accounting will reduce the level of volatility in our financial results that is attributable to changes in interest rates;

- our belief that we will collect all original contractual principal and interest payments on the substantial majority of our cured loans;

- our expectation that changes in the fair value of our trading securities will generally move inversely to changes in the fair value of our derivatives;

- our expectation that we will classify a significant majority of securities we purchase in the future as available-for-sale;

- our belief that we will collect the full principal and interest due in accordance with the contractual terms of the securities with respect to our Alt-A and subprime private-label mortgage-related securities classified as available-for-sale for which we have not recognized other-than-temporary impairment;

- our belief that our sources of liquidity will remain adequate to meet both our short-term and long-term funding needs;

- our belief that our volume of Alt-A mortgage loan acquisitions will continue to decline in future periods;

- our expectation that a GSE reform bill will be introduced in the Senate in May 2008;

- our expectation that housing, mortgage and credit market conditions will continue to negatively affect our results of operations and the amount of our core capital in 2008;

- our belief that the $6 billion in additional capital being raised will enable us to pursue growth and investment opportunities while also maintaining a prudent capital cushion in a volatile and challenging market through 2008 and 2009;

- our expectation that we may take any of the following actions to further preserve and build our capital, including: issuing additional preferred, convertible preferred or common stock; further reducing or eliminating our common stock dividend; forgoing purchase and guaranty opportunities; reducing the size of our investment portfolio through liquidations or by selling assets; changing our current business practices to reduce our losses and expenses; and reclassifying a portion of our investment securities from held for trading to available for sale;

- our estimate of the effect of hypothetical declines in home prices on our credit losses;

- our estimate of the effect of hypothetical stress test scenarios on the value of our Alt-A and subprime private-label securities and wraps; and

- our estimate of the effect of hypothetical changes in interest rates on the fair value of our financial instruments.

Forward-looking statements reflect our management's expectations or predictions of future conditions, events or results based on various assumptions and management's estimates of trends and

economic factors in the markets in which we are active, as well as our business plans. They are not guarantees of future performance. By their nature, forward-looking statements are subject to risks and uncertainties. Our actual results, financial condition, capital position and liquidity may differ, possibly materially, from that indicated in these forward-looking statements. There are a number of factors that could cause actual conditions, events or results to differ materially from those described in the forward-looking statements contained in this Offering Circular, including those factors described in the "Risk Factors" section of this Offering Circular.

Investors are cautioned to place the forward-looking statements in this Offering Circular and the documents incorporated by reference or that we make from time to time into proper context by carefully considering the risk factors discussed in the "Risk Factors" section of this Offering Circular in evaluating these forward-looking statements. These forward-looking statements are representative only as of the date of this Offering Circular, and we undertake no obligation to update any forward-looking statement as a result of new information, future events or otherwise except as required under the federal securities laws.

(This Page Intentionally Left Blank)

**Exhibit A**

# CERTIFICATE OF DESIGNATION OF TERMS OF
# 8.25% NON-CUMULATIVE PREFERRED STOCK, SERIES T

## CUSIP: 313586737

**1.    Designation, Par Value and Number of Shares.**

The designation of the series of preferred stock of the Federal National Mortgage Association ("Fannie Mae") created by this resolution shall be "8.25% Non-Cumulative Preferred Stock, Series T" (the "Series T Preferred Stock"), and the number of shares initially constituting the Series T Preferred Stock is 80,000,000[1], which number may be increased by the Board of Directors of Fannie Mae, or a duly authorized committee thereof, in accordance with Section 7 below.  Shares of Series T Preferred Stock will have no par value and will have a stated value of $25 per share. Shares of Series T Preferred Stock will have no stated maturity date, and, subject to Section 3 below, will be perpetual.  The Board of Directors of Fannie Mae, or a duly authorized committee thereof, in its sole discretion, may reduce the number of shares of Series T Preferred Stock, provided such reduction is not below the number of shares of Series T Preferred Stock then outstanding.

