## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **BERKLEY INSURANCE CO.**, *et al.*, | |
| *Plaintiffs,* | |
| **v.** | **Case No. 1:13-cv-1053-RCL** |
| **FEDERAL HOUSING FINANCE AGENCY**, *et al.*, | |
| *Defendants.* | |
| **In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations** | **Case No. 1:13-mc-1288-RCL** |
| This Memorandum Opinion relates to:<br>ALL CASES | |

## <u>MEMORANDUM OPINION</u>

This matter, born out of the 2008 financial crisis, has now reached its final stage before this Court. In broad strokes, it comprises both a class action (brought by the "Class Plaintiffs") and a set of individual lawsuits (brought by the "Berkley Plaintiffs") against the Federal Housing Finance Agency ("FHFA"), the Federal National Mortgage Association ("Fannie Mae"), and the Federal Home Loan Mortgage Corporation ("Freddie Mac") (collectively, "Defendants"). Plaintiffs are holders of common stock of Freddie Mac and junior preferred stock of Fannie Mae and Freddie Mac. Plaintiffs filed suit in 2013 to challenge the so-called "Net Worth Sweep," arising from an amendment to the agreement between the United States Department of the Treasury and the FHFA in the FHFA's capacity as conservator for Fannie Mae and Freddie Mac.

By 2022, when this case went to trial for the first time, Plaintiffs' sole remaining claim was for breach of the implied covenant of good faith and fair dealing based on the Net Worth Sweep, which allegedly harmed Plaintiffs by reducing the value of their preferred shares in Fannie Mae and Freddie Mac, and their common shares in Freddie Mac  On August 14, 2023, a jury returned a verdict in favor of Plaintiffs, awarding a total of $612.4 million.  Defendants have moved for Judgment as a Matter of Law under Rule 50(b) of the Federal Rules of Civil Procedure, asking the Court set aside the jury's verdict and enter judgment in Defendants' favor.  For the reasons contained herein, the Court will **DENY** Defendants' Motion.

## BACKGROUND

### A. Factual History

The Court assumes familiarity with the relevant factual and procedural background, detailed at length in numerous opinions.  *See Berkley Ins. Co. v. FHFA*, Nos. 1:13-cv-1053-RCL, 1:13-mc-1288-RCL, 2023 WL 3790739, at *1–2 (D.D.C. June 2, 2023); *Fairholme Funds, Inc. v. FHFA*, Nos. 1:13-cv-1053-RCL, 1:13-mc-1288-RCL, 2022 WL 4745970, at *1–3 (D.D.C. Sept. 23, 2022) (hereinafter "Mot. Summ. J. Op."); *In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigs.*, Nos. 1:13-cv-1053-RCL, 1:13-mc-1288-RCL, 2021 WL 5799379, at *1–3 (D.D.C. Dec. 7, 2021) (hereinafter "Class Cert. Op."); *Fairholme Funds, Inc. v. FHFA*, Nos. 1:13-cv-1053-RCL, 1:13-cv-1439-RCL, 2018 WL 4680197, at *1–4 (D.D.C. Sept. 28, 2018) (hereinafter "Mot. to Dismiss Op."); *Perry Capital LLC v. Lew* ("Perry I"), 70 F. Supp. 3d 208, 214–19 (D.D.C. 2014); *Perry Capital LLC v. Mnuchin* ("Perry II"), 864 F.3d 591, 633–34 (D.C. Cir. 2017).  The Court will reproduce only those facts necessary to resolve the pending motion.

During the 2008 financial crisis, Congress passed the Housing and Economic Recovery Act ("HERA"), which established the FHFA and designated it as Conservator of the government-

sponsored entities Fannie Mae and Freddie Mac (hereinafter the "GSEs"). The FHFA and the United States Department of the Treasury (hereinafter "Treasury") then entered into a series of agreements called Senior Preferred Stock Purchase Agreements ("PSPAs"). Under these agreements, the FHFA authorized Treasury to infuse the GSEs with capital by purchasing their securities, and the GSEs were prohibited from paying dividends to non-Treasury shareholders without Treasury's permission. Treasury and the FHFA amended the PSPAs on three occasions. One of the provisions of the Third Amendment—the Net Worth Sweep, adopted on August 17, 2012—is the focus of this lawsuit.

Under the Net Worth Sweep, each GSE was required to pay Treasury the difference between its net worth and a predetermined capital reserve each year, with that capital reserve decreasing until it reached zero in 2018. The Net Worth Sweep remains in place to the present day. Thus, the Third Amendment eliminated any future possibility for any non-Treasury stockholder—including Plaintiffs here—to receive dividends from the GSEs, because the GSEs owed their net worth to Treasury and would not take on further debt to pay dividends to other shareholders. *See* Mot. Summ. J. Op. at *3. On the day the Third Amendment was announced, the market valuation of the GSEs shares declined by $1.6 billion.