**2.    Dividends.**

(a)    Holders of record of Series T Preferred Stock (each individually a "Holder," or collectively the "Holders") will be entitled to receive, ratably, when, as and if declared by the Board of Directors, in its sole discretion out of funds legally available therefor, non-cumulative cash dividends at a rate of  8.25% per annum of the stated value of $25 per share of Series T Preferred Stock.  Dividends on the Series T Preferred Stock shall accrue from and including May 19, 2008 (the "Issue Date") and will be payable when, as and if declared by the Board of Directors (or a designated committee of the Board) quarterly on March 31, June 30, September 30 and December 31 of each year (each, a "Dividend Payment Date"), commencing June 30, 2008.  If a Dividend Payment Date is not a Business Day, the related dividend (if declared) will be paid on the next succeeding Business Day with the same force and effect as though paid on the Dividend Payment Date, without any increase to account for the period from such Dividend Payment Date through the date of actual payment.  A "Business Day" shall mean any day other than a Saturday, Sunday, or a day on which banking institutions in New York, New York are authorized by law to close.  Dividends will be paid to Holders on the record date fixed by the Board of Directors or a duly authorized committee thereof, which may not be earlier than 45 days or later than 10 days prior to the applicable Dividend Payment Date.

If declared, the initial dividend, which will be for the period from and including the Issue Date to but excluding June 30, 2008, will be $ 0.23490 per share and will be payable on June 30, 2008. Thereafter, if declared, quarterly dividends will be $ 0.51563 per share. The "Dividend Period" relating to a Dividend Payment Date will be the period from and including the preceding Dividend Payment Date (or, in the case of the initial dividend, May 19, 2008) to but excluding such Dividend Payment Date. Dividends payable on the Series T Preferred Stock for any period greater or less than a full Dividend Period will be computed on the basis of a 360-day year consisting of twelve 30-day months, with the dividend for such partial Dividend Period computed by dividing the per annum dividend rate by 360, and multiplying that amount by the number of days in such partial Dividend Period (using the 30 day month, 360 day year convention) and stated value of $25 per share, the product of which shall be rounded to the fourth digit after the decimal point.  (If the fifth digit to the right of the decimal point is five or greater, the

---

[1]         Plus up to 12,000,000 additional shares pursuant to the Underwriters' over-allotment option.

A-1

fourth digit will be rounded up by one.)  Dividends payable on the Series T Preferred Stock for each full Dividend Period will be computed by dividing the per annum dividend rate by four, and multiplying the result by the stated value per share of $25, the product of which shall be rounded to the fifth digit after the decimal point. (If the sixth digit to the right of the decimal point is five or greater, the fifth digit will be rounded up by one.) If Fannie Mae redeems the Series T Preferred Stock, the dividend that would otherwise be payable for the then-current quarterly Dividend Period will be included in the redemption price of the shares redeemed and will not be separately payable.

(b)      No dividend (other than dividends or distributions paid in shares of, or options, warrants or rights to subscribe for or purchase shares of, the common stock of Fannie Mae or any other stock of Fannie Mae ranking, as to the payment of dividends and the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, junior to the Series T Preferred Stock) may be declared or paid or set apart for payment on Fannie Mae's common stock (or on any other stock of Fannie Mae ranking, as to the payment of dividends, junior to the Series T Preferred Stock) unless dividends have been declared and paid or set apart (or ordered to be set apart) on the Series T Preferred Stock for the then-current quarterly Dividend Period; provided, however, that the foregoing dividend preference shall not be cumulative and shall not in any way create any claim or right in favor of the Holders of Series T Preferred Stock in the event that dividends have not been declared or paid or set apart (or ordered to be set apart) on the Series T Preferred Stock in respect of any prior Dividend Period. If the full dividend on the Series T Preferred Stock is not paid for any quarterly Dividend Period, the Holders of Series T Preferred Stock will have no claim in respect of the unpaid amount so long as no dividend (other than those referred to above) is paid on Fannie Mae's common stock (or any other stock of Fannie Mae ranking, as to the payment of dividends, junior to the Series T Preferred Stock) for such Dividend Period.