In 2013, in response to the Net Worth Sweep, two lawsuits were initiated in this Court: a class-action lawsuit and an individual lawsuit. Compl., *Fairholme Funds, Inc., et al. v. FHFA*, No. 13-cv-1053 (D.D.C. July 10, 2013), Berkley ECF No. 1; Compl., *In Re Fannie Mae/Freddie Max Senior Preferred Stock Purchase Agreements Class Action Litigs.*, No. 13-mc-1288 (D.D.C. Nov. 18, 2013), Class ECF No. 1.[1] The class-action lawsuit was brought by a class of private

---

[1] For purposes of this Memorandum Opinion, "Berkley ECF No." refers to the docket in No. 1:13-cv-1053 (the individual lawsuit), and "Class ECF No." refers to the docket in No. 1:13-mc-1288 (the class-action lawsuit).

individual institutional investors who own either preferred or common stock in Fannie Mae or Freddie Mac (Class Plaintiffs), and the individual lawsuit was brought by an institutional investor owning junior preferred stock in Fannie Mae and Freddie Mac and by various insurance companies (Berkley Plaintiffs). After many years of narrowing the dispute, which the Court briefly explains *infra*, only one claim—which is substantially identical between the two sets of Plaintiffs—remains: that Defendants, by agreeing to the Net Worth Sweep in the Third Amendment, breached the implied covenant of good faith and fair dealing. Specifically, agreeing to the Net Worth Sweep harmed Plaintiffs by eliminating any possibility that any GSE shareholders, other than Treasury, would receive dividends in the future, thereby depriving Plaintiffs' shares of much of their value.

## B. Procedural History

The initial complaint in each lawsuit alleged various claims for violations of the Administrative Procedure Act, breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of fiduciary duty. This Court dismissed the initial complaints in their entirety for failure to state a claim on September 30, 2014. *See Perry I*, 70 F. Supp. 3d at 246. On appeal, the D.C. Circuit affirmed in part, but remanded certain parts of Plaintiffs' breach of contract and implied covenant claims. *See Perry II*, 864 F.3d at 633–34.

### 1. Defendants' Motion to Dismiss

On remand, the Plaintiffs in each case filed an amended complaint and Defendants moved to dismiss in both. On September 28, 2018, the Court held that both sets of Plaintiffs stated a claim for breach of the implied covenant of good faith and fair dealing. Mot. to Dismiss Op. at *7–12. Specifically, the Court found that Plaintiffs pleaded sufficient facts to make out a cognizable claim that the Third Amendment violated their reasonable expectations that their rights to dividends and liquidation preferences would not be extinguished. *Id.* The Court also held that HERA's "best

4

interests" provision, which provides that the FHFA as Conservator may take any action authorized under the Act "which [it] determines is in the best interests of the [GSEs] or the [FHFA]," does not foreclose Plaintiffs' implied covenant claims. *Id.* The Court thereafter denied Defendants' motion for reconsideration. Reconsideration Order, Berkeley ECF No. 99, Class ECF No. 105.

### 2. Class Certification

On August 12, 2021, the Class Plaintiffs filed their motion to certify this action as a class action. Class ECF No. 132. The parties stipulated to certification of three classes on October 14, 2021, *see* Class ECF No. 133, and on December 7, 2021, the Court granted the Class Plaintiffs' motion for class certification after a "rigorous analysis" of the factual bases for class certification. *See* Class Cert. Op. at *3; Order Certifying Class, Class ECF No. 139. The following three classes were certified:

1. All current holders of junior preferred stock in Fannie Mae as of the date of certification, or their successors in interest to the extent shares are sold after the date of certification and before any final judgment or settlement (the "Fannie Preferred Class");
2. All current holders of junior preferred stock in Freddie Mac as of the date of certification, or their successors in interest to the extent shares are sold after the date of certification and before any final judgment or settlement (the "Freddie Preferred Class"); and
3. All current holders of common stock in Freddie Mac as of the date of certification, or their successors in interest to the extent shares are sold after the date of certification and before any final judgment or settlement (the "Freddie Common Class").

Order Certifying Class, Class ECF No. 139.

### 3. Summary Judgment Decision

On September 23, 2022, the Court resolved the parties' cross motions for summary judgment in each case. The Court ruled that Plaintiffs were not permitted to seek damages based on a theory of lost dividends or based on a theory of restitution, but that Plaintiffs *were* entitled to seek damages based on a "lost-value" theory: that the Net Worth Sweep caused Plaintiffs' shares

to be worth less than they otherwise would be worth.  Mot. Summ. J. Op. at *9–11.  The Court also rejected, for the second time, Defendants' argument that the implied covenant did not apply because the HERA "best interests" provision left no "gap" to be filled by the implied covenant.  *Id.* at *6–7.  Finally, the Court rejected Defendants' argument that the Supreme Court's decision in *Collins v. Yellen*, 594 U.S. 220 (2021), foreclosed Plaintiffs' implied covenant claim.  *Id.* at *5.

### 4.  Trial

The Court presided over two trials in this case: the first from October 18 to November 7, 2022, and the second from July 26 to August 14, 2023.

At the first trial, Defendants made an oral Motion for Judgment as a Matter of Law pursuant to Federal Rule of Civil Procedure 50(a) at the close of Plaintiffs' case, which the Court heard and denied.  Trial Tr. Oct. 26, 2022, 1818:18–19, 1830:2.[2]  At the close of all evidence, Defendants then filed a written Motion to Decertify the Class, incorporating some of the arguments from their Rule 50(a) Motion, which the Court also denied.  Mot., Class ECF No. 249; Trial Tr. Oct. 31, 2022, 2449:3–2450:6.  The first trial ended in a mistrial because of a deadlocked jury.  Min. Entry Nov. 7, 2022.