(c)      The Board of Directors of Fannie Mae, or a duly authorized committee thereof, may, in its discretion, choose to pay dividends on the Series T Preferred Stock without the payment of any dividends on Fannie Mae's common stock (or any other stock of Fannie Mae ranking, as to the payment of dividends, junior to the Series T Preferred Stock).

(d)      No full dividends shall be declared or paid or set apart for payment on any stock of Fannie Mae ranking, as to the payment of dividends, on a parity with the Series T Preferred Stock for any period unless full dividends have been declared and paid or set apart for payment on the Series T Preferred Stock for the then-current quarterly Dividend Period. When dividends are not paid in full upon the Series T Preferred Stock and all other classes or series of stock of Fannie Mae, if any, ranking, as to the payment of dividends, on a parity with the Series T Preferred Stock, all dividends declared upon shares of Series T Preferred Stock and all such other stock of Fannie Mae will be declared pro rata so that the amount of dividends declared per share of Series T Preferred Stock and all such other stock will in all cases bear to each other the same ratio that accrued dividends per share of Series T Preferred Stock (but without, in the case of any non-cumulative preferred stock, accumulation of unpaid dividends for prior Dividend Periods) and such other stock bear to each other.

(e)      No dividends may be declared or paid or set apart for payment on any shares of Series T Preferred Stock if at the same time any arrears exist or default exists in the payment of dividends on any outstanding class or series of stock of Fannie Mae ranking, as to the payment of dividends, prior to the Series T Preferred Stock.

(f)      Holders of Series T Preferred Stock will not be entitled to any dividends, whether payable in cash or property, other than as herein provided and will not be entitled to interest, or any sum in lieu of interest, in respect of any dividend payment.

A-2

3.      **Optional Redemption.**

(a)      The Series T Preferred Stock shall not be redeemable prior to May 20, 2013.  On or after that date, subject to (x) the notice provisions set forth in Section 3(b) below, (y) the receipt of any required regulatory approvals and (z) any further limitations which may be imposed by law, Fannie Mae may redeem the Series T Preferred Stock, in whole or in part, at any time, out of funds legally available therefor, at the redemption price of $25 per share plus an amount equal to the amount of the dividend (whether or not declared) for the then-current quarterly Dividend Period accrued to but excluding the date of such redemption, but without accumulation of unpaid dividends on the Series T Preferred Stock for prior Dividend Periods. The amount of dividends per share payable at redemption will be calculated in accordance with Section 2(a) above.  If less than all of the outstanding shares of Series T Preferred Stock are to be redeemed, Fannie Mae will select the shares to be redeemed from the outstanding shares not previously called for redemption by lot or pro rata (as nearly as possible) or by any other method that the Board of Directors of Fannie Mae, or a duly authorized committee thereof, in its sole discretion deems equitable.

(b)      In the event Fannie Mae shall redeem any or all of the Series T Preferred Stock as aforesaid, Fannie Mae will give written or electronic notice of any such redemption to Holders of Series T Preferred Stock not less than 30 days prior to the date fixed by the Board of Directors of Fannie Mae, or duly authorized committee thereof, for such redemption. Each such notice will state: (1) the number of shares of Series T Preferred Stock to be redeemed and, if fewer than all of the shares of Series T Preferred Stock held by a Holder are to be redeemed, the number of shares to be redeemed from such Holder; (2) the redemption price; (3) the redemption date; and (4) the place at which a Holder's certificate(s) representing shares of Series T Preferred Stock must be presented upon such redemption. Failure to give notice, or any defect in the notice, to any Holder of Series T Preferred Stock shall not affect the validity of the proceedings for the redemption of shares of any other Holder of Series T Preferred Stock being redeemed.

(c)      Notice having been given as herein provided, from and after the redemption date, dividends on the Series T Preferred Stock called for redemption shall cease to accrue and such Series T Preferred Stock called for redemption will no longer be deemed outstanding, and all rights of the Holders thereof as registered holders of such shares of Series T Preferred Stock will cease. Upon surrender in accordance with said notice of the certificate(s) representing shares of Series T Preferred Stock so redeemed (properly endorsed or assigned for transfer, if the Board of Directors of Fannie Mae, or a duly authorized committee thereof, shall so require and the notice shall so state), such shares shall be redeemed by Fannie Mae at the redemption price aforesaid. Any shares of Series T Preferred Stock that shall at any time have been redeemed shall, after such redemption, be cancelled and not reissued. In case fewer than all the shares represented by any such certificate are redeemed, a new certificate shall be issued representing the unredeemed shares without cost to the Holder thereof.