At the second trial, Defendants made an oral Rule 50(a) Motion for Judgment as a Matter of Law at the close of Plaintiffs' case.  Trial Tr. Aug. 1, 2023, 1500:4–1512:14.  Defendants made the same arguments from the first trial, now raised again in the instant Motion: that there is no "gap" in the shareholder contracts for the implied covenant to fill; that *Collins* forecloses Plaintiffs' implied covenant claim as a matter of law; that Plaintiffs failed to prove harm or damages with reasonable certainty; and that post-Third Amendment purchasers were not harmed by the share-

---

[2] Defendants then filed a written Rule 50(a) Motion "[s]trictly for appellate preservation purposes" but "understand[ing] the Court's ruling was a denial."  Trial Tr. Oct. 31, 2022, 2376:15–22, Berkley ECF No. 283.

price drop and thus lack standing.  Trial Tr. Aug. 1, 2023, 1500:4-1510:16.  The Court heard and denied the motion on all four grounds.  Trial Tr. Aug. 1, 2023, 1512:15.

The jury found in favor of Plaintiffs, determining that the Fannie Mae Preferred Class was entitled to damages of $299.4 million; the Freddie Mac Preferred Class was entitled to $281.8 million; and the Freddie Mac Common Class was entitled to $31.2 million, for a total verdict of $612.4 million awarded to Plaintiffs.  Verdict Form, Berkeley ECF No. 402, Class ECF No. 392.  The Court entered final judgment on March 20, 2024.  Judgment, Berkley ECF No. 428, Class ECF No. 421.

On April 17, 2024, Defendants filed a Motion for Judgment as a Matter of Law pursuant to Federal Rule of Civil Procedure 50(b).  Mot. J. as a Matter of L. ("Defs.' Mot."), Berkley ECF No. 430, Class ECF No. 423.  Plaintiffs filed an Opposition on June 7, 2024.  Resp. to Mot. for J. as a Matter of L. ("Opp'n"), Berkley ECF No. 435, Class ECF No. 428.  Defendants filed a Reply on July 16, 2024.  Reply to Opp'n to Mot. ("Reply"), Berkley ECF No. 436, Class ECF No. 429.  This motion is therefore ripe for this Court's review.

## LEGAL STANDARDS

### A.  Rule 50(b) Motion for Judgment as a Matter of Law

After a jury trial, a court may grant a motion for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure only if it finds that "a reasonable jury would not have had a legally sufficient evidentiary basis to find for the party on that issue[.]"  Fed. R. Civ. P. 50(a)(1).  Judgment as a matter of law is only proper, "considering the evidence in the light most favorable to the [non-movants] and making all reasonable inferences in their favor," if the Court concludes that there is no legally sufficient evidentiary basis for a reasonable jury to have found in their favor under controlling law.  *Hendry v. Pelland*, 73 F.3d 397 (D.C. Cir. 1996); *see Fox v. District of Columbi*a, 990 F. Supp. 13, 19 (D.D.C. 1997).  The jury's verdict must stand "unless

7

the evidence, together with all inferences that can be reasonably drawn therefrom, is so one-sided [in favor of the moving party] that reasonable persons could not disagree on the verdict," *Milone v. Wash. Metro. Area Transit Auth.*, 91 F.3d 229, 231 (D.C. Cir. 1996), that is, unless the nonmovant's evidence is so insufficient that a reasonable finder of fact "could not possibly find for the nonmovant." 9 Moore's Federal Practice § 50.60[1] at 50–87 (3d ed. 2002); *accord Muldrow ex rel. Estate of Muldrow v. Re–Direct, Inc.*, 493 F.3d 160, 165 (D.C. Cir. 2007).

Even if the Court finds the evidence that led to the jury verdict unpersuasive, or that it would have reached a different result if it were sitting as the fact-finder, that is not a basis for overturning the jury's verdict and granting judgment as a matter of law. *Huthnance v. Dist. Of Columbia*, 793 F. Supp. 2d 183, 197 (D.D.C. 2011), *aff'd*, 722 F.3d 371 (D.C. Cir. 2013). The Court may not grant the motion unless "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." *Me, Inc. v. Taylor*, 157 F.3d 139, 142 (2d Cir. 1998). In short, the Court "do[es] not . . . lightly disturb a jury verdict." *Radtke v. Lifecare Mgmt. Partners*, 795 F.3d 159, 163 (D.C. Cir. 2015) (ellipsis in original) (quoting *Muldrow v. Re-Direct, Inc.*, 493 F.3d 160, 165 (D.C. Cir. 2007)).

Finally, because a post-trial Rule 50(b) motion is a renewal of a Rule 50(a) motion for judgment as a matter of law, the post-trial motion is limited to those grounds that were specifically raised in the prior motion. *Thomas v. Mineta*, 310 F. Supp. 2d 198, 204 (D.D.C. 2004) (citing *Tolbert v. Queens College*, 242 F.3d 58, 70 (2d Cir. 2001)); *see also Whelan v. Abell*, 48 F.3d 1247, 1251 (D.C. Cir. 1995) (holding that a movant who omits a theory from his Rule 50(a) motion waives the theory as the basis for a Rule 50(b) motion).