(d)      The Series T Preferred Stock will not be subject to any mandatory redemption, sinking fund or other similar provisions. In addition, Holders of Series T Preferred Stock will have no right to require redemption of any shares of Series T Preferred Stock.

4.      **Liquidation Rights.**

(a)      Upon any voluntary or involuntary dissolution, liquidation or winding up of Fannie Mae, after payment or provision for the liabilities of Fannie Mae and the expenses of such dissolution, liquidation or winding up, the Holders of outstanding shares of the Series T Preferred Stock will be entitled to receive out of the assets of Fannie Mae or proceeds thereof available for distribution to stockholders, before any payment or distribution of assets is made to holders of Fannie Mae's common

stock (or any other stock of Fannie Mae ranking, as to the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, junior to the Series T Preferred Stock), the amount of $25 per share plus an amount, determined in accordance with Section 2 above, equal to the dividend (whether or not declared) for the then-current quarterly Dividend Period accrued to but excluding the date of such liquidation payment, but without accumulation of unpaid dividends on the Series T Preferred Stock for prior Dividend Periods.

(b)    If the assets of Fannie Mae available for distribution in such event are insufficient to pay in full the aggregate amount payable to Holders of Series T Preferred Stock and holders of all other classes or series of stock of Fannie Mae, if any, ranking, as to the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, on a parity with the Series T Preferred Stock, the assets will be distributed to the Holders of Series T Preferred Stock and holders of all such other stock pro rata, based on the full respective preferential amounts to which they are entitled (but without, in the case of any non-cumulative preferred stock, accumulation of unpaid dividends for prior Dividend Periods).

(c)    Notwithstanding the foregoing, Holders of Series T Preferred Stock will not be entitled to be paid any amount in respect of a dissolution, liquidation or winding up of Fannie Mae until holders of any classes or series of stock of Fannie Mae ranking, as to the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, prior to the Series T Preferred Stock have been paid all amounts to which such classes or series are entitled.

(d)    Neither the sale, lease or exchange (for cash, shares of stock, securities or other consideration) of all or substantially all of the property and assets of Fannie Mae, nor the merger, consolidation or combination of Fannie Mae into or with any other entity or the merger, consolidation or combination of any other entity into or with Fannie Mae, shall be deemed to be a dissolution, liquidation or winding up, voluntary or involuntary, for the purposes of this Section 4.

(e)    After payment of the full amount of the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae to which they are entitled pursuant to paragraphs (a), (b) and (c) of this Section 4, the Holders of Series T Preferred Stock will not be entitled to any further participation in any distribution of assets by Fannie Mae.

**5.    No Conversion or Exchange Rights.**

The Holders of shares of Series T Preferred Stock will not have any rights to convert such shares into or exchange such shares for shares of any other class or classes, or of any other series of any class or classes, of stock or obligations of Fannie Mae.

**6.    No Pre-Emptive Rights.**

No Holder of Series T Preferred Stock shall be entitled as a matter of right to subscribe for or purchase, or have any pre-emptive right with respect to, any part of any new or additional issue of stock of any class whatsoever, or of securities convertible into any stock of any class whatsoever, or any other shares, rights, options or other securities of any class whatsoever, whether now or hereafter authorized and whether issued for cash or other consideration or by way of dividend.

**7.    Voting Rights; Amendments.**

(a)    Except as provided below, the Holders of Series T Preferred Stock will not be entitled to any voting rights, either general or special.