## DISCUSSION

### A. Law of the Case

This matter has a long procedural history: initial dismissal, a trip up to the D.C. Circuit, remand, class certification, summary judgment, and two trials. Naturally, this elongated posture has resulted in significant case law—and now, at the final stage in this protracted litigation, nearly every argument raised in Defendants' motion can be disposed of by the law of the case doctrine.

This doctrine "refers to a family of rules embodying the general concept that a court involved in later phases of a lawsuit should not re-open questions decided . . . by that court or a higher one in earlier phases." *Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 697 (D.C. Cir. 2022) (quoting *Crocker v. Piedmont Aviation*, Inc. 49 F.3d 735, 739 (D.C. Cir. 1995) (internal quotation marks omitted)). Colloquially speaking, the doctrine dictates that "the same issue presented a second time in the same case in the same court should lead to the same result." *Id.* (quoting *Kimberlin v. Quinlan*, 199 F.3d 496, 500 (D.C. Cir. 1999) (internal quotation marks and citation omitted). This prudential doctrine "promotes the finality and efficiency of the judicial process by 'protecting against the agitation of settled issues.'" *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) (citation omitted).

To apply the law of the case here, the Court must first clear up a threshold dispute between the parties: Defendants argue that law of the case doctrine cannot apply at the Rule 50(b) stage. Reply at 2–3. Defendants cite several out-of-Circuit cases for this proposition, which this Court is not bound by—but in any event, Defendants misinterpret these cases. Defendants first pull from *In re Cattrell*, in which a bankruptcy court observed that a Rule 50(b) motion would be the "emptiest of technicalities" if law of the case applied. No. 19-33823-dwh13, 2021 WL 1100068 (Bankr. D. Or. Mar. 22, 2021) at *6. However, Defendants conveniently failed to include the rest of the quotation: that a Rule 50(b) motion would be the "emptiest of technicalities if the law of the

case applied *to interlocutory rulings*." *Id.*    Specifically, the court explained that it would be nonsensical to treat the denial of a Rule 50(a) motion as law of the case at the Rule 50(b) stage because, by definition, a Rule 50(b) motion is a "renewed" motion that mirrors the exact same arguments from a Rule 50(a) motion. *Id.*    There is no indication that the *In re Cattrell* court would extend its reasoning as far as Defendants suggest, barring the application of every one of a court's prior determinations once the case reaches the Rule 50(b) stage.    The other case cited by Defendants, *Rupolo v. Oshkosh Truck Corp.*, is similarly cabined, only finding that the denial of a Rule 50(a) motion should not constitute law of the case in deciding a Rule 50(b) motion.    No. 05-cv-2978 (SLT/RER), 2013 WL 5520756, at *17 (E.D.N.Y. Sept. 30, 2013).

Indeed, there are multiple examples of courts in this District applying the law of the case to deny a Rule 50(b) motion.    *See, e.g.*, *Campbell v. D.C.*, No. 12-cv-1769 (RC), 2016 WL 3023977 (D.D.C. May 25, 2016) (denying Rule 50(b) motion by observing that the defendant "merely restates unsuccessful arguments it made in previous motions"), *aff'd*, 894 F.3d 281 (D.C. Cir. 2018); *Freeman v. Giuliani*, 732 F. Supp. 3d 30, 45–46 (D.D.C. 2024) (denying Rule 50(b) motion because it "reargues" issues from the motion to dismiss stage, and the defendant had not "raised grounds to reach a different conclusion after trial to merit judgment as a matter of law") (internal citations and quotations omitted); *see id.* at 46 ("Rule 50(b) is not meant 'to rehash decisions that were made pre-trial, but to determine whether the jury verdict was supported by the evidence presented at trial.'") (quoting *Martin v. Howard Univ.*, No. 99-cv-1175 (TFH), 2006 WL 2850656, at *5 (D.D.C. Oct. 4, 2006).    Therefore, the Court will apply the law of the case here where appropriate.

"The application of the law of the case doctrine is a two-step process that requires determining (1) whether the 'same issue presented a second time in the same case in the same court

[would] lead to the same result' and (2) 'whether there are prudential reasons to ignore the applicable law-of-the-case.'" *United States v. Johnson*, No. 2-mj-222 (ZMF), 2023 WL 3220477, at *2 (D.D.C. May 3, 2023) (quoting *Kimberlin v. Quinlan*, 199 F.3d 496, 500 (D.C. Cir. 1999)). Prudential reasons may include "intervening legal changes to the applicable laws at issue," *id.*, or a finding that the previous decision was "clearly erroneous and would work a manifest injustice," *id.* (quoting *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir 1996)). For each of the issues Defendants raise in their motion, the Court will determine if law of the case disposes of the challenge, as Plaintiffs contend; where it does not, the Court will evaluate the arguments on their merits.

### B.  Defendants' Challenges Against All Plaintiffs

The first portion of Defendants' Motion presents arguments for judgment as a matter of law against all Plaintiffs, and the latter portion presents arguments as to only a subset of Plaintiffs: those who purchased stock in the GSEs *after* the Third Amendment was announced. Defs.' Mot. at 19, 44. The Court will first address the challenges that Defendants bring as to all Plaintiffs, and once those arguments are addressed, the Court will proceed to analyze Defendants' challenges as to the post-Third Amendment purchasers, which Defendants believe should prevail "at a minimum" even if their arguments as to the broader plaintiff population fail. Defs.' Mot. at 44.