A-4

(b)     Without the consent of the Holders of Series T Preferred Stock, Fannie Mae will have the right to amend, alter, supplement or repeal any terms of this Certificate or the Series T Preferred Stock (1) to cure any ambiguity, or to cure, correct or supplement any provision contained in this Certificate of Designation that may be defective or inconsistent with any other provision herein or (2) to make any other provision with respect to matters or questions arising with respect to the Series T Preferred Stock that is not inconsistent with the provisions of this Certificate of Designation so long as such action does not materially and adversely affect the interests of the Holders of Series T Preferred Stock; provided, however, that any increase in the amount of authorized or issued Series T Preferred Stock or the creation and issuance, or an increase in the authorized or issued amount, of any other class or series of stock of Fannie Mae, whether ranking prior to, on a parity with or junior to the Series T Preferred Stock, as to the payment of dividends or the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, or otherwise, will not be deemed to materially and adversely affect the interests of the Holders of Series T Preferred Stock.

(c)     Except as set forth in paragraph (b) of this Section 7, the terms of this Certificate or the Series T Preferred Stock may be amended, altered, supplemented, or repealed only with the consent of the Holders of at least two-thirds of the shares of Series T Preferred Stock then outstanding, given in person or by proxy, either in writing or at a meeting of stockholders at which the Holders of Series T Preferred Stock shall vote separately as a class. On matters requiring their consent, Holders of Series T Preferred Stock will be entitled to one vote per share.

(d)     The rules and procedures for calling and conducting any meeting of Holders (including, without limitation, the fixing of a record date in connection therewith), the solicitation and use of proxies at such a meeting, the obtaining of written consents, and any other aspect or matter with regard to such a meeting or such consents shall be governed by any rules that the Board of Directors of Fannie Mae, or a duly authorized committee thereof, in its discretion, may adopt from time to time, which rules and procedures shall conform to the requirements of any national securities exchange on which the Series T Preferred Stock are listed at the time.

**8.     Additional Classes or Series of Stock.**

The Board of Directors of Fannie Mae, or a duly authorized committee thereof, without the consent of the Holders of the Series T Preferred Stock, shall have the right at any time in the future to authorize, create and issue, by resolution or resolutions, one or more additional classes or series of stock of Fannie Mae, and to determine and fix the distinguishing characteristics and the relative rights, preferences, privileges and other terms of the shares thereof. Any such class or series of stock may rank prior to, on a parity with or junior to the Series T Preferred Stock as to the payment of dividends or the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, or otherwise.

**9.     Priority.**

For purposes of this Certificate of Designation, any stock of any class or series of Fannie Mae shall be deemed to rank:

(a)     Prior to the shares of Series T Preferred Stock, either as to the payment of dividends or the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, if the holders of such class or series shall be entitled to the receipt of dividends or of amounts distributable upon dissolution, liquidation or winding up of Fannie Mae, as the case may be, in preference or priority to the Holders of shares of Series T Preferred Stock.

A-5

(b)     On a parity with shares of Series T Preferred Stock, either as to the payment of dividends or the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, whether or not the dividend rates or amounts, dividend payment dates or redemption or liquidation prices per share, if any, be different from those of the Series T Preferred Stock, if the holders of such class or series shall be entitled to the receipt of dividends or of amounts distributable upon dissolution, liquidation or winding up of Fannie Mae, as the case may be, in proportion to their respective dividend rates or amounts or liquidation prices, without preference or priority, one over the other, as between the holders of such class or series and the Holders of shares of Series T Preferred Stock.

(c)     Junior to shares of Series T Preferred Stock, either as to the payment of dividends or the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, if such class shall be common stock of Fannie Mae or if the Holders of shares of Series T Preferred Stock shall be entitled to the receipt of dividends or of amounts distributable upon dissolution, liquidation or winding up of Fannie Mae, as the case may be, in preference or priority over the holders of such class or series.