### i.   Challenge 1: "Gap" in Shareholder Contracts for the Implied Covenant

Defendants argue that "the shareholder contracts, by incorporating HERA's 'best interests' provision, already specify the scope of FHFA's contractual discretion and thus contain no 'gap' for the implied covenant to fill." Defs.' Mot. at 19. But this argument was fully briefed, argued, and decided on summary judgment, as even Defendants observe: "this Court held that, notwithstanding HERA's 'best interests' provision, the shareholder contracts contain a gap for the

implied covenant to come into play, because 'whether a certain act falls within FHFA's statutorily authorized discretion and whether FHFA may incur monetary damages for exercising that discretion in a manner inconsistent with its independent contractual obligations are two separate inquiries.'" Defs.' Mot. at 23 (quoting Mot. Summ. J. Op. at *7).[3] The justification for invoking the law of the case doctrine to adhere to an underlying summary judgment ruling is particularly strong because, "[w]ere it otherwise, motions for summary judgment could not perform their function of simplifying and narrowing disputed issues." *Sloan v. Urb. Title Servs., Inc.*, 770 F. Supp. 2d 216, 224 (D.D.C. 2011) (internal citations and quotations omitted).

There have been no intervening legal changes since this holding that would counsel a different result, and Defendants allege none. Indeed, Defendants simply rehash the same arguments that this Court has already considered and rejected, which is not proper fodder for a Rule 50(b) motion. *Freeman*, 732 F. Supp. 3d at 46 ("Rule 50(b) is not meant 'to rehash decisions that were made pre-trial.'") (quoting *Martin*, 2006 WL 2850656, at *5). Abiding by the law of the case, the Court will not revisit this holding.

    *ii. Challenge 2:* Collins

Defendants' second argument is that "even if the implied covenant applied" to the shareholder contracts, "the Supreme Court's decision in *Collins* forecloses Plaintiffs' claim." Defs.' Mot. at 19. Specifically, Defendants argue that "*Collins* conclusively establishes that FHFA acted reasonably in agreeing to the Third Amendment, and that the Conservator's business decision to enter the Third Amendment for the public's benefit is not subject to judicial review." Defs.' Mot. at 24.

---

[3] The Court notes that it also landed this way at the motion to dismiss stage, explaining that Defendants' argument that the implied covenant does not apply is "directly contrary to the D.C. Circuit's opinion [in Perry II]." *See* Mot. to Dismiss Op. at *12–13 ("Defendants cannot simply say that since HERA permits the conservator to act in its own best interests, the FHFA can do whatever it wants and Plaintiffs could not expect otherwise.").

This is, again, the exact argument that Defendants raised at summary judgment and that the Court rejected.  As Defendants observe in their Motion, the Court explained that "[a]t issue in *Collins* was whether FHFA could reasonably have determined that adopting the Third Amendment was in the *best interests* of the *regulated entity* or the *Agency*, and thus acted within its statutory authority as conservator of the GSEs in so doing."  Mot. Summ. J. Op. at *5 (internal citations and quotations omitted, emphasis in original); Defs.' Mot. at 28.  But here, "the issue is whether FHFA violated the reasonable *expectations* of the *parties* by adopting the Third Amendment."  Mot. Summ. J. Op. at *5 (internal citations and quotations omitted, emphasis in original).  That distinction applies with the same force now.  There are no intervening legal changes since the Court's summary judgment holding and there is no indication that this holding works a "manifest injustice."  A Rule 50(b) motion is not a vehicle to re-litigate legal issues decided pretrial.  *Martin*, 2006 WL 2850656, at *4.  If Defendants wish to re-open this purely legal challenge, they must do so with the D.C. Circuit.  Here, the Court abides by the law of the case.

### iii.    *Challenge 3: Anticipatory Breach*

Defendants' next argument is that Plaintiffs' implied covenant claim is, in essence, a non-cognizable claim for anticipatory breach of a unilateral contract.[4]  Defs.' Mot. at 19.  However, the Court has reviewed the transcripts and cannot identify the portion of Defendants' Rule 50(a) Motion that raises this anticipatory breach argument.  *See* Trial Tr. Aug. 1, 2023, 1500:4–1510:17.  Because a post-trial Rule 50(b) motion the is limited to those grounds that were specifically raised in the Rule 50(a) motion, the Court will not address this issue now.  *Thomas v. Mineta*, 310 F.

---

[4] The shareholder contracts are unilateral because the shareholders already performed their obligation by purchasing the shares and owe no further obligation to the GSEs, and anticipatory breach claims traditionally do not apply to unilateral contracts or "bilateral contracts that have become unilateral by full performance on one side."  Mot. to Dismiss Op. at *5–6 (citation omitted).