(d)     The shares of Preferred Stock of Fannie Mae designated "5.25% Non-Cumulative Preferred Stock, Series D" (the "Series D Preferred Stock"), "5.10% Non-Cumulative Preferred Stock, Series E" (the "Series E Preferred Stock"), "Variable Rate Non-Cumulative Preferred Stock, Series F" (the "Series F Preferred Stock"), "Variable Rate Non-Cumulative Preferred Stock, Series G" (the "Series G Preferred Stock"), "5.81% Non-Cumulative Preferred Stock, Series H" (the "Series H Preferred Stock"), "5.375% Non-Cumulative Preferred Stock, Series I" (the "Series I Preferred Stock"), "5.125% Non-Cumulative Preferred Stock, Series L" (the "Series L Preferred Stock"), "4.75% Non-Cumulative Preferred Stock, Series M" (the "Series M Preferred Stock"), "5.50% Non-Cumulative Preferred Stock, Series N" (the "Series N Preferred Stock"), "Non-Cumulative Preferred Stock, Series O" (the "Series O Preferred Stock"), "Non-Cumulative Convertible Series 2004-1 Preferred Stock" (the "Series 2004-1 Preferred Stock"), "Variable Rate Non-Cumulative Preferred Stock, Series P" (the "Series P Preferred Stock"), "6.75% Non-Cumulative Preferred Stock, Series Q" (the "Series Q Preferred Stock"), "7.625% Non-Cumulative Preferred Stock, Series R" (the "Series R Preferred Stock"), "Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series S" (the "Series S Preferred Stock"), and "8.75% Non-Cumulative Mandatory Convertible Preferred Stock, Series 2008-1" (the "Series 2008-1 Preferred Stock") shall be deemed to rank on a parity with shares of Series T Preferred Stock as to the payment of dividends and the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae. Accordingly, the holders of record of Series D Preferred Stock, the holders of record of Series E Preferred Stock, the holders of record of Series F Preferred Stock, the holders of record of Series G Preferred Stock, the holders of record of Series H Preferred Stock, the holders of record of Series I Preferred Stock, the holders of record of Series L Preferred Stock, the holders of record of Series M Preferred Stock, the holders of record of Series N Preferred Stock, the holders of record of Series 2004-1 Preferred Stock, the holders of record of Series O Preferred Stock, the holders of record of Series P Preferred Stock, the holders of record of Series Q Preferred Stock, the holders of record of Series R Preferred Stock, the holders of record of Series S Preferred Stock, the holders of record of Series 2008-1 Preferred Stock and the Holders of Series T Preferred Stock shall be entitled to the receipt of dividends and of amounts distributable upon dissolution, liquidation or winding up of Fannie Mae, as the case may be, in proportion to their respective dividend rates or amounts or liquidation prices, without preference or priority, one over the other.

**10.     Transfer Agent, Dividend Disbursing Agent and Registrar.**

Fannie Mae hereby appoints Computershare Trust Company, N.A., as its initial transfer agent, dividend disbursing agent and registrar for the Series T Preferred Stock. Fannie Mae may at any time designate an additional or substitute transfer agent, dividend disbursing agent and registrar for the Series T Preferred Stock.

A-6

11.     **Notices.**

Any notice provided or permitted by this Certificate of Designation to be made upon, or given or furnished to, the Holders of Series T Preferred Stock by Fannie Mae shall be made by first-class mail, postage prepaid, to the addresses of such Holders as they appear on the books and records of Fannie Mae or by other written or electronic means to designated accounts of such Holders. Such notice shall be deemed to have been sufficiently made upon deposit thereof in the United States mail or electronic transmission to a designated account of the Holder. Notwithstanding anything to the contrary contained herein, in the case of the suspension of regular mail service or by reason of any other cause it shall be impracticable, in Fannie Mae's judgment, to give notice by mail, or if Fannie Mae has reason to believe other notification means would be ineffective, then such notification may be made, in Fannie Mae's discretion, by publication in a newspaper of general circulation in The City of New York or by hand delivery to the addresses of Holders as they appear on the books and records of Fannie Mae.

**Receipt and acceptance of a share or shares of the Series T Preferred Stock by or on behalf of a Holder shall constitute the unconditional acceptance by such Holder (and all others having beneficial ownership of such share or shares) of all of the terms and provisions of this Certificate of Designation. No signature or other further manifestation of assent to the terms and provisions of this Certificate of Designation shall be necessary for its operation or effect as between Fannie Mae and the Holder (and all such others).**

A-7

(This Page Intentionally Left Blank)