Supp. 2d 198, 204 (D.D.C. 2004) (citing *Tolbert v. Queens College*, 242 F.3d 58, 70 (2d Cir. 2001).[5]

    iv.    *Challenge 4: Proof of Damages with Reasonable Certainty at Trial*

Defendants' final argument as to all Plaintiffs is that "Plaintiffs failed at trial to prove harm or damages with reasonable certainty, as Delaware and Virginia law require." Defs.' Mot. at 19. To resolve this challenge, the Court will recap the evolution of Plaintiffs' damages theory before addressing the evidentiary support for it at trial.[6]

At summary judgment the Court concluded that, because an event study by one of Defendants' experts showed a sharp decline in stock prices after the Third Amendment's announcement, there was a "lingering dispute of material fact as to whether the Third Amendment and its elimination of possible future dividends harmed plaintiffs by depriving them of much of the value of their shares." Mot. Summ. J. Op. at *11. Therefore, the Court allowed Plaintiffs to proceed to trial on this "lost-value" theory: "that the Third Amendment, by eliminating any possibility of future dividends for non-Treasury shareholders, deprived plaintiffs' shares of much of their value, even if such dividends were not reasonably certain to occur in the foreseeable

---

[5] And in any event, at the risk of sounding like a broken record, this exact issue was already decided by the Court, twice—at the motion to dismiss stage and in denying Defendants' motion for reconsideration thereafter. The Court identified a distinction between the Plaintiffs' anticipatory breach of contract claims, which were dismissed, from Plaintiffs' implied covenant claims, which were allowed to proceed: anticipatory breach of contract claims "seek to hold defendants presently accountable for a *future* breach of an express provision," while implied covenant claims "seek to hold defendants presently accountable for a *present* breach," because the implied covenant is an "ongoing obligation" for which "performance is always due." Reconsideration Order at 3. Therefore, "[t]he anticipatory breach claim and the implied covenant claims are not identical." Reconsideration Order at 4. Defendants provide no basis for the Court to change course at this final stage in the litigation, other than repeating that "[r]espectfully, the Court should reconsider." Defs.' Mot. at 32

[6] Plaintiffs urge the Court to rely on the law of the case here too, because "at the close of evidence at both trials, the Court correctly rejected arguments about the evidentiary support for Plaintiffs' damages claims that are recycled again here." Opp'n at 29–30. However, as explained *supra*, it would be nonsensical to treat the denial of a Rule 50(a) motion as law of the case in resolving a Rule 50(b) motion, which is by definition a "renewed" motion. The Court will therefore, viewing the evidence and all inferences therefrom in the light most favorable to Plaintiffs, determine whether no reasonable jury could have a legally sufficient evidentiary basis to find for Plaintiffs. *See* Fed. R. Civ. P. 50(a)(1), (b).

future." *Id.* However, the Court granted summary judgment to the Defendants regarding Plaintiffs' "lost dividends" theory—that "the Third Amendment deprived plaintiffs of dividends that they would have eventually received"—because there was insufficient evidence that the GSEs would have resumed paying Plaintiffs' dividends without the Third Amendment.[7] *Id.* at *9. The Court also rejected Plaintiffs' request for restitution because such relief is barred under HERA and under relevant equitable principles. *Id.* at *11.

Here, Defendants argue that Plaintiffs, in trying to prove the lost-value theory at trial, "failed to introduce evidence (1) attempting to show that current shareholders are worse off today than they would be absent the Third Amendment; (2) attempting to account for the substantial increases in share prices that occurred shortly after the Third Amendment; or (3) showing that the one-day decline in share prices on August 17, 2012 was attributable solely to the Net Worth Sweep, as opposed to other terms of the Third Amendment." Defs.' Mot. at 36. The Court will review each argument in turn, looking at the evidence presented at trial to determine whether a reasonable jury could have found that Plaintiffs proved damages under the "lost-value" theory with reasonable certainty. To reiterate the Rule 50(b) standard, the Court may not assess the credibility of testimony or weigh the evidence—"this Court's role is confined to verifying that the jury's verdict was one that a reasonable jury could have reached." *Bowie v. Maddox*, 540 F. Supp. 2d 204, 208 (D.D.C. 2008) (Lamberth, J.).

---

[7] This Court's summary judgment opinion fleshes out the reasoning behind the denial of the Plaintiffs' lost-dividends theory. In short: "[E]ven without the Third Amendment, the GSEs would not have been able to resume paying plaintiffs dividends without first paying down Treasury's Liquidation Preference . . . Thus, in order to find it reasonably certain that the Third Amendment actually deprived plaintiffs of future dividends, a jury would have to find it reasonably certain that, among other things, Treasury and FHFA eventually would have amended the PSPAs to allow a paydown of the Liquidation Preference." Mot. Summ. J. Op. at *9. The Court concluded that there was insufficient evidence in the record to support such a finding from a jury.

1.  <u>Harm to Current Shareholders</u>

Defendants' first challenge regarding damages is that there is no evidence to show that current shareholders are worse off today due to the Third Amendment; that "[a] one-day decline in share prices over eleven years ago, standing alone, does not demonstrate harm to current shareholders." Defs.' Mot. at 37–38. But, as Plaintiffs correctly observe, "Defendants are once again confusing the evidence that proves the *existence* of harm [to current shareholders] with the evidence that proves a reasonable *estimate* of that harm." Opp'n at 30 (emphasis added). Specifically, "[t]he one-day stock drop was the evidence used to provide a reasonable *estimate* of the measure of that harm. But it was far from the only evidence as to the *existence* of that harm." Opp'n at 31 (emphasis added). Indeed, Plaintiffs provided ample evidence for the jury to conclude that the Net Worth Sweep is causing harm to shareholders today. Opp'n at 30–31 (citing portions of trial transcripts). The Court reproduces a sampling of that evidence here:

- Plaintiffs' expert, Dr. Bala Dharan, testified that the Net Worth Sweep transferred 100 percent of the net worth of the GSEs to Treasury as dividends. Trial Tr. July 31, 2023, 1121:11–16.

- Plaintiffs' expert, Professor Anjan Thaknor, testified that before the Third Amendment, the GSEs were already paying a 10% annual dividend of $18.9 billion to Treasury, but "because of the [N]et [W]orth [S]weep, the GSEs ended up paying $150.2 billion—not in total—but in excess of the 10 percent dividend." Trial Tr. July 28, 2023, 880:23–881:5; 912:10–13. That difference is $111 billion.

- On cross-examination, Defendant Edward Demarco, Acting Director of FHFA, agreed with Plaintiffs' counsel that the GSEs "would have been way better with this $111

billion on their books" in the event they needed protection from any economic downturn.  Trial Tr. Aug. 8, 2023, 2394:22–2395:22.

- Plaintiffs' expert, Professor Joseph Mason, testified that, by transferring all profits from the GSEs to Treasury, the Net Worth Sweep made it such that "[a]ll those profits would not be available to the companies to reinvest in new operations or distribute to shareholders as dividends now or anytime in the future."  Trial Tr. July 27, 2023, 765:6–11.

- In response to Plaintiffs' counsel's question, "does the $1.6 billion[8] in damages from the Net Worth Sweep still persist today," Professor Mason responded "yes." Defendants' objection was overruled.  Trial Tr. July 27, 2023, 767:2–7.

In short, Defendants are wrong to assert that the only evidence of harm from the Net Worth Sweep was the one-day drop in stock price on the date it was announced.  The Court is satisfied that a reasonable jury could conclude, based on the evidence presented at trial, that current shareholders are harmed by the Net Worth Sweep.

### 2.   The Relevance of Post-Third Amendment Share Price Increases

Defendants' next challenge regarding damages is that Plaintiffs failed to account for the increases in share prices that occurred in the weeks following the August 17, 2012 price drop. Defs.' Mot. at 39.  But the jury was free to conclude that those rebound share prices were irrelevant in the ultimate finding of harm to current shareholders.  "That positive developments at the GSEs caused price increases is in no way inconsistent with this fundamental fact: the Net Worth Sweep causes permanent and ongoing harm to private shareholders by making it impossible for them to

---

[8] To reiterate, the market value of the GSE shares declined by a total of $1.6 billion on the day the Third Amendment was announced.

ever receive anything from the Companies, and by giving everything to Treasury." Opp'n at 32–33. The Net Worth Sweep is "a fundamental and permanent change to the capital structure of the company," permanently alienating shareholders from the profits of the GSEs, which remains in place to this day. Opp'n at 34. That is the entire point of Plaintiffs' "lost-value" theory that this Court allowed to proceed to trial. The factual significance of the post-Third Amendment share price increases was properly turned over to the jury to determine, and the Court will not disturb the jury's conclusion—that current shareholders experience harm from the Net Worth Sweep, despite the share price increase in the weeks following its announcement.

### 3.  Net Worth Sweep as the Sole Cause of the One-Day Decline in Share Prices

Defendants third challenge regarding damages is that Plaintiffs "introduced no evidence to exclude an alternative cause of the share-price drop." Defs.' Mot. at 42. As context, the Third Amendment had two provisions: 1) the Net Worth Sweep, and 2) acceleration of the reduction of the mortgage portfolios (which is a "fancy way of saying that [the GSEs] were going to shrink a part of their business faster than they had been shrinking it before").[9] Trial Tr. July 27, 2023, 793:6–10. Defendants argue that Plaintiffs failed to isolate the effect of the Net Worth Sweep from the acceleration of the portfolio reduction, and therefore failed to eliminate the possibility that this other provision may have contributed to the stock price drop.

But the jury was presented with evidence to resolve this question. Plaintiffs elicited testimony from Dr. Mason in which he stated that, in his opinion, there was no reason to believe that anything besides the Net Worth Sweep could have caused the August 17, 2012 stock price drop. Trial Tr. July 27, 2923, 769:12–20. That is because, in his words, "the overriding effect

---

[9] The acceleration of reduction provision of the Third Amendment "start[ed] reducing [the GSEs] retained portfolios by 15 percent rather than 10 percent until they ultimately hit a floor of [$] 250 billion for each enterprise." Trial Tr. July 27, 2023, 793:2–5.

here comes from Treasury taking all the money generated by [the GSEs]" – i.e., the Net Worth Sweep. *Id.* at 769:22–24.

Defendants' challenge to that is as follows: Because Dr. Mason relied on the event study of Defendants' expert Dr. Attari, and that event study did not distinguish between the impact of the Net Worth Sweep and the acceleration of the portfolio reduction, Dr. Mason's testimony offers no basis for the jury to conclude that the Net Worth Sweep alone caused the stock price drop. Defs.' Mot. at 42–43.  But as Plaintiffs correctly observe, Dr. Mason did not rely solely on Dr. Attari's event study—Dr. Mason "reviewed a wealth of materials, including financial filings by Fannie Mae and Freddie Mac, FHFA reports, documents produced in this case, emails, deposition testimony, [and] court documents" in forming his opinion as to the impact of the Net Worth Sweep. Trial Tr. July 27, 2023, 753:1–5.  And *even if* Dr. Mason had only relied on Dr. Attari's event study in reaching his conclusion, *and* the study had failed to disaggregate a potentially confounding factor, that choice would go to the weight of Dr. Mason's opinion, which is for the jury to resolve. Opp'n at 39 (collecting cases).

The jury resolved this question in favor of Plaintiffs, and that conclusion was not unreasonable.  On top of the evidence sampled *supra*, the jury heard two different experts testify that the Net Worth sweep was "unprecedented" in U.S. financial history.  Trial. Tr. 1123:10, 898:13.  As compared to the unprecedented Net Worth Sweep, a reasonable jury could conclude that "a slight change in the pace of retained portfolio reduction was not a significant financial event."  Opp'n at 38.  Thus, the Court will leave the jury's verdict undisturbed.

## C. Defendants' "Standing" Challenge Against Post-Third Amendment Purchasers

Defendants include a Hail Mary challenge: that "at a minimum," the Court should find that all Plaintiffs who bought shares after the Third Amendment lack standing because they suffered

no injury from the share price drop. Defs.' Mot. at 43. Plaintiffs rebuff this challenge as "another meritless attempt to attack the definition of the certified class" that "comes in the poorly packaged guise of a purported 'standing' argument." Opp'n at 40. The Court agrees with Plaintiffs: having heard this argument several times before from Defendants via various procedural vehicles, the Court will abide by the law of the case.

The Court first explained at the Motion to Dismiss stage that the rights related to dividends and liquidation preferences travel with the shares to subsequent purchasers. Mot. to Dismiss Op. at *8. This informed the certification of the classes, which included current shareholders who have owned their shares continuously since before the Third Amendment; and current shareholders who bought their shares after the Third Amendment. Class Cert. Op. at *1; *see id.* at *8 ("[B]ecause the '[r]ights associated with dividends and liquidation preferences inhere in the security,' the Court need not further divide the classes for those who purchased their shares after the Third Amendment.") (quoting Mot. to Dismiss Op. at *8)).[10]

During the first trial, Defendants filed a Motion to Decertify the Class. Class ECF No. 249; *see* Trial Tr. Oct. 31, 2022, 2377:2–4 (stating that the Motion to Decertify followed a "line of argument that was raised in the context of the Rule 50(a) [motion]").[11] The Court denied this motion from the bench because it "misunderstand[s] the theory of harm" that this Court allowed to proceed to trial—namely, the lost-value theory. *See* Trial Tr. Oct. 31, 2022, 2499:10–12; Mot. Summ. J. Op. at *11. As the Court explained in denying Defendants' Motion to Decertify, "[t]he

---

[10] The Court also held the same when resolving the parties' motions in limine before the first trial. *See Fairholme Funds, Inc. v. FHFA*, 636 F. Supp. 3d 144, 158 (D.D.C. 2022) ("Because 'the contractual rights [plaintiffs] seek to enforce . . . inhere in the security, traveling to each subsequent acquirer,' the time that any plaintiff purchased GSE shares is irrelevant . . . . ." (quoting Mot. to Dismiss Op. at *8)).

[11] Specifically, during first trial, the Defendants made a Rule 50(a) Motion and stated that their arguments also served as a "basis for decertifying the classes" because the classes "now consist of . . . the entire universe of people who own shares today that they purchased after the Third Amendment, who suffered no harm." Trial Tr. Oct. 26, 2022, 1823:20–23. Defendants then followed up with their written Motion to Decertify the Class.

drop in the stock price is not itself the alleged injury. The alleged injury is that the Net Worth Sweep effectively eliminated the dividend rights that came with the shares as they were originally issued." *See* Trial Tr. Oct. 31, 2022, 2499:14–17. The Court further explained:

> "[W]hen someone buys a share in a company, they're purchasing a bundle of rights. And Plaintiffs are arguing here that the Net Worth Sweep removed one of the most valuable sticks from that bundle. That's a type of claim that travels with the shares . . . The drop in stock prices is just a measure of damages[.]"

*Id.* at 2449:18–2450:1.

Now, Defendants argue that the Court should "reconsider its rulings" that the claims travel with the shares. Defs.' Mot. at 46. The new twist that Defendants offer is to label this issue as a standing problem for lack of injury, presumably because standing is a jurisdictional issue that cannot be waived and can be raised at any point. *Steffan v. Perry*, 41 F.3d 677, 697 n.20 (D.C. Cir. 1994) (en banc). But this challenge offers nothing new in its substance. It is virtually indistinguishable from the challenges that this Court has already resolved at multiple points throughout this litigation, both pre-trial and during trial. The Court adheres to the law of the case: that claims challenging the Net Worth Sweep as a breach of the implied covenant in the shareholder certificates run with the shares, and thus are injuries experienced by all current shareholders, including post-Third Amendment purchasers. Therefore, Plaintiffs have identified an injury that satisfies the requirement for Article III standing.

Defendants have now exhausted all procedural vehicles at their disposal before this Court. The Court stands by its prior rulings, and to the extent Defendants questioned the sufficiency of the evidence at trial, the Court is satisfied that a reasonable jury could come to the verdict that was rendered here.

## CONCLUSION

For the foregoing reasons, the Court will **DENY** Defendants' Motion for Judgment as a Matter of Law [Berkley ECF No. 430, Class ECF No. 423]. The jury's verdict will stand.

A separate Order consistent with this Memorandum Opinion shall issue.

Date: _____

Royce C. Lamberth
United States District Judge